An official website of the United States government.



# Air Topics

Learn how air pollution can harm your health and the environment and what EPA is doing to protect the air we breathe.

## Effects of Pollution

- Acid Rain
- Ozone Layer Protection
- Transportation and Climate Change
- Visibility

## Indoor Air

- Asbestos
- Indoor Air Quality
- Mold
- Radon
- Wood Burning Appliances

## Research

- Air Research
  - Air Quality and Climate Change
- Air Research Grants

## Air Quality Management

- AP – 42: Compilation of Air Emission Factors
- Inventories and Emissions Factors

BLM_0000001

- Technical Air Pollution Resources
- Air Quality Management Process

# Air Pollutants

- Criteria (NAAQS) Air Pollutants
  - Carbon Monoxide (CO)
  - Ground Level Ozone
  - Lead
  - Nitrogen Dioxide (NO2)
  - Particulate Matter (PM)
  - Sulfur Dioxide (SO2)
- Greenhouse Gas (GHG) Emissions
- Hazardous Air Pollutants

# Data

- Status and Trends of Key Air Pollutants
- Air Quality Data Collected at Outdoor Monitors
- Environmental Benefits Mapping and Analysis Program (BenMAP-CE)

# What You Can Do

- Air Quality Index (AQI) Where You Live
- Carbon Footprint Calculator
- Energy Star Products
- Fuel Economy (MPG) Guide
- Green Vehicle Guide
- Indoor airPLUS

## News Releases about Air

EPA to Conduct Additional Soil Sampling Near the Fairfax Street Wood Treaters Site in Jacksonville, Fla.

BLM_0000002

EPA recognizes ExxonMobil, Enso Properties with Site Reuse Award for redevelopment of Fairmont, W.Va. Superfund Site

EPA Awards $149,000 to Protect Air and Water Quality in Ohio

EPA Approves Louisiana's Clean-Air Plan for Transport of Pollutants to Other States, Cleans Out Backlog

EPA, Port Everglades Report Shines Light on New Methods for Analyzing Potential Air Pollution Reductions

View More News Releases About Air →

## Laws and Regulations

- **Clean Air Act**
- National Ambient Air Quality Standards (NAAQS)
- Regulatory Information by Topic: Air

## EPA Offices and Programs

- Office of Air and Radiation

- Air, Climate, and Energy Research Program

LAST UPDATED ON APRIL 9, 2018

BLM_0000003



BLM LIBRARY

88067476

September 2007

# Record of Decision

## *Vegetation Treatments Using Herbicides*

**on Bureau of Land Management Lands
in 17 Western States
Programmatic Environmental Impact Statement**

SB
612
.W47
V4433
2007
c.2

...partment of the Interior
...of Land Management






Public Lands Managed by the Bureau of Land Management

BLM_0000005



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT

Washington, D.C. 20240

http://www.blm.gov



October 2, 2007

Dear Reader:

Enclosed for your information and use is the Record of Decision for the *Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic EIS (PEIS)*. This document is the result of extensive public involvement and outlines the specific decisions, standard operating procedures, and mitigation measures based on the Final PEIS concerning the use of herbicides in the Bureau of Land Management (BLM) integrated pest management program. The PEIS assessed five alternatives for herbicide use. The selected alternative is Alternative B in the PEIS that identifies the herbicide active ingredients approved for use on public lands administered by the BLM in the western Untied States, including Alaska.

The Record of Decision identifies herbicide active ingredients that are no longer approved for use on public lands unless they undergo additional human health and ecological risk analyses. In addition, the Record of Decision approves a scientific protocol for assessing herbicide active ingredients that may be considered for use in the future.

The Record of Decision defers to approved land use plans to determine the number of acres to be treated through the integrated pest management program and makes no land use or resource allocations in this regard. Please check with your local field or district offices concerning local vegetation treatment actions and how they will be implemented. The BLM consulted with both the Department of Interior's Fish and Wildlife Service and Department of Commerce National Marine Fisheries Service under Section 7 of the Endangered Species Act prior to issuing this decision. Results of those consultations are included into the Record of Decision.

The BLM thanks everyone who participated in this effort and looks forward to continued collaboration and success in reducing the threat of noxious weeds, invasive species and hazardous fuels on public lands.

Sincerely,

James L. Caswell

Director

BLM_0000007



# United States Department of the Interior
## BUREAU OF LAND MANAGEMENT
Washington, D.C. 20240
http://www.blm.gov



# Contact Person(s)

Gina Ramos, Sr. Weeds Specialist Co-Team Leader
Bureau of Land Management, WO-220
1849 C Street NW MS: 201 L.S. Washington, DC 20240
Phone: (202) 452-5084

Brian Amme, Project Manager Co-Team Leader
Bureau of Land Management, NV-932
P.O. Box 12000
Reno, Nevada 89520-006
Phone: (775) 861-6645

I approve selection of the Preferred Alternative described in the attached Record of Decision and analyzed in the Final Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement (U.S. Department of Interior, Bureau of Land Management, June 2007).

# Signature and Date

C. Stephen Allred
Assistant Secretary, Land and Minerals Management
U.S. Department of the Interior

Dated. _Sept 29, 2007_

BLM_0000009

# 9426030!7

S13
613
.W47
14133
2007
c. 2

# RECORD OF DECISION

BLM_0000010

BLM_0000011

# TABLE OF CONTENTS

Page

INTRODUCTION ......................................................................................................................................1-1

DECISION ................................................................................................................................................2-1
Herbicide Active Ingredients Approved for Use .................................................................................2-1
Herbicide Active Ingredients Not Approved for Use ..........................................................................2-1
Protocol for Identifying, Evaluating, and Approving Herbicide Active Ingredients...........................2-1
Treatment Acres...................................................................................................................................2-2
Herbicide Treatment Standard Operating Procedures .........................................................................2-2
Mitigation.............................................................................................................................................2-2
Monitoring ...........................................................................................................................................2-6

ALTERNATIVES CONSIDERED ..........................................................................................................3-1
Alternative A – Continue Present Herbicide Use (No Action Alternative)..........................................3-1
Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States
(Preferred Alternative)........................................................................................................................3-1
Alternative C – No Use of Herbicides .................................................................................................3-1
Alternative D – No Aerial Application of Herbicides ..........................................................................3-1
Alternative E – No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients ...........3-1
Environmentally Preferable Alternative ..............................................................................................3-2

MANAGEMENT CONSIDERATIONS ...................................................................................................4-1
Federal Laws, Regulations, and Policies that Influence Vegetation Treatment Policies .....................4-1
NEPA Requirements of the Program ...................................................................................................4-1
Consultation, Coordination, and Interrelationships .............................................................................4-2
Endangered Species Act Section 7 Consultation...............................................................................4-2
Government-to government Consultation ..........................................................................................4-2
Interrelationships and Coordination with Agencies ..........................................................................4-4
Integrating Vegetation Treatments.......................................................................................................4-6
General Site Selection and Treatment Priorities...............................................................................4-6
Issues Considered in the Decision Process and Summary of Environmental Consequences of Decision ...........4-7
Adverse Effects to Resources Evaluated in PEIS..............................................................................4-7
Beneficial Effects to Resources Evaluated in PEIS..........................................................................4-8
Measures to Minimize or Avoid Harm ................................................................................................4-9
Standard Operating Procedures and Mitigation.................................................................................4-9
Comparison of the Alternatives and Development of the Decision.......................................................4-9
Alternative A – Continue Present Herbicide Use (No Action Alternative)........................................4-9
Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States
(Preferred Alternative)....................................................................................................................4-10
Alternative C – No Use of Herbicides .............................................................................................4-10
Alternative D – No Aerial Application of Herbicides ......................................................................4-11
Alternative E – No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients ... 4-11

PUBLIC INVOLVEMENT.......................................................................................................................5-1
Development of the Draft Programmatic EIS........................................................................................5-1
Scoping Meetings...............................................................................................................................5-1
Newsletters and other Mailings.........................................................................................................5-1
Public Review and Comment on the Draft Programmatic EIS...........................................................5-2
Development of the Final Programmatic EIS and Preferred Alternative ..............................................5-2
Public Review and Comment on the Final Programmatic EIS...........................................................5-2

BLM_0000012

TABLE OF CONTENTS

# Appendixes

| | | |
|---|---|---|
| A | Protocol for Identifying, Evaluating, and Using New Herbicides | A-1 |
| B | Herbicide Treatment Standard Operating Procedures | B-1 |
| C | Endangered Species Act Section 7 Consultation with U.S. Fish and Wildlife Service and National Marine Fisheries Service | C-1 |
| D | Monitoring | D-1 |

# List of Tables

| | | |
|---|---|---|
| 1 | States in which Herbicide Active Ingredients are Approved for Use on Public Lands under this Record of Decision | 2-3 |
| 2 | Mitigation Measures | 2-4 |

# List of Figures

| | | |
|---|---|---|
| 1 | Relationship of the PEIS to BLM Field Offices | 4-3 |

BLM_0000013

# CHAPTER 1

# INTRODUCTION

The Bureau of Land Management (BLM), an agency of the U.S. Department of the Interior (USDI), administers vegetation on nearly 261 million acres (public lands; treatment area) in 17 states in the western U.S. (Alaska, Arizona, California, Colorado, Idaho, Montana, Nebraska, New Mexico, Nevada, North Dakota, South Dakota, Oklahoma, Oregon, Texas, Utah, Washington, and Wyoming). Management and control of vegetation for resource and habitat enhancement is accomplished using a variety of treatment methods, including, but not limited to: herbicides, prescribed fire and wildland fire use (collectively termed "fire use"), manual and mechanical methods, and biological controls such as insects, pathogens, fish, and domestic grazing animals.

The BLM last assessed its use of vegetation treatment methods during the late 1980s and early 1990s, by preparing Environmental Impact Statements (EISs) and Records of Decisions (RODs) that covered vegetation treatment activities in 14 western states in the continental U.S. These EISs evaluated the environmental impacts associated with vegetation control and modification using all treatment methods on approximately 500,000 acres of public lands annually in the western U.S. The EISs also evaluated the human health and non-target species risks of using 22 herbicide active ingredients on these public lands.

In response to the threats of wildfire, invasive vegetation, and noxious weeds, the President and Congress have directed the USDI and BLM, through implementation of the *National Fire Plan* and the *Healthy Forests Restoration Act of 2003* (HFRA), to take more aggressive actions to reduce catastrophic wildfire risk on public lands. The actions will be taken to protect life and property, and to manage vegetation in a manner that provides for long-term economic sustainability of local communities, improved habitat and vegetation conditions for fish and wildlife, and other public land uses.

As a result of these actions, the amount of hazardous fuels reduction and other vegetation management work using herbicides conducted by the BLM is expected to increase from about 150,000 acres to about 932,000 acres annually.

The BLM has identified several new herbicide active ingredients that it would like to use that are more effective in treating certain types of vegetation than currently approved herbicide active ingredients. The BLM has determined that the potential for increased use of herbicides, and approval for use of additional herbicide active ingredients on public lands, required further assessment under the National Environmental Policy Act (NEPA).

A *Final Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement* (PEIS) was released to the public on June 29, 2007. The PEIS analyzes the effects of using herbicides for treating vegetation on public lands in the western U.S., including Alaska. These lands include Oregon and California Land Grant lands, Coos Bay Wagon Road lands, Areas of Critical Environmental Concern, and lands administered by the BLM through its National Landscape Conservation System, such as Wilderness Study Areas, designated Wilderness Areas, National Monuments, National Conservation Areas, Wild and Scenic Rivers, and National Recreation Areas.

In accordance with NEPA, the PEIS identified impacts on the natural and human environment associated with herbicide use. The BLM evaluated five program alternatives in the PEIS, including the Preferred Alternative and the No Action Alternative. Alternative actions are those that could be taken to feasibly attain or approximate the BLM's objectives for herbicide use, as expressed in its programs, policies, and land use plans (i.e., to achieve the stated purpose and need of the PEIS). The alternatives considered in the PEIS address known public concerns and issues. Comments, documents, and information received concerning the PEIS were considered in preparing the ROD presented here.

BLM_0000014

BLM_0000015

# CHAPTER 2

# DECISION

The decision is to: 1) approve the herbicide active ingredients assessed and analyzed under the Preferred Alternative (Alternative B) in the PEIS for use on public lands administered by the BLM in 17 western states, including Alaska, and 2) approve the use of the scientific assessment protocol to guide the analytical methodology for consideration of the use or non-use of herbicides by the BLM. These decisions are supported by herbicide treatment standard operating procedures (SOPs) and mitigation measures to ensure that the natural and human environment are protected during implementation of herbicide treatments. This ROD makes no decisions regarding the number of acres to be treated.

## Herbicide Active Ingredients Approved for Use

The BLM will approve and use in 17 western states 14 herbicide active ingredients previously approved for use in BLM RODs and for which an analysis of risks to humans and non-target plants and animals was conducted for the PEIS or by the U.S. Department of Agriculture Forest Service (Table 1). These herbicide active ingredients are: 2,4-D, bromacil, chlorsulfuron, clopyralid, dicamba, diuron, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, sulfometuron methyl, tebuthiuron, and triclopyr. The BLM will also approve and use four additional herbicide active ingredients in all 17 states assessed in the PEIS: diquat, diflufenzopyr (in formulation with dicamba and known as Overdrive®), fluridone, and imazapic. In addition, the BLM will use diflufenzopyr as a stand-alone active ingredient at such time the ingredient becomes registered for use by the U.S. Environmental Protection Agency (USEPA) under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA).

These herbicide active ingredients and formulations shall be applied for uses, and at application rates, specified on the herbicide product label. The BLM will comply with changes in label directions and will comply with all state registration requirements. If state registration requirements do not allow the application of a particular herbicide active ingredient approved for use in the PEIS, the BLM will not authorize use of the

herbicide active ingredient within the state where its use is prohibited.

## Herbicide Active Ingredients Not Approved for Use

The BLM will not approve the use of six herbicide active ingredients approved in the prior EIS RODs—2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine. These herbicide active ingredients have not been used, or their use has been negligible, by the BLM since the last ROD approving herbicide active ingredients was issued in 1992. Although the risks to humans from the use of these herbicide active ingredients are not significant based on previous human health risk assessments and a review of the literature for the PEIS, the BLM has determined the risks to non-target plants and animals, especially sensitive species of concern, have not been adequately evaluated to support continued use of these herbicide active ingredients.

## Protocol for Identifying, Evaluating, and Approving Herbicide Active Ingredients

The BLM may consider the use of new herbicide active ingredients, products, and technologies in vegetation treatment projects. The BLM may also reconsider the use of herbicide active ingredients approved in previous EIS RODs, but not approved for use under this PEIS ROD. The process for identifying, evaluating, and approving herbicide active ingredients is outlined in the scientific methodology protocol attached to this ROD as Appendix A.

The BLM will be able to use herbicide active ingredients if: 1) they are registered by the USEPA under FIFRA for use on one or more land types (e.g., rangeland, aquatic, etc.) managed by the BLM; 2) the BLM determines that the benefits of use on public lands outweigh the risks to human health and the environment; and 3) they meet evaluation criteria to ensure that the decision to use the active ingredient is supported by scientific evaluation and NEPA

BLM_0000016

DECISION

documentation. The evaluation criteria are outlined in more detail in Appendix A of this ROD.

## Treatment Acres

This ROD makes no decisions regarding the numbers of acres to be treated under the Preferred Alternative or any other alternative. Treatment acre estimates given in Chapter 2 of the PEIS and used to assess the effects of the alternatives were derived from a combination of broad macro-scale assessments (e.g., National Fire Regime Condition Class), annual averages of emergency stabilization and rehabilitation work typically following catastrophic fire, national program level estimates of work conducted annually under various resource programs, and estimates from BLM field offices on the types (fire use, manual, mechanical, biological, and chemical) and scale (size in acres) of projects likely to be proposed in the near term (10 years). Treatment acreages are estimates to allow a reasoned analysis of impacts. They are not limits or targets. Because of the broad and programmatic structure of the PEIS analysis, it is not possible to provide site-specific information on acres or types of treatments for any ecological sub-unit addressed in the PEIS or for any specific vegetation type or species.

Actual goals and objectives for vegetation management, including the planning and implementation of vegetation treatment projects, are derived from approved land use plans as discussed in Chapter 2 of the PEIS. Nothing in this ROD supercedes or modifies the allocations identified in any approved BLM land use plan.

## Herbicide Treatment Standard Operating Procedures

The BLM will follow SOPs to ensure that risks to human health and the environment from herbicide treatment actions are kept to a minimum. Standard operating procedures are the management controls and performance standards intended to protect and enhance natural resources that could be affected by vegetation treatments involving the use of herbicides. These procedures are identified in Appendix B and include, but are not limited to:

- Take actions to prevent or minimize the need for vegetation control when and where feasible, considering the management objectives of the site.

- Use effective nonchemical methods of vegetation control when and where feasible.

- Use herbicides after considering the effectiveness of all potential methods or in combination with other methods or controls.

- Develop plans to thoroughly evaluate the need for chemical treatments and their potential for impact on the environment.

- Reseed or plant disturbed areas with desirable vegetation when the native plant community cannot recover and occupy the site sufficiently.

- Survey the project site for species listed or proposed for listing, or special status species. If a proposed project may affect a proposed or listed species or its critical habitat, the BLM will consult with the U.S. Fish and Wildlife Service (USFWS) and/or National Marine Fisheries Service (NMFS). The BLM will also follow protective measures identified in the NMFS *Endangered Species Act Section 7 Consultation Biological Opinion Proposed Vegetation Treatment Program for 17 Western States* (see Appendix C of this ROD).

- Avoid using tools and equipment for vegetation management in wilderness areas unless they are necessary for the protection of the wilderness resource.

- Meet responsibilities for consultation and government-to-government relationships with Native American tribes by consulting with appropriate tribal representatives prior to taking actions that affect tribal interests.

- Notify potentially affected parties of treatment activities that occur on public lands.

- Ensure that the public is allowed input into vegetation management actions on public lands under the NEPA process.

## Mitigation

In addition to using the SOPs identified above, the BLM will also implement additional measures to mitigate potential adverse environmental effects as a result of vegetation treatment activities using herbicides (Table 2). These SOPs and mitigation measures ensure that all practicable means to avoid or minimize environmental harm have been adopted by the BLM.

**TABLE 1**
**States in which Herbicide Active Ingredients are Approved for Use on Public Lands under this Record of Decision**

| Chemical | AK | AZ | CA | CO | ID | MT | NE | NV | NM | ND | OK | OR | SD | TX | UT | WA | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2,4-D | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Bromacil | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Chlorsulfuron | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Clopyralid | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Dicamba | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Diflufenzopyr + dicamba | ◎ | • | ◎ | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Diquat | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Diuron | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Fluridone | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Glyphosate | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Hexazinone | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Imazapic | ◎ | • | ◎ | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Imazapyr | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Metsulfuron methyl | • | • | ◎ | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Picloram | ◎ | • | ◎ | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Sulfometuron methyl | • | • | ◎ | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Tebuthiuron | ◎ | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Triclopyr | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |

•   Based upon the current EISs, these herbicide active ingredients have been analyzed and approved for application on BLM-administered lands.
◎   Based upon the current EISs, these herbicide active ingredients have been analyzed and approved for application on BLM-administered lands, but application is not allowed based on registration status in the state.

