

# The Bureau of Land Management *Today*

**Our Vision**
To enhance the quality of life for all citizens through the balanced stewardship of America's public lands and resources.

**Our Mission**
To sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

**Our Values**
To serve with honesty, integrity, accountability, respect, courage, and commitment to make a difference.

**Our Priorities**
To improve the health and productivity of the land to support the BLM multiple-use mission.

To cultivate community-based conservation, citizen-centered stewardship, and partnership through consultation, cooperation, and communication.

To respect, value, and support our employees, giving them resources and opportunities to succeed.

To pursue excellence in business practices, improve accountability to our stakeholders, and deliver better service to our customers.

BLM_0000167

BLM LIBRARY

88062166



June 2007

# Final

# *Vegetation Treatments Using Herbicides*

## on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement

*Volume 1: Abstract, Executive Summary, and Chapters 1 through 8*

**U.S. Department of the Interior**
**Bureau of Land Management**
FES 07-21



BLM_0000168



# Public Lands Managed by the Bureau of Land Management

**Legend:**
- BLM-managed lands
- BLM-administered minerals underlying federal surface (excluding National Park Service and Fish and Wildlife Service units)
- BLM National Monument
- BLM National Conservation, Recreation, and Protection Areas (National Conservation Areas, National Recreation Areas, Outstanding Natural Areas, and Cooperative Management and Protection Areas)
- Tribal lands where the BLM has trust responsibility for mineral operations
- BLM State Office
- State boundaries
- BLM Headquarters

In the Eastern United States, the BLM manages 40 million acres of subsurface mineral estate and 30,000 acres of surface, mostly small isolated parcels scattered throughout 31 states.

Eastern States are administered by the Eastern States Office in Springfield, VA.

Today, the BLM administers 261.8 million acres of public lands located primarily in 12 western states, including Alaska.

The agency administers 700 million acres of subsurface mineral estate located throughout the country.

BLM_0000169



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Washington, D.C. 20240
http://www.blm.gov



Dear Reader:

Enclosed for your review is the Final *Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic EIS (PEIS)* and the *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Report (PER)*. Together these documents assess, on a National level, the BLM's use of herbicides and describe the environmental effects of using non-herbicide treatment methods, including fire and mechanical, manual, and biological controls.

The Draft PEIS was released for public comment on November 10, 2005 for a 60-day public comment period. On January 9, 2006, the comment period was extended for an additional 30 days until February 10, 2006. Over 3,000 comments have been addressed in the Final PEIS and PER as comment responses and/or changes to the analysis based on the comments received through the public review. Additional information and analysis is included in the FEIS addressing comments related to degradates, use of POEA and R-11 surfactants, and risks associated with endocrine disrupting chemicals. In addition, the FEIS contains subsistence analysis required under Section 801(a) of the Alaska National Interest Lands Conservation Act (ANILCA).

The Final Programmatic EIS assesses five alternative approaches to the use of herbicides to treat vegetation on public lands, details the expected impacts and benefits from the BLM's use of herbicides, and provides analysis to determine which herbicide active ingredients will be approved for use on public lands administered by the BLM in the western United States, including Alaska.

This Final PEIS is available for public review for 30 days. Written comments on the Final PEIS will be accepted until July 30, 2007. Upon evaluation of any comments received, a Record of Decision will be issued or a supplemental analysis undertaken to address any significant information not previously considered within the scope of analysis contained in the Final PEIS. Please send written comments to:

> Bureau of Land Management
> Nevada State Office
> Attn: Brian C. Amme, EIS Project Manager
> 1340 Financial Blvd.
> P.O. Box 12000
> Reno, NV  89520-0006

Sincerely,

Bud Cribley
Acting Assistant Director,
Renewable Resources and Planning

000171




# FINAL

# PROGRAMMATIC ENVIRONMENTAL IMPACT STATEMENT VEGETATION TREATMENTS USING HERBICIDES ON BUREAU OF LAND MANAGEMENT LANDS IN 17 WESTERN STATES

( ) DRAFT

( X )  FINAL

**LEAD AGENCY:**

U.S. Department of the Interior
Bureau of Land Management
Washington Office, Washington, D.C.

**PROJECT LOCATION:**

Alaska, Arizona, California, Colorado, Idaho, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, Texas, South Dakota, Utah, Washington, and Wyoming

**COMMENTS ON THIS FINAL PROGRAMMATIC EIS SHOULD BE DIRECTED TO:**

Mr. Brian Amme
PEIS Project Manager
Nevada State Office
1340 Financial Boulevard
P.O. Box 12000
Reno, Nevada 89520-0006
Fax: (775) 861-6712

**DATE FINAL PROGRAMMATIC EIS FILED WITH THE U.S. ENVIRONMENTAL PROTECTION AGENCY:**

June 29, 2007

**DATE BY WHICH COMMENTS MUST BE POSTMARKED TO THE BLM:**

July 30, 2007

## ABSTRACT

This Final Programmatic Environmental Impact Statement (PEIS) analyzes the potential direct, indirect, and cumulative impacts associated with the Bureau of Land Management's use of herbicides on the human and natural environment. An accompanying Final Programmatic Environmental Report (PER) discloses the potential impacts to vegetation and the environment from utilization of non-herbicide treatment techniques, including, but not limited to, fire, mechanical, manual, and biological control methods. Together, herbicide and non-herbicide treatments make up the integrated pest management program that the BLM would apply to approximately 6 million acres annually of public lands in 17 western U.S. states, including Alaska. Alternatives analyzed in the PEIS include the No Action Alternative, or continuation of present management, as outlined in four previous EISs dating from 1986 to 1992. In addition, four action alternatives were evaluated: 1) the Preferred Alternative, which includes herbicide treatments on about 932,000 acres annually and adoption of four new herbicides for use on public lands; 2) a no herbicide use alternative; 3) a no aerial spraying alternative; and 4) an alternative that would limit herbicide use to non-acetolactate synthase-inhibiting active ingredients.

**RESPONSIBLE OFFICIAL FOR PEIS:**

Bud Cribley
Acting Assistant Director
Bureau of Land Management

BLM_0000173

# EXECUTIVE SUMMARY

BLM_0000174

BLM_0000175

# EXECUTIVE SUMMARY

## Proposed Action and Purpose and Need

The Bureau of Land Management (BLM), an agency of the U.S. Department of the Interior (USDI), administers vegetation on nearly 261 million acres (public lands) in 17 states in the western U.S., including Alaska. Management and control of vegetation on public lands for resource and habitat enhancement is an important function of this agency, including management to reduce the risk of wildfires to people and their property.

The BLM is proposing to treat vegetation on approximately 932,000 acres annually in 17 western states in the U.S., including Alaska, using 14 currently-approved and four new herbicide active ingredients. At present, the BLM treats about 300,000 acres annually using 20 approved herbicides. The proposed action would reduce the risk of catastrophic wildfires by reducing hazardous fuels, restoring fire-damaged lands, and improving ecosystem health by 1) controlling weeds and invasive species; and 2) manipulating vegetation to benefit fish and wildlife habitat, improve riparian and wetlands areas, and improve water quality in priority watersheds.

In recent years, the severity and intensity of wildfires in the West has increased dramatically from levels in the 1970s and 1980s, to a million or more acres annually. Changes in the vegetation on public lands have resulted in increases in hazardous flammable fuels.

Much of the increase in hazardous fuels can be attributed to fire exclusion policies over the past 100 years. Contributors to the change include intermittent- and long-term drought over the past 40 years and an increase in the spread of noxious weeds species and invasive vegetation.

Invasive vegetation and noxious weeds are the dominant vegetation on an estimated 35 million acres of public lands. The estimated rate of weed spread on western public lands in 1996 was 2,300 acres per day. Invasive vegetation and noxious weeds degrade or reduce soil productivity, water quality and quantity, native plant communities, wildlife habitat, wilderness values, recreational opportunities, and livestock forage, and are detrimental to the agriculture and commerce of the U.S. and to public health. Weed infestations can become permanent if left untreated.

In response to the threats of wildfire and invasive vegetation and noxious weeds, the President and Congress have directed the USDI and BLM, through implementation of the *National Fire Plan*, and the *Healthy Forests Restoration Act of 2003*, to take more aggressive actions to reduce catastrophic wildfire risk on public lands. The actions would be taken to protect life and property, and to manage vegetation in a manner that provides for long-term economic sustainability of local communities, improved habitat and vegetation conditions for fish and wildlife, and other public land uses.

The BLM last assessed its use of vegetation treatment methods during the late 1980s and early 1990s, by preparing Environmental Impact Statements (EISs) and Record of Decisions (RODs) that covered vegetation treatment activities in 14 western states in the continental U.S. These EISs evaluated the environmental impacts associated with vegetation control and modification from the use of herbicides, in addition to other treatment methods—manual, mechanical, and biological control methods, and use of fire—on approximately 500,000 acres of public lands a year in the western U.S. The EISs also evaluated the human health and non-target species risks of using 20 herbicide active ingredients on these public lands.

This *Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic EIS* (PEIS) has two primary objectives:

- Determine which herbicide active ingredients are available for use on public lands in the western U.S., including Alaska, to improve the agency's ability to control hazardous fuels and unwanted vegetation. In addition to the herbicides currently approved for use, additional active ingredients are being considered for use by the BLM in order to address emerging weed problems associated with public lands, such as downy brome (cheatgrass) and invasive aquatic species.

BLM_0000176

- In consultation with the U.S. Environmental Protection Agency (USEPA), U.S. Fish and Wildlife Service, and National Oceanic and Atmospheric Administration National Marine Fisheries Service, develop a state-of-the-science human health and ecological risk assessment (ERA) methodology. This methodology would serve as the initial standard for assessing human health and ecological risk for herbicides that may become available for use in the future.

The BLM has also prepared a *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Report* (PER) describing the environmental impacts of using non-herbicide vegetation treatment methods on public lands. Limiting analysis in the PEIS to the use of herbicides, while analyzing other treatment methods in the PER, was done because the primary issue of controversy identified through scoping, and which required National Environmental Policy Act (NEPA) review, was the BLM's continuing and proposed increase in the use of herbicides in vegetation treatment programs needed to implement the *National Fire Plan* and related initiatives. The use of herbicides has been affirmed as a central issue for analysis in all past EISs considered in this document. The use of the other non-herbicide techniques in an integrated pest management approach has also been affirmed in all previous EIS Records of Decision, and the BLM is not proposing to make any decisions relative to the use of non-herbicide vegetation treatment methods.

## Alternative Proposals

Five program alternatives were developed for and evaluated in this PEIS, including the Preferred Alternative and the No Action Alternative. Alternative actions were developed that 1) allow the BLM to continue its current use of 20 active ingredients in 14 western states, as authorized by earlier EIS RODs; 2) allow for the use of 14 active ingredients currently used by the BLM and four new active ingredients; 3) prohibit the use of herbicides; 4) prohibit the aerial application of herbicides; or 5) prohibit the use of sulfonylurea and other acetolactate synthase-inhibiting active ingredients. These program alternatives address many of the concerns raised during scoping, in particular the public's desire to see alternatives that place less emphasis on the use of herbicides, while still meeting the program's purpose and need. Alternatives

were also developed to ensure that the BLM complied with federal, tribal, state, and local regulations.

## Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under this alternative, the BLM would be able to continue to use 20 active ingredients approved for use in 14 western states under the earlier EIS RODs for each state. The BLM would also continue activities conducted under burned area emergency stabilization and rehabilitation and hazardous fuel reduction that are evaluated by NEPA compliance documents prepared by local BLM field offices. Under this alternative, an estimated 305,000 acres would be treated annually using herbicides.

## Alternative B - Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

This alternative represents the treatment of vegetation using herbicides in 17 western states, including Alaska, Nebraska, and Texas, states that were not included in the earlier EIS assessments. Under the Preferred Alternative, approximately 932,000 acres would be treated annually using herbicides, based on the herbicide use projections developed by BLM field offices. Based on these projections, the majority of treatments would occur in Nevada, Idaho, Oregon, and Wyoming.

Under the Preferred Alternative, the BLM would be able to use, in the western U.S., including Alaska, 14 active ingredients that were approved for use in the earlier RODs and for which an analysis of risks to humans and non-target plants and animals was conducted for this PEIS or by the U.S. Department of Agriculture Forest Service (Forest Service). These active ingredients are 2,4-D, bromacil, chlorsulfuron, clopyralid, dicamba, diuron, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, sulfometuron methyl, tebuthiuron, and triclopyr. The remaining six active ingredients currently approved for use by the BLM—2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine—have not been used by the BLM for several years, or their use has been limited to a very small number of acres. Although the risks to humans from the use of these chemicals are not significant based on evaluations done for the earlier EISs and a review of the literature for this PEIS, the

BLM_0000177

risks to non-target plants and animals, especially species of concern, have not been adequately evaluated. Under this alternative, their use would be discontinued. Should these chemicals be needed by the BLM in the future, the BLM would consult ERAs, if available, or conduct their own ERAs, to assess the risks to non-target and sensitive species. This analysis would be supported by the appropriate NEPA documentation and interagency consultation before these chemicals would be approved for use or applied on the ground.

The BLM would approve four additional active ingredients for use in all 17 states included in this PEIS: imazapic, diquat, diflufenzopyr (in formulation with dicamba), and fluridone. In addition, the BLM would approve diflufenzopyr for use in the future as a stand-alone active ingredient if it becomes registered for herbicidal use. These active ingredients and formulations could only be applied for uses, and at application rates, specified on the label directions.

Under the Preferred Alternative, the BLM proposes to use new active ingredients that are developed in the future if: 1) they are registered by the USEPA for use on one or more land types (e.g., rangeland, aquatic) managed by the BLM; 2) the BLM determines that the benefits of use on public lands outweigh the risks to human health and the environment; and 3) they meet evaluation criteria to ensure that the decision to use the active ingredient is supported by scientific evaluation through human health and ecological risk assessments and NEPA documentation.

## Alternative C - No Use of Herbicides

Under Alternative C, the BLM would not treat vegetation using herbicides and would not use new chemicals that are developed in the future. The BLM would continue to treat vegetation using fire, and mechanical, manual, and biological control methods. A PER has been prepared that accompanies this PEIS and discusses these treatment methods, proposed treatment levels during the next 10 to 15 years, and likely impacts to natural and social resources on public lands from these treatment methods.

## Alternative D - No Aerial Applications

This alternative is similar to the Preferred Alternative in that it represents the treatment of vegetation using herbicides in 17 western states, including Alaska, Nebraska, and Texas, and use of the same active

ingredients as allowed under the Preferred Alternative. Under Alternative D, however, only ground-based techniques would be used to apply herbicides and no aerial applications of herbicides would be allowed, which would reduce the risk of spray drift impacting non-target areas. Based on information obtained from field offices, an estimated 55% of herbicide treatments would occur using ground-based methods during the next 10 years. Thus, the BLM would treat approximately 530,000 acres annually using herbicides under this alternative. In comparison, during 1997 to 2005, approximately 66% of herbicide treatments were conducted aerially and 34% using ground-based methods.

Similar to the Preferred Alternative, the BLM would use new active ingredients developed in the future if they followed protocols for use of new active ingredients identified under the Preferred Alternative.

## Alternative E - No Use of Acetolactate Synthase-inhibiting Herbicides

This alternative was developed based on an alternative proposal for vegetation management on public lands submitted by the American Lands Alliance, an alliance of several environmental and conservation groups.

Under Alternative E, the BLM would not use sulfonylurea and other acetolactate synthase-inhibiting active ingredients approved in the earlier RODs, which are chlorsulfuron, imazapyr, metsulfuron methyl, and sulfometuron methyl. During 1999 to 2000, these active ingredients comprised approximately 28% of the active ingredients used by the BLM. Since 2001, however, these active ingredients have comprised approximately 8% of the active ingredients used by the BLM. The BLM would be able to use 10 active ingredients in the 17 western states that were approved for use in the earlier RODs and for which an analysis of risks to humans and non-target plants and animals was conducted for this PEIS. These active ingredients are: 2,4-D, bromacil, clopyralid, dicamba, diuron, glyphosate, hexazinone, picloram, tebuthiuron, and triclopyr. The six other active ingredients currently approved for use by the BLM—2,4-DP, atrazine, asulam, fosamine, mefluidide, and simazine—would not be used unless guidelines given for the Preferred Alternative were met.

The BLM would be allowed to use three additional active ingredients in all 17 states: diquat, diflufenzopyr (if it becomes registered for herbicidal use), and

BLM_0000178

fluridone. In addition, the BLM would be able to use a formulation of diflufenzopyr and dicamba. These active ingredients and formulations could only be applied for uses, and at application rates, specified on the label directions. Under Alternative E, the BLM would use new active ingredients developed in the future if they followed protocols for use of new active ingredients identified under the Preferred Alternative and did not contain sulfonylurea and imidazolinone chemistry and other acetolactate synthase-inhibiting compounds.

Under this alternative, the BLM would treat approximately 466,000 acres annually using herbicides. Spot herbicide treatments would be favored over broadcast treatments. Herbicides use would be discouraged in areas populated by amphibians. To protect Native American and Alaska Native resources, the BLM would establish herbicide-free zones around culturally significant plant and wildlife resources. This alternative would place greater emphasis on passive restoration than the other alternatives.

## Summary of Impacts

The direct and indirect effects of herbicide treatment alternatives on natural and socioeconomic resources are evaluated in this PEIS. The cumulative effects that result from the incremental impact of treatment actions when added to the effects of other past, present, and reasonably foreseeable future actions are also evaluated for herbicide and non-herbicide treatments. Standard operating procedures would be used to reduce impacts, and mitigation measures have been proposed to reduce significant adverse impacts to more reasonable levels.

### Direct and Indirect Impacts

In general, potential direct and indirect adverse impacts and benefits would be greatest under the Preferred Alternative and least under Alternative C. Fewer acres would be treated, or treatments would not be conducted aerially, under the other herbicide treatment alternatives, so risks and benefits would be intermediate between the Preferred Alternative and Alternative C.

Impacts from herbicide treatments on local and regional air quality would be minor for all alternatives. Pollutant emissions would be greater under Alternative D than the Preferred Alternative, even though 40% fewer acres would be treated under Alternative D,

because of the large number of acres treated using ground-based application methods under Alternative D. None of the treatments would result in emissions that exceed Prevention of Significant Deterioration thresholds or National Ambient Air Quality Standards.

None of the herbicides commonly used by the BLM appear to result in adverse impacts to soil. Treatments would benefit soil by restoring natural fire regimes and slowing the spread of weeds, which should reduce soil erosion and improve soil productivity. New herbicides proposed for use have little adverse impact on soil.

Several herbicides used, or proposed for use by the BLM, are known groundwater contaminants. Effects to surface water would be minor, and herbicide concentrations in surface water should not exceed safe levels for human health. Herbicide use would improve watershed function and water quality, since many treatments would be targeted at watersheds where water quality does not meet state or tribal standards. Adverse and beneficial impacts of alternatives would primarily be related to number of acres treated. Water quality would not be impacted by herbicides under Alternative C, but land health would deteriorate more rapidly than under the other herbicide treatment alternatives because herbicides could not be used to control weeds and other vegetation.

Herbicides pose risks to terrestrial and aquatic vegetation. Most aquatic herbicides, and several terrestrial herbicides, are non-selective and could adversely impact non-target vegetation. Accidental spills and herbicide drift from treatment areas could be particularly damaging to non-target vegetation, including croplands and other vegetation found on privately-owned lands near treatment areas. Herbicides would help to control aquatic vegetation that chokes waterways and impacts wetland function and values. Upland and riparian area treatments could control weeds and other vegetation to reduce soil erosion and reduce the risk of catastrophic fire. Risks to upland, wetland, and riparian vegetation from proposed herbicides would be similar to, or less than, risks from currently-available herbicides. Adverse impacts from herbicides to terrestrial and aquatic vegetation would be least under Alternative C, while benefits would be greatest under the Preferred Alternative. Buffer zones would be used to reduce the risks to vegetation from herbicide treatments under all alternatives proposing herbicide use.

Many of the herbicides currently available for use by the BLM pose risks to fish and wildlife. Accidental

BLM_0000179

spills and direct spraying of aquatic organisms could kill or harm animals, or affect the health and behavior of animals. Fish and wildlife could also forage on vegetation that has been treated, or prey on other animals that have been exposed to herbicides, and be harmed. All of the herbicides pose some risk to non-target terrestrial and aquatic vegetation, and damage to these plants could adversely impact habitats used by fish and wildlife. Acetolactate synthase-inhibiting herbicides are highly potent and can damage plants at low application rates, but do not appear to create unnecessary risks to aquatic organisms or wildlife. Of the new herbicides proposed for use, diquat poses a low to high risk to aquatic organisms and wildlife, depending on application rate and receptor scenario; fluridone, imazapic, and Overdrive® (a formulation of dicamba and diflufenzopyr) pose little or no risk to aquatic organisms and wildlife. The risk for adverse health effects to individual organisms would typically be greater for threatened, endangered, and other special status species than for secure species, depending on the herbicide and the exposure pathway. Furthermore, the risk for associated population-and species-level effects would be much greater for many TES species, given their low numbers and fragmented habitats. Buffers would be used between treatment areas and aquatic habitats to reduce risks to aquatic organisms. Buffers would also be used between treatment areas and habitats of special status species.

Livestock and wild horses and burros could be impacted by herbicides from an accidental spill, direct spray, herbicide drift, or by consuming herbicide-treated vegetation. Effects to animals could include death, damage to vital organs, decrease in growth, decrease in reproductive output and condition of offspring, and increased susceptibility to predation. However, most herbicides currently available for use by the BLM pose little or no risk to these animals. Of the new herbicides proposed for use, only diquat is fairly toxic to livestock and wild horses and burros. However, it would be used by the BLM as an aquatic herbicide, and frequent exposure to these animals would be unlikely. Risks from exposure to herbicides for livestock would be further reduced by restrictions placed on livestock use of treated areas as directed on herbicide labels.

While herbicide treatments could affect cultural or paleontological resources near or on the surface, they would be more likely to affect traditional cultural practices of gathering plants and the health of Native peoples. Cultural and paleontological resources could

be impacted by equipment, and to a lesser extent, by the chemicals in herbicides. A risk assessment was conducted to assess the risks to Native peoples from harvesting plants that could be treated with herbicides, or from direct exposure to herbicide spray. Native peoples would face risks when picking berries in areas treated with diquat. They could also face risks when consuming fish contaminated with 2,4-D, hexazinone, or picloram. Native peoples would face risk from diquat or fluridone if these chemicals were accidentally spilled or used at maximum application rates.

Herbicide treatments could affect visual, wilderness, and recreation resources. Treatments would remove and discolor vegetation, making it less visually appealing. Over the long term, landscapes should be more appealing as native vegetation was restored. Treatments in wilderness and other special areas would detract from the "naturalness" of the area. Although use of mechanical equipment would be strongly discouraged in these areas, its use would create noise and reduce the wilderness experience. Recreationists could be exposed to herbicides, experience less visually-appealing landscapes, or find fish and game less plentiful as a result of treatments. In addition, recreational areas could be closed for short periods of time after application to ensure treatment success and protect the health of visitors.

Social effects would be minor at the scale addressed in the PEIS. There would be benefits to communities that supply workers, materials, or services in support of treatment activities. Some businesses, such as recreation-based businesses and ranching operations, could be adversely affected if treatments closed areas used for recreation or by domestic livestock. There are potential environmental justice concerns because a large number of Native peoples and other minority groups live in the West and work in industries (e.g., forest products, herbicide applicator) or conduct activities (e.g., gathering of plants for traditional uses, recreation) that could potentially expose these groups to treated areas.

A human health risk assessment was conducted to assess risks to humans from the use of herbicides. At typical application rates, workers would not be at risk from use of herbicides except when using diquat, 2,4-D, 2,4-DP, atrazine, bromacil, diuron, fosamine, hexazinone, mefluidide, simazine, or tebuthiuron. At maximum application rates, there are also risks associated with the use of chlorsulfuron, fluridone, and triclopyr. Public receptors would be at less risk. The

BLM_0000180

EXECUTIVE SUMMARY

BLM would not use 2,4-DP, atrazine, fosamine, mefluidide, or simazine under the action alternatives. Except for diquat, new herbicides proposed for use pose few or no risks to workers or the public. To reduce risks from diquat, treatments would occur away from high residential and subsistence use areas.

## Cumulative Impacts

Treatments would contribute only minor amounts of pollutants to the air. Fire use would increase particulate matter in the air, but the amount of pollutants generated by fire use, and their effects on human health, should be less than those from wildfire, resulting in fewer pollutants accumulating than would occur without treatments. Treatments would lead to cumulative loss of soil from removal of vegetation and erosion, but improvement in vegetative quality should slow soil loss on public lands. Erosion has led to poor water quality on portions of public lands. Treatments that slow erosion would also benefit water quality and slow the cumulative loss of water quality. Over half of the wetlands in the U.S. have been lost since settlement by Europeans. Treatments would improve wetland and riparian area functions and values and slow the cumulative loss of water quality. Over half of degradation on public lands. With improvement in these areas, habitat for fish and other aquatic organisms would improve. However, many anadromous fish spend part or most of their lives off of public lands, and thus would potentially have to cope with poorer quality habitat while off of public land.

