would treat approximately 530,000 acres annually using herbicides under this alternative. In comparison, during 1997 to 2005, approximately 66% (80,467 acres annually) of herbicide treatments were conducted aerially and 34% (41,829 acres annually) using ground-based methods. Most aerial treatments occurred in New Mexico (47% of acres treated in western U.S.), Idaho (30%), and Arizona (8%), while states with the most acres treated using ground-based methods were Utah (20% of acres treated in western U.S.), Idaho (16%), and Wyoming (12%).

Similar to the Preferred Alternative, the BLM would be able to use new active ingredients that are developed in the future if: 1) they are registered by the USEPA for use on one or more land types (e.g., rangeland, aquatic) managed by the BLM; 2) the BLM determines that the benefits of use on BLM lands outweigh the risks to human health and the environment; and 3) they meet evaluation criteria to ensure that the decision to use the active ingredient is supported by scientific evaluation and NEPA documentation.

## Alternative E – No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients

This alternative was developed based on an alternative proposal for vegetation management on public lands submitted by the American Lands Alliance. The proposal is entitled the "Restore Native Ecosystems Alternative" (RNEA) and the full text of the proposal is in Appendix I.

In order to determine whether this alternative had merit for analysis relative to the proposed action, or should be dismissed from detailed analysis, a comprehensive policy review of the proposal was conducted by the BLM's National Science and Technology Center during 2002.

The BLM's policy review of the RNEA is provided in Appendix I of the Final PEIS. The policy analysis comprises identification of the individual goals and actions outlined in the RNEA proposal. For each goal or action, a determination has been made whether it is included in current BLM policy (yes/no) and a citation for the policy is provided. Under policy analysis, a brief summary outlining the policy is provided. Under the alternative comparison, the alternatives that apply to the policy are identified. In most cases, the policy is "common to all alternatives." The last column outlines the programmatic net effect or impact of the policy if

the analysis is different from that presented in the Final PEIS, or outside the scope of analysis.

Based on this analysis, certain components of the proposal that were relevant and applicable to herbicide use under the proposed action were carried forward into the alternative analyzed in the PEIS. The remaining content of the proposal was determined to be either already covered under existing BLM policy, and therefore already a component of the Preferred Alternative (Alternative B), or outside the scope of analysis of this PEIS.

Under Alternative E, the BLM would not use sulfonylurea and other acetolactate synthase-inhibiting active ingredients approved in the earlier RODs, which are chlorsulfuron, imazapyr, metsulfuron methyl, and sulfometuron methyl. During 1999 to 2000, these active ingredients comprised approximately 28% of the active ingredients used by the BLM. Since 2001, however, these active ingredients have comprised approximately 8% of the active ingredients used by the BLM. The BLM would be able to use, in the 17 western states, 10 active ingredients that were approved for use in the earlier RODs and for which an analysis of their risks to humans and non-target plants and animals was conducted for this PEIS. These active ingredients are: 2,4-D, bromacil, clopyralid, dicamba, diuron, glyphosate, hexazinone, picloram, tebuthiuron, and triclopyr. The six other active ingredients currently approved for use by the BLM—2,4-DP, atrazine, asulam, fosamine, mefluidide, and simazine—would not be used unless guidelines given for the Preferred Alternative were met.

In addition, the BLM would be allowed to use three additional active ingredients in all 17 states: diquat, diflufenzopyr (if it becomes registered for herbicidal use), and fluridone. The BLM would also be able to use a formulation of diflufenzopyr and dicamba. These active ingredients and formulations could only be applied for uses, and at application rates, specified on the label directions.

Under Alternative E, the BLM would be able to use new active ingredients that are developed in the future if they follow protocols for use of new active ingredients identified under the Preferred Alternative and do not contain sulfonylurea and imidazolinone chemistry and other acetolactate synthase-inhibiting compounds.

Under this alternative, the BLM would treat approximately 466,000 acres annually using herbicides (Table 2-6). Spot herbicide treatments would be favored

BLM_0000247

over broadcast treatments. Herbicide use would be discouraged in areas populated by amphibians. To protect Native American and Alaska Native resources, the BLM would establish herbicide-free zones around culturally significant plant and wildlife resources.

This alternative would place greater emphasis on passive restoration, by prohibiting or restricting activities such as livestock grazing, OHV use, logging, or oil and gas development in areas where these activities have promoted a less desirable vegetation community, or increased erosion. Chapter 1, Scope of Analysis, clearly states the PEIS does not evaluate these programs. Since these activities are allowed under FLPMA, restrictions on these activities would only be considered to the extent they are consistent with BLM vegetation and land use management practices and policies (e.g. excluding grazing animals from recently seeded areas) and as determined by the authorized office under the appropriate controlling regulations.

# Determination of Treatment Acreages

As discussed earlier, the BLM has been mandated under a variety of statutes and policy initiatives to increase the number of acres of vegetation treated annually to address the issues of catastrophic fire and invasive species spread and their relationships to habitat improvement and maintenance of healthy landscapes. The BLM estimates that approximately 6 million acres would need to be treated annually to meet these mandates. Acres to be treated by the BLM and assessed in this PEIS were estimated based on information provided by BLM field offices throughout the western U.S., including Alaska. Each field office was asked to estimate and summarize proposed vegetation treatment projects likely to occur during the next 10 years. For each project, the field office provided an estimate of the number of acres proposed for treatment, the general vegetation type(s) proposed for treatment, and the vegetation treatment method(s) proposed to be used. In many cases, multiple treatment methods were identified for a particular type of project. Treatments could occur on the same acres several times during 1 year, or over several years. Based on these surveys, field offices identified that approximately 4.6 million acres of treatments would be needed annually.

The BLM also reviewed Fire Regime Condition Classes (FRCCs) and concluded that an additional 1.4 million acres of treatments, beyond the estimates provided by the field offices, would be required annually. These

classes were created to represent qualitative measures describing the degree of departure from historical fire regimes. This departure may have resulted from activities such as fire exclusion, timber harvesting, livestock grazing, introduction and establishment of exotic plant species, introduced insects or disease, and/or other management activities, which have altered key ecosystem components such as species composition, structural stage, stand age, canopy closure, and fuel loadings. These treatments would be focused on those areas of vegetation having a high departure from the historical condition and where the risk of losing key ecosystem components to fire or other causes is high (FRCC 3). The intent of these treatments would be to transition FRCC 3 lands to areas where fire regimes are moderately altered from their historical conditions (FRCC 2), or are within their historical range of vegetation variability (FRCC 1).

As a result of these surveys and reviews, an estimated 6 million acres would need to be treated annually. Approximately 3.5 million acres would be treated primarily for hazardous fuels reduction and to control wildfires in the WUI, approximately 1 million acres would be treated to control unwanted vegetation to restore ecosystem health, and about 1.5 million acres a year would be subject to burned area rehabilitation and emergency stabilization efforts. Acres associated with these treatments are dependent on the severity and extent of the fire season in any given year and may vary considerably from this average.

## Non-herbicide Treatment Method Acreages used in Cumulative Effects Analysis

The alternatives describe differing levels of herbicide use, ranging from approximately 932,000 acres annually under Alternative B to 0 acres annually under Alternative C. However, non-herbicide treatments (manual and mechanical methods, biological control, and use of fire) would also occur under all alternatives. Although non-herbicide treatments were not evaluated in the analysis of direct and indirect effects of herbicide treatments (but were evaluated in the PER), as discussed in Chapter 1 of this PEIS under Decisions to be Made and Scope of Analysis, they are considered in the Cumulative Effects Analysis in Chapter 4 of this PEIS.

Under Alternative A, approximately 645,000 acres would be treated using fire, 582,000 acres would be treated using mechanical methods, 114,000 acres would

BLM_0000248

be treated using manual methods, and 253,000 acres would be treated using biological control.

Under Alternative B, approximately 2,107,000 acres would be treated using fire, 2,232,000 acres would be treated using mechanical methods, 271,000 acres would be treated using manual methods, and 454,000 acres would be treated using biological control.

Under alternatives C, D, and E, approximately 1,055,000 acres would be treated using fire, 1,986,000 acres would be treated using mechanical methods, 396,000 acres would be treated using manual methods, and 597,000 acres would be treated using biological control.

## Alternatives Considered but Not Further Analyzed

Several other alternatives were identified during public scoping and reviewed by the interdisciplinary team (ENSR 2002). In most cases, these alternatives would not fulfill the purpose and need for the project, are inconsistent with BLM or other federal, state, or local policies or regulations, or are not practical based on likely funding for vegetation treatments. The alternatives that were considered but not further analyzed are:

- **Treat up to 25 million acres annually.** This alternative was excluded from analysis because the BLM felt it was highly unlikely that the agency would have sufficient funding during the next 10 to 15 years to treat up to 25 million acres annually.

- **Treat fewer acres than are currently treated.** Under this alternative, fewer acres would be treated annually than would occur under the No Action Alternative (Alternative A). Given that current treatment levels have been insufficient to control unwanted vegetation and reduce the risk of wildfire to life and property on public lands, this alternative would not meet the project purpose and need.

- **Do not treat competing and unwanted vegetation.** Under this alternative, the BLM would continue burned area rehabilitation and emergency stabilization activities, hazardous fuels reduction activities that did not involve the treatment of vegetation, and passive vegetation management, but would not actively treat competing and unwanted vegetation. This

alternative was eliminated because it would not control the spread of unwanted vegetation, which could adversely impact land health on public lands and increase the risk of loss of life and property due to fires.

- **Treat only acres needed to protect human health and safety.** Under this alternative, the BLM would only treat those acres needed to protect human health and safety. Nearly all of these acres would be associated with hazardous fuels reduction near homes and other developments in the WUI. This alternative was eliminated because it would not maintain or improve land health on most public lands.

- **Do not conduct hazardous fuels treatments.** Like the preceding alternative, this alternative was excluded because it does not restore the health of fire-adapted ecosystems. The buildup of hazardous fuels that have led to catastrophic wildfires and significant impacts to air quality, water resources, human health, and other resources.

- **Revegetate with native vegetation.** Under this alternative, only native vegetation would be used to restore fire-impacted and other degraded public lands. This alternative was eliminated because it has been incorporated into the proposed action to the extent practical.

- **Exclude logging, grazing, OHV use, and energy/mineral development on public lands.** This alternative was eliminated because FLPMA requires that the BLM manage public lands for multiple uses including those listed. Field offices, however, can limit these activities, consistent with land use plans where doing so benefits vegetation management and land health and complies with the FLPMA.

The rest of this chapter includes actions that would be common to all alternatives.

## Herbicide Treatment Standard Operating Procedures and Guidelines

This section identifies standard operating procedures (SOPs) that would be followed by the BLM under all alternatives to ensure that risks to human health and the environment from herbicide treatment actions would be kept to a minimum. Standard operating procedures are

BLM_0000249

the management controls and performance standards required for vegetation management treatments. These practices are intended to protect and enhance natural resources that could be affected by future vegetation treatments.

## Prevention of Weeds and Early Detection and Rapid Response

Once weed populations become established, infestations can increase and expand in size. Weeds colonize highly disturbed ground and invade plant communities that have been degraded, but are also capable of invading intact communities. Therefore, prevention, early detection, and rapid response are the most cost-effective methods of weed control. Prevention, early detection, and rapid response strategies that reduce the need for vegetative treatments for noxious weeds should lead to a reduction in the number of acres treated using herbicides in the future by reducing or preventing weed establishment.

As stated in the BLM's *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996), prevention and public education are the highest priority weed management activities. Priorities are as follows:

- Priority 1: Take actions to prevent or minimize the need for vegetation control when and where feasible, considering the management objectives of the site.

- Priority 2: Use effective nonchemical methods of vegetation control when and where feasible.

- Priority 3: Use herbicides after considering the effectiveness of all potential methods or in combination with other methods or controls.

Prevention is best accomplished by ensuring the seeds and vegetatively reproductive plant parts of new weed species are not introduced into new areas.

The BLM is required to develop a noxious weed risk assessment when it is determined that an action may introduce or spread noxious weeds or when known habitat exists (USDI BLM 1992b). If the risk is moderate or high, the BLM may modify the project to reduce the likelihood of weeds infesting the site, and to identify control measures to be implemented if weeds do infest the site.

To prevent the spread of weeds, the BLM takes actions to minimize the amount of existing non-target vegetation that is disturbed or destroyed during project or vegetation treatment actions (Table 2-7). During project planning, the following steps are taken:

- Incorporate measures to prevent introduction or spread of weeds into project layout, design, alternative evaluation, and project decisions.

- During environmental analysis for projects and maintenance programs, assess weed risks, analyze potential treatment of high-risk sites for weed establishment and spread, and identify prevention practices.

- Determine prevention and maintenance needs, to include the use of herbicides if needed, at the onset of project planning.

- Avoid or remove sources of weed seed and propagules to prevent new weed infestations and the spread of existing weeds.

During project development, weed infestations are prioritized for treatment in project operating areas and along access routes. Weeds present on or near the site are identified, a risk assessment is completed, and weeds are controlled as necessary. Project staging areas are weed free, and travel through weed infested areas is avoided or minimized. Examples of prevention actions to be followed during project activities include cleaning all equipment and clothing before entering the project site; avoiding soil disturbance and the creation of other soil conditions that promote weed germination and establishment; and using weed-free seed, hay, mulch, gravel, soil, and mineral materials on public lands where there is a state or county program in place.

Conditions that enhance invasive species abundance should be addressed when developing mitigation and prevention plans for activities on public lands. These conditions include excessive disturbance associated with road maintenance, poor grazing management, and high levels of recreational use. If livestock grazing is managed to maintain the vigor of native perennial plants, particularly grasses, the chance of weeds invading rangeland is much less. By carefully managing recreational use and educating the public on the potential impacts of recreational activities on vegetation, the amount of damage to native vegetation and soil can be minimized at high use areas, such as campgrounds and OHV trails. Early detection in recreation areas is focused on roads and trails, where much of the weed spread occurs.

The BLM participates in the National Early Warning and Rapid Response System for Invasive Plants (Figure

BLM_0000250

ALTERNATIVES

**TABLE 2-7**
**Prevention Measures**

| BLM Activity | Prevention Measure |
|---|---|
| Project Planning | • Incorporate prevention measures into project layout and design, alternative evaluation, and project decisions to prevent the introduction or spread of weeds.<br>• Determine prevention and maintenance needs, including the use of herbicides, at the onset of project planning.<br>• Before ground-disturbing activities begin, inventory weed infestations and prioritize areas for treatment in project operating areas and along access routes.<br>• Remove sources of weed seed and propagules to prevent the spread of existing weeds and new weed infestations.<br>• Pre-treat high-risk sites for weed establishment and spread before implementing projects.<br>• Post weed awareness messages and prevention practices at strategic locations such as trailheads, roads, boat launches, and public land kiosks.<br>• Coordinate project activities with nearby herbicide applications to maximize the cost-effectiveness of weed treatments. |
| Project Development | • Minimize soil disturbance to the extent practical, consistent with project objectives.<br>• Avoid creating soil conditions that promote weed germination and establishment.<br>• To prevent weed germination and establishment, retain native vegetation in and around project activity areas and keep soil disturbance to a minimum, consistent with project objectives.<br>• Locate and use weed-free project staging areas. Avoid or minimize all types of travel through weed-infested areas, or restrict travel to periods when the spread of seeds or propagules is least likely.<br>• Prevent the introduction and spread of weeds caused by moving weed-infested sand, gravel, borrow, and fill material.<br>• Inspect material sources on site, and ensure that they are weed-free before use and transport. Treat weed-infested sources to eradicate weed seed and plant parts, and strip and stockpile contaminated material before any use of pit material.<br>• Survey the area where material from treated weed-infested sources is used for at least 3 years after project completion to ensure that any weeds transported to the site are promptly detected and controlled.<br>• Prevent weed establishment by not driving through weed-infested areas.<br>• Inspect and document weed establishment at access roads, cleaning sites, and all disturbed areas; control infestations to prevent spread within the project area.<br>• Avoid acquiring water for dust abatement where access to the water is through weed-infested sites.<br>• Identify sites where equipment can be cleaned. Clean equipment before entering public lands.<br>• Clean all equipment before leaving the project site if operating in areas infested with weeds.<br>• Inspect and treat weeds that establish at equipment cleaning sites.<br>• Ensure that rental equipment is free of weed seed.<br>• Inspect, remove, and properly dispose of weed seed and plant parts found on workers' clothing and equipment. Proper disposal entails bagging the seeds and plant parts and incinerating them. |
| Revegetation | • Include weed prevention measures, including project inspection and documentation, in operation and reclamation plans.<br>• Retain bonds until reclamation requirements, including weed treatments, are completed, based on inspection and documentation.<br>• To prevent conditions favoring weed establishment, re-establish vegetation on bare ground caused by project disturbance as soon as possible using either natural recovery or artificial techniques.<br>• Maintain stockpiled, uninfested material in a weed-free condition. |

**TABLE 2-7 (Cont.)**
**Prevention Measures**

| BLM Activity | Prevention Measure |
|---|---|
| Revegetation (Cont.) | • Revegetate disturbed soil (except travel ways on surfaced projects) in a manner that optimizes plant establishment for each specific project site. For each project, define what constitutes disturbed soil and objectives for plant cover revegetation. Revegetation may include topsoil replacement, planting, seeding, fertilization, liming, and weed-free mulching, as necessary. <br> • Where practical, stockpile weed-seed-free topsoil and replace it on disturbed areas (e.g., road embankments or landings). <br> • Inspect seed and straw mulch to be used for site rehabilitation (for wattles, straw bales, dams, etc.) and certify that they are free of weed seed and propagules. <br> • Inspect and document all limited term ground-disturbing operations in noxious weed infested areas for at least 3 growing seasons following completion of the project. <br> • Use native material where appropriate and feasible. Use certified weed-free or weed-seed-free hay or straw where certified materials are required and/or are reasonably available. <br> • Provide briefings that identify operational practices to reduce weed spread (for example, avoiding known weed infestation areas when locating fire lines). <br> • Evaluate options, including closure, to regulate the flow of traffic on sites where desired vegetation needs to be established. Sites could include road and trail ROW, and other areas of disturbed soils. |

2-2). The goal of this System to minimize the establishment and spread of new invasive species through a coordinated framework of public and private processes by:

- Early detection and reporting of suspected new plant species to appropriate officials;

- Identification and vouchering of submitted specimens by designated specialists;

- Verification of suspected new state, regional, and national plant records;

- Archival of new records in designated regional and plant databases;

- Rapid assessment of confirmed new records; and

- Rapid response to verified new infestations that are determined to be invasive.

## Herbicide Treatment Planning

BLM Manual 9011 (*Chemical Pest Control*) outlines the policies, and BLM Handbook H-9011-1 (*Chemical Pest Control*; USDI BLM 1988d) outlines the procedures, for use of herbicides on public lands. As part of policy, the BLM is required to thoroughly evaluate the need for chemical treatments and their potential for impact on the environment. The BLM is required to use only USEPA-registered herbicides that

have been properly evaluated under NEPA, and to carefully follow label directions and additional BLM requirements.

An operational plan is developed and updated for each herbicide project. The plan includes information on project specifications, key personnel responsibilities, and communication, safety, spill response, and emergency procedures. For application of herbicides not approved for aquatic use, the plan should also specify minimum buffer widths between treatment areas and water bodies. Recommended widths are provided in BLM Handbook H-9011-1 (*Chemical Pest Control*), but actual buffers are site and herbicide active ingredient specific, and are determined based on a scientific analysis of environmental factors, such as climate, topography, vegetation, and weather; timing and method of application; and herbicide risks to humans and non-target species. Recommended buffer widths for each herbicide active ingredient under different application scenarios are listed later in this chapter under Mitigation. Table 2-8 summarizes important SOPs that should be used when applying herbicides to help protect resources of concern on public lands.

BLM_0000252

## ALTERNATIVES



**Figure 2-2. National Early Warning and Rapid Response System for Invasive Plants.**

BLM_0000253

## Revegetation

Disturbed areas may be reseeded or planted with desirable vegetation when the native plant community cannot recover and occupy the site sufficiently.

Determining the need for revegetation is an integral part of developing a vegetation treatment. The most important component of the process is determining whether active (seeding/planting) or passive (natural recovery) revegetation is appropriate.

USDI policy states, "Natural recovery by native plant species is preferable to planting or seeding, either of natives or non-natives. However, planting or seeding should be used only if necessary to prevent unacceptable erosion or resist competition from non-native invasive species" (620 Departmental Memorandum 3 2004). This policy is reiterated in the USDI *Burned Area Emergency Stabilization and Rehabilitation* Manual, the BLM *Burned Area Emergency Stabilization and Rehabilitation* Manual (BLM H-1742-1; USDI BLM 2006a), and the *Interagency Burned Area Rehabilitation Guidebook* (USDI and USDA 2006d).

In addition to these handbooks and policy, use of native and non-native seed in revegetation and restoration is guided by BLM Manual 1745 (*Introduction, Transplant, Augmentation and Reestablishment of Fish, Wildlife and Plants*). This manual states that native species shall be used, unless it is determined through the NEPA process that: 1) suitable native species are not available; 2) the natural biological diversity of the proposed management area will not be diminished; 3) exotic and naturalized species can be confined within the proposed management area; 4) analysis of ecological site inventory information indicates that a site will not support reestablishment of a species that historically was part of the natural environment; or 5) resource management objectives cannot be met with native species.

When natural recovery is not feasible, revegetation can be used to stabilize and restore vegetation on disturbed sites and to eliminate or reduce the conditions that favor invasive species. Reseeding or replanting may be required when there is insufficient vegetation or seed stores to naturally revegetate the site.

To ensure revegetation success, there must be adequate soil for root development and moisture storage, which provides moisture to support the new plants. Chances for revegetation success are improved by selecting seed

with high purity and percentage germination; selecting native species or cultivars adapted to the area; planting at proper depth, seeding rate, and time of the year for the region; choosing the appropriate planting method; and, where feasible, removing competing vegetation. Planting mixtures are adapted for the treatment area and site uses. A combination of forbs, perennial grasses, and shrubs is typically used on rangeland sites, while shrubs and trees might be favored for riparian and forestland sites. A mixture of several native plant species and types or functional groups enhances the value of the site for fish and wildlife and improves the health and aesthetic character of the site. Mixtures can better take advantage of variable soil, terrain, and climatic conditions, and thus are more likely to withstand insect infestations and survive adverse climatic conditions.

The USDI BLM Native Seed program, which is in its sixth year, was developed in response to Congressional direction to supply native plant material for emergency stabilization and longer-term rehabilitation and restoration efforts. The focus of the program is to increase the number of native plant species for which seed is available and the total amount of native seed available for these efforts. To date, the program has focused on native plant material needs of emergency stabilization and burned area rehabilitation in the Great Basin, but is expanding to focus on areas such as western Oregon, the Colorado Plateau, and most recently the Mojave Desert. The Wildland Fire Management Program funds and manages the effort (USDI BLM 2006c).

The National Seed Warehouse is a storage facility for the native seed supply. Through a Memorandum of Understanding with the BLM Idaho State Director, each state (Idaho, Oregon, Nevada, Utah and Colorado) can reserve an annual seed supply for purchase based on a reasonable projection of annual acreage to be stabilized or rehabilitated over a 5-year period.

The Great Basin Restoration Initiative (GBRI) grew out of concern for the health of the Great Basin after the wildfires of 1999. The goal of GBRI is to implement treatments and strategies to maintain functioning ecosystems and to proactively restore degraded ones at strategic locations. Native plants are emphasized in restoration projects where their use is practical and the potential for success is satisfactory. Monitoring is recommended to measure treatment success. To increase the availability of native plants, especially native forbs, the GBRI has established a collaborative native plant project, the Great Basin Native Plant Selection and Increase Project, to increase native plant

BLM_0000254

availability and the technology to successfully establish these plants. This project is supported by funding from the BLM's Native Plant Initiative.

The BLM will follow the following SOPs when revegetating sites:

- Cultivate previously disturbed sites to reduce the amount of weed seeds in the soil seedbank.

- Revegetate sites once work is completed or soon after a disturbance.

- When available, use native seed of known origin as labeled by state seed certification programs.

- Use seed of non-native cultivars and species only when locally adapted native seed is not available or when it is unlikely to establish quickly enough to prevent soil erosion or weed establishment.

- Use seed that is free of noxious and invasive weeds, as determined and documented by a seed inspection test by a certified seed laboratory.

- Limit nitrogen fertilizer applications that favor annual grass growth over forb growth in newly seeded areas, especially where downy brome and other invasive annuals are establishing.

- Use clean equipment, free of plants and plant parts, on revegetation projects to prevent the inadvertent introduction of weeds into the site.

- Where important pollinator resources exist, include native nectar and pollen producing plants in the seed mixes used in restoration and reclamation projects. Include non-forage plant species in seed mixes for their pollinator/host relationships as foraging, nesting, or shelter species. Choose native plant species over manipulated cultivars, especially of forbs and shrubs, since natives tend to have more valuable pollen and nectar resources than cultivars. Ensure that bloom times for the flowers of the species chosen match the activity times for the pollinators. Maintain sufficient litter on the soil surfaces of native plant communities for ground-nesting bees.

- Where feasible, avoid grazing by domestic and wild animals on treatment sites until vegetation is well established. Where total rest from grazing is not feasible, efforts should be made

to modify the amount and/or season of grazing to promote vegetation recovery within the treatment area. Reductions in numbers, permanent or temporary fencing, changes in grazing rotation, and identification of alternative forage sources are examples of methods that could be used to remove, reduce or modify grazing impacts during vegetation recovery.

# Special Precautions

## Special Status Species

Federal policies and procedures for protecting federally-listed threatened and endangered plant and animal species, and species proposed for listing, were established by the Endangered Species Act of 1973 and regulations issued pursuant to the Act. The purposes of the Act are to provide mechanisms for the conservation of threatened and endangered species and their habitats. Under the Act, the Secretary of the Interior is required to determine which species are threatened or endangered and to issue recovery plans for those species.

Section 7 of the Act specifically requires all federal agencies to use their authorities in furtherance of the Act to carry out programs for the conservation of listed species, and to ensure that no agency action is likely to jeopardize the continued existence of a listed species or adversely modify critical habitat. Policy and guidance (BLM Manual 6840; *Special Status Species*) also stipulates that species proposed for listing must be managed at the same level of protection as listed species.

The BLM state directors may designate special status in cooperation with their respective state. These special status species must receive, at a minimum, the same level of protection as federal candidate species. The BLM will also carry out management for the conservation of state-listed species, and state laws protecting these species will apply to all BLM programs and actions to the extent that they are consistent with FLPMA and other federal laws.

The BLM consulted with the USFWS and NMFS during development of the PEIS as required under Section 7 of the Endangered Species Act. As part of this process, the BLM prepared a formal consultation package that included a description of the program; species listed as threatened or endangered, species

BLM_0000255

proposed for listing, and critical habitats that could be affected by the program; and a BA that evaluated the likely impacts to listed species, species proposed for listing, and critical habitats from the proposed vegetation treatment program. Over 300 species were evaluated in the BA. The BA also provides broad guidance at a programmatic level for actions that would be taken by the BLM to avoid adversely impacting species or critical habitat (USDI BLM 2007b).

Before any vegetation treatment or ground disturbance occurs, BLM policy requires a survey of the project site for species listed or proposed for listing, or special status species. This is done by a qualified biologist and/or botanist who consults the state and local databases and visits the site at the appropriate season. If a proposed project may affect a proposed or listed species or its critical habitat, the BLM consults with the USFWS and/or NMFS. A project with a "may affect, likely to adversely affect" determination requires formal consultation and receives a Biological Opinion from the USFWS and/or NMFS. A project with a "may affect, not likely to adversely affect" determination requires informal consultation and receives a concurrence letter from USFWS and/or NMFS, unless that action is implemented under the authorities of the alternative consultation agreement pursuant to counterpart regulations established for *National Fire Plan* projects.

## Wilderness Areas

Wilderness areas, which are designated by Congress, are defined by the Wilderness Act of 1964 as places "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." The BLM manages 175 Wilderness Areas encompassing over 7.2 million acres (USDI BLM 2006d).

Activities allowed in wilderness areas are identified in wilderness management plans prepared by the BLM. The BLM does not ordinarily treat vegetation in wilderness areas, but will control invasive and noxious weeds when they threaten lands outside wilderness area or are spreading within the wilderness and can be controlled without serious adverse impacts to wilderness values.

Management of vegetation in a wilderness area is directed toward retaining the natural character of the environment. Tree and shrub removal is usually not allowed, except for fire, insect, or disease control. Reforestation is generally prohibited except to repair

damage caused by humans in areas where natural reforestation is unlikely. Only native species and primitive methods, such as hand planting, are allowed for reforestation.

Tools and equipment may be used for vegetation management when they are the minimum amount necessary for the protection of the wilderness resource. Motorized tools may only be used in special or emergency cases involving the health and safety of wilderness visitors, or the protection of wilderness values.

