## Incomplete and Unavailable Information

According to the Council on Environmental Quality regulations for implementing the procedural provisions of NEPA (40 CFR 1502.22), if the information is essential to a reasoned choice among alternatives and the cost of gathering it is not excessive, it must be included or addressed in the PEIS.

Knowledge is, and always will be, incomplete regarding many aspects of terrestrial and aquatic species, forestland, rangelands, the economy, and society. However, central ecological, economic, and social relationships are well established, and a substantial amount of credible information about ecosystems in the project area is known. The alternatives were evaluated using the best available information.

As noted in Chapter 1, the primary issue of controversy identified through scoping, and which required NEPA review, was the BLM's continuing use of herbicides and proposed increase in herbicide use in vegetation treatment programs needed to implement the *National Fire Plan* and related initiatives. The use of herbicides has been affirmed as a central issue for analysis in all past EISs considered in this document.

To address issues related to the use of herbicides, the BLM prepared human health and ecological risk assessments for 10 herbicides/formulations currently-available to the BLM (bromacil, chlorsulfuron, diuron, sulfometuron methyl, and tebuthiuron), or proposed for future use (diflufenzopyr, diquat, fluridone, imazapic, and Overdrive® [diflufenzopyr in a formulation with dicamba]). The BLM also consulted risk assessments prepared by the Forest Service for nine other herbicides used by the BLM (2,4-D, clopyralid, dicamba, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr). For the remaining six herbicides (2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine), the BLM consulted earlier EISs prepared by the BLM, and the literature developed since 1991, to evaluate risks. These six herbicides would not be used by the BLM under the Preferred Alternative and Alternatives D and E, but could be used if the No Action Alternative was selected.

Risk assessments were developed in cooperation with the USEPA, USFWS, and NMFS, and are considered state-of-the-science. As such, they address many of the risks that would be faced by humans, plants, and animals, including special status species, from the use of

the herbicides, and supercede risk assessments prepared by the BLM for the previous vegetation treatment EISs.

To assess risks to other resources from the use of herbicides, the BLM consulted information in the risk assessments and supporting documentation (see appendixes B, C, and D and supporting Human Health and Ecological Risk Assessment reports); state, federal, and local databases, Geographic Information System (GIS) themes, and contract reports; subject experts within and outside of the BLM; and the current literature.

A programmatic analysis over a 17-state area generally summarizes information that may be available at finer scales (e.g. at the regional and local level), but is too decentralized and dispersed to be presented effectively. For example, although information pertaining to monitoring land use plan management activities over the last 20 or more years may be available at local BLM offices, it would take many years to summarize the conclusions contained in this vast amount of information for this PEIS, and the cost would be exorbitant. The BLM is currently undertaking a National Monitoring Initiative with an objective of bringing together a wide range of monitoring data into a central clearinghouse. This project has only recently become feasible due to the advancements of GIS and internet technology. The National Monitoring Initiative has been funded in the last 2 fiscal years, and is expected to take many years to complete.

The specific locations of all past treatment projects are not available for discussion in this PEIS. To date, the BLM has not developed a central clearinghouse of GIS data identifying the locations of all past projects that have occurred on public lands. These data are available in local field office GIS databases, maps, or project files. Locations of future projects are also unknown, as they will be determined later in time and are not necessarily identified at this time; for this PEIS analysis, these locations have been estimated. Local site-specific land use plans and activity plans will identify the priorities of each field office. The appropriate mix of treatments and their location is addressed at the Resource Management Planning (RMP) level.

This PEIS identifies human health and ecological risks associated with USEPA-registered herbicide active ingredients, as well as inerts and degradates for which information is available and not constrained by confidential business information (CBI) restrictions. Preparing a risk assessment for every conceivable combination of herbicide, tank mix, surfactant,

BLM_0000394

adjuvant, and other possible mixture is not feasible, as the BLM cannot prepare hundreds of risk assessments, and the cost would be exorbitant. To the degree a toxic substance is known to pose a significant human or ecological risk, the BLM has undertaken the necessary analysis to assess its impacts through risk assessments.

One resource area for which information is incomplete or unavailable is social and economic values. Although supply and labor costs related to vegetation treatments are likely to be available at the local or county level, they are not quantifiable over a 17-state area. The social and economic costs of invasive and noxious weeds are only now being understood and quantified by economists and vegetation scientists at local and regional scales. At the national scale, however, quantification of these costs is not possible beyond identifying basic trends, given the variety of economic, social and environmental factors involved in estimating these effects. As identified below, this PEIS assumes that locally available data would be consulted when proposing and assessing impacts under NEPA for site-specific projects at the local level.

While additional information may add precision to estimates or better specify relationships, new or additional information is unlikely to significantly change the understanding of the relationships that form the basis of the effects analysis presented in this chapter.

## Subsequent Analysis before Projects

Before site-specific actions are implemented and an irreversible commitment of resources made, information essential to those fine-scale decisions will be obtained by the local land managers. Localized data and information will be used to supplement or refine regional-level data and identify methods and procedures best suited to local conditions in order to achieve the objectives in this PEIS. Further analysis may be necessary to deal with site-specific conditions and processes. For example, mitigation measures identified in the following sections would be appropriate for protecting resources under the wide range of conditions that must be considered at the programmatic level of analysis. However, by considering more site-specific parameters, such as soil and vegetation type and amount of rainfall, the BLM may be able to use less restrictive mitigation measures and still ensure adequate protection of the resource; the possibility that more restrictive measures would be necessary could also occur. This subsequent analysis will be used to bridge the gap between broad-scale direction and site-specific decisions. This "step-down" analysis is described in Chapter 1 and shown in Figure 1-1.

## Program Goals by Ecoregion

The goals of chemical vegetation treatments, by ecoregion where treatments are planned, are discussed below.

### Temperate Desert Ecoregion

Over 70% of herbicide treatments would occur on BLM land in the Temperate Desert Ecoregion. Most of these treatments would be used to meet vegetation and integrated weed management (IWM) objectives (33% of treatments), reduce hazardous fuels (25%), conduct ES and BAR activities (19%), and improve rangeland health (12%). Improvements of wildlife habitat and watershed health are objectives of lesser importance (6% and 5% of treatments, respectively) in this ecoregion.

### Temperate Steppe Ecoregion

In the Temperate Steppe Ecoregion, most herbicide treatments would be conducted to meet IVM and/or IWM objectives (62% of treatments). Other important objectives include hazardous fuels reduction (25%) and improvement of rangeland health (11%).

### Subtropical Steppe Ecoregion

On BLM lands in the Subtropical Steppe Ecoregion, herbicide treatments would be used to improve habitat (38% of treatments), improve rangeland health (21%), reduce hazardous fuels (17%), and meet IVM and/or IWM objectives (11%).

### Mediterranean Ecoregion

In the Mediterranean Ecoregion, chemical treatments would be conducted primarily to improve forest health (35% of treatments), and to meet maintenance-related (28%) and IVM and/or IWM (20%) objectives. Improvement of rangeland health (9%) and recreation areas (6%) would also be important objectives.

### Marine Ecoregion

On BLM lands in the Marine Ecoregion, the majority of herbicide treatments would be conducted to meet IVM and/or IWM (69%) and maintenance-related (22%) objectives. Some less important treatment objectives include maintaining ROW (3%), improving forest

BLM_0000395

health (3%), and improving habitat for native vegetation (3%).

# Land Use

As discussed in Chapter 1, several federal laws, regulations, and policies guide BLM management activities on public lands. These include the *FLPMA of 1976*, which directs the BLM to manage public lands "in a manner that will protect the quality of scientific, scenic, historic, ecological, environmental, air and atmospheric, water resources and archeological values" and to develop resource management plans consistent with those of state and local governments to the extent that BLM programs also comply with federal laws and regulations. The *Taylor Grazing Act of 1934* provides federal protection and management of public lands by regulating grazing on public lands. The *Oregon and California Grant Lands Act of 1937* provides for the management of the revested Oregon and California and reconveyed Coos Bay Wagon Road grant lands for permanent forest production under the principle of sustained yield and for leasing of lands for grazing.

Management actions on public lands are guided by LUPs. Land use plan decisions establish goals and objectives for resource management, the measures needed to achieve these goals and objectives, and parameters for using public lands (USDI BLM 2000g). As discussed in Chapter 1, land use planning occurs at several levels. Planning at multiple levels allows the BLM to tailor decisions to specific needs and circumstances. The broadest level, which this PEIS represents, is a national-level programmatic study. This level of study contains broad regional descriptions of resources, provides a broad environmental impact analysis, including cumulative impacts, focuses on general policies, and provides Bureau-wide decisions on herbicide use and other available tools for vegetation management. Additionally, it provides an umbrella ESA Section 7 consultation for the broad range of activities described in the PEIS.

At the national level, this PEIS and the PER identify broad management goals and evaluate resource issues of national interest. This PEIS assumes that vegetation treatments could occur on up to approximately 6 million acres annually, that treatments would focus on areas with high levels of hazardous fuels and unwanted vegetation, that land uses would comply with the intent of Congress as stated in the FLPMA (43 U.S.C. 1701 *et seq.),* and that future land uses would be similar to those that currently occur on public lands. Based on these

evaluations, modifications to existing land uses could occur at lower levels, primarily the field office level, based on recommendations in the PEIS and PER.

# Air Quality

Air quality is the measure of the atmospheric concentration of defined pollutants in a specific area. Air quality is affected by pollutant emission sources, as well as the movement of pollutants in the air via wind and other weather patterns. Air quality standards have been designated in the U.S. to prevent significant human health and welfare impacts caused by pollutants in the air. The Clean Air Act, as amended in 1990, establishes a mandate to reduce emissions of specific pollutants via uniform federal standards. As the agency responsible for implementing the Act, the USEPA established the NAAQS for six pollutants to protect public health and welfare. These criteria pollutants are $SO_2$, $NO_2$, CO, $O_3$, lead, $PM_{10}$, and $PM_{2.5}$. In addition, PSD regulations, implemented as part of the New Source Review program, guide permitting officials in limiting potential air quality impacts above legally defined baseline levels (USEPA 2004). In essence, established facilities with new major pollutant sources that were previously in attainment of the NAAQS (or were unclassifiable with respect to these standards) are still considered to have acceptable emissions levels if the potential cumulative impacts do not exceed these guideline PSD significance levels. Prevention of Significant Deterioration levels are used in this analysis as criteria to indicate whether the herbicide use alternatives would significantly affect air quality.

The majority of the area covered by this PEIS meets existing air quality standards; however, there are many counties (or portions of counties) where air pollutants exceed maximum levels of one or more of the NAAQS (see Table 3-3). In addition, the Clean Air Act stipulates that the air quality of most areas should not significantly deteriorate. Therefore, this PEIS considers the contribution of proposed herbicide treatment alternatives to levels of the abovementioned criteria pollutants.

## Scoping Comments and Other Issues Evaluated in the Assessment

In line with scoping comments, this section assesses the effects of herbicide treatments on air pollutants and consequent effects on visibility and NAAQS. Most scoping comments were related to the impacts of smoke

from prescribed burning treatments on air quality. Specifically, comments called for an evaluation of the cumulative effects of smoke and an evaluation of the human health effects of smoke, particularly on asthmatics and in non-attainment zones (areas with levels of one or more criteria pollutants greater than the NAAQS). The impacts of prescribed burning on air quality are discussed in the PER (USDI BLM 2007b).

## Emission Sources

The potential impacts of herbicide use on air quality originate primarily from ground vehicle (truck, all-terrain vehicle [ATV], and boat) and aircraft (plane and helicopter) emissions, as well as fugitive dust (dust created by vehicle travel on unpaved roads) resulting from herbicide transport and application. In addition, spray drift (movement of herbicide in the air to unintended locations) and volatilization (the evaporation of liquid to gas) of applied herbicides temporarily results in herbicide particles in the air, which can be inhaled and deposited on skin or plant surfaces and affect humans, wildlife, and non-target plants. Herbicide particles can be transported away from the target location, depending on weather conditions and the herbicide application method. Spray drift and other off-site herbicide transport processes (e.g., wind blown dust) are discussed briefly in this section and more specifically in the sections pertaining to risks to humans, wildlife, non-target plants, and other resources.

## Methodology for Assessing Impacts to Air Quality

### Vehicle Use Emissions

This analysis includes annual emissions for the proposed alternatives and treatments by state for the following compounds: CO, total suspended particles (TSP), $PM_{10}$, $PM_{2.5}$, $NO_2$, and VOCs. Lead and $SO_2$ emissions should not occur, or occur in trace amounts, as a result of herbicide treatments involving vehicles and aircraft.

Exhaust emission factors were determined using vehicle data provided by the USDI BLM and the USEPA's Compilation of Air Pollutant Emission Factors (USEPA 1995a). Emission factors for fugitive dust from roads (assumed to be unpaved) were determined from trip mileage and soil properties provided by the BLM and the USEPA's Compilation of Air Pollutant Emission Factors (USEPA 2003a). All other emissions that would be associated with herbicide treatments would be

negligible, and are therefore not included in the annual emissions computations for each treatment alternative.

The potential annual emissions that would result from herbicide treatment within each state were based on an estimate of the annual acreage that would be treated by each of the five herbicide treatment methods (helicopter, fixed-wing plane, truck, ATV, and backpack) for each state for each alternative action (Table 4-1). To calculate the annual number of events for each treatment method by state, the estimated annual number of acres treated was divided by the total acreage per single treatment event. The annual air pollutant emissions from herbicide treatments for each state were then predicted based on emissions per treatment event.

#### Exhaust Emissions from Transportation Vehicles

To predict the annual vehicle emissions from each treatment method, the exhaust emissions for a single event were multiplied by the annual number of events per state for each method. The amount of pollutant emissions due to exhaust from transportation vehicles was calculated using the procedures (e.g., regarding trip mileage, vehicle type) described in the *Annual Emissions Inventory for BLM Vegetation Treatment Alternatives* (ENSR 2005a).

#### Particulate Emissions from Unpaved Roads

To predict the particulate emissions from travel on unpaved roads, the emissions for a single event were multiplied by the annual number of events per state for each treatment method. The amount of pollutant emissions due to exhaust from unpaved roads and vehicles was calculated using the procedures described in ENSR (2005a).

#### Total Annual Chemical Treatment Emissions

The annual pollutant emissions from vehicle exhaust and fugitive dust were combined for each treatment method. The resulting annual emissions for each method were then summed, yielding the total predicted emission by state and alternative (Tables 4-2 to 4-5). Because the proposed acreage to be treated by state and alternative is subject to change, so are the estimated annual emissions, as they are directly dependent on the number of acres treated. The total estimated emissions were then compared to the PSD emission source modeling threshold significance level. Under the PSD

BLM_0000397

TABLE 4-1
**Estimated Acres Treated Annually using Herbicides in Each State under Each Treatment Alternative**

| State | Treatment Alternative | | | | |
|---|---|---|---|---|---|
| | A | B | C | D | E |
| Alaska | 0 | 0 | 0 | 0 | 0 |
| Arizona | 9,960 | 36,300 | 0 | 23,595 | 18,150 |
| California | 5,060 | 5,620 | 0 | 3,935 | 2,810 |
| Colorado | 7,770 | 20,960 | 0 | 13,625 | 10,480 |
| Idaho | 57,100 | 258,990 | 0 | 168,345 | 129,480 |
| Montana | 23,190 | 53,160 | 0 | 34,555 | 26,580 |
| Nebraska | 0 | 0 | 0 | 0 | 0 |
| Nevada | 24,970 | 206,560 | 0 | 82,625 | 103,270 |
| New Mexico | 96,620 | 88,600 | 0 | 35,440 | 44,295 |
| North Dakota | 10 | 10 | 0 | 10 | 5 |
| Oklahoma | 0 | 0 | 0 | 0 | 0 |
| Oregon (Total) | 20,960 | 70,280 | 0 | 26,000 | 35,135 |
| Eastern | 8,380 | 28,110 | 0 | 10,400 | 14,055 |
| Western | 12,570 | 42,170 | 0 | 15,600 | 21,080 |
| South Dakota | 1,030 | 1,600 | 0 | 640 | 800 |
| Texas | 0 | 11,830 | 0 | 7,100 | 5,915 |
| Utah | 21,660 | 20,480 | 0 | 15,360 | 10,240 |
| Washington | 1,940 | 4,640 | 0 | 3,015 | 2,320 |
| Wyoming | 35,130 | 152,820 | 0 | 114,615 | 76,400 |
| Total | 305,400 | 931,850 | 0 | 528,860 | 465,880 |

program, if potential emissions for a given source and pollutant are less than the designated PSD level of 250 tons per year, it is assumed that these emissions are unlikely to significantly impact air quality. This is a conservative assumption, given that PSD levels are designed to apply to a single facility or a group of facilities, whereas the total predicted pollutant emissions presented here would be spread throughout an entire state or region.

**CALPUFF Modeling**

The USEPA's guideline California Puff (CALPUFF) "lite" air pollutant dispersion model (referenced in Appendix W of 40 CFR Part 51) was used to provide an example of potential PM (TSP, $PM_{10}$, and $PM_{2.5}$) impacts resulting from assumed herbicide application methods. Since most criteria pollutant emissions were very low, only example PM impacts were modeled. The total fugitive dust particulate emissions per truck spraying event (10 acres sprayed over 8 hours) were used to estimate maximum daily emission rates in the CALPUFF modeling analysis. Because vehicles traveling on unpaved roads emit the most PM (dust), and the truck spray scenario includes the most travel on dirt roads, this scenario was conservatively used to model the maximum potential impacts. Activities related to airplane and helicopter aerial spraying, ATV

spraying, and backpack spraying would cause substantially fewer PM emissions than truck spraying, and therefore are not included in the example modeling. Chemical treatment example modeling was conducted for five representative locations: Tucson International Airport (Arizona), Glasgow International Airport (Montana), Winnemucca Weather Service Office Airport (Nevada), Medford/Jackson County Airport (Oregon), and Lander/Hunt Field (Wyoming).

Total PM emissions were calculated for each treatment "event," and then divided by the number of days per event in order to determine daily TSP, $PM_{10}$, and $PM_{2.5}$ emissions. The daily emissions were modeled using CALPUFF "lite" based on a full year of meteorological conditions to predict the maximum air quality impacts likely to occur. The maximum potential impact period was defined as those consecutive days (excluding months when treatment activity is unlikely) during which the highest short-term impacts were predicted to occur. Once the period of maximum potential impact was established, CALPUFF "lite" was re-run, with daily emissions occurring only during that period, to determine both short-term and annual impacts (assuming one herbicide treatment event in each location per year). Because only one event was modeled per year, the results are provided as an example of the

BLM_0000398

ENVIRONMENTAL CONSEQUENCES

**TABLE 4-2**
**Annual Emissions Summary for Herbicide Treatments under Alternative A**

| State | Pollutant (tons per year) | | | | | |
|---|---|---|---|---|---|---|
| | CO | NO$_X$ | TSP | PM$_{10}$ | PM$_{2.5}$ | VOCs |
| Alaska | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Arizona | 0.93 | 0.11 | 4.02 | 0.85 | 0.12 | 0.07 |
| California | 0.49 | 0.06 | 2.14 | 0.45 | 0.06 | 0.03 |
| Colorado | 0.76 | 0.09 | 1.81 | 0.40 | 0.05 | 0.07 |
| Idaho | 5.34 | 0.64 | 13.30 | 2.91 | 0.37 | 0.38 |
| Montana | 2.17 | 0.26 | 5.05 | 1.13 | 0.14 | 0.15 |
| Nebraska | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Nevada | 1.31 | 0.15 | 5.76 | 1.23 | 0.17 | 0.09 |
| New Mexico | 5.29 | 0.59 | 19.33 | 4.33 | 0.59 | 0.44 |
| North Dakota | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Oklahoma | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Oregon (Total) | 1.97 | 0.22 | 10.37 | 2.47 | 0.35 | 0.14 |
|   Eastern | 0.81 | 0.10 | 2.55 | 0.56 | 0.07 | 0.06 |
|   Western | 1.15 | 0.13 | 7.82 | 1.91 | 0.27 | 0.08 |
| South Dakota | 0.05 | 0.01 | 0.13 | 0.03 | 0.01 | 0.00 |
| Texas | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Utah | 2.57 | 0.30 | 9.05 | 1.99 | 0.27 | 0.22 |
| Washington | 0.18 | 0.02 | 0.42 | 0.09 | 0.01 | 0.01 |
| Wyoming | 2.57 | 0.30 | 6.02 | 1.31 | 0.17 | 0.22 |
| Total | 23.63 | 2.75 | 77.40 | 17.19 | 2.31 | 1.82 |

maximum emission concentrations resulting from a single annual herbicide treatment event.

**Comparison to Air Quality Standards**

The short-term air quality impacts, as predicted using CALPUFF "lite," were compared to the applicable NAAQS as a threshold of significance (Table 4-6). Potential direct air quality impacts for TSP, PM$_{10}$, and PM$_{2.5}$ predicted using CALPUFF "lite" were added to a representative rural background concentration, and then compared to the NAAQS to determine if the example treatment method scenarios would be likely to exceed any NAAQS due to a single herbicide spraying event. No such exceedances of the applicable threshold values were predicted.

**Spray Drift and Volatilization**

Spray drift from various herbicide application methods was assessed using the model AgDRIFT® Version 2.0.05 (SDTF 2002), a product of a Cooperative Research and Development Agreement between the USEPA's Office of Research and Development and the Spray Drift Task Force (SDTF, a coalition of pesticide registrants). Maximum herbicide concentrations by particle size were predicted at increasing distances from the point of application 24 hours after treatment. These concentrations were modeled for the five representative locations described above, and averaged to present the potential effects of spray drift. Toxic risks to humans, wildlife, and non-target plants and other resources potentially affected by drift are presented in the relevant sections of this chapter.

## Standard Operating Procedures

The BLM has developed several management practices to minimize the potential adverse effects of herbicide use on air quality. These management practices are based on direction provided in BLM air quality, chemical pest control, and weed management manuals (e.g., manuals 7000 and 9011) and handbooks (e.g., H-9011-1; USDI BLM 1988d). Most of this guidance is related to the effects of spray drift or other forms of wind transport of herbicides. For example, guidance on spray particle size, wind velocity and direction, height of spray boom, herbicide formulation, and drift control spray systems is presented with respect to effects on spray drift and non-target species. The following SOPs have been developed to guide herbicide applications to minimize the effects on air quality:

BLM_0000399

TABLE 4-3
Annual Emissions Summary for Herbicide Treatments under Alternative B

| State | Pollutant (tons per year) | | | | | |
|---|---|---|---|---|---|---|
| | CO | NO$_X$ | TSP | PM$_{10}$ | PM$_{2.5}$ | VOCs |
| Alaska | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Arizona | 3.40 | 0.41 | 14.66 | 3.09 | 0.42 | 0.24 |
| California | 0.54 | 0.06 | 2.37 | 0.50 | 0.07 | 0.04 |
| Colorado | 2.06 | 0.24 | 4.88 | 1.07 | 0.14 | 0.18 |
| Idaho | 24.22 | 2.92 | 60.35 | 13.18 | 1.67 | 1.71 |
| Montana | 4.97 | 0.60 | 11.58 | 2.58 | 0.32 | 0.35 |
| Nebraska | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Nevada | 10.81 | 1.26 | 47.63 | 10.18 | 1.39 | 0.75 |
| New Mexico | 4.85 | 0.54 | 17.73 | 3.97 | 0.54 | 0.40 |
| North Dakota | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Oklahoma | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Oregon (Total) | 5.00 | 0.57 | 28.77 | 6.97 | 0.99 | 0.34 |
| Eastern | 1.31 | 0.15 | 2.55 | 0.56 | 0.07 | 0.09 |
| Western | 3.87 | 0.43 | 26.22 | 6.40 | 0.91 | 0.26 |
| South Dakota | 0.08 | 0.01 | 0.20 | 0.05 | 0.01 | 0.01 |
| Texas | 1.07 | 0.13 | 2.46 | 0.55 | 0.07 | 0.08 |
| Utah | 2.42 | 0.28 | 8.56 | 1.88 | 0.25 | 0.21 |
| Washington | 0.43 | 0.05 | 1.01 | 0.23 | 0.03 | 0.03 |
| Wyoming | 2.42 | 0.28 | 5.69 | 1.24 | 0.16 | 0.21 |
| Total | 62.27 | 7.35 | 205.89 | 45.49 | 6.06 | 4.55 |

- Consider the effects of wind, humidity, temperature inversions, and heavy rainfall on herbicide effectiveness and risks.

- Apply herbicides in favorable weather conditions to minimize drift. For example, do not treat when winds exceed 10 mph (6 mph for aerial applications) or rainfall is imminent.

- Use drift reduction agents, as appropriate, to reduce the drift hazard.

- Select proper application equipment (e.g., spray equipment that produces 200- to 800-micron diameter droplets [spray droplets of 100 microns and less are most prone to drift]).

- Select proper application methods (e.g., set maximum spray heights, use appropriate buffer distances between spray sites and non-target resources).

The analysis of potential air quality impacts assumes that guidance provided in BLM manuals, handbooks, and SOPs would be followed during herbicide treatment activities.

## Impacts by Alternative

### Impacts Common to All Alternatives

The potential impacts from herbicide applications on local and regional air quality would be minor for each treatment alternative. None of the predicted annual emissions by pollutant, state, or herbicide treatment alternative (A, B, D, and E) would exceed PSD annual emission significance thresholds. Furthermore, the total emissions from all the states, for each pollutant under each alternative, would be less than 25% of the PSD threshold (250 tons per year) for a single facility. Comparing the total emissions produced by all the states to the PSD threshold is especially conservative because the PSD threshold is designed to apply to one facility or a group of facilities and not entire states. For each treatment alternative, potential emissions would be highest in states with the greatest number of acres treated under each alternative. In addition, all PM concentrations resulting from a single example herbicide spraying event, as modeled using CALPUFF "lite," would be substantially lower than NAAQS thresholds at the five representative locations, and predicted concentrations would be at least four orders of magnitude smaller than assumed background

BLM_0000400

ENVIRONMENTAL CONSEQUENCES

TABLE 4-4
Annual Emissions Summary for Herbicide Treatments under Alternative D

| State | Pollutant (tons) | | | | | |
|---|---|---|---|---|---|---|
| | CO | $NO_X$ | TSP | $PM_{10}$ | $PM_{2.5}$ | VOCs |
| Alaska | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Arizona | 1.75 | 0.14 | 14.45 | 3.05 | 0.42 | 0.10 |
| California | 0.56 | 0.07 | 2.41 | 0.51 | 0.07 | 0.04 |
| Colorado | 2.49 | 0.24 | 5.74 | 1.21 | 0.15 | 0.18 |
| Idaho | 25.63 | 3.63 | 63.68 | 13.86 | 1.76 | 1.95 |
| Montana | 5.15 | 0.61 | 11.88 | 2.63 | 0.33 | 0.36 |
| Nebraska | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Nevada | 13.46 | 2.16 | 57.73 | 12.08 | 1.64 | 1.09 |
| New Mexico | 6.37 | 1.05 | 21.26 | 4.70 | 0.63 | 0.78 |
| North Dakota | 0.00 | 0.00 | 0.003 | 0.00 | 0.00 | 0.00 |
| Oklahoma | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Oregon (Total) | 3.89 | 0.40 | 20.55 | 4.81 | 0.67 | 0.26 |
|    Eastern | 1.39 | 0.15 | 4.26 | 0.93 | 0.12 | 0.09 |
|    Western | 2.50 | 0.25 | 16.29 | 3.88 | 0.55 | 0.16 |
| South Dakota | 0.10 | 0.01 | 0.23 | 0.05 | 0.01 | 0.01 |
| Texas | 1.11 | 0.13 | 2.54 | 0.56 | 0.07 | 0.78 |
| Utah | 2.63 | 0.29 | 9.17 | 1.98 | 0.27 | 0.22 |
| Washington | 0.50 | 0.05 | 1.13 | 0.25 | 0.03 | 0.03 |
| Wyoming | 19.84 | 2.07 | 46.05 | 9.80 | 1.23 | 1.55 |
| Total | 83.48 | 108.50 | 256.82 | 55.49 | 7.28 | 7.35 |

concentrations (Table 4-6). Concentrations would vary by alternative based on the number of treatment events.

Under the proposed alternatives, atmospheric concentrations of herbicides (predicted by particle size) resulting from spray drift from aerial, ground vehicle, and hand application would be temporary in nature (most predominant at the time and location of treatment) and, as predicted by modeling, would not significantly impact air quality. Maximum average herbicide concentrations from all five example modeling locations, 24 hours after treatment, were modeled at various distances from the point of application. Herbicide concentrations in the air tend to increase up to 1.5 kilometers (km) from the point of application (concentrations may double between 0.6 and 1.5 km from the application site), but then decrease slowly at greater distances.

Chemical volatilization is temporary in nature, and none of the herbicides proposed for use are likely to result in substantial volatilization from soils. Chemical vapor pressure (the pressure exerted by a vapor in equilibrium with its solid or liquid phase) largely affects the potential for volatilization of applied herbicides. Based on their vapor pressures, bromacil, diflufenzopyr

(Lyman et al. 1990; National Library of Medicine 2002), diquat (National Library of Medicine 2003), diuron (Lyman et al. 1990; Mackay et al. 1997), sulfometuron methyl (Lyman et al. 1990; National Library of Medicine 2003), and tebuthiuron (Tomlin 1994) are not expected to volatilize from dry or wet soil surfaces. Vapor pressure values are not available for imazapic; however, imazapic does not volatilize when applied in the field (American Cyanamid Company 2000 *cited in* Tu et al. 2001), and volatilization of imazapic from terrestrial systems is insignificant. Fluridone might volatilize slowly from wet soil surfaces, but volatilization from dry soils would not be expected (Lyman et al. 1990; Mackay et al. 1997; National Library of Medicine 2002). In addition, dicamba may volatilize from soil surfaces, but such an occurrence is not considered likely unless dicamba has been exposed at the soil surface under hot and dry conditions for several weeks (USDI BLM 1988d). Therefore, application of the evaluated herbicides would not impact air quality through volatilization.

BLM_0000401

**TABLE 4-5**
**Annual Emissions Summary for Herbicide Treatments under Alternative E**

| State | Pollutant (tons) | | | | | |
|---|---|---|---|---|---|---|
| | CO | NO$_X$ | TSP | PM$_{10}$ | PM$_{2.5}$ | VOCs |
| Alaska | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Arizona | 1.70 | 0.20 | 7.33 | 1.54 | 0.21 | 0.12 |
| California | 0.27 | 0.03 | 1.18 | 0.25 | 0.03 | 0.02 |
| Colorado | 1.03 | 0.12 | 2.44 | 0.53 | 0.07 | 0.09 |
| Idaho | 12.12 | 1.46 | 30.17 | 6.59 | 0.84 | 0.86 |
| Montana | 2.49 | 0.30 | 5.79 | 1.29 | 0.16 | 0.18 |
| Nebraska | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Nevada | 5.41 | 0.63 | 23.81 | 5.09 | 0.70 | 0.38 |
| New Mexico | 2.43 | 0.27 | 8.86 | 1.98 | 0.27 | 0.20 |
| North Dakota | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Oklahoma | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Oregon (Total) | 3.32 | 0.38 | 17.48 | 4.17 | 0.58 | 0.23 |
| Eastern | 1.39 | 0.16 | 4.36 | 0.97 | 0.13 | 0.10 |
| Western | 1.94 | 0.21 | 13.11 | 3.20 | 0.46 | 0.13 |
| South Dakota | 0.04 | 0.00 | 0.10 | 0.02 | 0.00 | 0.00 |
| Texas | 0.53 | 0.07 | 1.23 | 0.27 | 0.03 | 0.04 |
| Utah | 1.21 | 0.14 | 4.28 | 0.94 | 0.13 | 0.10 |
| Washington | 0.22 | 0.03 | 0.51 | 0.11 | 0.01 | 0.02 |
| Wyoming | 1.21 | 0.14 | 2.85 | 0.62 | 0.08 | 0.10 |
| Total | 31.98 | 3.77 | 106.03 | 23.40 | 3.11 | 2.34 |

**Alternative A – Continue Present Herbicide Use (No Action Alternative)**

Under the No Action Alternative, following the current vegetation management program, approximately 305,000 acres would be treated with herbicides each year (Table 4-1). This is the lowest treatment acreage of all alternatives, and it would correspond to emissions of approximately 77 tpy of TSP, 24 tpy of CO, and 17 tpy of PM$_{10}$, with emissions of all other pollutants totaling less than 3 tpy (Table 4-2). These emissions are lower than those associated with each of the other alternatives. In general, emissions would be greatest in states where more acres are treated (e.g., Idaho, New Mexico, Utah, and Wyoming).

**Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)**

Under the Preferred Alternative, an estimated 932,000 acres would be treated using herbicides annually. As this is the alternative with the greatest number of acres treated, it would also result in the greatest pollutant emissions (206 tpy TSP, 62 tpy CO, and 45 tpy PM$_{10}$; Table 4-3)—over 2 times the expected emissions under the No Action Alternative. These emissions would dominate in states with the greatest number of acres treated. Over half of the proposed herbicide treatment acreage under the preferred alternative would occur in Idaho and Nevada. Therefore, over half the predicted annual emissions would occur in these two states.

**Alternative C – No Use of Herbicides**

Under Alternative C, herbicides would not be used for vegetation management. Because there would be no associated emissions, herbicide treatments would not impact air quality. However, as under all of the alternatives, other treatment methods (fire use and mechanical, manual, and biological control methods) would emit pollutants, as discussed in the PER.

**Alternative D – No Aerial Applications**

Under Alternative D, about 529,000 acres would be treated annually using ground application methods alone. Although about 40% fewer acres would be treated under this alternative than under the Preferred Alternative, Alternative D would generate the most pollutant emissions (Table 4-4). Alternative D would result in approximately 257 tpy TSP, 83 tpy of CO emissions, and 55 tpy of PM$_{10}$ emissions, which is more than 20% more pollutant emissions than under the

ENVIRONMENTAL CONSEQUENCES

TABLE 4-6
Example NAAQS Compliance Analysis for Chemical Treatment

| Location | Pollutant | Averaging Period | CALPUFF Concentration ($\mu g/m^3$) | Background Concentration[1] ($\mu g/m^3$) | Total Concentration ($\mu g/m^3$) | NAAQS Standard[2] ($\mu g/m^3$) |
|---|---|---|---|---|---|---|
| Tucson, Arizona | TSP | 24-hour | 2.79E-04 | 40 | 40 | NA |
| | | Annual | 7.65E-07 | 11 | 11 | NA |
| | $PM_{10}$ | 24-hour | 5.47E-04 | 30 | 30 | 150 |
| | | Annual | 1.50E-06 | 8 | 8 | 50 |
| | $PM_{2.5}$ | 24-hour | 7.21E-05 | 30 | 30 | 35 |
| | | Annual | 1.97E-07 | 8 | 8 | 15 |
| Glasgow, Montana | TSP | 24-hour | 1.06E-04 | 40 | 40 | NA |
| | | Annual | 2.90E-07 | 11 | 11 | NA |
| | $PM_{10}$ | 24-hour | 2.36E-04 | 30 | 30 | 150 |
| | | Annual | 6.48E-07 | 8 | 8 | 50 |
| | $PM_{2.5}$ | 24-hour | 2.82E-05 | 30 | 30 | 35 |
| | | Annual | 7.74E-08 | 8 | 8 | 15 |
| Winnemucca, Nevada | TSP | 24-hour | 1.36E-04 | 40 | 40 | NA |
| | | Annual | 3.72E-07 | 11 | 11 | NA |
| | $PM_{10}$ | 24-hour | 2.72E-04 | 30 | 30 | 150 |
| | | Annual | 7.44E-07 | 8 | 8 | 50 |
| | $PM_{2.5}$ | 24-hour | 3.60E-05 | 30 | 30 | 35 |
| | | Annual | 9.85E-08 | 8 | 8 | 15 |
| Medford, Oregon | TSP | 24-hour | 3.75E-03 | 40 | 40 | NA |
| | | Annual | 1.04E-05 | 11 | 11 | NA |
| | $PM_{10}$ | 24-hour | 8.20E-03 | 30 | 30 | 150 |
| | | Annual | 2.28E-05 | 8 | 8 | 50 |
| | $PM_{2.5}$ | 24-hour | 1.14E-03 | 30 | 30 | 35 |
| | | Annual | 3.19E-06 | 8 | 8 | 15 |
| Lander, Wyoming | TSP | 24-hour | 6.08E-05 | 40 | 40 | NA |
| | | Annual | 1.67E-07 | 11 | 11 | NA |
| | $PM_{10}$ | 24-hour | 1.37E-04 | 30 | 30 | 150 |
| | | Annual | 3.75E-07 | 8 | 8 | 50 |
| | $PM_{2.5}$ | 24-hour | 1.72E-05 | 30 | 30 | 35 |
| | | Annual | 4.70E-08 | 8 | 8 | 15 |

[1] $PM_{10}$ Data from Table 6.1 of the Montana Modeling Guideline for Air Quality Permits (November 2002; Montana Department of Environmental Quality [2002]). TSP concentrations calculated by multiplying $PM_{10}$ data by 1.33. $PM_{10}$ concentrations are also conservatively used as background concentrations for $PM_{2.5}$.
[2] None of the states analyzed have ambient air quality standards for TSP.
NA = Not applicable.

Preferred Alternative. Compared to the Preferred Alternative, there would be greater engine emissions from ground vehicle use (in the absence of aerial spraying) and greater fugitive dust emissions from use of these vehicles on dirt roads. None of the states analyzed have ambient air quality standards for TSP, and all other emissions for this alternative (and for each state) would be below the PSD emission significance threshold of 250 tpy. However, because the potential for spray drift is usually highest in aerial applications, drift per acre of application would likely be lower for

Alternative D than for alternatives A, B, and E (spray drift is also largely dependent on weather conditions such as wind speed, temperature, and precipitation). See the Vegetation, Fish and Other Aquatic Resources, Wildlife Resources, and Human Health and Safety sections for the potential toxic effects of spray drift on humans, non-target plants, and animals.

**Alternative E – No Use of Acetolactate Synthase-inhibiting Herbicides**

Under Alternative E, approximately 466,000 acres would be treated annually using herbicides. Particulate emissions under Alternative E (106 tpy TSP, 32 tpy CO, and 23 tpy $PM_{10}$; Table 4-5) would be about twice those under the current vegetation management program (No Action Alternative). Half of the acreage treated would be in Idaho and Nevada, which would experience slightly more than half (53%) of the emissions under Alternative E.

## Mitigation for Herbicide Treatment Impacts

No mitigation measures are proposed for air quality.

# Soil Resources

## Introduction

Soil refers to the loose material composed of weathered rock and other minerals and partly decayed organic matter that covers large parts of land surfaces. Soil provides habitats for a great variety of organisms, functions as an essential component of terrestrial ecosystems, and is the essential medium for plant growth (Wild 1993). Healthy soil is fundamental to high functioning ecosystems, contains a diverse, thriving community of organisms, and. functions to protect downgradient ecosystems by functioning as a physical and biological filter of chemicals in the environment.

Noxious weeds and other invasive vegetation can impact soil function and reduce soil biodiversity. The amount of moisture in the soil can be altered if infiltration is reduced and runoff is increased on sites dominated by weeds (Lacey et al. 1989). Many noxious and invasive weeds have relatively sparse canopies, which allow for greater evaporation from the exposed soil than dense vegetative cover. Sites infested with weeds often have more extreme soil temperatures that can alter soil moisture regimes. Noxious and invasive weeds may alter soil nutrient availability for native species, alter soil constituents (e.g., soil fungi and bacteria), and slow the rate of natural plant succession (Olson 1999). Some weeds also produce toxins or allelopathic compounds that can suppress the growth and germination of other plants (Kelsye and Bedunah 1989).

Herbicide applications inevitably result in contact with soils, either intentionally for systemic treatments, or unintentionally as spills, overspray, spray drift, or windblown dust. In addition to direct application, transmission to soil may occur when an herbicide is transported through the plant from sprayed aboveground portions to roots, where it may be released into soil. Also, some herbicides remain active in plant tissue and can be released into the soil during plant decay and result in residual herbicide activity.

## Scoping Comments and Other Issues Evaluated in the Assessment

Commentors on the draft PEIS encouraged the BLM to focus vegetation management within the structure of achieving long-term ecosystem sustainability and maintaining biological diversity. In a general sense, soil health is a keystone factor for maintaining ecosystem sustainability. Concerns were voiced for evaluating groundwater protection, as certain soil characteristics play a role in attenuating the risk of groundwater contamination.

There was considerable concern that the PEIS should address herbicide fate and transport, such as runoff, overspray, drift, and drift of wind-eroded soil. One respondent recommended measuring organochlorine residues in soil. Other respondents felt that disturbances to biological soil crusts should be eliminated, that sites where the crust species are locally extinct must be re-inoculated, and that signs should be placed alongside trails to educate hikers about biological soil crusts.

## Standard Operating Procedures

The BLM would implement several SOPs to reduce impacts to soil:

- Minimize treatments in areas where herbicide runoff is likely, such as steep slopes when heavy rainfall is expected.

- Minimize use of herbicides that have high soil mobility, particularly in areas where soil properties increase the potential for mobility.

- Do not apply granular herbicides on slopes of more than 15% where there is the possibility of runoff carrying the granules into non-target areas.

BLM_0000404

ENVIRONMENTAL CONSEQUENCES

## Factors that Influence the Fate, Transport, and Persistence of Herbicides in Soil

The fate and transport of herbicides in soil is a function of their interaction with the soil environment, and is generally considered a complex process (Bovey 2001). Chemical, physical, and biological soil processes influence herbicide availability, phytotoxicity, and fate and transport (Anderson 1982). Herbicides dissipate from soils by transport with water or wind, through chemical or biological degradation processes, or by immobilization through adsorption onto soil surfaces.

### Chemical Processes

#### Adsorption

Adsorption to soil surfaces is probably the most influential factor on the fate and transport of herbicides in soils (Chiou and Kile 2000). Adsorption in soils is the process whereby ions and molecules are bonded to the surface of soil colloids due to the electrical attraction between themselves and the colloidal particles. All soil-applied herbicides are adsorbed to some extent. Adsorption occurs onto clay particles and onto both the solid and dissolved forms of organic matter. Adsorption affects herbicide mobility and availability to plants and other organisms, which in turn influences herbicide fate.

The organic carbon-water partitioning coefficient ($K_{oc}$), measures the affinity of a chemical to adsorb to soil organic carbon (a component of soil organic matter) relative to water (Table 4-7). For a given chemical, the greater the $K_{oc}$ value, the less soluble the chemical is in water and the higher affinity the chemical has for soil organic carbon. For most chemicals, a higher affinity for soil organic carbon (greater $K_{oc}$) results in less mobility in soil. When herbicide active ingredients are very water-soluble (low $K_{oc}$ values), the risk of leaching through soils and transport to surface water and groundwater increases.

#### Photochemical Decomposition and Chemical Reactions with Soil Constituents

Photodegradation and chemical reactions are common chemical degradation pathways in the environment. Herbicides may degrade in the presence of sunlight, converting to degradation products in a relatively short time. Chemical reactions, including hydrolysis, occur when chemical transformations replace or remove portions of the herbicide active ingredient's chemical structure, rendering it inactive.

### Physical Processes

#### Leaching

Leaching through soils is dependent on herbicide use patterns as well as soil texture, total organic carbon in soil, chemical half-life, amount and time of rainfall, and depth to water table. Fine-grained soils inhibit herbicide leaching because of either low vertical permeability through the soil or high soil surface area, both of which enhance adsorption to the solid phase. Coarse-grained soils with low total organic carbon do not adsorb herbicides as readily, and leaching is more likely.

#### Volatility

Volatilization is the process by which a substance passes from a solid or liquid state to a gaseous state. The volatilization of herbicides applied to soils is of concern when poor weed control occurs due to loss of the herbicides from the soil, or when injury to non-target species occurs due to drip of the vapors of the herbicides. None of the herbicides proposed for use are likely to result in substantial volatilization from soils.

Herbicide movement in soil depends on herbicide concentration, as well as on the physical status of soil, especially soil moisture content, organic matter content, and temperature.

Generally, herbicides may be moved from the application area with water runoff, or be leached through soil by rainwater infiltration and potentially reach the groundwater. Herbicide transport in runoff is usually greatest in areas with poorly infiltrating soils, flooding, and steep slopes. Poorly infiltrating soil includes compacted soil, soil with a non-biological surface crust, and fine textured soil, such as clay and clay loam.

#### Transport with Water or Wind

Herbicide transport includes movement with water or wind.

Wind can transport herbicides that have adsorbed to particles. The potential for wind blown transport depends on the weather and condition of the soil. Fine sand or silty textured soils, low soil stability, soil disturbance, and dryness all increase the risk for wind erosion of herbicide-containing particles.

BLM_0000405

**TABLE 4-7**
**Estimated Soil Half-life and Adsorption Affinity**
**for Active Ingredients**

| Herbicide | Soil Half-life (days) | Soil Adsorption ($K_{oc}$) |
|---|---|---|
| 2,4-D | 10 | 20 ml/g (acid/salt), 100 mL/g (ester) |
| 2,4-DP | 10 | 1,000 mL/g |
| Asulam | 7 | 40 mL/g |
| Atrazine | 60 | 100 mL/g |
| Bromacil | 60 | 32 mL/g |
| Chlorsulfuron | 40 | 40 mL/g |
| Clopyralid | 40 | 6 mL/g, ranges to 60 mL/g |
| Dicamba, sodium salt, or dimethylamine salt | 14 | 2 mL/g |
| Diflufenzopyr, sodium salt | 2 to 14 | 18 to 156 mL/g |
| Diquat | 1,000 | 1,000,000 mL/g |
| Diuron | 90 | 480 mL/g |
| Fluridone | 21 | 1,000 mL/g |
| Fosamine | 8 | 150 mL/g |
| Glyphosate | 47 | 24,000 mL/g |
| Hexazinone | 90 | 54 mL/g |
| Imazapic | 120 to 140 | 206 mL/g |
| Imazapyr | 25 to 141 | 1,000 mL/g |
| Mefluidide | 4 | 200 mL/g |
| Metsulfuron methyl | 30 | 35 mL/g |
| Picloram | 90 | 16 mg/L |
| Simazine | 60 | 130 mL/g |
| Sulfometuron methyl | 20 | 78 mL/g |
| Tebuthiuron | 360 | 80 mL/g |
| Triclopyr | 46 | 20 mL/g (salt), 780 mL/g (ester) |

Source: Vogue et al. (1994).

## Biological Processes

For best results, herbicides must remain in soils in an active and available form until their purpose is accomplished. Herbicidal activity is desirable, however, only until the herbicides have achieved their intended effect; longer persistence may pose a hazard to subsequent land use (Anderson 1982).

The length of time that an herbicide remains active in soils is called soil persistence or soil residual life. The half-life is the time it takes for half of the mass of an herbicide to disappear. The half-life can vary widely in soil, with some times as short as a matter of days and others taking years (Table 4-7). Chemical characteristics of the herbicide, as well as soil characteristics, especially moisture, temperature, organic matter, and the type and activity of soil organisms influence herbicide half-lives.

Soil microorganisms can sometimes degrade herbicide active ingredients. Moderate temperatures, organic material, and adequate moisture result in biologically active soils with large populations of soil microorganisms usually including capabilities for biodegradation. In contrast, soils that are very dry or wet, very cold or hot, or have low organic matter generally have less biological activity and smaller populations of active soil microorganisms.

## Impacts by Treatment

The following section discusses impacts to soil from herbicides currently used by the BLM and from herbicides proposed for use. This assessment of impacts assumes that SOPs (see Table 2-8) would be followed. SOPs are designed to reduce potential unintended impacts to soil. These procedures include using the lowest effective application rate; testing smaller areas for unintended consequences prior to treating larger areas; evaluating soil characteristics to determine the likelihood of herbicide transport by runoff, infiltration, or wind; limiting herbicide use on fine-textured and sandy soils, especially where soil can be transported onto adjacent areas potentially harming non-target vegetation; and carefully evaluating the use of herbicides on hot, dry, cold, wet, sodic (containing high levels of sodium), and saline (containing high levels of salts) soils.

Herbicides may indirectly affect soil through plant removal resulting in changes in physical and biological soil parameters. As vegetation is removed, there is less plant material to intercept rainfall and less to contribute organic material to the soil. Loss of plant material and soil organic matter can increase the risk of soil susceptibility to wind and water erosion. The risk for increased erosion would be temporary, lasting only until vegetation was reestablished. If herbicide treatments lead to revegetation with native plants, soil stability may be improved relative to sites dominated by invasive plants.

There are few studies addressing herbicide effects on biological soil crusts. Therefore, caution should be used when applying these chemicals to soils supporting biological soil crusts (Belnap et al. 2001) or to areas where management goals include crust recovery.

Youtie et al. (1999) studied the effects of two glyphosate herbicide formulations (Roundup® and Accord®) on moss-dominated biological soil crusts in a native bunchgrass community invaded by non-native

BLM_0000406

ENVIRONMENTAL CONSEQUENCES

grasses. Effects were measured by the change between pre- and post-treatment cover. The results showed that herbicide treatments did not have short-term impacts on bryophyte (moss and liverwort) cover or species diversity. In addition, biological crust cover was reduced where annual grass leaf litter accumulated, and herbicide treatment reduced litter buildup, suggesting that herbicide treatment slowed the loss of crust cover from annual grass invasion. The authors cautioned that removal of annual grasses requires repeated applications of herbicides and that long-term effects were not known.

Gadkari (1988 *cited in* Belnap et al. 2001) observed that a photosynthesis-inhibiting herbicide (simazine) had a significant impact on *Nostoc* (an algal community constituent) growth and nitrogen fixation. Some herbicides appear to inhibit growth and reproduction of green algae when biological crust species are tested under lab conditions (Belnap et al. 2001). Both positive and negative effects have been observed, depending on the compound and the species (Metting 1990). Peterson et al. (1994 *cited in* SERA 2004e) observed significant inhibition in growth of three species of cyanobacteria in laboratory exposures using metsulfuron methyl at a concentration of 0.003 milligrams active ingredient per liter (mg a.i./L). Of the several common constituents of the crust community, the cyanobacteria, which generally are embedded in the soil, may be the most resilient. In contrast, because lichen and moss constituents generally lay above the soil surface, they may be more susceptible to herbicide damage (Belnap 2005).

**Impacts of BLM-evaluated Herbicides**

### Bromacil

Bromacil can be used as a pre-emergent herbicide, and residual soil activity is necessary for this herbicide to be effective. Bromacil is persistent and highly mobile in soil, with a half-life of 124 to 155 days (see ENSR 2005b). There is limited research on the toxicity of bromacil to most soil organisms. It biodegrades in anaerobic soil, but biodegradation is slow in aerobic soil, with an estimated biodegradation half-life of 275 to 350 days, suggesting possible toxicity to some soil organisms. One soil bacterial isolate that can biodegrade bromacil has been identified (Chaudhry and Cortez 1988).

### Chlorsulfuron

Chlorsulfuron rapidly degrades in acidic soil by chemical hydrolysis, but remains relatively stable in neutral soil (see ENSR 2005c). The products of chemical hydrolysis are then biodegraded in soil (Sarmah and Sabadie 2002). Chlorsulfuron soil biodegradation rates are negatively correlated with pH and positively correlated with temperature, soil moisture content, organic matter content, and microbial biomass (James et al. 1999).

Chlorsulfuron reportedly remains active in soils for more than 1 year after application, especially at low temperatures and high pH (James et al. 1999). In a laboratory study in sandy soil, only 4% of added chlorsulfuron was transformed 126 days after application, and high residual concentrations were found in the lower soil profile (Andersen et al. 2001). Sarmah et al. (1999) observed that the rate of chlorsulfuron degradation in alkaline subsoils was slow. They concluded that under conditions conducive to leaching in alkaline systems, prolonged persistence of chlorsulfuron in the soil profile is possible. It is likely that in some soils dissipation rates could be slower than the reported average, including arid soils with high pH and low organic matter.

Chlorsulfuron appears to be only mildly toxic to terrestrial microorganisms, and effects are generally transient (SERA 2004a) even though bacteria have an enzyme that is functionally equivalent to the herbicide target enzyme in plants. Biodegradation of chlorsulfuron does occur in some soil systems. For example a bacterial strain (*Pseudomonas fluorescens* strain B2) isolated from soil was able to degrade 32% of added chlorsulfuron within 2 weeks (Zanardini et al. 2002). Rovesti and Desco (1990 *cited in* SERA 2004a) studied two soil nematode species in soil exposed to 312 to 10,000 ppm chlorsulfuron for 72 hours, and no effect was observed on reproduction, viability, or movement.

### Diuron

Diuron is highly persistent and has low to moderate mobility in soil (see ENSR 2005f). Despite its reported low to moderate soil mobility, diuron is frequently detected in groundwater (Spurlock et al. 2000). Sorption studies of diuron have shown that the proportion of organic matter in soil directly influences the amount of adsorbed diuron. Biodegradation is the major source of diuron attenuation, occurring under both aerobic and anaerobic conditions.

BLM_0000407

In one study, biodegradation in soil increased with increasing temperature and decreasing initial concentration, while pH had little effect on the degradation rates (ENSR 2005f). Biodegradation does not occur at freezing temperatures. 3,4-dichloraniline (3,4-DCA) is one breakdown product of diuron. 3,4-DCA is also persistent in soil and reportedly exhibits a higher toxicity to some receptors (Tixier et al. 2002; Skogerboe 2003; Giacomazzi and Cochet 2004). In soil, 3,4-DCA can exceed 5.0 μg/kilograms (kg) at typical application rates (Giacomazzi and Cochet 2004). Waterfleas are negatively affected by fairly low concentrations (1.0 μg/L) of 3,4-DCA in water, but it is unknown if effects to crustaceans occur in soil. Widehem et al. (2002) identified a common soil bacteria capable of transforming diuron to 3,4-DCA. In addition, 3,4-DCA was degraded by four fungal species (Tixier et al. 2002).

Diuron had adverse effects on bacterial community structure and on bacterial activity at a concentration of 25 mg/L (Giacomazzi and Cochet 2004). One study showed by molecular techniques that bacterial diversity seemed to decrease in soil treated by diuron or other phenylurea herbicides.

### Dicamba

Dicamba is not adsorbed by most soils and is highly mobile. Dicamba is moderately persistent in soil. Biodegradation is its primary fate, with slower rates at lower temperatures and in dry soil. It is likely to be rapidly degraded in soils with high microbial populations, but dissipates more slowly in hardwood forest soils (Voos and Groffman 1997a, b). The slower dissipation in hardwood forest soils is probably attributable to adsorption of dicamba in acidic and highly organic soil horizons. One study reported that dicamba dissipated from grassland soils in Texas in 4 weeks when applied at 0.25 lb/ac, and in 9 to 16 weeks when applied at 0.5 lb a.i./ac (Bovey 2001). However, when dicamba granules were applied at rates of 1.5 or 1.86 lbs a.i./ac to sand in semiarid grassland, dicamba residues were detected up to 48 inches deep 53 weeks after application. The primary breakdown product of dicamba is 3,6-dichlorosalicylic acid, which adsorbs to soils strongly. Very little information is available on the toxicity of this breakdown product (USDA Forest Service 1999).

According to one study, dicamba caused a transient decrease in nitrification after incubation in sandy loam soil at an application rate of 10 mg/kg, but this decrease was not substantial and was not observed after 3 weeks

of incubation (Tu 1994). In the same study, dicamba did not affect ammonia formation or sulfur oxidation. Martens and Bremner (1993) showed that dicamba did not affect urea hydrolysis or nitrification in four soil types at an application rate of 1 mg/kg. Dicamba did decrease urea hydrolysis by 6% in one of the four soil types, and inhibited nitrification in two of the soils at 7 and 14 days, but not at 21 days, after application at a rate of 50 mg a.i./kg soil. After herbicide applications for 24 years, there were no detectable residues of dicamba in soil at two long-term tillage sites or one long-term manured site, probably due to biodegradation and mobility (Miller et al. 1995).

### Diflufenzopyr

Biodegradation, photodegradation, and hydrolysis are the primary mechanisms that remove diflufenzopyr from soil. $K_{oc}$ values range from 18 to 156 ml/g. Soil biodegradation and photodegradation half-lives are 14 days or less (USEPA 1999c). Diflufenzopyr appears to be soluble enough that transport in surface runoff is possible, especially in neutral to alkaline soils (see ENSR 2005d).

### Diquat

Diquat readily adsorbs to soil surfaces, effectively immobilizing the chemical. The amount of diquat adsorbed depends on the type and amount of clay particles present, with soils high in clay adsorbing larger amounts than sandy soils. Sodic and saline soils adsorb reduced amounts (Kookana and Aylmore 1993). Diquat is resistant to anaerobic and aerobic biodegradation, possibly in part because it adsorbs so well to soil particles. There is some evidence that the more loosely bound fraction of diquat may be subject to slow biodegradation (Howard 1991). The half-life of diquat is 3 years or longer (see ENSR 2005e).

### Fluridone

Fluridone applications target unwanted aquatic vegetation, especially submerged vegetation. Fluridone adsorption to soil increases with clay content, organic matter content, cation exchange capacity, surface area, and decreasing pH (Weber et al. 1986 and Reinert 1989 cited in ENSR 2005g). The half-life of fluridone ranges from 44 to 365 days when it is applied on sandy loam, sandy clay loam, and peaty loam soils (10 °C and 18° to 24 °C; Howard 1991). Longer half-lives tend to be associated with dry soils (Malik and Drennan 1990 cited in ENSR 2005g). Fluridone can volatilize slowly from

BLM_0000408

ENVIRONMENTAL CONSEQUENCES

wet soil surfaces, but volatilization from dry soils would not be expected (ENSR 2005g).

The toxicity of fluridone to earthworms has been measured. No mortality was seen in direct exposures up to 103 mg/L (103 ppm; Eli Lilly and Company 2003); this concentration is approximately 1,000 times greater than the expected soil concentration in a typical use application.

### Imazapic

Imazapic is moderately persistent in soils and has not been found to move laterally with surface water. Imazapic has a half-life of 120 days in soil due to photolysis and a half life of 31 to 233 days in soil due to microbial degradation (American Cyanamid Company 2000 *cited in* Tu et al. 2001). Most imazapic is lost through biodegradation. Sorption to soil increases with decreasing pH and increasing organic matter and clay content. Little is known concerning the effects of imazapic on soil organisms or processes (see ENSR 2005h).

In the risk assessment for imazapic (SERA 2004c), Groundwater Loading Effects of Agricultural Management Systems (GLEAMS) modeling estimated the proportion of applied imazapic lost by runoff for clay, loam, and sand at rainfall rates ranging from 5 to 250 inches per year. Runoff would be negligible in relatively arid environments, as well as areas with sandy or loam soils. In clay soils, which have the highest runoff potential, off-site loss could reach up to 3.5% of the applied amount in regions with very high rainfall rates. The model showed that as rainfall rate increases, maximum soil concentrations are reduced because of imazapic losses from soil through percolation or runoff. Modeling also showed that longer-term concentrations in soil vary substantially with rainfall rates, ranging from about 1 to 2 mg a.i./kg soil in very arid soils to about 0.01 mg a.i./kg soil in regions with high rainfall.

### Sulfometuron Methyl

Sulfometuron methyl is hydrolyzed in acidic soil, but is stable in neutral soil. Hydrolysis and biodegradation appear to be important degradation pathways in soil (Sarmah and Sabadie 2002). The degradation rate for sulfometuron methyl was found to increase with increasing soil temperature and moisture content, and the half-life ranged from 2 to 5 weeks. Sulfometuron methyl moves readily through conductive, coarse-textured soils such as sand and sandy loams (ENSR 2005j).

Effects of sulfometuron methyl to soil organisms are not well studied. A study on the response of ectomycorrhizal symbiotic formation to sulfometuron methyl applications showed that the herbicide did not result in a reduction of the symbiont on tree seedlings (Busse et al. 2004).

### Tebuthiuron

In soil, tebuthiuron is resistant to abiotic degradation and biodegradation. Its field half-life ranges from 2 weeks to over 33 months (see ENSR 2005k). It has a low adsorption affinity to soil, with some adsorption occurring as organic matter and clay content increase. It is mobile in soil and has been detected in groundwater (USEPA 1994a).

The amount of tebuthiuron recovered from application sites in northcentral Arizona declined from 55% of that applied after 1 year to 5% after 8 years, but then increased during the remaining 3 years of the study. The increase may have been due to release of the soil-adsorbed fraction. No metabolites were found, suggesting little or no degradation in soil (National Library of Medicine 2002). Montgomery (1997) reported that 38% of tebuthiuron applied to rangeland at a rate of 0.84 kg/ha tebuthiuron remained after 21 months.

In an evaluation of brush control and reseeding in a post oak forest using tebuthiuron applied at a rate of 2.2 kg/hectare (ha), Gay et al. (1997) determined that total soil nitrogen was unchanged after treatment regardless of the reseeding method, possibly indicating few changes to nitrogen cycling from treatment methods. After a tebuthiuron application at the rate of 1.01 kg/ha in pellet form to sagebrush semi-desert in Utah, soft brome had both reduced persistent mycorrhizal root infection and reduced mycorrhizal spore density in its rhizosphere (Allen and West 1993). The herbicide did not appear to affect germination of mycorrhizal spores collected 6 months after herbicide application. Mostafa and Helling (2003) isolated three tebuthiuron-degrading bacteria from soil. Shelton et al. (1996) demonstrated that a *Streptomyces* strain degraded tebuthiuron in vitro.

### Impacts of Forest Service-evaluated Herbicides

#### 2,4-D

It is generally accepted that 2,4-D is rapidly inactivated in moist soil (Bovey 2001). However, its fate is largely dependent on pH (Aly and Faust 1964 *cited in* Tu et al. 2001). In alkaline soil, 2,4-D is rapidly converted to a

BLM_0000409

form that is susceptible to photodegradation and biodegradation, and that does not readily adsorb to soil particles. In acidic soil, 2,4-D resists degradation (Johnson et al. 1995 *cited in* Tu et al. 2001).

The half-life of 2,4-D averages 10 days in moist soils, but can be longer in cold or dry soils, or where the microbial community is not present to facilitate degradation (Tu et al. 2001). Warm and moist soil conditions that enhance microbial populations facilitate 2,4-D degradation (Foster and McKercher 1973 *cited in* Tu et al. 2001). In addition, 2,4-D has been shown to dissipate more rapidly in soils previously treated with 2,4-D, presumably because of an increase in 2,4-D degrading bacteria after the first application (Oh and Tuovinen 1991, Smith and Aubin 1994, and Shaw and Burns 1998 *cited in* Tu et al. 2001).

