**TABLE 4-15**
**Percentage of Acres Projected to be Treated Using Herbicides in Each Ecoregion for**
**Each Vegetation Subclass under the No Action Alternative**

| Vegetation Subclass[1] | Ecoregion | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Tundra | Subarctic | Marine | Mediterranean | Subtropical Desert | Subtropical Steppe | Temperate Desert | Temperate Steppe |
| Evergreen forest | 0 | 0 | 86 | 74 | 0 | <1 | 3 | 1 |
| Deciduous forest | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 |
| Mixed evergreen/deciduous forest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Evergreen woodland | 0 | 0 | 0 | 1 | 3 | 12 | 5 | 2 |
| Deciduous woodland | 0 | 0 | 0 | <1 | 7 | 4 | 0 | 0 |
| Mixed evergreen/deciduous woodland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Evergreen shrubland | 0 | 0 | 0 | 6 | 88 | 77 | 30 | 6 |
| Deciduous shrubland | 0 | 0 | 0 | 0 | 0 | 3 | <1 | 0 |
| Evergreen dwarf-shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deciduous dwarf-shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Perennial graminoid | 0 | 0 | 14 | <1 | 0 | 1 | 9 | 22 |
| Annual graminoid or forb | 0 | 0 | 0 | 16 | 0 | <1 | 21 | 3 |
| Perennial forb | 0 | 0 | 0 | 1 | <1 | 1 | 14 | 29 |
| Riparian/wetland | 0 | 0 | 0 | 2 | <1 | 1 | 1 | 0 |
| More than one subclass | 0 | 0 | 0 | 0 | 2 | 1 | 14 | 38 |
| Total for all ecoregions | 0 | 0 | 1 | 3 | 15 | 17 | 51 | 13 |

[1] See Table 3-4 and Vegetation section in Chapter 3 for a description of vegetation subclasses.

used to control downy brome, hoary cress, perennial pepperweed, and several other invasive species that are known to displace native vegetation and alter wildfire intensity and frequency.

About 2% of all treatment acres would be treated using Overdrive®. Overdrive® would be used on rangelands, ROW, oil, gas, and mineral sites, and cultural and recreation sites. This herbicide is not effective at controlling downy brome, but does have activity on oak species that may be controlled to reduce hazardous fuels. It also provides activity on several annual broadleaf species including burningbush, pigweed, and Russian thistle; several biennial species including bull, musk, and Scotch thistle, teasel, and diffuse knapweed; and several perennial species including spotted and Russian knapweed and field bindweed. The herbicide is also effective in controlling poisonous plants, such as whorled milkweed.

In addition to being able to use four new herbicides under this alternative, the BLM would be able to use herbicides in Alaska, Nebraska, and Texas. Although no herbicide treatments are planned on public lands in Alaska under this alternative, the ability to use herbicides in Nebraska and Texas would allow for more comprehensive weed management programs in these states.

**Alternative C – No Use of Herbicides**

Under Alternative C, non-target plants would not be affected by herbicide use. Effects to vegetation would stem from other vegetation treatment methods (see the accompanying PER). In general, the potential negative impacts to non-target plants from manual and mechanical treatment methods are expected to be lower than those from chemical and prescribed fire methods (the impacts from biological methods are less certain). Positive ecosystem benefits as a result of vegetation management may be less than under the Preferred Alternative, as there are certain invasive species for which herbicide use is the only effective method of treatment or for which treatment by other methods is impractical due to cost, time, accessibility, or public concerns (e.g., saltcedar in riparian areas). For example,

BLM_0000458

ENVIRONMENTAL CONSEQUENCES

rough terrain may prevent treatment by methods that require ground vehicle and foot access, while aerial treatment with herbicides would be possible in these areas. Vegetation treatments on ROW and oil and gas production facilities would have to be done by manual and mechanical means, or not done at all. Both options may be unfeasible for ROW, while the latter option would compromise the safety of oil and gas production facilities (USDI BLM 1991a).

In addition, it is often difficult to eradicate some species, such as shrubs that resprout from roots, by means other than herbicide application (e.g., rabbitbrush, honey mesquite, Harvard oak, tree cholla). Similarly, pre-emergent herbicides that persist in the soil are the most effective means of controlling invasive plants with seeds that remain viable for long periods of time. Furthermore, where prescribed fire is an appropriate alternative to larger-scale herbicide use (such as in rangelands), neighboring communities may object to the resulting smoke production or risk from escaped fires.

Under this alternative, without the use of herbicides, fewer total acres would be treated annually, and in some areas invasive plant populations would spread at a faster rate, than under the other alternatives, particularly where other treatment methods are not effective or possible (e.g., steep, rocky terrain, and large tracts of rangeland or grassland dominated by invasive, resprouting shrubs or without enough fine fuels to carry prescribed fires). In these areas, degradation of native plant communities would be greater than under the other alternatives.

**Alternative D – No Aerial Applications**

Alternative D would allow the use of the same herbicides in the same areas as allowed under the Preferred Alternative, and the benefits associated with availability of new and future herbicides would be the same for both alternatives. However, Alternative D would prohibit aerial herbicide applications. The total treatment acreage would be reduced to approximately 530,000 acres, because some large and remote areas cannot be effectively treated by ground application methods. This alternative would result in substantially fewer impacts to non-target vegetation from off-site drift as compared to alternatives where aerial spraying would be allowed. Drift is a major route of unintended damage to plants, and aerial application is a primary cause of off-site drift. Impacts per treatment would also be much lower under this alternative than under

alternatives A and B, and would be similar to or less than per area impacts under Alternative E.

Under this alternative, it is likely that long-term negative effects on desired plant communities and ecosystems would be greater than any potential short-term negative effects that would result from aerial applications under other alternatives. In addition, direct and indirect impacts from other vegetation treatment options might increase if these methods were used more extensively to compensate for the reduced number of acres treated by herbicides. These impacts could include greater vegetation damage from the use of ground-based equipment than under the other alternatives.

Prescribed fire and mechanical treatment would be substituted for aerial herbicide treatments as much as possible in large areas proposed for treatment. Fire would not be effective in areas with insufficient fuels to carry fire, while mechanical treatments might not be suitable in areas where sprouting species, such as rabbitbrush, might increase after mechanical treatment. This alternative would preclude treatment of large expanses of downy brome and other invasive annual grasses using imazapic and other herbicides. Fire could also result in substantial damage to sagebrush stands and enhance the development and spread of downy brome and other annual grasses, while mechanical disturbance could also lead to conditions that enhance the spread of weeds and other invasive plants (USDI BLM 1991a).

Nearly all (91%) aerial treatments are proposed for the Subtropical Steppe and Temperate Desert ecoregions. Of these, two-thirds would occur in evergreen shrublands to remove invasive vegetation, such as downy brome. The remaining treatments would focus primarily on control of undesirable annual and perennial grasses and forbs. Controlling sprouting woody species in areas where an herbaceous community is desired could be difficult because herbicide use would be limited and sprouting might be enhanced by burning and mechanical methods. Under this alternative, more acres in these ecoregions would continue to be dominated by shrubs, and the herbaceous component of plant communities would not be as diverse or productive as in communities where aerial applications of herbicides were used.

About 7% of aerial treatments would occur in the Temperate Steppe Ecoregion, with most of these treatments used to control perennial forbs such as knapweed, thistles, and leafy spurge. Prescribed fire could be used to treat large acreages, but control of

BLM_0000459

**TABLE 4-16**
**Percentage of Acres Projected to be Treated Using Herbicides in Each Ecoregion for Each Vegetation Subclass under the Preferred Alternative**

| Vegetation Subclass[1] | Ecoregion | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Tundra | Subarctic | Marine | Mediterranean | Subtropical Desert | Subtropical Steppe | Temperate Desert | Temperate Steppe |
| Evergreen forest | 0 | 0 | 79 | 76 | 0 | <1 | 1 | 1 |
| Deciduous forest | 0 | 0 | 0 | 0 | 0 | 0 | <1 | <1 |
| Mixed evergreen/deciduous forest | 0 | 0 | 0 | 0 | 0 | 0 | 0 | <1 |
| Evergreen woodland | 0 | 0 | 0 | 6 | 0 | 1 | 2 | <1 |
| Deciduous woodland | 0 | 0 | 0 | <1 | 5 | 5 | 0 | 0 |
| Mixed evergreen/deciduous woodland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Evergreen shrubland | 0 | 0 | 0 | 8 | 26 | 42 | 36 | 21 |
| Deciduous shrubland | 0 | 0 | 0 | 0 | 32 | 4 | <1 | 0 |
| Evergreen dwarf-shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deciduous dwarf-shrubland | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Perennial graminoid | 0 | 0 | 21 | <1 | 0 | 33 | 8 | 26 |
| Annual graminoid or forb | 0 | 0 | 0 | 10 | 0 | 8 | 20 | 2 |
| Perennial forb | 0 | 0 | 0 | <1 | <1 | 1 | 12 | 23 |
| Riparian/wetland | 0 | 0 | 0 | <1 | 2 | 4 | 1 | 0 |
| More than one subclass | 0 | 0 | 0 | 0 | 34 | 3 | 21 | 26 |
| Total for all ecoregions | 0 | 0 | <1 | 4 | <1 | 9 | 71 | 16 |

[1] See Table 3-4 and Vegetation section in Chapter 3 for a description of vegetation subclasses.

noxious weeds and other broadleaf species in this ecoregion would not be as effective as under the Preferred Alternative.

## Alternative E – No Use of Acetolactate Synthase-inhibiting Active Ingredients

Alternative E was developed based on a proposal for ecosystem-based vegetation management submitted by the American Lands Alliance, an alliance of several environmental and conservation groups (see Appendix I). Approximately 466,000 acres would be treated under Alternative E, which is slightly less than the acreage that would be treated under Alternative D and less than half of the acreage that would be treated under the Preferred Alternative. However, there would still be an increase from the average annual treatment acreage over the past 8 years (and likely to occur under the No Action Alternative). In addition to a relatively low impact to vegetation as a result of the low number of treatment acreage, per treatment impacts under Alternative E would also be lower than under the other herbicide-use alternatives because of the restrictions detailed by this alternative—most notably prohibition of the use of ALS-inhibiting active ingredients.

Sulfonylurea herbicides and other ALS-inhibiting herbicides (e.g., chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, sulfometuron methyl) block the synthesis of amino acids that are required for protein production and cell growth; thereby resulting in plant death. These herbicides are biologically active at small concentrations, which is beneficial to herbicide applicators because a small dose may be used, thereby saving money and possibly resulting in fewer cases of unintended damage to wildlife and the environment (e.g., groundwater contamination [Obrigawitch et al. 1998]). However, because of their high potency, these chemicals may pose excessive dangers to non-target plants. Off-site movement of even small concentrations of these herbicides can result in extensive damage to surrounding plants, and damage to non-target plants may result at concentrations lower than those reportedly required to kill target invasive species (Fletcher et al. 1996), including concentrations that cannot be detected by any standard chemical protocol (Whitcomb 1999). One study reported that drift of chlorsulfuron caused

BLM_0000460

ENVIRONMENTAL CONSEQUENCES

82% to 100% reductions in the yield of several crop species when it was applied at 0.008 to 0.004 times the label-suggested application rate (such as might occur with off-site drift) at critical stages of plant development (Fletcher et al. 1996). However, another study reported that risks to non-target plants associated with sulfonylurea herbicides are similar to those associated with other herbicides used at higher application rates (Obrigawitch et al. 1998). In addition, a predominant problem with ALS-inhibiting herbicides is that they can quickly confer resistance to weed populations, particularly since they are often used extensively as the primary weed control method and they have a single mode of action and long residual activity, allowing ample opportunity for the ALS-encoding gene in the target weed to mutate—resulting in a resistant version of ALS (Whitcomb 1999, Tranel and Wright 2002).

Sulfometuron methyl has been implicated in several cases of large-scale damage to non-target species as a result of off-site drift. In Franklin County, Washington, drift of sulfometuron methyl (as the active ingredient in the herbicide Oust®) caused over a million dollars in damage to more than 700 miles of roadside, including 300,000 young trees in one nursery (Turner 1987). Damage to croplands occurred in Idaho when public lands damaged by wildfire were treated with Oust® and treated soils drifted off-site in wind-blown soil. Responses by agencies to these types of findings varies from warnings about applying these herbicides during critical reproductive periods of non-target plants or during likely drift conditions to suggestions that the use of these herbicides should be severely limited or discontinued, or that the practice of aerial spraying should be abandoned. Because of the risks associated with off-site drift, the labeled use of sulfometuron methyl for burned areas has been rescinded by the USEPA, although the herbicide can still be used on noncrop and forestry sites per label directions.

Under this alternative, the BLM would not be able to use chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, or sulfometuron methyl. However, other herbicides proposed for use by the BLM pose risks that are similar to those associated with these five herbicides; therefore, it is uncertain whether this use restriction would actually reduce risk to non-target plants.

This restriction could ameliorate some of the public concern associated with herbicide use on public lands. However, the potency of these herbicides allows them to be used in very small amounts, which could limit their exposure to off-site species via runoff or drift. In addition, these herbicides may be most effective on particularly aggressive invasive species that have not responded to other herbicides or treatment methods. Control of these aggressive species may not be possible under Alternative E. Furthermore, as mentioned in the No Action Alternative, it is useful to have a range of herbicides and herbicide types available for use to combat diverse weed problems, and to minimize the chance that invasive species will become resistant to herbicides that are sprayed in the same location for several years.

Alternative E incorporates other management practices that would be likely to have positive impacts on vegetation communities. The suggested use of 500-foot buffers between broadcast herbicide applications and special status plants would reduce risks to sensitive plants from off-site drift and surface runoff. However, herbicide damage from off-site drift has been noted up to a mile from application, and the ERA predicted risks to special status terrestrial plants from application of bromacil and diuron at distances up to 900 feet. Alternative E would limit the use of broadcast applications, which would reduce the risks to non-target plants associated with off-site drift. Broadcast applications could be used in appropriate situations (i.e., where no other method is practical and non-target plant species and aquatic areas are distant from the application area), however, which would result in some ecosystem benefits from larger scale herbicide applications. Herbicides would not be used in riparian conservation areas, which would protect sensitive aquatic plant species and attendant ecosystem functions in these key areas. However, if these areas were to become degraded by invasive species, it could be more difficult to control and eradicate these species using non-herbicide methods, which would imperil native plants and important riparian ecosystem functions in these and adjoining areas.

While per treatment ecosystem benefits could be greater under Alternative E than under the other herbicide-use alternatives as a result of this ecosystem-based management approach, overall benefits to vegetation and ecosystems across the 17 western states (that could not be attained using other treatment methods) would be lower under this alternative because of the relatively low treatment acreage and the inability to use certain practices in situations where they are warranted (e.g., use of ALS-inhibitor herbicides on highly aggressive weeds).

BLM_0000461

## Mitigation for Herbicide Treatment Impacts

In addition to the SOPs identified earlier in this section and in Table 2-8, the following measures are recommended to reduce impacts to non-target vegetation from the use of herbicides:

- Minimize the use of terrestrial herbicides (especially bromacil, diuron, and sulfometuron methyl) in watersheds with downgradient ponds and streams if potential impacts to aquatic plants are of concern.

- Establish appropriate (herbicide specific) buffer zones around downstream water bodies, habitats, and species/populations of interest (see Tables 4-12 and 4-14). Consult the ERAs for more specific information on appropriate buffer distances under different soil, moisture, vegetation, and application scenarios.

- Limit aerial application of chlorsulfuron, metsulfuron methyl, and sulfometuron methyl to areas with difficult land access, where no other means of application is possible.

## Special Status Plant Species

### Introduction

As discussed in Chapter 3, public lands in the western U.S. support over 1,000 plant species that have been given a special status based on their rarity or sensitivity. Special status plants include approximately 150 species that are federally listed as threatened or endangered, or are proposed for federal listing. The remaining special status species include candidates for federal listing, and other species that warrant special attention and could potentially require federal listing in the future. Many of these species are threatened by competition with non-native plants and other invasive species. The *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment* (USDI BLM 2007b) provides a description of the distribution, life history, and current threats for each federally-listed plant species, as well as species proposed for listing. The BA also discusses the risks to threatened and endangered species, and species proposed for listing (collectively referred to as TEP plants) associated with each of the herbicides proposed for use by the BLM under the different alternatives.

### Impacts Assessment Methodology

The BLM reviewed the literature and findings from ERAs conducted by the BLM and Forest Service to assess the impacts to sensitive plant species from the use of herbicides (ENSR 2005b-k; SERA 2005a). The ERA methods are summarized earlier in the Vegetation section of this chapter. Methods used by the BLM are presented in detail in the *Vegetation Treatments Programmatic EIS Ecological Risk Assessment Protocol* (ENSR 2004) and in Appendix C; methods used by the Forest Service can be viewed on the Internet at http://www.fs.fed.us/r6/invasiveplant-cis/.

Although BLM ERAs used the same LOC for all non-target plant species, separate plant toxicity endpoints were selected to provide extra protection to special status plant species (see Table 4-11). Thus, ERAs for some herbicides predicted higher risks for special status plant species than for "typical" plant species under certain exposure scenarios. Risk assessments completed by the Forest Service also used different toxicity endpoints for sensitive and tolerant plant species. Risks to special status plant species were determined by comparing the HQs for sensitive plant species developed by the Forest Service with the same LOC that was used to determine risks to plants in the BLM ERAs (see Table 4-13).

Herbicide use does pose potential risks to sensitive plant species. However, these risks can be minimized by following certain SOPs, which can be implemented at the local level according to specific conditions (see Table 2-8). These SOPs include:

- Survey for special status plant species before treating an area. Consider effects to special status species when designing herbicide treatment programs.

- Use drift reduction agents to reduce the risk of drift hazard.

- Use a selective herbicide and a wick or backpack sprayer to minimize risks to special plants.

### Summary of Herbicide Impacts

Many special status plant species are threatened by the spread of non-native plants. Although a discussion of individual plant species is beyond the scope of this PEIS, the BA provides additional information on which TEP plant species are most at risk from competition with non-native plants. Invasive species are expected to

BLM_0000462

ENVIRONMENTAL CONSEQUENCES

continue to spread into habitats occupied by special status species, potentially encroaching on populations and resulting in reductions in population size and vigor, and even extirpation, in some cases. Furthermore, species with very small populations are also at risk of extirpation as a result of fire, even in habitats that are adapted to fire.

Fuels reduction and control of competing vegetation are important components of management programs for special status plant species. However, the sensitivity of these species requires special care during management to ensure that the management actions themselves do not harm or endanger populations. In the case of special status plant species, manual spot applications of herbicides may be the only suitable means of applying herbicides that can adequately ensure the protection of sensitive populations. In the case of special status plant species that are not federally listed or proposed for listing, the impacts associated with herbicide use would be a factor of the herbicide's ability to control non-native plants that threaten the species' habitat over the long term, and the extent of short-term harm that the herbicide would cause the species. For species with populations that are declining but secure, some mortality or a reduction in population size over the short term could be acceptable, provided the overall habitat for the species was improved, and provided herbicides did not remain in the soil and continue to impact growth and regeneration over the long term. In addition, treatment of weeds in areas that are close to sites that currently support special status species may improve habitat to such a degree that the rarer species are allowed to spread into portions of their original range that are no longer suitable for supporting them.

In some cases, special status plants are present because the site is pristine or relatively undisturbed. Herbicide use would not be required in these places. Similarly, most of the areas where aggressive herbicide treatments would take place (such as oil and gas ROW, heavily grazed rangelands) are unlikely (though not unknown) to support extensive populations of special status species.

All of the herbicides analyzed in ERAs would pose risks to terrestrial special status plant species in a situation where plants were directly sprayed, at either typical or maximum application rates, during a treatment. Herbicides with the greatest likelihood of harming special status plants (i.e., those that pose a high risk when applied at the typical application rate) include bromacil, chlorsulfuron, clopyralid, diflufenzopyr, diquat, imazapyr, metsulfuron methyl, Overdrive®,

picloram, sulfometuron methyl, and triclopyr. These herbicides would also present the most risk to terrestrial special status plant species as a result of drift from a nearby application site. The herbicide with the lowest risk to terrestrial plants is imazapic, which, according to ERAs, can be broadcast sprayed by ground methods 25 feet from a sensitive plant without risk.

The likelihood of adverse effects to special status terrestrial plants as a result of surface runoff from an upslope treatment site is dependent both on the herbicide used and the site conditions. Certain sites, such as those with clay soils that experience high annual rainfall, are more susceptible to surface runoff of rainwater. The timing of the herbicide application prior to a major rain event and the persistence of the herbicide on the site are also factors. Based on information from the ERAs, herbicides with the greatest likelihood of affecting special status plant species via surface runoff include imazapyr, metsulfuron methyl, picloram, and triclopyr. Of these herbicides, picloram has the longest soil half-life (see Soil Resources section). Herbicides with the least likelihood of impacting special status terrestrial plant species include imazapic, chlorsulfuron, and glyphosate, which pose no risk to sensitive plants via surface runoff, and bromacil, which poses low risks to sensitive plants only under a narrow range of site conditions.

The vast majority of the BLM's special status plant species are terrestrial. However, there are also aquatic plant species (including species in wetland habitats) for which separate risk analyses were completed. Aquatic plants could be harmed by a normal application of an aquatic herbicide, accidental direct spray or spray drift of a terrestrial herbicide from a nearby upland, accidental spill, or surface runoff from an upslope area into the water body where the plant is located. Use of 2,4-D and diquat to control vegetation in aquatic habitats would pose the greatest risks to any status plant species also in the habitat. Aquatic herbicides that would be safe for use in aquatic habitats where special status plant species occur include fluridone and aquatic formulations of glyphosate. In addition, triclopyr acid could be applied directly to the water column at the standard concentration without harm to sensitive aquatic plants.

The terrestrial herbicides that would pose the greatest risks to special status aquatic plants as a result of accidental direct spray, spray drift, or surface runoff include 2,4-D (assumed), bromacil, diquat, diuron, hexazinone (assumed), and sulfometuron methyl. An accidental spill of most terrestrial herbicides would pose

BLM_0000463

quite a high risk to special status plants. Notable exceptions would be picloram, with no risk, and diflufenzopyr with low risks. Based on the results of risk assessments, the safest terrestrial herbicides to use near aquatic habitats would be picloram and diflufenzopyr.

Additional indirect effects to certain special status plant species could occur if populations of pollinators were harmed by herbicide spraying. However, according to risk assessments risks to pollinators would be less than those associated with direct spray of the rare plants themselves. Management efforts to protect rare plants would also help prevent harm to insects in the vicinity. These management efforts include:

- Designating buffer zones around rare plants.

- Managing herbicide drift especially to nearby blooming plants.

- Using typical rather than maximum rates of herbicides in areas with rare plants.

- Choosing herbicide formulations that are not easily carried by social insects to hives, hills, nests and other "homes" in areas with rare plants.

- Choosing herbicides that degrade quickly in the environment when herbicides must be used in rare plant habitat.

- Timing the herbicide applications when pollinators are least active, such as in the evenings or after blooming has occurred for the day in rare plant habitat, and if necessary dividing the rare plant habitat into several treatments rather than one large treatment to keep from treating all blooming species at one time.

Effects to pollinators would be short-term, and population-level effects are not anticipated when these types of management practices are incorporated into project design when rare plants are present.

### *Alternative A – Continue Present Herbicide Use (No Action Alternative)*

Under this alternative, approximately 305,000 acres of public lands would be treated with herbicides annually. Based solely on acres treated, special status plant species would be less likely to be exposed to herbicides under this alternative than under the other herbicide-use alternatives. Therefore, less harm to special status plants

and plant populations from herbicide exposure should occur. For special status plant species, risks for impacts from herbicide exposure should not be substantially different under all the action alternatives, since the BLM would design herbicide treatments to avoid risks to these species (which would include the use of protective spray buffers and other mitigation measures identified in the BA). Nonetheless, the likelihood of an accidental exposure would be lower under the No Action Alternative, since less herbicide would be sprayed on public lands annually.

Because fewer acres would be treated with herbicides than under the other herbicide-use alternatives, less fuels reduction (i.e., through control of downy brome) and control of non-native species using herbicides would occur under the No Action Alternative. Although most fuels reduction is done using other treatment methods, it is expected that the risk of a fire damaging populations of special status species would be higher than under the other alternatives, since there likely would likely be less total fuels reduction on public lands. Furthermore, since existing weed infestations would not be controlled as rigorously with herbicides, it is expected that populations of non-native species would spread at a faster rate than under the other herbicide-use alternatives. In some circumstances, populations of special status plant species that occur in the same habitats as targeted weed species, and that are threatened by their spread, would be more likely to decline as a result of competition with weeds under this alternative than under the other herbicide-use alternatives.

Under this alternative, only those herbicides currently used by the BLM would be used to treat vegetation. Based on herbicide usage in the past decade, the majority of the total acreage would be treated with picloram, tebuthiuron, and 2,4-D. Risks to terrestrial plants associated with picloram are relatively high. Risks associated with tebuthiuron are low to moderate. Risks associated with 2,4-D are unknown, and given the lack of phytotoxicity information for this herbicide, assumed to be high. Risks to aquatic plants associated with picloram are very low. Risks associated with tebuthiuron range from low to high. Risks associated with 2,4-D are low to moderate. Therefore, risks to most special status plants would likely vary from low to high under this alternative, depending on the herbicide used.

BLM_0000464

ENVIRONMENTAL CONSEQUENCES

***Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)***

Under this alternative, approximately 932,000 acres of public lands would be treated with herbicides annually. Based solely on acres treated, special status plant species would be more likely to be exposed to herbicides under this alternative than under the other alternatives. Therefore, more harm to special status plants and plant populations from herbicide exposure would likely occur. In the case of special status plant species, the likelihood of an accidental exposure to herbicides would be greater than those under the other alternatives, since more acres would be treated, and more herbicide would be utilized. However, impacts to these species from herbicide exposure should not be substantially different than under the other alternatives, since the BLM would design herbicide treatments to avoid risks to these species (which would include the use of protective spray buffers and other mitigation measures identified in the BA). In addition, areas most in need of treatment, which would also receive the most intensive herbicide treatments, are not likely to support extensive populations of special status plant species.

Because more acres would be treated with herbicides than under the other alternatives, more fuels reduction and control of non-native species using herbicides would occur under the Preferred Alternative. Therefore, populations of special status species would be most likely to benefit from herbicide treatments through habitat improvements under this alternative. It is expected that the extent and rate of spread of weeds would be lowest under this alternative, and that there would be less competition with populations of special status plant species than under the other alternatives.

Under the Preferred Alternative, the BLM would be able to use only 14 of the 20 herbicides that would be available under the No Action Alternative, but would also be able to use four new herbicides, and additional new herbicides that become available for use in the future. The two new terrestrial herbicides, imazapic and diflufenzopyr, have low risks to sensitive terrestrial plants under most conditions. Therefore, risks to special status species could be reduced under this alternative, provided the BLM used these herbicides in place of herbicides with higher risks to sensitive plants, such as picloram and 2,4-D.

Of the two new aquatic herbicides, fluridone poses no risk to sensitive non-target plants during an application, but there are moderate to high risks associated with using diquat. Given that the risks associated with diquat are higher than those associated with aquatic herbicides currently used by the BLM, impacts to aquatic special status plant species would likely be greater under the Preferred Alternative than under the No Action Alternative, especially if diquat was used in place of other less toxic herbicides.

Finally, the greater number of herbicides available for use and the flexibility of additional future options under the Preferred Alternative would potentially allow the BLM to come up with treatment programs that are more effective at reducing weed infestations, safer for sensitive, non-target plants, and less likely to result in reduced effectiveness of herbicides from repeated use than under the No Action alternative.

***Alternative C – No Use of Herbicides***

Under this alternative, no public lands would be treated with herbicides. Therefore, special status species on public lands would not be exposed to herbicides unless chemicals were transported onto the land from off-site. The risks to special status plant species for harm due to herbicide exposure would be near zero under this alternative, and therefore much lower than under the other alternatives. However, impacts to these species from herbicide exposure should not be substantially different than under the other alternatives, since measures to protect these species would be implemented under the other alternatives.

Under this alternative, the BLM would be less effective at controlling weed infestation than under the other alternatives. Non-native plant species, including those that compete with, or are a threat to, special status plant species, would spread at a faster rate than under the other alternatives. Although other treatment methods could be substituted for herbicide treatments, it is unlikely that these control measures would be as effective under all circumstances. Furthermore, some treatments must be combined with herbicide treatments to achieve the desired result (e.g., burning or mechanical treatments followed by spraying). These treatments would be used on their own under this alternative, and would not be as effective at controlling weed infestations.

Under this alternative, special status plant species and their habitats would not benefit from manual spot treatments of herbicides, which can be used to control weed infestations in areas that are too sensitive to receive more disturbing or wide-scale treatments. Under this alternative, the BLM would have fewer tools to

BLM_0000465

control weeds near populations of special status species, many of which are threatened by non-native species. Overall, less would be done to improve the habitat of these species, making them more at risk for future population declines or extirpations.

### Alternative D – No Aerial Applications

Under this alternative, approximately 530,000 acres would be treated with herbicides annually, fewer than under the Preferred Alternative, but more than under all of the other alternatives. Based solely on acres treated, special status plant species would be less likely to be exposed to herbicides than under the Preferred Alternative, but more likely to be exposed to herbicides than under the other alternatives. Accordingly, the second greatest amount of herbicide-related impacts to special status plant populations would occur under this alternative. In the case of special status plant species, impacts would be similar to those under the other alternatives, since all herbicide treatments would be designed to avoid risks to these species. Risks for accidental exposure could be higher than under alternatives, A, C, and E.

