**TABLE 4-26**
**Risk Categories Used to Describe Forest Service-evaluated Herbicide Effects on Livestock
and Wild Horses and Burros According to Exposure Scenario**

| | 2,4-D | | Clopyralid | | Glyphosate[1] | | Hexazinone | | Imazapyr | | Metsulfuron | | Picloram | | Triclopyr[1] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[2] | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| **Acute/Accidental Exposures** | | | | | | | | | | | | | | | | |
| Direct spray, small mammal, 1st order absorption | L[3] | L | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | L | M |
| Direct spray, small animal, 100% absorption | M | M | L | L | L | M | L | M | 0 | L | 0 | L | L | L | L | M |
| Consumption of contaminated fruit, small mammal | L | L | 0 | 0 | 0 | L | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated grass, large mammal | M | M | L | L | L | M | L | M | 0 | L | 0 | L | L | M | L | M |
| Consumption of contaminated water, small mammal, spill | L | L | 0 | 0 | 0 | L | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Consumption of contaminated water, small mammal, stream | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Chronic Exposures** | | | | | | | | | | | | | | | | |
| Consumption of contaminated vegetation, small mammal, on-site | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated vegetation, small mammal, off-site | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated vegetation, large mammal, on-site | M | M | 0 | L | 0 | L | L | M | 0 | 0 | 0 | 0 | 0 | 0 | L | M |
| Consumption of contaminated vegetation, large mammal, off-site | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Consumption of contaminated water, small mammal | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] Risk categories are the same for both evaluated formulations.
[2] Typ = Typical application rate; and Max = maximum application rate.
[3] Risk categories: 0 = No risk (HQ < LOC); L = Low risk (HQ = 1 to 10 x LOC); M = Moderate risk (HQ = 10 to 100 x LOC); and H = High risk (HQ > 100 LOC). Risk categories are based on upper estimates of hazard quotients and the BLM LOCs of 0.1 for acute scenarios and 1.0 for chronic scenarios. The reader should consult the text of this section of the individual Forest Service risk assessments to evaluate risks at central estimates of hazard quotients.

ENVIRONMENTAL CONSEQUENCES

consumption of contaminated vegetation, as fewer non-target areas would be impacted by direct spray or spray drift. Based on label directions, there are no restrictions on livestock use of treated areas.

### Hexazinone

Applications of hexazinone at the typical and maximum application rates would pose a low to moderate risk to livestock under several exposure scenarios (SERA 1997). Small mammals face low risk from direct spray at the maximum application rate, assuming 1st order dermal absorption, and low to moderate risk assuming 100% dermal absorption. Acute exposure through consumption of contaminated vegetation sprayed at the maximum application rate poses a low risk to small mammals; and acute and chronic exposure through consumption of contaminated vegetation poses a moderate risk to large mammals. Also, acute exposure through consumption of contaminated water sprayed at the maximum application rate poses a low risk to small mammals. It appears that livestock are at risk from the application of hexazinone, but if food and water sources are not contaminated, risks are reduced, as direct spray can be avoided by removing livestock from the target area prior to treatment. Contamination of food and water sources could be minimized by utilizing spot applications of hexazinone at the typical application rate. Because hexazinone is used for woody species, it is not likely to be applied in rangelands where invasive plants are usually grasses or herbaceous vegetation. In addition, hexazinone is semi-selective, and is typically only applied in spot applications; therefore, risks to livestock under normal application may be lower than those predicted by the risk assessment. According to label directions, livestock should not be grazed, nor forage or hay cut, on treated areas for 60 days after application.

### Imazapyr

Applications of imazapyr at the typical application rate should not pose a risk to livestock, assuming that livestock consume primarily vegetation (SERA 2004d). Applications at the maximum application rate, however, would pose a low risk to livestock under a couple exposure scenarios: direct spray of a small animal and consumption of contaminated vegetation by a large mammal. Imazapyr is not registered for use in rangelands; therefore, it is unlikely that impacts via direct spray or consumption of contaminated vegetation would occur. The chance of adverse effects could be further minimized by removing livestock from areas near application sites prior to spraying and by observing

appropriate buffer distances from rangeland vegetation when applying imazapyr (see Vegetation section). Based on label directions, there are no restrictions on livestock use of treated areas.

### Metsulfuron Methyl

Livestock face minimal risk from the application of metsulfuron methyl. None of the HQs estimated for exposure to metsulfuron methyl exposure when applied at the typical application rate indicate risk to any of the terrestrial animal receptors (SERA 2004e). Applications at the maximum application rate pose a low risk to small animals under scenarios involving 100% absorption of direct spray and to large mammals under scenarios involving consumption of contaminated vegetation. Metsulfuron methyl is registered for use in rangeland, but impacts to livestock are unlikely if the typical application rate is used. If the maximum application rate is used, impacts to livestock can be avoided by removing livestock from application areas prior to spraying and by limiting the size of the application area or restricting access of livestock to recently sprayed areas to prevent consumption of large amounts of sprayed vegetation. Based on label directions, there are no restrictions on livestock use of treated areas for application rates of $1^2/_3$ ounces active ingredient per acre or less. If greater amounts of metsulfuron methyl are used, forage grasses may be cut for hay, fodder, or green forage and fed to livestock, including lactating animals, 3 days after treatment.

### Picloram

Application of picloram is not likely to impact livestock. Most of the HQs for the evaluated scenarios of picloram exposure were below the LOC for both the typical and maximum application rates (SERA 2003b). Under two scenarios, HQs were above the LOC, indicating a low to moderate risk for applications at the typical and maximum application rates: 100% absorption of direct spray by a small animal and acute exposure through consumption of contaminated vegetation by a large mammal. Picloram is registered for use in rangeland, and can be applied over large areas, as its primary targets are broadleaf and woody species. Therefore, it might be used to manage certain broadleaved plants without impacting native or desirable grasses. Impacts to livestock can be avoided by removing animals from application areas prior to spraying picloram and by limiting the size of the application area or restricting livestock access to recently sprayed areas to prevent consumption of large amounts of sprayed vegetation.

BLM_0000523

Picloram has a number of restrictions on use in areas grazed by livestock or used for cutting hay. In general, livestock should not be grazed on treated areas, nor should hay be cut, for 2 weeks after treatment.

### Triclopyr

Triclopyr presents some risk to livestock, particularly through the consumption of contaminated vegetation (SERA 2003c). Because risk categories determined using calculated HQs for the two evaluated formulations of triclopyr (triclopyr acid and triclopyr BEE) are the same, no differentiation will be made between these two formulations in this section. The following scenarios pose a low risk for applications at the typical application rate, and moderate risk for applications at the maximum application rate: first-order and 100% absorption of direct spray by a small mammal, and acute and chronic exposure through consumption of on-site contaminated vegetation by a large mammal. In addition, for applications at the maximum application rate, there would be a low risk associated with exposure through acute consumption of water contaminated by a spill by the small mammal and chronic exposure through consumption of off-site contaminated vegetation by the large mammal. No risk is predicted for small mammals as a result of acute or chronic exposure through consumption of contaminated vegetation or water. Triclopyr can be used in rangelands to selectively manage woody species without impacting native or desirable grasses. It also has low residual activity. Impacts to livestock can be avoided by removing animals from application areas prior to spraying and by limiting the size of the application area or restricting access of livestock to recently sprayed areas to prevent consumption of large amounts of sprayed vegetation.

There are few grazing restrictions for triclopyr, except for lactating dairy cattle. Hay should not be harvested within 14 days of application. Although cattle can graze at any time they would be removed from treated areas at least 3 days prior to slaughter.

### Impacts of Other Herbicides Currently Available for Use

2,4-DP, asulam, atrazine, fosamine, mefluidide methyl, and simazine were approved for use in the earlier BLM EISs. 2,4-DP could be used in forested rangeland, but would not be used in areas where livestock graze. It has low toxicity to mammals. Asulam is of low toxicity to mammals, but livestock should not graze in treated areas or be fed forage from treated areas. It would primarily be used in the control of brackenfern on

forested rangelands (Information Ventures, Inc. 1995a). Atrazine could be used for vegetation treatments in conifer plantations, but would not be used in forested or other rangelands where livestock might come in contact with the herbicide. It is slightly to moderately toxic to mammals (Information Ventures, Inc. 1995b; Extension Toxicology Network 1996e). Fosamine does not have a rangeland registration and would not be used where livestock graze. It is practically nontoxic to mammals (USEPA 1995). Mefluidide would not be cost-effective to use on rangelands. It is of low to moderate toxicity to mammals (Information Ventures, Inc. 1995c). Simazine could be used by the BLM on Christmas tree plantations, but would likely not be used where livestock graze. Simazine has low toxicity to most mammals, although sheep and cattle are more sensitive to simazine than other mammals, and a dose as low as 500 mg/kg can be fatal (Information Ventures, Inc. 1995d). The BLM has not used any of these herbicides, except fosamine (< 50 acres annually), since 1997, and does not plan to utilize them in the near future.

## Impacts by Alternative

The following sections discuss the expected effects of each of the five alternatives on livestock, and compare the effects expected under each alternative with those expected under the other alternatives. These effects may vary depending on the percentage of acres treated using different application methods and different herbicides, as well as on the size of treatment events.

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under the No Action Alternative, the BLM would continue its ongoing vegetation treatment programs in 14 western states, and would be able to use 20 herbicides previously approved under earlier RODs. Herbicide use under the No Action Alternative could impact livestock over an estimated 305,000 acres. Impacts to livestock (positive and negative) would be similar in nature those that have occurred in the past 10 years. Negative impacts to livestock may be lower than under the other herbicide-use alternatives because fewer total acres would be treated using herbicides. However, long-term positive impacts on livestock communities (i.e., improvements in rangeland forage) could be lower under this alternative, as well. Invasive plant populations would likely continue to expand at the current rate or more quickly, potentially increasing damage to desirable native forage, and the abundance of unpalatable or toxic plants.

ENVIRONMENTAL CONSEQUENCES

Because the new herbicides proposed in this PEIS (diquat, fluridone, imazapic, and Overdrive®) would not be used under this alternative, risks to livestock would be different than under the other alternatives. Fluridone and imazapic do not present any risks to livestock in modeled scenarios (similar to chlorsulfuron, metsulfuron methyl, and sulfometuron methyl), and Overdrive® poses low to moderate risk to large livestock under chronic exposure scenarios in which the animal ingests contaminated vegetation over a long time period. Diquat is fairly toxic to livestock, particularly under food ingestion scenarios (similar to 2,4-D and diuron). However, because diquat would be used by the BLM as an aquatic herbicide, frequent exposure to livestock would not be expected. Therefore, the No Action Alternative would prevent the BLM from using a greater repertoire of herbicides that are not injurious to terrestrial animals, possibly resulting in greater per area risks to livestock than under the other alternatives if more injurious herbicides (e.g., 2,4-D, bromacil, diuron, tebuthiuron, triclopyr) were used instead of safer alternatives, as well as decreasing the possibilities of more effective rangeland improvements. Conversely, prohibiting the use of diquat, particularly in rangeland riparian areas, could result in somewhat lower per area risk to livestock than under the other alternatives.

2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine were approved for use in the earlier BLM EISs, but the BLM has not used any of these herbicides, except fosamine (< 50 acres annually) since 1997, and does not plan to utilize them in the near future. None of these herbicides would normally be used in rangeland treatments where livestock might come into contact with the chemical. Instead, the BLM would use other herbicides, including triclopyr, sulfometuron methyl, bromacil, diuron, and Overdrive®, which are effective in controlling weeds and invasive vegetation, but have less risk to livestock.

## Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

The Preferred Alternative would result in the treatment of approximately 932,000 acres in 17 western states. In addition to the 14 previously approved herbicides, the BLM would be able to use the four new herbicides evaluated in this PEIS. This alternative would result in the most extensive effects to livestock (both negative and positive) because it proposes the most acres for treatment (3 times the acreage that would be treated under the No Action Alternative). The extent of positive and negative impacts to livestock would depend on the

relative amount each of the herbicides was used, whether they would be applied in rangeland environments, and the method of application. The chance for negative impacts would be highest if diuron, diquat, bromacil and/or 2,4-D were used extensively. However, diquat would be used by the BLM as an aquatic herbicide, and bromacil and diuron are non-selective herbicides that are not likely to be used extensively in rangelands. If these herbicides were used in restricted scenarios, as proposed, and other herbicides were used effectively to increase the abundance of native forage relative to unpalatable weeds, positive impacts to livestock could outweigh negative impacts. Furthermore, the ability to use the four new herbicides (diquat, fluridone, imazapic, and Overdrive®) as well as future herbicides that become registered with the USEPA would allow BLM managers more options in choosing herbicides that best match treatment goals and application conditions and are less toxic. As a result, there could be an increase in per capita benefits and a reduction in overall per capita risks to livestock (three of the four new herbicides present little to no risk to livestock), and an increase in habitat and ecosystem benefits from treatment. This alternative would also reduce risks and negative impacts associated with other vegetation management methods (e.g., risk of escaped prescribed fires; see the PER).

## Alternative C – No Use of Herbicides

Under Alternative C, livestock would not be affected by herbicide use. Primary impacts would stem from other vegetation treatment methods (see the PER). Positive benefits to rangelands as a result of vegetation management could be reduced under this alternative, as certain invasive species are only effectively controlled by herbicides, and in some situations other methods are impractical due to cost, time, or public concerns. For example, mechanical and manual methods are impractical over large land areas, which are more effectively treated by broadcast herbicide applications. In addition, it is often difficult to eradicate some species (e.g., rabbitbrush, honey mesquite, sand shinnery oak, tree cholla), by means other than herbicide application. Similarly, pre-emergent herbicides that persist in the soil are the most effective means of controlling invasive plants with seeds that remain viable for long periods of time.

Under this alternative, without the use of herbicides, invasive plant populations would likely continue to spread, possibly at increasing rates. The spread of invasive plant populations would cause further damage to susceptible native plant communities, including

BLM_0000525

rangeland communities that provide forage for livestock, particularly in situations where other treatment methods would not be effective or feasible (e.g., large tracts of rangeland or grassland dominated by invasive, resprouting shrubs; or areas without enough fine fuels to carry prescribed fires). The spread of invasive plant populations would likely have deleterious effects on livestock. Rangeland that contains excessive or unpalatable brush cover is less useful for grazing and has reduced carrying capacity for domestic livestock. Similarly, capacity for cattle grazing decreases proportionately with loss of forage caused by weed infestation. Economic returns in terms of improved grazing value typically exceed herbicide treatment costs on lands where herbicides are used to control weeds (Olson 1999). In addition, acres infested by noxious weeds that are toxic to livestock, including common tansy, leafy spurge, Russian knapweed, common St. Johnswort, tansymustard, and yellow starthistle, would increase; in contrast, these species would be targeted by the BLM for herbicide treatments under the other alternatives.

**Alternative D – No Aerial Applications**

Alternative D would be the same as the Preferred Alternative as far as herbicides that could be used, and areas that could be treated. Therefore, both alternatives would be equally likely to have both positive and negative effects on livestock and rangeland. The BLM would be able to choose from a suite of currently-approved herbicides and herbicides that could be approved under this PEIS, or in the future. However, this alternative would not allow the BLM to apply herbicides aerially. Fewer acres would be treated (535,000 acres) because some large areas, including rangelands, cannot be effectively treated by ground application methods. This alternative would substantially reduce the impacts of off-site drift to livestock, an exposure scenario that is not specifically modeled for most herbicides (consumption of contaminated vegetation off-site was modeled for most of the Forest Service herbicides, with no risk demonstrated to livestock for any of these herbicides, except triclopyr when applied at the maximum application rate). Conversely, without the option to spray herbicides aerially, large areas of rangeland may remain untreated under Alternative D, and which could negatively impact livestock habitat and forage in these areas over the long term.

Under this alternative, long-term negative impacts to rangeland could be greater than any potential short-term negative effects to livestock that would result from

aerial applications, particularly given that livestock would be removed from rangeland application areas before aerial spraying. Furthermore, most of the herbicides that are potentially damaging to livestock (e.g., bromacil, diquat, diuron, glyphosate, hexazinone, tebuthiuron) are not likely to be applied aerially in rangelands, and aerial spraying of other damaging herbicides (e.g., 2,4-D, Overdrive®) could be avoided. In addition, direct and indirect impacts from other vegetation treatment options could increase if these methods were used more extensively to compensate for the reduced number of acres treated by herbicides (see PER).

**Alternative E – No Use of Acetolactate Synthase-inhibiting Active Ingredients**

Approximately 466,000 acres would be treated under Alternative E, which is slightly less than the acreage that would be treated under Alternative D, and less than half of the acreage that would be treated under the Preferred Alternative, but is still an increase from the average annual treatment acreage that has occurred over the past 8 years and would likely occur under the No Action Alternative. Herbicide-related impacts to livestock would be lower under this alternative than under the Preferred Alternative because fewer acres would be treated with herbicides, and additional protective standards would be required during herbicide treatment (e.g., preferential use of spot rather than broadcast applications, preferential treatment of small versus large infestations).

Sulfonylurea herbicides and other ALS-inhibiting herbicides (e.g., chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, sulfometuron methyl) block the synthesis of amino acids that are required for protein production and cell growth, thereby resulting in plant death. ALS-inhibiting herbicides would not be used under this alternative because data suggest they have the potential to damage off-site native and crop plant species under the right conditions of environment and application. These herbicides are biologically active at low concentrations, and are applied at lower application rates than other herbicides to manage target plants. It is uncertain whether use of these herbicides would result in fewer cases of unintended damage to livestock and rangeland due to lower application rates, or more cases due to the high potency of the herbicides and their persistence. In 1981, the Environmental Effects Division of the USEPA recommended against registering sulfonylurea herbicides because they persist for long periods of time in the environment and they cannot be detected at low levels. However, risk

BLM_0000526

ENVIRONMENTAL CONSEQUENCES

assessments did not predict risk to livestock for any of the ALS-inhibiting herbicides, when applied at the typical application rate, under any of the modeled scenarios, suggesting that prohibiting the use of these herbicides would not benefit livestock and could indirectly harm livestock if more toxic herbicides were used in their place.

Alternative E incorporates other management practices that would be likely to have positive impacts on livestock and rangelands. Alternative E would limit the use of broadcast applications, which would reduce the possible risks to livestock associated with off-site drift and consumption of vegetation across large areas. However these applications would be available for use in appropriate situations (i.e., where no other method is practical, and susceptible non-target plant species and aquatic areas are distant from the application area), which would result in some ecosystem benefits from larger-scale herbicide applications. While per-treatment ecosystem benefits may be greater under Alternative E than under the other herbicide-use alternatives as a result of this ecosystem-based management approach, overall positive vegetation and ecosystem benefits (that cannot be attained by other treatment methods) across the western states would be lower under this alternative because of the relatively small treatment acreages and the inability to use certain practices in situations that might require their use (e.g., use of ALS-inhibitor herbicides on highly aggressive weeds). For example, imazapic, which has been shown to be effective in treating downy brome and leafy spurge, would be unavailable under this alternative. The BLM would also be unable to use chlorsulfuron and metsulfuron methyl to control yellow starthistle and several species of thistle that are harmful to livestock.

## Mitigation for Herbicide Treatment Impacts

The following actions would greatly reduce the risk of herbicide applications to livestock:

- Apply diuron, glyphosate, hexazinone, tebuthiuron, and triclopyr at the typical, rather than maximum, application rate to minimize risks to livestock.

- Do not apply 2,4-D, bromacil, dicamba, diuron, Overdrive[®], picloram, or triclopyr across large application areas, where feasible, to limit impacts to livestock, particularly through the contamination of food items.

- Where feasible, limit glyphosate and hexazinone to spot applications in rangeland to avoid contamination of food items.

- Do not aerially apply diquat directly to wetlands or riparian areas.

- Do not apply bromacil or diuron in rangelands, and use appropriate buffer zones (see Vegetation section in this chapter) to limit contamination of off-site rangeland vegetation.

# Wild Horses and Burros

## Introduction

The BLM, in conjunction with the Forest Service, manages wild horses and burros on BLM- and Forest Service-administered lands through the *Wild Free-Roaming Horse and Burro Act of 1971*. Animals are managed within 201 Wild Horse and Burro herd management areas, with the goal of maintaining the natural ecological balance of public lands as well as the ability to support multiple uses. Public lands inhabited by wild horses or burros are closed to grazing by domestic horses and burros under permit or lease. In FY 2005, wild horse and burro populations on public lands totaled over 31,760 animals, with nearly half of these animals living in Nevada (Table 3-7). Another 25,000 animals are held in holding pens. The population of wild horses and burros is approximately 4,000 animals above the Appropriate Management Level (AML) of 27,500. The AML is an estimate of the number of wild horses and burros that public lands can support while maintaining a thriving natural ecological balance (USDI BLM 2006c, d).

The proposed herbicide vegetation management activities could affect wild horses and burros through exposure to chemicals that could harm their health, or through changes in vegetation that could positively or negatively alter the carrying capacity of the HMAs. Adverse impacts to wild horses and burros could include direct harm to wild horses and burros and a reduction in the availability or quality of forage in HMAs (decreasing the carrying capacity of the HMAs). Alternately, herbicide vegetation management activities could improve the amount and quality of forage, potentially increasing the carrying capacity of the HMAs.

BLM_0000527

## Scoping Comments and Other Issues Evaluated in the Assessment

This section aims to contribute to the understanding of the impacts of herbicides on non-target species, focusing on wild horses and burros. The evaluation of the direct impacts of herbicides to wild horses and burros would help in the selection of less-toxic herbicides where feasible, a scoping concern identified by numerous respondents. The alternatives present a variety of herbicide use levels (including no use) for evaluation of relative positive and negative effect on wild horses and burros (i.e., results for large terrestrial animal herbivores can be applied to wild horses and burros (i.e., results for large herbivores [154 pound mule deer] are used to evaluate risks to common grazing animals on public lands, including wild horses and burros). The ERA methods are summarized in the Wildlife Resources section of this chapter. Methods used by the BLM are presented in detail in the *Vegetation Treatments Programmatic EIS Ecological Risk Assessment Protocol* (ENSR 2004) and in Appendix C. Methods used by the Forest Service can be viewed on the Internet at http://www.fs.fed.us/r6/invasiveplant-eis/.

## Standard Operating Procedures

Herbicide use carries a potential risk to wild horses and burros. However, risks can be minimized by following certain SOPs, which can be implemented at the local level according to specific conditions (see Table 2-8). These SOPs include the following:

- Use herbicides of low toxicity to wild horses and burros, where feasible.

- Remove wild horses and burros from identified treatment areas prior to herbicide application, in accordance with label directions for livestock.

- Take into account the different types of application equipment and methods, where possible, to limit the probability of contaminating non-target food and water sources.

These procedures would help to minimize impacts to wild horses and burros and rangeland on western public lands to the extent practical. As a result, long-term benefits to wild horses and burros from the control of invasive species would likely outweigh any short-term negative impacts to these animals associated with herbicide use.

## Impacts Assessment Methodology

The BLM reviewed the literature and findings from ERAs conducted by the BLM and Forest Service to assess the impacts to wild horses and burros from the use of herbicides (ENSR 2005b-k; SERA 2005a). Risks to wild horses and burros were not specifically evaluated in these documents, which focused on risks to plants, fish, and wildlife. However, results from the evaluation of large terrestrial animal herbivores can be applied to wild horses and burros (i.e., results for large herbivores [154 pound mule deer] are used to evaluate risks to common grazing animals on public lands, including wild horses and burros). The ERA methods are summarized in the Wildlife Resources section of this chapter. Methods used by the BLM are presented in detail in the *Vegetation Treatments Programmatic EIS Ecological Risk Assessment Protocol* (ENSR 2004) and in Appendix C. Methods used by the Forest Service can be viewed on the Internet at http://www.fs.fed.us/r6/invasiveplant-eis/.

## Summary of Herbicide Impacts

The extent of direct and indirect impacts to wild horses and burros would vary by the effectiveness of herbicide treatments in controlling target plants (that are not used as forage) and promoting the growth of native vegetation (that is used as forage); the extent and method of treatment (e.g., aerial vs. ground); the chemical used (e.g., toxic vs. non-toxic, selective vs. non-selective); the physical features of the terrain (e.g., soil type, slope); the weather conditions (e.g., wind speed); and the time of year (e.g., newborn horses and burros would be susceptible during foaling season, with March through June being a critical period) at the time of application. Potential adverse direct effects to individual animals as a result of exposure to herbicides include death, damage to vital organs, change in body weight, decreases in healthy offspring, and increased susceptibility to predation.

Adverse indirect effects could include reductions in forage amount and preferred forage type. Additionally, wild horses and burros may move out of herd management areas and onto lands that are not legally designated for wild horse and burro management. Possible positive effects include improvement in the quality and amount of forage and improvement in general habitat conditions. The impacts of herbicide use on wild horses and burros would depend directly on the sensitivity of each species to the particular herbicides used and the pathway by which the individual animal is

BLM_0000528

ENVIRONMENTAL CONSEQUENCES

exposed to the herbicide, and indirectly on the degree to which a species or individual is positively or negatively affected by changes in herd management area conditions.

Wild horses and burros would have a greater chance of exposure to herbicides—either via direct contact with the herbicide upon application or indirect contact via dermal contact with vegetation or ingestion of vegetation—if their range extent was partially or completely sprayed. However, it is unlikely that the entire range of a horse or burro herd would be sprayed, as these animals are wide ranging, and herd management areas are often larger than 10,000 to 100,000 acres (most treatments [77%] would be less than 1,000 acres).

Wild horses and burros may also experience greater impacts under conditions where herbicide transport is more likely, such as in areas where herbicides are aerially sprayed adjacent to herd management areas, dry areas with high winds, or areas with extensive rainfall and porous soils. However, these scenarios were not modeled.

The BLM and Forest Service risk assessments suggested several possible common impacts of herbicides to wild horses and burros (USDA Forest Service 2005; ENSR 2005b-k; SERA 2005a). Wild horses and burros, which likely consume large quantities of grass, are at relatively greater risk for harm than smaller wildlife or wildlife that feed on other herbaceous vegetation, seeds, or fruits, which have less herbicide residue than grass (Fletcher et al. 1994; Pfleeger et al. 1996). This is especially evident in the sections of the BLM ERAs that examine risk levels of large mammalian herbivores. However, harmful doses of herbicide may be unlikely unless the animal forages exclusively within the treatment area for an entire day, suggesting that smaller treatments may be more appropriate for herd management areas in cases where risk to herbivores from the consumption of contaminated vegetation is predicted by the ERAs.

In cases where herbicide treatments are able to reduce the cover of noxious and unpalatable weeds on grazed lands and replace them with more palatable native plants, there would be benefits to wild horses and burros associated with increased availability and quality of forage. An increase in the amount of forage within a given herd management area could increase the carrying capacity of that area. Many herd management areas are currently overburdened with wild horse and burro populations that exceed the appropriate management level.

Herbicide use, or a combination of herbicide use and another treatment method, may be the most effective means of controlling or eradicating some invasive plant species. Noxious weed infestations can greatly reduce the land's carrying capacity for domestic wild horses and burros, which tend to avoid weeds that have low palatability as a result of defenses such as toxins, spines, and/or distasteful compounds (e.g., thistle [Olson 1999]). In addition, some noxious weeds (e.g., horsetail, wild mustard, poison hemlock, tansy ragwort, yellow starthistle, and common St. Johnswort) are poisonous to horses. Grazing may ultimately be an effective means of managing invasive plants in HMAs. However, if vegetation is overgrazed (e.g., as a result of HMAs supporting horses and wild burros in excess of the AML), another method, such as herbicide treatment, is required to return vegetation to a more desirable composition, followed by grazing within the carrying capacity of the HMA. The success of weed removal would determine the level of benefit of the treatments over the long term.

Treatments that reduce the risk of future catastrophic wildfire through fuels reduction would also benefit wild horses and burros. Weeds of concern that could be found in rangelands include downy brome, medusahead, halogeton, rabbitbrush, diffuse knapweed, Russian thistle, and perennial pepperweed. Uncontrolled, high intensity wildfires can remove forage from large tracts of rangeland, reducing its suitability for wild horse and burro grazing. Some herbicides are approved for use in BLM programs for rangeland as well as fuels management (e.g., glyphosate, imazapic, sulfometuron methyl).

