ENVIRONMENTAL CONSEQUENCES

DP, atrazine, bromacil, diuron, hexazinone, simazine, and tebuthiuron also pose a risk to various public and occupational receptors when applied at the typical application rate.

### Maximum Application Rate

At the maximum application rate, more herbicides, in a greater number of exposure scenarios, have the potential to adversely affect human health. Fluridone, chlorsulfuron, clopyralid, glyphosate, picloram and triclopyr do not pose a risk when applied at the typical application rate, but do pose a risk under one or more exposure scenarios when applied at the maximum application rate. Clopyralid, glyphosate and picloram pose a low risk under the accidental scenario involving consumption of water from a small pond that has experienced a recent spill of herbicides mixed for the maximum application rate, which is a very unlikely scenario. In addition, a greater number of exposure scenarios and receptors are at risk for adverse effects from herbicide applications at the maximum application rate. Dicamba, diflufenzopyr, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl do not pose a risk to any receptor when applied at the maximum (or typical) application rate.

### Accidental Direct Spray and Spill Scenarios

Accidental direct spray and spill scenarios for many herbicides pose a risk to many receptors (accidental scenarios for diflufenzopyr, imazapic, and sulfometuron methyl were not evaluated because these chemicals are not considered toxic through short-term dermal exposure). These scenarios are unlikely, and can be avoided by following SOPs.

### Human Health Risks by Receptor

#### Occupational

2,4-D, 2,4-DP, asulam, atrazine, bromacil, diquat, diuron, fosamine, mefluidide, simazine, and tebuthiuron pose risks to occupational receptors when applied at both typical and maximum application rates. Atrazine and diuron pose a risk to most receptors at the typical application rate. For 2,4-D, atrazine, diquat, bromacil, simazine, and tebuthiuron, receptors working with aerial applications would be at low to moderate risk for adverse effects, even for applications at the typical application rate, and all or most occupational receptors would be at risk when applying these herbicides at maximum application rates. 2,4-D, 2,4-DP, atrazine, and fosamine also pose risks to ground applicators,

particularly during applications at the maximum application rate. In addition, there are potential cancer risks to workers who apply atrazine and bromacil aerially. Mixer/loaders working with aerial applications of fluridone are at low risk, and those working with atrazine, bromacil, diuron, simazine, and tebuthiuron are at high risk when applying those herbicides at the typical and maximum application rates.

Ground broadcast applicators are at risk from applying atrazine and diuron at the typical application rate, and 2,4-DP, bromacil, chlorsulfuron, fosamine, and tebuthiuron at the maximum application rate. All occupational receptors are at risk from applying atrazine, hexazinone, tebuthiuron, and triclopyr at the maximum application rate. The rest of the scenarios of potential exposure to herbicides pose risks to occupational receptors were not predicted. Workers involved in the aerial application of herbicides appear to be at greater risk than other occupational receptors; however, the application method that creates the most risk to workers appears to depend on the herbicide, so application methods for each herbicide should be carefully evaluated with respect to potential human health effects.

#### Public

In general, there are lower risks to public receptors than occupational receptors. However, within this category, there is higher risk to children than adults. Public receptors do not appear to be at risk from chlorsulfuron, dicamba, diflufenzopyr, imazapic, imazapyr, metsulfuron methyl, or sulfometuron methyl applications (accidental scenarios were not evaluated for imazapic and sulfometuron methyl because these chemicals are not toxic through short-term exposure for specific exposure routes). Diquat application at the typical application rate poses a low risk to child residents. At the maximum application rate, diquat poses a low to moderate risk to all public receptors, except swimmers. Under worst-case exposures, diuron poses a risk to most public receptors. In addition, 2,4-D, 2,4-DP, asulam, atrazine (also at maximum exposure), bromacil, clopyralid, diuron, fluridone, fosamine, glyphosate, hexazinone, mefluidide, picloram, simazine, tebuthiuron, and triclopyr may pose a risk to public receptors under one or more accidental exposure scenarios (e.g., exposure resulting from the spill of an herbicide into a small pond). For most herbicides (except diquat), risk to public receptors can be minimized or avoided by using the typical application rate and following SOPs that greatly reduce the likelihood of accidents.

BLM_0000585

## Impacts by Alternative

The following is a qualitative discussion of how risk from herbicide exposure would vary under each herbicide treatment alternative.

### Alternative A – Continue Present Herbicide Use (No Action Alternative)

Of the herbicide treatment alternatives (A, B, D, and E), the fewest acres treated would be under the No Action Alternative. Therefore, health risks to occupational and public receptors would be lowest. If the No Action Alternative were to result in more acres being treated by other vegetation management methods (e.g., prescribed fire, manual, biological treatments), then health risks from these methods would also have to be considered (see the PER). In addition, the new herbicides proposed in this EIS (diflufenzopyr+dicamba [Overdrive®], diquat, fluridone, and imazapic) would not be used. Of these new herbicides, diquat poses a potential risk to humans under various exposure pathways; however, diflufenzopyr, dicamba, fluridone, and imazapic are all relatively safe to humans, with no potential adverse effects predicted by the human health risk characterization, except in cases of unlikely accidental exposures of fluridone. Of the 20 previously-approved herbicides, only nine (asulam, clopyralid, fosamine, glyphosate, imazapyr, mefluidide, metsulfuron methyl, picloram and sulfometuron methyl) pose a similarly negligible to low risk to humans. Therefore, failure to approve the four new herbicides would limit the options for treatment of vegetation without appreciable risk to humans. As a consequence, the No Action Alternative may present greater risk to humans per each herbicide application than the other alternatives. In addition, this alternative may be less successful in controlling weeds and poisonous plants that adversely affect humans, especially weeds most effectively controlled by the four proposed herbicides.

Under the No Action Alternative, the BLM would be able to continue to use six herbicides that were approved for use under earlier BLM vegetation treatment RODs: 2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine (USDI BLM 1988b, 1991b, 1992a). Except for fosamine, which has been used on less than 50 acres annually, these chemicals have not been used by the BLM since 1997 and are not proposed for use under the other herbicide treatment alternatives.

In 1998, the BLM conducted a literature review to determine if the earlier vegetation treatment ROD

conclusions for asulam, atrazine, mefluidide, and simazine were justifiable based on past and 1998 toxicology and risk assessment procedures; a literature review was not performed for 2,4-DP and fosamine, but these herbicides were analyzed in the 1988 California EIS (USDI BLM 1988a, McMullin and Thomas 2000). Based on this analysis, it was determined that systemic risks associated with using asulam may be greater than those projected in the earlier EIS, but that risks to humans from the other three herbicides were similar to, or less than, those identified in earlier EISs.

Based on the earlier EISs, literature reviews done by the BLM, and other studies (USEPA 1995d, 2002), the risks to humans would be low for asulam, fosamine, and mefluidide, low to moderate for 2,4-DP and simazine, and moderate to high for atrazine. The BLM uses sulfometuron methyl, bromacil, and diuron in treatment situations where it used atrazine in the past, and triclopyr instead of fosamine. These substitute herbicides pose similar, or lower, risks to humans than the herbicides they would replace.

### Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative)

This alternative would likely have the greatest overall risk to human health of the five alternatives considered here because of the large number of acres treated. However, human health could benefit from the reduced occurrence of the noxious weeds and other invasive vegetation that would likely be brought about by this alternative. In addition, this alternative would include the use of the new herbicides evaluated in the BLM HHRA (ENSR 2005l). Of these four herbicides, three (all but diquat) appear to be relatively harmless to humans; the use of these herbicides would increase the options for appropriately managing vegetation while minimizing the risk to human receptors. Therefore, the Preferred Alternative could result in more positive impact to humans per application than the No Action Alternative. However, the new herbicide diquat potentially presents greater risk to humans in many application scenarios, and it is suggested that diquat not be used or be used only in very limited scenarios at the typical application rate, where there is risk to human receptors (e.g., possibly ground applications from trucks not near residences or berry gathering sites).

### Alternative C – No Use of Herbicides

Alternative C would eliminate human health risk associated with herbicide applications. However, risks

BLM_0000586

ENVIRONMENTAL CONSEQUENCES

to humans associated with alternative vegetation management methods would likely increase (these risks are perhaps greatest for prescribed fire treatments [see PER]). In addition, human health might be adversely affected if the noxious weeds and poisonous plants that can harm humans increase in occurrence as a result of a cessation of herbicide treatments.

**Alternative D – No Aerial Applications**

Human health risks per application area would be lower under Alternative D than under the other herbicide treatment alternatives because herbicides would not be likely to drift as far, potentially affecting fewer humans. This alternative would allow the use of the new herbicides, which on average present less risk to humans than the currently-used herbicides. Overall risks would be lower than under the Preferred Alternative, which would treat about 400,000 more acres and would use aerial spraying. However, under the Preferred Alternative, the BLM may eliminate more unwanted plants that adversely affect human health than under Alternative D. Overall risks would likely be similar to those under Alternative E, as a similar number of acres would be treated, and Alternative E places emphasis on spot applications over broadcast applications. However, Alternative E would prohibit the use of ALS-inhibiting herbicide active ingredients (i.e., chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl), which pose low risks to humans. Because the BLM would treat 240,000 more acres under Alternative D than under the No Action Alternative, but would not use higher risk aerial applications and would use less risky chemicals, it is difficult to infer which alternative would have a lower overall risk.

**Alternative E – No Use of Acetolactate Synthase-inhibiting Herbicides**

The five ALS-inhibiting herbicides (chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl) that would not be used under this alternative present some of the lowest risks with respect to human health. Even in accidental exposure scenarios, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl do not pose a risk to humans, and chlorsulfuron only poses a risk to workers where applied in ground broadcast applications at the highest application rate. From a practical perspective, eye and/or skin irritation are likely to be the only overt effects of mishandling the ALS-inhibiting herbicides, and these effects can be minimized or avoided by prudent industrial hygiene practices during the handling of these compounds. Bromacil, diquat, diuron, and tebuthiuron, which pose greater human health risks, would not be excluded by Alternative E; therefore, risk per area treated could increase if these herbicides were used in place of ALS-inhibiting herbicides. Alternative E places increased emphasis on spot rather than broadcast applications, which should mean that there would be less per area risk than under the No Action and Preferred alternatives, except in the few possible cases where occupational receptors would be at greater risk from spot applications. In addition, number of acres proposed for treatment (466,000) is half that of the Preferred Alternative (932,000), which would correspond to a lower overall risk. Conversely, more acres would be treated under Alternative E than under the No Action Alternative (305,000), which corresponds to a greater overall risk. Under Alternative D, the BLM would treat more acres (540,000) than under Alternative E, but would not use aerial spraying, although there would be a minimal amount of aerial spraying under Alternative E (spot applications are preferred over broadcast applications). However, Alternative D would allow the use of the ALS-inhibiting herbicides, which could limit the use of herbicides that may present higher human health risks, and correspond to a greater risk than under Alternative E.

## Mitigation

In addition to following SOPs, there are certain herbicide-specific measures that can be taken to substantially reduce or eliminate human health risk from herbicide use. The following mitigation measures were developed based on the BLM HHRA, the Forest Service HHRAs, and the earlier BLM EIS HHRAs:

- Use the typical application rate, where feasible, when applying 2,4-D, 2,4-DP, atrazine, bromacil, diquat, diuron, fluridone, fosamine, hexazinone, tebuthiuron, and triclopyr, to reduce risk to occupational and public receptors.

- Avoid applying atrazine, bromacil, diuron, or simazine aerially.

- Apply diquat by ATV, truck, or boat to reduce risks to occupational receptors; limit diquat applications to areas away from high residential and subsistence use to reduce risks to public receptors.

- Evaluate diuron applications on a site-by-site basis to avoid risks to humans. There appear

BLM_0000587

ENVIRONMENTAL CONSEQUENCES

to be few scenarios where diuron can be applied without risk to occupational receptors.

- Do not apply hexazinone with an over-the-shoulder broadcast applicator.

# Cumulative Effects Analysis

The National Environmental Policy Act and its implementing guidelines require an assessment of the proposed project and other projects that have occurred in the past, are occurring in the present, or are likely to occur in the future, which together may have cumulative impacts that go beyond the impacts of the proposed project itself. According to the Act (40 CFR §1508.7 and 1508.25[a][2]):

"Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to the other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. In addition, to determine the scope of Environmental Impact Statements, agencies shall consider cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement."

The purpose of this cumulative effects analysis is to determine if the effects of BLM vegetation treatments have the potential to interact or accumulate over time and space, either through repetition or when combined with other effects, and under what circumstances and to what degree they might accumulate.

## Structure of the Cumulative Effects Analysis

For this Programmatic EIS, the analysis of cumulative impacts is a four-step process that follows guidance provided in *Considering Cumulative Effects Under the National Environmental Policy Act* (CEQ 1997):

- Specify the class of actions for which effects are to be analyzed.

- Designate the appropriate time and space domain in which the relevant actions occur.

- Identify and characterize the set of receptors to be assessed.

- Determine the magnitude of effects on the receptors and whether those effects are accumulating.

**Class of Actions to be Analyzed**

This analysis addresses large, regional-scale trends and issues that require integrated management across broad landscapes. It also addresses regional-scale trends and changes in the social and economic needs of people. This analysis does not identify site-specific effects, in part because of the level of specificity in broad-scale management direction, and because site-specific information is not essential for determining broad-scale management direction. As discussed in Chapter 1, Proposed Action and Purpose and Need, site-specific issues would be addressed through NEPA compliance for resource management activities and other land use plans prepared at the state, district, or field office level.

The analysis of cumulative effects assumes that information provided in the PER is incorporated by reference in its entirety into the cumulative effects analysis. The analysis of cumulative effects assumes that SOPs and mitigation measures identified in Chapter 2 would be followed by the BLM under all alternatives to ensure that risks to human health and the environment from herbicide treatment actions were kept to a minimum.

The analysis recognizes that prevention, early detection, and rapid response are the most cost effective methods for weed control. Prevention, early detection, and rapid response strategies that reduce the need for vegetative treatments should lead to a reduction in the number of acres treated using herbicides in the future by reducing or preventing noxious weed establishment. However, once weed populations become established, infestations can increase and expand in size. Weeds colonize highly disturbed ground and invade plant communities that have been degraded, but are also capable of invading intact communities.

As stated in the BLM's *Partners Against Weeds: An Action Plan for the Bureau of Land Management* [USDI BLM 1996], prevention and public education are the highest priority weed management activities. Priorities are as follows:

- Priority 1: Take actions to prevent or minimize the need for vegetation control when and where feasible, considering the management objectives of the site.

BLM_0000588

ENVIRONMENTAL CONSEQUENCES

- Priority 2: Use effective nonchemical methods of vegetation control when and where feasible.

- Priority 3: Use herbicides after considering the effectiveness of all potential methods or in combination with other methods or controls.

Although prevention, early detection, and rapid response are the most cost effective methods of weed control, the analysis also recognizes that public lands must be administered under the principles of multiple use and sustained yield in accordance with the intent of Congress as stated in the FLPMA. Thus, vegetation must be managed to protect and enhance the health of the land while providing a source of food, timber, and fiber for domestic needs (USDI BLM 2000c). Land-disturbing activities are allowed on public lands, but must be conducted in a manner that minimizes ecosystem fragmentation and degradation, and lands should be rehabilitated when necessary to safeguard the long-term diversity and integrity of the land.

All vegetation treatment methods used by the BLM are considered in the analysis. These include herbicide use; manual, mechanical, and biological control methods; and use of fire, as identified in Chapter 2 (Alternatives).

For this PEIS, potential cumulative effects include those that were assessed for all land ownerships, including lands administered by other federal agencies and non-federal lands, particularly effects to air quality and terrestrial and aquatic species.

The analysis and disclosure of cumulative effects alerts decision-makers and the public to the context within which effects are occurring, and to the environmental implications of the interactions of known and likely management activities. During subsequent analyses for site-specific activities, local cumulative effects should be thoroughly considered when designing site-specific alternatives and mitigation measures.

**Appropriate Temporal and Spatial Domain**

### Temporal Domain

The analysis period covered by the cumulative effects analysis primarily begins in the 1930s with the passage of the Taylor Grazing Act, and continues through 2057. The ending date is based on the term that treatments would occur under this PEIS (about 10 years) and the time for treated areas to fully realize the results of the treatment in terms of meeting management objectives and desired vegetative conditions (up to 25 years or longer for some treatments). It is also based on the

difficulty of predicting advances in technology and the types and amounts of vegetation treatments needed very far into the future. Thus, a reasonable analysis period, and one on which most of the cumulative effects analysis is focused, is 50 years into the future.

### Spatial Domain

As discussed earlier, the BLM has been mandated under a variety of statutes and policy initiatives to increase the number of acres of vegetation treated annually to address the issues of catastrophic fire and invasive species spread and their relationships to habitat improvement and maintenance of healthy landscapes. The BLM estimates that approximately 6 million acres would be treated annually over at least the next 10 years to meet these mandates. Acres to be treated by the BLM and assessed in this PEIS were estimated based on information provided by BLM field offices throughout the western U.S., including Alaska. Treatments could occur on the same acres several times during a single year, or over several years.

In developing acreage estimates for all alternatives, it was assumed that if an acre was treated more than once using the same type of treatment during the same year, it would be counted once. If the acre was treated using two or more different methods during the same year (for example, fire use followed by herbicide treatment), each treatment would count as one acre. Thus, if an acre was treated using fire and herbicides during the same year, two acres would be counted as treated. If an acre was treated using two or more herbicides in a tank mix, it would be counted once.

For some resources and uses, the project area may be where the effect can be felt (known as the "footprint"), but for others, the footprint may extend well beyond that space. For example, air quality effects to humans can extend miles beyond the footprint of the development. For the purposes of this analysis, the spatial domain for past, present, and reasonably foreseeable activities is primarily the 17 western states evaluated in this PEIS. However, this PEIS also considers effects to resources that could occur outside of these states.

The alternatives analyzed in this PEIS identify alternative approaches to herbicide use, including abandonment of their use, as well as limitations on which herbicides may be used or how herbicides may be applied. The effects of vegetation treatments disclosed in the PEIS and PER, combined with subsequent site-specific NEPA analysis, provide a

BLM_0000589

comprehensive assessment of cumulative effects of future vegetation treatment activities on public lands. In light of the broad geographic scope and spatial resolution of this PEIS, the cumulative effects analysis cannot and does not address all possible cumulative effects that may result at specific sites on public lands.

For the purposes of this analysis, non-federal lands include lands owned and/or managed by individuals, corporations, American Indian tribes, Alaska Native corporations, states, counties, or other agencies. The BLM does not have the authority to regulate any activities or their timing on lands other than those the BLM administers. However, when an action takes place on public land, it may cause direct, indirect, or cumulative effects on non-federal lands. For example, a wildfire that begins on public land may burn to adjacent private land, or noxious weed infestations that begin on private land may infest adjacent public land. For these examples, treatment activities outlined in the PEIS and PER could benefit adjacent landowners indirectly as a result of better controls on noxious weeds and less severe forest fires.

This PEIS also considers the likely effects on public lands from reasonably foreseeable actions occurring on non-federal land. For example, development of non-federal land may potentially have direct impacts on terrestrial wildlife species that move between federal and non-federal habitats during the year or during their life cycle. The role of management of non-federal lands was considered in the analysis on these species and their associated ecosystems. Localized actions on non-federal lands often affect local environmental conditions on nearby federal land and may also affect federal management decisions.

In preparing the cumulative effects assessment, the BLM considered the magnitude and extent of BLM herbicide treatments in relation to herbicide treatments conducted by other federal and state agencies and private applicators, including treatments on privately-owned croplands and rangelands. The primary sources for this information were the BLM Pesticide Use Reports and the National Pesticide Use Database (Croplife Foundation 2006).

Based on the most recent information available for national pesticide use (2002), approximately 110 million pounds of herbicides were applied on non-federal lands in the 17 western states evaluated in the PEIS (Table 4-33). Of this amount, approximately 80% of herbicides by weight were applied in croplands, with the remainder applied in pasturelands and rangelands. In comparison, the BLM applied approximately 115,500 pounds of herbicides in the western U.S. in 2002 (and 147,572 pounds in 2005). Other federal agencies that apply herbicides include the Forest Service (82,703 pounds applied during 2004 within 17 western states).

The National Center for Food and Agricultural Policy (2002) reviewed trends in herbicide, fungicide, insecticide, and other pesticide use between 1992 and 2002 based on pounds of active ingredient applied to agricultural rangelands and croplands. During that period, herbicide use declined 5.5%, fungicide use declined 4.6%, insecticide use declined 21.2%, and other pesticide use increased 36.6% for the 17 western states. Overall pesticide use increased 2% during 1992 to 2002. Between 1997 and 2005, BLM herbicide use increased 2½-fold and would increase another 4-fold (to about 650,000 pounds annually) under the Preferred Alternative. However, under the Preferred Alternative, BLM herbicide use would be only 0.2% of the total amount of pesticides that was applied to agricultural rangelands and croplands during 2002.

### Set of Receptors to be Assessed

The set of receptors assessed in the cumulative effects analysis are the physical, biological, and human systems discussed in Chapter 3 (Affected Environment).

### Magnitude of Effects and Whether Those Effects are Accumulating

The potential extent of the total cumulative effects (e.g., number of animals and habitat affected), and how long the effects might last (e.g., population recovery time) are estimated to determine the magnitude of effects that could accumulate for each resource. Where possible, the assessment of effects on a resource is based on quantitative analysis (e.g., level of risk to humans from use of an herbicide). However, many effects are difficult to quantify (e.g., animal behaviors; human perceptions) and a qualitative assessment of effects is made.

As suggested by the CEQ (1997) handbook, *Considering Cumulative Effects Under the National Environmental Policy Act*, this PEIS considers the following basic types of effects that might occur:

- "Additive" – total loss of sensitive resources from more than one incident.

- "Countervailing" – negative effects are compensated for by beneficial effects.

BLM_0000590

ENVIRONMENTAL CONSEQUENCES

**TABLE 4-33**
**Herbicide Use in the Western United States for Agricultural Lands and BLM-administered Lands**

| State | Pounds of Herbicides Applied (2002) | |
|---|---|---|
| | Non-federal-administered lands | BLM-administered lands |
| Arizona | 920,369 | 4,933 |
| California | 12,929,480 | 2,621 |
| Colorado | 4,565,041 | 2,108 |
| Idaho | 3,532,008 | 2,826 |
| Montana | 4,656,964 | 8,193 |
| Nebraska | 22,614,643 | |
| Nevada | 55,648 | 5,379 |
| New Mexico, Oklahoma, and Texas | 25,159,648 | 35,854 |
| North Dakota | 14,192,512 | 11 |
| Oregon and Washington | 7,354,557 | 11,403 |
| South Dakota | 15,175,460 | 279 |
| Utah | 690,410 | 23,829 |
| Wyoming and Nebraska | 704,570 | 18,066 |
| **Total** | 109,588,484 | 115,502 |
| Sources: Croplife Foundation (2006) and BLM Pesticide Use Reports. | | |

- "Synergistic" – total effect is greater than the sum of the effects taken independently.

The purpose of the analysis of cumulative effects in this PEIS is to determine whether the effects are additive or synergistic or have some other relationship. Additive (or combined) effects on specific resources often are difficult to detect and do not necessarily add up in the strict sense of one plus one equals two. It is much more likely that an additive or combined effect would be greater than one but less than two. A synergistic effect, in theory, is a total effect that is greater than the sum of the additive effects on a resource. To arrive at a synergistic effect in this example (continuing with the numeric analogy), the total cumulative effect would need to end up greater than two. In the highly variable western U.S. environment, where natural variations in population levels can exceed the impacts of human activity, such an effect would need to be much greater than the hypothetical two to be either measurable or noteworthy. A countervailing effect has both negative and beneficial components. For example, herbicide treatments would harm or destroy vegetation used by some species of wildlife (negative effect), but would improve overall ecosystem health and lead to improved watershed conditions and habitat for other wildlife (positive effect).

In the analyses that follows, effects should be considered to be additive in nature, unless otherwise noted. While synergistic impacts have been demonstrated in the laboratory (for certain types of chemical reactions, for example), there is almost no evidence of such impacts occurring when dealing with biological resources. Where synergistic impacts are not specifically accounted for in the analysis section, neither studies nor other information are available to support the identification of such impacts.

Herbicide formulations are a commercial mixture of both active and inert (inactive) ingredients. Inert ingredients are ingredients that are added to the commercial product (formulation) but are not herbicidally active. As part of the ERA, the BLM assessed the general risks to plants and animals from inert ingredients found in herbicide formulations and from adjuvants. The ERAs also addressed potential risks associated with:

- Adjuvants – Chemicals that are added to the herbicide formulation to enhance the toxicity of the active ingredient or to make the active ingredient easier to handle. They include surfactants, materials that improve the emulsifying, dispersing, spreading, wetting, or other surface-modifying properties of liquids.

- Degradates – physical or biological breakdown compounds of a complex compound.

Based on concerns raised by the Services and the public about adjuvants, degradates, and an issue not addressed in the Draft PEIS or BA—the potential for herbicides to be endocrine disrupting chemicals—the BLM prepared an *Evaluation of Risks from Degradates, Polyoxyethyleneamine (POEA)) and R-11, and Endocrine Disrupting Chemicals* for the Final PEIS (see Appendix D of the Final PEIS) that addressed the following questions:

- Some surfactants may be more toxic to aquatic receptors than the active ingredient in an herbicide. Using polyoxyethyleneamine (POEA) as an example, what are the potential impacts of surfactants in Roundup Original® and Honcho® applied with glyphosate?

BLM_0000591

- The quantitative risk assessments only address the potential impacts of the active ingredients. What about the toxicity of degradates?

- The risk assessments did not identify endocrine disruption as a toxic endpoint. Are any of the herbicides considered to be endocrine disrupting chemicals?

The BLM ERAs also addressed potential risks associated with tank mixtures—the mixture of two or more compatible herbicides in a spray tank in order to apply them simultaneously.

The BLM used mixtures of two or more herbicides to treat approximately 25% of public lands during 2003 to 2005. The use of tank mixtures, along with the addition of an adjuvant (when stated on the label), may be an efficient use of equipment and personnel; however, knowledge of all products and their interactions is necessary to avoid unintended negative effects. The BLM evaluated tank mixtures to determine whether herbicide interactions can be classified as additive, synergistic, or antagonistic.

The analysis assumes that maintenance of past treatments has occurred, and that the BLM would make an investment in maintaining the condition achieved or the objectives of the project, rather than implementing stand-alone, one-time treatments. The analysis also assumes that the BLM would determine the need for the action based on past monitoring, and that additional monitoring would occur after the project to ascertain if effects are still accumulating or if the treatment has been effective in achieving the resource objective.

## Resource Protection Measures Considered in the Cumulative Effects Analysis

The cumulative impacts assessment assumes that SOPs, monitoring measures, and mitigation developed by the BLM for the alternatives (see Chapter 2 of the PEIS and PER) would be adopted to protect environmental and socioeconomic resources on public lands.

In addition, a number of federal, state, local, and tribal resource management and monitoring programs have been established to protect environmental resources and, in cases where there is existing environmental impairment, to effect restoration. The assessment of cumulative impacts recognizes the existence of these programs and assumes that the mandate under which each program was established will continue. The

cumulative effects analysis assumes that these programs effectively avoid or mitigate the environmental impacts that they are designed to address. The programs are discussed in the sections that follow.

### Air Quality

Air quality is regulated under the PSD permitting process. For sources located in state waters and onshore, the PSD program is administered by the state air quality agencies. Although minor sources of air pollutants are not subject to PSD permitting requirements, the analysis of cumulative effects to air quality in this PEIS considers the contribution of both major and minor sources of air pollution in the western U.S., including and Alaska.

### Water Quality

Water quality is regulated and/or monitored through various permitting and regulatory programs administered by the USEPA and state and local regulatory agencies. These programs have been established to protect against the significant degradation of water quality associated with specific human and development activities. In evaluating the cumulative effects to water quality, collective impacts associated with regulated and non-regulated activities and naturally occurring events are considered.

