*Tribal Leaders and*
*BIA Representatives*

*Pacific Region*

BIA Agency Office: **Central California Agency**
Self-Gov. Compact:
Term of Office - Expiration Date:
**Duane Garfield, Chairperson**
**Tule River Reservation**
**P.O. Box 589**
**Porterville, CA 93258**
Phone No: **(559) 781-4271** Fax No: **(559) 781-4610**
e-mail:

BIA Agency Office: **Southern California Agency**
Self-Gov. Compact:
Term of Office - Expiration Date: **Dec 2003**
**Dean Mike, Chairman**
**Twenty-Nine Palms Band of Mission Indians**
**46-200 Harrison Place**
**Coachella, CA 92236**
Phone No: **(760) 775-5566** Fax No: **(760) 775-4639**
e-mail:

BIA Agency Office: **Southern California Agency**
Self-Gov. Compact:
Term of Office - Expiration Date: **Dec 2002**
**Steve TeSam, Chairman**
**Viejas Band of Mission Indians**
**P.O. Box 908**
**Alpine, CA 91903**
Phone No: **(619) 445-3810** Fax No: **(619) 445-5337**
e-mail:

BIA Agency Office: **Central California Agency**
Self-Gov. Compact:
Term of Office - Expiration Date: **Nov 2000**
**Kevin Day, Chairperson**
**Tuolumne Rancheria**
**P.O. Box 699**
**Tuolumne, CA 95379**
Phone No: **(209) 928-3475** Fax No: **(209) 928-1677**
e-mail:

BIA Agency Office: **Central California Agency**
Self-Gov. Compact:
Term of Office - Expiration Date:
**Leora Treppa-Diego, Chairperson**
**Upper Lake Rancheria**
**P.O. Box 516**
**Upper Lake, CA 95485**
Phone No: **(707) 275-0737** Fax No: **(707) 275-0757**
e-mail:

BIA Agency Office: **Northern California Field Office**
Self-Gov. Compact: **YES**
Term of Office - Expiration Date: **Oct 2003**
**Susan M. Masten, Chairperson**
**Yurok Tribe**
**1034 Sixth Street**
**Eureka, CA 95501**
Phone No: **(707) 444-0433** Fax No: **(707) 444-0437**
e-mail:

BLM_0001059

# STATE HISTORIC PRESERVATION OFFICE CONSULTATION

BLM_0001060

BLM_0001061

 KSR&C No. 02-07-141

*KANSAS*

*STATE*

*HISTORICAL*

*SOCIETY*

◆

Cultural Resources Division

◆

?25 S.W. 6th Avenue
Topeka, Kansas
66615-1099
?ONE# (785) 272-8681
?AX# (785) 272-8682
?TY# (785) 272-8683

◆

*KANSAS HISTORY CENTER*

Administration
?ter for Historical Research
Cultural Resources
Education / Outreach
Historic Sites
?nsas Museum of History
Library & Archives

*HISTORIC SITES*

Adair Cabin
Constitution Hall
Cottonwood Ranch
?irst Territorial Capitol
Fort Hays
Goodnow House
Grinter Place
Hollenberg Station
Kaw Mission
?ais des Cygnes Massacre
?line Creek Battlefield
?ive American Heritage Museum
?awnee Indian Village
Pawnee Rock
?awnee Indian Mission

August 5, 2002

Gina Ramos
Vegetation EIS Co-Team Lead
US Department of the Interior
Bureau of Land Management
Washington, DC 20240

RE: Vegetation Treatments Programmatic EIS for Western US and Alaska
KS Statewide Projects File

Dear Ms. Ramos:

The Kansas State Historic Preservation Office (SHPO) would like to thank you for requesting our comments regarding the *Proposed Bureau of Land Management (BLM) Vegetation Treatments Programmatic Environmental Impact Statement (EIS) for the Western U.S., Including Alaska*. Because we are unaware of any Bureau of Land Management-administered lands present in the state of Kansas we do not have any concerns for implementation of the proposed vegetation treatments. The SHPO does not have any information to provide the BLM regarding resource areas, subsistence plants or animals, or traditional cultural properties within the state of Kansas of concern to Native American groups. We have chosen not to participate in the environmental process for preparation of the Vegetation EIS and do not wish to receive copies of the documents you produce.

Thank you for allowing us this opportunity to comment. If you have questions or need additional information regarding these comments, please contact Will Banks 785-272-8681 (ex. 214) or Jennifer Epperson (ex. 225).

Sincerely,

Mary R. Allman
State Historic Preservation Officer

Richard Pankratz, Director
Historic Preservation Office

RDP/jee



WYOMING

DEPARTMENT OF STATE PARKS & CULTURAL RESOURCES
STATE HISTORIC PRESERVATION OFFICE

RECEIVED
BUR. OF LAND MANAGEMENT
NEVADA STATE OFFICE
02 AUG 12 AM 7:30

Barrett Building
2301 Central Ave.
Cheyenne, WY 82002

(307) 777-7697
FAX (307) 777-6421

July 31, 2002

Mr. Brian Amme, Project Manager
U.S.D.I. Bureau of Land Management
Washington, D.C. 20240

RE: Bureau of Land Management (BLM) Vegetation Treatments Programmatic Environmental Impact Statement (EIS) for the Western U.S., Including Alaska; SHPO #0702RLC001

Dear: Mr. Amme,

Our staff has received information concerning the aforementioned project. Thank you for allowing us the opportunity to comment.

I am pleased that the BLM is seeking input from Native Americans concerning the effects these proposed treatments may have on resources important to them. Possessing this information prior to the development of the EIS will greatly increase the utility of this document.

There is another issue that I request the BLM analyze as part of the development of this EIS. This is an analysis of the effects of chemical vegetative treatments on organic archaeological remains (these organic remains include, but are not limited to; Carbon 14 dating samples, pollens, seeds, plant fibers, proteins, etc.). This is an issue of considerable concern, particularly the effect of "spike" and other ground penetrating chemical treatments. Addressing this issue as part of this EIS would greatly reduce concerns and confusion during the future development of project specific NEPA documents.

Please refer to SHPO project control number #0702RLC001 on any future correspondence dealing with this project. If you have any questions, contact me at 307-777-5497.

Sincerely,

Richard L. Currit
State Historic Preservation Officer

RLC:jh

Jim Geringer, Governor    John T. Keck, Director

# ENVIRONMENTAL PROTECTION AGENCY CONSULTATION

BLM_0001064

BLM_0001065

August 28, 2003

In Reply Refer To:
4000 (220)

MR 8/25/03

Dr. Tom Bailey, Chief
Environmental Protection Agency
Office of Prevention, Pesticides, and Toxic Substances
Environmental Risk Branch II
Environmental Fate and Effects Division (7505C)
Ariel Rios Building
1200 Pennsylvania Avenue, NW.
Washington, D.C. 20460

Dear Dr. Bailey:

Thank you for your Agency's comments addressing the Bureau of Land Management's (BLM) "A General Approach to the Ecological Risk Assessment (ERA) for the BLM Vegetation Treatment Environmental Impact Statement."

In May of 2002 two Toxicology Risk Assessment Teams were assembled to address both human health and ecological risks for herbicide use and practices on public lands. The teams included representatives from BLM, BLM's EIS contractor ENSR, Fish and Wildlife Service (FWS), National Marine Fisheries Service (NMFS), and the Environmental Protection Agency (EPA). The risk assessment teams had two purposes. The first was to review current and past methodologies used for risk assessments by the BLM and other agencies, including the EPA. The other purpose was to develop a consensus on which methodologies provided the best available science and process or protocol the BLM would use to conduct future human health and ecological risk analyses for chemical herbicides proposed for use on public lands administered by the BLM.

The comments and input provided by the EPA have been invaluable in this effort. The enclosed comment sheet and final ERA document outlines where the BLM has reviewed and incorporated your agency comments. We would like to especially thank Mike Davy from your Environmental Fate and Effects Division for his assistance in helping the BLM to develop the protocol.

If you have any questions or comments, please contact Gina Ramos, National Vegetation EIS Co-Team lead, at 202-452-5084.

Sincerely,

/s/James G. Kenna (Acting)

Assistant Director, Renewable Resources and Planning

Enclosure

LLM:220 l620 LS Rm. 204:Gramos:pat:8/12/03:452-5084:EPALetter

August 28, 2003

In Reply Refer To:
4000 (220)

Memorandum

To: Gary Frazier
Assistant Director for Endangered Species, FWS

From: Assistant Director, Renewable Resources and Planning
Bureau of Land Management

Subject: A General Approach to the Ecological Risk Assessment (ERA) for the Bureau of Land Management (BLM) Vegetation Treatment Environmental Impact Statement (EIS)

In May 2002, two Toxicology Risk Assessment Teams were assembled to address both human health and ecological risks for herbicide use and practices on public lands. The teams included representatives from the BLM, BLM's EIS contractor ENSR, Fish and Wildlife Service (FWS), National Marine Fisheries Service (NMFS), and the Environmental Protection Agency (EPA). The risk assessment teams had two purposes. The first was to review current and past methodologies used for risk assessments by the BLM and other agencies, including the EPA. The other purpose was to develop a consensus on which methodologies provided the best available science and process or protocol the BLM would use to conduct future human health and ecological risk analyses for chemical herbicides proposed for use on public lands administered by the BLM.

The BLM has finalized the attached ERA and will immediately start the risk assessments. The BLM will include the information from the risk assessments in the Draft EIS's Analysis section as well as in the Biological Assessment. We look forward to working with the FWS on the next phase of the EIS as well as ESA consultation. If you have any questions or comments, please contact Gina Ramos, Co-team lead at 202-452-5084.

/s/James G. Kenna (Acting)

Attachment

LLM:220 1620 LS Rm. 204:Gramos:pat:452-5084:FWSLetter

GRamos 8-28-03

August 28, 2003

In Reply Refer To:
4000 (220)

Ms. Laurie K. Allen
Acting Director, NOAA
National Marine Fisheries Service
Office of Protected Resources, F/PR-3
1315 East-West Highway
Silver Spring, Maryland 20910

Dear Ms. Allen:

Thank you for your comments addressing the Bureau of Land Management's (BLM) "A General Approach to the Ecological Risk Assessment (ERA) for the BLM Vegetation Treatment Environmental Impact Statement (EIS)."

In May 2002 two Toxicology Risk Assessment Teams were assembled to address both human health and ecological risks for herbicide use and practices on public lands. The teams included representatives from the BLM, BLM's EIS contractor ENSR, Fish and Wildlife Service (FWS), National Marine Fisheries Service (NMFS), and the Environmental Protection Agency (EPA). The risk assessment teams had two purposes. The first was to review current and past methodologies used for risk assessments by the BLM and other agencies, including the EPA. The other purpose was to develop a consensus on which methodologies provided the best available science and process or protocol the BLM would use to conduct future human health and ecological risk analyses for chemical herbicides proposed for use on public lands administered by the BLM.

The comments and input provided by NOAA have been very helpful. The enclosed comment sheet and final ERA document outlines where the BLM has reviewed and incorporated your agency comments. We would like to especially thank Kellie Foster and Rachel Friedman for their participation and assistance in helping the BLM to develop the protocol. If you have any questions or comments, please contact Gina Ramos, Co-team lead, at 202-452-5084.

Sincerely,

/s/James G. Kenna (Acting)

Assistant Director, Renewable Resources
and Planning

Enclosure
LLM:220 1620 LS Rm. 204:Gramos:pat:8/12/03:452-5084:NOAAFisheriesdoc.

# U.S. FISH AND WILDLIFE SERVICE AND NOAA NATIONAL MARINE FISHERIES SERVICE CONSULTATION



June 12, 2002

In Reply Refer To:
9015 (220)

Mr. Don Knowles
Director, National Marine Fisheries Service
Office of Protected Resources, F/PR3
1315 East-West Highway
Silver Spring, Maryland 20910

Dear Mr. Knowles:

On November 13, 2001, the Bureau of Land Management (BLM) met with Kellie Carter and Craig Johnson of the National Marine Fisheries Service (NMFS) and Rick Sayers and Jim Serfis of the U.S. Fish and Wildlife Service (FWS). The purpose of the meeting was to discuss the procedure for preparing a consultation agreement for the BLM's National Programmatic Environmental Impact Statement (EIS) for Vegetation Treatments. At this meeting, all three agencies agreed that the consultation would proceed according to the Section 7 Interagency Cooperation regulations at 50 CFR Part 402.

The BLM intends the national EIS to be a framework for the treatments of vegetation on BLM managed lands. Because the national EIS is broad in scope, specific details of every potential application will not be included in the EIS. Consequently, local and/or State BLM offices will still be required to conduct site specific consultations with the FWS and NMFS on actions determined to "May Affect" a listed species or adversely modify designated critical habitats.

**Identification of Agency Points of Contact for the preparation of the Vegetation EIS and consultation:**

Jim Serfis (FWS) and Kellie Carter (NMFS) will serve as the Points of Contacts (POC's) for their respective agencies on the Vegetation EIS. Both will also serve as team members on the EIS Interdisciplinary Team. As team members, they will provide agency input into the EIS and coordinate preparation of the Biological Opinions (BO's).

The POC's will represent their agency interests and act as the liaison to their agency staff. The BLM and ENSR International (BLM contractor) will coordinate with the POC's to develop the EIS schedule, to gather information and to contact their respective field offices for information,

and to review documents. We agreed that the POC's would attend the Vegetation EIS Interdisciplinary Team meetings and public scoping meetings whenever possible. The POC's or their representatives will also participate in conference calls and plan reviews to provide expertise regarding threatened and endangered species matters during the development of the ecological risk assessment work plan.

**Initiating Consultation:**

Discussions with the FWS and NMFS began on November 13, 2001. Public scoping meetings began in January 2002 and completed on March 12, 2002. After the draft public scoping report has been prepared and reviewed, the BLM, FWS, and NMFS will begin discussions to identify the "Action Area," identify potential effects to listed and proposed species and their critical habitat from the vegetation treatment methods, i.e., prescribed burning, chemical, mechanical, biological controls that will take place on BLM-managed surface lands (on a programmatic basis), identify the information needed to initiate the formal consultation process, and decide how to deal with the proposed treatment methods. These discussions will begin as soon as possible. The BLM will also develop the Preferred Alternative during this time.

The BLM will prepare an initiation package for the FWS and NMFS to begin the formal consultation process. Before preparation of the initiation package, BLM will work closely with NMFS and FWS to make the package as detailed and comprehensive as possible. Formal consultation will be initiated when the package provides all relevant data required by 50 CFR §402.14 (c) and when NMFS and FWS have received the required information. The initiation package will include the draft Biological Assessment (BA).

As part of the initiation package, the BLM will identify the effects of the proposed action on threatened, endangered, and proposed species and their critical habitat. For information on the effects of current and proposed herbicides (see attached lists of current and proposed herbicides) on threatened and endangered species, the BLM will provide FWS and NMFS information on these herbicides to the extent that the information is available to the public from the Environmental Protection Agency (EPA) and other sources, including industry. Such information may include toxic risks to listed species and fate, transport and monitoring methods to assess effectiveness of best management practices (BMP's).

When information is not available for currently approved or proposed herbicides, the BLM along with NMFS and FWS will make an assessment based on the relevant information. This information may be from studies of similar herbicides as to the likely effects to threatened and endangered species. For this EIS, the BLM will only be including those herbicides that have already received EPA labeling for range, forestry, rights of ways, and aquatic use. For those herbicides currently in use and addressed in the previous EIS's, no additional risk assessments will be prepared. Project specific consultation will rely on programmatic level risk assessments and will not require that additional, local risk assessments be prepared.

As discussed in the initial meeting, if the BLM determines that an action "May Affect" a listed species or its designated critical habitat and NMFS/FWS concur, the BLM may be able to modify the action to eliminate any adverse effects. If the BLM determines that an action is "likely to Adversely Affect" (LAA) a listed species or designated critical habitat, the BLM will attempt to modify the action to avoid such adverse effects.

To better assess the threats to listed and proposed species and their critical habitat, the BLM, FWS, and NMFS will begin discussions on the effects of the proposed action before the formal consultation stage to ensure that this information will be included in the Biological Opinion.

Initiation of formal consultation with the FWS and NMFS will occur with the release of the draft EIS. At that time, BLM will submit a final BA to the FWS and NMFS. Separate draft Biological Opinions will be completed by FWS and NMFS 135 days after formal consultation has begun, unless FWS, NMFS, and BLM mutually agree upon an extension. The BLM will review the draft Biological Opinions before the FWS and NMFS submit the final Biological Opinions. We anticipate that the final Biological Opinions will be submitted to BLM just before release of the Final EIS so that the BLM can publish the documents concurrently. The anticipated date for publication of the Biological Opinions and Final EIS is in the Summer of 2003. Both NMFS and FWS will assist BLM in reviewing the comments that BLM receives on the Draft EIS and will help BLM to develop the information to support the Final EIS. The BLM understands that if the selected alternative is not the preferred alternative, BLM will reinitiate consultation.

**Information that BLM and ENSR will provide for NMFS and FWS:**

The BLM intends the EIS to be a framework for the treatments of vegetation, but BLM will still require local and/or State offices to conduct site-specific consultations with the FWS and NMFS. As part of the BLM's commitment to protect listed and proposed species, the BLM will ensure that actions are not likely to jeopardize the continued existence of any listed or proposed species or result in the destruction or adverse modification of designated or proposed critical habitat. The BLM, along with assistance from NMFS and FWS, will modify the vegetation treatments in the preferred alternative to avoid the likelihood of jeopardy and adverse modification of critical habitat. Evaluation of the effects of the vegetation treatments will be to determine the "short-term harm versus the long-term good."

The Programmatic Biological Assessment will provide an overall framework for species assessments. A detailed Biological Assessment will need to be prepared for individual projects at the field office level (site-specific level analysis). The BLM will prepare an assessment for each listed species likely to be impacted by the proposed action or likely to be found in areas where vegetation treatments will occur. The BLM will provide sufficient information for each species needed to determine the effects of vegetation treatments on the species and their habitat.

Where practical, the BLM may group species based on habitat requirement or taxonomy when conducting analyses of the effect. Watersheds will identify the "action area" for some species and may be taken down to the 4th Hydrologic Unit Classification (HUC) Level.

The EIS will address threatened, endangered, and proposed species and designated and proposed critical habitat. The Biological Assessment will not address candidate species although some of these species, will be assessed in the EIS. The BLM will review State lists of threatened and endangered and sensitive species. The BLM will confer with individual States that have their own Threatened and Endangered Species Law (Oregon and California) if they require additional consultation.

**Information that the BLM will gather before consultation begins and separate requirements from each agency:**

The BLM understands that NMFS and FWS use the same guidance under the Endangered Species Act (ESA) for species and critical habitats. As required by NMFS, the BLM will prepare an Essential Fish Habitat Plan and coordinate the preparation of the documents with the NMFS POC and the NMFS Office of Habitat.

**Timelines for EIS ID team meetings, products, reports and updates:**

The BLM understands that the FWS and NMFS will provide no intermediate documents. Schedules will be coordinated with BLM and ENSR that meet the EIS schedule. The BLM will review the consultation flowchart with FWS and NMFS for any further clarification. To stay on schedule, the BLM will coordinate with the POCs for NMFS and FWS to ensure that schedules are met and to identify any problems during the informal and formal consultation process.

