BLM_0001225

# VOLUME III

# RESPONSE TO COMMENTS

This section provides a summary of the comments received on the Draft PEIS, PER, and Biological Assessment. A list of the agencies, organizations, and individuals who submitted substantive comments is provided. Finally, both general and specific comments and the BLM's responses to those comments are presented.

## Summary of Comments on the Draft Programmatic EIS

Over 3,000 individual comment documents on the Draft PEIS, PER, and BA were received during the public comment period from November 10, 2005, through February 10, 2006. Comments on the Draft PEIS, PER, and BA were received via letter, electronic mail, facsimile, and at public hearings.

Six hundred fifty-seven electronic mails, 77 facsimiles, and 234 letters were received. Each of the comment letters/electronic mails/facsimiles was read and substantive issues were identified. In addition, the BLM received over 2,000 form letters/electronic mails/facsimiles in response to solicitations from advocacy groups, and many of these were identical statements or slight variations thereof; these were also read and substantive issues identified. A total of 1,808 substantive comments were identified and responded to in this section.

Public hearings were held in Portland, Oregon on November 28, Sacramento, California on November 29, Salt Lake City, Utah on November 30, Albuquerque, New Mexico on December 1, Grand Junction, Colorado on December 5, Boise, Idaho on December 6, Billings, Montana on December 7, Cheyenne, Wyoming on December 8, and Las Vegas, Nevada and Washington, D.C. on December 13, 2006, for the BLM to provide an overview of the alternatives and to take public comments.

Comment letters and hearing transcripts were assigned tracking numbers and entered into a database. Individual tracking numbers were assigned to only one representative letter for identical or nearly identical form letters. All comments received on the draft documents are included in the Administrative Record.

The project interdisciplinary team reviewed all comment letters and hearing transcripts, and substantive comments (as defined in the BLM NEPA Handbook H-1790-1) requiring specific responses. A comment received a specific response if it 1) was substantive and related to inadequacies or inaccuracies in the analysis or methodologies used; 2) identified new impacts or recommended reasonable new alternatives or mitigation measures; and/or 3) involved substantive disagreements on interpretation of significance. After all comment letters/electronic mails/facsimiles were reviewed, each comment was assigned a comment issue code and each substantive comment was identified with a red line adjacent to the comment to identify each coded substantive comment. Over 1,800 substantive comments were identified and responded to in this Volume. The original and annotated letters have been entered into the Administrative Record.

Specific comments and responses were organized by subject headings that are similar to those in the PEIS and PER. Based on this organization, topics accounting for nearly 80% of the comments listed in Table III-1.

A list of commenting agencies, organizations, and individuals follows and includes the agency's, organization's, or individual's name and unique comment identifier number. Specific comments and responses are provided in this chapter under Specific Comments and Responses and are organized by subject headings in the PEIS and PER based on the content of the comment, and then by comment number. The text of the Final PEIS, PER, and BA have been revised or edited where appropriate to address the comments. Much of the additional information, either requested or provided by public input, has been incorporated in the Final PEIS, PER, and BA. Information on how specific comments were addressed and where they are addressed within the Final PEIS, PER, and BA is detailed in the response to each issue statement.

BLM_0001226

RESPONSE TO COMMENTS

**TABLE III-1**
**Comment Response Summary**

| Topic | Percent of Comments |
|---|---|
| Scope of analysis and causes of weed spread | 11.5 |
| Herbicide effects analysis | 7.9 |
| Vegetation treatment planning and management | 4.5 |
| Herbicide active ingredients evaluated in PEIS | 4.3 |
| Effects to vegetation | 4.0 |
| Monitoring | 3.9 |
| How effects of alternatives were estimated | 3.8 |
| Biological Assessment | 3.5 |
| Effects to human health and safety | 3.5 |
| Herbicide SOPs and guidelines | 3.5 |
| Effects to wildlife resources | 3.4 |
| Prevention of weeds | 3.0 |
| Cumulative effects analysis | 2.8 |
| Herbicide modes of action | 2.5 |
| Revegetation | 2.5 |
| Non-herbicide treatment methods | 2.3 |
| Alternative E – No use of sulfonylurea and other ALS-inhibiting active ingredients | 1.8 |
| Purpose and Need for Proposed Action | 1.7 |
| Determination of treatment acreages | 1.6 |
| Effects on air quality | 1.6 |
| Effects on social and economic values | 1.4 |
| Coordination and education | 1.3 |
| Special status species | 1.3 |
| Other | 23.9 |

The comments received by letter, electronic mail, and facsimile, and the transcripts from the nine public hearings have not been reproduced in this document. The issue statements presented in Specific Comments and Responses summarize the substantive and general comments received. Copies of all meeting transcripts, comment letters/electronic mails/facsimiles, and representative letters received from advocacy groups are included in the CD-ROM located in the back pocket of Volume I of the Final PEIS. Note that red lines are placed next to the substantive comments in the letters/electronic mails/facsimiles that are addressed in Volume III. Information contained on the CD-ROM is also included on the project website (http://www.blm.gov). The comment letters are part of the Administrative Record and can be inspected upon request to the BLM. In addition, several comment letters included extensive supporting material or large attachments. These were not reproduced on the CD, but are available for inspection upon request to the BLM.

# Commenting Agencies, Organizations, and Individuals

Written or oral substantive comments were received from the agencies, organizations, and individuals listed below. The number following the name of the organization or individual(s) below is a discrete identification number that was used in the response to comments process. The letter code corresponds with the comment delivery medium – electronic mail (EMC), form letter (FL), facsimile (FXC), public hearing (PHC), or letter (RMC). The four-digit number that follows the letter code is unique to each comment response.

# Specific Comments and Responses

Specific comments and responses are provided after the list of respondents and are organized by subject headings that are similar to those in the PEIS and PER and are based on the content of the comment, and then by comment number. In some cases, we have made modifications to comments to make them clearer to the reader. These modifications are enclosed in brackets.

BLM_0001227

**Federal Agencies**

| | |
|---|---|
| U.S. Department of Agriculture (USDA) Animal and Plant Health Inspection Service Plant Protection and Quarantine | FXC-0055 |
| USDA Animal and Plant Health Inspection Service Plant Protection and Quarantine | RMC-0189 |
| U.S. Department of Interior Bureau of Indian Affairs | RMC-0227 |
| U.S. Department of the Navy - Naval Air Station Fallon | RMC-0041 |
| U.S. Environmental Protection Agency | EMC-0505 |
| U.S. Environmental Protection Agency | FXC-0077 |
| U.S. Environmental Protection Agency | RMC-0202 |
| U.S. Fish and Wildlife Service Region 6 California/Nevada Operations Office | RMC-0233 |

**State Agencies**

| | |
|---|---|
| Arizona Game and Fish Department | EMC-0315 |
| Arizona Game and Fish Department | RMC-0081 |
| Butte Silver Bow Weed District | EMC-0403 |
| California Department of Food and Agriculture | FXC-0010 |
| California Department of Food and Agriculture | RMC-0056 |
| California Regional Water Quality Control Board | EMC-0300 |
| California Regional Water Quality Control Board | RMC-0070 |
| Camas Creek Cooperative Weed Management Area | FXC-0045 |
| Camas Creek Cooperative Weed Management Area | RMC-0116 |
| Central Valley California Regional Water Quality Control Board | RMC-0087 |
| Gunnison Watershed Weed Commission | FXC-0041 |
| Idaho State Department of Agriculture | RMC-0080 |
| Juntura Cooperative Weed Management Area | RMC-0105 |
| Mesa County - Tri River Area Extension | RMC-0005 |
| Metropolitan Water District of Southern California | RMC-0228 |
| Montana State University Extension | EMC-0608 |
| Nevada Department of Agriculture Noxious Weed Program | RMC-0093 |
| Nevada State Clearinghouse | RMC-0223 |
| New Mexico Department of Game and Fish | FXC-0038 |
| New Mexico Department of Game and Fish | RMC-0095 |
| North Dakota Department of Agriculture | FXC-0011 |
| Northside Tri-County Cooperative Weed Management Area | FXC-0044 |
| Northside Tri-County Cooperative Weed Management Area | EMC-0404 |
| Oregon Department of Agriculture | EMC-0635 |
| Oregon Department of Agriculture | RMC-0205 |
| State of Colorado | RMC-0146 |
| Utah Resource Development Coordinating Committee | RMC-0187 |
| Utah Resource Development Coordinating Committee | EMC-0550 |
| Washington State Noxious Weed Control Board | RMC-0031 |
| Wyoming Department of Agriculture | RMC-0164 |
| Wyoming Game and Fish Department | RMC-0144 |
| Wyoming State Grazing Board | RMC-0165 |

**County Agencies**

| | |
|---|---|
| Ada County Noxious Weed and Pest Department | EMC-0510 |
| Adams County Farm Service Committee | EMC-0449 |
| Adams County Noxious Weed Control Board | FXC-0052 |
| Albany County Weed and Pest Control District | RMC-0038 |
| Beaverhead County Weed Board | EMC-0395 |
| Cascade County Weed and Mosquito Management District | EMC-0604 |

RESPONSE TO COMMENTS

| | |
|---|---|
| Cassia County Commissioners | RMC-0147 |
| Cassia County Public Lands Committee | RMC-0110 |
| Clark County Idaho Board of Commissioners | RMC-0024 |
| Colorado County Weed Supervisor Association | RMC-0015 |
| Converse County Weed and Pest | RMC-0150 |
| Custer County Board of Commissioners | RMC-0101 |
| Ferry County Noxious Weed Control Board | EMC-0168 |
| Franklin County Noxious Weed Control Board | RMC-0059 |
| Grand County Board of Commissioners | RMC-0019 |
| Johnson County Weed and Pest Control | EMC-0031 |
| Kittitas County Noxious Weed Control Board | EMC-0313 |
| La Plata County Weed Office | EMC-0202 |
| Malheur County Cooperative Weed Management Area | RMC-0025 |
| Malheur County Court | RMC-0014 |
| Malheur County Soil and Water Conservation District | EMC-0040 |
| Malheur County Weed Control | EMC-0319 |
| Malheur County Weed Control | EMC-0325 |
| Mineral County Weed District | EMC-0413 |
| Modoc County Board of Supervisors | RMC-0224 |
| Niobrara County Weed and Pest Control District | EMC-0402 |
| Okanogan County Noxious Weed Board | EMC-0281 |
| Owyhee County Natural Resources Committee | EMC-0598 |
| Owyhee County Natural Resources Committee | FXC-0072 |
| Phillips County Weed Board | RMC-0172 |
| Pitkin County Commissioners | RMC-0157 |
| Pitkin County Weed Advisory Board | RMC-0138 |
| Powell County Board of Commissioners | RMC-0180 |
| Powell County Weed Board | RMC-0174 |
| Rio Blanco County Weed Department | EMC-0023 |
| San Miguel County Board of Commissioners | FXC-0016 |
| San Miguel County Board of Commissioners | RMC-0076 |
| Santa Barbara County Weed Management Area | EMC-0030 |
| Sublette County Weed and Pest Control District | EMC-0433 |
| Sweet Grass County Noxious Weed Program | EMC-0427 |
| Teton County Weed and Pest | EMC-0216 |
| Treasure County Weed District | EMC-0390 |
| Uintah County | RMC-0091 |
| Uintah County Commission | EMC-0323 |
| Uintah County Weed Board | RMC-0177 |
| Walla Walla County Noxious Weed Control Board | EMC-0219 |
| Wichita County Noxious Weed Department | EMC-0005 |

**Tribal Organizations**

| | |
|---|---|
| Alaska Inter-Tribal Council | EMC-0047 |

**Industry and Related Groups**

| | |
|---|---|
| Alliance of Forest Workers and Harvesters | EMC-0621 |
| American Farm Bureau Federation | EMC-0577 |
| Associated Oregon Loggers | EMC-0541 |
| BASF Corporation | EMC-0613 |
| Bennet Forest Industries | RMC-0188 |
| Boise Cascade | EMC-0565 |

BLM_0001229

| | |
|---|---|
| British Petroleum American Production company | EMC-0631 |
| Colorado Cattlemen's Association | RMC-0195 |
| Colorado Farm Bureau | EMC-0533 |
| Colorado Weed Management Association | FXC-0053 |
| CropLife America | EMC-0578 |
| CropLife America | FXC-0008 |
| Douglas Timber Operators | RMC-0030 |
| Douglas Timber Operators | RMC-0234 |
| Dow AgroSciences | EMC-0338 |
| Edison Electric Institute | EMC-0309 |
| Idaho Cattle Association | EMC-0648 |
| Idaho Farm Bureau Federation | FXC-0073 |
| Idaho Farm Bureau Federation | RMC-0192 |
| Lone Rock Timber Management Company | EMC-0230 |
| Montana Weed Control Association | EMC-0032 |
| New Mexico Cattle Growers' Association | EMC-0650 |
| New Mexico Federal Lands Council | EMC-0652 |
| New Mexico Wool Growers, Inc. | EMC-0651 |
| North American Weed Management Association | EMC-0461 |
| Oregon Cattlemen's Association | EMC-0360 |
| Oregon Society of American Foresters | EMC-0625 |
| Petroleum Association of Wyoming | EMC-0025 |
| Petroleum Association of Wyoming | EMC-0561 |
| Plum Creek Timber Company | RMC-0060 |
| Roseburg Resources Company | RMC-0017 |
| Scotts Miracle-Gro Company | EMC-0626 |
| Society of American Foresters | EMC-0186 |
| Society of American Foresters | EMC-0579 |
| South West Idaho Weed Control Association | EMC-0435 |
| Syngenta Crop Protection | EMC-0526 |
| Timber Products Company | RMC-0190 |
| Utah Farm Bureau Federation | FXC-0057 |
| Utah Farm Bureau Federation | EMC-0548 |
| Wyoming Farm Bureau Federation | EMC-0612 |

**Conservation Groups and Related Groups**

| | |
|---|---|
| Alaska Community Action on Toxics | EMC-0647 |
| Alaska Community Action on Toxics | FXC-0066 |
| Alliance for the Wild Rockies | EMC-0314 |
| American Forest Resource Council | EMC-0536 |
| Animal Welfare Institute | EMC-0193 |
| Animal Welfare Institute | EMC-0640 |
| Animal Welfare Institute | RMC-0231 |
| Arizona Department of Transportation | RMC-0086 |
| Arizona Public Service Company | EMC-0301 |
| Association of O & C Counties | FXC-0064 |
| Association of O&C Counties | RMC-0212 |
| Blue Mountains Biodiversity Project, League of Wilderness Defenders | RMC-0218 |
| Boulder Regional Group | EMC-0293 |
| Boulder Regional Group | EMC-0322 |
| California Indian Basketweavers Association | EMC-0643 |
| California Native Plant Society | EMC-0506 |

RESPONSE TO COMMENTS

| | |
|---|---|
| California Native Plant Society | RMC-0213 |
| California Oak Foundation | RMC-0208 |
| California Partners in Flight | EMC-0238 |
| California Weed Science Society | EMC-0187 |
| California Wilderness Coalition | RMC-0057 |
| Californians for Alternatives to Toxics | EMC-0646 |
| Carson Forest Watch | RMC-0170 |
| Center for Biological Diversity | RMC-0221 |
| Central Sierra Environmental Resource Center | RMC-0006 |
| Citizens for Fire Safety Sanity | FXC-0075 |
| Concerned Friends of Ferry County | EMC-0174 |
| Copper Country Alliance | FXC-0074 |
| Defenders of Wildlife | EMC-0623 |
| Desert Survivors | RMC-0069 |
| Embudo Valley Environmental Monitoring Group | EMC-0321 |
| Friends of the Inyo | EMC-0220 |
| Giustina Resources | FXC-0017 |
| Hampton Resources, Inc. | EMC-0344 |
| Hells Canyon Preservation Council | EMC-0512 |
| Idaho Conservation League | EMC-0641 |
| Idaho Conservation League | RMC-0203 |
| Institute For Culture and Ecology | EMC-0203 |
| Institute for Culture and Ecology | FXC-0013 |
| John Day-Snake Resource Advisory Council | EMC-0503 |
| Jordon Valley Cooperative Weed Management Area | EMC-0644 |
| Klamath River Keeper Program and Klamath Forest Alliance | EMC-0306 |
| Latir Neighborhood Association | FXC-0070 |
| Leavenworth Audubon Adopt-a-Forest (LEAF) | EMC-0173 |
| Legacy Lands Project | EMC-0247 |
| MCS Task Force of New Mexico | RMC-0210 |
| Natural Habitat | RMC-0160 |
| Natural Resources Defense Council and National Wildlife Federation | RMC-0214 |
| Natural Resources Defense Council, and National Wildlife Federation | EMC-0634 |
| Oregonians for Food and Shelter | FXC-0009 |
| Organic Consumers Association | EMC-0296 |
| Organic Consumers Association | EMC-0298 |
| Project 6 | EMC-0605 |
| Public Employees for Environmental Responsibility | RMC-0106 |
| Public Lands Advocacy | EMC-0544 |
| Public Lands Council | FXC-0063 |
| Public Lands Foundation | RMC-0020 |
| Rachel Carson Council | EMC-0324 |
| Resource Concepts, Inc. | EMC-0231 |
| Resource Concepts, Inc. | RMC-0040 |
| Resource Concepts, Inc. | RMC-0061 |
| Safe Alternatives for Our Forest Environment | EMC-0484 |
| Save Our ecoSystems, Inc. | RMC-0220 |
| Shoshone Natural Resource Coalition | EMC-0417 |
| Sierra Club Rocky Mountain Chapter | RMC-0050 |
| Sierra Club Utah Chapter | RMC-0217 |
| Sierra Club Utah Chapter | EMC-0639 |
| Siskiyou Project | EMC-0486 |

| | |
|---|---|
| Siskiyou Project | RMC-0100 |
| Siskiyou Project | RMC-0207 |
| Soda Mountain Wilderness Council | RMC-0167 |
| South Bend-Elkhart Audubon Society | EMC-0183 |
| Sullivan Natural Resources | EMC-0617 |
| The Aquatic Plant Management Society | FXC-0060 |
| The Flower Essence Society | EMC-0519 |
| The Lands Council | EMC-0562 |
| The Nature Conservancy | EMC-0446 |
| The Nature Conservancy | RMC-0155 |
| The Wilderness Society | EMC-0513 |
| The Wilderness Society | RMC-0215 |
| The Willits Environmental Center | RMC-0096 |
| Uncompahgre Plateau Project | EMC-0379 |
| Umpqua Watersheds | EMC-0217 |
| Utah Grazingland Network | RMC-0162 |
| Weed Science Society of America | EMC-0331 |
| Weed Science Society of America | FXC-0036 |
| Western Plant Health Association | EMC-0609 |
| Western Slope Environmental Resource Council | EMC-0590 |
| Western Slope Environmental Resource Council | RMC-0209 |
| Western Society of Weed Science | EMC-0566 |
| Western Watersheds Project | EMC-0525 |
| Western Watersheds Project | EMC-0584 |
| Western Watersheds Project | EMC-0585 |
| Western Watersheds Project | RMC-0219 |
| Willits Environmental Center | EMC-0362 |
| Womens Global Green Action Network | EMC-0067 |
| Wyoming Outdoor Council | RMC-0067 |

**Individuals**

| | |
|---|---|
| Abe, Jane | EMC-0246 |
| Adams, Bob | EMC-0406 |
| Adams, Carmen | EMC-0192 |
| Adams, Kelly B. | RMC-0111 |
| Adams, Kelly B. | RMC-0114 |
| Adams, Larry B. and Maxine | RMC-0117 |
| Adams, Phil (Roseburg Resources Company) | RMC-0131 |
| Adams, Steven L. | EMC-0052 |
| Adee, Avis E. | RMC-0094 |
| Ahlgren, Diane | EMC-0425 |
| Alderson, George and Frances | RMC-0053 |
| Alexander, Denise | EMC-0557 |
| Alexander, L.M. | EMC-0035 |
| Alexander, Patrick | EMC-0410 |
| Allen, Laura | EMC-0021 |
| Alper, Joshua | RMC-0156 |
| Altshool, Elsa | EMC-0042 |
| Amon, Robert F. | RMC-0149 |
| Anasavo, Thomas | EMC-0029 |
| Anderson, Bruce H. | EMC-0189 |
| Anderson, Jan C. (JCA Consulting) | EMC-0596 |

RESPONSE TO COMMENTS

| | |
|---|---|
| Anderson, Michael P. | EMC-0515 |
| Anderson, Shelly | EMC-0162 |
| Anderson, Val | EMC-0204 |
| Anonymous | EMC-0225 |
| Anonymous | EMC-0377 |
| Anonymous | EMC-0289 |
| Anonymous | EMC-0618 |
| Anonymous | RMC-0010 |
| Anonymous | EMC-0479 |
| Anonymous | FXC-0026 |
| Armer, Joan | EMC-0527 |
| Armintrout, Glen | FXC-0062 |
| Artley, Dick | EMC-0060 |
| Artley, Richard | EMC-0181 |
| Asher, Jerry | EMC-0223 |
| Asher, Jerry | EMC-0657 |
| Asher, Jerry | RMC-0042 |
| Athan, Tara | EMC-0337 |
| Atkin, David | EMC-0466 |
| Auchter, David (East Central Energy) | FXC-0076 |
| Bailey, John | EMC-0574 |
| Bailey, John | FXC-0069 |
| Bailey, John | RMC-0226 |
| Bailey, Michael | EMC-0156 |
| Baker, John L. (Fremont County Weed and Pest) | EMC-0509 |
| Baker, Omega M. | EMC-0043 |
| Banbury, Shera | EMC-0539 |
| Banks, Helen | EMC-0108 |
| Banner, Roger (Utah State University) | EMC-0443 |
| Banner, Roger (Utah State University) | EMC-0445 |
| Barager, Steve | RMC-0046 |
| Barnes, Sharon | EMC-0603 |
| Barr, Roger | EMC-0549 |
| Barrett, Anne Albrecht | EMC-0093 |
| Bartel, Donald A. (Sierra Consulting and Integrated Pest Management) | EMC-0523 |
| Barth, Bobbie | EMC-0227 |
| Bayers, Rich (Back Country Spraying) | EMC-0524 |
| Beck, George | EMC-0329 |
| Beebe, Ann | RMC-0064 |
| Beeland, DeLene | EMC-0597 |
| Bellovary, Christopher | EMC-0619 |
| Benjamin, Robert R. (Sheridan County Weed and Pest Control District) | FXC-0030 |
| Beran, Daniel (BASF) | EMC-0332 |
| Berger, Robert | EMC-0655 |
| Bernard, Doris | EMC-0454 |
| Bird, Deanna | EMC-0397 |
| Birdsey, Barbara | EMC-0126 |
| Bishop, Sarah G. | EMC-0330 |
| Bitner, Patricia (Lane County Audubon Society) | EMC-0318 |
| Black, Patricia | EMC-0535 |
| Blake, Ron | RMC-0108 |
| Blankenship, Jill | EMC-0493 |

BLM_0001233

| | |
|---|---|
| Blann, Deanna | EMC-0607 |
| Bluemer, Brad (Bonner County Weed Control) | EMC-0393 |
| Bockness, Scott (Montana Weed Control Association) | EMC-0508 |
| Boettcher, Robert | EMC-0242 |
| Bohman, Nancy | EMC-0528 |
| Boissonou, Cherrill | EMC-0109 |
| Boudreaux, Kristina A. | EMC-0163 |
| Bourne, Helen M. | FXC-0004 |
| Bowers, Lynn | RMC-0122 |
| Boyajian, Bo and Daniel | RMC-0066 |
| Boydston, Stanley | EMC-0356 |
| Brister, Bob | EMC-0170 |
| Brock, John H. | EMC-0211 |
| Brosbe, Lola | RMC-0084 |
| Brown, Cecil and Edith | FXC-0018 |
| Brown, Margo | EMC-0373 |
| Brownwood, Jeft | EMC-0518 |
| Brunk, Joseph (Sedgwick County Noxious Weeds Department) | EMC-0222 |
| Brye, Margaret | RMC-0118 |
| Bryngelson, Mark | EMC-0459 |
| Bryson, Anna | RMC-0073 |
| Bullock, Janet | RMC-0183 |
| Burch, D. | EMC-0489 |
| Burke, Erik and Jessyca | EMC-0070 |
| Burrell, Don and Mary | RMC-0063 |
| Burson, Allison | EMC-0166 |
| Burton, Richard C. | FXC-0056 |
| Busch, Roy and Mary | EMC-0019 |
| Butori, Dale (Fallon County Weed Department) | RMC-0136 |
| Calabro, Richard A. | FXC-0002 |
| Callahan, Jeanne | EMC-0048 |
| Callahan, Jeanne | FXC-0001 |
| Callahan, Jeanne | RMC-0013 |
| Callan, Cindy and Bob | RMC-0229 |
| Callicutt, Webb (Delta County Noxious Weed Program) | EMC-0212 |
| Callihan, Robert H. | EMC-0553 |
| Cameron, Sheena | FXC-0068 |
| Campbell, Bruce | FXC-0071 |
| Campbell, Elizabeth (Pueblo County Department of Public Works) | FXC-0061 |
| Campbell, Larry | EMC-0177 |
| Canepa, Judith K. | RMC-0032 |
| Cantlon, John D. (DuPont Vegetation Management) | EMC-0531 |
| Caress, Stanley M. | EMC-0045 |
| Caress, Stanley M. (University of West Georgia) | RMC-0012 |
| Carlson, Dave | EMC-0090 |
| Carmi, Ore | RMC-0039 |
| Carr, Dennis | EMC-0497 |
| Carrigan, Michael | RMC-0071 |
| Carroll, Brian M. | EMC-0555 |
| Carroll, Mike (Larimer County Weed Control District) | EMC-0213 |
| Caruso, Fred | EMC-0020 |
| Castellini, Randy | EMC-0269 |

