address root causes of weed problems/treatment needs. This claim is typical of analysis throughout the [P]EIS. As the [P]EIS does not address causes of weeds, it can not assume that post-treatment restoration of native vegetation will occur – especially over the long term, as the same land management practices (grazing, roading, oil and gas, etc.) that have resulted in the proliferation of cheatgrass and other weeds will harm or preclude the recovery of native vegetation.

**Response:** See response to Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0585-108
Western Watersheds
Project

**Comment:** SE [Executive Summary]-6 [of the Draft PEIS]. "although the number of domestic livestock and wild horses and burros that public lands can support has declined from historic levels, treatments should improve rangelands for these animals, and ensure that the public lands can support viable populations of wild horses and burros and a healthy ranching industry". BLM fails to mention that – despite the number that public land can support having declined, stocking rates of domestic livestock on the very same lands often have. Lands overstocked with domestic cattle and sheep is a fundamental cause of weed problems and degradation that this [P]EIS avoids addressing. Plus, even in areas where AUMs [Animal Unit Months] have remained the same, the average weight of cattle and sheep has increased due to breeding, hormone implants, etc. This means that the amount of forage consumed, and disturbance caused, has increased.

**Response:** Stocking rates of domestic livestock have decreased on public lands, and there has been a gradual decrease in the amount of grazing use since the Taylor Grazing Act was passed in the mid-1930s. This decrease is reflected in both the number of AUMs permitted and available for use and the number of AUMs actually used, and the trend continues today. Domestic livestock can create or contribute to invasive species problems. These issues must be dealt with at the local level. The rangeland health assessment is one key point in time to address the contribution of livestock grazing in promoting invasive species. The scope of the PEIS is intended to deal with specific vegetation treatments, and grazing management in general is outside the scope of this particular action.

EMC-0585-110
Western Watersheds
Project

**Comment:** The [P]EIS wrongly attributes nearly all of this change in vegetation and increase in hazardous fuels to fire exclusion policies. BLM ignores Best Available Science by failing to address and assess impacts of livestock grazing, roading, its own past vegetation manipulation projects, and other human-induced disturbance on vegetation change and accompanying changes in severity and intensity of wildfire.

**Response:** Fire exclusion policies have played a significant role in hazardous fuels build up over the past century. Other factors affecting vegetation and leading to the build up of hazardous fuels include numerous anthropogenic and natural influences. See Chapter 3, Affected Environment, and Chapter 4, Environmental Consequences, and the Cumulative Effects Analysis in the PEIS for a description of the context of current vegetation conditions.

EMC-0585-173
Western Watersheds
Project

**Comment:** [Page] B-29 [of Appendix B of the Draft PEIS] further discusses use of expanded list of herbicides on "public Domain Forestland", and energy and mineral sites. Yet, the [P]EIS claims it does not address use of herbicides on these sites. Spraying imazapic and sulfometuron methyl including aerially – on forests may have serious harmful consequences.

BLM_0001306

RESPONSE TO COMMENTS

**Response:** The section is referred to as an Overview of the BLM Vegetation Treatment Program in the Human Health Risk Assessment, found in Appendix B. This appendix discusses how herbicides are used and the methods applied, inclusively, for all the various BLM resource programs that involve potential vegetation treatments using herbicides and contact with humans.

EMC-0585-254
Western Watersheds
Project

**Comment:** The [P]EIS/PER, in ignoring the impacts of these projects on Forest products and values, violates the provisions of the Land Use Plans in many of the affected wild land areas.

**Response:** Vegetation treatments are required to be in conformance with local land use plans prior to being approved for implementation. Effects of vegetation treatments on forest products as a commodity are assessed in the NEPA analysis of the guiding land use plan. The PEIS assesses the effects of herbicide use on vegetation, not the products of vegetation. See Scope of Analysis in Chapter 1 of the PEIS.

EMC-0597(a)-002
Beeland, DeLene

**Comment:** Let's get to the heart of the three main issues as to why we have invasive grasses: leased grazing allotments used by private ranchers for cows, sheep and goat production; off-road vehicle "wreak-reation"; and oil and gas drilling, pumping, piping and associated roads. If the following root issues were addressed in more detail, invasive grasses would decline and there would be no need for aerial spraying of herbicides.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0643-017
California Indian
Basketweavers
Association

**Comment:** Further, it has been well documented in the historical and scientific literature that the BLM has a long history of programs and policies to *clear* native sagebrush, shinnery oak, juniper and pinyon pine from this region to make more rangeland, to provide fuelwood and charcoal, and to produce timber for mining. Some of these programs are on-going today. Treatment alternatives that amount to treating the symptoms only, rather than the causes of unwanted vegetation changes, are a waste of taxpayers' money during a time of tight budgets. This course may also result in causing further harm when evaluated correctly in the context of cumulative impacts. Accurate analysis is essential in order to develop appropriate alternatives and to evaluate the impacts of the use of herbicides at this scope, and requires "cause and effect" analysis of the root causes and sources of non-native species invasions and altered fire regimes. Such analyses will provide the BLM with the information needed to plan cost-effective and ecologically sustainable alternatives to restore public lands. It is not accurate for the BLM to portray the issues so narrowly that appropriate alternatives cannot even be developed.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. Alternatives developed for the PEIS address the Purpose and Need identified in Chapter 1 of the PEIS.

EMC-0646-094
Californians for
Alternatives to Toxics

**Comment:** Since many of the issues are similar or even identical to the current proposed program, we would respectfully ask that the public records for both of the Cottonwood Fire Vegetation Management Projects EAs, and the public record for the current Cottonwood Fire Vegetation Management Project FEIS, be incorporated by reference into the public record for this program, the BLM Vegetation Treatments

BLM_0001307

Using Herbicides PEIS.

**Response:** The public record for the site-specific projects referenced is outside the scope of this PEIS.

EMC-0646-219
Californians for
Alternatives to Toxics

**Comment:** Logging, whether part of fuel reduction thinning efforts, or timber harvesting, changes canopy levels, causes disturbances to soil and vegetation, and opens lands to possible invasive species infestations. For example, the scotch and french brooms both grow best in dry, disturbed soils with plenty of sunlight, such as those created with new partial cutting timber harvest techniques (Raj 2002). The literature also says that brooms rapidly invade following logging and land clearing and conversely don't do well in heavily forested, heavy shade areas (CDFA Encycloweedia website, Huckins and Soll 2004, Hoshovsky 1986). Logging equipment, vehicles, and workers also facilitate the movement of exotic weed seeds. The BLM should analyze the impacts of logging and fuel reduction activities will have on the spread of invasive species and noxious weeds both on and near BLM lands.

**Response:** Hazardous fuels reduction treatments will be designed to reduce the potential for crown fire in the wildland urban interface and in forest types where the native fire regimes have been significantly altered. In many cases, these treatments will create stand densities that are characteristic of the native forest structures that existed prior to the exclusion of fire. The overriding goal is to treat vegetation on lands only where necessary, and to prioritize treatment methods based on their effectiveness and likelihood of having minimal impact on the environment. To assist with vegetation management planning, key resource elements, such as plant community types, aquatic habitats, sensitive areas, and invasive species concentration areas, are inventoried and mapped regionally and district-wide. Inventories and maps allow field managers to identify areas of high ecological integrity; to ensure that there is suitable habitat for wide-ranging species; to identify areas where land uses may be incompatible with long-term ecosystem health; and to identify areas that could benefit from improved management. Inventories and mapping are also done at the local level to help managers better understand how proposed projects fit in with' vegetative conditions on a larger scale, such as within ecoregions or watersheds. The BLM also cooperates with other agencies, organizations, and landowners in regional planning efforts, including establishment of Cooperative Weed Management Areas, as discussed in Chapter 2 of the PEIS under Vegetation Treatment Planning and Management. In addition, the BLM will use Standard Operating Procedures to control invasive species and noxious weeds following ground-disturbing vegetation treatments.

EMC-0646-246
Californians for
Alternatives to Toxics

**Comment:** Without a description of which species are most problematic, what their response is to various treatment options, what their current and anticipated scope of invasion is or what are the various regional influences, the DEIS [Draft PEIS] fails to provide the evaluation necessary for informing the public and making an informed decision. For all the DEIS [Draft PEIS] tells us regarding the influences of the environment on the vegetation management program, we could guess that the problem is occurring on Mars, or in the sands of Saudi Arabia, or perhaps in Florida or Nova Scotia. NEPA requires more than this of a programmatic EIS. Without adequate description of the problem and the range of responses that may be taken, and with constant assurance that all that's necessary will be described at the more site-specific level in an EA or EIS, it is not possible to gain an adequate vision of what is in store under the various alternatives with the current DEIS [Draft PEIS]. That is not consistent with the demands of NEPA. The analysis cannot be delayed to the future

BLM_0001308

RESPONSE TO COMMENTS

because those future NEPA documents must tier to this one, and without a solid basis in the programmatic EIS, those documents will fail. To put it plainly, such piece mealing is patently illegal under NEPA. The decision maker and the public would have to scramble in the future to read every project proposal and NEPA document that flows from the current EIS to piece together a picture of the extent of the program, the priority given to particular species, the treatment options most likely to be employed, and what effects regional differences may make in the approach to controlling invasive plants. This is one of the primary failures of the DEIS [Draft PEIS] as it is currently written.

**Response:** The PEIS assesses the effects of herbicide use on human health and public land resources, including sensitive species. The PEIS does not assess invasive species and their response to specific treatments. The public lands covered by this PEIS are described on Map 1-1 in Chapter 1 of the PEIS. The NEPA Requirements of the Program in Chapter 1 of the PEIS include a description of how future analyses will be conducted at the site-specific level at the time a project is proposed and ready for analysis. Analysis of unspecified site-specific treatments is not possible at this programmatic level. Future EAs and EISs for site-specific projects may tier onto this PEIS. Tiering does not constitute piece-mealing under NEPA.

EMC-0646-247
Californians for
Alternatives to Toxics

**Comment:** As it currently stands the BLM's PEIS is doomed to be unsuccessful without first focusing on the cause of the weed infestations and utilizing a holistic native species ecosystem health approach to combating exotic species. For that reason CATs [Californians for Alternatives to Toxics] supports the Restore Native Ecosystems Alternative (which should be added to the Final PEIS for consideration). Of the alternatives included in the Draft PEIS, we can only support Alternative C, the no pesticides alternative. Yet no alternative can be adopted until a fully informative NEPA document is prepared. As described above, this Draft PEIS does not achieve the informational standard required by NEPA. We urge you to correct these deficiencies in the Final PEIS.

**Response:** See response to Comment RMC-0126-002 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding the causes and vectors of weed spread.   See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystem alternative. The PEIS meets the informational standards required under the Council on Environmental Quality regulations implementing NEPA for informed decision-making relative to the Proposed Action and Purpose and Need identified in Chapter 1 of the PEIS.

EMC-0648-005
Idaho Cattle
Association

**Comment:** As the BLM takes a more aggressive approach in controlling weeds, as is greatly needed, we must however stress the importance that other existing BLM range programs are not depleted. With decreasing budgets, we are concerned that the BLM will not be able to effectually implement this [P]EIS and the associated monitoring that would be required.

**Response:** See response to Comment EMC-0584-076 under PEIS Alternatives, Monitoring. Implementation of the decision to approve or not approve specific herbicides analyzed in this PEIS for use on public lands is not dependent upon funding of resource programs and associated projects.

BLM_0001309

FXC-0027-003
Firmage, Robert and
Gertrud

**Comment:** We would suggest that greater attention might be given to the contribution of overgrazing to such unwanted propagation as well as the introduction of seeds into wilderness areas through unrestricted ORV [off-road vehicle]- and ATV [all-terrain vehicle] use.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

FXC-0028-002
Little, Amanda Jane

**Comment:** Of course, the problem is complex due to many factors. But it is those factors (overgrazing, unrestricted motor vehicle use and pollution) that need to be considered more seriously on the side of the environment.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

FXC-0032-004
Germino, Matthew J.
(Idaho State
University)

**Comment:** Herbicide and other eradication efforts fail because they only treat the symptoms and not the causes of exotic plant invasions. Also, there is far too much uncertainty in the environmental risk of using herbicides as well as biological control agents to justify their use. Moreover, there is uncertainty in just how much certain weeds are really a problem and really need to be eradicated.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. Environmental risk uncertainty is addressed in the human health and ecological risk assessments found in Appendixes B and C of the PEIS.

FXC-0059-005
Evans, Gail

**Comment:** In order to combat the spread of invasive plant species, the causes of invasive plant introduction and dispersal must be revisited, namely: livestock grazing, logging, roads, off-road vehicles, and such ground-disturbing activities as gravel pits and mining. These activities must be severely limited on public land.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses.

FXC-0070-002
Latir Neighborhood
Association

**Comment:** The weeds have flourished through soil disturbance and seed mobility brought about by poorly managed land use (livestock grazing, off road vehicles, etc). Without prevention (curtailing these activities), no amount of perpetual poison application will solve the problem. Living organisms have an astonishing ability to adapt. The only real effect of herbicides, long term, is to select for herbicide resistant weeds. In the big picture, application of chemicals will never eradicate the weeds, but rather make them heartier.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses. Total eradication of weeds is an unrealistic goal and is not part of the BLM proposed action in this PEIS. Chemical treatment methods have been shown to be effective on vegetation.

BLM_0001310

RESPONSE TO COMMENTS

FXC-0071-021
Campbell, Bruce

**Comment:** While page 1-4 of the Draft Programmatic EIS mentions that certain activities will not be evaluated in the documents – for example, as it says on page 1-4 of the Draft Progr. EIS: "Thus, this PEIS does not evaluate vegetation management that is primarily focused on commercial timber or other forest product enhancement or use activities that are not related to improving forest or rangeland health or work authorized under the Healthy Forest Restoration Act of 2003." Page 6 of 8 of BLM's Frequently Asked Questions says that "The PEIS/PER will not address vegetation management that is primarily focused on commercial timber or other forest product enhancement and use, livestock forage enhancement and use". But, the Healthy Forests Act, despite its nice-sounding name, is a bill focusing on helping timber companies log valuable trees (even in locations usually off-limits) under the guise of fire safety (even though removing large trees including under the "goods for service" ploy) actually exacerbates fire risk, especially the risk of catastrophic fire. Thus, I call for analysis in a Supplemental Draft Programmatic EIS and ER about the purpose and need for herbicide spraying in 17 Western states. And while it is claimed that the issues mentioned earlier in this paragraph will not be addressed or evaluated, clearly the main reason for herbicide spraying on forestland is to replace natural diversity of trees with monoculture conifer plantations, and the main reason to change plant species on rangeland is to help the grazing industry. I discovered sections on Rangeland and on Public Domain Forests on page B-29 [of Appendix B] of the Draft PEIS – so it was mentioned for various uses but certainly not thoroughly analyzed. Will there be thorough analysis of such in a Supplemental Draft PEIS or PER or in the Final PEIS or PER?

**Response:** The purpose and need for herbicide use in 17 western states is analyzed in the PEIS and PER. The Draft PEIS assesses the effects of herbicide use in vegetation treatments to reduce hazardous fuels, control weeds and invasive species, benefit fish and wildlife habitat, improve riparian and wetland areas, and improve water quality in priority watersheds. A Supplemental EIS to analyze the purpose and need again is not required. Appendix B, Human Health Risk Assessment, applies to all activities within the BLM that may utilize herbicides. The discussion in Appendix B, Overview of the BLM Vegetation Treatment Program, provides supplemental information on all BLM programs that use herbicides relative to human health risk.

PHC-005-003
K. Fite

**Comment:** What I see here is BLM is proposing, in the report, massive, massive new disturbance – expanding disturbance from mechanical methods, fire, and other methods on public lands. While at the same time, not undertaking actions that are needed to address the causes of weeds and the causes of any heightened risk.

**Response:** See response to Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0055-004
Lamberts, Frances

**Comment:** I therefore urge the Bureau to pay greater attention to causative, land-disturbing activities—range overgrazing, excessive off-roads motoring, forest clearance, mining, roads proliferation and the like—in preference to treatment through mechanical eradication and herbicides. The latter types of treatments cannot truly be effective, it would seem, unless the causes of noxious weeds proliferation are addressed. I recommend, to this effect, that the Bureau consider the choice of the Restore-Native-Ecosystems alternative in the Programmatic EIS.

**Response:** The BLM has a mandate (see Introduction in Chapter 1 of the PEIS) to address increased hazardous fuels through direct reduction activities through a full range of treatment methods, as well as to manage for noxious weeds and invasive

BLM_0001311

species in the same manner. Mechanical and herbicide treatments through an integrated vegetation management program are considered effective for vegetation treatments and weed management. For all authorized activities, the BLM incorporates standard operating procedures and noxious weed and invasive species prevention measures into its land use authorizations. This is a direct acknowledgement that certain uses and activities have potential effects on resources; therefore, preventative and mitigating measures are put into place through development of the NEPA analysis and subsequent authorization for any project.

Elimination or curtailment of uses completely from public lands, such as described in the Restore Native Ecosystem Alternative in Appendix G, is contrary to numerous statutes and regulations, and outside the scope of analysis of the PEIS. The Scope of Analysis in Chapter 1 of the PEIS states that the PEIS does not evaluate policies and programs associated with land use activities, and does not make land use allocations, nor amend land use plans.

RMC-0067-009
Wyoming Outdoor
Council

**Comment:** BLM should ensure that the causes of invasive weed invasions are addressed; as proposed BLM will only treat the symptoms of the problem, which will do little or no good.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread.

RMC-0072-005
Zimmermann, Adele E.

**Comment:** If this is an effort to protect communities which have invaded wild lands from fire, it is the responsibility of those who chose to build in an area subject to wildfires to protect their ill-placed homes. Wholesale destruction of vegetation in wild lands to protect a few reckless homeowners is unwarranted.

**Response:** Lands administered by the BLM tend to be intermingled with state and private lands. Private landowners have the right to build on their lands as they see fit, in compliance with local zoning laws. The Bureau does work with local communities to influence local zoning laws, and to provide information to landowners on how to make their homes more defensible in the case they are threatened by a wildland fire.

RMC-0126-002
Stevens, Dean

**Comment:** Invasive species cannot be eliminated without eliminating the causes of weed invasion.

**Response:** Elimination of invasive species and noxious weeds is an unrealistic goal given the widespread nature of this global problem. With current technology, the best that can be attained is successful containment and control of invasive and noxious weed species where they exist. One of the first steps is to identify the infestation area, develop a management scheme to address the problem, introduce control measures to contain or reduce the infestation, and implement prevention measures to halt further spread and establishment of new infestations. Determining the causes of invasive species spread is problematical in that the mechanisms and vectors for spread are many and varied and rooted in the history of the settlement of this continent and the West.

Many of the public categorize the perceived "causes" of invasive species spread, as evidenced by comments on this and similar EISs, under four or five basic categories: livestock grazing, timber harvest, off-highway vehicle (OHV) use, and oil and gas exploration and development. By eliminating these disturbance activities, weed spread

BLM_0001312

RESPONSE TO COMMENTS

would be reduced and the need for vegetation treatments would also be reduced or eliminated. However, the dynamics of weed spread are complex and cannot simply be tied to causes of extractive uses or recreation. As stated in response to a similar comment in the *Northwest Area Noxious Weed Control Program EIS* (USDI BLM 1985a), in relation to livestock grazing, "Heavy grazing can contribute to the noxious weed problem by reducing desirable vegetation, allowing noxious weeds to better compete. One cannot say that noxious weeds occur as a result of or only in areas heavily grazed by livestock. Noxious weeds occur in forest land, good condition rangeland, and areas ungrazed by livestock (p. 94)." While this response is dated, it still holds true. Indeed, noxious weeds and invasive species are gaining foothold in many protected special areas such as wilderness study areas and wilderness areas that have little or no history of livestock grazing, timber harvest, OHV use, or oil and gas exploration. Many intact and healthy ecosystems have invasive and noxious weeds that cannot be attributed to any specific cause or land use. It is important to note that the vast majority of public lands where these activities take place <u>are not infested</u> with invasive or noxious weed species.

The primary weed vectors are wind, water, wildlife, and self- propagation. Secondary factors are ground disturbance and fire. Human influences are responsible for much of the spread and establishment of weeds we know today. Many weeds are documented on private lands and have spread onto public lands without help from livestock, OHV recreationists, or other commodity producers and vice versa. In areas of commingled land ownership—public, private, state—separating the "causes" to a common infestation would be futile. Because a disturbance takes place, it is not a forgone conclusion that invasive or noxious weeds will establish. There needs to be 1) conditions favorable to establishment of the species, 2) a seed or propagule source nearby, and 3) an effective vector to transport the seed or propagule to the site. If a source is not present, then the risk from infestation is minimal.

The BLM is mandated to manage vegetation for healthy plant communities, address invasive and noxious weed species where they occur, and implement prevention, containment, and control measures. Within an integrated pest management program, herbicides have consistently been demonstrated to be effective for vegetation control alone or in combination with other treatment tools, such as mechanical, fire, biological, and manual techniques, including passive management, in those cases where rehabilitation objectives can be met through those means. The key issue is managing vegetative competition and maintaining conditions that favor healthy plant communities that can outcompete invasive plants or that do not allow niches into which invasive plants can establish and spread.

RMC-0126-003
Stevens, Dean

**Comment:** Herbicides are not only poisonous and expensive, but they fail because they are "treating" symptoms, not the causes of weed invasion and undesirable vegetation.

**Response:** See response to Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0139-004
Jacobson, Don

**Comment:** Invasive species cannot be eliminated without eliminating the causes of weed invasion. Herbicides are not only poisonous and expensive, but they fail because they are "treating" symptoms, not the causes, of weed invasion and undesirable vegetation.

BLM_0001313

**Response:** See response to Comment RMC-0126-002 under PEIS Ch. 2 under Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0160-002
Natural Habitat

**Comment:** We agree with our colleagues, who have studied the draft, that you are addressing the symptoms rather than the causes and will be doing much more harm than good. You have made herbicide use itself the purpose rather than a credible concern about the causes of widespread invasive plants.

**Response:** See response to Comment RMC-0126-002 under PEIS Ch. 2 under Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0160-005
Natural Habitat

**Comment:** Of special concern to our group is: Uncontrolled livestock grazing; Off-road vehicles; [and] Prescribed fire with resumption of heavy livestock grazing.

**Response:** The concerns have been noted. See response to Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0167-002
Soda Mountain
Wilderness Council

**Comment:** Unfortunately, because both the draft environmental impact statement ("DEIS") and programmatic environmental report ("PER") fail to adequately address the *causes* of invasive species problem (instead opting to focus on methods to treat areas already invaded by weeds), the BLM has not yet created a successful strategy to deal with one of the West's most rampant causes of environmental degradation. For this reason, SMWC [Soda Mountain Wilderness Council] submits the following comments to encourage the BLM to rethink their approach so that BLM will come up with an effective solution to the problem of invasive weeds, rather than causing additional environmental problems by overconfidently applying herbicides to our public lands indiscriminately.

**Response:** The Purpose and Need for the PEIS is stated in Chapter 1 of the PEIS. The BLM acknowledges there are causes to invasive species spread, an issue that is discussed under Prevention and Early Detection of Weeds in Chapter 2, under Noxious Weeds and Other Invasive Vegetation in Chapter 3, and throughout Chapter 4 of the PEIS and PER. The decision to be made—determining which USEPA-registered herbicides will be available for use by the BLM for vegetation treatments and control overall, including, but not limited to, treatments addressing invasive and noxious species—does not require detailed analysis of the causes of invasive species proliferation in order to implement various BLM programs using herbicides. The decision to determine which USEPA-approved herbicides will be available does require detailed analysis of the environmental effects of the use of these herbicides on humans, animals, sensitive species, and other resources. Extensive risk assessments for human health and plants and animals were conducted to support a decision. The decision to utilize herbicides in an integrated pest management context for vegetation control has been affirmed in all past EIS Records of Decision, based on the need to control vegetation to meet ecological health goals and objectives.

The BLM disagrees with the assertion that it has no successful strategy in place to address these problems. The *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996) outlines the strategy the BLM follows to address invasive and noxious weed spread, including general and specific goals and objectives. This strategy is based on prevention, identification and inventory, control, and rehabilitation of infested lands within a multiple use context. A key feature of this strategy is to work with local partners, conservation groups, private landowners, and agencies, to form cooperative weed management areas, share resources and funding, and manage and

BLM_0001314

RESPONSE TO COMMENTS

control invasive and noxious weeds. Individual states, such as Nevada, have developed state-wide strategies based on the BLM model, which have demonstrated success in reducing infestations and restoring land health across the West. BLM application of herbicides is a controlled and conscientious process beginning with identifying the need, designing the project, and ensuring appropriate safeguards are in place prior to and after a project is implemented. This process is accomplished in an integrated pest management context, and the need for herbicides is determined by the best science weighed against other methods or combinations of methods. The BLM does not agree that the process to determine if herbicides are to be used in any given circumstance and how they are applied is indiscriminate. To do so would violate the Federal Insecticide, Fungicide and Rodenticide Act and ignore the BLM's obligation to comply with NEPA, Endangered Species Act, and numerous other statutes and regulations.

RMC-0167-004
Soda Mountain
Wilderness Council

**Comment:** However, the BLM hamstrings itself (to the detriment of the public lands) by focusing only on herbicides and other treatments, rather than the primary vectors that cause the spread of invasive weeds (including roads and livestock grazing). To achieve the stated goal that is quoted above, it is imperative that BLM focus on the primary causes of the invasive weed problem. In addition, the BLM should not give short shrift to passive treatments that can be used as effective treatment methods, and which do not have the negative ecosystem and human health issues associated with herbicide.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding vectors and spread. See expanded discussion under Prevention of Weeds and Early Detection and Rapid Response in Chapter 2 in the Final PEIS and PER regarding passive treatments and their role.

