and discussion of these methods is provided in the PEIS and PER. Each method is identified in the discussion under Vegetation Treatment Methods in Chapter 2 of the PER, including mechanical methods, manual methods (hand pulling), and biological control methods (grazing), and use of prescribed fire and herbicides.

EMC-0646-195
Californians for
Alternatives to Toxics

**Comment:** There is an abundance of literature regarding the control and management of yellow starthistle (YST). The BLM has failed to disclose this information and has thus skewed the evaluation of feasible alternatives. California governmental sources often rely on the expertise of Dr. Joseph DiTomaso of the University of California, Davis, in regards to YST management and control. DiTomaso states in UC Davis's Weed Research and Information web site that viable treatment options include grazing, mowing, manual removal, perennial grass reseeding, burning, and biological control. Yet the BLM has failed to evaluate most of these methods. With a myriad of low-impact effective and commonly used treatment options available, why is the BLM so focused on spraying? Hand pulling, hoeing, and other manual removal methods are most effective for smaller infestations. They are an "important tool in steep or uneven terrain" and "typically cause minimal environmental impact" (DiTomaso 2001).

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0646-199
Californians for
Alternatives to Toxics

**Comment:** Grazing has been shown to be effective controlling young yellow starthistle plants (DiTomaso 2001). If integrated with mowing, burning, bio-controls, or even as a treatment for re-growth after hand pulling, grazing could be efficiently and effectively utilized for controlling yellow starthistle. Yet the BLM has failed to mention or even consider grazing within the pages of the EA [PEIS].

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0646-201
Californians for
Alternatives to Toxics

**Comment:** Burning is recommended for use in the first, second, and third years of long-term management strategies ([Ditomaso] 2001). Is the BLM planning to wage war on weeds for the long term? Why were these feasible options [ burning and grazing] not included as potential alternatives or part of an integrated management strategy? The current EA [PEIS] is unacceptable and in violation of NEPA due to its failure to include analysis of long term, viable IPM [integrated pest management] options such as these.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0646-202
Californians for
Alternatives to Toxics

**Comment:** The EA [PEIS] fails to consider the option of using bio-control agents on yellow starthistle even though the literature shows that it has proven effective. Six different insects have become established in California for controlling Yellow starthistle. Two in particular, the false peacock fly (*Chaetorellia succinea*) and the hairy weevil (*Eustenopus villosus*), have been shown to have significant impact on seed production (DiTomaso 2001). DiTomaso (2001) also states that several plant pathogens have shown promise as bio-control tools, and in particular the naturally-occurring and host-specific *Ascophyta spp*. DiTomaso states that bio-control is recommended to be part of any integrated management strategy and that they provide the possibility of long-term and sustainable management (2001). Isn't that the ideal goal of noxious weed management? Bio-controls should at least be mentioned and evaluated?

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0646-218
Californians for
Alternatives to Toxics

**Comment:** Conversely, grazing could be considered as a tool for weed suppression and vegetation management. Such a technique is usually most successful when used in combination with other weed control techniques and employed over several seasons with cautious and restrictive rotational grazing practices (CDFA Encycloweedia website, Pitcher 1986, WA Noxious Weed Control Board). However, as previously mentioned, the use of grazers in weed management is a delicate tool that must be applied with great responsibility and commitment, not without careful planning, full analysis and monitored implementation. There is no hint of this level of awareness in the FEIS [Draft PEIS].

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

FXC-0074-006
Copper Country
Alliance

**Comment:** Because of their documented harmful effects (many of which your PEIS summarizes) on fish, wildlife and other organisms, herbicide use should never, anywhere, be the first option considered. BLM should always look at all other options first. BLM should evaluate which method has the least potential for harm to:
- Human health
- Farm animals and crops
- Subsistence resources
- Commercial fisheries
- Non-target species
- The natural ecosystem

**Response:** See response to Comment EMC-0238-007 under PEIS Environmental Consequences, Wildlife Resources.

RMC-0210-041
MCS Task Force of
New Mexico

**Comment:** The management of existing weeds should rely primarily on non-chemical methods, using herbicides only as a last resort, if at all.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0646-203
Californians for
Alternatives to Toxics

**Comment:** DiTomaso mentions problems with using herbicides as part of an integrated, long-term management strategy for YST [yellow starthistle]. DiTomaso reports that herbicides are not effective in the early years of a long-term strategy and do not provide control of seeds germinating after treatment. Yet this is exactly what the BLM is proposing. Is the BLM looking for a long-term solution to invasive plants or a short-term fix? Why has the BLM failed to disclose this information within the EA [PEIS]? While glyphosate is reported by DiTomaso to be effective on YST seedlings, so are hand pulling and other methods, which have lower adverse impact potential. The BLM has failed to objectively discuss the potential problems and disadvantages of their herbicide solution, again failing to comply with NEPA requirements and thus the EA is unacceptable.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

BLM_0001380

RESPONSE TO COMMENTS

RMC-0040(1)-003
Resource Concepts,
Inc.

**Comment:** Pg. 2-10 [of the Draft PER], the mechanical treatment section failed to mention the use of the Hydro-ax or other chopper/shredders that are part of the mowing tool suite.

**Response:** The PER discusses mechanical treatment tools by type, rather than by specific tool or brand of tool. The Hydroax would fall under the general discussion of mowing tools (Chapter 2, Mechanical Treatment subheading). This paragraph in the PER also mentions equipment that is used to cut and chip vegetation.

RMC-0217-022
Sierra Club Utah
Chapter

**Comment:** It is not clear from the discussion whether mechanical treatments are effective. After decades of using mechanical treatments the BLM should have some record of treated areas, the results of treatment and the effectiveness of treatment in reducing noxious weeds and undesirable invasive plants and restoring the potential natural community of plants to an area.

**Response:** Effectiveness of mechanical treatments is generally discussed in the Vegetation section of Chapter 4 of the PER under Adverse Effects of Treatments, Effects of Mechanical Treatments. Site-specific data on treatment effectiveness for mechanical treatments reside at individual field offices and are taken into account when planning vegetation treatment projects. In general, all treatment methods discussed in the PEIS and PER, including mechanical treatments, are considered by the BLM to be effective, within their physical limitations, under appropriate circumstances and conditions.

FXC-0071-003
Campbell, Bruce

**Comment:** I was appalled to see "manual (hand tools, hand-pulling, hand spraying)" on page 2 of 8 in an answer to a question in the Frequently Asked Questions paper at www.blm.gov/nhp/spotlight/VegEIS/faqs.htm about different types of vegetation management proposed under BLM's plan.

**Response:** In the context of the PEIS and PER, manual treatments include only those non-herbicide treatments done by hand and without mechanical equipment. Some herbicide treatments could be done manually using hand sprayers, backpack applicator, wick, etc., but in the PEIS and PER are still considered herbicide treatments.

FXC-0071-005
Campbell, Bruce

**Comment:** In how many alternatives can "manual" vegetation treatment include the use of herbicides sprayed by hand – and would that increase the likely quantity of "treated" acres beyond 932,000 a year? (I note that page 4-133 says that "5% of public lands" would be treated manually.) Not only should the documents differentiate between BLM lands and Forest Service lands when I believe they mean 5% of BLM lands, but also does this 5% figure include "hand spraying" which is considered one of the manual approaches according to the answers in the Frequently Asked Questions section?

**Response:** Manual treatments, as discussed in the PER in Chapter 2 under Manual Treatment, do not involve the use of herbicides. Herbicides could be applied manually, such as with wick applicators or by spot spraying, but any acres treated using herbicides, regardless of the application method, are included in the acreage for herbicides. The term "public lands," as defined in the first paragraph of Chapter 1 of the PEIS and PER, refers only to the nearly 261 million acres of BLM-administered lands in the 17 states evaluated in the PEIS and PER.

BLM_0001381

EMC-0174-002
Concerned Friends of
Ferry County

**Comment:** We have seen a great decline of various weeds prevalent in Ferry due to the use of biological control agents, namely insects that attack these non-native weeds. The use of weevils has drastically reduced the acres infested with knap weed and various thistles. A beetle has proven effective against St. Johns Wort. The BLM needs to investigate the use of these biological agents where and when ever possible to avoid the use of poisonous chemicals.

**Response:** The BLM reviewed (Chapter 2) and evaluated (Chapter 4) non-herbicide treatment methods in the PER, including the use of biological control agents. Based on treatment estimates from BLM field offices, approximately 8% of all acres treated would be treated using biological control agents.

FXC-0059-013
Evans, Gail

**Comment:** I also must demand that biocontrols – which I understand to be exotic organisms – not be unleashed in the wild. Not enough controlled testing has been done to ensure that these organisms will not have negative impacts on native plants.

**Response:** See response to Comment EMC-0446-062 under PER Vegetation Treatment Programs, Policies, and Methods, Biological Control.

**Alternatives, Determination of Treatment Acreages**

EMC-0405-010
Hoover, Victoria N.

**Comment:** Regarding Nevada, for example, there is no information on relevant acreage in Nevada being considered for treatments, information either for BLM land managers themselves or for the public. Nevada is a significant part of the Intermountain West, with more BLM public lands than any other state. Its vast sagebrush habitats would especially be subject to massive experiments of treatments that have never been tried and shown to work properly anywhere. Chainings have already done significant damage to natural ecosystems in Nevada (as well as Utah) and it is time to slow down on such treatments, not seek to justify their great expansion.

**Response:** See response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages. The BLM analyzed treatment effects by state for some resources, or by ecoregion or hydrologic region, depending upon the resource analyzed. Chapter 4 of the PEIS and PER note how many acres would be treated by regional area. An estimated number of acres treated in each state by each treatment method was required to conduct the air quality analyses; these figures can be found in the air quality reports on the CD that accompanies the Final PEIS.

EMC-0411-006
Schroyer, Don L.

**Comment:** How many acres infestated with invasive / noxious weeds on BLM lands have been treated with EPA approved herbicides, and how many acres have been treated by mechanical means?

**Response:** Please refer to Table 3-5 in Chapter 3 of the PEIS for an estimate of infested acres. Table 3-23 in Chapter 3 of the PEIS provides data pertaining to herbicide applications in 2005. Each year, the BLM publishes its Public Lands Statistics, which discloses acres of treatments on public lands (Available at: http://www.blm.gov/publications/). These data have not been summarized for each treatment method in this PEIS due to variability in standards for reporting public land statistics over the last 20 years.

BLM_0001382

EMC-0446-007
The Nature
Conservancy

**Comment:** Analysis scale: The Draft PEIS and PER propose an increase in vegetation management treatments on public land to 6 million acres per year, yet there is no map or description of where these treatment acres might occur other than a large scale map of assumed Fire Risk Regime Condition Classes (FRCC) across the entire West and a statement that over half of these treatments would occur in the Temperate Desert Ecoregion. The two documents defer to local land use plans for specific management areas, treatments and mitigation, yet many of BLM's land use plans are more than 15-20 years old and do not include updated information on fire regime condition class, ecological condition of vegetation to be treated, location of sensitive plant and animal species, or current goals for restoration of native plant communities.

**Response:** Site-specific information on treatment locations is unavailable and not included in the PEIS. See Determination of Treatment Acres in Chapter 2 of the Final PEIS for a discussion of how treatment acres were derived for analysis in the PEIS. Despite the age of many land use plans, periodic plan maintenance and amendment allow plans to remain current until such time as the plans require revision. All BLM land use plans have been reviewed for appropriate decisions, goals, and objectives relative to fire management and fire regime condition class. In those cases where decisions, goals, and objectives required modification to meet current fire management policies, all BLM land use plans were directed by the Department of Interior to be amended for Fire Management by 2004.

EMC-0446-036
The Nature
Conservancy

**Comment:** The current document does not clearly indicate where the majority of the acreage treatments are intended over the next decade. It would assist reviewers in analyzing potential effects to identify the acreage projected by individual field office and state level programs and the location of the additional 1.4 million acres of proposed treatment areas added by the national fire team based on fire regime condition class.

**Response:** See response to Comment EMC-0446-057 under PEIS Alternatives, Determination of Treatment Acreages.

EMC-0446-057
The Nature
Conservancy

**Comment:** Fuels treatments: BLM field offices developed acreage estimates of 4.6 million acres of treatments per year based on existing land use and fire plans. An additional 1.4 million acres of treatment needs were based on existing FRCC [Fire regime condition class] assessments and the stated goal of shifting FRCC 3 conditions to FRCC 1. Without maps of all proposed treatment areas it is not possible to determine whether there is overlap in these estimates or whether these acres address large-scale needs and priorities for maintenance of areas in existing FRCC 1. There is insufficient information on how the additional 1.4 million acres of treatment were determined by national staff. Additional information should be provided on the location and extent of all proposed treatment areas, their management objectives, and proposed methods of treatment in order to be able to assess potential cumulative effects from multiple treatments in adjacent areas or similar ecosystems.

**Response:** The PER in Chapter 1 under Determination of Treatment Acreages states that the 1.4 million acres were determined through the review of the fire regime condition classes on BLM-administered lands, and that these acres were beyond the 4.6 million acres of proposed treatments by field offices. Acres of treatments were broadly estimated from a variety of sources, including land use and fire plans. The paragraph further explains that treatments on the 1.4 million acres would be on vegetation exhibiting FRCC3 characteristics. Maintenance of FRCC 1 category lands is an important component of ensuring long-term viability of healthy forests and

BLM_0001383

shrublands. Maintenance projects were included in the acreage estimates provided by the BLM field offices (i.e. within the 4.6 million acreage calculation). A further breakdown is provided, showing an estimated 3.5 million acres would be treated for hazardous fuels reduction and to control wildfires in the wildland urban interface, an estimated 1 million acres would be treated to restore ecosystem health (which includes invasive plant control), and an estimated 1.5 million acres would receive burned area stabilization and rehabilitation. Finally, this section states clearly that the 6 million annual acres is an estimate. This estimate and the estimated breakdown of treatments will fluctuate annually as prior year treatments are assessed for maintenance treatment needs and new fuels estimates evolve due to such perturbations as extensive beetle kill, drought or blow down.

Because the PEIS and PER do not propose any vegetation treatments, maps of the locations of potential treatments are not included, either in the source documents or in the estimates provided by the field offices. The specific location, extent, management objectives, and proposed methods of treatments would be described in the site-specific NEPA or planning document at the time the project was proposed. It is beyond the capability of the PEIS and PER to provide this information, since specific locations may not be known at this time.

EMC-0525-113
Western Watersheds
Project

**Comment:** As the acreage estimates for treatments proposed under the EIS are based on BLM District/Field Office estimates – with no apparent scientific methodology applied for developing these estimates, BLM's great over-exaggerations about treatment needs in the past must be used as the lens through which the public views claims of treatment need in the [P]EIS/PER.

**Response:** See response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages.

EMC-0553-006
Callihan, Robert H.

**Comment:** This draft suggests a possible disparity between the extent of the problem and the extent of the proposed treatments. It states that 35 million acres are dominated by invasive species (p. ES-1 [of the Draft PEIS]), and 6 million acres are proposed for annual treatment (p. ES-2, 1-6 [of the Draft PEIS], but not whether or how the proposal is to treat in some way the entirety of the infested acreage. The draft describes the problem and focuses on analyzing and comparing the treatments, and discusses "programs, policies and methods" but stops short of explaining how the BLM will actually handle the 35-million-acre problem. The final draft or decision should address this deficiency.

**Response:** See responses to Comment RMC-0221-008 under PEIS Alternatives, Determination of Treatment Acreages, and Comment RMC-0126-002 under Proposed Action and Purpose and Need, Scope of Analysis. The PEIS does not propose to treat the entirety of the estimated 35 million acres of public lands infested with invasive species. The PEIS outlines the tools and techniques required to conduct vegetation treatments.

EMC-0584-013
Western Watersheds
Project

**Comment:** BLM, simultaneously with the Weed [P]EIS/PER is developing other EISs – such as the Upper Snake River District Fire, Fuels and Related Vegetation Management Plan Amendment. We attended that [P]EIS Scoping meeting held in Boise, and just like the Weed [P]EIS, BLM had no sound basis for estimates of acres proposed to be treated in the information that was provided to the public. We were told that BLM asked land managers in each field office to come up with estimates. However, there was no protocol followed as a basis for these estimates, and it appears

BLM_0001384

RESPONSE TO COMMENTS

no scientific methodology was followed. Our review of the USRD [USDI] Draft [P]EIS confirms that a systematic method to assess treatment "need" has not been used. Thus, not only does the Programmatic Weed [P]EIS/PER not rely on, or provide, current ecological information necessary to make science-based decisions on public lands, neither do the lower level EISs that will tier to it.

**Response:** See response to Comment EMC-0585-053 under PEIS Alternatives, Determination of Treatment Acreages. The BLM is not developing a "Weed" PEIS. This PEIS addresses the approval of specific herbicides for use in vegetation treatments primarily directed at reducing hazardous fuels, restoring fire-damaged lands, and improving ecosystem health (see Chapter 1 of the PEIS under Purpose and Need). Treatment of invasive and noxious weed species is one subset of the efforts that are required to meet this purpose. The PEIS and PER were not designed to question how field offices determined the need for vegetation treatments in local planning efforts. Determination of acreages for treatment in local land use planning efforts is accomplished at the field office level and supported by existing and current monitoring data, hazardous fuels assessments, and other criteria, as determined by the field office, and is outside of the scope of this PEIS.

EMC-0585-004
Western Watersheds
Project

**Comment:** How can a reader differentiate between treatments, and acres to be treated, for wildlife habitat vs. hazardous fuels vs. livestock forage treatments? It is impossible. Typical BLM EAs [Environmental Assessments])/activity plans and more site specific documents covering treatments and other activity plans often claim that a treatment project or herbicide use is conducted to both benefit or increase forage production and wildlife habitat improvement. Often, agency EAs, will claim both these and many other things would be benefits. Nowhere is any protocol or decisionmaking framework applied to determine precisely what actions will or will not be covered by the [P]EIS. One Field Office of BLM could arbitrarily claim a particular action claimed to benefit wildlife and livestock forage was covered by the [P]EIS, while a neighboring office with a similar project could claim it was not.

**Response:** See response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages. The adverse and positive effects of herbicide treatments at the programmatic level are discussed in the PEIS, while the adverse and beneficial effects of all treatment methods are discussed in the PER. If an action involves the use of herbicides, it is covered under the PEIS. It is quite possible that different field offices could come to different conclusions for a treatment, as site conditions, vegetation treated, and resources affected could differ between sites. For example, an herbicide could have different risks based on soil type and rainfall, as discussed in the ecological risk assessments. Benefits could vary in relation to application method, time of application, or other factors. Thus, the costs and benefits of project-specific treatments are best determined at the field office level.

EMC-0585-017
Western Watersheds
Project

**Comment:** (How has BLM defined "dominant"?). where are these lands? Are they the same lands targeted by the Field offices, or are they somewhere else? How has BLM management of human disturbances (grazing, roading, mining, Oil/Gas) caused this condition?

**Response:** As defined in Webster's Dictionary, dominant means commanding, controlling, or prevailing over all others, or the influence or control over ecological communities. Both definitions would apply to dominant vegetation. Although these lands could be anywhere, and for the PEIS include lands identified by field offices, Map 3-10 in the PEIS, which shows fire condition classes on public lands, is helpful in

BLM_0001385

identifying degraded lands. Those lands identified as Condition Class 3 have the greatest likelihood of having invasive vegetation or an abundance of hazardous fuels. Also see response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis

EMC-0585-038
Western Watersheds
Project

**Comment:** BLM provides no evidence of a systematic analysis or study methodology employed to develop the basis for it massive "treatment", including herbicide treatment, and state-by-state breakdown of proposed treatments in the DEIS [Draft PEIS] or PER. How, exactly, did BLM decide it needed to treat huge acreages in Nevada? How could it have decided this with incomplete, or no data at all on acreages on infestation (see PER Table 3.5, for example)?

**Response:** See response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages. The acreage estimates in Table 3-5 were incomplete; they have been corrected in the Final PEIS and PER.

EMC-0585-051
Western Watersheds
Project

**Comment:** Why are the specific details of this process [determination of acres to be treated] and specific responses not provided as an appendix in the [P]EIS? This is what is driving the massive increase in treatments and increased herbicide use.

**Response:** As noted on page 1-6 of the PER, field offices were queried as to the location of treatments, types of treatments, and vegetation proposed to be treated during the next 10 years. This information was used to assess impacts to vegetation on public lands. However, this information was based on "best estimates" at the time of the assessment, and may change over time in response to changing land conditions, funding, Congressional directives, and other factors. Thus, specific responses were not included in the PEIS and PER because they are subject to revision and some field offices did not provide detailed locations of projects (e.g., some projects were identified to Township). The exact locations of projects would be identified during NEPA analysis conducted at the local level. Analysis of proposed treatments at the broader level (e.g., ecoregion, state) was appropriate to identify factors driving the increase in treatments and herbicide use for the PEIS and PER and to predict responses of vegetation types likely to be treated.

EMC-0585-052
Western Watersheds
Project

**Comment:** BLM has provided no evidence that consistency, or consistent methodology, was applied in determination of any parameter or treatment type, acreage, etc. that were used by the Field Offices. The [Draft] [P]EIS, PER, etc. fail to provide any information on the baseline data, studies and analysis that was used by each BLM office in coming up with treatment acreages. Such information is essential to understanding the foundation of the [P]EIS, PER and associated documents, and must be fully revealed to the public in a Supplemental EIS.

**Response:** See Determination of Treatment Acres in the Scope of Report section of Chapter 1 of the PER for a discussion on how treatment acres were determined for use in the PEIS and PER. Data supporting the need for any specific vegetation treatment is available from the local field office proposing the treatment. See response to Comment RMC-0095-010 under PEIS Proposed Action and Purpose and Need, NEPA Requirements of the Program regarding the need to issue a Supplemental EIS.

EMC-0585-053
Western Watersheds
Project

**Comment:** If any assessment of the need and land conditions related to treatments that are underlying/driving this [P]EIS process have been derived from a scientific methodology, this must be provided to the public. Were specific land areas identified by BLM Field Offices? If so, where is the map of these areas? It is essential to

BLM_0001386

understand just where the FOs identified treatment acres to determine the validity of the claims of the [P]EIS that many of the treatments would be conducted in the Wildland Urban Interface, and to determine the degree of impact to ACECs [Areas of Critical Environmental Concern], WSAs [Wilderness Study Areas], T&E [threatened and endangered species] habitats, etc.

**Response:** See Determination of Treatment Acres in the Scope of Report section of Chapter 1 of the PER for a discussion on how treatment acres were determined for use in the PEIS and PER. The field offices were requested to document which vegetation types potential treatment(s) would be applied. General locations, in terms of plant communities, were identified rather than site-specific locations, as many site-specific locations are not known at this time. These data, which represent projections made by the BLM, are summarized by plant community and ecoregion in the PEIS and PER. Impacts to Areas of Critical Environmental Concern, Wilderness Study Areas, and threatened and endangered species habitat are assessed on a site-specific basis through NEPA analysis of a specific proposal to treat vegetation.

EMC-0585-232
Western Watersheds
Project

**Comment:** The BA [Biological Assessment] evaluated the likely impacts to TES [threatened, endangered, and sensitive] species, yet nowhere does it evaluate the impacts of acres projected to be treated to the species inhabiting the land areas that will suffer the brunt of the treatments. As the [P]EIS is based on specific information from FOs [field offices] concerning treatment acreages in particular geographic areas, such information should be readily available, and the impacts of these treatments adequately assessed.

**Response:** See response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages.

EMC-0585-235
Western Watersheds
Project

**Comment:** Such analysis must be conducted in relation to the lands where treatment is proposed under the [P]EIS. PER at 1-6 states that the field offices provided information on lands to be treated as part of this [P]EIS and methods to be used. Thus, BLM has a very good idea of which lands are to be treated, and where they are located. Instead of spending many pages rambling about Alaska, or a rare butterfly inhabiting a very small area, small where NO treatments were really envisioned to occur, BLM should have assessed the impacts of Veg Treatments on the lands – and the particular TES [threatened, endangered, and sensitive] species inhabiting the lands where treatments are likely to occur.

**Response:** See response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages. The focus of Chapter 4 of the PEIS is on those lands where treatments would occur and impacts are likely to be greatest. The BLM did provide discussions of likely affects to special status species under the Fish, Wildlife Resources, and Vegetation subsections of Chapter 4. In addition, information on the effects of all treatment methods on special status species is given in Chapter 4 of the PER, and in more detail in the Biological Assessment.

EMC-0606-007
Johnson, Kathy

**Comment:** 6 million acres? 5.1 million acres? 932,000 acres? How many acres are you ultimately going to be dumping on? And what happens if your spray gets on my private property?

**Response:** As discussed in Chapter 2 of the PEIS, herbicide treatments would occur on 0 to 932,000 acres, depending upon which alternative is selected in the Record of Decision. Herbicide treatments would occur on an estimated 932,000 acres under the

Preferred Alternative. In addition to these treatments, the BLM would use fire, and mechanical, manual, and biological control methods on an additional 5,068,000 acres. Thus, the total number of acres treated using all methods would be 6 million acres, and 16% of these acres would be treated using herbicides. Also see response to Comment RMC-0042-067 under PEIS Proposed Action and Purpose and Need, Purpose and Need for the Proposed Action.

RMC-0008-003
Globus, Maria W.

**Comment:** Is my area being considered for aerial spraying of herbicide?

**Response:** Please contact your local BLM field office to determine if the BLM is planning to aerial spray in your area.

RMC-0106-006
Public Employees for
Environmental
Responsibility

**Comment:** The D[raft] PEIS is an open-ended proposal to treat approximately 932,000 acres of public lands annually in 17 western states with 18 herbicides of unspecified formulation. The D[raft] PEIS does not state whether the same 932,000 acres will be treated each year or for how many years. It further does not indicate whether the same areas will be treated with the same or different herbicides in different or in the same years. It does not reveal the frequency of treatment within a single year. This leaves the public with no idea of how much land will actually be treated, or what kind of herbicide loads will be applied.

