EMC-0446-016
The Nature
Conservancy

**Comment:** We also support the use of aerial applications of herbicide on extremely large or inaccessible weed infestations where the only way to viably treat these areas would be via aircraft. The PEIS should require that each aerial application proposal include a detailed spray prescription, specifying riparian buffer zones, sites of rare and endangered species and communities, goal and objectives of application, protocols to minimize drift and avoid off-target damage, and suitable monitoring protocols that will elucidate effectiveness of treatment as well as negative impacts to off-target resources. In cases of herbicide use post-wildfire, we recommend that the BLM first determine the actual need of herbicide application (based upon pre-wildfire inventory of the range and extent of weeds in the area) prior to any aerial application to suppress weeds following a wildfire, and to allow for natural re-vegetation of native species, wherever possible.

**Response:** Best management practices are identified in Chapter 2 of the PEIS under Herbicide Treatment Standard Operating Procedures and Guidelines. Aerial spraying requires detailed spray prescriptions prior to implementing any project utilizing this method. Post wildfire herbicide needs follow the Burned Area Emergency Rehabilitation Team's recommendations, which are based on the circumstances and damage resulting from the wildfire. It is not always possible to utilize pre-wildfire inventories, as not all public lands are 100% inventoried for weeds and there is no way of knowing where a wildfire will occur beforehand.

EMC-0446-018
The Nature
Conservancy

**Comment:** Chemical herbicides are important tools for the management and control of non-native invasive plants when used responsibly. To be most effective in controlling non-native invasive plants on public land, the PEIS should:
- Require and recommend specific standards and practices to prevent new invasions and the spread of weeds;
- develop early detection and rapid response practices;
- Require that all vegetation control treatments occur within the context of a management plan with clear goals and objectives, and desired future conditions;
- Have clear guidelines for prioritization and integrated pest management methods for weed management; and
- Require adequate monitoring to ensure effective control, proper treatment selection, and minimal environmental and health impacts to ensure that off-target impacts are not beyond those predicted and deemed acceptable.

**Response:** The procedures suggested in this comment are already being implemented by the BLM. Also see response to Comment RMC-0205-013 under PEIS Alternatives, Vegetation Treatment Planning and Management.

EMC-0486-007
Siskiyou Project

**Comment:** Table 2-6 (DEIS [Draft PEIS], V[olume] 1, p. 2-18) "Standard Operating Procedures for Applying Pesticides" to water resources, streams, and wetlands indicates the use of, "Appropriate herbicide-free buffer zone for herbicides not labeled for aquatic use based on risk assessment guidance within minimum width of 100 feet for aerial, 25 feet for vehicle, and 10 feet for hand spray application." "Dicamba can result in groundwater and surface water contamination under conditions that favor such activities … a known groundwater contaminant, and has a high potential to leach into groundwater" (DEIS [Draft PEIS], V[olume] 1, p. 4-29). "Picloram can move off-site through surface or subsurface runoff, and has been detected in the ground water of 11 states … Concentrations in runoff are often reported to be adequate to prevent the growth of non-target terrestrial and aquatic plants" (DEIS [Draft PEIS], V[olume] 1, 4-31). Because of the risk of contamination of our surface waterways and ground

BLM_0001452

water from surface runoff, the buffers (mentioned above) do not seem adequate in protecting our watersheds. Herbicide treatments of any kind should reflect a 150 foot buffer for all channels including intermittent ones, (this figure is determined in the Northwest Forest Plan for riparian reserve protection from logging and other ground disturbing activity to ensure the least amount of surface runoff and this figure should honor the use of herbicides too as the loss of vegetation often leads to surface runoff) or a site specific tree length which ever is greater.

**Response:** The buffer distances identified in the PEIS reflect minimum requirements across a broad spectrum of vegetation types and ecoregions. Local plans, such as the Northwest Forest Plan, would determine appropriate buffer distances for vegetation and water resources within the area to which the plan applies. This PEIS does not supercede local or more conservative requirements that are developed through local planning, consultation with the Services, or court order (in those cases where the courts have specified buffer distances).

EMC-0498-004
Vallone, Cheryl L.

**Comment:** Focus foremost on managing BLM lands to prevent new weed infestations; follow best management practices for timing and dosage for all herbicides, and use herbicides only in conjunction with an integrated pest management approach that also uses other tools such as mechanical control, controlled burning, and carefully screened biological control organisms.

**Response:** See responses to Comments RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation and RMC-0042-087 under PEIS Alternatives, Vegetation Treatment Planning and Management.

EMC-0503-013
John Day-Snake
Resource Advisory
Council

**Comment:** Chapter 2 page 2-18 the [Draft] [P]EIS states recommended use of herbicides with low toxicity to wildlife "where feasible." That statement is like a red flag causing us to wonder what might be used and what circumstance would cause harm to wildlife. Perhaps the practice should be changed to "in all cases".

**Response:** See responses to Comment RMC-0144-005 under General Comments and Responses, and Comment EMC-0585-152 under PEIS Alternatives, Mitigation.

EMC-0566-009
Western Society of
Weed Science

**Comment:** The WSWS [Western Society of Weed Science] also supports a section that addresses development of sustainable fuel breaks in the brush/grasslands in an effort to return wildfires to historical size as well as protect property, critical habitat areas, and newly revegetated or rehabilitated sites. Suppression should be a last resort and prevention as fuel breaks and pro-active fuel management as vegetation treatments should be a first priority.

**Response:** See response to Comment EMC-0214-050 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

EMC-0584-045
Western Watersheds
Project

**Comment:** BLM's [P]EIS and the "updated" [P]EFR plans are woefully deficient in providing adequate periods of rest from livestock grazing following treatments. In order to determine necessary rest periods, BLM must understand the condition of the community pre-treatment (see, for example, Eddleman et al 1994 describing poor or fair condition lands requiring significant periods of rest post-treatment). Specific time periods must be applied (5-10 year minimum), along with measurable recovery standards for soils, microbiotic crusts, herbaceous and woody vegetation recovery before livestock grazing can resume.

**Response:** Most, although not all, vegetation treatments do require some rest from livestock grazing. The PEIS identifies the possibility of requiring rest from grazing in the Standard Operating Procedures for Applying Herbicides in Chapter 2 of the PEIS in Table 2-8. The BLM agrees that the amount of rest required may vary depending on several factors, including the condition of the plant community prior to treatment, and the climatic conditions during and immediately following treatment. However, rarely would a rest period of 5 to 10 years be required, as identified in this comment. The BLM has used 2 growing seasons of rest as the basic standard, and in many cases that amount of rest following the treatment or disturbance has been adequate. However, depending on the specific situation (plant community present before the disturbance, precipitation available following the disturbance, etc.), more or less than two growing seasons may be appropriate. Monitoring is the best means for determining the amount of rest needed for each specific recovery effort.

EMC-0584-065
Western Watersheds
Project

**Comment:** No treatments of any kind should be allowed during nesting periods for migratory birds, or in important or critical wildlife habitats during sensitive times of year such as winter in sage grouse wintering areas. The role of all past and proposed treatments on habitat fragmentation must be assessed. See Knick et al. 2003, Connelly et al. 2004 to understand the tremendous fragmentation that exists.

**Response:** See response to Comment EMC-0585-155 under PEIS Alternatives, Mitigation.

EMC-0584-074
Western Watersheds
Project

**Comment:** BLM current enforcement of grazing closure restrictions is incredibly lax – we have documented burn trespass after burn trespass where BLM has failed to administer more than a handslap - or simply ignored – permittee trespass of burns... Thus, we have no assurances that any livestock-related post-treatment measures will be followed, and these can not be used as "mitigation" for treatments.

**Response:** Temporarily restricting grazing following a burn or other treatment is a standard practice that must be identified as an element of these treatments within this document. Unauthorized use actions are taken if livestock are allowed to use a burn or treatment area during the prescribed rest period. The settlement of an unauthorized use situation is dependent on the facts of the specific case, whether the unauthorized use is determined to be willful or non-willful, and the documented number of animals and amount of time involved in the violation.

EMC-0584-102
Western Watersheds
Project

**Comment:** A 4-5 year closure of the pasture or allotment will result in ungrazed areas that help to provide grasses of sufficient height, or other necessary habitat components, for sage grouse and other native wildlife. Only temporary facilities should be allowed, if any are used at all – primarily electric fences. All post-fire rehab plans must specify removal dates for any livestock facilities that result from fire rehab activities.

**Response:** The amount of rest from grazing needed following treatment will vary depending upon the condition of the vegetation prior to treatment and the climatic conditions that occur following the treatment. A rest period of 4 to 5 years may be appropriate in some cases, but that amount of time would not be needed in all situations. This PEIS allows for decisions about the amount of rest following treatment to be made at the local level, based on the individual situations and the site conditions. In many situations, no facilities or only temporary facilities are required to help provide rest from livestock grazing. There may be some situations, however, in which construction of a more permanent structure such as a fence would be more economical

BLM_0001454

RESPONSE TO COMMENTS

and would provide for better management beyond the first few years following disturbance.

EMC-0584-112
Western Watersheds
Project

**Comment:** Periods of Rest: BLM must require adequate periods of rest from all livestock grazing to ensure that full recovery, or establishment of seeded vegetation, occurs. This time period is much longer than BLM ever requires, and is often dependent on the condition and health of vegetation communities pre-fire. Eddleman et al. (1994) described 4-5 year periods of rest as necessary for degraded western juniper communities.

**Response:** See response to Comment EMC-0584-075 under PEIS Alternatives, Mitigation.

EMC-0584-114
Western Watersheds
Project

**Comment:** Commitment to Rehab. Time periods sufficient to achieve adequate and healthy native vegetation communities, must be mandatory. A reasonable time period would be 5-10 years, given the vagaries of weather and drought cycles in depleted arid low elevation lands.

**Response:** The BLM guidance allows for flexibility in determining sufficient time to achieve adequate recovery of plant communities in rehabilitation projects. For funding purposes, mandatory timeframes for monitoring are set at 3 years for Emergency Stabilization and Rehabilitation projects. Given the variability of plant communities, environmental conditions, and climatic influences across a 17-state area, there is no basis provided by the commenter for the BLM to determine that 5 to 10 years is a reasonable time period in all situations.

EMC-0585-103
Western Watersheds
Project

**Comment:** The [P]EIS claims buffers would be used between treatment and non-treatment areas. Unfortunately, the extent of the land area needed to buffer impacts may be significantly greater on low elevation degraded BLM lands than on non-degraded lands, as often especially in arid climates, there is little standing vegetation to buffer or prevent drift/contamination (in contrast to dense higher elevation forests, or croplands with dense growth at ground level). Topography such as steep canyons may result in need for far greater buffers than are normally applied. Weather such as wind shifts, canyon winds, movement of air with diurnal heating and cooling, will all affect size and configuration of any wild land buffer.

**Response:** The buffers presented in the PEIS represent minimum distances based on drift modeling results. They do not incorporate the limiting impact that vegetation within the buffer zone would have on herbicide transport. It is recognized that these buffers may need to be adjusted for site-specific conditions. Also see response to Comment EMC-0585-204 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0585-154
Western Watersheds
Project

**Comment:** BLM also claims it will: "Establish appropriate herbicide-specific buffer zones to waterbodies …". Yet, BLM does not set out specific buffer zones, or provide a specific protocol for decisionmaking on appropriate buffers. Likewise, no specific buffers are provided for the witches brew of treatments described in the PER.

**Response:** Minimum buffer zones for herbicide treatments are given in Table 2-8 of the PEIS. However, buffer widths would usually be developed based on risk assessment guidance. The BLM has identified buffer zones to protect water bodies from individual herbicides evaluated by the BLM in Table C-16 of Appendix C of the PEIS, and in the ecological risk assessments prepared for the PEIS; similar guidance is

BLM_0001455

provided in the Forest Service risk assessments used in developing the FEIS. Manual treatments, and some mechanical treatments (e.g., mowing) are often appropriate for vegetation treatments close to water bodies; a minimum 25-foot buffer would be maintained for mechanical treatments as discussed in Table 2-5 of the PER. Because biological control organisms can move on their own, it is impractical to establish buffers for these organisms. There are also many situations where it is necessary to burn vegetation to the edge of water bodies.

EMC-0585-168
Western Watersheds
Project

**Comment:** Throughout the [P]EIS/PER, BLM makes sweeping statements such as: "if livestock grazing is managed to increase the vigor of native perennial plants, especially grasses, the chance of weeds invading rangelands is much less" ([page] 2-15 [of the PEIS]), yet provides few or no scientific records or studies to back up its rosy claims.

**Response:** The wording of the quotation in this comment has been changed by one word from the statement as it appeared in the PEIS. In the Draft PEIS in Chapter 2 under Herbicide Treatment Standard Operating Procedures, it stated "If livestock grazing is managed to maintain the vigor . . ." not "if livestock grazing is managed to increase the vigor . . ." as it was identified in the comment. This statement reflects the concept of "competitive advantage" which can occur when one plant species is grazed, and nearby plants are left ungrazed. The following statements are taken from Ecological Implications of Livestock Herbivory in the West, Edited by Martin Vavra, William A. Laycock and Rex D. Peiper, 1994. "Research in the sagebrush steppe has shown that defoliation of grasses during rapid growth decreases the depletion rate of soil water (Wraith it al. 1987, Daddy et al. 1988, Miller et al. 1990). Reduced uptake of soil resources by forage species due to decreased leaf area and root growth may enhance growth and/or establishment of ungrazed neighboring plants. Grazing avoidance-type plants often gain the competitive advantage over grazed species (Archer and Smeins 1991)." According to Ecological Implications of Livestock Herbivory in the West (M. Vavra, W.A. Laycock, and R.D. Piper, eds. 1994. Society for Range Management, Denver, Colorado), grazing can be managed to reduce this "competitive advantage" by making sure the plants have sufficient opportunity to grow undisturbed and reproduce at least occasionally; the statement in the PEIS is pointing out that this type of management would reduce the opportunity for weeds to become established and/or increase. "The best documented long term evidence indicating that light to moderate livestock use can be compatible with the sagebrush ecosystem is from communities where plant species composition remained unchanged from adjacent ungrazed sites in good ecological condition (Mueggler 2950, Laycock 1967, Beedlow et al. 1988), or where native perennial grasses, forbs and palatable shrubs have reestablished under good grazing management (Sneva et al. 1984, Kindschy 1987)."

EMC-0585-242
Western Watersheds
Project

**Comment:** BLM makes false claims. The claim that BLM 'recommends' as a SOP [Standard Operating Procedure] that grazing animals be fed only weed free forage for a minimum of 96 hours prior to going onto public lands' is completely divorced from the reality of BLM actions related to livestock turnout on public lands. In review of hundreds if not thousands of grazing permits and BLM NEPA or other assessments of grazing, WWP [Western Watersheds Project] has never found any permit Term and Condition or EA [Environmental Assessment] management requirement to so. In fact, BLM has repeatedly ignored our comments that such measures be used to control weed infestation and spread by domestic livestock. ([page] 2-15 [of the PER]). BLM elsewhere terms these SOPs [Standard Operating Procedures] "Mitigation". Examination of both Tables 2-6 [in the Draft PEIS] (SOPs [for Applying Herbicides]),

BLM_0001456

RESPONSE TO COMMENTS

and 2-7 (Mitigation [Measures]) show no indication that this is even "recommended". In fact, the discussion of "livestock" relates to limiting impacts of treatment to livestock, and not impacts of livestock to the land or treatment outcome. Livestock may continue to bring weeds onto lands, or create disturbed conditions for sprayed or treated lands to stay infested or to become reinfested, yet no SOP or mitigation is applied to limit this.

**Response:** This is a new recommendation that we will be making to all public land users that have grazing animals, but it will not be a condition of their permit. We have moved this recommendation from under the heading of Standard Operating Procedures and Guidelines to under the heading Prevention of Weeds and Early Response and Rapid Detection, as this action would do much to help prevent the spread of weeds.

EMC-0585-243
Western Watersheds
Project

**Comment:** BLM refers to "poor grazing management" as a resulting in "conditions that enhance invasive species spread", yet never defines "poor grazing management", or provides any data or other information showing where this has or is occurring. Since 35 million acres of public lands are now dominated by invasive species (where are these lands, and how old is this figure???), and weeds continue to spread at an alarming rate, such "poor" management must be commonplace. ([page] 2-15 [of the Draft PEIS]).

**Response:** Poor grazing management could involve various things, such as the use of excessive numbers of livestock, poor management that results in concentrations of animals in some areas, or grazing during critical times during the plants' annual growth cycle year after year; or leaving animals in the same area for a long period of time, which allows animals to graze the same plants repeatedly during the grazing season. Although these grazing practices may create conditions that would enhance the spread of invasive species, this is not the only vector that can do so. Many of the plant species that we now consider to be invasive were purposefully introduced into this country for a variety of reasons unrelated to livestock grazing, and many others were accidentally introduced through activities unrelated to livestock grazing. Many of the invasions of undesirable vegetation have occurred in areas that have not had any recent (or in some cases historical) livestock use, so it would not be correct to assume that areas dominated by invasive species have experienced poor grazing management. The 35 million acres are scattered throughout the West, and that figure was derived from information gathered in 2000.

EMC-0597a-006
Beeland, DeLene

**Comment:** If there is going to be oil and gas development on our public lands – BLM and other government agencies must set up a strict policy for vehicle washing, including the undercarriage of trucks and ORVs [off-road vehicles] to halt the spread of seeds and grasses using the network of roads and trails accessing the well-heads.

**Response:** See response to Comment EMC-0544-004 under PEIS Alternatives, Other Programs.

EMC-0623-013
Defenders of Wildlife

**Comment:** Follow best management practices for timing and dosage for all herbicides, and use herbicides only in conjunction with an integrated pest management approach that also uses other tools such as mechanical control, controlled burning, and carefully screened biological control organisms. Subsequent drafts of the [P]EIS should document how many acres the BLM intends to treat with other methods, so that stakeholders can evaluate pesticide treatment in the context of other weed control methods. BLM should also report on the efficacy of each method.

BLM_0001457

**Response:** See response to Comment EMC-0623-008 under PEIS Alternatives, Vegetation Treatment Planning and Management.

EMC-0640-041
Animal Welfare
Institute

**Comment:** In the event that BLM believes limited herbicide use is needed, the agency must: 1) minimize such use to the extent possible; 2) only use herbicides that will not produce a high impact or effect on non-target species; 3) use only application methods that will minimize impacts to non-target species; 4) ensure that its vegetation management plans be based on adaptive management; and 5) engage in comprehensive pre and post monitoring work to immediately assess the impact of herbicides on wild species and cease or alter herbicide use if adverse impacts are identified. Moreover, to the extent that the BLM considers adding any new herbicides to its poison arsenal, it should mandate that any toxicity tests be conducted using non-animal testing methodologies and that any field applications would be preceded by focused and limited field studies to determine how the herbicide might impact wildlife and other natural features and functions under natural conditions.

**Response:** See responses to Comment EMC-0623-008 under PEIS Alternatives, Vegetation Treatment Planning and Management, Comment EMC-0115-005 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated, Comment EMC-0640-036 under PEIS Environmental Consequences, Wildlife Resources, and Comment EMC-0640-037 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0643-047
California Indian
Basketweavers
Association

**Comment:** The DEIS [Draft PEIS] also does not substantively demonstrate through citation to scientific studies that the Preferred Alternative and the use of herbicides to kill unwanted vegetation will in fact in any way achieve the desired goals for restoration of native habitats.

**Response:** A listing of the scientific publications relied upon in this PEIS analysis is found in Chapter 6 of the Final PEIS.

EMC-0645-012
Wroncy, Jan (Gaia
Vision/Canaries Who
Sing)

**Comment:** [Herbicides should be considered for use only under the following conditions:] 1. When all ingredients in the formulation (including inert ingredients) are publicly disclosed and analyzed for their impacts to human health, wildlife and water quality; 2. There is notification to the public through signs, newspaper announcements and other means; 3. When surface and ground water samples are collected and analyzed for herbicides and their breakdown products; 4. When an up-to-date publicly accessible database is kept to record the formulation of herbicide, amount applied, date, time and weather conditions during application; 5. Vegetation cannot be burned the same year it was treated with herbicides; and 6. Herbicide treatments are not permitted during the bird nesting season of bird species found through site-specific surveys of the application area.

**Response:** Thank you for the suggestions to consider when applying herbicides. The BLM considers the toxicological effects of herbicides, the potential for public exposure and notification, and environmental variables, including effects on nesting species and use of fire after herbicide applications, if applicable, in the risk analysis and project design and through site-specific NEPA analysis for the project. Herbicide use records are currently not in a central database for the BLM; however, these records are available from the field offices or state, county, or local agencies that apply herbicides. Many regulatory agencies, such as the California Department of Environmental Quality, post herbicide use data on their websites. Similar data on herbicide application is also provided to both the U.S. Fish and Wildlife Service and

BLM_0001458

National Marine Fisheries Service when applications involve potential effects to listed species.

**EMC-0647-005**
**Alaska Community**
**Action on Toxics**

**Comment:** The vegetation management program must provide regular monitoring to determine if and when treatments are needed. Educational, physical, mechanical, and biological measures of prevention and control will be given priority over chemical measures. Herbicides will be used only as a last resort. If herbicides are used, the BLM will use the smallest amount of the least toxic formulation with the least potential for contamination of subsistence resources, wildlife, or human exposure. Further, no chemical is permitted for use if it is acutely toxic or proven to cause cancer, hormone disruption, reproductive damage, immune system damage or nervous system toxicity. The BLM will apply the precautionary approach in all pest management decisions to prevent harm to human health and the environment from the use of toxic pesticides that have not been fully tested. The public process should be open and inclusive if herbicides are being considered in a particular area. If herbicides are used as a last resort, people that may use the area should be properly notified well in advance with publication in local newspapers and signage around the perimeter. Signage should be posted at least 72 hours in advance and left up at least 72 hours following herbicide applications. The notification and signage should include information about the environmental and health effects of the herbicides.

**Response:** Most of these measures are listed as Standard Operating Procedures or mitigation in the PEIS or PER. Some of the herbicides used by the BLM could be acutely toxic if applied incorrectly or accidentally spilled; the BLM would review and consider human health and ecological risks before selecting and using herbicides to treat vegetation to minimize or avoid risks to humans and plants and animals.

**FL-0004-011**

**Comment:** PEIS is in need of a section addressing development of sustainable fuel breaks in the brush/grasslands in an effort to return wildfires to historical size as well as protect property, critical habitat areas and newly revegetated or rehabilitated sites. Suppression should be a last resort, prevention as fuel breaks and proactive fuel management as vegetation should be a first priority.

**Response:** See response to Comment EMC-0566-009 under PEIS Alternatives, Herbicide Treatment Standard Operating Procedures.

**FL-0007-008**

**Comment:** The second addition would be to place a greater emphasis on the development of sustainable fuel breaks. This would help to return wildfires to historical size, protect property, critical habitat areas, and newly rehabilitated sites.

**Response:** See response to Comment EMC-0566-009 under PEIS Alternatives, Herbicide Treatment Standard Operating Procedures.

**FXC-0071-014**
**Campbell, Bruce**

**Comment:** In regards to herbicide labels, will BLM assure that all herbicide/formulations (and not just in the original package) will have warning and instructions in Spanish(?) – seeing that almost all agricultural spraying and an increasing amount of rangeland and forestland spraying is done by Latino workers. If not, why if you wish the workers to understand the proper precautions to take? The BLM documents admit various risks to workers from herbicides proposed for use in vegetation treatments in 17 western states – for instance on page 4-131 [of the Draft PEIS] where it is said in a clear manner that "The health and safety of workers could be at risk from exposure to herbicides"

**Response:** Table 2-8 in Chapter 2 of the PEIS describes Standard Operating Procedures and Guidelines for applying pesticides. In addition, any work contracted by the BLM requires the contractor to have the appropriate state licenses and training for handling and applying any pesticide. If Latino workers are used, it is the responsibility of the contractor to relay appropriate information from the Material Safety Data Sheets (MSDS). MSDSs are available in Spanish. In addition, any BLM employee handling and applying pesticides is required to be trained and hold an updated state and federal license, and to be able to read and speak English.

FXC-0074-010
Copper Country
Alliance

**Comment:** In such a case [use of herbicides], BLM should adhere to the following guidelines:
- Aerial spraying is not used.
- The herbicide chosen has been fully tested for toxicity to humans and other non-target organisms.
- The herbicide chosen is the least toxic of effective herbicide candidates.
- The amount of herbicide used and the area covered are as small as possible for effective eradication.
- Public input prior to application is strongly encouraged through public notification.
- Warning of toxic risks are well-advertised.
- The treatment area is described in a way that the public can readily understand.
- Warning signs are posted around the perimeter of treated areas.

**Response:** See responses to Comment EMC-0585-157 under PEIS Alternatives, Mitigation, Comment EMC-0220-006 under PEIS Alternatives, Coordination and Education, and Comment EMC-0092-003 under PEIS Alternatives, Coordination and Education. The herbicides used by the BLM, or proposed for use, have been tested by the Environmental Protection Agency for their toxicity to plants, animals, and humans. In addition, the BLM and Forest Service conducted human health and ecological risk assessments to evaluate the risks to humans and plants and animals from the 18 herbicides proposed for use in the PEIS. Risk assessments done by the BLM are summarized in Appendixes B and C of the PEIS. Alternative D, No Aerial Spraying, was one alternative evaluated in the PEIS.

RMC-0006-034
Central Sierra
Environmental
Resource Center

**Comment:** Buffer distances between herbicide treatments and all aquatic habitats and sensitive species should be a minimum 50 feet. In an attempt to minimize potential impacts, the PEIS proposes that "Buffer zones would be used to reduce the risks to vegetation from herbicide treatments" p. ES-4 [of the Draft PEIS]). Yet in table C-16 (p. C-89 [of the Draft PEIS]) "buffer distances" to aquatic areas and non-target plants for some herbicides are zero (Chlorsulfuron, Diuron, Imazapic, Tebuthiuron), and, for some, not "evaluated" (Diquat, Fluridone, and Tebuthiuron). CSERC [Central Sierra Environmental Resource Center] urges that a *minimum* buffer distance for any herbicide used be 50 feet from all aquatic zones and all non-target plant and animal species. Furthermore, the buffer distances proposed in Table C-16 [of Appendix C of the PEIS] are based on modeling, not on empirical data (Table C-16, p. C-89 [of the Draft PEIS]). "In some cases, buffer distances were extrapolated (if the largest distance modeled still resulted in risk)" (p. C-89 [of the Draft PEIS]). Considering the significant possible negative effects, the accuracy of modeling is not high enough to be sufficient for establishing buffer guidelines. CSERC strongly urges that buffer distances must be determined empirically through experimentation under controlled conditions of varying droplet size, application rate and height, and wind

BLM_0001460

RESPONSE TO COMMENTS

speed. The alternative is to be extremely conservative.

