RMC-0144-010
Wyoming Game and
Fish Department

**Comment:** Another item of great concern was an inadequate discussion, analysis and evaluation of post-treatment management. A great deal of time, effort and funds will be allocated to the treatment program. Post management practices and activities will be critical in maintaining the effectiveness and longevity of the treatments. We recommend that proper post management practices be made a requirement for all proposed treatments activities.

**Response:** See response to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities. The BLM agrees that post-treatment practices should include actions to maintain the effectiveness and longevity of any particular treatment. In this regard, post-treatment monitoring plays an important role in determining the most appropriate post-treatment maintenance practices.

RMC-0208-004
California Oak
Foundation

**Comment:** The Draft PEIS fails to consider the potential effects of increased herbicide use on oak woodland ecosystems. Because oak woodlands in California are home to numerous endangered, threatened, and protected species, the failure to adequately assess the impacts to oak woodlands constitutes a failure to assess the impacts on these special-status species.

**Response:** The PEIS did not focus on impacts to special status species based on habitat type, but looked at risks based on guild. It was assumed in the ecological risk assessments and Biological Assessment that risks to special status birds, for example, would be similar regardless of habitat type. These risks include impacts to the animals' welfare, in addition to risks associated with modification or loss of habitat.

RMC-0214-004
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** Prior to undertaking any programmatic or specific initiative, BLM must substantiate its predicted effects with a record of site-specific analysis and monitoring that ensures that the act of vegetative eradication does not bring about significant adverse impacts alone or together with similar projects—a standard that the current proposal woefully fails to achieve.

**Response:** Site-specific analyses and monitoring records are available at the BLM field office or district level, and these data and analyses are factored into the purpose and need for any future treatments. The BLM proposes to use various treatment methods to control and manipulate vegetation to meet desired goals and objectives as expressed in land use plans, not conduct a program of vegetative eradication. In situations where an invasive species or noxious weed is targeted over broad areas, the proposed project would include post-treatment revegetation and stabilization objectives. The premise that vegetation treatments designed to reduce hazardous fuels and the potential for catastrophic fire or to restore and benefit habitat would result in adverse significant impacts is unsubstantiated.

RMC-0214-033
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** The lack of monitoring ensures this proposal will not succeed. The current D[raft] PEIS does not even begin to analyze the crucial role that monitoring should and would play in the implementation of any sound and responsible vegetative management program. Past history has clearly revealed that the BLM does not have the institutional resources to properly manage and employ a monitoring program that can correctly assess what is actually occurring on the agency's rangelands. There is even noticeable agreement within BLM that the agency does not have the means to successfully monitor rangeland conditions. We again cite the suppressed analysis formulated by BLM scientists for BLM's proposed new grazing regulations in regards to monitoring efforts on the BLM lands.

BLM_0001526

**Response:** All pesticide use authorizations require reporting of applications and follow-up monitoring, as appropriate, to determine efficacy of the treatment. It is beyond the scope of this PEIS to examine the overall monitoring program requirements of the various BLM resource programs. See response to Comment RMC-0038-009 under PEIS Alternatives, Vegetation Treatment Planning and Management regarding institutional resources.

RMC-0214-036
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** This state of affairs is readily apparent from the D[raft] PEIS itself: it does not provide any statistical or quantitative information obtained over the past 20 years of BLM vegetative management. A 1991 BLM vegetation treatment FEIS [Final EIS] stated that "rangeland treatments would have studies established in them to monitor treatment effects on vegetation as well as on other resources such as wildlife or water quality ..." (p. 1-37). There is no evidence that BLM has followed up with any subsequent monitoring data from that EIS, nor is such data evident in the D[raft] PEIS. It is our contention that the lack of data in the D[raft] PEIS is proof that the BLM simply lacks the institutional capabilities to monitor long term effects on the range. Given that the BLM cannot comprehensively assess what is occurring in the present, proposing to expand the use of herbicides and vegetative treatments is simply inconsistent with the agency's obligation to monitor the effects of these treatments.

**Response:** The 1991 [Final] EIS statement quoted is found in the Implementation Section of the document under "Monitoring." In that document, the BLM identified the monitoring strategies it would follow after vegetation treatment projects were proposed and implemented. The current PEIS commits to similar monitoring strategies for projects proposed in the future. See the Monitoring section in Chapter 2 of the Final PEIS and PER. The 1991 EIS does not make a commitment to summarize all field data gathered during treatment monitoring for any disclosed future period of time. Vegetation treatment and use effects are typically monitored by the BLM on an allotment and watershed basis on public lands throughout the West. Data obtained during monitoring are then factored into current and future forage allocation decisions with full public involvement, for livestock, wildlife, and wild horses, at the local field office level. These vegetation allocations depend on the agency knowing and understanding the condition of the range based on the monitoring data it has collected.

On a broader scale, the BLM is increasingly using remote sensing for collection of inventory and monitoring data to supplement the collection of field data. As these remote sensing techniques are validated on the ground, increased reliability on broad and mid-scale assessments becomes possible, which provides a better context for regional and locally collected data.

RMC-0217-011
Sierra Club Utah
Chapter

**Comment:** It appears the BLM merely plans to continue treatments that have failed in the past and undoubtedly continue to fail in the future. The BLM claims to have treated hundreds of thousands of acres annually but cannot even stem the increase of a single invasive and extremely undesirable plant. The PER states that treatments will be base on the success of past restoration treatments or treatments conducted under similar conditions or recommendations by local experts ([Draft] PER [page] 2-8). Yet there is not discussion of successful past restoration treatments. This is a huge failure in looking at treatment options.

**Response:** The claim that BLM vegetation treatments have failed in the past and are likely to fail in the future is unsubstantiated. Success of restoration treatments are documented at the level of the local field office. The BLM Legacy Program, as discussed in Chapter 2 of the PEIS and PER under Monitoring, is currently conducting

BLM_0001527

reviews of vegetation projects completed over 25 years ago, involving the original project designers, to compile lessons learned from these past efforts. Overall, the projects reviewed have demonstrated success in meeting the original objectives for which the projects were designed. Also see response to Comment RMC-0222-087 under PER Effects of Vegetation Treatments, Vegetation.

RMC-0217-012
Sierra Club Utah
Chapter

**Comment:** The PEIS should be able to identify past treatments that have been effective in reducing non-native plants and noxious weeds. The PEIS does not identify the number of acres that have been returned to the potential natural community through the use of chemicals, mechanical, manual or biological treatment techniques. After decades of such efforts surely the BLM could identify such places that the public could visit. The BLM should be able to show on maps those acres which have been rehabilitated using chemical treatments.

**Response:** See response to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities.

RMC-0218-036
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Purpose and Need. No discussion of past experience w[ith] using these herbicides – were they effective in controlling invasive weeds? In improving riparian habitat quality? In reducing fire severity? How was effectiveness measured? What didn't work? What ecological human health impacts resulted from their use? What impacts could not be measured but could still have taken place? What monitoring was done? How long did herbicide residues stay in soils? Were herbicides detected in ground or surface water? Were there repeated herbicide applications? Cumulative effects?

**Response:** See response to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities.

RMC-0221-025
Center for Biological
Diversity

**Comment:** The BLM has consistently failed to undertake meaningful, detailed surveys of BLM managed lands and to provide comprehensive inventories the public resources it is charged with managing. Even in the areas where the BLM has some data, it has failed keep those data current. As a result, the BLM has insufficient, outdated, and inadequate inventory data of many of the resources on public lands in violation of FLPMA [Federal Land Policy and Management Act]. As a result, the BLM's management decisions are not based on a strong foundation of accurate, detailed information regarding these public lands as Congress intended.

**Response:** The BLM is in full compliance with the FLPMA regarding inventory of public lands resources. The BLM is currently midway through a 10-year congressionally-funded initiative begun in 2000 for revising its land use planning base, including resource allocations. In compliance with Section 201 of FLPMA, inventories and data are being systematically undertaken and updated to support the land use plan revisions and new planning decisions. Each Approved Resource Management Plan is supported by a foundation of accurate and detailed information on the public lands to which the land use plans pertain. The planning initiative is being conducted with full public involvement, and the public has the opportunity to review the supporting data during the planning process. It is beyond the scope of the PEIS to summarize all current and ongoing inventory and monitoring efforts across all BLM-administered public lands.

BLM_0001528

RESPONSE TO COMMENTS

RMC-0221-072
Center for Biological
Diversity

**Comment:** The D[raft] PEIS fails to outline any comprehensive monitoring strategy for determining the impacts of the proposed action. Monitoring is an integral part of determining the impacts of an activity on a resource. Objective, quantifiable monitoring is essential for effective management (Christensen et al. 1996). Monitoring must be done frequently and properly, and in the absence of consistent monitoring, management activities should not be permitted. If the BLM goes forward with the proposed project on any basis, monitoring must be conducted before, during, and after herbicide treatments. Resources including soils, plant communities, rare, threatened and endangered species, water quality, and management compliance should all be regularly and consistently checked by the BLM. All results should be publicly available, and reports summarizing those results should be prepared.

**Response:** Monitoring is discussed in Chapter 2 of the PEIS and PER under Monitoring. Individual monitoring plans are developed at the time a project is proposed and are based on the site-specific conditions present at the project area. Monitoring for herbicide use follows applicable label guidelines, standards set forth in the BLM Manual 9011 – *Chemical Pesticide Use*, and state and local requirements for air and water quality. In the case of threatened and endangered species, monitoring requirements would be established through the applicable biological opinion, under a determination of effect.

RMC-0222-021
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Importantly, the DEIS [Draft PEIS] fails to analyze the results, on its own lands, of where a combination of chemical and non-chemical methods, including passive restoration have been used (see Appendix H [provided as an attachment with the comment] for such an example on Jenny Creek in the Cascade-Siskiyou National Monument), compared to results of where herbicide use alone has been used. If the DEIS [Draft PEIS] had analyzed the Restoration Alternative, it would have been forced to use its own experiences in comparing herbicide use combined with passive restoration, seeding with native species, and/or other treatments.

**Response:** The types of studies and analysis referred to comprise specific research to determine the relative effectiveness of different techniques in site-specific controlled settings and are beyond the scope of the programmatic analysis. Also see response to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities. In regard to analysis of the "Restoration Alternative," see response to Comment RMC-0222-013 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients.

RMC-0222-070
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The D[raft][] PEIS provides zero assurance that any particular monitoring will occur in the future and only says that the results of any monitoring that happens to be done "should" (not "shall") be made available to "interested parties" ([page] 2-11 [ of the Draft PEIS]).

**Response:** See responses to Comment RMC-0106-017 and Comment EMC-0584-076 under PEIS Alternatives, Monitoring.

RMC-0228-008
Metropolitan Water
District of Southern
California

**Comment:** Monitoring to evaluate the impacts on water quality is briefly discussed in Chapter 2. The Draft PEIS states that water quality monitoring should be conducted within 2 years after herbicide treatment to determine the effectiveness of buffer strips and the impact on water quality. For moving bodies of surface water, such as the

BLM_0001529

Colorado River, anything less than immediate monitoring after the application would be inadequate to evaluate the effects on surface water sources. The monitoring plan should include sampling immediately after and at timed intervals after each application for surface water sources. Ground water sources should be monitored for an extended period to account for the time for water percolation and infiltration into the groundwater aquifer. Aquifer hydrology should be evaluated to determine the proper locations and depths for groundwater sampling. Metropolitan [Water District of Southern California] recommends that a more comprehensive water quality monitoring plan be developed.

**Response:** Monitoring the effectiveness of a buffer strip in protecting water quality is a difficult undertaking. A number of variables must first be understood. If the buffer is designed to keep herbicides from reaching a stream via a surface water pathway, then sampling must occur when there is an event that causes the pathway to function, like rainfall, snowmelt, etc. There have been many attempts to monitor actual event-driven processes, most of which do not work because of the instrumentation involved (e.g. continuous sampling) and the unpredictability of events. Groundwater sampling can provide reasonable results if the monitoring is well-designed. This kind of monitoring requires a high degree of planning, meticulous execution (i.e., well construction), and careful sampling and quality control procedures.

RMC-0233-004
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** We strongly recommend that pre-treatment surveys and monitoring also be emphasized in the final PEIS/PER, in addition to post-treatment surveys and monitoring, in order to adequately determine treatment effectiveness and impacts on other resources.

**Response:** The text in the Monitoring sections of Chapter 1 of the Final PEIS and PER has been revised to reflect the need for pre-treatment monitoring. We have also included this information under the Standard Operating Procedure and Guidelines table in Chapter 2 of the PEIS (Table 2-8) and PER (Table 2-5).

## Alternatives, Coordination and Education

EMC-0011-003
Kiernan, Barbara

**Comment:** As it is, I had to discontinue my regular use of Crystal Cove State Park when I discovered – after years of ignorant bliss – that they apply pesticides, on a regular basis, to control "invasive" weeds. A practice that was not posted and that employees at the entrance booths were unaware of – when I inquired prior to entering the Park.

**Response:** The BLM is not responsible for the administration of Crystal Cove State Park. BLM coordination with the public is discussed in Chapter 2 of the PEIS under Coordination and Education. In addition, posting of treated areas is a Standard Operating Procedure for the BLM.

EMC-0092-003
Larson, Lyn

**Comment:** Educating the public is critical. Most of us don't even think about how our activities exacerbate this problem. Posting signs describing the problem and asking that people clean off their shoes, dust their clothes for seeds, don't bushwhack, drive their bloody off-road vehicles only in designated areas, etc., might help somewhat. (Waldo Lake in OR is doing a good job in this regard.)

**Response:** See response to Comment EMC-0220-006 under PEIS Alternatives, Coordination and Education. Posting of signs, observing strict reentry intervals, and other Standard Operating Procedures were identified in Table 2-8 of Chapter 2 of the

BLM_0001530

RESPONSE TO COMMENTS

PEIS.

EMC-0096-004
White, Sally

**Comment:** Education of the public that uses these resources is very possible. There are more people than ever available for volunteer work. Students from middle school through high school and beyond find it very fulfilling to participate in the removal of invasive plant species in conjunction with a service project. Start them looking at the lands they so treasure as a stewardship on a personal level while they are young and it will pay off in the future. Check with the Park Service, particularly Zion National Park in Utah, to see how they have been handling similar problems.

**Response:** The BLM and other federal, state, and local agencies actively recruit and use schoolchildren and other volunteers to help with vegetation removal. Volunteer opportunities with the BLM can be found at: http://www.blm.gov/volunteer/, while information useful to teachers and students can be found at: http://www.blm.gov/education/LearningLandscapes/explorers/lifetime/invasive.html.

EMC-0142-002
Mintz, Mary

**Comment:** Do you even post everywhere when and how and what you are using so the unsuspecting visitor can decide whether or not they want to visit the park?

**Response:** See response to Comment EMC-0011-003 under PEIS Alternatives, Coordination and Education.

EMC-0214-013
Vollmer, Jennifer
(BASF)

**Comment:** Social and Economic Values Bullet *"Provide public educational programs on the herbicides proposed for local use to minimize fears based on lack of information."* Along with education about the herbicide it is paramount to education the public on the need for the vegetation treatment and why the herbicide is a part of the best choice treatment.

**Response:** Comment noted. The bullet in Table 2-8 of Chapter 2 of the PEIS has been revised to read: "To minimize fears based on lack of information, provide public educational information on the need for vegetation treatments and the use of herbicides in an Integrated Pest Management program for projects proposing local use of herbicides."

EMC-0220-006
Friends of the Inyo

**Comment:** It is our understanding that under this current PEIS, site-specific analysis at the Field Office level will still be required until any on-the-ground activity takes places. We encourage the BLM to conduct aggressive outreach to communities potentially affected by any application of synthetic herbicide. Pets, children, livestock, endangered species, and non-target species will suffer unless the owners of public lands – especially those who inhabit the rural West – know what is being planned for their backyard. The negative impacts on local organic, conventional and subsistence agricultural must also be locally discussed, studied and disclosed.

**Response:** The BLM coordinates with the public on vegetation treatment projects and notifies potentially affected parties of treatment activities that occur on public lands.

EMC-0242-003
Boettcher, Robert

**Comment:** Most people are not aware of how weeds can be spread. A media campaign to make people aware of how they can help would be money well spent. I am sure you are aware of all the ways to transport weed seed so focus that in the media.

**Response:** The BLM works closely with the media to inform the public on the threat of weeds. Activities include national weed awareness week campaigns, production of

BLM_0001531

videos, newsletters, and other public information materials, meetings with the public, and volunteer activities. Additional information on how to make the public more aware of the weed problem can be found at: http://www.blm.gov/education/LearningLandscapes/explorers/lifetime/invasive.html.

EMC-0267-001
Medbery, Angela

**Comment:** No matter what scenario is adopted I would like to see the following items: A most important step in weed control must be a strong preventative approach. Signs at trailheads indicating the need to eliminate weed seeds from transportation, wheels, hooves, boots, propellers or whatever. Washing stations might also be provided. A place to shake down tents, sleeping gear and other baggage that may have come from prior trips in infested areas. A strong proactive education program should be instituted to educate the public to recognize weed species and report their occurrences.

**Response:** The BLM has a strong public education program that includes many of these suggestions, including, but not limited to, signs, brochures, weed identification booklets, weed occurrence reporting forms, public service announcements, quarantine areas, washing stations, weed-free hay stations for guides and outfitters, as well as K-12 educational materials for public schools, informational websites, and national, regional, and local weed campaigns.

EMC-0267-004
Medbery, Angela

**Comment:** Prompt response by land managers and applicators should be given to the concerns of citizens regularly visiting or touristing, living within or bordering the property designated for weed control

**Response:** See response to Comment EMC-0092-003 under PEIS Alternatives, Coordination and Education.

EMC-0267-008
Medbery, Angela

**Comment:** Entrances (both vehicular and walkways) need to be preposted before and posted after any use of chemicals in the contiguous property.

**Response:** The BLM agrees that posting before and after a spray project is important to neighboring land owners and the public in general. A discussion on posting is found under Coordination and Education in Chapter 2 of the PEIS and PER. Standard Operating Procedures related to posting are also found in Chapter 2 of the PEIS in Table 2-8 and in Table 2-5 in the PER. In addition, areas of high public use (i.e., recreation sites, campgrounds, etc.) are posted prior to treatments with re-entry times posted. In cases where BLM projects are far from local communities, the local BLM office would contact local landowners and interested parties. Information on BLM spray projects would also be available at the local BLM field office.

EMC-0306-019
Klamath River Keeper
Program and Klamath
Forest Alliance

**Comment:** To achieve effectiveness, all BLM Programs/Projects must include strong participation from all related stakeholders, emphasizing landowners, residents, businesses, managers, resource users, non government organizations, other community groups, schools/academia, and tribes. Strategies need include these stakeholders in planning, assessment, education, implementation, monitoring, and in gaining financial support. Treatments tools must be safe for the environment and humans.

**Response:** The BLM agrees. See Interrelationships and Coordination with Agencies and Consultation in Chapter 1, and Coordination and Education in Chapter 2 of the PEIS regarding BLM cooperation with local partners.

BLM_0001532

RESPONSE TO COMMENTS

EMC-0533-019
EMC-0548-036
Colorado Farm Bureau
Utah Farm Bureau
Federation

**Comment:** The [P]EIS should address coordination with adjacent landowners and other federal agencies. Noxious and invasive weeds do not respect land ownership or land management boundaries. Responses to controlling or eradicating these harmful weeds should likewise know no boundaries. Coordination with adjacent landowners is essential if noxious and invasive plants are to be effectively controlled.

**Response:** The BLM agrees with this comment. See response to Comment EMC-0295-002 under PEIS Proposed Action and Purpose and Need, Interrelationships and Coordination with Agencies. Chapter 1 of the PEIS, under Interrelationships and Coordination with Agencies, discusses BLM relationships with adjacent landowners. Coordination and collaboration is required at the local level for any vegetation management project, including weed management, to be effective, as discussed under Coordination and Education in Chapter 2 of the PEIS.

EMC-0584-111
Western Watersheds
Project

**Comment:** If BLM chooses to use chemicals, the treated lands, and surrounding areas, must be posted with signs in advance that warn the recreational public of chemical use and possible exposure. BLM's disastrous use of Oust demonstrates the uncertainty associated with use of chemicals in wild land settings, where wind erosion or water runoff may transport chemicals to unintended areas with unintended consequences.

**Response:** See response to Comment EMC-0267-008 under PEIS Alternatives, Coordination and Education.

EMC-0585-180
Western Watersheds
Project

**Comment:** BLM falsely claims that "signage" is used. This is simply not the case in wild land settings. We have never encountered a sign, despite dozens of encounters with sprayed vegetation on BLM lands. WWP [Western Watersheds Project] has never observed BLM signing sprayed areas. [Page] B-25 [of Appendix B of the Draft PEIS] claims that it is used on areas "directly sprayed".

**Response:** See the Coordination and Education section in Chapter 2 of the Final PEIS and PER for information on signage provided for treatment projects.

RMC-0049-004
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** Another area not well addressed within this document is the need for collaboration between landowners. In my experience, this is the major effort that most managers miss, and is the most essential for a successful vegetation management effort. CWMA's (Cooperative Weed Management Areas) and the documented success of the demonstration weed management program that I initiated in east/central Nevada both show the difference from the status quo of most invasive weed programs. That collaboration needs to be an emphasis of this EIS.

**Response:** See response to Comment EMC-0295-002 under PEIS Proposed Action and Purpose and Need, Interrelationships and Coordination with Agencies.

RMC-0049-027
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** Page 2-21 [of the Draft PEIS] The section of Coordination and Education needs to be strengthened substantially. As it currently is written, it will not accomplish the goal of proactive invasive plant management.

**Response:** See responses to Comment EMC-0533-019 under PEIS Alternatives, Coordination and Education, and Comment EMC-0295-002 under PEIS Proposed Action and Purpose and Need, Interrelationships and Coordination with Agencies.

RMC-0129-001
Noble, E.A.

**Comment:** Thousands of people with sensitivity to herbicides-pesticides life in rural areas to escape private spraying in urban areas. How do you expect to notify these

BLM_0001533

people who often have fewer contacts with radio-TV-newspaper-phone than the average person?

**Response:** See response to Comment EMC-0267-008 under PEIS Alternatives, Coordination and Education.

RMC-0210-048
MCS Task Force of
New Mexico

**Comment:** If herbicides are applied, the public must be notified in advance through newspaper articles, public service announcements, meetings, websites, and other means. A list of people wanting to be individually notified of herbicide use should be maintained by the BLM and these individuals contacted by letter, phone, or email (their choice) of proposed applications. The BLM should inform the public of the opportunity to be added to the notification list.

**Response:** See response to Comment EMC-0267-008 under PEIS Alternatives, Coordination and Education.

RMC-0210-049
MCS Task Force of
New Mexico

**Comment:** The PEIS acknowledges that it is critical for BLM to notify potentially affected parties of treatment activities that occur on public lands ([Draft] PEIS [page] 2-22), but it is likely the number of potentially affected parties is much greater than what is assumed. Chemically sensitive individuals, for example, can react adversely to drift or volatilization of pesticides applied miles away. Thus, the BLM needs to expand the range and number of people it notifies of herbicide applications.

**Response:** See response to Comment EMC-0267-008 under PEIS Alternatives, Coordination and Education. Also see the section on Herbicide Treatment Standard Operating Procedures and Guidelines in Chapter 2 of the PEIS for a discussion of procedures and mitigation to manage and reduce herbicide drift.

RMC-0210-050
MCS Task Force of
New Mexico

**Comment:** If herbicides are applied, signs should be posted at trailheads, along roadways or other right-of-ways, access points, and any other places that are needed to sufficiently warn members of the public of the presence of herbicides before entering an area. Signs should remain in place for at least 2 months after an application.

**Response:** See response to Comment EMC-0267-008 under PEIS Alternatives, Coordination and Education. The BLM will follow the label for the appropriate re-entry times after applying any herbicide. The length of time for signs to remain posted is based on the labeled re-entry time and appropriate mitigation for public safety, as identified through the project NEPA analysis at the local field office level.

RMC-0210-051
MCS Task Force of
New Mexico

**Comment:** BLM should not presume to know when re-entry into an area that has been applied with herbicides is safe ("BLM takes care ... to post the area with warnings about when re-entry con occur safely," [Draft] PEIS [Appendix B page] B-35). Even dried herbicides vaporize into the air for long periods after applications, and what is a safe re-entry time for one person may not be safe for another. Signs should just provide objective information and allow individuals to make their own informed choice about whether to enter an area.

**Response:** Re-entry periods are established by the USEPA-approved label for workers. In the human health risk assessments (HHRAs) and Appendix B of the PEIS, the "worst-case" accidental spray scenario evaluated was an accidental direct exposure of a person to herbicide spray at the maximum application rate.

BLM_0001534

RESPONSE TO COMMENTS

| | |
|---|---|
| RMC-0210-052 MCS Task Force of New Mexico | **Comment:** Signs and other forms of notification should at a minimum contain the following information: |

Time and date(s) of application (or anticipated application)
Site of application
Name of pesticide product, active ingredient and EPA registration number
Application method.
Name and phone number of whom to contact for additional information and to report adverse effects resulting from the application.

**Response:** See response to Comment EMC-0585-180 under Alternatives, Coordination and Education. We have provided additional information in Chapter 2 of the PEIS under Coordination and Education that discusses information that will be posted at treatment sites.

| | |
|---|---|
| RMC-0210-053 MCS Task Force of New Mexico | **Comment:** The BLM should also designate a permanent staff person whom the public can contact about the agency's pesticide and herbicide use, including past, present, or contemplated applications. The phone number and email address of the contact person should be widely publicized. |

**Response:** Each BLM State Office has a designated staff person that acts as the State Office Weed Coordinator and/or State Office Pesticide Coordinator. In addition, each BLM field office has a designated Field Office Weed Coordinator who coordinates all pesticide applications with the BLM state office. A listing of all state and Washington, D.C., weed coordinators is available on www.blm.gov/weeds. In addition, individual BLM state and field office web pages are linked from the BLM's main website.

| | |
|---|---|
| RMC-0210-054 MCS Task Force of New Mexico | **Comment:** If herbicides are used, the BLM should establish an Adverse Event Reporting System to collect reports of adverse effects resulting from herbicide use. This would include damage to property, wildlife, wanted vegetation, and human health. The existence of this system should be widely advertised, along with instructions for reporting adverse events. The data collected should be regularly reviewed and used to guide future decisions regarding vegetation management. |

**Response:** Under Section 682 of the Federal Insecticide, Fungicide, and Rodenticide Act, pesticide registrants are required to report any adverse incidents involving their pesticide (other than human health) to the USEPA's Ecological Incident Information System (EIIS). Other adverse incidents are reported to EIIS by state and/or federal agencies. USEPA's Enforcement and Compliance History Online is a web-based tool that provides public access to compliance and enforcement information for approximately 800,000 USEPA-regulated facilities. Anyone with access to the Internet can use this tool. In addition, the BLM tracks other incidents internally through its hazardous materials program and records the effects of vegetation treatments through monitoring, as outlined under Monitoring in Chapter 2 of the PEIS.