DECISION

**TABLE 2**
**Mitigation Measures**

| Resource | Mitigation Measures |
|---|---|
| Air Quality | None proposed. |
| Soil Resources | None proposed. |
| Water Resources and Quality | • Establish appropriate (herbicide-specific) buffer zones to downstream water bodies, habitats, and species/populations of interest (see Appendix C of PEIS, Table C-16). <br><br> • Areas with potential for groundwater for domestic or municipal water use shall be evaluated through the appropriate, validated USEPA model(s) to estimate vulnerability to potential groundwater contamination, and appropriate mitigation measures shall be developed if such an area requires the application of herbicides and cannot otherwise be treated with non-chemical methods. |
| Wetland and Riparian Areas | • See mitigation for Water Resources and Quality and Vegetation. |
| Vegetation | • Minimize the use of terrestrial herbicides (especially bromacil, diuron, and sulfometuron methyl) in watersheds with downgradient ponds and streams if potential impacts to aquatic plants are identified. <br><br> • Establish appropriate (herbicide-specific) buffer zones (see Tables 4-12 and 4-14 in Chapter 4 of the Final PEIS) around downstream water bodies, habitats, and species/populations of interest. Consult the ecological risk assessments (ERAs) prepared for the PEIS for more specific information on appropriate buffer distances under different soil, moisture, vegetation, and application scenarios. <br><br> • Limit the aerial application of chlorsulfuron and metsulfuron methyl to areas with difficult land access, where no other means of application are possible. Do not apply sulfometuron methyl aerially. <br><br> • To protect special status plant species, implement all conservation measures for plants presented in the *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment.* |
| Fish and Other Aquatic Organisms | • Limit the use of diquat in water bodies that have native fish and aquatic resources. <br><br> • Limit the use of terrestrial herbicides (especially diuron) in watersheds with characteristics suitable for potential surface runoff that have fish-bearing streams during periods when fish are in life stages most sensitive to the herbicide(s) used. <br><br> • To protect special status fish and other aquatic organisms, implement all conservation measures for aquatic animals presented in the *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment.* <br><br> • Establish appropriate herbicide-specific buffer zones for water bodies, habitats, or fish or other aquatic species of interest (see Final PEIS Appendix C, Table C-16, and recommendations in individual ERAs). <br><br> • Consider the proximity of application areas to salmonid habitat and the possible effects of herbicides on riparian and aquatic vegetation. Maintain appropriate buffer zones around salmonid-bearing streams (see Appendix C, Table C-16, of the Final PEIS, and recommendations in the individual ERAs). <br><br> • Avoid using the adjuvant R-11® in aquatic environments, and either avoid using glyphosate formulations containing polyoxyethyleneamine (POEA), or seek to use formulations with the least amount of POEA, to reduce risks to aquatic organisms in aquatic environments. <br><br> • At the local level, consider effects to special status fish and other aquatic organisms when designing treatment programs. |
| Wildlife | • To minimize risks to terrestrial wildlife, do not exceed the typical application rate for applications of dicamba, diuron, glyphosate, hexazinone, tebuthiuron, or triclopyr, where feasible. <br><br> • Minimize the size of application areas, where practical, when applying 2,4-D, bromacil, diuron, and Overdrive® to limit impacts to wildlife, particularly through contamination of food items. |

BLM_0000019

TABLE 2
Mitigation Measures (Cont).

| Resource | Mitigation Measures |
|---|---|
| Wildlife (cont.) | • Where practical, limit glyphosate and hexazinone to spot applications in rangeland and wildlife habitat areas to avoid contamination of wildlife food items.<br>• Avoid using the adjuvant R-11® in aquatic environments, and either avoid using glyphosate formulations containing POEA, or seek to use formulations with the least amount of POEA, to reduce risks to amphibians.<br>• Do not apply bromacil or diuron in rangelands, and use appropriate buffer zones (see Tables 4-12 and 4-14 in Chapter 4 of the Final PEIS) to limit contamination of off-site vegetation, which may serve as forage for wildlife.<br>• Do not aerially apply diquat directly to wetlands or riparian areas.<br>• To protect special status wildlife species, implement all conservation measures for terrestrial animals presented in the *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment.* |
| Livestock | • Minimize potential risks to livestock by applying diuron, glyphosate, hexazinone, tebuthiuron, and triclopyr at the typical application rate, where feasible.<br>• Do not apply 2,4-D, bromacil, dicamba, diuron, Overdrive®, picloram, or triclopyr across large application areas, where feasible, to limit impacts to livestock, particularly through the contamination of food items.<br>• Where feasible, limit glyphosate and hexazinone to spot applications in rangeland.<br>• Do not aerially apply diquat directly to wetlands or riparian areas used by livestock.<br>• Do not apply bromacil or diuron in rangelands, and use appropriate buffer zones (see Tables 4-12 and 4-14 in Chapter 4 of the Final PEIS) to limit contamination of off-site rangeland vegetation. |
| Wild Horses and Burros | • Minimize potential risks to wild horses and burros by applying diuron, glyphosate, hexazinone, tebuthiuron, and triclopyr at the typical application rate, where feasible, in areas associated with wild horse and burro use.<br>• Consider the size of the application area when making applications of 2,4-D, bromacil, dicamba, diuron, Overdrive®, picloram, and triclopyr in order to reduce potential impacts to wild horses and burros.<br>• Apply herbicide label grazing restrictions for livestock to herbicide treatment areas that support populations of wild horses and burros.<br>• Where practical, limit glyphosate and hexazinone to spot applications in rangeland.<br>• Do not apply bromacil or diuron in grazing lands within herd management areas (HMAs), and use appropriate buffer zones identified in Tables 4-12 and 4-14 in Chapter 4 of the Final PEIS to limit contamination of vegetation in off-site foraging areas.<br>• Do not apply 2,4-D, bromacil, or diuron in HMAs during the peak foaling season (March through June, and especially in May and June), and do not exceed the typical application rate of Overdrive® or hexazinone in HMAs during the peak foaling season in areas where foaling is known to take place. |
| Paleontological and Cultural Resources | • Do not exceed the typical application rate when applying 2,4-D, bromacil, diquat, diuron, fluridone, hexazinone, tebuthiuron, and triclopyr in known traditional use areas.<br>• Avoid applying bromacil or tebuthiuron aerially in known traditional use areas.<br>• Limit diquat applications to areas away from high residential and traditional use areas to reduce risks to Native Americans and Alaska Natives. |
| Visual Resources | None proposed. |
| Wilderness and Other Special Areas | Mitigation measures that may apply to wilderness and other special area resources are associated with human and ecological health and recreation (see mitigation measures for Vegetation, Fish and Other Aquatic Resources, Wildlife Resources, Recreation, and Human Health and Safety). |
| Recreation | Mitigation measures that may apply to recreational resources are associated with human and ecological health (see mitigation measures for Vegetation, Fish and Other Aquatic Resources, Wildlife Resources, and Human Health and Safety). |

BLM_0000020

DECISION

TABLE 2
Mitigation Measures (Cont).

| Resource | Mitigation Measures |
|---|---|
| Social and Economic Values | None proposed. |
| Human Health and Safety | • Use the typical application rate, where feasible, when applying 2,4-D, bromacil, diquat, diuron, fluridone, hexazinone, tebuthiuron, and triclopyr to reduce risk to occupational and public receptors.<br><br>• Avoid applying bromacil and diuron aerially. Do not apply sulfometuron methyl aerially.<br><br>• Limit application of chlorsulfuron via ground broadcast applications at the maximum application rate.<br><br>• Limit diquat application to ATV, truck spraying, and boat applications to reduce risks to occupational receptors; limit diquat applications to areas away from high residential and subsistence use to reduce risks to public receptors.<br><br>• Evaluate diuron applications on a site-by-site basis to avoid risks to humans. There appear to be few scenarios where diuron can be applied without risk to occupational receptors.<br><br>• Do not apply hexazinone with an over-the-shoulder broadcast applicator. |

The mitigation measures listed in Table 2 will apply to plants, animals, and other resources at the programmatic level in all 17 western states. Local BLM field offices may also use interactive risk assessment spreadsheets and other information contained in ecological risk assessments (ERAs) prepared in support of the PEIS to develop more site-specific mitigation and management plans based on local site-specific conditions (e.g., soil type, rainfall, vegetation type, herbicide treatment method, and herbicide application rate). In addition, the BLM may use timing restrictions or similar practices to reduce the level of risk to an acceptable level.

# Monitoring

Monitoring ensures that vegetation management SOPs and mitigation measures are adopted and implemented appropriately and determined to be effective. Monitoring is an adaptive process that continually builds upon past monitoring results. The regulations of 43 Code of Federal Regulations 1610.4-9 require that land use plans establish intervals and standards for monitoring and evaluating land management actions. During preparation of implementation plans, treatment objectives, standards, and guidelines are stated in measurable terms, where feasible, so that treatment outcomes can be measured, evaluated, and used to guide future treatment actions. This approach ensures that vegetation treatment processes are effective, adaptive, and based on prior experience.

Vegetation treatments will be monitored within a variety of established monitoring programs to determine the success of the completed work, identify corrective measures (if needed), and identify actions that could be taken in the future to enhance treatment success. Monitoring oversight is the responsibility of each BLM State Office.

Due to the diversity of plant communities on public lands, monitoring strategies may vary in time and space depending on the species. Sampling designs and techniques vary depending on the type of vegetation. For herbicide use, implementation monitoring is accomplished through the use of Pesticide Use Proposals and Pesticide Application Records.

The BLM will use the National Invasive Species Information Management System to track the success of herbicide and other invasive species treatments. Monitoring and inventory information are collected and analyzed and this information is input into the National database and available for BLM staff to determine appropriate treatments strategies for their treatment situation based on similar BLM projects.

The BLM will use established monitoring methodologies, such as the interagency monitoring program FIREMON, for monitoring fuels treatment effectiveness.

The BLM will use the Forest Vegetation Information System (FORVIS). FORVIS is a system for storage, retrieval, and analysis of data about forestlands. These data describe existing vegetation, classify sites relative to current condition, can be used in forest growth and structure and wildlife habitat models, describe landscapes, aid in developing forest restoration

treatments, and provide a record of treatment and disturbance events.

BLM monitoring activities also include long-term monitoring to evaluate the results of treatment practices 25 or more years later.

Additional monitoring methods and guidance are found in Appendix D.

BLM_0000022

BLM_0000023

# CHAPTER 3

# ALTERNATIVES CONSIDERED

Five program alternatives were evaluated in the PEIS. Alternatives were developed that: A) allow the BLM to continue its current use of 20 herbicide active ingredients in 14 western states, as authorized by earlier EIS RODs; B) allow for the use of 14 herbicide active ingredients currently used by the BLM and four new herbicide active ingredients; C) prohibit the use of herbicides; D) prohibit the aerial application of herbicides; or E) prohibit the use of sulfonylurea and other acetolactate synthase-inhibiting herbicide active ingredients.

## Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under this alternative, the BLM would continue to use 20 herbicide active ingredients currently approved for use in 14 western states. The BLM would also continue its activities conducted under emergency stabilization and burned area rehabilitation and hazardous fuel reduction that are evaluated by NEPA compliance documents prepared by local BLM field offices.

## Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

This alternative represents the treatment of vegetation using herbicides in 17 western states (including Alaska).

Under Alternative B, the BLM would use 14 herbicide active ingredients in 17 western states that are currently approved for use and for which an analysis of risks to humans and non-target plants and animals was conducted and analyzed in the PEIS. These herbicide active ingredients are: 2,4-D, bromacil, chlorsulfuron, clopyralid, dicamba, diuron, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, sulfometuron methyl, tebuthiuron, and triclopyr.

The BLM would use four newly-approved herbicide active ingredients in all 17 states included in the PEIS: imazapic, diquat, diflufenzopyr (in formulation with dicamba), and fluridone. In addition, the BLM would use diflufenzopyr as a stand-alone active ingredient if it becomes registered by the USEPA under FIFRA.

Under Alternative B, the BLM would also implement a scientific protocol for assessing herbicides for authorization of use on public lands.

## Alternative C – No Use of Herbicides

Under Alternative C, the BLM would not treat vegetation using herbicides and would not authorize the use of additional chemical formulations. The BLM would treat vegetation using fire and mechanical, manual, and biological control methods only.

## Alternative D – No Aerial Application of Herbicides

Alternative D is similar to Alternative B in terms of the herbicides proposed for use and implementation of a scientific protocol. Under Alternative D, however, only ground-based techniques would be used to apply herbicides (no aerial applications of herbicides would be allowed) to reduce the risk of spray drift impacting non-target areas.

## Alternative E – No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients

Under Alternative E, the BLM would not use sulfonylurea and other acetolactate synthase (ALS)-inhibiting herbicide active ingredients, which include chlorsulfuron, imazapyr, metsulfuron methyl, and sulfometuron methyl. The BLM would use 10 herbicide active ingredients currently approved for use and for which an analysis of their risks to humans and non-

BLM_0000024

ALTERNATIVES CONSIDERED

target plants and animals was conducted for this PEIS. These herbicide active ingredients are: 2,4-D, bromacil, clopyralid, dicamba, diuron, glyphosate, hexazinone, picloram, tebuthiuron, and triclopyr. The six other herbicide active ingredients currently approved for use by the BLM (2,4-DP, atrazine, asulam, fosamine, mefluidide, and simazine) would not be used unless guidelines outlined in the scientific protocol described in Alternative B were met.

In addition, the BLM would use three additional active ingredients in all 17 states: diquat, diflufenzopyr (if it becomes registered by the USEPA), and fluridone. The BLM would also use a formulation of diflufenzopyr and dicamba. Under Alternative E, the BLM would authorize the use of additional active ingredients consistent with the scientific protocol identified under Alternative B that do not contain sulfonylurea and other acetolactate synthase-inhibiting compounds.

# Environmentally Preferable Alternative

Alternative B, The Preferred Alternative, is the environmentally preferable alternative in this ROD. The BLM determined that the risks associated with the use of herbicides under this alternative will be minor, and the benefits of herbicide use will be greater than with the other alternatives; therefore, the BLM identified this alternative as the environmentally preferred alternative.

BLM_0000025

# CHAPTER 4

# MANAGEMENT CONSIDERATIONS

The decision to select Alternative B of the PEIS takes into consideration Administrative and Congressional policies and statutory requirements, agency resource management policies, manual and handbook guidance, resource management goals and objectives, concerns and input from the public, non-government organizations, industry and public agencies, and past experience managing vegetation. Through this review process, all practicable methods to reduce environmental harm were incorporated into this decision. The BLM also undertook consultation with the USFWS and NMFS under Section 7 of the Endangered Species Act (ESA). The USFWS concurred with the determination of Not Likely to Adversely Affect for threatened and endangered species, species proposed for listing, or their critical habitats given in the *Biological Assessment for Vegetation Treatments on Bureau of Land Management Lands in 17 Western States*. The NMFS issued a Biological Opinion and concluded that the proposed action is not likely to jeopardize the continued existence of endangered and threatened salmonids and other marine and estuarine species under the jurisdiction of the NMFS, or species proposed for listing, and is not likely to destroy or adversely modify their designated critical habitat. The USFWS concurrence letter and NMFS Biological Opinion are incorporated into this ROD and are found in Appendix C.

## Federal Laws, Regulations, and Policies that Influence Vegetation Treatment Policies

The President and Congress have directed the USDI and BLM, through implementation of the *National Fire Plan* and the *Healthy Forests Restoration Act of 2003*, to take more aggressive actions to reduce catastrophic wildfire risk on public lands.

The BLM's *A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan*; *Partners Against Weeds: An Action Plan for the Bureau of Land Management*; and *Pulling Together: National Strategy for Invasive Plant Management* identify broad objectives for management of vegetation on public lands, while treatment activities at the local level are guided by the goals, standards, and objectives of land use plans developed for each BLM field office.

Several laws provide for management and control of invasive vegetation. Two weed control laws, the Carlson-Foley Act of 1968 and the Plant Protection Act of 2000 (Public Law 106-224; includes management of undesirable plants on federal lands) authorize and direct the BLM to manage noxious weeds and to coordinate with other federal and state agencies in activities to eradicate, suppress, control, prevent, or retard the spread of any noxious weeds on federal lands. The Federal Noxious Weed Act of 1974 established and funded an undesirable plant management program, implemented cooperative agreements with state agencies, and established integrated management systems to control undesirable plant species. The Noxious Weed Control Act of 2004 established a program to provide assistance through states to eligible weed management entities to control or eradicate harmful, non-native weeds on public and private lands. The Public Rangelands Improvement Act of 1978 requires the BLM to manage, maintain, and improve the condition of the public rangelands so that they become as productive as feasible. Executive Order 13112, Invasive Species, directs federal agencies to prevent the introduction of invasive species and provide for their control, and to minimize the economic, ecological, and human health impacts that invasive species cause.

## NEPA Requirements of the Program

The PEIS provides NEPA compliance by assessing the program of using herbicides to treat undesirable vegetation on public lands administered by the BLM. The necessity for treatment is determined by BLM land use plans.

The PEIS provides a broad, comprehensive background source of information to which any necessary subsequent environmental analyses can be tiered. Tiering allows local offices to prepare more specific

BLM_0000026

environmental documents without duplicating relevant portions of the PEIS. In general, the NEPA process is implemented at multiple scales depending on the scope of the proposal (Figure 1).

The broadest level, which the PEIS represents, is a national-level programmatic analysis. This level of study contains broad regional descriptions of resources, provides a broad environmental impact analysis, including cumulative impacts, focuses on general policies, and provides Bureau-wide decisions on herbicide use for vegetation management. Additionally, it provides a programmatic ESA Section 7 consultation for the broad range of activities described in the PEIS.

The next scale of analysis represents a regional level of analysis, and may be prepared for regional or statewide programs. A regional level of analysis would typically focus on methods to be used, options, regional or statewide issues, and provide an ESA Section 7 consultation focused on regional issues.

The next scale of analysis is the option to prepare a field office-wide level analysis. This analysis would be prepared for district or field office-wide programs. The analysis is tiered to either or both of the two higher scales of analysis and focuses on impacts of methods and options for a single program. This scale provides ESA Section 7 consultation focused on local issues and species of concern that occur within the field office's administrative jurisdiction.

The local scale of analysis provides project level analysis and is prepared for site-specific proposals. The analysis may be tiered to any or all of the above scales of analysis. The analysis focuses on site-specific impacts of implementing a single management proposal as identified through local planning. Section 7 consultation under the ESA focuses on the implementing actions.

The environmental analysis of site treatment plans (including application of categorical exclusions, where appropriate) will be conducted at the BLM field office level. Analyses undertaken by local BLM offices will be prepared in accordance with NEPA guidance and will include public involvement as regulated by the Council on Environmental Quality, as well as follow USDI and BLM manual and handbook guidance and pertinent instruction memoranda.

The PEIS will also be used to facilitate the analysis process by providing BLM treatment design features, providing impact assessment data for herbicides, and in

overall uniformity of analysis. All additional analysis will be based on the PEIS and other applicable FEISs and RODs, including those for land use plans, timber management programs, and grazing management programs. If analysis finds potential for significant impacts not already described in the PEIS or another existing FEIS, a supplement or another EIS may be required.

# Consultation, Coordination, and Interrelationships

## Endangered Species Act Section 7 Consultation

As part of this PEIS, the BLM consulted with the USFWS and NMFS as required under Section 7 of the ESA. The BLM prepared a formal initiation package that included: 1) a description of the program, listed threatened and endangered species, species proposed for listing, and critical habitats that may be affected by the program; and 2) a *Biological Assessment for Vegetation Treatments on Bureau of Land Management Lands in 17 Western States*. The Biological Assessment (BA) evaluated the likely impacts to listed species, species proposed for listing, and critical habitats from the proposed use of herbicides and other treatment methods in its vegetation treatment program and identified management practices to minimize impacts to these species and habitats. The BLM also coordinated with the NMFS on Essential Fish Habitat as required under the Magnuson-Stevens Fishery Management Act. This package was submitted to the Services concurrently with release of the *Draft Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement* (Draft PEIS) in November 2005.

Consultation with the Services pursuant to the ESA and Magnuson-Stevens Fishery Management Act were completed in July 2007.

## Government-to government Consultation

Formal government-to-government consultation with federally-recognized traditional governments was initiated by the BLM through written correspondence in July 2002. The BLM initiated consultation with Native American tribes and Alaska Native groups to identify their cultural values, religious beliefs, traditional practices, and legal rights that could be affected by

BLM_0000027



(Adapted from USDI BLM 1991a)

**Level 1**
Vegetation Treatments EIS Study Area
**Regional Level of Analysis:**
EIS with broad, regional description of resources and broad environmental impact analysis. Focuses on general policies.

**Level 2**
State of Wyoming
BLM Administrative Offices
**Statewide Level of Analysis**
Analysis is tiered to level 1 and is prepared for statewide programs. Focuses on the impact of methods, options, and individual state issues.