Fire exclusion and the spread of weeds have degraded vegetation function and quality on public land and have led to a cumulative loss of vegetative productivity. Treatments would restore ecosystem processes and slow this loss. Improvement in vegetation characteristics would benefit wildlife. Some species that have adapted to degraded ecosystems could lose habitat as native vegetation was restored, but most species would benefit. Factors that have led to the loss of native vegetation and ecosystem health have adversely impacted rangelands used by domestic livestock and wild horses and burros. Treatments should improve rangelands for these animals, and ensure that public lands can support viable populations of wild horses and burros and a healthy ranching industry.

Treatments could add to the cumulative loss of paleontological and cultural resources, but risks would be low. Treatments could impact plants used by Native peoples for traditional lifeway uses, and the health of Native peoples. However, the BLM would use herbicides that are generally safe for use around people, and would conduct pre-treatment surveys to identify areas of cultural concern before conducting treatments to reduce the cumulative loss of these values.

Treatments would result in some short-term and temporary loss of visual, recreational, and wilderness and other special area values due to vegetation being killed or discolored. In some cases, areas might be closed to visitors during and after treatments; however, these impacts would be short-term and any values affected would be restored within two growing seasons in most cases.

Treatments would benefit local communities by providing jobs and income, and by reducing the risk of catastrophic wildfire that could harm people and destroy property. These gains would be minor in the context of the western economy, but would still be a cumulative benefit for many rural communities.

Treatments could harm the health of workers and the public. Most herbicides, however, would pose few risks to workers, and even fewer risks to the public, when applied at the typical application rate. New herbicides proposed for use pose few or no risks, except for diquat. If treatments restored natural fire regimes, reduced the risk of catastrophic fire, and slowed the spread of weeds, human health would benefit.

Treatments could result in short-term loss of some resources, including soil, vegetation, wildlife, and livestock forage opportunities. Over the long term, loss of resource values would be slowed, and in some cases, would be reversed. Short-term losses in resource functions would be compensated for by long-term gains in ecosystem health.

BLM_0000181

# TABLE OF CONTENTS AND LISTS OF TABLES, FIGURES, AND MAPS

BLM_0000182

BLM_0000183

# TABLE OF CONTENTS

# VOLUME 1

**Chapter 1. Proposed Action and Purpose and Need** ................................................................1-1
   Introduction ..........................................................................................................................1-1
      Organization of the Vegetation Treatments Assessments .............................................1-2
      Proposed Action ............................................................................................................1-3
   Purpose and Need for the Proposed Action...........................................................................1-4
   Decisions to be Made and Scope of Analysis ......................................................................1-4
      Scope of Analysis ..........................................................................................................1-5
      Decisions to be Made ....................................................................................................1-5
   Documents that Influence the Scope of the PEIS ..................................................................1-6
   Relationship to Statutes, Regulations, and Policies ..............................................................1-6
      Federal Laws, Regulations, and Policies that Influence Vegetation Treatments........1-6
      NEPA Requirements of the Program ............................................................................1-8
   Interrelationships and Coordination with Agencies ..............................................................1-9
      National Level Coordination ....................................................................................... 1-11
      State and County Level Coordination.......................................................................... 1-11
      Non-governmental Organizations ............................................................................... 1-12
      Cooperative Weed Management Areas ....................................................................... 1-12
   Consultation ........................................................................................................................ 1-12
   Public Involvement and Analysis of Issues......................................................................... 1-12
      Public Scoping Meetings............................................................................................. 1-13
      Scoping Issues and Concerns....................................................................................... 1-13
      Development of the Alternatives ................................................................................. 1-13
      Issues Not Addressed in the Draft PEIS ..................................................................... 1-13
      Public Review and Comment on the Draft Programmatic EIS, ER, and BA ............... 1-14
   Limitations of this PEIS....................................................................................................... 1-14
   Preview of the Remainder of the PEIS ................................................................................ 1-15

**Chapter 2. Alternatives** ................................................................................................................2-1
   Introduction ..........................................................................................................................2-1
   BLM Programs Responsible for Herbicide Treatments.........................................................2-1
      Wildland Fire Management............................................................................................2-2
      Rangeland Management.................................................................................................2-3
      Forest and Woodland Management ...............................................................................2-3
      Riparian Management ...................................................................................................2-4
      Wildlife, Fisheries, and Threatened and Endangered Species Management.................2-4
      Other Programs.............................................................................................................2-5
   Vegetation Treatment Planning and Management .................................................................2-5
      Land Use Planning .......................................................................................................2-5
      Site Selection and Treatment Priorities........................................................................2-6
   Vegetation Treatment Methods .............................................................................................2-8
      Integrating Vegetation Treatments................................................................................2-8
      Vegetation Treatment Method Selection ......................................................................2-9
   Herbicide Active Ingredients Evaluated under the Proposed Alternatives ............................2-9
   Herbicide Modes of Action and Treatment Methods........................................................... 2-13
   Description of the Alternatives ............................................................................................ 2-14
      Alternative A – Continue Present Herbicide Use (No Action Alternative).............. 2-14
      Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western
      States (Preferred Alternative)...................................................................................... 2-17

BLM_0000184

TABLE OF CONTENTS

Alternative C – No Use of Herbicides ............................................................................. 2-19
Alternative D – No Aerial Application of Herbicides .................................................... 2-19
Alternative E – No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients ...................................................................................................................... 2-20
Determination of Treatment Acreages ................................................................................... 2-21
Non-herbicide Treatment Method Acreages used in Cumulative Effects Analysis ................ 2-21
Alternatives Considered but Not Further Analyzed ............................................................... 2-22
Herbicide Treatment Standard Operating Procedures and Guidelines .................................... 2-22
Prevention of Weeds and Early Detection and Rapid Response .......................................... 2-23
Herbicide Treatment Planning ........................................................................................... 2-25
Revegetation .................................................................................................................... 2-27
Special Precautions .............................................................................................................. 2-28
Special Status Species ...................................................................................................... 2-28
Wilderness Areas ............................................................................................................. 2-29
Cultural Resources ........................................................................................................... 2-29
Monitoring ........................................................................................................................... 2-35
Monitoring Guidance used by BLM in Vegetation Management .......................................... 2-37
Monitoring Methods and Research .................................................................................... 2-38
Coordination and Education ................................................................................................. 2-39
Mitigation ............................................................................................................................ 2-40
Summary of Impacts by Alternative ...................................................................................... 2-40

Chapter 3. Affected Environments .......................................................................................... 3-1
Introduction and Study Area ................................................................................................. 3-1
Land Use and Ecoregions ..................................................................................................... 3-1
Land Use ......................................................................................................................... 3-1
Ecoregions ....................................................................................................................... 3-1
Climate ................................................................................................................................ 3-2
Tundra Ecoregion ............................................................................................................. 3-2
Subarctic Ecoregion ......................................................................................................... 3-2
Subtropical Steppe Ecoregion ........................................................................................... 3-2
Subtropical Desert Ecoregion ............................................................................................ 3-2
Temperate Steppe Ecoregion ............................................................................................. 3-2
Temperate Desert Ecoregion ............................................................................................. 3-2
Mediterranean Ecoregion .................................................................................................. 3-3
Marine Ecoregion ............................................................................................................. 3-3
Mountain Provinces .......................................................................................................... 3-3
Air Quality ........................................................................................................................... 3-3
Visibility Protection in Mandatory Federal Class I Areas .................................................... 3-4
Herbicide Drift ................................................................................................................. 3-6
Topography, Geology, Minerals, Oil, and Gas ....................................................................... 3-6
Tundra Ecoregion ............................................................................................................. 3-6
Subarctic Ecoregion ......................................................................................................... 3-7
Temperate Desert Ecoregion ............................................................................................. 3-7
Subtropical Desert Ecoregion ............................................................................................ 3-7
Temperate Steppe Ecoregion ............................................................................................. 3-7
Subtropical Steppe Ecoregion ........................................................................................... 3-7
Mediterranean Ecoregion .................................................................................................. 3-7
Marine Ecoregion ............................................................................................................. 3-7
Soil Resources ...................................................................................................................... 3-7
Biological Soil Crusts ....................................................................................................... 3-9
Micro and Macroorganisms ............................................................................................... 3-9
Soil Erosion ..................................................................................................................... 3-10

BLM_0000185

Soil Compaction ........................................................................................................ 3-10
Water Resources and Quality ............................................................................................ 3-11
    Water Resources ..................................................................................................... 3-11
    Water Quality ......................................................................................................... 3-15
Wetland and Riparian Areas .............................................................................................. 3-18
Vegetation ................................................................................................................. 3-19
    Tundra Ecoregion ................................................................................................... 3-19
    Subarctic Ecoregion ................................................................................................ 3-20
    Temperate Desert Ecoregion ...................................................................................... 3-20
    Subtropical Desert Ecoregion ..................................................................................... 3-22
    Temperate Steppe Ecoregion ..................................................................................... 3-22
    Subtropical Steppe Ecoregion ..................................................................................... 3-23
    Mediterranean Ecoregion .......................................................................................... 3-24
    Marine Ecoregion ................................................................................................... 3-25
    Noxious Weeds and other Invasive Vegetation .................................................................. 3-25
    Vegetation Condition and Fire Regimes .......................................................................... 3-27
    Non-timber Forest Products ....................................................................................... 3-29
    Special Status Species ............................................................................................. 3-30
Fish and Other Aquatic Organisms ...................................................................................... 3-30
    Alaska and the Pacific Northwest ................................................................................. 3-30
    The Arid Environment .............................................................................................. 3-31
    The Upper Colorado River Basin .................................................................................. 3-33
    California ............................................................................................................. 3-34
    Missouri River Basin ............................................................................................... 3-34
    Special Status Species ............................................................................................. 3-35
Wildlife Resources ........................................................................................................ 3-35
    Tundra Ecoregion ................................................................................................... 3-36
    Subarctic Ecoregion ................................................................................................ 3-37
    Temperate Desert Ecoregion ...................................................................................... 3-38
    Subtropical Desert Ecoregion ..................................................................................... 3-39
    Temperate Steppe Ecoregion ..................................................................................... 3-40
    Subtropical Steppe Ecoregion ..................................................................................... 3-41
    Mediterranean Ecoregion .......................................................................................... 3-41
    Marine Ecoregion ................................................................................................... 3-42
    Special Status Species ............................................................................................. 3-43
Livestock .................................................................................................................. 3-43
Wild Horses and Burros .................................................................................................. 3-44
Paleontological and Cultural Resources ................................................................................. 3-44
    Paleontological Resources ......................................................................................... 3-44
    Cultural Resources .................................................................................................. 3-45
    American Indian and Alaska Native Cultural Resources ....................................................... 3-45
    European Settlement Resources ................................................................................... 3-54
    Important Plant Uses and Species Used by American Indians and Alaska Natives ...................... 3-54
Visual Resources .......................................................................................................... 3-56
Wilderness and other Special Areas ..................................................................................... 3-56
Recreation ................................................................................................................. 3-58
Rights-of-way, Facilities, and Roads .................................................................................... 3-60
    Rights-of-way ........................................................................................................ 3-60
    Facilities and Roads ................................................................................................ 3-61
Social and Economic Values ............................................................................................. 3-61
    Social/Demographic Environment ................................................................................ 3-61
    Economic Environment ............................................................................................. 3-62
    Revenues Generated by BLM Lands ............................................................................. 3-62

BLM_0000186

TABLE OF CONTENTS

Expenditures by the BLM ........................................................................................ 3-65
Human Health and Safety ................................................................................................. 3-69
Background Health Risks .......................................................................................... 3-69
Risks from Diseases ................................................................................................. 3-70
Risks from Injuries .................................................................................................. 3-70
Risks from Cancer ................................................................................................... 3-71
Risk from Using Herbicides on Public Lands ......................................................... 3-72
Risk from Wildfire Control on Public Lands........................................................... 3-72

Chapter 4. Environmental Consequences ............................................................................... 4-1
Introduction and Effects ................................................................................................... 4-1
How the Effects of the Alternatives Were Estimated ...................................................... 4-1
Assumptions for Analysis ........................................................................................ 4-1
Incomplete and Unavailable Information ................................................................. 4-3
Subsequent Analysis before Projects ....................................................................... 4-4
Program Goals by Ecoregion ................................................................................... 4-4
Land Use............................................................................................................................ 4-5
Air Quality........................................................................................................................ 4-5
Scoping Comments and Other Issues Evaluated in the Assessment ........................ 4-5
Emission Sources...................................................................................................... 4-6
Methodology for Assessing Impacts to Air Quality ................................................ 4-6
Standard Operating Procedures ................................................................................ 4-8
Impacts by Alternative.............................................................................................. 4-9
Mitigation for Herbicide Treatment Impacts ........................................................... 4-13
Soil Resources .................................................................................................................. 4-13
Introduction.............................................................................................................. 4-13
Scoping Comments and Other Issues Evaluated in the Assessment......................... 4-13
Standard Operating Procedures ................................................................................ 4-13
Factors that Influence the Fate, Transport, and Persistence of Herbicides in Soil... 4-14
Impacts by Treatment ............................................................................................... 4-15
Impacts by Alternative.............................................................................................. 4-21
Mitigation for Herbicide Treatment Impacts ........................................................... 4-24
Water Resources and Quality............................................................................................ 4-24
Introduction.............................................................................................................. 4-24
Scoping Comments and Other Issues Evaluated in the Assessment......................... 4-24
Standard Operating Procedures ................................................................................ 4-24
Impacts by Treatment ............................................................................................... 4-25
Impacts by Herbicide................................................................................................ 4-29
Impacts by Alternative.............................................................................................. 4-34
Mitigation for Herbicide Treatment Impacts ........................................................... 4-36
Wetland and Riparian Areas ............................................................................................. 4-36
Introduction.............................................................................................................. 4-36
Scoping Comments and Other Issues Evaluated in the Assessment......................... 4-37
Factors that Influence the Fate, Transport, and Persistence of Herbicides in Wetland and Riparian
Areas ........................................................................................................................ 4-37
Methodology for Assessing Impacts to Wetland and Riparian Areas ...................... 4-37
Summary of Herbicide Impacts................................................................................ 4-37
Impacts by Alternative.............................................................................................. 4-41
Mitigation for Herbicide Treatment Impacts ........................................................... 4-44
Vegetation ......................................................................................................................... 4-44
Introduction.............................................................................................................. 4-44
Scoping Comments and Other Issues Evaluated in the Assessment......................... 4-44
Standard Operating Procedures ................................................................................ 4-44

Impacts Assessment Methodology ............................................................................. 4-45
Impacts Common to All Treatments........................................................................... 4-47
Summary of Herbicide Impacts Evaluated in ERAs .................................................. 4-63
Other Herbicides Previously Approved for Use on Public Lands ............................. 4-64
Impacts by Alternative ............................................................................................... 4-64
Mitigation for Herbicide Treatment Impacts ............................................................. 4-71
Special Status Plant Species ...................................................................................... 4-71
Fish and Other Aquatic Organisms .................................................................................. 4-76
Introduction ................................................................................................................ 4-76
Scoping Comments and Other Issues Evaluated in the Assessment.......................... 4-77
Standard Operating Procedures.................................................................................. 4-77
Impacts Assessment Methodology ............................................................................. 4-77
Impacts by Treatment................................................................................................. 4-80
Impacts by Alternative ............................................................................................... 4-89
Mitigation for Herbicide Treatment Impacts ............................................................. 4-92
Special Status Fish and Other Aquatic Organisms .................................................... 4-92
Wildlife Resources ........................................................................................................... 4-96
Introduction ................................................................................................................ 4-96
Scoping Comments and Other Issues Evaluated in the Assessment.......................... 4-98
Standard Operating Procedures.................................................................................. 4-98
Impacts Assessment Methodology ............................................................................. 4-99
Summary of Herbicide Impacts ............................................................................... 4-101
Impacts of Herbicide Treatments on Wildlife and Habitat by Ecoregion................ 4-109
Impacts by Alternative ............................................................................................. 4-114
Mitigation for Herbicide Treatment Impacts ........................................................... 4-118
Special Status Wildlife Species................................................................................ 4-118
Livestock ........................................................................................................................ 4-124
Introduction .............................................................................................................. 4-124
Scoping Comments and Other Issues Evaluated in the Assessment........................ 4-124
Standard Operating Procedures................................................................................ 4-124
Impacts Assessment Methodology ........................................................................... 4-125
Summary of Herbicide Impacts ............................................................................... 4-125
Impacts by Alternative ............................................................................................. 4-133
Mitigation for Herbicide Treatment Impacts ........................................................... 4-136
Wild Horses and Burros .................................................................................................. 4-136
Introduction .............................................................................................................. 4-136
Scoping Comments and Other Issues Evaluated in the Assessment........................ 4-137
Standard Operating Procedures................................................................................ 4-137
Impacts Assessment Methodology ........................................................................... 4-137
Summary of Herbicide Impacts ............................................................................... 4-137
Impacts by Alternative ............................................................................................. 4-143
Mitigation for Herbicide Treatment Impacts ........................................................... 4-146
Paleontological and Cultural Resources.......................................................................... 4-146
Scoping Comments and Other Issues Evaluated in the Assessment........................ 4-147
Standard Operating Procedures for Addressing BLM Actions on Paleontological, Cultural, and
Subsistence Resources.............................................................................................. 4-147
Herbicide Impacts on Paleontological and Cultural Resources ............................... 4-148
Herbicide Impacts on Native American Health ........................................................ 4-149
Impacts by Alternative ............................................................................................. 4-150
Mitigation for Herbicide Treatment Impacts ........................................................... 4-152
Visual Resources ............................................................................................................ 4-152
Scoping Comments and Other Issues Evaluated in the Assessment........................ 4-153
Standard Operating Procedures................................................................................ 4-153

BLM_0000188

TABLE OF CONTENTS

BLM Assessment of Visual Resource Values ................................................................ 4-153
Summary of Herbicide Impacts ................................................................................... 4-154
Impacts by Alternative ................................................................................................ 4-154
Mitigation for Herbicide Treatment Impacts ............................................................. 4-155
Wilderness and Special Areas ............................................................................................ 4-155
Scoping Comments and Other Issues Addressed in the Assessment .......................... 4-156
Standard Operating Procedures .................................................................................. 4-156
Summary of Herbicide Impacts ................................................................................... 4-156
Impacts by Alternative ................................................................................................ 4-157
Mitigation for Herbicide Treatment Impacts ............................................................. 4-159
Recreation ......................................................................................................................... 4-159
Scoping Comments and Other Issues Evaluated in the Assessment ........................... 4-159
Standard Operating Procedures .................................................................................. 4-160
Summary of Herbicide Impacts ................................................................................... 4-160
Impacts by Alternative ................................................................................................ 4-161
Mitigation for Herbicide Treatment Impacts ............................................................. 4-163
Social and Economic Values .............................................................................................. 4-163
Introduction ................................................................................................................. 4-163
Scoping Comments and Other Issues Evaluated in the Assessment ........................... 4-164
Standard Operating Procedures .................................................................................. 4-164
Impact Assessment Assumptions ................................................................................ 4-165
Summary of Herbicide Impacts ................................................................................... 4-165
Impacts by Alternative ................................................................................................ 4-166
Mitigation for Herbicide Treatment Impacts ............................................................. 4-174
Human Health and Safety .................................................................................................. 4-174
Scoping Comments and Other Issues Evaluated in the Assessment ........................... 4-175
Standard Operating Procedures .................................................................................. 4-175
Human Health Risk Assessment Methodology ........................................................... 4-175
Uncertainty in the Risk Assessment Process ............................................................... 4-181
Impacts by Alternative ................................................................................................ 4-195
Mitigation ................................................................................................................... 4-196
Cumulative Effects Analysis .............................................................................................. 4-197
Structure of the Cumulative Effects Analysis ............................................................. 4-197
Resource Protection Measures Considered in the Cumulative Effects Analysis ......... 4-201
Other Information Considered in Cumulative Effects Analysis .................................. 4-202
Analysis of Cumulative Effects by Resources .............................................................. 4-202
Unavoidable Adverse Effects ...................................................................................... 4-243
Relationship between the Local Short-term Uses and Maintenance and Enhancement of
Long-term Productivity ............................................................................................... 4-246
Irreversible and Irretrievable Commitment of Resources ........................................... 4-251
Energy Requirements and Conservation Potential ..................................................... 4-253
Natural or Depletable Resource Requirements and Conservation .............................. 4-253

**Chapter 5. Consultation and Coordination** ............................................................................ **5-1**
Preview of this Section ....................................................................................................... 5-1
Public Involvement ............................................................................................................ 5-1
Federal Register Notices and Newspaper Advertisements ........................................... 5-1
Scoping Meetings ........................................................................................................ 5-1
Newsletters ................................................................................................................. 5-2
Public Review and Comment on the Draft Programmatic EIS and ER, and Biological
Assessment ................................................................................................................. 5-2
Agency Coordination and Consultation ............................................................................. 5-3
Endangered Species Act Section 7 Consultation ......................................................... 5-3

BLM_0000189

Risk Assessment Coordination ..................................................................................5-3
Cultural and Historic Resource Consultation ..........................................................5-3
Government-to-government Consultation.................................................................5-3
Development of the Final Preferred Alternative ......................................................5-4
List of Preparers of the Programmatic EIS..............................................................5-4

**Chapter 6. References** ..............................................................................................................**6-1**

**Chapter 7. Glossary** ................................................................................................................**7-1**

**Chapter 8. Index** ......................................................................................................................**8-1**

# List of Tables

1-1     Key Issues (and Number of Comments) Identified During Scoping and Location Where Issues
        Are Addressed in the PEIS and PER .......................................................................................... 1-16
2-1     Herbicide Active Ingredients Proposed, Evaluated, and Included in Current Environmental
        Impact Statements of the Bureau of Land Management .............................................................. 2-11
2-2     States in which Herbicides are Approved for Use on Public Lands Based upon Current
        Environmental Impact Statements, Court Injunctions, and Changes in Registration Status ............... 2-12
2-3     Herbicides Approved and Proposed for Use on Public Lands ...................................................... 2-15
2-4     Average Number of Acres Treated Annually for Each BLM State Jurisdiction during 1997-
        2005 ............................................................................................................................................ 2-17
2-5     Historic Use of Herbicides by the BLM and Projected Future Use of Herbicides by the BLM
        under Each Alternative ................................................................................................................ 2-18
2-6     Comparison of the Alternatives .................................................................................................. 2-19
2-7     Prevention Measures ................................................................................................................... 2-24
2-8     Standard Operating Procedures for Applying Herbicides............................................................ 2-30
2-9     Mitigation Measures.................................................................................................................... 2-41
2-10    Summary and Comparison of Effects on Resources by Alternative............................................. 2-43
3-1     Acres of Public Lands in 17 Western States and Percent of Lands in the the State Administered
        by the BLM.................................................................................................................................. 3-1
3-2     National Ambient Air Quality Impact Significance Criteria ....................................................... 3-4
3-3     Counties within the Treatment Area that are Designated Nonattainment or Maintenance Areas
        for Various Pollutants.................................................................................................................. 3-5
3-4     Vegetation Classification System ............................................................................................... 3-21
3-5     Estimated Acres of Weed Infestations on Public Lands in 2000................................................. 3-28
3-6     Grazing Permits and Leases in Force and Active Animal Unit Months during Fiscal Year 2005 ....... 3-44
3-7     Wild Horses and Burros on Public Lands in Fiscal Year 2005.................................................... 3-45
3-8     Interpreted Paleontological Sites on Public Lands ...................................................................... 3-46
3-9     Cultural Resources on Public Lands............................................................................................ 3-47
3-10    Culture Areas, Prehistoric Occupation Periods, and Selected Common Site Types.................... 3-48
3-11    European Settlement Resource Types .......................................................................................... 3-55
3-12    Visual Resource Management Classes and Objectives and Appropriate Management Activities ....... 3-58
3-13    National Landscape Conservation System and Other Special Designation Areas on Public
        Lands as of September 2005 ....................................................................................................... 3-59
3-14    Estimated Recreation Use of Public Lands during Fiscal Year 2005 .......................................... 3-60
3-15    Population, Age Distribution, and Race in the Western States and Alaska................................... 3-63
3-16    Percent Unemployment for Western U.S. and Alaska ................................................................. 3-64
3-17    Percent Employment by Industry in 2004 ................................................................................... 3-65
3-18    Revenues Generated from Public Lands by Source for Fiscal Year 2005.................................... 3-66