Habitat manipulation using mechanical or chemical means may be allowed to protect threatened and endangered species and to correct unnatural conditions, such as weed infestations, resulting from human influence.

The BLM also manages a total of 610 Wilderness Study Areas (WSAs) encompassing nearly 14.3 million acres. These are areas that have been determined to have wilderness characteristics worthy of consideration for wilderness designation. The BLM's primary goals in WSAs are to manage them so as to not impair their wilderness values and to maintain their suitability for preservation as wilderness until Congress makes a determination on their future.

In WSAs, the BLM must foster a natural distribution of native species of plants and animals by ensuring that ecosystems and processes continue to function naturally.

## Cultural Resources

The effects of BLM actions on cultural resources are addressed through compliance with the National Historic Preservation Act, as implemented through a national Programmatic Agreement (*Programmatic Agreement among the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers Regarding the Manner in Which BLM Will Meet Its Responsibilities Under the National Historic Preservation Act*) and state-specific protocol agreements with SHPOs. The BLM's responsibilities under these authorities are addressed as early in the vegetation management project planning process as possible.

BLM_0000256

ALTERNATIVES

**TABLE 2-8**
**Standard Operating Procedures for Applying Herbicides**

| Resource Element | Standard Operating Procedure |
|---|---|
| Guidance Documents | BLM Handbook H-9011-1 (*Chemical Pest Control*); and manuals 1112 (*Safety*), 9011 (*Chemical Pest Control*), 9012 (*Expenditure of Rangeland Insect Pest Control Funds*), 9015 (*Integrated Weed Management*), and 9220 (*Integrated Pest Management*) |
| General | • Prepare spill contingency plan in advance of treatment. |
| | • Conduct a pretreatment survey before applying herbicides. |
| | • Select herbicide that is least damaging to environment while providing the desired results. |
| | • Select herbicide products carefully to minimize additional impacts from degradates, adjuvants, inert ingredients, and tank mixtures. |
| | • Apply the least amount of herbicide needed to achieve the desired result. |
| | • Follow product label for use and storage. |
| | • Have licensed applicators apply herbicides. |
| | • Use only USEPA-approved herbicides and follow product label directions and "advisory" statements. |
| | • Review, understand, and conform to the "Environmental Hazards" section on the herbicide label. This section warns of known pesticide risks to the environment and provides practical ways to avoid harm to organisms or to the environment. |
| | • Consider surrounding land use before assigning aerial spraying as a treatment method and avoid aerial spraying near agricultural or densely populated areas. |
| | • Minimize the size of application areas, when feasible. |
| | • Comply with herbicide-free buffer zones to ensure that drift will not affect crops or nearby residents/landowners. |
| | • Post treated areas and specify reentry or rest times, if appropriate. |
| | • Notify adjacent landowners prior to treatment. |
| | • Keep copy of Material Safety Data Sheets (MSDSs) at work sites. MSDSs available for review at http://www.cdms.net/. |
| | • Keep records of each application, including the active ingredient, formulation, application rate, date, time, and location. |
| | • Avoid accidental direct spray and spill conditions to minimize risks to resources. |
| | • Consider surrounding land uses before aerial spraying. |
| | • Avoid aerial spraying during periods of adverse weather conditions (snow or rain imminent, fog, or air turbulence). |
| | • Make helicopter applications at a target airspeed of 40 to 50 miles per hour (mph), and at about 30 to 45 feet above ground. |
| | • Take precautions to minimize drift by not applying herbicides when winds exceed >10 mph (>6 mph for aerial applications) or a serious rainfall event is imminent. |
| | • Use drift control agents and low volatile formulations. |
| | • Conduct pre-treatment surveys for sensitive habitat and special status species within or adjacent to proposed treatment areas. |
| | • Consider site characteristics, environmental conditions, and application equipment in order to minimize damage to non-target vegetation. |
| | • Use drift reduction agents, as appropriate, to reduce the drift hazard to non-target species. |
| | • Turn off applied treatments at the completion of spray runs and during turns to start another spray run. |
| | • Refer to the herbicide label when planning revegetation to ensure that subsequent vegetation would not be injured following application of the herbicide. |
| | • Clean OHVs to remove seeds. |

BLM_0000257

TABLE 2-8 (Cont.)
Standard Operating Procedures for Applying Pesticides

| Resource Element | Standard Operating Procedure |
|---|---|
| Air Quality<br><br>See Manual 7000 (*Soil, Water, and Air Management*) | • Consider the effects of wind, humidity, temperature inversions, and heavy rainfall on herbicide effectiveness and risks.<br><br>• Apply herbicides in favorable weather conditions to minimize drift. For example, do not treat when winds exceed 10 mph (6 mph for aerial applications) or rainfall is imminent.<br><br>• Use drift reduction agents, as appropriate, to reduce the drift hazard.<br><br>• Select proper application equipment (e.g., spray equipment that produces 200- to 800-micron diameter droplets [spray droplets of 100 microns and less are most prone to drift]).<br><br>• Select proper application methods (e.g., set maximum spray heights, use appropriate buffer distances between spray sites and non-target resources). |
| Soil<br><br>See Manual 7000 (*Soil, Water, and Air Management*) | • Minimize treatments in areas where herbicide runoff is likely, such as steep slopes when heavy rainfall is expected.<br><br>• Minimize use of herbicides that have high soil mobility, particularly in areas where soil properties increase the potential for mobility.<br><br>• Do not apply granular herbicides on slopes of more than 15% where there is the possibility of runoff carrying the granules into non-target areas. |
| Water Resources<br><br>See Manual 7000 (*Soil, Water, and Air Management*) | • Consider climate, soil type, slope, and vegetation type when developing herbicide treatment programs.<br><br>• Select herbicide products to minimize impacts to water. This is especially important for application scenarios that involve risk from active ingredients in a particular herbicide, as predicted by risk assessments.<br><br>• Use local historical weather data to choose the month of treatment. Considering the phenology of the target species, schedule treatments based on the condition of the water body and existing water quality conditions.<br><br>• Plan to treat between weather fronts (calms) and at appropriate time of day to avoid high winds that increase water movements, and to avoid potential stormwater runoff and water turbidity.<br><br>• Review hydrogeologic maps of proposed treatment areas .Note depths to groundwater and areas of shallow groundwater and areas of surface water and groundwater interaction. Minimize treating areas with high risk for groundwater contamination..<br><br>• Conduct mixing and loading operations in an area where an accidental spill would not contaminate an aquatic body.<br><br>• Do not rinse spray tanks in or near water bodies. Do not broadcast pellets where there is danger of contaminating water supplies.<br><br>• Maintain buffers between treatment areas and water bodies. Buffer widths should be developed based on herbicide- and site-specific criteria to minimize impacts to water bodies.<br><br>• Minimize the potential effects to surface water quality and quantity by stabilizing terrestrial areas as quickly as possible following treatment. |
| Wetlands and Riparian Areas | • Use a selective herbicide and a wick or backpack sprayer.<br><br>• Use appropriate herbicide-free buffer zones for herbicides not labeled for aquatic use based on risk assessment guidance, with minimum widths of 100 feet for aerial, 25 feet for vehicle, and 10 feet for hand spray applications. |
| Vegetation<br><br>See Handbook H-4410-1 (*National Range Handbook*), and manuals 5000 (*Forest Management*) and 9015 (*Integrated Weed Management*) | • Refer to the herbicide label when planning revegetation to ensure that subsequent vegetation would not be injured following application of the herbicide.<br><br>• Use native or sterile species for revegetation and restoration projects to compete with invasive species until desired vegetation establishes<br><br>• Use weed-free feed for horses and pack animals. Use weed-free straw and mulch for revegetation and other activities.<br><br>• Identify and implement any temporary domestic livestock grazing and/or supplemental feeding restrictions needed to enhance desirable vegetation recovery following treatment. Consider adjustments in the existing grazing permit, needed to maintain desirable vegetation on the treatment site. |

BLM_0000258

ALTERNATIVES

**TABLE 2-8 (Cont.)**
**Standard Operating Procedures for Applying Pesticides**

| Resource Element | Standard Operating Procedure |
|---|---|
| Pollinators | • Complete vegetation treatments seasonally before pollinator foraging plants bloom.<br>• Time vegetation treatments to take place when foraging pollinators are least active both seasonally and daily.<br>• Design vegetation treatment projects so that nectar and pollen sources for important pollinators and resources are treated in patches rather than in one single treatment.<br>• Minimize herbicide application rates. Use typical rather than maximum rates where there are important pollinator resources.<br>• Maintain herbicide free buffer zones around patches of important pollinator nectar and pollen sources.<br>• Maintain herbicide free buffer zones around patches of important pollinator nesting habitat and hibernacula.<br>• Make special note of pollinators that have single host plant species, and minimize herbicide spraying on those plants (if invasive species) and in their habitats. |
| Fish and Other Aquatic Organisms<br><br>See manuals 6500 (*Wildlife and Fisheries Management*) and 6780 (*Habitat Management Plans*) | • Use appropriate buffer zones based on label and risk assessment guidance.<br>• Minimize treatments near fish-bearing water bodies during periods when fish are in life stages most sensitive to the herbicide(s) used, and use spot rather than broadcast or aerial treatments.<br>• Use appropriate application equipment/method near water bodies if the potential for off-site drift exists.<br>• For treatment of aquatic vegetation, 1) treat only that portion of the aquatic system necessary to achieve acceptable vegetation management; 2) use the appropriate application method to minimize the potential for injury to desirable vegetation and aquatic organisms; and 3) follow water use restrictions presented on the herbicide label. |
| Wildlife<br><br>See manuals 6500 (*Wildlife and Fisheries Management*) and 6780 (*Habitat Management Plans*) | • Use herbicides of low toxicity to wildlife, where feasible.<br>• Use spot applications or low-boom broadcast operations where possible to limit the probability of contaminating non-target food and water sources, especially non-target vegetation over areas larger than the treatment area.<br>• Use timing restrictions (e.g., do not treat during critical wildlife breeding or staging periods) to minimize impacts to wildlife.<br>• Avoid using glyphosate formulations that include R-11 in the future, and either avoid using any formulations with POEA, or seek to use the formulation with the lowest amount of POEA available, to reduce risks to amphibians. |
| Threatened, Endangered, and Sensitive Species<br><br>See Manual 6840 (*Special Status Species*) | • Survey for special status species before treating an area. Consider effects to special status species when designing herbicide treatment programs.<br>• Use a selective herbicide and a wick or backpack sprayer to minimize risks to special status plants.<br>• Avoid treating vegetation during time-sensitive periods (e.g., nesting and migration, sensitive life stages) for special status species in area to be treated. |
| Livestock<br><br>See Handbook H-4120-1 (*Grazing Management*) | • Whenever possible and whenever needed, schedule treatments when livestock are not present in the treatment area. Design treatments to take advantage of normal livestock grazing rest periods, when possible.<br>• As directed by the herbicide label, remove livestock from treatment sites prior to herbicide application, where applicable.<br>• Use herbicides of low toxicity to livestock, where feasible.<br>• Take into account the different types of application equipment and methods, where possible, to reduce the probability of contamination of non-target food and water sources.<br>• Avoid use of diquat in riparian pasture while pasture is being used by livestock.<br>• Notify permittees of the project to improve coordination and avoid potential conflicts and safety concerns during implementation of the treatment.<br>• Notify permittees of livestock grazing, feeding, or slaughter restrictions, if necessary.<br>• Provide alternative forage sites for livestock, if possible. |

BLM_0000259

**TABLE 2-8 (Cont.)**
**Standard Operating Procedures for Applying Pesticides**

| Resource Element | Standard Operating Procedure |
|---|---|
| Wild Horses and Burros | • Minimize using herbicides in areas grazed by wild horses and burros. <br> • Use herbicides of low toxicity to wild horses and burros, where feasible. <br> • Remove wild horses and burros from identified treatment areas prior to herbicide application, in accordance with label directions for livestock. <br> • Take into account the different types of application equipment and methods, where possible, to reduce the probability of contaminating non-target food and water sources. |
| Cultural Resources and Paleontological Resources <br><br> See handbooks H-8120-1 (*Guidelines for Conducting Tribal Consultation*) and H-8270-1 (*General Procedural Guidance for Paleontological Resource Management*), and manuals 8100 (*The Foundations for Managing Cultural Resources*), 8120 (*Tribal Consultation Under Cultural Resource Authorities*), and 8270 (*Paleontological Resource Management*), <br><br> See also: *Programmatic Agreement among the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers Regarding the Manner in Which BLM Will Meet Its Responsibilities Under the National Historic Preservation Act.* | • Follow standard procedures for compliance with Section 106 of the National Historic Preservation Act as implemented through the *Programmatic Agreement among the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers Regarding the Manner in Which BLM Will Meet Its Responsibilities Under the National Historic Preservation Act* and state protocols or 36 CFR Part 800, including necessary consultations with State Historic Preservation Officers and interested tribes. <br> • Follow BLM Handbook H-8270-1 (*General Procedural Guidance for Paleontological Resource Management*) to determine known Condition 1 and Condition 2 paleontological areas, or collect information through inventory to establish Condition 1 and Condition 2 areas, determine resource types at risk from the proposed treatment, and develop appropriate measures to minimize or mitigate adverse impacts. <br> • Consult with tribes to locate any areas of vegetation that are of significance to the tribe and that might be affected by herbicide treatments. <br> • Work with tribes to minimize impacts to these resources. <br> • Follow guidance under Human Health and Safety in areas that may be visited by Native peoples after treatments. |
| Visual Resources <br><br> See handbooks H-8410-1 (*Visual Resource Inventory*) and H-8431-1 (*Visual Resource Contrast Rating*), and manual 8400 (*Visual Resource Management*) | • Minimize the use of broadcast foliar applications in sensitive watersheds to avoid creating large areas of browned vegetation. <br> • Consider the surrounding land use before assigning aerial spraying as an application method. <br> • Minimize off-site drift and mobility of herbicides (e.g., do not treat when winds exceed 10 mph; minimize treatment in areas where herbicide runoff is likely; establish appropriate buffer widths between treatment areas and residences) to contain visual changes to the intended treatment area. <br> • If the area is a Class I or II visual resource, ensure that the change to the characteristic landscape is low and does not attract attention (Class I), or if seen, does not attract the attention of the casual viewer (Class II). <br> • Lessen visual impacts by: 1) designing projects to blend in with topographic forms; 2) leaving some low-growing trees or planting some low-growing tree seedlings adjacent to the treatment area to screen short-term effects; and 3) revegetating the site following treatment. <br> • When restoring treated areas, design activities to repeat the form, line, color, and texture of the natural landscape character conditions to meet established Visual Resource Management (VRM) objectives. |

BLM_0000260

ALTERNATIVES

**TABLE 2-8 (Cont.)**
**Standard Operating Procedures for Applying Pesticides**

| Resource Element | Standard Operating Procedure |
|---|---|
| Wilderness and Other Special Areas<br><br>See handbooks H-8550-1 (*Management of Wilderness Study Areas (WSAs)*), and H-8560-1 (*Management of Designated Wilderness Study Areas*), and Manual 8351 (*Wild and Scenic Rivers*) | • Encourage backcountry pack and saddle stock users to feed their livestock only weed-free feed for several days before entering a wilderness area.<br><br>• Encourage stock users to tie and/or hold stock in such a way as to minimize soil disturbance and loss of native vegetation.<br><br>• Revegetate disturbed sites with native species if there is no reasonable expectation of natural regeneration.<br><br>• Provide educational materials at trailheads and other wilderness entry points to educate the public on the need to prevent the spread of weeds.<br><br>• Use the "minimum tool" to treat noxious and invasive vegetation, relying primarily on use of ground-based tools, including backpack pumps, hand sprayers, and pumps mounted on pack and saddle stock.<br><br>• Use chemicals only when they are the minimum method necessary to control weeds that are spreading within the wilderness or threaten lands outside the wilderness.<br><br>• Give preference to herbicides that have the least impact on non-target species and the wilderness environment.<br><br>• Implement herbicide treatments during periods of low human use, where feasible.<br><br>• Address wilderness and special areas in management plans.<br><br>• Maintain adequate buffers for Wild and Scenic Rivers (¼ mile on either side of river, ½ mile in Alaska). |
| Recreation<br><br>See Handbook H-1601-1 (*Land Use Planning Handbook, Appendix C*) | • Schedule treatments to avoid peak recreational use times, while taking into account the optimum management period for the targeted species.<br><br>• Notify the public of treatment methods, hazards, times, and nearby alternative recreation areas.<br><br>• Adhere to entry restrictions identified on the herbicide label for public and worker access.<br><br>• Post signs noting exclusion areas and the duration of exclusion, if necessary.<br><br>• Use herbicides during periods of low human use, where feasible. |
| Social and Economic Values | • Consider surrounding land use before selecting aerial spraying as a method, and avoid aerial spraying near agricultural or densely-populated areas.<br><br>• Post treated areas and specify reentry or rest times, if appropriate.<br><br>• Notify grazing permittees of livestock feeding restrictions in treated areas, if necessary, as per label instructions.<br><br>• Notify the public of the project to improve coordination and avoid potential conflicts and safety concerns during implementation of the treatment.<br><br>• Control public access until potential treatment hazards no longer exist, per label instructions.<br><br>• Observe restricted entry intervals specified by the herbicide label.<br><br>• Notify local emergency personnel of proposed treatments.<br><br>• Use spot applications or low-boom broadcast applications where possible to limit the probability of contaminating non-target food and water sources, especially vegetation over areas larger than the treatment area.<br><br>• Consult with Native American tribes and Alaska Native groups to locate any areas of vegetation that are of significance to the tribe and that might be affected by herbicide treatments.<br><br>• To the degree possible within the law, hire local contractors and workers to assist with herbicide application projects and purchase materials and supplies, including chemicals, for herbicide treatment projects through local suppliers.<br><br>• To minimize fears based on lack of information, provide public educational information on the need for vegetation treatments and the use of herbicides in an Integrated Pest Management program for projects proposing local use of herbicides. |

BLM_0000261

**TABLE 2-8 (Cont.)**
**Standard Operating Procedures for Applying Pesticides**

| Resource Element | Standard Operating Procedure |
|---|---|
| Rights-of-way | • Coordinate vegetation management activities where joint or multiple use of a ROW exists.<br>• Notify other public land users within or adjacent to the ROW proposed for treatment.<br>• Use only herbicides that are approved for use in ROW areas. |
| Human Health and Safety | • Establish a buffer between treatment areas and human residences based on guidance given in the HHRA, with a minimum buffer of ¼ mile for aerial applications and 100 feet for ground applications, unless a written waiver is granted.<br>• Use protective equipment as directed by the herbicide label.<br>• Post treated areas with appropriate signs at common public access areas.<br>• Observe restricted entry intervals specified by the herbicide label.<br>• Provide public notification in newspapers or other media where the potential exists for public exposure.<br>• Have a copy of MSDSs at work site.<br>• Notify local emergency personnel of proposed treatments.<br>• Contain and clean up spills and request help as needed.<br>• Secure containers during transport.<br>• Follow label directions for use and storage.<br>• Dispose of unwanted herbicides promptly and correctly. |

The BLM meets its responsibilities for consultation and government-to-government relationships with Native American tribes by consulting with appropriate tribal representatives prior to taking actions that affect tribal interests. The BLM's tribal consultation policies are detailed in BLM Manual 8120 (*Tribal Consultation Under Cultural Resource Authorities*) and Handbook H-8120-1 (*Guidelines for Conducting Tribal Consultation*). The BLM consulted with Native American tribes and Alaska Native groups during development of this PEIS. Information gathered on important tribal resources and potential impacts to these resources from herbicide treatments is presented in the analysis of impacts.

When conducting vegetation treatments, field office personnel consult with relevant parties (including tribes, native groups, and SHPOs), assess the potential of the proposed treatment to affect cultural and subsistence resources, and devise inventory and protection strategies suitable to the types of resources present and the potential impacts to them.

Herbicide treatments, for example, are unlikely to affect buried cultural resources, but might have a negative effect on traditional cultural properties comprised of plant foods or materials significant to local tribes and native groups. These treatments require inventory and protection strategies that reflect the different potential of each treatment to affect various types of cultural resources.

Impacts to significant cultural resources are avoided through project redesign or are mitigated through data recovery, recordation, monitoring, or other appropriate measures. When cultural resources are discovered during vegetation treatment, appropriate actions are taken to protect these resources.

# Monitoring

Monitoring ensures that vegetation management is an adaptive process that continually builds upon past successes and learns from past mistakes. The regulations of 43 CFR 1610.4-9 require that land use plans establish intervals and standards for monitoring and evaluating of land management actions. During preparation of implementation plans, treatment objectives, standards, and guidelines are stated in measurable terms, where feasible, so that treatment outcomes can be measured, evaluated, and used to guide future treatment actions. This approach ensures that vegetation treatment processes are effective, adaptive, and based on prior experience.

The diversity of plant communities on BLM lands calls for a diversity of monitoring approaches. Monitoring strategies may vary in time and space depending on the

species. Sampling designs and techniques vary depending on the type of vegetation. Guidance on monitoring methodologies can be found in such BLM documents as *Measuring and Monitoring Plant Populations* (BLM Technical Reference 1730-1), which was developed in cooperation with The Nature Conservancy. Other guidance documents include *Sampling Vegetation Attributes* (Interagency Technical Reference 4400-4), developed in cooperation with the Forest Service, the Natural Resource Conservation Service, and the Cooperative Extension Service; and the *Ecological Site Inventory* (BLM Inventory and Monitoring Technical Reference 1734-7). These documents, as well as numerous other guidance documents for specific plant communities, can be found on the National Science and Technology Center website (http://www.blm.gov/nstc). These documents, plus any regionally specific documents developed to meet management objectives allow for the flexibility needed to monitor the variety of vegetation on public lands.

Two types of monitoring of vegetation treatments may be pursued by the BLM. One type is implementation monitoring which answers the question, "Did we do what we said we would do?" The second type is effectiveness monitoring, which answers the question, "Were treatment and restoration projects effective?" Implementation monitoring is usually done at the land use planning level or through annual work plan accomplishment reporting. Effectiveness monitoring is usually done at the local project implementation level.

Invasive plant implementation monitoring for non-herbicide treatments is accomplished through site revisits performed during the growing season of the target species to determine if treatments were implemented correctly and the best time for follow-up treatments.

For herbicide use, implementation monitoring is accomplished through the use of Pesticide Use Proposals (PUPs) and Pesticide Application Records. Both documents are required by the BLM in order to track pesticide use annually. The PUP requires reporting of the pesticide proposed for use and the maximum application rate. It also requires reporting of the number and timing of applications. Targeted species and non-targeted species at the treatment site are described, as well as the other site characteristics. A description of sensitive resources and mitigation measures to protect these resources is also required. Most importantly, the integrated weed management approach to be taken (i.e., the combination of treatments to be used) is required. The NEPA document that analyzes the effects of the

treatment must also be referenced. PUPs must be signed by a certified weed applicator, the field office manager, state coordinator, and deputy state director before the treatment can go forward. The Pesticide Application Record, which must be completed within 24 hours after completion of the application, documents the actual rate of application and that all the above factors have been taken into account. Pesticide Application Records are used to develop annual state summaries of herbicide use for BLM.

PUPs and Pesticide Application Records can also be used for more site-specific implementation monitoring. For example, the Application Record can be used to track whether the application was made at the correct time, if mitigation for sensitive wildlife concerns is included in the PUP.

Monitoring of invasive plant treatment effectiveness can range from site visits to compare the targeted population size against pre-treatment inventory data, to comparing pre-treatment and post-treatment photo points, to more elaborate transect work, depending on the species and site-specific variables. The goals of monitoring should be to answer questions such as the following:

- What changes in the distribution, amount, and proportion of invasive plant infestations have resulted due to treatments?

- Has infestation size been reduced at the project level or larger scale (such as a watershed)?

- Which treatment methods, separate or in combination, are most successful for a particular species? (USDA Forest Service 2005).

Monitoring data can have far-reaching applications in fire management because it provides the scientific basis for planning and implementing future burn treatments. Measuring post-fire ecosystem response allows the BLM to understand the consequences of fire on important ecosystem components and to share this knowledge in a scientifically based language. Monitoring is the critical feedback loop that allows fire management to constantly improve prescriptions and fire plans based on the new knowledge gained from field measurements. FIREMON is an interagency monitoring program that is used for monitoring fuels treatment effectiveness. When a fuels treatment project involves an invasive species (such as tamarisk or Russian olive), monitoring can be done using a program such as FIREMON.

BLM_0000263

Another monitoring protocol frequently used to inventory and monitor forest vegetation is called the Forest Vegetation Information System or FORVIS. FORVIS is a system for storage, retrieval, and analysis of data about forestlands. These data describe existing vegetation, classify sites relative to current condition, can be used in forest growth and structure and wildlife habitat models, describe landscapes, aid in developing forest restoration treatments, and provide a record of treatment and disturbance events.

BLM monitoring activities also include the BLM Legacy program, which is an outgrowth of the need to provide current BLM field managers and specialists with an opportunity to learn about past land management practices and land treatments, and to evaluate the results of those practices 25 or more years later (USDI BLM 2002c). The Legacy program is intended to bring together current land managers and specialists with retired and active employees who performed the land treatments in the past. The underlying philosophy of the program is that if BLM land managers do not learn from the past, they cannot know which treatments are effective and which are not.

The *Healthy Forests Restoration Act of 2003* instructs the BLM to establish a collaborative multiparty monitoring, evaluation, and accountability process when significant interest is expressed in such an approach. The process is used to assess the positive and negative ecological and social effects of projects carried out under Healthy Forests Restoration Act authority. Multiparty monitoring can be an effective way to build trust and collaboration with local communities and diverse stakeholders, including interested citizens and tribes.

The results of monitoring should be made available to interested parties. A website with links to geospatial and other data sets will ensure that inventory data, and treatment methods and results, are shared easily. The BLM has a website, http://www.blm.gov, with links to BLM programs, such as the weed program, and other data sources, including geospatial data. Most state offices are tied into state data clearinghouses that contain useful information gathered by federal, state, and local agencies.

## Monitoring Guidance used by BLM in Vegetation Management

The BLM has prepared numerous guidance and strategy documents to aid field personnel in developing and implementing monitoring plans and strategies. These include the following:

- *BLM National Monitoring Strategy (2006).* The BLM is currently developing a national strategy to manage the collection, storage, and use of data describing the interrelationship of resource conditions, resource uses, and the BLM's own activities. The goals of the strategy are to: 1) enhance the efficiency and effectiveness of the BLM's assessment, inventory, and monitoring efforts; 2) establish and use a limited number of resource indicators that are common to most or all BLM field offices, and that are comparable or identical to measures used by other government agencies and non-governmental organizations; and 3) standardize data collection, evaluation, and reporting in a way that improves the quality of the BLM's land use planning and other management decisions, and enhances the BLM's ability to manage for multiple uses.

- *BLM Land Use Planning Handbook H-1601-1 (2005).* Establishes requirements for periodic implementation and effectiveness monitoring for land use planning decisions.

- *Monitoring Manual for Grasslands, Shrubland, and Savanna Ecosystems Vols. I and II. USDA Agricultural Research Service (2005).* Provides quantitative methods to address indicators of rangeland health.

- *BLM Technical Reference 1730-2 Biological Soil Crusts (2001).* Provides technical guidance on how to develop and implement effective monitoring plans for biological soil crusts.

- *BLM Handbook H-4180-1 Rangeland Health Standards (2001).* Provides technical guidance on evaluating rangeland health, developing plans to improve rangeland health, and monitoring the progress of rangeland health plans.

- *BLM Technical Reference 1730-1 Measuring and Monitoring Plant Populations (1998).* Provides technical guidance on how to develop and implement effective monitoring plans for vegetation and use monitoring in adaptive management.

BLM_0000264

- *BLM Technical Reference 1734-4 Sampling Vegetative Attributes (1996).* Provides the basis for consistent, uniform, and standard vegetation attribute sampling that is economical, repeatable, statistically reliable, and technically adequate.

- *Manual Section 9011 Chemical Pest Control (1992).* Establishes requirements for monitoring pesticide applications.

- *Manual Section 9014 Use of Biological Control Agents of Pests on Public Lands (1990).* Establishes requirements to monitor success or failure in survival, control, and spread of biological agents.

- *Guidelines for Coordinated Management of Noxious Weeds (1990).* Provides guidance on establishing monitoring plans for noxious weeds and their control.

- *BLM Handbook H-4400-1 Range Monitoring and Evaluation (1989).* Provides technical guidance on how to measure vegetation uses such as livestock grazing, wild horse and burro use, and wildlife browsing and foraging.

- *BLM Handbook H-9011-1 Chemical Pest Control (1988).* Provides technical guidance on post-treatment evaluations for pesticide applications to occur within 2 years of treatment.