Studies have generally shown that at typical application rates, no effect from 2,4-D can be detected on soil macroorganisms (Eijsackers and Van Der Drift 1976). Furthermore, most studies of the effects of 2,4-D on microorganisms concluded that the quantity of 2,4-D reaching the soil from typical applications would probably not have a serious negative effect on most soil microorganisms (Bovey 2001).

### Clopyralid

Clopyralid is unstable in soil, and its field dissipation half-life ranges from 10 to 161 days (SERA 2004b). Clopyralid does not appear to bind tightly to soil and will leach under favorable conditions; however, the potential for leaching or runoff is attenuated by the apparently rapid biodegradation of clopyralid in soil. Clopyralid can be persistent in plants, and can result in soil activity when plants containing clopyralid die and biodegrade, releasing clopyralid to the soil where it can again be taken up by plants.

Hassan et al. (1994 *cited in* SERA 2004b) summarized the effects of clopyralid on potential biocontrol agents. Exposures to clopyralid resulted in less than 30% mortality to 14 out of 17 insects and predatory mites in contact bioassays. Higher mortality rates (25% to 50%) were observed with clopyralid exposures to three insects: a beetle species, a pirate bug, and a green lacewing. A laboratory study on spiders reported an acute (96-hour) lethality of less than 10% following a direct application of clopyralid (as Lontrel EC, an emulsifiable concentrate of clopyralid) at the recommended application rate (Pekar 2002).

At concentrations of 1 or 10 mg a.i./kg soil, clopyralid had no effect on nitrification, nitrogen fixation, or degradation of carbonaceous material (Hassan et al. 1994 *cited in* SERA 2004b). Applications of Lontrel EC at 0.26 lb/ac had no substantial effect on spore germination in a fungal bioherbicide for round-leaved mallow (Grant et al. 1990 *cited in* SERA 2004b).

### Glyphosate

Glyphosate is a polar compound that is inactivated by soil adsorption. Adsorption is controlled by soil pH to a large degree (Gimsing et al. 2004). Glyphosate is water-soluble, but it has a high affinity to bind to soil particles (SERA 2003a). Adsorption of glyphosate increases with increasing clay content and cation exchange capacity, and decreasing soil pH and phosphorous content (Sprankle et al. 1975, Hance 1976, Nomura and Hilton 1977, and Rueppel et al. 1977 *cited in* Tu et al. 2001).

Glyphosate is biodegraded by soil organisms, and many species of soil microorganisms can use glyphosate as a carbon source (SERA 2003a). Glyphosate exposure results in the inhibition of respiration and nucleic acid synthesis in plants and in microorganisms. There is little information, however, to suggest that glyphosate is harmful to soil microorganisms under field conditions; some studies suggest glyphosate may benefit some soil microorganisms.

In a study of the direct and indirect effects of long-term glyphosate applications in ponderosa pine plantations in California, Busse et al. (2004) determined that both direct and indirect soil microbial characteristics in the top 4 inches of soil were generally unchanged after 9 to 13 years of continuous vegetation control by glyphosate. Single or repeated applications of glyphosate at the recommended field concentration had little effect on microbial communities.

### Hexazinone

Hexazinone has a relatively low affinity for soil particles and dissolves in soil water. Biodegradation is an importation fate, and the half-life in soil averages about 90 days, although hexazinone has been reported in the soil at low concentrations for up to 3 years after application. Soil organic matter content does not affect adsorption.

One field study designed to detect effects on non-target species suggests that hexazinone may have an effect on the behavior of soil mites. At an application rate of 0.9 lb/ac, soil mites tended to migrate deeper into the soil

BLM_0000410

ENVIRONMENTAL CONSEQUENCES

than mites from untreated plots. However, it is not known whether this behavior is related to toxicity, avoidance, or some other unidentified factor (Badejo and Adejuyigbe 1994). When testing pure strains of ectomycorrhizal fungi in a laboratory assessment, Diaz et al. (2003) determined that hexazinone had little or no adverse effect on fungi, and even stimulated the growth of one strain.

Hexazinone did not adversely affect the nitrogen cycle or soil respiration in acidic plant soils when applied at the recommended application rate (Vienneau et al. 2004). Busse et al. (2004) found that hexazinone did not alter soil respiration and the capability of mycorrhizal fungi to infect conifer seedling roots, even at concentrations detrimental to seedling growth.

### Imazapyr

Imazapyr is water soluble, potentially mobile, and has a long half-life (SERA 2004d). Imazapyr does not readily bind to mineral soils, but is likely to bind relatively strongly to organic soil. In a study of the fate of imazapyr applied to a railroad ROW, most imazapyr was found in the upper 12 inches of the soil and exhibited a half-life in the range of 67 to 144 days (Borjesson et al. 2004).

Imazapyr may persist in soil for a prolonged period in relatively arid regions, and does not bind tightly to alkaline soils with low organic matter. Thus, the potential for longer-term effects on soil organisms and downgradient systems exists (SERA 2004d). Imazapyr can "leak" from treated plants into the soil, where it remains active and can be taken up by non-target plants (Tu et al. 2001).

Effects on soil microorganisms appear to be highly species specific, with variations in sensitivity among species of up to a factor of 100 (SERA 2004d). Imazapyr can affect some sensitive microorganisms and potentially shift soil microbial community composition toward imazapyr tolerant species. Imazapyr can inhibit rates of cellulose decomposition and carboxymethyl cellulase activity in peat soil with 59% organic carbon (Ismail and Wong 1994 *cited in* SERA 2004d).

### Metsulfuron Methyl

The principal modes of degradation of metsulfuron methyl are hydrolysis and microbial degradation, with the latter being the only major pathway in alkaline soils (Sarmah et al. 1998). Degradation rates are affected by soil temperature, moisture content, and soil pH. Half-

lives in acidic or neutral soils vary from 5 to 190 days (Sarmah and Sabadie 2002, SERA 2004e). In acidic soils, adsorption of metsulfuron methyl is influenced by soil temperature, clay content, and organic matter content. In alkaline soils, adsorption is very low and leaching potential is high. This is likely to result in increased persistence in alkaline subsoils that often lack organic matter and biological activity (Sarmah et al. 1998).

An application of metsulfuron methyl at a rate of 5 mg a.i./kg soil decreased levels of amylase, urease, and protease activity in loamy sand and clay loam soil (Ismail et al. 1998). At surface application rates of 0.04 to 0.067 lb/ac, decreases in soil bacteria were apparent for 3 days but reversed completely after 9 days. Biodegradation of metsulfuron methyl increased as soil moisture increased from 20% to 80% of field capacity, and half-life increased when temperature was raised from 20° to 30°C (Ismail and Azlizan 2002). Peterson et al. (1994 *cited in* SERA 2004e) observed significant inhibition in growth of three species of cyanobacteria using metsulfuron methyl at a concentration of 0.003 mg a.i./L.

### Picloram

Photolysis and biodegradation are primary mechanisms of dissipation of picloram (USDA Forest Service 2000a). Picloram adsorbs to clay particles and organic matter, but if the soil contains little clay or organic matter, picloram is easily moved by water. Picloram has been reported to remain active in soil at levels toxic to plants for more than 1 year at typical application rates (SERA 2003b). The half-life of picloram in soil is reported to vary from 1 month under favorable environmental conditions to more than 4 years in arid regions (USDA Forest Service 2000a). Picloram can be persistent in plants. When plant parts containing picloram degrade, they may release it into the soil, where it can then be taken up by other plants.

The persistence of picloram in soil is dependant on soil moisture and temperature. Picloram dissipates most slowly when soils are alkaline, fine textured, and low in organic matter. Picloram degrades more rapidly under anaerobic than aerobic conditions and at lower application rates (USDA Forest Service 2000a).

Higher soil concentrations of picloram result in longer persistence of the compound. With high application rates, picloram may inhibit microbial activity (Krzyszowska et al. 1994). There does not appear to be a defined threshold for picloram toxicity to soil

BLM_0000411

microorganisms (SERA 2003b). Concentrations of picloram in the soil as low as 0.025 mg a.i./kg soil appear to result in an increase in the persistence of picloram, which may be attributable to negative effects on microbial populations.

### *Triclopyr*

There are two formulations of triclopyr—a triethyamine salt (TEA) and a butoxyethyl ester (BEE). Both formulations degrade to triclopyr acid in soil. Degradation occurs primarily through microbial metabolism, but photolysis and hydrolysis can be important. The average half-life of triclopyr acid in soil is 30 days (Tu et al. 2001). Triclopyr can be persistent in plants. When plants containing triclopyr die and biodegrade, they may release triclopyr to the soil, where it can then be taken up by other plants.

Microbial metabolism accounts for a significant percentage of triclopyr degradation in soils (SERA 2003c). In general, warm moist soils with a high organic content will support the highest rates of herbicide metabolism (Newton et al. 1990 *cited in* Tu et al. 2001). Johnson et al. (1995) found that microbial degradation of triclopyr was significantly higher in moist versus dry soils, and at 30ºC versus 15ºC. They also found that sunlight plays a role in the rate of microbial metabolism of triclopyr, as microbial metabolism slowed when soil was deprived of light.

Triclopyr inhibited growth of four types of ectomycorrhizal fungi associated with conifer roots at concentrations of 1,000 ppm and higher (Estok et al. 1989). Some evidence of inhibition of fungal growth was detected in bioassays with as little as 100 ppm triclopyr. Typical usage in forest plantations, however, results in triclopyr residues of only 4 to 18 ppm on the forest floor.

### Impacts of Other Herbicides Currently Available for Use

Asulam, atrazine, fosamine, mefluidide, simazine and 2,4-DP (also known as dichlorprop) have been previously approved for use on public lands in many western states (see Table 2-2), and risk assessments for these herbicides were provided in earlier BLM vegetation treatment EISs. The use of these herbicides by the BLM has been quite limited, with only fosamine used in the last 7 years. Table 2-3 provides information on areas where use of these herbicides is appropriate.

Atrazine, simazine, and 2,4-DP are persistent in soil, do not adsorb well, and are generally considered mobile. Persistence in soil is extended under dry and/or cold conditions. Asulam does not adsorb well; however, it is readily biodegraded and its metabolites will adsorb to the soil (Vogue et al. 1994; Information Ventures, Inc. 1995a, b, c; Mahler et al. 1998).

Mefluidide is not strongly adsorbed to the soil and has a half-life from 1 to 2 weeks. It does not cause adverse effects in soil microorganisms (Information Ventures, Inc. 1995d). Because fosamine is rapidly metabolized by soil microbes, it does not persist in soils; reported half-lives range from 1 to 6 weeks (Han 1979 *cited in* Tu et al. 2001).

## Impacts by Alternative

The BLM proposes use of herbicides to treat vegetation to improve ecosystem function and health, including soil health. However, herbicide treatments can also affect soil fertility and function, and can kill or harm soil organisms. The benefits and risks to soil under each alternative are discussed in the following sections.

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under the No Action Alternative, the BLM would continue current vegetation treatment programs in 14 western states and would treat an estimated 305,000 acres per year using both ground-based and aerial methods. Public lands in Alaska, Texas, and Nebraska are not included under this alternative.

Under this alternative, the BLM would be able to use the 20 herbicides previously approved in earlier EISs. However, based on the recent pattern of BLM herbicide use, it is likely that approximately three quarters of the area treated would involve the use of only four herbicides: 2,4-D, glyphosate, picloram, and tebuthiuron (Table 2-5). It is also likely that asulam, 2,4-DP, atrazine, mefluidide, and simazine would not be used at all because they have not been used in the last 7 years, and fosamine would likely be used on less than 50 acres annually.

Of the herbicides most often used by the BLM, chlorsulfuron, picloram, and tebuthiuron are persistent in soil for a year or more, while glyphosate and 2,4-D are relatively non-persistent in soil. None of these herbicides appears to result in severe adverse impacts to soil. Of these, glyphosate has been shown to have little or no impact on biological crust cover after 1 year,

BLM_0000412

ENVIRONMENTAL CONSEQUENCES

while impacts from the other commonly-used herbicides are less well known. 2,4-D, glyphosate, picloram, tebuthiuron, and other herbicides used by the BLM could benefit soil by removing invasive species and other unwanted vegetation and allowing restoration of native vegetation.

Fewer acres would be treated under this alternative than under the other alternatives. Negative effects to soils associated with invasive species could be greater because fewer acres with invasive species would be treated. Generally, invasive plants can increase the potential for wind or water erosion by altering fire frequency or producing chemicals that directly affect soil quality or organisms. These negative effects include increased sediment deposition and erosion, and alterations in soil nutrient cycling (Bossard et al. 2000). For example, millions of acres of grassland in the Great Basin have been taken over by downy brome. A study that compared soil organisms in native grasslands after invasion by soft brome found that the soft brome caused negative changes in most levels of the soil food web (Belnap and Phillips 2001). Soft brome invasion also appears to change soil physical characteristics and alter the cycling of carbon and nitrogen (Norton et al. 2004).

In areas with saltcedar invasions, salt accumulates in the soil as salt-accumulated leaves decompose. Scotch broom and gorse can increase the nitrogen content in soil, potentially giving an advantage to non-native species that thrive in a nitrogen-rich soil (Bossard et al. 2000). Studies in Montana have shown that sedimentation and erosion rates were 50% to 200% greater on sampling plots dominated by spotted knapweed than on plots dominated by native bunchgrasses (Lacey et al. 1989). In a few instances, invasive plants can positively affect soil through enrichment of certain nutrients and by providing erosion control.

Under this alternative, the BLM would not be able to use herbicides to eliminate unwanted vegetation on BLM lands in Texas (11,833 acres), Nebraska (6,354 acres) and Alaska (85.5 million acres). Invasive species are common on Texas and Nebraska public lands. In Alaska, there are only small, scattered outbreaks of invasive species, and the focus of invasive species treatments is to control these outbreaks before they become much larger. There is concern in Alaska regarding the use of herbicides in sensitive environments, including on tundra and in boreal forests, but herbicide use may be appropriate where impacts to soil and other resources would be negligible, and where

other treatment methods may not provide adequate vegetation control (Hebert 2001).

## Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

Under the Preferred Alternative, the BLM would be able to use four new herbicides in addition to 14 previously-approved herbicides to treat approximately 932,000 acres annually across 17 western states.

As discussed under the No Action Alternative, the use of herbicides would have both beneficial and adverse effects to soil. The area treated under this alternative would be approximately 3 times greater than under the No Action Alternative. Thus, effects would be approximately 3 times greater. By treating a larger area than under the No Action Alternative, the BLM would have a greater likelihood of reducing the number of acres covered by weeds and other invasive vegetation and restoring ecosystem function, to the benefit of soil resources.

Based on BLM patterns of use, 2,4-D, glyphosate, picloram, and tebuthiuron would comprise about 70% of the currently-used herbicides that would be used under this alternative. The risks and benefits of using these herbicides are discussed under the No Action Alternative. Approximately 10% of all treatment acres would be treated with the new herbicides, and of these, most would be treated using imazapic. Imazapic would be used to control downy brome, hoary cress, perennial pepperweed, and several other invasive species that are known to alter soil characteristics, alter wildfire intensity and frequency, and increase soil erosion. Potential effects to soil and soil organisms from the new herbicides appear to be minor.

In addition to using the four new herbicides, the BLM would be able to use herbicides in Alaska, Nebraska, and Texas. Although little to no herbicide usage is planned for Alaska under this alternative, being able to use herbicides in Nebraska and Texas would allow for a more comprehensive weed management program that should reduce the negative effects of invasive species on soil in those states.

If new herbicides are developed in the future that provide control of unwanted vegetation superior to that of currently-used or proposed herbicides and with fewer risks to soil and other resources, the BLM would be able to use these herbicides to the benefit of soil resources

BLM_0000413

upon completion of appropriate risk assessments and associated NEPA analysis.

**Alternative C – No Use of Herbicides**

Under Alternative C, no herbicides would be used in the BLM vegetation management program in 17 western states. Some areas would not be treated by any method, while other areas would be treated by mechanical, manual, biological, or fire methods.

Without the use of herbicides, it is likely that invasive plants would continue to rapidly spread, resulting in dramatic and potentially irreversible effects on soil quality through changes in organic matter content, diversity and abundance of soil organisms, and nutrient and water availability. As discussed above, weeds and other undesirable vegetation can outcompete native vegetation and lead to widespread incidence of fire and other conditions that can result in increased rates of soil erosion and loss of soil productivity. Other treatment methods, including use of fire, machinery, and livestock can remove vegetation, but also disturb soil, leading to soil erosion and loss of soil quality (see PER). In many situations, herbicides are the only, or the most effective method for controlling invasive vegetation. For example, mechanical and manual methods are not appropriate for large-scale treatments (hundreds to thousands of acres), and for treatments in remote areas that would require construction of roads and other soil disturbing activities to allow access by mechanical equipment. The effects of non-herbicide treatments on soil are discussed in the PER.

**Alternative D – No Aerial Applications**

Under Alternative D, the BLM would be able to use 14 previously-approved and four newly-approved herbicides in 17 states, but would not be able to apply herbicides from aircraft. Relative to other alternatives, there would be a reduced risk of inadvertent applications from off-site drift. Subsequently, there could be less risk to non-target soils.

Ground-based treatments could be used to in place of aerial treatments in some locations. However, in other areas ground-based treatments would be ineffective or too costly to implement, including remote areas, areas with difficult terrain, and large expanses of woodland and forest. Other locations where ground-based treatments would be ineffective include areas with extensive coverage of invasive species (such as downy brome in the Great Basin). Ground-based herbicide applications in these areas might not be comprehensive

enough to adequately control invasive species, and reinvasion would require additional treatments in the same area, requiring more herbicide to be used (USDI BLM 1991a).

Non-herbicide methods of vegetation control may be substituted in areas unsuitable for ground-based herbicide treatment. For example, where there is sufficient fuel to carry a fire, prescribed fire could be used to control large areas of invasive vegetation. Currently, vegetation management best practices use herbicide applications following fire to avoid reinvasion and promote native vegetation. In many areas, this would be impractical without the option of aerial application. Also, mechanical and/or biological treatments could be used instead, but the amount of area that could be treated by these methods would be substantially less, and these treatments would disturb more soil than aerial herbicide treatments (see PER).

**Alternative E – No Use of Acetolactate Synthase-inhibiting Herbicides**

Under this alternative, the BLM would not be able to use ALS-inhibiting herbicides. This group of herbicides has been shown to damage off-site native and crop species, and several weed species can develop resistance to these herbicides, making them less effective. Under this alternative, four currently-approved herbicides (metsulfuron methyl, sulfometuron methyl, chlorsulfuron, and imazapyr) and one proposed herbicide (imazapic) would not be used. The number of acres treated under this alternative would be approximately one-half the acreage that would be treated under the Preferred Alternative. In addition, aerial herbicide treatments and herbicide treatments in wetland, riparian, wilderness, and cultural resource areas would be discouraged, while more passive treatment methods would be promoted.

The impacts associated with reducing the area treated are discussed under Alternative C, and impacts associated with restrictions on aerial application are discussed under Alternative D. Impacts to soils associated with the use of herbicides in wetland and riparian areas are discussed in the Wetland and Riparian section of this chapter. Use of herbicides in areas with cultural resources is discussed in the Cultural Resources section.

This alternative would limit activities that are known to impact soils and lead to invasive species establishment, such as OHV use, minerals extraction, forestry, and livestock grazing. However, OHV use and livestock

BLM_0000414

ENVIRONMENTAL CONSEQUENCES

grazing could only be restricted to levels consistent with adopted BLM LUPs. Restrictions on grazing and OHV use would benefit soils, but in areas with extensive infestations of weeds and other invasive vegetation, the full benefits of restricting grazing, OHV use, and other ground-disturbing activities might not be fully realized until invasive species were controlled and sites were restored with native vegetation.

An extensive knowledge of ALS-inhibiting chemical behavior in soil appears to be lacking, including toxicity of residues, remnants of degradation products, presence and release of bound residues, and potential for groundwater pollution (Sarmah and Sabadie 2002). At this time, ALS-inhibiting herbicides have not been found to be more or less toxic to soil organisms or to demonstrate other soil effects that are notably different from those associated with the other herbicides.

Under this alternative, the BLM would not be able to use imazapic, which is proposed for extensive control of downy brome. This could reduce the number of acres of downy brome treated in the Great Basin and elsewhere, and could increase adverse effects to soil in comparison to the No Action Alternative.

## Mitigation for Herbicide Treatment Impacts

No mitigation measures are proposed for soil resources.

# Water Resources and Quality

## Introduction

The proposed herbicide treatments have the potential to affect water resources on or near public lands by altering water flows, surface water and groundwater quantity and quality, and rates of groundwater recharge. Surface water provides an important source of drinking water, provides habitat for fish and wildlife, and is used for recreation. Groundwater, and especially potable groundwater, provides drinking water for more than 97% of the rural population without access to public water supplies, and provides 30% to 40% of the water used for agriculture (Alley et al. 1999).

Studies have shown some groundwater supplies to be contaminated with herbicides and other contaminants (total dissolved solids, metals, etc). Generally, shallow groundwater aquifers are at greater risk for contamination than deeper sources. Water quality data for the surface water and groundwater resources of the

western states are available from several data sources, as discussed in Chapter 3 under Water Resources and Quality. These sources were used to develop a general assessment of water quality in the hydrologic regions of the western states, including Alaska, where the BLM has substantial land management responsibility. Data from the USEPA's Index of Watershed Indicators characterizes the condition and vulnerability of each of the 2,262 subbasins in the U.S. (Map 3-6). Information on general groundwater quality (based on concentration of TDS) was compiled from the USEPA's National Water Quality Inventory (USEPA 2000a; Map 3-7). Based on these assessments, watershed and groundwater water quality is poor to moderate over many areas in the West, primarily in areas associated with agricultural activities. Thus, actions that further deteriorate water quality or watershed health need to be carefully evaluated before being implemented on public lands.

## Scoping Comments and Other Issues Evaluated in the Assessment

During scoping, commentors encouraged the BLM to evaluate the effects of herbicides on watersheds and watershed sustainability; water supply (yield); and infiltration, runoff, and other hydrologic processes; and to address protection of surface water and groundwater quality and quantity, including conservation and pollution. A number of commentors pointed out the potential impacts associated with herbicide runoff, overspray, and drift. Commentors suggested that the effects of herbicide metabolites in water should be addressed. Specific concerns regarding the impacts of herbicides on water quality degradation and the accumulation of herbicides in surface water and groundwater were raised. Commentors also expressed concern about the effects of invasive species (saltcedar in particular) on water quality and quantity, and on riparian habitats.

## Standard Operating Procedures

The following discussion addresses potential impacts from herbicides currently available for use by the BLM and from herbicides proposed for use. This assessment of impacts assumes that SOPs (Table 2-8) designed to reduce potential unintended impacts to water are used. The following SOPs are recommended to reduce potential unintended impacts to water quality and quantity from the application of herbicides:

BLM_0000415

- Consider climate, soil type, slope, and vegetation type when developing herbicide treatment programs.

- Note depths to groundwater and identify areas of shallow groundwater and areas of surface water and groundwater interaction.

- Review hydrogeologic maps of proposed treatment areas or conduct site reconnaissance to identify areas of shallow groundwater.

- Select herbicide products to minimize impacts to water. This is especially important for application scenarios that involve risk from active ingredients in a particular herbicide, as predicted by risk assessments.

- Use local historical weather data to choose the month of treatment. Based on the phenology of the target species, schedule treatments based on the condition of the water body and existing water quality conditions.

- Plan to treat between weather fronts (calms) and at the appropriate time of day to avoid high winds that increase water movements, and to avoid potential stormwater runoff and water turbidity.

- When possible, plan to treat shallow areas, which are easier to control.

- Conduct mixing and loading operations in an area where an accidental spill would not contaminate an aquatic body.

- Do not rinse spray tanks in or near water bodies.

- Do not broadcast pellets where there is danger of contaminating water supplies.

- Minimize treating areas with high risk for groundwater contamination.

- Maintain buffers between treatment areas and water bodies. Buffer widths should be developed based on herbicide- and site-specific criteria to minimize impacts to water bodies.

- Minimize the potential effects to surface water quality and quantity by stabilizing terrestrial areas as quickly as possible following treatment.

## Impacts by Treatment

### Aquatic Vegetation Control Using Herbicides

#### *Water Quality*

The BLM currently uses four herbicides in riparian and aquatic habitats—2,4-D, glyphosate, imazapyr, and triclopyr—and is proposing to use diquat and fluridone in these areas as well. The remaining herbicides available to the BLM, or proposed for use, are registered for use on terrestrial sites.

Herbicides applied to streams, ponds, and lakes for aquatic vegetation control could impact surface water quality if applied at concentrations that exceed label requirements. Based on the HHRA (see the Human Health and Safety section in this chapter and Appendix B), there would be low risk to drinking water in areas treated with diquat, fluridone, glyphosate, or imazapyr, even if these herbicides were accidentally spilled in streams, ponds, or lakes used by humans. However, risk to drinking water associated with 2,4-D or triclopyr applications would be moderate to high.

Aquatic plant control can cause a high rate of plant decomposition and may cause rapid oxygen loss from water that can seriously degrade water quality. The magnitude of this effect depends on water temperature, lake or pond stratification, and the amount and rate of plant decomposition. The effects can persist from a few weeks to an entire growing season, but are generally not permanent.

The proliferation of invasive and unwanted aquatic vegetation in surface waters can affect water quality, resulting in water quality degradation. Blooms of weedy vegetation can result in reduced drinking water quality, potentially limit recreation opportunities, and lead to depletion of oxygen in water, which can degrade fish and wildlife habitat. Infestations can block channels or culverts, causing flooding. Use of aquatic herbicides to remove weedy and invasive aquatic vegetation could reverse such infestations and greatly improve water quality and enhance fish and wildlife habitat and recreational opportunities.

Water quality degradation could result from removal of riparian vegetation and reduction in shade. With the loss of shade, the resulting increase in surface-water temperature fluctuations could drive water temperature beyond tolerable limits for temperature sensitive fish and other aquatic species.

BLM_0000416

ENVIRONMENTAL CONSEQUENCES

### Water Quantity

Applications of herbicides to aquatic systems would not directly modify water quantity. However, indirect impacts to water quantity could occur if treatments involving the removal of unwanted aquatic vegetation were to reduce plant uptake of water, thereby increasing the amount of available water.

## Terrestrial Vegetation Control Using Herbicides

### Water Quality

The four primary means of off-site movement of herbicides are runoff, drift, misapplication/spills, and leaching. Surface water could be affected by any of these means, while groundwater potentially would be affected only by leaching. Site conditions and application technique are other factors that can influence the effects of an herbicide on water quality.

**Runoff and Leaching.** There are three physical properties that, when combined with climate, geology, and topography, determine the runoff and leaching potential of an herbicide: 1) persistence, which is the time a chemical stays active; 2) soil adsorption, which is the tendency of a chemical to bind to soil particles; and 3) solubility, which is the tendency of a chemical to dissolve in water (BPA 2000).

Herbicides must be relatively persistent in order to have either leach or runoff potential (non-persistent herbicides do not stay active long enough to create a risk). If an herbicide has a high soil adsorption, it is more likely to run off with soil movement. Soils high in organic content or clay tend to be the most adsorptive, while sandy soils low in organic content are typically the least adsorptive (USDI BLM 1991a). If an herbicide has low soil adsorption, it is likely to leach down through the soil. If an herbicide is highly soluble in water, it is likely to leach; with low solubility, it is likely to run off. Tables 4-8 and 4-9 list the factors associated with herbicide movement to groundwater, and physical properties and off-site movement potential (leaching and runoff) for each currently available and proposed herbicide.

Even if an herbicide has runoff or leaching potential, the likelihood of it reaching a water body also depends on site characteristics. For example, if a persistent herbicide with a high potential for leaching to groundwater was used at a site with low annual precipitation, and the depth to groundwater was over 100 feet, the overall potential for that herbicide to reach groundwater before degrading would be quite low. Conversely, the same herbicide, applied at a site with high annual rainfall, coarse underlying soils, and groundwater depths less than 100 feet would have a higher relative potential of reaching groundwater. Herbicides that are highly water soluble, relatively persistent, and not readily adsorbed by soil particles have the greatest potential for movement into the groundwater. Sandy soils low in organic content are the most susceptible to groundwater contamination (USDI BLM 1991a).

**Drift.** Herbicide drift can degrade surface water quality. Herbicides can reach water through drift, the airborne movement of herbicides beyond the treatment area. Three factors contribute to drift: 1) application technique; 2) weather conditions; and 3) applicator error. Aerial and broadcast applications are most likely to reach water through drift, because the herbicide is sprayed from a helicopter/plane or through a boom and must settle through the air to reach the treatment area. Spot and localized applications are less likely to result in drift because these applications are targeted to specific plants, and less herbicide is applied. Wind speed and air temperature, and their effect on herbicide evaporation, affect the potential for drift. During application when winds are over 5 mph and temperatures are warm, the potential for drift is greater (BPA 2000). Peak concentrations from aerial spraying of fine droplets with 50- to 70-foot buffer zones commonly range from 0.130 to 0.148 ppm (USDA 1988). Well-vegetated buffers can intercept herbicides and reduce the potential for herbicides to reach surface water. The BLM typically uses nozzles that produce large droplets, and requires 100-foot or wider buffers, to minimize the risk of herbicides drifting into surface waters (USDI BLM 1991a). Still, buffer widths up to 1,500 feet may be required for some herbicides to protect sensitive aquatic species from exposure to aerial drift (Appendix C).

The potential for spray drift to impact perennial and intermittent streams would be low because minimum 10-foot (ground-hand application), 25-foot (ground-vehicle), or 100-foot (aerial) buffers would be provided between treatment areas and water bodies (Note: The BLM would use information in the ERAs to develop more precise buffer distances based on soil, precipitation, vegetation, and treatment characteristics; see Appendix C). Herbicides applied near water bodies would have to move through the buffers, and would likely be mixed and diluted. The potential for spray drift to impact ephemeral streams would be

BLM_0000417

TABLE 4-8
Factors Associated with Herbicide Movement to Groundwater

| Category | Properties Increasing Likelihood of Groundwater Detection |
|---|---|
| Herbicide properties | Greater mobility (lower adsorption) Greater pesticide persistence (lower reactivity) |
| Agricultural management practices | Higher pesticide use Increasing proximity to pesticide application areas Reductions in depth or frequency of tillage |
| Well characteristics | Decreasing well depth Dug or driven (versus drilled) wells Poorer integrity of surficial or annular well seals |
| Hydrogeologic and edaphic factors | Unconsolidated aquifer materials (versus bedrock) Decreasing depth of upper surface of aquifer Decreasing thickness or absence of confining layers Higher hydraulic conductivity Higher soil permeability Increased recharge (from precipitation or irrigation) Younger groundwater age |
| Source: Barbash et al. (1999). | |

greatest because there are no proposed buffers for these streams. Herbicides applied near ephemeral streams are often liberated during storm surges (USDI BLM 1991a; Appendix C).

**Misapplications and Spills.** Herbicides registered for use in terrestrial habitats may affect surface water and groundwater as a result of unintentional spills or movement of herbicides from the upland sites into aquatic systems. Pollution results from herbicide concentrations that are elevated enough to impair water quality and the beneficial use of that water (USDI BLM 1991a). The potential for upland herbicide applications to reach water is affected by the herbicide's physical properties, the application method and rate, and site conditions (BPA 2000).

Most experts agree that misapplications and spills are the leading cause of impacts on non-target resources. Misapplications and spills are caused by failure to follow label instructions and restrictions, and by applicator carelessness. The impacts of spills depend on the persistence and mobility of the spill, as well as how quickly and thoroughly the spill is cleaned up.