Plant species of concern would not be exposed to herbicides directly from off-site drift associated with an aerial application. Adverse effects to terrestrial and aquatic special status plants could potentially occur by ground applications at distances ranging from 25 to 1,500 feet.

The amount of fuels reduction and control of non-native species, and the related benefits to special status species from habitat improvement would also be second highest under this alternative. Because aerial spraying would not occur under this alternative, the BLM would be unable to treat areas that are inaccessible by ground methods. In these areas, weed infestations would persist and likely spread, potentially impacting nearby populations of special status plant species.

Under this alternative, the herbicides available for use by the BLM would be the same as those discussed for the Preferred Alternative. The benefits associated with flexibility in selecting herbicides, and in using new herbicides that become available in the future, would be the same as those discussed under the Preferred Alternative. In some instances, herbicides with lower risks to special status plant species could be selected instead of herbicides that are currently being used. In addition, the BLM would have more flexibility to come up with treatment programs that are more effective at reducing weed infestations, safer for sensitive, non-

target plants, and less likely to result in reduced effectiveness of herbicides from repeated use than under the No Action Alternative.

### Alternative E – No Use of Acetolactate Synthase-inhibiting Active Ingredients

Under this alternative, approximately 466,000 acres would be treated with herbicides annually, more than under the No Action Alternative, but fewer than under the other herbicide-use alternatives. Based solely on acres treated, special status plant species would be less likely to be exposed to herbicides, and therefore would suffer fewer herbicide-related impacts than under the other action alternatives (with the exception of Alternative C). Suggested 500-foot buffers would help to protect these species further from impacts related to herbicide exposure, although for some herbicides this buffer would be insufficient to prevent all impacts to non-target sensitive plants. In the case of special status plant species, impacts would be similar to those under the other alternatives, since all herbicide treatments would be designed to avoid risks to these species. Risks for accidental exposure could be higher than under alternatives A and C.

The amount of fuels reduction and control of non-native species, and the related benefits to special status species from habitat improvement would also be greater than under alternatives A and C. Although fewer total acres would be treated than under Alternative D, and broadcast spraying would be minimized, the BLM would be able to conduct aerial spraying to reduce weed infestations in some areas if other means could not be used. Habitat improvements for these species would largely depend on the amount of other treatments (including manual spot applications of herbicide) that would be feasible in these areas.

The increased emphasis on passive restoration under Alternative E would likely benefit certain populations of special status plant species by helping to prevent the spread of weeds and limiting some forms of disturbance. With this type of management in place, it is possible that fewer herbicide treatments would be necessary in certain areas, minimizing risks to special status plants. In areas where such restrictions would be inconsistent with BLM management practices, they would not be enacted, and no benefit to special status plant species would occur.

Under this alternative, the BLM would not be able to use ALS-inhibiting herbicides (chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, sulfometuron methyl,

BLM_0000466

ENVIRONMENTAL CONSEQUENCES

and any other ALS-inhibiting herbicides that are made available in the future). Chlorsulfuron, imazapyr, metsulfuron methyl, and sulfometuron methyl pose high risks to special status terrestrial species under scenarios involving spray drift, and low to high risks under scenarios involving surface runoff. Prohibiting use of these herbicides could benefit special status terrestrial plant species, provided that one or more herbicides with lower risks to non-target plants were used in their stead. Imazapic, however, is the herbicide with the lowest risk to sensitive terrestrial plant species out of all the herbicides analyzed in the ERAs. Therefore, prohibiting its use would eliminate a suitable low risk option for treating weeds and other invasive vegetation such as downy brome, mustards, and thistles, and would require the BLM to use an herbicide with greater risk of harming special status plant species, unless a safer replacement was made available in the future.

The risks of ALS-inhibiting herbicides on special status aquatic plant species range from none to moderate, depending on the application rate and exposure scenario, and are similar to the risks associated with most of the herbicides the BLM would be allowed to use under this alternative. Therefore, potential impacts to aquatic plants from off-site drift and runoff would be much the same under this alternative as under alternatives B and D, except that there would potentially be less use of herbicides in riparian areas under Alternative E, limiting the likelihood of exposure.

Since the BLM would be able to use new herbicides that are made available in the future under this alternative, there would be more flexibility for creating effective treatment programs that minimize risks to special status plant species than under alternatives A and C. Because of the inability to use ALS-inhibiting herbicides, however, this flexibility would be less than that offered under alternatives B and D.

**Mitigation for Herbicide Treatment Impacts**

The following mitigation is recommended to reduce the likelihood of impacts to special status plant species from herbicide applications. This mitigation should be implemented in addition to the SOPs designed to protect plants presented in Chapter 2 (Alternatives) and the general mitigation recommended in the Vegetation section.

- To protect special status plant species, implement all conservation measures for plants presented in the *Vegetation Treatments on Bureau of Land Management Lands in 17*

*Western States Programmatic Biological Assessment* (USDI BLM 2007b). Apply these measures to sensitive plant species, as well as listed species.

# Fish and Other Aquatic Organisms

## Introduction

The BLM administers lands directly affecting almost 155,000 miles of fish-bearing streams and 4 million acres of reservoirs and natural lakes (USDI BLM 2006c). These habitats range from isolated desert springs of the Southwest to large interior rivers and their numerous tributaries throughout the Pacific Northwest and Alaska. Today, the rapid expansion of invasive species across public lands is one of the primary threats to ecosystem health and one of the greatest challenges in ecosystem management.

The BLM herbicide treatment program is designed to benefit ecosystems by removing and controlling the spread of invasive plant species. In aquatic systems, these plants (e.g., Eurasian watermilfoil, water-thyme) may clog slow-moving water bodies, contaminating water with an overabundance of organic material. This organic material reduces light and dissolved oxygen levels, eliminating habitat and decreasing growth or killing native plants and animals.

Riparian systems may be invaded by non-native species, which can be detrimental to native aquatic species. In riparian areas, non-native plants (e.g., common reed, saltcedar, Japanese knotweed) often support fewer native insects than native plant species, which could affect food availability for insectivorous fish species, such as salmonids. The replacement of native riparian plant species with some invasive species may adversely affect stream morphology (including shading and instream habitat characteristics), bank erosion, and flow levels. Removal of invasive species through herbicide use, when physical and climatic conditions and herbicide formulations allow treatments to be safe for native species and water quality, can help to restore a more complex vegetative and physical structure and natural levels of processes such as sedimentation and erosion.

BLM_0000467

## Scoping Comments and Other Issues Evaluated in the Assessment

Numerous scoping comments were centered around a desire for the BLM to focus on long-term ecosystem sustainability and biological diversity. There was some concern about herbicide bioaccumulation in fish. Many reviewers expressed a desire that the BLM use newer, less toxic herbicides and/or limit or avoid herbicide use.

## Standard Operating Procedures

This assessment of impacts assumes that SOPs (listed in Table 2-8) are used to reduce potential unintended impacts to fish and other aquatic organisms. These include the following:

- Develop and update an operational plan for each herbicide project that includes information on project specifications; key personnel responsibilities; communication procedures; safety, spill response, and emergency procedures; and minimum buffer widths for herbicides not approved for aquatic use.

- Use appropriate buffer zones based on label and risk assessment guidance.

- Minimize treatments near fish-bearing water bodies during periods when fish are in life stages most sensitive to the herbicide(s) used, and use spot rather than aerial treatments.

- Use appropriate application equipment and methods near water bodies if the potential for off-site drift exists.

- Where feasible, use spot hand applications within 20 feet of perennial streams and non-perennial streams with flowing water at the time of application.

- Use herbicides that are least toxic to fish, yet still effective.

- For treatment of aquatic vegetation, 1) treat only that portion of the aquatic system necessary to achieve acceptable vegetation management, 2) use the appropriate application method to minimize the potential for injury to desirable vegetation and aquatic organisms, and 3) follow use restrictions on the herbicide label.

## Impacts Assessment Methodology

### BLM Risk Assessment Methodology

A literature review and ERA were conducted to assess the impacts to fish and other aquatic resources from the use of herbicides. The methods presented here are a brief overview of the ERA process to determine the risks of herbicide use to fish and aquatic invertebrates. The ERA methods are presented in detail in the *Vegetation Treatments Programmatic EIS Ecological Risk Assessment Protocol* (ENSR 2004) and in Appendix C of this document.

#### *Problem Formulation*

Fish and aquatic species, including special status species, were evaluated to determine assessment endpoints and associated measures of effect. The essential biological requirements (i.e., survival, growth, and reproduction) for each of these groups of organisms are the attributes to be protected from herbicide exposure. Assessment endpoints, for the most part, reflect direct effects of an herbicide on these organisms, but indirect effects were also considered.

Measures of effect are measurable changes in an attribute of an assessment endpoint (or its surrogate, as discussed below) in response to a stressor to which it is exposed (USEPA 1998a). For the screening-level ERA, the measures of effect associated with the assessment endpoints generally consisted of acute and chronic toxicity data (from pesticide registration documents and from the available scientific literature) for the most appropriate surrogate species.

#### *Exposure Characterization*

The BLM uses herbicides in a variety of programs with several different application methods. In order to assess the potential ecological impacts of these herbicide uses, a variety of exposure scenarios were considered. These scenarios were selected based on actual BLM herbicide usage under a variety of conditions. The exposure scenarios considered in the ERAs were organized by potential exposure pathways. In general, the exposure scenarios describe how a particular receptor group may be exposed to the herbicide as a result of a particular exposure pathway. These exposure scenarios were designed to address herbicide exposure and acute and chronic (short- and long-term) impacts that may occur under a variety of conditions (e.g., accidental spills, surface runoff, and off-site drift into water bodies) and are as follows:

BLM_0000468

- Direct spray of the receptor or water body

- Off-site drift of spray to terrestrial areas and water bodies

- Surface runoff from the application area to off-site soils or water bodies

- Wind erosion resulting in deposition of contaminated dust into water bodies

- Accidental spills to water bodies

Fish and other aquatic animals are exposed to herbicides in three primary ways: 1) dermally, by direct absorption through the skin from swimming in herbicide-contaminated waters; 2) breathing, by direct uptake of herbicides through the gills or mouth during respiration; and 3) orally, by drinking herbicide-contaminated water or feeding on herbicide-contaminated prey. The type of exposure depends on the nature of the application, and the characteristic of the herbicide and the area treated. The susceptibility of fish and other aquatic organisms to herbicides depends on the herbicide formulation as well as the species exposed to it. Tolerance of fish and other aquatic organisms to herbicides is usually a function of size and metabolism.

A major problem associated with herbicide use is off-site drift to non-target resources. Herbicides drifting off site may eventually reach water bodies and contaminate fish and other aquatic organisms.

The AgDRIFT® computer model was used to estimate off-site herbicide transport due to spray drift. The GLEAMS computer model was used to estimate off-site transport of herbicides in surface runoff and root zone groundwater transport. The CALPUFF computer model was used to predict the transport and deposition of herbicides sorbed (i.e., reversibly or temporarily attached) to wind-blown dust. Each model simulation was approached with the intent of predicting the maximum potential herbicide concentration that could result from the given exposure scenario.

Aquatic exposure pathways were evaluated for fish, aquatic invertebrates, and non-target aquatic plants in two types of generic aquatic habitat: 1) a small pond (¼-acre pond 1 m in depth, resulting in a volume of 1,011,715 liters); and 2) a small stream representative of Pacific Northwest low-order streams that provide habitat for critical life stages of anadromous salmonids.

### Effects Characterization

In the majority of cases, toxicological data do not exist for the specific ecological receptors of concern (i.e., fish and aquatic invertebrate species of interest) considered in the risk assessment. Consequently, toxicological data for surrogate species (e.g., bluegill sunfish for warmwater species and rainbow trout for coldwater species) were evaluated and used to establish quantitative benchmarks for the ecological receptors of concern. These benchmark values are referred to as TRVs. Once developed, TRVs were compared with predicted environmental concentrations to determine the likelihood of adverse effects to ecological receptors.

### Risk Characterization

In order to address potential risks to ecological receptors, RQs were calculated by dividing the EEC for each of the previously described scenarios by the appropriate toxicity endpoint, an herbicide-specific TRV. For fish, the TRV was a species-specific toxicity value derived from the literature.

To facilitate the translation of RQs into readily applicable estimates of risk, the calculated RQs were compared to LOCs used by the USEPA in screening the potential risk of pesticides. These LOCs are used by the USEPA to analyze potential risk to non-target organisms and to assess the need to consider regulatory action. Distinct USEPA LOCs are currently defined for the following risk presumption categories:

- Acute high risk – the potential for acute risk is high.

- Acute restricted use – the potential for acute risk is high, but may be mitigated.

- Acute endangered species – Special status species may be adversely affected.

- Chronic risk – the potential for chronic risk is high.

The ecological risk implications of various exposure estimates can be readily determined by noting which RQs exceed the corresponding LOCs.

### Forest Service Methodology

The Forest Service risk assessment methodology was similar to that used by the BLM (see SERA 2001a for a complete description of the current methodology). The steps involved in the Forest Service risk assessments

BLM_0000469

include hazard identification, exposure assessment, dose response assessment, and risk characterization.

Hazard identification involved review of existing data, with a focus on dose-response and dose-severity relationships to determine the effect levels (e.g., NOAEL, LOAEL) and assessment endpoints (e.g., acute toxicity, subchronic or chronic systemic toxic effects, reproductive and teratogenic effects) that are most relevant for the herbicide risk assessments.

In the exposure assessment phase, the Forest Service developed four general and accidental/incidental exposure scenarios (i.e., direct spray, spray drift, runoff, and wind erosion) according to the application method and the chemical and toxicological properties of the given herbicide. The Forest Service scenario of contaminated irrigation water—a direct application scenario—was not evaluated by the BLM because the BLM does not typically irrigate vegetation. However, the BLM analyzed a scenario for accidental direct spray over streams for all terrestrial and aquatic herbicides. This would be the exposure route (for aquatic animals) most representative of what could occur while treating edges of ditches.

Dose response assessment described the degree or severity of risk as a function of dose. The risk characterization process then compared the exposure assessment to the dose response assessment to determine an LOC for a specific exposure scenario. Hazard quotients were developed through this process. Hazard quotients are analogous to the RQs developed in the BLM risk assessments—they are calculated as the projected level of exposure (i.e., EEC) divided by an index of an acceptable level of exposure or otherwise defined level of exposure (e.g., a NOAEL divided by an uncertainty factor). In addition, the herbicides were all compared based on their selectivity, potency, persistence in the environment, and ability to move off site. The BLM ERAs used BLM herbicide application rates, which may differ from those of the Forest Service.

## Adjuvants, Degradates, Inert Ingredients, and Tank Mixes

### Adjuvants

The BLM reviewed toxicity data for adjuvants, such as surfactants and anti-foam agents, to assess risks to aquatic life. In addition, the GLEAMS model was used to evaluate the risks associated with polyoxyethylenamine (POEA) and R-11, surfactants found in some glyphosate formulations (see Appendix

D) that are more toxic to aquatic organisms than glyphosate itself. These adjuvants are of greatest concern in terms of potential effects to fish and aquatic invertebrates. Using the GLEAMS model, the BLM predicted the portion of an adjuvant that would potentially reach an adjacent water body via surface runoff.

### Degradates

Degradates may be more or less mobile and more or less toxic in the environment than their source herbicides (Battaglin et al. 2003). Differences in environmental behavior (e.g., mobility) and toxicity between parent herbicides and degradates makes prediction of potential impacts challenging. For example, a less toxic, but more mobile, bioaccumulative or persistent degradate may have a greater adverse impact due to residual concentrations in the environment. The BLM conducted a detailed analysis of degradates for herbicides proposed for use under the herbicide treatment program. Several databases, including USEPA's ECOTOX database (http://cfpub.epa.gov/ecotox/), were searched, and relevant aquatic toxicity data for 11 degradates were identified and considered in the analysis.

### Inert Ingredients

Relatively little toxicity information was found on inert ingredients during preparation of the BLM ERAs. A few acute studies on aquatic or terrestrial species were reported. No chronic data, no cumulative effects data, and almost no indirect effects data (food chain species) were found for the inerts in the 10 herbicides.

A number of the inert ingredients found in herbicides are List 4 compounds (Inerts of Minimal Toxicity), which are naturally-occurring earthen materials (e.g., clay materials or simple salts) that would produce no toxicity at applied concentrations. However, some of the inerts, particularly the List 3 compounds and unlisted compounds, may potentially be moderately to highly toxic to aquatic species based on information in Material Safety Data Sheets or published data.

As a tool to evaluate List 3 and unlisted inerts in the ecological risk assessment, the exposure concentration of the generalized inert compound was calculated and compared to toxicity information. As described in more detail in Appendix D of the ERAs, the GLEAMS model was set up to simulate the effects of a generalized inert compound in a base-case watershed (annual precipitation rate of 50 inches per year, application area

BLM_0000470

ENVIRONMENTAL CONSEQUENCES

of 10 acres, slope of 0.05, surface roughness of 0.015, erodibility of 0.401 tons per acre, vegetation type of weeds) with a sand soil type. The chemical characteristics of the generalized inert compound were set at either extremely high or low values to describe it as either a very mobile or stable compound. The application rate of the inert/adjuvant compound was fixed at 1 lb a.i./acre.

### Tank Mixes

The BLM evaluated risks to aquatic organisms from mixing two herbicides together in a tank mix. The BLM assumed that products in a tank mix act in an additive manner. Therefore, to simulate a tank mix of two herbicides, RQs for those two herbicides were combined (see Appendix E of each ERA; diquat, fluridone, and tebuthiuron are not generally tank mixed by the BLM and were not included in the analysis). The application rates within the tank mix are not necessarily the same as those of each individual active ingredient applied alone. The percent of RQs exceeding LOCs for each of the 10 herbicide active ingredients was compared to the percent of RQs exceeding LOCs for tank mixes, to determine whether additional risks to aquatic organisms were predicted for tank mixes.

## Impacts by Treatment

The potential for effects on fish and other aquatic populations as a result of herbicide treatments would vary by the extent and method of treatment and chemical used. Herbicides could enter water bodies and come into contact with fish and aquatic invertebrates through drift, runoff, wind transport, accidental spills, and direct spraying. Potential impacts include mortality, reduced productivity, abnormal growth, and alteration of critical habitat. In general, risk to aquatic invertebrates and fish from spray drift is greater with smaller buffer zones, greater application rates, and greater application heights (i.e., aerial application or ground application with a high boom). Risk to aquatic invertebrates and fish from surface runoff is influenced by precipitation rate, soil type, and application area. There would be a risk to aquatic invertebrates and fish associated with most accidental exposure scenarios (i.e., direct spray or spill into a water body). Persistent herbicides (e.g., sulfometuron methyl) adsorbed to soil particles could also be carried off-site by wind or water, affecting fish and aquatic invertebrates in nearby aquatic areas. However, ERAs predicted no or low (diuron) risk to fish as a result of wind transport of herbicide particles under all evaluated scenarios.

Application rate was a major factor in determining risk, with higher application rates more likely to pose a risk to fish under the various exposure scenarios.

The risk characterization process of the ERA suggested that chlorsulfuron, dicamba, diflufenzopyr, Overdrive®, and sulfometuron methyl are very safe to fish and aquatic invertebrates, as there is no risk associated with use of these herbicides under any of the evaluated scenarios, including accidental direct spray or spill. In addition, imazapic does not pose a risk to fish or aquatic invertebrates, except when directly sprayed over a stream at the maximum application rate. There is no risk to fish or aquatic invertebrates associated with off-site drift of bromacil or tebuthiuron. Under surface runoff scenarios, diuron can present a moderate to high risk to fish and aquatic invertebrates if applied at the maximum application rate. The risks to fish and aquatic invertebrates associated with application of aquatic herbicides to ponds and streams is greater for diquat than for fluridone, which when applied at the typical application rate only poses a risk to aquatic invertebrates in streams (aquatic herbicides are not typically applied to streams; therefore, this is an accidental scenario). Tables 4-17 and 4-18 show the level of risk to fish and aquatic invertebrates for the different herbicides and application scenarios.

All of the herbicides pose some risk to non-target terrestrial and aquatic plants; these risks should be considered, as damage to riparian and aquatic plants may affect fish and aquatic invertebrates. The sections on Vegetation and Wetlands in this chapter discuss these risks, as well as herbicide application practices that can be used to reduce risk.

The ALS-inhibiting herbicides evaluated in this PEIS are chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl (all terrestrial herbicides). These herbicides are considered to be highly potent and are applied at low application rates because only small concentrations are necessary to damage plants. There is low risk to aquatic invertebrates associated with direct spray of imazapic or imazapyr at the maximum application rate. However, this risk is similar to or less than risks associated with the other evaluated herbicides, and could be avoided by applying at the typical application rate. Therefore, the ALS-inhibiting herbicides do not appear to pose an unnecessary risk to fish and aquatic invertebrates. In addition, it is possible that because they can be applied at very low rates, there is less risk of off-site transport associated with their use.

BLM_0000471

TABLE 4-17
## Risk Categories Used to Describe BLM-evaluated Herbicide Effects on Non Special Status Fish and Aquatic Invertebrates According to Exposure Scenario

| Application Scenario | BROM[1] | | CHLOR[1] | | DICAMBA | | DIFLU[1] | | DIQUAT | | DIURON | | FLUR[1] | | IMAZ[1] | | OVER[1] | | SULFM[1] | | TEBU[1] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[2] | Max[2] | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| **Direct Spray** | | | | | | | | | | | | | | | | | | | | | | |
| Fish pond | L[3] | L | 0 | 0 | 0 | 0 | 0 | 0 | L | L | M | M | 0 | O | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fish stream | L | M | 0 | 0 | 0 | 0 | 0 | 0 | L | M | H | H | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aquatic invertebrates pond | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | M | H | M | H | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Aquatic invertebrates stream | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | H | H | M | H | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | L | M |
| **Accidental Spill to Pond** | | | | | | | | | | | | | | | | | | | | | | |
| Fish pond | NE | M | NE | 0 | NE | 0 | NE | 0 | NE | H | NE | H | NE | M | NE | 0 | NE | 0 | NE | 0 | NE | L |
| Aquatic invertebrates pond | NE | L | NE | 0 | NE | 0 | NE | 0 | NE | H | NE | H | NE | H | NE | 0 | NE | 0 | NE | 0 | NE | L |
| **Off-Site Drift** | | | | | | | | | | | | | | | | | | | | | | |
| Fish pond | L[3] | L | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fish stream | L | M | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aquatic invertebrates pond | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aquatic invertebrates stream | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Surface Runoff** | | | | | | | | | | | | | | | | | | | | | | |
| Fish pond | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | L | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fish stream | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aquatic invertebrates pond | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aquatic invertebrates stream | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] BROM = Bromacil; CHLOR = Chlorsulfuron; DIFLU = Diflufenzopyr; FLUR = Fluridone; IMAZ = Imazapic; OVER = Overdrive®; SULFM = Sulfometuron methyl; and TEBU = Tebuthiuron.

[2] Typ = Typical application rate; and Max = Maximum application rate.

[3] Risk categories: 0 = No risk (majority of RQs < most conservative LOC for non special status species); L = Low risk (majority of RQs 1-10x most conservative LOC for non special status species); M = Moderate risk (majority of RQs 10-100x most conservative LOC for non special status species); H = High risk (majority of RQs >100 most conservative LOC for non special status species); and NE = Not evaluated. The risk category is based on the risk level of the majority of risk quotients observed in any of the scenarios for a given exposure group and receptor type. The reader should consult the risk tables in Chapter 4 of the ERAs (ENSR 2005b-k) to determine the specific scenarios that result in the displayed level of risk for a given receptor group.

ENVIRONMENTAL CONSEQUENCES

**Impacts of BLM-evaluated Herbicides**

### Bromacil

Bromacil is a non-selective, broad-spectrum, systemic herbicide that can be persistent in aquatic systems. It is not registered for use in riparian and aquatic systems. Bromacil does not tend to bioconcentrate appreciably in fish tissue. Bromacil poses a low to moderate risk to

fish and aquatic invertebrates in streams and ponds under typical and accidental direct spray and spill scenarios. Compared to fish, aquatic invertebrates are less sensitive to acute bromacil exposures.

Off-site drift of bromacil generally does not pose a risk to fish or aquatic invertebrates in streams or ponds. Surface runoff poses no risks to aquatic invertebrates or fish in streams, but could pose a low acute and chronic risk to fish in ponds (there is a low chronic risk associated with the typical application rate, in watersheds with sand or loam soils and 10 to 50 inches per year of precipitation). Because bromacil has a higher affinity for water than organic carbon, it is likely to run off from soils into water bodies.

Because of the non-selective nature of bromacil and its likelihood for runoff, it should not be applied near water bodies, especially ponds.

### Chlorsulfuron

Chlorsulfuron is a selective, ALS-inhibitor herbicide. It is not registered for use in aquatic systems.

Chlorsulfuron's physical and chemical properties suggest that it is highly soluble in water, and is likely to remain dissolved in water and runoff from soils into water bodies. In addition, this herbicide has a long half-life in ponds, but is not likely to bioconcentrate in aquatic wildlife. However, none of the evaluated scenarios, including accidental direct spray and spill of chlorsulfuron, pose any risk to fish and aquatic invertebrates in streams and ponds.

Chlorsulfuron is not likely to negatively impact fish and aquatic invertebrates, and it may have positive effects on these organisms if it is used to selectively target nuisance species in riparian zones, such as perennial pepperweed and hoary cress.

### Dicamba

Dicamba is an active ingredient that can be used as a stand-alone product or in the herbicide formulation Overdrive® along with diflufenzopyr. It is not registered for use in aquatic environments. Overdrive® can be applied using a wick applicator in riparian areas, and provides good control of several thistle and knapweed species that can become prevalent in riparian areas. The ERA analysis shows that accidental direct spray and spill scenarios do not pose a risk to fish and aquatic invertebrates. Off-site drift and surface runoff of dicamba also present no risk to fish and aquatic invertebrates.

Dicamba is not likely to negatively impact fish and aquatic invertebrates, and it may have positive effects on these organisms if it is used to selectively target nuisance species in riparian zones.

### Diflufenzopyr

Diflufenzopyr, an active ingredient in the herbicide formulation Overdrive® along with dicamba, is a selective, systematic post-emergence herbicide active ingredient. It is not registered for use in aquatic environments. Overdrive® can be applied using a wick applicator in riparian areas, and provides good control of several thistle and knapweed species that can become prevalent in riparian areas. The physical and chemical properties of diflufenzopyr suggest that this herbicide would be removed from an aquatic environment relatively rapidly following contamination and would not appreciably bioconcentrate in fish tissue. The ERA analysis shows that diflufenzopyr does not pose a risk to fish or aquatic invertebrates under direct spray and spill scenarios. Off-site drift and surface runoff of diflufenzopyr also present no risk to fish or aquatic invertebrates.

Diflufenzopyr is not likely to negatively impact fish or aquatic invertebrates, and it may have positive effects on these organisms if it is used to selectively target nuisance species in riparian zones.

### Diquat

Diquat is a non-selective, contact herbicide for the management of undesirable vegetation under non-cropland terrestrial and aquatic situations. The BLM proposes to use diquat to control aquatic plants. Plant species controlled using diquat include Eurasian watermilfoil, water-thyme, water hyacinth, and giant salvinia.

One study reported the likelihood of bioconcentration in aquatic species, but other studies suggest that diquat's bioconcentration potential is minimal (Howard 1991;

BLM_0000473

Petit et al. 1995; MacKay et al 1997). An accidental spill of diquat would pose a high risk to fish and aquatic invertebrates. Direct spray of diquat to ponds, as would occur with typical aquatic applications, would pose a low risk to fish and moderate risk to aquatic invertebrates. Direct spray to streams, which are not typical application sites, would pose a low risk to fish and predominantly a high risk to aquatic invertebrates. Because diquat is an aquatic herbicide, risk to aquatic organisms via off-site drift and surface runoff scenarios was not evaluated.

Given the short-term risks of diquat to fish and aquatic invertebrates, this herbicide should be used on a restricted basis, and then only in ponds that support very few native aquatic species because they are dominated by invasive plants. Other aquatic herbicides evaluated in this PEIS—fluridone, 2,4-D, and imazapyr—pose much lower risk to fish and aquatic invertebrates and could be used instead of diquat when native aquatic species are present, as appropriate, if they have activity on the target species. Glyphosate is also used to control aquatic plants, but the risks associated with its use may be similar to those associated with diquat, depending on application rate, product formulation, and the receptor of concern.

### Diuron

Diuron is a broad-spectrum herbicide with a relatively short half-life and little to no impact on measured water quality variables (Perschbaucher et al. 2004). It would not be used in riparian or aquatic habitats. Previous studies suggest that diuron tends to remain in the soil rather than moving into groundwater or running off into water bodies (Mueller-Warrant and Griffith 2005).

Diuron has a low to moderate tendency to bioaccumulate in aquatic organisms (National Library of Medicine 2002). Accidental direct spray and spill scenarios pose a moderate to high risk to fish and aquatic invertebrates. When applied at the typical or maximum application rate, off-site drift of diuron poses no to low risk to fish and aquatic invertebrates. At the maximum application rate, off-site drift of diuron poses low risk to fish and aquatic invertebrates in streams and ponds under most application scenarios with a buffer distance of 100 feet or less. According to the ERA, surface runoff poses low risk to fish and no or low risk to aquatic invertebrates in ponds in the majority of scenarios. Surface runoff also poses a low risk to fish in streams in watersheds with at least 25 inches of rain per year (mostly at the maximum application rate), and a low risk to aquatic invertebrates, when applied at the

typical and maximum application rates in watersheds with at least 10 inches of precipitation per year. In all cases, effects would be less likely in watersheds with loam soils.