**Impacts of BLM-Evaluated Herbicides**

BLM risk assessments indicate that herbicide exposure scenarios of direct spray and spill and indirect contact with foliage after direct spray would pose a risk to small mammals (large mammals were not modeled, but have a smaller surface area-to-body weight ratio, and are less likely to be impacted under these scenarios than small mammals). Several herbicides would pose a risk to large mammalian herbivores under the scenario of ingestion of food items contaminated by direct spray. Specific estimated risks to wild horses and burros from each individual herbicide are presented below. See the tables and figures in Section 4 of the ERAs (ENSR 2005b-k) for each herbicide for risk information on applicable ecological receptor groups according to herbicide

BLM_0000529

application method. Also, see Table 4-25 for a summary of the typical degree of risk each of the BLM herbicides poses to wild horse and burro receptors under different routes of exposure. Small mammals were used in direct spray and indirect contact with directly sprayed foliage scenarios. Because small mammals have a relatively larger surface area for absorption of herbicide and because 100% absorption is assumed, it is unlikely that wild horses and burros would be at more risk than small mammals. Large mammalian herbivores were used in the ingestion of food items contaminated by direct spray scenario. The receptor chosen for the large mammalian herbivore was a 154-pound mule deer. Chlorsulfuron, imazapic, and Overdrive® are the BLM-evaluated herbicides that are most likely to be used in rangeland situations with grazing wild horses and burros; however, it is possible that other herbicides used nearby could impact wild horses and burros if they were transported off site.

### Bromacil

Bromacil does not present a risk to small mammals via direct spray or indirect contact with foliage after direct spray (ENSR 2005b). These scenarios are very conservative because they assume 100% absorption, and small mammals have a relatively larger surface area for absorption of herbicide than large mammals. Therefore, it is unlikely that bromacil would affect larger wild horses and burros under these scenarios. No acute risk and low chronic risk were predicted for a large mammalian herbivore ingesting vegetation sprayed at the typical application rate, and low acute and moderate chronic risks were predicted for ingestion scenarios at the maximum application rate. Therefore, direct spray of bromacil onto rangeland could pose a risk to wild horses and burros that consume sprayed vegetation. The predicted chronic risk to wild horses and burros suggests that caution is needed in applying this herbicide in HMAs, particularly over large areas. However, because bromacil is a non-selective herbicide and is registered for non-cropland applications, it is not likely to be used in HMAs where vegetative cover is desired, suggesting that under typical use bromacil would not impact wild horses and burros. Any risk would come from off-site transport of bromacil to wild horse and burro grazing areas—a situation that could be avoided by following SOPs, including the use of appropriate buffer zones to prevent drift to off-site vegetation (see Vegetation section of this chapter). Use of bromacil in spot applications or over small areas would be unlikely to impact wild horses and burros.

### Chlorsulfuron

Risk quotients for mammalian receptors for all modeled scenarios were all below the most conservative LOC of 0.1, indicating that direct spray of chlorsulfuron would not likely pose a risk to wild horses and burros (ENSR 2005c). Therefore, as chlorsulfuron may be used in HMAs, this herbicide would primarily affect (positively or negatively) wild horses and burros through changes in the quality and abundance of forage. If used properly, its use in range and pasture areas could benefit wild horses and burros over the long term by controlling unpalatable invasive plant species and promoting the establishment and growth of native plant species that may be more desirable for forage.

### Dicamba

Overdrive® is a formulation of dicamba and diflufenzopyr; an analysis of risks to horses and burros for dicamba was conducted during preparation of the Overdrive® ERA. However, an ERA report for dicamba was not done by the BLM as part of this PEIS, although some information on dicamba is included in the Overdrive® ERA. The Forest Service conducted an ERA for dicamba, and the reader is encouraged to review this document (available at http://www.fs.fed.us/foresthealth/pesticide/risk.shtml).

The ingestion of food items contaminated by direct spray of dicamba at the maximum application rate poses a low acute and chronic risk to large mammalian herbivores. Because dicamba is proposed for use in rangelands and forestlands and has moderate residual activity, wild horses and burros may be at risk from the application of this chemical, particularly if it is sprayed throughout the range area. The use of dicamba in rangeland could benefit wild horses and burros by controlling unpalatable invasive plant species and promoting the establishment and growth of native plant species that may be more suited for forage. However, because chlorsulfuron and imazapic are less risky to wild horses and burros and have similar target species, these herbicides could be considered for use instead of dicamba, where possible.

### Diflufenzopyr

Risk quotients for terrestrial animals were all below the most conservative LOC of 0.1, indicating that direct spray of diflufenzopyr would not likely pose a risk to wild horses and burros (ENSR 2005d). Diflufenzopyr is proposed for use with the active ingredient dicamba in

BLM_0000530

ENVIRONMENTAL CONSEQUENCES

the herbicide Overdrive®, which may be used in rangelands.

### Diquat

Ingestion of food items contaminated by direct spray would pose a low chronic risk to large mammalian herbivores if diquat was applied at the typical application rate, and moderate acute and chronic risk if applied at the maximum application rate (ENSR 2005e). This suggests that wild horses and burros could be at risk from the short- and long-term consumption of vegetation contaminated by diquat. However, because diquat is an aquatic herbicide that is not proposed for use in terrestrial areas, the likelihood that wild horses and burros would be exposed to diquat is very minimal. Of most concern would be wild horses and burros that feed exclusively in riparian areas, where drift might impact riparian grasses; however, this unlikely scenario was not modeled.

### Diuron

Ingestion of food items contaminated by direct spray of diquat would pose no acute risk and moderate chronic risk to large mammalian herbivores if diuron was applied at the typical application rate, and low acute risk and high chronic risk if applied at the maximum application rate (ENSR 2005f). However, because diuron is a non-selective herbicide and is registered for non-cropland applications, it is not likely to be used in rangelands where some vegetative cover is desired. Therefore, exposure of wild horses and burros to diuron would be limited. If typically foraged rangeland plants were protected from off-site transport of diuron, such as with appropriate buffer zones (see Vegetation section in this chapter), then wild horses and burros would not likely be at risk from off-site drift or surface runoff of diuron.

### Fluridone

Risk quotients for large terrestrial animals were below the most conservative LOC of 0.1 for all scenarios (ENSR 2005g). These results indicate that accidental direct spray or drift of this aquatic herbicide would not likely pose a risk to wild horses and burros.

### Imazapic

Risk quotients for terrestrial animals were all below the most conservative LOC of 0.1, indicating that direct spray of imazapic would not likely pose a risk to wild horses and burros (ENSR 2005h). Proper use of imazapic in range and pasture areas could benefit wild horses and burros over the long term by controlling unpalatable invasive plant species and promoting the establishment and growth of native plant species that may be more desirable for forage.

### Overdrive®

Overdrive® poses low chronic risk to large mammalian herbivores that consume plants contaminated by direct spray at the typical application rate and a moderate risk for ingestion rates at the maximum application rate (ENSR 2005i). Because Overdrive® is proposed for use in rangelands and has moderate residual activity, wild horses and burros may be at risk from the application of this chemical, particularly if it is sprayed throughout the range area (an unlikely scenario). The use of Overdrive® in rangeland could benefit wild horses and burros by controlling unpalatable invasive plant species and promoting the establishment and growth of native plant species that may be more suited for forage. However, because chlorsulfuron and imazapic are less risky to wild horses and burros and have similar target species, these herbicides could be considered for use instead of Overdrive®, where possible.

### Sulfometuron Methyl

Risk quotients for terrestrial animals were all below the most conservative LOC of 0.1, indicating that direct spray of sulfometuron methyl is not likely to pose a risk to wild horses and burros (ENSR 2005j). Because this herbicide is relatively non-selective, it is not likely to be used in HMAs, and therefore, should result in few negative or positive impacts on wild horses and burros.

### Tebuthiuron

The ingestion of food items contaminated by direct spray of tebuthiuron at the maximum application rate would pose a low acute and chronic risk to large mammalian herbivores (ENSR 2005k). Tebuthiuron is not prominently used in rangeland habitat; the strength of this herbicide is its use as a habitat modifier, including thinning sagebrush to improve sage-grouse habitat. It is relatively non-selective but does not tend to harm grasses that are present. Therefore, impacts to wild horses and burros would be unlikely with intended use of this herbicide.

**Impacts of Forest Service-evaluated Herbicides**

The following information for eight herbicides proposed for use by the BLM is taken from ERAs performed by

BLM_0000531

the Forest Service to support assessment of the environmental consequences of using these herbicides in Forest Service vegetation management programs (risk assessment results available at USDA Forest Service [2005] and SERA [2005a]). Because the Forest Service completed these ERAs prior to completion of the PEIS, the BLM would use these ERAs to assess the potential ecological impacts of using these herbicides in future BLM vegetation management activities. The BLM previously evaluated and approved these eight herbicides in an earlier EIS—*Vegetation Treatment on BLM Lands in Thirteen Western States* (USDI BLM 1991a). As part of its risk assessments (see USDA Forest Service 2005), the Forest Service developed worksheets (see SERA 2005b), which allowed the BLM to assess risks of the herbicides using its own maximum application rates and LOCs (rather than the Forest Service rates and LOCs), to parallel the BLM process as much as possible. However, modeled risk scenarios for terrestrial animals may be different than those used for the BLM-evaluated herbicides, depending on the specificity of available toxicity data. The assessment of impacts below is presented using the Forest Service upper estimates of HQs, to maximize the conservatism of the assessment. In addition, it should be noted that the development of HQs by the Forest Service and the BLM is already conservative for many reasons (e.g., assumption of 100% dermal absorption, assumption of 100% of diet contaminated, use of most sensitive values for exposure and dose/response assessments). 2,4-D, clopyralid, glyphosate, metsulfuron methyl, and triclopyr are the Forest Service-evaluated herbicides that are most likely to be used in rangeland situations with grazing wild horses and burros. However, it is possible that other herbicides used nearby could impact wild horses and burros if they were transported off site.

### 2,4-D

2,4-D could pose a risk to some wild horses and burros as a result of direct spray as well as ingestion of sprayed vegetation (Table 4-26; SERA 1998). Adult wild horses and burros may face less risk from direct spray than young wild horses and burros because they have a smaller surface area to volume ratio over which to absorb the herbicide. Direct spray impacts to wild horses and burros from 2,4-D can largely be prevented if animals are removed from target areas before spraying. In addition, wild horses and burros face risk from the consumption of vegetation contaminated by 2,4-D at the application site; large mammals face moderate acute and chronic risk for ingestion scenarios involving both the typical and maximum application rates, and small mammals face low acute risk for ingestion scenarios involving the typical and maximum application rates. Large wild horses and burros that primarily consume grasses are particularly susceptible to risk under the vegetation consumption scenarios. However, long-term consumption of contaminated vegetation may be unlikely if the vegetation shows signs of damage. The risk assessment suggests that because large wild horses and burros eating large quantities of grass and other vegetation could be at risk from routine exposure to 2,4-D, and because 2,4-D is considered for use in rangeland, this herbicide should not be applied over large application areas where foragers would consume only contaminated food.

### Clopyralid

According to the Forest Service risk assessment (SERA 2004b), clopyralid unlikely to pose a risk to terrestrial animals. However, under a few scenarios there would be a low acute risk to wild horses and burros. Small mammals are at risk from 100% absorption of direct spray and consumption of contaminated insects, and large wild horses and burros face risk from the consumption of contaminated vegetation. Application of clopyralid at the maximum application rate also poses low chronic risk to large wild horses and burros consuming on-site contaminated vegetation. The most likely risk scenario would be the consumption of contaminated grass across large areas by wild horses and burros, which could likely be avoided by restricting access of these animals to sprayed areas. In addition, all risks identified fall within the lowest risk category.

### Glyphosate

Wild horses and burros would face some risk from the use of glyphosate in rangelands. Direct spray of a small animal, assuming 100% absorption, would pose a low risk if glyphosate was applied at the typical application rate, and a moderate risk if applied at the maximum application rate (SERA 2003a). Risks to small wild horses and burros from direct spray would likely be greater than risk to large wild horses and burros, because of their larger surface area to body weight ratios. Direct spray impacts from glyphosate can largely be prevented if wild horses and burros are removed from the target area before spraying glyphosate. For large mammals consuming contaminated vegetation, there would be low acute risk associated with applications at the typical application rate, and moderate acute risk and low chronic risk associated with applications at the maximum application rate. For small mammals there would be low risk associated with

BLM_0000532

ENVIRONMENTAL CONSEQUENCES

consumption of contaminated vegetation sprayed at the maximum application rate. The most likely risk scenario is the acute consumption of contaminated vegetation, which is particularly risky for herbivores that consume large amounts of grasses, which contain higher herbicide residue levels than other herbaceous vegetation and seeds. Glyphosate is used in rangelands for the management of grasses and broadleaves, including woody species. It is non-selective, suggesting that spot applications in rangeland would be the most appropriate use of this herbicide, because they would reduce of the likelihood that wild horses and burros would consume contaminated vegetation, since fewer non-target areas would be impacted by direct spray or spray drift.

### Hexazinone

At the typical and maximum application rates, several scenarios could potentially pose low to moderate risk to wild horses and burros (SERA 1997). Small mammals directly sprayed by hexazinone at the maximum application rate would face a low risk, assuming 1st order dermal absorption, and low to moderate risk assuming 100% dermal absorption. Acute exposure through consumption of contaminated vegetation would pose a low risk to small mammals if hexazinone was applied at the maximum application rate; acute and chronic exposure through consumption of contaminated vegetation would pose a moderate risk to large mammals. Also, acute consumption of contaminated water would pose a low risk to small mammals if hexazinone was applied at the maximum application rate. It appears that wild horses and burros would be at risk from adverse effects from hexazinone applications. However, if food and water sources were not contaminated, risks would be minimized, and direct spray could be avoided by removing wild horses and burros from the target area prior to treatment. Contamination of food and water sources could be minimized by utilizing spot applications of hexazinone at the typical application rate. Because hexazinone is used for woody species, it would not likely be applied in rangelands where invasive plants are usually grasses or herbaceous vegetation. In addition, hexazinone is semi-selective, and is typically only applied in spot applications; therefore, risks to wild horses and burros under normal applications may be lower than those predicted by the risk assessment.

### Imazapyr

For applications of imazapyr at the typical application rate, ERAs predicted no risks to wild horses and burros

under any exposure scenario (SERA 2004d). For applications at the maximum application rate, however, there is a low risk to wild horses and burros under two scenarios: direct spray (small animal) and consumption of contaminated vegetation (large mammal). Imazapyr is not registered for use in rangelands; therefore, it is unlikely that impacts via direct spray or consumption of contaminated vegetation would occur. The likelihood of impacts could be further minimized by removing wild horses and burros from areas near to application sites prior to spraying and by observing appropriate buffer distances from HMA vegetation when applying imazapyr (see Vegetation section in this chapter).

### Metsulfuron Methyl

Wild horses and burros would face minimal risk from the application of metsulfuron methyl. None of the HQs estimated for metsulfuron methyl exposure at the typical application rate indicate risk to any of the terrestrial animal receptors (SERA 2004e). When applied at the maximum application rate, metsulfuron methyl would pose a low risk to small animals via 100% absorption of direct spray and to large mammals via consumption of contaminated vegetation. Metsulfuron methyl is registered for use in rangeland, but impacts to wild horses and burros would be unlikely if the typical application rate was used. If the maximum application rate was used, impacts to wild horses and burros could be avoided by removing animals from application areas prior to spraying metsulfuron methyl, and by limiting the size of the application area or restricting access of wild horses and burros to recently sprayed areas to prevent consumption of large amounts of sprayed vegetation.

### Picloram

Application of picloram would not likely impact wild horses and burros. Most of the HQs for the evaluated scenarios of picloram exposure were below the LOC for both the typical and maximum application rates (SERA 2003b). Under two scenarios HQs were elevated above the LOC, indicating low to moderate risk at the typical and maximum application rates: 100% absorption of direct spray by a small animal and acute exposure through consumption of contaminated vegetation by a large mammal. Picloram is registered for use in rangeland, and it could be applied over large areas, as its primary targets are broadleaf and woody species. Therefore, it could be used to manage certain broadleaved plants without impacting native or desirable grasses. Impacts to wild horses and burros could be avoided by removing animals from application

BLM_0000533

areas prior to spraying picloram, and by limiting the size of the application area or restricting access of wild horses and burros to recently sprayed areas to prevent consumption of large amounts of sprayed vegetation.

### *Triclopyr*

Triclopyr presents some risk to wild horses and burros, particularly through the consumption of contaminated vegetation (SERA 2003c). Because risk categories determined using calculated HQs for the two evaluated formulations of triclopyr (triclopyr acid and triclopyr BEE) are the same, no differentiation will be made between these two formulations in this section. The following scenarios pose a low risk for applications at the typical application rate, and a moderate risk for applications at the maximum application rate: 1st order and 100% absorption of direct spray by a small mammal, and acute and chronic exposure through consumption of on-site contaminated vegetation by a large mammal. In addition, for applications at the maximum application rate, there would be a low risk associated with acute exposure through consumption of water contaminated by a spill by a small mammal, and chronic exposure through consumption of off-site contaminated vegetation by the large mammal. No risk is predicted for small mammals as a result of acute or chronic exposure through consumption of contaminated vegetation or water. Triclopyr can be used in rangelands to selectively manage woody species without impacting native or desirable grasses. It also has low residual activity. Impacts to wild horses and burros could be avoided by removing animals from application areas prior to spraying, and by limiting the size of the application area or restricting access of wild horses and burros to recently sprayed areas to prevent consumption of large amounts of sprayed vegetation. Because large wild horses and burros are susceptible to impacts from long-term consumption of vegetation contaminated by triclopyr, it is important to limit exposure of wild horses and burros to sprayed vegetation until residual activity has tapered off, particularly since sprayed grasses may not show signs of damage.

## Impacts by Alternative

The following sections discuss the expected effects of each of the five alternatives on wild horses and burros, and compare the effects expected under each alternative with those expected under the other alternatives. These effects may vary depending on the acreage treated using different application methods and herbicides, as well as the size of treatment events.

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Under the No Action Alternative, the BLM would continue its ongoing vegetation treatment programs in 14 western states, and would be able to use 20 herbicides previously approved under earlier RODs. Herbicide use under the No Action Alternative could impact wild horses and burros over an estimated 302,000 acres. The nature of impacts to wild horses and burros (positive and negative) would be similar to those that have occurred in the past 10 years. Negative impacts to wild horses and burros could be lower than under the other herbicide-use alternatives because fewer total acres would be treated using herbicides.

Long-term positive impacts on wild horse and burro communities (i.e., improvements in rangeland forage) could be lower under this alternative than the other herbicide-treatment alternatives. Under the No Action Alternative, invasive plant populations would likely continue to expand at the current rate or more quickly, potentially replacing desirable native forage, and increasing the abundance of unpalatable or toxic plants.

Three-fourths of wild horses and burros are found in Nevada, Utah, and Wyoming (see Table 3-7), and about 82,000 acres of vegetation would be treated in these states using herbicides. Of these acres, over 40% would occur in evergreen shrublands (primarily sagebrush), 19% would occur in annual and perennial grasslands (e.g., meadows, grasslands, and prairies), 18% would occur in perennial forb communities (treatments associated with non-native forbs including knapweed, thistles, and leafy spurge), and 4% would each occur in evergreen woodlands (primarily pinyon-juniper and pine forest treatments) and in riparian/wetland habitats. The focus of these treatments would be to remove and control invasive vegetation and improve native shrubland and grassland communities, to the benefit of wild horses and burros. Wild horses favor native grasses, including bluebunch wheatgrass, western wheatgrass, Indian ricegrass and blue grasses, and riparian/wetland vegetation, including sedges. Wild burros feed on a variety of plants, including grasses, Mormon tea, paloverde, and plantain. Treatments that improve range habitat should benefit these plant species.

Because the new herbicides proposed in this PEIS (diquat, fluridone, imazapic, and Overdrive®) would not be used under the No Action Alternative, risks to wild horses and burros would be different than under the other alternatives. Fluridone and imazapic do not

BLM_0000534

ENVIRONMENTAL CONSEQUENCES

present any risks to wild horses and burros under modeled scenarios (similar to chlorsulfuron, metsulfuron methyl, and sulfometuron methyl), and Overdrive® poses a low to moderate risk to large wild horses and burros under a chronic exposure scenario in which an animal ingests contaminated vegetation over a long time period. Diquat is fairly toxic to wild horses and burros, particularly under food ingestion scenarios (similar to 2,4-D and diuron). However, diquat is an aquatic herbicide, and frequent exposure to wild horses and burros would not be expected. Under the No Action Alternative, the BLM's repertoire of herbicides that are not injurious to terrestrial animals would be smaller than under the Preferred Alternative. As a result, per area risks to wild horses and burros would potentially be greater if more injurious herbicides (e.g., 2,4-D, bromacil, diuron, tebuthiuron, triclopyr) were used instead of safer herbicides, and the possibilities of more effective rangeland improvements would be reduced. However, prohibiting the use of diquat from use, particularly in rangeland riparian areas, could somewhat decrease per area risk to wild horses and burros.

2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine were approved for use in the earlier BLM EISs, but the BLM has not used any of these herbicides, except fosamine (< 50 acres annually) since 1997, and does not plan to utilize them in the near future. None of these herbicides would normally be used in rangeland treatments where wild horses and burros might come into contact with them. Instead, the BLM would use other herbicides, including triclopyr, sulfometuron methyl, bromacil, diuron, and Overdrive®, which are effective in controlling weeds and invasive vegetation, but have less risk to wild horses and burros.

The BLM would not be able to use herbicides in Alaska, Nebraska, and Texas under the No Action Alternative, but would be able to conduct herbicide treatments in these states under the other herbicide-treatment alternatives. No wild horses or burros use lands in these states.

### Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

The Preferred Alternative would result in the treatment of approximately 932,000 acres in 17 western states. In addition to the 14 previously approved herbicides, the BLM would be able to use the four new herbicides evaluated in this PEIS. This alternative would result in the most extensive effects to wild horses and burros (both negative and positive) because it proposes the

most acres for treatment (3 times the acreage that would be treated under the No Action Alternative). The extent of positive and negative impacts to wild horses and burros would depend on the relative amount each of the herbicides was used, whether they would be applied in rangeland environments, and the method of application. The likelihood of negative impacts would be greatest if diuron, diquat, bromacil and/or 2,4-D were used extensively. However, diquat, an aquatic herbicide, and bromacil and diuron, non-selective herbicides, are not likely to be used extensively in rangelands. If these herbicides were used in restricted scenarios as proposed, and other herbicides were used effectively to increase the abundance of native forage relative to unpalatable weeds, positive impacts to wild horses and burros could outweigh negative impacts.

Because more acres would be treated, benefits to wild horses and burros from improved rangeland and riparian conditions should be much greater under this alternative than under the other alternatives. Over 375,000 acres are proposed for treatment using herbicides in Nevada, Utah, and Wyoming, states with the largest populations of wild horses and burros. The percentage of treatments occurring in different plant community types would be similar to that of the No Action Alternative (43% of acres treated would occur in evergreen shrublands, 19% in annual and perennial grasslands, 18% in perennial forb communities, and 9% in evergreen woodlands), but 4 times as many acres would be treated in these states under this alternative.

The ability to use the four new herbicides (diquat, fluridone, imazapic, and Overdrive®) as well as future herbicides that become registered with the USEPA would allow BLM managers more options in choosing the least toxic herbicides that best match treatment goals and application conditions. As a result, there could be an increase in per capita benefits and a reduction in overall per capita risks to wild horses and burros (three of the four new herbicides present little to no risk to wild horses and burros) and an increase in habitat and ecosystem benefits from treatment. This alternative would also reduce risks and negative impacts associated with other vegetation management methods (e.g., risk of escaped prescribed fires; see the PER).

### Alternative C – No Use of Herbicides

Under Alternative C, wild horses and burros would not be affected by herbicide use. Primary impacts would stem from other vegetation treatment methods (see the accompanying PER; USDI BLM 2007a). Positive benefits to rangelands as a result of vegetation

BLM_0000535

management could be reduced under this alternative, as certain invasive species are only effectively controlled by herbicides, and in some situations other methods are impractical due to cost, time, or public concerns. For example, mechanical and manual methods are impractical over large land areas, which are more effectively treated by broadcast herbicide applications. In addition, it is often difficult to eradicate some species, such as shrubs that resprout from rhizomes (e.g., sand shinnery oak), by means other than herbicide application. Similarly, pre-emergent herbicides that persist in the soil are the most effective means of controlling invasive plants with seeds that remain viable for long periods of time.

Under this alternative, in the absence of herbicide treatments, invasive plant populations would likely continue to spread, possibly at increasing rates, and replace native vegetation, including rangeland forage for wild horses and burros, particularly where other treatment methods are not effective or possible (e.g., large tracts of rangeland or grassland dominated by invasive species, areas with resprouting shrubs or without enough fine fuels to carry prescribed fires). The spread of invasive weed populations would likely have deleterious effects on wild horses and burros. For example, rangeland within HMAs that contains excessive or unpalatable brush cover is less useful for grazing. However, it is uncertain how potential negative impacts from this alternative (mostly indirect) would compare with negative direct and indirect impacts from herbicide use.

### Alternative D – No Aerial Applications

Alternative D would be the same as the Preferred Alternative as far as herbicides that could be used, and areas that could be treated. Therefore, both alternatives would be equally likely to have both positive and negative effects on wild horses and burros and rangeland. The BLM would be able to choose from a suite of currently-approved herbicides and herbicides that could be approved under this PEIS, or in the future. However, this alternative would not allow the BLM to apply herbicides aerially. Fewer acres would be treated (535,000 acres) because some large areas, including rangelands, cannot be effectively treated by ground application methods. However, acres proposed for aerial treatments comprise only about 20% of all acres proposed for treatment in the primary wild horse and burro states—Nevada, Utah, and Wyoming. And of these acres, about 65% of aerial treatments would occur in evergreen shrublands, and 13% would occur in evergreen woodlands, habitats that provide less value to

wild horses and burros than grassland and riparian habitats.

This alternative would substantially reduce the impacts of off-site drift to wild horses and burros, an exposure scenario that was not specifically modeled for most herbicides (consumption of contaminated vegetation off-site was modeled for most of the Forest Service herbicides, with no risks to wild horses and burros predicted for any of these herbicides, except triclopyr at the maximum application rate). Conversely, without the option to spray herbicides aerially, large areas of rangeland may remain untreated under Alternative D, which could negatively impact wild horse and burro habitat and forage in these areas over the long term.

### Alternative E – No Use of Acetolactate Synthase-inhibiting Active Ingredients

Approximately 466,000 acres would be treated under Alternative E, which is slightly less than the acreage that would be treated under Alternative D, and less than half of the acreage that would be treated under the Preferred Alternative, but is still an increase from the average annual treatment acreage that has occurred over the past 8 years and would likely occur under the No Action Alternative. Herbicide-related impacts to wild horses and burros would be lower under this alternative than under the Preferred Alternative because fewer acres would be treated with herbicides, and additional protective standards would be required during herbicide treatment (e.g., preferential use of spot rather than broadcast applications, preferential treatment of small versus large infestations).

Sulfonylurea herbicides and other ALS-inhibiting herbicides (e.g., chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, sulfometuron methyl) block the synthesis of amino acids that are required for protein production and cell growth, thereby resulting in plant death. ALS-inhibiting herbicides would not be used under this alternative because data suggest they have the potential to damage off-site native and crop plant species under the right conditions of environment and application. These herbicides are biologically active at low concentrations, and are applied at lower application rates than other herbicides to manage target plants. It is uncertain whether use of these herbicides would result in fewer cases of unintended damage to wild horses and burros and rangeland due to lower application rates, or more cases due to the high potency of the herbicides and their persistence. In 1981, the Environmental Effects Division of the USEPA recommended against registering sulfonylurea herbicides because they persist

BLM_0000536

for long periods of time in the environment and they cannot be detected at low levels. However, risk assessments did not predict risk to wild horses and burros for any of the ALS-inhibiting herbicides when applied at the typical application rate, under any of the modeled scenarios, suggesting that the elimination of these herbicides would not benefit wild horses and burros and could indirectly harm wild horses and burros if more toxic herbicides were used in their place.