### Wetlands

Wetland impacts are mitigated through SOPs, permits, and approvals issued at the project implementation stages (if needed), and under Section 404 of the Clean Water Act, administered by the USACE, and state certification programs to protect wetlands and ensure no net loss of wetlands, where practical.

### Essential Fish Habitat

The amended Magnuson-Stevens Act requires federal agencies that authorize, fund, or conduct activities that may harm Essential Fish Habitat to work with NMFS to develop measures that minimize damage to EFH. By providing EFH conservation recommendations before an activity begins, NMFS may help prevent habitat damage before it occurs, rather than restoring habitat after the fact, which is less efficient, unpredictable, and often more costly. An analysis of EFH effects is provided as Appendix A in the *Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Biological Assessment* (USDI BLM 2006b).

BLM_0000592

ENVIRONMENTAL CONSEQUENCES

### Threatened and Endangered Species

The Endangered Species Act of 1973 and the PEIS scoping process are appropriate vehicles to identify species that are potentially at risk from the incremental cumulative effects of activities that may occur under the PEIS and PER. Effects on listed species identified for the analysis area by NMFS and the USFWS under Section 7 of the ESA are covered by this cumulative analysis. The potential effects on each of the other species identified through scoping have also been reviewed and included, as appropriate.

### Environmental Justice

Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations,* and an accompanying Presidential memorandum require each federal agency to make the consideration of environmental justice part of its mission. The existing demographics (race and income) and subsistence consumption of plants and animals, and mitigating measures and their effects, are presented.

### Consultation and Coordination with Indian Tribal Governments

Executive Order 13175, *Consultation and Coordination with Indian Tribal Governments,* requires consultation with tribal governments on "actions that have substantial direct effects on one or more Indian tribes." Representatives of the BLM have met with local tribal governments to discuss subsistence issues pertaining to the PEIS and PER (see Chapter 5, Consultation and Coordination), and have established a dialogue on environmental justice with these communities.

## Other Information Considered in Cumulative Effects Analysis

The assessment of cumulative impacts from vegetation treatment activities also considered the following information and assumptions:

- Mitigation and SOPs identified in PEIS would be more stringent than those required by the USEPA.

- The BLM would comply with existing and future regulations, including FLPMA.

Ground-disturbing activities on public lands are conducted only after any necessary site-specific NEPA analysis has been completed. Such analyses are required to describe the cumulative impacts of the site-specific alternatives on adjacent lands and resources. This process provides opportunities to detect and minimize cumulative environmental effects that cannot be specifically determined at the broad level of this PEIS. Subsequent analyses will help ensure that the incremental and interactive effects on public lands would continue to be considered when implementing treatment actions.

## Analysis of Cumulative Effects by Resources

### Air Quality

Cumulative impacts to air quality could result from the emissions of particulates associated with wildfire, wildland fire use and prescribed fire, as well as particulates, hydrocarbons, and other byproducts of combustion associated with the use of equipment. Indirect impacts from air emissions include impacts to human health and global climate change. These impacts may be regionally additive (e.g., increased concentrations of specific pollutants) or synergistic (e.g., chemical reactions that form ozone). Technology has played an important role in reducing air emissions from engine operation, and an important reason for conducting prescribed burns is to better control smoke emissions and to reduce future smoke emissions associated with wildfire.

#### Past Effects and Their Accumulation

The cumulative effects of pollutant-producing activities in the past have led to deterioration in air quality in the western United States. Detailed information about the historic and existing air quality in the area covered by this PEIS is only available for monitoring sites and for criteria pollutants. In the undeveloped regions of public lands, ambient pollutant levels are expected to be low, and probably negligible in remote areas. On public lands on the Alaska North Slope and much of the remaining portions of Alaska, air quality is generally good, except during periods with Arctic haze (USDI BLM 2005c). In general, locations in the treatment area with high ambient pollutant levels are areas that support commercial and industrial land uses (areas with large-scale mining operations, lumber mills, power plants or downwind from power plants, oil and natural gas extraction, etc.) and local population centers (areas with automobile exhaust, residential

BLM_0000593

heating, etc).

Despite increases in human population and industrialization, emissions of principal air pollutants in the U.S., after peaking in the 1970s and early 1980s, have generally declined or held steady during the past 2 decades due to more stringent air quality regulations and improvements in pollution control technology (USEPA 2005). Particulate matter is the principal pollutant of concern, from a public health perspective, that is generated by fire. Emissions of particulate matter from all sources have trended lower since the 1970s. However, PM emissions nationwide have shown a close relationship with the number of acres burned annually by wildfire. Since 1990, PM emissions associated with wildfire have ranged from 145,000 tons in 1995 to 1.2 million tons in 2002; the number of acres burned by wildfires in 1995 was one-third the number of acres burned in 2002. The level of PM associated with slash and prescribed burning, however, has trended downward since the 1970s, and in 2001 (165,000 tons) was about half the level of the early 1990s. Based on an estimate of emissions generated by current vegetation treatment activities (primarily from fire and mechanical treatments; see Table 4-4 in PER), BLM treatment activities have accounted for less than 0.5% of criteria pollutant emissions nationwide.

### Future Effects and Their Accumulation

Under the action alternatives, emissions associated with wildland fire use and prescribed fire and other treatment methods would be greater than those under the No Action Alternative. Still, emissions associated with BLM vegetation treatment activities would comprise less than 1% of total criteria pollutants generated nationwide. If the BLM were to achieve its goal of treating about 2 million acres annually using fire, annual emissions of PM from prescribed and wildland fire use on public lands would be similar to the total amount of PM emissions currently produced in the U.S. from prescribed fire, but would be only one-sixth the amount of PM produced by wildfires annually in recent years (USEPA 2005).

Although modeling was not done as part of the PER and PEIS to assess cumulative effects from use of fire and other treatment methods, modeling was done as part of a programmatic assessment of vegetation treatments in the Interior Columbia Basin of the Pacific Northwest (USDA Forest Service and USDI BLM 2000). Based on this assessment, the proposed increase in the amount of prescribed burning

conducted as a part of forest and rangeland management on Forest Service- and BLM-administered lands over the 100-year planning period would be expected to reduce the amount of wildfire activity within the project area. In addition, the analysis revealed that wildfire impacts on air quality may be significantly greater in magnitude than emissions from prescribed burning. The lower emissions from prescribed fire are attributed to prescribed burning techniques that reduce emissions, as well as smoke management plans implemented by federal, state, and tribal agencies that permit prescribed fires only during meteorological periods favorable to dispersion. If the number of wildfires is reduced over time, air quality impacts from smoke should also be reduced.

Air quality modeling suggested that PM emissions from prescribed burning could cause regional-scale exceedances of the NAAQS based on the cumulative impacts from all sources of air pollution on ambient air. This modeling analysis also assumed that local analysis would be done to assess the possibility of localized exceedances of the NAAQS caused by prescribed burning emissions. Local analysis would also be done for activities conducted by the BLM under this PEIS.

It can be assumed that state smoke management meteorologists would consider the cumulative effects of emissions from other sources (such as road dust and agricultural dust and burning) during the development of daily smoke management instructions, and that state smoke management program managers would consider these sources during development of the smoke management plan submitted for approval (as a component of the state smoke implementation plan) to the USEPA.

The Forest Service modeled several scenarios to predict the long-term effect of treating more acres, and/or targeting treatments in the WUI, on regional air quality and the condition of the land (Hann et al. 2002). The model assumed that in addition to use of fire, mechanical and hand cutting would be important treatment options in the WUI, where air quality and other considerations could limit the use of fire. Based on this analysis, air quality would generally improve as the number of acres treated annually increased, with the most noticeable improvement in air quality associated with treatments targeted at high priority western U.S. WUI landscapes. Thus, the Preferred Alternative, which includes over 4.3 million acres of wildland and prescribed fire use and mechanical treatments, in addition to 1.7 million acres of treatments using other

BLM_0000594

ENVIRONMENTAL CONSEQUENCES

methods, would be expected to provide greater improvement in ecosystem function and air quality than is projected under current treatment levels.

The increased use of wildland fire use and prescribed fire proposed by the BLM parallels national trends. The National Wildfire Coordinating Group Fire Use Working Team sanctioned an interdisciplinary and interagency working framework for coordinating development of modeling and data systems to support balancing the increased use of prescribed fire in the context of reducing the local and regional impacts of fires on air quality (Sandberg et al. 1999; USDA Forest Service and USDI BLM 2000). A number of modeling and data system enhancements are currently under development by the Joint Fire Sciences Program of the USDA Forest Service and the USDI. These systems include the modeling of meteorological conditions and smoke dispersion. The Forest Service and BLM also have developed a data system to support prescribed burning and to assist states with emissions tracking under their respective state smoke management plans. The use of more sophisticated models during the implementation of prescribed burning, together with enhanced monitoring of emissions, will help minimize possible impacts from the use of prescribed fire. The inherent limitations of any model used at the programmatic scale highlight the importance of the cooperative development and use of operational smoke management models by the states, with assistance from the BLM, Forest Service, and the USEPA.

Most emissions on public lands in Alaska are associated with wildfire and wildland fire use, and oil and gas exploration and development on the North Slope in the National Petroleum Reserve – Alaska (USDI BLM 2005c). Long term, fire emissions would likely remain near current levels. Emissions on the North Slope are expected to decrease as a result of an overall downward trend in oil production; therefore, any possible contribution from local sources to air quality and Arctic haze would be reduced. Greater reliance on technologies that reduce the need for permanent roads and pads, and reduce the size of facility footprints, would also result in lower levels of PM emissions. Arctic haze has the potential to increase as Asian economies grow. Until air pollution concentrations in Asia and Europe begin to decline, Arctic haze is likely to persist or get worse.

***Contribution of Alternatives to Cumulative Effects***

As discussed under Air Quality in Chapter 4 of the PER, the majority of emissions would be associated with wildland fire use, and prescribed fire, and to a lesser extent, with mechanical treatments. Manual and biological control methods and herbicide treatments would contribute only small amounts of pollutants to the air. These emissions would accumulate and the amount of emissions released into the environment would be related to the number of acres treated and the type of treatment. Exceedances of NAAQS, however, should not occur under any alternative, and under all alternatives vegetation treatments would account for less than 1% of pollutants generated nationwide.

As discussed in Chapter 2 under Determination of Treatment Acreages, approximately 645,000 acres would be treated using wildland fire use and prescribed fire and 582,000 acres would be treated using mechanical methods under Alternative A (No Action Alternative). Approximately 2,107,000 acres would be treated using fire and 2,232,000 acres would be treated using mechanical methods under the Preferred Alternative. Under alternatives C, D, and E, approximately 1,055,000 acres would be treated using fire, 1,986,000 acres would be treated using mechanical methods, 396,000 acres would be treated using manual methods, and 597,000 acres would be treated using biological control.

The *Annual Emissions Inventory for BLM Vegetation Treatment Methods* (ENSR 2005; included on the CD that accompanies the Final PEIS) found that annual emissions associated with prescribed fire and mechanical treatments for Alternative A were about 40% and 25% of those predicted to occur under the Preferred Alternative. Annual emissions for fire and mechanical treatment methods under Alternatives C, D, and E would be about 50% and 10% less, respectively, than those under the Preferred Alternative. Higher levels of fire treatments associated with the Preferred Alternative would increase smoke emissions and regional haze, although some of these impacts could be reduced by following proper smoke management procedures identified earlier in this chapter.

Although air emissions associated with vegetation treatments would be less under Alternatives A, C, D, and E than under the Preferred Alternative, gains in long-term air quality improvement are projected to be greater under the Preferred Alternative than under other alternatives, since more acres with hazardous fuels,

BLM_0000595

dense forest cover, and invasive vegetation that contribute to wildfire would be treated under the Preferred Alternative than other alternatives.

The cumulative effects of all projects affecting the North Slope of Alaska in the past generally have caused little deterioration in air quality, which remains better than what is required by national standards. The amount of air pollutants generated should remain near current levels, and approximately 50% lower than emission levels in the late 1980s (USDI BLM 2005c). Improvements in air pollution control technology would also help to reduce emissions from current levels.

## Soil Resources

### *Past Effects and Their Accumulation*

Cumulative impacts to soils on public lands and throughout the western U.S. have occurred from human-caused disturbance factors, including natural resource extraction, grazing, road construction, timber harvesting, OHV and other recreation use, agriculture, and development, as well as natural disturbances. More recently, large-scale, uncharacteristic wildfires have increased the number of landscapes with declining soil productivity by causing a reduction in effective vegetative ground cover and a loss of root strength, which has resulted in increased soil erosion rates (USDA Forest Service and USDI BLM 2000). Soils in the western U.S. are generally stable in wilderness areas, but in other locations soils are at varying levels of decreasing productivity depending on soil types and intensity of management. Determining the exact soil conditions in any given area is difficult because of the lack of inventory and monitoring data. In general, greater declines in soil productivity are directly associated with greater loss of soil through erosion and displacement, loss of soil organic matter, changes in vegetation composition, removal of whole trees and branches, and increases in bulk density from compaction.

Soil productivity may currently be higher in areas where fire has been suppressed and where organic matter and vegetation have not been removed. However, the unnaturally high amounts of vegetation and large woody material put these areas at risk for uncharacteristic fire intensity and severity, which can lead to decreased soil productivity because of high rates of erosion, loss of organic matter, woody material, and nutrient reservoirs.

In Alaska, non-oil and gas activities associated with villages, towns, and military sites have disturbed soils on public lands. Since the 1970s, oil and gas exploration and development have been the dominant soil-disturbing activities associated with public, other federal, state, tribal, and private lands on the North Slope. On the North Slope, direct impacts to soil and soil productivity persist on over 12,000 acres (USDI BLM 2005c). Another 18,000 acres of indirect impacts have occurred, some of which persist today.

### *Future Effects and Their Accumulation*

As discussed earlier in this chapter, vegetation treatments could occur on 6 million acres. Loss of vegetation and soil disturbance associated with use of treatment equipment could cause some short-term loss of soil functions, process, and productivity on nearly all treated land. However, it is assumed that watershed-level restoration treatments designed and implemented by the BLM and other federal agencies with large landholdings in the West would achieve long-term effects similar to those occurring under historical disturbance regimes (USDA Forest Service and USDI BLM 2000). The disturbance effects resulting from restoration activities are predicted to have less impact and be less severe than fire effects and erosion caused by past fire exclusion and traditional management activities. Monitoring and evaluation, integrated with adaptive management and sustainable use practices, would result in adjustments to treatment design and implementation and restoration actions in order to reduce soil disturbance to levels similar to historic conditions.

Studies in forested and rangeland environments have suggested that landscapes that contain native plant communities in natural mosaic patterns and have relatively uninterrupted natural disturbance regimes provide favorable conditions for soil functions and processes that contribute to long-term sustainability of soil productivity (Munn et al. 1978, Cannon and Nielsen 1984, and Hole and Nielsen 1970 *cited in* USDA Forest Service and USDI BLM 2000). In addition, a reduction in the spread of exotic and invasive vegetation is expected to help maintain soil productivity and function. Forests and rangelands with conditions outside the historical range of vegetation variability are most vulnerable to accelerated nutrient loss from management activities or wildfire.

In recent years, a number of policies, programs, and initiatives have been proposed to restore soil productivity and improve the health of ecosystems by

BLM_0000596

ENVIRONMENTAL CONSEQUENCES

the BLM and other federal, state, and local land management entities to meet nationwide and regionwide conservation goals. These include the *National Fire Plan*, *Healthy Forests Restoration Initiative*, this PEIS, the Interior Columbia Basin Ecosystem Management Project, the Great Basin Restoration and Conservation of Prairie Grasslands initiatives, the sage-grouse conservation program, and the program to treat invasive vegetation on Forest Service lands in the Pacific Northwest (USDA Forest Service and USDI BLM 2000, USDA Forest Service 2005, USDI BLM 2006c). The success of these policies and programs to restore healthy ecosystems will depend in part on future funding levels, and on our understanding of soil processes and our ability to develop and implement vegetation management projects that are effective and lead to long-term improvement in soil and other ecosystem resources. Much of the focus of these efforts is on reducing hazardous fuels and wildfire activity in the West. In addition, conservation programs and best management practices to reduce soil loss in agricultural areas have been developed and implemented during the past several decades. Although gains in soil productivity have been slow, improvement has been observed.

Changes in disturbance regimes, such as changes resulting from fire suppression, introduction of non-native plant species, timber management practices, human populations and related activity, minerals extraction, and livestock grazing over the past 100 years, have caused a departure from the historical ranges of vegetation composition and structure and landscape mosaic patterns. Still, in a study of the Interior Columbia Basin, soil disturbance on approximately 92% of federally-administered lands was rated as none to low. Nationwide, the estimated average annual loss of soil due to erosion associated with rainfall and wind on non-federal lands has decreased by about a third from levels in the early 1980s; similar trends have been seen in the western states (National Resources Conservation Service 2000). These data suggest a need for improvement in soil productivity and rangeland conditions throughout the West, but also suggest that long-term improvement in soil productivity in the West can occur under careful stewardship of lands.

***Contribution of Alternatives to Cumulative Effects***

Based on the number of acres treated, short-term impacts to soil function and productivity would be greatest under the Preferred Alternative (approximately 6 million acres for all treatments), and least under the No Action Alternative (1.9 million acres). The number of acres treated under Alternatives D and E (about 4.5 million acres each) would be similar, and short- and long-term effects under these two alternatives would be similar, while the effects under Alternative C (4 million acres) would be intermediate between those under these alternatives and the Preferred Alternative. Treatments would occur on about 2% of public lands annually under the Preferred Alternative.

During FY 2005, the BLM applied approximately 0.9 pounds of herbicide per acre treated. Based on this ratio, the BLM would apply about 840,000 pounds of herbicides annually under the Preferred Alternative, about half this much under Alternatives D and E, and about a third as much under Alternative A. Although the BLM would contribute only about 0.1% of the amount of pesticides applied annually in the western U.S., these herbicides would accumulate in the soil at a greater rate than presently occurs. Most herbicides that would be applied by the BLM have a soil half-life of 60 days or less, although the soil half-life for diquat is about 1,000 days.

Alternative E places greater emphasis on passive restoration than the other alternatives. Poorly planned or managed livestock grazing, forestry practices, minerals development, and OHV use are just some of the activities that can lead to loss of soil productivity and cause soil erosion. The BLM would also use passive restoration to improve soil conditions, but would have to balance soil protection and improvement with the multiple use requirements under FLPMA. As discussed in Chapter 2, Vegetation Treatment Programs, Policies, and Methods, passive restoration would be considered first when developing restoration management plans, and would be used to the extent possible within the constraints of FLPMA.

Short-term effects to soils could accumulate under all alternatives, but if treatments were successful, a countervailing effect of long-term improvement in soil function and productivity should more than offset short-term soil losses. Largest improvements are expected for the Preferred Alternative and Alternatives D and E.

**Water Resources and Quality**

Watersheds are natural divisions of the landscape and the basic functioning units of hydrologic systems. The BLM conducts monitoring of watersheds on public lands and bases the success of its treatments on the condition of watersheds and their subbasins (USDI BLM 2006c). Stream flow regimes and water quality

BLM_0000597

can be affected by modifications to watershed processes occurring as a result of both natural disturbances and land management activities. Water quality and quantity, which are key components of wetland and riparian habitat, can also have substantial influence over the health of fish and other aquatic organisms. They are components over which the BLM has some degree of influence on public lands (USDA Forest Service and USDI BLM 2000).

Section 303(d) of the Clean Water Act requires that water bodies violating state water quality standards and failing to protect beneficial uses be identified and placed on a 303(d) list. The delisting of 303(d) listed streams is a priority of the BLM. Nonpoint source pollution, which is the largest source of water quality problems on public lands, comes from diffuse or scattered sources rather than from an outlet, such as a pipe, that constitutes a point source. Sediment is a nonpoint source of pollution that results from activities such as grazing and timber harvest, and from erosion associated with wildfires and the spread of noxious weeds. Erosion and delivery of eroded soil to streams is the primary nonpoint source pollution problem of concern to the BLM.

### Past Effects and Their Accumulation

Problems associated with water quality in the western U.S. were first recognized in the 19th century when mining in California was polluting the water so greatly that crops could not be grown. Exploration and development of oil resources later contributed to water quality concerns, especially in California, Oklahoma, and Texas. New sources of pollution arose in the 20th century, including pollutants associated with agriculture (e.g., fertilizers, pesticides, and animals wastes), industry, and other human activities (e.g., sewage, household cleaning products, pollutants associated with automobiles). In 1999, the USEPA released its first ever national index on the quality of the nation's watersheds. The USEPA also conducted an assessment of general groundwater quality (based on concentration of TDS). Based on these assessments, 21% of the watersheds have serious problems. In watersheds in the West, water quality is poor to moderate over many areas (based on concentration of TDS for groundwater), primarily in areas associated with agricultural activities. Thus, actions that further deteriorate water quality or watershed health must be carefully evaluated before being implemented on public lands (Wright 2002).

Minor cumulative effects to water resources have occurred on public lands in Alaska. Cumulative effects to water resources from oil and gas exploration, gold

placer mining, and other development have included: 1) disturbance of stream banks and beds or lake shorelines; 2) melting of permafrost (thermokarst erosion); 3) temporary blockages of natural channels and floodways during construction of roads and pipelines that have resulted in the disruption of drainage patterns; 4) increased erosion and sedimentation in rivers and lakes; 5) removal of water from lakes for ice roads and pads; 6) spills; 7) removal of gravel from riverine pools and lakes; and 8) extensive erosion of off-road trails (USDI BLM 2005c).

The Clean Water Act of 1972 was intended to solve many of the nation's water pollution problems, but has had only modest success. In 1972, a third of the nation's rivers were safe for fishing and swimming. That number improved to more than 50% in the 1980s, but began to fall in the 1990s. The primary cause for deteriorating conditions in the 1990s was agricultural and municipal wastes rather than industrial wastes. (The standard for classifying deteriorating conditions has also changed over that time.) An estimated 14.1 million Americans drink water that contains agricultural pesticides in amounts that would exceed the acceptable concentrations for food products (Wright 2002).

Past land management activities on private and public lands in the western U.S. have contributed to deterioration in water quality. The spread of invasive plant species is one factor that degrades hydrologic function. In addition, buildup of hazardous fuels can lead to wildfires that adversely impact water resources and quality. Changes in hydrologic function have occurred as a result of changes in flow regimes due to dams, diversions, and surface water and groundwater withdrawal; and as a result of changes in channel geometry due to sedimentation and erosion, channelization, and installation of roads and railroads. Large amounts of wetland and riparian habitat, which function to cleanse water and recharge groundwater aquifers, have been lost in the West due to agriculture and urbanization. Over 109 million pounds of pesticides are applied annually in the western U.S.; these chemicals affect water quality.

During the early years of the BLM, most resource conservation and management was focused on upland sites. An increased emphasis on wetland and riparian habitat protection began in the 1960s with the passage of the Water Resources Research Act and Water Resource Planning Act (1965), which allowed the BLM to increase watershed research and planning. Much of the early work consisted of identifying lands in the critical stages of erosion (Muhn and Stewart 1988). In

BLM_0000598

ENVIRONMENTAL CONSEQUENCES

the 1970s, FLPMA was passed (1976) and the BLM began preparing land use plans to better manage natural resources.

### Future Effects and Their Accumulation

Despite spending nearly $1 trillion to improve water quality since the enactment of the 1972 Clean Water Act, the United States has no adequate database for water quality. Water quality monitoring is done by state and federal agencies, local governments, tribes, and others, among which there is wide variance in the extent and types of monitoring (Hayward 2005). Additionally, the nature of the resource presents challenges because the effects of both natural and man-made contaminants vary greatly according to specific water conditions. Researchers must account for water source, velocity, volume, depth, pH, photosynthetic activity, seasonal variations, and even time of day to accurately measure water quality. Thus, predicting the extent and magnitude of future effects to water resources and quality is difficult.

In its *2001 Annual Performance Plan* (USDI BLM 2000e), the BLM committed to 1) implementing water quality improvement prescriptions on public lands in 20% of watersheds within priority sub-basins that do not meet state/tribal water quality standards; 2) achieving proper functioning condition or an upward trend in wetland/riparian areas in 80% of priority watersheds by cooperating with the Forest Service and other land management agencies to restore degraded wetland and riparian areas; and 3) achieving an upward trend in the condition of uplands within 50% of priority watersheds by reducing the spread of weeds and reintroducing fire into specific landscapes. Generally, high priority watersheds are those that have impaired water bodies.

According to an Office of Management and Budget Program Assessment Rating Tool, in 2005 the BLM had met or was making measurable progress toward meeting its goals. The OMB assessment noted that the BLM was challenged by the need to meet multiple land use objectives, such as allowing oil and gas development that may conflict with restoration objectives (Office of Management and Budget 2005).

Based on information provided by field offices, the BLM would treat about 300,000 acres to improve watershed, and another 30,000 acres to improve wetland and riparian area functions and values. These types of treatments are not proposed for Alaska. Efforts to restore natural disturbance regimes, reduce the potential for large-scale wildland fire, and manage and control noxious weeds and other invasive vegetation would help to reduce erosion and sedimentation and restore native plant communities. In addition, the ability of the BLM and other resource-protection entities to use new herbicides, such as fluridone and imazapic, to control weeds would benefit public lands with minimal risk to drinking water, human health, and fish and wildlife.

Gravel mining, construction of roads, permanent drill pads, and water use from lakes during the winter months would be the major contributors to water resource impacts in Arctic Alaska. Impacts from activities such as gold mines in placer gravels, deteriorated OHV trails, and fires and fire control are the major contributors in the rest of the state. Because of the abundance of water resources in Alaska, the overall cumulative impact to water resources on public lands in Alaska would probably be small in magnitude, and most effects would be local in nature.

### Contribution of Alternatives to Cumulative Effects

Based on the number of acres treated, short-term adverse impacts and long-term improvements to hydrologic function and water quality would be greatest under the Preferred Alternative (approximately 6 million acres for all treatments), and least under the No Action Alternative (1.9 million acres). The number of acres treated under Alternatives D and E (about 4.5 million acres each) would be similar, and short- and long-term effects under these two alternatives would be similar, while the effects under Alternative C (4 million acres) would be intermediate between those under these alternatives and the Preferred Alternative. In addition, approximately twice as many acres would be treated using prescribed and wildland fire under the Preferred Alternative (2.2 million acres) than under alternatives C, D, and E (1.06 million acres), and three times as many as compared to the No Action Alternative (645,000 acres). It is anticipated that use of fire and herbicides would have the greatest short-term impact on water quality and quantity and watershed conditions. Adverse effects to water quality from wildfire and spread invasive species would accumulate in the West, but if BLM and other public and private vegetation treatment efforts were successful, a countervailing effect of long-term improvement in water resources and quality should help than slow losses. Improvements in water resources and quality should be greatest for the Preferred Alternative and Alternatives D and E.

BLM_0000599

Based on recent herbicide use, the BLM would apply about 652,000 pounds of herbicides annually under the Preferred Alternative, about half this much under Alternatives D and E, and about a third as much under Alternative A. This would amount to about 0.6% of the amount of pesticides applied annually in the western U.S. based on the Preferred Alternative. An increase in use of herbicides, regardless of source, would contribute to loss of water quality both on and off public lands, as these herbicides have the potential to move off site in surface water or groundwater. The movement of herbicides off public lands could contaminate public drinking water sources and water sources used by fish and wildlife. However, the use of newer herbicides by the BLM that pose fewer risks to humans and fish and wildlife, and strict adherence to buffer guidelines given in the PEIS, PER, ERAs, and HHRA during treatments to protect water resources, should mitigate for some of the loss in water quality. Alternative E places greater emphasis on passive restoration than the other alternatives. Passive restoration is often an important first step in improving watershed health because the anthropogenic activities that are causing degradation or preventing recovery are reduced or eliminated. Livestock grazing and OHV use are often cited as factors that lead to loss of wetland and riparian habitat function and watershed degradation. By prohibiting livestock from entering wetland and riparian areas, and placing limits on OHV activity, improvement in watershed function can be expected (Kauffman et al. 1997). Improvements in the management of these activities can also reduce potential impacts to wetland and riparian areas, and the BLM would have to balance watershed protection with the multiple use requirements under FLPMA. As discussed in Chapter 2, Vegetation Treatment Programs, Policies, and Methods, passive restoration would be considered first when developing restoration management plans, and would be used to the extent possible within the constraints of FLPMA.