The BLM, FWS, and NMFS will need to closely coordinate activities throughout the EIS process to ensure that we have the Biological Opinion by the time the Final EIS is completed. Gary Frazer, Assistant Director for Endangered Species, will sign the Biological Opinion for the FWS, and Don Knowles, Director of the Office of Protected Resources, will sign the Biological Opinion for the National Marine Fisheries Service.

If you have any questions or comments concerning the EIS, please contact Gina Ramos at 202-452-5084, Brian Amme, Vegetation EIS co-team leads at 202-452-5084 or 775-862-6645, or Tim Reuwsaat, Group Manager for Resources at 202-452-5179.

Sincerely,
/s/Elena C. Daly

Assistant Director, Renewable Resources
and Planning

Enclosure

LLM:220 1620 LS Rm. 201:GRamos:452-5084:pat:6/7/02:NMFS&FWSconsultation

# Currently Approved Herbicides from BLM Environmental Impact Statements

## Northwest Area Noxious Weed Control Program, December 1985

2,4-D
Picloram
Dicamaba
Glyphosate (Rodeo formulation)

## California Vegetation Management FEIS, August 1988

Amitrole
Asulam
Atrazine
Bromacil
2,4-D
Dalapon
Dicamba
Diuron
Fosamine
Glyphosate
Hexazinone
Picloram
Simazine
Tebuthiuron
Triclopyr

## Vegetation Treatment EIS - Thirteen Western States, July 1991

Atrazine
Bromacil
Chlorsulfuron
Clopyralid
2,4–D
Dicamba
Diuron
Glyphosate
Hexazinone
Imazapyr
Mefluidide
Metsulfuron Methyl
Picloram
Simazine

Sulfometuron Methyl
Tebuthiuron
Triclopyr

**Western Oregon FEIS, August 1992**

Asulam
Atrazine
2,4-D
Dicamba
Glyphosate
Hexazinone
Picloram
Triclopyr

**New Proposed Herbicides to be analyzed in the Vegetation EIS**

Diquat
Fluridone
Imazapic
Diflufenzopyr
MCPA

August 28, 2003

In Reply Refer To:
4000 (220)

Memorandum

To: Gary Frazier
Assistant Director for Endangered Species, FWS

From: Assistant Director, Renewable Resources and Planning
Bureau of Land Management

Subject: A General Approach to the Ecological Risk Assessment (ERA) for the Bureau of Land Management (BLM) Vegetation Treatment Environmental Impact Statement (EIS)

In May 2002, two Toxicology Risk Assessment Teams were assembled to address both human health and ecological risks for herbicide use and practices on public lands. The teams included representatives from the BLM, BLM's EIS contractor ENSR, Fish and Wildlife Service (FWS), National Marine Fisheries Service (NMFS), and the Environmental Protection Agency (EPA). The risk assessment teams had two purposes. The first was to review current and past methodologies used for risk assessments by the BLM and other agencies, including the EPA. The other purpose was to develop a consensus on which methodologies provided the best available science and process or protocol the BLM would use to conduct future human health and ecological risk analyses for chemical herbicides proposed for use on public lands administered by the BLM.

The BLM has finalized the attached ERA and will immediately start the risk assessments. The BLM will include the information from the risk assessments in the Draft EIS's Analysis section as well as in the Biological Assessment. We look forward to working with the FWS on the next phase of the EIS as well as ESA consultation. If you have any questions or comments, please contact Gina Ramos, Co-team lead at 202-452-5084.

/s/James G. Kenna (Acting)

Attachment

LLM:220 1620 LS Rm. 204:Gramos:pat:452-5084:FWSLetter

GRamos 8-20

August 28, 2003

In Reply Refer To:
4000 (220)

Ms. Laurie K. Allen
Acting Director, NOAA
National Marine Fisheries Service
Office of Protected Resources, F/PR-3
1315 East-West Highway
Silver Spring, Maryland 20910

Dear Ms. Allen:

Thank you for your comments addressing the Bureau of Land Management's (BLM) "A General Approach to the Ecological Risk Assessment (ERA) for the BLM Vegetation Treatment Environmental Impact Statement (EIS)."

In May 2002 two Toxicology Risk Assessment Teams were assembled to address both human health and ecological risks for herbicide use and practices on public lands. The teams included representatives from the BLM, BLM's EIS contractor ENSR, Fish and Wildlife Service (FWS), National Marine Fisheries Service (NMFS), and the Environmental Protection Agency (EPA). The risk assessment teams had two purposes. The first was to review current and past methodologies used for risk assessments by the BLM and other agencies, including the EPA. The other purpose was to develop a consensus on which methodologies provided the best available science and process or protocol the BLM would use to conduct future human health and ecological risk analyses for chemical herbicides proposed for use on public lands administered by the BLM.

The comments and input provided by NOAA have been very helpful. The enclosed comment sheet and final ERA document outlines where the BLM has reviewed and incorporated your agency comments. We would like to especially thank Kellie Foster and Rachel Friedman for their participation and assistance in helping the BLM to develop the protocol. If you have any questions or comments, please contact Gina Ramos, Co-team lead, at 202-452-5084.

Sincerely,

/s/James G. Kenna (Acting)

Assistant Director, Renewable Resources
and Planning

Enclosure
LLM:220 1620 LS Rm. 204:Gramos:pat:8/12/03:452-5084:NOAAFisheriesdoc.



United States Department of the Interior

FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

In Reply Refer to:
FWS/AES/DHCR/016804

APR 2004

Memorandum

To: Assistant Director –Endangered Species

From: Acting Chief, Division of Consultation, Habitat Conservation Planning, Recovery & State Grants

Subject: Consultation Agreement with BLM on the Vegetation Treatment Programmatic Environmental Impact Statement

Attached is a Consultation Agreement that describes the process that the Service and BLM will follow to complete the consultation for BLM's Vegetation Treatment program. BLM requested that we enter into the agreement to ensure an understanding of how the parties would work together and offer a timeline for the process. We worked with BLM to develop the agreement and have reviewed the document that has been finalized by BLM staff.

Please note that there are two copies to be signed and that one of the copies has been already signed by Judge Shepard. BLM staff requested that we retain the document signed by Judge Shepard and forward the document with your signature to BLM. Please let me know if you have any questions regarding the document.

Attachment

# BUREAU OF LAND MANAGEMENT

# and

# U.S. FISH AND WILDLIFE SERVICE,

# CONSULTATION AGREEMENT FOR THE

# VEGETATION TREATMENTS PROGRAMMATIC

# ENVIRONMENTAL IMPACT STATEMENT

## A. Purpose and Need:

This Consultation Agreement (Agreement) is formulated to establish an effective and cooperative process upon which the Endangered Species Act (ESA) Section 7 Consultation may be conducted between the Bureau of Land Management (BLM), Rangelands, Soil, Water and Air Group, Washington DC, and the U.S. Fish and Wildlife Service, Region 9 Washington DC Office (Service). This Agreement addresses consultation and conferencing on all species determined to be listed as threatened or endangered, or proposed for listing, and designated or proposed critical habitat occurring on the Federal lands managed by the BLM.

This Agreement will serve to define the process, products, actions, schedule and expectations of the BLM and the Service regarding the consultation process for the *Vegetation Treatments Programmatic Environmental Impact Statement* (Vegetation Treatments EIS).

The Federal agencies will convene an interagency team composed of their employees to conduct this consultation.

## B. Consultation Background:

The BLM manages 261 million acres of public land resources. BLM and its contractor, ENSR, are preparing a *Vegetation Treatments Programmatic Environmental Impact Statement* to evaluate proposed vegetation treatment methods and alternatives on lands administered by the BLM in the western continental United States and Alaska. This EIS is to serve to update the following four EISs developed by the BLM in the mid 1980s and early 1990s:

- Northwest Area Noxious Weed Control Program – 1986
- California Vegetation Management – 1988
- Vegetation Treatment of BLM Lands in Thirteen Western States – 1991
- Western Oregon Program Management of Competing Vegetation – 1992

The EIS will provide updated information and analyses provided in the earlier programmatic EISs, where necessary, to ensure that ongoing and proposed vegetation treatment methods are safe to humans and the environment and meet treatment objectives. Information provided in the EIS will help the BLM ensure that BLM vegetation treatment activities comply with applicable federal, state, local, and tribal laws, regulations, statutes, policies, and management plans.

**C. Authority:**

Authority to enter into this Agreement is contained in the following:

Endangered Species Act of 1973, as amended
Federal Land Policy and Management Act of 1976
Memorandum of Agreement on Endangered Species Act Section 7 Programmatic Consultation and Coordination among BLM, USDA Forest Service, NMFS, and the FWS, August 30, 2000

**D. Consultation Action:**

This Agreement encourages streamlining of the consultation process in the preparation of the Vegetation Treatments EIS. This increased coordination will enable the Vegetation Treatments EIS to incorporate species habitat needs and will facilitate and expedite the consultation process.

In November 2001, Informal Section 7 Consultation began with the Service on the Vegetation Treatments EIS. Formal consultation will commence when a complete written initiation request, as defined in 50 CFR 402.14 (c), including the draft Vegetation Treatments Programmatic Biological Assessment (BA) for the Draft Vegetation Treatments EIS, is received and determined to be complete by the FWS.

It is anticipated that BLM will initiate formal consultation with the Service at the time the Draft EIS is issued. The BLM will submit a draft BA as part of its consultation package. The Service will review the draft BA and notify the BLM within 30 days of any missing information in the BA. Once the draft BA is considered complete by the Service, a final BA will be prepared. The BLM will then prepare a written initiation request to start formal consultation. The Service will conduct the formal consultation within a 135-day time frame. The level of information expected in the programmatic biological consultation is unlikely to provide sufficient detail to reach conclusions that incidental take is reasonably certain to occur. Therefore, any incidental take exemptions would be deferred to site-specific consultations where sufficient detail would be available. Any request for an extension of the formal consultation period will be made by mutual agreement between BLM and the FWS.

The BA will follow the outline as found in guidance in the Endangered Species Consultation Handbook (March 1998). Anticipated environmental effects, conservation actions, mitigation, and monitoring will be disclosed in the BA. This includes analysis of direct, indirect, and interrelated and interdependent effects on listed, proposed, or candidate species, and/or designated or proposed critical habitat from the analysis of the actions in the Vegetation Treatments EIS.

**E. Operations:**

**The BLM agrees to:**

1. Appoint Ms.Gina Ramos as the primary contact regarding all BA and ESA issues and as BLM's consultation team member. If Ms. Ramos is not available, the secondary contact person is Mr. Brian Amme. Ms. Carol Spurrier will work with Ms. Ramos and Mr. Amme as necessary to facilitate consultation. If there are any unforeseeable changes in personnel, new contact person names and phone numbers will be immediately provided to the Service.

2. Prepare an assessment for each listed species that may potentially be impacted by the proposed action or likely to be found in areas where vegetation treatments would occur. The BLM will provide sufficient information for each species needed to determine the effects of vegetation treatments on the species and their habitat use. Where practical, the BLM may group species based on habitat requirement or taxonomy when conducting the affects analyses. The Programmatic BA will provide an overall framework for species assessments with a more detailed BA prepared for individual projects (site-specific level analysis).

3. Address candidate species in the BA. The BLM will review state lists of threatened and endangered and sensitive species and will confer with individual states that have their own threatened and endangered species law (Oregon and California) if they require additional consultation.

4. Will prepare an Essential Fish Habitat Plan and coordinate the preparation of the document with the Office of Habitat, NOAA Fisheries.

5. Submit recent risk assessments prepared by the BLM on chemicals that will be applied on BLM lands as part of the Vegetation Treatments EIS consultation package.

6. Submit recent risk assessments written by the FS on chemicals that will be applied on BLM lands as part of the Vegetation EIS consultation package.

7. Provide copies of the old BLM vegetation treatments EISs (as necessary), a copy of the preparation plan, and copies of relevant supporting documents as they are completed.

8. Hold meetings, conference calls, etc., as needed. If a milestone problem occurs, a conference call will be held to discuss the problem.

9. Appoint Mr. Bud Cribley and Mr. Dwight Fielder to the Division Chief/Group Manager Resolution Working Group; Appoint Mr. Ed Shepard to the Assistant Director Resolution Working Group and, Appoint Mr. Jim Hughes to the Director Resolution Working Group.

10. If there are any unforeseeable changes in personnel, new contact person names and phone numbers will be immediately provided to the FWS.

11. Provide a 90-day time frame for review of a final BA.

12. Identify all time commitments (see Attachment A). If the schedule for BLM provision of documents and other information has not been met and changes are required, changes to deadlines will not be finalized without mutual agreement with the Service on the necessary deadline changes.

**<u>The FWS agrees to:</u>**

1. Appoint Mr. Jim Serfis as the primary contact regarding all BA and ESA issues. If there are any unforeseeable changes in personnel, new contact person names and phone numbers will be immediately provided to the BLM and NOAA Fisheries.

2. Coordinate with counterpart offices for the purposes of this consultation, including identification of additional listed species list to be included in the Vegetation Treatments EIS project area.

3. Participate in milestone meetings, conference calls, etc.

4. Provide threatened and endangered species expertise to help the BLM identify conservation opportunities during preparation of the Vegetation Treatments EIS.

5. Provide a BO within the 135-day timeframe, unless extended by mutual consent.

6. Appoint Mr. Patrick Leonard to the Division Chief/Group Manager Resolution Working Group; Appoint Mr. Gary Frazer to the Assistant Director Resolution Working Group and, Appoint Mr. Clint Riley to the Director Resolution Working Group. If there are any unforeseeable changes in personnel, new contact person names and phone numbers will be immediately provided to the BLM.

7. Meet the time commitment found in Attachment A. Any scheduled changes will be made by mutual agreement.

**<u>The BLM and Service mutually agree to:</u>**

1. Provide early notification if any problems may arise that would affect the documents or timeframes.

2. Allow the primary contact personnel to make all the necessary changes to the timeframes. The Group Manager and Supervisor will only become involved if the problem becomes elevated and problem items require signatures.

3. Follow the initiation criteria as outlined in 50 402.14(c) in preparation of the initiation package.

4. Consider this as a programmatic level consultation. All Actions that could affect species will undergo consultation at the Field Office level. As part of the BLM's commitment to protect threatened and endangered species, the BLM will ensure that actions are taken to avoid a "jeopardy opinion." This is to ensure that there is continued existence of the listed species or no adverse modification of a designated critical habitat. The BLM, along with the Service, may design mitigation action for vegetation treatments that must be followed to avoid a jeopardy opinion. The focus of the intended outcome of the vegetation treatments will be to evaluate the "short term harm versus the long term good."

5. Describe a process for completing consultations at the state office and field office levels.

6. Review the comments that the BLM receives on the Draft EIS and develop the information to support the Final EIS. The BLM understands it that if the selected alternative is not the preferred alternative, BLM will reinitiate consultation.

7. Agree on effects during the informal consultation stage in order to ensure that this information will be included in the BO.

8. Coordinate as partners by mutually agreeing on conservation measures to promote recovery that will be included in the Vegetation Treatments EIS.

9. Only amend the Agreement by consensus of both parties.

10. Terminate the Agreement only if one party gives 60 day written notice.

11. Acknowledge that this Agreement is only to improve the internal management of this consultation by the BLM and the Service, and is not intended to and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United states, its agencies or instrumentalities, its officers or employees, or any other person. Nothing in this Agreement shall be construed as obligating either party to the expenditure of funds, or for the future payment of money, in excess of appropriations authorized by law.

12. Recognize the use of Issue Resolution Teams (IRT) if an impasse is reached regarding any aspect of this process, Agreement, or with any of the documents. Elevations of issues to IRTs will follow these tiers: Division Chief/Group Manager Level, Assistant Director Level, and Director Level. After 15 days, the Division Chief/Group Manager level Resolution Working Group will send unresolved issues to the Assistant Director Level Resolution Working Group. If resolution cannot be achieved within 15 days at the Assistant Director Level, the issue will be elevated to the Director Level. The Director Level Issue Resolution

Working group decisions will be issued within 15 days and are the final and binding resolutions of disputes.

13. All issue resolution working group reviews should be initiated by request of the applicable working group, or a specific agency. The request will include (1) a concise summary of issues in dispute and decisions that need to be made (2) agency position statements on each of the issues (3) all supporting rationale and documentation for consideration; and (4) a brief chronology of key actions taken to resolve the dispute.

**F. Term**

This Agreement shall take effect upon the date of the last signature. It shall remain in effect for four years, or until the BO for the BLM Vegetation EIS is completed, whichever comes first.

**G. Approved**

Ed Shepard
Bureau of Land Management

4/19/04
Date

Gary Frazer
U.S. Fish and Wildlife Service

4/12/04
Date

## Attachment A

### Schedule for Document Review and Completion of Formal Consultation

| Task | Due Date |
|---|---|
| BLM submit preliminary draft BA (including information on all treatment methods except use of herbicides) | November 15, 2004 |
| Service provide BLM with comments on preliminary draft BA (less sections on herbicides) | December 31, 2004 |
| BLM submit draft Ecological Risk Assessments to the Service | March 31, 2004 |
| BLM submit preliminary draft BA (including sections related to use of herbicides) to Service | May 15, 2004 |
| Service will notify BLM of any missing 50CFR 402.14(c) data in the preliminary draft BA | June 15 2004 |
| BLM provides Service with needed information and Final BA | August 22, 2004 |
| Service formulate draft Biological Opinion | November 20, 2004 |
| BLM reviews draft Biological Opinion and provides comments to Service | December 5, 2004 |
| Service prepare Final Biological Opinion | January 5, 2005 |

BLM_0001089

APPENDIX H

# ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT (ANILCA) § 810 ANALYSIS OF SUBSISTENCE IMPACTS

BLM 0031091

# TABLE OF CONTENTS

**Page**

Introduction....................H-1
Subsistence Evaluation Factors....................H-1
Evaluation of Alternatives and Findings....................H-2
ANILCA § 810(a) Evaluations and Findings for All Alternatives and the Cumulative Case....................H-2
Environmental Justice....................H-13
References....................H-14

BLM_0001092

BLM_0001093

# APPENDIX H

# ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT (ANILCA) § 810 ANALYSIS OF SUBSISTENCE IMPACTS

## Introduction

On October 11, 2001, the Bureau of Land Management (BLM) issued a Notice of Intent in the Federal Register to prepare a Programmatic Environmental Impact Statement (PEIS) on the treatment of vegetation on public lands in the western U.S., including Alaska. Subsequent Federal Register Notices in January 2002 notified the public of the location of public scoping meetings, changes to the meeting schedule, and extension of the public comment period. Information gathered at these meetings and during the comment period led to the development of the *Draft Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States PEIS* and the *Draft Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Report* (PER). Together, these documents assess on a national level the BLM's proposed use of herbicides, and describe the environmental impacts of using herbicides and other vegetation treatment methods, such as fire, manual removal, mechanical removal, and biological controls. Because of the programmatic nature of the proposed use of herbicides by the BLM, the two documents address a wide range of impacts that are inclusive of the extensive and diverse land area under analysis. Should herbicide use be proposed locally, then site-specific impacts of all vegetation treatments would be addressed and analyzed in additional NEPA documents prepared by local BLM offices and tiered to the PEIS and PER documents.

BLM-administered lands (public lands) are federally-owned lands and interests in lands (such as federally-owned mineral estate) that are administered by the Secretary of the Interior through the BLM. In Alaska, public lands also include lands selected, but not yet conveyed, to the State of Alaska or Native Corporations and villages.