RESPONSE TO COMMENTS

| | |
|---|---|
| Cederlof, James D. | EMC-0542 |
| Cenarrusa, John | EMC-0004 |
| Chamberlain, Lora | RMC-0097 |
| Chamberlain, Lora, and Bryan D. Graham | FXC-0039 |
| Chapman, James L. | EMC-0249 |
| Clark, Charlene Carroll | EMC-0452 |
| Clark, Lee | EMC-0003 |
| Cole, Brian | EMC-0056 |
| Cole, Elaine Jane | EMC-0122 |
| Collier, Phyllis | EMC-0581 |
| Colson, Cameron M. | EMC-0254 |
| Colton, Jeffrey P. (EarthSave Miami) | RMC-0206 |
| Compton, Rock | EMC-0372 |
| Conley, Jan (Environmental Association for Great Lakes Education) | EMC-0333 |
| Conrick, Teresa | EMC-0066 |
| Cox, Caroline (Northwest Coalition for Alternatives to Pesticides) | |
| Cox, Maryruth and Charles | EMC-0077 |
| Cox, William | EMC-0171 |
| Craig, Debra | EMC-0540 |
| Craig, Debra | RMC-0184 |
| Craig, Diane | RMC-0130 |
| Craig, Diane | EMC-0340 |
| Craig, Sue | RMC-0143 |
| Cranley, Mary | EMC-0059 |
| Criswell, J. Russell | FXC-0035 |
| Crockett, Ron P. | EMC-0132 |
| Cross, Virginia | RMC-0102 |
| Crowell, Lynn | EMC-0143 |
| Crowlie, Colleen | EMC-0430 |
| Crowlie, Colleen | EMC-0434 |
| Cushman, Robin | RMC-0230 |
| Custer, Matt | FXC-0014 |
| D'Amato, Tim (Boulder County Parks and Open Space) | EMC-0398 |
| Dalegowski, Daniel | EMC-0263 |
| Damus, Marilyn | EMC-0308 |
| Damus, Marilyn D. | RMC-0068 |
| Daniel, Bill | EMC-0559 |
| Dankers, Martha | EMC-0137 |
| Davlantes, Nancy | EMC-0575 |
| Day, Jean | EMC-0262 |
| de Benedictis, Paul and Gene | EMC-0010 |
| de Guia, Gabriel | EMC-0602 |
| de Miranda, Yvonne | EMC-0089 |
| Deakins, Cat | EMC-0049 |
| deFaria, Alexandra | RMC-0058 |
| Degan, Janet | FXC-0019 |
| Degan, Janet | RMC-0079 |
| Del Sesto, Holly | EMC-0288 |
| Delles, Susan | RMC-0173 |
| DeLong, Colleen | EMC-0496 |
| Detjen, Kristina | EMC-0141 |
| Dewey, Steven A. (Utah State University) | EMC-0218 |

BLM_0001235

| | |
|---|---|
| Dewey, Steven A. (Utah State University) | FXC-0029 |
| DiLabio, G. M. | EMC-0152 |
| DiTomaso, Joseph M. (Univeristy of California at Davis Cooperative Extension) | EMC-0366 |
| Dixon, Lydia | EMC-0200 |
| Donnelly, Patrick | EMC-0436 |
| Doran, Alicia (Colorado Weed Management Association | EMC-0279 |
| Doran, Mary | EMC-0453 |
| Dremann, Craig | EMC-0234 |
| Duane, Judy | FXC-0067 |
| Duane, Judy | RMC-0193 |
| Duncan, Celestine | EMC-0251 |
| Dunn, Sally | EMC-0642 |
| Dunne-Brady, Jane | EMC-0041 |
| Dyber, Kenneth James | EMC-0233 |
| Edwards, Gordon O. (Cassia County Weed Control) | RMC-0153 |
| Eggena, Madge | EMC-0250 |
| Eisler, David | EMC-0543 |
| Eklund-Brown, Sheri (Elko County Commision) | EMC-0207 |
| Eldridge, Lynnette | EMC-0637 |
| Elliott, Benton H. | EMC-0385 |
| Elliott, Charles | EMC-0100 |
| Elliott, Ruth A. | EMC-0081 |
| Elzinga, Stephen (Eagle County Weed and Pest Department) | EMC-0286 |
| English, E.D. | EMC-0074 |
| Enloe, Stephen (University of Wyoming) | EMC-0483 |
| Ernst, Harley L. | EMC-0226 |
| Erskine, Kim H. | RMC-0018 |
| Ertz, Brian | RMC-0191 |
| Ertz, Brian (Western Watersheds Project) | EMC-0596-2 |
| Evans, Gail | FXC-0059 |
| Fagerlie, Dan | EMC-0312 |
| Fairfield, Mary Eaton | EMC-0532 |
| Farrar, Don (Gilliam County Weed Control) | EMC-0418 |
| Fels, Harriett | RMC-0029 |
| Fetz, Margot | EMC-0478 |
| Filipelli, DeBorah | EMC-0480 |
| Filippi, Linda J. | EMC-0381 |
| Fine, Doug | EMC-0064 |
| Firmage, Robert and Gertrud | FXC-0027 |
| Firstenberg, Arthur | EMC-0327 |
| Firstenberg, Arthur | RMC-0078 |
| Firstenburg, Arthur | FXC-0020 |
| Fite, Katie | PHC-0005 |
| Fitzgerald, Tonie (Spokane County Extension) | EMC-0363 |
| Flaster, Trish (Botanical Liaisons) | EMC-0205 |
| Fleming, Robert L. and Linda F. | RMC-0133 |
| Folske, Dan (Burke County Weed Board) | RMC-0090 |
| Franklin, Samuel H., III | RMC-0023 |
| Franson, John | EMC-0382 |
| Frazier, Penny (Goods From The Woods) | EMC-0191 |
| Fredrickson, Lana J. | EMC-0589 |
| Fuller, Lodie | EMC-0383 |

BLM_0001236

| | |
|---|---|
| Gallo, Goodren | RMC-0134 |
| Gardner, James | RMC-0092 |
| Gardner, James | FXC-0025 |
| Garrett, Matt | EMC-0014 |
| Garvey, Lydia | EMC-0136 |
| Garvey, Lydia | EMC-0255 |
| Garvey, Lydia | EMC-0467 |
| Garvey, Lydia | RMC-0007 |
| Garvey, Lydia | RMC-0033 |
| Gates, Bruce D.C. | RMC-0124 |
| Gates, Corrine Cindy | RMC-0132 |
| Geeslin, Rita Jann | EMC-0057 |
| Germino, Matthew J. (Idaho State University) | FXC-0032 |
| Geyer, Eric (Roseburg Resources Company) | EMC-0582 |
| Ghandi, Theresa Marie K. | EMC-0649 |
| Ghandi, Theresa Marie K. | RMC-0211 |
| Gilbert, James | RMC-0198 |
| Gillen, Sylvia (USDA Natural Resource Conservation Service, Utah) | EMC-0501 |
| Gillman, Cathy | EMC-0520 |
| Gipson, Guy | EMC-0378 |
| Gladstone, David | EMC-0121 |
| Globus, Maria W. | RMC-0008 |
| Gloger, Laura | EMC-0038 |
| Goes, Jim | EMC-0149 |
| Gozart, Casey | EMC-0215 |
| Grace, Joanne | EMC-0007 |
| Grace, Susan | EMC-0182 |
| Graham, Bryan G. | RMC-0098 |
| Gray, Bonnie | RMC-0028 |
| Gray, Roger H. | EMC-0037 |
| Green, Alberta Patricia | EMC-0335 |
| Green, Jeanne | EMC-0259 |
| Green, Jeanne | EMC-0458 |
| Grewal, Martha | RMC-0113 |
| Griffin, Enid | EMC-0086 |
| Grother, Sheila (San Miguel County Weed Control Program) | RMC-0052 |
| Grover, Ravi | EMC-0444 |
| Gunder, Jenn | EMC-0063 |
| Gustin, Amy | RMC-0048 |
| Haas, Vicki | RMC-0158 |
| Haas, Wendy | RMC-0161 |
| Haines, Margaret | EMC-0105 |
| Hamilton, Pam | FXC-0050 |
| Hardebeck, Larry J. | EMC-0316 |
| Hardebeck, Larry J. | RMC-0089 |
| Harder, Herman | RMC-0154 |
| Hardy, John O. | EMC-0374 |
| Hardy, Roddy V. (BLM Salt Lake City Field Office) | EMC-0347 |
| Harrer, Roger | EMC-0248 |
| Harris, Ed | EMC-0570 |
| Harrison, Norma J. F. | EMC-0117 |
| Harrison, W.R. | EMC-0208 |

BLM_0001237

| | |
|---|---|
| Haskins, Bill | EMC-0567 |
| Hassell, Janet | EMC-0465 |
| Hastings, BJ and Trish | RMC-0085 |
| Hastings, BJ and Trish | FXC-0024 |
| Hatch, Duane | EMC-0420 |
| Hays, Lynn and Evelyn, and Tessa Hays-Nordin | EMC-0112 |
| Hecksel, Arlene | EMC-0099 |
| Helfand, Judy | EMC-0008 |
| Hiebel, Harvey | EMC-0599 |
| Higman, Jim | EMC-0349 |
| Hinckley, Ann | RMC-0002 |
| Hoernschemeyer, Don | RMC-0004 |
| Hollister, Joseph | EMC-0039 |
| Holstein, Gail | FXC-0054 |
| Hoover, Victoria N. | EMC-0405 |
| Horsley, Jim (Arizona Department of Transportation) | EMC-0304 |
| Howell, Mark (Starr Valley Conservation District) | EMC-0488 |
| Hudson, Marty (Klickitat County Noxious Weed Control Board) | EMC-0229 |
| Hughes, Arlin | EMC-0107 |
| Huls, Mark | EMC-0354 |
| Hunt, Thomas N. (Crop Protection Association) | EMC-0460 |
| Hunt, Wayne | EMC-0206 |
| Hupp, Kevin L. (Lincoln County Noxious Weed Control Board) | EMC-0563 |
| Hurd, John | EMC-0147 |
| Hutchinson, George B. | EMC-0085 |
| Inman, Roger | EMC-0287 |
| Issarescu, Patricia | FXC-0021 |
| Issarescu, Patricia | RMC-0074 |
| Issarescu, Patricia | FXC-0023 |
| Jackson, Nelroy E. | EMC-0636 |
| Jacob, Vicki and Julia Glover | EMC-0138 |
| Jacob, Vicki, and Julia Glover | EMC-0260 |
| Jacobson, Don | RMC-0139 |
| Jahr, Jim (Wilbur-Ellis) | EMC-0394 |
| Jeffress, Jim | EMC-0270 |
| Jenkins, D. Paul (Caribou County Weed Control) | RMC-0141 |
| Johanna, Ruth | EMC-0437 |
| Johnson, Anne | EMC-0144 |
| Johnson, Edwin S. | RMC-0119 |
| Johnson, Jacalyn | EMC-0545 |
| Johnson, Kathy | EMC-0606 |
| Johnson, Lisa | EMC-0375 |
| Johnson, Nancy | EMC-0071 |
| Johnson, Rachel B. | EMC-0284 |
| Johnson, Robert | EMC-0591 |
| Jones, Donna | EMC-0587 |
| Joos, Sandra | EMC-0083 |
| Jorgensen, Bernadette | RMC-0043 |
| Josey, Helen | EMC-0016 |
| Jung, Mari | EMC-0546 |
| Kallas, John | EMC-0240 |
| Kamal, Sue (MAST Institute UNCO) | EMC-0283 |

BLM_0001238

RESPONSE TO COMMENTS

| | |
|---|---|
| Kampmeyer, Al | EMC-0601 |
| Kanne, Claudia | EMC-0190 |
| Karl, Joanna | RMC-0011 |
| Kaufman, Albert | EMC-0464 |
| Kaufman, Eleanor | EMC-0534 |
| Keddem, Aliza | EMC-0098 |
| Keeran, Georgia | EMC-0253 |
| Keith, Laurie | EMC-0303 |
| Kelpsas, Bruce | EMC-0558 |
| Kenny, Robert | EMC-0127 |
| Keppelman, Tony | EMC-0013 |
| Kerrigan, Laurie | EMC-0551 |
| Keys, Paula | EMC-0432 |
| Kiernan, Barbara | EMC-0011 |
| Kimmel, Reida | EMC-0239 |
| Kimmel, Reida | EMC-0448 |
| Kincaid, Patricia M. | EMC-0154 |
| Kinsel, Sheldon | EMC-0157 |
| Kitchen, Boyd (Utah State University Extension) | EMC-0320 |
| Knight, John | EMC-0499 |
| Kokis, George | EMC-0164 |
| Kolbe, William A. (BASF) | EMC-0221 |
| Koppa, Jhon | FXC-0034 |
| Kotkosky, David | EMC-0273 |
| Kozlowski, James C. (National Society for Park Resources, National Recreation and Park Association) | EMC-0155 |
| Kranzush, Eric (Giustina Land and Timber Company) | RMC-0021 |
| Krepps, Robert L. | EMC-0495 |
| Kruse, Dave | EMC-0120 |
| Kuczora, Carol | EMC-0638 |
| Kunkle, Bill | RMC-0120 |
| Kurtz, Linda | EMC-0053 |
| Lagorio, Brad | EMC-0487 |
| Lamb, Alexandra | EMC-0583 |
| Lamberts, Frances | EMC-0196 |
| Lamberts, Frances | RMC-0055 |
| Lance, Jennifer | EMC-0028 |
| Landkammer, Linda | EMC-0095 |
| Lapin, Irene | EMC-0358 |
| Larson, Lyn | EMC-0092 |
| Laughlin, Robin | EMC-0600 |
| Leaf, Erika | EMC-0131 |
| Leberg, Mary Ann | RMC-0075 |
| Lee, Don L. | EMC-0588 |
| Legg, Geoff | EMC-0365 |
| Lengerich, Tim | EMC-0416 |
| Lent, Peter C. | EMC-0224 |
| Lessley, Catrina | EMC-0179 |
| Levanti, Deanna | EMC-0252 |
| Lewis, Jim (Pitkin County Land Management) | EMC-0346 |
| Liles, Anne Marie | EMC-0342 |
| Lindsay, Dianne | EMC-0624 |

Lindsay, Dianne                                                          RMC-0200
Lindsay, Heather                                                         EMC-0473
Linebaugh, Andrea J.                                                     EMC-0474
Little, Amanda Jane                                                      FXC-0028
Little, James                                                           EMC-0114
Little, Sam (Jefferson County Weed District)                            EMC-0560
Livingston, Deb                                                         EMC-0477
Livingston, Diane                                                       EMC-0024
Lockhart, Mary Ann                                                       EMC-0343
Lockridge, Ross                                                         EMC-0257
Long, Jennifer                                                          EMC-0530
Loud, Doris                                                             EMC-0472
Lovato, Andrew and Anhara, and Marise Korn                              RMC-0077
Love, Joe                                                              EMC-0055
Loveday, George                                                         RMC-0027
Lowe, Valerie                                                          EMC-0654
Luersman, Ed                                                           EMC-0507
Lutjens, William (BLM)                                                 EMC-0278
Lynch, Larry (Clark County Weed and Pest Control)                       EMC-0339
MacDonald, Breelyn                                                      EMC-0517
MacKenzie, John (Wilbur-Ellis)                                          EMC-0388
MacKillop, Kenneth                                                      EMC-0123
MacKinnon, Maisie                                                      EMC-0097
Magney, Tim                                                            EMC-0387
Mahdavi, Omid                                                          EMC-0594
Maizes, Beth (Hawthorne Health and Nutrition Institute)                 EMC-0357
Makelacy, Melladee                                                     EMC-0447
Malakian, Tiffany                                                      RMC-0178
Malmberg, Tony                                                         EMC-0317
Malone, Marty (Park County Extension)                                   EMC-0401
Mandelbaum, Ilene                                                      EMC-0180
Mandelbaum, Ilene                                                      RMC-0103
Manown, Lloyd and Marlene                                               EMC-0294
Mantle, Jen (Summit County Weed Program)                                EMC-0371
Manzagol, Sheila (Shining Mountain Herbs)                               EMC-0656
Maple, Susan                                                           RMC-0115
Mariluch, Ellen (Diamond Valley Weed District)                          RMC-0176
Marks, John B.                                                         EMC-0468
Markus, Patricia                                                       EMC-0384
Marr, Lynn and Russell                                                  EMC-0367
Martell, Jim (Canyon County Weed Control)                               FXC-0043
Martin, Tonya                                                          EMC-0036
Matheson, Paula                                                        EMC-0022
Matsumoto, Nancy                                                       EMC-0595
Matsumoto, Rebecca L.                                                  RMC-0201
Mattice, William H.                                                    RMC-0166
Maxwell, Bruce (Montana State University)                               EMC-0291
McCall, Jim (McCall Farms)                                              EMC-0328
McCaslin, Bob (Washington State Senator)                                RMC-0225
McClintic, Joann                                                       RMC-0137
McClone, Mark                                                          EMC-0124
McDorman, Bill                                                         EMC-0130

BLM_0001240

RESPONSE TO COMMENTS

| | |
|---|---|
| McDougall, Claire, and Paul Jones | EMC-0552 |
| McKay, Tim (The Northcoast Environmental Center) | RMC-0199 |
| McMahon, James P. | RMC-0026 |
| McNeel, Hank | EMC-0027 |
| McNeel, Hank | PHC-0006 |
| McSweeny, Charles | EMC-0547 |
| Medbery. Angela | EMC-0267 |
| Mendius, Barbara J. | EMC-0456 |
| Mentzer, Fred | EMC-0088 |
| Mervis, Louis M. | EMC-0258 |
| Mickey, Martha | RMC-0125 |
| Miessler, Del | RMC-0016 |
| Mike (last name not provided) | EMC-0400 |
| Miller, Arthur E. | EMC-0504 |
| Miller, Glenn (Oregon Department of Agriculture) | EMC-0421 |
| Miller, Glenn (Oregon Department of Agriculture) | EMC-0469 |
| Miller, Joel | EMC-0151 |
| Miller, Kyle J. (BASF) | EMC-0272 |
| Miller, Tracy | EMC-0129 |
| Milley, Ryan J. | EMC-0439 |
| Mintz, Mary | EMC-0142 |
| Miranda, Lara | RMC-0009 |
| Montagne, Joan | EMC-0244 |
| Moodry, John (Butte Silver Bow Weed District) | EMC-0399 |
| Mooney, Allen | EMC-0409 |
| Morris, John | EMC-0310 |
| Morris, Nancy | EMC-0350 |
| Morrow, Donald F. | RMC-0001 |
| Mortensen, Peter | EMC-0502 |
| Murphy, Jennifer | EMC-0069 |
| Murphy, Patricia | EMC-0237 |
| Murphy, Timothy | EMC-0034 |
| Name withheld by request | EMC-0361 |
| Neal, Dan | EMC-0261 |
| Needs, Kelly | EMC-0628 |
| Neff, Jack | FXC-0058 |
| Neff, Jack | RMC-0216 |
| Neil, Irvin and Marie | EMC-0054 |
| Nelson, Rachel | EMC-0429 |
| Nevin, Larry | EMC-0184 |
| Newcomb, Jean | EMC-0462 |
| Nikolaus, Ed | EMC-0282 |
| Nina Eckberg (Kootenai County Noxious Weed Control) | EMC-0210 |
| Nipper, M. | RMC-0145 |
| Noble, E.A. | RMC-0129 |
| Noble, Emily | EMC-0235 |
| Noble, Emily | EMC-0364 |
| Noble, Emily A. | EMC-0274 |
| Noel, Michael (Kane County Water Conservancy District) | EMC-0236 |
| Ogg, Alex, Jr. | EMC-0256 |
| Okuzumi, Margaret | EMC-0580 |
| Oliver, Cortney | EMC-0044 |

BLM_0001241

| | |
|---|---|
| Olsen, Jan (Idaho Department of Environmental Quality) | EMC-0482 |
| Olsen, Matthew | RMC-0135 |
| Ore, Ed | EMC-0078 |
| Orloff, Paula | EMC-0529 |
| Orsini, Alice | EMC-0556 |
| Orsini, Alice | RMC-0196 |
| Pape, Beverly | RMC-0036 |
| Pape, Dick | RMC-0035 |
| Pape, K. Richard | EMC-0113 |
| Pape, Louise | EMC-0199 |
| Parson, Ben | EMC-0160 |
| Pauley, Will and Jodi | EMC-0611 |
| Paulsen, Ketel | EMC-0471 |
| Paye, Floyd (Jefferson County Weed Control) | EMC-0422 |
| Peacock, Delores (Dog Valley Ranch) | EMC-0592 |
| Pearce, Mary | EMC-0075 |
| Pearson, Wayne | FXC-0003 |
| Peckman, Kristin | EMC-0051 |
| Peippo, K.M. | RMC-0171 |
| Peirce, Betsy | RMC-0186 |
| Peters, Katherine I. | RMC-0179 |
| Peterson, Bob | FXC-0015 |
| Peterson, Bob G. | RMC-0065 |
| Peterson, Dixie | RMC-0044 |
| Peterson, Dixie K. | FXC-0012 |
| Peterson, Mr. and Mrs. B.G. (Conejos Cabins) | FXC-0007 |
| Peterson, Mrs. Bob | FXC-0006 |
| Peterson, Troy | RMC-0051 |
| Petroski, Yolanda | EMC-0195 |
| Pevanik, Shirley | EMC-0068 |
| Pickering, Ruth M. | EMC-0476 |
| Picone, Chris | EMC-0046 |
| Pikus, Barbara | EMC-0463 |
| Pitman, Susan | EMC-0359 |
| Poferl, Gerri | EMC-0593 |
| Polonsky, B.L. | EMC-0522 |
| Porter, Mark C. (Wallowa Resources) | EMC-0630 |
| Post, Ken | EMC-0119 |
| Pretorius, Christel | EMC-0341 |
| Proctor, Gradey | RMC-0159 |
| Pugh, Fred and Sandra (First Christian Church) | RMC-0054 |
| Pustejovsky, Mark | RMC-0140 |
| Pyle, Sasha | EMC-0571 |
| Quicke, Harold (BASF) | EMC-0305 |
| Ra, Delilah | EMC-0116 |
| Ragan, Lisa C. | RMC-0175 |
| Ramsdale, Ellen | EMC-0481 |
| Ransom, Corey (Utah State University) | EMC-0414 |
| Ray, Lindsey | EMC-0450 |
| Raymond, Jeanne | EMC-0440 |
| Reade, Nathan (Eastern Sierra Weed Management Area) | EMC-0209 |
| Rechel, Eric | EMC-0241 |

BLM_0001242

RESPONSE TO COMMENTS

| | |
|---|---|
| Reed, Chad L. | EMC-0172 |
| Rekow, Paul (Boise County Weed Control) | EMC-0280 |
| Remington, Maggie | EMC-0302 |
| Revillini, Daniel | EMC-0554 |
| Rice, Evan and Suzy | EMC-0245 |
| Rice, Molly | EMC-0091 |
| Richards, Linda | EMC-0158 |
| Richards, Vivien | EMC-0161 |
| Richardson, Brett (Bighorn County Weed and Pest) | EMC-0376 |
| Richardson, Nausika | EMC-0307 |
| Richardson, Peter | EMC-0176 |
| Richins, Kirt H. | EMC-0615 |
| Riddle, Donna | EMC-0569 |
| Ries, Marcela | EMC-0033 |
| Rietsema, C.J. | EMC-0050 |
| Rife, Jonathan (Douglas County Noxious Weed Management Program | EMC-0277 |
| Rife, Jonathan (Douglas County Noxious Weed Management Program) | EMC-0276 |
| Rigge, Mara | EMC-0009 |
| Riley, Matthew | RMC-0181 |
| Ringer, Greg | EMC-0396 |
| Rizika, Adam W. | RMC-0127 |
| Robinson, Edith and James | RMC-0123 |
| Robinson, Ray | EMC-0380 |
| Roehl, Joel S. | FXC-0033 |
| Roesner, Quentin | EMC-0407 |
| Rogers, Lilith | EMC-0006 |
| Rojas, Jessica | EMC-0470 |
| Rose, Karen H. | FXC-0046 |
| Rose, Linda | FXC-0040 |
| Rosenzweig, Marcie A. | EMC-0148 |
| Rothman, William | EMC-0084 |
| Royer, Connie B. | RMC-0083 |
| Ruddenklau, Helle | EMC-0412 |
| Rude, Monica (Desert Woman Botanicals) | EMC-0627 |
| Rude, Monica, and Joanna Conrardy | EMC-0576 |
| Runnels, Judy | EMC-0228 |
| Russel, Dave (Roseburg Forest Products) | EMC-0017 |
| Ryan, Eleanor (North Amercian Butterfly Association) | FXC-0049 |
| Ryan, Eleanor (North American Butterfly Association) | EMC-0457 |
| Ryan, Stephanie | EMC-0133 |
| Rydalch, Dave (Fremont County Weed Control) | RMC-0112 |
| Sachau, B. | EMC-0001 |
| Sachau, B. | EMC-0408 |
| Safranek, Angela | EMC-0368 |
| Salmon, De Anne | EMC-0026 |
| Salvo, Mark (Sagebrush Sea Campaign) | EMC-0610 |
| Salvo, Mark (Sagebrush Sea Campaign), Cox, Caroline (Northwest Coalition for Alternatives to Pesticides), and O'Brien, Mary | RMC-0222 |
| Sanders, Kenneth D. (University of Idaho) | RMC-0109 |
| Sanders, Robert | EMC-0494 |
| Sanders, Sandy | RMC-0037 |
| Schleimer, Max and Millie | EMC-0118 |