RMC-0167-006
Soda Mountain
Wilderness Council

**Comment:** It is simply irrational for an agency to seek to "improve ecosystem health by controlling weeds and invasive plant species and managing vegetation to benefit fish and wildlife habitat, improve riparian and wetlands areas, and improve water quality in priority watersheds" without analyzing means to curb the introduction of invasive weeds (before the spread happens) and without fully analyzing the benefits associated with passive treatments of invasive weed?

**Response:** See responses to Comments RMC-0167-002 and RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0167-010
Soda Mountain
Wilderness Council

**Comment:** The BLM is legally obligated to revisit its approach to control invasive weeds and nonnative plant species and consider vectors that cause the spread of invasive weeds (such as livestock grazing).

**Response:** See response to Comment EMC-0562-008 under Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0200-002
Lindsay, Dianne

**Comment:** The PEIS/PER fails to adequately acknowledge the "cause" of vegetation problems. The Proposed Action and Purpose and Need are erroneous as stated: ([Draft PEIS] page 1 of the Executive Summary, paragraph 4 and line 8.) "Invasive vegetation and noxious weeds threaten soil productivity ... It should state "Livestock grazing, timber extraction and other resource extraction threatens soil productivity…"

**Response:** The Proposed Action and Purpose and Need are stated in Chapter 1 of the PEIS. The BLM has determined the statement in the Executive Summary is correct.

BLM_0001315

No change to the text is required.

RMC-0200-003
Lindsay, Dianne

**Comment:** The PEIS/PER fails to outline the best way to improve ecosystem health is by limiting resource extraction. This option is not included.

**Response:** See response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses. See Scope of Analysis in Chapter 1 of the PEIS. Limiting resource extractive activities is outside the scope of analysis of this PEIS.

RMC-0211-012
Ghandi, Theresa Marie
K.

**Comment:** Using cheat grass as a reason to apply herbicides annually to prevent wildfires does not get at the root cause of the presence of the cheat grass and its spread through out 73% of leased public lands, 270 million acres, in western states used for cattle grazing. Approximately 2000 large ranchers have leases that cover about 74-78% of federally leased grazing lands (data from a 1992 US Government Accounting Office study). Rather the cattle grazing, pulling up native species (such as bunch grasses) by the roots, breaking up the biotic soil crusts (lichens and algae), which cover much of soil in native systems, get trampled, churned up, and decline which worsens conditions for the native perennial grasses further, and also make it more difficult for seedlings of these species to establish. Herbicide treatments will fail until the root cause, large ranchers grazing cattle, is eliminated. Should BLM continue the grazing leases, then any plan to eliminate cheat grass [downy brome] will fail, short of ranchers switching to buffalo and restoring native soil and plant species as a condition of their leases.

**Response:** Elimination of livestock grazing is beyond the scope of this analysis. Livestock grazing is authorized under the grazing regulations at 43 CFR [Code of Federal Regulations] 4100. Land use plan decisions provide for allocations of public lands for livestock use. See Scope of Analysis in Chapter 1 of the PEIS. The PEIS does not state that downy brome is the reason to apply herbicides annually to prevent wildfires. It is not reasonable or cost effective to attempt to spray herbicides on downy brome infested rangelands, annually, in their entirety, for fire suppression. Herbicide treatments may feasibly occur <u>after</u> a fire, e.g., as a pre-emergent to prevent or retard the introduction of downy brome and allow native species to outcompete this aggressive invader. Once downy brome is established in a rangeland situation, the eventual restoration of perennial grasses and shrublands is a long-term process requiring different management strategies based on local conditions. These could include techniques such as mechanical disking and seeding of desirable species, or as appropriate, livestock grazing management or passive techniques including rest from grazing for rehabilitation success purposes.

RMC-0214-021
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** BLM neglected to analyze the reasons for the spread of invasive species. BLM has failed to fulfill the most basic requirement of NEPA which is to scientifically analyze the subject at hand. The agency is proposing a solution before it has documented the nature of the problem. Any rigorous scientific analysis cannot occur unless there is an identification and subsequent examination of the phenomena. BLM did not take a look (let alone a 'hard look') at the phenomena associated with the spread of invasive species that are central to the problem of invasive species.

**Response:** See responses to Comments RMC-0126-002 and RMC-0214-019 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

BLM_0001316

RESPONSE TO COMMENTS

RMC-0214-022
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** The Bureau fails to address the contributions that activities such as livestock grazing, building and maintenance of roads and trails, and motorized recreation make to the establishment and spread of invasive plant species on the public lands. These activities transport seeds and other propagules onto the land, then create ideal conditions for the invaders' establishment by disturbing the native vegetation and soil.

**Response:** See responses to Comments RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis and RMC-0214-019 under PEIS Alternatives, Vegetation Treatment Planning and Management.

RMC-0214-023
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** Under Executive Order 13112, Sec. 2, paragraph (3), the Bureau is obliged to avoid authorizing, funding, or carrying out "actions that it believes are likely to cause or promote the introduction or spread of invasive species ... unless, pursuant to guidelines that it has prescribed, the agency has determined and made public its determination that the benefits of such actions clearly outweigh the potential harm caused by invasive species; and that all feasible and prudent measures to minimize risk of harm will be taken in conjunction with the actions."

**Response:** The BLM is not proposing any actions it believes are likely to cause or promote the introduction or spread of invasive species. The BLM is proposing to adopt tools to aid in the reduction and spread of invasive species on public lands.

RMC-0214-024
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** Of all of the activities that contribute to the spread of invasive species, livestock grazing is paramount. But the D[raft] PEIS barely investigates the relationships that livestock grazing and the spread of noxious weeds share. BLM asserts that analysis of livestock grazing is outside the scope of the D[raft] PEIS ([Draft] PER [page] 1-6). Arbitrarily excluding the examination of known relationships between the spread of invasive species and an activity on BLM lands that directly contributes to the spread of invasive species is not permissible under the dictates of NEPA.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread in relation to livestock grazing. The Draft PEIS in Chapter 1 under Scope of Analysis states: "This PEIS does not evaluate policies and programs associated with land use activities authorized by the BLM, such as livestock use, off highway vehicle (OHV) use, and timber harvesting, and does not make land use allocations nor amend land use plans (Federal Register 2002)." The scope of the PEIS does include an examination of the effects of herbicide use on livestock grazing, as with all BLM programs. The PEIS broadly examines the use of herbicides in relation to hazardous fuels reduction activities and managing and controlling invasive species for the benefit of wildlife habitat. The effects of livestock grazing on rangeland health has been previously assessed in the Rangeland Reform '94 EIS (USDI BLM 1994) and most recently in the October 2004 Final EIS (USDI BLM. 2004. *Proposed Revisions to Grazing Regulations for the Public Lands*. FES 04-39. Washington, D.C.) and March 31, 2006, addendum to the Proposed Revisions to Grazing Regulations for the Public Lands (2006. *Addendum to the Final Environmental Impact Statement FES 04-39 Proposed Revisons to Grazing Regulations for the Public Lands*. Washington, D.C. Available at: http://www.blm.gov/grazing/). The livestock grazing program is also assessed in Resource Management Plan EISs, which outline the goals and objectives for landscape health that livestock grazing practices must meet. Limitations or restrictions on grazing due to invasive species spread are determined through activities

BLM_0001317

such as allotment monitoring, permit authorizations, and watershed assessments.

RMC-0214-025
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** Given that it is BLM's regulatory responsibility to facilitate multiple use on its lands, BLM should be critically analyzing solutions to the invasive species issues that benefit multiple use activities such as livestock grazing. Sustainable grazing can benefit from strategies that recognize that overgrazing can lead to significant infestations of invasive species. Overgrazing invites invasive weeds to consume the range, ultimately hindering the potential forage capacity of the range and the success of a livestock grazing enterprise. On the other end of this approach, BLM choose in the D[raft] PEIS/PER to promote livestock grazing as a "tool" for the suppression and elimination of noxious weed communities (PER ch.4).

**Response:** As discussed in Chapter 1 of the PER, "the BLM strives to attain a balance between the use of the land under its jurisdiction, and the protection of the environmental, historic, cultural, and scenic values that are so important to the American public." The BLM recognizes that human uses, including livestock grazing, can harm the land, and BLM managers try to limit the threats and risks to healthy lands. The effects of overgrazing, and the measures the BLM is taking to correct these effects, are discussed for several resources in Chapter 4 of the PEIS, primarily under Cumulative Effects Analysis. However, as discussed under Scope of Report in Chapter 1 of the PER and Scope of Analysis in Chapter 1 of the PEIS, the BLM did not evaluate policies and programs associated with land use activities authorized by the BLM, including livestock use, in these documents; these activities have been analyzed in earlier EISs. Livestock grazing is a tool to control invasive vegetation, and since the PER and PEIS focus on invasive vegetation control, the use of livestock to control vegetation was discussed in the PER.

RMC-0214-026
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** Clearly BLM is promoting the activity of livestock grazing without also looking seriously at the harmful relationship between livestock grazing and the spread of invasive species like Downy Brome. If the BLM was serious about complying with NEPA and thoroughly examining the problem of invasive species, it would have identified the vectors that lead to the spread of these communities. And it would have paid special attention to the ecological relationship that livestock grazing has with the invasion of cheatgrass, which is threatening to eliminate many opportunities for sustainable livestock grazing in the West.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread. Also see response to Comment RMC-0214-024 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0214-028
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** BLM should also consider additional steps not referred in the D[raft] PEIS that would be beneficial in slowing the spread of invasive plants on public lands. Many plant species that are invading natural systems in the West are not yet designated as "noxious"; these plants will escape regulation under this provision. Examples of species not now designated as noxious weeds that could be transported in hay, straw, or mulch include cheat grass and other *Bromus* species, various wheatgrasses, several *Setaria* grasses, and spreading knotweed. The agency should identify plant species invading its lands that are not now listed as "noxious" and work with state agricultural and transportation officials, including existing Invasive Species Councils; with the agricultural industry; with conservation organizations; and with public land users and ranchers to curtail the inadvertent spread of these plants, as well.

BLM_0001318

RESPONSE TO COMMENTS

**Response:** The PEIS and PER address all invasive species, not just species designated as noxious weeds. Standard Operating Procedures and other protection measures identified in Tables 2-8 and 2-9 in the PEIS, and 2-5 in the PER would help to reduce the spread of invasive vegetation and reduce the effects of vegetation treatments on resources. As noted in Chapter 1 of the PEIS, under Interrelationships and Coordination with Agencies, the BLM coordinates extensively with invasive species councils and other environmental groups, scientific and trade organizations, and other federal, state and local agencies to manage vegetation and control the spread of invasive vegetation.

RMC-0217-004
Sierra Club Utah
Chapter

**Comment:** This paragraph segues from a discussion of hazardous fuels to the inherent harm resulting from invasion by exotic plant species and noxious weeds. There is no transition or relationship provided by this paragraph. This is stated despite the fact that the exotic cheat grass is a major hazardous fuel on public lands. The paragraph also fails to deal with the full range of permitted activities that are major contributors to altered fire regimes and fire suppression. Livestock grazing, road building, water diversions and impoundments, and timber cutting have all contributed to the suppression of fires. In some plant communities these permitted activities far out weigh fire fighting in terms of fire suppression.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread. The text in the Introduction of Chapter 1 of the PEIS and PER has been revised to reflect relationship between downy brome (cheatgrass) and hazardous fuels and to clarify the contributions of public land activities to altered fire regimes.

RMC-0218-004
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** What's wrong with this picture? In addition to heavy-handed management instead of more natural, passive restoration techniques, the BLM's plan fails to deal with the many sources of invasive weed spread, such as the primary vectors of invasive plant introduction and dispersal: Livestock grazing, logging, off-road vehicles, roads, and other ground-disturbing activities such as mining and gravel pits. You simply can't solve a problem by addressing the symptoms rather than the causes. Indeed, the real purpose of this plan may have more to do with clearing the land for more cattle and sheep than getting serious about controlling invasive plants. Although invasive plants and reducing the risk of "catastrophic" fire (a favorite Bush Inc. public relations rationale for logging and magic words for getting federal funding) are referenced in the text , the actual title of the draft [P]EIS is "Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States"-- rather than the purpose or goal being to control the introduction and dispersal of invasive plants, which is ostensibly the purpose, judging by the bulk of the text.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread. The Purpose and Need, which are stated in Chapter 1 of the PEIS, do not include proposals for clearing land for more cattle and sheep. As stated under Scope of Analysis in Chapter 1 of the PEIS, the PEIS does not address vegetation treatments exclusively designed to increase forage production. The title of the PEIS is accurate. There is no stated goal in the PEIS to control the introduction and dispersal of invasive plants. The purpose of the PEIS is to examine the effects of herbicide use on public land resources. The actual use of herbicides is determined at the project development stage in an integrated pest management context. The BLM is not proposing to exclusively use herbicides on public lands.

BLM_0001319

RMC-0218-029
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Many issues, such as potential impacts to sage grouse, were not adequately analyzed with an eye to other cumulative impacts combined with the proposed action (e.g. Livestock grazing, roads, development, ORV [off-road vehicle] use, hunting, mining non-chemical control methods proposed, etc.) and the need to deal with root cause of invasive plant spread that are embedded in status quo management practices (e.g. livestock grazing, logging, soil disturbance, quarries, roading, etc.) that are considered too sacrosanct to touch. (e.g. of sage grouse issue analysis in NCAP [Northwest Coalition for Alternatives to Pesticides] comments).

**Response:** The Proposed Action in the PEIS does not propose any treatments that would directly or indirectly impact sage-grouse. Herbicide or non-herbicide vegetation treatments in sage-grouse habitat or with the potential to impact sage-grouse populations would be assessed in site-specific NEPA analysis at the time the project was proposed. Direct, indirect, and cumulative effects on sage-grouse would be assessed within the context of the site-specific analysis at the time the project was proposed. Because of the programmatic nature of this EIS, it is not possible to assess the effects of herbicide use on any one species, since there is no site-specific data on where a treatment project would occur or what species may be present. The PEIS assesses the impacts on plant communities as described in the ecoregions covered under the analysis for Wildlife Resources in Chapter 4 of the PEIS.

See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread. Cumulative effects to vegetation and wildlife resources are discussed in the respective resource sections of the Cumulative Effects Analysis section in Chapter 4 of the PEIS. See the Wildlife Resources section in Chapter 4 of the PEIS for a description of the herbicide exposure characterization that was developed to assess effects to the full range of species that may occur on public lands. See Appendix C of the PEIS for a full discussion of the exposure characterization process used in the ecological risk assessments. The exposure characterization for wildlife species was developed in collaboration with the U.S. Fish and Wildlife Service, the National Marine Fisheries Service, and the Environmental Protection Agency, and uses the best available science to assess impacts to wildlife species at the programmatic level.

RMC-0218-039
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Why were these control methods insufficient? It is likely that their insufficiency was due to failure to deal with the root causes of invasive plant introduction and dispersal, in which case, more of the same "treatment" will continue to be ineffective.

**Response:** See response to Comment RMC-0222-013 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding causes of invasive plant introduction and dispersal.

RMC-0218-044
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Precommercial thinning and prescribed fire (and in some cases, shrub mowing) can be used to accomplish these ends without the hazardous use of toxic chemicals. In the case of prescribed fire, the effect is much more similar to natural processes. Herbicides should only be used as a last resort to control or eradicate exotic invasive species, if they are used at all, not to artificially clear land of sagebrush for livestock or thin stands of trees for maximum commercial plantation growth or public lands. Yet these expansions of the uses to which herbicides are applied are not analyzed or justified in the DEIS [Draft PEIS] in violation of NEPA.

BLM_0001320

**Response:** As discussed under Scope of Analysis in the Decisions to be Made and Scope of Analysis section of Chapter 1 of the PEIS, the PEIS does not address herbicide use relative to livestock grazing or commercial timber production. Also see response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

RMC-0218-046
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** We are also very concerned by admissions on pp. [pages] 4-62 - 4-63 [of the Draft PEIS] that even under the "No Action" alternative (status quo management) (and presumably under the preferred alternative, although this is not clear), herbicide application would focus on "controlling" many native desert species that no one but ranchers would usually consider a problem – including sagebrush, rabbitbrush, pinyon trees (a native cultural plant of significance and limited occurrence), juniper trees, "other evergreen woodland species" (p. 4-62 [of the Draft PEIS]) and plant community indicators in the Sonoran and Chihuahuan desert such as mesquite (also of Native cultural importance), creosotebush and snakeweed, as well as oak species! (p. 4-63 [of the Draft PEIS]) Who gave the BLM a mandate to "control" all these native desert species which form the critical underpinning of distinct habitat niches for adapted wildlife?! This seems like a thinly veiled plan to convert the temperate desert, temperate steppe, subtropical desert and subtropical steppe ecoregions to cattle and sheep pasture on a large scale. Artificial conversion via poisoning with toxic chemicals is even more insidious than using logging or prescribed fire in that the chemicals to be used are acknowledged to change the native plant species composition and biodiversity of the application sites.

**Response:** See Scope of Analysis in the Decisions to be Made and Scope of Analysis section of Chapter 1 of the PEIS. Conversion of plant communities to cattle and sheep pasture is outside the scope of this PEIS. The BLM is guided by statutory and regulatory considerations in regard to application of herbicides on public lands. Intentional over-contamination of public lands with would violate a number of statutes, including, but not limited to the Federal Insecticide, Fungicide, and Rodenticide Act, NEPA, and the Federal Land Policy and Management Act. The BLM has not closed any public lands to public use as a result of herbicide treatments, nor artificially converted ecoregions to cattle and sheep use.

RMC-0218-050
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** The use of toxic herbicides planned for use in these environments are thus acknowledged to potentially convert fundamental plant species composition, altering ecological niche habitats and affecting biodiversity as well as removing targeted native components of these ecosystems (e.g. pinyon pine, sagebrush, mesquite, etc.) This planned conversion of native plant communities to something else (presumably livestock pasture) and the potential conversion of these native ecosystems to artificial environments, sometimes dominated by the very invasive plants the DEIS [Draft PEIS] implies it is the purpose of this program to eradicate (e.g. Downy brome, medusahead and Russian thistle) must be analyzed thoroughly in the DEIS [Draft PEIS] as part of the intentional or foreseen consequences and purpose of the action alternatives with herbicide use (and through tree and brush manual and fire-removal, part of the "No Herbicides use" alternative as well) yet the DEIS [Draft PEIS] appears to incorporate no such analysis or admission that conversion to pasture is part of the plan. Without such admission and analysis, decision-making may be made in ignorance of the true intent or consequences of the program.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. Total eradication of weeds is an unrealistic goal and is not part of the BLM

BLM_0001321

Proposed Action in the PEIS. Chemical treatment methods have been shown to be effective on vegetation.

RMC-0218-052
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** As the NCAP [Northwest Coalition for Alternatives to Pesticides] comments describe at length, it is known that herbicide use, livestock grazing and prescribed fire have all harmed sage grouse and their essential habitat components, yet this was not analyzed in the DEIS [Draft PEIS] (a violation of NEPA disclosure, analysis and scientific accuracy requirements) nor was the predictable loss of critical habitat for sage grouse and possible direct loss of individual sage grouse adequately considered and mitigated (a violation of the APA [Administrative Procedures Act] and ESA [Endangered Species Act].)

**Response:** The BLM has complied with all NEPA disclosure, analysis, and scientific accuracy requirements for the Proposed Action described in Chapter 1 of the PEIS. The BLM has violated neither the APA, nor the ESA in the development of the PEIS. See response to Comment RMC-0218-029 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the proposed action and analysis of impacts to sage-grouse. Although the sage-grouse is the subject of petitions for listing, it is not a listed species at this time, nor has critical habitat been identified for this species; thus the sage-grouse is not subject to ESA requirements. In any case, should sage-grouse be considered a listed species, the BLM would treat it as a listed species, and consult under the ESA.

RMC-0218-053
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Livestock grazing is obviously within the scope of this DEIS [Draft PEIS] as it could both contribute to the spread of invasive plants as a root cause of their introduction and dispersal (and has done so) and could benefit from invasive plant control. Yet the impacts of livestock grazing re: the spread of invasives are not analyzed in the DEIS [Draft PEIS].

**Response:** See response to Comment RMC-0214-036 under PEIS Alternatives, Monitoring. Livestock grazing is outside of the scope of the PEIS. The intent of the PEIS is not to assess the alleged spread of invasive species via livestock grazing.

RMC-0218-054
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** It is interesting how enthusiastic the BLM is about using herbicides to counter the rapid expansion of invasive plants across public lands as "one of the primary threats to ecosystem health" (DEIS [Draft PEIS] p. 4-73), when in reality, active management practices by the BLM, including livestock grazing, logging, mining, roading and allowing the use of off-road vehicles are far greater threats to the ecosystem and also all introduce invasive plants and disperse them throughout public lands. Yet known means to control these management practice vectors of invasive plant introduction and dispersal are not considered and analyzed, although dealing with them is absolutely essential to stopping or slowing the invasive weed problems.

**Response:** See response to Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0218-055
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Similarly, there is no analysis in the DEIS [Draft PEIS] of the need to change or reduce the scale of these management practices themselves (beyond vehicle cleansing to reducing overall soil disturbances, eliminating unnecessary roads, prohibiting larger forest canopy openings, reducing livestock number and access to riparian areas, banning open pit mining, controlling the number and vehicle access/use of quarries, etc.) The fall back argument is FLPMA's [Federal Land Policy Management Act's] multiple use requirement, but there is no reason the BLM can't

BLM_0001322

RESPONSE TO COMMENTS

control (regulate) or change the nature of these management activities or reduce or prohibit them in sensitive areas, so these core roots of the problem are basic to the purpose and need of the BLM plan, within the scope of the project, and must be thoroughly analyzed and considered in an alternative (or more than one alternative) as required by NEPA. This could easily have been done by analyzing (and hopefully adopting) the "Restore Native Ecosystems Alternative" already carefully prepared. Why was this scientifically defensible citizen's proposal not included as an alternative to be considered instead of buried in an appendix? This is an obvious breach of NEPA's requirements for a full range of alternatives.

**Response:** The BLM agrees that it does have discretion under FLPMA to control (regulate) or change the nature of management activities or reduce or prohibit them in sensitive areas. This is accomplished through the land use planning process (FLMPA Section 202) at the local level, and is not the subject of this PEIS. As stated in the Scope of Analysis in Chapter 1 of the PEIS, this document does not evaluate policies and programs associated with land use activities authorized by the BLM, and does not make land use allocations nor amend approved land use plans. Also see response to Comment RMC-0126-04 regarding analysis of the Restore Native Ecosystems alternative.

RMC-0221-004
Center for Biological
Diversity

**Comment:** In general, this type of overarching, programmatic analysis can only be useful if there is also site-specific analysis conducted for each and every on-the-ground application. At best, a programmatic EIS can only identify and analyze the likely impacts of such an expansive project by reference to general parameters. This D[raft] PEIS does not even meet those general standards because it fails to identify and analyze the causes of the problem it is attempting to solve and it has completely failed to adequately identify and analyze likely impacts of the project, including, but not limited to, impacts to native species, ecosystems, air and water quality, and human health. If the BLM chooses to go forward with this ill-conceived project, the BLM should acknowledge that programmatically approved treatments will not be appropriate on any of the public lands that it is charged with managing and that it must prepare subsequent site-specific EISs for each and every such project.

**Response:** The PEIS is not intended to programmatically approve any vegetation treatments, and specific treatments are not proposed in this document. It has been clearly identified in the Draft PEIS that site-specific NEPA analysis, as well as ESA [Endangered Species Act] consultation, must be completed prior to any project approval. Chapter 1 of the PEIS, under NEPA Requirements of the Program, and Figure 1-1 in Chapter 1 of the PEIS, describe the "step-down" process used to ensure the appropriate analysis is conducted at each level of consideration for vegetation treatments.

See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis in regard to causes and vectors of weed spread. As a point of clarification, the BLM has not proposed this analysis to solve a problem of the causes of weed spread, but to assess the effects of herbicide use on human health and public land resources. Impacts to native species, ecosystems, air and water quality, and human health from proposed herbicide use are described in Chapter 4 of the PEIS (Environmental Consequences).

RMC-0221-016
Center for Biological
Diversity

**Comment:** First, and most importantly, the BLM has failed to consider the causes of vegetation conversions in the western landscapes and the causes of catastrophic fire, unhealthy ecosystems, and impaired wildlife habitat. Looking at the causes of the

BLM_0001323

problem along with proposed treatments is critical to restoring the land to long-term health. The lands managed by BLM need long-term preventative management, not just triage. The BLM's misidentification of the proper scope of the project fundamentally undermines the adequacy of the DEIS [Draft PEIS]. The BLM cannot separate the ways in which its management practices have allowed and continue to allow nonnative plants to flourish and invade large areas of the western landscape from its proposals to "treat" those non-native plants where they have taken hold. This overall flaw in BLM's conception of the proposed project has inevitably led to a DEIS [Draft PEIS] whose scope and stated purpose and need are far too narrowly conceived. Limiting the scope of the proposed project and the DEIS [Draft PEIS] to only vegetation treatments using herbicides is both nonsensical and violates NEPA's requirement that an EIS look at the whole of the action including "the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity." 42 U.S.C. [United States Code] § 4332(C)(iv).

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. See also the discussion under Chapter 4, Cumulative Effects Analysis, under Vegetation for a discussion of conversions in the western landscapes and the causes of catastrophic fire, unhealthy ecosystems, and impaired wildlife habitat. See response to Comment RMC-0218-055 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding BLM management practices and the proper avenue for addressing changes in resource management or allowable activities on public lands. Discussion of the relationship between short-term uses of the human environment and the maintenance and enhancement of long-term productivity is found under Relationship between the Local Short-term Used and Maintenance and Enhancement of Long-term Productivity in Chapter 4 of the PEIS.