**Response:** The method for determining the number of acres treated annually, and how acres would be counted if they were treated more than once, is discussed in Chapter 1 of the PER under Determination of Treatment Acreages, and in Chapter 2 of the PEIS under Alternative A – Continue Present Herbicide Use (No Action Alternative). Also see response to Comment RMC-0208-003 under PEIS Alternatives, Vegetation Treatment Planning and Management.

RMC-0106-010
Public Employees for
Environmental
Responsibility

**Comment:** The Abstract of the DPEIS [Draft PEIS] states that together herbicidal and nonherbicidal treatments will be used on approximately 6 million acres in 17 western states. Thus, nonherbicidal methods are to be used on at least ~5 million acres. But, no indication is given on whether the two approaches may be used on the same lands, in the same or different years, for how many years, what combinations of herbicidal and nonherbicidal treatments are to be used, or the frequency of applications. A vague reference is made to impacts of non-herbicidal techniques over a period of 10 years (p. 4-45 [of Draft PEIS]), but no firm commitment is made to a complete review at that time. Moreover, the 1991 EIS for 13 western states seemed to indicate a 10 year period of treatments, but the same program has continued to present. The prospect that combined methods of treatment will be needed, and changes in herbicides used to avoid development of resistance are only briefly mentioned on p. 4-45 [of Draft PEIS], although development of herbicide resistance is of great importance.

**Response:** The methods applied to any particular area or project proposed for treatment, and how often treatments may occur for that project, are evaluated on a case-by-case basis at the project-specific level. The integration of herbicidal and non-herbicidal treatment methods under an integrated weed management framework is discussed under Vegetation Treatment Methods in Chapter 2 of the PER. This discussion outlines that some areas may receive one or more treatments in combination, such as prescribed burning followed by an herbicide application, and some areas may be treated using one or more treatment methods over several years. The PER discloses the general effects of treatments on resources and vegetation in the absence of a specific time frame. The discussion of likely impacts to natural resources from proposed treatments over the next 10 years is in error, and has been corrected in

BLM_0001388

RESPONSE TO COMMENTS

the PEIS under Impacts Common to All Treatments in the Vegetation section of Chapter 4 of the PEIS.

The 1991 EIS Record of Decision states that the effective time frame for the 1991 FEIS is considered 10 to 15 years, which means that the decision time frame is applicable through 2001 to 2006. Recognizing this constraint, the BLM initiated this PEIS in 2001 to provide continuity in the programmatic NEPA analysis beyond 2006, unless new program requirements, new research data, or management policy changes dictate the need for a new PEIS or a supplement.

The paragraph discussing herbicide resistance summarizes the factors that may affect treatment success. Resistance to herbicides may be addressed through other non-herbicidal treatment methods to attain long-term control; the PEIS does not imply that more or different herbicides will need to be used to address species resistance to herbicides.

RMC-0208-021
California Oak
Foundation

**Comment:** The Draft PEIS fails to identify, however, which of its lands will be subject to herbicide treatments.

**Response:** See response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages.

RMC-0208-025
California Oak
Foundation

**Comment:** By failing to plainly identify and describe the lands on which the BLM proposes to apply herbicide active ingredients, the Draft PEIS fails to quantify the scope of the BLM's vegetation management program. The result is a Legally inadequate environmental document. (See 40 CFR [Code of Federal Regulations] § 1505.15 ("The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration"]; *Animal Def. Council v. Hodel* (9th Cir. 1988) 840 F.2d 1432, 1439 ["Where the information in the initial EIS was so incomplete or misleading that the decisionmaker and the public could not make an informed comparison of the alternatives, revision of an EIS may be necessary to provide 'a reasonable, good and objective presentation of the subjects required by NEPA.' '" ].)

**Response:** The lands to which herbicides may be applied are identified on Map 1-1 of the PEIS and PER. These lands are further described in Chapter 3 of the Draft PEIS and PER. The scope of the BLM's vegetation treatment program is described in Chapter 2 of the PEIS and PER. Also see response to Comment RMC-0208-003 under PEIS Alternatives, Vegetation Treatment Planning and Management.

RMC-0214-020
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** The D[raft] PEIS Obfuscates the Number of Acres to be Treated. The D[raft] PEIS states that traditional vegetative treatments along with an expansion of herbicidal treatments will be used upon approximately 6 million acres. But the D[raft] PEIS does not indicate whether these approaches are to be used on the same lands, during the same periods of time, for how many years, the rate of recurrence of treatments on the lands, and what combinations of treatments will be applied. The D[raft] PEIS' lack of specificity is in direct contrast to the requirements of NEPA. BLM needs to provide accurate and unambiguous numbers on the acres to be treated and provide the context of when, how long, and in what combinations these treatments will take place. Without this information, BLM's "analysis" of environmental impacts is little more than wishful thinking.

BLM_0001389

**Response:** A discussion of how acres were counted for use in the analyses is discussed in Chapter 2 of the PEIS under Determination of Treatment Acreages. Also see response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages.

RMC-0218-031
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Potential for Site-Specific Analysis at the Programmatic Stage – According to the DEIS [Draft PEIS], "–the BLM also reviewed information that was provided by local field offices in 2002 for development of this PEIS. This information included the location, treatment method, application method, vegetation class, and size for the treatment in acres for treatments proposed during the next 10 to 15 years."( DEIS [Draft PEIS] (AKA PEIS), p.4-42) Obviously then, enough site-specific information was provided to give a much clearer picture of ecological and human health impacts that could result if the proposed herbicide applications took place – if only this information had been disclosed to the public and decision makers as region-specific sections or appendixes to the PEIS. Even if only representative sample applications had been described for different states, portraying the range of typical situations, ecotypes, species, proximity to human habitation or use, etc. that would be affected and a scenario for each herbicide proposed for use in that state, that would have been much more informative and helpful to decision-making than the complete lack of such site-specific available detail in the PEIS & appendixes.

**Response:** The statement is found under Impacts Assessment Methodology in the Vegetation section of the PEIS and is a summary of the impact assessment methodology used for the ecological risk assessments. The complete description of how treatment acres were determined is found under Determination of Treatment Acreages in Chapter 1 of the Final PER and Chapter 2 of the Final PEIS and is the source for the summary statement referenced. The results from the 2002 data gathering are not sufficient to provide site-specific data for several reasons. Potential projects were estimated in non-specific locations of general vegetation types, framed as the ecoregions assessed in this PEIS. In many cases, multiple treatments were identified for a particular type of project. Treatments could occur on the same acres several times during 1 year, or over several years. The BLM also reviewed the Fire Regime Condition Class (FRCC) maps that were available and estimated the acreage potentially needed to move FRCC 3 class areas toward FRCC 2 and 1 classes. Estimates were also included on average numbers of acres covered by Emergency Stabilization and Rehabilitation projects following catastrophic fire. The non-specific nature of the data provided are useful in determining overall acreage estimates for the purposes of a programmatic analysis. The PEIS relies on representative sample applications in its analysis of impacts to vegetation and wildlife by ecoregions. Air quality analysis and modeling were accomplished using soil types for six representative locations across the West. Typical vegetation treatment methods are discussed in Chapter 2 of the PER under Vegetation Treatment Methods.

RMC-0221-008
Center for Biological
Diversity

**Comment:** Unfortunately, before initiating the proposed project the BLM failed to undertake any systematic needs analysis to determine actual demand for the proposed action. Rather the BLM simply relied on information provided from each state about how many acres of public lands are "infested" and need to be treated. The information had no uniform context, nor was there adequate consideration of alternative solutions besides herbicide spraying.

**Response:** The proposed action was based on the need to reduce the risk of catastrophic wildfires by reducing hazardous fuels, restoring fire-damaged lands, and improving ecosystem health. See Chapter 1 of the PEIS, Purpose and Need. The

BLM_0001390

RESPONSE TO COMMENTS

policy direction and context for this need is described in Chapter 1 under Introduction and Documents that Influence the Scope of the PEIS. The BLM relied on a variety of information sources in determining the potential acres to be treated, including Fire Regime Condition Class estimates, resource enhancement projects proposed by field offices to meet land use plan objectives, ongoing and potential Emergency Stabilization and Rehabilitation projects based on past fire history, as well as projects oriented toward addressing noxious weed and invasive species control. The number of acres that potentially could be treated does not necessarily correlate with the number of acres "infested." Treatment of all acres containing noxious weeds or invasive species would greatly exceed the estimates outlined in this PEIS. Vegetation treatments would utilize all accepted non-herbicide and herbicide methods of treatments in an integrated pest management context. The PEIS does not propose that all vegetation treatments be accomplished with herbicides alone.

**RMC-0221-022**
Center for Biological Diversity

**Comment:** The D[raft] PEIS fails to adequately describe the lands on where the BLM proposes to undertake aerial spraying of herbicides. Under NEPA, the BLM is required to describe the program and its projected impacts on the environment. 42 U.S.C. § 4332(2)(C). The project description must be readily understood by the interested public. 40 C.F.R. § 1502.8; *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 493 (9th Cir. 1987). By failing to clearly identify and describe the lands on which it proposes to apply herbicides, the D[raft] PEIS fails to provide the public and decision makers with a clear understanding of the scope of the proposed project.

**Response:** See response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages. The BLM has provided an estimate of the number of acres to be treated aerially, and discussed the types of impacts that could result from aerial treatments, in the PEIS. The proposed program is to treat about 932,000 acres of public lands using herbicides. Information on specific projects would be made available to the public during NEPA analysis at the local field level.

**RMC-0221-051**
Center for Biological Diversity

**Comment:** Because this D[raft] PEIS is wholly inadequate, the BLM may not lawfully rely on it in approving site-specific actions. For the BLM to proceed with site-specific projects based solely on this D[raft] PEIS or D[raft] PER that fail to identify and analyze even the most basic environmental impacts of the project would undermine both the letter and spirit of NEPA and undermine public participation and oversight in the management of our public lands.

**Response:** The BLM does not agree that the Draft PEIS is inadequate. The BLM did not intend to rely on the Draft PEIS for approval of site-specific actions, as no site-specific projects are proposed in this analysis. The PEIS will be used to support future BLM state and field office decisions through tiering to this analysis, which will support site-specific vegetation treatment decisions based upon individual NEPA analysis.

**RMC-0228-003**
Metropolitan Water District of Southern California

**Comment:** The Draft PEIS and attached maps do not provide specific locations for the application of herbicides. Without this information, Metropolitan [Water District of Southern California] cannot determine potential impacts to its or CDWR's [California Department of Water Resources'] facilities. Therefore, our comments at this time will be of a general nature and will focus on the areas in the lower Colorado River Hydrologic region, which would affect the Colorado River.

**Response:** The PEIS is a programmatic document assessing the effects of herbicide use on public lands resources, and does not contain site-specific locations for any

BLM_0001391

potential herbicide treatments. Specific projects involving herbicide use would be proposed at the local field office level and would undergo separate and site-specific NEPA analysis once the locations were determined.

RMC-0228-006
Metropolitan Water
District of Southern
California

**Comment:** The Preferred Alternative (B) and the other alternatives (excluding C), include herbicide application to aquatic and terrestrial areas for vegetation management. The aquatic herbicide application includes wetlands and riparian areas. The Draft PEIS does not specify the location, inclusion, or proximity of these areas to the Colorado River. Metropolitan is concerned about herbicide application directly to aquatic areas that are hydrologically connected to the Colorado River.

**Response:** See response to Comment RMC-0228-003 under PEIS Alternatives, Determination of Treatment Acreages. General impacts of herbicides to water quality are discussed under Water Resources and Quality in Chapter 4 of the PEIS.

## Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives

EMC-0032-002
Montana Weed Control
Association

**Comment:** As an invasive plant management professional, I would have to say that while the need to perpetually review, scrutinize, and monitor the herbicides which are approved for use on the BLM administered lands is very important; I believe that the technical reviews done to satisfy the environmental safety standards for product use labeling by the EPA, should be used to lessen some unnecessary review responsibilities on BLM resource managers. It seems possible that by building stronger cooperative efforts between the BLM, EPA, and the product manufacturers, many of the environmental concerns could be addressed during the product labeling approval process. The manufacturers of these products dedicate vast amounts of energy and money to ensure that the products they are providing will meet the societal scrutiny, and limit any potential environmental liability that exists related to product usage. Improved collaboration between these entities would seem to be a logical consideration. Detailed analysis of both the inert and active ingredients contained in the proposed products early on in the review process, by external specialists may also provide a platform for improved modeling techniques. The development of standardized risk assessment tools for the purpose of meeting the NEPA requirements should be created in such a fashion that it could be adopted by all governmental agencies. This should reduce the existing duplication by the various federal agencies with environmental responsibilities.

The economic dynamics associated with developing these environmental policies alone, should dictate that by leveraging corporate funding to assist in the review process, would allow for reduction or redirection of taxpayer-based funding to support program implementation of the much-needed land improvements. The increasing demands being placed upon public land resources to provide diversified opportunities to the general public, necessitate elevating the levels of stewardship being applied to mitigate the negative impacts of these activities. The costs associated with meeting these responsibilities are also increasing, and therefore; the pursuit of ecologically sound, cost effective management programs is a must.

**Response:** The registration of herbicides is the responsibility of the U.S. Environmental Protection Agency (USEPA), which requires the registrant to provide the data necessary for the preparation of human health and ecological risk assessments associated with the herbicide. Under NEPA, federal agencies are required to prepare an EIS when the proposed action is likely to have a significant impact on the quality of the human environment. Appendix E of the PEIS identifies the process the BLM will

BLM_0001392

RESPONSE TO COMMENTS

follow when evaluating the need to add herbicides to its list of already approved chemicals, including the process for assessing hazards and risks according to the NEPA guidance. This process includes the analysis of risks to humans and the environment from the use of herbicides on BLM-administered lands. As part of this analysis, the BLM considers application rates, potential human and ecological receptors (e.g., general public, workers, wildlife), and exposure scenarios (e.g., ingestion, exposure to skin) that would be expected for herbicide applications on BLM-administered lands. The BLM can better predict risks to humans and the environment by using this analysis than by using only USEPA registration data. Although there are additional costs associated with the BLM analysis, protection to human and environmental health is likely to be greater as well.

EMC-0040-003
Malheur County Soil and Water Conservation District

**Comment:** The private ground treatment [of Class A weeds in Malheur County] has been showing good results, but the lack of treatment on BLM ground that neighbors the treated areas result in continued spread of the weeds. A MOU [Memorandum of Understanding] between Vale BLM and MC SWCD [the Malheur County Soil and Water Conservation District] has been in place since April of 2002 for treating BLM land, but the injunction that was imposed on BLM that limits what class of chemicals that can be used has taken away the ability of our cooperative efforts from being successful on both private and public ground. MC SWCD would like to encourage the removal of the injunction that is handicapping the control of these invasive species. New chemicals like Plateau, Tordon and Telar are the best treatment of these weeds and are unavailable to use as a tool on BLM land due to the injunction.

**Response:** The BLM is still bound by a court-ordered injunction preventing it from using all but a number of herbicides. The BLM intends that the analysis contained within this PEIS will resolve many of the issues that led to the Oregon court injunction preventing the BLM from using modern, safe, and more effective herbicides on public lands in Oregon.

EMC-0129-001
Miller, Tracy

**Comment:** I am requesting that the agency review its use of pesticides to use the least toxic, vinegar based products such as BurnOutII that have been proven (and I have tested) to eliminate weeds without toxic consequences to flora and fauna.

**Response:** BurnOut II®, a non-selective herbicide, it is not an USEPA registered product, and therefore has not gone through the same, necessary screening and testing as those that are USEPA registered. Though considered a "Minimal Risk Pesticide" that is exempt from USEPA registration, the label indicates that this herbicide is "Corrosive, causes irreversible eye damage . . ." According to USEPA's Office of Pesticide Programs' Label Review Manual, the statement "Corrosive. Causes irreversible eye damage. . ." should be indicated by the toxic signal word "Danger." However, the label for BurnOut II® only contains signal word "Caution," which might result in inappropriate handling the herbicide. The application of BurnOut II® would result in a non-selective treatment, potentially harming both undesirable and desirable vegetation, and minimizing the chance for desirable vegetation to gain a competitive advantage. In contrast, use of a selective herbicide to eliminate the undesirable vegetation would not exhibit a significant negative impact on desirable plants. Appendix E of the PEIS identifies the process the BLM would follow when evaluating new herbicides proposed for use, including an assessment of human health and ecological risks and compliance with NEPA.

BLM_0001393

EMC-0161-005
EMC-0271-004
Richards, Vivien
Takemori, Claire

**Comment:** Several of the herbicides proposed do even not have products currently registered for use by the California by the Department of Pesticide Regulation. As a California resident and user of public lands I worry about the irreparable damage these chemicals will do to the natural surroundings and public lands I enjoy, as well as the health hazards these chemicals pose to my family.

**Response:** See response to Comment EMC-0018-003 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0218-004
Dewey, Steven A.
(Utah State University)

**Comment:** It seems utterly foolish to me that the BLM or any other federal land management agency would take upon themselves the role of overseeing or second-guessing the EPA. And yet, that is exactly what BLM is doing by creating its own list of herbicides that excludes site-approved products already deemed safe and effective by EPA. It is my opinion that all herbicides meeting EPA registration requirements for range and/or wildland sites should be automatically approved for use on BLM lands. Alternative B [in the PEIS] allows use of four additional active ingredients (imazapic, diquat, diflufenzopyr, and fluridone) beyond the currently approved fourteen. But why stop there? Why deny your agency's land managers the use of newer products (such as aminopyralid) that may be even more effective and safe? If the BLM's goals for vegetation management are to decrease invasive and noxious weeds, to decrease the risk of wildfire, and to improve habitat for endangered species, then I'm convinced that arbitrarily limiting or completely eliminating any safe and effective herbicide option (product or application method) for vegetation management is a recipe for eventual failure.

**Response:** See response to Comment EMC-0032-002 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0238-005
California Partners in
Flight

**Comment:** CalPIF [California Partners in Flight] is concerned that several of the active ingredients under Alternative B carry potentially moderate or high exposure risk to biota. Those active ingredients for which we are concerned include Bromacil, Diquat, Diuron, Fluridone, and Tebuthiuron. We recommend that in the final planning document it be stated that the risk of exposure to fish and wildlife will be considered when deciding what active ingredient(s) to use, and that all efforts will be made to select active ingredient(s) that pose the lowest risk of impacting fish and/or wildlife. Only when it can be shown that chemicals with lower risk are unlikely to be effective should chemicals with a higher risk of injury to fish and wildlife be chosen.

**Response:** See responses to Comment EMC-0585-157 under PEIS Alternatives, Mitigation and Comment RMC-0115-002 under PEIS Alternatives, Monitoring.

EMC-0246-002
Abe, Jane

**Comment:** I would also be interested to know what influence the chemical companies have in these proposed actions.

**Response:** See Chapter 2 of the PEIS under Herbicide Active Ingredients Evaluated under the Proposed Alternatives. Chemical manufacturing companies were invited to participate in the public process and asked to submit nominations for active ingredients for the BLM to consider in the PEIS. Once the nominations were submitted, from both the BLM field offices and industry, the BLM vetted the information and proposals based on need at the field office level. The BLM is responsible for the proposed action analyzed in the PEIS.

BLM_0001394

RESPONSE TO COMMENTS

EMC-0317-002
Malmberg, Tony

**Comment:** With herbicides, usually broad leafed plants are killed and it moves the plant community backwards to a less diverse and less complex community. It will even create more bare ground in a lot of cases. Our idea is to stress the weeds we don't want and favor the plants we do want. We can usually do this with planning the time of grazing to stress those plants without sacrificing the health of the plant community or using poison.

**Response:** In addressing the management of broadleaf species and the need to maintain a diverse plant community, Pokorny et. al. 2005 (Pokorny, M.L., R.L. Sheley, C.A. Zabinski, R.E. Engel, T.J. Svejcar, and J.J. Borkowski. 2005. Plant Functional Group Diversity as a Mechanism for Invasive Resistance. Restoration Ecology 13:448-459) summarized their research by making the following statement: "Grasslands high in functional group diversity, particularly the forb functional groups, are important for resisting invasion by nonindigenous forbs." The authors continue by stating, "Diversity can be maintained or restored during management practices. For example, intermediate levels of disturbance, proposed to maintain high levels of diversity, can be obtained by regulating grazing and burning time and intensity. Diversity can also be maintained through careful planning of herbicide applications."

Several of the herbicides proposed for use by the BLM are selective (2,4-D, chlorsulfuron, clopyralid, dicamba, imazapyr, metsulfuron-methyl, picloram, tebuthiuron, diflufenzopyr + dicamba, and imazapic; see Table 2-3 of the PEIS). Selectivity (the toxicity of a chemical to some species more than others) can be based on several factors, including, but not limited to, timing and rate of application. Some selective herbicides are toxic to broadleaf species but practically non-toxic to grass species. This type of selectivity allows for the desirable grass species to tolerate the application of the herbicide at a rate that is effective for the management of the targeted broadleaf species. Not all broadleaf species are affected at the same rate of application; thus, selectivity can be achieved by selecting the proper use rate of the herbicide. The use of an herbicide does not create a bare ground situation unless the herbicide is registered for bare ground applications and is used in a site that requires total vegetation management.

Chapter 1 of the Programmatic EIS outlines the tiering process, from the broad, comprehensive national-level programmatic study, which this document is, to site-specific analysis which will be done at the local level. The site-specific analysis will address the issues of eliminating competitive vegetation through the use of a herbicide for the management of a specific weed species. The commentor's issues will be addressed when a site-specific Environmental Assessment (EA) is prepared and a Pesticide Use Proposal is developed. These documents will take into account the biology and ecology of the targeted species and how they relate to the most efficacious use of the proposed herbicide and the least amount of impact on the site of application.

EMC-0338-008
Dow AgroSciences

**Comment:** Comments on general information on clopyralid, picloram, and tebuthiuron: We understand that for efficiency and expediency it was useful to use information from previous assessments for herbicides already approved. However, it appears that the risk assessments were completed by different methods, different entities (SERA [Syracuse Environmental Research Associates, Inc.] for the USDA Forest Service assessments and ENSR for the BLM), at different times, and using different maximum use rates. It is not reasonable to compare results using these two approaches unless the data and methodologies are comparable for BLM use sites. For example if a maximum use rate of 10 lb a.i./A triclopyr were used this would far exceed the maximum use rate of 2 lb a.i./A on grazed lands (except for IPT [individual

BLM_0001395

plant treatments] treatments - see discussion below under the triclopyr section). Rates of triclopyr and picloram are higher for brush control than for herbaceous weed control most often used on rangeland.

**Response:** A discussion of herbicides evaluated using BLM and Forest Service methodologies is given in Chapter 2 of the PEIS under Herbicide Active Ingredients Evaluated under the Proposed Alternatives. A comparison of the two methodologies is given under Impacts Assessment Methodology in the Vegetation section of Chapter 4 of the PEIS. In general, the exposure assessment and risk characterization process were similar for the BLM and Forest Service methodologies. The BLM used risk assessment spreadsheets developed by the Forest Service to conduct its analysis of Forest Service-evaluated herbicides. As part of the analysis, the BLM entered application rates into the spreadsheets that would apply to treatments on BLM-administered lands to ensure that the assessment of risks would reflect these application rates. The rate used for triclopyr is the maximum rate for non-cropland applications, and is greater than the rate for rangeland/pasture applications. We used the higher application rate to provide a more conservative assessment of risks.

EMC-0357-002
Maizes, Beth
(Hawthorne Health and
Nutrition Institute)

**Comment:** I would like to see the Manufacturers MSDA Sheet [MSDS] on the herbicides you are considering.

**Response:** The manufacturer's Material Safety Data Sheets can be found at http://www.cdms.net/. Also see response to Comment EMC-0505-017 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0374-001
Hardy, John O.

**Comment:** Why wasn't Sulfosulfuron considered in the treatments? Sulfosulfuron has a road side label and is effective in controlling cheat grass without causing damage to desirable bunch grass vegetation. Since most wild fires are started along roadsides by vehicles that pull over on top of flammable material, it seems that Sulfosulfuron would be a good option to look into.

**Response:** The process for selecting herbicide active ingredients evaluated in the PEIS is provided in Chapter 2 of the PEIS under Herbicide Active Ingredients Evaluated under the Proposed Alternatives. Sulfosulfuron did not meet one or more of the criteria for selection of new active ingredients given in that section.

EMC-0446-029
The Nature
Conservancy

**Comment:** Diflufenzopyr is not a new herbicide. It has been used in the past mainly for weed control in soy and corn crops. A new label now allows its use in non-crop areas. Under the Preferred Alternative, BLM projects its use on only two percent of all acres treated. There is no justification given in the PEIS for the use of this herbicide other than a mention of Overdrive being effective on oak and several other species, with no reference cited ([Draft] PEIS [page] 4-63). We question the need to include this herbicide, since equivalent control can be achieved with other herbicides on the Preferred Alternative list. There is one published paper (Lym and Deibert 2005) that discusses the effectiveness of diflufenzopyr+dicamba in non-crop areas on *Cirsium arvense* (Canada thistle) and *Euphorbia esula* (leafy spurge), but this treatment was not more effective than other available herbicides after one year of treatment. Since no other documented studies on the use of this herbicide in non-crop areas are cited, we recommend removing this formulation from the BLM-approved use list.

**Response:** On March 3. 1999, the EPA announced approval of applications to conditionally register the following products:
EPA Registration Number – 7969-157: Diflufenzopyr – Technical Herbicide – Acid

BLM_0001396

RESPONSE TO COMMENTS

formulation.
EPA Registration Number – 7969-151: Diflufenzopyr – Sodium Salt (93%)
EPA Registration Number – 7969-150: Distinct® = Diflufenzopyr – Sodium Salt (21.4%) and Dicamba – Sodium Salt (55%)

Of the three products, only the diflufenzopyr + dicamba has received full registration and was originally registered for use in field corn and non-crop areas, being sold under the trade name Distinct®. As the registration process proceeded, diflufenzopyr + dicamba expanded its label to include application onto pasture, hay, and rangeland situations. These, along with the noncropland sites were placed under the trade name Overdrive® (which has the same EPA Registration Number as Distinct®) in 2004, with the cropland applications remaining under the trade name Distinct®, along with what are identified as fallow and fence line areas, therefore, the common name of the herbicide Overdrive® is diflufenzopyr + dicamba. When diflufenzopyr is applied with dicamba, it causes dicamba's translocation to the meristematic sinks, where it delivers effective weed control at reduced rates of dicamba, and across a wider range of weed species, which is the strength of this herbicide.