**Response:** As discussed in Table 2-8 under Herbicide Treatment Standard Operating Procedures and Guidelines in Chapter 2 of the PEIS, the buffer zone would be at least 100 feet for aerial applications, 25 feet for vehicle applications, and 10 feet for hand applications. Buffer widths could be greater if modeling done for the herbicide risk assessments showed that larger buffers are required to protect aquatic habitats. Modeling did show that some herbicides were safe to use adjacent to aquatic habitats, as noted above. However, minimum buffer requirements would still apply to those herbicides.

RMC-0040(1)-008
Resource Concepts,
Inc.

**Comment:** Pg. 2-26 [of the Draft PER], in Table 2-4 Vegetation Treatment Methods Standard Operating Procedures and Guidelines, wildlife resources section for Mechanical treatments, limiting chaining clearings to 100 yards in width may not be appropriate for fuels reduction projects. For example, in the Mt. Wilson area (Ely BLM District, Nevada) 600 to 700 feet was the prescription width for tree thinning activities along the wildland-urban interface. A qualified specialist, or specialists, should determine the appropriate chaining width, considering the best available knowledge regarding potential fire behavior and the wildlife habitat concerns of each specific treatment site.

**Response:** There may be instances where the 100 foot buffer is not appropriate for the site-specific objectives and proposed actions. The wording in Table 2-5 of Chapter 2 of the Final PER has been changed to read: "Chaining should be designed to provide the maximum mosaic of treated and nontreated sites. No more than 50% of an area should be chained at one time. Provide natural travel lanes, resting and thermal cover areas, snags, and corridors (> 30 feet wide) connecting non-chained areas. The size of clearings and chaining widths should be determined using best available knowledge regarding potential fire behavior and the wildlife habitat concerns of the specific site, but they generally should not exceed 100 yards at their widest point. Fuel breaks and projects to provide protective fuel buffers are possible exceptions."

RMC-0040(1)-009
Resource Concepts,
Inc.

**Comment:** Pg. 2-27, Table 2-4 [of the Draft PEIS], wild horse and burro section for chemical treatments, includes an SOP [Standard Operating Procedures] of minimizing herbicide use in areas grazed by horses and burros. This SOP would preclude use of herbicides in millions of acres of Nevada, and substantial acreages in Wyoming. Instead, areas of weed infestations treated with chemical may need to be temporarily fenced. Limiting herbicide use across all herd management areas and other horse and burro grazing areas could lead to increases in noxious weed infestations throughout these two states. In many instances, areas grazed by horses will very likely be a high priority for treatment due to year around grazing, and in some cases overgrazing, which establishes ideal conditions for weed infestations.

**Response:** The SOPs in Table 2-5 of the Final PER refer to minimizing use of herbicides in vegetation treatment project areas that may be actively grazed by wild horses and/or burros. Minimizing herbicide use does not necessarily mean precluding the use of herbicides. Under an integrated pest management approach, herbicide use can be minimized by various methods, including, but not limited to selective targeting of the herbicide to individual plants or groups of plants, or the use of other treatment techniques (manual, mechanical, fire, biological) in conjunction with herbicides or in place of herbicides. This information has been clarified in the text for the SOP in Table 2-4.

BLM_0001461

RMC-0049-024
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** Page 2-14 [of the Draft PEIS] Herbicide Treatment Standard Operating Procedures – need to incorporate Ecologically Based Invasive Weed Management as part of the standard operating procedures.

**Response:** The BLM's Manual 9015 (*Integrated Weed Management*) incorporates the same integrated approach used in ecologically-based invasive weed management. The BLM goes further to identify standard operating procedures that will be used in conjunction with the treatment in Chapter 2 of the FEIS under Vegetation Treatment Standard Operating Procedures and Guidelines.

RMC-0057-012
California Wilderness
Coalition

**Comment:** The D[raft] PEIS fails to describe specific measures to minimize dispersal of invasive and non-native vegetation. The Final PEIS should require development of Best Management Practices to minimize the dispersal of invasive weeds and require BLM employee and contractor compliance with these practices.

**Response:** Measures to minimize dispersal of invasive and non-native vegetation are discussed in Chapter 2 of the PEIS under Herbicide Treatment Standard Operating Procedures and Guidelines. At the broad scale of this PEIS, it is not feasible to identify which specific measures would be utilized, since they would be determined on a project-by-project basis, depending on factors such as the type of treatment and the characteristics of a particular treatment site. As discussed in this section of the PEIS, the BLM is required to develop a noxious weed risk assessment for all projects that disturb the ground or alter plant communities to determine the risk of introducing noxious weeds. The BLM will design management practices or prescriptions, as necessary. These activities will take place at the local level, and will be part of the local environmental analysis process for vegetation treatment projects.

RMC-0070-005
California Regional
Water Quality Control
Board

**Comment:** Your [P]EIS should include detailed descriptions of all project-wide and site-specific temporary and permanent Best Management Practices (BMPs) or other measures to be utilized/installed. This is necessary for us to evaluate the effectiveness of proposed BMPs or other measures in mitigating the potential water quality impacts that may result from project implementation. Of particular concern are measures proposed to mitigate the potential water quality impacts of aerial pesticide applications, and ground applications in proximity to surface waters (including wetlands).

**Response:** Project-wide and site-specific BMPs and related measures are outside the scope of the PEIS/PER, which is not project- or site-specific. Chapter 4 of the PEIS, under the Water Resources and Quality subheading, lists Standard Operating Procedures (SOPs) that are recommended to reduce potential unintended impacts to water resources from herbicide treatments. These SOPs provide general guidance that will be consulted when the BLM develops treatment programs and assesses their impact at the local level. Project-level SOPs and mitigation measures will be developed at the local level based on detailed information about the proposed treatment program and the treatment site.

RMC-0080-008
Idaho State Department
of Agriculture

**Comment:** Under the "General" guidelines of Table 2-6 on page 2-17 [of the Draft PEIS], Standard Operating Procedures for Applying Herbicides, the seventh bulleted item states, "Have licensed applicator apply herbicides." This guideline is more stringent than Idaho state law requires and may be more stringent than other states as well. For example, members of a seasonal weed crew that apply general use herbicides are not required to obtain an applicators license in Idaho as long as they are directly supervised by a licensed applicator. Following appropriate state laws is adequate and

BLM_0001462

will significantly lessen the burden of supervisors trying to find qualified applicants as well as decrease program costs. ISDA [Idaho State Department of Agriculture] suggests that this bulleted item be changed to read: "Follow respective state laws regarding herbicide application licenses."

**Response:** The BLM requires BLM employees who supervise and handle pesticides to complete and pass BLM course 9000-1, a USEPA approved course to certify BLM employees for the handling and application of pesticides. Where the BLM has reciprocal agreements with the states, those states recognize the BLM 9000-1 course for state certification. Where no reciprocal agreement is in place, BLM employees follow state laws regarding herbicide application licensing.

RMC-0106-022
Public Employees for
Environmental
Responsibility

**Comment:** [Page] 4-13 [of the Draft PEIS]. Here and elsewhere, the assumption that SOPs [Standard Operating Procedures] and label instructions will be followed is insufficient. Noncompliance must have stated mitigations.

**Response:** By definition, a Standard Operating Procedure is a set of instructions providing direction and cover features of operations that lend themselves to a definite or standard procedure without loss of effectiveness. The USEPA defines them as " a set of written instructions that document a routine or repetitive activity followed by an organization." The development and use of such instructions "promote quality through consistent implementation of a process or procedure within the organization." There is no need to mitigate for a group of instructions.

As for "following the label," the BLM understands that the label associated with any herbicide is defined by the courts as a "legal document," and any deviation from the guidelines, directions, and precautions stated on the label, or other relevant application information, is a violation of federal law.

RMC-0144-011
Wyoming Game and
Fish Department

**Comment:** [Page] 2-16 [of the Draft PEIS] statement: "Where total rest from grazing is not feasible, efforts should be made to modify the amount and/or season of grazing to promote vegetation recovery within the treatment area." We strongly recommend BLM replace the term 'should' with 'will'. We generally recommend a minimum of at least two growing seasons of rest, assemblage of forage reserve areas to accommodate grazing permittees or lessees, and appropriate post management as a part of the plan.

**Response:** The statement cited is among the Standard Operating Procedures the BLM will follow when revegetating sites, and is followed by examples of the types of modifications that could be made to livestock grazing practices in a treatment area. The PEIS does not stipulate actual terms and conditions of grazing permits, and it is beyond the scope of the PEIS at this programmatic level to predetermine what specific terms and conditions or modifications to grazing permits should be made. The BLM generally provides a minimum of two growing seasons of rest, although a rest period of less or more than 2 years can be authorized if there is sufficient justification based on monitoring for modifying the rest period. The BLM recognizes the potential advantages of using forage reserve areas to help facilitate the needed rest following vegetation treatments, including the potential benefits to grazing permittees by providing more options during the rest period.

RMC-0144-015
Wyoming Game and
Fish Department

**Comment:** 2-15 statement: "If the risks is moderate to high, the BLM may have to modify the project....". We suggest the term 'may have to' to be replaced with 'will' such that the risk will be less than moderate.

BLM_0001463

**Response:** Project modification is one method to address moderate to high risk of weed establishment or spread. Other methods to address moderate to high risk may include identifying specific mitigation through NEPA analysis, selecting a no project alternative, or implementing specific prevention measures, without modifying the project.

RMC-0144-016
Wyoming Game and
Fish Department

**Comment:** [Page] 2-15 [of the Draft PEIS] statement: "Conditions that enhance the invasive species abundance should be addressed....". We strongly urge the term 'should be' be replaced with 'will be'. This is crucial to the long-term success of the treatments.

**Response:** The statement refers in general to the variety of prevention measures that are feasible in any given circumstance. In order to design and implement prevention measures, the conditions that enhance invasive species abundance should be addressed in order to ensure an appropriate prevention measure is identified. The statement has been modified to state: "Conditions that enhance invasive species abundance should be addressed in developing mitigation and prevention plans for activities on public lands. For example, excessive disturbance…"

RMC-0210-044
MCS Task Force of
New Mexico

**Comment:** Ground application of herbicides should not be applied within 1 mile of surface water, residences, roads, trails, campgrounds, or other areas that are occupied, or may become occupied, by members of the public.

**Response:** See responses to Comment EMC-0585-185 under PEIS Environmental Consequences, Herbicide Effects Analysis, Comment EMC-0597(a)-007 under PEIS Environmental Consequences, Air Quality, and Comment RMC-0210-043 under PEIS Alternatives, Alternative D - No Aerial Application of Herbicides.

RMC-0210-046
MCS Task Force of
New Mexico

**Comment:** No herbicides should be used unless the identity of all inert ingredients and contaminants in the product are disclosed to the public.

**Response:** See responses to Comments EMC-0623-017, EMC-0646-011, and FXC-0071-020 under PEIS Environmental Consequences, Herbicide Effects Analysis.

RMC-0210-047
MCS Task Force of
New Mexico

**Comment:** No vegetation should be burned sooner than one year after an application of herbicide.

**Response:** The burning of vegetation following herbicide application would depend upon several factors, including the species to be managed, the site of the proposed treatment, environmental conditions, management plans, and other similar factors. Wolters et. al. 1994 (Wolters, G.L., C.H. Sieg, A.J. Bjugstad and F.R. Gartner. 1994. Herbicide and fire effects on leafy spurge density and seed germination. U.S. Department of Agriculture Forest Service Research Notes RM-526. Fort Collins, Colorado) found that a fall application of picloram followed by a spring burn gave better control of leafy spurge in North Dakota than use of herbicides alone. French broom canopy cover was reduced from 87% to less than 1% when plants were treated with an herbicide, cut and burned one month later, then treated with glyphosate for two years to control the germinated seedlings (Bossard, C.C. 2000. *Genista monspessulana*. In: Bossard, C.C., R.M. Randall and M.C. Hoshovsky [eds.]. Invasive Plants of California's Wildlands. University of California Press, Berkeley.)

BLM_0001464

RESPONSE TO COMMENTS

| | |
|---|---|
| RMC-0221-033<br>Center for Biological<br>Diversity | **Comment:** The D[raft] PEIS should also analyze an alternative that mandates the use of weed- and seed-free livestock feed and supplements on public lands. All livestock should be certified weed- and seed-free before being turned out on the public lands. This simple preventative measure would reduce the potential for future invasive colonization and spread by non-native species. |

**Response:** An alternative that mandates the use of weed and seed-free livestock feed is beyond the scope of the PEIS, as discussed under Scope of Analysis in Chapter 1 of the PEIS. The use of weed and seed free livestock feed is endorsed by the BLM and many other groups as a prevention measure, and is listed as a Standard Operating Procedure in Table 2-6 of Chapter 2 of the PEIS.

RMC-0222-063
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The BLM wrongly considers the use of "SOPs [Standard Operating Procedures] identified in the [Draft] PEIS" ([page] 4-197) as an assumption for cumulative impacts assessment, as the DEIS [Draft PEIS] indicates that the ten Standard Operation Procedures it identifies as mitigation for herbicide use "can be implemented at local level according to specific conditions" [emphasis added]. One of the "Standard Operating Procedures," "use native or sterile species for revegetation and restoration projects" cannot be assumed to be operating for the purposes of cumulative impacts, as it is not part of any alternatives being considered by the BLM ([pages] 2-10 through 2-13 [of the Draft PEIS]). It is part of the unanalyzed Restoration Alternative.

**Response:** As noted in Chapter 2 of the PEIS under Herbicide Treatment Standard Operating Procedures and Guidelines, "SOPs would be followed by the BLM under all alternatives…" However, as noted in the comment, not all SOPs may be implemented at the local level because not all SOPs may be relevant or useful for a specific project. However, if an SOP is relevant or useful in reducing impacts, the BLM would implement the SOP. These SOPs, including revegetation, were analyzed as part of all alternatives, including Alternative E, also referred to as the Restoration Alternative. Also see response to Comment EMC-0646-230 under PEIS Alternatives, Herbicide Treatment Planning.

RMC-0222-084
\Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The BLM goal does not mention native vegetation but instead "desirable" vegetation (which could be exotic, as in introduced pasture grasses). Desirable for whom? Livestock permittees? Sage grouse? Ground cover in the midst of disturbance? Erosion control?

**Response:** Desirable plant communities are defined in goals and objectives typically identified and determined through land use planning (See BLM Handbook H- 1601-1). They are often called "Desired Outcomes," and may be expressed in written form in the planning document as Desired Future Condition, Desired Plant Community, or Desired Range of Conditions. The Desired Outcome may be restricted to natives only, or may include a combination of native and non-native species. Based on the objectives outlined in the land use plan, vegetation treatment proposals are identified to meet these objectives.

RMC-0228-007
Metropolitan Water
District of Southern
California

**Comment:** Metropolitan [Water District of Southern California] is also concerned about the terrestrial herbicide application that could occur close to the Colorado River. The Standard Operating Procedures in the Draft PEIS specify buffer zones of 100 feet for aerial, 25 feet for vehicle, and 10 feet for hand spray applications. These buffer zones should be adequate to avoid overspray but aerial applications may be more prone to error. However, the mechanism to ensure compliance with these procedures

BLM_0001465

has not been specified.

**Response:** These are the minimum buffer distances that would be applied for herbicide treatments. Herbicide-specific buffer zones were identified in Chapter 4 of the PEIS under Vegetation and Fish and Other Aquatic Resources (wildlife resources buffers would be the same as those for vegetation) that are in many cases greater than those given in the Standard Operating Procedures. Although it is impossible to ensure 100% compliance with procedures, use of qualified pesticide applicators, as discussed in Comment RMC-0005-003 under Alternatives, Herbicide Treatment Modes of Action and Treatment Methods is the most effective way to ensure compliance.

## Alternatives, Prevention of Weeds and Early Detection and Rapid Response

EMC-0133-006
Ryan, Stephanie

**Comment:** What preventative-based practices for [treating invasive vegetation] can be used instead? I hear you are not even open to considering this. Is this true? If you are interested in considering alternatives, please respond and I will happily offer you the best research I can find.

**Response:** See responses to Comment RMC-0222-059 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response, and Comment RMC-0214-029 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

EMC-0214-050
Vollmer, Jennifer
(BASF)

**Comment:** An important missing priority is the development of sustainable fuel breaks in the brush/grasslands in an effort to return wildfires to historical size as well as protect property, critical habitat areas and newly revegetated or rehabilitated sites. Suppression should be a last resort, prevention as fuel breaks and pro-active fuel management as vegetation treatments should be a first priority.

**Response:** We agree that the development of fuel breaks is an important element in managing fire. We don't agree that suppression should be considered a last resort. Suppression efforts will always be necessary. We do agree that more emphasis must be place on prevention and treatment efforts to reduce the risk of wildfire threatening lives or property. This is emphasized in the documents, *A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-Year Comprehensive Strategy Implementation Plan* (USDI and USDA 2006a) and *Protecting People and Sustaining Resources in Fire Adapted Ecosystems: A Cohesive Strategy* (USDA and USDI 2006b). The Bureau has already increased fuels treatments five-fold since the year 2000.

EMC-0221-014
EMC-0256-004
EMC-0272-004
EMC-0299-004
EMC-0305
EMC-0325-009
EMC-0328
EMC-0332
EMC-0347
EMC-0348
EMC-0368
EMC-0370
EMC-0376-009

**Comment:** PEIS is in need of a section addressing development of sustainable fuel breaks in the brush/grasslands in an effort to return wildfires to historical size as well as protect property, critical habitat areas and newly revegetated or rehabilitated sites. Suppression should be a last resort, prevention as fuel breaks and pro-active fuel management as vegetation treatments should be a first priority.

**Response:** See response to Comment EMC-0241-050 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

BLM_0001466

RESPONSE TO COMMENTS

EMC-0388
EMC-0390
EMC-0391
EMC-0392
EMC-0393
EMC-0394
EMC-0399
EMC-0400
EMC-0418
EMC-0422
EMC-0427
EMC-0431
EMC-0433
EMC-0438
EMC-0443
EMC-0482
EMC-0578
EMC-0596

EMC-0233-004
Dyber, Kenneth James

**Comment:** What about prevention of the problems that create the so-called need for usage of herbicides?

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread. See also responses to Comment RMC-0167-007 under PEIS Alternatives, Vegetation Treatment Planning and Management, Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives regarding prevention-based practices.

EMC-0306-008
Klamath River Keeper
Program and Klamath
Forest Alliance

**Comment:** As directed by the BLM's policies, Department of Interior's policies, presidential Executive Order 11312, the BLM should focus primarily on preventing the introduction and spread of prioritized invasive plants rather than relying largely on unproven methods to eliminate existing invasive plant populations through the use of unsafe herbicides on public lands. It is well understood and accepted that the only way to achieve the effective control of invasive plants, the BLM must first adopt strong prevention-based practices for activities (livestock grazing; road construction, use and management; use of off-road vehicles; timber harvests; mining; energy development; fuel reduction projects; watershed/habitat restoration and various forms of recreation) that encourage invasive plants.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread. See also responses to Comment RMC-0167-007 under PEIS Alternatives, Vegetation Treatment Planning and Management, Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives regarding prevention-based practices.

EMC-0331-007
Weed Science Society
of America

**Comment:** Finally, WSSA [Weed Science Society of America] supports two additional sections not currently covered in the Programmatic Environmental Impact Statement (PEIS). The WSSA strongly encourages the BLM to add section that addresses an Early Detection Rapid Response (EDRR) protocol for invasive weeds. In

BLM_0001467

Appendix D [of the Draft PEIS], the process to secure a new herbicide is 2+ years. This is unacceptable for EDRR. There must be an approved procedure for EDRR in regard to herbicide use.

**Response:** See Herbicide Treatments Standard Operating Procedures and Guidelines in Chapter 2 of the Final PEIS regarding discussion of Early Detection and Rapid Response (EDRR). The use of the protocol described in Appendix E of the Final PEIS to evaluate new herbicides does not constrain, nor preclude, the BLM from implementing EDRR practices with existing tools or already approved herbicides. The objective of the protocol is to provide a consistent, state-of-the-science methodology and public process for the BLM to evaluate herbicides for use on public lands. The 2+ years outlined is necessary to integrate the BLM budget process requirements to provide funding to conduct risk assessments and National Environmental Policy Act compliance for herbicide approval. The last effort to review and approve herbicides for use on public lands was initiated in 1988 and completed in 1992. Adopting the proposed protocol in the PEIS would establish a consistent approach and streamline this process to about 2 years in contrast to the 16 years that have lapsed since the last effort.

EMC-0331-008
Weed Science Society
of America

**Comment:** The WSSA [Weed Science Society of America] also supports a section that addresses development of sustainable fuel breaks in the brush/grasslands in an effort to return wildfires to historical size as well as protect property, critical habitat areas, and newly revegetated or rehabilitated sites. Suppression should be a last resort and prevention as fuel breaks and pro-active fuel management as vegetation treatments should be a first priority.

**Response:** See response to Comment EMC-0214-050 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

EMC-0350-001
Morris, Nancy

**Comment:** In light of all the recent studies that show there is very serious potential health hazards to many segments of our population and wildlife when exposed to chemical herbicides, we need to take a preventive approach to managing invasive weeds. Another factor to consider is that more and more herbicides are used to treat our lands because invasive plants are becoming resistant to these chemicals. Dousing areas with herbicides, exposing people and wildlife to toxic chemicals is not the solution. There are numerous cases where helicopter spraying companies contracted by BLM have even broken the law by using concentrations of chemicals that where beyond the recommended level and have needlessly exposed people to pesticide drift. Using preventive measures would stop this and prevention should be the goal since new invasives can appear if BLM doesn't regulate the activities that cause invasive plant species to take over in the first place.

**Response:** See responses to Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives regarding prevention. The BLM is not aware of any Federal Insecticide, Fungicide, and Rodenticide Act violations involving helicopter spraying contracted by the agency. All herbicide spray activities are required to have pesticide application reports completed within 24 hours of the spray activity.

EMC-0446-017
The Nature
Conservancy

**Comment:** The Draft PEIS should provide additional guidance, direction, and emphasis on prevention and early detection of weed outbreaks, rapid response to detected outbreaks, and integrated pest management that would minimize the need for

BLM_0001468

RESPONSE TO COMMENTS

future control efforts. The main focus of the PEIS appears to be on treatment of already infested areas. The Draft PEIS is mostly silent on prioritization of treatment areas, recommendations of which method(s) to use under different circumstances, or how to prioritize weed species, treatments and sites of high value. The PEIS should provide guidance on how to select among different weed control methods and combinations of methods, how to determine when certain treatments are allowable, and under which conditions certain treatment options (and certain herbicides) may not be used or only used as a last resort.

**Response:** See response to Comment RMC-0205-013 under PEIS Alternatives, Vegetation Treatment Planning and Management.

EMC-0447-003
Makelacy, Melladee

**Comment:** The Forest Service made a commitment to address prevention as part of its every day management decisions, and adopted an objective of reducing its reliance on herbicides, BLM's proposed herbicide increase will only create a dependence on chemicals. I strongly urge the BLM to take a similar approach.

**Response:** The BLM's approach to prevention is discussed in Chapter 2 of the Draft PER under Prevention of Weeds and Early Detection and Rapid Response. This section has been revised and expanded for the Final PER, and this information has also been included in the Final PEIS.

EMC-0452-001
Clark, Charlene Carroll

**Comment:** As a physician in the West, and member of PSR, I feel moved to write you about the pesticide use planned by the BLM. The long term effects of these poisons on human health is only now being recognized. It should not be after the harm is done that we find alternate methods of invasive vegetation control, and stop the use of pesticides. We should be doing that now. Please adopt strong prevention-based practices for activities (livestock grazing, road construction and use, use of off-road vehicles, timber harvests, and fuel reduction projects) that encourage invasive plants.

**Response:** The long-term effects of herbicide use are assessed in the human health risk assessment found in Appendix B of the PEIS. Prevention is discussed in Chapter 2 of the Final PEIS and PER under Prevention of Weeds and Early Detection and Rapid Response. See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding the causes and vectors of weed spread.

EMC-0488-005
Howell, Mark (Starr
Valley Conservation
District)

**Comment:** Early detection and rapid response to these invasive plants must be addressed. Only through the education of identifying these plant species to mapping them through some sort of GPS [Global Positioning System] system, and destroying them through spraying or mechanical means will we finally be able to get some sort of control over this growing problem in the West.

**Response:** Prevention, Early Detection and Rapid Response, and mapping of infestations are part of the BLM's ongoing invasive species management program and strategy. The program and strategy are discussed under Prevention of Weeds and Early Detection and Rapid Response in Chapter 2 of the PER and has been included in Chapter 2 of the Final PEIS.

EMC-0489-003
Burch, D.

**Comment:** Until the agency takes a similar approach to that of the Forest Service who made a commitment to address prevention as part of its every day management decisions, and adopted an objective of reducing its reliance on herbicides, BLM's proposed herbicide increase will only create a dependence on chemicals.

BLM_0001469

**Response:** Prevention policies are already established within the BLM. See responses to Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives regarding prevention.

EMC-0496-003
DeLong, Colleen

**Comment:** Focus foremost on managing lands to prevent new weed infestations.

**Response:** See responses to Comments RMC-0222-059 and RMC-0214-029 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

EMC-0503-009
John Day-Snake
Resource Advisory
Council

**Comment:** There needs to be greater emphasis on prevention in the document. No clear text or guidance is given to prevention of weed infestations. The document does state several times the importance of prevention, but only states actions that ought to be taken, rather than establishing some policies which would more clearly assist with prevention (such as those established by FS [Forest Service] Region 6 (weed free hay requirements, vehicle washings, etc).

**Response:** Prevention policies are already established within the BLM. See responses to Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives regarding prevention.

EMC-0512-005
Hells Canyon
Preservation Council

**Comment:** BLM has not taken effective steps to prevent invasive weed spread, and until you do so no herbicides should be used.

**Response:** See responses to Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives regarding prevention. The BLM has been aggressively implementing and stipulating prevention practices, as outlined in the BLM *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996). The BLM welcomes efforts to promote invasive species prevention on lands administered by the Forest Service, which provide additional coordinated and seamless prevention practices across agency jurisdictions.