**Alternatives, Mitigation**

| | |
|---|---|
| EMC-0584-073 Western Watersheds Project | **Comment:** Mitigation. Large blocks of land (>10,000 acres) should be established within watersheds where no grazing or treatments are conducted, as reference areas for the outcomes/effectiveness/damage of the treatments that are proposed. Other mitigation includes termination of grazing disturbance on reference areas. |

BLM_0001535

**Response:** Set-asides of specific large blocks of land for reference areas in relation to vegetation treatments would need to be accomplished through applicable regulatory processes in conformance with applicable land use and implementation plans, (e.g., watershed management plan or habitat management plan). Establishing closures to grazing is a land use allocation determined through land use planning and implemented through regulations at 43 CFR [Code of Federal Regulations] 4100. See Scope of Analysis in Chapter 1 of the PEIS. This PEIS does not make nor propose land use allocations.

EMC-0584-075
Western Watersheds
Project

**Comment:** BLM must develop adequate mitigation for activities carried out under this [P]EIS. For example, if BLM wants to burn or thin 10,000 acres of sage grouse habitat, it should be removing livestock use from 10,000 acres of suitable habitat in order to provide better quality nesting and wintering habitat, not allowing livestock use to continue on neighboring lands.

**Response:** The BLM would very rarely develop a treatment project that would disturb a solid block of 10,000 acres. Most projects are designed to treat smaller areas and provide intermingled areas of untreated land to provide habitat for species that could temporarily be adversely affected by the vegetation treatments. Removing livestock from the surrounding or nearby unaffected areas would not automatically result in improved habitat for sage-grouse, and there is no assurance that the birds displaced or affected by the treatment would use the areas from which livestock were removed. Since the BLM would be unable to guarantee any direct benefit to the sage-grouse potentially impacted by the vegetation treatment, a decision of that kind would appear to be unreasonable and arbitrary.

EMC-0585-152
Western Watersheds
Project

**Comment:** Table 2-7 [of the Draft PEIS] presents weak, non-mandatory and often nebulous mitigation measures. There is no guarantee that any will be applied. Example "where feasible" BLM will implement mitigation measures for plants described in the 17 states EIS, or will "consider" manual spot applications. No decisionmaking scenario or flowchart is provided to ensure minimal use of herbicides or treatments. Despite the large number and many types of treatments covered in the PER – there is no decisionmaking framework or specific mandated mitigation measures for any treatment scenario. This all maximizes ecological/environmental risk and uncertainty of treatment outcomes in the short, mid and long term.

**Response:** As discussed in Chapter 2 of the PEIS under Mitigation, mitigation measures are not mandated, because local offices have the site-specific knowledge and therefore need the flexibility to develop measures that could be more or less stringent based on local information. Additional decision-making guidance is provided in the final PEIS/PER in Chapter 2, but is still at a broad, programmatic level. During implementation planning tied to goals and objectives (i.e. desired outcomes) set at the regional/local land use planning level, detailed prioritization will be developed in order to effectively restore ecosystem processes specific to the plant communities in which the actual implementation will take place.

EMC-0585-153
Western Watersheds
Project

**Comment:** Other examples: BLM claims it will "regulate' the use of diquat, "regulate" the use of terrestrial herbicides in watersheds, which have characteristics suitable for potential surface runoff" (but only in watersheds "with fish-bearing streams during periods when fish are in life stages most sensitive to the herbicide(s) use"!). What does regulate mean? Why in the world would BLM not regulate toxic diquat and other herbicide use in all watersheds?

BLM_0001536

**Response:** An Environmental Assessment is prepared for each proposed action in the field. For projects involving the use of herbicides, a Pesticide Use Proposal is prepared that identifies how the pesticide will be applied. The BLM regulates the use of herbicides by complying with label requirements and other Standard Operating Procedures and mitigation identified in this PEIS, by complying with federal, state, and local laws pertaining to the use of herbicides, and by following BLM handbooks, manuals, and directives on herbicide use.

EMC-0585-155
Western Watersheds
Project

**Comment:** Wildlife "mitigation" is even worse: BLM will: "Minimize" risks by applying chemicals "at the typical application rate where feasible". When and where is "feasible'? What limits, or triggers, or decisionmaking framework are used to determine 'feasibility"? Why is there no specific prohibition on using chemicals during critical periods of the year, such as when nests, eggs, nestlings, young, are present? What happens if BLM exceeds the "typical" application rate?

**Response:** Measures to protect wildlife from herbicide treatments are discussed in Tables 2-8 and 2-9 and in Chapter 4 of the PEIS under Wildlife Resources, Mitigation for Herbicide Treatment Impacts. These measures give specific guidance on application rates and methods for specific chemicals, using timing restrictions, and avoiding applications during critical periods. To be effective, herbicide treatments must be applied when the likelihood of success is greatest to achieve long-term benefits for wildlife and their habitats. Since the young of most species of vertebrates may not mature for 1 or more years, avoiding applications during periods when young are present may preclude herbicide treatments on most, if not all, public lands. An assessment of the risks to wildlife from use of herbicides would be identified for projects at the local level, and specific Standard Operating Procedures and mitigation to reduce effects to wildlife (e.g., size of treatment area, type and amount of herbicide use, time of year of application, presence of threatened, endangered, and sensitive species) could be developed at that time based on public input.

EMC-0585-156
Western Watersheds
Project

**Comment:** "Minimize the size of application areas where practical" ... "where practical, limit" ... to avoid contamination of food items. What determines practicality? Again here, there is no certainty that any safeguards will be applied, and BLM is free to deviate from claimed protections/mitigations.

**Response:** See response to Comment EMC-0585-155 under PEIS Alternatives, Mitigation.

EMC-0585-157
Western Watersheds
Project

**Comment:** Why is there no mitigation or mechanism to prohibit use of these chemicals in sensitive habitats, or during sensitive times of the year? Why is there no protocol to use chemicals of lesser impacts.

**Response:** See response to Comment EMC-0585-155 under PEIS Alternatives, Mitigation. As noted in Table 2-8 of the PEIS, Standard Operating Procedures (SOPs) for Applying Herbicides, the BLM will select the chemical that is least damaging to the environment while providing the desired results. SOPs and mitigation for use of herbicides in sensitive habitats are discussed in Chapter 4 of the PEIS for several resource areas, and in the Biological Assessment prepared in support of the PEIS.

EMC-0585-158
Western Watersheds
Project

**Comment:** Nowhere does BLM mandate that any particular action occur, such as mandatory "no treatment" during nesting periods for migratory birds. Why is there no prohibition on method of application (such as aerial application) during sensitive periods of the year, such as migratory bird nesting?

BLM_0001537

**Response:** See response to Comment EMC-0585-155 under PEIS Alternatives, Mitigation. In some situations, long-term benefits of treating vegetation and perpetuating nesting or other critical habitat may outweigh the costs of not treating vegetation during the nesting period. Although nesting habitat might be saved for a few seasons, it could be lost over the long term if treatments outside of the nesting period were ineffective.

EMC-0585-159
Western Watersheds
Project

**Comment:** The [Draft] [P]EIS states "where feasible" would implement mitigation for non-TES [threatened, endangered, and sensitive] species "unless treatments are specifically designed to improve habitats for these species". BLM will always have an out –just claim that some nebulous benefit of some kind will result decades down the road – and Boom – the action can go ahead and kill or destroy nests, intact habitats, etc.

**Response:** Besides the Standard Operating Procedures and the mitigating measures listed in Chapter 2 of the PEIS/PER, the BLM will follow the conservation measures outlined in the Biological Assessment for projects involving all special status species. In addition, site-specific mitigation will be developed at the local level through the NEPA process as interdisciplinary teams, including biologists, work together to design projects which will not lead to the listing of special status species. These steps are required by BLM policy in Manual 6840 (Special Status Species Management). Thus, no habitat improvement actions would move forward without consideration for effects on special status species.

EMC-0585-160
Western Watersheds
Project

**Comment:** This provides no reassurance whatsoever, as BLM loosely applies claims of habitat improvement for many projects it undertakes – with no science or data used to demonstrate positive improvement. Why can't BLM simply avoid chemical treatment during times of maximum sensitivity of native species? Why are non-TES [threatened, endangered, and sensitive] species given lesser uncertain protections? Why are buffer zones not specifically described and made mandatory?

**Response:** See responses to Comment EMC-0585-154 under PEIS Alternatives, Herbicide Treatment Standard Operating Procedures, and Comment EMC-0585-155 under PEIS Alternatives, Mitigation. Standard Operating Procedures and mitigation are designed to minimize, and hopefully avoid adverse impacts to wildlife, regardless of their status (TES or non-TES). Additional mitigation is identified to provide additional protection to TES species since the loss of only a few individuals could have an adverse effect on the welfare of the population.

EMC-0585-163
Western Watersheds
Project

**Comment:** It is shocking that BLM proposes no adequate mitigation measures for visual resources. Recreational visitors to specific areas may visit them to view vibrant spring wildflower displays, or fall aspen leaf color, or for other purposes. Herbiciding, burning or otherwise treating scenic or wilderness areas using methods, or during periods of the year when recreational uses are maximized, and creating ugly brown or dead zones, should not be given blanket coverage. BLM has ACECs [Areas of Critical Environmental Concern, SMAs [Surface Management Areas], WSAs [Wilderness Study Areas], Wilderness areas, and many other special use areas that require special management attention, and BLM's herbicide and other treatments must comply with protection of scenic and aesthetic values, too.

**Response:** Visual mitigation will be applied when a proposed action has been received and the specific details of the project have been identified. Visual Standard Operating Procedures will be used to reduce visual impacts. Any proposed action that would

BLM_0001538

RESPONSE TO COMMENTS

exceed the degree of contrast for the project area will be mitigated in compliance with BLM Manual Handbook 8431-1. In the case of dead zones or prescribed fire, a short term contrast may exist. This impact would be allowed if the long term visual quality would be improved by the regrowth of desirable vegetation on the site.

| EMC-0585-164 Western Watersheds Project | **Comment:** The mitigation table provides no specific measures for Wilderness areas, instead referring a reader to various sections of Chapter 4. Thus, there is no assurance that any mitigation/SOP [Standard Operating Procedure] will be applied. |
|---|---|
| | **Response:** Mitigation requirements are addressed in existing BLM guidance: BLM Manual 8560. |
| EMC-0585-166 Western Watersheds Project | **Comment:** Human health and safety mitigations are grossly inadequate. "Use the typical application rate". Instead, most harmful chemicals must be prohibited in areas with high recreational use, abundant neighboring habitations, areas where forest products – especially non-traditional forest products are sought, etc. |
| | **Response:** The risk assessments show generally no risk to low risk if applied at the typical rate. Use of mitigation measures and label precautions along with notification to the public are adequate to minimize risk. |
| EMC-0585-167 Western Watersheds Project | **Comment:** BLM must forbid use of diuron, instead of the nebulous, uncertain "evaluate … on a site by site basis'. There is no clear and specific framework for any evaluation provided. |
| | **Response:** The application of diuron should be evaluated on a site-by-site basis because the exposure potential could be different for different sites. Some sites may be sparsely populated and have minimal exposure pathways through which people could be exposed to diuron. At more heavily populated sites it may be inadvisable to use diuron. |
| EMC-0643-044 California Indian Basketweavers Association | **Comment:** NEPA requires analysis and mitigation of effects including those which are aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. (40 CFR [Code of Federal Regulations] § 1508.8 (b)). Indian tribes throughout the BLM analysis area continue to suffer adverse impacts to their health and culture, resulting from impacts that may be social, economic, and environmental, due to BLM's land management practices. The current proposal adds additional cumulative impacts that are not been mitigated by this DEIS [Draft PEIS]. The mitigation measures found on page 2-24 (Table 2-7) [of the Draft PEIS] are wholly inadequate to protect Native American health and cultural practices. The mitigation promises nothing but grants BLM full latitude to implement mitigation measures at the agency's discretion. Mitigations are mere suggestions without any accountability. |
| | **Response:** As noted in Chapter 2 of the PEIS under Special Precautions (Cultural Resources), the BLM is required to take actions to notify tribes of proposed actions and minimize or avoid impacts to tribal members and their resources. As discussed in the same chapter under Coordination and Education, the BLM would notify tribes before any actions occur that could affect tribal members or their resources. Mitigation measures proposed in the PEIS are standards that may be used in any project, but do not preclude other measures once specific actions and effects are identified. |
| RMC-0163-005 Skrine, Eugene | **Comment:** CEQ [Council on Environmental Quality] requires consideration of mitigation measures, i.e., has the agency considered everything reasonably to mitigate |

BLM_0001539

the unavoidable impacts of their action. Invasive plant prevention, the use of some non-herbicide treatment methods, and site restoration can reduce the environmental impacts of the BLM's herbicide proposal. These practices and methods need to be addressed in this EIS.

**Response:** The BLM has identified mitigation measures in the PEIS and Biological Assessment that it feels are appropriate to avoid, reduce, or compensate for significant impacts to resources. It anticipates that additional measures will be identified during public review and comment on the Draft PEIS and PER. Prevention of weeds and early detection and rapid response, and revegatation are discussed in Chapter 2 of the PEIS and PER. This information will also be included in the Final PEIS to ensure that the public is aware that these activities are an important component of integrated vegetation management.

RMC-0218-035
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Mitigation measures are inadequate to avoid significant impacts from herbicide use. There is lots of vague direction, open to widely varying interpretation, such as: "Minimize the use of terrestrial herbicides, in watersheds with down-gradient ponds and streams if potential impacts to aquatic plants exist." (DEIS [Draft PEIS] p2-23) What does "minimize" mean? Minimize to what level? Mitigation measures presented in Table 2-7 [of the Draft PEIS] are generally lacking compulsory requirements or specific detailed instructions. There is a lot of loophole language such as "where feasible," "consider," "minimize," "limit" and "regulate" rather the defining or requirement language such as "avoid," "Don't use more than $\underline{X}$ amount," "only use manual spot applications," "establish buffer zones as required by the herbicide label," etc. Language such as "where feasible" and "where practical" allows managers to disregard those mitigations if they are not convenient. Yet this weasel-word language is pervasive throughout the proposed mitigations. E.g.: "minimize the size of applications areas, where practical, when applying 2, 4-D, bromacil, diuron, and Overdrive to limit impacts to wildlife..." (p 2-23, Table 2-7 [of the Draft PEIS]) And what does "regulate" mean in this context? – "Regulate the use of diquat in waterbodies that have native fish and aquatic resources."(ibid) Clearly any Finding of No Significant Impact for water quality, fish, aquatic organisms, wildlife, livestock, wild horse and burros, wilderness values, human health, etc. cannot rely on such weak and vaguely-defined mitigation measures, which may not even be applied at all in many cases where loophole language such as "where feasible," "where practical" or "evaluate," "consider" or regulate" is used. (See all of Table 2-7, pp 2-23-25 [of the Draft PEIS].)

**Response:** The PEIS serves to identify the project purpose and need (Chapter 1 of the PEIS), project alternatives (Chapter 2), baseline conditions (Chapter 3), and the environmental and social consequences of implementing the alternatives. Mitigation measures are proposed to reduce the potential impacts that could occur under the Preferred Alternative or other alternatives. However, required mitigation measures cannot be identified until the Preferred Alternative is identified in the Record of Decision. Some mitigation measures are broadly worded because they must apply to actions that could occur anywhere on public lands in the western U.S. Thus, it may be possible to state that only "x" amount of herbicide can be used, but if doing so results in the invasive species continuing to spread, it may be better in the long run, to use more than "x" amount of herbicide, assuming the benefits outweigh the social and environmental costs. These types of decisions are best made at the local level when developing the project and conducting the environmental analysis. In addition, an EIS does not have to result in a Finding of No Significant Impact. The purpose of an EIS is to disclose direct and indirect adverse environmental impacts associated with the

BLM_0001540

RESPONSE TO COMMENTS

proposed action and alternatives and the significance of those impacts (40 CFR 1802.16(a,b)). The EIS must include a discussion of the "means to mitigate adverse environmental impacts" (40 CFR 1502.16(h)). However, NEPA does not require federal agencies to carry out mitigation measures that would reduce or eliminate significant environmental impacts. Thus, an agency need not adopt mitigation measures contained in an EIS unless agency-specific NEPA procedures require their adoption or the agency commits to implementing them in the Record of Decision.

**Alternatives, Summary of Impacts by Alternatives**

EMC-0214-014
Vollmer, Jennifer
(BASF)

**Comment:** This Table [2-8 of the Draft PEIS] is misleading in adequately depicting comparative risks. Effects appeared to be solely based on: greater treated acres = greater adverse effects. There is no description of greater or lesser magnitude of the actual effects. Example: Effects for Alternative D appear to assume all aerial application will result in negative impact drift. In reality, drift from aerial application can be negligible or have no adverse effects, dependent on the herbicide applied and the area impacted by the few feet of drift, if it occurs.

**Response:** It is not possible to portray all possible risk scenarios at the programmatic level, qualitatively or quantitatively. It is true that not all aerial applications would result in adverse effects from drift. However, under similar conditions (e.g., wind, temperature, topography, herbicide type, application equipment and method), it is more likely that drift would cause adverse effects under an aerial application than under ground-based methods, since the material would be able to travel farther before reaching the ground. The BLM has attempted to assume that conditions would be similar for applications under each alternative for comparisons given in Table 2-10 of Chapter 2 of the Final PEIS.

RMC-0080-007
Idaho State Department
of Agriculture

**Comment:** On page 2-33 [of the Draft PEIS] under the summary of cumulative effects on livestock the PEIS states, "Treatments would restore native vegetation favored by livestock and make rangelands more resilient to disturbance." ISDA [Idaho State Department of Agriculture] suggests that this sentence be changed to read, "Treatments would restore native and desirable non-native vegetation favored by livestock and make rangelands more resilient to disturbance." We also ask that any similar phrasing in the PEIS be changed to read the same. The objective should be to establish desirable vegetative communities that will stabilize soils, resist invasive species, as well as meet multiple-use objectives (livestock, wildlife, watershed values). Native plant communities are certainly the most desirable but we cannot discount the value of certain non-native species in meeting these objectives.

**Response:** The BLM agrees. We have revised Chapter 2 (Table 2-10 of the Final PEIS) and Chapter 4 (Livestock) of the Final EIS to reflect this distinction.

RMC-0218-032
\ Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Reassuring statements in the "Summary and Comparison of Effects on Resources by Alternatives" Table 2-8 [of the Draft PEIS] such as "There would be risks to human health from vegetation treatments, but...use of less toxic herbicides have the potential to reduce these risks" (p[age] 2-39 DEIS [Draft PEIS]) and: "New herbicides are proposed for use should improve treatment success while having minimal impacts to aquatic organisms" (p. 2-31 DEIS [Draft PEIS]) ignore admissions buried in the text that only "[a]pproximately 10% of all treatment areas would be treated with the new herbicides." (DEIS [Draft PEIS] p. 4-20)

BLM_0001541

**Response:** Both herbicides currently available to the BLM and herbicides proposed for use have risks to humans. Although only about 10% of acres would be treated using herbicides proposed for use, based on projections from BLM field offices, their use would help to reduce overall risks to humans associated with use of herbicides. More importantly, the PEIS identifies Standard Operating Procedures and mitigation to help reduce or avoid situations in which humans are most likely to be adversely impacted by an herbicide.

**Affected Environment, General Issues**

EMC-0525-003
Western Watersheds
Project

**Comment:** Unless the environmental setting in which the herbicide use and treatments would occur are fully revealed and assessed based on sound ecological and Best [Available] Science (please see Annotated Bibliography submitted with RNEA [Restore Native Ecosystems Alliance] and Bibliography Attached to comments), BLM can not develop a reasonable range of alternatives, nor apply adequate analysis of impacts of the proposed action under any alternative. Nor can it ensure that the public lands, waters and native biota will de protected from unnecessary and undue degradation.

**Response:** The BLM has provided a description of the environmental setting in Chapter 3 of the PEIS and PER appropriate for a programmatic document. A range of alternatives was developed based on public scoping comments, as discussed in Chapter 1 of the PEIS under Development of the Alternatives. The analysis of effects from using herbicides was based on information in Chapter 3, and use of Best available science, as discussed in Chapter 4 of the PEIS under How the Effects of the Alternatives Were Estimated. The Standard Operating Procedures and mitigation identified in Chapters 2 and 4 of the PEIS identify measures to protect resources from unnecessary and undue degradation. This section also notes that site-specific analyses would be required before implementation of a local project.

EMC-0585-233
Western Watersheds
Project

**Comment:** Further, to conduct an adequate assessment, BLM needs to provide adequate baseline data on the conditions of the lands in the areas slated for treatment, as ecological conditions will have great impacts on the risks, outcomes and environmental effects of treatments.

**Response:** The BLM has provided an overview of conditions on public lands in Chapter 3 of the PEIS and PER that is appropriate at the programmatic level of analysis. A more detailed assessment of land conditions would be developed for each project at the field office level and would be used to determine risks, outcomes, and environmental effects.

RMC-0144-020
Wyoming Game and
Fish Department

**Comment:** [Pages] 3-26 and 3-27 and 3-65 [of the Draft PEIS]: There are differences in the estimates of downy brome acreages. For example, there are estimates of 10 million acres, 11.4 million acres and infesting 56 million acres and growing at 14% a year. This should be clarified.

**Response:** You are correct. The acre figures for downy brome from different cited sources are not consistent. The coverage of downy brome is difficult to estimate, as reflected in the extant literature. In addition, some of the figures cited include several bromus species, while others reflect only downy brome. Table 3-5 in the Final PEIS provides BLM estimates for all bromus species by state.

BLM_0001542

RESPONSE TO COMMENTS

**Affected Environment, Water Resources and Quality**

RMC-0144-019
Wyoming Game and
Fish Department

**Comment:** [Page] 3-14 [of the Draft PEIS] statement under the Missouri Hydrologic Region says: "Most of the streams in western Montana flow year-around, while in Wyoming only the larger rivers, such as the North Platte, flow year-around." This statement is incorrect. Our Department's Fish Division can supply pertinent information relative to streams that flow year-around in Wyoming.

**Response:** The text of the PEIS has been changed in response to this comment. See the Water Resources and Water Quality section of Chapter 3.

**Affected Environment, Vegetation**

EMC-0411-003
Schroyer, Don L.

**Comment:** How many invasive / noxious weed species have been identified on lands being managed by BLM?

**Response:** The total number of invasive and noxious weed species that have been identified on BLM lands is approximately 110 species.

EMC-0411-005
Schroyer, Don L.

**Comment:** How many acres are infested with invasive / noxious weed species on lands being managed by BLM?

**Response:** The PEIS in Chapter 3 under Noxious Weeds and Other Invasive Vegetation states that an estimated 36 million acres of public lands are infested with noxious and invasive weeds.

EMC-0585-034
Western Watersheds
Project

**Comment:** [The BLM failed to] compile current data (through 2005) on weeds and invasive species [in Table 3-5], including a much broader range of invasive species (all noxious weeds in project area, and all major invasive species in project area). The 2000 data is already 5 or more years old.

**Response:** The information in Table 3-5 of the Final PEIS and PER has been updated through 2005. However, these are only estimates of weed populations on public lands. We included the most common weed species/groups in the table.

EMC-0585-036
Western Watersheds
Project

**Comment:** [The BLM failed to] provide any information for lands critical to the actions in the EIS and PER. The Table presents "0"/Zero acres of weed infestations of *Bromus* or halogeton in Nevada, despite millions of acres containing significant infestations of these invasive species (likely 10-20 million acres), Fite, recent field observations over extensive areas of northern and central Nevada. As the public lands of Nevada are slated for large-scale treatment under the EIS and PER, such gross omissions are unforgiveable and render an analysis scientifically untenable. Thus, no basis for any legitimate analysis is provided.

**Response:** Information for several species in Nevada was inadvertently not included in Table 3-5. The information in Table 3-5 of the Final PEIS and PER has been updated through 2005.

RMC-0042-081
Asher, Jerry

**Comment:** If the effect was negative, a profound effect of weeds usually means devastating or seriously damaging on vast scale. Suggest instead of "profound effect" using devastating, seriously damaging or irreversible degrading. Those kind of words more accurately reflect what has and will continue to happen on the ground.

BLM_0001543

**Response:** The text of the PEIS and PER has been changed in response to this comment. See the Vegetation section of Chapters 3 and 4 in both documents.

RMC-0042-082
Asher, Jerry

**Comment:** "Noxious weeds are undesirable plants that infest either land or water resources, and may cause physical and economic damage…" (last para pg. 3-25 [of the Draft PEIS]) "Weed infestations are capable of destroying wildlife habitat; reducing opportunities for hunting, fishing…". ([Draft] [P]EIS first para, pg. 3-26, [Draft] PER 4th para. pg. 3-39) The words are capable leaves the reader wondering: "Does it happen? If so, is it a rare occurrence?"

**Response:** Although weed infestations can and do destroy wildlife habitat, small weed infestations may not harm habitat, and may even provide some habitat diversity. Thus, it is probably best to leave the document wording as is.

RMC-0049-011
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** Page 3-40 Table 3-5 [of the Draft PER]. Where did these numbers originate from? Nevada has more that 3 million acres of land occupied by pure bromus species. The figure for halogeton and medusahead are equally inaccurate. I could not find the source in the references at the end of the book.

**Response:** See responses to Comment RMC-0144-020 under PEIS Affected Environments, and Comments EMC-0585-036 and EMC-0585-034 under PEIS Affected Environments, Vegetation.

RMC-0042-080
Asher, Jerry

**Comment:** "…competition with other species, influenced by the introduction on non-native invasive plant species, has had a profound effect on native vegetation" (BLM [Draft] [P]EIS 3rd para. Pg. 3-19, and first para. Pg 4-42, and [Draft] PER 7th para, pg. 4-31). Was the effect positive or negative?

**Response:** The text of the PEIS and PER has been changed in response to this comment. See the Vegetation section of Chapters 3 and 4 in both documents.