**Level 3**
Rock Springs District and Resource Areas
**District or Resource Area Level of Analysis**
Analysis is tiered to either or both above levels. Focuses on impacts of methods and options for specific multi-management proposals, (may become Level 4).

**Level 4**
Big Sagebrush Burn Area
**Project Level of Analysis**
Analysis is tiered to any or all above levels. Focuses on site-specific impacts of implementing a single management proposal.

Figure 1
Relationship of the PEIS to BLM Field Offices

4-3

BLM_0000028

MANAGEMENT CONSIDERATIONS

BLM actions. This included sending out letters to all tribes and groups that could be directly affected by vegetation treatment activities, and requesting information on how the proposed activities could impact Native American and Alaska Native interests, including the use of vegetation and wildlife for subsistence, religious, and ceremonial purposes.

A letter was sent to all of the tribal governments that described the proposed action. The tribes were provided with information on the project and were asked to provide the BLM with any concerns they might have about any of the proposed vegetation treatments and their impacts on subsistence, religious, and ceremonial purposes and traditional cultural properties. The BLM invited the tribes to call if they had questions or wanted to set up individual meetings with the BLM. The letter also invited the tribal councils to attend the scoping meeting scheduled for their community.

The BLM conducted an Alaska National Interest Lands Conservation Act (ANILCA) § 810 Analysis of Subsistence. During this process, the BLM invited public participation and collaborated with Alaska Natives to identify and protect culturally significant plants used for food, baskets, fiber, medicine, and ceremonial purposes.

The BLM consulted with State Historic Preservation Officers as part of Section 106 consultation under the National Historic Preservation Act to determine how proposed vegetation treatment actions could impact cultural resources. Formal consultations with State Historic Preservation Officers and Indian tribes also may be required during implementation of projects at the local level.

## Interrelationships and Coordination with Agencies

In its role as manager of nearly 261 million acres in the western U.S., including Alaska, the BLM has developed numerous relationships at the federal, tribal, state, and local levels, as well as with conservation and environmental groups with an interest in resource management, and members of the public that use public lands or are affected by activities on public lands.

Several federal agencies administer laws that govern activities on public lands. Federal agencies, including the Department of Defense, the Department of Energy, the National Park Service, the USFWS, the Bureau of Reclamation, the Bureau of Indian Affairs, and the Forest Service, administer lands adjacent to or in close proximity to public lands administered by the BLM, and have vegetation management issues that are similar to the BLM's. Other agencies, such as the NMFS, the Agricultural Research Service, the Animal and Plant Health Inspection Service, the Natural Resource Conservation Service, and the U.S. Geological Survey Biological Services, play vital roles in coordination with national, tribal, state, county and private interests through their oversight and coordination responsibilities. These agencies and the BLM regularly coordinate on vegetation management and control efforts to benefit all federally-administered lands. Other local coordination includes the sharing of equipment, training, and financial resources, and developing vegetation management plans that cross administrative boundaries.

### National Level Coordination

Invasive species management is coordinated by several groups at the national level. The National Invasive Species Council was formed among several federal agencies per Executive Order 13112 to develop strategies to control invasive species on federal lands. Comprised of 16 federal agencies with direct invasive plant management responsibilities, the Federal Interagency Committee for the Management of Noxious and Exotic Weeds serves to coordinate invasive plant management activities in federal lands across the United States and its territories. A related committee is the Federal Interagency Committee on Invasive Terrestrial Animals and Pathogens, which consists of 10 federal departments and agencies responsible for managing non-vegetative invasive species in terrestrial ecosystems. The BLM also coordinates with the Aquatic Nuisance Species Task Force, which is co-chaired by the USFWS and NMFS, and is responsible for coordinating efforts by the federal government and the private sector in controlling aquatic nuisance species. The BLM also produces national level strategies for invasive species prevention and management (e.g., *Partners Against Weeds: An Action Plan for the Bureau of Land Management*, and *Pulling Together: National Strategy for Invasive Plant Management*).

Fire and fuels management coordination involves both federal and state entities. The Wildland Fire Leadership Council is a cooperative, interagency organization dedicated to achieving consistent implementation of the goals, actions, and policies in the *National Fire Plan* and the *Federal Wildland Fire Management Policy*. The National Fire and Aviation Executive Board was

BLM_0000029

established to resolve wildland fire management issues on an interagency level by improving coordination and integration of federal fire and aviation programs.

The National Interagency Fuels Coordination Group, chartered under the National Fire and Aviation Executive Board, was established shortly after the *National Fire Plan* in October of 2001 under the direction and guidance of the Department of the Interior's Bureau of Indian Affairs, BLM, USFWS, National Park Service, and Forest Service. The primary purpose of the group is to provide leadership and coordination in uniting the Departments' resources and fire management programs under a common purpose for reducing risks to communities while improving and maintaining ecosystem health. The group provides assistance and guidance in the development and implementation of an effective interagency fuels management program, which includes addressing risks from severe fires in wildland urban interface communities and restoring healthy ecological systems in other wildland areas.

The National Wildfire Coordinating Group provides coordination among the following agencies and their programs: Forest Service; BLM, National Park Service, Bureau of Indian Affairs, USFWS, and the National Association of State Foresters. The BLM is also one of six federal agencies that provide scientific support for the management of fuels and wildland fires in the Joint Fire Science Program.

### State and County Level Coordination

The BLM is required to coordinate with state and local agencies under several laws, including the Clean Air Act, the Sikes Act, Federal Land Policy and Management Act (FLPMA), and Section 106 of the National Historic Preservation Act. The BLM coordinates closely with state resource management agencies on issues involving the management of public lands, the protection of fish and wildlife populations, including federal- and state-listed threatened and endangered species, invasive and noxious weeds, fuels and wildland fire management, and herbicide applications. Herbicide applications are also coordinated with state and local water quality agencies to ensure that treatment applications are in compliance with applicable water quality standards and do not result in unacceptable surface or groundwater contamination.

Local and state agencies work closely with the BLM to manage weeds on local, state, and federal lands. The BLM participates in exotic plant pest councils, state

vegetation and noxious weed management committees, state invasive species councils, county weed districts, and weed management associations found throughout the West.

The Healthy Forests Restoration Act directs the Forest Service and BLM to develop an annual program of work for federal land that gives priority to authorized hazardous fuel reduction projects that provide for protecting at-risk communities or watersheds. The recommendations made by Community Wildfire Protection Plans are taken into account by the agencies in accordance with the HFRA, which gives priority in allocating funding to communities that have adopted these plans, or that have taken measures to encourage willing property owners to reduce fire risk on private property. All prescribed burning is coordinated with state and local air quality agencies to ensure that local air quality is not significantly impacted by BLM activities.

### Non-governmental Organizations

The BLM coordinates at the national and local levels with several resource advisory groups and non-governmental organizations, including: BLM Resource Advisory Councils, the Western Governors' Association, the National Association of Counties, the Western Area Power Administration, the National Cattlemen's Association, the National Wool Growers Association, the Society of American Foresters, and the American Forest and Paper Association. The BLM also solicits input from national and local conservation and environmental groups with an interest in land management activities on public lands, such as The Nature Conservancy and Ducks Unlimited. These groups provide information on strategies for weed prevention, effective weed treatment methods, use of domestic animals to control weeds, landscape-level planning, vegetation monitoring, techniques to restore land health, and methods to ensure that prescribed burning does not impact the safe operation of power transmission lines.

### Cooperative Weed Management Areas

Cooperative Weed Management Areas (CWMAs) are composed of local, private, and federal interests. CWMAs typically center on a particular watershed or similar geographic area in order to pool resources and management strategies in the prevention and control of weed populations. Much of the BLM's on-the-ground invasive species prevention and management is done directly or indirectly through CWMAs. The BLM

BLM_0000030

MANAGEMENT CONSIDERATIONS

participates in numerous CWMAs throughout the West, several of which are showcase examples of interagency and private cooperation in restoring land health.

## Integrating Vegetation Treatments

Per BLM policy and manual direction, including Department of Interior Manual 517 (*Integrated Pest Management*), the BLM utilizes an integrated pest management approach to managing and treating vegetation. This approach is inclusive of concepts such as integrated weed management and more broadly, integrated vegetation management.

The BLM treats vegetation using fire, mechanical and manual methods, biological treatments, and herbicides. In an integrated vegetation management program, each management option is considered, recognizing that no one management option is a stand-alone option and that each has its own strengths and weakness. Utilizing the strengths of each allows for a more effective and environmentally sound program. When the BLM plans vegetation treatment projects, all control methods should be available for use, allowing the BLM to select the one method, or the combination of methods, that optimizes vegetation control with respect to environmental concerns, effectiveness, and cost of control.

## General Site Selection and Treatment Priorities

Several factors influence where treatments will occur and treatment priorities:

- Statutory mandates, including the FLPMA, ESA, HFRA, and Taylor Grazing Act.
- Program guidance including such initiatives as the Healthy Forests Initiative, Healthy Lands Initiative, and the Great Basin Restoration Initiative.
- Goals of the Strategic and Annual Performance Plans.
- Existing risks to resources.
- Likelihood of success in restoring natural biotic communities.
- Cost-effectiveness of actions.

National priorities have been established for various BLM vegetation management programs. These priorities were developed for use in conjunction with state and local office priorities for meeting restoration goals, and address site-specific conditions and/or issues as identified in the land use plan.

The following treatment priorities have been established to promote integrated efforts across BLM resource programs that manage vegetation:

- Wildland urban interface community protection treatments that are designed to reduce the risk of wildfire to the community and/or its infrastructure developed collaboratively with the community.
- Treatments to restore or maintain healthy, diverse, resilient, and productive native plant communities.
- Special status species habitat improvement projects designed to improve or protect special status fish, wildlife, and plant habitat.
- Treatments that will be planned, implemented, and/or monitored using funding from multiple sources, both internal and external.
- Landscape treatments (>1,000 acres for mechanical and >4,500 acres for prescribed fires), coordinated across field office boundaries, to improve treatment effectiveness.
- Contracted treatments that support economic opportunities for rural communities and/or high potential to use stewardship contracting authorities.
- Treatments that have a high potential for woody biomass utilization.

Vegetation treatment methods are selected based on several parameters, which may include the following:

- Management program/objective for the site.
- Historic and current conditions.
- Opportunities to prevent future problems.
- Opportunities to conserve native and desirable vegetation.
- Effectiveness and cost of the treatment methods.

BLM_0000031

MANAGEMENT CONSIDERATIONS

- Success of past restoration treatments or treatments conducted under similar conditions or recommendations by local experts.

- Characteristics of the target plant species, including size, distribution, density, life cycle, and life stage in which the plant is most susceptible to treatment.

- Non-target plant species that could be impacted by the treatment.

- Land use of the target area.

- Proximity to communities.

- Slope, accessibility, and soil characteristics of the treatment area.

- Weather conditions at the time of treatment, particularly wind speed and direction, precipitation prior to or likely to occur during or after application, and season.

- Proximity of the treatment area to sensitive areas, such as wetlands, streams, or habitat for plant or animal species of concern.

- Potential impacts to humans and fish and wildlife, including non-game species.

- Need for subsequent revegetation and/or restoration.

The above parameters are considered before a treatment method is selected. For most vegetation treatment projects, pretreatment surveys are conducted before selecting one or more treatment methods. These surveys involve the consideration of all feasible treatments, including their potential effectiveness based on previous experience, and best available science, impacts, and costs. Before vegetation treatment or ground disturbance occurs, the BLM consults specialists or databases for information on sensitive areas within the project area. The site may have to be surveyed for listed or proposed federal threatened or endangered species and for evidence of cultural or historic sites. In some cases, areas may receive one or more treatments in combination, such as prescribed burning followed by an herbicide application, and some areas may be treated using one or more treatment methods over several years.

## Issues Considered in the Decision Process and Summary of Environmental Consequences of Decision

The BLM considered the adverse and beneficial treatment effects and other issues identified during scoping and development of the PEIS in evaluating alternatives and developing the ROD. The BLM recognizes that there are risks in using herbicides, and has worked to develop SOPs and mitigation measures to reduce these risks. The BLM also recognizes that herbicides can be used to improve ecosystem health. In addition, all treatment alternatives will include the use of non-herbicide treatment methods, with their inherent risks and benefits.

### Adverse Effects to Resources Evaluated in PEIS

The Preferred Alternative would not result in emissions that exceed Prevention of Significant Deterioration thresholds or National Ambient Air Quality Standards. None of the herbicides commonly used by the BLM appear to result in adverse impacts to soil. Of the herbicide active ingredients most often used by the BLM, picloram and tebuthiuron are persistent in soil for a year or more, while clopyralid, glyphosate, and 2,4-D are relatively non-persistent in soil. Potential effects to soil and soil organisms from these herbicide active ingredients and the new herbicide active ingredients appear to be minor.

Several herbicide active ingredients have been identified as groundwater contaminants (e.g., 2,4-D, glyphosate, picloram, simazine). The BLM will adhere to herbicide product labels with regards to application restrictions associated with groundwater protection and will use other SOPs and mitigation measures to further reduce risks to groundwater. Effects to surface water would be minor, and herbicide concentrations in surface water should not exceed safe levels for human health. There is potential for herbicides to be transported in surface water and impact non-target vegetation and the BLM will use buffers to reduce or avoid this risk.

Herbicides pose risks to terrestrial and aquatic vegetation. Most aquatic herbicides, and several terrestrial herbicides, are non-selective and could adversely impact non-target vegetation. Accidental spills and herbicide drift from treatment areas could be

BLM_0000032

MANAGEMENT CONSIDERATIONS

particularly damaging to non-target vegetation, including croplands and other vegetation found on privately-owned lands near treatment areas.

Herbicides pose risks to fish and wildlife. Accidental spills and direct spraying of organisms could kill or harm animals, or affect the health and behavior of animals. Fish and wildlife could also forage on vegetation that has been treated, or prey on other animals that have been exposed to herbicides, and be harmed. All of the herbicides pose some risk to non-target terrestrial and aquatic vegetation, and damage to these plants could adversely impact habitats used by fish and wildlife. The risk for adverse health effects to individual organisms would typically be greater for threatened, endangered, and other special status species than for secure species.

Herbicides pose some risk to livestock and wild horses and burros from accidental spill, direct spray, herbicide drift, or by consuming herbicide-treated vegetation. Effects to animals could include death, damage to vital organs, decrease in growth, decrease in reproductive output and condition of offspring, and increased susceptibility to predation.

Herbicide treatments could affect cultural or paleontological resources near or on the surface, through the use of herbicide application equipment, and to a lesser extent, by the chemicals in herbicides.

Herbicide treatments could affect visual, wilderness, and recreation resources. Treatments would remove and discolor vegetation, making it less visually appealing in the short term. Treatments in wilderness may detract from the "naturalness" of the area. Recreationists could be exposed to herbicides. Recreational areas could be closed for short periods of time after application to ensure treatment success and protect the health of visitors.

Some businesses, such as recreation-based businesses and ranching operations, could be adversely affected if treatments required long-term closure of areas used for recreation or by domestic livestock. There are potential environmental justice concerns because a large number of Native peoples and other minority groups live in the West and work in industries (e.g., forest products, herbicide applicator) or conduct activities (e.g., gathering of plants for traditional uses, recreation) that could potentially expose these groups to treated areas.

A human health risk assessment was conducted to assess risks to humans from the use of herbicides. At typical application rates, workers would not be at risk from use of herbicide active ingredients except when using diquat, 2,4-D, bromacil, diuron, hexazinone, or tebuthiuron. At maximum application rates, there are also risks associated with the use of chlorsulfuron, fluridone, and triclopyr. Public receptors would be at less risk.

Herbicide treatments could impact plants used by Native peoples for traditional lifeway uses, and the health of Native peoples. Native peoples would face risks when picking berries in areas treated with diquat. They could also face risks when consuming fish contaminated with 2,4-D, hexazinone, or picloram. Native peoples would face risk from diquat or fluridone if these chemicals were accidentally spilled or used at maximum application rates.

## Beneficial Effects to Resources Evaluated in PEIS

Herbicide treatments that remove or facilitate removal of hazardous fuels from public lands would be expected to benefit the health of ecosystems in which natural fire cycles have been altered. Herbicide treatments should also reduce the incidence and severity of wildfires across the western U.S. Herbicide treatments that control populations of non-native species on public lands would be expected to benefit ecosystems by reducing the importance of non-native species and aiding in the reestablishment of native species.

Herbicide treatments could result in short-term loss of some resources, including soil, vegetation, wildlife, and livestock forage opportunities. Over the long term, loss of resource values would be slowed, and in some cases, would be reversed. Short-term losses in resource functions would be compensated for by long-term gains in ecosystem health.

Herbicide treatments would benefit soil, watershed function and water quality, and vegetation by restoring natural fire regimes and slowing the spread of weeds. With improvement in these areas, habitat for fish and other aquatic organisms would also improve.

Herbicide treatments that limit the spread of non-native plants in habitats occupied by special status species would benefit these vulnerable populations. Improvement of habitat near populations of special status species could also be extremely beneficial by providing suitable habitat for expansion of populations, perhaps aiding in their recovery.

BLM_0000033

Herbicide treatments that reduce the cover of noxious weeds on rangelands should improve the quality of forage and ensure that public lands can support healthy and viable populations of wildlife, livestock, and wild horses and burros.

In general, herbicide treatments would have short-term negative effects and long-term positive effects on non-target vegetation, soils, surface and groundwater, and visual resources. The reduction of hazardous fuels and noxious weeds on lands adjacent to or near wilderness would provide long-term benefits by reducing the likelihood that noxious weeds would spread onto these unique areas, or that a catastrophic wildfire would burn through them, thus degrading their unique qualities. Herbicide treatments would improve the aesthetic and visual qualities of recreation areas for hikers, bikers, horseback riders, and other public land users; reduce the risk of recreationists coming into contact with noxious weeds and poisonous plants; increase the abundance and quality of plants harvested from public lands; and improve habitat for fish and wildlife sought after by fishermen and hunters. In most cases, herbicides proposed for use pose few or no risks to workers or the public.

# Measures to Minimize or Avoid Harm

## Standard Operating Procedures and Mitigation

During preparation of the PEIS, the BLM reviewed vegetation management guidance in agency manuals and handbooks, other federal agency (e.g., Forest Service, National Park Service, USFWS, NMFS) guidance, and recommendations provided during scoping in developing SOPs and conservation measures in the PEIS and BA to provide guidance to BLM field offices in reducing the effects to resources from herbicide applications.

During preparation of the Draft PEIS, additional mitigation measures to reduce risks to natural and human resources from the use of specific herbicide active ingredients were identified as part of development of the ERAs and a human health risk assessment (HHRA) prepared in support of the Draft PEIS.

Based on concerns raised by the Services and public about the ERAs prepared for the Draft PEIS and BA

regarding adjuvants, degradates, and an issue not addressed in the Draft PEIS or BA—the potential for herbicides to be endocrine disrupting chemicals—the BLM prepared an *Evaluation of Risks from Degradates, Polyoxythyleneamine (POEA), and Endocrine Disrupting Chemicals* for the Final PEIS. Based on this assessment, the BLM identified an additional mitigation measure in the Final PEIS:

- Avoid using the adjuvant R-11® in aquatic environments, and either avoid using glyphosate formulations containing POEA, or seek to use formulations with the least amount of POEA, to reduce risks to amphibians and other aquatic organisms.

During preparation of the ROD, the BLM identified an additional mitigation measure to reduce risks to plants, animals, and humans:

- Prohibit aerial application of sulfometuron methyl.

The BLM's decision is to adopt SOPs given in Appendix B and mitigation measures identified in Table 2 of this ROD.

# Comparison of the Alternatives and Development of the Decision

In general, potential direct and indirect adverse impacts and benefits from use of herbicides would be greatest under the Preferred Alternative and least under Alternative C. Fewer acres would be treated, or treatments would not be conducted aerially, under the other herbicide treatment alternatives, so risks and benefits would be intermediate between the Preferred Alternative and Alternative C.

The following discusses important factors considered by the BLM when evaluating the alternatives and selecting the alternative upon which the Decision is based, and identifying the environmentally preferred alternative.