BLM_0000190

TABLE OF CONTENTS

| | | |
|---|---|---|
| 3-19 | Estimated Benefits to Local Economies by Recreation on Public Lands during Fiscal Year 2005 | 3-66 |
| 3-20 | Summary of BLM Jobs and Expenditures for the Management of the Lands and Resources Program by Activity and Subactivity | 3-67 |
| 3-21 | BLM Wildland Fire Suppression Expenditures Fiscal Year 1998 through Fiscal Year 2005 | 3-68 |
| 3-22 | BLM Action Fires Larger than 10,000 Acres during 1999 to 2005 | 3-68 |
| 3-23 | Herbicide Uses and Costs for Vegetation Treatments on Public Lands during 2005 | 3-69 |
| 3-24 | BLM Payments to States and Local Governments during Fiscal Year 2005 | 3-71 |
| 3-25 | Mortality Rates (per 100,000 Population) and Causes of Death by State 2002-2003 | 3-72 |
| 4-1 | Estimated Acres Treated Annually using Herbicides for Each State under Each Treatment Alternative | 4-7 |
| 4-2 | Annual Emissions Summary for Herbicide Treatments under Alternative A | 4-8 |
| 4-3 | Annual Emissions Summary for Herbicide Treatments under Alternative B | 4-9 |
| 4-4 | Annual Emissions Summary for Herbicide Treatments under Alternative D | 4-10 |
| 4-5 | Annual Emissions Summary for Herbicide Treatments under Alternative E | 4-11 |
| 4-6 | Example NAAQS Compliance Analysis for Chemical Treatment | 4-12 |
| 4-7 | Estimated Soil Half-life and Adsorption Affinity for Active Ingredients | 4-15 |
| 4-8 | Factors Associated with Herbicide Movement to Groundwater | 4-27 |
| 4-9 | Herbicide Physical Properties and Off-site Movement Potential | 4-28 |
| 4-10 | Anaerobic Half-life and Relative Mobility in Soil for Herbicides Analyzed in this PEIS | 4-39 |
| 4-11 | Risk Categories Used to Describe Typical Herbicide Effects to Vegetation According to Exposure Scenario and Ecological Receptor Group | 4-49 |
| 4-12 | Buffer Distances to Minimize Risk to Vegetation from Off-site Drift of BLM-evaluated Herbicides | 4-54 |
| 4-13 | Risk Categories Used to Describe Effects of Forest Service-evaluated Herbicides According to Exposure Scenario and Ecological Receptor Group | 4-57 |
| 4-14 | Buffer Distances to Minimize Risk to Vegetation from Off-site Drift of Forest Service-evaluated Herbicides | 4-61 |
| 4-15 | Percentage of Acres Projected to be Treated Using Herbicides in Each Ecoregion for Each Vegetation Subclass under the No Action Alternative | 4-67 |
| 4-16 | Percentage of Acres Projected to be Treated Using Herbicides in Each Ecoregion for Each Vegetation Subclass under the Preferred Alternative | 4-69 |
| 4-17 | Risk Categories Used to Describe BLM-evaluated Herbicide Effects on Non Special Status Fish and Aquatic Invertebrates According to Exposure Scenario | 4-81 |
| 4-18 | Risk Categories Used to Describe Forest Service-evaluated Herbicide Effects on Fish and Aquatic Invertebrates According to Exposure Scenario | 4-87 |
| 4-19 | Buffer Distances to Minimize Risk to Non Special Status Fish and Aquatic Invertebrates from Off-site Drift of BLM-evaluated Herbicides from Broadcast and Aerial Treatments | 4-93 |
| 4-20 | Risk Categories Used to Describe BLM-evaluated Herbicide Effects on Special Status Fish and Aquatic Invertebrates According to Exposure Scenario | 4-97 |
| 4-21 | Buffer Distances to Minimize Risk to Special Status Fish and Aquatic Organisms from Off-site Drift of BLM Herbicides from Broadcast and Aerial Treatments | 4-98 |
| 4-22 | Risk Categories Used to Describe BLM-evaluated Herbicide Effects on Non Special Status Wildlife According to Exposure Scenario | 4-103 |
| 4-23 | Risk Categories Used to Describe Forest Service-evaluated Herbicide Effects on Wildlife According to Exposure Scenario | 4-107 |
| 4-24 | Risk Categories Used to Describe BLM-evaluated Herbicide Effects on Special Status Wildlife According to Exposure Scenario | 4-121 |
| 4-25 | Risk Categories Used to Describe BLM-evaluated Herbicide Effects on Livestock and Wild Horses and Burros According to Exposure Scenario | 4-127 |
| 4-26 | Risk Categories Used to Describe Forest Service-evaluated Herbicide Effects on Livestock and Wild Horses and Burros According to Exposure Scenario | 4-131 |

BLM_0000191

4-27    BLM-evaluated Herbicide Risk Categories by Aggregate Risk Index for Occupational
        Receptors ................................................................................................................................... 4-185
4-28    BLM-evaluated  Herbicide Risk Categories by Aggregate Risk Index for Public Receptors ............ 4-186
4-29    Forest Service-evaluated Herbicide Risk Categories by Hazard Quotient for Occupational
        Receptors ................................................................................................................................... 4-187
4-30    Forest Service-evaluated Herbicide Risk Categories by Hazard Quotient for Public Exposures ....... 4-188
4-31    Scenarios Resulting in High Risk to Occupational Receptors from Herbicides Evaluated in the
        1988-1991 BLM EISs.................................................................................................................. 4-191
4-32    Scenarios Resulting in High Risk to Public Receptors from Herbicides Evaluated in the 1988-
        1991 BLM EISs.......................................................................................................................... 4-192
4-33    Herbicide Use in the Western United States for Agricultural Lands and BLM-administered
        Lands......................................................................................................................................... 4-200
5-1     List of Preparers of the Programmatic EIS/ER/BA.................................................................... 5-5

## List of Figures

1-1    Relationship of the PEIS to BLM Field Offices............................................................................. 1-10
1-2    How this Programmatic EIS is Organized...................................................................................... 1-17
2-1    Summary of Acres Treated Using Herbicides during 1997-2005.................................................... 2-17
2-2    National Early Warning and Rapid Reponse System for Invasive Plants ........................................ 2-26
3-1    Relationship between Area Occupied by Invasive Species and Time................................................ 3-27

## List of Maps
### (Located at the end of the chapter)

1-1     Public Lands Administered by the Bureau of Land Management ..................................................... 1-19
3-1     Ecoregion Divisions .................................................................................................................... 3-73
3-2     Class I Areas................................................................................................................................ 3-75
3-3     Oil and Gas Wells on Public Lands ............................................................................................. 3-77
3-4     Soil Orders on Public Lands ........................................................................................................ 3-79
3-5     Hydrologic Regions...................................................................................................................... 3-81
3-6     Wastershed Surface Water Quality on Public Lands ..................................................................... 3-83
3-7     General Groundwater Quality on Public Lands ............................................................................. 3-85
3-8     Vegetation Types and Ecoregions on Public Lands in Alaska ......................................................... 3-87
3-9     Vegetation Types and Ecoregions on Public Lands in the Western U.S. ........................................ 3-89
3-10    Fire Regime Condition Classes on Public Lands ......................................................................... 3-91
3-11    Native Areas of Western North America....................................................................................... 3-93
3-12    National Landscape Conservation System Areas........................................................................... 3-95

BLM_0000192

TABLE OF CONTENTS

# VOLUME 2

**Appendix A. Common and Scientific Names of Plants and Animals Given in This Programmatic EIS** .................................................................................................................................... **A-1**

**Appendix B. Human Health Risk Assessment** ........................................................................................**B-1**
Introduction ...............................................................................................................................B-1
    Human Health Risk Assessment Overview ......................................................................B-1
    Organization of Document .................................................................................................B-2
Hazard Identification ................................................................................................................B-2
    Chemical Characteristics and Usage ................................................................................B-2
        Dicamba .....................................................................................................................B-2
        Diflufenzopyr ............................................................................................................B-2
        Diquat .......................................................................................................................B-2
        Fluridone ...................................................................................................................B-2
        Imazapic ....................................................................................................................B-2
        Sulfometuron Methyl ................................................................................................B-3
    Toxicity Profiles ...............................................................................................................B-3
        General Information...................................................................................................B-3
        Dicamba .....................................................................................................................B-3
        Diflufenzopyr ............................................................................................................B-6
        Diquat .......................................................................................................................B-9
        Fluridone ...................................................................................................................B-12
        Imazapic ....................................................................................................................B-14
        Sulfometuron Methyl ................................................................................................B-16
Dose-response Assessment .......................................................................................................B-17
    Types of Dose-response Values ........................................................................................B-17
        Dietary Assessment...................................................................................................B-17
        Non-dietary (Occupational or Residential) Assessment ..........................................B-18
    Available Dose-response Values .......................................................................................B-18
        Dicamba .....................................................................................................................B-19
        Diflufenzopyr ............................................................................................................B-20
        Diquat .......................................................................................................................B-23
        Fluridone ...................................................................................................................B-24
        Imazapic ....................................................................................................................B-25
        Sulfometuron Methyl ................................................................................................B-26
    Inert Ingredients...............................................................................................................B-27
Exposure Assessment ...............................................................................................................B-28
    Overview of the BLM Vegetation Treatment Program.....................................................B-28
        Land Programs ..........................................................................................................B-28
        Application Methods..................................................................................................B-30
    Herbicide Use Parameters ................................................................................................B-33
    Occupational Receptors ....................................................................................................B-33
        Routine Use Exposure Scenarios .............................................................................B-33
        Accidental Exposure Scenarios ...............................................................................B-34
    Public Receptors ..............................................................................................................B-35
        Routine Use Exposure Scenarios .............................................................................B-35
        Accidental Exposure Scenarios ...............................................................................B-36
        Exposure Parameters for Public Receptors ..............................................................B-37
    Calculation of Exposure Point Concentrations ................................................................B-51
        Occupational Exposures ...........................................................................................B-52

BLM_0000193

Public Exposures ...................................................................................................B-52
Chemical-specific Parameters .....................................................................................B-56
Absorption Factors ...............................................................................................B-56
Skin Permeability Constants .................................................................................B-56
Fish Bioconcentration Factors ..............................................................................B-57
Risk Characterization .......................................................................................................B-57
Approach for Risk Characterization ...........................................................................B-57
Food (%PAD) Assessment .....................................................................................B-57
Non-food (MOE) Assessment ...............................................................................B-57
Aggregate Risk Index............................................................................................B-58
Equations for Quantifying Potential Exposure and Risk .............................................B-58
Estimating Potential Occupational Exposures .......................................................B-59
Inhalation of Herbicide .........................................................................................B-60
Estimating Potential Exposure for Public Receptors .............................................B-61
Dermal Contact with Herbicide ............................................................................B-61
Results of Risk Characterization .................................................................................B-67
Occupational Receptors ........................................................................................B-67
Public Receptors....................................................................................................B-74
Evaluation of Currently-available Herbicide Active Ingredients.................................B-80
Evaluation of Dose-response Values Used in Previous EISs ...................................B-81
Evaluation of Receptors and Exposure Pathways Used in the Earlier Human
Health Risk Assessments ...................................................................................B-82
Summary of Currently-available Herbicide Active Ingredient Evaluation ...............B-82
Uncertainty Analysis ..................................................................................................B-82
Hazard Identification .............................................................................................B-82
Dose-response Assessment ....................................................................................B-83
Exposure Assessment.............................................................................................B-83
Risk Characterization ............................................................................................B-84
References .........................................................................................................................B-87

Appendix C.   Ecological Risk Assessment ......................................................................................C-1
Structure and Methodology of the Ecological Risk Assessment..........................................C-1
Problem Formulation..................................................................................................C-1
Exposure Characterization ..........................................................................................C-2
Effects Characterization ..............................................................................................C-3
Literature Review ...................................................................................................C-4
Toxicity Reference Value Development ..................................................................C-4
Risk Characterization ..................................................................................................C-5
Rare, Threatened, and Endangered Species ............................................................C-6
Uncertainty Analysis ..................................................................................................C-7
Application Methods and Herbicide Usage.........................................................................C-8
Aerial Application ......................................................................................................C-8
Ground Application....................................................................................................C-8
Aquatic Application....................................................................................................C-8
Non-target Species Exposure Characterization ..................................................................C-10
Ecological Receptors................................................................................................C-10
Surrogate Species ................................................................................................C-10
Exposure Pathways...................................................................................................C-12
Direct Spray........................................................................................................C-15
Off-site Drift.......................................................................................................C-16
Surface Runoff ....................................................................................................C-17
Wind Erosion and Off-site Transport of Terrestrial Herbicide....................................C-20

BLM_0000194

Accidental Spill .................................................................................................. C-22
Non-target Species Effects Characterization ................................................................. C-22
Terrestrial Species Effects Characterization ........................................................... C-23
Bromacil ................................................................................................... C-23
Chlorsulfuron ............................................................................................ C-23
Diflufenzopyr ........................................................................................... C-24
Diquat ..................................................................................................... C-24
Diuron ..................................................................................................... C-25
Fluridone ................................................................................................. C-25
Imazapic .................................................................................................. C-26
Overdrive® ............................................................................................... C-27
Sulfometuron Methyl ................................................................................. C-28
Tebuthiuron ............................................................................................. C-29
Aquatic Species Effects Characterization ............................................................... C-29
Bromacil ................................................................................................... C-29
Chlorsulfuron ............................................................................................ C-30
Diflufenzopyr ........................................................................................... C-30
Diquat ..................................................................................................... C-31
Diuron ..................................................................................................... C-31
Fluridone ................................................................................................. C-32
Imazapic .................................................................................................. C-32
Overdrive® ............................................................................................... C-33
Sulfometuron Methyl ................................................................................. C-34
Tebuthiuron ............................................................................................. C-34
Rare, Threatened, and Endangered Species Characterization ..................................... C-35
Non-target Species Risk Characterization ................................................................... C-36
Bromacil ........................................................................................................ C-36
Direct Spray ............................................................................................. C-36
Off-site Drift ............................................................................................ C-57
Surface Runoff .......................................................................................... C-58
Wind Erosion and Transport Off-site .......................................................... C-58
Accidental Spill to Pond ............................................................................ C-58
Potential Risk to Salmonids from Indirect Effects ........................................ C-59
Chlorsulfuron ................................................................................................. C-59
Direct Spray ............................................................................................. C-59
Off-Site Drift ............................................................................................ C-59
Surface Runoff .......................................................................................... C-60
Wind Erosion and Transport Off-site .......................................................... C-60
Accidental Spill to Pond ............................................................................ C-60
Potential Risk to Salmonids from Indirect Effects ........................................ C-61
Diflufenzopyr ................................................................................................. C-61
Direct Spray ............................................................................................. C-61
Off-site Drift ............................................................................................ C-61
Surface Runoff .......................................................................................... C-62
Wind Erosion and Transport Off-site .......................................................... C-62
Accidental Spill to Pond ............................................................................ C-62
Potential Risk to Salmonids from Indirect Effects ........................................ C-62
Diquat ........................................................................................................... C-63
Direct Spray ............................................................................................. C-63
Off-site Drift to Terrestrial Plants ............................................................... C-63
Accidental Spill to Pond ............................................................................ C-64

Potential Risk to Salmonids from Indirect Effects ............................................. C-64
Diuron ............................................................................................................................ C-64
Direct Spray ...................................................................................................... C-64
Off-site Drift ..................................................................................................... C-65
Surface Runoff .................................................................................................. C-65
Wind Erosion and Transport Off-site ............................................................... C-66
Accidental Spill to Pond ................................................................................... C-66
Potential Risk to Salmonids from Indirect Effects ............................................. C-66
Fluridone ....................................................................................................................... C-67
Direct Spray ...................................................................................................... C-67
Off-site Drift to Non-target Terrestrial Plants .................................................. C-68
Accidental Spill to Pond ................................................................................... C-68
Potential Risk to Salmonids from Indirect Effects ............................................. C-68
Imazapic ........................................................................................................................ C-69
Direct Spray ...................................................................................................... C-69
Off-site Drift ..................................................................................................... C-69
Surface Runoff .................................................................................................. C-69
Wind Erosion and Transport Off-site ............................................................... C-70
Accidental Spill to Pond ................................................................................... C-70
Potential Risk to Salmonids from Indirect Effects ............................................. C-70
Overdrive® ..................................................................................................................... C-71
Direct Spray ...................................................................................................... C-71
Off-site Drift ..................................................................................................... C-71
Surface Runoff .................................................................................................. C-72
Wind Erosion and Transport Off-site ............................................................... C-72
Accidental Spill to Pond ................................................................................... C-72
Potential Risk to Salmonids from Indirect Effects ............................................. C-73
Sulfometuron Methyl .................................................................................................... C-73
Direct Spray ...................................................................................................... C-73
Off-site Drift ..................................................................................................... C-73
Surface Runoff .................................................................................................. C-74
Wind Erosion and Transport Off-site ............................................................... C-74
Accidental Spill to Pond ................................................................................... C-74
Potential Risk to Salmonids from Indirect Effects ............................................. C-75
Tebuthiuron ................................................................................................................... C-75
Direct Spray ...................................................................................................... C-75
Off-site Drift ..................................................................................................... C-76
Surface Runoff .................................................................................................. C-76
Wind Erosion and Transport Off-site ............................................................... C-77
Accidental Spill to Pond ................................................................................... C-77
Potential Risk to Salmonids from Indirect Effects ............................................. C-77
Uncertainty Analysis .................................................................................................................. C-78
Toxicity Data Availability ............................................................................................. C-78
Degradates, Inert Ingredients, Adjuvants, and Tank Mixtures ...................................... C-78
Degradates ......................................................................................................... C-83
Inerts ................................................................................................................. C-83
Adjuvants and Tank Mixtures ........................................................................... C-84
Concentration Models ................................................................................................... C-86
AgDRIFT® ........................................................................................................ C-86
GLEAMS .......................................................................................................... C-86
CALPUFF ......................................................................................................... C-87

BLM_0000196

TABLE OF CONTENTS

Potential Indirect Effects on Salmonids ............................................................................. C-88
Herbicide Application Recommendations ............................................................................. C-88
References ............................................................................................................................ C-91

**Appendix D.** **Evaluation of Risks from Degradates, Polyoxyethyleneamine (POEA) and R-11, and Endocrine Disrupting Chemicals** ............................................................................ **D-1**
Introduction .......................................................................................................................... D-1
Potential Ecological Impacts of the Surfactant Polyoxyethyleneamine (POEA) and R-11 ............... D-1
Degradates ............................................................................................................................ D-2
Aquatic Toxicity Review .......................................................................................... D-5
Human Health Toxicity Review ................................................................................ D-7
Conclusions ............................................................................................................. D-8
Potential Endocrine Disrupting Chemicals ........................................................................... D-8
References ........................................................................................................................... D-33

**Appendix E.** **Protocol for Identifying, Evaluating, and Using New Herbicides** ....................... **E-1**
Identification and Approval of New Chemical Products and Technologies ................................ E-1
Networking ............................................................................................................. E-1
Research and Demonstration ................................................................................... E-1
Technical Research and Publications ........................................................................ E-2
Vendor Marketing ................................................................................................... E-2
Determining the Need for New Herbicides ........................................................................... E-2
Assessment of Hazards and Risks ......................................................................................... E-3
NEPA Documentation ........................................................................................................... E-5
Review Existing NEPA Documents .......................................................................... E-5
Prepare a New NEPA Document .............................................................................. E-6
Special Status Species ............................................................................................. E-6
References ............................................................................................................................ E-8

**Appendix F.** **Reference Manuals and Handbooks** ....................................................................... **F-1**

**Appendix G.** **Tribal and Agency Consultation** ............................................................................ **G-1**

**Appendix H.** Alaska National Interest Lands Conservation Act (ANILCA) §810 Analysis of Subsistence Impacts ........ **H-1**
Introduction .......................................................................................................................... H-1
Subsistence Evaluation Factors ............................................................................................. H-1
Evaluation of Alternatives and Findings ................................................................................ H-2
ANILCA § 810(a) Evaluations and Findings for All Alternatives and the Cumulative Case .... H-2
Environmental Justice ............................................................................................ H-13
References ........................................................................................................................... H-14

**Appendix I.** **Restore Native Ecosystems Alternative and BLM Policy Analysis** .......................... **I-1**
Restore Native Ecosystems Alternative ................................................................................. I-1
Bureau of Land Management National Policy Analysis of Restore Native Ecosystems Proposal .... I-23

**Appendix J.** **Special Status Species List** ......................................................................................... **J-1**

BLM_0000197

# List of Tables

| B-1 | Acute Toxicity Categories and Definitions | B-5 |
| B-2 | Toxicity Categories for Short-term Tests | B-5 |
| B-3 | Summary of Toxicological Endpoint Data | B-21 |
| B-4 | Summary of Herbicide Use - Dicamba | B-39 |
| B-5 | Summary of Herbicide Use - Diflufenzopyr | B-41 |
| B-6 | Summary of Herbicide Use - Diquat | B-43 |
| B-7 | Summary of Herbicide Use - Fluridone | B-45 |
| B-8 | Summary of Herbicide Use - Imazapic | B-47 |
| B-9 | Summary of Herbicide Use - Sulfometuron Methyl | B-49 |
| B-10 | Summary of Herbicide Risk Categories by Aggregate Risk Index | B-71 |
| B-11 | Occupational Scenarios with Aggregate Risk Indices Below One | B-73 |
| B-12 | Routine Exposure Public Scenarios/Receptors with Aggregate Risk Indices Below One | B-77 |
| B-13 | Accidental Exposure Public Scenarios with Aggregate Risk Indices Below One | B-78 |
| C-1 | Levels of Concern | C-6 |
| C-2 | Herbicide Application Methods and Usage Statistics | C-9 |
| C-3 | Surrogate Species Used in Quantitative ERA Evaluations | C-11 |
| C-4 | Vertebrate Surrogate Species Evaluated by Life History | C-12 |
| C-5 | Selected Toxicity Reference Values for Bromacil | C-37 |
| C-6 | Selected Toxicity Reference Values for Chlorsulfuron | C-39 |
| C-7 | Selected Toxicity Reference Values for Diflufenzopyr | C-41 |
| C-8 | Selected Toxicity Reference Values for Diquat | C-43 |
| C-9 | Selected Toxicity Reference Values for Diuron | C-45 |
| C-10 | Selected Toxicity Reference Values for Fluridone | C-47 |
| C-11 | Selected Toxicity Reference Values for Imazapic | C-49 |
| C-12 | Selected Toxicity Reference Values for Overdrive® | C-51 |
| C-13 | Selected Toxicity Reference Values for Sulfometuron Methyl | C-53 |
| C-14 | Selected Toxicity Reference Values for Tebuthiuron | C-55 |
| C-15 | Risk Levels Used to Describe Typical Herbicide Effects According to Exposure Scenario and Ecological Receptor Group | C-79 |
| C-16 | Buffer Distances (feet) to Minimize Risk from Off-site Drift of Herbicides | C-89 |
| D-1 | Selected Toxicity Values for Polyoxyethyleneamine | D-3 |
| D-2 | Review of AgDrift Results | D-3 |
| D-3 | Polyoxyethyleneamine (POEA) Risk Quotients (RQs) for Aquatic Exposure | D-4 |
| D-4 | Degradates Identified for Active Ingredients | D-10 |
| D-5 | Listings of Endocrine Disrupting Potential of BLM Herbicides | D-30 |
| I-1 | Bureau of Land Management Policy Analysis of Restore Native Ecosystems Proposal | I-24 |

# List of Figures

| C-1 | Conceptual Model for Terrestrial Herbicides. | C-13 |
| C-2 | Conceptual Model for Aquatic Herbicides. | C-14 |
| D-1a | Aquatic Toxicity – 2,4-D Toxicity Reference Values and Degradate Toxicity Data | D-21 |
| D-1b | Aquatic Toxicity – 2,4-D Toxicity Reference Values and Degradate Toxicity Data | D-22 |
| D-2 | Aquatic Toxicity – Diquat Toxicity Reference Values and Degradate Toxicity Data | D-23 |
| D-3a | Aquatic Toxicity – Diuron Toxicity Reference Values and Degradate Toxicity Data | D-24 |
| D-3b | Aquatic Toxicity – Diuron Toxicity Reference Values and Degradate Toxicity Data | D-25 |
| D-4 | Aquatic Toxicity – Fluridone Toxicity Reference Values and Degradate Toxicity Data | D-26 |
| D-5 | Aquatic Toxicity – Imazapyr Toxicity Reference Values and Degradate Toxicity Data | D-27 |
| D-6 | Aquatic Toxicity – Metsulfuron Methyl Toxicity Reference Values and Degradate Toxicity Data | D-28 |
| D-7 | Aquatic Toxicity – Triclopyr Toxicity Reference Values and Degradate Toxicity Data | D-29 |
| E-1 | New Herbicide Evaluation and Approval Process | E-3 |

BLM_0000198

TABLE OF CONTENTS

# VOLUME 3

Response to Comments ...........................................................................................................................................III-1

BLM_0000199

# CHAPTER 1
# INTRODUCTION

BLM_0000200

BLM_0000201

# TABLE OF CONTENTS

Page

Introduction .................................................................................................................................... 1-1
    Organization of the Vegetation Treatments Assessments ....................................................... 1-2
    Proposed Action ..................................................................................................................... 1-3
Purpose and Need for the Proposed Action .................................................................................... 1-4
Decisions to be Made and Scope of Analysis ................................................................................. 1-4
    Scope of Analysis ................................................................................................................... 1-5
    Decisions to be Made ............................................................................................................ 1-5
Documents that Influence the Scope of the PEIS ........................................................................... 1-6
Relationship to Statutes, Regulations, and Policies ........................................................................ 1-6
    Federal Laws, Regulations, and Policies that Influence Vegetation Treatments ...................... 1-6
    NEPA Requirements of the Program ....................................................................................... 1-8
Interrelationships and Coordination with Agencies ........................................................................ 1-9
    National Level Coordination ................................................................................................ 1-11
    State and County Level Coordination ................................................................................... 1-11
    Non-governmental Organizations ......................................................................................... 1-12
    Cooperative Weed Management Areas ................................................................................. 1-12
Consultation ................................................................................................................................ 1-12
Public Involvement and Analysis of Issues ................................................................................... 1-12
    Public Scoping Meetings ...................................................................................................... 1-13
    Scoping Issues and Concerns ............................................................................................... 1-13
    Development of the Alternatives ........................................................................................... 1-13
    Issues Not Addressed in the Draft PEIS ............................................................................... 1-13
    Public Review and Comment on the Draft Programmatic EIS, ER, and BA .......................... 1-14
Limitations of this PEIS ............................................................................................................... 1-14
Preview of the Remainder of the PEIS ......................................................................................... 1-15

## List of Tables

1-1    Key Issues (and Number of Comments) Identified During Scoping and Location Where Issues Are
       Addressed in the PEIS and PER ......................................................................................... 1-16

## List of Figures

1-1    Relationship of the PEIS to BLM Field Offices ......................................................................... 1-10
1-2    How this Programmatic EIS is Organized .................................................................................. 1-17

## List of Maps

1-1    Public Lands Administered by the Bureau of Land Management ................................................. 1-19

BLM_0000203

# CHAPTER 1

# PROPOSED ACTION AND PURPOSE AND NEED

## Introduction

The Bureau of Land Management (BLM), an agency of the U.S. Department of the Interior (USDI), administers vegetation on nearly 261 million acres (public lands; treatment area) in 17 states in the western U.S., including Alaska (Map 1-1). These lands encompass approximately 1 out of every 5 acres from the Rocky Mountains to the Pacific Ocean. Management and control of vegetation for resource and habitat enhancement is accomplished using a variety of treatment methods, including, but not limited to: herbicides, prescribed fire and wildland fire use for resource benefit (collectively termed "fire use"), manual and mechanical methods, and biological controls such as insects, pathogens, fish, and domestic grazing animals.