- *NEPA Handbook H-1790-1 Chapter VI – Monitoring (1988).* All actions and mitigation measures, including monitoring and enforcement programs, adopted in a decision document are legally enforceable commitments. The purposes of monitoring in a NEPA context are to 1) ensure compliance with decisions, 2) measure effectiveness of decisions, and 3) evaluate validity of decisions.

- *Manual Section 1734 Monitoring and Inventory Coordination (1983).* Provides the BLM with technical guidance on how to develop and implement effective monitoring plans for vegetation.

Numerous other technical references for inventory, monitoring, and assessment are found at: http://www.blm.gov/nstc/library/techref.htm. In addition, state-specific handbooks to guide monitoring based on the national level guidance (e.g., *Nevada Monitoring Handbook, Oregon Monitoring Handbook*).

# Monitoring Methods and Research

Fuels treatment and noxious weed control projects must begin with an understanding of which techniques and monitoring methods are most effective, as determined through careful research and follow-up monitoring. The BLM has been supporting research at universities and Forest Service research stations through the Joint Fire Science program and projects such as the Great Basin Restoration Initiative. The Joint Fire Science program has supported research on such topics as fire effects, effects from fuels treatments, and the use of fire as a tool in controlling invasive plants (http://jfsp.nifc.gov/). Under the Great Basin Restoration Initiative, ongoing projects involving weed control, restoration, and fire treatments help provide a link between science and management to ensure that ecologically-based restoration is implemented. These projects are summarized at http://www.fire.blm.gov/gbri/technology.html.

Dissemination of research and monitoring results and information occurs in a variety of ways, including formal conferences and workshops of fire management professionals, the National Science and Technology Center, publications such as Resource Notes, and BLM state websites. Snapshots, an online publication found at http://www.fire.blm.gov/snapshots.htm, highlights BLM projects that support the *National Fire Plan*. Examples of successful projects and community collaborations that have been discussed in Snapshots include creation and monitoring of fuels breaks, habitat improvement through prescribed burning, fuels reduction and associated monitoring, and the progress of a downy brome taskforce. Examples of project successes include the following:

- In Wyoming, a multi-agency prescribed burn was completed in 2005 to reduce hazardous fuels and improve the health and vigor of native plant communities. Monitoring methods include permanent vegetation transects and photo points to provide post-burn results and an elk collaring study to show which treatment areas are being used by elk. The information obtained during this study will be shared with the public, and the site will be used by school classes.

- In Wyoming, a tamarisk reduction project was started in the Bighorn Basin in 2000 to restore native cottonwood galleries. The project involves various combinations of treatments, as well as plantings of native species following the treatments.

- In Washington, the BLM has been treating reed canarygrass since 2003, using a combination of prescribed burning, herbicides, and mowing, followed by seedbed preparation and reseeding with native seed mixtures. This project is a partnership with the Natural Resource Conservation Service, Washington State Department of Fish and Wildlife, and the U.S. Fish and Wildlife Service.

BLM offices maintain monitoring reports to document that fuels treatments meet set objectives. Monitoring plans typically include plots and photo points, at which pre- and post-treatment data are collected. This type of monitoring has successfully provided data that has allowed the BLM to confirm that project goals have been met.

# Coordination and Education

As demonstrated at public scoping meetings for the PEIS, the public is deeply interested in BLM vegetation treatment activities, especially individuals that live in close proximity to public lands, have commercial operations dependant on vegetation on or adjacent to public lands, or use public lands for recreation. The BLM strives to keep the public informed about its vegetation treatment activities through regular coordination and communication. The BLM also encourages the public to participate in the environmental review process during the development and analysis of local vegetation management programs.

Several laws and Executive Orders set forth public involvement requirements, including involving the public in the environmental analysis, land use planning, and implementation decision-making processes to address local, regional, and national interests (USDI BLM 2000f).

The BLM is ultimately responsible for land use plan decisions, including decisions about vegetation management, on public lands. The BLM has found, however, that collaborative relationships with stakeholders, including individuals, communities, and governments, improves communication, provides a greater understanding of different perspectives, and helps to find solutions to issues and problems. Input from the public and government agencies has been critical during development of this PEIS and the PER.

The NEPA process ensures that the public is allowed input into vegetation management actions on public lands. For treatment projects requiring an EA or EIS, the BLM must notify the public of the proposed project and give the public the opportunity to comment on the site-specific analysis done for the project. Treatment actions may be modified in response to comments posed by the public. The public may also be invited to observe treatment activities and participate in project monitoring.

Public lands are often commingled with private lands, or lands under the jurisdiction of tribal, state, or local governments or other federal agencies. Multijurisdictional planning assists land use planning efforts when there is a mix of land ownership and government authorities, and there are opportunities to develop complementary decisions across jurisdictional boundaries.

Examples of these planning efforts include development of weed treatment programs involving the BLM and nearby private landowners, or coordination with parties who hold land use authorizations including ROW, leases, permits, or easements. Many BLM weed coordinators hold classes for public land users to make them aware of the problem and to solicit their help in reporting new weed infestations.

Because vegetation treatments have a direct effect on the productivity and use of grazing allotments, coordination and consultation with the grazing permittee(s), and any other interested parties affected by a vegetation treatment, would be necessary.

It is critical that the BLM notify potentially affected parties of treatment activities that occur on public lands. This can be done through a letter, phone call, meeting, newsletter, newspaper article, or other medium to ensure that potentially affected parties can comment on the proposed action and take any steps needed to protect life and property from proposed actions.

Prior to herbicide treatments, the BLM posts entry points onto public lands where the herbicide application will take place. Information provided in the posting will includes herbicide product applied; active ingredients; USEPA registration number; application date; period of time which must elapse before a person without

BLM_0000266

protective clothing may enter a treatment site; and other warnings or information required to ensure the safety of the public.

The BLM enjoys wide participation in various national, state, and local prevention and education efforts pertaining to noxious and invasive species and hazardous fuels management. The BLM participates in state FireWise programs, state Fire Safe Councils, the National Wildfire Coordinating Group Wildland Fire Education Working Team, and the National Wildland Fire Prevention and Education Team. Local education efforts such as Project: FIRE bring BLM natural resource professionals into schools to educate students about fire prevention and safety. Noxious weed and invasive species education programs span the K-12 grades and are led by many local BLM field office ecologists and natural resource professionals. The BLM also participates in Project Learning Tree. Project Learning Tree, one of the most widely-used environmental education programs in the country, provides education curricula for fire and invasive species education.

## Mitigation

Table 2-9 identifies the measures the BLM proposes to mitigate adverse environmental impacts identified in Chapter 4 (Environmental Consequences). As defined by CEQ regulation 1508.20, mitigation includes: 1) avoiding the impact altogether by not taking a certain action or parts of an action; 2) minimizing impacts by limiting the degree or magnitude of the action and its implementation; 3) rectifying the impact by repairing, rehabilitating, or restoring the affected environment; 4) reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action; and 5) compensating for the impact by replacing or providing substitute resources or environments.

Numerous mitigation measures were developed from information provided in ERAs and during development of this PEIS. The measures listed below would apply to plants, animals, and other resources at the programmatic level in all 17 western states. However, local BLM field offices could use interactive spreadsheets and other information contained in the ERAs to develop more site-specific mitigation and management plans based on local conditions (e.g., soil type, rainfall, vegetation type, herbicide treatment method, and herbicide application rate). It is possible that mitigation measures would be less restrictive than those listed below if local site conditions were evaluated using the ERAs when developing project-level mitigation plans. In addition, the BLM may be able to use timing restrictions or similar practices to reduce the level of risk to an acceptable level. For example, it may be necessary to apply diuron at the typical herbicide application rate to ensure protection of a migratory bird species. However, it may be acceptable to use the maximum application rate during periods of the year when the bird has migrated from the treatment area. Local field managers would consult the ERAs and review species life history requirements before making these decisions to ensure that birds and other resources are adequately protected.

## Summary of Impacts by Alternative

Table 2-10 summarizes the likely effects of vegetation treatments using herbicides for each alternative. Information contained in this table is discussed in more detail in Chapter 4 (Environmental Consequences).

BLM_0000267

TABLE 2-9
Mitigation Measures

| Resource | Mitigation Measures |
|---|---|
| Air Quality | None proposed. |
| Soil Resources | None proposed. |
| Water Resources and Quality | • Establish appropriate (herbicide specific) buffer zones to downstream water bodies, habitats, and species/populations of interest (see Appendix C, Table C-16). |
| Wetland and Riparian Areas | • See mitigation for Water Resources and Quality and Vegetation. |
| Vegetation | • Minimize the use of terrestrial herbicides (especially bromacil, diuron, and sulfometuron methyl) in watersheds with downgradient ponds and streams if potential impacts to aquatic plants are of concern.<br><br>• Establish appropriate (herbicide specific) buffer zones around downstream water bodies, habitats, and species/populations of interest. Consult the ERAs for more specific information on appropriate buffer distances under different soil, moisture, vegetation, and application scenarios.<br><br>• To protect special status plant species, implement all conservation measures for plants presented in the *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment.* |
| Fish and Other Aquatic Organisms | • Limit the use of diquat in water bodies that have native fish and aquatic resources.<br><br>• Limit the use of terrestrial herbicides in watersheds with characteristics suitable for potential surface runoff, that have fish-bearing streams, during periods when fish are in life stages most sensitive to the herbicide(s) used.<br><br>• To protect special status fish and other aquatic organisms, implement all conservation measures for aquatic animals presented in the *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment.*<br><br>• Establish appropriate herbicide-specific buffer zones for water bodies, habitats, or fish or other aquatic species of interest (see Appendix C, Table C-16, and recommendations in individual ERAs).<br><br>• Avoid using the adjuvant R-11® in aquatic environments, and either avoid using glyphosate formulations containing POEA, or seek to use formulations with the least amount of POEA, to reduce risks to aquatic organisms. |
| Wildlife | • To minimize risks to terrestrial wildlife, do not exceed the typical application rate for applications of dicamba, diuron, glyphosate, hexazinone, tebuthiuron, or triclopyr, where feasible.<br><br>• Minimize the size of application areas, where practical, when applying 2,4-D, bromacil, diuron, and Overdrive® to limit impacts to wildlife, particularly through contamination of food items.<br><br>• Where practical, limit glyphosate and hexazinone to spot applications in rangeland and wildlife habitat areas to avoid contamination of wildlife food items.<br><br>• Avoid using the adjuvant R-11® in aquatic environments, and either avoid using glyphosate formulations containing POEA, or seek to use formulations with the least amount of POEA, to reduce risks to amphibians.<br><br>• Do not apply bromacil or diuron in rangelands, and use appropriate buffer zones (see Vegetation section in Chapter 4) to limit contamination of off-site vegetation, which may serve as forage for wildlife.<br><br>• Do not aerially apply diquat directly to wetlands or riparian areas.<br><br>• To protect special status wildlife species, implement all conservation measures for terrestrial animals presented in the *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment.* Apply these measures to special status species (refer to conservation measures for a similar size and type of species, of the same trophic guild). |

BLM_0000268

ALTERNATIVES

TABLE 2-9
Mitigation Measures (Cont.)

| Resource | Mitigation Measures |
|---|---|
| Livestock | • Minimize potential risks to livestock by applying diuron, glyphosate, hexazinone, tebuthiuron, and triclopyr at the typical application rate, where feasible.<br><br>• Do not apply 2,4-D, bromacil, dicamba, diuron, Overdrive®, picloram, or triclopyr across large application areas, where feasible, to limit impacts to livestock, particularly through the contamination of food items.<br><br>• Where feasible, limit glyphosate and hexazinone to spot applications in rangeland.<br><br>• Do not aerially apply diquat directly to wetlands or riparian areas used by livestock.<br><br>• Do not apply bromacil or diuron in rangelands, and use appropriate buffer zones (see Vegetation section in Chapter 4) to limit contamination of off-site rangeland vegetation. |
| Wild Horses and Burros | • Minimize potential risks to wild horses and burros by applying diuron, glyphosate, hexazinone, tebuthiuron, and triclopyr at the typical application rate, where feasible.<br><br>• Consider the size of the application area when making applications of 2,4-D, bromacil, dicamba, diuron, Overdrive®, picloram, and triclopyr in order to reduce potential impacts to livestock.<br><br>• Apply herbicide label grazing restrictions for livestock to herbicide treatment areas that support populations of wild horses and burros.<br><br>• Where feasible, limit glyphosate and hexazinone to spot applications in rangeland.<br><br>• Do not apply bromacil or diuron in grazing lands within herd management areas, and use appropriate buffer zones (see Vegetation section in Chapter 4) to limit contamination of vegetation in off-site foraging areas.<br><br>• Do not apply 2,4-D, bromacil, or diuron in herd management areas during the peak foaling season (March through June, and especially in May and June), and do not exceed the typical application rate of Overdrive® or hexazinone in HMAs during the peak foaling season. |
| Paleontological and Cultural Resources | • Do not exceed the typical application rate when applying 2,4-D, bromacil, diquat, diuron, fluridone, hexazinone, tebuthiuron, and triclopyr in known traditional use areas.<br><br>• Avoid applying bromacil or tebuthiuron aerially in known traditional use areas.<br><br>• Limit diquat applications to areas away from high residential and traditional use areas to reduce risks to Native Americans and Alaska Natives. |
| Visual Resources | None proposed. |
| Wilderness and Other Special Areas | Mitigation measures that may apply to wilderness and other special area resources are associated with human and ecological health and recreation. Please refer to the Vegetation, Fish and Other Aquatic Resources, Wildlife Resources, Recreation, and Human Health and Safety sections of Chapter 4. |
| Recreation | Mitigation measures that may apply to recreational resources are associated with human and ecological health. Please refer to the Vegetation, Fish and Other Aquatic Resources, Wildlife Resources, and Human Health and Safety sections of Chapter 4. |
| Social and Economic Values | None proposed. |
| Human Health and Safety | • Use the typical application rate, where feasible, when applying 2,4-D, 2,4-DP, atrazine, bromacil, diquat, diuron, fluridone, fosamine, hexazinone, tebuthiuron, and triclopyr to reduce risk to occupational and public receptors.<br><br>• Avoid applying atrazine, bromacil, diuron, or simazine aerially.<br><br>• Limit application of chlorsulfuron via ground broadcast applications at the maximum application rate.<br><br>• Limit diquat application to ATV, truck spraying, and boat applications to reduce risks to occupational receptors; limit diquat applications to areas away from high residential and subsistence use to reduce risks to public receptors.<br><br>• Evaluate diuron applications on a site-by-site basis to avoid risks to humans. There appear to be few scenarios where diuron can be applied without risk to occupational receptors.<br><br>• Do not apply hexazinone with an over-the-shoulder broadcast applicator. |

BLM_0000269

**TABLE 2-10**
**Summary and Comparison of Effects on Resources by Alternative**

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| EFFECTS ON AIR QUALITY |||||
| **General Effects:** None of the predicted annual emissions by pollutant or state would exceed prevention of significant deterioration (PSD) annual emissions significance thresholds. Treatments would result in approximately 77 tons per year (tpy) of total suspended particles (TSP), 24 tpy of carbon monoxide (CO), and 17 tpy of PM$_{10}$ (particulate matter less than 10 microns in diameter). These emissions are lower than emissions all other herbicide treatment alternatives. | **General Effects:** None of the predicted annual emissions by pollutant or state would exceed PSD annual emissions significance thresholds. Particulate matter concentrations from treatments are expected to be substantially lower than NAAQS thresholds based on modeling. Treatments would result in approximately 206 tpy of TSP, 62 tpy of CO, and 45 tpy of PM$_{10}$. These emissions are twice those predicted for the No Action Alternative, with half of the emissions occurring in Idaho and Nevada. | **General Effects:** Herbicides would not be used for vegetation management. There would be no herbicide treatment-related emissions associated with this alternative. | **General Effects:** None of the predicted annual emissions by pollutant or state would exceed PSD annual emissions significance thresholds. Particulate matter (PM) concentrations are substantially lower than NAAQS thresholds at sample locations. Treatments would result in approximately 257 tpy of TSP, 83 tpy of CO, and 55 tpy of PM$_{10}$, greater than the amount of emissions generated under the Preferred Alternative, even though 40% fewer acres would be treated. The elevated amounts of emissions are primarily related to the reliance on ground equipment for treatment applications. However, herbicide drift would likely be less than under the other herbicide treatment alternatives. | **General Effects:** None of the predicted annual emissions by pollutant or state would exceed PSD annual emissions significance thresholds. PM concentrations are substantially lower than NAAQS thresholds at sample locations. Treatments would result in approximately 106 tpy of TSP, 32 tpy of CO, and 23 tpy of PM$_{10}$, about twice those of the No Action Alternative and half those of the Preferred Alternative. |

**Cumulative Effects:** The cumulative effects of all agricultural, commercial, industrial, and other activities that have emitted air pollutants in the western U.S. and Alaska have contributed to deterioration in air quality. Despite increases in these activities and in human population, total emissions of principal air pollutants peaked in the 1970s and early 1980s and have generally declined during the past 2 decades. BLM treatment activities have contributed < 1% of criteria pollutants nationwide in recent years. Emissions associated with fire use and other treatment methods under the action alternatives would increase from current levels, but would still comprise < 1% of total pollutants generated nationwide. Most emissions would be associated with the use of fire. However, emissions associated with wildfire are generally greater than those associated with prescribed fire on a per unit area basis. Smoke emissions would be reduced by permitting fires only during meteorological periods favorable to dispersion and avoiding population centers. BLM efforts to use vegetation treatments, including fire use, to restore historical fire regimes, native vegetation, and natural ecosystem processes should reduce the frequency and intensity of wildfire, resulting in less accumulation of pollutants than would occur under the No Action Alternative. Although 40% fewer acres would be treated using herbicides (the number of acres treated using other treatment methods would be similar between the two alternatives), criteria pollutant emissions would be greater under Alternative D than the Preferred Alternative because herbicide treatments would be ground-based, while much of the acreage treated under the Preferred Alternative would be applied using aircraft. Exceedances of NAAQS would not occur under any alternatives. Improvements in pollution control technology should further reduce pollutants associated with vegetation treatments in the future.

| | | EFFECTS ON SOIL RESOURCES | | |
|---|---|---|---|---|
| Under the No Action Alternative, approximately 305,000 acres would be treated annually. None of the herbicides likely to be used would result in severe effects to | Under the Preferred Alternative, approximately 932,000 acres would be treated annually. None of the herbicides likely to be used would result in severe effects to | Under Alternative C, herbicides would not be used for vegetation management; thus there would be no effects to soil from herbicides. Because herbicides would not be | Under Alternative D, approximately 530,000 acres would be treated annually. The risk of inadvertent applications to soils off of public lands would be | Under Alternative E, approximately 466,000 acres would be treated annually. ALS-inhibiting herbicides would not be used under this alternative. |

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

2-43

June 2007

BLM_0000270

ALTERNATIVES

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

ALTERNATIVES

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| soil. Because fewer acres would be treated under this alternative than under the other herbicide treatment alternatives, benefits to soil from treatments (e.g., improved soil productivity, reduced soil erosion) would be less under this alternative than under the other treatment alternatives. | soil. New herbicides proposed for use would have minor effects on soil, but should help reduce populations of invasive species. Because more acres would be treated under this alternative than under the other alternatives, benefits to soil from treatments (e.g., improved soil productivity, reduced soil erosion) would be greatest under this alternative. Herbicides could also be used to benefit soils in Alaska, Nebraska, and Texas if treatments occurred there. | used to treat vegetation, invasive plant populations could increase and adversely affect soil resources in areas where herbicide treatments are the only practical method of treatment. Other treatment methods (manual, mechanical, biological, and use of prescribed fire) could also disturb and harm soil and could be more detrimental to soil in a treatment area than the use of herbicides. | less under this alternative than under the other treatment alternatives. In areas where ground-based treatments were ineffective or too costly to implement, vegetation control might not occur, potentially resulting in adverse effects to soil. Because fewer acres would be treated under this alternative than under the Preferred Alternative, benefits to soil from treatments (e.g., improved soil productivity, reduced soil erosion) would be less. New herbicides proposed for use would have minor effects on soil, but should help reduce populations of invasive species. It is likely that the BLM would use less imazapic under this alternative than under the Preferred Alternative. Herbicides could also be used to benefit soils in Alaska, Nebraska, and Texas if treatments occurred there. | However, ALS-inhibiting herbicides have not been found to be more toxic to soil organisms or to demonstrate other soil effects notably different from the other herbicides available to, or proposed for use by, the BLM. Thus, there could be greater impacts to soil under this alternative if the BLM uses non-ALS-inhibiting herbicides. This alternative would discourage activities that are known to harm soils (e.g., OHV use, livestock grazing). Because fewer acres would be treated under this alternative than under the Preferred Alternative, benefits to soil from treatments (e.g., improved soil productivity, reduced soil erosion) would be less. In addition, the BLM would not be able to use imazapic, which has been proposed for treatment of downy brome. Catastrophic fires and damage to soil in the Great Basin and elsewhere in the western U.S. have been attributed to the growth and spread of downy brome. Herbicides could also be used to benefit soils in Alaska, Nebraska, and Texas if treatments occurred there. |
| **Cumulative Effects:** Human activities associated with commodity extraction, agriculture, and urbanization, and more recently with large-scale, catastrophic wildfire have resulted in soil erosion and loss of soil productivity on public lands and throughout the West. Soils in Alaska have been impacted by mineral extraction, logging, and oil and gas development. Treatments would lead to loss of vegetation and soil, but long-term improvement in ecosystems should restore soil and improve soil productivity. Several recently implemented conservation programs by the BLM will also improve soil on rangelands. Rangeland health on public lands has shown improvement over the past 2 decades, and nationwide, the rate of soil loss has slowed. Short-term soil loss would be greatest under the Preferred Alternative, but long-term improvement in soil function would be greatest under this alternative. Soil loss would be irretrievable, but soil productivity on degraded lands could be retrieved over decades or centuries. | | | | |
| **EFFECTS ON WATER RESOURCES AND QUALITY** | | | | |
| Impacts to surface and groundwater quality would be | Benefits and risks to water quality and quantity would be greatest | There would be no effects from herbicides on water quality. In | The BLM would be unable to treat large areas with herbicides. | Under this alternative, ALS-inhibiting herbicides would not |

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

2-45

June 2007

BLM_0000272

ALTERNATIVES

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| similar to the ongoing program. Herbicides most commonly used are known groundwater contaminants (2,4-D, glyphosate, picloram, and tebuthiuron), and several other herbicides that may be used (2,4-DP, atrazine, and simazine) are also known groundwater contaminants. Impacts to water quality and quality, and benefits to watersheds from herbicide treatments would be lowest under this alternative. | under this alternative. Of new herbicides proposed for use, diquat and fluridone are effective in controlling aquatic plants to improve water quality in lakes and streams, but diquat is a known groundwater contaminant. Imazapic is not known to contaminate groundwater and in upland treatments could serve as a replacement for herbicides that are known groundwater contaminants. Removal of unwanted vegetation should improve hydrologic functions in treated watersheds. The BLM would also be able to use herbicides to improve watershed function and water resources and quality in Alaska, Nebraska, and Texas, although no herbicide treatments are currently proposed for Alaska and Nebraska. | areas with weeds and other infestations, hydrologic functions could deteriorate in areas where herbicide treatments are the only effective treatment method. | Thus, benefits to watersheds from large-scale herbicide treatments would not occur. Fire use and mechanical treatments could replace herbicide treatments in some areas, but could be less effective and cause greater soil disturbance, leading to reduced water quality. Risk of herbicide drift, in terms of reducing off-site contamination of water bodies, would be lower under this alternative than under the other treatment alternatives. The BLM would be able to use herbicides to improve watershed function and water resources and quality in Alaska, Nebraska, and Texas, although no herbicide treatments are currently proposed for Alaska and Nebraska. | impact surface water and groundwater quality. Passive treatments promoted under this alternative could benefit watersheds long-term, but would have few short-term benefits. Restrictions on herbicide treatments in riparian areas would limit the risk of adverse impact from herbicides on water resources in these areas, but would also limit long-term gains from treatment of unwanted vegetation. The BLM would be able to use herbicides to improve watershed function and water resources and quality in Alaska, Nebraska, and Texas, although no herbicide treatments are currently proposed for Alaska and Nebraska. |
| **Cumulative Effects:** As a result of human activities, 21% of watersheds nationwide have serious water quality problems. Commodity extraction, livestock grazing, fire suppression, and spread of weeds have contributed to water quality problems on public lands, primarily from high turbidity and sediment levels and high water temperatures. Future BLM efforts will focus on watersheds where water quality does not meet state or tribal standards. Management of weeds and other invasive vegetation and restoration of natural fire regimes would cause erosion and sedimentation over the short term, but treatments should improve watershed health over the long term. In Alaska, most aquatic areas are of high quality, although there are water quality concerns associated with mining and oil and gas development. Short-term impacts and long-term improvements would be greatest under the Preferred Alternative. There would be more emphasis on passive management to improve ecosystem health under Alternative E, but this management would have to be considered within the multiple use requirements of FLPMA. An accidental spill of an herbicide or a major fire would cause damage to water bodies that could result in irretrievable reduced production or the deaths of individual organisms in the short-term. Over the long term, effects of treatments on water resources and quality could be reversed under all alternatives. | | | | |
| **EFFECTS ON WETLAND AND RIPARIAN AREAS** | | | | |
| Potential benefits and risks of using herbicides would be lowest under this alternative. Approximately 2,300 acres of wetland and riparian areas would be treated. The BLM would not be able to use four herbicides proposed for use that would be more effective in treating vegetation in or near wetland and | Potential benefits and risks of using herbicides would be greatest under this alternative. Approximately 10,000 acres of wetland and riparian areas would be treated. The BLM would be able to use four herbicides proposed for use that would be more effective in treating vegetation in or near wetland and | Possible ecosystem benefits of not using herbicides include the elimination of risks associated with accidental spills, drift, and persistence of herbicides on non-target biota. However, the risk of noxious weeds and invasive vegetation spreading are greatest under this alternative, especially for plant species that cannot be | Risk of herbicide drift, in terms of reducing off-site contamination of wetland and riparian areas, would be lower under this alternative than under the other treatment alternatives (although differences would be small because few acres [< 2%] would be treated by air under alternatives A, B, and E). However, control of unwanted | Under this alternative, ALS-inhibiting herbicides would not impact surface water and groundwater quality. Passive treatments and limits on the use of livestock and OHV activity (within the limitations of the FLPMA) could benefit riparian and wetland areas. Restrictions on use of herbicides in riparian |

ALTERNATIVES

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| riparian areas and that have similar or lower ecological risks than herbicides currently available for use by the BLM. | riparian areas and that have similar or lower ecological risks than herbicides available for use by the BLM. The BLM would also be able to use new herbicides in the future that may be even more effective and safer than currently-available herbicides. The BLM would be able to treat unwanted wetland and riparian vegetation in Alaska, Nebraska, and Texas. | effectively controlled using other treatment methods. It could be more difficult for the BLM to effectively treat unwanted vegetation in remote riparian and wetland areas using non-herbicide treatment methods. | upland vegetation over large and/or remote areas would be more difficult, reducing benefits to watershed that could improve downslope wetland and riparian areas. The BLM would be able to treat unwanted wetland and riparian vegetation in Alaska, Nebraska, and Texas. | conservation areas could benefit these areas, unless noxious weeds or other invasive vegetation were present that would not effectively be controlled using other treatment methods. The BLM would be able to treat unwanted wetland and riparian vegetation in Alaska, Nebraska, and Texas. |

**Cumulative Effects:** An estimated 53% of wetlands have been lost in the U.S., and much of the remaining habitat has become degraded from agriculture, commodity extraction, urbanization, and other human activities. The spread of weeds and fire suppression have also caused some wetland and riparian areas on public lands to fail to function properly. To correct this situation, vegetation treatments would be focused on watershed in greatest need, and approximately 30,000 acres of wetland and riparian habitat would be treated annually using all treatment methods. Collaborative efforts by the BLM, Forest Service, other federal, state, tribal, and local land management agencies, and private conservation groups will slow or stop the decline in wetland acreage. Restoring natural fire regimes and native vegetation, and controlling weeds and other invasive vegetation, would improve wetland and riparian habitat and function, with greatest benefits likely to occur under the Preferred Alternative. Use of new herbicides proposed for use by the BLM would further reduce risks to wetland and riparian areas from the use of herbicides. Alternative C would ensure that wetland and riparian areas were not impacted by herbicides, but aquatic weed control could be difficult under this alternative as herbicides are the most effective treatment methods for controlling some aquatic plants. It is unlikely that there would be an irreversible or irretrievable commitment of resources under all alternatives.