**Site Conditions.** Site conditions that determine the potential for an herbicide to intercept water include proximity of the treatment area to water and buffer width. The type of water body determines the potential for contamination, should an herbicide reach the water body. Small, still water bodies, such as ponds and small wetlands, are the most likely to be affected; these water bodies move small volumes of water and have a limited ability to disperse or dilute contaminants. By contrast, large fast-moving rivers would be least likely to be affected because the volume and turbulence of the water would help dilute the herbicide quickly (BPA 2000).

Rainfall is another factor affecting the potential for herbicides to contaminate water bodies after treatment. Herbicides, particularly granular formulations, are likely to be washed from treatment areas toward water bodies.

The vegetation, ground cover, or soil type between a treatment area and a water body can influence whether herbicides will reach water. Thick vegetation might block drift or absorb an herbicide moving through water or ground before it reaches a water body. In comparison, where little to no vegetation is present, the herbicide would encounter less resistance when washing toward the water body.

Additional effects to water quality that could occur from herbicide treatments include increased nutrient loads to surface water and groundwater. Soluble nutrients can enter surface water or groundwater. Nutrients adsorbed to particles may be moved to water bodies by wind and water erosion. Nutrient enrichment of aquatic systems can lead to algal blooms and eutrophication (mineral and organic nutrient loading and subsequent proliferation of plant

BLM_0000418

ENVIRONMENTAL CONSEQUENCES

**TABLE 4-9**
**Herbicide Physical Properties and Off-site Movement Potential**

| Herbicide | Physical Properties | | | Off-site Movement Potential | |
|---|---|---|---|---|---|
| | Persistence | Solubility (mg/l) | Adsorption (Koc) | Groundwater Leaching | Surface Water Runoff |
| *Aquatic Use Herbicides* | | | | | |
| 2,4-D | Moderate | $3.39 \times 10^4$ | 19-109 | Moderate | Low |
| 2,4-DP | Low | 50 | 1,000 | Low | Moderate |
| Diquat | High | 700,000 | 690 | Low | High |
| Fluridone | Low | 10 | 1,000 | Low | High |
| Glyphosate | Moderate | 900,000 | 24,000 | Low | High |
| Imazapyr | Moderate | >11,000 | 100 | High | Low |
| Triclopyr TEA | Moderate | 2,100,000 | 20 | High | Low |
| Triclopyr BEE | Moderate | 23 | 780 | Low | High |
| *Terrestrial Use Herbicides* | | | | | |
| Asulam | Low | 7 | 55,000 | Moderate | Low |
| Atrazine | Moderate | 33 | 100 | High | Moderate |
| Bromacil | Moderate | 700 | 32 | High | Moderate |
| Chlorsulfuron | Moderate | 7,000 | 400 | High | Low |
| Clopyralid | Moderate | 300,000 | 6 | High | Low |
| Dicamba | Moderate | 400,000 | 3 | High | Low |
| Diflufenzopyr | Low | 5,850 | 18-156 | High | Moderate |
| Diuron | Moderate | 42 | 480 | Moderate | High |
| Fosamine ammonium | Low | Completely soluble | 79 | Low | Low |
| Hexazinone | High | 33,000 | 40 | High | Moderate |
| Imazapic | High | 2,200 | 206 | Low | Low |
| Mefluidide | Low | 180 | 200 | Low | Moderate |
| Metsulfuron methyl | Moderate | 9,500 | 35 | High | Moderate |
| Picloram | Moderate | 200,000 | 16 | High | Low |
| Simazine | Moderate | 6 | 130 | High | Moderate |
| Sulfometuron methyl | Low | 70 | 78 | Moderate | Moderate |
| Tebuthiuron | High | 2,500 | 80 | High | Low |
| Sources: USDI BLM (1991a), Vogue et al. (1994), Mahler et al. (1998), and BPA (2000). | | | | | |

life), resulting in decreased dissolved oxygen contents. The extent and duration of effects would be dependent on the geographic location, and on the extent of vegetation removal, as well as on revegetation management practices. The removal of large amounts of vegetation along streams could lead to higher water temperatures, to the detriment of fish and other aquatic organisms.

In contrast to the negative effects to water that could result from herbicide treatments, herbicide use can benefit water quality if vegetation removal reduces the risk of fire and post-fire sedimentation. Treatment of upland areas could reduce hazardous fuels and contribute to long-term benefits to surface water quality by reducing the risk of high-intensity wildfires. In addition, the use of herbicides to control invasive species in terrestrial and aquatic systems could provide long-term benefits to water quality with the return of more stable soils, attenuated nutrient cycling, and a return to normal fire cycles.

**Application Technique.** Application technique can also have an impact on leaching and runoff potential. Applications over large areas (broadcast and aerial techniques) are more likely to result in deposition of herbicides in soils than spot or localized treatments, thus increasing the potential for runoff and leaching.

From a watershed perspective, the concentration and amount of the herbicide applied can influence the risk of water contamination. The ratio of treated to untreated surface area in any given watershed is usually sufficiently low to permit rapid dilution. This ratio is

BLM_0000419

much lower than that for the concentrated areas or blocks of land typically targeted by the BLM for rangeland and forestry treatments. For example, aerial application of herbicides along a 100-foot wide ROW would result in about 2% to 3% of a 640-acre area (section) being treated. By contrast, treatment areas of 10% to 25% per section can occur in forestry practice, and areas greater than 75% per section are common in rangeland applications. Risk of direct application to streams along ROW would increase if the linear flight path of the applicator crossed several streams. No single factor can be used to anticipate the effect of herbicides on stream systems. By following label instructions and restrictions, and establishing buffers, applicators can reduce the potential for herbicides to reach water bodies.

### *Water Quantity*

The use of herbicides to remove vegetation could affect water quantity by altering both the magnitude of base flows and the frequency and magnitude of peak flows. For some treatment areas, the removal of vegetation, especially in large quantities, could improve groundwater recharge by limiting the amount of water lost through sublimation or plant evapotranspiration. In this case, base flows, which are dependent on the quantity of groundwater discharge, would increase. These changes could be very minor or short-lived if the vegetation did not evapotranspirate or sublimate large proportions of precipitation, or if areas were revegetated quickly (Satterlund and Adams 1992).

Under some circumstances, vegetation removal could result in the reduction of groundwater discharge and base flow as a function of reduced infiltration rates. Reduced infiltration rates result in more surface runoff reaching streams and lakes immediately after a rain event, thus increasing the velocity, frequency, and magnitude of peak stream flows. These changes in water quantity could alter the physical characteristics of stream channels and affect the speed of water movement. Any changes would last until the site was revegetated.

## Impacts by Herbicide

### Aquatic Vegetation Control

#### *2,4-D*

The salt formulation of 2,4-D is registered for use in aquatic systems. 2,4-D is a known groundwater contaminant; the USEPA has set a maximum concentration of 0.07 mg/L as a permissible level for this herbicide in potable water.

Concentrations of up to 61 mg/L 2,4-D have been reported immediately following direct application to water. Based on label directions, treated water should not be used for irrigation if the water could be consumed by humans. Concentrations as low as 0.22 mg/L can damage sensitive plants (Que Hee and Sutherland 1981 *cited in* Tu et al. 2001).

There are conflicting conclusions regarding biodegradation of 2,4-D in aquatic systems (Que Hee and Sutherland 1981 and Wang et al. 1994 *cited in* Tu et al. 2001). Biodegradation can take place in bottom sediments if the appropriate microbial population is present and the pH level is sufficiently high, but it is not likely to occur in the water column. Under acidic conditions, when microbial activity is inhibited (Sandmann et al. 1988 *cited in* Tu et al. 2001), biodegradation may not occur. Differences in reported half-lives of 2,4-D may arise from differences in the microbial populations in treatment areas and the influence of plants on soil biological and chemical properties (Boucard et al. 2005).

2,4-D changes form and function with changes in pH (Que Hee and Sutherland 1981 *cited in* Tu et al. 2001). In alkaline waters, 2,4-D takes a negatively-charged form that is water-soluble and remains in the water column. In water of a lower pH, 2,4-D remains in a neutral molecular form, increasing its potential for adsorption to organic particles in water and increasing its persistence. 2,4-D is predicted to adsorb to suspended particles in muddy waters with a fine silt load (Que Hee and Sutherland 1981 *cited in* Tu et al. 2001), but little adsorption has been observed in the field (Halter 1980 *cited in* Tu et al. 2001).

In terrestrial applications, most formulations of 2,4-D do not bind tightly with soils, and therefore have a moderate potential to leach into the soil column and to move off site in surface or subsurface water flows (Johnson et al. 1995 *cited in* Tu et al. 2001). In a study on groundwater expressed as spring flow, 2,4-D was detected in 7% of the samples (Wood and Anthony 1997).

#### *Diquat*

Diquat would be applied to remove emergent, floating, or submerged aquatic vegetation. In aquatic systems, diquat (ionic) adsorbs to sediment, suspended solids, and aquatic vegetation, and becomes immobilized

BLM_0000420

ENVIRONMENTAL CONSEQUENCES

(Simsiman and Chesters 1976). Thus, diquat is ineffective in turbid waters. Loss of diquat from aquatic systems, both through photolysis and biodegradation, is possible, but only when the herbicide is not adsorbed to solid surfaces. When adsorbed, the herbicide is protected from biodegradation and photolysis (Howard 1991). Aquatic half-lives of 1 to 2 days have been reported for diquat, as a result of sorption onto particulates and sediments (National Library of Medicine 2002). Diquat is a known groundwater contaminant, and the USEPA has set a maximum concentration level of 20 μg/L for potable water. It has a moderate potential to leach into the groundwater and a high potential to be transported in surface water runoff.

### Fluridone

Fluridone would be applied to ponds, lakes, canals, and reservoirs, but has limited use in flowing water because it works through contact maintained over several weeks. Water quality is not degraded when fluridone is used at a concentration of less than 20 ppb, and it is generally considered safe to use in areas where swimming or fishing occur (Washington Department of Ecology 2002). Whole-lake treatments using fluridone are possible because the herbicide does not cause a rapid plant kill, which could result in oxygen-depleted water and reduced water quality.

Photodegradation in aquatic systems is an important loss pathway for fluridone (British Crop Protection Council and The Royal Society of Chemistry 1994). Fluridone is stable to hydrolysis, volatilizes slowly from water, and adsorbs to suspended solids and sediments (USEPA 1986; Lyman et al. 1990; Tomlin 1994; Mackay et al. 1997; ENSR 2005g). Desorption from sediments followed by photolysis is reported to be a loss pathway (ENSR 2005g). Biodegradation can also remove fluridone from aquatic systems. Aquatic dissipation half-lives from 4 days to 9 months (anaerobic sediments) have been reported. Fluridone has low potential to leach to groundwater and is not known to contaminate groundwater. It does have high potential to be transported in stormwater runoff.

### Glyphosate

Glyphosate, which is registered for aquatic use, would be applied to wetland and emergent aquatic vegetation. Glyphosate dissipates rapidly from surface water through adsorption to organic substances and inorganic clays and by biodegradation (Folmar et al. 1979; Feng et al. 1990; Zaranyika and Nydandoro 1993; Paveglio 1996 cited in Tu et al. 2001). It does not photodegrade,

and in water has an estimated half-life of 12 days to 10 weeks. It is generally considered immobile because of its adsorption characteristics; however, it is a known groundwater contaminant. The USEPA has set a maximum concentration limit of 0.7 mg/L as a permissible level for glyphosate in potable water.

Strong adsorption to particles slows microbial degradation, allowing glyphosate to persist in aquatic environments. Glyphosate can be inactivated by adsorption if mixed with muddy water (Tu et al. 2001). Residues adsorbed to suspended particles are precipitated into bottom sediments where they can persist until biodegraded or be released into water (Goldsborough and Brown 1993 and Extension Toxicology Network 1996a cited in Tu et al. 2001).

Glyphosate is unlikely to enter waters through surface runoff or subsurface flow because it binds strongly to soils, except when the soil itself is washed away by runoff; even then, it remains bound to soil particles and generally unavailable (Rueppel et al. 1977 and Malik et al. 1989 cited in Tu et al. 2001). More recent studies found solution-phase glyphosate in 36% of 154 stream samples, while its degradation product, aminomethylphosphonic acid, was detected in 69% of the samples. The highest measured concentration of glyphosate was 8.7 μg/L, well below the USEPA's maximum concentration limit of 700 μg/L.

Glyphosate may stimulate algal growth at low concentration; Austin et al. (1991) have suggested that this could contribute to eutrophication of waterways. An increase in periphyton concentrations in artificial streams has been reported by Austin et al. (1991), and Wong (2000) reported an increase in chlorophyll-a synthesis by a green microalgae (Scenedesmus quadricauda) at a concentration of 0.02 mg/L (cited in SERA 2003a).

### Imazapyr

Imazapyr is registered for use in aquatic systems, including brackish and coastal waters, to control emergent, floating, and/or riparian and wetland plants. Imazapyr is water soluble and potentially mobile (SERA 2004d). Imazapyr is rapidly degraded by sunlight in aquatic solutions, with a half-life of approximately 2 days that decreases with increasing pH (Mallipudi et al. 1991 and Mangels 1991 cited in Tu et al. 2001). Imazapyr does not appear to degrade in anaerobic systems, such as wetland soil or lake or pond sentiments, and will bind strongly to peat (American Cyanamid 1986 cited in Tu et al. 2001).

BLM_0000421

In their literature review of imazapyr, Tu et al. (2001) found no reports of imazapyr contamination in water despite its potential for mobility. It is not known to be a groundwater contaminant. Battaglin et al. (2000) stated that little is known about its occurrence, fate, or transport in surface water or groundwater. In one study, imazapyr (from terrestrial applications) was detected in 4% of the 133 samples taken from streams, but was not detected in reservoirs or groundwater.

### Triclopyr

The two formulations of triclopyr, a triethyamine salt and a BEE, behave very differently in water. Both formulations are used to control woody riparian vegetation. However, only the triethylamine salt formulation of triclopyr (known as Garlon 3A[®], now marketed as Renovate 3[®]), is registered for use for selective control of submersed aquatic plants. Both formulations readily degrade to the acid form, which is the active form in plants.

The triethylamine salt formulation of triclopyr is soluble in water and photodegrades in several hours with adequate sunlight. Field studies have shown that triclopyr (salt formulation) and its metabolites dissipate from water, with half-lives ranging from 0.5 to 10 days and sediment dissipation half-lives ranging from 3 to 13 days (Petty et al. 2003). Johnson et al. (1995) found triclopyr acid in water had a half-life due to photolysis of 1 to 12 hours (*cited in* Tu et al. 2001). The rate of degradation in water is generally dependent on water temperature, pH, and sediment content.

No adverse effects on water quality were observed following triclopyr triethyamine salt applications in two studies of whole-pond applications in closed systems (no water exchange; Petty et al. 2001). Results of these studies were comparable with those of triclopyr dissipation studies conducted in reservoirs, lakes, and river systems, and indicated that the degradation and dissipation of triclopyr and its metabolites are similar in representative systems throughout the U.S. (Petty et al. 2001).

The BEE formulation (terrestrial use only, not registered for aquatic application) is not water-soluble and can partition into organic materials and be transported to sediments, where it is persistent. Alternatively, bound ester forms can degrade through hydrolysis or photolysis to triclopyr acid (Smith 1976 *cited in* Tu et al. 2001), which will diffuse into the water column and continue to degrade (Tu et al. 2001). The fate and effects of triclopyr BEE were investigated in a first-order forest stream (Thompson et al. 1995). Measurements of triclopyr in stream samples indicated that the ester form was rapidly converted to the acid, and that partition to organic materials occurred as chemical pulses moved downstream.

### Assessment of Impacts of Herbicides Used for Terrestrial Vegetation Control

#### Bromacil

Bromacil is mobile in soil and can reach groundwater and surface water. It can be persistent in most aquatic environments because it is stable to hydrolysis, and photodegradation occurs rapidly only under alkaline conditions (ENSR 2005b). Bromacil is a known groundwater contaminant, and the USEPA standard for drinking water is 90 µg/L. The environmental hazards section of current product labels includes a groundwater advisory warning users not to apply bromacil in areas with permeable soils in order to protect water quality. Biodegradation is a major loss mechanism in aerobic and anaerobic aquatic systems. Bromacil is not expected to partition to suspended particles or sediments in aquatic systems, but will remain dissolved in the water column and has a high potential to leach into the groundwater.

#### Chlorsulfuron

Chlorsulfuron is persistent and mobile in some soils. In aquatic environments, the environmental fate of chlorsulfuron is related to pH and temperature. Hydrolysis rates are fastest in acidic waters and slower in more alkaline systems (Sarmah and Sabadie 2002). As hydrolysis rates drop, biodegradation becomes the mechanism affecting the breakdown of chlorsulfuron. Photodegradation is not an important loss mechanism in natural systems, although photodegradation has been observed under laboratory conditions. Aquatic dissipation half-lives from 24 days to more than 365 days have been reported (ENSR 2005c), with a shorter time reported for flooded soil (47 to 86 days) than anaerobic aquatic systems (109 to 263 days; SERA 2004a). Chlorsulfuron is not known to be a groundwater contaminant, but has a high potential to leach into the groundwater. Chlorsulfuron has low potential to be transported in surface water; in a large study of surface water, chlorsulfuron was detected in only 1% of the 133 samples taken from Midwest streams (Battaglin et al. 2000).

BLM_0000422

ENVIRONMENTAL CONSEQUENCES

### Clopyralid

Clopyralid does not appear to bind tightly to soil and will leach under favorable conditions (SERA 2004b). However, leaching and subsequent contamination of groundwater appear to be minimal, which is consistent with a short-term monitoring study of clopyralid in surface water after an aerial application (Rice et al. 1997a *cited in* SERA 2004b). Clopyralid is not known to be a common groundwater contaminant, and no major off-site movement has been documented. Clopyralid does not bind with suspended particles in water; biodegradation in aquatic sediments is the main pathway for dissipation. The average half-life of clopyralid in water has been measured at 9 and 22 days (Dow AgroSciences 1998).

### Dicamba

Because dicamba is mobile in soil, terrestrial application of this herbicide can result in groundwater and surface water contamination under conditions that favor such activities. Biodegradation is the major mechanism for dicamba degradation in water. Although photodegradation occurs, it is not the major loss process. Hydrolysis and sediment adsorption are not significant loss mechanisms (Howard 1991). Dicamba is a known groundwater contaminant, and has a high potential to leach into groundwater. The USEPA has set health advisory concentration levels for dicamba (e.g. 300 µg/L for 1-day exposures), but has not set maximum concentration limits for potable water. Dicamba is registered for use on ditch banks, but should not be applied directly to water.

Following herbicide applications for 1 to 24 years, there were no detectable residues of dicamba in groundwater at two long-term tillage sites and one long-term manured site in Alberta (Miller et al. 1995). However, a regional study of pesticides in shallow groundwater in Delaware, Maryland, and Virginia detected dicamba in groundwater at low concentrations, generally less than 3 µg/L (Koterba et al. 1993).

### Diflufenzopyr

Diflufenzopyr appears to be soluble, with transportation from surface runoff following application, particularly when diflufenzopyr is applied on soils with neutral to alkaline pH. However, based upon proposed uses, fate characteristics, and model predictions, the USEPA does not include diflufenzopyr among constituents that occur in significant quantities in drinking water (USEPA

1999c). Diflufenzopyr is not a known groundwater contaminant.

Biodegradation, photolysis, and hydrolysis are important mechanisms in removing diflufenzopyr from aquatic systems. Its half-life is less than 1 month, with hydrolysis and photolysis rates higher in acidic environments. The aquatic dissipation half-life for diflufenzopyr is 25 to 26 days in aerobic and 20 days in anaerobic conditions. Diflufenzopyr's expected half-life in small ponds is estimated at 24 days. These factors suggest that diflufenzopyr would be removed from an aquatic environment relatively rapidly if contamination occurred (USEPA 1999c).

### Diuron

Diuron is a known surface water and groundwater contaminant. The USGS National Ambient Water Quality Assessment Program analyzed pesticide occurrence and concentrations for major aquifers and shallow groundwater in agricultural areas and found diuron in 71% of 2,608 samples. The maximum concentration of diuron was 0.34 ppb. The USEPA recently (February 2005) placed diuron on the drinking water contaminant candidate list. Diuron is currently labeled for use on ditch banks, but should not be applied directly to water.

In aquatic systems, biodegradation and photodegradation appear to be the primary loss mechanisms for diuron. An aquatic biodegradation half-life of 33 days has been reported for aerobic systems. Aquatic dissipation half-lives have been reported ranging from 3 to 10 days in anaerobic pond sediment to 177 days in a drainage ditch. Diuron is stable to hydrolysis and is unlikely to volatilize from aquatic systems (USEPA 2001a). Diuron is expected to adsorb to suspended solids and sediments (National Library of Medicine 2002).

The principal product of biodegradation is 3,4-dichloraniline (3,4-DCA), which also persists and exhibits higher toxicity than diuron (Tixier et al. 2002; Giacomazzi and Cochet 2004). In areas where diuron is used for crop production, monitoring has shown high concentrations of 3,4-DCA in small streams. 3,4-DCA was detected year-round in surface water (333 detections, 13 non-detections), with a range from 0.05 ppb (detection limit) to 26 ppb; the majority of the sample detections were less than 1 ppb (USEPA 2001a). At a poorly drained field site along an intermittent stream in Oregon, diuron and its transformation product, DCPMU (3-(3,4-dichlorophenyl)-1-methyl-urea), were

BLM_0000423

detected in the stream at a maximum concentration of 28 µg/L, and were detected in shallow groundwater immediately adjacent to a tributary stream at 2 to 13 µg/L. Movement through soil transported the herbicide and its metabolite to the stream, while surface runoff removed less than 1% of the applied herbicide (Field et al. 2003).

### Hexazinone

Hexazinone and its degradates persist, are highly mobile, and are readily washed into surface waters. Hexazinone has been identified as a groundwater contaminant in Hawaii, Minnesota, Georgia, Arkansas, Florida, Maine, and North Carolina. The USEPA Office of Water has issued a lifetime health advisory, which sets a maximum concentration level of 0.21 mg/L for hexazinone in drinking water. In addition, the USEPA requires a groundwater advisory on all product labels stating that hexazinone must not be used on permeable soils. In areas where irrigation water is contaminated with hexazinone or where groundwater discharges to surface water, hexazinone residues in water could pose a threat to plants. Hexazinone is labeled for use on ditch banks, but should not be applied directly to water.

In surface water, hexazinone resists photodegradation (Neary et al. 1983 *cited in* Tu et al. 1991). Hexazinone does not bind strongly to particulates or sediments. The main method of degradation is by microorganisms in soils. The average half-life of hexazinone in soils and water is 90 days (Tu et al. 2001). Hexazinone has been detected in streams near terrestrial application sites up to 30 days after treatment, and reported in runoff up to 6 months post-treatment in a forestry dissipation study (Neary and Michael 1996; Michael et al. 1999). Mayack et al. (1982) and Neary et al. (1984, 1993 *cited in* Tu et al. 2001) concluded that hexazinone was diluted in the mainstream flow to very low concentrations in forested watersheds.

### Imazapic

In aquatic systems, imazapic rapidly photodegrades, with a half-life of 1 to 2 days (Tu et al. 2001). Since aerobic biodegradation occurs in soils, aerobic biodegradation is likely important in aquatic systems. Aquatic dissipation half-lives have been reported from 30 days (water column) to 6.7 years in anaerobic sediments (SERA 2004c). Little is known about the occurrence, fate, or transport of imazapic in surface water or groundwater (Battaglin et al. 2000). However, according to the herbicide label for Plateau®, in which

imazapic is the active ingredient, it is believed to be a groundwater contaminant (BASF 2004).

### Metsulfuron Methyl

Metsulfuron methyl is stable to hydrolysis at neutral and alkaline pHs and has a half-life of 3 weeks in acidic systems (Extension Toxicology Network 1996b). The persistence of metsulfuron methyl (initial concentration 10 µg/L) was investigated using in situ enclosures in a woodland/boreal forest lake, and the half-life was estimated at approximately 29 days (Thompson et al. 1992). Adsorption to sediments and suspended solids is not expected to be an important fate (USDA 1995). Little is known about the occurrence, fate, or transport of metsulfuron methyl in surface water or groundwater (Battaglin et al. 2000). Metsulfuron methyl is not known to be a groundwater contaminant, although it has a high potential to leach into the groundwater.

### Picloram

Picloram can move off site through surface or subsurface runoff, and has been detected in the groundwater of 11 states (Howard 1991 *cited in* EXTOXNET 1996c). The USEPA's maximum concentration level for picloram in potable water is 0.5 mg/L. Picloram does not bind strongly with soil particles and is not degraded rapidly in the environment (Tu et al. 2001). Concentrations in runoff have been reported to be great enough to damage crops, and could cause damage to certain submerged aquatic plants (Forsyth et al. 1997 *cited in* Tu et al. 2001). Therefore, picloram should not be applied near waters used for irrigation or adjacent to areas with aquatic species of concern.

Picloram may degrade through photolysis, especially in non-turbid and moving water. Woodburn et al. (1989) found that the half-life of picloram in water was 2 to 3 days (*cited in* Tu et al. 2001). Maximum picloram runoff generally occurs following the first significant rainfall, after which runoff concentrations drop to levels that persist up to 2 years post-application (Scifres et al. 1971; Johnsen 1980; Mayeux et al. 1984; and Michael et al. 1989 *cited in* Tu et al. 2001).

### Sulfometuron Methyl

Sulfometuron methyl degrades quickly by hydrolysis in acidic water, but is stable in neutral water. Biodegradation and photolysis are major loss pathways in aquatic systems, where hydrolysis rates generally are slow. Aquatic dissipation half-lives are estimated at 1 to

BLM_0000424

ENVIRONMENTAL CONSEQUENCES

3 days to 2 months in aerobic systems, and several months in anaerobic sediments (Extension Toxicology Network 1996d). Little is known about its occurrence, fate, or transport in surface water or groundwater in the U.S. (Battaglin et al. 2000). Sulfometuron methyl is not known to be a groundwater contaminant. In one surface water study, sulfometuron was detected in 2% of 133 samples taken from streams.

### *Tebuthiuron*

Tebuthiuron persists in the environment, perhaps because of its low sorption affinity to soil. Tebuthiuron can be used on ditch banks, but should not be applied directly to water. In one study of 71 streams, tebuthiuron was detected in 16% of 134 stream samples taken, with concentrations up to 0.076 µg/l, but was not detected in groundwater (Battaglin et al. 2001). In water, tebuthiuron is resistant to hydrolysis and photolysis, although some photodegradation has been reported at a pH of 9 (National Library of Medicine 2002). Tebuthiuron is expected to slowly biodegrade in aquatic systems. Aquatic dissipation half-lives are estimated to be longer than 1 month under aerobic conditions, and longer than 12 months under anaerobic conditions (USEPA 1994a).

### Other Herbicides Previously Approved for Use on BLM Lands

Asulam, atrazine, fosamine, mefluidide, simazine, and 2,4-DP (also known as dichlorprop) are currently approved for use on public lands. However, the historical use of these herbicides by the BLM has been quite limited, with only fosamine used in the last 7 years. 2,4-DP is registered to control aquatic weeds in ditches and for upland purposes, is mobile in soils, and has been detected in surface water and groundwater (National Library of Medicine 2002). Both atrazine and simazine persist in rainwater, groundwater, and surface water. Mefluidide and fosamine are not commonly known to contaminate groundwater or surface water. Fosamine adsorbs to soil and biodegrades, making it less likely to be mobilized. However, upon reaching water it is generally stable until it partitions into sediments (Tu et al. 2001).

## Impacts by Alternative

The BLM would focus treatment efforts on watersheds that provide opportunities for watershed improvement and protection (USDI BLM 2000a). In addition, the BLM would strive to increase the number of properly

functioning wetland/riparian areas and uplands to benefit water quality.

Much of this work would be directed at hazardous fuels and weed reduction to improve watershed function and water quality and reduce the risk of catastrophic fires. When fire clears the vegetation, the soils that were anchored by root systems become vulnerable to wind and water erosion. When soils are carried into lakes and streams, water quality diminishes as a function of increased sedimentation and turbidity (USDI BLM 2000d). Work would also be directed at controlling invasive vegetation, such as pinyon and juniper that have overtaken many native shrub and grassland communities. These trees diminish water that native species are reliant upon and can cause increased soil erosion (USDI BLM 1999).

Watersheds dominated by annual grasses such as downy brome offer far less protection from wildland fire and erosion than those dominated by native grasses. The reduced cover provided by annuals allows more rainfall to strike the soil surface, loosening soil particles and forming a seal over the pores at the soil surface. As the pores seal, infiltration decreases, which leads to increased runoff and loss of soil moisture. Eventually, soils are transported to streams and other aquatic bodies, increasing sedimentation and reducing water quality.

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under the No Action Alternative, the BLM would treat an estimated 305,000 acres per year using the current vegetation treatment programs in 14 western states. This alternative is a continuation of the current vegetation management program using both ground-based and aerial treatment methods. Public lands in Alaska, Nebraska, and Texas have not been part of the herbicide program historically, and would not be included under this alternative.

Impacts to surface water and groundwater quality and quantity would be similar to impacts from the ongoing program. Under the No Action Alternative, it is unlikely that 2,4-DP, asulam, atrazine, mefluidide, and simazine would be used, and fosamine might only be used on a limited basis (<100 acres annually). Of these herbicides, atrazine, simazine, and 2,4-DP are known groundwater contaminants.

Based on historic use, 2,4-D, glyphosate, picloram, and tebuthiuron would constitute approximately 70% of herbicide use. All of these herbicides are known

BLM_0000425

groundwater contaminants, although only glyphosate has high surface water runoff potential. In addition, of the other herbicides proposed for use, diquat, diuron, bromacil, dicamba and hexazinone are also known to be groundwater contaminants. For most terrestrial applications, herbicide concentrations are diluted as they move from the treated site to downgradient locations (Michael 2000). Out of 236 studies of pesticide contamination of surface waters in drainage basins throughout the U.S., none reported pesticide concentrations exceeding USEPA safe levels for human health, except where chemicals were applied directly to or spilled into the stream channel (Larson et al. 1997).

Under the No Action Alternative, Overdrive®, diquat, fluridone, and imazapic would not be available for use. Both diquat and fluridone are considered effective against the invasive plant Eurasian watermilfoil, as well as other problematic aquatic plants (Washington Department of Ecology 2002, Skogerboe 2003). Triclopyr would be the only herbicide under this alternative available to treat submersed vegetation. Prohibiting the use of two proposed herbicides available for treatment of aquatic plants would potentially allow for continued negative effects on water quality associated with some forms of weeds and invasive aquatic vegetation, potentially resulting in degraded fish and wildlife habitat and limited recreation opportunities.

Fewer acres would be treated under this alternative than under the other alternatives. Therefore, impacts on water quality and quantity from herbicides would be more limited. However, continued impacts to water quality and quantity from invasive plant species over the untreated areas could potentially occur.

## Alternative B – Expand Herbicide Use and Allow For Use of New Herbicides in 17 Western States (Preferred Alternative)

Under the Preferred Alternative, an estimated 932,000 acres per year would be treated across 17 western states. Out of all the alternatives, this is the largest acreage proposed for treatment. Therefore, benefits and risks to surface water and groundwater would be greater than under the other alternatives. It is estimated that several thousand acres of public lands are being newly infested by noxious invasive weeds each day. The result is damage to watersheds and subsequent deterioration in water quality and quantity. Until more acres are treated, it will be impossible for the BLM to bring the spread of invasive plants down to a reasonable level by locating and treating new infestations, and reducing the size of existing infestations.