### Fluridone

Fluridone is a slow-acting, broad-spectrum aquatic herbicide that can be used selectively for management of aquatic species, including water-thyme and Eurasian watermilfoil. As fluridone is relatively non-persistent, it is not expected to affect water quality for a substantial period of time (Muir et al. 1980).

Fluridone has little tendency to bioaccumulate in fish (Washington Department of Health 2000). An accidental spill of fluridone poses moderate to high risk to fish and aquatic invertebrates. Direct spray of fluridone over a pond (normal application) at the maximum application rate poses a low risk to fish and aquatic invertebrates. Accidental direct spray of fluridone over a stream (aquatic herbicides are not typically applied to streams) at the maximum application rate poses no or low risk to fish and aquatic invertebrates. Because fluridone is an aquatic herbicide, off-site drift and surface runoff scenarios were not evaluated.

To the extent that typical use of fluridone is successful in removing damaging invasive vegetation with a minimal of residence time in the water body, water quality and wildlife habitat in water bodies would likely improve over the long term with its use. Because there are no risks to fish and aquatic invertebrates from normal use of fluridone at the typical application rate, appropriate use of this herbicide would likely result in an overall benefit to fish and other aquatic organisms. Fluridone poses much lower risk to fish and aquatic organisms than diquat.

### Imazapic

Imazapic, an ALS-inhibitor, is a selective, systemic herbicide. It would not be used for treatment of aquatic vegetation, but could be used in riparian areas where the application could be monitored to ensure that the herbicide would not come in direct contact with water. Leafy spurge and the perennial mustards would be target species.

The average half life for imazapic in a pond is 30 days, and this herbicide has little tendency to bioaccumulate in fish (Barker et al. 1998). According to the manufacturer's label, imazapic has a high runoff

BLM_0000474

ENVIRONMENTAL CONSEQUENCES

potential from soils for several months or more after application. Accidental direct spray and spill scenarios generally pose no risk to fish or aquatic invertebrates when imazapic is applied at either the typical or maximum application rate. Risk assessments show fish and aquatic invertebrates are not at risk from off-site drift or surface runoff of imazapic.

When imazapic is used appropriately, it should not impact fish or aquatic invertebrates in streams or ponds. There is only a low chance of risk to stream aquatic invertebrates in the case of accidental direct spray. The use of imazapic may have positive effects on fish and aquatic invertebrates if it is used to selectively target nuisance species in riparian zones.

### Overdrive®

Overdrive® is an herbicide formulation containing the active ingredients dicamba and diflufenzopyr. It is a selective, systematic herbicide, with low residence times in water bodies and a low bioconcentration potential (National Library of Medicine 2002). Overdrive® application does not pose a risk to fish or aquatic invertebrates under any application scenario (also see toxicity studies under dicamba and diflufenzopyr).

Overdrive® is not likely to negatively impact fish and aquatic invertebrates, and it may have positive effects on these organisms if it is used to selectively target nuisance plant species in riparian zones, provided herbicide use is seen as an acceptable vegetation treatment method in these sensitive areas.

### Sulfometuron Methyl

Sulfometuron methyl, an ALS-inhibitor, is a broad-spectrum, pre- and post-emergent herbicide. It is not approved for use in aquatic systems, but could be used to treat perennial pepperweed, hoary cress, and other weeds associated with riparian systems if the application was made far enough from water to ensure that the active ingredient did not get into the water. Sulfometuron methyl has a relatively low residence time in aquatic systems, and bioaccumulation in aquatic organisms has not been detected (Extension Toxicology Network 1996d).

According to ERAs, there would be no risks to fish or aquatic invertebrates associated with the use of sulfometuron methyl under any of the evaluated scenarios. Therefore, if herbicide treatments are needed in riparian areas, sulfometuron methyl may be able to

effectively target nuisance plants without negative impacts to fish and aquatic invertebrates. In addition, use of sulfometuron methyl in riparian zones may have positive effects on fish and aquatic invertebrates if it results in more diverse vegetation structure and native plant communities.

### Tebuthiuron

Tebuthiuron is a relatively non-selective herbicide absorbed by plant roots through the soil. Tebuthiuron has little tendency to bioaccumulate in aquatic organisms (National Library of Medicine 2002), but may have a moderate residence time in water bodies (over 1 year in anaerobic conditions).

Under an accidental spill scenario, tebuthiuron would pose a low risk to fish and aquatic invertebrates in ponds. Accidental direct spray of tebuthiuron over the pond would pose a low chronic risk to aquatic invertebrates, and accidental direct spray over a stream would pose a low to moderate chronic risk to aquatic invertebrates. Fish are not at risk from accidental direct spray. Off-site drift and surface runoff of tebuthiuron does not pose a risk to fish or aquatic invertebrates.

If tebuthiuron is applied at the typical application rate, under normal application scenarios, it is likely to have little or no impact on fish or aquatic invertebrates.

### Impacts of Forest Service-evaluated Herbicides

The following information for eight herbicides used by the BLM is taken from ERAs prepared by the Forest Service to support their assessment of the environmental consequences of using these herbicides in Forest Service vegetation management programs. The BLM previously evaluated and approved these eight herbicides in an earlier EIS—*Vegetation Treatment on BLM Lands in Thirteen Western States* (USDI BLM 1991a).

### 2,4-D

2,4-D is an herbicide that has formulations registered for use on aquatic vegetation, including water hyacinth and Eurasian watermilfoil, and as a tank mix partner to control purple loosestrife. The toxicity of 2,4-D to fish and other aquatic organisms is relatively low (Norris et al. 1991). Risk is greater under scenarios of direct application to water bodies or accidental direct spills. The ester formulations of 2,4-D (including the BEEs found in Aqua-Kleen) are approximately 200 to 1,000 times more toxic to fish than the amine formulations,

BLM_0000475

when toxicity is measured by acute (24- to 48-hour) $LC_{50}$ (concentration causing 50% mortality [median lethal concentration]) values. While these esters are chemically stable, they are short-lived in natural water because of biological degradation. At the typical application rate, 2,4-D poses a low risk to fish and aquatic invertebrates, while at the maximum application rate, 2,4-D poses a moderate risk to fish and aquatic invertebrates under scenarios of accidental direct spray or spill to a stream and pond (Table 4-18). Routine acute and chronic exposure scenarios do not pose a risk to fish.

### Clopyralid

Clopyralid is a selective herbicide most effectively used post-emergence for the control of broadleaf weeds. It is not registered for aquatic vegetation management, but can be used in riparian areas if the application does not impact standing water. Clopyralid is used to treat teasel, common cocklebur, and several species of thistles and knapweeds that could be found in riparian areas. Based on limited acute bioassays, clopyralid appears to be relatively non-toxic to fish and aquatic invertebrates. The risk assessment only predicted risks to aquatic organisms associated with accidental spill scenarios, with low risk to fish and aquatic invertebrates for the typical application rate and low risk to fish and moderate risk to aquatic invertebrates for the maximum application rate.

### Glyphosate

Glyphosate is a non-selective systemic aquatic herbicide. It can be applied as a broadcast, spot, or wipe application, and is effective in controlling purple loosestrife, common reed, cattail, and in some situations, saltcedar. In general, glyphosate is very immobile in soil, being readily adsorbed by soil particles and subject to microbial degradation (Norris et al. 1991). This immobility reduces the potential for glyphosate to enter water bodies during runoff.

Based on bioassays, technical grade glyphosate is classified as non-toxic to practically non-toxic in freshwater fishes (USEPA OPP 1993). Some formulations are more toxic to fish than technical grade glyphosate. At the typical application rate, the less toxic formulation of glyphosate poses little risk to fish or aquatic invertebrates, except under accidental spill scenarios, for which there is a low to moderate risk to fish and a low risk to aquatic invertebrates. At the typical application rate, the more toxic formulation of glyphosate poses a high risk to fish and aquatic invertebrates under accidental spill scenarios, and a low risk under routine acute exposure scenarios (moderate risk to sensitive fish species). At the maximum application rate, the less toxic formulation of glyphosate poses a low risk to fish and aquatic invertebrates under acute exposure scenarios. Accidental spills for the maximum application rate pose moderate to high risk to fish and low risk to aquatic invertebrates. At this same application rate, the more toxic formulation of glyphosate poses a high risk to fish and a low risk to aquatic invertebrates under accidental spill scenarios, and moderate risk to fish and low risk to aquatic invertebrates under acute exposure scenarios. Based on these data, the USEPA classified glyphosate formulation as moderately toxic to practically non-toxic to freshwater fishes (SERA 2003a).

### Hexazinone

According to ERAs, there is no risk to fish or aquatic invertebrates in ponds or streams associated with any exposure scenario for hexazinone (accidental spill scenarios were not modeled).

Bioassays on the active ingredient hexazinone and commercial formulations that include hexazinone indicate that commercial formulations are substantially less toxic than the active ingredient alone, even when exposures are normalized for hexazinone levels (Wan et al. 1988). Some aquatic invertebrates, such as daphnids and glass shrimp, are thought to be slightly more sensitive to hexazinone than fish.

### Imazapyr

Imazapyr is an ALS-inhibiting herbicide used in the control of a variety of grasses, broadleaf weeds, vines, brush species, and aquatic vegetation. It is effective in the control of saltcedar, which dominates many riparian systems in the West. Imazapyr is relatively non-toxic to fish and aquatic invertebrates (SERA 2004d). At the typical and maximum application rates, imazapyr poses no risk to fish or aquatic invertebrates in streams or ponds under acute and chronic exposure scenarios. For the typical application rate, moderate risk is predicted for sensitive fish species for accidental spill scenarios, and for the maximum application rate, high risk to sensitive fish and low risk to tolerant fish and aquatic invertebrates are predicted for accidental spill scenarios.

Aquatic invertebrates have similar sensitivity to imazapyr as fish. Based on two studies using *Daphnia magna*, no mortality was observed at 24 or 48 hours of exposure of up to 100 mg/L of imazapyr; with the

BLM_0000476

ENVIRONMENTAL CONSEQUENCES

second study showing a NOEC after 48 hours at 180 mg/L (SERA 2004d). No adverse effects to fish and other aquatic organisms appear to be likely at either the typical application rate or the maximum application rate for a normal exposure.

### Metsulfuron Methyl

Metsulfuron methyl is a selective ALS-inhibiting herbicide used pre- and post-emergence in the control of many annual and perennial weeds and woody plants. It is not registered for use in aquatic situations, but can be applied in riparian areas if the herbicide does not come into contact with water (SERA 2004c). Overall, metsulfuron methyl appears to have a very low potential to cause any adverse effects in aquatic animals. According to the ERAs, metsulfuron methyl poses almost no risk to fish or aquatic invertebrates in streams and ponds under accidental, acute, and chronic exposure scenarios involving application of typical and maximum rates (although an accidental spill at the maximum application rate poses a low risk to sensitive fish species).

Values from 96-hour $LC_{50}$ values for acute toxicity in bluegill sunfish and rainbow trout ranged from approximately 150 mg/L to 1,000 mg/L for both species (SERA 2004e). In rainbow trout, signs of sublethal toxicity include erratic swimming behavior, lethargy, and color change at concentrations around 100 mg/L, with a NOEC of 10 mg/L (SERA 2004e). One investigation did not observe any effects on rainbow trout hatching, larval survival, or larval growth over a 90-day exposure period, at a NOEC of up to 4.5 mg/L (Kreamer 1996 *cited in* SERA 2004e). The NOEC of 10 mg/L for sublethal effects in rainbow trout is approximately 100 times more sensitive than bluegill sunfish that has a NOEC of 1,000 mg/L.

Metsulfuron methyl is relatively non-toxic to aquatic invertebrates. Based on acute bioassays in daphnids, metsulfuron methyl is relatively non-toxic, with an acute median exposure concentration ($EC_{50}$) value for immobility ranging from over 150 mg/L to 720 mg/L and acute NOEC values for immobility ranging from over 150 mg/L to 420 mg/L (SERA 2004e). Typically, the endpoint for aquatic invertebrates when exposed to high concentrations of metsulfuron methyl is a decrease in growth rate.

### Picloram

Picloram is a pyridine herbicide that acts as a plant growth regulator. It would not be used to control aquatic vegetation.

The acute and chronic toxicity of picloram to aquatic organisms has been assayed in various species of fish and invertebrates. Based on studies, the USEPA classified picloram acid as moderately toxic to freshwater fish (SERA 2003b).

According to the ERAs, when applied at either the typical or the maximum application rate, picloram poses low risk to sensitive fish species under acute exposure scenarios. Under accidental spill scenarios, risks to sensitive fish are high, risks to tolerant fish are low (for both application rates), risks to aquatic invertebrates are low for the typical rate, and risks to aquatic invertebrates are moderate for the maximum rate.

### Triclopyr

Triclopyr is a selective, systemic herbicide used on broadleaf and woody species, including woody species found in riparian and aquatic areas, such as saltcedar, willows, and purple loosestrife. Commercial formulations of triclopyr may contain the acid formulation (TEA) or the BEE formulation; these triclopyr derivatives are evaluated separately in the Forest Service risk assessment. The risk characterizations for aquatic animals differ for triclopyr TEA and triclopyr BEE. When applied at the typical or maximum application rate, triclopyr TEA poses no risk to fish or aquatic invertebrates in streams or ponds under acute and chronic exposure scenarios. Under an accidental spill scenario, there would be low risk to fish and aquatic invertebrates. When applied at the typical rate, triclopyr BEE would pose a moderate risk to fish and a low risk to aquatic invertebrates under acute exposure scenarios, and a high risk to fish and a moderate risk to aquatic invertebrates under a scenario involving an accidental spill into a stream or pond. Triclopyr acid would pose a moderate risk to fish and a high risk to aquatic invertebrates under an accidental spill scenario involving the maximum application rate. Triclopyr BEE would pose a high risk to fish and a moderate risk to aquatic invertebrates under acute exposure scenarios at the maximum application rate, and high risk to fish and aquatic invertebrates as a result of an accidental spill into a stream or pond.

Some effects may be anticipated for fish and aquatic invertebrates under certain conditions. While there is a

BLM_0000477

TABLE 4-18
### Risk Categories Used to Describe Forest Service-evaluated Herbicide Effects on Fish and Aquatic Invertebrates According to Exposure Scenario[1]

| Application Scenario | 2,4-D | | Clopyralid | | Glyphosate[2] | | Hexazinone | | Imazapyr | | Metsulfuron Methyl | | Picloram[3] | | Triclopyr[4] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[5] | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| **Acute/Accidental Exposures** | | | | | | | | | | | | | | | | |
| Fish (sensitive species) – accidental spill | L[6] | M | L | L | H | H | NE | NE | M | H | 0 | L | H | H | L/H | M/H |
| Fish (tolerant species) – accidental spill | NE | NE | 0 | 0 | H | H | NE | NE | 0 | L | 0 | 0 | L | L | NE/NE | NE/NE |
| Fish (sensitive species) – acute exposure, peak EEC | 0 | 0 | 0 | 0 | M | M | 0 | 0 | 0 | 0 | 0 | 0 | L | L | 0/M | 0/H |
| Fish (tolerant species) – acute exposure, peak EEC | NE | NE | 0 | 0 | L | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE/NE | NE/NE |
| Aquatic Invertebrates – accidental spill | L | M | L | M | M | H | NE | NE | 0 | L | 0 | 0 | L | M | L/M | H/H |
| Aquatic Invertebrates – acute exposure, peak EEC | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/L | 0/M |
| **Chronic Exposures** | | | | | | | | | | | | | | | | |
| Fish – chronic exposure | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/0 | 0/0 |
| Aquatic invertebrates – chronic exposure | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0/0 | 0/0 |

[1] Risk levels are presented for the maximum application rate in aquatic applications.
[2] Risk levels for the more toxic glyphosate formulation are presented here.
[3] Sensitive and tolerant aquatic invertebrates were evaluated for picloram. Information is presented for sensitive aquatic invertebrates.
[4] First value is for triclopyr acid formulation (TEA) and second value is for triclopyr butoxythel formulation (BEE).
[5] Typ = typical application rate; and Max = maximum application rate.
[6] Risk categories: 0 = No risk (HQ < LOC); L = Low risk (HQ = 1 to 10 x LOC); M = Moderate risk (HQ = 10 to 100 x LOC); H = High risk (HQ > 100 LOC); and NE = Not evaluated. Risk categories are based on upper estimates of hazard quotients and the BLM LOCs of 0.1 for acute scenarios and 1.0 for chronic scenarios. The reader should consult the text of this section of the individual Forest Service risk assessments to evaluate risks at central estimates of hazard quotients.
Fish sensitive species include coldwater fish, such as trout and salmon, while fish tolerant species include warmwater fish, such as fathead minnows.

ENVIRONMENTAL CONSEQUENCES

ENVIRONMENTAL CONSEQUENCES

major difference in the potential hazards posed by triclopyr TEA formulations (which are registered for aquatic use; e.g., Garlon 3A®) and triclopyr BEE formulations (which are not registered for aquatic use; e.g., Garlon 4®) to fish, there are no significant differences among species in terms of sensitivity to the various agents. Sublethal effects of Garlon 4® on salmonids occur at concentrations between 0.32 and 0.43 mg/L, where fish were lethargic, while behavioral changes to Garlon 3A® would occur at 200 mg/L. Subchronic toxicity in fathead minnows (at the embryo-larval stages) was observed when the fish were subjected to 140 mg/L of triclopyr TEA for 28 days (Mayes et al. 1984; Mayes 1990, *cited in* SERA 2003c). This study found that survival of these minnows was greatly reduced at this toxicity level.

Based on acute lethality, aquatic invertebrates are equally sensitive as fish to the various forms of triclopyr (SERA 2003c). No significant effects have been noted on frog embryos with the application of Garlon 3A® and Garlon 4®. Studies on embryos and tadpoles of three frog species using Garlon 4®, exposure to 0.6, 1.2, and 4.6 ppm a.e. caused no effect on hatching success, malformations, or subsequent avoidance behavior of embryos, although the two higher concentrations were associated with mortality or immobility in tadpoles (SERA 2003c).

Although triclopyr BEE is more toxic than triclopyr TEA, the risk of triclopyr BEE to aquatic animals is low, as this formulation will rapidly hydrolyze to triclopyr acid, lowering risk to aquatic animals.

## Impacts of Other Herbicides Currently Available for Use

Asulam, atrazine, 2,4-DP, fosamine, mefluidide, and simazine were approved for use in the earlier BLM EISs. Research shows asulam, fosamine, mefluidide, and simazine are practically nontoxic to cold- and warmwater fish (rainbow trout and bluegill sunfish, respectively) while asulam is slightly toxic to aquatic invertebrates (*Daphnia magna*; Extension Toxicology Network 1993; USEPA 1995b, d; English Nature 2003). Data show that atrazine may cause reductions in phytoplankton, zooplankton, aquatic invertebrate, and fish populations, but in general, is not acutely toxic (USEPA 2003b). 2,4-DP may be toxic to aquatic organisms. The 2,4-DP butoxy ethyl ester (technical) is highly toxic to fish, but practically nontoxic to freshwater invertebrates (Wan et al. 1990). The BLM has not used any of these herbicides, except fosamine (less than 50 acres annually), since 1997.

## Impacts of Adjuvants, Degradates, Inert Ingredients, and Tank Mixes

### Adjuvants

Various sources of toxicity data (Muller 1980; Lewis 1991; Dorn et al. 1997; Wong et al. 1997) suggest that, for herbicides with high application rates, adjuvants have the potential to cause acute, and potentially chronic, adverse effects to aquatic species.

Based on GLEAMS modeling for POEA, risks to aquatic organisms were not predicted for the majority of pond and stream scenarios involving exposure to this adjuvant. However, risks were predicted (using the most conservative acute endangered species LOC) for applications at a distance of 0 feet from the water body. This scenario, which essentially assumes a direct application to the water body with no dilution or drift, is highly conservative and highly unlikely under BLM application practices. Risks to special status aquatic organisms in streams and ponds were also predicted for aerial applications of POEA at the maximum rate at a distance of 100 feet from the water body. Therefore, a buffer zone of greater than 100 feet is necessary for aerial applications of POEA at the maximum rate in an area containing special status aquatic species. However, it is unlikely that the BLM would apply glyphosate formulations containing POEA in an area known to contain special status aquatic species.

For non special status species, the only predicted risks to aquatic organisms occurred under scenarios involving POEA applications at the maximum application rate, at a distance of 0 feet from the water body. As stated previously, this scenario is highly unlikely and assumes zero dilution and no drift (i.e., essentially direct application). Furthermore, even under these conditions, risks are predicted only for fish, not invertebrates or amphibians. This assessment indicates that even under conservative conditions (scenarios with the most conservative amount of drift, and herbicide applications at the maximum rate) the potential risks to aquatic receptors from POEA would be minimal.

Because of a lack of physical chemical property information, POEA was not modeled for leaching properties and runoff to water bodies and aquatic receptors. Therefore, there is some uncertainty associated with risk from this exposure.

The adjuvant R-11 is a nonylphenol ethoxylate that is acutely toxic to aquatic life (Stark 2003) and is suspected to be an endocrine-disrupting chemical

BLM_0000479

(Bakke 2003). The BLM has decided to suspend the use of R-11 in its herbicide applications.

When selecting adjuvants, BLM land managers must follow all label instructions and abide by any warnings. In general, adjuvants compose a relatively small portion of the volume of herbicide applied. Nonetheless, selection of adjuvants with limited toxicity and low volumes is recommended for applications near aquatic habitats to reduce the potential for the adjuvant to influence the toxicity of the herbicide.

### Degradates

Based on a review of toxicity data for adjuvants, in most cases, predicted risks to aquatic organisms from degradates would likely be less than risks from the active ingredients diquat, diuron, imazapyr, and metsulfuron methyl predicted in ERAs. For some degradates associated with 2,4-D, diuron, fluridone, and triclopyr, selected aquatic species may be more sensitive to the degradate than to the active ingredient. These findings should be considered in the context of herbicide use practices, the concentration of degradate relative to the parent compound, the process of degradate production, and the body of available toxicity data. For instance, in some cases, the increased toxicity of the degradate may be offset by the fact that only a minute amount of the degradate is produced, which would likely disperse rapidly in an active aquatic system. Furthermore, focusing on a single toxicity study may be overly conservative and may not be representative of risks found in the field or in other laboratory studies.

### Inert Ingredients

Based on GLEAMS modeling of a generalized inert compound in a "base case" watershed, concentrations of inert ingredients exceeded concentrations of herbicide active ingredients under all stream and pond scenarios.

In general, greater exposure concentrations of inerts occurred under higher application rates, exceeding 1 mg/L for the maximum pond application scenario. These results suggest that inerts associated with the application of herbicides may contribute to acute toxicity to aquatic organisms if they reach the aquatic environment. However, given the lack of specific inert toxicity data, this statement may overestimate their potential toxicity. It is assumed that toxic inerts would not represent a substantial percentage of the herbicide, and that minimal impacts to the environment would result from these inert ingredients.

### Tank Mixes

Risk assessment analysis of tank mixes indicates that risks to aquatic organisms vary by tank mix. The risks to fish and aquatic invertebrates associated with applications of tank mixes of bromacil plus sulfometuron methyl, and imazapic plus diflufenzopyr are no greater than those associated with applications of bromacil, imazapic, or diflufenzopyr alone. Risks to aquatic receptors for a tank mix of chlorsulfuron and diuron are greater than those for chlorsulfuron (but not diuron) alone, and risks for a tank mix of sulfometuron methyl and bromacil are greater than for bromacil applied alone.

There is some uncertainty in this evaluation because herbicides in tank mixes may not interact in an additive manner; this may overestimate risk if the interaction is antagonistic, or it may underestimate risk if the interaction is synergistic. In addition, other products may also be included in tank mixes and may contribute to the potential risk.

To reduce the potential for negative impacts to aquatic organisms, BLM land managers must follow all label instructions and abide by any warnings. Labels for both tank mixed products should be thoroughly reviewed, and mixtures with the least potential for negative effects should be selected, particularly when a mixture is applied in a manner that increases the potential for risk to nearby aquatic organisms.

## Impacts by Alternative

Important invasive species that would be treated by the BLM using herbicides include water-thyme and Eurasian watermilfoils, which are found in ponds, lakes, and streams; and perennial pepperweed, saltcedar, knapweed, and thistles, which are found in riparian habitats. These species displace native vegetation and decrease species diversity. Dense concentrations of aquatic plants can lower the concentration of dissolved oxygen in the water and can upset the balance of the fish community by providing too much cover for small fish (Payne and Copes 1986). Invasive riparian plants form monocultures that crowd out more desirable native plant species.

The BLM proposes to treat aquatic and riparian vegetation to improve habitat for fish and aquatic organisms on public lands. However, herbicide treatments can also lead to the harm or even death of fish and aquatic organisms. The following discusses the

BLM_0000480

ENVIRONMENTAL CONSEQUENCES

habitat benefits and health risks to fish and aquatic organisms under each alternative.

**Alternative A – Continue Present Herbicide Use (No Action Alternative)**

Under the No Action Alternative, the BLM would continue its ongoing vegetation treatment programs in 14 western states, and would be able to use 20 herbicides previously approved under earlier RODs. Herbicide use under the No Action Alternative would impact target and non-target vegetation over an estimated 305,000 acres annually, including approximately 2,250 acres of riparian and aquatic habitat. Herbicides used to manage aquatic and riparian vegetation under this alternative could include select formulations of 2,4-D, glyphosate, and imazapyr, and certain formulations of triclopyr in riparian areas where contact with water could be avoided. The BLM would not be able to use herbicides to treat public lands in Alaska, Nebraska, or Texas under this alternative.

The nature of impacts to fish and aquatic invertebrates (positive and negative) would be similar to those that have occurred in recent years. Negative impacts to fish and aquatic invertebrates associated with herbicide use would be lower than under the other herbicide treatment alternatives (B, D, and E) because far fewer acres would be treated. However, long-term positive impacts to riparian and aquatic vegetation communities and resulting positive impacts on fish and aquatic invertebrates would also be lower under this alternative. These positive long-term impacts to fish and aquatic invertebrates include improvement of riparian and instream habitat, through eradication of aquatic weeds that dominate water systems and the resulting increase in dissolved oxygen content, and the regrowth of native riparian vegetation and increase in shade habitat.

In addition, because the new herbicides proposed in this PEIS (Overdrive®, diquat, fluridone, and imazapic) would not be used, risks to fish and aquatic invertebrates would be different under this alternative. Because the BLM would not use the new herbicides, which have low risks to aquatic wildlife, per area risks to fish and aquatic invertebrates from accidental and drift scenarios could be greater than under the other herbicide-use alternatives. Furthermore, fluridone is specifically indicated for aquatic use, whereas none of the other previously-approved herbicides are strictly aquatic herbicides. Diquat and select formulations of 2,4-D would be used in the aquatic vegetation treatment program, both of which have been effective in the control of Eurasian watermilfoil and water-thyme. The

other herbicides registered for aquatic use, glyphosate and triclopyr, are not as effective in controlling these species.

Under this alternative, the BLM would be able to continue to use asulam, atrazine, 2,4-DP, fosamine, mefluidide, and simazine on public lands, although these chemicals have not been used, or used sparingly (fosamine) since 1997. These chemicals are not approved for use in riparian and aquatic habitats, except for 2,4-DP, which could be used to treat western brackenfern in riparian habitats. Except for 2,4-DP, these herbicides are practically nontoxic to slightly toxic to freshwater fish.

**Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)**

The Preferred Alternative would result in the herbicide treatment of approximately 932,000 acres annually across 17 western states, of which about 10,100 acres would consist of aquatic and riparian habitat. The BLM would only be allowed to use 14 previously-approved herbicides, six fewer than under the No Action Alternative, but would also be able to use the four new herbicides evaluated in this PEIS. In addition, the BLM would be able to treat vegetation using herbicides in Alaska, Texas, and Nebraska, although it is anticipated that few or no herbicide treatments would occur in Alaska.

As this alternative proposes to treat the most acres of all the alternatives (more than four times the acreage proposed under the No Action Alternative), it could result in the most extensive impacts to fish and aquatic invertebrates. The potential for acute and chronic toxic effects to fish and other aquatic organisms could be four times greater under this alternative than under the other alternatives, due to the greater acreage that would be considered.

The BLM's ability to use four new chemicals (fluridone and diquat for aquatic applications, and imazapic and Overdrive® for terrestrial applications), could reduce risks to fish and other aquatic organisms. For example, fluridone shows no risks to aquatic organisms at normal application rates and could replace other aquatic herbicides currently used by the BLM on public lands. It appears to be effective in the control of Eurasian watermilfoil and water-thyme, and can be used instead of diquat in states where diquat is not legal for use in aquatic systems, such as California (Bossard et al. 2000).

BLM_0000481

Overdrive® and imazapic would primarily be used on rangelands, but could still provide benefits greater than those under the No Action Alternative. Overdrive® would be used to treat thistles and knapweeds, while imazapic could be used to control downy brome. These invasive plant species degrade riparian and rangeland habitats and can lead to shortened fire cycles, followed by soil erosion and sedimentation. Under accidental direct spray and spill and off-site drift scenarios, Overdrive® and imazapic present very low or no risks to fish and aquatic invertebrates, similar to chlorsulfuron, diflufenzopyr, and sulfometuron methyl but lower than the risks associated with other herbicides currently being used. For the surface runoff scenarios that were evaluated, risks to fish and aquatic invertebrates were not predicted for any of the new herbicides, whereas some of the other herbicides do present risk to these organisms under some surface runoff scenarios. Each of the currently available and new herbicides evaluated in this PEIS has different properties (e.g., mode of action), is suggested for different uses, and is most effective/least risky in different scenarios, suggesting that the more herbicides available for use, the easier it is to select one or more that would present the least risk to fish and aquatic invertebrates for specific aquatic applications or terrestrial applications near water bodies.