Alternative E incorporates other management practices that would be likely to have positive impacts on wild horses and burros and rangelands. Alternative E would limit the use of broadcast applications, which would reduce the possible risks to wild horses and burros associated with off-site drift and consumption of vegetation across large areas. However these applications would be available for use in appropriate situations (i.e., where no other method is practical and susceptible non-target plant species and aquatic areas are distant from the application area), which would result in some ecosystem benefits from larger-scale herbicide applications. While per-treatment ecosystem benefits may be greater under Alternative E than under the other herbicide-use alternatives as a result of this ecosystem-based management approach, overall positive vegetation and ecosystem benefits (that cannot be attained by other treatment methods) across the western states would be lower under this alternative because of the relatively small treatment acreage and the inability to use certain practices in situations that might require their use (e.g., use of ALS-inhibitor herbicides on highly aggressive weeds). For example, imazapic, which has been shown to be effective in treating downy brome and leafy spurge, would be unavailable under this alternative. The BLM would also be unable to use chlorsulfuron and metsulfuron methyl to control yellow starthistle and several species of thistle that are harmful to wild horses and burros.

## Mitigation for Herbicide Treatment Impacts

The following actions would greatly reduce the risks to wild horses and burros from herbicide applications:

- Apply diuron, glyphosate, hexazinone tebuthiuron, and triclopyr at the typical application rate to minimize risks to wild horses and burros.

- Do not apply 2,4-D, bromacil, diuron, Overdrive®, picloram, or triclopyr across large

application areas, where feasible, to limit impacts to wild horses and burros, particularly through the contamination of food items.

- Apply herbicide label grazing restrictions for livestock to herbicide treatment areas that support populations of wild horses and burros.

- Where practical, limit glyphosate and hexazinone to spot applications in rangeland to avoid contamination of food items.

- Do not aerially apply diquat directly to wetlands and riparian areas.

- Do not apply bromacil and diuron in grazing lands within HMAs, and use appropriate buffer zones (see Vegetation section) to limit contamination of vegetation in off-site foraging areas.

- Do not apply 2,4-D, bromacil, or diuron in HMAs during the peak foaling season (March through June, and especially in May and June), and do not exceed the typical application rate of Overdrive® or hexazinone in HMAs during the peak foaling season.

# Paleontological and Cultural Resources

Invasive plants may have long-term negative impacts on paleontological and cultural resource sites by displacing native vegetation and increasing the potential for soil erosion, potentially leading to the loss of paleontological and cultural resources. In addition to limiting these impacts, removal of invasive vegetation would contribute to the restoration and maintenance of historic and ethnographic cultural landscapes (USDI National Park Service 2003).

Herbicides could harm traditional use plants, or threaten the health of the people gathering, handling, or ingesting recently treated plants, fish, or wildlife that are contaminated with herbicides (BPA 2000). Since roots and other plant materials harvested by Native peoples may be found in close proximity to weed treatment areas, the potential exists for herbicides to drift from treatment areas onto areas used by Native peoples (ENSR 2001). In some cases, vegetation important to Native peoples, including juniper, may be treated in areas where these plants are invasive and crowding out more desirable vegetation.

BLM_0000537

## Scoping Comments and Other Issues Evaluated in the Assessment

Some respondents felt that cultural preservation is an important issue, and encouraged addressing the impacts to cultural and archaeological sites. Other respondents suggested that traditional cultural properties should be properly safeguarded, and treatments should be completed in a way that is sensitive to cultural resources. There was concern about the effects of herbicides on basket plants and the people who collect them, in particular Native Americans. Respondents noted that fire generally helps these basket plants, while herbicides are detrimental.

## Standard Operating Procedures for Addressing BLM Actions on Paleontological, Cultural, and Subsistence Resources

Before proceeding with vegetation treatments, the effects of BLM actions on cultural resources would be addressed through compliance with the NHPA, as implemented through a national Programmatic Agreement (*Programmatic Agreement among the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers Regarding the Manner in Which BLM Will Meet Its Responsibilities Under the National Historic Preservation Act*) and state-specific protocol agreements with SHPOs. Effects on paleontological resources would be addressed as outlined in resource management plans developed under the authority of the FLPMA and site specific NEPA documents developed for vegetation treatments. The BLM's responsibilities under these authorities are addressed as early in the vegetation management project planning process as possible.

The processes for identifying and managing cultural resources are addressed in USDI BLM manuals 8100 *(The Foundations for Managing Cultural Resources)*, 8110 *(Identifying and Evaluating Cultural Resources),* 8120 *(Tribal Consultation under Cultural Resource Authorities*), 8130 *(Planning for Uses of Cultural Resources)*, 8140 *(Protecting Cultural Resources)*, and Handbook H-8120-1 *(Guidelines for Conducting Tribal Consultation)*. Processes for identifying and managing paleontological resources are outlined in Manual 8270 *(Paleontological Resource Management)*. The BLM Cultural Resource Management program is responsible for the study, evaluation, protection, management,

stabilization, and inventory of paleontological, historical, and archeological resources. The program also ensures close consultation with Native American tribal and Alaska Native group governments, as required by law, for the maintenance, preservation, and promotion of native cultural heritage and resources, including plant and animal subsistence resources and the use of vegetation for religious and ceremonial purposes. The BLM initiated consultation with Native American tribes and Alaska Native groups to identify their cultural values, religious beliefs, traditional practices, and legal rights that could be affected by BLM actions. Consultation included sending letters to all tribes and groups that could be directly affected by vegetation treatment activities, and requesting information on how the proposed activities could impact Native American and Alaska Native interests, including the use of vegetation and wildlife for subsistence, religious, and ceremonial purposes (see Appendix G).

**Paleontological Resources**

The processes for identifying paleontological resources includes consultation with BLM regional paleontologists, paleontology program contacts in BLM field offices, state geological survey agencies, local colleges, universities or museums, or SHPOs (if individual SHPOs deal with fossil resources) as part of the planning process. Procedures would be developed for protecting significant fossil resources as outlined in BLM Handbook 8270-1 *(General Procedural Guidance for Paleontological Resource Management)*. Resource Management Plans may be in place that have classified sensitivity levels for important fossil resources and management prescriptions associated with each sensitivity level. Specific protective measures for paleontological resources would be identified at the local level during project development. In the case of RMPs that lack this classification scheme, project-specific analysis would be needed to assess whether paleontological resource inventories based on available information should be conducted. If a project area contained documented locations with paleontological resources within the proposed project area, or had geological or geomorphic characteristics likely to contain vertebrate fossils, a field inventory could be required to locate and report previously unrecorded paleontological resources. Site-specific mitigation measures would be developed during the implementation stage of the vegetation treatments, if needed.

BLM_0000538

ENVIRONMENTAL CONSEQUENCES

**Cultural Resources**

Treatments would follow standard procedures for identifying cultural resources, in compliance with Section 106 of the NHPA, as implemented through the Nationwide Programmatic Agreement and state protocols. The process includes necessary consultations with SHPOs and interested tribes and Tribal Historic Preservation Offices (THPOs), where they are in place, at the state or local level as projects are planned.

As part of the process of preparing for vegetation treatments, cultural resource specialists would identify historic properties eligible for the NRHP. Historic properties may include any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the NRHP. Impacts to National Register-eligible cultural resources can be avoided through project redesign or be mitigated through recordation, data recovery, monitoring, or other appropriate measures. If National Register-eligible cultural resources were discovered during vegetation treatments, appropriate actions would be taken to protect these resources or recover data following consultation processes. An important concern regarding the presence of non-cultural resource personnel on the ground during herbicide treatments is the unauthorized collection of artifactual material, especially from National Register-eligible properties. Procedures would be developed, as part of an unanticipated discoveries plan that would include reporting previously unrecorded cultural resources to local BLM professionals.

**Subsistence Resources**

Discussions would be held with Native American tribes and Alaska Native groups to determine which plants that could be affected by proposed herbicide treatments have traditional lifeway values, and whether there are specific, traditional collecting areas. Important plants to Native Americans include oak, juniper, pinyon, lodgepole pine, cottonwood, mesquite, amaranth, cattail, and brackenfern. These trees, shrubs, and plants or their fruits and seeds are traditionally used for subsistence, clothing, basketry, shelter, utilitarian items, and possibly medicines by one or more tribes or groups in the western U.S. and Alaska. Since other target species have common names similar to those of some plants used traditionally, such as whorled milkweed or common reeds, the difference in names should be explained to Native Americans and Alaska Natives in those areas where treatments are planned. Treatments of plants that are important for maintaining traditional lifeways may need to be modified or cancelled in

certain areas. On the other hand, there could be long-term benefits associated with treatments, such as reduction or elimination of non-native or invasive plant competitors, which would allow proliferation of traditionally used native species.

# Herbicide Impacts on Paleontological and Cultural Resources

**Paleontological Resources**

The effect of herbicide treatments on fossil material would vary with respect to: 1) fossil type; 2) minerals; 3) degree of fossilization; and 4) whether the fossil is exposed or buried. Although it may be possible for chemicals found in herbicides to impact unique fossil material, herbicide treatments are more likely to affect researchers, students, or other field personnel conducting paleontological research than the paleontological resources. More likely, damage to fossil materials, if present, would result from the use of wheeled equipment used to apply herbicides. The potential for impacts to fossils would depend on the attributes of the fossil material, whether the fossil is buried or exposed, and the method of herbicide application. Methods involving the use of vehicles driving cross-country would potentially crush fossil material exposed on the surface.

**Cultural Resources**

While herbicide treatments may affect buried organic cultural resources, they are more likely to have a negative effect on traditional cultural practices of gathering plant foods or materials important to local tribes or groups. The effect of herbicide treatments on cultural resources depends on the method of herbicide application and the herbicide type used. Some chemicals can cause soil acidity to increase, which would result in deterioration of artifacts—even some types of stone from which artifacts are made. Application of chemical treatments can also result in impacts such as altering or obscuring the surfaces of standing wall masonry structures, pictograph or petroglyph panels, and organic materials. While chemicals may affect the surface of exposed artifacts, they can generally be removed without damage if treated soon after exposure. Organic substances used as inactive ingredients in herbicide formulations, such as diesel fuel or kerosene, may contaminate the surface soil and seep into the subsurface portions of a site. These organic substances could interfere with the

BLM_0000539

radiocarbon or Carbon 14 (C-14) dating of a site (USDI BLM 1991a).

### Subsistence Resources

Depending on the selected application method for herbicide treatment plans, the BLM might be unable to avoid plants identified by Native American tribes and Alaska Native groups as being important in traditional subsistence, religious, or other cultural practices. Consultation would be undertaken with tribes and groups to locate any areas with plants that are of importance to the tribe and that might be affected by chemical treatments. Certain chemical treatments could also pose a possible health risk, through residues left on plants used as traditional foods or for ceremonial purposes, or as a result of contaminating other food sources or drinking water, as discussed below. A study to assess the exposure of basketweavers to forestry herbicides showed that detectable residues of herbicides were found on 49% of plant materials used by Native Americans inside treatment areas, but only 3% of plant materials outside of treatment areas, and that residues continued to be detected for several months (Segawa et al. 1997). However, a study of herbicide uptake by lomatium and bitter root roots in rangeland treated with picloram and sulfometuron methyl showed that no herbicide residues were found in roots at 2, 6, and 45 weeks after treatment (ENSR 2001). Thus, risks would vary depending upon the time of plant use and herbicide treatment, and the portions of the plants that were used.

## Herbicide Impacts on Native American Health

### Exposure Characterization

The potential risks to Native Americans from exposure to herbicides used in BLM programs were evaluated separately from risks to other public receptors (see Human Health and Safety section in this chapter). Native Americans could be exposed to higher levels of herbicides as a result of subsistence and cultural activities such as plant gathering and consumption of fish caught in local streams. Therefore, risk levels determined for Native American receptors reflect unique exposure scenarios as well as typical scenarios for public receptors, but with higher levels of exposure than public receptors.

The BLM risk assessments assume that the Native American receptors (154-pound adult and 33-pound child) are exposed to herbicides via dermal contact with spray, dermal contact with sprayed foliage, ingestion of

drinking water from a sprayed pond, ingestion of berries containing spray, dermal contact with water in a sprayed pond, and ingestion of fish from a sprayed pond.

#### Dermal Contact

For potential herbicide contact, the risk assessments assume the 50th percentile surface area of the Native American's lower legs, lower arms, and hands are exposed (i.e., 698 $in^2$ for adult men and women and 249 $in^2$ for children [USEPA 1997]), and that Native American receptors contact foliage for 3 hours per day of subsistence activities (Harper et al. 2002). A dermal transfer coefficient value—to estimate the amount of herbicide transferred from foliage to skin—at the high end of the range was used for harvesting blueberries (i.e., 232 $in^2$/hour for the adult [USEPA 2000b] and 47 $in^2$/hour for the child based on the child to adult surface area ratio [CalEPA 1996]). The USEPA (2001c) recommends an exposed surface area of 2,790 $in^2$ for an adult swimmer and 1,023 $in^2$ for a child swimmer. Because no specific data were available regarding surface area, these estimates were used to evaluate the Native American child-and-adult in the HHRA. The exposure time for swimming is assumed to be 2.6 hours/day in accordance with Harris and Harper (1997) which results in a swimming exposure frequency of 2.6 hours/day for 70 days/year. Incidental ingestion during swimming was not evaluated for Native Americans, since it is assumed that the pond is also used as a source of drinking water; any incidental ingestion during swimming is therefore included in the drinking water scenario.

#### Ingestion

Risk assessments assume that adult Native Americans ingest 1 quart of water per day (Harper et al. 2002) from a sprayed pond, and Native American children consume half the adult rate, or 0.5 quarts/day. The berry ingestion rate was developed from information provided in Harper et al. (2002), which lists an ingestion rate of 0.7 lbs/day for an adult of the Native American Spokane tribe gathering aboveground terrestrial vegetation. Berries are likely to be a small fraction of this 0.7 lbs/day. However, since this rate was not subdivided into additional categories, it was conservatively assumed that the ingestion rate for berries is 0.7 lbs/day for an adult Native American. For a Native American child, the ingestion rate was scaled by body weight (i.e., 0.7 lbs/day x 33 lbs / 154 lbs) to 0.15 lbs/day (per CalEPA 1996). The adult fish ingestion rate was assumed to be 2 lbs/day based on a high fish diet scenario discussed in Harper et al. (2002). The high fish

BLM_0000540

ENVIRONMENTAL CONSEQUENCES

diet consists primarily of fish, supplemented by big game; aquatic amphibians, crustaceans, and mollusks; small mammals; and upland game birds. This value is much higher than the 95th percentile fish ingestion rate of 0.4 lbs/day recommended in USEPA (1997) for a Native American subsistence population. For Native American children, the ingestion rate was scaled by body weight (i.e., 1.9 lbs/day x 33 lbs / 154 lbs) to 0.4 lbs/day (per CalEPA 1996).

The Forest Service risk assessments evaluated risk to Native Americans—in addition to typical risk for public receptors—for the scenarios of acute and chronic consumption of contaminated fish.

**Risk Characterization**

Native American adults face the same risks that public receptors face, as well as additional risks associated with exposure to some herbicides as a result of unique subsistence practices or increased time spent in treated areas. There are risks to Native American adults associated with exposure to diquat when it is accidentally spilled or applied at the maximum rate (low risk), and with the consumption of fish contaminated with 2,4-D (high risk) and hexazinone (moderate risk). There are risks to Native American children associated with exposure to diquat when it is applied at the typical rate. There are also risks associated with berry picking in areas sprayed with diquat at the typical rate. Both Native American adults and children residing near the treatment area would face additional risks (i.e., low risk from exposure to diquat when it is applied at the typical or maximum rate, and moderate risk from diquat when accidentally spilled; low risk from exposure to fluridone when it is accidentally spilled). See the Vegetation, Fish and Aquatic Invertebrates, Wildlife, and Human Health and Safety sections in this chapter for more information on the risks of herbicides to Native Americans and the resources they use.

# Impacts by Alternative

The following is a discussion of how risk from herbicides would vary under each herbicide treatment alternative.

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Of the herbicide treatment alternatives, the fewest acres would be treated under the No Action Alternative; therefore, levels of risk to paleontological and cultural resources, and health risks to Native Americans, Alaska Natives, and other human receptors would be lower than under the other herbicide treatment alternatives. If more acres to be treated by other vegetation management methods (e.g., prescribed fire, manual, mechanical, or biological treatments) under the No Action Alternative, then the risks from these methods would also have to be considered (see the associated PER). In addition, the new herbicides proposed in this PEIS (diflufenzopyr+dicamba [Overdrive®], diquat, fluridone, and imazapic) would not be used. Of these new herbicides, diquat poses a high risk to humans; however, diflufenzopyr, dicamba, and imazapic are all relatively safe to humans, with no potential adverse effects evident from the human health risk characterization, except in cases of unlikely accidental scenarios for dicamba. Of the 20 previously-approved herbicides, only four (clopyralid, imazapyr, metsulfuron methyl, and sulfometuron methyl) have negligible to low risks to humans. Therefore, failure to approve the four new herbicides would limit the options for treatment of vegetation without appreciable risk to humans. Thus, the risk to humans for each herbicide application may be greatest under the No Action Alternative.

Under this alternative, the BLM may be less successful in controlling weeds and poisonous plants that adversely affect humans, especially weeds most effectively controlled by the four newly proposed herbicides, than under the other alternatives. Weeds and other invasive vegetation can displace native species that are desirable to Native Americans, and may provide poorer quality forage and cover for wildlife used by Native American tribes.

Under the No Action Alternative, the BLM would be able to continue to use six herbicides that were approved for use under earlier BLM vegetation treatment RODs: 2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine. Except for fosamine, which has been used on less than 50 acres annually, these chemicals have not been used by the BLM since 1997 and are not proposed for use under the other herbicide treatment alternatives. It is unlikely that these chemicals would be used under the No Action Alternative.

In 1998, the BLM conducted a literature review to determine whether the earlier vegetation treatment ROD conclusions for asulam, atrazine, mefluidide, and simazine were justifiable based on past and 1998 toxicology and risk assessment procedures. This assessment was based on a literature search and *California Vegetation Management Final EIS* (California EIS; USDI BLM 1988a) to identify potential

BLM_0000541

human health risks. A literature review was not done for 2,4-DP or fosamine, but these herbicides were analyzed in the California EIS (McMullin and Thomas 2000). Based on this analysis, it was determined that systemic risks from using asulam may be greater than projected in the earlier EIS, but that risks to humans from the other three herbicides are similar to, or less than, those identified in earlier EISs. Based on the earlier EISs, literature reviews done for the BLM, and other studies, the risks to humans would be low for asulam, fosamine, and mefluidide, low to moderate for 2,4-DP, and simazine, and moderate to high for atrazine (USEPA 1995d). The BLM uses sulfometuron methyl, bromacil, and diuron in treatment situations where it used atrazine in the past, and triclopyr instead of fosamine. These substitute herbicides have similar, or lower, risks to humans than the herbicides they are replacing.

## Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

Because of the large number of acres treated, this alternative would likely result in the most overall risk to paleontological and cultural resources and human health. The number of acres treated using ground-based application methods would be greater under this alternative and Alternative D than under the other alternatives, increasing the risk of damage to paleontological and cultural resources from equipment. However, human health could benefit from a reduction in the noxious weeds and poisonous plants that adversely affect humans, which would likely occur under this alternative. In addition, this alternative would allow the use of the new herbicides evaluated in the BLM HHRA (ENSR 2005l). Of these four herbicides, three appear to be relatively harmless to humans; use of these herbicides would increase the options for appropriately managing vegetation while minimizing the risk to human receptors. It is suggested that diquat be used only in very limited scenarios at the typical application rate and where risk to human receptors is not predicted, such as ground applications from trucks not near residences or berry gathering sites. 2,4-D, glyphosate, picloram, and tebuthiuron would be used for about 70% of herbicide treatments. There is low risk to human health associated with use of glyphosate, picloram, and tebuthiuron at normal application rates, but risks to human health are low to moderate for 2,4-D.

Although the BLM would be able to treat vegetation in Alaska, Nebraska, and Texas under the Preferred Alternative and Alternatives D and E, it is unlikely that the BLM would use herbicides in Alaska, especially in areas with important Alaska Native resources.

## Alternative C – No Use of Herbicides

Alternative C would eliminate risks to paleontological, cultural, and human health from herbicide applications. However, risks to these resources and human health associated with alternative vegetation management methods would occur (these risks are perhaps greatest for prescribed fire treatments [see PER]). In addition, human health might be adversely affected if populations of noxious weeds and poisonous plants that adversely affect humans were to remain at current levels or increase as a result of ceasing herbicide treatments.

## Alternative D – No Aerial Applications

Human health risks per application area would be lower for Alternative D than for the No Action and Preferred alternatives because herbicides would not be likely to drift as far, potentially affecting fewer humans. For many herbicides, the greatest risks to occupational receptors are associated with aerial applications; these risks would be eliminated under this alternative. Furthermore, this alternative would allow the use of the new herbicides, which pose on average less risk to humans than the currently used herbicides. Overall risks to human health would be lower than under the Preferred Alternative, which would treat about 400,000 more acres and would use aerial spraying (however, the Preferred Alternative could eliminate more noxious and poisonous weeds that adversely affect human health than Alternative D). Overall risks to cultural and paleontological resources from ground-based equipment would be similar to the Preferred Alternative, but risks associated with the herbicides themselves would be less, since fewer acres would be treated with herbicides. Risks under Alternative D would likely be greater than those under Alternative E, as Alternative E places emphasis on spot applications over broadcast applications, establishes herbicide-free zones to protect culturally significant plant and wildlife resources, and prioritizes treatments that would enhance and preserve culturally significant plants and animals. However, Alternative E would not allow the use of ALS-inhibiting herbicide active ingredients (i.e., chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl), which exhibit the lowest risks to humans out of the herbicides analyzed by the BLM. In addition, these chemicals are effective in controlling weeds that can displace native plant species and associated wildlife that are of value to Native American tribes. Because 240,000 more acres would be treated

BLM_0000542

ENVIRONMENTAL CONSEQUENCES

under Alternative D than under the No Action Alternative, but higher risk aerial applications would not occur and chemicals of lower risk would be used, it is difficult to infer which of these two alternatives would have lower overall risk.

**Alternative E – No Use of Acetolactate Synthase-inhibiting Herbicides**

The five herbicides (chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl) that would not be used under this alternative are among those that pose the least risk to human health. Even in accidental scenarios, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl do not pose a risk to humans, and chlorsulfuron only poses a risk to workers when it is applied in ground broadcast applications at the highest application rate, and poses a risk to the general public if a large amount is accidentally spilled into a very small pond—an unlikely scenario. From a practical perspective, eye and/or skin irritation are likely to be the only effects of mishandling ALS-inhibiting herbicides; these effects can be minimized or avoided by prudent industrial hygiene practices while handling of these compounds. Bromacil, diquat, and diuron, which pose the most severe human health risks, could be used under Alternative E; therefore, risk to humans per area treated is not likely to decrease dramatically as a result of elimination of ALS-inhibiting herbicide active ingredients.

Alternative E places increased emphasis on spot rather than broadcast applications, which would tend to decrease per area risk relative to the No Action and Preferred alternatives, except in the few possible cases where occupational receptors would be at a greater risk from spot applications. In addition, the proposed number of acres treated (466,000) is half that of the Preferred Alternative (932,000), which would translate to lower overall risk. Conversely, more acres would be treated under Alternative E than under the No Action Alternative (305,000), so overall risk would be greater.

Under all alternatives, the BLM would collaborate with Native American tribes and Alaska Native groups to identify and protect culturally significant plants used for food, basketweaving, fibers, medicine, and ceremonial purposes, and would use minimal impact treatments where culturally significant species are known to occur. In addition, under Alternative E the BLM would establish herbicide-free zones to protect culturally significant plant and wildlife resources, which would reduce the likelihood that Native Americans and Alaska

Natives would consume vegetation with herbicide residues.

## Mitigation for Herbicide Treatment Impacts

In addition to SOPs, there are certain herbicide-specific measures that could be taken to substantially reduce or eliminate human health risk from herbicide use. The following mitigation measures were developed based on the BLM HHRA, the Forest Service HHRAs, and the *Final EIS Vegetation Treatment on BLM Lands in Thirteen Western States* (1991 13-State EIS; USDI BLM 1991a):

- Do not exceed the typical application rate when applying 2,4-D, bromacil, diquat, diuron, fluridone, hexazinone, tebuthiuron, and triclopyr in known traditional use areas.
- Avoid applying bromacil or tebuthiuron aerially in known traditional use areas.
- Limit diquat applications to areas away from high residential and traditional use areas to reduce risks to Native Americans and Alaska Natives.

# Visual Resources

Visual resources consist of land, water, vegetation, wildlife, and other natural or manmade features visible on public lands. Vast areas of grassland, shrubland, canyonland, and mountain ranges on public lands provide scenic views to recreation visitors, adjacent landowners, and travelers. In addition, roads, rivers, and trails pass through a variety of characteristic landscapes where natural attractions can be seen and where cultural modifications exist. Activities occurring on these lands have the potential to disturb the surface features of the landscape and impact scenic values.

Bureau policy requires that all acres of BLM land be inventoried for scenic values and be assigned a Visual Resource Management (VRM) Class (I-IV) during the land use planning process. These VRM classes are part of the land use plan decisions for a particular office and set the management standards for visual resources that activity level plans must subsequently meet. The acreage of BLM-managed public lands that are categorized as Class I, II, III, or IV is not currently known.

BLM_0000543

The proposed vegetation treatments would affect visual resources by changing the scenic quality of the landscape. Herbicide treatments would kill vegetation in the applied area, resulting in visual contrast such as more open, "browned" landscape until new plants were to grow in the area. The degree of change to scenic quality could, in terms of visitor perception, vary relative to a particular area's inherent visual appeal, and distance from human activity, as well as public sensitivity to changes in the landscape character of the area. However, according to the BLM's VRM policy, the extent of visual impact must be evaluated at the project level according to the visual contrast rating process (Handbook 8431-1). This process compares the amount of contrast to the form, line, color, and texture of the characteristic landscape of an area as a result of a surface disturbing activity.

In general, the effects of vegetation treatments on the visual quality of the landscape would be most notable to travelers, sightseers, and residents for the first year to several years following treatment, particularly in impacted areas near major roads or residential areas. Scenic impacts from vegetative treatments are most likely to be associated with projects that 1) reduce the visual rating of the treatment site over the long term, or 2) result in short- or long-term degradation of high-sensitivity visual resources.

## Scoping Comments and Other Issues Evaluated in the Assessment

Scoping comments stressed that treatments should improve management of public lands for multiple use and maximum public benefit. The visual quality of the landscape is seen as one component of public benefit, particularly if lands are located in highly visible areas along roads.

## Standard Operating Procedures

There are several SOPs that would help reduce the impact of herbicide treatments on visual resources:

- Minimize the use of broadcast foliar applications in sensitive watersheds to avoid creating large areas of browned vegetation.

- Consider the surrounding land use before assigning aerial spraying as an application method.

- Avoid aerial spraying near agricultural or densely populated areas, where feasible.

- At areas such as visual overlooks, leave sufficient vegetation in place, where possible, to screen views of vegetation treatments.

- Use SOPs that minimize off-site drift and mobility of herbicides (e.g., do not treat when winds exceed 10 mph; minimize treatment in areas where herbicide runoff is likely; establish appropriate buffer widths between treatment areas and residences), to contain the visual changes to the intended treatment area.

- If the area is a Class I or II visual resource, ensure that the change to the characteristic landscape is low and does not attract attention (Class I), or if seen, does not attract the attention of the casual viewer (Class II).

- Lessen visual impacts by 1) designing projects to blend in with topographic forms; 2) leaving some low-growing trees or planting some low-growing tree seedlings adjacent to the treatment area to screen short-term effects; and 3) revegetating the site following treatment.

- When restoring treated areas, design activities to repeat the form, line, color, and texture of the natural landscape character to meet established VRM objectives.

A more detailed list of SOPs is found in BLM Manual Handbook H-8431-1 (*Visual Resource Contrast Rating*).

## BLM Assessment of Visual Resource Values

The BLM identifies and evaluates visual resource values through the VRM Inventory system (Handbook H-8410-1; USDI BLM 1986a). The VRM system is a policy used by the BLM to inventory and manage visual resources on public land based on the aforementioned VRM classes describing scenic quality, sensitivity level, and distance zone criteria. Visual resource management objectives are established in resource management plans in conformity with land use allocations (USDI BLM 1984b). These area-specific objectives provide the standards for planning, designing, and evaluating future management projects.