Regardless of the alternative chosen, there would be an accumulation of loss of water resources and quality under all alternatives, but the rate of loss would be expected to slow from historic levels over the long term.

## Wetland and Riparian Areas

Under natural conditions, wetland and riparian plant communities have a high degree of structural and species diversity, reflecting past disturbances from floods, fire, and fish and wildlife use (Gregory et al. 1991). Since European settlement, many wetland and riparian areas have been drained or altered and their functions and values lost or reduced. The Clean Water Act (1972) and Executive Order 11990, *Protection of Wetlands and Floodplains* (1977), identified the importance of wetland and riparian areas and directed federal and state agencies to focus more attention on the health of these areas. As a result of legislative and policy guidance, the BLM and other land management entities have spent considerable effort and money to restore wetland and riparian functions and values during the past several decades.

### Past Effects and Their Accumulation

Cumulative impacts to wetland and riparian areas on public lands and throughout the western U.S. have occurred from human-caused disturbance factors, including natural resource extraction, recreation, dams and diversions, road construction, agriculture, urbanization, and fire exclusion. An estimated 53% of wetlands present at the time of colonization in the lower 48 states have been lost in the U.S., but less than 0.1% have been lost in Alaska. The USFWS estimates that about 117,000 acres of wetlands were lost annually between 1985 and 1995 (Wright 2002), while the USEPA has estimated wetland losses on non-federal rural lands at approximately 70,000 to 90,000 acres annually (Washington State Department of Ecology 2005).

Today, the BLM's annual budget for wetland and riparian management is nearly $22 million (USDI BLM 2006b). Program priorities include identifying priority watersheds on which to focus restoration efforts, with special emphasis on watersheds that contain habitat for sage-grouse. The BLM spent an additional $13 million in FY04 assessing the condition of watersheds and conducting restoration efforts in areas that are less than properly functioning (USDI BLM 2006c).

Even with these efforts, 25% of wetlands surveyed on public lands in the lower 48 states are not functioning properly or are functioning at risk (USDI BLM 2006c), while 50% of riparian areas are non-functional, or are functioning at risk. The poorest functioning riparian areas are found in the southwest and Montana, while most riparian areas in Alaska, Colorado, and Utah function properly. High sediment and turbidity levels and high temperatures are the primary reasons for listing wetlands and riparian areas as not functioning properly (USDA Forest Service and USDI BLM 2000; USDI BLM 2006b). In addition to water quality and flow concerns, many wetlands and streams have lost the capability to support salmonids and other aquatic organisms.

BLM_0000600

ENVIRONMENTAL CONSEQUENCES

The spread of invasive plant species is one factor that degrades wetland and riparian function. In addition, hazardous fuels buildup can lead to catastrophic wildfires that adversely impact wetland and stream habitat. Within riparian woodlands, the abundance of mid-size trees has increased while the abundance of trees in other size categories has decreased, primarily due to fire exclusion, increasing the risk of wildfire and reducing the value of these habitats to fish and wildlife. Within riparian shrublands, there has been extensive conversion to riparian herblands and increases in exotic grasses and forbs, primarily because of processes and activities associated with excessive livestock grazing. This conversion has made these shrublands more susceptible to fire and reduced their value to fish and wildlife (USDA Forest Service and USDI BLM 2000).

### Future Effects and Their Accumulation

The rate of loss of wetland and riparian habitat in the West has slowed, and on public lands there has been some improvement in the functional quality of these areas. For example, the percentage of wetland and riparian areas in the lower 48 states that lack the characteristics necessary for high function has decreased by about 10% since 1996 (USDI BLM 1997, USDI BLM 2006d). Vegetation treatment programs proposed by the BLM and Forest Service, and similar efforts by other agencies, private landowners, and private entities (e.g., Ducks Unlimited, The Nature Conservancy) to protect and preserve wetland and riparian habitat, should restore wetland and riparian habitat and health over the long term. In the Interior Columbia Basin, proposed treatment efforts could improve aquatic habitat capacity by 50% over 100 years (USDA Forest Service and USDI BLM 2000).

Efforts to restore natural disturbance regimes, reduce the potential for large-scale wildland fire, and control noxious weeds and other invasive vegetation should help to reduce erosion and sedimentation and restore native plant communities. In addition, the ability of the BLM and other resource-protection entities to use new herbicides, such as fluridone, to control aquatic weeds would benefit lakes and ponds and the aquatic organisms that use these habitats. In Alaska, early detection and control of weeds would be effective in protecting wetland and riparian habitat, as the state does not yet face a severe weed problem as in the lower 48 states (Hebert 2001).

### Contribution of Alternatives to Cumulative Effects

Based on the number of acres treated, short-term adverse impacts and long-term improvements to wetland and riparian area function and productivity would be greatest under the Preferred Alternative, and least under the No Action Alternative. The number of acres treated, and short- and long-term impacts, under alternatives D and E would be similar, while Alternative C would be intermediate between these alternatives and the Preferred Alternative. Treatments would occur on about 10,000 and 2,300 acres of wetland and riparian habitat annually under the Preferred Alternative under the No Action Alternative, respectively. Short-term effects could accumulate, but if treatments were successful, a countervailing effect of long-term improvement in wetland and riparian area function and productivity should more than offset short-term losses.

Herbicide treatments would not be allowed under Alternative C. Therefore, control of some aquatic weeds, including giant salvinia, water-thyme, and Eurasian watermilfoil could be difficult, as mechanical and other treatment methods would be less effective. Under alternatives C and D, it could be difficult for the BLM to adequately treat weed infestations in remote areas and large weed infestations to benefit aquatic organisms. Thus, the risk of loss of aquatic habitat and habitat function in more remote areas could be greater under these alternatives than under the Preferred Alternative.

Alternative E places greater emphasis on passive restoration than the other alternatives. Passive restoration is often a critical first step in successful riparian or wetland area restoration because the anthropogenic activities that are causing degradation or preventing recovery are reduced or eliminated. Livestock grazing is often cited as a factor that causes loss of wetland and riparian habitat function; by prohibiting livestock from entering these areas, improvement in habitat function can be expected (Kauffman et al. 1997). However, the BLM must balance wetland and riparian habitat protection with the multiple use requirements under FLPMA. Therefore, the BLM modifies the timing and duration of grazing to reduce potential impacts, rather than implementing total exclusion, whenever possible. As discussed in Chapter 2, Vegetation Treatment Programs, Policies, and Methods, passive restoration would be considered first when developing restoration management plans, and would be used to the extent possible within the constraints of FLPMA.

BLM_0000601

Regardless of the alternative chosen, there would be an accumulation of loss of wetland and riparian functions and values under all alternatives over the short term, but the rate of loss would be expected to slow from historic levels, over the long term, if the BLM was successful in improving wetland and riparian habitat functions and values.

## Vegetation

Historically, ecosystems on public lands were comprised of a mosaic of vegetation types adapted to natural disturbances, including climate, fire, flood, and geological events. They were dynamic and resilient, tending to return to some developmental pathway when disturbed or changed. However, ecosystems have biological or physical limits that, if exceeded as a result of natural or human causes, can lead to deterioration in ecosystem health. If these limits are exceeded for extended periods of time, the characteristics of the ecosystem can change, often substantially, to the detriment of the ecosystem.

### *Past Effects and Their Accumulation*

North America has been occupied by Native peoples for at least 12,000 years (USDI BLM 2005c). Contrary to the beliefs of European emigrants arriving in the western U.S. in the 18th century, western lands at that time were not pristine wilderness but ecological systems in which humans were an active component. American Indians used fire as a tool to manage vegetation. As Euroamericans moved west, they reshaped ecosystems to meet their needs. They cleared forests for agriculture and grazed livestock, fragmenting landscapes and changing plant and animal species composition. As people settled areas, they built homes and other structures, and began suppressing fires to protect their property. The resultant fire exclusion promoted aging forests and shrublands, insect and disease outbreaks, an overaccumulation of fuel, and a consequent increase in fire severity and intensity. The disruption of natural fire cycles in fire-adapted ecosystems became the dominant agent of change that initiated an increased wildland fire risk (Hann et al. 2002).

Most rangelands have experienced significant changes in fire regimes during the past 150 years. Removal of the use of fire by native Americans would have significantly changed fire regimes for many rangelands. Some rangelands have experienced reductions in herbaceous cover and increased dominance of woody species, resulting in a lengthening of the fire return interval. Other rangelands have shorter fire return intervals, primarily as a result of wildland fire disturbances that created conditions favorable for exotic species' invasions.

Previously, wildland fire had maintained grasslands by rejuvenating decadent grasses and killing young woody species that might have seeded between fire occurrences. Although woody species would have increased based on reductions in the frequency of fires alone, other factors also contributed to these changes. During the late 19th and early 20th centuries, decreases in grass cover caused by overgrazing by livestock provided open sites that promoted more rapid establishment of woody species. As woody species increased, they competed for soil nutrients and moisture, which inhibited recovery and production of herbaceous cover. Because combustible vegetation became patchier, fire frequency continued to decrease on these sites.

Later in the 20th century, organized fire suppression further contributed to the invasion of grasslands by woody species and the increased density of woodlands and shrublands. Some rangeland sites lost much of their herbaceous ground cover. On some sites, this loss of ground cover resulted in increased wind and water erosion. Erosion further reduced herbaceous cover, perpetuating the cycle of degradation. During the 20th century, many of these rangelands also provided suitable sites for non-native species establishment. Invasive herbaceous non-native species affect rangeland fire regimes much differently than invasive woody species. Many non-native annual plant species dry out earlier than native perennials, prompting a longer annual flammable period. The longer flammable season, coupled with denser ground cover typical of these non-native species, triggers much more frequent fire. In many cases, each time a fire occurs, additional opportunities for the establishment of non-native species are created. The result is a cycle of ecosystem degradation and costly, unwanted wildland fires.

Fire exclusion and historical logging practices altered forest structure, species composition, and associated fire regimes, particularly in forest types with high frequency fire regimes. Fire suppression efforts began influencing forest structure and composition more than 100 years ago. In the absence of fire, understory trees became much denser in dry forest types. In these areas, understories shifted to species that were more shade-tolerant and less resistant to fire and drought cycles. As these forests aged, resistance further declined and they became increasingly susceptible to insect and disease outbreaks. As a result, wildland fires in these degraded

BLM_0000602

ENVIRONMENTAL CONSEQUENCES

forests burned more severely and became more difficult to control.

Natural reseeding and well-intentioned, aggressive planting programs also helped create dense stands of smaller trees and brush where forests of large trees had once existed. Although mechanical thinning and slash treatment programs were planned for many of these plantations, funding for these activities did not keep pace with the need to reduce stand density.

Today, forest structure on significant portions of federal lands has shifted to a dominance of these small, more closely spaced trees. As these stands age, they become susceptible to, and provide fuel for, intense wildland fire (USDA Forest Service and USDI BLM 2000).

In some forests and woodlands, logging, grazing, and unnaturally severe fires have also contributed to increases in non-native plants, insects, and pathogens. The invasion of non-native plants has caused various impacts to ecosystems, including displacement and endangerment of native species, reduced site productivity, and degraded water quality.

Since the 1970s, the interior West's population has increased more rapidly than the country at large. As human populations continue to grow in the WUI, even more people and their property will be at risk from unwanted wildland fires. The vegetation in many of these interface areas, where wildland fire now poses the greatest threat to human lives and values, evolved with fire.

Actions taken by the BLM and other land management agencies to restore watersheds and ecosystem health by treating invasive vegetation and reducing hazardous fuels can reverse the trend of increasing risk of unwanted wildland fire and deteriorating land health. For example, in 1986, the BLM reported that only 34% of public land was in excellent or good condition (Forest Service 1989). Today, approximately 42% of public land is considered to be in excellent or good condition (USDI BLM 2006c).

### *Future Effects and Their Accumulation*

Treatments that remove hazardous fuels from public lands would be expected to benefit the health of plant communities in which natural fire cycles have been altered. Treatments that restore and maintain fire-adapted ecosystems, through the appropriate use of mechanical thinning, fire, and other vegetation treatment methods, would decrease the effects of wildfire on plant communities and improve ecosystem resilience and sustainability. Treatments should also reduce the incidence and severity of wildfires across the western U.S. (USDA Forest Service and USDI BLM 2000). Treatments that control populations of non-native species on public lands would be expected to benefit native plant communities by reducing the importance of non-native species and aiding in the reestablishment of native species.

Over half the treatments would occur in the Temperate Desert Ecoregion. Much of this ecoregion is comprised of grasslands and shrublands that have altered fire regimes, have suffered catastrophic fires during the past decade, and are dominated by downy brome and other invasive species. Recovery to pre-fire conditions could take decades to centuries. Treatments would improve the mix of habitats so that vegetation would be more resilient to disturbance and sustainable over the long term. Treatments would reduce the encroachment and density of woody species in shrublands and/or herblands. Treatments would slow the spread of weeds and increase the number of acres dominated by bunchgrasses and other important forage species for wildlife and livestock. As a result, plant communities that have declined substantially in geographic extent from historical to current periods (e.g., big sagebrush and bunchgrasses) would increase. Treatments would not be implemented in shrublands and other communities with the potential to become dominated by downy brome. In situations where loss of native understory has occurred, such as in pinyon-juniper woodlands, and prescribed fire is desired to remove woody vegetation after mechanical treatments, analysis should show that reseeding and possibly application of a selective herbicide can be effective to restore desired native species.

Given the current rate of urbanization and degradation of privately-owned lands and the limited funding available to restore public and other publicly-owned lands, the extent of weeds and other exotic and undesirable plants would continue to increase, but the rate of expansion would slow (USDA Forest Service and USDI BLM 2000). Based on modeling done for development of the cohesive strategy and assuming vegetation treatment funding would remain near current levels, the cumulative number of acres of site degradation within 15 years from severe wildland fires and invasive plants would triple from current levels. However, even in that short time frame, risk to watersheds would only increase by one-fifth under the proposed program (assuming equal weighting of

BLM_0000603

treatments in the WUI and non-WUI), and would remain static if more emphasis was given to restoring natural fire regimes and healthy ecosystems in the non-WUI (67% of treatments in non-WUI; Hann et al. 2002). Modeling done for treatments of BLM- and Forest Service-administered lands in the Interior Columbia Basin, which encompasses much of the Pacific Northwest, showed that over a 100-year analysis period, there would be a decrease in vegetation types that are most susceptible to fire, insect, and disease risks, and an increase in vegetation that is more resilient to these risks if treatments similar to those proposed in this PEIS were implemented (USDA Forest Service and USDI BLM 1996).

### *Contribution of Treatment Alternatives to Cumulative Effects*

Based on the number of acres treated, short-term adverse impacts and long-term improvements to vegetation would be greatest under the Preferred Alternative, and least under the No Action Alternative. The total number of acres treated, and the effects to vegetation would be similar under Alternatives D and E. Effects to vegetation under Alternative C would be intermediate between these alternatives and the Preferred Alternative.

It is anticipated that the use of wildland and prescribed fire and herbicides, and mechanical methods, would have the greatest short term impacts on vegetation, and that impacts would be somewhat in proportion to acres treated. Approximately three times as many acres would be treated annually using herbicides under the Preferred Alternative than under the No Action Alternative, and about twice as many acres would be treated using herbicides under the Preferred Alternative than under alternatives D and E. No acres would be treated using herbicides under Alternative C. In addition, approximately twice as many acres would be treated using prescribed and wildland fire under the Preferred Alternative (2.2 million acres) than under alternatives C, D, and E (1.06 million acres), and three times as many as compared to the No Action Alternative (645,000 acres). Acres treated using mechanical methods would be similar among alternatives B, C, D, and E (about 2 million acres annually), and greater than for the No Action Alternative (about 582,000 acres annually).

Alternative E places greater emphasis on passive restoration than the other alternatives. Passive restoration is often considered a critical first step in successful restoration of degraded areas, since anthropogenic activities that are causing degradation or preventing recovery are halted. As discussed at the beginning of the cumulative effects section, passive restoration would be considered under all alternatives when developing restoration management plans, and would be used to the extent possible within the constraints of FLPMA. However, alternatives A through D would likely take a more aggressive approach to vegetation management than Alternative E.

All alternatives include both passive and active management. Recovery of vegetation through passive management is expected to take longer than under active management, where treatments such as seeding with native species, establishing intermediate vegetation to control erosion, and use of pre-emergent herbicides to prevent weed establishment would be expected to promote faster recovery.

The use of ever greater amounts of herbicides and their repeated use may result in weed populations that develop a resistance to a particular herbicide over time. This risk would be greatest under the Preferred Alternative and least under Alternatives C and A. Herbicide resistant plants are present in a population in extremely small numbers. The repeated use of one herbicide allows these few plants to survive and reproduce. The number of resistant plants then increases in the population until the herbicide no longer effectively controls the weed. To reduce this risk, the BLM would 1) rotate herbicides, 2) apply these herbicides with the understanding that they can lead to weed resistance if used yearly for several consecutive years, 3) use mechanical and biological management options to eliminate weed escapes that may represent the resistant population, 4) use passive methods of weed control to reduce or eliminate factors leading to the spread of weeds, and 5) keep accurate records of herbicide application.

Regardless of the alternative chosen, there would be a cumulative loss of native vegetation function. Over the long term, treatments should restore native vegetation and natural fire regimes and benefit ecosystem health and slow the loss of native vegetation function. The rate of loss under each alternative would be somewhat in proportion to the number of acres treated under each alternative and the ability of the BLM to implement passive restoration techniques to slow the spread of weeds.

### Fish and Other Aquatic Organisms

Fish, the dominant aquatic vertebrate in the analysis area, constitute a key component of aquatic systems on

BLM_0000604

ENVIRONMENTAL CONSEQUENCES

public lands. Fish are a critical resource to humans and as such have influenced the development, status, and success of social and economic systems in Alaska and the western U.S. Aquatic organisms such as insects and other aquatic invertebrates provide food for fish. The health of fish and other aquatic organisms is often indicative of the health of the watershed. Fish and other aquatic organisms are often more sensitive than humans and wildlife to herbicides and other chemicals in their environment, and thus can be an indicator of the concentrations of these pollutants in aquatic bodies.

The BLM administers lands directly affecting almost 155,000 miles of fish-bearing streams and 4 million acres of reservoirs and natural lakes (USDI BLM 2006c). These habitats range from isolated desert springs of the Southwest to large interior rivers and their numerous tributaries throughout the Pacific Northwest and Alaska. Today, the rapid expansion of invasive species and buildup of hazardous fuels across public lands are threats to ecosystem health and one of the greatest challenges in ecosystem management.

### Past Effects and Their Accumulation

Cumulative impacts to fish and other aquatic organisms and the lakes, ponds, wetlands, and riparian areas that provide habitat for aquatic organisms on public lands and throughout the western U.S. have occurred from human-caused disturbance factors, including natural resource extraction, recreation, fire exclusion, construction of roads, dams, and hydropower facilities, agriculture, and urbanization. In addition to natural disturbances, use of wetland and riparian areas by livestock and wild horses and burros has degraded habitat values. Water withdrawal from ditches and diversions have impacted fish habitat on public and other lands. Overfishing has been blamed for the declines in some fish populations (USDA Forest Service and USDI BLM 2000). The introduction of non-native game fish has also impacted some native fish populations.

The condition of much of the remaining habitat has become degraded since that time. BLM surveys show that about 25% of wetlands and 50% of riparian habitat on public lands outside of Alaska lack characteristics necessary for "proper" functioning condition (USDI BLM 2006c). A proper functioning wetland or riparian area has the necessary physical and structural components to dissipate stream energy associated with high water flows, as well as conditions that support a diverse and healthy population of fish and other aquatic organisms.

The spread of invasive plant species is one factor that degrades habitat for aquatic organisms. In addition, hazardous fuels can lead to large-scale wildfires that can adversely impact wetland and stream habitat. Within riparian woodlands, the abundance of mid-size trees has increased while the abundance of trees in other size categories has decreased, primarily due to fire exclusion, increasing the risk of wildfire and reducing the value of these areas to aquatic organisms. Within riparian shrublands, there has been extensive conversion to areas dominated by exotic grasses and forbs, primarily because of processes and activities associated with excessive livestock grazing pressure. This conversion has made these areas more susceptible to fire and reduced their value to aquatic organisms (USDA Forest Service and USDI BLM 2000).

Activities in Alaska, including oil and gas development and subsistence and recreational fishing, have impacted fish and other aquatic organisms on public lands. These effects have accumulated, but do not appear to have adversely affected fish populations to a great extent. The permitting process and the regulatory environment for protecting fish have improved over time and are generally effective. Proper construction and placement of bridges and culverts have greatly reduced effects but have not eliminated them. Little is known about the effects of water withdrawals from lakes on fish. Some fish have been harmed or killed during water extraction, but these numbers have been small and have not accumulated (USDI BLM 2005c).

As discussed under Wetland and Riparian Areas, during the early years of the BLM, most resource conservation and management was focused on upland sites. An increased emphasis on wetland and riparian habitat protection began in the 1960s. In the 1970s, FLPMA was passed (1976) and the BLM began preparing land use plans to better manage natural resources on public lands. Land use plans set goals and objectives for natural resource management and identify priority watersheds on which to focus restoration efforts, with special emphasis on watersheds that contain habitat for sage-grouse. In addition, the BLM is assessing the condition of wetland and riparian areas, and conducting restoration efforts in areas that are less than proper functioning. The BLM has restored about 160,000 acres of wetlands, and about 1,000 miles of stream habitat.

Past control efforts by the BLM, other federal and state agencies, private landowners, and businesses (particularly the agricultural industry) have resulted in the application of thousands of tons of herbicides and other pesticides to the environment. As discussed

BLM_0000605

earlier, some of these herbicides break down relatively quickly in the environment or are not harmful to aquatic organisms at typical application rates. However, some herbicides are harmful to aquatic organisms, and may persist in the environment for many months.

### *Future Effects and Their Accumulation*

The rate of loss of wetland and riparian areas has slowed with the passage of federal, state, and local regulations that strive to protect wetland and riparian habitat. There has been some improvement in the functional quality of wetland and riparian areas on public lands, a trend that is likely to continue. For example, the percentage of wetland and riparian areas that lack the characteristics necessary for high function has decreased by about 10% since 1996 (USDI BLM 1997, USDI BLM 2006d). As a result, the loss of riparian and wetland functions and values over portions of the West should slow in the future.

Efforts to restore natural disturbance regimes, reduce the potential for large-scale wildland fire, and manage and control noxious weeds and other invasive vegetation would help to reduce erosion and sedimentation and restore native plant communities. Restoration of native vegetation should improve riparian habitat and moderate stream temperatures and water flows. In addition, the ability of the BLM and other natural resource management agencies to use aquatic herbicides to control aquatic weeds would benefit lakes and ponds and the aquatic organisms that use these habitats.

Modeling done for the Interior Columbia Basin assessment predicted that vegetation treatments proposed by the BLM and Forest Service would improve the habitat capacity for fish and other aquatic organisms, including threatened and endangered salmon, but that fish populations might be slow to respond to improved habitat conditions. Fish inhabit streams found on and off public lands, and streams cross multiple jurisdictions, including private land, along their entire course. In many cases the condition of the stream habitat off of public lands and on private or other jurisdiction lands is unknown and could be of lower quality. A portion of most fish populations is harvested each year. Competition with non-native fish may limit the ability of native species to access or fully utilize available habitat. Perhaps most importantly, dams and other diversions found in the Columbia River, Colorado River, and most other major rivers in the West also limit access to upriver habitats and alter occupied habitats for certain anadromous fish and other species.

Thus, restoration of native vegetation and natural ecosystems may be most immediately beneficial to resident fish rather than migratory fish that may travel off of public lands to meet part of their life requisites (USDA Forest Service and USDI BLM 2000).

Most water-related impacts to fish resources on public lands in Alaska would be associated with oil and gas development, mining, and other development. Development would include an increased number of ice roads and new pipelines, spills of hazardous materials, and habitat disturbance. Potential impacts to fish would be related to water withdrawal and direct habitat loss or indirect disturbance associated with construction of facilities.

### *Contribution of Alternatives to Cumulative Effects*

Based on the number of acres treated, short-term adverse impacts and long-term improvements to the health and productivity of aquatic organisms would be greatest under the Preferred Alternative, and least under the No Action Alternative. The number of acres treated under alternatives D and E and their associated short- and long-term effects would be similar, while Alternative C would be intermediate between these alternatives and the Preferred Alternative. Treatments would occur on about 10,000 acres of wetland and riparian habitat annually under the Preferred Alternative, but aquatic organisms would also benefit from upland treatments located near aquatic habitats.

Because herbicide treatments would not be allowed under Alternative C, control of some aquatic weeds, including giant salvinia, water-thyme, and Eurasian watermilfoil, could be difficult, as mechanical and other non-herbicide treatment methods are less effective. Under Alternative B, the BLM's ability to use four new chemicals (fluridone and diquat for aquatic applications, and imazapic and Overdrive® for terrestrial applications), and new herbicides as they become available, would provide new capabilities to the BLM for controlling problematic invasive species and would provide benefits to aquatic resources and habitats if invasive species were controlled or eliminated. Under alternatives C and D, it could be difficult for the BLM to adequately treat remote areas or large weed infestations to benefit aquatic organisms. Thus, the risk of loss of aquatic habitat and habitat function in more remote areas could be greater under alternatives C and D than under the other alternatives.

BLM_0000606

ENVIRONMENTAL CONSEQUENCES

Alternative E places greater emphasis on passive restoration than the other alternatives. Passive restoration of aquatic habitats would likely entail mitigation and management of terrestrial-based activities, which could directly or indirectly affect habitat quality. As discussed in Chapter 2, Vegetation Treatment Programs, Policies, and Methods, passive restoration would be considered when developing restoration management plans, and would be used to the extent possible within the constraints of FLPMA.

Under Alternative E, the BLM would not be able to use ALS-inhibiting active ingredients (i.e., chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl).

Of the herbicides that would be unavailable to the BLM under this alternative, imazapyr is the only one that could be used in riparian and aquatic habitats, where it has been shown to be very effective against saltcedar. Imazapyr poses little risk to fish and aquatic organisms when used at typical application rates. Without imazapyr, the BLM would likely treat larger stands of saltcedar using prescribed fire followed by a foliar application of triclopyr, and smaller stands by cutting the stem and applying triclopyr.

Chlorsulfuron, imazapic, and sulfometuron methyl do not pose risks to fish or aquatic invertebrates. Metsulfuron methyl poses a low risk to aquatic invertebrates in streams under an accidental direct spray scenario involving the maximum application rate (an unlikely scenario). Therefore, disallowing use of these four herbicides would be unlikely to benefit fish and aquatic organisms if they are replaced with herbicides that are more harmful to fish and other aquatic organisms.

Short-term effects could accumulate, but if treatments were successful, a countervailing effect of long-term improvement in habitat for aquatic organisms would offset habitat losses. Regardless of the alternative chosen, loss of aquatic habitat and values would accumulate under all alternatives, but the rate of loss would be expected to slow from historic levels over the long term..