Chapters 3 (Affected Environment) and 4 (Environmental Consequences) of the PEIS and Chapters 3 (Public Land Resources) and 4 (Effects of Vegetation Treatments) of the PER provide detailed descriptions of the affected environment and the potential effects of the various alternatives on subsistence resources. This appendix uses the detailed information presented in the PEIS and PER to evaluate the potential impacts to subsistence pursuant to Section 810(a) of the Alaska National Interest Land Conservation Act (ANILCA).

## Subsistence Evaluation Factors

Section 810(a) of ANILCA requires that an evaluation of subsistence uses and needs be completed for any federal determination to "withdraw, reserve, lease, or otherwise permit the use, occupancy or disposition of public lands." As such, an evaluation of potential impacts to subsistence under ANILCA § 810(a) must be completed for the PEIS and PER. ANILCA requires that this evaluation include findings on three specific issues:

- The effect of use, occupancy, or disposition on subsistence uses and needs;
- The availability of other lands for the purpose sought to be achieved; and
- Other alternatives that would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes (16 USC § 3120).

A finding that the proposed action may significantly restrict subsistence uses imposes additional requirements, including provisions for notices to the State of Alaska and appropriate regional and local

subsistence committees, a hearing in the vicinity of the area involved, and the making of the following determinations, as required by Section 810(a)(3):

- Such a significant restriction of subsistence uses is necessary, and consistent with sound management principles for the utilization of the public lands;
- The proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of use, occupancy, or other disposition; and
- Reasonable steps will be taken to minimize adverse effects upon subsistence uses and resources resulting from such actions.

To determine if a significant restriction of subsistence uses and needs may result from any one of the alternatives discussed in the PEIS or treatments reviewed in the PER, including their cumulative effects, the following three factors in particular are considered:

- Reductions in the availability of subsistence resources caused by a decline in the population or amount of harvestable resources;
- Reductions in the availability of resources used for subsistence purposes caused by alteration of their normal locations and distribution patterns; and
- Limitations on access to subsistence resources, including limitations resulting from increased competition for the resources.

# Evaluation of Alternatives and Findings

Under each of the alternatives presented below, the proposed actions involved two primary decisions: 1) the determination of which herbicide active ingredients are available for use on public lands in the western U.S., including Alaska, in order to improve the agency's ability to control hazardous fuels and unwanted vegetation; and 2) the development of a state-of-the-science ecological risk assessment methodology to evaluate herbicides that may become available in the future[1]. There are no specific projects proposed under any of the alternatives. When a project is proposed, the BLM will be required to initiate a site-specific NEPA analysis of the proposed actions and conduct an additional ANILCA § 810 Analysis of Subsistence. During this process, the BLM will invite public participation and collaborate with Alaska Natives to identify and protect culturally significant plants used for food, baskets, fiber, medicine and ceremonial purposes. For this document, the evaluation and findings required by ANILCA § 810 are similar for all five alternatives considered in the PEIS, primarily because of the programmatic nature of the proposed herbicide use. The BLM has found that none of the alternatives in the PEIS result in a finding of "may significantly restrict subsistence uses and needs.

A subsistence evaluation and finding under ANILCA § 810 must also include a cumulative impacts analysis. The discussion below begins with evaluations and findings for each of the five alternatives discussed in the PEIS. Finally, the cumulative case, as discussed in Chapter 4 (Environmental Consequences) of the PEIS, is evaluated. This approach helps the reader to separate the subsistence restrictions that would potentially be caused by activities proposed under the alternatives from those that would potentially be caused by past, present, and future activities that could occur, or have already occurred, under the vegetation management program.

## ANILCA § 810(a) Evaluations and Findings for All Alternatives and the Cumulative Case

The following evaluations are based on information relating to the environmental and subsistence consequences of alternatives A through E and the cumulative impacts analysis as presented in Chapter 4 (Environmental Consequences) of the PEIS. The evaluations and findings focus on potential impacts to subsistence resources themselves, as well as access to resources, and economic and cultural issues that relate to subsistence use.

---

[1] To be developed by BLM in consultation with the U.S. Environmental Protection Agency (EPA), U.S. Fish and Wildlife Service (USFWS) and National Oceanic and Atmospheric Administration National Marine Fisheries Service.

**Evaluation and Findings for Alternative A - Continue Present Herbicide Use (No Action Alternative)**

Under this alternative, the BLM would continue current vegetation management activities in Alaska, and resource values would receive attention at present levels. Currently, vegetation management in Alaska consists of less than 50 acres of weed control, fewer than 200 acres of mechanical fuels reduction treatments each year, and periodic prescribed burns for wildlife habitat enhancement. Direction contained in existing laws, regulations, and policies would continue to be implemented. In general, most activities would be analyzed on a case-by-case basis and few uses would be limited or excluded, provided they were consistent with state and federal laws. Fire would be managed consistent with the *Alaska Land Use Plan Amendment for Wildland Fire and Fuels Management* (USDI BLM 2005).

***Evaluation of the Effect of Use, Occupancy, or Disposition on Subsistence Uses and Needs***

Selection of this alternative would result in the fewest acres treated; therefore, levels of risk from herbicide and other vegetation management treatments to subsistence resources would be lower than under the other alternatives. Threats from invasive plants and severe fire, however, would be higher than under the other alternatives. This alternative is likely to have more impact on subsistence resources than the Preferred Alternative (Alternative B), as it may be less effective at controlling invasive plants and excessive fuels.

Under the No Action Alternative, the BLM would have fewer options to control unwanted vegetation on BLM lands in Alaska (85.5 million acres). In Alaska, invasive plant species are generally found on road rights-of-way and areas of human-caused disturbance like cities, villages, trails and recreation areas; however, they are continually expanding their range. The focus of invasive species treatments is to control infestations before they spread to adjacent areas, where they are likely to have negative effects on subsistence resources by displacing native plants that are a food source for Native peoples and subsistence animals. Without weed and fuel control treatments, changes in the native plant community could increase over time and become permanent. Some invasive plants are known to change nutrient cycling regimes or increase erosion and sedimentation in streams, which could reduce fish populations.

Manual vegetation removal treatments, such as pulling, digging or mowing, can selectively remove unwanted vegetation, but may cause trampling and piling of debris on adjacent plants that could be used for subsistence and wildlife forage. These impacts would be limited to small areas. Impacts from mechanical vegetation removal treatments would be similar, but on a greater scale, as heavy equipment causes more severe impacts to plants and soil through disturbance and compaction. Mechanical treatments can be conducted over larger areas than manual treatments, but would be limited in Alaska by cost and access. The BLM would hire workers from local communities to conduct vegetation management activities. Higher levels of treatment could result in an additional source of income for rural Alaskans who depend on subsistence.

Under this alternative, fuel reduction treatments to prevent wildland fires would be more limited than under other alternatives, and the untreated hazardous fuels could result in severe fires that threaten life and property. Severe fires could destroy homes, and reduce subsistence opportunities by destroying plants and wildlife habitat over large areas. Areas affected by severe burns may take from several years to several decades to revegetate to healthy conditions. However, fire is still a natural ecosystem process in Alaska, and only a few areas in the state have altered fire regimes that are more conducive to fires because of human interference or as a result of insect infestations. Fighting wildland fires in Alaska and elsewhere is a major source of seasonal employment for Alaska Natives throughout the state. The income generated by this seasonal work comprises a major portion of the rural economy, and provides the cash necessary to purchase equipment and supplies needed for subsistence harvesting.

***Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved***

The purpose sought to be achieved under the No Action Alternative is to manage public lands in Alaska to prevent the spread and establishment of invasive non-native plants and to reduce hazards caused by excessive fuel loads. Because the PEIS is not area-specific, but applies to all federal public lands administered by the BLM, no other lands are appropriate for the purpose sought to be achieved. As a result, the "other lands" evaluation as required by ANILCA is more applicable to the future site-specific proposals that could result from the PEIS, at which

time discrete, bounded lands would be proposed for vegetation treatment.

The lands that would be selected for weed control or fuels reduction treatments include areas on public lands in Alaska where invasive non-native plants occur, or areas with an abundance of fire fuels that increase the likelihood of catastrophic fire. Additionally, lands where habitat is much less productive than desired for wildlife may be subject to treatments to improve wildlife habitat. The objectives of treatments would be to restore land health. In the future, areas of proposed treatment would be prioritized and analyzed under an appropriate NEPA document. Given that the BLM would propose future treatments on public lands only, other lands would not be available for the purpose. Lands administered by other federal agencies in Alaska are directed by their own planning documents. State- and Native Corporation-administered lands cannot be considered in a BLM plan, and under BLM policy other public lands outside of Alaska are not considered under ANILCA.

***Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence Purposes***

Other alternatives that would define the types of vegetation management actions allowed on public lands needed for subsistence include the action alternatives, which are presented and analyzed in Chapters 2 and 4 of the main body of the PEIS. These alternatives were created to represent a wide range of potential vegetation treatment activities that could occur on public lands, along with management actions that would serve to protect specific resource values following current national guidelines. Additional alternatives that were considered, but not analyzed in detail, are also discussed in Chapter 2.

***Findings***

The No Action Alternative would not significantly restrict subsistence use and needs in Alaska, as envisioned vegetation treatment would be minimal and treatment with herbicides has not been considered for Alaska. Expansion of invasive species and excessive hazardous fuel loads could occur under this alternative, resulting in the loss or displacement of native plants used by Alaska Natives for subsistence purposes. Additionally, invasive species and severe fires could reduce forage and habitat for subsistence animals. Potential invasive species spread and severe fires may eventually result in a significant reduction of species available for subsistence use, but this consequence is not expected to occur during the life of the PEIS and PER. Initially, displacement would be localized to disturbed areas that are easily accessible to humans, such as along roads. As more invasive, non-native plants are introduced and adapt to local conditions, they will become more widespread and problematic. No limits to access for subsistence purposes are envisioned as a result of this alternative.

**Evaluation and Finding for Alternative B - Expand Herbicide Use and Allow for the Use of New Herbicides in 17 Western States (Preferred Alternative)**

Under the Preferred Alternative, the BLM would be able to use four new herbicides in addition to 14 herbicides that have been previously-approved to treat approximately 932,000 acres annually across 17 western states. In addition, the BLM would be able to use herbicides in Alaska. Although no herbicide treatments are planned for Alaska under this alternative, the BLM could use herbicides as a part of an integrated vegetation management program that would more actively manage invasive non-native and undesirable plants, thereby reducing their negative effects on the environment and on subsistence use. It is estimated that over the next 10 years, no more than 1,000 acres of public lands in Alaska would be treated with herbicides in any year. The herbicides considered for use in Alaska must be registered in Alaska. At present, 13 of the 18 herbicide active ingredients proposed for use are registered for use in Alaska, and the list is further reduced to only certain formulations of those active ingredients that are registered in Alaska. That list is available from the Alaska Department of Environmental Quality.

Implementation of the Preferred Alternative would be guided by Standard Operating Procedures (SOPs) that serve to protect habitat and resources from potential impacts as a result of permitted activity. Standard Operating Procedures for use with herbicide application are found in Chapter 2 of the Final PEIS, in Table 2-8 and additional mitigations are found in Table 2-9 of the same chapter. There is concern in Alaska about the use of herbicides in sensitive environments, including tundra and boreal forests, but herbicide use may be appropriate where impacts to soil and other resources would be negligible, and where other treatment methods would not provide adequate vegetation control (Hebert 2001).

If new herbicides are developed in the future that provide control of unwanted vegetation superior to that of currently-used or proposed herbicides and with fewer risks to soil and other resources, the BLM would be able to use these herbicides, to the benefit of resources, upon completion of appropriate risk assessments and associated NEPA analysis.

Non-herbicide treatment options (fire use, and mechanical, manual, and biological control methods) would be guided by SOPs listed in Table 2-5 of the PER to protect resources. Fire would be managed in accordance with the *Alaska Land Use Plan Amendment for Wildland Fire and Fuels Management* (BLM 2005).

***Evaluation of the Effect of Use, Occupancy, or Disposition on Subsistence Uses and Needs***

In Alaska, the use of herbicides would have both beneficial and adverse effects. The area treated under this alternative would be greater than under the No Action Alternative, and thus the effects of herbicide use would be greater. By treating a larger area than under the No Action Alternative, the BLM would have a greater likelihood of reducing the number of acres covered by weeds and other invasive vegetation, and restoring ecosystem function to the benefit of subsistence resources. In this way, the Preferred Alternative has the greatest potential for the long-term protection of subsistence resources from impact by invasive plants or catastrophic fire by permitting flexibility in the management of vegetation resources.

Impacts to subsistence and wildlife from integrated weed management and fuels reduction treatments are expected to have short-term negative and long-term positive effects. Undesirable impacts from herbicide use could include: 1) overspray onto non-target species that would result in injury or death of plants; 2) accidental spills that could kill non-target plants and run into wetlands or streams; 3) herbicide drift from the application site that could damage plants; and 4) toxicity to organisms, including people, from excessive contact or ingestion. The BLM has developed SOPs to minimize the negative effects of vegetation management treatments. Part of the NEPA process for vegetation treatments is consultation with Native groups and the public to determine the location of important subsistence resources that might be affected by herbicide treatments, in order to minimize or eliminate the undesirable impacts of the treatments. The BLM would work closely with subsistence users to minimize impacts to subsistence resources in particular, and would follow guidance under Human Health and Safety in Chapter 4 of the PEIS in areas that may be visited by people after treatments.

If necessary for the protection of subsistence plants and wildlife forage, the BLM would: 1) use drift reduction agents with herbicide, as appropriate, to reduce the drift hazard to non-target species; 2) refer to the herbicide label when planning revegetation to ensure that desirable vegetation would not subsequently be injured by the herbicide; and 3) consider site characteristics, environmental conditions, and application equipment in order to minimize damage to non-target vegetation. To protect fish and wildlife, the BLM would: 1) use buffer zones based on label and risk assessment guidance; 2) minimize treatments near fish-bearing water bodies during periods when fish are in life stages most sensitive to the herbicide(s) used; 3) use appropriate application equipment/methods near water bodies if the potential for off-site drift exists; 4) use herbicides least toxic to fish; 5) treat only the portion of the aquatic system necessary to achieve acceptable vegetation management; 6) select the appropriate application method(s) to minimize the potential for injury to desirable vegetation and aquatic organisms; 7) follow water use restrictions presented on the herbicide label; 8) minimize treatments during nesting and other critical periods for birds and other wildlife; and 9) use herbicides of low toxicity to wildlife.

To protect water resources, the BLM would: 1) consider climate, soil type, slope, and vegetation type when determining contamination risk; 2) conduct mixing and loading operations in an area where an accidental spill would not contaminate an aquatic body; 3) refrain from rinsing spray tanks in or near water bodies; 4) refrain from broadcasting pellets where there is danger of contaminating water supplies; 5) minimize treating areas with high risk for groundwater contamination; 6) maintain herbicide-free buffers between treatment areas and water bodies; and 7) use the appropriate herbicide-free buffer zone for herbicides not labeled for aquatic use based on risk assessment guidance, with minimum widths of 100 feet for aerial, 25 feet for vehicle, and 10 feet for hand spray applications.

Impacts of non-herbicide treatments are discussed under the No Action Alternative, above.

***Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved***

The purpose sought to be achieved under the Preferred Alternative is to more effectively manage public lands in Alaska to prevent the spread and establishment of invasive non-native plants and to reduce hazards caused by excessive fuel loads. The lands that would be selected for weed control or fuels reduction treatments include areas on public lands in Alaska where invasive non-native plants occur and areas with an abundance of fire fuels that increase the likelihood of catastrophic fire. The objective of treatments is to restore land health. In the future, areas of proposed treatment would be prioritized and analyzed under an appropriate NEPA document. Given that the BLM would propose future treatments on public lands only, other lands would not be available for the purpose. Lands administered by other federal agencies in Alaska are directed by their own planning documents. State- and Native Corporation-administered lands cannot be considered in a BLM plan, and under BLM policy other public lands outside of Alaska are not considered under ANILCA.

***Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence Purposes***

Other alternatives that would define the types of vegetation management actions allowed on public lands needed for subsistence include the action alternatives, and No Action Alternative, which are presented and analyzed in Chapters 2 and 4 of the main body of the PEIS. These alternatives were created to represent a wide range of potential vegetation treatment activities that could occur on public lands, along with management actions that would serve to protect specific resource values following current national guidelines. Additional alternatives that were considered, but not analyzed in detail, are also discussed in Chapter 2.

***Findings***

The Preferred Alternative would not significantly restrict subsistence use in Alaska, since no herbicide treatments for Alaska are proposed under this alternative. Instead, the alternative examines the parameters by which herbicides use would be allowed, and requires individual, site-specific NEPA analyses any time that herbicide treatments are proposed in the future. In this way, the BLM would be able to define with local input the required SOPs and mitigations that would be applied to prevent damage to subsistence plants and animals. When projects are proposed, local communities would be given the opportunity to participate in the planning process and assist with the design of proposed treatments. The Preferred Alternative also prescribes a range of mitigations and required SOPs that are available for use by the BLM in order to minimize impacts to resources and human health. The list of SOPs is presented in Table 2-8 of Chapter 2 of the PEIS, and mitigations are listed in Table 2-9, in the same chapter.

**Evaluation and Findings for Alternative C – No Use of Herbicides**

Alternative C, the No Use of Herbicides Alternative, would eliminate the risks associated with herbicide application that have been identified for the Preferred Alternative. However, the risks associated with other vegetation management techniques, as discussed under the No Action Alternative, could be greater under Alternative C. The greatest risks would likely be associated with prescribed fire treatments. In addition, human health might be adversely affected by noxious weeds, other invasive plants, and/or fuels being maintained at current levels or increasing. Under this alternative, lands selected by the State and by Native or Village Corporations could be treated, with the permission and cooperation of the selecting organization.

Under Alternative C, weed control treatments in Alaska are expected to increase up to approximately 300 acres, with approximately 1,000 acres treated using manual or mechanical fuels reduction methods. Prescribed fire treatments may occur when conditions are appropriate, but are unlikely to occur annually. Under this alternative, there would be no risk from herbicides to paleontological, cultural, and subsistence resources, or to the health of Native Americans, Alaska Natives and other people. No herbicide use has been proposed or analyzed for public lands in Alaska. Direction contained in existing laws, regulations, and policies would continue to be implemented. In general, proposed vegetation management activities would be analyzed on a case-by-case basis and few uses would be limited or excluded as long as they were consistent with state and federal laws and SOPs. Fire would be managed in accordance with the *Alaska Land Use Plan Amendment for Wildland Fire and Fuels Management* (BLM 2005).

#### *Evaluation of the Effect of Use, Occupancy, or Disposition on Subsistence Uses and Needs*

Alternative C is likely to have an indirect impact on subsistence resources, similar to the No Action Alternative, as it may be less effective at controlling invasive plants and excessive fuel loads than the herbicide-use alternatives. Non-native or other undesirable vegetation can displace native species that may be used by Alaska Natives for subsistence purposes, and may result in poorer quality forage and cover for wildlife used for subsistence. These potential impacts to subsistence are described in detail under the No Action Alternative. There would be no direct impact to subsistence resources from herbicides or other chemicals under this alternative, as no herbicide use would be allowed. However, there would be direct effects to subsistence resources by manual, mechanical, and prescribed fire treatments that could temporarily displace wildlife and damage or kill plants used for subsistence. See the discussion of the impacts of these treatments under the No Action Alternative.