BLM_0001243

| | |
|---|---|
| Schmidt, Richard H. | RMC-0185 |
| Schmiett, Diana | EMC-0297 |
| Schoellhorn, Nylene | EMC-0537 |
| Schoelsler, Senator Mark (9th Legislative District) | EMC-0620 |
| Schoenberger, Barbara | EMC-0326 |
| Schrader, Don | RMC-0062 |
| Schroeder, Gary (C & D Lumber Company) | EMC-0428 |
| Schroyer, Don L. | EMC-0411 |
| Schroyer, Don L. | EMC-0475 |
| Schroyer, Don L. | RMC-0169 |
| Schubert, Jesse | EMC-0568 |
| Schuetz, Mark | FXC-0065 |
| Schutz, Christopher A. | EMC-0622 |
| Seastedt, Timothy R. | EMC-0125 |
| Seraphinoff, Mike | EMC-0111 |
| Settell, Mike | EMC-0201 |
| Shapiro, Michael | EMC-0389 |
| Shaw, T. Gray | EMC-0018 |
| Sheldahl, Mark (Weyerhauser Company) | EMC-0491 |
| Sherksnas, William C. | EMC-0614 |
| Shields, Charles and Helane | EMC-0167 |
| Shoemaker, Bob (Platte County Weed and Pest Control District) | RMC-0128 |
| Shonle, Irene (Colorado State University Cooperative Extension) | EMC-0198 |
| Sierra, Claire | EMC-0197 |
| Silfvast, Stacey | EMC-0128 |
| Silva, Nancy | EMC-0423 |
| Simonson, Annette | EMC-0073 |
| Simonson, Annette | EMC-0175 |
| Skinner, Monte B. | RMC-0151 |
| Skrine, Eugene | EMC-0485 |
| Skrine, Eugene | RMC-0163 |
| Small, Jack W. and Joyce C. | EMC-0140 |
| Smith, Dallen R. (Utah State University Extension) | EMC-0438 |
| Smith, Jeanne | EMC-0110 |
| Smith, John J. | EMC-0072 |
| Snitkin, Barry | EMC-0165 |
| Snyder, T. | EMC-0573 |
| Sohn, Rick | EMC-0002 |
| Sokol, Dan | RMC-0045 |
| Solomon, Seely | RMC-0099 |
| Southerland, Barbara | FXC-0051 |
| Spitz, Jon | EMC-0290 |
| Springer, Jon | EMC-0146 |
| Stadtler, Al | EMC-0490 |
| Stanek, Barbara L. | EMC-0334 |
| Stanger, Janice | RMC-0034 |
| Stanley, Leslee (Shoshone County Noxious Weed Control Department) | EMC-0285 |
| Steele , Mark | EMC-0115 |
| Steinbach, Imogene K. | EMC-0564 |
| Steinberg, Gary (Sheridan County Weed District) | EMC-0415 |
| Stellflug, Rick (Valley County Weed District) | EMC-0391 |
| Stern, Nancy | RMC-0082 |

RESPONSE TO COMMENTS

| | |
|---|---|
| Stevens, Dean | RMC-0126 |
| Stingle, Karen | EMC-0243 |
| Stokes, Tyler | EMC-0012 |
| Stone, Delight | RMC-0148 |
| Stone, Valerie | EMC-0352 |
| Strong, Marilyn | EMC-0104 |
| Strong, Marilyn and Wennstrom, Jerry | EMC-0103 |
| Stuart, Laura | EMC-0134 |
| Stuckman, Scott | EMC-0061 |
| Sutcliffe, Ron | RMC-0047 |
| Sutherland, Julie | RMC-0232 |
| Sutherland, Ron | EMC-0194 |
| Sverdlove, Jill | EMC-0185 |
| Swartz, Alan | RMC-0182 |
| Swolak, Peter | EMC-0572 |
| Takemori, Claire | EMC-0271 |
| Talpai, Ayala | EMC-0087 |
| Tarter, Dean and Mary | RMC-0104 |
| Tarter, Mary (Harding County Weed and Pest) | RMC-0107 |
| Tashel, Carole | EMC-0653 |
| Tashjian, Randy | EMC-0455 |
| Taylor, Ann | EMC-0150 |
| Taylor, Lisa (Summit County Weed Program) | EMC-0370 |
| Taylor, Miranda | EMC-0153 |
| Taylor, Miranda | FXC-0005 |
| Temple, James | EMC-0629 |
| Templeton, Judith A. | RMC-0197 |
| Tennenbaum, Gary (Pitkin County Open Space and Trails) | EMC-0353 |
| Tepfer, Gary | EMC-0159 |
| Terry, Noalani | EMC-0101 |
| Tesche, Elwyn | RMC-0121 |
| Thaemert, Ron (University of Idaho Blaine County Extension) | FXC-0031 |
| Thieda, Shirley | RMC-0088 |
| Thoen, Cheryl | EMC-0292 |
| Thompson, Julie | EMC-0295 |
| Thompson, Valerie | EMC-0586 |
| Tim Higgs (Grand County Weed Department) | FXC-0047 |
| Tipps, Betsy L. | EMC-0336 |
| Tipps, Betsy L. | FXC-0037 |
| Tombleson, Barbara | EMC-0441 |
| Toro, Ida | EMC-0266 |
| Tower, Robert | EMC-0442 |
| Treagle, Charlotte | EMC-0311 |
| Tremper, Lorana M. | EMC-0106 |
| Tretter, Kathryn | RMC-0168 |
| Trochlell, Cathy | EMC-0538 |
| Troutman, Doug | EMC-0139 |
| Turner, Jay | FXC-0042 |
| Turner, Terry (Hill County Weed District) | RMC-0142 |
| Tvedt, Dee | EMC-0082 |
| Tyler, Valerie | EMC-0492 |
| Underwood, Barbarah | EMC-0632 |

BLM_0001245

| | |
|---|---|
| Unger, Kris | EMC-0232 |
| Vallone, Cheryl L. | EMC-0498 |
| Van, Tammy | EMC-0419 |
| Vanecek, Michael | EMC-0268 |
| Vardaman, Emilie | EMC-0275 |
| Varvares, Chris | EMC-0386 |
| Vernon, Jason | EMC-0348 |
| Verrét, Cathy (Product Awareness Consulting) | EMC-0079 |
| Viani, Susan and Nick | EMC-0076 |
| Vickrey, Doug | FXC-0048 |
| Vinton, Joanne | EMC-0169 |
| Volk, Terry (Bottineau County Weed Control) | EMC-0392 |
| Vollmer, Jennifer (BASF) | EMC-0214 |
| Vollmer, Joseph G. | EMC-0299 |
| Wade, David, and Nancy Pobanz | EMC-0451 |
| Wahl, Mark | EMC-0145 |
| Walker, Larry (Chaffee County Weed Department) | EMC-0355 |
| Walters, Scott | EMC-0062 |
| Wanek, Catherine | EMC-0633 |
| Ward, E. | EMC-0369 |
| Wassmuth, Carol Ann | EMC-0135 |
| Waterman, Sharon (Coos County Weed Advisory Board) | EMC-0424 |
| Watkins, Ian | FXC-0022 |
| Weinschenk, Kelly Corbet (Smart Foods Healthy Kids, Inc). | RMC-0022 |
| Wellner, Melanie K. | EMC-0514 |
| Wenzel, Robert | EMC-0094 |
| Wenzel, Robert | EMC-0516 |
| West, Robin | RMC-0003 |
| Westman, Betty | EMC-0511 |
| Wheeler, Mark and Michele Gila | EMC-0102 |
| White, Kathryn C. | EMC-0058 |
| White, Sally | EMC-0096 |
| Whitney, Dana | EMC-0521 |
| Wick, Paul (Teton County Weed District) | EMC-0431 |
| Wieckert, Karen E. | EMC-0345 |
| Wieczorek, Emily | EMC-0265 |
| Wild, Kathryn | EMC-0616 |
| Williams, Carley Marie | RMC-0194 |
| Wilson, Robert E. (University of Nevada Cooperative Extension) | RMC-0049 |
| Wilson, Susanna | EMC-0500 |
| Winans, Greg (Tri County Cooperative Weed Management Area) | EMC-0351 |
| Winfree, Robin | EMC-0080 |
| Wolfe, William T. | RMC-0152 |
| Wroncy, Jan (Gaia Vision/Canaries Who Sing) | EMC-0645 |
| Wroncy, Jan (Gaia Vision/Canaries Who Sing) | RMC-0204 |
| Wunderlich, Ray, III | EMC-0264 |
| Wyant, Jake M. P. (Gem County Weed Control) | EMC-0178 |
| Ylatupa-Mcwhorter, Shaun | EMC-0426 |
| Young, Frank | EMC-0188 |
| Zeligs, Natasha | EMC-0015 |
| Zimmermann, Adele E. | RMC-0072 |
| Zolezzi, Paul (Rocking C Ranch) | EMC-0065 |

BLM_0001246

BLM_0001247

## Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement

### General Comments and Reponses

RMC-0042-076
Asher, Jerry

**Comment:** Under alternative C (no herbicides) pg. 2-29 [of the Draft PEIS]: "It *could* be more difficult to effectively treat unwanted vegetation…". Does anyone doubt that it won't be more difficult? "Invasive plant populations would likely continue to spread…" (same statement sixth para. pg 4-114, second full para. pg. 4-1199). Is there doubt that the weeds will continue to spread with no herbicide use? "There would be no risk to TES species…" (because of no herbicides). What about the risk from unchecked weeds out competing the TES species? It is beyond a risk because weeds are and will continue to out compete TES species.

**Response:** See response to Comment RMC-0144-005 under General Comments and Responses.

RMC-0042-077
Asher, Jerry

**Comment:** Under the No Action alternative, "As a result, invasive species would *likely* continue their rapid expansion across western landscapes" (last para pg 4-61) Does anyone think the weed spread will stop?

**Response:** See response to Comment RMC-0144-005 under General Comments and Responses.

RMC-0144-005
Wyoming Game and
Fish Department

**Comment:** Throughout both documents there are numerous instances of the terms 'would', 'may', 'should', 'assume', and 'could'. We have worked with many BLM Field Offices over the years and often receive conflicting degrees of analysis and at times are faced with statements that indicate the policy says we 'may' or 'could' or 'would' consider the items but we do not have to under the guidance documents. We recommend that these be changed to 'will be'. Some examples in the Treatment [Draft] PER are on pages 2-9,2-16,2-19,2-20,4-8, 4-1 02. Some examples in the Herbicide [Draft] PEIS are on pages 2-12,2-15,4 11,4-13,4-22,442, 4-62, 4-67,4-68, 4-72, 4-90, 4-94,4-96,4-116, 4-120, 4-150, 4-154, 4-166,4-167, and 4-194.

**Response:** The PEIS and PER describe programs and alternatives that may or may not be implemented. Although many of the activities discussed in the PEIS and PER do occur, many aspects of these programs (e.g., acres treated, location of treatments, types of mitigation) are only proposed at this time and may not be implemented. Thus, there is no certainty at this time that many of the actions described above will occur.

RMC-0144-006
Wyoming Game and
Fish Department

**Comment:** There are several instances in both documents where it 'assumes' SOPS [Standard Operating Procedures] will be followed or were followed in discussion alternative and effects of the alternative. Again we strongly urge that 'assume' be replaced with 'will be evaluated and followed".

**Response:** It is possible that some SOPs would not be implemented or would not be relevant, depending upon which alternative is chosen. See response to Comment RMC-0144-005 under PEIS General Comments and Responses.

RMC-0042-083
Asher, Jerry

**Comment:** To more accurately reflect field conditions, suggest replacing *may* and *are capable* with usually, or commonly, or frequently.

BLM_0001248

RESPONSE TO COMMENTS

|                                                      |                                                                                                                                                                                                                                                                                                                                       |
| ---------------------------------------------------- | --- |
|                                                      | **Response:** See response to Comment RMC-0144-005 under General Comments and Responses. |

## Executive Summary

| RMC-0006-008<br>Central Sierra<br>Environmental<br>Resource Center | **Comment:** CSERC [Central Sierra Environmental Resource Center] asks, how can losses be both short-term and irreversible? |
| --- | --- |
|                                                                    | **Response:** This statement is incorrect. Short-term losses would not be irreversible. It has been corrected in the Final PEIS. |

## Proposed Action and Purpose and Need – Introduction

| EMC-0306-011<br>Klamath River Keeper<br>Program and Klamath<br>Forest Alliance | **Comment:** Segmenting the proposed action in the PEIS and PER, is not consistent with the National Environmental Policy Act, and does not allow for adequate assessment of the human and environmental impacts. This segmentation does not adequately offer the reviewer the information to reasonably assess the effectiveness potential for controlling invasive plants. |
| --- | --- |
|                                                                                | **Response:** See responses to Comment EMC-0306-012 under PEIS Proposed Action and Purpose and Need, Introduction and Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments. |
| EMC-0306-012<br>Klamath River Keeper<br>Program and Klamath<br>Forest Alliance | **Comment:** The PEIS indicates that the past EIS's assessed the modification and control of vegetation on ½ million acres. This PEIS identifies there being about 900,000 acres of BLM lands to be managed with herbicides. The BLM states that the PEIS focus is to assess the impacts to the human environment from the proposed herbicide use and that the PEIS will result in a preferred alternative and decision for a federal action on public lands. With 15% of the unwanted vegetation on BLM lands being managed with the use of herbicides, this leaves 85 % of the BLM lands or another 5 million acres of unwanted vegetation to be treated with non-herbicide methods. The BLM indicates that the PER will assess the impacts to the human environment on the remaining 85% of the BLM lands that are occupied with unwanted vegetation. The BLM further states that there will be no new decision for non-herbicide treatments on this remaining 5 million acres. There are several million new acres of unwanted vegetation proposed to be managed in the PER/PEIS for which no new decision will be made. This is not compliant with the requirements under the NEPA, NFMA [National Forest Management Act], ESA [Endangered Species Act], CWA [Clean Water Act] and other pertinent laws and regulations. |
|                                                                                | **Response:** Congress and the Administration made the decision for federal government agencies to treat more acres to reduce the threat of catastrophic fire. The BLM has determined that it does not need to make further decisions on the use of non-herbicide treatments. The use of integrated pest management (IPM) techniques with all methods, herbicide and non-herbicide, has been affirmed in all past EIS records of decision concerning vegetation treatments. With the exception of herbicides, no modifications to those decisions are proposed by the agency.  The PEIS assesses the effects of the use of approved and proposed herbicides on human health and public land resources in light of the increased number of acres that potentially could be treated with herbicides. |
| EMC-0411-004<br>Schroyer, Don L. | **Comment:** What year did the BLM start actively managing against invasive/noxious weed species? |

BLM_0001249

**Response:** The BLM has conducted vegetation treatments since its establishment in 1946, including noxious and invasive weed management. It is the responsibility of the BLM to manage public lands under the Federal Land Management and Policy Act and Public Rangelands Improvement Act. As stated in the Purpose and Need, vegetation treatments on public lands serve an important function in reducing the risk of wildfires, improving resource, and enhancing habitats.

RMC-0049-019
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** Page 1 [of draft PEIS] last paragraph leaves out the role of science in addressing the invasive weed problem. Where is the consultation and incorporation of new knowledge into changes in management practices as the knowledge is developed?

**Response:** The specific section referenced is a summary of past EIS efforts the BLM has undertaken. The current PEIS and PER used available research and scientific analysis in their development. The PEIS also outlines that the BLM uses an IPM approach to vegetation treatments, which incorporates new knowledge and science. The BLM is also moving towards adaptive management in its land use planning, which allows changes in knowledge to be incorporated into management practices.

EMC-0590-011
Western Slope
Environmental
Resource Council

**Comment:** Effective management and treatment of unwanted vegetation can be performed using non-herbicide techniques, including fire, mechanical, manual, cultural, and biological control methods. These types of methods have been used traditionally, and in many cases offer the most appropriate options for management that will protect and preserve our local resource lands, as well as our local populations. These non-chemical methods should be considered and integrated into the discussion and analysis presented in the PEIS.

**Response:** The BLM agrees that these non-herbicide methods are effective for treating unwanted vegetation. The PER that accompanies the PEIS addresses all non-herbicide methods of control in the context of integrated pest management. These methods are also addressed under Alternative C – No Use of Herbicides, in the PEIS.

RMC-0218-026
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** The Programmatic Environmental Report (PER) should have been incorporated in the D[raft] EIS ("PEIS") and subject matter therein should have underwent much more detailed and rigorous analysis due to the tremendous expansion of non-herbicide control method proposed – from 2 million to 6 million acres annually.

**Response:** See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments regarding development of the PER. The PER discloses the general environmental effects of non-herbicide treatments on up to approximately 5 million acres per year of vegetation across the various ecoregions comprising the western U.S. and Alaska. This information is provided to assist BLM offices in future project level analyses of vegetation treatment projects. There are no treatments proposed in the PER requiring rigorous analysis.

EMC-0008-002
Helfand, Judy

**Comment:** Living on a ranch, I am well aware of the problems with controlling unwanted plants. Manual and biologic methods exist. Even if the short term costs appear to be less, the long terms costs of spraying are enormous. Please reject the recommended alternative given in the plan and utilize other methods.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

BLM_0001250

RESPONSE TO COMMENTS

EMC-0026-002
Salmon, De Anne

**Comment:** I'm writing to ask you to consider effectively managing and treating unwanted vegetation by a variety of non-herbicide techniques including fire, mechanical, manual, cultural and biological control methods.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

**Proposed Action and Purpose and Need – Organization of the Vegetation Treatments Assessments**

EMC-0060-004
Artley, Dick

**Comment:** You have failed to seriously consider the following methods that will both slow down the noxious weed spread and kill them where they are already established: 1) Hand pulls them. This is very effective. I know, I have done it. We used a small gas-powered auger to break-up the soil around the root to assure we got every root from the ground. 2) If you really want to stop noxious weed spread to areas that are not yet affected, stop all livestock grazing in that area. Tell the rancher to go elsewhere. Even BLM biologists must know that cattle often carry noxious weed seeds in their hair.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation. Hand-pulling weeds is one option under manual methods. Also see response to Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0306-009
Klamath River Keeper
Program and Klamath
Forest Alliance

**Comment:** The PEIS is more focused on insuring the broad-scale application and chronic use of various herbicides than it is on achieving an effective approach to managing invasive plant species. The BLM's proposed action will most certainly fail if the agency does not adequately incorporate proven non-toxic methods to reduce existing invasive plant populations. The BLM needs to make a specific measurable commitment to reducing its reliance on herbicides for controlling target invasive plant species.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment RMC-0222-059 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

EMC-0503-007
John Day-Snake
Resource Advisory
Council

**Comment:** The rationale for separating the herbicide use from the other vegetation management treatments isn't clear. By separating the other means of weed control into a separate document, it takes away from the integrated risk management aspect. Please clarify your intent.

**Response:** See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments regarding separation of herbicide use and non-herbicide treatments. See Chapter 2 in the Final PEIS under Integrated Vegetation Management regarding the BLM's integrated weed management approach.

EMC-0585-006
Western Watersheds
Project

**Comment:** BLM's scoping Notice stated that BLM would evaluate the impacts of treatments – and not only herbicide use. This has not occurred, and no range of alternatives has been developed, and no "hard look" has been taken.

**Response:** See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments

BLM_0001251

regarding development of the PER. The PER outlines the effects of non-herbicide treatments on public lands resources. The PEIS assesses the impacts of herbicide use. See Chapter 2 of the PEIS, Range of Alternatives, for the range of alternatives included for analysis.

**EMC-0585-055**
Western Watersheds
Project

**Comment:** BLM claims that its old EISs evaluated use of herbicides in addition to other treatments on approx. 500,000 acres a year ([page] ES-1 [of the Draft PEIS]). There is a large difference between treating that acreage each year, and now claiming that the old EISs' cover the greatly expanded treatments that this [P]EIS is associated with. Much greater impacts to populations of special status species, big game winter ranges, water quality in watersheds, etc. would occur if treatments had been staggered over the past 20 years - in contrast to the massive number acreage of treatments BLM is now proposing.

**Response:** See responses to Comment RMC-0222-005 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments, and Comment RMC-0222-006 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

**EMC-0585-076**
Western Watersheds
Project

**Comment:** BLM's old Veg. Treatment documents that underwent NEPA review, and included a range of alternative actions, and chemicals and acres treated. Now, BLM attempts to somehow authorize a drastic increase in treatments never contemplated in the old EISs - and sneak these in through the PER - without conducting current NEPA on the scope or scale of the non-herbicide treatments it proposes. BLM also cites several policies, none of which have undergone NEPA review.

**Response:** The BLM is not authorizing any treatments in the PEIS or PER. See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments regarding development of the PER. Policy development at the Congressional, Administrative, or Departmental level is not a federal action requiring NEPA analysis by the BLM, and is outside of the scope of analysis for the PEIS.

**EMC-0585-079**
Western Watersheds
Project

**Comment:** [Draft] [P]EIS at 1-3 states that PER discloses the general impacts of using non-herbicide treatments to the environment, and the PEIS provides an updated herbicide analysis. Yet, nowhere is a NEPA analysis of a wide range of alternatives of treatments (as laid out in the PER) conducted. Serious scientific deficiencies with the PER are described later. BLM PER at [page] 1-6 describes BLM's FO [Field Office] estimation and summary of projects that underlie the [P]EIS proposal. Yet, nowhere is there an analysis of an alternative range of non-herbicide "treatment" acres.

**Response:** See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments regarding development of the PER. See also Alternatives Considered but Not Further Analyzed in Chapter 2 of the PEIS in regard to alternatives for acres for potential treatment.

**EMC-0585-080**
Western Watersheds
Project

**Comment:** [Draft] [P]EIS [page] 1-7 abandons legitimate NEPA analysis of treatments and alternatives, stating: "the intent of this [P]EIS is to comply with NEPA by assessing the program [sic] impacts of using herbicides to treat vegetation" on BLM lands. Yet, in the scoping notice, BLM stated that it would analyze the impacts of treatments. To comply with NEPA, BLM must assess a range of treatment actions as laid out in the PER.

BLM_0001252

RESPONSE TO COMMENTS

|  | **Response:** See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments regarding development of the PER. |
|---|---|
| EMC-0585-084<br>Western Watersheds<br>Project | **Comment:** BLM in the DEIS [Draft PEIS] abandoned any analysis of alternative courses of treatment action beyond herbicide use, without any reasoned and valid demonstration of its reasons for doing so. |
|  | **Response:** See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments regarding development of the PER. |
| EMC-0585-231<br>Western Watersheds<br>Project | **Comment:** [Page] 1-7 describes the PEIS as " …. Provides Bureau-wide tools for vegetation management. Additionally, it provides an umbrella ESA [Endangered Species Act] consultation". Yet, as previously discussed, there is no current or inclusive NEPA analysis of vegetation management or the battery of treatments proposed. Thus, an adequate BA [Biological Assessment] can not be prepared, and necessary ESA consultation cannot be done under this leaky "umbrella". |
|  | **Response:** As discussed in Chapter 1 of the PEIS under Organization of the Vegetation Treatments Assessments, the BLM was not required to assess non-herbicide management activities because the use of such techniques was affirmed in the previous EISs, and the BLM is not proposing to make any decisions relative to the use of non-herbicide vegetation treatment methods. However, the U.S. Fish and Wildlife Service and National Marine Fisheries Service felt that the effects of all treatment methods should be evaluated in the BA, to better understand the relationship between herbicide and non-herbicide treatment methods, and because the BLM did not prepare a BA at the time it prepared previous EISs. Thus, the BA includes an assessment of all treatment methods. |
| RMC-0095-004<br>New Mexico<br>Department of Game<br>and Fish | **Comment:** However, the D[raft] PEIS fails to address two major issues, which preclude the document from meeting the intent of the National Environmental Policy Act (NEPA) Council on Environmental Quality regulations 1500.l(b), which states that NEPA documents must concentrate on the issues that are truly significant to the action in question, and 1500.2(C), which states that Federal agencies, to the fullest extent possible, shall use all practicable means, to…avoid or minimize any possible adverse effects of their actions upon the quality of the human environment. |
|  | **Response:** The Draft PEIS meets the intent of 40 CFR [Code of Federal Regulations] 1500.1(b). The Draft PEIS focuses on the use of herbicides, which has been identified as the major point of controversy in this PEIS. The issues relevant to a decision on approving herbicides for use on public lands are disclosed in the PEIS using the best available and scientifically accurate information obtainable. The PEIS also meets the intent of 40 CFR [Code of Federal Regulations] 1500.2 (f) [sic], which states "Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment." As stated under the Purpose and Need on page 1-3 of the Draft PEIS, "The need for the proposed action is to reduce the risk of catastrophic wildfires by reducing hazardous fuels, restoring fire-damaged lands, and improving ecosystem health by 1) controlling weeds and invasive species, and 2) manipulating vegetation to benefit fish and wildlife habitat, improve riparian and wetlands areas, and improve water quality in priority watersheds. Additional benefits |

BLM_0001253

accruing …directly relate to restoration of fish and wildlife habitat and improvement of forest and ecological condition which would meet…objectives set forth in the Healthy Forests Restoration Act of 2003…to improve the health of the nation's forest and rangelands. The Herbicide Treatment Standard Operating Procedures and Mitigation sections of Chapter 2 of the PEIS outline the standard operating procedures and mitigation measures required to minimize possible adverse effects of actions.

RMC-0205-014
Oregon Department of
Agriculture

**Comment:** [the approach] for selecting between non-chemical approaches [is unclear], but the handoff between the PEIS and PER is not well delineated.

**Response:** Although it was difficult to understand the intent of this comment (perhaps because some wording was lost during preparation of the letter), it appears that the commenter is concerned about how different treatment methods would be selected. Under all alternatives, the BLM would have several vegetation treatment methods available for use. Based upon an assessment of likelihood of success, using past experience and scientific knowledge as a guide, BLM field offices would select the method(s) that would best manage vegetation and ensure long-term treatment success. This would be done at the local level on a project-by-project basis.

RMC-0214-011
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** The Subjugation of Non-chemical Treatments to the PER is Invalid. BLM's decision to abolish consideration of mechanical and vegetative treatments to a non-NEPA document is without merit or justification. The definition of a programmatic EIS (PEIS) is a "document in which the Agency considers a number of related actions or projects being decided within one program. As such, a PEIS looks to the environmental consequences of a program as a whole. One of its purposes is to assess the impact of connected and cumulative actions under one programmatic umbrella in order to determine significant impacts to the environment. In it, the analysis of environmental impacts is tied to a specific program and the individual and cumulative effects of each project individually, and all projects together, are analyzed in a way which allows senior level decision makers to examine the implications of their programs." BLM has composed a document that fails in this regard—a document whose singular nature is to analyze treatments of invasive species via the use of chemical applications.