RMC-0221-028
Center for Biological
Diversity

**Comment:** As part of the D[raft] PEIS, the BLM must identify other ongoing projects that impact the areas affected by the proposed project. In this instance, the BLM has failed to include many significant ongoing activities that impact the introduction, establishment, and spread of invasive plants in the environmental baseline analysis, the no-action alternative, or in the cumulative impacts analysis.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of invasive species spread. The environmental baseline is adequately described under Chapter 3 Affected Environment, as well as the cumulative impacts discussion found in Chapter 4 of the PEIS. The environmental baseline has also been previously discussed in the four EISs considered in the PEIS. The No Action Alternative of the PEIS, which is the continuation of management described in the previous EISs, takes the baseline into account.

RMC-0221-029
Center for Biological
Diversity

**Comment:** One of the fundamental causes of vegetation-type conversion, catastrophic wildfires and non-native weed invasions in the West is livestock grazing. Livestock are grazed on 165 million acre of BLM lands on the seventeen western states, but the DEIS [Draft PEIS] fails to address livestock as a vector of non-native species, widespread surface disturbance, and impaired watersheds leading to vegetation-type conversion, contributing to the very conditions that this DEIS [Draft PEIS] seeks to address.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed

BLM_0001324

RESPONSE TO COMMENTS

spread. The PEIS is responding to the need for additional tools to meet the intent of the Administration and Congress to address healthy landscapes through the National Fire Plan and the Healthy Forests Restoration Act of 2003.

RMC-0221-034
Center for Biological
Diversity

**Comment:** The impacts of livestock on our public lands are not limited to general vegetation effects – the specific impacts to particular ecosystems is also well known. The DEIS [Draft PEIS] addresses the impacts of the alternatives on these areas, but fails to enumerate the disturbance and vegetation conversion caused by livestock in these areas.

**Response:** See response to Comment RMC-0214-024 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0221-042
Center for Biological
Diversity

**Comment:** All of these impacts of livestock grazing can contribute to the establishment and colonization of non-native species, but the DEIS [Draft PEIS] fails to address these causative factors and instead retains its focus on herbicide treatments alone. The BLM should reduce the spread of invasive weeds by livestock grazing by retired permits in infested areas, suspending livestock grazing in areas of high disturbance and in ecologically-susceptible areas (riparian corridors, post-fire, wet meadows, disrupted biological crusts), and avoiding grazing in areas with intact native vegetation communities. One of the most comprehensive treatments available to the BLM is to limit livestock grazing in our public lands, improving the aesthetic and ecological landscape for all public lands users and diminishing the need to use chemical and biological controls.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. See also response to Comment RMC-0221-016 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0221-043
Center for Biological
Diversity

**Comment:** Off-highway vehicle ("OHV") use is a widespread and potentially harmful land use that the BLM failed to consider in the DEIS [Draft PEIS]. Preventing further colonization and invasions of non-native plant species can be partially attained through strict management of this type of recreation, and yet the DEIS [Draft PEIS] fails to address this type of preventative and proactive "treatment" in its analysis.

**Response:** Off-highway vehicle management is properly addressed through land use planning, and is outside the scope of this analysis. See Scope of Analysis in Chapter 1 of the PEIS. Prevention is discussed in Chapter 2 of the PER and PEIS under Prevention of Weeds and Early Detection and Rapid Response. See also response to Comment RMC-0167-002 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding BLM prevention strategies.

RMC-0222-003
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** We are further concerned that the DEIS [Draft PEIS] and PER that BLM has produced are contrary to the National Environmental Policy Act (NEPA). There is a direct link – cause and effect – between some land uses (such as livestock grazing), the spread of invasive species and the need for "vegetation treatments" (e.g., manipulation, burning, herbicide spraying. It is folly not to address these links in the DEIS [Draft PEIS]/PER. Furthermore, splitting out non-chemical vegetation treatments from herbicides (while avoiding the issue of passive restoration altogether) in two separate documents (one of which is an EIS and the other a "report") is "segmentation," which is disallowed under NEPA.

BLM_0001325

**Response:** The PEIS has been developed following the CEQ [Council on Environmental Quality] regulations and is in compliance with NEPA. The PER accompanies the PEIS to provide supporting information for the Alternative C analysis (No Use of Herbicides), cumulative impact analysis, and the Biological Assessment, pertaining to the effects of non-herbicide vegetation treatments on public lands resources. See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes of weed spread. Passive restoration is a valid technique for addressing vegetation problems and is not precluded from use by the analysis of effects of herbicides on human health and public land resources. Passive treatments are addressed in Chapter 2 of the PEIS and PER. Developing an environmental report to disclose effects of non-herbicide treatments on an estimated number of acres to support an EIS analysis does not constitute segmentation. Segmentation is the process of conducting individual analyses resulting in individual decisions for segments of a single connected action, such as a highway or transmission line. In the context of vegetation treatments, segmentation would take the form of analyzing and approving multiple contiguous smaller treatment projects derived from larger landscape-based proposal.

The baseline acre figure used in the PER is a fixed number representing potential acres to be treated. This figure was identified in the Department of Interior Cohesive Strategy policy document as the number of acres that would need to be addressed to make progress towards reducing hazardous fuels to prevent catastrophic fire. See the discussion Chapter 2 of the PEIS for Alternatives Considered but Eliminated from Detailed Analysis.

See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments for a discussion of the development of the PER.

RMC-0222-006
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Finally, in addition to the number of states and acres treated, the BLM has proposed a broader vegetation management program with different and greater goals that would employ more active (and no passive) treatment methods on more habitat types and in different combinations than was authorized in previous environmental impact statements and agency records of decision. As the [Draft] PER ([page] 1-1) states, "previous EISs primarily focused on vegetation control of competing and unwanted vegetation for resource enhancement (forestry and rangelands), noxious and invasive weed control related to surface use activities (oil and gas, rights-of-way), and reduction of hazardous fuels to protect resources at risk from wildfire damage." The new BLM vegetation management program as described in the NEPA-less PER is intended to "reduce hazardous fuels, improve rangeland health, and manage and control vegetation affecting other resources." ([Draft] PER: [page] 1-5. emphasis added) including wildlife habitat and watersheds. Thus, the BLM seeks to expand its current program from basic weed and hazardous fuel control to a landscape-scale vegetation management program with significant environmental impacts. This enlarged program requires further analysis under NEPA, particularly as it is linked to major increases in herbicide use.

**Response:** The BLM has not proposed a broader vegetation management program with different or greater goals than currently exist today. The analysis focuses on an increase in the number of acres to be potentially treated by herbicides, based on the policy context described in Chapter 1 of the PEIS. The resource programs, vegetation, and habitat types included in the analysis are the same as those that have been previously assessed for herbicides in the past. No previous analysis has considered

BLM_0001326

RESPONSE TO COMMENTS

Alaska, however. Therefore, the environmental impacts of herbicides on the vegetation and habitat types in that state have been included in the analysis in the PEIS.

RMC-0222-032
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The Restoration Alternative conditions herbicide use on avoidance of unnecessary invasive species spread by livestock (EIS [Draft PEIS]: G-8):

Action- Prevention 3- Reduce spread of invasive weeds caused by domestic livestock grazing:
1. retire domestic livestock grazing permits at earliest opportunity where grazing has been found to promote invasion or persistence of invasive species
2. prioritize invasives prevention and restoration activities for areas where domestic livestock grazing has been permanently ended
3. manage livestock movement patterns to insure animals are not moving seeds of invasive species from infested to uninfested areas
4. suspend livestock grazing on non-cohesive soils in perennially saturated meadows
5. manage livestock grazing to favor native species
6. avoid grazing in systems still containing a strong component of native perennials, biological soil crusts, or other features known to act as natural barriers to invasion or increase of invasive exotic species.

Perhaps the BLM politically does not want to rein in livestock grazing in this manner, but it is under a NEPA obligation to consider how reductions in the need for herbicide use might directly, indirectly, or cumulatively result from such constraints on livestock grazing.

**Response:** Although grazing can contribute to some invasive species problems, one cannot assume that all invasive species problems are associated with grazing of domestic livestock. The comment makes some good suggestions, such as managing grazing to favor native vegetation, and managing livestock movement patterns to avoid moving seeds of invasive plants from infested areas to uninfested areas. The BLM does manage the grazing program with these kinds of objectives in mind. The BLM rangeland health assessments consider the presence of invasive species when assessing overall rangeland health, and if the BLM determines that livestock grazing is significantly contributing to invasive species problems, the grazing management is changed to address the problem. The BLM is not able to implement all of the actions identified in this comment because, when taken as a whole, they are too restrictive and would cause the agency to be in violation of several laws, including the Taylor Grazing Act, and the Federal Land Policy and Management Act. These laws direct the agency to manage for multiple uses, and specifically identify grazing as an acceptable use of the public lands managed by the BLM. This comment suggests that if livestock grazing is found to promote invasion or persistence of invasive species, the only option available to address the issue would be to retire the grazing permits. Similarly, if livestock grazing is managed to favor native species, then grazing would be avoided in those areas to provide a barrier to further invasions. Since livestock grazing would be eliminated regardless of whether invasive species were present, the BLM would be unable to remain in compliance with those laws that direct the agency to manage for multiple uses that include grazing. The PEIS has been revised to include some discussion of how other activities can affect invasive species problems. Although the effects of these other activities are discussed in relation to the need for vegetation treatments, these activities are outside the scope of the PEIS analysis, and comments concerning changes in those activities must be addressed during site-specific decisions

BLM_0001327

and/or local land use planning efforts.

RMC-0222-033
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** As another example, the DEIS [Draft PEIS] does not estimate how control of invasive species (a Purpose of the PEIS) might be increased by following the Restoration Alternative's conditioning of herbicide use on prevention of off-road vehicle use that results in invasive species (DEIS [Draft PEIS]: [Appendix G, page] G-9), e.g.: Action- Prevention 5 - Precede all road or off-road vehicle route reconstruction, and any consideration of adding existing or illegal user-created roads and off-road vehicle routes to the transportation system, by NEPA analyses of their impacts, including potential to facilitate the spread of invasive species into native ecosystems. Action- Prevention 6 - Close or restrict non-essential, designated routes for motorized vehicle travel in areas of high risk for spread of invasive species.

The DEIS [Draft PEIS] admits ([page] 2-13) that Alternative E (the BLM's version of the Restoration Alternative) would "place greater emphasis on passive restoration...where...activities [e.g., livestock grazing and ORV [off-road vehicle] driving] have promoted a less desirable vegetation community [e.g., invasive species] or increased erosion [i.e., a condition associated with invasive species]," but avoids analyzing the meaning for this herbicide use, stating:

Since these activities [e.g., livestock grazing and ORV driving] are allowed under FLPMA [Federal Land Policy and Management Act], however, restrictions on their use would only be considered to the extent they are consistent with BLM vegetation and land use management practices (e g . excluding grazing animals from recently seeded areas).

**Response:** The BLM conducts NEPA analysis on all federal actions. The spread of noxious weeds and invasive species is one of the critical elements of the human environment and is considered in all NEPA analyses undertaken by the BLM. The reconstruction of off-highway vehicle (OHV) routes, placement of OHV routes into BLM transportation systems, and closure or restriction of OHV use and routes is outside the scope of the analysis of the PEIS. There is no established relationship between OHV road closures and the need to use herbicides.

RMC-0222-035
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Consider the following failure to include prevention in livestock management: Continue to graze livestock where grazing has been found to promote invasion or persistence of invasive species more invasive species (i.e., a greater number of invasive species and/or increased introduction, establishment and/or spread of invasive species)
- more herbicide treatments
- more forage for cattle
- continued or increased cattle grazing
- more invasive species
- more herbicide treatments - and so on.

**Response:** The BLM includes prevention practices in its livestock grazing program, e.g., use of weed-free forage and quarantine prior to placement of livestock onto the range, in addition to the terms and conditions of grazing use authorizations. The scenario presented above, which assumes more herbicide treatments due to livestock grazing and the premise of increased livestock grazing, is unsubstantiated in fact, ignores other potential integrated weed management vegetative treatments using non-herbicide methods (including passive techniques), and is outside the scope of analysis

BLM_0001328

RESPONSE TO COMMENTS

of the PEIS. See Scope of Analysis in Chapter 1 of the PEIS. The PEIS does not address vegetation treatments exclusively designed to increase forage production or the effects of livestock grazing on vegetation.

RMC-0222-043
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Elsewhere, the DEIS [Draft PEIS] ([page] 4-45) does note that merely poisoning invasive species may not result in native vegetation returning:

Some treatments are very successful at removing weeds over the short term, but are not successful at promoting the establishment of native species in their place. In such cases, seeding of native plant species would be beneficial. Weeds may resprout or reseed quickly, outcompeting native species, and in some cases increasing vigor as a result of treatments. The success of treatments would depend on numerous factors, and could require the use of a combination of methods to combat undesirable species.

Although the above passage refers to the need to "use a combination of methods to combat undesirable species", the DEIS [Draft PEIS] in fact gives only the example of seeding species as an example of combining methods. For example, the DEIS [Draft PEIS] never mentions combining herbicide use with removal of livestock grazing or ORV [off-road vehicle] use.

**Response:** Most of the discussion on using multiple methods to control vegetation, including use of active treatments (e.g., use of herbicides, fire, mechanical control) in combination with passive treatments (e.g., removing livestock, ORV management), is found in Chapter 2 of the PER (Site Selection and Treatment Priorities; Vegetation Treatment Methods; and Vegetation Treatment Standard Operating Procedures and Guidelines sections). Much of this material is included in the Final PEIS to help the reader better understand BLM vegetation treatment policies and procedures.

RMC-0222-082
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The Programmatic Environmental Report (PER) proposed a three-fold increase in vegetation treated directly, from 2 million to 6 million acres per year (PER [page] ES-2). These treatments will have significant impacts in and of themselves. Likewise, they will include ground disturbances and removal of vegetation, favoring invasive species, the primary response to which will be herbicides, which will have additional impacts (PER [page] ES-2). This should not be examined in a report, but through NEPA, which will: Fully analyze reasonable alternatives for vegetation treatments, including the Restoration Alternative ([Draft] [P]EIS, Appendix I) and insure public review of the scientific accuracy of conclusions regarding benefits and impacts.

**Response:** See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments regarding development of the PER and its relationship to the PEIS. See Appendix I in the Final PEIS for the Policy Analysis Summary of the Restoration Alternative. The PER accompanies the PEIS and is subject to the same public review and comment as the PEIS regarding its scientific accuracy of conclusions.

RMC-0222-091
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to

**Comment:** Another recent (2005) publication from the Pacific Northwest Research Station (USDA FS [Forest Service]) has a similar conclusion. "Herbicides, prescribed fire, and other methods kill weeds, but without a source of native seeds or a long-term strategy for restoration, the treated areas are recolonized by the same species or by other, potentially more damaging, invasive plants." The publication does point out, however, that this problem can be solved by addressing the causes of invasive plant problems: "Research can contribute information on best practices to minimize invasive

BLM_0001329

Pesticides), and
O'Brien, Mary

risks in road maintenance, recreation, range management, prescribed fire, thinning, wildlife habitat improvement, and timber management." Such an analysis is necessary for the DEIS [Draft PEIS]/PER to succeed, but it has been ignored in both the[P]EIS and NEPA-less PER.

**Response:** The BLM does not dispute the conclusions of the reference cited. See Site Selection and Treatment Priorities, and Revegetation, in Chapter 2 of the PER for a discussion on post-treatment restoration practices. The BLM considers restoration and site rehabilitation when designing and planning vegetation treatment projects, and does not consider treatments without follow-up actions to ensure the project meets site restoration objectives.   The BLM agrees with the conclusion that research can contribute information on best practices to minimize invasive risks. The BLM relies on available past and current research, as well as professional expertise, in applying best practices to vegetation treatment projects.

RMC-0222-136
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The BLM scarcely acknowledges the effects of livestock grazing on sage grouse (PER: [pages] 4-80 - 81) and its role in the spread of invasive species, and ultimately shirks responsibility for managing grazing in the DEIS [Draft PEIS] /PER by stating that such land use decisions are outside the scope of either document. "Although this PER addresses vegetation treatments, it will not directly address any other aspects of the livestock grazing program" (PER: [page] 1-6). Similarly, the PER only addresses soil stabilization as it specifically relates to vegetation treatment activities (and not soil disturbance related to land use, such as livestock grazing, which creates seedbeds for invasive weeds) (PER: [page] 1-6). The BLM claims that it is not permitted to "to restrict, limit, or eliminate FLPMA [Federal Land Policy and Management Act]-authorized activities as a means to restore land health" in the DEIS [Draft PEIS] /PER (PER: [page] 1-6).

**Response:** The effects of livestock grazing on sage-grouse and the spread of invasive species are outside the scope of analysis of this PEIS. Under NEPA, analysis of impacts of livestock grazing effects on any resource requires a proposed action directly related to livestock management, e.g., livestock grazing permit authorizations, changes in grazing use or grazing systems.   See Proposed Action and Scope of Analysis in Chapter 1 of the PEIS for a full description of the issues analyzed in this PEIS.

RMC-0222-137
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** However, the BLM is also required by FLPMA [Federal Land Policy Management Act] to manage public lands "in a manner that will protect the quality of …environmental …resources" (PER: [page] 1-7). There are many cases across the West where the agency has adjusted grazing intensity, duration, and season of use to achieve resource goals on public lands without compromising multiple-use management. FLPMA allows the BLM to make such adjustments, and the Restore Native Ecosystems Alternative [RNE] includes a full set of grazing prescriptions to control invasive species and restore native vegetation. Unfortunately, the BLM failed to develop its own grazing rules for public lands beset by invasive species.

**Response:** The BLM agrees that grazing practices may be adjusted to meet resource goals and objectives. The regulations governing adjustments to livestock grazing, found at 43 CFR [Code of Federal Regulations] 4100, are not the subject of this PEIS. Grazing regulations are addressed in separate EISs related to grazing management, including the Range Reform EIS (1995), and more recently in the Proposed Revisions to Grazing Regulations for the Public Lands (BLM October 2004). See Appendix I in the Final PEIS for a policy analysis of the RNE alternative. The grazing prescriptions

BLM_0001330

RESPONSE TO COMMENTS

contained in this alternative are outside the scope of the analysis of the PEIS.

**Proposed Action and Purpose and Need, Documents that Influence the Scope of the PEIS**

EMC-0646-101
Californians for
Alternatives to Toxics

**Comment:** Once again, because the issues are identical, we would respectfully ask that the public record for the Forest Service's R6 [Region 6] Invasive Plant Program EIS, 2005, (which the BLM is tiering to), be incorporated by reference into the public record for this program, the BLM Vegetation Treatments Using Herbicides PEIS. Some of the comments provided in Appendix A refer to the document USDA 2003 (or Bakke 2003).

**Response:** The public record of the Forest Service's Region 6 Invasive Plant Program EIS is outside the scope of this PEIS. This PEIS does not tier to the Region 6 EIS. The BLM has incorporated by reference into this PEIS the results of recent toxicological analyses conducted by the Forest Service. Council on Environmental Quality regulations at 40 CFR [Code of Federal Regulations] 1502.21, Incorporation by Reference, state: Agencies shall incorporate material into an [EIS] by reference when the effect will be to cut down on bulk without impeding agency and public review of the action.

RMC-0163-003
Skrine, Eugene

**Comment:** The last EIS the BLM used to assess, compare and disclose the effects of its vegetation treatment program, including - herbicides, manual, mechanical, biological control, and the use of fire was developed in the late 1980s and early 1990s. A lot has been learned about the underlying causes and behaviors of invasive plants since that time. The BLM's 1980s analysis is likely out of date, and in need of revision (Malheur case). Without this type of updated analysis, how can the true effects of the treatments be disclosed? Without this type of more inclusive analysis, how can even the tradeoffs between the use of different herbicides be accurately disclosed, i.e., "how does the public know how critical a certain chemical is to meeting the need for action? Is this chemical the only way, or can the problem also be controlled, possibly better, thru a combination of methods, including, prevention, and nonchemical treatment methods?"

**Response:** As noted in the Introduction in Chapter 1 of the PEIS, because much of the analysis done in the late 1980s and early 1990s is out of date and covered fewer acres than the current proposal, the BLM decided to update the information on herbicide (PEIS) and other treatment (PER) uses and their effects. The analysis of effects from the use of herbicides on plants and animals was based on risk assessments prepared since the late 1990s (and in 2005 for the 10 herbicides analyzed by the BLM), and on humans for 6 herbicides evaluated in risk assessments in 2005 and a literature review of effects of the other herbicides done in the late 1990s. The PEIS and PER analyzed a variety of treatment methods, and combinations, including passive treatments.

**Proposed Action and Purpose and Need, Relationship to Statutes, Regulations, and Policies that Influence Vegetation Treatments**

EMC-0606-001
Johnson, Kathy

**Comment:** Why are the previous years', (1986 all the way through to 1992!)!!!! studies/times/monies having to be replaced? Where is the oversight committee and who is it? Where is the accountability for those four existing, (implemented?) EIS's.

**Response:** The Council on Environmental Quality (CEQ) provides oversight to implementing the National Environmental Policy Act (NEPA). Environmental impact analysis often requires periodic updating to account for new information and to reflect

BLM_0001331

the current environmental baseline relative to a proposed action. Replacing existing EISs with new analyses furthers the purposes of NEPA and is within the agency's discretion to do so and is required under regulation when the agency determines new analysis is necessary for understanding environmental effects of agency decision-making (43 CFR [Code of Federal Regulations] 1502.4, 1502.9). The CEQ counsels in its 40 Most Asked Questions, for EISs that concern on-going programs, EISs more than 5 years old should be carefully re-examined to determine if the criteria under 43 CFR 1502.9 compel preparation of an EIS supplement. The agency made the decision to complete one programmatic EIS rather than supplement 4 separate EISs.

RMC-0087-006
Central Valley
California Regional
Water Quality Control
Board

**Comment:** At the very least, the evaluation of new active ingredients must confirm that their use will result in compliance with applicable water quality regulations. Also note that new products may not be applied to water unless allowed by the NPDES permit.

**Response:** See response to Comment RMC-0087-004 under PEIS Proposed Action and Purpose and Need, Relationship to Statutes, Regulations, and Policies. As stated in Chapter 1 under Relationship to Statutes, Regulations, and Policies, the BLM must comply with the Clean Water Act and Safe Drinking Water Act, among other state and federal regulations and statutes.

RMC-0218-057
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** The following was not considered (as required) in the BLM PEIS or appendixes: "Project practices must be consistent with direction from the February 3, 1999 Executive Order on Invasive Species (Executive Order #13112), which requires federal agencies to use relevant programs and authorities to prevent the introduction and spread of invasive species (Noxious Weed Risk Assessment, Appendix B)." (as quoted from the 18 Fire Competing Vegetation Control Environmental Assessment, p. 60, emphasis ours – Deschutes National Forest, Bend-Fort Rock District).

**Response:** The BLM is guided by the relevant authorities listed under Relationship to Statutes, Regulations, and Priorities of Chapter 1 of the PEIS, including Executive Order 13112. The BLM actively uses its relevant programs and authorities to prevent the introduction and spread of weeds. The PEIS examines the use of herbicide tools for managing vegetation, including the use of herbicides to reduce and prevent the spread of weeds.

RMC-0218-058
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** There is a need to ensure compliance with the Clean Water Act in regard to prohibiting additional water quality impacts to 303(d) listed water quality – listed streams, which was not met by the BLM PEIS, PER or appendixes regarding potential herbicide-induced water quality impairment to these streams. This should have been analyzed and additional herbicide or other management impairment to 303(d) listed streams prohibited at the programmatic level.

**Response:** BLM offices are required to coordinate with state agencies and the USEPA concerning activities on federal lands in 303(d) listed waterways, to ensure that planned activities meet the requirements for no further degradation of those water bodies. Degradation includes both immediate and cumulative impacts. Central to this analysis is why the water quality has been degraded and whether the action would contribute to further or sustained impacts relative to the specific impairment(s) of that water body. If this examination shows further or sustained impairment, then these agencies will examine alternatives and their impacts and make decisions based on these discussions and written comments.

BLM_0001332

RESPONSE TO COMMENTS

Streams listed under section 303(d) are listed by the offending pollutant, such as sediment, temperature, or a specific metal. In non-agricultural areas it is highly unlikely that a stream would be listed on 303(d) for pesticides/herbicides. In the rare event that a stream on public lands is listed on 303(d) for pesticides/herbicides, the BLM would not continue to apply pesticides/herbicides in that stream's drainage basin. Water quality monitoring is a requirement of every application of pesticide or herbicide. Chemical application plans require review and approval by hydrologists to ensure, among other things, compliance with the Clean Water Act.

RMC-0087-004
Central Valley
California Regional
Water Quality Control
Board

**Comment:** Prior to applying aquatic pesticides directly into a waterbody in California, the BLM must apply for a Statewide General NDPES [National Pollutant Discharge Elimination System] permit for use of aquatic pesticides. Information regarding this permit and the applicable fee schedule can be found at this website: http://www.waterboards.ca.gov/aquatic/index.html.

**Response:** The BLM will follow USEPA, or, if applicable, USEPA-approved state guidance, in these matters, including any requirements for permits. Also see response to Comment RMC-0087-006 under PEIS Proposed Action and Purpose and Need, Relationship to Statutes, Regulations, and Policies and PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0213-002
Mike Carroll (Larimer
County Weed Control
District)

**Comment:** You should cite EPA approval of herbicides under the FIFRA (Federal Insecticide, Fungicide and Rodenticide Act) registration process and the danger of limiting BLM's vegetation management tools.