Diflufenzopyr was identified for use by field offices, as discussed in Chapter 2 of the PEIS under Herbicide Active Ingredients Evaluated under the Proposed Alternatives. Although it is not widely used, it is effective against certain target plants that must be controlled by BLM personnel. Because its use is not extensive, the BLM believes that the benefits from use of diflufenzopyr outweigh its potential risks with its safe application.

EMC-0446-030
The Nature
Conservancy

**Comment:** [Diuron] has been marketed in the U.S. for decades and has been used mostly in agricultural situations in the past. It is still used on some croplands, but is typically not used in non-crop (natural/wildland) areas. Diuron is moderately to highly persistent in soils, its mobility depends on soil type, and it has been found in groundwater sources in California. Given that the Preferred Alternative projects use of this herbicide at less than one percent of all treatments, we question the need to include it. There are other herbicides that can provide the same or better level of weed control than diuron with fewer environmental effects.

**Response:** As stated in Chapter 2 of the PEIS under Herbicide Modes of Action and Treatment Methods, diuron is a non-selective herbicide which is registered for use where there needs to be bare ground, in sites associated with oil and gas, rights-of-way, and recreational and cultural resources. Impacts to resources from the use of diuron are addressed in Chapter 4 of the PEIS. Although not widely used, it is an important herbicide for maintaining bare ground at oil and gas, paleontological, cultural, and other sites where the presence of invasive vegetation would create a risk to that site. Because its use is not extensive, the BLM believes that the benefits outweigh its potential risks with its safe application.

EMC-0505-010
U.S. Environmental
Protection Agency

**Comment:** The PEIS discusses the changes that may occur in the future and how these would be handled. EPA supports the use of adaptive management and offers the following suggestion for your consideration. At the close of this process there will be an approved list of herbicide active ingredients. Concurrently, there is a an ongoing effort to develop less toxic, more selective and less persistent herbicides that offer significant reductions in risks found with older active ingredients and formulations. However, these newer, less toxic herbicides will not be on that list and will be unavailable to BLM until reviewed and approved. Accordingly, we suggest that the BLM might consider developing a protocol that would permit the use of newer, less

BLM_0001397

toxic herbicides as they are developed and approved by EPA.

**Response:** The BLM has a process to adopt newer, less toxic herbicides, as outlined in the Final PEIS in Appendix E (Protocol for Identifying, Evaluating, and Using New Herbicides), and in Chapter 2 under Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0505-017
U.S. Environmental
Protection Agency

**Comment:** EPA suggests that BLM consider adding a representative label for each of the approved herbicide active ingredients and a reference to EPA's website for pesticide registration and ready access to complete fact sheets on all registered products. http://cfpub.epa.gov/oppref/rereg/status.cfm?show=rereg.

**Response:** The BLM has included a link to a website that provides representative labels for each approved herbicide active ingredient, and has listed the link to the EPA's website for pesticide registration and ready access to complete fact sheets on all registered products. This information is found in Chapter 2 of the PEIS under Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0541-018
Associated Oregon
Loggers

**Comment:** Disparage the prescriptive obstacles of previous herbicide decisions, which hobbled action. Previous herbicide policies that dictated overly-specific silvicultural applications must be avoided. Limiting management options by edicts, such as herbicide bans, is nonsensical. This BLM revision needs to clearly explain that herbicide use for regeneration, and prompt young forest establishment must be an integral practice supported by the plan revision.

**Response:** Herbicides remain an important tool in the management of woody species on lands that are managed for sustained yield of commercial timber and in situations where natural tree regeneration is exacerbated by the effects of uncharacteristically severe wildfire. In 1984, the Forest Service and BLM were enjoined from the use of herbicides in Oregon by the U.S. District Court for the District of Oregon (Civil No. 82-6273-B). The BLM returned to court in 1987 and received a partial dissolve of the injunction that allowed the use of herbicides containing dicamba, glyphosate, picloram, and 2,4-D to control and eradicate noxious weeds on BLM lands in Oregon (Civil No. 83-6272-BU). However, this injunction is outside the scope of this document and will need to be addressed at the next scale of analysis for regional or statewide programs in Oregon. Five program alternatives were developed and evaluated in this PEIS. Alternative actions were developed to address the concerns raised during scoping. It is the public's desire to see alternatives that have less emphasis on the use of herbicides (see Chapter 1, Development of the Alternatives). Alternatives were also developed to ensure that BLM complied with federal, tribal, state, and local regulations.

EMC-0562-010
The Lands Council

**Comment:** The Lands Council is adamantly opposed to the use of Roundup. While the manufacturer Monsanto (the BLM's source for Roundup toxicological and safety information) touts Roundup as relatively safe and nontoxic, glyphosate (the active ingredient in Roundup) and its formulations can cause serious health repercussions, most commonly respiratory or contact symptoms. A Swedish study has linked glyphosate exposure to the lymphatic cancer non-Hodgkins lymphoma. *See* Hardell & Eriksson (1999). Glyphosate is nitrosated "very readily" to the contaminant N-nitrosoglyphosate, a member of a chemical family of which approximately 75% are know carcinogens. *See* Sittig (1980); Young and Khan (1978); Lijinsky (1974). While the EPA thus far considers this contaminant to be "not toxicologically significant", consideration of its carcinogenic potential has thus far relied exclusively on the results

BLM_0001398

of unpublished studies conducted by Monsanto, hardly an unbiased source. *See* Rubin (1996); EPA (1993).

**Response:** In the 1999 Hardell paper the authors do not show that glyphosate causes Non-Hodgkins lymphoma (NHL), nor was the sample size sufficient to report a significant association. Recent work by DeRoos et al. (A.J. DeRoos, A. Blair, J.A. Rusiecki, J. A. Hopping, M. Svec, M. Dosemeci, D.P. Sandler, and M.C. Alavanja. 2005. Cancer Incidence among Glyphosate-exposed Pesticide Applicators in the Agricultural Health Study. Environmental Health Perspectives 113: 49-54), with larger sample size and better epidemiologic techniques failed to show any link with NHL, all cancers, or cancers by target organ, except for a "suggested" association with multiple myeloma (although the sample size was small). Neither the USEPA nor the consensus of the scientific community conclude that glyphosate is carcinogenic. There is literature that suggests N-nitrosglyphosate maybe a transformation product but there is no evidence that this compound causes cancer.

EMC-0562-011
The Lands Council

**Comment:** The BLM has neglected to consider the use of non-toxic organic herbicides and other weed control methods utilized by organic farming practices. For example, St. Gabriel Laboratories produces an organic herbicide called Burn Out®. It is advertised to work faster than Roundup® and by meeting NOP [National Organic Program] Organic Farming Requirements is less likely to have adverse impacts to the environment or human health.

**Response:** The process for selecting herbicide active ingredients evaluated in the PEIS is provided in Chapter 2 of the PEIS under Herbicide Active Ingredients Evaluated under the Proposed Alternatives. Also see response to Comment EMC-0129-001 regarding the use of BurnOut II®.

EMC-0563-002
Hupp, Kevin L.
(Lincoln County
Noxious Weed Control
Board)

**Comment:** You should look into a new product that has just recently been approved. "Milestone" by Dow agro sciences has just been approved for use under a "Caution" label. It has a lot of versatility and would aid you in controlling some infestations that are in sensitive areas.

**Response:** See response to Comment EMC-0566-008 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response. Should the Protocol for Identifying, Evaluating, and Using New Herbicides (Appendix E of the PEIS) be approved through a Record of Decision, the BLM will review any requests from the field offices for new herbicide products to assess. The BLM will determine, based on the protocol, the most appropriate products to evaluate and enter them into the queue for funding.

EMC-0566-008
Western Society of
Weed Science

**Comment:** The WSWS [Western Society of Weed Science] also supports the developed Appendix D [in the PEIS], "Protocol for Identifying, Evaluating and Using New Herbicides" to facilitate evaluation and addition of new chemicals as they become available in the future. However, the process outlined for approval of a new herbicide or for a new use of an existing herbicide is lengthy. A more rapid response to use of new herbicides may actually assist with eradication efforts if an invasive plant is found in a non-infested area. Waiting two to three years for use of a herbicide that has been registered by the U.S. EPA would appear to be inconsistent with the mandate set forth in the 1999 Executive Order 13112, which is to prevent the introduction of invasive species, provide for their control, and minimize their economic, ecological, and human health impacts. As you are aware, the executive order required the formation of an Invasive Species Council comprised of a number of federal agencies,

BLM_0001399

including BLM, which was tasked to complete a *National Invasive Species Management Plan.* On page 6 of the Plan the Council is tasked to lead, "... development, testing, transfer, and training concerning use of environmentally compatible pesticides and herbicides in controlling invasive species." On page 36 "The Council will review and propose revisions of policies and procedures (i.e., advance approval for quarantine actions, pesticide applications, and other specific control techniques, and interagency agreements that address jurisdictional and budget issues)." New herbicides provide opportunities for a rapid response to new infestations of invasive plants when they are relatively small in size. Failure to use US EPA approved herbicides early in the invasion cycle will likely lead to use of larger amounts of herbicides to control the invasive plants once their population has expanded. Rapid response is effective in eradicating invasive plants before they spread. We encourage the BLM to consider a way to respond more rapidly to the use of new EPA registered herbicides.

**Response:** The BLM disagrees that implementing a protocol for evaluating new herbicides would be inconsistent with Executive Order (E.O.) 13112. The BLM does not rely on the results of studies on new herbicide formulations to move forward and implement the EO with existing tools. The proposed protocol allows the BLM to provide a public process for evaluation of herbicides that are being considered for use on public lands. The BLM has attempted to integrate the herbicide evaluation process into is budget cycle to ensure that appropriated funds are available to conduct studies for new herbicides, as well as updated studies on existing herbicides, by placing them on a regular schedule for reevaluation. Without consideration of identified dedicated funding, approval of new herbicides and reevaluation of currently approved herbicides may be delayed beyond the predicted time frame because of studies that are incomplete due to lack of identified funds. The time frame proposed reasonably accommodates the time needed to obtain funding, conduct the literature searches and toxicological assessments, and comply with NEPA in order to approve the product for use. The protocol also provides a standard methodology for analysis where none currently exists within the agency. The last approval of herbicides occurred in 1992, in association with studies dating to 1988. This length of time is unacceptable to the agency and our partners. The proposed process will provide the public and partner agencies a higher level of certainty about how the BLM manages herbicide use. In addition, the process allows better coordination among manufacturers, agencies, and product users to assess the best products on the market to accomplish specific objectives. The BLM agrees that early detection and rapid response (EDRR) is important to effectively manage invasive species, and the BLM proactively uses USEPA-approved herbicides, approved for use on public lands, early in the invasion cycle.

EMC-0584-058
Western Watersheds
Project

**Comment:** For several years prior to the Oust drift onto ag. crops disaster, the corporation that manufactured Oust aggressively marketed its use at weed seminars attended by federal agencies. We are quite suspicious of the role of chemical corporations in pushing the use of herbicides, and are alarmed that this harmful chemical is now being proposed by BLM for use.

**Response:** Chemical companies do promote the use of herbicides they manufacture. Oust®(sulfometuron methyl) is effective at preventing emergence of cheatgrass, which covers millions of acres in the western U.S and displaces native vegetation. The prudent use of Oust may be an acceptable risk when comparing the benefits to the rangeland ecosystem to the risks to human and ecological health. Based on the human health and ecological risk assessment conducted by the BLM, risks to human and

BLM_0001400

ecological health is none to low for use of Oust® (see discussion on sulfometuron methyl under each resource section in Chapter 4 of the PEIS).

EMC-0585-057
Western Watersheds
Project

**Comment:** Determine which active herbicide ingredients are available for use on public lands. This is reckless. BLM cannot limit itself to just the "active" ingredients, as carriers, breakdown products, etc. may have serious environmental effects.

**Response:** The BLM focused its analysis of human health and ecological risk on herbicide active ingredients, as most of the published, agency, and registration information on risks associated with the use of an herbicide focuses on the active ingredient. However, the BLM did look at other herbicide formulation components in Appendix C of the PEIS under Degradates, Inert Ingredients, Adjuvants, and Tank Mixtures in the Uncertainty Analysis section. In addition, the BLM conducted additional analysis of degradates and the potential for herbicides to act as endocrine disruptors for the Final PEIS; see Appendix D.

EMC-0585-146
Western Watersheds
Project

**Comment:** [The] [P]EIS ignores a broad range of current science in claiming that it did not need to conduct new assessments for the PEIS on already used chemicals other than Oust, and "it was determined that the remaining 19 herbicides did not require further analysis for human health risks". BLM then states that it needed new analyses for non-target species assessments. BLM did not conduct "new" analyses (ERAs [ecological risk assessments]) for 9 chemicals, but used old and incomplete Forest Service info ("interactive" spread sheets that were supposed to determine exposure concentrations under various scenarios).

**Response:** The BLM conducted human health risk assessments for 6 herbicides, including Oust® (sulfometuron methyl). A literature search was done by the BLM in the late 1990s to determine if new information on human health risks from the remaining 19 herbicides justified a new analysis for these herbicides as part of the PEIS. Based on this review, the earlier BLM human health risk assessments were appropriate for use, except in a few circumstances. These circumstances, and their associated risk to humans, were discussed in Appendix B of the PEIS, under Evaluation of Currently-available Herbicide Active Ingredients. The BLM used nine risk assessments prepared by the Forest Service to determine risks to plants and animals. The methodology used by the Forest Service to assess risks was similar to that used by the BLM. These assessments are generally only a few years old and are complete.

EMC-0585-189
Western Watersheds
Project

**Comment:** BLM fails to present information on use of combinations of chemicals, or multiple chemicals used in the same area to control multiple species of weeds or to kill the same weeds.

**Response:** During 2005, the BLM applied herbicides on approximately 156,770 acres of BLM-administered lands. A combination of herbicides in a tank mix was applied to 38,102 acres, or 24% of all acres treated. Tank mixes were used to kill one or more species of weeds.

EMC-0585-194
Western Watersheds
Project

**Comment:** We are alarmed at the BLMs proposal to allow use of Diquat, given that the BLM's own Risk Characterization results show that Diquat exceeds EPA's level of concern for occupational receptors under the majority of terrestrial scenarios ([page] B-69 [of Appendix B of the Draft PEIS]). BLM does not claim to now use Diquat on lands, but land contamination is very likely, and this opens the door for future use on land. Contamination of riparian vegetation and soils, and impacts to aquatic biota, are

likely from its use in aquatic systems.

**Response:** Risks to humans from the use of diquat at typical application rates are none for 10 of 17 worker scenarios, low for 5 of 17 scenarios, and moderate for 2 of 17 scenarios (see Table B-10 in Appendix B of the PEIS). Mitigating measures will reduce risks to acceptable levels, as discussed in Chapter 2 of the PEIS under Mitigation.

EMC-0585-195
Western Watersheds
Project

**Comment:** We also are alarmed that BLM proposes to use fluridone, despite accidental risks exceeding EPA's level of concern for occupational receptors.

**Response:** No risk was projected in any of the many fluridone exposure worker or general public scenarios, except for the accidental spill, in which the risk could be low if the typical application rate was used. No risk was projected in any of the many fluridone exposure worker or general public scenarios that considered routine use and the typical application rate. The assumptions made in the accidental scenarios are very conservative.

EMC-0590-022
Western Slope
Environmental
Resource Council

**Comment:** The growing of grapes, including organic grapes for wine, is a growing agricultural pursuit in our area. Damage to grape vineyards and other crops by 2,4-D has been reported since the herbicide was first introduced in 1947 (23). We are especially concerned about the proposed use of sulfometuron methyl, one of a group of sulfonylurea (SU) compounds that are excessively persistent in the environment and cannot be detected at low levels in environmental samples (28), presenting potential long-term dangers to any human, animal or plant receptors. Sulfometuron methyl sprayed by the BLM in Idaho in 2001 to control non-native grasses and noxious weeds on public rangeland is alleged in a lawsuit to have damaged over 100,000 acres in 11 counties and resulted in hundreds of millions of dollars lost in farm revenue (29). Local tests and expert discussion leads us to question the proposed use of imazapic (trade name Plateau), since it can kill species that should be encouraged; as well as of tebuthiuron (Spike), since it has led to substantial cheatgrass expansion in certain trials (30).

**Response:** The labeled use of sulfometuron methyl (Oust®) is for the control of many annual and perennial grasses and broadleaf weeds in forestry and non-croplands. A 24(c) label or Special Local Needs Label was approved for the states of Utah, Idaho and Nevada to use the herbicide to control downy brome (*Bromus tectorum*), cheat (*Bromus secalinus*), and medusa head (*Taeniatherum caput-medusae*) on fire-damaged land, firebreaks, and other non-crop areas owned and administered by agencies of the State of Idaho or the federal government such as the U.S. Department of Agriculture and the U.S. Department of Interior including the BLM, the Forest Service, and the U.S. Fish and Wildlife Service. However, since the 2001 incident in Idaho, the 24-C label approving its use for fire-damaged lands has been pulled, and the current labeled use of sulfometuron methyl is limited to bare ground applications. The PEIS and PER identify the parameters for use and standard operating procedures that are designed to reduce the risk of all of the herbicides currently used by the BLM, including, but not limited to tebuthiuron, as well as those proposed for use, including imazapic.

EMC-0590-023
Western Slope
Environmental
Resource Council

**Comment:** Also indicated in Table 1 are the herbicides that are reported in the most recent "US Forest Service Regional Report of Pesticide Use on National Forest System Lands" as having been used on our local Grand Mesa-Uncompahgre-Gunnison National Forest (GMUG under Notes). An indication that five of the pesticides in

BLM_0001402

RESPONSE TO COMMENTS

Table 1 are on the Pesticide Action Network's list of "Bad Actor" pesticides is also included in the Table (PAN-BA under Notes). The "Bad Actor" list was created to identify "most toxic" pesticides. A chemical found on the list is at least one of the following: a carcinogen, a reproductive or developmental toxicant, a cholinesterase inhibitor, a groundwater contaminant, or a pesticide with high acute toxicity.

**Response:** None of the herbicides proposed for use by the BLM is a carcinogen, has high acute toxicity, or is a cholinesterase inhibitor. Information on reproductive effects was presented in the BLM (included on the CD that accompanies the PEIS or in earlier BLM EISs listed in the PEIS) and Forest Service (http://www.fs.fed.us/foresthealth/pesticide/risk.shtml) human health risk assessments.

EMC-0606-002
Johnson, Kathy

**Comment:** Why do you "need to determine which herbicide active ingredients…Hasn't that already been done by the chemical company's MSDS [Material Safety Data Sheets] sheets that must accompany any and all chemicals?

**Response:** The MSDSs provide useful information on the risks to humans and terrestrial and aquatic organisms and were used in preparing the human health and ecological risk assessments for the PEIS. However, the BLM conducted additional analysis to quantify the risks to humans, fish and wildlife, plants, cultural and scenic resources, and other resources on public lands, under realistic conditions and based on realistic application scenarios. This additional analysis helped the BLM better assess risks and to develop appropriate standard operating procedures and mitigation to reduce them.

EMC-0606-004
Johnson, Kathy

**Comment:** You are currently using 14 herbicides and what to use 4 new ones! Why do you need so many?? That is ridiculous!! 18 different chemicals, (POISON cocktails) to control the forest fires and keep the forests healthy?????? Show me the tests that were done on the many different combinations of these 18 chemicals. What were the results of even mixing two of them together? What is 'out there' that can't be fought with the current already approved chemicals? Alien growth? Please!!!!???? Get Real!

**Response:** When determining which active ingredients required a risk assessment prior to being added on the current approved list, several factors were considered. One of these factors was management of undesirable vegetation for which there were a limited number or no effective herbicides available under our current program. For example, there are very few herbicides available to control invasive aquatic vegetation under the current program, and aquatic species are not being effectively controlled. The addition of two of the proposed active ingredients will allow for the BLM to be more aggressive in stopping the negative impacts associated with this group of species. A similar case can be made for the management of invasive winter annual grasses and the critical impacts associated with these species on lands administered by the BLM. Under the current list of active ingredients, the option available for management of these species eliminates all annual vegetation, including desirable species. One of the proposed active ingredients, when approved, will selectively eliminate the undesirable species.

EMC-0623-016
Defenders of Wildlife

**Comment:** BLM should minimize use of any herbicide that is a known groundwater contaminant, developmental or reproductive toxin, acutely toxic, carcinogen or endocrine disruptor. Defenders is pleased that the BLM is planning to discontinue use of three such chemicals (2,4-DP, atrazine and simazine), and that none of the new herbicides currently proposed is such a chemical, but we are disappointed that BLM

BLM_0001403

has signaled its intent to continue to six chemicals that are such known toxins.

**Response:** The BLM would consider the potential for an herbicide to contaminate groundwater when evaluating treatment options and application methods. In addition, the BLM would use Standard Operating Procedures and mitigation measures identified in Chapter 2 of the PEIS to reduce risks to groundwater. As noted in Chapter 2 of the PEIS under Site Selection Priorities in the Vegetation Treatment Planning and Management section, the BLM would consider nonchemical methods of vegetation treatment before using herbicides.

EMC-0630-013
Porter, Mark C.
(Wallowa Resources)

**Comment:** I commend the [P]EIS team for providing means to adopt new chemicals over time. This is critical as herbicides are consistently becoming narrower in spectrum and more non-toxic to the environment and to humans. I hope that the [P]EIS team is already working to incorporate Milestone Herbicide into this [P]EIS.

**Response:** Additional herbicides will be considered for use on public lands following approval of a final protocol for herbicide evaluations. Also see response to Comment EMC-0566-008 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

EMC-0643-005
California Indian
Basketweavers
Association

**Comment:** The BLM intends to approve, via this [P]EIS, a tripling of the use of herbicides on approximately 932,000 acres annually, on 6 million acres in 17 states. Approximately 70% of applications will be 2,4-D, glyphosate, picloram and tebuthiuron (p. 4-149 [of the Draft PEIS]). The [P]EIS seeks to show an environmental clean bill of health for the use of a total of 14 herbicides.

**Response:** The PEIS presents BLM risk assessments for the four new herbicides and new ecological risk assessments for five old herbicides, and incorporates recent Forest Service risk assessments with updated spreadsheets for the remaining herbicides being considered for use by the BLM under the Preferred Alternative and Alternatives D and E. As discussed in the PEIS, there are risks associated with the use of herbicides, although risks are none to low for most application and exposure scenarios. The PEIS does not show an environmental clean bill of health, but discloses the risks to the environment and humans from the use of herbicides.

EMC-0643-078
California Indian
Basketweavers
Association

**Comment:** Clopyralid (Transline) is emerging as a serious groundwater contaminant in California and it is highly persistent in the environment. Oddly, these attributes of clopyralid were not addressed substantively in the D[raft [P]EIS. Clopyralid is restricted for use in the state of California (2003) and throughout the nation for most lawn uses because it has been found to contaminate compost made from lawn clippings. Even after the high temperatures generated in the manufacture of compost, after 18 months the herbicidal action of the chemical was still active and resulted in mortality to vegetable plants in nurseries using the compost that contained clopyralid-contaminated grass clippings (Bezdicek 2001, Vanderoort et al. 1997). If this chemical can remain active this long after composting, there is little chance that it will break down any more rapidly in nature. This suggests that the chemical may become an environmental and health threat due to its unusual pattern of long persistence rates. The BLM should prohibit the use of this dangerous chemical on public lands.

**Response:** Research has demonstrated that clopyralid, unlike other herbicides that generally breakdown in composting, breaks down very slowly during composting. As a result of this situation, labels have been changed on those formulations that are registered for lawn and turf related applications The BLM would not apply any

BLM_0001404

herbicide active ingredient or formulation unless it meets the state's registration requirements.

EMC-0646-018
Californians for
Alternatives to Toxics

**Comment:** BLM's position is that new chemicals and formulations can be used if approved internally, without NEPA review (see [PEIS] Appendix D-2). Specifically, adoption of new formulations and new active ingredients would depend on pesticide registration of the product to stand in for the required analysis. This process cannot stand. It is in direct conflict with established law, as was recently cited in Californians for Alternatives to Toxics et al v. California Department of Food and Agriculture, __ Cal.Rptr.3d __; 2005 WL 3549483; 2006 Daily Journal D.A.R. 1204 in which CATs [Californians for Alternatives to Toxics] argument that reliance on the registration process and labels of pesticides was not sufficient to satisfy the requirements of the California Environmental Quality Act.

**Response:** The PEIS does not propose to use pesticide registration as a replacement for NEPA analysis. The discussion in Appendix E of the Final PEIS under Determining the Need for New Herbicides describes the process by which herbicide formulations would be vetted and considered for adoption by the agency. The NEPA requirements for approval by the agency are described in Appendix E in Figure E-1 and under NEPA Documentation. Also see response to Comment EMC-0566-008 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

EMC-0646-184
Californians for
Alternatives to Toxics

**Comment:** The BLM has neglected to consider the use of non-toxic organic herbicides and other weed control methods utilized by organic farming practices. For example St. Gabriel Laboratories produces an organic herbicide called Burn Out. It is advertised to work faster than Roundup (the glyphosate the BLM is proposing to liberally apply) and by meeting NOP [National Organic Program] Organic Farming Requirements is less likely to have adverse impacts to the environment or human health. If the BLM insists on using herbicides, why not use ones that are least likely to have adverse environmental impacts? What about hot foam or other non-herbicide methods the BLM has used in other projects before? What about mulching/covers and solarization? What about organizing volunteer weed pulling days? What about flaming or torching? Goats? Bio-control agents?