EMC-0575-003
Davlantes, Nancy

**Comment:** It is abundantly clear that the spread of invasive plants is caused by removal of native vegetation and ground disturbance by off-road vehicles, logging and grazing. BLM can stop the spread of invasive plant species by restricting or limiting these activities from intact native ecosystems, particularly in riparian areas. The PEIS offers none of these preventative management measures as an alternative to herbicide spraying – a major shortfall of the plan.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses.

EMC-0584-025
Western Watersheds
Project

**Comment:** Passive treatments primarily minimize site disturbance, and generally remove or minimize an environmental irritant that is affecting the health of the plant community. Thus, they have less risk of soil erosion, weed invasion or proliferation and other negative impacts associated with them. They also have a high probability of being beneficial to watersheds, native wildlife habitats and populations and the economic well-being of western communities that are increasingly dependent on tourism and recreational uses of public lands. An array of passive treatments (provided

BLM_0001470

RESPONSE TO COMMENTS

to BLM in the RNEA [Restore Native Ecosystems Alternative]) exist that will enable BLM to treat many of the affected lands. Such treatments, wrongfully ignored by BLM, includes: Livestock grazing treatment: Livestock grazing treatments can reduce spread of flammable invasive species, heal damaged understories so that more natural, cool-burning fires can occur, and reduce the proliferation of doghair thickets of dense young trees which serve as ladder fuels. Treatments include significant reductions in livestock numbers accompanied by prudent utilization and trampling standards in plant communities found to have damaged understories vulnerable to invasion by flammable exotic species. Closure of pastures with known invasive species infestations. Closure of lands to grazing that have known exotic species infestations is a prudent first step toward control of spread of flammable, watershed-altering exotics. Closure of pastures "at risk" to weed invasion – such as any Wyoming big sagebrush, Basin big sagebrush, or juniper communities that still contain relatively intact understories. This [P]EIS process should map and identify such areas, as well as all areas where cheatgrass already dominates the understory.

Livestock removal treatment: Grazing permit buyout and permit retirement using federal fire funds is a very reasonable treatment that will heal damaged lands, help restore natural fire cycles, minimize the spread of exotics and other hazardous fuels. Livestock facility removal treatment: Livestock facilities (fences, artificial watering sites – especially troughs associated with pipelines and water haul sites, corrals, etc.) serve as zones of livestock concentration, and result in areas of severe disturbance readily colonized by highly flammable exotic species. Removal of these facilities and restoration of disturbed zones will limit spread of invasive flammable species, and help develop healthy understories necessary to carry cool, light fires in surrounding lands. We are alarmed that BLM's Draft [P]EIS casually casts aside Alternatives development based on a series of passive livestock treatments, and fails to adequately explain the ecological benefits of such treatments.

**Response:** The benefits of passive treatments are described under Prevention of Weeds and Early Detection and Rapid Response in Chapter 2 of the Final PEIS and PER. See response to Comment RMC-0126-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding analysis of the Restore Native Ecosystems alternative. See also response to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of invasive vegetation spread.

EMC-0584-038
Western Watersheds
Project

**Comment:** Pristine and near-pristine lands should be protected using all possible techniques, especially passive restoration techniques such as immediate removal or reduction of livestock disturbance. Such lands typically serve as important habitats for native species and protection of biodiversity. Economically, it is a lot more cost-effective to keep lands from becoming degraded than it is to conduct wide-scale treatments after they have become degraded. It is critical that a BLM Weed EIS [PEIS] do so.

**Response:** See response to Comment EMC-0486-020 under PEIS Alternatives, Vegetation Treatment Planning and Management. The BLM agrees that it is more cost-effective to prevent lands from being degraded than to rehabilitate the lands after they are degraded.

EMC-0585-068
Western Watersheds
Project

**Comment:** BLM never addresses an array of passive treatments in its PER, let alone under a range of alternatives in the [P]EIS, and the dramatically increased acreage.

BLM_0001471

**Response:** Passive treatments were included in the Standard Operating Procedures and mitigation in the PEIS, and were also considered in some detail for Alternative E. However, the focus of the PEIS and PER was on the effects of the treatments.

Alternative C in the PEIS did evaluate the effects of not using herbicides, but the PER focused on the management of vegetation using prescribed fire, and manual, mechanical, and biological control techniques. Also see responses to Comments RMC-0222-005 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments and Comment RMC-0222-006 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0623-009
Defenders of Wildlife

**Comment:** Monitoring and Rapid Response. Ongoing monitoring and prevention need to become an integrated part of BLM's response to invasive species. It has been proven time and again that eradication of new exotics, as well as controlling the spread of established invaders, is best accomplished when early detection and rapid response capabilities are in place. The BLM needs to investigate and expand its capacity building in early detection and rapid response.

**Response:** See response to Comment FL-0004-010 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response and the section on Prevention of Weeds and Early Detection and Rapid Response in Chapter 2 of the Final PEIS.

EMC-0630-007
Porter, Mark C.
(Wallowa Resources)

**Comment:** Another aspect of the [P]EIS that could use more emphasis is the prevention of weeds. While mentioned in the document, it is a critical element of Integrated Weed Management and needs more detail. The use of certified weed free forage and mulch products should be required on all BLM lands and projects. The North American Weed Management Association has a developed a program and standards for certifying such products which is easily accessible at their website (http://www.nawma.org/ ). Their standards are very applicable to the Western US.

**Response:** See responses to Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives regarding prevention. BLM policies require certified weed-free forage and mulch, and the BLM collaborates with State Departments of Agriculture in developing weed-free standards based on the Weed Science Society of America certification standards.

EMC-0630-008
Porter, Mark C.
(Wallowa Resources)

**Comment:** The [P]EIS should provide some prevention standards for all activities that happen on the BLM such as road work, grazing, recreational use, and logging (i.e. ATV's [all-terrain vehicles]). Cleaning equipment, quarantining livestock before entry onto allotments if they are from out of the local area, or having completed a weed education course before being able to ride an ATV on BLM lands are some examples of such measures.

**Response:** These practices are already being applied in the BLM and are part of existing management under all alternatives analyzed. Also see responses to Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives regarding prevention practices.

BLM_0001472

RESPONSE TO COMMENTS

EMC-0630-009
Porter, Mark C.
(Wallowa Resources)

**Comment:** Finally, prevention standards need to recognize that members of the public who use BLM lands are critical partners in weed control. Prevention standards should not, in general, be penalties of use but rather means with which to enlist participation in the management of noxious weeds.

**Response:** The BLM agrees with this comment.

EMC-0641-006
Idaho Conservation
League

**Comment:** Purpose and Need for Action We believe that the BLM should take a strong leadership role in the proactive management of noxious and invasive weeds. The most effective way to do so is to focus on prevention by aggressively addressing root causes of noxious weed dispersal. The PER itself states that "prevention and detection is the cheapest and most effective weed control method" (p. 2-16 [of the Draft PER]). Yet neither the PER nor the PEIS considers prevention as a treatment method. Rather, the documents focus exclusively on reactive methods such as herbicide application, fire use, mechanical and manual treatments, and biological controls. Simply treating current infestations of weeds does little to prevent future problems and ensures that the cycle of treatment and infestation will continue into the foreseeable future. The BLM needs to consider alternatives that more directly and more aggressively seek to reduce activities that contribute to the spread of noxious weeds such as roads, irresponsible ORV [off-road vehicle] use, and grazing. Though we appreciate the BLM's duty to manage public lands for multiple uses including grazing, OHV [off-highway vehicle] use, and energy/mineral development, we believe the BLM can and should do much more to promote more responsible and less ecologically destructive use.

We recognize that the current [P]EIS is broad in scope and provides basic information to local BLM offices to assist them with the development of more specific weed management programs. Nonetheless, we feel it is critical that the BLM address root causes of the spread of noxious weeds at the programmatic level and to direct local BLM agencies to do the same at the RMP (Resource Management Plan] and implementation levels. A focus on the prevention of noxious weed infestations via the aggressive management of primary vectors should be uniform to all BLM agencies and management plans.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread, and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses. The *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996) outlines that BLM Resource Management Plans (RMPs) should address invasive species and provide appropriate goals, objectives, and management direction for invasive species. The BLM is currently in the process of a 10-year national level effort, which began in 2000, to revise most of its existing land use plans. Direction for invasive species management, as well as off-highway vehicle management, among other programs, is being incorporated into these RMPs as they are revised, per direction outlined in Appendix C of the Land Use Planning Handbook H-1601-1 (2005).

EMC-0641-011
Idaho Conservation
League

**Comment:** The BLM should strictly enforce ORV [off-road vehicle] regulations and initiate an aggressive campaign encouraging responsible use. As part of this decision, the BLM should encourage ORV users to clean off their vehicles at car washes before and after use. Signs identifying noxious weeds should be posted at the trailheads. The BLM should work with ORV clubs on a noxious weed control program in which club members hand pull weeds before they seed, similar to the "Adopt a Highway"

BLM_0001473

program.

**Response:** The BLM already has established relationships with ORV user groups for weed education and volunteer activities. Prevention measures including vehicle washing are encouraged and in applicable cases required as a term and condition of a land use authorization or permit.

EMC-0645-004
Wroncy, Jan (Gaia
Vision/Canaries Who
Sing)

**Comment:** I was amazed to find that the comments I wrote to the BLM sixteen years ago regarding the proposed treatment of symptoms (invasive species) with herbicides on 13 Western States were still germane! Since that EIS, the BLM has done nothing in the "prevention" department, and has added more chemicals and more acreage to the proposal. This only proves BLM's utter failure to grasp what is important here: prevention, passive and active restoration, native plants and seeds are the keys to dealing with invasive plants – not herbicide use!

**Response:** The BLM disagrees with your comment regarding prevention. See responses to Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives. The BLM has been aggressively implementing and stipulating prevention practices, as outlined in the *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996).

EMC-0646-210
Californians for
Alternatives to Toxics

**Comment:** Focusing non-chemical control efforts along the river corridors, at trail heads and recreation locations, and along side roads would be an obvious starting point for reducing weed vectors. If prevention actions aren't part of the proposed project, after a few years, following project completion, a new problem may arise, with possibly worse conditions. CATs [Californians for Alternatives to Toxics] questions the wisdom of the proposed herbicide related actions without a long-term game plan to manage invasive species in the project area, and hopes the BLM provides this as part of project NEPA documentation.

**Response:** See responses to Comment EMC-0590-010 under PEIS Alternatives, Vegetation Treatment Planning and Management, Comment EMC-0590-012 under PEIS Alternatives, Vegetation Treatment Planning and Management, and Comment FL-0004-010 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

EMC-0646-211
Californians for
Alternatives to Toxics

**Comment:** The standard Region 5 Forest Service prevention weed methods of washing heavy equipment and vehicles, weed free straw, and education of area users are a good start (USDA Forest Service 2000). While CATs applauds these efforts, we feel that more can, and should be done. The BLM must include those and additional methods as part of the proposed actions for this project to be successful. Immediate action, digging or pulling new infestations, post and pre project monitoring, and flagging and avoiding large infestations can all be effective. These are basic prevention methods commonly referred to by weed experts and utilized with success by many public land managers.

**Response:** The sections on Herbicide Treatment Standard Operating Procedures (SOPs) and Guidelines in Chapter 2 of the Final PEIS and PER include a section on Prevention of Weeds and Early Detection and Rapid Response to include more information on and SOPs for prevention of the spread of weeds.

BLM_0001474

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0646-212<br>Californians for<br>Alternatives to Toxics | **Comment:** The BLM needs to develop a plan to deal with prevention, and eliminate disturbance factors that led to past, and will lead to future, invasive species distribution and establishment. Re-vegetation with desirable and competitive natives is essential, but timing and reduction of the seed bank first is essential to rehabilitation success. What specific activities on BLM public lands have facilitated invasive species infestations? What can the BLM do to limit future invasions?<br><br>**Response:** See Chapter 2 of the Final PEIS and PER under Vegetation Treatment Standard Operating Procedures and Guidelines (Prevention of Weeds and Early Detection and Rapid Response) for information on prevention. |
| EMC-0646-213<br>Californians for<br>Alternatives to Toxics | **Comment:** Seed banks exist and one-time (or short term) herbicide spraying treatments will not prevent the weeds from returning and proliferating, most likely in greater numbers, as herbicide residues in the soil will kill any competitive natives. Each noxious or exotic weed species must be analyzed to determine the most effective treatment strategy. It appears that the BLM accepts the presence and proliferation of noxious weeds and cheatgrass, as the PEIS fails to disclose adequate prevention measures.<br><br>**Response:** See responses to Comment EMC-0070-003 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, Comment RMC-0217-031 under PEIS Alternatives, Vegetation Treatment Planning and Management, and Comment EMC-0238-009 under PEIS Alternatives, Monitoring. |
| EMC-0646-214<br>Californians for<br>Alternatives to Toxics | **Comment:** Disturbances are likely to occur beyond what is described in PEIS or PER. The PEIS fails to even outline efforts to keep vehicles, machinery, or workers (shoe treads, clothing) clean of exotic seeds, the very least that can be expected. Unfortunately, while cleaning efforts will reduce the likelihood of seed dispersal, this approach is not fail-safe and in most cases avoidance is not feasible. It is possible however to set strict guidelines that weed infestations exceeding specific magnitudes of density or area will be avoided. Recent land management policy (USDA Forest Service) has suggested buffers established around weed populations are necessary to ensure their isolation (Lassen National Forest 2005, Clark 2003). Such mitigation will reduce the extent of future herbicide treatments deemed necessary for weed suppression. For this reason, among others described below, a more thorough analysis is required so that mitigations can be formed.<br><br>**Response:** Standard Operating Procedures (SOPs) to reduce the spread of weeds, including use of clean equipment that is free of plants and plant parts, are discussed in the PEIS and PER in Chapter 2 under Vegetation Treatment SOPs and Guidelines, and in Tables 2-8 (PEIS) and Table 2-5 (PER). These tables have been expanded to include more SOPs to prevent the spread of weeds. Although buffers may be useful in slowing the spread of weeds in some areas, new infestations may develop from wind dispersal of seeds from isolated sites, and buffers may be impractical for larger infestations. The objective of the PEIS and PER is to evaluate the treatment of vegetation. Isolation of weeds is not mitigation for the treatment of weeds. |
| EMC-0646-217<br>Californians for<br>Alternatives to Toxics | **Comment:** The exclusion of grazers from sensitive areas where weeds exist already or may spread to in order to facilitate the restructuring of soil, provide a competitive advantage to native perennials, and eliminate an additional vector of seed dispersal, is necessary to achieve the desired goals of the PEIS. The exclusion of grazers from existing infestations is most crucial and should be the bare minimum expected. |

BLM_0001475

**Response:** As stated under Scope of Analysis in Chapter 1 of the PEIS, management of livestock grazing is outside the scope of the PEIS analysis. BLM policy is to exclude grazing for up to two growing seasons following reclamation or rehabilitation of public lands damaged thought wildfire or other activities, or until short-term objectives are met as determined through monitoring. Grazing use restrictions for specific areas are identified through terms and restriction of livestock grazing permits as determined through allotment evaluations and monitoring conducted under the grazing regulations at 43 CFR [Code of Federal Regulations] 4100.

EMC-0646-227
Californians for
Alternatives to Toxics

**Comment:** The BLM needs to include steps to prevent the spread of weeds by both vehicles and especially off-road vehicles as part of its weed management strategy. The PEIS must analyze the impacts that off-road vehicles are having on the spread of invasive weed and thus the potential success of the proposed actions.

**Response:** See responses to Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives regarding prevention. Off-road vehicle use is outside the scope of analysis of the PEIS.

FL-0004-010

**Comment:** PEIS is in need of a section addressing Early Detection Rapid Response (EDRR). In Appendix D [of the Draft PEIS] the process to secure a new herbicide is 2+ years. This is unacceptable for EDRR [Early Detection and Rapid Response]. There must be an approved procedure for EDRR in regard to herbicide use.

**Response:** See response to Comment EMC-0566-008 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response. EDRR is common to all alternatives. Chapter 2 of the PER under Herbicide Treatment Standard Operating Procedures describes standard operating procedures for prevention, and the BLM's *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996) identifies further measures to prevent and reduce the introduction and spread of noxious and invasive weeds that can be incorporated into site-specific level actions. The BLM has included additional information on EDRR in Chapter 2 of the Final PEIS under Herbicide Treatment Standard Operating Procedures and Guidelines.

FL-0007-007
EMC-0214-049
EMC-0221-013
EMC-0256-003
EMC-0272-003
EMC-0299-003
EMC-0305
EMC-0325-008
EMC-0328
EMC-0332
EMC-0347
EMC-0348
EMC-0368
EMC-0370
EMC-0371
EMC-0376-008
EMC-0382
EMC-0387
EMC-0388

**Comment:** [The] PEIS is in need of a section addressing Early Detection Rapid Response (EDRR). In Appendix D the process to secure a new herbicide is 2+ years. This is unacceptable for EDRR. There MUST be an approved procedure for EDRR in regard to herbicide use. Example: A process modeled after EPA/FIFRA [Federal Insecticide, Fungicide and Rodenticide Act] Section 18, to allow temporary, targeted new herbicide use by limited BLM district(s) while the appendix D [in the Draft PEIS] protocol is in process. Following NEPA, an EA should be sufficient for this very small-scale use that is typical of an EDRR because, due to the small area treated, there would be no significant effect.

**Response:** The BLM supports the principles associated with the EDRR system, and is committed to addressing new infestations of invasive species as they are found. In an integrated pest management approach, several management options are available to the land manager. In addressing the problem, should an herbicide be the management option of choice, the land manager upon evaluating several factors associated with the infestation (including species of interest, location of infestation, characteristics associated with the infestation, and other factors), would have several active ingredients to consider along with their different formulations, as a result of information presented in the Final PEIS. The BLM is in the process of establishing a

BLM_0001476

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0390<br>EMC-0391<br>EMC-0392<br>EMC-0393<br>EMC-0394<br>EMC-0399<br>MEC-0400<br>EMC-0418<br>EMC-0422<br>EMC-0427<br>EMC-0431<br>EMC-0433<br>EMC-0438<br>EMC-0443<br>EMC-0482<br>EMC-0483-011<br>EMC-0501<br>EMC-0578<br>EMC-0596 | policy regarding the use of herbicides not presently approved for use on lands they administer (see Appendix E of the Final PEIS). Such a policy will follow NEPA guidelines and may involve specific mitigation measures. |
| FXC-0032-005<br>Germino, Matthew J.<br>(Idaho State<br>University) | **Comment:** The BLM should pursue a course of action that addresses the cause of invasions, and should not consider mass application of herbicide or other reactive-eradication measures. Actions that address the susceptibility of BLM lands to initial invasion and long-term persistence of weeds are the only path towards economically and environmentally sounds and pro-active control measures. As the attached manuscript suggests, land uses and revegetation with only grasses probably contribute to the susceptibility of communities to persistence of weeds.<br><br>**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread. |
| RMC-0006-024<br>Central Sierra<br>Environmental<br>Resource Center | **Comment:** The continued spread of exotic-invasive weeds should be prevented prior to allowing any use of herbicide treatments.<br><br>**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. |
| RMC-0006-032<br>Central Sierra<br>Environmental<br>Resource Center | **Comment:** The BLM needs to develop and implement innovative policies focused on reducing and preventing invasions of new weed species. Dollars invested in prevention would be well spent if such expenditures can curtail a potential loss of billions of dollars to agricultural and environmental weed problems in the future.<br><br>**Response:** The BLM agrees that prevention is important for containing costs and invasions of new weed species. Also see response to Comment FL-0004-010 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response. |
| RMC-0128-003<br>Shoemaker, Bob (Platte<br>County Weed and Pest<br>Control District) | **Comment:** Thank you for extending the comment period. It is important to make provisions to be able to respond very quickly to new weeds as they appear. It would be a good idea to get the BLM involved with the Early Detection Rapid Response Program. An emergency herbicide approval procedure should be included to allow this program to work as it was intended. |

BLM_0001477

**Response:** See Prevention of Weeds and Early Detection and Rapid Response under Vegetation Treatment Standard Operating Procedures and Guidelines in Chapter 2 of the Final PER for a discussion of Early Detection and Rapid Response. The proposed protocol for approval of additional herbicides for use on public lands is described in Appendix E of the Final PEIS. The BLM has the flexibility to respond proactively to new infestations of invasive species without an emergency herbicide approval procedure.

RMC-0144-009
Wyoming Game and
Fish Department

**Comment:** The analysis failed to thoroughly discuss, analyze and evaluate more passive, long-term management actions. Section 2-8 in the Treatment [Draft] PER lightly touched on programs and actions to prevent or minimize the need for treatments in the long-term. In 50 to 100 or more years, these passive actions may make a large difference in terms of effectiveness of the treatments and reduction in management costs associated with treatment re-entry.

**Response:** See response to Comment RMC-0167-007 under PEIS Proposed Action and Purpose and Need, Scope of Analysis Also see Vegetation Treatment Standard Operating Procedures and Guidelines in Chapter 2 of the PEIS and PER for a discussion on passive treatment methods.

RMC-0163-002
Skrine, Eugene

**Comment:** The use of herbicides is not the only way to meet this need. Preventing the introduction, establishment and spread of invasive plants in the first place is the best approach to meeting the underlying need for action. Why isn't invasive plant prevention addressed and emphasized in this EIS?

**Response:** The BLM agrees that prevention is the best approach. See Prevention of Weeds and Early Detection and Rapid Response in Chapter 2 of the PEIS and PER for a discussion of prevention and early detection. This discussion has been expanded to better highlight the role prevention takes in an integrated pest management program.

RMC-0172-003
Phillips County Weed
Board

**Comment:** Specifically, the Phillips County Weed Board supports Alternative B. This alternative provides the most progressive approach to the invasive weed issue. Additionally, PEIS is in need of a section addressing Early Detection Rapid Response (EDRR). In Appendix D [of the Draft PEIS], the process to secure a new herbicide is 2+ years. This is unacceptable for EDRR. There must be an approved procedure for EDRR in regard to herbicide use.

**Response:** See Section on Prevention of Weeds and EDRR in Chapter 2 of the Final PEIS. Also see response to Comment EMC-0566-008 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response. There is nothing in the protocol that precludes the BLM from implementing EDRR with available tools and approved herbicides.

RMC-0200-005
Lindsay, Dianne

**Comment:** The PEIS/PER fails to address prevention of the weed problem.

**Response:** See responses to Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives regarding prevention. Prevention is discussed under Prevention of Weeds and Early Detection and Rapid Response in Chapter 2 of the Final PER and PEIS.

BLM_0001478

RESPONSE TO COMMENTS

RMC-0210-040
MCS Task Force of
New Mexico

**Comment:** The primary focus of weed control should be on prevention, by minimizing factors that foster weed establishment or spread, such as ground-disturbing activities associated with livestock grazing, logging, mining, road and other construction, and off-road vehicles, as well as only using 100% weed-free seed for revegetation.

**Response:** See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread and response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public lands uses. It is BLM policy is to utilize weed-free seed for all revegetation projects.

RMC-0214-029
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** The Singularly Most Effective Strategy is Not Even Considered—Prevention. The BLM in the D[raft] PEIS ignores almost without exception "prevention" as a primary mean to address the spread of invasive species. The most effective treatment within the realm of Integrated Pest Management is preventing the spread of invasive species to begin with—biologically and economically.

**Response:** As discussed in Chapter 2 of the PER, under Vegetation Treatment Standard Operating Procedures and Guidelines, prevention is identified as the cheapest and most effective weed control method, and prevention and early detection strategies could reduce the number of acres treated for noxious weeds in the future. We have included additional information on weed prevention strategies in the Final PER and PEIS under Prevention of Weeds and Early Detection and Rapid Response.

RMC-0218-005
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** "The purposes of the proposed action are to provide BLM personnel with the herbicides available for vegetation treatment on public lands and to describe the conditions and limitations that apply to their use." (DEIS [Draft PEIS], p, 1-3) This automatically biases the decision toward their preferred action alternative, which is illegal under the National Environmental Policy Act. Such a narrow and mechanistic focus also de-emphasizes the whole range of prevention measures that could be implemented to limit invasive plant introduction and spread, such as weed-free livestock feed requirements; keeping livestock, heavy equipment and off-road vehicles out of invasive weed-infested areas; vehicle inspections and cleaning; limits on forest canopy removal and ground-disturbing activities which encourage invasive exotics; public education and re-planting native plants in disturbed areas, etc.

**Response:** The Proposed Action (Alternative B; see Chapter 2 of the PEIS) and Purpose and Need (see Chapter 1 of the PEIS) provide the context for the analysis of the alternatives. The alternative analysis compares and contrasts the environmental effects of continuing present practices with regard to herbicide use, the BLM's proposed action to use additional herbicide formulations, the effects that would result if no herbicides were used, the environmental effects on public lands resources if herbicides were used without the techniques of aerial spraying, and consideration of eliminating certain classes of ALS (acetolactate synthase)-inhibiting herbicides. The analysis is appropriate to support the decisions to be made and is not illegal under NEPA. See response to Comment RMC-0167-002 and Comment RMC-0167-007 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding prevention measures. Prevention is discussed under Prevention of Weeds and Early Detection and Rapid Response in Chapter 2 of the PEIS and PER. The BLM *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996) details the prevention measures for the BLM to follow, which include but are not limited to weed-free livestock feed requirements; keeping livestock, heavy equipment and off-road vehicles

BLM_0001479

out of invasive weed-infested areas; vehicle inspections and cleaning; limits on forest canopy removal and ground-disturbing activities that encourage invasive exotics; public education; and re-planting native plants in disturbed areas. The BLM PAW Action Plan has been implemented for over a decade, and there is no implied de-emphasis in the PEIS of continuing with sound and prudent prevention practices in public lands resource management.

RMC-0218-028
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Prevention of introduction and dispersal of invasive exotic plants should have been the overriding priority and emphasis in all of the BLM's action alternatives and thoroughly discussed and laid out as a strategic plan – treating symptoms endlessly with more and more toxic herbicide use does not address the causes of the problem and therefore does not meet the purpose and need of the project without a carefully planned prevention program.

**Response:** Prevention is discussed in Chapter 2 of the Final PEIS and PER (Herbicide Treatment Standard Operating Procedures and Guidelines). The PEIS was developed to assess the impacts of herbicide use in vegetation treatments across a range of activities, including hazardous fuels reduction and habitat enhancement. The purpose of the PEIS was not to develop a strategic plan focusing on exotic plants, as discussed in Chapter 1 of the PEIS under Scope of Analysis.

RMC-0221-018
Center for Biological
Diversity

**Comment:** The proposed project reviewed in the D[raft] PEIS offers none of these preventative measures as vegetation treatments, and it is a major shortfall of the framing of the scope of the project.