EMC-0630-004
Porter, Mark C.
(Wallowa Resources)

**Comment:** There is growing body of literature and many all too true stories across the west about the ability of these invaders to cause harm to our environment and the local economies that rely on them. These impacts must be addressed so that the general public can grasp the gravity of the situation and justify the use of herbicides, millions of dollars, and countless hours invested in managing them.

**Response:** We have included additional information in Chapter 3 under Vegetation (Noxious Weeds and other Invasive Vegetation) of the Final EIS on how invasive species harm the environment. Although the focus of the PEIS is on how herbicides could harm the environment, there is discussion in Chapters 3 and 4 on the effects of weeds and other invasive vegetation on natural and human resources.

EMC-0646-236
Californians for
Alternatives to Toxics

**Comment:** Because the surveys and evaluations for the presence of invasive plants on BLM lands in the western US provided for the current analysis varies from district to district -- with some doing a good or even exemplary job, some barely getting by and others in-between -- no adequate determination of a range of values for presence of invasive plants can be made. Indeed, it isn't made, with only lists of invasive plants provided to guide the decision maker and no informative description of where and particularly how much of the plants are currently present and how they are expected to spread given current knowledge. By not taking on the challenge of giving broad brush descriptions of this status, the DEIS [Draft PEIS] leaves the future under any of the alternatives subject to uninformed speculation.

BLM_0001544

**Response:** The BLM acknowledges there are spatial gaps in pre-treatment inventory and monitoring data for invasive plants. The baseline description of invasive plants in the 17-state area of the western U.S. that this PEIS addresses is given in Chapter 3 under Noxious Weeds and other Invasive Vegetation in the Vegetation section.

RMC-0042-089
Asher, Jerry

**Comment:** Hopefully you can insert considerable information, like a few pages or a section, in the [P]EIS and PER about the impacts, i.e. what is the problem with weeds? Otherwise, how will the reader even begin to grasp why we want to use herbicides and treat so many acres of weeds? If lots of detail about the problem with weeds is not possible in the [P]EIS and PER, then perhaps a companion document could prepared and referenced in the [P]EIS, that would comprehensively describe the problem/challenges, since the [P]EIS and PER comprehensively describe the solution.

**Response:** See response to Comment RMC-0049-028 under Affected Environment, Vegetation.

RMC-0049-028
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** Page 3-1 [of the Draft PEIS and PER] This section needs to focus on the effect of invasive weed expansion and domination over native plant communities. As it currently is written it only talks in a very general way about what are the current estimated acreages. This is only a very small part of the picture. It does not address the very rapid expansion of dominated acres and the wholesale environmental changes and consequences as a result of the domination by a very few species of plants that are forming expansive monocultures.

**Response:** See response to Comment RMC-0042-054 under PEIS Proposed Action and Purpose and Need, Purpose and Need for the Proposed Action. Additional information on noxious weeds and other invasive vegetation has been provided in Chapter 3 of the Final PEIS under Noxious Weeds and other Invasive Vegetation in the Vegetation section.

**Affected Environment, Livestock**

RMC-0049-012
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** Page 3-55 Table 3-6 [of the PER] is not really relevant unless the grazing AUM's [Animal Unit Months] are compared over time. Changes happen slowly on much of the land managed by the BLM. What is the change in grazing pressure that has occurred?

**Response:** Table 3-6 in Chapter 3 of the PER under Livestock identifies the number of grazing permits and leases, and the amount of grazing use in AUMs by state, and is used in this chapter of the PER to identify how much grazing use occurs on public lands. This table was never intended to reflect a trend over time. To respond to the comment, there has been a gradual decrease in the amount of grazing use since the Taylor Grazing Act was passed in the mid 1930s. This decrease is reflected in both the number of AUMs permitted and available for use, and the number of AUMs actually used, and the trend continues today. The number of AUMs actually used may reflect greater fluctuations in response to annual growing conditions, such as drought periods when the amount of use is reduced. Following a drought the use temporarily increases with the return of more normal precipitation; however, when measured over longer periods of time the overall trend still reflects a gradual reduction in grazing use.

BLM_0001545

**Affected Environment, Human Health and Safety**

FXC-0071-015
Campbell, Bruce

**Comment:** I also object that a comparison of some cancer rates on pages 3-70 mentions African-American and Caucasian rates, but does not mention the burgeoning Latino population which is the main demographic group coming into contact with toxic materials such as herbicides.

**Response:** The source document for cancer rates did not break out Latinos from other races. However, the National Cancer Institute reports that cancer rates are lower for Hispanics than for Caucasians and African-Americans (see http://surveillance.cancer.gov/statistics/types/lifetime_risk.html).

**Environmental Consequences, How the Effects of the Alternatives were Estimated, General Issues**

EMC-0018-004
Shaw, T. Gray

**Comment:** As a California resident and user of public lands I am concerned about irreparable damage from exposure to these chemicals, both to myself and to the public lands I enjoy. Non-target exposure negatively impacts water quality, soil productivity, native vegetation and wildlife (terrestrial and aquatic), native peoples (during plant gathering), and workers (handlers), not to mention recreationalists and members of the public who use and live near these lands.

**Response:** The risk assessment specifically evaluated exposures to Native People, workers, and recreational users of the land, and considered a variety of exposure pathways. The risk assessment helped to identify which herbicides could pose potential health risks under these circumstances, and therefore should be restricted.

EMC-0026-003
Salmon, De Anne

**Comment:** The herbicides that are proposed have negative impacts to the environment and human health. This is a non-disputable fact despite the statement by the BLM that the risks are worth the benefits. Our water quality and soil productivity may be reduced to unsafe levels.

**Response:** As discussed in Chapter 4 of the PEIS, herbicide use could adversely impact natural resources and human health. However, that BLM conducted extensive ecological and human health risk assessments to evaluate these risks and identify Standard Operating Procedures and mitigation measures to reduce the risk of adverse effects from the use of herbicides. In addition, it should be noted that ecosystem degradation from wildfires and the spread of invasive vegetation also adversely impact natural resources and human health and that without vegetation management these adverse affects would only increase.

EMC-0056-002
Cole, Brian

**Comment:** Tripling the amount of herbicide used may not solve some of the problems, and it would be harmful for people using the land. The BLM should be trying to protect the land, and keep it safe and usable for the public. By using more toxic herbicides, the health of BLM land users is compromised. As well, the health of the environment would decline as well. The herbicides would wash into streams and kill fish. Vegetation not meant to be sprayed could be killed. Please consider and understand that increasing the amount of herbicide applied would not only cause health problems, and damage to the environment, but it may not necessary prevent fires, or kill invasive weeds.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives

BLM_0001546

RESPONSE TO COMMENTS

Were Estimated.

| | |
|---|---|
| EMC-0066-004<br>Conrick, Teresa | **Comment:** As a California resident and user of public lands I worry about the irreparable damage these chemicals will do to the natural surroundings and public lands I enjoy, as well as the health hazards these chemicals pose to my family. These ill-conceived spray plans will negatively impact water quality, soils productivity, native vegetation and wildlife (terrestrial and aquatic), native peoples (during cultural plant gathering practices), workers (those applying these hazardous chemicals), not to mention recreationalists and members of the public who use and live near these lands.<br><br>**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. |

EMC-0066-005
EMC-0069-007
Conrick, Teresa
Murphy, Jennifer

**Comment:** Public land management should be based on long-term ecological health, the best science available, and should err on the side of safety and conservation. I am troubled that massive amounts of extremely toxic poisons are being justified using peoples fear of catastrophic wildfires and invasion of invasive species. Non-herbicide vegetation treatment options are available! The proposed actions appear to meet financial needs of chemical companies and other large corporate interests, rather than for support ecological integrity and public interests. I worry about the long-term costs of all these pesticide applications, particularly those to the environment, the natural area, and the people who live near and use BLM public lands and natural areas.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0069-004
Murphy, Jennifer

**Comment:** These chemicals will do irreparable damage to the natural surroundings and public lands I enjoy. These ill-conceived spray plans will negatively impact water quality, soils productivity, native vegetation and wildlife (terrestrial and aquatic), native peoples (during cultural plant gathering practices), workers (those applying these hazardous chemicals), not to mention members of the public who use and live near these lands. These plans are unnecessary and unsafe for both human and environmental health.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0115-005
Steele , Mark

**Comment:** One million acres of herbicide spraying is tremendous. I will agree that 2-4, D and its sisters are pretty benign as far as herbicides go, but the large amount of lands and the sheer volume of 500,000 to 2 million gallons of herbicide being used in land treatment is an issue unto itself. How such widespread spraying affects insects, birds, wildlife, groundwater. permittees who will lose their grazing areas for a period of years afterwards, and the list goes on, will most likely be addressed by those with more authority than I, but I only point out the sheer volume of everything involved in this pushes it to the top.

BLM_0001547

**Response:** The use of herbicides on public lands requires that the BLM utilize only those herbicides that have been evaluated, analyzed, and approved by the USEPA. These procedures include both human health and ecological risk analysis, which consider potential impacts on insects, birds, livestock and wildlife. For those herbicides being considered for rangeland applications, tests are run to determine potential impacts on the grazing livestock, and if necessary, grazing restrictions are implemented on the final label. These grazing restrictions typically last less than 4 weeks, and only occur under the specific conditions identified on the herbicide label. Those herbicides registered for general applications on rangeland would be selective for the management of broadleaved species, with little or no impact on the desirable grass community at the proposed use rates. In situations where the undesirable vegetation is a broadleaved species, the application of these herbicides would typically reduce the competition of the target species, both for nutrients and space, allowing the desirable vegetation—grasses—to have a greater chance to grow.

EMC-0140-011
Small, Jack W. and
Joyce C.

**Comment:** In this day of on-line access to all manner of scientific information, it should not be a problem to spend a few hours on Google checking out what is known of the effects of chemicals you plan to use. It would be helpful to down load some of it and make it available to those who don't yet have a computer.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0161-007
EMC-0271-005
Richards, Vivien
Takemori, Claire

**Comment:** These ill-conceived spray plans will negatively impact water quality, soils productivity, native vegetation and wildlife (terrestrial and aquatic), native peoples (during cultural plant gathering practices), workers (those applying these hazardous chemicals), not to mention recreationalists and members of the public who use and live near these lands.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0181-003
Artley, Richard

**Comment:** Has the BLM not received the word yet that manufactured herbicides and pesticides are extremely toxic and dangerous? In addition, these toxic chemicals retain their toxicity for long periods. If you would like a more scientific view of this dangerous stuff, I have at least a dozen scientific articles on it that I could send you. One of my articles even proves that the increases in cancer and birth defects in America is due to manmade chemical application... primarily pesticides.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0246-001
Abe, Jane

**Comment:** I am shocked at the proposed use of pesticides on government lands for weed control. These substances are poisons. Has no one thought about their potential effects on soil organisms and wild life, to say nothing of the other flora in the area? It is naive to think that chemicals that are powerful enough to kill "noxious" species would do no harm to the "preferred." It is time to take another look at these ideas.

BLM_0001548

There will be no going back, after such action is taken.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0266-003
Toro, Ida

**Comment:** How detrimental will these applications be to the populace in the areas sprayed? Does anyone at BLM really know or care. Generally, these facts are usually found out after the fact when the damage has already been done. What about the water, i.e., creeks, streams, rivers, lakes, etc. - Poisoned. What of the wildlife that live within those waters? What of the birds? How will this affect them?

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0306-007
Klamath RiverKeeper
Program and Klamath
Forest Alliance

**Comment:** Negative impacts from toxic spray plan will include direct, indirect and cumulative effects to the environment and human health. Water quality and soil productivity will be reduced to unsafe levels. Non-targeted vegetation, and wildlife (terrestrial and aquatic) will all suffer greatly from the proposed toxic dousing. Native peoples would be specifically exposed to risk during cultural plant gathering practices. Workers applying these hazardous chemicals would be particularly at risk. Recreationalists and other members of the public could also be subject to exposure. The BLM inappropriately states that the risks are worth the benefits.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0314-004
Alliance for the Wild
Rockies

**Comment:** Under several laws and regulations the BLM must use objective science in evaluating the effects of herbicide use:

\* The Endangered Species Act at 16 USC [United States Code] 1536(a)(2) requires you use the best available scientific and commercial data in assessing the impacts on species;
\* NEPA regulation 40 CFR [Code of Federal Regulations] 1502.22 delineates various actions you must take when you find data gaps while evaluating the impacts of actions;
\* The Data Quality Act (DQA) requires you to use objective (e.g. peer reviewed, no financial CoI [conflict of interest]) data in any document that you disseminate to the public (e.g., EIS');
\* When evaluating impacts, in the 9th Circuit at least, the Cuddy Mountain decision (137 F 3d at 1207) requires that you be more specific than the use of generalized claims without specifics and cite to authority.

**Response:** See responses to Comments RMC-0221-061 and Comment RMC-0211-013 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0324-003
Rachel Carson Council

**Comment:** We question whether the specific conditions in Alaska have been given sufficient consideration. These include reduced numbers of organisms to metabolize the chemicals and the greater fragility of the ecosystems there -- that could lead to

BLM_0001549

longer persistence of the chemicals and more profound impacts on non-target populations.

**Response:** The resource conditions in Alaska were identified in Chapter 3 of the PEIS and PER, and effects of treatments on Alaska resources were discussed in Chapter 4 of the PEIS and PER. As noted for Comment EMC-0108-002 under PEIS Appendix G, Tribal and Agency Consultation, the BLM would only use small amounts of herbicides in Alaska, if at all, and would mainly limit treatments to small areas, along ROWs, and disturbed sites.

EMC-0324-019
Rachel Carson Council

**Comment:** The chemicals tebuthiuron, picloram, glyphosate are all broad-spectrum herbicides capable of killing many different types of vegetation. Such actions can be harmful to insects, birds, fish and of course to people. Birds depend on vegetation for food and habitat and on insects for food. Fish depend on vegetation for food, habitat and for temperature regulation in the form of shading of riparian areas. Where beneficial insects, butterflies, and migratory birds feed, and or establish populations, these chemicals should not be routinely used. Fish can be harmed when temperature increases follow loss of shade-producing vegetation. Additional research needs to take place on the effect of these chemicals on bacteria, fungi, aquatic algae and grasses.

**Response:** The BLM evaluated exposure and risk to birds, fish, invertebrates and other ecological receptors, and discussed indirect effects to salmonids. See Chapter 4 of the PEIS under the relevant resource sections.

EMC-0336-002
Tipps, Betsy L.

**Comment:** While studies to date may indicate that these products are "safe", Google searches of bromacil, chlorsulfuron, diquat, diuron, fluridone, hexazinone, tebuthiuron, picloram, and triclopyr did not produce unequivocal scientific evidence that these chemicals are perpetually safe at any amount, much less the amounts you propose; are perpetually safe when used once, much less year after year; and that they will not have long-term, cumulative negative effects on human health, the development of children's neurological and immune systems, air quality, water quality, soil quality, and wildlife health and abundance. Some of these chemicals have already been shown to cause reproductive and developmental harm, and it is likely that among the group currently proposed or those that may be added under the provisions of the agreement are known to be or will be discovered as carcinogens and/or neurotoxins.

**Response:** All chemicals can cause harm. It is the exposure/dose that determines their risk to humans, plants, and animals. The purpose of the BLM risk assessments was to use application-specific and environmental fate and transport properties to determine exposure/dose and risk. The large majority of the exposure scenarios show no risk or low risk to human and ecological receptors at typical application rates. Most of the herbicides proposed for use by the BLM degrade relatively rapidly (days to weeks) and thus are unlikely to persist in the environment.

EMC-0338-004
Dow AgroSciences

**Comment:** It is important to note the exclusion of risks associate with non-chemical alternatives mentioned. There is no mention of the risks to workers using mechanical, fire or other methods to control invasive plants particularly in Alternative C: No Use of Herbicides. This ignores the dangers to workers using these methods such as the inhalation of vehicle exhaust or smoke from prescribed fires, risks associated with fire escape, physical injuries from over-exertion or injuries as a resulting from operation of heavy equipment.

BLM_0001550

RESPONSE TO COMMENTS

**Response:** See response to Comment EMC-0566-004 under PEIS Environmental Consequences, Non-herbicide Effects Analysis.

EMC-0354-002
Huls, Mark

**Comment:** Although new chemical technology has obviously produced herbicides less toxic than those of the past, there can be no argument that those proposed and in use in many places today are still lethal to the biochemical processes of man, nature and beast. It surprises me that there would be any support for such an action among ranchers who run the risk of birth deformities and cancer in their livestock from such an exposure. The problem with genetic mutation and cancers is that these results from chemical exposures, which have been proven in several studies, are long term effects and therefore are without the immediate reaction and blame of something that produces side effects immediately.

**Response:** The large majority of the exposure scenarios indicate that there is no risk or low risk to livestock associated with using the herbicides evaluated in the PEIS at typical application rates; see Tables 4-25 and 4-26 in Chapter 4 of the PEIS. See responses to Comment EMC-0336-002 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated and Comment EMC-0197-003 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0386-003
Varvares, Chris

**Comment:** Recognize the cost, both of applying the herbicides directly, and their short- and long-term effects on the environment.

**Response:** The short- and long-term costs and benefits of applying herbicides are discussed in Chapter 4 of the PEIS. More detailed information on the costs to humans, plants, and animals, is given in Appendixes B and C of the PEIS.

EMC-0446-024
The Nature
Conservancy

**Comment:** Some of the background information used in the Draft EIS on the environmental fates of the herbicides imazapic, 2,4-D, glyphosate, imazapyr, triclopyr, clopyralid, hexazinone, picloram and fosamine ammonium is cited from the Conservancy's Weed Methods Control Handbook ([Draft] PEIS pages 4-8, 15, 16, 17, 18, 19, 27, 28, 29, 30, 31, 32, 39, 46). While we appreciate the reference to our work, this Conservancy handbook is not a report of original research and study results, but is instead a compilation and review of available scientific literature. Therefore, we strongly recommend that BLM PEIS' authors find and cite from those original scientific sources instead of referencing our handbook.

**Response:** The references to the Weed Control Handbook were reviewed and changed in response to this comment, as appropriate. Where the original article was not obtained, a "cited in" citation is used. Where the handbook did not have an internal reference, the handbook was used as the citation.

EMC-0505-019
John Day-Snake
Resource Advisory
Council

**Comment:** While the risk assessments discussed in the Appendixes A, B, and C include information on background, methodologies, analysis, use and predicted impacts and outcomes, they do not address incidents. Applicants are required to report such occurrences. For example, in Appendix C the risk assessment for sulfometuron-methyl, with respect to non-target plants, indicates that risk quotients for typical and rare, threatened or endangered (RTE) terrestrial plants were all well below the plant Level of Concern (LOC), indicating that wind erosion is not likely to pose a risk to non-target terrestrial plants (appendix C [of the Draft PEIS], page C-74). However, a few years ago, BLM's application of this herbicide to control cheat grass in a burned area of south central Idaho resulted in off-target movement by wind blown dust and farmers in the area reported a high degree of crop loss that they attributed to this

BLM_0001551

herbicide. Investigations by the Idaho Department of Agriculture support this contention. It is clearly desirable to avoid off-target effects and the [P]EIS should include a discussion of risks from incidents for this and other herbicides.

**Response:** The ecological risk assessments (ERAs) provide information reported to USEPA on accidents and spills, including reports of spills and their effects on the environment (see Section 2.3, Herbicide Incident Reports, in the ERAs, which are found on the CD that accompanies the PEIS). Additional information on the risks associated with spills is provided in Chapter 4 and Appendixes B and C of the PEIS. The BLM also modeled for the effects of herbicide drift on non-target vegetation and other resources, including humans, fish, and wildlife, and provided the results in the PEIS and ERAs.

EMC-0512-002
Hells Canyon
Preservation Council

**Comment:** We are very concerned about this proposal to use herbicides on such a broad scale which will affect large areas in the West. The "one size fits all" approach is inappropriate considering the diversity of the habitat you intend to treat. The EIS fails to disclose the impacts of herbicide use on amphibians, fish populations or sage grouse. Other "special status" species may be negatively impacted from this large scale use of herbicides. HCPC [Hells Canyon Preservation Council] strongly suggests you redo EIS's for each different ecosystem and address each individual impact on specific resources in each habitat type.

**Response:** The PEIS and PER used several different approaches for analyzing impacts, depending on the types of data that were available and appropriate method of analysis. Thus, some effects were assessed based on state boundaries, while others, such as wildlife habitat, were assessed based on ecoregions. As defined in Webster's Dictionary, "an ecosystem is the complex of a community and its environment functioning as an ecological unit in nature." Thus, there are thousands of ecosystems in the West, and it would be impossible to analyze all ecosystems in a programmatic document, if at all. The PEIS does disclose impacts to fish, amphibians, and sage-grouse in the Fish and Other Aquatic Organisms and Wildlife Resources sections of Chapter 4.

EMC-0512-003
Hells Canyon
Preservation Council

**Comment:** The toxicity of the herbicides proposed for use are not well understood or fully disclosed in the [P]EIS. There are significant data gaps and lack of adequate risk assessment for several herbicides proposed for use. Without clear and complete knowledge of the impacts to amphibians, insects, native plants, fish, and other wildlife this action is not acceptable to the public. Non-target species should not be put in danger by BLM's use of herbicides.

**Response:** See response to Comment EMC-0640-036 under PEIS Environmental Consequences, Wildlife Resources. Data collected and analyzed during the risk assessment are provided for each herbicide in ecological risk assessments (ERAs) prepared by the BLM (and available on the CD included with the PEIS) and by the Forest Service (http://www.fs.fed.us/foresthealth/pesticide/risk.shtml). The risks to amphibians, insects, native plants, fish, and other wildlife is discussed in the ERAs, and also in Chapter 4 and Appendixes B and C of the PEIS.

EMC-0525-023
Western Watersheds
Project

**Comment:** Some of this information is already assembled, but the Weed [P]EIS/PER preparers have ignored it. In fact, the recent Conservation Assessment for Greater Sage Grouse (Connelly et al. 2004) provided GIS maps and information on BLM lands and landscape-level fragmentation factors that could be readily built upon by BLM in a Supplemental Weed [P]EIS. The data used in this mapping included information, for

BLM_0001552

RESPONSE TO COMMENTS

example, cheatgrass presence in understories, livestock facilities, and many other factors fragmenting species habitats. Instead of providing necessary information and mapping based on the information provided by the individual field offices, which BLM claims is driving this process, the [P]EIS provides limited and near-meaningless mapping at such a scale that it can not be properly related to the proposed actions.

**Response:** The level of mapping provided in the PEIS and PER is appropriate for a programmatic-level document. Mapping elements used to describe sage-grouse habitat conditions may not be appropriate for other resource areas discussed in the PEIS and PER. In addition, the focus of the PEIS and PER is not on factors causing fragmentation and invasive species issues, but on the methods used to control invasive species. Also see response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages.

EMC-0525-076
Western Watersheds
Project

**Comment:** The [Draft] [P]EIS/PER fails to examine such current population attributes in relation to areas slated for Treatment, and assess outcomes of treatments on many high priority species.

**Response:** The PEIS, PER, and Biological Assessment discuss likely effects from treatment activities on species of concern. In addition, the ecological risk assessments prepared for herbicides used by the BLM deal extensively at the programmatic level with the risks to species of concern associated with herbicide use. As noted in Chapter 2 of the PEIS under Special Precautions, Special Status Species, the BLM would evaluate risks to sensitive species and their populations at the local level for each treatment project.

EMC-0525-079
Western Watersheds
Project

**Comment:** Sadly, the series of Alternatives (Proposed and Preferred Actions) cast aside reasonable analysis of the impacts of the massive intervention and treatment disturbance put forth in the [P]EIS/PER on these species, and the viability of habitats that will be drastically fragmented under the [P]EIS actions.

**Response:** The analysis of the alternatives is found in Chapter 4 of the PEIS. The Proposed Action and Purpose and Need are identified in Chapter 1 of the PEIS. The PEIS proposes no actions that would drastically fragment viability of habitats for avian and other sensitive species. Analysis of herbicide use on sensitive species is presented under Wildlife Resources in Chapter 4 of the PEIS. Effects of non-chemical treatments on wildlife sensitive species are discussed under Wildlife Resources in the PER.

EMC-0525-087
Western Watersheds
Project

**Comment:** The [P]EIS treatments (chaining, fire, chopping, herbiciding, and "biological control" livestock grazing) are identical to past activities that have caused the conversions that are dooming native species. The [P]EIS has failed to both provide a baseline of information on past acreages converted, the habitat fragmentation that has resulted, and the direct, indirect and cumulative impacts of its proposed greatly expanded treatments on resulting new conversion.

**Response:** The baseline conditions of public land resources are described in Chapters 3 of the PEIS and PER. Cumulative effects are described in Chapter 4 of the PEIS under Cumulative Effects.

EMC-0525-089
Western Watersheds
Project

**Comment:** Nowhere does the [P]EIS and PER provide any protocol, analysis, mitigation, SOP [Standard Operating Procedure] or other provisions or analyses that would retain large tracts of any vegetation type, ensure seed-producing pine, or promote growth of native grasses and forbs. In fact, as the [P]EIS fails to address

BLM_0001553

livestock disturbance impacts and effects on outcomes of any treatments, and fails to provide science-based limitations on post-treatment livestock grazing and trampling use, there is no certainty that native grasses and forbs will not deteriorate further. This is especially the case as the very treatments identified may weaken or kill native grasses and forbs, as well as microbiotic soil crusts.

**Response:** An important objective of vegetation treatments is to promote the growth of desirable and healthy vegetation, including seed-producing vegetation. Given that 80% of treatments would be 1,000 acres or less, large tracts of land would remain untreated. The impacts of livestock on vegetation and other resources are discussed in Chapter 4 of the PER under Biological Treatments for each resource area, and also in the Analysis of Cumulative Effects in Chapter 4 of the PEIS. A discussion of the effects of treatments on soil, including microbiotic soil crusts, is included in the Soil Resources section of Chapter 4 of the PEIS and PER.

EMC-0525-144
Western Watersheds
Project

**Comment:** What are the impacts of treatments, and likelihood of success under drought conditions? How would the effects of a passive treatment (reduction in, or removal of livestock) compared to invasive disturbance treatments as proposed under the EIS?