## Alternative A – Continue Present Herbicide Use (No Action Alternative)

Records of Decisions prepared in the late 1980s and early 1990s collectively allowed the BLM to use a total of 20 herbicide active ingredients in 14 western states. They did not allow the BLM to use herbicides to treat vegetation in Alaska, Nebraska, or Texas. Earlier RODs did not approve herbicides that are effective in the

BLM_0000034

MANAGEMENT CONSIDERATIONS

control of giant salvinia, milfoils, and downy brome (cheatgrass). Earlier RODs did not provide a streamlined procedure to adopt new herbicide active ingredients that are more effective and have fewer environmental and human health risks than currently approved herbicide active ingredients. Earlier RODs provided SOPs and mitigation measures, but the level of protection afforded by these measures was determined to be less than protection provided under the other alternatives. For these reasons, the BLM did not select this alternative for the Decision.

## Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

This alternative allows the BLM to use a total of 18 herbicide active ingredients in 17 western states, including Alaska, Nebraska, and Texas.

This alternative best meets the purpose and need for the proposed action. The purposes of the proposed action are to provide BLM personnel with the herbicides available for vegetation treatment on public lands and to describe the conditions and limitations that apply to their use. The need for the proposed action is to reduce the risk of catastrophic wildfires by reducing hazardous fuels, restoring fire-damaged lands, and improving ecosystem health by: 1) controlling weeds and invasive species, and 2) manipulating vegetation to benefit fish and wildlife habitat, improve riparian and wetland areas, and improve water quality in priority watersheds.

Additional benefits accruing from implementation of the proposed action directly relate to restoration of fish and wildlife habitat and improvement of forest and ecological condition, which would meet BLM and USDI objectives set forth in the *Healthy Forests Restoration Act of 2003* and BLM Handbook H-4180-1 (*Rangeland Health Standards*) to improve the health of the nation's forests and rangelands.

The current suite of herbicides used by the BLM are ineffective in treating some species of invasive plants, particularly downy brome, which significantly increase the risk of large-scale wildfires. Under this alternative, the BLM will be able to use imazapic, an herbicide active ingredient shown to be effective in treating downy brome, and aquatic herbicide active ingredients diquat and fluridone, which are effective in treating giant salvinia and milfoils.

This alternative addresses concerns identified during preparation of the ERAs and HHRA, and raised by the public, by incorporating SOPs and mitigation measures to reduce or eliminate risks to the natural and social environment.

To address concerns regarding herbicide drift, the BLM will avoid aerial application of bromacil, chlorsulfuron, diuron, and metsulfuron methyl, and will prohibit aerial application of sulfometuron methyl, on all public lands, will avoid aerial applications of diquat in riparian areas and wetlands, and will avoid use of tebuthiuron in traditional use areas.

To address potential risks associated with R-11® and POEA, the BLM will avoid using the adjuvant R-11® in aquatic environments, and either avoid using glyphosate formulations containing POEA, or seek to use formulations with the least amount of POEA, to reduce risks to amphibians and other aquatic organisms.

For these reasons, the BLM selected this alternative for the Decision. The BLM determined that the risks associated with the use of herbicides under this alternative will be minor, and the benefits of herbicide use will be greater than with the other alternatives; therefore, the BLM identified this alternative as the environmentally preferred alternative.

## Alternative C – No Use of Herbicides

Herbicide use would not be allowed under Alternative C. This alternative would not provide avenues for integrating all vegetation methods; research has shown that the integration of all available methods provides the soundest approach to addressing invasive plant control. Also, there would be negative impacts associated with an increased use of non-chemical treatments such as increased disturbance to soil and reduction in the ability to selectively treat for specific species.

As shown in the PEIS, risks from herbicide use are minor if the BLM follows SOPs and mitigation measures identified in this ROD. Other treatment methods also have risks, may not be appropriate for large-scale treatments, may result in greater environmental effects, and are 2 to 4 times more costly than herbicide treatments.

Although there would be no risks to humans and the environment from herbicides under this alternative, the risk of environmental damage from the spread of weeds and other invasive vegetation, and increased risk of wildfire especially due to downy brome, would be

BLM_0000035

greater under this alternative than the other action alternatives. For these reasons, the BLM did not select this alternative for the Decision and did not consider this alternative to be the environmentally preferred alternative.

## Alternative D – No Aerial Application of Herbicides

This alternative was developed to address concerns regarding herbicide spray drift impacting non-target areas. Without aerial applications, large expanses of downy brome and other invasive plant species, and weed infestations in remote areas or areas with rugged terrain, would be difficult and cost-prohibitive to treat.

More acres would have to be treated in difficult terrain using ground-based methods, increasing safety concerns for ground crews. Large areas of saltcedar, Russian olive, and other woody species could not be cost-effectively treated under this alternative. Aerial application of certain herbicides is necessary to achieve goals for managing vegetation and is about 3 times less expensive than ground-based herbicide treatment methods. For these reasons, the BLM did not select this alternative for the Decision.

## Alternative E – No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients

This alternative would not allow the BLM to use sulfonylurea and other ALS-inhibiting active ingredients approved in the earlier RODs.

Based on ERAs and the HHRA presented in the PEIS, ALS-inhibiting herbicide active ingredients are potentially less harmful to plants, animals, and humans than herbicide active ingredients that would be allowed under this alternative. Under this alternative, the BLM would lose the ability to effectively control such aggressive species as perennial pepperweed and hoary cress, and to a lesser extent salt cedar. The BLM would not be able to use imazapic, which has been shown to be effective in controlling downy brome, which cannot be effectively controlled using other herbicide active ingredients. For these reasons, the BLM did not select this alternative for the Decision.

BLM_0000036

BLM_0000037

# CHAPTER 5

# PUBLIC INVOLVEMENT

The public, state, local and government agencies, and non-governmental organizations provided valuable input into the decision processes used to develop the PEIS and ROD.

## Development of the Draft Programmatic EIS

The BLM published a Federal Register Notice of Intent to Plan (Notice) on October 12, 2001 (Federal Register, Volume 66, Number 198, Pages 52148-52149). The BLM also released a press release concurrent with the Notice. The Notice asked the public to help the BLM identify issues and resources relevant to vegetation treatment activities on lands administered by the BLM in 17 western states, including Alaska. The Notice stated that public comments on the proposal would be accepted from October 12 through November 11, 2001. A second Federal Register Notice was published on January 2, 2002, notifying the public of the location of public scoping meetings, and extending the public comment period until March 29, 2002 (Federal Register, Volume 67, Number 1, Pages 101-102). A third Federal Register Notice was published on January 22, 2002, notifying the public of changes to the meeting schedule (Federal Register, Volume 67, Number 14, Pages 2901-2903).

All affected states issued public notices of the scoping period, which were placed in newspapers in or near locations where public meetings were held. In addition, information on the location of scoping meetings was provided by electronic mail in early December 2001, and again in early January 2002, to all members of the public that had placed their names on the electronic mailing list for the project before the date of the announcements.

### Scoping Meetings

Eighteen public scoping meetings were held in 12 western states, including Alaska, during early 2002. The scoping meetings were conducted in an open-house style. Informational displays were provided at the meeting, and handouts describing the project, the NEPA process, and issues and alternatives were given to the public. A formal presentation provided the public with additional information on program goals and objectives. This presentation was followed by a question and answer session. The BLM received 1,034 requests to be placed on the project mailing list from individuals, organizations, and government agencies, and 381 written comment letters or facsimiles on the proposal. In addition, the public provided comments on the project at the public scoping meetings; over 2,800 catalogued individual comments (written and oral) were given during public scoping. In many cases, multiple respondents submitted the same comment. A *Scoping Comment Summary Report for the Vegetation Treatments Programmatic EIS* was prepared that summarized the issues and alternatives identified during scoping. This document was made available to the public in July 2002.

### Newsletters and other Mailings

The BLM prepared three newsletters during preparation of the Draft PEIS. These newsletters were made available to those individuals that provided their names and addresses to the BLM during scoping, and to BLM state offices and local field offices for distribution to visitors.

In July 2005, the BLM sent out a business reply mail request to those on the mailing list to let the BLM know if they would like to remain on the mailing list and if they would like to receive a printed and/or CD copy of the Draft PEIS, and a supporting *Draft Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Report* (PER) and *Draft Biological Assessment for Vegetation Treatments on Bureau of Land Management Lands in 17 Western States*. In April 2007, the BLM sent out a business reply mail request to those on the mailing list to let the BLM know if they would like to remain on the mailing list and if they would like to receive a printed and/or CD copy of the Final PEIS, PER, and BA.

BLM_0000038

PUBLIC INVOLVEMENT

## Public Review and Comment on the Draft Programmatic EIS

The Notice of Availability (NOA) of the *Draft Vegetation Treatments using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement* was published in the Federal Register on November 10, 2005 (Federal Register, Volume 70, Number 217, Pages 68474-68475). The public comment period was originally scheduled from November 10, 2005, through January 9, 2006, however, a notice extending the public comment period through February 10, 2006, was published in the Federal Register on January 20, 2006 (Federal Register, Volume 71, Number 13, Pages 3292). Public notices announcing the comment period were placed in newspapers with circulation in or near locations where public meetings were held. The BLM issued a press release on November 10, 2006, notifying the public that the Draft PEIS, PER, and BA were available for public review, and providing the schedule for public comment hearings. Information on the Draft PEIS, PER, and BA was also posted on the interactive website (http://www.blm.gov). The public was able to access the website to download a copy of the Draft PEIS, PER, BA, and supporting documents.

Ten public hearings were held in the western U.S. for the BLM to provide an overview of the alternatives and to take public comments. Nearly 3,000 comments were received on the Draft PEIS, PER, and BA. These included letters, electronic mail, and facsimiles, and comments provided at public hearings in Boise and Sacramento (no public testimony was given at the other public hearings). A summary of the comments received and specific comments and responses are presented in Volume III of the Final PEIS.

## Development of the Final Programmatic EIS and Preferred Alternative

After completion of the public hearings and closure of the public comment period on the Draft PEIS, the PEIS core team, resource staff, and management met to review the comments and alternative proposals and to develop the BLM's final Preferred Alternative. No alternative proposals were received from the public, although the BLM did receive numerous comments in support of all four of the proposed actions (alternatives B, C, D, and E).

Six hundred fifty-seven electronic mails, 77 facsimiles, and 234 letters were received on the Draft PEIS, PER, and BA. Each of the comment letters/electronic mails/facsimiles was read and substantive issues were identified. In addition, the BLM received over 2,000 form letters/electronic mails/facsimiles in response to solicitations from advocacy groups, and many of these were identical statements or slight variations thereof; these were also read and substantive issues identified. A total of 1,808 substantive comments were identified and responded to.

The BLM took these comments into consideration when reviewing the alternatives developed for the Final PEIS. Based on these comments, the BLM developed a final Preferred Alternative for the Final PEIS. This alternative is similar to the draft Preferred Alternative identified in the Draft PEIS in terms of numbers and types of acres that would be treated using herbicides, but does include new SOPs and mitigation measures to reduce the risks associated with the use of herbicides.

## Public Review and Comment on the Final Programmatic EIS

The NOA of the *Final Programmatic Environmental Impact Statement and Environmental Report for Vegetation Treatments on Public Lands Administered by the Bureau of Land Management in the Western United States, Including Alaska* was published in the Federal Register on June 29, 2007 (Federal Register, Volume 72, Number 125, Pages 35718-35719). The public review period was from June 29, 2007, through July 30, 2007.

A total of 36 individual written comment letters and 3 facsimile comment letters were received on the Final PEIS, PER, and BA. In addition, 15 mailed and 136 facsimiled petition letters originating from a single advocacy group's website were received by the BLM. The advocacy group also mailed a box containing an additional estimated 2,500 copies of the same petition letter. The petition letters were electronically-generated and were not considered unique comment letters requiring further agency consideration or response.

BLM_0000039

The PEIS core team and management reviewed the comments on the BLM's Preferred Alternative and other issues raised by the public. A review of the comment letters received identified no substantive or significant new issues not previously addressed in the Draft or Final PEIS, PER or BA. No new information was identified that indicated that the BLM should modify the final Preferred Alternative or alter the decision to select the Preferred Alternative in this ROD.

BLM_0000040

BLM_0000041

## APPENDIX A

# PROTOCOL FOR IDENTIFYING, EVALUATING, AND USING NEW HERBICIDES

BLM_0000043

# APPENDIX A

# PROTOCOL FOR IDENTIFYING, EVALUATING, AND USING NEW HERBICIDES

The U.S. Department of the Interior Bureau of Land Management (USDI BLM) may become aware of new herbicide active ingredients, products, and technologies that are developed and marketed in the future, and may consider application of these products or technologies in vegetation treatment projects. The BLM may also want to use herbicide active ingredients that were approved for use by earlier EIS Records of Decisions (RODs), but are not approved for use under this ROD for the *Final Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement* (PEIS). This appendix discusses the procedures that the BLM would follow if an alternative is identified in a ROD that allows the BLM to use herbicide active ingredients approved for use in the past, and if new herbicide active ingredients are approved for use in the future.

## Identification and Approval of New Chemical Products and Technologies

The means by which the BLM could learn of new products and their applications include, but are not limited to, through professional networking, technical research and publications, and vendor marketing.

## Networking

Participation in professional networks is an important method for staying current on new herbicides, yielding information on the technical, regulatory, efficacy, and environmental aspects of herbicide products in the development phase and those currently on the market. The primary professional associations that BLM land managers participate in and network with include, but are not limited to:

- U.S Environmental Protection Agency (USEPA) Office of Pesticide Programs;

- U.S. Fish and Wildlife Service (USFWS);
- National Oceanic and Atmospheric Administration National Marine Fisheries Service (NMFS);
- U.S Department of Agriculture (USDA) Agricultural Research Service;
- Natural Resource Conservation Service;
- Weed Science Society of America;
- Western Society of Weed Science;
- Society for Range Management;
- State pest control associations;
- State departments of agriculture;
- Universities and colleges;
- University extension services;
- County conservation districts; and
- County weed districts.

For the most part, networking occurs at the local level, with BLM professional staff and managers working with local representatives of the organizations mentioned above. Bureau of Land Management state weed coordinators and vegetation management professionals often represent the agency at annual meetings and workshops. BLM Washington Office managers and staff network at national and international level annual meetings, sponsor and attend regional and local meetings and workshops, and participate in field trips to treatment demonstration areas on public or private lands.

## Research and Demonstration

Demonstration areas for current and emerging technologies play an important role in facilitating research and evaluating efficacy of treatment applications. Current BLM practice allows for limited and controlled use of new herbicides on demonstration plots up to 5 acres in size, with a maximum of 15 acres per field office. Approval to adopt a new herbicide for research and demonstration use is provided by the Washington Office after an initial evaluation of USEPA

BLM_0000044

NEW HERBICIDE EVALUATION PROTOCOL

Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) registration materials and risk assessments. If research and demonstration results appear favorable, the BLM then considers the herbicide for general approval after further human health and ecological risk assessments are undertaken, and the results are evaluated through the National Environmental Policy Act (NEPA) process.

## Technical Research and Publications

In addition to the professional journals associated with vegetation management societies and associations, the BLM obtains information on vegetation management and herbicide treatments from the following sources: USDA Agricultural Research Service research publications, university research summaries, cooperative extension service publications, USEPA registration data, toxicological and risk assessment studies, literature summaries, and technical databases. Databases and technical sources consulted by the BLM include: AGRICOLA, Aquatic Sciences and Fisheries Abstracts, Biological Sciences, BIOSIS/Biological Abstracts, Chemical Abstracts/Scifinder Scholar, Environmental Science and Pollution Management, MedLine, Safety Science and Risk, Toxline, Water Resources Abstracts, Web of Science/Science Citation Index, and Zoological Records. The general public and non-governmental organizations also provide the BLM with information through the NEPA process and other participatory processes.

## Vendor Marketing

Vendors of invasive plant control technologies, including agrochemical company representatives, contact the BLM to introduce new active ingredients and new formulations, and to provide updates on existing products. These contacts may come in the form of mailed brochures or advertisements, telephone contacts, or personal visits. Companies may sponsor seminars in local cities and towns to promote and educate local, county, state, and federal professionals in the area on the safe use of products and technologies.

Occasionally, members of the public who are interested in various approaches to vegetation treatment send relevant information to the BLM. As with vegetation treatment methods identified through other avenues, if the BLM determines that the approach may have some utility for meeting its needs, a product demonstration or additional information may be requested.

## Determining the Need for New Herbicides

In order for the BLM to consider and approve a new active ingredient or formulation, the BLM must first consider whether there is a need for an available product. Factors that would be considered when assessing the need for adopting an available product include, but are not limited to: spectrum of application, efficacy, factors that could limit efficacy, extent or scope of use, cost, availability, availability of substitute or alternative products or technologies, expected effectiveness compared to any currently used methods, previous use reports at other sites and their outcomes, results from research and demonstration use, training and personnel requirements, and any other relevant factors including hazards and risks. Once a need is determined, the BLM would then integrate the approval process with its annual budget cycle. In general, the approval/budget process should take approximately 2 fiscal years to complete once a need for an available product is identified (see Figure A-1).

The determination for the need is a primarily a "bottom up" process that would typically start with the BLM field office collecting information regarding the need to: 1) add a new active ingredient to the BLM list of approved active ingredients; 2) modify existing herbicide product labels (e.g., add aerial applications to a label); or 3) identify new active ingredients through contacts within the local research community. Once the BLM field office determines a need, it would provide a summary and request as an attachment to its end-of-year pesticide use report.

Once the request is made, it would then go to the state weed or pesticide coordinator, who would review the request and any other requests received. The state weed or pesticide coordinator would then screen the suggestions and requests, clarify any information required, submit additional requests and suggestions identified throughout the year by other sources, and provide a single summary request to the BLM Washington, D.C., office with its annual statewide pesticide use report.

Before an herbicide active ingredient is proposed for consideration by the BLM field or state office, it will have a completed USEPA FIFRA registration in place, and be labeled for use on the site proposed (e.g. rangeland, pasture, non-cropland, aquatic habitat). The

BLM_0000045



**Figure A-1. New Herbicide Evaluation and Approval Process.**

BLM will not consider any active ingredients in its review and approval process, including research and demonstration, for products proposed to be registered, or in the registration process, before the FIFRA registration process is complete. The BLM will comply with changes in label directions that may occur in the future, and will comply with state registration requirements. Thus, if current state requirements do not allow the application of an herbicide being considered for use by the BLM, the BLM will not apply that herbicide in the state where it is not approved for use.

Proposals and suggestions will be received and reviewed by the BLM office in Washington, D.C. Specialists involved in this review will include the senior weed specialist, integrated pest management specialist, rangeland specialist, and others who may have an interest in the determination to be made. This group will determine whether the new active ingredient being proposed will benefit the BLM, or if the benefit will be so limited in scope that the cost to proceed will

not be justified. This group will also determine whether a proposed label modification will benefit the entire BLM. Once the proposals and suggestions have been reviewed, final recommendations will be forwarded by the Rangeland Division Chief to the Assistant Director for Renewable Resources and Planning for inclusion into the following fiscal year's budget process to conduct risk assessments.

## Assessment of Hazards and Risks

Any new herbicide active ingredient considered for use by the BLM must be registered under FIFRA, which requires product performance data relating to its effectiveness. This requirement was designed "to ensure that pesticide products will control the pests listed on the label and that unnecessary pesticide exposure to the environment will not occur as a result of the use of ineffective products" (40 Code of Federal Regulations [CFR] 158.202[i]). Therefore, any new pesticide registered under FIFRA is expected to be generally

BLM_0000046

NEW HERBICIDE EVALUATION PROTOCOL

effective for the labeled uses. To further assess the potential for site-specific effectiveness prior to an actual application in the field, the BLM field office manager will investigate its use through professional networks, technical publications, and research reports, such as those described in the previous section.