In recent years, the severity and intensity of wildfires in the West has increased dramatically from levels in the 1970s and 1980s. Although the recent increase in wildfires is directly related to drought conditions throughout the western U.S., it is also influenced by changes in the vegetation on public lands that have occurred during the past 50 years and have resulted in increases in hazardous flammable fuels. Hazardous fuels include living and dead and decaying vegetation that form a special threat of ignition and resistance to control. As the population has increased in the western U.S., the loss of life and property has also increased as more people live in close proximity to public lands in areas now referred to as the wildland urban interface (WUI).

Much of the change in vegetation and increase in hazardous fuels on public lands can be attributed to fire exclusion policies over the past 100 years. Contributors to this change include natural influences, such as intermittent and long-term drought over the past 40 years. They also include anthropogenic influences, such as alteration of vegetation and habitat at the local and landscape levels through authorized uses on public lands (e.g., livestock grazing and timber management), full fire suppression policies to protect infrastructure and vegetative resources, and the increased spread of noxious weed species and invasive vegetation.

Some noxious weeds and other invasive vegetation, such as downy brome[1] (also known as cheatgrass), act as hazardous fuels in upland landscapes. Downy brome is a self-perpetuating winter annual that spreads easily across upland landscapes altered by fire, through a prolific seed source. Wind and soil erosion transport the seed over wide areas and into previously undisturbed habitats.

Invasive vegetation and noxious weeds are highly competitive and can often out-compete native vegetation, especially on recently disturbed sites. Invasive vegetation and noxious weeds are the dominant vegetation on an estimated 35 million acres of public lands (USDI BLM 2000a). The estimated rate of weed spread on western public lands in 1996 was 2,300 acres per day (USDI BLM 1996). Invasive vegetation and noxious weeds degrade or reduce soil productivity, water quality and quantity, native plant communities, wildlife habitat, wilderness values, recreational opportunities, and livestock forage, and are detrimental to the agriculture and commerce of the U.S. and to public health (National Academy of Sciences 1968, USDI BLM 2000b). Weed infestations can become permanent if left untreated.

In response to the threats of wildfire and invasive vegetation and noxious weeds, the President and Congress have directed the USDI and BLM, through implementation of the *National Fire Plan* (USDI and U.S. Department of Agriculture [USDA] Forest Service 2001a), and the *Healthy Forests Restoration Act of 2003*, to take more aggressive actions to reduce catastrophic wildfire risk on public lands. The actions would be taken to protect life and property, and to manage vegetation in a manner that provides for long-term economic sustainability of local communities,

---

[1] Common and scientific names of plants and animals given in this PEIS are provided in Appendix A.

BLM_0000204

PROPOSED ACTION AND PURPOSE AND NEED

improved habitat and vegetation conditions for fish and wildlife, and other public land uses.

As a result of these actions, the amount of hazardous fuels reduction and other vegetation management work conducted by the BLM are expected to increase from current levels to about 6 million acres annually; about 932,000 acres, or 16% of acres treated, would involve the use of herbicides. The BLM last assessed its use of vegetation treatment methods during the late 1980s and early 1990s, by preparing Environmental Impact Statements (EISs) and Record of Decisions (RODs) that covered vegetation treatment activities in 14 western states in the continental U.S. (all states shown on Map 1-1, except Alaska, Nebraska, and Texas; USDI BLM 1985; 1987a, b; 1988a, b; 1989; 1991a, b; 1992a). The previous EISs primarily focused on vegetation control of competing and unwanted vegetation for resource enhancement (forestry and rangelands), noxious and invasive weed control related to surface use activities (oil and gas, rights-of-way [ROW]), and reduction of hazardous fuels to protect resources at risk from wildfire damage. These EISs evaluated the environmental impacts associated with vegetation control and modification on approximately 500,000 acres of public lands a year in the western U.S. The EISs also evaluated the human health and non-target species risks of using 22 herbicide active ingredients on these public lands.

The impacts of the proposed increased level of vegetation treatments related to the use of herbicides are likely to be greater in magnitude than the impacts assessed in earlier vegetation treatment assessments prepared by the BLM for the western states. In addition, the BLM has identified several new herbicides that it would like to use that are more effective in treating certain types of vegetation than currently approved herbicides. Thus, the BLM has determined that the potential for increased use of herbicides, and approval for use of additional herbicides on public lands, requires further assessment under the National Environmental Policy Act (NEPA).

## Organization of the Vegetation Treatments Assessments

The BLM's assessment of vegetation treatment activities on public lands consists of two interrelated parts—this *Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic EIS* (PEIS) addressing the BLM's use of herbicides, and a *Vegetation Treatments on Bureau of Land Management Lands in 17 Western*

---

### Terminology

**Active ingredient (a.i.)** is the chemical or biological component that kills or controls the target pest.

**Fire use** a term not used in federal fire policy. It is used in the context of the PEIS/PER to refer to prescribed fire or wildland fire use to meet resource objectives.

**Hazardous fuels** include living and dead and decaying vegetation that form a special threat of ignition and resistance to control.

**Herbicide** is a chemical pesticide used to treat vegetation.

**Invasive plants** are plants that are not part of (if exotic), or are a minor component of (if native), the original plant community or communities that have the potential to become a dominant or co-dominant species on the site if their future establishment and growth are not actively controlled by management interventions, or are classified as exotic or noxious plants under state or federal law. Species that become dominant for only one to several years (e.g., short-term response to drought or wildfire) are not invasive plants.

**Native species** historically occurred or currently occur in a particular ecosystem and were not introduced.

**Noxious weeds** are designated by federal or state law as generally possessing one or more of the following characteristics: aggressive and difficult to manage; parasitic; a carrier or host of serious insects or disease; or non-native, new, or not common to the U.S.

**Prescribed fires** are any fire ignited by management actions to meet specific objectives. A written, approved prescribed fire plan must exist, and NEPA requirements (where applicable) must be met, prior to ignition.

**Undesirable plants** are species classified as undesirable, noxious, harmful, exotic, injurious, or poisonous under state or federal law, but not including species listed as endangered by the Endangered Species Act (ESA), or species indigenous to the planning area.

**Weeds** are plants that interfere with management objectives for a given area at a given point in time.

**Wildfires** are unplanned, unwanted wildland fires including unauthorized human-caused fires, escaped wildland fire use events, escaped prescribed fire projects, and all other wildland fires where the objective is to put the fire out.

**Wildland fires** are any non-structure fires that occur in the wildland. Three distinct types of wildland fire have been defined and include wildfire, wildland fire use, and prescribed fire.

**Wildland fire use fires** are the application of the appropriate management response to naturally-ignited wildland fires to accomplish specific resource management objectives in pre-defined designated areas outlined in Fire Management Plans.

**Wildland urban interface** (WUI) is an area where structures and other human development intermingle with undeveloped wildlands or vegetative fuels.

---

BLM_0000205

*States Programmatic Environmental Report* (PER; USDI BLM 2007a) describing the environmental effects of using non-herbicide vegetation treatment methods on public lands. This organization was selected because the primary issue of controversy identified through scoping, and which required NEPA review, was the BLM's continuing and proposed increase in the use of herbicides in vegetation treatment programs needed to implement the *National Fire Plan* and related initiatives. The use of herbicides has been affirmed as a central issue for analysis in all past EISs considered in this document.

The use of the other non-herbicide techniques in an integrated pest management approach has also been affirmed in all previous EIS Records of Decision, and the BLM is not proposing to make any decisions relative to the use of non-herbicide vegetation treatment methods.

Although more acres are proposed for treatment under all methods than were identified in previous EISs, the BLM has determined that additional analysis of treating these acres under non-herbicide methods in the PEIS is unnecessary. Congress and the Administration made the decision for federal agencies to treat more acres to reduce the threat of catastrophic fire. The PEIS and PER broadly estimate the acres that could be potentially treated under each method for analysis purposes in the PEIS. The acre totals used in this programmatic analysis are not site-specific as to locations or method(s) used. As identified below in Chapter 2, current land use plans guide the level of treatment activity necessary to meet broad goals and objectives for vegetation. It is anticipated that acres identified for treatments in land use plans and step down activity level plans would be modified in the future as they are revised or amended to reflect the increase in activity mandated by Congress, and that those plans will provide the necessary NEPA analysis to support increased acres of treatment.

Treatment of vegetation is not a static disturbance that accumulates over time. Vegetation treatments are dynamic and typically show results within the first two growing seasons. Once vegetation objectives are met, the projects are maintained over time, resulting in viable and resilient vegetation communities over the long term. As more acres are treated, more acres of vegetation meet management objectives as outlined in local land use plans. Projects implemented over the last ten to twenty years typically have met their objectives and become part of the baseline for analysis of new projects. Because of this dynamic continuum of treatment, revegetation, monitoring, and maintenance, the BLM

does not anticipate there would be any different or significant impacts identified beyond what has been analyzed in previous EISs.

This PEIS analyzes the effects of herbicide use on humans, plants, and animals and other environmental and social resources associated with public lands. This analysis will provide the basis for a programmatic Endangered Species Act (ESA) Section 7 consultation with the U.S. Fish and Wildlife Service (USFWS) and National Oceanic and Atmospheric Administration National Marine Fisheries Service (NMFS) on herbicide use, and the potential impacts of herbicide use on plant and animal species of concern.

The PER discloses the general impacts on the environment of using non-herbicide treatment methods, including fire use, and mechanical, manual and biological control methods, to treat hazardous fuels, invasive species, and other unwanted or competing vegetation. The PEIS provides an updated analysis of impacts (direct, indirect, and cumulative) to public land environmental and socioeconomic resources from proposed vegetation treatment activities utilizing herbicides. The PER is linked to the PEIS in the cumulative impact analysis of the PEIS, where all methods of treatment, including the use of herbicides, are assessed.

## Proposed Action

To maintain and improve the effectiveness of its vegetation management practices, the BLM proposes to:

- Determine which herbicide active ingredients are available for use on public lands in the western U.S., including Alaska, to improve the agency's ability to control hazardous fuels and unwanted vegetation. In addition to the herbicides currently approved for use, additional active ingredients are being considered for use by the BLM in order to address emerging weed problems associated with public lands, such as downy brome and invasive aquatic species; and

- In consultation with the U.S. Environmental Protection Agency (USEPA), USFWS, and NMFS, develop a state-of-the-science risk assessment methodology. This methodology will serve as the initial standard for assessing human health and ecological risk for herbicides that may become available for use in the future.

BLM_0000206

PROPOSED ACTION AND PURPOSE AND NEED

Actions related to the use of herbicides are addressed in this PEIS. Actions related to the use of other treatment methods are addressed in the PER.

In order to ensure that the agency fulfills its responsibility for protection of the public, Native American and Alaska Native subsistence practices, public land workers, and federally-listed species, species proposed for listing, and BLM sensitive species (collectively referred to as "special status" species), a risk assessment was conducted (see appendices B and C). The assessment consisted of a comprehensive literature search, and in some cases new toxicological analyses, for 1) active ingredients currently in use to determine if there are any new human health and ecological health risks that have been identified since the chemicals were last assessed (1988–1992); and 2) active ingredients proposed for use by the BLM. This risk assessment was used in the assessment of the human health and environmental effects of the various alternatives. An appendix was prepared in response to public comments on the risk assessments prepared for the draft PEIS (Appendix D). Specifically, this appendix addresses three concerns raised by the public about the human health and ecological risk assessments:

- Some surfactants may be more toxic to aquatic receptors than the active ingredient in the formulation. Using polyoxytheyleneamine (POEA) as an example, what are the potential impacts of POEA in different formulations of herbicides containing glyphosate?

- The risk assessments only address the potential impacts of the active ingredients, what about the toxicity of degradates?

- The risk assessments did not identify endocrine disruption as a toxic endpoint. Are any of the herbicides considered to be endocrine disrupting chemicals?

In addition, the BLM developed a risk assessment methodology to be used for analyses of herbicides proposed for use in the future (Appendix E). This methodology is based upon the methodology used for the risk assessments for this PEIS.

## Purpose and Need for the Proposed Action

The purposes of the proposed action are to provide BLM personnel with the herbicides available for vegetation treatment on public lands and to describe the conditions and limitations that apply to their use. The need for the proposed action is to reduce the risk of catastrophic wildfires by reducing hazardous fuels, restoring fire-damaged lands, and improving ecosystem health by 1) controlling weeds and invasive species, and 2) manipulating vegetation to benefit fish and wildlife habitat, improve riparian and wetlands areas, and improve water quality in priority watersheds.

Additional benefits accruing from implementation of the proposed action directly relate to restoration of fish and wildlife habitat and improvement of forest and ecological condition, which would meet BLM and USDI objectives set forth in the *Healthy Forests Restoration Act of 2003* and BLM Handbook H-4180-1 (*Rangeland Health Standards*) to improve the health of the nation's forests and rangelands.

## Decisions to be Made and Scope of Analysis

This PEIS analyzes the effects of using herbicides for treating vegetation on public lands in the western U.S., including Alaska. These lands include Oregon and California Land Grant lands, Coos Bay Wagon Road lands, and lands administered by the BLM through its National Landscape Conservation System (NLCS), such as Wilderness Study Areas (WSAs), designated Wilderness Areas, National Monuments, National Conservation Areas, National Recreation Areas, and areas of critical environmental concern.

Decisions expected to be made through this PEIS process include:

- Which USEPA-registered herbicides will be available for use by the BLM and under what circumstances?

- Which vegetation management practices could be used with applications of herbicides and under what circumstances?

This PEIS makes broad assumptions on the numbers of acres to be treated annually by herbicides by each state or in aggregate on a national scale to assist with the impacts analysis. Because of the broad nature of this PEIS and the uncertainty associated with timing and location of treatments on a national scale, specific levels of acres to be treated by any method are appropriately assessed at the regional, state, or local level. For meaningful NEPA analysis, the BLM assesses the

BLM_0000207

overall acres to be treated by each resource program in its land use plan (LUP) EISs (see description of BLM resource programs in Chapter 2), thus these decisions would be made at a later time and at a more site-specific level.

## Scope of Analysis

The focus of this PEIS is to provide an analysis of the expected increased use of herbicides related to implementing mandates to reduce hazardous fuels and manage and control vegetation affecting other resources. This PEIS does not, however, evaluate vegetation treatment activities involving herbicides that are not directly related to the need to reduce hazardous fuels, or to modify the vegetation community to improve rangeland and/or forestland health.

Thus, this PEIS does not evaluate vegetation management that is primarily focused on commercial timber or other forest product enhancement or use activities that are not related to improving forest or rangeland health or work authorized under the *Healthy Forests Restoration Act of 2003*.

This PEIS will not evaluate policies and programs associated with land use activities authorized by the BLM, such as livestock use, off-highway vehicle (OHV) use, and timber harvesting, and will not make land use allocations nor amend approved land use plans (Federal Register 2002). Human-related activities and natural processes have inherent risks and threats to the health of the land, which can lead to the decline of plant communities and ecosystems. Although this PEIS refers to activities consistent with the authorities under the Federal Land Policy and Management Act (FLPMA) and other statutes that may contribute, in some cases, to land and resource degradation (e.g., livestock grazing, OHV use, recreation), its focus is on proactive vegetation treatments to maintain and restore ecological conditions. The focus of the PEIS is not to restrict, limit, or eliminate FLPMA-authorized activities as a means to restore land health. These types of management actions are defined and considered under land use planning regulations (43 Code of Federal Regulations [CFR] 1610) and are outside the scope of this PEIS.

Commercial timber activities conducted with the primary purpose of providing a sustained yield of timber volume to commercial industries are not included in this PEIS or the associated PER. Rather, they represent a manner of vegetation harvest (i.e., the species [product] is removed and replanted for future

harvest). Commercial timber allocations and sustainable harvest were previously analyzed in BLM LUP EISs for the field offices with timber programs.

Although this PEIS addresses herbicide use in relation to vegetation treatments, it does not address vegetation treatments exclusively designed to increase forage production or the effects of livestock grazing on vegetation. The effects on vegetation that result from livestock forage use on public lands were analyzed in previous EISs, both programmatically at the national level (USDI BLM and USDA Forest Service 1994) and at the local land use planning level, in either LUP EISs or as individual EISs or Environmental Assessments (EAs) at the field office level, as well as at the allotment-specific level.

This PEIS does not address abandoned mine land reclamation, or energy production. Abandoned mine land reclamation is a form of site stabilization and remediation that does not necessarily involve vegetation treatment activities, although in some cases vegetation treatments may be associated with site stabilization. The scope of analysis for the overall use of herbicides, and other methods of control outlined in the PER associated with this PEIS, would sufficiently cover their use in these types of activities.

This PEIS will not analyze fire suppression operations, as they do not constitute vegetation treatment actions. This PEIS will address soil stabilization only where specifically related to the vegetation treatment activities. Soil stabilization effects are related to post-fire emergency stabilization (activities undertaken within 1 year of the fire control date) and rehabilitation (treatments applied up to 3 years after the fire control date).

This PEIS addresses the use of chemical herbicides in general. Herbicides are also commonly used to control vegetation by those authorized to use public lands for ROW, lease holdings, oil and gas facilities, and other mineral developments. In many cases, the control of vegetation is stipulated in the ROW, lease, or authorizing permit. These permits and authorizations are issued in conjunction with a site-specific NEPA compliance document (EA or EIS), which assess the impacts of the control method, and identifies mitigation to reduce development impacts on the environment.

## Decisions to be Made

At least 30 days after the USEPA publishes the Notice of Availability (NOA) of the final PEIS, the BLM

BLM_0000208

decision-maker will evaluate public comment on the draft and final PEIS and prepare a ROD. The decision may be to select one of the alternatives in its entirety, or to combine features from several alternatives that fall within the range of alternatives analyzed in the PEIS. The ROD will address significant impacts, alternatives, environmental preferences, and relevant economic and technical considerations.

## Documents that Influence the Scope of the PEIS

Much of the scope of this PEIS is based on several EISs that were prepared from 1985 through 1992 to evaluate the use of herbicides for vegetation treatment activities on public lands. These EISs include: *Northwest Area Noxious Weed Control Program EIS* (USDI BLM 1985), *Supplement to the Northwest Area Noxious Weed Control Program* (USDI BLM 1987b), *California Vegetation Management Final EIS* (USDI BLM 1988a), *Final EIS Vegetation Treatment on BLM Lands in Thirteen Western States* (USDI BLM 1991a), and *Final Record of Decision Western Oregon Program-Management of Competing Vegetation* (USDI BLM 1992a).

These documents identify vegetation treatment activities involving the use of herbicides in 14 western states and evaluate the risks of using 22 herbicide active ingredients. Where appropriate, information in these documents that is relevant to analysis of the current proposal is cited and incorporated by reference.

Other documents and policies that influence the scope of this PEIS include: 1) *National Fire Plan* (USDI and USDA 2001a); 2) *Healthy Forests Initiative of 2002 and Healthy Forests Restoration Act of 2003* (Public Law 108-148); 3) Chapter 3 *(Interagency Burned Area Emergency Stabilization and Rehabilitation)* in BLM Manual 620 (*Wildland Fire Management*; USDI 2004); 4) *A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan* (USDI and USDA 2006a); 5) *Protecting People and Sustaining Resources in Fire Adapted Ecosystems: A Cohesive Strategy* (USDA and USDI 2006b); 6) *Draft Interagency Burned Area Emergency Response Guidebook* (USDA and USDI 2006c); 7) *Interagency Burned Area Rehabilitation Guidebook* (USDA and USDI 2006d); and 8) *Draft Burned Area Emergency Stabilization and Rehabilitation Handbook* (H-1742-1; USDI BLM 2006a). These documents provide policy and guidance for hazardous fuels reduction and land restoration activities to reduce the risk of wildfires and restore fire-adapted ecosystems, and to rehabilitate and restore lands damaged by wildfires. The *Meeting the Invasive Species Challenge Management Plan* (National Invasive Species Council 2001) and *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996) identify appropriate actions to control weeds on public lands.

Numerous other BLM manuals and handbooks were also consulted when developing the PEIS. These are listed in Appendix F.

## Relationship to Statutes, Regulations, and Policies

### Federal Laws, Regulations, and Policies that Influence Vegetation Treatments

Several federal laws, regulations, and policies guide BLM management activities on public lands. The ***Federal Land Policy and Management Act of 1976 (FLPMA)*** directs the BLM to manage public lands "in a manner that will protect the quality of scientific, scenic, historic, ecological, environmental, air and atmospheric, water resources and archeological values" and to develop resource management plans (RMPs) consistent with those of state and local governments to the extent that BLM programs also comply with federal laws and regulations. The ***Taylor Grazing Act of 1934*** introduced federal protection and management of public lands by regulating grazing on public lands. The ***Oregon and California Grant Lands Act of 1937*** provides for the management of the revested Oregon and California and reconveyed Coos Bay Wagon Road grant lands for permanent forest production under the principle of sustained yield and for leasing of lands for grazing.

Several acts provide for management and control of invasive vegetation. Two weed control acts, the ***Carlson-Foley Act of 1968*** and the ***Plant Protection Act of 2000*** (Public Law 106-224; includes management of undesirable plants on federal lands) authorize the BLM to manage noxious weeds and to coordinate with other federal and state agencies in activities to eradicate, suppress, control, prevent, or retard the spread of any noxious weeds on federal lands. The ***Federal Noxious Weed Act of 1974*** established and funded an undesirable plant management program, implemented cooperative agreements with state agencies, and established integrated management

BLM_0000209

systems to control undesirable plant species. The *Noxious Weed Control Act of 2004* established a program to provide assistance through states to eligible weed management entities to control or eradicate harmful, nonnative weeds on public and private lands. The *Public Rangelands Improvement Act of 1978* requires the BLM to manage, maintain, and improve the condition of the public rangelands so that they become as productive as feasible.

The BLM must comply with numerous federal laws that govern activities on public lands. *The Clean Air Act*, as revised in 1990, would primarily govern prescribed fire smoke emissions, and requires the USEPA and states to carry out programs to assure attainment of the National Ambient Air Quality Standards (NAAQS). The *Safe Drinking Water Act* is designed to protect the quality of public drinking water and its sources. The *Wilderness Act of 1974* provides management directions to protect wilderness values and guides activities and permitted uses within these areas.

*The Clean Water Act* regulates discharges into waters of the United States, including wetlands. As authorized by the Clean Water Act, the National Pollutant Discharge Elimination System (NPDES) permit program controls water pollution by regulating point sources that discharge pollutants into waters of the United States. Based on a recent ruling by the USEPA (2006), an NPDES permit is not required for applications of herbicides directly to water in order to control aquatic vegetation, or for application of herbicides that are present over or near water, where a portion of the herbicide will unavoidably be deposited to the water in order to target the pest vegetation. The ruling does not apply to terrestrial herbicide applications that drift over and into waters of the U.S.; issues related to these applications are under review by the USEPA.