| EFFECTS ON VEGETATION |
|---|

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| The nature of impacts to vegetation would be similar to impacts that have occurred in the past, as the BLM would continue to treat about 305,000 acres annually. Negative impacts to vegetation (i.e., harm to non-target vegetation) would be less under this alternative than under the other herbicide treatment alternatives, as would long-term positive benefits on vegetation and improvement in ecosystems. Since the BLM would not be able to use proposed herbicides, risks to non-target plants could be greatest under this alternative. Treatments would not be allowed in Alaska, Nebraska, and Texas. Risks to special status species | The most extensive impacts (both negative and positive) to vegetation would occur under this alternative. The BLM would be able to use four proposed herbicides that pose less risk to non-target plants than herbicides currently used. The BLM could also be able to use new herbicides in the future, which could reduce risks to non-target plants and provide greater ecosystem benefits. Risks to special status species would be greatest under this alternative. Use of proposed herbicides and new herbicides in the future should reduce the risk to special status species from treatments. Ecosystem benefits to special status species from | Non-target plants would not be affected by herbicides, but effects to vegetation would result from other treatment methods. Positive ecosystem benefits from vegetation management would be least under this alternative, as there are certain invasive and weedy species for which herbicide use is the only effective method of treatment or for which other methods are impractical. Under this alternative, invasive plant populations would likely continue to spread, possibly at increased rates. There would be no risks to special status species from use of herbicides under this alternative, although ecosystem benefits to special status species | This alternative would substantially reduce the risk of off-site drift to non-target vegetation, and impacts to non-target vegetation could be least under this alternative. Similar to the Preferred Alternative, there would be benefits associated with increased availability of new and future herbicides. However, the BLM might not be able to treat large and remote areas using ground treatment methods, increasing the likelihood that noxious weeds and other invasive species would spread in these areas. Fire and mechanical treatments would be substituted in some of these areas, but might not be as effective in areas with | Per treatment impacts to non-target vegetation from herbicide use could be least under this alternative because ALS-inhibiting herbicides would not be used. Several studies have shown that drift of ALS-inhibiting herbicides can have adverse effects on crops found near treatment areas. Focus on passive treatments and avoidance of herbicide use in riparian conservation and important cultural areas could provide benefits to these areas, except where aggressive weeds would only be controlled by ALS-inhibiting herbicides. Treatments would be allowed in Alaska, Nebraska, and Texas, although |

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

2-47

June 2007

BLM_0000274

ALTERNATIVES

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| would be less under this alternative than under the other treatment alternatives because fewer acres would be treated. | vegetation treatments would be greatest under this alternative. The BLM would be able to treat vegetation in Alaska, Nebraska, and Texas using herbicides, although use of herbicides is currently planned for Alaska or Nebraska. | from herbicide treatments would be least under this alternative. | insufficient fuel to carry fires, or where sprouting species increased after mechanical treatments. Treatments would also be allowed in Alaska, Nebraska, and Texas, although use of herbicides in Alaska is unlikely. Based on acres treated, special status species would be less likely to be exposed to herbicides than under the Preferred Alternative. special status species would not be exposed to herbicides from off-site drift. However, ecosystem benefits to special status species from aerial treatments, especially in remote areas and large areas with invasive vegetation would be less than under the Preferred Alternative. The BLM would be able to treat vegetation in Alaska, Nebraska, and Texas using herbicides, although no treatments are currently planned for Alaska or Nebraska. | use of herbicides in Alaska is unlikely. Increased emphasis on passive restoration could benefit some special status species. Risks to special status species may be greater from using non-ALS-inhibiting herbicides than from using ALS-inhibiting herbicides. The BLM would be able to treat vegetation in Alaska, Nebraska, and Texas using herbicides, although no treatments are currently planned for Alaska or Nebraska. |

**Cumulative Effects:** Human-caused effects to vegetation began when man first arrived in North America, nearly 12,000 years ago, but intensified in the western U.S. during the past 150 years as a result of modern human influences such as commodity extraction and urbanization. Fire suppression led to altered fire regimes and ecosystem degradation that has resulted in high severity fires and the spread of noxious weeds and other invasive vegetation during the past few decades. Many forest areas have become dominated by mid-seral shade-tolerant species, woodlands have invaded grasslands, and some native grasslands and shrublands have been invaded by annual weeds. Only 34% of public land was considered to be in good to excellent condition in 1986. Treatments to reduce hazardous fuel levels, control the spread of weeds, and restore native vegetation should improve ecosystem health over much of the West. Treatments would be focused in degraded watersheds and in the Temperate Desert Ecoregion to benefit sagebrush and other evergreen shrubland species. Based on modeling, treatments should slow land degradation and increase the number of acres of vegetation that are resilient to risks from fires, insects, and disease. All treatments would benefit vegetation, but the Preferred Alternative would convey the greatest benefits as more acres would be treated under that alternative than the other alternatives. Treatments would kill target and non-target species, and would return some areas to an early successional stage. Native plant production that was lost from treatments could not be retrieved, but treatments should result in improved native plant communities and improved ecosystem health in the long term.

**EFFECTS ON FISH AND OTHER AQUATIC ORGANISMS**

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| Potential benefits and risks of using herbicides would be lower than under the other herbicide treatment alternatives. Approximately 2,300 acres of habitat for aquatic organisms | Potential benefits and risks of using herbicides would be greatest. Approximately 10,000 acres of habitat for aquatic organisms could be treated. The BLM would be able to use four | Possible ecosystem benefits include the elimination of risks associated with accidental spills, drift, and persistence of herbicides. However, the risk of noxious weeds and invasive | Risk of herbicide drift, in terms of reducing off-site contamination of habitat for aquatic organisms, would be lower under this alternative than under the other treatment alternatives (although | Disallowing use of ALS-inhibiting herbicides would have limited benefits fish and other aquatic organisms, as ALS-inhibiting herbicides pose few risks to aquatic organisms. |

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

2-48

June 2007

BLM_0000275

ALTERNATIVES

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| could be treated. The BLM would not be able to use four herbicides proposed for use that are more effective in treating vegetation in or near wetland and riparian areas and that have ecological risks to aquatic organisms similar to or lower than those associated with herbicides currently available for use by the BLM. | herbicides proposed for use that are more effective in treating vegetation in or near wetland and riparian areas and that have ecological risks to aquatic organisms similar to or lower than those associated with herbicides currently available for use by the BLM. The BLM would be able to use new herbicides in the future that may be even more effective and safer than currently-available herbicides. The BLM would be able to treat unwanted wetland and riparian vegetation in Alaska, Nebraska, and Texas to the benefit of aquatic organisms found on public lands in these states. | vegetation spreading in riparian and wetland areas would be greatest, especially for plant species that cannot be effectively controlled using other treatment methods. It also could be more difficult for the BLM to effectively treat unwanted vegetation in remote riparian and wetland areas. | differences would be small because few acres [< 2%] would be treated by air under alternatives A, B, and E). However, control of unwanted upland vegetation over large and/or remote areas would be difficult, limiting benefits to watersheds that could improve downslope wetland and riparian areas. Risk of herbicide drift from aerial applications affecting riparian and wetland vegetation and aquatic organisms would be lowest under this alternative. The BLM would be able to treat unwanted wetland and riparian vegetation in Alaska, Nebraska, and Texas to the benefit of aquatic organisms found on public lands in these states. | Passive treatments and limits on the use of livestock and OHV activity (within the limitations of the FLPMA) could benefit riparian and wetland areas used by aquatic organisms. Restrictions on the use of herbicides in riparian conservation areas could benefit aquatic organisms found in these areas, unless noxious weeds or other invasive vegetation could not be effectively controlled using other treatment methods. The BLM would be able to treat unwanted wetland and riparian vegetation in Alaska, Nebraska, and Texas, to the benefit of fish and aquatic organisms found on public lands in these states. |

**Cumulative Effects:** Human-related activities, including urbanization, building of dams, conversion of wetlands to other land types, fire exclusion, agriculture, and construction of roads have had a profound impact on populations and habitats of fish and other aquatic organism in the western U.S. Fire suppression has led to degraded riparian habitats, while the spread of weeds and other invasive vegetation have clogged waterways, and degraded upland and riparian habitats that has led to erosion and degradation of water quality in habitats used by these organisms. Efforts to restore natural fire regimes and control the spread of invasive vegetation should benefit aquatic habitat. Treatments would be focused in the most degraded watershed subbasins. However, benefits may be greater for resident fish than fish that migrate off of public lands (e.g., anadromous fish), as the BLM would not have control over factors that could harm migratory fish off of public lands. Adverse and beneficial effects of using herbicides would be greatest under the Preferred Alternative; effects of other treatment methods would be similar among all action alternatives. Herbicides would not be used under Alternative C; thus, the BLM's ability to control aquatic weeds would be limited. Treatments could adversely affect the health and survivorship of aquatic organisms, and indirectly impact these organisms through impacts to habitat. New herbicides proposed for use should improve treatment success while having minimal impacts to aquatic organisms. Fish harmed or killed, and short-term productivity lost, from treatment would be irreversible. However, treatments should restore habitat function and populations should recover following treatment.

**EFFECTS ON WILDLIFE**

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| Beneficial and adverse impacts to wildlife would be less under this alternative than under the other herbicide treatment alternatives. The nature of wildlife impacts would be similar to those during the past 10 years. The BLM would not be able to use four new herbicides that pose fewer risks to wildlife than many currently- | Beneficial and adverse impacts to wildlife would be greatest under this alternative. Approximately 2 times more vegetation would be treated specifically to benefit wildlife than under the No Action Alternative. New herbicides proposed for use are less toxic to wildlife than many currently available herbicides, although | Wildlife would not be affected by herbicide use. Benefits to wildlife habitat could be lowest under this alternative, as there are certain invasive species for which herbicide use is the only effective method of treatment, especially in remote areas, areas with limited fuel to carry a fire, and in shrublands where mechanical | There would be fewer impacts to wildlife due to off-site drift than under the other herbicide treatment alternatives. Wildlife may be unable to avoid contact with herbicides, especially in areas typically treated using aircraft. However, long-term negative impacts on wildlife habitat and ecosystems could be | Elimination of the use of ALS-inhibiting herbicides would provide few benefits, if any, to wildlife, including special status species, and could result in more harm to wildlife if more toxic herbicides that are currently available to the BLM were used in their place. Other management practices proposed under this |

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| available herbicides. The BLM would be unable to use herbicides to treat unwanted vegetation in Alaska, Nebraska, and Texas, to the benefit of wildlife. | diquat and fluridone pose some risks to amphibians. Future herbicides should also be less toxic, allowing managers to reduce the overall risk to wildlife from herbicide treatments. Over 70% of all treatments would occur in the Temperate Desert Ecoregion, a much higher percentage than under the No Action Alternative, to benefit sage-grouse and other species using evergreen shrublands. The BLM would be able to use herbicides to treat wildlife habitat in Alaska, Nebraska, and Texas. | treatments are not effective in controlling shrubs. | greatest under this alternative, especially in remote areas that could not be effectively treated using fire (due to lack of fuels) or other treatment methods (primarily due to cost or lack of effectiveness). The BLM would be able to use herbicides to treat wildlife habitat in Alaska, Nebraska, and Texas. | alternative, including limitations on the use of broadcast applications in some riparian areas, especially those used by amphibians, could reduce short-term impacts to wildlife. The BLM would be able to use herbicides to treat wildlife habitat in Alaska, Nebraska, and Texas. |
| **Cumulative Effects:** Human activities associated with commodity extraction, agriculture, and urbanization, and more recently with large-scale, catastrophic wildfire, have resulted in the loss of wildlife and impacts to their habitats. Livestock and wild horses and burros can compete with native herbivores for food. Timber management has led to tree stands dominated by early- to mid-seral, shade tolerant species to the detriment of wildlife that need old-growth forests. Fire suppression has modified forest habitats and favored the encroachment of woodlands into grassland habitats, while intensive, short-cycle fires have promoted weed establishment and spread. Human activities have fragmented the landscape and hindered the movement and habitat use of wildlife, and have placed species with narrow habitat requirements and limited mobility at great risk. Proposed vegetation treatments would slow or reverse many of these adverse effects to wildlife habitat. Habitat loss would continue, especially off public lands. Modification of habitats due to fire suppression and spread of weeds and other invasive vegetation would be slowed on public lands. Some treatments would be designed to restore large areas of land and reduce habitat fragmentation, while most treatments would strive to create a mosaic of habitats to benefit a diversity of wildlife species. Greatest adverse impacts and benefits from treatments would occur under the Preferred Alternative. Risks to wildlife would not occur under Alternative C, and would be less under the other treatment alternatives than under the Preferred Alternative. However, herbicides may be needed to control vegetation that is not readily controlled using other treatment methods; use of proposed and new herbicides in the future would reduce health risks to wildlife from current levels. All treatments could kill or harm wildlife and adversely impact their habitats, but short-term impacts would be offset by long-term gains in number of acres revegetated using native vegetation and in improvement to ecosystem health. Loss of individual animals would be irretrievable, but treatments should restore habitat function and populations would be expected to improve in the long term. | | | | |
| **EFFECTS ON LIVESTOCK** | | | | |
| Beneficial and adverse impacts to livestock would be less than under the other herbicide treatment alternatives. The nature of livestock impacts would be similar to those during the past 10 years. The BLM would not be able to use four new herbicides that pose fewer risks to livestock than many currently-available herbicides. The BLM would be unable to use herbicides to treat | Beneficial and adverse impacts to livestock would be greatest under this alternative. Approximately 3 times more vegetation would be treated to specifically benefit livestock than under the No Action Alternative. Three of the four new herbicides proposed for use are less toxic to livestock than currently available herbicides. The BLM's ability to use new herbicides in the future should | Livestock would not be affected by herbicide use. Positive livestock habitat benefits could be lowest under this alternative, as there are certain invasive species for which herbicide use is the only effective method of treatment, especially in remote areas, areas with limited fuel to carry a fire, and in shrublands where mechanical treatments are not effective in controlling shrubs. | There would be fewer impacts to livestock due to off-site drift than under the other herbicide treatment alternatives. Long-term negative impacts on livestock forage could be greater under this alternative than under other treatment alternatives, especially in remote areas that could not be effectively treated using fire (due to lack of fuels) or other treatment methods (due to cost or lack of | Elimination of the use of ALS-inhibiting herbicides would provide few benefits, if any, to livestock, and could result in more harm to livestock if more toxic herbicides that are currently available to the BLM were used in their place. Other management practices proposed under this alternative, including limitations on the use of broadcast applications in some riparian |

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

2-50

BLM_0000277

June 2007

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| unwanted vegetation in Nebraska, Texas, and Alaska. | further reduce the risks to livestock from the use of herbicides. The BLM would be able to use herbicides in Texas, Nebraska, and Alaska, to the benefit of any livestock that are found on public lands in those areas. | Herbicides, which are effective in the treatment of noxious weeds and other invasive plants that are toxic to livestock, would be unavailable. | effectiveness). The BLM would be able to use herbicides in Texas, Nebraska, and Alaska, to the benefit of any livestock that are found on public lands in those areas. | areas, could reduce short-term impacts to livestock. The BLM would be able to treat rangeland in Alaska, Nebraska, and Texas. |

**Cumulative Effects:** Commodity extraction, agriculture, and urbanization are some of many human-related factors that have adversely impacted lands used by livestock. Altered fire regimes have led to large and severe fires, facilitated the spread of noxious weeds and other invasive vegetation, and have removed forage and degraded rangelands used by livestock in the West. Treatments would restore native vegetation and desirable non-native vegetation favored by livestock and make rangelands more resilient to disturbance. Adverse impacts and improvements to rangeland would be greatest under the Preferred Alternative. Risk of herbicide drift impacting livestock on and off public lands would be least under alternatives D and E. New herbicides proposed for use by the BLM, in particular imazapic, would improve rangelands while having minimal impacts to livestock. Treatments could kill or harm livestock and damage vegetation used by livestock for forage and cover. Long-term treatments would benefit livestock and slow or reverse rangeland degradation.

**EFFECTS ON WILD HORSES AND BURROS**

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| Beneficial and adverse impacts to wild horses and burros would be less than under the other herbicide treatment alternatives. The nature of wild horse and burro impacts would be similar to those during the past 10 years. Only 26% of treatments would occur in states where most (75%) wild horses and burros occur. Also, treatments in these states would mostly occur in evergreen shrublands, habitats that are not as important to wild horses and burros as grasslands, limiting risks to these animals. The BLM would not be able to use four new herbicides that pose fewer risks to wild horses and burros than many currently-available herbicides. | Beneficial and adverse impacts to wild horses and burros would be greatest under this alternative. Approximately 3 times more vegetation would be treated to specifically benefit wild horses and burros than under the No Action Alternative. Forty percent of treatments would occur in states where most (75%) wild horses and burros occur. However, as with the No Action Alternative, treatments in these states would mostly occur in evergreen shrublands, habitats that are not as important to wild horses and burros as grasslands, limiting risks to these animals. Three of the four new herbicides proposed for use are less toxic to wild horses and burros than currently available herbicides. The BLM's ability to use new herbicides in the future should further reduce the risks to wild horses and burros from the use of herbicides. | Wild horses and burros would not be affected by herbicide use. Benefits to wild horses and burros rangeland could be lowest under this alternative, as there are certain invasive species for which herbicide use is the only effective method of treatment, especially in remote areas, areas with limited fuel to carry a fire, and in shrublands where mechanical treatments are not effective in controlling shrubs. Herbicides, which are effective in the treatment of noxious weeds and other invasive plants that are toxic to wild horses and burros, would be unavailable. | There would be fewer impacts to wild horses and burros due to drift than under the other herbicide treatment alternatives. Long-term negative impacts on wild horses and burros forage could be greater under this alternative, especially in remote areas that could not be effectively treated using fire (due to lack of fuels) or other treatment methods (primarily due to cost or lack of effectiveness). | Elimination of the use of ALS-inhibiting herbicides would provide few benefits, if any, to wild horses and burros, and could result in more harm to wild horses and burros if more toxic herbicides that are currently available to the BLM were used in their place. Other management practices proposed under this alternative, including limitations on the use of broadcast applications in some riparian areas, could reduce short-term impacts to wild horses and burros. |

**TABLE 2-10 (Cont.)**

**Summary and Comparison of Effects on Resources by Alternative**

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

2-51

BLM_0000278

June 2007

ALTERNATIVES

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| **Cumulative Impacts:** Wild horses and burros are protected under the Wild Free-roaming Horses and Burros Act of 1971. By the 1800s, more than 2 million animals were found in the western U.S., but by the 1950s, numbers were less than 20,000. As with livestock, human-caused factors have degraded rangelands used by wild horses and burros. These animals have also contributed to rangeland degradation. About 37,000 animals are found in the West, but the number of wild horses and burros the habitat can support is probably closer to 25,000. Efforts to better match wild horse and burro numbers to rangeland conditions should help to improve conditions for these animals. Treatments would restore native vegetation favored by wild horses and burros and make rangelands more resilient to disturbance. Adverse impacts and improvements to rangeland would be greatest under the Preferred Alternative. Risk of herbicide drift impacting wild horses and burros would be least under alternatives D and E. New herbicides proposed for use by the BLM, in particular imazapic, would improve rangelands while having minimal impacts to these animals. Treatments could kill or harm wild horses and burros and damage vegetation used by wild horses and burros for forage and cover. Over the long-term, treatments would benefit wild horses and burros and slow or reverse rangeland degradation. | | | | |
| **EFFECTS ON PALEONTOLOGICAL AND CULTURAL RESOURCES** | | | | |
| The risks to paleontological and cultural resources and health of Native Americans and other human receptors would be lower than under the other herbicide treatment alternatives. Fewer acres would be treated to control weeds and poisonous plants that could adversely affect humans, and that could displace native vegetation desirable to Native peoples' lifeway uses. This alternative would be least affective among herbicide treatment alternatives in reducing hazardous fuels, perhaps leading to greater incidence of wildfire and loss of paleontological and cultural resources, and Native people's life and property. | The risks to paleontological and cultural resources and health of Native Americans and other human receptors would be greatest under this alternative. However, benefits from reduction in noxious weeds and other invasive vegetation that are poisonous or displace vegetation used by Native Americans and Alaska Natives would also be greatest under this alternative. Herbicides could be used where paleontological and cultural resources were at risk from other treatment methods. Three of the four herbicides proposed for use are relatively harmless to Native peoples and other human receptors. The BLM would be able to treat vegetation in Alaska, Nebraska, and Texas using herbicides, which may benefit vegetation that provided lifeway values. | There would be no risks to paleontological and cultural resources and human health from herbicide applications. Native people's health might suffer if noxious weeds and poisonous plants that harm humans are not controlled in traditional lifeway and other use areas. | Human health risks from herbicide drift would likely be lower than under the other treatment alternatives. However, benefits to vegetation used by Native peoples for traditional lifeway uses and to habitats used by fish and game harvested by Native peoples would be less than under the other herbicide treatment alternatives, as treatments would be less likely to occur in remote areas and areas where there is insufficient fuel to carry a fire or it is too costly to treat vegetation using other treatment methods. The BLM would be able to treat vegetation in Alaska, Nebraska, and Texas using herbicides, which may benefit vegetation used for Native lifeway uses in these states. | The BLM would not be able to use ALS-inhibiting herbicides that have low risk to humans. The BLM would make additional effort to collaborate with Native American tribes and Alaska Native groups to protect and enhance culturally significant plants and other sites of cultural importance. Because fewer acres would be treated under this alternative, improvements in vegetation quality and reductions in populations of plant species that are harmful or poisonous to humans would not be as great as under the Preferred Alternative. |

**ALTERNATIVES**

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| **Cumulative Effects:** Most paleontological material is buried and thus has been minimally disturbed, except where these resources are near the surface. Vegetation treatment activities would have little impact on paleontological resources, and can even protect these resources by reducing erosion. Cultural resources were destroyed or taken by settlers and collectors; these losses slowed after passage of the National Historic Preservation Act and Archaeological Resources Protection Act. Treatments would have little effect on cultural resources, although vegetation and other traditional lifeway resources would be impacted. Risks to paleontological and cultural resources would be least under the No Action Alternative. Benefits to vegetation for traditional lifeway uses would be greatest under the Preferred Alternative. Treatments could result in unavoidable adverse effects, but the risks would be minor. Treatments would likely result in short-term loss of vegetation used for food, baskets, and other traditional lifeway uses. Over the long term, restoration of natural fire regimes and native vegetation, and control of weeds, should improve vegetation used for traditional lifeway activities. Loss of paleontological and cultural resources would be irretrievable. Vegetation used for traditional lifeway uses would be lost from treatments and human-caused activities, but over the long-term, treatments should slow or reverse this loss on public lands. | | | | |
| **EFFECTS ON VISUAL RESOURCES** | | | | |
| Adverse visual impacts associated with herbicide treatments would be similar to current impacts, and lower than under the other herbicide treatment alternatives. Improvements in the visual characteristics of landscapes would also be lower under this alternative than the other treatment alternatives. | Adverse visual impacts associated with herbicide treatments would be greatest under this alternative. Over the long term, this alternative should have the greatest positive impact on visual resources as natural vegetation communities and landscapes are restored. The BLM would be able to use herbicides to improve visual resources on lands in Alaska, Nebraska, and Texas. | Visual resources would not be impacted by herbicide treatments. However, there could be less improvement in the visual quality of the landscape over time if herbicides could not be used to treat invasive plants, or large areas were burned instead to remove unwanted vegetation. | Impacts to the visual resources would be less than under the Preferred Alternative, but greater than under the No Action Alternative. Areas that could not be effectively treated except by aerial applications of herbicides would not be treated. The BLM would be able to use herbicides to improve visual resources on lands in Alaska, Nebraska, and Texas. | Impacts to visual resources would be similar to those under Alternative D as broadcast treatments would be discouraged. ALS-inhibiting herbicides would not be used to control downy brome and other invasive vegetation to benefit visual resources. The BLM would be able to use herbicides to improve visual resources on lands in Alaska, Nebraska, and Texas. |
| **Cumulative Effects:** Some past human activities have modified the visual characteristics of public lands. In addition, large, severe wildfires, and in some situations the spread of weeds and other noxious and invasive vegetation have altered the landscape and made portions of the West less visually appealing. Proposed vegetation treatments would impact visual quality over the short term by killing vegetation and burning rangeland and forests, causing large areas to appear brown or black. Over the long term, the health and visual appearance of public lands should improve as degraded lands were revegetated with native vegetation and natural fire regimes were restored. Adverse impacts and benefits would be greatest under the Preferred Alternative. The risk of herbicide drift impacting the visual characteristics of non-public lands would be least under alternatives D and E. Treatments would have short-term impacts on visual characteristics in the treatment area, but visual qualities of the area should improve over the long-term. Impacts to the visual characteristics of the area could be reversed if native, more visually appealing vegetation was restored. | | | | |
| **EFFECTS ON WILDERNESS AND OTHER SPECIAL AREAS** | | | | |
| Fewer acres would be treated under this alternative than under the other herbicide treatment alternatives. Adverse impacts to wilderness and other special areas would be less, but benefits to ecosystem health would also be less under this alternative than under other herbicide treatment alternatives. | Adverse impacts, including temporary closures of wilderness areas, would be greatest under this alternative. Visitors could be displaced to other wilderness and recreation areas. Positive ecosystem benefits would also be greatest under this alternative and the BLM would be most likely to control noxious weeds and other invasive species in wilderness and other special areas under this | There would be no risks to wilderness and other special area users from accidental exposure to herbicides. However, weeds could spread more rapidly and infest more acres in wilderness and other special areas if herbicides could not be used. | Although aerial treatments in wilderness and other special areas would be uncommon under the other treatment alternatives, this alternative would ensure that the amount of area temporarily closed to wilderness and other special area visitors was kept small. However, aerial treatments could be completed more quickly and with fewer disturbances to solitude and other wilderness | An emphasis on ecosystem based management and on controlling weed populations outside of wilderness and other special areas before treating larger infestations in these areas could help to protect wilderness values. However, if weed infestations become established in wilderness and other special areas before they were controlled outside the area, they could spread rapidly |

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

2-53

June 2007

BLM_0000280

ALTERNATIVES

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| | alternative. Risk to wilderness and other special area users from the new herbicides would be less than risks associated with most currently-available herbicides. | | values than other treatment methods, including mechanical treatments and fire use. | and degrade the wilderness experience. The five herbicides that would not be allowed for use under this alternative are among the lowest risk herbicides that would be available to the BLM |

**Cumulative Effects:** Wilderness and other special areas represent about 4% of lands in the U.S. and represent some of the last remaining wild conditions and natural landscapes in the country. Because of their small size (the average size of wilderness areas on public lands is 42,000 acres), most wilderness areas are ecological "islands." Thus, a large, severe fire or weed infestation can substantially alter the characteristics of wilderness. Treatments to restore natural fire regimes and ecosystem health should benefit wilderness and other special areas. Although few treatments are proposed for these special areas, treatments near special areas would reduce the risk of weeds and catastrophic fire impacting special areas. Short-term impacts and long-term benefits from treatments would be greatest under the Preferred Alternative. Mechanical treatments would be limited under all alternatives. Under Alternative E, treatment of weeds in special areas could not occur until weed threats near special areas were halted, potentially increasing the risk of weed spread within wilderness and other special areas. Treatments could adversely impact the "unspoiled" nature of wilderness over the short term, but effects would begin to disappear within 1 to 2 growing seasons, and special area ecosystems would benefit over the long term.

| EFFECTS ON RECREATION | | | | |
|---|---|---|---|---|
| Fewer acres would be treated than under the other treatment alternatives. Thus, adverse effects to recreation, including temporary site closures, decline in scenic appeal of recreation sites, and potential human and wildlife health effects, would be less than under the other treatment alternatives. However, benefits to recreation from treatments, including control of thorny and poisonous plants, restoration of degraded areas to a more natural condition, and reduced risk of catastrophic fires, would also be less. The BLM would not be able to use herbicides to treat recreation sites in Alaska, Nebraska, and Texas. | Effects to recreation would be greatest under this alternative. It is likely that there would be more temporary site closures and loss of recreation opportunities, including plant collecting, sightseeing, hiking, horseback riding, fishing, and hunting, than under the other treatment alternatives. Risks to humans, fish, and wildlife from currently-available herbicides would be greatest based on the number of acres treated. However, new herbicides with lower risks to humans, fish, and wildlife than most currently-available herbicides could reduce overall risk from use of herbicides on recreation areas. The BLM would be able to use herbicides in Alaska, Nebraska, and Texas to benefit recreation sites, although the BLM presently does not have plans to use herbicides in Alaska. | There would be no risks to wilderness and other special area users from accidental exposure to herbicides. However, there are certain plants that could be injurious to humans, which are most easily controlled by herbicides (e.g., sprouting plants such as poison oak). An increase in populations of these weeds could discourage recreational use of infested areas. | Similar to the other treatment alternatives, it is unlikely that aerial spraying would be used in high public use recreation areas. However, aerial spraying would also be limited in more remote areas. Thus, the number of acres temporarily closed due to herbicide treatments would be less than under the other treatment alternatives. | An emphasis on passive restoration, ecosystem-based management techniques, greater reliance on spot versus broadcast treatments, and limits on use of herbicides in riparian areas would result in fewer effects to recreation areas and users as compared to other treatment alternatives. Because fewer acres would be treated, especially in areas where broadcast treatments would typically occur, restoration of natural vegetation might not occur, or might be more difficult or costly in these areas. The BLM would not be able to use ALS-inhibiting herbicides under this alternative. These herbicides tend to have lower risk to humans, fish, and wildlife than other herbicides that are currently-available or proposed for use. |