Under the Preferred Alternative, herbicide use in Alaska, Nebraska, and Texas would be allowed, although little or no herbicide treatment is planned for Alaska. Use in Nebraska and Texas would allow for a more comprehensive weed management program that would help reduce the negative effects of invasive species in those two states.

This alternative would prohibit the use of 2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine, but would allow four new herbicides (Overdrive®, diquat, fluridone, and imazapic) to be used, in addition to approved herbicides. Approximately 10% of treatment acres would be treated using these new herbicides. Diquat and fluridone could be directly applied in aquatic systems to control unwanted submersed aquatic vegetation. Approval of diquat and fluridone would provide new capabilities for controlling invasive aquatic plants and could provide benefits to water quality if invasive aquatic plants were eliminated. Fluridone, in particular, has been effective at controlling Eurasian watermilfoil without resulting in impacts to drinking water quality or recreation (Washington Department of Ecology 2002).

Both dicamba and diquat are known groundwater contaminants. However, increased protection of groundwater could be possible if imazapic (not known to contaminate groundwater) was used for treating terrestrial species in place of one of these known groundwater contaminants. Diflufenzopyr is not known to contaminate groundwater, but has a high potential to leach to groundwater. Except for fluridone, which has a high potential for surface water runoff, the proposed herbicides have low potential to flow to aquatic bodies in stormwater runoff.

## Alternative C – No Use of Herbicides

No herbicides would be used in the BLM vegetation management program under Alternative C. Some areas would not be treated, while other areas would be treated by mechanical, manual, or biological methods, or fire. Without treatment, land degradation would accelerate, leading to poorer water quality. As discussed in the PER, other treatments also impact water quality and quantity, with fire and mechanical treatments having the greatest effects. However, the risks of impacts to surface water and groundwater quality would be low under this alternative.

The only alternatives to herbicide treatment of submersed vegetation are mechanical or manual removal; water drawdown on controlled reservoirs,

BLM_0000426

ENVIRONMENTAL CONSEQUENCES

lakes, and ponds; and flooding with salt or brackish water. These treatments generally are not as effective as chemical treatments at controlling many invasive aquatic plants (Aquatic Ecosystem Restoration Foundation 2004, USDI BLM 2007a). Without effective treatment, some invasive aquatic plants would go largely uncontrolled, potentially resulting in degraded water quality and reduced quantity.

**Alternative D – No Aerial Applications**

Under Alternative D, herbicide treatment with four newly-approved herbicides and the previously-approved herbicides would be allowed in 17 states. These herbicides would be applied by ground application methods. The estimated area treated would be approximately 529,000 acres per year. Ground-based herbicide treatments could be used to replace aerial treatments in some locations, and non-herbicide treatment methods could be substituted in some areas unsuitable for ground-based herbicide treatment.

Aerial application has the advantage of treating large areas or areas of difficult terrain. However aerial application is more likely to result in misapplications or drift, and thus negatively impact water quantity and quality. The extent of the impact would depend on the weather, the size and location of the treatment area, the use of buffers, and the kind and concentration of herbicide used.

**Alternative E – No Use of Acetolactate Synthase-inhibiting Herbicides**

Under Alternative E, the BLM would not be able to use ALS-inhibiting herbicides (chlorsulfuron, imazapyr, imazapic, metsulfuron methyl, and sulfometuron methyl). Approximately 466,000 acres would be treated under this alternative. Aerial and broadcast treatments and treatments in wetland, riparian, wilderness, and cultural resource areas would be discouraged, while more passive treatment methods would be promoted. Of the six herbicides registered for aquatic use, imazapyr is ALS-inhibiting and would not be allowed. Of the four newly proposed herbicides, imazapic is ALS-inhibiting and would not be allowed.

Impacts associated with size of treatment area are discussed under Alternative C; impacts associated with aerial applications are discussed under Alternative D. Because of the smaller treatment acreage, the negative effects of weedy and invasive species on water quality and quantity could be greater than under the other alternatives. The risks to water quality and quantity

from use of herbicides would be lower than under the Preferred Alternative. Fewer treatments in wetland and riparian areas could correspond to greater impacts to surface water quality if wetland areas containing substantial infestations of invasive species were to remain untreated.

Currently, little is known about the occurrence, fate, or transport of ALS-inhibiting herbicides in surface water or groundwater in the U.S. (Battaglin et al. 2000, 2001). An extensive study of Midwestern streams, reservoirs, and groundwater in 1998 found relatively low concentrations of sulfonylurea and imidazolinone herbicides in 83% of 133 samples from streams, in 6 of 8 reservoir samples, and 5 of 25 groundwater samples. These results indicate that some ALS-inhibiting herbicides are mobile and may reach surface water and groundwater. Therefore, contamination of water resources by ALS-inhibiting herbicides would potentially be less than under the other alternatives.

## Mitigation for Herbicide Treatment Impacts

The following mitigation measure should be considered to reduce, minimize, or mitigate impacts to water resources from the use of herbicides:

- Establish appropriate (herbicide specific) buffer zones to downstream water bodies, habitats, and species/populations of interest (see Appendix C, Table C-16).

# Wetland and Riparian Areas

## Introduction

The BLM manages over 23 million acres classified as riparian or wetland. Wetland and riparian areas in the western U.S. and Alaska are influenced by human activity, natural disturbance, and local physical and biological conditions. Invasive plant species degrade wetland and riparian area function and present a challenge to vegetation management. An estimated 59,000 acres of wetland habitat and 16,500 stream miles on BLM lands lack characteristics necessary for "high" functioning wetland and riparian habitats (USDI BLM 2006d). Invasive plant species are one cause of degradation of wetland function.

The proposed herbicide treatments could cause long-term alterations to vegetation, hydrology, or soils to the extent that a specific area no longer functions properly

BLM_0000427

or is fragmented, the biodiversity of high quality areas is reduced, or special status wildlife or plants are harmed or displaced. Treatments would be beneficial, as they contribute to removal or control of invasive species and replacement with native species.

## Scoping Comments and Other Issues Evaluated in the Assessment

During scoping, concerns pertaining to treatment of wetland and riparian areas included protection of unique areas and areas of high biological importance; management of invasive species (e.g., saltcedar) that provide habitat for species that use aquatic and riparian areas; and the need to maintain species diversity and sensitive areas like vernal pools. One proposed treatment alternative included a suggestion to defer treatments in wetland and riparian areas where long-term control of invasive species is unlikely.

## Factors that Influence the Fate, Transport, and Persistence of Herbicides in Wetland and Riparian Areas

If applied directly to wetlands and riparian areas, herbicides dissipate by transport through water or wind, through chemical or biological degradation, or through adsorption and immobilization in soils. When herbicides are applied to well-drained areas, adjacent wetlands and riparian areas can play a critical role in filtering herbicides from runoff, through physical trapping and through chemical and biological processes. These affect herbicide availability, phytotoxicity, and fate and transport (Anderson 1982).

Saturated wetland soils have chemical and biological characteristics that are different from well-drained upland soils, including oxidation-reduction status, pH, and high organic content. For example, oxygen depletion of saturated soils facilitates oxidation-reduction, reductive chemical processes, and anaerobic microbial processes. Soil pH can be closer to neutral in wetland soils than in well-drained soils, or wetland soils may be more acidic than well-drained areas if peat is present. The characteristics of wetland soils affect their capacity to adsorb, transport, and transform herbicides. The extent of the effects on herbicide fate is dependent on the duration of saturation, soil temperature, the kind and amount of organic matter, and the nature and content of reactive chemicals present in the soil. For example, some chemical processes that degrade

herbicides only occur to measurable degrees when soils are anaerobic or lack free oxygen.

The rate of breakdown in anaerobic systems can be estimated by the measured anaerobic half-life (Table 4-10). Generally, anaerobic degradation processes are much slower than the degradation processes in well-drained soils where oxygen is present.

## Methodology for Assessing Impacts to Wetland and Riparian Areas

The BLM reviewed the literature and findings from ERAs to assess the impacts to aquatic plant species from the use of herbicides (ENSR 2005b-k, SERA 2005a). The ERA methods and results for aquatic and terrestrial vegetation are summarized in the Vegetation section of this chapter. Methods used by the BLM are presented in detail in the *Vegetation Treatments Programmatic EIS Ecological Risk Assessment Protocol* (ENSR 2004) and in Appendix C; methods used by the Forest Service are available at http://www.fs.fed.us/r6/invasiveplant-cis/.

Herbicide use poses potential risks to aquatic and riparian plant species. However, appropriate implementation of SOPs should minimize these risks (see Table 2-8). These SOPs include the following:

- Survey for special status aquatic and riparian plant species before treating an area.

- Use drift reduction agents to reduce the risk of drift hazard.

- Use a selective herbicide and a wick or backpack sprayer.

- Use an appropriate herbicide-free buffer zone for herbicides not labeled for aquatic use. This information is discussed in the ERA guidance provided in the Vegetation section of this chapter.

## Summary of Herbicide Impacts

### Impacts from Herbicides Applied to Wetlands and Riparian Areas

Use of herbicides to control aquatic and riparian vegetation can improve habitat quality for fish and wildlife, improve hydrologic function, and reduce soil erosion. Non-native species, such as purple loosestrife, form extensive monotypic stands that displace native vegetation used by wetland animal species for food and

BLM_0000428

ENVIRONMENTAL CONSEQUENCES

cover (Bossard et al. 2000). Purple loosestrife can also alter the hydrology and soil conditions of wetland pastures and impact recreational activities. Water-thyme is an aquatic species that forms large mats that fill the water column and can severely restrict water flow, leading to a decrease in habitat for fish and wildlife and water quality. Eurasian milfoil is an aquatic species that has spread widely over the western U.S. and has been found to alter the physical and chemical characteristics of lakes and streams. Much of the BLM's vegetation control effort in wetland and riparian areas would focus on these species.

Most aquatic herbicides are non-selective and could cause adverse impacts to non-target wetland and riparian species diversity, competitive interactions, species dominance, and vegetation distribution (Kleijn and Snoeijing 1997). Herbicide applications could reduce plant cover, leading to increased sedimentation, increased nutrient loading, alterations in native vegetation, and changes to temperature and hydrologic conditions.

An increase in soil erosion and surface water runoff could result from vegetation reduction, which could lead to streambank erosion and sedimentation in wetlands and riparian areas (Ott 2000). The amount and likelihood of streambank erosion and sedimentation would be directly proportional to the size of the treatment area (i.e., larger treatment areas would lead to increased risk of streambank erosion and sedimentation). Additionally, sedimentation could result in a reduction in the acres of wetland and riparian habitat.

The following six chemicals are approved for use in aquatic systems by the USEPA, including wetlands and riparian areas. Two of these chemicals (diquat and fluridone) are newly proposed for use on public lands.

### 2,4-D

2,4-D salt formulations are approved for use in riparian and aquatic systems. The principal hazard of 2,4-D exposure to non-target plants is from unintended direct deposition or spray drift (SERA 1998). 2,4-D salt formulations can be used in spot treatments and applied according to the labeled rate without substantially affecting native aquatic vegetation and without significantly changing species diversity (USDA Forest Service 2005, Washington Department of Ecology 2004). 2,4-D has been shown to be effective for treating Eurasian watermilfoil. 2,4-D ester formulations are toxic to fish and aquatic invertebrates and should not be

used near aquatic systems. Kuhlmann et al. (1995) found no biodegradation of 2,4-D under anaerobic (sulfate reducing) conditions in a laboratory experiment of sediments and groundwater. In aerobic riparian soils that have a high content of organic material, an active microbial community, high pH values, and high temperatures, toxic effects are limited because of rapid degradation of 2,4-D. 2,4-D may inhibit shoot and/or root growth of macrophytes in aquatic systems (Roshon et al. 1999).

### Diquat

Diquat, a contact herbicide approved for floating, submerged, and aquatic vegetation, would be used in ponds, lakes, canals, and reservoirs. Diquat persists in the environment, but is quickly adsorbed to soils and sediments, immobilizing it and rendering it unlikely to contaminate leachate or runoff. Target wetland species that could be controlled by diquat include Eurasian watermilfoil, water-thyme, water hyacinth, and giant salvinia. Diquat kills on contact, but it does not kill plant roots, and therefore it is often used for single-season control of submerged aquatic plants and not for plant eradication (Washington Department of Ecology 2004).

As a non-selective aquatic herbicide, diquat should not be applied in wetlands where there is the potential for killing or harming aquatic plants of concern. Large areas should not be treated with diquat in a single application without some procedure to remove treated vegetation, as studies have shown that rapid rates of plant decomposition following treatment may deoxygenate water, potentially resulting in negative effects to fish and other aquatic organisms.

### Fluridone

Fluridone is a slow-acting, broad-spectrum aquatic herbicide that can be used at low concentrations on both submerged and emergent aquatic plants. Fluridone photodegrades, volatilizes slowly from water, and adsorbs to suspended solids and sediments (National Library of Medicine 2002).

Fluridone would be used to treat ponds, lakes, canals, and reservoirs, but not flowing waters where contact time cannot be maintained. It is a non-selective herbicide at higher application rates, but is most frequently applied at lower application rates, where it selectively affects submerged aquatic plants while only minimally affecting emergent vegetation. Where the entire water body is infested with a non-invasive

BLM_0000429

ENVIRONMENTAL CONSEQUENCES

species, such as Eurasian watermilfoil, a whole water body treatment of fluridone can be used. Fluridone is not suitable for spot treatments (sites less than 5 acres within a larger water body), as it is difficult to maintain enough contact time between the plant and the fluridone to kill the plant (Washington Department of Ecology 2004).

### Glyphosate

Glyphosate is approved for fresh and brackish water, including estuaries, and wetland and emergent aquatic vegetation. Glyphosate may be used in riparian and aquatic habitats along shorelines for species such as purple loosestrife, reed canarygrass, giant reed, and cattail, and for floating aquatic species such as waterlily. Disking, with a follow-up application of glyphosate the following year, has been used effectively in Washington State to control reed canarygrass (Paveglio and Kilbride 2000) Glyphosate is also used to control grasses, herbaceous plants, and some broadleaf trees and shrubs in riparian areas. Glyphosate dissipates rapidly from surface water by adsorption and biodegradation and may move into surface water with eroded soil particles.

Freshwater aquatic macrophytes and algae are reported to be sensitive to glyphosate at concentrations as low as 20 mg/l; however, stimulation in growth of some green algae has also been reported at low concentrations (0.02 mg/l; SERA 2003a).

### Imazapyr

Imazapyr is approved for use in wetlands and riparian areas, including brackish and coastal waters. It is used to control emergent and floating plants. Imazapyr has been shown to be effective in the management of saltcedar, which has invaded many riparian zones throughout the western U.S.. Imazapyr is used to treat emergent wetland plants such as cordgrass, reed canarygrass, and phragmites, and floating plants such as waterlily. Imazapyr use may result in effects to non-target aquatic vegetation, and high concentrations of imazapyr in surface water may adversely affect some aquatic macrophytes (SERA 2004d).

Residual soil contamination with imazapyr could be prolonged in some areas, possibly resulting in substantial inhibition of plant growth (SERA 2004d). Imazapyr is not likely to degrade in anaerobic soils or sediments, and has been shown to strongly bind to peat (American Cyanamid 1986, SERA 2004d).

**TABLE 4-10**
**Anaerobic Half-life in Soil for Herbicides Analyzed in this PEIS**

| Herbicide | Anaerobic Soil Half-life (days) |
|---|---|
| 2,4-D | 333 |
| 2,4-DP | > 200 |
| Asulam | > 14 |
| Atrazine | 15-77 |
| Bromacil | 144 to 198 |
| Chlorsulfuron | 109 to 263 |
| Clopyralid | > 1,000 |
| Dicamba | Not determined |
| Diflufenzopyr | 20 |
| Diquat | > 1,000 |
| Diuron | 5 to 100 |
| Fluridone | 4 to 270 |
| Fosamine ammonium | 4 |
| Glyphosate | 12 to 70 |
| Hexazinone | Stable |
| Imazapic | > 1,000 |
| Imazapyr | > 500 |
| Mefluidide | No information found |
| Metsulfuron methyl | 338 |
| Overdrive® | 88 |
| Picloram | > 500 |
| Simazine | 71 |
| Sulfometuron methyl | 60 |
| Tebuthiuron | Not determined |
| Triclopyr | < 1 |

Sources: Krueger et al. 1991; USEPA 1992, 1994a, b, 1995c, 1996, 1999a, 2001b, 2003d ; Krzyszowska et al. 1994; Tomlin 1994; Kuhlmann et al. 1995; SERA 1997, 2003a, 2003b, 2004c, 2004d, 2004e; Harrison et al. 1998; Strek 1998a, b; Suzuki et al. 2001.

### Triclopyr

Triclopyr controls a variety of weed species and can be effective as a spot treatment for Eurasian watermilfoil because it is relatively selective for this species at low application rates. In addition, it is effective in riparian areas as a treatment for purple loosestrife, as it does not damage native grasses and sedges (Washington Department of Ecology 2004).

Commercial formulations of triclopyr may contain the triethylamine salt (TEA) or the BEE formulations, both of which degrade to an acid form. Both formulations are used to selectively treat unwanted riparian woody vegetation; however, only the TEA formulation is approved for selective control of submersed aquatic vegetation (SERA 2003c). Triclopyr BEE is projected

BLM_0000430

ENVIRONMENTAL CONSEQUENCES

to be somewhat more hazardous when used where runoff to open water may occur.

**Impacts from Herbicides Applied to Uplands**

Non-target wetland and riparian areas could be exposed to herbicides through a variety of routes, including accidental spills or direct spray, local spray drift from adjacent target areas, surface water runoff, and soil erosion (Karthikeyan et al. 2003). Risks to wetland and riparian non-target species would depend on a number of factors, including the amount, selectivity, and persistence of the herbicide used; the application method used; the timing of the application; and the plant species present. Risks to wetlands and riparian areas from surface runoff would be influenced by precipitation rates, soil types, and proximity to the application area. Some herbicides (e.g., sulfometuron methyl) that adsorb onto soil particles could be carried off site, increasing their risk of affecting vegetation in wetlands and riparian areas.

Unintentional applications can have severe negative impacts on wetland and riparian systems. In particular, accidental spills near wetland and riparian areas could be particularly damaging to wetland and riparian vegetation. Spray drift can also degrade water quality in wetland and riparian areas and could damage non-target vegetation.

### Bromacil

Bromacil is not selective, and accidental exposure could injure riparian shade trees and other desirable non-target wetland and riparian vegetation. Bromacil is mobile and has the ability to persist in wetland environments.

### Chlorsulfuron

Chlorsulfuron is effective at low concentrations and is prone to leaching. Hydrolysis rates are the fastest in acidic waters and are slower as the pH rises (Sarmah and Sabadie 2002). When hydrolysis rates drop, biodegradation becomes the primary loss mechanism. Strek (1998a, b) studied the dissipation of chlorsulfuron in an anaerobic sediment/water system; biodegradation progressed much more slowly than in aerobic soil systems, with a half-life greater than 365 days.

### Clopyralid

Clopyralid typically leaches and is generally rapidly degraded in soil, except in arid soils with low microbial populations where it remains stable and could

potentially reach wetlands and riparian areas. Clopyralid is relatively non-toxic to aquatic plants. Overall, effects to non-target wetland and riparian vegetation from normal application of clopyralid are likely to be limited to sensitive plant species in or very near the treatment area, and could be avoided by maintaining an adequate buffer between the treatment area and wetland and riparian areas (SERA 2004b). Clopyralid is not likely to affect aquatic plants via off-site drift or surface runoff pathways; however, the higher concentrations associated with accidental spills could result in temporary growth inhibition of aquatic plants.

### Dicamba

Direct spray and accidental spill scenarios of dicamba pose a moderate to high risk to both terrestrial and aquatic plants. In water, biodegradation is the major mechanism for dicamba degradation. Dicamba is mobile in soils and is therefore likely to reach surface water and groundwater. A study on the fate of dicamba in a riparian wetland showed that dicamba was demethylated to 3,6-dichlorosalicylic acid under both aerobic and anaerobic conditions. The rates of dicamba degradation were generally more rapid in the surface than in the subsurface soil microcosms. The study indicated that some riparian wetland soils possess limited potential to degrade dicamba (Pavel et al. 1999).

### Diflufenzopyr

Diflufenzopyr is an active ingredient in the herbicide formulation Overdrive®, along with dicamba. Diflufenzopyr is not approved for the treatment of aquatic plants, but poses a low risk to riparian species and aquatic plants via off-site drift.

### Diuron

Under accidental direct spray and spill scenarios for diuron, there is generally a high risk to aquatic plants. Off-site drift typically poses low to moderate risk to aquatic plants, provided the ERA-recommended 900-foot buffer is used (ENSR 2005f).

### Hexazinone

Aquatic plants are at moderate to high risk from acute and chronic exposure to hexazinone at both the typical and maximum application rates. Aquatic algal species are also sensitive to hexazinone exposure. Furthermore, it is likely that aquatic macrophytes are sensitive, based on the effects of hexazinone on algae and terrestrial plants (SERA 1997).

### Imazapic

The risk to aquatic plants from accidental spills of imazapic is moderate to high at the maximum application rate and low to moderate at the typical application rate (there is no acute risk to aquatic plants in standing water at the typical application rate). Aquatic plants are generally not at risk from off-site drift of imazapic, except when applied aerially at the maximum application rate with a buffer of 100 feet or less. Imazapic rapidly degrades through photodegradation in aquatic systems (SERA 2004c).

### Metsulfuron Methyl

Aquatic macrophytes face low risk from acute exposure to metsulfuron methyl at upper exposure limits (SERA 2004e). Metsulfuron methyl is stable to hydrolysis at neutral and alkaline pHs. Larsen and Aamand (2001) evaluated biodegradation of metsulfuron methyl (25 μg/L) under anaerobic and aerobic conditions in sandy sediments; the herbicide did not biodegrade under any of these conditions.

### Picloram

The toxicity of picloram to aquatic plants varies substantially among different species. There is low risk to sensitive aquatic macrophytes from acute exposure to picloram at the maximum application rate. Because picloram does not bind strongly to soil particles and is not rapidly degraded in the environment, it has a high potential for being transported to wetland and riparian areas.

### Sulfometuron Methyl

Aquatic plants are at high risk from accidental direct spray and spill of sulfometuron methyl, but are unlikely to be at risk from off-site drift, provided a minimum 900-foot buffer is maintained, as recommended in the ERA for this herbicide (ENSR 2005j). Aquatic plants in standing water are typically at low to moderate risk for adverse effects from surface runoff scenarios. Sulfometuron methyl should not be applied during high winds, as drift could cause extensive damage to vegetation at a substantial distance from the application site.

### Tebuthiuron

Aquatic plants are at high risk for adverse effects under tebuthiuron spill scenarios, and potentially at high risk for adverse effects from direct spray scenarios. Aquatic plants are not at risk for adverse effects under scenarios involving off-site drift of tebuthiuron; however, surface runoff typically poses a risk to submerged aquatic plants for herbicide treatments at the maximum application rate, and at the typical application rate in sandy soils. Tebuthiuron is resistant to hydrolysis and photolysis in aquatic systems; however, some photodegradation has been reported at alkaline conditions (pH=9), and tebuthiuron is expected to biodegrade slowly in aquatic systems.

### Impacts of Other Herbicides Currently Available for Use

Asulam, atrazine, fosamine, mefluidide, simazine and 2,4-DP (also known as dichlorprop) are currently approved for use on public lands in many western states (see Table 2-2). These herbicides have not been used, or have only been used infrequently (fosamine), during the past 7 years. They are not registered for use in riparian or aquatic areas. Atrazine, simazine, and 2,4-DP are persistent and considered mobile in well-drained soils, and could reach wetlands and riparian areas. Persistence is extended under dry and/or cold conditions. Mefluidide is not strongly adsorbed to soil but has a half-life of 1 to 2 weeks. Fosamine is rapidly metabolized by soil microbes and does not persist (Han 1979 *cited in* Tu et al. 2001).

## Impacts by Alternative

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under the No Action Alternative, the BLM would continue its ongoing vegetation treatment programs in 14 western states, and would be able to use 20 herbicides that were previously approved under earlier RODs. Herbicide use under the No Action Alternative would impact target and non-target vegetation over an estimated 305,000 acres annually, including approximately 2,300 acres of riparian and aquatic habitat. Herbicides used to control aquatic and riparian vegetation under this alternative could include 2,4-D, glyphosate, and imazapyr, which are registered for aquatic uses; and dicamba, tebuthiuron, and triclopyr in riparian areas where contact with water can be avoided.

The nature of impacts would be similar to those that have occurred in the past 10 years. Negative impacts to wetland and riparian vegetation would be lower than under the other herbicide treatment alternatives (B, D, and E) because far fewer acres would be treated. In addition, adverse impacts to wetland and riparian

BLM_0000432

ENVIRONMENTAL CONSEQUENCES

vegetation in areas receiving treatments could be greater than at present if newer, more effective herbicides could not be used.

Of the 20 herbicides previously approved, it is unlikely that 2,4-DP, asulam, atrazine, fosamine, mefluidide, or simazine would be used. It is likely that 2,4-D and glyphosate (aquatic uses), and picloram and tebuthiuron (upland uses), would be used most frequently under this alternative. Glyphosate and 2,4-D have been demonstrated to provide benefits through the control of invasive riparian and wetland plant species.

Diflufenzopyr+dicamba (as Overdrive®), diquat, fluridone, and imazapic would not be available for use under this alternative. Risks to wetland and riparian areas from use of these herbicides are similar to or lower than risks associated with currently-approved herbicides. Use of other herbicides in place of these four herbicides could pose a greater risk to wetland and riparian plants under accidental spill and drift scenarios than under alternatives B, D, and E. In addition, fluridone is specifically indicated for aquatic use, whereas none of the other currently-approved herbicides are strictly aquatic herbicides. Under the other herbicide treatment alternatives, aquatic vegetation would be treated with diquat and fluridone, both of which are effective in the control of Eurasian watermilfoil, water-thyme, water hyacinth, and giant salvinia. The other herbicides registered for aquatic use—glyphosate and triclopyr—are not as effective in controlling these species.

Under the No Action Alternative, the BLM would not be able to use new chemicals that may become available in the future and that may be more effective and safer to use in wetland and riparian areas than herbicides currently available to the BLM. Public lands in Alaska, Nebraska, and Texas have not been part of the herbicide program historically, and would not be included under this alternative.

### Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

Under Alternative B, the Preferred Alternative, herbicide treatments would occur on approximately 932,000 acres annually across 17 western states, of which about 10,000 acres would consist of aquatic and riparian habitat. The BLM would only be allowed to use 14 currently-approved herbicides (six fewer than under the No Action Alternative), but would be able to use the four new herbicides evaluated in this PEIS. In addition,

the BLM would be able to treat vegetation using herbicides in Alaska, Nebraska, and Texas. Although it is anticipated that few or no herbicide treatments would occur in Alaska, the BLM would retain the option to use herbicides in Alaska should the need arise and the benefits of using herbicides outweigh the risks of other treatment methods.

This alternative could result in the most extensive impacts to wetlands and riparian areas (both negative and positive) because it proposes the greatest total treatment acreage (more than four times the acreage proposed under the No Action Alternative).

The BLM's ability to use four new chemicals (fluridone and diquat for aquatic applications, and imazapic and Overdrive® for terrestrial applications), would provide new capabilities for controlling problematic invasive species and would potentially result in benefits to wetland and riparian areas if invasive species were controlled or eliminated. Fluridone, in particular, has been effective at controlling Eurasian watermilfoil (Washington Department of Ecology 2002). Based on recent use patterns, 2,4-D, glyphosate, picloram, and tebuthiuron would continue to comprise the majority of herbicide use under this alternative. The benefits and risks of these herbicides are discussed under the No Action Alternative.

Overdrive® and imazapic would primarily be used on rangelands, but their use could still provide greater benefits to riparian and wetland areas, relative to the No Action Alternative. Overdrive® would be used to treat thistles and knapweeds, while imazapic could be used to control downy brome. These invasive plant species degrade riparian habitats and can lead to shortened fire cycles, followed by soil erosion and sedimentation.

The ability to use herbicides as they become registered with the USEPA would allow BLM managers more options in choosing herbicides to match treatment goals and application conditions, and options to use herbicides that pose less risk to wetlands and riparian areas than currently-used or proposed herbicides.

The BLM does not propose to use herbicides in Alaska (where the majority of the wetland and riparian areas on BLM lands are found). However, the BLM would retain the option to use herbicides in Alaska should the need arise and the benefits of using herbicides outweigh the risks of other treatment methods.

BLM_0000433

**Alternative C – No Use of Herbicides**

Herbicides would not be used to manage vegetation under Alternative C. Primary effects to riparian and wetland vegetation would stem from other vegetation treatment methods including fire, manual, mechanical, and biological control (see PER; USDI BLM 2007a). The possible ecosystem benefits of not using herbicides would be the elimination of risks to non-target biota associated with accidental spills, drift, and persistence of herbicides.

Without herbicide treatments, it is likely than some invasive plants would continue to spread rapidly, resulting in dramatic and potentially irreversible effects on wetland and riparian areas. As discussed previously, invasive species outcompete native vegetation and lead to widespread incidence of fire and other conditions that can result in loss of ecosystem function in wetlands and riparian areas.

Positive ecosystem benefits as a result of vegetation management could be reduced under this alternative, as there are certain invasive species for which herbicide use is the only effective method of treatment or the only practical method, based on cost, time, accessibility, or public concerns. For example, rough terrain that cannot be accessed for ground-based treatments could potentially be treated using herbicides applied by aircraft. Other treatment methods, such as mechanical, fire, and biological, can result in soil disturbance and sedimentation of aquatic bodies, and may not adequately treat the pest plant.

In addition, it is often difficult to eradicate some species (such as aquatic species and those that resprout from rhizomes) by means other than herbicide application. These species include Eurasian watermilfoil and water-thyme, which form dense mats of aquatic vegetation that crowd out native plants and degrade fish habitat (Bossard et al. 2000). Chemical treatments (including the use of 2,4-D, diquat, and fluridone) are more effective at controlling these species than other treatments, such as mechanical harvesters that tend to fragment and spread the weed.

**Alternative D – No Aerial Applications**

Alternative D is similar to the Preferred Alternative in that it would allow for use of the same herbicides in the same areas, and would have similar benefits associated with increased availability of new and future herbicides. However, this alternative would not allow the use of aerial application methods, thereby reducing the total

treatment acreage to 530,000 acres. However, there would be little difference between the alternatives as far as treatments in wetlands and riparian areas and associated impacts. Nearly all (98%) of the acreage proposed for treatment in wetland and riparian habitats under the Preferred Alternative would be treated using ground-based methods, and therefore could also be treated under Alternative D. However, the potential for impacts to wetlands and riparian areas from off-site drift from upland treatment areas would be substantially less under Alternative D than under the Preferred Alternative. Drift is a major route of unintended damage to non-target vegetation, with aerial application being the primary cause of off-site drift.