Under the Preferred Alternative, the BLM would be able to use new herbicides approved in the future under the Preferred Alternative. Use of these herbicides could potentially reduce risks to fish and aquatic organisms associated with herbicide use, particularly if they were less toxic or used in smaller quantities than currently used and proposed herbicides.

### Alternative C – No Use of Herbicides

Under Alternative C, fish and aquatic invertebrates would not be affected by herbicide use; effects would stem from other vegetation treatment methods (see the accompanying PER). Ecosystem benefits resulting from vegetation management could be reduced under this alternative, as there are certain invasive species for which herbicide use is the only effective method of treatment or for which treatment using other methods is impractical due to cost, time, accessibility, or public concerns. For example, rough terrain may not allow treatment by methods requiring terrestrial vehicle and foot access, but these inaccessible areas could potentially be treated using herbicides applied by aircraft. Other treatment methods, such as mechanical methods and fire use, can result in soil disturbance and sedimentation of aquatic bodies, and may not adequately treat the pest plant.

In addition, it is often difficult to eradicate some species, such as aquatic species and those that resprout from rhizomes, by means other than herbicide application. For example, Eurasian watermilfoil and water-thyme form dense mats that crowd out native aquatic plants and degrade fish habitat (Bossard et al. 2000), and in some cases chemical treatments, including the use of 2,4-D, diquat, and fluridone, are more effective than other treatments, such as mechanical harvesters that tend to fragment and spread the weed. This treatment alternative would likely leave many aquatic areas untreated, resulting in continued negative impacts to the aquatic species that are native to these areas.

### Alternative D – No Aerial Applications

Alternative D would allow use of the same herbicides in the same areas as under the Preferred Alternative, and would have similar benefits associated with the increased availability of new and future herbicides. Although this alternative would not allow the use of aerial application methods, thereby reducing the total potential treatment acreage (to 530,000 total acres), there would have little difference between Alternative D and the Preferred Alternative as far as acreage treated in aquatic and riparian habitats. Nearly all (98%) of the acres proposed for treatment in aquatic and riparian habitats under the Preferred Alternative would be treated using ground-based methods, and therefore could also be treated under Alternative D. This alternative would substantially reduce the potential for impacts to water bodies as a result of off-site drift from application on upland habitats. Drift is a major route of unintended damage to water bodies and resident fish and aquatic invertebrates, with aerial application the primary cause of off-site drift. Therefore, per area impacts would be much lower under this alternative than under the No Action Alternative and the Preferred Alternative, and would be similar to or less than per area impacts from Alternative E. However, without the use of aerial spraying, large areas of vegetation would remain untreated under Alternative D, which could lead to continued or future degradation of upland habitats to the detriment of nearby streams and other aquatic habitats.

### Alternative E – No Use of Acetolactate Synthase-inhibiting Active Ingredients

Approximately 466,000 acres would be treated under Alternative E, which is slightly less than the acreage that would be treated under Alternative D, and less than half of the acreage that would be treated under the

BLM_0000482

ENVIRONMENTAL CONSEQUENCES

Preferred Alternative. In addition, the BLM would not be able to use ALS-inhibiting active ingredients (i.e., chlorsulfuron, imazamic, imazapyr, metsulfuron methyl, and sulfometuron methyl).

Of the herbicides that would be unavailable to the BLM under this alternative, imazapyr is the only one that could be used in riparian and aquatic habitats, where it has been shown to be very effective against saltcedar. Imazapyr poses little risk to fish and aquatic organisms when used at typical application rates. Without imazapyr, the BLM would likely treat larger stands of saltcedar using prescribed fire followed by a foliar application of triclopyr, and smaller stands by cutting the stem and applying triclopyr.

Chlorsulfuron, imazapic, and sulfometuron methyl do not pose risks to fish or aquatic invertebrates. Metsulfuron methyl poses a low risk to aquatic invertebrates in streams under an accidental direct spray scenario involving the maximum application rate (an unlikely scenario). Therefore, disallowing use of these four herbicides would be unlikely to benefit fish and aquatic organisms if they are replaced with herbicides that are more harmful to fish and other aquatic organisms.

Alternative E incorporates other management practices that would be likely to have positive effects on fish and aquatic invertebrates. In addition, herbicides would not be used in riparian conservation areas, which would protect aquatic species and attendant ecosystem functions in these key habitats.

## Mitigation for Herbicide Treatment Impacts

The following recommended general management practices are designed to reduce potential unintended impacts to non special status fish and aquatic invertebrates from the application of herbicides in the BLM vegetation management program. Mitigation appropriate for special status species is later in this section under Special Status Fish and Other Aquatic Organisms.

- Limit the use of diquat in water bodies that have native fish and aquatic resources.
- Limit the use of terrestrial herbicides (especially diuron) in watersheds with fish-bearing streams during periods when fish are in life stages most sensitive to the herbicide(s) use.

- Establish appropriate herbicide-specific buffer zones for water bodies, habitats, and aquatic species of interest (see Table 4-19, Appendix C, Table C-16, and recommendations in individual ERAs).
- Avoid using the adjuvant R-11® in aquatic environments, and either avoid using glyphosate formulations containing POEA, or seek to use formulations with the least amount of POEA, to reduce risks to aquatic organisms.
- Consider the proximity of application areas to salmonid habitat and the possible effects of herbicides on riparian and aquatic vegetation. Maintain appropriate buffer zones around salmonid-bearing streams (see Appendix C, Table C-16, and recommendations in individual ERAs).

These practices would help minimize impacts to fish, aquatic invertebrates, and aquatic ecosystems on public lands to the extent practical.

## Special Status Fish and Other Aquatic Organisms

### Introduction

As discussed in Chapter 3, public lands in the western U.S. support over 150 species of aquatic animals that have been given a special status based on their rarity or sensitivity. Included are 78 species of fish, 13 mollusks, and 7 species of aquatic arthropods that are federally-listed as threatened or endangered, or are proposed for federal listing. Populations of non-native aquatic species and riparian weeds may alter aquatic habitats, making them less suitable for special status fish and aquatic invertebrates. The *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment* (USDI BLM 2007b) provides a description of the distribution, life history, and current threats for each federally-listed animal species, as well as species proposed for listing.

### Impacts Assessment Methodology

Beginning in spring 2002, the BLM participated in an Ad Hoc Interagency Team to address the effects of invasive vegetation and noxious weed treatments on humans, plants, and animals. This team consisted of ecologists and toxicologists from the BLM, USEPA, NMFS, and USFWS.

BLM_0000483

TABLE 4-19

**Buffer Distances to Minimize Risk to Non Special Status Fish and Aquatic Invertebrates from Off-site Drift of BLM-evaluated Herbicides from Broadcast and Aerial Treatments**

| Application Scenario | BROM[1] | CHLR | DICA | DIFLU | DIQT | DIUR | FLUR | IMAZ | OVER | SULF | TEBU |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minimum Buffer Distance (feet) from Fish and Aquatic Invertebrates** | | | | | | | | | | | |
| **Typical Application Rate** | | | | | | | | | | | |
| Aerial | NA | 0 | NA | NA | NA | NA | NA | 0 | NA | 0 | NA |
| Low boom | 0 | 0 | 0 | 0 | NA | 0 | NA | 0 | 0 | 0 | 0 |
| High boom | 0 | 0 | 0 | 0 | NA | 0 | NA | 0 | 0 | 0 | 0 |
| **Maximum Application Rate** | | | | | | | | | | | |
| Aerial | NA | 0 | NA | NA | NA | NA | NA | 0 | NA | 0 | NA |
| Low boom | 0 | 0 | 0 | 0 | NA | 100 | NA | 0 | 0 | 0 | 0 |
| High boom | 0 | 0 | 0 | 0 | NA | 100 | NA | 0 | 0 | 0 | 0 |

[1] BROM = Bromacil; CHLR = Chlorsulfuron; DICA = Dicamba; DIFLU = Diflufenzopyr; DIQT = Diquat; DIUR = Diuron; FLUR = Fluridone; IMAZ = Imazapic; OVER = Overdrive®; SULFM = Sulfometuron methyl; and TEBU = Tebuthiuron.
NA = Not applicable.
Boom height = The Tier 1 ground application model allows selection of a low (20 inches) or a high (50 inches) boom height.

In May 2002, the BLM began the process of developing the assessment procedures that would be followed while conducting ERAs. This process involved close coordination with NMFS, the USFWS, and the USEPA; representatives of these agencies participated in weekly telephone calls with the BLM and its contractor who prepared the ERAs. These agencies also provided information they felt was necessary to meet their requirements for consultation under the ESA, and reviewed draft work products prepared by the BLM contractor. In November 2002, the BLM submitted a draft *Vegetation Treatments Programmatic EIS Ecological Risk Assessment Protocol* to the USEPA, NMFS, and USFWS. Comments from these agencies were used in the development of the final ERA protocol (ENSR 2004). Risk assessments for 10 chemicals were completed in May 2005 (ENSR 2005b-k). Information from the ERAs is included in the BA and in this section, including information on likely risks to special status fish and other aquatic resources, and on SOPs that should be followed to minimize these risks.

The BLM also reviewed the literature and findings from ERAs conducted by the Forest Service to assess the impacts to sensitive fish and aquatic invertebrate species from the use of eight herbicides currently used by the BLM (2,4-D, clopyralid, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr; SERA 2005a). The ERA methods are summarized earlier in this section. Methods used by the BLM are presented in detail in the *Vegetation Treatments Programmatic EIS Ecological Risk Assessment Protocol* (ENSR 2004) and in Appendix E; methods

used by the Forest Service are available at http://www.fs.fed.us/r6/invasiveplant-eis/.

There are potential risks to sensitive fish and aquatic invertebrate species. Although the predicted risks for adverse health effects to individual organisms are the same as those predicted for non special status fish and aquatic invertebrate species, the associated population- and species-level effects would be much greater for many sensitive species because of their limited/fragmented distribution and limited population size. Risks to special status fish and aquatic invertebrate species can be minimized by following certain SOPs, which can be implemented at the local level according to specific conditions (see Table 2-8). These SOPS include the following:

- Survey for special status fish and aquatic invertebrate species before treating an area. Consider effects to special status species when designing herbicide treatment programs.

- Use drift reduction agents to reduce the risk of drift hazard.

- Select herbicide products carefully to minimize additional impacts from degradates, adjuvants, inert ingredients, and tank mixtures.

- Maintain appropriate buffer zones between treatment areas and water bodies with special status fish and aquatic invertebrates.

- Minimize treatments near water bodies during periods when fish and aquatic invertebrates are

BLM_0000484

ENVIRONMENTAL CONSEQUENCES

in the life stage most sensitive to the herbicide used.

## Summary of Herbicide Effects to Special Status Fish and Aquatic Invertebrates

The invasion and spread of non-native plant species into aquatic and riparian habitats may affect certain populations of special status fish and aquatic invertebrates. An overview of the ways in which non-native aquatic and riparian plants may affect aquatic habitats is presented earlier in this section. As discussed in the BA, numerous listed fish and other aquatic species are threatened by the changes in water quality and flow which may result from weed infestations. Salmon, for example, require a high level of dissolved oxygen, which is reduced when aquatic weeds such as Eurasian watermilfoil and water-thyme invade an aquatic system. A decrease in dissolved oxygen associated with the encroachment/excessive growth of vegetation has also been listed as a threat to the Foskett specked dace in south-central Oregon (USFWS 1985) and the unarmored threespine stickleback in southern California (NatureServe Explorer 2001). For species such as these, herbicide treatments to reduce coverage of non-native plant species in aquatic and riparian habitats would likely improve habitat over the long term.

Numerous special status aquatic animals, however, are most threatened by changes in water levels and quality associated with development, upslope land use practices, and groundwater pumping, and the expansion of non-native fish populations. For most of the aquatic animals discussed in the BA, invasions of non-native plant species into riparian and aquatic habitats were not listed as threats to the species' survival. For these animals, health risks and increased inputs of chemicals into the water associated with herbicide spraying could outweigh any habitat improvements resulting from minimized weed infestations. In addition, some herbicide treatments could have short-term adverse effects on special status fish and aquatic invertebrates by killing non-target native vegetation and reducing the overall cover of riparian vegetation that regulates water temperature through shading. It is also likely, however, that the weed infestations (if present) in or near the aquatic habitats that support some of these species do not currently require herbicide treatments under the BLM's vegetation management programs.

A more conservative LOC of 0.05 was used to determine risks to special status fish and aquatic invertebrates. The potential effects of herbicides on special status aquatic animals could be greater than the effects on non special status fish and other aquatic organisms (an LOC of 0.1 was used for non special status species), as shown in Table 4-20 for BLM-evaluated herbicides. Aquatic herbicides with the greatest likelihood of impacting special status fish and aquatic invertebrates during a normal application to an aquatic habitat include diquat and the more toxic formulation of glyphosate. Normal aquatic applications of 2,4-D and imazapyr would not pose a risk to special status fish or aquatic invertebrates.

Terrestrial herbicides with the greatest likelihood of impacting special status aquatic animals as a result of a spill, drift, accidental direct spray into an aquatic habitat, or surface runoff are diuron, picloram, and the more toxic formulation of glyphosate. According to ERAs, there would be no risks to fish or aquatic invertebrates associated with chlorsulfuron, dicamba, diflufenzopyr, imazapic, Overdrive®, or sulfometuron methyl.

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under this alternative, approximately 2,300 acres of aquatic and riparian habitats and 302,700 acres of upland habitats on public lands would be treated with herbicides annually. Considering acreage alone, it is likely that special status fish and aquatic invertebrates would be exposed to herbicides less under this alternative than under the other herbicide-use alternatives. Adverse health risks associated with herbicide exposure should be less extensive, as well. Risks to special status species would also be lower, although mitigation would be required to protect these species and their habitat from harm under all alternatives, which should minimize differences in risk to special status species.

Control of weed infestations in aquatic and riparian areas would be less extensive under the No Action Alternative than under the other herbicide-use alternatives. Therefore, the degree of benefit to special status aquatic animals, particularly species that are currently threatened by infestations of non-native plants, would likely be lower than under the other herbicide-use alternatives. However, short-term adverse impacts to habitats that support special status aquatic animals (such as increased water temperatures) would be lower as well. The degree of benefits versus impacts to these habitats from treatments would largely depend on where the treatments occurred.

BLM_0000485

Under this alternative, only those herbicides currently used by the BLM would be used to treat vegetation. 2,4-D, glyphosate, imazapyr, and triclopyr acid would be used in aquatic and riparian habitats. Certain herbicides that are not registered for aquatic use (i.e., dicamba and clopyralid) could also be used in riparian areas, provided the herbicide did not contact the water. Of these herbicides, only glyphosate is likely to pose toxicological risks to special status fish and aquatic invertebrates during a normal application, but only if the more toxic formulation is used, or the less toxic formulation is applied at the maximum application rate. Although risks associated with an accidental spill would be greater, continuing use of these herbicides to treat riparian and aquatic vegetation should continue to pose a low risk to special status aquatic animals.

### Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

Under the Preferred Alternative, approximately 10,000 acres of aquatic and riparian habitats and 922,000 acres of upland habitats on public lands would be treated with herbicides annually. Based on acreage, this alternative would entail the greatest amount of herbicide exposure to special status fish and aquatic invertebrates. Although a greater amount of herbicides would be used in aquatic and riparian habitats than under the other alternatives, risks to aquatic animals from their normal use would remain minimal, provided glyphosate was only applied at typical application rates, and only the less toxic formulation was used. However, since more terrestrial herbicides would be used under this alternative as well, risks associated with accidental spill of those herbicides in or near a water body, and accidental direct spray into a water body, would also be greater than under the other alternatives.

The most extensive control of weed infestations in aquatic and riparian areas would occur under this alternative. Therefore, the degree of benefit to special status aquatic animals over the long term through habitat improvements would potentially be greater than under the other alternatives. As under the other alternatives, the degree of benefits versus impacts to these habitats from treatments would largely depend on where the treatments occurred.

Under the Preferred Alternative, the BLM would be able to use 14 of the 20 currently-approved herbicides that are currently available for use under the No Action Alternative, as well as four new herbicides and other new herbicides that become available in the future. One

of the two new aquatic herbicides that could be used under this alternative, diquat, would pose low to high risks to fish, and moderate to high risks to aquatic invertebrates during a normal application, depending on the application rate and type of aquatic habitat. Fluridone would pose no to moderate risks to fish and aquatic invertebrates, depending on the application rate and type of aquatic habitat. Use of diquat or fluridone in place of safer aquatic herbicides under the Preferred Alternative would likely increase the incidence of adverse health effects to aquatic organisms per area treated, relative to the No Action Alternative. Dicamba, Overdrive®, and imazapic pose no risk to fish or aquatic invertebrates. Therefore, these herbicides would provide the BLM with increased safe options for treating riparian areas under the Preferred Alternative. Herbicides that become available in the future could allow the BLM even more flexibility to develop effective treatment programs in and near aquatic habitats, while minimizing risks to special status aquatic organisms.

### Alternative C – No Use of Herbicides

Under this alternative, no public lands would be treated with herbicides. Therefore, there would be no impacts to special status aquatic animals as a result of herbicide exposure during vegetation treatments. The BLM would likely be less effective at controlling weed infestations than under the other alternatives, so there would be fewer benefits to special status fish and aquatic invertebrate habitat that is degraded by non-native species. In addition, if other treatment methods were used to control weeds in riparian areas in lieu of herbicides, the disturbance to habitat could be greater. Mechanical methods and containment using domestic animals, for example, can result in greater sedimentation into aquatic habitats and more extensive removal of riparian vegetation, as compared to herbicide treatments, which would affect water quality.

### Alternative D – No Aerial Applications

Under this alternative, approximately 530,000 acres would be treated with herbicides annually, more than under all other alternatives except the Preferred Alternative. However, the amount of riparian and aquatic habitat treated would be similar to the amount that would be treated under the Preferred Alternative, since ground-based methods would be used to apply herbicides to 98% of the treated acreage in these habitats. Therefore, the risks to aquatic animals from exposure to herbicides would potentially be somewhat lower, but not substantially different, than under the

BLM_0000486

Preferred Alternative. It is likely that riparian and aquatic habitats that support special status fish and aquatic invertebrates would be exposed to less off-site drift than under the No Action and Preferred alternatives, since aerial spraying would not occur in adjacent upland areas.

The amount of long-term benefit, as well as the short-term adverse impacts, to riparian and aquatic habitats associated with herbicide applications would be much the same as under the Preferred Alternative. In addition, the herbicides available for use by the BLM would be the same as those discussed for the Preferred Alternative. The risks associated with using diquat and fluridone, and the benefits associated with flexibility in selecting herbicides, and in using new herbicides that become available in the future, would be the same as those discussed under the Preferred Alternative.

### *Alternative E – No Use of Acetolactate Synthase-Inhibiting Active Ingredients*

Under this alternative, approximately 466,000 acres would be treated with herbicides annually, more than under the No Action alternative, but fewer than under the other herbicide-use alternatives. In addition, herbicide use in riparian and aquatic habitats would be minimized by prohibiting its use in riparian conservation areas and limiting the use of broadcast applications. These management practices would help minimize the risk that special status fish and aquatic invertebrates would be exposed to herbicides. Risks to special status aquatic animals from herbicide exposure would be lower than under the Preferred Alternative and Alternative C, and in some areas would be lower than under No Action Alternative.

The limited number of acres treated and the additional restrictions on herbicide treatments in and near aquatic habitats would limit some opportunities for using herbicides to make long-term habitat improvements. Accordingly, the associated short-term adverse impacts to habitats that support aquatic animals would be minimized in certain areas as well. The degree of effect to special status fish and aquatic invertebrates would depend on where herbicide applications were allowed to occur, and whether the BLM would use manual treatment methods, or a different type of vegetation treatment, in place of broadcast treatments in habitats that support special status species.

Under this alternative, the BLM would not be able to use chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, sulfometuron methyl, or any other ALS-inhibiting herbicides that are made available in the future. Of these, imazapyr is registered for use in riparian areas, and the other four herbicides can be used in riparian areas, providing no herbicide is allowed to enter adjacent water bodies. None of these herbicides pose toxicity risks to special status fish or aquatic invertebrates during a direct spray into an aquatic habitat, even at the maximum application rate. Eliminating the use of ALS-inhibitors would reduce the BLM's choices when developing treatment programs, and could result in greater risks to special status aquatic animals if other more toxic herbicides were used in their place.

### Mitigation for Herbicide Treatment Impacts

The following mitigation is recommended to reduce the likelihood of impacts to special status fish and aquatic invertebrates from herbicide applications. This mitigation should be implemented in addition to the SOPs and mitigation designed to protect aquatic animals presented earlier in this section.

- Implement all conservation measures for aquatic animals presented in the *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment* (USDI BLM 2007b).

- Establish appropriate herbicide-specific buffer zones for water bodies that are habitats for fish or other aquatic species of interest as shown in Table 4-21.

- At the local level, consider effects to special status fish and other aquatic organisms when designing treatment programs.

These practices would help minimize impacts to fish, aquatic invertebrates, and aquatic ecosystems on public lands to the extent practical.

# Wildlife Resources

## Introduction

The nearly 261 million acres of public lands sustain an abundance and diversity of wildlife resources. Public lands provide a permanent or seasonal home for more than 2,400 species of amphibians, reptiles, birds, and mammals (USDI BLM 2006c). An important activity of the BLM is managing vegetation to improve wildlife habitat—areas where basic needs such as food,

BLM_0000487

**TABLE 4-20**
**Risk Categories Used to Describe BLM-evaluated Herbicide Effects on Special Status Fish and**
**Aquatic Invertebrates According to Exposure Scenario**

| Application Scenario | BROM[1] | | CHLOR | | DICAMBA | | DIFLU | | DIQUAT | | DIURON | | FLUR | | IMAZ | | OVER | | SULFM | | TEBU | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[2] | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| **Direct Spray** | | | | | | | | | | | | | | | | | | | | | | |
| Fish pond | L[3] | L | 0 | 0 | 0 | 0 | 0 | 0 | L | H | M | H | 0 | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fish stream | M | M | 0 | 0 | 0 | 0 | 0 | 0 | M | M | H | H | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aquatic invertebrates pond | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | M | H | M | M | 0 | H | 0 | 0 | 0 | 0 | 0 | 0 | L | L |
| Aquatic invertebrates stream | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | H | H | M | H | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | L | M |
| **Accidental Spill to Pond** | | | | | | | | | | | | | | | | | | | | | | |
| Fish pond | NE | M | NE | 0 | NE | L | NE | 0 | NE | H | NE | H | NE | M | NE | 0 | NE | 0 | NE | 0 | NE | M |
| Aquatic invertebrates pond | NE | M | NE | 0 | NE | M | NE | 0 | NE | H | NE | H | NE | H | NE | 0 | NE | 0 | NE | 0 | NE | L |
| **Off-Site Drift** | | | | | | | | | | | | | | | | | | | | | | |
| Fish pond | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fish stream | 0 | M | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aquatic invertebrates pond | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aquatic invertebrates stream | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Surface Runoff** | | | | | | | | | | | | | | | | | | | | | | |
| Fish pond | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | L | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Fish stream | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aquatic invertebrates pond | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Aquatic invertebrates stream | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NE | NE | 0 | 0 | NE | NE | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] BROM = Bromacil; CHLOR = Chlorsulfuron; DIFLU = Diflufenzopyr; FLUR = Fluridone; IMAZ = Imazapic; OVER = Overdrive®; SULFM = Sulfometuron methyl; and TEBU = Tebuthiuron.
[2] Typ = Typical application rate; and Max = Maximum application rate.
[3] Risk categories: 0 = No risk (majority of RQs < most conservative LOC for special status species); L = Low risk (majority of RQs 1-10x most conservative LOC for special status species); M = Moderate risk (majority of RQs 10-100x most conservative LOC for special status species); H = High risk (majority of RQs >100 most conservative LOC for special status species); and NE = Not evaluated. The risk category is based on the risk level of the majority of risk quotients observed in any of the scenarios for a given exposure group and receptor type. The reader should consult the risk tables in Chapter 4 of the ERAs (ENSR 2005b-k) to determine the specific scenarios that result in the displayed level of risk for a given receptor group.

ENVIRONMENTAL CONSEQUENCES

ENVIRONMENTAL CONSEQUENCES

TABLE 4-21
**Buffer Distances to Minimize Risk to Special Status Fish and Aquatic Organisms from Off-site Drift
of BLM-evaluated Herbicides from Broadcast and Aerial Treatments**

| Application Scenario | BROM[1] | CHLR | DICA | DIFLU | DIQT | DIUR | FLUR | IMAZ | OVER | SULF | TEBU |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Minimum Buffer Distance (feet) from Fish and Aquatic Invertebrates** | | | | | | | | | | | |
| **Typical Application Rate** | | | | | | | | | | | |
| Aerial | NA | 0 | NA | NA | NA | NA | NA | 0 | NA | 0 | NA |
| Low boom | 0 | 0 | 0 | 0 | NA | 0 | NA | 0 | 0 | 0 | 0 |
| High boom | 0 | 0 | 0 | 0 | NA | 100 | NA | 0 | 0 | 0 | 0 |
| **Maximum Application Rate** | | | | | | | | | | | |
| Aerial | NA | 0 | NA | NA | NA | NA | NA | 0 | NA | 0 | NA |
| Low boom | 0 | 0 | 0 | 0 | NA | 100 | NA | 0 | 0 | 0 | 0 |
| High boom | 0 | 0 | 0 | 0 | NA | 900 | NA | 0 | 0 | 0 | 0 |

[1] BROM = Bromacil; CHLR = Chlorsulfuron; DICA = Dicamba; DIFLU = Diflufenzopyr; DIQT = Diquat; DIUR = Diuron; FLUR = Fluridone; IMAZ = Imazapic; OVER = Overdrive®; SULFM = Sulfometuron methyl; and TEBU = Tebuthiuron.
NA = Not applicable.
Boom height = The Tier I ground application model allows selection of a low (20 inches) or a high (50 inches) boom height.

shelter, water, reproduction, and movement are met. Plants are an important component of habitat, providing food and cover for wildlife. Food is a source of nutrients and energy, while good cover prevents the loss of energy by providing shelter from extremes in wind and temperature. Cover also affords protection from predators. The eight ecoregions encompassed by public land in the western states support different wildlife species and habitats; these characteristics are described further in Chapter 3. Areas that have been impacted by invasive plants may support fewer native wildlife species in areas with intact native plant communities. Invasive plants can change habitat conditions and vital ecosystem functions in such a way that some native species are not able to adapt to the altered ecosystem. These areas may also support an increased number of non-native wildlife species, which compete with native wildlife for available resources.

This section begins with an assessment of risks to general wildlife, including insects, birds, and small and large mammals, and is followed by an assessment of risks to special status wildlife species. Initial discussion in this section focuses on the risks to wildlife health from the use of herbicides, followed by an assessment of the risks and benefits to wildlife from treating vegetation in each ecoregion, followed by an assessment of impacts to wildlife under each alternative.

## Scoping Comments and Other Issues Evaluated in the Assessment

Some respondents felt that the BLM should manage for biodiversity and identify specific sites that have high wildlife value. Other respondents wanted the EIS to address the habitat requirements of different wildlife species and the ways in which vegetation treatments would influence these habitats. Considering treatment effects to ground-nesting birds was also mentioned as an important issue to consider. Numerous comments promoted the idea that wildlife habitat improvement efforts should be directed at restoring habitat and natural ecological processes.

The protection of sage-grouse and their habitat was advised. It was noted that carefully applied herbicides may improve sage-grouse habitat. One respondent noted that aggressive saltcedar removal efforts in the Mojave River have killed wildlife in the past. Numerous comments encouraged the BLM to use this PEIS process as an opportunity for recovering the full range of native species and ecosystems across the western states, including species such as white-tailed and black-tailed prairie dogs, black-footed ferret, Columbia spotted frog, Washington ground squirrel, and wolves.

## Standard Operating Procedures

Herbicide use poses a potential risk to wildlife. However, risk can be minimized by following certain standard operating procedures, which can be

BLM_0000489

implemented at the local level according to specific conditions. The following general procedures, which are designed to reduce potential unintended impacts to wildlife from the application of herbicides in the BLM vegetation management program, were taken into consideration when evaluating risks to wildlife from herbicide use (also see Table 2-8):

- Use herbicides of low toxicity to wildlife.

- Use spot applications or low-boom broadcast applications, where possible, to limit the probability of contaminating non-target food and water sources, especially vegetation over areas larger than the treatment area.

- Conduct pre-treatment surveys for sensitive habitat and special status species within or adjacent to proposed treatment areas.

- Use timing restrictions (e.g., do not treat during critical wildlife breeding or staging periods) to minimize impacts to wildlife.

## Impacts Assessment Methodology

The BLM reviewed the literature and findings from Ecological Risk Assessments (ERAs) conducted by the BLM and Forest Service to assess the impacts to wildlife from the use of herbicides (ENSR 2005b-k; USDA Forest Service 2005). The methods presented here provide a brief overview of the ERA process to determine the risks of herbicide applications to wildlife species. The ERA methods are presented in detail in Appendix C and in the *Vegetation Treatments Programmatic EIS Ecological Risk Assessment Protocol* (ENSR 2004).