A Contrast Rating System (BLM Manual Handbook H-8431-1; *Visual Resource Contrast Rating*; USDI BLM 1986b) provides a systematic means to evaluate the approved VRM objectives, and to identify mitigation measures to minimize adverse visual impacts. The

BLM_0000544

ENVIRONMENTAL CONSEQUENCES

Contrast Rating System is designed to compare the respective features of the existing characteristic landscape with a proposed project and to identify those parts that are not in harmony. These features include the basic design elements of form, line, color, and texture that characterize the landscape and the surrounding environment. Modifications to a landscape that repeat the natural landscape's basic elements are said to be in harmony with their surroundings, while those that differ markedly may be visually displeasing. The information generated is used to determine the amount of visual contrast created and whether the VRM objective for the area would be met, and to develop additional mitigation measures necessary to meet the VRM objective.

## Summary of Herbicide Impacts

The removal of vegetation would affect the visual qualities of treatment sites by creating openings and other vegetation-free areas that provide a noticeable visual contrast to the surrounding areas. In addition, the use of herbicides could create visually distinct areas of discolored vegetation (i.e., areas where herbicides have killed vegetation), which could contrast markedly from surrounding areas of green vegetation. The degree of these effects would depend on the amount of area treated, the appearance of the background vegetation and the vegetation being removed, the type of treatment method used, and the season of treatment.

In general, herbicide treatments would have short-term negative effects and long-term positive effects on visual resources. The greater the area of vegetation treatment, the greater the visual impact is likely to be. The effects of treatments over a large portion of the landscape are more likely to be observed by people than the effects of small-scale treatments. However, since areas receiving large-scale treatments are most likely to be degraded lands of low to moderate scenic quality, the visual impact from treatment would be minimized and there would likely be an improvement in the scenic quality of the land over the long term. Color contrasts caused by vegetation removal would be most apparent in areas dominated by green and/or flowery vegetation and by large plants, such as conifer trees. The visual impacts would be heightened if the herbicides also prevented the manifestation of seasonal changes in vegetation, such as spring flowers and/or fall color. The contrast between a cleared area and the surrounding vegetation would be less in much of the arid west, where low-growing shrubs, and browns, grays, and earth tones dominate the landscape than in areas with greater amounts of rainfall (e.g., the Marine Ecoregion). In addition, the brown

colors associated with vegetation treatments would be least noticeable during the late fall and the winter, when they would blend more naturally with surrounding colors, than in the spring and summer, when the green colors of new growth are more likely to be present.

Impacts to visual resources from herbicide treatments would begin to disappear within one to two growing seasons in most landscapes. The regrowth of vegetation on the site would eliminate much of the stark appearance of a cleared area. Impacts would last for the longest amount of time in forests and other areas where large trees and shrubs were removed.

Over the long term, vegetation treatments would likely improve visual resources on public lands. Treatments that aim to rehabilitate degraded ecosystems, if successful, would result in plant communities that are dominated by native species. Native-dominated communities tend to be more visually appealing than plant communities that have been overtaken by weeds (e.g., plant communities supporting a downy brome monoculture) or other undesired species (e.g., grasslands experiencing encroachment by conifer seedlings).

## Impacts by Alternative

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

The No Action Alternative would continue current vegetation and herbicide treatments; therefore, visual impacts would remain the same as at present. These impacts would be less than those under The Preferred Alternative, because only one-third as many acres would be treated using herbicides. The greatest visual impacts would likely be associated with the largest treatment areas. Under the No Action Alternative, projects with the largest treatment acreage (those over 1,500 acres in size; 10% of all herbicide treatments) would be located in New Mexico (one-third of all large-scale treatments) and Idaho/Nevada (one-third of all large-scale treatments). However, assuming that treatments would be effective in reducing or eliminating invasive species populations and promoting conditions that favor the development of native plant communities, the visual quality of degraded landscapes would not improve over the long term to the same extent as under the other treatment alternatives. As compared to the Preferred Alternative, many lands would be left untreated and would continue to be dominated by invasive plants or would be invaded in the future by

BLM_0000545

invasive plants. Landscapes containing a large component of invasive species often contrast with surrounding natural landscapes and have a negative visual impact. For example, downy brome often turns brown during summer, while native species usually remain green long into summer or fall.

### Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

The Preferred Alternative would result in the greatest short-term negative impact on visual resources, as it involves treatment of the most acres with herbicides. The most dramatic effects would be seen in states with the most acres treated, such as Idaho, Nevada, and Wyoming, and in project areas where large acreages are treated. Under the Preferred Alternative, projects with the largest treatment acreage (those over 2,000 acres in size; 10% of all herbicide treatments) would be located in Idaho (one-third of large-scale treatments) and Wyoming (20% of all large-scale treatments). One third fewer large-scale treatments would occur in New Mexico under this alternative than under the No Action Alternative. However, herbicide treatments in drier states, such as New Mexico, Nevada, and Wyoming, could have reduced visual impact because visual color contrast between natural and "browned" treated areas would be less dramatic (versus wetter states with higher percentages of green vegetation, especially coniferous forests). Over the long term, this alternative could have the greatest positive impact on visual resources, as invasive plants and unwanted vegetation would be removed and visually preferable native vegetation and ecosystems would become reestablished on more acres.

### Alternative C – No Use of Herbicides

Because no herbicide treatments would take place under Alternative C, visual resources would not be adversely impacted by herbicide treatments. Conversely, visual resources would not improve over time, and the visual quality of landscapes could become further degraded as invasive plants continued to invade and spread. There are certain kinds of invasive plants that are most effectively removed by herbicide treatments (e.g., Russian knapweed, purple loosestrife, Canada and Scotch thistles, yellow star-thistle); it may be difficult to eliminate these species by non-chemical treatment methods. In addition, if prescribed burning were to increase under this alternative in order to maintain control of invasive plants, visual impacts from blackened vegetation and landscapes and short-term

smoke would likely be more dramatic than visual impacts from herbicide use.

### Alternative D – No Aerial Applications

Impacts to visual resources under Alternative D would be less than under the Preferred Alternative, and similar to those under the No Action Alternative and Alternative E, based on number of acres treated. In addition, because large-scale treatments are less feasible without aerial spraying, fewer large areas of vegetation are likely to be killed by herbicides, further minimizing the short-term visual impact of herbicide treatments. Over the long term, however, this alternative would leave more large tracts of land untreated than the other treatment alternatives. Therefore, the No Action and Preferred alternatives, and Alternative E, could result in more large land areas of recovering native vegetation and ecosystems, and consequently improved visual quality over time.

### Alternative E – No Use of Acetolactate Synthase-inhibiting Herbicides

Based on number of acres treated, the visual impacts from herbicide treatments under this alternative would be similar to those under Alternative D. Visual impacts under this alternative would be somewhat moderated as compared to the Preferred Alternative because aerial and boom/broadcast spraying of larger tracts of land would be avoided, thereby reducing visibility of treated lands and sensitivity to treatments. In addition, imazapic, which is proposed for use in treating large expanses of downy brome, would not be used. As fewer large tracts of land with degraded visual quality would be treated, however, fewer large improvements would be made in the visual quality of vegetation and landscapes.

## Mitigation for Herbicide Treatment Impacts

No mitigation measures are proposed for visual resources.

# Wilderness and Special Areas

Because of their special status, wilderness and special areas have strict guidelines for vegetation treatments. These guidelines prohibit activities that degrade the quality, character, and integrity of these protected lands. Vegetation treatments used in wilderness areas follow the guidance contained in 43 CFR 6300 (*Wilderness*

BLM_0000546

ENVIRONMENTAL CONSEQUENCES

*Management*; Federal Register 2000), and in the *Management of Designated Wilderness Areas* Handbook H-8560-1 (USDI BLM 1988e), *Management of Designated Wilderness Areas* Manual 8560 (USDI BLM 1993), *Interim Management Policy for Lands under Wilderness Review* Handbook H-8550-1 (USDI BLM 1995) and the *Wilderness Inventory and Study Procedures* Handbook H-6310-1 (USDI BLM 2001a). The guidance states:

- Noxious weeds may be controlled by grubbing or with chemicals when they threaten lands outside wilderness or are spreading within the wilderness, provided the control can be done without serious impacts on wilderness values and treatments are necessary to maintain the natural ecological balances.

- Plant control must be approved for native plants when needed to maintain livestock grazing operations where practiced prior to the designation of wilderness.

- Reseeding may be done by hand or aerial methods to restore natural vegetation.

There are no set restrictions on vegetation treatments in other types of special areas. However, the unique characteristics of these areas would be considered when preparing management plans for treatment activities.

Herbicide treatments can be used to remove noxious weeds, as long as they do not adversely affect wilderness values. The proposed herbicide treatments could affect wilderness and special areas by altering the existing plant species composition and structure, and altering the visual qualities of treated areas.

## Scoping Comments and Other Issues Addressed in the Assessment

Respondents suggested that weeds should be stopped from spreading into wilderness areas by treating them outside of these areas, while others requested that treatments within wilderness areas be undertaken only after the spread of weeds outside of these areas has been effectively halted. Other respondents proposed that unique natural areas, including riparian zones, roadless areas, old growth areas, and areas of highest biological integrity, should be protected and that roadless areas should not be treated.

## Standard Operating Procedures

Actions that reduce the risk of spreading noxious weeds, prevent the establishment of new invaders, and promote public awareness would be encouraged by the BLM in wilderness and special areas.

- Encourage backcountry pack and saddle stock users to feed their livestock only weed-free feed for several days before entering a wilderness area.

- Encourage stock users to tie and/or hold stock in such a way as to minimize soil disturbance and loss of native vegetation.

- Revegetate disturbed sites with native vegetation if there is no reasonable expectation of natural regeneration.

- Provide educational materials at trailheads and other wilderness entry points to educate the public on the need to prevent the spread of weeds.

- Use the "minimum tool" to treat noxious and invasive vegetation, relying primarily on use of ground-based tools, including backpack pumps, hand sprayers, and pumps mounted on pack and saddle stock.

- Use chemicals only when they are the minimum method necessary to control weeds that are spreading within the wilderness or threaten lands outside the wilderness.

- Give preference to those herbicides that have the least impact on non-target species and on the wilderness environment.

- Implement herbicide treatments during periods of low human use, where feasible (USDI BLM 1988e).

- Address wilderness and special areas in management plans.

- Maintain adequate buffers for Wild and Scenic Rivers (¼ mi on either side of river, ½ mi in Alaska).

## Summary of Herbicide Impacts

In general, herbicide treatments in wilderness and special areas would have short-term negative effects and long-term positive effects on wilderness and special status area values. In wilderness areas and WSAs, only

BLM_0000547

treatments that improve the natural condition of these areas would be allowed. Therefore, long-term effects, if treatments were successful, would be beneficial; noxious weed infestations and risk of future catastrophic wildfires would be reduced in these areas.

The overall effect of herbicides on wilderness and special areas would depend on whether the end condition of the treatment site (considering both long-term benefits and short-term impacts) was an improvement in wilderness characteristics. In many cases (e.g., an eradication of a small population of an incipient pest, a prescribed fire that mimics historical fire), communities in the treatment area would quickly recover, and the overall effect would be positive. In other cases (e.g., treatments that require the creation of access roads to treatment sites, treatments that require repeated access to a site in order to meet a desired objective), the impacts of the treatment to the wilderness character of the site would outweigh the potential long-term benefits.

The short-term effects of vegetation treatments in other special areas would typically be less than those in wilderness areas, as human activities and influences are not necessarily incompatible with their unique qualities. However, all treatments would have the potential to alter these unique qualities, as well as to provide long-term benefits by controlling weeds and reducing fire risks.

The reduction of hazardous fuels and noxious weeds on lands adjacent or near to wilderness and special areas would provide long-term benefits by reducing the likelihood that noxious weeds would spread onto these unique areas, or that a catastrophic wildfire would burn through them, thus degrading their unique qualities. Because there would be fewer restrictions on the intensity of treatments on lands adjacent to wilderness and special areas, preventative treatments in these areas would eliminate or reduce the need for intrusive treatments in wilderness and special areas in the future. The need for emergency fire suppression activities, which can be very damaging, would also be reduced.

Use of herbicides to treat undesirable vegetation could potentially affect the "naturalness" of wilderness areas and WSAs by killing non-target native vegetation through imprecise application and/or drift. The degree of effects would depend on the application method, with spot applications less likely to cause adverse effects than aerial applications. For the most part, vehicle-mounted sprayers would not be used to treat vegetation, given the existing restrictions on wilderness areas.

However, vehicles could be used in extreme scenarios, if approved. The long-term effects of herbicide treatments on wilderness and special areas would depend on the success of the treatment in controlling noxious weeds. In most cases, the benefits of eradicating noxious weeds from wilderness and special areas would far outweigh the potential short-term negative effects of using chemical treatments.

The potential effects of chemical treatments on other special areas would depend on numerous site-specific factors, as discussed for the effects of other treatment methods above. Some special areas would support resources that are more sensitive to exposure to herbicides than the resources in other areas. There would also be human health risks involved with using certain types of herbicide application (e.g., aerial application) in special areas that are managed to support wilderness activities.

## Impacts by Alternative

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Impacts to wilderness and special areas under the No Action Alternative as a result of herbicide treatments would be similar to those that are currently experienced. Wilderness and special areas that are dominated by invasive species are usually less visually appealing and offer fewer wilderness characteristics. Under the No Action Alternative, the BLM would treat only a third of the number of acres treated under the Preferred Alternative. Although BLM field offices did not specifically identify how many acres would be treated in wilderness and special areas when providing information for this PEIS, it is presumed that fewer acres in wilderness and special areas would be treated under the No Action Alternative than under the other herbicide-treatment alternatives. Therefore, fewer positive benefits from herbicide treatments would be generated under this alternative, but there would also be fewer negative impacts on wilderness characteristics, species of concern, and other resources associated with herbicide treatments in wilderness and special areas. In addition, per capita vegetation treatments would not likely be as effective in restoring wilderness and special lands because the No Action Alternative would not allow the use of the four new herbicides evaluated in this PEIS.

BLM_0000548

ENVIRONMENTAL CONSEQUENCES

**Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)**

Because Alternative B involves the most treatment acres, it could also have the greatest short-term adverse impact on wilderness and special areas, primarily by resulting in the temporary closure of more lands. Along with these closures, there might be more lost opportunities for collection of plant materials than under other alternatives. Although only a small portion of the acres treated using herbicides would be in wilderness and special areas, more acres in wilderness and special areas would be treated under this alternative than the other alternatives. Thus, this alternative could have the largest positive impact on wilderness and special areas since it would reduce the risk of loss of wilderness values and improve wilderness characteristics over the largest acreage possible. As a result, recreation hours spent at a given site could be greatest under this alternative. Given the larger number of acres that would be treated, it is more likely that the BLM would be able to contain and eradicate noxious weed populations in wilderness and special areas under this alternative.

Under this alternative, four new herbicides would be available for use by the BLM, and herbicide treatments could occur in Alaska, Nebraska, and Texas. Based on the HHRA and ERA, the risks to recreationists and sensitive species from these new herbicides, in many cases, are less than risks associated with currently-available herbicides, such as 2,4-D, hexazinone, and triclopyr. The Alaska BLM does not anticipate using herbicides on public lands, and public lands in Nebraska and Texas are not associated with wilderness or other special areas.

**Alternative C – No Use of Herbicides**

Alternative C would have the benefit of protecting wilderness and special area users, sensitive species, and other resources from accidental exposure to herbicides. However, there are certain plants that could be injurious to humans, which are most easily controlled or eradicated using herbicides (e.g., Russian knapweed, purple loosestrife, Canada and Scotch thistles, yellow star-thistle). Therefore, Alternative C could negatively impact activities in wilderness and special areas, particularly camping, hiking, and other activities that would present opportunities for easy contact with these noxious weeds. Visitation to these lands could be lower than under the Preferred Alternative, and greater concentrations of visitors could occur in other wilderness and special areas, resulting in greater impact to these areas.

If other treatment methods were used in place of herbicides, these methods could have a greater impact on wilderness and special area values. For example, prescribed burning would be more likely to result in restricted access by recreationists, decreased air quality, more dramatic changes in the visual landscape for a longer period of time, and shorter visit times by recreationists and sightseers. In addition, it is likely that fewer acres would be treated in highly visible areas overall (as a result of the adverse visual and air quality impacts of prescribed burning), meaning that over the long term these areas would remain of a lower ecosystem quality. Fire use would also displace sensitive wildlife and could lead to erosion that impacts fish habitat.

**Alternative D – No Aerial Applications**

Aerial spraying would be uncommon in wilderness and special areas under all treatment alternatives. By prohibiting aerial spraying, Alternative D would likely limit the number of acres that could be covered by a single treatment. This limit to acreage could have the benefit of reducing the acreage of lands that are temporarily closed to wilderness use. Furthermore, wilderness and special areas and their values could be disproportionately negatively affected by this alternative if prescribed burning were to increase as a result of fewer larger-scale areas being treated with herbicides. Hunting, camping, backpacking, horseback riding, and other wilderness pursuits would be limited in burned areas, and possibly shifted to other areas.

**Alternative E – No Use of Acetolactate Synthase-inhibiting Active Ingredients**

Several components of Alternative E pertain to wilderness and special areas (see Appendix I). As discussed in the other resource sections, fewer acres would be treated under this alternative than under the Preferred Alternative and Alternative D. While fewer treated acres would tend to result in fewer negative and positive impacts, an increased emphasis on ecosystem-based management techniques under Alternative E would tend to decrease the short-term negative benefits and possibly increase the long-term positive benefits associated with this alternative. Limits on herbicide use in riparian areas under this alternative would minimize the potential for direct and indirect harm to riparian vegetation, aquatic animals, and water quality.

BLM_0000549

ENVIRONMENTAL CONSEQUENCES

Under Alternative E, the following restriction would be implemented: "except for treatment of small infestations without motorized equipment, prescribe treatments within designated wilderness or wilderness study areas only after the spread of invasive species from outside these areas has been effectively halted" (see Appendix I). Under the other treatment alternatives, however, actions could be taken to control invasive species within wilderness and special areas before controlling invasive species populations outside special areas. The BLM policy is to treat infestations where they are found and to prevent their further spread. By not treating an infestation in a wilderness or other special area until the larger invasive species problem outside of the area is addressed, invasive species populations within wilderness and special areas could grow beyond an effectively treatable level.

The five herbicides (chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl) that would not be used under this alternative are some of the least risky herbicides with respect to human health (see Human Health and Safety section). In addition, the ERAs predicted no risk to fish and terrestrial wildlife from most ALS-inhibiting herbicides (chlorsulfuron, imazapic, sulfometuron methyl), and a low risk in a few scenarios (imazapyr, metsulfuron methyl), suggesting that the elimination of these herbicides would not likely benefit wildlife and could indirectly harm wildlife in wilderness and special areas if more toxic herbicides were used in their place (see Wildlife Resources section). The other herbicides proposed for use by the BLM pose risks to non-target plants that are similar to those associated with these five herbicides; therefore, it is uncertain whether this use restriction would actually reduce risk to non-target plants. Thus, avoidance of ALS-inhibiting herbicides might provide few, if any, benefits to wilderness and special areas and special area users.

## Mitigation for Herbicide Treatment Impacts

Mitigation measures that may apply to wilderness and special area resources are associated with human and ecological health and recreation. Please refer to the Vegetation, Fish and Other Aquatic Resources, Wildlife Resources, Recreation, and Human Health and Safety sections of this chapter.

# Recreation

Approximately 40% of public lands are within a day's drive of 16 major urban areas in the West (USDI BLM 2005a). Outdoor recreation, nature, adventure, and heritage tourism are the fastest growing segments of the travel and tourism industry Recreational use of public lands consists predominately of camping and picnicking, which represented 43% of all visitor days in 2005 (USDI BLM 2006d). Other important recreational activities included non-motorized travel, such as hiking, horseback riding, and mountain biking; OHV travel; viewing public land resources and interpretation and education; and hunting. Snow- and ice-based activities, such as cross-country skiing, snowmobiling, and snowshoeing represented less than 1% of visitor days. The BLM administers many acres of public lands and facilities at least in part for these recreational pursuits. Many of these lands are managed for multiple uses; activities designed for one program or purpose (e.g., vegetation control/enhancement) must be compatible with other programs and purposes.

Less than 1% of the acreage considered in this PEIS consists of intensively managed, developed recreation areas that tend to have high public visitation. Many of these areas are near major urban areas in California, Arizona, and Utah, and include National Monuments and other National Conservation Areas (see Map 3-12). In these areas, the goals of vegetation treatments include maintaining the appearance of the area and protecting visitors from the adverse effects of contact with noxious weeds and other invasive/unwanted species. Treatments would likely be done using mechanical and manual methods, or with spot treatments using herbicides, and treatment effects on the public would be minimal. However, herbicide treatments would be more likely with increasing distance away from high-use visitor areas. Thus, hikers, hunters, campers, horsemen, livestock owners, and users of plant resources for cultural, social, and economic purposes would be at the greatest risk of coming into contact with herbicide treatment areas.

## Scoping Comments and Other Issues Evaluated in the Assessment

Several respondents remarked that treatments should not be used as an excuse to close OHV trails. Another commentor requested that areas not be treated solely to improve recreational use. If treatments require any travel or access routes to be closed, the impacts on

BLM_0000550

ENVIRONMENTAL CONSEQUENCES

recreation and nearby areas that would handle the shift in use should be addressed. The effects of herbicides on recreational users should also be addressed.

## Standard Operating Procedures

There are several SOPs that could help reduce the negative impacts of herbicide treatments on recreation:

- Schedule treatments to avoid peak recreational use times, while taking into account the optimum management period for the targeted species.

- Notify the public of treatment methods, hazards, times, and nearby alternative recreation areas.

- Adhere to entry restrictions identified on the herbicide label for public and worker access.

- Post signs noting exclusion areas and the duration of exclusion, if necessary.

- Use herbicides during periods of low human use, where feasible.

In addition, SOPs identified in the Human Health and Safety, Fish and Aquatic Resources, and Wildlife Resources sections should be implemented to further reduce risks to recreationists and the resources they use.

## Summary of Herbicide Impacts

Vegetation treatments would have short-term negative impacts and long-term positive impacts on recreation. During treatments, there would be some scenic degradation, as well as distractions to users (e.g., noise from machinery). In addition, there would be some human health risks to recreationists associated with exposure to herbicides. These risks are discussed in more detail in the Human Health and Safety section. Finally, some areas would be off-limits to recreation activities as a result of treatments, generally for a few hours or days, but potentially for at least one full growing season or longer depending on the treatment. In most cases, recreationists would be able to find alternative sites offering the same amenities, but a lessened experience could result if concentrated use occurred in these alternative sites.

Site closures would generally last for a short time period following herbicide application, depending on the recommendations on the herbicide label. Usually the recommended exclosure periods would not exceed 24 hours; however, recreational access could be restricted for a season or more to allow vegetation to recover following treatment.

During site closures, signs would be posted stating the chemical used, the date of application, and a contact number for more information, and would remain in place for a period of at least 2 weeks following treatment. Dead brown vegetation could temporarily reduce recreational potential until vegetation recovered, although in most cases any substantial amounts would be removed to avoid hazardous fuels build up. Chemical treatments could also pose some health risks to recreational users, which would be greatest for aerial herbicide applications, and to users engaging in activities such as ingesting berries or fish (see Human Health and Safety section). Chemical treatments would generally result in long-term benefits to recreationists by controlling noxious weeds and other unwanted vegetation and improving plant species diversity. Herbicide use would likely negatively impact sightseeing recreational opportunities, as further discussed in the Visual Resources section.

Developed recreation sites with public facilities would be treated in order to maintain the appearance of the area and to protect visitors from the adverse effects of unwanted vegetation (e.g. thistles, ragweed, and poison ivy). Long-term adverse effects on developed recreational facilities would be unlikely, as treatments are expected to improve the vegetative health and utility of these sites. In some cases, developed recreation sites could be temporarily closed during treatment implementation.

Dispersed recreation in non-developed areas would potentially be affected to a greater degree than recreation in developed sites because most of the 6 million acres of vegetation treatments would occur in these undeveloped, dispersed areas. Recreational activities in these areas are spread out across the landscape, and different types of recreational activities would be affected differently. Impacts to recreation in areas with a greater abundance of recreational opportunities (e.g., Alaska) would not be as significant as impacts to areas with less extensive recreational opportunities. However, over the long term, recreationists in these dispersed recreation areas would likely benefit from a reduction in invasive plants, especially thorny or poisonous noxious weeds, provided by herbicide treatments. In addition, herbicide treatments that reduce the risk of wildfire would reduce the likelihood of recreationists being displaced from favorite hunting, fishing, and camping sites by wildfires.

BLM_0000551

During the recent wildfires that swept through the Great Basin, not only were traditional recreation activities affected, but some special events were altered or cancelled. Signs were destroyed, hiking and camping areas burned over, wildlife and game displaced, and the scenery in the Great Basin marred (USDI BLM 1999).

Recreational use of motorized vehicles on public lands is typically limited to designated routes and trails. Trails located in areas of vegetation treatments would be closed during treatments and for a period of time following treatments to allow vegetation to recover. Closures could last for several growing seasons following treatments involving complete removal of vegetation was completely removed, while less intensive treatments may not require site closures beyond what is recommended for safety on herbicide-use labels.

The effects of herbicide treatments on fish and wildlife could have indirect negative impacts on recreational activities such as fishing, hunting, and wildlife viewing. For example, aerial application of an herbicide over a large area could adversely affect these types of recreation activities by harming or displacing game and non-game fish and wildlife species.

Vegetation treatments could also impact scenic views, particularly large treatments next to roads. The effects of vegetation management on the visual quality of the landscape are discussed further in the Visual Resources section.

The impacts of individual herbicides on recreation would differ primarily based on human health risks to recreationists and short-term recreation area closures. The Human Health and Safety section describes the potential risks to different types of recreationists (e.g., hikers, hunters, anglers, swimmers, and plant collectors) associated with exposure to different herbicides. Herbicide-use labels present the minimum period of time that a sprayed site must be closed to humans. The longer a site is closed, the greater the adverse effect to recreationists in terms of lost use days, particularly at sites that experience a higher volume of visitors. Because most mandatory site closure periods are less than 24 hours, it is expected that the impacts would be minimal, particularly if treatments were scheduled during a period of low visitation. On sites experiencing more extensive treatments, however, longer closures could be required to allow vegetation to recover.

Unintended impacts of herbicides on non-target plants and animals could impact recreation activities (e.g.,

hiking, plant collecting, hunting, and fishing) in off-site areas. The risks to non-target species from use of the evaluated herbicides are discussed in the Vegetation, Fish and Aquatic Resources and Wildlife Resources sections. The longer an herbicide lingers in soil (depending also on its ability to bind to soil [Koskinen et al. 2003]), the more likely it is to contaminate groundwater or run off into water bodies used by recreationists.

Over the long term, herbicide treatments would have a positive effect on recreation on treated lands. Removal of weedy vegetation would return public lands to a more "natural" or "desirable" condition, which hikers and nature enthusiasts would likely value over degraded lands. In addition, the increased aesthetic value of treated sites would benefit most recreational users. In some instances, treated sites could become more desirable as destinations for outdoor activities, making them more popular to recreational users. In addition, fuels reduction treatments would reduce the likelihood of future wildfires on public lands used for recreation. As a result, recreationists would be provided with safer conditions, and there would be less of a chance that a wildfire would burn a large acreage of lands used for recreation. Where wildfires do occur, they are capable of causing damage to recreational resources in large areas and affected sites require long periods of time for recovery. Treatment of sites to restore native vegetation would enhance fish and wildlife habitat, to the benefit of hunters, birdwatchers, and other users of these resources.

## Impacts by Alternative

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Impacts to recreation areas under the No Action Alternative as a result of herbicide treatments would be similar to those that are currently experienced. Assuming a steady increase in number of recreational users of public lands (although numbers of recreational visitors have held steady or trended slightly downward in recent years), there would be more impact to lands from human activities (e.g., spreading weeds, starting fires), but the same level of treatment. Developed and undeveloped recreation lands that are dominated by invasive species are usually less visually appealing and less attractive to recreationists than areas that support native plant communities.

BLM_0000552

ENVIRONMENTAL CONSEQUENCES

Most treatments would occur in New Mexico (32%), Idaho (19%), Wyoming (12%) and Nevada (8%). Although these states would account for 71% of treatment acres, they accounted for only 20% of visitor days during 2005 (USDI BLM 2006d). Thus, the likelihood of visitors to public lands coming into contact with herbicide treatment areas would be minor, as treatments would occur in states with relatively few visitors.