**Wildlife Resources**

Public lands sustain an abundance and diversity of wildlife and wildlife habitat. Wildlife is found in areas where basic needs—food, shelter, water, reproduction, and movement—are met (Anderson 2001). In general, the greater the diversity of habitats in an area the more

species of wildlife that area can support. Some species, however, have special behaviors and physical traits that allow them to successfully compete with other animals in only one or a few habitats, limiting their distribution.

As discussed in Chapter 3, several structural features make some habitats better for wildlife than others. These features include: 1) structure, 2) vertical layers, 3) horizontal zones, 4) edge, and 5) and special features. The more of these features that are present in a habitat, the more niches there are in which animals can live (Cooperrider et al. 1986).

Historically, landscapes provided a continuous mosaic of vegetation types adapted to climatic and natural disturbance regimes. Plant communities were dynamic and resilient, tending to return to some developmental (successional) pathway after a disturbance. Although structural complexity varied depending on the characteristics of the dominant vegetation (e.g., forestlands tend to be more structurally complex than grasslands), even structurally "simple" habitats provided numerous niches for wildlife to exploit. For example, grasslands may provide only one or two strata, or levels, of vegetation for wildlife to use, but still contain a diversity of wildlife species (Payne and Bryant 1998).

At the ecoregion level, habitats showed little change over decades or even hundreds or thousands of years. However, at the landscape level (1,000 to 100,000s of acres; Paige and Ritter 1999) and stand level (1 to 1,000s of acres), vegetation and habitats were in constant flux, changing and adapting to natural perturbations in the environment. Disturbances consisting of infrequent, high-intensity events (such as drought, flood, and major fire) interspersed with frequent, low intensity events (wildlife grazing, low intensity burns, disease) constantly shaped and modified the environment. As a result, habitat types varied over time and space and resulted in different species groups being dominant at different times depending on the characteristics of the habitat.

### Past Effects and Their Accumulation

North America has been occupied by Native peoples for at least 12,000 years. As humans settled the West, they altered succession and introduced disturbance processes to which many native plants and animals were not evolved. The following sections examine direct and indirect human-related effects on wildlife habitat loss, modification, and fragmentation, and on wildlife health. These effects have resulted in death and harm to

BLM_0000607

wildlife that has accumulated since the arrival of man in North America.

**Habitat Loss.** Approximately 21% of land in the western states (excluding Alaska) has been converted to intensive uses—urbanization, agriculture, and pastureland—that provide fewer benefits for wildlife than undisturbed habitats or habitats subjected to less intensive uses (Wright 2002). Although wildlife find food and shelter in highly modified habitats, these habitats generally provide fewer habitat values and are less structurally complex than the habitats they replace. Therefore, they support fewer wildlife species and numbers.

Conversion of lands to more intensive uses has caused injury and mortality to wildlife, primarily less mobile species that live near the ground surface, and species that depend on special habitat lost during conversion. Large numbers of wildlife have been displaced, and many of these animals have died because they were unable to find food, shelter, or other life requisites, or were unable to successfully compete with species found in their new environs. As urbanization and development has intensified in the West during the past several decades, it has not been uncommon to see coyote, bear, deer, and other wildlife in urbanized settings. Some of these animals prey upon dogs, cats, and other domestic animals, or upon vegetation used for landscaping, and must be captured, removed, and in some case euthanized, to reduce this problem. Loss of habitat is also an important factor contributing to the increase in the number of species listed as threatened or endangered in recent years (see BA prepared for this PEIS; USDI BLM 2007b).

Some lands that have been developed for agricultural, urban, and industrial uses were once some of the most productive lands in terms of resource values and wildlife habitat. Once converted to these uses, the habitat values they provided were impacted, often significantly, and most wildlife populations they supported decreased. Wetland and riparian areas in the West are good examples of productive habitats that have been lost or modified as a result of development. Even where wetlands and riparian areas still exist, they have often been converted to other uses. For example, much of the remaining wetland habitat in central and northern California has been converted to agricultural uses (e.g., rice production). Although these areas provide habitat for waterfowl and other wildlife, their food, cover, and other habitat values are usually less than they were before the conversion.

Industrial activities, such as mining, can substantially modify or eliminate habitat within and near the development footprint. Dams and water diversions have been constructed on most major rivers in the West. Where streams and rivers that once supported a productive riparian ecosystem have been dammed, the riparian ecosystems have been inundated by large lakes or reservoirs that provide some habitat for wildlife, but are generally not as productive as they once were.

Not all species are harmed by conversion of land to more intensive uses. Numerous species are adapted to urbanized environments. Even native species that can readily adapt to change, or find their needs met by the modified habitat, may thrive. For example, deer, elk, geese, and some songbirds have benefited by the conversion of lands to urban, agricultural, and recreational uses. These species find food and water at bird feeders, in intensively managed pasturelands, at golf courses and other parks, and in cornfields and other croplands. In some cases, species that use developed habitats may benefit from reduced predation pressure, as their predators are unable to adapt to the new surroundings.

**Habitat Modification.** Most of the remaining 79% of lands that have not been converted to more intensive land uses (which would include most of the lands managed by the BLM) have still undergone some modification that has reduced their value to wildlife. An analysis of habitat condition in the Interior Columbia Basin showed a general downward trend in habitat value from historical conditions for nearly all habitat types evaluated in the study (USDA Forest Service and USDI BLM 2000). This study also showed that species that rely upon older forests, sagebrush, and grassland habitats have been most affected by loss and modification of habitat in the region; similar losses of these habitat types have been seen throughout the western U.S. (Payne and Bryant 1998, Paige and Ritter 1999, Smith 2000). Factors that have modified habitat in the West include grazing by domestic livestock and wild horses and burros, timber management, fire suppression, and invasion by weeds and other unwanted vegetation.

Grazing. Excessive grazing pressure has modified wildlife habitat over many areas in the West. Wetland and riparian areas, in particular, have suffered from heavy domestic livestock and wild horse and burro grazing pressure (USDA Forest Service and USDI BLM 2000). Livestock grazing can remove or trample vegetation used by wildlife for food and cover. Domestic livestock removed much of the native grass in

BLM_0000608

ENVIRONMENTAL CONSEQUENCES

the Great Basin by the early 20th century, and today, less than 1% of the sagebrush steppe in the region remains untouched by livestock (Paige and Ritter 1999). Livestock selectively choose grasses and forbs because of their palatability and avoid browsing on sagebrush, which can have a toxic effect on the microorganisms in their rumen (Young 1994). Grasses and forbs also provide food and cover for sage-grouse and other sagebrush-dependent species. In areas with sparse vegetative cover, such as the Subtropical Desert Ecoregion, livestock can remove much of the available forage.

Timber Management. Since the 1800s, millions of acres of timber have been harvested in the West. Historically, preferred timber species were often the more valuable shade-intolerant species such as ponderosa pine, western white pine, and western larch, and the larger trees. Many stands were harvested using even-aged harvest techniques, such as clearcutting, which promoted conversion of forests to shade-intolerant trees that usually had single-storied canopies and lacked vertical structure (Payne and Bryant 1998). Species that depend upon late seral forest habitat or a mosaic of forest types, such as spotted owl, white headed woodpecker, white-breasted nuthatch, and western grey squirrel, declined in numbers. Deer and elk thrived in intensively managed forests, as dense even-aged stands provided good hiding cover (although poor snow intercept-thermal cover), and were often in close proximity to recently-harvested clearcuts that provided grasses, forbs, and shrubs for forage. The checkerboard system of clearcutting also increased edge (a place where two habitat types meet, such as a forestland and shrubland), to the benefit of edge species, including most game species, but to the detriment of forest-interior species (Payne and Bryant 1998).

Fire Exclusion. During the past 100 years, fires have become less frequent and more intense in the western U.S. (Agee 1993; Lyon et al. 2000a). Exceptions to this general trend have occurred in grassland and shrubland habitats that have been invaded by exotic annual grasses, where fire frequency has increased beyond natural fire cycles. Intense wildfires likely harm or kill more wildlife than less intense fires, and are more likely to destroy large areas of habitat, potentially eliminating "islands" of habitat that may provide the only remaining refuge for some species (Lyon et al. 2000b).

Lack of frequent non-lethal burns has resulted in an increase in stand density, an increase in shade tolerant species, and an encroachment of invasive species and trees into grasslands. In forests, nearly uniform stands of

dense, mid-seral trees limit the amount of light that can reach the understory, preventing growth of understory shrubs, grasses, and forbs (Payne and Bryant 1998). These changes have not only resulted in habitat loss for species that require open old-growth stands and early seral stages, but have also led to conditions that could result in large, severe fires in the future. Fire suppression has benefited some species, such as northern spotted owl in parts of its range, but has made them more susceptible to harm by a large fire (Thomas et al. 1990).

Dense stands of mid-seral trees are often lacking in special habitat features that are found in more mature forests. For example, early- and mid-seral forests are less able to capture snow in their branches than more mature trees. Where large trees capture snowfall in their branches during winter, rather than letting it accumulate on the ground, shrubs and other types of forage are more readily available to deer and other browsers, and animals are able to travel through the snow without difficulty.

Changes in rangeland habitat, either from fire suppression that has allowed shrubs and trees to invade grasslands, or from high fire frequency that has encouraged the growth of non-native annual weeds, has impacted rangeland species such as sage-grouse, Brewer's sparrow, and sage sparrow (Paige and Ritter 1999). Encroaching shrubs and trees crowd out grasses and forbs used by wildlife, while annual weeds provide little forage value or habitat structure for wildlife. Declines in big game winter range, density of nesting raptors, and non-game bird abundance have also been observed in areas dominated by downy brome (USDA Forest Service and USDI BLM 2000).

Invasive Species. Euroamerican settlement facilitated the invasion and spread of invasive plants. Weeds and other invasive species are able to colonize disturbed (downy brome) and relatively intact (spotted knapweed, yellow starthistle, and leafy spurge) sites, reproduce and grow quickly, and outcompete native species for water and nutrients. Construction of roads and ROWs has facilitated the spread of weeds. Noxious weeds and other exotic plants harm wildlife by reducing the amount of high quality forage and habitat complexity in an area so that it is unable to support an abundance and diversity of wildlife (Payne and Bryant 1998). Invasive species can also increase sedimentation and surface water runoff to the detriment of amphibians and other aquatic species whose habitats may be impacted. Pinyon-juniper woodlands have encroached into grasslands over much of the West, to the detriment of

BLM_0000609

edge species and ground-nesting and foraging species. However, the expansion of these species has also benefited wildlife, as pinyon-juniper woodlands provide forage for wintering deer, and in some areas, support more bird species than forest and sagebrush communities (Payne and Bryant 1998).

Habitat Fragmentation. From historical to current periods, there has been an increase in fragmentation of larger habitats into smaller "islands" of habitat and a loss of connectivity within and between blocks of habitat, especially in lower elevation forests, shrublands, and riparian areas (USDA Forest Service and USDI BLM 2000). All of the factors discussed above have contributed to the fragmentation of habitats in the West.

In general, the smaller the habitat island, the fewer the species it can support, since larger areas support a greater diversity of vegetation types and microhabitats. Larger areas are also able to support uncommon species that live at low population densities. In addition, small islands, on average, support small populations, which are more likely than large populations to go extinct (Hunter 1990). This risk of extinction is a concern for several special status species that are restricted to small islands of habitat. A catastrophic wildfire or other major habitat-disturbing event could make the habitat unsuitable for some special status species, leading to their extinction. For example, pygmy rabbits in Washington State are restricted to a few small areas of sagebrush habitat in central Washington surrounded primarily by agricultural land. A major fire event or disease would likely eliminate the population (McAllister 1995).

Fragmentation isolates sedentary and less mobile animal populations, or populations with restricted habitat requirements, and reduces their ability to disperse across the landscape, potentially leading to long-term loss of genetic exchange. Even where habitats are contiguous, human disturbance (e.g., roads, noise) and development can discourage wildlife from moving between adjacent areas, effectively fragmenting habitat. Fencing for livestock can also inhibit the free movement of some wildlife species.

Public land settlement policies have, in part, contributed to the fragmentation of habitats across the West. Public lands in many states outside of Nevada are often scattered and have taken on checkerboard, jigsaw, and patchwork patterns as a result of public land policies pursued by the country prior to the BLM's founding in 1946. As a result, blocks of public land are often isolated and surround by agricultural or other lands. From a wildlife perspective, these blocks act as islands, and some species may be unwilling or unable to travel between blocks of public land or other suitable habitat (Muhn and Stewart 1988). In contrast, there are also large tracts of contiguous public lands in the West that provide habitat connectivity for many species, including sage-grouse, deer, elk, and numerous migratory bird species.

**Wildlife Health**. Human-related activities are responsible for the death and injury of wildlife each year. Hunting removes large numbers of animals each year. Approximately 409,000 hunters used public lands in FY 2005 (USDI BLM 2006d). Hunting did not adversely affect populations of most species, but overharvest of other species, including American bison, pronghorn antelope, and wild turkey, nearly led to their demise.

Thousands of animals are killed each year by automobiles and other vehicles, and from flying into powerlines and other elevated structures associated with ROW, wind-power generating facilities, transmission towers, and other structures. Wildland and prescribed fires kill or harm animals, with animals that have limited mobility and live above the ground being most vulnerable (Lyon et al. 2000b). Disturbance associated with public recreation, including public-use facilities and OHV use, has displaced wildlife or impacted their activity patterns and habitat use, and likely led to some deaths or reduced animal health.

The use of pesticides, especially organochlorine pesticides such as DDT, has caused death, sickness, and poor reproduction in birds and other wildlife, especially prior to the 1980s when the public was largely unaware of these issues. Diseases that spread from domestic animals to wildlife (e.g., rabies) can also contribute to the loss or harm of wildlife.

In recent years, several studies have focused on the effects of herbicides and other pesticides on amphibian survival, development, and growth. A study of herbicides sprayed for pest control in Canada showed that effects to amphibian embryos and larvae from hexazinone, glyphosate, triclopyr, and three other herbicides that are not used by the BLM, were similar to those found in freshwater fish when herbicides were applied at typical application rates; high concentrations of hexazinone did not affect embryos and tadpoles, but concentrations of triclopyr 2.4 ppm or greater led to death of newly hatched tadpoles (Berrill et al. 1994; Berrill et al. 1997).

BLM_0000610

ENVIRONMENTAL CONSEQUENCES

Herbicides can often be more selective than mechanical or fire treatments and just as selective as manual treatments in forestlands (Payne and Bryant 1998). Common herbicides used in forest wildlife management include asulam, atrazine, 2,4-D, glyphosate, simazine, and tebuthiuron; however, the BLM has not used atrazine or asulam on public lands since at least 1997. Spraying herbicides over conifer plantations eliminates competing shrubs and hardwood sprouts, but also reduces the value of these forests to wildlife (Rutske 1969). If treatments are done in patches or strips, important refuge areas can be created for amphibians, reptiles, birds, and small mammals (Payne and Bryant 1998); staggering treatments over several years can achieve the same effect.

### *Future Effects and Their Accumulation*

The objective of future management will be to restore native vegetation in fire-adapted ecosystems to benefit wildlife and their habitats. Treatments that reduce hazardous fuels on public lands, control the spread of non-native plant species, and restore natural fire regimes would benefit most wildlife. Species that have adapted to, or have exploited, habitats that have developed as a result of fire suppression and weed spread may decline in numbers. However, modeling conducted during development of the cohesive strategy, and for the Interior Columbia Basin assessment, suggests that it will take decades to centuries for treatments to result in major habitat changes (USDA Forest Service and USDI BLM 2000; Hann et al. 2002).

**Habitat Loss.** Vegetation treatments will do little to slow the loss of habitat in the West. Population growth in the West will likely continue to exceed that of the rest of the country, placing new demands on undeveloped land to meet human-related needs, including urbanization, agriculture, and recreation. As a result, more wildlife will be lost or displaced as lands are converted to uses that do not support historic species or numbers of wildlife, and it is likely that many displaced animals will perish. It is also possible that loss of habitat could lead to the extirpation of species, although the provisions of the ESA should minimize this risk. Most habitat loss would occur on privately-owned lands, although public lands will continue to be developed for mining, oil and gas, recreation, roads and other uses as authorized under FLPMA.

**Habitat Modification.** The basic premise of the vegetation treatment program is to manage ecosystems to maintain viable populations of native and desirable non-native plant and animal species. This goal would be accomplished by using fire and other treatments to reduce hazardous fuels and the risk of catastrophic fire, to reduce or eliminate weeds and other invasive plants, and to promote conditions that favor the restoration and development of native vegetation. While treatments would not stem the loss and modification of vegetation and wildlife habitat that occurs on private lands, they would improve ecosystem health on public lands and improve habitat for wildlife that historically used treatment areas.

Over half the treatments would occur in the Temperate Desert Ecoregion. Much of this ecoregion is comprised of grasslands and shrublands that have altered fire regimes, have suffered large-scale fires during the past decade, and are dominated by downy brome and other invasive species. Treatments are also targeted at evergreen woodlands, primarily to slow the encroachment of pinyon, juniper and other woodland species into grassland habitats.

There is currently greater awareness than there was historically, on the part of the BLM and other federal land management agencies, and the public, about the effects of livestock, wild horses and burros, timber management practices, mining, fluid minerals, and other land disturbing activities, on wildlife habitat. Better management of human-related disturbance factors through application of site-specific mitigation, SOPs, reclamation and rehabilitation, and monitoring, will continue to benefit wildlife habitat.

Habitat Fragmentation. Factors that contribute to habitat fragmentation on and off public lands will continue, increasing the likelihood of local extinctions of wildlife and loss of species diversity; these risks are greatest on privately-owned lands. Vegetation management that creates a mosaic of native vegetation within larger continuous areas of similar habitat would be beneficial to "interior" and wide-ranging species. Efforts to restore native vegetation in disturbed areas would help to link islands of habitat, as would forest treatments focused on thinning, rather than clearcutting, timber. Closing and revegetating little-used or abandoned roads and removing or modifying fencing and other barriers would encourage the movement of wildlife among habitats and facilitate genetic exchange among populations. Treatments that reduce the risk of catastrophic fire and the spread of weeds would result in more continuous stands of similar vegetation and a reduced likelihood that islands of good habitat would be surrounded by less desirable habitat (e.g., a patch of native riparian sagebrush surrounded by a continuous stand of downy brome).

BLM_0000611

ENVIRONMENTAL CONSEQUENCES

In addition, efforts by the BLM and Forest Service to consolidate landholdings through land tenure adjustments, such as land exchanges with other federal agencies and private landowners to create larger blocks of common ownership, would help to reduce habitat fragmentation and improve management of federal and private lands.

**Wildlife Health**. Hunting and other disturbance factors that have impacted wildlife in the past are likely to continue. However, current management of game populations and enforcement of hunting laws has reduced the risk of major declines in the numbers of game species from historic levels. Development and implementation of land use and project-level plans that consider the effects of OHVs and other disturbance factors, road closures, screening of facilities, and other SOPs to minimize disturbances would benefit wildlife.

Although the amount of herbicides used by the BLM and Forest Service to treat vegetation would increase in response to proposed treatment programs, the risks to wildlife should remain near current levels, or decline, as both agencies move towards used of less toxic chemicals to treat vegetation. In particular, the BLM and other federal agencies would ensure that herbicide formulations that have been shown to be harmful to amphibians and other wildlife, such as atrazine and glyphosate formulations containing POEA and R-11, are not used or are used minimally and only in areas where benefits of use greatly outweigh risks to wildlife. Atrazine appears to increase mortality in amphibians and acts as an endocrine disruptor that chemically castrates and feminizes male amphibians (Hays et al. 2006; Rohr et al. 2006). Atrazine, which would be available for use only under Alternative A, has not been used by the BLM for over 7 years and there are no plans to use this herbicide in the future.

The use of atrazine, glyphosate formulations containing POEA and R-11, triclopyr, and other herbicides that are harmful to amphibians and other wildlife, would continue to be used on private lands and could cause the decline in numbers of amphibians and other wildlife in areas where they are used. Fifty-one thousand tons of glyphosate, thirty-eight thousand tons of atrazine, and six hundred sixty-eight tons of triclopyr were applied to non-federal agricultural lands and rangelands during 2002. Use of triclopyr has increased 11-fold, and glyphosate 6-fold, since 1992 on these lands.

### *Contribution of Treatment Alternatives to Cumulative Effects*

Based on the number of acres treated, short-term adverse impacts and long-term improvements to wildlife and habitat would be greatest under the Preferred Alternative, and least under the No Action Alternative. The number of acres treated, and the effects to wildlife and habitat would be similar under alternatives D and E. Effects to wildlife and habitat under Alternative C would be intermediate between these alternatives and the Preferred Alternative.

It is anticipated that the use of wildland fire use and prescribed fire and herbicides, and mechanical methods, would have the greatest short term impacts on wildlife and their habitat, and that impacts would be somewhat in proportion to acres treated. Approximately three times as many acres would be treated annually using herbicides under the Preferred Alternative than under the No Action Alternative, and about twice as many acres would be treated using herbicides under the Preferred Alternative than under alternatives D and E. No acres would be treated using herbicides under Alternative C. In addition, approximately twice as many acres would be treated using prescribed and wildland fire under the Preferred Alternative than under alternatives C, D, and E, and three times as many as compared to the No Action Alternative. Acres treated using mechanical methods would be similar among alternatives B, C, D, and E (about 2 million acres annually), and greater than for the No Action Alternative (about 582,000 acres annually).

Short-term effects from treatments and other human causes would accumulate, but a countervailing effect of long-term improvement in the ecosystem health and wildlife habitat with success and maintenance of treatments, would offset short-term losses.

Alternative E places greater emphasis on passive restoration than the other alternatives. Passive restoration is often considered a critical first step in successful restoration of degraded areas, since anthropogenic activities that are causing degradation or preventing recovery are halted. As discussed at the beginning of the cumulative effects section, passive restoration would be considered under all alternatives when developing restoration management plans, and would be used to the extent possible within the constraints of FLPMA. However, alternatives A through D would likely take a more aggressive approach to vegetation management than Alternative E.

BLM_0000612

ENVIRONMENTAL CONSEQUENCES

All alternatives include both passive and active management. Recovery of vegetation through passive management is expected to take longer than under active management, where treatments such as seeding with native species, establishing intermediate vegetation to control erosion, and use of pre-emergent herbicides to prevent weed establishment would be expected to promote faster recovery.

The risks to wildlife from use of herbicides could be less under Alternative E than under the other herbicide use alternatives because ALS-inhibiting herbicides would not be used under Alternative E. ALS-inhibiting herbicides are effective at very low doses and could drift onto wildlife and harm them. However, in this assessment, the ALS-inhibiting herbicides mostly posed no risk to terrestrial wildlife (chlorsulfuron, imazapic, sulfometuron methyl), except for a few cases of low risk (imazapyr, metsulfuron methyl), suggesting that prohibiting the use of these herbicides would not likely benefit wildlife and could indirectly harm wildlife if more toxic herbicides that are currently available to the BLM were used in their place.

The risk of herbicide drift affecting wildlife and their habitats would be less under alternatives D and E than under the other herbicide treatment alternatives, as aerial treatments are prohibited under Alternative D, and discouraged under Alternative E.

Over the long term, treatments should restore native vegetation and natural fire regimes and benefit ecosystem health and wildlife and their habitats. Regardless of the alternative chosen, however, there would be a cumulative loss of native vegetation and healthy ecosystem function that would continue into the future.

Livestock

Approximately 165 million acres of public lands are open to livestock grazing, with use levels established by the Secretary of the Interior and administered through the issuance of grazing permits/leases. The majority of the grazing permits issued by the BLM involve grazing by cattle, with fewer and smaller grazing permits for other kinds of livestock, which would include primarily sheep and horses. Livestock grazing leases and fees contribute $12 to $15 million annually to the U.S. Treasury, and ranching is an important economic and social component of many rural communities (USDI BLM 2006e). There are over 12.7 million active animal unit months that could be authorized for use on public lands. The ability of public lands to support healthy

populations of domestic livestock is important to the livelihood of livestock producers.

*Past Effects and Their Accumulation*

Loss of native vegetation and deterioration in ecosystem health on public land due to changes in fire regimes, as well as an increase in lands dominated by noxious weeds and other invasive vegetation, has contributed to reductions in the ability of public lands to support livestock grazing. Livestock grazing itself is a factor contributing to some of these changes. However, increases in other human-caused factors such as mineral extraction and recreation have also affected vegetation communities or resulted in conflicts that reduce the ability of public lands to support livestock grazing. Where human activities and wildland fire have disturbed the land, weeds and other unwanted species have taken over and in some cases dominated landscapes (USDA Forest Service and USDI BLM 2000). It is estimated that downy brome alone covers over 11 million acres in the West, and that leafy spurge covers 3 million acres (Lajeuness et al. 1998). Weed species are often of little nutritional value to livestock, and some weed species are toxic to livestock.

*Future Effects and Their Accumulation*

The focus of management in the future is on restoring ecosystem processes and maintaining livestock populations in balance with the health of rangelands. Many of these treatments will require rest from livestock grazing and will therefore result in temporary reductions in livestock grazing. In the long term, treatments that remove hazardous fuels from public lands would be expected to benefit the health of plant communities in which natural fire cycles have been altered. Treatments that restore and maintain fire-adapted ecosystems through the appropriate use of mechanical thinning, fire, and other vegetation treatment methods would decrease the effects of wildfire on communities and improve ecosystem resilience and sustainability. Treatments should also reduce the incidence and severity of wildfires across the western U.S. to the benefit of livestock (USDA Forest Service and USDI BLM 2000).

Vegetation treatments would provide a better mix of habitats so that vegetation would be more resilient to disturbance and sustainable in the long term. Treatments would reduce the encroachment and density of woody species in shrublands and/or undesirable herbaceous species in rangelands. Treatments would slow the spread of weeds and increase the number of acres

BLM_0000613

dominated by bunchgrasses and other important forage for livestock. Although the number of acres impacted by weeds and other exotic and undesirable plants would continue to increase, the rate of increase should slow (USDA Forest Service and USDI BLM 2000).

In addition, the BLM will continue efforts to bring livestock populations in balance with the condition of rangelands. Where feasible, the BLM will incorporate the use of livestock as part of the overall weed management program, and improvements will be made to the grazing management program and grazing regulations (see *Proposed Revisions to Grazing Regulations for the Public Lands Final EIS*; USDI BLM 2004). Although these efforts should benefit the livestock industry, it is projected that there will be a slow, but steady loss in availability of public lands for livestock grazing (USDA Forest Service 1989, USDA Forest Service and USDI BLM 2000).

### Contribution of Treatment Alternatives to Cumulative Effects

Based on the number of acres treated, short-term impacts and long-term improvements to domestic livestock would be greatest under the Preferred Alternative, and least under the No Action Alternative. The number of acres treated, and the effects to these animals, would be similar under alternatives D and E. Effects to livestock under Alternative C would be intermediate between these alternatives and the Preferred Alternative. Short-term effects from treatments and other human causes would accumulate, but if treatments were successful, a countervailing effect of long-term improvement in the ecosystem health and range conditions.

Alternative E places greater emphasis on passive restoration through the elimination or reduction of uses on public lands than the other alternatives. Livestock grazing is often cited as a factor contributing to loss of resource function and degradation of rangeland quality. By reducing the number of livestock entering degraded areas, improvement in ecosystem health can be expected (Kauffman et al. 1997). Thus, fewer livestock may be able to graze on public lands under this alternative than under the other alternatives.

The risks to non-target vegetation from use of herbicides could be less under Alternative E than under the other herbicide use alternatives because ALS-inhibiting herbicides would not be used. ALS-inhibiting herbicides are effective at very low doses and could drift onto non-target vegetation, where a potential

impact could occur, depending on the species composition of the non-target site and the ALS-inhibiting herbicide selected. However, risk assessments did not predict risk to livestock for any of the ALS-inhibiting herbicides when applied at the typical application rate under any of the modeled scenarios, suggesting that prohibiting the use of these herbicides would not benefit livestock and could indirectly harm livestock if more toxic herbicides were used in their place.