Since more acres would be treated under Alternative C than under the No Action Alternative, there would be more potential direct impacts to subsistence resources from vegetation treatments. In addition to the impacts described for the No Action Alternative, there would be more exhaust from equipment used, and smoke from prescribed fire, that could impact individuals sensitive to particulates produced by combustion. Although the income generated by seasonal work could supplement the rural economy and provide cash to purchase equipment and supplies needed for subsistence harvesting, individuals conducting these treatments could suffer injuries from manual labor or machinery.

#### *Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved*

The purpose sought to be achieved under Alternative C is to manage public lands in Alaska to prevent the spread and establishment of invasive non-native plants and to reduce hazards caused by excessive fuel loads. The lands that would be selected for weed control or fuels reduction treatments include areas on public lands in Alaska where invasive non-native plants occur and areas with an abundance of fire fuels that increase the likelihood of catastrophic fire. The objectives of treatments are to restore land health. In the future, areas of proposed treatment would be prioritized and analyzed under an appropriate NEPA document. Given that the BLM would propose future treatments on public lands only, other lands would not be available for the purpose. Lands administered by other federal agencies in Alaska are directed by their own planning documents. State- and Native Corporation-administered lands cannot be considered in a BLM plan, and under BLM policy other public lands outside of Alaska are not considered under ANILCA.

#### *Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence Purposes*

Other alternatives that would define the types of vegetation management actions allowed on public lands needed for subsistence include the action alternatives, and No Action Alternative, which are presented and analyzed in Chapters 2 and 4 of the main body of the PEIS. These alternatives were created to represent a wide range of potential vegetation treatment activities that could occur on public lands, along with management actions that would serve to protect specific resource values following current national guidelines. Additional alternatives that were considered but not analyzed in detail are also discussed in Chapter 2.

#### *Findings*

Alternative C would not significantly restrict subsistence use and needs in Alaska. Within 10 years, the area treated to control invasive plants is likely to increase to not more than 300 acres, and the area treated to reduce hazardous fuels is likely to increase to no more than 1,000 acres. Under this alternative, there would be no risks to paleontological, cultural, and subsistence resources and human health from herbicide applications. However, risks to these resources and human health associated with alternative vegetation management methods, such as manual clearing or prescribed fire use, could be greater than under this alternative than under the No Action Alternative. The greatest risks would likely be associated with prescribed fire treatments (see Chapter 4 in the PER). In addition, human health might be adversely affected by invasive weeds and poisonous plants that adversely affect humans being maintained at current levels or increasing because herbicides were not a treatment option. In the long run, this alternative could result in expansion of invasive species and increased fuel loads and loss of native plants that provide forage and cover for wildlife used for subsistence.

**Evaluation and Findings for Alternative D – No Aerial Application of Herbicides**

Alternative D is the No Aerial Application of Herbicides Alternative. Restriction on aerial applications would reduce the risk of herbicide drift and impacts to unintended targets. Alternative D would be much like the Preferred Alternative in that no aerial herbicide applications are proposed or likely to be proposed in Alaska under the Preferred Alternative. Under Alternative D, the BLM would be able to use four new herbicides, in addition to previously-approved herbicides for 17 western states that are registered in Alaska. Although aerial herbicide treatments would not be allowed, the BLM could use ground-based application as a part of an integrated vegetation management program. It is estimated that no more than 1,000 acres of public lands in Alaska would be treated with herbicides in any year for the next 10 years. The herbicides considered for use in Alaska must be registered in Alaska. At present, 13 of the 18 active ingredients are registered for use in Alaska. This list is further reduced to specific formulations of the active ingredients registered for use in Alaska.

If new herbicides are developed in the future that provide control of unwanted vegetation superior to that of currently-used or proposed herbicides and with fewer risks to soil and other resources, the BLM would be able to use these herbicides to the benefit of resources upon completion of appropriate risk assessments and associated NEPA analysis.

Non-herbicide treatment options (fire use, and mechanical, manual, and biological control methods) would be guided by SOPs listed in Table 2-5 of the PER to protect resources. Fire would be managed in accordance with the *Alaska Land Use Plan Amendment for Wildland Fire and Fuels Management* (BLM 2005).

***Evaluation of the Effect of Use, Occupancy, or Disposition on Subsistence Uses and Needs***

Alternative D would be much like the Preferred Alternative in that no aerial herbicide applications are proposed or likely to be proposed in Alaska under the Preferred Alternative. Required SOPs for use with herbicide application are found in Table 2-8 of Chapter 2 of the final PEIS, and additional mitigations are found in Table 2-9 of same chapter.

The use of herbicides would have both beneficial and adverse effects. The area treated under this alternative would be greater than the area treated under the No Action Alternative; thus, the effects associated with herbicide use would be greater. However, by treating a larger area than under the No Action Alternative, the BLM would have a greater likelihood of reducing the number of acres covered by weeds and other invasive vegetation and restoring ecosystem function, to the benefit of subsistence resources.

Alternative D has the potential for long-term preservation of subsistence resources from impact by invasive plants or catastrophic fire by permitting flexibility in the management of vegetation resources.

Impacts to subsistence and wildlife from integrated weed management and fuels reduction treatments are expected to have short-term negative and long-term positive effects. Undesirable impacts from ground-based herbicide applications under this alternative could include: 1) overspray onto non-target species that would result in injury or death of plants; 2) accidental spills that could kill non-target plants and run into wetlands or streams; and 3) herbicide drift off the application site that could damage plants. The SOPs specific to reducing impacts to subsistence resources would include consultation with Native groups and the public to determine the location of important cultural and subsistence resources that might be affected by herbicide treatments. The BLM would work with subsistence users to minimize impacts to these resources, and would follow Human Health and Safety guidance provided in Chapter 4 of the PEIS in areas that may be visited by subsistence users after treatments.

For the protection of subsistence plants and wildlife forage, the BLM would: 1) use drift reduction agents, as appropriate, to reduce the drift hazard to non-target species; 2) refer to the herbicide label when planning revegetation to ensure that desirable vegetation would not subsequently be injured by the herbicide; and 3) consider site characteristics, environmental conditions, and application equipment in order to minimize damage to non-target vegetation. To protect fish and wildlife, the BLM would: 1) use buffer zones based on label and risk assessment guidance; 2) minimize treatments near fish-bearing water bodies during periods when fish are in life stages most sensitive to the herbicide(s) used; 3) use appropriate application equipment/method near water bodies if the potential for off-site drift exists; 4) use herbicides least toxic to

fish, yet still effective; 5) treat only the portion of the aquatic system necessary to achieve acceptable vegetation management; 6) select appropriate application method(s) to minimize the potential for injury to desirable vegetation and aquatic organisms; 7) follow water use restrictions presented on the herbicide label; 8) minimize treatments during nesting and other critical periods for birds and other wildlife; 9) use herbicides of low toxicity to wildlife, where feasible; and 10) use timing restrictions, as specified on the herbicide label, to minimize impacts to wildlife. Impacts of non-herbicide treatments are discussed under the No Action Alternative, above.

*Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved*

The purpose sought to be achieved under Alternative D is to manage public lands in Alaska to prevent the spread and establishment of invasive non-native plants and to reduce hazards caused by excessive fuel loads, without the use of aerial herbicide applications. The lands that would be selected for weed control or fuels reduction include areas on public lands in Alaska where invasive non-native plants occur and areas with an abundance of fire fuels that increase the likelihood of catastrophic fire. The objectives of treatments are to restore land health. In the future, areas of proposed treatment would be prioritized and analyzed under an appropriate NEPA document. Given that the BLM would propose future treatments on public lands only, other lands would not be available for the purpose. Lands administered by other federal agencies in Alaska are directed by their own planning documents. State- and Native Corporation-administered lands cannot be considered in a BLM plan, and under BLM policy other public lands outside of Alaska are not considered under ANILCA.

*Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence Purposes*

Other alternatives that define the types of vegetation management actions allowed on public lands needed for subsistence include the action alternatives, and No Action Alternative, which are presented and analyzed in Chapters 2 and 4 of the main body of the PEIS. These alternatives were created to represent a wide range of potential vegetation treatment activities that could occur on public lands, along with management actions that would serve to protect specific resource values following current national guidelines. Additional alternatives that were considered, but not analyzed in detail, are also discussed in Chapter 2.

*Findings*

Alternative D would not significantly restrict subsistence use in Alaska. Site-specific treatments would be analyzed in NEPA documents that would identify numerous SOPs and mitigations that would be required to prevent damage to subsistence plants and animals. For proposed projects, local communities would be given the opportunity to participate in the planning process and assist with design of proposed treatments. This alternative prescribes mitigations and SOPs to minimize impacts to resources and human health. Standard Operating Procedures are listed in Table 2-8 in Chapter 2 of the Final PEIS, and mitigations are listed in Table 2-9 of the same chapter.

**Evaluation and Findings for Alternative E – No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients**

Alternative E prohibits the use of Sulfonylurea and other Acetolactate Synthase (ALS)-inhibiting active ingredients, which include chlorsulfuron, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl. Alternative E incorporates additional management practices of limiting application techniques; however, the resulting effects to subsistence resources would be similar to those described under the Preferred Alternative.

*Evaluation of the Effect of Use, Occupancy, or Disposition on Subsistence Uses and Needs*

Under Alternative E, the BLM would be able to use some herbicides, but not ALS-inhibiting herbicides. Although no herbicide treatments have been planned for Alaska, the BLM could use herbicides under this alternative as a part of an integrated vegetation management program that would more actively manage invasive non-native plants and other unwanted vegetation, thereby reducing their negative affects on the environment and subsistence uses. It is estimated that treatments would start on fewer than 100 acres. Within 10 years, it is estimated that no more than 1,000 acres of public lands in Alaska would be treated with herbicides in any year.

Impacts to subsistence use under this alternative would be similar to those described under the Preferred Alternative. Herbicides would be applied primarily by spot spraying, wiping, or injection, which would

reduce impacts to non-target plants by preventing overspray that could damage or kill plants unintentionally. However, the high concentrations of herbicides used for these application techniques could have increased toxicity to animals exposed to the herbicide or ingesting treated plants. Non-herbicide treatment impacts would be the same as those described under the No Action Alternative.

Alternative E, like the Preferred Alternative, would be guided by a standard set of SOPs that serve to protect subsistence resources from potential impacts associated with vegetation management activities. Alternative E would be similar to the Preferred Alternative in reducing impacts from invasive non-native plants and excessive fuels. Impacts to subsistence resources are expected to have short-term negative effects (injury or death to non-target plants, injury to animals directly exposed to treatments) and long-term positive effects (healthy native plant communities that support healthy populations of subsistence wildlife). Alternative E does place increased emphasis on spot rather than broadcast applications, which would tend to correspond to less per area risk than under the No Action and Preferred alternatives. The risk per area treated, however, is not likely to be dramatically lowered by prohibiting the use of ALS-inhibiting herbicide active ingredients. In addition, because the number of acres proposed for treatment under Alternative E and the Preferred Alternative are similar (up to 1,000), overall risks would be similar for both alternatives. Conversely, more acres would be treated under Alternative E than under the No Action Alternative (50), so overall short-term risk would be greater.

Under all alternatives, the BLM would collaborate with Alaska Native groups to identify and protect culturally significant plants used for food, basket-weaving and other fibers, medicine, and ceremonial purposes, and would use minimal impact treatments or avoidance where culturally significant species are known to occur. In addition, under Alternative E, the BLM would establish herbicide-free zones to protect culturally significant plant and wildlife resources, which would reduce the likelihood that Alaska Natives would consume vegetation with herbicide residues.

#### *Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved*

The purpose sought to be achieved under Alternative E is to manage BLM lands in Alaska to prevent the spread and establishment of invasive non-native plants and to reduce hazards caused by excessive fuel loads, without using ALS-inhibiting herbicides. The lands that would be selected for vegetation management treatments include areas on public lands in Alaska where invasive non-native plants occur, areas with an abundance of fire fuels that increase the likelihood of catastrophic fire, and areas of degraded wildlife forage and habitat. The objectives of treatments are to restore land health and, subsequently, the subsistence resources that depend on healthy plant communities. In the future, areas of proposed treatment would be prioritized and analyzed under an appropriate NEPA document. Given that the BLM would propose future treatments on pubic lands only, other lands would not be available for the purpose. Lands administered by other federal agencies in Alaska are directed by their own planning documents. State- and Native Corporation-administered lands cannot be considered in a BLM plan, and under BLM policy other public lands outside of Alaska are not considered under ANILCA.

#### *Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence Purposes*

Other alternatives that would define the types of vegetation management actions allowed on public lands needed for subsistence include the action alternatives, and No Action Alternative, which are presented and analyzed in Chapters 2 and 4 of the main body of the PEIS. These alternatives were created to represent a wide range of potential vegetation treatment activities that could occur on public lands, along with management actions that would serve to protect specific resource values following current national guidelines. Additional alternatives that were considered, but not analyzed in detail, are also discussed in Chapter 2.

#### *Findings*

Alternative E would not significantly restrict subsistence use and needs in Alaska, as a relatively small number of acres are being considered for herbicide treatments in Alaska (less than 1,000 acres). Under this alternative, risk per area treated would not likely be dramatically lowered by prohibiting the use of ALS-inhibiting herbicide active ingredients. Even under accidental exposure scenarios, imazapic, imazapyr, metsulfuron methyl, and sulfometuron methyl do not pose a risk to humans, and chlorsulfuron only poses a risk to workers under scenarios involving

ground broadcast applications at the highest application rate, and risk to the general public under scenarios involving an accidental spill of a large amount of chlorsulfuron into a very small pond—an unlikely scenario. Bromacil, diquat, and diuron, which pose the most severe human health risks, could be used under Alternative E; therefore, risk per area treated is not likely to be reduced by prohibiting the use of ALS-inhibiting herbicide active ingredients. Alternative E does place increased emphasis on spot rather than broadcast applications, which would tend to correspond to less per area risk than under the No Action and Preferred alternatives, except in the few possible cases where occupational receptors would be at a greater risk from spot applications.

Risks to subsistence resources and health risk to Native Americans and Alaska Natives associated with other vegetation management methods would likely be greater under Alternative E. The greatest risks would likely be associated with prescribed fire treatments (see the final PER). Because the number of acres proposed for treatment under Alternative E and the Preferred Alternative is similar (up to 1,000), overall risks would be similar for both alternatives.

**Evaluation and Findings for the Cumulative Case**

The Cumulative Case as presented within the Cumulative Effects Analysis in Chapter 4 of the PEIS is a discussion of impacts that could affect the management decisions contained within alternatives A through E.

For this Programmatic EIS, the analysis of cumulative impacts is a four-step process that follows guidance provided in *Considering Cumulative Effects Under the National Environmental Policy Act* (CEQ 1997):

- **Specify the class of actions of which effects are to be analyzed.**

All vegetation treatment methods used by the BLM are considered in the analysis. These include herbicide use, manual, mechanical, and biological control methods, and use of fire, as identified in Chapter 2 (Alternatives). For the PEIS, potential cumulative effects include those assessed for all land ownerships, including lands administered by other federal agencies and non-federal lands, particularly effects on air quality and terrestrial and aquatic species. The analysis and disclosure of cumulative effects alerts decision-makers and the public to the context within which effects are occurring, and to the environmental implications of the interactions of known and likely management activities. During subsequent analyses for site-specific activities, local cumulative effects should be important considerations in the design of site-specific alternatives and mitigation measures.

- **Designate the appropriate time and space domain in which the relevant actions occur.**

The analysis period covered by the cumulative effects analysis primarily begins in the 1930s with the passage of the Taylor Grazing Act, and continues through 2057.

For purposes of this analysis, the spatial domain for past, present, and reasonably foreseeable activities is primarily the 17 western states evaluated in the PEIS.

- **Determine the magnitude of effects on the receptors and whether those effects are accumulating.**

The set of receptors assessed in the cumulative effects analysis are the physical, biological, and human systems discussed in Chapter 3 (Affected Environment).

The potential extent of the total cumulative effects (e.g., number of animals and habitat affected), and how long the effects might last (e.g., population recovery time), are estimated to determine the magnitude of effects that could accumulate for each resource. Where possible, the assessment of effects on a resource is based on quantitative analysis (e.g., level of risk to humans from use of an herbicide). However, many effects are difficult to quantify (e.g., animal behaviors; human perceptions) and a qualitative assessment of effects is made.

The purpose of the analysis of cumulative effects in the PEIS is to determine whether the effects are additive or synergistic or have some other relationship. Additive (or combined) effects on specific resources often are difficult to detect and do not necessarily add up in the strict sense of one plus one equals two. It is much more likely that an additive or combined effect would be greater than one but less than two. A synergistic effect, in theory, is a total effect that is greater than the sum of the additive effects on a resource. To arrive at a synergistic effect in this example (continuing with the numeric analogy), the total cumulative effect would need to end up greater than two. In the highly variable western U.S. environment, where natural variations in population levels can exceed the impacts of human activity, such an effect would need to be much greater than the

hypothetical two to be either measurable or noteworthy. A countervailing effect occurs when an impact has both negative and beneficial effects. For example, herbicide treatments would harm or destroy vegetation used by some species of wildlife (negative effect), but would improve overall ecosystem health that would lead to improved watershed conditions and habitat for other wildlife (positive effect).

Resource analysts have tried to keep the cumulative analysis useful, manageable, and concentrated on meaningful potential effects. The cumulative analysis considers in greatest detail activities that are more certain to happen and that are geographically in or near public lands, and activities identified during scoping as being of greatest concern. The guiding principles from existing standards, criteria, and policies that control management of the natural resources of concern have been used to help focus the analysis. For areas where existing standards, criteria, and policies are not available, the resource experts used their best judgment to focus the analysis.

### *Evaluation of the Effect of Such Use, Occupancy, or Disposition on Subsistence Uses and Needs*

The PEIS Cumulative Effects Analysis in Chapter 4 did not include a specific section on subsistence. The following information is from the wildlife, fish, and vegetation sections, since subsistence resources fall into these categories.

Based on the number of acres treated, short-term adverse impacts and long-term improvements to wildlife and habitat would be greatest under the Preferred Alternative, and least under the No Action Alternative. The number of acres treated, and the effects to wildlife and habitat would be similar under alternatives D and E. Effects to wildlife and habitat under Alternative C would be intermediate between these alternatives and the Preferred Alternative. Short-term effects from treatments and other human causes would accumulate, but a countervailing effect of long-term improvement in the ecosystem health, with success and maintenance of treatments, would offset short-term losses.

Alternative E places greater emphasis on passive restoration than the other alternatives. Passive restoration is often considered a critical first step in successful restoration of degraded areas, since anthropogenic activities that are causing degradation or preventing recovery are halted. All alternatives include both passive and active management. Recovery of vegetation through passive management is expected to take longer than under active management, where treatments such as seeding with native species, establishing intermediate vegetation to control erosion, and use of pre-emergent herbicides to prevent weed establishment would be expected to promote faster recovery.

The risks to wildlife, fish and vegetation from use of herbicides could be less under Alternative E than under the other herbicide use alternatives because ALS-inhibiting herbicides would not be used under Alternative E. ALS-inhibiting herbicides are effective at very low doses and could drift onto wildlife and plants and harm them. However, the ALS-inhibiting herbicides mostly posed no risk to terrestrial wildlife (chlorsulfuron, imazapic, sulfometuron methyl), except for a few cases of low risk (imazapyr, metsulfuron methyl), suggesting that prohibiting the use of these herbicides would not likely benefit wildlife used for subsistence purposes and could indirectly harm wildlife if more toxic herbicides that are currently available to the BLM were used in their place.