**Response:** The decision to address non-herbicide treatments in the PER was arrived at through numerous discussions with the Council on Environmental Quality (CEQ). The CEQ correctly pointed out to the BLM that a PEIS should focus on the programmatic decision to be made—in this case, the adoption of a suite of herbicides into the integrated pest management (IPM) tool kit the BLM uses. The IPM approach has been discussed and affirmed in all previous EISs pre-dating this effort, and the BLM is not making any decisions about whether IPM would be used, as it is required by BLM manual direction and policy. Nor is the BLM making decisions about the other vegetation treatment techniques; only herbicides, as stated in the Proposed Action and Purpose and Need in Chapter 1 of the PEIS. The purpose of the PER, which is stated in Chapter 1 of the PER, is to disclose the potential environmental effects of the other control techniques that may be incorporated by reference into field-level NEPA analyses. The PER accompanies the PEIS to provide the context and background for the use of herbicides in an IPM context. These non-herbicide techniques are also analyzed in Alternative C of the PEIS. The effects disclosures in the PER are included under Cumulative Effects found in Chapter 4 of the PEIS.

The BLM disagrees with the statement the document's singular nature is to analyze treatments of invasive species via the use of chemical applications. The Proposed

BLM_0001254

RESPONSE TO COMMENTS

Action and Purpose are well established to determine which herbicides should be available for use on public lands. The need for the Proposed Action is to reduce the risk of catastrophic wildfire by reducing hazardous fuels, restoring fire-damaged lands, and improving ecosystem health by 1) controlling weeds and invasive species, and 2) manipulating vegetation to benefit fish and wildlife habitat and improve forest and ecological conditions. Not all vegetation is invasive or noxious. The PEIS covers the use of herbicides and their effects on all vegetation types.

RMC-0214-018
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** It is not within BLM's purview to literally exile treatments and strategies other than the herbicide alternative to a non-NEPA document that exists outside the scope of the D[raft] PEIS. The agency has offered an EIS that is singularly fixated on one aspect of the issue: an EIS that fails to consider legitimate alternatives other than the preferred strategy of employing chemical based herbicides as the sole means to combat the spread of noxious and invasive species on the public lands of the West.

**Response:** As discussed in Chapter 1 of the PEIS under Organization of the Vegetation Treatments Assessments, the primary issue identified during scoping and requiring analysis was the use of herbicides and the increase in the number of herbicides used and acres treated using herbicides. The BLM did consider a non-herbicide use alternative (Alternative C) and did provide an analysis of the costs and benefits of other treatment methods. Also see response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

RMC-0217-013
Sierra Club Utah
Chapter

**Comment:** The Sierra Club Utah Chapter is concerned that the PEIS is attempting to sneak into a programmatic EIS a series of treatments which are not analyzed by publishing the PER at the same time as the PEIS and apparently linked to the PEIS in a loose fashion.

**Response:** As stated in the Proposed Action in Chapter 1 of the PEIS, the PEIS has been developed to determine which herbicide active ingredients would be available for use on public lands in the Western U.S., including Alaska. The PEIS is not proposing any specific treatments, or series of treatments. Site-specific NEPA analysis would be conducted for all future proposed vegetation treatment projects prior to approval. The PER discloses the general impacts of non-herbicide treatment methods on vegetation within the various ecoregions comprising the western U.S. and Alaska. The PER serves to provide the context and background for the cumulative impact analysis and ESA [Endangered Species Act] consultation. The PER does not propose any treatments, but serves as a general environmental report on the impacts of these non-herbicide treatment methods for incorporation by reference into more regional and site-specific environmental analyses under NEPA.

RMC-0218-042
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** We share these concerns, and apparently herbicide use was the dominant concern of the public, giving rise to the BLM's unwise decision to split off the non-chemical methods of control out of the DEIS [Draft PEIS] into the less rigorously analyzed programmatic "environmental report" (which is highly questionable legally).

**Response:** Herbicide use was the dominant concern of the public and is the focus of the PEIS. Non-chemical methods are addressed under Alternative C of the PEIS. The PER is a general disclosure of the estimated effects of up to five million acres per year of non-chemical treatment methods on ecoregions and public lands resources. The PER does not analyze these effects in relation to a specific proposed action, nor does it propose any decisions regarding the use of these methods. There is no regulation or statute precluding an agency from developing an environmental report on any activity

BLM_0001255

at any time to provide useful information to agency staff for designing projects or estimating environmental impacts in subsequent NEPA analyses.

RMC-0221-045
Center for Biological
Diversity

**Comment:** Some ongoing vegetation treatments are detailed in the Draft Programmatic Environmental Report ("DPER"). However, first, it is entirely unclear how the BLM intends the DPER to be used and why these treatments were not evaluated along with the other herbicide treatments in the context of a consolidated EIS. The NEPA process and the circulation of draft documents are intended to *inform* the public and decision makers. Unfortunately, the process undertaken by the BLM here, issuing a D[raft] PER at the same time as a D[raft] PEIS, has done the opposite; it has confused the issue and muddied the analysis. The public has not been adequately informed of the purpose of the DPER or how it relates to the D[raft] PEIS. In order to fulfill its mandates under NEPA, the BLM must thoroughly explain its objectives for producing this document, how it relates to the D[raft] PEIS, and provide the public adequate time to review and comment on the documents once those explanations are provided.

**Response:** The organization of the PEIS and PER is discussed in Chapter 1 of the PEIS and PER under Organization of the Vegetation Treatments Assessment. The level of analysis was similar for all treatment methods in the PEIS and PER. However, only herbicide treatments required NEPA review in an EIS. These objectives were provided in both documents, and the public was given 90 days to review the documents.

RMC-0222-005
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** We also contend that the PER (if it is to remain a separate document from the DEIS [Draft PEIS], which it should not) must be analyzed under NEPA. Environmental impact statements and records of decisions in the late 1980s and early 1990s (PER: [pages] ES-1; 1-1; 1-7) analyzed the consequences of non-chemical vegetation treatments on 500,000 acres in 14 western states (PER: [pages] ES-1, ES-2). The PER describes annual treatments on approximately 6 million acres annually (PER: [page] 1-5) in 17 western states (PER: ES-1). Such an enormous expansion of the BLM vegetation management program, particularly when considered with the more than three-fold increase in proposed herbicide applications (from 300,000 to 932,000 acres annually; PER: ES-1), requires that the agency produce a new environmental impact statement (EIS) to assess all reasonable alternatives and the impacts of preventing and treating unwanted vegetation on 6 million acres of public lands per year. The fact that the BLM believes it was mandated by the President's *National Fire Plan* and *Healthy Forests Restoration Act of 2003* and other policies to "take more aggressive actions to reduce catastrophic wildfire risk on public lands" (PER: [page] 1-1) does not excuse the agency from analyzing the PER pursuant to NEPA.

**Response:** See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments for a discussion of the development of the PER. The Proposed Action in Chapter 1 of the PEIS does not include a proposal to prevent and treat unwanted vegetation on 6 million acres of public lands per year. The proposed action is to "determine which herbicide active ingredients are available for use on public lands...to improve the agency's ability to control hazardous fuels and unwanted vegetation." The six million acres figure used for analysis purposes was derived from ongoing BLM programs, estimated Emergency Stabilization and Rehabilitation (ES&R) work following catastrophic fire, and Fire Regime Condition Class data. This estimated acreage serves as a baseline for analysis to determine the relative proportion of acres that could be

BLM_0001256

RESPONSE TO COMMENTS

treated with herbicides out of the suite of IPM treatment methods available, and to estimate the impacts of herbicide use on human health and public land resources and sensitive species. The analysis would be used determine which herbicides the BLM would adopt for use, as well as which herbicides the BLM would discontinue using in its ongoing program work.

RMC-0222-047
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The BLM falsely identifies the "primary issue of controversy" to be BLM's "continuing and proposed increase in the use of herbicides in vegetation treatment problems needed to implement the National Fire Plan and related initiatives" (1-2). In fact, the primary issue of controversy that the Restore Native Ecosystems Coalition raised in person with Brian Amme of BLM as early as 2002, and which we have raised throughout our development and transmittal to the BLM of the Restoration Alternative is that the BLM: refuses to acknowledge BLM management that is causing vegetation problems via their other "stand-alone" land management practices (e.g., ORV [off-road vehicle] use managed by recreation managers; livestock use managed by livestock managers; tree-cutting managed by "fuels reduction" managers); refuses to consider and utilize passive restoration as a non-toxic approach proven to be effective in many sites experiencing invasive species problems; and refuses to link (1) prevention of invasive species, (2) "control" of invasive species, and (3) maintenance and restoration of native vegetation habitat as a valid, integrated approach to controlling invasive species that is different than the BLM's current practice and preferred alternative.

**Response:** Herbicide use was identified as the primary issue of controversy during scoping with the public; this issue has also been affirmed as the primary issue of controversy in every previous EIS leading to this effort. The BLM acknowledges that the primary issue of controversy for the Restore Native Ecosystem (RNE) Coalition may be different; however, the BLM is obligated to identify the broad scoping issues for analysis from the full range of scoping comments received, not just those received from the RNE Coalition, which is a narrow focus interest group that does not broadly represent the public at large. At the time of submittal of the RNE alternative in 2002, BLM informed the RNE coalition much of the submitted alternative was outside the scope of analysis and would be more properly addressed in land use planning at the local level. Also see responses to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread; response to Comment RMC-0167-007 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding passive restoration; and response to Comment RMC-0222-019 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding Integrated Weed Management.

RMC-0222-139
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** BLM's failure to address the link between livestock grazing and invasive species; the lack of grazing prescriptions in the DEIS [Draft PEIS]/PER; and the agency's oft-stated goal to reduce sagebrush and increase grasses and forbs (purportedly to improve sage grouse habitat) would have us believe that the DEIS [Draft PEIS]/PER are in fact an elaborate (veiled) grazing plan. And under this program, federal grazing permittees will be the only beneficiaries. As stated above, and as demonstrated daily across the sagebrush steppe, grazing harms sage grouse. Livestock will continue to consume the bulk of grasses and forbs that result from vegetation treatments described in the DEIS [Draft PEIS]/PER, and will continue to cause weed problems wherever they are allowed to graze among weeds, on burned sites or in areas sprayed with herbicides.

BLM_0001257

**Response:** See the Proposed Action in Chapter 1 of the PEIS. The PEIS addresses the effects of herbicide use on human health and public land resources. The PEIS contains no information at this national programmatic level that would allow the analysis in the PEIS or the information contained in the Environmental Report to serve as an elaborate grazing plan. Grazing plans are specific to allotments, developed at the field office level, based on existing land use plan goals and objectives, following the grazing regulations at 43 CFR [Code of Federal Regulations] 4100.

## Proposed Action and Purpose and Need – Proposed Action

RMC-0218-033
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** There is no explanation as to why the BLM hasn't been able to use herbicides in Alaska, Nebraska, and Texas (DEIS [Draft PEIS] p. 4-20). It is because residents of those states don't want herbicides used? There should be analysis of current methods use in those states to control invasive plants or reduce fire risk, the need for these activities or herbicide use in those states, why herbicides haven't been used in those states and how current BLM plans to introduce herbicide use in those states relate to state law, local regulations and the public interest in Alaska, Nebraska and Texas, as well as any special ecological considerations regarding herbicide use in those states.

**Response:** Herbicides can be used in Alaska, Nebraska and Texas, although herbicide use by the BLM has not been extensive in these states. Public lands in Nebraska and Texas were not previously considered in the 13-state Vegetation Treatments EIS (1991) due to the small acreage of public lands present in those states, even though the states with BLM offices that administer the public lands in Nebraska and Texas (Wyoming and New Mexico), were considered. The use of herbicides on public lands in Alaska has not been considered in any previous EIS. The BLM included these states in this current programmatic analysis to bring all the BLM public lands in the 17 western states, including Alaska, under one EIS for herbicide use for consistency, which will ensure that the BLM's list of approved herbicides applies to all states in the West with BLM administration.

## Proposed Action and Purpose and Need – Purpose and Need for the Proposed Action

EMC-0018-005
Shaw, T. Gray

**Comment:** Public land management should be based on long-term ecological health and the best science available, and should err on the side of safety and conservation. Non-herbicide vegetation treatment options are available.

**Response:** As noted in Chapter 1 of the PEIS under Purpose and Need for the Proposed Action, one need for the proposed action is to improve ecosystem health. The BLM is considering both herbicide and non-herbicide treatment methods to improve ecosystem health. Also see response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0101-005
Terry, Noalani

**Comment:** The BLM needs to educate the public on how exotic plants are spread (of course, it would help if some of these species had not been introduced intentionally, perhaps even by the BLM) and the dangers they present, and do whatever it can to prevent infestations. Livestock grazing, road construction, logging and fuel reduction projects as well as off-road vehicles, hunters and anglers, and even bikers, hikers and boaters spread the seeds of these plants. These activities need to be monitored with an eye to preventing the spread of weeds. Also, I understand seeding some areas with native plants is very helpful; this is being done on the Uncompahgre Plateau west of here.

BLM_0001258

RESPONSE TO COMMENTS

**Response:** A discussion of how invasive vegetation is spread is given in the Vegetation section of Chapter 3 of the PEIS and PER under Noxious Weeds and other Invasive Vegetation.

EMC-0139-015
Troutman, Doug

**Comment:** I have had but a brief time to give cursory review to the document, but find it basically disappointing and distorted. I worry after 30 years of experience that while fuel reduction is a proclaimed goal, "range improvement" for livestock grazing is the real proposed alternative. The impacts section is particularly weak in Recreation, Wilderness, and again repeatedly reflects what's good for cows is good for the USA.

**Response:** The BLM disagrees. The Proposed Action and Purpose and Need are stated in Chapter 1 of the PEIS. The Scope of Analysis in Chapter 1 of the PEIS outlines that the PEIS will not address vegetation treatments that enhance forage production for livestock grazing.

EMC-0161-009
Richards, Vivien

**Comment:** Public land management should be based on long-term ecological health, the best science available, and should err on the side of safety and conservation.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation; Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated; and Comment RMC-0222-059 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

EMC-0362-003
Willits Environmental
Center

**Comment:** The BLM's claim that these herbicides are necessary to reduce catastrophic wildfires and to protect ecosystems from invasive weeds is false. In reality, creating a landscape of dead plant matter will only increase the hazard of large scale wildfire. The soil biology on which all plants are dependent to be healthy will be destroyed by the use of these poisons.

**Response:** See response to Comment EMC-0646-174 under PEIS Environmental Consequences, Cumulative Effects Analysis.

EMC-0503-010
John Day-Snake
Resource Advisory
Council

**Comment:** There is very little discussion in the document as to the rationale for the massive amount of weed treatment being proposed in the [P]EIS. We are supportive of the efforts of BLM to address the threat that noxious weeds pose to the health of public and private lands throughout the west. We feel that the BLM leaves itself susceptible to lawsuits and future obstacles by leaving out the huge body of peer reviewed literature that carefully documents the impacts of invasive species.

**Response:** As discussed under Scope of Analysis in the Decisions to be Made and Scope of Analysis section of Chapter 1 of the PEIS, the PEIS is not a weed management document. The PEIS is an analytical document that addresses the use of herbicides on vegetation and public land resources. Invasive species and noxious weeds are included under vegetation. See Chapter 6 for the list of references used in the development of this PEIS.

EMC-0584-069
Western Watersheds
Project

**Comment:** An independent assessment of the "need" for the proposed actions, and the risks of undertaking new disturbance must be conducted as part of this process. We would like to be involved with this effort, and would be happy to provide you with a list of names of scientists that could be involved in this. This should be conducted by qualified ecologists not tied to Western Land Grant universities.

**Response:** The Department of Interior's draft Cohesive Strategy to implement the National Fire Plan are among the policy documents referenced that provide an assessment of the need for the proposed action in the PEIS. The BLM is not aware of any statutory or regulatory requirement for an agency to conduct an independent assessment to support its Purpose and Need for a Proposed Action. There is no rationale provided as to why a qualified ecologist from a Western Land Grant University is any less qualified than a scientist from a different educational institution. The BLM considers such a restriction as unnecessarily biased to disregard any credited educational institution as the source of objective scientific information on any subject. See PEIS Chapter 6, References, for the source documents used and Chapter 5, Consultation and Coordination, for a list of the qualified preparers and reviewers of the documents.

EMC-0585-132
Western Watersheds
Project

**Comment:** While this [P]EIS frequently claims herbicide use related to livestock forage is not part of what the [P]EIS addresses, it provides no clear way to distinguish herbicide use related to forage vs. other purposes. This must be clearly separated, and a rationale and methodology applied.

**Response:** The PEIS provides an analysis of the impacts of herbicide use on public land resources, as related to hazardous fuels reduction and controlling unwanted vegetation in the form of invasive species and noxious weeds. The Proposed Action is described in Chapter 1 of the PEIS. NEPA analysis conducted for individual and site-specific projects will identify the Purpose and Need relative to the Proposed Action for that project and identify whether the project is related to forage or other purposes. As identified in the PER, beneficial effects of vegetation treatments would cross-cut many resource programs, including, but not limited to wildlife habitat, water quality and quantity, sensitive species, wild horses and burros, and livestock.

EMC-0640-018
Animal Welfare
Institute

**Comment:** The purpose and need of the PEIS is unclear and the scope of the analysis in the PEIS, PER and associated documents is confusing. The PEIS claims that its purpose and need are to lessen the potential for catastrophic wildfires by reducing hazardous fuels, restore fire damaged land, and improve ecosystem health by controlling weeds and invasive species and manipulating vegetation to benefit fish and wildlife habitat. Though the introductory section of the PEIS seems to emphasize various presidential directives and orders intended to address the risk of catastrophic wildfires, this carefully crafted purpose statement clearly goes beyond controlling or manipulating vegetation to reduce the potential for catastrophic wildfires and goes beyond controlling the spread of invasive exotic species to effectively cover all aspects of vegetation management of relevance to the BLM.

**Response:** Vegetation treatment methods apply to any type of vegetation treatment conducted by the BLM, and all resource program work involving vegetation treatments conducted by the BLM (approximately one million acres per year of the six million acres identified in the PEIS) have been factored into the acreage calculation and PEIS analysis for the purposes of assessing cumulative impacts. The BLM has determined that the Purpose and Need and Scope of Analysis are clear in the PEIS and do not require modification or further clarification.

EMC-0640-021
Animal Welfare
Institute

**Comment:** There is a clear disconnect in the content of the purpose and need statement versus the decision to be made. The BLM cannot claim that it needs to engage in vegetation management to address a whole range of issues (i.e. reduction in hazardous fuels, improve wildlife habitat, control weeds and invasive species) but then make a decision that is limited to the expansion of herbicide use on western public

RESPONSE TO COMMENTS

lands. Regardless of the existence of previous NEPA documents on herbicidal and non-herbicidal techniques, the BLM erred and violated federal law by failing to subject the entire program to review as part of this decision-making process. Indeed, many of those previous NEPA documents are, as the BLM concedes, either old or regional/local in scope and, therefore, do not provide a programmatic level of review for such a wide-ranging program that is clearly required under NEPA. Strangely, in this case, the BLM spent the time and effort to prepare a programmatic review of its entire vegetation management program but has limited its decision to a single component of the program. That decision simply makes no sense.

**Response:** See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments regarding development of the PER. The BLM developed the programmatic analysis based on the programmatic decision to be made. Alternative C in Chapter 4 of the PEIS provides an analysis of impacts of non-herbicide methods used to treat vegetation. The PER further discloses the effects of non-herbicide treatments on ecoregions and different vegetation communities at an assumed level of activity for analysis purposes.

EMC-0640-028
Animal Welfare
Institute

**Comment:** While there is ample evidence that many ecosystems in the western United States have evolved with fire and that the suppression of fires have altered these ecosystems, it is not as clear that we are able to accurately emulate the intensity, frequency, or geographic range of the natural fire paradigm through the use of prescribed burning. We may be able to estimate the frequency of natural fires in a particular ecosystem pre-European colonization (i.e. average of 1 fire ever 25 years, 50 years, 100 years), but it may be impossible to determine the specific frequency, duration, and intensity of such fires using our existing techniques. Moreover, even if we can obtain such information, are we using prescribed burning to emulate those conditions or are we overusing prescribed burning to achieve a desirable habitat condition that benefits a particular interests or maximizes biodiversity at the expense of natural processes? Moreover, can we legitimately strive to return ecosystems to the conditions that existed pre-European colonization considering that we don't have a solid understanding of what those ecosystems looked like or how they were structured? Modern day threats to ecosystems are different than those of the past, and environmental conditions of today may be different than those of the past. The suggested criteria won't prevent the use of prescribed burning, disking, plowing, or even herbicide use, but they will promote the role of natural factors in driving ecosystem processes wherever and whenever possible regardless of the current condition of the area except when certain conditions prevail.

**Response:** The commenter makes several good points, but it is difficult to respond to these declarative statements. Because ecosystems are dynamic in space and time, the BLM does not have, nor has it had, a goal of simply returning vegetation to a specific point of time (e.g. the conditions that existed pre-European settlement). In general, most vegetation management treatments in the BLM are designed around specific objectives, such as reducing fuel loadings in a particular location, providing sage-grouse habitat, or eliminating conifer competition. Whether these produce conditions that emulate pre-European settlement times, or prescribed burning is being over-used, cannot be evaluated.

BLM_0001261

EMC-0643-069
California Indian
Basketweavers
Association

**Comment:** Risks to Air Quality and Water Quality are both highest in the BLM "Preferred Alternative" (p. 4-9 and 4-32 [of the Draft PEIS]). The [P]EIS claims to offset these impacts by stating that "benefits" are highest in these alternatives as well, (the benefits being the elimination of non-native weeds from public lands). Yet, the [P]EIS offers no scientific documentation for the promise of benefits or success. What evidence can the agency show to demonstrate that the use of herbicides at any scale can or has had an appreciable effect on the presence or expansion of invasive weeds? In fact, research has shown that herbicide intervention has the net effect of simplifying ecosystems and reducing biological diversity (e.g., Groves 1989, referenced in CIBA 2002). In particular, without concomitant plans to limit invasion-promoting disturbance and protecting uninvaded areas, the use of herbicides as proposed in this [P]EIS is nothing but a waste of time and money. Weeds will simply return, with herbicide resistance and with less competition from the native species that are easily killed by the chemical herbicides. These issues were well referenced and documented in CIBA's [California Indian Basketweaver's Association's] previous comments in scoping, 2002.

**Response:** See response to Comment EMC-0646-174 under PEIS Environmental Consequences, Cumulative Effects Analysis.

FXC-0019-002
Degan, Janet

**Comment:** When the entire ecosystem is taken into account, the healthy choice is no herbicide use, which benefits the public, wildlife, plants, land, water and air. The herbicides include several persistent, mobile, and toxic chemicals, including known developmental and reproductive toxins. Proposed herbicides that put applicators at risk are: 2,4-D, bromacil, chlorsulfuron, diquat, diuron, fluridone, hexazinone, tebuthiuron, and triclopyr. Also included is picloram which is no longer registered for use by the California Department of Pesticide Regulation (CDPR).

**Response:** Treatment of vegetation without the use of herbicides is evaluated in the PEIS under Alternative C, while the risks to applicators from use of herbicides are discussed in detail in the PEIS in Appendix B and in Chapter 4 under Human Health and Safety. The BLM would only use herbicides that are registered by the USEPA, and would not use herbicides unless they were registered for use in the state in which the treatment was occurring. Picloram poses low risk to fish, wildlife, and humans, but can have adverse impacts on non-target plants, as discussed in Chapter 4 of the PEIS.

FXC-0071-012
Campbell, Bruce

**Comment:** Why make such generalizations as to say in an answer to Frequently Asked Questions on the URL mentioned earlier in this comment that "Hazardous Fuel Treatments" will target "dead and down woody materials", "sagebrush", and "juniper and pinyon trees," when elsewhere in the documents it mentions the importance of snags for habitat including for sensitive species, it calls for the removal of juniper and pinyon to help sagebrush land plus mentions need to assist sage grouse habitat, and it mentions how junipers and pinyons are native species in at least some of their current range?

**Response:** The response given in the "Frequently Asked Questions" was kept short to provide the public with a succinct document that provided an overview of the proposed program. The PEIS and PER were more comprehensive and allowed for a more detailed discussion of hazardous fuels treatments.

PHC-005-005
K. Fite

**Comment:** So when I look – and I have not read these documents in their entirety yet, but in listening to their presentation, what I see here is a bonanza for the chemical companies. BLM is proposing to greatly expand its weed treatment on public lands, at

BLM_0001262

RESPONSE TO COMMENTS

the same time it is increasing its disturbance. Part of what is going on here – I'm sure the only way BLM would be able to pay for treating all these expanded acres is using federal fire funds.

**Response:** Herbicides are just one of the tools available for fuels treatments. Managers and resource specialists generally have a very good estimate of which tools are most effective and the outcomes of various vegetation treatments. As stated under Site Selection and Treatment Priorities in Chapter 2 of the PEIS, herbicide treatments will be chosen when effective non-chemical methods of vegetation control are not feasible and only after considering the effectiveness of all treatment methods. Following integrated weed management procedures, most herbicide treatments will be combined with other methods, including removal of treated fuels mechanically or by fire plus revegetation. If a noxious weed population is considered to be a fuels hazard or has altered the fire regime, fire funding would be a possibility. However, because not all noxious weeds are in this category other resource programs could be funding their treatment. Treatments may also be funded by other sources. For example, if treatments are part of a cooperative weed management area covering differing land ownerships, other outside funding may be used as well.

RMC-0042-010
Asher, Jerry

**Comment:** Give more detailed explanation of the problem/impacts from weeds in the Summary, Purpose and Need sections especially, and elsewhere in the EIS and similar places in the PER.

**Response:** The BLM has provided additional information on impacts from weeds throughout the Final PEIS and PER, and in particular in Chapter 3 under Noxious Weeds and other Vegetation. However, the primary objective of the PEIS and PER is to document the effects of treating vegetation.

RMC-0042-054
Asher, Jerry

**Comment:** The Executive Summaries and the Purpose and Need, discuss the history of fire as follows: "...severity and intensity of wildfires in the West has increased dramatically..." I can't find similar comments about the weed expansions that have occurred all over the west.

**Response:** Information on weed expansion is given in the Introduction in Chapter 1 and under Noxious Weeds and other Invasive Vegetation in the Vegetation section of Chapter 3 of the PEIS.

RMC-0042-055
Asher, Jerry

**Comment:** Say something similar about weeds in the Summary and Purpose and Need sections of the BLM EIS and PER because weeds have also increased dramatically.

**Response:** See response to Comment RMC-0042-054 under PEIS Proposed Action and Purpose and Need, Purpose and Need for the Proposed Action. Additional information on noxious weeds and other invasive vegetation has been provided in Chapter 3 of the Final PEIS under Noxious Weeds and other Invasive Vegetation in the Vegetation section.