**Response:** A discussion of the FIFRA process is in Chapter 1 of the PEIS under Federal Laws, Regulations, and Policies that Influence Vegetation Treatments.

EMC-0267-002
Medbery, Angela

**Comment:** All people using pesticides on public lands need to be trained, certified, registered and/or licensed with regular continuing education according to the relevant state regulation.

**Response:** As discussed in Chapter 1 of the PEIS under Relationship to Statutes, Regulations, and Policies, "All the herbicides evaluated in this PEIS are registered with the USEPA, and all applicators that apply them on public lands (i.e., certified applicators or those directly supervised by a certified applicator) must comply. . ." It is the policy of the BLM, as stated in Manual 9011 (.12) (B.) (5) (a.), that all persons applying pesticides, both general and restricted use, on BLM-administered lands be certified or under the direct supervision of a certified applicator. The BLM plan for training and certification of pesticide applicators, Appendix 2 Handbook H-9011-1, Chemical Pest Control, outlines how the BLM certifies its applicators. This process is very similar to the method by which individual states certify their respective applicators. In both cases, the certification plans are approved by the USEPA. One notable exception is that state certification is required only for "restricted use" pesticides, while the BLM certification is required for the application of both "general" and "restricted use" pesticides.

EMC-0278-013
Lutjens, William
(BLM)

**Comment:** What ability will the BLM have to abide by the Carlson-Foley Act of 1968 without the aid of herbicides?

**Response:** The BLM will continue to abide by all applicable statutes and regulations regarding herbicide use, including the Carlson-Foley Act.

BLM_0001333

FXC-0041-008
Gunnison Watershed
Weed Commission

**Comment:** I would also encourage BLM to address environmental issues by educating those entities in the final decision by explaining EPA's registration process, the best available science (Integrated Pest Management), and the extent of the noxious weed issue particularly if herbicides are not used.

**Response:** The extent of the weed problem is discussed in detail in Chapter 3 of the PER and PEIS under Noxious Weeds and Other Invasive Vegetation in the Vegetation section of the chapters. Use of best available science is discussed in Chapter 2 of both documents under Vegetation Treatment Planning and Management; the USEPA registration process is also discussed in Chapter 2 of the PEIS under Herbicide Active Ingredients Evaluated under the Proposed Action, and in Chapter 1 under Relationships to Statutes, Laws, and Regulations. Information on registering herbicides can also be found on the USEPA website at: http://www.epa.gov/pesticides/regulating/index.htm.

FXC-0071-022
Campbell, Bruce

**Comment:** I do not believe that BLM is abiding by a number of laws in regards to this extensive herbicide spraying proposal. The previous paragraph mentions basically that specific needs for vegetation management are not thoroughly addressed, yet if both rangeland and forestland herbicide application (and "needs") were thoroughly evaluated, some sane conclusions would be to greatly reduce activities which create increasingly dry forests (such as logging big trees and planting overstocked monoculture conifer plantations) as well as reduce road-building and vehicular use (including logging-related transport as well as off-highway vehicle use) in order to not spread noxious and invasive weeds. In this theme of the need to prevent conditions which some feel necessitate herbicide applications, and in the spirit and letter of the need to obey laws of the USA, I feel that Executive Order 13112, Invasive Species, is being violated since it "directs federal agencies to prevent the introduction of invasive species". The Carlson-Foley Act of 1968 and Plant Protection Act of 2000 calls for BLM to "prevent, or retard the spread of any noxious weeds in federal lands." The Clean Air Act, Clean Water Act, and Safe Drinking Water Act are all violated by these plans.

**Response:** See Relationship to Statutes, Regulations and Policies in Chapter 1 of the PEIS. The BLM does not agree that any statutes or Executive Orders (EO) are violated by the Proposed Action analyzed in the PEIS. The Proposed Action is consistent with the direction cited in the Carson-Foley Act and E.O. 13112, as noted in this section of the PEIS.

**Proposed Action and Purpose and Need, NEPA Requirements of the Program**

EMC-0155-002
Kozlowski, James C.
(National Society for
Park Resources,
National Recreation
and Park Association)

**Comment:** No longer will BLM have to take the necessary "hard look" at the environmental impacts of any proposed use of herbicides and pesticides in a particular situation. Rather, once adopted, a programmatic EIS necessarily assumes that the environmental impacts of herbicide and pesticide use by BLM has been adequately addressed on a nationwide basis, making any further analysis of the issue unnecessary in subsequent site specific environmental documents. Contrary to BLM's view, I do not think that site-specific analysis of vegetation treatment activities is unrealistic, nor is repetitive or routine, given the potential environmental impacts.

**Response:** As discussed in Chapter 1 of the PEIS under NEPA Requirements of the Program, the PEIS provides overall guidance to the BLM on the use of herbicides and Standard Operating Procedures (SOPs) and other mitigation that must be followed by local field offices for specific projects. However, field offices would still be required

BLM_0001334

to conduct their own NEPA analysis of project-specific impacts and to coordinate closely with the public during this analysis. Local field offices can use information provided in the PEIS when developing their own environmental assessments. For example, information on risks to plants, animals, and humans that resulted from the risk assessments could be used by local field offices to determine appropriate treatments, SOPs, and mitigation.

EMC-0405-004
Hoover, Victoria N.

**Comment:** Site-specific information, needed to make decisions, is lacking. A programmatic EIS like this, that generalizes management, fails because it is impossible to know if a vegetative treatment is appropriate, or what its impacts would be, without detailed site-specific information. Some management actions might be appropriate, but this document does not allow members of the public to ascertain the facts, so it is quite useless, and contrary to the requirements of the National Environmental Policy Act (NEPA) to disclose the impacts of a proposed action.

**Response:** The information required to make decisions on adopting the use of certain herbicides on public lands is presented in the PEIS. A Programmatic EIS represents a broad analysis and is not intended to be site-specific. Site-specific analysis will occur at such time as a project is proposed.

EMC-0503-008
John Day-Snake
Resource Advisory
Council

**Comment:** We feel that BLM should describe the process by which this [P]EIS will be used to develop on-the-ground treatments. Provide enough detail to describe the step-down process to on-the-ground projects.

**Response:** See NEPA Requirements of the Program and Figure 1-1 in Chapter 1 of the PEIS.

EMC-0584-087
Western Watersheds
Project

**Comment:** The BLM must require as part of the [P]EIS/PER ROD [Record of Decision] that all future projects that are tiered or related to this EIS undergo, further environmental review at the level of an EA [Environmental Assessment] or EIS with full and open public comment and participation in the process.

**Response:** See response to Comment EMC-0155-002 under PEIS Proposed Action and Purpose and Need, NEPA Requirements of the Program.

EMC-0584-090
Western Watersheds
Project

**Comment:** BLM should use this [P]EIS process to set science-based post fire/treatment standards to be incorporated in all ESR [Emergency Stabilization and Rehabilitation] agency plans.

**Response:** The purpose of the PEIS is to provide an analysis of impacts to human health and public land resources resulting from the expected increase in the use of herbicides. The PER provides Standard Operating Procedures that are relevant to vegetation management and restoration activities at the programmatic level and may be incorporated into locally developed ESR plans, as appropriate.

EMC-0585-005
Western Watersheds
Project

**Comment:** The [P]EIS analysis is to be used so that at the NEPA document level, "they [BLM] don't have to do another 30,000 to 60,000 dollar risk assessment". So when it comes time to do the project, BLM plans to do NEPA but apply BMPs [Best Management Practices] laid out in the PEIS. Yet, PEIS BMPs are woefully deficient, and there is no requirement to conduct NEPA at a level of at least an EA [Environmental Assessment] or EIS that will allow full public participation.

BLM_0001335

**Response:** See NEPA Requirements of the Program and Figure 1-1 in Chapter 1 of the PEIS. Site-specific NEPA analysis, including public participation, is required for all vegetation treatment projects. Site-specific mitigation measures would be developed at the project level based on the site-specific analysis, and would be applied to the project in addition to the Standard Operating Procedures and requirements developed through this PEIS.

EMC-0585-086
Western Watersheds
Project

**Comment:** BLM punts to its Land Use Plans for uses and allocations. Many BLM Land Use Plans are based on tremendously outdated information, and allow a broad array of very damaging activities – facts that BLM has not analyzed and assessed in the PEIS. These include gross over-allocation of AUMs [Animal Unit Months] (especially since unreliable and unsustainable cheatgrass and other weed production now envelops so many grazing allotments), and lands completely Open to motorized uses or plans on paper, but no Travel Plans that allow control of roading. As reduction or cessation of livestock use on lands is a passive treatment, it must be addressed in the [P]EIS.

**Response:** Assessment of the data used to develop approved BLM land use plans, or the allocations derived from the public process in development of an approved land use plan, is outside of the scope of this project. Passive treatments are discussed in Chapter 2 of the PEIS and PER under Prevention of Weeds and Early Detection and Rapid Response. The reduction or cessation of livestock grazing is a resource allocation decision, not a vegetation treatment proposal. Passive treatments are proposed, designed and decided in the same manner as any other treatment method the BLM utilizes for vegetation control and must meet land use plan goals and objectives in a similar manner. Removing or curtailing an authorized use from public lands does not necessarily constitute a passive vegetation treatment.

PHC-005-007
K. Fite

**Comment:** So what we have here is an agency proposing massive new disturbance – and going back to Nevada again – having just reviewed the ELRMP [Ely Resource Management Plan], what does the [Ely] RMP propose to do, but treat millions of acres of pinyon juniper, woody vegetation. They aren't focusing on the cheatgrass, or the extensive crested wheatgrass seedings, which are basically biological deserts out there. No, they are planning radically disturbing, through the use of fire, through the use of mechanical methods, valuable pinyon juniper forests.

**Response:** The BLMs Resource Management Plan (RMP) planning process is the appropriate forum to outline future vegetation treatment programs, objectives, and treatment methods. The allocations proposed in the Ely Draft RMP are outside the scope of this programmatic analysis.

RMC-0070-004
California Regional
Water Quality Control
Board

**Comment:** These objectives require that no levels of herbicides be detectable in waters (including wetlands) of the Lahontan Region at any time. Your [P]EIS should: (1) clearly acknowledge these requirements, (2) provide for adequate mitigation measures to assure compliance with these objectives, and (3) provide for adequate monitoring and reporting to assess compliance with these objectives.

**Response:** Actions to meet local herbicide-use requirements and mitigation and monitoring measures would be developed at the local field level, as discussed in Chapter 1 of the PEIS under NEPA Requirements of the Program.

BLM_0001336

RESPONSE TO COMMENTS

RMC-0095-010
New Mexico
Department of Game
and Fish

**Comment:** We therefore recommend that a Supplemental D[raft] PEIS be developed to addresses these issues. The Supplemental may need to develop new alternatives for public consideration, but at the least, should propose new best management practices, standard operating procedures, and recommended mitigations, standards and guidelines based on the findings of the new analyses.

**Response:** Council on Environmental Quality regulations at 40 CFR [Code of Federal Regulations] 1502.9 provide the standards for issuing a Supplemental EIS. The regulation states: Agencies 1) Shall prepare supplements to either drafts or final environmental impact statements if: (i) The Agency makes substantial changes in the proposed action that are relevant to environmental concerns; (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. The issues identified in the Draft PEIS have been adequately analyzed at the programmatic level. The BLM has not made any substantial changes in its proposed action, nor has the analysis or public comment identified significant new circumstances or information relevant to environmental concerns which would compel BLM to publish a supplemental EIS.

RMC-0221-047
Center for Biological
Diversity

**Comment:** The D[raft] PER states that 3.5 million acres would be treated primarily for hazardous fuels reduction and to control fires in the WUI. This is more than half of the total vegetation treatment area identified in the D[raft] PER and D[raft] PEIS of 6 million acres annually. Because there is no meaningful identification or analysis of the impacts of the project on WUI areas, site-specific NEPA analysis of any such projects must be undertaken when those site-specific projects are proposed. The BLM cannot rely on this D[raft] PEIS or D[raft] PER to truncate future NEPA analysis or to categorically exclude any of these actions from subsequent site-specific analysis.

**Response:** The section in Chapter 1 of the PEIS under NEPA Requirements of the Program clearly states that step-down, site-specific NEPA analysis is required. Local level analysis will meet the requirements of NEPA; analysis will be focused on whatever issues (such as listed in the comment) are identified locally by the BLM and the public.

EMC-0630-011
Porter, Mark C.
(Wallowa Resources)

**Comment:** Another area of the [P]EIS that needs clarification is how this document will be put into use on the ground. There was not a clear process outlined as to how the adopted [P]EIS will be used by the districts and management units to go about on the ground work.

**Response:** The NEPA Requirements of the Program are given in Chapter 1 and on Figure 1-1 of the Draft PEIS.

**Proposed Action and Purpose and Need, Interrelationships and Coordination with Agencies**

EMC-0155-004
Kozlowski, James C.
(National Society for
Park Resources,
National Recreation
and Park Association)

**Comment:** Given the potential impact of the proposed programmatic EIS might on National Parks and Monuments in 17 states, I question whether this proposed project was adequately coordinated with the National Park Service in addition to the other federal agencies noted by BLM. In addition, to the National Park Service, I would hope that BLM would promote coordination among state and local recreation resource managers in the states potentially affected by the proposed programmatic EIS.

**Response:** The BLM regularly coordinates with local, state, and federal agencies, including the National Park Service (see Interrelationships and Coordination with Agencies in Chapter 1 of the PEIS), and environmental and conservation

BLM_0001337

organizations. This coordination occurs at the national and local levels of the BLM. In addition, agencies were provided with copies of the Draft PEIS and PER and asked to provide comments on the documents.

EMC-0295-002
Thompson, Julie

**Comment:** I would like to see the BLM apply some type of pressure/encouragement to the county governments in the areas where you are planning to use the herbicides. Many counties have a prison population that could be transported to these remote areas to do some manual labor. If I had a choice to sit in a cell or get out into the back country for a few days, do some camping and see the stars, I'd pull weeds to do it. We have other options besides chemicals. Please be a little more creative in accomplishing your goals. This is the wilderness we are talking about.

**Response:** As discussed under Interrelationships and Coordination with Agencies in Chapter 1 of the PEIS, the BLM is actively involved in coordinating with local governments and in participating with local Cooperative Weed Management Areas. The BLM utilizes numerous partnerships across the public lands to leverage its funding and capacity to manage vegetation on the ground. Many BLM field offices also utilize volunteers and other types of labor, including low-risk prison populations, for BLM non-herbicide vegetation treatment projects.

RMC-0205-024
Oregon Department of Agriculture

**Comment:** We recommend that BLM establish direct communication with the public water system operator or community liaison downstream of the BLM land management areas. There are no requirements to develop or implement "drinking water protection plans" in Oregon, but the communities that elect to move forward voluntarily will request that BLM be involved in the planning and protection of that source area.

**Response:** Interrelationships and Coordination with Other Agencies is discussed in Chapter 1 of the PEIS. Local BLM field offices are encouraged to coordinate with local agencies and the public concerning any herbicide project that could affect ground or surface drinking or agricultural water sources. The BLM agrees that it should be involved in planning drinking water protection plans for local communities.

EMC-0315-002
Arizona Game and Fish Department

**Comment:** We request that close coordination between the [Arizona Game and Fish] Department and BLM occur prior to the implementation of treatments to reduce negative impacts to wildlife and wildlife habitat.

**Response:** See response to Comment RMC-0144-018 under Proposed Action and Purpose and Need, Interrelationships and Coordination with Agencies.

EMC-0315-004
Arizona Game and Fish Department

**Comment:** The [Arizona Game and Fish] Department supports the idea of vegetation treatments designed to improve fish, wildlife, and native plant habitats. We applaud the Bureau's efforts to use additional tools and strategies to address vegetation concerns, particularly invasive species issues. We request that the Department be involved with treatment planning and implementation level activities. Additionally, we request BLM coordinate with the Department regarding potential negative impacts to any potentially affected wildlife population (including game species) prior to implementation of treatments.

**Response:** See response to Comment RMC-0144-018 under Proposed Action and Purpose and Need, Interrelationships and Coordination with Agencies.

BLM_0001338

RESPONSE TO COMMENTS

EMC-0446-014
The Nature
Conservancy

**Comment:** We believe that the PEIS and PER should put greater emphasis on coordination with other Federal and State agencies on vegetation management treatments and new herbicide proposals to meet the stated intent of building collaborative relationships. The BLM coordinates with the U.S. Fish and Wildlife Service (USFWS) and National Marine Fisheries Service [NMFS] on potential impacts to Federally-listed, proposed and candidate species. The BLM should also initiate coordination with USFWS on conserving migratory Birds of Conservation Concern, both at the project level and for new herbicide proposals. Department of the Interior and BLM policy requires annual coordination with state wildlife agencies on management proposals. To be most successful, this coordination should be designed to pro-actively meet conservation and recovery goals for all species of concern rather than merely avoiding "jeopardy" or minimizing adverse effects to these species. The PEIS and PER should require early and pro-active coordination with all agencies involved in the management of fish, wildlife and rare plant resources.

**Response:** Coordination with other agencies and interested parties is discussed in several sections of the PEIS, PER, and Biological Assessment (BA). These sections include Chapter 1 (Interrelationships and Coordination with Agencies), Chapter 2 (Coordination and Education in PEIS, and Coordination in PER), and Chapter 5 (Consultation and Coordination) in the PEIS; Chapter 1 (Interrelationships and Coordination with Agencies) and Chapter 2 (Coordination) of the PER; and Chapter 3 of the BA (Species Status Species Management Consultation Protocol). Coordination with agencies is also discussed extensively in Appendixes B (Human Health Risk Assessment), C (Ecological Risk Assessment), E (Protocol for Identifying, Evaluating, and Using New Herbicides, and G (Tribal and Agency Consultation). The USFWS, NMFS, and USEPA coordinated extensively with the BLM during preparation of the risk assessments and in evaluating risks to species of concern.

EMC-0533-021
Colorado Farm Bureau

**Comment:** For example, the Animal and Plant Health Inspection Service (APHIS) has published for public comment a Draft Action Plan on Noxious Weeds. Like the BLM document, the APHIS draft does not mention coordination with BLM or other agencies in implementing its action plan. We submit that BLM and APHIS must work together on both of these plans if either one is to be effective. We have suggested to APHIS that they work with BLM, and we suggest to BLM that they work together with APHIS and other agencies.

**Response:** See Chapter 1 of the PEIS under Interrelationships and Coordination with Agencies. The BLM coordinates with federal agencies that administer laws that govern activities on public lands. The BLM and APHIS operate cooperatively through a national-level Memorandum of Understanding (MOU). The Action Plan from APHIS referenced in the comment is The Draft Weed Action Plan developed by APHIS for the implementation of the Plant Protection Act. The Action Plan is related to APHIS regulatory plans, not specific to interagency cooperation. However, the BLM would coordinate with APHIS on implementation of the Plant Protection Act and other activities on BLM-managed lands, per the National MOU.

EMC-0584-086
Western Watersheds
Project

**Comment:** BLM and the Forest Service often embark on fire-related/treatment projects. The interrelationships of all ongoing or planned activities in this region, including across ownership boundaries, must be fully explored.

**Response:** See Chapter 1 of the PEIS under Interrelationships and Coordination with Agencies. The BLM and Forest Service cooperate extensively on projects involving fire management. They were the two primary agency leads on the development of the

BLM_0001339

*National Fire Plan* (USDI and USDA 2001a) and *Protecting People and Sustaining Resources in Fire Adapted Ecosystems: A Cohesive Strategy* (USDA and USDI 2006b). The BLM also worked closely with the Forest Service during development of the Interior Columbia Basin Ecosystem Management Project, which covers fire and other natural resource management activities on BLM- and Forest Service-administered lands in the Pacific Northwest.

RMC-0144-003
Wyoming Game and
Fish Department

**Comment:** Several of the activities, as cited in many sections, will have impacts to fish and wildlife resources, their habitats, and associated recreational opportunities. We recommend that BLM consult with State Fish and Wildlife Agencies prior to, and during development, implementation and monitoring of vegetation treatment activities.

**Response:** See response to Comment RMC-0233-017 under PEIS Proposed Action and Purpose and Need, Interrelationships and Coordination with Agencies.

RMC-0233-009
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** We applaud BLM's commitment to the concept in the D[raft] PEIS/PER and recommend that they engage in a cooperative effort with the Service, State wildlife agencies, and the U.S. Forest Service (USFS) to develop a consistent, seamless monitoring approach for HFRA [Healthy Forests Restoration Act] projects in the final PEIS/PER. The State of Utah offers as an example, the Utah Partners for Conservation and Development, an organized interagency entity which coordinates vegetation restoration projects and can provide the structure and support in which to design such a monitoring system.

**Response:** See response to Comment RMC-0081-003 under PEIS Alternatives, Coordination and Education. The BLM supports collaborating on an interagency basis to develop consistent monitoring approaches for vegetation treatments, including HFRA projects. At this time such a monitoring system has not been designed. This PEIS recognizes the value and need for monitoring of vegetation treatments. However, development of a monitoring approach among all federal and state regulatory and wildlife agencies, specifically for HFRA projects, is beyond the scope of this PEIS.

RMC-0233-017
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** We recommend that the BLM ensure that proposed management actions in the final PEIS/PER not conflict with either State or local working group activities designed to benefit sage-grouse. We encourage BLM to contact each State wildlife agency sage-grouse coordinator to facilitate communication and coordination on these issues for the final PEIS/PER.

**Response:** The BLM coordinates extensively with state fish and wildlife agencies on issues related to sage-grouse and other fish and wildlife. BLM representatives often are participants in committees developing and overseeing sage-grouse restoration plans and activities in the western U.S.

EMC-0446-010
The Nature
Conservancy

**Comment:** Regional coordination/integration of vegetation management practices: For vegetation management of this magnitude (24 percent of all BLM-managed public land would be treated in the first decade) coordination of treatment goals, priorities and areas to be protected should occur above the project and field office levels. Due to the scale of treatments in some areas (over 50 percent of all fuels reduction projects would occur in one ecoregion) specific regional strategies that include additional multi-agency regional analysis, priority setting among adjacent landowners, and management guidelines is needed to ensure projects are designed to restore ecological function rather than contribute to the continued decline of certain community types, particularly sagebrush and other shrub communities. The BLM's Great Basin

BLM_0001340

RESPONSE TO COMMENTS

Restoration Initiative makes a good start in describing general treatment needs for public land within the Great Basin, but the treatment goals need to be more specific for particular plant communities and ecological condition, better integrated with sagebrush management guidelines, consistent with regional sage-grouse and other special status species restoration strategies, and prioritized with other agencies conservation and restoration strategies to be effective.

**Response:** The implementation recommendations on the types of vegetation methods identified in the Great Basin Restoration Initiative and other initiatives for vegetation treatments are incorporated in the analysis of the PEIS and PER for the purpose of managing vegetation to restore ecological function, reduce fuels, and control and manage noxious and invasive weeds. The BLM's interrelationship and coordination with agencies is discussed in Chapter 1 of the PEIS under Interrelationships and Coordination with Agencies. At the local level, BLM field offices closely coordinate projects with their partners and adjacent landowners, and will incorporate the broad level analysis within this PEIS into local land use plans and more specifically into site-specific level analysis.

RMC-0070-007
California Regional
Water Quality Control
Board

**Comment:** Your [P]EIS should specify that this office requires ample notification of specific weed control projects which utilize pesticides within the Lahontan Region. Such notification is necessary for us to be able to assess compliance with State water quality standards. Your [P]EIS should also specify that this office will receive copies of monitoring results related to water quality within the Lahontan Region.

**Response:** See Chapter 1 of the Final PEIS under Interrelationships and Coordination with Agencies. The type of coordination described is accomplished at the local field office level. The text has been revised to clarify this relationship. Specific notification and monitoring requirements for your agency need to be communicated to the field office within your jurisdiction. In most cases these relationships are already established among the state regulatory and federal agencies.

RMC-0081-003
Arizona Game and Fish
Department

**Comment:** The Department supports the idea of vegetation treatments designed to improve fish, wildlife, and native plant habitats. We applaud the Bureau's efforts to use additional tools and strategies to address vegetation concerns, particularly invasive species issues. We request that the Department be involved with treatment planning and implementation level activities. Additionally, we request BLM coordinate with the Department regarding potential negative impacts to any potentially affected wildlife population (including game species) prior to implementation of treatments.

**Response:** Site-specific analysis is coordinated with the appropriate county, state, and federal agencies. It is crucial that the BLM coordinate with local state fish and game agencies when developing local site-specific analysis for vegetation treatment projects.

RMC-0144-018
Wyoming Game and
Fish Department

**Comment:** Pages 2-31 and 2-32 [of the Draft PEIS] cite that fish and wildlife may be harmed or killed using some herbicides. State fish and wildlife agencies are responsible for wildlife management and we are concerned that the BLM may not adequately consult and coordinate with those agencies in the planning, development, execution and post treatment management of the treatments. We believe strong partnerships between the BLM and state agencies will alleviate these concerns.

**Response:** Management of wildlife on the public lands is a partnership between the BLM, which manages the habitats, and the appropriate state wildlife agency, which manages the animals. All vegetation treatments will affect some wildlife and/or its

BLM_0001341

habitat. The BLM is required to seek the involvement of the public in the environmental analysis, land use planning, and implementation decision-making process to address local, regional, and national interests. The BLM is ultimately responsible for land use plan decisions, including vegetation management on public lands. Collaborative relationships with stakeholders, including individuals, communities, governments, and the state wildlife agency, improves communication, provides the BLM with a greater understanding of different perspectives, and helps the BLM find solutions to issues and problems. The NEPA process requires the BLM to notify the public of a proposed project, and give the public an opportunity to comment on the site-specific analysis done for the project. It is critical for the BLM to notify potentially affected parties of treatment activities that occur on public lands and provide an opportunity to comment on the proposed action, and to take any steps needed to mitigate the effects of the action. Treatment actions may be modified in response to comments posed by the public.