**Response:** See response to Comment EMC-0562-011 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives regarding the use of BurnOut II®. Non-herbicide treatment methods that would be used by the BLM, including the use of biological controls, are discussed in the PER. In addition, the BLM would use Standard Operating Procedures and mitigation measures identified in Chapter 2 of the PEIS to reduce risks to the environment and human health. As noted in Chapter 2 of the PEIS under Site Selection and Treatment Priorities in the Vegetation Treatment Planning and Management section, the BLM would consider nonchemical methods of vegetation treatment before using herbicides.

EMC-0647-006
Alaska Community
Action on Toxics

**Comment:** BLM does not provide justification for its "approved" list of herbicides. It is wrong to state that "Except for diquat, new herbicides proposed for use pose few or no risks to workers or the public." Herbicides are inherently harmful and should be replaced with safe non-chemical alternatives. We are particularly concerned that BLM is proposing to add diquat to its list of "approved" herbicides. The following acute (short-term) health effects may occur immediately or shortly after exposure to diquat:
- irritation of the eyes, nose, and throat and may cause nosebleeds
- nausea, vomiting, diarrhea, tremors, convulsions, and even death

- reproductive toxicity that may decrease fertility in males.
- repeated exposure may cause clouding of the eye lenses (cataracts) and damage skin
- damage to the liver, kidneys and lungs.

Since diquat is a nonselective herbicide, it may present a danger to non-target plant species. Cows are particularly sensitive to the toxic effects of this material.
http://extoxnet.orst.edu/pips/diquatdi.htm

**Response:** These symptoms are associated with acute exposure to the active ingredient, which would not occur except in the accidental spill scenario. The diquat risk assessment, for 17 occupational scenarios involving typical application rates, predicted no risk for 10 scenarios, low risk for 5 scenarios, and moderate risk for 2 scenarios (mixer-loaders for plane and helicopter). Risk can be managed with the proper use of personal protective equipment and by following label instructions. The risk assessments included a large mammalian herbivore, which could be used as a surrogate to estimate risk to cows from use of diquat.

FL-0006-007

**Comment:** The proposed actions appear to meet financial needs of chemical companies and other large corporate interests, rather than support ecological integrity and public interests.

**Response:** The BLM disagrees. The Proposed Action is required to support restoration of ecological integrity and maintenance of healthy ecosystems in the public interest. See Social and Economic Values in Chapter 4 of the PEIS for a discussion of the economic benefits of herbicides and their applications.

FXC-0071-009
Campbell, Bruce

**Comment:** Which active ingredients/formulations of herbicides considered by BLM did you not do a recent risk assessment on due to reliance on earlier risk assessments? Which herbicides/formulations relied on BLM's risk assessments from 1988 and/or 1991? Which herbicides/formulations relied on old U.S. Forest Service risk assessments? (I object that it was handily presumed that, "Based on the general similarity of the risk assessments conducted by the BLM in 1988 and 1991 and the current risk assessment, it is likely that the risk estimates calculated previously would not differ significantly from risk estimates calculated for the present herbicide active ingredients using the updated risk assessment methods and the updated toxicity values. Therefore new risk assessments were not conducted for the herbicides currently in use other than sulfometuron methyl and dicamba." How do these updated risk assessment methods and updated toxicity values impact contamination pathways, cumulative impacts on human receptors and of sensitive species(?) – and if you are not sure, present the info, conduct the risk assessments, and find out!).

**Response:** The BLM prepared human health risk assessments (HHRAs) for the PEIS for diflufenzopyr, diquat, fluridone, imazapic, and sulfometuron methyl and ecological risk assessments (ERAs) for bromacil, chlorsulfuron, diflufenzopyr, diquat, diuron, fluridone, imazapic, sulfometuron methyl, and tebuthiuron. The Forest Service prepared HHRAs and ERAs for 2,4-D, clopyralid, dicamba, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr in the late 1990s and early 2000s. The BLM did not conduct HHRAs or ERAs for six currently-available herbicides—2,4-DP, asulam, atrazine, fosamine, mefluidide, and simazine—because they have not been used, or have been little used, by the BLM during the past decade, and under the Preferred Alternative and alternatives D and E would not be used by the BLM in the future until a new risk assessment was conducted and the chemicals found to be safe. Information on the risks from the use of herbicides can be found in Chapter

BLM_0001406

4 and appendixes B and C of the PEIS, in the HHRAs and ERAs prepared in support of the PEIS (and included on the CD that accompanies the Final PEIS), and from the Forest Service at http://www.fs.fed.us/foresthealth/pesticide/risk.shtml. Scenarios, receptors, and dose-response values for risks to humans from herbicides evaluated in 1988 and 1991 were discussed and evaluated in Appendix B of the PEIS under Evaluation of Currently-available Herbicide Active Ingredients. Risk assessment conclusions would not change significantly for these herbicides with updated risk assessment methods and dose-response values. The dose-response values and exposure pathways used in the earlier risk assessments and currently used by the USEPA were compared. If the earlier risk assessment found a particular herbicide to pose toxic effects, then it is likely that this outcome would not change with an updated risk assessment.

FXC-0071-010
Campbell, Bruce

**Comment:** In regards to the 9 herbicides for which BLM relied on outdated federal land management agency risk assessments, is it true that only dicamba underwent a new risk assessment? In regards to the other 8 herbicides (2,4-D, clopyralid, glyphosate, hexazinone, imazapyr, metsulfuron, methyl, picloram, and triclopyr), were there complete toxicological profiles for any of these in the old Forest Service or BLM risk assessments? Do you know if there have been well-conducted studies since those documents of about 14 to 18 years ago which would lead to a more complete toxicological profile? And besides calling for complete toxicological profiles for all herbicides and formulations which BLM is considering using in vegetation treatments, did BLM seek any studies since the 1988 and 1991 era in regards to inert ingredients, adjuvants, and degradants relating to these 9 herbicides? If so, which studies were they? If not, why not?

**Response:** See response to Comment FXC-0071-009 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives for a discussion of data sources and dates of analysis for herbicides evaluated by the BLM. See response to Comment FXC-0071-008 under PEIS Environmental Consequences, Herbicide Effects Analysis for analysis of inert ingredients, adjuvants, and degradants.

RMC-0067-003
Wyoming Outdoor
Council

**Comment:** The most significant cause of catastrophic wildfires on BLM lands relates to the invasion of cheatgrass into sagebrush habitats. Yet the herbicides that will be used most heavily to control weeds are effective against broadleaved plants (dicots), not grasses (monocots). Thus, it is not clear to us that any real reduction in the incidence of catastrophic wildfire can be realized unless the herbicide that is used is effective against grasses. But if the herbicide used were to also kill native grasses (such as glyphosate does), it is not apparent to us that any real benefit will be achieved: BLM would likely just be creating ecological niches for further weed invasion.

**Response:** Table 2-3 of the PEIS lists the herbicides that are currently approved and proposed for use on BLM-administered lands. This table includes imazapic and describes the areas where its registered use would be appropriate. Imazapic is a herbicide identified as having activity on grasses and broadleaves, and has significant activity on downy brome (*Bromus tectorum*) while having safety on several grass species, as described on the Plateau® label.

RMC-0067-004
Wyoming Outdoor
Council
RMC-0221-070

**Comment:** We believe there is a real issue of the "cure being worse than the disease" with what is being proposed. We would all like to reduce the incidence of catastrophic wildfires and the spread of noxious weeds, but if the herbicides that are used kill all manner of native vegetation in addition to undesirable vegetation, it is not apparent to

BLM_0001407

| | |
|---|---|
| Center for Biological Diversity | us any real benefit is being achieved. 2-4-2, Tebuthiuron, Picloram, and glyphosate will kill many highly desirable native species in addition to any undesirable invasives. The programmatic EIS does not appear to analyze or provide for mitigation that ensures this is not the case. |

**Response:** See response to Comment EMC-0317-002 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding herbicide selectivity. The potential for herbicide treatments to impact non-target vegetation is discussed in detail under several resource sections in Chapter 4 of the PEIS, including Vegetation and Wildlife Resources. In most cases, loss of some non-target vegetation would be acceptable if the long-term health of the ecosystem is improved.

Table 2-3 in Chapter 2 of the PEIS lists the herbicides that are currently approved and proposed for use on BLM lands. This table includes imazapic and describes the areas where its registered use is appropriate. Imazapic is a herbicide identified as having activity on grasses and broadleaves, and has significant activity on downy brome (*Bromus tectorum*) while being safe for several grass species, as identified on the Plateau® label. Also see response to Comment EMC-0486-020 under PEIS Alternatives, Vegetation Treatment Planning and Management.

| | |
|---|---|
| RMC-0068-005 Damus, Marilyn D. | **Comment:** Most of the chemicals you are planning to use do not have very thorough safety testing. I don't know of any that have long records of completely safe use, and some are already known to cause reproductive and developmental harm. In fact, I think I even read that you are reserving the right to add more herbicides later, without going through the EIS process again. |

**Response:** See response to Comment EMC-0032-002 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. As a result of the process for registration of a herbicide through the USEPA and the risk assessments completed by the BLM and Forest Service, the BLM will have a sound understanding of the herbicide chemistry and its behavior in the environment prior to allowing its application on public lands. As discussed in Appendix E of the PEIS, the BLM would have to prepare a NEPA EIS to use new herbicides in the future.

| | |
|---|---|
| RMC-0069-008 Desert Survivors | **Comment:** Studies presented in the PEIS do not even begin to shed any light on this matter. Studies done by herbicide manufacturers are worthless; they are obviously self-serving. The long-term effects of all of these chemicals are lethal. That has been brought forward in many studies on fish and amphibians, as well as humans. Studies of residues in soils are inadequate. The use of these chemicals should not even be considered by the BLM. |

**Response:** The BLM, like all government agencies, relies on pesticide toxicological studies required and reviewed by the USEPA. The USEPA has very stringent and comprehensive standards for these studies. See: http://www.epa.gov/pesticides/regulating/data.htm#dissipation. USEPA scientists review and approve (or reject) the study results. The BLM also conducted a comprehensive literature review for the nine herbicides proposed for use by the BLM (see individual ecological risk assessments), and for six herbicides the BLM currently can use, but does not propose to use under the Preferred Alternative and Alternatives D and E (see Appendix B of the PEIS under Evaluation of Currently-available Herbicide Active Ingredients). Use of herbicides in the proper manner and with mitigating measures described in the PEIS will certainly not be lethal to humans, and likely not lethal to wildlife, partly because the (human) risks are low and partly

BLM_0001408

RESPONSE TO COMMENTS

because the (human and wildlife) risks are based on the no-adverse-effect level with safety factors, not on lethality. The risk assessments are used to identify doses and use parameters that will not cause adverse effects in people.

RMC-0069-018
Desert Survivors

**Comment:** Also instructive would be a listing of campaign contributions and/or bribes made to the Bush campaign and those of other Republican office holders by chemical companies and/or herbicide manufacturers. There has been a rash of proposals for use of herbicides and pesticides on our public lands since the advent of the current administration, and it is likely that influence from chemical companies and/or herbicide and pesticide manufacturers is responsible for this. Such research, which is publicly available, would help the public immensely in its effort to evaluate the need for these types of programs. Most observers accept the corruption of the Bush Administration and its kowtowing to corporate interests as a given, but we need to know the details. This information was left out of your PEIS. It is the most important information that we need to judge the significance of this herbicide-spraying program. Send me this information as soon as you can.

**Response:** Thank you for your interest in this project. The information you request is outside of the scope of the analysis in the PEIS.

RMC-0076-005
San Miguel County
Board of
Commissioners

**Comment:** We support Alternative B, although we feel great caution should be exercised in expanding herbicide use and increasing acres of control. We are particularly concerned about the use of new herbicides. We feel that new technology needs a thorough vetting before its use on public lands. We have seen a number of herbicides withdrawn from use after we've become more familiar with their at-first-unrecognized toxicity.

**Response:** See response to Comment EMC-0032-002 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

RMC-0101-005
Custer County Board
of Commissioners

**Comment:** While it appears that with approval of the Preferred Alternative, the BLM will be able to use Plateau® and other new chemicals that have been developed since this issue was last addressed in 1991, we would encourage the addition of one more chemical to the list. The chemical is Milestone® (aminopyralid) manufactured by Dow AgroSciences LLC. It's effectiveness in controlling spotted knapweed (Centaurea maculosa); our other noxious weed of major concern, exceeds that of other recommended chemicals and is environmental safe. If it cannot be added to the current PEIS we would encourage you to start the "Protocol for Identifying, Evaluating and Using New Herbicides" [Appendix D of the Draft PEIS] immediately.

**Response:** See response to Comment EMC-0566-008 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response. The BLM has been made aware of aminopyralid and will consider its evaluation for use in the future.

RMC-0101-006
Custer County Board
of Commissioners

**Comment:** Along with support of the above protocol, it follows that the EPA approval of herbicides under the Federal Insecticide, Fungicide and Rodenticide Act registration process is also a must. The EPA has looked at all the environmental concerns including Human Health Risk Assessments (HHRA) and Environmental Risk Assessments (ERA) and there should he no need for BLM to go through the same process and expense again. Ideally it would seem that once a new chemical has gone through the rigorous FIFRA registration process, its approval by the BLM, or any government agency for that matter, would be automatic.

BLM_0001409

**Response:** NEPA requires the BLM to evaluate the use of herbicides for its intended application scenarios.

RMC-0101-007
Custer County Board
of Commissioners

**Comment:** Also as a point of clarification, once a new active ingredient has gone through the BLM Herbicide Evaluation Protocol and a Supplemental EIS and Record of Decision is issued additional NEPA processes should not be required at the local level in order to use the herbicide on public lands. For example, when the Preferred Alternative for this EIS is chosen and the use of Imazapic is permitted, all the Field Offices in the Western United States should not be required to write additional NEPA documents to use it.

**Response:** The PEIS represents the highest tier of analysis under NEPA, and does not represent site-specific analysis for the use of herbicides. The PEIS will allow field offices and districts the tool, under the CEQ regulations, of effective tiering (40 CFR [Code of Federal Regulations] 1502.20) for site-specific projects. The BLM has an affirmative obligation to comply with NEPA at every level of decision-making. At this programmatic level, the decision is to ascertain which herbicide active ingredients may be used on public lands. This analysis, inclusive of the risk assessments, will not need to be repeated at the local or regional level. The PEIS does not determine which herbicides will ultimately be used for any specific project, where or how they may be applied, or what specific mitigation measures may need to be implemented to protect sensitive resources at the local level. The BLM will continue to conduct NEPA at the project-specific level, or regional level as appropriate, for all vegetation treatment projects regardless of the method used.

RMC-0106-012
Public Employees for
Environmental
Responsibility

**Comment:** It is stated [on page 2-4 of the PEIS] that the decision to use the particular active ingredients proposed is "...based on a detailed analysis of the risks to human health and non-target species..." Properly described this is a detailed analysis of extremely limited information about the impacts of these herbicides. The "detailed analysis" then is performed on surrogate species, and supplies virtually no information on soil and aquatic microorganisms.

**Response:** See response to Comment EMC-0585-199 under PEIS Environmental Consequences, Herbicide Effects Analysis regarding the use of surrogate species. Soil and water microorganisms were not evaluated because studies show that microorganisms actually degrade herbicides. Terrestrial invertebrates were assessed using the susceptible honeybee. Aquatic invertebrates were assessed, as they are part of the food chain for fish and consumers of fish (herons, mink, etc.).

RMC-0106-013
Public Employees for
Environmental
Responsibility

**Comment:** It is stated [on page 2-4 of PEIS] that local BLM offices were "...consulted to determine if they had information from field applications that would suggest that any of these chemicals should be reanalyzed." There is no evidence of specific application of any information from field offices. If such exists, it must be cited in full. If there is no such information, that should be stated.

**Response:** The BLM did not receive information from the field offices that any of the herbicides in use should be reanalyzed, except for sulfometuron methyl (Oust®). Thus, Oust® was reanalyzed. Several offices did make recommendations for new herbicides they would like reviewed in the PEIS for use in the future.

RMC-0106-014
Public Employees for
Environmental

**Comment:** This account [pages 2-4 to 2-6 of PEIS] is confused-since the problem encountered did not involve human health, the statement that "It was determined that the remaining 19 herbicides did not require further analysis for human health risks"

RESPONSE TO COMMENTS

| | |
|---|---|
| Responsibility | does not follow. |

**Response:** Sulfometuron methyl, an herbicide currently used by the BLM, could have impacts to non-target vegetation, which could have implications for human health (consumption of crops) and ecological health. The remaining 19 herbicides used by the BLM did not require analysis for human health risks. However, several of the herbicides used by the BLM did require analysis of ecological risks. Thus, the statements are consistent.

RMC-0109-003
Sanders, Kenneth D.
(University of Idaho)

**Comment:** I do wish that atrazine had remained on the list of approved herbicides, as research many years ago had shown it to be promising tool for controlling annual grasses.

**Response:** As shown in Table 2-4 of the PEIS, the BLM has not used atrazine during the past 7 years, and there are several environmental concerns associated with its use. If Alternative A is selected by the BLM, the BLM would be able to continue to use atrazine. If another alternative is chosen, the BLM would have to meet the requirements of the protocol to use new herbicides as discussed in Appendix E of the PEIS, before the BLM could use atrazine in the future.

RMC-0157-005
Pitkin County
Commissioners

**Comment:** Although the County supports Alternative B, the Board feels great caution should be exercised in expanding herbicide use and increasing acres of control. The Board is particularly concerned about the use of new herbicides. Any new technology needs a thorough vetting before its use on public lands, as a number of herbicides have been withdrawn from use after greater familiarity with their initially unrecognized toxicity.

**Response:** See responses to Comment EMC-0646-018 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, and Comment EMC-0566-008 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response. The BLM has undertaken extensive toxicological studies on human health and ecological risks to minimize the risk that an herbicide will be adopted for use and then subsequently withdrawn due to unforeseen toxicity considerations.

RMC-0159-007
Proctor, Gradey

**Comment:** We are extremely concerned about the toxicity, drift potential, and persistence of this chemical [dicamba] and expect the BLM to fully analyze the potential adverse effects that may result from using products containing dicamba. We are also concerned that dicamba may increase the risk of other plant diseases on the BLM.

**Response:** See response to Comment RMC-0159-005 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. The BLM did evaluate toxicity and risk associated with dicamba application scenarios, which considered herbicide drift, and predicted a range of risks to vegetation from use of dicamba, from none to high. Risks to humans and fish and wildlife were generally none to low under various treatment scenarios. Risks from drift would be minimized by following the buffer recommendations presented in Table 4-12 of the PEIS. The BLM is not aware of dicamba increasing the risk for plant diseases.

RMC-0159-010
Proctor, Gradey

**Comment:** While just triclopyr is known as 3,5,6-tricholor-2-pyridinyloxy acetic acid, herbicides contain either triethylamine salt of triclopyr, or the butoxyethyl ester of triclopyr. Which form and what products is the BLM proposing to use?

BLM_0001411

**Response:** As of December 2005, the BLM presently applies both the triethylamine and the butoxyethyl ester formulations of triclopyr. The following labeled products are available for use on BLM-administered lands: Garlon 3A®, Garlon 4®, Remedy®, Pathfinder II®, Tahoe 3A®, and Tahoe 4E®.

RMC-0159-011
Proctor, Gradey

**Comment:** Triclopyr has many different documented toxicities. Triclopyr causes an increase in breast cancer, an increase in genetic damage such as dominant lethal mutations, an increased incidence of reproductive problems, and damage to the kidneys. The ester form of triclopyr is highly toxic to fish, inhibits behaviors in frogs that help them avoid predators, and decreases the survival rate of baby birds. Triclopyr also inhibits the growth of mycrorhizal fungi , and with fixation of atmospheric nitrogen. Triclopyr is mobile in soil and readily contaminates wells, streams, and rivers. The major breakdown product of triclopyr (3,5,6-trichloro-2-pyridinol) disrupts normal growth and development of nervous systems and accumulates in fetal brains. We are very concerned that these same effects will occur in wildlife and people if the BLM uses this chemical on our National Forest.

**Response:** The BLM is not responsible for administering herbicide use on National Forests; that is the responsibility of the U.S. Department of Agriculture Forest Service. However, the BLM did find that triclopyr posed potentially unacceptable risks to humans on BLM-administered lands during assessments of human health in 1991 for an earlier EIS, and based on subsequent review in the late 1990s, as discussed in Appendix B of the PEIS under Evaluation of Currently-available Herbicide Active Ingredients. The Forest Service conducted an assessment of ecological risks, and found that triclopyr resulted in low to medium risks for several ecological receptors.

RMC-0159-014
Proctor, Gradey

**Comment:** Both 2, 4-d and dicamba were dropped from the Forest Service Region 6 herbicide report due to higher toxicity levels. And based on the Forest Service risk assessment, triclopyr, and picloram are not far behind. It would strongly suggest you research their data so that their full story can unfold on these chemicals, before the effects do.

**Response:** The risks of using 2,4-D and dicamba were important considerations when the Forest Service decided against using these herbicides in the Pacific Northwest. In addition, these herbicides were rarely used by the Forest Service. The risks of using these herbicides are mainly associated with their potential to act as endocrine disruptors, and to produce degradate products that may also be harmful. See response to Comment EMC-0646-016 under PEIS Environmental Consequences, Herbicide Effects Analysis regarding the analysis of degradates and endocrine disruptors that was conducted by the BLM. Compared to the Forest Service, the BLM uses these herbicides more extensively on the lands it administers, and based on its assessment of the risks associated with these herbicides, feels that they are acceptable if mitigation measures identified in the PEIS are used to minimize risks.

RMC-0173-005
Delles, Susan

**Comment:** 2,4-D has been shown to be toxic to
  a. Birds  such as Sagegrouse due to habitat fragmentation and Brewers Sparrows reducing availability of insects which are a part of their diet.
  b. Fish  The toxicity of this chemical to fish is demonstrated by the warning on the EPA label. The toxic effects occur even in low concentrations.
  c. Frogs  A recent study from Willamette University shows that 2,4-D interferes with frog sex hormones.
  d. Pets  2,4-D is linked with Bladder Cancer and testicular problems in dogs.
  e. Persistence and Contamination

BLM_0001412

RESPONSE TO COMMENTS

(1) USGS surveys show persistence in agricultural and urban areas, in streams and rivers, and to a lesser extent in wells.
(2) People  Centers for Disease Control found that about 25% of Americans carry this chemical in their bodies. Levels are higher in children
(3) Air  USGS found that 60% of air samples collected had this chemical on a national level.
(4) Drift  problems show this chemical to be one of the top five pesticides involved in drift incidents over 26 states.
(5) Dioxin_This is a deadly persistent contaminant in 2,4-D.

**Response:** The risks to humans, plants, animals, and other resources from the use of 2,4-D are discussed in the relevant resource sections of Chapter 4 of the PEIS.

RMC-0173-006
Delles, Susan

**Comment:** Glyphosate (Roundup/Rodeo). This is currently the most popular chemical being used in agriculture and on urban and suburban landscapes. Studies have shown this chemical to be:
a.  Carcinogenic to humans in the form of Non-Hodgkins Lymphoma (see references)
b.  Miscarriages in human females
c.  Reduction of male reproductive capacity
d.  Birds  This chemical effects the plants birds use for food and shelter
e.  Fish  Disruption of Fish immune systems has been shown
f.  Frogs/Amphibians  Genetic damage and inhibited development has been shown
g.  Persistence
    (1) A regional study in the Midwest showed that Glyphosate applied in spring persisted into the fall harvest system
    (2) Contamination has been found in six streams in King County WA – an urban area.

**Response:** The risks to humans, plants, animals, and other resources from the use of glyphosate are discussed in the relevant resource sections of Chapter 4 of the PEIS.

RMC-0173-007
Delles, Susan

**Comment:** Picloram. This chemical is very dangerous and was evaluated by the EPA in 1995. Both the Ecological Effects Branch and the Environmental Fate and Ground Water Branch of the EPA recommended that the use of this chemical not be continued. However, the EPA did not accept these recommendations. The Journal of Pesticide Reform of Spring 1998 Vol. 18 #1 with peer reviewed literature referred for citation had this to say about the chemical: "In laboratory tests, Picloram causes damage to the liver, kidney and spleen. Other adverse effects observed in laboratory tests include embryo loss in pregnant rabbits, and testicular atrophy in male rats. The combination of Picloram and 2,4-D causes birth defects and decreases birth weights in mice. Picloram is contaminated with the carcinogen hexachlorobenzene, Hexacholorobenzend, in addition to causing cancer of the liver, thyroid, and kidney, also damages bones, blood, and the immune system and the endocrine system. Nursing infants and unborn children are particularly at risk from hexachlorobenzene. Picloram is toxic to juvenile fish at concentrations less than 1 part per million (ppm.) Concentrations as low as 0.04 ppm have killed trout fry. In Montana, roadside Spraying of Tordon killed 15,000 pounds of fish in a hatchery ¼ mile downstream from the Tordon treatment. Picloram is persistent and highly mobile in soil. It is widely found as a contaminant of groundwater and also has been found in streams and lakes. It is also extremely phytotoxic, and drift and runoff from Picloram treatments have caused startling damage to crops particularly tobacco and potatoes."

BLM_0001413

**Response:** Picloram is rated by the USEPA as being only slightly toxic to humans via ingestion. It is contaminated with less than 100 parts per million of hexachlorobenzene (HCB). The USEPA's 1995 RED Fact Sheet for picloram rated the carcinogenic risk to the general public from the trace contaminant HCB in picloram as negligible, and the risk to workers mixing picloram as "not-unacceptable." As discussed in Chapter 4 of the PEIS, picloram is persistent in the soil and has been detected in groundwater, but risks to humans and wildlife are generally none to low. The BLM would limit the size of the application area, where feasible, to reduce the potential for picloram to impact soil and water quality.