**Response:** See responses to Comment RMC-0167-007 and Comment EMC-0590-010 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding prevention measures. See response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding curtailment of public land uses as a prevention measure.

RMC-0221-019
Center for Biological
Diversity

**Comment:** The BLM also failed to discuss or determine the benefits of passive restoration, including the removal of livestock and off-highway vehicles from weed infested or otherwise disturbed areas. The D[raft] PEIS entirely neglects the effects of livestock on weeds species; and the D[raft] PEIS fails to compare alternatives that incorporate passive restoration treatment.

**Response:** The benefits of passive restoration are discussed in the PER under Chapter 4, Effects of Vegetation Treatments. The comparison of alternatives in the PEIS is germane to the Proposed Action and Purpose and Need, as stated in Chapter 1 of the PEIS. Passive treatment, where appropriate, is an option that may be considered by the authorized officer in the design for any vegetation treatment project.

RMC-0221-020
Center for Biological
Diversity

**Comment:** While the D[raft] PER does discuss prevention, minimization, and non-chemical treatments, it is entirely unclear how the BLM intended the two documents to relate to each other. For example, the D[raft] PER states that when developing treatment objectives, the BLM will first take actions to prevent or minimize the need for vegetation controls and use effective, non-chemical solutions. However, the D[raft] PEIS proposes the use of herbicides without including any discussion of prevention and minimization or prioritization of non-chemical solutions.

**Response:** See response to Comment EMC-0505-008 under PEIS Alternatives, Vegetation Treatment Planning and Management.

BLM_0001480

RESPONSE TO COMMENTS

RMC-0222-022
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** When preventative actions and restoration treatments (potentially including passive treatments) are linked to the judicious use of herbicides, the herbicide use will have far more lasting, positive results (i.e., efficacy) than spraying invasive species while leaving intact the activities that fostered the introduction, establishment and spread of invasive species. This is, in popular parlance, a "no-brainer." Yet this DEIS [Draft PEIS] insists on disconnecting herbicide use from any other management on BLM lands and then purports to estimate the benefits of herbicide spraying apart from other preceding or subsequent non-chemical treatments. The benefits/costs of herbicide use alone versus herbicide use limited and conditioned by priorities for prevention and non-chemical passive and/or active restoration must be analyzed in the [P]EIS.

**Response:** See responses to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread, Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on uses of public lands, Comment RMC-0218-005 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, and Comment RMC-0218-030 under PEIS Alternatives, Description of the Alternatives regarding prevention. See Scope of Analysis in Chapter 1 of the PEIS. The management of resource programs is properly addressed through land use planning. Herbicides are used in an integrated pest management context that includes consideration of prevention, non-chemical treatment and passive or active restoration, prior to a herbicide project being proposed.

RMC-0222-034
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** But annual herbicide use prescribed for 900,000 acres by the DEIS [Draft PEIS] is itself a "vegetation and land use management practice." So, given the [P]EIS purpose (i.e., to describe the conditions and limitations that apply to herbicide use), this [P]EIS is the appropriate place in which to analyze the Restoration Alternative's approach to conditioning and limiting use of herbicides, including linking prevention to herbicide use, for its direct, indirect, and cumulative beneficial impacts.

**Response:** As discussed in Chapter 2 of the PEIS and PER, prevention is an important element of all alternatives, not just the Restoration Alternative's approach. Also see responses to Comment RMC-0222-059 and Comment RMC-0214-029 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

RMC-0222-037
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The BLM must analyze the consequences for herbicide use of herbicide treatments being linked to prevention. The DEIS [Draft PEIS] has not done this, and then the BLM expects the public to fund and acquiesce each year to toxic applications on 930,000 acres of the land the BLM is charged with managing each year, even though much of the toxic applications will be doomed to failure because of the BLM's failure to explicitly link their applications of toxic chemicals to prevention of the need for at least some toxic applications.

**Response:** See response to Comment RMC-0222-024 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients regarding prevention and its relationship to all alternatives. See response to Comment RMC-0167-002 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding project design using herbicides. Herbicides are considered effective in controlling certain vegetation. Herbicide methods are applied under an integrated pest management framework, which includes prevention practices. Claims that the BLM's application of herbicides is doomed to failure are unsubstantiated.

BLM_0001481

| | |
|---|---|
| RMC-0222-059<br>Salvo, Mark<br>(Sagebrush Sea<br>Campaign), Cox,<br>Caroline (Northwest<br>Coalition for<br>Alternatives to<br>Pesticides), and<br>O'Brien, Mary | **Comment:** Chapter 2 of the Programmatic Environmental Report does <u>not</u> indicate that passive restoration treatments would be considered "first" when developing restoration management plans, nor does it indicate that it would be used "to the extent possible within the constraints of FLPMA [Federal Land Policy and Management Act]." It doesn't even use the words passive restoration.<br><br>**Response:** As noted in several places in Chapter 2 of the PER and PEIS, and in particular under Vegetation Treatment Standard Operating Procedures and Guidelines, prevention and early detection of weeds is identified as the cheapest and most effective weed control method. Prevention and early detection are passive restoration techniques that can lead to a reduction in the number of acres that are actively treated. This section also notes that the BLM must manage livestock, recreation, and other land uses to minimize the introduction and spread of weeds. |

**Alternatives, Revegetation**

| | |
|---|---|
| EMC-0115-006<br>Steele , Mark | **Comment:** The most important question I can ask at this time is does BLM have the several million pounds of native grass seed to restore the land immediately after spraying to try and insure cheatgrass does not come back the next year from lack of enough grass competition? If not, then we begin a cycle of spray, plant, and pray, and are at the mercy of the weather and other factors. Those of us with a history of CRP [Conservation Reserve Program] and disturbances from natural gas pipelines, drought years, and competition among weeds and the commercial grasses we planted, would have a concern about starting an ongoing program that may never really see an end. That has to be balanced with the need to fight the invasion of cheatgrass.<br><br>**Response:** See response to Comment EMC-0584-095 under PEIS Alternatives, Herbicide Treatment Planning. |
| EMC-0115-007<br>Steele , Mark | **Comment:** If the BLM does not have on hand several million pounds of the various native grass seeds for the areas in question (and I doubt they do because of the very nature of the grasses and lack of commercial growing), then other grasses will have to be used. A monoculture of thousands of acres of crested wheatgrass may not be much better than the same amount in cheatgrass. The reseeding needs to be done in native species that have evolved over the thousands of years to compete here. Those same species do very well, when established and not disturbed on the surface, against most invasive weeds like cheatgrass. Leafy spurge and a few other specific weeds can infest native grasses, but we are mostly concerned with cheatgrass, which has a hard time competing against established native grasses and plants.<br><br>**Response:** See response to Comment EMC-0623-007 under PEIS Alternatives, Herbicide Treatment Standard Operating Procedures. |
| EMC-0125-003<br>Seastedt, Timothy R. | **Comment:** First, herbicide use, without proactive reseeding and aggressive changes in management, will fail to solve this problem. The work will provide cosmetic, short-term effects only. This is not good science, nor is it effective use of taxpayer resources.<br><br>**Response:** See response to Comment RMC-0222-019 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding the BLM's Integrated pest management approach to vegetation treatments. |
| EMC-0139-019<br>Troutman, Doug | **Comment:** One final comment. The BLM should address a program of acquiring a continuous source of native seeds and plants for restocking wherever fire, chemical or |

BLM_0001482

RESPONSE TO COMMENTS

other means is used to "treat" the land. Only by the total exclusion of such seedings as "Crested Cheatgrass" – crested wheatgrass, will range trends truly improve on the public lands.

**Response:** See response to Comment EMC-0584-077 under PEIS Alternatives, Herbicide Treatment Planning.

EMC-0234-009
Dremann, Craig

**Comment:** No herbicide spray program will ever manage the cheatgrass in the Great Basin, because there is no longer a sufficient native seed source in the vicinity to naturally restore the cheatgrass areas after spraying.

**Response:** It is BLM policy that natural recovery by native plant species is preferable to planting or seeding (BLM Handbook 1742-1 *Burned Area Emergency Stabilization and Rehabilitation*), but where native seedbanks have been depleted, native seed is applied. Also see response to Comment EMC-0584-095 under PEIS Alternatives, Herbicide Treatment Planning.

EMC-0234-013
Dremann, Craig

**Comment:** In the last decade, the agency has never involved the Ecological Restoration professionals, because their agency annual budget from Congress to manage exotics annually on their land has only been 3 cents per acre. So the lack of exotic plant management funds, and the lack of professional consultation has left the agency without any successful restoration technologies or any knowledge on how to achieve the "Restore Option".

**Response:** The claim the BLM has never consulted with ecological restoration professionals is unsubstantiated. See response to Comment RMC-0167-008 under PEIS Alternatives, Decisions to be Made and Scope of Analysis.

EMC-0234-016
Dremann, Craig

**Comment:** Regarding the [Draft] PEIS [PER], Chapter 4, Effects of Vegetation Treatment: 13.) Page 4-26 [of the Draft PER], Standard Operating Procedure: "The goal of revegetation is to stabilize and restore vegetation on a disturbed site and to eliminate or reduce the conditions that favor invasive species." That is a nice statement in the document, but for the last 50 years, BLM has done everything in their power to avoid doing that, by intentionally sowing millions of pounds annually of exotic and invasive non-native invasive species. How can we believe that the BLM, after these documents are approved, will start to do anything that they are claiming in these documents, and not just continue to sow another million pounds of exotic seeds in 2006?

**Response:** The seed mixtures utilized by BLM, which may include non-native species, are not considered to be exotic species or invasive non-native species. Please refer to Chapter 1 of the PER, Terminology, for definitions of what is considered to be exotic and invasive vegetation. Also see response to Comment EMC-0234-024 under PEIS Alternatives, Herbicide Treatment Planning.

EMC-0234-018
Dremann, Craig

**Comment:** The issue of fire being useful as a "restoration" tool is only applicable, if there still exists in the soil-seed bank, any of the native understory and fire-colonizing seeds to sprout after the fire. According to a survey of the Great Basin that I conducted in 1997, better than 90% of the Great Basin's native shrub understory (grasses and forbs) has been extinct for such a long period of time (>100 years), that the native seeds in the soil-seed bank have been dead for decades.

BLM_0001483

**Response:** Revegetation is discussed in Chapter 2 of the PEIS and PER under Revegetation. It states, "Reseeding or replanting may be required to revegetate sites in which the soil has been disturbed or vegetation removed, and where there is insufficient vegetation or seed stores to naturally revegetate the site." The section further lays out Standard Operating Procedures (SOPs) for the BLM to follow when revegetating sites. These SOPs include using weed-free seed, revegetating soon after treatment is completed, cleaning equipment to remove weed seeds, and using non-natives only when locally adapted native seed is not available. The Native Plant Materials Development program is supported by the BLM fire program. This program is working towards developing an extensive supply of locally adapted native seed for the multitude of ecoregions that the BLM manages.

EMC-0234-019
Dremann, Craig

**Comment:** Even in areas of BLM land where the native understory plants are still abundant, and are still producing seeds in the Great Basin, there exists a modern paradox-that even if 200 pounds of local native understory seeds per acre were applied to 80% of the Great Basin soils, that the seedlings would not survive. You can see pictures at http://www.ecoseeds.com/good.exaple.html. I'm certain that the $2.3 million USDA/BLM project discovered that dying seedling paradox in their test plots also, at http://www.ecoseeds.com/2.3million.html so I'm referencing their conclusions when they are published, in my comments.

**Response:** See response to Comment EMC-0623-007 under PEIS Alternatives, Herbicide Treatment Standard Operating Procedures. The Native Plant Materials program covers BLM lands across all states with BLM lands, not just in the Great Basin. The BLM has been consistently increasing their knowledge regarding the planting of local natives through interagency efforts which include pollination studies, genetic variability tests, and development of seed transfer zones.

EMC-0234-022
Dremann, Craig

**Comment:** BLM has no current knowledge on how to replant local native understory plants (grasses and forbs), and for 50 years BLM has resorted to the sowing millions of pounds of exotic and invasive non-native seeds, in the States that this document covers. Page 4-95 [of the Draft PER] states: "Treatments that control populations of non-native species on public lands would be expected to aid in the re-establishment of native plant species. The use of fire, herbicides, or other treatment methods to simply kill vegetation is often inadequate, especially for large infestations. Thus, the BLM would introduce and establish competitive plants to successfully manage weed infestations and restore desirable plant communities (Jacobs et al. 1999)." Unfortunately, for the last 50 years, to BLM, "Competitive plants" and "Desirable" plant communities also included the sowing of exotic and invasive plant seeds by the millions of pounds per year, like Crested Wheatgrass, Smooth Brome, Intermediate Wheatgrass, etc.

**Response:** See response to Comment EMC-0234-019 under PEIS Alternatives, Herbicide Treatment Planning.

EMC-0234-023
Dremann, Craig

**Comment:** All aerial and most hand-seeding of Great Basin understory plants (grasses and forbs) does not work. Page 4-114 [of the Draft PER] states: "Aerial reseeding would also be allowed to restore natural vegetation." Yes, that would be a good plan if it would work, but it doesn't and it will not, as BLM knows it, and that's why that suggestion has no references next to it.

**Response:** The BLM has found the use of aerial reseeding, especially after wildfire, to be useful and cost efficient. The use of mechanical and manual methods for reseeding

BLM_0001484

RESPONSE TO COMMENTS

in designated wilderness or Wilderness Study Areas is often precluded by policy and physical restrictions for manual and mechanical methods due to lack of access, terrain, remoteness, and the general incompatibility of mechanical equipment with wilderness and wilderness values. Where revegetation goals allow, aerial reseeding is a cost efficient and effective method of seed dispersal in areas of terrain otherwise inaccessible. Success of any reseeding is dependent on several factors, including but not limited to available moisture, soil characteristics, and time of year. Reseeding provides an opportunity to revegetate unstable soils and control erosion following fire, to reduce potential degradation of wilderness values.

EMC-0234-024
Dremann, Craig

**Comment:** Herbicides cannot restore native vegetation or restore natural ecosystem processes. Page 4-163 [page 4-136 of the PER] states: "Herbicides would be used to treat vegetation to... restore native vegetation, and restore natural ecosystem processes," but there's no supporting documents. It's as if BLM has a big wish for that to happen, but all the Ecological Restoration professionals know that herbicides will not restore the native vegetation or restore the native ecosystem processes in the Great Basin. The only option is seeding of the local native understory (grasses and forbs).

**Response:** It is true that seeding is an important component of restoration in the Great Basin. Several long-term projects are currently in place in the Great Basin under the auspices of the Great Basin Restoration Initiative (Great Basin Native Plant Selection and Increase Project, Integrating Weed Control and Restoration, A Regional Experiment to Evaluate Effects of Fire and Fire Surrogate Treatments in the Sagebrush Biome). These projects are making great strides in restoration with and without herbicides. Results will most likely vary due to site-specific variables, but seeding will most certainly be a component leading to success. At the local level, the integrated weed management process will help the BLM determine the appropriate combination of treatment and restoration requirements, including type of seeding.

To ensure that suitable native species are made available, the Native Plant Materials Development program (a Congressionally directed interagency program) has been in place since 2001. This program is funded primarily through federal fire appropriations (emergency fire rehabilitation funding). Its purpose is to manage and supply native plant materials for use in federal land for rehabilitation and restoration efforts. Creating a native plant material supply takes time, research into the use of the proper locally adapted seed, and a long-term commitment to reach the supply level required. Efforts have been successful in moving toward such a goal; commercial native grass seed growers are on the increase.

EMC-0238-008
California Partners in Flight

**Comment:** CalPIF supports another recommendation in Alternative E that we believe will be a critical component of success for the herbicide treatment program. In the overarching discussion covering all of the Alternatives, BLM has taken the position that it will only use native plants in its post-treatment vegetation work. CalPIF strongly supports that position. We urge BLM to resist using non-native plant species in post-treatment revegetation other than as an initial step in the long-term establishment of native vegetation. We support the following recommendations for the use of native plants put forth under the Revegetation section of Alternative E, and recommend they be incorporated as part of the final planning document:

- In revegetation efforts, whenever it is possible to do so, use native seed and seedlings that have been grown from seeds of locally adapted populations.
- If native seeds/plants are not available, revegetation projects will rarely be undertaken until native plant seed or plants become available. Non-native

BLM_0001485

plant species will be used only in extremely degraded/severely altered systems as an intermediate step toward/placeholder for native restoration.

- When reseeding with non-native species, certification must be provided that only species that have been documented as non-persistent are present in the seeding mixture.

**Response:** See response to Comment EMC-0584-077 under PEIS Alternatives, Herbicide Treatment Planning. BLM policies are in concert with the majority of recommendations listed in this comment. Revegetation projects may need to take place prior to native seed availability, though, to ensure stability and reduce risk of noxious weed infestation. Once seed is available, restoration efforts would take place based on the local office priorities. The BLM also has policy that no noxious or invasive plant seeds be part of seed mixtures (established both in BLM Handbook 1742-1 [*Burned Area Emergency Stabilization and Rehabilitation*] and a 2006 Instructional Memorandum).

EMC-0446-042
The Nature
Conservancy

**Comment:** In much of the Intermountain West where downy brome (*Bromus tectorum*) has invaded, fire frequency has been greatly increased, leading to the destruction of native plant and animal communities and the perpetuation of downy brome domination. Projects to restore healthy native plant communities as well as to restore historic fire regimes are needed in these areas in addition to or instead of fuels treatment projects. Only one paragraph ([Draft[ PER [page] 2-3) discusses the BLM's native plant initiative, which has a goal of increasing native seed production for restoration use on 500,000 acres per year. The amount of seed production projected appears to be inadequate to meet the needs of fire rehabilitation (which treats 1.5 million acres per year), resource management needs (1.0 million acres per year) and restoration of historic fire regimes in altered landscapes (over 1.0 million acres per year). The PER should integrate the goals and funding of this program with both the fuels reduction and the burned area rehabilitation programs in these documents.

**Response:** Fuels treatments reduce hazardous fuels to a level where restoration of healthy plant communities and the return of more natural fire intervals will be successful. Without such treatments, restoration projects may fail as a result of unnaturally intense wildfire. The initiative referred to in the comment is the Great Basin Restoration Initiative, and the acreage referenced is only applicable to the Great Basin. On a larger scale, the Native Plant Materials Development program is a Congressionally-directed program that has been in place since 2001 and is funded primarily through federal fire management appropriations (emergency fire rehabilitation funding). Its purpose is to develop a program to manage and supply native plant materials for use in rehabilitation and restoration efforts on federal land. Creating a native plant material supply requires time, use of the appropriate locally adapted seed, and a long-term commitment to reach the supply level required. So far, efforts have been successful in moving toward program goals; commercial native grass seed growers are on the increase.

EMC-0498-008
Vallone, Cheryl L.

**Comment:** Follow all control efforts with restoration of native plant species.

**Response:** Revegetation of disturbed or treated sites is discussed in Chapter 2 of the PER under Vegetation Treatment Standard Operating Procedures and Guidelines.

EMC-0541-012
Associated Oregon
Loggers

**Comment:** Herbicide use must be an available tool to direct rapid establishment of reforestation, and "free-to-grow" status, after any harvest or stand damage. The current BLM reforestation backlog of poorly-stocked stands is abysmal, in part due to

BLM_0001486

RESPONSE TO COMMENTS

unnecessary herbicide use obstacles. This problem must be corrected to accomplish forest sustainability. Such a backlog is illegal for non-federal forest landowners in Oregon. Why do BLM managers blatantly disregard Oregon reforestation law? You might not be aware that the Oregon Forest Practices Act requires any landowner [including BLM] to reforest stands to "free to grow" standards within six years of completion of commercial activities, when stocking levels drop below legal standards. [Refer to ORS 527.745 and OAR 629-610-0000 to 629-610-0090]. While the BLM seldom harvests many burned areas, nonetheless commercial activities do occur across these burned forests—which might be construed as commercial [such as a single tree planting, fireline construction, contract firefighting, erosion control, riparian improvement, or grass seeding].

**Response:** The BLM agrees that successful reforestation is a vital component of a sustainable forest management program. And in certain situations, the use of herbicides to control competing vegetation is an important tool toward ensuring timely and successful reforestation. While the BLM strives for timely reforestation of all forest lands following commercial harvest activities and catastrophic events, such as wildfire, the federal government is not subject to state law unless Congress explicitly directs it. Congress has not made the public lands in Oregon subject to the Oregon Forest Practices Act. The focus of the PEIS and PER is on restoring the health and vigor of vegetation communities on BLM-administered lands. As such, these documents do not address the need for rapid reforestation following commercial timber harvest activities. The use of pesticides to promote forest growth on BLM-managed lands in western Oregon will be addressed in the step down NEPA process that will follow the completion this PEIS and PER.

EMC-0584-012
Western Watersheds
Project

**Comment:** We are alarmed that BLM in the PEIS avoids focus on treating the extensive crested wheatgrass and other seedings that have so altered and largely destroyed wildlife habitats, and which often form the basis of stocking excessive numbers of livestock that also affect native vegetation in or near these seedings. Many crested wheatgrass seedings that resulted in the aftermath of past treatments have become infested with cheatgrass, halogeton or other weeds and now contain continuous fine fuels. In many seedings, exotics such as crested wheatgrass have been planted at unnaturally thick densities, and thus present an increased fire risk, or have significant components of cheatgrass in understories. Large wildfires sweep across such seedings  - as in the 2005 Clover fire in the Jarbidge Field Office. The harm and fragmentation of native species habitats caused by these seedings must be assessed – as it is important to in understanding their role in habitat fragmentation on top of the extensive alterations of habitat proposed by BLM under the DEIS [Draft PEIS]/PER. Both the Jarbidge and Burley BLM lands provide a perfect example of a woefully fragmented landscape where crested wheatgrass seedings have greatly fragmented sage grouse habitats across middle to lower elevations, and many are in very poor condition and have rampant cheatgrass, halogeton and other problems – as well as loss of forage. Yet, in Burley, BLM persists in promoting the killing of native vegetation (junipers, mountain big sagebrush, pinyon, and other species) in the Jim Sage and other areas, while ignoring the habitat loss, and weed and fire risks, posed by the crested wheatgrass and other purposefully altered lands, including those BLM itself "treated" with fire and which have become weedlands. The Weed [P]EIS/PER continues blindly down this same path.

**Response:** The Scope of Analysis in Chapter 1 of the PEIS states that it does not address vegetation treatments exclusively designed to increase forage production, which was the objective of many past crested wheatgrass seedings. But the commenter

should be aware that as part of management to move toward or exceed rangeland health standards, many BLM offices are now treating crested wheatgrass seedings by adding additional native forbs and shrubs to those old seedings.

Historically the BLM did use non-natives at a greater scale than it does currently. While it is true that non-natives still can be used by the BLM, their use is primarily for emergency stabilization to reduce erosion after disturbance, since native species can take longer to become established. The BLM has committed to the use of natives, as established in policy. Use of crested wheatgrass as part of seed mixes containing native and non-native species may still occur, but must meet BLM policy requirements listed in BLM Manual 1745 (*Introduction, Transplant, Augmentation and Reestablishment of Fish, Wildlife and Plants*). This manual states, "Native species shall be used, unless through the NEPA process it is determined that: 1) suitable native species are not available; 2) the natural biological diversity of the proposed management area will not be diminished; 3) exotic and naturalized species can be confined within the proposed management area; 4) analysis of ecological site inventory information indicates that a site will not support reestablishment of a species that historically was part of the natural environment; or 5) resource management objectives cannot be met with native species. Also, seeding must meet BLM policy requirements established in BLM Handbook 1742-1 (*Burned Area Emergency Stabilization and Rehabilitation*), which requires the use of a native/non-native worksheet that must document the rationale for using non-native plants and lists criteria for selecting native plants for revegetation.

EMC-0584-030
Western Watersheds
Project

**Comment:** BLM must focus significant treatment and restoration efforts and spending of federal fire funds on restoration of native species composition and function to crested wheatgrass that has been rampantly seeded as following ill-conceived sagebrush removal or as post-fire "rehab", and lands overrun by cheatgrass. The current abundance of federal fire funds should be used to follow-through on BLM post-fire rehab actions that have failed in the past (please evaluate all seedings and identify failures and causes of failure), or where crested wheatgrass and other exotics were planted as a first step in arid lands rehabilitation.

**Response:** See response to Comment EMC-0584-077 under PEIS Alternatives, Herbicide Treatment Planning.

EMC-0584-031
Western Watersheds
Project

**Comment:** BLM should use this [P]EIS/PER as an opportunity to complete post-fire rehabilitation that has failed or had poor results on likely tens of millions of acres across the arid West. As part of this [P]EIS/PER process, BLM should identify all lands where post-fire rehab/"emergency" stabilization with crested wheatgrass, intermediate wheatgrass and other exotics was conducted, and prioritize treatment of these lands to return them to native vegetation and restore natural fire cycles.

**Response:** See response to Comment EMC-0584-077 under PEIS Alternatives, Herbicide Treatment Planning. Restoring the ecological role of fire is required under federal fire policy. Monitoring of post fire stabilization and rehabilitation has been established in BLM Handbook 1742-1 (*Burned Area Emergency Stabilization and Rehabilitation*). Areas that are identified as needing restoration of native vegetation will be prioritized, and restoration will be implemented based on goals and objectives established in the local land use plan.