**Response:** It is likely that the impacts of treatments, and their success or failure, would be influenced by extremes in weather (e.g., drought, periods of heavy rainfall), although it is difficult to predict treatment outcomes based on weather at the programmatic level. For example, more vegetation may be killed or harmed under drought conditions, but restoration success may also be lower than it would be during periods with above-average rainfall. The primary objective of the PEIS and PER was to evaluate the effects of treatments. However, a discussion of the adverse and beneficial effects of passive treatments is provided in Chapter 2 of the PER under Vegetation Treatment Standard Operating Procedures and Guidelines.

EMC-0553-013
Callihan, Robert H.

**Comment:** Technical errors and omissions mentioned here reflect this draft's insufficient involvement of personnel having an adequate grasp of weed science in all of its ramifications. Calling weed management "vegetation management" is fine, but changes neither the nature of the problems nor the science needed to address them. My principal recommendation regarding the BLM's weed management activity is that the agency acknowledge that it is dealing with a specialty, not simply a few elements of that specialty. Proper acknowledgment will warrant more than token involvement of true weed specialists. It takes more than assigning a title to be a specialist. To be well qualified for BLM purposes, weed specialists should have not only experience but also a formal education focused on weed science and technology, including range and forest science. Such personnel are needed not only for development of documents such as this but also for directing related field work. They are the personnel most likely to have not only adequate preparation, but also a basic professional interest and motivation so focused on weed technology that its application will be sound. That basic motivation is not a minor consideration, and it's not obtained by simply retraining or reassigning personnel from another profession.

**Response:** The development of the PEIS reflects the interdisciplinary involvement of a broad range of professional resource specialists, including weed scientists. The PEIS is not a weed management document. The PEIS is an analytical document addressing the use of herbicides on vegetation and public land resources. Invasive species and noxious weeds are included under vegetation. BLM standards for qualifications for resource specialist positions are guided by Office of Personnel Management standards,

BLM_0001554

and are outside the scope of this analysis.

EMC-0584-084
Western Watersheds
Project

**Comment:** Actions under the Alternatives of the [P]EIS/PER will bring about widespread soil erosion and relocation in wind and water. In order to understand the impacts of the actions, the current condition of all lands (soils, veg, microbiotic crusts, etc.) must be thoroughly assessed. The [P]EIS fails to assess effects of multiple or overlapping treatments. For example, how will herbicide runoff be accelerated in burned landscapes? This also relates to air quality problems, and possible increased air or water pollution on top of other pollutants.

**Response:** See responses to Comment EMC-0584-071 under PEIS Environmental Consequences, Cumulative Effects Analysis, and Comment EMC-0585-010 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0584-109
Western Watersheds
Project

**Comment:** Risk Assessments: BLM must conduct assessments of the risks of seeding failure/loss, increased depletion, weed invasions, under various post-treatment grazing strategies and across a broad range of alternatives. What are the risks of seeding weakening and depletion if grazing is allowed to resume too soon?

**Response:** Each vegetation treatment project has site-specific NEPA analysis conducted at the time the project is proposed. Issues such as treatment success are evaluated within the context of the proposal.

EMC-0584-110
Western Watersheds
Project

**Comment:** Minimal Use of Chemicals: BLM must strive to minimize use of chemicals in wild land settings. An increasing segment of the public has health problems related to chemical sensitivities. Chemicals may leach into water, blow on eroding soils into other sites. Wind erosion is far more significant in post-fire environments, as dark bare soil surfaces heat up, with the result of funnel-cloud erosion/dustdevils blowing soils away. Cancer, respiratory problems and many other human health effects of herbicides and other treatment chemicals are well-known.

**Response:** The BLM would strive to minimize herbicide use, as noted in Chapter 2 of the PEIS and PER under Site Selection and Treatment Priorities. Also see response to Comment RMC-0214-011 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments.

EMC-0585-010
Western Watersheds
Project

**Comment:** While BLM superficially examines a few risks of herbicides, nowhere are the risks of treatments, or combined treatment and herbicide use examined.

**Response:** The PEIS, PER, and ecological and human health risk assessments provide extensive coverage of the risks of herbicides to natural and human resources. The risk assessments evaluated several tank mixes (applications of a mixture of several herbicides). However, an analysis of potential combinations of herbicides and other treatment methods is impractical at the programmatic level, as there could potentially be hundreds of combinations of treatments. This analysis is best done at the local level for each project.

EMC-0585-014
Western Watersheds
Project

**Comment:** Although BLM entitles the [P]EIS "Vegetation Treatments on BLM lands in 17 western states", it fails to assess the environmental impacts of vegetation treatments and take a hard look at a reasonable range of alternatives related to the massive array of treatments proposed.

BLM_0001555

**Response:** The Purpose and Need for the Proposed Action is described in Chapter 1 of the PEIS. The PEIS does not propose a massive array of treatments. The PEIS assesses the human health and ecological risk from the use of herbicides on public land resources. The BLM has determined the range of alternatives analyzed is reasonable and appropriate to the Proposed Action and Purpose and Need. Effects of other non-chemical treatment methods are described in the PER. The environmental impacts of a vegetation treatment are assessed at the time the treatment is proposed through site-specific NEPA analysis.

EMC-0585-023
Western Watersheds
Project

**Comment:** BLM must use best available science and provide a basis for the claimed purpose and need. BLM must provide baseline information on the numbers of acres treated/manipulated in the past, the environmental effects of these treatments, and the current condition of these treated lands. The proposed vegetation treatments and herbicides have been purposefully employed by BLM and the Forest Service for a significant period of time. They have caused harmful, often irreversible changes to habitats for species such as sage grouse and pygmy rabbit (MDFW [Montana Department of Fish and Wildlife] 1995, Braun 1998, Connelly et al. 2000, Connelly et al. 2004). The very treatments described in the PER have led to large-scale habitat declines.

**Response:** See response to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities. The BLM has utilized the best available science in its assessment of the herbicides identified in the Proposed Action and Purpose and Need of Chapter 1 of the PEIS. See Appendices B through D of the PEIS for a summary of the scientific methodology used in the analysis of herbicides.

EMC-0585-060
Western Watersheds
Project

**Comment:** BLM must conduct analysis and provide data that shows: What is the current ecological condition of lands subject to past treatments, or proposed for treatment under the DEIS [Draft PEIS]? How might chemical, carrier, breakdown product impacts be magnified in degraded environments of bare disturbed soils, devegetated wild land springs, etc.?

**Response:** The PEIS discussed the current condition of public lands at the programmatic level based on surveys conducted by the BLM (see Wetland and Riparian Areas, Vegetation, and Wildlife Resources sections of Chapter 3). The ecological risk assessments considered soil, slope, vegetation type, and other factors when determining risks from the use of herbicides under different field conditions. These assessments would be used by local field offices to predict the effectiveness of herbicide treatments on degraded lands.

EMC-0585-089
Western Watersheds
Project

**Comment:** These are also the areas where most of the pesticide spraying related to grasshopper, Mormon cricket and other pest control occurs. So, the same lands are more likely to be subjected to multiple classes and types of pesticides – and their carriers, contaminants and breakdown products. Congress recently allocated funds for a large-scale increase in insect spraying on the same lands where this EIS contemplates massive increases in herbiciding and disturbance treatments. Plus, these are the lands closest to areas where private land owners may be applying a vast array of chemicals – for everything from weeds to insect infestations to fungicides – both terrestrially or aerially, so impacts of drift or off-site transport - either from BLM to private lands, or vice versa, and multiple chemical and breakdown and carrier exposure is most likely to happen. In arid lands subject to brief periods of favorable plant growth, many of the herbicide/pesticide treatments may be compressed into a short time frame occurring on

BLM_0001556

RESPONSE TO COMMENTS

both BLM and private lands at the same time. Thus, risks of overlapping chemical exposure, including from degradates, must be assessed.

**Response:** Based on BLM Pesticide Use Reports for 2004 and 2005, the BLM treated 58,838 acres using the following pesticides: carbaryl (22,905 acres), deltamithrin (694), MCH (60), verbenone (33), acetaphate (3), benomyl (3), chlorothalonil (6), dithane (3), esfenvalerate (66), iprodione (3), malathion (503), metaxyl (3), permethrin (3), propaconizole (6), triophante-methyl (3), and diflubenzuron (34,544). The focus of the PEIS is on how the BLM manages vegetation using herbicides. The BLM would follow label directions and Standard Operating Procedures identified in Chapter 2 of the PEIS to avoid or minimize the likelihood of herbicides applied by the BLM on public lands being carried to non-target lands. The BLM would also coordinate with other pesticide applicators near the treatment area to reduce the likelihood of multiple treatments on public or non-public lands. See responses to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment, and Comment EMC-0505-009 under PEIS Alternatives, Monitoring.

EMC-0585-094
Western Watersheds
Project

**Comment:** Chemicals applied in burned or otherwise disturbed environments or environments where soils have been disturbed or altered by grazing are much more likely to erode in wind or water, and end up killing non-target organisms, polluting wildlife water sources, infiltrating domestic water supplies, etc. Thus, any Risk Assessment can not be conducted using "normal" situations as a baseline. It must consider the significant environmental disturbance that will result from treatments, or in the case of ESR [Emergency Stabilization and Rehabilitation], in the post-fire environment, occurring on top of ongoing chronic disturbances of livestock grazing, OHV [off-highway vehicle] activity, or other human-caused abuses.

**Response:** The BLM's GLEAMS models used in the herbicide ecological risk assessments (ERAs) used fate and transport conditions to represent conditions of erodible soils expected after fire. The ERAs are available for review on the CD that accompanies the Final PEIS. As discussed in Chapter 4 of the PEIS and PER under Soil Resources and in the Cumulative Effects Analysis, livestock grazing, OHV [off-highway vehicle] use, and even BLM vegetation treatments can cause erosion. As proposed by the BLM in the PEIS and PER, passive (e.g., reduce livestock and OHV use) and active (e.g., use herbicides and prescribed fire) treatments would be used to control weeds and other invasive vegetation and reduce hazardous fuels. Although these treatments could lead to short-term loss of soil, it is anticipated that BLM-administered lands would improve with time, as would soil stability as native vegetation revegetates the treatment site.

EMC-0585-099
Western Watersheds
Project

**Comment:** Land in proximity to UI [urban interfaces] or with weed problems (where [P]EIS claims many activities are to occur) typically have more roading and OHV [off-highway vehicle] use, more livestock use, and typically, in more disturbed lands related to livestock projects or other human activities, and thus are in the poorest condition and subject to accelerated erosional or runoff events. This is more likely to deliver pollutants into ground and surface waters as soils and vegetation are disturbed. Throughout this process, BLM must conduct analyses and risk assessments based on worst-case rugged wild land scenarios.

**Response:** See response to Comment EMC-0585-094 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

BLM_0001557

EMC-0591-002
Johnson, Robert

**Comment:** I request that input which challenges the use of herbicides registered by the EPA have their claims subject to the "Daubert standard" which the courts use. The US Supreme Court ruled in Daubert vs Merrill Dow Pharmaceutical that opposing claims must meet the scientific method. http://www.daubertontheweb.com/. In the Daubert case a number of academically qualified individuals "re-analyzed" existing peer reviewed research and professed their analysis revealed danger to the medicine in question. Despite their academic backgrounds, the court rejected their claims as not scientifically sound. Regarding herbicides, groups such as the Northwest Coalition for Alternatives to Pesticides (NCAP) will re-analyze peer reviewed studies and claim health concerns. However NCAP has failed to submit their re-analysis to peer review. The US Supreme Court has ruled such non-peer reviewed "re-analysis" is not to be considered. I request that the BLM reject non-peer reviewed re-analysis of the herbicides it is considering under Alternative B.

**Response:** The BLM will accept all information presented by reviewers and the public and give appropriate consideration to the information's validity based on its scientific defensibility with regard to peer review, professional expertise, and professional judgment.

EMC-0597(a)-008
Beeland, DeLene

**Comment:** What are the bioaccumulative effects? When these poisons reach our watersheds – which they will – what are the effects on fishes and amphibians – and ultimately on water quality? On soil quality? On the beetles and burrowing animals ecosystems depend upon for soil production? On birds? Twenty years from now, will trails have to be closed to hikers because of accumulated poisons in the soil that can't be contained and are jettisoned into the air by a disturbance as small as a boot-print? If BLM insists on retaining its public lands grazing program, will humans eventually eat the cows that ate grasses coated in herbicides? Fifty years from now will we have altered the food web once more because top predators such as wolves, bears and cougars will hold the accumulated health effects of herbicides in their bodies and their young?

**Response:** Bioaccumulation was evaluated for the piscivorous (fish-eating) bird (bald eagle). The risk assessment found either no risk or low risk to this indicator species. The amount of time that herbicides proposed for use by the BLM persist in the environment is generally short—days to weeks (see response to Comment RMC-0069-009 under PEIS Alternatives, Monitoring). The BLM also evaluated risk to hikers and found either no (non-diquat herbicides) or low risk (diquat). However, hikers would not likely be exposed to diquat, as it is an aquatic herbicide.

EMC-0641-019
Idaho Conservation
League

**Comment:** We have serious concerns about the adverse impacts of aerial herbicide application on aquatic environments, particularly over smaller streams and intermittent channels. We do not believe that the minimum 100-foot buffer zones between water bodies are adequately protective. Furthermore, we feel unsure about how the BLM might prevent contamination to streams via wind drift, even with buffer zones, particularly since the elevation of spraying will vary. Although we recognize that aerial and broadcast applications may be appropriate in some areas, we strongly encourage the BLM to consider adopting an alternative that does not involve using aerial applications in regions containing wetlands or small streams and other shallow water bodies. The BLM should also refrain from utilizing aerial applications in regions containing critical habitat for threatened and endangered fish species. Amphibians are also extremely sensitive to herbicides, even at relatively low levels. The PEIS needs to analyze potential impacts to amphibians and associated species from the use of these herbicides.

BLM_0001558

**Response:** See responses to Comment RMC-0006-034 and Comment RMC-0228-007 under PEIS Alternatives, Herbicide Treatment Standard Operating Procedures. Avoidance of the use of herbicides near amphibian-bearing waters was an important component of Alternative E (see Chapter 2 of the PEIS). To protect amphibians and reptiles, and fish species of concern, the BLM would follow guidance in the Biological Assessment prepared in support of the PEIS. This document, along with Chapter 2 of the PEIS, lists numerous mitigation and conservation measures that would be implemented to reduce risks to the animals, including not broadcast spraying in habitats with special status species.

EMC-0643-006
California Indian
Basketweavers
Association

**Comment:** The BLM is embarking, in this EIS, upon a new path that essentially would institutionalize a policy with the potential for irreversible long term, serious, adverse impacts to the environment. The use of chemical poisons to kill plants at this scale on public lands is unprecedented. It has been known for half a century that pesticides have unintended adverse effects on human health and the environment—such as increased risks for cancer, neurological disorders, reproductive disorders, endocrine and immune system dysfunction; impaired surface and ground water, and harm to fish and wildlife. Public lands play an essential role providing largely unpolluted refugia ensuring the survival of countless numbers of species of plants and wildlife.

**Response:** As discussed in Chapter 4 of the PEIS, herbicides do have adverse effects on humans and the environment, although the effects of herbicides proposed for use by the BLM are generally none to low. Risks to human health and fish and wildlife are discussed in detail in Appendixes B and C of the PEIS and in the human health risk assessment (HHRA) and ecological risk assessments (ERAs) prepared in support of the PEIS (see HHRA and ERAs on the CD that accompanies the PEIS). However, as discussed in the Introduction (Chapter 1 of the PEIS), the increase in weeds, invasive vegetation, and hazardous fuels also threaten the health and welfare of humans and fish and wildlife and are adversely impacting the "naturalness" of public lands.

EMC-0643-007
California Indian
Basketweavers
Association

**Comment:** Separate from this, the BLM has failed in this DEIS [Draft PEIS] to document with scientific evidence that the use of herbicides will result in improving ecosystem health or restoring lands. In fact, there is much evidence in the scientific literature that suggests that the use of herbicides results in simplifying ecosystems and further reducing biological diversity, eliminating native species and setting the stage for worse invasions of weeds. We insist that the BLM follow up on these issues and address them in a substantive manner, with full documentation and with references footnoted, in the final EIS, as required by the National Environmental Policy Act.

**Response:** Scientific literature on herbicide use is found under References in Chapter 6 of the PEIS. The BLM is not attempting to make the case that use of herbicides results in the improvement of ecosystem health or restoration of land. Herbicides are one tool utilized for vegetation treatments in an integrated pest management framework, to attain improved ecosystem function. Experience and scientific literature support the idea that vegetation treatment and manipulation to meet desired goals and objectives have positive and beneficial outcomes in attaining desired outcomes, such as improved ecosystem function. The BLM also recognizes that herbicides have risks associated with their use. The impacts (beneficial and adverse) and risks of herbicide use are analyzed and disclosed in the PEIS.

BLM_0001559

EMC-0643-024
California Indian
Basketweavers
Association

**Comment:** The [P]EIS must analyze the direct, indirect, and cumulative environmental, health and cultural impacts of the chemical products as they will actually be used, as mixtures, in the field and at environmentally relevant concentrations. (See Attachment 3). Further, common sense dictates that pesticide products in full formulation that have not been tested for their environmental impacts should not be permitted for use on the public's lands unless there are overriding, emergency situations in which their use is absolutely essential. Pesticides should be used only as a "last resort" in integrated pest management programs, as affirmed by former Secretary of Agriculture Anne Venneman (U.S. GAO [Government Accounting Office] 2001 cited in CIBA's [California Indian Basketweavers Association's] comments, 2002). As alternative methods of prevention and control such as were recommended by CIBA in the Restore Native Ecosystems Alternative have not been implemented by the BLM, it is clear that pesticides are not a "last resort" method.

**Response:** See response to Comment EMC-0623-017 under PEIS Environmental Consequences, Herbicide Effects Analysis. As stated in Chapter 2 of the Final PEIS under Site Selection Priorities in the Vegetation Treatment Planning and Management section, the BLM would first take actions to prevent or minimize the need for vegetation controls where feasible; then use effective nonchemical methods of vegetation control where feasible; and finally use herbicides only after considering the effectiveness of all potential methods and their impacts on the environment.

EMC-0643-045
California Indian
Basketweavers
Association

**Comment:** The DEIS [Draft PEIS] even concludes that risks to Native people and others "would be greatest under the Preferred Alternative." Risks to wildlife, air quality, and water quality are also the highest under the Preferred Alternative. The DEIS [Draft PEIS] also finds, "However, as the long term objective of treatment is to restore native plant communities and habitats, including those of traditional importance to Native Peoples, the greatest benefits would accrue under the Preferred Alternative."(page 4-221, also see p 2-34 Table 2-8 [of Chapter 2 of the Draft PEIS]). There is no explanation as to how these binaries are weighed one against another.

**Response:** The Preferred Alternative analyzes the most acres of proposed herbicide use out of all the alternatives presented. Since herbicides would be applied to more acres, there is greater risk from the use of herbicides overall. Also, since more acres would be treated under this alternative, more acres would be potentially restored, reducing the need for future applications, and providing greater benefits over the long term as compared to the other alternatives.

EMC-0646-083
Californians for
Alternatives to Toxics

**Comment:** This indirect effect associated with surfactants, carrying toxic substances through cell walls to cause effect, is in need of thorough evaluation. Data exists showing the ability of surfactants to carry toxic substances through plant surfaces, and a growing body of data showing similar transport through animal cell walls. This is a serious issue, and as Marc et al state, *"our results question the safety of glyphosate and Roundup on human health"*. The BLM must consider such warnings in its NEPA analysis but has failed in the draft PEIS.

**Response:** The BLM has prepared a new Appendix D for the Final PEIS to address endocrine disrupting chemicals and other inert ingredients that may be associated with glyphosate and other herbicides used or proposed for use by the BLM.

BLM_0001560

RESPONSE TO COMMENTS

EMC-0646-111
Californians for
Alternatives to Toxics

**Comment:** Results from every research project and data review needs to be thoroughly analyzed, through peer review and independent analysis, unlike USDA 2003. There has never been a time when the need for critical, objective analysis has been more important than with the issues surrounding endocrine effects. This is especially true when one considers that new pathways of communication and functional overlap between the various endocrine systems are still being discovered (WHO 2002).

**Response:** See responses to Comment EMC-0646-021 under PEIS Environmental Consequences, Herbicide Effects Analysis and Comment EMC-0646-053 under Environmental Consequences, Non-herbicide Effects Analysis.

EMC-0646-232
Californians for
Alternatives to Toxics

**Comment:** Also missing is even a rudimentary analysis of how differences in climate, soil, topography and other factors will impact what treatments may be used and how efficacious they will be.

**Response:** Chapter 4 of the PEIS discusses how soil, rainfall, and other natural and social factors would influence, and be influenced by treatment methods. The ecological risks assessments used soil type, slope, weather, vegetation, and other factors in models to predict risks for each herbicide. The reader should consult the individual risk assessments found on the CD that accompanies the PEIS for more information. An analysis of site-specific factors that could influence treatment success and impacts would be conducted for each project at the local level.

EMC-0646-234
Californians for
Alternatives to Toxics

**Comment:** The Draft PEIS fails to inform the decision maker by making several very serious lapses in the description of the environmental consequences of the proposed program. The primary assumption is that for a programmatic EIS the BLM is absolved from analysis of the relative need for any of the means of control. The BLM can and must come up with, at the very least, pie charts and graphs that illustrate the proportion of each treatment option that may be anticipated to be used. This is not an impossible task, or if it is, why it is impossible should be described in the EIS. How can a decision maker be informed without this basic information?

**Response:** The estimated number of acres to be treated using herbicides for each alternative is given in Table 2-6 in the PEIS, and for all treatments in Chapter 4 of the Draft PER under Vegetation. However, to assist the reader with analysis of the alternatives, we have provided an estimate of the number of acres to be treated using other treatment methods in the section on Determination of Treatment Acreages in the Final PEIS.

EMC-0646-235
Californians for
Alternatives to Toxics

**Comment:** The BLM fails to provide fundamental information for project analysis related to noxious weed and invasive weed treatments. How much extra spraying will be involved to treat noxious weeds? What portion of the annual BLM budget will go towards which weed treatment methods? It what areas will which herbicides be considered? Are there areas or situations where certain chemicals will not be considered acceptable? Where is the analysis of the extra spraying proposed for weeds regarding impacts and effects to watershed, vegetation, and wildlife?

**Response:** Much of the information on treatments used in the PEIS and PER was obtained from local field offices during a data request in 2002. It is difficult to determine how much spraying will be focused specifically on weeds. Local offices may have identified weed control as the purpose of a spray program, or they may have mentioned that the purpose is to reduce hazardous fuels, improve wildlife habitat, or

BLM_0001561

assist with revegetation, which may or may not involve the treatment of weeds. An estimate of the costs of treatments per acre is given for each alternative in Chapter 4 of the PEIS under Social and Economic Values. For purposes of the PEIS, the BLM assumed that treatments and herbicide use could occur anywhere, but, as discussed in Chapter 4 of the PEIS under Vegetation, most treatments would occur in the Temperate Desert and Subtropical Steppe ecoregions. It was not practical, however, to identify the locations of specific projects in the PEIS; the locations will be identified during analysis at the local level. The risk assessments evaluated numerous treatment scenarios based on soil type, rainfall, habitat type (wetland or upland), vegetation type, proximity to humans or species of concern, and other factors. The results of risk assessments were used to identify situations in which use of one or more herbicides would not be acceptable; these situations were also identified in Chapter 4 of the PEIS and in the Biological Assessment. An assessment of the impacts of herbicide treatments on natural and human resources is provided in Chapter 4 of the PEIS.

EMC-0646-245
Californians for
Alternatives to Toxics

**Comment:** The agency must use high quality information and accurate scientific analysis, 40 C.F.R. [Code of Federal Regulations] 1500.1(b), and must disclose "any responsible opposing view." Id. 1502.9(b). The [P]EIS must disclose and analyze opposing opinions. Center For Biological Diversity v. United States Forest Service, 349 F.3d 1157 (9th Cir. 2003). Thus far the BLM has failed to disclose opposing scientific opinion regarding toxicity of herbicide formulations, potential impacts of herbicide applications, and potential alternatives, thus violating this NEPA requirement.

**Response:** The PEIS discloses and analyzes extant scientific data, not opinions, on herbicide use and its effects. These data are included under resource sections in Chapter 4 of the PEIS. In addition, a comparison of the adverse and beneficial effects (and opposing opinions) of herbicide use is provided in Chapter 4 of the PER. Scientific toxicity of herbicides was evaluated using quantitative risk analyses, based on scientific methodologies consistent with USEPA guidance. Both peer and non-peer reviewed literature submitted during the NEPA process was reviewed and considered in the PEIS analysis. The PEIS is not a forum for airing opposing opinions, but an analytical tool to weigh scientific information that will result in a decision on which herbicides are appropriate for use on public lands. To the extent scientific data, not opinion, were submitted relative to the decision to be made, it was considered in the analysis.

FL-0006-005

**Comment:** I am concerned that these plans are unnecessary and unsafe for both human and environmental health. Public land management should be based on long-term ecological health, the best science available, and should err on the side of safety and conservation.

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

FXC-0019-001
Degan, Janet

**Comment:** On p. 3 of 9 in the (FAQ) section, the following statement misleads the public: "Expected benefits (from these treatments of vegetation and soil) would include: reduced wildland fire risk, improved vegetation condition, improved fish and wildlife habitat, and improved watershed function." In truth, instead of benefits, there would be health and safety dangers created by poisoning the vegetation, poisoning the fish and wildlife habitat, and poisoning the water supply within the treated watersheds.

BLM_0001562

RESPONSE TO COMMENTS

**Response:** As discussed in Chapter 4 of the PEIS and PER, proposed vegetation treatments would have both adverse and beneficial effects. These effects include the potential for herbicides to harm the environment and human health. However, by not treating vegetation, weeds and other invasive vegetation, and wildfires that result from high levels of hazardous fuels, could exclude or eliminate more desirable vegetation from fish and wildlife habitat, and cause extensive erosion that could harm watersheds.

RMC-0006-037
Central Sierra
Environmental
Resource Center

**Comment:** The environmental scope of this PEIS is too large, and it should be broken down by eco-region. There is too much environmental variation across eco-regions covered by the 17 western states. This plan should be broken down by eco-region. If nothing else, because this is a programmatic EIS, an NEPA level environmental assessment should be required for each specific site or project.

**Response:** The analysis of risks to resources from herbicides was based on risk assessment protocols that did not lend themselves well to analysis by ecoregions. In addition, some other resources were better analyzed based on state jurisdiction (air quality) or hydrologic region (water). Analysis of habitat effects for wildlife was done by ecoregion in the PEIS. An analysis of effects by ecoregions was done for more resources in the PER, including plants and wildlife.