As stated above, the BLM only uses herbicide products that are registered by the USEPA under FIFRA. For an herbicide to be considered for use on public lands, a body of USEPA-reviewed toxicological, environmental fate, and ecotoxicity data submitted by the pesticide manufacturer to support its registration application will be available for review, especially for new active ingredients. Active ingredients for products undergoing reregistration could have fewer data available if the original registration package did not include extensive ecological toxicology data. These data could then be used to conduct an assessment of the potential human health and ecological risks from the herbicide's use, including, but not limited to, the following components:

- Identification of potential use patterns, including target plants, formulation, application methods, locations to be treated, application rate, and anticipated frequency of use.

- Review of chemical hazards relevant to the human health risk assessment, including systemic and reproductive effects, skin and eye irritation, allergic hypersensitivity, carcinogenicity, dermal absorption, eurotoxicity, immunotoxicity, and endocrine disruption.

- Estimation of exposure to workers applying the chemical or reentering a treated area.

- Environmental fate and transport, including drift, leaching to groundwater, and runoff to surface streams and ponds.

- Estimation of exposure to members of the public.

- Review of available ecotoxicity data, including hazards to mammals, birds, reptiles, amphibians, fish, and aquatic invertebrates.

- Estimation of exposure to terrestrial and aquatic wildlife species.

- Characterization of risk to human health and wildlife.

If the available toxicity or ecotoxicity data were inconclusive, or if substantial disagreement should occur among the results of technical studies that could affect the potential risk conclusions for the chemical, the BLM will conduct a formal peer review of the available scientific information to develop a consensus as to the endpoint(s) in question. The peer review process will include the following steps, based largely on USEPA's peer review process (USEPA 2000):

- The BLM will conduct a literature search of studies submitted to the USEPA, studies published in professional journals, and research projects conducted by other government agencies or universities. The identified literature will be indexed and abstracted.

- A peer review committee will be formed, consisting of reviewers with recognized relevant technical expertise, who represent a balanced range of scientific points of view, and who do not have any real or perceived bias or conflict of interest. The peer reviewers will be supplied with their charge, the results of the literature review, and a description of the issue at hand.

- The input of each reviewer will be sent to BLM. If the results of the peer review were not consistent at this point, a working session will be convened, in which the peer reviewers will come together to discuss the technical aspects of the questions and attempt to reach a consensus.

The details of the peer review process will be determined by the question to be answered and the nature of the controversy. To the extent they are relevant, the guidelines and processes in USEPA's *Peer Review Handbook* (USEPA 2000) will be followed.

After making a decision to budget for the risk assessment(s), the next step will be to review the human health and ecological risk assessment protocols. The initial protocols to be reviewed are the protocols used in the PEIS effort for the human health risk assessment and ecological risk assessment (see appendices B and C of the PEIS; ENSR 2004, 2005). The BLM assumes there will be further research conducted on a continuing and ongoing basis, and environmental standards and end-points would change over time, as the science was refined. There would be regulatory changes, as well, to keep pace with new information. Therefore, it is

BLM_0000047

required that the risk assessment protocols be reviewed by the BLM to ensure they reflect the best science available and to ensure current standards for environmental review are utilized while the risk assessments are conducted. If there were new information, or changes to environmental standards were identified, the protocols will be revised as required to meet the new standards prior to conducting additional risk assessments, whether for new active ingredients or new risk assessments for previously-approved active ingredients. Standards for literature review in the protocols will also be reviewed and updated as necessary to ensure that all ecotoxicological literature available was identified prior to conducting a risk assessment.

# NEPA Documentation

The potential use of new herbicide active ingredients will require a review to ensure compliance with NEPA. The review will follow the process outlined in the BLM *National Environmental Policy Act Handbook* (H-1790-1; USDI BLM 1988). The review process will consist of the steps outlined in the following text.

## Review Existing NEPA Documents

The following text describes the types of NEPA documents that would be reviewed to determine whether any have fully covered the use of the proposed new herbicide.

### BLM NEPA Documents

The BLM will review this PEIS or other agency Programmatic EISs for relevant information about the proposed herbicide. The BLM will also review NEPA documents prepared by other federal agencies with the BLM as a cooperating agency for relevant information.

### Other Agency NEPA Documents

NEPA documents for which the BLM was not listed as a cooperating agency, but for which the scope is relevant to evaluation of the proposed herbicide, would also be reviewed by the BLM. Possible source agencies could include the USDA Forest Service, National Park Service, USDA Animal and Plant Health Inspection Service, and the military services.

Depending on the outcome of the review, it might be appropriate to tier, supplement, or incorporate by reference parts or all of existing document(s) as part of

the document preparation process:

- *Tiering* (40 CFR 1508.28) could be used to prepare new, more specific, or more narrow environmental documents without duplicating relevant parts of previously prepared general documents, such as this PEIS. Tiering is mostly used to avoid unnecessary paperwork; documents can be tiered only if decisions made in the new document would not change or modify the decision(s) of the more general document.

- *Supplementing* (40 CFR 1502.9c) is most often used to address alternatives not previously analyzed, and may lead to a new decision. In this instance, a supplemental EIS (SEIS) to this PEIS could be prepared. Supplemental documents are generally prepared when there is a substantial change in the proposed action that is relevant to environmental concerns; that is, if there are significant new circumstances or facts relevant to environmental concerns and bearing on proposed action or impacts that were not addressed in the previous analysis. If the existing PEIS is supplemented, the same standard procedural and documentation requirements for EISs are followed (see Chapter 5 of the *National Environmental Policy Act Handbook*; USDI BLM 1988), except that additional scoping is optional. In addition, the SEIS must identify the EIS being supplemented and explain the relationship to the prior analysis early in the text. Further, the SEIS should identify changes in the proposed project and/or significant new information or changed circumstances that necessitate preparation of the supplement.

- *Incorporating by reference* (40 CFR 1502.21) is a technique used to avoid redundancies in analysis and to reduce the bulk of a NEPA document. An EIS must identify the documents that are incorporated by reference and indicate where they are available for public review. Relevant portions of the incorporated analysis must be referenced by page number, and summarized in the EIS to the extent necessary to provide the decisionmaker and public with an understanding of significance of the referenced material to the current analysis. The new NEPA document must be able to stand alone.

BLM_0000048

If existing NEPA documentation was found to be adequate, but the BLM was not formally a cooperating agency on the document, then the BLM will adopt the document to comply with NEPA; adoption will be in accordance with the requirements set forth in 40 CFR 1506.3.

If existing NEPA documentation was determined to be inadequate, a new NEPA document will be prepared.

## Prepare a New NEPA Document

The process for complying with NEPA for proposals to approve the use of new active ingredients on BLM public lands differs from the standard NEPA screening process for other federal actions. For example, neither the USDI, nor the BLM have categorical exclusions ("a category of [federal] actions that does not individually or cumulatively have a significant effect on the human environment…for which, therefore, neither an Environmental Assessment (EA) nor an EIS is required;" 40 CFR 1508.4) that address the use of herbicides; therefore, this step does not apply. The BLM, through this and previous EISs, has already determined that approval of herbicides for future use on public lands is a controversial federal action significantly affecting the human environment. It is therefore inappropriate to use an EA and Finding of No Significant Impact (FONSI) for such approval. This is not to say a particular project involving the use of herbicides could not be assessed with an EA level analysis, properly tiered to a land use plan EIS or other NEPA document, such as this Programmatic EIS. This determination of significance only applies to the approval of a new active ingredient for use by BLM overall. Site-specific impacts for any project using herbicides will be assessed at a level appropriate for the project, using the standards for "Significantly" found under 40 CFR 1508.27.

Initially, the BLM will use this PEIS as its basis for conducting future risk assessments and approvals. Following the guidance under 40 CFR 1502.9 (4) *Environmental Impact Statement. Draft, Final and Supplemental Statements*, the BLM will conduct risk assessments on new active ingredients and build on the analysis contained in this PEIS through the issuance of a SEIS. A final decision on whether an active ingredient was approved will be recorded in a Record of Decision. Supplemental EISs will be utilized for approvals of new active ingredients until such time as the need for a new programmatic EIS was warranted and such a document was prepared. For cost efficiency, it is recommended

that BLM assess several active ingredients together in one Supplemental EIS.

## Special Status Species

Federal policies and procedures for protecting federally-listed threatened and endangered plant and animal species, and species proposed for listing, were established by the Endangered Species Act (ESA) of 1973 and regulations issued pursuant to the Act. The purposes of the Act are to provide mechanisms for the conservation of threatened and endangered species and their habitats. Under the ESA, the Secretary of the Interior is required to determine which species are threatened or endangered and to issue recovery plans for those species.

Section 7 of the ESA specifically requires all federal agencies to use their authorities in furtherance of the ESA to carry out programs for the conservation of listed species, and to ensure that no agency action is likely to jeopardize the continued existence of a listed species or adversely modify critical habitat. Policy and guidance (BLM Manual 6840) also stipulates that species proposed for listing are managed at the same level of protection as listed species.

The BLM state directors may designate sensitive species in cooperation with their respective state. These sensitive species (special status) must receive, at a minimum, the same level of protection as federal candidate species. The BLM will also carry out management for the conservation of state-listed species, and state laws protecting these species shall apply to all BLM programs and actions to the extent that they are consistent with the Federal Land Policy and Management Act (FLPMA) and other federal laws.

The BLM will consult with the USFWS and NMFS should the BLM decide to use new herbicides or herbicide-application technologies in the future, as required under Section 7 of the ESA. As part of this process, the BLM will prepare a consultation package that could include a description of the program; species listed as threatened or endangered, species proposed for listing, and critical habitats that could be affected by the program; and a Biological Assessment (BA) that evaluates the likely impacts to listed species, species proposed for listing, and critical habitats from the proposed vegetation treatment program. The BLM will also provide guidance on actions that will be taken by the BLM to avoid adversely impacting species or destroying critical habitat.

Before any vegetation treatment or ground disturbance occurs, BLM policy requires a survey of the project site for species listed or proposed for listing, or special status species. This is done by a qualified biologist consulting state and local databases and visiting the site at the appropriate season. If a proposed project may affect a proposed or listed species or its critical habitat, the BLM consults with the USFWS and/or NMFS. A project with a "may affect, likely to adversely affect" determination requires formal consultation and receives a Biological Opinion from the USFWS and/or NMFS. A project with a "may affect, not likely to adversely affect" determination requires informal consultation and receives a concurrence letter from USFWS and/or NMFS.

# References

ENSR. 2004. Vegetation Treatments Programmatic EIS Ecological Risk Assessment Protocol. Report Prepared for the Bureau of Land Management, Reno, Nevada. Westford, Massachusetts.

ENSR. 2005. Human Health Risk Assessment Final Report. Report Prepared for the Bureau of Land Management, Reno, Nevada. Westford, Massachusetts.

U.S. Department of the Interior Bureau of Land Management (USDI BLM). 1988. National Environmental Policy Act Handbook. Bureau of Land Management Handbook H-1790-1 Washington, D.C.

U.S. Environmental Protection Agency (USEPA). 2000. Peer Review Handbook 2nd Edition. Washington, D.C. Available at: http://www.epa.gov/osp/spc/prhandbk.pdf.

BLM_0000050

BLM_0000051

## APPENDIX B

# HERBICIDE TREATMENT STANDARD OPERATING PROCEDURES

BLM_0000052

BLM_0000053

# APPENDIX B

# HERBICIDE TREATMENT STANDARD OPERATING PROCEDURES

This section identifies standard operating procedures (SOPs) that will be followed by the U.S. Department of the Interior Bureau of Land Management (USDI BLM) under all alternatives to ensure that risks to human health and the environment from herbicide treatment actions will be kept to a minimum. Standard operating procedures are the management controls and performance standards required for vegetation management treatments. These practices are intended to protect and enhance natural resources that could be affected by future vegetation treatments.

## Prevention of Weeds and Early Detection and Rapid Response

Once weed populations become established, infestations can increase and expand in size. Weeds colonize highly disturbed ground and invade plant communities that have been degraded, but are also capable of invading intact communities. Therefore, prevention, early detection, and rapid response are the most cost-effective methods of weed control. Prevention, early detection, and rapid response strategies that reduce the need for vegetative treatments for noxious weeds should lead to a reduction in the number of acres treated using herbicides in the future by reducing or preventing weed establishment.

As stated in the BLM's *Partners Against Weeds: An Action Plan for the BLM*, prevention and public education are the highest priority weed management activities. Priorities are as follows:

- Priority 1: Take actions to prevent or minimize the need for vegetation control when and where feasible, considering the management objectives of the site.

- Priority 2: Use effective nonchemical methods of vegetation control when and where feasible.

- Priority 3: Use herbicides after considering the effectiveness of all potential methods or in combination with other methods or controls.

Prevention is best accomplished by ensuring the seeds and vegetatively reproductive plant parts of new weed species are not introduced into new areas.

The BLM is required to develop a noxious weed risk assessment when it is determined that an action may introduce or spread noxious weeds or when known habitat exists. If the risk is moderate or high, the BLM may modify the project to reduce the likelihood of weeds infesting the site, and to identify control measures to be implemented if weeds do infest the site.

To prevent the spread of weeds, the BLM takes actions to minimize the amount of existing non-target vegetation that is disturbed or destroyed during project or vegetation treatment actions (Table B-1). During project planning, the following steps are taken:

- Incorporate measures to prevent introduction or spread of weeds into project layout, design, alternative evaluation, and project decisions.

- During environmental analysis for projects and maintenance programs, assess weed risks, analyze potential treatment of high-risk sites for weed establishment and spread, and identify prevention practices.

- Determine prevention and maintenance needs, to include the use of herbicides if needed, at the onset of project planning.

- Avoid or remove sources of weed seed and propagules to prevent new weed infestations and the spread of existing weeds.

During project development, weed infestations are prioritized for treatment in project operating areas and along access routes. Weeds present on or near the site are identified, a risk assessment is completed, and weeds are controlled as necessary. Project staging areas are weed free, and travel through weed infested areas is avoided or minimized. Examples of prevention actions to be followed during project activities include cleaning all equipment and clothing before entering the project site; avoiding soil disturbance and the creation of other

BLM_0000054

STANDARD OPERATING PROCEDURES

soil conditions that promote weed germination and establishment; and using weed-free seed, hay, mulch, gravel, soil, and mineral materials on public lands where there is a state or county program in place.

Conditions that enhance invasive species abundance should be addressed when developing mitigation and prevention plans for activities on public lands. These conditions include excessive disturbance associated with road maintenance, poor grazing management, and high levels of recreational use. If livestock grazing is managed to maintain the vigor of native perennial plants, particularly grasses, the chance of weeds invading rangeland is much less. By carefully managing recreational use and educating the public on the potential impacts of recreational activities on vegetation, the amount of damage to native vegetation and soil can be minimized at high use areas, such as campgrounds and off-highway vehicle (OHV) trails. Early detection in recreation areas is focused on roads and trails, where much of the weed spread occurs.

The BLM participates in the National Early Warning and Rapid Response System for Invasive Plants (Figure B-1). The goal of this System to minimize the establishment and spread of new invasive species through a coordinated framework of public and private processes by:

- Early detection and reporting of suspected new plant species to appropriate officials;

- Identification and vouchering of submitted specimens by designated specialists;

- Verification of suspected new state, regional, and national plant records;

- Archival of new records in designated regional and plant databases;

- Rapid assessment of confirmed new records; and

- Rapid response to verified new infestations that are determined to be invasive.

## Herbicide Treatment Planning

BLM Manual 9011 (*Chemical Pest Control*) outlines the policies, and BLM Handbook H-9011-1 (*Chemical Pest Control*) outlines the procedures, for use of herbicides on public lands. As part of policy, the BLM is required to thoroughly evaluate the need for chemical treatments and their potential for impact on the environment. The BLM is required to use only U.S.

Environmental Protection Agency (USEPA)-registered herbicides that have been properly evaluated under National Environmental Policy Act (NEPA), and to carefully follow label directions and additional BLM requirements.

An operational plan is developed and updated for each herbicide project. The plan includes information on project specifications, key personnel responsibilities, and communication, safety, spill response, and emergency procedures. For application of herbicides not approved for aquatic use, the plan should also specify minimum buffer widths between treatment areas and water bodies. Recommended widths are provided in BLM Handbook H-9011-1 (*Chemical Pest Control*), but actual buffers are site and herbicide active ingredient specific, and are determined based on a scientific analysis of environmental factors, such as climate, topography, vegetation, and weather; timing and method of application; and herbicide risks to humans and non-target species. Table B-2 summarizes important SOPs that should be used when applying herbicides to help protect resources of concern on public lands.

## Revegetation

Disturbed areas may be reseeded or planted with desirable vegetation when the native plant community cannot recover and occupy the site sufficiently.

Determining the need for revegetation is an integral part of developing a vegetation treatment. The most important component of the process is determining whether active (seeding/planting) or passive (natural recovery) revegetation is appropriate.

U.S. Department of the Interior policy states, "Natural recovery by native plant species is preferable to planting or seeding, either of natives or non-natives. However, planting or seeding should be used only if necessary to prevent unacceptable erosion or resist competition from non-native invasive species" (620 Departmental Memorandum 3 2004). This policy is reiterated in the USDI *Burned Area Emergency Stabilization and Rehabilitation* Manual, the BLM *Burned Area Emergency Stabilization and Rehabilitation* Manual (BLM H-1742-1), and the *Interagency Burned Area Rehabilitation Guidebook*.

BLM_0000055

**TABLE B-1**
**Prevention Measures**

| BLM Activity | Prevention Measure |
|---|---|
| Project Planning | • Incorporate prevention measures into project layout and design, alternative evaluation, and project decisions to prevent the introduction or spread of weeds.<br>• Determine prevention and maintenance needs, including the use of herbicides, at the onset of project planning.<br>• Before ground-disturbing activities begin, inventory weed infestations and prioritize areas for treatment in project operating areas and along access routes.<br>• Remove sources of weed seed and propagules to prevent the spread of existing weeds and new weed infestations.<br>• Pre-treat high-risk sites for weed establishment and spread before implementing projects.<br>• Post weed awareness messages and prevention practices at strategic locations such as trailheads, roads, boat launches, and public land kiosks.<br>• Coordinate project activities with nearby herbicide applications to maximize the cost-effectiveness of weed treatments. |
| Project Development | • Minimize soil disturbance to the extent practical, consistent with project objectives.<br>• Avoid creating soil conditions that promote weed germination and establishment.<br>• To prevent weed germination and establishment, retain native vegetation in and around project activity areas and keep soil disturbance to a minimum, consistent with project objectives.<br>• Locate and use weed-free project staging areas. Avoid or minimize all types of travel through weed-infested areas, or restrict travel to periods when the spread of seeds or propagules is least likely.<br>• Prevent the introduction and spread of weeds caused by moving weed-infested sand, gravel, borrow, and fill material.<br>• Inspect material sources on site, and ensure that they are weed-free before use and transport. Treat weed-infested sources to eradicate weed seed and plant parts, and strip and stockpile contaminated material before any use of pit material.<br>• Survey the area where material from treated weed-infested sources is used for at least 3 years after project completion to ensure that any weeds transported to the site are promptly detected and controlled.<br>• Prevent weed establishment by not driving through weed-infested areas.<br>• Inspect and document weed establishment at access roads, cleaning sites, and all disturbed areas; control infestations to prevent weed spread within the project area.<br>• Avoid acquiring water for dust abatement where access to the water is through weed-infested sites.<br>• Identify sites where equipment can be cleaned. Clean equipment before entering public lands.<br>• Clean all equipment before leaving the project site if operating in areas infested with weeds.<br>• Inspect and treat weeds that establish at equipment cleaning sites.<br>• Ensure that rental equipment is free of weed seed.<br>• Inspect, remove, and properly dispose of weed seed and plant parts found on workers' clothing and equipment. Proper disposal entails bagging the seeds and plant parts and incinerating them. |
| Revegetation | • Include weed prevention measures, including project inspection and documentation, in operation and reclamation plans.<br>• Retain bonds until reclamation requirements, including weed treatments, are completed, based on inspection and documentation.<br>• To prevent conditions favoring weed establishment, reestablish vegetation on bare ground caused by project disturbance as soon as possible using either natural recovery or artificial techniques.<br>• Maintain stockpiled, uninfested material in a weed-free condition. |

BLM_0000056

STANDARD OPERATING PROCEDURES

**TABLE B-1 (Cont.)**
**Prevention Measures**

| BLM Activity | Prevention Measure |
|---|---|
| Revegetation (Cont.) | • Revegetate disturbed soil (except travel ways on surfaced projects) in a manner that optimizes plant establishment for each specific project site. For each project, define what constitutes disturbed soil and objectives for plant cover revegetation. Revegetation may include topsoil replacement, planting, seeding, fertilization, liming, and weed-free mulching, as necessary.<br>• Where practical, stockpile weed-seed-free topsoil and replace it on disturbed areas (e.g., road embankments or landings).<br>• Inspect seed and straw mulch to be used for site rehabilitation (for wattles, straw bales, dams, etc.) and certify that they are free of weed seed and propagules.<br>• Inspect and document all limited term ground-disturbing operations in noxious weed infested areas for at least 3 growing seasons following completion of the project.<br>• Use native material where appropriate and feasible. Use certified weed-free or weed-seed-free hay or straw where certified materials are required and/or are reasonably available.<br>• Provide briefings that identify operational practices to reduce weed spread (for example, avoiding known weed infestation areas when locating fire lines).<br>• Evaluate options, including closure, to regulate the flow of traffic on sites where desired vegetation needs to be established. Sites could include road and trail rights-of-way (ROW), and other areas of disturbed soils. |

In addition to these handbooks and policy, use of native and non-native seed in revegetation and restoration is guided by BLM Manual 1745 (*Introduction, Transplant, Augmentation and Reestablishment of Fish, Wildlife and Plants)*. This manual states that native species shall be used, unless it is determined through the NEPA process that: 1) suitable native species are not available; 2) the natural biological diversity of the proposed management area will not be diminished; 3) exotic and naturalized species can be confined within the proposed management area; 4) analysis of ecological site inventory information indicates that a site will not support reestablishment of a species that historically was part of the natural environment; or 5) resource management objectives cannot be met with native species.