USEPA regulates pesticides under two major federal statutes. The *Federal Insecticide, Fungicide and Rodenticide Act (FIFRA)* establishes procedures for the registration, classification, and regulation of all pesticides. Before any pesticide may be sold legally, the USEPA must register it. The USEPA may classify a pesticide for general use if it determines that the pesticide is not likely to cause unreasonable adverse effects to applicators, or the environment, or for restricted use if the pesticide must be applied by a certified applicator and in accordance with other restrictions. All the herbicides evaluated in this PEIS, except diflufenzopyr as a stand-alone active ingredient, are registered with the USEPA. Diflufenzopyr is approved as a formulation with dicamba and is labeled

as Distinct, but could not be used as a stand-alone active ingredient by the BLM until it is registered with the USEPA. All applicators that apply them on public lands (i.e., certified applicators or those directly supervised by a certified applicator) must comply with the application rates, uses, and handling instructions on the herbicide label, and where more restrictive, the rates, uses, and handling instructions developed by the BLM. Under the *Federal Food, Drug, and Cosmetic Act*, the USEPA establishes tolerances (maximum legally permissible levels) for pesticide residues in food.

The *Food Quality Protection Act of 1996* changed the way the USEPA sets residue limits (tolerances) for pesticides on foods under the Federal Food, Drug, and Cosmetic Act, and the way the USEPA reviews and approves pesticides under FIFRA. Specifically, the Act mandated a single, health-based standard for all pesticides in all foods; provided special protections for infants and children; expedited approval of safer pesticides; created incentives for the development and maintenance of effective crop protection tools for American farmers; and required periodic reevaluation of pesticide registrations and tolerances to ensure that the scientific data supporting pesticide registrations will remain up to date in the future.

The *Resource Conservation and Recovery Act (RCRA)* regulates the disposal of toxic wastes, including the disposal of unused herbicides, and provides authority for toxic waste cleanup actions when there is a known operator. *The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA)* regulates how to clean up spills of hazardous materials and when to notify agencies in case of spills.

Several laws pertain to the protection of plants and animals and their habitats. The *Migratory Bird Conservation Act of 1929, as amended,* makes it unlawful to directly, or indirectly, harm migratory birds. If the USFWS determines that migratory birds could be harmed by BLM vegetation treatment actions, the two agencies would develop a site-specific assessment and mitigation to prevent harm to these birds. *The Endangered Species Act (ESA) of 1973* provides for conserving endangered and threatened species of plants and animals. The ESA also requires that federal agencies consult with the USFWS and NMFS to ensure that any actions that they authorize, fund, or carry out are not likely to jeopardize the continued survival of a listed species or result in the adverse modification or destruction of its critical habitat. The *Wild Free-Roaming Horse and Burro Act of 1971, as amended by the Public Rangelands Improvement Act of 1978*

BLM_0000210

provides for the management, protection, and control of wild horses and burros on public lands and authorizes the "adoption" of wild horses and burros by private individuals. The *Fish and Wildlife Conservation Act of 1980* encourages federal agencies to conserve and promote the conservation of non-game fish and wildlife species and their habitats. The *Sikes Act of 1974* authorizes the USDI to plan, develop, maintain, and coordinate programs with state agencies for the conservation and rehabilitation of wildlife, fish, and game on public lands.

Laws and acts that pertain to the protection of historic and cultural resources and the rights of Native American tribes and Alaska Native groups include the *Historic Sites Act of 1935*, which provides for the preservation of historic American sites, buildings, objects, and antiquities of national significance. The *National Historic Preservation Act (NHPA) of 1966* requires federal agencies to take into account the potential affects of their actions on properties that are listed or are eligible for listing on the National Register of Historic Places (NRHP), and to consult with State Historic Preservation Officers (SHPOs), Indian tribes, and local governments regarding the effects of federal actions on historic properties. The *Archeological Resources Protection Act of 1979* prohibits the excavation, removal, damage, or other alteration or defacement of archaeological resources on federal or Indian lands without a permit. *The American Indian Religious Freedom Act of 1978* requires federal land managers to include consultation with traditional Native American or Alaska Native religious leaders in their management plans. The *Native American Graves Protection and Repatriation Act of 1990* recognizes the property rights of Native Americans and Alaska Natives in certain cultural items, including Native American and Alaska Native human remains and sacred objects. *Section 810 of the Alaska National Interest Lands Conservation Act* (ANILCA) addresses the effects of proposed activities on Alaska Native subsistence uses.

This PEIS follows the guidelines in several Executive orders (EOs). *Executive Order 11990, Protection of Wetlands*, ensures that federal agencies minimize the destruction, loss, or degradation of wetlands, and enhance and preserve the natural and beneficial values of wetlands, when carrying out actions on federal lands. *Executive Order 12898, Environmental Justice*, requires that federal agencies address the environmental justice of their actions on minority populations and on low-income populations. *Executive Order 13045, Protection of Children from Environmental Health*

*Risks and Safety Risks*, ensures that federal agencies identify and assess the environmental health and safety risks that may disproportionately affect children. *Executive Order 13084, Consultation and Coordination with Indian Tribal Governments* directs federal agencies to respect tribal self-government and sovereignty, tribal rights, and tribal responsibilities whenever they formulate policies "significantly or uniquely affect Indian tribal governments." *Executive Order 13112, Invasive Species*, directs federal agencies to prevent the introduction of invasive species and provide for their control, and to minimize the economic, ecological, and human health impacts that invasive species cause. *Executive Order 13186, Responsibilities of Federal Agencies to Protect Migratory Birds*, requires that federal agencies that have, or are likely to have, a measurable negative effect on migratory bird populations develop a Memorandum of Understanding (MOU) with the USFWS that shall promote the conservation of migratory bird populations.

## NEPA Requirements of the Program

Federal agencies are required to prepare an EIS under NEPA when the proposed action is likely to have a significant impact on the quality of the human environment (42 U.S.C. [United States Code] 4321 et seq.; USDI BLM 1988c). An EIS is intended to provide decision-makers and the public with a complete and objective evaluation of significant environmental impacts, beneficial and adverse, resulting from the proposed action and all reasonable alternatives.

The intent of this PEIS is to comply with NEPA by assessing the program impacts of using herbicides to treat vegetation on public lands administered by the BLM. Additional guidance for NEPA compliance and for assessing impacts is provided in the Council on Environmental Quality (CEQ) *Regulations for Implementing the Procedural Provisions of NEPA* (40 Code of Federal Regulations [CFR] Parts 1500-1508), and the BLM *National Environmental Policy Act Handbook* H-1790-1 (USDI BLM 1988b).

To the extent practicable, existing environmental analyses were used in analyzing impacts associated with the proposed action and alternatives, including information contained in documents listed in a previous section, Documents that Influence the Scope of the PEIS.

This PEIS provides a broad, comprehensive background source of information on which any necessary

BLM_0000211

subsequent environmental analyses can be tiered. In general, the NEPA process may be done at multiple scales depending on the scope of the proposal, as shown in Figure 1-1. The broadest level, which this PEIS represents, is a national-level programmatic study. This level of study contains broad regional descriptions of resources, provides a broad environmental impact analysis, including cumulative impacts, focuses on general policies, and provides Bureau-wide decisions on herbicide use and other available tools for vegetation management. Additionally, it provides an umbrella ESA Section 7 consultation for the broad range of activities described in the PEIS.

The next scale of analysis represents a regional level of analysis, and may be prepared for regional or statewide programs. A regional level of analysis would typically focus on methods to be used, options, regional or statewide issues, and provide an ESA Section 7 consultation focused on regional issues. Examples of these types of analyses are found in such documents as the *Interior Columbia Basin Ecosystem Management Plan* (USDA Forest Service and USDI BLM 1997), and the *Northwest Area Noxious Weed Control Program EIS* (USDI BLM 1985).

Below the regional scale of analysis, there is the option to prepare a field office level of analysis. This analysis may be prepared for district or field office-wide programs. The analysis is tiered to either or both of the two higher scales of analysis and focuses on impacts of methods and options for a single program, such as a field office invasive and noxious weed program or prescribed fire and wildland fire use program. Local LUPs, such as RMPs and Management Framework Plans (MFPs), guide analysis at this level. Collectively, these LUPs outline the specific resource goals and objectives and use allocations for a specific geographic area. The uses and allocations allowed by the LUP are analyzed in an EIS associated with the development of the LUP. Land use plans are developed to include the proposed action and alternatives that identify specific management strategies to meet particular national, regional, and local goals and objectives. This scale provides ESA Section 7 consultation focused on local issues and species of concern that occur within the field office's administrative jurisdiction.

The local scale provides project level analysis and is prepared for site-specific proposals. The analysis may be tiered to any or all of the above scales of analysis. The analysis focuses on site-specific impacts of implementing a single management proposal as identified through local planning. Examples include, but are not limited to, weed control, prescribed fire, hazardous fuel reduction, and WUI projects. Section 7 consultation under the ESA focuses on the implementing actions.

Tiering allows local offices to prepare more specific environmental documents without duplicating relevant portions of this PEIS. Analyses done by local BLM offices will be prepared in accordance with NEPA guidance and will include public involvement as regulated by the CEQ, as well as follow USDI and BLM manual and handbook guidance and pertinent instruction memoranda.

# Interrelationships and Coordination with Agencies

In its role as manager of nearly 261 million acres in the western U.S., including Alaska, the BLM has developed numerous relationships at the federal, tribal, state, and local levels, as well as with conservation and environmental groups with an interest in resource management, and members of the public that use public lands or are affected by activities on public lands.

As noted previously, several federal agencies administer laws that govern activities on public lands. Federal agencies, including the Department of Defense, the Department of Energy, the National Park Service, the USFWS, the Bureau of Reclamation, the Bureau of Indian Affairs, and the USDA Forest Service, administer lands adjacent to or in close proximity to public lands administered by the BLM, and have vegetation management issues that are similar to the BLM's. Other agencies, such as the Agricultural Research Service, the Animal, Plant, Health Inspection Service, the Natural Resource Conservation Service, and the U.S. Geological Survey Biological Services, play vital roles in coordination with national, tribal, state, county and private interests through their oversight and coordination responsibilities. These agencies and the BLM regularly coordinate on vegetation management and control efforts to benefit all federally-administered lands. Other local coordination includes the sharing of equipment, training, and financial resources, and developing vegetation management plans that cross administrative boundaries.

BLM_0000212



(Adapted from USDI BLM 1991a)

**Level 1**
Vegetation Treatments EIS Study Area
**Regional Level of Analysis:**
EIS with broad, regional description of resources and broad environmental impact analysis. Focuses on general policies.

**Level 2**
State of Wyoming
BLM Administrative Offices
**Statewide Level of Analysis**
Analysis is tiered to level 1 and is prepared for statewide programs. Focuses on the impact of methods, options, and individual state issues.

**Level 3**
Rock Springs District and Resource Areas
**District or Resource Area Level of Analysis**
Analysis is tiered to either or both above levels. Focuses on impacts of methods and options for specific multi-management proposals, (may become Level 4).

**Level 4**
Big Sagebrush Burn Area
**Project Level of Analysis**
Analysis is tiered to any or all above levels. Focuses on site-specific impacts of implementing a single management proposal.

## Figure 1-1
## Relationship of the PEIS to BLM Field Offices

1-10

BLM_0000213

## National Level Coordination

Invasive species management is coordinated by several groups at the national level. The National Invasive Species Council was formed among several federal agencies per Executive Order 13112 to develop strategies to control invasive species on federal lands. Comprised of 16 federal agencies with direct invasive plant management responsibilities, the Federal Interagency Committee for the Management of Noxious and Exotic Weeds serves to coordinate invasive plant management activities in federal lands across the United States and its territories. A related committee is the Federal Interagency Committee on Invasive Terrestrial Animals and Pathogens, which consists of ten federal departments and agencies responsible for managing non-vegetative invasive species in terrestrial ecosystems. The BLM also coordinates with the Aquatic Nuisance Species Task Force, which is co-chaired by the USFWS and NMFS, and is responsible for coordinating efforts by the federal government and the private sector in controlling aquatic nuisance species. The BLM also produces national level strategies for invasive species prevention and management (e.g., *Partners Against Weeds: An Action Plan for the Bureau of Land Management* [USDI BLM 1996], and *Pulling Together: National Strategy for Invasive Plant Management* [USDI BLM 1998]).

Fire and fuels management coordination involves both federal and state entities. The Wildland Fire Leadership Council is a cooperative, interagency organization dedicated to achieving consistent implementation of the goals, actions, and policies in the *National Fire Plan* and the *Federal Wildland Fire Management Policy*. The National Fire and Aviation Executive Board was established to resolve wildland fire management issues on an interagency level by improving coordination and integration of federal fire and aviation programs.

The National Interagency Fuels Coordination Group, chartered under the National Fire and Aviation Executive Board, was established shortly after the *National Fire Plan* in October of 2001 under the direction and guidance of the Department of the Interior's Bureau of Indian Affairs, BLM, USFWS, National Park Service, and USDA Forest Service. The primary purpose of the group is to provide leadership and coordination in uniting the Departments' resources and fire management programs under a common purpose for reducing risks to communities while improving and maintaining ecosystem health. The Group provides assistance and guidance in the development and implementation of an effective interagency fuels management program, which includes addressing risks from severe fires in WUI communities and restoring healthy ecological systems in other wildland areas.

The National Wildfire Coordinating Group provides coordination among the following agencies and their programs: USDA Forest Service; USDI BLM, National Park Service, Bureau of Indian Affairs, and USFWS; and the National Association of State Foresters. The BLM is also one of six federal agencies that provide scientific support for the management of fuels and wildland fires in the Joint Fire Science Program.

## State and County Level Coordination

The BLM is required to coordinate with state and local agencies under several acts, including: the Clean Air Act, the Sikes Act, FLPMA, and Section 106 of the NHPA. The BLM coordinates closely with state resource management agencies on issues involving the management of public lands, the protection of fish and wildlife populations, including federal- and state-listed threatened and endangered species, invasive and noxious weeds, fuels and wildland fire management, and herbicide application. Herbicide applications are also coordinated with state and local water quality agencies to ensure treatment applications are in compliance with applicable water quality standards, and do not result in unacceptable surface or ground water contamination.

Local and state agencies work closely with the BLM to manage weeds on local, state, and federal lands, and are often responsible for weed treatments on public lands. The BLM participates in exotic plant pest councils, state vegetation and noxious weed management committees, state invasive species councils, county weed districts and weed management associations found throughout the west.

The Healthy Forests Restoration Act (HFRA) directs the USDA Forest Service and USDI BLM to develop an annual program of work for federal land that gives priority to authorized hazardous fuel reduction projects that provide for protecting at risk communities or watersheds. The recommendations made by Community Wildfire Protection Plans (described under Coordination in Chapter 2) are taken into account by the agencies in accordance with HFRA, which gives priority in allocating funding to communities that have adopted these plans, or that have taken measures to encourage

BLM_0000214

willing property owners to reduce fire risk on private property (USDA Forest Service and USDI BLM 2004). All prescribed burning is coordinated with state and local air quality agencies to ensure that local air quality is not significantly impacted by BLM activities.

## Non-governmental Organizations

The BLM coordinates at the national and local levels with several resource advisory groups and non-governmental organizations, including: BLM Resource Advisory Councils, the Western Governors' Association, the National Association of Counties, the Western Area Power Administration, the National Cattlemen's Association, the National Wool Growers Association, the Society of American Foresters, and the American Forest and Paper Association. The BLM also solicits input from national and local conservation and environmental groups with an interest in land management activities on public lands, such as The Nature Conservancy. These groups provide information on strategies for weed prevention, effective weed treatment methods, use of domestic animals to control weeds, landscape level planning, vegetation monitoring, techniques to restore land health, and methods to ensure that prescribed burning does not impact the safe operation of power transmission lines.

## Cooperative Weed Management Areas

Cooperative Weed Management Areas (CWMAs) are composed of local, private, and federal interests. CWMAs typically center on a particular watershed or similar geographic area in order to pool resources and management strategies in the prevention and control of weed populations. Much of the BLM's on-the-ground invasive species prevention and management is done directly or indirectly through CWMAs. The BLM participates in numerous CWMAs throughout the west, several of which are showcase examples of interagency and private cooperation in restoring land health.

## Consultation

As part of this PEIS, the BLM consulted with the USFWS and NMFS as required under Section 7 of the ESA (see Chapter 5 and Appendix G). The BLM prepared a formal initiation package that included: 1) a description of the program, listed threatened and endangered species, species proposed for listing, and critical habitats that may be affected by the program; and 2) a *Biological Assessment for Vegetation Treatments on Bureau of Land Management Lands in* *17 Western States* (BA; USDI BLM 2007b). The BA evaluated the likely impacts to listed species, species proposed for listing, and critical habitats from the proposed use of herbicides and other treatment methods in its vegetation treatment program and identified management practices to minimize impacts to these species and habitats.

The BLM initiated consultation with Native American tribes and Alaska Native groups to identify their cultural values, religious beliefs, traditional practices, and legal rights that could be affected by BLM actions. This included sending out letters to all tribes and groups that could be directly affected by vegetation treatment activities, and requesting information on how the proposed activities could impact Native American and Alaska Native interests, including the use of vegetation and wildlife for subsistence, religious, and ceremonial purposes (see Appendix G).

The BLM conducted an Alaska National Interest Lands Conservation Act (ANILCA) § 810 Analysis of Subsistence. During this process, the BLM invited public participation and collaborated with Alaska Natives to identify and protect culturally significant plants used for food, baskets, fiber, medicine, and ceremonial purposes. The findings required by ANILCA § 810 are given in Appendix H.

The BLM also consulted with SHPOs as part of Section 106 consultation under the NHPA to determine how proposed vegetation treatment actions could impact cultural resources. Formal consultations with SHPOs and Indian tribes also may be required during implementation of projects at the local level (see Appendix G).

## Public Involvement and Analysis of Issues

The purpose of scoping is to focus the analysis in an EIS on the significant issues and reasonable alternatives in order to eliminate extraneous discussion and to reduce the length of an EIS (USDI BLM 1988b). Scoping is an ongoing process that involves the public in developing an EIS.

The BLM published a Federal Register (FR) Notice of Intent (NOI) on October 11, 2001, notifying the public that the BLM had formed a team to prepare a PEIS on the treatment of vegetation on public lands in the western U.S., including Alaska. The NOI also stated that comments on the proposal would be accepted from October 12 through November 11, 2001.

BLM_0000215

A second Federal Register Notice of Intent was published on January 2, 2002, notifying the public of the location of public scoping meetings, and extending the public comment period until March 29, 2002.

A third Federal Register Notice of Intent was published on January 22, 2002, notifying the public of changes to the meeting schedule.

All affected states issued public notices of the scoping period, which were placed in newspapers in or near locations where public meetings were held. In addition, information on the location of scoping meetings was provided by electronic mail in early December 2001, and again in early January 2002, to all members of the public that had placed their names on the electronic mailing list for the project before the date of the announcements.

## Public Scoping Meetings

Eighteen public meetings were held in 12 western states, including Alaska, and one meeting was held in Washington, D.C. The scoping meetings were conducted in an open-house style. Informational displays were provided at the meeting, and handouts describing the project, the NEPA process, and issues and alternatives were given to the public. A formal presentation provided the public with additional information on program goals and objectives. This presentation was followed by a question and answer session.

The BLM received 1,034 requests to be placed on the project mailing list from individuals, organizations, and government agencies, and 381 written comment letters or facsimiles on the proposal. In addition, the public provided comments on the project at the public scoping meetings; over 2,800 catalogued individual comments (written and oral) were given during public scoping. In many cases, multiple respondents submitted the same comment. A *Scoping Comment Summary Report for the Vegetation Treatments Programmatic EIS* (ENSR 2002) was prepared that summarized the issues and alternatives identified during scoping. This document was made available to the public in July 2002.

## Scoping Issues and Concerns

A wide range of issues was identified during scoping. Issues accounting for over 80% of the comments considered in the PEIS and PER are listed in Table 1-1.

The primary issue of controversy identified through scoping, and which required NEPA review, was the BLM's continuing and proposed increase in the use of herbicides in vegetation treatment programs needed to implement the *National Fire Plan* and related initiatives. The use of herbicides has been affirmed as a central issue for analysis in all past EISs considered in this document.

After scoping, the BLM determined that a NEPA review was not required to assess the impacts of other treatment activities on environmental and social resources on public lands at the national programmatic level. The use of these techniques has been affirmed in all previous EISs, and the BLM has authority under existing statutes to utilize these methods of treatment as necessary. Program- and project-specific NEPA analysis of the use of these techniques, and under what circumstances, will occur at the land use planning and project level.

## Development of the Alternatives

The public comments influenced the development of several vegetation management alternatives. As noted in Table 1-1, numerous respondents suggested that the BLM reduce or eliminate the use of herbicides, avoid aerial applications of herbicides, or avoid the use of sulfonylurea and other acetolactate synthase (ALS)-inhibiting active ingredients. Based on these comments and NEPA-review requirements, alternatives addressing the use of herbicides are evaluated in the PEIS. The effects of other non-herbicide vegetation treatments are described in the PER.

## Issues Not Addressed in the Draft PEIS

Approximately 16% of comments received were not addressed in the PEIS or PER because they were beyond the scope of the document or did not meet the basic purpose and need of the project. The following are examples of comments not addressed in the PEIS or PER:

- Address the impacts of livestock grazing on aquifer recharge and wildlife habitat

- Amend the Mining Act of 1872

- Have scoping meetings in each district and extend the scoping period

- Classify wild horses as big game for sportsmen

- Increase penalties for violators of OHV rules

BLM_0000216

- The BLM is unconstitutional

## Public Review and Comment on the Draft Programmatic EIS, ER, and BA

The Notice of Availability (NOA) of the *Draft Vegetation Treatments using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement* was published in the Federal Register on November 10, 2005. The public comment period was originally scheduled from November 10, 2005, through January 9, 2006; however, a notice extending the public comment period through February 10, 2006, was published in the Federal Register on January 20, 2006. Public notices announcing the comment period were placed in newspapers with circulation in or near locations where public meetings were held. The BLM issued a press release on November 10, 2006, notifying the public that the Draft PEIS, PER, and BA were available for public review, and listing the schedule for public comment hearings. Information on the Draft PEIS, PER, and BA were also posted on the interactive website. The public was able to access the website to download a copy of the Draft PEIS, PER, and BA.

Public hearings were held in Portland, Oregon on November 28, Sacramento, California on November 29, Salt Lake City, Utah on November 30, Albuquerque, New Mexico on December 1, Grand Junction, Colorado on December 5, Boise, Idaho on December 6, Billings, Montana on December 7, Cheyenne, Wyoming on December 8, and Las Vegas, Nevada, and Washington D.C. on December 13, 2006. These hearings allowed the BLM to provide an overview of the alternatives and to take public comments and subsistence testimony. Nearly 3,000 comments were received on the Draft PEIS, PER, and BA. Comments included letters, electronic mail, facsimiles, and comments provided at the public hearings in Boise and Sacramento (no public testimony was given at the other public hearings). A summary of the comments received and issues identified and specific comments and responses are presented in Volume III of this final PEIS. All comments are reproduced on the CD located in the back pocket of Volume I of the PEIS.

## Limitations of this PEIS

This PEIS is a programmatic document that addresses the broad impacts associated with the proposed action and alternatives to the proposed action. Environmental impacts are assessed at a general level because of the broad land area analyzed in the PEIS. Site-specific impacts would be assessed in NEPA documents prepared by local BLM offices and tiered to this document.

The analyses of impacts of the use herbicides in this PEIS are based on the best and most recent information available. As is always the case when developing management direction for a wide range of resources, not all information that might be desired was available. The CEQ Regulations provide direction on how to proceed with the preparation of an EIS when information is incomplete or unavailable:

"If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement: 1) a statement that such information is incomplete or unavailable; 2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; 3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and 4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason" (40 CFR 1502.22 b).

For this PEIS, the primary effect of unavailable information is the inability to quantify certain impacts. Where quantification was not possible, impacts have been described in qualitative terms. A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable adverse impacts on the human and socioeconomic environment and support the BLM's evaluation of such impacts have been included in chapters 3 and 4, in the appendices that accompany this PEIS, and in supporting documents that were prepared for this PEIS that have been included on the accompanying CD or are available on the BLM website at http://www.blm.gov. A copy of the PER and its supporting documents are also available at this website.

BLM_0000217

If changes in the proposed vegetation treatment activities and levels occur in the future, they would be reviewed to determine whether additional environmental documentation was needed, including an EA or EIS. This PEIS would serve as a source document that would be used to support any additional documentation that may be required. Any new or additional actions would also be evaluated for compliance with federal, state, and local laws and regulations prior to implementation, and the public would be informed of any major actions that may be considered for implementation by the BLM as part of the NEPA compliance process.

# Preview of the Remainder of the PEIS

The format of this PEIS follows guidance provided by the CEQ and BLM *National Environmental Policy Act Handbook* H-1790-1 (USDI BLM 1988b). Because this PEIS contains a broad range of information, Figure 1-2 shows the types of information found in the PEIS, and where it is located.