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

2-54

BLM_0000281

June 2007

ALTERNATIVES

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| **Cumulative Effects:** Recreation resources were of minor importance to the BLM until the 1950s. Natural resource commodity extraction, effects of fire suppression, and spread of weeds have adversely impacted recreational opportunities on public lands. Vegetation treatments would add to this cumulative loss by reducing recreation opportunities in treatment areas over the short term. Over the long term, vegetation management should increase recreational opportunities, including those involving wildlife viewing, hunting, hiking, and water sports. The greatest adverse impacts and benefits would occur under the Preferred Alternative. Loss of recreational opportunities would not be avoided during some treatments, especially in areas that required closure to protect the health and safety of visitors. Long-term improvement in ecosystem health should increase the number and quality of recreational opportunities and reduce the likelihood of large, severe fires and weed infestations making large tracts of public land unsuitable for recreation. Closure of facilities and restrictions on access as a result of treatments would result in irretrievable loss of recreational opportunities during the period of the closure or other restrictions, but those opportunities would be restored following completion of the treatment. The risk of future losses would be lessened over the long term as ecosystem health improved on public lands. | | | | |
| **EFFECTS ON SOCIAL AND ECONOMIC VALUES** | | | | |
| Social and economic benefits and impacts from herbicide treatments would be similar to what has occurred during the past several years. Approximately $30 million would be spent on herbicide treatments, or about $100 per acre. There would be little noticeable overall change in population, employment, and income on a regional scale, although small communities near larger treatment areas could benefit. Overall risks to minority populations and children would be less under this alternative than under the other treatment alternatives because fewer acres would be treated. However, risks per acre could be greater because the BLM would not be able to use new herbicides in the future that may have less health risk than currently-available herbicides, including the four herbicides evaluated in this PEIS. Long-term wildland fire cost savings and benefits from restoration of natural vegetation and ecosystems would be least under this alternative. | Social and economic benefits and impacts from herbicide treatments would be greatest under this alternative. Approximately $89 million would be spent on herbicide treatments, or about $95 per acre. There would be little noticeable overall change in population, employment, and income on a regional scale, although small communities near larger treatment areas could benefit, and increases in population, employment, and income, although short-term and localized, would be greatest under this alternative. Overall risks to minority populations and children would be greatest under this alternative. However, risks per acre could be less than under the other treatment alternatives because the BLM would be able to use new herbicides in the future that may have less health risk than currently-available herbicides, including the four herbicides evaluated in this PEIS. Long-term wildland fire cost savings and benefits from restoration of natural vegetation and ecosystems would be greatest under this alternative. | There would be no social and economic benefits from herbicide treatments under this alternative. There would be no change in population, employment, and income on a regional scale from herbicide treatments, but increases in these factors could result from use of other treatment methods. There would be no risks to minority populations and children from herbicides. Long-term wildland fire cost savings and benefits from restoration of natural vegetation and ecosystems would be less under this alternative than the other treatment alternatives, especially in areas where other treatment methods would be less effective than herbicide treatment methods. | Economic benefits and impacts from herbicide treatments would be less than for the Preferred Alternative, but greater than for the other treatment alternatives. Approximately $77 million would be spent on herbicide treatments, or about $145 per acre. There would be little noticeable overall change in population, employment, and income on a regional scale, although small communities could benefit. Overall risks to minority populations and children would be similar to the No Action Alternative and less than the other treatment alternatives because 1) fewer acres would be treated than under the Preferred Alternative; 2) the BLM would be able to use newer herbicides with less health risks than currently-available herbicides, an improvement over the No Action Alternative and Alternative E; and 3) the risk of herbicide drift impacting humans would be less under this alternative than the other treatment alternatives. Long-term wildland fire cost savings and benefits from restoration of natural vegetation and ecosystems | Approximately $60 million would be spent on herbicide treatments, or about $128 per acre. There would be little noticeable overall change in population, employment, and income on a regional scale, although small communities near larger treatment areas could benefit. Overall risks to minority populations and children would be similar to the other herbicide-treatment alternatives. This alternative would clearly establish protection for Native Americans and Alaska Natives, but would also discourage use of ALS-inhibiting herbicides which tend to have less health risk than non-ALS-inhibiting herbicides. Long-term wildland fire cost savings and benefits from restoration of natural vegetation and ecosystems would be less than under the Preferred Alternative, similar to that of Alternative D, and greater than that of the No Action Alternative. An objective of this alternative is to restore native ecosystems and use passive treatments, where feasible. However, the BLM would have limited ability to conduct |

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| | | | would be less than under the Preferred Alternative, and similar to that under the other treatment alternatives. | broadcast treatments, limiting the size of areas that could be effectively treated, especially if fire use would be ineffective to treat these areas. The BLM would also not be able to use imazapic and other ALS-inhibiting herbicides that have shown effectiveness in controlling downy brome and other noxious weeds and invasive species. |

**Cumulative Effects:** Population growth rates in the West have exceeded those of the rest of the U.S. for several decades, with growth greatest in communities associated with the WUI. Agricultural, forestry, mining, fishing, and service jobs are important and closely tied with actions on public lands. Revenues derived from public lands have fluctuated with national and global needs and public policies, but in general, revenues provided to the BLM from mining and oil and gas development have increased, while timber harvesting and grazing revenues have declined. Expenditures by the BLM to state and local governments have doubled in the past 10 years, with the largest increases in states with active mining and oil and gas operations. Future high growth rates are expected, including those of minority populations that could potentially suffer greater impacts from treatments than in the past. Employment and income will continue to be tied to the global economy, with mining and oil and gas exploration and development increasing, and timber harvesting and grazing declining. However, timber-related jobs could increase in the short term as timber is removed to reduce hazardous fuels on BLM- and Forest Service-administered lands. Revenues to the federal government will reflect these trends. Costs to the federal government for fire suppression and restoration of historical fire regimes and ecosystem health would exceed $1.6 billion annually and would likely increase over time. Costs for vegetation treatments on public lands are estimated at $1.1 billion annually. Treatments could have adverse effects on local industries and communities, but long-term gains in ecosystem health should benefit communities and many resource-based industries. Treatments would require a substantial financial commitment by the federal government and would not be retrievable once spent.

| | | EFFECTS ON HUMAN HEALTH AND SAFETY | | |
|---|---|---|---|---|
| Risk to occupational and public receptors would be lower than under other herbicide treatment alternatives. The risk to humans per application could be greater than under the other treatment alternatives, however, because the BLM would not be able to use new herbicides proposed for this PEIS, nor herbicides developed in the future, that likely would have fewer risks to humans than currently-available herbicides. In addition, the BLM would be able to use six herbicides that would not be allowed under the other herbicide treatment alternatives—2,4-DP, asulam, atrazine, fosamine, mefluidide, | This alternative would likely result in the most overall risk to human health of all alternatives because of the large number of acres treated. The BLM would be able to use new herbicides that have lower health risks than currently-available herbicides. This alternative would also be most effective in treating noxious weeds and poisonous plants that adversely affect humans. | Alternative C would not result in human health risk from herbicide applications. However, human health could be adversely affected if noxious weeds and poisonous plants that are harmful to humans increased in occurrence under this alternative. | Human health risks per application area could be lower than for other herbicide treatment alternatives because herbicides would not drift as far. Overall risks would be lower than under the Preferred Alternative because fewer acres would be treated. Health of users of more remote public lands might be adversely affected if noxious weeds and poisonous plants that are harmful to humans increased in occurrence in these areas under this alternative due to the inability of the BLM to treat them using aircraft. | The BLM would not be able to use ALS-inhibiting herbicides that have low risk to humans. However, this alternative favors spot over broadcast treatments, encourages additional protection of cultural resource and other areas used by Native Americans and Alaska Natives, and would treat fewer acres, thus presenting fewer risks to humans as compared to the Preferred Alternative. Health of users of more remote public lands might be adversely affected if noxious weeds and poisonous plants that are harmful to humans increased in occurrence in these areas due to the inability of the BLM to treat |

**TABLE 2-10 (Cont.)**
**Summary and Comparison of Effects on Resources by Alternative**

| No Action Alternative | Preferred Alternative | Alternative C | Alternative D | Alternative E |
|---|---|---|---|---|
| and simazine—herbicides that have greater risk to humans than other currently-available or proposed herbicides. | | | | them using aircraft and other broadcast-treatment methods. |

**Cumulative Impacts:** Risks to health from occupational injury or death, from cancer, and from exposure to pollutants has generally declined during the past few decades. However, risk from wildfire in recent years has held steady or increased as more people have moved into the WUI and the number and severity of wildfires has increased. Proposed vegetation treatments pose risks to worker and public health. Injuries and death could result from use of equipment, fire, and herbicides to treat vegetation, but the risk is very small to negligible. Treatments would minimize human exposure to smoke by scheduling prescribed burns when meteorological conditions are favorable for smoke dispersion. Risk from wildfire would hold steady or be reduced over time as levels of hazardous fuels and risk of wildfire in WUI areas were reduced. Risk of exposure to herbicides would increase under alternatives B, D, and E, although the BLM proposes to use new herbicides that pose less human health risk than most currently-available herbicides. Alternative E places greater emphasis on hazardous fuels treatments in the WUI and development of defensible spaces near structures, which would reduce risk to human life from wildfire. There would be risks to human health from vegetation treatments, but long-term improvement in ecosystem health and use of less toxic herbicides have the potential to reduce these risks.

# CHAPTER 3
# AFFECTED ENVIRONMENT

BLM 0000285

# TABLE OF CONTENTS

Page

Introduction and Study Area ........................................................................................................................3-1
Land Use and Ecoregions ............................................................................................................................3-1
    Land Use.................................................................................................................................................3-1
    Ecoregions .............................................................................................................................................3-1
Climate .........................................................................................................................................................3-2
    Tundra Ecoregion..................................................................................................................................3-2
    Subarctic Ecoregion .............................................................................................................................3-2
    Subtropical Steppe Ecoregion..............................................................................................................3-2
    Subtropical Desert Ecoregion ..............................................................................................................3-2
    Temperate Steppe Ecoregion ...............................................................................................................3-2
    Temperate Desert Ecoregion................................................................................................................3-2
    Mediterranean Ecoregion.....................................................................................................................3-3
    Marine Ecoregion.................................................................................................................................3-3
    Mountain Provinces ..............................................................................................................................3-3
Air Quality ...................................................................................................................................................3-3
    Visibility Protection in Mandatory Federal Class I Areas ...................................................................3-4
    Herbicide Drift .....................................................................................................................................3-6
Topography, Geology, Minerals, Oil, and Gas ............................................................................................3-6
    Tundra Ecoregion..................................................................................................................................3-6
    Subarctic Ecoregion .............................................................................................................................3-7
    Temperate Desert Ecoregion................................................................................................................3-7
    Subtropical Desert Ecoregion ..............................................................................................................3-7
    Temperate Steppe Ecoregion ...............................................................................................................3-7
    Subtropical Steppe Ecoregion..............................................................................................................3-7
    Mediterranean Ecoregion.....................................................................................................................3-7
    Marine Ecoregion.................................................................................................................................3-7
Soil Resources..............................................................................................................................................3-7
    Biological Soil Crusts ...........................................................................................................................3-9
    Micro and Macroorganisms ..................................................................................................................3-9
    Soil Erosion .........................................................................................................................................3-10
    Soil Compaction...................................................................................................................................3-10
Water Resources and Quality .......................................................................................................................3-11
    Water Resources....................................................................................................................................3-11
    Water Quality .......................................................................................................................................3-15
Wetland and Riparian Areas.........................................................................................................................3-18
Vegetation ....................................................................................................................................................3-19
    Tundra Ecoregion..................................................................................................................................3-19
    Subarctic Ecoregion .............................................................................................................................3-20
    Temperate Desert Ecoregion................................................................................................................3-20
    Subtropical Desert Ecoregion ..............................................................................................................3-22
    Temperate Steppe Ecoregion ...............................................................................................................3-22
    Subtropical Steppe Ecoregion..............................................................................................................3-23
    Mediterranean Ecoregion.....................................................................................................................3-24
    Marine Ecoregion.................................................................................................................................3-25
    Noxious Weeds and other Invasive Vegetation ...................................................................................3-25
    Vegetation Condition and Fire Regimes ..............................................................................................3-27
    Non-timber Forest Products..................................................................................................................3-29
    Special Status Species...........................................................................................................................3-30
Fish and Other Aquatic Organisms ..............................................................................................................3-30
    Alaska and the Pacific Northwest.........................................................................................................3-30

BLM_0000286

AFFECTED ENVIRONMENT

The Arid Environment ....................................................................................................................... 3-31
The Upper Colorado River Basin ...................................................................................................... 3-33
California .......................................................................................................................................... 3-34
Missouri River Basin ........................................................................................................................ 3-34
Special Status Species ...................................................................................................................... 3-35
Wildlife Resources .................................................................................................................................. 3-35
Tundra Ecoregion ............................................................................................................................ 3-36
Subarctic Ecoregion ........................................................................................................................ 3-37
Temperate Desert Ecoregion ........................................................................................................... 3-38
Subtropical Desert Ecoregion .......................................................................................................... 3-39
Temperate Steppe Ecoregion ........................................................................................................... 3-40
Subtropical Steppe Ecoregion ......................................................................................................... 3-41
Mediterranean Ecoregion ................................................................................................................ 3-41
Marine Ecoregion ............................................................................................................................ 3-42
Special Status Species ...................................................................................................................... 3-43
Livestock ................................................................................................................................................. 3-43
Wild Horses and Burros ......................................................................................................................... 3-44
Paleontological and Cultural Resources ................................................................................................. 3-44
Paleontological Resources ............................................................................................................... 3-44
Cultural Resources .......................................................................................................................... 3-45
American Indian and Alaska Native Cultural Resources ................................................................. 3-45
European Settlement Resources ....................................................................................................... 3-54
Important Plant Uses and Species Used by American Indians and Alaska Natives ........................ 3-54
Visual Resources ..................................................................................................................................... 3-56
Wilderness and other Special Areas ....................................................................................................... 3-56
Recreation ............................................................................................................................................... 3-58
Rights-of-way, Facilities, and Roads ..................................................................................................... 3-60
Rights-of-way .................................................................................................................................. 3-60
Facilities and Roads ........................................................................................................................ 3-61
Social and Economic Values .................................................................................................................. 3-61
Social/Demographic Environment .................................................................................................. 3-61
Economic Environment ................................................................................................................... 3-62
Revenues Generated by BLM Lands ............................................................................................... 3-62
Expenditures by the BLM ............................................................................................................... 3-65
Human Health and Safety ....................................................................................................................... 3-69
Background Health Risks ................................................................................................................. 3-69
Risks from Diseases ........................................................................................................................ 3-70
Risks from Injuries .......................................................................................................................... 3-70
Risks from Cancer ........................................................................................................................... 3-71
Risk from Using Herbicides on Public Lands ................................................................................. 3-72
Risk from Wildfire Control on Public Lands .................................................................................. 3-72

# List of Tables

3-1   Acres of Public Lands in 17 Western States and Percent of Lands in the the State Administered by the BLM................................................................................................................................. 3-1

3-2   National Ambient Air Quality Impact Significance Criteria........................................................ 3-4

3-3   Counties within the Treatment Area that are Designated Nonattainment or Maintenance Areas for Various Pollutants ..................................................................................................................... 3-5

3-4   Vegetation Classification System ............................................................................................... 3-21

3-5   Estimated Acres of Weed Infestations on Public Lands in 2000 ................................................ 3-28

3-6   Grazing Permits and Leases in Force and Active Animal Unit Months during Fiscal Year 2005 ............... 3-44

3-7   Wild Horses and Burros on Public Lands in Fiscal Year 2005.................................................... 3-45

3-8   Interpreted Paleontological Sites on Public Lands ..................................................................... 3-46

3-9   Cultural Resources on Public Lands ........................................................................................... 3-47

3-10  Culture Areas, Prehistoric Occupation Periods, and Selected Common Site Types.................... 3-48

3-11  European Settlement Resource Types ......................................................................................... 3-55

3-12  Visual Resource Management Classes and Objectives and Appropriate Management Activities ............. 3-58

3-13  National Landscape Conservation System and Other Special Designation Areas on Public Lands as of September 2005................................................................................................................... 3-59

3-14  Estimated Recreation Use of Public Lands during Fiscal Year 2005........................................... 3-60

3-15  Population, Age Distribution, and Race in the Western States and Alaska................................... 3-63

3-16  Percent Unemployment for Western U.S. and Alaska ................................................................. 3-64

3-17  Percent Employment by Industry in 2004 .................................................................................. 3-65

3-18  Revenues Generated from Public Lands by Source for Fiscal Year 2005..................................... 3-66

3-19  Estimated Benefits to Local Economies by Recreation on Public Lands during Fiscal Year 2005 ............. 3-66

3-20  Summary of BLM Jobs and Expenditures for the Management of the Lands and Resources Program by Activity and Subactivity ........................................................................................................ 3-67

3-21  BLM Wildland Fire Suppression Expenditures Fiscal Year 1998 through Fiscal Year 2005 ...................... 3-68

3-22  BLM Action Fires Larger than 10,000 Acres during 1999 to 2005............................................. 3-68

3-23  Herbicide Uses and Costs for Vegetation Treatments on Public Lands during 2005 ................... 3-69

3-24  BLM Payments to States and Local Governments during Fiscal Year 2005 ............................... 3-71

3-25  Mortality Rates (per 100,000 Population) and Causes of Death by State 2002-2003 ................... 3-72

# List of Figures

3-1   Relationship between Area Occupied by Invasive Species and Time........................................... 3-27

# List of Maps

3-1   Ecoregion Divisions .................................................................................................................. 3-73

3-2   Class I Areas ............................................................................................................................. 3-75

3-3   Oil and Gas Wells on Public Lands ............................................................................................ 3-77

3-4   Soil Orders on Public Lands....................................................................................................... 3-79

3-5   Hydrologic Regions ................................................................................................................... 3-81

3-6   Wastershed Surface Water Quality on Public Lands ................................................................... 3-83

3-7   General Groundwater Quality on Public Lands........................................................................... 3-85

3-8   Vegetation Types and Ecoregions on Public Lands in Alaska...................................................... 3-87

3-9   Vegetation Types and Ecoregions on Public Lands in the Western U.S. ...................................... 3-89

3-10  Fire Regime Condition Classes on Public Lands ........................................................................ 3-91

3-11  Native Areas of Western North America..................................................................................... 3-93

3-12  National Landscape Conservation System Areas ........................................................................ 3-95

BLM_0000288

# CHAPTER 3

# AFFECTED ENVIRONMENT

## Introduction and Study Area

This chapter describes the natural and socioeconomic environment of public lands in the western U.S., including Alaska, which would be affected by the alternatives under consideration. It focuses on resources that were identified in Chapter 1, and is useful in understanding the environmental, cultural, and social consequences of the proposed program and alternatives.

## Land Use and Ecoregions

### Land Use

The BLM manages nearly 261 million acres in the western U.S. and Alaska. Public lands represent from less than 0.1% of the total land area in some states to over 67% of lands in Nevada (Table 3-1).

Approximately 164 million acres of public lands are upland rangeland, of which approximately 161 million acres are open to livestock grazing. Other public uses on rangeland include recreation, and oil, gas, and mineral development.

Another 55 million acres are forestland and woodland. Forestlands and woodlands are a source of timber and other forest products, and are used for livestock grazing, recreational, and cultural purposes.

Wetland and riparian areas total about 23 million acres and are primarily used for recreation and grazing. The remaining 19 million acres consist of barren mountains, mountaintops, glaciers, sand dunes, and playas. These areas are primarily used for recreation.

### Ecoregions

Because this PEIS addresses a broad geographic region with a diverse range of biophysical characteristics, it is useful to subdivide this region into smaller, homogeneous areas for analysis. Where possible, information on resources has been organized by ecoregions rather than by state boundaries. Ecoregions are geographic areas that are delineated and defined by

similar climatic conditions, geomorphology, and soils (Bailey 1997, 2002). Since these factors are relatively constant over time and strongly influence the ecology of vegetative communities, ecoregions may have similar potentials and responses to disturbance (Clarke and Bryce 1997; Jensen et al. 1997). Ecoregions, therefore, provide a useful framework for organizing, interpreting, and predicting changes to vegetation following management treatments.

**TABLE 3-1**
**Acres of Public Lands in 17 Western States and Percent of the State Administered by the BLM**

| State | Acres of BLM Land | Percent of State Lands Administered by the BLM |
|---|---|---|
| Alaska | 85,468,616 | 23.5 |
| Arizona | 12,218,180 | 16.8 |
| California | 15,230,638 | 15.1 |
| Colorado | 8,363,916 | 12.6 |
| Idaho | 12,001,817 | 22.5 |
| Montana | 7,963,511 | 8.5 |
| Nebraska | 6,354 | <0.1 |
| Nevada | 47,824,624 | 67.6 |
| New Mexico | 13,371,737 | 17.2 |
| North Dakota | 58,837 | 0.1 |
| Oklahoma | 2,136 | <0.1 |
| Oregon | 16,135,761 | 26.0 |
| South Dakota | 274,437 | 0.6 |
| Texas | 11,833 | <0.1 |
| Utah | 22,858,179 | 42.1 |
| Washington | 408,580 | 0.9 |
| Wyoming | 18,366,584 | 29.3 |
| Total | 260,565,740 | 23.5 |
| Source: USDI BLM (2006c, d). Acreages are approximate and subject to change in response to land transfers. | | |

The public lands addressed in this PEIS lie within eight major physiographic regions, or ecoregion divisions: Tundra, Subarctic, Subtropical Steppe, Subtropical Desert, Temperate Steppe, Temperate Desert, Mediterranean, and Marine, including Mountain Provinces (Map 3-1).

BLM_0000290

AFFECTED ENVIRONMENT

# Climate

Climate is the statistical distribution of atmospheric conditions, as determined by the weather patterns that result from long-term fluctuations in global atmospheric and hydrologic cycles. Climatic patterns describe the annual distribution of energy and moisture, thus affecting the amount and seasonal distribution of temperature, precipitation, and winds. These factors influence the composition and distribution of rangeland vegetation, as well as the formation and erosion of rangeland soils, and hydrological conditions. These factors also influence the distribution of wind-borne air pollutants, such as smoke from wildfires and prescribed fires.

The western U.S. experiences several broad climatic groups: polar, boreal, temperate, Mediterranean highland, and dry. Polar and boreal climates dominate in Alaska, while a humid temperate climate is characteristic of the coastal areas of Washington, Oregon, and northern California. The southern California coast has a Mediterranean climate, while mountainous areas have a highland climate. The rest of the western states east of the Cascade, Sierra Nevada, and Rocky mountains are characterized by a dry climate. On a regional scale, temperature and precipitation vary with latitude, elevation, distance from the oceans, and the position of mountain ranges with respect to prevailing winds. The eight ecoregions found in the treatment area are based on the seasonality of precipitation, and on the degree of dryness or cold, and depend largely on latitude and continental position.

## Tundra Ecoregion

The climate of the westernmost and northernmost portion of Alaska (including the Alaska Peninsula and Aleutian Islands), is typified by cold Arctic air masses. The tundra climate has a very short, cool summer and a long, severe winter, with the warmest average monthly temperature between 50 °F and 32 °F (freezing). Between 55 and 188 days per year typically have a daily mean temperature above freezing. Annual precipitation is often less than 8 inches, but the climate is humid because of the low potential evaporation.

## Subarctic Ecoregion

The moist, boreal climate type demonstrates a large seasonal temperature range. Winters dominate, with cool, short summers. Because average monthly temperatures are below freezing for up to 7 consecutive months, soil moisture freezes solidly to depths up to 14 feet. Only a single month has an average temperature above 50 °F. The limited precipitation (10 to 20 inches annually) falls mainly during the short summer months, although thunderstorms are uncommon.

## Subtropical Steppe Ecoregion

The western subtropical steppe borders deserts on both the north and south, with the temperate steppe to the north and east. This ecoregion division has a hot semiarid climate where potential evaporation exceeds precipitation, and where all months have average temperatures above freezing. Bright sunny days with cool clear nights are typical. Precipitation ranges from 10 to 20 inches per year, with a summertime peak due to thunderstorm activity.

## Subtropical Desert Ecoregion

South and west of the Arizona-New Mexico Mountains is the subtropical desert climate. This region is not only very dry, but also has extreme maximum summer temperatures. In addition, both daytime solar and nocturnal radiation are high, leading to extreme daily temperature variations. Annual precipitation is less than 8 inches.

## Temperate Steppe Ecoregion

Temperate steppes are areas with a semiarid continental climatic regime, where evaporation usually exceeds precipitation. Seven or fewer months have an average temperature above 50 °F. Winters are cold and dry, and summers are warm to hot, with at least 1 month's average temperature below freezing.

## Temperate Desert Ecoregion

Temperate deserts are generally dry with wide temperature differences between summer and winter. In the intermountain region between the Pacific coast and Rocky Mountains, the temperate desert has a very pronounced drought season and a short humid season. Most precipitation falls in winter, despite a small peak in late spring. Eight or more months have an average temperature above 50 °F. Winter is relatively short, but with at least 1 month's average temperature below freezing.

BLM_0000291

## Mediterranean Ecoregion

Most of California west of the Sierra Nevada Mountains and Mojave Desert is typified by alternate wet winters and dry summers, within a strong transition zone between the dry desert and the wet coast. Mild temperatures dominate, with the coldest average monthly temperature between 65 °F and 27 °F. Most precipitation occurs in winter, with the wettest month receiving nearly 3 times the precipitation of the driest summer month.

## Marine Ecoregion

The temperate oceanic climate extends from southeast Alaska down the Pacific Coast to southwestern Oregon. This climate receives abundant rainfall from maritime air masses, with average temperatures moderated by the ocean. Although the warmest average monthly temperature is above 72 °F for at least 4 months, the average temperature is above 50 °F; the coldest month averages just above 32 °F. Annual precipitation is high (40 to 80 inches per year), but significantly lower in summer. The relatively low temperatures reduce evaporation, producing a very damp, humid climate with substantial cloud cover. Mild winters and cool summers are typical.

## Mountain Provinces

The mountainous portions of all eight ecoregion divisions exhibit a highland climate, where site-specific conditions vary greatly, depending on altitude and exposure. Windward slopes typically have greater precipitation (and leeward slopes less precipitation) than the ecoregion division as a whole. Southern exposures also tend to be warmer than slopes with northern exposures. Finally, the occurrence of mountain winds (up slope during the day, down slope at night) and diurnal temperature inversions is greatest near mountains.

# Air Quality

Because air pollution can directly pose health risks and cause significant welfare impacts to humans, improvement of air quality in the U.S. is an important regulatory goal. The Clean Air Act (originally passed in 1955 and amended several times since), establishes a mandate to reduce emissions of specific pollutants via uniform federal standards. Under the Act, the USEPA is responsible for setting standards and approving state implementation plans (SIPs) to ensure that local agencies comply with the Act.

The standards set by the USEPA include primary and secondary NAAQS for six pollutants, referred to as criteria pollutants, to protect public health and welfare. The criteria pollutants are sulfur dioxide ($SO_2$), nitrogen dioxide ($NO_2$), carbon monoxide (CO), ozone ($O_3$), lead (Pb), and particulate matter (PM).

Particulate matter (PM) is a generic term for a broad class of chemically and physically diverse substances that exist as discrete particles over a wide range of sizes. For regulatory purposes, PM is sub-classified by the particle's aerodynamic diameter. $PM_{10}$ includes all PM with an aerodynamic diameter of 10 microns or less and is referred to as inhalable PM. $PM_{2.5}$ includes all PM with an aerodynamic diameter of 2.5 microns or less, called fine PM, and is by definition a subset of $PM_{10}$. Studies have shown more serious health effects associated with $PM_{2.5}$; therefore, the USEPA promulgated more stringent standards for this class of PM.

The NAAQS are listed in Table 3-2. The primary NAAQS protect the health of sensitive individuals, and the secondary NAAQS protect the general welfare of the public. Different averaging periods are established for the criteria pollutants based on their potential health and welfare effects. The NAAQS are enforced by states, which in some cases have adopted additional or more stringent standards.

All areas of the nation have been classified based on their status with regard to attaining the NAAQS. An area is designated by the USEPA as being in attainment for a criteria pollutant if ambient concentrations of that pollutant are below the NAAQS, or being in nonattainment if criteria pollutant concentrations violate the NAAQS. Once nonattainment areas comply with the NAAQS, they are designated as maintenance areas. Areas that are classified as nonattainment must implement a plan to reduce ambient concentrations below the NAAQS. Areas where insufficient data are available to determine attainment status are designated as unclassified, and are treated as attainment areas for regulatory purposes.