Under this alternative, invasive plant populations in remote wetland and riparian areas would likely continue to spread. Ground-based herbicide treatments could be used in some locations, but likely would not be used in areas that are too remote, have difficult terrain, or cover large expanses. Areas with coverage of invasive species may not be comprehensively treated using ground-based methods, and subsequent reinvasion could require frequent re-treatment in the same area. Non-herbicide vegetation control may be substituted in areas unsuitable for ground-based herbicide treatment. For example, prescribed fire can be used to control some unwanted vegetation types. However, many invasive riparian and wetland plant species are able to resprout after fire. Biological treatments have been shown to be effective in some riparian and wetland areas for some species; however, the number of invasive species with known biological control agents and the effectiveness of these agents are limited.

**Alternative E – No Use of Acetolactate Synthase-inhibiting Herbicides**

Approximately 466,000 acres would be treated under Alternative E, which is slightly less than the acreage that would be treated under Alternative D, and less than half of the acreage that would be treated under the Preferred Alternative. Under this alternative, ALS-inhibiting herbicides would not be allowed, including imazapic, imazapyr, chlorsulfuron, metsulfuron methyl, and sulfometuron methyl. Of these, only imazapyr is registered for use in wetland and riparian areas. ALS-inhibiting herbicides are potent and have the benefit of very low application rates; however, their potency leads to residual herbicidal activity. This group of herbicides has been shown to damage off-site native and crop species, and several weed species can develop resistance to these herbicides, making them less effective.

BLM_0000434

ENVIRONMENTAL CONSEQUENCES

Under this alternative, herbicide treatments would be discouraged, broadcast spraying would be prohibited, and passive treatment methods would be promoted in wetland and riparian areas. Imazapyr has been shown to be effective against saltcedar, a particularly pernicious riparian area invader that has few effective treatments. The inability to use imazapyr to control species such as saltcedar could potentially correspond to greater adverse effects to wetland and riparian areas form these invasive species than under the other alternatives, in which imazapyr use is allowed.

Alternative E proposes management that may benefit wetland and riparian areas, such as limiting the effects of minerals extraction, forestry practices, livestock grazing and OHV use. However, these restrictions would be applied only to the extent that they are consistent with adopted BLM LUPs.

## Mitigation for Herbicide Treatment Impacts

See mitigation measures for Water Resources and Quality and Vegetation sections.

# Vegetation

## Introduction

The present-day composition and distribution of plant communities in the western U.S. are influenced by many factors, including physical factors (e.g., climate, drought, wind, geology, topography, elevation, latitude, slope, exposure) and natural disturbance and human-management patterns (e.g., insects, disease, fire, cultivation, domestic livestock grazing, wildlife browsing; Gruell 1983). In addition, exotic plant species have caused a decline in extent of some native plant communities in each of the western states. The rapid expansion of invasive plant species across public lands continues to be a primary cause of ecosystem degradation, and control of these species is one of the greatest challenges in ecosystem management. The recent increase in wildfires has been influenced by changes in vegetation on public lands over the past 100 years, which have resulted in increases in hazardous flammable fuels.

## Scoping Comments and Other Issues Evaluated in the Assessment

The largest number of comments submitted was related to vegetation. Numerous scoping comments were centered around a desire for the BLM to focus on long-term ecosystem sustainability and biological diversity. Numerous comments suggested that the PEIS address all invasive plants, not just weeds. One respondent proposed focusing on minimizing the spread of existing weed infestations, while others wanted to ensure that weed control measures do not result in more ecological disturbances than the weeds themselves. A large number of comments recommended evaluating the impact of herbicides on other plant and animal species within the areas considered for treatment. Several comments called for the PEIS to address the impacts of new-generation, high-potency pesticides on non-target plants. There was some concern about weeds becoming herbicide resistant, and about how the BLM would prevent the death of beneficial native plants from herbicides. To improve sage-grouse habitat, one respondent recommended that instead of burning sagebrush, the BLM should treat strips of vegetation with herbicides, allow cattle to break the vegetation down, and then plant the area with grass.

## Standard Operating Procedures

There are risks to non-target plants associated with herbicide use. However, these risks can be minimized by following certain SOPs, which can be implemented at the local level according to specific conditions. The following general procedures are designed by the BLM to reduce potential unintended impacts to vegetation from herbicide treatments:

- Conduct pre-treatment surveys for sensitive habitat and special status species within or adjacent to proposed treatment areas.

- Consider site characteristics, environmental conditions, and application equipment in order to minimize damage to non-target vegetation.

- Use drift reduction agents, as appropriate, to reduce the drift hazard to non-target species.

- Turn off aerially applied treatments at the completion of spray runs and during turns to start another spray run.

- Refer to the herbicide label when planning revegetation to ensure that subsequent

BLM_0000435

vegetation will not be injured following application of the herbicide.

- Clean OHVs to remove seeds.

- Use native or sterile species for revegetation and restoration projects.

- Use weed-free feed for horses and pack animals.

- Use weed-free straw and mulch for revegetation and other activities.

These procedures would help minimize impacts to plants and ecosystems on public lands to the extent practical. As a result, long-term benefits to native plant communities from the control of invasive species would likely outweigh any short-term negative impacts to native plants associated with herbicide use.

## Impacts Assessment Methodology

The BLM reviewed the literature and findings from ERAs conducted by the BLM and Forest Service, and from earlier BLM vegetation treatment EISs, to assess the impacts to target and non-target vegetation from the use of herbicides (ENSR 2005b-k; SERA 2005a). The methods presented here are a brief overview of the ERA process to determine the risks to non-target species associated with herbicide use. The ERA methods are presented in detail in Appendix C. In addition, the BLM reviewed information provided by local field offices in 2002 for development of this PEIS. This information included the location, treatment method, application method, vegetation class, and size of the treatment (in acres) for treatments proposed during the next 10 to 15 years.

### BLM Methodology

#### *Problem Formulation*

Both terrestrial and aquatic non-target plants, including surrogates for special status species, were evaluated to determine assessment endpoints and associated measures of effect. The essential biological requirements (i.e., survival, growth, and reproduction) of each of these groups of organisms are the attributes to be protected from herbicide exposure. Assessment endpoints, for the most part, reflect direct effects of an herbicide on these organisms, but indirect effects were also considered.

Measures of effect are measurable changes in an attribute of an assessment endpoint (or its surrogate, as

discussed below) in response to a stressor to which it is exposed (USEPA 1998a). For the screening-level ERA, the measures of effect associated with the assessment endpoints generally consisted of acute and chronic toxicity data (from pesticide registration documents and from the available scientific literature) for the most appropriate surrogate species. Assessment endpoints for non-target vegetation include acute mortality and adverse direct effects on growth, reproduction, or other ecologically important sublethal processes.

#### *Exposure Characterization*

In order to assess the potential ecological impacts of these herbicide uses, the following exposure scenarios were considered that address herbicide exposure and acute and chronic (short- and long-term) impacts that may occur under a variety of conditions:

- Direct spray of the receptor or water body;

- Off-site drift of spray to terrestrial areas and water bodies;

- Surface runoff from the application area to off-site soils or water bodies;

- Wind erosion resulting in deposition of contaminated dust; and

- Accidental spills to water bodies.

The AgDRIFT® computer model was used to estimate off-site herbicide transport due to spray drift. The GLEAMS computer model was used to estimate off-site transport of herbicide in surface runoff and root zone groundwater transport. The CALPUFF computer model was used to predict the transport and deposition of herbicides sorbed (i.e., reversibly or temporarily attached) to wind-blown dust. Each model simulation was conservatively approached with the intent of predicting the maximum potential herbicide concentration that could result from the given exposure scenario.

#### *Effects Characterization*

In the majority of cases, toxicological data do not exist for the specific plant receptors of concern. Consequently, toxicological data for surrogate species, obtained from a literature review, were evaluated and used to establish quantitative benchmarks (i.e., toxicity reference values [TRVs]) for the ecological receptors of concern. Data from scientific studies were used to compile statistical endpoints into a matrix for each chemical and receptor. Data were further subdivided

BLM_0000436

ENVIRONMENTAL CONSEQUENCES

into acute adverse effect levels, chronic adverse effect levels, and no observed adverse effect levels (NOAELs). For each chemical, receptor, and route of exposure, the lowest reported acute statistical endpoint was selected as the acute TRV. Chronic TRVs, based on longer exposure periods and associated endpoints such as growth and reproduction, were developed, when possible, to provide supplementary data to the risk assessment. Before the chronic NOAEL TRV was determined, a chronic lowest observed adverse effect level (LOAEL) was identified, which was the lowest herbicide level that was found to cause significant adverse effects in a chronic study. Once a LOAEL was selected, the chronic NOAEL TRV was established as the highest NOAEL value that was less than both the LOAEL and the acute TRV. Once developed, TRVs were compared with predicted environmental concentrations of the herbicide to determine the likelihood of adverse effects to ecological receptors.

### Risk Characterization

In order to address potential risks to plant receptors, risk quotients (RQs) were calculated by dividing the estimated exposure concentration (EEC) for each of the previously described scenarios by the appropriate herbicide-specific TRV. To facilitate the translation of RQs into readily applicable estimates of risk, the calculated RQs were compared to Levels of Concern (LOCs) used by the USEPA in screening the potential risk of herbicides. Distinct USEPA LOCs are currently defined for the following risk presumption categories:

- Acute high risk – The potential for acute risk is high;

- Acute restricted use – The potential for acute risk is high, but may be mitigated;

- Acute endangered species – Special status species may be adversely affected; and

- Chronic risk – The potential for chronic risk is high.

The ecological risk implications of various exposure estimates can be readily determined by noting which RQs exceed the corresponding LOCs.

The risks of tank mixes on plant receptors were determined using the assumption that the products in tank mixes act in an additive manner. The predicted RQs for two active ingredients were summed for each individual exposure scenario to see if additional RQs exceeded the corresponding LOCs. However, there is

some uncertainty in this evaluation because herbicides in tank mixes may not interact in an additive manner; this may overestimate risk if the interaction is antagonistic, or it may underestimate risk if the interaction is synergistic. In addition, other products may also be included in tank mixes and may contribute to the potential risk.

### Uncertainty Analysis

For any ERA, a thorough description of uncertainties is a key component of risk determination that serves to identify possible weaknesses in the analysis and to elucidate what impact such weaknesses might have on the final risk conclusions. In this analysis, listed uncertainties were followed by a logical discussion of what bias, if any, the uncertainty may introduce into the risk conclusions. This bias was represented in qualitative terms that best describe whether the uncertainty might: 1) underestimate risk, 2) overestimate risk, 3) be neutral with regard to the risk estimates, or 4) be unable to be determined without additional study.

### Forest Service Methodology

The Forest Service risk assessment methodology was similar to that used by the BLM (see SERA 2001a for a complete description of the methodology). The steps involved in the Forest Service risk assessments include hazard identification, exposure assessment, dose response assessment, and risk characterization.

Hazard identification involved the review of existing data with a focus on the dose-response and dose-severity relationships to determine the effect levels (e.g., NOAEL, LOAEL) and assessment endpoints (e.g., acute toxicity, subchronic or chronic systemic toxic effects, reproductive and teratogenic effects) that are most relevant for the herbicide risk assessments.

In the exposure assessment phase, the Forest Service developed four general and accidental/incidental exposure scenarios (i.e., direct spray, spray drift, runoff, and wind erosion) for groups of non-target vegetation according to the application method and the chemical and toxicological properties of the given herbicide. The Forest Service scenario of contaminated irrigation water—a direct application scenario—was not evaluated by the BLM because their vegetation treatment program does not typically involve irrigation of vegetation.

BLM_0000437

Dose response assessment described the degree or severity of risk as a function of dose. A dose was derived—usually from a series of experimental doses—that was associated with a negligible, or at least a defined, level of risk. These dose levels are generally referred to as reference values, or more specifically as "reference doses" (RfDs). To derive the reference value, the experimental threshold was divided by uncertainty factors used to account for discrepancies between experimental exposure conditions and the conditions of the receptor might experience during Forest Service exposure. Often, reference values are standard across government agencies.

The risk characterization process then compared the exposure assessment to the dose response assessment to determine an LOC for a specific exposure scenario. Hazard Quotients (HQs) were developed through this process. Hazard Quotients are analogous to the RQs developed in the BLM risk assessments—they are calculated as the projected level of exposure (i.e., EEC) divided by an index of an acceptable level of exposure or otherwise defined level of exposure (e.g., a NOAEL divided by an uncertainty factor). In addition, the herbicides were all compared based on their selectivity, potency, persistence in the environment, and ability to move off site.

As with the BLM risk assessments, information on effects to native species was incomplete (the USEPA conducts studies predominantly on agricultural crops, rather than native species), so impacts were extrapolated from the risk assessment or herbicide labels. Using herbicide labels to identify close relatives of native or desirable species does help to reduce uncertainty. However, Boutin et al. (2004) concluded that it was likely that the suite of species currently used in most risk assessments were not representative of the habitats found adjacent to agricultural treatment areas, and might cause an unacceptable bias and underestimated risk.

## Impacts Common to All Treatments

The effectiveness of herbicide treatments in managing target plants and the extent of disturbance to native plant communities varies by the extent and method of treatment (e.g., aerial vs. ground) and chemical used (e.g., selective vs. non-selective), as well as by local plant types and physical features (e.g., soil type, slope) and weather conditions (e.g., wind speed) at the time of application. Treatments would likely affect plant species composition of an area and might affect plant species

diversity. Species composition and species diversity are equally important contributors to ecosystem function (USDA Forest Service 2005). Because certain herbicides may target certain types of plants (e.g., broadleaf species), an herbicide treatment program for a given ecosystem and area should include multiple types of herbicides. For example, if picloram or clopyralid are the only herbicides used in a highly invaded area, weedy annual grasses, such as medusahead, downy brome, and barbed goatgrass may begin to dominate. The following sections detail the possible effects of herbicide treatments on both target and non-target plants.

### Non-target Plants

Herbicides could come into contact with and impact non-target plants through drift, runoff, wind transport, or accidental spills and direct spraying. Potential impacts include mortality, reduced productivity, and abnormal growth. Risk to off-site plants from spray drift is greater under scenarios with smaller buffer zones and application from greater heights (i.e., aerial application or ground application with a high boom). Risk to off-site plants from surface runoff is influenced by precipitation rate, soil type, and application area. Plant receptors would be at risk under most accidental exposure scenarios (i.e., direct spray or spill). Persistent herbicides (e.g., bromacil) adsorbed to soil particles could also be carried off-site by wind or water, affecting plants in other areas. Risk assessments predicted no risk to plant receptors from wind transport of herbicide particles under all of the evaluated scenarios. (However, an incident of extensive damage to crop species has been reported as a result of drift of sulfometuron methyl over a large area [see ENSR 2005j]). Application rate is a major factor in determining risk, with higher application associated with greater risk to plants under various exposure scenarios.

### Target Plants

Herbicides offer an effective and often resource-efficient means of treating and managing unwanted vegetation. Mechanical and manual methods are often more time and labor intensive than herbicide application, and cause soil disturbance, which can provide the appropriate conditions for invasive weeds to resprout from roots and rhizomes or grow from dormant seeds. In addition, herbicide use may be seen as less dangerous than treatment with prescribed fire in dry areas that have high fire risk. The use of herbicides would benefit plant communities with weed infestations by decreasing the growth, seed production, and

BLM_0000438

competitiveness of target plants, thereby releasing native species from competitive pressures (e.g., water, nutrient, and space availability) and aiding in the reestablishment of native species. The degree of benefit to native communities would depend on the toxicity of the herbicide to the target species and its effects on non-target species, as well as the success of the treatments over both the short and long term.

Use of preemergence and postemergence soil residual herbicides is common in ROWs, near oil and gas and other facilities, and along roads where vegetation must be eliminated for safety, to reduce fire hazards, and for aesthetic purposes. Other treatment methods, such as manual methods and use of fire, are often not as effective at eliminating vegetation and may not be as safe to use as herbicides.

Some treatments are very successful at removing weeds over the short term, but are not successful at promoting the establishment of native species in their place. In such cases, seeding of native plant species would be beneficial. Weeds may resprout or reseed quickly, outcompeting native species, and in some cases increasing in vigor as a result of treatments. The success of treatments would depend on numerous factors, and could require the use of a combination of methods to combat undesirable species. In addition, repeated use of a particular herbicide on a particular site could cause target weeds to develop a certain level of resistance to that herbicide over time, reducing the effectiveness of long-term treatments.

Invasive plant treatment effectiveness monitoring would be conducted at treated sites and would range from site re-visits to compare the targeted population size against pre-treatment inventory data, to comparing pre-treatment and post-treatment photo points, to more elaborate transect work depending on the species and site specific variables. The goals of such monitoring would be to: 1) identify what changes in distribution, amount, and proportion of invasive plant infestations have resulted due to treatments; 2) determine if infestation size been reduced at the project level or at a larger scale such as a watershed; and 3) determine which treatment methods, separate or in combination, are most successful for a given species (USDA Forest Service 2005).

In addition to herbicide treatments, the BLM would use other forms of vegetation treatment on public lands. A PER has been developed to accompany this PEIS that discusses these treatment methods, along with their likely impacts to natural resources over the next 10 years. In many cases, the treatments would return all or a portion of the treated area to an early successional stage, killing off disturbance-intolerant species (e.g., sagebrush) and freeing up resources such as light and nutrients for early successional species (e.g., annual grasses and forbs). In areas where fire suppression has historically occurred, vegetation treatments would be expected to benefit native plant communities by mimicking a natural disturbance component that has been missing from these communities, altering them over time. In areas that have been highly degraded, merely restoring disturbance to the ecosystem may in some cases adversely affect native plant communities by encouraging the spread of weeds or the persistence of an altered vegetation structure and species composition. These effects would vary depending on the treatment used, the type of vegetation on the treatment site, the amount of degradation on the site, and numerous other factors.

**Impacts of BLM-Evaluated Herbicides**

*Bromacil*

Bromacil is a non-selective, "broad-spectrum," systemic herbicide, which is most effective against annual and perennial weeds, brush, woody plants, and vines. Bromacil kills target plants by blocking electron transport and the transfer of light energy, thereby disrupting photosynthesis. Because of its non-selective nature, bromacil may be highly effective in areas where a variety of invasive species dominate and where very few non-target plants exist. Bromacil is best used in areas where bare ground is desired (e.g., around fences and structures); it has high residual activity, so it would be effective for an extended period of time.

Because of its non-selective qualities, bromacil poses a high risk to non-target species in the immediate vicinity of the treatment area. The risk assessment for bromacil shows that it poses a high risk to non-target terrestrial and aquatic plants in accidental direct spray and spill scenarios (Table 4-11). Off-site drift of bromacil generally poses a moderate risk to non-target terrestrial plants, with somewhat lower risk as buffer zones get larger and application heights get smaller, and with high risk to special status terrestrial plants under scenarios involving the maximum application rate at lower buffer distances and higher application heights. Most off-site drift scenarios pose low or no risk to aquatic plants. At buffer distances of 900 feet, aquatic plants are not at risk from off-site drift of bromacil. Bromacil does not pose a risk to typical non-target terrestrial plants under surface runoff scenarios, but does pose a low risk to special

BLM_0000439

**TABLE 4-11**

**Risk Categories Used to Describe Typical Herbicide Effects to Vegetation According to Exposure Scenario and Ecological Receptor Group**

| Application Scenario | BROM[1] | | CHLOR[1] | | DICAMBA | | DIFLU[1] | | DIQUAT | | DIURON | | FLUR[1] | | IMAZ[1] | | OVER[1] | | SULFM[1] | | TEBU[1] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[2] | Max[2] | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| **Direct Spray** | | | | | | | | | | | | | | | | | | | | | | |
| Terrestrial plants | H[3] [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | M [1:1] | H [1:1] | H [1:1] | H [1:1] | M [1:1] | H [1:1] | NE | NE | L [1:1] | M [1:1] | M [1:1] | H [1:1] | O [1:1] | L [1:1] | M [1:1] | H [1:1] |
| Special status terrestrial plants | H [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | NE | NE | L [1:1] | M [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] | H [1:1] |
| Aquatic plants pond | H [1:2] | H [2:2] | M [1:2] | M [2:2] | L [1:2] | L [1:2] | L [1:2] | L [2:2] | H [2:2] | H [2:2] | H [2:2] | H [2:2] | O [2:2] | O [2:2] | L [1:2] | L [2:2] | M [1:2] | M [2:2] | H [2:2] | H [2:2] | L [2:2] | M [2:2] |
| Aquatic plants stream | H [2:2] | H [2:2] | M [2:2] | M [2:2] | L [1:2] | L [1:2] | L [1:2] | L [1:2] | H [2:2] | H [2:2] | H [2:2] | H [2:2] | O [2:2] | O [2:2] | L [2:2] | M [2:2] | M [2:2] | H [1:2] | H [2:2] | H [2:2] | M [1:2] | H [1:2] |
| **Accidental Spill to a Pond** | | | | | | | | | | | | | | | | | | | | | | |
| Aquatic plants pond | NE | H [1:1] | NE | H [1:2] | NE | M [1:1] | NE | L [1:1] | NE | H [2:2] | NE | H [1:1] | NE | L [2:2] | NE | H [2:2] | NE | M [1:1] | NE | H [2:2] | NE | H [2:2] |
| **Off-Site Drift** | | | | | | | | | | | | | | | | | | | | | | |
| Terrestrial plants | M [3:6] | M [3:6] | M [5:12] | M [8:12] | M [4:6] | M [3:6] | O [4:6] | O [4:6] | L [7:12] | M [7:12] | O [5:6] | L [4:6] | NE | NE | O [18:18] | O [13:18] | O [5:6] | O [4:6] | O [12:12] | O [12:12] | O [6:6] | O [4:6] |
| Special status terrestrial plants | M [3:6] | H [3:6] | M [7:12] | M [7:12] | H [2:6] | M [3:6] | L [3:6] | L [4:6] | M [7:12] | M [7:12] | M [3:6] | M [3:6] | NE | NE | O [17:18] | O [13:18] | L [3:6] | L [4:6] | H [5:12] | H [8:12] | O [5:6] | L [3:6] |
| Aquatic plants pond | O [9:12] | L [7:12] | O [24:24] | O [24:24] | O [9:12] | O [8:12] | O [12:12] | O [12:12] | NE | NE | L [8:12] | M [6:12] | NE | NE | O [36:36] | O [34:36] | O [12:12] | O [12:12] | L [13:24] | L [12:24] | O [12:12] | O [12:12] |
| Aquatic plants stream | O [8:12] | L [6:12] | O [24:24] | O [22:24] | O [8:12] | L [6:12] | O [8:12] | L [6:12] | NE | NE | L [6:12] | M [6:12] | NE | NE | O [36:36] | O [33:36] | O [8:12] | O [6:12] | L [14:24] | L [10:24] | O [12:12] | O [12:12] |
| **Surface Runoff** | | | | | | | | | | | | | | | | | | | | | | |
| Terrestrial plants | O [42:42] | O [42:42] | O [42:42] | O [42:42] | O [42:42] | O [42:42] | O [42:42] | O [42:42] | NE | NE | O [42:42] | O [42:42] | NE | NE | O [42:42] | O [42:42] | O [42:42] | O [42:42] | O [42:42] | O [42:42] | O [42:42] | O [42:42] |
| Special status terrestrial plants | O [39:42] | O [38:42] | O [42:42] | O [42:42] | O [42:42] | O [42:42] | O [34:42] | O [33:42] | NE | NE | O [38:42] | O [34:42] | NE | NE | O [42:42] | O [42:42] | O [34:42] | O [33:42] | O [32:42] | O [28:42] | O [38:42] | O [34:42] |
| Aquatic plants pond | M [70:84] | H [45:84] | O [64:84] | O [53:84] | O [78:84] | M [45:84] | O [84:84] | O [84:84] | NE | NE | M [50:84] | H [64:84] | NE | NE | O [80:84] | O [62:84] | O [70:84] | O [67:84] | M [42:84] | H [38:84] | O [65:84] | L [55:84] |
| Aquatic plants stream | O [45:84] | L [55:84] | O [80:84] | O [77:84] | O [84:84] | O [83:84] | O [84:84] | O [84:84] | NE | NE | L [35:84] | L [39:84] | NE | NE | O [84:84] | O [83:84] | O [84:84] | O [84:84] | L [69:84] | L [60:84] | O [84:84] | L [74:84] |

ENVIRONMENTAL CONSEQUENCES

ENVIRONMENTAL CONSEQUENCES

**TABLE 4-11 (Cont.)**
**Risk Categories Used to Describe Typical Herbicide Effects to Vegetation According to Exposure Scenario and Ecological Receptor Group**

| Application Scenario | BROM[1] | | CHLOR[1] | | DICAMBA | | DIFLU[1] | | DIQUAT | | DIURON | | FLUR[1] | | IMAZ[1] | | OVER[1] | | SULFM[1] | | TEBU[1] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[2] | Max[2] | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| **Wind Erosion** | | | | | | | | | | | | | | | | | | | | | | |
| Terrestrial plants | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | NE | NE | 0 [9:9] | 0 [9:9] | NE | NE | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] |
| Special status terrestrial plants | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | NE | NE | 0 [9:9] | 0 [9:9] | NE | NE | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] | 0 [9:9] |
| Aquatic plants pond | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE |
| Aquatic plants stream | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE |

[1] BROM = Bromacil; CHLOR = Chlorsulfuron; DIFLU = Diflufenzopyr; FLUR = Fluridone; IMAZ = Imazapic; OVER = Overdrive®; SULFM = Sulfometuron methyl; and TEBU = Tebuthiuron.
[2] Typ = Typical application rate; and Max = Maximum application rate.
[3] Risk categories: = 0 = No risk (majority of RQs < most conservative LOC for non special status species); L = Low risk (majority of RQs 1-10x most conservative LOC for non special status species); M = Moderate risk (majority of RQs 10-100x most conservative LOC for non special status species); H = High risk (majority of RQs >100 most conservative LOC for non special status species); and NE = Not evaluated. The Risk Category is based on the risk level of the majority of risk quotients observed in any of the scenarios for a given exposure group and receptor type. The reader should consult the risk tables in Chapter 4 of the ERAs (ENSR 2005b-k) to determine the specific scenarios that result in the displayed level of risk for a given receptor group. The number in brackets represents the number of RQs in the indicated risk category: number of scenarios evaluated.

status terrestrial plants when applied in watersheds with clay soils and precipitation levels greater than 100 inches per year (in/yr). Aquatic plants are at risk from surface runoff of bromacil; under most surface runoff scenarios there would be a moderate risk to aquatic plants in ponds associated with applications at the typical application rate, and moderate to high risk associated with applications at the maximum application rate (higher risk with increased precipitation and sand or clay soils). Aquatic plants in streams are at no to low risk under most surface runoff scenarios, with moderate risk when bromacil is applied at the maximum application rate and in sand soils or in loam soils with greater application areas (100 and 1,000 acres) and increased precipitation (200 to 250 in/yr). For applications of bromacil at the typical application rate, chronic risk to aquatic plants in the stream from surface runoff of bromacil would be much less than acute risk (chronic risk would be low in larger application areas and in watersheds with sand soils and more than 100 in/yr precipitation). Because bromacil is a non-selective herbicide and poses a significant risk to non-target plants, it would be most appropriately used in areas exclusively composed of invasive species at substantial distances (greater than 900 feet) from non-target populations (Table 4-12).

### Chlorsulfuron

Chlorsulfuron is a selective herbicide used on perennial broadleaf weeds and grasses. Chlorsulfuron inhibits the synthesis of ALS, which is the catalyst for the production of amino acids that are required for protein synthesis and cell growth. Chlorsulfuron is effective both pre- and post-emergence, inhibiting seed germination and killing established plants. Chlorsulfuron is highly active, with only small concentrations required to kill target plants. Due to its activity, chlorsulfuron is highly effective in managing aggressive invasive species such as hoary cress, perennial pepperweed, and selected biennial thistles (bull, musk, and Scotch), and yellow starthistle.

Accidental direct spray or spill of chlorsulfuron poses a moderate to high risk to terrestrial plants and aquatic plants in streams (Table 4-11). Accidents mostly pose a moderate risk to aquatic plants in ponds (but high chronic risk at the maximum application rate). Off-site drift of chlorsulfuron presents low to moderate risk to typical non-target terrestrial plant species and higher risk to special status terrestrial plant species. Risk associated with off-site drift would be high for aerial applications and ground applications with high booms and small buffer distances. In more than half of the

modeled scenarios, no risk to aquatic plants from off-site drift of chlorsulfuron was predicted. Risk to aquatic plants was never predicted when chlorsulfuron was applied either aerially or on the ground with 900-foot buffers (Table 4-12). However, there would be a low risk to aquatic plants with smaller buffer distances. Terrestrial plants are not at risk from surface runoff of chlorsulfuron; however, aquatic plants are at low risk at higher precipitation levels and in watersheds with loam soils, particularly at the maximum application rate (aquatic plants in streams are not at chronic risk under any scenario). Because of its activity, chlorsulfuron should be applied at the lowest possible dose and with buffer distances of at least 900 feet from non-target plant populations, particularly if the non-target plants are perennial and broadleaved or grasses. This herbicide may be best used at low rates and spot applications on highly aggressive species and in areas where target plants are the dominant species.

### Dicamba

Overdrive® is a formulation of dicamba and diflufenzopyr. An analysis of risks to vegetation for dicamba was conducted during preparation of the Overdrive® ERA.

Risk assessments predicted high risk to non-target terrestrial plants and low to moderate risk to aquatic plants under accidental direct spray and spill scenarios (Table 4-11). Off-site drift of dicamba poses moderate to high risk to terrestrial plants with buffers of less than 1,000 feet for typical species, and buffers of less than 1,050 feet for special status species.

Aquatic plants in streams are at low risk under scenarios involving off-site drift of dicamba when it is applied at the maximum rate. Surface runoff does not pose a risk to special status terrestrial plants. Dicamba could be effective in suppression or control of weeds when applied at least 1,000 feet from non-target plant populations of interest or 1,050 feet from special status plant species (Table 4-12).

### Diflufenzopyr

Diflufenzopyr, an active ingredient in the herbicide formulation Overdrive® (along with dicamba), is a selective, systematic herbicide active ingredient used for the management of annual broadleaf weeds post-emergence, and the management and/or suppression of many perennial broadleaf weeds and annual grasses. Accidental direct spray and spill scenarios pose a moderate to high risk to non-target terrestrial plants and

BLM_0000442

ENVIRONMENTAL CONSEQUENCES

a low chronic risk to aquatic plants (Table 4-11). Off-site drift of diflufenzopyr poses low risk to terrestrial plants with buffers of less than 100 feet for typical species and less than 900 feet for special status species. Aquatic plants are not at risk under off-site drift or surface runoff scenarios. However, surface runoff poses low to moderate risk to special status terrestrial plants in watersheds with clay and loam soils and 25 in/yr of precipitation or more. Diflufenzopyr could be effective in suppression or management of several broadleaf weeds in native perennial grasslands when applied at least 100 feet from non-target plant populations of interest or 900 feet from special status plant species (Table 4-12). Its use should be avoided in areas containing special status plants that have clay and/or loam soil types and moderate to high levels of precipitation.

### Diquat

Diquat is a non-selective, contact herbicide for weed management in non-cropland and aquatic areas. The BLM proposes to use diquat only in aquatic areas. Diquat is a cell membrane disrupter that is activated by exposure to sunlight to form oxygen compounds that damage cell membranes. As a non-selective aquatic herbicide, diquat is best used to control aggressive invasive plant species in water bodies where few native plant species exist. Appropriate target species include Eurasian watermilfoil, water-thyme, water hyacinth, and giant salvinia. Diquat does kill plant parts on contact, but it does not kill the roots of the plant, and therefore is often used for single-season control of submersed aquatic plants (Washington Department of Ecology 2004).