### BLM Methodology

#### Problem Formulation

Wildlife receptors, representing different categories of terrestrial animal species, were evaluated to determine the effects of herbicide exposure in terms of certain assessment endpoints and associated measures of effect. The essential biological requirements for each of these groups of organisms are the endpoints to be protected from herbicide exposure. These endpoints include mortality, growth, reproduction, or other ecologically-important sublethal processes. These assessment endpoints, for the most part, reflect the direct effects of an herbicide on these organisms, but indirect effects were also considered. Measures of effect are measurable changes in an attribute of an assessment endpoint (or its

surrogate, as discussed below) in response to a stressor to which it is exposed (USEPA 1998a). For the screening-level ERA, the quantitative measures of effect associated with the assessment endpoints generally consisted of acute and chronic toxicity data (from pesticide registration documents and from the available scientific literature) for the most appropriate surrogate species.

#### Exposure Characterization

The BLM uses herbicides in a variety of programs (e.g., maintenance of rangeland and recreational sites) with several different application methods (e.g., application by aircraft, vehicle, backpack). In order to assess the potential ecological impacts of these herbicide uses to terrestrial wildlife, the following exposure scenarios and receptor types were considered as routes of the most plausible acute and chronic (short- and long-term) impacts that would occur under a variety of conditions. These receptors represent a range of wildlife receptors that could be extrapolated to the typical wildlife species found on public lands. These receptors also represent different feeding guilds (herbivore, omnivore, and carnivore). The exposure scenarios include:

Direct spray of terrestrial wildlife:

- Small mammal – 100% absorption

- Pollinating insect – 100% absorption

- Small mammal – 1st order dermal absorption (absorption occurs over 24 hours, taking into consideration the potential for some herbicide to not be absorbed)

Indirect contact with foliage after direct spray:

- Small mammal – 100% absorption

- Pollinating insect – 100% absorption

- Small mammal – 1st order dermal absorption

Ingestion of food items contaminated by direct spray:

- Small mammalian herbivore – acute and chronic exposure

- Large mammalian herbivore – acute and chronic exposure

- Small avian insectivore – acute and chronic exposure

- Large avian herbivore – acute and chronic exposure

BLM_0000490

ENVIRONMENTAL CONSEQUENCES

- Large mammalian carnivore – acute and chronic exposure

Exposure scenarios involving off-site drift, surface runoff, and wind erosion were not modeled for terrestrial wildlife because the direct spray scenarios were more conservative than scenarios involving wind erosion or runoff. Risk from consumption of food would be much greater if the food item was directly sprayed by an herbicide than if the herbicide drifted or was carried by water onto the food item.

### Effects Characterization

In the majority of cases, toxicological data do not exist for specific wildlife species of concern. Consequently, toxicological data for surrogate wildlife receptors, obtained from a literature review, were evaluated and used to establish quantitative benchmarks (i.e., toxicity reference values for the ecological species of concern). Data from acceptable studies were used to compile statistical endpoints into a matrix for each chemical and for each receptor. Data were further subdivided into acute adverse-effect-levels, chronic adverse-effect-levels, and no-observed-adverse-effect-levels. For each chemical, receptor, and route of exposure, the lowest reported herbicide level resulting in an identified acute statistical endpoint was selected as the acute TRV. Chronic TRVs, based on longer exposure periods and associated endpoints such as growth and reproduction, were developed, when possible, to provide supplementary data to the risk assessment. Before the chronic NOAEL TRV was determined, a chronic lowest-observed-adverse-effect-level was identified, which was the lowest herbicide level that was found to cause significant adverse effects in a chronic study. Once a LOAEL was selected, the chronic NOAEL TRV was established as the highest NOAEL value that was less than both the LOAEL and the acute TRV. Once developed, TRVs were compared with predicted environmental concentrations (estimated exposure concentrations of the herbicide to evaluate the likelihood of adverse effects to ecological receptor).

### Risk Characterization

In order to address potential risks to wildlife receptors from exposure to herbicides, RQs were calculated by dividing the estimated exposure concentration for each of the previously described scenarios by the appropriate herbicide-specific TRV. To facilitate the translation of RQs into readily applicable estimates of risk, the calculated RQs were compared to levels of concern defined by the USEPA for screening the potential risk

of pesticides. Distinct USEPA LOCs were used for acute and chronic risks, and for potential increased risks to special status species. The ecological risk implications of various exposure estimates can be readily determined by noting which RQs exceed the corresponding LOCs.

### Forest Service Methodology

The Forest Service risk assessment methodology was similar to that used by the BLM (see SERA [2001a] for a complete description of the current methodology). The steps involved in the Forest Service risk assessments were classified as hazard identification (analogous to BLM problem formulation), exposure assessment, dose response assessment (analogous to BLM effects characterization), and risk characterization.

Hazard identification involved the review of existing data with a focus on the dose-response and dose-severity relationships to determine the effect levels (e.g., NOAEL, LOAEL) and assessment endpoints (e.g., acute toxicity, subchronic or chronic systemic toxic effects, reproductive effects) that are most relevant for the herbicide risk assessments.

In the exposure assessment phase, the Forest Service developed several general and accidental/incidental exposure scenarios: direct spray, ingestion of contaminated media (via grooming activities, vegetation, prey species, or water), and indirect contact with contaminated vegetation. Actual exposure scenarios and receptors depended on the available herbicide toxicity data. The Forest Service also used an allometric approach to model exposure for different sizes of animals; however, exposure assessments were only as specific as the available toxicity data. For example, if the hazard identification process suggested that large mammals would be more sensitive than small mammals, or birds more sensitive than mammals, then exposure levels were modeled separately. Exposures also varied depending on the application method and the chemical and toxicological properties of the given herbicide.

Dose response assessment described the degree or severity of risk as a function of dose. A dose was derived—usually from a series of experimental doses—that was associated with a negligible, or at least a defined, level of risk. These dose levels are generally referred to as reference values, or more specifically as "reference doses" (RfDs). To derive the reference value, the experimental threshold was divided by an uncertainty factor used to account for discrepancies

BLM_0000491

between experimental exposure conditions and the actual conditions the receptor might experience during Forest Service exposure. Often, reference values are standard across government agencies.

The risk characterization process then compared the exposure assessment to the dose response assessment to develop hazard quotients for risk determination. HQs are analogous to the RQs developed in the BLM risk assessments; they are calculated as the projected level of exposure (i.e., EEC) divided by an index of an acceptable level of exposure or otherwise defined level of exposure (e.g., a NOAEL divided by an uncertainty factor). In addition, the herbicides were all compared based on their selectivity, potency, persistence in the environment, and ability to move off site.

## Summary of Herbicide Impacts

While some field studies suggest that appropriate herbicide use is not likely to directly affect wildlife (e.g., Cole et al. 1997, Sullivan et al. 1998), there is the potential for herbicides (used properly or improperly) to harm wildlife individuals, populations, or species (USDA Forest Service 2005). Possible adverse direct effects to individual animals include death, damage to vital organs, change in body weight, decrease in healthy offspring, and increased susceptibility to predation. Adverse indirect effects include reduction in plant species diversity and consequent availability of preferred food, habitat, and breeding areas; decrease in wildlife population densities within the first year following application as a result of limited reproduction; habitat and range disruption (as wildlife may avoid sprayed areas for several years following treatment), resulting in changes to territorial boundaries and breeding and nesting behaviors; and increase in predation of small mammals due to loss of ground cover (USEPA 1998b).

In the absence of prominent direct effects, it can be said that the main risk to wildlife from herbicide use is habitat modification. In forests, for example, herbicide use may result in minor and temporary effects on plant communities and wildlife habitats following single applications to young stands or stands following harvest, including some beneficial effects, but it usually results in a significant drop in forage the season following treatment. However, forage species and wildlife use of treated areas are likely to recover two to several years after treatment (Escholz et al. 1996; McNabb 1997; Miller and Miller 2004).

The extent of direct and indirect impacts to wildlife would vary by the effectiveness of herbicide treatments in controlling target plants and promoting the growth of native vegetation, as well as by the extent and method of treatment (e.g., aerial vs. ground) and chemical used (e.g., toxic vs. non-toxic; selective vs. non-selective), the physical features of the terrain (e.g., soil type, slope), and weather conditions (e.g., wind speed) at the time of application. The impacts of herbicide use on wildlife would depend directly on the sensitivity of each species to the particular herbicides used, the pathway by which the individual animal was exposed to the herbicide, and indirectly on the degree to which a species or individual was positively or negatively affected by changes in habitat. Species that reside in an area year-round and have a small home range (e.g., insects, small mammals, territorial birds), would have a greater chance of being directly adversely impacted if their home range was partially or completely sprayed because they would have greater exposure to herbicides—either via direct contact upon application or indirect contact as a result of touching or ingesting treated vegetation.

In addition, species feeding on animals that have been exposed to high levels of herbicide would be more likely to be impacted, particularly if the herbicide bioaccumulates in their systems. Although these scenarios were not modeled, wildlife could also experience greater impacts in systems where herbicide transport is more likely, such as areas where herbicides are aerially sprayed, dry areas with high winds, or areas where rainfall is high and soils are porous. Wildlife that inhabit subsurface areas (e.g., insects, burrowing mammals) may also be at higher risk if soils are non-porous and herbicides have high soil-residence times. The degree of interception by vegetation, which depends on site and application characteristics, would also affect direct spray impacts. The impacts of herbicide use on wildlife would primarily be site- and application-specific, and as such, site assessments would have to be performed at the field level, using available impact information, to determine an herbicide-use strategy that would minimize impacts to wildlife, particularly in habitat that supports special status species.

The BLM and Forest Service risk assessments suggested several common impacts of herbicides to wildlife. Birds or mammals that eat grass that has been sprayed with herbicides have relatively greater risk for harm than animals that eat other vegetation or seeds, because herbicide residue is higher on grass (Fletcher et

BLM_0000492

ENVIRONMENTAL CONSEQUENCES

al. 1994; Pfleeger et al. 1996). This phenomenon is apparent with large mammalian herbivores in the BLM risk assessments. Grass foragers might include deer, elk, rabbits and hares, chukar, quail, and geese (USDA Forest Service 2005). However, harmful doses of herbicide are not likely unless the animal forages exclusively within the treatment area for an entire day. For example, studies of white-tailed deer have reported an average home range of about 400 acres (Fowler 2005), which would be about the size of the typical application area (two-thirds of herbicide treatments would be 400 acres or less), and less than half the size of a large application area of 1,000 acres (20% of treatments would be 1,000 acres or larger). Scenarios of chronic consumption of contaminated vegetation would also be unlikely if vegetation were to show signs of damage (these signs may not occur immediately after spraying). In addition, insect foragers (e.g., bats, shrews, and numerous bird species) would be at risk from herbicide applications because of the small size of insects and their correspondingly large surface area.

**Impacts of BLM-Evaluated Herbicides**

Risks from direct spray and spills, indirect contact with foliage after direct spray, and ingestion of food items contaminated by direct spray are generally low or non-existent for terrestrial fauna, with a few exceptions, particularly for mammalian herbivores and pollinating insects. Specific risks to wildlife from each individual herbicide are presented below. See the tables and figures in Section 4 of the ERAs for each herbicide for risk information on ecological receptor groups according to herbicide application method. Also, see Table 4-22, and Appendix C, for a summary of the typical degree of risk each of the BLM herbicides poses to different receptor categories under different routes of exposure.

*Bromacil*

Direct spray of a pollinating insect poses a low risk for scenarios involving the typical and maximum application rates. This is a conservative scenario that assumes the insect absorbs 100% of the herbicide with no degradation or limitations to uptake. The ERAs predicted low acute and chronic risks to small mammalian herbivores for scenarios involving ingestion of food sprayed at the maximum application rate. No acute risk, and low chronic risk, was predicted for large mammalian herbivores ingesting vegetation sprayed at the typical application rate, and moderate acute and chronic risks were predicted for similar exposure scenarios involving the maximum application rate.

Therefore, direct spray of bromacil at the maximum application rate poses a risk to pollinating insects and large mammalian herbivores, as well as to small mammalian herbivores and large mammalian carnivores. Chronic risks to large mammalian herbivores are moderate, suggesting that caution is needed when applying this herbicide in forage areas, although it is unlikely that large mammals would obtain food solely within the application area, as assumed by ERAs. Because bromacil is a non-selective herbicide and is registered for non-cropland uses, it is not likely to be used in rangelands or wildlife grazing areas where some vegetative cover is desired; this would limit its exposure to large mammalian herbivores. If typically foraged rangeland plants were protected from off-site transport of bromacil, for example by using appropriate buffer zones (see Vegetation section in this chapter), then large mammalian herbivores would not likely be at risk from off-site drift or surface runoff of bromacil (these scenarios were not modeled). Risks to birds and small mammals under any modeled scenario are unlikely. Use of bromacil in spot applications or over small areas would be unlikely to adversely impact wildlife populations and should have positive effects through beneficial habitat modification.

*Chlorsulfuron*

Risk quotients for terrestrial wildlife were all below the most conservative LOC of 0.1 (acute endangered species), indicating that direct spray of chlorsulfuron is not likely to pose a risk to terrestrial animals. Therefore, use of chlorsulfuron would primarily affect wildlife through habitat modification. Its use in forested rangeland and other wildlife habitat areas could benefit wildlife over the long term by controlling invasive plant species and promoting the establishment and growth of native plant species that may provide more suitable wildlife habitat and forage.

*Dicamba*

Overdrive® is a formulation of dicamba and diflufenzopyr. An analysis of risks to wildlife was conducted for dicamba during preparation of the Overdrive® ERA. However, an ERA report for dicamba was not done by the BLM as part of this PEIS, although some information on dicamba is included in the Overdrive® ERA. The Forest Service conducted an ERA for dicamba, which the reader is encouraged to review (available at http://www.fs.fed.us/foresthealth/pesticide/risk.shtml).

BLM_0000493

**TABLE 4-22**

**Risk Categories Used to Describe BLM-evaluated Herbicide Effects on Non Special Status Wildlife According to Exposure Scenario**

| Application Scenario | BROM[1] | | CHLOR | | DICAMBA | | DIFLU | | DIQUAT | | DIURON | | FLUR | | IMAZ | | OVER | | SULFM | | TEBU | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[2] | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| **Direct Spray of Terrestrial Wildlife** | | | | | | | | | | | | | | | | | | | | | | |
| Small mammal – 100% absorption | 0[3] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pollinating insect – 100% absorption | L | L | 0 | 0 | 0 | L | 0 | 0 | L | L | L | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Small mammal – 1st order dermal absorption | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Indirect Contact with Foliage After Direct Spray** | | | | | | | | | | | | | | | | | | | | | | |
| Small mammal – 100% absorption | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pollinating insect – 100% absorption | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Small mammal – 1st order dermal absorption | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Ingestion of Food Items Contaminated by Direct Spray** | | | | | | | | | | | | | | | | | | | | | | |
| Small mammalian herbivore – acute | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Small mammalian herbivore – chronic | 0 | L | 0 | 0 | 0 | L | 0 | 0 | L | M | L | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Large mammalian herbivore – acute | 0 | L | 0 | 0 | 0 | L | 0 | 0 | 0 | M | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Large mammalian herbivore – chronic | L | M | 0 | 0 | 0 | L | 0 | 0 | L | M | M | H | 0 | 0 | 0 | 0 | L | M | 0 | 0 | L | L |
| Small avian insectivore – acute | 0 | 0 | 0 | 0 | L | M | 0 | 0 | 0 | M | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Small avian insectivore – chronic | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | M | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Large avian herbivore – acute | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Large avian herbivore – chronic | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | L | H | 0 | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Large mammalian carnivore – acute | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Large mammalian carnivore – chronic | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] BROM = Bromacil; CHLOR = Chlorsulfuron; DIFLU = Diflufenzopyr; FLUR = Fluridone; IMAZ = Imazapic; OVER = Overdrive®; SULFM = Sulfometuron methyl; and TEBU = Tebuthiuron.

[2] Typ = Typical application rate; and Max = Maximum application rate.

[3] Risk categories: 0 = No risk (majority of RQs < most conservative LOC for non special status species); L = Low risk (majority of RQs 1-10x most conservative LOC for non special status species); M = Moderate risk (majority of RQs 10-100x most conservative LOC for non special status species); and H = High risk (majority of RQs >100 most conservative LOC for non special status species). The risk category is based on the risk level of the majority of risk quotients observed in any of the scenarios for a given exposure group and receptor type. The reader should consult the risk tables in Chapter 4 of the ERAs (ENSR 2005b-k) to determine the specific scenarios that result in the displayed level of risk for a given receptor group.

BLM_0000494

ENVIRONMENTAL CONSEQUENCES

Accidental direct spray at the maximum application rate poses low risk to pollinating insects. The ingestion of food items contaminated by direct spray of dicamba at the typical application rate poses a low acute risk to small avian insectivores and large mammalian carnivores. The ingestion of food items contaminated by direct spray of dicamba at the maximum application rate poses a moderate acute risk to the small avian insectivores, a low acute and chronic risk to large mammalian herbivores, and low chronic risk to small mammalian herbivores. Because dicamba is proposed for use in rangelands and forestlands and has moderate residual activity, insects and wildlife could be at risk from the application of this chemical, particularly if it is sprayed throughout the range area. The use of dicamba in rangeland could benefit wildlife by controlling unpalatable invasive plant species and promoting the establishment and growth of native plant species that may be more suited for forage.

### Diflufenzopyr

Risk quotients for terrestrial wildlife were all below the most conservative LOC of 0.1, indicating that direct spray of diflufenzopyr is not likely to pose a risk to terrestrial animals. Therefore, use of diflufenzopyr would primarily affect (positively or negatively) wildlife through habitat modification. Its use in forested rangeland and other wildlife habitat areas would benefit wildlife by controlling invasive plant species and promoting the establishment and growth of native plant species that may provide more suitable wildlife habitat and forage. Loss of vegetation due to treatments would impact wildlife short-term, especially species that use knapweeds, thistles, and other target vegetation for food and cover.

### Diquat

Risk quotients for terrestrial wildlife were above the most conservative LOC of 0.1 for several scenarios. Accidental direct spray of diquat at the typical and maximum application rates poses a low risk to pollinating insects. No risks to small mammals were predicted due to direct spray or indirect contact with foliage. Both of these scenarios conservatively assumed 100% absorption.

Risk assessments predicted acute and chronic risks to nearly all of the receptor types as a result of ingesting food items contaminated by direct spray, with the greatest risk predicted for large mammalian and large avian herbivores. For large mammalian herbivores, no acute and low chronic risks and moderate acute and chronic risks were predicted as a result of ingesting vegetation sprayed at the typical and maximum application rates, respectively. For large avian herbivores, no acute and low chronic risks were predicted for ingestion scenarios involving the typical application rate, and low acute and high chronic risks were predicted for ingestion scenarios involving the maximum application rate. In addition, ERAs predicted: low chronic risks to small mammalian herbivores for ingestion scenarios involving the typical application rate, and low acute and moderate chronic risks for ingestion scenarios involving the maximum application rate; moderate acute and chronic risks for ingestion scenarios involving the maximum application rate; and low acute risks to large mammalian carnivores for ingestion scenarios involving the maximum application rate.

### Diuron

Acute RQs for terrestrial wildlife were above the most conservative LOC of 0.1 for several scenarios. Direct spray of pollinating insects at the typical and maximum application rates poses a low and moderate risk, respectively. In addition, low risk was predicted for the pollinating insect from indirect contact with foliage impacted by direct spray at the maximum application rate.

Risk assessments predicted acute and/or chronic risks to all of the receptor types as a result of ingesting food items contaminated by direct spray, with the greatest risk predicted for large mammalian herbivores (moderate chronic risk for ingestion of food sprayed at the typical application rate, and low acute and high chronic risks for the maximum application rate). In addition, ERAs predicted: low chronic risks to small mammalian herbivores for ingestion scenarios involving the typical application rate, and low acute and moderate chronic risks for ingestion scenarios involving the maximum application rate; low acute and chronic risks to small avian insectivores for ingestion scenarios involving the maximum application rate; low acute and moderate chronic risks to large avian herbivores for ingestion scenarios involving the maximum application rate; and low chronic risks to large mammalian carnivores for ingestion scenarios involving the typical and maximum application rates.

### Fluridone

Risk quotients for terrestrial animals were below the most conservative LOC of 0.1 for all scenarios. These results indicate that accidental direct spray or drift of

BLM_0000495

this aquatic herbicide would be unlikely to pose a risk to terrestrial wildlife.

### *Imazapic*

Risk quotients for terrestrial wildlife were all below the most conservative LOC of 0.1, indicating that direct spray of imazapic is not likely to pose a risk to terrestrial animals. Therefore, use of imazapic would primarily affect wildlife through habitat modification. Its use in forested rangeland and other wildlife habitat areas could benefit wildlife by controlling invasive plant species and promoting the establishment and growth of native plant species that provide more suitable wildlife habitat and forage.

### *Overdrive®*

Most of the RQs for terrestrial wildlife were below the most conservative LOC of 0.1, indicating that direct spray of Overdrive® is not likely to pose a risk to terrestrial animals. However, there would be low chronic risk to large mammalian herbivores as a result of consuming plants contaminated by direct spray at the typical application rate and moderate chronic risk at the maximum application rate. Because Overdrive® is proposed for use in rangeland and wildlife habitat, large mammalian herbivores could be particularly at risk from application of this herbicide, although it is unlikely that these large animals would do all of their foraging within or immediately adjacent to application areas. The use of Overdrive® would primarily affect (positively or negatively) wildlife through habitat modification. Its use in wildlife habitat areas could benefit most wildlife by controlling invasive plant species and promoting the establishment and growth of native plant species that provide more suitable wildlife habitat and forage.

### *Sulfometuron Methyl*

Risk quotients for terrestrial wildlife were all below the most conservative LOC of 0.1, indicating that direct spray of sulfometuron methyl is not likely to pose a risk to terrestrial animals. Because this herbicide is relatively non-selective, it is not likely to be used in wildlife habitat areas, and therefore, should result in few negative or positive impacts on wildlife. Long-term positive impacts could result if sulfometuron methyl was used to clear former wildlife grazing habitat of an aggressive invasive, such as downy brome, and native forage was able to reestablish once this area was cleared.

### *Tebuthiuron*

Risk quotients for pollinating insects were above the most conservative LOC of 0.1 for direct spray of insects (low risk at the typical and maximum application rates) and indirect contact with foliage after direct spray (low risk at the maximum application rate).

The ingestion of food items contaminated by direct spray at the maximum application rate poses a risk to mammalian herbivores. Low acute risk and chronic risk were predicted for the small and large mammalian herbivores. The strength of this herbicide is its use as a habitat modifier in the BLM shrub reduction program. It is relatively non-selective, but tends to harm grasses that are present. At low rates of application, tebuthiuron is used to thin shrubs, creating a more favorable habitat for shrub-dependent species. Because this application often takes place on land with a low concentration of grass forage, risks to mammalian herbivores associated with its use might be lower than those predicted under the ingestion scenarios, and wildlife forage and habitat could be enhanced by these applications. Birds and mammalian carnivores should not be adversely impacted by direct spray of tebuthiuron under any application scenarios.

### Impacts of Forest Service-evaluated Herbicides

The following information for eight herbicides proposed for use by the BLM is taken from ERAs prepared by the Forest Service to support assessment of the environmental consequences of using these herbicides in Forest Service vegetation management programs. As part of these ERAs, the Forest Service developed worksheets (see USDA Forest Service 2005) that allowed the BLM to assess risks for BLM typical and maximum application rates and LOCs, rather than the Forest Service rates and LOCs. Thus, the risk assessment process for the Forest Service-evaluated herbicides parallels the BLM process as much as possible. However, some Forest Service modeled risk scenarios for terrestrial animals may be different than those used in the BLM ERAs, depending on the specificity of available toxicity data. The assessment of impacts is presented below using the Forest Service upper estimates of hazard quotients to maximize the conservatism of the assessment. In addition, it should be noted that the development of HQs by the Forest Service, as well as the BLM, is already conservative for many reasons (e.g., assumption of 100% dermal absorption, assumption that 100% of diet is contaminated, use of most sensitive values for exposure and dose/response assessments). Risks to TEP species

BLM_0000496

ENVIRONMENTAL CONSEQUENCES

are specifically analyzed in the Biological Assessment accompanying this document (USDI BLM 2007b).

### 2,4-D

2,4-D poses a risk to some terrestrial wildlife under direct spray as well as ingestion of contaminated food scenarios (Table 4-23; SERA 1998). Direct spray of 2,4-D at both the typical and maximum application rates poses a moderate risk to insects and small mammals, assuming 100% absorption of the herbicide. Small mammals face low risk from direct spray if 1st order dermal absorption is assumed. In addition, mammals and large birds would be at risk from the consumption of vegetation contaminated by 2,4-D at the application site: large mammals and large birds would be at moderate acute and chronic risk for ingestion scenarios involving both the typical and maximum application rates (large birds face high acute risk for ingestion scenarios involving the maximum application rate), and small mammals face low acute risk for ingestion scenarios involving the typical and maximum application rates. Long-term consumption of contaminated vegetation would be unlikely if the vegetation were to show signs of damage. In other acute scenarios, small mammals face low risk from consumption of water contaminated by an accidental spill; small mammals face moderate to high risk and small birds face high risk from the consumption of contaminated insects; predatory birds face high risk from the consumption of fish contaminated by a spill; and carnivorous mammals and birds face low risk from the consumption of small mammals contaminated by direct spray of 2,4-D. The risk assessment indicates that insectivores and large herbivores eating large quantities of grass and other vegetation are at risk from routine exposure to 2,4-D, suggesting that 2,4-D should not be applied over large application areas where foragers would only consume contaminated food.

### Clopyralid

According to the Forest Service risk assessment (SERA 2004b), clopyralid is not likely to pose a risk to terrestrial animals; however there are several scenarios under which there would be low acute risk to a variety of receptors at the typical and maximum application rates (Table 4-23). For the typical application rate, small mammals are at risk from 100% absorption of direct spray and consumption of contaminated insects and vegetation. For the maximum application rate, insects are at risk from direct spray, large birds are at risk from the consumption of contaminated vegetation, and small birds face risk from the consumption of contaminated

insects. Application of clopyralid at the maximum application rate also poses a low chronic risk to large mammals and large birds consuming on-site contaminated vegetation. The Forest Service asserts that use of clopyralid in Forest Service programs is not likely to result in adverse effects to terrestrial animals; risks identified all fall within the lowest risk category.

### Glyphosate

Glyphosate applications pose low to moderate risk to several terrestrial wildlife receptors under multiple exposure scenarios involving applications at the typical and maximum application rates (Table 4-23; SERA 2003a). Direct spray of a small animal and an insect, both assuming 100% absorption, poses a low risk at the typical application rate and a moderate risk at the maximum application rate. Consumption of vegetation contaminated by a spill poses a low risk to small mammals for scenarios involving for the maximum application rate only. A large mammal consuming contaminated vegetation would face low acute risk for scenarios involving the typical application rate, moderate acute risk, for scenarios involving the maximum application rate, and low chronic risk for scenarios involving the maximum application rate; a large bird consuming contaminated vegetation would face a low acute and chronic risk. Consumption of contaminated insects would pose a low risk to both small mammals and small birds if the herbicide was applied at the typical application rate. The herbicide would pose a moderate risk if applied at the maximum rate. Acute risks from glyphosate exposure are low at the typical application rate under all scenarios, and there are no chronic risks. Exposure scenarios with the greatest risk are direct spray and acute consumption of contaminated vegetation and insects. Glyphosate is non-selective, suggesting that spot applications in rangeland and wildlife habitat areas would be the most appropriate use of this herbicide. Spot applications would have lower risks associated with consumption of contaminated vegetation and insects than broadcast applications, as fewer non-target areas would be impacted by direct spray or spray drift.

### Hexazinone

Several exposure scenarios involving application of hexazinone would pose a low to moderate risk to wildlife receptors (Table 4-23; SERA 1997). Small mammals would face low risk if directly sprayed at the maximum application rate, assuming 1st order dermal absorption, and low to moderate risk assuming 100% dermal absorption. Similarly, 100% absorption of direct

BLM_0000497

TABLE 4-23

**Risk Categories[1] Used to Describe Forest Service-evaluated Herbicide Effects on Wildlife According to Exposure Scenario**

| | 2,4-D | | Clopyralid | | Glyphosate[2] | | Hexazinone | | Imazapyr | | Metsulfuron | | Picloram | | Triclopyr[2] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[3] | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| **Acute/Accidental Exposures** | | | | | | | | | | | | | | | | |
| Direct spray, small mammal, 1st order absorption | L[4] | L | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | L | M |
| Direct spray, small animal, 100% absorption | M | M | L | L | L | M | L | M | 0 | L | 0 | L | L | L | L | M |
| Direct spray, bee, 100% absorption | M | M | 0 | L | L | M | L | M | 0 | L | 0 | 0 | 0 | L | L | M |
| Consumption of contaminated fruit, small mammal | L | L | 0 | 0 | 0 | L | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated grass, large mammal | M | M | L | L | L | M | L | M | 0 | L | 0 | L | L | M | L | M |
| Consumption of contaminated grass, large bird | M | H | 0 | L | L | L | L | M | 0 | L | 0 | 0 | 0 | 0 | L | M |
| Consumption of contaminated water, small mammal, spill | L | L | 0 | 0 | 0 | L | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Consumption of contaminated water, small mammal, stream | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated insects, small mammal | M | H | L | L | L | M | 0 | 0 | 0 | L | 0 | L | L | M | L | M |
| Consumption of contaminated insects, small bird | H | H | 0 | L | L | M | M | M | L | L | 0 | 0 | 0 | 0 | L | M |
| Consumption of contaminated small mammal, predatory mammal | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Consumption of contaminated small mammal, predatory bird | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated fish, predatory bird, spill | H | H | 0 | 0 | 0 | 0 | L | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Chronic Exposures** | | | | | | | | | | | | | | | | |
| Consumption of contaminated vegetation, small mammal, on-site | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated vegetation, small mammal, off-site | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated vegetation, large mammal, on-site | M | M | 0 | L | 0 | L | L | M | 0 | 0 | 0 | 0 | 0 | 0 | L | M |
| Consumption of contaminated vegetation, large mammal, off-site | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Consumption of contaminated vegetation, large bird, on-site | M | M | 0 | L | 0 | L | L | M | 0 | 0 | 0 | 0 | 0 | L | L | M |
| Consumption of contaminated vegetation, large bird, off-site | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated water, small mammal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated fish, predatory bird | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] Risk categories are based on upper estimates of hazard quotients and the BLM LOCs of 0.1 for acute scenarios and 1.0 for chronic scenarios. The reader should consult the text of this section of the individual Forest Service risk assessments to evaluate risks at central estimates of hazard quotients.
[2] Risk categories are the same for both evaluated formulations.
[3] Typ = Typical application rate; and Max = maximum application rate.
[4] Risk categories: 0 = No risk (HQ < LOC); L = Low risk (HQ = 1 to 10 x LOC); M = Moderate risk (HQ = 10 to 100 x LOC); and H = High risk (HQ > 100 LOC).