The No Action Alternative would treat only a third of the acreage treated under the Preferred Alternative, and therefore would fall short of the Preferred Alternative in its ability to treat vegetation and generate positive benefits for recreation lands and users, but would also have fewer negative impacts on recreation associated with herbicide treatments. In addition, per capita vegetation treatments would not likely be as effective in restoring recreation lands because the No Action Alternative would not allow the use of the four new herbicides evaluated in this PEIS. Because fewer total acres would be treated under this alternative than under the other herbicide treatment alternatives, this alternative might have fewer long-term recreation benefits than the other treatment alternatives, if a greater amount of treatment acres were to translate to a greater improvement of ecosystem health and scenic quality.

### Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

Because Alternative B involves the largest number of treatment acres, it could also have the largest short-term adverse impact on recreation, primarily by resulting in the temporary closure of more lands. Along with these closures, there might be more lost opportunities for collection of plant materials than under other alternatives. Because of the large number of treatment acres, however, this alternative could have the largest positive impact on recreation, since it would reduce the risk of visitor contact with undesirable plant species and would increase visitor exposure to desirable plants and wildlife over the largest acreage possible. As a result, recreation hours spent at a given site could be greatest under this alternative.

Under the Preferred Alternative, most treatments would occur in Idaho (28%), Nevada (22%), Wyoming (16%), and New Mexico (10%). Although these states account for 76% of treatment acres, they accounted for only 20% of visitor days during 2005 (USDI BLM 2006d). Thus, the likelihood of visitors to public lands coming into contact with herbicide treatment areas would be minor, as treatments would occur in states with relatively few visitors.

Under this alternative, four new herbicides would be available for use by the BLM, and herbicide treatments could occur in Alaska, Nebraska, and Texas. Based on the HHRA, the risks to recreationists from these new herbicides, in many cases, are less than risks associated with currently-available herbicides, such as 2,4-D, hexazinone, and triclopyr. Although the Alaska BLM does not anticipate using herbicides on public lands, treatments in Nebraska and Texas could potentially affect recreational users in those states.

### Alternative C – No Use of Herbicides

Alternative C would have the positive benefit of protecting recreationists from accidental exposure to herbicides. However, certain plants that can be injurious to humans are most easily controlled or eradicated using herbicides (e.g., Russian knapweed, purple loosestrife, Canada and Scotch thistles, yellow star-thistle). Therefore, Alternative C could negatively impact recreation activities, particularly camping, hiking, and other activities that would present opportunities for easy contact with these noxious weeds. Over 900,000 acres treated under the Preferred Alternative would not be subject to herbicide treatment under this alternative. As a result, these areas could have fewer recreationists because of dominance by undesirable plant species. Visitation to these lands could be lower than under the Preferred Alternative, and higher concentrations of visitors could occur in other areas, resulting in greater impacts elsewhere.

Furthermore, if other treatment methods were used in place of herbicides, these methods could have a greater impact on recreation. For example, prescribed burning could result in restricted access by recreationists, decreased air quality, and more dramatic changes in the visual landscape for a longer period of time. In addition, it is likely that fewer acres would be treated in highly visible areas overall (as a result of the adverse visual and air quality impacts of prescribed burning), meaning that in the long term these areas would remain of a lower ecosystem quality, limiting their attraction to recreationists.

### Alternative D – No Aerial Applications

It is unlikely that aerial spraying would occur in high public use recreational areas under any of the alternatives, but aerial spraying would occur in dispersed use areas under the No Action Alternative,

BLM_0000553

Preferred Alternative, and Alternative E. By prohibiting aerial spraying, Alternative D would also likely limit the number of acres that could be covered by a single treatment. This limit could have the benefit of reducing the acreage of lands that are temporarily closed to recreation. Furthermore, dispersed recreation (i.e., recreation in non-developed areas) could be disproportionately negatively affected by this alternative if prescribed burning were to increase as a result of fewer larger-scale areas being treated with herbicides. Hunting, camping, backpacking, horseback riding and other pursuits would be limited in burned areas, and possibly shifted to other areas.

### Alternative E – No Use of Acetolactate Synthase-inhibiting Active Ingredients

Under Alternative E herbicide treatments would result in impacts similar to those under Alternative D, with slightly fewer acres being treated and a reduced, though not eliminated, emphasis on aerial spraying. While fewer treated acres (over Alternative D) would tend to correspond to fewer impacts, an increased emphasis on ecosystem-based and passive management techniques under Alternative E would tend to decrease the short-term negative effects and possibly increase the long-term positive benefits associated with this alternative. For example, because spot treatments would be favored over broadcast treatments, Alternative E would limit the negative short-term impacts to recreationists from drift of herbicides into off-site areas that have not been temporarily closed to visitors. In addition, limits on herbicide use in riparian areas would minimize the potential for direct and indirect harm to riparian vegetation, aquatic animals, and water quality. As compared to the Preferred Alternative, however, this alternative would treat substantially fewer acres, resulting in fewer long-term improvements to the environmental quality of recreation sites.

The five herbicides (chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl) that would not be used under this alternative are some of the least risky herbicides with respect to human health (see Human Health and Safety section). In addition, the ALS-inhibiting herbicides either pose no risk to terrestrial wildlife (chlorsulfuron, imazapic, sulfometuron methyl), or low risk (imazapyr, metsulfuron methyl), suggesting that eliminating the use of these herbicides would be unlikely to benefit fish and wildlife and could indirectly harm fish and wildlife if more toxic herbicides were used in their place (see Fish and Other Aquatic Resources and Wildlife Resources

sections). Thus, there would likely be few, if any, benefits to anglers and hunters and other recreationists.

## Mitigation for Herbicide Treatment Impacts

Mitigation measures that may apply to recreational resources are associated with human and ecological health. Please refer to the Vegetation, Fish and Other Aquatic Resources, Wildlife Resources, and Human Health and Safety sections of this chapter.

# Social and Economic Values

## Introduction

Herbicide treatments have the potential to affect people, communities, and economies in each of the 17 western states that could receive treatments. The susceptibility of these entities to social and economic effects stems from the importance of public lands to the lives of the people and communities in the West, especially in the states with the largest amounts of public land. Public lands commonly provide a major portion of economic sustenance, especially in rural areas, by supporting ranching (grazing leases), mining, active and passive recreation opportunities, and a myriad of other activities that westerners rely on. The dollar value of the social sustenance may not be readily quantifiable, but it, too, is important to the way of life of westerners. "Wide open spaces" are not just a cliché in western songs and novels, they are a tangible part of the experience that attracts and/or retains people who live in western states. The large expanses of federal lands are a significant contributor to the open spaces that define the "sense of place" in many parts of the West. Through support of economies and the social context of the West, federal lands are highly important to the western states. Actions that affect federal lands, such as the application of herbicides, have the potential to affect the economic and social environment of the region.

The extent of potential effects would vary from state to state because of the differing prevalence of federal lands and also because the treatment area in each state would vary, both in acreage and in percentage of land area treated, depending on local issues and needs. The most pervasive effects would likely occur in states with large amounts of public land. During 2002, information was gathered from BLM field offices on the general location of herbicide treatment projects likely to occur under the No Action and Preferred alternatives. Based on this

BLM_0000554

ENVIRONMENTAL CONSEQUENCES

information, nearly two-thirds of herbicide treatments proposed under the Preferred Alternative would occur in Idaho, Nevada, and Wyoming, with the largest increases in herbicide use from current levels likely to occur in Nevada.

This EIS is programmatic in nature and very broad in scale. A programmatic analysis at this scale does not permit the completion of a detailed, quantitative social and economic analysis. Therefore, only general effects and expected trends will be addressed here. Concerned individuals should be assured that more detailed, site-specific analyses would be conducted during the development of actual herbicide treatment projects. Public participation in developing the details of such proposals would be encouraged at appropriate times in those processes.

## Scoping Comments and Other Issues Evaluated in the Assessment

Among the major concerns identified during scoping, were suggestions that economic and ecological costs and benefits to local communities and residents should be examined. Some individuals proposed that the BLM's needs for people and fiscal resources should be addressed, as should costs to state and local governments and private individuals, including secondary costs from such things as loss of recreational use activities. Environmental justice issues—disproportionate effects on minorities, low-income, and child populations —and Indian Trust issues were raised. Several comments addressed potential economic effects on ranchers from grazing restrictions or changes to forage productivity, while others questioned whether grazing permittees would pay for a portion of the treatment costs. A few respondents questioned whether the BLM would perform the treatment work or contract it out; others proposed contracting to local vendors. Some were concerned about potential economic effects on local fire fighters. Evaluation of the effects of the herbicide use alternatives, both beneficial and detrimental, will address these issues to the greatest degree possible, given the scale of the potentially affected geographic area and the necessarily inexact nature of the alternatives in advance of specific treatment project proposals.

There are numerous stakeholders throughout the western U.S. with differing needs and perspectives, and all of their interests must be taken into consideration when planning the treatment program. On a local level, stakeholders include people in communities located in the vicinity of public lands, such as adjacent landowners, local businesses, and users of public lands (e.g. ranchers and recreationists), as well as the counties and states that benefit from BLM revenues. On a national level, the stakeholders include all taxpayers, whose tax dollars support BLM programs and who have partial "ownership" of federal public lands. Given the wide range in stakeholders whose needs and interests must be considered, many different and often conflicting opinions must be considered. The alternative selected for implementation will be one that balances both national and local interests.

## Standard Operating Procedures

Herbicide use would affect local social and economic resources; some effects would be adverse. Following selected SOPs would reduce some of the adverse effects. The following general procedures are designed to reduce potential adverse impacts to social and economic conditions from the application of herbicides in the BLM vegetation management program:

- Consider surrounding land use before selecting aerial spraying as a method, and avoid aerial spraying near agricultural or densely-populated areas.

- Post treated areas and specify reentry or rest times, if appropriate.

- Notify adjacent landowners prior to treatment.

- Notify grazing permittees of livestock feeding restrictions in treated areas if necessary, as per label instructions.

- Notify the public of the project to improve coordination and avoid potential conflicts and safety concerns during implementation of the treatment.

- Control public access until potential treatment hazards no longer exist, per label instructions.

- Observe restricted entry intervals specified by the herbicide label.

- Notify local emergency personnel of proposed treatments.

- Avoid aerial spraying during periods of adverse weather conditions (imminent snow or rain, fog, or air turbulence).

- During helicopter applications, apply herbicides at an airspeed of 40 to 50 miles per

BLM_0000555

hour (mph), and at an elevation of about 30 to 45 feet above ground.

- Comply with herbicide-free buffer zones to ensure that drift will not affect crops or nearby residents/landowners.

- Use spot applications or low-boom broadcast applications where possible to limit the probability of contaminating non-target food and water sources, especially vegetation over areas larger than the treatment area.

- Consult with Native American tribes and Alaska Native groups to locate any areas of vegetation that are of significance to the tribe and that might be affected by herbicide treatments.

- Work with Native American tribes and Alaska Native groups to minimize impacts to these resources.

- To the degree possible within the law, hire local contractors and workers to assist with herbicide application projects.

- To the degree possible within the law, purchase materials and supplies, including chemicals, for herbicide treatment projects through local suppliers.

- To minimize fears based on lack of information, provide public educational information on the need for vegetation treatments and the use of herbicides in an Integrated Pest Management program for projects proposing local use of herbicides.

These procedures would help minimize impacts to people, communities, and human activities in the vicinity of herbicide treatment projects on public lands in the 17-state study region.

## Impact Assessment Assumptions

The social and economic analyses for the application of herbicides are guided by a number of key assumptions. First and foremost, this is a 17-state PEIS with no site-specific information on which types of herbicides would be used in any particular area. Consequently, there will be little or no discussion of specific application parameters; any such discussion will be strictly to provide examples. It is expected that communities that are particularly dependent on a single industry are more susceptible to the effects of herbicide use than other communities. In particular, ranching communities and

recreation-dependent communities may be more affected than more diversified communities. However, it is not possible to identify particular communities at this scale of analysis. More specific analysis of the effects to communities would be conducted when individual projects were proposed, and the analysis would consider elements cited in this section.

The proposed use of herbicides would only apply to public lands; this PEIS does not attempt to predict possible decisions or actions by other agencies or private individuals. Also, it is not expected that any of the alternatives would significantly affect ongoing, long-term trends such as the increasing demand for outdoor recreation or growth in urban, suburban and rural populations, particularly in states from the Rocky Mountains to the Pacific.

It is assumed that herbicide treatment alternatives would meet, to different degrees, the need for the proposed action (i.e., reduce the risk of wildland fire and improve ecosystem health). Herbicide treatments would reduce the risk of wildland fire by reducing hazardous fuels to reduce the size and severity of wildland fires. In turn, the cost of wildland fire suppression and the loss of life and property would be reduced. Treatments that improve ecosystem health could increase or improve the amount and quality of commercial and casual uses, improve or maintain market and non-market values of existing uses, and reduce the cost of operations on public lands. However, it was not possible to quantify these benefits at this programmatic level of analysis, since there is uncertainty as to when, where, and how treatments would occur.

## Summary of Herbicide Impacts

Social effects of the individual herbicides are, for the most part, impossible to differentiate at the scale addressed by this PEIS. The potential for differing social effects among the chemicals would derive from people's perceptions of different health and safety risks for different chemicals. Data on such perceptions are not available, and, in fact, could differ from one community to another, depending on the level of knowledge about herbicides in the community and possible past experiences with their use (or "misuse," such as accidental spills or damage to non-target plants). The Human Health and Safety section in this chapter discusses health and safety issues related to the proposed herbicides in more detail. There is also some potential for beneficial or adverse effects on the social fabric of communities depending on the success or

BLM_0000556

ENVIRONMENTAL CONSEQUENCES

failure of vegetative treatment programs using various chemicals. Successful improvement in the productivity of rangeland, for example, would help sustain a ranching-dependent community, whereas lack of success could put additional pressure on often tight economic margins in ranching, which would tend to encourage out-migration. Successfully reducing hazardous fuels in the WUI could encourage people to remain in, or move to, a community, whereas major fire losses, particularly in smaller communities, could encourage some people to move away. These potential effects are somewhat speculative, but should be examined more closely at the project-specific level.

Economic effects of individual herbicides on communities could be similar to social effects. Changes in range productivity, wildfire risk, and access or attractiveness for recreation activities could potentially affect employment opportunities and income levels in a community, in either a positive or negative fashion. As with social effects, however, the broad scale of this PEIS and the lack of data preclude the ability to accurately predict whether and where such effects would occur, and whether they would be beneficial or adverse.

There would be direct and indirect economic effects from application of herbicides. These effects would vary, depending on the quantities of each herbicide selected for use and the methods of application for each. Table 3-23 illustrates the dramatic differences in costs associated with the various herbicides used in 2005, which ranged from approximately $1 per acre for tebuthiuron to almost $127 per acre for bromacil.

In addition to the chemical costs, there would be costs for applying the herbicides. The USDA Forest Service (2005) estimated the average cost per acre for application at $100 for ground application and $25 for aerial application. The BLM's range of estimated application costs is even broader. For ground applications, the BLM's estimates range from $50 to $300 per acre for backpack or ATV applications, and $25 to $75 per acre for boom sprayer applications. Aerial applications are estimated at $6 to $40 per acre for fixed-wing aircraft and $25 to $200 per acre for helicopter applications. The differences are largely due to the variation in labor and time required to cover an acre by each application mode. It takes many more man-hours to treat an acre on foot or from a small ATV, for example, than to treat an acre with an aircraft. At best, all of these estimates are crude averages; actual costs would vary widely, dictated by terrain, scale of the treatment project, accessibility of the treatment area,

size of the problem vegetation stand being treated, and other factors. None of the specifics of these factors are available for evaluation at the programmatic level, but they would be analyzed in greater detail for specific projects as they were developed.

The source of labor for the applications, included in the application cost, would vary with the project. Aerial application projects would be contracted out in most cases. Ground applications would be done by a combination of contractors and BLM personnel, either full-time or part-time employees. The determination of in-house or contract application would be determined for each project individually, depending on the specific needs of the project and the capabilities of the state or local BLM office.

Purchase of chemicals and contracting of applications would generate dollars to benefit the economy; the location of the benefit would depend on where the chemicals and contractors were obtained. Locally purchased chemicals would generate more local benefit, for example, whereas mass purchase of chemicals from a state or national distributor would likely have little local benefit. Herbicide application would tend to sustain local employment, and, in some cases, provide temporary employment for others.

## Impacts by Alternative

### Impacts Common to All Alternatives

#### Population and Demography

None of the five alternatives being analyzed are likely to cause substantive changes to existing patterns and trends in population or demographic conditions in the western states. While there would be some increased employment generated by the increase in BLM acreage treated with herbicides under each of the alternatives, the jobs would generally be short-term, temporary positions or contracted work, which would not be sufficient to encourage measurable in-migration of workers and their families. With few exceptions, perhaps including pilots and certified herbicide applicators, jobs generated by the increased herbicide treatments program would tend to pay moderate wages. Depending on the size and duration of any particular treatment project, there could be small, localized population increases, but it is not possible to ascertain if, or where, such changes would take place at this time. It is unlikely that any such growth would excessively burden the community in which it would occur because

BLM_0000557

ENVIRONMENTAL CONSEQUENCES

the growth would be small, even in the context of the rural West.

### *Environmental Justice*

Executive Order No. 12898, "*Federal Action to Address Environmental Justice in Minority Populations and Low-Income Populations*" (59 FR 7629), is "intended to promote nondiscrimination in federal programs substantially affecting human health and the environment, and to provide minority communities and low-income communities access to public information on, and an opportunity for participation in, matters relating to human health and the environment." It requires each federal agency to achieve environmental justice as part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects, including social and economic effects, of its programs, policies, and activities on minority and low-income populations.

Environmental justice concerns are usually directly associated with impacts on the natural and physical environment, but these impacts are likely to be interrelated with social and economic impacts as well. Native American and Alaska Native access to cultural and religious sites may fall under the umbrella of environmental justice concerns if the sites are on tribal lands or a treaty right has granted access to a specific location.

USEPA guidelines for evaluating potential adverse environmental effects of projects require specific identification of minority populations when either: 1) a minority population exceeds 50% of the population of the affected area, or 2) a minority population represents a meaningfully greater increment of the affected population than that of the population of some other appropriate geographic unit.

Public lands occur predominantly in rural areas. There are large minority populations in rural areas of the West and Alaska, particularly Hispanics and Native Americans. Approximately 63% of the nation's Hispanic population, 68% of the nation's American Indian population, and 50% of the nation's Asian/Pacific Islander population reside in the western U.S., which contains less than 32% of the nation's total population (Table 3-15). In addition, Hispanics represent a high percentage of the total population of some states, including New Mexico, California, Texas, and Arizona, in particular. Similarly, Alaska, New Mexico, and several other western states have disproportionately high percentages of Native Americans and Alaska Natives. Issues of concern might include the propensity of Native Americans and Alaska Natives to use native plants for cultural and traditional purposes, and the potential for herbicides to damage some of these native plants if projects are not carefully planned and implemented. This combination of factors suggests the possibility that any significant effects associated with herbicide use for vegetation treatments could disproportionately affect these minority populations. It is not possible to determine whether minorities or low income populations would actually be disproportionately affected at this broad scale of analysis, however, because it is not known if treatment areas would coincide with concentrations of minority or low-income populations, or with Native American and Alaska Native use areas. Specific evaluations of environmental justice impacts would be conducted in concert with environmental analyses for site-specific treatment project proposals.

Issues specific to Native Americans, such as subsistence gathering of rangeland products, have been addressed in more detail in the Cultural and Paleontological Resources section, but they must also be addressed in detail with project-specific analyses.

### *Protection of Children*

Executive Order 13045, *Protection of Children from Environmental Health Risks and Safety Risks,* instructs federal agencies to identify and assess environmental health risks and safety risks that may disproportionately affect children, and to ensure that their policies, programs, activities, and standards address disproportionate risks to children that result from environmental health or safety risks. Children could have a greater chance of being exposed to health and safety risks associated with vegetation treatments than adults because they typically spend more time outdoors, and because children, especially young children, tend to be more vulnerable to adverse effects from exposure to environmental contaminants. Although children may spend more time outdoors, they are not often on public land without adult supervision because of the remoteness of most public lands. Thus, the increased opportunity for exposure would generally be negligible to minor. If there are potential risks for adverse effects to people who happen to be outside in the vicinity of herbicide treatments, the project could have a disproportionate effect on children.

BLM_0000558

### *Employment and Income*

All of the vegetation treatment alternatives would result in economic benefits to western states and local communities by providing employment and labor income opportunities. The BLM would require the services of local pesticide applicators, pilots, and others, creating jobs and generating income. The benefits are not quantifiable at the scale of this analysis; they would be small in the context of the 17-state region, but could be more significant for some communities, depending on the expertise and availability of personnel in the relevant BLM offices. Local effects cannot be determined at the scale of this PEIS, but details of local economic effects would be determined at the time specific projects were analyzed under NEPA regulations. Regardless of the local economic situation, the nature of treatments indicates employment and related income effects would be short-term in nature and geographically dispersed, benefiting certain communities throughout the 17-state study area. In general, it is expected that communities located in areas with large amounts of public lands, and therefore the most potential treatment acreage, would receive the greatest employment and economic benefits. Idaho, Nevada, Wyoming, and New Mexico are the four states with the largest anticipated treatment acreage under each of the five alternatives, which suggests that communities in these states would also be among the largest beneficiaries of employment and income effects from the proposed herbicide program. Employment and income effects would have the greatest impact on smaller communities, where the increase in jobs and dollars would have a greater influence on the area economy than it would in or near larger towns and cities.

### *Perceptions and Values*

A range of stakeholder perceptions and values would be influenced by the herbicide treatment alternatives. For example, individuals who have an aversion to chemical use in the environment could find all of the alternatives offensive, except Alternative C. Alternatively, individuals with a much greater concern about wildfires or the effects of invasive species would likely favor the most efficient means of attacking vegetation problems. Some westerners have philosophical issues with government ownership and management of large land areas, but they might be somewhat encouraged by plans to employ private contractors for some of the treatment work and would presumably favor the most efficient means possible to reduce fire risk and improve range productivity. Some individuals place high values on the health and pristine nature of the land and would therefore prefer to see that the least intrusive methods be implemented. All of the alternatives have similar negative and positive responses to these perceptions and values. A few differences are addressed below.

### *Invasive Species Control Cost Savings*

Estimating the environmental and economic damages caused by invasive vegetation, and the environmental benefits and cost savings from treating invasive vegetation, cannot be quantified at the 17-state regional scale. However, on a national scale, the costs of treating invasive vegetation can be enormous. For example, purple loosestrife, which occurs in 48 states, costs approximately $45 million per year on control (ATTRA 1997). A total of $100 million is spent annually in aquatic invasive species control in the U.S. (OTA 1993). In. U.S. agriculture, crop losses due to weeds are estimated at $24 billion annually, and costs of herbicide treatments are about $3 billion annually (Pimentel 1997, 2005). Forage losses due to weeds total about $1 million annually, and ranchers spend about $5 billion annually to control invasive vegetation in pastures and rangelands. Total direct and indirect costs of leafy spurge in Montana, South Dakota, and Wyoming is estimated at nearly $2 million annually on wildlands and up to $46 million annually for grazing lands (Bangsund and Leistritz 1991; Bangsund et al. 1993). Annual losses from knapweed in Montana are estimated at over $40 million annually (Hirsch and Leitch 1996). The Research Group (2000) evaluated the impacts of 21 species of weeds and estimated that both existing and potential invasive weeds are costing Oregon about $100 million annually.

Studies that have attempted to project the costs and benefits of treating leafy spurge and yellow star-thistle have shown that benefits could total over $50 million or more annually if leafy spurge is controlled in the Great Plains region (Bangsund et al. 1997, 1999a). Still, net returns per acre are often negative early in the treatment program, with gains in net return not seen until 10 years or more after treatment, with highest returns from ground spraying rather than aerial spraying programs ((Bangsund et al. 1996, 1999b; Hartmans 1997). Kadrmas et al. (2003) estimated the cost of treating 50 acres of public lands using a single application of herbicides and single attempt at revegetation. The cost of treating 50 acres of weeds was estimated at $7,500 at year 0. However, if the 50 acres were not treated and the weeds continued to spread, weeds would cover an estimated 182 acres by year 18 and it would require

BLM_0000559

approximately $27,000 to restore to a healthy ecosystem.

### Wildland Fire Cost Savings

All of the herbicide treatment alternatives would commit approximately half of the treatment acreage to hazardous fuels and invasive weed reduction in the WUI. Neither the suppression cost savings, nor the reduction in property losses can be quantified at the 17-state regional scale. The potential savings should be addressed further in environmental reviews for specific projects, although they may not be quantifiable even at that scale because of the number of variables contributing to when and where a fire may start and how much damage it may cause. These factors include weather conditions, terrain, human acts of omission, and structure type and density, among others. Further, it may take several years to build a sufficient experience base of data to quantitatively estimate the benefits of vegetative treatment on wildfire suppression costs and damage reduction. The Forest Service and BLM came to similar conclusions when trying to ascertain the effects of vegetation treatment activities on future fire suppression costs in the Interior Columbia Basin (USDA Forest Service and USDI BLM 2000).

Despite the lack of quantifiable data, it is expected that herbicide treatments in non-WUI areas would also reduce hazardous fuels, including invasive weeds, which contribute disproportionately to fire risk. Downy brome provides one example of the potential cost savings from attacking invasive weeds, and the costs of fighting downy brome-fueled fires have been estimated at around $20 million per year, and up to $15 million annually in southern Idaho alone, including rehabilitation costs (Duncan and Clark 2005). Consequently, it is expected that all of the alternatives would reduce the cost of fire suppression in the backcountry as well as in the WUI.

### Economic Activity and Public Revenues Generated from BLM Lands

Commercial activities that occur on public lands could be affected by vegetation treatments. Vegetation treatments would not directly affect mineral resources, but could temporarily reduce access to such resources. Vegetation treatments would be unlikely to cause significant reductions in BLM revenues generated from mineral leases. Most of the BLM's mineral lease revenues come from Alaska, Colorado, and Montana (see Table 3-18), yet only about 8% of the herbicide treatments would occur in these three states under the

Preferred Alternative; herbicide treatments would not be allowed in Alaska under the No Action Alternative. Further, restrictions on access for these activities are likely to be minimal in most places because durable road access is generally required for commercial mineral extraction ventures. Consequently, adverse effects on employment and revenue from mineral production due to herbicide treatments, if any, would likely be very minor.

Historically, nearly all of the BLM's revenues from timber sales came from Oregon. In 2005, timber sales amounted to $26.4 million and nearly all timber revenues were from Oregon ($23.5 million, Table 3-18), where at most about 8% of all herbicide treatments are proposed to occur. Treatments would result in long-term improvements in the condition of forest resources and would lead to increases in potential products and revenues generated from public lands over the long term. However, the potential effects are not quantifiable at the scale of this PEIS.

Effects on harvesting other vegetation (non-timber) products would depend on the product and the design of specific herbicide treatment projects. Indiscriminate application of herbicides could damage resources or reduce their value. Alternatively, herbicidal control of undesirable, invasive plants could enhance the habitat for desirable species. Public involvement in project planning and environmental review should be encouraged to minimize adverse effects and maximize benefits.

Herbicide treatments would necessitate some site closures to grazing activities during treatments and for a suitable recovery period afterward, both for effectiveness of the treatment and for safety of the livestock. Treatments that require temporary rest from grazing would result in a reduction in forage for livestock. Although alternative grazing sites may be available, the costs associated with grazing in a different area would likely be higher. The economic effects of temporarily reducing forage production and/or access would vary depending on the size and flexibility of the affected ranching operations. It is not possible to quantify the effects at the 17-state regional scale. Although forage production could decrease initially following treatment, production would likely increase over the long-term as woody vegetation and weed species were controlled, increasing the suitability of rangeland areas for grazing. Treatments would result in an increased quantity and quality of forage, increased animal production, reduced fire hazard, and a reduced risk of sickness in livestock associated with ingesting

BLM_0000560

ENVIRONMENTAL CONSEQUENCES

poisonous plants (see the Livestock section in this chapter for more information). As for other vegetation products, public involvement in project planning and site-specific environmental review should be encouraged to minimize adverse effects and maximize benefits.