The risk that herbicide drift would affect livestock would be less under alternatives D and E than under the other herbicide treatment alternatives, as aerial treatments are prohibited under Alternative D, and discouraged under Alternative E. Regardless of the alternative chosen, there would be a cumulative loss of rangeland forage for livestock.

## Wild Horses and Burros

The *Wild Free-Roaming Horses and Burros Act of 1971* provides protection for all wild horses and burros on federal lands and provides guidance for their management as a wildland species. At the time the Act was passed, approximately 17,000 wild horses occupied federal lands designated for their protection. By 1980, the number of wild horses had increased to between 65,000 and 80,000 (USDI BLM 2005d). As a result of this increase, impacts to vegetation, water, and soil from wild horses and burros increased, especially in heavily used areas. Loss of native vegetation, especially grasses and some shrubs, due to wildfires and invasive plants further reduced available forage and increased competition among wild horses and burros, livestock, and wildlife for dwindling resources. The loss of native vegetation and degradation of ecosystems has impacted wild horses and burros and has likely reduced herd productivity in some herd management areas. At the same time, wild horses and burros have adversely impacted vegetation, although efforts to reduce herd populations in recent years have reduced these effects (USDI BLM 2001c).

### Past Effects and Their Accumulation

The wild horses that roam the West are feral descendants of domestic stock that were brought to North America by European colonists. No native wild horses existed in North America at that time, even though horses evolved in North America, and spread to Eurasia about 2.5 to 3 million years ago. The last remaining native horses persisted in North America until about 8,000 to 10,000 years ago, when they

BLM_0000614

ENVIRONMENTAL CONSEQUENCES

became extinct. Climate change, change in vegetation, and perhaps overexploitation by Native Americans may have contributed to the horse's demise in North America (USDI BLM 2005d).

The Spaniards reintroduced horses and burros into North America during the 1500s. By the 1800s, more than 2 million wild horses roamed western North America. Population growth resulted from successful reproduction in the wild, and from escape or abandonment of domestic horses brought to the frontier by trappers, settlers, miners, and other immigrants. Wild burro herds also increased as individuals escaped from shepherds and miners. At the same time, the available open range began to shrink as livestock, fences, farms, ranches, and roads proliferated. Wild horses were shot to reduce competition with livestock, or rounded up and sold for use as draft animals, military mounts, and food. Burros were less persecuted because they tended to graze lands that were too barren and dry for livestock to use (USDI BLM 2001c, 2005f).

The Taylor Grazing Act of 1934 authorized the formation of the Grazing Service (a precursor to the BLM) and empowered the Service to responsibly manage grazing pressure on federal rangelands. This step accelerated the capture and removal of wild horses and burros, which were primarily used as pet food. Lucrative European markets for horsemeat emerged, as did domestic markets for use of horsemeat in pet and chicken feed. By the 1950s, the number of wild horses dropped to less than 20,000. In addition, professional horse-catchers often used brutal methods to capture and transport wild horses for sale to slaughterhouses. Public concern developed over the falling population and inhumane treatment of animals (USDI BLM 2005d).

In response to concerns over the plight of wild horses and burros, the Wild Horse Annie Act was passed in 1959 that prohibited hunting or harassment of wild horses on public lands using motorized vehicles or aircraft, although enforcement was difficult. In the *Wild Free-Roaming Horses and Burros Act of 1971*, Congress stated that free-roaming horses and burros were living symbols of the historic and pioneer spirit of the West; that they contributed to the diversity of life forms within the Nation and enriched the lives of the American people; and that these horses and burros were fast disappearing from the American scene. Congress mandated that wild free-roaming horses and burros be protected from capture, branding, harassment, and death (USDI BLM 2005d). Responsibility for management fell upon the BLM and Forest Service.

Under protection, herds thrived and increased to over 65,000 by 1980. Unlike wildlife, which are hunted, and livestock, which are managed under a permit system, there were no controls on wild horse and burro populations. In absence of control, populations increase by 15 to 20% annually.

The BLM strives to manage wild horses and burros as wildland species, not as livestock. Typically, the BLM does not feed or water the animals, but does intervene during extreme drought, fire, or freezing weather, and may relocate animals or remove them from the range during extreme conditions. For example, more than 3,500 animals were removed from public lands in 2000 due to extreme drought conditions and placed in long-term holding facilities (USDI BLM 2001c).

Wild horses and burros are managed in herd management areas, where the BLM tries to balance the number of animals with the available resources needed by the animals for survival. Land managers consider the number of animals, rangeland health, and other desired rangeland uses in developing an appropriate management level. Wild horse advocates express concern about keeping numbers too low to maintain genetic diversity. Many sportsmen and ranchers want the number of wild horses and burros reduced because they compete with wildlife and livestock for food (USDI BLM 2001c).

Urbanization has reduced the amount of private land near public land that is available to wild horses and burros. Paved highways, traffic, cross-fencing, and livestock gates impede herd movements and have reduced the amount of land available for wild horses and burros. Loss of native vegetation and deterioration in ecosystem health on public land during the past 100 years due to changes in fire regimes, increases in lands dominated by weeds and other noxious vegetation, and other human-caused factors, have increased competition for dwindling plant resources by these animals and further contributed to the loss and degradation of native plants. Livestock and wild horses and burros often congregate in areas with high quality forage or water, including wetland and riparian areas. As some native habitats are impacted, they provide new areas for invasive weeds, perpetuating the downward trend in land health. Although wild horses and burros occur in 10 states, most animals are found in Nevada (46%) or Wyoming (13%), in the Temperate Desert Ecoregion (see Table 3-7). Rangeland conditions in many areas where wild horses and burros are found are degraded. To reduce damage to rangeland ecosystems, the BLM began to reduce wild horse and burro numbers

BLM_0000615

beginning in the 1980s. By 1996, there were about 40,000 wild horses and burros on public lands. In FY 2005, wild horse and burro populations on public lands totaled over 31,760 animals, with nearly half of these animals living in Nevada (Table 3-7). Another 25,000 animals are held in holding pens. The population of wild horses and burros is approximately 4,000 animals above the Appropriate Management Level (AML) of 27,500. The AML is an estimate of the number of wild horses (USDI BLM 2006c, d).

### Future Effects and Their Accumulation

The focus of management in the future will be on restoring native ecosystem processes and keeping wild horse and burro populations in balance with the health of rangelands. Treatments that remove hazardous fuels from public lands would be expected to benefit the health of plant communities in which natural fire cycles have been altered. Treatments that restore and maintain fire-adapted ecosystems, through the appropriate use of mechanical thinning, fire, and other vegetation treatment methods would decrease the effects of wildfire on communities and improve ecosystem resilience and sustainability. Treatments should also reduce the incidence and severity of wildfires across the western U.S. to the benefit of wild horses and burros (USDA Forest Service and USDI BLM 2000).

Treatments would improve the mix of habitats so that vegetation would be more resilient to disturbance and sustainable over the long term. Treatments would reduce the encroachment and density of woody species in shrublands and/or herblands. Treatments would slow the spread of weeds and increase the number of acres dominated by bunchgrasses, Indian ricegrass, western wheatgrass, and other important forage species of wild horses and burros. As a result, plant communities that have declined substantially in geographic extent from historical to current periods (e.g., big sagebrush and bunchgrasses) would increase. Although the number of acres impacted by weeds and other exotic and undesirable plants would continue to increase, the rate of increase should slow (USDA Forest Service and USDI BLM 2000, USDI BLM 2001c).

The BLM will continue management efforts to keep wild horse and burro populations at appropriate management levels in balance with the condition of rangelands. This will require continued removal and adoption of animals, and continuing efforts to develop a fertility control agent for these animals. Nearly 209,000 animals have been adopted since 1971 (USDI BLM 2006d). The number of animals found in the Temperate

Desert. However, populations on public lands need to be reduced from about 31,000 to 27,500 animals to bring populations in balance with their habitat. As a result, effects to wild horses and burros from habitat degradation will continue to accumulate because fewer animals can be supported by degraded ecosystems than by healthy ecosystems (USDI BLM 2001c, 2005f).

### Contribution of Treatment Alternatives to Cumulative Effects

Based on the number of acres treated, short-term adverse impacts and long-term improvements to the wild horses and burros would be greatest under the Preferred Alternative, and least under the No Action Alternative. The number of acres treated, and the effects to these animals would be similar under alternatives D and E. Effects to wild horses and burros under Alternative C would be intermediate between these alternatives and the Preferred Alternative. Short-term effects from treatments and other human causes would accumulate. A countervailing effect of long-term improvement in ecosystem health and the ability of public lands to support wild horses and burros would offset short-term losses through successful treatments meeting desired objectives.

Alternative E places greater emphasis on passive restoration than the other alternatives. Passive restoration is often considered a critical first step in successful restoration of degraded areas, since anthropogenic activities that are causing degradation or preventing recovery are halted. Foraging by wild horses and burros is often cited as a factor contributing to loss of resource function and degradation of rangeland quality. By maintaining the number of wild horses and burros on public lands at levels in balance with rangeland productivity, improvement in habitat function would be expected (Kauffman et al. 1997).

The risks to non-target vegetation from use of herbicides could be less under Alternative E than under the other herbicide use alternatives because ALS-inhibiting herbicides would not be used. ALS-inhibiting herbicides are effective at very low doses and could drift onto non-target vegetation and degrade the forage quality of the impacted area. However, as with livestock, risk assessments did not predict risk to wild horses and burros for any of the ALS-inhibiting herbicides, when applied at the typical application rate, under any of the modeled scenarios, suggesting that prohibiting the use of these herbicides would not benefit livestock and could indirectly harm these animals if more toxic herbicides were used in their place.

BLM_0000616

ENVIRONMENTAL CONSEQUENCES

The risk of drift affecting wild horse and burro health would be less under alternatives D and E than under the other herbicide treatment alternatives, as aerial treatments are prohibited under Alternative D, and discouraged under Alternative E. Regardless of the alternative chosen, there would be a cumulative loss of rangeland habitat for wild horses and burros.

**Paleontological and Cultural Resources**

*Paleontological Resources*

Paleontological resources (plant and animal fossils) are nonrenewable. Since paleontological material is buried, the location of plant and animal fossils is predictable only to a limited degree, making assessment of cumulative impacts difficult. In many settings, paleontological resources are well protected by nature, in that they are so deeply buried and completely encased in sediments or rock that virtually nothing can impact them aside from excavation. In other instances, they are located on or near the ground surface and are very susceptible to impacts.

Once paleontological resources are impacted or displaced from their natural context, the damage is irreparable and cumulative. Paleontological resources are found over much of the West. Except perhaps for mechanical treatments and fire use, vegetation treatment methods do not present a substantial threat to paleontological resources.

**Past Effects and Their Accumulation.** Most paleontological material is typically buried considerably deeper than archaeological material and is therefore not regularly encountered by chance. However, some fossiliferous formations, particularly in the arid West, crop out at or near the surface and may have surface expressions or eroded material as "float." Natural and human activities that cause ground disturbance have likely impacted near-surface paleontological resources throughout the West. Paleontological research and excavation, necessary for the recovery of scientific data, have contributed to the displacement of paleontological resources. Past exploration and development of the West led to legal and illegal collecting and inadvertent damage, especially prior to the 1970s when there was less concern for protecting these resources. As awareness for the importance of these resources has increased, and as state and federal regulations have been put in place that require surveys for and prohibit the removal of paleontological resources, the cumulative loss of paleontological resources has slowed.

**Future Effects and Their Accumulation.** Most paleontological material is exposed as a result of natural erosion. Typically, erosion occurs as a result of the action of flowing water, but it also can occur as a result of wind, seasonal freezing and thawing, ground subsidence, and the movement of soil down slopes. Natural erosion, and its impact on paleontological resources, is difficult to assess because in most cases it is regarded as discovery rather than a negative impact to the resource. Some of the most important paleontological resources are associated with river bank cuts and drainages.

An estimated 305,000 to 932,000 acres could be disturbed by herbicide treatments during the next 10 to 15 years under the herbicide treatment alternatives. Of this area, about half would be treated using ground-disturbing equipment, and only a small portion would involve substantial ground disturbance that could impact paleontological resources. An additional 1.7 to 5.1 million acres could be impacted by other vegetation treatment methods, including 4.3 million acres by wildland fire use or prescribed fire and ground-disturbing equipment. These treatment methods pose the greatest risks to paleontological resources, either through direct harm to resources, or indirectly as a result of soil erosion and other soil disturbances that could result from treatments (see PER). In addition, population growth and development in the West have resulted in land impacts that disturb soil. These actions have the potential to add to the cumulative loss of paleontological resources. Site reclamation would not reduce this loss, as paleontological resources would have already been lost during site disturbance and development.

New innovations in technology that reduce the amount of surface disturbance associated with development on public and private lands, and enforcement of regulations that require the assessment and protection of paleontological resources before ground-disturbing activities can occur, would contribute to the future protection of paleontological resources and slow their cumulative loss. Assessments to identify and protect paleontological resources in proposed treatment areas should minimize or avoid the loss of these resources. In addition, vegetation treatments that restore natural fire regimes and native plant communities, and improve ecosystem health, would lead to conditions that would slow soil erosion and reduce risk of fire, slowing the loss of paleontological resources.

**Contribution of Alternatives to Cumulative Effects.** The potential for cumulative impacts to paleontological

BLM_0000617

resources from vegetation treatments would be least under the No Action Alternative and greatest under the Preferred Alternative, based on the number of acres that would be impacted by ground-disturbing activities. Other treatment alternatives would be intermediate between these two. Most equipment would disturb only the upper few inches of soil, and in many cases, would be confined to existing disturbed areas such as roadways, trails, and other ROWs. All treatment methods could cause indirect loss of paleontological resources as a result of erosion and soil disturbance, but these effects would be minimal. Potential effects would be further reduced because the BLM has surveyed, or would conduct surveys in the future, for paleontological resources to lessen the chance they would be impacted by treatment activities. Thus, there would be a negligible cumulative loss of paleontological material on public lands due to vegetation treatment methods under all alternatives.

### Cultural Resources and Traditional Lifeway Values

Cultural resources, including archaeological and historic sites and materials, as well as traditional cultural properties, have a very limited ability to absorb cumulative impacts. Cultural resources, which are non-renewable resources, risk being destroyed by erosion, construction, excavation, data collection, and looting; removal of artifacts from their surrounding contexts; movement of the material such that it loses context; or removal or re-deposition of artifacts and their surrounding context to another location. Cultural properties, including camps, cabins, hunting and fishing sites, graves, and areas of particular religious or traditional importance, lose their integrity and thus their potential eligibility for the National Register of Historic Places when they become degraded as a result of natural or human disturbance processes, or when the people who value these places can no longer access them, thus losing their cultural connection to the site over time.

**Past Effects and Their Accumulation.** Prior to European settlement, Native American and Alaska Native tools, pottery, artwork, religious artifacts, and other cultural resources were subject only to the effects of the natural environment, such as the forming, deforming, and destroying of resources and sites, and the effects of human activity, such as Native people reusing found objects and materials. Later, as Europeans settled in North America, settlers collected, harmed, or destroyed cultural resources and sites and displaced Native peoples. Under the influence of inspired leaders, however, traditional Native cultures have survived

(Garbarino and Sasso 1994, Zimmerman and Molyneaux 1996).

As settlement continued in the West, more lands were developed and additional cultural resources were destroyed, taken, or lost. On public lands in the western U.S., grazing, timber removal, and mineral extraction were activities that likely caused the greatest loss of cultural materials due to land disturbance, especially prior to the 1960s, when the National Historic Preservation Act (1966) and NEPA (1969) were passed.

Historically, Alaska Natives were geographically widespread and technologically capable people who lived in dispersed, small communities based on family and social connections (USDI BLM 2005e). Life in the northern subarctic revolved around the caribou, or reindeer, while the Inuit and Aleut hunted waterfowl and marine mammals including whales, and fish. Alaska Natives had intermittent contact with Russian, American, British, and Norwegian traders, explorers, missionaries, and government representatives in the early 1800s. This contact intensified when commercial whaling north of the Bering Strait began in the 1850s. Activities that have had the greatest effect on cultural resources in Alaska, particularly on public lands along the Arctic Coast, are most likely linked to both oil development and military activity, given that public lands on the Arctic North Slope were designated as a Naval Petroleum Reserve in 1920. Alaska also was a theatre of war during World War II, and remnants of military bases and other Cold War-related facilities remain today and are considered historic resources.

The inadvertent loss of cultural materials was slowed by the passage of the National Historic Preservation Act and NEPA, which mandated the identification of cultural resources potentially affected by developments and mitigation for potential impacts. In addition, these developments resulted in the discovery of many previously undocumented cultural resources. The Archaeological Resources Protection Act of 1979 added additional protections for cultural resources on public or Native-owned lands. In addition, the Native American Graves Protection and Repatriation Act of 1990 provided protection for Native human remains, sacred objects, and associated funerary objects on federal and Native-owned lands.

**Future Effects and Their Accumulation.** Cultural resources are distributed unevenly across the western states and Alaska. Areas with high probabilities of prehistoric and historic use are generally predictable, but specific subsurface cultural resources are often

BLM_0000618

## ENVIRONMENTAL CONSEQUENCES

unknown until some sort of disturbance occurs, making it difficult to assess the cumulative impacts to cultural resources. The more surface and subsurface disturbance that occurs, the larger the area affected and the greater the possibility that cultural resources will be impacted. Because of their surface or near-surface stratigraphic contexts, cultural resources are not well protected by soil and vegetation, and are vulnerable to any surface- or subsurface-disturbing activity.

The buildup of hazardous fuels and spread of noxious weeds and other invasive vegetation have increased the risk of wildfire and displacement of plants and animals that are important to Native peoples for their traditional lifeway values. Although fire is being reintroduced to undeveloped areas in the West that were historically burned by Native peoples to maintain early successional plant species and improve habitat for game species, natural disturbance regimes have not been restored over much of the West. Encroachment by non-native species into natural ecosystems continues, to the detriment of many native species of importance to Native peoples.

Resource extraction, livestock grazing, motorized recreation, and other land disturbing activities would increase the potential for impacts to cultural resources. However, federal regulations and management policies that require the identification of cultural resources and mitigation of impacts prior to most ground-disturbing activities, including those associated with vegetation treatments are likely to remain in effect. An increase in the number of acres treated to restore native vegetation and natural fire regimes, and to promote ecosystem health could have short-term impacts on access to traditional resources by Native peoples. For example, herbicide use, wildland fire use, or prescribed fire could prohibit use of traditional areas by Native peoples until areas are safe to enter and resources are suitable for use.

**Contribution of Alternatives to Cumulative Effects.** As with paleontological resources, the potential for cumulative impacts to cultural resources from the use of herbicides and other treatment methods would be least under the No Action Alternative and greatest under the Preferred Alternative, based on the number of acres that would be impacted by ground-disturbing activities. Other treatment alternatives would be intermediate between these two. It is anticipated that the use of wildland and prescribed fire and mechanical methods would have the greatest short term impacts on wildlife and their habitat, and that impacts would be somewhat in proportion to acres treated. Approximately twice as many acres would be treated using prescribed and wildland fire under the Preferred Alternative than under

alternatives C, D, and E, and three times as many as compared to the No Action Alternative. Acres treated using mechanical methods would be similar among alternatives B, C, D, and E, and greater than for the No Action Alternative.

Most ground-based equipment would disturb only the upper few inches of soil, and in many cases, would be confined to existing disturbed areas such as roadways, trails, and ROWs. Cultural resources on the surface should be discovered during pretreatment surveys. All treatment methods could cause indirect loss of cultural resources as a result of erosion and soil disturbance, but these effects should be minimal. Potential effects would be further reduced because the BLM has inventoried, or would conduct inventories for, cultural resources in treatment areas to lessen the chance that they would be impacted by BLM vegetation treatment activities. Thus, there should be a negligible cumulative loss of cultural resources on public lands due to herbicide and other vegetation treatment methods under all alternatives.

Based on the number of acres treated using herbicide and non-herbicide treatment methods, short-term impacts to plants that are important to Native peoples, as well as habitats used by fish and wildlife that are important to Native peoples, would be greatest under the Preferred Alternative and least under the No Action Alternative. However, as the long-term objective of treatments is to restore native plant communities and habitats, including those of traditional importance to Native peoples, the greatest benefits should accrue under the Preferred Alternative. In addition, since the herbicides proposed for use by the BLM are less harmful to non-target vegetation, fish and wildlife, and humans than most currently-available herbicides used by the BLM, and any future herbicides used by the BLM would also likely have low risk. The Preferred Alternative and Alternative D should have fewer cumulative impacts than the other herbicide-use alternatives.

As long as surveys and inventories were completed prior to vegetation treatments in areas that are likely to have cultural resources and lifeway values, the effects on those resources would be minimized. The accidental discovery or damage to sites, presently known or unknown, would affect those sites to some extent, but would also require measures to recover or record the remaining material, adding that information to the archaeological record.

The National Historic Preservation Act requires federal agencies to take into account the effects of a proposed

BLM_0000619

action on properties included in, or eligible for, the National Register of Historic Places (also known as historic properties) before approving or funding the action. The Act also requires federal agencies to complete a cultural resources survey prior to federal actions and ground-disturbing activities that occur on federal lands, and in some cases to survey private lands if there is a clear link between the land and the activities on federal lands. Surveys on private lands are most applicable to cooperative projects involving federal agencies and private landowners to reduce hazardous fuels or invasive species on commingled land jurisdictions. These surveys ensure that the protection of cultural resources goes beyond just the federal component. The BLM's guidelines and policies require that all effects to identified historic properties and other cultural resources identified during surveys be mitigated to the satisfaction of the land manager and the State Historic Preservation Officer. Standard operating procedures and agency guidance, as identified in manuals and handbooks (see Table 2-8 of the PEIS and Table 2-5 of the PER), would reduce the likelihood of impacts to cultural resources.

**Visual Resources**

Humans have had a profound effect on landscapes across the western U.S. and Alaska. While much of Alaska is still primarily a natural landscape with scenic qualities that have not been changed substantially by humans, changes to the landscape in the lower 48 states have been substantial (USDA Forest Service and USDI BLM 1997; USDI BLM 2005c). Much of this change reflects past land management goals that focused on resource allocation, as commodity production took precedence over custodial protection of land. Since the 1970s, however, concern for ecosystem conditions has gained importance and is reflected by a greater effort on the part of federal, state, tribal, and other land stewards to restore ecosystems to near historic conditions. The objective of these efforts is to provide continued, predictable flows of resources, including visual resources, which contribute to both traditional and current human demands and values (USDA Forest Service and USDI BLM 1997).

*Past Effects and Their Accumulation*

Scenic quality, a measure of the visual appeal of the land, is rated based on landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications. Sensitivity levels, which are measures of public concern for scenic quality, consider the types of users of the area, the amount of use, public interest in the area, adjacent land uses, and whether the area is classified as a special area. As landscapes are modified by human factors, impacts to scenic quality occur, and visual effects may accumulate on a particular landscape, based on levels of activity and degree of modification. For example, an area of high mining interest may display landscapes modified in form and color due to waste dumps, open pits, and other facilities. Efforts to mitigate these effects by designing waste dumps to mimic landforms and rehabilitating with vegetation cover often reduce these effects concurrently and over time to a point where the modifications may be substantially unnoticeable in the long term. Contrary to some common perceptions, lands in the western U.S. were not pristine wilderness prior to settlement by non-Indian emigrants, but ecological systems in which humans were an active component. American Indians used fire as a tool to manage vegetation to provide better forage for game animals, to encourage growth of plants used for food, and in ceremonial events (USDA Forest Service and USDI BLM 1997).

As European settlers moved into the West, impacts to the natural landscape accelerated. With population growth came an increase in extraction of minerals and other resources, agriculture, road construction, urbanization, and similar types of development that have the potential to adversely impact the visual qualities of the landscape. In addition, timber harvesting, livestock grazing, the introduction of exotic species, and the exclusion of fire have resulted in substantial changes to the landscape, succession and disturbance regimes, and associated vegetation composition, structure, and pattern.

The systematic exclusion of fire from western ecosystems began in the early 1900s, with the intent of reducing threats to lives, property, and timber from fire. The result over time was a change from seral, fire-adapted species to more fire-susceptible species that often formed dense, unhealthy stands subject to large-scale fires and disease outbreaks. Trees that are dead or dying as a result of insect infestations, and areas that have been browned and blackened by wildland fire, have become common visual characteristics of western landscapes during the last several decades. Where human activities and wildland fire have disturbed the land, weeds and other unwanted invasive species have taken over and dominated landscapes (USDA Forest Service and USDI BLM 1997). It is estimated that downy brome alone covers over 11 million acres in the West, and that leafy spurge covers 3 million acres (Lajeuness et al. 1998). In addition, some invasive

BLM_0000620

ENVIRONMENTAL CONSEQUENCES

species have spread into pristine areas independently of human activities or wildland fire because they compete well and are adaptable. Regardless of whether these species are present because of anthropogenic or natural processes, they may provide a seasonal visual contrast to native vegetation, particularly downy brome, which turns brown and dries during summer and fall when most native plant species are still green.

### Future Effects and Their Accumulation

The proposed vegetation treatments would affect visual resources by changing the scenic quality of the landscape. Vegetation treatments would kill or harm vegetation in the applied area, resulting in a more open, browned or blackened landscape until new plants were to grow in the area. Treatment areas would vary in terms of their visual appeal prior to treatment and their distance from human activity, as well as in terms of the resulting public sensitivity to the pre- and post-treatment visual character of the area. The effects of vegetation treatments on the visual quality of the landscape would be most notable to travelers, sightseers, and residents for the first year to several years following treatment, particularly in treated areas located near major roads or residential areas.

The BLM's treatment program would focus on near-term vegetation management to improve the likelihood of moving toward or maintaining ecosystem processes that function properly over the long term (50 to 100 years or more from now) and require less treatment in the future to maintain. Through long-term passive management to reduce disturbance factors (e.g., limitations on OHVs, reduction in grazing activity), and active management of forestlands and rangelands (e.g., use of fire, weed removal), landscapes that have been degraded in the past will gradually return to a mosaic of plant community types that are more diverse and visually appealing.

The BLM will continue to pursue initiatives and planning efforts to preserve and protect intact landscapes and restore degraded lands. In addition to the initiatives listed above, the BLM, through land use planning, provides support to the National Landscape Conservation System, Congressionally-designated National Conservation Areas and Monuments, and wilderness and special areas, including Areas of Critical Environmental Concern, by identifying appropriate goals, objectives, and management actions, with public input, to preserve and conserve special public land values.

Other federal, state, tribal, and local agencies, and private conservation groups have also increased their commitment to improving land health and therefore the visual characteristics of lands in the western U.S., including Alaska. Their ability to improve land health will depend on future funding and competing demands on land resources. Given the population growth in the western U.S., and the need to provide food and other resource commodities, visual impacts to lands in the western U.S. will continue to accumulate over the long term. At the same time, continual implementation of Congressional and administrative policies that aim to conserve and enhance resources will provide some countervailing effect to these long term changes.

### Contribution of Treatment Alternatives to Cumulative Effects

Based on the number of acres treated, short-term adverse impacts and long-term improvements to the visual qualities of public lands would be greatest under the Preferred Alternative, and least under the No Action Alternative. The number of acres treated, and the effects to visual resources, would be similar under Alternatives D and E. Effects to visual resources under Alternative C would be intermediate between these alternatives and the Preferred Alternative. Short-term effects from treatments and other human causes would accumulate, but would be offset in the long term through the countervailing effect of treatment success and improvement in the health and visual characteristics of the land.

The risks to non-target vegetation from use of herbicides could be less under Alternative E than under the other herbicide use alternatives because ALS-inhibiting herbicides would not be used. Because ALS-inhibiting herbicides are effective at very low doses, any drift onto non-target vegetation could temporarily and locally degrade the visual qualities of the affected area.