The risk of herbicide drift affecting wildlife and their habitats would be less under alternatives D and E than under the other herbicide treatment alternatives, as aerial treatments are prohibited under Alternative D, and discouraged under Alternative E.

The proposed vegetation treatments could kill or harm wildlife and could cause unavoidable short-term adverse impacts to wildlife habitat and behavior. The extent of these disturbances would vary by the extent and type of treatment. In general, greatest risks would be associated with the use of fire and herbicide treatments. If treatments were successful, species currently using treatment sites could be displaced by species better adapted to restored sites.

All treatments would have short-term adverse impacts to wildlife and their habitats, as discussed above. Treatments that improve habitat would provide long-term benefits to wildlife. Treatments that remove hazardous fuels from public lands and reduce the risk of large, intense wildfire would reduce future death and injury of wildlife and lead to improved habitat. Treatments that control populations of non-native species on public lands would be expected to benefit most wildlife over the long term by aiding in the re-establishment of native vegetation and restoring wildlife habitat to near historical conditions.

Regardless of the alternative chosen, there would be a cumulative loss of native vegetation and healthy ecosystem function. Over the long term, treatments should slow this loss and help to restore native vegetation and natural fire regimes and benefit ecosystem health and wildlife and their habitats.

Because herbicide use in the planning area is uncertain, the level of vegetation treatments projected through this plan is minimal. Site-specific analysis would be conducted on proposed projects, and no cumulative impacts to subsistence species are anticipated.

#### *Evaluation of the Availability of Other Lands for the Purpose Sought to be Achieved*

The purpose sought to be achieved under the PEIS and PER is to manage BLM lands to prevent the spread and establishment of invasive non-native plants and to reduce hazards caused by excessive fuel loads. The lands that would be selected for weed control or fuels reduction treatments include areas on public lands where invasive non-native plants occur and areas with an abundance of fire fuels that increase the likelihood of catastrophic fire. The objectives of treatments are to restore land health. In the future, proposed treatment areas would be prioritized and analyzed under an appropriate NEPA document. Given that the BLM would propose this future treatment on public lands only, other lands would not be available for the purpose. Lands administered by other federal agencies in Alaska are directed by their own planning documents. State- and Native Corporation-administered lands cannot be considered in a BLM plan, and under BLM policy other public lands outside of Alaska are not considered under ANILCA.

#### *Evaluation of Other Alternatives that would Reduce or Eliminate the Use, Occupancy, or Disposition of Public Lands Needed for Subsistence Purposes*

Alternatives that would reduce or eliminate the use of public lands needed for subsistence include the four action alternatives that are presented and analyzed in Chapters 2 and 4, as well as the No Action Alternative. These alternatives were created to represent a range of potential vegetation management activities that could occur on public lands, along with management actions that would serve to protect specific resource values. Additional alternatives that were considered, but not analyzed in detail, are also discussed in Chapter 2.

#### *Finding*

Actions described in the PEIS and PER, when taken into consideration with the analysis presented as the cumulative case, would not significantly restrict subsistence use and needs in Alaska, as relatively few acres are being considered for treatment (less than 6,000 acres of vegetation treatments statewide). Additionally, these documents do not include any proposed on-the-ground projects. When proposed, site-specific projects will require an additional NEPA analysis, which will include public input and consultation with local native communities and entities that could be affected. A subsequent ANILCA § 810 Analysis of Subsistence Impacts will also be required for each proposed project.

## Environmental Justice

Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, and an accompanying Presidential memorandum require each federal agency to make the consideration of Environmental Justice part of its mission. The existing demographics (race and income) and subsistence consumption of plants and animals, and mitigating measures and their effects are presented.

### Consultation and Coordination with Indian Tribal Governments

Executive Order 13175, *Consultation and Coordination with Indian Tribal Governments*, requires consultation with tribal governments on "actions that have substantial direct effects on one or more Indian tribes." Representatives of the BLM have met with local tribal governments to discuss subsistence issues relating to the PEIS and PER (see Chapter 5, Consultation and Coordination), and have established a dialogue on Environmental Justice with these communities.

In addition to ANILCA, Environmental Justice, as defined in Executive Order 12898, also calls for an analysis of the effects of federal actions on minority populations with regard to subsistence. Specifically, Environmental Justice is:

> The fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement

Case No. 1:20-cv-02484-MSK Document 25-10 filed 04/27/21 USDC Colorado pg 50 of 96

of environmental laws, regulations, and policies. Fair treatment means that no group of people, including racial, ethnic, or socioeconomic group should bear a disproportionate share of the negative environmental consequences resulting from industrial, municipal, and commercial operations or the execution of federal, state, local, and tribal programs and policies.

Section 4-4 of Executive Order 12898, regarding the Subsistence Consumption of Fish and Wildlife, requires federal agencies to collect, maintain, and analyze information on the consumption patterns of populations that principally rely on fish and/or wildlife for subsistence, and to communicate to the public any risks associated with the consumption patterns. To this end, the subsistence analyses of all alternatives, located in Chapter 4 (Environmental Consequences) of the PEIS, have been reviewed and found to comply with Environmental Justice.

Additional guidance is found in the CEQ document, *Environmental Justice – Guidance under the National Environmental Policy Act*, December 1997, and USEPA, Region 2, Interim Environmental Justice Policy December 2000.

**Government-to-Government Consultation with Federally-Recognized Tribes**

The BLM formally consults with federally-recognized tribes before taking actions that will have a substantial, direct effect on federally-recognized tribes or their assets, rights, services, or programs. The BLM initiated consultation with Alaska Native groups in the form of a letter sent on July 3, 2002 to 230 tribes and Alaska Native entities that could be directly affected by vegetation treatment activities. The letter requested information on how the proposed activities could impact Native American and Alaska Native interests, including the use of vegetation and wildlife for subsistence, religious, and ceremonial purposes. A public scoping meeting for the BLM's proposed vegetation management PEIS was held in Anchorage, Alaska on March 6, 2002.

When future vegetation treatment projects are proposed, local BLM offices will initiate site-specific analysis and NEPA documentation. This process will include consultation with Alaska Native groups to determine if culturally important areas and plants could be impacted by proposed vegetation treatments. Proposed treatments of plants that are important for maintaining traditional lifeways may need to be modified or cancelled in certain areas. On the other hand, there may be long-term benefits, such as reducing or eliminating invasive non-native plant competitors, which would allow proliferation of traditionally used plants.

# References

**Council on Environmental Quality. 1997.** Considering Cumulative Effects Under the National Environmental Policy Act. Washington, D.C.

**Hebert, M. 2001.** Strategic Plan for Noxious and Invasive Plants Management in Alaska. University of Alaska. Fairbanks, Alaska.

**U.S. Department of Interior Bureau of Land Management. 2005.** Alaska Land Use Plan Amendment for Wildland Fire and Fuels Management. Fairbanks, Alaska. Available at: http://fire.ak.blm.gov/content/planning/Complete_Land_Use_Plan_Amendment_186pages.pdf

BLM_0001107

# APPENDIX I

# RESTORE NATIVE ECOSYSTEMS ALTERNATIVE AND BLM POLICY ANALYSIS OF ALTERNATIVE

BLM_0001109

Case No. 1:20-cv-02484-MSK Document 25-10 filed 04/27/21 USDC Colorado pg 53 of 96

# TABLE OF CONTENTS

Page

Restore Native Ecosystems Alternative ........ I-1
Bureau of Land Management National Policy Analysis of Restore Native Ecosystems Proposal ........ I-23

## List of Tables

I-1 Bureau of Land Management Policy Analysis of Restore Native Ecosystems Proposal ........ I-24

BLM_0001110

BLM_0001111

# RESTORE NATIVE ECOSYSTEMS ALTERNATIVE

**Submitted to the Bureau of Land Management**
**Sixteen-state Vegetation Management Plan**
**Draft Environmental Impact Statement**

Revised 26 August 2002
In response to Bureau of Land Management comments
and to conform to the preferred DEIS outline

I. OVERVIEW 1

II. DEFINITIONS 2

III. VEGETATION TREATMENT PLANNING 3

IV. SITE SELECTION AND TREATMENT PRIORITIES 5
- A. General 5
- B. Invasive Species Treatments 6
- C. Prescribed Fire, Wildfire, and Fire Suppression Treatments 6
- D. Fuels Reduction 7

V. PREVENTION VEGETATION TREATMENTS 8
- A. General 8
- B. Invasive Species 8
  1. Livestock Grazing 9
  2. Roads and Off-Road Vehicles 9
  3. Fire Suppression 9
  4. Wildand-Urban Interface 9
  5. Timber 10
  6. Altered Hydrological Regimes 10
  7. Oil, Gas, and Mineral Exploration and Development 11
  8. Disturbance to Biological Soil Crusts 12
- C. Prevention of Excess Fuels 12

VI. RESTORATION VEGETATION TREATMENTS 13
- A. Direct Treatments of Invasive Species 13
- B. Prescribed Fire 14
- C. Fuels Reduction 15
- D. Fire Suppression 15
- E. Forage Enhancement 15

VII REVEGETATION 16

VIII. MONITORING AND EVALUATION 16

IX. TRIBAL RELATIONS FOR VEGETATION TREATMENTS 18

X. COORDINATION, EDUCATION, AND PUBLIC AWARENESS 19

Endnotes 21

BLM_0001113

# RESTORE NATIVE ECOSYSTEMS ALTERNATIVE

## I. OVERVIEW

GOAL OVR 1: ECOLOGICAL INTEGRITY

Enhance the ecological integrity of BLM land by restoring natural processes, native species, ecosystem function, and resilience of plant and animal communities (see Endnote 1).

Action-OVR 1

Give approximately equal overall effort to vegetation treatments that

a. **Prevent** conditions that favor vegetation problems; and
b. **Restore** ecological integrity on sites with vegetation problems.

Action-OVR 2

Base treatments on the **best available science** and knowledge.

a. Assess the likelihood that a proposed treatment will contribute to long-term ecological integrity, citing documented, relevant case examples where possible.
b. If a treatment has not previously been attempted, cite scientific evidence that the treatment could be expected to contribute to long-term ecological integrity.

Action-OVR 3

State objectives, standards and guidelines in **clear, measurable terms**, then measure the outcomes of treatments so that they can be held accountable to long-term and treatment goals.

Action-OVR 4

Perform restoration in a **precautionary** manner, recognizing that our understanding of complex ecosystems and the consequences of our activities is limited.

Action-OVR 5

Include realistic and dedicated funding for, and an institutional commitment to, **assessment, monitoring and appropriate response** to monitoring results. Design and implement assessment (including the gathering of baseline data) and monitoring systems before activities commence.

Action-OVR 6

Encourage and facilitate **public participation** by local, regional and national stakeholders in such activities as assessment, monitoring, early detection of invading species, provision of new and scientific information, review of assessment and monitoring protocols, and analysis of alternatives for actions.

Action-OVR 7

Provide:

a. clear and significant incentives (e.g., awards, grants, budgets) for prevention of vegetation problems and restoration of ecological integrity; and
b. disincentives for activities that encourage vegetation problems and delay recovery of ecological integrity.

Action-OVR 8

Ensure that treatments are **accountable to public funding.** Rely on best available science, awarding contracts on the basis of "best value" for ecological integrity, avoid treatments of symptoms, and use local community workforces whenever feasible.

## II. DEFINITIONS OF TERMS USED IN THE RESTORE NATIVE ECOSYSTEMS ALTERNATIVE

**Actions** Activities needed to achieve desired outcomes (goals, objectives, standards), including actions to restore or protect land health. These actions include proactive measures as well as criteria that shall be applied to guide day-to-day activities occurring on public land.

**Active Restoration Treatments**

Actions other than suspension of activities to restore ecological integrity or native species populations. Includes, but is not limited to

1. Road and off-road vehicle route removal
2. Culvert removal
3. Prescribed burning
4. Use of biological control introductions, cultural methods, mechanical methods, chemical methods, and prescribed fire to directly act on invasive exotic species
5. Fish and wildlife habitat rehabilitation
6. Reintroduction of extirpated species
7. Planting and care of native seeds and plants
8. Reintroduction of soil biota required by native species, when necessary
9. Other necessary activities based on priorities established in the ecological restoration assessment.

**Conservation** Protection of landscape, ecological, and native genetic diversity and the processes that maintain them.

**Ecological Integrity** The ability of an ecosystem to support and maintain a balanced, adaptive community of organisms having a species composition, diversity, and functional organization comparable to that of natural habitats within the region.

**Goals** Goals are broad statements of desired outcomes (e.g., maintain ecosystem health and productivity).

**Historical Fire Regimes** The historical range of variation of fire intervals, seasons, intensities by which native vegetation and wildlife have been shaped and to which they have adapted prior to the arrival of Euro-American settlers.

**Invasive Species** Exotic species shown by observation and/or scientific evidence to aggressively expand their occupancy of land, whether or not they are viewed as directly impacting economic activities, or have been listed on formal "noxious weed" lists. "Invasive species" does not include native species that increase in response to particular human activities (e.g., juniper, mesquite, sagebrush).

**Objectives** Objectives identify specific desired conditions for resources and have established timeframes for achievement and are usually quantifiable and measurable.

**Passive Restoration Treatments**

Suspension of activities that cause the loss of ecological integrity or native species populations in a specific area Passive restoration treatments may include:

1. Area , road, and off-road vehicle route closures
2. Voluntary livestock permit retirement
3. Retirement of vacant livestock allotments

4. Livestock grazing exclosures (e.g., in aggressive weed infestations, uplands "at risk" of weed infestation, riparian areas, habitat of threatened or endangered species, springs, wetlands)
5. Restrictions of logging activities
6. Restrictions of oil and gas and mineral development, including allowing expired leases to remain expired
7. Restrictions on other human activities, as relevant
8. Prescribed natural fire (i.e., allowing fires to burn under predefined circumstances).

**Prevention Treatments** Actions that avoid causing conditions that favor the presence of invasive species. Prevention is not limited to prevention of the *introduction* of invasive species.

**Restoration** Actions to regain ecological integrity.

**Standards** Standards are limitations placed on management activities to ensure compliance with applicable laws and regulations or to limit the discretion authority in project decision-making. Compliance with relevant standards is mandatory.

**Vegetation Treatments**

Actions which, based on scientific evidence, will:

(1) affect the "conservation and restoration of vegetation communities, watersheds and wildlife habitats." They include:
  (a) prevention treatments that result in
    1. measurable soil, hydrological, and vegetation changes that resist invasive exotic species; or
    2. forests with understory vegetation and fire regimes that resist dense tree growth;
  (b) prevention treatments of vegetation that pose fire hazards to important ecological values or unique ecological features; and
  (c) active and passive restoration treatments that restore native vegetation and/or conditions favorable to native communities.

(2) affect the protection of human lives or property threatened by fuels, via necessary thinning/fuels reduction, or other treatments.

**Wildlands-Urban Interface** The area next to a home where fires most directly threaten structures and community space where there are flammable community values. Defensible community space should be created (e.g., some thinning) within a treatment zone up to 500 meters (which includes a more intensive home-site treatment zone up to 60 meters) for firefighter safety and protection of other flammable community values.

## III. VEGETATION TREATMENT PLANNING

GOAL-PLAN 1

Vegetation treatments are based on assessments of (1) the condition of vegetation; (2) major human causes of degraded conditions of the vegetation; (3) opportunities for prevention of soil disturbance and vegetation problems; (4) opportunities for conservation of native vegetation ; (5) results of past restoration treatments; and (6) comparative likelihood of treatment options for achieving long-term restoration.

Action-PLAN 1

Using existing information initially, map habitats within ecoregions, watersheds, and subwatersheds of the 16 western states:

1. key areas of native vegetation and high ecological integrity; areas of mixed native and exotic vegetation and condition; and areas of low ecological integrity
2. suitable and critical habitat for habitat-specialist terrestrial and aquatic wildlife species
3. suitable habitat for wide-ranging species (e.g., bull trout and sage grouse) that require use of extensive or temporally diverse (e.g., winter/summer habitat) areas within the ecoregion
4. hotspots of plant and wildlife biodiversity
5. habitats "at risk" of further fragmentation or degradation
6. important aquatic areas, such as riparian areas, steep/unstable slopes, wet meadows, and aquatic species' strongholds
7. areas where restoration will increase potential for habitat connectivity
8. areas that could benefit from improved management or restoration to maintain or enhance ecological integrity.

Action-PLAN 2

Consult conservation center databases and other sources of information and scientists on species occurrence. Lack of data may mean no reliable inventories have been conducted.

Action-PLAN 3

Identify spatial and temporal association of particular vegetation problems and compare and contrast with the spatial and temporal occurrence of past and continuing human activities.

Action-PLAN 4

Overlay the ecoregion habitat maps with:

1. a grazing allotment assessment with the goal of phasing out grazing in sensitive areas over time. These include degraded areas, key habitats, and areas where grazing is clearly incompatible with native vegetation and habitat recovery.
2. a logging assessment with the goal of ceasing logging in areas where there is a high risk that it would thwart the recovery of native vegetation or increase existing levels of degradation.
3. a roads and off-road vehicle routes assessment with the goal of closing and decommissioning roads and off-road vehicle routes in ecologically sensitive areas including riparian areas, unstable slopes, sensitive watersheds, and wildlife migration corridors (see Endnote 2).
4. an amphibian assessment. Avoid herbicide use in amphibian habitats, as many amphibians are highly vulnerable to herbicide applications and drift.

Action-PLAN 5

Using existing data, prepare and update every three years, maps of:

1. invasive exotic species concentrations within each watershed and subwatershed.
2. exotic species plantings on BLM lands, and, when available, adjacent private and public lands.

Action-PLAN 6

Prior to implementing site-specific vegetation treatments, prepare goals based on:

1. vegetation conditions, including invasive species concentrations
2. vulnerable wildlife and plant species and habitats
3. habitat important for threatened, endangered, and sensitive species and carnivores; connectivity for habitat-specialist wildlife
4. past and present activities within the watershed leading to vegetation problems
5. passive and active restoration needs
6. feasible restoration goals

## IV. SITE SELECTION AND TREATMENT PRIORITIES

### A. General

Action- PRIORITIES 1

Prioritize treatments shown to have a high probability of restoring natural processes and natural biotic communities (based on previous experiments or operational use) over treatments without this kind of documentation.

Action- PRIORITIES 2

Prioritize vegetation treatments based on scientific evidence of efficacy as follows:

1. cessation of activities that impede natural recovery (i.e., passive restoration)
2. active restoration treatments that incorporate passive restoration
3. active restoration treatments to restore ecological integrity.

Action- PRIORITIES 3

Vegetation prevention and restoration treatments must utilize:

1. a precautionary approach, which, in the face of uncertain outcomes, proceeds experimentally and cautiously
2. best available science and experiential and indigenous knowledge where applicable
3. an adaptive process that regularly incorporates revisions from monitoring and evaluation
4. a public process
5. the least intrusive techniques available to restore ecological integrity
6. the least risky interventions that are likely to provide the greatest ecological benefit
7. recovery plans for threatened and endangered species, or improvements on such plans
8. prevention strategies to reduce the need for chemical and mechanical treatments, and prescribed fire, so that the number of acres treated annually with these methods will decline over the life of the EIS.

Action- PRIORITIES 4

Herbicide treatments must be of lower priority than non-chemical treatments, and shall be used only in conjunction with:

1. elimination or reduction of the conditions that have favored the presence of invasive species
2. encouragement of conditions that resist invasive species (see Endnote 3).