RMC-0042-061, 062
Asher, Jerry

**Comment:** The reader needs to learn about the common permanency (some authors call it "irreversible") to many weed invasions. Add some language in the Summary and Introduction and Purpose and Need like the following: "The impact of (weed) invasions can be permanent when economic and environmental factors limit the ability of a managing agency to restore the ecosystem to a healthy state" (National Academy of Sciences 1992) (pg3-26 USDA EIS 2005)[;] "...Ecological damage from extensive

BLM_0001263

noxious weed infestations in often permanent" (Utah State, Biological Wildlife brochure – enclosed) [; and] "Loss of wildlife habitat function would be irretrievable." This is a great sentence in your [Draft] BLM [P]EIS, under Cumulative impacts, pg 2-32 [of the Draft PEIS]. However, it is very small print buried in a table. Similar language needs to be "up front" in the text of the document.

**Response:** The BLM has added language in the Summary, Introduction, and Purpose and Need sections on how the impacts of weed invasions that may become permanent impacts both ecologically and economically. We have also expanded the section on invasive species issues in Chapter 3 under Noxious Weeds and other Invasive Vegetation.

RMC-0042-063
Asher, Jerry

**Comment:** "The BLM estimates that nearly 36 million acres of public lands were infested with weeds in 2000, and that invasive plants and noxious weeds are spreading at approximately 2300 acres per day." (pg 3-26) Great that you included this information that is critical to helping people understand the severity of the situation. However, it is "buried" back deep in the huge document.

**Response:** The text of the Final PEIS and PER has been changed in response to this concern. The estimated rate of weed spread has been added to the Executive Summary and Chapter 1 of both documents.

RMC-0042-064
Asher, Jerry

**Comment:** Include that 2300 acres per day increase in the Summary and the Proposed Action/Purpose and Need sections of the [P]EIS and Environmental Report [PER]. That is where the Forest Service put their similar estimate of weed spread (USDA 2005 pg. 1-2).

**Response:** See response to Comment RMC-0042-063 under PEIS Proposed Action and Purpose and Need, Purpose and Need for the Proposed Action.

RMC-0042-067
Asher, Jerry

**Comment:** "...BLM estimates that nearly 36 million acres of public lands were infested with weeds in 2000...". "BLM treated approximately between 250,000 and 320,000 acres of noxious weeds during 2001 and 2004. (pg. 3-326). On average then, BLM is treating about 285,000 acres per year. Therefore, since BLM is treating less than one percent of the weed acreage, it would appear that 35 million acres are growing and spreading unchecked. (I know BLM does not intend to treat all weed acres). If that 35 million is exaggerating, suggest substituting the acreage that is growing unchecked – and the amount of weeds spreading unchecked (out of control) will still be enormous.

**Response:** The BLM proposes to increase treatment acreages of areas infested with weeds several-fold from current levels. Treatment levels are determined, in part, by the amount of funding approved by Congress; the BLM does not anticipate being able to treat more than 6 million acres annually (and only a portion of acres would be treated to control weeds), based on project funding and manpower estimates. The BLM hopes to slow, and potentially reverse, the increase in the number of acres infested with weeds. Even with the proposed treatments, the spread of weeds will continue to be a major issue faced by the BLM.

RMC-0042-074
Asher, Jerry

**Comment:** Replace threaten with damages, degrades, deterioration, blocks ability to meet management objectives, weeds are taking over and dominating many areas.

BLM_0001264

RESPONSE TO COMMENTS

**Response:** The text of the PEIS has been changed in response to this comment. See the Introduction in Chapter 1 and the Executive Summary.

RMC-0050-004
Sierra Club Rocky
Mountain Chapter

**Comment:** More generally the document seems to lack a compelling scientific argument for why the large-area spraying program discussed is going to have any long-term impacts on the BLM's goal of fire reduction. (Or perhaps the real goal is long term employment for the pest control profession!) If there's a proof of concept study out there demonstrating this, then the BLM really should tell us about it. Buying into a multimillion dollar, risky management program without a large-scale proof of management efficacy is unacceptable and resource-wasting. We all know that the accepted and proposed new herbicides kill weeds. What we do not know is what returns 2-5 years after the treatment, and how this recovery alters the fuel loads in ways that are considered acceptable, desirable, and ecologically and economically significant.

**Response:** Herbicides are just one tool available for fuels treatments. Managers and resource specialists generally have a very good idea of which tools are most effective, and a good prediction of the outcome of various vegetation management treatments. However, as the commenter suggests, these outcomes are not always exactly as predicted. Thus, treatments must be monitored and continually evaluated, which is the concept behind adaptive management. If the specific treatment prescribed results in the desired condition in subsequent years, then treatment objectives are met. If monitoring shows that the desired condition has not been reached, then the treatment must be re-evaluated, and modifications made so that future applications produce the conditions desired.

RMC-0069-004
Desert Survivors

**Comment:** Many of the "noxious weeds" referred to in the PEIS have been around for many years and do not pose a threat to life, whether human, plant or animal. The fostering of a "noxious weed threat" is a weird form of mass hysteria that the BLM simply repeats and repeats in an attempt to propagandize. Effects of these "noxious weeds" are 'way overblown in the PEIS and are not adequately proven.

**Response:** See response to Comment EMC-0503-010 under PEIS Proposed Action and Purpose and Need, Purpose and Need for the Proposed Action. It is the responsibility of the BLM to manage public lands under the Federal Land Management and Policy Act. As stated in the Purpose and Need, manipulating vegetation on public lands is an important function of the BLM to reduce the risk of wildfires, improve resources, and enhance habitats.

RMC-0069-006
Desert Survivors

**Comment:** Fire has been apart of Western ecology for millions of years. Most of the vegetation is fire-adapted. The BLM is reacting to spectacular news reports and awe-inspiring real-time photos of military spray machines and smoke-jumpers, but really the millions of dollars the BLM spends on fires is wasted. Natural fire cleanses the landscape. Putting out fires interrupts this process and results in larger fires from the larger amounts of fuels that result from the fire being extinguished. A better way to deal with fuel buildup is to let the fires burn, thus eliminating the problem. The real difficulty comes from the rural community and BLM fire professionals, both of whom have come to depend on the fire program for summer employment. These socio-economic drivers of the fire program are not dealt with in the PEIS, but they should be. Using herbicides is not going to solve the fire problem. Letting the fires burn will do this for you.

BLM_0001265

**Response:** The commenter is correct in asserting that socioeconomic (and political) considerations can become the basis for some land management and vegetation management decisions and activities. However, it is important to note that the BLM is attempting to increase the use of the Appropriate Management Response to fires, as well as planning for more areas to employ Wildland Fire Use concepts. This is being done to help reduce the amount of taxpayer dollars spent on wildfire suppression, but with the realization that fire is a naturally occurring phenomenon. Under the appropriate environmental and management conditions, naturally occurring fire may be used to restore or maintain vegetation. The increase in human population in the west in recent years, as well as the socioeconomic rationale for fire suppression, indicate that some degree of fire suppression and fuels management capability remain desirable for BLM-administered public lands.

RMC-0069-016
Desert Survivors

**Comment:** Your herbicide spraying program fails with respect to all four "public benefits" touted on your website. It does not "reduce wildland fire risk", it increases it. It does not "improve vegetation condition", it kills vegetation. It does not "improve fish and wildlife habitat", it kills fish and wildlife. It does not "improve watershed condition", it pollutes the watershed. This proposal to use herbicides on public lands must be eradicated.

**Response:** As discussed in Chapter 2 of the PEIS under Site Selection Priorities, herbicide treatments will be chosen when effective non-chemical methods of vegetation control are not feasible, and only after considering the effectiveness of all potential methods. Following integrated weed management procedures, most herbicide treatments will be combined with other methods, including removal of treated fuels mechanically or by fire plus revegetation. If herbicides can control invasive plants that have disrupted fire regimes and provide a competitive edge to species that do not disrupt fire regimes, then wildland fire risk is reduced. Similarly, providing a means for native species to reestablish can also improve vegetation condition. When applied following label requirements and using mitigation measures included in the PEIS/PER, as well as conservation measures required by regulatory agencies, neither habitat or watershed condition will be impacted.

RMC-0072-006
Zimmermann, Adele E.

**Comment:** If this proposed action has been instigated by businesses which graze livestock on public lands; and whose bottom line would be enhanced by using public funds and endangering the public's lives and health and the health of our ecosystems; then such action, being against the interests of all but a handful of the residents of the states targeted by the action, is illegal.

**Response:** The Purpose and Need for the Proposed Action is discussed in Chapter 1 of the PEIS.

RMC-0096-003
The Willits
Environmental Center

**Comment:** The BLM's claim that these herbicides are necessary to reduce catastrophic wildfires and to protect ecosystems from invasive weeds is false. In reality, creating a landscape of dead plant matter will only increase the hazard of large scale wildfire.

**Response:** The BLM does not agree with this comment. In some cases herbicides are applied to prevent emergence of the plant to begin with. In cases where plants are treated and killed, a secondary treatment is planned to remove any remaining dead plant material.

BLM_0001266

RMC-0159-002
Proctor, Gradey

**Comment:** Further, nowhere in this document does it address the real reasons why invasive plants are so pervasive on public lands (logging, road building, cattle grazing, ATVs, and mining). Until the BLM begins to deal with the source of the problem, there is only going to be an increase in these heavy-handed tactics to the great detriment of the environment.

**Response:** See response to comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis. The BLM is addressing invasive plants in a four-pronged strategy that includes prevention, inventory, control, and rehabilitation (*Partners Against Weeds - An Action Plan for the BLM*; USDI BLM 1996). The BLM considers the use of herbicides, in an IPM context, an effective tool for controlling invasive species.

RMC-0218-040
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** It is not clear that the proposed control methods would "maintain or improve land health on most public lands" as they haven't so far, so there should have been further analysis of alternatives dropped from further analysis, such as "Treat only acres needed to protect human health and safety." There does not appear to be any substantiation in the D[raft] PEIS of the need to reduce wildfire risk or the extent of human lives and private property threatened by this risk across the BLM lands in question – no maps or figures.

**Response:** Nationally, there has been a steady increase in acres affected by wildfire over the past four and a half decades, with a trend towards severe fire behavior. Two to 3 percent of all ignitions escape initial attack, becoming the problem fires that damage resources, threaten communities, and cost millions of dollars in suppression efforts. There is a process in place that gives treatment priority to projects in the Wildland Urban Interface, which is where lives and property are most at risk. This is emphasized in the documents *A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan* (USDI and USDA 2006a) and *Protecting People and Sustaining Resources in Fire Adapted Ecosystems: A Cohesive Strategy* (USDA and USDI 2006b). This process is included in local planning efforts resulting in Community Wildfire Protection Plans (CWPPs) developed by local communities with participation by Federal and State wildland fire agencies. Direction for developing these CWPPs can be found in *Preparing a Community Wildfire Protection Plan, A Handbook for Wildland-Urban Interface Communities* (2004. Communities Committee, National Association of Counties, National Association of State Foresters, Society of American Foresters, and Western Governor's Association, Bethesda, Maryland. Available at: www.safnet.org/policy and press/cwpp.cfm).

While fuel reduction treatments have proven effective in changing fire behavior and effects at the individual stand level, the more complex issue of changing landscape-scale fire behavior, effects, and suppression costs may also be addressed with fuel treatments designed to reduce problem fire spread and intensity on the landscape. The deliberate and strategic placement of hazardous treatments on a portion of the landscape may dramatically reduce the size and intensity of the problem fires affecting the entire landscape. A strategic approach to the placement of treatments, including their arrangement on the landscape, orientation relative to the prevailing wind, treatment size, treatment shape, and treatment prescription, could reduce the undesired effects of problem fires. Current modeling efforts are focused on such a strategy that will lead to maintaining and improving land health.

An updated section in the final PEIS/PER discusses these efforts and the prioritization process is discussed in the PEIS and PER under Site Selection and Treatment Priorities.

## Proposed Action and Purpose and Need – Decisions to be Made

EMC-0640-025
Animal Welfare
Institute

**Comment:** Though the sole decision in this process is whether to expand the use of herbicides for various purposes on western public lands, it is important that the BLM impose restrictions on all vegetation management techniques to prevent the misuse of such techniques to intentionally alter natural regimes to create what may be a more desirable condition. In other words, using any of the vegetation management techniques discussed in the PEIS or PER should not be permitted simply to alter, set back, or change natural successional patterns to create or maintain a particular habitat condition that may be considered by some to be more desirable than a later successional state. For example, using such techniques primarily to improve habitat for timber production or livestock grazing should not be permitted as such efforts would be to the principal benefit of private commercial interests and may adversely affect native wildlife using such areas. More specifically, employing any of the vegetation management techniques to remove or kill native shrub or tree species to facilitate the expansion of grassland habitat should not be allowed as it would represent an interruption in natural succession and would benefit some native species while harming others.

**Response:** The decision to be made in the PEIS process is to determine which herbicides are appropriate for use on public lands, not to decide whether to expand the use of herbicides for various purposes on western public lands. The purposes for which BLM uses herbicides remains the same for all resource programs, and no new purposes are proposed. Vegetation treatments are required to conform to land use plans and be consistent with the goals and objectives contained in the land use plan. These goals and objectives may include achieving a desired future condition in some cases or achieving better forage or timber production, as determined by the guiding land use plan. Effects on resources for those types of projects are addressed in separate NEPA analyses and are not the subject of this PEIS. See Chapter 1 of the PEIS under Decisions to be Made and Scope of Analysis.

EMC-0640-026
Animal Welfare
Institute

**Comment:** The current condition of some of our ecosystems may have been created as a result of fire suppression efforts. Assuming such areas are not in the wildland-urban interface, do not pose a risk of fueling a catastrophic wildfire because of an abundance of invasive exotic species, have not been degraded as wildlife habitat (including protected species habitat) due to the presence of invasive exotic species, and do not require manipulation to benefit a protected species, natural processes should be allowed to continue unabated. In time, natural factors such as naturally-caused fires, blowdowns, disease, or age will cause the system to return to an early successional stage. While such criteria may appear to be unnecessarily restrictive, they are intended to allow natural processes to predominate and for species assemblages to change over time as succession proceeds except when vegetation manipulation is needed to protect property, native vegetation, native species, and protected species. Such criteria, if adopted, would also prevent the BLM from using such treatments to primarily benefit commercial interests at the expense of native wildlife. This is not to say that no manipulation or control is permitted. Indeed, as suggested, this plan would allow for vegetation manipulation to achieve specific results consistent with many of the management concerns identified by the BLM in the PEIS and PER. While the use of vegetation management techniques under these circumstances would impact the

BLM_0001268

natural successional stage, such impacts would be deemed beneficial overall because of the circumstances or species involved.

**Response:** Land use plan goals and objectives guide how public lands are managed and what types of vegetation treatments may be necessary to effect required results to meet those objectives. Public lands that exhibit characteristics of natural functioning systems and desirable FRCCs [Fire Regime Condition Classes], and are resilient, are typically areas desired by the BLM for conservation and protection with minimal vegetative manipulation, usually in the form of maintenance and prevention activities, as required to ensure long-term stability of the system and resources.

RMC-0144-007
Wyoming Game and
Fish Department

**Comment:** We understand that both documents do not evaluate vegetation treatments not associated directly with hazardous fuel reduction or to control vegetation to improve rangeland and forestland. They also do not evaluate programs associated the other BLM land use activities cited throughout the document as being significant contributors to the need for vegetation treatments, such as livestock grazing, OHV, recreation, mineral extraction, and ROWs. Some examples are located in the discussion of the Treatment [Draft] PER on pages 1-5, 1-6,2-16,3-11,3-20, 3-28, 3-29,3-30,3-72, 4-17, 4-66,4-80,4-82,4-92 and 4-117 among other; and in the Herbicide [Draft] PEIS on pages as 1-4, 2-15, 2-28, 2-30-32, 3-17, 3-19, 3-30, 3-36; 3-58 and 59, and 4-21 among others. We are disappointed that all vegetation treatments, regardless of program, were not addressed. We do not believe that cumulative effects can or will be adequately analyzed and disclosed if all vegetation treatments are not addressed in project documents. In, Wyoming, many vegetation treatments are almost exclusively designed to increase forage production for livestock.

**Response:** The Cumulative Effects Analysis in Chapter 4 of the PEIS considers all vegetation modifications on public lands, regardless of resource program.

RMC-0167-008
Soda Mountain
Wilderness Council

**Comment:** Moreover, "agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements," 40 C.F.R. § 1502.24, and thus the BLM is required to look at all methods (deemed scientifically viable) to cure the rampant spread of invasive weeds. The single track approach that the BLM has utilized in the DEIS [Draft PEIS] and PER quite frankly ignores the large quantity of scientific literature that identifies management of the causes of the spread of invasive species as the necessary focus in order for eventual curtailment of weed invasion.

**Response:** The Proposed Action and Purpose and Need are identified in Chapter 1 of the PEIS. The identified purpose of this PEIS is not to cure the rampant spread of invasive weeds, but to determine which herbicides would be available for BLM personnel to accomplish vegetation treatments in a variety of program areas. All analysis contained in the PEIS meet standards for professional and scientific integrity. Extensive literature sources were reviewed during the development of this PEIS and PER. See Chapter 6, References, of the PEIS and Chapter 5 of the PER for a listing of the scientific and published literature reviewed. In addition, BLM personnel involved with vegetation treatments maintain professional expertise by reviewing existing scientific literature; standing in scientific and professional societies; consulting with professional and academic experts in such fields as ecology and restoration; and coordinating with university extension services, the Natural Resource and Conservation Service (NRCS), professional weed societies, and the public, in the design of any particular vegetation treatment project proposal. The BLM also relies on its extensive experience and success with vegetation treatments, spanning several

decades.

RMC-0191-015
Ertz, Brian

**Comment:** Given the BLM's most substantive argument being whether a given course of action is within or outside the scope of a given mandate (whether it be a mandate of law as is the case with NEPA as one example, or whether it be a mandate of scientific necessity as is the case with consideration of degradates) reading the Draft PEIS and speaking with representatives of the Vegetation Treatment PEIS indicates the agency's inability to fulfill the mandates of section 102 of NEPA. It seems as though representatives have spent more time crafting explanations aimed at curtailing wise and legitimate consideration of science and law than at studying and understanding the potential harmful implications to human and environmental health of this unnecessarily anthropogenic course of action.

**Response:** This PEIS is developed in compliance with Section 102 of NEPA. Current science, quantifiable risk assessments, peer-reviewed literature reviews, and professional expertise, as well as relevant law, were all considered in the development of the PEIS. See Chapter 6 (References) of the PEIS, and references associated with Appendixes B (Human Health Risk Assessment) and C (Ecological Risk Assessment). Also see Relationship to Statutes, Regulations, and Policies in Chapter 1 of the PEIS for a discussion of the legal framework guiding development of this PEIS.

RMC-0217-007
Sierra Club Utah
Chapter

**Comment:** The PEIS then identifies a purpose and need which arbitrarily limits the analysis of the current situation, the problems or origin of the problem, and the availability of techniques for treating the problem. The purposes of the proposed action are to provide BLM personnel with the herbicides available for vegetation treatment on public lands and to describe the conditions and limitations that apply to their use. [[Draft] PEIS [page] 1-31]

**Response:** The BLM has not arbitrarily limited the analysis of the current situation in the PEIS. The Purpose and Need in Chapter 1 of the PEIS frame the analysis required to address the Proposed Action, which is to assess the effects of four herbicide formulations proposed for use on public lands. The current situation is described in Chapter 3 and summarized in the Introduction of Chapter 1 of the PEIS. The problems and origins of the problems are discussed in Chapters 1 through 4 of the PEIS and PER. The availability of techniques are under Vegetation Treatment Methods in Chapter 2 of the PER and also discussed under the analysis of Alternative C in Chapter 4 of the Draft PEIS.

RMC-0221-048
Center for Biological
Diversity

**Comment:** Comprehensive, site-specific analysis should be provided for all vegetation treatments. The manual treatments outlined in the D[raft] PER include chaining, tilling, drill seeding, mowing, roller chopping, blading, grubbing, and feller-bunching. The D[raft] PER admits that these methods are not effective for noxious weed control, and instead need to be used as a follow-up to herbicide treatments. There is no analysis or discussion of how many acres will be subjected to these subsequent treatments, which exacerbates the disturbance to which these lands and the species that depend on them are subjected.

**Response:** See NEPA Requirements of the Program in Chapter 1 of the PEIS for a description of the NEPA requirements for vegetation treatments and the step-down process for assessing site-specific impacts of vegetation treatment projects. The PEIS and PER broadly estimated the acres that potentially could be treated under each method. These estimates are not site specific as to location or method(s) used in this programmatic analysis. The PEIS and PER are not focused exclusively on noxious

BLM_0001270

weed control. Also see Purpose and Need for the Proposed Action in Chapter 1 of the PEIS. Some mechanical methods may not be effective for primary control of certain types of noxious weeds; however, these methods and techniques may be very effective for other vegetation treatment objectives. Vegetation treatments are primarily designed to stabilize and restore disturbance, not to exacerbate disturbance.

**Proposed Action and Purpose and Need – Scope of Analysis**

EMC-0070-003
Burke, Erik and
Jessyca

**Comment:** Invasive plants are often spread by inappropriate uses of public lands such as livestock grazing, road construction and use, the use of off-road vehicles, timber harvesting, and poorly managed fuel reduction projects. Hikers, campers, horse users, and pet owners could benefit from education programs about cleaning themselves and their animals to reduce the spread of invasive plants.

**Response:** Invasive plants are spread through a number of means and vectors. The BLM does not consider uses of public lands under the Federal Land Policy and Management Act (FLPMA) to be inappropriate. The BLM employs a variety of prevention measures, of which public and user education is a central component. The BLM publishes literature that is available in every field office on appropriate conduct on public lands to prevent the spread of weeds, provides educational programs in local schools and other venues, and works with industry and commercial business promoting recreational uses of public lands, to educate their customers on weed prevention. The BLM also employs similar prevention techniques in its own work on public lands, including, but not limited to, vehicle washing, animal grooming and quarantine, and use of weed-free hay and mulch. The BLM also cooperates with state and local fish and game agencies to set up check stations where guides, outfitters, and the public can trade uncertified hay and straw for certified weed-free products during peak use times such as hunting season.

EMC-0079-002
Verrét, Cathy (Product
Awareness Consulting)

**Comment:** What are the causes of invasive plant problems? Perhaps addressing the cause rather than just the effect would ameliorate the situation enough to eliminate the need to spray herbicides.

**Response:** See response to Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0080-004
EMC-0079-003
EMC-0082-001
EMC-0083-003
EMC-0085-003
EMC-0089-002
EMC-0103-001
EMC-0112-002
EMC-0114-001
EMC-0117-001
EMC-0124-003
EMC-0127-003
EMC-0128-002
EMC-0128-003
EMC-0136-001
EMC-0159-003
EMC-0260-004

**Comment:** You need to consider the causes of invasive plant problems, and then act in a manner to prevent and reduce the problem. For instance, livestock grazing, road construction and use, use of off-road vehicles, timber harvests, and fuel reduction projects all encourage invasive weeds on BLM land. BLM needs to change the way the agency manages these activities in order to prevent invasive plant problems. BLM also needs to make a strong commitment to reducing its reliance on herbicides.

**Response:** See response to Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0442-002
EMC-0447-002
EMC-0489-002
EMC-0528-002

EMC-0082-002
EMC-0081-002
EMC-0083-004
EMC-0091-002
EMC-0093-005
EMC-0097-004
EMC-0098-001
EMC-0103-002
EMC-0111-001
EMC-0114-002
EMC-0119-001
EMC-0127-003
EMC-0127-004
EMC-0128-003
EMC-0129-002
EMC-0135-002
EMC-0138-003
EMC-0147-002
EMC-0147-003
EMC-0148-002
EMC-0149-003
EMC-0149-004
EMC-0150-002
EMC-0151-002
EMC-0152-001
EMC-0154-002
EMC-0179-002
EMC-0258-002
EMC-0260-005
EMC-0262-012
EMC-0265-003
EMC-0293-001
EMC-0318-003
EMC-0439-002
EMC-0441-002
EMC-0466-002

**Comment:** The BLM agency must adopt strong prevention-based practices for activities (livestock grazing, road construction and use, of off-road vehicles, timber harvests, and fuel reduction projects) that encourage invasive plants. Livestock grazing, road construction and use, of off-road vehicles, timber harvests, and fuel reduction projects all encourage invasive weeds on BLM land. BLM needs to change the way the agency manages these activities in order to prevent invasive plant problems.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses.

EMC-0087-002
Talpai, Ayala

**Comment:** Please instead address the reasons that unwanted plants can invade. Poison sprays only mask the situation by removing a symptom rather than eliminating what caused the problem.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

BLM_0001272

RESPONSE TO COMMENTS

EMC-0092-002;
EMC-0260-003
Larson, Lyn
Jacob, Vicki, and Julia
Glover

**Comment:** If the BLM doesn't deal with the causes of this problem, and adopt strong prevention-based practices for activities (livestock grazing, road construction and use, use of off-road vehicles, timber harvests, and fuel reduction projects) that encourage invasive plants, it's just putting itself on a never-ending treadmill of pesticide use. BLM should also make a strong, measurable commitment to reducing its reliance on herbicides, not increasing it! Really, there's plenty of information out there on ways to avoid pesticide use, even on such a massive scale.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses.

EMC-0092-004
Larson, Lyn

**Comment:** Manage livestock grazing more selectively. Ranchers get such a free ride on BLM land. Stop constructing roads in roadless areas! Clinton's Forest Plan had it right! Too bad Bush came along to undo us all. Be more restrictive with off-road vehicle use (a tough one, I know, with so many jerks out there saying "it's a free country...") No more clearcuts. OSU [Oregon State University] School of Forestry will never convince me that this is a reasonable forestry practice. Re-plant thinning and "fuel reduction" projects intelligently. See attached for what should be planted, and where.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses.