RMC-0144-023
Wyoming Game and
Fish Department

**Comment:** We compliment the BLM on the work, program goals and objectives addressed in the documents. We strongly recommend the BLM include a requirement to consult and collaborate with state wildlife agencies in the planning, implementation, and monitoring of vegetation treatments based on the potential short and long-term effects on fish and wildlife populations and their habitat and associated wildlife recreational activities. Strong partnerships could alleviate many of these concerns.

**Response:** The BLM agrees. See the discussion in Chapter 1 of the PEIS regarding interrelationships and Coordination with Agencies.

**Proposed Action and Purpose and Need, Consultation**

EMC-0619-005
Bellovary, Christopher

**Comment:** 16 USC [United States Code] § 1536(a)(2) [ESA [Endangered Species Act] § 7(a)(2)] requires that the BLM receive appropriate Biological Opinions from the Fish and Wildlife Service and National Marine Fisheries Service before engaging in official agency action that may result in harm to threatened and endangered species. At this point, I haven't seen any indication that this has been performed, but clearly would need to be done before the BLM can engage in the spraying of these herbicides. I strongly suggest that this oversight be remedied.

**Response:** See response to Comment RMC-0214-040 under PEIS Alternatives, Special Status Species. It is anticipated that the Services will issue a Biological Opinion or written concurrence with the BLMs finding that the proposed action "may affect, but is not likely to adversely affect" listed species or critical habitat.

**Proposed Action and Purpose and Need, Public Involvement, Scoping, and Issues**

EMC-0585-078
Western Watersheds
Project

**Comment:** BLM has failed to evaluate a reasonable range of alternatives, and take a hard look (best done through comparisons of relative impacts under various alternative), of the large-scale vegetation manipulation and treatment that it proposes.

**Response:** As discussed in Chapter 1 of the PEIS under Development of the Alternatives, the BLM developed a range of alternatives based on information obtained from the public during scoping. In turn, the alternatives analysis was based on the number of acres proposed for treatment for each alternative and reflects the scale of vegetation treatment proposed for each alternative.

BLM_0001342

RESPONSE TO COMMENTS

| | |
|---|---|
| RMC-0057-006<br>California Wilderness<br>Coalition | **Comment:** The D[raft] [P]PEIS fails to consider an alternative that prohibits mechanical treatments in areas with wilderness characteristics. Council on Environmental Quality (CEQ) regulations require a reasonable range of alternatives to be presented and analyzed in the [P]EIS so that issues are "sharply defined" and the EIS provides "a clear basis for choice among options…" 40 C.F.R. [Code of Federal Regulations] § 1502.14. CEQ regulations and court decisions make clear that the discussion of alternatives is "the heart" of the NEPA process. Environmental analyses must "[r]igorously explore and objectively evaluate all reasonable alternatives."<br><br>**Response:** See response to Comment RMC-0057-007 under PEIS Proposed Action and Purpose and Need, Development of the Alternatives. |
| RMC-0057-007<br>California Wilderness<br>Coalition | **Comment:** Given the extensive concern for WSAs [wilderness study areas] and other areas with wilderness characteristics demonstrated during the scoping process, the BLM should have prepared an action alternative that responds to these concerns. This violates NEPA's requirements to develop a full range of alternatives and to explore each in detail (40 CFR [Code of Federal Regulations] 1502.14, 1505.1).<br><br>**Response:** The PEIS programmatically covers all public lands administered by BLM, including special areas such as WSAs, wilderness, and areas with wilderness characteristics. Concern regarding vegetative treatments in these areas is noted. Activities conducted in WSAs are guided by non-impairment and minimum tool requirements outlined in the Wilderness Study Area Interim Management Plan (IMP) Handbook H-8550-1. Activities in designated wilderness are guided by the Wilderness Act, Wilderness management plans, and minimum requirements and tool analysis. Activities within areas with wilderness characteristics are guided by local land use plans. In all cases, for any proposed project with potential effects to these special areas, impacts are assessed through project-specific NEPA analysis and mitigation applied where appropriate. Scoping did not result in identification of any issues that remain unresolved and need to be addressed through a separate alternative specific to wilderness, on a national programmatic basis. |
| RMC-0067-007<br>Wyoming Outdoor<br>Council | **Comment:** BLM should revisit its preferred alternative and select an alternative that relies less on the broadcast use of herbicides and instead focuses on biological means of control and very selective use of herbicides as the means of reducing catastrophic wildfires and invasions of noxious weeds.<br><br>**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation. |

**Proposed Action and Purpose and Need, Preview of the Remainder of the PEIS**

| | |
|---|---|
| EMC-0585-241<br>Western Watersheds<br>Project | **Comment:** Table 1-1 [of the Draft PEIS] claims livestock grazing is addressed in 2 places, 1-1, 2-15 (statement that BLM 'recommends' as a SOP [Standard Operating Procedure] that grazing animals be fed only weed free forage for a minimum of 96 hours prior to going onto public lands', and also bundles a mention of 'poor gazing management' under   1-4, 2-14 (eliminates consideration of no grazing alt.), and Chapter 4. 2-15 states [text missing from comment].<br><br>**Response:** Livestock grazing and related issues are covered elsewhere in the PEIS, especially in Chapter 4, and in the PER. We have included references to these sections in Table 1-1 of the Final PEIS. |

BLM_0001343

## Alternatives, Introduction

RMC-0138-003
Pitkin County Weed
Advisory Board

**Comment:** The Pitkin County Weed Advisory Board fully supports alternative B, although we feel great caution should be exercised in expanding herbicide use and increasing the number of acres to control. We feel other alternatives would hold back weed control progress on the 262 million acres the BLM controls.

**Response:** Your comment has been noted.

## Alternatives, BLM Programs Responsible for Herbicide Treatments

EMC-0640-029
Animal Welfare
Institute

**Comment:** An approach that emphasizes allowing natural factors to control ecosystem processes where and when applicable is entirely consistent with the legal framework under which the BLM operates. Specifically, BLM's multiple use mandate only requires the agency to allow for appropriate multiple use of its land. It does not mandate that the BLM facilitate such use by manipulating nature or natural processes in ways that would adversely affected native species of fauna or flora.

**Response:** See Purpose and Need for the Proposed Action in Chapter 1 of the PEIS. The BLM is not proposing to facilitate multiple use of the public lands by manipulating nature or natural processes in ways that would adversely affect native species of fauna or flora. BLM vegetation treatments are designed to meet land use plan goals and objectives for vegetation for the overall benefit of native species and their habitat.

PHC-005-006
K. Fite

**Comment:** As part of the treatments that are going to be conducted under the Healthy Forests Initiative, fire funds will be used to buy these herbicides that are going to be sprayed on public lands, while at the same time, we aren't addressing the unnecessary roading on public lands. We aren't addressing the run-a-muck now, oil and gas exploration, including in Brian's home state of Nevada, where there are now suddenly all these proposals for ramped oil and gas exploration across very fragile sagebrush landscapes in sage grouse habitats, pygmy rabbit habitats, etc.

**Response:** Herbicide projects would be funded through a variety of BLM natural resource programs, not exclusively fire funds. Off-road vehicle use, access, and oil and gas leasing issues are addressed in land use plans and are outside the scope of this PEIS.

RMC-0130-002
Craig, Diane

**Comment:** What my biggest concern is – is who is to gain? It certainly is not our lands, they have evolved perfectly on their own accord and have their own built in abilities to deal with invasive plants (introduced by man and domesticated animals I might add); it certainly is not the people who use the lands after all who would choose willfully and consciously to walk through a cocktail of poisons, carcinogens, mutagens and hormone disrupting chemicals. It certainly would not be the wildlife that would have something to gain after all do they have bank accounts to roll that huge sum of dollars into as the taxpayers pay for this both on a national and local level. I for one am abhorred that the money I work honestly and hard for would be used to exterminate so many species on our planet.

**Response:** See responses to Comment EMC-0646-174 under PEIS Environmental Consequences, Cumulative Effects Analysis and Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. The BLM manages public lands on behalf of the American public.

BLM_0001344

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0544-004<br>Public Lands<br>Advocacy | **Comment:** [The following concern should be addressed:] How oil and gas operations will be managed while vegetation is being re-established |
| | **Response:** The BLM has several oil and natural gas development environmental standard operating procedures for noxious and invasive weed prevention and control. Refer to BLM Washington Office Instruction Memorandum 2004-194 on environmental Best Management Practices policy and the "Operations BMPs" identified at: http://www.blm.gov/bmp/Technical_Information.htm. The BLM resource specialist evaluates each oil and natural gas drilling and production proposal and determines, on a site-specific basis, the most appropriate noxious weed prevention and control measures or Best Management Practices for the situation. |

**Alternatives, Vegetation Treatment Planning and Management**

| | |
|---|---|
| EMC-0027-003<br>McNeel, Hank | **Comment:** I feel that a much stronger emphasis should be placed on how the Bureau of Land Management and their cooperators utilize a combination of Integrated Weed Management. I realize that you are mainly covering herbicides in this PEIS but if you do not stress the balanced approach of an Integrated Weed Management approach much of the public still think that all the BLM does is use herbicides. You need to have a brief on the comparison of different control techniques and methods from the Annual Integrated Weed Management Reports that the Washington Office is supposed to receive from all BLM State Offices annually. |
| | **Response:** Chapter 2 of the PER discusses the treatment methods and planning that would be used by the BLM, including Site Selection and Treatment Priorities. We have expanded the discussion in this section, and have included this material in the Final PEIS to help the public better understand that the BLM would use fire use and manual, mechanical, and biological control treatment methods, in addition to herbicide use, and that herbicide use would comprise only about 16% of treatments. Also see responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation and Comment RMC-0222-059 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response. |
| EMC-0145-002<br>Wahl, Mark | **Comment:** Integrated vegetation management is now a science in a mature phase that can obviate much pesticide usage. The toxics in very small quantities are being shown by current research to be extremely harmful to wildlife. |
| | **Response:** Herbicides would be used on only about 16% of acres treated annually, as discussed in the response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation. Based on ecological risk assessments conducted for the PEIS (see Appendix C of the PEIS), most of the proposed treatment scenarios would result in low risk to wildlife, and Standard Operating Procedures and mitigation identified in Tables 2-8 and 2-9 of the PEIS would help to further reduce these risks. |
| EMC-0233-002<br>Dyber, Kenneth James | **Comment:** I do not feel this is an effective way to deal with an invasive plant problem. Before drenching our lands with herbicides, please consider the reasons for this invasive plant problem, such as use of off road vehicles, large timber harvests & livestock grazing. These practices all encourage invasive weeds on BLM land. |
| | **Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread. |

BLM_0001345

EMC-0286-004
Elzinga, Stephen
(Eagle County Weed
and Pest Department)

**Comment:** Each Colorado BLM Field Office should be required to develop and implement an Integrated Weed Management Plan (IWMP) (Local governing bodies in Colorado operate under this requirement). Each BLM Field Office should have a staffer, a professional series position, tasked with meeting that unit's IWMP management objectives.

**Response:** See response to Comment RMC-0210-053 under PEIS Alternatives, Coordination and Education.

EMC-0291-002
Maxwell, Bruce
(Montana State
University)

**Comment:** I believe that much more attention needs to be given to premanagement assessment of the weed populations in order to make economic and environmentally sound decisions. Herbicides, or any other form of management should not be allowed to be used on public lands until there is scientifically sound evidence that populations are invasive and represent a significant threat to management goals. Literature that makes general statements about the invasiveness of species is not adequate to become a rationale for management of these species. There seems to be a general assumption that species listed on noxious weed lists are extremely invasive under all conditions and will always have a significant impact, regardless of the management objective. Plant species are not invasive. Species can have populations that are invasive, but there are no cases that, I know of, where all populations of any given weed species are invasive. We have accumulated many measurements over the past 10 years that convincingly draw into question these assumptions that have become commonplace. I am defining invasive as a population that is consistently increasing in density and/or spatial extent. The definition of invasive also commonly includes a population that is having a significant impact on management objectives

**Response:** Noxious weeds are a legal definition promulgated by state law. Not all noxious weeds are considered extremely invasive under all conditions. Invasive plants exhibit characteristics that tend toward long-term dominance of a vegetation community. Please refer to the Glossary of the PEIS and PER for definitions of invasive plants and noxious weeds. Invasive species may also include biological organisms, including but not limited to, animals, insects, and parasites.

EMC-0306-005
Klamath RiverKeeper
Program and Klamath
Forest Alliance

**Comment:** In order for the BLM to implement the proposed action it would require a consistent annual budget at the level required to implement its' proposed program. Government budget are subject to fluctuations and shortfalls. The effective management of invasive plants can only occur if there is consistent and thorough management annually. Without persistent and thorough annual management the program can not be successful.

**Response:** See responses to Comment RMC-0038-009 under PEIS Alternatives, Vegetation Treatment Planning and Management and Comment RMC-0144-025 under PEIS Alternatives, Vegetation Treatment Planning and Management.

EMC-0306-006
Klamath RiverKeeper
Program and Klamath
Forest Alliance

**Comment:** The use of herbicides will eliminate various other non-target plants on the application sites. Reducing desired native plant population and concentrations will create a condition that increases the potential and likelihood for invasive plants. Furthermore, the ineffective control of invasive plants by using herbicides will result in the development of herbicide resistant invasive plants.

**Response:** See response to Comment EMC-0646-191 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding the types of vegetation targeted by herbicides. Herbicide resistance is the inherited ability of a plant to survive

BLM_0001346

RESPONSE TO COMMENTS

an herbicide application to which the wild-type was susceptible. Resistant plants occur naturally within a population and differ slightly in genetic makeup but remain reproductively compatible with the wild-type. Herbicide resistant plants are present in a population in extremely small numbers. The repeated use of one herbicide allows these few plants to survive and reproduce. The number of resistant plants then increases in the population until the herbicide no longer effectively controls the weed. Herbicide resistance is not the natural tolerance that some species have to an herbicide. The appearance of herbicide-resistant weeds is strongly linked to repeated use of the same herbicide or herbicides with the same site of action in a monoculture cropping system or in non-crop areas.

See Comment EMC-0267-007 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods for strategies to minimize development of resistant weed species.

EMC-0306-015
Klamath River Keeper
Program and Klamath
Forest Alliance

**Comment:** To achieve effectiveness, all BLM Programs/Projects must clearly identify the Goals and objectives, including the desired future condition. The desired future condition needs to identify what plant community (native or not) is needed at each site. A plant community that best meets the goals and objectives needs to be part of the desired condition. Identification of the type of ecosystem being managed will help provide varying direction. Ecosystem ex: Agricultural, Urban/Suburban, and Wildland. All laws, regulations, and policies need to be followed.

**Response:** The Draft PEIS addresses the use of herbicides as a tool to treat vegetation. Goals, objectives, and desired future conditions are expressed in the controlling local land use plan that provides the context for any proposed vegetation treatment, as discussed under Scope of Analysis in the Decisions to be Made and Scope of Analysis section of Chapter 1 of the PEIS. This PEIS does not make any land use decisions or allocations.

EMC-0306-016
Klamath River Keeper
Program and Klamath
Forest Alliance

**Comment:** To achieve effectiveness, all BLM Programs/Projects must develop a comprehensive strategy, that identifies all of the integrated elements, including a cost benefits analysis and the level of success that is expected. (See SRRC [Salmon River Restoration Council] 13 Steps Program at www.srrc.org or in its' brochures and handouts). Proven methods need to be utilized, where appropriate. Strategies need to include various assessments and recommendations including: identifying what values needs to be protected and restored; what are the risks associated with the noxious weeds; opportunities and constraints; short and long term cost of management, and timeline of actions to be taken. Action Plans must include tasks such as: preventing the spread at all levels; stakeholder education; coordination /communication; completing a comprehensive inventory of all prioritized species; developing annual work plans for each species; tracking and effectiveness monitoring; and an inclusive program that covers all of the vectors and emphasizes early detection, rapid, response, thorough and persistent treatment, zero seed prescription, and uses the most appropriate tool. Each population needs to visited at least 3 times a year and have at least 2 sets of eyes per visit. Many species need to be managed year round. All life stages need to be easily identified.

**Response:** See response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. Local land use and activity plans guide and outline the strategies for local action plans. The frequency of visits to monitor plant populations is based on the site-specific analysis and the goals and objectives that the project is designed to meet.

BLM_0001347

EMC-0306-017
Klamath River Keeper
Program and Klamath
Forest Alliance

**Comment:** To achieve effectiveness, all BLM Programs/Projects must include a strategy that includes the management and evaluation of all of the invasive plant species present at the 4th or 5th Field Watershed scale, which may include more than one planning unit and managing agencies jurisdiction.

**Response:** See response to Comment EMC-0306-016 under PEIS Alternatives, Vegetation Treatment Planning and Management. BLM watershed evaluations are conducted at the Hydrologic Unit Code (HUC) level appropriate to the scale of the evaluation. Typically this is at the 4th or 5th Field Watershed scales.

EMC-0306-018
Klamath River Keeper
Program and Klamath
Forest Alliance

**Comment:** To achieve effectiveness, all BLM Programs/Projects can not just manage a single species of prioritized invasive species. A full community of invasive species needs to be managed simultaneously.

**Response:** See response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. The PEIS does not propose management of any single prioritized species. The BLM manages across a full range of vegetation types. Priorities for management are determined through local land use, activity, and project planning.

EMC-0306-020
Klamath River Keeper
Program and Klamath
Forest Alliance

**Comment:** To achieve effectiveness, all BLM Programs/Projects must have a means of support that can insure the level of treatment to achieve the desired level of control. Approach needs to be consistent with the areas customs and culture, as well as be received with acceptance and support by the local community.

**Response:** See responses to Comment EMC-0306-016 under PEIS Alternatives, Vegetation Treatment Planning and Management and Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0343-001
Lockhart, Mary Ann

**Comment:** The plan as described sounds as if you are "throwing out the baby with the bath," This plan suggests wholesale spraying without doing the necessary preliminary precise identification of what invasive [species] you will be dealing with and what herbicide would be the most effective without being destructive of everything else.

**Response:** See Response to Comment EMC-0486-020 under PEIS, Alternatives, Vegetation Treatment Planning and Management. Treatments under an IPM framework require such identification of the species and the most effect and appropriate herbicide.

EMC-0446-006
The Nature
Conservancy

**Comment:** We are concerned that the proposed major expansion of vegetation treatments on public land by the BLM discussed in the Draft PEIS and PER is not supported by identified ecological goals for each ecoregion, restoration objectives for individual plant communities, adequate mandatory guidelines for selecting and applying appropriate treatment methods, and appropriate monitoring strategies at multiple scales that will measure both accomplishment in meeting restoration objectives as well as effects to other resources. We will discuss these concerns in more detail for each document in the sections below.

**Response:** See response to Comment EMC-0446-071 under PER Vegetation Treatment Programs, Policies, and Methods, Monitoring.

BLM_0001348

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0446-013<br>The Nature<br>Conservancy | **Comment:** Altered landscapes: The PEIS and PER need to acknowledge that there are significant areas on public land that are so highly altered that they are not economically or practically recoverable. For example, in areas of significant downy brome (*Bromus tectorum*) infestation, inappropriate (prescribed fire) or insufficient (plowing or tilling without appropriate native plant restoration techniques) actions in these areas may cause increases in downy brome infestation and fire frequency. Guidance needs to be provided for areas where specific treatments are not appropriate in specific ecosystems, for example, restricting the use of prescribed fire in sagebrush plant communities below elevation gradients where downy brome is most likely to invade. |

**Response:** See response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. Parameters for the use of specific techniques for vegetation control are developed at the local planning level based on site-specific conditions and the identification of highly altered landscapes where certain treatment techniques may not be advisable.

| | |
|---|---|
| EMC-0446-045<br>The Nature<br>Conservancy | **Comment:** The PER should include ecologically-based goals for restoration that quantify desired outcomes. The PER should describe how the BLM intends to measure goals to "sustain the condition of healthy lands, and, where land conditions have degraded, to restore desirable vegetation to more health conditions" (PER 4-32). These goals, objectives, priorities and strategies should be based on the best available science for the specific plant communities scheduled for treatment not on general concepts of fire risk and fuels treatment drawn from other habitat types. |

**Response:** See response to Comment EMC-0446-050 under PEIS Alternatives, Site Selection Methods.

| | |
|---|---|
| EMC-0486-020<br>Siskiyou Project | **Comment:** Passive restoration needs to take place, stop the logging and reduce the grazing cattle among other things. "Prevention and early detection is the cheapest and most effective wed control method. Prevention and early detection strategies than reduce the need to vegetative treatments for noxious weeds could lead to a reduction in the number of acres treated for noxious weeds in the future by reducing or preventing their establishment" (DEIS [Draft PEIS], p. 2-16). In addition, "There are several drawbacks and limitations to herbicide use ... Weeds may develop a resistance to a particular herbicide over time" (DEIS [Draft PEIS], p. 2-14) and therefore chemical treatment should only be considered as a very last resort. |

**Response:** The BLM agrees that prevention and early detection is the cheapest and most effective form of weed control. In those instances where weeds have become established, a vegetation treatment using one or more methods is employed. The BLM follows an integrated approach to vegetation treatment, commonly called integrated pest management (IPM) or integrated weed management (IWM), and recognizes this approach as the most effective approach to treating vegetation. An underlying principle of IPM is to utilize available tools for vegetation treatments in a manner that emphasizes the appropriate tool or method(s) for any particular project or circumstance. There is no priority order implied in using mechanical, manual, biological, fire, or herbicide treatments, or passive treatments. In some cases, a combination of methods may be appropriate for a given situation, such as use of mechanical methods in combination with fire, or use of a pre-emergent herbicide following a prescribed fire or wildland fire to prevent or reduce invasion by downy brome. In other cases, a method may not be appropriate for a situation, such as herbicide spraying near human habitation, or using prescribed fire within a wildland

BLM_0001349

urban interface, where the risk of harm or damage to people and structures is likely. In some cases a small weed infestation may be effectively eradicated using herbicides first, ending the risk of invasive species spread altogether for that area. In each situation, a project plan is developed, appropriate risk analysis is undertaken and a method is selected through site-specific NEPA analysis. In this manner, the decision-maker has a full array of tools to choose from to best meet the needs of the situation. To mandate use of chemicals as a last resort only does not provide the early detection and rapid response flexibility needed to address vegetation problems.

EMC-0496-001
DeLong, Colleen

**Comment:** Please address the invasive species problems on the lands you manage carefully and with a strong land stewardship ethic. Please do not focus only on only short term goals of cattle production. Consider the whole picture, including soil and water quality, wildlife habitat, and restoring native plant communities, and long-term ecosystem health.

**Response:** As discussed in Chapter 2 of the PEIS and PER, multiple programs within the BLM have an interest in land management and stewardship. The PEIS and PER describe the benefits to plants and humans and other animals that use public lands, and little effort was spent on vegetation management for cattle production. As noted in Chapter 1 of the PEIS under Scope of Analysis, the PEIS does not address vegetation treatments exclusively designed to promote livestock forage. If one reviews the topics covered in Chapters 3 and 4 of the PEIS and PER, it becomes evident that these documents address a diversity of resources.

EMC-0496-004
DeLong, Colleen

**Comment:** Follow best management practices for timing and dosage for all herbicides, and use herbicides only in conjunction with an integrated pest management approach that also uses other tools such as mechanical control, controlled burning, and carefully screened biological control organisms. Minimize use of any herbicide that is a known groundwater contaminant, developmental or reproductive toxin, acutely toxic, carcinogen or endocrine disruptor. Take strong steps to avoid harming wildlife, by evaluating non-target impacts and taking a realistic look at the dangers of combinations of chemicals and of "inactive" ingredients like surfactants. Halt aerial spraying.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation. Best management practices and mitigation measures to protect resources, including groundwater and wildlife, during herbicide applications are identified in Tables 2-8 and 2-9 of the PEIS. Risks to wildlife from combinations of chemicals and inactive ingredients were discussed in the ecological risk assessments prepared for each herbicide in support of the PEIS. Under Alternative D in the PEIS, aerial spraying would not be allowed on public lands.

EMC-0499-006
Knight, John

**Comment:** Below is the integrated weed management definition found in Section 7270.5 of the California Food & Agriculture Code, Division 4, Part 4 Weeds, Article 1.7 Noxious Weed Management. It reads in whole: For the purposes of this article, "integrated weed management plan" means an ecosystem-based control strategy that focuses on long-term prevention of weeds through a combination of techniques, such as biological controls, judicious use of herbicides, modified land management, and cultural practices, and where control practices are selected and applied in a manner that minimizes the risks to human health, nontargeted organisms, and the environment. This definition would be a good standard to follow regarding the complicated issue of invasive species.

BLM_0001350

RESPONSE TO COMMENTS

**Response:** The PER focused on a program of integrated weed management that included prevention and use of several control methods (manual and mechanical methods, fire use, biological control, and use of herbicides). As the PEIS focused specifically on herbicide treatments, it was not clear to many readers of the PEIS that herbicide treatments were but a small part of the BLM's overall vegetation management program. A discussion of integrated weed management principles and strategies has been included in Chapter 2 of the Final PEIS under Integrating Vegetation Treatments.