RMC-0173-009
Delles, Susan

**Comment:** As a resident of Southern Oregon for thirty years, the historical record of aerial spraying of these chemicals is clearly a negative one. In the 70s, extensive spraying of 2, 4-D and T, 4, 5-T have documented many health effects of coastal Oregon residents that resulted in a number of lawsuits. The controversy that resulted, led to the suspension of use of these chemicals by public land agencies except in small-localized applications. There is no justification for the program the PEIS proposes except to support the chemical industry.

**Response:** See response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. The herbicide 2, 4, 5-T was rarely used by the BLM in the 1970s. In the few instances when 2, 4, 5-T was sprayed, it was used in a 1:2 or 1:3 mixture with 2, 4-D. The BLM also used an herbicide called Silvex. The active ingredient in Silvex is 2,4,5-trichlorophenoxy proprionic acid (2,4,5-TP), a different chemical from 2,4,5-T. The BLM is an end-user of herbicides (i.e., consumer) in the same manner as any other person, company, or agency that purchases and applies herbicides.

RMC-0191-007
Ertz, Brian

**Comment:** In the Draft PEIS appendixes, within the ERA [ecological risk assessment] for each proposed herbicides it is mentioned that "The potential toxicity of degradates should be considered when selecting an herbicide." (D[raft] PEIS C-83) The very next sentence claims that "...it is beyond the scope of this risk assessment to evaluate all of the possible degradates of the various herbicide formulations of the ten herbicides." (D[raft] PEIS C-83). Perhaps, but not one of the ERA evaluations of the proposed 10 new herbicide active ingredients consider a single degradate of proposed herbicide in risk analysis. Bromacil, diflufenzopyr, Diuron, Imazapic, Sulfometuron Methyl, Chlorsulfuron, Diquat, Fluridone, Overdrive, Tebuthiuron, let alone the herbicides approved under previous EIS programs for current levels of administration, all make reference to the same thing in section 7.3.1 of their individual Risk Assessments.

**Response:** The BLM conducted an analysis of degradates for the Final PEIS and provided the information in Appendix D. Also see response to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment.

RMC-0208-035
California Oak
Foundation

**Comment:** Although it purports to assess 25 herbicide active ingredients, the Draft PEIS did not specifically analyze 19 active ingredients, including 2,4-D, hexazinone, triclopyr, and glyphosate, which had been analyzed in prior EIS's and previously approved for use on federal lands in the late 1980's and early 1990's. (Draft PEIS, at pp. 2-4 to 2-6.) Instead, for these herbicides, the BLM relied on the previous assessments and a "comprehensive literature review" (Draft PEIS, at p. 2-4: see also p. 4-2 [BLM "consulted risk assessments prepared by the Forest Service for nine other herbicides used by the BLM," including 2,4-D, glyphosate, hexazinone, and triclopyr].) However, as the studies cited above show, these active ingredients pose a substantial threat to wildlife in and around BLM lands that is not adequately addressed

BLM_0001414

RESPONSE TO COMMENTS

in the Draft PEIS. Moreover, the historic use of these and other active ingredients since the 1980's has resulted in an environment that is vastly different than the one assessed by the earlier EIS's, on which the BLM now relies. According to the Draft PEIS, 2,4-D, glyphosate, hexazinone, and triclopyr were assessed in EIS's in 1988, 1991, and 1992. (Draft PEIS, at p. 2-5.) Now, more than a decade later, the BLM proposes a massive vegetation management project, heavily reliant on the use of herbicides in general and two of these active ingredients in particular (see p. 4-46), but fails to conduct any further analysis of the effects of these known toxic ingredients. Reliance on outdated analysis and selective literature does not satisfy the "hard look" at the scientific data that is required by NEPA. (See 40 C.F.R. §§ 1500.l (b); 1502.24; *Native Ecosystems Council v. United States Forest Serv.* (9th Cir. 2005) 418 F.3d 953, 964.).

**Response:** See response to Comment FXC-0071-009 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. The BLM contracted expert literature reviews on all herbicides to assess what information is available and whether this information is substantially different than information used to prepare earlier BLM risk assessments. The USEPA was consulted for up-to-date toxicity information on each BLM herbicide, and a comprehensive literature review was performed for each of the 10 ecological risk assessments (ERAs) prepared by the BLM for this PEIS (see Appendix A to each ERA; see the ERAs on the CD included with the PEIS).

RMC-0208-063
California Oak
Foundation

**Comment:** In reviewing these comments, please keep in mind that both federal courts in the Ninth Circuit and the California state court have held that an agency may not curtail its assessment of the environmental effects of applying herbicides by relying on the registration of these chemicals by the Environmental Protection Agency (*see, Save Our Ecosyststems v. Clark* (9th Cir. 1984) 747 F.2d 1210, 1247 ("[t]he EPA registration process for herbicides under FIFRA is inadequate to address environmental concerns under NEPA [National Environmental Policy Act] ... ." ) or in California, by the Department of Pesticide Regulation (*Californians for Alternatives to Toxics v. Department of Food & Agriculture* (2005) 2005 Cal. App. LEXIS 2060,26-27 ).

**Response:** The BLM did not rely on the USEPA or Federal Insecticide, Fungicide and Rodenticide Act to determine whether individual herbicides should be used on public lands. The BLM used a variety of information sources to assess the risks associated with using herbicides on public lands. The reader is encouraged to review the individual risk assessments prepared by the BLM and Forest Service, and information sources contained therein, to learn more about how the analysis of risks was conducted. Information from the risk assessments was then used to conduct a NEPA analysis of the effects of use of herbicides on public lands.

RMC-0213-007
California Native Plant
Society

**Comment:** In Idaho, Oust was sprayed aerially in 1999 and 2000, resulting in drift that allegedly damaged 100,000 acres of farmland. Use of the chemical was subsequently suspended by the Idaho BLM, and the incident is the subject of an ongoing lawsuit involving over 100 farmers, BLM, and DuPont (manufacturer of the chemical). While DuPont claims that BLM used the chemical improperly, BLM claims that it followed label instructions. This incident suggests that such damage cannot be predicted or avoided even if the chemical is used according to instructions approved by the U.S. Environmental Protection Agency's pesticide registration process. Soil tests conducted by the Montana State University have determined that crop damage was caused by concentrations of Oust[©] ranging from 0.079-24 ppb.

BLM_0001415

**Response:** The labeled use of sulfometuron methyl (Oust®) is for the control of many annual and perennial grasses and broadleaf weeds in forestry and non-croplands. A 24(c) label or Special Local Needs Label was approved for the states of Utah, Idaho and Nevada to use the herbicide to control downy brome (*Bromus tectorum*), cheat (*Bromus secalinus*), and medusahead (*Taeniatherum caput-medusae*) on fire-damaged land, firebreaks, and other non-crop areas owned and administered by agencies of the State of Idaho or the federal government such as the U.S. Department of Agriculture and the U.S. Department of Interior including the BLM, the Forest Service, and the U.S. Fish and Wildlife Service. However, since the 2001 incident in Idaho, the 24-C label approving its use for fire-damaged lands has been pulled, and the current labeled use of sulfometuron methyl is limited to bare ground applications. The PEIS and PER identify the parameters for use and standard operating procedures that are designed to reduce the risk of all of the herbicides currently used by the BLM including, but not limited to, sulfometuron methyl, as well as those proposed for use, including imazapic.

RMC-0214-043
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** The BLM proposes to use 18 herbicides annually on nearly 1 million acres in 17 western states. This would more than triple the acreage that BLM currently treats with herbicides. See D[raft] PEIS Executive Summary-1. One of the BLM-selected herbicides included in the Preferred Alternative (as well as alternatives A, D, and E) is 2,4-D, which is especially inappropriate for the proposed use because of its toxicity, existing scope of contamination, and threats to the environment and public health.

**Response:** See responses to Comment RMC-0106-037 under PEIS Environmental Consequences, Fish and Other Aquatic Organisms and Comment RMC-0159-014 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

RMC-0216-019
Neff, Jack

**Comment:** BLM's wish list contains more than 1,000 separate toxic chemical compounds present within the brand-name pesticides, herbicides, and fungicides BLM proposes.

**Response:** The PEIS analyzes the impacts of using herbicides on public lands. The use of fungicides on public lands is outside the scope of the document. See response to Comment EMC-0585-057 under PEIS Environmental Consequences, Herbicide Active Ingredients Evaluated under the Proposed Alternatives regarding other herbicide formulation constituents.

RMC-0217-008
Sierra Club Utah
Chapter

**Comment:** The PEIS makes the arbitrary and unsupported leap to merely defining a list of chemicals that might at some future point be used in ways the PEIS does not identify as the most effective, having the least environmental impact, or even scientifically supported as useful for solving the actual problem to be remedied.

**Response:** See response to Comment EMC-0374-001 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. As noted in this comment response, the BLM considered effectiveness, environmental risk, and scientific studies of the proposed herbicides when determining which herbicides to evaluate in the PEIS.

RMC-0218-009
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** The BLM would also reserve the right to use new, unspecified active ingredients if they were registered by the EPA and the BLM determined the benefits of use outweighed the risks to public health and the environment. Incorporating approval of such future undefined toxic chemical use without assessment of potential risks at this stage is legally sketchy since it leaves the public and decision-makers in the dark

BLM_0001416

RESPONSE TO COMMENTS

as to what those future risks would be while approving them now.

**Response:** Under the Preferred Alternative and alternatives D and E, the BLM would not be able to use new herbicides without conducting a risk assessment, preparing a supplemental EIS, and going through the public review and comment process. These procedures are discussed in more detail in Appendix E of the PEIS under Prepare a New NEPA Document.

RMC-0218-019
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Toxicity of herbicides proposed for use: Region 6 of the Forest Service decided to drop the use of 2,4-D and dicamba due to their higher toxicity across various exposure scenarios for different wildlife species, humans, water quality, etc . Based on the Forest Service risk assessments, picloram and triclopyr are close behind for high toxicity and should be dropped from use. According to BLM assessments (although their tables seem to under-estimate risk compared to the Forest Service's), Diquat and Diuron consistently come out with higher toxicity risks than other proposed herbicides and should not be used. Picloram and clopyralid both contain an impurity (hexachlorobenzene) that has been identified as having potential to cause human cancer. The Forest Service analysis makes it clear that aerial and boom spraying greatly increase the risks of non-target plant, aquatic organism, wildlife and human hazardous exposures. The Forest Service also made the distinction that the sulfonylurea herbicides should not be aerially sprayed due to their high potency, The sulfonylurea herbicides (listed and banned under alt. [Alternative] E) pose a significant risk to fruit and seed production (including crop plants) and should not be used.

**Response:** Similar to the Forest Service risk assessments, the BLM risk assessments found that aerial and boom spraying pose higher risks to receptors than other methods of herbicide application. Table 4-29 in the Human Health and Safety section of the PEIS indicates that there is no risk to humans associated with use of clopyralid, picloram, or triclopyr at typical and maximum application rates, or diquat at the typical application rate. These results were obtained using Forest Service risk assessment models with BLM herbicide application rates. Although these herbicides do not pose risks to plants, fish, or wildlife, the BLM proposes to use buffers (see Table 4-14 of the PEIS) to minimize risk to non-target vegetation, and other mitigation measures (see Vegetation, Fish and Other Aquatic Organisms, and Wildlife Resources sections of Chapter 4 of the PEIS) to minimize risk to plants and animals from aerial and boom spraying. Also see response to Comment RMC-0173-007 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

RMC-0218-034
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Unspecified "new" herbicides not analyzed in this programmatic EIS should not be allowed for use in the future without analysis at this scale. Otherwise the public and decision-makers have no idea what impacts they are agreeing to in choosing an alternative that allows for unspecified new herbicides to be used with risk assessment and analysis only at the District level, where less funding and scientific expertise is available for the kind of detailed risk assessment and analysis needed. Yet automatic adoption of unspecified new herbicides through such inadequate assessment at the District level is proposed for alternatives B. D, and E. ([see] pp. 2-11 - 2-13, DEIS [Draft PEIS])

**Response:** As discussed in Appendix E (Protocol for Identifying, Evaluating, and Using New Herbicides) of the Final PEIS, the BLM considers the use of herbicides to be a "controversial federal action affecting the human environment." Thus, the BLM would be required to conduct a risk assessment and prepare an EIS for any new herbicides proposed for use.

BLM_0001417

RMC-0221-054
Center for Biological
Diversity

**Comment:** This D[raft] PEIS and the D[raft] PER completely fail to analyze the effects of eight herbicides proposed for continued use by the BLM: clopyralid, dicamba, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr. The BLM justifies its omission of analyses for these chemicals by noting that "these herbicides have been evaluated in a previous BLM EIS (USDI BLM 1991), as well as more recently in an invasive plant EIS prepared by the U.S. Department of Agriculture Forest Service (Forest Service; USDA Forest Service 2004)." Appendix C DEIS [Draft PEIS] Ecological Risk Assessment at p. C-1. Thus, the D[raft] PEIS and D[raft] PER defer to previous analyses for nearly half the 18 herbicides proposed for use in the preferred alternative.

**Response:** The BLM conducted a human health risk assessment for dicamba and analyzed dicamba for risks to plants and animals as part of its assessment of Overdrive® for the ERA. For the remaining seven herbicides, the BLM updated and modified the Forest Service spreadsheets using BLM exposure parameters and application rates to better reflect herbicide application risks on BLM-administered lands.

RMC-0221-055
Center for Biological
Diversity

**Comment:** Unfortunately, however, the previous [Forest Service] analyses are either insufficient because they are outdated, or they do not analyze all of the herbicides proposed for use in this action. One of the previous analyses was the BLM's evaluation of herbicides from 1991. Relying on an outdated EIS from 1991 – by now nearly 15 years old – is a violation of NEPA's requirements to insure the use of high-quality, accurate, and updated scientific data. 40 C.F.R. [Code of Federal Regulations] § 1502.22. Hundreds, if not thousands, of new studies have been published over the past 15 years regarding the effects of numerous herbicides, including those proposed for use in this action, on a variety of variables. Analyses from the BLM's previous EIS do not replace the need for new analyses in this D[raft] PEIS due to the outdated nature of the 1991 document.

**Response:** See responses to Comment RMC-0221-054 and Comment FXC-0071-009 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. The oldest Forest Service risk assessment used in the PEIS was prepared in 1998, the most recent in 2005.

RMC-0221-058
Center for Biological
Diversity

**Comment:** The Forest Service was proposing to treat 8,989 acres per year out of 24.9 million acres on National Forest System land (USDA Forest Service 2005 at p. 240) whereas the BLM's preferred alternative would treat an astounding 932,000 acres annually. The BLM's analysis of impacts is not analogous to the Forest Service's analyses, as the Forest Service concluded that the small number of acres to be treated with herbicide per year "represents a negligible risk to wildlife on a regional scale." While we disagree with the Forest Service's conclusion that the treatment of nearly 9,000 acres per year would not have serious adverse environmental impacts, particularly on endangered species and rare or restricted plant communities, even if those conclusions were supportable, the fact remains that the analyses and conclusions from the Forest Service's EIS is simply not comparable [with] the BLM's vastly larger proposal.

**Response:** The two documents are not comparable, as the Forest Service is primarily treating forestlands in the Pacific Northwest, while most public lands are rangelands where weeds and other invasive vegetation have been more successful in establishing and spreading. Based on information provided by BLM field offices, the percentage of acres treated using herbicides in western Oregon (where most BLM forestlands are

BLM_0001418

RESPONSE TO COMMENTS

located) would be less than half the percentage used by the BLM in the 17 states covered in the PEIS. The PEIS, supporting ecological risk assessments, and Biological Assessment discuss the risks to plants and animals, including threatened, endangered, and sensitive species. These assessments found that for most treatment scenarios, the risks were very minor, but were moderate to high for other scenarios.

RMC-0221-059
Center for Biological
Diversity

**Comment:** In sum, the BLM's D[raft] PEIS and D[raft] PER fail to include any analyses whatsoever about the effects of hexazinone on the biota of nearly 1 million acres proposed for treatment annually, and it does not disclose that it relied on conclusions from a previous, much-smaller Forest Service program that did not include the use of dicamba or 2,4-D. The BLM must not rely on the Forest Service's 2004 EIS for its analyses these three chemicals, nor can it rely on its previous 15-year-old analysis. The lack of examination of these three chemicals as well as the other five chemicals that remain wholly unexamined in these documents due to the BLM's reliance on outdated and non-comparable data, renders the D[raft] PEIS inadequate.

**Response:** Based on information provided in Table 2-4 of the PEIS, less than 1% (9,300 acres) of the total number of treated acres would be treated using hexazinone under the No Action and Preferred Alternatives, and Alternatives D and E. The BLM used Forest Service risk assessments for some herbicides because they were recently completed and followed protocols that were similar to those used by the BLM. The BLM did not use 15-year-old analysis for its risk assessments, but relied on recent toxicological data for analysis of ecological and human health effects.

**Alternatives, Herbicide Modes of Action and Treatment Methods**

EMC-0018-003
Shaw, T. Gray

**Comment:** Several of the herbicides proposed do even not have products currently registered for use by the California by the Department of Pesticide Regulation.

**Response:** The BLM would not apply any herbicide active ingredient or formulation unless it meets the states registration requirements.

EMC-0027-008
McNeel, Hank

**Comment:** Page 2-14 [of Draft PER], Second Column, Paragraph 2, Line 7. Anyone applying pesticides on BLM lands must be certified whether the pesticide is general or restricted use. Refer to the BLM Manuals 9011 and H-9011-Chemical Pest Control.

**Response:** This clarification has been made in Chapter 2 of the Final PEIS under Herbicide Modes of Action and Treatment Methods, and in Chapter 2 of the Final PER under Herbicides Evaluated in the PEIS in the section on Herbicides.

EMC-0063-002
EMC0066-002
EMC0069-003
Gunder, Jenn
Conrick, Teresa
Murphy, Jennifer

**Comment:** Several of the herbicides proposed do even not have products currently registered for use by the California by the Department of Pesticide Regulation.

**Response:** See response to Comment FXC-0071-006 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0076-002
Viani, Susan and Nick

**Comment:** BLM needs to make a strong commitment to reducing its reliance on herbicides, for the sake of all life!

**Response:** As noted in Chapter 2 of the PEIS under Site Selection Priorities in the Vegetation Treatment Planning and Management section, the BLM would consider nonchemical methods of vegetation treatment before using herbicides as part of an

BLM_0001419

integrated pest management approach to vegetation management. The PER lists other treatment methods the BLM could use before choosing to use herbicides.

EMC-0080-005
Winfree, Robin

**Comment:** You need to make a strong commitment to reducing its reliance on herbicides. It has been proven that plants develop resistance to repeated applications of herbicides, requiring stronger and more potent applications.

**Response:** See responses to Comments EMC-0076-002 and EMC-0267-007 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods.

EMC-0091-003
Rice, Molly

**Comment:** BLM also needs to make a strong commitment to reducing its reliance on herbicides: This agency needs to make a specific measurable commitment to reducing reliance on herbicides. 1 have worked for a Landscaping company and recognize the more you spray, the more you Have to spray!!!! The weeds become immune to the chemicals, and that just means the chemical companies make them stronger and stronger.

**Response:** See responses to Comments EMC-0076-002 and EMC-0267-007 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods.

EMC-0093-006
Barrett, Anne Albrecht

**Comment:** BLM needs to make a strong commitment to reducing its reliance on herbicides. These products are chemicals made from expensive foreign oil, and tripling their use does not support the present administration's lip service to reduction of reliance on foreign oil, which is the raw source for these poisonous and not necessary agents.

**Response:** See response to Comment EMC-0076-002 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods.

EMC-0101-002
Terry, Noalani

**Comment:** Large-scale use perpetuates a cycle of pesticide resistance leading to stronger and heavier use of pesticides that create more resistance, etc.

**Response:** See response to Comment EMC-0267-007 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods.

EMC-0133-005
Ryan, Stephanie

**Comment:** BLM also needs to make a strong commitment to reducing its reliance on herbicides by changing your practices in the first place which are contributing to this problem.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread. See also response to Comment EMC-0145-006 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0140-013
Small, Jack W. and
Joyce C.

**Comment:** I think it would be a step forward to begin monitoring the numbers with respect to the amount of chemicals being dispensed, and make some commitments in the direction of changing the whole program to one more environmentally friendly.

**Response:** Table 2-4 of the PEIS gives historic and proposed herbicide use by the BLM. This information is based on Pesticide Application Reports completed for each herbicide application by the BLM. Yearly reports of the acres treated, herbicide applied, application rates, and application type (ground vs. aerial) are prepared, which allows the BLM to track the pesticides that are applied on BLM-administered land.

BLM_0001420

RESPONSE TO COMMENTS

Also see response to Comment EMC-0121-004 under PER Vegetation Treatment Programs, Policies, and Methods, Vegetation Treatment Methods regarding non-herbicide treatment methods used by the BLM and research to find other effective methods to treat vegetation.

EMC-0214-003
Vollmer, Jennifer
(BASF)

**Comment:** Alternatives/Herbicide Modes of Action and Treatment Methods/last paragraph: A drawback of herbicide use is "Weeds may develop a resistance..." This is more likely to happen with limited available herbicides where BLM would have no choice but to use the same herbicide repeatedly over the course of time to control a particular weed, encouraging resistance development. Several herbicide options for control of a weed species will allow BLM to modify the vegetation treatment program to avoid resistance development.

**Response:** See response to Comment EMC-0267-007 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods.

EMC-0237-002
Murphy, Patricia

**Comment:** We also need to be responsive to the fact that you would be engaging in an herbicide cycle, where plants develop resistance, and more and more poison will be needed to control unwanted growth.

**Response:** See response to Comment EMC-0267-007 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods.

EMC-0237-004
Murphy, Patricia

**Comment:** We need to seriously consider that the poison of herbicide application is going to be with us a long time after the plants it kills are dead. We also need to be responsive to the fact that you would be engaging in an herbicide cycle, where plants develop resistance, and more and more poison will be needed to control unwanted growth.

**Response:** See response to Comment EMC-0267-007 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods.

EMC-0248-002
Harrer, Roger

**Comment:** It seems to me that it's pretty well established that many if not all invasive species prosper most in areas where there's no competition, and that is exactly what you have if you spray, is it not? I don't think there are herbicides specific to any of the noxious weeds.

**Response:** A number of herbicides the BLM proposes to use are selective (2,4-D, chlorsulfuron, clopyralid, dicamba, imazapyr, metsulfuron-methyl, picloram, tebuthiuron, diflufenzopyr + dicamba, and imazapic; see Table 2-3 in Chapter 2 of the PEIS). Selective herbicides are more toxic to some species than to others. Selectivity can be based upon several factors, including, but not limited to, timing and rate of application. Some of these selective herbicides are toxic to broadleaf species, but are practically non-toxic to grass species. This type of selectivity allows for the desirable grass species to tolerate the application of the herbicide at a rate that is effective for the management of the targeted broadleaf species. Not all broadleaves are affected at the same rate of application; thus, selectivity can be achieved by selecting the proper use rate of the herbicide. When conducting an environmental assessment for local projects, field managers will determine if herbicides can be used to selectively manage vegetation, where appropriate, to ensure that non-target vegetation is retained on the site. For rights-of-way and along roadways, removal of all vegetation may be appropriate and non-selective herbicides may be used.

BLM_0001421

EMC-0267-007
Medbery, Angela

**Comment:** Intense record keeping should be maintained to discover signs of plant resistance to the chemicals that are used.

**Response:** Herbicide resistance is the inherited ability of a plant to survive an herbicide application to which the wild-type was susceptible. Resistant plants occur naturally within a population and differ slightly in genetic makeup, but remain reproductively compatible with the wild-type. Herbicide resistant plants are present in a population in extremely small numbers. The repeated use of one herbicide allows these few plants to survive and reproduce. The number of resistant plants then increases in the population until the herbicide no longer effectively controls the weed. Herbicide resistance is not the natural tolerance that some species have to a herbicide. The appearance of herbicide-resistant weeds is strongly linked to repeated use of the same herbicide or herbicides with the same site of action in a monoculture cropping system or in non-crop areas.

There are several things that can be done, and are being done by the BLM, to minimize the potential development of resistant weed species, including, but not limited to the following:

1) rotate herbicides – by understanding the different modes of action of each herbicide proposed for use on public lands, select the appropriate one to minimize resistance;
2) understand the potential effects of long-term residual herbicides on the selection for resistant weeds, and correctly apply these herbicides with the understanding that they can lead to weed resistance if used yearly for several consecutive years;
3) use mechanical and biological management options to eliminate weed escapes that may represent the resistant population; and
4) keep accurate records of herbicide applications.

EMC-0306-010
Klamath River Keeper
Program and Klamath
Forest Alliance

**Comment:** The use of Tordon/Picloram and other herbicides proposed for use in this project are not authorized for use for controlling invasive plants in California.

**Response:** See response to Comment EMC-0018-003 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0314-008
Alliance for the Wild
Rockies

**Comment:** Finally, it has recently been shown in careful field experiments (I also attended a presentation by the team leader, as her experiment was performed nearby) that herbicides which target broad-leaf plants (forbs--as most herbicides do) cause weeds to thrive! This is because removing the native forbs opens-up resource niches (nutrients, water compartments, etc.) to weed seeds, which are often present because of human or other activity (Monica L. Pokorny, Roger L. Sheley et al. 'Plant Functional Group Diversity as a Mechanism for Invasion Resistance' Restoration Ecology:13:448-59 (Sept. 2005) doi:10.1111/j.1526-100X.2005.00056.x). In fact, this experiment demonstrates why any activity, such as fire and animal grazing, which targets forbs, seems to inevitably cause weeds. But note, of these various human actions, herbicides are the most direct attack on native forbs. Much other literature supports this direct experiment. Such results--along with the inevitable growth of resistance from overuse of any one management tool--point to the need for a far more integrated approach in immunizing the delicate native resources under your management from aggressive invasive plant species.

**Response:** In the final two paragraphs of the cited article, the authors discuss the importance of maintaining functional group diversity and point out: "Diversity can be maintained or restored during management practices. For example, intermediate levels

BLM_0001422

RESPONSE TO COMMENTS

of disturbance, proposed to maintain high levels of diversity, can be obtained by regulating grazing and burning time and intensity. Diversity can also be maintained through careful planning of herbicide applications." See response to Comment EMC-0267-007 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods, which discusses management strategies to deal with the potential for development of resistant weed species.