BLM_0001488

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0584-036<br>Western Watersheds<br>Project | **Comment:** As part of this [P]EIS, BLM must consider restoration of native vegetation on all lands initially seeded to exotics in past or future ESR [Emergency Stabilization and Rehabilitation] activities. This NEPA document should include a timetable for accomplishing this.<br><br>**Response:** All ESR activities utilize certified weed-free seed. Depending on availability, native seed is used where appropriate. ESR activities are required to be funded and completed within 3 years of a fire event. |
| EMC-0584-077<br>Western Watersheds<br>Project | **Comment:** BLM must commit to mandatory use of native species, and local ecotypes not over-sized cultivars, in all post-treatment plantings. BLM cannot rely on the old excuse of seed being unavailable or too expensive for use. Use of all native seed with commitments to reseed repeatedly must be part of the planning and funding for all projects. Planned development of reliable supplies of native ecotype seed sources is essential.<br><br>**Response:** See responses to Comment EMC-0584-012 under PEIS Alternatives, Herbicide Treatment Planning and Comment EMC-0446-042 under PEIS Alternatives, Herbicide Treatment Planning. |
| EMC-0584-091<br>Western Watersheds<br>Project | **Comment:** Use of Native Species: BLM must commit to use native species in all restoration seedings in all instances. In the past, BLM has used exotic, soil depleting crested and Siberian wheatgrasses, and aggressive, invasive, weedy forage kochia and intermediate wheatgrass. Instead of focusing on larger exotic plants (primarily because they produce livestock forage, no matter how limited its palatability), BLM must use natives, especially species like Poa sandbergii, bottlebrush squirreltail and Indian ricegrass in lower elevation sites. In the past, BLM has failed to rest lands for sufficient periods of time to allow successful establishment of seeded native species.<br><br>**Response:** See response to Comment EMC-0584-077 under PEIS Alternatives, Herbicide Treatment Planning. |
| EMC-0584-092<br>Western Watersheds<br>Project | **Comment:** As part of this [Draft] [P]EIS, please provide a science-based (not livestock-forage-based, but ecological science-based) assessment of predicted establishment times for seedings or recovery of native vegetation under the various environmental settings, and include in this predictions of "success" with specific livestock rest periods much greater than are now applied. Please also thoroughly describe and assess the ecological impacts of the exiting seedings – impacts on soils, waters, vegetation, weeds, native biota, recreational and cultural concerns.<br><br>**Response:** See response to Comment EMC-0584-077 under PEIS Alternatives, Herbicide Treatment Planning. The Native Plant Materials Development program is scientifically based and is incorporating studies that have already and will continue to provide information on seed establishment and recovery at the regional or local level. The recommendations made in this comment are best performed at the local level using data specific to seeding sites. Effects analyses will be performed during the site-specific NEPA process. |
| EMC-0584-093<br>Western Watersheds<br>Project | **Comment:** BLM must closely study the lessons provided by the bluebunch wheatgrass seeding in an ungrazed area near Kuna Butte in the Four Rivers FO [Field Office] – and any examples the agency may have across the West. Due to no grazing occurring for a decade, seeded bluebunch wheatgrass was surviving and thriving at low elevations. In addition, please use existing exclosures as reference areas for |

BLM_0001489

comparison of effects of no grazing for several years following a fire, vs. BLM's typical woefully inadequate 2 growing season's rest. There are also exclosures in the Jarbidge FO that can serve as reference sites and comparative examples. One is located north of Winter Camp Butte, others are near Roseworth. Please visit these sites, and quantify the differences between vegetation inside and outside these exclosures, and use this information in developing a realistic time frame for livestock exclusion from seeded lands.

**Response:** The BLM has established numerous reference locations and key use areas throughout the West in relation to allotment monitoring and other program requirements (e.g., wildlife habitat). Each state in the West has specific examples of these types of reference areas that are utilized by field office resource specialists in the planning of future treatments. BLM policy is two growing seasons or until the specific restoration objectives are met for that site. The authorized officer has the administrative flexibility to extend grazing closures longer than two growing seasons to allow for recovery of vegetation and habitat resources.

EMC-0584-095
Western Watersheds
Project

**Comment:** BLM must use some of its burgeoning fire funding to set up a reliable network and system for supply and storage of native seed, including locally adapted ecotypes, so that this native seed is readily available in the wake of fire. BLM will then no longer have the time-worn excuse that "we couldn't get native seeds, so had to plant cwg". It is time to act responsibly, and apply federal fire funds to setting up a reliable system of seed supply. BLM must also commit to re-seeding of natives in subsequent years, if initial seeding attempts are not successful due to drought or other factors. This must be factored into any

**Response:** See response to Comment EMC-0446-042 under PEIS Alternatives, Herbicide Treatment Planning. Monitoring, as required under BLM Handbook 1742-1 (*Burned Area Emergency Stabilization and Rehabilitation*), would help to determine if re-seeding is necessary. The National Seed Warehouse has been supplying a variety of tested seed through Memoranda of Understanding with Great Basin states.

EMC-0584-097
Western Watersheds
Project

**Comment:** BLM claims it may reseed or replant areas with "desirable" vegetation when the plant community cannot receive and occupy the site sufficiently. BLM provides no methodology or protocol used for making such determinations.

**Response:** See responses to Comment EMC-0584-012 and Comment EMC-0446-042 under PEIS Alternatives, Herbicide Treatment Planning.

EMC-0584-113
Western Watersheds
Project

**Comment:** Low elevation sagebrush-steppe communities may require a decade or more, and repeated seeding efforts during periods of favorable weather, to allow re-establishment of native vegetation. The [P]EIS plan must address these necessary periods of rest, and not base its actions on the convenience of the livestock industry.

**Response:** The BLM agrees that lower elevation and lower precipitation sagebrush-steppe communities often require greater effort to establish the desired native vegetation. As a result of the lower precipitation available, the appropriate conditions for seed germination and seedling survival in these harsh environments may not occur every year. Therefore, reclamation efforts may not respond as quickly as they would in areas where favorable conditions for establishment of the desired vegetation occur more frequently. We agree that the manager must plan for additional effort and possibly additional rest from livestock grazing to promote recovery of these lower elevation areas; however, this planning must be based on site-specific monitoring and

BLM_0001490

RESPONSE TO COMMENTS

prescribed at the local level. In most cases we would expect the recovery to occur sooner than the 10 or more years indicated by this comment.

**EMC-0584-115**
**Western Watersheds**
**Project**

**Comment:** What About Restoration? "Rehabbing" in the BLM sense, is vastly different from restoration to a full component of native vegetation and ecological processes. Under what circumstances will BLM undertake Restoration?

**Response:** The need for restoration is determined by the local field office based on resource conditions and circumstances (e.g., catastrophic fire).

**EMC-0623-007**
**Defenders of Wildlife**

**Comment:** Native Species in Restoration. Restoration efforts should include native species. Since one of the outstanding obstacles to the use of native species is seedstock availability, BLM should develop models to predict the species needed to restore the native vegetative communities that have been displaced by invasive species, conduct an inventory of available native seedstocks and work with relevant agencies and organizations (such as the Natural Resources Conservation Service and local Natural Heritage Programs) to build capacity to identify and utilize native species in restoration efforts.

**Response:** See responses to Comment EMC-0584-012 and Comment EMC-0446-042 under PEIS Alternatives, Herbicide Treatment. The Native Plant Materials Development program is scientifically based and is incorporating studies that have already and will continue to provide information on seed establishment and recovery at the regional or local level. The program involves numerous organizations at all levels, and is coordinated by the Plant Conservation Alliance. The Plant Conservation Alliance promotes rehabilitation, restoration, and conservation activities through partnerships with other federal agencies, state governments, tribes, and the private sector.

**EMC-0623-014**
**Defenders of Wildlife**

**Comment:** Follow all control efforts with restoration of native plant species. Native species restoration is particularly critical in habitats for rare, declining and listed species. Where this is not practicable due to seed availability, all plantings must be ecologically appropriate and pose low risk of invasiveness.

**Response:** See response to Comment EMC-0623-007 under PEIS Alternatives, Herbicide Treatment Standard Operating Procedures. Restoration projects are developed at the local level using interdisciplinary teams, including biologists, to ensure that ecologically appropriate actions are developed.

**EMC-0646-230**
**Californians for**
**Alternatives to Toxics**

**Comment:** The omission of re-vegetation, in the forms of grasses and forbs, from the proposed action will not achieve the desired conditions of a "biologically and structurally diverse forest" as described in the FEIS [Draft PEIS]. The herbal layer will most likely consist of significant areas dominated by annual exotic grasses and weeds, which contribute to catastrophic fire, soil destabilization, and increased soil moisture loss. This will defeat the BLM's very justification for the proposed actions. If the PEIS is not altered to avoid these consequences, an analysis of their effects must be undertaken due to the significant impacts that may be anticipated. This concern was not addressed in the PEIS.

**Response:** Revegetation of sites is discussed in Chapter 2 of the Final PEIS and PER under Revegetation.

BLM_0001491

| | |
|---|---|
| FXC-0071-011<br>Campbell, Bruce | **Comment:** Will any genetically engineered (crossing the trans-species barrier to natural reproduction) grasses, turf, plants, or trees be used in revegetating any sites on BLM land which have undergone "vegetation treatments"? |
| | **Response:** No. BLM has not used genetically engineered or modified plants in its revegetation projects in the past and the use of genetically engineered plants in the future is not proposed under this PEIS. |
| RMC-0006-029<br>Central Sierra<br>Environmental<br>Resource Center | **Comment:** Page 2-15 of the [Draft] PEIS states, "Disturbed areas may be re-seeded or planted with desirable vegetation when the native plant community cannot recover and occupy the site sufficiently." Repeated seeding or planting of native vegetation and animals should be required until self-sustaining native vegetation and wildlife communities, free of exotic invasive weeds, become established. This should be a requirement for any project, not an option. |
| | **Response:** One of the goals of any vegetation treatment or project is to ensure that disturbed non-target vegetation has the capability to recover its native plant community and sufficiently occupy the site free of exotic species or weeds. The statement found under Herbicide Treatment Standard Operating Procedures in Chapter 2 of the Draft PEIS refers to the BLM prevention practice to ensure that areas disturbed as a result of vegetation treatments or by projects are either reseeded or planted with desirable vegetation. In this case it is a requirement, rather than an option, that one or the other prevention measures be accomplished. Depending on the objective of the treatment, seeds or plants that will directly compete with noxious weeds may be either native or non-native species, depending on the circumstances and availability of native seed and/or plant stocks. The need to repeat seeding or planting of desirable vegetation is determined on the success of the initial treatment and establishment of desired vegetation, based on monitoring. |
| RMC-0040(1)-007<br>Resource Concepts,<br>Inc. | **Comment:** Pg. 2-25, in Table 2-4 [of the Draft PER] Vegetation Treatment Methods Standard Operating Procedures and Guidelines, vegetation section for Mechanical treatments, there is a SOP [Standard Operating Procedure] to use plant and seed stock from appropriate elevations when conducting revegetation activities. This SOP should also apply to Fire Use and Chemical Control when seeding is necessary. |
| | **Response:** The suggested rewording has been incorporated into the Final PER in Table 2-5. |
| RMC-0067-005<br>Wyoming Outdoor<br>Council | **Comment:** The following scenario is readily imaginable. An area is sprayed with herbicides killing essentially all broad-leafed vegetation, or perhaps all vegetation. Then the area is seeded to an introduced grass such as crested wheatgrass. This has been the exact scenario that has played out on BLM lands for at least the last 50 years. But the effect of this scenario is to create another monoculture of an introduced species, crested wheatgrass, which is by no means clearly an improvement over what may have been there beforehand, even if it was a noxious weed. If this scenario is possible, BLM needs to provide evidence that crested wheatgrass monocultures are a desirable change in the vegetation community. In the view of many (including many scientists), a monoculture of crested wheatgrass is as noxious and ecologically undesirable as a monoculture of cheatgrass [downy brome]. It certainly will have no lesser impacts on native species and native ecosystems. Again, the programmatic EIS does not appear to ensure that the result of the herbicide spraying is to not replace one introduced species with another introduced species, a pyrrhic victory at best. |

BLM_0001492

RESPONSE TO COMMENTS

**Response:** Development of forage for livestock, such as through crested wheatgrass seedings, is beyond the scope of this PEIS, as stated in Chapter 1 of the PEIS under Scope of Analysis. The scenario described in the comment does not accurately represent the intent of vegetation treatments conducted by the BLM. Seedings, such as crested wheatgrass, are developed typically through mechanical treatment of the soil and vegetation through chaining or plowing and ripping, in much the same way an agricultural field is prepared and planted with seed to grow a crop. The BLM does not spray vegetation to kill it only to replace it with a monoculture seeding of crested wheatgrass. An important difference between crested wheatgrass and downy brome is that the latter is an invasive species and crested wheatgrass is not. Downy brome also has little forage value, where crested wheatgrass has high forage value for livestock. Seedings developed for forage are designed and implemented based on land use plan objectives. Seedings, such as would be addressed under this PEIS would fall under Emergency Stabilization and Rehabilitation (ES&R), and would utilize pre-emergent herbicides to retard the growth of downy brome, prior to seeding with an appropriate seed mix in order to increase the competitive advantage of the native vegetation. ES&R seedings are not typically monocultures of crested wheatgrass; rather, they are an appropriate grass and forb species mix to stabilize the soils and provide a favorable environment for reestablishment of native vegetation.

RMC-0067-006
Wyoming Outdoor
Council

**Comment:** BLM needs to explain more clearly what exactly will replace the invasive species it is targeting and how that will be achieved. What species will replace the invasive species, or will bare dirt or another suite of weeds or introduced species be the result? Over what time frame will this occur—will the replacement of undesirable species be immediate or occur over time, by natural revegetation? How will this change occur—will BLM actively plant native species to replace the invasives, plant other introduced species such as crested wheatgrass, or simply allow natural succession to occur? When and where will various options be used? What impact will budget limitations have on what is done? What scientific basis is there for pursuing any of these routes and claiming that they will be successful? The environmental impact statement needs to answer these questions before a proposed action can be properly chosen.

**Response:** Revegetation is discussed under Revegetation in Chapter 2 of the PEIS and PER. The BLM has committed to the use of natives for revegetation, as established in policy. BLM Manual 1745 (*Introduction, Transplant, Augmentation and Reestablishment of Fish, Wildlife and Plants*) states, "Native species shall be used, unless through the NEPA process it is determined that: 1) suitable native species are not available; 2) the natural biological diversity of the proposed management area will not be diminished; 3) exotic and naturalized species can be confined within the proposed management area; 4) analysis of ecological site inventory information indicates that a site will not support reestablishment of a species that historically was part of the natural environment; and 5) resource management objectives cannot be met with native species." Also, seeding must meet BLM policy requirements as established in BLM Handbook 1742-1 (*Burned Area Emergency Stabilization and Rehabilitation*), which requires the use of a Native/Non-native Worksheet that must document the rationale for using non-native plants, and lists criteria for selecting native plants for revegetation.

To ensure that suitable native species are made available, the Native Plant Materials Development program (a Congressionally directed interagency program) has been in place since 2001 and is funded primarily through federal fire appropriations (emergency fire rehabilitation funding). Its purpose is to develop a program to manage

BLM_0001493

and supply native plant materials for use in rehabilitation and restoration efforts on federal land. Creating a native plant material supply takes time, research into the use of the proper locally adapted seed, and a long-term commitment to reach the supply level required. Efforts have been successful in moving toward such a goal; commercial native grass seed growers are on the increase.

Revegetation specifics must be determined at the local level, where knowledge, expertise, and site-specific research can be used to determine the best means of revegetation after treating invasives. The scientific basis for restoration is a growing field, and the latest studies can be accessed by local project planners from such journals as Restoration Ecology.

RMC-0067-008
Wyoming Outdoor
Council

**Comment:** Emphasis should be given to promoting the establishment of native plant species and communities.

**Response:** See response to Comment EMC-0584-077 under PEIS Alternatives, Herbicide Treatment Planning.

RMC-0213-017
California Native Plant
Society

**Comment:** BLM introduces non-native seeds to a variety of habitats such as prairies. CNPS [California Native Plant Society] believes that BLM's seeding program should be assessed before or along with proposals to spray herbicides to manage non-native plants. Introductions include alfalfa, crested wheatgrass, sweetclover, white and subterranean clover, tall fescue, smooth brome, non-native pines, and Norway spruce. The BLM Seed Guidebook recommends many non-native grasses and forbs for "rehabilitation and conservation seeding," including many species considered to be moderately to highly invasive in natural ecosystems by the Exotic Pest Plant Councils, U.S. Fish and Wildlife Service, National Invasive Species Council and Executive Order No.13112 concerning Invasive Species.

**Response:** BLM Instruction Memorandum (IM) #2006-073 dated 1-27-06 directs the use of weed-free seed on lands administered by the BLM. The IM addresses all BLM programs which place seed or approve the placement of seed on public lands as well as addressing the quality of seed purchased by BLM for use on public lands. In addition, BLM Manual Section 1745 (1992) establishes policy and guidance for transplantation, augmentation, and reestablishment of habitat on public land utilizing native, and when necessary, introduced plant species. All BLM field offices are required to use seed on public lands that contain no noxious weed seed and meets certified seed quality. All seed applied on public land must have a valid seed test, within 1 year of the acceptance date, from a seed analysis lab by a registered seed analyst (Association of Official Seed Analysts). The seed lab results shall show no more than 0.5% by weight of other weed seeds; and the seed lot shall contain no noxious, prohibited, or restricted weed seeds according to state seed laws in the respective state(s). All seed procured for use on public land meets the Federal Seed Act criteria. In addition, BLM state contracts for seed may be more restrictive with "other weed seeds" of concern as deemed necessary. This includes all donated seed or seed used for "mitigation or restoration" by contractors per reclamation plan must meet BLM's noxious weed seed policy prior to use on public lands. BLM does allow an exemption for small reclamation projects, less than 20 acres (not to exceed 200 pounds of seed) which have an approved BLM reclamation or rehabilitation plan or permit. This IM also includes straw or mulches applied as part of seeding, stabilization, rehabilitation, or restoration projects on public lands must be certified weed seed-free.

BLM_0001494

RESPONSE TO COMMENTS

RMC-0222-039
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The Restoration Alternative proposes that revegetation may be needed, and that the revegetation use native seeds/plants (DEIS [Draft PEIS] [Appendix G page] G-16):

Action- Revegetation 1
In revegetation efforts, whenever it is possible to do so, use native seed and seedlings that have been grown from seeds of locally adapted populations.

Action- Revegetation 2
If native seeds/plants are not available, revegetation projects will rarely be undertaken until native plant seed or plants become available. Non-native plant species will be used only in extremely degraded/severely altered systems as an intermediate step toward/placeholder for native restoration, accompanied by a full commitment to complete restoration of native species. This commitment must include funds set aside as part of the project, with specific deadlines for accomplishment.

Action- Revegetation 3
When reseeding with non-native species, certification must be provided that only species that have been documented as non-persistent are present in the seeding mixture.

Action- Revegetation 4
Assure availability of native seed and plants:
1. establish BLM contracting systems that will provide growers the necessary assurance their native, locally-adapted seed plants will be purchased if grown
2. establish sufficient storage facilities for native seeds for major revegetation efforts.

The DEIS [Draft PEIS] does not include these revegetation considerations in its Alternative E ([page] 2-13 [of the Draft PEIS]), which is supposedly "based" on the Restoration Alternative. Alternative B (BLM's Preferred Alternative; [Draft PEIS page] 2-11) does not mention use of native vegetation for reseeding/revegetation linked to herbicide use.

**Response:** Revegetation of disturbed or treated sites is discussed in Chapter 2 of the Final PEIS and PER under Vegetation Treatment Standard Operating Procedures and Guidelines.

RMC-0222-040
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The DEIS [Draft PEIS] needs to examine the results of where revegetation with and without native seeds has been linked to herbicide use on BLM lands or in the scientific literature in order to compare Alternative B with the Restoration Alternative for its cumulative consequences for subsequent herbicide use.

**Response:** See response to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods. Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities. See Appendix I of the Final PEIS for a comparison of the Preferred Alternative (Alternative B) to the No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients (Alternative E).

BLM_0001495

RMC-0222-042
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** However, at [Draft PEIS page] 4-61, under "Impacts by Alternative", the DEIS [Draft PEIS] proposes no plan to revegetate with native vegetation:

Herbicides would be used on rangelands dominated by annual grasses such as downy brome and medusahead, followed by revegetation with perennial grasses and forbs.

The DEIS [Draft PEIS] doesn't state whether the perennial grasses and forbs will be exotic or native.

**Response:** See response to Comment RMC-0222-039 under Alternatives, Revegetation. As discussed in this section of the PEIS, the BLM attempts to select species that are native or adapted to the area when revegetating a site. Non-native species are used only when locally adapted native seed is not available.

RMC-0222-044
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The above passage (and DEIS [Draft PEIS]) fails to note a major reason herbicide activity may not result in native vegetation: Often there are virtually no native seed sources remaining in a large, highly invaded site (e.g., where cheatgrass or star thistle form a near-monoculture over hundreds or thousands of acres). DEIS [Draft PEIS] fails to analyze on what proportion of the estimated 900,000 acres of annually sprayed acres revegetation might be needed based on its own experience of the failure of herbicide use to promote the establishment of native species.

**Response:** For purposes of analysis, the BLM estimated the number of acres that may potentially treated with herbicides on an annual basis. The proportion of these acres requiring revegetation is unknown at this time and cannot be summarized at this scale of analysis. Site-specific requirements for revegetation would be identified in the overall treatment project proposal at the time the treatment is proposed.

RMC-0222-046
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The DEIS [Draft PEIS] fails to analyze the Restoration Alternative's explicit commitment to seeding with native species and its commitment to developing an institutional availability/storage of native seeds for revegetation. The Restoration Alternative's use of native species for revegetation as a condition/limitation on use of herbicides must be examined.

**Response:** See responses to Comment RMC-0222-042 and Comment EMC-0115-007 under PEIS Alternatives, Herbicide Treatment Planning, and Comment EMC-0623-007 under PEIS Alternatives, Herbicide Treatment Standard Operating Procedures.

**Alternatives, Special Status Species**

EMC-0338-007
Dow AgroSciences

**Comment:** Comments on the use of herbicides around Threatened and Endangered species: Herbicides can benefit threatened and endangered (T&E) species by controlling noxious and invasive weeds that otherwise adversely alter habitats making them less suitable for T&E organisms. There are herbicides that are selective and will control noxious or invasive plants without harming T&E species. Generalizations that herbicides should not be used around T&E species ignores the potential value of herbicides to help restore T&E habitats. An additional important aspect is that the spread of invasive plants is a greater threat to some T&E species than the use of a selective herbicides. For example, use of herbicides that control sensitive invasive broadleaf species could be used around T&E grass species. Both Dr. Rod Lym, North Dakota State University, and Dr. Joe DiTomaso, University of California, have conducted field research that support this beneficial effect of herbicides in improving or preserving T&E habitat quality. Additionally, some measure of unintentional

BLM_0001496

RESPONSE TO COMMENTS

damage to T&E species should be articulated where non-herbicidal approaches are taken. Mechanical removal of invasive plants will likely disturb habitats and possibly physically damage T&E species.

**Response:** The BLM agrees that the use of herbicides can benefit T&E and other special status species. The PEIS does not generally conclude that herbicides should not be used around T&E and other special status species. The PEIS discloses the effects of herbicide use on these sensitive species and provides recommendations in the form of Standard Operating Procedures for mitigation of impacts. The BLM proposes to use the conservation measures outlined in the Biological Assessment to protect sensitive and federally-listed species and critical habitats. NEPA analysis and consultation will also take place at the local level, potentially allowing for use of selective herbicides and incorporation of additional protective measures for listed and other special status species. Any action implemented under this PEIS that "May Affect" an Endangered Species Act (ESA)-listed species will be subject to the consultation requirements under section 7(a)(2) of the ESA.

EMC-0446-009
The Nature
Conservancy

**Comment:** The PEIS and PER should reference and utilize the many recovery and conservation plans that apply to Federally listed and rare species found on public land for restoration goals needed to assist in species recovery. In some cases, restoration of historic fire regimes, without other significant habitat restoration, may lead to additional decline of species of concern.

**Response:** This comment pertains to plans that will be consulted on a site-specific and species-specific basis after the PEIS has been approved. Many federal recovery plans for listed species are referenced in the Biological Assessment that has been issued as a supporting document to the PEIS/PER. Other recovery and conservation plans will be consulted at the local level when developing treatment programs and participating in consultation with the U.S. Fish and Wildlife Service and National Marine Fisheries Service. The potential for adverse effects to special status species that occur within a project site will be considered before conducting vegetation treatments, including the use of fire.

EMC-0446-067
The Nature
Conservancy

**Comment:** All special status species should be surveyed prior to designing any vegetation treatment. Treatments should be designed to conserve and restore habitats for special status species in addition to avoiding or minimizing adverse effects to these species. Additional guidance should be provided to plan projects that will conserve and restore habitats used by Birds of Conservation Concern (USFWS 2002).

**Response:** As noted in Chapter 2 of the PEIS and PER, under Special Precautions, Special Status Species, surveys are conducted for special status species to ensure that BLM vegetation treatment actions have minimal impact upon these species. When planning projects, the BLM generally strives to implement projects that benefit a broad range of resources, including bird and other wildlife special status species. Guidance to conserve and restore habitats by Birds of Conservation Concern would be developed at the local level.

EMC-0467-005
Garvey, Lydia

**Comment:** It's also extremely concerning that endangered, threatened, sensitive species would be certainly be killed, violation of the ESA [Endangered Species Act]!!! Herbicide use Must be Prohibited for use in riparian areas, aerially, or in Wilderness Areas, ORVs [off-road vehicles] must be restricted also. Biocontrols (exotic) must Not be released in the wild without stringent testing to ensure that they will not harm native plants. The herbicides with the least impacts are the ones that have been studied

BLM_0001497

the least... They all are toxic!

**Response:** The BLM is complying with the ESA through formal consultation with both the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (the Services). The Biological Assessment (BA) is found on the CD included with the Final PEIS and PER. The BA is also available for public download from the Washington Office Website where the PEIS is posted and was posted during public comment. A discussion on biological control agents and the National interagency approval process for release of organisms is described under Biological Control in Chapter 2 of the PER. The BLM does not release any biological agents until they have been 1) thoroughly tested and determined to be host-specific and approved for release by the USDA Agricultural Research Service; 2) undergone ESA consultation; and 3) have appropriate NEPA analysis conducted prior to release.  See response to Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations of uses. See Scope of Analysis in Chapter 1 of the PEIS. ORV use is outside the scope of analysis of the PEIS.

EMC-0525-093
Western Watersheds
Project

**Comment:** BLM must conduct on-the-ground inventories of species, and habitat conditions and populations across the [P]EIS area. BLM must use its current special status species list, Partner in Flight species lists, information from the Conservation Data Center, and other important recent summaries, such as Connelly et al. 2004 and Dobkin and Sauder 2004, and Wisdom et al. 2004, to examine species of concern and their habitat needs. It must conduct in depth surveys and analyses for species of concern, and collect thorough and up-to-date information on the quality and quantity of habitats across the [P]EIS area. BLM must carefully review these lists, and updated information, and assess habitat conditions for these species. BLM must conduct systematic baseline surveys for breeding birds, migrants, wintering species. BLM should work with experts to assess populations, genetic uniqueness, etc.) BLM must also fully consider the changing dynamics in wildlife populations – such as elk, and the high priority segments of the public place on this species, as well as antelope and mule deer.

**Response:** It is not possible in this PEIS to conduct inventories of species habitat conditions and populations across a 17-state area of the West, including Alaska, encompassing nearly 261 million acres of public lands. The cost and time would be exorbitant. BLM has reviewed all current and pertinent information provided by the Services and other agencies and organizations relative to sensitive species addressed in this PEIS. The BLM conducts appropriate wildlife baseline inventories to support site-specific NEPA analysis for vegetation treatments at the time a project is proposed or during monitoring and assessments leading up to a project proposal.