RMC-0049-003
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** As a whole, the document does not adequately (1) describe the ecological impacts that are certain to occur if all the federal, state, and private landowners in the Western U.S. do not do a better job of addressing the problem that we are all facing. (2) Nor does it look at solutions as part of an ecological process. Instead, the approach seems to be to simply reflect the removal of undesirable species and does not reflect much thought into what happens after that. By addressing vegetation management in terms of ecological or biological sequences that look into the future achieves a much more comprehensive and sustainable result. An approach outlined by Dr. Roger Sheley and described by him as Ecologically-Based Rangeland Weed Management is one science based approach to ecological manipulation. This concept touches on numerous areas of vegetation Manipulation, and is the basis for much of the newer science about invasive weed management in all the areas addressed by this [P]EIS.

**Response:** The PEIS analyzes the impacts of herbicide use under the different alternatives based on known BLM activities; cumulative impacts are based on known activities by the BLM and other federal land management agencies. The BLM cannot analyze unknown activities on other federal lands or on state or private lands. BLM handbooks, manuals, and policies incorporate an integrated approach to vegetation management. Using an integrated pest management or integrated vegetation management approach provides the local field office the ability to evaluate and select the method or combination of methods that will meet local vegetation management objectives. The Department of Interior adopted and endorses Integrated Pest Management (IPM) as defined in 7USC (United States Code) 136r-1: IPM is a science-based, decision-making process and a sustainable approach to manage pests by combining biological, cultural, physical, and chemical tools in a way that minimizes economic, health, and environmental risks. Another term used in addressing vegetation only is Integrated Vegetation Management (IVM). IVM is an ecosystem-based strategy for controlling unwanted vegetation using the most appropriate, environmentally sound, and cost effective combination of biological, chemical, cultural, manual, or mechanical methods. In IPM programs, herbicides are considered transition tools that enable the manager to manage vegetation and replace them with desirable, competitive vegetation. BLM Manual 9011 recommends selecting the least toxic low-residual herbicide that is effective against the target vegetation and applying

BLM_0001563

it in a judicious manner.

| | |
|---|---|
| RMC-0049-026<br>Wilson, Robert E.<br>(University of Nevada<br>Cooperative Extension) | **Comment:** At the very least, this [P]EIS should analyze the effect of invasive weed domination if a less aggressive management effort is maintained over the long term.<br><br>**Response:** The No Action Alternative and alternatives C, D, and E provide a range of alternatives that assess less aggressive responses to invasive species. See Chapter 4 of the PEIS for the analysis of these alternatives. |
| RMC-0049-029<br>Wilson, Robert E.<br>(University of Nevada<br>Cooperative Extension) | **Comment:** Section 4-1[of the PEIS]. This section needs to specifically address the environmental consequences of invasive weed domination. It needs to discuss fully the environmental consequences of extensive monocultures of alien plant species and the resulting reduction of native flora and fauna that cannot survive in this newly forming environment. It also needs to address better the environmental consequences of herbicides on the plant communities where they are used. The consequences will be different for different classes of herbicides.<br><br>**Response:** The environmental consequences of invasive species are discussed under Alternative C for each resource area in Chapter 4 of the PEIS. Under Alternative C, the BLM would not be able to use herbicides, and thus the spread of weeds would likely be greater under this alternative than under the other alternatives. The PER discusses the effects of weeds on natural and social resources. In addition, the BLM has expanded the discussion of the spread and consequence of invasive weeds in the Final PEIS and PER, as well as expanding the discussion on herbicides is included in Chapter 2 of the Final PEIS and PER. Also see response to Comment EMC-0585-062 under Alternatives, Monitoring. |
| RMC-0072-007<br>Zimmermann, Adele E. | **Comment:** No Environmental Impact Statement can reliably predict the cumulative and long-term effects of wide-scale application of any chemical; relatively toxic, such as the proposed herbicides; or relatively benign, such as the fire retardant dropped on forest fires. Therefore any EIS, however well researched, is inadequate and any action based on such a Statement is illegal.<br><br>**Response:** The BLM does not agree with the comment. Most herbicides have a safe threshold of use. See response to Comment EMC-0646-048 under PEIS Environmental Consequences, Herbicide Effects Analysis. |
| RMC-0106-003<br>Public Employees for<br>Environmental<br>Responsibility | **Comment:** The D[raft] PEIS reiterates in numerous places that the information available is insufficient to support direct analysis of potential impacts. But then proceeds to obscure these deficiencies in so-called state-of-the-art risk analyses based on multiple assumptions, surrogate species, and guesswork. All the while, unmistakable evidence of harm to non-target plants, wildlife, aquatic life, and humans from the specific herbicides proposed to be used dribbles through.<br><br>**Response:** See response to Comment EMC-0640-036 under PEIS Environmental Consequences, Wildlife Resources. |
| RMC-0170-005<br>Carson Forest Watch | **Comment:** Our Western States' long-term drought needs to be analyzed in this DEIS [Draft PEIS] – low water levels, dry soils, loss of vegetation, warm temps, etc. all must be evaluated in this DEIS [Draft PEIS] – as it directly affects the condition of our soils and watersheds. Also, drought will affect any analysis of effects of herbicides – less ability of soil & water to dilute chemicals, absorption rates, etc. |

BLM_0001564

RESPONSE TO COMMENTS

**Response:** Prior to any application of an herbicide, local environmental conditions are taken into account. Risk analyses conducted for the herbicides under the GLEAMS and CALPUFF modeling covered a variety of environmental variables, including rainfall and soils. See Appendix C of the PEIS under Concentration Models of the PEIS for a description of the modeling methods used in the development of this analysis.

RMC-0191-006
Ertz, Brian

**Comment:** The potential harms of the Preferred Alternative are not adequately considered given the Biological Assessments as well as the Risk Assessments compiled for the proposed new herbicides.

**Response:** The PEIS summarized information provided in the risk assessments and Biological Assessment (BA), and provided information from numerous other sources (see References). However, the reader is encouraged to review the risk assessments, BA, and other appendixes and supporting information provided with the PEIS and PER to have a better understanding of the risks and benefits of using herbicides and other treatment methods.

RMC-0191-016
Ertz, Brian

**Comment:** The BLM is using this Vegetation Treatment PEIS to attempt to administer the Preferred Alternative which would triple the amount of toxic herbicides to be used across urban interfaces and public lands. All considerations of the impacts of such action given the Biological Assessments [BAs] and Ecological Risk Assessments [ERAs] are conducted as if human beings, ecosystems, and RTE [rare, threatened, and endangered] species exist in clean isolate environments free of any exposure to toxicity other than the given compound which the specific BA or ERA addresses. This environment no longer exists. As the science demonstrates above, degradates persist, Organic Wastewater Contaminants are found in waters all over the country, the risks of interactions and reasonable assessments regarding levels of these contaminants was not conducted nor considered by the agency in this PEIS. The BLM has failed to give a reasonable assessment of the risks associated with the Preferred Alternative's "ambitious" tripling of herbicide treatments to include at least 10 new formulations in addition to the eight previously approved for current levels of administration.

**Response:** See response to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment concerning degradates, and responses to Comment EMC-0585-199 and Comment RMC-0191-012 under PEIS Environmental Consequences, Herbicide Effects Analysis concerning other contaminants.

RMC-0200-008
Lindsay, Dianne

**Comment:** The PEIS/PER fails to include the most up to date and broad research in regard to human and animal health. Petrochemicals behaving like estrogens are having a serious affect on people and wildlife. This kind of result may not show up in your research because it may affect the next generation more than the one exposed. It is not addressing the possible long term affects on our children and later generations. (References are available by request).

**Response:** No reliable data was found on the endocrine disrupting effects of the 10 BLM herbicides bromacil, chlorsulfuron, dicamba, diflufenzopyr, diuron, fluridone, fosamine, imazapic, oust, and tebuthiuron. Typical endocrine disruptors, such as nonylphenol ethoxylates (NPE), were not found in these BLM active ingredients or inerts. The BLM has prepared a new Appendix D for the Final PEIS to address endocrine disrupting chemicals and other inert ingredients that may be associated with glyphosate and other herbicides used, or proposed for use, by the BLM. Also see response to Comment EMC-0267-005 under PEIS Alternatives, Herbicide Active

BLM_0001565

Ingredients Evaluated under the Proposed Alternatives.

RMC-0221-006
Center for Biological
Diversity

**Comment:** In this case, the BLM cannot rely on general assessments of the impacts of herbicides provided in the D[raft] PEIS without assessing the risks to all the components of the ecosystem in which the site-specific action will take place. Such risks include, but not limited to, potential impacts to rare, threatened and endangered species, and air and water quality. The BLM cannot authorize any herbicide vegetation treatments where the condition of the land and the extent of the resources have not been adequately assessed. An understanding of the ecological and hydrological functions of a specific area and the plant and animal communities that exist there is integral to interpreting how herbicides will affect and be effective on that landscape. Site-specific analysis must be conducted using short- and long-term scenarios before any herbicide treatments can be approved.

**Response:** The PEIS is a programmatic analysis assessing the human health and ecological risks of herbicide use as well as impacts on public lands resources, including sensitive species. Human health and ecological risk assessments for the herbicides proposed under this PEIS are found in Appendixes A and B of the PEIS. See Chapter 4 of the PEIS for analysis of potential impacts to threatened and endangered species, and air and water quality. In addition, the BLM has developed a Biological Assessment that accompanies the PEIS analysis for consultation under the Endangered Species Act. Proposals for vegetation treatments derive from the needs identified in land use plans and other resource-specific or integrated activity plans, which are based on an understanding of the ecological and hydrological functions of the area to which they apply. See NEPA Requirements of the Program in Chapter 1 of the PEIS for a description of the step-down process for NEPA under which analysis occurs at differing scales. Site-specific analysis occurs later in time when individual projects are proposed. The BLM can authorize herbicide vegetation treatments in compliance with applicable regulations, statutes, and executive orders. In every case, site-specific analysis is conducted before any herbicide treatments are approved.

RMC-0221-011
Center for Biological
Diversity

**Comment:** The identification and analysis of the environmental impacts of the proposed project is a huge undertaking not the least of which is the identification and analysis of the impacts of the proposed project on hundreds, if not thousands, of native species. Nonetheless, it is an undertaking that is mandated by NEPA and the Endangered Species Act (ESA). Because the D[raft] PEIS prepared by BLM is legally inadequate, the agency cannot properly rely on this document in approving the proposed project.

**Response:** The PEIS meets the requirements of both NEPA and the ESA. Under the National Environmental Policy Act (NEPA), the BLM is required to disclose the impacts associated with a proposed action and compare those impacts with reasonable alternatives to the proposal. Under the ESA, the BLM is required to consult with National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife Service (USFWS) to ensure that the proposed action is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or modification of critical habitat. 16 U.S.C. § 1536(a)(2) (2006). The BLM initiated informal consultation with USFWS and NMFS in November 2001 (refer to PEIS under Consultation in Chapter 1, and in Chapter 5, Consultation and Coordination). The BLM also proposed a formal initiation package, and consultations with USFWS and NMFS are ongoing and will be completed by the time the Record of Decision is signed.

BLM_0001566

RMC-0221-060
Center for Biological
Diversity

**Comment:** If the BLM insists on moving forward with this ill-conceived project, it must first undertake detailed analysis of each of the herbicides it is proposing to use and their potential impacts on the environment based on reliable, current, high-quality data. Given that the impacts to native plants and animals, including rare, threatened, and endangered species, have not been widely studied and are largely unknown, this task will require the BLM to do more than simply rely on previously prepared NEPA documents. Because the proposed action may irreparably harm native species and ecosystems, the BLM cannot go blindly forward – NEPA analysis must provide sufficient information and detail for a reasoned decision-making process. Without first identifying and disclosing to the public the potential adverse impacts of the proposed project on public lands and the native ecosystems that those lands support, the BLM cannot approve this project.

**Response:** The BLM conducted detailed risks assessments for 10 herbicides (included on the CD that accompanies the Final PEIS), and used assessments recently prepared by the Forest Service (http://www.fs.fed.us/foresthealth/pesticide/risk.shtml) to analyze the risks associated with an additional 9 herbicides. These results generally show no risk to low risk at typical application rates. Also see responses to Comment RMC-0211-013 under PEIS Environmental Consequences, Herbicide Effects Analysis, and Comment EMC-0640-036 under PEIS Environmental Consequences, Wildlife Resources. The BLM also evaluated the risks to species of concern in Chapter 4 of the PEIS, and in a Biological Assessment that was prepared in support of the PEIS and is available on the CD that accompanies the Final PEIS.

### Environmental Consequences, Subsequent Analysis before Projects

EMC-0646-244
Californians for
Alternatives to Toxics

**Comment:** How will future decision makers take into account adaptations of native species to invasive plants, and how are they to deal with these the possible displacement of these other species since guidance is not provided in the programmatic DEIS [Draft PEIS]?

**Response:** While some examples of a single native species adapting to invasive species have been observed, it does not mean that the invaded ecosystem can properly function. Any system where a diverse plant community has been replaced by a monoculture, regardless of whether a native species is able to exist with the monoculture, will not provide the inputs necessary to maintain natural ecological processes in the long term.

If adaptation of native species to invasive species occurs, it will be at a much smaller scale than this programmatic EIS. Each case will be considered during the local NEPA analysis.

### Environmental Consequences, Herbicide Effects Analysis

EMC-0067-002
Womens Global Green
Action Network

**Comment:** Your research is based under tightly controlled laboratory conditions and their use in the real world --in the field conditions --has an entirely different outcome.

**Response:** The BLM does not do research on the effects of herbicides on plant and animal health, but relies on others including USEPA, herbicide manufacturers and the scientific literature. The USEPA uses various conservative safety factors to extrapolate from animal studies to humans. As discussed in Appendix C of the PEIS under Non-target Species Exposure Characterization, use of surrogate species is often necessary to address the broad range of species likely to be encountered on public lands.

BLM_0001567

EMC-0139-014
Troutman, Doug

**Comment:** I see no evidence of studies of sufficient length to declare any of these compounds can't have mutagenic effects in the environment.

**Response:** Every pesticide is tested for mutagenicity as part of the Federal Insecticide, Fungicide, and Rodenticide Act USEPA pesticide registration requirements. The objectives of these studies are to detect the capacity of a chemical to alter genetic material in mammalian cells and to evaluate the relevance of these mutagenic changes to mammals (i.e., carcinogenicity or other health effects). A review of the available mutagenicity information presented in the registration materials indicated that only three active ingredients (diquat, hexazinone, and metsulfuron methyl) had reported a positive (mutagenic) result for one of the series of required mutagenicity tests. These positive tests included gene mutation (mouse lymphoma cells), chromosomal aberration (human blood lymphocytes), and bacterial reverse mutation (Ames) assays. However, the evidence was not sufficient for the USEPA to classify these, or any other active ingredients as carcinogens.

EMC-0142-004
Mintz, Mary

**Comment:** Have you read the EPA reports on this chemical and have you read the MSD [Material Safety Data] sheets on these products?

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0155-001
Kozlowski, James C.
(National Society for Park Resources, National Recreation and Park Association)

**Comment:** Given the existing registration process of herbicides and pesticides under FIFRA [Federal Insecticide, Fungicide and Rodenticide Act] which relies heavily on industry supplied safety data, in my opinion, there are too many uncertain human and environmental variables to necessarily assume herbicide and pesticide use policy on BLM lands can, or should be effectively settled within the broad parameters of a programmatic EIS. To do so, in my opinion, would effectively subvert the legislative intent of NEPA.

**Response:** While there are variables, herbicides and pesticides have generally undergone a rigorous series of toxicity tests, especially compared to many other chemicals which are used in consumer products.

EMC-0176-002
Richardson, Peter

**Comment:** Each year increasing evidence appears in the scientific literature that the public health is at risk as we add more new chemicals to the environment. I would argue that a more conservative approach than is offered in the D [Draft] [P]EIS be considered. You are putting our children and grandchildren at risk.

**Response:** The human health risk assessments done by the BLM (see Appendix B of the PEIS) and Forest Service (see http://www.fs.fed.us/foresthealth/pesticide/risk_assessments/091702_24d.pdf) for herbicides proposed for use in the PEIS included safety factors. The human health risk assessments were based on very conservative exposure assumptions and toxicity values for the various herbicides. The risk calculations assumed that members of the public would repeatedly be exposed to spray drift, and recently-sprayed vegetation and waterbodies, which is unlikely. The specific dermal contact rates and ingestion rates used were at the upper end of the range of possibilities. The toxicity values used for the herbicides were derived by USEPA, and are based on a thorough review of toxicology literature. The toxicity values incorporate several safety factors to account for sensitive individuals and long-term exposure.

BLM_0001568

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0267-005<br>Medbery, Angela | **Comment:** Implementation of any new chemical testing data that might relate to endocrine disruptor chemical effects or immune system effects should be reviewed. This new data should be used in a precautionary atmosphere for more conservative use of any permitted chemicals. |
| | **Response:** Endocrine disrupting effects were evaluated in Appendix D of the Final PEIS. Also see response to Comment EMC-0646-021 under PEIS Environmental Consequences, Herbicide Effects Analysis. |
| EMC-0308-005<br>Damus, Marilyn | **Comment:** Most of the chemicals you are planning to use do not have very thorough safety testing. I don't know of any that have long records of completely safe use, and some are already known to cause reproductive and developmental harm. In fact, I think I even read that you are reserving the right to add more herbicides on later, without going through the [P]EIS process again. Any or all of these herbicides could be the next DDT that causes untold harm and diminishes our quality of life. Even if none prove to be as damaging as DDT, there is so much potential for harm (for example, look at Daconil 2787 (chlorothalonil), a lawn-care chemical that was once thought to be safe but has killed people who walked on the ground where it had been applied). By our thoughtless loss of priorities in this country, we are threatening our food, our water, our air, and in doing so, children's future as well as our own. |
| | **Response:** As the federal authority to determine safety, it is the USEPA's duty to evaluate and register pesticides for use. The BLM uses information from the USEPA and other scientific sources and constructs exposure scenarios within the label requirements, but typical of BLM needs. The BLM uses these exposure scenarios to evaluate risk in order to assess effects under NEPA. Also see response to Comment EMC-0505-010 under Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. |
| EMC-0314-003<br>Alliance for the Wild Rockies | **Comment:** First, the registration/risk assessment data ignores the vast majority of health endpoints (data gaps). Next, these classic toxicology methods fail to test what they claim they are testing: dose levels, cumulative and concurrent exposure to mixed chemicals and vulnerable stages of development (in that respect, classic toxicology and chemical RA [risk assessment] are literally(!) scientific frauds). Almost all the data gaps and the faulty test methods concern the long-term (chronic) effects of exposure to these chemicals. Finally, all such safety tests are performed by parties with massive (typically tens of millions to many billions of dollars of revenue depend on their chemical being declared safe enough to use (financial conflict of interests, CoI). Since in sum this is not knowledge, these registration tests are seldom published in peer-reviewed journals; and to my knowledge none has ever been published in an independent one (i.e. a journal with adequate strictures against, and disclosure of, financial CoI). |
| | **Response:** See responses to Comment EMC-0308-005 under PEIS Environmental Consequences, Herbicide Effects Analysis, and Comment RMC0069-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. |
| EMC-0316-002<br>Hardebeck, Larry J. | **Comment:** The safety studies on the chemicals you are proposing are not thorough enough to demonstrate their safety for all members of our society, and they certainly do not address the long-term repercussions that may occur down the road (say 20 years), for example, cancer of various types, autoimmune disease, etc. |

BLM_0001569

**Response:** See responses to Comment EMC-0244-002 under PEIS Environmental Consequences, Human Health and Safety, and Comment RMC 0069-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0340-004
Craig, Diane

**Comment:** What I also question is where does the research on these chemicals come from? – how long were the studies done and on what subjects, and for what results were they looking for. I would hope that the vast majority of the population understands is that it is the chemical companies themselves that provide the information on these chemicals to government agencies such as the [US]EPA and it is their studies that are used – not biased at all is it!

**Response:** Congress and the USEPA have determined the procedures for safety testing of pesticides. The manufacturer seeking registration must supply USEPA scientists with a wide range of toxicological data for review, and the USEPA then determines if the data meet its standards for registration. The USEPA extrapolates information from these studies to develop toxicity values for humans by applying various safety factors.

EMC-0350-002
Morris, Nancy

**Comment:** The pesticide industry is one that polices itself and the test results regarding safety for the pesticides manufactured and used is highly questionable and does not truly reflect the dangers of these chemicals. One only has to look historically how many pesticides including some herbicides have been used on our agricultural fields and ranges lands and how many of these have been pulled from the market after many people were harmed and the environment seriously damaged. Pesticide drift presents a significant health issue because people and wildlife are being treated as guinea pigs every time they are exposed to these chemicals.

**Response:** See response to Comment EMC-0340-004 under PEIS Environmental Consequences, Herbicide Effects Analysis. Drift was specifically evaluated in the BLM risk assessments; see response to Comment RMC-0210-042 under Alternatives, Description of the Alternatives – Alternative D.

EMC-0430-002
Crowlie, Colleen

**Comment:** But still I am not happy with the thought of herbicides being used on public lands so I want to put my 2 cents in. In the Ecological Risk Assessment when explaining the very complex problem of measuring toxicity I see that you have had to rely on surrogate species because that is the group of animals that have been tested and you need factual information to fit into your formula. All I can think of is those desert toads that come out when it rains, and they seem to be disappearing in recent years. I doubt there is a laboratory animal that is similar enough to those toads that I would believe the surrogate species data.

**Response:** See response to Comment EMC-0585-199 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0457-003
Ryan, Eleanor (North American Butterfly Association)

**Comment:** The terrestrial insect tested in your document is the honeybee, a very sturdy creature. Given their listed status and the very sensitive nature of butterfly species, herbicides need to be tested on both adult and larva stages. Caterpillars will be directly eating the treated foliage, not at one remove like bees, who take only nectar. Cabbage butterflies are not native but abundant and easily raised. They could be a good test subject.

**Response:** Honeybees are actually fairly sensitive insects because of their feeding strategy, hairy structure, and soft abdominal cuticle. While bees take nectar, they are exposed to sprayed horizontal flower parts. The BLM also used honeybees because of

BLM_0001570

the availability of toxicology information, which is mostly lacking for butterflies.

EMC-0575-007
Davlantes, Nancy

**Comment:** May I suggest that these chemical companies such as Monsanto, experiment on contained areas that will not pollute surrounding land and lifeforms. They are certainly rich enough to afford doing a serious, scientific study on the affects of their chemical soups. And not endanger countless life forms including humans in the process.

**Response:** See response to Comment RMC-0076-005 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0585-059
Western Watersheds
Project

**Comment:** Develop a state-of-the-art human health and ecological risk assessment methodology. In order to adequately assess ecological risk, BLM must provide essential information on the conditions of the lands where treatments could occur, and the full range of species, including habitat specialists, that inhabit them. It must also assess the whole range of risks – from use of multiple chemicals on the same land to the impacts of breakdown products/degradates.

**Response:** Ecological risk is assessed through a formal quantitative process that is described in Appendix C of the PEIS and should not be confused with environmental impact analysis. Information on conditions of lands and affected species, including habitat specialists, is considered and addressed in the site-specific NEPA analysis for any herbicide treatment project. Information derived from inventory and monitoring of the area proposed for treatment is factored into the need for a proposed herbicide project, including the need to treat with multiple chemicals over time. Breakdown and degradates of herbicide are addressed in the Ecological Risk Assessment discussion in the Final PEIS.

EMC-0585-102
Western Watersheds
Project

**Comment:** BLM claims that TES [threatened, endangered, and sensitive] species may be at "slightly greater risk" from herbicides than non-TES species. This is not valid --- they may be at much greater risk. Habitats for many TES species are already greatly fragmented (cause of perilous low levels of populations) or limited. See, for example, Dobkin and Sauder 2004 assessment of current status of bird and mammal species in the arid Intermountain west. Any increased disturbance or alteration of non-target vegetation or other mishap such as drift that hams remaining intact habitats may have far greater impacts on population and species viability. Such analysis, and the woefully limited, substanceless and deficient Biological Assessment do not employ Best Available Science.

**Response:** The paragraph summarizing the effects on aquatic organisms and terrestrial wildlife in the Executive Summary has been modified for clarity in the Final PEIS. According to risk assessments, the risk level representing the risk of adverse health effects to individuals exposed to herbicides can range from the same to substantially greater for TES species, as compared to non-TES species. However, any associated effects at the level of the population or the species would likely be much greater for TES species. The Biological Assessment (BA) and Chapter 4 of the PEIS discuss the potential for these effects, and consider the low population numbers and fragmented habitats of these species. Conservation measures presented in the BA reflect the need for additional protection of TES species and their habitats. In addition, treatment programs developed at the local level will take into account TES species, with a much greater level of detail about where treatments will occur in relation to TES species populations and habitats, and additional conservation measures to protect them, as appropriate.

BLM_0001571

EMC-0585-178
Western Watersheds
Project

**Comment:** [On PEIS Appendix B page] b-33 "herbicide use parameters are claimed to be dependent on condition of non-target veg., the soil type, depth to water table and presence of other water sources" The RA then refers the reader to Tables B-4 to b-9 [in Appendix B of the PEIS] that "summarize the veg treatment program for each of the herbicides. Nowhere is any info provided on the critical factors of the condition of non-target vegetation, soil type, depth to water table and presence of other water sources provided. We are aware of no methodology used by BLM to determine depth to water table, presence of other water sources, etc. as part of treatments. Please provide the methodology and protocols claimed to be used.

**Response:** Each ecological risk assessment (see individual ecological risk assessments on the CD provided with the Final PEIS) and Appendix C (in Uncertainty Section under Concentration Models) of the PEIS included a discussion of the GLEAMS model that was used to predict the loading of herbicide to nearby surface water bodies and to groundwater.

EMC-0585-185
Western Watersheds
Project

**Comment:** Drift models used by BLM focus on ag fields. Drift and Gleams and are not valid for use in topographically rugged wild land settings subject to rapid temperature and wind shifts, or sparse vegetation and aridity of BLM lands. The forest applications of these models are based on the presence of much greater shielding foliage than typically occurs on BLM lands. Thus, these analyses do not adequately assess risks associated with spray drift, or transport into water or neighboring soils in runoff or by winds. Water bodies may be subject to chemical contamination with herbicides and their degradates through application drift, soil and water runoff, and wind deposition of contaminated soils.