When natural recovery is not feasible, revegetation can be used to stabilize and restore vegetation on disturbed sites and to eliminate or reduce the conditions that favor invasive species. Reseeding or replanting may be required when there is insufficient vegetation or seed stores to naturally revegetate the site.

To ensure revegetation success, there must be adequate soil for root development and moisture storage, which provides moisture to support the new plants. Chances for revegetation success are improved by selecting seed with high purity and percentage germination; selecting native species or cultivars adapted to the area; planting at proper depth, seeding rate, and time of the year for the region; choosing the appropriate planting method; and, where feasible, removing competing vegetation. Planting mixtures are adapted for the treatment area and site uses. A combination of forbs, perennial grasses, and shrubs is typically used on rangeland sites, while shrubs and trees might be favored for riparian and forestland sites. A mixture of several native plant species and types or functional groups enhances the value of the site for fish and wildlife and improves the health and aesthetic character of the site. Mixtures can better take advantage of variable soil, terrain, and climatic conditions, and thus are more likely to withstand insect infestations and survive adverse climatic conditions.

The USDI BLM Native Seed program was developed in response to Congressional direction to supply native plant material for emergency stabilization and longer-term rehabilitation and restoration efforts. The focus of the program is to increase the number of native plant species for which seed is available and the total amount of native seed available for these efforts. To date, the program has focused on native plant material needs of emergency stabilization and burned area rehabilitation in the Great Basin, but is expanding to focus on areas such as western Oregon, the Colorado Plateau, and most recently the Mojave Desert. The Wildland Fire Management Program funds and manages the effort.

The National Seed Warehouse is a storage facility for the native seed supply. Through a Memorandum of

BLM_0000057

STANDARD OPERATING PROCEDURES



**Figure B-1. National Early Warning and Rapid Response System for Invasive Plants.**

BLM_0000058

STANDARD OPERATING PROCEDURES

Understanding with the BLM Idaho State Director, each state (Idaho, Oregon, Nevada, Utah and Colorado) can reserve an annual seed supply for purchase based on a reasonable projection of annual acreage to be stabilized or rehabilitated over a 5-year period.

The Great Basin Restoration Initiative (GBRI) grew out of concern for the health of the Great Basin after the wildfires of 1999. The goal of GBRI is to implement treatments and strategies to maintain functioning ecosystems and to proactively restore degraded ones at strategic locations. Native plants are emphasized in restoration projects where their use is practical and the potential for success is satisfactory. Monitoring is recommended to measure treatment success. To increase the availability of native plants, especially native forbs, the GBRI has established a collaborative native plant project, the Great Basin Native Plant Selection and Increase Project, to increase native plant availability and the technology to successfully establish these plants. This project is supported by funding from the BLM's Native Plant Initiative.

The BLM will follow the following SOPs when revegetating sites:

- Cultivate previously disturbed sites to reduce the amount of weed seeds in the soil seedbank.

- Revegetate sites once work is completed or soon after a disturbance.

- When available, use native seed of known origin as labeled by state seed certification programs.

- Use seed of non-native cultivars and species only when locally adapted native seed is not available or when it is unlikely to establish quickly enough to prevent soil erosion or weed establishment.

- Use seed that is free of noxious and invasive weeds, as determined and documented by a seed inspection test by a certified seed laboratory.

- Limit nitrogen fertilizer applications that favor annual grass growth over forb growth in newly seeded areas, especially where downy brome (cheatgrass) and other invasive annuals are establishing.

- Use clean equipment, free of plants and plant parts, on revegetation projects to prevent the inadvertent introduction of weeds into the site.

- Where important pollinator resources exist, include native nectar and pollen producing plants in the seed mixes used in restoration and reclamation projects. Include non-forage plant species in seed mixes for their pollinator/host relationships as foraging, nesting, or shelter species. Choose native plant species over manipulated cultivars, especially of forbs and shrubs, since natives tend to have more valuable pollen and nectar resources than cultivars. Ensure that bloom times for the flowers of the species chosen match the activity times for the pollinators. Maintain sufficient litter on the soil surfaces of native plant communities for ground-nesting bees.

- Where feasible, avoid grazing by domestic and wild animals on treatment sites until vegetation is well established. Where total rest from grazing is not feasible, efforts should be made to modify the amount and/or season of grazing to promote vegetation recovery within the treatment area. Reductions in grazing animal numbers, permanent or temporary fencing, changes in grazing rotation, and identification of alternative forage sources are examples of methods that could be used to remove, reduce or modify grazing impacts during vegetation recovery.

# Special Precautions

## Special Status Species

Federal policies and procedures for protecting federally-listed threatened and endangered plant and animal species, and species proposed for listing, were established by the Endangered Species Act of 1973 and regulations issued pursuant to the Act. The purposes of the Act are to provide mechanisms for the conservation of threatened and endangered species and their habitats. Under the Act, the Secretary of the Interior is required to determine which species are threatened or endangered and to issue recovery plans for those species.

Section 7 of the Act specifically requires all federal agencies to use their authorities in furtherance of the Act to carry out programs for the conservation of listed

BLM_0000059

species, and to ensure that no agency action is likely to jeopardize the continued existence of a listed species or adversely modify critical habitat. Policy and guidance (BLM Manual 6840; *Special Status Species*) also stipulates that species proposed for listing must be managed at the same level of protection as listed species.

The BLM state directors may designate special status in cooperation with their respective state. These special status species must receive, at a minimum, the same level of protection as federal candidate species. The BLM will also carry out management for the conservation of state-listed species, and state laws protecting these species will apply to all BLM programs and actions to the extent that they are consistent with Federal Land Policy and Management Act (FLPMA) and other federal laws.

The BLM consulted with the U.S. Fish and Wildlife Service (UFWS) and National Marine Fisheries Service (NMFS) during development of the *Final Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement* (PEIS) as required under Section 7 of the Endangered Species Act. As part of this process, the BLM prepared a formal consultation package that included a description of the program; species listed as threatened or endangered, species proposed for listing, and critical habitats that could be affected by the program; and a Biological Assessment (BA) that evaluated the likely impacts to listed species, species proposed for listing, and critical habitats from the proposed vegetation treatment program. Over 300 species were evaluated in the BA. The BA also provides broad guidance at a programmatic level for actions that will be taken by the BLM to avoid adversely impacting species or critical habitat.

Before any vegetation treatment or ground disturbance occurs, BLM policy requires a survey of the project site for species listed or proposed for listing, or special status species. This is done by a qualified biologist and/or botanist who consults the state and local databases and visits the site at the appropriate season. If a proposed project may affect a proposed or listed species or its critical habitat, the BLM consults with the USFWS and/or NMFS. A project with a "may affect, likely to adversely affect" determination requires formal consultation and receives a Biological Opinion from the USFWS and/or NMFS. A project with a "may affect, not likely to adversely affect" determination requires informal consultation and receives a concurrence letter from USFWS and/or NMFS, unless that action is

implemented under the authorities of the alternative consultation agreement pursuant to counterpart regulations established for *National Fire Plan* projects.

## Wilderness Areas

Wilderness areas, which are designated by Congress, are defined by the Wilderness Act of 1964 as places "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." The BLM manages 175 Wilderness Areas encompassing over 7.2 million acres.

Activities allowed in wilderness areas are identified in wilderness management plans prepared by the BLM. The BLM does not ordinarily treat vegetation in wilderness areas, but will control invasive and noxious weeds when they threaten lands outside wilderness area or are spreading within the wilderness and can be controlled without serious adverse impacts to wilderness values.

Management of vegetation in a wilderness area is directed toward retaining the natural character of the environment. Tree and shrub removal is usually not allowed, except for fire, insect, or disease control. Reforestation is generally prohibited except to repair damage caused by humans in areas where natural reforestation is unlikely. Only native species and primitive methods, such as hand planting, are allowed for reforestation.

Tools and equipment may be used for vegetation management when they are the minimum amount necessary for the protection of the wilderness resource. Motorized tools may only be used in special or emergency cases involving the health and safety of wilderness visitors, or the protection of wilderness values.

Habitat manipulation using mechanical or chemical means may be allowed to protect threatened and endangered species and to correct unnatural conditions, such as weed infestations, resulting from human influence.

The BLM also manages a total of 610 Wilderness Study Areas (WSAs) encompassing nearly 14.3 million acres. These are areas that have been determined to have wilderness characteristics worthy of consideration for wilderness designation. The BLM's primary goals in WSAs are to manage them so as to not impair their wilderness values and to maintain their suitability for

BLM_0000060

STANDARD OPERATING PROCEDURES

preservation as wilderness until Congress makes a determination on their future.

In WSAs, the BLM must foster a natural distribution of native species of plants and animals by ensuring that ecosystems and processes continue to function naturally.

## Cultural Resources

The effects of BLM actions on cultural resources are addressed through compliance with the National Historic Preservation Act, as implemented through a national Programmatic Agreement (*Programmatic Agreement among the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers Regarding the Manner in Which BLM Will Meet Its Responsibilities Under the National Historic Preservation Act*) and state-specific protocol agreements with State Historic Preservation Officers (SHPOs). The BLM's responsibilities under these authorities are addressed as early in the vegetation management project planning process as possible.

The BLM meets its responsibilities for consultation and government-to-government relationships with Native American tribes by consulting with appropriate tribal representatives prior to taking actions that affect tribal interests. The BLM's tribal consultation policies are detailed in BLM Manual 8120 (*Tribal Consultation Under Cultural Resource Authorities*) and Handbook H-8120-1 (*Guidelines for Conducting Tribal Consultation*). The BLM consulted with Native American tribes and Alaska Native groups during development of the PEIS. Information gathered on important tribal resources and potential impacts to these resources from herbicide treatments is presented in the analysis of impacts.

When conducting vegetation treatments, field office personnel consult with relevant parties (including tribes, native groups, and SHPOs), assess the potential of the proposed treatment to affect cultural and subsistence resources, and devise inventory and protection strategies suitable to the types of resources present and the potential impacts to them.

Herbicide treatments, for example, are unlikely to affect buried cultural resources, but might have a negative effect on traditional cultural properties comprised of plant foods or materials significant to local tribes and native groups. These treatments require inventory and protection strategies that reflect the different potential of each treatment to affect various types of cultural resources.

Impacts to significant cultural resources are avoided through project redesign or are mitigated through data recovery, recordation, monitoring, or other appropriate measures. When cultural resources are discovered during vegetation treatment, appropriate actions are taken to protect these resources.

BLM_0000061

TABLE B-2
Standard Operating Procedures for Applying Herbicides

| Resource Element | Standard Operating Procedure |
|---|---|
| Guidance Documents | BLM Handbook H-9011-1 (*Chemical Pest Control*); and manuals 1112 (*Safety*), 9011 (*Chemical Pest Control*), 9012 (*Expenditure of Rangeland Insect Pest Control Funds*), 9015 (*Integrated Weed Management*), and 9220 (*Integrated Pest Management*). |
| General | <ul><li>Prepare operational and spill contingency plan in advance of treatment.</li><li>Conduct a pretreatment survey before applying herbicides.</li><li>Select herbicide that is least damaging to the environment while providing the desired results.</li><li>Select herbicide products carefully to minimize additional impacts from degradates, adjuvants, inert ingredients, and tank mixtures.</li><li>Apply the least amount of herbicide needed to achieve the desired result.</li><li>Follow herbicide product label for use and storage.</li><li>Have licensed applicators apply herbicides.</li><li>Use only USEPA-approved herbicides and follow product label directions and "advisory" statements.</li><li>Review, understand, and conform to the "Environmental Hazards" section on the herbicide product label. This section warns of known pesticide risks to the environment and provides practical ways to avoid harm to organisms or to the environment.</li><li>Consider surrounding land use before assigning aerial spraying as a treatment method and avoid aerial spraying near agricultural or densely populated areas.</li><li>Minimize the size of application area, when feasible.</li><li>Comply with herbicide-free buffer zones to ensure that drift will not affect crops or nearby residents/landowners.</li><li>Post treated areas and specify reentry or rest times, if appropriate.</li><li>Notify adjacent landowners prior to treatment.</li><li>Keep a copy of Material Safety Data Sheets (MSDSs) at work sites. MSDSs are available for review at http://www.cdms.net/.</li><li>Keep records of each application, including the active ingredient, formulation, application rate, date, time, and location.</li><li>Avoid accidental direct spray and spill conditions to minimize risks to resources.</li><li>Consider surrounding land uses before aerial spraying.</li><li>Avoid aerial spraying during periods of adverse weather conditions (snow or rain imminent, fog, or air turbulence).</li><li>Make helicopter applications at a target airspeed of 40 to 50 miles per hour (mph), and at about 30 to 45 feet above ground.</li><li>Take precautions to minimize drift by not applying herbicides when winds exceed >10 mph (>6 mph for aerial applications), or a serious rainfall event is imminent.</li><li>Use drift control agents and low volatile formulations.</li><li>Conduct pre-treatment surveys for sensitive habitat and special status species within or adjacent to proposed treatment areas.</li><li>Consider site characteristics, environmental conditions, and application equipment in order to minimize damage to non-target vegetation.</li><li>Use drift reduction agents, as appropriate, to reduce the drift hazard to non-target species.</li><li>Turn off applied treatments at the completion of spray runs and during turns to start another spray run.</li><li>Refer to the herbicide product label when planning revegetation to ensure that subsequent vegetation would not be injured following application of the herbicide.</li><li>Clean OHVs to remove seeds.</li></ul> |

BLM_0000062

STANDARD OPERATING PROCEDURES

### TABLE B-2 (Cont.)
### Standard Operating Procedures for Applying Pesticides

| Resource Element | Standard Operating Procedure |
|---|---|
| Air Quality<br><br>See Manual 7000 (*Soil, Water, and Air Management*) | • Consider the effects of wind, humidity, temperature inversions, and heavy rainfall on herbicide effectiveness and risks.<br>• Apply herbicides in favorable weather conditions to minimize drift. For example, do not treat when winds exceed 10 mph (>6 mph for aerial applications) or rainfall is imminent.<br>• Use drift reduction agents, as appropriate, to reduce the drift hazard.<br>• Select proper application equipment (e.g., spray equipment that produces 200- to 800-micron diameter droplets [spray droplets of 100 microns and less are most prone to drift]).<br>• Select proper application methods (e.g., set maximum spray heights, use appropriate buffer distances between spray sites and non-target resources). |
| Soil<br><br>See Manual 7000 (*Soil, Water, and Air Management*) | • Minimize treatments in areas where herbicide runoff is likely, such as steep slopes when heavy rainfall is expected.<br>• Minimize use of herbicides that have high soil mobility, particularly in areas where soil properties increase the potential for mobility.<br>• Do not apply granular herbicides on slopes of more than 15% where there is the possibility of runoff carrying the granules into non-target areas. |
| Water Resources<br><br>See Manual 7000 (*Soil, Water, and Air Management*) | • Consider climate, soil type, slope, and vegetation type when developing herbicide treatment programs.<br>• Select herbicide products to minimize impacts to water. This is especially important for application scenarios that involve risk from active ingredients in a particular herbicide, as predicted by risk assessments.<br>• Use local historical weather data to choose the month of treatment. Considering the phenology of the target species, schedule treatments based on the condition of the water body and existing water quality conditions.<br>• Plan to treat between weather fronts (calms) and at appropriate time of day to avoid high winds that increase water movements, and to avoid potential stormwater runoff and water turbidity.<br>• Review hydrogeologic maps of proposed treatment areas. Note depths to groundwater and areas of shallow groundwater and areas of surface water and groundwater interaction. Minimize treating areas with high risk for groundwater contamination.<br>• Conduct mixing and loading operations in an area where an accidental spill would not contaminate an aquatic body.<br>• Do not rinse spray tanks in or near water bodies. Do not broadcast pellets where there is danger of contaminating water supplies.<br>• Maintain buffers between treatment areas and water bodies. Buffer widths should be developed based on herbicide- and site-specific criteria to minimize impacts to water bodies.<br>• Minimize the potential effects to surface water quality and quantity by stabilizing terrestrial areas as quickly as possible following treatment. |
| Wetlands and Riparian Areas | • Use a selective herbicide and a wick or backpack sprayer.<br>• Use appropriate herbicide-free buffer zones for herbicides not labeled for aquatic use based on risk assessment guidance, with minimum widths of 100 feet for aerial, 25 feet for vehicle, and 10 feet for hand spray applications. |
| Vegetation<br><br>See Handbook H-4410-1 (*National Range Handbook*), and manuals 5000 (*Forest Management*) and 9015 (*Integrated Weed Management*) | • Refer to the herbicide label when planning revegetation to ensure that subsequent vegetation would not be injured following application of the herbicide.<br>• Use native or sterile species for revegetation and restoration projects to compete with invasive species until desired vegetation establishes.<br>• Use weed-free feed for horses and pack animals. Use weed-free straw and mulch for revegetation and other activities.<br>• Identify and implement any temporary domestic livestock grazing and/or supplemental feeding restrictions needed to enhance desirable vegetation recovery following treatment. Consider adjustments in the existing grazing permit, to maintain desirable vegetation on the treatment site. |