BLM_0000218

PROPOSED ACTION AND PURPOSE AND NEED

TABLE 1-1
Key Issues (and Number of Comments) Identified During Scoping and
Location Where Issues Are Addressed in the PEIS and PER

| Issue | Where Addressed in PEIS and (PER) |
|---|---|
| *Program Purpose and Need* | |
| Focus on long-term ecosystem sustainability and biological diversity; clearly define restoration objectives (39) | 1-1, 1-3, 2-1, 2-5, 2-22, Ch. 4. (Chs. 1, 2) |
| Need to address all invasive plants, not just weeds (34) | 1-1, 2-3, 2-22 (Chs. 2, 4) |
| Evaluate land use impacts, such as grazing and fire suppression, on the decline of ecosystem health (377) | 1-1, 1-5, Ch. 4 (Chs.1, 2, 4) |
| Focus on addressing the causes rather than treating the symptoms (102) | 2-5, 2-15, 2-23 (Ch. 2) |
| Address how PEIS will impact Resource Management Plans and other local planning (23) | 1,-5, 1-8 (Ch. 1) |
| Work closely with agencies, conservation groups, and private landowners on vegetation management (93) | 1-9, 1-11, 2-25, 2-39, Ch. 5 (Ch. 1) |
| *Proposed Action* | |
| Ensure that adequate funds are available to treat enough land and monitor treatment success (45) | 2-22 |
| Consider all treatment methods (11) | 2-8, 2-14 (Ch. 2) |
| Naturally-occurring fires should be allowed to burn and restored to public lands (38) | 1-1, (Chs. 2, 3, 4) |
| Use newer, less toxic herbicides where feasible, and limit use or avoid use of herbicides (75) | 2-9,  Ch. 4, App. B, C |
| Describe how herbicides were chosen and evaluated in the PEIS (33) | 2-9,  Ch. 4, App. B, C |
| Describe where acres will be treated and method of accounting for acres that receive multiple treatments (28) | 2-21 (Ch. 1) |
| *Other Potential Alternatives* | |
| Reduce or eliminate the use of herbicides; apply from the ground rather than from the air (206) | 2-19 |
| Fuels reduction should only occur in WUI or where there is a threat of significant wildfire (39) | 1-1, 2-22 (Ch. 2) |
| Treat more acres; treat fewer acres (8) | 2-22 |
| Develop a no-grazing alternative; develop a no-logging alternative; develop a no-OHV alternative (12) | 1-5 |
| Develop restrictions on motorized vehicle use on public lands (72) | 1-5 |
| Develop an alternative based on an ecosystem management approach (2) | 2-20 |
| *Restoration Goals and Best Management Practices* | |
| Identify restoration objectives and focus on preventative measures to eliminate the causes of land degradation (103) | 2-22, Ch. 4 (Ch. 2) |
| Restoration efforts should focus on restoring natural disturbance regimes and ecosystem processes (11) | 2-22, Ch. 4 (Ch 4 ) |
| Improve management of public lands for multiple use and maximum public benefit (22) | 2-1 (Ch. 2) |
| Use native plants and certified native seed, where practical, for revegetation (59) | 2-22, 2-27 (Ch. 2) |
| Restrict grazing on lands that are being rehabilitated or that have not been impacted by livestock (10) | 2-23, 2-32 (Ch. 2) |
| Monitor success of treatments and establish performance measures to determine treatment success (42) | 2-35 (Ch. 2) |
| Include public education as part of the vegetation treatment program (39) | 2-39 (Ch. 2) |
| *Environmental Consequences* | |
| Address the impacts on air quality from prescribed burning (18) | (Ch. 4) |
| Address the impacts of herbicides on water quality (39) | 4-24 |
| Assess the role of fire in contributing to weed growth (44) | (Chs. 1, 2, 3, 4) |
| Evaluate the effects of herbicide treatments on non-target species (28) | 4-44 |
| Address the role of grazing in controlling weeds and other invasive vegetation and hazardous fuels (27) | (Ch. 4) |
| Vegetation treatments should focus on restoring habitat and natural ecological processes (25) | 1-1, 1-3, 2-1, 2-5, 2-8, Ch. 4 (Chs. 1, 2, 4) |
| Address the impacts of treatments on species of concern (55) | 4-71, 4-92, 4-124 (Ch. 4) |
| Describe how treatments will occur in wilderness areas (26) | 2-16,2-29,  4-155 (Chs. 2, 4) |
| Address the impacts of prescribed fire on powerline operations and safety (12) | (Ch. 4) |
| Evaluate the impacts to subsistence crops used by Native Americans and Alaska Natives (10) | 4-149 (Ch. 4) |
| Address the risks to humans and fish and wildlife from use of herbicides and smoke from prescribed fire (54) | 4-101, 4-174 (Ch. 4 ) |
| Address how will vegetation treatments will affect the local economy (40) | 4-163  (Ch. 4) |

BLM_0000219

## VOLUME 1

**Chapter 1 Proposed Action and Purpose and Need**
Summarizes the proposed action, purpose and need, and decisions to be made in this PEIS.

**Chapter 2 Alternatives**
Describes and compares the proposed management alternatives.

**Chapter 3 Affected Environment**
Presents existing natural and socioeconomic resources on public lands in the western U.S.

**Chapter 4 Environmental Consequences**
Evaluates the impacts of the alternatives on public land resources in the western U.S. and describes mitigation proposed for program-related impacts to resources.

**Chapter 5 Consultation and Coordination**
Describes the scoping and public hearing processes, agencies contacted, and government-to-government consultation, and lists the preparers of the PEIS.

**Chapter 6 References**
Lists the documents and other sources used to prepare the PEIS.

**Chapter 7 Glossary**
Provides definitions for important terms used in the PEIS.

**Chapter 8 Index**
Lists where significant issues, resource descriptions, NEPA terms, and agencies and groups discussed in the PEIS are located.

**Acronyms, Abbreviations, and Symbols (fold-out at end of Volume 1)**
Lists the acronyms, abbreviations, and symbols used in the PEIS.

## VOLUME 2

**Appendixes**
A. Common and Scientific Names of Plants and Animals Given in the PEIS
B. Human Health Risk Assessment
C. Ecological Risk Assessment
D. Evaluation of Risks from Degradates, Polyoxythylene-amine (POEA), and Endocrine Disrupting Chemicals
E. Protocol for Identifying, Evaluating, and Using New Herbicides
F. BLM Reference Manuals and Handbooks
G. Consultation Agreements
H. ANILCA Section 810 Analysis of Subsistence Impacts
I. American Lands Alliance Alternative and BLM Analysis of Alternative
J. Special Status Species List

## VOLUME 3

**Comments and Responses**
Provides a summary of the comments received on the Draft PEIS, PER, and BA

## Related Reports
### (on the CD located in the back pocket of the PEIS)

1. Biological Assessment
2. Human Health Risk Assessment Final Report
3. Ecological Risk Assessments for Each Herbicide Evaluated by the BLM
4. Ecological Risk Assessment Protocol
5. Comment Letters. Facsimiles. and Electronic Mail on Draft PEIS. PER. and BA

**Figure 1-2**
**How This Programmatic EIS is Organized.**

BLM_0000220

BLM_0000221



Source: USDI BLM 2001b
Note:   Coverage for BLM-administered lands is not available
        for Texas, Nebraska, or Oklahoma

N

0   100   200   300   400
Miles

BLM-administered Lands

0   200   400   600   800
Miles

Map 1-1
Public Lands Administered by the Bureau of Land Management

1-19

BLM_0000223

# CHAPTER 2
# ALTERNATIVES

BLM_0000224

BLM_0000225

# TABLE OF CONTENTS

Page

Introduction ........................................................................................................................................2-1
BLM Programs Responsible for Herbicide Treatments .....................................................................2-1
    Wildland Fire Management .........................................................................................................2-2
    Rangeland Management ..............................................................................................................2-3
    Forest and Woodland Management .............................................................................................2-3
    Riparian Management .................................................................................................................2-4
    Wildlife, Fisheries, and Threatened and Endangered Species Management ...............................2-4
    Other Programs ..........................................................................................................................2-5
Vegetation Treatment Planning and Management ..............................................................................2-5
    Land Use Planning .....................................................................................................................2-5
    Site Selection and Treatment Priorities ......................................................................................2-6
Vegetation Treatment Methods .........................................................................................................2-8
    Integrating Vegetation Treatments .............................................................................................2-8
    Vegetation Treatment Method Selection ....................................................................................2-9
Herbicide Active Ingredients Evaluated under the Proposed Alternatives .........................................2-9
Herbicide Modes of Action and Treatment Methods ...................................................................... 2-13
Description of the Alternatives ....................................................................................................... 2-14
    Alternative A – Continue Present Herbicide Use (No Action Alternative) ................................ 2-14
    Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States
    (Preferred Alternative) ............................................................................................................. 2-17
    Alternative C – No Use of Herbicides ...................................................................................... 2-19
    Alternative D – No Aerial Application of Herbicides ................................................................ 2-19
    Alternative E – No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients ........ 2-20
Determination of Treatment Acreages ............................................................................................ 2-21
    Non-herbicide Treatment Method Acreages used in Cumulative Effects Analysis ..................... 2-21
Alternatives Considered but Not Further Analyzed ......................................................................... 2-22
Herbicide Treatment Standard Operating Procedures and Guidelines .............................................. 2-22
    Prevention of Weeds and Early Detection and Rapid Response ................................................ 2-23
    Herbicide Treatment Planning .................................................................................................. 2-25
    Revegetation ............................................................................................................................ 2-27
Special Precautions ........................................................................................................................ 2-28
    Special Status Species .............................................................................................................. 2-28
    Wilderness Areas ..................................................................................................................... 2-29
    Cultural Resources ................................................................................................................... 2-29
Monitoring ..................................................................................................................................... 2-35
    Monitoring Guidance used by BLM in Vegetation Management .............................................. 2-37
    Monitoring Methods and Research ........................................................................................... 2-38
Coordination and Education ............................................................................................................ 2-39
Mitigation ...................................................................................................................................... 2-40
Summary of Impacts by Alternative ............................................................................................... 2-40

BLM_0000226

ALTERNATIVES

# List of Figures

| 2-1 | Summary of Acres Treated Using Herbicides during 1997-2005 | 2-17 |
| 2-2 | National Early Warning and Rapid Reponse System for Invasive Plants | 2-26 |

# List of Tables

| 2-1 | Herbicide Active Ingredients Proposed, Evaluated, and included in Current Environmental Impact Statements of the Bureau of Land Management | 2-11 |
| 2-2 | States in which Herbicides are Approved for Use on Public Lands Based upon Current Environmental Impact Statements, Court Injunctions, and Changes in Registration Status | 2-12 |
| 2-3 | Herbicides Approved and Proposed for Use on Public Lands | 2-15 |
| 2-4 | Average Number of Acres Treated Annually for Each BLM State Jurisdiction during 1997-2005 | 2-17 |
| 2-5 | Historic Use of Herbicides by the BLM and Projected Future Use of Herbicides by the BLM under Each Alternative | 2-18 |
| 2-6 | Comparison of the Alternatives | 2-19 |
| 2-7 | Prevention Measures | 2-24 |
| 2-8 | Standard Operating Procedures for Applying Herbicides | 2-30 |
| 2-9 | Mitigation Measures | 2-41 |
| 2-10 | Summary and Comparison of Effects on Resources by Alternative | 2-43 |

BLM_0000227

# CHAPTER 2

# ALTERNATIVES

## Introduction

This chapter discusses the preferred and alternative actions that have been developed to treat vegetation using herbicides on public lands in the western U.S., including Alaska. The preferred and alternative actions are those that could be taken to feasibly attain, or approximate the BLM's objectives for vegetation management, as expressed in its programs, policies, and land use plans.

Alternatives were developed to respond to the various significant issues and alternative proposals raised during scoping, yet still meet the project's purpose and need described in Chapter 1. Alternatives were also developed to ensure BLM compliance with federal, tribal, state, and local regulations. This chapter also includes mitigation measures for the proposed action and alternatives.

As described in the *Scoping Comment Summary Report for the Vegetation Treatments Programmatic EIS* (ENSR 2002), alternative proposals generated during scoping primarily focused on the types of herbicides that would be used by the BLM, methods of application, and amounts of herbicides applied. To help the reader better understand the alternative proposals, this chapter 1) identifies BLM programs primarily responsible for treatment of vegetation using herbicides; 2) describes the types of planning and project implementation that must occur before herbicides can be used on public lands; and 3) lists the herbicides evaluated in the PEIS, their mode of action, and their methods of application. These sections are followed by a description of the five alternatives developed for this PEIS, and a summary of 1) standard operating procedures (SOPs) and special precautions that would apply under all alternatives, 2) additional protective (mitigation) measures developed during preparation of the PEIS, and 3) environmental and socioeconomic impacts that would result from implementation of the alternatives.

## BLM Programs Responsible for Herbicide Treatments

In order to be effective, vegetation management by the BLM must involve all programs that rely on healthy plant species and communities to meet their objectives. The BLM's overarching goal for vegetation management is as follows:

> *Through an interdisciplinary collaborative process, plan and implement a set of actions that improve biological diversity and ecosystem function and which promote and maintain native plant communities that are resilient to disturbance and invasive species. Healthy functioning plant communities will enhance the ability to attain economic benefits on public lands* (USDI BLM 2006b).

If this goal is met, eventually the number of acres needing treatment should be reduced as a result of overall improvement in conditions. To achieve this goal, the BLM must 1) understand and plan for the condition and use of public lands, 2) focus on restoring sites that will most benefit from treatments, 3) select the appropriate treatments and SOPs to improve the likelihood of restoration success, 4) monitor treatments to better understand what treatments are successful or unsuccessful, and 5) convey information about treatment activities to BLM staff and the public.

Concurrently, public lands must be administered under the principles of multiple use and sustained yield in accordance with the intent of Congress as stated in the FLPMA. Thus, vegetation must be managed to protect and enhance the health of the land while providing a source of food, timber, and fiber for domestic needs (USDI BLM 2000c). Land-disturbing activities must be conducted in a manner that minimizes ecosystem fragmentation and degradation, and lands should be rehabilitated when necessary to safeguard the long-term diversity and integrity of the land.

Vegetation treatments using herbicides are primarily conducted by the Wildland Fire Management, Rangeland Management, Public Domain Forest

BLM_0000228

Management, Riparian Management, and Wildlife and Fisheries Management programs. Each program, as described below, has its own objectives for vegetation management, but still must meet the broad goal identified above. Types of herbicide treatments conducted by these programs include hazardous fuels reduction, weed control, fish and wildlife habitat improvement, habitat improvement for threatened and endangered species, and restoration of riparian habitats.

## Wildland Fire Management

Efforts to reduce the risk of wildfire are primarily the responsibility of the Wildland Fire Management program. During fiscal year (FY) 2005, the Wildland Fire Management program conducted hazardous fuel treatments on about 542,000 acres in the WUI and nearly 727,000 acres in non-WUI areas. The program conducted Emergency Stabilization and Burned Area Rehabilitation activities on nearly 880,000 acres. Together, the USDI and Forest Service conducted over 3 million acres of hazardous fuels treatments and treated nearly 2.4 million acres in the WUI during FY 2005 (USDI BLM 2006c, d). Between 2001 and 2006, federal land management agencies invested more than 60% of fuels treatment dollars in the WUI, enabling collaborative treatment of some 8.5 million acres near communities (USDI BLM 2006c).

Prior to 1998, the BLM managed hazardous fuels on approximately 57,000 acres annually. Historically, approximately 70% of acres were managed to restore fire-adapted ecosystems, while the remaining 30% were managed to reduce wildfire risks to communities.

Under current direction, the number of acres treated annually by the BLM to reduce wildland fire risk would increase significantly, to about 3.5 million acres in the western U.S., including Alaska, and most treatments would occur in the WUI. Although all treatment methods would be used, prescribed fire and mechanical treatments would account for most fuels reduction in the continental U.S., and wildland fires for resource use would account for most fuels reduction in Alaska.

The Wildland Fire Management program is guided by the policies expressed in the following national policy documents: 1) *National Fire Plan* (USDI and USDA 2001a); 2) *Healthy Forests Initiative of 2002 and Healthy Forests Restoration Act of 2003* (Public Law 108-148); 3) Chapter 3 *(Interagency Burned Area Emergency Stabilization and Rehabilitation)* in BLM Manual 620 (*Wildland Fire Management*; USDI BLM 2004b); 4) *A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan* (USDI and USDA 2006a); 5) *Protecting People and Sustaining Resources in Fire Adapted Ecosystems: A Cohesive Strategy* (USDI and USDA 2006b); 6) *Draft Interagency Burned Area Emergency Response Guidebook* (USDI and USDA 2006c); 7) *Interagency Burned Area Rehabilitation Guidebook* (USDI and USDA 2006d); and 8) *Draft Burned Area Emergency Stabilization and Rehabilitation Handbook* (H-1742-1; USDI BLM 2006a).

### Wildland Urban Interface (WUI)

The WUI has generally been defined by the National Wildfire Coordinating Group (NWCG) as "the line, area or zone, where structures and other human development meet or intermingle with undeveloped wildland or vegetative fuel." A more specific definition is provided in the *Healthy Forests Restoration Act of 2003*:

1. An area within or adjacent to an at-risk community that is identified in recommendations to the Secretary of the Interior or Agriculture in a community wildfire protection plan (CWPP); or

2. In the case of an area for which a CWPP is not in effect:

   (a) an area extending ½ mile from the boundary of an at-risk community;

   (b) an area within 1½ miles from the boundary of an at-risk community, including any land that has a sustained steep slope that creates the potential for wildfire behavior endangering the at-risk community; has a geographic feature that aids in creating an effective fire break such as a road or ridge top; or is in Fire Regime Condition Class 3, as documented by the Secretary of the Interior in the project-specific environmental analysis; and

   (c) an area that is adjacent to an evacuation route for an at-risk community that the Secretary determines, in cooperation with the at-risk community, requires hazardous fuel reduction to provide safer evacuation from the at-risk community.

The variation in the WUI definition allows local issues to drive the definition, but makes national mapping of WUI difficult.

BLM_0000229

## Rangeland Management

Approximately 165 million acres of public lands are upland rangeland, of which approximately 160 million acres are open to livestock grazing (USDI BLM 2006e). The Rangeland Management program in Alaska is responsible for reindeer grazing on approximately 5 million acres in western Alaska. The Rangeland Management program is responsible for upland health management, assessment, and restoration; rangeland improvement planning and implementation; allotment planning and administration; and resource monitoring. Management of rangeland ecosystems is conducted on a landscape basis through land use plans.

Vegetation treatment activities conducted by this program are designed to promote compliance with the state and regional rangeland health standards, but specific benefits of these projects often include livestock forage improvement, wildlife habitat improvement, suppression of plants that are toxic to wildlife and livestock, removal of plants that compete with more desirable vegetation, improvement of watershed conditions on rangelands, and restoration of native plant communities.

Vegetation treatments on public lands also include activities to control invasive species such as noxious weeds. The BLM uses an integrated pest management approach, more specifically integrated vegetation management. The goal of integrated vegetation management is to control invasive and unwanted vegetation, to prevent the spread of noxious weeds, to eradicate early-detected noxious weed species in areas where certain weeds have not yet become established, and to control weeds where they have become established. Vegetation control methods include physical and biological controls, and use of herbicides. The policy, direction, and requirements for planning and implementing integrated weed management are given in BLM Manual 9015, *Integrated Weed Management* (USDI BLM 1992b).

A total of 205,256 acres were treated to prevent the spread of noxious weeds and invasive plants in fiscal year (FY) 2005, and an estimated 317,959 acres were treated in FY 2004 by the Invasive and Noxious Weed program (USDI BLM 2006c). In addition, 3.9 million acres were inventoried for weeds during FY 2005.

Currently, the funding and labor resources available to combat weeds dictate a containment strategy. Actions will continue to be targeted at preventing the spread of weeds into the most vulnerable areas (USDI BLM 2000b).

## Forest and Woodland Management

Approximately 26 percent (69 million acres) of the lands managed by BLM consist of forestlands and woodlands (USDI BLM 2006e). Of these lands, 57 million acres are classified as woodlands and 12 million acres are classified as forestlands. Two and one-half million acres are managed under the Oregon and California (O&C) Grant Lands program, while the remaining 66.6 million acres are managed under the Public Domain Forest Management program.

Woodlands are defined as land with 5% or more cover of low-stature tree species not typically used in commercial wood products, including land that formerly had such tree cover and will be naturally or artificially regenerated. Forestland is defined as land that has 10% or more cover of tall-stature tree species typically used in commercial wood products, including land that formerly had such tree cover and will be naturally or artificially regenerated.

Approximately 36.5 million acres of forestlands and woodlands are managed by the BLM in Alaska. These consist primarily of black spruce (14.7 million acres) and white spruce (17.2 million acres) woodlands. The remaining 4.6 million acres consist of many different forest types, including paper birch, aspen, balsam poplar, mountain hemlock and Sitka spruce.

Approximately 16 million of the 32 million acres of BLM forestlands and woodlands found in the remaining 16 western states consist of pinyon/juniper woodlands, where a mix of pinyon pine and juniper tree species predominates. Approximately 2.7 million acres are comprised of the Douglas-fir forest type, 1.9 million acres are the western juniper forest type, 1.1 million acres are the ponderosa pine forest type, and 0.3 million acres each are the lodgepole pine and aspen forest types. The remaining 10 million acres consist of a wide variety of forest and woodland types.

The Public Domain Forest Management and O&C Grant Lands programs are responsible for timber and non-timber special forest product sales, reforestation efforts, fish and wildlife habitat improvement, and forest vegetation composition and structure improvements intended to increase diversity and productivity of forest landscapes, as well as their resiliency in response to disease, insects, and wildfire.

BLM_0000230

The FLPMA and BLM Manual 5000-1, *Forest Management Public Domain* (USDI BLM 1991c), direct the policy of the Public Domain Forest Management program, including requirements for planning and implementing forestry and woodland management projects.

Management of the O&C Grant Lands program is authorized under *The Oregon and California Grant Lands Act of 1937* (43 U.S.C. 1181). The FLPMA applies to all public lands, including the O&C grant lands by definition (§103(e)). However, §701(b) of FLPMA (43 USC 170) provides that if any provision of FLPMA is in conflict with or inconsistent with the *Oregon and California Grant Lands Act* and *Coos Bay Wagon Road Act*, insofar as they relate to management of timber resources and disposition of revenue from lands and resources, the latter Acts will prevail.

Treatments that are addressed in this document include: 1) reducing plant competition to enhance the growth of desired tree species and structures, 2) managing forest stands to provide habitat for wildlife and prevent epidemic insect or disease outbreaks, and 3) managing vegetation that could serve as fuel for wildfires. In 2006, the program implemented forest restoration treatments on 31,948 acres and forest management treatments on 28,644 acres (USDI BLM 2006c). Sales of timber, wood products, and non-timber special forest products totaled nearly $36.1 million during FY 2005 (USDI BLM 2006d).

## Riparian Management

The BLM manages over 23 million acres of riparian and wetland areas, comprising about 9% of public lands, and providing habitat for roughly 80% of the fish and wildlife species on public lands. The Riparian Management program's responsibilities include watershed, riparian, and wetland inventories, assessments, maintenance, restoration, and reconstruction. During 2005, the program assessed the condition of over 4,300 miles of streams, implemented enhancement projects on approximately 310 acres of wetlands and 542 miles of streams, and monitored over 8,200 acres of lakes and wetlands and 2,380 miles of streams (USDI BLM 2006c).

## Wildlife, Fisheries, and Threatened and Endangered Species Management

The BLM manages nearly 261 million acres in the 17 western states, including some of the nation's most ecologically diverse wildlife habitat—more habitat than any other federal or state agency. BLM-administered land is important to big game, waterfowl, shorebirds, songbirds, raptors, and hundreds of species of non-game mammals, reptiles, and amphibians.

The BLM's Wildlife Management program provides support for land use planning and development of conservation plans for at-risk species, such as the mountain plover, greater and Gunnison sage-grouse, lesser prairie chickens, white-tailed, black-tailed and Gunnison's prairie dogs, and their habitats. BLM biologists work with partners in big game habitat restoration, including reestablishment of bighorn sheep into historically occupied habitats, restoration of mule deer winter ranges, and enhancement of summer ranges for elk. BLM biologists continue to monitor habitat conditions and populations of numerous species, including prairie dogs, amphibians, sage-grouse, burrowing and spotted owls, muskox, caribou, and moose populations. One of the Wildlife Management program's highest priorities is development and implementation of conservation plans for the greater and Gunnison's sage-grouse. The BLM manages over 30 million acres of sage-grouse habitat in an 11-state region.

The BLM Fisheries program oversees management that directly affects over 155,000 miles of fish-bearing streams and 4 million acres of lakes and reservoirs. Water bodies on BLM-administered lands are diverse, ranging from isolated desert springs harboring populations of rare and unique fishes, to large interior Columbia River tributaries supporting salmon and resident fishes of exceptional regional and national value. These waters also support subsistence fisheries that sustain Native American cultural heritages, as well as fisheries providing recreational opportunities for the growing human population of the western United States.