The Clean Air Act also provides for the prevention of significant deterioration (PSD) of air quality, especially in areas of the country where the air quality is much better than standards. In Class I areas, only a

BLM_0000292

AFFECTED ENVIRONMENT

**TABLE 3-2**
**National Ambient Air Quality Impact Significance Criteria ($\mu g/m^3$)**

| Pollutant | Averaging Period[1] | NAAQS | | PSD Increments[2] | |
|---|---|---|---|---|---|
| | | Primary | Secondary | Class I | Class II |
| $NO_2$ | Annual | 100 | 100 | 2.5 | 25 |
| CO | 1-hour | 40,000 | NA | NA | NA |
| | 8-hour | 10,000 | NA | NA | NA |
| $PM_{10}$ | 24-hour | 150 | 150 | 8 | 30 |
| | Annual | NA | NA | 4 | 17 |
| $PM_{2.5}$ | 24-hour | 35 | 35 | NA | NA |
| | Annual | 15 | 15 | NA | NA |
| $SO_2$ | 3-hour | NA | 1,300 | 25 | 512 |
| | 24-hour | 365 | NA | 5 | 91 |
| | Annual | 80 | NA | 2 | 20 |
| Lead | Quarter | 1.5 | 1.5 | NA | NA |
| $O_3$ | 1-hour[3] | 235 | 235 | NA | NA |
| | 8-hour[3] | 157 | 157 | NA | NA |

[1] Annual standards are never to be exceeded. Short-term standards (those other than annual or quarterly) are not to be exceeded more than once per year, except for $O_3$, $PM_{10}$, and $PM_{2.5}$ standards. For $O_3$, the expected number of days with ozone levels above the standard is not to be exceeded more than once per calendar year. For $PM_{10}$, the standard is attained when the 99th percentile concentration for the year is less than the standard. For $PM_{2.5}$, the standard is attained when the 98th percentile concentration for the year is less than the standard.
[2] Prevention of significant deterioration (PSD) increments are the maximum amounts of pollutants allowed above a specified baseline concentration. Class I areas are predominantly large national parks and wilderness areas as of August 7, 1977.
[3] The 1-hour NAAQS will no longer apply to an area 1 year after the effective date of the designation of that area for the 8-hour ozone NAAQS. The effective designation date for most areas is June 15, 2004.
NA = Not applicable.

very small amount or increment of air quality deterioration is permissible. Class I areas include specified national parks, wilderness areas, and certain Indian reservations (Map 3-2). Mandatory Class I areas, which include large national parks and wilderness areas that were in existence on August 7, 1977, are a subset of Class I areas that may not be redesignated, and are subject to visibility protection regulations. All areas that have not been designated Class I are considered Class II areas. The PSD permit provisions of the Clean Air Act only apply to stationary sources of air pollution and do not include prescribed fire, which is defined as a temporary source. Some states, however, have regulations to restrict intrusions of smoke from prescribed burning that might adversely impact visibility within mandatory federal Class I and other smoke-sensitive areas.

Detailed knowledge of the existing air quality for the area covered by this PEIS is limited to available monitoring sites for criteria pollutants. In the undeveloped regions of public lands, ambient pollutant levels are expected to be low, and probably negligible in remote areas. In general, locations experiencing high ambient pollutant levels in the treatment area are areas with commercial and industrial land use (areas with mills, power plants, etc.), and local population centers (areas with automobile exhaust, residential heating, etc.).

Table 3-3 lists counties with public lands that are designated as nonattainment or maintenance areas for each criteria pollutant. $PM_{10}$, $O_3$, and $NO_2$ concentrations are expected to be higher near industrial areas and cities where there are significant combustion sources and vehicles. High $SO_2$ concentrations occur primarily near coal-fired power plants, smelters, and refineries.

## Visibility Protection in Mandatory Federal Class I Areas

Under the Clean Air Act, Congress created the Grand Canyon Visibility and Transport Commission (GCVTC). The GCVTC was comprised of eight western states, six tribal agencies, and four federal land management agencies, and was charged with assessing the current scientific information on

BLM_0000293

TABLE 3-3
Counties within the Treatment Area that are Designated Nonattainment or
Maintenance Areas for Various Pollutants

| Pollutant | State | Nonattainment | Maintenance |
|---|---|---|---|
| PM$_{10}$ | Arizona | Cochise*, Gila*, Maricopa*, Pima*, Pinal*, Santa Cruz*, Yuma* | Gila*, Mohave* |
| | California | Fresno*, Imperial*, Inyo*, Kern*, Kings*, Madera*, Mono*, Riverside*, San Bernardino, Stanislaus*, Tulare* | Kern*, Mono* |
| | Colorado | Prowers* | Adams*, Arapahoe*, Archuleta*, Boulder*, Broomfield, Denver, Douglas, Freemont*, Jefferson, Pitkin*, Routt*, San Miguel* |
| | Idaho | Bannock*, Bonner, Power*, Shoshone* | Ada* |
| | Montana | Missoula*, Rosebud*, Silver Bow* | None |
| | Nevada | Clark*, Washoe* | None |
| | New Mexico | Dona Ana* | None |
| | Oregon | Jackson*, Lake*, Lane* | Josephine*, Klamath* |
| | Utah | Salt Lake, Utah | None |
| | Washington | Yakima* | None |
| | Wyoming | Sheridan* | None |
| SO$_2$ | Arizona | Cochise*, Gila*, Pinal* | Greenlee*, Pima* |
| | Montana | Lewis and Clark*, Yellowstone* | None |
| | Nevada | None | White Pine* |
| | New Mexico | None | Grant* |
| | Utah | Salt Lake*, Tooele* | None |
| NO$_2$ | None | None | None |
| CO | Alaska | None | Fairbanks North Star* |
| | Arizona | Maricopa* | Pima* |
| | California | Los Angeles*, Riverside*, San Bernardino* | Butte*, El Dorado*, Fresno*, Kern*, Napa*, Placer*, San Diego*, Solano*, Sonoma*, Stanislaus*, Yolo* |
| | Colorado | None | Boulder*, El Paso*, Jefferson*, Larimer*, Teller* |
| | Idaho | None | Ada* |
| | Montana | Missoula* | Cascade*, Yellowstone* |
| | Nevada | None | Carson City*, Douglas*, Washoe* |
| | New Mexico | None | Bernalillo |
| | Oregon | Marion*, Polk* | Clackamas*, Jackson*, Josephine*, Klamath*, Lane*, Washington* |
| | Utah | Utah* | Salt Lake |
| | Washington | Spokane* | Yakima* |
| Ozone | Arizona | Maricopa* | None |
| | California | Butte, El Dorado*, Fresno*, Imperial, Kern*, Kings, Napa*, Placer*, Riverside*, San Bernardino*, San Diego*, Solano*, Sonoma*, Stanislaus, Tulare, Yolo | Kern*, Monterey, San Benito, San Diego |
| | Colorado | None | Boulder*, Jefferson |
| | Nevada | Washoe | Clark*, King*, Pierce*, Snohomish*, Yakima* |
| | New Mexico | Dona Ana* | None |
| | Oregon | Marion*, Polk* | Clackamas*, Washington* |
| | Utah | None | Salt Lake |
| Lead | Montana | Lewis and Clark* | None |

* Only a portion of the county is in nonattainment or maintenance for the pollutant.
Notes: States that are not listed for a particular pollutant do not have counties within the treatment area that are also within nonattainment or maintenance areas for that pollutant.
Source: USEPA Green Book available at http://www.epa.gov/oar/oaqps/greenbk/.

BLM_0000294

AFFECTED ENVIRONMENT

visibility impacts and making recommendations for addressing regional haze in the western U.S (GCVTC 1996). The GCVTC signed and submitted more than 70 recommendations to the USEPA indicating that visibility impairment was caused by a wide variety of sources and pollutants, and that a comprehensive strategy was needed to remedy regional haze (Grand Canyon Visibility Transport Commission 1996). Based on the findings and recommendations from the GCVTC, the USEPA established regional haze regulations, and encouraged states to coordinate their implementation efforts through regional planning organizations.

The Western Regional Air Partnership (WRAP) was established in 1997 as a successor to the GCVTC. The WRAP is a voluntary organization comprised of 13 western governors (Alaska, Arizona, California, Colorado, Idaho, Montana, North Dakota, New Mexico, Oregon, South Dakota, Utah, Washington, and Wyoming), 11 tribal leaders, and 2 federal departments (USDA and USDI).

In the 1990 amendments to the Clean Air Act, the U.S. Congress directed the USEPA to develop regional haze regulations to achieve the national visibility goal of "the prevention of any future, and the remedying of any existing impairment of visibility in mandatory Class I federal areas, which impairment results from manmade air pollution."

The USEPA promulgated the Regional Haze Rule in 1999 to improve visibility in 156 mandatory federal Class I national parks and wilderness areas where visibility is an important value (USEPA 1999a). Improvement in visibility must be made every 10 years for the 20% most impaired (haziest) days, and there must be no degradation for the 20% best (clearest) days, until the national visibility goal is reached in 2064. State implementation plans and tribal implementation plans (TIPs) outline how reasonable progress towards this goal will be achieved and demonstrated. Section 308 of the Regional Haze Rule provides nationally applicable provisions of the rule in the development of SIPs and TIPs, which address regional haze.

## Herbicide Drift

Aerial and ground application of herbicides may transport herbicides through drift, allowing airborne herbicides to move beyond the intended target. The primary factors that influence drift are droplet size, wind speed, humidity, formulation of the herbicide, height of emission, equipment and application techniques, and the size of the area treated with the herbicide. The factor that has the greatest influence on downwind movement is droplet size. Procedures that can be employed to reduce drift include: 1) using a lower spray nozzle height, 2) using the lower end of the pressure range, 3) increasing the spray nozzle size, 4) using drift-reducing nozzles, 5) using drift control additives, and 6) using sprayer shields (Hofman and Solseng 2001). Additionally, several university extension service agencies provide assistance regarding SOPs to minimize herbicide spray drift (Dexter 1993, Hofman and Solseng 2001).

# Topography, Geology, Minerals, Oil, and Gas

The diversity in the landscape of the treatment areas reflects differences in geologic processes and the effects of climate, which have been shaping the land over a long period of time.

In 2005, on-shore public lands produced about 40% of the nation's coal, about 11% of its natural gas, and about 5% of its oil (USDI BLM 2006c). In FY 2005, the BLM administered over 54,000 oil and gas leases, of which approximately 21,000 leases were producing. BLM geothermal resources produced over 34 megawatt-hours of electric power. Information pertaining to mineral, oil, and gas resources, presented below, was gathered from the Mineral Resources Program, a section of the U.S. Geological Survey (USGS).

## Tundra Ecoregion

The Tundra Ecoregion is rich in minerals, oil, and gas. Metallic minerals including silver, lead, and zinc are found throughout the North Slope region of Alaska. To the south, along the western coast of Alaska, are significant concentrations of gold. The Northern Alaska physiographic province accounts for almost half of the oil and more than half of the undiscovered conventional gas assessed on onshore federal lands. Oil and coal resources extracted in Alaska are predominantly from the Tundra Ecoregion (i.e., North Slope). As of 2005, Alaska accounted for 17% of the crude oil discovered in the U.S. (Energy Information Administration 2006).

BLM_0000295

## Subarctic Ecoregion

Gold is the most dominant mineral extracted in this ecoregion. Other mineral operations include copper mining, and production of aggregate (e.g., construction sand, gravel, and crushed stone). There are limited discoveries of coal, gas, and oil resources in the central portion of Alaska.

## Temperate Desert Ecoregion

Raw, non-fuel minerals extracted throughout this ecoregion include aggregate, gypsum, limestone, trona, shale, and stone. Metallic minerals, predominantly silver and gold, are extracted in the southern portions of this ecoregion. There is very little oil and gas found in this ecoregion. However, coalfields located in the Temperate Steppe Ecoregion extend into this ecoregion, and are found throughout southwest Wyoming and central and southwest Utah.

## Subtropical Desert Ecoregion

Minerals predominantly extracted from the western portion of this ecoregion are construction aggregate including construction sand, gravel, and crushed stone. Metallic minerals (e.g., gold, silver, and copper) dominate the central and eastern portion of this region. Gypsum is prominent in southern Nevada. Limited oil and gas reserves are located in southern Arizona and southwest New Mexico. No coalfields are found in this ecoregion.

## Temperate Steppe Ecoregion

Construction aggregate (including crushed stone and common clay) is the dominant mineral extracted throughout the southern and central sections of this ecoregion. While industrial minerals within this region are predominantly extracted for construction purposes, Wyoming contains the world's largest source of trona. Trona is the principal ore from which soda ash is produced. Metallic minerals and precious stones (i.e., gems) are extracted throughout the northern and northeastern portions of the ecoregion.

There are significant deposits of coal concentrated throughout the Colorado Plateau extending into the Rocky Mountains and Great Plains. Significant oil reserves are located throughout the region (Map 3-3). The Powder River Basin and the Wyoming Thrust Belt provinces of the Rocky Mountains and Northern Great Plains regions have the second largest concentrations (behind Alaska) of undiscovered conventional oil and gas, respectively, assessed on federal lands (Gautier et al. 1998; U.S. Departments of Interior, Agriculture, and Energy 2003).

## Subtropical Steppe Ecoregion

Construction aggregate and metallic minerals dominate the nonfuel minerals extracted in this ecoregion. In addition, potash accounts for a significant portion of minerals mined in New Mexico. The Carlsbad Potash District (in New Mexico) is the largest potash-producing area in the U.S. (Energy Information Administration 2001). There are extensive coalfields throughout northern Arizona and New Mexico. These fields extend up into the Colorado Plateau. No oil or natural gas reserves have been located in this ecoregion.

## Mediterranean Ecoregion

Industrial minerals such as aggregate, limestone, and shale dominate mineral extraction throughout this ecoregion. There is no coal mining within this ecoregion, although oil and natural gas extraction is predominant in the San Joaquin, Ventura/Santa Barbara, Los Angeles, and Santa Maria regions.

## Marine Ecoregion

Metallic minerals such as gold, silver, aluminum, lead, and zinc are mined in southeast Alaska and in Washington. In western Oregon, aggregate is the most dominant mineral extracted. There are no significant oil, natural gas, or coal resources within this region.

# Soil Resources

Soils in the treatment area are diverse and range from the arid, saline soils of the southwest, to the clayey glaciated soils of Montana, to the cold, wet permafrost soils of Alaska. Soils are the result of complex interactions between parent material (geology), climate, topography, organisms, and time (Brady and Weil 1999). Soils are classified by the degree of development into distinct layers or horizons and their prevailing physical and chemical properties (Fanning and Fanning 1989). Similar soil types are grouped together into soil orders based on defining characteristics, such as organic matter and clay content, amount of mineral weathering, water and temperature regimes, or other characteristics that give soil unique properties, such as the presence of volcanic ash or permafrost (Jenny 1980).

BLM_0000296

AFFECTED ENVIRONMENT

Eleven soil orders are represented on public lands in the western U.S. and Alaska (Map 3-4). Because soils develop under local conditions of climate, parent material, and vegetation, each ecoregion may contain several or all of the soil orders as a result of various combinations of local soil forming factors. Soils are organized here by soil order rather than by ecoregion.

**Aridisols** are found on over 40% of public lands (105 million acres). They occur across wide parts of the western U.S. in Nevada, Arizona, New Mexico, central Wyoming, southern Idaho, and southern California. These soils are characterized by an extreme water deficiency. They are light colored soils, are low in organic matter, and may have subsurface accumulations of soluble materials, such as calcium carbonate, silica, gypsum, soluble salts, and exchangeable sodium. Vegetation on these soils includes scattered desert shrubs and short bunchgrasses, which are important resources for livestock. Aridisols are generally not very productive without irrigation, and may be prone to salinity buildup. Surface mineral deposits often form physical crusts that impede water infiltration.

**Gelisols** occur on over 27% of public lands (71 million acres), almost exclusively in the tundra regions of Alaska. They are underlain by permanently frozen ground (permafrost). Some gelisols in wet environments have developed large accumulations of organic matter, particularly in areas of bogs and wetlands. Soil forming processes take place very slowly above the permafrost in the active layer that thaws seasonally. These soils support tundra vegetation of lichens, grasses, and low shrubs that grow during the brief summers. Plant productivity is low and limited by the extremely short growing season of the northern latitudes, low levels of solar radiation, and poor water drainage. Bare rock is also common in Alaska, comprising nearly 8 million acres.

**Mollisols** occur on about 15% of public lands (40 million acres). They are found in much of North and South Dakota and northern Montana, as well as in eastern Oregon, Washington, and Idaho where they have developed from basalt and loess parent materials. These soils typically support grasslands and are mineral soils with thick, dark-colored surface horizons rich in organic matter from the dense root systems of prairie grasses. They are one of the most productive soils on public lands, and their high organic matter content helps reduce the risk of groundwater contamination by herbicides. Mollisols extend from upland areas to the prairie grasslands, where they are most abundant. Mollisols support a variety of plant communities,

including grasslands, chaparral-mountain shrub, and forests. Since they have developed primarily under grassland vegetation, mollisols have been used extensively for livestock grazing.

**Entisols** occur on about 9% of public lands (23 million acres). Entisols occur extensively in eastern Montana, western Colorado, South Dakota, Wyoming, Utah, and central California. They are young, weakly developed mineral soils that lack significant profile development (soil horizons) and are often found in lower elevation, arid and semiarid environments supporting desert shrub and sagebrush communities. Entisols can include recent alluvium, sands, soils on steep slopes, and shallow soils. Soil productivity ranges from very low in soils forming in shifting sand or on steep rocky slopes to very high in certain soils formed in recent alluvium. Productivity is often limited by shallow soil depth, low water holding capacity, or inadequate available moisture, but these soils do support rangeland vegetation and may support trees in areas of higher precipitation.

**Alfisols** occur on less than 2% of public lands (4 million acres). They can be found throughout the mountains of western Montana and Wyoming and in central Colorado and California. They are characterized by subsurface clay accumulations and nutrient-enriched subsoil. Alfisols commonly have a mixed vegetative cover and are productive for most crops, including commercial timber.

**Inceptisols** also occur on less than 2% of public lands (4 million acres). Inceptisols are found in northern Idaho and parts of Washington, Oregon, and Montana, as well as southwest Alaska. They are generally young mineral soils, but have had more time to develop profile characteristics than Entisols. They principally occur in very cool to warm, humid and subhumid regions and in most physiographic conditions, and often support coniferous and deciduous forests as well as rangeland vegetation. They may form in resistant rock or thin volcanic ash on steep mountain slopes or depressions, on top of mountain peaks, or next to rivers. Productivity is varied and may be high where moisture is adequate.

The other soil orders represent less than 1% of public lands each (1 million acres or less), and therefore, will not be discussed in detail. **Andisols** are soils that have formed on volcanic ash deposits. They have high amounts of volcanic glass and organic matter, giving them a light, fluffy texture. **Histosols** are organic soils that typically form in lowland areas with poor water drainage. While not extensive, Histosols are often

BLM_0000297

associated with riparian or wetland resources and can be very important locally.

**Spodosols** are highly leached, acid soils that typically form on sandy soils under cold, humid conditions at high elevations. **Ultisols** are strongly acid mineral soils associated with advanced soil weathering and are low in nutrients. **Vertisols** have large amounts of expanding clay that causes them to have high shrinking and swelling characteristics.

The concept of soil quality encompasses a soil's capacity to function and to sustain plant and animal productivity, air and water quality, and human health (Soil Quality Institute 2001). It is a function of each soil's inherited properties (texture, type of minerals, depth) as well as more dynamic properties that can change with management (porosity, infiltration, effective ground cover, and aggregate stability). The ability of a soil to filter, buffer, degrade, immobilize, and detoxify herbicides is a function of the soil quality.

Management activities can result in changes in certain soil properties such as soil porosity, organic matter, biological activity, and susceptibility to erosion. These changes in turn affect the fate of herbicides in soils. For example, disturbances that result in increased susceptibility to erosion will affect the off-site movement of certain herbicides that are designed to bind to soil particles. Herbicides can alter soil organism diversity and composition. Compaction or surface disturbance may affect soil activated herbicides from reaching the root zone of target plants.

## Biological Soil Crusts

Biological soil crusts (also known as cryptogamic, microbiotic, cryptobiotic, or microphytic crusts) are commonly found in semiarid and arid environments. They provide important functions, such as improving soil stability and reducing erosion, fixing atmospheric nitrogen and contributing nutrients to plants, and assisting with plant growth (Belnap and Gardner 1993, Evans and Ehleringer 1993, Eldridge and Greene 1994, Belnap and Giliette 1998, Harper and Belnap 2001). Crusts are composed of a highly specialized nonvascular plant community consisting of cyanobacteria, green and brown algae, mosses, and lichens, as well as liverworts, fungi, and bacteria (Belnap and Phillips 2001). Biological soil crusts occupy open spaces between the sparse vegetation of the Great Basin, Colorado Plateau, Sonoran Desert, and the inner Columbia Basin, and also occur in agricultural areas and native prairies, and in Alaska.

Biological soil crusts can reach up to several inches in thickness and vary in terms of color, surface topography, and surficial coverage. Crusts generally cover all soil spaces not occupied by vascular plants, which may be 70% or more in arid regions (Belnap 1994). They are well adapted to severe growing conditions, but are influenced by disturbances such as compression from domestic livestock grazing, tourist activities (hiking, biking, and OHVs), mechanical treatment and agricultural practices (extensive tillage and planting), application of herbicides, and military activities (Peterjohn and Schlesinger 1990, Belnap 1995, USGS 2004). Disturbance of biological crusts results in decreased soil organism diversity, nutrients, stability, and organic matter. Trampling may reduce the number of crust organisms found on the surface and increase runoff and the rate of soil loss without apparent damage to vegetation (Eldridge 1996). Burial of crusts by sediments kills non-mobile photosynthetic components (mosses, lichens, and green algae) of the crust (Campbell 1979). Fires can cause severe damage to biological crusts, but recovery is possible, depending on fire size and intensity. Shrub presence (particularly sagebrush) may increase fire intensity, thereby decreasing the likelihood of early vegetative or crust recovery after a burn (USGS 2003).

## Micro and Macroorganisms

Microorganisms help to break down and convert organic remains into forms that can be used by plants. Microorganisms, such as mycorrhizal fungi, nitrogen-fixing organisms, and certain types of bacteria assist plant growth, suppress plant pathogens, and build soil structure. One of the main benefits of mycorrhizal fungi is the improved uptake of nutrients (predominantly phosphorous) and water by plants (Allen 1991). Soil microorganisms are also important in the breakdown of certain types of herbicides.

Macroorganisms, such as insects, earthworms, and small burrowing mammals, mix the soil and allow organic matter on the surface to become incorporated into the soil. These organisms are part of a food chain that is essential to the cycling of nutrients within the soil. Soil microorganisms are also important in the breakdown of certain types of pesticides.

AFFECTED ENVIRONMENT

## Soil Erosion

Soil erosion is a concern throughout the western U.S. and Alaska, particularly in semiarid rangelands. The quantity of soil lost by water or wind erosion is influenced by climate, topography, soil properties, vegetative cover, and land use. While erosion occurs under natural conditions, rates of soil loss may be accelerated if human activities are not carefully managed.

Tundra lands in Alaska are susceptible to erosion if the thick vegetative mat overlying permafrost is disturbed or removed. Trails quickly turn into widely braided ruts, especially in wetlands and at streambank crossings. The resulting gully erosion can rapidly erode substantial quantities of previously frozen soils. Erosion from aufeis (thick ice that builds ups as a result of repeated overflow) and anchor ice is also a concern due to spring breakup flood events leaving disturbed streamchannels. These events cause previously stable riparian areas to form a long-lasting sequence of extensively braided channels, especially in glacial soils.

Rangelands are affected by all four types of water erosion—sheet, rill, gully, and streambank. Sheet erosion is relatively uniform erosion from the entire soil surface and is therefore often difficult to observe, while rill erosion is initiated when water concentrates in small channels as it runs off the soil. Sheet and rill erosion are capable of reducing the productivity of rangeland soils, but often go unnoticed. Gully and streambank erosion is far more visible, and may account for up to 75% of erosion in desert ecosystems (Hein 2002). Changes in water flow patterns in arid areas resulting from thunderstorms and fire events can cause an increase in the size and frequency of runoff events and sediment yield to local water sources (Water Science and Technology Board and Board on Environmental Studies and Toxicology 2002).

It is possible to control rates of soil erosion by managing vegetation, plant residues, and soil disturbance. Vegetative cover is the most significant factor in controlling erosion because it intercepts precipitation, reduces rainfall impact, restricts overland flow, and improves infiltration. Biological soil crusts are particularly important for protecting the soil and controlling erosion in desert regions, but are easily disturbed by grazing and human activities.

With a decrease in vegetative cover, the potential risk of herbicides entering surface water and groundwater can increase (Purdue Pesticide Program 2001). Herbicides can be transported by surface water runoff, potentially increasing the risk of direct injury to nontarget species, harming aquatic organisms in streams and ponds, and leading to groundwater contamination (University of Missouri Extension 1997).

Differences in chemical solubility, adsorptive characteristics, volatility, and degradability, plus soil properties that affect water movement, biological activity, and chemical retention, affect the amount of a herbicide that may leach to groundwater. The speed at which leaching of chemicals through soil occurs is dependent on the soil characteristics. Soil texture (sand, silt, and clay) affects the movement of water and herbicides through soil. The coarser the soil, the faster the movement of percolating water and the lower the opportunity for adsorption of dissolved chemicals. Soils with more clay and organic matter tend to hold water and dissolved chemicals longer. These soils also have far more surface area onto which herbicides can be adsorbed (LaPrade 1992).

Wind erosion is most common in arid and semiarid regions where lack of soil moisture greatly reduces the adhesive capability of soil (Brady and Weil 2002). In addition to moisture content, soil particle size (texture), mechanical stability of aggregates and clods, and presence of vegetation also affect the ability of wind to move soil. While wind erosion on rangelands is difficult to quantify, the presence of natural vegetation on most rangelands is generally sufficient to keep wind erosion from becoming a serious problem. Most wind erosion problems result from bare, exposed soils with weak or degraded soil structure, such as along trails or on sand dunes or disturbed surfaces. Herbicides can be potentially transported by blowing soils after application. Herbicides bound to soil particles may be moved offsite by wind erosion events.

## Soil Compaction

Soil compaction occurs when moist or wet soil aggregates are pressed together and the pore space between them is reduced. Compaction changes soil structure, reduces the size and continuity of pores, and increases soil density. Wheel traffic, large animals, vehicles, and people can cause soil compaction. Generally, soils made up of particles of about the same size compact less than soil with a variety of particle sizes. Numerous rock fragments can create bridges that reduce compaction. Plant litter and roots, and soil organic matter, structure, moisture, and texture all affect

BLM_0000299

a soil's ability to resist compaction. In areas of rangeland where compaction exists, compacted soil extends generally less than 6 inches below the soil surface, although it can be as deep as 2 feet under heavily used tracks and roads (USDA Natural Resource Conservation Service 1996). Compaction becomes a problem when the increased soil density limits water infiltration, increases runoff and erosion, or limits plant growth or nutrient cycling (Soil Quality Institute 2001).

# Water Resources and Quality

## Water Resources

Water resources in the western U.S. and Alaska are important for fish and wildlife habitat and a variety of human needs, such as domestic consumption, industrial activities, crop irrigation, livestock watering, and recreation. Numerous legal and policy requirements have been established to manage water resources for these multiple needs, including the Clean Water Act, the Colorado River Basin Salinity Control Act, and EO 11988 (*Floodplain Management*).

Water resources are classified as surface water or groundwater. Surface water resources include rivers, streams, lakes, ponds, reservoirs, and wetlands. Major river systems (e.g., Colorado, Columbia, Snake, Missouri, Arkansas, Rio Grande, and Yukon rivers) and their tributaries are important sources of water in the western U.S and Alaska.

The quantity and quality of surface water resources are affected by precipitation, topography, soil type, vegetation, agricultural practices, urbanization, and general land use practices, especially for large tracts of public land. The alteration of vegetative cover from land use practices can have significant impacts on water infiltration, soil erosion, and stream sedimentation.

The largest quantities of useable freshwater occur as groundwater, which provides drinking water for more than 97% of the rural population without access to public-water supplies, and between 30 and 40% of the water used for agriculture (Alley et al. 1999). Groundwater is obtained primarily from wells that tap into aquifers. Aquifers are layers of permeable rocks that are recharged with freshwater from precipitation that percolates through the unsaturated zone to the water table, typically in upland, mountainous areas. Recharge rates generally range from a tiny fraction to about one-half of the average annual precipitation. Streams are commonly a significant source of recharge

to groundwater downstream from mountain fronts and steep hillslopes in arid and semiarid areas.