Accidental spray and spill of diquat poses moderate to high risk to terrestrial plants at the typical application rate and high risk at the maximum application rate (Table 4-11). Accidental sprays or spills of diquat pose a high risk to aquatic plants. Off-site drift of diquat to terrestrial areas poses a low risk to terrestrial plants, which is associated with aerial applications and ground applications at short buffer distances. Non special status terrestrial plants are not at risk if diquat is applied aerially or from the ground with buffers greater than 1,200 feet (Table 4-12). As a non-selective aquatic herbicide, diquat should not be applied in water bodies where there are aquatic plants of concern. Riparian species within 900 feet of the water body should also be considered, as they may be at risk from off-site drift of diquat; this risk would be lessened if diquat were applied via a ground application method. Diquat should not be used if special status riparian plants are present.

### Diuron

Diuron is a non-selective, broad-spectrum herbicide, effective both pre- and post-emergence. Diuron disrupts photosynthesis by blocking electron transport and the transfer of light energy, thereby resulting in plant death. Because of its non-selective nature, diuron may be highly effective in areas where a variety of invasive species dominate and where very few non-target plants exist. Diuron is best used in areas where bare ground is desired (e.g., around fences and structures).

Risk assessments generally predicted high risk to terrestrial and aquatic plants under accidental direct spray and spill scenarios (risk to typical terrestrial plant species is moderate at the typical application rate; Table 4-11). Off-site drift of diuron presents a risk to special status terrestrial plants under all modeled scenarios, with higher risk at the maximum application rate and at shorter buffer distances. Typical terrestrial plant species are also at risk under scenarios of off-site drift when diuron is applied at the maximum application rate and with buffer distances less than 900 feet, and when applied at the typical application rate with a high boom and a buffer less than 100 feet. Off-site drift of diuron poses low to moderate risk to aquatic plants under most application scenarios. In some cases application with a 900-foot buffer does not pose a risk to aquatic plants, depending on the application rate, the application height, and the type of water body (Table 4-12). In a few cases (clay soils with more than 50 in/yr precipitation and loam soils with 250 in/yr), surface runoff of diuron poses a low risk to special status terrestrial plants. Surface runoff poses a moderate to high risk to aquatic plants in ponds under the majority of scenarios. Aquatic plants in the stream are at risk from surface runoff under most scenarios. Diuron is most safely applied with spot applications at the typical application rate, especially in the vicinity of water bodies with aquatic plants of interest or near special status plants.

### Fluridone

Fluridone is a slow-acting, broad-spectrum, systemic aquatic herbicide that can be used selectively at low concentrations. Fluridone kills target plants by causing the breakdown of chlorophyll, thereby preventing plants from synthesizing food. Because of this mode of action, fluridone must remain in contact with the target aquatic species for an extended period of time, depending on the species, for effective control. Fluridone is one of two new herbicides proposed for use by the BLM that can effectively target harmful and invasive underwater

BLM_0000443

aquatic plants; in particular, it would be used to manage water-thyme and Eurasian watermilfoil. Often these aquatic invasives are great disrupters of aquatic ecosystem function. Fluridone may be most effectively used when smaller water bodies are heavily or completely infested with these invasive plants—i.e., in situations where complete eradication is possible in order to prevent the spread of remaining plants. However, at low concentrations, some native aquatic plants, especially pondweeds, may escape harm (Washington Department of Ecology 2004).

Risk to terrestrial plants from fluridone application could not be evaluated because of a lack of toxicity testing. Aquatic plants are at low risk under scenarios involving an accidental spill of fluridone mixed for the maximum application rate (Table 4-11). Because the risks associated with off-site drift of fluridone to terrestrial plants are unknown, care should be taken in the application of fluridone, even though it appears to be safe to non-target aquatic plants if used as registered. Off-site deposition rates of fluridone suggest that small percentages (0-24%) of the chemical would drift off site, potentially affecting terrestrial plants. Drift would be lowest (0-2%) when fluridone is applied on the water surface with buffer distances of 100 feet or more. The low toxicity of fluridone to aquatic plants suggests that it may not be effective against certain aquatic species. Rates and application methods must be adjusted according to target species identity to achieve management goals, while maintaining care to minimize off-site drift, particularly if non-target plants of interest are within 100 feet of the application site (Table 4-12).

### Imazapic

Imazapic, an ALS-inhibitor, is a selective, systemic herbicide used on annual and perennial broadleaf weeds and grasses. Like other ALS-inhibitors, imazapic is quite active, with only small concentrations required to kill target plants. Due to its activity, imazapic may be highly effective, particularly in spot applications, at controlling aggressive invasive species that have not responded to other herbicides or treatment methods. Several short-term studies have shown that pre-emergent/fall application of imazapic can be effective in controlling invasive species (e.g., leafy spurge) while improving the establishment of native grassland plants (Beran et al. 1999; Markle and Lym 2001; Masters et al. 2001; Kirby et al. 2003). However, despite its selectivity, studies have found that some plants that are supposedly tolerant to imazapic are likely to be injured if they are directly sprayed by the herbicide at the typical application rate (many native bunchgrasses

remain tolerant [SERA 2001b]). Imazapic is proposed for BLM use in fuels reduction because of its effectiveness against downy brome, and in forested rangeland management because of its effectiveness against hoary cress and perennial pepperweed. Accidental direct spray and spill scenarios pose a low risk to terrestrial plants for applications at the typical application rate, and a moderate risk for applications at the maximum application rate (Table 4-11). Aquatic plants are at moderate to high risk for adverse effects from accidents for applications at the maximum application rate, and low to moderate risk for applications at the typical application rate. There is no acute risk to aquatic plants in a water body under typical application rate scenarios (ENSR 2005h). When imazapic is applied aerially with buffers of 300 feet or less, off-site drift presents low risk to terrestrial plants. Aquatic plants are generally not at risk from off-site drift of imazapic, except when applied aerially at the maximum application rate with a buffer of 100 feet or less (Table 4-12). Surface runoff of imazapic presents a low risk to aquatic plants in ponds for applications at the maximum application rate in areas with sandy soils and precipitation greater than 25 in/yr. Overall, application of imazapic at the typical application rate, with buffers greater than 300 feet during aerial application, should not pose a risk to non-target plants.

### Overdrive®

Overdrive® is an herbicide formulation containing the active ingredients dicamba and diflufenzopyr. It is a selective, systematic herbicide for the management of broadleaved weeds pre- or post-emergence. Diflufenzopyr inhibits the transport of auxin (a hormone that regulates plant growth and development), and dicamba functions as a synthetic auxin. When used together, these chemicals disrupt plant hormone balance and protein synthesis (Retzinger and Mallory-Smith 1997). Because Overdrive® targets dicotyledons (broadleaved plants), it can be used in native grasslands, particularly if invasive broadleaves are more of a problem than invasive annual grasses. This herbicide provides a good option for vegetation and wildlife habitat management in forested rangeland settings. It can be used to control several broadleaf species, including burningbush, pigweed, Russian thistle, biennial thistles (bull, musk, and Scotch), knapweeds (diffuse, Russian, and spotted), and field bindweed.

Risk assessments predicted moderate to high risk to terrestrial and aquatic plants under direct spray and accidental spill scenarios (Table 4-11). Off-site drift of Overdrive® poses a low risk to special status terrestrial

ENVIRONMENTAL CONSEQUENCES

**TABLE 4-12**
**Buffer Distances to Minimize Risk to Vegetation from Off-site Drift of BLM-evaluated Herbicides**

| Application Scenario | BROM[1] | CHLR[1] | DICM[1] | DIFLU[1] | DIQT[1] | DIUR[1] | FLUR[1] | IMAZ[1] | OVER[1] | SULF[1] | TEBU[1] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Buffer Distance from Non-target Aquatic Plants* | | | | | | | | | | | |
| **Typical Application Rate** | | | | | | | | | | | |
| Aerial | NA | 0 | NA | NA | NE | NA | NE | 0 | NA | 1,300 | NE |
| Low Boom[2] | 100 | 0 | 0 | 100 | NE | 900 | NE | 0 | 100 | 900 | 0 |
| High Boom[2] | 900 | 0 | 0 | 900 | NE | 1,000 | NE | 0 | 900 | 900 | 0 |
| **Maximum Application Rate** | | | | | | | | | | | |
| Aerial | NA | 300 | NA | NA | NE | NA | NE | 300 | NA | 1.500 | NE |
| Low Boom[2] | 900 | 0 | 0 | 900 | NE | 1,000 | NE | 0 | 900 | 900 | 0 |
| High Boom[2] | 900 | 0 | 0 | 900 | NE | 1,000 | NE | 0 | 900 | 900 | 0 |
| *Buffer Distance (feet) from Non-target Terrestrial Plants* | | | | | | | | | | | |
| **Typical Application Rate** | | | | | | | | | | | |
| Aerial | NA | 1,350 | NA | NA | 1,200 | NA | NE | 0 | NA | 0 | NE |
| Low Boom[2] | 950 | 900 | 1,000 | 100 | 100 | 0 | NE | 0 | 0 | 0 | 0 |
| High Boom[2] | 950 | 900 | 1,000 | 100 | 900 | 100 | NE | 0 | 100 | 0 | 0 |
| **Maximum Application Rate** | | | | | | | | | | | |
| Aerial | NA | 1,350 | NA | NA | 1,200 | NA | NE | 900 | NA | 0 | NE |
| Low Boom[2] | 1,000 | 1,000 | 1,050 | 100 | 900 | 200 | NE | 0 | 100 | 0 | 50 |
| High Boom[2] | 1,000 | 1,000 | 1,050 | 100 | 900 | 500 | NE | 0 | 100 | 0 | 50 |
| *Buffer Distance (feet) from Threatened, Endangered, and Sensitive Plants* | | | | | | | | | | | |
| **Typical Application Rate** | | | | | | | | | | | |
| Aerial | NA | 1,400 | NA | NA | 1,200 | NA | NE | 0 | NA | 1,500 | NE |
| Low Boom[2] | 1,200 | 1,000 | 1,050 | 100 | 900 | 1,000 | NE | 0 | 100 | 1,100 | 0 |
| High Boom[2] | 1,200 | 1,000 | 1,050 | 900 | 900 | 1,000 | NE | 0 | 900 | 1,000 | 50 |
| **Maximum Application Rate** | | | | | | | | | | | |
| Aerial | NA | 1,400 | NA | NA | 1,200 | NA | NE | 900 | NA | 1,500 | NE |
| Low Boom[2] | 1,200 | 1,050 | 1,050 | 900 | 1,000 | 1,000 | NE | 0 | 900 | 1,100 | 100 |
| High Boom[2] | 1,200 | 1,000 | 1,050 | 900 | 1,000 | 1,000 | NE | 0 | 900 | 1.000 | 500 |

[1] BROM = Bromacil; CHLR = Chlorsulfuron; DICM = Dicamba; DIFLU = Diflufenzopyr; DIQT = Diquat; DIUR = Diuron; FLUR = Fluridone; IMAZ = Imazapic; OVER = Overdrive®; SULF = Sulfometuron methyl; and TEBU = Tebuthiuron.
[2] High boom is 50 inches above ground and low boom is 20 inches above ground.
NE = Not evaluated and NA = not applicable.
Buffer distances are the smallest modeled distance at which no risk was predicted. In some cases, buffer distances were extrapolated if the largest distance modeled still resulted in risk, or interpolated if greater precision was required.

plants at distances greater than 100 feet (Table 4-12). Surface runoff generally does not pose a risk to non-target plants, except to special status terrestrial species under scenarios in which Overdrive® is applied in watersheds with silt and clay soils and precipitation greater than 25 in/yr, and to aquatic species in watersheds with silt, clay, and sand soils and precipitation greater than 25 in/yr or in all soil types with precipitation greater than 200 in/yr (at the maximum application rate). It appears that Overdrive® can be safely applied in areas that do not contain special status plants and where non-target plants of interest are not broadleaved (i.e., they are monocotyledons such as grasses and lilies).

## *Sulfometuron Methyl*

Sulfometuron methyl, an ALS-inhibitor, is a broad-spectrum, pre- and post-emergent herbicide used to target broadleaf weeds and annual and perennial grass species. Like chlorsulfuron and imazapic, sulfometuron methyl is highly active, but is less selective than chlorsulfuron. Therefore, sulfometuron methyl should not be used in situations where selectivity is required, but could be useful in areas with multiple highly aggressive invasive species that have not responded to other herbicides or treatment methods. Sulfometuron methyl is effective in the management of downy brome, hoary cress, and perennial pepperweed. As with other highly active herbicides, care should be taken to apply

BLM_0000445

sulfometuron methyl using methods and under conditions that limit the potential for spread off site.

For applications of sulfometuron methyl at the maximum application rate, accidental direct spray and spill scenarios pose a high risk to aquatic species and special status terrestrial plant species and a low risk to typical plant species (Table 4-11). Off-site drift of sulfometuron methyl presents a high risk to special status terrestrial plants, but no risk to typical plants species under modeled scenarios. This prediction contradicts past reported incidents of damage to crops resulting from off-site drift covering large distances from the site of application. In addition, other risk evaluations have reported potential damage to non-target plants even when applied at distances of greater than 900 feet (Table 4-12). Aquatic plants are at low risk under off-site drift scenarios, with some higher levels of risk at shorter buffer distances. Aquatic plants are not at risk under off-site drift scenarios if a minimum 900-foot buffer distance is used. Surface runoff of sulfometuron methyl poses a low to moderate risk to special status terrestrial plants, if applied in watersheds with clay or silt soils or loam soils and 100 in/yr precipitation or greater. Aquatic plants in ponds are at low to moderate risk under most surface runoff scenarios. Aquatic plants in streams are at low to moderate risk in watersheds with sand soils or greater than 50 in/yr of precipitation. Sulfometuron methyl should not be applied in the vicinity of special status plant species. In addition, this active ingredient should be applied with buffers greater than 900 feet from aquatic areas and non-target terrestrial plants of interest. Furthermore, it has been shown that application in areas with dry soils that have been recently disturbed, and therefore are more susceptible to off-site drift, can be problematic. However, application in watersheds with high probability for surface runoff (sandy soils, high precipitation) could also pose an additional risk to aquatic plants.

### *Tebuthiuron*

Tebuthiuron is a relatively non-selective herbicide absorbed by plant roots through the soil for use against broadleaved and woody weeds and grasses. Tebuthiuron disrupts photosynthesis by blocking electron transport and the transfer of light energy. Because of its non-selectivity, tebuthiuron should be used in areas dominated by invasive species, particularly woody invasives, such as in rangelands or ROWs invaded by shrubs, trees, and other undesirable species. The strength of this herbicide is its use as a habitat modifier in the BLM sagebrush management program. At low rates of application, tebuthiuron is used to thin sagebrush, creating a more favorable habitat for sagebrush-dependent species.

Accidental direct spray and spill scenarios pose a high risk to terrestrial plants for applications of tebuthiuron at the maximum application rate, and a moderate risk for applications at the typical application rate (Table 4-11). Aquatic plants are at high risk under spill scenarios, aquatic plants in ponds are at low to moderate risk under direct spray scenarios, and aquatic plants in streams are at moderate to high risk under direct spray scenarios. Off-site drift from applications at a distance of less than 900 feet poses a low risk to terrestrial plants under several exposure scenarios, mostly for applications at the maximum application rate and at distances of less than 100 feet (Table 4-12). Aquatic plants are not at risk under off-site drift scenarios; however, surface runoff poses a risk to aquatic plants in ponds under most scenarios when tebuthiuron is applied at the maximum application rate, and under select scenarios when applied at the typical application rate (e.g., most sand soils). Aquatic plants in streams are at risk under a few surface runoff scenarios involving the maximum application rate (e.g., sand soils with precipitation 50 in/yr and greater, and large application areas). Threatened, endangered, and sensitive terrestrial plants in watersheds with clay and silt soils and precipitation of 50 in/yr and greater are also at risk under surface runoff scenarios. Most risk to vegetation from registered use of tebuthiuron can be avoided by applying at the typical application rate, using buffers of more than 100 feet, and avoiding application near special status species.

### Impacts of Forest Service-evaluated Herbicides

The following information for eight herbicides proposed for use by the BLM is taken from ERAs prepared by the Forest Service to support assessment of the environmental consequences of using these herbicides in Forest Service vegetation management programs. Because the Forest Service completed these ERAs prior to the completion of this PEIS, the BLM has used these ERAs to assess the potential ecological impacts of vegetation treatments with these herbicides in future management activities. The BLM previously evaluated and approved these eight herbicides in earlier EISs. As part of their risk assessments, the Forest Service developed worksheets, which allowed the BLM to assess risks of the herbicides using BLM maximum application rates and LOCs (rather than the Forest Service rates and LOCs), so that the risk assessment process for the Forest Service-evaluated herbicides

BLM_0000446

ENVIRONMENTAL CONSEQUENCES

parallels the BLM process as much as possible. However, risk scenarios modeled for terrestrial plants may be different than those modeled in BLM ERAs, depending on the specificity of available toxicity data. The assessment of impacts below is presented using the Forest Service upper estimates of HQs to maximize the conservatism of the assessment. In addition, it should be noted that HQs developed by the Forest Service (as well as the BLM) are already conservative for many reasons (e.g., use of most sensitive values for exposure and dose/response assessments).

### 2,4-D

2,4-D is a plant growth regulator that acts as a synthetic auxin hormone. 2,4-D alters the metabolism and growth characteristics of plants, often causing a proliferation of abnormal growth that interferes with the transport of nutrients throughout the plant. Broad-leaved plants are more susceptible to the effects of 2,4-D than narrow-leaved plants, such as grasses. Plant community diversity studies have shown that 2,4-D can be effectively used in invasive species management without significantly affecting species diversity (USDA Forest Service 2005). This herbicide has limited residual activity and limited effectiveness on perennial species, but it does have some effectiveness in managing biennial thistles (bull, musk, Scotch) in forested rangeland situations, possibly for the enhancement of wildlife species. 2,4-D may also be used in riparian and aquatic areas. It is effective on broadleaved plants, such as Eurasian watermilfoil, and may be used in spot treatments at the labeled rate without substantially affecting native aquatic plants (Washington Department of Ecology 2004).

The principal hazard to non-target plants is unintended direct deposition or spray drift of 2,4-D (SERA 1998). Non-target plants that are accidentally sprayed at normal application rates are likely to be damaged (Table 4-13). Although off-site drift exposure scenarios were not directly modeled, ERAs predicted that drift of 2,4-D following low-flight agricultural application would result in deposition of the herbicide at 5% of the application rate 100 feet downwind from the application site. Thus, at the maximum BLM application rate for terrestrial scenarios (1.9 lbs a.i./ac), the deposition at 100 feet would be 0.1 lbs a.i./ac, decidedly less than the lowest rate expected to affect sensitive plants (0.5 lbs a.i./ac). If 2,4-D were to drift off site during aquatic applications at the maximum application rate (8 lbs a../ac), the deposition at 100 feet would be 0.4 lbs a.i./ac. This is slightly below the minimum application rate used by the Forest Service, suggesting that at a

buffer distance of 100 feet, damage to less sensitive plants (e.g., grasses) is unlikely. The effects on sensitive plants (e.g., broadleaves) at this distance are less certain. At a buffer distance of 200 feet, herbicide deposition is predicted to be 2% of the application rate, resulting in deposition of 0.16 lbs a.i./ac, a concentration that is unlikely to affect non-target plants, when applied at the maximum application rate. Therefore, damage to off-site plants from terrestrial applications of 2,4-D at the maximum application rate plants is unlikely if buffer distances are at least 100 feet. For aquatic applications, a buffer of at least 200 feet should protect off-site plants from damage during applications at the aquatic maximum application rate.

The toxicity of 2,4-D to aquatic plants is low at the typical application rate, but moderate at the maximum application rate. Risks are greater in cases of direct application to water bodies or accidental direct spills. One study suggested that 2,4-D application to water bodies may result in adverse effects on aquatic macrophytes, although the concentrations that inhibited shoot and/or root growth by 25% and 50% were below the expected environmental concentrations from typical use (Roshon et al. 1999).

### Clopyralid

Clopyralid is a selective herbicide most effectively used post-emergence for the control of broadleaf weeds. Clopyralid is a plant growth regulator that is rapidly absorbed across leaf surfaces, and acts as a synthetic auxin hormone, causing a proliferation of abnormal growth that interferes with the transport of nutrients, which can then result in substantial damage to the plant, or death. The modeled BLM application rates were 0.35 pounds acid equivalent per acre (lb a.e./ac; typical) and 1 lb a.e./ac (maximum). Clopyralid would be considered for use in forested rangeland areas for the management of several weedy species, including diffuse and spotted knapweed, yellow starthistle, and bull, Canada, Scotch, and musk thistles.

As expected, direct spray of clopyralid poses a high risk to sensitive plant species; direct spray also poses a low risk to tolerant plant species for applications at the maximum application rate (Table 4-13). Off-site drift of clopyralid from low-boom ground applications and aerial applications may cause damage to sensitive plant species at distances of about 500 feet from the application site, when applied at the typical application rate (SERA 1999), and at distances of greater than 900 feet when applied at the maximum application rate

BLM_0000447

## TABLE 4-13
### Risk Categories Used to Describe Effects of Forest Service-evaluated Herbicides According to Exposure Scenario and Ecological Receptor Group

| | 2,4-D | | Clopyralid | | Glyphosate[1] | | Hexazinone | | Imazapyr | | Metsulfuron | | Picloram | | Triclopyr[1] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| **Terrestrial Plants** | | | | | | | | | | | | | | | | |
| Direct spray, sensitive plants | NE[3] | NE | H | H | M | H | NE | NE | H | H | H | H | H | H | H | H |
| Direct spray, tolerant plants | NE | NE | 0 | L | L | M | NE | NE | M | M | L | M | L | M | NE | NE |
| Off-site drift, low boom, sensitive plants | NE | NE | L [4:6] | M [3:6] | 0 [5:6] | L [3:6] | L [3:6] | L [4:6] | L [4:6] | M [3:6] | L [4:6] | M [4:6] | M [3:6] | M [4:6] | L [3:6] | M [3:6] |
| Off-site drift, low boom, tolerant plants | NE | NE | 0 [6:6] | 0 [6:6] | 0 [6:6] | 0 [6:6] | 0 [6:6] | 0 [4:6] | 0 [6:6] | 0 [5:6] | 0 [6:6] | 0 [6:6] | 0 [6:6] | 0 [6:6] | NE | NE |
| Off-site drift, aerial, sensitive plants | NE | NE | M [2:6] | H [2:6] | L [3:6] | M [2:6] | NE | NE | M [2:6] | H [2:6] | M [2:6] | H [2:6] | L [3:6] | M [3:6] | M [2:6] | H [2:6] |
| Off-site drift, aerial, tolerant plants | NE | NE | 0 [6:6] | 0 [6:6] | 0 [6:6] | 0 [5:6] | NE | NE | 0 [4:6] | 0 [3:6] | 0 [5:6] | 0 [4:6] | 0 [6:6] | 0 [5:6] | NE | NE |
| Surface runoff, sensitive plants | NE | NE | 0 [23:30] | 0 [22:30] | 0 [30:30] | 0 [30:30] | NE | NE | 0 [18:30] | 0 [18:30] | 0 [21:30] | 0 [18:30] | 0 [21:30] | 0 [22:30] | M [13:30] | H [13:30] |
| Surface runoff, tolerant plants | NE | NE | 0 [30:30] | 0 [28:30] | 0 [30:30] | 0 [30:30] | NE | NE | 0 [30:30] | 0 [30:30] | 0 [25:30] | 0 [22:30] | 0 [30:30] | 0 [27:30] | NE | NE |
| **Aquatic Plants** | | | | | | | | | | | | | | | | |
| Accidental spill, sensitive macrophytes | NE | NE | H | H | M | M | NE | NE | H | H | H | H | 0 | 0 | H | H |
| Accidental spill, sensitive algae | NE | NE | L | L | NE | NE | NE | NE | M | H | M | H | M | M | H | H |
| Accidental spill, tolerant algae | NE | NE | 0 | 0 | NE | NE | NE | NE | 0 | 0 | L | M | 0 | 0 | NE | NE |
| Acute exposure, sensitive macrophytes | L | M | 0 | 0 | 0 | 0 | H | H | L | L | L | L | 0 | L | L | M |
| Acute exposure, sensitive algae | NE | NE | 0 | 0 | NE | NE | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE |
| Acute exposure, tolerant algae | NE | NE | 0 | 0 | NE | NE | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE |
| Chronic exposure, sensitive macrophytes | 0 | 0 | 0 | 0 | 0 | 0 | M | H | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Chronic exposure, sensitive algae | NE | NE | 0 | 0 | NE | NE | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE |
| Chronic exposure, tolerant algae | NE | NE | 0 | 0 | NE | NE | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE |

[1] Risk categories for the more toxic formulations are presented here.

[2] Typ = Typical application rate; and Max = Maximum application rate.

[3] 0 = No risk (HQ < LOC); L = Low risk (HQ = 1 to 10 x LOC); M = Moderate Risk (HQ = 10 to 100 x LOC); H = High risk (HQ > 100 LOC); and NE = Not evaluated. Risk categories are based on upper estimates of hazard quotients and the BLM LOC of 1.0. The reader should consult the text of this section of the individual Forest Service risk assessments to evaluate risks at central estimates of hazard quotients. If more than one scenario is involved in an exposure pathway (i.e., off-site drift and surface runoff), then the number of scenarios with the given risk category (out of the total number of evaluated scenarios) is displayed in parentheses. The reported risk category is that of the majority of the RQs for each exposure pathway. As a result, risk may be higher than the reported risk category for some scenarios within each category. The reader should consult the text of this section of the Forest Service risk assessment worksheets (SERA 2005b) to determine the specific scenarios that result in the displayed level of risk for a given receptor group.

ENVIRONMENTAL CONSEQUENCES

ENVIRONMENTAL CONSEQUENCES

(Table 4-14). Hazard quotients are greater for aerial applications (moderate to high risk at smaller buffer distance and higher application rates) than low-boom ground applications (low to moderate risk). Tolerant species are not at risk under off-site drift scenarios. In addition, the Forest Service risk assessment states that damage to non-target species via off-site drift could probably be minimized or avoided during the application process (SERA 1999). For instance, well-directed ground applications (e.g., spot applications) conducted under conditions that do not favor off-site drift would probably have no impact on off-site plant species.

Clopyralid tends to leach into the soil column with rain, where it is rapidly degraded, except in arid soils with low microbial populations. It is not readily absorbed by roots, suggesting that surface runoff is unlikely to affect off-site vegetation. However, sensitive plant species face low to moderate risk under scenarios involving surface runoff of clopyralid applied at the maximum application rate in clay soils, which allow minimal infiltration, at most precipitation levels (i.e., greater than 10 in/yr). Wind erosion of treated soil in arid climates could cause damages to non-target vegetation within 200 to 900 feet of the application site.

Clopyralid is relatively non-toxic to aquatic plants. It is not likely to affect aquatic plants via off-site drift or surface runoff pathways. However, accidental spills may result in temporary growth inhibition of aquatic plants; spills would present a high risk to aquatic macrophytes and a low risk to sensitive algae species. Overall, effects to non-target vegetation from normal application of clopyralid are likely to be limited to sensitive plant species in or very near the treatment area.

### Glyphosate

Glyphosate is a non-selective systemic herbicide that can damage all groups or families of non-target plants to varying degrees. Glyphosate inhibits the production of aromatic amino acids and certain phenolic compounds. This leads to a variety of toxic effects in plants, including the inhibition of photosynthesis, respiration, and nucleic acid synthesis, thereby resulting in cellular disruption, decreased growth, and death at sufficiently high levels of exposure. Because of its non-selective nature, glyphosate may be highly effective in spot applications or in areas where a variety of invasive species dominate and where very few non-target plants exist. Glyphosate is best used in areas where bare ground is desired (e.g., around fences and structures); however, it has low residual activity, so it would not be

effective for an extended period of time. Glyphosate may also be used in riparian and aquatic habitats on shoreline and floating-leaved species such as purple loosestrife, giant reed, cattails, and water lilies. Exposure via direct spray would pose a moderate to high risk to sensitive plant species and low to moderate risk to tolerant plant species (Table 4-13). In addition, one field study suggests that drift from glyphosate could affect long-term sustainability of populations of lichens and bryophytes (Newmaster et al. 1999). Unintended drift, particularly following aerial application, is one of the more plausible exposure scenarios for non-target terrestrial plants (SERA 2003a). The estimates for off-site drift encompass plausible exposures attributable to wind erosion. For relatively tolerant species, there is no indication that glyphosate is likely to result in damage at distances as close as 50 feet from the application site (Table 4-14). Low to moderate risk to sensitive species is predicted for ground broadcast and aerial applications at the maximum application rate, at off-site distances of 100 feet or less. Drift from ground broadcast applications at the typical application rate would pose a low risk to sensitive species within 25 feet, and drift from aerial application at the typical application rate would pose a low risk to sensitive species within 300 feet. It should be noted, however, that all of these drift estimates are based on low-boom ground or aerial broadcast sprays. If glyphosate was directly applied using a backpack sprayer, little if any damage due to drift would be anticipated.

Plant species are not likely to be affected by runoff of glyphosate under any conditions; because glyphosate absorbs strongly to soil, plant roots do not readily absorb it. A field study conducted using glyphosate found no effect to plant diversity in an 11-year examination of site-preparation using herbicides, though structural composition and perennial species presence were altered. These changes may have ecological implications if species lost (e.g., native huckleberry or cherry) were heavily fed upon by wildlife or were used in traditional gathering (Miller et al. 1999).

There is little indication from the risk assessment that adverse effects to aquatic plants are plausible for typical applications of glyphosate (SERA 2003a). A single study suggests that glyphosate application may result in adverse effects on aquatic macrophytes (Roshon et al. 1999). In addition, the risk assessment indicates that accidental spills pose a moderate risk to aquatic macrophytes.

BLM_0000449

### Hexazinone

Hexazinone is an "s-triazine" herbicide that inhibits photosynthesis and the synthesis of RNA, proteins, and lipids. Although some foliar absorption may occur, the major route of exposure involves hexazinone moving from the soil surface to the root system of plants, where, in most species, it is readily absorbed and translocated throughout the plant. The differential toxicity of hexazinone to plants is based on variations in the ability of different plants to absorb, degrade, and eliminate the herbicide. The BLM modeled application rates of 1 lb a.i./ac (typical rate) and 8 lbs a.i./ac (maximum rate). Hexazinone is effective against woody species (e.g., juniper, mesquite, cottonwood), and therefore is not used in forested rangeland areas. It may be used for fuels reduction.

As with other herbicides, hexazinone may affect non-target plants through accidental direct spray and off-site drift scenarios (SERA 1997). During aerial applications at the typical application rate and at distances of 100 feet or less from the application site, some damage to sensitive non-target vegetation is plausible due to drift of liquid formulations (low risk). At maximum application rates, sensitive species may be at low to moderate risk under scenarios involving drift following aerial applications at distances of 500 feet or less (no risk is predicted at 900 feet from the application site; Tables 4-13 and 4-14). There would be a low risk to tolerant species under scenarios involving aerial drift at maximum application rates at distances of 50 feet or less (no risk is predicted at 100 feet). Ground applications of granular formulations or spot treatments with liquid applications of hexazinone should be associated with minimal drift; however, there are no studies available in the literature to support this speculation. In addition, soil contamination and consequent transport of hexazinone to off-site non-target vegetation may occur. Based on the limited dose-response data available for plants, the levels of exposure detected are likely to be toxic to non-target as well as target vegetation. The magnitude of any observed effects will be determined predominantly by local conditions, particularly soil type and rainfall. In porous and/or sandy soils with low levels of organic matter and under conditions of high rainfall, adverse effects to off-site vegetation are most plausible.