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

4-107

June 2007

BLM_0000498

ENVIRONMENTAL CONSEQUENCES

ENVIRONMENTAL CONSEQUENCES

spray by insects would pose a low to moderate risk. Acute consumption of contaminated vegetation would pose a low risk to the small mammal for treatments at the maximum application rate. Acute and chronic consumption of contaminated vegetation would pose a moderate risk to both large mammals and large birds. Acute consumption of contaminated insects would pose a moderate risk to small birds, and acute consumption of contaminated fish would pose a low to moderate risk to predatory birds. Also, acute consumption of contaminated water would pose a low risk to small mammals for scenarios involving a spill at the maximum application rate. It appears that wildlife, especially sensitive species, are at risk from the application of hexazinone; the effects of hexazinone on insects, birds, and soil microarthropods are less certain than the effects on mammals. If food and water sources were not contaminated, risks would be reduced. Contamination of food and water sources could be minimized by utilizing spot applications at the typical application rate. Because hexazinone is semi-selective, is used to control woody species, and is typically only applied in spot applications, risks to wildlife under normal application could be lower than those predicted by the risk assessment.

### Imazapyr

Imazapyr does not pose substantial risks to terrestrial animal species, but there are low risks associated with several exposure scenarios, mostly involving herbicide applications at the maximum application rate (Table 4-23; SERA 2004d). The only scenario involving the typical application rate that would pose a risk (low risk) to wildlife is that of a small bird consuming contaminated insects. Therefore, application of imazapyr at the typical application rate is not likely to result in adverse effects to terrestrial animals, with the possible exception of small insectivorous bird. For the maximum application rate, however, the following scenarios pose a low risk to wildlife receptors: direct spray of small animals and insects, consumption of contaminated vegetation by large mammals and large birds, and consumption of contaminated insects by small mammals and small birds. The HQs for terrestrial invertebrates are based on a single study using mortality as the endpoint, so results for this receptor are less certain. Because imazapyr is primarily used for the management of saltcedar in riparian zones and is relatively costly to use in the management of upland vegetation, large-scale impacts to wildlife are unlikely, even at the maximum application rate. Wildlife that reside mostly within the riparian zone would be most at risk from application of imazapyr.

### Metsulfuron Methyl

None of the HQs estimated for metsulfuron methyl exposure at the typical application rate indicate risk to any of the receptors (Table 4-23; SERA 2004e). For applications at the maximum application rate, metsulfuron methyl would pose a low risk to small animals via 100% absorption of direct spray and consumption of contaminated insects, and to large mammals via consumption of contaminated vegetation. Application of metsulfuron methyl at the typical application rate should not result in any adverse effects to terrestrial animals.

### Picloram

Most of the HQs for the evaluated scenarios of picloram exposure were below the LOC for both the typical and maximum application rates (Table 4-23; SERA 2003b). Under three scenarios, low risk was predicted for applications at the typical application rate: 100% absorption of direct spray by small animals, acute consumption of contaminated vegetation by large mammals, and acute consumption of contaminated insects by small mammals. For the maximum application rate, risk was somewhat elevated for these three scenarios (low to moderate risk), and two additional scenarios posed low risk: 100% absorption of direct spray by insects and chronic consumption of on-site contaminated vegetation by the large bird. Therefore, picloram applications at the typical rate would potentially have few adverse effects on terrestrial animals.

### Triclopyr

Application of the two evaluated formulations of triclopyr, triclopyr acid and triclopyr butoxyethyl ester (BEE), poses a risk to insects, mammals, and birds under several exposure scenarios (Table 4-23; SERA 2003c). Because risks calculated for these two formulas are the same, no differentiation will be made between triclopyr acid and triclopyr BEE in this section. The following scenarios pose a low risk for applications at the typical rate and a moderate risk for applications at the maximum rate: first-order and 100% absorption of direct spray by small mammals, 100% absorption of direct spray by insects, acute consumption of contaminated vegetation by large mammals and large birds, acute consumption of contaminated insects by small birds and small mammals, and chronic

BLM_0000499

consumption of on-site contaminated vegetation by large mammals and large birds. In addition, for the maximum application rate, there would be low risk associated with acute consumption of contaminated vegetation by small mammals following an accidental spill, acute consumption of contaminated small mammals by carnivorous mammals, and chronic consumption of off-site contaminated vegetation by large mammals. No risk is predicted for small mammals as a result of acute or chronic consumption of contaminated vegetation or water, or for predatory birds as a result of consumption of contaminated fish. In summary, acute or accidental direct spray scenarios would pose a low to moderate risk to terrestrial mammals and insects, consumption of contaminated vegetation would pose a low to moderate risk to large mammals and large birds, and consumption of contaminated insects would pose a low to moderate risk to small birds.

**Impacts of Other Herbicides Currently Available for Use**

2,4-DP, asulam, atrazine, fosamine, mefluidide methyl, and simazine were approved for use in the earlier BLM EISs. 2,4-DP could be used in forested rangeland. It has low toxicity to mammals and is practically non-toxic to waterfowl and upland game birds. Asulam is of low toxicity to birds and mammals, and would primarily be used to control brackenfern on forested rangelands (Information Ventures, Inc. 1995a). Atrazine could be used for vegetation treatments in conifer plantations, but would not be used in forestlands or other rangelands. It is slightly toxic to non-toxic in birds, and is slightly to moderately toxic to mammals (Information Ventures, Inc. 1995b; Extension Toxicology Network 1996e). Fosamine is practically nontoxic to insects, birds, and mammals, although some chronic reproductive effects have been noted in mallards (USEPA 1995d). Mefluidide is of low to moderate toxicity to birds and mammals (Information Ventures, Inc. 1995c). Simazine could be used by the BLM on Christmas tree plantations, but would not likely not be used on rangeland. Simazine is almost non-toxic to birds and mammals, although sheep and cattle are more sensitive to simazine than other mammals, and a dose as low as 500 mg/kg can be fatal (Information Ventures, Inc. 1995d). The BLM has not used any of these herbicides, except fosamine (< 50 acres annually), since 1997, and does not plan to utilize them in the near future.

## Impacts of Herbicide Treatments on Wildlife and Habitat by Ecoregion

### Tundra and Subarctic

Herbicides have not been used on public lands in Alaska on Arctic tundra or in subarctic forests, and herbicide treatments have not been proposed for these regions. Use of herbicides in these habitats is discouraged because forbs valuable to many tundra and boreal forest wildlife species would be reduced substantially (Braun 1980).

### Temperate Desert

The goal of most treatments in this ecoregion is to restore lands damaged by fires in the Great Basin, and to benefit sage-grouse and other wildlife that use sagebrush communities. In particular, efforts would be focused on improving existing sagebrush stands and replacing invasive annual grasses with native bunchgrasses and forbs (USDA Forest Service and USDI BLM 2000). Although few wildlife vertebrates are endemic to the sagebrush analysis region, the Great Basin provides habitat for about 100 bird, 70 mammal, and 23 amphibian and reptile species (USDI BLM 1999).

At low to mid-elevations, long fire intervals have created climax sagebrush communities that are found on large areas of public land. These communities have diminished perennial herbaceous understory as a result of grazing and other habitat disturbances and competition from sagebrush plants. Where perennial species have been lost, downy brome has replaced these grasses, to the detriment of wildlife habitat (Perryman et al. 2003). As downy brome and other annual grasses have replaced native sagebrush and other shrubs in the region, populations of mule deer, pronghorn, bighorn sheep, Columbian sharp-tailed grouse, sage-grouse, and several species of raptors have declined due to loss of habitat and prey species that depend on shrub habitat (USDI BLM 1999). Vegetation treatments that promote a mixed sagebrush-grass-forb community benefit wildlife. Habitat in these communities is improved by creating openings in dense and crowded sagebrush and rabbitbrush stands, removing invasive species, and promoting production of perennial grasses and forbs (Paige and Ritter 1999, USDI BLM 1999, Sage Grouse Conservation Planning Team 2001).

BLM_0000500

ENVIRONMENTAL CONSEQUENCES

Treatments can improve habitat structure, complexity, and layering to the benefit of species that rely on a diversity of plant types and cover to meet their daily needs. Several studies have shown that densities of songbirds and small mammals are greater in mixed communities than in pure sagebrush or grassland stands (USDI BLM 1991a).

Sagebrush rangelands are often treated with herbicides to increase herbaceous plants, with herbicides that remove broad-leaved plants without harming grasses being the most widely used. As noted in the Vegetation section, 2,4-D, glyphosate, picloram, and tebuthiuron are important herbicides for control of sagebrush, rabbitbrush, and other woody species. Olson et al. (1994) used low rates of tebuthiuron to thin big sagebrush stands and enhance wildlife habitat in Wyoming. Glyphosate can be applied to sagebrush in winter months to kill only sagebrush above the snow.

Other studies have shown, however, that nesting and brood-rearing habitat for sage-grouse and other birds can be depleted by spraying. In Wyoming, it can take sagebrush 14 to 17 years to recover from herbicide spraying (see review in Connelly et al. 2000). Past efforts to reduce sagebrush habitat has been implicated as contributing to the decline in sage-grouse breeding populations throughout the West, especially if the treated area was reseeded with crested wheatgrass (Robinson and Bolen 1989; see review in Connelly et al. 2000). Herbicide use may also cause sage-grouse emigration from an area and reduce the suitability of an area for broods and wintering sage-grouse (see review in Connelly et al. 2000). Braun et al. (1977) recommended that sagebrush control not occur within a 2-mile radius of sage-grouse leks, nesting areas, wintering grounds, or breeding grounds. However, Urness (1979) believed that herbicides could be used to prevent shrub invasion onto leks and alter the size and density of sagebrush to more closely approximate nesting requirements. Dahlgren et al. (2006) treated mountain big sagebrush stands with tebuthiuron to reduce canopy cover and increase production of forbs. Sage-grouse adults and their young preferred the treated plots over the untreated plots, although most use of treated plots occurred near the boundary of the treated plots and intact sagebrush areas. The authors suggested that low rates of tebuthiuron be used to ensure that only a portion of the treated sagebrush was killed.

Herbicidal control of sagebrush can reduce populations of some birds, such as Brewer's sparrow and vesper sparrow, and can reduce the production of forbs and seeds that are important to nesting birds and their young for food and cover. Thus, sagebrush treatments must be carefully designed to ensure that large stands of sagebrush are not lost.

Herbicide treatments and fire use may be the only effective ways to control large areas of annual weeds and other invasive vegetation in this ecoregion. For smaller areas, however, mechanical treatments are recommended over herbicides for improving sage-grouse habitat. Mechanical methods often do less damage to the understory and are more effective than herbicides for sagebrush habitat improvement (USDI BLM 1991a).

Response by mammals varies with herbicide treatment. Deer mice seem unaffected, northern pocket gophers and least chipmunks can decrease, American badgers might decrease initially should gophers or ground squirrels be affected negatively, and montane voles usually increase (Cooperrider et al. 1986; Payne and Bryant 1998). Once preferred forbs return to an area, small mammals apparently return to pretreatment levels.

Elk benefit from conversion of sagebrush to bunchgrass-dominated sites. Elk use increased 89% on chemically treated versus untreated sites in Wyoming (Wilbert 1963, Severson and Medina 1983). Mule deer used sagebrush less in Colorado after it was sprayed with 2,4-D. Loss of forbs associated with herbicide treatments of sagebrush stands can be detrimental to white-tailed deer, as forbs can comprise 60% or more of the deer's diet (Robinson and Bolen 1989).

Pronghorns rely heavily upon browse diets during fall and winter, but forbs are important in spring and summer. Herbicide treatments that thin dense stands of tall sagebrush and improve forb and grass understories can benefit pronghorns (Urness 1979).

In general, treating large units of sagebrush with herbicides is not recommended for wildlife habitat management. If treatments are done in patches or strips, important refuge areas can be created for amphibians, reptiles, birds, and small mammals (Payne and Bryant 1998); staggering treatments over several years can achieve the same effect. Howard and Wolfe (1976) recommended patterned treatments of small tracts, instead of large tracts, for species such as ferruginous hawks because such treatments improve the prey base. Leaving strips of untreated vegetation between strips of treated vegetation also affords wildlife the opportunity to find food and cover resources while treated stands recover. Spraying areas with over 39% big sagebrush cover can benefit sage-grouse as long as treatments are

BLM_0000501

in small blocks, strips, or patches (Holecheck et al. 1989). Spraying should be conducted before forbs emerge. Little benefit from any habitat modification can be expected unless livestock grazing is closely regulated after treatment (Payne and Bryant 1998).

## Subtropical Desert

Herbicides such as 2,4-D, picloram, tebuthiuron, and dicamba are used to control woody species such as mesquite, creosotebush, and snakeweed in Subtropical Desert habitats. Mesquite has invaded millions of acres of shortgrass and mixed-grass prairies of the Southwest. The invasion of woody species has occurred at the expense of native grassland species, and has reduced the carrying capacity for species that depend upon shortgrass and mixed-grass prairies. In Texas, woody shrubs infest over 80% of the state's rangelands (Robinson and Bolen 1989). Brush removal may help to conserve water when the foliage of the moisture-demanding brush is removed. However, in some areas, the expanded range of mesquite has increased the distribution and abundance of white-tailed deer, doves, quail, and cottontail (McCormick 1975 *cited in* USDI BLM 1991a).

Where dense canopies are a problem, treatment with triclopyr and clopyralid might be needed to thin woody vegetation. Stem application of triclopyr is a desirable method of mesquite control because it promotes quick removal of mesquite with minimal damage to native plants and wildlife (Waggoner et al. 2003). In general, no more than 60% of a mesquite-dominated habitat should be treated, and treatments should be in strips or as a patchwork of openings. Germano (1978 *cited in* USDI BLM 1991a) observed that jackrabbits, antelope, quail, and lizards favored openings in mesquite stands. Except for northern mockingbirds and golden-fronted woodpeckers, most nongame birds in northern Texas were unaffected by herbicide-treated areas designed to improve habitat for mourning doves and northern bobwhite, as long as stems and dead trees were left standing. Total density of nongame birds increased 54% on managed versus unmanaged sites; species diversity and richness were similar (Payne and Bryant 1998). Where soil is disturbed in the fall by disking to promote forbs and grasses, herbicides such as diuron and 2,4-D can be cost-effective to enhance production of foods for northern bobwhite and mourning doves.

As long as cover is maintained, white-tailed deer appear to adapt to reduction in browse species associated with herbicide treatments of mesquite. Spraying large blocks of cover habitat adversely affects deer, but treating woodlands in alternating bands can benefit deer (USDI BLM 1991a, Payne and Bryant 1998). Herbicide treatments of upland habitat should be acceptable for most wildlife as long as 20% of an area is left as old, mature woodland.

Herbicides have also been targeted for plants such as burroweed, creosote bush, American tarwort, tree cholla, yucca, and pricklypear. In creosote bush communities, tebuthiuron treatments were more effective than mechanical treatments in killing these plants, but changes in grass and forb densities were the same whether creosote bush was chemically or mechanically treated (Morton and Melgoza 1991). In Arizona, Smith (1984 *cited in* USDI BLM 1991a) compared bird use in creosote bush treated with tebuthiuron and found that birds used openings created through treatment for nesting and foraging sites. After 3 years, rodent abundance was 71% higher on creosote bush areas treated with tebuthiuron than control plots in southeastern Arizona (Standley and Smith 1988).

Cautious and guarded use of herbicides in hot desert communities is recommended. Aside from the semidesert grasslands, herbicides probably have limited value, particularly in the Sonoran and Mojave deserts. Plant control by chemical means usually must be followed by revegetation, which may be unsuccessful due to low and erratic precipitation. In addition, because of the sparse vegetation over much of the desert, removal of vegetation can have substantial impacts on native wildlife that rely on affected plants for food and cover and that cannot readily find new habitat (Payne and Bryant 1998).

## Temperate Steppe

The BLM administers between 10 and 15 million acres of short- and mixed-grass prairie grasslands that support over 130 species of wildlife, including lesser prairie chicken, mountain plovers, and prairie dogs. Over three-quarters of treatments in the Temperate Steppe Ecoregion would be focused on annual and perennial grasses and forbs, including downy brome, leafy spurge, and several species of knapweeds and thistles. Much of this work would be done in support of the BLM's Conservation of Prairie Grasslands initiative.

Control of broadleaf plants by selective herbicides, such as 2,4-D, usually increases grass production. 2,4-D is also effective in controlling weedy forbs, such as bull, musk, and Scotch thistle. 2,4-D can be tank mixed with other herbicides, such as glyphosate, dicamba, picloram, and triclopyr to enhance the activity of these herbicides.

BLM_0000502

ENVIRONMENTAL CONSEQUENCES

Applications of picloram may damage sensitive grasses as well as broadleaf plants, and can substantially alter the composition of grassland communities and affect wildlife diets (USDI BLM 1991a). For example, Fagerstone et al. (1977) found that the prairie dog diet changed significantly from forbs to grass after their habitat was treated with 2,4-D, which significantly reduced the abundance of forbs on the site. Despite the diet change, the 2,4-D treatment appeared to have little detrimental effect on prairie dogs.

Leafy spurge can be controlled with picloram, dicamba, and glyphosate (Hickman et al. 1990). Grasshopper sparrow and savannah sparrow densities were lower in areas with high densities of leafy spurge in North Dakota (Scheiman et al. 2003). Because forbs and other broadleaved plants are important to many wildlife species, patchwork treatments of herbicides should be applied when treating large areas of leafy spurge.

Prairie threeawn is an herbaceous invader on degraded, tallgrass prairie range sites; it colonizes bare soil and maintains dominance for many years, and its value to wildlife is minimal. Atrazine effectively controls prairie threeawn (Engle et al. 1990).

Picloram, clopyralid, and a mixture of 2,4-D and clopyralid were used to treat spotted knapweed to enhance elk forage production in Montana (Rice et al. 1997b). Herbicide application increased winter elk forage by 47% at sites with low to moderate spotted knapweed infestations. However, success would be greatest at sites having a significant bunchgrass component prior to treatment.

Herbicide treatments have also been used to reduce the cover of woody shrubs, such as mesquite and Eastern redcedar, which encroach upon prairie grasslands. While these woody species can benefit some wildlife species (see Wildlife Resources section in Chapter 3), they can also crowd out grassland and forb species, reducing the value of habitat for some species (Engle et al. 1987; Payne and Bryant 1998). Woody shrubs can be controlled where canopy cover reduces the amount of understory vegetation used for food and cover. Picloram and tebuthiuron are effective in controlling woody shrubs.

Herbicides such as 2,4-D have been used in evergreen and deciduous forests at higher elevations to thin sagebrush, snowbrush ceanothus, chokecherry, snowberry, and other shrubs (Vallentine 1989). After treatment, plants often resprout from the crown, producing palatable forage. Whisenant (1987) successfully treated big sagebrush with clopyralid,

leaving bitterbrush and serviceberry relatively unharmed. Treating bitterbrush areas with 2,4-D in Idaho resulted in plants that were unharmed or only slightly damaged (Vallentine 1989). Damage to bitterbrush can be reduced if an area targeted for sagebrush control is treated early, before bitterbrush twigs elongate or began to flower (Payne and Bryant 1998). Bitterbrush plants less than 12 inches tall and those that are flowering will be severely damaged or killed by 2,4-D.

**Subtropical Steppe Ecoregion**

Over three-quarters of treatments in the Subtropical Steppe Ecoregion would be focused on sagebrush and other evergreen shrublands, while 12% would focus on pinyon, juniper, and other evergreen woodland species. Healthy pinyon-juniper woodlands, with a full complement of understory grasses, forbs, and shrubs, provide excellent wildlife habitat. However, in many areas, pinyon and juniper have increased in density to the point that understory vegetation is excluded, to the detriment of wildlife (USDA Forest Service and USDI BLM 2000).

Broad-scale herbicide use in pinyon-juniper woodlands has not been popular over the past several decades, especially when used to open up pinyon-juniper stands. The possibility of destroying midstory shrubs that are important food sources is a major disadvantage to herbicide use (Payne and Bryant 1998

Picloram and tebuthiuron are the main herbicides used to treat pinyon-juniper woodlands. Both picloram and tebuthiuron may persist in the soil for several years and may injure understory grasses, shrubs, and forbs. Individual tree treatments with these herbicides are often more effective in controlling trees and less injurious to understory species than broadcast applications. Using picloram on some sites can also result in dominance by annual grasses, such as downy brome or medusahead, if these species become resistant to picloram (USDI BLM 1991a).

Studies of wildlife use of treated pinyon-juniper habitats have shown that mule deer use was greater in a chemically treated plot than on a mechanically treated plot because herbicide treatment resulted in more openings in the woodlands and a greater retention of screening cover (Severson and Medina 1983). If used properly, aerial broadcasts can create numerous, small, irregularly-shaped openings in terrain that is too rough for mechanical operations (Short and McCulloch 1977).

BLM_0000503

Herbicides can be used with mechanical treatment to manipulate pinyon and juniper (Evans et al. 1975). Small trees that escape chaining, cabling, or dozing can be treated effectively with picloram to ensure that the opening created is free of trees. Unwanted invaders of mechanically prepared openings, including downy brome, can be controlled with atrazine or glyphosate. Glyphosate can be used to desiccate leaves or needles, rendering them more susceptible to prescribed burning.

Tebuthiuron has been used to control sand shinnery oak to improve habitat for lesser prairie chickens in areas where it forms a dense canopy cover. In a study in Oklahoma, tebuthiuron effectively controlled sand shinnery oak and increased grass production, yet did not reduce the abundance and diversity of forbs required by lesser prairie chickens (Doerr and Guthery 1983).

**Mediterranean and Marine Ecoregions**

Approximately 11,000 acres would be treated annually using herbicides in the Marine and Mediterranean ecoregions under the proposed action, primarily using ground-based methods. Over three-quarters of treatments in the Mediterranean and Marine ecoregions would occur in evergreen forestlands. Many of these efforts would be focused on integrated weed management and forest health. The objectives of forest health treatments would be to stem the decline in old-forest habitats primarily due to fire exclusion, to restore more natural fire regimes and reduce hazardous fuels to reduce the potential for catastrophic wildfires, and to restore forests recently burned by wildfires. Fire exclusion has resulted in a gradual shift in stand composition from shade-intolerant tree species such as ponderosa pine, to dense stands of shade-tolerant species such as Douglas-fir and grand fir (Wisdom et al. 2000). High stand densities can make foraging difficult for Lewis' woodpecker, and reduce the vigor of oaks used by western grey squirrels for foraging. The loss of large trees and snags can limit the abundance of nesting and foraging sites for woodpeckers, bats, and other wildlife.

Herbicides are an important tool for improving forest productivity in the Marine Ecoregion, and studies suggest that the range of wood volume gains from effectively managing forest vegetation (primarily using herbicides) is 30% to 450% for Pacific Northwest forests (Wagner et al. 2004). Herbicides can be effective in improving forest wildlife habitat by 1) reducing populations of invasive exotic plants, 2) creating snags and downed woody material, 3) maintaining patches of early-successional vegetation within late-successional communities, and 4) maintaining woody and herbaceous plant communities for browsing species (Lautenschlager et al. 1995; Wagner et al. 2004).

Herbicide use in forests has often been perceived by the public as inconsistent with the ecological aspects of forest management. As discussed above, under typical application scenarios, herbicides evaluated by the BLM pose negligible chronic or acute toxicity hazards to wildlife, and most are rapidly eliminated from animal systems once ingested or absorbed (Tatum 2004; Wagner et al. 2004). Response by wildlife to herbicide-induced habitat alteration is highly variable. Black-tailed deer readily browse Douglas-fir seedlings treated with 2,4-D, atrazine, and fosamine, but reduce use of seedlings treated with glyphosate (Bovey 2001). Because herbicides can alter habitat and successional patterns, they may be useful for restoring desirable habitat conditions, especially early-successional plant communities (see review in Guynn et al. 2004).

Due to abundant rainfall along the Pacific Coast, amphibians are common in habitats west of the Cascade Range. As noted above, ERAs did not assess risks to amphibians from herbicide treatments, but several studies have evaluated risks to amphibians from 2,4-D, atrazine, glyphosate, hexazinone, triclopyr, and other pesticides.

Amphibian populations from around the world have apparently declined or experienced range reductions, and some populations have experienced increases in developmental deformities (Kiesecker 2002). Kiesecker (2002) found that trematode infection was required for development of limb deformities in wood frogs, but that deformities were more common at sites adjacent to agricultural runoff where atrazine and other pesticides were used.

A study of herbicides sprayed for pest control in Canada showed that effects to amphibian embryos and larvae from hexazinone, glyphosate, triclopyr, and three other herbicides that are not used by the BLM were similar to those found in freshwater fish when herbicides were applied at typical application rates. High concentrations of hexazinone did not affect embryos and tadpoles, but 2.4 ppm or greater concentrations of triclopyr did lead to death of newly hatched tadpoles (Berrill et al. 1994; Berrill et al. 1997).

Several studies have shown high rates of larval amphibian mortality in areas treated with glyphosate formulations containing POEA (Relyea 2005a).

BLM_0000504

ENVIRONMENTAL CONSEQUENCES

Although glyphosate and POEA can be absorbed by soil and broken down by soil microbes, complete breakdown can take weeks and death still occurs in amphibians exposed to glyphosate formulations containing POEA (Giesy et al. 2000). However, Relyea (2005b) found that 2,4-D had no impact on tadpoles and did not lead to a loss of species richness in aquatic communities.

Herbicides can often be more selective than mechanical or fire treatments and just as selective as manual treatments in forestlands (Payne and Bryant 1998). Common herbicides used in forest wildlife management include asulam, atrazine, 2,4-D, glyphosate, simazine, and tebuthiuron; however, the BLM has not used atrazine or asulam on public lands since at least 1997. Spraying herbicides over conifer plantations eliminates competing shrubs and hardwood sprouts, but also reduces the value of these forests to wildlife (Rutske 1969). If treatments are done in patches or strips, important refuge areas can be created for amphibians, reptiles, birds, and small mammals (Payne and Bryant 1998); staggering treatments over several years can achieve the same effect.

Weed management in forestlands would reduce or eliminate weed populations that displace native plants that are generally more desirable to wildlife. Plant species of concern include knapweeds, yellow starthistle, toadflaxes, downy brome, and several species of thistle. Several studies have shown that elk use of forest habitats was substantially lower on sites dominated by knapweeds than on sites dominated by native grasses (Sheley et al. 1999a). Yellow starthistle forms dense stands that provide limited value to wildlife, and it is poisonous to some animals (Sheley et al. 1999b). Knapweeds are effectively controlled by picloram, clopyralid, dicamba, and 2,4-D; these herbicides, along with glyphosate, can also be used to control yellow starthistle. Dalmatian and yellow toadflax displace existing plant communities and associated wildlife, although deer have been observed to browse Dalmatian toadflax, the seeds are eaten by some species of birds and small mammals, and the vegetation can provide some cover for smaller wildlife, toadflaxes are not known to be heavily used by any native species (Lajeunesse 1999). Toadflaxes are often controlled using picloram. Thistle spines make them unpalatable to some wildlife and often create effective barriers to movement (Beck 1999). Several herbicides, including chlorsulfuron, clopyralid, 2,4-D, dicamba, imazapic, metsulfuron methyl, and picloram, are used to control thistles.

Phenoxy herbicides (2,4-D, 2,4-DP) have been used in the California chaparral to stimulate shrub regrowth and increase production of grass and forbs (USDI BLM 1988a). Dense, decadent chaparral provides minimal value to deer and other large mammals, but good food and cover for reptiles, small mammals, and birds, such as mountain quail, thrashers, and wrentits. In one study, species composition, population size, and relative abundance of birds did not change 2 years after herbicide treatment of chaparral (Beaver 1976). Sites of dense chaparral treated as a patchwork mosaic should benefit most edge wildlife.