Recreation-based businesses such as outfitters, bait shops, OHV sales and repair shops, fish and hunting shops, and outdoor gear and equipment rental shops are direct beneficiaries of recreational activity. Other services such as gas stations, restaurants, and hotels that are frequented by recreationists also benefit. Temporary closure of a popular recreation site, either to protect public safety during herbicide treatments or to decrease user-related impacts during the site's post-treatment recovery, would result in temporary losses of revenues to surrounding businesses. In most cases, these effects would be short term in nature, lasting only as long as the site closure. In general, most recreational activities would continue, but would shift to other locations (see the Recreation section in this chapter). Depending on the location of the alternate use area, the economic benefits would shift from one community to another. If there were a suitable nearby alternative to the closed site, the effects on surrounding businesses would be minimal; if not, the businesses would be adversely affected for a period of time. It is not possible to quantify the potential effects at the 17-state regional scale, or to identify businesses that would benefit from or be harmed by potential shifts in recreational activities. Over the long term, an improvement in the quality of a site from vegetation treatment could lead to increased recreational usage and a net increase in revenues to surrounding businesses. Reductions in hazardous fuels and the risk of wildfires would benefit the economies of rural communities, which are often dependent on recreational and wilderness values. In some cases, severe wildfires, particularly those occurring during the tourist season, could cause long-term disruption to recreation values, which would adversely affect recreational businesses. To the degree that treatments would reduce the risk of wildland fires, the herbicide treatment alternatives would benefit recreation-related economic activity.

Recreation provides revenues to the BLM through fees and permits. Closure of a popular fee-based recreation site would result in a loss of revenues to the BLM. The severity of any such losses cannot be determined at this scale because no specific fee-based recreation sites have been identified for treatment. Detailed effects would be examined at the site-specific project level.

*Expenditures by BLM (Financial Efficiency)*

Herbicide treatments would require a large financial investment by the BLM, which would vary by alternative. These costs represent a substantial input of financial resources into the communities surrounding BLM lands, particularly in areas where BLM land-holdings are extensive.

The most cost-effective alternative is the one that produces the greatest benefits for the least amount of financial investment. The cheapest alternative, if it did not substantially improve the health of the land, could require indefinite repeat treatments, thus costing more money over the long term. Unfortunately, it is not possible to determine, on a 17-state regional scale, which broad alternative would be most cost-effective. Benefits to the health of the public lands depend on the specific problem to be addressed in each specific area. These benefits would be evaluated on a site-specific basis as project proposals were developed. Irrespective of the particular alternative selected, the costs associated with restoring or maintaining an ecosystem through vegetation treatments is generally much less than the cost of suppressing wildfires and implementing fire rehabilitation programs (USDI 2001).

An additional consideration regarding BLM expenditures is the distribution of payments to state and local governments (see Table 3-24). None of the herbicide treatments would affect these payments, as they are established by Congress, and none of the alternatives would alter the formula-based payments.

If goods and services were purchased locally, or additional workers were hired locally in support of the herbicide treatment alternatives, state and local governments would benefit through increased tax revenues. The relative public benefits would depend on the taxing structure of the individual states.

*Effects on Private Property*

Herbicide treatments could affect private property in the vicinity of public lands, particularly parcels adjacent to treatment areas. Over the short term, there would be minor risks for property damage associated with herbicide treatments because it is possible that some herbicide could drift onto private property, especially during aerial treatments. Under such a scenario, crops could be lost, or, alternatively, rangeland weeds could be killed, resulting in benefits to private property. Losses and gains would likely be minor and short term in nature.

Over the long term, a reduction in hazardous fuels on public lands would reduce the likelihood of wildfires migrating from public lands to nearby private property and impacting the WUI. Herbicide treatments would also reduce the risks of noxious weeds spreading onto neighboring parcels, including poisonous weeds, which could harm livestock. A reduction in such risks could lead to increased property values over the long term. Any such effects are not quantifiable at this scale of analysis.

**Impacts of Individual Alternatives**

The following sections discuss the expected effects of each of the five alternatives on social and economic resources. These effects vary in degree, for the most part, rather than in kind. The differences depend on the percentage of acres treated using different application methods and on the total acreages to be treated. Because very little quantification of effects is possible at the 17-state regional scale, the differences are often stated roughly in proportion to the acreages to be treated.

### *Alternative A – Continue Present Herbicide Use (No Action Alternative)*

Under the No Action Alternative, the BLM would continue its ongoing vegetation treatment programs in 14 western states, and would be able to use 20 herbicides previously approved under earlier RODs. Approximately 305,000 acres would be treated with herbicides annually.

Since future treatment levels would be similar to current levels, there would likely be little change to existing patterns and trends in population or demographic conditions in the western United States. While there would be localized increases in employment generated by the increase in BLM acreage treated with herbicides under this alternative, the jobs would generally be short-term, temporary positions or contracted work, which would not be sufficient to encourage measurable in-migration of workers and their families.

Most treatments would occur in New Mexico (32%), Idaho (19%), Wyoming (12%) and Nevada (8%). Except for New Mexico, these states have substantially lower per capita minority and Native American populations than the entire western U.S. (see Table 3-15). In addition, the percentage of the population under 18 in these states is less than or similar to the percentage in the remainder of the West. Thus, disproportionate impacts to minority populations and children from vegetation treatments should not occur under this alternative. Public lands provide lifeway values for Indian tribes, and there is concern among Indian tribes and the public that the BLM vegetation treatments could adversely impact native plants used for cultural and traditional purposes if projects are not carefully planned and implemented. The BLM would consult with Indian tribes before implementing treatments that could impact vegetation of importance to Indian tribes to reduce these potential impacts.

Based on the assumption that the average costs to treat vegetation using ground-based and aerial methods are $35 per acre and $125 per acre, respectively, and using information on the cost of herbicides in Table 3-23 and assumptions from the BLM on the percentage of acres to be treated using ground- and aerial-based methods for each herbicide, approximately $30.1 million would be spent on herbicide applications; $24 million would be spent on ground-based applications, and $6.1 million would be spent on aerial applications under the No Action Alternative. The cost per acre treated would be approximately $98.70 per acre.

These expenditures would provide employment and income benefits. Regardless of the local economic situation, the nature of treatments indicates employment and related income effects would be short-term in nature and geographically dispersed, benefiting certain communities throughout the 17-state study area. In general, it is expected that communities located in areas where the most acres were treated would receive the greatest employment and economic benefits.

Neither the suppression cost savings nor the reduction in property losses can be quantified at the 17-state regional scale under this alternative. However, benefits would be most likely to occur in ecoregions/states with the greatest number of acres treated (Idaho, Wyoming, Nevada, and New Mexico; Temperate Desert Ecoregion), or where the risk of fire starting by lightning or human causes is greatest (California in 2005; USDA Forest Service 2000b, USDI BLM 2006c).

Commercial activities that occur on public lands could be affected by vegetation treatments. As noted earlier, most treatments would occur in New Mexico, Idaho, Wyoming, and Nevada. Only about 1% of timber sales occur in these states. Effects on timber sales from vegetation treatments would be greatest in Oregon, where over 95% of timber sales occur. Based on grazing leases, licenses, and permit fees, over 55% of these expenditures occur in these states, while 44% of active animal unit months occur in these states (see Table 3-6; USDI BLM 2006c). Oregon and Utah also have large

BLM_0000562

ENVIRONMENTAL CONSEQUENCES

populations of livestock on public lands. Thus, vegetation treatment activities could affect grazing activities and income in these states. Effects on recreation expenditures would likely be modest, as only 27% of recreation expenditures would occur in these four states. Treatments in California, Oregon, and Utah would be more likely to affect recreation expenditures, as nearly 56% of annual recreation expenditures occur in these states.

Herbicide treatment effects on private property from drift and accidental applications would be less under this alternative than under the other treatment alternatives. Over the long term, a reduction in hazardous fuels on public lands would reduce the likelihood of wildfires migrating from public lands to nearby private property and impacting the WUI. Herbicide treatments would also reduce the risks of noxious weeds, including poisonous weeds, spreading onto neighboring parcels. These benefits would be less under this alternative than under the other treatment alternatives.

### Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

The Preferred Alternative would result in herbicide treatments on approximately 932,000 acres annually in 17 western states. In addition to the 14 previously-approved herbicides, the BLM would be able to use the four new herbicides evaluated in this PEIS.

As future treatment levels would be 3 times that of current levels, there would likely be a minor change in existing patterns and trends in population and demographic conditions in the western states. While there would be localized increases in employment generated by the increase in BLM acreage treated with herbicides under the Preferred Alternative, the jobs would generally be short-term, temporary positions or contracted work, which would not be sufficient to encourage measurable in-migration of workers and their families.

Under the Preferred Alternative, most treatments would occur in Idaho (28%), Nevada (22%), Wyoming (16%), and New Mexico (10%). Except for New Mexico, these states have substantially lower per capita minority and Native American populations than the entire western U.S. (see Table 3-15). In addition, the percentage of the population under 18 in these states is less than or similar to the percentage in the remainder of the western U.S. Thus, disproportionate impacts to minority populations

and children from vegetation treatments should not occur under this alternative. The potential for impacts to plants that provide traditional lifeway values would be greatest under this alternative. Some treatments could occur in Alaska, Nebraska, and Texas under this alternative.

Anticipated adjustments to herbicide usage would not substantively change the expenditure per acre for chemicals, as nearly 90% of the herbicide usage would simply be a proportional increase in the pattern of active ingredients used in recent years. Of the four new herbicides, imazapic would be the most heavily used; it falls in the lower price range for chemicals. Detailed information is not available on types of herbicides to be used in each of the proposed treatment projects. However, based on information obtained from field offices in 2002, it is assumed that approximately 45% of the acreage would be treated from the air and 55% from the ground. Under this scenario, it is expected that existing social and economic trends would continue, with a substantial increase in economic activity generated.

Based on the assumptions given under the No Action Alternative for costs to treat vegetation using herbicides, approximately $69.6 million would be spent on ground-based applications, and $19.5 million on aerial applications, or $89.1 million for all applications under the Preferred Alternative. This figure is about 3 times the amount that would be spent under the No Action Alternative. However, the average cost per acre treated would be $95.60 per acre, or 3% less per acre than under the No Action Alternative.

Considering the scale of the increase in the herbicide treatment program under the Preferred Alternative, it is expected that the economic benefits would likely spread to more local communities than under the other treatment alternatives, and that some individual communities would experience substantial gains. Which communities would be affected, and to what degree, cannot be determined at this time.

Neither the suppression cost savings nor the reduction in property losses can be quantified at the 17-state regional scale under this alternative. However, benefits would be greatest under this alternative because of the acreage treated. As with the other treatment alternatives, benefits would be most likely to occur in those ecoregions/states with the greatest number of acres treated (Idaho, Wyoming, Nevada, and New Mexico; Temperate Desert Ecoregion), or where the risk of fire starting by lightning or human causes is greatest

BLM_0000563

(California; USDA Forest Service 2000b, USDI BLM 2006c).

Commercial activities that occur on public lands could be affected by vegetation treatments. As with the other treatment alternatives, effects on commercial activities should be greatest in those states where most acres would be treated (Idaho, Wyoming, Nevada, and New Mexico), where most timber sales occur (Oregon), where most grazing occurs (Wyoming, Montana, Idaho, Utah, and Oregon), and where the greatest recreation expenditures occur (California, Oregon, and Utah).

Herbicide treatment effects on private property from drift and accidental applications would be greatest under this alternative. Some herbicide could drift onto private property, especially during aerial treatments. Under such a scenario, crops could be lost. Alternatively, rangeland weeds could be killed, resulting in benefits to private property. Losses and gains would likely be minor and short term in nature.

Over the long term, a reduction in hazardous fuels on public lands would reduce the likelihood of wildfires migrating from public lands to nearby private property and impacting the WUI. Herbicide treatments would also reduce the risks of noxious weeds, including poisonous weeds, spreading onto neighboring parcels. These benefits would be greatest under this alternative.

### Alternative C – No Use of Herbicides

Under Alternative C, the BLM would not be able to use herbicides to treat vegetation. Positive social benefits could be less than under the other alternatives because wildfire risk reduction in WUI areas would not be as effective and the economic benefits to ranching communities would not be as great as under the other alternatives. It is likely that fire suppression costs and fire damage losses would be greater under Alternative C than under the other alternatives. In addition, benefits to rangelands could be less under this alternative, as certain invasive species are effectively controlled only by herbicides, and in some situations other methods are impractical due to cost, time, or public concerns.

Under this alternative, invasive plant populations would likely continue to spread, possibly at increasing rates, without use of herbicides. Related declines in rangeland capacity, combined with the potential for the spread of invasive plants from public lands to private ranch lands in areas where other treatment methods are not effective or practical, would adversely affect ranching profits and

would thus be detrimental to local economies in rural areas of the West.

Generally, non-herbicide vegetation treatment methods tend to be more labor intensive and thus more expensive on a per acre basis in situations where herbicides are preferred, which translates into less effective control of undesirable vegetation. As a result, more workers could be hired in some places under this alternative, although many of the additional jobs would likely be low paying, unskilled labor positions.

### Alternative D – No Aerial Applications

Alternative D would be the same as the Preferred Alternative as far as which herbicides could be used, but the limitation on aerial application would preclude treatments in some areas that would not be suitable for ground application due to access difficulties or the scale of vegetation problems. Because of this limitation, and perhaps also because of the often higher cost of ground application, fewer acres—530,000—would be treated under Alternative D than under the Preferred Alternative. More acres would be treated under Alternative D than under the No Action Alternative. Consequently, the types of social and economic effects of Alternative D would be similar to the effects described for the No Action and Preferred alternatives, but would fall between them in magnitude.

As under the other herbicide treatment alternatives, most treatments would occur in Idaho, Wyoming, Montana, and Nevada. These states have lower per capita minority and Native American populations than the remainder of the western U.S., and the percentage of the population under 18 in these states is less than or similar to the percentage in the remainder of the western U.S. (see Table 3-15). Thus, disproportionate impacts to minority populations and children from vegetation treatments should not occur under this alternative.

Based on the assumptions given under the No Action Alternative for costs to treat vegetation using herbicides, approximately $76.7 million would be spent on ground-based applications under Alternative D, or about 14% less than would be spent under the Preferred Alternative, although 43% fewer acres would be treated under Alternative D. The average cost per acre treated would be $144.72, or nearly 51% and 47% more than for treatments under the Preferred and No Action alternatives, respectively.

It is expected that the economic benefits to local communities would be less than under the Preferred

BLM_0000564

ENVIRONMENTAL CONSEQUENCES

Alternative, but greater than under the No Action Alternative. Which communities would be affected, and to what degree, cannot be determined at this time.

Herbicide treatment effects on private property from drift and accidental applications would be intermediate between the No Action and Preferred alternatives. Over the long term, a reduction in hazardous fuels on public lands would reduce the likelihood of wildfires migrating from public lands to nearby private property and impacting the WUI. Herbicide treatments would also reduce the risks of noxious weeds, including poisonous weeds, spreading onto neighboring parcels. These benefits would be intermediate to those of the Preferred and No Action alternatives, and similar to Alternative E.

### Alternative E – No Use of Acetolactate Synthase-inhibiting Active Ingredients

Approximately 466,000 acres would be treated under Alternative E, which is approximately 11% less than the acreage that would be treated under Alternative D, and about half of the acreage that would be treated under the Preferred Alternative. The acreage treated would be one and one-half times the acreage that would be treated under the No Action Alternative.

Alternative E would have somewhat more positive social effects than other alternatives in that it would clearly establish protection for Native American and Alaska Native resources. Economically, it could result in prohibitions or restrictions on certain commercial and recreational activities that support and sustain some rural communities. Without more specific information on such restrictions, however, it is not possible to accurately predict how significant the effects would be. In most other respects, the social and economic effects of Alternative E would be similar to those associated with other alternatives and proportional to the acreage treated.

The profile of selected active ingredients under Alternative E would be very similar to the profile for the No Action Alternative, and would only notably differ from the Preferred Alternative in that there would be more use of glyphosate and no use of imazapic (Table 2-5). Because these are both lower priced active ingredients, the adjustment would not significantly affect economic activity.

Based on the assumptions given under the No Action Alternative for costs to treat vegetation using herbicides, approximately $57.7 million would be spent on ground-based applications, and $2.3 million would be spent on aerial applications (assuming that the percentage of acres treated using aerial methods for each herbicide would only be one-third the percentage of acres treated using aerial methods for each herbicide under the Preferred Alternative). Thus, although half as many acres would be treated under this alternative compared to the Preferred Alternative, costs would be reduced by only one-third. The cost per acre treated would be about $128.75 under this alternative, or 11% less than under Alternative D, but 35% and 30% greater than the cost per acre treated under the Preferred and No Action alternatives, respectively.

## Mitigation for Herbicide Treatment Impacts

No mitigation measures are proposed for social and economic resources.

# Human Health and Safety

The use of herbicides under a variety of application methods, as proposed in this PEIS, involves potential risk or the perception of risk to workers and members of the public living or engaging in activities in or near herbicide treatment areas. Therefore, as part of the PEIS, an HHRA has been conducted to evaluate potential human health risks that may result from herbicide exposure both during and after treatment of public lands. The HHRA has been conducted to be scientifically defensible, to be consistent with currently available guidance where appropriate, and to meet the needs of the BLM vegetation treatment program.

Risk to two types of human "receptors" was evaluated: occupational receptors and public receptors. Receptors are representative population groups that could have specific exposures to the herbicides. Occupational receptors included those workers that mix, load, and apply herbicides and operate transport vehicles, recognizing that in some cases an occupational receptor may perform multiple tasks, increasing his or her exposure. Public receptors included those members of the public most likely to come into contact with applied herbicides. The public receptors included adult hiker/hunters and anglers, and adult and child berry pickers, swimmers, Native Americans, and residents. Receptors were evaluated assuming both accidental (e.g., direct spray or spill onto skin) and routine exposure scenarios (e.g., ingestion of berries that have been recently sprayed).

BLM_0000565

## Scoping Comments and Other Issues Evaluated in the Assessment

A large number of respondents during public scoping were concerned about the risks to human health from herbicide treatments. Respondents suggested that at-risk groups like infants, the elderly, sick people, and people with sensitivities to chemicals be specifically addressed. Numerous respondents urged the BLM to describe all potential toxicological hazards of herbicide chemicals, including their ability to disrupt hormone systems and immune systems. Establishing a goal of using the minimum effective dosage and developing protocols for achieving this was encouraged. There was also concern about the effects of herbicides on basket plants and the people who collect them, in particular Native Americans. Some respondents also felt that the uncertainties regarding the environmental effects of herbicides and inert ingredients should be disclosed. According to some respondents, Oust® (herbicide formulated with sulfometuron methyl) should be considered for evaluation even though it was evaluated previously in the 1991 13-State Vegetation EIS (USDI BLM 1991a). One respondent noted that if there are insufficient toxicological data to be found for a specific herbicide, then that herbicide should not be used.

## Standard Operating Procedures

Standard operating procedures designed to reduce potential unintended impacts to human health from the application of herbicides in the BLM vegetation management program, and considered when evaluating impacts, are listed in Table 2-8. These SOPs include the following:

- Establish a buffer between treatment areas and human residences based on guidance given in the HHRA, with a minimum buffer of ¼ mile for aerial applications and 100 feet for ground applications, unless a written waiver is granted.

- Use protective equipment as directed by the herbicide label.

- Post treated areas with appropriate signs at common public access areas.

- Observe restricted entry intervals specified by the herbicide label.

- Provide public notification in newspapers or other media where the potential exists for public exposure.

- Have a copy of Material Safety Data Sheets at work sites.

- Notify local emergency personnel of proposed treatments.

- Contain and clean up spills and request help as needed.

- Secure containers during transport.

- Follow label directions for use and storage.

- Dispose of unwanted herbicides promptly and correctly.

The results from the HHRA will help inform BLM field offices about the proper application of herbicides to ensure that impacts to humans are minimized to the extent practical.

## Human Health Risk Assessment Methodology

The BLM conducted an HHRA to evaluate potential risks to humans from exposure to the following six active ingredients, four of which are proposed for use on public lands: dicamba, diflufenzopyr, diquat, fluridone, imazapic, and sulfometuron methyl. The four active ingredients not currently used on public lands are diflufenzopyr, diquat, fluridone, and imazapic. Sulfometuron methyl (Oust®) and dicamba were evaluated for risks to humans in earlier EISs and are currently used by the BLM, but were reevaluated for this PEIS. Oust® has been found to impact non-target vegetation when carried on soil to untreated areas; these effects were not evaluated in the earlier vegetation treatment EISs. Dicamba is used in formulation with diflufenzopyr (as Overdrive®), and was reassessed as part of the evaluation of the formulation. These active ingredients may be formulated into herbicides under a variety of trade names and manufacturers. Therefore, specific trade names and manufacturers are not discussed in this report.

The remaining 18 active ingredients that are available for use by the BLM were evaluated in other HHRAs. The BLM relied on HHRAs prepared in recent years by the Forest Service to evaluate the risks to human health associated with nine active ingredients (2,4-D, chlorsulfuron, clopyralid, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr). For the remaining nine active ingredients (2,4-DP, asulam, atrazine, bromacil, diuron, fosamine, mefluidide, simazine, and tebuthiuron), the BLM relied

BLM_0000566

on information provided in earlier BLM vegetation treatment EISs (USDI BLM 1988a, 1989a, 1991a).

As this PEIS relies upon the HHRA results developed by both BLM and Forest Service, the following sections discuss the risk assessment methods used by the BLM in the current assessment, the risk assessment methods used by Forest Service, and the methods used by BLM in the earlier EIS HHRAs. This discussion is followed by a discussion of the uncertainties in the risk assessment process.

**BLM Human Health Risk Assessment Methodology**

The BLM HHRA follows the four-step risk assessment model identified by the National Academy of Sciences (NAS 1983). These steps are: 1) hazard identification, 2) dose response assessment, 3) exposure assessment, and 4) risk characterization. The outcome of each of these steps is discussed below. More detailed information on the methodology used to evaluate risks is in Appendix B and in the *Vegetation Treatments Programmatic EIS Human Health Risk Assessment Final Report* (ENSR 2005l).

### *Hazard Identification*

The hazard identification section provides information on the herbicide active ingredient characteristics and usage, and toxicity profiles. Much of the toxicity information discussed in this section is from USEPA reports, such as the Pesticide Fact Sheets or HHRAs conducted by the USEPA OPP Health Effects Division to evaluate use of the pesticides on specific crops. In addition, a literature search was conducted to ensure that relevant available information was used in these toxicity profiles. The databases searched include the National Library of Medicine's Hazardous Substances Data Bank and Toxline. The USEPA receives many unpublished toxicity data sets that are referenced in USEPA reports using Master Record Identification (MRID) numbers. The HHRA references USEPA reports for the MRID information.

Both acute (short term) and chronic (longer term) toxicity information is discussed for the active ingredient. The USEPA has developed toxicity categories for pesticides based on acute toxicity animal tests conducted in support of registration of the pesticides (USEPA 2003f). Acute toxicity studies are used to determine a number of toxicity endpoints based on short-term exposure to a substance. The toxicity endpoints considered are oral, inhalation, and dermal acute toxicity; eye irritation; skin irritation; and dermal

sensitization. An important endpoint in acute testing is the toxicity reference level known as the median lethal dose ($LD_{50}$), which is the dose, usually administered orally, that kills 50% of the test animals. The lower the $LD_{50}$ is, the greater the toxicity of the chemical. For the different toxicity endpoints, the USEPA defines four toxicity categories (Lists; I through IV), with higher toxicity categories representing lower herbicide acute toxicity. In longer-term toxicity studies (chronic or subchronic), the endpoints for evaluation are the dose at which no adverse effects were seen (NOAEL), and the lowest observed adverse effect level (LOAEL), which is the lowest level at which adverse effects are seen in chronic studies.

In addition to their active ingredients, most herbicides contain inert ingredients (i.e., those substances included in the formulation that are not the active ingredients) that have various functions such as diluents, binders, dispersants, carriers, stabilizers, neutralizers, antifoamers, and buffers.

The USEPA categorizes inert ingredients into four lists (54 FR 48314):

- List 1 – Inert ingredients of toxicological concern. Any product containing a List 1 ingredient must include the label statement, "this product contains the toxic inert ingredient (name of inert)."

- List 2 – Inerts of unknown toxicity/high priority for testing inerts.

- List 3 – Inerts of unknown toxicity. Inert ingredients on this list have not yet been determined to be of known potential toxicological concern nor have they been determined to be of minimal concern. These substances will continue to be evaluated to determine if they merit reclassification to List 1, 2, or 4.

- List 4 – Inerts of minimal concern. List 4 is subdivided into List 4A (minimal risk inert ingredients) and List 4B (inerts that have sufficient data to substantiate that they can be used safely in pesticide products).

BLM scientists received clearance from the USEPA to review Confidential Business Information (CBI) on inert compounds identified in products containing the six active ingredients evaluated in this risk assessment. The information received listed the inert ingredients, as well as their chemical abstract number, supplier,

BLM_0000567

USEPA registration number, percentage of the formulation, and purpose of the formulation. The BLM reviewed one formulation of diflufenzopyr and dicamba; two formulations of diquat; four formulations of fluridone; two formulations of imazapic; and one formulation of sulfometuron methyl. Because it is confidential, this information, including the name of the ingredients, may not be disclosed.

The USEPA has a listing of regulated inert ingredients at http://www.epa.gov/opprd001/inerts/index.html. This listing divides inert ingredients into four lists. The number of inert ingredients found in the six herbicides evaluated in the HHRAs for each category is shown below (seven inerts were not found on the USEPA lists):

    List 1 - Inert ingredients of toxicological concern: None.

    List 2 - Potentially toxic inert ingredients: None.

    List 3 - Inerts of unknown toxicity: 5.

    List 4A - Inerts of minimal toxicity: 9.

    List 4B - Inerts that have sufficient data to substantiate that they can be used safely in pesticide products: 18.

Based on this information, the majority of the inerts are of minimal risk. A few are in the category of unknown toxicity.

### Dose-Response Assessment

The purpose of the dose-response assessment is to identify the types of adverse health effects an herbicide may potentially cause and to define the relationship between the dose of an herbicide and the likelihood or magnitude of an adverse effect (response). The dose-response assessment identifies quantitative dose-response values that are used in risk calculations to derive risk estimates. The dose-response values used in the HHRA were developed by the USEPA. None of the six herbicides evaluated in the BLM HHRA are designated as potential carcinogens by the USEPA; therefore, this toxicity assessment focuses on non-carcinogenic effects (i.e., potential toxic effects other than cancer). Non-carcinogenic effects are evaluated differently depending on whether the exposure is dietary or non-dietary.

For dietary exposures to non-carcinogenic chemicals, toxicity is represented by a population adjusted dose (PAD), which may be calculated for acute effects or chronic effects. A PAD is an acute or chronic RfD divided by the Food Quality Protection Act (FQPA) Safety Factor, which accounts for cases where infants and children may have extra sensitivity to the pesticide (USEPA 2000c). Reference doses are derived by identifying an NOAEL, which is obtained from the acute or chronic toxicity studies, and dividing the NOAEL by the appropriate uncertainty factors (UFs). Typically, a 10-fold UF is applied to account for variation within the human population (i.e., to account for individuals that may be more sensitive to the effects; intraspecies), and an additional 10-fold factor is applied to account for the differences between humans and animals (interspecies; USEPA 2000c). The FQPA Safety Factor is applied to the PAD in addition to the uncertainty factors used to derive the RfD.

A margin of exposure (MOE) approach is used to evaluate potential non-dietary exposures to herbicides. For evaluating non-cancer effects for non-dietary exposures, toxicity is represented by the NOAEL. The NOAELs are identified for a variety of exposure durations and exposure routes (short-, intermediate-, and long-term exposure durations via oral, dermal, and inhalation exposure routes). The NOAELs representing non-dietary exposures were used to evaluate the occupational receptors and the public receptors for the following scenarios: dermal contact with spray, dermal contact with foliage, dermal contact with water while swimming, and incidental ingestion of water while swimming. The NOAEL divided by the intake (see the Exposure Assessment section below for a description of how intakes are derived) results in the MOE (USEPA 2000c). Unless specified otherwise, the target MOE is 100, which accounts for uncertainties in the NOAEL. MOEs greater than the target MOE indicate no significant risk.