Regardless of the alternative chosen, there would be a cumulative loss of visual resources. Longer term, these resources should improve, and the cumulative loss should slow.

### Wilderness and Other Special Areas

The toughest challenge faced by the BLM and other federal wilderness land stewards is to keep wilderness wild, and (as stated in the Wilderness Act of 1964) "affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable" (Hendee and Dawson 2002). The invasion of wilderness

BLM_0000621

ecosystems by noxious weeds and other non-native plant species is of great risk to wilderness. Some species have been introduced to wilderness areas by pack stock, livestock that have been specifically brought into these areas, or wild horses and burros, which may travel in and out of wilderness areas. Native migratory wildlife, particularly birds, can be vectors for spreading non-native seeds in their droppings or on their fur as they migrate through wilderness. Hikers may also bring in weed seeds on their clothing,

### Past Effects and Their Accumulation

There are numerous threats to wilderness and special areas. These threats include: 1) exotic and non-native species; 2) wildland fire suppression; 3) loss of water and deterioration in water quality; 4) fragmentation and isolation of wilderness as ecological islands; 5) loss of threatened and endangered species; 6) deterioration in air quality; 7) motorized and mechanical equipment trespass and use; 8) increasing commercial and public recreation use; 9) adjacent land uses; and 10) urbanization and encroachment. Wilderness and special areas comprise about 4% of lands in the U.S. As wilderness and special areas often represent the last remaining pieces of many ecosystems, wild conditions, and natural landscapes that have either disappeared or been altered, these threats could have a profound effect on the values of wilderness and special area values now and in the future (Hendee and Dawson 2002). Loss of wilderness values associated with these threats has accumulated in the past and will continue to do so into the future.

Vegetation treatments primarily would address threats 1 through 6. Non-native species are a direct threat to wilderness. Noxious weeds often outcompete native species and spread rapidly, altering native ecosystems to the detriment of wilderness. Secondary impacts can then result from vegetation management, such as use of mechanical methods and wildland and prescribed fire. Although treatments are usually implemented with the intent of restoring native conditions, sometimes management actions cause other perturbations to the ecosystem.

Fire prevention and suppression alter the natural fire frequency of fire dependant ecosystems, leading to changes in ecosystem function and structure. As discussed in Vegetation, fire suppression has led to an accumulation of fuel loads, as well as forest stands dominated by dense concentrations of shade-tolerant trees, that contribute to larger and more intense wildfires. The use of fire and other treatment methods to reduce hazardous fuels and the risk of wildfire should improve ecosystem function on public lands. However, benefits to wilderness and special areas may be minimal because treatments are primarily targeted toward the WUI and priority watersheds, rather than toward wilderness and special areas. In addition, the public is often not receptive to the wildland fire use approach and use of fire and other treatments (especially mechanical) in these areas because they disturb the sense of solitude and wilderness.

Water resources in wilderness and special areas are threatened. In some cases, water storage facilities in wilderness and special areas that were built before passage of the Wilderness Act continue to be used today. The quality of water in some wilderness streams may be affected by runoff from grazed areas and other pollutant sources within and outside of wilderness and special areas.

Because of their small size (42% of all wilderness areas in the U.S. are 10,000 to 50,000 acres, and the average size of wilderness areas administered by the BLM is 42,000 acres), most wilderness areas are ecological "islands" that are vulnerable to outside influences. A large fire or infestation of weeds can substantially alter the characteristics of wilderness. Without connectivity to other wilderness areas, it is often impossible for low-mobility species, species with narrow habitat requirements, or species with large home ranges to find enough habitat within the wilderness to survive, or to survive a major fire or other threat to survival.

Polluted air is a threat to wilderness and special areas because of its physical and biological impacts and its accompanying reduced visibility. The wilderness experience can be greatly diminished for visitors to wilderness areas near urban sources of air pollution. Treatments involving the use of fire in wilderness areas would contribute to these impacts.

The remaining threats listed can affect wilderness when they weaken the natural conditions, processes, and variability that were historically part of a wilderness or special area. Most of these threats will increase over time, and their impacts to wilderness resources and values will accumulate.

### Future Effects and Their Accumulation

The goal of wilderness fire management would be to restore fire to its natural role in the wilderness ecosystem. Although benefits would accrue from fire management—reduced hazardous fuels, improved

BLM_0000622

ENVIRONMENTAL CONSEQUENCES

wildlife habitat, and a mosaic of vegetation types—the intent of management would be to restore naturalness. In larger wildernesses, land managers also aim to perpetuate landscapes and landscape processes. However, there are limits to fire management. As mentioned earlier, fires can impact regional air quality, escape from within the wilderness and harm people and property, and alter habitat to the detriment of threatened and endangered species. Mechanical and manual treatments can disturb solitude, while chemical treatments can affect plant, animal, and human health and impact the wildness of an area.

In wilderness and special areas, where noxious weeds and other invasive species are limited to small areas, it may be possible to control weed infestations with minimal tools. Introducing and establishing native plants is also necessary to successfully manage weed infestations and restore desirable plant communities (Jacobs et al. 1999). The degree of benefit would depend on the success of these treatments over both the short and long term. Successful management would also require knowledge of the source of weeds and implementation of controls to minimize future spread of weeds onto wilderness and special areas.

Increasing recreational use of wilderness and special areas, which is projected to occur in the 21st century, will put greater pressure on wilderness ecosystems, resources, and values, especially in areas located near major population centers. The BLM, Forest Service, and other federal land management agencies with wilderness protection responsibilities work closely to protect and enhance wilderness values. However, disturbances outside of wilderness boundaries, including urbanization and agriculture, could further isolate some wilderness areas. Approximately 86% of wilderness acres administered by the BLM are achieving wilderness character as specified by statute, and about 73% of wilderness study areas are meeting their heritage resource objectives (USDI BLM 2006c). Although impacts to wilderness areas from altered fire regimes and spread of weeds should slow as treatments restore ecosystems and historic fire regimes, loss of wilderness values may be inevitable from other threats identified above, which are outside the agency's control and would continue to accumulate over the long term.

### Contribution of Alternatives to Cumulative Effects

Based on the number of acres treated, short-term adverse impacts and long-term improvements to wilderness and special areas should be greatest under the Preferred Alternative, and least under the No Action Alternative. The number of acres treated, and the effects to wilderness and special areas, would be similar under Alternatives D and E. Effects to these resources under Alternative C would be intermediate between these alternatives and the Preferred Alternative. Short-term effects from treatments and other human causes would accumulate. However, a countervailing effect of long-term improvement in the function of wilderness and special areas from successful treatments would offset short-term losses.

Several components of Alternative E pertain to wilderness and special areas (see Appendix I of the PEIS). As discussed in the other resource sections, fewer acres would be treated under this alternative than under the other treatment alternatives.

Under Alternative E, except for treatment of small infestations without motorized equipment, treatments would be prescribed within designated wilderness or wilderness study areas only after the spread of invasive species from outside these areas was effectively halted. Under the other treatment alternatives, however, actions could be taken to control invasive species within wilderness and special areas before controlling invasive species populations outside special areas. The BLM policy is to treat infestations where they are found and to prevent their further spread. By not treating an infestation in a wilderness or other special area until the larger invasive species problem outside of the area is addressed, invasive species populations within wilderness and special areas could grow beyond an effectively treatable level.

The five herbicides (chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl) that would not be approved under this alternative are some of the least risky herbicides with respect to human health (see Human Health and Safety section). In addition, the ERAs predicted no risk to fish and terrestrial wildlife from most of these herbicides (chlorsulfuron, imazapic, sulfometuron methyl), and a few cases of low risk (imazapyr, metsulfuron methyl), suggesting that the elimination of these herbicides would not likely benefit wildlife and could indirectly harm wildlife in wilderness and special areas if more toxic herbicides were used in their place (see Wildlife Resources section). The other herbicides proposed for use by the BLM pose risks to non-target species that are similar to the risks associated with these five herbicides; therefore, it is uncertain whether this use restriction would actually reduce risk to non-target plants and animals. Thus, avoidance of ALS-inhibiting herbicides

BLM_0000623

might provide few, if any, benefits to wilderness and special areas and special area users.

Regardless of the alternative chosen, there would be a cumulative loss of wilderness values and other special area values. Over the long term, these values should improve, and cumulative loss should be slowed.

## Recreation

The BLM's long-term goal for recreation is to provide opportunities to the public for environmentally responsible recreation. Public lands host over 68 million visitors annually. Over 4,000 communities with a combined population of 23 million people are located within 25 miles of public lands. Although much of the focus of the recreation program is on providing visitor services, the BLM's most daunting challenge is to manage travel on public lands. Technological advances in modes of transportation, coupled with the explosive growth of this activity, have created a management challenge to meet these needs while protecting land resources (USDI BLM 2005a). As identified during scoping, the public recognizes the potential for travel access routes to spread weeds and for off-road travel activities to degrade land, leading to conditions that favor the establishment and spread of unwanted vegetation.

Cumulative effects to recreational resources would result from past and future activities that have long-term effects on solitude, naturalness, or primitive/unconfined recreation. Short-term or transient loss of an area's naturalness and solitude from such impacts as temporary roads and noise from equipment would not be cumulative. Therefore, their contribution to the cumulative impacts would be "momentary."

### Past Effects and Their Accumulation

Although the BLM showed interest in recreational activities on public lands in the 1940s and 1950s, it was not until 1961 that the BLM developed a recreation management handbook, and not until 1963 that the agency began an inventory to identify recreation sites and facilities (Muhn and Stewart 1988). Between 1963 and 1968, the number of recreational visits to public lands more than tripled, and over the next decade visits nearly doubled to about 50 million visitors annually.

With population growth in the western U.S. came an increase in extraction of mineral and other resources, agriculture, road construction, urbanization, and similar types of development, which have altered western landscapes and reduced the amount of land available for recreation. Timber harvesting and livestock grazing, the introduction of exotic species, and the exclusion of fire have also resulted in substantial changes to the landscape, succession and disturbance regimes, and associated vegetation composition, structure, and pattern that have impacted the quality of the recreation experience (USDA Forest Service and USDI BLM 1997). The effects of OHV use on soil and vegetation were first brought to public attention in the late 1960s in the California deserts, and eventually led to the development of a management program for OHV use on public lands and establishment of the Imperial Sand Dunes National Recreation Lands (Muhn and Stewart 1988). OHV and other travel-related activities continue to present challenges for land managers.

Wildfires and the spread of weeds have led to the cumulative loss of recreational resources, although these losses are not irreversible. Wildfires are capable of causing substantial damage to large areas of recreational resources and require long periods of time for recovery. During the recent wildfires that swept through the Great Basin, not only were traditional recreation activities affected, but some special events were altered or cancelled. Signs were destroyed, hiking and camping areas burned over, wildlife and game displaced, and the scenery in the Great Basin marred (USDI BLM 1999). Noxious weeds and other invasive vegetation adversely impact the scenic and recreational qualities of public lands. They displace native vegetation to the detriment of fish and wildlife sought by wildlife viewers, hunters, and fishermen. Given the increase in the number and magnitude of wildfires during the past decade, and a weed population that grows by 1,000 acres a day on public lands, losses of recreational opportunities continue to accumulate (USDI BLM 2006c).

In recent years, several initiatives have been introduced to provide additional recreation opportunities, including the National Landscape Conservation System, Great Basin Restoration Initiative, Sage-grouse Habitat Conservation Strategy, and the Prairie Grasslands Conservation Initiative. All of these initiatives are designed to bring improved management to critical natural systems under the BLM's jurisdiction and to address conservation at the landscape level. Continued implementation of these initiatives will lead to improved recreational opportunities on public lands.

### Future Effects and Their Accumulation

As urbanization of the West continues and the American public's desire to recreate increases, public

BLM_0000624

ENVIRONMENTAL CONSEQUENCES

land recreation areas will experience greater usage. Although the satisfaction rating of visitors to public lands is presently 94%, increased usage will inevitably increase the expectations of the public regarding the quality of their recreation experience (USDI BLM 2006c). The trend towards greater limits on public access to privately-held forestlands and hunting and fishing lands, as a result of concerns by landowners over public safety, litigation, vandalism, and damage to natural resources and commodity products (e.g., timber) produced on these lands, will put additional pressure on public lands to meet the recreational needs of Americans.

Vegetation treatments would have short-term cumulative effects. There would be some scenic degradation, as well as distractions to users (e.g., noise from machinery) from treatments. In addition, there would be some human health risks to recreationists associated with exposure to herbicides or smoke from fire. Some areas would be off-limits to recreation activities as a result of treatments, for periods ranging from a few hours to days, or even one full growing season or longer, depending on the treatment. In most cases, recreationists would be able to find alternative sites offering the same amenities or experiences, although a lessened experience could result from more concentrated use in these alternative sites. The effects of herbicide treatments and fire use on fish and wildlife could have indirect negative impacts on recreational activities such as fishing, hunting, and wildlife viewing. For example, aerial application of an herbicide over a large area could adversely affect these types of recreation activities by harming or displacing fish and wildlife species. Vegetation treatments could also impact scenic views, particularly those located next to roads. The effects of vegetation management on the visual quality of the landscape are discussed further under Visual Resources.

The BLM's treatment program would focus on near-term vegetation management to improve the likelihood of moving toward or maintaining properly functioning ecosystems in the long term (50 to 100 years or more from now). Through passive management to reduce disturbance factors (e.g., closure of roads, reduction in grazing activity), and active management of forestlands and rangelands (e.g., through use of fire, weed removal), the BLM hopes to restore a mosaic of plant community types that are more diverse and visually appealing than those in lands that are not functioning properly. Vegetation treatments that reduce hazardous fuels, restore natural fire regimes, and control weeds

and other invasive vegetation would slow the loss of recreational opportunities and the reduction in quality of the recreation experience. In addition, treatments that reduce the risk of wildfire would reduce the likelihood of recreationists being displaced from their favorite hunting, fishing, and camping sites by wildfires. Treatments in public use facilities (e.g., campgrounds, visitor centers) could have short-term impacts, but would enhance the visitor experience and ensure continued high-satisfaction ratings from visitors over the long term.

### Contribution of Alternatives to Cumulative Effects

Based on the number of acres treated, short-term adverse impacts and long-term improvements to recreation resources on public lands would be greatest under the Preferred Alternative, and least under the No Action Alternative. However, based on visitor use days, the number of visitors to public lands in states where the majority of treatments would take place, as a percentage of all visitors to public lands, is small in relation to the number of acres treated in those states (USDI BLM 2006d), suggesting that effects to recreationists could be less than expected based on treatment acreage.

Alternative E places greater emphasis on passive restoration than the other alternatives. Passive restoration is often a critical first step in successful restoration of degraded areas, since it entails halting anthropogenic activities that are causing degradation or preventing recovery. OHVs are often cited as a factor contributing to loss of resource function and degradation of scenic quality. By controlling OHV use, improvement in recreational values can be expected (Kauffman et al. 1997). However, the BLM would have to balance resource protection with the multiple use requirements under FLPMA. As discussed in Chapter 2 of the PEIS, Vegetation Treatment Planning and Management, passive restoration would be considered when developing restoration management plans, and would be used to the extent possible within the constraints of FLPMA.

Regardless of the alternative chosen, there would be an accumulation of loss of recreation resources. Longer term, these resources should benefit from the proposed treatments and cumulative losses should slow.

### Social and Economic Values

The western U.S., including Alaska, is more sparsely populated than the rest of the U.S., containing about

BLM_0000625

ENVIRONMENTAL CONSEQUENCES

32% of the total U.S. population, but comprising approximately 65% of the total land area. However, population growth between 1990 and 2000 averaged over 16%, which was slightly higher than the national average. Many of the western states exceeded the national average, with growth rates of 20% or higher during this time period.

The western U.S. contains a large percentage of the nation's minority populations, including over 60% of the nation's Hispanics and American Indians, and over 50% of the nation's Asian/Pacific Islanders. In particular, Arizona, California, New Mexico, and Texas contain large Hispanic populations, which comprise from 25% to over 40% of the total population in each of these states. Over 15% of Alaska's population is comprised of Alaska Natives. Federal agencies must be cognizant of the needs of these peoples when formulating management decisions. Executive Order 12898, Environmental Justice, requires that federal agencies address the potential for their actions to have disproportionate effects on minority populations and/or low-income populations.

Population growth can stimulate economic growth and provide economic diversification. However, development in support of the growing population is encroaching on previously undeveloped areas near public lands. Growth also increases demands on public lands for timber, minerals, livestock grazing, and other commodities, and for recreation and roads. Because public lands and open space are an important component of the western landscape, they are valued by westerners, who expect the BLM to manage public lands to ensure their protection and enhancement. These conflicting demands can make it challenging for BLM land managers to meet the multiple need requirements under FLPMA, while still preserving the natural characteristics of the landscape.

Agency social and economic policy has long emphasized the goal of supporting rural and tribal communities by promoting the continued production of goods and services from public lands for those communities deemed dependent upon timber harvest and processing, mineral extraction, and livestock forage. In addition, the BLM promotes the use of services provided by communities in support of BLM management activities (e.g., firefighting and herbicide applications; USDA Forest Service and USDI BLM 2000, USDI BLM 2006c).

*Past Effects and Their Accumulation*

**Population.** Population growth rates in much of the West exceed those of the rest of the country. Nevada, Arizona, Idaho, and Utah have been among the fastest growing states in the U.S. in recent years; between 1970 and 2000, Nevada's population grew 309%, while the population of the rest of the country grew only 38%. This growth has placed increasing demands on public lands and other open spaces for recreation, and for providing the natural resources needed to support growth in this region and in the world.

Population growth has been highest in the WUI. Increasing migration to rural areas with a high quality of life is expected to continue as our country moves toward a more service-based economy (USDA Forest Service and USDI BLM 2000). Growth in the WUI, however, has increased the risk of wildfire to people and property, and has impacted fish and wildlife habitat use and movements among public lands, rural areas, and the WUI.

**Environmental Justice.** The western U.S. contains a large percentage of the nation's minority populations. These populations use public lands, and Native Americans and Alaska Natives depend on public lands for food and other traditional lifeway values. Many individuals in the forestry, mining, oil and gas, and service sectors also derive work from public lands. Native American, Alaska Native, and Hispanic populations increased at 2 to 4 times the rate of growth of the population as a whole during the past decade, suggesting that ever greater numbers of minorities use public lands for pleasure and work and have the potential to be affected by vegetation treatments and other activities.

**Employment and Income.** Over 23% of the nation's employment opportunities, amounting to over 40 million jobs, are located in the western U.S. (Table 3-17). Employment in the trade and services industries accounts for over half of the total jobs. Industries related to natural resources, such as agriculture and mining, are important sources of employment and represent nearly one third of the nation's agricultural services, forestry, and fishing jobs. Recreation and tourism associated with public lands provide many jobs in the services sector. For example, an estimated $1.3 billion was spent by hunters and anglers on hunting and fishing supplies while using public lands, and $1.7 billion was spent by wildlife viewers using public lands during FY 2005 (USDI BLM 2006d). Changing federal land uses have affected the number and types of jobs associated with

BLM_0000626

## ENVIRONMENTAL CONSEQUENCES

public and other federal lands. For example, jobs associated with the timber industry have declined in recent years as the amount of timber harvested on federal lands has declined, while recreation employment has increased. In addition, some industries, including timber harvesting, wood products manufacturing, and mining, have become more mechanized, reducing employment opportunities over time. Still, sales of timber, wood products, and non-wood forest products from public lands totaled approximately $36 billion, and leasable minerals generated $38.9 million, in FY 2005 (USDI BLM 2006c, d).

Vegetation treatments have likely had minimal impact on employment and income in the West. However, increased federal budgets for wildland fire suppression and restoration of natural fire regimes have increased employment and income in communities that have supported these efforts. For example, $201 million was spent on hazardous fuels reduction treatments and $25 million was spent by the BLM on Emergency Fire Stabilization and Rehabilitation Projects during FY 2005 (USDI BLM 2006b, c).

**Perceptions and Values.** Survey research shows differences in the opinions of residents of small, rural towns and residents of larger urban areas. Residents of urban areas tend to be more concerned about environmental protection, be less sympathetic to local economic impacts, and have greater trust in the federal government and environmental organizations than do residents of rural areas (Harris and Associated 1995 *cited in* USDA Forest Service and USDI BLM 2000). Rural residents want less government intrusion into their lives, and believe that current government policies tend to favor the environment too much over jobs. Rural residents seek a balance between the environment and jobs, enjoying the open spaces and clean air and water that public and other federal lands provide, while still wanting jobs so that they and their children will be able to remain in the community. In recent decades, federal land management policies have discouraged employment in some sectors (e.g., forestry), while promoting employment in others (e.g., oil and gas and other mineral exploration and development). However, some of the values that rural westerners associate with public lands, including clean air and native vegetation, have been lost or degraded by the increase in the number and severity of wildfires and the spread of noxious weeds and other invasive vegetation.

**Revenues.** Mineral leases, recreation and grazing fees, and sale of timber are important sources of revenue for the federal government, although the contribution of

each to the U.S. Treasury fluctuates in response to the national and global economy and national and local policies. For example, the amount of revenue collected from mineral leases and permits and recreation fees in FY 2005 was about 4 times that collected in 1996, which reflected national energy policies, higher energy prices, and increases in the recreating population. In contrast, in 2005 timber sale revenues were 4 times less, and grazing fee collections were about 15% less, than in 1996 (USDI BLM 2006c). Timber sale reductions reflect policies that have discouraged timber harvesting on federal lands in response to concerns over the loss of forest wildlife, including the spotted owl, and forest habitat, including mature and old-growth forests. Livestock use reductions reflect continuing resource damage and implementation of protections for federally-listed plant and animal species (USDA Forest Service and USDI BLM 2000).

**Expenditures.** The BLM makes payments to counties to compensate them for the non-taxable status of federal lands in their jurisdiction. Generally, there is a per acre payment associated with the county population, (payments in lieu of taxes, or PILT) and an additional revenue-sharing payment based on revenues received from the sale of timber, grazing fees, recreation fees, special use permits, and other uses. There is concern in counties over the potential loss of revenue if changes in federal land uses cause a decline in timber harvest or other resource revenue. However, since 1996, payments have doubled, with the largest gains seen in states with an active mining and oil and gas industry (e.g., Alaska and Nevada).

**Effects on Private Property.** The value of rural property has increased in recent years as the population has increased and more people are able to move to rural areas or buy second homes for recreation, retirement, or as investment property. In some areas, however, it is likely that recent wildfires have depressed home values, either because of the future risk of fire, or because of land degradation associated with recent fires.

### *Future Effects and Their Accumulation*

**Population.** None of the proposed treatment methods being analyzed is likely to cause substantive changes to existing patterns and trends in population or demographic conditions in the western states. In particular, it is unlikely that vegetation treatments would either exacerbate or counteract the trend toward out-migration from small rural communities. Effects of growth upon the landscape would continue to accumulate.

BLM_0000627

**Environmental Justice.** As Hispanic, Native American, and Alaska Native populations grow, the likelihood of these groups using public lands is likely to increase. With increasing levels of treatment, the possibility increases that any significant effects associated with vegetation treatments would disproportionately affect these minority populations. However, there are no data to suggest that there is any relationship between treatment areas and areas of low income or minority population, because treatment areas are widely scattered across the landscape. The BLM is proposing to use new herbicides that are less harmful than many currently-available herbicides, and would likely use even safer herbicides in the future. This could reduce health risks to minority groups and to the general public on a per-acre basis.

**Employment and Income.** Based on an assessment done for the BLM and Forest Service for the Interior Columbia Basin, recreation and tourism associated with public lands are expected to show little change during the next decade (USDA Forest Service and USDI BLM 2000). If fuel prices remain high, fewer people may travel to public lands for recreation. Jobs associated with the timber industry could increase as more timber is harvested to restore natural fire regimes and reduce the risk of wildfire. Employment in mining and oil and gas industries would reflect the global economy. However, since many of the available and potential oil and gas and mineral resources in the U.S. are located on public lands, and since the need for these resources is likely to continue to grow, these industries will continue to be important employers in the West.

Vegetation treatments will have a minimal impact on employment and income in the West. However, increased federal budgets for vegetation treatment activities discussed in this PEIS, and wildland fire suppression and restoration of natural fire regimes, would increase employment and income in communities that provide support to these efforts.

**Perceptions and Values.** The treatment alternatives would be associated with a range of stakeholder perceptions and values. For example, individuals who have an aversion to chemical use in the environment could find all of the alternatives undesirable. Alternatively, individuals with a much greater concern about wildfires or the effects of invasive species would likely favor the most efficient means of attacking vegetation problems that could lead to catastrophic fires. As the number of acres treated could increase 3-fold from current levels, it is likely that both groups would be affected by treatments. Some westerners have

philosophical issues with government ownership and management of large land areas, but they might be somewhat encouraged by plans to employ private contractors for some of the treatment work and would presumably favor the most efficient means possible to reduce fire risk to protect and maintain range productivity.

**Revenues.** Certain commercial activities that occur on public lands could be adversely affected by vegetation treatments over the short term, such as OHV tours or guide and outfitter operations. Vegetation treatments would not directly affect mineral resources and would be unlikely to cause significant reductions in BLM revenues generated from mineral leases. Vegetation treatments to reduce fire risk in forested areas would serve to protect commercially valuable timber from loss through catastrophic fire (USDA Forest Service and USDI BLM 2000).

Vegetation treatments could necessitate closures of some sites to grazing activities during treatments and for a suitable recovery period afterward, usually two growing seasons, both for effectiveness of the treatment and, for some methods, for safety of the livestock. Treatments that require temporary rest from grazing would force livestock operators to find alternative forage sources on private or other lands, which could lead to increased costs for the same amount of revenue. Livestock grazing on lands administered by the BLM and Forest Service in the Interior Columbia Basin is projected to decline about 1% annually to ensure protection of rangeland habitats and special status species. It is likely that alternative sources of forage will become scarcer as population growth leads to greater use of private pasturelands for crop production and urban uses.

Recreation-based businesses such as outfitters, bait shops, OHV sales and repair shops, fish and hunting shops, and outdoor gear and equipment rental shops are direct beneficiaries of recreation use of public lands. Other services such as gas stations, restaurants, and hotels that are frequented by recreationists also benefit. Temporary closures of recreation areas due to treatments would reduce revenues from these sources. As discussed above, recreation activity on public lands is expected to remain near current levels over the next decade.

**Expenditures.** Vegetation treatments would require a large commitment of financial resources by the BLM, which would vary by treatment method, location, terrain and other factors. Using guidance from the Healthy

BLM_0000628

ENVIRONMENTAL CONSEQUENCES

Forests Initiative, the *National Fire Plan*, and the *10-Year Comprehensive Strategy Implementation Plan*, the USDA and USDI are proposing to spend $770 million during FY 2007 for wildland fire management. Of this, nearly $200 million would be spent on hazardous fuels treatments and $24 million on land rehabilitation (USDI BLM 2006b). In addition, funding to conduct additional vegetation treatments would come from other program budgets within both agencies for program-specific treatments. These benefits would accumulate in the communities where the funds were spent. Over $984 million was spent by the federal government to control wildland fire during 2005, and based on modeling done for the cohesive strategy, even greater sums may be needed in the future to manage wildfire risk (Hann et al. 2002; USDI BLM 2006c).

A major component of vegetation treatments, as proposed under the *National Fire Plan* and *10-Year Comprehensive Strategy Implementation Plan*, is to promote community assistance. In FY 2004, assistance with fuel hazard treatments, risk assessment plans, and other wildfire preparedness was given to over 14,000 communities by the USDA and USDI. The agencies also initiated approximately $140 million in contractual actions.

**Effects on Private Property.** Vegetation treatments could affect private property in the vicinity of public lands, particularly parcels adjacent to treatment areas. Over the short term, there would be minor risks for property damage associated with treatments because it is possible that some treatment effects would extend beyond BLM boundaries onto private property. Long term, treatments that reduce the risk of loss of property to wildfire and improve the scenic and recreational values of public lands should increase property values near public lands.