Action- PRIORITIES 5

Prior to implementing a site-specific treatment:

1. identify and prioritize restoration options
2. select the least intrusive/intensive methods that will effectively move the site toward the stated goals of ecological integrity
3. identify riparian conservation areas, consisting of the riparian community and hydrological energy zones; and an outer zone that provides buffers for the riparian conservation area and considers slope stability and soil erosion.

Action- PRIORITIES 6

State for all site-specific restoration projects and activities:

1. measurable conservation and restoration objectives
2. specific indicators and measures for determining results
3. timelines for analysis of whether goals, objectives and standards have been met
4. decision making processes that will be used to respond to analysis of results.

## B. Invasive Species Treatments

GOAL- PRIORITIES 1

The ecological impact of invasive species shall be minimized through conservation and restoration of native vegetation communities, watersheds and wildlife habitats.

Action- PRIORITIES 7

Give priority to two facets of the control of invasive species as defined in Executive Order No. 13112, "Invasive Species":

1. prevent the spread of invasive species from areas where they are present
2. restore native species and habitats to reduce the effects of invasive species and to prevent further invasions.

Action- PRIORITIES 8

Give treatment priority to areas in which exotic plant invasions have adverse ecological impacts on native plant communities, watersheds, and wildlife habitats.

Action- PRIORITIES 9

Develop, with the input of knowledgeable scientists and citizens, a long-term (e.g., 100-year) plan for prevention and minimization of unwanted exotic vegetation within the planning area, and restoration of ecological integrity, including native vegetation. Short-term plans (e.g., 1, 5, or 10 year horizons) will be integrated within the 100-year plan; all shall emphasize experimentation and adaptation.

Action- PRIORITIES 10

The long term vegetation management plan for integrated agency action shall include:

1. identification and lessening of the **conditions** that cause or favor the introduction, establishment, and spread of invasive species, and methods to ameliorate those conditions
2. plans for preservation or restoration of historical disturbance regimes
3. restoration of the native vegetation community, via seeding and planting, to increase resistance to invasion
4. active vegetation treatments to reduce the abundance of invasive exotic species populations.

## C. Prescribed Fire, Wildfire, and Fire Suppression Treatments

GOAL- PRIORITIES 2

Natural fire regimes and native vegetation types will be restored, wherever feasible.

Action- PRIORITIES 11

Collect baseline data on historical fire regimes and plant and animal communities to use as a guide for restoration activities.

Action- PRIORITIES 12

Base fire management decisions on the 1995 Wildland Fire Policy, the updated 2001 Wildland Fire Policy, and current science. As required by the Fire Policy, create Fire Management Plans for every burnable acre.

Action- PRIORITIES 13

Through an open process that fully includes the public and utilizes the best available science, develop Fire Management Plans that:

1. allow certain remote wildland areas to burn under carefully prescribed conditions where ecological benefits would result
2. prescribe "Minimum Impact Suppression Tactics" where they would be most appropriate
3. prohibit aggressive soil-disturbing suppression methods where they would be damaging (e.g. bulldozers in roadless areas, chemical retardants in riparian areas)

4. determine ecological risks of fire – exotic species, population impacts - in all areas covered by plans, and carefully weigh benefits and risks as part of this process.

Action- PRIORITIES 14

Based on Fire Management Plans, use fire suppression to protect:

1. areas of high ecological values that may be at risk from exotic species invasion following fire
2. areas where human life, developed property or irreplaceable ecological values or cultural resources (e.g., rare forest types, a major portion of the population of an endangered species, or pictographs) are at stake
3. areas that should be protected until prescribed burning or other treatments can reduce excess fuels
4. important wildlife habitats (e.g., within 2 miles of sage grouse leks, big game winter ranges).

Action- PRIORITIES 15

Fire fighting shall be avoided in:

1. areas where nearby natural fire barriers such as bodies of water or rocky ridges are likely to extinguish the fire
2. Wilderness Areas, Wilderness Study Areas, roadless areas/potential wilderness areas, Wild and Scenic Rivers, and Research Natural Areas, except when fire threatens to escape from these areas or permanently impair ecological or cultural values.

Action- PRIORITIES 16

Mechanical fire suppression (i.e., with bulldozers) shall be avoided in riparian zones, steep slopes and other ecologically sensitive areas.

### D. Fuels Reduction

GOAL- PRIORITIES 3

Human lives and property will be protected from wildfire and natural processes will be restored.

Action- PRIORITIES 17

Distinguish between fuels treatments intended to restore ecological integrity and those primarily intended to protect property and human life.

Action- PRIORITIES 18

Fuels reduction funds under the National Fire Plan shall be used:

1. only in the wildlands urban interface to protect lives and property
2. for strategic fire management planning and firefighter training to maximize the safety, ecological soundness, and effectiveness of fire and fuels management actions including prescribed fire, wildland fire use, and fire suppression.

Action- PRIORITIES 19

Fuels reduction shall, except for restoration or conservation necessity:

1. minimize or avoid road construction and reconstruction
2. avoid roadless areas, old growth, endangered species habitat, riparian areas, ecological sensitive areas and other areas of high ecological integrity
3. avoid habitat of threatened and endangered species.

Action- PRIORITIES 20

Fuels reduction treatments shall not:

1. increase motorized vehicle use or livestock access
2. supply biomass plants
3. increase fire risk through accumulation of activity fuels
4. include chaining

     5. include clearcutting
6. limit native plant recovery through chipping or ground disturbing activities.

Action- PRIORITIES 21

Use positive economic incentives that encourage ecologically based restoration activities and eliminate incentives that encourage activities that are ecologically degrading.

1. contracts for fuels reduction/thinning for wildlands urban interface or restoration shall not include:
   a) commercial timber sales
   b) "goods for services" stewardship contracts
2. all fuel reduction projects shall be paid for by appropriated dollars and any material of commercial value shall be sold in a separate contract and all revenues shall be returned to the treasury or used to support monitoring.

## V. PREVENTION VEGETATION TREATMENTS

### A. General

Action- PREVENTION 1

The BLM shall not authorize, fund, or carry out actions that it believes are likely to cause or promote the introduction or spread of invasive species unless the agency has determined and made public its determination that the public benefits of such actions clearly outweigh the potential harm caused by invasive species; and that all feasible and prudent measures to minimize risk of harm will be taken in conjunction with the actions.

### B. Invasive Species

Action- PREVENTION 2

Develop and implement comprehensive, science-based protocols designed to prevent the spread of invasive species in relation to all activities on BLM lands that have been identified in the scientific literature as primary facilitators of the establishment and spread of invasive species, watershed degradation, and loss of native species.

#### 1. Livestock Grazing

GOAL- PREVENTION 1

The introduction, establishment, and spread of invasive species due to livestock grazing shall be minimized.

Action- PREVENTION 3

Reduce spread of invasive weeds caused by domestic livestock grazing:

1. retire domestic livestock grazing permits at earliest opportunity where grazing has been found to promote invasion or persistence of invasive species
2. prioritize invasives prevention and restoration activities for areas where domestic livestock grazing has been permanently ended
3. manage livestock movement patterns to insure animals are not moving seeds of invasive species from infested to uninfested areas
4. suspend livestock grazing on non-cohesive soils in perennially saturated meadows.
5. manage livestock grazing to favor native species
6. avoid grazing in systems still containing a strong component of native perennials, biological soil crusts, or other features known to act as natural barriers to invasion or increase of invasive exotic species.

### 2. Roads and Off-Road Vehicles

GOAL- PREVENTION 2
Invasive species introduction, establishment and spread due to road, fire break, and off-road vehicle route construction, use, and maintenance shall be minimized.

Action- PREVENTION 4
Develop GIS maps and databases of all system (authorized and constructed) and non-system (user-created) roads and routes.

Action- PREVENTION 5
Precede all road or off-road vehicle route reconstruction, and any consideration of adding existing or illegal user-created roads and off-road vehicle routes to the transportation system, by NEPA analyses of their impacts, including potential to facilitate the spread of invasive species into native ecosystems.

Action- PREVENTION 6
Close or restrict non-essential, designated routes for motorized vehicle travel in areas of high risk for spread of invasive species.

Action- PREVENTION 7
Implement measures that reduce the likelihood of weed seed dispersal, such as educating equipment operators, implementing appropriate protocols for vehicle and equipment washing, restricting recreational access and seasonal travel. Consider restricting road grading activities in areas with high populations of invasive species.

Action- PREVENTION 8
Implement full area closures that prohibit all motorized travel on lands outside of designated and NEPA analyzed transportation system roads and off-road vehicle routes.

Action- PREVENTION 9
Identify and designate for obliteration non-essential system and non-system roads and off-road vehicle routes that do not comply with native vegetation protection goals.

Action- PREVENTION 10
Cease new road construction and most road reconstruction in riparian areas

Action- PREVENTION 11
Reclaim obliterated roads to native vegetation.

### 3. Fire Suppression

Action- PREVENTION 12
Utilize Minimum Impact Suppression Techniques and fully reclaim fire lines with native vegetation after fire emergency situations have ended, in order to prevent the spread of invasive species into the disturbed fire line corridors and to prevent the use of fire line corridors as illegal off-road vehicle travelways.

### 4. Wildland-Urban Interface

Action- PREVENTION 13
Home-site treatments in the wildland-urban interface (e.g., thinning, pruning, and mowing of vegetation) must be undertaken primarily within a 20 - 60 meter (66-200 feet) intensive treatment zone where fires most directly threaten structures and human life.

Action- PREVENTION 14

Defensible community space that may include public and private lands may be created within an additional treatment zone up to 500 meters (which includes the 60 meter home-site treatment zone) for fire fighter safety and protection of other flammable community values.

Action- PREVENTION 15

Treatments to create defensible space may include thinning small diameter trees, pruning, mowing, roof cleaning , as well as replacement of flammable landscape and building materials.

Action- PREVENTION 16

Long-term maintenance activities within the wildland-urban interface (i.e., prescribed burning, mechanical brush removal, etc.) as well as monitoring plans must be considered and a funding commitment secured before any action is undertaken.

Guideline- PREVENTION 1

Management of the wildland-urban interface zone should be a cooperative partnership between relevant agencies, tribes, communities, and homeowners. Cooperation shall extend from the initial risk assessment and following through to future maintenance and should account for appropriate access to structures for fire fighting as well as fire resistant landscaping and consideration of construction standards and proper zoning laws for all land ownerships.

Action- PREVENTION 17

Restoration priorities must be identified through a restoration assessment before any restoration fuels reduction activities take place.

**5. Timber**

GOAL- PREVENTION 3

The introduction, establishment, and spread of invasive species due to timber sales shall be minimized.

Action- PREVENTION 18

Maintain old-growth vegetation communities as bulwarks of vegetational resistance to invasion; minimize disturbance of old-growth or late seral vegetation communities; and, whenever possible, maintain intact forest canopies adjacent to areas such as roads and clearcuts where invasive species are abundant.

Action- PREVENTION 19

Design and plan timber sales for maximum prevention of introduction, spread, and establishment of invasive species, including pathogens.

**6. Altered Hydrological Regimes**

GOAL- PREVENTION 4

The introduction, establishment, and spread of invasive species due to altered flow regimes of rivers and streams will be minimized.

Action- PREVENTION 20

Prioritize treatments of riparian areas where restoration is likely to be successful; e.g., areas where the natural historic flow regime is extant.

Action- PREVENTION 21

Restore native historical flow regimes whenever it is possible to do so.

### 7. Oil, Gas, and Mineral Exploration and Development

GOAL- PREVENTION 5

The introduction, establishment, and spread of invasive species due to oil, gas, and mineral exploration and development will be minimized.

Action- PREVENTION 22

Prohibit surface disturbance associated with oil and gas exploration, development, and production activities in areas with

1. endangered, threatened, candidate, sensitive, or rare plant species
2. steep slopes.

Action- PREVENTION 23

Minimize surface disturbance associated with oil and gas exploration, development, and production activities in areas with sensitive soils.

Action- PREVENTION 24

In areas where seismic exploaration activities are permitted best available technologies must be used (i.e., helicopter shot-hole technologies over the use of 65,000 pound thumper trucks.

Action- PREVENTION 25

Locate wells and associated roads and pipelines on slopes less than 25% to avoid or minimize surface disturbance; on slopes greater than 25%, prohibit surface disturbing activities.

Action- PREVENTION 26

Keep removal and disturbance of vegetation to a minimum through construction site management (e.g. using previously disturbed areas and existing easements, limiting equipment/materials storage and staging area sites etc.) on both individual well locations and within oil and gas project areas.

Action- PREVENTION 27

Limit vehicular traffic to the running surface of roads and well locations as authorized in Applications for Permit to Drill (APD's) and Right of Ways (ROWs) thus prohibiting all traffic on two-tracks and trails near oil and gas well location and within oil and gas project areas.

Action- PREVENTION 28

Require that all gravel and other surfacing materials used for the project are free of noxious weeds.

Action- PREVENTION 29

Complete a survey for any and all endangered, threatened, candidate, sensitive, or rare plant species prior to allowing any surface-disturbing activities involved with oil and gas exploration, development, and production activities.

Action- PREVENTION 30

Adopt a "No Net Loss" policy for all special status plant species.

Action- PREVENTION 31

Each operator must submit a Surface Use Plan containing appropriate erosion control and revegetation measures (e.g., reintroduction of biological soil crust or mycorrhizae) with each APD request.

Action- PREVENTION 32

Grading and landscaping shall be used during and after construction activities are completed to minimize slopes, and water bars shall be installed on disturbed slopes in areas with unstable soils where seeding alone may not adequately control erosion.

Action- PREVENTION 33

Upon the completion of the drilling phase, require immediate reclamation of all portions of the pad that can be reclaimed using the soils originally removed during construction.

Action- PREVENTION 34

With each APD request, the oil and gas operators must submit a reclamation plan that includes, but shall not be limited to:

1. identification of lands to be disturbed
2. detailed description of the baseline condition and resources on the land including existing uses, soil characteristics, slope, topography, vegetative cover, and productivity
3. methods to control erosion
4. plans to revegetate and restore the areas disturbed
5. measures that address steep slopes, sensitive soils, recontouring requirements, short-term seedbed preparation measures, seeding mixtures and methods, and long-term reclamation goals
6. steps to be taken to comply with federal, state, and local environmental laws, regulations, and policies.

**8. Disturbance to Biological Soil Crusts**

GOAL- PREVENTION 6

Biological soil crusts shall be maintained as a partial shield preventing establishment or spread of invasive exotic species (See Endnote 4).

Action- PREVENTION 35

Using existing data, map and describe the presence and integrity of biological soil crusts at the ecoregion and watershed levels within the 16 western states; locally develop maps at the subwatershed level.

Action- PREVENTION 36

Prepare and implement a general plan for damaged biological soil crusts.

Action- PREVENTION 37

Prohibit livestock grazing for at least five years following a fire in areas capable of maintaining biological soil crusts. Return of livestock will be delayed past five years if significant recovery of the biological soil crust has not occurred.

**C. Prevention of Excess Fuels**

Goal- PREVENTION 7

Shrub and tree establishment shall be maintained at historical densities to prevent excess fuels.

Action- PREVENTION 38

Reduce or eliminate livestock grazing in forests and shrublands where:

1. historical grass and forb competition to tree and shrub seedlings density has been or can be diminished by grazing
2. historical understory necessary to carry "cooler" fires has been or can be diminished by grazing.

Action- PREVENTION 39

Exclude livestock for at least five years from forest and shrubland areas following fuels reduction treatments (e.g., burning, thinning), and until pre-determined native vegetation composition, density, and ground cover have been attained.

Action- PREVENTION 40

Allow wildland fire and consider prescribed burning in order to maintain capacity for cooler, understory fires within shrublands and forests.

## VI. RESTORATION VEGETATION TREATMENTS

### A. Direct Treatments of Invasive Species

Action- RESTORATION 1

Use the least intrusive/extensive/risky vegetation treatment methods to enhance wildlife habitat and populations.

Action- RESTORATION 2

Analyze potential effects of site-specific treatments on an array of species; reliance on assessments of effects only on umbrella species is not sufficient (see Endnote 5).

Action- RESTORATION 3

Direct treatments of invasive species shall be part of an over-all ecologically based restoration plan and may include:

1. Biological control
2. Cultural (manual) practices
3. Mechanical treatments
4. Chemical treatments
5. Prescribed fire

Action- RESTORATION 4

Base the selection of direct treatment methods on:

a. ecological priorities for restoration rather than potential economic benefits
b. size of the proposed treatment area, its location, and the biology of the target invasive species.

Action- RESTORATION 5

Except for treatment of small infestations without motorized equipment, prescribe direct treatments within designated wilderness or wilderness study areas only in conjunction with efforts to halt avoidable spread of invasive species into the wilderness from outside these areas.

Guideline- RESTORATION 1

Adopt the Carhart Model (Arthur Carhart National Wilderness Training Center) for completing minimum requirement analyses and minimum-impact tool analysis. The model assists managers in making administrative decisions concerning wilderness.

Action- RESTORATION 6

Prioritize nonchemical methods, unless shown to be ineffective, over chemical methods.

Action- RESTORATION 7

Small infestations have higher priority for active restoration treatments than large-scale infestations, with the exception of biological control. Use seasonal employees to detect and treat small infestations.

Action- RESTORATION 8

Use only those biological control agents that have been demonstrated to pose no threat to native species.

Action- RESTORATION 9

Use cultural treatments that have been shown effective in restoring native vegetation in scientific studies (e.g., use of properly timed fire, properly timed and managed goat grazing, mulching, and hand pulling) and conduct operational research to develop new, effective cultural treatments.

Action- RESTORATION 10

Plant and seed appropriate native species to compete with exotic species.

Action- RESTORATION 11

Use mechanical treatments that have been shown to be effective in restoring native vegetation in scientific studies (e.g., mowing, spot fire [flamer], mastication, weed eaters, mulching, and weed wrenches) and conduct operational research to develop new, effective mechanical treatments.

Action- RESTORATION 12

For chemical treatments, use application methods that minimize exposure to people, wildlife, and native plants. Spot treatment methods shall be preferred over broadcast methods.

Action- RESTORATION 13

Do not use broadcast herbicide treatments within 500 feet of endangered, threatened, candidate, sensitive, or rare plants. If herbicides are necessary for protection of a rare species, allow only application methods that apply herbicides only to the target plants.

Action- RESTORATION 14

Avoid application of herbicides and prohibit broadcast spraying in riparian conservation areas. Avoid application of herbicides (e.g. atrazine) with adverse effects on aquatic species and amphibians.

Action- RESTORATION 15

Prohibit the use of herbicides in known aquatic and terrestrial amphibian habitat, including breeding, rearing, and overland dispersal areas.

Action- RESTORATION 16

Only herbicides that minimize adverse effects on environmental and human health, based on knowledge of all ingredients in the formulation, shall be utilized for chemical control.

Action- RESTORATION 17

Prohibit use of sulfonylurea herbicides and other acetolactate synthase-inhibiting herbicides due to their demonstrated ability to damage off-site native and crop species.

Action- RESTORATION 18

Design treatments to account for wildlife habitat needs, for instance, by the timing and location of activities. Avoid treatments during nesting season for migratory birds, and during identified sensitive periods for wildlife (e.g., critical wintering habitat for big game or sage grouse).