EMC-0096-002
White, Sally

**Comment:** There are multiple strategies that could be employed in place of the temporary fix of using a poison, something that has so many other effects on other organisms other than those targeted. What efforts have been made to consider the cause and source of these invasive plants? Livestock grazing has a tremendous impact on the success of invasive plant species. In addition to cattle causing mass disturbances in the soil structure thereby making it easier for invasives to get a foothold, they also ingest the seeds of many of these species and deposit them undigested in another location complete with the extra fertilizer needed to get a healthy head start (middle school science). And we all know that there is a high chance of the seeds of plant species considered invasive to be "in the mix" when ranchers drop bales of hay off during the seasons where finding forage is a bit more difficult. Said ranchers not only pay the very minimum for access to BLM property, I would say that they are not held accountable for aiding in the disbursement of invasive plant species.

Road construction is an obvious threat. This would include the actual construction process which is greatly disturbing to the environment, and the aftermath of additional vehicular travel through the area in which motorists bring unwanted seeds through on their tires, clothing and with their pets. Off-road vehicles are probably the worst offenders in spreading invasive plant species. They have the "advantage" of being allowed to do what on-road vehicles do, but at a higher level of invasion. The method in which timber is harvested and fuel reduction projects all encourage invasive plants on BLM land. What has the agency done to stem any of these methods that have been proven sources of spreading invasive plant species?

BLM_0001273

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses. See also response to Comment RMC-0167-007 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding prevention practices implemented by the BLM.

EMC-0097-003
MacKinnon, Maisie

**Comment:** So far BLM has refused to consider the causes of invasive plant problems. Instead, the agency is putting itself on a treadmill of pesticide use.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0102-002
Wheeler, Mark and
Michele Gila

**Comment:** You may have heard it before, but livestock grazing, road construction and use, use of off-road vehicles, timber harvests, and fuel reduction projects all encourage invasive weeds on BLM land. BLM should change the way the agency manages these activities in order to prevent invasive plant problems. BLM also needs to make a strong commitment to reducing its reliance on herbicides.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0104-001
Strong, Marilyn

**Comment:** Spraying is not an effective way to deal with the agency's invasive plant problem. So far BLM has refused to consider the causes of invasive plant problems. Instead, the agency is putting itself on a treadmill of pesticide use.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0105-002
Haines, Margaret

**Comment:** I urge BLM to take a look at the increased use of off-road vehicles, which have dramatically hiked the rate of growth of invasive plants in these over-used areas. Perhaps some of the other causes can be evaluated as well. Use of pesticides on these huge blocks of land is a preventable expense as well as a huge health risk, which needs to be avoided at all costs. It is a well known fact that pesticides have been linked to several forms of cancer.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. See Appendix B, Human Health Risks Assessment for a discussion of carcinogenicity of the herbicides evaluated in this PEIS.

EMC-0112-001
Hays, Lynn and
Evelyn, and Tessa
Hays-Nordin

**Comment:** I am writing in regards to the Vegetation Treatments Using Herbicides Programmatic EIS. There are activities that encourage the spread of invasive plants that you are attempting to deal with using herbicides. Use of off the road vehicles & road construction, livestock grazing, these are some of the activities. Consider the causes of invasive plant problems.

**Response:** See response to Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis.

III-49

BLM_0001274

RESPONSE TO COMMENTS

EMC-0120-001
Kruse, Dave

**Comment:** Please address invasive species with better management of the public land instead of using more herbicides. The spreading of invasive species is often related to land management practices.

**Response:** See response to Comment RMC-0126-002 under PEIS Alternatives, Vegetation Treatment Planning and Management.

EMC-0121-003
Gladstone, David

**Comment:** Further, the BLM needs to open its eyes and recognize the causes of the invasives before taking a shotgun, detrimental-to-the-earth approach. In particular, livestock grazing (at lease rates which do not even cover the cost of land maintenance), road construction/use (with concomitant siltation of abutting streams), allowance of off-road vehicles, non-sustainable timber harvests, and fuel reduction projects (which often are merely pretexts to allow timber companies to cut more trees) all encourage the growth and rampant spreading of invasives. Thus BLM should first seriously consider changing the way it permits and manages these activities.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses.

EMC-0125-004
Seastedt, Timothy R.

**Comment:** Current and previous management activities by the BLM have contributed to these [invasive species] problems. Without dramatic change in land use practices, the system is going to remain dominated by non-native species.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding contributions of land use practices to the spread of non-native species.

EMC-0133-003
Ryan, Stephanie

**Comment:** Your quick fix here is not only not addressing the root cause of the problem it is making matters worse as history has shown that plants develop resistance to pesticide use which only requires more pesticides of different, equally toxic nature to get the same gain as before. This treadmill is unwise, get off of it now.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. Pesticide resistance is considered in the design of vegetation treatment projects within an integrated pest management (IPM) context. Pesticide resistance is also considered in the selection of herbicides to be applied to a target species.

EMC-0133-004
Ryan, Stephanie

**Comment:** Better to consider the system as a whole, invasive plants are caused by what? Livestock grazing, road construction and use, use of off-road vehicles, timber harvests, and fuel reduction projects all encourage invasive weeds on BLM land. BLM needs to change the way the agency manages these activities in order to prevent invasive plant problems.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0137-002
Dankers, Martha

**Comment:** However, I urge you to consider the overall environmental conditions that encourage the spread of these plants and use non-toxic methods of control. I encourage you to examine more closely the use of off-road vehicles, over-grazing and timber

BLM_0001275

management practices that foster the spread of invasive plants.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0139-003
Troutman, Doug

**Comment:** The [P]EIS is totally remiss in not identifying livestock grazing as the number one source of degradation of native resources and introduction of noxious weeds on the public lands.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EM-C0139-017
Troutman, Doug

**Comment:** FLPMA calls for multiple use, and places Recreation before grazing! It is time that we realized though grazing is a legitimate use, it should not have dominance, and should no longer be a "loss leader" and subsidy to industry, yes grazing is run by big industry, not mom and pop operations.

**Response:** The comment has been noted.

EMC-0145-006
Wahl, Mark

**Comment:** Undertake serious examinations of livestock grazing, road construction engineering, use of off-road vehicles, timber harvests, and fuel reduction projects. Thereby consider measures that will reduce transport of weeds and destruction of hardy native growth that holds weeds at bay. Make specific measurable commitments to reducing herbicide use through these measures (___% a year).

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. The BLM is committed to reducing herbicide use over the long-term. BLM Manual 9015 Integrated Weed Management states that one of its policies is to "promote and facilitate development of use-oriented management strategies that reduce the long-term dependence on noxious weed control programs."

EMC-0166-002, 003
EMC-0174-001
EMC-0185-007, 008
Burson, Allison
Concerned Friends of
Ferry County
Sverdlove, Jill

**Comment:** We feel that: (a) Invasive species cannot be eliminated without eliminating the causes of weed invasion. (b) Herbicides are not only poisonous and expensive, but they fail because they are "treating" symptoms, not the causes, of weed invasion and undesirable vegetation.(c) The BLM should analyze the Restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands [is available at:} (www.blm.gov/nhp/spotlight/vegEIS/vol2/PEIS_Appendix_G_RNEA__Alternative.pdf).

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. See response to Comment RMC-0222-013 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystems alternative.

EMC-0170-002
Brister, Bob

**Comment:** I believe that the invasive species problem must be addressed, but not by massive herbicide use. The introduction and establishment of invasive species is mainly caused by logging, road building, off road vehicles and livestock grazing.

BLM_0001276

RESPONSE TO COMMENTS

These harmful activities should be eliminated or restricted. If not, then the problem will continue to grow.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0174-003
Concerned Friends of
Ferry County

**Comment:** There was an agreement, as you should be aware, on May, 24 1989, a Mediated Agreement on vegetation management in the Pacific Northwest Region of the U.S. Forest Service was signed by Northwest Coalition for Alternatives to Pesticides, Paul Merrell, the U.S. Forest Service, and Oregonians for Food and Shelter. One major purpose of this Mediated Agreement was to clarify the distinction between prevention (i.e., detection and amelioration of the conditions that cause or favor the presence of competing or unwanted vegetation) and treatment (activities for controlling or eradicating infestations of competing or unwanted vegetation) or early treatment (i.e., activities for controlling or eradicating initial, small infestations of competing or unwanted vegetation). A second major purpose was to operationalize the Record of Decision for the Final EIS for Vegetation Management, which stated that prevention is the preferred alternative for managing vegetation (emphasis added). The Mediated Agreement spells out specific steps required for, among other things, (a) site-specific analyses, (b) public participation; and (c) monitoring and evaluation for all vegetation management projects. The Mediated Agreement is the Forest Service's Pacific Northwest Region's interpretation of its obligations under the Record of Decision and is part of its administrative practice. The provisions of the Mediated Agreement are not optional. The Forest Service must document the prevention they've done. If they haven't done it, they're not abiding by the MA. *We expect that the BLM should have to go through the same procedure* to reach a record of decision that states that the prevention is the preferred alternative for managing vegetation and not resort to a DM that stresses the use of Herbicides.

**Response:** The BLM is not bound by the terms or conditions that the Forest Service agreed to when it signed the Mediated Agreement. The BLM was approached by plaintiffs in the litigation that led to the Mediated Agreement, but declined for many reasons to become a party to the Mediated Agreement. The BLM is still bound by a court ordered injunction preventing it from using all but a number of herbicides. The PEIS will resolve many of the issues that led to the Oregon court injunction preventing the BLM from using modern, safe, and more effective herbicides on public lands in Oregon. The BLM will not be following similar procedures prior to reaching a ROD on the Vegetation Treatments Using Herbicides PEIS.

EMC-0175-002
Simonson, Annette

**Comment:** [The noxious plant problem] is brought on by many sources, forest harvests, recreationalists and the general mixing of the forest to urban interface. It cannot be solved by entering into the short term and toxic solution of herbicide use. As a botanist who has worked and also volunteered in noxious weed removal programs, I can testify that plants that spread by multi-mechanisms (wind, seed, water, rhizomonously, and by animal/human attachment) will not be stopped, or even slowed by chemical means, except for the very short term. And, at what costs?

**Response:** The BLM agrees plants that spread by multi-mechanisms will not be easily stopped. Use of herbicides is not intended to accomplish complete control and eradication of noxious or invasive species. Vegetation treatment projects involving the use of herbicides are designed to accomplish a specific goal, which in many cases may be only one step in the long-term restoration or rehabilitation of an area through

BLM_0001277

an integrated vegetation management approach. The BLM applies prevention and mitigation measures during herbicide use to ensure toxicity impacts are reduced or minimized in all cases.

**EMC-0177-001**
**Campbell, Larry**

**Comment:** It makes absolutely no sense to treat weeds before an analysis of the cause of the weeds is complete. Otherwise what you are proposing is a perpetual herbicide spray program that does little more than subsidize the chemical industry. You need to analyze the vectors for weed seed spread and the cause of ground disturbance that has prepared the seed bed. Wherever spraying is proposed you should first manage the vectors of seed spread and the cause(s) of ground disturbance. Anything less can not be defended scientifically and demonstrates a less than full commitment to weed control.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

**EMC-0181-006**
**Artley, Richard**

**Comment:** Fire danger can be reduced by removing the fine fuels around structures. Just see the research findings of Dr. Jack Cohen, a fire physicist working at the experiment station in Missoula.

**Response:** The BLM agrees with this statement.

**EMC-0189-003**
**Anderson, Bruce H.**

**Comment:** Is there a better solution? Yes, by first looking at where the invasive plant explosion of the last 50 years has come from. Instead of dousing a new problem with a short term fix, the BLM must adopt strong prevention-based practices for activities (livestock grazing, weed contaminated hay use, road construction and use, use of off-road vehicles, timber harvests, and fuel reduction projects adjacent to invasive weed areas) that encourage invasive plants. At the same time, the BLM needs to make a specific, measurable commitment to reducing reliance on herbicides. Human activity is what has brought the invasive weed explosion of the last 50 years. Focus on the cause, not the product, or you are committing your agency to an environmentally unsustainable, break the bank costly ever increasing chemical program.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses.

**EMC-0196-005**
**Lamberts, Frances**

**Comment:** It is well known that land clearing and disturbance, such as forest clear cutting and road building serve to both let weed species "get in" and reduce the resistance capacity of the native ecosystem to be weakened. In contrast, as forestry research has repeatedly documented, when large, native forest stands are left intact (or managed/harvested with minimal canopy breaks and soil disturbance), they can and do act as physical barriers to bio-invasive species, even halting the spread of these to adjoining lands. This, preventive effect operates in grass land, scrub-vegetation, wetlands and other ecosystems your Agency administers and must protect for the future: the more that the native vegetation and native insect predators are disrupted, eliminated or weakened, the better is the chance that noxious invasive species will thrive. I therefore urge the Bureau to pay greater attention to causative, land-disturbing activities--range overgrazing, excessive off-roads motoring, forest clearance, mining, roads proliferation and the like—in preference to treatment through mechanical eradication and herbicides. The latter types of treatments cannot be truly effective, it

BLM_0001278

RESPONSE TO COMMENTS

would seem, unless the causes of noxious weeds proliferation are addressed. I recommend, to this effect, that the Bureau consider choice of the Restore-Native-Ecosystems alternative in the Programmatic EIS.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread. See responses to Comments RMC-0126-004 and RMC-0222-013 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystems proposal.

EMC-0205-003
Flaster, Trish
(Botanical Liaisons)

**Comment:** [The BLM] would be more successful to get more strict with the causes of the problem. Down here, there is a problem with overgrazing to be sure, but the worse and most destructive damage is being caused by off-road vehicles (especially those ATV's (all-terrain vehicles), but also 4 wheel drive vehicles and motorcycles). There is no control (aside from a view generic and un-enforced signs) to keep these people from driving all over the place, which they do, often in large groups and often and fast. It's tremendously destructive! and disturbing to the wildlife. The dry washes are particularly impacted and you see all these ripped up places branching off from the roads and washes when they drive too. Everyplace that borders these areas if full to the gills with invasive weeds, which of course will spread into every disturbed soil area available, not to mention the erosion problem that is happening too.

**Response:** The BLM agrees that uncontrolled off-highway vehicle (OHV) activity can result in disturbance of vegetation and soils, as well as serve as a vector for weed spread. Proper education of OHV recreationists on weed prevention practices and agency enforcement of OHV regulations are required to reduce the risk of weed spread from this activity.

EMC-0205-009
Flaster, Trish
(Botanical Liaisons)

**Comment:** Publicly owned sagebrush lands have been fragmented and degraded by livestock grazing, off-road vehicle use, energy development, and road construction for the past 150 years. Under the BLM's draft policies, sagebrush habitats are targeted for burning, brush beating, chaining, and herbicide spraying, purportedly to improve habitat for sage grouse and other wildlife. Unfortunately, these treatments have not been proven to work, or work well, without also eliminating the aforementioned causes of weed invasion and undesirable conditions on BLM lands.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. The PEIS assesses the effects of herbicide use on public land resources across the vegetation communities of major ecoregions, which include sagebrush habitats. Vegetation treatment success is dependant on many factors, such as available precipitation and timing, which is not necessarily related to whether or not a public land activity is eliminated.

EMC-0217-003
Umpqua Watersheds

**Comment:** The FEIS should consider the causes of invasive weeds more, instead of just spraying the results of problems with herbicides. For instance, invasive weeds are often spread by off-road vehicles. The Roseburg BLM especially has a problem with enforcing ORVs (off-road vehicles), due in large part to a lack in funds. However, the aforementioned statement is not the point. ORVs are just one cause of noxious weeds; causes should be addressed rather than symptoms. After all, if only the effects of a problem are considered and dealt with, the root of the issue is never fully resolved.

BLM_0001279

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0232-001
Unger, Kris

**Comment:** As a citizen involved in a local initiative to address issues of invasives and native plants (www.earthsangha.org), I'm opposed to an invasive mgmt plan that fails to address the vectors introducing invasives to an ecosystem. An integrated approach to this issue would involve an analysis and adressal of the responsible vectors. In addition, in my experience, indiscriminate blanket applications of herbicides have profound and complex consequences for an ecosystem. While localized delivery is more expensive, it's also more effective, in the long run. The best environmental solutions are those that most closely rely on established, natural patterns. I thank you for your attention.

**Response:** The BLM is not proposing indiscriminate blanket applications of herbicides on public lands. The BLM has multiple layers of assessment that occur prior to a vegetation project being proposed and implemented. These assessments include, but are not limited to noxious weed risk assessments, Standard and Guides assessments, Riparian Proper Functioning Condition (PFC) assessments, watershed assessments, and allotment evaluations. These assessments address both the natural and anthropogenic causes of conditions within the assessment area. The results of the assessments are used to adjust management of activities as well as identify areas and priorities where vegetation manipulation may provide positive benefits and restore degraded areas.

EMC-0239-004
Kimmel, Reida

**Comment:** It is very important to consider causes for the spread of invasive species and to try to control them. Loggers and other vehicle users spread weed seeds on their tires. The closure of roads, the restriction of recreational ORV use, and a strong public education program to inform users of BLM land on the ways they can help to reduce the spread of alien invasive species would do a lot to reduce the future spread of unwanted weeds.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses. The BLM has a strong ongoing public education program in place.

EMC-0241-002
Rechel, Eric

**Comment:** If you want to control weeds work on the cause of the problem and don't spend my money on a aerial stunt displays. Work to stop grazing, work on controlling illegal roads, and work on not permitting any new roads. Your spray program will only be a temporary fix and you know it. Until you get to the cause of our weed problem, spraying is just a way to throw money at a serious problem here in the west. How do you know that if you spray one species of weeds you won't be setting up an environment for another species to take off and be another pervasive problem. Your biggest factor causing this weed problem is over grazing. Stop grazing the west and you will control the weed problem.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

BLM_0001280

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0249-003<br>Chapman, James L. | **Comment:** It's treating the symptoms and not the diseases. The symptoms are the invasive weeds, but the diseases are what brought them there - logging, road building, off road vehicles and livestock grazing. These weeds "hitchhike" on the tires of logging trucks and ORVs [off-road vehicles], on livestock hooves and in feces, and are easily established wherever the ground has been disturbed. |

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0253-003
Keeran, Georgia

**Comment:** I urge BLM to first perform in-depth studies to determine how and why these plants are being introduced. It would be very short sighted to not study the factors involved and simply broadcast herbicide over almost a million acres of public land. Please take the time and effort to investigate how the "invasive plants" are being introduced: One major factor is very minimal control over ATV's [all-terrain vehicles] and other motor powered recreational vehicles (4WD [4-wheel drive], snowmobiles, motorcycles) onto public lands. Please consider the banning of non-essential motor powered vehicles on BLM land.

**Response:** See response to Comment EMC-0232-001 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding pre-treatment assessments. See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0263-004
Dalegowski, Daniel

**Comment:** There is no good reason to employ pesticides to control fire danger or to combat invasive species. The best reason to use this strategy is that it is cheap, easily conceived, and easily accomplished. A better solution is to eliminate those activities on our public lands which lead to the adverse ecological changes in question. Discontinue grazing on public lands. Discontinue logging on public lands. Allow natural fire regimes to proceed. Move human settlements to safe distances from public forests to eliminate risk to society from such natural processes.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0286-005
Elzinga, Stephen
(Eagle County Weed
and Pest Department)

**Comment:** BLM permittees (recreation, grazing, mineral/energy, etc) should be held accountable for the impacts their use of BLM lands cause.

**Response:** The BLM allows for accountability by authorized users of the public lands. Use authorizations for activities on BLM lands often contain provisions for ensuring remediation of impacts of activities. For example, Special Recreation Use Permits may include collection of fees for the activity to fund post-activity monitoring and clean up, as well as bonds for post-activity remediation. Locatable minerals mining operations are fully bonded for future remediation, in some cases up to and exceeding 100 years into the future, based on monitoring and reclamation success. Oil and gas operations are likewise responsible to ensure proper reclamation under the terms and conditions of granted rights-of-way and other permits. Grazing use is regulated through the terms and conditions of permits, and penalties are in place for violations to those terms, including trespass fees.

EMC-0292-002
Thoen, Cheryl

**Comment:** The BLM needs to consider the causes of invasive plant problems. Livestock grazing, the construction and subsequent use of roads in new areas, use of

BLM_0001281

off-road vehicles, timber harvests, and fuel reduction projects all encourage invasive weeds. BLM needs to change the way the agency manages these activities in order to prevent invasive plant problems. Rather than increasing spraying, the BLM should make a strong commitment to reducing its reliance on herbicides, for the good of our families and the environment.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0293-002
Boulder Regional
Group

**Comment:** BLM that the agency needs to make a specific measurable commitment to reducing reliance on herbicides. We have personally witnessed many problems such as vegetation restoration projects presently being conducted on the Grand Staircase Escalante National Monument (GSENM) that have promoted invasive weeds in the past prior to NEPA and that do the same now because NEPA is not being conducted saying it is an "Emergency" and that more disturbance is mere "maintenance" of the already chained and treated areas. This new Veg [P]EIS will only allow outfits such as GSENM and every other BLM area office to create more problems that will continue to cycle for centuries to come. At some point the BLM must stop passing their problems off with more treatments and use of herbicides---and finally deal with the real culprits: grazing of domestic livestock and creating or allowing states to build large herds of game animals.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0306-003
Klamath RiverKeeper
Program and Klamath
Forest Alliance

**Comment:** The United States Bureau of Land Management (BLM) is proposing to spray almost a million acres per year with herbicides to kill invasive plants and control excessive fuels. This triples the agency's current herbicide use on BLM lands in the United States. This proposed BLM action is not an effective way to deal with the agency's invasive plant and fuels management problem. This is partly due to the BLM's refusal to adequately consider and address the causes of invasive plant problems and to develop fuels management programs that result in the reintroduction of natural fire into ecosystems that evolved with fire as a key influence. Instead, the agency is depending inappropriately on the use of herbicides to address the invasive plant problems and reduce excessive fuels on BLM lands. The BLM's over-dependence on the use of herbicides will not adequately result in the stated purpose and need which is to: 1) Reduce Risk from Wildfires and Unwanted Vegetation, and to 3) Protect Life and Property. In fact the proposed action will more likely result in a worse resource condition than currently exists.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. See pages 2-1 through 2-5 of Chapter 2 of the Final PER for a description of the Wildland Fire Management Program, which includes fuels management. A key goal of all wildland fire and fuels management is to restore fire adapted ecosystems. Herbicides are one tool that may be used in conjunction with other non-chemical methods to achieve fuels management objectives. The primary tools applied in fuels management projects are prescribed fire and mechanical methods not involving the use of herbicides.

BLM_0001282

RESPONSE TO COMMENTS

EMC-0306-004
Klamath RiverKeeper
Program and Klamath
Forest Alliance

**Comment:** Activities allowed by the BLM, such as: livestock grazing; road construction, use and management; use of off-road vehicles; timber harvests; mining; energy development; fuels reduction projects; watershed/habitat restoration and various forms of recreation all encourage invasive plants to be introduced, occupy, spread, and cause harm to the natural and human resources on the BLM lands. Several of the Klamath Forest Alliance personnel have witnessed BLM land management activities that have encouraged the introduction and spread of invasive plants on BLM lands while recreating or visiting BLM lands. The BLM needs to change the way the agency manages these activities in order to adequately prevent invasive plant problems.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0322-002
Boulder Regional
Group

**Comment:** We strongly oppose BLM's proposal to spray herbicides over vast areas of the western landscape to control noxious weeds. For many years the BLM has been fostering the very activities which have encouraged the growth of the noxious weed. Cattle grazing, ORV [off road vehicle] use, Road construction, Timber Sales, Fuel Reduction Programs and other activities have all contributed to the current problem. The proposal to spray herbicides, many of them proven to be both mutagenic and tetragenic, over the already stressed native plants and wildlife is unacceptable. Once again the BLM is failing to address the root of the problem and instead adding another layer of stressors to our already beleaguered public lands to deal with a problem created by uncontrolled and unmanaged grazing and other uses. You are failing to take a hard look and do the potentially unpleasant (politically) work of addressing the underlying causes of the problem. We request that the BLM take some stronger prevention based measures to address the causes of the noxious weed problem.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. Human Health risk assessments addressing mutagenicity and teratogenicity are found in Appendix B of the PEIS. Information on prevention is included in Chapter 2 of the PEIS and PER under Prevention of Weeds and Early Detection and Rapid Response.

EMC-0324-001
Rachel Carson Council

**Comment:** We have several reasons for objecting to this widespread spraying. We find that there is an apparent failure to deal with the causes of invasive species problems. The conditions contributing to the spread of invasive plant species are relevant. These include higher temperatures in Alaska, attributed to increased atmospheric levels of greenhouse gases. There are local disruptions of areas caused by the building of roads, by increased usage of ATVs [all-terrain vehicles] and other vehicular traffic.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0361-004
Name withheld

**Comment:** I demand the BLM study further to remedy the cause of evasive weeds which have proven to be ORV's, livestock, logging trucks. Until such time, efforts to poison 17 states will surely fail.

BLM_0001283

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0386-002
Varvares, Chris

**Comment:** Add to the goal of preventing the spread of noxious weeds, preventing the spread of harmful chemicals across the land that can poison water, and threaten wildlife and humans, and the whole approach gets turned on its head. Start by looking at the causes of the spread of invasive weeds. Indeed, focus on the causes. Yes there are trade-offs…limit access, etc.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0389-002
Shapiro, Michael

**Comment:** Rather than address the causes of spreading invasives by eliminating these activities [logging, road building, off-road vehicles, and livestock grazing], the BLM proposes to address the symptoms by increasing the use of herbicides that poison the air, land, water, wildlife and humans and require the use of mechanized equipment for application. Until the agency addresses the causes of weed invasions, its proposed treatments for the weed invasion and other undesirable vegetation will fail. Invasive species cannot be eliminated without eliminating the causes of weed invasion. Herbicides are not only poisonous and expensive, but they fail because they are "treating" symptoms, not the causes, of weed invasion and undesirable vegetation. The BLM should analyze the Restore Native Ecosystems Alternative in the DEIS/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystems (RNE) alternative.

EMC-0405-003
Hoover, Victoria N.

**Comment:** The EIS [PEIS] fails to look at the causes of why it is claimed these treatments are needed. It elaborate proposals for chemical and mechanical treatments of vegetation put the cart before the horse. In fact there is no horse. Ways to attack symptoms of problems are looked at in excessive detail and the causes of problems are carefully ignored.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0405-005
Hoover, Victoria N.