EMC-0503-015
John Day-Snake
Resource Advisory
Council

**Comment:** It is far more controversial addressing the use of herbicides to treat unwanted vegetation to reduce plant competition and enhance the growth of desired species than to control noxious weeds. The use of herbicides for wildland reduction of native species is highly controversial and either this use should be removed from the document or carefully justified. Using herbicide in this manner directly resulted in the lawsuit in Oregon, which completely eliminated the use of herbicides on public lands. Why risk the continuance of the injunction?

**Response:** See responses to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated and Comment EMC-0646-174 under PEIS Environmental Consequences, Cumulative Effects Analysis.

EMC-0503-016
John Day-Snake
Resource Advisory
Council

**Comment:** There should be more emphasis placed on developing weed management plans that would outline priority strategies, monitoring and delineate treatment recommendations based on the biology of the invasive species.

**Response:** See responses to Comment RMC-0205-013 under PEIS Alternatives, Vegetation Treatment Planning and Management and Comment EMC-0446-071 under PER Vegetation Treatment Programs, Policies, and Methods, Monitoring.

EMC-0505-008
U.S. Environmental
Protection Agency

**Comment:** All management options outlined in the PEIS and PER have potential advantages and risks, and herbicide use is no exception. Based on significant increases of herbicide use described in the PEIS there is the potential for increased impacts to surface and ground water, drinking water, protected beneficial uses, and non-targeted flora and fauna. With respect to ground water recharge, herbicides which photo- or bio-degrade may be problematic if they end up in an abiotic subsurface zone. Other effects such as plant reproductive, endocrine and secondary effects are now understood as potential problems. With this in mind, we suggest that if a risk analysis reveals a potential adverse impact to surface or ground water quality, and particularly in recharge areas or source water watersheds, associated to using an herbicidal method over non-herbicidal, extra consideration should be given to the better understood option, with the least risk potential. In most cases this would be a non-chemical approach, as the risks from non-herbicidal management methods are generally better understood.

**Response:** As discussed in Chapter 2 of the PEIS under Site Selection Priorities, the BLM would take actions to minimize the need for vegetation controls, use effective non-chemical methods of vegetation control, use herbicides only after considering the effectiveness of all potential methods, and prioritize treatments based on their effectiveness and their likelihood of having minimal impacts on the environment. The purpose of the PEIS and PER is to identify the risks and benefits of using each treatment method, in different regions of the country and for different types of land management, so that BLM land managers can use the most suitable treatment option.

BLM_0001351

EMC-0505-016
U.S. Environmental
Protection Agency

**Comment:** BLM proposes a three-fold increase in the amount of land proposed for fuels management. To achieve this endpoint the Final PEIS might address the major variables taken into consideration and resources needed to implement this goal, e.g., weather, moisture content, winds, other fire/activities, smoke direction, and availability of manpower.

**Response:** Based on the major variables noted, the commenter suggests that all acres will be treated through prescribed burning. Prescribed fire is but one of five treatment methods the BLM would use to treat vegetation (see Chapter 2 of the PER for a description of the treatment methods). Certainly the number of acres treated and treatment method utilized will be dependent on a host of variables, including, to name a few, funding availability, prescribed burning windows, and NEPA decisions, as well as those mentioned in the comment. All of these factors will be taken into consideration as specific projects are conceived and planned.

EMC-0508-003
Bockness, Scott
(Montana Weed
Control Association)

**Comment:** [The Draft] BA [Biological Assessment] at [page] 1-1: "At the time earlier EISs were completed, the BLM was proposing to treat only about 16% of the total acreage that would be treated under the program that is now being proposed". This exposes the fallacy of the BLM claim that the old EISs covered the effects of the non-herbicide vegetation treatments to be conducted.

**Response:** The previous EISs addressed the use and effects of non-herbicide treatments in the areas for which the EISs were developed. The use of non-herbicide methods in an integrated pest management framework has been affirmed in all past EISs, based on impact analysis. This PEIS does not propose any new decisions relative to the use of non-herbicide treatments. The determination of acres assessed in this PEIS is discussed under Determination of Treatment Acres in Chapter 2 of the PEIS. Although the acres identified for analysis exceed estimates of earlier EISs, the actual number of acres treated is dependent upon the goals and objectives identified in individual land use plans, many of which are still in place since the previous EISs were developed. This PEIS does not authorize specific treatments nor increase the rate of treatments over current implementation. The impacts relative to non-herbicide treatments are estimated to be the same as the impacts identified in previous EISs.

EMC-0525-055
Western Watersheds
Project

**Comment:** BLM's [P]EIS and PER, by proposing profligate use of non-selective fire, chaining or herbicides in pinyon-juniper or western juniper communities will kill shrubs, too. Nowhere does BLM provide a protocol for determining the best or most appropriate treatment methods to be used, or for avoiding old growth or mature plant communities. This is precisely the type of information and analysis that the [P]EIS should have provided, but it has failed to do so.

**Response:** Additional guidance is provided in Chapter 2 of the Final PEIS/PER under Vegetation Treatment Methods, although it is presented at a broad, programmatic level. Implementation planning is tied to goals and objectives (i.e., desired outcomes) set at the regional/local land use planning level. During implementation planning, prioritization will be developed in order to effectively restore ecosystem processes specific to the plant communities where the actual implementation will take place.

EMC-0541-014
Associated Oregon
Loggers

**Comment:** Herbicide use & application warrants different/special consideration within "wildland-urban interface zones" and "ownership perimeter zones", located near BLM forest boundaries [1-2 miles]. Such "ownership perimeter zones" would address the forest protection values of adjacent non-federal landowners [wildfire, pests, invasives, etc], and the impact of lacking BLM management on these

RESPONSE TO COMMENTS

neighboring non-federal lands. There are significant private timberland holdings in Oregon's alternating BLM sections in the checker-board O&C [Oregon and California] ownership. Wildfire and pest hazards on BLM forests are a clear & present danger to neighboring non-federal lands. These BLM "perimeter areas" should be placed into a category that allows application of a full array of management tools including full use of the array herbicides and application methods.

**Response:** Chapter 1 of the PER proposes that the BLM use a wide array of treatments to reduce wildfire risk and to restore forest and rangeland health. Decisions concerning treatment objectives and which type of treatment would best accomplish the treatment objective will be made by the local BLM decision-maker based on information obtained through local analysis and public involvement. BLM managers are directed to work closely with local stakeholders, including adjacent land owners, in developing treatment alternatives.

EMC-0563-003
Hupp, Kevin L.
(Lincoln County
Noxious Weed Control
Board)

**Comment:** I would also add that you need a sufficient number of staff to carryout these activities. You currently have an understaffed program here in Washington State. One person in the field cannot keep up with the 75,000 acres in Lincoln County let alone the acreages in other Counties. You won't see anything getting accomplished by continuing that way of management.

**Response:** Staffing for vegetation management activities and multiple use activities is based on available appropriated funding. The BLM recognizes the need to provide additional staff resources, and to utilize partnerships and contracting to meet its vegetation management needs.

EMC-0575-004
Davlantes, Nancy

**Comment:** These public lands need long-term management strategies that will restore native ecosystems, not simply attempts to eliminate invasive plant species. The Programmatic Environmental Report (PER) that was issued along with the PEIS does nothing to remedy these shortcomings; it simply addresses treatments other than herbicide spraying that may be used to control invasive plants.

**Response:** Elimination of invasive species is unrealistic, and is not a stated goal of the PEIS. Long-term management strategies are outlined in local land use and activity plans. The PER is not intended to be a strategy or management plan. The PER discloses the effects of non-chemical methods on public land resources.

EMC-0584-046
Western Watersheds
Project

**Comment:** BLM can not use "natural fire regimes", historical ranges of variability and other models as a basis for any fire planning. The potential for anything resembling a "natural "fire regime has been drastically altered by 150 years of livestock grazing and other disturbance so that natural fire regimes no longer exist in many areas. The imposition of the disturbance that would mimic a natural fire cycle is likely only to further degrade values of public lands – soil water, watershed, wildlife and important and T&E [threatened and endangered] species habitats. As part of its assessment, BLM must first determine the current condition of all the vegetation communities in the affected lands. This information must be newly collected as part of this process, since most BLM inventories, especially in these lands with ancient [Land Use Plans] LUPs, are nearly 25 or more years old. This necessary is critical to understanding the risks of any treatment disturbance to these lands.

**Response:** This is exactly the process BLM will be using. As discussed in Chapter 2 of the PEIS under Vegetation Treatment Planning and Management, key resource elements such as plant community types, aquatic habitats, sensitive species, and

BLM_0001353

invasives are inventoried and mapped regionally, district-wide, and locally. This inventory and mapping is done in an effort to identify areas of high ecological integrity, to ensure suitable habitat exists, to identify areas where land uses are incompatible with long-term ecosystem health, and to identify areas that could benefit from vegetation treatments. Different scales of inventory and mapping allow managers to better understand how proposed projects fit in with vegetative conditions at different scales.

**EMC-0584-068**
Western Watersheds
Project

**Comment:** BLM's vegetation efforts can not be limited to disturbance-style treatments alone. Plant communities which are still healthy should be managed in a way to effectively: 1) prevent their conversion to weed-dominated communities; 2) prevent loss of biodiversity; 3) prevent changes in their fire frequencies and intensities; 4) prevent the conversion of shrub lands to woody thickets. BLM's DEIS [Draft PEIS]/PER ignores analysis of a range of prevention-based Alternatives.

**Response:** See responses to Comment RMC-0167-007 under PEIS Alternatives, Vegetation Treatment Planning and Management, Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives.

**EMC-0584-078**
Western Watersheds
Project

**Comment:** Any habitation interface projects must focus on projects at the actual interface with inhabited lands. This is an area of 1/8 mile or less. Any interface projects must be tied to private landowners taking strict efforts to control any fire danger on their own private lands. Intensive wildland-urban interface treatments include thinning, pruning, mowing, roof cleaning, replacement of flammable landscape and building materials). These actions should be limited to the interface, and the private property, and be use to create 1/8 mile of defensible space. In reality, the interface is to be the area where most federal fire funds are being spent. Instead, BLM across-the-board is roaming far from any real interfaces in projects being conducted.

**Response:** See response to Comment RMC-0221-046 under PEIS Alternatives, Vegetation Treatment Planning and Management. BLM funding guidance is very clear in directing which funds are to be expended in the wildland urban interface (WUI) and which funds are to be used to treat areas outside of WUI. Expenditures are monitored closely for compliance with established guidance.

**EMC-0584-079**
Western Watersheds
Project

**Comment:** As part of this EIS, BLM should provide detailed maps of all interfaces, and a list and report of all criteria used to determine the existence of an interface.

**Response:** There are several ways to determine what is included in wildland urban interface (WUI) and what is not. The WUI has been defined in *A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan* (USDI and USDA 2006a) and *Protecting People and Sustaining Resources in Fire Adapted Ecosystems: A Cohesive Strategy* (USDA and USDI 2006b) as "the line, area or zone, where structures and other human development meet or intermingle with undeveloped wildland or vegetative fuel." The other way a WUI boundary can be determined is through the development of a Community Wildfire Protection Plan (CWPP). These plans are developed by local communities with participation by state and local wildland fire agencies. Critical infrastructure such as powerlines, roadways, and critical watersheds may be incorporated into a WUI defined as part of a CWPP. CWPPs allow for a localized definition of WUI to be developed. Guidance for defining WUI is also provided in the *Healthy Forests Restoration Act of 2003* to be used in the absence of a

BLM_0001354

RESPONSE TO COMMENTS

CWPP. The variation in WUI definition across the country allows for local issues to drive WUI definition, but makes national mapping of WUI difficult, and is not required for a reasoned choice among alternatives regarding herbicide use at this national scale.

EMC-0585-175
Western Watersheds
Project

**Comment:** [Page] B-30 [of Appendix B of the PEIS] provides no clear protocol and decision making process or framework for BLM to follow in either determining treatment method, chemicals to be used, or application methods to be used. A "pretreatment survey" does not provide adequate assurance that public safety and the health of the environment will be adequately protected. This is particularly the case as BLM may be increasingly relying on local weed districts or public lands permittees in weed applications.

**Response:** Additional guidance on prioritization is provided in Chapter 2 of the Final PEIS and PER under Site Selection and Treatment Priorities, although it is still at a broad, programmatic level. During implementation planning tied to goals and objectives (i.e., desired outcomes) set at the regional/local land use planning level, detailed prioritization will be developed in order to effectively restore ecosystem processes specific to the plant communities in which the actual implementation will take place.

Public scoping and analysis concerning public and environmental health will take place at the local project level. Risk assessments and pre-treatment surveys will provide necessary data for the analysis needed to develop projects that provide adequate assurances.

EMC-0590-010
Western Slope
Environmental
Resource Council

**Comment:** The PEIS as presented is only one component of what should be a much broader approach to the issue of unwanted vegetation on BLM lands. Vegetation management needs to take into account the conditions that have led to the vegetation problems, and present methods for *preventing* those problems, as well as methods for *restoring ecological integrity* to sites where vegetation problems exist. The PEIS as it is presently configured addresses only the some of the issues associated with short-term treatments. Prevention and restoration are not addressed.

**Response:** The PEIS presents a detailed analysis of the herbicide component of an integrated pest management strategy for controlling unwanted vegetation. The PER presents additional information on other methods of non-herbicide control. Prevention and revegetation are discussed under Vegetation Treatment Standard Operating Procedures and Guidelines in Chapter 2 of the PEIS and PER. Integrated pest management is a long-term strategy for vegetation control which adapts control techniques according to the success of the project and need for additional actions. For example, an herbicide may be used to gain initial control of a weed infestation and then other treatment methods, such as insects or pathogens, applied to control and reduce the infestation over the long term to meet resource objectives as articulated in land use plans.

EMC-0590-012
Western Slope
Environmental
Resource Council

**Comment:** Any consideration of options at a site-specific level should be based in science, and should also consider whether the approach is a short-term "fix" or part of a long-term management plan that is expected to improve habitat and resource conditions. It does no good to wipe out an entire area (including non-target species) to attempt eradication of an invasive species, and by so doing create conditions that allow recolonization by the same or another offensive invasive.

BLM_0001355

**Response:** See response to Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis Also see response to Comment EMC-0590-010 under PEIS Alternatives, Vegetation Treatment Planning and Management. BLM vegetation treatment projects are developed within the context of the long-term goals and objectives of land use plans and any applicable activity level management plans for the area under consideration. In this context, all vegetation treatments are accomplished for long-term management objectives, not a short-term "fix." For example, hazardous fuels reduction activities are conducted for the long-term management of fuels and to reintroduce fire into ecosystems where it has been previously excluded. Invasive species and noxious weed prevention and control activities are conducted for the benefit of restoring long-term ecological function of an area. There are no proposals to wipe out entire areas of all vegetation, including non-target vegetation, in an attempt to eradicate invasive species. Total eradication of invasive species is an unrealistic goal and is not a stated goal of this PEIS. Vegetation treatment projects are designed with rehabilitation and restoration goals identified in land use plans and other activity-level management plans. Treating vegetation in such a manner as to create conditions for re-colonization of any invasive species would be self-defeating.

EMC-0590-013
Western Slope
Environmental
Resource Council

**Comment:** A no-herbicide alternative is included in the Vegetation Treatment proposals as "Alternative C". While we are very concerned about the impacts of herbicides on our ecosystems, and are supportive of the spirit of Alternative C, we recognize that there are specific and isolated instances where a controlled judicious application may be warranted. In such cases, follow-up on the efficacy of a treatment and the ecological effects of that treatment on all affected organisms should be performed. Based on the application options presented in the DEIS [Draft PEIS], we are requesting that that no applications using aerial deposition methods (from an airplane or helicopter) or large-area applications (greater than five contiguous acres) using boom/broadcast methods be allowed at any time. In those instances where Alternative C is not feasible and all other non-chemical options have been explored, we allow that spot applications delivered by boat, horse or human application vehicles may permitted. We request that the outcomes of such spot applications be monitored and analyzed for at least three years to assess the impacts on diversity of native species, attainment of ecologically effective densities by interactive species, and resilience of sensitive species and any impacted organisms.

**Response:** Please see response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. Monitoring requirements for any particular vegetation treatment project are determined through local project planning and NEPA analysis and will follow established monitoring procedures appropriate to the site-specific conditions and circumstances.

EMC-0590-014
Western Slope
Environmental
Resource Council

**Comment:** We are also concerned regarding the management context in which vegetation treatment decisions are made. As is emphasized in the Restore Native Ecosystems Alliance Alternative (Draft PEIS, Volume 2, Appendix H), we request that there be written into the DEIS [Draft PEIS] an explicit incorporation of an emphasis on diversity of native species, attainment of ecologically effective densities by interactive species, and resilience of sensitive species and any impacted organisms as an overall management goal in managing vegetation for fire suppression or invasive species control.

BLM_0001356

RESPONSE TO COMMENTS

**Response:** Management goals and objectives are properly determined in land use plans and subsequent activity level management plans for a particular resource or program. Setting overall vegetation management goals is outside the scope of this analysis. See Scope of Analysis in Chapter 1 of the PEIS. The PEIS examines the use of herbicides, in particular four herbicides not previously approved for use, in the context of vegetation treatments proposed to meet the management goals stated in the guiding land use plans.

EMC-0623-008
Defenders of Wildlife

**Comment:** Best Practices for Pesticide Application and Other Control Methods. The BLM should establish a goal of using the minimum effective dosage, and develop protocols related to application methods and timing to reach this goal. The BLM should also utilize alternatives to pesticides wherever feasible.

**Response:** Under the Vegetation Treatment Planning and Management section of Chapter 2 of the PEIS, the vegetation treatment priorities are identified, with the overriding goal being to "treat vegetation on lands only where necessary, and to prioritize treatment methods based on their effectiveness and likelihood to have minimal impacts on the environment." Table 2-8 of the PEIS points out how the goals identified will be addressed, which include using the proper amount of chemical needed to complete the task. Also see response to Comment EMC-0641-018 under PEIS Alternatives, Site Selection Methods.

EMC-0623-010
Defenders of Wildlife

**Comment:** Wildlife Recovery. The BLM should use this planning process as an opportunity for the recovery of the full range of native species and ecosystems across these western states. Species such as the sage grouse, white-tailed prairie dog, black-footed ferret, Columbia spotted frog, Washington ground squirrel, and desert yellowhead are threatened, at least in part, because of damaging land management practices. To this end, this analysis should consider how the full range of land use impacts has led to the decline of such species and ecosystems. The analysis should consider, for example, the impacts of livestock grazing, motorized vehicle use, recreation, energy exploration and development, logging, fire suppression, and mining.

**Response:** An important objective of the BLM vegetation treatment program is to restore ecosystem health on degraded lands for the benefit of all species and ecosystems, as discussed in Chapter 1 of the PEIS under Purpose and Need for the Proposed Action. Also see Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis

EMC-0646-187
Californians for
Alternatives to Toxics

**Comment:** Integrated Weed Management (IWM) is a subset of integrated pest management (IPM), and frequently referred to by the BLM in regards to invasive weed management plans. The California Department of Pesticide Regulation calls IPM a widely accepted approach to pest management that results in effective suppression of pest populations while minimizing human health and environmental hazards. Yet the BLM is disregarding public health, instead proposing actions focused on killing as much unwanted vegetation as quickly as possible, while incorrectly claiming it uses IPM to deal with unwanted vegetation.

**Response:** The PEIS does not propose to kill as much unwanted vegetation as quickly as possible. Public health and human health risks are extensively evaluated in the PEIS, including Human Health Risk Assessments. BLM agrees with the CDPR views on IPM and IWM. Chapter 2 of the PER addresses how the various management options will be utilized under Vegetation Treatment Methods, pointing out that, "in an integrated weed management program, each management option is considered,

BLM_0001357

recognizing that no one management option is a stand alone option and that each has its own strengths and weaknesses." As defined in the Departmental Manual 517, "Integrated Pest Management is a sustainable approach to managing pests by combining biological, cultural, physical, and chemical tools in a way that minimizes economic, health, and environmental risks." (7 U.S.C. 136r-1). Also see response to Comment EMC-0641-018 under PEIS Alternatives, Site Selection Methods.

EMC-0646-189
Californians for
Alternatives to Toxics

**Comment:** CATs [Californians for Alternatives to Toxics] is concerned that the BLM has failed to discuss and disclose established weed treatment threshold levels for this project. The BLM needs to establish that current treatments are failing to control weed infestations at pre-established threshold levels before considering the use of toxic chemicals. CATs also expects the BLM to quantify any weed increases above threshold levels. How much are populations increasing? How big were infestations when treatments began and how big are they now? Where are the monitoring results to determine whether past treatments have been effective or if new treatments are needed?

**Response:** See responses to Comment EMC-0646-174 under PEIS Environmental Consequences, Cumulative Effects Analysis; Comment EMC-0646-182 under PEIS Environmental Consequences, Vegetation; and Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis

EMC-0646-191
Californians for
Alternatives to Toxics

**Comment:** The key to any IPM [integrated pest management] strategy is to know the ecology, biology, and life cycle of the invasive species. "Integrated pest management is a proven approach to managing pest problems, including invasive nonnative plants. Integrated pest management is based on a sound understanding of the ecology and biology of a pest and its environment" (Andrascik et al. 1996). This is something the BLM must do and include within NEPA documentation prior to evaluating control plans. The BLM has failed to even identify the primary species targeted for herbicide spraying. How the species reproduces, spreads, and colonizes are all essential information. Some species are know for being prolific seed producers and maintaining extensive seed banks, while other reproduce vegetatively and can clone themselves.

**Response:** The BLM has expanded upon the information on vegetation treatment guidelines, including the use of an IPM strategy, in Chapter 2 of the Final PEIS under Vegetation Treatment Planning and Management. Much of this information was provided in the PER, where all treatment methods are discussed that would be used as part of an IPM strategy. As part of the strategy, the BLM would evaluate the ecology of the invasive species before selecting a treatment method and application strategy. The BLM has revised Table 2-3 in the Final PEIS to show the primary species targeted for each herbicide.

EMC-0646-198
Californians for
Alternatives to Toxics

**Comment:** Other management methods recommended by experts and ignored by the EA [PEIS] for evaluation and analysis are tilling, mowing, grazing, and prescribed burning. Mowing, a cost effective late season tool, is also a popular treatment method (DiTomaso 2001). Properly timed mowing (or weed whacking) can limit YST [yellow starthistle] ability to produce seeds, provide excellent control, and reduce seed banks and populations. The BLM should at the least be considering an integrated method alternative that combines mowing, grazing and hand pulling with revegetation efforts.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

BLM_0001358

RESPONSE TO COMMENTS

EMC-0646-225
Californians for
Alternatives to Toxics

**Comment:** Although the proposed actions are rehabilitative and preventative in nature, plans for consistent long-term maintenance need to be implemented for proactive management. The proposed actions intend to return the BLM lands to pre-historical natural conditions. But without changes in future management, the existing conditions will likely return with more severity. Specifically, the Forest should include consistent prescribed burning as an element of their typical management practices. We hope that the BLM evaluate and incorporate a maintenance strategy, founded on prescribed burning, into the proposed action plan. The restoration of a site to pre-historically natural conditions is unlikely to be achieved with the omission of a reoccurring fire regime. We fear that negligence of future maintenance could lead to circumstances where the BLM incorrectly feels that chemical treatment of vegetation would be the only viable solution. We are opposed to any land management actions that will likely lead to future vegetation management strategies dependent upon herbicides.

**Response:** The BLM agrees that maintenance of restored landscapes is an important component of ensuring the long-term success, viability, and resilience of plant communities. Maintenance of vegetation treatments is one of the assumptions used in the cumulative impacts analysis of the PEIS. Some areas may not be appropriate for maintenance through prescribed fire in every case. Local Fire Management Plans (FMPs) identify areas where prescribed fire and fire use for resource benefit are appropriate or not allowable. Also see response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

The Vegetation section in Chapter 3 of the PEIS and PER provides a discussion on fire ecology by major plant community type. It includes discussions on altered fire regimes and causes of noxious weed and other invasive species expansion. As discussed under Prevention and Early Detection in Chapter 2 of the PER, the BLM acknowledges that weeds colonize highly disturbed ground as well as degraded plant communities or even intact communities. This section reiterates that the BLM is required to develop a noxious weed risk assessment when an action may introduce or spread noxious weeds, that modification of actions must take place to reduce likelihood of infestations when the risk is determined to be moderate or high, and that control measures must be implemented if weeds do infest the site. This direction, as well as direction for monitoring post-treatment, is part of BLM policy in BLM Manual 9011, which is focused on changing the current trends of increasing exotics.

EMC-0646-231
Californians for
Alternatives to Toxics

**Comment:** The goal of a control program could be to eradicate completely a plant everywhere, it could be to eradicate it only in a specific area, or it could be to reduce its population to a level that does not significantly displace native flora and fauna (Dahlsten et al. 1989). The Draft PEIS does not make this analysis. Furthermore, it does not provide an adequate system for making decisions for each site. How can BLM staff prepare NEPA documents in the future when they have no decision making guidance in the programmatic EIS?

**Response:** See responses to Comment RMC-0205-013 under PEIS Alternatives, Vegetation Treatment Planning and Management and Comment EMC-0446-071 under PER Vegetation Treatment Programs, Policies, and Methods, Monitoring.

EMC-0647-004
Alaska Community
Action on Toxics

**Comment:** The BLM must implement vegetation management strategies with the following guidelines:

BLM_0001359

- Least disruptive of natural controls.
- Least hazardous to human health.
- Minimize negative impacts to non-target organisms, including other plants, insects, aquatic invertebrates, fish, and wildlife.
- Least damaging to ecological systems, including water quality, nutrient cycling, soil microbes, mycorhyziae, plant-animal interdependencies.
- Most likely to produce long-term solutions in vegetation control requirements.
- 

**Response:** See response to Comment EMC-0505-008 under PEIS Alternatives, Vegetation Treatment Planning and Management.