EMC-0446-019
The Nature
Conservancy

**Comment:** For situations in which herbicides are to be used, the PEIS should describe how to select among different herbicides and selection methods. Herbicides recommended for use should be selective for the target weed(s) and known to be effective for control of those species; have relatively low persistence in soils and the environment; have low potential for off-site movement; and minimize potential harmful impacts to off-target organisms and human health (including that of the applicators).

**Response:** The BLM's 9011 manual for *Chemical Pest Control* and 9015 *Integrated Weed Management* describes how the BLM would select the appropriate method(s) to be used in controlling and managing vegetation (9015) as well as the factors to consider before considering chemical pest control (9011). In addition, site-specific analysis would prepare a proposed action that takes into consideration the target species and identifies the best-known, safe and effective method to control vegetation. In conjunction with a site-specific analysis, the preparation of a Pesticide Use Proposal allows the preparer to evaluate the various components of the herbicide application, including, but not limited to, targeted species, characteristics of the proposed herbicide, environmental considerations at the proposed treatment site, desired species composition of the site, sensitive areas associated with the proposed application, and timing of application. Evaluation of all of these components requires the preparer to have a good understanding of the herbicide in order to provide the necessary information on the proposal.

Table 2-2 of the PEIS identifies each of the current approved and proposed herbicides characteristics and the area where it's registered use is appropriate.

EMC-0446-020
The Nature
Conservancy

**Comment:** The Draft PEIS lists certain herbicides that would be allowed for vegetation management, without adequately describing their appropriate uses. The PEIS should list species (where known) and types of plants (including categories for new invaders) that will be controlled and the rationales for controlling each. The Draft PEIS needs to more clearly identify management goals and associated treatments in order to assess which are suitable for public land and to assess the potential impacts of each to native plant communities and their associated wildlife. In some cases, the BLM appears to be controlling native species to artificially increase allowable uses rather than to protect land health. For example, the Draft PEIS discusses situations where native species such as oaks, sagebrush, and rabbitbrush, are being controlled primarily to produce additional forage for livestock on native shrublands and grasslands, rather than to improve ecosystem health. We believe that controlling vegetation to artificially alter rather than restore native ecosystems is not appropriate on BLM-managed public lands. Artificially creating areas for livestock grazing that are not consistent with native plant communities will not restore healthy ecosystems or natural fuel regimes, will not protect ecological values, and will require additional, expensive treatments to maintain.

**Response:** See response to Comment EMC-0646-191 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding the types of vegetation

BLM_0001423

targeted by herbicides. As discussed in Chapter 1 of the PEIS under Purpose and Need for the Proposed Action, the goals of vegetation treatments are to improve ecosystem health and reduce the risk of catastrophic wildfire. The analysis of treatment effects presented in Chapter 4 of the PEIS and PER focuses on how treatments would meet those goals, and discusses impacts to resources from treatments. Although treatments could benefit livestock forage, as discussed under Livestock, most treatment situations discussed in the PEIS focus on other resource benefits.

**EMC-0446-021**
The Nature
Conservancy

**Comment:** The Draft PEIS suggests that there are situations where the BLM allows the use of herbicides for complete vegetation control on public land – not to manage for natural resources, but to maintain open lots and industrial-type sites. For example, the herbicide bromacil, one of the herbicides listed in the Draft PEIS, is labeled for use to control undesirable vegetation for extended periods of time in areas such as railroads, highway and pipeline rights-of-way, petroleum tank farms, lumberyards, storage areas and industrial plant sites. These treatment methods would be more appropriately discussed under a separate category for "facility maintenance" rather than as generally accepted management methods under "vegetation treatment".

**Response:** See Rights-of-way, Facilities, and Roads in Chapter 3 of the Final PEIS on treating vegetation along utility rights-of-way, oil and gas facilities as well as general facilities maintenance.

**EMC-0446-025**
The Nature
Conservancy

**Comment:** The Draft PEIS lacks up-to-date information and citations from the scientific literature on potential and appropriate uses of various herbicides. The PEIS lacks rationale for including some herbicides on the recommended "approved for use" list in the Preferred Alternative, other than the fact that the BLM is already using these chemicals and wants to continue to do so. We suggest including a section in the PEIS that justifies the use of each herbicide by describing under what conditions specific herbicides will be used, for what purposes, and why that specific herbicide is appropriate and recommended over others. There are several herbicides on the Preferred Alternative list that could be replaced by more modern herbicides with less environmental impact, less persistence in soil, and with similar control results.

**Response:** See response to Comment EMC-0646-191 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding the uses of herbicides. See response to Comment EMC-0374-001 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives for the process used to select herbicides for analysis.

**EMC-0446-027**
The Nature
Conservancy

**Comment:** Bromacil is a pre-emergent herbicide frequently used to keep all vegetation clear along fencerows, parking lots, railroads, etc. It is often used by the oil and gas industry to kill all vegetation on the pads around drilling sites and platforms. This herbicide has a relatively long residence time/half-life, a high potential for water contamination, and a high potential for lateral movement. It is not clear why the BLM needs to use this herbicide for general vegetation management treatments, since there are few uses for it in a natural landscape. If this herbicide is needed for facilities maintenance, a clear statement restricting it to such uses should be included. It can be used effectively, but this herbicide can cause severe damage if used incorrectly due to its long persistence and ability to leach through soil and contaminate groundwater. If this herbicide remains on the BLM's list, there should be a strict process developed for its application in limited circumstances that includes a determination of risks, prior to use.

BLM_0001424

RESPONSE TO COMMENTS

**Response:** Bromacil is a non-selective herbicide which is registered for use where there needs to be bare ground, in sites associated with oil and gas, rights-of-way, and recreational and cultural resources, as shown in Table 2-3 of the PEIS. The BLM would follow label instructions regarding the use of bromacil, and Standard Operating Procedures and mitigation measures given in the PEIS, to reduce the risk of bromacil harming the environment.

EMC-0446-031
The Nature
Conservancy

**Comment:** Tebuthiuron is currently widely used by the BLM. According to the PEIS, it was used to treat 34.5 percent of all BLM-managed public land acres treated using herbicides from 1999-2003. The Preferred Alternative proposes that it will be used in the future on 25 percent of all herbicide-treated acres. Tebuthiuron is generally used for control of shrubs and trees as well as weeds, since it eliminates all vegetation from the treatment area. It is often applied at a pre-emergent stage for the long-term control of shrubs such as sagebrush, rabbitbrush, and other native shrub species. It provides long-lasting, non-selective control, and can be used in upland/dry areas away from any water resources. We understand that the BLM uses this herbicide to thin or eliminate woody plants in order to increase grass production for livestock grazing, for non-selective control of all vegetation in oil and gas production areas, and in-concert with chaining to remove sagebrush and juniper. We are concerned with the possible widespread use of this chemical in native grass and shrubland areas, since its non-selective nature has the potential of significantly altering native species composition and inhibiting restoration of a full complement of native species. We do not believe that this chemical will assist the BLM in meeting its goal of improving land health. We recommend that the uses and restrictions for use of tebuthiuron on public land be specifically detailed in the PEIS.

**Response:** The extent of vegetation control provided by tebuthiuron is dependent on which formulation is applied, and the application rate. According to the label, the dry formulation provides "total control of brush and weeds", while the granular formulation provides "control of woody plants." The label states that that between 1.2 lbs and 4.0 lb. active ingredient (a.i.) of the dry flowable formulation is required to achieve activity on selected weedy grasses for bare ground control. Between 0.5 and 4.0 lbs a.i. of the granular formulation are required to achieve activity on selected woody species in rangeland and pasture applications. On a supplemental label for the application of tebuthiuron to reduce canopy cover of big sagebrush, the rate of application is between 0.2 and 0.3 lbs. a.i. tebuthiuron. This rate of application of tebuthiuron is well below the rate required for the management of annual grasses. Therefore, native perennial grasses are at significantly less risk from application of tebuthiuron at rates used to thin sagebrush, which would not be considered a bare ground application. According to BLM records, over 95% of the tebuthiuron applied on public lands in 2003 was applied at this reduced rate for the purpose of opening up sagebrush dominated sites. At these application rates, damage to the native grass community was not significant.

EMC-0585-111
Western Watersheds
Project

**Comment:** BLM states [on page ES-1-1 of the Draft PEIS] that as a result, the amount of hazardous fuels reduction and other vegetation management work is expected to increase, and 15% will involve use of herbicides. BLM does not reveal the data and analysis used to derive this projection and these figures – either for acreage of herbicide or acreage to be treated by other means. Nor is data presented or the public informed of how much herbiciding will accompany each of the treatment methods, and where it will be conducted, in each of the states, or what specific type of treatments will be accompanied by herbicide use.

BLM_0001425

**Response:** See response to Comments EMC-0585-051 and EMC-0405-010 under PEIS Alternatives, Determination of Treatment Acreages.

EMC-0585-174
Western Watersheds
Project

**Comment:** BLM proposes use of existing and new chemicals on Rights-of-way and recreation and cultural sites. So here [page B-30] to it appears BLM is authorizing these chemicals to be used in rights-of-way that elsewhere the [P]EIS claims are not included in acreage totals. In areas such as Wyoming that [are] undergoing massive energy exploration and development, large acreages may be treated on or near rows, exploration swaths, etc.

**Response:** As noted in Chapter 2 of the PEIS, under Other Programs, herbicides are often the preferred treatment method on rights-of-way. All areas proposed for treatments, including rights-of-way, are included in the acreage totals.

EMC-0585-181
Western Watersheds
Project

**Comment:** How much of the land is considered "directly sprayed" vs. BLM supplying contractors or private entities such as ranchers with chemicals or funding counties or weed districts to apply chemicals? Is aerial application considered 'directly sprayed'?

**Response:** The BLM considers the application of herbicides by any method, including, but not limited to, all-terrain vehicle or truck-mounted spray, backpack, pack animals, and aerial application, to be a "direct spray" method, regardless of who is applying the herbicide. Acres of public lands directly sprayed with herbicides are quantified in annual pesticide use reports and do not differentiate what agency or entity sponsored the spraying.

EMC-0585-183
Western Watersheds
Project

**Comment:** A question that is unanswered in the [P]EIS, PER, HHRA [Human Health Risk Assessment], etc. is: How much of the chemical application, or treatment, will be done by BLM itself, or will significant parts of this treatment be turned over to local governments, grazing permittees, etc. If so, we are very concerned that even the inadequate mitigation, SOPs [Standard Operating Procedures], etc. will not be followed.

**Response:** The policy for application of pesticides on BLM-administered lands is addressed in BLM Manual 9011 – Chemical Pest Control, Section 0.1, "Guidelines for Conducting Chemical Pest Control Program." As stated in the policy, "… chemical pest control programs, including those done under BLM proposals, cooperative projects, on rights-of-way, or by lessees and concessionaires, and other activities and authorizations issued pursuant to a permit, must be submitted for review and approval in the PUP (Pesticide Use Proposal) format which is in conformance with the procedures below." Whether the application is made by a local government official, permittee, or contract applicator, the same requirements apply for the preparation of the pesticide use proposal.

In addition, as stated in Chapter 1 of the PEIS, under Relationship to Statutes, Regulations, and Policies, "All the herbicides evaluated in this PEIS are registered with the USEPA, and all applicators that apply them on public lands (i.e., certified applicators or those directly supervised by a certified applicator) must comply…" It is the policy of the BLM, as stated in Manual 9011 (.12) (B.) (5) (a.), that all persons applying pesticides, both general and restricted use, on BLM-administered lands will be certified or under the direct supervision of a certified applicator. The BLM plan for certification of pesticide applicators, Appendix 2, Handbook H-9011-1, *Chemical Pest Control*, outlines how the BLM certifies its applicators. This process is very similar to

BLM_0001426

RESPONSE TO COMMENTS

the method by which individual states certify their respective applicators. In both cases, the certification plans are approved by the USEPA.

Also see response to Comment EMC-0585-181 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods.

EMC-0646-239
Californians for
Alternatives to Toxics

**Comment:** The Draft PEIS does not describe the various methods for controlling the most problematic plant species, whether they are currently or anticipated to become the most problematic. Not all plant groups respond the same to herbicide application, for example. Some may be knocked back only to resurrect in a year or two. Others require considerably more herbicide and stronger adjuvants than "usual" before a dose is lethal.

**Response:** Chapter 4 of the PEIS discusses how invasive species of greatest concern would be treated and the costs and benefits associated with these treatments. We have also listed the major species to be treated using each herbicide in Table 2-3 in Chapter 2 of the Final PEIS.

EMC-0646-240
Californians for
Alternatives to Toxics

**Comment:** An analysis at the programmatic level, for example, could describe plants by the characteristics that most influence the ability and the means to control it by providing guidance such as the following: "Herbicides will not be the control method of choice for invasive plants that spread by profuse seed production such as purple loosestrife, et cetera (listing other species with this characteristic on western BLM lands). These seeds are relatively long-lived and germinate sporadically, therefore the seed bank of an established population of such a plant is at little risk since it is not affected by a control program that removes only the current year's standing crop of growing plants. Plants should be removed before they go to seed and the entire plant including all roots and root tips must be removed. Plant locations should be flagged and rechecked every year."

**Response:** See responses to Comment RMC-0221-072 under PEIS Alternatives, Monitoring, and Comment RMC-0210-053 under PEIS Alternatives, Coordination and Education. Regarding the development of programmatic species management plans based on specific plant characteristics, such generalities would provide little beneficial guidance to those preparing site-specific analysis documents. The purple loosestrife example provided in the comment, which states that because of its profuse seed production "the seed bank of an established population of such a plant is at little risk since it is not affected by a control program that removes only the current year's standing crop of growing plants," leaves one to question whether we are more concerned with the seed bank of the invasive species or the risk associated with the environment and ecology of the area the plant infests.

The approach proposed in the comment would also eliminate any type of integration with other management options for "invasive plants that spread by profuse seed production." The management plans for invasive species are best addressed by the tiered documents associated with the PEIS and PER, as outlined in Chapter 1 of the PEIS.

FL-0006-003

**Comment:** Several of the herbicides proposed do not even have products currently registered for use by the California Department of Pesticide Regulation. As a California resident and user of public lands I worry about the irreparable damage these chemicals will do to the natural surroundings and public lands I enjoy, as well as the health hazards these chemicals pose to my family.

BLM_0001427

**Response:** See response to Comment FXC-0071-006 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

FXC-0071-006
Campbell, Bruce

**Comment:** If an active ingredient is not currently registered for use by the California Department of Pesticide Regulation, can it be used on federal land (or water) within the State of California? (I understand that Picloram is no longer registered for use in California).

**Response:** The BLM would not use an herbicide on public lands administered by the BLM in California or any other state unless the active ingredient and the particular formulation have been registered for use in the state.

FXC-0071-007
Campbell, Bruce

**Comment:** In regards to "active ingredients" that "may be developed in the future," what if an active ingredient has been discovered and experimented with as of November 10th, 2005 when these BLM documents came out? (Since such has been developed, just because it is not an active ingredient currently being used as a registered herbicide or herbicide formulation does not mean that it hasn't already been "developed". Could such active ingredients be used as herbicides by BLM under the auspices of the Programmatic EIS and Programmatic Environmental Report? Please also note that 3 of the newer active ingredients proposed for use by BLM have yet to be evaluated by the California Dept. of Pesticide Regulation.) Could any of the three active ingredients newly proposed by BLM for use as an herbicide in vegetation treatment be used in California despite the lack of review and approval by CA Dept. of Pesticide Regulation?

**Response:** Only those herbicide active ingredients evaluated in the Final PEIS could be used by the BLM, although not all herbicides evaluated in the PEIS may be used, depending upon the alternative chosen in the Record of Decision. As discussed in Appendix D of the PEIS, the BLM could use new herbicides, or available herbicides currently not used by the BLM, in the future if the protocol outlined in Appendix D is followed. The BLM would not use an herbicide on public lands administered by the BLM in California or any other state unless the active ingredient and the particular formulation have been registered for use in the state.

PHC-006-003
H. McNeel

**Comment:** I need to clarify on the use of pesticides on BLM lands. I see in the [Draft] [P]EIS it says restricted use pesticides, individuals must be certified. On the policy within the BLM, it is any pesticide used on BLM lands will be certified, the individuals will be certified. I'd like for that to be clarified.

**Response:** As directed by the Federal Insecticide, Fungicide, and Rodenticide Act, Section 4, and as stated on the label of pesticides classified as "Restricted Use," restricted use products must be applied by a "Certified Applicator or persons under the direct supervision and only for those uses covered by the Certified Applicator's certification." It is the BLM's policy, as stated in Manual 9011 (.12) (B.) (5) (a.), that all persons applying pesticides, both general and restricted use, on BLM-administered lands must be certified or under the direct supervision of a certified applicator. The BLM plan for training and certification of pesticide applicators, Appendix 2 Handbook H-9011-1, *Chemical Pest Control*, outlines how the BLM certifies its applicators. This process is similar to the process by which individual states certify their respective applicators in that the certification plans are approved by the USEPA. However, state certification is required only for "restricted use" pesticides, while the BLM certification is required for the application of both "general" and "restricted use" pesticides.

BLM_0001428

RESPONSE TO COMMENTS

The BLM requires any BLM personnel supervising or applying pesticides to complete BLM course 9000-1, a USEPA approved course for Integrated Pest Management and certification in the handling and application of pesticides. This course requires the completion of 40 hours of classroom time and testing to handle and apply pesticides in five categories: Agriculture and Pest, Forestry, Aquatic, Rights-of-way, and Research and Development. Recertification is required every three years. In cases where BLM has no reciprocal agreement with the state, the BLM requires BLM personnel to procure a state license.

RMC-0005-003
Mesa County - Tri
River Area Extension

**Comment:** As for concerns of the health aspects of herbicide use, for the most part problems occur when applicators are not properly trained. Health problems can be prevented when herbicides are used as directed on the label. BLM should use the best educational materials and conduct workshops to assure that employees who are applying herbicides are well trained. Applicators should be certified by their State to assure they are qualified to do their job. Each BLM field office should have a supervisor who is certified and who is assigned primarily as a weed manager. Weed management should be their primary job, not a secondary task that gets less than the full attention of the supervisor. Problems occur when there is insufficient training, supervision and leadership. These suggestions will make the BLM weed management efforts more successful and, more importantly, safer for employees and the public.

**Response:** See response to Comment EMC-0267-002 under PEIS Proposed Action and Purpose and Need, Federal Laws, Regulations, and Policies that Influence Vegetation Treatments. In the BLM's *Partners Against Weeds - An Action Plan for the BLM* (PAW; USDI BLM 1996), it states under the Budget and Program Opportunities section of the Introduction that "Each Field Office should have at least one individual who has weed management as their primary responsibility depending upon local need."   Appendix 2 in the PAW document later identifies the responsibilities of both the state and field office weed specialist.

RMC-0006-035
Central Sierra
Environmental
Resource Center

**Comment:** Only pesticides that identify all ingredients on the label should be allowed. Our national pesticide law only requires that certain ingredients in a pesticide (the active ingredients) be identified on the label. All the others are misleadingly called "inert ingredients" and are not identified. These same ingredients often escape from most of the testing and evaluation required for active ingredients. They're not really inert, just untested. The public is being kept in the dark as a favor to the pesticide industry. It's time for a change. Diuron, for example, is the active ingredient of several formulations – Karmex, Karmex DF, Krovar, Krovar 1 DF, Diurex 80 DF, Diurex 4L, Diuron FL – used on California thoroughfares. The portion of diuron in these formulations ranges from 20% to 80%. The identity of the 20% to 60% of the formulations' ingredients is a secret. Chemical manufacturers conceal from the public the names of many chemicals in their formulations, and they are supported by state and federal agencies in this subterfuge. The information that is publicly available about inert ingredients, however, indicates that the majority are biologically active and toxic – often as much as are the active ingredients or in some cases, even more so.

**Response:** Labeling of pesticides is regulated under the Federal Insecticide, Fungicide, and Rodenticide Act and is outside of the jurisdiction of the BLM. Inert ingredients are discussed in Appendix C of the PEIS under Degradates, Inert Ingredient, Adjuvants, and Tank Mixtures.

BLM_0001429

RMC-0076-003
San Miguel County
Board of
Commissioners

**Comment:** Herbicides are toxic chemicals and must be used properly by well trained applicators. We believe that such use, when in full compliance with the label, can be an effective weed control measures. We suggest that the BLM use professional applicators certified by applicable state or federal agencies for herbicide applications and that BLM personnel be assigned primary duties in weed management rather than weed management as an ancillary duty. Public health concerns and potential for environmental damage must be mitigated through planning, appropriate choice of herbicides and proper application by well trained applicators.

**Response:** See responses to Comment RMC-0005-003 under Alternatives, Herbicide Modes of Action and Treatment Methods, and Comment EMC-0585-183 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods.

RMC-0106-015
Public Employees for
Environmental
Responsibility

**Comment:** p. 2-8, Table 2-3 [of the Draft PEIS]. Classification of herbicides as selective or non-selective doesn't help—the example of a selective herbicide as one affecting only broad-leaved plants should invite as careful application as is said to be needed for non-selective (broad spectrum) herbicides because "broad-leaved" plants is a general term that may include non-target species.

**Response:** See response to Comment EMC-0585-044 under PEIS Glossary.

RMC-0122-003
Bowers, Lynn

**Comment:** [There is] no system for tracking who is using what poison in any given rural area.

**Response:** The BLM requires their field offices to provide documentation of all pesticide use on public lands. In addition, any use of pesticides by the counties through contracts is reported to the appropriate state.

RMC-0159-005
Proctor, Gradey

**Comment:** Dicamba acts by mimicking auxins in the plant, resulting in abnormal cell division. It also acts by inhibiting an enzyme found in the nervous system, acetylcholinesterase. Inhibition prevents the smooth transition of nerve impulses. It inhibits enzymes in animal livers that detoxify and excrete foreign chemicals. An oral dose of 3.5 oz. would kill an average sized human. Dicamba caused reproductive problems even at extremely low doses in laboratory tests. These adverse effects were exhibited in both mammals and birds. Dicamba is also alarmingly mutagenic, significantly increasing the unwinding rate, or single strand breaks, of the genetic material in rat livers. It also caused unscheduled DNA synthesis and an increase in sister chromatid exchanges. Dicamba has also caused mutations in bacteria. Dicamba greatly increases the risk of contracting the cancer non Hodgkin's lymphoma up to two decades after exposure. There are also impurities in the products that increase the potential carcinogenicity, such as dimethylnitrosamine, which causes cancer in lab animals. Given the potential adverse health effects, why is the BLM proposing to use such a toxic chemical? What will the BLM do to ensure that the environment is protected from this poisonous chemical?

**Response:** The toxicity of dicamba is summarized in Appendix B of the PEIS under Toxicity Profiles in the Hazard Identification section. As represented in this section, it is not considered highly toxic. Dicamba is not classified by the USEPA as a carcinogen and poses no risk to workers and the general public under any of the exposure scenarios considered in the risk analysis done by the BLM, except for the accidental spill scenario, under which there would be a low risk to workers. The toxicity values used in the risk assessments account for a large variety of toxic effects, and consider a safe dose to be one at which none of these toxic effects have been

BLM_0001430

RESPONSE TO COMMENTS

observed.

RMC-0205-021
Oregon Department of
Agriculture

**Comment:** We recognize that protecting water quality is a high priority for public land management, and within the municipal watersheds, this also includes protecting human health. Within the mission, budget, and legal authority, we request that BLM consider local drinking water protection priorities when developing management plans for federal lands and facilities. Implementing protective actions and land use decisions can be very effective in providing clean source water to public intakes and wells. This will preserve the use of public funds that would otherwise be spent to upgrade treatment facilities to remove contaminants downstream.

**Response:** Provisions of the Well Head Protection program in the Safe Drinking Water Act provide for protection of local or municipal drinking water supplies. These requirements include buffer zones around wells used for drinking water supply. Additionally, provisions in the Source Water Assessment Program in the Clean Water Act amendments of 1996 require delineation of boundaries of areas providing source waters for public water supplies. The BLM will consider this information during treatments.

RMC-0208-029
California Oak
Foundation

**Comment:** Many of the same herbicide active ingredients the BLM proposes to use have historically been used to control vegetation throughout California generally and within oak woodland habitats specifically. In addition, different active ingredients have accumulated over time in California's agricultural lands, rivers, streams, and oak woodlands, suggesting the potential for far greater environmental impacts as more herbicide active ingredients are emitted into the environment as a result of the BLM's vegetation management proposal. The net result is that the BLM's proposed use of herbicides on its lands containing oak woodland habitats will exacerbate the threat to oak woodlands and the special status species that inhabit or rely on oak woodland ecosystems.

**Response:** See response to Comment RMC-0208-003 under PEIS Alternatives, Vegetation Treatment Planning and Management.

RMC-0211-027
Ghandi, Theresa Marie
K.

**Comment:** I did not find a history of previous "control" applications in areas where noxious or invasive weeds have taken root. Could past use of herbicides by various parts of BLM and agriculture have contributed to the soil being open to invasive species? With trees and animals migrating north could some of the increased problems with fires be the result of changing weather patterns? One hundred plus days of no rain in Phoenix and the ongoing drought could be more than just a part of the cause. Clear cutting forests changes weather patterns, justifying more cutting to prevent fires and a downward spiral makes the problem huge.

**Response:** A summary of past applications of herbicide treatments over the 17-state area is provided in Chapter 2 of the PEIS (Figure 2-1 and Table 2-4). With regard to the causes of the spread of weeds and invasive species, please refer to response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

RMC-0221-050
Center for Biological
Diversity

**Comment:** The Center [for Biological Diversity] questions the effectiveness of use of herbicides to control fire. Herbicides may have the effect of killing standing vegetation, leaving brushy and highly flammable dead vegetative tissue in its place—which may not actually reduce fire danger at all. The analysis of the herbicide treatments also fails to address potentially caustic reactions when the chemicals are

BLM_0001431

burned, through natural or artificially ignited fires, and fails to analyze how application of herbicides increases or decreases the flammability of the undesirable vegetation. Without identifying and answering these questions it is impossible for the BLM to explain how its proposed action will mitigate the hazard of catastrophic wildfire.