EMC-0559-005
Daniel, Bill

**Comment:** There is a huge list of "Special Status" species that may be threatened to the point of uplisting under the Endangered Species Act or locally or regionally extirpated by the preferred action, yet the DEIS [Draft PEIS] fails to analyze how each species would be affected or whether requires mitigation.

**Response:** The intent of BLM vegetation treatments is to improve public lands for special status species, and implement Standard Operating Procedures (SOPs) and mitigation to avoid or minimize impacts to these species from treatment actions, so these species would not be extirpated by the Preferred Alternative, or require listing under the Endangered Species Act. In general, SOPs and mitigation measures identified in the PEIS, PER, and Biological Assessment apply to broad species groups, in many cases, making it unnecessary to analyze how each species would be affected

BLM_0001498

RESPONSE TO COMMENTS

by treatment actions. In addition, effects to special status species would be analyzed at the local level under NEPA prior to implementing any projects.

EMC-0585-065
Western Watersheds
Project

**Comment:** The current documented declines or endangerment of many species were not considered. Outcomes of treatments may wipe out/locally extirpate rare or declining species. See Dobkin and Sauder 2004, discussion of small mammals existing in highly fragmented habitats. In a context of species existing in small, highly fragmented pockets of suitable habitat, BLMs treatments that may disturb native habitats or herbicide drift, may have much greater impacts.

**Response:** The potential effects of treatments on special status species are addressed in the PEIS, PER, and Biological Assessment (BA). This information may be found in Chapter 4 of the PER under the subheadings Effects to Special Status Plant Species, Effects to Special Status Fish and Other Aquatic Organisms, and Effects to Special Status Wildlife Species; in Chapter 4 of the PEIS under the subheadings Special Status Plant Species, Special Status Fish and Other Aquatic Organisms, and Special Status Wildlife Species, and throughout Chapters 4 through 6 of the BA. Conservation measures presented in the BA for threatened, endangered, and proposed for listing (TEP) species take into account factors that make species especially sensitive to treatments, such small, fragmented habitats. When developing treatment programs at the local level, the BLM would take into account all special status species in and near the treatment area, and come up with additional conservation measures, as needed, on a species by species basis. In addition, consultation with U.S. Fish and Wildlife Service and National Marine Fisheries Service would occur at the project level.

PHC-006-006
H. McNeel

**Comment:** One other thing is I think would help you is – and I haven't read this in detail, is what happens if the BLM doesn't use a herbicide or a combination of the integrated weed management. What happens to our threatened and endangered species.

**Response:** Information on the benefits to threatened and endangered species from integrated weed management is provided in the Biological Assessment that accompanies the PEIS (and is included on the CD that is included with the Final PEIS). Additional information is provided in the Special Status Species sections for Vegetation, Fish and Other Aquatic Organisms, and Wildlife Resources in Chapter 4 of the PEIS and PER.

PHC-006-007
H. McNeel

**Comment:** Many people do not understand that these are useful tools also to save our native species and our threatened and endangered species. Sometimes the risk of the weed or the nonwanted plant is greater on eradicating a threatened and endangered species that the use of herbicides.

**Response:** See response to Comment PHC-006-006 under PEIS Alternatives, Special Status Species.

RMC-0006-036
Central Sierra
Environmental
Resource Center

**Comment:** All areas to be treated with herbicides should first be surveyed for rare and at-risk plants and animals. If rare and at-risk plants and animals are found on the site, herbicide treatments should not be allowed, or actions to mitigate impacts to rare and at-risk species should first be taken.

**Response:** As discussed in the PEIS in Chapter 2 under Special Precautions, Special Status Species, surveys for special status species would be conducted before any vegetation treatment or ground disturbance occurs. Conservation measures to protect

BLM_0001499

special status plant and animal species are given in the Biological Assessment.

RMC-0144-017
Wyoming Game and
Fish Department

**Comment:** [Page] 2-15 [of the Draft PEIS] statement: "The BLM state directors may designate sensitive species in cooperation with their respective state." We recommend this be changed from the term 'may' to 'will'. The Wyoming Game and Fish Department recently completed a Comprehensive Wildlife Conservation Strategy Plan for the state that lists state species of concern and sensitive species and we will gladly supply the document to you for inclusion in Appendix H [of the Draft PEIS] – Special Status Species List.

**Response:** The decision to designate a sensitive species is within the state director's discretionary authority and is mutually agreed upon with the affected state. The PEIS analyzes the merits and environmental impacts of adopting specific herbicides for use on public lands. The PEIS does not propose to commit state directors to any specific course of action. The use of "may" is appropriate in this case.

RMC-0205-018
Oregon Department of
Agriculture

**Comment:** As a result of a lawsuit filed against the Environmental Protection Agency (EPA) by the Washington Toxics Coalition (2002), a federal judge ordered that "buffer zones" be placed around salmon bearing streams for the application of certain pesticides. The buffers include a 20 yard no application zone adjacent to salmon bearing waters when specific pesticides are being applied by ground methods, and a 100 yard buffer during aerial applications. Of the 26 pesticides still being investigated for their potential affects on threatened and endangered salmon species, diuron, 2,4-D, and triclopyr are the only 3 that are approved for use on BLM lands. DEQ asks that BLM keep these restrictions in mind during the potential application of these pesticides. More information and maps of the affected areas can be found at: http://www.epa.gov/espp/wtc/maps.htm.

**Response:** The Court issued this Order in response to the Plaintiffs' motion for injunctive relief to establish buffer zones as an interim measure to minimize the risk of jeopardy from pesticide use to 26 sub-groups of listed Pacific salmon and steelhead. These measures are intended to be in place until the USEPA and National Marine Fisheries Service (NMFS), where appropriate, complete consultation on the effects of these herbicides.

The General Exceptions section of the USEPA's website addressing the lawsuit (http://www.epa.gov/espp/wtc/maps.htm#wtc1) provides exceptions to the buffer strip requirement, including "programs authorized by the NMFS," which includes this BLM activity. The exceptions state that only a 1-yard buffer strip is required for "Use of a pesticide undertaken as part of a specific agency action (other than USEPA's authorization of a pesticide use under FIFRA)" where authorized through consultation with NMFS. A Biological Assessment (BA) has been prepared for the activities addressed in the PEIS, and consultation is underway. Herbicide-specific buffers for listed threatened, endangered, and sensitive fish species are established in the BA (see Table 5-6) and PEIS (see Table 4-21). Suggested conservation measures in the BA include a restriction on the use of triclopyr butoxyethyl ester (BEE) in areas where threatened, endangered, and sensitive aquatic species may occur, and restrictions on diuron and triclopyr BEE where off-site drift or surface runoff may occur into habitat that supports threatened, endangered, or aquatic species or species proposed for listing. These proposed restrictions are more stringent than those imposed by the Court. The BA prepared for this PEIS also states that local consultation with NMFS and/or U.S. Fish and Wildlife Service will be required for use of herbicides in riparian areas where threatened or endangered species, or species proposed for listing, are found. During

BLM_0001500

such consultation, the BLM would implement any new label guidelines or restrictions established by the USEPA, or include the buffers established by the Court if no new information exists.

RMC-0213-005
California Native Plant Society

**Comment:** The best available science indicates that many registered pesticides are likely to cause negative impacts to endangered species even when used lawfully. There is evidence that long-term impacts of herbicides can have dire effects on rare plants. CNPS [California Native Plant Society] is particularly concerned with the known reproductive effects of sulfonylurea herbicides. Many of the current scientific publications addressing the reproductive effects of the sulfonylurea herbicides are not included in the literature review for the BLM's assessment. Copes of these omitted references will be sent by U.S. mail and are summarized and cited below. We hope that your staff will review these important sources and reevaluate the PEIS to address these well-known impacts that have been documented by peer-reviewed scientific studies funded by the U.S. EPA.

**Response:** The BLM evaluated the risks to rare, threatened and endangered species in the ecological risk assessments, prepared a Biological Assessment for threatened and endangered species, and proposed mitigation measures and Standard Operating Procedures to reduce risks to these species. These assessments were based on scientific publications and USEPA registration documents. Although sulfonylurea herbicides pose low to high risks to plant species of concern, they would pose little risk to fish and wildlife species of concern, as discussed in the PEIS in Chapter 4 (Vegetation, Fish and Other Aquatic Resources, and Wildlife Resources sections).

RMC-0213-009, 010
California Native Plant Society

**Comment:** The following at-risk taxa are also known or likely to occur on BLM lands in California, Nevada, or both, and should be included in the Special Status Species List in Appendix H of the Draft PEIS:

*Astragalus cimae* var. *cimae; Astragalus inyoensis; Astragalus johannis-howellii; Atriplex argentea* var. *longitrichoma; Eriogonum beatleyae; Eriogonum microthecum* var. *schoolcraftii; Lathyrus hitchcockianus; Opuntia pulchella; Pediomelum castoreum; Salvia funerea;* and *Sclerocactus polyancistrus*

This does not include additional taxa in the Watch-list portion, which could number at least as many species that should be considered.

**Response:** Most of these species are classified as Watch-list species by the California and/or Nevada Natural Heritage Programs. Watch-list is not a special status species category used by the BLM. The list does include BLM sensitive species, which are designated by BLM State Directors, in cooperation with applicable state agencies and Natural Heritage programs to ensure their accuracy and completeness. As mandated in BLM Manual 6840, sensitive species lists are periodically reviewed and updated. A species-by-species response to this comment is provided below.

*Astragalus cimae* var. *cimae* does not occur on lands administered by the BLM in California. It does occur on BLM-administered lands in Nevada, but it is a Nevada Watch-list species.
*Astragalus inyoensis* is a California and Nevada Watch-list species.
*Astragalus johannis-howellii* is on the special status plant species list in Appendix H of the PEIS for its occurrence in California. It is a Nevada Watch-list species.
*Atriplex argentea* var. *longitrichoma* is not known to occur in California. It is a Nevada Watch-list species.

BLM_0001501

*Eriogonum beatleyae* occurs only in Nevada. It is has been delisted and dropped from consideration by the Nevada Native Plant Society.

*Eriogonum microthecum* var. *schoolcraftii* is not known to occur in California. It is a Nevada Watch-list species.

*Lathyrus hitchcockianus* has not been seen in California for over a century, and is not on BLM or California Native Plant Society lists. It is a Nevada Watch-list species.

*Opuntia pulchella* is considered by the California Native Plant Society to be "Rare, Threatened, or Endangered in California, but More Common Elsewhere." This is not a special status species category used by the BLM.

*Pediomelum castoreum* is a California and Nevada Watch-list species.

*Salvia funereal* is a California and Nevada Watch-list species.

*Sclerocactus polyancistrus* is a California and Nevada Watch-list species.

| | |
|---|---|
| RMC-0214-040<br>Natural Resources<br>Defense Council and<br>National Wildlife<br>Federation | **Comment:** BLM initiated informal consultation with the Fish and Wildlife Service and NOAA [National Oceanic and Atmospheric Administration] Fisheries in 2001. See D[raft] PEIS at 5-2. The proposed massive use of herbicides across federal lands in the west is likely to adversely affect dozens of listed species and their critical habitat. BLM must therefore initiate formal consultation with the Services to prevent jeopardy to threatened and endangered species. BLM's failure to do so violates the ESA [Endangered Species Act].<br><br>**Response:** The BLM initiated consultation with the U.S. Fish and Wildlife Service and National Marine Fisheries Service (formerly NOAA Fisheries) in 2001. With the release of the Draft PEIS to the public in November 2005, the BLM initiated formal consultation with the Services as required under the ESA. The Services responded to the request for consultation and requested additional information and clarification of the proposed action. As part of the consultation process, a meeting and follow-up conference call transmitted this information. This coordination and discussion of additional information allowed the BLM to conclude the proposed action, at the scale of the programmatic consultation, resulted in a determination of "May Affect, Not Likely to Adversely Affect" (NLAA). The BLM subsequently transmitted this additional information and a request for concurrence to the Services. In September 2006, and again in May 2007, the BLM received a Letter of Concurrence from the USFWS. The NMFS has indicated that it will issue a formal biological opinion on June 14, 2007. |
| RMC-0218-016<br>Blue Mountains<br>Biodiversity Project,<br>League of Wilderness<br>Defenders | **Comment:** There is a huge list of "Special Status" species that may be threatened to the point of uplisting under the Endangered Species Act or locally or regionally extirpated by the preferred action yet the DEIS [Draft PEIS] fails to analyze how each species would be affected or require needed mitigation.<br><br>**Response:** See response to Comment EMC-0338-007 under PEIS Alternatives, Special Status Species. |
| RMC-0218-059<br>Blue Mountains<br>Biodiversity Project,<br>League of Wilderness<br>Defenders | **Comment:** The BLM has evidently not done wildlife population surveys for Management Indicator (or "Special Status") species as required by the National Forest Management Act. This prevents a Finding of No Significant Impact or "will not likely lead to a trend toward uplisting" finding for BLM Management Indicator, listed or special status species as population levels are not known and viability thresholds have not been established for these species, causing the PEIS or an ROD [Record of Decision] adopting one of the action alternatives (particularly any involving herbicide use) to be in violation of NFMA [National Forest Management Act) and the ESA [Endangered Species Act]. |

BLM_0001502

RESPONSE TO COMMENTS

**Response:** The BLM is an agency in the Department of Interior with a management mandate outlined in the Federal Land Policy and Management Act (FLPMA) of 1976, and is not subject to the National Forest Management Act. However, under FLPMA, the BLM routinely inventories for special status wildlife habitat and populations. The PEIS/PER include Standard Operating Procedures (see Chapter 2) to survey for both threatened and endangered species as well as other special status species. BLM policy states that actions should not lead to the need to list special status species (BLM Manual 6840 – *Special Status Species Management*).

RMC-0221-012
Center for Biological
Diversity

**Comment:** The BLM's proposed aerial spaying of herbicides over nearly one million acres of public lands annually would violate the Endangered Species Act ("ESA") because many, if not all, of the 18 herbicides that the BLM proposes to spray over public lands were approved for use by the Environmental Protection Agency ("EPA") in violation the ESA. As courts have found, the EPA has repeatedly granted approval for registration of many pesticides and other toxic chemicals without first consulting with the Fish and Wildlife Service ("FWS") and/or the National Marine Fisheries Service ("NMFS") as to the potential impacts to listed species. *See, e.g., Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir. 2005) (affirming the district court's order finding that EPA violated the ESA by failing to consult on the impacts of 54 pesticides before approving them for use and enjoining their use near streams in California, Oregon, and Washington that support listed species of salmon and steelhead until EPA completed the required consultation); *Center for Biological Diversity v. Leavitt*, No. C 02-01580 (N.D. Cal. September 19, 2005) Order Re Cross-Motions for Summary Judgment (finding that EPA failed to comply with Section 7(a)(2) of the ESA in its registration of 66 pesticides and failed to make the required determinations regarding effects of pesticide registrations on the threatened California red-legged frog).

**Response:** The BLM consults with the Services (U.S. Fish and Wildlife Service and National Marine Fisheries Service) on its vegetation treatment projects if there is a "May Affect" determination for an ESA-listed species. The BLM is consulting with the Services on the use of its approved herbicides through this PEIS, and is in full compliance with the requirements of the ESA. The BLM proposes to use the conservation measures outlined in the Biological Assessment to protect special status species and critical habitats. Consultation will also take place at the local level for any action that "May Affect" an ESA-listed species. Consultation at this scale will allow the BLM to implement any additional protective measures required by the Services for federally-listed species. The Federal Insecticide, Fungicide, and Rodenticide Act requires that the USEPA register herbicides. All of the herbicides that BLM proposed to use have been registered by the USEPA under this Act.

RMC-0221-013
Center for Biological
Diversity

**Comment:** There is no evidence in the D[raft] PEIS or elsewhere in the record that the 18 herbicides that the BLM proposes to use in this project, including the 4 "new" herbicides, were properly approved by EPA in accordance with the ESA [Endangered Species Act]. Both active and inactive ingredients in the herbicide mixtures can have adverse impacts throughout the ecosystem. Pursuant to Section 7 of the ESA, the BLM has an independent duty to conserve and protect the threatened and endangered species that depend on the public lands it is charged with managing. Therefore, the BLM cannot ignore EPA's failure to comply with the ESA in this regard and to do so would also violate the ESA.

**Response:** See response to Comment RMC-0221-012 under PEIS Alternatives, Special Status Species.

BLM_0001503

RMC-0221-014
Center for Biological
Diversity

**Comment:** Even if some or all of the herbicides that the BLM proposes to utilize in the proposed project were properly approved by the EPA in accordance with the ESA [Endangered Species Act], which the Center [for Biological Diversity] does not concede, the BLM has failed to ensure that the proposed project will not jeopardize listed species or destroy or adversely modify critical habitat. Although the BLM has initiated consultation with the FWS [U.S. Fish and Wildlife Service] and the NMFS [National Marine Fisheries Service], the BLM has failed to provide adequate information regarding the likely impacts to listed species and their habitats necessary to assess the extent of such impacts from the proposed wholesale aerial herbicide spraying. As discussed below in Section III.D., the information provided by the BLM in the Biological Assessment including the Ecological Risk Assessment is wholly inadequate. In order to comply with the ESA (as well as NEPA), the potential impacts that must be identified and analyzed to determine how and to what extent the proposed action may affect listed species or their habitats include, but are not limited to: direct impacts to plants (including seed banks), to wildlife, and to their habitats (including impacts to critical habitat); indirect impacts to listed species and their habitats through contamination of air, water, and soils; direct and indirect impacts to species due to bioaccumulation of these herbicides and/or their breakdown products throughout the ecosystem; direct and indirect synergistic effects from these herbicides, their breakdown products, and/or other chemicals found in the environment; and cumulative impacts to listed species and their habitats from this and other projects that impact air and water quality and soils.

**Response:** See response to Comment RMC-0221-012 under PEIS Alternatives, Special Status Species. The BLM has initiated consultation with the Services, which will determine the adequacy of the information contained in the Biological Assessment. Information on the impacts and effects to sensitive wildlife species and their habitat from herbicide use, appropriate for the programmatic scale of this analysis, is disclosed in the PEIS and PER. The BLM will follow all of the mandates of the ESA in its consultation with the Services to ensure that no listed species is jeopardized through the use of herbicides.

RMC-0221-015
Center for Biological
Diversity

**Comment:** Because the herbicides that the BLM has proposed to use in this project were not approved for registration in accordance with the ESA [Endangered Species Act], and the BLM has independently failed to fulfill its obligations under the ESA, approval of the proposed project will violate the ESA.

**Response:** See responses to Comment RMC-0221-012 under PEIS Alternatives, Special Status Species, and Comment EMC-0338-007 under PEIS Alternatives, Special Status Species.

RMC-0221-023
Center for Biological
Diversity

**Comment:** Inevitably, because the area of the proposed project is not clearly defined, the identification of potential environmental effects is fatally flawed. For example, the D[raft] PEIS fails to provide any meaningful information about the rare, threatened, and endangered species and their habitats that may be affected by the proposed project, indeed, even the list of species that may occur in the 17 western states encompassed by the project is incomplete. NEPA demands far more. Moreover, the BLM cannot fulfill its obligations to protect and conserve listed species under the Endangered Species Act ("ESA") without detailed information about the status of those species and their habitats on the public lands that may be impacted by the proposed action.

BLM_0001504

**Response:** As noted under each relevant resource section (Vegetation, Fish and other Aquatic Organisms, and Wildlife Resources) in Chapter 4 of the PEIS under Special Status Species, information on federally-listed species, and species proposed for listing, including habitats on public lands that could be affected by vegetation treatment actions, is given in detail in the Biological Assessment. The Biological Assessment also provides Standard Operating Procedures and mitigation to minimize and avoid impacts to these species from treatment actions. Also see response to Comment RMC-0006-036 under Alternatives, Special Status Species.

RMC-0221-026
Center for Biological
Diversity

**Comment:** Accurate baseline data regarding rare, threatened, and endangered species on BLM managed public lands is also critical to identifying and analyzing the potential impacts of the proposed action under NEPA and the ESA [Endangered Species Act]. For example, in many areas of the arid west native plants may not emerge every year but only in years of high rainfall or when temperatures are favorable. The survival of these native plants depends on the survival of dormant seed in the soils. Without detailed, longitudinal surveys, the locations of these native plant seed banks remain unknown to the BLM. Responsible resource management is thus impossible. Without this necessary information, allowing aerial herbicide spraying in areas that may contain native seed banks critical to the survival of native plants is irresponsible.

**Response:** The BLM routinely inventories for special status plants. The PEIS and PER include Standard Operating Procedures to survey for federally-listed species, as well as other special status species. These detailed surveys should include gathering data on flowering and seed production of native plants. BLM policy states that actions should not lead to the need to list special status species (BLM Manual 6840 – *Special Status Species Management*). Standard Operating Procedures and Guidelines in the PEIS and PER (see Chapter 2) include minimizing damage to non-target species, which includes seedbank damage, through use of selective techniques or selective herbicides. Local interdisciplinary teams that include biologists consider survey data on the species populations, their productivity, and potential impacts to the seedbank when designing actions that may affect species, in order to ensure that site-specific mitigation is developed if necessary.

## Alternatives, Wilderness Areas

EMC-0252-004
Levanti, Deanna

**Comment:** Furthermore, using herbicides in national and state parks and reserves is not acceptable. Destroying the wildfire ecosystem on lands that have been marked for the preservation of that very ecosystem is beyond counterproductive.

**Response:** The agencies that administer national and state parks, not the BLM, will make decisions about what land treatments are appropriate for the management and protection of lands under their jurisdiction. The BLM does not manage national parks or state parks, but it does manage the Headwaters Forest Reserve in northern California. Nothing in the enabling legislation for the Headwaters Forest Reserve prohibits the use of herbicides to meet the purposes for which the area was established. However, the Resource Management Plan for this area states, "Implementation Guidelines – Following completion of weed mapping and inventory, direct removal of weed infestations will occur using hand tools. Herbicides will not be used."

EMC-0513-004
The Wilderness
Society

**Comment:** The focus of these comments is the need for the PEIS to include specific limits and requirements for use of herbicides in designated Wilderness, Wilderness Study Areas (WSAs) and other lands with wilderness characteristics. All of these areas

BLM_0001505

contain special natural character that can be compromised by the use of herbicides; protecting that special character requires special attention in the PEIS.

**Response:** Limits on the use of herbicides in designated wilderness and wilderness study areas are provided in BLM Manual 8560 – *Management of Designated Wilderness Areas* (8560.37A h. (2) Plant Control). For wilderness study areas the BLM Handbook 8550-1 – *Interim Management Policy for Lands Under Wilderness Review* (H8550-1 Chapter 3 C. Watershed Rehabilitation and Vegetative Manipulation) addresses the issues of herbicide use. Nothing in the PEIS would change this guidance. There is no specific guidance for herbicide use on other lands with wilderness characteristics; since they have no legislative designation, they would be subject to the same rules regarding herbicide use as other undesignated public lands.

EMC-0513-018
The Wilderness Society

**Comment:** Prior to permitting or even considering use of herbicides on lands with wilderness values, BLM should consider all other alternatives. Any such proposals should be required to meet a high burden of proof to determine if use of herbicides is really justified in light of their interference with the naturalness of these lands.

**Response:** This statement generally agrees with the guidance provided in the BLM Manual 8560 – *Management of Designated Wilderness Areas* and H8550-1 – *Interim Management Policy and Guidelines for Lands Under Wilderness Review*. Consideration of the use of herbicides in wilderness and wilderness study areas is required to meet the higher standards that are associated with these lands than other public lands.

EMC-0513-022
The Wilderness Society

**Comment:** A determination that there is "no effective alternative" and that the use of a herbicide is needed to maintain the natural ecosystem should be an explicit requirement before considering use of herbicides in WSA [wilderness study area]. Further, as recommended by the IMP [integrated management plan], a minimum tool assessment should be conducted. A similar approach is appropriate for lands with wilderness characteristics, which can and should be managed to preserve and enhance their wilderness characteristics.

**Response:** The BLM's interim management policy for WSAs allows the use of herbicides to maintain wilderness values as defined in the Wilderness Act. Use of the minimum tool for such applications is required.

EMC-0513-033
The Wilderness Society

**Comment:** The Preferred Alternative, including Tables 2-8 and 2-9, must be revised based on the corrected analysis of impacts of herbicides and the legal and policy requirements [regarding Wilderness Area] set out above.

**Response:** We have revised Table 2-8 in the Final PEIS to note that the BLM would follow the "minimum tool." The other issues discussed earlier are not Standard Operating Procedures, are referenced in management plans identified in Table 2-8, or are covered in Chapter 2 under Monitoring. Also see response to Comment EMC-0513-022 under PEIS Alternatives, Wilderness Areas.

RMC-0049-025
Wilson, Robert E.
(University of Nevada Cooperative Extension)

**Comment:** Page 2-16 [of the Draft PEIS] Wilderness areas. The benign neglect of invasive species suggested in this section is inexcusable for a land management agency. Specifically because it is perceived by managers that motorized equipment cannot be used within wilderness areas then the agency has a responsibility to take a very aggressive stance toward control of invasive species before they have been allowed to dominate that "pristine" environment.

BLM_0001506

RESPONSE TO COMMENTS

**Response:** The requirements of the Wilderness Act do include managing the naturalness of an area to protect it from invasive species. This requirement is reflected in BLM Manual 8560, *Management of Designated Wilderness Areas*, which applies to the areas addressed in this comment.

RMC-0057-014
California Wilderness
Coalition

**Comment:** The Vegetation Treatment Method selection should include a consideration of the treatment area's wilderness values. The D[raft] PEIS currently states that managers will consider an area's land use before selecting a treatment method but the method selection does not direct managers to take special consideration for areas with wilderness characteristics.

**Response:** In Chapter 2 of the PEIS under Special Precautions – Wilderness Areas, it states, "management of vegetation must be directed toward retaining the natural character of the environment." It also states, "tools and equipment may be used for vegetation management when they are the minimum amount necessary for the protection of the wilderness resource." Table 2-6 (Standard Operating Procedures) in Chapter 2 of the PEIS states, "use chemicals only when they are the minimum method necessary to control weeds that are spreading within the wilderness or threaten lands outside the wilderness."

RMC-0218-017
EMC-0559-006
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders
Daniel, Bill

**Comment:** There should be no herbicide use or vehicle use in Wilderness Areas as proposed.

**Response:** The Wilderness Act allows the use of vehicles or herbicides in wilderness for various administrative purposes. However, this use would be rare.