**Response:** The BLM acknowledges that water bodies located in and near application areas may be subject to impacts due to drift, soil and water runoff, and wind-driven transport of soil. In fact, its approach to exposure modeling includes separate analyses of each of these phenomena, as well as analysis of direct application to the water body. The selected models are generally applicable to rugged, arid, windy, and sparsely vegetated lands. Each of these aspects can be considered by the models, when they are relevant to prediction of the exposure concentration. In fact, the modeling approaches employed are consistent with standard practices, and their application was approved of by the relevant resource agencies.

EMC-0585-188
Western Watersheds
Project

**Comment:** All the modeling and assessments also fail to include the often limited growing season in arid lands, and the fact that "treatment" activities may be compressed into a short time frame – thus members of the public are more likely to be exposed to multiple chemical or other treatment products (such as smoke, blowing disturbed soils, etc.) at one time. Many BLM lands border Forest lands upslope, and the likelihood of multiple exposures from multiple chemicals and multiple agency treatments is real.

**Response:** The BLM coordinates with the Forest Service and other agencies, organizations, and private entities with an interest in herbicide spraying to ensure that spray treatments are coordinated to reduce risks to humans and the environment. Treatment activities may be compressed into a short time frame, but herbicide treatments comprise only about 16% of all vegetation treatments, and treatments are spread nearly 261 million acres. In addition, many treatments are in remote areas, and treatment areas are posted to discourage the public from entering them. The human health and ecological risk assessments prepared by the BLM and Forest Service considered soil and vegetation type and rainfall patterns when modeling risks from the

BLM_0001572

RESPONSE TO COMMENTS

use of herbicides.

EMC-0585-190
Western Watersheds
Project

**Comment:** There really is no "updated" information at all on any but 6 chemicals, and even this "new" information is woefully deficient. BLM has improperly limited information on Hazard Identification, including toxicity (acute, chronic, subchronic, chronic/carcinogenicity, developmental, reproductive, neurotoxicity, mutagenicity, and metabolism of chemicals) it plans to use in greatly expanded amounts. BLM has improperly limited information on Dose-Response Assessments, including dietary, non-dietary, acuter dietary, chronic dietary, oral, dermal, inhalation.

**Response:** The comment does not specify what scientific information the BLM omitted. The commentor's list shows the BLM's evaluation to be comprehensive. Drift was an explicit part of the exposure analysis and risk assessment. All available USEPA toxicity information was utilized in the human health risk assessment. The BLM also used Forest Service risk assessments for nine herbicides; these assessments have been conducted since 1998.

EMC-0585-192
Western Watersheds
Project

**Comment:** The secrecy surrounding inert ingredients provides no assurance or legitimate way to assess impacts to the environment or receptors. Although List 3 contains chemicals of unknown toxicity, BLM strangely jumps to the conclusion that this translates into "minimal risk" (see [page] B-27-28 [of Appendix B of the Draft PEIS). Just because something may be "unknown". It cannot be assumed to present "minimal risk"!

**Response:** Of the 32 inert ingredients found in herbicides evaluated by the BLM, none were found in categories of toxicological concern (List 1), none were found in the category of unknown toxicity/high priority (List 2), 5 were found in the category of unknown toxicity (List 3) and 27 were found in the category of minimal concern (List 4), as discussed under Inert Ingredients, in the Dose-response Assessment section of Appendix B (Human Health Risk Assessment) of the PEIS. Hence, 84% of the inert ingredients are in the category of minimal risk, and none are in the toxicological concern or high priority categories.

EMC-0585-197
Western Watersheds
Project

**Comment:** BLM continues to use the inappropriate ag and forest drift models (see C-3 [of Appendix C of the Draft PEIS]) to assess wild land arid risk of exposure. BLM inappropriately relies on "surrogate" lab animal studies to understand effects to animals in wild land and water settings. (see [page] C-4 [of Appendix C of the Draft PEIS], discussion of TRVs [toxicity reference values]).

**Response:** The Agdrift model (drift) is predominantly dependent on the physical properties of the herbicide being applied, the method of application, and the wind speed. The model does not incorporate other weather-related inputs, such as humidity, and is therefore applicable to a wide range of conditions. The BLM modeled arid environments via GLEAMS (surface runoff) under a wide range of relevant environmental conditions. The wind erosion model was designed to represent a "reasonable, but conservative" impact under the range of meteorological conditions tested. Conditions in Wyoming, Montana, and Oregon were modeled using a highly conservative incorporation/mixing depth of 1 millimeter (thinner affected soil depths result in elevated herbicide emissions during fugitive dust events). A range of important input parameters was evaluated, and the impacts to model predictions were documented, in order to facilitate prioritization of site-specific analysis by land managers, when appropriate. The use of laboratory results to assess toxicity is a standard approach for assessing impacts to wild populations in ecological risk

BLM_0001573

assessment. Toxicity data on wild populations is generally lacking, and confounding factors (e.g., diet, body weight, other stressors) present in natural habitats make interpretation of results difficult.

EMC-0585-199
Western Watersheds
Project

**Comment:** BLM claims to apply information based on species guilds. Yet, there is no guild for insectivorous birds, granivorous birds, frugivorous birds, predatory birds, etc. – just "small, large and piscivorous birds". A great many guilds are not represented in the analysis. Likewise, BLM uses small and large mammals. BLM fails to differentiate between insectivorous small mammals, granivorous small mammals, predatory small mammals, etc.

**Response:** It is impractical to assess all possible guilds, although the BLM captured most of them using omnivorous birds and mammals. The honeybee (*Apis mellifera*) was selected as the surrogate species to represent pollinating insects. The deer mouse (*Peromyscus maniculatus*) was selected as the surrogate species to represent small mammalian frugivores (i.e., fruit eaters) although it is an omnivore. The mule deer (*Odocoileus hemionus*) was selected as the surrogate species to represent large mammalian herbivores. The coyote (*Canis latrans*) was selected as the surrogate species to represent a large mammalian carnivore and omnivore. The American robin (*Turdus migratorius*) was selected as the surrogate species to represent small avian invertivore and frugivore. The Canada goose (*Branta canadensis*) was selected as the surrogate species to represent large avian herbivores. The Northern subspecies of the bald eagle (*Haliaeetus leucocephalus alascanus*) was selected as the surrogate species to represent large avian piscivores (fish eaters).

EMC-0585-200
Western Watersheds
Project

**Comment:** [On page] C-6 [of Appendix C of the Draft PEIS]. Acute LOC [Level of Concern] was lowered. There was no systematic methodology to examine population viability on top of individual viability.

**Response:** The acute Level of Concern was lowered for rare, threatened, and endangered species to protect for not only population, but individual viability. See Table C-1 (Levels of Concern) in Appendix C of the PEIS for Levels of Concern to plants and animals and species of concern.

EMC-0585-202
Western Watersheds
Project

**Comment:** [Page] C-7 [of Appendix C of the Draft PEIS] states that a thorough description of uncertainties is a key component, and serves to identify weaknesses in this process. Why, then, does BLM throughout the DEIS [Draft PEIS] and PER ignore uncertainties and predict rosy outcomes?

**Response:** A key part of risk assessment is to disclose uncertainties. Uncertainties can work both ways: they may be over conservative or under conservative. In a quantitative risk assessment, efforts are made to identify the most likely point estimate of risk with narrative statements describing where the uncertainties lie. Not all the risk assessment outcomes are "rosy." Several herbicide-exposure-receptor scenarios do show risk, and the BLM will mitigate, restrict or delete the herbicide or the application rate under these scenarios.

EMC-0585-203
Western Watersheds
Project

**Comment:** [Draft PEIS Appendix C, Page] C-7 reveals that the models used by BLM, did not estimate additional risks from adjuvants, inert ingredients, or chemical breakdown products/degradates. BLM claims "evaluating the potential additional/cumulative risks from mixtures of pesticides is substantially more difficult, particularly at the level of a PEIS". Well, BLM is claiming elsewhere that the PEIS will adequately assess risks and impacts, and yet fails to do so here! BLM then uses a

BLM_0001574

qualitative assessment, based on labels, most of which say mixing is ok.

**Response:** Uncertainty analysis is part of a risk assessment. The PEIS and human health and ecological risk assessments focus on the risks from the active ingredients. It would be difficult and extremely expensive to analyze all the breakdown products and degradates found in the herbicide formulations used by the BLM. Furthermore, there is little or no information on the risks associated with these products in the scientific and agency literature and in production registration documents. The human health risk assessments and ecological risk assessments make predictions of risk regardless of favorable or unfavorable outcome. Uncertainty analysis improves our perspective of the risk estimates, their conservatisms, and unknowns. Concerning inerts and degradates, see response to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment.

EMC-0585-204
Western Watersheds
Project

**Comment:** BLM models use buffers of 100, 300 and 900 feet. In wild land areas with downdrafts, rugged canyons, canyon breezes, thermals, etc. much greater buffers may be required. Plus, as aerial application is allowed under varying wind speeds in different states, such uncertainties must also be assessed.

**Response:** The buffers presented in the PEIS represent minimum distances based on drift modeling results. It is recognized that these buffers may need to be adjusted for site-specific conditions.

EMC-0585-205
Western Watersheds
Project

**Comment:** The list of surrogate species is extremely limited ([page] C-11 [of Appendix C of the Draft PEIS]). Honeybee, rat, mouse, dog, rabbit, guinea pig, mallard, bobwhite quail, ring-necked pheasant, Japanese quail, chicken. Many of these species are very similar – example: avian granivores, so this list does not represent the "guild" approach claimed by BLM, and is full of deficiencies as described above.

**Response:** See response to Comment EMC-0585-199 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0585-206
Western Watersheds
Project

**Comment:** Table C-4 [of Appendix C of the Draft PEIS] then presents "vertebrate surrogate species evaluated by life history". This list is extremely limited, and does not cover necessary important species types, even under the guild approach. The robin, goose, deer mouse, mule deer, bald eagle, coyote that it includes are generalist, or common species and coyotes are predators but also omnivorous to some degree. NONE of these species is rare or declining.

**Response:** See response to Comment EMC-0585-199 under PEIS Environmental Consequences, Herbicide Effects Analysis. The species selected for quantitative evaluation in the ecological risk assessments are species for which life history and toxicological response data are available. It is not practical, and can be illegal, for researchers to test chemicals using rare or declining species.

EMC-0585-207
Western Watersheds
Project

**Comment:** There are no burrowing mammals (such as the pygmy rabbit or northern Idaho ground squirrel or kit fox)? How might herbicides and vapors of breaks down products affect burrowing mammals? How are vapors suspended in the air column? Not only may an animal consume herbicided vegetation for prolonged periods, it may also be subject to inhalation of chemicals, plus suddenly encounter an environment where essential cover from predators is being defoliated or killed.

BLM_0001575

**Response:** Although none of the surrogate species used in the ecological risk assessments are strict burrowing animals, the deer mouse to some degree would be exposed to conditions cited above. A burrow would tend to offer protection from foliar herbicide spray, compared to a non-burrowing animal shelter that is directly sprayed, and thus risks to a burrowing animal from herbicides should generally be less than those for a non-burrowing animal.

EMC-0585-208
Western Watersheds
Project

**Comment:** If species existing in environments that contain no surface water sources, and consume sprayed vegetation or dew on sprayed vegetation, how will this affect their water balance, or organ function? Exposure pathway scenarios do not adequately reflect real-life scenarios for wild animals on public lands.

**Response:** Species, such as kangaroo rats, that do not consume water obtain water from their diet. Exposure to herbicides from consumption of foods exposed to herbicides was evaluated in the ecological risk assessments. Life history questions such as these are uncertainties and the reason safety factors are used in deriving toxicity reference values for interspecies extrapolation.

EMC-0585-209
Western Watersheds
Project

**Comment:** The [Draft] [P]EIS drastically underplays the impacts and likelihood of direct spray exposure (see C-15 [of Appendix C of the Draft PEIS]). Animals that inhabit an area to be sprayed will be in contact with these chemicals. BLM also claims that "impacts outside of the intended application area are accidental exposures that are not typical. Yet, BLM provides no information or data showing that it has ever systematically monitored its own applications of chemicals applied in wild land settings under the many ways covered under this [P]EIS. This monitoring is required if BLM is to be able to make such statements. Where is the data that shows this is not typical, or that BLM 99% - or whatever – of the time –does not misapply chemicals? We are being asked to believe in a fantasy world that BLM has constructed here.

**Response:** The BLM modeled a direct spray scenario for ecological receptors. Risks were low to none at typical application rates. The BLM also modeled herbicide drift scenarios, which demonstrate the potential for herbicides to drift off-target, with similar results. The BLM is not a research organization, but relies on the USEPA and other organizations for research. See response to Comment EMC-0267-002 under PEIS Proposed Action and Purpose and Need, Federal Laws, Regulations, and Policies that Influence Vegetation Treatments regarding training of herbicide applicators and ensuring that herbicide applications are done properly.

EMC-0585-217
Western Watersheds
Project

**Comment:** [Page ] C-15 [of Appendix C of the Draft PEIS] states that "there is little information on magnitude of transfer of herbicide from plant to animal. Well, if an animal walks through sprayed vegetation, it will contaminate itself with herbicide, inhale fumes, etc.

**Response:** Wildlife may come into contact with herbicides by walking through areas that have previously been sprayed. However, there is little information available on how much herbicide is transferred to the animal through this exposure route. The BLM ecological risk assessments used an assumption of $1/10^{th}$ the exposure due to a direct spray of the animal. This assumption was based on work by Harris and Soloman (1992; see citation in Appendix C [of the Draft PEIS]) which evaluated the dislodgeable residues of 2,4-D present on turf 1 to 24 hours after application. Other research (Nishioka, M.G., H.M. Burkholder, M.C. Brinkman, S.M. Gordon, and R.G. Lewis. 1996. Measuring transport of lawn-applied herbicide acids from turf to home: correlation of dislodgeable 2,4-D turf residues with carpet dust and carpet surface

BLM_0001576

RESPONSE TO COMMENTS

residues. Environmental Science and Technology 30:3313-3320) has indicated that the dislodgeable residues of 2,4-D and dicamba may be as low as 0.1% to 0.3% of the application levels on turf.

EMC-0585-218
Western Watersheds
Project

**Comment:** [Page] C-16 [of Appendix C of the Draft PEIS]. Again, drift models here (as previously discussed) do not represent real world arid land scenarios.

**Response:** The results generated by the Agdrift model are predominantly dependent on the physical properties of the herbicide being applied, the method of application, and the wind speed. The model does not incorporate other weather-related inputs, such as humidity, and is therefore applicable to a wide range of conditions. The wind erosion model was designed to represent a "reasonable, but conservative" impact under the range of the meteorological conditions tested. Conditions in Wyoming, Montana, and Oregon were modeled using a highly conservative incorporation/mixing depth of 1 millimeter (thinner affected soil depths result in elevated herbicide emissions during fugitive dust events).

EMC-0585-219
Western Watersheds
Project

**Comment:** Water is much more scarce and concentrated – often limited small springs and seeps, puddles, or small streams, and many of these may be receiving significant in-flow from large surrounding areas during runoff events. Such scenarios (very small water bodies, often receiving concentrated inflow/runoff from large areas) are not represented in the models used by BLM. Plus, BLM has ignores the fact that many of its treatments are likely to occur in lands where livestock use is most concentrated – which are often sites nearest water or flatter areas bordering draws. So herbicide application directly to degraded zones of livestock concentration is much more likely to result in herbicide and breakdown product contamination of, and concentration in, ground and surface waters.

**Response:** The parameters described in the comment reflect the base watershed that was evaluated in the GLEAMS model used in the risk assessments. These parameters were selected for the modeling of inerts in order to provide consistency between the models for inerts and active ingredients. This assessment was done to compare predicted exposure concentrations between an inert additive and the active ingredient. The conditions selected for modeling by GLEAMS are reasonable worst-case conditions, as they are the ones predicted to lead to high runoff and loading to nearby surface waters.

EMC-0585-223
Western Watersheds
Project

**Comment:** [Appendix C, page] C-19 [of the Draft PEIS]. BLM's model does not take into account a combination of high risk events.

**Response:** The BLM modeled an accidental spill scenario in the human health risk assessments and ecological risk assessments, which is a worst-case scenario and would simulate a high-risk event.

EMC-0585-224
Western Watersheds
Project

**Comment:** Calculations of ambient water concentrations may not reflect wild land scarce-water settings. The [P]EIS provides no information on the size of the ponds or steams and topographical and vegetation components used in modeling.

**Response:** The sizes of the ponds and stream are presented in the Appendix C of the PEIS under Non-target Species Exposure Characterization. The ecological risk assessments (ERAs) considered two types of generic aquatic habitat: 1) a small pond (¼-acre pond of 1 meter [m] depth, resulting in a volume of 1,011,715 liters); and 2) a small stream representative of Pacific Northwest low-order streams that provide

BLM_0001577

habitat for critical life-stages of anadromous salmonids. The stream size was established at 2 m wide and 0.2 m deep with a mean water velocity of approximately 0.3 meters per second, resulting in a base flow discharge of 0.12 cubic meters per second (cms). Details on the vegetative components used in the modeling are found in the two modeling appendixes of the ERAs (for GLEAMS and AgDrift) and in the Air Quality Modeling for BLM Vegetation Treatment Methods document (for CALPUFF). The BLM believes that these assumptions are reasonable, but conservative, worst-case ones representative of arid western lands. In addition, the importance of these input parameters to predicted risk has been explored in order to help the land manager identify situations that may result in higher impacts and that should be subject to additional, site-specific analysis.

EMC-0585-225
Western Watersheds
Project

**Comment:** [Page] C-20 [of Appendix C the Draft PEIS]. Wind erosion. BLM states "dry conditions and wind may also allow transport of herbicide in fugitive dust". This does not consider degraded site conditions and the level of site disturbance, as would be typical of many sites where herbicides may be applied. This is especially critical in understanding the fate of chemicals in post-burn ESR environments where large black burn surfaces essentially generate their own weather and winds. Plus, the modeling examines only small acreages (1,000) see [page] C-21 [of Appendix C of the Draft PEIS], yet BLM in post-burn environment may apply chemicals such as Oust over tens of thousands of acres. Erosion models also do not appear to take into account OHV [off-highway vehicle] use, cattle or sheep trampling of soils.

**Response:** The BLM has attempted to evaluate migration of herbicides from application sites in three different ways (drift, runoff, and blown dust). Each of these approaches has been done in a conservative albeit general fashion. Every attempt was made to select worst-case model inputs. Notably, for the dust model, it was assumed that all of the applied herbicide was associated with a very thin (1-mm) soil layer. This assumption maximized the potential prediction of rapid and complete herbicide transport. Similarly, the soils were assumed to be both disturbed (i.e., no vegetation cover) and very fine in texture in order to maximize predicted migration. Finally, a range of important input parameters was evaluated, and the impacts to model predictions were documented in order to facilitate prioritization of site-specific analysis by land managers when appropriate.

EMC-0585-226
Western Watersheds
Project

**Comment:** [The] BLM describes "overdrive" being a combination of chemicals, and no toxicity data available, so BLM extrapolates to another mixture. [Pages] C-28 and C-29 [of Appendix C of the Draft PEIS] show adverse impacts of tebuthiuron and other chemicals BLM proposes to use.

**Response:** Overdrive® is assessed via its constituent active ingredients, dicamba and diflufenzopyr, and toxicity data are provided in the human health risk assessment (HHRA) and ecological risk assessment (ERA). When Overdrive toxicity data were available, these toxicity values were used in the ERA. The ERA and HHRA do predict risks for certain active ingredient exposure/receptor scenarios, but they are generally low for typical applications.

EMC-0585-227
Western Watersheds
Project

**Comment:** BLM's Table C-15 [in Appendix C of the Draft PEIS] "Risk levels used to describe typical herbicide effects according to exposure scenario and ecological receptor groups" only provides information for 11 chemicals. The inadequacy of the drift models used by BLM is shown by the large numbers of zeroes in off-site drift, surface runoff, wind erosion.

BLM_0001578

RESPONSE TO COMMENTS

**Response:** Appendix C of the PEIS only presents the tables generated during BLM's ecological risk assessment. Table C-15 presents the risk levels for the herbicides for which BLM conducted risk assessments. The herbicides covered in the Forest Service ecological risk assessments are not included in this table. Risk levels generated by the Forest Service ecological risk assessments are presented in Chapter 4 of the PEIS (see Table 4-13). The nature of the model selected to predict drift impacts as well as its mode of application are entirely consistent with current practice in the field (e.g., USEPA analysis during herbicide registration). This analysis of drift impacts is consistent with the review and approval of the proposed modeling approach by the USEPA and other agencies. The "large number of zeros" arise from anticipated site conditions as well as the level of toxicity documented for the herbicides. It should be noted that not all scenarios were found to be risk free. The BLM believes that these findings are consistent with the best available science.

EMC-0585-228
Western Watersheds
Project

**Comment:** Wind erosion effects are not shown for aquatic species. This does not even evaluate any assessment of impacts to water bodies. As scarce isolated desert springs, seeps potholes, puddles tinajas, etc. may serve as critical water sources for terrestrial fauna, this is critical. Plus, many rare desert aquatic species exist in environments of limited water that may be subject to input of runoff or windblown soils from large land areas, and subsequent evaporation events that concentrate chemicals.

**Response:** The more conservative direct spray and off-site drift scenarios were assumed to address any potential impacts to aquatic resources from wind erosion. These evaluations included impacts to rare species within a small waterbody. In addition, the ecological risk assessment protocols were designed to evaluate and document the importance of several aspects of both the environment and mode of application to help land managers identify those situations such as desert springs in which elevated risks might be expected. This was done to help identify mitigation measures (e.g., set-backs or avoidance altogether) as well as the potential need for site-specific risk analysis.

EMC-0585-229
Western Watersheds
Project

**Comment:** The surface runoff calculations are not representative of the real world of often degraded and desertified arid lands where BLM's treatments and herbiciding will occur.

**Response:** The surface runoff calculations represent a wide range of conditions. The GLEAMS modeling (discussed in Appendix C of the PEIS under Concentration Models) presents reasonable worst-case situations that would most favor migration leaching into surface water, which may not occur under the arid conditions typical of BLM lands.

EMC-0590-029
Western Slope
Environmental
Resource Council

**Comment:** We are also concerned that the synergistic effects of combining herbicides is very poorly understood and not well-addressed in the analyses presented in the DEIS [Draft PEIS] and PER. The EPA does not require pesticides to be studied for synergistic effects for registration of these chemicals, however they are known to occur. Often these effects are exploited in the development of herbicide products for field application (see study on the synergistic effects of diflufenzopyr with dicamba. With the multitude of chemicals being used in environmental settings, the potential for unknown toxic effects on organisms resulting from synergistic mixtures of chemicals is very real. Herbicides interact cumulatively and synergistically in aquatic and terrestrial environments, and such effects are likely responsible for the decline is species abundance, as evidenced by studies on the decline of frogs and toads over the past twenty years.

BLM_0001579

**Response:** The BLM analyzed dicamba together with diflufenzopyr. Also see responses to Comment RMC-0221-070 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, and Comment RMC-0159-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

EMC-0606-009
Johnson, Kathy

**Comment:** The food chain starts at the herbal level , (vegetation). What studies have been done to show that the critters', (especially endangered/protected) DNA are not being altered in the least! ??

**Response:** See responses to Comment RMC-0055-006 under PEIS Environmental Consequences, Social and Economic Values, and EMC-0007-001 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0619-002
Bellovary, Christopher

**Comment:** While I am glad to see the BLM taking the expansion of invasive species on public lands as a quite serious concern, the use of any untested herbicides appears to be an ultra vires action, that is outside of the BLM's discretional authority. Article III courts give administrative agencies great deference when it comes to scientific matters within their range of expertise, but there is no scientific data to rely upon with untested herbicides. The result is that courts would give no deference to the agency decision, as this would be by definition an arbitrary and capricious action.

**Response:** See response to Comment EMC-0308-005 under PEIS Environmental Consequences, Herbicide Effects Analysis. The BLM does not use untested herbicides.

EMC-0619-003
Bellovary, Christopher

**Comment:** I fully agree that of the herbicides that look promising based on successful laboratory results should be tested under field conditions before final approval is given. That said, when you lack the results of laboratory testing to rely on, you do not have sufficient data on which to make an educated prediction of the results. To proceed with the aerial application of these herbicides anyway is irrational, would needlessly risk the biological diversity within these areas that are necessary for their productivity, and would be at least as likely to increase the spread of invasive species as it would be to contain them. Such an unscientific approach to the management of our public lands would be a clear breach of the BLM's legal duty to protect the public lands for current and future generations.

**Response:** See response to Comment RMC-0218-043 under PEIS Alternatives, Vegetation Treatment Planning and Management. The USEPA requires field testing of herbicides as part of the registration process to ensure that the chemicals are effective and safe to the environment.

EMC-0623-017
Defenders of Wildlife

**Comment:** Evaluate the toxicity of each actual herbicide being used, not just the active ingredients. Recent research has found that the herbicide Roundup is extremely deadly to tadpoles, with the culprit being not the glyphosate, but the surfactant added to it. BLM must follow best management practices with respect to each formulation, not just each active ingredient. Furthermore, BLM must evaluate any combinations of chemicals for potential for synergistic impacts.

**Response:** BLM evaluated representative mixtures of herbicides (tank mixes) and also evaluated inert compounds in the BLM risk assessments. The BLM conducted additional analysis of degradates and the potential for proposed herbicides to act as endocrine disruptors for the Final EIS (see Appendix D). Inert ingredients found in BLM herbicides have little or no toxicity (see Degradates, Inert Ingredients,

BLM_0001580

Adjuvants, and Tank Mixtures in Appendix C of the PEIS; also see response to Comment RMC-0173-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives). As noted in Appendix C, BLM land managers have control over the selection of adjuvants, active ingredients, and tank mixtures, and can select herbicide formulations to reduce risk to humans and the environment. See response to Comment RMC-0221-070 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives for synergistic impacts.

EMC-0623-019
Defenders of Wildlife

**Comment:** Defenders of Wildlife maintains that the Environmental Protection Agency registration guidelines, which the BLM has signaled its intention to follow in adopting future chemical formulations, are not sufficiently protective of wildlife. We urge that the BLM follow regulations under the Endangered Species Act when evaluating new active ingredients, and implement best management practices as directed by these regulations.