BLM_0000063

**TABLE B-2 (Cont.)**
**Standard Operating Procedures for Applying Pesticides**

| Resource Element | Standard Operating Procedure |
|---|---|
| Pollinators | • Complete vegetation treatments seasonally before pollinator foraging plants bloom. <br> • Time vegetation treatments to take place when foraging pollinators are least active both seasonally and daily. <br> • Design vegetation treatment projects so that nectar and pollen sources for important pollinators and resources are treated in patches rather than in one single treatment. <br> • Minimize herbicide application rates. Use typical rather than maximum rates where there are important pollinator resources. <br> • Maintain herbicide free buffer zones around patches of important pollinator nectar and pollen sources. <br> • Maintain herbicide free buffer zones around patches of important pollinator nesting habitat and hibernacula. <br> • Make special note of pollinators that have single host plant species, and minimize herbicide spraying on those plants (if invasive species) and in their habitats. |
| Fish and Other Aquatic Organisms <br><br> See manuals 6500 (*Wildlife and Fisheries Management*) and 6780 (*Habitat Management Plans*) | • Use appropriate buffer zones based on label and risk assessment guidance. <br> • Minimize treatments near fish-bearing water bodies during periods when fish are in life stages most sensitive to the herbicide(s) used, and use spot rather than broadcast or aerial treatments. <br> • Use appropriate application equipment/method near water bodies if the potential for off-site drift exists. <br> • For treatment of aquatic vegetation, 1) treat only that portion of the aquatic system necessary to achieve acceptable vegetation management, 2) use the appropriate application method to minimize the potential for injury to desirable vegetation and aquatic organisms, and 3) follow water use restrictions presented on the herbicide label. |
| Wildlife <br><br> See manuals 6500 (*Wildlife and Fisheries Management*) and 6780 (*Habitat Management Plans*) | • Use herbicides of low toxicity to wildlife, where feasible. <br> • Use spot applications or low-boom broadcast operations where possible to limit the probability of contaminating non-target food and water sources, especially non-target vegetation over areas larger than the treatment area. <br> • Use timing restrictions (e.g., do not treat during critical wildlife breeding or staging periods) to minimize impacts to wildlife. |
| Threatened, Endangered, and Sensitive Species <br><br> See Manual 6840 (*Special Status Species*) | • Survey for special status species before treating an area. Consider effects to special status species when designing herbicide treatment programs. <br> • Use a selective herbicide and a wick or backpack sprayer to minimize risks to special status plants. <br> • Avoid treating vegetation during time-sensitive periods (e.g., nesting and migration. sensitive life stages) for special status species in area to be treated. |
| Livestock <br><br> See Handbook H-4120-1 (*Grazing Management*) | • Whenever possible and whenever needed, schedule treatments when livestock are not present in the treatment area. Design treatments to take advantage of normal livestock grazing rest periods, when possible. <br> • As directed by the herbicide product label, remove livestock from treatment sites prior to herbicide application, where applicable. <br> • Use herbicides of low toxicity to livestock, where feasible. <br> • Take into account the different types of application equipment and methods, where possible, to reduce the probability of contamination of non-target food and water sources. <br> • Avoid use of diquat in riparian pasture while pasture is being used by livestock. <br> • Notify permittees of the herbicide treatment project to improve coordination and avoid potential conflicts and safety concerns during implementation of the treatment. <br> • Notify permittees of livestock grazing, feeding, or slaughter restrictions, if necessary. <br> • Provide alternative forage sites for livestock, if possible. |

BLM_0000064

STANDARD OPERATING PROCEDURES

**TABLE B-2 (Cont.)**
**Standard Operating Procedures for Applying Pesticides**

| Resource Element | Standard Operating Procedure |
|---|---|
| Wild Horses and Burros | • Minimize using herbicides in areas grazed by wild horses and burros.<br>• Use herbicides of low toxicity to wild horses and burros, where feasible.<br>• Remove wild horses and burros from identified treatment areas prior to herbicide application, in accordance with herbicide product label directions for livestock.<br>• Take into account the different types of application equipment and methods, where possible, to reduce the probability of contaminating non-target food and water sources. |
| Cultural Resources and Paleontological Resources<br><br>See handbooks H-8120-1 (*Guidelines for Conducting Tribal Consultation*) and H-8270-1 (*General Procedural Guidance for Paleontological Resource Management*), and manuals 8100 (*The Foundations for Managing Cultural Resources*), 8120 (*Tribal Consultation Under Cultural Resource Authorities*), and 8270 (*Paleontological Resource Management*)<br><br>See also: *Programmatic Agreement among the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers Regarding the Manner in Which BLM Will Meet Its Responsibilities Under the National Historic Preservation Act* | • Follow standard procedures for compliance with Section 106 of the National Historic Preservation Act as implemented through the *Programmatic Agreement among the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers Regarding the Manner in Which BLM Will Meet Its Responsibilities Under the National Historic Preservation Act* and state protocols or 36 Code of Federal Regulations Part 800, including necessary consultations with State Historic Preservation Officers and interested tribes.<br>• Follow BLM Handbook H-8270-1 (*General Procedural Guidance for Paleontological Resource Management*) to determine known Condition 1 and Condition 2 paleontological areas, or collect information through inventory to establish Condition 1 and Condition 2 areas, determine resource types at risk from the proposed treatment, and develop appropriate measures to minimize or mitigate adverse impacts.<br>• Consult with tribes to locate any areas of vegetation that are of significance to the tribe and that might be affected by herbicide treatments.<br>• Work with tribes to minimize impacts to these resources.<br>• Follow guidance under Human Health and Safety in the PEIS in areas that may be visited by Native peoples after treatments. |
| Visual Resources<br><br>See handbooks H-8410-1 (*Visual Resource Inventory*) and H-8431-1 (*Visual Resource Contrast Rating*), and manual 8400 (*Visual Resource Management*) | • Minimize the use of broadcast foliar applications in sensitive watersheds to avoid creating large areas of browned vegetation.<br>• Consider the surrounding land use before assigning aerial spraying as an application method.<br>• Minimize off-site drift and mobility of herbicides (e.g., do not treat when winds exceed 10 mph; minimize treatment in areas where herbicide runoff is likely; establish appropriate buffer widths between treatment areas and residences) to contain visual changes to the intended treatment area.<br>• If the area is a Class I or II visual resource, ensure that the change to the characteristic landscape is low and does not attract attention (Class I), or if seen, does not attract the attention of the casual viewer (Class II).<br>• Lessen visual impacts by: 1) designing projects to blend in with topographic forms; 2) leaving some low-growing trees or planting some low-growing tree seedlings adjacent to the treatment area to screen short-term effects; and 3) revegetating the site following treatment.<br>• When restoring treated areas, design activities to repeat the form, line, color, and texture of the natural landscape character conditions to meet established Visual Resource Management (VRM) objectives. |

BLM_0000065

STANDARD OPERATING PROCEDURES

**TABLE B-2 (Cont.)**
**Standard Operating Procedures for Applying Pesticides**

| Resource Element | Standard Operating Procedure |
|---|---|
| Wilderness and Other Special Areas<br><br>See handbooks H-8550-1 (*Management of Wilderness Study Areas (WSAs)*), and H-8560-1 (*Management of Designated Wilderness Study Areas*), and Manual 8351 (*Wild and Scenic Rivers*) | • Encourage backcountry pack and saddle stock users to feed their livestock only weed-free feed for several days before entering a wilderness area.<br>• Encourage stock users to tie and/or hold stock in such a way as to minimize soil disturbance and loss of native vegetation.<br>• Revegetate disturbed sites with native species if there is no reasonable expectation of natural regeneration.<br>• Provide educational materials at trailheads and other wilderness entry points to educate the public on the need to prevent the spread of weeds.<br>• Use the "minimum tool" to treat noxious and invasive vegetation, relying primarily on the use of ground-based tools, including backpack pumps, hand sprayers, and pumps mounted on pack and saddle stock.<br>• Use chemicals only when they are the minimum method necessary to control weeds that are spreading within the wilderness or threaten lands outside the wilderness.<br>• Give preference to herbicides that have the least impact on non-target species and the wilderness environment.<br>• Implement herbicide treatments during periods of low human use, where feasible.<br>• Address wilderness and special areas in management plans.<br>• Maintain adequate buffers for Wild and Scenic Rivers (¼ mile on either side of river, ½ mile in Alaska). |
| Recreation<br><br>See Handbook H-1601-1 (*Land Use Planning Handbook, Appendix C*) | • Schedule treatments to avoid peak recreational use times, while taking into account the optimum management period for the targeted species.<br>• Notify the public of treatment methods, hazards, times, and nearby alternative recreation areas.<br>• Adhere to entry restrictions identified on the herbicide product label for public and worker access.<br>• Post signs noting exclusion areas and the duration of exclusion, if necessary.<br>• Use herbicides during periods of low human use, where feasible. |
| Social and Economic Values | • Consider surrounding land use before selecting aerial spraying as a method, and avoid aerial spraying near agricultural or densely-populated areas.<br>• Post treated areas and specify reentry or rest times, if appropriate.<br>• Notify grazing permittees of livestock feeding restrictions in treated areas, if necessary, as per herbicide product label instructions.<br>• Notify the public of the project to improve coordination and avoid potential conflicts and safety concerns during implementation of the treatment.<br>• Control public access until potential treatment hazards no longer exist, per herbicide product label instructions.<br>• Observe restricted entry intervals specified by the herbicide product label.<br>• Notify local emergency personnel of proposed treatments.<br>• Use spot applications or low-boom broadcast applications where possible to limit the probability of contaminating non-target food and water sources, especially vegetation over areas larger than the treatment area.<br>• Consult with Native American tribes and Alaska Native groups to locate any areas of vegetation that are of significance to the tribes and Native groups and that might be affected by herbicide treatments.<br>• To the degree possible within the law, hire local contractors and workers to assist with herbicide application projects and purchase materials and supplies, including chemicals, for herbicide treatment projects through local suppliers.<br>• To minimize fears based on lack of information, provide public educational information on the need for vegetation treatments and the use of herbicides in an integrated pest management program for projects proposing local use of herbicides. |

BLM_0000066

STANDARD OPERATING PROCEDURES

**TABLE B-2 (Cont.)**
**Standard Operating Procedures for Applying Pesticides**

| Resource Element | Standard Operating Procedure |
|---|---|
| Rights-of-way | • Coordinate vegetation management activities where joint or multiple use of a ROW exists.<br>• Notify other public land users within or adjacent to the ROW proposed for treatment.<br>• Use only herbicides that are approved for use in ROW areas. |
| Human Health and Safety | • Establish a buffer between treatment areas and human residences based on guidance given in the HHRA, with a minimum buffer of ¼ mile for aerial applications and 100 feet for ground applications, unless a written waiver is granted.<br>• Use protective equipment as directed by the herbicide product label.<br>• Post treated areas with appropriate signs at common public access areas.<br>• Observe restricted entry intervals specified by the herbicide product label.<br>• Provide public notification in newspapers or other media where the potential exists for public exposure.<br>• Have a copy of MSDSs at work site.<br>• Notify local emergency personnel of proposed treatments.<br>• Contain and clean up spills and request help as needed.<br>• Secure containers during transport.<br>• Follow label directions for use and storage.<br>• Dispose of unwanted herbicides promptly and correctly. |

BLM_0000067

## APPENDIX C

# ENDANGERED SPECIES ACT SECTION 7 CONSULTATION WITH U.S. FISH AND WILDLIFE SERVICE AND NATIONAL MARINE FISHERIES SERVICE

BLM_0000069



# United States Department of the Interior



FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer To:
FWS/AES/DCHRS/027171

SEP 1 2006

Memorandum

To:        Assistant Director - Renewable Resources and Planning
           Bureau of Land Management

From:      Chief - Branch of Consultation and HCPs

Subject:   Draft Vegetation Treatments Using Herbicides on BLM lands in 17 Western State
           Programmatic EIS

In a letter sent April 24, 2006, you clarified the Draft Vegetation Treatments Using Herbicides
on Bureau of Land Management lands in 17 Western State Programmatic Environmental Impact
Statement (PEIS), including the Draft Vegetation Treatments Using Herbicides on BLM lands in
17 Western State Programmatic Environmental Report (PER) and the Vegetation Treatments on
BLM lands in 17 Western States Programmatic Biological Assessment (BA). With
consideration of that clarification, you requested concurrence that the Vegetation Treatments on
BLM lands in 17 Western states is not likely to adversely affect proposed or listed endangered or
threatened species or proposed or designated critical habitat.

In general, we would prefer to follow an alternative consultation process for evaluating a
program such as the Vegetation Treatments Using Herbicides on BLM lands in 17 Western
States. However, given the available specificity for the nature of the subsequent projects to be
implemented under this program and, more importantly, the nature of the conservation measures
to be incorporated, we will respond to your request herein. As clarified in your April 24, 2006,
memorandum, any proposed actions carried out under this PEIS will follow all Standard
Operating Procedures (SOPs) and conservation measures contained within the PEIS, PER, BA,
the Ecological Risk Assessments and additional conservation measures may be developed as a
result of site-level consultation. Under this circumstance, we concur that the proposed action
would not likely adversely affect any threatened or endangered species under the jurisdiction of
the Service. In addition, all specific actions carried out under this PEIS would also undergo
consultation. Thus, if any subsequent action does not conform to these standards, it may be
necessary to conduct formal consultation on that particular action.

In this particular consultation, we were able to obtain a level of detail and incorporation of
conservation measures, such that we are able to make a determination as to the likely effects that
would result from implementation of the Draft Vegetation Treatments Using Herbicides on BLM
lands in 17 Western State Programmatic EIS. However in future, the Service believes a different



2

approach for program-level consultations, as described below, would be more efficient and more meaningful.

The ESA states that "each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered or threatened species or result in the adverse modification of critical habitat." The ESA does not define "consultation". Although, "consultation" is typically used to describe the section 7(a)(2) process by which federal agencies ensure their actions do not jeopardize listed species, the term consultation is used in both section 7(a)(1) and 7(a)(2). Consultation under section 7(a)(1) would entail federal agencies designing and implementing programs within their authorities that promote the conservation of listed species. This consultation would ensure that overarching federal programs incorporate conservation actions appropriate for listed species. The federal agency would then subsequently consult under 7(a)(2) to insure its actions conducted under the program do not jeopardize listed species.

In general, programs such as the vegetation management PEIS, are better described as a "strategy" for completing specific projects. A fundamental component of this type of strategy is the identification of conservation elements (supporting ecosystem restoration and function) of the subsequent specific actions and by itself has no effect on listed species or designated critical habitat that can be meaningfully identified and evaluated. Since ultimately there would be specific actions that may affect listed species, those individual projects would be subject to section 7(a)(2) consultation. However, any review of the strategy itself under section 7(a)(2) would be meaningless given the multiple layers of assumptions that would need to be made about implementation of the strategy and the potential affects to listed species and designated critical habitat.

The specific review of actions that follow the strategy will be evaluated against the jeopardy and adverse modification/destruction standards. At this smaller scale, a more focused review of impacts and potential effects to species is possible because it takes into consideration relevant information at the local level.

The conservation elements identified as part of the strategy would be subsequently incorporated at the project-level as Best Management Practices (BMPs) or Project Design Criteria (PDCs). The action agency would then consult with the Service to seek advice on crafting BMPS or PDCs that best contribute to the conservation of listed species. Thus, the resulting 7(a)(1) consultation would entail recommendations to the action agency on how to contribute to 7(a)(1) responsibilities. This information would frame the subsequent project-level consultations. The project-level consultation would need to contain all relevant information in a BA including species lists, incorporation of BMPs, and information on conditions within the action area--this would help provide sufficient information for the Services to conduct an evaluation of jeopardy and adverse modification/destruction of critical habitat at that scale.

3

This concludes informal consultation under section 7 of the Endangered Species Act on BLM's vegetation management plan for BLM lands in 17 western States PEIS. If any further material change is made in the PEIS or associated documents that would alter its effects on listed species, you should request reinitiation of consultation. If you have questions about this consultation, please feel free to contact Ms. Marjorie Nelson; Chief, Branch of Consultation and Habitat Conservation Plans (703/358-2106).

Attachment

BLM_0000073



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, Maryland 20910

Bud Cribley
Acting Deputy Assistant Director,
Renewable Resources and Planning
1849 C Street, NW
Washington DC 20240

JUN 2 6 2007

Dear Mr. Cribley:

Enclosed is NOAA's National Marine Fisheries Service (NMFS) biological opinion, issued under the authority of section 7(a)(2) of the Endangered Species Act, on the effects of the Bureau of Land Management's (BLM's) Vegetation Treatment Program. Based on the proposed action as described in BLM's Draft Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement, Draft Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Report and Final Biological Assessment for Vegetation Treatments on Bureau of Land Management Lands in 17 Western States and other information, we conclude that the proposed action is not likely to jeopardize the continued existence of endangered and threatened salmon and trout, threatened green sturgeon and threatened southern resident killer whales as described in the attached biological opinion. We also conclude that the proposed action is not likely to destroy or adversely modify designated critical habitat for threatened and endangered salmonids and southern resident killer whales.

This programmatic vegetation treatment program requires subsequent section 7 review on site-specific vegetation treatments and does not authorize the take of listed species unless that take has been exempted from the section 9 prohibitions by a biological opinion on a site-specific action where a vegetation treatment is anticipated to take listed species. There is no incidental take identified or exempted in this programmatic biological opinion. If take is anticipated for site-specific treatments then the amount or extent of take will be identified during those consultations.

This biological opinion does not cover any new active ingredients that may become available for use in the future. We understand that you intend to conduct a supplemental EIS to support the use of new active ingredients. Additional section 7 review will be required at that time. We also understand that you also will not use diflufenzopyr as a stand-alone active ingredient until it becomes registered by the Environmental Protection Agency for herbicidal use. Appropriate regulatory approvals and the applicable environmental reviews will also be obtained before release of biocontrol agents onto your lands.



Section 7(a)(1) of the Act directs Federal agencies to utilize their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information. NMFS believes the conservation recommendation listed below is consistent with these obligations and, therefore, should be implemented.

> We recommend that BLM make efforts to establish or join regional monitoring programs. Such an effort is underway for Oregon and Washington lead by the United States Forest Service. These efforts will relieve the burden of duplicative monitoring, make more efficient use of increasingly scarce funds and possibly monitor more sites for trends in water quality due to vegetation management activities.

In order for NMFS to be kept informed of actions minimizing or avoiding adverse effects or benefiting listed species or their habitats, we request that BLM notify NMFS' Office of Protected Resources if this conservation recommendation is implemented in the final action.

This concludes formal consultation for the proposed vegetation treatment program. Reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of this action that may affect listed species or critical habitat in a manner or to an extent not previously considered in this biological opinion; (3) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in this biological opinion; or (4) a new species is listed or critical habitat designated that may be affected by the identified action.

## ESSENTIAL FISH HABITAT

The Magnuson-Stevens Fishery Conservation and Management Act requires federal agencies to consult with the Secretary of Commerce, through NMFS, with respect to "any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency that may adversely affect any essential fish habitat (EFH) identified under this Act" (16 U.S.C. §1855(b)(2)). When a federal action agency determines that an action may adversely affect EFH, the federal action agency must initiate consultation with NMFS. In order to carry out this EFH consultation, NMFS' regulations at 50 CFR §600.920(e)(3) call for the federal action agency to submit to NMFS an EFH assessment containing "a description of the action; an analysis of the potential adverse effects of the action on EFH and the managed species; the federal agency's conclusions regarding the effects of the action on EFH; and proposed mitigation, if applicable."

2

In a June 26, 2006 letter, we requested additional information from you to better understand your not likely to adversely affect EFH determination provided on April 24, 2006. We appreciate the additional analysis you provided and after reviewing the revised EFH assessment (dated January 2007), we believe that on a programmatic level the assessment adequately evaluates potential impacts on EFH. As explained in the EFH assessment, you determined that it is not possible to forecast site-specific vegetation management needs below the programmatic level and, therefore, additional evaluations of site-specific effects will be the subject of subsequent "step-down" EFH evaluations. While we believe that an adequate evaluation has been conducted at the programmatic level, we support your proposal to conduct additional, site-specific evaluations of proposed actions to determine if adverse impacts on EFH may occur. Consistent with your rationale for adopting a "step-down" approach, we believe it would be appropriate pursuant to 50 CFR §600.920(j)(3) to defer all EFH Conservation Recommendations to site-specific consultations. If, after conducting such site-specific analyses, you determine a proposed action may adversely affect EFH, we recommend you contact the appropriate NMFS regional office to ensure any EFH consultation requirements are satisfied.

If you have questions regarding the biological opinion, please contact me or Kellie Foster at (301) 713-1401 x131. If you have questions regarding the EFH assessment, please contact David MacDuffee at 301-713-4300 x155.