The BLM's Threatened and Endangered Species Management program is responsible for the management and recovery of federally-listed species, including plants, wildlife, and fish on public lands. In addition, the program is responsible for the management of sensitive plant species on public lands.

The Wildlife Management, Fisheries Management, and Threatened and Endangered Species Management programs support the Great Basin Restoration and the Conservation of Prairie Grasslands initiatives. In 2000, the BLM implemented the Great Basin Restoration Initiative, a regional restoration strategy to restore and

BLM_0000231

enhance nearly 70 million acres of sagebrush habitat in Nevada, Utah, Oregon, and Idaho, and California. The focus of this effort is to prevent much of the land burned in wildfires from being overwhelmed by annual grasses and noxious weeds. The same year, the BLM also began the Conservation of Prairie Grasslands initiative to protect and maintain important grasslands on approximately 15 million acres of short- and mixed-grass prairie in a 7-state area that extends from Canada to Mexico. Both efforts focus on managing healthy landscapes and protecting and restoring habitats to benefit wildlife. The Wildlife Management and Fisheries Management programs are also responsible for managing subsistence uses on public lands in Alaska.

FLPMA and several manuals (BLM Manual 6500 - *Wildlife and Fisheries Management*; BLM Manual 6720 - *Aquatic Resource Management*; BLM Manual 6780 - *Habitat Conservation Management Planning*; and BLM Manual 6840 - *Special Status Species Management*) outline the policy, direction, and requirements for planning and implementing management and treatments for fish, wildlife, and special status species and their habitat.

## Other Programs

Several other programs within the BLM also treat vegetation using herbicides, although to a lesser extent than the programs listed above (USDI BLM 2004a). These include the Cultural Resources, Recreation, Wilderness, Energy and Minerals, Transportation, and Realty and Ownership Management programs. Herbicides are used to manage vegetation on recreation and wilderness areas and on lands disturbed by energy and mineral development. The Realty and Ownership Management program issues ROW. Herbicides are often preferred for use on ROW over other treatment methods or in conjunction with other treatments because they are often most effective at controlling or removing vegetation before, or shortly after, it emerges. Other facilities requiring vegetation management include campgrounds, visitor centers, and other recreational facilities; administrative buildings; communications facilities; and roads. At these sites, vegetation management focuses on controlling vegetation that can pose a safety or fire hazard, or is not aesthetically pleasing The BLM uses premergence and postemergence herbicides to control emerging vegetation.

# Vegetation Treatment Planning and Management

The BLM's *Strategic Plan* (USDI BLM 2000a); *A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan* (USDI and USDA 2002); *Partners Against Weeds: An Action Plan for the Bureau of Land Management* (USDI BLM 1996), and *Pulling Together: National Strategy for Invasive Plant Management* (USDI BLM 1998) identify broad objectives for management of vegetation on public land, while treatment activities at the local level are guided by the goals, standards, and objectives of land use plans developed for each BLM field office.

Although vegetation management actually occurs at the local level, policies established at the national level help direct local efforts. Examples of national policy direction designed to improve vegetation management efforts include development of rangeland health standards and development of assessments and evaluations for land, water, air, and vegetative health (USDI BLM 2002a). These assessments provide information that is used to ascertain achievement of land health standards and to identify causes for not meeting standards. These assessments are used to help identify restoration activities and establish restoration priorities.

## Land Use Planning

Land use planning decisions are the basis for every on-the-ground action the BLM undertakes. Land use plans, usually in the form of RMPs, ensure that public lands are managed in accordance with the intent of Congress, as stated in FLPMA (43 USC 1701 et seq.), under the principles of multiple use and sustained yield. As required by FLPMA and BLM policy, "public lands must be managed in a manner that protects the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish, and wildlife and domestic animals; that will provide for outdoor recreation and human occupancy and use; and that recognizes the Nation's need for domestic sources of minerals, food, timber, and fiber from the public lands by encouraging collaboration and public participation throughout the planning process."

BLM_0000232

ALTERNATIVES

Land use plans guide land use and vegetation management decisions within the geographic area they cover, and provide specific goals, standards, objectives, and expected outcomes that apply to vegetation treatment projects and activities. These plans identify important local resources to be protected, identify historic, current, and future desired conditions for vegetation, and describe land use activities and levels that are appropriate to maintain healthy vegetation. Wise planning also considers the importance of other natural resources, such as water and soil, when developing vegetation restoration strategies. In addition, BLM land use plans identify transportation facilities, utility corridors, and other infrastructure development on public lands that is likely to receive some form of vegetation treatment.

To assist with vegetation management planning, key resource elements, such as plant community types, aquatic habitats, sensitive areas, and invasive species concentration areas, are inventoried and mapped regionally and district-wide. Inventories and maps allow field managers to identify areas of high ecological integrity; to ensure that there is suitable habitat for wide-ranging species; to identify areas where land uses may be incompatible with long-term ecosystem health; and to identify areas that could benefit from improved management. Inventories and mapping are also done at the local level to help managers better understand how proposed projects fit in with vegetative conditions on a larger scale, such as within ecoregions or watersheds. The BLM also cooperates with other agencies, organizations, and landowners in regional planning efforts, including establishment of Cooperative Weed Management Areas.

## Site Selection and Treatment Priorities

Upon approval of a land use plan, subsequent implementation decisions are often put into effect by developing implementation plans. Implementation plans, also referred to as "activity plans," tend to focus on multiple resources, and include vegetation treatment activities within a BLM field office jurisdiction. Implementation plans are made with the appropriate level of NEPA analysis; implementation decisions are usually made by BLM field managers. Implementation decisions identify site-specific vegetation management practices to achieve desired outcomes laid out in the land use plans. Some examples of practices include fuels treatments and integrated vegetation management techniques for weed infestations.

### General Site Selection and Treatment Priorities

Several factors influence where treatments will occur and treatment priorities:

- Statutory mandates, including the FLPMA, ESA, HFRA, and Taylor Grazing Act.

- Program guidance including such initiatives as the Healthy Forests Initiative and the Great Basin Restoration Initiative.

- Goals of the Strategic and Annual Performance Plans.

- Existing risks to resources.

- Likelihood of success in restoring natural biotic communities.

- Cost-effectiveness of actions.

National priorities have been established for various BLM vegetation management programs. These priorities were developed for use in conjunction with state and local office priorities for meeting restoration goals, and address site-specific conditions and/or issues as laid out in the land use plan. For example, the following treatment priorities have been established to promote integrated efforts across BLM resource programs that manage vegetation:

- WUI community protection treatments that are designed to reduce the risk of wildfire to the community and/or its infrastructure developed collaboratively with the community.

- Treatments to restore or maintain healthy, diverse, resilient, and productive native plant communities.

- Special status species habitat improvement projects designed to improve or protect special status fish, wildlife, and plant habitat.

- Treatments that will be planned, implemented, and/or monitored using funding from multiple sources, both internal and external.

- Landscape treatments (>1,000 acres for mechanical and >4,500 acres for prescribed fires), coordinated across field office boundaries, to improve treatment effectiveness.

- Contracted treatments that support economic opportunities for rural communities and/or high potential to use stewardship contracting authorities.

BLM_0000233

- Treatments that have a high potential for woody biomass utilization.

### Weed Treatment Site Selection and Treatment Priorities

For noxious weeds and invasive plants, vegetation treatment priorities identified in the *EIS Vegetation Treatment on BLM Lands in Thirteen Western States* (USDI BLM 1991a) are still applicable. They are:

- Take actions to prevent or minimize the need for vegetation controls, where feasible.
- Use effective nonchemical methods of vegetation control, where feasible.
- Use herbicides only after considering the effectiveness of all potential methods.

Development of a weed management strategy is set up at the local level and aligned with the land use planning objectives.

Actions to prevent or minimize the need for vegetation control can include protecting intact systems; maintaining conditions that have led to healthy lands (e.g., allowing natural fires to burn); reducing the impact of ongoing activities (e.g., improving grazing management practices); and applying mitigation measures to new projects to minimize soil and vegetation disturbance and avoid introductions of invasive species.

If treatment is required, efforts are focused on activities that restore natural ecosystem processes, and on ventures that are likely to succeed and provide the greatest benefits with the least expenditure of capital. Also beneficial to treatment success is site-specific analysis that includes 1) a determination of site potential under current circumstances, 2) an evaluation of land health based on land assessment studies, 3) an assessment of causes of land degradation, 4) an assessment of the likely effectiveness of treatment methods, and 5) an evaluation of the success of restoration efforts on similar types of land.

Several management objectives are considered when determining appropriate treatment of an infestation.

- Containment to prevent weed spread from moving beyond the current infestation perimeter;

- Control to reduce the extent and density of a target weed;
- Eradication to completely eliminate the weed species including reproductive propagules (this is usually only possible with small infestations); and
- Restoration of native plant communities and habitats using native species that are adapted to the project site to compete with invasives.

Several variables are considered when determining what, when, and how weed populations should be treated. These include, but are not limited to:

- The species – is it an aggressive non-native species that could be on a state noxious weed list or an adjacent state's noxious weed list, or that could be a species known for altering plant communities or ecological processes on a regional basis? If a species is native to a project area, how does current management influence the increase of the species beyond acceptable levels?
- Location – is the infestation found in a special management area, in a formerly uninfested area, or upslope/upstream from current treatments (i.e., could the species reinfest treated areas)? Does the infestation pressure or negatively impact special status plants or their habitats?
- Extent – is the infestation at a size where eradication is possible, in an area where other infestations are numerous, or of a size that may not be able to be eradicated, but can be contained or controlled to some extent? Is the extent of the infestation so large that one treatment would cover all of the known locations of an endemic species or its required resources?

The following suggests a decision process for prioritizing weed treatments in order to focus efforts towards success. It provides broad guidance to be adapted to the local level based on species, size, and extent of infestations. Priorities are then matched with the management objectives listed above.

1. Highest Priority: New aggressive infestations in an uninfested area or small infestations in areas of special

BLM_0000234

concern (e.g., wilderness, research natural areas). Management objective: Eradicate.

2. Higher Priority: Areas of high traffic or sources of infestation and larger infestations in areas of special concern. Management objective: Control.

3. High Priority: Existing large infestations or roadside infestations where spread can be checked or slowed. Management objective: Contain.

The overriding goal is to prioritize treatment methods based on their effectiveness and likelihood to have minimal impacts on the environment, and to restore desirable vegetation on lands where necessary (i.e., where desired vegetation cannot reestablish naturally).

## Vegetation Treatment Methods

Although this PEIS focuses on BLM vegetation treatments using herbicides, such treatments are only a small part of a larger effort proposed by the BLM to treat vegetation on approximately 6 million acres each year. In addition to herbicides, the BLM uses fire and manual, mechanical, and biological control treatment methods. The use of these non-herbicide methods is discussed in more detail in the PER. As with herbicides, treatments using other methods can occur anywhere on public lands, although actual treatment methods, acres treated, and treatment locations are determined at the local field level and by Congressional direction and funding. Currently, the BLM is treating about 2 million acres annually using all methods.

Herbicides are chemicals that kill or injure plants. Herbicides can be categorized as selective or non-selective. Selective herbicides kill only a specific type of plant, such as broad-leaved plants, while non-selective herbicides kill all types of plants. The use of herbicides and modes of action are discussed in more detail below.

Fire use includes prescribed fire and wildland fire use for resource benefits. Prescribed fire is the intentional application of fire to wildland fuels under specified conditions of fuels, weather, and other variables. The intent is for the fire to stay within a predetermined area to achieve site-specific resource management objectives. Wildland fire use for resource benefit is a fire ignited by lightening but allowed to burn within specified conditions of fuels, weather, and topography, to achieve specific objectives

Mechanical treatment involves the use of vehicles such as wheeled tractors, crawler-type tractors, or specially designed vehicles with attached implements designed to cut, uproot, or chop existing vegetation. Mechanical methods that may be used by the BLM include chaining, root plowing, tilling and drill seeding, mowing, roller chopping and cutting, blading, grubbing, and feller-bunching.

Manual treatment involves the use of hand tools and hand-operated power tools to cut, clear, or prune herbaceous and woody species. Treatments include cutting undesired plants above the ground level; pulling, grubbing, or digging out root systems of undesired plants to prevent sprouting and regrowth; cutting at the ground level or removing competing plants around desired species; or placing mulch around desired vegetation to limit competitive growth (USDI BLM 1991a).

Biological control involves the intentional use of domestic animals, insects, nematodes, mites, or pathogens (agents such as bacteria or fungus that can cause diseases in plants) that weaken or destroy vegetation (USDI BLM 1991a, Bonneville Power Administration [BPA] 2000). Biological control is used to reduce the targeted weed population to an acceptable level by stressing target plants and reducing competition with the desired plant species.

## Integrating Vegetation Treatments

The BLM treats vegetation using fire, mechanical and manual methods, biological treatments, and herbicides. In an integrated vegetation management program, each management option is considered, recognizing that no one management option is a stand-alone option and that each has its own strengths and weakness. Utilizing the strengths of each allows for a more effective and environmentally sound program. When the BLM plans vegetation control management projects, all control methods should be available for use, allowing the BLM to select the one method, or the combination of methods, that optimizes vegetation control with respect to environmental concerns, effectiveness, and cost of control.

No individual method will control undesirable vegetation in a single treatment; diligence and persistence will be required over a number of years to subdue vegetation such as weeds. The success of different treatment methods depends on the type of vegetation being controlled. It is important to think of

these treatment methods as they relate to specific characteristics of weeds and other vegetation.

## Vegetation Treatment Method Selection

Vegetation treatment methods are selected based on several parameters, which may include the following:

- Management program/objective for the site.
- Historic and current conditions.
- Opportunities to prevent future problems.
- Opportunities to conserve native and desirable vegetation.
- Effectiveness and cost of the treatment methods.
- Success of past restoration treatments or treatments conducted under similar conditions or recommendations by local experts.
- Characteristics of the target plant species, including size, distribution, density, life cycle, and life stage in which the plant is most susceptible to treatment.
- Non-target plant species that could be impacted by the treatment.
- Land use of the target area.
- Proximity to communities.
- Slope, accessibility, and soil characteristics of the treatment area.
- Weather conditions at the time of treatment, particularly wind speed and direction, precipitation prior to or likely to occur during or after application, and season.
- Proximity of the treatment area to sensitive areas, such as wetlands, streams, or habitat for plant or animal species of concern.
- Potential impacts to humans and fish and wildlife, including non-game species.
- Need for subsequent revegetation and/or restoration.

These parameters are considered before a treatment method is selected (USDI BLM 1991a). For most vegetation treatment projects, pretreatment surveys are conducted before selecting one or more treatment methods. These surveys involve the consideration of all feasible treatments, including their potential effectiveness based on previous experience, and best available science, impacts, and costs. Before vegetation treatment or ground disturbance occurs, the BLM consults specialists or databases for information on sensitive areas within the project area. The site may have to be surveyed for listed or proposed federal threatened or endangered species and for evidence of cultural or historic sites. In some cases, areas may receive one or more treatments in combination, such as prescribed burning followed by an herbicide application, and some areas may be treated using one or more treatment methods over several years.

## Herbicide Active Ingredients Evaluated under the Proposed Alternatives

In previous EISs, a total of 25 herbicide active ingredients were reviewed, 22 were evaluated, and 20 were approved for use in one or more states (Tables 2-1 and 2-2). The decision to approve these herbicides for use on public lands was based on a detailed analysis of the risks to human health and non-target species from the use of these chemicals.

Since the majority of these assessments were completed in the late 1980s, a comprehensive literature review was conducted as part of this PEIS to determine whether there was any significant new information relevant to environmental concerns regarding the continued use of these herbicides (McMullin and Thomas 2000). Local BLM field offices were also consulted for information from field applications suggesting that any of these chemicals should be re-analyzed. If so, a new risk assessment for that active ingredient was completed as part of this PEIS in order to assess whether the BLM should continue its use.

Based on the literature review and information from the field, sulfometuron methyl (Oust®) was found to potentially have significant impacts on non-target vegetation when carried on soil to untreated areas, effects that were not evaluated earlier. Thus, the toxicity and environmental fate of sulfometuron methyl were analyzed in this PEIS. It was determined that the remaining 19 herbicides did not require further analysis for human health risks. However, the BLM determined that the level of analysis contained in the non-target species assessments for fish and wildlife for the

---

**Herbicide Terminology**

**Active ingredient (a.i.)** is the chemical or biological component that kills or controls the target pest.

**Adjuvant(s)** are chemicals that are added to the pesticide formulation to enhance the toxicity of the active ingredient or to make the active ingredient easier to handle.

**Formulation** is the commercial mixture of both active and inactive ingredients.

**Herbicide** is a chemical pesticide used to treat vegetation.

**Herbicide resistance** occurs when naturally occurring heritable characteristics allow individual weeds to survive and reproduce, producing a population, over time, in which the majority of the plants of the weed species have the resistant characteristics.

**Other ingredient(s)** are those ingredients that are added to the commercial product (formulation), but are not herbicidally active. In the past, these were referred to as inert ingredients.

---

previous EISs was inadequate to characterize the risks to species of concern, including anadromous fish.

Since the mid-1990s, the Forest Service conducted ecological risk assessments (ERAs) for nine herbicide active ingredients also used by the BLM: 2,4-D, clopyralid, dicamba, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr. In addition, the Forest Service prepared interactive spreadsheets that allowed the BLM to determine exposure concentrations for plants and animals under different application rates and exposure scenarios for these herbicides. The ERAs and spreadsheets are available on the Internet at the Forest Service Pesticide Management and Coordination website at http://www.fs.fed.us/foresthealth/pesticide/risk.shtml.

Information contained in the ERAs was used by the BLM to characterize risks to non-target species from the specific chemicals and is incorporated by reference into this PEIS.

The Forest Service did not conduct ERAs for bromacil, chlorsulfuron, diuron, and tebuthiuron. Thus, the BLM conducted new ERAs for these herbicides as part of this PEIS.

The remaining six active ingredients currently approved for use by the BLM—2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine—have not been used, or their use has been limited to a very small

number of acres, by the BLM for several years, primarily due to the availability of other, more effective approved active ingredients.

The BLM proposes to use four new herbicide active ingredients that are registered and available for use—diflufenzopyr (as a formulation with dicamba), diquat, fluridone, and imazapic. All four of the herbicides have been deemed effective in controlling vegetation, have minimal effects on the environment and human health if used properly, and are registered (except diflufenzopyr as a stand-alone active ingredient) with the USEPA. Diflufenzopyr is approved as a formulation with dicamba and is labeled as Distinct® and Overdrive®, but cannot be used as a stand-alone active ingredient by the BLM until it is registered with the USEPA.

The new active ingredients were selected based on: 1) input from BLM field offices on types of vegetation needing control; 2) studies indicating that these active ingredients would be more effective in controlling noxious weeds and other unwanted vegetation targeted for control than active ingredients currently used by the BLM; 3) USEPA approval for use on rangelands, forestlands, and/or aquatic environments (see http://cfpub.epa.gov/oppref/rereg/status.cfm?show=rereg for information on herbicide registration and fact sheets on all registered products); 4) responses from herbicide manufacturers to a request from the BLM in October 2001 for a list of herbicides not currently approved for use on public lands that may be appropriate to control vegetation; 5) the ability of the herbicide formulations to be applied on a variety of plant species needing control; 6) the level of risk of the herbicidal formulations to human health and the environment; and 7) the funds available to the BLM to conduct human health and ecological risk assessments of the proposed herbicides.

Diflufenzopyr, which is used in combination with dicamba for weed control, inhibits the transport of auxin in the plant. The result is an abnormal accumulation of auxin or auxin-like compounds in the growing points of susceptible plants and an imbalance in growth hormones in the plant. The combination of diflufenzopyr and dicamba is registered for use in all 17 western states except Alaska and California.

Diquat is a post-emergence, nonselective herbicide that can be applied directly to vegetation or to ponds, lakes, or drainage ditches for the management of aquatic weed species. Diquat is a cell membrane disrupter, whose

BLM_0000237

ALTERNATIVES

## TABLE 2-1
### Herbicide Active Ingredients Proposed, Evaluated, and included in Current Environmental Impact Statements of the Bureau of Land Management

| Active Ingredient | EIS in Which Herbicide Evaluated | | | | Summary of Evaluations for all EISs | | |
|---|---|---|---|---|---|---|---|
| | Northwest Area Noxious Weed Control Program (1985) | California Vegetation Management (1988) | Vegetation Treatment on BLM Lands in 13 Western States (1991) | Western Oregon Program – Management of Competing Vegetation (1992) | Active Ingredients Considered | Active Ingredients Evaluated | Active Ingredients Approved for Use |
| 2,4-D | Yes (Esteron-99; DMA-4) | Yes | Yes | Yes | Yes | Yes | Yes |
| 2,4-DP | | Yes | | | Yes | Yes | Yes |
| Ammonium sulfamate | | | | Proposed, not evaluated | Yes | No | No |
| Amitrole | | Yes | Evaluated, but not included | | Yes | Yes | No |
| Asulam | | Yes | | Yes | Yes | Yes | Yes |
| Atrazine | | Yes | Yes | Yes | Yes | Yes | Yes |
| Bromacil | | Yes | Yes | | Yes | Yes | Yes |
| Chlorsulfuron | | | Yes | | Yes | Yes | Yes |
| Clopyralid | | | Yes | | Yes | Yes | Yes |
| Dalapon | | Yes | Evaluated, but not included | Proposed, but not evaluated | Yes | Yes | No |
| Dicamba | Yes (Banvel) | Yes | Yes | Yes | Yes | Yes | Yes |
| Diquat | | | | Proposed, but not evaluated | Yes | No | No |
| Diuron | | Yes | Yes | Proposed, but not evaluated | Yes | Yes | Yes |
| Fosamine | | Yes | | Proposed, but not evaluated | Yes | Yes | Yes |
| Glyphosate | Yes (Rodeo) | Yes | Yes | Yes | Yes | Yes | Yes |
| Hexazinone | | Yes | Yes | Yes | Yes | Yes | Yes |
| Imazapyr | | | Yes | | Yes | Yes | Yes |
| Mefluidide | | | Yes | | Yes | Yes | Yes |
| Metsulfuron methyl | | | Yes | | Yes | Yes | Yes |
| Monosodium methanearsonate | | | | Proposed, but not evaluated | Yes | No | No |
| Picloram | Yes (Tordon 2K, Tordon 22K) | Yes | Yes | Yes | Yes | Yes | Yes |
| Simazine | | Yes | Yes | | Yes | Yes | Yes |
| Sulfometuron methyl | | | Yes | | Yes | Yes | Yes |
| Tebuthiuron | | Yes | Yes | | Yes | Yes | Yes |
| Triclopyr | | Yes | Yes | Yes | Yes | Yes | Yes |
| Active Ingredients Evaluated or Available for Use | 4 | 16 | 17 | 8 | 25 | 22 | 20 |

ALTERNATIVES

**TABLE 2-2**
**States in which Herbicides are Approved for Use on Public Lands Based upon Current Environmental Impact Statements, Court Injunctions, and Changes in Registration Status** [1]

| Chemical | AZ | CA | CO | ID | MT | NV | NM | ND | OK | OR East | OR West | SD | UT | WA | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2,4-D | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| 2,4-DP |  | • |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Asulam |  | ◉ |  |  |  |  |  |  |  |  | ○ |  |  |  |  |
| Atrazine | • | • | • | • | • | • | • | • | • | ○ | ○ | • | • | • | • |
| Bromacil | • | • | • | • | • | • | • | • | • | ○ |  | • | • | • | • |
| Chlorsulfuron | • |  | • | • | • | • | • | • | • | ○ |  | • | • | • | • |
| Clopyralid | • |  | • | • | • | • | • | • | • | ○ |  | • | • | • | • |
| Dicamba | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Diuron | • | • | • | • | • | • | • | • | • | ○ |  | • | • | • | • |
| Fosamine |  | • |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Glyphosate | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Hexazinone | • | • | • | • | • | • | • | • | • | ○ | ○ | • | • | • | • |
| Imazapyr | • |  | • | • | • | • | • | • | • | ○ |  | • | • | • | • |
| Mefluidide | • |  | • | • | • | • | • | • | • | ○ |  | • | • | • | • |
| Metsulfuron methyl | • |  | • | • | • | • | • | • | • | ○ |  | • | • | • | • |
| Picloram | • | ◉ | • | • | • | • | • | • | • | • | • | • | • | • | • |
| Simazine | • | • | • | • | • | • | • | • | • | ○ |  | • | • | • | • |
| Sulfometuron methyl | • |  | • | • | • | • | • | • | • | ○ |  | • | • | • | • |
| Tebuthiuron | • | • | • | • | • | • | • | • | • | ○ |  | • | • | • | • |
| Triclopyr | • | • | • | • | • | • | • | • | • | ○ | ○ | • | • | • | • |

[1] These chemicals have not been approved for use in Alaska, Nebraska, and Texas.