As shown on Map 3-5, nine hydrologic regions have been identified in the treatment area: Alaska, Pacific Northwest, California, Upper Colorado, Lower Colorado, Rio Grande, Missouri, Great Basin, and Arkansas-White-Red (Seaber et al. 1987). Most public lands occur in arid to semiarid environments in the Great Basin and Colorado drainage basins.

### Alaska Hydrologic Region

The BLM administers approximately 143,000 miles of riparian habitat and nearly 12.6 million acres of wetlands in Alaska (USDI BLM 2006d). This hydrologic region occupies the entire state of Alaska, and is characterized by an abundance of water resources. Major river systems, such as the Yukon, drain the mountain ranges, and extensive wetlands dot the low-lying plains and coastal regions.

The Yukon and Kuskokwim river drainages are two of the dominant drainages in Alaska. The Yukon River drains an area of more than 330,000 square miles ($mi^2$), making it the fourth largest drainage basin in North America. Its mainstem, the Yukon River, originates in northwestern Canada and extends through central Alaska, discharging into the Bering Sea (Brabets et al. 2000). Major tributaries of the Yukon River include the Tanana, Nenana, and Chena rivers.

The Kuskokwim River is the second largest drainage in Alaska. The glacially turbid mainstem is approximately 900 miles long, originating from the interior headwaters of the Kuskokwim Mountains and the shadows of the Alaska Range. The Kuskokwim River flows in a southwest direction to the Bering Sea.

Hydrologic processes are strongly affected by the presence of permafrost, which may thaw seasonally or be continuous throughout the year, particularly in the North Slope. In central Alaska, permafrost is discontinuous, and an active layer at the surface that thaws during the summer months can supply groundwater for domestic use. The valleys of major rivers have alluvial aquifers with an active layer in the summer months that also supply good quality groundwater. During the winter, permafrost generally extends to the surface, impeding water infiltration and groundwater recharge.

BLM_0000300

AFFECTED ENVIRONMENT

**Pacific Northwest Hydrologic Region**

The Pacific Northwest Hydrologic Region includes the wet coastal areas of Oregon and Washington, as well as the semiarid Columbia Plateau in eastern Washington, Oregon, and southern Idaho. The region is drained by the Columbia, Willamette, and Snake River systems, which are important sources of hydroelectric power and irrigation for agriculture.

The coastal areas of Oregon and Washington are influenced by medium to high rainfall levels due to the interaction between marine weather systems and the mountainous nature of the region. Mountains within this area are generally rugged with steep canyons. Tributary streams are short and have steep gradients, creating rapid surface water runoff with relatively short-term water storage, limiting recharge.

The Columbia River Basin drains approximately 259,000 mi$^2$. The basin extends roughly from the crest of the Coast Ranges of Oregon and Washington, east through Idaho, to the Continental Divide in the Rocky Mountains of Montana and Wyoming; and from the headwaters of the Columbia River in Canada to the high desert of northern Nevada and northwestern Utah. Its mainstem, the Columbia River, originates in two lakes that lie between the Continental Divide and the Selkirk Mountain Range in British Columbia. After flowing a circuitous path for approximately 1,200 miles, it joins the Pacific Ocean near Astoria, Oregon.

The Columbia River has 10 major tributaries—the Kootenay, Okanagan, Wenatchee, Spokane, Yakima, Snake, Deschutes, Willamette, Cowlitz, and Lewis rivers.

The Pacific Northwest Hydrologic Region includes a network of coastal streams and rivers. Many are rain-driven systems that are hydrologically flashy and influenced primarily by rain storms during the winter. Streams west of the Cascade Range typically discharge directly into the Pacific Ocean.

The southernmost portion of this hydrologic region extends down to the northern portion of the Great Basin. This area is geologically very new and contains extensive areas of lava and other volcanic rock. The rock substrata are very permeable; therefore, streams tend to lose much of their flow through percolation. Only large rivers that lie below the water table contain substantial flows year-round. In most years, abundant precipitation along the western side of the Cascade Range produces abundant surface water flow in streams

flowing off the Cascade Range to the Pacific Ocean. Aridity progressively increases and precipitation decreases east of the Cascade Range because of rainshadow effects caused by the mountains.

Timing of precipitation east of the Cascade Range coincides with periods of relatively high solar radiation; thus, precipitation is rapidly evaporated, limiting the amount of surface water available to streams in this portion of the region (Spence et al. 1996). Generally, streams that flow year-round east of the Cascade Range are fed by snowmelt from higher elevations or by groundwater discharge from aquifers recharged during periods of abundant precipitation.

Groundwater is an important resource in this hydrologic region for domestic consumption and irrigation, particularly when surface water supplies are insufficient. It is generally contained in shallow alluvial aquifers along major streams and their valleys.

**California Hydrologic Region**

This hydrologic region includes nearly the entire state of California, as well as parts of southern Oregon. The region is characterized by a Mediterranean climate with winter precipitation, and a prolonged summer period with little precipitation.

The California region is drained by rivers such as the Sacramento and San Joaquin. Surface water flow in streams is derived mainly from snowmelt in the mountainous areas during the spring months. During the remainder of the year, many streams have no flow or intermittent flow that follows major storms.

Groundwater in the mountainous areas is relatively deep, and is contained in sedimentary units that continue under the intermountain basins and form a deep reservoir that is seldom tapped because of its depth. Shallow groundwater can be found in sands and gravels that fill the basins between the mountain ranges. This groundwater is fed by infiltration of surface water from streams that flow off the mountain ranges. Groundwater in southeastern California is the main source of water for domestic consumption and agricultural irrigation.

**Upper Colorado Hydrologic Region**

This hydrologic region includes the Colorado Plateau, which encompasses parts of southern Wyoming, western Colorado, eastern Utah, and northern Arizona and New Mexico. The upper reaches of the Colorado

BLM_0000301

River and its tributaries drain this region. Precipitation varies greatly with elevation, and occurs as winter snows and heavy fall rainstorms.

Perennial surface water flow occurs in major rivers (e.g., the Green River and Colorado River). Major streams are fed by snowmelt in the mountainous areas. Dams serve as flood control, domestic supply, and power generation for the major urban centers, as well as provide surface water for irrigation. Intermittent flow occurs in tributaries to the major rivers, and ephemeral flow occurs in small canyons. Surface water runoff or groundwater baseflow are the major processes that deliver precipitation and snowmelt to streams. In Colorado, the annual hydrograph for most streams is dominated by snowmelt in the mountains; however, there is also a rain component, which varies by region. For instance, in the southwest portion of Colorado, summer monsoonal flow produces ample rain. The larger rivers in Colorado are perennial, but the smaller rivers and streams are either intermittent or ephemeral.

Groundwater is found in most of the sedimentary rocks of the Colorado Plateau, and is the major source of water for domestic and municipal use. Major aquifer systems are not present; groundwater is localized and can be abundant in some areas and absent in others. Farming and ranching are usually limited to stream valleys, where irrigation water comes mostly from surface water. Groundwater baseflow is the major source of water for perennial flows in the late summer and early fall. Seeps and springs are an historic source of water for Native American tribes and a current source of water for smaller ranches.

**Lower Colorado Hydrologic Region**

This hydrologic region is comprised of the lower reaches of the Colorado River in the desert southwest of Arizona, New Mexico, and southern Nevada. In this region, public lands are mainly restricted to the arid valleys, while many of the upland areas are administered by the Forest Service. The climate is arid, and precipitation is limited to the winter months and periods of heavy storms. Most precipitation during summer evaporates before it can infiltrate into the desert sands.

Surface water flow in the arid basins of the southwest is ephemeral to non-existent most of the year. Spring snowmelt and periods of heavy rain during the winter result in surface water flow in the mountainous areas and along the mountain fronts in the intervening basins. During the rest of the year, surface water flow is absent except after major storms, where flash floods are common along the mountain fronts. Only major rivers draining the Colorado Plateau or the Mogollon Rim, such as the Gila and Bill Williams rivers, have perennial flow.

Groundwater is found in the alluvium of the basins and in the bedrock of the mountainous areas (i.e., deep reservoirs to depths of many thousands of feet). Groundwater is recharged by precipitation in the mountains and infiltration of stream flow along the base of the mountains. The shallow groundwater reservoirs are used extensively for irrigation and domestic consumption. Irrigation demand and mine dewatering have substantially lowered the water levels in the shallow groundwater reservoirs of the Arizona basins. However, groundwater levels in the basins of southern New Mexico have not been substantially affected by irrigation. Many of the basins have shallow groundwater surfacing in playa lakes.

**Rio Grande Hydrologic Region**

This region occupies central New Mexico and western Texas. The Rio Grande and Pecos rivers are major surface water resources that derive their water from the mountainous regions of southern Colorado and flow through New Mexico to the Gulf of Mexico. Surface water flow is present year-round in the Rio Grande and is caused by spring snowmelt and summer monsoon thunderstorms. Agricultural diversions account for approximately 90% of surface water use and may result in practically no flow during the summer months (Levings et al. 1998).

The Rio Grande aquifer system covers a $70,000\text{-mi}^2$ area of southern Colorado, central New Mexico, and western Texas. It consists of a network of hydrologically interconnected aquifers in basin-fill deposits located along the valleys of the Rio Grande and nearby rivers. These aquifers are generally composed of unconsolidated sediment deposits present in intermountain basins. Groundwater recharge primarily originates as precipitation in the mountainous areas that surround the basins, while most of the precipitation that falls in the valleys is lost to evaporation and transpiration. Potential evaporation may exceed 100 inches per year, while precipitation is frequently less than 8 inches per year (Levings et al. 1998).

Most groundwater withdrawal occurs as discharge from pumping wells, of which about 90% is used for irrigation of commercial crops. Most cities and

BLM_0000302

AFFECTED ENVIRONMENT

communities in the area, such as Albuquerque, Las Cruces, and Santa Fe, New Mexico, rely on groundwater for municipal use. Groundwater withdrawals in closed basins have caused long-term water level declines, while withdrawals from wells located near the Rio Grande, or its perennial tributaries, generally do not cause long-term water level declines in the aquifer.

**Missouri Hydrologic Region**

This hydrologic region covers the largest geographic area of the nine regions, including much of Montana, Wyoming, northeastern Colorado, North Dakota, South Dakota, and Nebraska. This region represents the eastern front of the Rocky Mountains stretching to the Great Plains, most of which is drained by the Missouri and Platte rivers and their tributaries.

Surface water resources are dominated by the major rivers and their tributaries. Precipitation is generally sparse in the summer and fall months, and surface water flow is generally dependent on snowmelt in the mountainous areas. Rivers flow mainly from late spring to early fall and can be dry in some parts of the region during the winter months. Surface water is directly connected to groundwater through shallow alluvial aquifers that are found along all the major rivers and their tributaries. Groundwater baseflow supplies stream and river flow in the late summer and fall. Surface water is the main source of municipal and irrigation water in the Rocky Mountain region, and irrigation return flow is a major component of surface water flow.

Groundwater in Wyoming and western Montana is found both in the igneous rocks of the uplifts and the basins, although groundwater in the uplifts is generally not used. Groundwater is used extensively for irrigation, much of it becoming irrigation return water that flows into major streams and their tributaries. In addition to irrigation, groundwater is also used for municipal and domestic water supplies. Major aquifers in the Great Plains are the Ogallala Aquifer of eastern Wyoming, Nebraska, and Kansas, and the Dakota Aquifer of North and South Dakota. These aquifers are overdrawn and the water table has been declining for decades. Recharge comes only from stream infiltration and spring snowmelt.

**Great Basin Hydrologic Region**

The Great Basin of Nevada and Utah is an arid region located in the rainshadow of the Sierra Nevada Mountains. The Great Basin is characterized by northerly trending mountain ranges and intermountain valleys with closed drainage. Precipitation generally falls as rain and snowfall in the mountains. Streams flowing down from the mountains carry water to the basins, which infiltrates into the alluvial sediments and provides the only substantial recharge to groundwater in the basins. Surface water flow in the basins is derived almost entirely from the mountain streams.

Apart from major rivers (e.g., the Humbolt and Truckee rivers), surface water flow in the basins of Utah and Nevada is intermittent along the mountain fronts and ephemeral in the basins themselves. Surface water flow in the mountainous areas is limited mainly to late spring snowmelt in the higher areas of the ranges. Agricultural diversions of major streams exiting the mountains are common, and major rivers are used extensively for irrigation. Surface water flow in northern Nevada has been affected by groundwater pumping from mining areas into the rivers. The Humboldt River, from Battle Mountain to Winnemucca, Nevada, is dominated by mine discharge.

Groundwater is found in the alluvium of the basins and in the deeper rocks that underlie the alluvial basins. Shallow groundwater in the alluvium of the basins is the main source of water for domestic consumption, irrigation, and power plant cooling. Some areas of the Great Basin, particularly in northern Nevada, have geothermal reservoirs that underlie the shallow groundwater reservoirs. These geothermal waters have been tapped, often inadvertently, by open pit mining and dewatering of areas used for gold mining. The Great Basin contains many of the largest groundwater reservoirs in the United States. These reservoirs are largely untapped at present, but major urban areas like Las Vegas are actively pursuing their development.

**Arkansas-White-Red Hydrologic Region**

This hydrologic region occupies the drainage of the Arkansas, Canadian, and Red River basins above the points of the highest backwater effect of the Mississippi River. It includes all of Oklahoma and parts of Colorado, New Mexico, Texas, Kansas, Missouri, and Louisiana. Only a relatively small proportion of public lands are found in this region, primarily concentrated near the headwaters of the Arkansas River in central Colorado and near the headwaters of the Canadian River in northeastern New Mexico.

Surface waters generally originate from precipitation falling in the eastern Rocky Mountains. Precipitation is relatively sparse in the summer and fall months, and

BLM_0000303

surface water flow is typically dependent on snowmelt in the mountainous areas. Surface water resources are used extensively for agricultural irrigation.

Groundwater resources, which are extensive in this region, consist primarily of the Ogallala Aquifer and alluvial aquifers associated with the river valleys. The Ogallala Aquifer underlies much of this region, and water withdrawals are used almost exclusively for irrigation (Robson and Banta 1995).

## Water Quality

Water quality is defined in relation to its specified and/or beneficial uses, such as human consumption, irrigation, fisheries, livestock, industry, or recreation. The quality of surface water is determined by interactions with soil, transported solids (organics and sediments), rocks, groundwater, and the atmosphere. The Clean Water Act established the basic structure for regulating discharges of pollutants into the waters of the U.S., and is responsible for setting water quality standards for all contaminants in surface waters. Section 313 of the Clean Water Act requires all federal agencies to comply with state water quality standards "...to the same extent as any nongovernmental entity." Thus, the BLM has a responsibility to fulfill its obligations under the Clean Water Act and Safe Drinking Water Act, to maintain waters that meet or surpass designated beneficial uses, to restore impaired water resources in support of their designated beneficial uses, and to provide water for public consumption and use (USEPA 2003d).

Section 303(d) of the Clean Water Act requires that water bodies violating state water quality standards and failing to protect beneficial uses be identified and placed on a 303(d) list (USEPA 2003d). The delisting of 303(d) listed streams is a priority of the BLM.

Nonpoint source pollution, the largest source of water quality problems, comes from diffuse or scattered sources rather than from an outlet, such as a pipe that constitutes a point source. Sediment is a nonpoint source of pollution that results from activities such as livestock grazing and timber harvest. Erosion and delivery of eroded soil to streams is the primary nonpoint source pollution problem of concern to the BLM (USDI BLM 1980).

The most important factors affecting water quality are sediments, microbes, pesticides, nutrients, metals, and radionuclides (Nash 1993). Sedimentation and nutrient loading affect surface waters, while agricultural runoff and industrial wastes can also leach into groundwater. Surface water quality is also affected by solar loading and shade producing vegetation that affect water temperature, flow, total suspended solids (TSS), total dissolved solids (TDS), turbidity, changes in dissolved oxygen, salinity, and acidity.

The susceptibility of aquifers to groundwater contamination relates to geology, depth to groundwater, infiltration rates, and solubility of contaminants. Deep aquifers are often too deep to be affected by surface alteration or shallow waste disposal. However, shallow aquifers may be directly affected by surface alternation and by waste and wastewater disposal. Shallow, unconfined aquifers with rapid recharge rates are generally the most vulnerable to contamination because of the rapid infiltration of groundwater from the surface to the water table.

Water quality data for the surface and groundwater resources of the western states are available from the USGS National Water Information System (NWIS) database (USGS 2002b), the USGS National Water Quality Assessment (NAWQA) Program (USGS 2002c), the USEPA's Index of Watershed Indicators (USEPA 1999b), the USEPA's National Water Quality Inventory (USEPA 2000a), the USGS Groundwater Atlas of the United States (USGS 2000), and from state water quality databases. These sources have been used to develop a general assessment of water quality in the hydrologic regions of the western states (including Alaska), where the BLM has substantial land management responsibility. Data from the USEPA's Index of Watershed Indicators characterizes the condition and vulnerability of each of the 2,262 subbasins in the U.S. (Map 3-6). Information on general groundwater quality (based on concentration of TDS) was compiled from the USEPA's National Water Quality Inventory (USEPA 2000a; Map 3-7).

### Alaska Hydrologic Region

Surface and groundwater resources in Alaska are of relatively good quality. The lack of industrial and agricultural development reduces the risk of contamination of water resources. Human activities, such as mining, oil drilling, and waste disposal in small villages contribute to localized surface and groundwater pollution. Oil drilling adds petrochemicals to both surface water and groundwater, and waste disposal adds nitrates and colliform bacteria. Public lands have localized surface water and groundwater contamination from oil drilling.

BLM_0000304

AFFECTED ENVIRONMENT

### Pacific Northwest Hydrologic Region

Surface water quality has been degraded in the agricultural areas of eastern Washington and Oregon and in southern Idaho by contamination resulting from agricultural and grazing practices. Elevated levels of nitrates, phosphates, and other nutrients are found in these waters. In Montana, agricultural practices in the Bitterroot Valley have added nutrients to surface water. Fish farming has also contributed to elevated nutrient levels in these streams and rivers of Washington. Irrigation return waters in the Snake River Basin are contributing nutrients and pesticides to surface waters (Clark et al. 1998). Herbicide use results in elevated levels of these chemicals in surface waters during the growing season; however, these levels typically decline after the growing season.

Groundwater is generally of good quality for most uses across the Pacific Northwest. Rivers and streams with lower water quality are primarily the result of thermal modifications, pathogens, habitat alteration, and concentrated agricultural activities in areas such as the Willamette Valley and the Columbia Plateau (Wentz et al. 1998; Williamson et al. 1998; USEPA 2000a). Elevated levels of nitrates and pesticides have been detected in the groundwater in the Snake River Basin and the Columbia Plateau.

### California Hydrologic Region

Surface water resources in California show elevated concentrations of TDS from high salinity, particularly in the southern portion of the region. Groundwater and surface water diversions are used for agricultural irrigation in California. Because of the arid nature of the climate, much of this irrigation water evaporates, leading to irrigation return waters that flow back into streams with elevated levels of salt, nutrients, and pesticides. In the agricultural areas of the Central Valley of California (San Joaquin and Sacramento River basins), nutrient loadings to streams and accumulation of pesticides in aquatic organisms and streambed sediments are a problem (Dubrovsky et al. 1998; Domagalski et al. 2000). Nitrate concentrations in streams generally meet USEPA drinking water standards, but at levels that can pose a problem for aquatic life.

Groundwater in southern California has naturally high concentrations of TDS from the presence of evaporite beds in the sedimentary rocks that underlie the desert areas. In agricultural areas, extensive fertilizer use, combined with heavy irrigation to overcome the high evaporation rates, have resulted in elevated concentrations of nitrates in shallow groundwater reservoirs. Pesticides are present in shallow groundwater reservoirs, but at concentrations generally below USEPA drinking water standards. In agricultural areas, groundwater is used for irrigation, leading to substantial declines in shallow groundwater tables and contamination of groundwater resources by agricultural practices. In the desert areas administered by the BLM, groundwater is generally not affected by pesticides. The low recharge rate for groundwater in these areas means that any application of herbicides is unlikely to enter and affect groundwater resources.

### Upper Colorado Hydrologic Region

In this hydrologic region, surface waters generally flow out of the southern Rocky Mountains and work their way to major rivers. Water quality in the southern Rocky Mountains is generally good, except in historic mining areas. As the surface waters pass through the Colorado Plateau country, quality declines due to agricultural practices, evaporation, a change in the nature of the bedrock, and urban wastewater disposal practices (Spahr et al. 2000). Concentrations of nutrients and pesticides increase as the waters pass through this area. Groundwater quality in this region appears to be influenced mainly by the nature of the bedrock. In areas of sedimentary rock, concentrations of TDS, along with radon, uranium, and metals, can be high. Mesozoic rocks in this region may host uranium, selenium, evaporite, and copper deposits. In areas of the Colorado Plateau administered by the BLM, grazing and mining are the main activities, often leading to local groundwater contamination from metals, especially the uranium-rich areas of the Colorado Plateau.

### Lower Colorado Hydrologic Region

High surface water temperatures in this hydrologic region affect water quality. Total dissolved solids concentrations can be elevated, especially along major rivers with extensive agriculture in their river valleys, such as the Salt and Gila rivers of Arizona. Agricultural land use practices and mining have been the major contributors to surface water degradation in this region. Public lands in this region are used mainly for grazing and mining, resulting in localized impacts to surface waters. These impacts include increases in turbidity, sedimentation, salinity, and possible chemical contamination. High erosion rates can be expected wherever there is a large percentage of exposed soil, a very common result of grazing by domestic animals in this region (Bogan et al. 2003).

BLM_0000305

Groundwater quality in this region is dependent on the rocks that host the groundwater reservoir. Shallow groundwater reservoirs are mainly in alluvium or Late Tertiary sedimentary beds dominated by lakebeds and evaporites, causing saline groundwater with elevated concentrations of TDS. In mining districts, concentrations of metals are elevated in the groundwater, and in areas of extensive grazing, shallow alluvial groundwater may have elevated concentrations of nitrates and bacteria. Deep groundwater reservoirs are usually contained in carbonate rocks, leading to groundwater of good quality and low concentrations of TDS.

### Rio Grande Hydrologic Region

Elevated levels of TDS associated with agriculture in the Rio Grande River valley can pose a problem for surface water quality. Agricultural practices along the Rio Grande River have also contributed nutrients and pesticides to surface waters (Levings et al. 1998). The upper reaches of the Rio Grande River in Colorado and the tributaries to the Rio Grande River in southern Colorado have shown elevated metal concentrations, primarily due to the Creede, Colorado, mining district.

Most of the groundwater resources utilized in the Rio Grande River basin are used for irrigation and livestock watering, although drinking water is also an important use. Nitrate concentrations may exceed USEPA standards, particularly in agricultural areas such as the San Luis and Rincon valleys. Pesticides have been detected in the groundwater in both agricultural and urban areas, but generally do not exceed USEPA standards. Volatile organic compounds (VOCs) may be present in shallow groundwater in urban areas such as Albuquerque and Santa Fe (Levings et al. 1998).

### Missouri Hydrologic Region

In the high Rocky Mountains of this hydrologic region, surface water has low concentrations of dissolved solids and meets all aquatic and drinking water standards, except in areas of historic mining. As surface water leaves the mountains and enters the plains and valleys surrounding the mountainous area, the water quality changes. In Colorado, agricultural land use practices and urban wastewater disposal degrade the water quality by adding nutrients and pesticides (Dennehy et al. 1998). In Wyoming, dewatering from mining and petroleum extraction has resulted in localized increases in concentrations of dissolved solids and metals in surface waters. Grazing activities in the Great Plains affect surface water quality by contributing sediments

and nutrients. Bacterial contamination of surface water by domestic livestock is considered a significant non-point source of water pollution (Bohn and Buckhouse 1985, George 1996). Areas of extensive agriculture often have elevated nutrients and pesticides in the surface water. Agricultural practices have contributed nutrients and pesticides to surface waters in basins along major rivers in this region.

Groundwater in this region is generally of good quality and low in TDS, except in areas of historic and present-day mining, where there are elevated concentrations of sulfate and metals in the groundwater. In areas of the Rocky Mountains administered by the BLM, mining is the principal source of groundwater contamination. A secondary source of contamination is the geology of the bedrock, where rocks rich in uranium and radon contribute to groundwater. This is particularly evident in Wyoming and in the South Platte River basin of Colorado (Dennehy et al. 1998). Shallow alluvial groundwater in agricultural areas has elevated concentrations of nutrients and pesticides. Shallow groundwater along the Colorado Front Range and in large urban areas of the Rocky Mountains shows local evidence of contamination by wastewater, petroleum by-products, and nutrients and/or pesticides used on lawns and golf courses. In the Great Plains, groundwater has nitrate concentrations that often exceed the USEPA limit of 10 parts per million (ppm) and also has elevated concentrations of pesticides.

### Great Basin Hydrologic Region

Water quality in the rivers and streams of this hydrologic region has been affected by agricultural land use along the major rivers, urban waste disposal practices, the chemical composition of rocks in the river basins, and past mining activity. Public lands in the Great Basin generally exclude urban and agricultural areas, but include most of the areas of past mining. Agricultural practices have contributed nutrients and pesticides to surface waters in basins along major rivers. Urban areas, such as Reno, Las Vegas, and Salt Lake City, have added nutrients and synthetic organic compounds to surface waters as well. Past mining activity has added metals to surface waters in localized areas throughout the Great Basin. The chemical makeup of near-surface rocks has contributed arsenic, uranium, and radon to surface waters (Bevans et al. 1998).

Groundwater quality in the Great Basin is determined mainly by the chemistry of the rocks that host the groundwater reservoir. Groundwater in reservoirs made of carbonate rocks and sandstones has relatively low

BLM_0000306

AFFECTED ENVIRONMENT

concentrations of TDS and is of good quality. Groundwater in the central parts of basins with playa lakes, and in areas with evaporite beds, generally has elevated concentrations of salts and TDS. Groundwater in mining areas often has high localized concentrations of mercury, arsenic, and other metals. In areas of extensive agriculture, shallow alluvial aquifers are often contaminated with nitrates and pesticides.

**Arkansas-White-Red Hydrologic Region**

Surface water quality is typically moderate in this hydrologic region, and poor in areas with extensive agricultural or livestock production. The upper reaches of the Arkansas River, where most public lands are located, rely primarily on spring snowmelt for recharge and are generally of better water quality than other portions of the region.

Groundwater quality is relatively good in this region. The TDS concentration of water in the aquifers in eastern Colorado and eastern New Mexico is generally less than 500 milligrams per liter (mg/L), but may exceed 1,000 mg/L in small areas of Colorado. Concentrations less than 250 mg/L are found in northeastern Colorado and are the result of relatively high recharge rates in areas of sandy soil that contains few soluble minerals (Robson and Banta 1995).

# Wetland and Riparian Areas

Wetlands are generally defined as areas inundated or saturated by surface water or groundwater at a frequency and duration sufficient to support vegetation that is typically adapted for life in saturated soil. Wetlands include bogs, marshes, shallows, muskegs, wet meadows, estuaries, and riparian areas. According to the 1987 Corps of Engineers Wetland Delineation Manual, an area must exhibit evidence of at least one positive wetland indicator from each of the following parameters to be defined as a wetland (Environmental Laboratory 1987):

- **Soils** - The substrate is predominately undrained hydric soil, or the soils posses characteristics that are associated with reducing soil conditions;
- **Hydrology** - The area is inundated either permanently or periodically at a mean water depth of less than 6.6 feet or the soil is saturated to the surface at some time during the growing season of the prevalent vegetation; and

- **Vegetation** - The land supports predominately hydrophytes. Hydrophytes are macrophytic plants with the ability to grow in water or on a substrate that is at least periodically deficient in oxygen as a result of excessive water content and depleted soil oxygen levels.

The BLM administers approximately 12.8 million acres of wetlands. Of these, approximately 12.6 million acres are found in Alaska (USDI BLM 2006d).

Riparian and wetland areas comprise approximately 9% of public lands (USDI BLM 2006c). The benefits of these vital areas, however, far exceed their relatively small acreage. The functions of wetland and riparian areas include water purification, stream shading, flood attenuation, shoreline stabilization, groundwater recharge, and habitat for aquatic, semiaquatic, and terrestrial plants and animals (USEPA 2001b).

The BLM has surveyed 89% of the wetland acreage in the lower 48 states. Only a small fraction of the wetlands in Alaska have been surveyed due to their pristine nature and lack of immediate development pressure. Sixty-seven percent of wetlands in the lower 48 states evaluated were judged to be functioning properly (USDI BLM 2006d). Ninety-eight percent of Alaska wetlands are assumed to be functioning properly. The remaining Alaska wetlands have been placed in the "Unknown" category because some questions have been raised about development impacts.