Aquatic plants are at moderate to high risk under acute and chronic exposure scenarios involving both the typical and maximum application rates. Aquatic algal species are also sensitive to hexazinone exposure. Furthermore, it is likely that aquatic macrophytes are sensitive based on the effects of hexazinone on algae and terrestrial plants (SERA 1997; Roshon et al. 1999).

### Imazapyr

Imazapyr is an ALS-inhibiting herbicide used in the control of a variety of grasses, broadleaf weeds, vines, and brush species. Although post-emergence application is more effective than pre-emergence application, toxicity can be induced either through foliar or root absorption. Due to its activity, imazapyr may be highly effective in controlling aggressive invasive species that have not responded to other herbicides or treatment methods. The strength of this herbicide is in the management of saltcedar in riparian zones. In addition, imazapyr can be used to treat emergent plants such as spartina, reed canarygrass, and phragmites, and floating-leaved plants such as water lilies. BLM application rates modeled were 0.45 lb a.i./ac (typical rate) and 1.5 lbs a.i./ac (maximum rate).

Imazapyr is an effective herbicide, and even "tolerant" plants that are directly sprayed with imazapyr at normal application rates are likely to be damaged (SERA 2004d). The risk assessment predicted a high risk to sensitive plant species and a moderate risk to tolerant species under direct broadcast spray scenarios (Table 4-13). Off-site drift of imazapyr could cause damage to sensitive plant species at distances of less than 900 feet from the application site after both ground broadcast (low boom) or aerial applications at the typical application rate, and possibly at distances greater than 900 feet after applications at the maximum application rate (low to moderate risk for ground applications and low to high risk for aerial applications at both application rates; 900 feet was the maximum distance modeled), depending on site-specific conditions, such as wind speed and foliar interception (Table 4-14). Tolerant species are not likely to be affected by off-site drift of imazapyr, except under drift scenarios following 1) low boom ground application at the maximum application rate at distances of 25 feet or less, or 2) aerial application at the maximum application rate at distances of 100 feet or less. In addition, wind erosion of soil contaminated with imazapyr could lead to adverse effects to sensitive plants, particularly in relatively arid environments and where local soil surface and topographic conditions favor wind erosion. However, the risk assessment estimated daily soil losses from erosion to be 0.001% to 0.1% of the application rate, similar to loss predicted from off-site drift at distances greater than 500 feet from the application site (SERA 2004d).

BLM_0000450

ENVIRONMENTAL CONSEQUENCES

When applied to areas in which runoff is favored (e.g., clay soils over a wide range of rainfall rates or loam soils at annual rainfall rates of 100 in/yr or more), damage from runoff appears to be more likely than damage from drift. For applications at the typical application rate, the risk assessment predicted low risk to plants at sites with clay soils and 15 to 20 in/yr precipitation, and with loam soils and more than 100 in/yr precipitation; moderate risk to plants at sites with clay soils and 25 to 150 in/yr precipitation; and high risk to plants at sites with clay soils and more than 200 in/yr precipitation. For applications at the maximum application rate, the risk assessment predicted moderate risk to plants on sites with clay soils and 15 to 25 in/yr precipitation, and to plants on sites with loam soils and more than 100 in/yr precipitation; and high risk to plants on sites with clay soils and more than 50 in/yr precipitation. Residual soil contamination with imazapyr could be prolonged in some areas, possibly resulting in substantial growth inhibition (Rahman et al. 1993 *cited in* SERA 2004d). In relatively arid areas in which microbial degradation may be the predominant factor in the decline of imazapyr residuals in soil, residual toxicity to sensitive plant species could last for several months to several years (estimated at 10 months to 5.5 years [SERA 2004d]).

Effects to aquatic plants are also plausible. Peak concentrations of imazapyr in surface water could be associated with adverse effects to some aquatic macrophytes (low risk at both application rates). Longer term concentrations of imazapyr, however, are substantially below the level of concern (LOC; SERA 2004d).

Unicellular algae do not appear to be at risk from routine imazapyr application (Roshon et al. 1999, SERA 2004d). Accidental spills of imazapyr pose a high risk to aquatic macrophytes and a moderate to high risk to sensitive algae species.

### *Metsulfuron Methyl*

Metsulfuron methyl is a selective ALS-inhibiting herbicide used pre- and post-emergence in the control of many annual and perennial weeds and woody plants. Due to its potency, metsulfuron methyl may be highly effective in controlling aggressive invasive species that have not responded to other herbicides or treatment methods. Metsulfuron methyl can be used in forested areas for the management of wildlife habitat and for the control of invasive plant species such as hoary cress, perennial pepperweed, biennial thistles (bull, musk, and Scotch), and yellow starthistle. The BLM application

rates modeled were 0.03 lb a.i./ac (typical rate) and 0.15 lb a.i./ac (maximum rate).

For terrestrial plants, the dominant factor in determining the risk characterization is the potency of metsulfuron methyl relative to the application rate (SERA 2004e). The typical application rate is over 800 times greater than the no observable effects concentration (NOEC) in the vegetative vigor (direct spray) assay of the most sensitive non-target species and approximately 8 times greater than the NOEC for the most tolerant species in the same assay. Exposure via direct spray poses a high risk to sensitive species and a low to moderate risk to tolerant species (Table 4-13). Damage to sensitive non-target species could be expected in ground broadcast applications at distances of about 900 feet from the application site at the typical application rate in areas in which off-site drift is not reduced by foliar interception (Table 4-14; SERA 2004e). Risks to sensitive non-target terrestrial plants from off-site drift are slightly higher for aerial applications (low to high risk) than for low-boom ground applications (low to moderate risk). In addition, tolerant plants face low risk from aerial applications with buffers of 25 feet at the typical application rate and 50 feet at the maximum application rate. Directed foliar applications (i.e., via backpack sprayer) may reduce the risk of off-site drift by an unquantifiable amount (SERA 2004e).

Runoff of metsulfuron methyl could be substantial under favorable conditions. In watersheds with clay soils and 15 to 250 in/yr of precipitation, sensitive terrestrial plants face mostly high risk from exposure via runoff; tolerant plants face low risks at the typical application rate with 50 to 250 in/yr precipitation, and low to moderate risks at the maximum application rate with 15 to 250 in/yr precipitation. Plants in watersheds with loam soils face lower risks of damage via runoff of metsulfuron methyl, with risks only predicted for sensitive plants for applications at the typical rate at sites with 100 in/yr precipitation, or for applications at the maximum application rate at sites with 100 to 250 in/yr precipitation.

In very arid regions, in which runoff might not be substantial, wind erosion could result in damage to off-site plant species, depending on local conditions. Daily soil losses as a result of wind erosion range from 0.001% to 0.1% of the application rate—similar to off-site losses associated with drift at a distance of 500 feet or more from the application site (SERA 2004e).

The potential for damage to aquatic plants appears to be substantially less than the potential for damage to

BLM_0000451

TABLE 4-14
**Buffer Distances to Minimize Risk to Vegetation from Off-site Drift of Forest Service-evaluated Herbicides**

| Application Scenario | 2,4-D | Clopyralid | Glyphosate | Hexazinone | Imazapyr | Metsulfuron Methyl | Picloram | Triclopyr |
|---|---|---|---|---|---|---|---|---|
| *Buffer Distance (feet) from Sensitive Plants* | | | | | | | | |
| **Typical Application Rate** | | | | | | | | |
| Aerial | NE | 900 | 300 | 300 | 900 | 900 | >900 | 500 |
| Low Boom | NE | 900 | 50 | NE | 900 | 900 | >900 | 300 |
| **Maximum Application Rate** | | | | | | | | |
| Aerial | NE | 1,000 | 300 | 900 | >900 | >900 | >900 | >900 |
| Low Boom | NE | 1,000 | 300 | NE | >900 | >900 | >900 | >900 |
| *Buffer Distance (feet) from Tolerant Terrestrial Plants* | | | | | | | | |
| **Typical Application Rate** | | | | | | | | |
| Aerial | NE | 0 | 25 | NE | 100 | 50 | 25 | NE |
| Low Boom | NE | 0 | 25 | 0 | 25 | 25 | 25 | NE |
| **Maximum Application Rate** | | | | | | | | |
| Aerial | NE | 25 | 50 | NE | 300 | 100 | 50 | NE |
| Low Boom | NE | 25 | 25 | 100 | 50 | 25 | 25 | NE |

NE = Not evaluated.
Buffer distances are the smallest modeled distance at which no risk was predicted. In some cases, buffer distances were extrapolated if the largest distance modeled still resulted in risk, or interpolated if greater precision was required.

terrestrial plants, except under accidental spill scenarios. The HQs for routine acute and chronic exposure of aquatic algae are all substantially below the LOC; i.e., there is no risk predicted (SERA 2004e). Aquatic macrophytes face low risk from acute exposure to metsulfuron methyl at upper exposure limits. Accidental spills would pose a high risk to aquatic macrophytes, moderate to high risk to sensitive algae species, and low to moderate risk to tolerant algae species.

### Picloram

Picloram is a pyridine herbicide that acts as a plant growth regulator. It mimics naturally occurring plant auxins or hormones in a manner that leads to uncontrolled and abnormal growth that can in turn lead to gross signs of toxicity or death (SERA 2003b). Picloram is more toxic to broadleaf and woody plants than grains or grasses (Extension Toxicology Network 1996c, SERA 2003b). Picloram is reportedly a good choice for vegetation management in habitat modification situations because it can manage undesirable broadleaf species, including woody species, without injury to desirable grasses. It may be particularly effective in maintaining species diversity in grasslands invaded by spotted knapweed, where its persistence in soils allows it to help initially suppress spotted knapweed seedlings (Rice et al. 1997a); repeated application may be required to successfully control knapweed due to its long-term seed viability

(USDA Forest Service 2005). The resistance potential of non-target plants to picloram has not been generally documented; however, it is known that yellow starthistle has developed resistance to picloram, with resistant plants being more tolerant by factors ranging from 3- to 35-fold compared to non-resistant plants (Fuerst et al. 1996 *cited in* SERA 2003b). The BLM application rates modeled were 0.35 lbs a.e./ac (typical rate) and 1.0 lbs a.e./ac (maximum rate).

Picloram can be considered highly selective to broadleaf plants, but may be toxic to many different plant species if directly sprayed at the typical application rate (SERA 2003b). The risk assessment showed that direct spray of picloram at the typical and maximum application rates poses a high risk to sensitive plant species and a low to moderate risk to tolerant plant species (Table 4-13). Off-site drift of picloram associated with ground and aerial applications may cause damage to sensitive plant species at distances of nearly 1,000 feet from the application site (risk is low to moderate for low-boom ground applications and low to high for aerial applications), depending on wind speed and foliar interception (Table 4-14; SERA 2003b). Tolerant plant species would probably not be impacted by the drift of picloram (low risk is predicted only at the maximum application rate and a distance of 25 feet or less) and might experience relatively little damage unless they were directly sprayed.

BLM_0000452

ENVIRONMENTAL CONSEQUENCES

Runoff may present a significant risk to sensitive non-target terrestrial plant species under conditions in which runoff is favored (mostly high risk is predicted in watersheds with clay soil over a very wide range of rainfall amounts). Low risk is also predicted for sensitive plants in watersheds with loam soils and 100-150 in/yr precipitation, and for tolerant species in watersheds with clay soils and 150 to 250 in/yr precipitation, when picloram is applied at the maximum application rate.

Daily soil losses due to wind erosion, expressed as a portion of application rate, could be in the range of 0.00001 to 0.001. This is substantially less than off-site losses associated with runoff from clay but similar to off-site losses associated with drift in the range of about 200 feet to 900 feet. As with the drift scenarios, wind erosion could lead to adverse effects in sensitive plant species. Wind erosion of soil contaminated with picloram is most plausible in relatively arid environments and where local soil surface and topographic conditions favor this type of event. Furthermore, there is high potential for picloram to leach into groundwater in most soils (USDA Forest Service 2005). In addition, because picloram persists in soil, non-target plant roots can take up picloram, which could impact revegetation efforts.

The toxicity of picloram to aquatic plants varies substantially among different species; however, the only risks predicted by ERAs for routine exposures are a low risk to sensitive aquatic macrophytes from acute exposure to picloram at the maximum application rate, and a moderate risk to sensitive algae species from an accidental spill of picloram.

### Triclopyr

Triclopyr is a selective, systemic herbicide used on broadleaf and woody species. Triclopyr mimics auxin, a plant growth hormone, thus disrupting the normal growth and viability of plants. Commercial formulations include two triclopyr derivatives, triclopyr acid and triclopyr BEE, which were evaluated separately in the Forest Service risk assessment (including separate worksheet calculations). Triclopyr could be used to manage woody riparian and aquatic species of interest, including saltcedar and willow. Triclopyr can be effective as a spot treatment for Eurasian watermilfoil because it is relatively selective for this species at low application rates. In addition, it is effective in riparian areas as a treatment for purple loosestrife because it does not damage native grasses and sedges (Washington Department of Ecology 2004). The BLM application

rates modeled in the worksheets were 1.0 lbs a.e./ac (typical rate) and 10.0 lbs a.e./ac (maximum rate).

Because of the relatively low toxicity of triclopyr acid (terrestrial plant NOEC=0.333 lb/ac) compared to triclopyr BEE (terrestrial plant NOEC = 0.003 lb/ac), the risk characterization for the former is much less severe than the latter (SERA 2003c). Direct spray of both formulations poses a high risk to plants (Table 4-13). The potential impact of off-site drift associated with broadcast applications varies substantially with the application rate. At the typical application rate, potentially damaging exposure could occur within about 300 feet of the application site. At the maximum application rate, damaging drift could occur at distances of greater than 900 feet from the application site (Table 4-14; SERA 2003c).

At the typical application rate, potentially damaging runoff from triclopyr acid would be anticipated only under relatively high rainfall conditions in watersheds with clay soils (low risk was predicted for sensitive and tolerant species with rainfall of 200 in/yr or greater). While a lesser amount of triclopyr BEE will run off, low to moderate risk to plants is predicted for applications of this more toxic formulation, starting at relatively modest rainfall rates (i.e., 15 to 25 inches per year) in all modeled soil types (i.e., clay, loam, sand). At the maximum application rate, damage due to runoff after the application of triclopyr acid would be expected at annual rainfall rates as low as 25 inches per year in clay, loam, and sand soils (mostly low risk). For triclopyr BEE, low to high risk is predicted for applications in all but the most arid areas.

Both formulations of triclopyr have been found to decrease the relative long-term abundance and diversity of lichens and bryophytes; normal application rates in aerial spraying were found to reduce abundance by 75%, with colonists and drought tolerant species being less susceptible than later-successional mesophytic forest species (Newmaster et al. 1999). Triclopyr was also found to inhibit growth of four types of ectomychorrhizal fungi associated with conifer roots at concentrations of 1,000 parts per million (Estok et al. 1989 *cited in* SERA 2003c).

Aquatic stream plants are at low risk from routine acute exposure to triclopyr acid at the maximum application rate. For longer-term exposures, there is no predicted risk to aquatic plants associated with triclopyr TEA applications, even at the maximum application rate. Triclopyr BEE is much more toxic to aquatic plants than triclopyr TEA under laboratory conditions; however, the

BLM_0000453

levels of exposure under field conditions would be less, even under acute scenarios because of the rapid hydrolysis of triclopyr BEE to triclopyr acid, as well as the lesser runoff of triclopyr BEE resulting from low water solubility and high affinity for soils (SERA 2003d). Nonetheless, triclopyr BEE is projected to be somewhat more hazardous when used where runoff to open water may occur. Acute exposure poses a low risk to aquatic stream plants under scenarios involving applications at the typical rate, and a moderate risk under scenarios involving applications at the maximum rate. Accidental spill of triclopyr acid poses a low to moderate risk to aquatic macrophytes and algae, whereas accidental spill of triclopyr BEE poses a high risk to aquatic macrophytes and algae.

**Impacts of Tank Mixes**

Risk assessment analysis of tank mixes indicates that risks to plants vary by tank mix. Tank mixes of bromacil and sulfometuron methyl, and of imazapic and diflufenzopyr, pose a greater risk to aquatic plants and special status terrestrial plants than bromacil, imazapic, or diflufenzopyr alone (risks to aquatic plants are not greater versus imazapic applied alone). In some cases, plant species may be particularly sensitive to these tank mixes. In addition, application of a tank mix of chlorsulfuron and diuron poses a greater risk to all plant receptors than application of chlorsulfuron alone (but not application of diuron alone). Risks to most receptors are also greater for a tank mix of sulfometuron methyl and bromacil, versus sulfometuron methyl alone.

There is some uncertainty in this evaluation because herbicides in tank mixes may not interact in an additive manner; the evaluation may overestimate risk if the interaction is antagonistic, or it may underestimate risk if the interaction is synergistic. In addition, other products may also be included in tank mixes that contribute to the potential risk. Based on the results of ERAs, precautions (e.g., increased buffers, decreased application rates) should be taken when applying tank mixes to reduce the increased risks to plants associated with these applications.

## Summary of Herbicide Impacts Evaluated in ERAs

The effects of herbicides on target plants depend on their mode of action. Contact herbicides (e.g., diquat) only kill the plant parts that they touch, while translocated herbicides (e.g., dicamba) are transported throughout the plant. Herbicides that provide long-term

weed management (e.g., bromacil) affect plants when they are present in the soil, with the degree of damage and non-selectivity often increasing with herbicide concentration (Holecheck et al. 1995). Selective herbicides only affect certain plant species, whereas non-selective herbicides affect all or most plant species. The non-selective herbicides evaluated in this PEIS include bromacil, diquat, diuron, fluridone (except at low concentrations), glyphosate, sulfometuron methyl, and tebuthiuron. The other herbicides (2,4-D, chlorsulfuron, clopyralid, diflufenzopyr, hexazinone, imazapic, imazapyr, metsulfuron methyl, Overdrive®, picloram, and triclopyr) exhibit some selective qualities and would be most effective when used to target certain plant species. Because of their selective nature, they may be able to be used in areas where non-target vegetation exists in communities with target vegetation. In addition, diquat and fluridone would be used exclusively for the management of aquatic plants; 2,4-D, glyphosate, imazapyr, and triclopyr could be used for aquatic as well as terrestrial vegetation management.

The herbicides that create the most short-term risk to non-target plant species, given that application scenarios follow SOPs, are those that are applied in a manner that increases the likelihood for off-site transport (e.g., drift, surface runoff). The risk characterization process of the ERA indicated that risk to typical and special status terrestrial plants is moderate under scenarios involving off-site drift of bromacil and chlorsulfuron and risk to special status terrestrial plants is moderate to high under scenarios involving off-site drift of diquat, diuron, and sulfometuron methyl. Diuron poses a moderate risk to aquatic plants under scenarios involving off-site drift associated with applications at the maximum application rate. None of the herbicides pose risk to non-target plants under wind erosion scenarios.

Impacts to non-target plants would be lessened for herbicides that selectively target the desired species type. However, some changes in species composition could occur in these communities despite lessened impacts to non-target species as a result of altered competitive relationships. The lasting effects of treatments using non-selective herbicides would depend on the species present in the seedbank to reestablish at the site. In many cases, reseeding or replanting treatments would be necessary after an application of a non-selective herbicide to ensure the presence of native species on the site following treatment.

The ALS-inhibiting herbicides evaluated in this PEIS are chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl. These herbicides are

BLM_0000454

ENVIRONMENTAL CONSEQUENCES

applied at low application rates, with only small concentrations necessary to damage plants. The ERAs predicted some risks to non-target plants associated with those herbicides; however, the risks were similar to the risks associated with the other evaluated herbicides. Nevertheless, because of the potency of these herbicides, they may be most appropriate for use when the target plant is the dominant cover species, or when there is a particularly aggressive invasive species that has not successfully controlled by other methods (USDA Forest Service 2005).

## Other Herbicides Previously Approved for Use on Public Lands

Asulam, atrazine, fosamine, mefluidide, simazine, and 2,4-DP (also known as dichlorprop) are currently approved for use on public lands. However, the historical use of these herbicides by the BLM has been quite limited, with only fosamine used in the last 7 years (on less than 50 acres annually). Asulam is used in post-emergent control of broadleaf weeds, perennial grasses, and nonflowering plants in forestry and rangeland areas and ROW (Information Ventures, Inc. 1995a). Atrazine provides selective weed control in conifer reforestation, and on ROW, and energy, mineral, cultural, and recreation sites. It is toxic to many plants and should not be used under windy conditions near desirable trees, shrubs, or plants (Information Ventures, Inc. 1995b). Fosamine is used to control brush and herbaceous plants. No acute effects to aquatic plants are expected from normal use of fosamine, but movement of fosamine from the treatment site due to drift or runoff can adversely affect non-target and non-target species (USEPA 1995d). Mefluidide is registered for forestry, rangeland, and ROW. Contact with non-target species may injure or kill susceptible plants (Information Ventures, Inc. 1995c). Simazine is a selective herbicide that is used to control broadleaf and grass weeds in forestry, rangeland, and ROW uses. It is toxic to many plants (Information Ventures, Inc. 1995d). 2,4-DP is registered to control aquatic weeds in ditches and for a variety of upland uses. It is a broadleaf herbicide (Pesticide Management Educator Program 2001).

## Impacts by Alternative

The overall goal of treating vegetation would be to restore natural fire regimes and to reduce or eliminate populations of undesirable vegetation. Treatments aimed at achieving these goals should result in a more desirable successional stage in forest and rangeland habitats, increase plant species diversity, and create a more stratified age structure for wildlife.

Species diversity and vegetative structural components would be enhanced under most treatments, although some treatments could be designed to reduce the size or density of stands of trees or shrubs. Herbicides would provide better control of resprouting vegetation than other treatment methods, particularly when applied before burning. Herbicides would be used on rangelands dominated by annual grasses, such as downy brome and medusahead, followed by revegetation with perennial grasses and forbs. Herbicides would also be used to suppress or thin shrubs in favor of herbaceous vegetation. In some areas, herbicide treatments might reduce the cover of perennial grasses and forbs over the short term, but perennial grass and forbs communities should improve over the long term as shrub stands are thinned to allow more light and nutrients to reach the understory and competition for annual grasses and forbs is reduced.

The following sections detail the expected effects of each of the five alternatives on target and non-target plant communities, and provide comparisons of effects among alternatives. These effects may vary depending on the acreage treated using different application methods and different herbicides, as well as the size of treatment events.

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under the No Action Alternative, the BLM would continue current vegetation treatment programs in 14 western states, and would treat an estimated 305,000 acres per year using both ground-based and aerial methods. Public lands in Alaska, Nebraska, and Texas would not be eligible for herbicide treatments under this alternative.

Under this alternative, the BLM would be able to use the 20 herbicides previously approved in earlier EIS RODs. However, based on the recent pattern of BLM herbicide use, it is likely that approximately 75% of the area treated would involve the use of only four herbicides: 2,4-D, glyphosate, picloram, and tebuthiuron (see Table 2-5).

As the No Action Alternative would be a continuation of current vegetation treatment practices, impacts to vegetation would be similar in nature to those that have occurred in the past. As a result, invasive species would likely continue their rapid expansion across western

BLM_0000455

landscapes. Negative impacts to vegetation (i.e., harm to non-target plants) could be lower than under the other herbicide-use alternatives based on the number of acres treated. However, long-term benefits to plant communities (i.e., eradication of unwanted vegetation and resulting improvements in ecosystems) would be much less under this alternative than the other alternatives. Invasive plant populations would likely continue to expand at the current rate or more quickly, increasing damage to native plant communities and inhibiting ecosystem functions.

Because the new herbicides proposed for use by the BLM (diquat, fluridone, imazapic, and Overdrive®) would not be used under this alternative, risks to vegetation would be different than under the other alternatives. The risks to terrestrial plants associated with exposure to these four herbicides (especially imazapic) under accidental direct spray, spill, and off-site drift scenarios are lower than those associated with exposure to bromacil and chlorsulfuron, and similar to or lower than the risks associated with exposure to the other pre-approved herbicides. Imazapic has been reported to successfully control the spread of aggressive invasives, including downy brome, Russian knapweed, and perennial pepperweed, and has had positive effects on native prairie restoration (Whitson 2001, Shinn and Thill 2002). In addition, risks to aquatic plants associated with use of the new herbicides are similar to or lower than those associated with use of the pre-approved herbicides (e.g., bromacil, diuron), under all application scenarios. Since the BLM would not use the new herbicides under the No Action Alternative, risks to terrestrial plants from accidents and off-site drift during each application event could be greater than under the other herbicide-use alternatives in situations where less harmful new herbicides would otherwise be appropriate. However, risks to special status terrestrial plants from surface runoff would be greatest with the use of diflufenzopyr, suggesting that per treatment risks to these species under surface runoff scenarios might be less under this alternative than under the other herbicide-use alternatives.

Over half the treatments occurring under the No Action Alternative would be in the Temperate Desert Ecoregion, with a third of the treatments targeted to improve sagebrush and other evergreen shrublands, and a third targeted at annual and perennial invasive grasses and forbs (Table 4-15). The focus of most treatments in this ecoregion is to improve habitat for sage-grouse and other wildlife that use sagebrush communities by improving the structural diversity and species composition of sagebrush and rabbitbrush stands, removing invasive species, and promoting production of perennial grasses and forbs desired by sage-grouse and other wildlife (Paige and Ritter 1999). Picloram may be active in the soil for an extended period of time after application and is potentially more damaging to perennial grasses than 2,4-D. Application of picloram to control rabbitbrush and forbs in this ecoregion should decrease production of some desirable shrubs, forbs, and grasses, although grass production should recover as picloram dissipates (USDI BLM 1991a).

Glyphosate could be used to spot treat unwanted annual grasses and forbs. It is effective on downy brome, but is non-selective and can harm desirable plant species if not used carefully. Tebuthiuron is a broad-spectrum herbicide that has a long period of activity in the soil and is effective at thinning sagebrush. However, tebuthiuron may damage grasses and other desirable plants. Application of tebuthiuron at high rates has been shown to decrease perennial grasses and allow annual grasses, as well as rabbitbrush, to increase.

Forty percent of herbicide treatments would occur in the Subtropical Steppe, Temperate Steppe, and Subtropical Desert ecoregions. Within these regions, over half the treatments would be targeted at evergreen shrublands. As in the Temperate Desert Ecoregion, treatments would focus on management of sagebrush/rabbitbrush and control of annual and perennial invasive forbs and grasses.

Over three-quarters of the treatments in the Subtropical Steppe Ecoregion would be focused on sagebrush and other evergreen shrublands, while 12% of the treatments in this ecoregion would focus on pinyon, juniper and other evergreen woodland species. Picloram and tebuthiuron are the main herbicides used to treat pinyon-juniper woodlands. Both picloram and tebuthiuron may persist in the soil for several years and may injure understory grasses, shrubs, and forbs. Treating individual trees with these herbicides is often a more effective means of controlling trees and less injurious to understory species than broadcast applications. Using picloram on some sites can also result in dominance by annual grasses, such as downy brome or medusahead, if these species become resistant to picloram (USDI BLM 1991a).

Over three-quarters of the treatments in the Temperate Steppe Ecoregion would be focused on annual and perennial grasses and forbs, including downy brome, knapweeds, and thistles. Control of broadleaf plants using selective herbicides, such as 2,4-D, usually

BLM_0000456

ENVIRONMENTAL CONSEQUENCES

increases grass production. 2,4-D is also effective in controlling weedy forbs, such as bull, musk, and Scotch thistle. 2,4-D can be tank mixed with other herbicides, such as glyphosate, dicamba, picloram, and triclopyr to enhance the activity of these herbicides. Applications of selective herbicides, such as 2,4-D, are expected to increase grasses and decrease broadleaf species. Applications of picloram may damage sensitive grasses as well as broadleaf plants, and can substantially alter the composition of grassland communities (USDI BLM 1991a).

Herbicides such as picloram and tebuthiuron are used to control woody species such as mesquite, creosotebush, and snakeweed in Subtropical Desert habitats. These herbicides usually decrease woody plant growth and increase growth of grasses, although it may take several years before grass and forb production increases in response to reduced competition from shrubs. Picloram is effective in controlling snakeweed, while tebuthiuron is effective in controlling creosotebush and tarbrush. However, tebuthiuron can be injurious to many grasses and forbs, and may promote the development of annual forbs, including Russian thistle. Dicamba has been used to control undesirable herbaceous and woody species and has minimal impact on grasses if applied at normal application rates (0.5 to 1 lb a.i./acre; USDI BLM 1991a).

Under this alternative, the BLM would be able to continue to use 2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine, although it is unlikely that these herbicides would be used. In recent years, the BLM has used other herbicides in their place that are more effective or have fewer environmental and/or human health risks. Bromacil, dicamba, and glyphosate have been substituted for asulam; bromacil, diuron, sulfometuron methyl, and tebuthiuron have replaced atrazine; triclopyr has replaced fosamine; sulfometuron methyl has replaced mefluidide (and imazapic would also replace mefluidide); diuron and hexazinone have replaced simazine; and 2,4-D, dicamba, imazapyr, and triclopyr have replaced 2,4-DP.

**Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)**

Alternative B, the Preferred Alternative, would result in the treatment of approximately 932,000 acres across the 17 western BLM states. In addition to the 14 currently-approved herbicides, the BLM would be able to use the four others evaluated in this PEIS.

Under this alternative, over 70% of acres would be treated in the Temperate Desert Ecoregion, a much greater proportion than would be treated under the No Action or other alternatives (Table 4-16). Fifteen percent of treatments would occur in the Temperate Steppe Ecoregion. As under the No Action Alternative, treatments in the Temperate Desert Ecoregion would be targeted primarily toward sagebrush, rabbitbrush, and other evergreen shrubland species, and annual grass and perennial forb weeds, while those in the Temperate Steppe Ecoregion would focus on control of invasive annual and perennial grasses and forbs.

This alternative would result in the most extensive impacts to vegetation (both negative and positive) because it proposes the most acres for treatment (3 times the acreage proposed under the No Action Alternative). The use of the four new herbicides and the ability to use future herbicides that become registered with the USEPA would allow BLM managers more options in choosing herbicides to best match treatment goals and application conditions, and might therefore reduce overall risk to vegetation and increase positive ecosystem benefits from treatment. In addition, the ability to use future registered herbicides would allow the BLM to employ the most technologically-advanced herbicides, which would likely reduce risk to non-target plants and increase management benefits. This alternative would also reduce risks and negative impacts associated with other vegetation management methods (e.g., risk of escaped prescribed fires; see the PER). Furthermore, it is useful to have a range of herbicides and herbicide types available for use to combat diverse weed problems, and to minimize the chance that invasive species will become resistant to herbicides that are sprayed in the same location for several years. Weed resistance to herbicides can be minimized by using multiple herbicides with different sites of action in the same application, alternating herbicides with different sites of action each year, or alternating herbicide use with other effective forms of treatment (e.g., prescribed fire, mechanical removal).

Based on BLM patterns of use, 2,4-D, glyphosate, picloram, and tebuthiuron would comprise about 70% of the herbicides that would be used under this alternative (see Table 2-5). The risks and benefits of using these herbicides are discussed under the No Action Alternative. Approximately 10% of all treatment acres would be treated with the new herbicides, and of these, over three-fourths of these acres would be treated using imazapic. Imazapic could be used in all areas except riparian and wetland areas. Imazapic would be

BLM_0000457