Glyphosate treatments during fall have been used to improve the success of perennial grass seedings in grasslands dominated by invading annuals in California (Vallentine 1989). Herbicides can also be a valuable tool for improving elk habitat by toppling oaks in areas where dense stands occur. Elk use increased dramatically after Gambel oak was sprayed with herbicides (Kufeld 1977); mule deer response was minimal. Small areas of 12 acres or less should be treated to create habitat diversity and feeding sites. Tebuthiuron and triclopyr are effective for treating almost all oak species. Large trees should be protected for their mast-producing potential because acorns are relished by turkey, bear, deer, elk, and other wildlife species (Payne and Bryant 1998).

## Impacts by Alternative

The following sections detail the expected effects of each of the five alternatives on terrestrial wildlife, and compare these effects to those expected under the other alternatives. These effects may vary depending on the percentage of acres treated using different application methods and different herbicides, as well as the size of treatment events. Earlier in this section, SOPs were described that would reduce some of the impacts described below.

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under the No Action Alternative, the BLM would continue its ongoing vegetation treatment programs in 14 western states. Based on the information gathered from BLM field offices in 2002, approximately 3.4% of acres would be treated specifically to benefit wildlife and their habitats, although all treatments would be likely to provide long-term benefits to wildlife.

Under this alternative, the BLM would be able to use the 20 herbicides previously approved in earlier EIS

BLM_0000505

RODs. However, based on the recent pattern of BLM herbicide use, it is likely that approximately three fourths of the area treated would involve the use of only four herbicides: 2,4-D, glyphosate, picloram, and tebuthiuron (Table 2-5). Herbicide use under the No Action Alternative would impact wildlife on approximately 305,000 acres. Public lands in Alaska, Nebraska, and Texas would not be eligible for herbicide treatments under this alternative.

Wildlife impacts (positive and negative) would be similar to those that have occurred in the past 10 years. Negative impacts to wildlife could be lower than under the other herbicide-use alternatives, based on the relative number of acres treated. Impacts would include loss of non-target vegetation used by wildlife, and effects to wildlife health from exposure to herbicides. Aerial applications have the greatest potential to affect wildlife because they typically cover the largest treatment areas (USDI BLM 1991a). The use of glyphosate is of concern in areas with amphibians.

Long-term positive impacts on wildlife communities (i.e., improvements in habitat and ecosystem function) would be much less under this alternative than under the other alternatives. Invasive plant populations would likely continue to expand at the current rate or greater, increasing damage to native plant communities and wildlife habitat and inhibiting ecosystem functions associated with those communities.

In addition, because the new herbicides proposed in this PEIS (diquat, fluridone, imazapic, and Overdrive®) would not be used, risks to wildlife would be different under this alternative than under the other herbicide treatment alternatives. Imazapic does not present any risks to wildlife in modeled scenarios (similar to chlorsulfuron, dicamba, fluridone, metsulfuron methyl, and sulfometuron methyl), and Overdrive® poses a low to moderate risk to large mammalian herbivores under the chronic ingestion of contaminated vegetation scenario. Diquat is fairly toxic to terrestrial wildlife, particularly under food ingestion scenarios (similar to 2,4-D and diuron). However, diquat is an aquatic herbicide and frequent exposure to terrestrial animals would not be expected. Therefore, the No Action Alternative would prevent the use of a greater repertoire of herbicides that are not injurious to terrestrial animals, possibly increasing per area risks to wildlife if more injurious herbicides were used instead (e.g., 2,4-D, bromacil, diuron, tebuthiuron, triclopyr), as well as decreasing the possibilities of more effective wildlife habitat and native ecosystem improvements.

2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine were approved for use in the earlier BLM EIS RODs, but the BLM has not used any of these herbicides, except fosamine (< 50 acres annually), since 1997, and does not plan to utilize them in the near future. These six herbicides have low toxicity to wildlife, although atrazine could exhibit endocrine-disrupting effects via inhibition of androgen receptors in mammals, amphibians, and potentially reptiles (Rohr et al. 2006; see review in Storrs and Kiesecker 2004). Atrazine appears to increase mortality in amphibians and acts as an endocrine disruptor that chemically castrates and feminizes male amphibians (Hays et al. 2006; Rohr et al. 2006). A review by the USEPA (2003e), however, suggested that information about the effects of atrazine on amphibians was inconclusive. Under this alternative, the BLM would use other herbicides, including bromacil, diuron, sulfometuron methyl, and triclopyr, which are effective in controlling weeds and invasive vegetation, but have less risk to wildlife.

The BLM would not be able to use herbicides in Alaska, Nebraska, and Texas under the No Action Alternative, but would be able to conduct herbicide treatments in these states under the other herbicide-treatment alternatives. No herbicide treatments would occur in Alaska or Nebraska, based on information provided by local field offices during 2002. Approximately 11,000 acres would be treated annually in Texas using herbicides under the other alternatives, which would benefit wildlife in the Subtropical Desert Ecoregion.

**Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)**

The Preferred Alternative would result in the treatment of approximately 932,000 acres across the western BLM states. In addition to the 14 previously-approved herbicides, the BLM would be able to use the four new herbicides evaluated in this PEIS. Based on the information provided by local field offices in 2002, approximately 6.8% of acres (6 times as many acres as under the No Action Alternative) would be treated specifically to benefit wildlife and their habitats, although all treatments would be likely to provide long-term benefits to wildlife.

This alternative would result in the most extensive effects to wildlife because it proposes the most acres for treatment (3 times the acreage proposed under the No Action Alternative). The relative degree of positive

BLM_0000506

ENVIRONMENTAL CONSEQUENCES

versus negative impacts would depend on the relative amount of each herbicide used; the chance for negative impacts would be higher if diuron and/or diquat and possibly bromacil and 2,4-D were used extensively. If these herbicides were used only in restricted scenarios, as is proposed, positive impacts could outweigh negative impacts. The use of the four new herbicides and the ability to use future herbicides that become registered with the USEPA would allow BLM managers more options in choosing herbicides that best match treatment goals and application conditions, and are less toxic, and may therefore reduce overall per capita risk to wildlife (three of the four new herbicides present little to no risk to wildlife) and increase positive habitat and ecosystem benefits from treatment. In addition, the ability to use future registered herbicides would allow the BLM to employ the most technologically-advanced herbicides, which would likely reduce risk to wildlife and increase management benefits. This alternative would also reduce risk and negative impacts that might be associated with other vegetation management methods (e.g., risk of escaped prescribed fires; see the PER).

Based on current BLM usage, 2,4-D, glyphosate, picloram, and tebuthiuron would comprise about 70% of herbicides that would be used under this alternative. The risks and benefits of using these and other currently-available herbicides are discussed under the No Action Alternative. Approximately 10% of all treatment acres would be treated with the new herbicides, and about three-fourths of these acres would be treated using imazapic. Imazapic could be used in all areas except riparian and wetland areas. Imazapic would be used to control downy brome, hoary cress, leafy spurge, perennial pepperweed, and several other invasive species that are known to displace native vegetation and alter wildfire intensity and frequency. Imazapic use would occur in the Great Basin where downy brome has replaced native shrubs after recent catastrophic fires. As noted above, several wildlife species populations have shown sharp declines in the Great Basin, apparently due to loss of sagebrush and other key habitat components.

About 2% of all treatment acres would be treated using Overdrive®. Overdrive® would be used on rangelands; ROW; oil, gas, and mineral sites; and cultural and recreation sites. This herbicide is not effective in downy brome control, but does control oak species to reduce hazardous fuels. It also can be used to control several annual broadleaf species, including burningbush, pigweed, and Russian thistle; several biennial species,

including bull, musk, and Scotch thistle, teasel, and diffuse knapweed; and several perennial species including spotted and Russian knapweed and field bindweed. As discussed earlier, these species displace native vegetation, which is more desirable to wildlife, and can lead to conditions that foster wildfires that kill or harm wildlife and destroy habitat.

In addition to being able to use four new herbicides under this alternative, the BLM would be able to use herbicides in Alaska, Nebraska, and Texas. Herbicide use should be avoided in Arctic tundra and subarctic forests. At this time, the BLM does not propose to conduct herbicide treatments in Arctic and subarctic tundra and forest habitats, but could do so in the future should the need arise and the agency deems that treatments were safe for wildlife and their habitats. If used, herbicide weed treatments would likely be targeted for developed areas and ROW. The ability to use herbicides in Nebraska and Texas would allow for more comprehensive weed management programs in these states, which should reduce the negative effects of invasive species on native vegetation and improve wildlife habitat.

Under this alternative, over 70% of treated acres would be in the Temperate Desert Ecoregion, a much greater proportion than under the No Action or other alternatives. Fifteen percent of treatments would occur in the Temperate Steppe Ecoregion. As with the No Action Alternative, treatments in the Temperate Desert Ecoregion would primarily target sagebrush, rabbitbrush, and other evergreen shrubland species, and annual grass and perennial forb weeds, while those in the Temperate Steppe Ecoregion would focus on control of invasive annual and perennial grasses and forbs. Much of the increase in treatment acreage in this region is associated with the Great Basin Restoration Initiative and related attempts to restore fire-damaged ecosystems and improve habitat for sage-grouse and other sagebrush-dependent species.

### Alternative C – No Use of Herbicides

Under Alternative C, wildlife would not be affected by herbicide use. Primary effects would stem from other vegetation treatment methods (see the accompanying PER). Positive ecosystem and habitat benefits as a result of vegetation management could be reduced under this alternative, as there are certain invasive species for which herbicide use is the only effective method of treatment or for which other methods are impractical due to cost, time, accessibility, or public concerns (e.g., saltcedar in riparian areas). For example, rough terrain

BLM_0000507

may prevent treatment by methods requiring terrestrial vehicle and/or foot access, while aerial treatment with herbicides in these areas would be possible. In addition, it is often difficult to eradicate some species, such as shrubs that resprout from rhizomes, by means other than herbicide application (e.g., rabbitbrush, honey mesquite, sand shinnery oak, tree cholla). Similarly, pre-emergent herbicides that persist in the soil are the most effective means of controlling invasive plants with seeds that remain viable for long periods of time.

Under this alternative, in the absence of herbicide treatments, invasive plant populations would likely continue to spread, possibly at increasing rates, and cause further damage to susceptible native plant communities and wildlife habitat, particularly in areas and for species where other treatment methods are not effective or possible (e.g., large tracts of rangeland or grassland dominated by invasive, resprouting shrubs or without enough fine fuels to carry prescribed fires). However, it is uncertain how potential negative impacts from this alternative (mostly indirect) would compare with negative direct and indirect impacts from herbicide use.

## Alternative D – No Aerial Applications

Alternative D would allow the use of the same herbicides in the same areas as under the Preferred Alternative, and would have similar benefits resulting from the increased availability of new and future herbicides. However, this alternative would not allow the use of aerial application methods, thereby dramatically reducing the acreage on which treatments (530,000 acres) would be possible because some large and remote areas cannot be effectively treated by ground application methods.

Because non-aerial treatments would be smaller, fewer wildlife would be exposed to herbicides than under alternatives with aerial treatment options (it would be difficult for most wildlife to avoid spray from aircraft by fleeing). Ground treatments would also be better able to avoid patches of important wildlife habitat or use areas within the larger treatment area than aerial treatments.

This alternative would result in fewer impacts to wildlife due to off-site drift than under the Preferred Alternative. Off-site drift was not specifically modeled for most herbicides (consumption of contaminated vegetation off site was modeled for most of the Forest Service herbicides, with no risk demonstrated for any of these herbicides except triclopyr at the maximum

application rate); however, off-site drift impacts to vegetation are somewhat common (see Vegetation section in this chapter), and could alter habitat as well as forage. Conversely, without the option for aerial spraying, the BLM would be unable to treat large areas of vegetation under Alternative D, which could negatively impact wildlife habitat in these areas over the long term.

Under this alternative, long-term negative impacts on wildlife habitat and ecosystems could be greater than any potential short-term negative effects to wildlife that would result from aerial applications under other alternatives. In addition, direct and indirect impacts from other vegetation treatment options could increase if these other treatments were used more extensively to compensate for the loss of acres able to be treated by herbicides (see the PER).

Prescribed fire and mechanical treatments would be substituted for aerial herbicide treatments as much as possible in large areas proposed for treatment. Fire would not be effective in areas with insufficient fuels to carry fire, and could kill or harm wildlife that were unable to flee, as well as substantially alter habitats. Fire could also result in substantial damage to sagebrush stands and enhance the development and spread of downy brome and other annual grasses (USDI BLM 1991a). Mechanical treatments might not be suitable in areas where sprouting species, such as rabbitbrush, might increase after mechanical treatment. This alternative would preclude treatment of large expanses of downy brome and other invasive annual grasses using imazapic and other herbicides.

## Alternative E – No Use of Acetolactate Synthase-inhibiting Active Ingredients

Approximately 466,000 acres would be treated under Alternative E, which is slightly less than the amount that would be treated under Alternative D, and less than half of the amount that would be treated under the Preferred Alternative. In addition to a relatively low impact to wildlife as a result of minimal acreage treated, per-treatment impacts under Alternative E would be lower than under the other herbicide-use alternatives because of some of the standards detailed by this alternative (e.g., preferential use of spot rather than broadcast applications, preferential treatment of small versus large infestations).

Sulfonylurea herbicides and other ALS-inhibiting herbicides (e.g., chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, sulfometuron methyl) block the

BLM_0000508

ENVIRONMENTAL CONSEQUENCES

synthesis of amino acids that are required for protein production and cell growth, thereby resulting in plant death. ALS-inhibiting herbicides would not be used under this alternative because data suggest they have the potential to damage off-site native and crop plant species under certain conditions of environment and application. These herbicides are biologically active at small concentrations, and relatively low application rates are necessary to manage target plants. In 1981, the Environmental Effects Division of the USEPA recommended against registering sulfonylurea herbicides because they persist for long periods of time in the environment and they cannot be detected at low levels. However, in this assessment, the ALS-inhibiting herbicides mostly posed no risk to terrestrial wildlife (chlorsulfuron, imazapic, sulfometuron methyl), except for a few cases of low risk (imazapyr, metsulfuron methyl), suggesting that prohibiting the use of these herbicides would not likely benefit wildlife and could indirectly harm wildlife if more toxic herbicides that are currently available to the BLM were used in their place.

Alternative E incorporates other management practices that would be likely to have positive impacts on wildlife communities and habitats. Alternative E would limit the use of broadcast applications, which would reduce the possible risks to wildlife associated with off-site drift and consumption of vegetation across large areas. However, these applications would be available for use in appropriate situations (i.e., where no other method was practical and susceptible non-target plant species and aquatic areas were distant from the application area), which would allow some positive ecosystem benefits from larger-scale herbicide applications. In addition, herbicides would not be used in National Riparian Conservation Areas, which would protect wildlife species that frequent the riparian zone and attendant ecosystem functions in these key areas. While per-treatment ecosystem benefits could be greater under Alternative E than under the other herbicide-use alternatives as a result of this ecosystem-based management approach, overall benefits to vegetation and ecosystems across the 17 western states (that cannot be attained by other treatment methods) would be lower under this alternative because of the relatively low treatment acreage and the inability to use certain practices in situations that might require their use (e.g., use of ALS-inhibiting herbicides on highly aggressive weeds).

## Mitigation for Herbicide Treatment Impacts

The following actions would reduce the risks to wildlife associated with herbicide applications:

- Apply dicamba, diuron, glyphosate, hexazinone, tebuthiuron, and triclopyr at the typical application rate to minimize risks to terrestrial wildlife.

- Minimize the size of application areas, where practical, when applying 2,4-D, bromacil, diuron, and Overdrive® to limit impacts to wildlife, particularly through the contamination of food items.

- Where practical, limit glyphosate and hexazinone to spot applications in rangeland and wildlife habitat areas to avoid contamination of wildlife food items.

- Avoid using glyphosate formulations that include R-11® in the future, and either avoid using any formulations with POEA, or seek to use the formulation with the lowest amount of POEA available to reduce risks to amphibians.

- Do not aerially apply diquat directly to wetlands or riparian areas.

- Do not apply bromacil and diuron in rangelands, and use appropriate buffer zones (see Vegetation section) to limit contamination of off-site vegetation, which may serve as forage for wildlife.

## Special Status Wildlife Species

### Introduction

As discussed in Chapter 3, public lands in the western U.S. support over 200 species of terrestrial wildlife (including birds, mammals, amphibians, reptiles, mollusks, and arthropods) that have been given a special status based on their rarity or sensitivity. Included are 67 species that are federally listed as threatened or endangered, or are proposed for federal listing. Some of these species have habitat requirements that have been or are being altered or reduced by invasions of non-native plant species. The *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment* (USDI BLM 2007b) provides a description of the distribution, life history, and current threats for each federally-listed

BLM_0000509

animal species, as well as species proposed for listing. The BA also discusses the risks to federally-listed terrestrial wildlife associated with each of the herbicides proposed for use by the BLM under the different alternatives.

## Impacts Assessment Methodology

The BLM reviewed the literature and findings from ERAs conducted by the BLM and Forest Service to assess the impacts to sensitive wildlife species from the use of herbicides (ENSR 2005b-k; SERA 2005a). The ERA methods are summarized earlier in this section. Methods used by the BLM are presented in detail in the *Vegetation Treatments Programmatic EIS Ecological Risk Assessment Protocol* (ENSR 2004) and in Appendix C; methods used by the Forest Service can be viewed at http://www.fs.fed.us/r6/invasiveplant-eis/.

As discussed earlier, the USEPA has defined various LOCs for use in assessing risks to different organisms. As far as risks to terrestrial wildlife are concerned, the LOC for acute risks to endangered species is the most conservative. However, there is only one LOC to determine chronic risks. Risk assessments completed by the BLM used the USEPA's chronic risk LOC and the acute high risk when documenting risks to most terrestrial wildlife. Risk assessments used the chronic risk LOC and the acute endangered species LOC when documenting risks to special status terrestrial wildlife.

There are potential risks to special status wildlife species associated with herbicide use. Although the predicted risks for adverse health effects to individual organisms are the same as those predicted for non special status wildlife, the associated population- and species-level effects would be much greater for many sensitive species because of their limited/fragmented distribution and limited population size. Risks to special status wildlife can be minimized by following certain SOPs, which can be implemented at the local level according to specific conditions (see Table 2-8). These SOPs include the following:

- Survey for special status wildlife species before treating an area. Consider effects to these species when designing treatment programs.

- Use drift reduction agents to reduce the risk of drift hazard.

- Select herbicide products carefully to minimize additional impacts from degradates, adjuvants, inert ingredients, and tank mixtures.

- Avoid treating vegetation during time-sensitive periods (e.g., nesting and migration) for species of concern in the area to be treated.

## Summary of Herbicide Effects to Special Status Wildlife Species

Non-native plant species reduce the suitability of some habitats to support special status wildlife species. For some species, particularly butterflies and moths, certain plant species must be present on a site to serve as larval host plants. Other species require, or at the very least prefer, certain plants as food sources. For example, lesser and Mexican long-nosed bats meet most of their dietary needs from agave and cactus (USFWS 1994b, 1995a), and the northern Idaho ground squirrel feeds on native bunchgrasses to fulfill a large portion of its dietary needs (USFWS 2000). Encroachment of non-native plant species, and displacement of native plant species that serve as important sources of food, reduces the suitability of the habitat for these wildlife species. Similarly, the risks to non-target plants associated with herbicide applications amount to indirect risks to these wildlife species through alteration of their habitat.

For some special status wildlife species it is the structure, rather than the species composition of the habitat, that makes it suitable. For example, the western snowy plover nests in areas where vegetation is sparse, the Yuma clapper rail is associated with dense marsh vegetation (USFWS 1997), the southwestern willow flycatcher occurs in riparian areas with dense growths of deciduous shrubs and trees (USFWS 1995b), and kangaroo rats require open, grassland conditions. In some cases, invasive plant species alter the structure of habitats, making them less suitable for supporting sensitive wildlife species (e.g., the encroachment of European beachgrass into western snowy plover habitat, or the exclusion of marsh vegetation by saltcedar and arrowweed in Yuma clapper rail habitat). For these species, use of herbicides to control weed infestations would likely provide a long-term benefit. In other cases, non-native plant species may invade an area without making drastic structural changes, and the suitability of the habitat, though not ideal, is maintained (e.g., thickets of saltcedar and Russian olive providing nesting habitat for the southwestern willow flycatcher, or desert kangaroo rats thriving in annual grasslands dominated by non-native plant species such as red brome). For these species, use of herbicides may result in some improvement of habitat, but the long-term benefits may not outweigh the short-term risks to the species associated with herbicide treatments.

BLM_0000510

ENVIRONMENTAL CONSEQUENCES

Some special status wildlife species occupy a wide variety of plant community types, as long as they provide adequate food, cover, and breeding/nesting/denning habitat. These species tend to be larger animals that cover a larger geographic area and eat a wide variety of food items, such as gray wolves, grizzly bears, and bald eagles. Although these species could potentially benefit to some degree from weed control, and are typically at low risk for impacts from exposure to herbicide, they may be impacted through disturbances associated with herbicide treatments (e.g., presence of herbicide applicators, trucks/ATVs, and/or helicopters in their habitat).

The most conservative LOC of 0.1 was used to determine risks to special status terrestrial wildlife species. Terrestrial herbicides with the greatest likelihood of impacting special status wildlife species, via any exposure pathway, include 2,4-D, bromacil, diuron, and hexazinone, for which moderate to high risks to special status terrestrial wildlife were predicted for applications at the typical application rate, under one or more exposure scenario (Table 4-24). Terrestrial herbicides with the least likelihood of impacting special status wildlife species include chlorsulfuron, diflufenzopyr, imazapic, and sulfometuron methyl, for which no risks to special status wildlife were predicted via any exposure pathway.

Although amphibians are considered terrestrial wildlife during their terrestrial phase, they do have an aquatic phase that is not represented by risk assessments for other terrestrial animals. For these species, ERAs assumed that risks to fish (see Fish and Other Aquatic Organisms section of this chapter) represent risks to aquatic amphibians. Aquatic herbicides with the greatest likelihood of impacting special status amphibian species during a normal application to an aquatic habitat are diquat and the more toxic formulation of glyphosate. Normal applications of 2,4-D and imazapyr would not pose a risk to aquatic amphibians. Terrestrial herbicides with the greatest likelihood of impacting special status amphibian species as a result of a spill, drift, accidental direct spray into an aquatic habitat, or surface runoff are bromacil, diuron, and picloram. The following herbicides would pose no risk to aquatic amphibians, according to ERAs: chlorsulfuron, diflufenzopyr, imazapic, Overdrive®, and sulfometuron methyl.

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under this alternative, approximately 305,000 acres of public lands would be treated with herbicides annually.

Based on the acreage that would be treated, it is likely that special status wildlife species would be exposed to herbicides less under this alternative than under the other herbicide-use alternatives. Adverse health effects associated with herbicide exposure should be less extensive as well. Risks to special status species would also be lower, although mitigation would be required to protect these species (as well as key plant food species) from harm under all alternatives, which should minimize differences in risk to special status species among the alternatives.

Out of the four herbicide-use alternatives, control of weed infestations would likely be the least extensive under this alternative, and weed populations would spread at a faster rate. Wildlife species for which native plant communities provide the most suitable habitat would likely fare the worst under this alternative, as far as the quality of their habitat was concerned. For wildlife species that can successfully utilize habitats comprised of non-native plant species, differences among alternatives would be less clear. Although control of weeds and encouragement of native conditions would typically benefit wildlife habitat in general, removal of species that provide key habitat components (such as saltcedar and Russian olive that support nesting southwestern willow flycatchers) could harm some special status species. There are also disturbances associated with herbicide applications that could temporarily impact some special status species. The degree of benefits and impacts to wildlife habitat from treatments would largely depend on where the treatments occurred.

Under this alternative, only those herbicides currently used by the BLM would be used to treat vegetation. The majority of the total acreage would continue to be treated with picloram, tebuthiuron, and 2,4-D. Out of all the herbicides currently used by the BLM, 2,4-D has the highest risk to wildlife, according to ERAs. Although it is likely that the BLM would continue to use 2,4-D extensively because it is inexpensive, alternatives that allow for the use of new herbicides (alternatives B, D, and E) may offer the BLM more options for substituting herbicides that are less toxic to wildlife where special status species occur. Picloram and tebuthiuron pose a low risk to wildlife if applied at the typical rather than the maximum application rate, so continued use of these herbicides would have little impact to special status wildlife species.

BLM_0000511

**TABLE 4-24**
**Risk Categories[1] Used to Describe BLM-evaluated Herbicide Effects on Special Status Wildlife According to Exposure Scenario**

| Application Scenario | BROM[1] | | CHLOR[1] | | DICAMBA | | DIFLU[1] | | DIQUAT | | DIURON | | FLUR[1] | | IMAZ[1] | | OVER[1] | | SULFM[1] | | TEBU[1] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[2] | Max[2] | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| **Direct Spray of Terrestrial Wildlife** | | | | | | | | | | | | | | | | | | | | | | |
| Small mammal – 100% absorption | 0[3] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pollinating insect – 100% absorption | L | L | 0 | 0 | L | L | 0 | 0 | L | M | L | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | M |
| Small mammal – 1st order dermal absorption | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Indirect Contact with Foliage After Direct Spray** | | | | | | | | | | | | | | | | | | | | | | |
| Small mammal – 100% absorption | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pollinating insect – 100% absorption | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Small mammal – 1st order dermal absorption | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Ingestion of Food Items Contaminated by Direct Spray** | | | | | | | | | | | | | | | | | | | | | | |
| Small mammalian herbivore – acute | 0 | L | 0 | 0 | 0 | L | 0 | 0 | 0 | L | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | M |
| Small mammalian herbivore – chronic | 0 | L | 0 | 0 | 0 | L | 0 | 0 | L | M | L | M | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Large mammalian herbivore – acute | 0 | M | 0 | 0 | 0 | L | 0 | 0 | L | M | 0 | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Large mammalian herbivore – chronic | L | M | 0 | 0 | L | M | 0 | 0 | L | M | M | H | 0 | 0 | 0 | 0 | L | M | 0 | 0 | 0 | L |
| Small avian insectivore – acute | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | M | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Small avian insectivore – chronic | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | M | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Large avian herbivore – acute | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | M | 0 | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Large avian herbivore – chronic | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | L | H | 0 | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Large mammalian carnivore – acute | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Large mammalian carnivore – chronic | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] BROM = Bromacil; CHLOR = Chlorsulfuron; DIFLU = Diflufenzopyr; FLUR = Fluridone; IMAZ = Imazapic; OVER = Overdrive®; SULFM = Sulfometuron methyl; and TEBU = Tebuthiuron.

[2] Typ = Typical application rate, and Max = Maximum application rate.

[3] Risk categories: 0 = No risk (majority of RQs < most conservative LOC for special status species); L = Low risk (majority of RQs 1-10x most conservative LOC for special status species); M = Moderate risk (majority of RQs 10-100x most conservative LOC for special status species); H = High risk (majority of RQs >100 most conservative LOC for special status species); and NE = Not evaluated. The Risk Category is based on the risk level of the majority of risk quotients observed in any of the scenarios for a given exposure group and receptor type. The reader should consult the risk tables in Chapter 4 of the ERAs (ENSR 2005b-k) to determine the specific scenarios that result in the displayed level of risk for a given receptor group.

ENVIRONMENTAL CONSEQUENCES

ENVIRONMENTAL CONSEQUENCES

### Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

Under the Preferred Alternative, approximately 932,000 acres of public lands would be treated with herbicides annually. Based on this acreage, the incidence of special status wildlife exposure to herbicides would be greater than under the other alternatives. Adverse health effects associated with herbicide exposure would likely be greater as well. Risks to special status species would be greater, although mitigation to protect these species and their habitats from harm, as identified in the BA, would be required under all alternatives, minimizing the differences in risk among alternatives.

Out of all the alternatives, the Preferred Alternative would likely result in the most extensive control of weed infestations, and it is expected that weed populations would spread at the lowest rate under this alternative. Positive and negative impacts to special status wildlife habitat resulting from herbicide treatments, as discussed under the No Action Alternative, would likely be in line with the amount of acreage treated under each alternative, and would therefore be greatest under this alternative.

Under the Preferred Alternative, the BLM would be able to use 14 of the 20 currently approved herbicides that are currently available for use under the No Action Alternative, as well as four new herbicides and other new herbicides that become available in the future. The two new terrestrial herbicides, imazapic and diflufenzopyr pose no risks to sensitive wildlife under all exposure scenarios analyzed in ERAs. Therefore, risks to special status terrestrial wildlife could be reduced under this alternative, provided the BLM used these herbicides in place of herbicides with higher risks to sensitive wildlife, such as 2,4-D and diuron.

Of the two new aquatic herbicides, diquat poses low to high risks to aquatic amphibians, depending on the application rate. There are no risks to aquatic amphibians associated with fluridone usage at the typical application rate, but low to moderate risks if it is used at the maximum application rate. If diquat were used instead of another less toxic herbicide to treat vegetation in habitats that support special status amphibians, herbicide-related impacts would likely be greater under the Preferred Alternative than under the No Action Alternative. Under the Preferred Alternative, however, less than 1% of acres treated with herbicides would be treated with diquat.

Because a greater number of herbicides would be available for use under this alternative, the BLM would have more flexibility to develop treatment programs that are more effective at improving wildlife habitat while minimizing risks to special status wildlife species than under the No Action Alternative. Of particular benefit to special status wildlife would be a suitable, inexpensive replacement for 2,4-D, which poses a high risk to terrestrial animals.