### Exposure Assessment

The purpose of the exposure assessment is to predict the magnitude and frequency of potential human exposure to the herbicides under consideration. The BLM takes care to prevent exposures to applied pesticides both through worker training programs and by posting areas that have just been sprayed with information on when reentry into these areas is appropriate. However, to be conservative, the HHRA has evaluated both routine use and accidental exposure scenarios. In addition, exposures were evaluated for two application scenarios: applications using the

BLM_0000568

ENVIRONMENTAL CONSEQUENCES

maximum application rate designated by the herbicide label, and applications using a typical application rate that was defined by BLM for this program.

To estimate the potential risk to human health that may be posed by the planned herbicide use, it was first necessary to estimate the potential exposure dose of each herbicide for each receptor via each applicable exposure route. Exposure dose equations combine the estimates of herbicide concentration in the environmental medium of interest, with assumptions (exposure parameters) regarding the type and magnitude of each receptor's potential exposure to provide a numerical estimate of the exposure dose. The exposure dose is defined as the amount of herbicide taken into the receptor, expressed in units of milligrams of herbicide per kilogram of body weight per day (mg/kg-day). The exposure doses were combined with the dose-response values (PADs or NOAELs) to estimate potential risks and hazards for each receptor.

Various guidelines and databases, such as the USEPA's *Exposure Factors Handbook* (USEPA 1997) and the *Framework for Assessing Non-Occupational, Non-Dietary (Residential) Exposure to Pesticides* (USEPA 1998c), were used to develop the exposure parameters. For each exposure scenario, the exposure parameters were used to calculate an exposure factor (EF), which was then used in the risk calculations. The use of the EF combines all the exposure parameters into one value in order to simplify the risk calculations.

**Occupational Exposure Scenarios**. Both routine-use and accidental exposure scenarios were included in the occupational evaluation. For the routine-use exposure scenario, the exposure assumptions were derived using information from the BLM concerning proposed use of the herbicides, and unit exposure (UE) information from the Pesticide Handlers Exposure Database (PHED), which is a generic database containing empirical dermal and inhalation exposure data for workers mixing, loading, or applying pesticides (USEPA 1998d). To add consistency to the risk assessment process, the USEPA, in conjunction with the PHED task force, has evaluated all data within the system and developed a series of surrogate standard UE values for various exposure scenarios. The majority of the UE values have been taken from these surrogate values. In addition to these values, the USEPA recommended UEs separately for aquatic applications of diquat and fluridone. Generally, UEs are expressed in units of milligrams per pound of active ingredient, and equate the milligrams of active ingredient absorbed by an occupational receptor to the

pounds of active ingredient handled in a given day or exposure scenario.

For aerial applications, occupational receptors that may come into routine contact with herbicides include pilots and mixer/loaders. For ground applications by backpack, the occupational receptor is assumed to be an applicator/mixer/loader. For the remaining application methods (horseback, and spot and boom/broadcast methods for ATV, truck mount, and boat applications), applicators, mixer/loaders, and applicator/mixer/loaders were evaluated. In addition, for each occupational receptor, dermal and inhalation exposure pathways were evaluated. For the routine exposures, the exposure dose was calculated using the herbicide application rate and the acres treated per day. Details on how this was done are presented in the *Vegetation Treatments Programmatic EIS Human Health Risk Assessment Final Report*, found on the CD located in the back of Volume I of the PEIS (ENSR 2005l).

Accidental exposures for occupational receptors could occur via spills or direct spray onto a worker. To calculate exposures from direct spills, it is necessary to know the concentration of active ingredient in the formulation that is spilled onto the worker. These concentrations were calculated from the information provided on the herbicide labels. As a worst-case scenario for an accidental exposure, a direct spill event on an occupational receptor was evaluated. This HHRA used the same spill scenario evaluated by the BLM in the *Final EIS Vegetation Treatment on BLM Lands in Thirteen Western States* (USDI BLM 1991a). The spill scenario assumes that 0.5 L (½ quart) of the formulation is spilled on a worker between the waist and the feet. It is assumed that 80% of the spill lands on clothing and 20% lands on bare skin. The penetration rate through clothing is assumed to be 30%. While some of the herbicide labels require the use of gloves while handling the herbicide, others do not. Therefore, this scenario assumes that gloves are not worn.

**Public Use Exposure Scenarios.** The HHRA evaluated the potential risk to public receptors using public lands treated with herbicides. This was done by developing exposure scenarios that combine potential receptors and exposure pathways to identify potential exposures to the herbicide active ingredient addressed in this PEIS. Two types of public use exposure scenarios are addressed:

- Potential exposure by public receptors during routine use of public lands to herbicide active ingredient(s) that may have drifted outside of the area of application.

BLM_0000569

ENVIRONMENTAL CONSEQUENCES

- Accidental scenarios where public receptors may prematurely enter a sprayed area (a reentry scenario), be sprayed directly, or may contact water bodies that have accidentally been sprayed directly or into which an herbicide active ingredient has accidentally been spilled.

Although all of these public scenarios are expected to occur rarely, they are nonetheless used as the basis for evaluating potential public health risks associated with herbicide use in the BLM vegetation treatment program.

Based on consideration of potential public uses of BLM lands, and consistent with the 1991 13-State EIS (USDI BLM 1991a), receptors evaluated in this HHRA include 1) hiker/hunter; 2) berry picker - child and adult; 3) angler; 4) swimmer - child and adult; 5) nearby resident - child and adult; and 6) Native American - child and adult.

Although there are many different exposure scenarios and receptors that could be evaluated, the selected scenarios cover a range of potential exposures that could occur under worst-case conditions on public lands. It is assumed that public receptors could be exposed through one or more of the following exposure pathways: 1) dermal contact with spray, 2) dermal contact with foliage, 3) dermal contact with water while swimming, 4) ingestion of drinking water or incidental ingestion of water while swimming, 5) ingestion of berries, and 6) ingestion of fish.

Although all public receptor exposures to herbicides used on pubic lands are considered to be accidental, public receptor exposures were evaluated under two scenarios. Routine-use exposures are assumed to occur when public receptors come into contact with environmental media that have been impacted by spray drift. Accidental exposures are assumed to occur when public receptors come into contact with environmental media that have been subject to direct spray or spills. Each of these scenarios is discussed below.

Public receptors could be exposed to herbicides via off-site drift following routine aerial application. AgDRIFT, a computer model that is a product of the Cooperative Research and Development Agreement between the USEPA's Office of Research and Development and the SDTF (a coalition of pesticide registrants), was utilized in the HHRA to evaluate the off-site deposition of herbicides (SDTF 2002). See Appendix C of the *Vegetation Treatments Programmatic EIS Human Health Risk Assessment Final Report* (ENSR 2005l) for a complete description of AgDRIFT modeling methods.

In addition, public receptors could be exposed to herbicides via surface runoff. The GLEAMS model, a modified version of the Chemical Runoff Erosion Assessment Management System (CREAMS) model that was originally developed to evaluate non-point source pollution from agricultural field-size areas, was used to simulate surface runoff of the three terrestrial herbicides considered in the HHRA. See Appendix D of the *Vegetation Treatments Programmatic EIS Human Health Risk Assessment Final Report* (ENSR 2005l) for a complete description of GLEAMS modeling methods.

In addition to exposures due to inadvertent spray drift, this HHRA also evaluates potential acute accidental exposures by public receptors to the herbicide active ingredient. Accidental exposure could occur through direct spray and spills. The same types of receptors introduced above are also evaluated for the accidental scenarios. However, because direct spray and spills are localized, exposures to multiple media are not assumed in these scenarios. It is assumed that each of the herbicide active ingredients could be directly sprayed onto humans, foliage, and/or berries, and each of the herbicide active ingredients could be directly sprayed or spilled into a water body. However, for the aquatic herbicide active ingredients (fluridone and diquat), the direct spray into a water body pathway is a reentry scenario.

### Risk Characterization

The purpose of the risk characterization is to provide estimates of the potential risk to human health from exposure to herbicides. The results of the exposure assessment are combined with the results of the dose-response assessment to derive quantitative estimates of risk. For the noncarcinogenic active ingredients evaluated in this HHRA, risk is described simply by the comparison of the exposure doses to the appropriate dose-response values.

The USEPA risk assessment guidance for pesticides provides different non-cancer methods for evaluating food and non-food exposures (USEPA 2000c). For food exposure, a percent PAD method is used, and for non-food exposure, a MOE method is used, as described in the Dose-Response Assessment section above.

In assessing risks to humans, it is important to evaluate the cumulative or aggregate risk from all potential exposure pathways for each receptor. For the public receptors, both dietary and non-dietary pathways have been evaluated. To address this, the USEPA's OPP has developed the aggregate risk index (ARI) approach,

BLM_0000570

ENVIRONMENTAL CONSEQUENCES

which combines potential risks from various pathways expressed as MOEs (for non-dietary exposures) and %PADs (for dietary exposures; USEPA 1999d, 2001d). It is important that only exposure pathways encompassing similar exposure durations be combined (i.e., acute exposures cannot be combined with chronic exposures). The ARI is an extension of the MOE concept. As with the MOE, potential risk increases as the ARI decreases. The ARI is compared against a target value of 1, which is the LOC set by the USEPA. Values > 1 do not exceed the USEPA's LOC. The ARI method allows for direct comparisons between routes and between chemicals. It considers each route's potency when route-specific NOAELs that may have different UFs are used. ARIs were developed for each of the identified exposure scenarios. Cumulative accidental ARIs were not calculated, as it is assumed that each receptor would be accidentally exposed via only one potential exposure pathway. Details on the ARI method are provided in the *Vegetation Treatments Programmatic EIS Human Health Risk Assessment Final Report* (ENSR 2005l).

**Forest Service Human Health Risk Assessment Methodology**

The Forest Service risk assessment methodology was similar to that used by the BLM (see SERA [2001a] for a complete description of the methodology). The steps involved in the Forest Service risk assessments included hazard identification, exposure assessment, dose response assessment, and risk characterization.

Hazard identification involved the review of toxicological data with a focus on the dose-response relationships to determine the effect levels (e.g., NOAEL, LOAEL) and assessment endpoints (e.g., acute toxicity, subchronic or chronic systemic toxic effects, reproductive and teratogenic effects) that are most relevant for the herbicide risk assessments. Carcinogenic endpoints were evaluated for the Forest Service herbicides, as some contain potential carcinogens in their formulations (i.e., hexachlorobenzene in clopyralid and picloram) and 2,4-D was still being evaluated by the USEPA for carcinogenicity.

In the exposure assessment phase, the Forest Service developed general and accidental exposure scenarios for workers expected to be handling the herbicides and for the general public who could be inadvertently exposed to herbicides. General exposure for workers included exposure via directed foliar, broadcast ground, and broadcast aerial applications. Accidental exposure

scenarios for workers included immersion or contaminated clothing and spills. Exposure scenarios for the public included 1) direct spray, 2) dermal exposure from contaminated vegetation, 3) exposure to contaminated water, 4) acute exposure via spills, 5) consumption of contaminated fish, and 6) consumption of contaminated vegetation.

Dose response assessment described the degree or severity of risk as a function of dose. The Forest Service assessments used RfDs, derived by other government agencies. The RfD is designed to be protective of chronic or lifetime exposure, and it is a very conservative component of the Forest Service risk characterization process because the duration of any plausible and substantial exposures is far less than a lifetime.

The risk characterization process then compared the exposure assessment to the dose response assessment to determine an HQ for a specific exposure scenario. Hazard quotients were calculated by dividing the exposure level determined in the HHRA by the RfD. A higher HQ indicates that the exposure level exceeds the RfD by a large amount. A quantitative risk assessment for carcinogenicity was conducted for hexachlorobenzene (found in the herbicide formulations of clopyralid and picloram), but not for any of the active ingredients. 2,4-D was still being reviewed as a potential carcinogen at the time of assessment, and therefore no carcinogenicity risk assessment was conducted.

**Previous BLM EISs Methodology and Toxicology Literature Review**

Asulam, atrazine, bromacil, diuron, fosamine, mefluidide, simazine, tebuthiuron, and 2,4-DP are herbicides currently available to the BLM for which new HHRAs were not conducted either by the BLM or the Forest Service. Human health risk assessments were conducted for these herbicides by the BLM for earlier vegetation treatment EISs (USDI BLM 1988a, 1989a, 1991a). Since 1997, the BLM has not used asulam, atrazine, mefluidide, simazine, and 2,4-DP, and has used fosamine only sparingly (< 50 acres annually). It is unlikely that the BLM would use these herbicides in the future, and they would not be available for use under the action alternatives (alternatives B though E).

Literature reviews and evaluations were conducted for the period 1991 to 1998 to assess whether toxicity data for many of these herbicides (asulam, atrazine, bromacil, diuron, mefluidide, simazine, tebuthiuron)

BLM_0000571

that were reported since the 1991 13-State EIS would indicate that a new HHRA should be conducted (i.e., if the new toxicity data suggested greater risks to humans; McMullin and Thomas 2000). 2,4-DP, atrazine, bromacil, diuron, simazine, and tebuthiuron did not have recent toxicity data suggesting additional risks to humans; therefore, the human health risks of these herbicides are reported in this chapter using results from the earlier EIS (also see Appendix B for more information on the risks associated with these herbicides). The literature review suggested that revisions may be warranted for asulam (based on a lower RfD) and for mefluidide (based on development of an RfD).

The 1991 13-State EIS HHRA also evaluated occupational and public receptors similar to the current PEIS. Doses to receptors were estimated using assumptions about the characteristics of typical herbicide applications based on realistic as well as worst-case values for these estimates. Doses to receptors resulting from accidental exposures were evaluated. The risk assessment developed MOEs based on a ratio of the estimated herbicide intake to the acceptable concentration represented by the RfD. In addition, cancer slope factors were available for specific herbicides, such as bromacil. For these herbicides, potential cancer risks were also estimated. The cancer slope factor for bromacil was available from the USEPA at the time of the 1991 EIS. However, in the current review, the USEPA did not provide a cancer slope factor (USEPA 1994b); therefore, bromacil is likely not carcinogenic.

Exposure scenarios for the public included 1) dermal exposure through spray drift, 2) dermal contact with vegetation, and 3) consumption of berries, water, fish, and game. It was assumed that occupational receptors could be exposed through inhalation and dermal contact. Occupational receptors included 1) aerial pilots; 2) mixer-loaders; 3) backpack applicators; 4) ground mechanical applicators; and 5) hand applicators.

Routine and worst-case exposures were calculated using variable parameters such as application rate, size of treatment area, and drift conditions. The following accidental scenarios were also analyzed: 1) spills of herbicide concentrate and mix on a person's skin; 2) direct spraying of a worker from a broken hose; 3) direct spraying of a person from aerial application; 4) immediate reentry to a sprayed area; 5) consumption of water from a pond that has been aerially sprayed, or that has received a spill from an airplane or tank mix truck;

and 6) consumption of berries that have been directly sprayed.

## Uncertainty in the Risk Assessment Process

The risk assessments conducted by the BLM and Forest Service incorporate various conservative assumptions to compensate for uncertainties in the risk assessment process. Within any of the steps of the human health risk evaluation process, assumptions must be made due to a lack of absolute scientific knowledge. Some of the assumptions are supported by considerable scientific evidence, while others have less support. Every assumption introduces some degree of uncertainty into the risk evaluation process. Regulatory risk evaluation methodology requires that conservative assumptions be made throughout the risk assessment process to ensure that public health is protected. This conservatism, both in estimating exposures and in setting toxicity levels likely led to an exaggeration of the real risks of the vegetation management program to err on the side of protecting human health.

### Impacts Common to All Herbicides

Each of the HHRAs developed risk estimates for occupational and public receptors for a variety of routine and accidental scenarios. The risk estimates for each herbicide, and for herbicides in general, are presented below.

#### Occupational Receptors

Herbicide application methods may require the use of heavy machinery, which could involve potential health and safety impacts to people working in the herbicide application programs (occupational receptors). However, the main potential impact associated with the use of herbicides is exposure to the chemicals (including the herbicide active ingredient(s) and other compounds added to the herbicide formula). These chemicals can all be toxic to human workers and exposed members of the public to varying degrees (any chemical poses a health risk at a high enough dose). Most clinical reports of herbicide effects are of skin and eye irritation.

Short-term effects of excessive exposure to herbicides include nausea, dizziness, or reversible abnormalities of the nervous system. In extreme cases of prolonged, repeated, and excessive exposure (resulting from careless and/or negligent work habits), longer-term

BLM_0000572

ENVIRONMENTAL CONSEQUENCES

health problems can result, including: organ damage, immune system damage, permanent nervous system damage, production of inheritable mutations, damage to developing offspring, and reduction of reproductive success. It is important to note that the USEPA evaluates and registers herbicides according to a uniform, health-based standard to ensure a "reasonable certainty of no harm" to consumers. The USEPA is responsible for restricting a product's use according to its potential impacts on human health and the environment. Much of that restriction is done through the product label, which states the precautions that must be taken as well as how and where to apply a certain herbicide.

Occupational exposure to herbicides varies with the method of application. The greatest risk occurs when the worker must directly handle and/or mix chemicals. Spot and localized herbicide applications, including the use of backpack sprayers and aerial mixers/loaders, require the most hands-on use of herbicides and, therefore, carry the greatest risk of exposure. Under all application methods, workers can be exposed to herbicides from accidental spills, splashing, leaking equipment, contact with spray, or entering treated areas. Exposure can occur either through skin or through inhalation. Adherence to operational safety guidelines, use of protective clothing, equipment checks, and personal hygiene can prevent incidents from occurring. The herbicide label and corresponding Material Safety Data Sheet (MSDS) detail these application requirements in addition to safety guidelines.

### Public Receptors

Public receptors can be exposed by being accidentally sprayed, by entering areas soon after treatment (e.g., eating berries or other foods, touching vegetation), drinking contaminated water, or accidentally coming into contact with herbicides that have drifted downwind. Members of the general public, both visitors and residents, are less likely to be repeatedly exposed than vegetation management workers.

Members of the public, both visitors and nearby residents, could potentially be exposed to herbicides from drift or accidental spraying if they were in the area at the time of application. Since aerial and broadcast applications have a higher potential for drift, these application techniques might create a higher potential for public exposure, particularly under certain weather conditions (e.g., high winds).

Laboratory tests on animals have shown that most herbicides are not carcinogenic, even at doses and repeated exposures well above those which could occur accidentally as part of vegetation management activities. Furthermore, herbicides are designed to work on plants, not animals, so that the toxic effects generally do not affect the central nervous system or other vital functions.

Calculated dose-response values and exposure doses were combined to estimate potential risks (in terms of ARIs for BLM HHRA herbicides and in terms of HQs for previously evaluated Forest Service herbicides) from each individual herbicide for each receptor. In addition, the strength of these risks was evaluated by herbicide as well as by receptor, herbicide treatment method (e.g., aerial vs. terrestrial), and herbicide treatment alternative.

### Human Health Risks Associated with Herbicides Evaluated in the BLM Human Health Risk Assessment

The HHRA listed the acute toxicity categories for each herbicide developed by the USEPA, and conducted risk calculations to determine potential risks from routine and accidental exposures for specific receptors. The USEPA has developed toxicity categories for pesticides based on acute toxicity animal tests conducted in support of registration of the pesticides (USEPA 2003g). All six of the herbicides evaluated in the BLM HHRA show slight to very slight acute toxicity to humans as designated by the USEPA in most categories. Based on the USEPA categories, dicamba may result in reversible eye irritation and severe skin irritation. Diquat causes moderate acute dermal effects and reversible eye irritation, and fluridone causes reversible eye irritation. The USEPA has not developed acute toxicity categories for sulfometuron methyl.

None of the six herbicides are designated as potential carcinogens by the USEPA. Therefore, the risk calculations discussed below consider non-cancer risk.

Tables 4-27 and 4-28 present summaries of the level of risk each receptor (occupational and public) would face during the application of a given herbicide, for both maximum and typical application rate scenarios. ARIs are partitioned into no, low, moderate, and high levels of risk for ease of comparison (no risk is identified as an ARI greater than 1, low risk is between 1 and 0.1, moderate risk is between 0.1 and 0.01, and high risk is less than 0.01). These designations are strictly for comparison purposes, and do not imply actual risks to people. The *Vegetation Treatments Programmatic EIS*

BLM_0000573

*Human Health Risk Assessment Final Report* (ENSR 2005l) presents more detailed tables of ARIs for each herbicide and receptor.

### Dicamba

For the routine application scenarios at the typical and maximum application rates, dicamba does not present an unacceptable risk to occupational or public receptors. However, dicamba applications do present low risk to occupational receptors during accidental scenarios.

### Diflufenzopyr

For occupational receptors, routine use ARIs were calculated for inhalation exposures under both typical and maximum application rate scenarios. No dermal toxicity values are available for diflufenzopyr, which, based on laboratory data, is not expected to be toxic through the dermal route. Routine use ARIs are greater than 1 under both the typical and maximum application rate scenarios, indicating no exceedance of the USEPA's LOC. Because the accidental occupational scenarios all assume dermal exposure and diflufenzopyr does not have a short-term dermal NOAEL because it is not expected to be toxic through the dermal route, an accidental scenario ARI was not calculated.

For public receptors, routine use scenario ARIs are greater than 1 under both the typical and maximum application rate scenarios for all public receptors, indicating no LOC. Under the accidental scenario, it is assumed that public receptors are exposed directly to maximum herbicide application rates via dermal contact, incidental ingestion of water while swimming, or dietary exposure pathways at the maximum application rate. All accidental scenario ARIs are greater than 1, indicating no LOC.

These results indicate that exposures to diflufenzopyr are not expected to exceed the USEPA's LOC for occupational or public receptors under the scenarios evaluated.

### Diquat

At the typical application rate, diquat presents a low to moderate risk to some occupational receptors (all aerial, backpack, and horseback applicators), and a low risk to child residents. When diquat is applied at the maximum application rate, there is low to high risk to occupational receptors (except boat applicators) and public receptors (except swimmers). Diquat poses a high risk to

occupational receptors and a low to moderate risk to public receptors under all accidental scenarios.

### Fluridone

Fluridone does not pose a risk to occupational or public receptors when applied at the typical application rate. When fluridone is applied at the maximum application rate, there is low risk to aerial mixer/loaders. For accidental scenarios, fluridone poses a low to high risk to all occupational receptors, and a low risk to child and resident public receptors.

### Imazapic

Imazapic applications do not present risk to any receptors when applied in routine use situations at either the typical or maximum application rate. Accidental scenarios involving dermal contact with direct spray or vegetation or dietary exposure were not calculated because imazapic has not been shown to have acute dietary or dermal effects in hazard analyses conducted by the USEPA (ENSR 2005l). Accidental scenarios involving dermal contact with a sprayed water body or a water body into which herbicide is spilled do not result in risk to swimmers.

### Sulfometuron Methyl

Sulfometuron methyl applications do not present risk to any receptors when applied in routine use situations at either the typical or maximum application rate. Accidental scenarios involving dermal contact with direct spray or vegetation or dietary exposure were not calculated because sulfometuron methyl has not been shown to have acute dietary or dermal effects in hazard analyses conducted by the USEPA (ENSR 2005l). Accidental scenarios involving dermal contact with a sprayed water body or a water body into which sulfometuron methyl is spilled do not present a risk to swimmers.

### Human Health Risks Associated with Herbicides Evaluated in the Forest Service Human Health Risk Assessment

The BLM used the results of HHRAs prepared by the Forest Service for nine active ingredients (2,4-D, chlorsulfuron, clopyralid, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr [SERA 2005b]). The Forest Service HHRAs presented the risk results as HQs. To create the summary tables presented here, (Tables 4-29 and 4-30), HQs were used to designate a risk level as no, low, moderate or high,

BLM_0000574

ENVIRONMENTAL CONSEQUENCES

for ease of comparison (no risk is identified as an HQ greater than 1, low risk is an HQ between 1 and 10, moderate risk is an HQ between 10 and 100, and high risk is an HQ greater than 100). Tables 4-29 and 4-30 present summaries of the risks to occupational and public receptors, respectively, associated with the Forest Service-evaluated herbicides.

### 2,4-D

Workers involved in ground or aerial application of 2,4-D may face low risks based on central estimates of exposure, or low to moderate risks based on upper limits of exposure (SERA 1998). At the typical and maximum application rates, workers involved in directed ground spray, broadcast ground spray, aerial application, and aquatic application face low to moderate risk from 2,4-D exposure. Workers also face low to moderate risk from wearing contaminated gloves for 1 hour, exposure to a spill on the hands for 1 hour (maximum rate only), and exposure to spill on the lower legs for 1 hour. The general public faces low to moderate risk from most modeled scenarios at the typical and maximum application rates. The consumption of contaminated fish presents a moderate risk to the general public, and a high risk to subsistence populations. However, the Forest Service HHRA asserts that (when applied at the typical application rate) there should not be unacceptable risks to the general public associated with exposure to 2,4-D, but that accidental exposures could pose a higher risk. The major concern for members of the general public involves the consumption of contaminated vegetation (fruit) over a period of several months, a scenario that is not likely to occur.

### Chlorsulfuron

For both workers and the general public, most exposures to chlorsulfuron at the typical or maximum application rate would not pose a risk (SERA 2004a). Ground broadcast applications at the maximum application rate would pose a low risk to workers.

From a practical perspective, eye and/or skin irritation are likely to be the only overt effects of mishandling chlorsulfuron. These effects can be minimized or avoided by prudent industrial hygiene practices during the handling of the compound.

### Clopyralid

There are no risks to public or occupational receptors associated with most of the anticipated typical and accidental exposure scenarios for clopyralid evaluated in the Forest Service risk assessment. Irritation and damage to the skin and eyes can result from direct exposure to relatively high levels of clopyralid; this is likely to be the only overt effect as a consequence of mishandling clopyralid (SERA 2004b). Children face low risk from consumption of water contaminated by an accidental spill.

The human health risks of hexachlorobenzene and pentachlorobenzene were also analyzed in the Forest Service HHRA, as technical grade clopyralid may be contaminated with these chemicals. Hexachlorobenzene was evaluated for potential carcinogenicity. Based on the levels of contamination of technical grade clopyralid with hexachlorobenzene and pentachlorobenzene, and the relative potencies of these compounds compared to clopyralid, this contamination is not significant in terms of potential systemic toxic effects. In addition, the contamination of clopyralid with hexachlorobenzene does not appear to present any substantial cancer risk above the Forest Service cancer risk LOC of 1 in 1 million.

### Glyphosate

For both workers and members of the general public, there are no risks associated with nearly all exposures to glyphosate at the typical or maximum application rate (SERA 2003a). The risk assessment calculated no risk for all but one of the tested scenarios, usually at least by a factor of 5. There is low risk to children in the general public associated with accidental exposure to glyphosate consumption of contaminated water after an herbicide spill into a small pond.

### Hexazinone

Over the range of plausible application rates, all worker groups exposed to hexazinone may face risks, with the highest risks predicted for workers using an over-the-shoulder broadcast applicator (belly grinder; SERA 1997). Workers exposed to hexazinone via direct and broadcast ground spray and aerial applications at the maximum application rate are at low risk. There would be a low risk associated with accidental exposure to hexazinone mixed for the maximum application rate via contaminated gloves (also low risk at the typical application rate) and via spills on lower legs. The most likely effects include irritation to the eyes, respiratory tract, and skin. Even under the most extreme exposure scenarios, outward toxic effects are not likely to be observed; however, the upper estimates of exposure levels could be associated with subclinical (non-

BLM_0000575

TABLE 4-27
**BLM-evaluated Herbicide Risk Categories by Aggregate Risk Index for Occupational Receptors**

| Receptor | Dicamba | | | Diflufenzopyr | | | Diquat | | | Fluridone | | | Imazapic | | | Sulfometuron Methyl | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[1] | Max | Accid | Typ | Max | Accid | Typ | Max | Accid | Typ | Max | Accid[2] | Typ | Max | Accid | Typ | Max | Accid |
| Plane - pilot | NE[3] | NE | NE | NE | NE | NE | L | M | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| Plane - mixer/loader | NE | NE | NE | NE | NE | NE | M | H | H | 0 | L | L-H | 0 | 0 | NE | 0 | 0 | NE |
| Helicopter - pilot | NE | NE | NE | NE | NE | NE | L | M | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| Helicopter - mixer/loader | NE | NE | NE | NE | NE | NE | M | H | H | 0 | L | L-H | 0 | 0 | NE | 0 | 0 | NE |
| Human/backpack - applicator/mixer/loader | 0 | 0 | L | 0 | 0 | NE | L | M | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| Human/horseback - applicator | 0 | 0 | L | 0 | 0 | NE | L | L | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| Human/horseback - mixer/loader | 0 | 0 | L | 0 | 0 | NE | 0 | L | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| Human/horseback - applicator/mixer/loader | 0 | 0 | L | 0 | 0 | NE | L | M | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| ATV - applicator[4] | 0 | 0 | L | 0 | 0 | NE | 0 | L | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| ATV - mixer/loader | 0 | 0 | L | 0 | 0 | NE | 0 | L | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| ATV - applicator/mixer/loader | 0 | 0 | L | 0 | 0 | NE | 0 | L | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| Truck - applicator[4] | 0 | 0 | L | 0 | 0 | NE | 0 | M | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| Truck - mixer/loader | 0 | 0 | L | 0 | 0 | NE | 0 | L | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| Truck - applicator/mixer/loader | 0 | 0 | L | 0 | 0 | NE | 0 | M | H | 0 | 0 | L-H | 0 | 0 | NE | 0 | 0 | NE |
| Boat - applicator | NE | NE | NE | NE | NE | NE | 0 | 0 | H | 0 | 0 | L-H | NE | NE | NE | NE | NE | NE |
| Boat - mixer/loader | NE | NE | NE | NE | NE | NE | 0 | 0 | H | 0 | 0 | L-H | NE | NE | NE | NE | NE | NE |
| Boat - applicator/mixer/loader | NE | NE | NE | NE | NE | NE | 0 | 0 | H | 0 | 0 | L-H | NE | NE | NE | NE | NE | NE |

[1] Typ = Typical application rate; Max = Maximum application rate; and Accid = Accidental rate. Typical and maximum application rate categories include short-, intermediate-, and long-term exposures. Accidental scenario category includes accidents with herbicide mixed at both the typical and maximum application rates and with a concentrated herbicide.