### *Contribution of Treatment Alternatives to Cumulative Effects*

The costs of prescribed fire range from $50 per acre to $1,300 per acre depending on the location of the burn, but the cost in most circumstances would be about $290 per acre in the WUI, and $105 per acre outside the WUI based on average treatment costs during 2002 to 2005 (USDI BLM 2006c). The range of costs for mechanical treatments is also quite broad: from $100 to $600 per acre. Estimated costs for manual treatments range from $70 to $700 per acre. Costs for biological treatment vary depending on the type of organism employed. Use of domestic animals—cattle, sheep or goats—is quite inexpensive, in the range of $12 to $15 per acre. Use of

biological control agents such as insects, nematodes, mites or other pathogens is more costly, ranging from $80 to $150 per acre for ground applications and $150 to $300 per acre for aerial applications. As itemized in the PEIS, the overall average cost per acre would be approximately $96 per acre for treatment involving both ground-based and aerial applications.

Based on the number of acres treated as discussed under treatment acreages in Chapter 2 of the PEIS, estimated annual treatment costs would be greatest under the Preferred Alternative ($1.4 billion) and lowest under Alternative A ($420 million). Treatment costs for the other three alternatives are estimated at $1.1 billion annually. Short-term adverse impacts in terms of costs and long-term improvements in terms of resource benefits would be greatest under the Preferred Alternative, and least under the No Action Alternative. The other three alternatives would be intermediate between these two. However, the contribution of treatment actions to the economy of the western U.S. would be minor.

**Human Health and Safety**

When addressing cumulative impacts to human health and safety, the impacts to individuals conducting vegetation treatments, as well as the effects of these treatments (or lack of treatment) on the welfare of the public must be considered. In addition, it must also be acknowledged that vegetation treatments to improve ecosystem resilience and promote the welfare of the public are a cooperative effort among federal, tribal, state, and county land-management agencies, as well as other local and private cooperators. The bulk of the responsibility, however, falls upon the BLM and Forest Service because of the large amounts of public land they administer in the WUI. Finally, it must be taken into consideration that it will take many years before measurable results are achieved.

### *Past Effects and Their Accumulation*

Risks to public health in areas in close proximity to public lands include risks from occupational injury and death, from exposure to industrial pollutants, including pesticides and herbicides, from cancer, and from wildfire.

**Occupational Risks.** In 2005, more than 29 million nonfatal injuries were reported in the United States (CDC 2007a). Some chronic injuries are directly linked to the nature of the work performed. For example, vibration syndrome affects a large proportion of

BLM_0000629

workers using chippers, grinders, chainsaws, jackhammers, or other handheld power tools, causing blanching and reduced sensitivity in the fingers. Noise-induced hearing loss may also affect production workers who are exposed to noise levels of 80 decibels or more on a daily basis. Still, since 1992, the nationwide nonfatal injury rate has declined by about 34% (CDC 2007a).

The occupational fatality rate in 2005 was approximately 4.0 fatalities per 100,000 employed. The fatality rate for the agriculture, forestry, fishing, and hunting sector was the highest, at 32.5 fatal industries per 100,000 workers. The mining sector had the second highest rate, at 25.6 fatalities per 100,000 employed. The largest number of fatal work injuries resulted from construction-related incidents, which accounted for 21% of workplace fatalities in 2005 (U.S. Department of Labor Bureau of Labor Statistics 2007). In 1994, the occupational fatality rate was 5.3 per 100,000 employed. During the past decade, the trend in the fatality rate has steadily declined (Centers for Disease Control and Prevention 2005). Deindustrialization and greater emphasis on safety in the workplace are factors often cited as accounting for the downward trend in occupation injury risk in the U.S. (Loomis et al. 2003).

Only minor injuries have occurred to workers involved in vegetation treatment activities on public lands during the past decade. As discussed under Human Health and Safety in the PER, there are minor risks to workers from treating vegetation, primarily associated with the operation of heavy equipment and power tools, and the use of fire and herbicides. Workers would follow SOPs to minimize the risk of injury when treating vegetation, including using protective equipment, and using herbicides with low health risks.

**Cancer Risks.** Based on the data shown in Table 3-25, cancer accounted for between 13% and 33% of all deaths in the treatment states in 2002-2003. Nationwide, cancer accounts for approximately 23% of all fatalities (National Center for Health Statistics 2007b). In the western U.S., cancer mortality rates are generally highest in counties in western and southern Nevada and northern California, and lowest in counties in Utah, central Colorado, and northern New Mexico (Devesa et al. 1999). Cancer rates increased during most of the 20th century, but began to decline in the 1990s for the leading causes of cancer (Wingo et al. 2005). Improved detection and treatment, along with healthier lifestyles, are believed to account for the declining rates.

Several herbicides used by the BLM could cause cancer in workers and the public based on exposure scenarios evaluated in HHRAs done for earlier EISs. These include 2,4-DP, asulam, atrazine, bromacil, and simazine (see Tables 4-31 and 4-32). With the exception of atrazine, cancer risks were only predicted for accidental exposure scenarios. In the case of atrazine, cancer risks were predicted for maximum and accidental exposure scenarios (USDI BLM 1991a). Except for bromacil, these chemicals have not been used by the BLM since at least 1997, and bromacil is used on less than 1% of the total acreage treated using herbicides.

**Exposure to Pollutants.** Exposure to industrial pollutants and toxic chemicals, including those produced by industries operating on public lands (e.g., mining, oil and gas), is a public health concern. The Toxics Release Inventory (TRI) is the principal source of data for analyzing the amount of toxic chemicals used in American industry. Although data on recent trends in toxic emissions are confusing due to differing data reporting requirements, the overall trend in toxic emissions since 1988 is downward, a sign of the increasing efficiency and dematerialization of our economy (Hayward 2005).

Air pollutants have the potential to impact the health of people using or living near public lands. The USEPA has identified criteria pollutants that affect air quality and human health (see Air Quality in Chapter 3). Despite increases in human population and industrialization, emissions of principal air pollutants in the U.S., after peaking in the 1970s and early 1980s, have generally declined or held steady during the past 2 decades due to more stringent air quality regulations and improvements in pollution control technology (USEPA 2005).

Particulate matter is the principal pollutant of concern, from a public health perspective, for activities occurring on public lands. Nationwide, emissions of particulate matter from all sources have trended downward since the 1970s. However, PM emissions have shown a close relationship with the number of acres burned annually by wildfire. Since 1990, PM emissions associated with wildfire have ranged from 145,000 tons in 1995 to 1.2 million tons in 2002; the number of acres burned by wildfires in 1995 was one-third the number of acres burned in 2002. The level of PM associated with slash and prescribed burning, however, has trended downward since the 1970s, and in 2001 (165,000 tons) was about half the level of the early 1990s. Based on an estimate of emissions generated by current vegetation treatment activities

BLM_0000630

ENVIRONMENTAL CONSEQUENCES

(primarily fire and mechanical treatments; see Table 4-4 in PER), BLM treatment activities have accounted for less than 0.5% of criteria pollutant emissions nationwide.

Herbicides contain chemical compounds that are harmful to human health. Most of the herbicides used by the BLM do not pose a risk to human receptors when applied at the typical application rate. At the maximum application rate, however, more herbicides, in a greater number of exposure scenarios, have the potential to adversely affect human health. Aerial applications of herbicides pose a greater risk to the public due to off-site drift than ground applications, as herbicides applied at greater distances from the ground are able to drift farther from the target application area. Spot applications would be less likely to pose a risk to downwind receptors than boom/broadcast applications. However, spot applications would be more likely to pose a risk to workers charged with applying the herbicide through dermal contact.

In recent years there has been concern regarding the potential for herbicides used by the BLM or other federal, state, or private applicators to contain compounds that are endocrine disruptors. According to the World Health Organization (2002), endocrine disrupters have been defined as exogenous substances that alter function(s) of the endocrine system and consequently cause adverse health effects in an intact organism or its progeny, or in (sub)populations. Endocrine disrupters interfere with the functioning of the endocrine system in at least three possible ways:

- By mimicking the action of a naturally-produced hormone, such as estrogen or testosterone, and thereby setting off similar chemical reactions in the body;

- by blocking the receptors in cells receiving the hormones (hormone receptors), thereby preventing the action of normal hormones; or

- by affecting the synthesis, transport, metabolism and excretion of hormones, thus altering the concentrations of natural hormones.

During the toxicity review for the HHRAs, no endocrine disrupting effects were noted. The toxicity review consisted of a literature search and a review of USEPA registration data. In order to further evaluate whether any of the BLM herbicides have endocrine disruption effects, the BLM conducted a search of endocrine disrupter databases, including sources from

the U.S., the European Union, and Japan. The databases included official government lists and lists published by concerned citizen groups, such as the Pesticide Action Network. The results of this search are presented in Table D-5 in Appendix D. With the exception of 2,4-D and diuron, none of the BLM herbicides were included among those associated with endocrine disrupting effects. As shown in the table, diuron and 2,4-D are listed by the European Commission Directorate-General for the Environment (2000) as Category 2 chemicals, meaning that there is evidence of the potential for the listed chemical to cause endocrine disruption. Diuron only appeared on a single list, so there is some uncertainty within the scientific community about this chemical's status as an endocrine disruptor.

Several other lists include 2,4-D as a potential or probably endocrine disrupting chemical. However, the Endocrine Disruptor Knowledge Base supported by the U.S. Food and Drug Administration's National Center for Toxicological Research indicates that there are no reports in the scientific peer-reviewed literature of 2,4-D acting as an estrogen receptor binder.

The USEPA Health Effects Division (HED) HHRA that was used in the RED, and a correction to the HED HHRA provided by the 2,4-D Industry Task Force, were reviewed. The HED HHRA and Task Force correction provided additional detail regarding the studies used to test for potential endocrine effects. In general, the studies cited as showing evidence of endocrine disruption effects were conducted using extremely high doses of 2,4-D, where often renal saturation or other systemic effects were noted. The findings of these studies, therefore, do not indicate that 2,4-D has selective toxicity to the endocrine system.

In the health risk assessment conducted to support the reregistration of 2,4-D (USEPA 2004c), the USEPA concluded that there is not sufficient evidence that 2,4-D is an endocrine disrupting chemical. The USEPA did not conduct the health risk assessment using endocrine disruption endpoints. Since the current studies that showed evidence of endocrine effects were tested using doses above renal saturation, the USEPA recommended formal testing of 2,4-D for endocrine endpoints. However, there is no standard protocol for determination of endocrine effects of chemicals.

The lack of a standardized and broadly accepted set of protocols for identifying and quantifying potential endocrine effects has very important implications. The absence of such a test has contributed to the development of several, potentially conflicting,

BLM_0000631

summaries of potential endocrine disruptors. As importantly, in the absence of an agreed upon process to quantify dose-response relationships, quantitative risk assessments are difficult and highly uncertain.

Nationwide, the annual amount of herbicide use has declined from an estimated 620 million pounds of active ingredient in 1982 to 553 million pounds in 2001, although the amount of herbicide use has remained relatively steady since the late 1980s. The amount of other pesticides used has also declined by about 15% during the same period (Donaldson et al. 2004).

Vegetation treatment activities by the BLM, Forest Service, and other agencies, for agricultural and other uses, have contributed to the release of harmful materials into the environment. As discussed above, prescribed fire use has steadily increased during the past decade and has contributed to PM emissions. Heavy equipment, transport vehicles, and power tools have also contributed minor amounts of PM and other pollutants into the atmosphere. Herbicide use by the BLM, Forest Service, agricultural operations, and others has steadily increased, but these users have emphasized the use of less toxic herbicides that have shorter half-lives and do not bioaccumulate. Users have also kept application rates as low as possible, to minimize the amount of toxic material released into the environment while still meeting treatment goals. In addition, these users have increased passive treatments and non-herbicide treatments, such as biological control, to minimize the use of herbicides in vegetation control.

**Risks from Wildfire.** Wildfires cause loss of life and property. According to the National Interagency Fire Center (2005), 12 people died from wildland fire accidents in 2005. During 1999 to 2005, 149 individuals died from wildland fire accidents, including agency personnel, contractors, volunteers, and private individuals. The largest number of fatalities was associated with use of a vehicle or ground-based mechanical equipment (23.8%), heart attacks (22.7%), use of aircraft (22.3%), or burnovers (20.2%). During 2005, wildland fires resulted in the loss of 240 primary structures, many on or near BLM- or Forest Service-administered lands (USDI BLM 2006c).

Growth in the western U.S. has exceeded that of the rest of the country, and while the region remains more rural than the rest of the country, over 23 million people now live within 25 miles of public lands (USDI BLM 2006c). As wildfires have become more severe, the associated risks to life and property within the WUI have increased. Because of concern about this risk, the

Department of the Interior stepped up efforts to reduce hazardous fuels in the WUI from 164,000 acres in 1991 to over 506,168 acres in FY 2005. Despite these efforts, over $91 million was spent by the BLM in 2005 on fire control, much of it in the WUI (USDI BLM 2006c).

### Future Effects and Their Accumulation

**Occupational Risks.** It is projected that incidence of occupational injury and death will continue to decline as our nation moves to a more service-oriented economy. Occupations with higher risk of injury and death will continue to be associated with rural areas and public lands; risks in these areas will likely be greater than in more urbanized areas. However, continued improvement in equipment and emphasis on workplace safety should help to reduce risks of occupational injury and death in the West.

Out of the various treatment activities, mechanical treatments and herbicide use pose the greatest risk to worker health. The number of acres treated using herbicides and mechanical methods will increase 3-fold under the Preferred Alternative. Thus, risks of injury associated with equipment could also increase 3-fold, and permanent injuries and loss of life could accumulate. It is likely that risk to workers from application of and exposure to herbicides would not be as great as at present, since the BLM would place the greatest emphasis on use of herbicides that have low risk to humans. For example, three of the four herbicides proposed for use by the BLM would pose essentially no risk to humans under exposure scenarios modeled in the HHRA.

**Cancer Risks.** Cancer rates have declined for over a decade, and are likely to continue to do so with improvements in lifestyle and our ability to recognize and treat the underlying causes. Cancer risks for workers conducting fire and herbicide treatments on public lands could increase because more acres would be treated by these methods. However, risks to workers would be lessened by improvement in equipment and treatment technologies and use of newer herbicides, including those proposed for use in this PEIS, that pose no known cancer risk.

**Exposure to Pollutants.** The trend in pollutant emissions is expected to continue to decrease nationwide. For example, the USEPA projects that emissions from automobiles will decline by more than 80% over the next 25 years as Americans shift to more fuel efficient and less polluting vehicles and use fuels that have been developed to reduce emissions. Industrial

BLM_0000632

ENVIRONMENTAL CONSEQUENCES

pollution is also expected to decline as our economy becomes more service-based (Hayward 2005).

The proposed increase in use of fire by the BLM, Forest Service, and other federal and state land management agencies to restore natural fire regimes and reduce hazardous fuels could increase the amount of smoke, and therefore the incidence of health effects associated with PM and other harmful constituents of smoke in the West. The Forest Service modeled several scenarios to predict the long-term effect of treating more acres and/or targeting treatments in the WUI on regional air quality and the condition of the land (USDA Forest Service and USDI BLM 2000). The model assumed that in the WUI, where air quality and other considerations could limit the use of fire, mechanical and hand cutting would be important treatment options, in addition to use of fire. According to the model, air quality would generally improve as the number of acres treated annually increased, and improvement in air quality would be most noticeable for treatments targeted at high priority western U.S. WUI landscapes. Thus, the proposed action, which includes over 4.3 million acres of fire use and mechanical treatments, in addition to 1.7 million acres of treatments using other methods, would be expected to provide greater improvement in ecosystem function and air quality than is projected under current treatment methods (see Air Quality).

Risks to the public and workers on or near public lands from exposure to herbicides could increase as a result of the increase in herbicide use. To reduce this risk, the BLM would primarily use herbicides that have low risk to humans, including new herbicides proposed for use as part of this PEIS, and would continue to identify and make available to field offices herbicides that have lower risk to workers than currently-available herbicides.

**Risks from Wildfire.** In response to the threats of wildfire and invasive vegetation and noxious weeds, the President and Congress have directed the USDI and BLM, through implementation of the *National Fire Plan* (USDI and USDA Forest Service 2001), and the *Healthy Forests Restoration Act of 2003*, to take more aggressive actions to reduce catastrophic wildfire risk on public lands. The intent of these actions is to protect life and property, and to manage vegetation in a manner that provides for long-term economic sustainability of local communities, improved habitat and vegetation conditions for fish and wildlife, and other public land uses.

Treatment activities to reduce fire risk include timber harvest, thinning, prescribed fire, fuel reduction activities, greenstrips, brush reduction, and effective suppression efforts. While prescribed fire is not without risk, it is generally safer to burn under the controlled conditions of prescribed fire than to chance a wildfire when fuels are extremely dry and weather conditions are unfavorable.

The proposed treatment program would restore natural fire regimes and encourage the growth of native vegetation that is more resilient to wildfire, reducing the risk of wildland fire. If plant community structure, species composition, and disturbance regimes return to near historical ranges, then disturbances should have effects that are similar to historical effects, which would be less severe, and result in less fire danger, than at present. Because of the limitations on the types and amounts of treatments that can occur in the WUI, it may be more difficult to restore natural fire regimes on lands in the WUI than on non-WUI lands, but over the long term, benefits to the WUI should accrue and the loss of life and property associated with wildfire should slow or begin to decrease (USDA Forest Service and USDI BLM 2000; USDI BLM 2006c).

An assessment of risks to people and property from varying levels and types of treatments was done for the cohesive strategy. Assuming funding levels remained static and two-thirds of treatments were targeted for the WUI, risks to people and property would remain near current levels after 15 years (Hann et al. 2002). If more funding was provided, it would be possible to substantially reduce the risk that life and property would be lost.

### *Contribution of Treatment Alternatives to Cumulative Effects*

As discussed above, short-term risks to human health are related to the types of treatments and methods used, and the number of acres treated. Based on number of acres treated, the greatest risk to human health would occur under the Preferred Alternative, and the least risk would occur under the No Action Alternative. The other alternatives would likely be intermediate between these two.

Risks associated with fire use and mechanical, manual, and biological control treatments would be similar for the four action alternatives, which differ primarily in the types of herbicides available for use and number of acres treated. Risks associated with herbicide use could be less under alternatives C, D and E than under the

BLM_0000633

Preferred Alternative, because fewer acres would be treated and aerial spraying would be prohibited (Alternatives C and D) or discouraged (Alternative E). The risk of off-site drift would be less under these alternatives, with no risk under Alternative C. Alternative E would prohibit use of ALS-inhibiting herbicides, some of which have less risk to humans than herbicides that would be allowed under this alternative. About one-third as many acres would be treated using herbicides under the No Action Alternative, compared to the other alternatives. However, the BLM would be able to use several herbicides (2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine) under the No Action Alternative that pose high risks to human health, but that would not be available for use under the other herbicide treatment alternatives.

Alternative E places greater emphasis on passive restoration than the other alternatives and would result in fewer risks or injuries to workers due to less emphasis on the use of mechanical, herbicide or fire treatments. Alternative E also focuses more hazardous fuels treatments in the WUI, and encourages practices to reduce vegetation near homes and to develop a defensible space in the WUI to reduce risks to people and property from wildfires.

Regardless of the alternative chosen, there could be an accumulation of injury or loss of human life from treatments, and there would be a cumulative loss of property from wildfires. Over the long term, restoration of natural fire regimes and improvement in ecosystem health should reduce risk to human health from activities originating on public lands and affecting public land users or those living near public lands.

# Unavoidable Adverse Effects

This section summarizes the unavoidable adverse effects that would occur under the actions considered in the PEIS and PER. Unavoidable adverse effects would primarily be associated with the use of herbicides and fire.

## Air Quality

An increase in emissions of air pollutants would occur as a result of all the action alternatives. However, air quality standards would not be exceeded under any of the alternatives (see *Air Quality Modeling for BLM Vegetation Treatment* Methods [ENSR 2005m] and *Annual Emissions Inventory for BLM Vegetation Treatment Methods* [ENSR 2005a] that are found on the CD that accompanies the PEIS and on the BLM website at http://www.blm.gov).

## Soil Resources

Regardless of the method used to remove vegetation, vegetation treatments would potentially result in adverse short-term impacts through increased erosion and reduced water infiltration, leading to loss of soil and reduced soil productivity. The degree of these effects would vary by region, depending on climate, landform, hydrology, soil, vegetation, and land use. In many western U.S. regions, the combination of hydrologic characteristics, steep topography, and slow vegetative growth make soil erosion a serious concern (Kennard and Fowler 2005).

Vegetation treatments could disturb biological soil crusts, potentially reducing soil quality and ecosystem productivity. The extent of impacts to biological soil crusts would be dependent on the intensity and kind of disturbance and the amount of area covered. The duration of the effects would vary, but recovery of biological soil crusts typically takes much longer than the recovery of vascular vegetation.

## Water Resources and Quality

An increase in soil erosion and surface water runoff could result from vegetation removal, which could lead to stream bank erosion and sedimentation (Ott 2000). Rates of runoff would be influenced by precipitation rates, soil types, and proximity to the treated area. All vegetation removal activities could disturb the soil and reduce the amount of vegetation binding to soil, potentially causing erosion and increased sedimentation. The removal of vegetation would decrease the amount of rainfall captured by plants, detritus, and soil, potentially leading to increased stormwater flows, runoff velocity, and sedimentation. Herbicides have the potential to directly impact surface water quality or leach through the soil and impact groundwater quality.

## Wetland and Riparian Areas

An increase in soil erosion and surface water runoff could result from vegetation removal, and could lead to streambank erosion and sedimentation in wetlands and riparian areas (Ott 2000). Rate of runoff would be influenced by precipitation rate, soil type, and proximity to the treated area. All vegetation removal activities could disturb the soil and reduce the amount of vegetation binding to soil, potentially causing erosion and increased sedimentation of wetlands and riparian

BLM_0000634

ENVIRONMENTAL CONSEQUENCES

areas. Sediments can impact plants within wetland and riparian areas by reducing the amount of sunlight reaching plants and slowing or stopping plant growth.

The removal of vegetation would decrease the amount of rainfall captured by plants, detritus, and soil, potentially leading to increased stormwater flows and runoff velocity in both ecosystems. Increased stormwater runoff can scour wetlands, modify their morphology, and affect the distribution and abundance of aquatic organisms within the area. Decomposition of treated non-target aquatic vegetation could result in oxygen depletion. Siltation of wetlands could reduce water quality and the amount of oxygen available to aquatic organisms. In addition, siltation could reduce the acreage of wetland and riparian habitat.

### Vegetation

The proposed vegetation treatments would cause unavoidable short-term disturbances to plant communities by killing both target and non-target plants. The extent of disturbances would vary by the extent and type of treatment. In many cases, the treatments would return all or a portion of the treated area to an early successional stage by freeing up resources such as light and nutrients for early successional species, such as annual grasses and forbs.

### Fish and Other Aquatic Organisms

Removal or alteration of terrestrial vegetation, either through treatment activities or natural occurrences such as catastrophic fire, could result in an increase in soil erosion and surface water runoff, potentially leading to streambank erosion and sedimentation in aquatic habitats (Ott 2000). Sediments can harm spawning habitat, make foraging more difficult for aquatic organisms, and harm breathing organs of aquatic animals. The effects of catastrophic fire in watersheds would be ameliorated through timely emergency stabilization activities that are usually implemented within the same season as the fire, and are designed to minimize erosion and siltation.

### Wildlife Resources

The proposed vegetation treatments could kill or harm wildlife, and cause unavoidable short-term adverse impacts to wildlife habitat and behavior. The extent of these disturbances would vary by the extent and type of treatment. In general, greatest risks would be associated with the wildland fire use, prescribed fire, and herbicide treatments. If treatments were successful, species using

sites prior to treatment could be displaced by species better adapted to the restored sites.

Many species that use wetlands have evolved life-history strategies that depend upon stable conditions (i.e., stable water quality and quantity). For example, vegetation removal resulting in increased water flows to wetlands during the spring could flood the breeding sites of aquatic organisms that breed or lay eggs in moist soil, harming or killing eggs or juveniles.

### Livestock

The proposed vegetation treatments could temporarily affect non-target vegetation that might provide forage, shelter, or other life requisites for livestock. Livestock could also be adversely impacted by herbicide treatments. Livestock, which consume large quantities of grass, are at greater risk for harm than smaller wildlife or wildlife that feed on other herbaceous vegetation, seeds, or fruits, because herbicide residue is higher on grass than it is on these other plants (Fletcher et al. 1994; Pfleeger et al. 1996; see Appendix C). These potential impacts are usually mitigated because livestock can be removed from areas scheduled for treatment.

### Wild Horses and Burros

The proposed vegetation treatments could adversely affect wild horse and burro populations by killing or harming non-target vegetation that might provide forage, shelter, or other life requisites for wild horses and burros. Wild horses and burros could also be impacted by herbicide treatments. Because these animals likely consume large quantities of grass, they are at greater risk for harm than smaller wildlife or wildlife that feed on other herbaceous vegetation, seeds, or fruits. However, harmful doses of herbicide would be unlikely unless an animal were to forage exclusively within the treatment area for an entire day. Therefore, smaller treatments may be most appropriate in herd management areas in certain cases involving use of an herbicide with a demonstrated risk to herbivores from the consumption of contaminated vegetation. In some cases, treatment areas can be designed to exclude use by wild horse and burros to reduce the likelihood of adverse impacts to these animals.

BLM_0000635

## Paleontological and Cultural Resources

### Paleontological Resources

The loss of paleontological resources has the potential to be adverse, especially if it results in the loss of scientifically important fossils. However, if surveys and inventories were conducted in areas where ground-disturbing activities were proposed to occur, and treatments avoided paleontological resource sites, the incidence of impacts would be greatly reduced, and any impacts that did occur would be minimal. Use of SOPs would reduce the likelihood of impacts to paleontological resources.

### Cultural Resources and Traditional Lifeway Values

Cultural resources are nonrenewable, so any effects to these resources would have some importance. Because the exact locations of all potential cultural resources sites are unknown, their disturbance cannot be entirely avoided. There are cultural resources on public lands that may relate to the entire span of human occupation, including locales used by the first humans to enter the Western Hemisphere. Historic and prehistoric sites representing varied ages, cultures, and functions, may be located anywhere within the treatment area. Because soil forms slowly in the Arctic, cultural resources that are thousands of years old may be near the surface at Arctic sites. If surveys and inventories for cultural resources were conducted in areas where vegetation treatments were proposed to occur before the work began, effects to cultural resources in these areas could be reduced or avoided. Timely intervention following the discovery of cultural resources would effectively mitigate many effects, either through site avoidance or data recovery. Archaeological excavation to recover scientific data under the terms of an appropriate data recovery plan could result in the partial or total destruction of the site, although the recovered data would effectively mitigate for this destruction.

In many areas of the West, noxious weeds and other invasive vegetation grow together with more desirable vegetation used for traditional lifeway values such as food or basketweaving. Vegetation treatments in these areas could harm desirable plants, discourage or prohibit Native peoples from using these areas, or in the case of herbicides, potentially harm Native peoples harvesting plant materials in treated areas.

## Visual Resources

The proposed vegetation treatments would not result in unavoidable adverse effects to visual resources over the long term. Over the short term, vegetation treatments would kill or harm vegetation in the applied area, resulting in a more open, browned or blackened landscape until new plants were to grow in the area. While these effects are unavoidable, they are considered short-term impacts, as the vegetation would recover and lead to improved natural conditions. Treatment areas would vary in terms of their visual appeal prior to treatment and their distance from human activity, as well as in terms of the resulting public sensitivity to the pre- and post-treatment visual character of the area. The effects of vegetation treatments on the visual quality of the landscape would be most noticeable to travelers, sightseers, and residents for the first year to several years following treatment, particularly near major roads or residential areas.