### B. Prescribed Fire

Action- RESTORATION 19

Use prescribed fire to restore native vegetation, historical fire regimes, and native ecosystems; and to mitigate human safety threats, but only in concert with a restoration assessment with clear objectives, and where it will not increase invasive species.

Action- RESTORATION 20

Consideration of the following must be documented prior to prescribed burns, if relevant:

1. long-term damage to biological soil crusts
2. soil erosion through wind and runoff events
3. long-term loss of nutrients from already nutrient-deficient landscapes
4. loss of populations and habitat of special status species
5. risk of spread of invasive species
6. the levels of nuclear testing radionuclides in the immediate and adjacent area
7. interrelation between prescribed burning projects on adjacent Federal/state lands
8. indigenous uses of plants that may be impacted.
9. impacts on air quality
10. lethal effects on mature ponderosa pine, particularly from fire damage of roots

Action- RESTORATION 21

Burned areas (natural or prescribed) must be protected from livestock grazing for at least five years and until measurable recovery criteria are met.

Action- RESTORATION 22

Prescribed burning teams shall:

1. use existing roads
2. limit ground disturbance
3. address risk of fire spreading beyond the project area and onto surrounding lands.

### C. Fuels Reduction

Action- RESTORATION 23

Fuels reduction to restore natural fire processes shall be based on comprehensive restoration assessments with clear objectives, in conjunction with other active or passive methods.

Action- RESTORATION 24

Following fire, all standing trees shall be left for wildlife habitat, soil stability, and nutrient cycling, except where removal is necessary to maintain public safety or to restore ecological integrity (e.g., possible removal of small green trees that "should" have burned, so that future fires can burn more naturally).

### D. Fire Suppression

Action- RESTORATION 25

Minimize introduction of invasive species during and after fire suppression operations:

1. clean equipment of invasive species seeds before moving equipment off roads to build fire breaks
2. seal all firebreaks to prevent off-road vehicle access.

Action- RESTORATION 26

Minimize post-fire disturbance to burned areas to allow natural recovery.

Action- RESTORATION 27

Monitor all fire camps and helicopter spots for invasive species following fire.

### E. Forage Enhancement

Action- RESTORATION 28

Conduct forage enhancement projects only if they incorporate ecological principles to encourage native species, and will not result in any net loss of native plant communities.

## VII. REVEGETATION

Action- REVEGETATION 1

In revegetation efforts, whenever it is possible to do so, use native seed and seedlings that have been grown from seeds of locally adapted populations.

Action- REVEGETATION 2

If native seeds/plants are not available, revegetation projects will rarely be undertaken until native plant seed or plants become available. Non-native plant species will be used only in extremely degraded/severely altered systems as an intermediate step toward/placeholder for native restoration, accompanied by a full commitment to complete restoration of native species. This commitment must include funds set aside as part of the project, with specific deadlines for accomplishment.

Action- REVEGETATION 3

When reseeding with non-native species, certification must be provided that only species that have been documented as non-persistent are present in the seeding mixture.

Action- REVEGETATION 4

Assure availability of native seed and plants:

1. establish BLM contracting systems that will provide growers the necessary assurance their native, locally-adapted seed/plants will be purchased if grown
2. establish sufficient storage facilities for native seeds for major revegetation efforts.

Action- REVEGETATION 5

Determine, in landscape, watershed, and subwatershed vegetation assessments, the feasibility of providing habitat for wildlife and plant species that have been extirpated or nearly extirpated.

Action- REVEGETATION 6

Prepare a public report on potential reintroduction of extirpated species, including foreseeable human activities or developments that would foreclose options for such reintroductions.

Action- REVEGETATION 7

Collaborate with federal, state, local and private land managers to reduce sale and planting of exotic invasive species, and increase availability and use of appropriate native species, with particular attention to inholdings and other lands adjacent to BLM lands.

Action- REVEGETATION 8

Focus invasive species public education programs on 10-20 of the most ecologically problematic local invasive species and those that have the potential to invade a given District. Include information about how these species are introduced to public lands.

Action- REVEGETATION 9

Following fire or other disturbances, do not propose reseeding unless it can be shown that natural regeneration is unlikely. Use native species unless they are not available. Always use certified weed-free seed.

## VIII. MONITORING AND EVALUATION

Action- MONITOR 1

Before resources are committed to modify a plant community, gather baseline data to reflect existing conditions. If treatments are initiated, data shall be collected to substantiate whether or not any of the

goals, objectives, and standards have been met. If baseline and post-treatment evaluation monies are not available, then the project shall not be approved (see Endnote 6).

Action -MONITOR 2

Monitoring must be used to:

1. inventory baseline conditions at the landscape, watershed, subwatershed, and project site levels
2. measure whether positive goals for native ecosystem recovery, conservation, and integrity are being attained
3. track biodiversity and health using an increaser/decreaser species procedure (including biological soil crusts, wildlife, and endemic/sensitive species)
4. practice precaution, retain flexibility, and respond to change, unforeseen harm, failure to reach objectives, and/or new information
5. quantify invasive species population changes
6. establish success/problems with specific prevention and restoration treatments in a variety of sites.

Action- MONITOR 3

Monitoring and evaluation of vegetation treatments shall:

1. relate to the clearly stated objectives of all restoration projects
2. be an integral component of each restoration project
3. be incorporated into the essential costs of each project
4. use scientific principles of experimental design including replication and measurements from untreated control areas for comparison with treated locations
5. use a process responsive to all-party and scientific input
6. encourage involvement of local, regional and national stakeholders
7. be documented in a sixteen-state central database with assessments, objectives, monitoring procedures, and analyses in comparable formats
8. outline clear procedures for responding to monitoring and evaluation results

Action- MONITOR 4

Monitoring methods shall be:

1. Relevant: evaluates progress toward stated objectives
2. Sensitive: quickly detects change, shows trends, identifies critical features
3. Available: inexpensive, easily applied
4. Measurable: accurately quantifiable with acceptable methods
5. Defensible: minimally subject to individual bias
6. Verifiable: allows others applying the same methods to achieve similar results
7. Inclusive: avoids reductionism, where feasible
8. Scheduled: monitoring interval firmly scheduled.

Action- MONITOR 5

Goals, objectives, and standards must be written for all projects tiered to this EIS. All projects must be monitored to determine if their goals, objections, standards, and guidelines are being met on schedule.

Action- MONITOR 6

Objectives and standards must be written in such a manner as to be measurable with concrete ecosystem indicators. Reliance on "professional judgment" without evidence should be minimized, so that conclusions and ecosystem conditions can be independently verified.

Action- MONITOR 7

Each District must prepare an annual monitoring report of all vegetation restoration projects (passive and active). These reports should be available at a central BLM location (see Endnote 7).

Action- MONITOR 8

Each District must annually report whether goals, objectives, and standards are being met. For those that are not being met, indicate plans for meeting them.

Action- MONITOR 9

All proposals to undertake a vegetation restoration activity must include a description of the monitoring that will be necessary to determine the compatibility of the activity with specific goals, objectives, and standards; and the treatment efficacy.

Action- MONITOR 10

Require the submission of an annual monitoring plan at or near any and all locations disturbed by oil and gas activities before granting approval of an Application for Permit to Drill.

Action- MONITOR 11

Annually monitor for five years all firelines, fire camps, helicopter spots, and fire retardant-treated areas for invasive species; eliminate introduced invasive species.

Action- MONITOR 12

Monitor progress toward attainment of long term health and integrity of the watershed, aquatic, riparian, and native vegetation and soil resources.

## IX. TRIBAL RELATIONS FOR VEGETATION TREATMENTS

GOAL- TRIBES 1

Native American Indian concerns and issues relative to vegetation prevention and restoration treatments are addressed and mitigated in full collaboration with Native Tribal people.

Action- TRIBES 1

Consultation and collaboration with Native Tribes shall take place throughout the process of developing and implementing this EIS in accordance with Executive Order No. 13084, Consultation and Coordination with Indian Tribal Governments.

Action-TRIBES 2

Contact Native Tribal representatives from Tribal governments and organizations when vegetation treatments are being planned. Give particular attention to consultation and collaboration with local Tribal people when activities may affect Native cultural resources, hunting, fishing and gathering areas, sacred sites, or Tribal trust lands.

Action- TRIBES 3

Analyze treatment proposals pursuant to Executive Order No. 12898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations.

Action- TRIBES 4

In collaboration with Tribal people, identify culturally significant plants used for food, basketweaving and other fibers, medicine, and ceremonial purposes.

Action- TRIBES 5

Develop protocols for enhancement and protection of culturally significant plants:

1. utilize traditional indigenous knowledge and wisdom to protect and enhance native vegetation communities, native resources, and ecosystems.
2. prioritize treatments that will enhance and preserve culturally significant plants and animals.

3. use minimal impact vegetation treatments or avoidance where culturally significant species are known to occur. Vegetation treatments will not result in net loss of native species of importance to indigenous people for subsistence or cultural purposes.

Action- TRIBES 6
Establish herbicide-free zones to protect culturally significant plant and wildlife resources.

Action- TRIBES 7
Provide notification to Indian communities of the exact locations, dates, and times that herbicide applications will take place, via letters of notification and posting in prominent locations (such as community bulletin boards and local post offices). Also, prior to and following treatments, post boundaries of treated lands where traditional activities may occur, to ensure notification of elders and traditionalists and protect their health.

Action- TRIBES 8
Monitor the impacts of different vegetation treatments upon the viability and health of culturally significant plants and animals. Adapt treatment approaches as necessary to ensure culturally significant plant and animal resources are protected for seven generations.

## X. COORDINATION, EDUCATION, AND PUBLIC AWARENESS

Action- CEPA 1
Identify activities that prevent, minimize, or reverse (as well as facilitate) the introduction, establishment, spread, and reinvasion of specific invasive exotic plant species (e.g., cheatgrass, ventanata, starthistle) on BLM lands.

Action- CEPA2
Incorporate findings of the analysis (CEPA-1) in all site-specific treatment decisions.

Action- CEPA 3
Develop and maintain a central web site featuring prevention and passive and active restoration treatments, including:

1. scientific literature on treatment outcomes of relevance to BLM lands
2. BLM projects that have resulted in reestablishment of native vegetation, reintroduction of extirpated species, increase in sensitive species populations, reduction in acres needing restoration treatments, or reestablishment of natural fire regimes
3. successful BLM projects or programs to alter activities that have facilitated the introduction, establishment and spread of invasive species.

Action- CEPA 4
Establish annual awards to BLM employees, Districts, and inholding landowners for accomplishments such as:

1. successful passive and active restoration of native vegetation
2. equality of effort to prevention and restoration treatments
3. exemplary monitoring
4. significant involvement of NGOs, students, and other volunteers in conservation and restoration activities.

Action- CEPA 5
Eliminate funding based on acres of vegetation directly treated the previous year without (a) documented alteration of the conditions that favored the presence of the vegetation that was directly treated and (b) restoration programs to restore the site to native vegetation.

Guideline- CEPA 1

Offer simple invasive exotic species reporting forms to BLM lands visitors in order to encourage the reporting of locations in which particular invasive species are present.

Action- CEPA 6

Educate the public, including owners of lands neighboring BLM lands, about:

1. the natural role of fire and protecting their homes from fire through the Fire Wise Program
2. prevention of invasive species introduction, establishment, and spread.

## Endnotes

1. Vegetation (and thus ecosystem) problems on BLM lands in sixteen western U.S. states include fragmentation; simplified ecosystems; invasive exotic species; altered fire regimes; compacted and otherwise heavily-disturbed soils; and impaired watersheds, with disturbed upland and riparian systems.

2. The three most common activities on public lands managed by the BLM that continue to contribute to declining watershed health are:
   - *Livestock grazing*, which has caused severe, widespread, long-lasting damage to soils, vegetation, riparian areas, streams, and associated species;
   - *Roads*, which damage water quality, riparian areas, the quantity and timing of water flows, aquatic and riparian flora and fauna, and the overall hydrologic and ecological functions of watersheds; and
   - *Logging*, which has contributed to degradation of water quality, riparian areas, soils, vegetation, and aquatic resources.

   These activities lead to elevated sedimentation, degraded soils, degraded riparian areas, and altered stream flows within much of the BLM-managed landscape. Fire in watersheds, a natural process, plays a far smaller role in watershed degradation than these activities.

3. This prioritization is essential, as herbicides can (1) have numerous adverse toxic effects on workers; nearby residents; beneficial soil organisms; and native plant, aquatic, terrestrial and avian species; (2) simplify the vegetation community; and (3) render the treated site more vulnerable to return of invasive species. Herbicides alone do not address the conditions that favor the introduction, establishment and spread of invasive species, and yet they are often used as stand-alone technological "fixes."

4. These crusts of lower plants and cyanobacteria cover soil surfaces between individual plants in healthy arid grasslands, shrublands, and dry woodlands. While they fix nitrogen, increase soil fertility, improve water infiltration, stabilize soils, and enhance the establishment of vascular plants, they also may provide a shield that reduces or prevents establishment and spread of exotic species. Biological soil crusts are particularly susceptible to damage from physical disturbance.

5. An example of the insufficiency of analysis for effects solely on an umbrella species involves sagebrush canopy "thinning" for sage grouse. This may negatively impact nesting cover for migratory bird species of concern.

6. There is an obvious, admitted, ongoing, and institutional failure to adequately monitor, survey, and document the impacts of human activities on habitats, native vegetation, and native wildlife on federal public lands. Even when monitoring has occurred, land managers have rarely translated the findings into management improvements. Good intentions and monitoring plans have been insufficient to direct sufficient funding, staff, or attention to the outcomes of vegetation and other restoration treatments, among other human activities. It is essential that both the continuation and initiation of vegetation restoration activities be dependent upon prior adequate baseline and post-treatment monitoring. "We do what we get funded for" is neither a legally sufficient nor an ecologically responsible approach to the required, continuous finding of compatibility of treatment activities with the goals, objectives, standards, and guidelines of this EIS.

7. Monitoring needs to be documented so that it can be independently reviewed by non-BLM scientists, the scientifically literate public, and others who are concerned about the ecological health of the nation's federal public lands.

BLM_0001135

Case No. 1:20-cv-02484-MSK Document 25-10 filed 04/27/21 USDC Colorado pg 79 of 96

# Bureau of Land Management National Policy Analysis of Restore Native Ecosystems Proposal

In 2002, a comprehensive proposal was submitted by a citizen's coalition during scoping for the PEIS. This proposal (Alternative E in the PEIS, and often referred to in public comments as the Restore Native Ecosystems proposal) was included as Appendix G in the Draft PEIS. In order to determine whether the proposal had merit for analysis relative to the proposed action, or should be dismissed from detailed analysis, a comprehensive policy review was conducted of the proposal. The policy review was conducted by the BLM's National Science and Technology Center in Denver, Colorado, during 2002. This review was not included in the Draft PEIS, but has been included in the Final PEIS in response to public comments on how the proposal was evaluated in the PEIS.

The proposal as submitted provided the source and framework for the limited herbicide use alternative analyzed in the PEIS as Alternative E. In order to develop Alternative E for analysis in the PEIS, certain components of the proposal that were relevant and applicable to herbicide use under the proposed action were carried forward into the alternative analyzed in the PEIS. The remaining content of the proposal was determined to be either already covered under existing BLM policy and, therefore, already a component of the Preferred Alternative (Alternative B), or determined to be outside the scope of analysis for this PEIS.

The following Table summarizes the BLM's national policy review of the proposal. The policy analysis comprises identification of the individual Goals and Actions outlined in the proposal. Each Goal or Action then has a determination whether it is included in current BLM policy (Yes/No) and a citation for the policy. Under Policy Analysis, a brief summary is provided outlining the policy. Under Alternative Comparison, the Alternatives that apply to the policy are identified. In most cases, this is "common to all alternatives." The last column outlines the programmatic net effect or impact of the policy if the analysis is different from that presented in the PEIS, or outside the scope of analysis.

BLM_0001136

**TABLE I-1**
**Bureau of Land Management Policy Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| Ecological Integrity | OVR 1 | | 41; BLM Mission Statement | Policy | Common to all alternatives. | None |
| | OVR 1 | Yes | 43 | Prevention of conditions that favor vegetation problems and restoration of ecological integrity in the project design. | Common to all alternatives.<br><br>Alternative E would emphasize overall equal effort to these considerations, however, these are already considered together in the project design for vegetation treatments as part of integrated vegetation management. Prevention and restoration have equal consideration under BLM vegetation strategies. | None |
| | OVR 2 | Yes | 29, 41, 42, and 43 | Assessment of treatments and citations of scientific literature are accomplished through project design proposals and associated NEPA analyses. | Common to all alternatives. | None |
| | OVR 3 | Yes | 1, 23, 27, and 42 | BLM policy is to state objectives, standards, and guidelines in quantifiable terms where possible. Monitoring of outcomes is built into project design. | Common to all alternatives. | None |

**Table I-1 (Cont.)**

**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Ecological Integrity (Cont.)** | OVR 4 | Yes | 41, 42, and 43 | The BLM recognizes the limitations of the understanding of complex ecosystems and the effects of activities on them. | Alternative E would mandate use of the "Precautionary Principle" in all restoration activities. The Precautionary Principle emphasizes not taking action due to limited knowledge, and therefore would favor passive management over active treatments. | Addressed in impact analysis in PEIS and PER. |
| | OVR 5 | Yes | 18, 41, 42, and 44 | Monitoring is part of project design. | Common to all alternatives. | None |
| | OVR 6 | Yes | 1, 26, 29, and 32 | Public participation is encouraged whenever possible in all BLM activities. | Common to all alternatives. | None |
| | OVR 7 | Yes | 29, 41, and 43; Federal Acquisition Regulations (FARs); and Title 4 Appropriations | BLM provides incentives and disincentives for public lands activities. | Common to all alternatives. | None |
| | OVR 8 | Yes | Title 4 Appropriations and Government Performance and Results Act | Congress has mandated BLM be accountable to public funding. | Common to all alternatives. | None |
| **Definitions** | | No | | Many of the definitions used in the RNE proposal do not comport with agency usage or definitions contained in policy, law, regulations, or executive order. | Alternative E only. | None |

BLM_0001138

**TABLE I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Vegetation Treatment Planning** | PLAN 1 | Yes | 1,5, and 32 | BLM considers a wide range of factors in planning vegetation treatments including, but not limited to, those outlined in the RNE proposal. | Common to all alternatives. | None |
| | PLAN 1 | Yes | 1, 5, and 32 | Requirements to map habitat variables including, but not limited to, those listed, are included in land use planning policy guidance. In addition, there are several mapping initiatives and efforts that address various components at different spatial scales, these include , but are not limited to, efforts such as LANDFIRE, GAP, and Re-GAP. | Common to all alternatives. | Mapping all the variables at multiple spatial scales across the 17 states analyzed in the PEIS is beyond the scope of analysis of the proposed action. Some of the habitat variables are best suited for local (field office-level) spatial effects analysis, whereas other habitat variables are best suited for broad-scale spatial effects analysis. Broad spatial scale mapping analyses are already occurring for these types of habitat variables by BLM and other agencies and have been incorporated into the PEIS analysis as appropriate. |
| | PLAN 2 | Yes | 6, 9, 26, and 27 | BLM regularly consults with conservation centers, natural heritage centers, the Services, and other data sources on species occurrences. | Common to all alternatives. | None. |
| | PLAN 3 | Yes | | | Common to all alternatives. | None. |