**Comment:** In general herbicides are ineffective because they treat only the symptoms, not the causes of weed invasion, causes like livestock overgrazing, wide dispersion of off-road vehicles, road construction, etc. And, the herbicides most commonly used tend not to be effective against annual grasses that are common throughout the West, such as cheat grass [downy brome]. Seeds can remain potentially active in the ground for many years—10 to 15 years or longer.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed

BLM_0001284

RESPONSE TO COMMENTS

|  | spread. The BLM agrees that the seed bank of annual grasses such as downy brome can remain potentially active for many years. |
|---|---|
| EMC-0416-002<br>Lengerich, Tim | **Comment:** Invasive species cannot be eliminated without eliminating the causes of weed invasion.<br><br>**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. |
| EMC-0416-003<br>Lengerich, Tim | **Comment:** Herbicides are not only poisonous and expensive, but they fail because they are "treating" symptoms, not the causes, of weed invasion and undesirable vegetation.<br><br>**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. |
| EMC-0444-001<br>Grover, Ravi | **Comment:** Herbicides are not only poisonous and expensive, but they ultimately fail because they are treating symptoms, not the causes, of weed invasion and undesirable vegetation. Instead, the BLM should analyze the Restore Native Ecosystems Alternative in the DEIS/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands.<br><br>**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystems alternative. |
| EMC-0456-001<br>Mendius, Barbara J. | **Comment:** I have recently hear of the BLM's intended vastly increased use of herbicides on public lands in the West. Not only is this approach severely detrimental to wildlife and very costly, it also does NOT address the causes of the problem such as road building, ORVs [off-road vehicles] and grazing.<br><br>**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. |
| EMC-0462-002<br>Newcomb, Jean | **Comment:** From this experience, I seriously disagree that spraying herbicides is effective. Only the symptoms are being addressed, not the causes or prevention of the invasive plant overgrowth.<br><br>**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. |
| EMC-0464-001<br>Kaufman, Albert | **Comment:** I believe that herbicides are not only poisonous and expensive, but they ultimately fail because they are treating symptoms, not the causes, of weed invasion and undesirable vegetation. |

BLM_0001285

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0465-003
Hassell, Janet

**Comment:** Causes that need to be addressed include practices that disturb the land. This logging, clear cutting, road building, use of off road vehicles and livestock over-grazing. Weed seeds are transported by hooves, tires, and in feces. Of course, natural means of seed travel will always occur through wind, animals, and rains. However, if we have control over the artificial and additional means of weed spread, this should reduce the overall burden of control.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0466-003
Atkin, David

**Comment:** The BLM should not continue to rely on the use of herbicides on the public lands. Instead, the BLM should concentrate on addressing the activities that bring in the invasive plants or contribute to their spread.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0467-001
Garvey, Lydia

**Comment:** The BLM plan fails to deal with the sources of invasive weed spread (grazing, logging, ORVs [off-road vehicles], roads, mining etc..),& ignorantly just addresses the symptoms rather than the causes of. The draft EIS "Vegetation Treatments Using Herbicides on BLM Lands in 17 Western States", rather than the Goal to control the introduction & dispersal of invasives - is BLM making herbicide use itself the purpose!

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. The Purpose and Need are identified in Chapter 1 of the PEIS.

EMC-0513-002
The Wilderness
Society

**Comment:** As a preliminary matter, The Wilderness Society wants to emphasize that BLM should be giving primary importance to finding and eradicating the causes of the noxious weeds, invasive species and other unwanted vegetation that are the target of the herbicide treatments (such as roads, off-road vehicle tracks, and transmission corridors). Unless and until BLM fulfills these responsibilities, control of unwanted vegetation cannot succeed on a long-term basis. We recommend that BLM make a formal commitment as part of this PEIS to identify and evaluate the most common causes of invasive species proliferation on public lands, including but not limited to use of off-road vehicles, and to develop a strategy for controlling these causes concurrent with a strategy for applying herbicides or using other unnatural means of eliminating existing vegetation.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. See Scope of Analysis in Chapter 1 of the PEIS.

EMC-0525-012
Western Watersheds
Project

**Comment:** These degraded communities are extremely vulnerable to weed invasion - especially with chronic grazing or motorized disturbance. As chronic grazing, roading (often linked to livestock facilities or management and other disturbance continues:

BLM_0001286

Livestock and vehicles assist the spread of weeds via mud trapped in hooves and tires and/or on hides; Livestock transport weed seeds in their digestive systems, spreading them across the landscape in manure; Livestock trample soils and vegetation, and vehicles churn soil and smash vegetation, facilitating weed establishment; Livestock crush and trample microbiotic crusts that may inhibit weed establishment; Livestock may selecting native species over exotics, providing a competitive advantage to invasives species by eliminating competition with native species; Livestock can alter landscape variables (such as fire regimes) giving advantages to exotics. (Belsky and Gelbard 2000, Gelbard and Belnap 2003).

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. See Scope of Analysis in Chapter 1 of the PEIS. Livestock grazing is outside of the scope of analysis of this PEIS.

EMC-0525-013
Western Watersheds
Project

**Comment:** BLM has failed to assess the combined effects of desertification, livestock grazing and exotic species/weed increase and infestation in its hazardous fuels problems. Even PRIA [the Public Rangelands Improvement Act] acknowledged that production on many BLM lands was below potential, and would decline even further. In the [P]EIS/PER, BLM constructs a fantasyland. It ignores chronic grazing as a cause of weed invasions and any need for treatment. It ignores consideration of any actions/treatments that could lessen the impacts or severity of grazing disturbance. It continues the current level of grazing while interjecting or superimposing massive treatment disturbance. This will ultimately result in even further loss of soil, microbiotic crusts, water, watershed integrity, wildlife habitat, and forage across the arid West.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0525-108
Western Watersheds
Project

**Comment:** BLM must also conduct comprehensive assessments, in representative sites grazed by livestock, and assess the role of livestock degradation in causing hazardous fuels or weed problems.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding livestock grazing.

EMC-0525-114
Western Watersheds
Project

**Comment:** BLM must conduct a current livestock grazing capability and suitability analysis. BLM is aware that it has based livestock use areas and stocking rates on old adjudication processes – where AUMs [Animal Unit Months] claimed and then assigned in the adjudication process were often greatly inflated by ranchers. These "adjudicated" AUMs were not based on the ability of the land to sustain such high numbers of livestock and levels of use.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0525-115
Western Watersheds
Project

**Comment:** In the [P]EIS capability and suitability analysis, BLM must examine: Slope, distance to natural water, dispersion of "forage" across the landscape – i.e. many lands have been so depleted that it takes dozens of acres to support an AUM [Animal Unit Month] – so the costs (including in weight gain/loss of livestock) are often so great that grazing is a resoundingly losing proposition, areas inaccessible due to winter snow, summer desiccation, etc.

BLM_0001287

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0525-116
Western Watersheds
Project

**Comment:** Directly relevant to the Weed EIS [PEIS] is an assessment of the risk that continued livestock grazing may push habitats over ecological thresholds from which they can not recover. Examples: Continued heavy stocking and degradation of mountain big sagebrush opening the door to cheatgrass invasion of understory; continued heavy stocking and degradation of juniper leading to cheatgrass invasion of understory; continued heavy stocking and degradation of sagebrush leading to both juniper and cheatgrass invasion of sagebrush.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0525-117
Western Watersheds
Project

**Comment:** BLM must also determine, for example, if lands where taxpayers may spend hundreds of dollars an acre to restore native vegetation that has been destroyed by livestock are suitable for continued grazing following treatment.

**Response:** Decisions concerning allowable uses, including grazing, are made in local land use plans, and are outside the scope of this analysis.

EMC-0525-121
Western Watersheds
Project

**Comment:** BLM must assess the following existing threats to native vegetation and special status species, T&E [threatened and endangered] species, and other important biota across the project area: Wells and windmills; Pipelines; Troughs; Pipelines; Roads (often linked to facilities); Salting Sites; Weed Infestations; Powerlines; Fences; and Aquifer depletion.

**Response:** The impacts of herbicide use on native vegetation and special status species are described in Chapter 4 of the PEIS under Vegetation. Assessing the effects of existing facilities on public lands, including aquifer depletion across 17 states on native vegetation and special status species, is beyond the scope of analysis for this PEIS.

EMC-0525-122
Western Watersheds
Project

**Comment:** BLM must assess the following existing threats to native vegetation and special status species, T&E [threatened and endangered] species, and other important biota across the project area: Cheatgrass-dominated understories; Cheatgrass, few shrubs; Altered understory species composition; Altered understory species structure; Altered overstory species composition; Altered overstory species structure (see, for example, Katzner and Parker 1997, and Federal Register 68 (43): 10389-10409) describing impacts of livestock-altered or thinned sagebrush to pygmy rabbit)

**Response:** The impacts of herbicide use on native vegetation and special status species are described in Chapter 4 of the PEIS under Vegetation. Assessing the effects of undefined altered vegetation composition and structure across 17 states on native vegetation and special status species is beyond the scope of analysis for this PEIS.

EMC-0525-124
Western Watersheds
Project

**Comment:** [BLM must assess the following existing threats to native vegetation and special status species, threatened and endangered species, and other important biota across the project area]: Grazing season/disturbance conflicts with nesting, birthing, wintering or other critical period in species life cycle; Grazing use levels fail to provide necessary habitat components (cover or food) based on nest available science; Livestock structural alteration of shrubs

BLM_0001288

RESPONSE TO COMMENTS

<table>
<tr><td></td><td><strong>Response:</strong> See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.</td></tr>
<tr><td>EMC-0525-125<br>Western Watersheds<br>Project</td><td><strong>Comment:</strong> [BLM must assess the following existing threats to native vegetation and special status species, threatened and endangered species, and other important biota across the project area]: Energy project siting (wind, geothermal, other) and associated roading and infrastructure such as utility corridors and lines; Mines and mining exploration and associated roading; Oil and Gas exploration and Development.</td></tr>
<tr><td></td><td><strong>Response:</strong> See Scope of Analysis in Chapter 1 of the PEIS. Also see NEPA Requirements of the Program in Chapter 1 of the PEIS. Site-specific projects for public land uses are assessed under NEPA at the time they are proposed. These projects are outside the scope of analysis of this PEIS.</td></tr>
<tr><td>EMC-0525-126<br>Western Watersheds<br>Project</td><td><strong>Comment:</strong> [BLM must assess the following existing threats to native vegetation and special status species, threatened and endangered species, and other important biota across the project area]: OHV [off-highway vehicle] races; Areas of high OHV use; Unregulated motorized use; Road densities; Communication towers and other vertical structures</td></tr>
<tr><td></td><td><strong>Response:</strong> See Scope of Analysis in Chapter 1 of the PEIS. OHV use is outside the scope of analysis for this PEIS and unrelated to the Proposed Action in this PEIS.</td></tr>
<tr><td>EMC-0525-127<br>Western Watersheds<br>Project</td><td><strong>Comment:</strong> [BLM must assess the following existing threats to native vegetation and special status species, threatened and endangered species, and other important biota across the project area]: De-watering proposals (example – aquifer depletion and water export to Las Vegas), land disposal proposals.</td></tr>
<tr><td></td><td><strong>Response:</strong> These projects are outside the scope of analysis of this PEIS and are unrelated to the Proposed Action in the PEIS. Many of these projects (e.g., water export to Las Vegas, land disposal proposals) are currently being analyzed or have been previously analyzed in site-specific EISs.</td></tr>
<tr><td>EMC-0525-128<br>Western Watersheds<br>Project</td><td><strong>Comment:</strong> Often overlooked threats from livestock facilities and structures include: Physical harm to species - obstacles such as fences that can cause injury or mortality; Structures cause species avoidance of areas, i.e. sage grouse avoid vertical structures. Providing elevated predator perches and nest predator perches (in the case of songbirds – brood parasite perches). Attract predators and act as sinks; Attract brood parasites</td></tr>
<tr><td></td><td><strong>Response:</strong> See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.</td></tr>
<tr><td>EMC-0525-131<br>Western Watersheds<br>Project</td><td><strong>Comment:</strong> The impacts of grazing on native wildlife, including species displaced by treatments into neighboring or sub-optimal habitats, must be assessed. For example, inundating sage grouse nesting or brood rearing habitats with large numbers of cattle or sheep during nesting season may cause: Removal of cover necessary to protect nesting birds and to hide and provide essential insect food for chicks; cause flushing of birds from nests – thus revealing nests to predators; cause separation of broods and increased vulnerability to predation; strip essential cover to hide hens and nests and conceal chicks from aerial vision-oriented predators and screen scent from ground-based predators. If this is coupled with loss of a significant portion of nesting habitat due to a BLM sagebrush Tebuthiuron "treatment", impacts will be magnified, and</td></tr>
</table>

BLM_0001289

populations suffer significant losses.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. Also see NEPA Requirements of the Program and Figure 1-1 in Chapter 1 of the PEIS. Any proposal to apply tebuthiuron in sagebrush habitat would have site-specific project impacts on resources and wildlife assessed through NEPA at the time the project is proposed.

EMC-0525-134
Western Watersheds
Project

**Comment:** BLM must study the extent of cheatgrass in understories, and areas already dominated by cheatgrass. BLM must assess the risk of cheatgrass invasion of understories with continued or extended livestock use or disturbance. BLM cannot gloss over the role of ongoing livestock grazing in continuing disturbance that spreads and promotes cheatgrass, medusahead and other weed growth; in retarding recovery and continuing weakening of native vegetation in plant communities that still have a significant component of native species present, etc.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0525-136
Western Watersheds
Project

**Comment:** In any discussion of plant communities where BLM claims the fuels/fuel loading is too heavy, BLM must examine causes heavy fuels related to livestock degradation, topsoil loss and change in site potential, climate change, etc.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0525-138
Western Watersheds
Project

**Comment:** In addition, with extensive depletion over large areas, BLM must assess the diminishing returns – and increased ecological damage done by livestock having to roam over dozens if not hundreds of acres to sustain themselves/harvest an AUM [Animal Unit Month]. This may lead to more trampling impacts, more disturbance, more sites for weeds to take hold, and more livestock-vectored movement of weed seeds across the landscape. BLM must identify areas where grazing is unsustainable, or where it will cause harm to still-intact communities, as part of the capability and suitability analyses. What lands are really capable, or suitable, to be grazed post-treatment?

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0525-140
Western Watersheds
Project

**Comment:** BLM fails to address shifted, intensified or increased use by livestock that may occur as livestock are shifted into untreated lands. Nowhere does the [P]EIS mandate removal of livestock grazed on treated lands, not merely displacement of livestock and their impacts to nearby areas. Increasingly, we are seeing BLM fail to reduce AUMs [Animal Unit Months] following fire, and Nevada BLM often takes no action whatsoever to limit livestock use of treatments. This all reduces the effectiveness of any treatments, and increases likelihood of increased weed proliferation in the wake of treatment or post-fire disturbance.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. BLM policy is to rest treatment areas at least two growing seasons following rehabilitation after fire or until treatment goals are achieved.

BLM_0001290

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0525-142<br>Western Watersheds<br>Project | **Comment:** All impacts of livestock grazing on all elements of the [P]EIS must be assessed during drought. How does drought affect productivity of vegetation? What are the additive, synergistic and cumulative impacts of grazing depletion and drought on loss of plant vigor, weakening, or death?<br><br>**Response:** The analysis of drought and livestock grazing on plant vigor are outside the scope of analysis of this PEIS. |
| EMC-0525-143<br>Western Watersheds<br>Project | **Comment:** How much are plants of good vs. poor vigor affected by drought? What utilization levels are appropriate on drought-stressed vegetation? What stocking rates are necessary to prevent depletion during drought? How does drought affect fuels and fire danger in plant communities weakened by the combined effects of grazing and drought? Do they become vulnerable to cheatgrass and other weeds that increase fire dangers and cause fuels problems?<br><br>**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. |
| EMC-0525-156<br>Western Watersheds<br>Project | **Comment:** BLM must conduct a full inventory and assessment of all existing livestock facilities and developments on lands identified by its Field Offices for treatment under the [P]EIS/PER, including, all water haul and salting sites, and all vegetation treatments that have been conducted on these lands. The full array of direct, indirect, cumulative and synergistic impacts of these projects and activities must be assessed.<br><br>**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. |
| EMC-0525-166<br>Western Watersheds<br>Project | **Comment:** Instead of taking strong and decisive action to restore and enhance habitats and populations, BLM pursues a path of new and extended habitat alteration and fragmentation across the allotments under the guise of hazardous fuels, and restoring a "natural" fire interval that can no longer be considered natural under the chronic disturbance caused by livestock and in the face of exotic species invasions.<br><br>**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. See Wildland Fire Management Program under Planning and Management at the National Level in Chapter 2 of the PER for a description of the BLM Fire Management program, including hazardous fuels management. |
| EMC-0525-168<br>Western Watersheds<br>Project | **Comment:** The habitat for many native wildlife species across the [P]EIS lands is already fragmented. Fragmentation would continue and escalate with new livestock developments, livestock management practices that result in zones of livestock concentration, and other disturbances under the actions as laid out in the [P]EIS/PER.<br><br>**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. |
| EMC-0538-002<br>Trochlell, Cathy | **Comment:** Yes, it's true that there is a problem with invasive weeds on BLM lands. This is due to the regular introduction of those weeds through overgrazing, off-road vehicle use and other poor management practices. |

BLM_0001291

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0538-003
Trochlell, Cathy

**Comment:** I request that you use my tax dollars to eliminate grazing and ORV use on my public lands. The use of herbicides will only pollute MY air, land, water, and wildlife found on my public lands. Furthermore, the BLM should analyze the Restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding analysis of the Restore Native Ecosystems alternative.

EMC-0561-002
Petroleum Association
of Wyoming

**Comment:** PAW [Petroleum Association of Wyoming] commends the Bureau of Land Management (BLM) in its efforts compile this programmatic environmental impact statement (PEIS). It is our understanding that the primary objective of these documents is identification of herbicides suitable for use on public lands and the report does not address energy production activities as stated on page 1-6 [of Chapter 1] and the PEIS [PER] also does not address energy production as stated on page 1-4 [of the PER]. Both documents, however, have the potential to influence reclamation work that is done by our members in our efforts and commitment to land stewardship.

**Response:** The decisions on which herbicides are appropriate for use on public lands, and any constraints identified in the PEIS on their use, would apply to all activities that utilize herbicides, including reclamation work by authorized users of the public lands.

EMC-0562-007
The Lands Council

**Comment:** The National Environmental Policy Act (NEPA) and its implementing regulations require the Region to address the causes of invasive plants and to design alternatives around eliminating the introduction of them. 40 C.F.R. [Code of Federal Regulations] § 1508.25 (scope of the proposed project). The selected invasive plant management project focuses too much on herbicidal treatment of the spread of invasive plants e.g. the increasing number of populations of weeds – rather than preventing the underlying causes of these increases. The BLM standards must adequately address prevention of the spread of invasives by other means. Logging, road building, off road vehicles and livestock grazing are causes for the introduction and establishment of non-native plant species on public lands. Invasive weeds "hitchhike" on the tires of logging trucks, ORV's [off-road vehicles], and on livestock hooves. Noxious weeds such as Dalmatian Toad Flax and Knapweed are easily established when the ground has been disturbed by these activities.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses.

EMC-0562-008
The Lands Council

**Comment:** Herbicide treatments fail because they are "treating" symptoms, not the causes, of weed invasion and undesirable vegetation. Passive restoration is a more potent management tool than the broad application of new toxic herbicides. This involves the cessation of all activities, including herbicide applications that cause or can exacerbate conditions conducive to the establishment and growth of invasive species. Instead, the BLM should close areas to grazing and exclude operators and

BLM_0001292

RESPONSE TO COMMENTS

users where a weed problem exists. This includes closing all roads that are weed vectors as well as requiring weed free feed on all BLM lands.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses.

EMC-0580-003
Okuzumi, Margaret

**Comment:** Please consider the causes of vegetation conversions and the spread of invasive species in the western landscapes, as well as the causes of catastrophic fire, unhealthy ecosystems and impaired wildlife habitat. Management objectives on public lands should emphasize environmentally-benign biological and mechanical control of invasive plant species, and no management activities should be permitted that may cause further introduction of non-native species.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. See also the Introduction in Chapter 1 of the PEIS for a discussion of the context under which this PEIS was developed.

EMC-0580-004
Okuzumi, Margaret

**Comment:** The spread of invasive plants is caused by removal of native vegetation and ground disturbance by off-road vehicles, logging and grazing. I ask BLM to stop the spread of invasive plant species by restricting or limiting these activities from intact native ecosystems, particularly in riparian areas. The PEIS must offer these types of preventative management measures as an alternative to herbicide spraying - a major shortfall of the plan.

**Response:** See Scope of Analysis in Chapter 1 of the PEIS. See also response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. Restricting or limiting public land uses authorized under the Federal Land Policy Management Act (FLPMA) is outside the scope of analysis for this PEIS.

EMC-0580-005
Okuzumi, Margaret

**Comment:** Examining the causes of the spread of invasive plant species instead of one simplistic treatment could result in a management plan that is far more sensible and beneficial in restoring the land to long-term health and productivity. These public lands need long-term management strategies that will restore native ecosystems, not simply attempts to eliminate invasive plant species.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. Long term management strategies are developed and implemented through local land use plans.

EMC-0584-002
Western Watersheds
Project

**Comment:** The Draft [P]EIS fails to adequately address the role of livestock, and BLM and other agency management of livestock, on the ecological health and fire regime of lands across the Project area. It fails to present scientific information and analysis necessary to understand the role of livestock in causing fuels problems – including the role of ongoing livestock grazing across the lands of the EIS area and adjoining National Forest, state and private lands.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

BLM_0001293

EMC-0584-003
Western Watersheds
Project

**Comment:** The [P]EIS and alternatives are based on BLM's false premise that it can impose fire and other treatments to bring about "historical" ranges of fire occurrence and achieve some artificially derived "desired" future conditions. This is not based on the hard, cold facts that cattle and sheep grazing and other human disturbances in the arid West have created an unnatural environmental setting – often with massive topsoil loss, lowered ecological site potential, desertification, and great vulnerability to weed invasion following disturbance. The risk of alien invasive species dominance of sites following BLM's proposed disturbance treatments interjects great risk into BLM's claims that it can restore lands by inflicting large-scale new disturbances.

**Response:** See the Purpose and Need for the Proposed Action in Chapter 1 of the PEIS. The PEIS and alternatives address the use of herbicides on public lands. The BLM is not proposing large scale new disturbances to restore lands.

EMC-0584-004
Western Watersheds
Project

**Comment:** In this setting, BLM's premise that chaining, fire and other disturbance will have beneficial outcomes, especially with no significant changes in land management (reduced grazing, roading, other continued sources of degradation) is unrealistic and not based on either common sense or scientific reality.

**Response:** Beneficial outcomes of non-chemical vegetation treatment methods are described in the PER. Vegetation treatment projects are designed within a milieu of ongoing management activities, which may include changes to land management at the local scale in conjunction with treatment activities. This PEIS/PER does not preclude local consideration of changes to management of public land uses consistent with local land use plans.

EMC-0584-005
Western Watersheds
Project

**Comment:** BLM must recognize the deficiencies of livestock grazing and other allocation components of Land Use Plans, and their role in contributing to hazardous fuels, weeds and other ecological problems. The livestock grazing and vegetation portions of many Land Use Plans are woefully outdated. New Land Use Plans ignore (example, Craters of the Moon, Black Rock) fail to address forage allocations in any way. There is no management requirement for conservative use levels, no specific new or updated allocation for livestock, no concrete habitat goals related to livestock use, and BLM continues to apply known harmful levels of vegetation use.

**Response:** See the Scope of Analysis in Chapter 1 of the PEIS. Land use planning or the content of approved land use plans is outside of the scope of this PEIS.

EMC-0584-007
Western Watersheds
Project

**Comment:** As management on the ground over the course of the [P]EIS/PER will be carried out under out-dated old plans, and new plans with often even fewer standards and that do not address forage/stocking allocations, we believe it is not possible for BLM to predict rosy short, mid or long-term outcomes to its proposed treatments.

**Response:** The comment has been noted. The analysis contained in the PEIS discloses the impacts of herbicide use based on best available information.

EMC-0584-009
Western Watersheds
Project

**Comment:** An [P]EIS grappling with weeds, and fire, fuels and vegetation treatment must address livestock grazing as a causal agent; analyze the impacts of livestock grazing in continuing to cause "unnatural" fire cycles and weed problems; honestly assess the impact of chronic livestock grazing on the ultimate outcome/effectiveness/success of any treatments; develop a range of alternatives that minimizes livestock and other disturbances as prevention and part of an Integrated Pest Management Strategy. Without including significant changes in livestock grazing

BLM_0001294

RESPONSE TO COMMENTS

practices including reduced stocking rates and/or removal of livestock from lands at risk to cheatgrass/weed invasion or dominance, or where restoration actions may be undertaken, and more protective levels and standards of use, BLM will be wasting taxpayer dollars on this Fire EIS[PEIS] effort.

BLM must fully address livestock as a causal agent in ecosystem disruption, and alteration of composition, structure and function of native ecosystems in the arid lands (see Fleischner 1994) covered by the EIS. The role of livestock in causing any fuels problem must be fully assessed, including all direct, indirect and cumulative impacts of past and ongoing livestock use on rangeland health problems associated with fire, hazardous fuels and weeds. A wide range of up-to-date livestock management alternative components must accompany all alternatives in this [P]EIS process. These should include analysis of a range of reductions in stocking rates and use levels, and their effects on ecosystem processes, fire, fuels, weeds, restoration, rehabilitation efforts.

BLM must fully analyze reductions in, or cessation of livestock use and grazing permit retirement as part of any treatment analysis that is conducted. Federal fire funds should be used to buyout and retire grazing permits on lands that are treated and where subsequent grazing will result in new weed problems, or still-intact lands determined to be at risk to weed invasion, or determined to be at risk of crossing thresholds from which recovery may not be possible. The inextricable linked fire/fuels problems and livestock grazing effects must be addressed.