PHC-006-004
H. McNeel

**Comment:** One of the other things I would like to see is a greater emphasis on your integrated weed management, how the culmination of the integrated weed management practices would strengthen, and I think it would help a great deal when it goes to the final for the people to accept it.

**Response:** See responses to Comments EMC-0646-187 and EMC-0486-020 under PEIS Alternatives, Vegetation Treatment Planning and Management.

RMC-0006-031
Central Sierra
Environmental
Resource Center

**Comment:** The selected programmatic alternative should require that prior to herbicide treatments, a specific, feasible plan be in place to prevent re-introduction of the same species or introduction of other invasive exotic species into the project area. This could be as simple as excluding all anthropogenic vectors for invasive exotic species (people, vehicles, OHVs [off-highway vehicles], livestock, etc.) from treated sites until stable native plant and animal communities are re-established. It should also include containment of other known exotic invasive plant populations in the area.

**Response:** BLM Handbook H-9015.8, *Integrated Pest Management*, requires the BLM to develop a risk assessment when it is determined that an action may introduce or spread noxious weeds or when known weed habitat exists. It is also required to determine the potential for spread or introduction of noxious weed species and to prescribe follow-up monitoring and project actions necessary to reduce or prevent the spread of noxious weeds having moderate to high risk for establishment. The primary focus of a risk assessment is on each ground-disturbing or site-altering project authorized, funded, or conducted on BLM-administered lands. This requirement exists for all vegetation treatment methods, including herbicide use, and must occur prior to project approval. Exclusion of activities or resource uses from a particular area under treatment or rehabilitation is determined during risk assessment development and is in some cases mandatory by policy, such as in the case of post-fire rehabilitation where grazing by livestock and/or wild horses may be excluded for up to two growing seasons or longer to ensure establishment of desirable vegetation. Other types of closures and their duration are determined by the authorized officer and based on risk to resources.

RMC-0038-009
Albany County Weed
and Pest Control
District

**Comment:** The proposal is triple the number of acres that will be treated – but if there is no funding to do so, how will that be accomplished? Funding for noxious weed treatments in Albany County is from a 2004 budget that has hit a balance of \$-120.91 for 2006. If other counties or areas are funded in the same manner, it is not possible to triple the amount of acres treated without increasing the funding on these projects. The appropriate funding should be present before proposing to increase treatments; otherwise this proposal has no legitimacy and is an unattainable goal.

BLM_0001360

RESPONSE TO COMMENTS

**Response:** Funding for vegetative treatments and their monitoring, whether for hazardous fuels treatments, post fire-rehabilitation, or invasive species management, is derived through a number of BLM resource programs, including, but not limited to, Wildland and Prescribed Fire, Fuels Management and Reduction, and Emergency Stabilization and Rehabilitation, as well as other sources outside the federal government, including partnerships with counties and agencies, competitive and non-competitive grants, stewardship contracting, and other conservation programs focused on vegetation management. These outside funds are in addition to programmed or emergency funds authorized by Congress. Increased program work can also be accomplished in a variety of ways, such as community and volunteer programs, not necessarily dependant on direct funding increases from Congress.

RMC-0042-087
Asher, Jerry

**Comment:** "Currently, the funding and labor resources available to combat weeds dictate a containment strategy." (para 6 pg. 2-2 [of the Draft PEIS]). How will the reader know what containment means? I can't find that word defined in the [P]EIS. Explain what containment means. And, more importantly, please explain what elements of Integrated Weed Management don't get accomplished with the current funding/labor resources. Surely there is a way to word the sentences consistent with [P]EIS document guidelines, while still getting the message across about what won't be accomplished.

**Response:** As stated in the sentence following the above-mentioned sentence, BLM actions will be targeted at preventing the spread of weeds into the most vulnerable areas.

RMC-0057-013
California Wilderness
Coalition

**Comment:** The D[raft] PEIS states "Vegetation treatment methods are selected based on several parameters, which may include…" (2-9). Instead of suggesting what might be used as a guide to select treatment methods, the D[raft] PEIS should lay out specific criteria to guide management decisions. These criteria should include consideration of an area's wilderness values and proximity to existing communities.

**Response:** See response to Comment RMC-0205-013 under PEIS Alternatives, Vegetation Treatment Planning and Management. Such planning considers special values in the project areas as well as community concerns.

RMC-0080-006
Idaho State Department
of Agriculture

**Comment:** ISDA [Idaho State Department of Agriculture] is also aware of decreasing budgets that the BLM has had to deal with over the past several years, particularly for weed management. BLM field offices, at least in Idaho, have had to increasingly rely on cooperative ventures (i.e. CWMAs [Cooperative Weed Management Areas]) and grant money to supplement weed treatment budgets and meet target acres. This raises the questions, is the proposed amount of acres to be treated under Alternative B [in the PEIS] fiscally feasible? Will money have to be diverted from other important programs in order to effectively treat targeted acres? ISDA believes that these are valid questions that must be addressed in the PEIS.

**Response:** See responses to Comments RMC-0038-009 and RMC-0144-02 under PEIS Alternatives, Vegetation Treatment Planning and Management. The BLM assumes that future vegetation treatments will be based on agency priorities and available funding. The availability or amount of future funding cannot be predicted with certainty in the PEIS. Reprogramming of funds from one resource program to another can occur at the national level under extenuating circumstances with the approval of Congress. However, the BLM typically does not reprogram appropriated funds at the national level from other resource programs for on-the-ground activities

BLM_0001361

such as vegetation treatments at the field office level.

RMC-0091-008
Uintah County

**Comment:** Uintah County wants clear direction provided to field managers when the preferred alternative is implemented. Proper management should be the first option considered for habitat restoration, followed by biological, mechanical, then chemical, in that order. Chemical treatment should not be used as a quick fix for habitats.

**Response:** See response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

RMC-0110-007
Cassia County Public
Lands Committee

**Comment:** A couple of additions should be incorporated into the final EIS. The first is to increase the response to a determined need. In Appendix D [of the Draft PEIS], the process to secure a new herbicide is 2+ years. There needs to be in place an expedited procedure to approve an herbicide for use. The second addition would be to place a greater emphasis on the development of sustainable fuel breaks. This would help to return wildfires to historical size, protect property, critical habitat areas, and newly rehabilitated sites.

**Response:** See Response to Comment EMC-0566-008 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response. The process described in Appendix E of the of the Final PEIS is an expedited process. The BLM agrees that sustainable fuel breaks are a useful tool in managing wildfire. Fuel breaks for protection of property are proposed based on the need for wildfire defense, as identified by the local field office in collaboration with local communities. Reintroduction of fire into the ecosystem and effective progress towards moving Fire Regime Condition Class (FRCC) 3 landscapes to FRCC 2 and 1 landscapes.

RMC-0144-004
Wyoming Game and
Fish Department

**Comment:** Many of the treatments are within Wildfire Urban Interface (WUI). We recommend more treatments following appropriate consultation on areas away from WUI areas, as they could be more beneficial to a wider array of fish and wildlife species.

**Response:** As discussed in the PER in Chapter 1 under Determination of Treatment Acreages, about 30% of acres treated by the Wildland Fire Management Program are for WUI-related treatments. During preparation of the PEIS, field offices were asked to identify lands proposed for treatment and treatment purpose (e.g., hazardous fuels reduction, WUI treatment, wildlife habitat improvement). Only 2% of treatments were identified to occur in the WUI, although it is highly likely that treatments identified for hazardous fuels reduction and other treatment purposes would also occur in the WUI.

RMC-0144-025
Wyoming Game and
Fish Department

**Comment:** The BLM should include a more thorough analysis and discussion of passive management actions and post-treatment management practices to reduce the need for future re-entry treatments, reduce operational costs and effects. Given the estimates of invasive species and noxious weed spreading at a rate of 2,300 acres per day on BLM managed lands, which amounts to 839,000 acres per year, and that downy brome alone infests over 56 million acres, is the dominate vegetation on 11.4 million acres and is growing at 14% per year, that equates to approximately 784,000 acres per year. We recommend the BLM consider additional funding and personnel to address program goals and objectives especially in areas away from WUI sites and in state fish and wildlife priority areas.

**Response:** See response to Comment RMC-0144-009 under PEIS Alternatives, Vegetation Treatment Planning and Management. BLM budget expenditures are

BLM_0001362

RESPONSE TO COMMENTS

guided by Administrative and Congressional direction and priorities. The BLM proactively pursues outside grant and funding sources, matching funds, and cooperative management agreements to increase its capability in terms of funding and personnel to address increased work loads to meet program goals and objectives on all public lands.

RMC-0160-003
Natural Habitat

**Comment:** The wide variety of herbicides, many of which will likely be highly toxic to amphibians, fish, insects, birds and on and on are not appropriate for a healthy respect for biodiversity and healthy landscapes. Biocontrols are also a concern without real testing and monitoring.

**Response:** As noted in Chapter 4 of the PEIS, herbicides do pose risks to plants and animals and can cause short-term loss of biodiversity. However, the spread of weeds and other invasive vegetation can also harm wildlife and their habitat and reduce biodiversity. In many situations, herbicides are the only or best treatment method available to the BLM. A discussion of the testing and monitoring protocols for biocontrols is found in Chapter 2 of the PER under Vegetation Treatment Methods, Biological Control.

RMC-0167-007
Soda Mountain
Wilderness Council

**Comment:** By opting to analyze only the types of herbicides that can be used on public lands, the BLM has illegally narrowed the purpose and need of the DEIS [Draft PEIS] in an attempt to limit the consideration of reasonable alternatives, such as management of the vectors and passive treatment of invasive weeds.

**Response:** The BLM properly scoped the project and considered all reasonable alternatives relative to the proposed action. Council on Environmental Quality (CEQ) Regulations at 40 CFR [Code of Federal Regulations] 1501.7 (3) require the agency to identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review, narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere. In this case, the issues associated with other management approaches have been previously identified and analyzed in the four EISs pre-dating this PEIS, each of which has affirmed an integrated pest management (IPM) approach. In addition, the PER accompanying this PEIS details and discusses other vegetation treatment options and their potential environmental effects. At the land use plan level, each of approximately 162 field office RMPs and their associated EISs have also outlined alternative management approaches for sustaining ecological health in a multiple use context.

See responses to Comments RMC-0167-002 and Comment RMC-0126-002 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding vectors and passive management. BLM management of vectors and passive treatment of invasive species are actions that are common to all alternatives and do not require a separate alternative. The BLM has ongoing programs under existing management that address prevention and vector management, including but not limited to such actions as pre-inventory, risk assessment, quarantine, use of weed-free forage, use of weed-free seed, stipulations to land use authorizations such as rights-of-way grants, recreational restrictions, and vehicle and equipment washing. Other programs, such as oil and gas, livestock grazing, mineral materials, and forestry, have applied stipulations, terms and conditions, and statutory requirements to prevent undue and unnecessary degradation of public lands. In addition, the BLM has ongoing early detection and control programs for invasive species where they are found. In order to ensure effective control, an IPM approach is used which includes the use of herbicides.

BLM_0001363

Proactive treatment of vegetation occurs on less than 3% of all public lands. Passive management, in some cases framed as a no project alternative, is considered as an option in all vegetation treatment proposals.

RMC-0167-013
Soda Mountain
Wilderness Council

**Comment:** It is the hope of SMWC [Soda Mountain Wilderness Council] that the BLM take success stories, such as progress toward recovery on the former Box-O, into account when determining the extent to which passive treatments (such as resting from livestock grazing and decommissioning of roads) should be emphasized as an alternative treatment method.

**Response:** See response to Comment RMC-0167-008 under PEIS Alternatives, Decisions to be Made and Scope of Analysis. The BLM relies on many sources for information pertaining to potential vegetation treatments. Under an integrated pest management approach, success stories of previous and current projects are considered one of the best guides for implementing projects of a similar nature. Management actions such as resting from livestock or road decommissioning are accomplished within the constraints of the guiding land use plan and within the terms and conditions of authorizing permits. Rehabilitation actions often include a component to remove grazing and/or limit vehicular access for a limited period of time while vegetation reestablishes.

RMC-0173-002
Delles, Susan

**Comment:** The PEIS does not adequately address the causes of noxious Weed invasion and spread. The focus of the document is too narrow. The main causes of invasive species proliferation are: 1. Roadbuilding; 2. Logging; 3. Livestock Grazing; [and] 4. Off Road Vehicle use. These actions have been excluded for consideration in the PEIS but are major factors affecting the conservation and restoration of native vegetation, fish and wildlife habitat. Fuels/fire management, soil stabilization, and general watershed function were also left out of the picture.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes of noxious weed infestations. See the Scope of Analysis in Chapter 1 of the PEIS. Also see Relationship among Land Use, Land Use Planning, Land Health Standards, Ecosystem Functionality, and Vegetation Treatments in Chapter 1 of the PER for the relationship of this document to ecosystem functionality.

RMC-0173-003
Delles, Susan

**Comment:** The PEIS focuses on treating the symptoms of the problem of invasive species rather than the causes that I have mentioned above. The use of toxic chemicals to eliminate invasive/noxious species will compound the problem rather than alleviate it by contaminating soils, water and air.

**Response:** Herbicides have been demonstrated to be effective in the control of vegetation. See the risk modeling contained in Appendixes B and C of the PEIS for a discussion of the potential for contamination. Also see the discussion under Air Quality, Soil Resources, and Water Quality and Quantity in Chapter 4 of the PEIS for further discussion of the potential for contamination of these resources.

RMC-0173-010
Delles, Susan

**Comment:** Forest practices have evolved since those days. No longer are hardwoods (a major target for historical spray use) on public lands considered a weed. Many are retained on the landscape after logging operations. Although further ecological progress remains to be made in current forest management, the reduced herbicide use has eliminated a very important negative impact on our forests and streams.

BLM_0001364

RESPONSE TO COMMENTS

**Response:** Herbicides remain an important tool in the management of woody species on lands that are managed for sustained yield of commercial timber and in situations where natural tree regeneration is exacerbated by the effects of uncharacteristically severe wildfire. Current information on forest development recognizes the important contributions of early seral stages to overall forest development, including nitrogen fixation, soil protection, and wildlife habitat. Under the proposed program of work outlined in the PEIS and PER, herbicides would be used primarily to control non-native species, such as downy brome and tamarask, and invasive native species that have invaded native shrublands and grasslands due to the exclusion of fire, such as juniper.

RMC-0191-005
Ertz, Brian

**Comment:** The RNEA [Restore Native Ecosystems Alternative ] is a comprehensive programmatic approach that represents the best hope for curtailing the negative implications of invasive weeds while mitigating the destructive impacts that the Preferred Alternative inevitably entails. I hope for consideration that addresses the mitigation of causes for invasive weeds and that minimizes the anthropogenic harms associated with the herbicide and soil disturbing "treatments".

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystem alternative.

RMC-0191-017
Ertz, Brian

**Comment:** I ask that before administration of the Preferred Alternative takes place, real science is conducted/considered and that the questions raised here and submitted by other public interested parties be fully and genuinely considered. I hope the agency gives a better-faith consideration for these comments than they did the RNEA [Restore Native Ecosystems Alternative]. I would hope that the agency is able to consider the adverse effects that current management practices are having on invasive weeds proliferation and rather than just treat the symptoms of such mismanagement I hope that the *causes* are addressed and mitigated.

**Response:** See responses to Comment RMC-0191-015 under PEIS Alternatives, Decisions to be Made and Scope of Analysis; Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients; and Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis In the PEIS the BLM has used standard accepted scientific models and quantitative risk assessment techniques approved by USEPA. Science related to ecosystem function is less quantitative and subject to more uncertainty. See Chapter 6, References, for a listing of the scientific literature used in the development of the PEIS.

RMC-0199-003
McKay, Tim (The
Northcoast
Environmental Center)

**Comment:** I urge the BLM to consider using passive treatments as a means of preventing weed invasion and resting areas of public land where weed growth is fostered by overgrazing and rampant off-road vehicles. Furthermore, the BLM should analyze the Restore Native Ecosystems Alternative [RNEA] in the DEIS [Draft PEIS]/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands.

**Response:** See Response to Comments RMC-0144-009 under PEIS Alternatives, Vegetation Treatment Planning and Management and Comment RMC-0167-013 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding passive management, and response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-

BLM_0001365

inhibiting Active Ingredients regarding the RNEA.

RMC-0200-007
Lindsay, Dianne

**Comment:** The PEIS/PER fails to take a leadership role in managing unwanted vegetation in this 21st century of increasing global pollution and impending environmental crisis. Non chemical treatment should be obvious at this point, and agencies need to set examples for private landowners who look to you for the most informed methods.

**Response:** See responses to Comment EMC-0295-002 under PEIS Proposed Action and Purpose and Need, Interrelationships and Coordination with Agencies and Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. The BLM utilizes an integrated pest management approach to treating vegetation, which includes chemical and non-chemical treatment methods. See Chapter 1 of the PEIS, Interrelationships and Coordination with Agencies, for a description of the interrelationships among the BLM and agencies and the public, including private landowners.

RMC-0204-015
Wroncy, Jan (Gaia
Vision/Canaries Who
Sing)

**Comment:** To overgraze public lands in the name of private profit is an insult, but then to justify the use of toxic chemicals and fire to "correct" the poor condition of the land caused by overgrazing is outright assault on the owners of land (the public) and on the environment itself as well. Therefore the omission of the alternative which would have examined the causes of the problem in the first place was a grave flaw of the Draft [P]EIS for sure.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients.

RMC-0205-013
Oregon Department of
Agriculture

**Comment:** Explicit decision making recommendations are needed to guide local decision making between herbicide use and non-chemical controls. On lands were herbicide use is authorized under the PEIS, the plan needs to clearly describe the decision making process and risk considerations.

**Response:** The Prevention of Weeds and Early Detection and Rapid Response section of Chapter 2 of the PEIS and PER reiterates that the BLM is required to develop a noxious weed risk assessment when an action may introduce or spread noxious weeds, that modification of actions must take place to reduce the likelihood of infestations when the risk is determined to be moderate or high, and that control measures to be implemented must be identified if weeds do infest the site. This direction is required under BLM Manual 9015 (*Integrated Weed Management*); direction on determining treatment method is also found in BLM policy in BLM Manual 9011 (*Chemical Pest Control*). These policies, as well as integrated weed management methods (which includes prevention techniques), are reiterated during the intensive certification training for BLM employees involved in weed management. Additional guidance is provided in Chapter 2 of the PEIS/PER, although it is presented at a broad, programmatic level. Implementation planning is tied to goals and objectives (i.e., desired outcomes) set at the regional/local land use planning level. During implementation planning, prioritization will be developed in order to effectively restore ecosystem processes specific to the plant communities where the actual implementation will take place.

BLM_0001366

RESPONSE TO COMMENTS

RMC-0205-015
Oregon Department of
Agriculture

**Comment:** Expanding risk management decision making process to carefully evaluate the least harmful control method for local conditions will help ensure that herbicides are used only in specific conditions where other methods are not feasible.

**Response:** See response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

RMC-0208-003
California Oak
Foundation

**Comment:** As discussed in more detail below, the Oak Foundation has several concerns about the sufficiency of the environmental documents prepared for this program. To summarize, the Draft PEIS fails to adequately describe the program in sufficient detail to allow meaningful public comment. For example, the extent to which the BLM may apply herbicides to BLM managed lands that contain oak woodlands or are adjacent to non-BLM managed lands that contain oak woodlands is unknowable from the data provided.

**Response:** The PEIS is a programmatic document broadly assessing the impacts of herbicide use on public lands resources. The unit of analysis is the ecoregion, as described in Chapter 3 of the PEIS and PER. Each ecoregion contains an assemblage of plant types, which are generally discussed under each heading. California, for the most part, falls within the Mediterranean ecoregion; the vegetation assemblages common to this ecoregion, including oak woodlands, are described under Vegetation in the PEIS. The broad scale of this analysis precludes a detailed discussion of any one particular vegetation type within an ecoregion, although examples are used where appropriate. The sizes of potential treatments were estimated from a variety of sources, as described under Determination of Treatment Acreages in Chapter 1 of the PER; this information has also been added to Chapter 2 of the Final PEIS. The PEIS does not analyze any specific vegetation treatment projects. Individual projects will have site-specific NEPA analysis conducted at such time as there is a proposal to analyze and a location has been determined. See NEPA Requirements of the Program and Figure 1-1 in Chapter 1 of the PEIS for a description of the step-down NEPA process for project analysis.

RMC-0208-019
California Oak
Foundation

**Comment:** The Draft PEIS fails to describe the program in sufficient detail to allow meaningful public comment. For example, the extent to which the BLM may apply herbicides to BLM managed lands that contain oak woodlands or are adjacent to non-BLM managed lands that contain oak woodlands is unknowable from the data provided.

**Response:** See response to Comment RMC-0208-003 under PEIS Alternatives, Vegetation Treatment Planning and Management.

RMC-0214-019
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** BLM must go back and analyze all strategies, impacts, and activities that either contribute to or diminish the problem associated with the spread of noxious weeds on BLM lands. The very nature of a PEIS requires that the BLM take a 'hard look' at all of the activities that occur on BLM land. Grazing, mining, cross-country travel, vegetative treatments, and herbicide treatments all have been shown to be contributing factors to the spread of noxious weeds. It is not BLM's right to conveniently ignore these facts. Nor can it ignore legitimate alternatives other than chemical based herbicides to combat the spread of noxious and invasive species.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis The PEIS examines and analyzes the effects of using herbicides on all vegetation and resources on public lands in the west and

BLM_0001367

Alaska, and its context is broader than just addressing weed spread. The PER also examines the effects of using other non-herbicide techniques on vegetation and resources. The BLM has previously examined the causes and contributing factors of weed spread and documented them in its invasive species strategy and *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996). Alternatives Considered but Not Further Analyzed are discussed in Chapter 2 of the PEIS. The programmatic decisions made in the PEIS are relative to adopting—or not adopting—certain herbicides for use on public lands, as well as developing a protocol to determine how future herbicides may be assessed using current scientific standards, with public involvement, ensuring technical and scientific accuracy in the data leading to a decision by the agency.

RMC-0214-037
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** BLM Disregards its Statutory Mandate to Use Integrated Pest Management. The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) requires that: "Federal agencies shall use Integrated Pest Management techniques in carrying out pest management activities and shall promote Integrated Pest Management through procurement and regulatory policies, and other activities." 7 U.S.C. [United States Code] § 136r-1. The term "pest" is defined in FIFRA to include weeds and invasive species. 7 USC §§ 136(t) ("The term 'pest' means any . . . weed") & 136(cc) ("The term 'weed' means any plant which grows where not wanted."). BLM therefore must promote IPM in its regulatory policies generally, and is obligated to use Integrated Pest Management (IPM) in carrying out all weed eradication in particular. The proposed D[raft] PEIS disregards this statutory obligation by failing to include IPM as a basic limit on chemical herbicide use in *all* of the alternatives.

**Response:** As discussed in Chapter 2 of the PER, under Vegetation Treatment Methods, the BLM uses an integrated program to treat vegetation. The PER states that the program is for the management of weeds, but should read that it is for the management of vegetation; this has been corrected in the Final PER. Because much of the information on vegetation management and integrated vegetation management in the PER is very relevant to the PEIS, this information has also been included in the Final PEIS.

RMC-0217-020
Sierra Club Utah
Chapter

**Comment:** Essentially the BLM needs to make a scientific analysis of the situation and base treatments on that analysis. By so narrowly defining the purpose and need at this draft stage the BLM is precluding a realistic and scientifically valid evaluation of various treatment protocols available. It may be that it is not the intention of the BLM to make such an analysis. If this is the case the BLM should clearly state that it does not plan to take a hard look at the problem of weeds, invasive and exotic plants, the relationship of permitted activities to the problem and the most effective means of remedying the problem.

**Response:** See Chapter 2 of the PER and PEIS for a description of BLM vegetation treatment project design processes and considerations. Prior to any treatment, the BLM considers the best available science in the design of the project and bases its treatment proposals on land use plan goals and objectives, standards and guides for rangeland health, and integrated pest management methodologies. Vegetation treatment projects are evaluated under NEPA at the time they are proposed, and suitable alternative treatment protocols are assessed, as appropriate for the situation. The Purpose and Need are stated in Chapter 1 of the PEIS. It is neither the purpose nor the intent of this PEIS to conduct a programmatic analysis of the "problem of weeds and their relationship of permitted activities." This PEIS is being developed to address additions of chemical herbicides to the tools available to the BLM to reduce

BLM_0001368

hazardous fuels to prevent future catastrophic fires and to improve wildlife habitat and forest and ecological condition through the control of unwanted vegetation including, but not limited to, noxious weeds and invasive plant species.

RMC-0217-031
Sierra Club Utah
Chapter

**Comment:** In particular any treatment needs to identify the means by which it will deal with the retained seed bank of exotic and weedy species.

**Response:** It is true that some exotic seed can remain viable for multiple years. Seed viability has been a part of ongoing research that has helped to provide direction on which treatments are most appropriate for certain species. Successful control requires various amounts of continued treatments in various combinations, depending on the species, which is the basis of integrated weed management. For one species, a pre-emergent herbicide may be needed, and for another species one treatment of emergent herbicide, followed by mechanical or manual treatments, would be more successful. Whatever appropriate treatment is used, the amount of viable seed will be reduced. BLM Manual 9015 provides guidance on integrated weed management.