**Response:** Through an integrated vegetation management approach, prescribed fire has been successfully used both prior to herbicide treatment and in the season following herbicide treatment. Usually herbicide treatments are completed prior to prescribed fire to provide the fuel necessary to accomplish the burn. Prescribed fire cannot immediately follow a chemical treatment, because the intent is for the vegetation to dry first. Therefore, with at least one season lag time, caustic reactions from the dried vegetation should not be an issue.

When vegetation is treated and killed during a fuels treatment, a secondary treatment is planned to remove any remaining dead plant material. This process would be no different for vegetation treated by herbicide. After the initial treatments, monitoring and follow-up treatments (which can be of any type, not necessarily chemical), will occur if necessary. A comprehensive literature review on the use of prescribed fire for controlling invasive plants can be found at www.weedcenter.org under publications.

RMC-0221-065
Center for Biological
Diversity

**Comment:** The D[raft] PEIS and D[raft] PER fail to include detailed information on the amounts of herbicides that have been used in the project area in the past, as well as the past and current amounts of herbicides that are used by other agencies and on private lands within the project area. These types of data are critical for any meaningful cumulative effects analysis.

**Response:** Information on historic use of herbicides on BLM-administered lands is provided in Table 2-4 in Chapter 2 of the PEIS (see column "Historic Use [1999-2005]). We have also included information on herbicide use on other lands in the western U.S. in the Vegetation section of the Cumulative Effects Analysis in Chapter 4 of the Final PEIS. The commenter may also want to consult the National Pesticide Use Database at http://www.ncfap.org/database/state/default.asp to obtain additional information on pesticide use by state.

RMC-0233-066
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Because some of the herbicides are restricted use (2,4-D, picloram) and more toxic than others, the final PEIS should state if priority for use will be given to the less toxic herbicides before resorting to the use of more toxic herbicides.

**Response:** See response to Comment EMC-0585-157 under PEIS Alternatives, Mitigation.

**Alternatives, Description of the Alternatives**

EMC-0562-004
The Lands Council

**Comment:** The alternatives section of NEPA documents are the foundation and crux of the law and without providing an adequate range of feasible alternatives within the PEIS, its analysis is incomplete and violates NEPA requirements. The BLM fails to show preference for alternatives that consider the contributing causes if noxious weed infestation. The preferred alternative does not consider non-chemical treatments such as integrating a combination of goat grazing, mowing, prescribed burns, bio-controls, ground covers, etc.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed

BLM_0001432

RESPONSE TO COMMENTS

spread.   See response to Comment EMC-0486-020 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding the integrated pest management approach used in designing BLM vegetation treatments projects.

EMC-0562-005
The Lands Council

**Comment:** NEPA requires that all feasible alternatives be objectively evaluated. By disregarding scientific literature (see citations later in this comment letter), the PEIS is not giving preference to reasonable and feasible alternatives that must be included as part of the possible effective treatment methods. Moreover, the Council on Environmental Quality (CEQ) advises [i]n determining the scope of alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative. Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant. CEQ, *Forty Most Asked Questions Concerning CEQ's NEPA Regulations*, § 2 (a).

**Response:** The BLM has analyzed a reasonable range of reasonable alternatives in regard to the Proposed Action and Purpose and Need of the PEIS. Scientific literature was reviewed in the development and analysis of the PEIS alternatives and is documented in Chapter 6, References.

EMC-0585-067
Western Watersheds
Project

**Comment:** BLM failed to evaluate any alternatives related to the greatly increased treatment acreages (as discussed in the PER). BLM never evaluates a reasonable range of alternatives or alternative acreages for non-herbicide treatments.

**Response:** See responses to Comments RMC-0222-005 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments and RMC-0222-006 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. As noted for Comment EMC-0585-236 under Biological Assessment, non-herbicide treatment actions were evaluated in earlier EISs.

EMC-0585-069
Western Watersheds
Project

**Comment:** BLM failed to evaluate a reasonable range of alternatives. BLM never examined an alternative, or range of alternatives including alternative treatment acres that focused on passive restoration.

**Response:** See response to Comment EMC-0585-068 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0585-071
Western Watersheds
Project

**Comment:** BLM has not assessed a reasonable range of alternative[s] related to chemical use. It has primarily eliminated from consideration some chemicals that it has not used much ([P]EIS at [page] ES-2). BLM has failed to analyze a range of alternatives that do not use chemicals such as Oust that are known to have caused great economic [harm], instead only eliminating this use under one alternative. BLM has not presented a reasoned analysis why it chose to add diquat and other chemicals under several Alternatives.

**Response:** The range of alternatives evaluated in the PEIS was developed based on comments received during scoping. Oust® and similar herbicides with sulfonylurea and other acetolactate synthase-inhibiting active ingredients would not be allowed under Alternative E. Alternative A is the No Action Alternative. Alternative B includes the full suite of chemicals being considered for use by the BLM. Alternative C prohibits use of herbicides (including Oust®), while Alternative D prohibits aerial spraying. Since Oust® could not be aerially sprayed under Alternative E, Alternative E

BLM_0001433

responds to some of the issues evaluated in Alternative D. A discussion of how herbicides were chosen for analysis is given in Chapter 2 of the PEIS under Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0585-072
Western Watersheds
Project

**Comment:** There is no clear comparison of components of some alternatives, as any passive treatments that may be occurring to some degree on some BLM lands are not assessed under the No Action alternative.

**Response:** Passive treatments were considered under all alternatives, as passive treatments were considered in Chapter 2 of the PEIS under Standard Operating Procedures and Guidelines. Also see response to Comment EMC-0585-068 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0585-136
Western Watersheds
Project

**Comment:** Also, BLM's discussion claims that BLM uses IPM [Integrated Pest Management], and something it calls IVM [Integrated Vegetation Management], with goals of controlling and prevention of invasive vegetation. BLM violates its own policies and guidance by: Casting aside the RNEA [Restore Native Ecosystems Alternative] and failing to assess a range of passive restoration treatments, and ignoring analysis of a range of alternatives and data that are based on IPM.

**Response:** See response to Comment EMC-0585-068 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0619-008
Bellovary, Christopher

**Comment:** For these reasons, I consider the PEIS to be incomplete. The PEIS includes the use of herbicides with inadequate laboratory data from which a rational decision maker can base a decision and still comply with their legal duties as caretaker of the public land. The PEIS does not evaluate alternatives that most decision makers would consider before herbicides, such as reducing or eliminating disturbances by off-road vehicles, logging and grazing through effective regulations or mechanical and biological controls, all of which are likely to have a significantly lower impact on threatened and endangered native species. Furthermore, the PEIS does not appear to comply with applicable Federal law. I suggest that these shortfalls be remedied, as this PEIS provides and incomplete basis for rational decision-making to occur.

**Response:** The reference to inadequate laboratory data is unsubstantiated. The toxicological analyses conducted for human health and ecological risk presented in the PEIS, Appendixes B and C, disclose the results of the quantitative risk methodology developed in collaboration with toxicological scientists from USEPA, U.S. Fish and Wildlife Service, and National Marine Fisheries Service, and represent the most current state of the science in human health and ecological risk assessment. See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses. Impacts to Threatened and Endangered Species are described in Chapter 4 of the PEIS and in the Biological Assessment submitted to the services for consultation under Section 7 of the Endangered Species Act. The BLM has complied with all federal laws in the development of this PEIS.

EMC-0640-024
Animal Welfare
Institute

**Comment:** The use of herbicidal and non-herbicidal vegetation treatments should be limited to the direct control of invasive exotic species that represent a potential fuel source for a catastrophic wildlife fire, to reduce the potential for a catastrophic wildfire to destroy property within the wildland-urban interface where there is documented

BLM_0001434

RESPONSE TO COMMENTS

evidence that such species have degraded wildlife (including fish) habitat, or where vegetation manipulation is deemed crucial to facilitating the recovery potential of protected species (state, federal, and special status species). These limitations would be in addition to the restrictions suggested above.

**Response:** The range of uses of chemical and non-chemical methods for vegetation treatments, described in Chapter 2 of the PEIS and PER, include control of vegetation related to hazardous fuels and prevention of catastrophic fire. Restrictions and criteria for use are described in Table 2-6 of the PEIS and Table 2-4 of the PER in Chapter 2.

EMC-0646-185
Californians for
Alternatives to Toxics

**Comment:** The BLM has failed to include an IPM [integrated pest management] alternative. Weed control scientists regularly point to the necessity of integrating multiple methods for effective long term weed control.

**Response:** See response to Comment EMC-0486-020 under PEIS Alternatives, Vegetation Treatment Planning and Management. The BLM already conducts its activities in an IPM context, which has been affirmed in the Records of Decision in all past vegetation EISs leading to this effort. Use of IPM applies to Alternatives A, B, D, and E in the PEIS, as existing management, and does not require a separate alternative analysis. The PEIS focuses on the herbicide component of an IPM program. See Vegetation Treatment Planning and Management in Chapter 2 of the Final PEIS.

PHC-005-011
K. Fite

**Comment:** So I would just urge BLM to prepare a Supplemental Draft EIS that embraces a broader range of alternatives, including passive restoration techniques. And we – the same coalition of groups that worked in developing an alternative before, would be happy to work with you in amending what we presented, or providing additional information, if necessary.

**Response:** See responses to Comment EMC-0585-068 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, and Comment RMC-0167-007 under PEIS Alternatives, Vegetation Treatment Planning and Management.

RMC-0067-002
Wyoming Outdoor
Council

**Comment:** BLM's preferred alternative appears to be focused on substantial expansion of the use of herbicides as a means to reduce the incidence of catastrophic fires, and perhaps to a lesser degree as a means to reduce the spread of invasive or noxious weeds. Thus, the preferred alternative appears to be focused on areas that have been subject to catastrophic fires due to cheatgrass invasion in Nevada, Oregon, Idaho, and Wyoming. This expansion of the use of herbicides is problematic for a number of reasons.

**Response:** See response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages.

RMC-0087-005
Central Valley
California Regional
Water Quality Control
Board

**Comment:** Another concern with Alternative B [in the Draft PEIS] is that the BLM would use new active ingredients that are developed in the future if the BLM determines that the benefits of use on public lands outweigh the risks to human health and the environment. The PEIS fails to explain or provide examples of what type of benefits can outweigh risks to human health and the environment. What does the BLM consider an acceptable risk to human health and the environment?

**Response:** The BLM cannot authorize new herbicides without conducting a new EIS and risk assessment and allowing the public to comment on the proposal. The BLM used the USEPA's definition of acceptable risks (Levels of Concern). There are

BLM_0001435

significant environmental benefits associated with using herbicides in a responsible manner, if risk assessments show risks to be none to low. The habitat is preserved or restored for wildlife, endangered species, native plants, and recreational users.

RMC-0106-007
Public Employees for
Environmental
Responsibility

**Comment:** On p. 1-4, it is stated that the D[raft] [P]PEIS "...does not address vegetation treatments exclusively designed to increase forage production..." It is presumed, therefore, that herbicide treatments using the 20 previously approved herbicides will continue. This means that well over one million acres in the best case will be treated annually or at some unspecified interval with herbicides. The [Draft] [P]EIS documents PEER (Public Employees for Environmental Responsibility) has reviewed that involve "rangeland improvement" generally claim additional benefits to wildlife, habitat, and watershed conditions and thus are not exclusively devoted to "rangeland improvement."

**Response:** The PEIS and PER address vegetation treatments that provide a multitude of resource benefits. Although treatments would increase forage production, their primary objectives are to control invasive vegetation and reduce hazardous fuels. Under alternatives B through E, only 18 or fewer herbicides would be used by the BLM, and under all alternatives, about 930,000 or fewer acres would be treated using herbicides each year.

RMC-0163-004
Skrine, Eugene

**Comment:** The Range of Alternatives considered in the DEIS [Draft PEIS] are too narrow. The only Alternative that considers use of non-chemical methods is Alternative C, No Use of Herbicides. This creates a false choice. In the real world, the treatment of invasive plants is not an all herbicides or no herbicides proposition. The best choice for treatment is most often a combination of these methods. These combination alternatives need to be considered. Invasive plant prevention and site restoration also need to be included. Only focusing on treatment, and excluding other important elements of Integrated Weed Management, almost assure the continuation of the invasive plant problem. Only a thoughtful combination of prevention, treatment (both herbicides and non-herbicides) and site restoration will assure success in meeting the stated underlying need.

**Response:** Alternatives A, B, D, and E involved the use of herbicides, prescribed fire, and manual, mechanical, and biological control treatments. Alternative C did not include the use of herbicides, but did include the use of the other treatment methods. Response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments discusses the rationale for only evaluating herbicide use in the PEIS. All elements of vegetation control were considered when doing the analysis in the PEIS, although a detailed discussion of prevention and site restoration were mostly limited to the PER; this discussion has been included in the Final PEIS.

RMC-0170-003
Carson Forest Watch

**Comment:** There are numerous effective, safe, & proven alternatives to herbicides for treating noxious weeds. The DEIS [Draft PEIS] needs to fully analyze these non-toxic methods & propose a wide range of alternatives, as per NEPA regs.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation and Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments.

BLM_0001436

RESPONSE TO COMMENTS

RMC-0214-012
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** The D[raft] PEIS fails to consider seriously alternatives that do not focus primarily upon chemical treatment. The one alternative that does not include chemical treatments as the primary action is relegated to the PER. The very fact that traditional vegetative treatments are relegated to what BLM considers a second tier NEPA document is proof that the agency has not considered the broad options that a PEIS requires an agency to explore.

**Response:** Alternative C analyzed non-herbicide treatments. The PEIS includes a full range of herbicide use alternatives, ranging from no use of herbicides to no aerial spraying of herbicides, to using only certain herbicides, to treatment of 932,000 acres using herbicides. Also see responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments.

RMC-0218-002
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** The Bureau of Land Management's preferred alternative would almost triple herbicide use from the current 325,000 acres per year and increase non-chemical manipulation of the land from 500,000 acres a year to six million acres annually--a twelve-fold increase.

**Response:** The BLM currently treats about 2 million acres, and proposes to increase treatment levels to about 6 million acres annually (see Executive Summary under Program Objectives and Goals in the PER). The BLM's proposed action would increase herbicide use 3-fold, from about 325,000 acres to 932,000 acres annually, and increase non-herbicide treatments 3-fold, from about 1.7 million acres to 5.1 million acres annually.

RMC-0218-030
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Inadequate range of alternatives – there is no alternative offered that would emphasize prevention and only use the most ecologically benign herbicides in "last resort" scenarios where risks from invasives outweigh risks from herbicide use and no other non-herbicide control method has worked. In other words the introduction to use of new, less toxic herbicide is held captive to required continued use of existing, more toxic herbicides, so that those members of the public who want only the least toxic herbicides for potential use if needed are not allowed that option, as it is instead either "No Herbicides" or use of all herbicides proposed for use in the offered alternatives.

**Response:** The comment is incorrect. See response to Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis for a discussion on prevention. The BLM incorporates prevention measures into all resource programs and authorizations for public land uses. A separate alternative to highlight ongoing policy and practice under all alternatives is not required to assess the environmental effects of herbicide active ingredients on public land resources. Under an integrated pest management (IPM) vegetation treatment strategy, each situation and treatment method is assessed for the best treatment for the given circumstances. An IPM approach does not imply a priority order of use of methods in which herbicides are a last resort only. In some cases, it may be more effective to use herbicides on a small infestation first and eradicate it immediately, rather than through trial and error approaches, potentially allowing the infestation to spread beyond practical control. In every case, best available science and professional expertise and judgment are used to determine which method of treatment is appropriate for a given set of circumstances and provides the authorized officer maximum flexibility to meet land use plan goals and objectives in designing treatment options. See Chapter 2 of the PER for a

BLM_0001437

discussion of vegetation treatment programs, policies, and methods.

The characterization that the public is provided either a choice of no herbicides (Alternative C) or the use of all herbicides currently approved (Alternative A), plus those proposed under Alternative B, is incorrect. See Table 2-2 of Chapter 2 of the PEIS for a list of herbicides currently approved and proposed under Alternative B. It is noted that six approved herbicides have not been used, or have been used at a limited scale over the past decade. Under Alternative B, the use of these six previously-approved herbicides would be discontinued by the agency. The four proposed herbicide active ingredients under Alternative B are considered to be less toxic, with greater efficacy, than many of the active ingredients currently approved, providing the agency with alternative, less toxic products to use in lieu of more toxic products that are available.

RMC-0222-012
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** In contrast to Alternative E (i.e., "No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients"), the central element of the Restoration Alternative is the linkage of prevention, treatment (both passive and active), and restoration to judicious use of herbicides. By contrast, Alternative B, the Preferred Alternative in the DEIS [Draft PEIS], merely describes the disembodied use or lack of use of herbicides.

**Response:** See responses to Comment RMC-0222-059 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response, Comment RMC-0163-005 under PEIS Alternatives, Mitigation, and Comment RMC-0148-001 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients.

## Alternatives, Alternative A – Continue Present Herbicide Use (No Action Alternative)

EMC-0214-006
Vollmer, Jennifer
(BASF)

**Comment:** Current Emergency Stabilization and Rehabilitation efforts are ineffective with annual bromes out competing expensive plantings of introduced and native grasses and forbs. Of the treatments allowed under Alternative A, none will result in a successful plantings. In my experience, at this time BLM range specialists are satisfied with a 10% desirable plant establishment rate for soil stabilization. These types of results are unacceptable to private landowners and should be unacceptable to tax payers. One reason only a 10% establishment rate is achieved is due to the lack of appropriate herbicide treatment to control the competing annual brome under Alternative A.

**Response:** Thank you for your comment. The Proposed Action and Preferred Alternative (Alternative B; see Chapter 2 under Description of the Alternatives) of the PEIS includes the use of herbicides that would provide greater control of competing annual brome species.

EMC-0503-014
John Day-Snake
Resource Advisory
Council

**Comment:** Why is it, if current levels of herbicide use, according to the [Draft] [P]EIS, are 160,000 acres, that the "no action" alternative states 305,000 acres would be treated?

**Response:** Although about 160,000 acres have been treated using herbicides in recent years, it was estimated by the BLM that the number of acres treated would be closer to 305,000 at the time of the release of the Draft PEIS based on information provided by field offices.

BLM_0001438

RESPONSE TO COMMENTS

RMC-0049-020
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** Alternative A has been demonstrated that it is inadequate to address the scope of the invasive weed problem as it is currently being implemented. As such, the effect of increased infestations of invasive weeds on the environment needs to be included in this [Draft] [P]EIS.

**Response:** See responses to Comment RMC-0221-008 under PEIS Alternatives, Determination of Treatment Acreages, Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, Comment FL-0004-010 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response, and Comment EMC-0553-006 under PEIS Alternatives, Determination of Treatment Acreages.

**Alternatives, Alternative B – Expand Herbicide Use and Allows for Use of New Herbicides in 17 Western States (Preferred Alternative)**

EMC-0503-011
John Day-Snake
Resource Advisory
Council

**Comment:** The practices discussed in Alternative E should be incorporated into the preferred alternative such as restricting activities such as livestock grazing, OHV [off-highway vehicle] use, logging or oil and gas development in areas where these activities have promoted a less desirable vegetation community or increased soil disturbance and erosion. Also the early detection/rapid response strategies from Alternative E should be incorporated in the preferred alternative.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients.

EMC-0503-012
John Day-Snake
Resource Advisory
Council

**Comment:** Considerations regarding amphibians in alternative E should be included in the preferred alternative [in the PEIS]. A few of the chemicals proposed for use such as diquat, diuron, and tebuthiuron pose a potential risk to aquatic species and more detailed requirements for their use should be included in the document.

**Response:** Standard Operating Procedures and Guidelines and mitigation to minimize or avoid risks to amphibians are given in Chapter 2 of the PEIS and in Chapter 4 under the Wetland and Riparian Areas, Vegetation (habitat protection), and Wildlife Resources sections. These protections include elements of Standard Operating Procedures and mitigation recommended under Alternative E. The BLM would treat only about 10,000 acres of wetlands annually using herbicides, and would use the herbicides and treatment methods (e.g., spot treatments) with the least potential to impact amphibians, where feasible. In some cases, impacts to individual amphibians would have to be weighed against the benefits of treating a site and enhancing the long-term success of the local population.

EMC-0562-003
The Lands Council

**Comment:** The Lands Council strongly opposes the preferred Alternative B, which allows herbicide use and also proposes the use of new herbicides. The range of alternatives should be developed based on the statutory goals and requirements of NEPA, NFMA [National Forest Management Act], and the ESA [Endangered Species Act]. 40 C.F.R.[Code of Federal Regulations] § 1502.2(d) (analyses shall state how alternatives will or will not achieve the requirements of NEPA and other environmental laws and policies); *See Westlands Water District v. U.S. Dept. of Interior*, 376 F.3d 853, 872 (9th Cir. 2004). Instead, the BLM seems primarily focused on experimenting with new chemical treatments of invasive plants, to the exclusion of other alternatives.

BLM_0001439

**Response:** The range of alternatives is governed by the breadth of the PEIS' Purpose and Need Statement in Chapter 1; an agency need not consider alternatives that are "inconsistent with the basic policy objectives for the management of the area." *Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174, 1180 (9th Cir. 1990). Where alternatives are analyzed in a NEPA document, the document is adequate "if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Id*. at 1180-81. *See also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) (demonstrating that courts only require federal agencies to consider, in their EIS, alternatives that are reasonable). "When [the statement of purpose] is to accomplish one thing, it makes no sense to consider alternative ways in which another thing might be achieved." *City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986).

The purposes of the proposed action are to provide BLM personnel with the herbicides available for vegetation treatment on public lands and to describe the limitations that apply to their use, as discussed in Chapter 1 of the PEIS under Purpose and Need for the Proposed Action. The need for the proposed action is to reduce the risk of catastrophic wildfires by reducing hazardous fuels, restoring fire-damaged lands, and improving ecosystem health by 1) controlling weeds and invasive species and 2) manipulating vegetation to benefit fish and wildlife habitat, improve riparian and wetlands areas, and improve water quality in priority watersheds. *Id*. Since it is the BLM's purpose to "provide BLM personnel with the herbicides available for vegetation treatment," this defines the range of alternatives BLM must consider.

Furthermore, the BLM considered alternatives to extend beyond the purpose of the proposed action. Therefore, the BLM has not focused on experimenting with new chemical treatments to the exclusion of other alternatives. As examples, the BLM included a no action alternative (see Alternative A – Continue Present Herbicide Use [No Action Alternative] in Chapter 2 of the PEIS) and an alternative which contemplated no use of herbicides by using fire, mechanical, manual, and biological control methods only (see Alternative C – No Use of Herbicides in Chapter 2 of the PEIS).

Council on Environmental Quality (CEQ) regulations addressing more specific requirements for alternatives call for the following: (1) no action alternative; (2) other reasonable courses of actions; and (3) mitigation measures not in the proposed action. 40 C.F.R. § 1502.25(b) (2006). The BLM included a no action alternative (see Alternative A – Continue Present Herbicide Use [No Action Alternative] in Chapter 2 of the PEIS), other reasonable courses of actions (see Alternatives B – D in Chapter 2 of the PEIS), and mitigation measures (see Mitigation in Chapter 2 of the PEIS). CEQ regulations further state that agencies shall (1) evaluate all reasonable alternatives, and for alternatives which were eliminated from study, briefly discuss the reasons for their having been eliminated; (2) devote substantial treatment to each alternative considered in detail; (3) include reasonable alternatives not within the jurisdiction of the lead agency; (4) include the alternative of no action; (5) identify the agency's preferred alternative(s); and (6) include appropriate mitigation measures not already included in the proposed action or alternatives. 40 C.F.R. § 1502.14 (2006). The BLM has addressed (1) – (6) requirements in the PEIS. See PEIS Chapter 2.

The BLM properly addressed the range of alternatives as defined by the purpose and need statement of the proposed action. The BLM properly met specified range of alternative requirements as outlined in CEQ regulations. The BLM is not bound by the NMFA, which applies to the U.S. Forest Service, an agency within the Department of

BLM_0001440

RESPONSE TO COMMENTS

Agriculture. The PEIS meets the statutory requirements of NEPA and the ESA.

EMC-0609-002
Western Plant Health
Association

**Comment:** This report suggests banning the use of herbicides on up to 5.1 million acres of public lands. WPHA [Western Plant Health Association] represents the manufacturers of fertilizers, crop protection, and biotechnology products, as well as agricultural retailers in California, Arizona, and Hawaii.

**Response:** The PEIS does not ban the use of herbicides on any public land, but does state that herbicides would be used on approximately 932,000 acres, and other treatment methods would be used on about 5.1 million acres of public land annually. It is likely, however, that there are public lands where the use of herbicides, or other treatment methods, would not be beneficial.

**Alternatives, Alternative D – No Aerial Application of Herbicides**

EMC-0338-006
Dow AgroSciences

**Comment:** Also in this alternative it is mentioned that the most sensitive factor for aerial applications is the potential for spray drift. This assumes that the application will be made with a liquid spray solution; however, there are granular formulations of some herbicides, such as tebuthiuron (Spike 20P™), which generally eliminates or greatly reduces drift onto non-target areas.

**Response:** The BLM agrees that granular formulations would result in less drift from aerial spraying. Also see response to Comment EMC-0338-013 under PEIS Environmental Consequences, Wildlife Resources.

EMC-0623-015
Defenders of Wildlife

**Comment:** Drastically curtail the plan treat roughly 400,000 acres of anticipated herbicide application aerially. Aerial application involves too great a risk of pesticide drift, reduces the chance that application will be followed by on-the-ground native species restoration, and sets up a cycle whereby the same areas are sprayed year after year. Aerial application should occur only as a last resort in areas that are too remote for ground application and where chance of re-infestation is low.