**Alternatives, Monitoring**

EMC-0130-001
McDorman, Bill

**Comment:** Please send me your 20, 30 and 40 year studies proving the long-term effectiveness of spraying herbicides on BLM lands to control weeds. Please include data about diversity of species. Pretty bold to try a million acre experiment. You must have some amazing data.

**Response:** See response to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities.

EMC-0238-009
California Partners in
Flight

**Comment:** We recommend the final planning document include a more extensive discussion of post-treatment monitoring. We did not find that extensive discussion anywhere in the Biological Assessment. If the Preferred Alternative is selected and the acres treated annually are to triple over the current condition, how will effective monitoring be accomplished? Will the annual budget for monitoring be tripled? It is critical to know what the effect of such an extensive annual herbicide treatment program will have on fish and wildlife, both as a result of direct application on populations and their habitats, and indirectly through habitat modification and temporary losses of habitat and forage. CalPIF [California Partners in Flight] recommends that, at a minimum, an avian monitoring program be developed and undertaken as an integral part of the herbicide treatment plan. We recommend avian monitoring because birds are often the easiest category of wildlife to monitor in that they are easily detectable and often show high site fidelity.

BLM_0001507

**Response:** We have revised the Monitoring section in Chapter 2 of the PEIS and PER to include more information on post-treatment monitoring and BLM guidance on monitoring. As discussed, monitoring is primarily implemented at the local field office level. Monitoring is included as a specific task and component of each treatment project design. As projects are funded, monitoring is included in the funding allocation. In those cases where herbicide treatments are planned and potential impacts to avian species are identified, appropriate monitoring for these species and their habitat would be proposed as part of the monitoring plan.

EMC-0291-003
Maxwell, Bruce
(Montana State
University)

**Comment:** I prefer to keep that aspect separate. Regardless, the point is that the report should call for monitoring of weed populations prior to initiating management with herbicides or any other management. The report should identify methods and standards that allow populations to be site-specifically evaluated for their potential to be invasive and set thresholds for management given specific management objectives. Only after substantial changes that would include these concepts should the PEIS receive approval.

**Response:** See responses to Comment EMC-0133-002 under PEIS Environmental Consequences, Human Health and Safety, and Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0340-005
Craig, Diane

**Comment:** I also wonder how the BLM intends to monitor such a program and what they have in mind when it eradicates vast populations that nature placed in these areas to live in harmony and balance. Is the BLM responsible for providing emergency healthcare to the wildlife and plant populations it intends to exterminate with this senseless act?

**Response:** See response to Comment RMC-0130-005 under PEIS Alternatives, Monitoring.

EMC-0340-006
Craig, Diane

**Comment:** The BLM as stated "monitoring ensures that vegetation management is an adaptive process that continually build upon past successes and learns from past mistakes" my question here is how can the BLM evaluate such successes and mistakes when it recognizes "that many sites treated in the past lack monitoring data. In many cases, project monitoring was not done, was done sporadically without consistent documentation, or was done but the records were lost or destroyed". A major concern to me resulting from the lack of administrative documents is one that few would think of, but due to the categorical and systematic assault on our lands resources by this administration I cannot help but wonder about the possibility of deliberate over-contamination of chemicals in certain areas so as to close them to public use and the public eye – thus allowing for the unseen logging, mining and continued rape of the land to occur.

**Response:** The BLM acknowledges gaps in monitoring information from past activities, as discussed in Chapter 2 of the PEIS under Monitoring. As identified in the PEIS, the reasons for these gaps are many and varied and span some 40 years or more. Standards and requirements for documentation in the past (e.g. dating from the 1960's) were less stringent than standards considered in subsequent decades and are not reflective of standards for documentation in use today. Record keeping likewise is not consistent from office to office over a multiple decade time frame. The BLM also acknowledges the importance of and need for monitoring; the two statements quoted in the comment are not inconsistent with one another. In general, monitoring records are

BLM_0001508

RESPONSE TO COMMENTS

available at the field offices and are used in the design of vegetation treatment projects, as well as to support current and future vegetation allocation decisions in land use plans and appropriate permitted use. Although monitoring records are not complete, the BLM is guided by statutory and regulatory considerations pertaining to application of herbicides on public lands. Intentional over-contamination of public lands with herbicides without environmental consideration would violate a number of statutes, including, but not limited to the Federal Insecticide, Fungicide and Rodenticide Act, NEPA, and Federal Land Policy and Management Act. The BLM has not closed any public lands to public use as a result of herbicide treatments. All public land uses are authorized only after the appropriate NEPA analysis and public participation has occurred.

EMC-0405-012
Hoover, Victoria N.

**Comment:** Since this whole project, as outlined in the [P]EIS/PER, is basically one massive experiment, BLM should start small on these treatments, and monitor results carefully for several seasons before expanding the scope of the efforts. A wide range of ecoregions, with a large number of vegetation communities and habitats, is being considered. Yet, apparently no carefully, scientifically documented controls are planned. For each type of vegetation, BLM should design a control area to see objectively the difference between treated and untreated areas.

**Response:** This PEIS assesses the impacts of herbicide use on human health, ecological resources, vegetation, and other public land resources. The PEIS does not authorize any action to be taken on the ground, as stated under NEPA Requirements of the Program and in Figure 1-1 in Chapter 1 of the PEIS. The proposed action and analysis does not represent a massive experiment. The proposed action represents a need to provide additional tools to treat vegetation. These tools are well established practices in use by numerous federal, state, and county agencies. Treatments proposed at the local field level would have established monitoring requirements and timeframes. Controls for treated and untreated areas are developed at the local field level in collaboration with state, county, and local agencies, as well as university extension services. The PEIS allows local BLM field offices to utilize the analysis to prepare site-specific environmental documents. Also see responses to Comment EMC-0446-032 under PEIS Alternatives, Monitoring and Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0411-007
Schroyer, Don L.

**Comment:** What is the rate-of-success of containment, control or eradication for chemical vs. mechanical means?

**Response:** The BLM utilizes an integrated pest management framework for vegetation treatment planning. Under an IPM framework, multiple tools or methods may be used alone or in combination effectiveness. The BLM cannot compare the "rate of success" between two specific treatment methods across the 17-state area for several reasons. In many cases, these types of data are incomplete. Furthermore, the BLM does not apply vegetation treatments through either chemical-only or mechanical-only methods. The benefits (success) and adverse effects of the different treatment methods are discussed in Chapter 4 of the PER. In general, treatment methods utilized meet the resource specific objectives identified for a specific project. Not all treatment methods are appropriate for all situations; thus, a comparison of relative success or "rate of success" between two methods is not ascertainable.

EMC-0446-012
The Nature

**Comment:** Monitoring results and effects at regional scales: The draft PEIS and PER do not provide adequate direction on the need to monitor ecological conditions,

BLM_0001509

| | |
|---|---|
| Conservancy | treatment implementation and management effectiveness relative to project goals, or describe the tools available to do so. LANDFIRE is a wildland fire, ecosystem, and fuel assessment-mapping project designed to generate consistent, comprehensive, multi-scale maps of vegetation, fire, and fuel characteristics for the United States. Tools such as LANDFIRE will be especially useful not only for analyzing and documenting hazardous fuels conditions, identifying ecosystems at risk, conserving ecosystem function, and implementing Fire Program Analysis, but it also provides a framework and data for monitoring the success of treatments over time, including changes in Fire Regime Condition Class (FRCC). We recommend that the public investment and value of LANDFIRE be utilized to the greatest extent possible. |

**Response:** The BLM agrees that the LANDFIRE tool is useful and will assist BLM in regional-scale monitoring and effects analysis as the tool is developed and refined. See Monitoring in Chapter 2 of the Final PEIS for additional information on available monitoring tools. The most recent LANDFIRE rapid assessment map is included in the Final PEIS (Map 3-10) in addition to the National FRCC map in the Draft PEIS.

| | |
|---|---|
| EMC-0446-032 The Nature Conservancy | **Comment:** Mitigation/Monitoring: On page 2-21 of the [Draft] PEIS, monitoring for treatment effectiveness is mentioned. However, the only specific requirement listed is for water resources and there is no requirement to monitor impacts to non-target species or habitats. We strongly urge that the PEIS include guidelines and requirements for monitoring to assess potential off-target impacts as well as to assess treatment effectiveness. |

**Response:** The Monitoring section of Chapter 2 of the PEIS is not exclusive to water resources. The section addresses monitoring requirements at the project level and uses an example of addressing monitoring for water resources to determine the effectiveness of buffer strips for water quality. See the Monitoring section of Chapter 2 of the PER for a description of the BLM's responsibility for monitoring vegetation treatments.

| | |
|---|---|
| EMC-0446-063 The Nature Conservancy | **Comment:** No reference is made to the potential for invasive species encroachment post-disturbance, or the need for monitoring regarding this encroachment. Given the high disturbance associated with chaining this monitoring should be included as an SOP [Standard Operating Procedure] ([Draft] PER [page] 2-24). |

**Response:** Specific monitoring requirements are established during project design at the time the project is proposed. The need to monitor for post-disturbance encroachment of invasive species following vegetation treatments applies to all treatment methods, including chaining. The BLM *Partners Against Weeds - An Action Plan for the BLM* (USDI BLM 1996) establishes a strategy goal (page 22) to ensure site-specific monitoring objectives that address infestation and control of noxious weed species are included in activity plans. Following this guidance, site-specific project plans for vegetation treatments are required to include a monitoring component. In addition, BLM Manual 9015, *Integrated Weed Management*, states that a noxious weed risk assessment, which considers post-disturbance encroachment, must be completed for each project. If the potential for post-disturbance encroachment is identified, specific actions to mitigate this risk are proposed during the site-specific project design and NEPA analysis.

| | |
|---|---|
| EMC-0505-009 U.S. Environmental Protection Agency | **Comment:** EPA believes the Final PEIS should include additional information and assurances regarding adequate monitoring and evaluation to determine if application rates are effective, buffers are sufficient, drift is minimized and specific goals and |

BLM_0001510

endpoints are being met. In particular, the Final PEIS should discuss in the detail appropriate for a national programmatic level document a commitment to using the best available techniques for monitoring, evaluating, and mitigating impacts from those herbicides that are known to be persistent and that migrate through soil into groundwater.

**Response:** The BLM is dependent on the USEPA's pesticide registration and labeling processes to release products that are effective and generally safe when used in the manner authorized by the label instructions. The BLM has neither the resources nor the legal mandate to independently make these determinations, nor is the BLM mandated to conduct herbicide efficacy or use research. When completing environmental evaluations for herbicide use, the BLM uses USEPA, industry, university, and other studies and risk assessments to help determine whether a pesticide can be used safely and effectively on public lands.

The BLM applies herbicides according to label directions. Because the label directions for some herbicides include mitigating measures or restrictions (for example, related to wind drift, persistence in the soil, movement through the soil, impacts to non-target vegetation, or impacts to aquatic species), the BLM assumes that the USEPA has based these mitigating measures and restrictions on research or scientific information. The BLM does monitor the effects of herbicide applications on the target species along with non-target vegetation occurring in and adjacent to a treated area.

The BLM pays careful attention to calibration and proper use of equipment, as well as applicator training, to ensure that the planned application rate is the actual application rate. The BLM monitors wind and temperature during application to maximize the effectiveness of the herbicide and to prevent herbicide movement off the target area. The BLM also observes soil moisture when using herbicides that are known to be mobile as a result of higher soil moisture. This type of monitoring tends to entail an observation of an indicator or a measurement, followed by a decision to treat or not treat at that time. It usually does not include periodic or systematic monitoring of soil moisture.

The BLM does not have the resources nor the technical expertise to monitor the fate and/or transport of herbicides through the soil or into groundwater. Setting up a research level project to track the movement of small amounts of a chemical or compound through the soil is very complex, even when the amount applied, location of application, and variable environmental factors are controlled or accounted for. Such research is done on very small areas. Trying to monitor small amounts of any substance moving through the soil on a long-term basis in an extensive management context is technically and financially prohibitive.

EMC-0505-018
U.S. Environmental
Protection Agency

**Comment:** We encourage BLM to develop a formal set of criteria for routine demonstration or small scale testing. For example, it might not be practical to commit to a full scale project controlling a large expanse of weeds using insects for biological control or some other biologically based approach, but if this were tried on a limited acreage, the results of that test would inform, and perhaps improve, future efforts. Small investments in demonstration projects can pay off over time and improve or expand the understanding of how to manage vegetation and achieve the desired condition.

**Response:** The BLM seeks input from different groups prior to making the decision to apply a pesticide. The BLM participates in research and demonstration projects, even

BLM_0001511

funding many in order to better understand how to use the different management options available for a particular species, site, or environment.

EMC-0525-105
Western Watersheds
Project

**Comment:** BLM typically has very little current information on ecological conditions and the health of native plant communities across the landscape. The last comprehensive ecological inventories (SVIM) were conducted primarily in the late 70s and early 1980s. When BLM conducts its limited and narrow Fundamentals of Rangeland Health assessments and allotment evaluations, it typically relies on old data, and never re-visits the sites where [P]EIS data had been collected. Key Area sites are located in only the most accessible areas, and are clustered in particular areas of the allotments, leaving vast land areas with no monitoring information at all collected. BLM also fails to collect necessary data on degradation caused by livestock facilities and management activities. Such information is critical to understanding sources of flammable cheatgrass or other weed invasion, causes of roading, the inter-relationship and cumulative impacts of grazing facilities and roading. Current, comprehensive data on condition of soils vegetation, and habitats must be systematically collected. Likewise, BLM relies heavily on wildlife species data in databases and not current inventories. We fear that unless compilation and assessment of this information is conducted at the level of the [P]EIS/PER, data and analysis necessary to understand all direct, indirect and cumulative impacts of the proposed actions will never be done.

**Response:** The BLM acknowledges there are gaps in inventory and monitoring data that can be summarized at the spatial scale of this PEIS/PER (17 states). The monitoring data deficiencies described in the comment are focused on livestock grazing and are outside of the scope of this programmatic analysis.

EMC-0525-107
Western Watersheds
Project

**Comment:** As part of this process, BLM must revisit its limited monitoring sites (or at least a subset), and must also establish a series of new ESI [ecological site inventory] and monitoring sites that represent the ecological condition of the lands.

**Response:** Implementation of monitoring of vegetation treatments will be at the local field office level. The commenter is encouraged to participate in the specific NEPA analyses for future projects at that level with regard to establishing new ESI or monitoring sites. Monitoring is discussed in Chapter 2 of the PEIS and PER under Monitoring.

EMC-0525-132
Western Watersheds
Project

**Comment:** BLM must Conduct Population Viability, Persistence, Extinction/Extirpation Models for species of Native Wildlife, Rare Plants, Special Status Species and T&E [threatened and endangered] Species Under all Alternatives.

**Response:** See response to Comment EMC-0525-111 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0561-006
Petroleum Association
of Wyoming

**Comment:** PAW [Petroleum Association of Wyoming] believes it is important for BLM to do ongoing monitoring and then adaptively make changes as warranted during reclamation in order for effective management to occur. Execution of a project monitoring plan provides the feedback necessary for the ongoing stewardship activities that will ultimately bring about the desired goal set. Designating resources at project initiation to steward restoration activities through time is vital to project success. Our member's experience has shown the added expense is quickly cost justified by positive project results.

**Response:** The BLM agrees.

BLM_0001512

RESPONSE TO COMMENTS

EMC-0584-010
Western Watersheds
Project

**Comment:** Unfortunately, the Draft [P]EIS does not provide adequate information on vegetation communities in the affected lands and their surroundings. BLM must collect and analyze extensive baseline information on past fire and vegetation conversion or manipulation projects in the affected lands in each vegetation type identified in the D[raft] PEIS/PER, and the effects of these treatments on wildlife corridors, habitat fragmentation, likelihood of human-caused fires or disturbance, etc. Data and maps must be compiled and assessed that indicate where all past treatments have been conducted. Without understanding the past dispersion and impacts of treatments and disturbance across the landscape, BLM can not adequately assess the impacts of various alternatives related to treatment and land health. Information that needs to be acquired and assessed includes data and maps of:

Past disturbance events on these lands (fire- prescribed or wild, chemical treatment, mechanical treatment – chaining, cutting, etc.); Seedings or any other post-disturbance treatments that have occurred and their current condition; Condition of treatments and seedings, including cheatgrass and other fine fuels and weeds in interspaces; Impacts of all livestock facilities; Impacts of roading, and roading links to past treatments or livestock or other land uses. Assessment should include a valid study of the current ecological condition and health of soils, vegetation, important wildlife habitats and other important values of the affected lands, a comparison between these conditions and conditions at the time of the disturbance.

**Response:** See response to Comment EMC-0525111 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0584-011
Western Watersheds
Project

**Comment:** For all lands where treatments have been identified by BLM Field offices, BLM must collect current information on: Vegetation species composition, its current ecological condition; livestock grazing regimen and standards of use; wildlife habitats and populations occurring here. Information on periods of rest, trespass, and other livestock factors must be included. Current information on ecological condition, presence of weeds and other exotic species, etc. on all lands within the project area must be collected as part of this effort. It must be the basis for decision making on "acres to be treated" for various purposes in the [P]EIS. For example, how many acres of salt desert shrub communities, Wyoming big sagebrush, or other communities have a significant component of cheatgrass in the understory? How many of these lands have already crossed thresholds, where succession is truncated? How many are at risk of crossing thresholds? How many acres, and what is the location, of each vegetation type is in good or better ecological condition? After solid, on-the-ground collection of new information, BLM must develop a rigorous protocol for determining all lands in need of "treatment", and explain in comprehensive detail, with supporting science, why these lands need treatment.

**Response:** See response to Comment EMC-0525-111 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. Pre-treatment planning and inventory for treatment application is accomplished at the local field office level at the time the project is proposed.

EMC-0584-072
Western Watersheds
Project

**Comment:** We are extremely concerned that monitoring and mitigation in the DEIS [Draft PEIS]/PER are not adequate and do not even begin to address the large-scale disturbance of plant and animal community composition, function and structure that undertaking the large-scale treatments will affect. Monitoring. The [P]EIS fails to provide necessary monitoring, and decisive actions that will occur post-treatment if

BLM_0001513

treatment protocols, livestock rest, etc. is violated. BLM should establish specific post-treatment criteria for monitoring for livestock trespass, sound studies of soil health, stability and recovery, etc.

**Response:** The Proposed Action is described in Chapter 1 of the PEIS under Proposed Action. The PEIS does not propose large-scale disturbance or large-scale treatments, nor are any treatments authorized through this PEIS (see Decisions to be Made and Scope of Analysis in Chapter 1 of the PEIS). Monitoring is discussed in Chapter 2 of the PEIS and PER under Monitoring. Mitigation measures are summarized in Table 2-9 in Chapter 2 of the Final PEIS. Standard Operating Procedures are discussed in Table 2-8 in Chapter 2 of the Final PEIS. Post-treatment violations in the form of trespass or other unauthorized uses would be addressed through the applicable regulatory process. In the case of livestock, action would be initiated under 43 CFR [Code of Federal Regulations] 4150, Unauthorized Grazing Use. Implementation of monitoring for any given treatment will be at the local field office level as part of the treatment project design and NEPA analysis, including development of post-treatment criteria for monitoring. Project funding, regardless of the program funding source (Emergency Stabilization and Rehabilitation, Healthy Forests Initiative, Range, Wildlife, Noxious Weeds), includes funding for the monitoring component.

EMC-0584-076
Western Watersheds
Project

**Comment:** BLM must develop a comprehensive monitoring plan with specific schedules, with all monitoring to be funded as part of the original "treatment" cost. Otherwise, timely and necessary monitoring will never occur.

**Response:** Implementation of monitoring for any given treatment will be at the local field office level as part of the treatment project design and NEPA analysis, including development of post-treatment criteria for monitoring. Project funding, regardless of the program funding source (Emergency Stabilization and Rehabilitation, Healthy Forests Initiative, Range, Wildlife, Noxious Weeds), includes funding for the monitoring component.

EMC-0584-098
Western Watersheds
Project

**Comment:** Livestock Trespass, Other Post-Fire Non-Compliance: As part of this NEPA process, BLM must review records of livestock trespass or non-compliance, and assess its frequency and impacts to treatment outcomes. What are the impacts of trespass on outcome of rehab efforts? BLM must also provide strict penalties for post-fire trespass by livestock on burned areas. As taxpayers often have spent hundreds of thousands of dollars on post-fire rehab and other ESR [Emergency Stabilization and Rehabilitation] activities, accountability and effectiveness of rehab is essential. Please describe how trespass may harm any site recovery. For example, trespass has been a tremendous problem in Burley BLM lands, and documented by Miriam Austin of WWP [Western Watersheds Project] and others over the years. The trespassed public lands at Rice Canyon and in the Goose Creek watershed of Burley BLM provide a perfect example of BLM Post-fire failures to control livestock.

**Response:** The PEIS identifies restricting livestock if necessary as a Standard Operating Procedure in Table 2-8 (Standard Operating Procedures for Applying Herbicides) of the PEIS. In many situations restricting livestock is necessary to allow either recovery or establishment of native perennial vegetation following treatment. If grazing occurs too soon, new seedlings and possibly existing plants that were stressed during the treatment may be damaged. As a result of this damage, the desirable vegetation may not be able to take advantage of the additional soil resources that were made available by removing the less desirable vegetation. In such a situation it is likely that "weeds" or other undesirable invasive vegetation will outcompete the native

BLM_0001514

RESPONSE TO COMMENTS

vegetation and maintain a significant presence on the site. The outcome of grazing an area too early would occur regardless of whether the grazing is an authorized or unauthorized use. Therefore, the BLM believes that the PEIS adequately addresses this situation. The BLM did do some additional review of livestock trespass in general, as well as some specific situations. Although unauthorized grazing use occurs in some situations, it was not identified as a significant problem for most treatments or wildfires. Unauthorized use actions are taken if livestock are allowed to use a burn or treatment area. The settlement of an unauthorized use situation is dependent on the facts of the specific case, whether the unauthorized use is determined to be willful, or non-willful, and the number of animals and amount of time involved in the violation.

EMC-0584-116
Western Watersheds
Project

**Comment:** Analysis of Past EFR [Emergency Fire Rehabilitation]/Rehab/Restoration Actions. As part of this NEPA process, BLM must assess all its post-fire rehab herbicide use efforts and seedings in the past 30-40 years, or however long records have been kept. For example, which cwg seedings in the Jarbidge were planted, when? With what species? What is their current condition? Following this, BLM must collect site-specific data on the current condition, health, wildlife, recreational and other values of these areas seeded post-fire. How many new fences, pipelines, troughs, etc. have been built using ESR funds, or federal fire funds? What impacts have they had? A complete analysis must be presented in this NEPA document.

**Response:** See responses to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities, and Comment EMC-0525–111 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0585-008
Western Watersheds
Project

**Comment:** Nowhere, in any scientific, systematic, baseline or comprehensive way, is effectiveness ever examined in the DEIS [Draft PEIS]/PER or associated documents When I inquired of the PEIS preparers ([Brian] Amme) where effectiveness is examined, the response was: "in the scientific literature, and by the Weed control districts and other levels", and suggested I go to state weed meetings. These state weed meetings do not scientifically or systematically 1 examine the effectiveness of treatment projects conducted across public lands. I have attended them. Small papers and reports, at times funded by chemical companies, are all they entail. If BLM is aware of current and accurate information compiled by any of these parties, it should have been presented in the DEIS [Draft PEIS], and has not been. Tremendous risk and uncertainty surrounds any BLM action under which BLM would claim that "effectiveness" was somehow examined at state weed meetings, and this information somehow magically incorporated into treatment of millions of acres of public lands.

**Response:** The BLM uses professional judgment and expertise in designing vegetation treatment projects. Knowledge of the effectiveness of methods and techniques of vegetation control that is applied to public lands is derived from many sources including, but not limited to: monitoring of past projects, scientific literature, participation in professional societies, society meetings, workshops, university research, university and agricultural extension services, and other federal agencies (e.g. Natural Resource Conservation Service, Agricultural Research Service, U.S. Department of Agriculture), as well as the local expertise available from state and county agencies. There is no single scientific comprehensive study of the effectiveness of all vegetation treatment methods over the 17-state area this PEIS addresses. Development and funding of a research design to scientifically and comprehensively address vegetation treatment effectiveness over a 17-state area is beyond the scope of this PEIS. The BLM will continue to rely on professional judgment and the available

BLM_0001515

extant literature and expertise, as described above, when designing vegetation treatment projects and selecting methods of treatments for effectiveness.

EMC-0585-024
Western Watersheds
Project

**Comment:** BLM has conducted no effectiveness monitoring, and provides no science-based analysis that its drastic increase in just such activity as has harmed these habitats in the past, will result in positive or beneficial changes for natural communities. BLM has refused to address the causes of any "need" for treatments.

**Response:** See response to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities. The broad adverse and beneficial effects of treatments are described in Chapter 4 of the PER. The need for an increase in acres treated to address hazardous fuels conditions has been established under direction from Congress and the Administration.

EMC-0585-028
Western Watersheds
Project

**Comment:** If these previous treatments are now in poor condition, are infested with weeds, etc. it is critical to use this information in this [P]EIS. This is especially the case as the [P]EIS page after page makes sweeping and unsubstantiated assertions that disturbance or treatment actions under it Preferred or other alternatives would result in beneficial outcomes, and improvements in soils, watersheds, all components of the environment.

**Response:** See response to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities. Site-specific conditions and successes or failures of previous treatments are taken into account during the design of proposed vegetation projects at the local field office level. The broad adverse and beneficial effects of treatments methods on vegetation and public lands resources are described in Chapter 4 of the PEIS.

EMC-0585-031
Western Watersheds
Project

**Comment:** Instead of presenting any data or analysis of current conditions on these lands where it has conducted past treatment projects, BLM has used "existing environmental analyses in analyzing impacts of the proposed action and alternative". None of these "existing" documents ever examines the condition of the treated lands, or the effectiveness of treatments.

**Response:** The BLM often relies on existing environmental analyses when assessing impacts of new projects or proposals. The BLM has relied on independent and new scientific data and analyses for the herbicides evaluated in this PEIS. Information from existing environmental analyses has been incorporated by reference where appropriate. See responses to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities, Comment EMC-0585-148 under PEIS Alternatives, Monitoring, and Comment RMC-0222-087 under PER Effects of Vegetation Treatments, Vegetation regarding effectiveness monitoring. Chapter 4 of the PEIS, and in particular Chapter 4 of the PER, provide examples of treatment successes and failures based on studies done by the BLM, other agencies, and research organizations.