**Response:** The BLM must generally follow the guidance of the USEPA in the use of registered herbicides, as USEPA is the authorized agency. The Endangered Species Act does not specify risk assessment procedures. BLM endeavored to evaluate risk to rare, threatened and endangered species by using additional conservatisms (e.g. more conservative levels of concern) above and beyond USEPA's guidance.

EMC-0640-007
Animal Welfare
Institute

**Comment:** The fact that the BLM lumped amphibians in with fish in assessing the potential impact of herbicide use is problematic, especially given the fact that amphibians are known to be particularly sensitive to toxins.

**Response:** Fish and amphibians are both sensitive and share an aquatic environment, although there are obvious differences (e.g., adult amphibians leave the water). Both species are exposed via dermal and respiratory mechanisms and have a more permeable dermis. Both reproduce in the aquatic environment and amphibians spend all of their life cycle in or near water. Unfortunately, there is limited controlled toxicological data for the effects of herbicides on amphibians. Also see response to Comment EMC-0643-077 under PEIS Environmental Consequences, Wildlife Resources for a discussion of a study showing the similarities between fish and amphibians.

EMC-0640-008
Animal Welfare
Institute

**Comment:** Using surrogate species (mice, rats, dogs, and others) to assess herbicide impacts on a variety of wild species as well as the proposed widespread use of herbicides may result in unknown or unexpected impacts of potential significance. Consequently, the BLM should employ the precautionary principle and avoid, to the maximum extent possible, the use of herbicides and only use herbicides where there is compelling and valid scientific evidence that the potential for adverse impacts are none to small.

**Response:** Generally, the risks to non-plant ecological receptors at typical application rates are none to small. Uncertainty due to interspecies extrapolation is addressed in Comment EMC-0643-036 under PEIS Environmental Consequences, Wildlife Resources.

EMC-0640-037
Animal Welfare
Institute

**Comment:** In addition to the significant cruelty and suffering associated with these live animal tests (including lethal dose, dermal, eye, and other tests) and the fact that there are non-animal tests available that could and should be used to test such poisons, the test results themselves provide no indication of the potential impact of the

BLM_0001581

herbicide on wildlife or the environment when applied in the field. First, testing a herbicide in a laboratory environment on mice, rats, guinea pigs, rabbits, or dogs provides no evidence of how the herbicide will react in a field environment given the potential for the herbicide to be altered by environmental conditions (i.e. sunlight, heat, cold, naturally occurring elements in the soil, natural toxins). Second, for the same reasons, the amount of herbicide determined to be toxic to a rat or a dog in a laboratory environment may not accurately predict the amount of toxin fatal to a wild animals as the physical condition of wild animals (i.e. immune function, body condition, presence or absence of injury or disease, stress level, etc.) may be very different than the condition of laboratory animals. For example, while a certain amount of herbicide may kill 50 percent of laboratory mice, the amount necessary to kill one or more wild mice may be much lower because the physical condition of the wild mouse because he/she lives in the wild may be compromised compared to a mouse living in a laboratory environment. Similarly, a wild fox that has to engage in a day-to-day struggle to find food and avoid predators to survive in the wild may have a very different reaction to a direct or indirect exposure to a herbicide compared to a dog forced to consume the poison in a laboratory environment. Third, the use of surrogate species to predict the impact of herbicides on a wide-ranging variety of wild species is both scientifically invalid and doomed to significant errors in understanding the potential impact of herbicides in a natural environment. The toxicity studies referred to in the PEIS and Ecological Risk Assessment report used mice, rats, guinea pigs, rabbits, dogs, some fish species, some bird species, and perhaps a few addition common species. To suggest that these species can act as surrogates for the variety of wild species (i.e. deer, pronghorn, turkey, waterfowl, song birds, furbearers, raptors, bears, mountain lions, wild horses and burros) that may be exposed, directly or indirectly, to herbicides applied for vegetation treatment in 17 western states is ridiculous. As a consequence, the BLM must admit that its assessment of the potential impacts of herbicides on wild species is completely speculative because it is based on no critical evidence or data.

**Response:** All data used in this PEIS concerning toxic effects on animals were derived from published sources. There are differences in extrapolating from the laboratory to the wild animal. Using published data derived from laboratory animals provides the controlled experimental design that is not possible with wild animals. Uncertainty factors are used to address extrapolations such as this; see response to Comment EMC-0643-036 under PEIS Environmental Consequences, Wildlife Resources. To evaluate risks to humans, the results of animal toxicity testing are essential, since it is obviously impossible to conduct studies on humans. The extrapolation of animal toxicity data to humans involves the use of various safety factors.

EMC-0640-038
Animal Welfare
Institute

**Comment:** Of particular concern is BLM's decision to use fish as a surrogate to understand the impact of herbicides on amphibians. Considering the documented sensitivity of amphibians to slight changes in environmental conditions, to natural toxins, and to human-produced toxins including products intentionally and unintentionally released into aquatic ecosystems, suggesting that the herbicidal impacts on fish will mimic the impacts to amphibians is blatantly wrong and scientifically reckless.

**Response:** See response to Comment EMC-0640-007 under Environmental Consequences, Herbicide Effects Analysis.

BLM_0001582

RESPONSE TO COMMENTS

EMC-0643-011
California Indian
Basketweavers
Association

**Comment:** Although the DEIS [Draft PEIS] includes or references volumes of literature in support of the risk analysis for the chemicals, we find consistent data gaps that were avoided during this analysis, in those that preceded this one, and in those upon which this analysis are based. These data gaps are summarized here:

- Failure to fully analyze the environmental impacts of the chemicals as they are actually applied in the field, as a formulation or mixture
- Failure to fully analyze the environmental impacts of the degradates and secondary metabolites of the chemicals
- Failure to include data for endocrine disruption at environmentally relevant (dilute) exposures as a toxicological endpoint
- Failure to analyze the ecological effects to ecosystems from use of herbicides to manipulate vegetation. Ecological references by citation and footnote are almost completely lacking in the EIS. 40 CFR [Code of Federal Regulations] § 1502.24. The analysis must not be limited to toxicological effects analysis.
- Failure to document with citation and footnote proof that herbicides will achieve the desired results for restoration of natural plant communities and fire regimes

**Response:** The BLM evaluated mixtures (tank mixes) and inert compounds in the risk assessments. In response to public comments the BLM has provided more information on degradates and endocrine effects in Appendix D in the Final PEIS. Also see responses to Comment RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated, and Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment. It is not clear what the commentor means by ecological effects, but the methodology used is in compliance with all USEPA ecological risk assessment methodology and guidance. Chapter 4 of the PEIS includes a discussion of the risks and benefits of using herbicides to restore natural plant communities and to control invasive vegetation. Additional information is provided in the PER in Chapter 4. The information sources are referenced in Chapter 4 and in the Reference chapter.

EMC-0643-018
California Indian
Basketweavers
Association

**Comment:** Risk assessments must analyze the herbicide products as they are actually applied in the field—in other words, as the full formulation, as it is supplied by the manufacturer, purchased off the shelf, and also as they will be combined with any other added products such as the surfactant, colorant, buffering agent, or other additives. Each product as it is applied in the field is a *mixture*.

**Response:** See response to Comment EMC-0643-011 and 0646-058 under PEIS, Environmental Consequences, Herbicide Effects Analysis.

EMC-0643-021
California Indian
Basketweavers
Association

**Comment:** The methodology used to inform the current risk assessment process in the DEIS [Draft PEIS] does not incorporate the latest science that is known concerning environmental risks from pesticides.

**Response:** See response to Comment EMC-0640-036 under PEIS Environmental Consequences, Wildlife Resources.

EMC-0643-026
California Indian
Basketweavers
Association

**Comment:** The BLM analyses contain little to no information about the environmental effects of the degradates of the herbicides proposed. Research has shown that degradates are prevalent in ground water and are frequently detected more often than their parent compounds. An extensive review of the literature (in Kolpin et al. 2004) found that 30% of the degradates found in groundwater were more toxic than the parent compound. Kolpin et al. state: "[S]imply stating that relatively few detections of herbicide parent compounds were observed in ground water provides a

BLM_0001583

false impression that little chemical transport to ground water is occurring from herbicide applications at the land surface." The [P]EIS must analyze the environmental and health impacts of the degrades and metabolites of the chemicals proposed for use, in the context of direct, indirect, and cumulative impacts relative to human health, water, cultural impacts to Indian people, and to wildlife.

**Response:** See response to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment.

EMC-0643-030
California Indian
Basketweavers
Association

**Comment:** Do present risk assessment methods capture these risks? No, according to the authors of a recent review of the mechanisms of estrogenic endocrine disruptor chemicals (EEDCs). Welshons et al. (2003) concluded that: "Information about the mechanism of action of EEDCs, together with information concerning mechanisms of hormone action, predict that current risk assessment assumptions can lead to a dramatic underestimation of responses (and thus risk) associated with exposure to low doses of EEDCs, particularly during development when the effects of very small changes in hormonal activity are permanent."

**Response:** The BLM risk assessments used the authoritative toxicity factors from the USEPA's Office of Pesticides and other information provided by the USEPA, and a comprehensive literature search. See response to Comment RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated on endocrine disruptors.

EMC-0643-032
California Indian
Basketweavers
Association

**Comment:** While the EPA has failed to meet the timeline mandated by the statutes of FQPA [Food Quality Protection Act], the BLM is not exempt from utilizing existing and readily available information to inform its risk analyses in order to meet NEPA standards for scientific integrity. 40 C.F.R. 1500.1 (b), 1502.24. Hermaphroditic wildlife, or animals with ambiguous gender or deformed secondary sex characteristics have now been documented among frogs, fish, river otters, polar bears, and alligators; endocrine disruptor chemicals have also been implicated in skewed human sex ratios and low fertility rates. The scientific literature is filled with documentation of these effects, to such a degree that it cannot be ignored. Yet, the BLM risk assessment does not even raise the topic of endocrine disruptor chemicals.

**Response:** See response to Comment EMC-0643-030 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0643-037
California Indian
Basketweavers
Association

**Comment:** The DEIS [Draft PEIS] inappropriately limited ecological risk assessment to the six "new" herbicides proposed for use by the BLM and relied upon a set of data that was inappropriately dominated by industry funded studies, and makes conclusions ma. The DEIS [Draft PEIS] justifies no further analysis of eight chemicals by stating: "These herbicides have been evaluated in a previous BLM EIS (USDI BLM 1991), as well as more recently in an invasive plant EIS prepared by the U.S. Department of Agriculture Forest Service (Forest Service; USDA Forest Service 2004)." (D[raft] PEIS, Vol. 2, Appendix C; p. C-1). The most current of these analyses, the Forest Service's 2005, Region 5 Invasive Species EIS, is based on chemical literature review evaluations made by contractor SERA (Syracuse Environmental Research Associates). These reviews by SERA do not incorporate the latest, published information concerning the ecological and environmental effects of the chemicals. The reviews are found to rely predominantly on old industry registrant studies that are not peer reviewed and unpublished. We ask BLM to reject all such literature if it is not published in a peer reviewed journal. The final SERA reports themselves were peer-

BLM_0001584

reviewed to test methods and assumptions, but the data reports upon which the SERA reports have been drawn from have largely *not* been published or peer reviewed. These SERA reports are the foundation of the BLM's health risk assessment for these eight chemicals, yet they are both out of date, incomplete, and over biased towards industry generated studies.

**Response:** Both the Forest Service and BLM relied on product registration documents because these are often the most complete sources of information and because there is limited information in the technical literature. Both the BLM and Forest Service reviewed registration documents and conducted database searches to identify sources of published information on herbicide effects (see Appendix A of the BLM ecological risk assessments included on the CD that accompanies the Final PEIS). Concerning using USEPA registration data, see response to Comment RMC-0069-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. The risk assessment methods used by the BLM and Forest Service were similar and are compared in the Impacts Assessment Methodology in the Vegetation section of Chapter 4 of the PEIS, and also in several other resource sections of Chapter 4.

EMC-0643-038
California Indian
Basketweavers
Association

**Comment:** We believe that BLM's acceptance of industry sources that demonstrate lack of harm, and exclusion of current sources found in mainstream, academic and peer-reviewed scientific journals that document harmful effects, suggests a biased analysis and fails to provide a reliable foundation for decision making as required under NEPA.

**Response:** See responses to Comment RMC-0076-005 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives; Comment EMC-0585-008 under PEIS Alternatives, Monitoring, and Comment EMC-0340-004 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0643-039
California Indian
Basketweavers
Association

**Comment:** Open literature from unbiased, academic and peer reviewed journals appears to be almost completely lacking. In some instances, new information that is readily available and highly topical has been ignored. This is especially true relative to impacts to frogs and other amphibians. Given the current downward trend among amphibian populations globally, it is unconscionable for the BLM to ignore the latest science relative to this issue. The widespread use of poisons in agriculture today creates a greater obligation on public lands to provide unpolluted refugia for wildlife.

**Response:** See responses to Comment RMC-0076-005 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, Comment EMC-0585-008 under PEIS Alternatives, Monitoring, and Comment EMC-0340-004 under PEIS Environmental Consequences, Herbicide Effects Analysis for a discussion of sources of information. As noted for response to Comment EMC-0643-077 under PEIS Environmental Consequences, Wildlife Resources, the BLM provided additional information on the risks to amphibians from the use of herbicides in Chapter 4 of the Final PEIS under Wildlife Resources.

EMC-0643-060
California Indian
Basketweavers
Association

**Comment:** Inaccurate characterization of "less toxic" herbicides. The [P]EIS makes a recurring generalization throughout the document, namely that "the herbicides proposed for use by the BLM are less harmful to non-target vegetation, fish and wildlife, and humans than most currently-available herbicides used by the BLM, and any future herbicides used by the BLM would also likely have low risk." (e.g., p. [page] 4-221, Herbicide DEIS [Draft PEIS]). This statement is not factually correct. "Less toxic" is a relative term: relative to what? Several of the proposed "new"

BLM_0001585

herbicides, in the ALS [acetolactate synthase] group, are exponentially more toxic to plants than any of the herbicides currently in use.

**Response:** The four new chemicals (not including sulfometuron methyl) evaluated in the PEIS generally have low toxicity to non-target species. Oust® has higher toxicity to non-target plants, but is currently available for use by the BLM and was re-evaluated based on concerns from the field.

EMC-0643-065
California Indian
Basketweavers
Association

**Comment:** For these "new" chemicals, more precaution is needed, because a large body of scientific literature has not yet accumulated over years of study by academic and independent scientists that fully demonstrates their true environmental impacts. It should be noted that in all cases, these harmful characteristics have not been captured under the EPA mandated testing that the chemicals undergo in order to be registered for use under FIFRA [Federal Insecticide, Fungicide, and Rodenticide Act]. Even atrazine, banned in most European countries, was recently re-registered by the EPA in the U.S. in spite of volumes of literature showing it to be a cancer causing chemical, an endocrine disruptor, and a probable link in the global decline of amphibians (Hayes et al. 2002, 2003, 2005). And as noted in our discussion about 2,4-D, above, the EPA itself has acknowledged that it has failed to require testing data on the actual chemicals as they are applied in the field. These deficiencies do not exempt the BLM from its duties under NEPA to address this issue and to make decisions that are protective of the environment.

**Response:** Under the BLM Preferred Alternative and Alternatives D and E, atrazine would not be allowed for use on BLM-administered lands unless new human health and ecological risk assessments were conducted to show that it is safe for use (see Description of the Alternatives in Chapter 2 of the PEIS). According to FIFRA, the USEPA is responsible for registering pesticides, not the BLM. The BLM relies on the USEPA for safety testing. The BLM did a comprehensive literature survey on the toxicological effects for all the new herbicides, as documented in the ecological risk assessments (ERAs) for each herbicide (ERAs are available on the CD that accompanies the Final PEIS).

EMC-0643-066
California Indian
Basketweavers
Association

**Comment:** Clearly, a lack of sufficient, targeted study does not equate to a lack of harm. A lack of studies rather suggests the need to take a precautionary approach and to act conservatively. The list of existing studies for each toxicological endpoint should be listed in table style for each chemical, and not tucked away in an appendix in digital format, that is not easily accessible either to the public or decision makers. Studies demonstrating ecological harm should be listed also. It is not appropriate for BLM to limit analysis to toxicological endpoints mirroring EPA registration format. The agency "shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement." 40 CFR [Code of Federal Regulations] § 1502.24.

**Response:** See responses to Comment EMC-0643-065 under PEIS Environmental Consequences, Herbicide Effects Analysis, Comment RMC-0173-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, and Comment RMC-0221-067 under PEIS Environmental Consequences, Herbicide Effects Analysis. The human health and ecological risk assessments are long, complex documents that do not lend themselves well to being incorporated verbatim into the PEIS. Thus, these documents are included on a CD that accompanies the PEIS for those individuals that would like more detailed information on the literature, methods, toxicological endpoints, and other information used in preparing the risk assessments.

BLM_0001586

RESPONSE TO COMMENTS

EMC-0646-011
Californians for
Alternatives to Toxics

**Comment:** A glaring deficiency found in the PEIS is it's lack of analysis of potential negative effects from all toxic substances proposed for use in this program. The substances in need of analysis include all components of the final tank mixture that is then applied into the environment. All inerts, adjuvants and active ingredients. The analysis should also include any known degradates and contaminants that could cause negative impacts. The BLM has instead chosen to give cursory analysis to certain active ingredients (AIs), while piggybacking on limited analysis used by the Forest Service for others, and refusing to perform any analysis whatsoever for potential effects from the use of the hundreds of toxic substances BLM introduces into the environment as inerts, adjuvants and degradates. These comments will illustrate the need for adequate analysis to be performed on all components of the final mixture of pesticides, adjuvants and diluents.

**Response:** All active ingredients and inert compounds were evaluated in the PEIS risk assessments for the 10 herbicides analyzed by the BLM; see response to Comment RMC-0173-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. The BLM has conducted additional analysis of degradates and the potential for herbicides to be endocrine disruptors for the Final PEIS; see responses to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment, and Comment RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. The risk assessments were exhaustive evaluations of the risks of using herbicides proposed by the BLM; also see response to Comment EMC-0640-036 under PEIS Environmental Consequences, Wildlife Resources on the development of the risk assessments. The information from the risk assessments is then used to identify risks to natural and social resources in Chapter 4 of the PEIS.

EMC-0646-016
Californians for
Alternatives to Toxics

**Comment:** This rationale is false and can be upheld as such. To state that there has been no research in the last 15 years on either 2,4-D, clopyralid, dicamba, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr, that would warrant further concern, is simply wrong, and wrong by a wide margin. There are countless studies, all readily available through Toxline and PubMed, or other search engines, and many within the last few years, that show a need for great concern with the use of products containing these active ingredients. Case in point. The BLM risk assessment of these chemicals was 1988 or 1991. One of the above compounds, 2,4-D, is a commonly listed endocrine disruptor (ED). Alkylphenol ethoxylates, surfactants commonly used by the BLM in herbicide mixtures, are also EDs. Endocrine disruptors were unknown as a health problem until 1991, with the greatest advances in identification, and understanding, of the effects and pathways involved, occurring in the past seven years. This fact alone invalidates the assessment claims stated above in EIS [Draft PEIS page] 1-3. If, as stated, there was a "comprehensive literature search" of "new human health and ecological health risks", some very important data was overlooked. Without taking such evidence into consideration, BLM has failed in its analysis.

**Response:** The literature review referenced was for human health. It was not stated that no new research has been conducted; rather, it was stated that the toxicity values used in risk assessments have not changed substantially since 1991. Table 5-22 of the human health risk assessment (HHRA; available on the CD that accompanies the PEIS) compares the dose-response values used for 2,4-D and other currently-available pesticides to the most recent dose-response information (as of 2003). The toxicity data used for 2,4-D in the 1988 California Vegetation Management Final EIS were the

BLM_0001587

same as the data currently provided on the Integrated Risk Information System. Therefore, potential risks from 2,4-D, if calculated today, would be similar to those calculated in 1988. An uncertainty evaluation was carried out in the HHRA (and summarized in Appendix B of the PEIS under Evaluation of Currently-available Herbicide Active Ingredients) for all currently-available herbicides to determine whether the earlier HHRAs were still appropriate. Dose-response values, receptors, and exposure pathways were considered. The conclusions of a current risk assessment would not change for any of the previously evaluated herbicides, with the possible exception of simazine, an herbicide that has not been used by BLM since at least 1997. 2,4-D is not listed in agency lists as an ED compound, although the USEPA plans to perform ED screening on 2,4-D. Also see response to Comment EMC-0646-102 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0646-017
Californians for
Alternatives to Toxics

**Comment:** Even greater disregard is paid to adjuvants, inert ingredients, and known degradates; the effects of diluents have been ignored entirely. This area of discussion is particularly important in part due to the inconsistent approach to its analysis taken by BLM. Appendix C [of the Draft PEIS] describes a list of herbicides and adjuvants to be used, but for most names only the active ingredient where, for a few, a formulation containing the active ingredient is named. Any number of inert ingredients and adjuvants can be associated with and used depending on the formulation employed. The formulations used should be identified so that the full range of inerts, diluents and degradates can be analyzed and so that it can be assured that no chemical, to the extent possible, will be used in the program, and thus no significant potential adverse impact will have been overlooked. Without a confirmed list of chemicals that may be used, the NEPA analysis cannot be accomplished.

**Response:** The BLM has added information on degradates and the potential for herbicides to act as endocrine disruptors; see responses to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment and Comment RMC-0221-070 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. For inert ingredients, see response to Comment RMC-0173-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. Inert compounds are considered Confidential Business Information by USEPA, and according to USEPA cannot be disclosed. See response to Comment EMC-0623-017 under PEIS Environmental Consequences, Herbicide Effects Analysis for a discussion on BLM efforts to evaluate herbicide formulations. Adjuvants were discussed in Appendix C of the PEIS under Degradates, Inert Ingredients, Adjuvants, and Tank Mixtures.

EMC-0646-020
Californians for
Alternatives to Toxics

**Comment:** BLM cannot depend on the registration of pesticides to satisfy the requirements of NEPA. All pesticides used in the program must be subject to NEPA analysis and, as an integral part of those pesticides, the so-named inerts of chemicals of the formulations, degradants and allowed diluents must be analyzed.

**Response:** All herbicides used by the BLM, or proposed for use, were evaluated under NEPA in the PEIS, or in earlier EISs prepared by the BLM. See response to Comment EMC-0646-017 under PEIS Environmental Consequences, Herbicide Effects Analysis for information on the analysis of inerts, formulations, degradates, and diluents.

EMC-0646-021
Californians for
Alternatives to Toxics

**Comment:** It has been clearly established in the scientific literature that the substances that contribute to the makeup of individual formulations, the adjuvants that increase the efficacy of specific formulations, and diluents that may be allowed, by the registration label, can be highly toxic and often more toxic than the active ingredient

BLM_0001588

RESPONSE TO COMMENTS

[AI]. The BLM addressed these issues with the following; [1] Inerts, "Relatively little toxicity information was found. A few acute studies on aquatic or terrestrial species were reported. No chronic data, no cumulative effects data, and almost no indirect effects data (food chain species) were found for the inerts in the 10 herbicides." ([Draft] [P]EIS C-83); [2] Adjuvants, "In general, adjuvants compose a relatively small portion of the volume of herbicide applied; however, selection of adjuvants with limited toxicity and low volumes is recommended to reduce the potential for the adjuvant to influence the toxicity of the herbicide." ([Draft] [P]EIS C-84); [3] The Full Tank Mixture "Ecological Risks of Degradates, Inerts, Adjuvants, and Tank Mixtures – Only limited information is available regarding the toxicological effects of degradates, inerts, adjuvants, and tank mixtures. In general, it is unlikely that highly toxic degradates or inerts are present in approved herbicides. Also, selection of tank mixes and adjuvants is under the control of BLM land managers, and to reduce uncertainties and potential risks, products should be thoroughly reviewed and mixtures with the least potential for negative effects should be selected" (Bromacil ERA [ecological risk assessment] pg 7-10). Once again, this rationale and subsequent lack of analysis for these broad class of chemicals is unjustified, and illegal in respect to NEPA and ESA [Endangered Species Act]. There is a wide body of data concerning many effects from the list of BLM approved inerts and adjuvants and their degradates, readily available through internet search engines. We hope the following data we present will help you to understand this fact. Time constraints, however, force us to highlight only certain compounds, effects and pathways in this comment period. One chemical family and associated health effects is herein highlighted for each of the individual concerns, i.e.; a) For AIs [active ingredients], 2,4-D/endocrine & reproductive; b) For inerts, POEA [polyethoxylated tallowamine] /multiple concerns; c) For adjuvants & degradates, NPE [nonylphenol ethoxylate] /endocrine disruption & acute toxicity. Endocrine disruption will be the primary health effect analyzed that has not been given analysis in the PEIS or supporting documents. NEPA is very clear what agencies must do when there is insufficient data on a potential significant adverse effect: Describe the data gaps that need to be filled and describe either how those shall be filled or why it is not possible to do so.

**Response:** The BLM disagrees that there is a wide body of data on inert and degradate compound toxicity. Among the new herbicides for which the BLM did risk assessments and the USFS herbicides that did not have ecological risk assessments, no active ingredient or inert compounds were found to be clearly associated with endocrine disruption in information available to the BLM or on any agency lists. In response to public comment, the BLM provided more information on degradates and toxicity in Appendix D of the Final PEIS. Also see responses to Comment EMC-0646-017 under PEIS Environmental Consequences, Herbicide Effects Analysis, Comment RMC-0106-037 (POEA) under PEIS Environmental Consequences, Fish and Other Aquatic Organisms, and Comment EMC-0646-102 (2,4-D) under PEIS Environmental Consequences, Herbicide Effects Analysis. The BLM has proposed as mitigation to no longer use formulations of glyphosate that contain POEA, or if no alternative formulations are available, to use the formulation with the lowest amount of POEA. A discussion of how the BLM handled incomplete and unavailable information is found in Chapter 4 of the PEIS under Incomplete and Unavailable Information in the section on How the Effects of the Alternatives Were Estimated.

EMC-0646-024
Californians for
Alternatives to Toxics

**Comment:** It is important for BLM to present the analytical route and investigative tools used to arrive at the conclusion that scientific data had changed little in the toxic profiles of "2,4-D, clopyralid, dicamba, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr," since 1992. It might open a window

BLM_0001589

through which we could understand where this assessment was derived from and support claim that this analysis upholds NEPA.