Sincerely,

James H. Lecky
Director, Office of Protected Resources

cc: Steve Hodapp
1849 C Street, NW
Washington, DC 20240

3

BLM_0000077

# ENDANGERED SPECIES ACT SECTION 7 CONSULTATION

# BIOLOGICAL OPINION

Action Agency:       Bureau of Land Management

Activity:            Proposed Vegetation Treatment Program for 17 Western States

Consulting Agency:   National Marine Fisheries Service Office of Protected Resources

Approved By:         _____

Date Issued:                      JUN 2 6 2007

---

Section 7(a)(2) of the Endangered Species Act (ESA) (16 U.S.C. §1531 *et seq.*) requires that each federal agency shall insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of critical habitat of such species. When the action of a federal agency may affect a protected species, that agency is required to consult with either the National Marine Fisheries Service (NMFS) or the United States Fish and Wildlife Service (USFWS), depending on the protected resources (species and/or critical habitat) that may be affected (50 CFR 402.14(a)). Federal agencies are exempt from this requirement to consult formally if they have concluded that an action "may affect, but is not likely to adversely affect" endangered species, threatened species, or designated critical habitat and NMFS or USFWS concur with that conclusion (50 CFR 402.14(b)).

The Bureau of Land Management (BLM) has initiated formal consultation with the NMFS Office of Protected Resources (OPR) on BLM's national vegetation treatment program. This biological opinion (Opinion) represents OPR's assessment of the national program within which vegetation treatments will be conducted. This consultation does not address the effects of individual, site-specific vegetation treatments conducted by BLM field offices. Site-specific treatments will be addressed in subsequent section 7 consultations conducted by NMFS regions.

This Opinion considers information provided in BLM's Draft Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement, Draft Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Report (PER) and Final Biological Assessment for Vegetation Treatments on Bureau of Land Management Lands in 17 Western States, status reviews and listing documents and other published and unpublished literature. This Opinion was prepared in accordance with section 7 of the ESA and associated implementing regulations.

1

BLM_0000078

## 1.0     CONSULTATION HISTORY

In November 2001, OPR received a request from BLM for technical assistance with their efforts to develop an Environmental Impact Statement (EIS) pursuant to the National Environmental Policy Act (NEPA) and the subsequent section 7 consultation pursuant to the ESA on their proposed vegetation treatment program.  On November 16, 2001, BLM along with USFWS and OPR (Services) met to discus agency points of contact for the technical assistance, procedures for initiating consultation, information necessary to initiate consultation and timelines for completion of the EIS.  Those meetings culminated in a letter from BLM on June 12, 2002, containing the results of those discussions.

In May 2002, the Services and a representative from the Environmental Protection Agency began assisting BLM in the development of the protocols to conduct ecological risk assessments (ERAs) to support the selection of a preferred alternative for the EIS.  In October 2002, BLM requested comments on the draft ERA protocols pursuant to NEPA and section 7 of the ESA.  On February 28, 2003, OPR submitted comments on the ERA protocols to BLM.

On October 2, 2003, BLM requested a meeting with the Services to discuss developing a consultation agreement to govern early coordination for the consultation, establish a dispute resolution process and procedures to evaluate and refine the consultation process. OPR declined to enter into an agreement because:  (1) the published regulations, policy and guidance provides sufficient details about the consultation process that an agreement would be redundant; and (2) the consultation process was flexible enough to accommodate the NEPA process.  OPR stated this position in writing on October 20, 2003 in response to a draft consultation agreement from BLM.

On November 8, 2005, BLM concluded that their proposed use of herbicides may affect and was likely to adversely affect listed species and designated critical habitat and requested initiation of formal consultation.  The request for consultation was accompanied by a Draft Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement (EIS), a Draft Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Report (PER) and a Draft Biological Assessment for Vegetation Treatments on Bureau of Land Management Lands in 17 Western States (BA).

On December 19, 2005, OPR requested a meeting with BLM to clarify the proposed action for consultation (use of herbicides only or the vegetation treatment program) and to discuss the spatial scale and the key assumptions that would guide the section 7 analyses.  On January 18, 2006, the Services met with BLM.  BLM questioned whether the proposed action described in the draft EIS authorized, funded or carried out any action and opined whether the activities described in the draft EIS was an action subject to section 7 consultation.  The Services advised BLM to notify the Services as to whether they would withdraw their request for consultation or proceed with consultation and, if consultation were to proceed, to clarify the proposed action.

BLM_0000079

BLM requested a conference call with the Services on February 27, 2006, to discuss a draft reply to OPR's December 19, 2005, letter in light of the January 18, 2006, meeting. Based on that meeting and subsequent discussions BLM further clarified in a letter dated April 24, 2006, their intent to engage in consultation with the Services and expanded the scope of the consultation to encompass the vegetation treatment program. The proposed treatment program would include all measures currently in use (prescribed fire, mechanical, manual, biological control methods and herbicide use) but would increase the number of active ingredients that could be used during vegetation. BLM also reached a "may affect, not likely to adversely affect" listed species and their critical habitat conclusion on their vegetation treatment program based on conservation measures included in the draft biological assessment, standard operating procedures included in the draft EIS and the use of additional conservation measures developed by local field offices upon proposing site-specific treatments. In response to BLM's conclusion, OPR transmitted a letter of non-concurrence on June 26, 2006, to BLM based on the evidence provided and the reliance on future conservation measures to prevent or mitigate adverse effects to listed species at the site-specific level. This letter also informed BLM that formal consultation was required and identified additional information that was necessary to initiate formal consultation.

BLM requested a meeting with OPR to discuss the non-concurrence letter on November 14, 2006. At the meeting, BLM requested clarification regarding the information requested in OPR's non-concurrence letter. On January 31, 2007, OPR received a final BA which included the requested information. Consultation was initiated on January 31, 2007.

BLM also reached a "may affect, but not likely to adversely affect" conclusion on listed species and critical habitat under USFWS jurisdiction. On September 1, 2006, USFWS issued a concurrence letter to BLM. On February 13, 2007, BLM transmitted the final BA to USFWS for reconsideration. On March 20, 2007, USFWS revalidated their September 1, 2006, concurrence letter.

# BIOLOGICAL OPINION

## Scope of this Biological Opinion

This biological opinion is specific to the activities assessed in the draft EIS and PER and the final BA; therefore, this opinion only addresses vegetation treatment methods that are directly related to reducing hazardous fuels and/or modifying the vegetation community to improve rangeland and forestland health; therefore, vegetation management primarily focused on commercial timber or salvage activities are not evaluated in this biological opinion.

This biological opinion addresses only the active ingredients and formulations containing those active ingredients listed in Table 1 and the adjuvants listed in Table 2. BLM is

BLM_0000080

discontinuing the use of 2,4-DP, asulam, atrazine, fosamine, mefluidide and simazine; therefore, those active ingredients are not addressed in this Opinion. Any vegetation treatments involving active ingredients or adjuvants not listed in Tables 1 or 2 will require review pursuant to section 7 of the ESA.

## 2.0     Description of the Proposed Action

The following describes BLM's national vegetation treatment program. This program includes the process used to determine site- and area-specific vegetation treatments, the methods used for vegetation treatments, standard operating procedures and other protective measures as well as considerations for listed, proposed or future proposed species or critical habitat.

BLM proposes to implement its national vegetation treatment program to reduce hazardous fuels, control unwanted vegetation and improve habitat and resource conditions. Vegetation would be managed on approximately 6 million acres annually in 17 western states using five primary treatment methods: prescribed fire will be used on approximately 2.1 million acres, mechanical methods on approximately 2.2 million acres, manual methods on approximately 271,000 acres, herbicides on approximately 932,000 acres and biological control agents will be used on the remaining 454,000 acres. The 17 states which contain lands that will be managed by this treatment program are: Alaska, Arizona, California, Colorado, Idaho, Montana, North Dakota, South Dakota, Nebraska, Nevada, New Mexico, Oklahoma, Oregon, Texas, Utah, Washington and Wyoming. BLM proposes to use these treatment methods anywhere on the 262 million acres of public lands that it manages in the above listed states, although actual treatment methods, acres treated, and treatment locations would be determined at the local field level and by congressional funding. BLM expects to implement its vegetation treatment program over the next 15 years under the authority of the Federal Land Policy and Management Act of 1976 (FLPMA, 43 U.S.C. 1740 *et seq.*) and Congressional direction as specified in *A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan* (U.S. Department of Interior and U.S. Department of Agriculture Forest Service 2002) as well as several other statutes, policies and manuals as specified below.

**BLM Decision Process for Vegetation Treatments**
BLM developed manuals and policies at the national level to comply with the relevant statutes and other mandates that determine how BLM is to conduct its vegetation treatment program to restore and protect public lands. These manuals and policies are implemented at the field level in the form of Land Use Plans (LUPs) which outline the general resource goals and objectives based on desired future conditions for the land, land use allocations (e.g., timber harvest, grazing allotments) and, land health standards and associated guidelines on how to meet those standards. Activity Level Plans design and select the vegetation treatment methods consistent with the national treatment program to achieve the objectives of the LUPs. Activity Level Plans require inventories of the land

BLM_0000081

including sensitive habitat and listed or otherwise sensitive species. NEPA review is required at all levels of planning from the LUPs to the Activity Level Plans to the site-specific treatment activities. The vegetation treatment program described in this Opinion provides the framework by which site-specific treatments are designed to meet LUP goals and objectives. The vegetation treatment methods including SOPs and protective measures are selected and designed at the Activity-Level planning stage and carried out during the actual site- and area-specific treatments (Project-Level activities). All decisions to treat vegetation require the consideration of protected species, sensitive areas and the principles of integrated pest management (IPM).

Explicit in BLM's approach to its vegetation treatment program are the principles of IPM (See *Protected Species Considerations* section below). The IPM approach specifies that all alternatives available through integrated pest management (including but not limited to prevention, education, biological, cultural, mechanical and chemical methods) are to be explored. BLM may decide to not treat the vegetation in a particular area and instead rely on natural ecological process to return the land to a more natural state although this rarely happens. If there are a variety of viable treatment alternatives for an area, the most cost effective methods shall be chosen. All proposed uses of chemical pest control methods are to be reviewed and studied thoroughly to evaluate the need for such uses and to determine the possible impacts each may have on the environment.

Below are descriptions of the vegetation treatment methods included in BLM's vegetation treatment program.

**Description of Treatment Methods**

**Fire Treatments**
Fire treatment methods will be used on approximately 2.1 million acres of BLM-administered lands. Fire is a treatment method that is used to reduce the buildup of hazardous fuels (dry, dead parts of trees, shrubs and other vegetation that can burn easily), control weeds and maintain fire dependent species and ecosystems. A prescribed fire is the intentional application of fire to fuels under specified conditions of fuels, weather, and other variables. The intent is for the fire to stay within a predetermined area to achieve site-specific resource management objectives. Prescribed burns are utilized only in pre-planned areas and when there are adequate fire management personnel and equipment available to achieve defined resource objectives.

The BLM conducts prescribed fire treatments in accordance with its Prescribed Fire Management Policy, which requires the preparation of a prescribed burning plan prior to every burn. Fuel models are used to set standards for an area to be treated, and the burn is delayed until the natural conditions of the site approach this standard. This method involves preparing the site for the burn, igniting the burn and post-fire activities which include extinguishing any remaining hot spots.

5

**Site Preparation**

Prescribed fire projects typically consist of numerous pre- and post-fire activities in addition to the actual prescribed burn.  The required activities are dependent upon the local conditions and the individual project to be carried out.  The range of possible activities follows:

Road construction and maintenance may be required to provide access to treatment sites.  The extent of work related to this activity is dictated by the condition of the roads leading to the site and the site itself.  Remote locations may require temporary camps for personnel and equipment.  Depending on the size of the project, camps may be large and require daily shuttles of supplies.

Fuel breaklines are constructed prior to a prescribed burn to control and prevent the fire from spreading.  Different types of breaklines are constructed depending on the width needed to contain the fire and the types of fuels needing removal.  Descriptions of breaklines follow.

> Firelines are constructed by removing all fuels down to the bare soil.  Firelines are commonly constructed using hand tools similar to that used during manual control treatment methods.  This type of fireline is often used in conjunction with other activities, such as black lining and wet lining (described below), and brush beating.  Machine-built firelines are created using bulldozers, tractors with plows, et cetera.  This type of fireline is utilized when a fuel break must be wide and/or lengthy, or when smaller fires have the potential to grow rapidly.

> Wet lines are created using water (with or without surfactants) which is sprayed on vegetation to increase moisture content or limit fire spread.  Wet lines are most commonly used in short vegetation or fuel (e.g., grass, pine needles). Because wet lines require large amounts of water, a reliable water source (ponds or streams) must be near the area.  Portable water pumps or pumps mounted on fire engines and in some cases, buckets suspended beneath helicopters may be used to strengthen a fireline or to quickly treat a hot spot.  A helibase or helispot must also be located close to the project, and refueling of the helicopter is typically done on-site.

> A black line is a pre-burned area that is used as a fireline, often in conjunction with other types of firelines.  Vegetation is ignited on the inside of another type of fireline to create a wide fireline.

> An explosive built fireline is created using explosives, though this activity is used only under special circumstances and is uncommon.  A long-linear explosive device is laid across the ground, and quickly removes burnable fuel and exposes soil to stop the spread of a fire.

6

BLM_0000083

Natural breaks in vegetation and fuel, such as rocky ridges, riparian areas, wetlands, or pre-existing breaks such as roads, can also be utilized to help contain prescribed fire.

**Methods of Ignition**

Prescribed fires are ignited using a number of different techniques. Hand-held ignition sources include pressurized kerosene drip torches, propane torches, diesel flame-throwers, flares, and ignition grenades. Hand ignition entails fire personnel walking through the burn area igniting the area in a set pattern. Prescribed burns on large, accessible areas may be started through mechanized methods including truck- or tractor-mounted flame-throwers. Helicopters may be used to aerially release an ignition fuel onto the area to be treated. Aerial ignition allows large, inaccessible areas to be treated in a relatively short amount of time using large drip torches (helitorches) or a "ping-pong" ball dispenser, which releases ping-pong ball sized spheres filled with potassium permanganate onto the area to be treated.

**Post-fire Activities**

After the prescribed burn hot spots are extinguished mostly by dousing any remaining burning spots with water and/or soil. Fire engines are used on flat terrain to bring water to the hot spots, and hose is placed along the ground in areas where vehicles cannot travel. Hoses are supplied with water from portable pumps, fire engines, or water tenders. Hand tools (e.g., shovels, backpack pumps, the Pulaski) are used to cool hotspots in areas that are inaccessible to vehicles and hoses. Firefighters will make sure the fire is extinguished before the site is abandoned.

**Mechanical and Manual Treatments**

Mechanical and manual treatment methods will be used annually on approximately 2.2 million and 271,000 acres, respectively. Mechanical treatments are generally used to remove thick stands of vegetation, often to prepare the site for replanting a desired species. This method involves the use of tractors or other types of vehicles with attached equipment (e.g., chains, plows, harrows, rangeland drills, and mowers). These vehicles tend to remove all vegetation in the path of travel, and often uproot vegetation and disturb the soil. The type of mechanical method used on a particular site is based on characteristics of the undesired species present, seedbed preparation and revegetation needs, topography and terrain, soil characteristics and climatic conditions. Mechanical treatment activities commonly occur in old agricultural areas, industrial sites, and roadsides. Common types of equipment used in mechanical treatments include chaining, tilling and drilling seed, mowing, roller chopping and cutting, blading, grubbing, and feller-bunching.

Chaining entails pulling heavy chains behind two tractors in a "U" or "J" shaped pattern. Chaining works well for crushing brittle brush and uprooting woody plants. This practice can be done on irregular, moderately rocky terrain, on slopes of up to 20%.

7

BLM_0000084

Tilling involves the use of angled disks (disk tilling) or pointed, metal-toothed implements (chisel plowing) to uproot, chop, and mulch vegetation. This technique is commonly used on sites where complete removal of vegetation or thinning is desired, often in conjunction with seeding operations. Tilling equipment is pulled by either a crawler-type tractor or a large four-wheel-drive farm tractor. Tilling works best on areas with smooth terrain, with deep, rock-free soils, and is often used for removal of sagebrush and similar shrubs.

Seed drilling is often used in conjunction with tilling. The drills for seeding are either towed by or mounted on a tractor. The seed drill opens a furrow in the seedbed, deposits a measured amount of seed into the furrow, and then closes the furrow to cover the seed.

Mowing tools, such as rotary mowers or straight-edged cutter bar mowers, can be used to cut herbaceous and woody vegetation above the ground surface. This technique is often implemented along highway rights-of-way (ROW) to reduce fire hazards, improve visibility, prevent snow buildup, or improve the appearance of the area.

Roller chopping tools are heavy bladed drums that cut and crush vegetation up to five inches in diameter using a rolling action. The drums are pulled by crawler-type tractors, farm tractors, or special vehicles designed for forested areas or range improvement projects.

Blading, which also utilizes crawler-type tractors, shears small brush at ground level. Blading use is limited to relatively-level areas and can only be used for certain undesirable plant species.

Grubbing utilizes a brush rake or root rake attached to a crawler-type tractor. This method snares brush and roots below the soil surface and combs it from the soil. Typically, grubbed areas are reseeded to prevent extensive runoff and erosion.

Feller-bunchers are machines that grab trees, cut them at the base, pick them up, and move them into a pile or onto the bed of a truck. They are used in forest thinning to remove potentially hazardous fuels.

Techniques for reseeding an area, commonly used in conjunction with mechanical control methods, include drill seeding and aerial application of seed. Drill seeding is commonly used on areas with moderate slopes, and entails the use of rangeland drills attached to tractors. Aerial seeding is the application of seed using fixed wing aircraft or helicopters.

Manual treatment methods involve the use of hand-operated power tools and hand tools to cut, clear, or prune herbaceous and woody species. A number of hand tools may be used during manual treatments: hand saws, axes, shovels, rakes, machetes, grubbing

8

hoes, mattocks (a combination of axe and grubbing hoe), brush hooks, and hand clippers. Power tools such as chainsaws and power brush saws may also be used.

Manual treatments are most suitable for areas in which the weed infestation is limited and soil types allow for complete removal of the plant material. Pulling also works well on certain plant species. Manual techniques are used in sensitive areas, where other treatment methods would not be appropriate, and in areas that are inaccessible to ground vehicles.

**Biological Control Treatments**
Biological control (biocontrol) agents will be used on approximately 454,000 acres of BLM-administered lands. Biocontrol methods involve the use of living organisms to selectively suppress, inhibit, or control herbaceous and woody vegetation. The most common biological control agents are domestic animals and parasitic insects although mites, nematodes, and pathogens are also used occasionally. Domestic animals, such as sheep and goats will not be used in erosion hazard areas, sites with compactable soils, riparian areas, or steep, erodible slopes. Insects, mites, nematodes, and pathogens are commonly used on sites where the population of target plants is large enough to support a viable population of the control agent, and when adequate numbers of the agents can be obtained. In many cases, three to five biocontrol agents are required to control a single plant species. Activities associated with insects, mites, nematodes, and pathogens as biocontrols include their collection and release, transport by vehicle, inventory and monitoring to determine treatment success and competitive seeding to establish native/desirable plants. Insects, pathogens, and other biological control agents will be tested to ensure that they are host specific, and they will feed only on the target plant, and not on crops, native flora, or endangered or otherwise sensitive plant species. BLM will obtain the appropriate regulatory approvals and conduct the applicable environmental reviews before release of biocontrol agents onto their lands.

**Herbicide Treatments**
Herbicide treatment methods include the application of formulations containing 18 active ingredients (AIs) to treat vegetation on approximately 932,000 acres of BLM-administered lands in the western U.S. and Alaska, annually. Of the 18 AIs BLM proposes to continue to use formulations containing 14 active ingredients (2,4-D, bromacil, chlorsulfuron, clopyralid, dicamba, diuron, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, sulfometuron methyl, tebuthiuron, and triclopyr) but is also proposing to add four new active ingredients (diflufenzopyr [as a formulation with dicamba], diquat, fluridone, and imazapic) to their treatment program. BLM will not use diflufenzopyr as a stand-alone active ingredient until it becomes registered by the Environmental Protection Agency for herbicidal use.

BLM generally uses several formulations of each active ingredient. Table 1 shows the AIs (alone and in combination with other AIs as tank mixtures) and the formulations containing those AIs that BLM proposes for use, the states where the AIs will be applied, the projected number of acres that will be treated and the types of areas (i.e., Rights of Way, rangeland, etc.) where herbicides will be applied. BLM also proposes to add

BLM_0000086