• Based upon the current EISs, these herbicides have been analyzed and approved for application on BLM lands.

○ Based upon the current EISs, these herbicides have been analyzed and approved for application on BLM lands, but are not currently approved for use in Oregon per court injunction (Southern Oregon Citizens Against Toxic Sprays (SOCATS) v. Watt, No. 79-1098 (District Court of Oregon, October 20, 1982), 13 Environmental Law Report 20, 176.

◉ Based upon the current EISs, these herbicides have been analyzed and approved for application on BLM lands, but application is not allowed due to change in registration status in the state.

mode of action is to intercept electrons from photosynthesis and transfer the energy from photosynthesis to various free radicals that damage cell membranes. Diquat is registered for use in all 17 western states.

Fluridone is a systemic, selective, aquatic herbicide that can be applied to the water surface or subsurface, or as a bottom application just above the floor of the water body. Fluridone is absorbed from the water by the plant shoots and taken up from the soil by the roots. In susceptible plants, fluridone inhibits the formation of carotene, which is essential in maintaining the integrity of chlorophyll. Fluridone is registered for use in all 17 western states.

Imazapic, a selective, systemic herbicide, can be applied both pre-emergence and post-emergence for the management of selective broadleaf and grassy plant species. Its mode of action is associated with the synthesis of branch-chained amino acids. Imazapic is registered for use in all 17 western states except Alaska and California.

In order to ensure that the use of these active ingredients is appropriate for public lands, the BLM conducted human health risk assessments (HHRAs) and ERAs to assess the potential for risks to humans and non-target plants and animals, including special status species, from using these active ingredients. An analysis of: 1) the toxicity and environmental fate of each active

BLM_0000239

ingredient, and for a formulation of diflufenzopyr and dicamba (Overdrive®); 2) risks associated with surfactants found in herbicide formulations and herbicide active ingredient degradates; and 3) potential for herbicides considered in the PEIS to be endocrine disrupting chemicals, are provided in Chapter 4, Environmental Consequences, and in appendixes B, C, and D.

For new and currently available herbicides that may be proposed for use in the future, the BLM would follow the following steps for conducting risk assessments used in this PEIS: 1) assess a product's or a technology's effectiveness for use on target vegetation on public lands; 2) identify the level of data and analysis needed to conduct a human health and ecological risk assessment for that chemical; 3) determine the level of NEPA documentation required to support a decision to use a new product or technology; and 4) consult with the ESA regulatory agencies. These steps are discussed in more detail in Appendix E.

## Herbicide Modes of Action and Treatment Methods

Herbicides are chemicals that kill or injure plants. Some herbicides are derived from plants, while others are manufactured synthetically. Herbicides can be classified by their mode of action, and include growth regulators, amino acid inhibitors, grass meristem destroyers, cell membrane destroyers, root and shoot inhibitors, and amino acid derivatives, which interfere with plant metabolism in a variety of ways (Table 2-3; Bussan and Dyer 1999).

Herbicides can be categorized as selective or non-selective. Selective herbicides kill only a specific type of plant, such as broad-leaved plants. Many herbicides used for vegetation management are selective for broadleaved plants, so that they can be used to manage such species while maintaining the desirable grass species in rangeland communities. Glyphosate is non-selective, so it must be used carefully around desirable and non-target plants (Rees et al. 1996).

Herbicides are most effective on pure stands of a single weed where desirable and non-target plants are scarce or absent (Colorado Natural Areas Program 2000). Herbicides are also effective for rhizomatous weed species that are unpalatable to livestock, require repeated cutting or pulling for control, or are located in remote areas where pulling and cutting are not feasible. Herbicides often work well in combination with other control treatments. For example, tamarisk, Russian olive, and Siberian elm can be controlled by cutting stems close to the ground in the fall and then spraying or painting the stems with an herbicide registered for that use.

Herbicide treatments would follow BLM procedures outlined in BLM Handbook H-9011-1 (*Chemical Pest Control*), and manuals 1112 (*Safety*), 9011 (*Chemical Pest Control*), and 9015 (*Integrated Weed Management)*, and would meet or exceed states' label standards (USDI BLM 1991a). Several herbicide application methods are available. The application method chosen depends upon the treatment objective (removal or reduction); accessibility, topography, and size of the treatment area; characteristics of the target species and the desired vegetation; location of sensitive areas and potential environmental impacts in the immediate vicinity; anticipated costs; equipment limitations; and meteorological and vegetative conditions of the treatment area at the time of treatment.

Herbicide application schedules are designed to minimize potential impacts to non-target plants and animals, while remaining consistent with the objective of the vegetation treatment program. The application rates depend upon the target species, the presence and condition of non-target vegetation, soil type, depth to the water table, presence of other water sources, and the label requirements.

Herbicides can be applied aerially with helicopters or fixed-wing aircraft, or on the ground with vehicles or manual application devices. Operation of helicopters is more expensive than operation of fixed-wing aircraft, but helicopters are more maneuverable and more effective in areas with irregular terrain. Helicopters also are more effective for treating target vegetation in areas with multiple vegetation types.

Two or more herbicides may be applied at the same time in a tank mix, when tank mixtures are specified on at least one of the labels for the chemicals used in the mix. Approximately 25% of herbicide applications on public lands involved tank mixes during 2002-2005.

Manual applications of herbicides are used only in small areas, in areas inaccessible by vehicle, and in areas where weeds are scattered. They are sometimes considered when special status plants are known or suspected in all or a portion of a project area. Herbicides may be applied with a backpack applicator or spray bottle, wick (wiped on), or wand (sprayed on). Herbicides can be applied to trees around the

BLM_0000240

circumference of the trunk on the intact bark (basal bark), to cuts in the trunk or stem (frill, or "hack and squirt"), to cut stems and stumps (cut stump), or injected into the inner bark (Tu et al. 2001).

Herbicides can be used selectively to control specific types of vegetation, or non-selectively to clear all vegetation on a particular area. Herbicides can be applied over large areas and/or in remote locations using aircraft, or applied using spot applications in smaller, easily accessible locations.

There are several drawbacks and limitations to herbicide use. Herbicides can damage or kill non-target plants. Herbicides can be toxic or cause health problems in humans, other animals, and other plants. Herbicides must be applied by someone with the appropriate certification identified in state laws and BLM policy (Colorado Natural Areas Program 2000).

Herbicides would be applied according to the current label directions. The BLM would comply with changes in label directions that may occur in the future, and would comply with state registration requirements. Thus, if current state requirements do not allow the application of an herbicide approved for use in the PEIS, the BLM would not apply that herbicide in the state where it is not approved for use.

Weed populations may develop a resistance to a particular herbicide over time. Herbicide resistance is the inherited ability of a plant to survive an herbicide application to which the wild-type was susceptible. Resistant plants occur naturally within a population and differ slightly in genetic makeup, but remain reproductively compatible with the wild-type. Herbicide resistant plants are present in a population in extremely small numbers. The repeated use of one herbicide allows these few plants to survive and reproduce. The number of resistant plants then increases in the population until the herbicide no longer effectively controls the weed. Herbicide resistance is not the natural tolerance that some species have to an herbicide. The appearance of herbicide-resistant weeds is strongly linked to repeated use of the same herbicide or herbicides with the same site of action in a monoculture cropping system or in non-crop areas.

There are several things that can be done, and are being done by the BLM, to minimize the potential development of resistant weed species, including, but not limited to the following:

- Rotate herbicides – by understanding the different modes of action of each herbicide proposed for use on public lands, select the appropriate one to minimize resistance;

- Understand the potential effects of long-term residual herbicides on the selection for resistant weeds, and correctly apply these herbicides with the understanding that they can lead to weed resistance if used yearly for several consecutive years;

- Use mechanical and biological management options to eliminate weed escapes that may represent the resistant population; and

- Keep accurate records of herbicide application.

# Description of the Alternatives

Five program alternatives were developed for and evaluated in this PEIS, including the Preferred Alternative and the No Action Alternative. Alternative actions are those that could be taken to feasibly attain, or approximate the BLM's objectives for herbicide use, as expressed in its programs, policies, and land use plans.

Alternatives were developed that 1) allow the BLM to continue its current use of 20 active ingredients in 14 western states, as authorized by earlier EIS RODs; 2) allow for the use of 14 active ingredients currently used by the BLM and four new active ingredients; 3) prohibit the use of herbicides; 4) prohibit the aerial application of herbicides; or 5) prohibit the use of sulfonylurea and other acetolactate synthase-inhibiting active ingredients. These program alternatives address many of the concerns raised during scoping, in particular the public's desire to see alternatives that place less emphasis on the use of herbicides, while still meeting the program's purpose and need. Alternatives were also developed to ensure that the BLM complied with federal, tribal, state, and local regulations.

## Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under this alternative, the BLM would be able to continue to use 20 active ingredients approved for use in western states under the earlier EIS RODs for each state (Table 2-1; USDI BLM 1987a, 1988b, 1991b, 1992a). The BLM would also continue its activities conducted under Emergency Stabilization and Burned Area Rehabilitation and hazardous fuel reduction that are

BLM_0000241

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

## TABLE 2-3
### Herbicides Approved and Proposed for Use on Public Lands

| Herbicide | Herbicide Characteristics and Target Vegetation | Areas Where Registered Use is Appropriate | | | | | |
|---|---|---|---|---|---|---|---|
| | | Rangeland | Forestland | Riparian and Aquatic | Oil, Gas, and Minerals | ROW | Recreation and Cultural Resources |
| *Herbicides Approved for Use on Public Lands* | | | | | | | |
| 2, 4-D | Selective; foliar absorbed; postemergent; annual/perennial broadleaf weeds. Key species treated include burningbush, mustard species, and Russian thistle. | ● | ● | ● | ● | ● | ● |
| 2, 4-DP | Selective; foliar absorbed; postemergent; broadleaf weeds and woody species. Key species treated include burningbush, mustard species, Russian thistle, and brush species. | ● | ● | | ● | ● | ● |
| Asulam | Inhibits mitosis; controls growing grasses and certain broadleaf weeds. Key species treated include brackenfern, dock, and Johnsongrass. | | | | ● | ● | |
| Atrazine | Selective; mostly root absorbed; inhibits photosynthesis. Key species treated include annual grasses, mustards, pigweed, and Russian thistle. | | ● | | | ● | |
| Bromacil | Non-selective; inhibits photosynthesis; controls wide range of weeds and brush. Key species treated include annual grasses and broadleaf weeds, burningbush, and Russian thistle. | | | | ● | ● | ● |
| Chlorsulfuron | Selective; inhibits enzyme activity; broadleaf weeds and grasses. Key species treated include biennial thistles and annual and perennial mustards. | ● | | | ● | ● | ● |
| Clopyralid | Selective; mimics plant hormones; annual and perennial broadleaf weeds. Key species treated include knapweeds, mesquite, and starthistle and other thistles. | ● | ● | | ● | ● | ● |
| Dicamba | Growth regulator; annual and perennial broadleaf weeds, brush, and trees. Key species treated include knapweeds, burningbush, and Russian and other thistles. | ● | | | ● | ● | ● |
| Diuron | Preemergent control; annual and perennial broadleaf weeds and grasses. Key species treated include annual grasses and broadleaf weeds, burningbush, and Russian thistle. | | | | ● | ● | ● |
| Fosamine ammonium | Inhibits bud and leaf formation; broadleaf weeds, brush, and trees. Key species treated include field bindweed, leafy spurge, and locust. | | | | ● | ● | ● |
| Glyphosate | Non-selective; annual and perennial grasses and broadleaf weeds, sedges, shrubs, and trees. Key species treated include annual, biennial, and perennial grasses and broadleaf weeds and woody shrubs. | ● | ● | ● | ● | ● | ● |
| Hexazinone | Foliar or soil applied; inhibits photosynthesis; annual and perennial grasses and broadleaf weeds, brush, and trees. Key species treated include mesquite and scrub oak. | ● | ● | | ● | ● | ● |
| Imazapyr | Non-selective; preemergent and postemergent uses; absorbed through foliage and roots; annual and perennial broadleaf weeds, brush, and trees. Key species treated include saltcedar. | ● | ● | ● | ● | ● | ● |
| Mefluidide | Growth inhibitor; suppresses seed production of grasses, brush, and trees. Key species treated include roadside grasses. | | | | ● | ● | ● |
| Metsulfuron methyl | Selective; postemergent; inhibits cell division in roots and shoots; annual and perennial broadleaf weeds, brush, and trees. Key species treated include annual and perennial mustards and biennial thistles. | ● | ● | | ● | ● | ● |
| Picloram | Selective; foliar and root absorption; mimics plant hormones; certain annual and perennial broadleaf weeds, vines, and shrubs. Key species treated include knapweeds, leafy spurge, and starthistle. | ● | ● | | ● | ● | ● |
| Simazine | Used selectively or as complete vegetation killer; requires much moisture for activation; inhibits photosynthesis. Key species treated include annual grasses, mustards, pigweed, and Russian thistle. | | | | ● | ● | ● |

BLM_0000242     June 2007

ALTERNATIVES

ALTERNATIVES

**TABLE 2-3 (Cont.)**
**Herbicides Approved and Proposed for Use on Public Lands**

| Herbicide | Herbicide Characteristics | Areas Where Registered Use is Appropriate | | | | | |
|---|---|---|---|---|---|---|---|
| | | Rangeland | Forestland | Riparian and Aquatic | Oil, Gas, and Minerals | ROW | Recreation and Cultural Resources |
| *Herbicides Approved for Use on Public Lands (Cont.)* | | | | | | | |
| Sulfometuron methyl | Broad-spectrum pre and postemergent control; inhibits cell division; grasses and broadleaf weeds. Key species treated include downy brome, annual and perennial mustards, and medusahead. | | • | | • | • | • |
| Tebuthiuron | Relatively non-selective soil activated herbicide; pre and postemergent control of annual and perennial grasses, broadleaf weeds, and shrubs. Key species treated include creosotebush, oak, Russian olive, and sagebrush (thinning). | • | | | • | • | • |
| Triclopyr | Growth regulator; broadleaf weeds and woody plants. Key species treated include mesquite and saltcedar. | • | • | • | • | • | • |
| *Herbicides Proposed for Use on Public Lands* | | | | | | | |
| Diflufenzopyr + Dicamba | Postemergent; inhibits auxin transport; broadleaf weeds. Key species treated include knapweeds, burningbush, and Russian thistle and other thistles. | • | | | • | • | • |
| Diquat | Non-selective and foliar applied. Key species treated include giant salvinia,water-thyme, and watermilfoils. | | | • | ◘ | ◘ | ◘ |
| Fluridone | Aquatic herbicide to control submersed aquatic plants. Key species treated include water-thyme and watermilfoils. | | | • | | | |
| Imazapic | Selective postemergent herbicide; inhibits broadleaf weeds and some grasses. Key species treated include downy brome, leafy spurge, medusahead, and mustards. | • | • | | • | • | • |

• = Areas where USEPA approved registration exists and the BLM has approval or proposes to use on public lands; ◘ = Areas where USEPA approved registration exists, but where the BLM does not propose to use on public lands.

evaluated by NEPA compliance documents prepared by local BLM field offices.

During 1999 through 2005, approximately two-thirds of acres were treated with just three active ingredients: picloram, tebuthiuron, and 2,4-D, and the majority of treatments were in Idaho, Montana, and Utah (Tables 2-4 and 2-5 and Figure 2-1). During that period, the BLM did not report any use of 2,4-DP, asulam, atrazine, mefluidide, or simazine, and treated less than 50 acres annually using fosamine. It is unlikely that the BLM would use these herbicides in the future since there are more suitable active ingredients available and approved for use to meet current needs.

Under this alternative, an estimated 305,000 acres would be treated annually using herbicides (Table 2-6), an increase over the number of acres that have been treated in recent years (Figure 2-1). Estimates of the number of acres that would be treated under the No Action Alternative were developed based on information provided by BLM field offices throughout the western U.S., including Alaska, during summer 2002.

**TABLE 2-4**
**Average Number of Acres Treated Annually for Each BLM State Jurisdiction during 1997-2005.**

| State | Acres Treated Annually | Percentage of all Public Lands Treated |
|-------|------------------------|----------------------------------------|
| Arizona | 7,664 | 6.3 |
| California | 2,676 | 2.2 |
| Colorado | 5,480 | 4.0 |
| Idaho | 30,572 | 25.0 |
| Montana, North Dakota, and South Dakota | 7,739 | 6.3 |
| Nevada | 4,820 | 3.9 |
| New Mexico, Oklahoma, and Texas | 42,570 | 34.8 |
| Oregon and Washington | 3,543 | 2.9 |
| Utah | 11,175 | 9.1 |
| Wyoming and Nebraska | 6,667 | 5.5 |

In developing acreage estimates for all alternatives, it was assumed that if an acre was treated more than once using the same type of treatment during the same year, it would be counted once. If the acre was treated using two or more different methods during the same year (for example, fire use followed by herbicide treatment), each treatment would count as one acre. Thus, if an acre was treated using fire and herbicides during the same year,

two acres would be counted as treated. If an acre was treated using two or more herbicides in a tank mix, it would be counted once.



**Figure 2-1. Summary of Acres Treated Using Herbicides during 1997-2005.**

## Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

This alternative represents the treatment of vegetation using herbicides in 17 western states (including Alaska). Under the Preferred Alternative, approximately 932,000 acres would be treated annually using herbicides, based on the herbicide use projections developed by BLM field offices and funding projections for BLM vegetation treatment activities during the next decade. Based on field office projects, the majority of treatments would occur in Nevada, Idaho, Oregon, and Wyoming.

Under the Preferred Alternative, the BLM would be able to use, in the western U.S., including Alaska, the 14 active ingredients that were approved for use in the earlier RODs and for which an analysis of risks to humans and non-target plants and animals was conducted for this PEIS or by the Forest Service. These active ingredients are: 2,4-D, bromacil, chlorsulfuron, clopyralid, dicamba, diuron, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, sulfometuron methyl, tebuthiuron, and triclopyr.

The remaining six active ingredients currently approved for use by the BLM—2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine—have not been used, or their use has been limited to very few acres, by the BLM for several years. Although the risks to humans from the use of these chemicals are not significant based on evaluations done for the earlier EISs and a review of the literature for this

BLM_0000244

ALTERNATIVES

## TABLE 2-5
### Historic Use of Herbicides by the BLM and Projected Future Use of Herbicides by the BLM under Each Alternative (as a percentage of all acres treated using herbicides)

| Active Ingredient | Historic Use (1999-2005) | Projected Use Under Each Alternative | | | | |
|---|---|---|---|---|---|---|
| | | No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
| *Herbicides Approved for Use on Public Lands* | | | | | | |
| 2,4-D | 16.9 | 18 | 18 | 0 | 33 | 20 |
| 2,4-DP | 0 | 0 | 0 | 0 | 0 | 0 |
| Asulam | 0 | 0 | 0 | 0 | 0 | 0 |
| Atrazine | 0 | 0 | 0 | 0 | 0 | 0 |
| Bromacil | 0.7 | <1 | <1 | 0 | <1 | <1 |
| Chlorsulfuron | 0.9 | 1 | 1 | 0 | 1 | 0 |
| Clopyralid | 4.2 | 8 | 7 | 0 | 5 | 9 |
| Dicamba | 3.2 | 2 | <1 | 0 | <1 | <1 |
| Diuron | 1.1 | <1 | <1 | 0 | 1 | <1 |
| Fosamine ammonium | 0.01 | 0 | 0 | 0 | 0 | 0 |
| Glyphosate | 8.6 | 16 | 10 | 0 | 11 | 19 |
| Hexazinone | 0.4 | <1 | <1 | 0 | <1 | <1 |
| Imazapyr | 1.1 | 2 | 2 | 0 | 2 | 0 |
| Mefluidide | 0 | 0 | 0 | 0 | 0 | 0 |
| Metsulfuron methyl | 5.5 | 5 | 5 | 0 | 9 | 0 |
| Picloram | 16.4 | 16 | 15 | 0 | 26 | 16 |
| Simazine | 0 | 0 | 0 | 0 | 0 | 0 |
| Sulfometuron methyl | 7.2 | <1 | <1 | 0 | 2 | 0 |
| Tebuthiuron | 30.7 | 25 | 25 | 0 | <1 | 25 |
| Triclopyr | 3.1 | 5 | 5 | 0 | 4 | 7 |
| *Herbicides Proposed for Use on Public Lands* | | | | | | |
| Diflufenzopyr + Dicamba | 0 | 0 | 2 | 0 | 5 | 2 |
| Diquat | 0 | 0 | <1 | 0 | 1 | <1 |
| Fluridone | 0 | 0 | <1 | 0 | 1 | <1 |
| Imazapic | 0 | 0 | 8 | 0 | 5 | 0 |

PEIS, the risks to non-target plants and animals, especially species of concern, have not been adequately evaluated. Should these chemicals be needed by the BLM in the future, the BLM would consult ERAs for these active ingredients prepared by the Forest Service or other agencies, if available, or conduct their own ERAs, to assess the risks to non-target species. This analysis would be supported by the appropriate NEPA documentation and interagency consultation before these chemicals would be approved for use or applied on the ground.

The BLM would be allowed to use four additional active ingredients in all 17 states included in this PEIS: imazapic, diquat, diflufenzopyr (in formulation with dicamba), and fluridone. In addition, the BLM would be able to use diflufenzopyr in the future as a stand-alone

active ingredient if it becomes registered for herbicidal use. These active ingredients and formulations could only be applied for uses, and at application rates, specified on the label directions. Under the Preferred Alternative, the BLM would also be able to use new active ingredients that are developed in the future if: 1) they are registered by the USEPA for use on one or more land types (e.g., rangeland, aquatic, etc.) managed by the BLM; 2) the BLM determines that the benefits of use on public lands outweigh the risks to human health and the environment; and 3) they meet evaluation criteria to ensure that the decision to use the active ingredient is supported by scientific evaluation and NEPA documentation. These evaluation criteria are discussed in more detail in Appendix E.

TABLE 2-6
Comparison of the Alternatives

| Analysis Element | Alternative A (No Action) | Alternative B (Preferred Alternative) | Alternative C (No Use of Herbicides) | Alternative D (No Aerial Spraying of Herbicides) | Alternative E (No ALS-inhibiting Herbicides) |
|---|---|---|---|---|---|
| Approximate Number of Acres Treated Annually Using Herbicides: | 305,000 | 932,000 | 0 | 530,000 | 466,000[1] |
| *Treatment Planning*: | | | | | |
| Focus of vegetation treatments[2] | Active | Active | Active | Active | Passive |
| Cost of treatment used as a selection criteria | No | No | No | No | Yes |
| Width of WUI | Variable | Variable | Variable | Variable | 500 meters |
| *Use of Treatments*: | | | | | |
| Restrictions on acres treated using herbicides | Yes | No | Yes | No | Yes |
| Restrictions on types of herbicides used | Yes[3] | No | No | No | Yes[3] |
| Restrictions on use of herbicides in amphibian habitats[4] | Yes | Yes | Yes | Yes | Yes[5] |
| Restrictions on use of herbicides in areas with culturally significant plant and wildlife resources[6] | No | No | No | No | Yes |

[1] Assumes that the number of acres treated using herbicides is about half the number treated for Alternative B, although not explicitly stated in the proposal.
[2] Passive treatments involve suspension of activities that cause the loss of ecological integrity; all other treatments are active.
[3] Under Alternative A, limited to herbicides approved for use in each state based on earlier EIS RODs. Under Alternative E, sulfonylurea and other acetolactate synthase-inhibiting herbicides would not be used.
[4] Restrictions on use of herbicides in areas with amphibians would be based on the ecological risk assessment, on federal, state, local, and tribal regulations, and on local experience in using herbicides. Restrictions include avoidance of glyphosate formulations that include R-11 in the future, and either avoidance using any formulations with polyoxytheyleneamine, or use of the formulation with the lowest amount of polyoxytheyleneamine available.
[5] Herbicide use would be avoided in areas with amphibians.
[6] Use of herbicides in areas with culturally significant plant and animal resources would be based on human and ecological risk assessments; on federal, state, local, and tribal regulations, and on local experience in using herbicides.

## Alternative C – No Use of Herbicides

Under Alternative C, the BLM would not be able to treat vegetation using herbicides and would not be able to use new chemicals that are developed in the future. The BLM would be able to treat vegetation using fire, and mechanical, manual, and biological control methods. A PER has been prepared that accompanies this PEIS and discusses these treatment methods, proposed treatment levels during the next 10 to15 years, and likely impacts to natural and social resources on public lands from these treatment methods (USDI BLM 2007a).

## Alternative D – No Aerial Application of Herbicides

This alternative is similar to the Preferred Alternative in that it represents the treatment of vegetation using herbicides in 17 western states, including Alaska, and use of the same active ingredients as allowed under the Preferred Alternative. Under Alternative D, however, only ground-based techniques would be used to apply herbicides (no aerial applications of herbicides would be allowed) to would reduce the risk of spray drift impacting non-target areas. Based on information obtained from field offices, an estimated 55% of herbicide treatments would involve use of ground-based methods during the next 10 years. Thus, the BLM

BLM_0000246