The BLM defines properly functioning wetlands as those that: 1) support adequate vegetation, landform, or debris to dissipate energies associated with wind action, wave action, and overland flow from adjacent sites, thereby reducing erosion and improving water quality; 2) filter sediment and aid floodplain development; 3) improve floodwater retention and groundwater recharge; 4) develop root masses that stabilize islands and shoreline features against cutting action; 5) restrict water percolation; 6) develop diverse ponding characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterbird breeding, and other uses; and 7) support greater biodiversity (Prichard et al. 2003). This assessment does not take into consideration the habitat value of the wetland to fish and wildlife.

About 20% of wetlands are considered to be functional, but at risk, and 2% are non-functional, in terms of their

BLM_0000307

ability to dissipate energy associated with high-flow events (USDI BLM 2006d). Public lands with poorly functioning wetlands tend to be located in the southwestern U.S.

Riparian areas, according to the BLM, are green zones along flowing-water features such as rivers, streams, and creeks (Gebhardt et al. 1990). These areas exclude streams where water flows for only brief periods during storm runoff events (ephemeral streams). The BLM administers approximately 143,000 miles of riparian habitat in the treatment area. Of this, approximately 107,565 miles are found in Alaska (USDI BLM 2006d).

It is estimated by the BLM that 46% of surveyed riparian areas in the lower 48 states and 100% of riparian areas in Alaska are properly functioning in terms of having adequate vegetation, landform, or large woody debris present to dissipate stream energy associated with high waterflows (USDI BLM 2006c). Eight percent of riparian areas in the lower 48 states are considered non-functional, and 38% are functioning but at risk (USDI BLM 2006c). Poorest functioning riparian areas are found in the southwest and Montana, while most riparian areas in Alaska, Colorado, and Utah function properly.

# Vegetation

The composition and distribution of plant communities in the western U.S. have been influenced by many factors, including climate, drought, insects, diseases, wind, domestic livestock grazing, cultivation, browsing by wildlife, and fire (Gruell 1983). Other activities that have a direct and/or indirect effect on plant communities include logging, minerals extraction and reclamation activities, recreational activities, and ROW development including road construction and maintenance. In addition, competition with non-native invasive plant species has resulted in the loss of native plant communities in portions of the western states.

Before European settlement, naturally occurring fire was an important influence on the landscape of the West, and plant communities are adapted to the occasional intense fires that burned over the landscape (Gruell 1983). The exclusion of fire following European settlement has caused significant changes in plant species composition in the western U.S., especially in areas adapted to fire (Swetnam 1990). Where fire-adapted communities previously limited the expansion of juniper, sagebrush, and other less fire-tolerant species, exclusion of fire has resulted in

invasion of these species into the surrounding ecosystems (Gruell 1983). The circumstance has also contributed to accumulation of hazardous fuels.

Vegetation within the treatment area has been classified into 14 subclasses that are consistent with the National Vegetation Classification Standard (Federal Geographic Data Committee 1997; Table 3-4). The subclasses differentiate vegetation on the basis of growth form (tree, shrub, or herb), life history strategy (evergreen or deciduous, annual or perennial), and percent of canopy closure (forest or woodland) or hydrologic influences. The following sections discuss important vegetation subclasses for each ecoregion.

## Tundra Ecoregion

Located at high latitudes in northern and western Alaska, plant communities in the Tundra Ecoregion are adapted to withstand an extremely short growing season, continuous permafrost, and limited rooting depths. Slow-growing dwarf shrubs, grasses and sedges, and cryptogams (lichens) are the dominant vegetation types in this region. Approximately 39 million acres of public lands occur within this ecoregion.

Perennial graminoid communities are found on over 13 million acres (Map 3-8). Along Alaska's coastal regions to the north, west, and southwest, cottongrass-tussock communities are the most widespread plant systems. Cottongrass occurs as the dominant species in extensive patches in flat, poorly drained areas, and is associated with other sedges, dwarf shrubs, lichens, mosses, dwarf birch, Labrador tea, and cinquefoil. Similar plant communities are also found at low elevations in the mountainous North Slope and Alaska Peninsula regions.

Deciduous shrublands (both dwarf and non-dwarf) are found in many of the same areas as perennial graminoid communities, as well as higher elevation alpine areas. Deciduous dwarf-shrubland occurs on over 10 million acres and is characterized by shrubs that are less than 2 feet tall, a reduced stature that is attributable to extremely harsh growing conditions. Characteristic plant species include dwarf birch, willow, blueberry, and Labrador tea and other shrubs. A variety of forbs and graminoids are found in the understory, and lichen species may be an important component. At high elevations in mountainous areas, dwarf Arctic birch, crowberry, and dwarf blueberry are also common.

BLM_0000308

AFFECTED ENVIRONMENT

Deciduous shrubland species occur on over 6 million acres and are generally the same as those found in deciduous dwarf-shrublands, but are taller because of slightly better growing conditions. Willow, dwarf birch, alder, huckleberry, Labrador tea, and heath species are common. These communities may be successional to forest or woodland, or may be the climax vegetation where frozen and poorly drained permafrost soils limit tree growth. Stunted black spruce and other tree species are occasionally scattered throughout shrub communities.

In areas underlain by permafrost, nearly 3 million acres of sedge-dominated wet meadows, bogs, and wetlands are scattered among the shrublands. Along major rivers and streams, riparian communities composed of alder, willows, and stunted stands of spruce and birch can be found. In shrublands, pure stands of stunted alder shrubs are found in wet drainages, at the head of streams, along river terraces, or on slopes. Some evergreen spruce woodlands, spruce hardwood forests composed of white spruce, paper birch, and alder, and black spruce forests also occur, in low amounts, in the Tundra Ecoregion.

## Subarctic Ecoregion

Located within the central continental region of Alaska, the Subarctic Ecoregion primarily consists of evergreen forests and open lichen woodlands collectively known as the boreal forest, or taiga. The climate in this region is characterized by low precipitation (10 to 20 inches average annual precipitation), extreme ranges of temperature, low humidity, and high evaporation rates. However, as it is a diverse area, large portions of this region are semiarid as well. Approximately 43 million acres of public lands occur in this ecoregion.

Over 20 million acres of evergreen woodlands and mixed evergreen-deciduous woodlands can be found throughout this region. Within the lowland areas of interior central Alaska, evergreen woodlands are often composed of pure stands of black spruce, with an understory of willow, dwarf birch, crowberry, blueberry, lichens, and mosses. Within the mountainous regions of central and south-central Alaska, woodlands are also common, typically supporting a number of boreal tree species: white spruce, black spruce, tamarack, balsam poplar, paper birch, and aspen.

Deciduous shrubland occurs on 10 million acres, predominantly at higher elevations in the mountainous areas of this region. These shrublands are composed of a wide variety of low growing shrubs, herbs, grasses, and sedges, rooted in mosses and lichens. Mountain avens, low growing willows, dwarf birch, Labrador tea, blueberry, green alder, moss campion, and blackish oxytrope are all common species. Along riparian areas, deciduous tree species are prevalent. Paper birch, aspen, and balsam poplar are all found in these deciduous forest riparian communities. Extensive sphagnum bogs occur in old river terraces, ponds, and sloughs. These scattered wetlands are composed of sphagnum and other mosses, sedges, bog rosemary, Labrador tea, rose, birches, willow, bog cranberry, soapberry, and blueberry. About 2 million acres of forested communities also occur in the Subarctic Ecoregion. Mixed evergreen-deciduous forests, supporting many of the same species as woodlands, can be found in mountainous areas between elevations of about 1,000 and 3,000 feet (timberline). Spruce-hardwood forests, consisting of white spruce, birch, aspen, and poplar, with an undergrowth of mosses and berries, are common.

## Temperate Desert Ecoregion

The Temperate Desert Ecoregion is composed of arid lands in the rain shadow of the Pacific mountain ranges, including the Great Basin, Columbia Plateau, and Wyoming Basin. Plant communities, which are adapted to pronounced summer drought and cold winters, are composed primarily of xerophytic semidesert shrubs. Approximately 105 million acres of public lands occur in this ecoregion.

Evergreen shrublands in the form of sagebrush communities occur on nearly 74 million acres (Map 3-9). These shrublands typically consist of fairly dense to open vegetation, with shrubs that are 2 to 6 feet high and an understory of perennial and annual grasses and forbs (Cronquist et al. 1972). On the drier sites, shrub density is generally high, while on more mesic sites individuals are more robust and widely spaced, with greater coverage of herbaceous species.

In the plains and tablelands of the Columbia River and Snake River plateaus and the Wyoming Basin, representative shrubs in sagebrush communities include big sagebrush, black sagebrush, low sagebrush, Mormon tea, and bitterbrush (Cronquist et al. 1972). Important perennial grasses include bluebunch and western wheatgrass, Sandberg bluegrass, Idaho fescue, and basin wildrye. Medusahead and downy brome are introduced annual grasses that have become abundant in these communities where the native herbaceous

BLM_0000309

TABLE 3-4
Vegetation Classification System

| Order | Class | Subclass |
|-------|-------|----------|
| Tree Dominated | Closed Tree Canopy | 1. Evergreen Forest |
| | | 2. Deciduous Forest |
| | | 3. Mixed Evergreen-Deciduous Forest |
| | Open Tree Canopy | 4. Evergreen Woodland |
| | | 5. Deciduous Woodland |
| | | 6. Mixed Evergreen-Deciduous Woodland |
| Shrub Dominated | Shrubland | 7. Evergreen Shrubland |
| | | 8. Deciduous Shrubland |
| | Dwarf-Shrubland | 9. Evergreen Dwarf-Shrubland |
| | | 10. Deciduous Dwarf-Shrubland |
| Herb Dominated | Herbaceous Vegetation | 11. Perennial Graminoid |
| | | 12. Annual Graminoid or Forb |
| | | 13. Perennial Forb |
| | | 14. Riparian/Wetland |

Source: Developed by the BLM based on the Federal Geographic Data Committee Vegetation Subcommittee's National Vegetation Classification Standard (Federal Geographic Data Committee 1997).

understory has been depleted, particularly in lower precipitation zones. They have an adaptive advantage over seedlings of most existing grass species in their ability to take advantage of limited moisture early, short lifespans, and prolific seed production. Where repeated fire or grazing have removed the native vegetation, these invasives, as well as invasive forbs, will dominate the site, taking advantage of what moisture exists and outcompeting the native vegetation. They then dry out and become fuel, burning very intensely and carrying fire into previously unburned areas, thus repeating and expanding the cycle.

In the Great Basin and northern Colorado Plateau, common shrubs in salt desert shrub communities are shadscale, fourwing saltbush, spiny hopsage, and greasewood. These communities occur from valley bottoms to mid-elevations in areas with shallow water tables and accumulated salts. Understory vegetation is generally sparse, with a large amount of bare soil or desert pavement exposed (MacMahon 1988). Species such as saltgrass, Indian ricegrass, squirreltail, fescues, and James' galleta may be found in this understory layer. Fires are generally absent due to the sparse fuels, and efforts to reestablish native plant communities are complicated by the dry conditions.

In the mountainous regions, sagebrush communities can be found scattered throughout the forested areas, and sagebrush communities dominate the foothills adjacent to the forested habitat. These higher elevation sagebrush communities are dominated by big sagebrush and other shrubs including antelope bitterbrush, mountain mahogany, and snowberry. The herbaceous component of these plant communities often contains Idaho fescue, bluebunch wheatgrass, various needlegrass and bluegrass species, and a variety of forbs.

Pinyon-juniper (evergreen) woodlands occur on nearly 14 million acres. These communities can be found in small areas in central Oregon, and at elevation zones above sagebrush communities throughout the rest of the ecoregion. Young pinyon-juniper trees are easily killed by fire, which historically limited their expansion into sagebrush communities (West and Van Pelt 1987). Stands of pinyon-juniper have established in many locations, and form dense canopies that cause the loss of understory plants. These closed-canopy pinyon-juniper stands generally do not have enough understory shrubs to carry a surface fire, and do not burn until conditions are met to carry a crown fire.

Deciduous shrublands typically occur at similar elevations as sagebrush, on arid, saline soils on nearly 3 million acres. Dropping leaves during times of drought enable plants such as greasewood, hopsage, catclaw acacia, and European smoketree to survive the harsh conditions. Many of these species are fairly tolerant of alkaline and saline conditions, and occur as lesser members of sagebrush and pinyon-juniper communities.

Other vegetation classes include the perennial bunchgrass grasslands of Oregon, Washington, and Idaho (6 million acres), and the evergreen forests that

BLM_0000310

AFFECTED ENVIRONMENT

occur at elevations above woodlands (over 1 million acres). Dominant tree species in these forests include ponderosa pine and Douglas-fir. In a few areas, mountains are high enough to support subalpine fir and Engelmann spruce.

## Subtropical Desert Ecoregion

The Subtropical Desert Ecoregion occupies southeast California, southern Nevada, Arizona, New Mexico, and western Texas, and includes the Chihuahuan, Sonoran, and Mojave deserts. Vegetation is adapted to dry conditions, and includes numerous xerophytic plants, such as small, hard-leaved or spiny shrubs, cacti, or hard grasses, which are widely spaced and provide little ground cover. Large portions of these hot deserts have no visible plants and are made of shifting sand dunes or nearly sterile salt flats. Approximately 29 million acres of public lands occur in this ecoregion.

Although major fires were not historically common in this region due to the wide spacing between plants and sparse fuels, the invasion of fire-prone species (e.g., red brome, downy brome, and buffelgrass) has shortened the fire interval in some areas, resulting in significant changes in plant communities.

Evergreen shrub communities are prevalent in desert habitats on over 23 million acres of public lands. On the plains of the Sonoran Desert, shrublands of creosote bush and saltbush species cover extensive areas in nearly pure stands. Individual shrubs are typically widely spaced, with large amounts of bare ground in between.

Large plants, such as the treelike saguaro cactus, prickly pear cactus, ocotillo, creosote bush, and smoke tree often form communities with a near-woodland appearance. They are commonly associated with blue paloverde, bursage, mesquite, desert ironwood, crown of thorns, jojoba, acacia, and many species of cactus, yucca, and agave.

In the Mojave Desert, Joshua tree shrublands are widespread. Other common shrubs in this region include creosotebush, bursage, thornbush, shadscale, all scale, spiny hopsage, and greasewood. The Mojave Desert is especially rich in annual plants, which are abundant during the rainy season in winter and spring (Brown 1982).

Shrublands occurring adjacent to shallow playa lakes and desert washes, and in other moist habitats, have a unique species composition. Greasewood and catclaw acacia, which occur as scattered individuals in many plant communities throughout the ecoregion, often form pure stands in desert washes. Mesquite is another shrub species that may be found growing along washes and watercourses. Shrubs associated with alkaline soils near playas include mesquites, whitethorn acacia, blue paloverde, ironwood, desert willow, and canyon ragweed.

Evergreen shrublands in the Chihuahuan Desert include such species as mesquite, American tarwort, acacia, and creosotebush. Shrubs have recently increased in density in the Chihuahuan Desert, which is thought to have historically existed as open grassland or grassland scattered with shrubs (Buffington and Herbel 1965). Evergreen shrublands grade into grasslands, with the relative abundance of each plant community determined by such factors as fire, grazing, climate change, and seed dissemination (Holechek et al. 1995).

Perennial grasslands occur on nearly 4 million acres in the high plains of southeast Arizona (in the Chihuahuan Desert), where they are best developed on deep, well-drained soils on level sites (Brown 1982). Black grama and tobosagrass grasses are characteristic, along with sideoats grama and hairy grama, bush muhly, vine and curly mesquite, pappusgrass, tanglehead, and threeawn. Shrubs and succulents characteristic of this grassland include yucca, bear grass, agaves, sumac, ocotillo, acacias, mimosas, and cacti.

Deciduous and evergreen woodlands occur in select areas on over 1 million acres, predominantly on higher elevation slopes (pinyon-juniper woodlands) and in eastern New Mexico (oak and mesquite woodlands).

## Temperate Steppe Ecoregion

The Temperate Steppe Ecoregion, which is typified by a semiarid continental climate, includes the Rocky Mountains and the Great Plains. Vegetation communities adapted to this climate include steppe, or shortgrass prairie, and semidesert, as well as the evergreen and deciduous forests and woodlands of the Rocky Mountains. Approximately 19 million acres of public lands occur in this ecoregion.

Perennial grassland communities are widespread in this ecoregion (over 4 million acres), which includes the prairie grasslands of the Great Plains, the Palouse grasslands of Oregon, Washington, and Idaho, and the mountain grasslands of the Rocky Mountains.

BLM_0000311

Prairie grasslands, which occur on the broad, flat belt of land that slopes eastward from the foothills of the Rocky Mountains, vary in height in response to precipitation. Dominant grasses in the shortgrass communities are buffalograss and blue grama, which occur with other herbs, as well as some woody species, including mesquite, sagebrush, and yucca.

Mixed grass communities include both warm-season (e.g., blue grama) and cool season species, such as needlegrasses, wheatgrasses, and fescues grass species. Shrubs, including juniper, sagebrush, rabbitbrush, and forbs are also important components of mixed grass communities (Brown 1982).

The Palouse grasslands, or northwest bunchgrass prairies, are dominated by bluebunch wheatgrass, Idaho fescue, Sandberg bluegrass, and rough fescue. Many of the introduced species are Mediterranean annuals that are well adapted to grazing and the predominantly winter precipitation regime.

Perennial mountain grasslands are scattered throughout areas at elevations from 3,000 to over 9,000 feet in the Rocky Mountains, particularly in western Montana. These grasslands are part of the vegetation mosaic created by the highly complex environment of the Rocky Mountains. Important grasses in these communities include bromes, bluegrasses, oatgrasses, sedges, wheatgrasses, fescues, needlegrasses, hairgrasses, reedgrasses, bentgrasses, and junegrass. Forb components vary with site, latitude, and management. Shrubs include several species of sagebrush, rabbitbrush, snakeweed, shrubby cinquefoil, rose, horsebrush, and prickly pear cactus (Mueggler and Stewart 1980).

Evergreen forests occur on over 2 million acres in the mountain regions, with species composition that varies by altitude. Subalpine forests are composed of Engelmann spruce, subalpine fir, and mountain hemlock. Below this zone, Douglas-fir, western white pine, grand fir, western larch, lodgepole pine, and ponderosa pine are common. Lodgepole pine or ponderosa pine forests may occur at the lowest elevations, and often grade into grasslands or evergreen shrubland. Fire is an important component of all of these forests, with the highest natural frequency on the lowest elevation sites. Lodgepole pine is specifically adapted to regenerate after fire.

Deciduous forests may occur along streams and rivers in the eastern portion of this ecoregion. Eastern species such as ash, hackberry, elm, birch, and bur oak may be found. Deciduous forests composed of quaking aspen are prevalent throughout the Rocky Mountains up into Alaska (DeByle and Winokur 1985). Aspen may form extensive pure stands or exist as a minor component of other forest types.

The most common type of shrubland in this ecoregion is sagebrush steppe. Sagebrush-dominated communities occur on the plains and lower mountain slopes on nearly 8 million acres. Chaparral shrublands and pinyon-juniper woodlands (2 million acres) are also found in some of the lower elevation areas on warm, dry sites.

## Subtropical Steppe Ecoregion

The Subtropical Steppe Ecoregion, located in northern Arizona, New Mexico, and Texas, is composed of plateaus and high plains. Because of its altitude, the climate is semiarid, rather than arid. This region is composed primarily of grassland vegetation, with locally found shrubs and woodlands. Pinyon-juniper woodlands are common on the Colorado Plateau. To the east, in New Mexico and Texas, grasslands grade into savanna woodlands or semideserts composed of xerophytic shrubs and trees. Approximately 13 million acres of public lands occur in this ecoregion.

The perennial graminoid communities in this region are composed of xerophytic grasses, with shrubs and low trees growing singly or in clumps, and occupy over 4 million acres. Common grass species include blue and hairy grama, buffalograss, threeawn species, sideoats grama, bluestem, and bristly wolfstail. Shrubs and trees, such as mesquite, oaks, and junipers, often grow in open stands among the grasses. The perennial grasslands grade into evergreen woodlands, with the respective coverage of each vegetation class dependent on the amount and type of disturbance to which a particular area is subjected.

Evergreen woodlands of drought-tolerant juniper and pinyon pines consist of a relatively open canopy on dry sites at mid-elevations on nearly 4 million acres. Plant composition in pinyon-juniper woodlands exhibits wide geographic variation. In the Colorado Plateau and the central and southern Rockies, doubleleaf pinyon replaces singleleaf pinyon and is associated with Rocky Mountain juniper, Utah juniper, and oneseed juniper (Cronquist et al. 1972). In the dry mountains of southern New Mexico and Arizona, alligator juniper, Emory oak, gray oak, and Mexican pinyon dominate (Brown 1982). The understory layer of shrubs, grasses, and forbs in these communities is composed of representatives from

BLM_0000312

adjacent sites above and below the woodland zone. Important understory species include big sagebrush, western and bluebunch wheatgrass, blue grama, cliffrose, bitterbrush, Indian ricegrass, mountain mahogany, rubber rabbitbrush, and Mormon tea (Garrison et al. 1977).

It is estimated that small surface fires historically occurred every 10 to 30 years (Leopold 1924), and large stand-replacing fires occurred every 100 to 300 years (Miller and Rose 1999). Fires easily kill young trees and frequent fires maintain the sagebrush-grassland communities (West and Van Pelt 1987). Drought and competition from grasses probably helped slow the invasion of juniper into adjacent shrublands, particularly at lower elevations. Many pinyon-juniper sites may have historically cycled between grass-shrub and pinyon-juniper communities, with fire as the chief driving force (West and Van Pelt 1987).

At higher elevations (up to 7,000 feet), chaparral is a common type of evergreen shrubland on over 4 million acres, with pinyon-juniper and oak-juniper woodlands also occurring. Plant communities consist of dense to moderately open stands of evergreen and sclerophyllous shrubs of relatively uniform height. Most chaparral shrubs are deep-rooted, sprout readily from the root crown, and regenerate quickly after burning (Brown 1982). Shrub live oak is common, and associated with mountain mahogany, yellowleaf silktassel, sumac, hollyleaf buckthorn, pointleaf and Pringle manzanita, desert ceonothus, and other oak species. Grass species may include sideoats grama and hairy grama, cane bluestem, plains lovegrass, threeawn, and bristly wolfstail. Forbs are not particularly abundant, except during a brief period after burns (Brown 1982).

Evergreen forests occur at the highest elevations in this region. Over 7,000 feet, forests of ponderosa pine, Douglas-fir, lodgepole pine, limber pine, and aspen may be found. Engelmann spruce, corkbark fir, limber pine, and bristlecone pine occur in subalpine forests.

## Mediterranean Ecoregion

The Mediterranean Ecoregion occupies most of California (excluding deserts in the southeastern portion of the state) and a portion of southern Oregon. This region supports a distinctive assemblage of hard-leaved evergreen trees and shrubs, commonly known as chaparral, which are adapted to withstand severe summer droughts and frequent fires. Coniferous forests and oak woodlands are also characteristic of the region.

Approximately 6 million acres of public lands occur in this ecoregion.

Evergreen shrubland occurs on over 2 million acres. Along coastal areas a type of chaparral known as maritime chaparral is common. Inland evergreen shrublands are found in the low hills of mountainous regions, often forming a mosaic pattern with deciduous (oak) woodlands, grasslands, or evergreen forests. Important chaparral species include manzanita, wedgeleaf ceanothus, hollyleaf buckthorn, poison oak, chamise, Christmasberry, mountain mahogany, California scrub oak, blue oak, and interior live oak (Holechek et al. 1995). Chaparral shrubs are adapted to recurrent fire, and the ecosystem depends on periodic fires for its persistence. Herbaceous vegetation is generally lacking in chaparral communities, except after fire.

Nearly 1 million acres of deciduous woodlands and evergreen woodlands also occur in foothills throughout California, typically on sites that are more mesic than those occupied by chaparral. Deciduous oak woodlands include stands of Oregon white oak, California black oak, blue oak, valley oak, and various other oaks. On cooler, moister sites in the Coast Ranges, oak woodlands merge with mixed hardwood forests in which tanoak, California laurel, and Pacific madrone are common. Evergreen live oaks are common associates, and conifer species such as Coulter pine, digger pine, Douglas-fir, and grand fir may also be present. Understory vegetation varies by location and may include poison oak, snowberry, serviceberry, blackberry, wild oats, bromes, bluegrass, ryegrass, and needlegrass.

Evergreen woodland communities composed of live oaks occur in moist, frost-free areas such as the coastal hills from San Francisco into southern California, where adequate moisture and mild temperatures allow them to carry out photosynthesis through the winter. Evergreen oak woodlands are composed of species such as canyon live oak, interior live oak, coast live oak, and Engelmann oak. Oak woodlands may exist as open, park-like savannas, occupying a transition zone between grasslands and denser woodlands. Shrubs are generally absent because they cannot compete with trees for moisture on drier sites. Evergreen woodlands also include some endemic tree species such as Monterey cypress, Torrey pine, Monterey pine, and Bishop pine.

In the mountains of California and southern Oregon, evergreen forests are the dominant vegetation type, occupying nearly 2 million acres of public lands. These

BLM_0000313

forests are a diverse assemblage of many conifer species, and are adapted to a long, warm growing season, relatively mild winters, and periods of summer drought. Tree species include ponderosa pine, Douglas-fir, white fir, sugar pine, incense cedar, Jeffrey pine, California red fir, and giant sequoia (Szaro 1995). At elevations between 6,500 and 9,500 feet, subalpine forests composed of mountain hemlock, California red fir, lodgepole pine, western white pine, and whitebark pine occur.

Evergreen forests also occur along coastal northwestern California as redwood-dominated communities. Other common tree species forests include Douglas-fir, western hemlock, and western red cedar. The understories are dominated by Pacific rhododendron, western azalea, salal, California huckleberry, western swordfern, and redwood sorrel. Pine-cypress forests also occur along the coast, while mixed forests of tanoak, coast live oak, madrone, and Douglas-fir occur further inland.

For the most part, annual and perennial graminoid communities are located in the valleys and plains of the Mediterranean Ecoregion. While it is generally believed that the Central Valley, the largest grassland expanse in California, was historically dominated by perennial grassland communities, other plant communities (e.g., oak woodlands, chaparral, annual grasslands, and desert scrub) may have also been present (Blumler 1992, Hamilton 1997). Large portions of the native vegetation have been replaced by annual grasses, however, as a result of introduced species, fires, and overgrazing by livestock of early Spanish settlers (Sims 1988). Annual grasses include introduced species such as wild oat, slender oat, soft chess, ripgut brome, red brome, and wild barley. Common forbs include redstem filaree, broadstem filaree, turkey mullein, true clovers, and burclover. Perennial grasses, which are found in moist, lightly grazed or relict areas, include Idaho fescue and purple needlegrass (Garrison et al. 1977). With the development of irrigation, the California grassland ecosystem has become intensively utilized for agriculture.

## Marine Ecoregion

The Marine Ecoregion Division occupies the Cascade and Coast Ranges of western Washington and Oregon, and the Coast Mountains of southeastern Alaska, along the Pacific Coast. The mild, rainy climate produces conditions that are hospitable for dense forest communities, which are characteristic of this region.

Approximately 4 million acres of public lands occur in this ecoregion.

In the Cascade and Coast Ranges, complex, multi-storied evergreen forests occupy over 1 million acres, with species composition varying by altitude and climate. At lower elevations, Douglas-fir, western red cedar, western hemlock, grand fir, silver fir, Sitka spruce, and Alaska cedar are the dominant tree species. Subalpine forests composed of mountain hemlock, subalpine fir, whitebark pine, and Alaska cedar extend to timberline, which varies from 7,700 to 10,000 feet. In the drier climates of the eastern Cascade Range, forests dominated by ponderosa pine are common. Evergreen forests are often associated with understory plants such as vine maple, huckleberry, elderberry, salal, Oregon grape, twinflower, and western swordfern (Franklin 1988).

The area between the Cascade and Coast ranges is also characterized by dense evergreen forests. Much of the land in this intermountain region once existed as Douglas-fir, western redcedar, and western hemlock forests, but has since been developed for agricultural and urban uses.

Evergreen forests are also the predominant vegetation type found in the Coast Mountains of southeastern Alaska. Forests in this region are restricted to low elevation, coastal rainforests dominated by Sitka spruce and western hemlock. Associated species include Alaska cedar and mountain hemlock.

Along the major river channels, deciduous riparian forests composed of broadleaf trees such as black cottonwood, red alder, willow, and birch are common. In poorly drained areas, wetlands characterized by sphagnum moss, sedges, and willows occur.

Vegetation types with minor coverage in the Marine Ecoregion include Oregon white oak woodlands, which occur as scattered stands at low elevations, and prairies (perennial graminoid communities), which now occur only as remnant patches in the Willamette Valley and Puget Sound lowlands. Both of these community types are being lost as a result of succession by evergreen forests and development.

## Noxious Weeds and other Invasive Vegetation

Invasive plants are undesirable plants that infest land or deplete water resources, and may cause physical and

BLM_0000314