### Alternative C – No Use of Herbicides

Under this alternative, no public lands would be treated with herbicides. Therefore, there would be no impacts to special status wildlife species as a result of herbicide exposure during vegetation treatments. However, the BLM would likely be less effective at controlling weed infestations than under the other alternatives. Therefore, there would be fewer benefits to special status wildlife habitat under this alternative, as compared to the herbicide-use alternatives. In addition, if other treatment methods were used to control weeds in lieu of herbicides, the disturbance to wildlife habitat could be greater. Mechanical treatments, for example, would potentially be louder and more disturbing to wildlife, especially during the breeding season, and vegetation removal would potentially be more immediate and complete, with a greater likelihood of altering habitat characteristics and injuring small animals present on the site.

### Alternative D – No Aerial Application of Herbicides

Under this alternative, approximately 530,000 acres would be treated with herbicides annually, more than under all other alternatives except the Preferred Alternative. Based on acreage treated, the likelihood that special status wildlife species would be exposed to herbicides and suffer adverse health effects would be second highest under this alternative as well. Because aerial methods would not be used to apply herbicides, there would potentially be less risk that special status wildlife species would be inadvertently sprayed during treatments, but an increased risk of disturbing wildlife and crushing or hitting animals with trucks/ATVs because there would be more ground applications.

Benefits to wildlife habitat associated with herbicide treatments would not be as great as under the Preferred Alternative, particularly in areas that are inaccessible by ground methods. The degree of impact to special status wildlife would depend on which species were present in

BLM_0000513

areas that could not be treated, and whether non-native plant species are a threat to their habitat.

Under this alternative, the herbicides available for use by the BLM would be the same as those discussed for the Preferred Alternative. The benefits associated with flexibility in selecting herbicides, and in using new herbicides that become available in the future, would be the same as those discussed under the Preferred Alternative.

### *Alternative E – No Use of Acetolactate Synthase-inhibiting Active Ingredients*

Under this alternative, approximately 466,000 acres would be treated with herbicides annually, more than under the No Action Alternative, but fewer than under the other herbicide-use alternatives. Considering only acres treated, special status wildlife species would be less likely to be exposed to herbicides, and therefore would experience fewer herbicide-related impacts than under the other action alternatives (with the exception of Alternative C). Impacts to special status amphibians and riparian species from herbicides would be reduced under this alternative, since herbicide use would be discouraged in areas populated by amphibians, and would not occur in riparian conservation areas. Furthermore, the limit in broadcast applications under this alternative would decrease the likelihood that special status wildlife would be directly sprayed by herbicides.

Benefits to wildlife habitat associated with herbicide treatments would be minimized under this alternative, but would still be greater than those under the No Action Alternative and Alternative C. The increased emphasis on passive restoration under Alternative E would likely benefit some special status wildlife species by reducing disturbance and preventing the spread of weeds in some areas. With this type of management in place, it is possible that fewer vegetation treatments would be necessary in certain areas, minimizing risks to special status wildlife species.

Under this alternative, the BLM would not be able to use chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, sulfometuron methyl, or any other ALS-inhibiting herbicides that are made available in the future. According to the ERAs, there are no risks to special status wildlife associated with exposure to chlorsulfuron, imazapic, or sulfometuron methyl under any exposure pathway, even when applied at the maximum application rate. In addition, there are no risks associated with exposure to imazapyr or

metsulfuron methyl when applied at the typical application rate, except in the case of a small bird eating contaminated invertebrates (low risk). The risks associated with applying either of these two chemicals at the maximum application rate are none to low, depending on the exposure pathway. Since these ALS-inhibiting herbicides are among the most benign as far as risks to terrestrial animals are concerned, there would be no apparent benefit to special status wildlife from discontinuing their use. Furthermore, there could be increased risks to special status wildlife from exposure to herbicides under this alternative if more toxic herbicides (such as 2,4-D, diuron, or hexazinone) were used in place of ALS inhibitors.

The risks to special status amphibians associated with the use of ALS-inhibiting herbicides are generally none or low, with the exception of an accidental spill exposure of imazapyr. Therefore, increased risks to special status amphibians could occur if the BLM substituted more toxic herbicides (e.g., bromacil, diuron, or glyphosate) in place of ALS inhibitors. However, since use of herbicides would be discouraged in areas populated by amphibians under this alternative, impacts to special status amphibians could still be lower under this alternative than under the other herbicide-use alternatives.

Since the BLM would be able to use new herbicides that are made available in the future under this alternative, there would be more flexibility for creating effective treatment programs that minimize risks to special status wildlife species than under alternatives A and C. However, the inability to use ALS-inhibiting herbicides would reduce this flexibility below the level offered under alternatives B and D.

### Mitigation for Herbicide Treatment Impacts

The following mitigation is recommended to reduce the likelihood of impacts to special status terrestrial wildlife species from herbicide applications. This mitigation should be implemented in addition to the SOPs designed to protect wildlife and the general mitigation for wildlife.

- To protect special status wildlife species, implement all conservation measures for terrestrial animals presented in the *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment*. Apply these measures to sensitive species, as well as listed species (refer to conservation measures for a similar

BLM_0000514

ENVIRONMENTAL CONSEQUENCES

size and type of species, of the same trophic guild).

- Avoid using glyphosate formulations that include R-11® in the future, and either avoid using any formulations with POEA, or seek to use the formulation with the lowest amount of POEA available, to reduce risks to special status amphibians.

# Livestock

## Introduction

Public lands provide an important source of forage for many ranches and help to support the agricultural component of many communities scattered throughout the West. Approximately 165 million acres of public lands are open to livestock grazing, with use levels established by the Secretary of the Interior and administered through the issuance of grazing permits/leases. The majority of the grazing permits issued by the BLM involve grazing by cattle, with fewer and smaller grazing permits for other kinds of livestock, primarily sheep and horses. Many allotments are managed according to an allotment management plan, which outlines how livestock grazing is managed to meet multiple-use, sustained-yield, and other needs and objectives, as determined through LUPs. Even if there is no allotment management plan, grazing is managed to ensure that 1) watersheds are in or are making significant progress towards properly functioning physical condition; 2) ecological processes including the hydrologic cycle, nutrient cycle, and energy flow are maintained; 3) water quality complies with state water quality standards; and 4) habitats are or are making significant progress towards being restored or maintained for proposed, candidate or listed federal threatened and endangered species and other special status species.

## Scoping Comments and Other Issues Evaluated in the Assessment

This section aims to contribute to the understanding of the impacts of herbicides on non-target species, focusing on livestock.. Evaluation of direct impacts of herbicides to livestock will help in the selection of less-toxic herbicides where feasible, which was a scoping concern identified by numerous respondents.

The alternatives present a variety of herbicide use levels (including no use) for evaluation of relative positive and negative effects on livestock, and one of the alternatives will evaluate the relative impacts of aerial versus ground application on livestock; these were key issues identified in the scoping process. Evaluation of the effects of herbicide use on livestock is in concert with the goal identified by some respondents of improving the management of public lands for multiple use and public benefit.

## Standard Operating Procedures

Herbicide use poses a potential risk to livestock; however, risk can be minimized by following certain SOPs, which can be implemented at the local level according to specific conditions. The following general procedures are designed to reduce potential unintended impacts to livestock from the application of herbicides in the BLM vegetation management program:

- Whenever possible and whenever needed, schedule treatments when livestock are not present in the treatment area. Design treatments to take advantage of normal livestock grazing rest periods, when possible.

- As directed by the herbicide label, remove livestock from treatment areas prior to herbicide application, where applicable.

- Use herbicides of low toxicity to livestock, where feasible.

- Take into account the different types of application equipment and methods, where possible, to reduce the probability of contamination of non-target food and water sources.

- Avoid use of diquat in riparian pasture while pasture is being used by livestock.

- Notify permittees of the project to improve coordination and avoid potential conflicts and safety concerns during implementation of the treatment.

- Notify permittees of livestock grazing or feeding restrictions, if necessary (see below for restrictions associated with each herbicide).

- Notify adjacent landowners prior to treatment.

- Provide alternate forage sites for livestock, if possible.

BLM_0000515

These procedures would help minimize impacts to livestock and rangeland on western BLM lands to the extent practical. As a result, long-term benefits to livestock from the control of invasive species would likely outweigh any short-term negative impacts to livestock associated with herbicide use.

## Impacts Assessment Methodology

The BLM reviewed the literature and findings from ERAs conducted by the BLM and Forest Service to assess the impacts to livestock from the use of herbicides (ENSR 2005b-k; SERA 2005a). Risks to livestock were not specifically evaluated in these documents, which focused on risks to plants, fish and wildlife. However, results from the evaluation of terrestrial animal species can be applied to livestock species (i.e., results for large herbivores [154 pound mule deer] are applied to evaluate risks to common grazing animals on BLM lands—cows, sheep, and horses). The ERA methods are summarized in the Wildlife section of this chapter. Methods used by the BLM are presented in detail in the *Vegetation Treatments Programmatic EIS Ecological Risk Assessment Protocol* (ENSR 2004) and in Appendix C; methods used by the Forest Service can be viewed on the Internet at http://www.fs.fed.us/r6/invasiveplant-eis/.

## Summary of Herbicide Impacts

The extent of direct and indirect impacts to livestock would vary by the effectiveness of herbicide treatments in controlling target plants (that are not used as forage) and promoting the growth of native vegetation (that is used as forage), the extent and method of treatment (e.g., aerial vs. ground) and chemical used (e.g., toxic vs. non-toxic, selective vs. non-selective), the physical features of the terrain (e.g., soil type, slope), and the weather conditions (e.g., wind speed) at the time of application. Possible adverse direct effects to individual animals include death, damage to vital organs, change in body weight, decreases in healthy offspring, and increased susceptibility to predation. Possible adverse indirect effects include reductions in forage amount and preferred forage type. The impacts of herbicide use on livestock would depend directly on the sensitivity of each species to the particular herbicides used, the pathway by which the individual animal was exposed to the herbicide, and indirectly on the degree to which a species or individual is positively or negatively affected by changes in rangeland conditions, including forage quality and availability.

Livestock would have a greater chance of being directly adversely impacted by herbicide use if their range extent was partially or completely sprayed because they would have greater exposure to herbicides—either via direct contact with the herbicide upon application or indirect contact via dermal contact with vegetation or ingestion of vegetation. However, livestock could be removed from an area during vegetation treatment, or treatments could be scheduled to occur when livestock were not present, reducing the potential risks. If livestock are removed from the area specifically to facilitate vegetation treatment, the grazing permittee would be adversely affected as a result of the area being unavailable for grazing purposes. The permittee would need to either find alternative pasture somewhere else, or modify ranching operations to account for the unavailable forage, which would result in increased costs and/or a loss of income.

Even though large treatments (e.g., aerial applications on rangelands) would usually occur when livestock are not in the treated pasture, some risk of indirect contact and consumption of contaminated vegetation over a large area would still exist. Some spot treatments could be applied at any time, regardless of the presence of livestock, but in situations where spot treatments are proposed in livestock concentration areas such as riparian areas, treatments may need to be conducted when livestock are not present or temporary fencing may be needed to reduce livestock exposure.

Livestock may experience greater impacts in systems where herbicide transport is more likely, such as areas where herbicides are aerially sprayed adjacent to rangeland, dry areas with high winds, or areas where rainfall is high and soils are porous; however these scenarios have not been modeled. The degree of interception by vegetation, which depends on site and application characteristics, would also affect direct spray impacts. As is evident, the impacts of herbicide use on livestock would be site and application specific, and as such, site assessments would have to be performed, using available impact information, to determine an herbicide-use strategy that would minimize impacts to livestock.

The BLM and Forest Service risk assessments suggested several possible common impacts of herbicides to livestock (ENSR 2005b-k; SERA 2005a). Livestock, which likely consume large amounts of grass, have a relatively greater risk for harm than animals that feed on other herbaceous vegetation or seeds and fruits, because herbicide residue is higher on

BLM_0000516

ENVIRONMENTAL CONSEQUENCES

grass than it is on other plants (Fletcher et al. 1994, Pfleeger et al. 1996); this is especially evident when examining risk levels of large mammalian herbivores in the BLM risk assessments. However, harmful doses of herbicide are not likely unless the animal forages exclusively within the treatment area for an entire day, suggesting that smaller treatments may be more appropriate for rangelands in cases where an herbicide has demonstrated risk to herbivores under scenarios involving consumption of contaminated vegetation.

In cases where herbicide treatments reduce the cover of noxious and unpalatable weeds on grazed lands, there would be short- and long-term benefits to livestock from increased quality of forage. In some cases, herbicides are the most effective means of controlling or eradicating invasive plant species. Noxious weed infestations can greatly reduce the land's carrying capacity for domestic livestock, which tend to avoid most- weeds (Olson 1999). Cattle, in particular, preferentially graze native plant species over weeds, which often have low palatability as a result of defenses such as toxins, spines, and/or distasteful compounds. In addition, some noxious weeds (e.g., common tansy, houndstongue, Russian knapweed, and common St. Johnswort) are poisonous to livestock. Although goats and sheep are more likely to consume alien weeds than cattle, they also tend to select native or introduced forage species over weeds (Olsen and Wallander 1998, Olson 1999). The success of weed removal would determine the level of benefit of the treatments over the long term.

Treatments that reduce the risk of future catastrophic wildfire through fuels reduction would also benefit livestock. Weeds that may present a fire hazard in rangelands include downy brome, Russian thistle, burningbush, oak, pinyon, and juniper. Uncontrolled, high intensity wildfires can remove forage from large tracts of rangeland, reducing its suitability for livestock grazing. Some herbicides are approved for use in BLM programs for rangeland as well as fuels management (e.g., glyphosate).

Over the short term, there would be minor impacts to livestock rearing as a result of mandatory restrictions associated with the use of herbicides. Livestock owners would not be able to slaughter (for food) animals that have consumed forage that has been treated with certain herbicides within the time period specified on the herbicide label. In addition, dairy animals would not be allowed to graze on areas treated with certain chemicals for the time period specified on the label.

**Impacts of BLM-evaluated Herbicides**

According to BLM risk assessments, herbicide exposure scenarios of direct spray, spill, and indirect contact with foliage after direct spray do not pose a risk to small mammals (large mammals were not modeled, but have a smaller surface area to body weight ratio, so are less likely to be impacted by these scenarios than small mammals; Table 4-25). Several herbicides do pose a risk to large mammalian herbivores under a scenario of ingestion of food items contaminated by direct spray. Risks to livestock associated with each individual herbicide are presented below. See the tables and figures in Section 4 of the ERAs (ENSR 2005b-k) for each herbicide for risk information on applicable ecological receptor groups according to herbicide application method. Also, see Table 4-25 in this section for a summary of the typical degree of risk each of the BLM herbicides pose to possible livestock receptors under different routes of exposure. Large mammalian herbivores were evaluated for a scenario in which they ingest food items contaminated by direct spray of the herbicide. The receptor chosen for the large mammalian herbivore was a 154-pound mule deer. Chlorsulfuron, imazapic, and Overdrive® are the BLM-evaluated herbicides that would be most likely to be used in rangeland situations with grazing livestock. However, it is possible that other herbicides used nearby could impact livestock if they are transported off site.

### Bromacil

Bromacil does not present a risk to small mammals via direct spray or indirect contact with foliage after direct spray (Table 4-25; ENSR 2005b). These scenarios are very conservative because they assume 100% absorption and because small mammals have a relatively larger surface area for absorption of herbicide. Therefore, it is unlikely that bromacil would affect larger livestock under these scenarios. No acute risk and low chronic risk were predicted for a large mammalian herbivore ingesting vegetation sprayed at the typical application rate, and low acute and moderate chronic risks were predicted for ingestion scenarios at the maximum application rate. Therefore, direct spray of bromacil onto rangeland could pose a risk to livestock consuming sprayed vegetation. The prediction of chronic risk to livestock suggests that caution is needed in applying this herbicide in forage areas, particularly over large areas. However, bromacil is a non-selective herbicide that is not registered for application on rangelands or other livestock grazing areas where some vegetative cover is desired, suggesting that under

BLM_0000517

ENVIRONMENTAL CONSEQUENCES

**TABLE 4-25**

**Risk Categories Used to Describe BLM-evaluated Herbicide Effects on Livestock and Wild Horses and Burros According to Exposure Scenario**

| Application Scenario | BROM[1] | | CHLOR | | DICAMBA | | DIFLU | | DIQUAT[2] | | DIURON | | FLUR[2] | | IMAZ | | OVER | | SULFM | | TEBU | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[3] | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| **Direct Spray of Terrestrial Wildlife** | | | | | | | | | | | | | | | | | | | | | | |
| Small mammal – 100% absorption | 0[4] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Small mammal – 1st order dermal absorption | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Indirect Contact with Foliage After Direct Spray** | | | | | | | | | | | | | | | | | | | | | | |
| Small mammal – 100% absorption | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Small mammal – 1st order dermal absorption | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Ingestion of Food Items Contaminated by Direct Spray** | | | | | | | | | | | | | | | | | | | | | | |
| Small mammalian herbivore – acute | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Small mammalian herbivore – chronic | 0 | L | 0 | 0 | 0 | L | 0 | 0 | L | M | L | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Large mammalian herbivore – acute | 0 | L | 0 | 0 | 0 | L | 0 | 0 | 0 | M | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Large mammalian herbivore – chronic | L | M | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | L | M | M | H | 0 | 0 | 0 | 0 | L | M | 0 | L |

[1] BROM = Bromacil; CHLOR = Chlorsulfuron; DIFLU = Diflufenzopyr; FLUR = Fluridone; IMAZ = Imazapic; OVER = Overdrive®; SULFM = Sulfometuron methyl; and TEBU = Tebuthiuron.

[2] Diquat and fluridone are aquatic herbicides that would not be used in terrestrial areas. Therefore, exposure of livestock via direct spray is less likely than with the other herbicides.

[3] Typ = Typical application rate; and Max = Maximum application rate.

[4] Risk categories: 0 = No risk (majority of RQs < most conservative LOC for livestock); L = Low risk (majority of RQs 1-10x most conservative LOC for livestock); M = Moderate risk (majority of RQs 10-100x most conservative LOC for livestock); and H = High risk (majority of RQs >100x most conservative LOC for livestock). The Risk Category is based on the risk level of the majority of risk quotients observed in any of the scenarios for a given exposure group and receptor type. The reader should consult the risk tables in Chapter 4 of the ERAs (ENSR 2005b-k) to determine the specific scenarios that result in the displayed level of risk for a given receptor group.

ENVIRONMENTAL CONSEQUENCES

typical use bromacil would not impact livestock. Any risk would come from off-site transport of bromacil to livestock grazing areas—a situation that could be avoided by following SOPs, including the use of appropriate buffer zones to prevent drift to off-site vegetation (see Vegetation section). Use of bromacil in spot applications or over small areas is not likely to impact livestock. Based on label directions, there are no restrictions on livestock use of treated areas.

### Chlorsulfuron

Risk quotients for mammalian receptors for all modeled scenarios were below the conservative LOC of 0.1, indicating that direct spray of chlorsulfuron is not likely to pose a risk to livestock (ENSR 2005c). Therefore, as chlorsulfuron is likely to be used in rangelands, this herbicide would primarily affect (positively or negatively) livestock through changes in the quality and abundance of forage. If used properly, its use in range and pasture areas could benefit livestock over the long term by controlling unpalatable invasive plant species and promoting the establishment and growth of native plant species that may be more desirable for forage. Based on label directions, there are no restrictions on livestock use of treated areas.

### Dicamba

Overdrive® is a formulation of dicamba and diflufenzopyr; an analysis of risks to livestock for dicamba was conducted during preparation of the Overdrive® ERA. However, an ERA report for dicamba was not done by the BLM as part of this PEIS, although some information on dicamba is included in the Overdrive® ERA. The Forest Service conducted an ERA for dicamba, and the reader is encouraged to review this document (available at: http://www.fs.fed.us/foresthealth/pesticide/risk.shtml).

The ingestion of food items contaminated by direct spray of dicamba at the maximum application rate would pose a low acute and chronic risk to large mammalian herbivores. Because dicamba is proposed for use in rangelands and forestlands and does have moderate residual activity, livestock may be at risk from the application of this chemical, particularly if it is sprayed throughout the range area. The use of dicamba in rangeland could benefit livestock by controlling unpalatable invasive plant species and promoting the establishment and growth of native plant species that may be more suited for forage. However, because chlorsulfuron and imazapic are less risky to livestock and have similar target species, these herbicides could

be considered for use instead of dicamba, where possible. Based on label directions, there are no restrictions on livestock use of treated areas, other than for lactating animals.

### Diflufenzopyr

Risk quotients for terrestrial animals were all below the most conservative LOC of 0.1, indicating that direct spray of diflufenzopyr is not likely to pose a risk to livestock (ENSR 2005d). Diflufenzopyr is proposed for use with the active ingredient dicamba in the herbicide Overdrive®, which may be used in rangelands. Based on label directions, there are no restrictions on livestock use of treated areas.

### Diquat

For large mammalian herbivores ingesting food items contaminated by diquat, there would be a low chronic risk if the food was directly sprayed at the typical application rate, and a moderate acute and chronic risk if the food was sprayed at the maximum application rate (ENSR 2005e). This suggests that livestock could be at risk from the short- and long-term consumption of vegetation contaminated by diquat. Although registered for non-cropland and aquatic applications, use on public lands would be limited to aquatic applications. Thus, the likelihood of exposure of livestock to diquat is minimal. Livestock that feed exclusively in riparian areas, where drift might impact riparian grasses, and/or drink water from ponds treated with diquat are potentially at risk. These unlikely scenarios were not directly modeled because livestock will be removed from areas where diquat is used to avoid potential exposure.

### Diuron

For scenarios involving large mammalian herbivores ingesting food items contaminated by diuron, there would be no acute risks but there would be high chronic risk if the food was directly sprayed at the typical application rate, and moderate acute and chronic risk if the food was sprayed at the maximum application rate (ENSR 2005f). However, because diuron is a non-selective herbicide, it is not likely to be used in rangelands where some vegetative cover is desired; therefore, its exposure to livestock would be limited. If typically foraged rangeland plants were protected from off-site transport of diuron, such as with appropriate buffer zones (see Vegetation section), livestock should not be at risk from off-site drift or surface runoff of diuron. Based on label directions, there are no restrictions on livestock use of treated areas.

BLM_0000519

### Fluridone

Risk quotients for large terrestrial animals were below the most conservative LOC of 0.1 for all scenarios (ENSR 2005g). These results indicate that accidental direct spray or drift of this aquatic herbicide would be unlikely to pose a risk to livestock.

### Imazapic

Risk quotients for terrestrial animals were all below the most conservative LOC of 0.1, indicating that direct spray of imazapic would be unlikely to pose a risk to livestock (ENSR 2005h). Therefore, since imazapic would likely be used in rangelands, it would primarily affect (positively or negatively) livestock through changes in the quality and abundance of forage. If applied properly, use of imazapic in range and pasture areas could benefit livestock over the long term by controlling unpalatable invasive plant species and promoting the establishment and growth of native plant species that may be more desirable for forage. Based on label directions, there are no restrictions on livestock use of treated areas.

### Overdrive®

Overdrive® poses a low chronic risk to large mammalian herbivores that consume plants contaminated by direct spray at the typical application rate and a moderate risk for ingestion scenarios involving direct spray at the maximum application rate (ENSR 2005i). Because Overdrive® is proposed for use in rangelands and has moderate residual activity, livestock may be at risk from the application of this chemical, particularly if it is sprayed throughout the range area. The use of Overdrive® in rangeland could benefit livestock by controlling unpalatable invasive plant species and promoting the establishment and growth of native plant species that may be more suited for forage. However, because chlorsulfuron and imazapic are less risky to livestock and have similar target species, these herbicides could be considered for use instead of Overdrive®, where possible. Based on label directions, there are no restrictions on livestock use of treated areas.

### Sulfometuron Methyl

Risk quotients for terrestrial animals were all below the most conservative LOC of 0.1, indicating that direct spray of sulfometuron methyl would be unlikely to pose a risk to livestock (ENSR 2005j). This herbicide is relatively non-selective, and is not registered for sites that are grazed. Thus, it should not impact livestock.

### Tebuthiuron

For large mammalian herbivores ingesting food items contaminated by tebuthiuron, there would be a low acute and chronic risk if the food was directly sprayed at the maximum application rate (ENSR 2005k). The strength of this herbicide is its use as a habitat modifier in the BLM shrub reduction program; it is relatively non-selective but does not tend to harm grasses present. Therefore, impacts to livestock would be unlikely with intended use of this herbicide. According to the label for Spike 80DF, which has tebuthiuron as an active ingredient, if a treated area is to be used for haying or grazing, no more than 5 pounds per acre of Spike 80DF should be applied, and the product should not be applied more than once per year.

## Impacts of Forest Service-evaluated Herbicides

The following information for eight herbicides proposed for use by the BLM is taken from ERAs performed by the Forest Service to support assessment of the environmental consequences of using these herbicides in Forest Service vegetation management programs (risk assessment results available at SERA [2005a]). Because the Forest Service completed these ERAs prior to completion of the PEIS, the BLM would use these ERAs to assess the potential ecological impacts of using these herbicides in future BLM vegetation management activities. The BLM previously evaluated and approved these eight herbicides in an earlier EIS—*Vegetation Treatment on BLM Lands in Thirteen Western States* (USDI BLM 1991a). As part of its risk assessments (see USDA Forest Service 2005), the Forest Service developed worksheets (see SERA 2005b), which allowed the BLM to assess the risks of the herbicides using its own maximum application rates and LOCs (rather than the Forest Service rates and LOCs), and to parallel the BLM risk assessment process as much as possible. However, modeled risk scenarios for terrestrial animals may be different than those used for the BLM-evaluated herbicides, depending on the specificity of available toxicity data. The assessment of impacts below is presented using the Forest Service upper estimates of HQs, to maximize the conservatism of the assessment. In addition, it should be noted that the HQs developed by the Forest Service (as well as the BLM) are already conservative for many reasons (e.g., assumption of 100% dermal absorption, assumption of 100% of diet contaminated, use of most sensitive values for exposure and dose/response assessments). 2,4-D,

BLM_0000520

ENVIRONMENTAL CONSEQUENCES

clopyralid, glyphosate, metsulfuron methyl, and triclopyr are the Forest Service-evaluated herbicides that are most likely to be used in rangeland situations with grazing livestock. However, it is possible that other herbicides used nearby could impact livestock if they were transported off site.

### 2,4-D

2,4-D does present some risk to livestock under direct spray and ingestion scenarios (Table 4-26; SERA 1998). Large livestock may face less risk from direct spray than small livestock because they have a smaller surface area to volume ratio over which to absorb the herbicide. Direct spray impacts to livestock can largely be prevented if animals are removed from target areas before spraying 2,4-D. Small mammals, and perhaps smaller livestock, face low risk from the consumption of water contaminated by a spill. In addition, livestock face risk from the consumption of vegetation contaminated by 2,4-D at the application site: large mammals face moderate acute and chronic risk, and small mammals face low acute risk, for both the typical and maximum application rates. Large livestock that primarily consume grasses are particularly susceptible to adverse effects under the vegetation consumption scenarios, although long-term consumption of contaminated vegetation may be unlikely if the vegetation shows signs of damage. The risk assessment suggests that because large livestock eating large quantities of grass and other vegetation are at risk from routine exposure to 2,4-D and because 2,4-D is considered for use in rangeland, this herbicide should not be applied over large application areas where livestock would only consume contaminated food.

According to label directions for one formulation, dairy animals should be kept out of areas treated with 2,4-D for 7 days. Grass for hay should not be harvested for 30 days after treatment. Meat animals should be removed from treated areas 3 days prior to slaughter. Similar restrictions may be in place for other formulations, but users of 2,4-D should consult label directions before applying formulations of this active ingredient.

### Clopyralid

According to the Forest Service risk assessment (SERA 2004b), clopyralid is not likely to pose a risk to terrestrial animals. However, there are a few scenarios involving clopyralid applications under which livestock would be at low risk. For all modeled application rates, small mammals are at low chronic and acute risk from 100% absorption of direct spray and consumption of contaminated insects, and large mammals face risk low chronic and acute risks from consumption of contaminated vegetation at the typical and maximum application rates. Application of clopyralid at the maximum application rate also poses a low chronic risk to large mammals consuming on-site contaminated vegetation. The most likely livestock risk scenario would be the consumption of contaminated grass across large areas by large livestock, which could be avoided by restricting access of livestock to sprayed areas. In addition, all risks identified fall within the lowest risk category.

According to label directions, there are no restrictions on grazing or hay harvest following application at labeled rates, and livestock should not be transferred from treated grazing areas to sensitive broadleaf crop areas without first allowing for 7 days of grazing on untreated pasture.

### Glyphosate

Livestock face some risk from the use of glyphosate in rangelands. Direct spray of a small animal, assuming 100% absorption, poses a low risk at the typical application rate and moderate risk at the maximum application rate (SERA 2003a). Smaller livestock, such as sheep and goats, are more likely to experience adverse effects from direct spray than larger livestock, such as cattle and horses, because of their larger surface area-to-body weight ratios. Direct spray impacts can largely be prevented if livestock are removed from the target area before spraying glyphosate. Large mammals consuming contaminated vegetation face low acute risk for scenarios involving the typical application rate, and moderate acute risk for scenarios involving the maximum application rate, and low chronic risk for scenarios involving maximum application rate. Small mammals face low risk from consumption of contaminated vegetation (fruit) sprayed at the maximum application rate. The most likely risk scenario is the consumption of contaminated vegetation (acute exposure), which is particularly risky for cattle because they consume large amounts of grasses, which contain higher herbicide residue levels than other herbaceous vegetation and seeds. Glyphosate is used in rangelands for the management of grasses and broadleaves, including woody species, and it is non-selective, suggesting that spot applications in rangeland would be the most appropriate use of this herbicide. Spot applications would reduce risks associated with

BLM_0000521