[2] For all occupational receptors accidentally exposed to fluridone, there is low risk from exposure to solutions mixed with water to the typical application rate, moderate risk from exposure to solutions mixed with water to the maximum application rate, and high risk from exposure to concentrated solutions (prior to mixing with water).

[3] Risk categories: 0 = No risk (majority of ARIs > 1); L = Low risk (majority of ARIs >1 but < 0.1); M = Moderate risk (majority of ARIs > 0.1 but < 0.01); H = High risk (majority of ARIs < 0.01); and NE = Not evaluated. The reported risk category represents the typical/most common risk level for estimated risks from various time periods. See the *Vegetation Treatments Programmatic EIS Human Health Risk Assessment Final Report* (ENSR 2005l) for the range of risk levels for each scenario.

[4] ATV and Truck categories include spot and boom/broadcast application scenarios.

**TABLE 4-28**
**BLM-evaluated Herbicide Risk Categories by Aggregate Risk Index for Public Receptors**

| Receptor | Dicamba | | | Diflufenzopyr | | | Diquat | | | Fluridone | | | Imazapic | | | Sulfometuron Methyl | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[1] | Max | Accid | Typ | Max | Accid | Typ | Max | Accid | Typ | Max | Accid | Typ | Max | Accid | Typ | Max | Accid |
| Hiker/hunter (adult) | 0[2] | 0 | 0 | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | NE | NE | NE | NE | NE | NE |
| Berry picker (child) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | L | 0 | 0 | L | NE | NE | NE | NE | NE | NE |
| Berry picker (adult) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | NE | NE | NE | NE | NE | NE |
| Angler (adult) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | NE | NE | NE | NE | NE | NE |
| Residential (child) | 0 | 0 | 0 | 0 | 0 | 0 | L | L | M | 0 | 0 | L | NE | NE | NE | NE | NE | NE |
| Residential (adult) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | M | 0 | 0 | L | NE | NE | NE | NE | NE | NE |
| Native American (child) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Native American (adult) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Swimmer (child) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Swimmer (adult) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] Typ = Typical application rate; Max = Maximum application rate; and Accid = Accidental rate. Typical and maximum application rate categories include short-, intermediate-, and long-term exposures. Accidental scenario category includes accidents with herbicide mixed at both the typical and maximum application rates and with a concentrated herbicide.

[2] Risk categories: 0 = No risk (majority of ARIs > 1); L = Low risk (majority of ARIs >1 but < 0.1); M = Moderate risk (majority of ARIs > 0.1 but < 0.01); H = High risk (majority of ARIs < 0.01); and NE = Not evaluated. The reported risk category represents the typical/most common risk level for estimated risks from various time periods. See the *Vegetation Treatments Programmatic EIS Human Health Risk Assessment Final Report* (ENSR 2005l) for the range of risk levels for each scenario.

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

4-186

June 2007

ENVIRONMENTAL CONSEQUENCES

BLM_0000577

ENVIRONMENTAL CONSEQUENCES

**TABLE 4-29**
**Forest Service-evaluated Herbicide Risk Categories by Hazard Quotient for Occupational Exposures**

| Treatment Method | Risk Categories | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2,4-D[1] | | Chlorsulfuron | | Clopyralid | | Glyphosate | | Hexazinone | | Imazapyr | | Metsulfuron Methyl | | Picloram | | Triclopyr[1] | |
| | Typ[2] | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| *General Exposures* | | | | | | | | | | | | | | | | | | |
| Directed foliar and spot treatments (backpack) | L[3] | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Broadcast ground spray (boom spray) | L | M | 0 | L | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Aerial applications (pilots and mixer/loaders) | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Aquatic applications | L | L | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE | NE |
| *Accidental/Incidental Exposures* | | | | | | | | | | | | | | | | | | |
| Immersion of hands | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Wearing contaminated gloves | M | M | 0 | 0 | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Spill on hands | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Spill on lower legs | L | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] Where different formulations exist, risks reported are the most conservative.
[2] Typ = Typical application rate; and Max = Maximum application rate.
[3] Risk categories: 0 = No risk (majority of HQs < 1); L = Low risk (majority of HQs >1 but < 10); M = Moderate risk (majority of HQs > 10 but < 100); H = High risk (majority of HQs > 100); and NE = Not evaluated. Risk categories are based on typical and upper HQ estimates. To determine risk for lower or central HQ estimates, see the individual herbicide risk assessments (SERA 2005b). Risk categories are based on comparison to the HQ of 1 for typical and maximum application rates.

BLM Vegetation Treatments Using Herbicides
Final Programmatic EIS

4-188

June 2007

BLM_0000579

ENVIRONMENTAL CONSEQUENCES

**TABLE 4-30**
**Forest Service-evaluated Herbicide Risk Categories by Hazard Quotient for Public Exposures**

| Treatment Method | Hazard Quotient | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2,4-D[1] | | Chlorsulfuron | | Clopyralid | | Glyphosate | | Hexazinone | | Imazapyr | | Metsulfuron | | Picloram | | Triclopyr[1] | |
| | Typ[2] | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max | Typ | Max |
| *Acute/Accidental Exposures* | | | | | | | | | | | | | | | | | | |
| Direct spray - child, entire body | 0[3] | M | 0 | 0 | 0 | 0 | 0 | 0 | L | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Direct spray - woman, lower legs | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | L | M |
| Dermal - contaminated vegetation, woman | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | L |
| Consumption of contaminated fruit | L | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L |
| Consumption of contaminated water - pond, spill | M | H | 0 | 0 | 0 | L | 0 | L | M | M | 0 | 0 | 0 | 0 | 0 | L | 0 | L |
| Consumption of contaminated water - stream, ambient | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated fish - general public | M | M | 0 | 0 | 0 | 0 | 0 | 0 | L | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated fish - subsistence populations | H | H | 0 | 0 | 0 | 0 | 0 | 0 | M | M | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Chronic/Longer-term Exposures* | | | | | | | | | | | | | | | | | | |
| Consumption of contaminated fruit | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | L | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated water | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated fish - general public | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Consumption of contaminated fish - subsistence populations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[1] Where different formulations exist, risks reported are the most conservative.
[2] Typ = Typical application rate; and Max = Maximum application rate.
[3] Risk categories: 0 = No risk (majority of HQs < 1); L = Low risk (majority of HQs >1 but < 10); M = Moderate risk (majority of HQs > 10 but < 100); H = High risk (majority of HQs > 100); and NE = Not evaluated. Risk categories are based on typical and upper HQ estimates. To determine risk for lower or central HQ estimates, see the individual herbicide risk assessments (SERA 2005b). Risk categories are based on comparison to the HQ of 1 for typical and maximum application rates.

symptomatic) effects and possible reproductive effects. In some accidental exposure scenarios, members of the general public may face risks from exposure to hexazinone. At the typical application rate, there is low to moderate risk to public receptors associated with exposure to hexazinone under the following scenarios: direct spray of the entire body, acute consumption of water contaminated by a spill, and acute consumption of contaminated fish by the general public and subsistence populations. For application at the maximum rate, the risks to public receptors associated with the above scenarios are low to moderate. The following additional scenarios pose a low risk: direct spray of the lower legs, acute and chronic consumption of fruit, and consumption of stream water contaminated by runoff or percolation.

### Imazapyr

Most exposures to imazapyr at either the typical or the maximum application rate do not present a risk to either workers or members of the general public, suggesting that workers and the general public would generally not be at any substantial risk from longer-term exposure to imazapyr even at the upper range of the application rate considered in the risk assessment (SERA 2004d). From a practical perspective, eye irritation is likely to be the only overt effect as a consequence of mishandling imazapyr. This effect can be minimized or avoided by prudent industrial hygiene practices during the handling of the compound.

### Metsulfuron Methyl

Typical exposures to metsulfuron methyl at the typical or maximum application rates do not present a risk to workers or the general public (SERA 2004e). For workers, there is no risk associated with acute or chronic exposure scenarios, even at the upper ranges of estimated dose. For members of the general public, no risks were predicted for any of the exposure scenarios. From a practical perspective, eye and skin irritation are likely to be the only overt effects of mishandling metsulfuron methyl. These effects can be minimized or avoided by prudent industrial hygiene practices during the handling of this compound.

### Picloram

Typical exposures to picloram at either the typical or maximum application rates present few risks to workers or the general public (SERA 2003b). For workers, no risks were predicted even at the upper ranges of exposure. For members of the general public, no risks

were predicted except for the consumption of water by a child following an accidental spill of a large amount of picloram into a very small pond, which presents a low risk. From a practical perspective, eye irritation and skin sensitization are likely to be the only overt effects as a consequence of mishandling picloram. Based on the standard assumptions used in this and other Forest Service risk assessments, the contamination of picloram with hexachlorobenzene does not appear to present a substantial cancer risk, even at the upper ranges of plausible exposure.

### Triclopyr

Workers face low risk from directed and broadcast ground spray and aerial applications at the upper ranges of exposures for both equivalent formulations of triclopyr (triclopyr acid and triclopyr BEE), at the maximum application rate (SERA 2003c). At the maximum application rate, workers face low risk from accidental exposure to contaminated gloves (1 hour duration). Thus, for workers who may apply triclopyr repeatedly over a period of several weeks or longer, it is important to ensure that work practices involve reasonably protective procedures to avoid the upper extremes of potential exposure. At higher application rates, measures that limit exposure should be developed on a case-by-case basis depending on the application rate and method. There is low to moderate risk to the general public from triclopyr applications under several acute or accidental scenarios: 1) direct spray to the entire body; 2) direct spray to the lower legs; 3) dermal contact with contaminated vegetation; 4) acute consumption of contaminated fruit (maximum application rate only); and 5) acute consumption of pond water contaminated by a spill.

### Human Health Risks Associated with Herbicides Evaluated in Previous BLM EISs and Literature Review

As discussed earlier, the human health risks of asulam, atrazine, bromacil, diuron, fosamine, mefluidide, simazine, tebuthiuron, and 2,4-DP were evaluated in earlier BLM vegetation treatment EISs. These herbicides were not reevaluated in the BLM HHRA for the current PEIS because a literature review and evaluation showed that most toxicity values for these herbicides reported in more recent studies were not substantially lower (i.e., present more risk) than the values used to assess risks to human health in the 1991 13-State EIS (McMullin and Thomas 2000). Tables 4-31 and 4-32 present summaries of the risks to occupational and public receptors associated with the

BLM_0000580

## ENVIRONMENTAL CONSEQUENCES

nine herbicides that were evaluated in the earlier EISs and subsequent literature reviews. The earlier EISs calculate a margin of safety (MOS), which is the NOAEL divided by the exposure dose (and the same as the MOE used in the current HHRA), and cancer risk estimates for potential carcinogens. The EISs included summary tables that identified herbicides and scenarios that pose a high risk, where high risk is identified as an MOS less than 100, or a cancer risk estimate greater than 1 in 1 million. Therefore, Tables 4-31 and 4-32 also report the high risk herbicides and exposure scenarios, as presented in the earlier EISs.

Another difference between this PEIS HHRA and earlier EIS HHRAs is the toxicity assessment. For the current HHRA, the USEPA either provided toxicity values for the various exposure durations (acute, short term, long term) and exposure routes (oral, dermal), or convened a panel to develop these values for this project. This ensured that the toxicity values used in the current HHRA were consistently derived and have had the benefit of peer review. In the development of these values, the USEPA selected the most sensitive endpoint from the most sensitive species; therefore, the values are protective of all other potential toxic effects (i.e., those that may occur at higher exposure levels). This methodology is standard practice for current HHRA guidance. However, during development of the earlier EISs, there was not much agency-derived information on the herbicides evaluated, nor was the methodology for evaluation as standardized. Thus, the authors evaluated separate toxic endpoints for systemic and reproductive effects for each herbicide, rather than just the most sensitive endpoint. Risks are discussed by toxic endpoint below, rather than in the context of the most sensitive endpoint.

### 2,4-DP

According to the 1988 *California Vegetation Management Final EIS* (1988 California EIS), backpack and hand applicators are at risk from typical 2,4-D application practices (USDI BLM 1988a). Backpack and hand applicators and ground applicators, mixer-loaders, and applicator/mixer-loaders are also at risk for systemic and reproductive effects from maximum exposures. There are risks for systemic, reproductive, and cancer effects to workers and public receptors associated with accidental scenarios of spill to skin and direct spray. Public receptors are at risk for systemic, reproductive, and cancer effects as a result of picking contaminated vegetation, and for systemic and reproductive risks associated with drinking directly sprayed water and eating berries. Nearby residents also face risks for systemic and reproductive effects from treatments on public lands.

### Asulam

According to the 1988 California EIS, asulam applications would pose few risks to workers or the public. Hand applicators would be at risk for systemic and reproductive effects from maximum exposures, while the public would be at risk from systemic, reproductive, and cancer effects from contact with vegetation by picking.

### Atrazine

According to the 1991 13-State EIS, workers and the public would face numerous risks from exposure to atrazine. Workers would be at risk for systemic and/or reproductive effects under nearly all scenarios involving the typical application rate, and would be at risk for systemic, reproductive, and cancer effects under all scenarios involving the maximum application, as well as accidental scenarios. The public would be at risk for systemic and/or reproductive effects under several exposure scenarios involving the maximum application rate. The public would be at risk for systemic, reproductive, and cancer effects under all scenarios involving accidental exposures, except for contact with vegetation by a hiker or from fishing (systemic and reproductive effects only), or by living near a treated area (reproductive effect only).

### Bromacil

According to the 1991 13-State EIS, there would be a risk to workers associated with several exposure scenarios involving typical bromacil application practices. Pilots and aerial mixer-loaders face a risk for systemic, reproductive, and cancer effects from typical and maximum exposures to bromacil. Backpack and hand applicators and ground applicators, mixer-loaders, and applicator/mixer-loaders are also at risk for systemic and reproductive effects from maximum exposures. Risks for systemic, reproductive, and cancer effects to workers and public receptors are associated with accidental scenarios of spill to skin (concentrate and mixture), direct spray (no cancer risk), consumption of fish from a directly sprayed water body (no cancer risk), consumption of directly sprayed berries (no cancer risk), and drinking from water contaminated by a truck spill or a jettison of mixture (no cancer risk). The cancer slope factor for bromacil used in the HHRA was the one available from the USEPA at the time of the 1991 13-State EIS. However, in its most recent review

BLM_0000581

### TABLE 4-31
### Scenarios Resulting in High Risk to Occupational Receptors from Herbicides Evaluated in the 1988-1991 BLM EISs

| Treatment Method | 2,4-DP | | | Asulam | | | Atrazine | | | Bromacil | | | Diuron | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ[1] | Max | Accid | Typ | Max | Accid | Typ | Max | Accid | Typ | Max | Accid | Typ | Max | Accid |
| Aerial pilot | 0[2] | 0 | NA | 0 | 0 | NA | S,R | S,R,C | NA | R,C | S,R,C | NA | S,R | S,R | NA |
| Aerial mixer-loader | 0 | 0 | NA | 0 | 0 | NA | S,R | S,R,C | NA | S,R,C | S,R,C | NA | S,R | S,R | NA |
| Aerial fuel truck operator | 0 | 0 | NA | 0 | 0 | NA | 0 | S,R,C | NA | 0 | 0 | NA | 0 | S,R | NA |
| Backpack applicator | S,R | S,R | NA | 0 | 0 | NA | R | S,R,C | NA | 0 | S,R | NA | S | S,R | NA |
| Ground mechanical applicator | 0 | S,R | NA | 0 | 0 | NA | R | S,R,C | NA | 0 | S,R | NA | S | S,R | NA |
| Ground mechanical mixer-loader | 0 | S,R | NA | 0 | 0 | NA | S,R | S,R,C | NA | 0 | S,R | NA | S | S,R | NA |
| Ground mechanical applicator/mixer-loader | 0 | S,R | NA | 0 | 0 | NA | S,R | S,R,C | NA | 0 | S,R | NA | S | S,R | NA |
| Hand applicator | S,R | S,R | NA | 0 | 0 | NA | R | S,R,C | NA | 0 | S,R | NA | S | S,R | NA |
| Skin spill, concentrate | NA | NA | S,R,C | NA | NA | S,R,C | NA | NA | S,R,C | NA | NA | S,R,C | NA | NA | S,R |
| Skin spill, mixture | NA | NA | S,R,C | NA | NA | S,R,C | NA | NA | S,R,C | NA | NA | S,R,C | NA | NA | S,R |
| Direct spray, person | NA | NA | NA | NA | NA | NA | NA | NA | S,R,C | NA | NA | S,R | NA | NA | S,R |

| Treatment Method | Fosamine | | | Mefluidide | | | Simazine | | | Tebuthiuron | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Typ | Max | Accid | Typ | Max | Accid | Typ | Max | Accid | Typ | Max | Accid |
| Aerial pilot | 0 | 0 | NA | 0 | S | NA | S,R | S,R | NA | R | S,R | NA |
| Aerial mixer-loader | 0 | 0 | NA | 0 | 0 | NA | S,R | S,R | NA | R | S,R | NA |
| Aerial fuel truck operator | 0 | 0 | NA | 0 | 0 | NA | 0 | 0 | NA | 0 | S | NA |
| Backpack applicator | S | S,R | NA | 0 | S | NA | 0 | 0 | NA | 0 | S,R | NA |
| Ground mechanical applicator | 0 | S | NA | 0 | S | NA | 0 | 0 | NA | 0 | S,R | NA |
| Ground mechanical mixer-loader | 0 | S | NA | 0 | 0 | NA | 0 | 0 | NA | 0 | S,R | NA |
| Ground mechanical applicator/mixer-loader | 0 | S | NA | 0 | 0 | NA | 0 | 0 | NA | 0 | S,R | NA |
| Hand applicator | 0 | S | NA | S | S | NA | 0 | 0 | NA | R | S,R | NA |
| Skin spill, concentrate | NA | NA | S,R | NA | NA | S,R | NA | NA | S,R,C | NA | NA | 0 |
| Skin spill, mixture | NA | NA | S,R | NA | NA | S,R | NA | NA | S,R,C | NA | NA | S,R |
| Direct spray, person | NA | NA | NA | NA | NA | NA | NA | NA | S,R | NA | NA | S,R |

[1] Typ = Typical application rate; Max = Maximum application rate; and Accid = Accidental application.

[2] Risk categories: 0 = No risk; S = Systemic risk; R = Reproductive risk; C = Cancer risk; and NA = Not applicable. Marked scenarios are those that result in high risk under the given herbicide. High risks are defined as those exposures that may result in a margin of safety (MOS) < 100 or a cancer risk greater than one-in-one million. The MOS is the NOEL divided by the dose; therefore, the larger the MOS, the smaller the estimated human dose compared to the animal NOEL, and the lower the presumed risk to human health.

In the earlier BLM EISs, risk estimates were presented separately for different land uses (rangeland, public domain forestland, oil and gas sites, ROW, and recreation and cultural sites). In this table, the scenario is marked if any of these land uses showed a high risk for the specific herbicide.

ENVIRONMENTAL CONSEQUENCES

**TABLE 4-32**
**Scenarios Resulting in High Risk to Public Receptors from Herbicides**
**Evaluated in the 1988-1991 BLM EISs**

| Treatment Method | 2,4DP[1] Accid[2] | ASU Accid | Atrazine Max | Atrazine Accid | BRO Accid | DIUR Accid | FOS Accid | MEF Accid | Simazine Max | Simazine Accid | TEB Accid |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Direct spray, person | S,R,C[3] | 0 | R | S,R,C | S,R | S,R | 0 | 0 | 0 | S,R,C | S,R |
| Drinking directly sprayed water | S,R | 0 | R | S,R,C | 0 | S,R | 0 | 0 | 0 | S,R,C | R |
| Eating fish from directly sprayed water | 0 | 0 | R | S,R,C | S,R | S,R | 0 | 0 | 0 | S,R,C | 0 |
| Immediate reentry, hiker | 0 | 0 | R | S,R | 0 | S | S | S | 0 | 0 | 0 |
| Immediate reentry, picker | S,R,C | S,R,C | S,R | S,R,C | S,R | S,R | 0 | 0 | 0 | S,R,C | S,R |
| Eating directly sprayed berries | S,R | 0 | S,R | S,R,C | S,R | S,R | 0 | 0 | 0 | S,R,C | S,R |
| Angler | 0 | 0 | 0 | S,R | 0 | 0 | 0 | 0 | R | 0 | 0 |
| Nearby resident | S,R | 0 | 0 | R | 0 | 0 | S | 0 | 0 | 0 | 0 |
| Drinking water contaminated by a jettison of mixture | NA | NA | 0 | S,R,C | S,R | S,R | NA | 0 | 0 | S,R,C | S,R |
| Drinking water contaminated by a truck spill | NA | NA | 0 | S,R,C | S,R | S,R | NA | S | 0 | S,R,C | S,R |

[1] 2,4DP = 2,4-DP; ASU = Asulam; BRO = Bromacil; DIUR = Diuron; FOS = Fosamine; MEF = Mefluidide; and TEB = Tebuthiuron.
[2] Accid = Accidental application; and Max = Maximum application rate.
[3] Risk categories: 0 = No risk; S = Systemic; R = Reproductive; C = Cancer; and NA = Not applicable. Marked scenarios are those that result in high risk under the given herbicide. High risks are defined as those exposures that may result in a margin of safety (MOS) < 100 or a cancer risk greater than one-in-one million. The MOS is the NOEL divided by the dose; therefore, the larger the MOS, the smaller the estimated human dose compared to the animal NOEL, and the lower the presumed risk to human health.
In the earlier BLM EISs, risk estimates were presented separately for different land uses (rangeland, public domain forestland, oil and gas sites, ROW, and recreation and cultural sites). In this table, the scenario is marked if any of these land uses showed a high risk for the specific herbicide.

of bromacil, the USEPA did not provide a cancer slope factor (USEPA 1994b), therefore bromacil is likely not carcinogenic.

***Diuron***

According to the 1991 13-State EIS, there are risks to workers and the general public associated with both routine and accidental exposures to diuron. Aerial application poses a risk to most evaluated public receptors for systemic effects from worst-case exposures (e.g., direct exposure of hikers, berry pickers, anglers, and nearby residents; spray drift to skin; vegetation contact by berry pickers; consumption of contaminated drinking water and fish). Berry pickers also face a risk for systemic effects from worst-case direct exposure and contact with vegetation scenarios. In aerial application scenarios, pilots and mixer-loaders are at risk for systemic and reproductive effects under both typical and worst-case exposures, and fuel-truck

operators are at risk for systemic and reproductive effects under worst-case exposures. In addition, backpack and hand applicators and ground applicators, mixer-loaders, and applicator-mixer-loaders are at risk for systemic and reproductive effects for typical (systemic only) and worst-case exposures. There are also risks to workers and the public for systemic and reproductive effects associated with accidental exposures of spill to skin (herbicide concentrate and mixture), direct spray, drinking or eating fish from a directly sprayed water body, or immediate reentry into a sprayed area by a berry picker.

***Fosamine***

According to the 1991 13-State EIS, there would be few risks to workers associated with applications of mefluidide. Backpack applicators could experience systemic effects at the typical and maximum rates, and ground applicators and hand applicators could

BLM_0000583

experience systemic effects at the maximum rate. Backpack applicators could also experience reproductive effects as a result of applications at the maximum rate.

### *Mefluidide*

According to the 1991 13-State EIS, there would be few risks to workers associated with applications of mefluidide. Pilots, backpack applicators, and hand applicators could experience systemic effects as a result of application of mefluidide at the maximum rate, and hand applicators could experience systemic effects as a result of applications at the typical rate. Hikers reentering a treated area, or drinking water from a spill at the accidental rate would be at risk for systemic effects.

### *Simazine*

According to the 1991 13-State EIS, potential effects to workers would be limited to systemic and reproductive effects to pilots and aircraft mixer-loaders, and would be associated with application at the typical and maximum application rates. In addition, a spill to a worker's skin of either a concentrate or mixture of simazine could result in systemic, reproductive, and cancer effects. The public could experience systemic, reproductive, and cancer effects under most accidental scenarios analyzed in the HHRA. However, hikers entering recently treated areas and contacting vegetation, anglers, and nearby residents would not be at risk under accidental exposure scenarios.

### *Tebuthiuron*

According to the 1991 13-State EIS, tebuthiuron poses health risks to workers under various application scenarios. Typical and worst-case aerial application exposure to tebuthiuron could result in systemic and reproductive effects to pilots and to mixer-loaders (no systemic risk at typical exposures). Fuel-truck operators could experience systemic effects from worst-case exposure to tebuthiuron during aerial application. Backpack applicators face systemic and reproductive risks from worst-case exposures to tebuthiuron. For workers using ground mechanical equipment, there are systemic and reproductive risks to applicators, mixer-loaders, and applicator/mixer-loaders associated with worst-case exposures to tebuthiuron. Hand applicators are at risk from typical (reproductive effects) and worst-case (systemic and reproductive effects) exposures. Several accidental scenarios also pose a risk for systemic and reproductive effects to workers and the

public: 1) spill of herbicide mixture to skin; 2) direct spray to person; 3) drinking directly sprayed water (reproductive only); 4) immediate reentry of a berry picker into a sprayed area; 5) consumption of directly sprayed berries; and 6) consumption of water contaminated by a jettison of mixture or by a truck spill.

## Human Health Risks by Application Method

### *Air*

Aerial applications of herbicides generally pose a greater risk due to off-site drift than ground applications, as herbicides applied at greater distances from the ground are able to drift farther from the target application area. Therefore, risks to public receptors recreating or living near an application area would extend out greater distances if the herbicide was applied aerially than if it was applied by a ground application method. The BLM does not apply dicamba and diflufenzopyr by air.

### *Ground*

Ground applications typically pose a lower risk to off-site receptors than aerial applications because the receptors are less likely to be exposed to spray drift. Similarly, spot rather than boom/broadcast applications are less likely to result in adverse effects to downwind receptors. However, these spot applications could present an increased risk to the occupational receptors charged with applying the herbicide because they are more likely to come into contact with the herbicide (their exposure doses may be higher). In particular, occupational receptors applying diquat by backpack and horseback would be at low to moderate risk for adverse effects from exposure to the herbicide, whereas those applying diquat at the typical application rate by ATV or truck would not be at risk. In contrast, chlorsulfuron does not pose a risk to workers involved with aerial applications, but does pose a risk to workers conducting ground broadcast applications at the highest application rate, and exposure to hexazinone is greatest for workers using an over-the-shoulder broadcast applicator.

### *Typical Application Rate*

Most of the herbicides do not present a risk to human receptors when applied at the typical application rate. Diquat applications at the typical application rate would pose a low to moderate risk to plane and helicopter pilots and mixer/loaders, backpack applicator/mixer/loaders, horseback applicators and applicator/mixer/loaders, and child residents. 2,4-D, 2,4-

BLM_0000584