## Wilderness and Special Areas

The effects of fire on wilderness and special areas would depend on a number of factors, such as the vegetation on the site, the condition of the site, the weather, fuel and soil moisture conditions under which the fire occurred, and the particular unique quality of the site that requires special management. In general, sites with special qualities that could be destroyed by fire would be the most likely to experience significant adverse effects from fire treatments.

Use of mechanical treatment methods would adversely affect wilderness areas and wilderness study areas because vehicles and heavy equipment are incompatible with the "unspoiled" nature of wilderness. For this reason, mechanical treatments would only be allowed on a very limited number of sites where no other method was feasible (e.g., tamarisk removal) and in the few areas where mechanical treatments have occurred in the past and repeat treatments are required.

Use of herbicides to treat undesirable vegetation could potentially affect the condition of wilderness areas and wilderness study areas by killing non-target native vegetation through imprecise application and/or drift. Since label directions, SOPs, and any additional wilderness restrictions would be followed during application of herbicides, there is little impact expected from drift due to imprecise application or other accidental scenarios. The degree of effects would depend on the application method, with spot

BLM_0000636

applications less likely to cause adverse effects than aerial applications.

**Recreation**

There would be some scenic degradation, as well as distractions to public land users (e.g., noise from machinery) from treatments. In addition, there would be some human health risks to recreationists associated with exposure to herbicides (if use were allowed) or smoke from fire. These risks are discussed in more detail under Human Health and Safety. Finally, some areas would be off-limits to recreation activities as a result of treatments, from periods ranging from a few hours to days, or even one full growing season or longer, depending on the treatment. In most cases, recreationists would be able to find alternative sites offering the same amenities, although a lessened experience could result from more concentrated use in these areas.

The effects of herbicide treatments and fire use on fish and wildlife could have indirect negative impacts on recreational activities such as fishing, hunting, and wildlife viewing. For example, aerial application of an herbicide over a large area could adversely affect these activities by harming or displacing wildlife.

**Social and Economic Values**

Short-term closures or restrictions on public lands for certain vegetation treatments, such as implementation of herbicide use re-entry restrictions to protect public health or to restrict access by grazing animals until seeding efforts are established (up to two growing seasons) are unavoidable. It is expected that communities that are particularly dependent on a single industry would be most susceptible to adverse effects to employment or income due to vegetation treatment projects. In particular, ranching communities and recreation-dependent communities may be more affected than communities with diversified industries.

Limits on grazing activity on public lands could put additional pressure on often tight economic margins in ranching. Closures of treatment areas for extended periods of time could temporarily affect some recreational uses and commercial activities.

**Human Health and Safety**

All treatment methods have the potential to injure or kill workers or the public. The health and safety of workers could be at risk from exposure to herbicides; from

working on uneven ground, broken terrain, and in dense vegetation; from use of hand and power tools; from inhalation of smoke; from exposure to falling debris; and from other accidental situations. Although workers would follow SOPs to reduce risks, not all risks could be avoided.

Members of the public could be at risk from flying debris if they were near an area where manual or mechanical equipment was used. Risks could be avoided if a safe zone was established around work areas and the public did not enter this area. However, spray drift of herbicide, particulate matter, and other harmful materials associated with herbicide and fire treatments could harm the public outside of treatment areas. Smoke risks would be minimized or avoided by following fire management plans and conducting burns during periods when meteorological conditions were favorable to reduce smoke impacts to the public. Herbicide drift would be minimized by using proper application equipment, using drift reduction agents, and spraying during periods with little or no wind.

# Relationship between the Local Short-term Uses and Maintenance and Enhancement of Long-term Productivity

This section discusses the short-term effects of vegetation treatment activities, versus the maintenance and enhancement of potential long-term productivity of public land environmental and social resources.

Short term refers to the total duration of vegetation treatment activities considered in the PEIS and PER (about 10 to 15 years), whereas long term refers to an indefinite period of time. The specific impacts vary in kind, intensity, and duration according to the activities occurring at any given time. Initial activities, such as herbicide and mechanical treatments and fire use, result in short-term, localized impacts. However, the overarching goal of the proposed vegetation treatments program is to restore natural fire regimes, vegetation, and ecosystems, which should benefit all resources over the long term.

**Air Quality**

Vegetation treatments would cause short-term degradation of air quality, with most degradation associated with fire use. As discussed earlier, much of the focus of treatments is on restoring natural fire regimes and reducing the incidence and severity of

BLM_0000637

wildfires. In general, wildfire impacts on air quality would likely be significantly greater than emissions from prescribed burning (USDA Forest Service and USDI BLM 2000), since techniques to minimize emissions would be implemented during prescribed burns and smoke management plans would permit prescribed fires only during meteorological periods favorable to dispersion. Thus, the proposed vegetation treatments should reduce smoke emissions associated with public lands over the long term.

In addition, state smoke management meteorologists would consider the cumulative effects of emissions from other sources (such as road dust, other federal vegetation management activities, and agricultural dust and burning) during the development of daily smoke management instructions. State smoke management program managers would also consider these sources during development of smoke management plans submitted for approval (as a component of the state smoke implementation plan) to the USEPA (USDA Forest Service and USDI BLM 2000).

## Soil Resources

Although treatments would have short-term effects on soil condition and productivity, it is predicted that the soil disturbance associated with restoration activities would have less impact and be less severe than soil erosion caused by wildfire and encroachment by invasive species and noxious weeds. Furthermore, monitoring and evaluation, integrated with an adaptive management approach, would allow the BLM to adjust treatments to reduce soil disturbance to levels similar to historical conditions.

Studies in forested and rangeland environments indicate that forest and range landscapes that resemble conditions within historical ranges of variability provide favorable conditions for soil functions and processes that contribute to long-term sustainability of soil productivity (Munn et al. 1978, Cannon and Nielsen 1984, and Hole and Nielsen 1970 *cited in* USDA Forest Service and USDI BLM 2000).

Restoration activities that move forests and rangelands toward historical ranges of variability would provide favorable conditions for soil functions and processes, and contribute to long-term soil productivity levels at the broad scale (USDA Forest Service and USDI BLM 2000).

## Water Resources and Quality

The BLM proposes a 3-fold increase in overall treatment acreage, and over a 4-fold increase in the number of acres treated in wetland and riparian habitats. Treatment of vegetation would cause a short-term increase in soil erosion and surface water runoff. Successful control of invasive plants, however, would lead to improved conditions in watersheds over the long term, with the greatest improvement likely to occur in degraded watersheds. The eventual growth of desirable vegetation in treated areas would moderate water temperatures, buffer the input of sediment and herbicides from runoff, and promote streambank stability. Ongoing efforts by the BLM to enhance vegetation would also help to increase the acreage of watersheds that are functioning properly. Improvement of watersheds and water resources and quality would benefit salmonids and other species of concern that depend upon these habitats for their survival (USDA Forest Service and USDI BLM 2000).

Vegetation treatments that reduce hazardous fuels would benefit ecosystems by reducing the chances of a large, uncontrolled wildfire, which could result in the destruction of a large amount of high quality habitat potentially leading to erosion, especially if followed by heavy rainfall. Hazardous fuels reduction would also decrease the likelihood that wildfire suppression activities would occur in or near aquatic habitats.

The BLM's ability to use four new chemicals (fluridone and diquat for aquatic applications, and imazapic and Overdrive® for terrestrial applications), and new herbicides as they become available, would provide new capabilities for controlling problematic invasive species that would be less likely to contaminate water than treatments with many of the currently available herbicides.

## Wetland and Riparian Areas

Removal of vegetation could cause a short-term increase in soil erosion and surface water runoff and could impact wetland and riparian areas. Successful control of invasive plants in wetlands and riparian areas, however, would lead to improved conditions in these habitats over the long term. The eventual growth of desirable vegetation in treated areas would moderate water temperatures, buffer the input of sediment and herbicides from runoff, and promote bank stability in riparian areas. Ongoing efforts by the BLM to enhance wetland and riparian vegetation would also help to increase the miles of streams and acres of wetlands that

BLM_0000638

ENVIRONMENTAL CONSEQUENCES

are classified by the BLM as "Proper Functioning." Improvement of riparian and wetland habitat would also benefit salmonids and other species of concern that depend upon these habitats for their survival (USDA Forest Service and USDI BLM 2000).

Control of aquatic and riparian vegetation can improve habitat quality for fish and wildlife, improve hydrologic function, and reduce soil erosion. Non-native species, such as purple loosestrife, form extensive monotypic stands that displace native vegetation used by wetland animal species for food and cover (Bossard et al. 2000). Water-thyme is an aquatic species that forms large mats that fill the water column and can severely restrict water flow, leading to a decrease in water quality and habitat for fish and wildlife. Eurasian watermilfoil, a species of aquatic plant that has spread widely over the western U.S., alters the physical and chemical characteristics of lakes and streams. Much of the BLM's vegetation control efforts in wetland and riparian areas would focus on these species.

**Vegetation**

All treatments would have short-term adverse impacts to target vegetation, and in some cases non-target vegetation. Treatments that remove or control invasive vegetation could provide immediate benefits to non-target species, however, such as increased access to water and nutrients and enhanced vigor from reduced competition with invasive species.

Treatments that remove hazardous fuels from public lands would be expected to benefit the long-term health of plant communities in which natural fire cycles have been altered. The suppression of fire results in the buildup of dead plant materials (e.g., litter and dead woody materials), and often increases the density of flammable living fuels on a site. Treatments that restore and maintain fire-adapted ecosystems, through the appropriate use of mechanical thinning, wildland fire use or prescribed fire, and other vegetation treatment methods, would decrease the effects of future wildfires on plant communities and improve ecosystem resilience and sustainability. Over the long term, treatments should also reduce the incidence and severity of wildfires across the western U.S.

Treatments that control populations of non-native species on public lands would be expected to benefit native plant communities over the long term by aiding in the reestablishment of native species. The degree of benefit would depend on the success of these treatments over both the short and long term. Some treatments are very successful at removing weeds over the short term, but are not successful at promoting the establishment of native species in their place. In such cases, seeding and planting of native plant species would be beneficial.

Although modeling was not done as part of the PEIS and PER to determine the long-term effects of vegetation treatments, modeling done for similar treatments proposed by the BLM and Forest Service in the Interior Columbia Basin showed that improvements in land condition would be slow. However, treatments would improve the mix of habitats so that vegetation would be more resilient to disturbance and sustainable in the long term. Plant communities that have declined substantially in geographic extent from historical to current periods (e.g., big sagebrush and bunchgrasses) would increase. Although the extent of weeds and other exotic and undesirable plants would continue to increase, the rate of expansion would be slower (USDA Forest Service and USDI BLM 2000).

**Fish and Other Aquatic Organisms**

Control of aquatic and riparian vegetation can improve habitat quality for fish and wildlife, improve hydrologic function, and reduce soil erosion. Vegetation treatments that reduce hazardous fuels would benefit aquatic organisms by reducing the chances of a large, uncontrolled wildfire, which could result in the destruction of a large amount of high quality wetland and riparian habitat, especially if followed by heavy rainfall. Hazardous fuels reduction would also decrease the likelihood that wildfire suppression activities would occur in or near aquatic habitats. Treatments that restore natural fire regimes and native vegetation near streams should ensure a steady supply of large woody debris that would provide habitat for aquatic organisms in the future.

**Wildlife Resources**

All treatments would have short-term adverse impacts to wildlife and their habitats, as discussed above. Treatments that improve habitat would provide long-term benefits to wildlife. Treatments that remove hazardous fuels from public lands and reduce the risk of large, intense wildfire would reduce the potential for future death and injury of wildlife and lead to improved habitat. Treatments that control populations of non-native species on public lands would be expected to benefit most wildlife over the long term by aiding in the reestablishment of native vegetation and restoring wildlife habitat to near historical conditions.

BLM_0000639

ENVIRONMENTAL CONSEQUENCES

Although modeling was not done as part of the PEIS and PER to determine the long-term effects of vegetation treatments, modeling done for similar treatments proposed by the BLM and Forest Service in the Interior Columbia Basin showed that improvements in habitat would be slow, perhaps not occurring for decades.

### Livestock

The proposed vegetation treatments would affect the availability and palatability of vegetation over the short term. These impacts would begin to disappear within one to two growing seasons after treatment.

All treatments that successfully reduce the cover of noxious weeds and restore native vegetation on grazed lands would benefit livestock by increasing the number of acres available for grazing and the quality of forage. In addition, treatments would remove some noxious weeds (e.g., tansy ragwort, houndstongue, Russian knapweed, and common St. Johnswort) that are harmful to livestock. The success of weed removal and restoration of native habitats would determine the level of benefit of the treatments over the long term.

Treatments that reduce the risk of future catastrophic wildfire through fuels reduction would also benefit livestock. Uncontrolled, high intensity wildfires can remove forage from large tracts of rangeland, reducing its suitability for livestock in the short term. Treatments that restore and maintain fire-adapted ecosystems, through the appropriate use of mechanical thinning, fire, and other vegetation treatment methods would decrease the effects of wildfire on rangeland plant communities and improve ecosystem resilience and sustainability.

### Wild Horses and Burros

The proposed vegetation treatments would affect the availability and palatability of vegetation over the short term. These impacts would begin to disappear within one to two growing seasons after treatment.

All treatments that successfully reduce the cover of noxious weeds and restore native vegetation on grazed lands would benefit wild horses and burros by increasing the number of acres available for foraging and the quality of forage. In addition, treatments would remove some noxious weeds (e.g., tansy ragwort, houndstongue, Russian knapweed, and common St. Johnswort) that are poisonous to wild horses and burros. The success of weed removal and restoration of native

habitats would determine the level of benefit of the treatments over the long term.

Treatments that reduce the risk of future catastrophic wildfire through fuels reduction would also benefit wild horses and burros. Uncontrolled, high intensity wildfires can remove forage from large tracts of rangeland, reducing its suitability for wild horses and burros. Treatments that restore and maintain fire-adapted ecosystems, through the appropriate use of mechanical thinning, fire, and other vegetation treatment methods would decrease the effects of wildfire on rangeland plant communities and improve ecosystem resilience and sustainability.

### Paleontological and Cultural Resources

#### Paleontological Resources

Because paleontological resources are nonrenewable, there is no difference between short-term and long-term impacts. The resource cannot recover from some types of adverse impacts. Once disturbed, the materials and information of paleontological deposits may be permanently compromised. Any destruction of paleontological sites, especially those determined to have particular scientific value, would represent long-term losses. Furthermore, once paleontological deposits were disturbed and exposed, natural erosion could accelerate the destruction of fossils, and exposed fossils would be vulnerable to unauthorized collecting and digging. Any discoveries of paleontological resources as a result of surveys required prior to treatment would enhance long-term knowledge of the area and these resources.

#### Cultural Resources and Traditional Lifeway Values

Any destruction of cultural resource sites would represent long-term losses. Archaeological excavation to recover scientific data under the terms of an appropriate data recovery plan could result in the partial or total destruction of the site, although the recovered data would effectively mitigate for this destruction. Any investigations of cultural resources made during inventories or investigations required prior to vegetation treatments would enhance knowledge of the history and early inhabitants of the region and serve to effectively mitigate further potential effects of activities in the area.

Vegetation treatments could have short-term impacts on vegetation used for traditional lifeway values, especially if herbicide drift were to impact non-target vegetation,

BLM_0000640

ENVIRONMENTAL CONSEQUENCES

or treatments were to affect both target and non-target vegetation, as would occur during certain herbicide treatments (such as with non-selective herbicides) and fire use. In addition, fire use and herbicide treatments could displace Native peoples from traditional use areas until it was safe to reenter, or desirable vegetation was reestablishing. However, long-term restoration of native plant communities and natural ecosystem processes to the benefit of traditional lifeway resources should compensate for the short-term losses in use.

**Visual Resources**

The proposed vegetation treatments would affect visual resources by changing the scenic quality of the landscape. Over the short-term, impacts to visual resources from all treatment methods would begin to disappear within one to two growing seasons. The regrowth of vegetation on the site would eliminate much of the stark appearance of cleared areas, and the site would develop a more natural appearance. Impacts would last for the longest amount of time in forests and other areas where large trees and shrubs were removed.

Over the long term, vegetation treatments would likely improve visual resources on public lands. Treatments that aim to rehabilitate degraded ecosystems, if successful, would result in plant communities dominated by native species (see Vegetation section for more information). Native-dominated communities tend to be more visually appealing and productive than areas that have been overtaken by weeds (e.g., areas supporting a downy brome monoculture), or that have been invaded by woody species (e.g., grasslands experiencing encroachment by conifer seedlings).

**Wilderness and Special Areas**

Impacts to wilderness and sensitive area resources would begin to disappear within one to two growing seasons after treatment, regardless of the treatment method. The regrowth of vegetation on the site would eliminate much of the stark appearance of cleared areas, and the site would develop a more natural appearance. The longest lasting impacts would occur in forests and other areas where large trees and shrubs were removed. Benefits to plants and animals in terms of ecosystem function and improved forage and cover would occur as the treated area recovered.

Over the long term, vegetation treatments would likely improve resources on wilderness and special areas. Treatments that aim to rehabilitate degraded ecosystems would result in plant communities that are dominated by

native species (see Vegetation section for more information). Native-dominated communities often provide better habitat for fish and wildlife, including species of concern.

**Recreation**

There would be some scenic degradation, as well as distractions to users (e.g., noise from machinery), from treatments. In addition, there would be some human health risks to recreationists associated with exposure to herbicides (if use were allowed) or smoke from fire. Finally, some areas would be off-limits to recreation activities as a result of treatments. These effects would be localized and short term.

Developed recreation sites with public facilities would be treated in order to maintain the appearance of the area and to protect visitors from the adverse effects of unwanted vegetation (e.g. thistles, ragweed, and poison ivy). Some mechanical activities, such as mowing in visitor use areas or along ROWs, would provide an immediate benefit in terms of improved appearance of vegetation. Long-term adverse effects on developed recreational facilities would be unlikely, as treatments are expected to improve native vegetation and the utility of these sites. In some cases, developed recreation sites could be temporarily closed during treatments.

Treatments that restore native vegetation and natural fire regimes and other ecosystem processes would be beneficial to recreationists. Treatments would improve the aesthetic and visual qualities of recreation areas for hikers, bikers, horseback riders, and other public land users; reduce the risk of recreationists coming into contact with noxious weeds and poisonous plants; increase the abundance and quality of plants harvested from public lands; and improve habitat for fish and wildlife sought by fishermen and hunters. These benefits would be long term and improve the productivity of land resources and their ability to provide recreational values.

**Social and Economic Values**

Vegetation treatments would adversely affect use of treated areas over the short term. Any restrictions on the use of treated lands could cause social and economic hardship to affected parties. However, individuals and industries involved in the restoration of native ecosystems on public lands would benefit.

Over the long term, most users of public lands, and those with interests near public lands, would likely

BLM_0000641

benefit. An important goal of treatments is to restore ecosystem health so that public lands can provide sustainable and predictable products and services. In addition, treatments would reduce risks to communities associated with large-scale wildfire, improve ecosystem health to the benefit of recreationists and other public land users, and emphasize employment- and income-producing management activities near those communities most in need of economic support and stimulus. The enhancement in long-term productivity of public lands to provide for social and economic needs would reflect not only the success or failure of treatments, but also the influence of outside forces (e.g., economy, lifestyle changes, climate) over which the BLM and other federal agencies have no control (USDA Forest Service and USDI BLM 2000).

## Human Health and Safety

The proposed vegetation treatments could harm the health of workers and the public over the short term. Adverse reactions to smoke and herbicides could cause minor to severe discomfort to sensitive individuals, but most symptoms would go away in a few hours. If serious injury or death resulted from treatments, the effects to the health of the affected individual would be long term, or in the case of death, permanent.

All treatments that successfully reduce the cover of noxious weeds and restore native vegetation would help to restore natural fire regimes and improve ecosystem health. If treatments were successful, long-term improvement in fire regimes and ecosystem health would reduce the risk of wildfire and slow the spread of poisonous and other noxious weeds that are harmful or annoying to humans. As native vegetation was restored, it could be possible to reduce the number of acres treated with herbicides. Even if this were not possible, the ability to use several new herbicides evaluated in this PEIS, and new herbicides that may become available in the future that are effective and less harmful to humans than currently-available herbicides, should reduce the risk to humans from herbicides on a per acre basis.

# Irreversible and Irretrievable Commitment of Resources

This section identifies irreversible and irretrievable commitments of resources that would occur from vegetation treatments. Irreversible and irretrievable commitments of resources refer to impacts or losses to resources that cannot be reversed or recovered.

Examples are the extinction of a species or the permanent conversion of a vegetated wetland to open water. In the first case, the loss is permanent and not reversible under current genetic technology. In the second case, it is possible the open water could be drained, so while the initial loss of the vegetated wetland is irretrievable, the action could be reversible.

## Air Quality

Air quality would be affected by all treatment methods, with fire use contributing the most to degradation of air quality. These effects would occur only during the period of the treatment activity and there would be no irreversible or irretrievable effects on air quality.

## Soil Resources

Disturbance activities associated with current and proposed treatments could result in soil erosion and loss of soil and soil productivity. This loss of soil and soil productivity would be irretrievable in the disturbance area, although the soil could be available for use at some other location. However, a benefit of increasing the amount of acres treated would be to slow the loss of soil and soil productivity due to invasive vegetation and wildfire and to restore soil structure and function on degraded sites as part of a larger goal to restore native ecosystem processes. As a result of these actions, soil productivity in disturbed areas should reestablish over time.

## Water Resources and Quality

An accidental herbicide spill or uncontrolled prescribed fire could cause damage to water bodies lasting for several months. The ability to use water resources in the affected area could be lost for an unknown period of time. However, these impacts could be reversed if restoration treatments were successful and herbicides naturally degraded. Other treatments should not result in irreversible or irretrievable commitments of water resources.

## Wetland and Riparian Areas

There would be no irreversible or irretrievable commitment of wetland or riparian resources. Although there would be short-term impacts to these resources from vegetation treatments, these impacts would not be irretrievable and would be reversed if restoration treatments were successful. In Alaska, it is possible that changes in the melting permafrost due to fire use could

BLM_0000642

ENVIRONMENTAL CONSEQUENCES

cause subsidence that could last a long time and possibly be permanent.

### Vegetation

Native vegetation and plant productivity that was lost as a result of treatments would be irretrievable only until vegetation was reestablished, usually within several growing seasons.

### Fish and Other Aquatic Organisms

Several of the herbicides currently used, or proposed for use, by the BLM would have a moderate to high risk of causing adverse health effects to fish and other aquatic organisms under maximum application and accidental spill scenarios, and could potentially result in illness or death. Loss of control over a prescribed fire could also harm aquatic habitat and cause mortality or injury to aquatic organisms. Treatments would likely result in short-term habitat degradation and some reduction in populations of fish and other aquatic organisms. These effects, however, would be reversible, as habitats would improve and aquatic organism populations would likely increase as a result.

### Wildlife Resources

Native wildlife and habitat productivity that was lost as a result of treatments would be irretrievable until native plant communities were reestablished, usually within several growing seasons. Treatments that improve rangeland and forestland ecosystem health, including plant productivity, would translate into benefits for wildlife, except for those species that have adapted to or thrive in areas where vegetation has changed from historic conditions.

### Livestock

Short-term loss in vegetation function and quality from treatments would have a short-term impact on livestock productivity. Although some livestock could be displaced from public lands, forage could be found elsewhere, although possibly at a higher cost. As rangelands improved, their ability to support livestock use levels at or near current levels should also improve. Herbicide treatments have the potential to cause injury or death to livestock. Although this impact would represent an irreversible loss of the individual animal, the impacts to the livestock operation and industry would be reversible.

### Wild Horses and Burros

Short-term loss in vegetation function and quality as a result of treatments would have a short-term impact on wild horse and burro productivity. Wild horses and burros could be removed from rangelands to reduce their impacts to rangeland health and to speed up the process of rangeland restoration. These animals would be placed into adoption and would provide value to their owners. As rangelands improved, their ability to support populations of wild horses and burros near current levels would also improve.

Herbicide treatments have the potential to cause injury or death to wild horse and burros. Although this impact would represent an irreversible loss of the individual animal, the impacts to the wild horse and burro populations would be reversible.

### Paleontological and Cultural Resources

#### Paleontological Resources

Because paleontological resources are nonrenewable, any impacts would render the resource disturbance irreversible and the integrity of the resource irretrievable.

#### Cultural Resources and Traditional Lifeway Values

Cultural resources are nonrenewable, so any impacts would be irreversible, and the integrity of the affected resource would be irretrievable. If near-surface cultural resources were encountered, as during disking or chaining, such resources could be damaged or destroyed. The loss of such cultural resource information would be irreversible and irretrievable. Archaeological excavation to recover scientific data under terms of an appropriate data recovery plan could result in the partial or total destruction of the site, although the recovered data would effectively mitigate for this destruction. Any investigations of cultural resources made during inventories or investigations required prior to vegetation treatments would enhance knowledge of the history and early inhabitants of the region and serve to effectively mitigate further potential effects of activities in the area. Overall, such finds could help fill gaps in our knowledge of the history and early inhabitants of the area.

Vegetation treatment activities would impact plants and animals of traditional importance to Native peoples. However, these effects should be short-term and

BLM_0000643

reversible, as native plant communities would recover and habitat for fish and game species would improve.

### Visual Resources

There would be no irreversible or irretrievable commitment of visual resources. Although there would be short-term impacts to visual resources from vegetation treatments, loss of visual resources would not be irretrievable and could be reversed if restoration treatments were successful.

### Wilderness and Special Areas

There would be no irreversible or irretrievable commitment of resources. Although there would be short-term impacts to wilderness and special area resources from vegetation treatments, these impacts would not be irretrievable and could be reversed if restoration treatments were successful.

### Recreation

There would be no irreversible or irretrievable commitment of recreation resources. Although there would be short-term impacts to recreation resources from vegetation treatments, these impacts would not be irretrievable and could be reversed if restoration treatments were successful.

### Social and Economic Values

Vegetation treatments would involve a substantial commitment by the BLM in terms of labor and financial resources. An estimated $1.1 billion would be needed to treat 6 million acres annually using the treatment and acreage assumptions outlined in Chapter 2. Several thousand jobs would be created to support treatment and restoration activities. Once the financial resources were used, they could not be retrieved. Treatments that result in the closure of recreation or grazing areas could have an irretrievable impact on the income of those involved in these industries.

### Human Health and Safety

Serious injury or death to humans caused by vegetation treatments could be irreversible and irretrievable. However, risk of death or serious injury is very unlikely, based on incidence of injury (very low) and death (none) associated with BLM vegetation treatments during the past decade. It is likely that humans would experience minor discomfort from fire and herbicide treatments, but these effects would be short term and reversible.

## Energy Requirements and Conservation Potential

Herbicide formulations may contain petroleum products, and all herbicide treatment methods require the use of energy, to operate equipment to treat vegetation and to transport workers to and from the job site. Wildland fire use and prescribed fire would likely require the least amount of energy per acre treated, followed by biological control, manual, herbicide, and mechanical treatment methods. For herbicide treatments, less energy would be used to conduct aerial treatments than ground treatments for each acre treated. Because the Preferred Alternative treats the most acres using herbicides, it would use the most energy. The amount of energy used to treat vegetation using fire, mechanical, manual, and biological control methods would be similar among the action alternatives. The fewest acres treated, and the least amount of energy used would occur under the No Action Alternative.

## Natural or Depletable Resource Requirements and Conservation

Herbicide formulations may contain natural or depletable resources as constituents of the herbicide products or as carriers. It is anticipated that the use of natural and depletable resources would be minimal, with greatest use under the Preferred Alternative, and least amount of use under the No Action Alternative, with other alternatives intermediate between these two. All herbicide treatment methods require the use of energy, as described above.

BLM_0000644

BLM_0000645

# CHAPTER 5
# CONSULTATION AND COORDINATION

BLM_0000647