**Table I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Vegetation Treatment Planning (Cont.)** | PLAN 4 | No | | Assessment goals are contrary to established uses under FLPMA. | Alternative E only. | The assessments are better suited for spatial analysis at the local field office level. These data are not available at the broad programmatic scale of this PEIS analysis at this time and the cost to obtain these data would be exorbitant due to the site-specific scale. Herbicide use in amphibian habitats is addressed in Chapter 4 of the PEIS and PER under Wildlife Resources. |
| | PLAN 5 | Yes | 16, 32, and 40 | BLM conducts invasive species inventories on a 3 year cycle. BLM does not map exotic species plantings on a broad scale. Existing seedings are platted on master title plats (MTPs) and can be considered in local vegetation management planning at the field office level. | Common to all alternatives. | None. |
| | PLAN 6 | Yes | 5, 32, 40, 43, and 50 | Actions are included in BLM assessment process | Common to all alternatives. | None. |
| **Site Selection and Treatment Priorities** | PRIORITY 1 | Yes | 4, 16, 32, 40, 41, 43, and 44 | BLM treatment priorities consider probability of success. | Common to all alternatives. | None. |
| | PRIORITY 2 | Yes | 4, 16, 32, 40, and 44 | BLM vegetation treatment priorities are based on land use planning goals | Alternative E only. | Addressed in impacts analysis in PEIS |

**TABLE I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Site Selection Priorities (Cont.)** | PRIORITY 3 | Yes | 3, 5, 26, and 42 | All planning factors listed are considered in the vegetation treatment design. | Common to all alternatives. | There is no BLM policy on using the Precautionary Principle. However, the BLM does approach projects with uncertain outcomes experimentally and uses adaptive management based on effectiveness monitoring results. |
| | PRIORITY 4 | Yes | 4, 7, 32, 40, and 58 | Same as BLM herbicide treatment priority policy for all herbicide use activities. | Alternatives A through D. Alternative E would add elimination or reduction of the conditions favoring the presence of invasive species and encourage conditions that resist invasive species in conjunction with herbicide use. | Would narrow the scope of herbicide treatment to invasive species only. The BLM herbicide use activity encompasses a broader range of activities than only invasive species. Limiting herbicide use to invasive species would not fully meet the purpose and need of the PEIS. |
| | PRIORITY 5 | Yes | 41, 44, and 59 | | Common to all alternatives. | None. |
| | PRIORITY 6 | Yes | 4, 5, 32, 38, 41, et al. | | Common to all alternatives. | None. |
| **Invasive Species Treatments** | PRIORITY 1 | Yes | 4, 18, 32, 38, 41, and 42 | | Common to all alternatives. | None. |
| | PRIORITY 7 | Yes | 4, 16, 32, 40, and 41 | Policy by Executive Order and Native Invasive Species Management Plan | Common to all alternatives. | None. |
| | PRIORITY 8 | Yes | 59 | Policy by Executive Order | Common to all alternatives. | None. |

BLM_0001141

**Table I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Invasive Species Treatments (Cont.)** | PRIORITY 9 | Yes | 16 and 32 | National and local level long-term and short-term plans for prevention and minimization inclusive of adaptive management already exist. | Alternatives A through D. Alternative E would develop 100 year plans. | BLM land use planning horizons are 20 years. National Invasive Species Council Management Plan is not necessarily time sensitive and represents on-going policy until changed by Congress or the President. |
| | PRIORITY 10 | Yes | 4, 16, 32, et al. | Restoration of historical disturbance regimes, native vegetation communities, and active vegetation treatments to reduce invasive species populations are included within the purpose and need for the PEIS. | Common to all alternatives. | None. |
| **Prescribed Fire, Wildfire, and Fire Suppression Treatments** | PRIORITY 2 | Yes | 3, 26, 38, and 39 | Restoration of natural fire regimes is included in the purpose and need for the PEIS. | Common to all alternatives. | None. |
| | PRIORITY 11 | Yes | 1, 3, 26, and 39 | Collection of baseline data is ongoing. | Common to all alternatives. | None. |
| | PRIORITY 12 | Yes | 34 | BLM Fire Management complies with the cited guidance and policy. | Common to all alternatives. | Fire management decision-making is outside the scope of analysis of the PEIS. |
| | PRIORITY 13 | Yes | 29 | BLM Fire Management Planning (FMP) process includes these considerations. | Common to all alternatives. | Development of FMPs occurs at the local field office level through the National FPA process and is outside the scope of analysis of the PEIS |

**TABLE I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Prescribed Fire, Wildfire, and Fire Suppression Treatments (Cont.)** | PRIORITY 14 | N/A | | Wildland Fire Leadership Council provides guidance and direction on fire suppression policy at the national level. | | Fire suppression policies are set at the national level, and are outside the scope of analysis of the PEIS. |
| | PRIORITY 15 | N/A | | Field Office FMPs outline local parameters for fire suppression based on resource values to be protected. | | Fire suppression tactics are outside the scope of analysis of the PEIS. |
| | PRIORITY 16 | N/A | | Field Office FMPs outline local parameters for fire suppression based on resource values to be protected. | | Fire suppression tactics are outside the scope of analysis of the PEIS. |
| **Fuels Reduction** | PRIORITY 3 | Yes | 34 and 37 | Protection of human life and property is the highest priority for the BLM by policy. | Common to all alternatives. | None. |
| | PRIORITY 17 | Yes | 29, 34, and 37 | All projects have a purpose and need identified for NEPA analysis. | Common to all alternatives. | None. |
| | PRIORITY 18 | N/A | | Congress determines the priorities for allocation and use of fuels reduction funds associated with the National Fire Plan (NFP). | | Allocation and use of fuels reduction funds is outside the scope of analysis of the PEIS. |
| | PRIORITY 19 | No | 1, 34, and 37 | Fuels reduction projects are determined based on local situations and studies, and are guided by parameters contained in local land use plans and FMPs | N/A | Would restrict flexibility of where fuels reduction activities could occur. Priority scheme would only partially meet the PEIS purpose and need. |

**Table I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Fuels Reduction (Cont.)** | PRIORITY 20 | No | 33, 34, 36, and 37 | Restrictions on fuels treatments are contrary to national and agency policy, as set by the Administration and Congress. | N/A | Would restrict the use of certain tools and methods to accomplish project work. Does not meet purpose and need of PEIS to use all available tools and methods. |
| | PRIORITY 21 | No | 29, 41, 43, Federal Acquisition Regulations (FAR), and Title 4 Appropriations | Fuels reduction contract restrictions are contrary to National Fire Plan Policy and the Healthy Forests Restoration Act. | N/A | Fuels reduction contracting is outside the scope of analysis of the PEIS. |
| **Prevention Vegetation Treatments** | PREVENT 1 | Yes | 1, 4, 16, 32, and 40 | Policy under Executive Order (E.O.) | Common to all alternatives. | None. |
| **Invasive Species** | PREVENT 2 | Yes | 1, 28, 30, 32, and 43 | BLM prevention protocols are science-based. | Common to all alternatives. | None. |
| **Livestock Grazing** | PREVENT 1 | Yes | 1, 22, 43. and 45 | These considerations are included within the grazing management program authorizations. | Common to all alternatives. | Grazing administration is outside the scope of analysis of the PEIS. |
| | PREVENT 3 | No | | | | Grazing administration is outside the scope of analysis of the PEIS. |
| **Roads and Off-Road Vehicles** | PREVENT 2 | Yes | 1, 21, 32, and 57 | BMPs for road construction activities already exist. | Common to all alternatives. | Off-road vehicle management is outside the scope of analysis of the PEIS. |

## TABLE I-1 (Cont.)
## Bureau of Land Management Analysis of Restore Native Ecosystems Proposal

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Roads and Off-Road Vehicles (Cont.)** | PREVENT 4 | No | 1 and 57 | Transportation inventory and planning in conducted during land use planning. | | Out of scope. The cost of developing a GIS map and database of all BLM transportation system routes in the western U.S. would be exorbitant, and the task is not germane to the decisions to be made in the PEIS. |
| | PREVENT 5 | Yes | 1, 15, and 29 | Invasive species spread analysis is a critical element of the human environment component of all BLM NEPA analyses. | Common to all alternatives. | Off-road vehicle management and planning is outside the scope of analysis of the PEIS. |
| | PREVENT 6 | N/A | 1 and 57 | | | Vehicle route designation is a function of land use planning and is outside the scope of analysis of the PEIS. |
| | PREVENT 7 | Yes | 32 | BLM prevention BMPs in place. | Common to all alternatives. | None. |
| | PREVENT 8 | No | 1, 20, 21, and 57 | Designation of Open, Closed, or Limited OHV use and subsequent implementation is accomplished through land use planning. | | Vehicle route designation and area closures are a function of land use planning and are outside the scope of analysis of the PEIS. |
| | PREVENT 9 | No | 57 | Vegetation protection goals are developed through land use planning. | | Transportation planning is outside the scope of analysis of the PEIS. |

**Table I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Roads and Off-Road Vehicles (Cont.)** | PREVENT 10 | No | 10, 11, and 59 | Road construction is disallowed only in non-discretionary closures (e.g., Wilderness, Wilderness Study Areas [WSAs]). Discretionary closures are developed through land use planning. | | Restrictions on road construction are outside the scope of analysis of the PEIS. |
| | PREVENT 11 | No | 29 | Reclamation standards for obliterating roads are guided by local land use and transportation plans. | | Mandating standards for road obliteration is outside the scope of analysis of the PEIS. |
| **Fire Suppression** | PREVENT 12 | Yes | 3 and 29 | MIST is applied as required under FMPs. Fire line reclamation standards are addressed in ESR plans following wildfire. | Common to all alternatives. | Fire suppression tactics are outside the scope of analysis of the PEIS. |
| **Wildland Urban Interface** | PREVENT 13 | No | 34 | Federal agencies have no legal authority on private land. | | Fire prevention measures for private landowners are outside the scope of analysis of the PEIS. |
| | PREVENT 14 | No | 34 | Defensible community space is developed through collaborative planning with local communities and their fire protection agencies. | | Fire protection and suppression tactics are outside the scope of analysis of the PEIS. |
| | PREVENT 15 | No | 34 | Federal agencies have no legal authority on private land. | | Fire prevention measures for private landowners are outside the scope of analysis of the PEIS. |
| | PREVENT 16 | Yes | 34 | Long-term maintenance and monitoring are included in the design of vegetation treatments. | Common to all alternatives. | Budgetary commitments or allocations are outside the scope of analysis of the PEIS. |

**TABLE I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Wildland Urban Interface (Cont.)** | PREVENT 17 | No | 34 | Restoration and fuels reduction activities are separate activities with different purposes. | | Restoration priorities and assessments are developed through several layers of planning, from land use plans to watershed assessments, and are outside the scope of analysis of the PEIS. |
| **Timber** | PREVENT 3 | Yes | 16 | Prevention of the introduction, establishment, and spread of invasive species is policy by E.O. | Common to all alternatives. | Commercial timber management is outside the scope of analysis of the PEIS. |
| | PREVENT 18 | N/A | 35 | Vegetation objectives are established in land use plans. | | Setting vegetation management goals is outside the scope of analysis of the PEIS. |
| | PREVENT 19 | Yes | 16, 29, 32, and 35 | Project design and NEPA analysis take into consideration factors of invasive species introduction, establishment, and spread. | Common to all alternatives. | Commercial timber sales are outside the scope of analysis of the PEIS. |
| **Altered Hydrologic Regimes** | PREVENT 4 | No | 11, 16, 43, and 44 | There are no BLM policies pertaining to invasive species and altered hydrologic regimes. Prevention of invasive species introduction, establishment, and spread is policy by E.O. | | Setting goals for altered hydrologic regimes is outside the scope of analysis of the PEIS. |
| | PREVENT 20 | Yes | 11, 43, and 44 | PFC assessments are used in determining riparian restoration priorities. | Common to all alternatives. | Determining treatment priorities for riparian areas is outside the scope of analysis of the PEIS. |

**Table I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Altered Hydrologic Regimes (Cont.)** | PREVENT 21 | No | 11, 43, and 44 | PFC assessments are used in determining riparian restoration priorities. | | Restoration of native historical flow regimes is outside the scope of this PEIS. |
| **Oil, Gas, and Mineral Exploration and Development** | PREVENT 5 | Yes | 16 | Prevention of invasive species introduction, establishment, and spread is policy through E.O. | Common to all alternatives. | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| | PREVENT 22 | No | 1 | Restrictions on fluid mineral activities are developed through land use planning. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| | PREVENT 23 | No | 1 | Restrictions on fluid mineral activities are developed through land use planning. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| | PREVENT 24 | No | 1 | Seismic exploration technologies and methods involve varying degrees of surface impacts and provide different data sets; however, none are considered "best available technology" from this standpoint, as the methods utilized are based on the information needs of the operator. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| | PREVENT 25 | Yes | 1 and 29 | Standard Operating Procedures (SOPs) and Conditions of Approval (COAs) for APDs are developed through land use planning and NEPA analysis. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |

**TABLE I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Oil, Gas, and Mineral Exploration and Development (Cont.)** | PREVENT 26 | Yes | 1 and 29 | BMPs are applied as mitigation resulting from NEPA analysis. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| | PREVENT 27 | Yes | 1 and 29 | SOPs and COAs for APDs are developed through land use planning and NEPA analysis. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| | PREVENT 28 | Yes | 29 and 32 | Prevention measure incorporated into mineral materials permit authorizations. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| | PREVENT 29 | Yes | 29 | ESA consultation is required for all federal actions involving TES species. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| | PREVENT 30 | No | N/A | There is no statute, regulation, or E.O. that outlines a "no net loss" policy to adopt for special status plant species. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| | PREVENT 31 | Yes | 43 CFR 3162.3-1(2) | Surface use plans are required with each APD. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| | PREVENT 32 | Yes | 1 and 29 | SOPs and COAs for APDs are developed through land use planning and NEPA analysis. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |

## Table I-1 (Cont.)

## Bureau of Land Management Analysis of Restore Native Ecosystems Proposal

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Oil, Gas, and Mineral Exploration and Development (Cont.)** | PREVENT 32 | Yes | 1 and 29 | SOPs and COAs for APDs are developed through land use planning and NEPA analysis. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| | PREVENT 34 | Yes | 1, 29, and 43 CFR 3162.3-1 | SOPs and COAs for APDs are developed through land use planning and NEPA analysis. | | Oil, gas, and mineral exploration and development operations are outside the scope of analysis of the PEIS. |
| **Disturbance to Biological Soil Crust** | PREVENT 6 | No | 12 | There are no national policies regarding biological soil crusts and invasive species prevention. | Alternative E | Biological soil crusts are addressed in the PEIS. |
| | PREVENT 35 | No | 1 and 29 | Inventory of resources is a function of land use planning and site-specific NEPA analysis. | | Out of scope. The cost of mapping all biological soil crusts at the ecoregion and watershed level across 17 western states would be exorbitant. |
| | PREVENT 36 | Yes | 12 and 29 | Resource damage and mitigation are addressed through project-level NEPA analysis. | Common to all alternatives. | SOPs for biological soil crusts relative to herbicide use are presented in the PEIS. |

**TABLE I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Disturbance to Biological Soil Crust (Cont.)** | PREVENT 37 | No | 3, 12, and 29 | Livestock exclusion policies for ESR projects are two growing seasons, and may be extended at the discretion of he BLM based on resource recovery objectives. | Alternative E would extend livestock exclusion for biological crust recovery to five years. | Current policy is a minimum of two growing seasons and is tied to meeting multiple resource recovery objectives as defined in the ESR plan, not to recovery specifically for biological soil crusts. Livestock would be displaced longer under Alternative E to allow for recovery. Biological crusts would have up to another three years for recovery. |
| **Prevention of Excess Fuels** | PREVENT 7 | No | 5, 22, and 23 | The BLM has no policies to maintain densities of shrub and tree establishment at historical levels to prevent excess fuels. Historical densities may be characterized by excess fuels in some cases. | | Determining historical densities of shrub and tree establishment is outside the scope of analysis of the PEIS. |
| | PREVENT 38 | No | 5, 22, and 23 | Standards and guidelines are established under 43 Code of Federal Regulations (CFR) 4100 and local Resource Advisory Councils (RACs), which guide decisions for reduction or elimination of grazing. | | Out of scope. Livestock grazing levels in any plant community are determined through grazing authorizations under 43 CFR 4100. |

BLM_0001151

**Table I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Prevention of Excess Fuels (Cont.)** | PREVENT 39 | No | 5, 22, and 23 | Livestock exclusion policies for ESR projects entail two growing seasons, and may be extended at the discretion of the BLM based on resource recovery objectives. | Alternative E would extend livestock exclusion in forest and shrublands to five years. | Current policy requires a minimum of two growing seasons, and is tied to meeting multiple resource recovery objectives as defined in the ESR plan, not to recovery specifically for biological soil crusts. Livestock would be displaced longer under Alternative E to allow for recovery. Forests and shrublands would have up to another three years for recovery. |
| | PREVENT 40 | Yes | 5, 23, and 34 | Local FMPs outline the use of fire for resource benefit and prescribed fire for each burnable acre. | Common to all alternatives. | Development of FMPs occurs at the local level through the National FPA process, and is outside the scope of analysis of the PEIS. |
| **Restoration Vegetation Treatments** | RESTORE 1 | Yes | 4, 32, and 43 | The BLM uses an IWM approach to vegetation treatments. | Common to all alternatives. | None. |
| | RESTORE 2 | Yes | 4, 29, 30, 31, 32, and 43 | Potential effects of projects on resources and species are analyzed at the site-specific level under NEPA. | Common to all alternatives. | Site-specific NEPA assesses effects on resources and habitats that are present and does not rely on "umbrella" species. |
| | RESTORE 3 | Yes | 4 and 32 | The BLM uses an IWM approach that includes all treatment methods. | Common to all alternatives. | Addressed in the PEIS. |

**TABLE I-1 (Cont.)**
**Bureau of Land Management Analysis of Restore Native Ecosystems Proposal**

| Goal | Action | Current BLM Policy (Yes/No) | Policy Source (refer to key at end of table) | Policy Analysis | Alternative Comparison | Programmatic Net Effect or Impact if Different from PEIS/PER Analysis |
|---|---|---|---|---|---|---|
| **Restoration Vegetation Treatments (Cont.)** | RESTORE 4 | Yes | 41 and 42 | Ecological priorities and treatment area characteristics are considered in vegetation treatment design. | Common to all alternatives. | None. |
| | RESTORE 5 | Yes | 16 | E.O. policy requires infestations to be treated where found and to prevent their further spread. | Common to all alternatives. | None. |
| **Guideline** | RESTORE 1 | Yes | 65 and Wilderness Act | The BLM utilizes the Carhart Model for minimum requirements analysis and impact tool requirements in Wilderness and WSAs. | Common to all alternatives. | None. |
| | RESTORE 6 | Yes | 4, 8, 16, 32, and 58 | The BLM utilizes an IWM approach to vegetation treatments. | Common to all alternatives. | None. |
| | RESTORE7 | Yes | 4, 8, 16, 32, and 58 | BLM treatment priorities for invasive species infestations are developed through an IWM framework. Seasonal employees and volunteers detect and control small infestations. | Common to all alternatives. | None. |
| | RESTORE 8 | Yes | ARS, TAG | Biological controls are authorized through ARS and approved through the national level multi-agency Technical Advisory Group (TAG). The BLM does not utilize or introduce any biological control agent that has not been approved or scientifically validated through the ARS/TAG testing programs. | Common to all alternatives. | None. |