Background information that must be presented and assessed includes: Current stocking rates (average actual use as well as active permitted use) in all allotments, and in all vegetation types and all lands where Field Offices slated treatment in information used to form the basis of this [P]EIS/PER; Utilization levels and other management standards applied on the affected lands vs. current range science texts; [and] Current ecological condition of soils, vegetation, habitats related to stocking rates, levels of use allowed, etc.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. Congress determines the scope and use of federal fire funds. At this time, federal fire funds are not authorized to be used in the livestock grazing program to buy out and retire grazing permits.

EMC-0584-015
Western Watersheds
Project

**Comment:** The [P]EIS's discussion of vegetation communities and treatments ignores honest assessment of alterations in ecosystem composition, function and structure that exist in the real world as a result of livestock grazing and other disturbances, past vegetation treatments followed by livestock grazing, etc.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0584-017
Western Watersheds
Project

**Comment:** The DEIS [Draft PEIS]/PER fails to provide information to tie proposed treatments to such land areas, and fails to assess the role (and ecological condition) of past treatments past and current livestock management (especially under out-dated paradigms and levels of use), and develop new goals, objectives and allocations that better address the pressing habitat needs of many important species and that address root causes of hazardous fuels problems, and thus provide better and more cost-effective protection from hazardous fuel and weed problems. What are the risks of treating wild lands, as BLM proposes, under the current alternatives, or under a new

BLM_0001295

range of reasonable alternatives?

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. Also see Relationships among Land Use, Land Use Planning, Land Health Standards, Ecosystem Functionality, and Vegetation Treatments in Chapter 1 of the PER for a discussion on the relationship of vegetation treatments to land use planning. Goals, objectives, and allocations are determined in land use planning and are beyond the scope of analysis of the PEIS.

EMC-0584-019
Western Watersheds
Project

**Comment:** In many areas of BLM lands across the West, sheep AUMs [Animal Unit Months] have been converted to cattle AUMs, with no necessary reduction in AUMs, and no examination of the impacts of sheep vs. cattle use, and the often decreased capability of steep, rocky or other terrain for cattle use (vs. sheep). This capability and suitability of lands for livestock grazing must be assessed as part of any treatment this process. Please see USFS [Forest Service] methods used in development of the Boise, Payette and other recent southern Idaho Forest Plans.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0584-022
Western Watersheds
Project

**Comment:** BLM must determine if stocking of grazing lands that are not capable or suitable is a major contributing factor to fuels and weeds problems.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0584-023
Western Watersheds
Project

**Comment:** All alternatives must include provisions for regulation of livestock disturbance based on current science and current capability and suitability determinations. This includes science-based standards of use, such as 25% or less allowable utilization of upland vegetation, no grazing during critical growing periods for native species, no grazing during nesting periods for migratory birds and sage grouse, measurement of livestock trampling damage to native vegetation and microbiotic crusts and means to minimize trampling damage, no movement of livestock from lands infested with exotics to more intact communities.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0584-024
Western Watersheds
Project

**Comment:** BLM does not take into account the scientific literature – including that published in the Journal of Range Management – demonstrating that utilization limits historically followed by BLM (typically, 40%, 50% or 60% utilization limits) contribute to degradation of native vegetation, and plant community changes that result in fuel and weed problems, and other ecological problems affecting a host of important habitats. These ecological problems include disturbance and loss of soils and microbiotic crusts that results in extensive weed problems. See Anderson 1991, Anderson and Holte 1981, Anderson and Inouye 2001, Belnap 1995, Belnap and Gillette 1997, Belnap et al. BLM Tech Bull. 2001, Belsky and Gelbard 2000, Beymer and Klopatek 1992, Braun 1998, Connelly et al. 2004, Donahue 1999, Fleischner 1994, Freilich et al. 2003, Galt et al. 1999, Galt et al. 2000, Gelbard and Belnap 2003, Hockett 2002, Holechek 1996b, Holechek et al. 1998, Holechek et al. 1999 a and b, Holechek et al. 2000, Holechek et al. 2001.

BLM_0001296

RESPONSE TO COMMENTS

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0584-026
Western Watersheds
Project

**Comment:** Road/ORV [off-road vehicle] trail closure and rehab/restoration treatment: Closures and restoration treatments quell the spread of flammable invasive species from disturbed road and trail edges. Roads are known to serve as conduits for weed invasion (Gelbard and Belnap 2003). Then, domestic livestock spread weeds from road or trail margins crosscountry into wild land areas. Road closure coupled with grazing reductions can have large-scale positive effects, as roads as weed conduits can be closed, and livestock reductions minimize spread of weeds already present within the area.

Allowing natural successional processes and healing processes to occur in plant communities that are still relatively intact is the most cost-effective method of attaining natural fire cycles, reducing buildup of hazardous fuels over time, etc. Natural mortality occurs in sagebrush, sagebrush-bitterbrush and other vegetation types. Allowing natural processes to play out, while removing or minimizing those agents that are disturbing natural ecological processes takes patience, but minimizes risks of exotic invasion that accompany aggressive intervention such as fire or mowing.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. The benefits of passive treatments are described under Prevention of Weeds and Early Detection and Rapid Response in Chapter 2 of the Final PEIS.

EMC-0584-060
Western Watersheds
Project

**Comment:** We often encounter areas on public lands – such as leafy spurge spraying in the Lost River Area or white top spraying near Battle Mountain or on the Owyhee Front – where all native veg. has been killed by herbicides, and leafy spurge continues to thrive. The role of continued livestock grazing post-treatment in continuing weed invasion must be addressed – and the [P]EIS does not do this.

**Response:** Livestock grazing is outside the scope of analysis of the PEIS. Post-treatment objectives include, but are not limited to, rest from grazing for up to two growing seasons following treatments or until management objectives are met as determined through monitoring. Many noxious weeds, especially leafy spurge, are extremely pernicious and difficult to control. Herbicide applications may at times include non-target vegetation within the project area in order to achieve effective results.

EMC-0584-085
Western Watersheds
Project

**Comment:** Recently discovered mercury contamination of Idaho waters and lands from gold roasting in Nevada must be considered in this analysis, also as these substances will pollute waters on top of the chemical, sediment or other substances from treated lands.

**Response:** Air and water quality impacts from hard rock mining activities are outside the scope of the analysis of the PEIS.

EMC-0585-002
Western Watersheds
Project

**Comment:** It is impossible to determine exactly what the [P]EIS covers. In [P]EIS at [page] 1-4 Scope of Analysis BLM states: "the [P]EIS does not evaluate vegetation treatment activities involving herbicides not directly related to the need to reduce hazardous fuels, or to modify the vegetation community to improve rangeland health...". But BLM also states that the [P]EIS does not address treatments designed to

increase forage production or the effects of livestock grazing on vegetation. Yet, elsewhere it sounds like it does. It is extremely difficult to get a straight answer, either from reading the [P]EIS, or in WWP's [Western Watersheds Project's] inquiries and attendance at public meetings, to get a straight answer on what herbicide use and treatments are, or are not, covered by this [P]EIS. No criteria are established to allow treatments for various purposes to be differentiated.

**Response:** As noted in the comment and in Chapter 1, the PEIS evaluates treatments related to the need to reduce hazardous fuels and improve rangeland and forestland health. Although herbicide treatments would improve forage for livestock, this was not the focus of the PEIS, and rangeland improvement to benefit livestock has been evaluated in earlier EISs. Rangeland and forestland improvements to benefit fish and wildlife, cultural resources, wilderness values, and visual resources were not the focus of earlier livestock EISs, and thus have been covered in more detail in the PEIS and PER.

EMC-0585-018
Western Watersheds
Project

**Comment:** BLM ignores assessing the role of chronic livestock grazing disturbance; its own extensive past vegetation treatments (often undertaken for livestock); livestock facilities and often associated roading; and previous treatments that have been claimed to be undertaken to reduce "invading" species, "reintroducing fire" or other disturbance, and wildlife and habitat improvement and the hazardous fuels funding has been used -- in fostering spread of hazardous fuels such as cheatgrass.

**Response:** See responses to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis and Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0585-096
Western Watersheds
Project

**Comment:** Mining, oil and gas, and other activities conducted on public lands de-stabilize soils and alter vegetation in wild lands. These activities involve the use of harmful substances that may pollute lands and waters, as well as disturb underlying rocks or aquifers and may bring harmful substances to the surface or bring these substances into contact with ground or surface waters. These impacts on top of herbicide or treatment disturbance have not been assessed.

**Response:** See Scope of Analysis in Chapter 1 of the PEIS. These activities are outside the scope of analysis of this PEIS.

EMC0585-244
Western Watersheds
Project

**Comment:** BLM claims that "if livestock grazing is managed to maintain the vigor of native perennial plants especially grasses, the chance of weeds invading rangeland is much less". Yet, BLM never provides data (such as that from current FRH [Federal Rangeland Health] assessments), analysis, acreage figures or maps, showing where such management is occurring. Nor does it provide any information on the lands where native grasses have been depleted, and are rarely present, or present at only reduced levels. Plus, in this claim, BLM undercuts the role of forbs, shrubs, trees and other native vegetation, and intact function, structure and composition of vegetation communities in limiting or slowing invasions (see Fleischner 1994, describing livestock alteration of composition, function and structure of native ecosystems in the arid West). (2-15).

**Response:** Please refer to the Decision to be Made and Scope of Analysis section of Chapter 1 of the PEIS. Evaluation of livestock grazing management is outside the scope of the PEIS. The BLM agrees that healthy rangelands and landscapes, exhibiting characteristics of intact function, structure and composition of plant communities,

BLM_0001298

RESPONSE TO COMMENTS

inclusive of forbs, shrubs, trees, and other native vegetation, can help to slow down or prevent invasions. Vegetation treatments proposed by the BLM are designed to accomplish these goals along with site-specific objectives.

EMC-0619-006
Bellovary, Christopher

**Comment:** BLM has failed to consider the causes of vegetation conversions and the spread of invasive species in the western landscapes, as well as the causes of catastrophic fire, unhealthy ecosystems and impaired wildlife habitat. Management objectives on public lands should emphasize environmentally benign biological and mechanical control of invasive plant species, and no management activities should be permitted that may cause further introduction of non-native species. The spread of invasive plants is caused by removal of native vegetation and ground disturbance by off-road vehicles, logging and grazing. BLM can stop the spread of invasive plant species by restricting or limiting these activities from intact native ecosystems, particularly in riparian areas. The PEIS offers none of these preventative management measures as an alternative to herbicide spraying. This is a major shortfall of the plan, and need to be evaluated as an alternative, or else this PEIS will be woefully incomplete and insufficient to pass judicial review.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses. Prevention is discussed in Chapter 2 of the PEIS and PER under Prevention and Early Detection of Weeds.

EMC-0619-007
Bellovary, Christopher

**Comment:** Looking at the causes of the spread of invasive plant species instead of simply one type of treatment could result in a management plan that would be far more sensible and beneficial in restoring the land to long-term health and productivity. These public lands need long-term management strategies that will restore native ecosystems, not simply attempts to eliminate invasive plant species. The Programmatic Environmental Report (PER) that was issued along with the PEIS does nothing to remedy these shortcomings; it simply addresses treatments other than herbicide spraying that may be used to control invasive plants.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses. Long-term management strategies are outlined in the goals and objectives of local land use plans. The PER discloses the effects of non-chemical treatment methods on public land resources. The PEIS and PER do not represent a management plan.

EMC-0623-005
Defenders of Wildlife

**Comment:** Curtail Deliberate Introductions. For any noxious weed strategy to be effective BLM must consider the root causes that have led to the widespread invasion of invasive exotics. Therefore, the [P]EIS should investigate the role of BLM's own and other agency activities with respect to introduction of invasive species. Deliberate introduction has been a root cause of the spread of many noxious weeds (Tamarix, Melaleuca, etc). Executive Order 13112 directs all federal agencies to cease activities that lead to the proliferation of invasive species. BLM should consider as a management alternative the adoption of a precautionary stance toward introductions of plants, seeking native alternatives wherever feasible. The [P]EIS should also consider avenues of coordination with other agencies engaged in revegetation work to eliminate the use of exotic species.

BLM_0001299

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses. Executive Order [E.O.] 13112 does not direct agencies to cease activities that lead to the proliferation of invasive species. Rather, E.O. 13112 directs federal agencies to not authorize, fund, or carry out actions that it believes are likely to cause or promote the introduction or spread of invasive species in the United States. The BLM does not propose to deliberately introduce any noxious weeds or invasive species on public lands. Coordination with other agencies is described in Chapter 1 of the PEIS under Interrelationships and Coordination with Agencies.

EMC-0623-006
Defenders of Wildlife

**Comment:** Evaluate Impact of Land Use Practices. The [P]EIS should also consider the role of land management practices in facilitating the spread of invasive plants. In particular, the [P]EIS should study of role of livestock grazing and motorized vehicle use in contributing to the spread of noxious weeds and the resulting loss of ecosystem health. Livestock grazing and motorized vehicles both carry the seeds of exotic species throughout BLM lands and facilitate establishment of these species by disturbing soil and the native vegetation community. The [P]EIS should recognize the detrimental effects of motor vehicle use and livestock grazing. Restriction of grazing, motor vehicles and other activities may well be a critical element in both the rehabilitation of lands affected by invasives and the protection of lands not already impacted. Restriction of grazing and vehicle use on such lands should be considered in management alternatives.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses.

EMC-0623-012
Defenders of Wildlife

**Comment:** Focus foremost on preventing new weed infestations, by immediately ceasing deliberate introduction of exotic species; evaluating current land use and management practices and discontinuing practices that have a high potential to inadvertently spread noxious weeds and implementing mitigation strategies to minimize introductions associated with moderate risk practices; and implementing a monitoring and rapid response program to quickly detect and eliminate new invasions.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses.

EMC-0627-002
EMC-0633-004
Rude, Monica (Desert Woman Botanicals)
Wanek, Catherine

**Comment:** Second of all, let's look at why the invasive plants are spreading in the first place, often because the soil has been disturbed by logging and off-road vehicles, the native plants eaten by cattle, all of which create an opportunity for more aggressive plants to take over. Why don't you consider restricting these activities, a sort of preventative management, which would also help restore native ecosystems, instead of further degrading them with chemicals? Desert lands are very fragile, easily damaged and take a long long time to recover from casual damage, if they ever do recover. Every time we do something to the land, it has an impact, often one we cannot predict.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed

BLM_0001300

spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses.

EMC-0628-004
Needs, Kelly

**Comment:** It is unreasonable and unethical to propose a vegetation treatment that does not take into account economic factors that adversely effect the land in question. Commercial logging, livestock, and energy production are direct causes of habitat destruction and weed vectors and ignoring these facts does not make them go away. The government refusal to confront these issues makes every American pay twice for the insult. First to have our valuable land used at the cost of the taxpayer and then to pay for our out of control problems such as habitat loss and massive weed populations not only with money but incalculable risks to our health.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses.

EMC-0633-003
Wanek, Catherine

**Comment:** Also, invasive plants are spreading in the first place because the soil has been disturbed by off-road vehicles and the native plants have been consumed by cattle -- which allows more aggressive plants to take over.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses.

EMC-0640-023
Animal Welfare
Institute

**Comment:** Furthermore, to make matters worse, the BLM explicitly excluded from its analysis any discussion of livestock grazing, off-road vehicle use, logging activities, oil and gas development, or other human uses of BLM managed lands that contribute to the introduction and spread of invasive exotic species on public lands in the west. It simply makes no sense to engage in a concerted effort to control, eliminate, or manage invasive exotic species using techniques, including the use of poisonous chemicals, that will adversely impact, temporarily or long-term, soils, air and water quality, non-target vegetation, fish, invertebrates, amphibians/reptiles, birds, and mammals without taking proactive steps to reduce some of the primary pathways or mechanisms that caused the invasive exotic species to take hold in the first place.

Again, if the BLM had properly defined the scope of its analysis it should have provided a more complete strategy to address the threat of the spread of invasive exotic species on western public lands by encompassing both the causes of the problem and a full array of potential solutions. Such solutions could include, but would not be limited to, vegetation management (as discussed in the PEIS and PER), closure of grazing allotments, restriction in ORV [off-road-vehicle] recreational access to BLM lands, closure and reclamation/restoration of illegal and unnecessary roads, restrictions on oil and gas development, and other limitations or restrictions on human use intended to minimize the chance of the introduction or spread of invasive exotic species. The Restore Native Ecosystems alternative proposed by American Lands Alliance provides such a comprehensive strategy to address such threats and should be adopted by the BLM as a framework for the preparation of a new programmatic document to address its management issues of concern.

To address such deficiencies and, in particular, to both properly define the scope of the PEIS and to clarify the decision to be made, the BLM should broaden the parameters

BLM_0001301

of its analysis to include both causes and potential treatments for the management issues of concern (i.e. hazardous fuel reduction, improving ecosystem health, controlling weeds and invasive species, restoring fire damaged lands, and manipulating vegetation to improve wildlife habitat), comprehensively address the environmental impacts of all such activities in relationship to the issues of concern, and reissue the PEIS, PER and associated documents for public review. Such a holistic approach to this issue will not only result in a more informed and ecologically responsible decision, but it will also be consistent with both the plain language and intent of NEPA.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses. See also response to Comment RMC-0222-013 regarding analysis of the Restore Native Ecosystems alternative. The Scope of Analysis for the Proposed Action is properly defined and outlined in Chapter 1 of the PEIS.

EMC-0641-003
Idaho Conservation
League

**Comment:** While treatment is an important aspect of this project, the BLM should prioritize efforts to prevent the initial introduction, disturbance of soils, and vectors for the spread of weeds into the area. In particular, we believe that more should be done to address major causes of the spread of noxious weeds such as high road densities, overgrazing, soil disturbance from vegetation management, and irresponsible ORV [off-road vehicle] use.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread; response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses; and response to Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding prevention.

EMC-0641-008
Idaho Conservation
League

**Comment:** The BLM needs to require the development of updated Travel Management Plans that incorporate aggressive strategies for the control of noxious weed infestations. Travel Plans should include a requirement for the establishment of a system that designates specific roads, trails, areas, and time frames for motor vehicle use. Though the adoption of such a designation system may not be appropriate or feasible on a regional scale, on a local scale, it is a crucial part of a proactive, comprehensive noxious weed management program. We hope that the BLM will incorporate significantly stronger standards for travel plan compliance as part of both this ROD and the Travel Plan ROD.

**Response:** Off-road vehicle use and travel management are outside the scope of analysis of this PEIS, as discussed in Chapter 1 under Scope of Analysis. Travel management plans are developed in conjunction with land use planning at the local level.

EMC-0641-009
Idaho Conservation
League

**Comment:** Additionally, the PEIS should consider road decommissioning as an effective way of reducing noxious weed invasions and recovering native ecosystems. The PEIS should include a road density analysis, which identifies unclassified, high-risk, and low-use roads that could feasibly be decommissioned and obliterated.

BLM_0001302

RESPONSE TO COMMENTS

**Response:** See response to Comment EMC-0641-008 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0641-010
Idaho Conservation
League

**Comment:** ORVs [off-road vehicles] act as major vectors for the spread of noxious weeds both by carrying seeds of invasive species throughout BLM lands and by promoting the establishment of these species by disturbing soil. The BLM should coordinate with the Idaho State Department of the Interior, the Idaho Department of Parks and Recreation, and local Cooperative Weed Management Agencies regarding options for the prevention and control of illegal and irresponsible ORV use. The [P]EIS needs to include an analysis of the contribution of cross-country ORV use to the spread of noxious weeds. Managers should recognize which species of noxious weeds are spread by ORVs and which species take advantage of ORV-disturbed trails.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses. See Scope of Analysis in Chapter 1 of the PEIS; ORV use is outside the scope of analysis of this PEIS.

EMC-0641-012
Idaho Conservation
League

**Comment:** Livestock are significant vectors of noxious weed. Livestock can transport weed seeds in their hooves and hides as well as in their digestive tract. In addition, overgrazed areas are significantly more susceptible to noxious weed invasion. The EIS fails to recognize the relationship between livestock grazing and the spread of noxious weeds, and the alternatives provided include no measures to control and prevent infestations related to grazing activities. The issue of grazing is particularly significant to this PEIS as the majority of proposed treatments would occur in Nevada, Idaho, Oregon, and Wyoming, four grazing intensive states.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding livestock grazing.

EMC-0641-013
Idaho Conservation
League

**Comment:** The BLM needs to assess the role that overgrazing has played in noxious weed expansion and assess different management strategies to reduce this threat. Specifically, the BLM should analyze how changing the frequency and intensity of grazing will affect noxious weed spread and native species restoration. We recommend that the BLM follow the lead of the Forest Service's Pacific Northwest Region which adopted a standard that uses "available administrative mechanisms to incorporate invasive plant prevention practices into rangeland management." The mechanisms to be utilized include the revision of permits and allotment management plans and annual operating instructions.

**Response:** See response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding livestock grazing. The BLM livestock grazing program has similar prevention practices in its grazing program administration.

EMC-0643-010
California Indian
Basketweavers
Association

**Comment:** However, we assert as we did in 2002 that it is not legally or scientifically valid to ignore the "cause and effect" bases for weed establishment while conducting analysis of the environmental impacts of alternative treatments including herbicides to kill weeds. It is not possible to accurately evaluate a range of alternatives without analysis and understanding of the sources and causes of weed establishment.

BLM_0001303

Case No. 1:20-cv-02484-MSK   Document 25-12   filed 04/27/21   USDC Colorado   pg 80 of 81

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. The Alternatives analyzed in the PEIS are appropriate for the Purpose and Need for the Proposed Action found in Chapter 1 of the PEIS.

EMC-0646-209
Californians for
Alternatives to Toxics

**Comment:** CATs [Californians for Alternatives to Toxics] is concerned that the BLM has failed to discuss, analyze, or evaluate weed vectors as part of the PEIS. The BLM should determine the major sources of weed spread (waterways, vehicles, area visitors, livestock grazing, wind and/or wildlife) and include a plan to prevent the cause of weed spread, not just treat the symptoms. Including preventative measures as part of any treatment strategy is critical for long-term control of invasive species and noxious weeds. The BLM's PEIS is doomed to be unsuccessful without first focusing on the cause of the weed infestations and utilizing a holistic native species ecosystem health approach to combating exotic species. For that reason CATs supports the Restore Native Ecosystems Alternative (which we didn't see evaluated as one of the alternatives, even though we know a coalition of groups presented it to the BLM during the scoping phase of the PEIS). We will attach a copy as Appendix B as part of our comments.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. The BLM *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996) outlines the prevention strategies being implemented by the agency. See responses to Comments RMC-0126-004 and RMC-0222-013 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystems alternative.

RMC-0222-096
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The DEIS [Draft PEIS]/PER also does not address the potential of removing roads to restore weed free habitats. Ripping roadbeds, restoring stream crossings, and recontouring roads were all found to reduce weed invasion. Bradley (1997) found that ripping the roadbed discouraged weed invasion in western Montana. In northern California, Madej et al. (2001) reported that following full recontour and stream crossing restoration some weeds emerged on hot dry terrain; however, very few weeds appeared in the more common moister terrain. Following hundreds of miles of full road recontour, few weeds were reported in north central Idaho (USDA FS [Forest Service] 2003).

**Response:** The PEIS addresses the effects of herbicide use on human health and public lands resources. Road removal and road re-contouring are management actions unrelated to the purpose and need of the PEIS, and are beyond the scope of analysis. Road closure, removal and re-contouring decisions are made at the local field office level based on the goals and objectives contained in local land use plans.

EMC-0455-002
Tashjian, Randy

**Comment:** Rather than address the causes of spreading invasives by eliminating these activities, the BLM proposes to address the symptoms by increasing the use of herbicides that poison the air, land, water, wildlife and humans and require the use of mechanized equipment for application. This is not the best way to handle this situation, in my opinion.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

BLM_0001304

Document header

RESPONSE TO COMMENTS

EMC-0455-003
Tashjian, Randy

**Comment:** Invasive species cannot be eliminated without eliminating the causes of weed invasion.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0455-004
Tashjian, Randy

**Comment:** Herbicides are not only poisonous and expensive, but they fail because they are "treating" symptoms, not the causes, of weed invasion and undesirable vegetation.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0525-106
Western Watersheds
Project

**Comment:** BLM can not ignore evidence that its limited old data does show - i.e., only a small fraction of larger size grasses present are present in most sites that should be dominated by these species. Thus, desertification has occurred, and "production" is greatly less than that of good or better condition sites, and this is typical of nearly all sites. BLM must also tie water developments, water hauling or other livestock management practices to site depletion and alteration of species structure, composition and weeds, hazardous fuels and fire problems.

**Response:** Please refer to Chapter 1 of the PEIS, Scope of Analysis. Evaluation of livestock grazing and facilities is outside the scope of the PEIS.

EMC-0525-111
Western Watersheds
Project

**Comment:** BLM must conduct a comprehensive analysis of pre-existing projects and disturbance across the landscape, and include analyses of treatments and disturbance factors across land ownership boundaries. BLM must also assess significant ecological problems that may have arisen in the wake of past manipulation, hazardous fuels or other treatments.

**Response:** An analysis of this magnitude is outside the scope of the 17-state PEIS, and is not essential to a reasoned choice among alternatives to determine which herbicides considered in this PEIS are appropriate for use on public lands. An analysis similar to the one described in the comment was undertaken in the mid-1990s by the Interior Columbia Basin Ecosystem Management Project, over portions of a four-state area. The science assessment team conducted this analysis, which was used by the EIS team to develop a Draft EIS and a subsequent Supplementary Draft EIS. However, no Record of Decision for the Final EIS was implemented by the Forest Service or BLM for this project. One reason is that such an assessment, even over a four-state area, is not scientifically defensible because no validated model(s) exist to support the simulations or analysis. Models and their attendant analyses must be replicable, verifiable, and valid, both empirically and statistically, for an agency to rely upon them in its decision-making. As no such models currently exist, it is not possible for the BLM as an agency to compile and analyze such data in this manner. The cost of developing and validating appropriate models to address ecological questions at the sub-continental scale would be exorbitant, and would not contribute significantly to the decisions to be made through this PEIS.

EMC-0585-105
Western Watersheds
Project

**Comment:** [Page] ES-5 [of the Draft PEIS] claims treatments "over the long term" would make landscapes "more appealing" as native vegetation was restored. Yet, there is no evidence provided that native vegetation would be restored, as BLM fails to

BLM_0001305