RMC-0218-043
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** The BLM still barges forward with a proposed action that not only plans to greatly increase the use of herbicides, including herbicides known to be highly toxic and new ones with inadequate testing and/or very high potency, but also to use them for rather frivolous unnecessary purposes: "–some treatments could be designed to reduce the size or density of stands of trees or shrubs....Herbicides could also be used to suppress or thin shrubs in favor of herbaceous vegetation." (PEIS p. 4-61)

**Response:** The registration of herbicides is the responsibility of the USEPA, which requires the registrant to provide the data necessary for the preparation of human health and ecological risk assessments, including information on the "inert" or "other" ingredients. Breakdown pathways and the composition of the formulation carrier are presented as part of the overall registration package the registrant must provide to the USEPA. In addition, the BLM conducted its own risk assessments, or used risk assessments prepared by the Forest Service, to evaluate risks associated with the use of herbicides under BLM application rates and field conditions. Overall, herbicides proposed for use by the BLM would have no or low toxicity under most application and receptor scenarios. Herbicides are never used frivolously by the agency. Herbicides are utilized in various ways, according to their label and intended purpose, including selectively targeting certain vegetation types to promote growth of desirable species to meet management objectives.

RMC-0221-032
Center for Biological
Diversity

**Comment:** The D[raft] PEIS only addresses mechanical and chemical methods for reducing the risk of catastrophic wildfire, but does not provide guidance in the proactive prevention of fires and the long-term recovery of burned lands. Allowing livestock grazing to continue in recently burned areas compromises the ability of post-fire areas to recover; post-fire livestock grazing can delay recovery of burned areas, and should not be permitted in burned areas until vegetation recovery has occurred (Beschta et al. 2004). Monitoring in post-fire areas should determine whether livestock will adversely impact recovery of vegetation and soil resources, since some vegetation communities may not reach their compositional peak until the second or third year (Guo 2001).

**Response:** The analysis of vegetation treatment projects in the PEIS is primarily concerned with treatments designed to modify existing plant communities. The wildland fire management program does promote vegetation treatment projects that would reduce the risk of catastrophic wildfire. As discussed in Chapter 2 of the PER under Planning and Management at the National Level, "although all treatment

BLM_0001369

methods would be used, prescribed fire and mechanical treatments would account for most fuels reduction in the continental U.S., and wildland fires for resource use would account for most fuels reduction in Alaska." The PEIS team agrees with commentor's statements about the potential impacts of grazing too soon after a burn. The BLM has used two growing seasons of rest as the basic standard, which has been adequate in many cases. However, depending on the specific situation (plant community present before the burn, precipitation available following the burn, etc.), a shorter or longer period of rest may be appropriate, as determined by monitoring. Revegetation is discussed under Revegetation in Chapter 2 of the PEIS and PER.

RMC-0221-046
Center for Biological
Diversity

**Comment:** The D[raft] PER uses the term wildlife urban interface ("WUI") to refer specifically to the areas where open lands meet urban development, especially houses. This generally considered an area within 20 to 60 meters of houses where a defensible zone can be created. Fences, powerlines, trails, roads, and properties without buildings do not constitute WUI areas (Nowicki, 2001). The BLM has never prepared a comprehensive study of how many acres of WUI there are on BLM lands, how many of these acres are forested, and how many of these acres need to be treated for invasive species.

**Response:** There are several ways to determine what is included in WUI and what is not. WUI has been defined in *A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-year Comprehensive Strategy Implementation Plan* (USDI and USDA 2002) and *Protecting People and Natural Resources, A Cohesive Fuels Treatment Strategy* (USDI and USDA 2006) as "the line, area, or zone where structures and other human development meet or intermingle with undeveloped wildland or vegetative fuel." The other way a WUI boundary can be determined is through the development of a Community Wildfire Protection Plan (CWPP). These plans are developed by local communities, with participation by state and local wildland fire agencies. Critical infrastructure such as powerlines, roadways, or critical watersheds may be incorporated into a WUI defined as part of a CWPP. CWPPs allow for a localized definition of WUI to be developed. Guidance for defining WUI is also provided in the *Healthy Forests Restoration Act of 2003* to be used in the absence of a CWPP. The variation in WUI definition across the country allows for local issues to drive WUI definition, but makes national mapping of WUI difficult.

An updated section on Wildland Fire Management is included in Chapter 2 of the Final PEIS and PER will discuss CWPPs and WUI in more detail.

RMC-0222-019
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Altered landscapes: The PEIS and PER need to acknowledge that there are significant areas on public land that are so highly altered that they are not economically or practically recoverable. For example, in areas of significant downy brome (*Bromus tectorum*) infestation, inappropriate (prescribed fire) or insufficient (plowing or tilling without appropriate native plant restoration techniques) actions in these areas may cause increases in downy brome infestation and fire frequency. Guidance needs to be provided for areas where specific treatments are not appropriate in specific ecosystems, for example, restricting the use of prescribed fire in sagebrush plant communities below elevation gradients where downy brome is most likely to invade.

**Response:** See response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. Parameters for the use of specific techniques for vegetation control are developed at the local

BLM_0001370

RESPONSE TO COMMENTS

planning level based on site-specific conditions and the identification of highly altered landscapes where certain treatment techniques may not be advisable.

**Alternatives, Site Selection Priorities**

EMC-0175-003
Simonson, Annette

**Comment:** This brings me to my second point, which is, why in heavens would we risk contamination of our water sources, fish-bearing streams, sensitive species habitat or even human health to embark on a program that will only require repeated toxic applications?

**Response:** As discussed in Chapter 2 of the PEIS and PER, BLM vegetation treatments are designed to provide conditions that discourage future weed infestations, primarily through revegetation and preventing the causes that have led to weed infestations in the past. It is the intent of the BLM to restore conditions on a site such that treatments on the site would no longer be needed.

EMC-0505-015
U.S. Environmental
Protection Agency

**Comment:** Chapter 2, page 2-8, fourth paragraph: The PDEIS [Draft PER] states that "The following vegetation treatment priorities identified in the EIS Vegetation Treatment on BLM Lands in the Thirteen Western States (USDI BLM 1991a) still *apply today* (italics added) is not consistent with the Vegetation treatment methods section on the right side of the page. The USDI BLM 1991(a) reference identifies a specific preference for non-chemical controls without regard to environmental impact or suitability besides effectiveness. The Vegetation treatment methods section states "all control methods should be available for use, allowing the BLM to select the one method, or the combination of methods, that optimizes vegetation control with respect to environmental concerns. With this in mind, we recommend removing the three words "still apply today" and add that the current focus of IVM [integrated vegetation management] is to use the option(s) that represent the "method, or combination of methods, that optimize vegetation control with respect to environmental concerns, effectiveness, and cost of control," similar to the language in 2-8, Vegetation Treatment Methods. One example is shown in a study supporting the IPM approach, looking at species diversity under various Rights of Way Management methods, commonly referred to as the Bramble and Burns studies (Bramble, WC., WR. Byrnes, RJ. Hutnik, and S.A. Liscinsky. 199 1. Prediction of cover type on rights-of-way after maintenance treatments. J. Arboric. 17:38-43.)

**Response:** As noted in the section on Site Selection and Treatment Priorities in the Final PEIS, treatment methods were prioritized "based on their effectiveness and likelihood to have minimal impacts on the environment." Thus, the statement referring to the use of herbicides has been modified to state that risks to the environment are considered in addition to their effectiveness.

EMC-0585-100
Western Watersheds
Project

**Comment:** Maps presented at public sessions on the DEIS [Draft PEIS] show just how far from population centers nearly all of Nevada and much of Wyoming, Idaho and Oregon BLM land really is. Yet, the same materials claim that many of the treatments will occur in urban interfaces. We believe that BLM may be mis-representing areas in UIs and/or in need of treatment to protect human habitation, in order to be able to maximize funding to conduct the large-scale wild land alteration this EIS would enable. The data and scientific basis for such maps and claims must be provided to the public.

**Response:** Much of the public lands that the BLM manages are indeed far from the wildland urban interface (WUI). Any vegetation management projects undertaken

BLM_0001371

outside of the WUI would not consider WUI protection as a purpose and need for the project. Other resource management objectives would predominate. Only those BLM managed public lands identified in Community Wildfire Protection Plans or defined using the *Healthy Forests Restoration Act* as being WUI would consider WUI protection as a need for a specific project. Also see response to Comment RMC-0221-046 under PEIS Alternatives, Vegetation Treatment Planning and Management.

## Alternatives, Non-herbicide Treatment Methods

EMC-0233-005
Dyber, Kenneth James

**Comment:** What about alternatives to these harmful chemicals, such as importation of other forms of life, be it plant, or insect, to maintain a natural balance in the ecosystem?

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0375-004
Johnson, Lisa

**Comment:** Please consider using other methods of weed eradication, such as mechanical removal, biological controls and even, as a last resort, targeted use of herbicides, rather than inundating the west with herbicides.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0446-050
The Nature
Conservancy

**Comment:** This PER section ([Draft] PER [page] 2-8) describes general parameters that may be considered in selecting a treatment method but does not include any requirements or guidelines to be used by field offices. Vegetation methods should be based upon ecologically-based goals for restoration that include desired outcomes for the specific plant communities scheduled for treatment not on general concepts of fire risk and reduction of fuel loads that have been drawn from other habitat types. Vegetation treatments should use the best available science in prioritization and planning (PER Chapter 2). LANDFIRE will provide quantitative reference conditions that synthesize the best available science on fire and vegetation dynamics for all potential vegetation types across the U.S. and can be used to help set goals and assess alternative strategies for achieving goals.

**Response:** Ecologically-based goals for restoration are established at the local land use planning level and are framed as desired outcomes for specific plant communities or fire regime condition classes. Goals are based on restoration assessment processes such as the Fire Regime Condition Class or land use health assessment processes (see Chapter 3 of the PER under Vegetation Condition and Fire Regimes and Chapter 1 of the PER under Relationships among Land Use, Land Use Planning, Land Health Standards, Ecosystem Functionality, and Vegetation Treatments). Implementation plans tiered to the land use plans establish strategies and treatment methods to effectively restore ecosystems specific to the plant communities in which the actual implementation will take place. Use of best available science is required under federal fire policy. LANDFIRE is being developed and will be used by BLM for the purposes presented in this comment.

The BLM is currently developing guidance for integrating vegetation management programs that will be implemented through the BLM's directives systems, including manuals and handbooks. This direction will ensure additional consistency in assessment processes, best management practices, and treatment effectiveness monitoring. Additional discussion on prioritization of treatments is included under

BLM_0001372

RESPONSE TO COMMENTS

Vegetation Treatment Planning and Management in Chapter 2 of the PEIS.

EMC-0496-002
DeLong, Colleen

**Comment:** Please do not use herbicides as your primary solution to the problem of [invasive] species. Herbicides can be part of a responsible plan, but should not be the whole plan. Over reliance on herbicides indiscriminately poses threats to wildlife, ecosystems and water systems rural residents depend on. Please use a broader and safer array of tools to deal with invasive weeds.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0505-014
U.S. Environmental
Protection Agency

**Comment:** Section 2-8 [of the PER], Vegetation Treatment Methods, refers to "integrated weed management", and states that "...no one management option is a stand alone option and that each has its own strengths and weaknesses." EPA suggests changing the statement to address "integrated vegetation management" rather than "integrated weed management" because the practices are not limited to weed control, but extend into wildfire fuels management, endangered species management, etc.

**Response:** The wording of this section has been changed to reflect integrated vegetation management rather than weed management.

EMC-0623-002
Defenders of Wildlife

**Comment:** While weeds are a famously intractable problem, strategies do exist for controlling existing infestations and for preventing weeds from spreading to new areas. Land managers can use mechanical removal, controlled burning, biological control, and herbicides to control invasives, and can prevent new infestations with monitoring and early detection, and by curtailing land use practices that spread weeds. Innovative approaches combine multiple methodologies for prevention, control and restoration are needed to remove weeds, improve wildlife habitats, and prevent infestation of lands that are currently weed-free. However, the approach outlined in the PEIS depends almost entirely on herbicide use, to the exclusion of other prevention, control, and restoration efforts. Defenders [of Wildlife] predicts that this focus on herbicide use to the exclusion of other methods will fail to curtail weed invasions in the West, while potentially exposing people and wildlife to unnecessary levels of herbicides.

**Response:** See response to Comment EMC-0076-002 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods.

EMC-0641-018
Idaho Conservation
League

**Comment:** Because of the serious ecological damage caused by noxious weeds, we support the judicious use of herbicides when careful analysis demonstrates its appropriateness on a site-specific basis. However, the environmental costs of herbicide use must always be carefully weighed against the benefits in light of alternative methods of noxious weed control and prevention. The burden rests on the BLM to demonstrate, via analyses of the characteristics of specific herbicides as well as site conditions and weather patterns, that proposed herbicide application treatments will not adversely impact non-target species or overall ecosystem integrity. Non-herbicide treatments and prevention techniques should be utilized in situations where herbicide application may result in unintended harm.

**Response:** As discussed in Chapter 2 of the PEIS and PER under Vegetation Treatment Methods, application of herbicides is but one method proposed by the BLM for treatment of vegetation. Other methods include manual, mechanical, and biological control methods, and use of prescribed fire. Only about 16% of acres would be treated

BLM_0001373

using herbicides; the remaining acres would be treated using other methods. Non-herbicide treatment methods are considered first when planning a vegetation treatment program, and herbicide use is only considered if it is effective and safe, as discussed in Chapter 2 of the PEIS under Site Selection Priorities. The effectiveness and safety of herbicides are discussed in Chapter 4 and in Appendixes B and C of the PEIS.

RMC-0049-005
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** The last point that needs to be better emphasized is to use all the tools available. While herbicides are a focus of one of these draft publications, the draft publication on Vegetation Treatments should have emphasized much more thoroughly how the various tools work together to achieve the goal of making native plant communities much more resilient and better able to resist domination by invasive plant species. Where we do not have complete knowledge, the document should reflect that and allow for incorporation of new knowledge as it becomes available.

**Response:** See response to Comment RMC-0049-008 under PEIS Alternatives, Site Selection Methods. The Final PER identifies and provides additional information on the other various vegetation methods available to the BLM. Also see the text in Chapter 2 of the PER under Standard Operating Procedures and Guidelines, which describes how integrated pest management is used to ensure that all the tools work together to achieve resource management goals.

RMC-0049-008
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** It is important that the agency be allowed as much flexibility as possible when newer tools become available. Where they are most appropriate, new tools – including new herbicides – should be used where science indicates that it is appropriate in the battle to combat invasive weed species domination.

**Response:** The BLM agrees the agency needs flexibility to use new tools, including new herbicides, and to use them appropriately as best science would indicate. However, the BLM also has a responsibility to ensure public involvement in its decision-making, as well as a responsibility to ensure that the tools used on public lands do not result in unforeseen or unintended consequences.

RMC-0069-015
Desert Survivors

**Comment:** In all cases, there are other means that can be used to manage public lands in a responsible manner. Spraying herbicides is a kind of "final solution" management tool that seems to solve one problem but ends up creating more. "Fly a plane over and the work is done!" But at what cost? These chemicals must not be used on public lands.

**Response:** Although addressed separately in the PEIS, chemical treatments are just one method employed by the BLM to control vegetation. Other methods, which are discussed in the PER, include fire, mechanical treatments, manual treatments, and biological control. As stated in Chapter 2 of the PER under Vegetation Treatment Methods, no single management option is regarded as a stand-alone option for successful vegetation treatments. When developing treatment programs, the BLM considers all available management options, and then selects the method or combination of methods that optimizes vegetation control with respect to environmental concerns, effectiveness, and cost of the treatment.

EMC-0075-002
Pearce, Mary

**Comment:** It would be better to use animals that graze on weeds and other mechanical ways of using weeds to make fertilizers and soil conditioners.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

BLM_0001374

RESPONSE TO COMMENTS

EMC-0080-002
Winfree, Robin

**Comment:** This is not an effective way to deal with invasive plant problems. Use a little more people-power to control and prevent the spread of invasive plants, and you will win the gratitude of citizens everywhere.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0181-007
Artley, Richard

**Comment:** For noxious weeds use hand digging. A small gas powered auger will help to dig down deep enough to get all the roots. The superior characteristic to hand digging is that all non-target vegetation survives.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0239-003
Kimmel, Reida

**Comment:** Herbicides should not be the preferred control method for an agency charged with the protection of the public lands and their species. Manual control is effective on many invasives like Scotch broom. The use of burning as in fuel reduction projects, and other heat related techniques for killing plants are effective. Controlled intensive grazing by sheep or goats has proved to be very effective in combating certain weeds, and gives a boost to local economies. If the BLM practices a policy of integrated pest management, using herbicides only as a last resort, the lands it manages will be far healthier for the discretionary use of poisons.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0239-005
Kimmel, Reida

**Comment:** We hear often that chemicals are the only choice because they are the most cost-effective. With the increase in the price of fuel and petrochemical products this may not be the case very much longer. Even more importantly, as I see it, the herbicides are not that effective. Timber companies in my neighborhood spray repeatedly, three or four times in establishing a new crop of trees. Their lands here Western Oregon, in spite of the sprays, are a sea of broom, thistle, and blackberry. If herbicides don't even work very well, in spite of repeated applications, against these common invasives, how can they hope to deal with leafy spurge? The BLM needs to establish a firm policy of control which decreases, not increases, the use of herbicides, while relying more and more on conventional and innovative approaches to clearing our public lands of unwanted and harmful species.

**Response:** Within Chapter 2 of the PER, under the heading "Site Selection and Treatment Priorities," the priorities for vegetation treatments are identified. As stated in the BLM's action plan, *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996), "... an IWM (Integrated Weed Management) approach, where all weed management practices are considered for use, is the best approach where noxious weeds have infested an area." In Manual Section 9015, the BLM's policy regarding Integrated Weed Management is spelled out; pointing out that the BLM is "vitally interested in an integrated pest management approach." Only through the integration of all available management options can the BLM hope to address the issue of invasive weed species. The use of livestock as a weed management tool for leafy spurge has proven extremely effective, along with the introduction of USDA-APHIS-PPQ [U.S. Department of Agriculture-Animal and Plant Health Inspection Service-Plant Protection and Quarantine]-approved biological control agents. Research supported by the BLM has demonstrated the effective use of competitive grasses in the management of creeping perennials, which along with the other management options

BLM_0001375

for leafy spurge have proven to be cost-effective when used in an integrated approach. Also see responses to Comment EMC-0174-003 under PEIS Proposed Action and Purpose and Need, Scope of Analysis and Comments EMC-0203-007 and EMC-0646-182 under PEIS Environmental Consequences, Vegetation.

EMC-0242-002
Boettcher, Robert

**Comment:** I have been a member of a county weed board for over 20 years and we have had great success in controlling weeds with an integrated management approach. There are several ways to do this such as insects, hand pulling, hoeing, burning anything to keep the plants from going to seed. The problem with tripling your use of herbicides is where does this run off to as there is far to much pollution to mainly our water supply already.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0252-003
Levanti, Deanna

**Comment:** Herbicide use should always be a last resort. Through controlling wildfires is no simple task, the government must make use of various resources and methods. Primarily, the wildfire ecosystem must be understood. Any solution must fit into the natural cycles of that ecosystem. Rather than try to downright destroy the wildfire ecosystem, we should try to induce naturally occurring controls. Knowledge about those methods comes from studying and observing the ecosystem, as generations of Native Americans have done. We must tap in to any existing knowledge about control methods, asking for Native American participation and that of any who possess such knowledge. Some methods include cyclical burning of underbrush by man and re-establishing a natural balance in the ecosystem to assure nature's own control methods are in place--for example, the presence of small animals that eat underbrush, or the growth of trees that block light and hence control underbrush growth.

**Response:** See responses to Comment EMC-0585-157 under PEIS Alternatives, Mitigation and Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0253-004
Keeran, Georgia

**Comment:** There are better ways to control non-desirable plants: Use of beneficial insects; control spraying of herbicides that eradicate specific plant types and do not eradicate beneficial plants. Please consider seriously the indiscriminate spraying. In attempting to resolve one problem you may well be creating additional problems. The balances that existed before the "weeds" were introduced must be reestablished/preserved.

**Response:** See responses to Comments RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation and RMC-0214-029 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

EMC-0257-007
Lockridge, Ross

**Comment:** I would like to see a real commitment within the BLM that does not pit the chemical industries against healthier nontoxic agricultural solutions. Often there are other alternatives that can be committed to that are clearly safer than the use of herbicides, like mechanical removal of vegetation, the use of goats as follow-up, or the No-Action alternatives.

**Response:** See response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

BLM_0001376

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0275-003<br>Vardaman, Emilie | **Comment:** Fourth, there are better, cheaper, easier ways to dispose of weeds: goats. They have been used for several years under contract from the state and federal governments to eat weeds. This is an affordable, non toxic option that should be used. |
| | **Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation. |
| EMC-0350-003<br>Morris, Nancy | **Comment:** I find it very frustrating that the BLM continues to cater more to the pesticide industry as a way to resolve invasive problems than looking at real solutions that would not cause harm to people, air, water, and wildlife. Non-toxic solutions do exist if we put energy into this type of preventive research. |
| | **Response:** See response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. |
| EMC-0505-006<br>U.S. Environmental<br>Protection Agency | **Comment:** However, herbicides are only one strategy that may find value as the most environmentally sound approach to addressing these crises. Consequently, to assess and choose the best scenario requires that herbicides be compared to other management options such as fire, beneficial insects resulting in biological control, manual and mechanical methods such as weed pulling, mowing, etc. For this reason, we encourage the BLM to develop alternatives that include all management options so that the comparison is clear, and so that the decision-making process is spelled out in some detail. |
| | **Response:** See Chapter 4 of the PEIS, Environmental Consequences. Alternative C, No Use of Herbicides, provides the baseline comparison of non-chemical methods relative to herbicide use. |
| EMC-0533-015<br>Colorado Farm Bureau | **Comment:** In fact, we suggest that livestock grazing should be more prominently considered in the final [P]EIS as an integral tool for reducing fuel loads and managing harmful invasive and noxious weeds on BLM lands. Cattle, sheep and goats provide an ecologically safe and effective way to manage vegetation. |
| | **Response:** The PEIS does consider the use of domestic grazing animals as a viable option for limiting the growth and reproduction of undesirable vegetation. In many situations grazing can be effectively used along with other methods to help control the targeted vegetation. Use of grazing animals requires that the grazing season be prescribed specifically to control undesirable vegetation without impacting other resources present. Although this method can be effective, it would not work in every situation and must be considered along with other options for each site-specific situation. |
| EMC-0533-016<br>Colorado Farm Bureau | **Comment:** Using livestock grazing as a way to reduce fuel loads and harmful noxious weeds might also provide an economical and efficient solution to the issue of what to do with livestock when allotments are being restored or treated. Using livestock in this beneficial way could provide a "win-win" situation for both ranchers and for the environment. This option should be better developed in the final PEIS. |
| | **Response:** See response to Comment EMC-0533-015 under PEIS Alternatives, Site Selection Methods. |

BLM_0001377

EMC-0552-003
McDougall, Claire, and
Paul Jones

**Comment:** I think it would be more progressive for the Bureau of Land Management to look at some alternative methods. Any invasive weed can be pulled or chopped down before the seeds drop. On our subdivision we have proven this to be effective. Bringing in predatory insects has also been effective. Why this love-affair with the chemical? Why this obsession with eradicating weeds over and above concern for our children's health and the health of the smaller animals in our eco-system?

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0562-012
The Lands Council

**Comment:** The Lands Council would like to see integrated manual and cultural treatments considered as a preferred alternative. Hand pulling, hoeing, and other manual removal methods are most effective for smaller infestations. They are an "important tool in steep or uneven terrain" and "typically cause minimal environmental impact". DiTomaso (2001). The following excerpt was taken from the *Integrated Vegetation Management's Technical Bulletin, Bio-Integral Resource Center, Berkeley,* Drlik et al (1998).

"The Bradley method is an approach that was developed by the Bradley sisters in Sydney, Australia. It combines the strategies of containment and reduction and can be used most successfully in natural areas where weed stands are close to or intermingled with native vegetation. This approach uses carefully planned hand weeding to tip the ecological balance in favor of the native vegetation, which is then allowed to regenerate and fill the area where the weeds have been removed. The weeding is always done outward from the edge of the best stands of natives. The Bradley's recommend choosing an area you can visit easily and often, where the native vegetation meets a mixture of natives and weeds not worse than 1 weed to 2 natives. Using this method, the two Bradley sisters (both over fifty) cleared a 40-acre woodland reserve so successfully that the area needed only slight attention once or twice a year (mainly in vulnerable spots such as roadsides and creek banks) to be maintained weed-free. To do this they expended only a minimum amount of time: an average of 45 minutes per day between the two of them. This low-cost, low-impact approach enables restoration to occur with minimal labor or equipment."

**Response:** See response to Comment EMC-0486-020 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding the integrated pest management (IPM) approach used in designing BLM vegetation treatment projects. Manual and cultural methods are included within the range of options for vegetation treatments. The IPM approach represents existing policy and is subsumed under Continue Present Herbicide Use (No Action Alternative) and the Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative).

EMC-0562-013
The Lands Council

**Comment:** Other management methods recommended by experts and ignored as a preferred alternative are tilling, mowing, and grazing. For instance mowing, a cost effective late season tool, is a popular treatment method. *See* DiTomaso (2001). Properly timed mowing (or weed whacking) can provide excellent control, and reduce seed banks and populations. The BLM should be favoring an integrated method alternative that combines mowing, grazing, and hand pulling with revegetation efforts.

**Response:** See response to Comment EMC-0486-020 under PEIS Alternatives, Vegetation Treatment Planning and Management. The BLM utilizes an integrated weed management (IWM) approach, which includes the methods described. Analysis

BLM_0001378