**Response:** See responses to Comment EMC-0001-002 and Comment RMC-0208-061 under PEIS Environmental Consequences, Air Quality.

RMC-0210-042
MCS Task Force of
New Mexico

**Comment:** Herbicides should not be aerially applied (because of inevitable and unacceptable amount of drift on to nontarget areas and species).

**Response:** As discussed in the PEIS in Chapter 4 under Vegetation, there would be impacts to non-target vegetation from drift. However, the long-term beneficial effects on desired plant communities and ecosystems would be greater than any potential short-term negative effects from aerial treatments because some large and remote areas cannot be effectively treated using ground methods.

RMC-0210-043
MCS Task Force of
New Mexico

**Comment:** If herbicides are aerially applied, they should not be applied within 5 miles of surface water, residences, roads, trails, campgrounds, or other areas that are occupied, or may become occupied, by the public.

**Response:** See response to Comment EMC-0585-178 under PEIS Environmental Consequences, Herbicide Effects Analysis.

BLM_0001441

**Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients**

EMC-0234-010
Dremann, Craig

**Comment:** The "Restore Option" does not contain any mention that tens of millions of dollars will need to be invested, to develop and invent the successful methods to achieve successful restoration of the Great Basin habitat, and that the Appendix G [of the Draft PEIS] lists the old methods that have never worked: Page 17, Section VI "Restoration Vegetation treatments, Part A, "Direct treatments of Invasive Species", Action - Restoration 3 lists the old methods that have never worked on cheatgrass in the Great Basin, for example--Biocontrol, cultural practices, mechanical treatments, chemical treatments and prescribed fire.

**Response:** Comment noted. The "Restore Option" is a citizen-based alternative submitted to the BLM, described in Appendix I of the Final PEIS. New techniques to address successful long-term cheatgrass control would require substantial investment and time, as well as practical application on large areas. Until such techniques are developed, it is foreseeable many of the standard techniques would continue to be utilized.

EMC-0234-014
Dremann, Craig

**Comment:** The "Restore Option" suggests that BLM can legally intentionally sow seeds of exotic or non-native plants on their lands. The "Restore Option" VII. Revegetation. Action - Revegetation 2 and 3 suggests that BLM has already written the legally-required NEPA documents allowing the agency to intentionally sow millions of pounds per year of exotic and non-native seeds on their lands? The intentional sowing of a single pound of non-native seed or any exotic plant seeds is illegal, because their use has never been covered by any NEPA documents (EIR, EIS, etc.), but nevertheless, millions of pounds of exotic seeds that permanently change the native ecosystems that BLM has a duty to protect, are sown by the agency every year. You can read about the BLM's intentional sowing of exotic seeds at http://www.ecoseeds.com/juicy.gossip.six.html. Either BLM will have to explain their intentional sowing each year of exotic and non-native seeds in a NEPA document, or they will have to immediately discontinue their use.

**Response:** The "Restore Option" referred to is Alternative E (see Chapter 2 of the PEIS for a description of the alternative), which is derived from a Citizen's alternative described in Appendix G and included for analysis in this PEIS. BLM policy does allow for the use of non-native seed in vegetation treatment and rehabilitation projects and is not illegal. Use of native and non-native seed is guided by BLM Manual 1745 *Introduction, Transplant, Augmentation and Reestablishment of Fish, Wildlife and Plants*. Each project that proposes the use of non-native seed has site-specific NEPA analysis conducted prior to implementation.

EMC-0416-004
Lengerich, Tim

**Comment:** The BLM should analyze the Restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands (www.blm.gov/nhp/spotlight/vegEIS/vol2/PEIS_Appendix_G_RNEA_Alternative.pdf)

**Response:** The Citizen's Alternative to Restore Native Ecosystems was evaluated under Alternative E in the PEIS. Also see response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis

BLM_0001442

RESPONSE TO COMMENTS

EMC-0447-004
Makelacy, Melladee

**Comment:** Herbicides are not only poisonous and expensive, but they ultimately fail because they are treating symptoms, not the causes, of weed invasion and undesirable vegetation. Instead, the BLM should analyze the Restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystem alternative.

EMC-0450-001
Ray, Lindsey

**Comment:** I would like to urge you to take another look at the management of the BLM land concerning the noxious weeds. Please take a look at the restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER. The herbicide use is not only costly but harmful to the environment.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystem alternative.

EMC-0455-005
Tashjian, Randy

**Comment:** The BLM should analyze the Restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystem alternative.

EMC-0456-002
Mendius, Barbara J.

**Comment:** Please consider seriously the citizen's alternative, Restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER, which addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystem alternative.

EMC-0464-002
Kaufman, Albert

**Comment:** Instead, the BLM should analyze the Restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystem alternative.

EMC-0489-004
Burch, D.

**Comment:** Herbicides are not only poisonous and expensive, but they ultimately fail because they are treating symptoms, not the causes, of weed invasion and undesirable vegetation. Instead, the BLM should analyze the Restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands.

BLM_0001443

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystem alternative.

EMC-0512-007
Hells Canyon
Preservation Council

**Comment:** We encourage the BLM to consider and analyze the citizen's alternative to restore native ecosystems. Limiting motorized vehicles, livestock and ground disturbing activities would likely be much more effective than herbicide use. The net effects of using herbicides are not disclosed in the [P]EIS and are likely to show a net loss in natural resource values on public lands.

**Response:** The Citizen's Alternative to Restore Native Ecosystems was evaluated under Alternative E in the PEIS. Also see response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0521-003
Whitney, Dana

**Comment:** I urge the BLM to consider using passive restoration as a means of preventing weed invasion and resting areas of public land where weed growth is fostered by overgrazing and rampant off-road vehicles. Furthermore, the BLM should analyze the Restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands.

**Response:** See response to Comment RMC-126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystems alternative.

EMC-0559-002
Daniel, Bill

**Comment:** The BLM should consider and incorporate the Restore Native Ecosystems Alternative, a thorough and scientifically defensible plan to prevent the introduction and dispersal of invasive plants.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystems alternative.

EMC-0584-059
Western Watersheds
Project

**Comment:** At the best, herbicide use is only a temporary measure or intermediate step to be used, and it does not address the basic causes of weed problems. A range of alternatives without use of sulfonylurea and acetolactate synthase-inhibiting herbicides should not be developed. This is essential due to the demonstrated ability of these chemicals to damage off-site plant species.

**Response:** See responses to Comment EMC-0585-071 under PEIS Alternatives, Description of the Alternatives, and Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0630-010
Porter, Mark C.
(Wallowa Resources)

**Comment:** Please clarify the reasoning behind Alternative E and explain rationale for considering acetolactate synthase-inhibiting herbicides separately from the rest of the herbicides. These chemicals have low environmental toxicities and are becoming very important in the effective and precise control of noxious weeds in the borage and mustard families.

**Response:** See response to Comment EMC-0585-071 under PEIS Alternatives, Description of the Alternatives.

BLM_0001444

RESPONSE TO COMMENTS

EMC-0643-046
California Indian
Basketweavers
Association

**Comment:** Further, the BLM implies that none of the other alternatives share the objective of restoring native communities, which is not accurate. In 2002, CIBA [California Indian Basketweaver's Association] spent many weeks working with a coalition of other conservation biologists and analysts to develop a citizens/scientists alternative to the BLM herbicide proposal. This alternative, included as an appendix (G-I) in the volume 2 of the DEIS [Draft PEIS], included extensive references from the scientific literature, each of which was included as a hard copy reference provided to the BLM with annotations to each reference. In spite of this major contribution, the BLM did not use any of the scientific literature to inform the analysis. This is contrary to the NEPA process which states: "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 CFR [Code of Federal Regulations] § 1500.1 (b). The Restore Native Communities Alternative exemplifies a best science management approach to achieve this objective. The DEIS [Draft PEIS] failed to demonstrate that this or other alternatives would not be effective. The conclusion is not supported anywhere in the record, and the DEIS [Draft PEIS] is inaccurate and misleading.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystems (RNE) alternative. The literature cited and annotated bibliography was considered in the development of this PEIS. All alternatives analyzed in the Draft PEIS have the capability to restore ecosystems; the RNE alternative is not unique in this regard, nor does it represent a best science management approach over the approach the BLM already uses. Refer to the policy analysis in Appendix I in the Final PEIS for a summary of actual BLM policy in regard to the RNE alternative.

EMC-0645-016
Wroncy, Jan (Gaia
Vision/Canaries Who
Sing)

**Comment:** The BLM needs to reconsider the Restore Native Ecosystems Alternative, reissue a draft [P]EIS and make the PER subject to the NEPA process.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystems alternative. See response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments regarding development of the PER. The BLM has determined that a new Draft PEIS is not necessary, since there has been no change in the Proposed Action or Purpose and Need, nor has new information arisen relevant to environmental concerns.

EMC-0646-183
Californians for
Alternatives to Toxics

**Comment:** The BLM has failed to include an alternative based on ecological healing and prevention. The current PEIS is focused purely on treatment of symptoms, rather than prevention of the conditions that lead to the problem. CAT [Californians for Alternatives to Toxics] supports an alternative with a focus on restoring native ecosystems. In such an alternative the BLM would view vegetation management in the context of first, prevention of conditions that have led to introduction, colonization, proliferation, and spread of invasive species and fuels hazards; and then second, restoration of healthy public lands (including forests, grasslands, etc) to strong native ecosystems; thereby third, reducing the need for continued treatments (passive restoration). An alternative suggested to the BLM, yet without reason excluded from the PEIS/PER analyses, that CATs endorses is the Restore Native Ecosystems Alternative.

BLM_0001445

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystem alternative.

EMC-0648-004
Idaho Cattle
Association

**Comment:** Additionally, we suggest that Alternative E be removed completely from consideration as it would severely limit the effectiveness to manage invasive species and inappropriately asserts that reductions in livestock grazing would be a management tool. It is not the role for this document to attempt to regulate grazing.

**Response:** See Scope of Analysis in Chapter 1 of the PEIS. Livestock grazing is outside the scope of analysis of the PEIS. There is no attempt to regulate grazing through the PEIS. Alternative E (No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients) is described under Description of the Alternatives in Chapter 2 of the PEIS. Alternative E represents a reasonable alternative to analyze in the PEIS in regard to the herbicide component contained in the citizens' alternative presented in Appendix I of the PEIS. The alternative description also provides a summary of the role passive management would take under the Restore Native Ecosystems Alternative proposal. See the revised text under Description of the Alternatives in Chapter 2 of the Final PEIS for clarification.

FXC-0071-024
Campbell, Bruce

**Comment:** Since need for forest and rangeland herbicide use was not thoroughly analyzed (to say the least), NEPA is being violated too. Also, though I cannot go into detail here, the so-called American Lands Alliance Alternative (E [in the Draft PEIS]) is not what some preparers of their submission to BLM had in mind.

**Response:** The PEIS presents detailed analysis on herbicide use and its impacts to public land resources relative to the Purpose and Need for the Proposed Action, found in Chapter 1 of the PEIS. See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the American Lands Alliance proposal.

RMC-0049-022
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** Alternative E does not address how invasive mustard (Brassicaceae) species and some annual grasses will be addressed without this family of herbicides.

**Response:** 2,4-D, dicamba, and picloram can be used to treat invasive Brassicaceae, while annual grasses would be treated using glyphosate.

RMC-0080-003
Idaho State Department
of Agriculture

**Comment:** Additionally, in its current form this alternative [Alternative E] falls outside the scope of analysis of the PEIS. The stated Scope of Analysis of the PEIS "...is to provide an analysis of the expected increased use of herbicides related to implementing mandates to reduce hazardous fuels and manage and control vegetation affecting other resources" and "...does not address...the effects of livestock grazing on vegetation." (pg. 1-4). The PEIS, however, does address the effects of livestock grazing on vegetation under the description of Alternative E. The PEIS states: This alternative would place greater emphasis on passive restoration, by prohibiting or restricting activities such as livestock grazing, OHV use, logging, or oil and gas development in areas where these activities have promoted a less desirable vegetation community, or increased erosion. (pgs. 2-13 - 2-14)

**Response:** See responses to Comment RMC-0163-004 under PEIS Alternatives, Description of the Alternatives and Comment RMC-0148-001 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-

BLM_0001446

RESPONSE TO COMMENTS

inhibiting Active Ingredients.

RMC-0080-004
Idaho State Department
of Agriculture

**Comment:** The [Draft] PEIS again addresses livestock effects on vegetation under this alternative on page 4-216, "By reducing the number of livestock entering degraded areas, improvement in ecosystem health can be expected." If this PEIS is not to address the impacts to livestock grazing as it says, then Alternative E is not within the scope of analysis and should not be considered by the decision-maker.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. The PEIS and PER did not evaluate management of livestock grazing as a vegetation treatment method. Passive restoration, including management of grazing, was an important component of Alternative E and was considered in the Cumulative Effects Analysis in Chapter 4 of the PEIS.

RMC-0126-004
Stevens, Dean

**Comment:** The BLM should analyze the Restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER, a citizens' alternative submitted to the BLM that addresses both the causes and effects of weed invasion and undesirable vegetation on public lands [see the following link]: www.blm.gov/nhp/spotlight/vegEIS/vol2/PEIS_Appendix_G_RNEA_Alternative.pdf.

**Response:** The Restore Native Ecosystems (RNE) alternative was reviewed by the BLM National Science and Technology Center (NSTC), which determined that the alternative contained a variety of policy provisions which were either duplicative of current BLM policy subsumed under current management (Alternatives A and B), or were outside the scope of this analysis. The salient points of the RNE alternative relative to herbicide use were summarized and used to formulate Alternative E in the PEIS. Alternative E (No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients) is described under Description of the Alternatives in Chapter 2 of the PEIS. A policy analysis of the alternatives is given in Appendix I in the Final PEIS.

RMC-0139-005
Jacobson, Don

**Comment:** Also, the BLM should analyze the Restore Native Ecosystems Alternative in the DEIS [Draft PEIS]/PER, a citizens' alternative submitted to the BLM that addresses both the causes and effects of weed invasion and undesirable vegetation on public lands [see the following link]: www.blm.gov/nhp/spotlight/vegEIS/vol2/PEIS_Appendix_G_RNEA_Alternative.pdf.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystems alternative.

RMC-0148-001
Stone, Delight

**Comment:** Herbicides are not only poisonous and expensive, but they ultimately fail because they are treating symptoms, not the causes of weed invasion and undesirable vegetation. Instead, the BLM should analyze the Restore Native Ecosystems Alternative in the DEIS/PER, a citizens' alternative submitted to the BLM that addresses both the causes and the effects of weed invasion and undesirable vegetation on public lands.

**Response:** The Restore Native Ecosystems (RNE) Alternative as submitted provided the source and framework for the limited herbicide use alternative analyzed in the PEIS as Alternative E. In order to develop Alternative E for analysis in the PEIS, certain components of the RNE Alternative that were relevant and applicable to

BLM_0001447

herbicide use under the Preferred Alternative were carried forward into the alternative analyzed in the Draft PEIS. The remaining content of the RNE proposal was determined to be either already covered under existing BLM policy and, therefore, already a component of the Preferred Alternative, or determined to be outside the scope of analysis for this PEIS. A table was prepared for the Final PEIS that summarizes the BLM's national policy review of the RNE Alternative (Appendix I, Final PEIS). The policy analysis identifies the individual Goals and Actions outlined in the RNE proposal. Each Goal or Action then has a determination indicating whether it is included in current BLM policy (Yes/No) and a citation for the policy. Under Policy Analysis, a brief summary is provided outlining the policy. Under Alternative Comparison, the Alternatives that apply to the policy are identified. In most cases, this is "common to all alternatives." The last column outlines the programmatic net effect or impact of the policy if the analysis is different from that presented in the PEIS, or outside the scope of analysis. Also see response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes of weed invasions.

RMC-0191-004
Ertz, Brian

**Comment:** It is disappointing that the RNEA [Restore Native Ecosystems Alternative] submitted in 2002 was cast aside as "not within the scope of the Draft PEIS". Such a statement made by Brian Amme during The DEIS public hearing in Boise Idaho, reasonably suggests the BLM's failure to comply with Section 102 of NEPA requiring federal agencies to lend appropriate support to initiatives and programs designed to anticipate and *prevent* a decline in the quality of mankind's world environment. Simply publishing the RNEA in the appendixes does not constitute consideration of the Alternative nor does it constitute "support", especially considering the lack of integration concerning the wisdom and science represented in the RNEA's call to *prevent* the *causes* of invasive species.

**Response:** See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients. Also see responses to Comment RMC-0163-004 under PEIS Alternatives, Description of the Alternatives and Comment RMC-0148-001 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients.

RMC-0222-010
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** This D[raft] EIS fails to abide by Section 1502.14 of NEPA ("Alternatives including the proposed action"), because it has not considered a reasonable alternative provided to the BLM in 2002. The Restore Native Ecosystem Alternative ("Restoration Alternative": Appendix G [in the Draft PEIS]) is a reasonable alternative. The alternative meets the Purpose and Need by describing 1) herbicides that should be available for vegetation treatment on public lands; and 2) conditions and limitations that apply to herbicide use

**Response:** See response to Comment RMC-0148-001 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients.

RMC-0222-011
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for

**Comment:** The BLM claims ([page] 2-13 [of the Draft PEIS]) that Alternative E (i.e., "No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients") is "based on" an alternative submitted by American Lands Alliance, "an alliance of several environmental and conservation groups." In fact, the Restoration Alternative was submitted by the Restore Native Ecosystems Coalition of which the American Lands Alliance was only one entity that prepared the Alternative. The

BLM_0001448

RESPONSE TO COMMENTS

Alternatives to
Pesticides), and
O'Brien, Mary

original alternative was collaboratively developed by numerous organizations and submitted by 43 organizations; the revised version was submitted by 13 organizations.)

**Response:** Alternative E was submitted to the BLM by an individual associated with the American Lands Alliance, although the cover letter with the alternative did not note that numerous organizations were requesting that the alternative be included in the PEIS. We have modified the text in the Final PEIS reflect that the alternative was submitted by the American Lands Alliance, but deleted the wording that suggested the organization is an alliance of other groups.

RMC-0222-013
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** As illustrated by the title BLM has given its Alternative E substitute for the Restoration Alternative (i.e., "No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients"), the BLM describes Alternative E only in terms of what it does not do (e.g., doesn't use ALS-inhibiting/sulfonyl urea herbicides, doesn't rely exclusively on active vegetation treatments to (1) control invasive species establishment and/or spread and/or (2) to restore native ecosystems so they will subsequently resist invasive species). The BLM fails to analyze the active, positive control of invasive species that has been and can be accomplished with (1) prevention of the conditions that favor the introduction, establishment, and/or spread of invasive species, and (2) passive treatments in conjunction with, or sometimes obviating the need for, use of (3) herbicides.

**Response:** Alternative E relied on the salient points contained in the Restore Native Ecosystems (RNE) proposal, found in Appendix I of the PEIS, as they relate to herbicide use and the proposed action. The remainder of the proposal contained recommendations that were either 1) already contained within existing BLM policy and therefore already a part of existing management underlying all alternatives presented, 2) outside of the scope of analysis of this PEIS and/or properly addressed in local land use planning, or 3) contrary to statute or regulation. A policy analysis of the alternatives is given in Appendix I in the Final PEIS.

RMC-0222-016
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Thus, the Restoration Alternative, by giving highest priority to passive treatments and second highest priority to passive treatments linked to active treatments (which sometimes and sometimes do not employ herbicides) (1) provides "conditions and limitations" that apply to the use of herbicides for "controlling weeds and invasive species", and (2) "manipulate[es] vegetation to benefit fish and wildlife habitation, improve riparian and wetlands areas, and improve water quality in priority watersheds." The Restoration Initiative thus fully meets the Purpose and Need of the [P]EIS and should have been fully analyzed. It was not analyzed in the DEIS [Draft PEIS].

**Response:** The PEIS does not propose a priority ranking for treatment types. Within an integrated pest management context, the most effective treatment method or combination of methods, including the use of passive treatments, is considered in the design of any vegetation treatment project. Prioritization of passive treatments over herbicide treatments does not constitute conditions and limitations to the use of herbicides. Conditions and limitations are those circumstances that are identified that guide or modify the use of herbicides in a given situation. These conditions and limitations, commonly referred to as standard operating procedures, include buffers, application rates, and drift management practices, among others. They are found in Table 2-8 (Standard Operating Procedures for Applying Herbicides) in Chapter 2 of the PEIS. Passive treatments, by inherent definition, are not considered to be

BLM_0001449

treatments that manipulate vegetation, i.e., change, alter, remove, seed, or replant.

The Restore Native Ecosystems proposal only partially meets the Purpose and Need in regard to determining which herbicides would be available for use and those portions of the proposal that meet the purpose and need were carried forward in the development of Alternative E. A policy analysis of the alternative is given in Appendix D of the Final PEIS.

RMC-0222-024
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** In its summary of its Alternative E (i.e., Table 2-8 [Summary and Comparison of Effects on Resources by Alternatives], at [pages] 2-26 through 2-39 [in Chapter 2 of the Draft PEIS]), the BLM focuses on Alternative E's (a) lack of use of ALS [acetolactate synthase]-inhibiting/sulfonyl urea herbicides, even though such herbicides account for less than 17% of BLM's projected herbicide use in their preferred Alternative B (Table 2-4 at [page] 2-11 [in Chapter 2 of the Draft PEIS]), and (b) reduced use of active treatments (i.e., emphasis on passive restoration). The BLM has failed to analyze the Restoration Alternative's active reliance on integrating herbicide use with positive management for prevention and non-chemical active treatments and/or passive restoration actions.

**Response:** Regardless of the percentage of projected herbicide use for ALS-inhibiting sulfonylurea herbicides, the BLM considers it reasonable to analyze the elimination of this class of herbicides in the impact analysis of the PEIS. Integrated herbicide use with active management for prevention and non-chemical treatments or passive restoration is included within the integrated pest management approach currently practiced by the BLM and is subsumed under all alternatives with the exception of Alternative C (No Use of Herbicides), which would disallow herbicide use, but continue to utilize an integrated pest management approach using other non-herbicide methods.

RMC-0222-029
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The Restoration Alternative conditions herbicide or other treatments on a prior consideration of whether passive treatments can replace, avoid, or augment herbicide use to attain vegetation goals (DEIS [Draft PEIS]: G-4):

Action- Plan 6
Prior to implementing site-specific vegetation treatments, prepare goals based on:
1. vegetation conditions, including invasive species concentrations
2. vulnerable wildlife and plant species and habitats
3. habitat important for threatened, endangered, and sensitive species and carnivores: connectivity for habitat-specialist wildlife.
4. past and present activities within the watershed leading to vegetation problems
5. passive and active restoration needs
6. feasible restoration goals

Thus, the Restoration Alternative looks at the whole invasive species problem, not merely what herbicide to spray where. Neither the BLM's alternative E (a fatally truncated version of the Restoration Alternative) nor Alternative B (their Preferred Alternative) include the above planning steps.

**Response:** See responses to Comment RMC-0163-004 under PEIS Alternatives, Description of the Alternatives, and Comment RMC-0148-001 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients.

BLM_0001450

RESPONSE TO COMMENTS

### Alternatives, Alternatives Considered but not Further Analyzed

EMC-0027-010
McNeel, Hank

**Comment:** I feel you need to address what would happen to native plant species, wildlife habitat, recreation etc. if no weed control treatments were made on BLM lands.

**Response:** The BLM would treat weeds and other vegetation under all alternatives. Thus, an analysis of what would happen if no weed control occurred was not done for the PEIS or PER.

### Alternatives, Herbicide Treatments Standard Operating Procedures and Guidelines

EMC-0267-006
Medbery, Angela

**Comment:** [No matter what scenario is adopted I would like to see] Strict avoidance of chemical use in the presence of any people who claim asthma, allergy and/or chemical sensitivity to those chemicals.

**Response:** As discussed in Chapter 2 of the PEIS in Table 2-8 and under Coordination and Mitigation, the BLM will post herbicide treatment areas and dates and conduct other public information activities so as to minimize public exposure to herbicides.

EMC-0446-011
The Nature
Conservancy

**Comment:** Standard Operating Procedures (SOP's) and Guidelines: The Standard Operating Procedures (SOP's) and Guidelines described in both the Draft PEIS and PER should include additional requirements for wildlife species that are not Federally listed. The SOP's and Guidelines should be mandatory rather than optional ("must" rather than "where possible") to be effective. The PEIS and PER assume that these SOP's and Guidelines are adequate to protect public resources, however, information in the reports appears to contradict this assumption. As an example, there are no specific SOP's to mitigate the impacts of proposed fire or mechanical treatments in sagebrush communities to protect habitat for declining sage grouse populations, although the BLM has developed such guidelines (Guidance for the Management of Sagebrush Communities for Sage-grouse Conservation, November 2004). Although both documents cite the likely negative impacts caused by livestock grazing immediately after certain vegetation treatments, the SOP for livestock use following treatments only requires the BLM to "Provide alternative forage sites for livestock, if possible." In our experience, a minimum of two years of complete rest, preferably three or more, following prescribed fire treatments is needed to allow for native plant restoration. We believe this guidance should be strengthened.

**Response:** Additional SOPs and guidelines have been included in the Final PEIS and PER. The intent of the SOPs was not to be all-encompassing, but rather to provide guidelines that would apply BLM-wide, with the understanding that additional site-specific SOPs and guidelines would be developed at the local level. Although SOPs would apply to most situations, there are situations in which they might not apply. The SOPs do not ensure resource protection, but are only measures designed to reduce impacts to resources. Because SOPs do not ensure resource protection, additional mitigation measures were developed for the PEIS to provide additional protection. As discussed in the PER in Chapter 2 under SOPs and Guidelines, grazing by domestic livestock would be avoided until vegetation on treatment sites is well established. If total rest from grazing is not possible, efforts should be made to modify the amount and/or season of grazing to promote vegetation recovery within the treatment area.

BLM_0001451