EMC-0585-058
Western Watersheds
Project

**Comment:** BLM must provide data and studies of the effects and effectiveness of its past use of the chemicals currently being used and carried forward in this [P]EIS in real-world, wild land settings, to understand the environmental and other effects of their use. BLM has not done this in the DEIS [Draft PEIS].

BLM_0001516

RESPONSE TO COMMENTS

**Response:** See responses to Comment EMC-0238-009 and Comment EMC-0340-006 under PEIS Alternatives, Monitoring.

EMC-0585-061
Western Watersheds
Project

**Comment:** What is the condition of the sage grouse habitats where treatments have occurred? Have these treatments been effective in achieving the outcomes predicted or claimed? This is critical to understand the effects of both herbicides and treatments on wild lands.

**Response:** See response to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities. The condition of specific habitats, such as sage-grouse habitat, is assessed at more regional or local scales in land use or activity level plans. This PEIS and PER assess impacts and effects of vegetation treatments broadly across 17 western states and are organized by ecoregion rather than wildlife habitat. Adverse and beneficial effects of treatment methods on wildlife resources, by ecoregion, are described in the Wildlife Resources section of Chapter 4 of the PER.

EMC-0585-062
Western Watersheds
Project

**Comment:** BLM claims "the use of the other non-herbicide techniques in an integrated pest management approach has been affirmed in all previous EIS, and the BLM is *not proposing to make any decisions relative to the use of non-herbicide vegetation treatment methods*" ([page] ES-2 [of the Draft PEIS]). Here BLM admits it has been using many of these techniques all along, yet refuses to examine their effectiveness, or ecological consequences, or to develop a decisionmaking framework to determine which treatments to use or how it will decide when to spray vs. when to mow, for example.

**Response:** The BLM includes effectiveness monitoring as a component of all approved vegetation treatment projects. The BLM examines the ecological and environmental consequences of proposed vegetation treatments at the project-specific level through the NEPA process. The framework for selecting treatment methods or techniques is described in Chapter 2 of the PER under Planning and Management at the Local Level. The BLM utilizes an integrated pest management approach when assessing the need for treatments and when selecting an appropriate treatment method.

EMC-0585-137
Western Watersheds
Project

**Comment:** BLM provides no systematically collected monitoring data that gauges the success, costs, or environmental impacts of BLM vegetation actions that have occurred to date using IPM [Integrated Pest Management]. How many acres has BLM used IPM or IVM [Integrated Vegetation Management] on? Where? What has been the success in the short, mid and long terms? What actions have been taken to control livestock grazing pre or post-treatment, or to limit continued disturbance or spread of weeds at these areas where IPM/IVM is claimed to have been conducted?

**Response:** See responses to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities and Comment EMC-0525-111 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0585-140
Western Watersheds
Project

**Comment:** [Page] 2-2 [of the Draft PEIS] "rangeland management" further describes BLM treating 317,959 acres to prevent the spread of noxious weeds and invasive plants in 2004, and inventorying only 8.9 million acres. BLM also claims that funding and labor dictates a containment strategy. If BLM has only surveyed 8.9 million acres how can it possibly know how many acres need to be treated?

BLM_0001517

**Response:** BLM public lands are on a 3-year inventory cycle. Each field office assesses its public lands through various methods, including but not limited to: rapid assessment techniques, watershed inventories, statistical sampling, and remote sensing, as well as vehicle and pedestrian surveys and field observations. The 8.9 million acres inventoried for weeds was in Fiscal Year 2004 only. The total number of acres inventoried and re-inventoried for weeds is greater than 8.9 million acres. See Determination of Treatment Acreages in the Scope of Report section of Chapter 1 of the PER for a description on how acres were estimated for the PER and PEIS.

EMC-0585-143
Western Watersheds
Project

**Comment:** [Page] 2-4 [of the Draft PEIS] summarizes the 1992 13 States EIS, and claims that BLM acts to minimize or prevent the need for veg controls, uses effective nonchemical control, uses herbicides only after considering effectiveness of other methods. Yet, the [P]EIS provides no current evaluation of herbicide or treatment effectiveness. So BLM has no current framework for identifying which herbicide or treatment, or combination, would be most effective to use in a wild land setting.

**Response:** The PEIS/PER does not provide a 17-state-wide summary of effectiveness of treatments applied in the past. The availability of effectiveness monitoring data for treatment applications varies greatly among field offices. In the PEIS, it is not possible to summarize specific projects and their results over a 17-state area spanning over 4 decades. Decisions on treatment(s) to apply are made at the local field office level and determined within an integrated pest management framework. Refer to the Proposed Action in the Introduction section of Chapter 1 of the PEIS. The PEIS assesses the impacts of four proposed herbicides on human health, ecologically sensitive species, and public lands resources.

EMC-0585-144
Western Watersheds
Project

**Comment:** Nowhere in the current [Draft] [P]EIS which claims to base its actions and those of the PER on this old EIS does BLM provide information or facts that demonstrate where, how much acreage, and how successful actions under the old EIS have been, or how best to minimize herbicide use.

**Response:** See response to Comment EMC-0585-143 under PEIS Alternatives, Monitoring.

EMC-0585-148
Western Watersheds
Project

**Comment:** This demonstrates the great risks with BLM's greatly expanded herbicide and other treatment acreages, and a great likelihood of unnecessary and undue degradation to lands and waters from BLM's actions. BLM cannot get off the hook by claiming it never bothered to monitor the projects, or lost the results. WWP [Western Watersheds Project] regularly receives information from BLM District or Field Offices in FOIAs [Freedom of Information Act], or reviews agency project and other files as part of IBLA [Interior Board of Land Appeals]/OHA [Office of Hearings and Appeals] or other litigation, and records of past treatments do exist. Example, Jarbidge office BLM FOIA, producing all documents of veg treatments, ESR [Emergency Stabilization and Rehabilitation], etc. As part of this EIS process, BLM must demonstrate some accountability to the American public. It could readily review past ESR [emergency stabilization and rehabilitation], chaining, prescribed fire, etc. project 36, files, and systematically monitor all, or a randomly selected subset of the sites to determine the effectiveness and risks of treatments. BLM must revisit treated sites in order to gauge the environmental effects, and to develop a valid baseline.

**Response:** See response to Comment EMC-0585-143 under PEIS Alternatives, Monitoring. The BLM agrees post-treatment monitoring should occur and the results used to establish baseline information at the local field office level. Individual project

BLM_0001518

RESPONSE TO COMMENTS

and site-specific data are best utilized locally to be meaningful in understanding local vegetative conditions. The BLM Legacy Program provides a broad-level sample for effectiveness monitoring for treatments greater than 25 years old. The results of these field visits are incorporated into the PEIS and PER.

EMC-0585-149
Western Watersheds
Project

**Comment:** Instead, BLM relies on unsubstantiated assertions and predictions of the beneficial nature and impacts of all actions it proposes. This is even more egregious, as BLM claims that "monitoring ensures that vegetation management is an adaptive process that continually builds on past mistakes". . . . "this ensures that vegetation treatment processes are effective, adaptive, and based on prior experience". Yet, BLMs [P]EIS provides no evidence that the agency can be trusted to monitor or learn anything – or be effective, adaptive or base anything on past experience.

**Response:** The BLM relies on the value of monitoring, particularly effectiveness monitoring, in its decision-making process to undertake specific vegetation treatments.

EMC-0585-150
Western Watersheds
Project

**Comment:** If BLM plans to rely on adaptive management, or claim that it is learning from treatments, this [P]EIS must establish specific mandated short, mid and long term monitoring for specific parameters of vegetation, soil, habitat health and ecological integrity on all treatments.

**Response:** Monitoring by the BLM is implemented at the land use plan level and at smaller spatial scales, as funding and priority allow. See response to Comment EMC-0584-076 under PEIS Alternatives, Monitoring.

EMC-0628-002
Needs, Kelly

**Comment:** I also believe that adequate monitoring are required to determine whether existing treatments are effective, much less adding thousand of more acres to the budget. What budget has been allocated to cover monitoring the effects and results of the proposed treatment? No treatment should take place if no system is in place to evaluate whether that treatment was effective.

**Response:** See responses to Comment EMC-0585-150 and Comment EMC-0585-143 under PEIS Alternatives, Monitoring.

EMC-0640-009
Animal Welfare
Institute

**Comment:** Furthermore, the BLM must employ comprehensive monitoring strategies both pre and post treatment (including immediately post treatment) to track herbicide impacts and to use such data to alter or terminate the area-specific herbicide application program.

**Response:** See response to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities.

EMC-0640-032
Animal Welfare
Institute

**Comment:** With regard to impacts, the PEIS and PER failed to comprehensively articulate the potential impacts of both herbicidal and non-herbicidal treatment programs and to include and describe a comprehensive monitoring program to assess the impact of such programs both pre and post-treatment. This failure is particularly egregious considering that the BLM has been using herbicidal and non-herbicidal treatment programs for years, yet the PEIS did not include any description of impact data collected, lessons learned, mistakes made, or adjustments implemented based on past practices. Though the BLM attempts to disregard this critical omission by claiming that past monitoring efforts (pre and post treatment) were not sufficient or sufficiently standardized, it is incomprehensible that data on the field application of

BLM_0001519

various herbicides, for example, and their impact on non-target vegetation, fish, wildlife, soil bacteria, and invertebrates are not available in a form that could have been incorporated into the PEIS. Even if the BLM could have only provided summaries of impacts previously encountered with the use of herbicidal or non-herbicidal vegetation treatments, such summaries would have provided the public with a better understanding of the potential impacts, or lack of impacts, expected under the proposed action.

**Response:** See responses to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities and Comment EMC-0525-087 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0640-035
Animal Welfare
Institute

**Comment:** Finally, if the BLM implements the proposed action, it is crucial that its plan be based on adaptive management and that it establish stringent criteria for pre and post treatment monitoring to assess the impact of its treatment options on wildlife, fish, amphibians, protected wildlife, invertebrates, air and water quality, soils, human safety, and other ecosystem components. The pre-monitoring effort must evaluate the condition of the proposed treatment area including species (flora and fauna) composition, abundance, and density data so that the impact of the treatment can be quantitatively measured. Post-treatment monitoring must be initiated immediately after treatment (not 1 to 2 years after treatment) to measure how the treatment affected various ecosystem components. Prior to treatment the BLM should establish treatment specific criteria, which, if exceeded as determined by post-treatment monitoring, would result in either a cessation or alteration to the treatment program to prevent any future violation of the criteria.

**Response:** See response to Comment EMC-0584-076 under PEIS Alternatives, Monitoring.

FXC-0074-007
Copper Country
Alliance

**Comment:** Additionally, methods should be evaluated for their long-term effectiveness, including ability to remove or disable seeds and roots.

**Response:** The Final PEIS/PER has an expanded section on Monitoring in Chapter 2, although it is presented at a broad, programmatic level. Implementation planning is tied to goals and objectives (i.e., desired outcomes) set at the regional/local land use planning level. During implementation planning, detailed effectiveness monitoring is developed. Invasive plant treatment programs throughout the country managed by various entities (federal, state, county, university, etc.) are continually evaluating the long-term effectiveness of treatment methods; such information is used to build site-specific effectiveness monitoring.

RMC-0006-026
Central Sierra
Environmental
Resource Center

**Comment:** For the rare cases where herbicides may be determined to be necessary, project plans should include realistic exit strategy. Any chosen alternative should require that when herbicide treatments are used, follow-up monitoring, analysis, and rehabilitation are carried out until the desired stable native plant and animal communities are established.

**Response:** Follow-up monitoring of herbicide treatment projects to determine treatment success and follow-up rehabilitation to meet restoration objectives are considered and implemented in each herbicide treatment project proposal. In the case of emergency stabilization and rehabilitation projects following wildland fire, follow-

BLM_0001520

RESPONSE TO COMMENTS

up monitoring, treatment, and rehabilitation are required for the first 3 years. Use closures for livestock and other animals are implemented for at least two growing seasons or until rehabilitation objectives are met. The only way to determine whether objectives have been met and reopen an area to use is through the necessary monitoring.

RMC-0006-030
Central Sierra
Environmental
Resource Center

**Comment:** Herbicide treatments don't provide beneficial results unless they are followed up closely until the desired native vegetation community is well established. Even after this, annual surveys should be conducted to catch re-growth from the seed bank or re-introduction of the same species or other invasive species. If exotic invasive plants do reappear, then it will be much easier to catch them with manual removal when their populations are small. It should be a requirement of any herbicide plan to guarantee that follow-up observation and rehabilitation is planned and success is achieved.

**Response:** See response to Comment EMC-0584-076 under PEIS Alternatives, Monitoring. Post-treatment monitoring is an essential component of any treatment proposal.

RMC-0069-009
Desert Survivors

**Comment:** Does the BLM have data from any recent controlled comprehensive studies of what happens to herbicides or herbicide residues after application? Do you have any data on the persistence of same in either groundwater, foliage or other plant materials, or in soil at the sites treated in the past? Such studies would have to go on for two, five, ten or twenty or fifty years, so we may see if the water, soil, plants or animals are contaminated, for how long, and in what way. Are you conducting such studies now? When will they be completed? Are any studies designed to test these subjects on BLM lands now? If so, Desert Survivors would like learn of such studies and see the results.

**Response:** A large number of studies have been reported in the literature and in the PEIS about the fate of herbicides in groundwater and soil (see Soil Resource and Water Resources and Quality sections in Chapter 4 of the PEIS, and Sections 3.2 and 3.3, and Appendix A of the ecological risk assessments). The herbicides that the BLM proposes to use are generally short-lived in soil and groundwater. The BLM is not funded as a research organization, and does not conduct studies on the fate of herbicides on BLM-administered lands; the agency relies on the research of others, such as the USEPA and U.S. Geological Survey.

RMC-0069-010
Desert Survivors

**Comment:** Without any data, the allegation that there is no danger from these substances remains exactly that, an allegation. And I am not referring to studies done by pesticide manufacturers, which have an obvious bias. I am referring to studies actually performed by public agencies on the ground. We need to see what happens to the land, its water, its plants and its animals, when these substances are applied. At a time when school districts, neighborhood groups and municipalities are challenging the California State Department of Transportation ("Caltrans") when it applies pesticides to every roadside, our citizens should expect no less of the BLM on our public lands.

**Response:** The potential risks to human health from the herbicides were carefully evaluated in the human health risk assessments and ecological risk assessments using scientific data and reasonable assumptions about how humans, plants, and animals may come in contact with the herbicides. Also see response to Comment RMC-0069-009 under PEIS Alternatives, Monitoring.

BLM_0001521

RMC-0070-006
California Regional
Water Quality Control
Board

**Comment:** All alternatives that include pesticide applications should contain a detailed monitoring plan to verify that the above Basin Plan pesticide objectives are not violated. Your [P]EIS should display clearly what type of monitoring is planned, including a detailed schedule for monitoring to be conducted.

**Response:** See response to Comment EMC-0584-076 under PEIS Alternatives, Monitoring.

RMC-0080-009
Idaho State Department
of Agriculture

**Comment:** ISDA [Idaho State Department of Agriculture] is pleased to see BLM address monitoring and the adaptive nature of vegetation management. We are, however, concerned with how BLM is going to monitor and follow-up herbicide treatments. On page 2-21 the [Draft] PEIS states[:] The BLM recognizes that many sites treated in the past lack monitoring data. In many cases monitoring was not done, was done sporadically without consistent documentation, or was done but the records were lost or destroyed. The PEIS then goes on to say that to correct these problems "…monitoring must be designed to determine if the treatment was effective…and to ensure that the treatment did not adversely impact other resources." We have two concerns with these statements. One, this statement is extremely ambiguous and does not offer any real solutions. Too what degree is effectiveness to be monitored and impacts to be investigated? Two, how is BLM going to expect personnel to monitor three times the amount of vegetation treatments when resources are insufficient to monitor what they currently treat? ISDA suggests the BLM, in the PEIS, describe the components of an effective monitoring program (including identification of parameters for developing tangible objectives), or at least, require weed program supervisors to be trained in how to carry out an effective monitoring program. If BLM wants to make a change in the effectiveness of its monitoring, it must begin in the PEIS.

**Response:** See response to Comment EMC-0584-076 under PEIS Alternatives, Monitoring. See also the revised text pertaining to monitoring in Chapter 2 of the Final PEIS under Monitoring. The BLM would monitor for the effectiveness of the treatment and use any of the techniques recommended in BLM Technical Report TR 1730-1, Measuring and Monitoring. The BLM would also use the North America Weed Management Association standards in order to be consistent with data collection standards with other agencies.

RMC-0087-007
Central Valley
California Regional
Water Quality Control
Board

**Comment:** In the "Monitoring" section, it states that, "Post-treatment monitoring generally occurs within 2 years after treatment and, where applicable, should include a water monitoring program to determine the effectiveness of buffer strips and impacts, if any, to water quality." If BLM applies aquatic pesticides, post-treatment monitoring 2 years after an application will not show if there was an impact or not. To make monitoring data more useful, surface water monitoring must occur at least prior to an application as well as immediately after an application in one or more sites downstream of the treatment area. Our office has on file available for your viewing examples of monitoring plans that may serve as models for the plans that would have to be developed for your project.

**Response:** The statement refers to monitoring of water quality impacts from terrestrial applications. This has been clarified in the Final PEIS. The BLM agrees that post-treatment monitoring for aquatic applications after 2 years would not be timely to determine impacts. Also see response to Comment RMC-0070-007 under PEIS Proposed Action and Purpose and Need, Interrelationships and Coordination with Agencies. BLM monitoring criteria and requirements for aquatic treatments within the jurisdiction of the California Regional Water Quality Control Board will be

BLM_0001522

coordinated through this agency at the time a project is proposed.

RMC-0106-004
Public Employees for
Environmental
Responsibility

**Comment:** The woeful lack of direct on-the-ground evidence of impacts from all previously-used herbicides is the result of 20 years of failure to implement a meaningful monitoring program. This is evident from the fact that virtually no evidence of adverse impact from 20 years of application of these herbicides to public lands is used, or cited, in the pages of impact analysis.

**Response:** The BLM disagrees with the commentor's statement. The BLM monitors herbicide treatments according to the monitoring requirements identified and developed for the specific project through site-specific NEPA analysis. The commenter presents no information that monitoring has not occurred in the past for herbicide projects. Herbicides have specific half-lives and degradation rates that do not result in accumulation or persistence in the environment for more than a few years for a few herbicides, and less time for most herbicides. Thus, herbicides applied several years in the past no longer exist in any tangible form or persist only in negligible or trace amounts in the present. Persistence in the environment, even for a few years, is dictated by a number of variables including rate of application, number of times applied in one area, soil clay content, ability of target vegetation to fully absorb the herbicide by its mode of action, and available moisture, among others. Over the last 20 years the BLM has seen no evidence of adverse effects to public lands from proper applications of herbicides, cumulatively or otherwise.

RMC-0106-005
Public Employees for
Environmental
Responsibility

**Comment:** PEER [Public Employees for Environmental Responsibility] recommends that instead of authorizing a new program of herbicidal treatment, a thorough inventory be made of all of the problem areas presently targeted to establish current conditions of pesticide contamination of land and water, including the occurrence and nature of degradates of both active and inert ingredients of the pesticides used to date by the BLM. Small test areas (less than 10 acres) should then be established to thoroughly examine the effects of all herbicides proposed to be used on vegetation, soils, and aquatic and terrestrial wildlife (target and non-target species). Data are especially deficient for soil biota and for the behavior of herbicides in the soil column above the water table (unsaturated zone), and should be emphasized in a rigorous study. No herbicidal treatment program should be implemented until this study is completed (probably requiring at least 5 years) and only if justified by this study. Herbicidal treatments to "improve" rangeland should be part of this study. In the interim carefully monitored non-herbicidal methods should be used to address the problems of invasive species.

**Response:** The PEIS is not authorizing a new program of herbicidal treatment. Vegetation treatments by the BLM using herbicides have been ongoing for several decades. In developing this PEIS, risk assessments for human health and ecological risk have been undertaken for the four herbicides proposed for use and for an additional nine herbicides already approved for use on public lands, based on extensive toxicological literature searches conducted in conjunction with the risk studies. The BLM has conducted these risk analyses in addition to the studies and research undertaken by USEPA to register the active ingredients under the Federal Insecticide, Fungicide, and Rodenticide Act. To the extent practicable, all active and inert ingredients of the herbicides considered in the PEIS have been addressed in this analysis. The BLM evaluated the nature of degradates in Appendix D of the Final PEIS. Incomplete and unavailable information is addressed in Chapter 4 under Incomplete and Unavailable Information.

RMC-0106-008
Public Employees for
Environmental
Responsibility

**Comment:** Even at that, to eliminate from discussion the environmental impacts of two decades of herbicidal treatments of public lands for range improvement is irresponsible. It is stated in the 1991 FEIS for vegetation treatment in 13 western states (p. 1-37) that "Many rangeland treatments would have studies established in them to monitor treatment effects on vegetation as well as on other resources such as wildlife or water quality…"

**Response:** All vegetation treatments completed since the 1991 FEIS would have completed site-specific level analysis and appropriate field office monitoring data to evaluate their level of effectiveness. These data are not summarized in this PEIS.

RMC-0106-009
Public Employees for
Environmental
Responsibility

**Comment:** All monitoring data from those years must be cited or incorporated by reference to accessible documents. If the BLM has no useful impact data from those 20 years to apply to the present analysis, it must say so. PEER [Public Employees for Environmental Responsibility] suspects this is the case as the BLM has failed to respond to repeated FOIAs [Freedom of Information Act's] and two appeals seeking monitoring results from the 199 1-2001 vegetation treatment program in 13 western states. The ROD [Record of Decision] for the 1991 EIS required monitoring to assess effectiveness of the herbicidal applications and their environmental impacts. So, where are the data?

**Response:** See response to Comment RMC-0106-008 under PEIS Alternatives, Monitoring. Monitoring data for specific projects resides at the field office where the project was proposed and implemented. The 1991 ROD established that monitoring would occur. The ROD did not establish that monitoring data would be summarized in a subsequent analysis of herbicide effects. The PEIS does not summarize these data. The cost to collate 20 years of complex monitoring data across 17 states would be exorbitant.

RMC-0106-016
Public Employees for
Environmental
Responsibility

**Comment:** [Page] 2-21 [of the Draft PEIS]. The requirement to establish intervals and standards for monitoring and evaluation has clearly not been implemented in the past. For example, the monitoring program for the Northwest Area FEIS, 1985, p. 184-185 and Western Oregon Program FEIS, 1989, p. 237-238 call for only extremely limited monitoring of surface water quality. Assessing the effects of herbicide applications requires full inventory of the state of the area to be treated before treatment. Ecosystem effects can only be assessed by comparison with a control area in which vegetation and ecosystem functions have not been degraded. The D[raft] PEIS should lay out a monitoring protocol that is scientifically and legally defensible, and tie it to actions required upon determination that specific thresholds of adverse effects have been reached. These procedures and findings should be mandatory, and they must include adequate monitoring of groundwater.

**Response:** Current monitoring standards are based upon relevant guidance in BLM manuals and handbooks, in addition to local, state, and federal regulatory standards applicable to the project or area to be treated (e.g., groundwater) and subsequently monitored. Monitoring activities outlined in previous EISs may no longer conform to current standards. In all cases, current standards and protocols for monitoring are followed.

RMC-0106-017
Public Employees for
Environmental
Responsibility

**Comment:** Past experience shows the inadequacy of the statement that monitoring results "...should be made available to interested parties." Make this mandatory and specify reporting interval. If the costs of an adequate program are prohibitive, only Alternative C is appropriate.

BLM_0001524

RESPONSE TO COMMENTS

**Response:** The BLM already has legal mandates in the Federal Land Policy and Management Act (1976) and the Public Rangelands Improvement Act (1978) to inventory and report on a continuing basis the range condition and trend in that condition. The BLM also provides monitoring data and results to interested parties and the public through a number of venues, including the NEPA process for specific actions. Nothing in the PEIS analysis can make reporting monitoring results any more mandatory. In cases where information is not provided as requested by interested parties, the public has relief through Freedom of Information Act (FOIA) requests to obtain such data.

RMC-0106-059
Public Employees for
Environmental
Responsibility

**Comment:** [On] p. 4-199 [of the Draft PEIS]. "Determining the exact [or any!] status of soil conditions for any given area is difficult because of the lack of inventory and monitoring data." (emphasis added). This, sadly, is the unfortunate truth. 20 years of herbicidal treatment of public lands have been undertaken with no record of the status of the land and no monitoring of the impacts to soil resources. This record is hardly the basis for justifying open-ended continuation of the same procedures.

**Response:** Order 3 soil inventories and land health assessments have been conducted on millions of acres of federal lands. However, these inventory and monitoring activities are not generally intended to measure the impacts of herbicide use. Nevertheless, extensive studies have been conducted on the environmental and health risks associated with each of the herbicides proposed for use in the PEIS. There is no "open-ended" use of herbicides implied by the PEIS. Use is restricted to specific herbicides applied by qualified applicators according to strict use guidelines. No herbicide use will be conducted without further environmental analysis at the local project scale.

RMC-0130-005
Craig, Diane

**Comment:** I also wonder how the BLM intends to monitor such a program and what they have in mind when it eradicates vast populations that nature placed in these areas to live in harmony and balance. Is the BLM responsible for providing emergency healthcare to the wildlife populations it intends to exterminate with this senseless act? The BLM as states "monitoring ensures that vegetation management is an adaptive process that continually build upon past successes and learns from past mistakes" my question here is how can the BLM evaluate such successes and mistakes when it recognizes "that many sites treated in the past lack monitoring data. In many cases, project monitoring was not done, was done sporadically without consistent documentation, or was done but the records were lost or destroyed."

**Response:** The BLM acknowledges gaps in monitoring information from past activities, as discussed in the Monitoring section in Chapter 2 of the PEIS. As identified in the PEIS, the reasons for gaps are many and varied and span some 40 years or more. Standards and requirements for documentation in the past (e.g., dating from the 1960s) were less stringent than standards considered in subsequent decades, and are not reflective of standards for documentation in use today. Record keeping likewise is not consistent from office to office over a multiple decade time frame. The BLM also acknowledges the importance of and need for monitoring. In general, monitoring records are available at BLM field offices and are used in the design of vegetation treatment projects, as well as to support current and future vegetation allocation decisions in land use plans and appropriate permitted uses. When monitoring data are lacking, the BLM relies on professional judgment (field experience) for predicting the effects of treatment actions at the local level.

BLM_0001525