**Response:** The BLM does not state that the scientific data have not changed; it states that the current toxicity values (derived by USEPA) for these chemicals are not substantially different from the toxicity values used in the earlier risk assessment. Therefore, the results of risk assessments for these herbicides would not change. The previous risk assessments showed that for some herbicide-exposure situations, there is a potential for risk. Still, the BLM conducted a detailed analysis of the human health and ecological risks associated with the use of 2,4-D, clopyralid, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr by using information from recent risk assessments prepared by the Forest Service. In addition, the BLM conducted its own risk assessment for dicamba for this PEIS. Thus, although the scientific data may have changed little since 1992, the BLM still conducted an analysis of these herbicides using up-to-date information.

EMC-0646-031
Californians for
Alternatives to Toxics

**Comment:** The BLM, however, sees no need for concern in the body of scientific data provided since 1992 on endocrine, neurologic or reproductive effects relating to 2,4-D. When the BLM last did an ERA [ecological risk assessment] for 2,4-D, endocrine disruption was an unknown science. And though it was better understood by 1998, it isn't mentioned in the SERA [Syracuse Environmental Research Associates, Inc.] 1998 supporting document. Nor can it currently be found in the BLM PEIS or 2,4-D supporting documents. It has somehow missed detection during the BLM's search for "new human health and ecological health risks" for 2,4-D.

**Response:** See responses to Comment EMC-0646-024 under PEIS Environmental Consequences, Herbicide Effects Analysis, Comment RMC-0221-070 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, and Comment RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0646-038
Californians for
Alternatives to Toxics

**Comment:** In truth, science has come a long way since 1991 with respect to toxicology in general. There are ample reasons why the AIs need to be reanalyzed, and new ERAs [ecological risk assessments] prepared. The above are only a few of them. Every AI [active ingredient], (as well as other components in the final mix), needs to be analyzed for the full range of known health effects, including neurotoxicity, immunotoxicity and endocrine disruption. All data used in this analysis needs to be derived from published and peer reviewed studies and reports, to ensure the integrity of the analysis. Only then can the following statement be made.

**Response:** The BLM agrees that the science with respect to toxicology has come a long way since 1991; it was an important reason for updating the risk assessments for herbicides proposed for used under alternatives B, D, and E. However, the BLM relied on earlier risk assessments to evaluate several herbicides that could be used under Alternative A, but would not be used under alternatives B, D, and E because the current toxicity values (derived by USEPA) for these herbicides are not substantially different from the toxicity values used in the earlier risk assessments. See response to Comment EMC-0646-031 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0646-040
Californians for
Alternatives to Toxics

**Comment:** The analysis must also take into account the fact that real world conditions can often increase the potency of toxic substances. Numerous studies, mostly with insecticides, have demonstrated that pesticide toxicity can increase with environmental

BLM_0001590

RESPONSE TO COMMENTS

factors, such as differences in temperature, water pH, and competition (Boone and Semlitsch 2002, Boone MD, Bridges CM 1999, Zaga et al. 1998). Predatory stress has been also shown to increase pesticide toxicity, in the case of carbaryl, making it anywhere from 4 to 46 times more lethal (Boone and Semlitsch 2001, Relyea and Mills 2001, Relyea 2003). Understanding the complexities of toxic response, and how seemingly insignificant factors can produce different results, is one of the recent advances in the science of toxicology.

**Response:** Varying environmental conditions are confounding factors that make it difficult to attribute effects to the primary independent variable—dose. See the Uncertainty Analysis section of Appendix C of the PEIS for a discussion of compounding factors that can influence the results of a risk analysis and how the BLM tended to err on the side of caution. Also see response to Comment EMC-0646-031 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0646-048
Californians for
Alternatives to Toxics

**Comment:** Another important fact that has been overlooked by BLM in your preparation of the [P]EIS, is, quite simply, whatever comes out the end of the spray nozzle, is the material that BLM is adding to the environment, and which must be analyzed for potential adverse impacts to satisfy the requirements of NEPA. To isolate components of the final mix and pretend that their introduction into the environment is not your responsibility, is, to put it mildly, absurd, in addition to being in violation of law. To state that analysis cannot be attempted because it wouldn't fit into current modeling does not re-leave you of performing other aspects of amassing data and evaluating potential effects ([Draft] PEIS p C-78 [of Appendix C]).

**Response:** The BLM used the most current state-of-the-science methods, toxicity information, models, and risk assessment guidance available to perform the risk assessments. Also see response to Comment EMC-0646-021 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0646-052
Californians for
Alternatives to Toxics

**Comment:** The scientific body of toxicological data concerning chemicals used as inerts or adjuvants, or their degradates, by the BLM, is massive. Some of these substances are 100 to 10,000 times more toxic than the AI they are mixed with. Because the BLM is having trouble locating this data, might we suggest that you start with studies referenced here. Many of these studies then reference other studies which can be then acquired, and those studies reference other studies, etc. This is known as following a reference trail, and very helpful for locating data about specific chemicals or health effects.

**Response:** The BLM disagrees that there is massive literature on inerts, adjuvants and degradates. See responses to Comment 0646-021 under Environmental Consequences, Herbicide Effects Analysis, and Comment EMC-0646-011 and Comment EMC-0646-017 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0646-053
Californians for
Alternatives to Toxics

**Comment:** Interesting enough, the BLM is aware of the importance of viewing the application of the final mix as a singular action. In the Ecological RA [risk assessment; Appendix C of the PEIS] you state; In a detailed herbicide risk assessment, it is preferable to estimate risks not just from the a.i. of an herbicide, but also from the cumulative risks of degradates, inert ingredients (inerts), and adjuvants........However, using currently available models (e.g., GLEAMS), it is only practical to make deterministic risk calculations (i.e., exposure modeling, effects assessment, and RQ derivations) for a single a.i." ([Draft] PEIS [Appendix C] p [page] C-78).

BLM_0001591

This statement raises some serious questions. First, if the NEPA analysis of an agency program calling for the treatment of a million acres a year with toxic substances isn't the right time for a detailed risk assessment, when is? Second, just because current modeling standards don't allow for cumulative analysis risk quotients of all ingredients, this does not excuse BLM from analyzing the individual components and then making assessments as to their cumulative effect. And irrespective of how you perform a cumulative analysis, the individual substances need to be analyzed and toxicologically profiled. As NEPA demands, the BLM must perform the following steps: 1) State "that such information is incomplete or unavailable." 2) "A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts". 3) "A summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts". 4) "An evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community". (40 CFR [Code of Federal Regulations] 1502.22). BLM must analyze all components of the final mixture that pose a risk to human health or the environment. This is an unavoidable reality. NEPA demands it, for endangered species ESA [Endangered Species Act] demands it, and responsible decision making demands it. Claiming that there is no data available for review, when there is a wide body of data with relevant information, does not free BLM from it's responsibilities.

**Response:** See response to Comment EMC-0646-048 under PEIS Environmental Consequences, Herbicide Effects Analysis. The BLM did not limit the assessment to active ingredients, but looked at tank mixes and inert compounds; see response to Comment RMC-0173-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. For example, BLM used GLEAMS modeling for surfactant inert compounds to determine the environmental concentrations and compared them to available toxicity information/levels of concerns. The BLM conducted additional analysis of degradates and endocrine disrupting capability of herbicides for the Final PEIS; see Appendix D. A discussion of how the BLM handled incomplete and unavailable information is found in Chapter 4 of the PEIS under Incomplete and Unavailable Information in the section on How the Effects of the Alternatives Were Estimated. The BLM stated what information was unavailable in the herbicide risk assessments (see CD that accompanies the PEIS) and in Appendixes B and C of the PEIS; the relevance of this incomplete or unavailable information is given in the Uncertainty Analysis sections of the human health (Appendix B) and ecological (Appendix C) risk assessments. The risk assessments and Chapter 4 of the PEIS provide reasonably foreseeable significant adverse impacts and an evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

EMC-0646-054
Californians for
Alternatives to Toxics

**Comment:** In the Consent Decree for *Californians for Alternatives to Toxics et al v. The Environmental Protection Agency*, C00-3150 CW, EPA agreed to considered inerts, adjuvants, degradants and diluents in ESA [Endangered Species Act] consultations undertaken under the CD. This approach should be applied to all analysis of pesticide use in the BLM program where listed species may be affected. The BLM has failed to make such analysis in the draft PEIS.

**Response:** The BLM acknowledges that the USEPA agreed to consider inerts, adjuvants, degradants and diluents in ESA consultations undertaken under the consent decree. See Appendix D of the Final PEIS for an expanded discussion of these substances. During the development of the Final PEIS, the BLM reviewed all available data on inerts and degradants, and associated use of diluents, adjuvants, and surfactants

BLM_0001592

RESPONSE TO COMMENTS

to the extent practicable, given the data that exists and is currently available. The BLM also conducted extensive toxicological risk assessments on the herbicides considered under this PEIS, in addition to and beyond the risk assessments conducted by USEPA to register such ingredients for use under the Federal Insecticide, Fungicide, and Rodenticide Act. The cost to the BLM to assess every possible combination of active ingredient, tank mixture, and degradant, given the lack of information that exists on these substances would be exorbitant.

EMC-0646-055
Californians for
Alternatives to Toxics

**Comment:** Each individual component must be analyzed as an individual action. Then, an analysis of the cumulative effects from all components of the final mix must be performed. Where similar modes of action are identified, this fact must be addressed. There should also be an analysis of cumulative effects both for environmental effects and as they pertain to the general body burden of an individual or species, including how this affects the immune system.

**Response:** See responses to Comments EMC-0646-053 and Comment EMC-0585-203 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0646-058
Californians for
Alternatives to Toxics

**Comment:** The PEIS states that selection of tank mixes and adjuvants is under the control of BLM land managers, and to reduce uncertainties and potential risks, products should be thoroughly reviewed and mixtures with the least potential for negative effects should be selected. As we have noted previously, this is in violation of established law.

None of this rationale concerning analysis or use of inerts, adjuvants, and degradates, satisfies legal requirements. On one hand, BLM is saying that ERAs [ecological risk assessments] are important to decision making. On the other hand BLM is saying that analysis of the full mixture is a) impossible to address and b) will be addressed adequately at the site specific level because land managers and field workers will have the knowledge needed to pick the components that will produce the least toxicity.

**Response:** See response to Comment EMC-0646-053 under PEIS Environmental Consequences, Herbicide Effects Analysis. The BLM evaluated adjuvants in 1991 (USDI BLM. 1991. Final Environmental Impact Statement Vegetation Treatment on BLM Lands in Thirteen Western States. BLM Wyoming State Office. Casper, Wyoming) and as part of the ERAs prepared for each herbicide evaluated by the BLM (and included on the CD that accompanies the Final PEIS).

EMC-0646-059
Californians for
Alternatives to Toxics

**Comment:** Without documentation in support, the BLM claims that there is little data available concerning inerts, adjuvants and degradates currently used by BLM. Then BLM claims that the issues are too complex and are outside the scope of the [P]EIS. Yet BLM expects land managers to have enough information to choose the right combinations of inerts and adjuvants to limit toxicity. If BLM does not provide this data at the program level, where is this knowledge going to come from? Does BLM think that their land managers and field workers spend their free time doing Toxline and PubMed data searches, and studying up on the latest health effects in medical journals, in order to have the knowledge needed to perform their task of choosing "mixtures with the least potential for negative effects".

**Response:** See responses to Comment EMC-0646-053 and Comment EMC-0646-058 under PEIS Environmental Consequences, Herbicide Effects Analysis.

BLM_0001593

| | |
|---|---|
| EMC-0646-060<br>Californians for<br>Alternatives to Toxics | **Comment:** There needs to be an NEPA analysis of individual components at the program level and any additions made in the future so land managers will have a basic understanding of potential effects at the project level. Congress intended that NEPA would serve this purpose. Currently, the Biological Assessment for this program does not even contain the words inert and adjuvant, let alone analyze potential effects, thus illustrating that BLM's failure to realize these mandates have created an Agency-wide incompetence.<br><br>**Response:** See response to Comment EMC-0646-053 under PEIS Environmental Consequences, Herbicide Effects Analysis. The Biological Assessment does reference the mode of action of inerts, but relies on the analysis in the ecological risk assessments for effects to sensitive species and does not differentiate between effects caused by the active ingredient and effects from other components of the herbicide formulation. |
| EMC-0646-062<br>Californians for<br>Alternatives to Toxics | **Comment:** Hopefully, this data will help BLM to see the insufficiency of the statement "it is unlikely that highly toxic degradates or inerts are present in approved herbicides".<br><br>**Response:** See response to Comment EMC-0646-053 under PEIS Environmental Consequences, Herbicide Effects Analysis. |
| EMC-0646-064<br>Californians for<br>Alternatives to Toxics | **Comment:** However, the names of many inerts are known, and from this list we can assess effects. POEA (polyethoxylated tallowamine, listed as polyoxethylene-alkylamine by Monsanto) is the primary inert in the original RoundUp formulation. In every scientific study we have reviewed that deals with the differences in toxicity between glyphosate and POEA in the RoundUp formulation, it has been shown, or stated, that the surfactant POEA was the primary contributor to the toxicity of RoundUp. [See Relyea 2005b, 2005c.]<br><br>**Response:** See responses to Comments EMC-0046-002 and EMC-0257-005 under PEIS Environmental Consequences, Wildlife Resources. |
| EMC-0646-087<br>Californians for<br>Alternatives to Toxics | **Comment:** There are countless inerts in use, or proposed for use, by the BLM. Some are identified through the EPA list of inerts which, (especially in terms of list 3), is dated and provides insufficient data. Some are highly toxic, some are not. The affected community (BLM employees, contract workers, anyone passing through or near the annually treated million acres, all wildlife that call these acres home, etc.) is depending on BLM to amass as much pertinent data, with help from the scientific and environmental communities, and perform an honest evaluation of the known data. It is required under NEPA.<br><br>**Response:** See response to Comment EMC-0646-053 under PEIS Environmental Consequences, Herbicide Effects Analysis. |
| EMC-0646-088<br>Californians for<br>Alternatives to Toxics | **Comment:** When dealing with additives to a tank mixture, it makes little difference whether the chemical is an inert (premixed with the AI [active ingredient] in a commercial mixture), or an adjuvant (mixed in at the tank stage). This is especially true for surfactants, a necessary component of most herbicide mixtures. Since they are essential, their use can be expected. And this use must be analyzed at the program level, in order for there to be reasoned decision making at the project level. |

BLM_0001594

RESPONSE TO COMMENTS

|  | **Response:** See response to Comment EMC-0646-053 under PEIS Environmental Consequences, Herbicide Effects Analysis. The BLM evaluated adjuvants in 1991 (USDI BLM. 1991. *Final Environmental Impact Statement Vegetation Treatment on BLM Lands in Thirteen Western States*. BLM Wyoming State Office. Casper, Wyoming), and in Appendix D of the Final PEIS. |
|---|---|
| EMC0646-099 Californians for Alternatives to Toxics | **Comment:** BLM must analyze the effects of any diluent, including diesel, that may be used with any of the herbicides in its proposed program. |
|  | **Response:** Typical diluents used by the BLM include water, crop oils, penetrator oils, and in the past, diesel. The effects of diesel and kerosene oil were evaluated by the BLM in 1991 (USDI BLM. 1991. *Final Environmental Impact Statement Vegetation Treatment on BLM Lands in Thirteen Western States*. BLM Wyoming State Office, Casper, Wyoming). Diesel is a USEPA List 1 Inert of Toxicological Concern. The BLM in recent years has moved away from using diesel to using water, crop-based adjuvants, and other inert ingredients that are List 3 or 4 ingredients that are of minimal toxicity. |
| EMC-0646-102 Californians for Alternatives to Toxics | **Comment:** Some of the comments provided in Appendix A refer to the document USDA 2003 (or Bakke 2003). This is the current risk assessment for NPEs [nonylphenol ethoxylates] used by the FS [Forest Service]. Since the BLM is piggybacking on FS Ras [risk assessments], it is assumed that the BLM will attempt to piggyback on the USDA 2003 as a supporting document for endocrine disruption [ED] effects from NPEs nonylphenol polyethoxylate's) and other EDs proposed for use. This would be a mistake, as USDA 2003 is limited in it's understanding of endocrine disruptor effects, poorly written, and outdated. |
|  | **Response:** The BLM has prepared a new Appendix D for the Final PEIS to address ED chemicals. None of the herbicide active ingredients are known or suspected EDs, with the possible exception of 2,4-D, which is scheduled for additional USEPA evaluation. The only known ED inert compound used by the BLM is R-11, a NPE compound which is also suspected of being toxic to aquatic life (Stark et al; 2003 Agricultural Adjuvants: Acute Mortality and Effects on Population Growth Rate of Daphnia Pulex after Chronic Exposure, Environmental Toxicology and Chemistry Vol. 22, No. 12, pp. 3056-3061). The USEPA has registered R-11 for aquatic use. The U.S. Department of Agriculture (D. Bakke, Human and Ecological Risk Assessment of Nonylphenol Polyethoxylate-based (NPE) Surfactants in Forest Service Herbicide Applications, 2003) concluded concentrations associated with normal operations are below any levels of concern. Given the lack of agreement in the literature, the BLM proposes to no longer use R-11 as an intentional adjuvant. |
| EMC-0646-146 Californians for Alternatives to Toxics | **Comment:** There is no discussion of endocrine disruption in the PEIS. The only reference to ED [endocrine disruptor] effects that could be found were in the FS [Forest Service] ERAs [ecological risk assessments]. Concerning ED and glyphosate, the FS supporting document, SERA [Syracuse Environmental Research Associates, inc.] 2003b, is one of the few places within the extended body of the PEIS where one can find a discussion of endocrine disruption. Unfortunately, it is a very limited and poorly written analysis. |
|  | **Response:** See responses to Comment EMC-0646-021 under PEIS Environmental Consequences, Herbicide Effects Analysis; Comment RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated; and Comment RMC-0221-070 under PEIS Alternatives, Herbicide Active Ingredients |

BLM_0001595

Evaluated under the Proposed Alternatives.

**EMC-0646-151**
Californians for
Alternatives to Toxics

**Comment:** This limited ED [endocrine disruptor] analysis of glyphosate performed by SERA is, for most extent and purposes, the entire body of analysis relating to endocrine disruption in the whole of the PEIS, PER and supporting documents. Though some of the SERA ERA's [ecological risk assessments] (supporting documents found on the FS [Forest Service] website) contain this brief analysis of ED, it is interesting to note that the SERA ERA for 2,4-D, the most well known ED among the herbicides that are relying on FS ERAs, has no discussion whatsoever of endocrine disruption. A further discussion of endocrine disruption will be provided below in a later section.

**Response:** See response to Comment EMC-0646-021 under PEIS Environmental Consequences, Herbicide Effects Analysis. 2,4-D is not contained on any official government lists as an ED compound; however, the USEPA has targeted 2,4-D for additional ED screening studies, according to USEPA's 2005 Reregistration Eligibility Decision. Also see responses to Comment RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated and Comment RMC-0221-070 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

**EMC-0646-152**
Californians for
Alternatives to Toxics

**Comment:** BLM has proposed one of the largest herbicide projects in history, not only in acreage, but also for the number of active ingredients, inerts and adjuvants at their disposal. Unfortunately, the level of analysis performed is a throwback to the late 1980's. The excuses used for foregoing analysis are: a) Research since 1988 has shown no need to re-analyze 11 of the herbicides in question. As such, it is appropriate to piggyback on analysis provided by the FS [Forest Service]. b) There isn't enough data available to do proper analysis of inerts, adjuvants and degradates, and besides, they're probably harmless anyway. c) The issues are too complex.

**Response:** See responses to Comments EMC-0646-024 and EMC-0646-053 under PEIS Environmental Consequences, Herbicide Effects Analysis.

**EMC-0646-153**
Californians for
Alternatives to Toxics

**Comment:** We have demonstrated, with overwhelming support from scientific data, that: a) Research since 1988 shows a pressing need for re-analysis of all AIs [active ingredients]. The example given is 2,4-D, shown to be an endocrine disruptor, and recently listed as a Proposition 65 reproductive toxicant. b) For many of the inerts, adjuvants and degradates that are known, there is a wealth of information available, for both acute and chronic effects. In some cases, these additives can be 1000 to 10,000 times more toxic than the AI. The examples given, inerts in glyphosate products and NPE [nonylphenol ethoxylate] adjuvants and degradates, have had countless studies performed that are readily available. Endocrine disruption, a family of health effects that was not known in 1988, is now being extensively researched. There are numerous ED's [endocrine disruptors], both known and suspected, among the additives. c) Yes, the issues are very complex. If BLM is not up to the task, then it would be best to abandon the herbicide component of this program, until such time that BLM can effectively carry out it's mandate. When that time comes, all ingredients (and their degradates) proposed and approved for use in this project, will need thorough analysis, updated profiles, and with RA's [risk assessments] for any substance that shows a clear threat to human health or the environment. Cumulative effects analysis is important with or without GLEAMS modeling.

BLM_0001596

**Response:** See responses to Comment EMC-0646-038, EMC-0640-037, EMC-0643-030, and EMC-0646-053 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0647-003
Alaska Community
Action on Toxics

**Comment:** In a systematic review of the peer-reviewed scientific literature concerning health effects of pesticides, a team of physicians from the Ontario College of Family Physicians concluded: "The literature does not support the concept that some pesticides [including herbicides] are safer than others; it simply points to different health effects with different latency periods for the different classes...Some more surprising positive associations were found for pesticides that are considered less toxic in acute poisoning settings...[For example] the herbicides glyphosate and glufosinate had associations with congenital malformations. Parental preconception exposure to glyphosate was associated with late abortion.[1]" Although glyphosate is touted as a "safe" herbicide, the latest science demonstrates that it is associated with serious adverse environmental and health effects.

**Response:** The conclusions of this study do not necessarily reflect a consensus among governmental regulators or the scientific community. The BLM risk assessment was conducted using comprehensive toxicology data supplied by the USEPA.

FL-0001-004

**Comment:** Aerial application is particularly problematic, since only a small fraction of the pesticides actually land on the target pest; the rest drifting off-site causing "unanticipated" health and ecological impacts.

**Response:** See response to Comment RMC-0200-012 under PEIS Environmental Consequences, Air Quality.

FXC-0071-008
Campbell, Bruce

**Comment:** For the ten herbicide active ingredients/formulations which BLM prepared human health and ecological risk assessments for related to these Programmatic documents, did BLM seek data on all tests which are considered to make a complete toxicological profile? If not, why not? If not, did BLM abide by what you mentioned on Page 1-11 [of Chapter 1 of The Draft PEIS]) – which says that "The Council on Environmental Quality Regulations provide direction on how to proceed with the preparation of an EIS when information is incomplete or unavailable: "If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement: 1) a statement that such information is incomplete or unavailable;". Is such a statement in these recent Programmatic BLM documents? If so, where is it? In the human health and ecological risk assessments for the five herbicides/formulations currently available to BLM (bromacil, chlorsulfuron, diuron, sulfometuron methyl, and tebuthiuron) as well as those proposed for future use (diflufenzopyr, diquat, fluridone, imazapic, and Overdrive), where in the documents (if existent) is detailed information about their inert ingredients, adjuvants, and degradation products?

**Response:** The BLM found sufficient toxicological information to proceed with the risk assessments for the active ingredients. The BLM relied on the USEPA's evaluation of the toxicity of inert compounds. Also see responses to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment on Degradates; Comment EMC-0640-036 under PEIS Environmental Consequences, Wildlife Resources on the level of analysis, and Comment RMC-0173-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives on inert ingredients.

BLM_0001597

FXC-0071-018
Campbell, Bruce

**Comment:** Did the risk considerations for the herbicides consider substances such as thalidonmide or such as dioxin contaminants which impact humans much more than those in the animal kingdom? If not, why not(?) – especially when these statements on page B-83 of [Appendix B of] the Draft Programmatic EIS tell of the uncertainty involved when extrapolating similar risk levels from animals to humans" "Extrapolation from animals to humans introduces uncertainty into the risk characterization. Usually, the difference between the human reaction to a chemical and the test animal reaction to a chemical is unknown." And "because the fate of a chemical can differ in animals and humans, it is possible that animal experiments will not reveal an adverse effect that would manifest itself in humans." There will be considerably more on dioxin contaminants under the 2,4-D heading.

**Response:** See responses to Comment RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated, and Comment EMC-0643-030 and Comment FXC-0071-025 under PEIS Environmental Consequences, Herbicide Effects Analysis.

FXC-0071-019
Campbell, Bruce

**Comment:** Despite saying that a commenter during the scoping process urged that the Programmatic documents describe all potential toxicological hazards including the ability of herbicides/formulations to disrupt the hormone system and the immune system, did the Draft Programmatic EIS and Programmatic Environmental Report research impacts of the proposed to be used substances on hormone and immune systems of various species including humans of various ages and health conditions? Where is such an evaluation in the documents? If they were not evaluated, why not?

**Response:** See responses to Comments RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated and Comment EMC-0643-030 and Comment EMC-0646-021 under PEIS Environmental Consequences, Herbicide Effects Analysis.

FXC-0071-020
Campbell, Bruce

**Comment:** Where in the Draft Programmatic documents is analysis of synergistic effects on workers, other humans, animals, threatened/endangered/sensitive species from not only various chemicals within an herbicide formulation, but also different active ingredients being applied together (such as Overdrive®) along with the inert ingredients? Will such analysis be in the final Programmatic BLM document regarding vegetation treatment? Also, seeing that many species travel, and seeing that herbicides drift and runoff (as well as direct aquatic habitat application) will bring various residues to similar areas to impact various species. I object to BLM scientists getting access to USEPA's inert ingredient Confidential Business Information and yet not share this info with the public. It is clear that both EPA and BLM are in bed with the chemical industry, so rather than getting assurance that key info is being shared, it is clear the agencies and industry are winking at each other and not interested in true analysis of effects from inert ingredients, active ingredients, synergistic effects, etc. Also, was any analysis conducted in regards to species exposed to various herbicide formulations and also exposed to fire retardants which on page 4-59 of the PEIS [Draft PER] admits are "especially harmful to aquatic organisms?"

**Response:** The BLM did evaluate approved mixtures of active ingredients (tank mixes) in the risk assessments (see Adjuvants and Tank Mixtures in Appendix C of the PEIS and individual ecological risk assessments included on the CD that accompanies the PEIS). Additionally, the BLM did obtain and evaluate inert compound information, and is required by law to maintain confidential business information proprietary. Fire retardants rapidly degrade in the environment, are not commonly applied to herbicide

BLM_0001598