RESPONSE TO COMMENTS

treatment areas, and are restricted to upland non-aquatic or riparian uses. Also see response to Comment RMC-0122-002 under Appendix C.

FXC-0071-025
Campbell, Bruce

**Comment:** I do not have time to get into harmful impacts from specific active ingredients – with the exception of 2,4-D and glyphosate which I will paste below. Also in regards to 2,4-D, I cannot find the specific info currently, but it was more than half the time that 2,4-D contains either the 2,3,7,8-TCDD dioxin contaminant or the 1,2,3,7,8-Pentachlorodibenzo-p-dioxin which are the two considered to have the highest Toxic Equivalency Value (thus the most toxic). As far as other active ingredients, besides reminding you that the document says that animals (like horses and burros were just mentioned) could suffer "death" as well as many ailments due to herbicide Spraying, please look at some of your own material to discover health and safety hazards for many species due to this massive BLM herbicide application plan.

**Response:** The BLM provides an analysis of the risks associated with using 2,4-D, glyphosate, and other herbicides the BLM proposes to use in Chapter 4 and in Appendices B and C of the PEIS, and in the ecological risk assessments prepared by the BLM (an included on the CD that accompanies the PEIS) and Forest Service (http://www.fs.fed.us/foresthealth/pesticide/risk.shtml). According to the USEPA's 2005 Reregistration Decision for 2,4-D, the dioxin/furan contaminants were always low in 2,4-D in the 1980s, and the industry has since reduced these contaminants. Using 1987 data, the USEPA found cancer and noncancer effects from these contaminants to be of no toxicological concern.

FXC-0075-004
Citizens for Fire Safety
Sanity

**Comment:** The mandate of the BLM is not to conduct "risk assessments" for pesticide use. Please inform us as to how many toxicologists the BLM employs and location of the laboratories that allow the BLM to conduct this kind of research. Our impression is this is the responsibility of the EPA to do this kind of research though their efforts have been sabotaged by the Bush Administration.

**Response:** It is not the BLM's mission to conduct herbicide research. It is the USEPA's mission to regulate pesticides; hence the BLM's reliance on USEPA data, models, and guidance. The BLM contracted the toxicological services for preparation of the ecological risk assessments, and consulted with in-house and other federal toxicologists and scientists. Also see response to Comment EMC-0640-036 under PEIS Environmental Consequences, Wildlife Resources.

RMC-0095-008
New Mexico
Department of Game
and Fish

**Comment:** The second major omission in the D[raft] PEIS is the failure of the document to analyze or address the long-term persistence (fate) of these chemicals in the environment, particularly as they pertain to adverse affects to groundwater resources and amphibians. Many of the herbicides discussed in the D[raft] PEIS have been identified as groundwater contaminants. As a likely result of the long-term persistence of some of these chemicals in the environment, recent research has implicated atrazine, an herbicide currently approved for use by the BLM, in causing reproductive malformations in frogs. The PDEIS [Draft PEIS] states that atrazine has not been used much in the last few years by the BLM, but does not discuss why, or why it should be reauthorized for use in this PDEIS [Draft PEIS].

**Response:** See response to Comment EMC-0316-003 under PEIS Environmental Consequences, Soil Resources. The BLM would not be allowed to use atrazine and five other herbicides currently approved for use under the three of the action alternatives (the Preferred Alternative and alternatives D and E). Alternative C prohibits the use of all herbicides.

BLM_0001599

RMC-0106-040
Public Employees for
Environmental
Responsibility

**Comment:** P. 4-173 [of the Draft PEIS]. Inerts. a) Analysis of Confidential Business Information is done only for the 6 active ingredients in this section. While HHRAs [human health risk assessments] may have been assessed in previous EISs (1988, 1989, 1991), none of these assessed inert components except to state that most of the formulations did not contain USEPA List 1 and 2 substances. Therefore, this PDEIS [Draft PEIS] assesses inert components for only 33 percent of the herbicides proposed to be used.

**Response:** Toxicity information was sought and evaluated for all inerts. Confidential Business Information was analyzed for dicamba, diflufenzopyr, fluridone, imazapic, oust, diuron, bromacil, fosamine, chlorsulfuron, and tebuthiuron, and all inerts were classified by the four USEPA list categories.

RMC-0106-041
Public Employees for
Environmental
Responsibility

**Comment:** The USEPA categorization cited is incomplete. List 4 has two subdivisions: 4a inerts of minimal risk; 4b substances that have yielded sufficient information to determine that current uses have no adverse public health or environmental effects. This D[raft] PEIS lumps all List 4 inerts under 4a. However, the wording of 4b requires knowledge of when each item included was evaluated and what uses were then "current," and what cumulative impact might be relevant.

**Response:** We have revised the text in the Final PEIS to reflect that there at two subdivisions for List 4 inert ingredients.

RMC-0106-045
Public Employees for
Environmental
Responsibility

**Comment:** A perusal of this literature gives no confidence that the BLM's assessment of inerts in 6 herbicide formulations is sufficient.

**Response:** See response to Comment RMC-0106-040 under PEIS Environmental Consequences, Herbicide Effects Analysis.

RMC-0106-047
Public Employees for
Environmental
Responsibility

**Comment:** Thus, at least 21 inerts in 50% of the herbicides proposed for use are potentially harmful to human health and to the environment. How many of the inerts in List 4 are actually harmful to human, plant, and wildlife receptors by current or cumulative use is unknown—this is underscored by the statement re inerts (p. C-83) that "relatively little toxicity information was found (from 6 sources). A few acute studies on aquatic or terrestrial species were reported. No chronic data, no cumulative effects data and almost no indirect effects data (food chain species) were found for inerts in the 10 herbicides [Appendix C evaluates one herbicide not proposed for use in the Draft PEIS].

**Response:** By definition, according to the USEPA, List 4 inerts are of minimal risk (List 4A) or there is sufficient data to indicate that they can safely be used in pesticides (List 4B). Hence, the USEPA has determined that they have minimal toxicity and risk to humans, plants, and wildlife. As shown on Page C-83 of Appendix C of the PEIS, only 12 inerts of unknown toxicity were found for 10 herbicides. All herbicides evaluated in Appendix C are used, or proposed for use, by the BLM. Also see response to Comment RMC-0106-041 under PEIS Environmental Consequences, Herbicide Effects Analysis.

RMC-0106-055
Public Employees for
Environmental
Responsibility

**Comment:** P. [Page] 4-178 [of the Draft PEIS]. It is stated that in all steps in the HHRA [human health risk assessment] evaluation process, "…assumptions must be made due to a lack of absolute scientific knowledge." For too much of this process, the problem is the absolute lack of knowledge.

BLM_0001600

RESPONSE TO COMMENTS

**Response:** Risk assessments will always be an evolving art and science. USEPA-approved state-of-the-science methods were used in the BLM risk assessments. A large body of toxicological literature was available for each of the herbicides.

RMC-0130-004
Craig, Diane

**Comment:** I also question where does the research on these chemicals come from? – how long were the studies done and on what subjects, and for what result were they looking for. I would hope that the vast majority of the population understands is that it is the chemical companies themselves that provide the information on these chemicals and it is their studies that are used – not biased at all is it!

**Response:** See responses to Comment RMC-0069-009 under PEIS Alternatives, Monitoring. The USEPA is the federal agency designated to regulate pesticides (including toxicity testing) and does so in concert with its statutory authority and judicial review. Extensive human health toxicity profiles were provided in Appendix B of the PEIS under Toxicity Profiles in the Hazard Identification section. These profiles were based on USEPA documents, which rely in part on manufacturer studies, as well as on literature searches using the National Library of Medicine's Hazardous Substance Database and Toxline.

RMC-0159-008
Proctor, Gradey

**Comment:** Dicamba also contains numerous toxic inert ingredients. Virtually all the testing that has been done on Dicamba have been on the chemical itself, not the products and their inert ingredients and contaminants. There is evidence that these other ingredients greatly increase the toxicity and the health risks. We are very concerned that these health risks are largely unknown and believe that the [P]EIS should disclose how little we know about the health and environmental risks associated with this chemical, the other herbicides proposed for use, including the inert ingredients, and any other chemicals used on BLM land, including but not limited to rodenticides, fire retardants, fire propellants, and any other pesticides, and the potential for synergistic effects with surfactants, and between chemicals if multiple chemicals are used at the same location over time. We also believe that what we do know enough about the risks to know that the toxicity of these chemicals far outweighs many of the dubious benefits of herbicide treatments.

**Response:** While no information was gathered by the BLM on synergism with non-herbicides, rodenticides and other non-herbicide pesticides are either not used or are infrequently used by the BLM. Fire propellants and retardants are sparingly used, and generally not in the same locations and at the same time as herbicides. All of these chemical classes are either rapidly degraded in the environment or are not used. Dicamba does not contain any inert ingredients on USEPA List 1 or List 2, and contains only one ingredient on List 3, indicating that dicamba formulations do not contain substances of known toxicity. Another inert is on List 4B, and one is unlisted but is a common naturally occurring mineral.

RMC-0173-008
Delles, Susan

**Comment:** Inert ingredients of chemicals do not require listing on the label. Health and safety studies are kept secret so the public does not know possible dangers. However, many of these "Inert Ingredients" can add to the toxicity of the product. Included for reference on pg   is a list of Inert Ingredients for 2,4-D. (Journal of Pesticide Reform, Winter 2005 Vol 25 #4 obtained by them through a Freedom of Information Act request). These ingredients are rarely disclosed to the public.

**Response:** Inert ingredients are regulated as confidential business information, and the BLM is prohibited from explicitly identifying them in a product. However, the BLM received approval from the USEPA to review the list of inerts for the 10 herbicides

BLM_0001601

evaluated by the BLM in their risk assessments. The results of that review are provided in Appendix C of the PEIS under Degradates, Inert Ingredients, Adjuvants, and Tank Mixtures in the Uncertainty Analysis section. Also see response to Comment RMC-0106-004 under PEIS Alternatives, Monitoring.

RMC-0191-009
Ertz, Brian

**Comment:** This citation of scientific literature suggesting the necessity that degradates be considered when prescribing herbicide application is wise. Scientific studies undertaken by the USGS [U.S. Geological Survey] confirm the necessity for degradate consideration. How are we to know that the EPA's thresholds or RTE [rare, threatened, and endangered] species' toxicity thresholds for concentration levels have not been exceeded when as studies out of the USGS indicate that frequencies of detection in ground water for a given herbicide increased multifold when its degradates are considered (Kolpin, Thurman, and Linhart 1998). The "GLEAMS" model protocol the agency uses (D[raft] PEIS [on page] C-17 [of Appendix C) to assess concentration levels of herbicides in environments associated with treatment makes no mention accounting for pre-existing concentrations associated with adjacent public or private (agricultural, adjacent agency, organic wastewater contaminants, etc.) treatment, the cumulative toxicity levels associated with these contaminants in addition to degradates resulting from proposed treatment will inflate levels of toxic chemicals beyond those accounted for in the model.

**Response:** Additional text on degradates associated with the herbicides under consideration is included in Appendix D of the Final PEIS. Very little fate or toxicological data are available for herbicide degradates, so a quantitative assessment is not feasible. The risk assessments were designed to assess the potential risks associated with individual herbicides as applied by the BLM, not all potential sources of risk within a watershed. There is no sound way to estimate background levels of contaminants in the environment and incorporate that information into a quantitative risk assessment. Section 4 (Environmental Consequences) of the PEIS includes a qualitative discussion of potential cumulative impacts on the environment due to the effects of BLM vegetation treatments. The Uncertainty Associated with Herbicide Concentration Models section of each ecological risk assessment (ERA) indicates that "unidentified stressors" may have an unknown effect on the results of the ERA (copies of each ERA are included on the CD that accompanies the Final EIS). These unidentified stressors may include herbicides or other chemicals added to the environment by agricultural or industrial sources.

See response to Comment RMC-0191-007 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives regarding consideration of degradates, and response to Comment EMC-0646-164 under PEIS Environmental Consequences, Herbicide Effects Analysis regarding multiple treatments within a watershed. The BLM examined USGS data for herbicides in surface water and groundwater (Larsen et al, 1997 Pesticides in Surface Waters, distribution, Trends, and Governing Factors, Ann Arbor Press, Chelsea, Michigan.; Scribner et al. 2002. Reconnaissance Data for Glyphosate, Other Selected Herbicides, Their Degradation Products, and Antibiotics in 51 Streams in Nine Midwestern States, U.S. Geological Survey Open-File Report 03–217). Few, if any, data points were available for surface waters in proximity to BLM-administered lands except downstream of urban areas. Most of this work has been reported for agricultural areas where herbicides are intensively used and groundwater is often shallow. The GLEAMS model does not account for preexisting conditions, but concentrations of herbicides on public lands should be none to low, depending upon the recency and frequency of herbicide applications on or near the treatment site, and the type of herbicide used. However, as

BLM_0001602

RESPONSE TO COMMENTS

stated in Appendix C of the PEIS under GLEAMS in the Concentration section, the GLEAMS modeling approach either approximates or overestimates the rate of loading observed in the field. Thus, the conservative nature of the model may indirectly account for the risks associated with preexisting conditions.

RMC-0191–010
Peacock, Delores (Dog Valley Ranch)

**Comment:** The BLM claims to be sensitive to the risks associated with use of herbicides pointing to the "acceptable" levels at which the herbicides it hopes to approve break down. However, the degradates that these herbicides break down into are sometimes as harmful if not more harmful than the parent herbicides (Kolpin, Thurman, and Linhart 1998). Given these findings regarding the effects that degradates have on both human and environmental health, Koplin concludes that, "it is essential that degradates are included in any type of herbicide investigation" (Kolpin, Thurman, and Linhart 1998). As we can see in section 7.3.1 the BLM agrees. However, the agency states that, "it is beyond the scope of this risk assessment…" (D[raft] PEIS [page] C-83). We've heard this before in reference to the Restore Native Ecosystems Alternative being "beyond the scope" of the Vegetation Treatment [P]EIS. This "unknown" cannot be accepted.

**Response:** See response to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment.

RMC-0191-011
Ertz, Brian

**Comment:** Given these findings regarding the effects that degradates have on both human and environmental health, Koplin concludes that, "it is essential that degradates are included in any type of herbicide investigation" (Kolpin, Thurman, and Liinhart 1998). As we can see in section 7.3.1 the BLM agrees. However, the agency states that, "it is beyond the scope of this risk assessment ..." (DPEIS [Draft PEIS page] C-83). We've heard this before in reference to the Restore Native Ecosystems Alternative being "beyond the scope" of the Vegetation Treatment EIS. This "unknown" cannot be accepted.

**Response:** See responses to Comment RMC-0191-007 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, and Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment.

RMC-0191-012
Ertz, Brian

**Comment:** In addition to the actual toxicity levels of treated or affected waterways being neglected in favor of superficial consideration of isolate herbicide parent compounds, the effect of synergistic and antagonistic interactions between herbicides, degradates, and previously existing contaminants in watersources were not adequately (not at all) considered in either the herbicide ERAs [ecological risk assessments] nor the Biological Risk Assessments submitted by the BLM. All considerations of risks associated with application of herbicides to specific species were conducted as if these species were only being exposed to a given herbicide. Studies have shown the presence of various Organic Wastewater Contaminants (OWCs) in streams across the country. Such compounds represent the fallout of pharmaceuticals, hormones, pesticides, etc. that inevitably find their way into our waterways as a result of water treatments' inability to break them down. Scientists wonder about the potential for increased toxicity of chemical *mixtures* and about the effects that such interaction may have on the health of humans and aquatic ecosystems (Kolpin et al. 2002). The adverse affects of such mixtures can be pronounced and implicate the endocrine, immune, and nervous systems of humans and animals alike (Porter et al 1999). Neurological, endocrine, immune, and developmental effects may show up only when pesticides are tested in combination (Boyd et al., 1990; Porter et al., 1993). I make this point to illustrate the inadequate consideration that has been given to the health of our

BLM_0001603

ecosystems and human populations should such a drastic upsurge in the use of herbicides be allowed to take place as the Preferred Alternative prescribes. I am concerned that given the little we know about the pre-existing chemicals that are persistent in our environments (which include the lands managed by the BLM) as a result of both public and private use (agriculture, pre-existing agency treatments, joe-sixpack's overzealous landscaping techniques, waste disposal, etc.) and their effect on human and environmental health, to administer more chemicals into the soup that already exists is extremely unwise. It's akin to a pharmacist handing a patient a bottle of volatile pills without ever asking whether the patient is on any other drugs. This in conjunction with the agency's seemingly lackluster mentioning of these issues without the good-faith effort and scientific consideration that one would hope for, let alone being prescribed in the BLM's own account and by the body of scientific literature, is unfortunate and negligent.

**Response:** See responses to Comments RMC-0191-009, RMC-0221-070, and Comment RMC-0159-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. In addition, very little fate or toxicological data are available for herbicide degradates, so a quantitative assessment is not feasible. Furthermore, there is no sound way to estimate background levels of contaminants in the environment and incorporate that information into a quantitative risk assessment. It is impractical and beyond the scope of this PEIS to evaluate the potential effect of all possible non-herbicide contaminants in all surface water bodies of 17 western states.

RMC-0191-014
Ertz, Brian

**Comment:** The lack of consideration for the science regarding degradates, baseline toxicity levels, the potential for increased toxicity to species given mixtures etc. constitutes a failure on the part of BLM to give adequate consideration to relevant scientific data required by NEPA (See 40 C.F.R. [Code of Federal Regulations] §§ 1500.1(b); 1502.24; *Native Ecosystems Council v. United States Forest Serv.* (9th Cir. 2005) 418 F.3d 953, 964.).

**Response:** See response to Comment EMC-0623-017 under PEIS Environmental Consequences, Herbicide Effects Analysis regarding degradates and mixtures. See Appendixes B and C in the Final PEIS for the risk analysis results and the methodology used to evaluate herbicide toxicity and risks associated with mixtures, including the section in Appendix C on Degradates, Inert Ingredients, Adjuvants, and Tank Mixtures. Incomplete and unavailable information is presented in Chapter 4 of the PEIS under Incomplete and Unavailable Information in the section on How the Effects of the Alternatives were Estimated. The BLM adequately considered the relevant, extant scientific data on the toxicity and degradates of the herbicide active ingredients evaluated in the PEIS. Also see responses to Comment EMC-0646-048 under PEIS Environmental Consequences, Herbicide Effects Analysis, Comment RMC-0191-007 and Comment RMC-0159-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, and Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment.

RMC-0204-007
Wroncy, Jan (Gaia
Vision/Canaries Who
Sing)

**Comment:** The Draft [P]EIS does not consider obtaining informed consent from the members of the public who are assumed to be likely to receive some amount of exposure from pesticides, by-products, contaminants, pyrolytic or phytolytic products, petroleum distillates, inerts, surfactants, smoke, fire ignitors and/or fire retardants that may be used in the vegetation management program. First of all there is not complete information given as to the full formulations of the pesticides, what their inerts are, what their breakdown products are, their pyrolytic or phytolytic products, what surfactants, Spreader-stickers, activators or contaminants are in them, much less any

BLM_0001604

RESPONSE TO COMMENTS

health, environmental fate or impact information about them. The full formulations of the pesticides are usually not even tested; only the inert ingredients. How can the BLM ever hope to get informed consent without providing the "information" to the public being asked to give their consent. To expose people to chemicals and/or smoke without their explicit prior informed consent is, many of us would argue, in fact a criminal act, not becoming of a public agency.

**Response:** The BLM will post locations intended for herbicide use to warn people to stay out until the restricted entry interval has elapsed. Extensive information about the human toxicity of the herbicides is provided in the PEIS and human health risk assessment that accompanies the PEIS (and is included on the CD that accompanies the Final PEIS). The active ingredients were evaluated in the risk assessment, while the inert ingredients (Confidential Business Information) were determined to be of minimal risk to humans or had no known toxicity data. Also see responses to Comment RMC-0173-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, Comment EMC-0646-048 under PEIS Environmental Consequences, Herbicide Effects Analysis, Comment RMC-0159-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment, and Comment RMC-0191-007 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

RMC-0208-040
California Oak
Foundation

**Comment:** Ultimately, "little is known about the fate of pesticides (transport, dissolution, degradation, and deposition onto soil, plants, and water) and their impact on ecosystems in the topographically complex landscape of California." (Exhibit 23.) In some cases, pesticide residue in winter and SPRCing rain and snow has been found at levels " 'uncomfortably close' " to the published median concentrations." *(Ibid.)*.

**Response:** The BLM disagrees with the commentor. Herbicides proposed for use by the BLM have been used for many years, and many studies have been conducted on the fate of these chemicals in the environment. This information is provided in Sections 3.2 (Herbicide Physical-chemical Properties) and 3.3 (Herbicide Environmental Fate) in the ecological risk assessments prepared by the BLM for each herbicide and in the risk assessments prepared by the Forest Service (http://www.fs.fed.us/foresthealth/pesticide/risk.shtml) that were used by the BLM for the PEIS.

RMC-0208-058
California Oak
Foundation

**Comment:** California's ecosystems are also contaminated by a number of other active ingredients that are not proposed for use by the BLM. Nevertheless, the synergistic effects of these active ingredients must be assessed in order to project the real potential for cumulative impacts of the BLM's vegetation management program. (See exhibits 23, 24, 25 [studies assessing the potential of different herbicides to interact cumulatively and/or synergistically in both the aquatic and terrestrial environments].)

**Response:** See response to Comment EMC-0590-029 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods. The exhibits only reference glyphosate plus its surfactant adjuvant, and triclopyr formulations in separate mixtures (e.g., triclopyr not mixed with glyphosate) and with differing water hardness. It is well known that surfactants enhance toxicity to plants and potentially to aquatic life. The BLM did evaluate the potential for synergistic effects in Appendix C of the PEIS under Degradates, Inert Ingredients, Adjuvants, and Tank Mixtures.

BLM_0001605

| | |
|---|---|
| RMC-0210-021<br>MCS Task Force of<br>New Mexico | **Comment:** The PEIS fails to disclose the identity of the "inert" ingredients in the products containing the six active ingredients evaluated in this risk assessment. It states that BLM scientists obtained this information, but claims that because it is considered Confidential Business Information, it cannot be disclosed to the public ([Draft] PEIS [page] 4-173). The [Draft] PEIS further claims that the majority of the inerts are of "minimal risk" and only a few are on EPA's List 3, "Inerts of Unknown Toxicity". But failing to provide the identity of the inert ingredients prevents the public from being able to affirm or refute this claim and thus violates NEPA. The BLM is, in effect, saying "just trust us" rather than providing the public with the information it needs to fully participate in the EIS process. Under NEPA, an Environmental Impact Statement is (EIS) required to provide "high quality" data to the public. Providing "no" data on the identity of the inert ingredients, even though this information is known BLM and relied upon to reach conclusions in the draft PEIS, falls far short of providing "high quality" data.<br><br>**Response:** The BLM is prohibited by law from releasing Confidential Business Information. See response to Comment RMC-0106-004 under PEIS Alternatives, Monitoring. |
| RMC-0210-022<br>MCS Task Force of<br>New Mexico | **Comment:** The BLM should only have considered using and analyzing herbicides whose manufacturers were willing to provide the identity of inerts in their products and allow this information to be disclosed to the public.<br><br>**Response:** See response to Comment RMC-0210-021 under PEIS Environmental Consequences, Herbicide Effects Analysis. |
| RMC-0210-027<br>MCS Task Force of<br>New Mexico | **Comment:** The draft PEIS and Forest Service Risk Assessments fail to adequately analyze the herbicides proposed for use regarding their potential endocrine-disrupting effects. While herbicide active ingredients are evaluated for gross reproductive and developmental effects, many endocrine-disrupting effects are far more subtle.<br><br>**Response:** See response to Comment RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. |
| RMC-0210-029<br>MCS Task Force of<br>New Mexico | **Comment:** According to Theo Colborn: The U.S. EPA has rarely used the open literature in its risk assessments, generally using only data submitted by manufacturers. Industry continues to use traditional toxicology protocols that test for cancer, reproductive outcome, mutations, and neurotoxicity, all crude endpoints in light of what is known today about functional endpoints. In using manufacturer data, the U.S. EPA misses almost all delayed developmental, morphologic, and functional damage of fetal origin ... Brucker-Davis (1998) published a comprehensive review of the open literature in which she found 63 pesticides that interfere with the thyroid system – a system known for more than a century to control brain development, intelligence, and behavior. Yet, to date, the U.S. EPA has never taken action on a pesticide because of its interference with the thyroid system. (A Case for Revisiting the Safety of Pesticides: A Closer Look at Neurodevelopment by Theo Colburn, Env. Health Perspectives, Vol. 114, No. 1, January, 2006, http://ehp.hiehs.nih.gov/members/2005/7940/7940.pdf). The EPA has, however, expressed concern that "Based on currently available toxicity data, which demonstrates effects on the thyroid and gonads following exposure to 2,4-D there is concern regarding its endocrine disruption potential" (EPA Reregistration Eligibility Decision for 2,4-D, June, 2005, p. 21, www.epa.gov/oppsrrd1/REDs/24d_red.pdf). The EPA also noted there was a need for further testing of 2,4-D regarding its endocrine- |

BLM_0001606

RESPONSE TO COMMENTS

disrupting potential.

**Response:** See response to Comment RMC-0222-104 under PEIS Environmental Consequences, Herbicide Effects Analysis.

RMC-0210-030, 036
MCS Task Force of
New Mexico

**Comment:** The draft PEIS errs in placing too much emphasis on the concept of RfD [reference dose] and not placing enough emphasis on prudent concerns regarding the hazards of applying toxic herbicides to the environment, including their potential to cause adverse effects in humans, wildlife, vegetation, and water resources.

**Response:** The RfD is the USEPA's reference dose, which is derived from toxicity studies of laboratory animals. Safety factors are used to address uncertainty from interspecies extrapolation or high to low dose extrapolation. Safety factors are fundamental in extrapolating to other non-target species, be they humans, wildlife, or plants. Although a firm experimental basis does not exist for safety factors, toxicologists have used them for many years to address uncertainty. The BLM and Forest Service conducted risk assessments for the herbicides the BLM proposes to used under the PEIS; the risks associated with the use of these herbicides are given in the ecological risk assessments, and in Chapter 4 and Appendixes B and C of the PEIS. Based on this information, the BLM developed Standard Operating Procedures and mitigation to prevent or minimize risks associated with the use of these herbicides, as discussed in Chapter 2 of the PEIS under the Herbicide Standard Operating Procedures and Mitigation sections.

RMC-0210-032
MCS Task Force of
New Mexico

**Comment:** a) Too narrow a focus on the NOAEL [no-observed-adverse-affect-level] means that information on the shape of the dose-response curve is ignored. Such data could be important in estimating levels of concern for public safety. b) As scientific knowledge increases and the correlation of precursor effects (e.g., enzyme induction) with toxicity becomes known, questions about the selection of the appropriate "adverse effect" arise. c). Guidelines have not been developed to take into account the fact that some studies have used larger (smaller) numbers of animals and, hence, are generally more (less) reliable than other studies. These and other "scientific issues" are not susceptible to immediate resolution, since the data base needed is not yet sufficiently developed or analyzed. U.S. EPA work groups are presently considering these issues.

**Response:** Concerning the NOAEL, the shape of the dose response curve is typically only important at higher doses, and not at the no effect level. It is most conservative to use the NOAEL as the BLM did. Enzyme induction may not be an adverse effect; it may simply be a defensive response that has no adverse effect on health. The USEPA animal testing guidelines specify the minimum number of animals for statistical significance.

RMC-0210-033
MCS Task Force of
New Mexico

**Comment:** The term "safety factor" suggests, perhaps inadvertently, the notion of absolute safety (i.e., absence of risk). While there is a conceptual basis for believing in the existence of a threshold and "absolute safety" associated with certain chemicals, in the majority of cases a firm experimental basis for this notion does not exist.

**Response:** A safety factor does not represent absolute safety. It is a mechanism to extrapolate from one species to another by dividing a toxicity dose by a factor such as 10 or 100 or another quantity to provide conservatism for assessing risks to non-target species. Use of safety factors or uncertainty factors is an empirical principal that has been used by toxicologists world-wide for many years, based on extensively studied

BLM_0001607

chemicals and extrapolations from (1) individual to individual, (2) species to species, and (3) acute to chronic effects.

**RMC-0211-013**
Ghandi, Theresa Marie K.

**Comment:** I'll start with the science BLM used in the draft PEIS. So called "scientific studies" produced by USEPA and included in the PEIS are not "verifiable science". Science relies on observation and classification being verifiable by other scientists. If you do not publish something in a sufficiently complete way that an independent scientist can replicate results and is peer reviewed, it is not acceptable science by any reputable scientist. No one can replicate an experiment or testing involving secret substances. The United States pesticide (includes herbicides) regulatory system, i.e. USEPA and BLM's PEIS fail to meet basic criteria of the scientific method: ability to be verified and reproduced with 0.95 of original study by other scientists and this submitted for peer reviewed scientific study.

**Response:** Most (not all) of the toxicological studies were performed under USEPA oversight for registration. Extensive directives specify USEPA requirements and quality assurance/quality control. When the USEPA receives data, they are carefully reviewed and commented on by USEPA scientists. Studies are sometimes rejected and must be redone. Testing results are public information. The BLM also reviewed the scientific literature for toxicity information. See responses to Comment RMC-0069-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives and Comment EMC-0640-036 under PEIS Environmental Consequences, Wildlife Resources.

**RMC-0211-017**
Ghandi, Theresa Marie K.

**Comment:** The PEIS can not be trusted to protect the public, wildlife, aquatic life, birds, cattle and other range animals and the vegetation these species feed upon because peer review scientific tests were not done on the Endocrine Disruption aspects of herbicides used by BLM. This omission eliminates the possibility that results of the so called "scientific studies" included in the BLM PEIS are reliable and can be trusted to protect the public.

**Response:** See responses to Comment RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated, Comment EMC-0267-005 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives regarding endocrine disruption aspects, and Comment EMC-0640-036 under PEIS Environmental Consequences, Wildlife Resources regarding the quality of the studies used to evaluate risks from the use of herbicides.

**RMC-0211-018**
Ghandi, Theresa Marie K.

**Comment:** Although short term tests for cancers were included I did not find any test results for endocrine disruption on the proposed chemicals in the PEIS. The chemical family tree of organophosphates, chlorinated hydrocarbons, organochlorines, furans, dioxins and PCBs [polychlorinated biphenyls] are proven endocrine disruptors. That means that the chemicals disrupt the body's hormonal system, be that human, bird, aquatic, livestock or wild life, i.e. wild horses (the last of them) or collaterally damaged vegetation. Omitting and or ignoring the peer reviewed scientific studies of the endocrine disruption aspects of herbicides proposed to be used by BLM threatens the extinction of all life species down stream and proposed areas of application by interfering with hormones necessary to reproduction.

**Response:** None of the chemical classes listed above include herbicides that are used or proposed for use by the BLM. The BLM conducted additional analysis on herbicides used or proposed for use by the BLM for their potential to be endocrine disruptors for the Final PEIS; this information is provided in Appendix D of the Final

BLM_0001608

RESPONSE TO COMMENTS

EIS. Also see response to Comment RMC 200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

RMC-0214-047
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** The BLM has failed to consider the epidemiological data on adverse reproductive outcomes and the data on steroid hormone disruption in the Preferred Alternative and the other alternatives incorporating use of 2,4-D in the D[raft] PEIS.

**Response:** See responses to Comment RMC-0218-027 and Comment RMC-0222-104 under PEIS Environmental Consequences, Herbicide Effects Analysis, and Comment EMC-0324-011 under Environmental Consequences, Human Health and Safety.

RMC-0216-009
Neff, Jack

**Comment:** BLM submits no contingency for the foreseeable consequences resulting from a combination of the nine active ingredients (2,4-D, chlorsulfuron, clopyralid, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr) likely released in the toxic spill on BLM land.

**Response:** Prior to the application of an herbicide on BLM-administered lands, the agency prepares a Pesticide Use Proposal which is tied into the Environmental Assessment. Proposals are specific for a site or a particular weed species. An understanding of how each herbicide is to be used is needed to prepare the plan. The nine herbicides identified in the comment would not all be in the same spray tank, since some of them are selective for the management of broadleaf species, while others offer no selectivity. Some are applied and require incorporation into the soil for their herbicidal activity to be expressed. Given the different properties associated with each herbicide identified, all of them would not be used in a single application. Also see response to Comment RMC-0122-002 under Appendix C.

RMC-0216-020
Neff, Jack

**Comment:** BLM's language to describe the environmental consequences of the draft [P]EI[S]R probably comes directly from the warning labels, instruction labels and disclaimer language provided by the manufacturers of these harmful, toxic products.

**Response:** The information used to describe the environmental consequences that is contained in Chapter 4 and Appendixes B and C of the PEIS was taken or based on information provided in the risk assessments conducted by the BLM and Forest Service, the scientific literature, discussions with agencies and field personnel, and other credible sources of information about the risks associated with the herbicides. Warning labels and instruction labels were used to help develop the Standard Operating Procedures. Also see response to Comment EMC-0640-036 under PEIS Environmental Consequences, Wildlife Resources.

RMC-0216-023
Neff, Jack

**Comment:** BLM never acknowledges its responsibility under the law to insure these hazardous chemicals are used safely because BLM cannot insure these hazardous chemical are used safely. BLM wants to bring in thousands of workers into environmentally-sensitive habitats and abdicate control over substances which constitute a threat to national security.

**Response:** The BLM believes that the new herbicides are safe to use under the typical application scenarios, with the mitigation measures and other site-specific and safety precautions associated with the label. Also see responses to Comment RMC-0208-040 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, and Comment EMC-0267-002 under PEIS Proposed Action and Purpose and Need, Federal Laws, Regulations, and Policies that Influence Vegetation Treatments.

BLM_0001609

RMC-0218-021
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** Generally the synergistic effects of combined active ingredients in formulas, chronic toxicity effects, effects on amphibians, insects and vital soil functions have not been well studied for most of these herbicides and studies have been on lab animals, not wildlife in wild conditions.

**Response:** Concerning synergistic effects, see responses to Comment RMC-0159-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, and Comment RMC-0122-002 under Appendix C. Also see Degradates, Inert Ingredients, Adjuvants, and Tank Mixtures in the Uncertainty Analysis Section of Appendix C of the PEIS.

RMC-0218-027
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** New or more recent scientific findings as to the toxicity and other imparts of 2,4-D, glyphosate and other herbicide active ingredients, formulas, inerts, metabolites and impurities should have been disclosed and analyzed in the DEIS [Draft PEIS] (examples given in the NCAP [Northwest Coalition for Alternatives to Pesticides] comments).

**Response:** See responses to Comment EMC-0646-016 under PEIS Environmental Consequences, Herbicide Effects Analysis and Comment FXC-0071-009 and Comment RMC-0221-070 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives for information on the timing of development of the risk assessment for the PEIS. Also note that the BLM has included updated information on degradates and the potential for herbicides to act as endocrine disruptors in Appendix D of the Final PEIS.

RMC-0220(i)-003
Save Our ecoSystems,
Inc.

**Comment:** The attached list includes hundreds of chemicals, but it can never be complete so long as manufacturers continually introduce new ones and send them to market. Testing of new ones, if it is done, is done by the manufacturers themselves. This list, however is published by the EPA which they say "performs an independent review of studies conducted in mice and rats to evaluate the carcinogenic potential of pesticides." Two chemicals you propose to spray on our public lands are on this list: Bromacil is "a possible human carcinogen." (page 8). Diuron is a "known/likely" carcinogen. (page 12).

**Response:** Neither bromacil nor diuron is currently listed as a known or likely human or animal carcinogen by the USEPA, the federal government's regulator of pesticides and authority on environmental carcinogens. Inconclusive evidence prompted the USEPA to list diuron as category C, possible human carcinogen, in 1996 and require that it be assessed using the reference dose for noncarcinogenicity.

RMC-0220(k)-001
Save Our ecoSystems,
Inc.

**Comment:** "humans are more sensitive than the most sensitive experimental animals tested to date…" See pg IV-17, attached: Chemical Hazards to Human Reproduction Council on Environmental Quality to the White House.

**Response:** Standard risk assessment guidance treats humans as more sensitive than laboratory animals and utilizes uncertainty factors to extrapolate from laboratory animals to humans (for example, the no observed adverse effect level from animals may be divided by uncertainty factors from 10 to 1,000, based on interspecies extrapolation and other factors). The BLM and Forest Service used uncertainty factors to account for the risks to humans during the development of the risk assessments for the PEIS.

BLM_0001610

RESPONSE TO COMMENTS

RMC-0221-061
Center for Biological
Diversity

**Comment:** The BLM fails to adequately analyze the impacts even of the 10 herbicides that it chose to examine: bromacil, chlorsulfuron, diflufenzopyr (with dicamba), diquat, diuron, fluridone, imazapic, sulfometuron methyl, and tebuthiuron. The Ecological Risk Assessment portion of the Biological Assessment fails to fully and adequately consider cumulative acute and chronic and synergistic ecological effects of these herbicides on biota, and present its results in a clear, concise, accessible format as required by NEPA. 40 C.F.R [Code of Federal Regulations] § 1502.1.

**Response:** The BLM conducted detailed, state-of-the-science human health and ecological risk assessments, which are provided on the CD that accompanies the PEIS. These risk assessments were developed in cooperation with the USEPA, U.S. Fish and Wildlife Service, and National Marine Fisheries Service. Subsequently, two appendixes (Human Health Risk Assessment and Ecological Risk Assessment) were prepared for the PEIS to summarize the findings of the risk assessments in a clear and concise format, and the information was incorporated into the effects analysis of Chapter 4 of the PEIS. The Biological Assessment incorporates much of this material in the text by reference and provides conservation measures to protect species of concern. The risk assessments and appendixes evaluated acute, chronic, and synergistic effects, and cumulative effects were evaluated in both the PEIS and Biological Assessment.

RMC-0221-064
Center for Biological
Diversity

**Comment:** The methodology used for this Ecological Risk Assessment ("ERA") was to develop a "Toxicity Reference Value" using both U.S. EPA toxicity studies and current literature. Typically, surrogate species had to be used for analyses of effects on rare, threatened, or endangered ("RTE") species due to lack of available studies. The ERA addressed RTE animal species using the same toxicity endpoint for other non-RTE species, but the acute Level of Concern was lowered. While this approach may make sense for assessing the potential impacts on individual animals in some instances, it does not adequately and fully express the risks of the proposed action to populations of at-risk species or provide meaningful information regarding direct, indirect or cumulative impacts on those populations and their habitats. The ERA fails to include any information on overall populations of special-status species in the project area; the status of specific populations in different locations and habitat types within the project area; how many of these specific populations would be exposed to herbicide treatment; and how often these populations would be exposed.

**Response:** Appendix C of the PEIS and the supporting ERAs thoroughly address RTE species to the extent possible, given that it is against the law to experiment or perform toxicology studies on RTE species. Effects on RTE species are evaluated at the level of the individual organism; it is especially important to protect every individual of an RTE species. The ERAs also looked at secondary impacts of herbicide application on the habitats of several RTE species. The ERAs provide a listing of RTE species in Appendix C of the ERA. Information on the direct, indirect, and cumulative impacts on populations of RTE species in the project area; the status of specific populations in different locations and habitat types within the project area; and populations that could be exposed to herbicide treatment are provided in the Biological Assessment that accompanies the PEIS. The Biological Assessment, along with the PEIS and PER, would be used by the BLM and U.S. Fish and Wildlife Service and National Marine Fisheries Service during consultations to ensure that RTE species are protected from herbicide treatments.

BLM_0001611

RMC-0221-067
Center for Biological
Diversity

**Comment:** We could find no disclosure of the literature used to formulate the Toxicity Reference Values in the ERA [ecological risk assessment]. This information is important for the public to be able to determine whether any key studies were omitted.

**Response:** All literature sources are described in Appendix C of the PEIS under Effect Characterization, Literature Review, and are also included with the effects characterization in Appendix C under Non-target Species Effects Characterization. References used to develop the ERAs are also included in the individual ERAs and their appendixes.

RMC-0221-069
Center for Biological
Diversity

**Comment:** Chemicals also can have complex effects on wildlife: even sublethal doses can result in adverse impacts on immune function and reproductive rates, and can increase stress on individuals. The ERA [ecological risk assessment] provided no such detailed information on these sublethal but potentially significant impacts on populations of wildlife, which is particularly troubling in the case of rare, threatened, and endangered species.

**Response:** The BLM did consider non-lethal effects in the risk assessments; see those sections of the ERAs related to chronic effects. Also see response to Comment RMC-0069-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

RMC-0221-071
Center for Biological
Diversity

**Comment:** Widespread aerial herbicide application by the BLM with little understanding of the extremely serious potential direct, indirect, cumulative, and additive/synergistic effects it may cause would be irresponsible and violate both NEPA and the ESA [Endangered Species Act].

**Response:** The human health risk assessments and ecological risk assessments considered various potential receptors and exposure pathways for each herbicide, including risks associated with aerial spraying. It is difficult to quantitatively evaluate synergistic effects of herbicides, since the toxicology studies are done on individual herbicides. Also see response to Comment RMC-0159-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, in Appendix C of the Final PEIS under Degradates, Inert Ingredients, Adjuvants, and Tank Mixtures in the Uncertainty Analysis section, and in Appendix D of the Final PEIS.

RMC-0222-097
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The evaluations of herbicide risks in the DEIS [Draft PEIS] fall short of NEPA's mandate to include accurate scientific analyses of the following topics: nonlethal effects on fish; nonlethal effects on amphibians; nonlethal effects on plants; effects on birds of herbicide damage to habitat; hazards of inert ingredients; occupational hazards; and synergistic hazards.

**Response:** The comment is incorrect; sublethal effects were evaluated and used for these receptors. None of the effects are based on mortality; instead, BLM ecological risk assessments are based no-observed-adverse-effect levels, which are even more conservative than sublethal effects.

RMC-0222-104
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for

**Comment:** Hazards of inert (unidentified) ingredients in herbicides: The DEIS [Draft PEIS] ([page] C-84 [of Appendix C of the PEIS]) states that "minimal impacts to the environment would result from these inert ingredients." However, the DEIS [Draft PEIS] ignores recent research showing that the combination of inert ingredients with the herbicidal ingredients in a commercial herbicide product can pose hazards not identified when ingredients are tested singly. For example, scientists from the

RESPONSE TO COMMENTS

Alternatives to
Pesticides), and
O'Brien, Mary

University of Caen showed that the combination of inerts and herbicidal ingredients in Roundup is toxic to human placental cells and disrupts the synthesis of sex hormones. This research was published in the journal *Environmental Health Perspectives*. (Richard et al 2005) In another example, researchers from the University of Minnesota showed that the combination of inert ingredients and herbicidal ingredients in two commercial 2,4-D products acts like estrogen in breast cancer cells. This research was published in the *Journal of Toxicology and Environmental Health*. (Lin and Garry 2000).

**Response:** The BLM is aware of these reports. The BLM has provided new information in the Final PEIS in Appendix D on the potential for herbicides to affect the endocrine system.

RMC-0222-107
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Synergistic effects: the cumulative effects analysis in the DEIS [Draft PEIS] does not consider effects of exposure to multiple herbicides. For example, it was shown over 20 years ago that picloram and 2,4-D are synergistically toxic to trout. This research was conducted by Daniel Woodward at the U.S. Fish and Wildlife Service and published in the Journal of Range Management. (Woodward 1982) In addition, imazapic herbicides and commonly used organophosphate insecticides are synergistically toxic to non-target plants, according to imazapic's manufacturer. (BASF Corporation 2004).

**Response:** Herbicide manufacturers have combined active ingredients where they have been shown to be effective either in products or tank mixes. The BLM evaluated mixed products and tank mixes. The BLM rarely uses insecticides and would not simultaneously apply insecticides and herbicides. There is no record of the BLM ever having prepared a tank mix of an organophosphate insecticide with an herbicide. As a proposed mitigation measure, the BLM will either avoid using any formulations of glyphosate with POEA, which may be the toxic component in glyphosate, or seek to use the formulation with the lowest amount of POEA available. Also see responses to Comments RMC-0221-070 and RMC-0159-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

**Environmental Consequences, Non-herbicide Effects Analysis**

EMC-0566-004
Western Society of
Weed Science

**Comment:** It is important to note the exclusion of risks associated with non-chemical alternatives mentioned in this alternative. There is no mention of the risk to workers using mechanical, fire or other methods to control invasive plants particularly in Alternative C: No Use of Herbicides. This ignores the dangers to workers using these methods such as the inhalation of vehicle exhaust or smoke from prescribed fires, risks associated with fire escape, physical injuries from over-exertion or injuries as a resulting from operation of heavy equipment. In Alternative D: No Aerial Applications, it should be noted that aerial applications of herbicides are often the method of control that offers the least disturbance to an area. Mechanical methods, as is mentioned in the PEIS, will often disturb the ground cover which opens the area to new weed infestations, and actually facilitates the spread of invasive plants into new habitats. Also in this alternative it is mentioned that the most sensitive factor for aerial applications is the potential for spray drift. This assumes that the application will be made with a liquid spray solution; however, there are granular formulations of many herbicides which greatly reduce or eliminate drift onto non-target areas.

**Response:** There is some discussion of the risks of non-chemical treatments in the PEIS, primarily under Alternative C for each of the resource areas covered in Chapter

BLM_0001613

4. However, most of this information was provided in the PER, since the PER covered all treatment methods.

RMC-0057-010
California Wilderness
Coalition

**Comment:** The DPEIS [Draft PER] states "There would be some short-term scenic degradation, as well as distractions to users (e.g., noise from machinery), from treatments" ([page] 4-117). However the DPEIS [Draft PER] does not acknowledge the potential for mechanical treatments, and the use of heavy machinery required for such treatments, to create future routes for unauthorized off road vehicle use. Such use will encourage the spread of noxious weeds and undermine the intent of the treatments. Furthermore, unauthorized off road vehicle use in areas managed for non-motorized recreation will degrade habitat and wilderness values on BLM lands. These impacts are not analyzed in the DPEIS [Draft PER].

**Response:** Based on the page number and quotation provided in this comment, it is assumed that the comment refers to the Draft PER rather than the Draft PEIS. The text of the Final PER has been modified in response to this concern. See the discussion on Effects of Mechanical Treatments, under the Recreation subheading, in Chapter 4 of the PER.

RMC-0217-033
Sierra Club Utah
Chapter

**Comment:** The draft PEIS needs to be fleshed out with a lot more information about all of the aspects of altered fire regimes, the causes of exotic plant invasions, and realistic and effective methods of changing the current trends of increasing exotics (both in numbers and in areas affected).

**Response:** The PEIS assesses the impacts of proposed herbicides on human health, ecological risk, vegetation and other public lands resources. Information on altered fire regimes, causes of exotic plant invasions, and effective treatment methods is provided in the PER.

RMC-0222-045
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Regardless, the DEIS [Draft PEIS] never analyzes the consequences of using "a combination of methods to combat undesirable species," let alone the consequences of herbicide use with and without native seedings in a range of settings.

**Response:** The BLM operates under an integrated pest management (IPM) framework in regard to vegetation treatments. Under IPM, methods and combinations of methods are utilized to achieve the greatest effectiveness to meet vegetation management objectives identified in local land use and activity plans. The analysis of impacts in Chapter 4 of the PEIS assumes that IPM methods and combinations of methods are used to reduce impacts to the natural and social environment. We have included text in Chapter 4 of the Final PEIS under How the Effects of the Alternatives were Estimated to note that use of IPM methods and combinations of methods were considered in the analysis.

**Environmental Consequences, Air Quality**

EMC-0001-002
Sachau, B.

**Comment:** Spray drifts can drift thousands of miles. Spraying out west come east.

**Response:** See the discussion on spray drift in Chapter 4 of the PEIS under Air Quality. The ecological risk assessments evaluated spray drift when determining risks from herbicide use. The reader should consult the individual risks assessments found on the CD that accompanies the PEIS for more information. An analysis of site-specific factors that could influence treatment success and impacts would be conducted for each project at the local level.

BLM_0001614

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0013-002<br>Keppelman, Tony | **Comment:** It is especially dangerous to apply anything like [an herbicide] by air so that it pollutes the air all the animals, including us, breath. It is a known fact that such airborne chemicals can travel hundreds of miles to be breathed by hundreds of thousands of people. |
| | **Response:** See response to Comment EMC-0001-002 under PEIS Environmental Consequences, Air Quality. |
| EMC-0050-002<br>EMC-0051-002<br>EMC-0055-002<br>EMC-0067-007<br>Rietsema, C.J.<br>Peckman, Kristin<br>Love, Joe<br>Womens Global Green<br>Action Network | **Comment:** An integral part of this proposal involves aerial spraying of toxic pesticides, which increases negative impacts on non-targeted vegetation, wildlife, and people, including recreationalists, tourists, and native peoples (pesticide application areas include Alaska, where native fishing and plant gathering is widespread). Although the proposal claims care would be taken in applying the pesticides in a controlled manner, these chemicals are known to drift much further than anticipated and cause unexpected health and ecological impacts. The pesticides that would be used include persistent and mobile chemicals, including known developmental and reproductive toxins. |
| | **Response:** See response to Comment EMC-0001-002 under PEIS Environmental Consequences, Air Quality. |
| EMC-0059-002<br>Cranley, Mary | **Comment:** The aerial spraying of toxic pesticides is unacceptable, posing serious risks to non-targeted vegetation, wildlife, and people, including forest users such as tourists, and native peoples. In addition to acute or short-term health effects, many of these pesticides are also known to cause reproductive and developmental problems including birth defects; neurological problems; and cancer. Aerial application is particularly problematic, since only a small fraction of the pesticides actually land on the target pest; the rest drifting off-site causing "unanticipated" health and ecological impacts. |
| | **Response:** See response to Comment EMC-0001-002 under PEIS Environmental Consequences, Air Quality. |
| EMC-0061-002<br>Stuckman, Scott | **Comment:** The aerial application of pesticides poses certain risks because the application is not targeted; rather, much of the pesticide can drift off-site, creating unanticipated health and ecological problems. |
| | **Response:** See response to Comment EMC-0001-002 under PEIS Environmental Consequences, Air Quality. |
| EMC-0078-002<br>Ore, Ed | **Comment:** You cannot think that nobody is affected by the spraying of hazardous materials into our environment. Every time a hazardous material is sprayed it travels many miles through the air and onto non target areas. Someone will be affected somewhere. The elderly and children are most affected. |
| | **Response:** See response to Comment EMC-0001-002 under PEIS Environmental Consequences, Air Quality. |
| EMC-0101-007<br>Terry, Noalani | **Comment:** Since we are downwind of pesticides sprayed in Nevada, I really object to spraying herbicides in huge amounts and think other measures are more appropriate. And in case you think, the herbicides can't travel this far, be aware that we get smoke from fires in California, Arizona, Utah, and yes, Nevada, in our valley. |

BLM_0001615

**Response:** See response to Comment EMC-0001-002 under PEIS Environmental Consequences, Air Quality.

EMC-0140-004
Small, Jack W. and
Joyce C.

**Comment:** The hazards to the people that do the spraying, or who live in the area of spraying, are often shrugged off The effects are not immediately apparent (the guy doesn't immediately drop dead). What needs a lot more attention is many ways these agents can be spread. Spraying from the air, or on windy days, easily gets spread beyond the specific area being treated. Chemicals getting into the water table adds up over time, and in some cases goes down hill a long way, often turning up in places where people rarely think to look or test for it.

**Response:** See response to Comment EMC-0001-002 under PEIS Environmental Consequences, Air Quality.

EMC-0173-003
Leavenworth Audubon
Adopt-a-Forest (LEAF)

**Comment:** The Diffuse Knapweed recovers the soils in a number of ways. First, it extracts nitrogen so that native plants, that cannot tolerate much nitrogen, can thrive. Removing the handpulled knapweed skeletons from the site then removes the nitrogen, leading to reduced nitrogen in the soils, and a great boost in native plant growth. Second, the handpulling of the knapweed initiates a rush of microbial activity when the root is pulled out, stimulating recovery of soils and boosting native plant recovery. Third, knapweed helps to develop biological soil crust, as it shades the crust in the hot summer, helping it to develop, much as blue bunch wheatgrass does in their symbiotic relationship.

**Response:** Diffuse knapweed provides some benefits to the environment. However, it also displaces native vegetation and the species that depend upon native vegetation and may lead to soil erosion. Studies in Montana have shown that sedimentation and erosion rates were 50% to 200% greater on sampling plots dominated by spotted knapweed than on plots dominated by native bunchgrasses (Lacey et al. 1989).

EMC-0190-003
Kanne, Claudia

**Comment:** Aerial spraying of toxic pesticides could kill me. The BLM has no control of where the toxic chemicals will be carried in the wind. There is no place for me to escape the toxic chemicals you may use.

**Response:** Although the BLM cannot control where herbicides will be carried, the agency can take steps to reduce the potential for herbicide drift. These steps include applying herbicides during periods with little wind, or using drift reduction agents. These Standard Operating Procedures (SOPs) are discussed in Chapter 4 of the PEIS under SOPs. In addition, the BLM modeled the effects of herbicide drift when analyzing the risks of using herbicides. Based on this analysis, the BLM developed buffer guidelines to avoid or reduce risks to non-target vegetation and fish and wildlife that may be found on lands adjacent to public lands. Also see response to Comment RMC-0200-012 under PEIS Environmental Consequences, Air Quality.

EMC-0267-003
Medbery, Angela

**Comment:** Recognition should be given that wind gusts, variable vegetative covers and heights, and changing weather and climate patterns may impact drift and chemical effectiveness in unpredictable manners.

**Response:** These variables were evaluated when conducting the ecological and human health risk assessments to assess the risks from the use of herbicides. Please review the risk assessments (available on the CD that accompanies the PEIS) and Appendixes B and C of the PEIS. In addition, herbicide drift is evaluated in Chapter 4 of the PEIS under Air Quality.

BLM_0001616

RESPONSE TO COMMENTS

EMC-0316-001
Hardebeck, Larry J.

**Comment:** I am writing to oppose the BLM's plan to significantly increase herbicide use in 17 western states. I am especially concerned about the aerial applications you have planned, which will cause the chemicals to be spread far and wide. Just look at what happened on the BLM test plots in Idaho where they used OUST, a supposedly safe chemical manufactured by Du Pont.

**Response:** Alternative D, as explained in Chapter 2 of the PEIS and evaluated in Chapter 4, looked the risks and benefits of only conducting herbicide spray treatments using ground-based methods. The BLM conducted modeling to determine the likelihood of herbicides drifting and impacting humans, non-target vegetation, and other resources. Based on this assessment, the BLM developed Standard Operating Procedures and mitigation measures to reduce the likelihood of drift impacts to humans and the environment.

EMC-0324-002
Rachel Carson Council

**Comment:** We question whether there has been sufficient consideration of the drift laws, that apply to commercial pesticide applicators, existing in the individual states. For example, under these local regulations 2,4-D is not allowed to be applied in areas where certain crops (Tomatoes, grapes, and others) are being grown.

**Response:** See response to Comment RMC-0200-012 under PEIS Environmental Consequences, Air Quality.

EMC-0324-005
Rachel Carson Council

**Comment:** Pesticide drift, the unintentional airborne movement of pesticides beyond the target area where pesticides are applied, can occur through the unpredictable weather and wind patterns, human error and/or equipment failure. It is most common with aerial pesticide spraying. Regulations pertaining to pesticide drift are administered by states and have varying degrees of severity and scope. Some prohibit applications of 2,4-D to commercial areas due to the sensitivity of certain crops such as tomatoes, and grapes. (Feitshans, Theodore A. "An Analysis of State Pesticide Drift Laws," San Joaquin Agricultural Law Review, No. 1, 1999). We question whether sufficient consideration has been given to this issue.

**Response:** See response to Comment RMC-0200-012 under PEIS Environmental Consequences, Air Quality.

EMC-0336-003
Tipps, Betsy L.

**Comment:** By proposing to apply much of the herbicides using aerial means, the plan virtually guarantees maximum dispersal of these toxic agents, into areas and places there the chemicals are not wanted such as our homes, our schools, our parks, our farms and ranches, and places where my family and I like to hike and camp on remote BLM lands.

**Response:** Approximately 400,000 acres would be treated aerially using herbicides. The BLM will post herbicide treatment areas, as discussed in Chapter 2 of the PEIS under Coordination and Education. The BLM also modeled spray drift to determine what the risks were to non-target vegetation and humans and animals from spray drift, and to develop appropriate Standard Operating Procedures and mitigation to eliminate or reduce these risks.

EMC-0446-023
The Nature
Conservancy

**Comment:** Some ALS [acetolactate synthase]-inhibiting herbicides have higher potential for off-site movement than other effective herbicides. The PEIS should provide guidance on how to weigh the benefits of increased effectiveness against the increased risk of off-site movement that certain ALS[-inhibiting] herbicides could pose. We believe that use of ALS-inhibiting chemicals should be allowed, but only in

BLM_0001617

justifiable circumstances and within the context of an adaptive management plan.

**Response:** The risks and benefits of not using ALS-inhibiting herbicides were evaluated under Alternative E – No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients. Use of these herbicides was evaluated under Alternative B – Expand Herbicide Use and Allow for Use of New Herbicides in 17 Western States (Preferred Alternative). The risks associated with off-site movement of these chemicals are discussed under Alternative E in the Vegetation section of Chapter 4 of the PEIS. As noted in that section, these herbicides carry risks because they are very potent, but their use in small amounts helps to mitigate risks. To reduce the risks associated with off-site drift of herbicides, the BLM would comply with buffer guidelines presented in Tables 4-12 and 4-14 in Chapter 4 under Vegetation.

EMC-0505-026
U.S. Environmental
Protection Agency

**Comment:** In a report of this nature, it is typical to address the individual and total uncertainties in the analysis. There are many uncertainties in the emission rates, the meteorology, model formulation and choice of background values and these should be addressed and evaluated.

**Response:** Both the PEIS and PER indicated that, "The number of acres [to be] treated in each state is an approximation, based on field data compiled for this analysis." The USEPA's *Compilation of Air Pollution Emission Factors, AP-42, Fifth Edition* details the uncertainty of each emission factor used to develop the annual air pollutant emissions by state and alternative. ENSR (2005a) described the methodology (including uncertainties) used to estimate direct particulate matter impacts for typical, but hypothetical (example) emission scenarios. As directed by Council on Environmental Quality regulations, where uncertainties exists, and obtaining "certain" information is not readily possible, the BLM uses reasonable but conservative assumptions so that actual impacts would be less than those predicted to occur.

EMC-0505-028
U.S. Environmental
Protection Agency

**Comment:** The Agency recommends using area specific background information instead of the default background concentrations. Historically, most PM10 modeling analyses have been done with dispersion and/or receptor models. Since these models don't account for all sources, a background concentration needs to be used to account for other sources. The "PM10 SIP [particulate matter less than 10 microns in diameter State Implementation Plan] Development Guideline" (June 1987) recommends using nearby monitoring data to develop reasonable background values. The BLM report referred to documents from Arizona and Montana which contained default background concentrations. Our recommendation would be to not use default values and to develop values that were relevant to the specific area being modeled. By using default values, it appears that the values may be overly conservative. BLM used values of 30 ug/m3 and 8 ug/m3 as 24-hour and annual average background values for both PM10 and PM2.5 [particulate matter less than 2.5 microns in diameter]. These values for PM10 may be overly conservative for many areas in the West. The values for PM2.5 are almost certainly higher than background concentrations in most areas of the West. There are annual average PM2.5 concentrations in some urban locations in the West that are as low as 4 ug/m3; rural areas would be even lower.

**Response:** When developing concentration estimates of particulate matter for typical, but hypothetical (example) emission scenarios, the *Annual Emissions Inventory for BLM Vegetation Treatment Methods – Final Report* (ENSR 2005a) clearly states, "To compare modeled particulate concentrations due to each treatment method to the National Ambient Air Quality Standard, a regional background concentration is needed to represent ambient particulate concentrations due to background sources in

BLM_0001618

RESPONSE TO COMMENTS

the vicinity of the treatment area." In addition, "This analysis assumed that vegetation treatment takes place in rural areas, therefore concentrations measure[d] at most monitors would yield an overly conservative estimate of ambient particulate concentrations in the vicinity of the treatment areas." Therefore, the analysis assumed rural background particulate matter concentrations based on documented guidance (New Mexico Air Quality Bureau 1998, and Montana Department of Environmental Quality 2002; see ENSR 2205a for full citations). However, given the lack of specific proposed activities (location, timing, amount, conditions, etc.), it is not possible to further quantify background conditions.

EMC-0544-003
Public Lands
Advocacy

**Comment:** [The following concern should be addressed:] Air quality impacts from vegetation treatments and their affect on oil and gas operations.

**Response:** Potential air quality impacts from future herbicide use are described in the Final PEIS in Chapter 4 under Air Quality, and air quality impacts from other future vegetation treatment methods are described in the Final PER in Chapter 4 under Air Quality. Potential air quality impacts described in these documents would not have any unique implications for oil and gas operations.

EMC-0585-176
Western Watersheds
Project

**Comment:** BLM ignores analysis of the variation between states in legal limits on wind speeds where aerial application is allowed. How does Idaho differ from California? BLM must establish a conservative wind speed that maximizes public safety and the health of the land, air and water, not rely on whatever is allowed in any particular state. BLM can not assess risk without evaluating application and drift under various wind speeds.

**Response:** Management practices that the BLM would follow to minimize the potential adverse effects of herbicides on air quality, and to minimize herbicide drift, are presented under Standard Operating Procedures in the Air Quality section of Chapter 4 of the PEIS. These practices were established to protect human and environmental health on public lands, and may be more or less conservative than state requirements. However, the BLM would also comply with state requirements pertaining to herbicide applications if they are more restrictive than BLM requirements.

EMC-0590-017
Western Slope
Environmental
Resource Council

**Comment:** Under the vegetation management programs proposed by the BLM, the area of public lands that will be treated with herbicides in the 17 Western States could cover over 932,000 acres. Proposed methods of herbicide application across the BLM land programs include aerial-, ground-, or boat-based applications. Proposed application vehicles include airplane, helicopter, all-terrain vehicle, boat, horse or humans. Application methods include aerial deposition, boom/broadcast, and spot applications. While all of these components of application are of concern to WSERC [Western Slope Environmental Resources Council], we are especially concerned with the potentials for spray drift from aerial and boom/broadcast applications, with the volatilization of pesticides in the days following applications, with the potential transport of chemicals on particulate matter, and with exposure of workers and citizens to the chemicals during and following applications.

**Response:** As expected, the risk assessments showed higher risks associated with aerial and boom applications than other types of herbicide applications. Generally, risk drops dramatically with distance, and there are no residents on BLM-administered lands. Also see responses to Comment EMC-0336-003 under PEIS Environmental Consequences, Air Quality, and Comment EMC-0185-002 under PEIS Environmental

BLM_0001619

Consequences, Human Health and Safety on spray drift.

EMC-0597(a)-007
Beeland, DeLene

**Comment:** Finally, how can BLM propose aerial herbicide spraying in arid climates where pesticide "drift" is becoming well-documented as an air-polluter and as a root cause for asthma, endocrine-disruptor diseases and cancers? Even if BLM hits their intended targets, some of the herbicide will remain air borne and drift, or – it will settle and in dry months with little rain, it will become airborne once more and drift to nearby communities, or watersheds.

**Response:** The BLM evaluated the risks associated with drift in Appendixes B (Human Health Risk Assessment) and C (Ecological Risk Assessment). Based on this analysis, the BLM proposed protective buffers to reduce or avoid risks to humans, non-target vegetation, and other resources from herbicide drift. Many of the herbicides proposed for use by the BLM have short half-lives and biodegrade relatively quickly, as discussed under Soil Resources and Water Resources and Quality in Chapter 4 of the PEIS.

EMC-0630-012
Porter, Mark C.
(Wallowa Resources)

**Comment:** The [P]EIS shows very little cognition of the sophisticated understanding of drift in aerial applications that is available today. Though I cannot give you a reference for this type of material I know it exists as I have seen several presentations on the matter. From personal experience I can say that aerial applications can be extremely precise, very small scale, with new technologies and tight application standards impacts of drift can be very well mitigated. New GIS technologies also allow the precise mapping of targets prior to treatment and on board helicopters allow the same technologies accurately map spray swaths.

**Response:** See response to Comment RMC-0200-012 under PEIS Environmental Consequences, Air Quality.

RMC-0129-004
Noble, E.A.

**Comment:** What investigation, if any in these days of cover-up of unwanted reality, has been made to establish any correlation between rapid spread of "unwanted" grasses and greenhouse warming? If all of this vegetation is killed. What will there be to keep dust down in case of continued drought?

**Response:** We are not aware of studies that look at the spread of invasive vegetation and global warming. After invasive vegetation is removed, sites would be revegetated with native vegetation or other suitable vegetation to stabilize soils and minimize dust and erosion.

RMC-0200-012
Lindsay, Dianne

**Comment:** The PEIS fails to adequately address drift problems with aerial spraying.

**Response:** Both the PER and the PEIS in the Air Quality sections of Chapters 3 and 4 address potential "drift" of herbicide from aerial spraying, including several management practices the BLM has developed to minimize potential adverse effects of herbicide use on air quality. The BLM also modeled drift to determine the effects to non-target vegetation and other resources from the drift of herbicides applied aerially or by boom sprayers.

RMC-0208-061
California Oak
Foundation

**Comment:** Here, the Draft PEIS calls for a survey of the "project site" for special status species before any treatment occurs. (Draft PEIS, at p. [page] 2-16.) This local-level requirement, however, fails to account for herbicide drift, which, as the above-referenced studies show, carries the active ingredients to ecosystems outside of the target site. Accordingly, the Draft PEIS is deficient in assessing the true impact to

BLM_0001620

RESPONSE TO COMMENTS

special status species from the use of herbicides on BLM land. This requirement also fails to ecosystems outside of the target site. Accordingly, the Draft PEIS is deficient in assessing the true impact to special status species from the use of herbicides on BLM land. This requirement also fails to account for impacts on populations of species that cannot be identified except at larger "landscape" scales.

**Response:** Both the PER and the PEIS in the Air Quality sections of Chapters 3 and 4 address potential "drift" of herbicides during aerial spraying, as well as several management practices the BLM has developed to minimize the potential adverse effects of herbicide use on air quality. In addition, the BLM identified Standard Operating Procedures and Guidelines (see Chapter 2 under Herbicide Treatment Standard Operating Procedures) and mitigation measures (see Chapter 2 under Mitigation; also see mitigation sections for each resource area discussed in Chapter 4 of the PEIS) in the PEIS, and for species of concern in the PEIS and Biological Assessment (BA; see Conservation Measures in BA) to reduce the potential for risks to species of concern from herbicide drift. At the project level, direct and indirect effects from the proposed action will be analyzed, and if it is determined that the project "May Affect" Endangered Species Act-listed species, Section 7 consultation with the U.S. Fish and Wildlife Service and National Marine Fisheries Service will be initiated.

RMC-0204-008
Wroncy, Jan (Gaia
Vision/Canaries Who
Sing)

**Comment:** The Bureau of Land Management may be unaware of how much pesticides drift, leach, vaporize, generally move about, and persist, but the BLM certainly can not deny that the smoke (and any additional chemicals in it) created by the intentionally set fires on BLM lands does in fact travel off the site to other properties not belonging to the BLM. The members of the public, individually, need to be asked whether they will give their informed consent to such expose and to the trespass onto their land.

**Response:** Potential air quality impacts from future herbicide use are described in the Final PEIS in Chapter 4 under Air Quality, and impacts from other future vegetation treatment methods (including smoke from prescribed fires) are discussed in the Final PER in Chapter 4 under Air Quality. The BLM's actions (including use authorizations) must comply with applicable local, state, tribal, and federal air quality laws, regulations, standards, and implementation plans. Therefore, potential air quality impacts are managed below scientifically based and legally enforced regulatory significance thresholds, and no interference with personal property rights are likely to occur.

**Environmental Consequences, Soil Resources**

EMC-0042-001
Altshool, Elsa

**Comment:** Herbicides are not selective. When you spray, plants we want are too often killed. Why shouldn't there be plants on government land. They are harmless, and help to hold soil; We need no more flying soil.

**Response:** Some herbicides are selective, as shown in Table 2-3 of the PEIS. The BLM would use selective herbicides and establish buffers adjacent to treatment areas to reduce the risk of herbicides impacting non-target vegetation. Following removal of invasive vegetation, sites would be revegetated with native vegetation or other suitable vegetation to stabilize soils and minimize dust and erosion.

EMC-0145-003
Wahl, Mark

**Comment:** They [herbicides] also sterilize soils -- thus inviting more invasives in succeeding years thus creating an endless escalating cycle of pesticide dependence. This has been seen in numerous locations throughout the country and these sensitive

BLM_0001621

wild systems are certainly no exception.

**Response:** Herbicides do not sterilize the soil. When herbicides are applied, they may reduce the vigor of or kill non-target plant species that come in contact with the herbicide prior to its breakdown. Upon the breakdown of the active ingredients of the herbicide, which occurs at a rate that has been discussed in this PEIS for each herbicide proposed for use, plants that would have been susceptible to the herbicide are able to re-establish, naturally or artificially, and prosper on the site. The main consideration for reducing reinvasion is the establishment of adequate plant cover on the site after treatment to reduce opportunities for invasive plant establishment. This is a function of proper post-treatment management and not sterilization of the site by herbicides. Also see response to Comment EMC-0173-004 under PEIS Environmental Consequences, Soil Resources.

EMC-0173-004
Leavenworth Audubon
Adopt-a-Forest (LEAF)

**Comment:** It is clear that the massive spraying of herbicides that you propose will degrade the soils and invite knapweed to come in and do its soil healing work. You will actually create knapweed fields. That is the opposite of what you are supposed to do. Your job is to prevent weeds by maintaining healthy soils. To maintain healthy soils you will need to stop your soil disturbing activities. Overgrazing weakens the ecosystem, weakens the soils, weakens the native plants. Overgrazing compacts the soils. Knapweed is not the only weed that is a response to soil degradation. If you want to stop weeds, quit inviting them in. Restore degraded soils, then you will not have weeds. Healthy soils lead to healthy plants and those healthy soils and plants keep out weeds.

**Response:** The PEIS includes a description of how invasive species, including knapweed, damage soil quality and health. Accelerated wind and water erosion, production of chemicals that negatively affect soil quality, altered fire frequency and nutrient cycling, reduced water availability, altered soil physical characteristics, and reduced soil food web function can result from dominance of a site by invasive species. It is further explained that negative short-term impacts to the soil resource are minor and will be minimized by use of Standard Operating Procedures. The clearly stated net result of the proposed herbicide use would be the restoration of healthy soil and ecosystem function.

EMC-0248-003
Harrer, Roger

**Comment:** And what about erosion of denuded areas? Isn't that likely and doesn't that even cause more problems?

**Response:** Stabilization of soils is an important component of restoring vegetation after treatment or wildfire. It would never be the intent of a project to leave an area susceptible to erosion after treatment. BLM policies do not allow for that. Stabilization would be an important step in any project with erosion concerns. Revegetation Standard Operating Procedures are discussed under Revegetation in Chapter 2 of the PER.

EMC-0316-003
RMC-0089-002
Hardebeck, Larry J.

**Comment:** In addition to concerns I have about breathing these herbicides as they float by in the air, I believe there is good science to demonstrate how these chemicals will eventually end up contaminating our water and soils, and ultimately, our food supply. Once they are in our soil and water, how will they be removed? Chlordane, which was banned in 1988, continues to contaminate our food and water and make some of our foods and fish unsafe to eat. Why? It lingers in the soil for 14 years after application and we do not know how to remove it. How many of the herbicides that the BLM is planning to use will linger this long, or longer?

BLM_0001622

RESPONSE TO COMMENTS

**Response:** As shown in Table 4-7 in Chapter 4 of the PEIS, all but two of the herbicides the BLM proposes to use have half-lives (the amount of time needed for half of the chemical to disappear) of a few weeks to months; diuron and tebuthiuron may persists for one or more years. The BLM would avoid using persistent herbicides in areas near croplands or drinking water supplies.

EMC-0585-106
Western Watersheds
Project

**Comment:** As another example, under Cumulative Impacts ([page] ES-6 [of the Draft PEIS]) BLM claims that treatments that slow erosion would benefit water quality. Unfortunately, most of the treatments being proposed to be used (and where these herbicides would be applied), result in exposure of large areas of soil to wind and water erosion. Treatments remove both protective vegetation as well as kill or harm microbiotic crusts, on top of the poor or degraded conditions of lands that causes weed problems/need for "restoration" --- in the first place. Soil erosion in the short and mid-term may create gullying and loss of remaining topsoil that will cause long-term problems. Unless causes of degradation are addressed and assessed, and taken into consideration before any treatments are conducted so that the appropriate type of treatment can be applied, outcomes of treatments can not be so rosily predicted. The [P]EIS consistently fails to provide effectiveness or other monitoring information, scientific data, references and analysis to support such claims.

**Response:** The assumption that most of the treatments proposed result in exposure of large areas of soil to wind and water erosion is inaccurate. The PEIS does not propose any treatments. Treatments discussed in the PEIS and PER relative to the cumulative impacts of herbicide use range from vegetative control with herbicides to activities such as reseeding and site stabilization; mechanical treatment in the form of disking, chopping, or cutting; biological controls; and use of prescribed fire. Many of these techniques, including herbicide application, do not necessarily result in large areas of soil exposure. For example, herbicides may be applied after a catastrophic fire, where vegetation has been removed through burning, as a pre-emergent to reduce competition of cheatgrass in preparation for reseeding with soil stabilizing grasses and forbs. In cases where soil is exposed, reseeding or other stabilization measures are implemented to stabilize soils and control erosion. Initial treatments of vegetation should not be viewed as stand-alone activities that do not include site preparation and follow-up stabilization measures and monitoring. The commenter provides no information to lead the BLM to the conclusion that treatments designed to slow erosion would not benefit water quality.

Impacts of herbicide application to microbiotic crusts would depend on the specific herbicide used, application rate, and number of repeat treatments. In a study using two glyphosate herbicides on moss-dominated microbiotic crusts, the herbicides had no short-term negative impact on the crusts (Youtie, B., J. Ponzetti, and D. Salzer. 1999. Fire and herbicides for exotic annual grass control: effects on native plants and microbiotic soil organisms. *In* D. Eldridge and D. Freudenberger, eds. Proceedings of the VI International Rangeland Congress, Aitkenvale, Queensland, Australia. Pages 590-591). In fact, litter buildup on heavy annual grass dominated sites can significantly reduce microbiotic crust cover (Belnap, J., J. Hilty Kaltenecker, R. Rosentreter, J. Williams, S. Leonard, and D. Eldridge. 2001. Biological Soil Crusts: Ecology and Management. U.S. Dept. of Interior, Bureau of Land Management. Technical Reference 1730-2). Prescribed burning under proper conditions would result in low intensity fires that would not be harmful to microbiotic crusts and could actually be beneficial to the crusts by reducing the risk of hot wildfires that would damage the crusts.

BLM_0001623

Mechanical treatment can impact microbiotic crusts, depending on the degree of surface disturbance. Treatment design could help mitigate any impacts to sites with highly developed microbiotic crust communities.

EMC-0585-169
Western Watersheds
Project

**Comment:** The rosy predicted Preferred Alternative outcomes of Table 2-8 [of the Draft PEIS] are based on little or no data. Here, BLM predicts "minor effects" to soil under the Preferred Alternative. Yet, [P]EIS/PER is based on large increases in defoliation including of non-target vegetation interspersed with herbicided areas – especially acute with large-scale aerial applications, and great expansion of 'treatments' on BLM lands. Nowhere is an adequate analysis of herbicide or treatment impacts to microbiotic crusts provided.

**Response:** Vegetation treatments could result in the loss of vegetation over large areas. However, without treatments, areas with large amounts of hazardous fuels would be prone to large-scale wildfires, while large areas of invasive vegetation may make these areas unattractive to wildlife for habitat and humans for social and recreational values. Treatments would be designed to minimize the loss of non-target vegetation (in contrast to wildfires, which would destroy nearly all vegetation in their path), and sites would be revegetated to restore more desirable vegetation to the site. As noted in Chapter 4 of the PEIS under Soil Resources, Impacts by Treatment, there is limited information on herbicide effects on biological soil crusts. Caution would be used in applying herbicides to soils supporting biological soil crusts.

EMC-0585-170
Western Watersheds
Project

**Comment:** BLM's analysis ignores the poor condition of many soils and microbiotic crusts across BLM lands, especially the poor condition or arid lands most likely to be treated using herbicides or other treatment disturbances.

**Response:** The analysis of the PEIS discusses the reduced soil function and health of sites dominated by invasive species, which are those that would be treated. Accelerated wind and water erosion, production of chemicals that negatively effect soil quality, altered fire frequency and nutrient cycling, altered physical characteristics, and reduced soil food web function can result from dominance of a site by invasive species, as explained in this document. The analysis cites a study by Youtie et al. ((Youtie, B., J. Ponzetti, and D. Salzer. 1999. Fire and herbicides for exotic annual grass control: effects on native plants and microbiotic soil organisms. *In* D. Eldridge and D. Freudenberger, eds. Proceedings of the VI International Rangeland Congress, Aitkenvale, Queensland, Australia. Pages 590-591), which observes that biological soil crust was reduced where annual grass leaf litter accumulated. The analysis also describes the increased fire frequency on sites dominated by some invasive species, such as downy brome and hoary cress, and states that fire can result in severe damage to biological soil crusts.

EMC-0601-004
Kampmeyer, Al

**Comment:** Issue two with spraying; after spraying and the weeds are gone (you know, only the vegetation goes, the weed seed source will always be in the soil) you have bare ground. Lovely, another spring storm, heavy snow, fluke rainfall, with episodic runoff, and no vegetation to hold the sediment. Has anyone at BLM ever seen erosion before? Sediment deposition in waterways is also pollution. You can not control erosion when you have bare ground, there has to be some vegetative cover to control it. Are you prepared to spray and plant? Good luck, in the arid West that won't meet with any success.

**Response:** Vegetation treatments are not designed to result in bare ground without any follow-up reseeding or planting, unless bare ground is the management objective (e.g.

BLM_0001624

RESPONSE TO COMMENTS

facility management). The goal of emergency stabilization and rehabilitation following fire is to prevent erosion, and seeding, reseeding, or planting is included in follow-up actions to stabilize soils. Where possible, seeding is accomplished prior to wet season precipitation events such as snow or rainfall, to facilitate germination and sprouting in the spring season, ensure soil stabilization to prevent erosion, and encourage growth.

EMC-0643-067
California Indian Basketweavers Association

**Comment:** The DEIS [Draft PEIS] does not provide scientific documentation from field collected data demonstrating that its plan to utilize herbicides and clearing of native trees such as juniper and pinyon and other types of vegetation manipulations will result in "reduce[ing] the negative effects of invasive species on soil" (p. [page] 4-20 [of the Draft PEIS]).

**Response:** The space limitations of the PEIS prohibit an exhaustive documentation of all available field collected data on benefits to soil resources from invasive species control. The PEIS makes reference to numerous studies that document the negative effects of invasive species on soil resources. The proposed treatments would greatly reduce or eliminate invasive species on the treated sites and allow for restoration of native species on these sites. Thus, ecosystem function would be restored on these site and the negative effects of invasive species on the soil would be reduced.

RMC-0106-018
Public Employees for Environmental Responsibility

**Comment:** Discussion of the behavior of herbicides in soil is incomplete. It is obvious from contamination of groundwater that at least some of the herbicides (e.g., 2,4-D, Diquat, Glyphosate, Bromacil, Dicamba, Diuron, Hexazinone, Atrazine, and Simazine) are capable of transport through soils unchanged to groundwater. There is no correlation between occurrence of groundwater contamination and the Soil Adsorption Coefficient, which for known groundwater contaminants ranges from 2 mL/g to 1 million mL/g. The BLM should assess the occurrence of groundwater contamination with soil type(s) and vertical distance to the water table in contaminant source areas to better understand transport mechanisms through the unsaturated zone.

**Response:** There are numerous factors that can influence the potential leaching of herbicides through soil and into the groundwater, as discussed in the PEIS. The importance of the soil adsorption coefficient as one of these factors is well established by studies, and clearly stated in the PEIS. The influence of herbicide use patterns; chemical half-life; rainfall amount, intensity, and duration; and depth to the water table can vary greatly, but does not negate the influence of soil adsorption. The very broad scale of the PEIS does not allow the BLM to assess the potential occurrence of groundwater contamination for each soil type and possible vertical distance to the water table in treated areas. More detailed environmental analysis will be conducted at the local level during the activity planning stage.

RMC-0106-019
Public Employees for Environmental Responsibility

**Comment:** [On] p. [page] 4-11 [of the Draft PEIS. It is not clear how the SOPs [Standard Operating Procedures] will help. The herbicides are more likely to penetrate soil on lower slopes where contact is maintained over longer periods.

**Response:** As discussed in the SOPs portion of the soil impact analysis, herbicide transport to non-target areas can occur via solution in runoff water, erosion of soil particles to which herbicides are adsorbed, and water transport of granular herbicides. The SOPs are designed to reduce the risk of these modes of herbicide transport. In fact, the purpose of the SOPs is to reduce the mobility of the herbicides and the soil particles to which the herbicides are adsorbed.

BLM_0001625

RMC-0106-020
Public Employees for
Environmental
Responsibility

**Comment:** [On] p. [page] 4-12 [of the Draft PEIS]. The statement on Factors that Influence the Fate, Transport, and Persistence of Herbicides in Soil is simplistic and wholly inadequate.

**Response:** The statement on factors that influence the fate, transport and persistence of herbicides in soil is an introductory statement for a complex process. This statement is followed by more detailed information on the 1) chemical processes of a) adsorption to soil particles and soil organic matter and b) photochemical decomposition and chemical reactions with soil constituents; 2) physical processes of a) leaching, b) volatility, and c) transport with water or wind; and 3) biological processes.

RMC-0106-021
Public Employees for
Environmental
Responsibility

**Comment:** [On] p. [page] 4-13 [of the Draft PEIS]. Table 4-7 [of the Draft PEIS] should take into account half-life and adsorption characteristics of degradates and "inert" components.

**Response:** Herbicide degradates and "inert" components are generally not determined to be biologically active or environmental hazards. Thus, only the active ingredients of the herbicides proposed for use were included in Table 4-7 of the PEIS.

RMC-0106-023
Public Employees for
Environmental
Responsibility

**Comment:** p. [Page] 4-13 [of the Draft PEIS]. The statement that "...removal of annual grasses requires repeated applications of herbicides and that long-term effects were not known" (emphasis added) says a lot more than is dealt with in this D[raft] PEIS.

**Response:** This statement is based on comments from Youtie et al. (1999; see full citation in Chapter 6, References, in PEIS), who studied the effects of glyphosate on soil crusts and bunchgrass communities. They were concerned about the effects of multiple treatments, but noted that multiple treatments were needed to remove annual grasses, and removal of annual grasses slowed the loss of the soil crust. As noted under Mitigation in Chapter 2 of the PEIS, the BLM would limit glyphosate applications to the typical application rate, and would use spot applications, where feasible, to reduce the amount of glyphosate applied to any one area.

RMC-0106-024
Public Employees for
Environmental
Responsibility

**Comment:** [Pages] 4-14 to 4-19 [of the Draft PEIS]. Of the 18 herbicides assessed, practically no discussion of breakdown products (and this only to say there is no information available), none of inerts; no information is provided on number of formulations assessed. The D[raft] PEIS admits that very little information is available on effects on soil organisms. One might ask what the BLM was doing over the past 20 years of herbicidal treatments of public lands!

**Response:** See response to Comment EMC-0585-192 under PEIS Environmental Consequences, Herbicide Effects Analysis for information on inert ingredients. See responses to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment, and Comment EMC-0623-017 and Comment RMC-0191-009 under PEIS Environmental Consequences, Herbicide Effects Analysis for information on degradates and formulations.

RMC-0106-025
Public Employees for
Environmental
Responsibility

**Comment:** Page 4-16. The statement that "Runoff would be negligible in relatively arid environments is wrong.

**Response:** As stated in Chapter 4 under Soil Resources, runoff of imazapic would be less in areas with little rainfall and sandy soils than in areas with clay soils and heavy rain.

BLM_0001626

RESPONSE TO COMMENTS

RMC-0106-027
Public Employees for
Environmental
Responsibility

**Comment:** This description [of groundwater impacts] is inadequate—are they not known to contaminate groundwater because they were sought and not detected, or were they not sought and therefore not detected?

**Response:** The chemicals were not found to contaminate groundwater. They were sought and may have been found in a few groundwater samples, or in surface water, but not often enough or at high enough concentrations to warrant concern.

RMC-0205-017
Oregon Department of
Agriculture

**Comment:** Many of the pesticides on the proposed list have been detected in surface or groundwaters in the U.S. Geological Survey National Ambient Water Quality Assessment (NAWQA) studies. These include 2,4D, atrazine, bromacil, dicamba, diuron, glyphosate, simazine, and triclopyr (http://pubs.usgs.gov/circ/circ1161/nawqa91.d.dtml These data suggest that standard application practices may result in measurable concentrations of these compounds in surface waters near application areas, sometimes above water quality standards. These results emphasize the need to limit use of chemical herbicide controls whenever feasible. Occurrence in Oregon of other BLM proposed herbicides, including asulam, chlorsulfuron, clopyralid, fosamine, hexazinone, imazapyr, mefluidide, picloram and tebuthiuron, are unknown due to lack of water quality data.

**Response:** Detection limits have decreased dramatically during the last decade. It is now possible to detect parts per billion, where parts per million was the standard before. The ability of laboratory methods to detect such low levels has resulted in documented pesticide occurrence in waters over a wider area than was realized in the past. However, concentrations are rarely above recommended exposure limits for humans or aquatic species. The detection of a pesticide in waters does necessarily mean that standard application procedures were used during the treatment. A properly developed treatment plan will consider measures to keep immediate and cumulative levels of pesticides safe. Water quality monitoring will be a requirement of every application of pesticide or herbicide. Chemical application plans will have the review and approval of hydrologists to ensure that the level of risk to human health and the environment is acceptable.

RMC-0205-023
Oregon Department of
Agriculture

**Comment:** While we recognize that the application of herbicides is one of the most effective ways to prevent fires by destroying unwanted vegetation, the non-herbicidal options for addressing the vegetation should be considered in areas that potentially impact public water supplies. Herbicides can negatively impact the water quality in streams and groundwater serving as public water supply sources. Most herbicides are not monitored at the intakes or wells for public water supplies as part of the routine requirements to meet federal drinking water standards. Most communities and public water providers do not have the resources to increase their monitoring capabilities when significant areas are sprayed adjacent to or upstream of their intake or well.

**Response:** Public water supply sources, groundwater contamination potential and effects on water quality are considered in any herbicide use proposal. Mitigation for herbicide use in situations that may affect water resources or aquatic habitat includes application of Standard Operating Procedures (SOPs; see Table 2-5 in the PER for a description of SOPs) including, but not limited to, the use of mandatory or discretionary buffers, application rates, and drift management. Alternative non-herbicide treatment methods are also considered. Just as mechanical or manual techniques would likely be used in lieu of prescribed fire in a wildland urban interface situation, non-herbicide methods would be considered in situations where public water supplies and/or groundwater or surface water quality may be affected.

BLM_0001627

RMC-0220c-001
Save Our ecoSystems,
Inc.

**Comment:** The attached maps show small segments of BLM and USFS [U.S. Forest Service] public lands, not necessarily the ones you are proposing to spray, but they are representative. The blue lines showing waterways are everywhere. One can see at a glance that it would be virtually impossible to spray such areas without contaminating their waters. Forest streams flow down into rivers and eventually oceans. They create drinking water for humans and other animals (who would be even more directly affected).

**Response:** In areas with many waterways, the BLM could use several Standard Operating Procedures or mitigation measures listed in Chapter 2 of the PEIS to reduce or avoid impacts to aquatic bodies. These measures include selecting herbicides with minimal adverse affects on water or aquatic organisms, using treatment methods (hand spraying, mechanical treatments) that have little or no potential to contaminate water, and ensuring that buffers are maintained between treatment areas and aquatic bodies.

## Environmental Consequences, Water Resources and Quality

EMC-0123-001
MacKillop, Kenneth

**Comment:** The contamination of groundwater is one that I will focus on. A massive influx of toxins will overload an already stressed ecosystem. The health costs of contaminated water have not been properly evaluated. Our behavior in placing toxins into the aquifers will be considered criminal by future generations, who face further increases in cancer and reproductive harm.

**Response:** The application of pesticides/herbicides will not result in a massive influx of toxins into aquifers. Careful adherence to recommended application procedures will prevent exceedence of recommended concentration levels. Further, degradation processes in soils and aquifers will decrease concentrations to levels that are not deleterious to wildlife or human health.

EMC-0484-001
Safe Alternatives for
Our Forest
Environment

**Comment:** The Bureau of Land Management should not be considering herbicide use in steep mountainous areas such as Trinity County, California. Here, the terrain includes an abundance of watercourses. These watercourses are heavily used for domestic water supplies and are the principal water supply for the majority of people here in Trinity County. Most herbicide labels instructions have warnings, "do not apply where runoff is likely". There is almost nowhere in this kind of terrain that herbicides can be safely or legally used.

**Response:** The BLM will take into consideration slope, soil type, infiltration capacity and stream patterns when applying herbicides. Provisions in the Wellhead Protection Act will protect local drinking water supplies from potential contamination, as there is a requirement for buffer zones around municipal water supply wells. If the application procedures for an herbicide state "do not apply where runoff is likely," these instructions will be followed.

EMC-0585-123
Western Watersheds
Project

**Comment:** In addition, many hikers are accompanied by domestic dogs that invariably drink water encountered, and the effects of various chemicals or treatments on these animals has not been assessed. Treatments that increase algal concentrations in wild land waters may have particularly harmful impacts not only to domestic dogs, but also to wildlife. Bighorn sheep in the Oregon Owyhee (as well as domestic dogs) have died from algal blooms caused by excessive nutrients and temperatures.

**Response:** The impact assessment to wildlife, livestock, and wild horses and burros is applicable to domestic dogs. An Activity Plan covering the use of chemicals and

BLM_0001628

RESPONSE TO COMMENTS

treatments on specific federal lands considers the vegetation that will take advantage of the void existing after treatment. The native and/or invasive plants that can likely fill this void are considered, along with their adverse and beneficial effects. The BLM notes the commentor's statement that the effects of algal blooms should be considered, along with other replacement species.

Pesticides/herbicides do not stimulate algal growth. Pesticides/herbicides will be applied in accordance with manufacturers' recommendations, and will not result in concentrations in water bodies that are harmful to aquatic life, wildlife, or domestic animals.

EMC-0585-177
Western Watersheds
Project

**Comment:** Aquatic application is particularly alarming – as there is no assurance that chemicals will not be quickly transported into areas where the public is recreating. The limited wild land surface waters often tied to limited aquifers in the arid West are critical for survival of many species of wildlife and wild horses that have nowhere else to drink. Pollution/contamination of sources of drinking water by aquatic chemicals, especially if animals inhabiting degraded lands are also coping with degraded habitats subject to grazing, fragmentation, energy development, etc. with suboptimal cover or food or where they are otherwise stressed from human disturbances, may increase harmful responses to chemicals.

**Response:** Degradation of pesticides and/or herbicides by biodegradation, adsorption and dispersion processes will minimize risks to shallow aquifers. Assessment of the surrounding environmental conditions, rainfall data, flow patterns, human use patterns, and the nature of degradation of the chemical all come into play when planning for a reasonable level of assurance that chemicals will not be quickly transported into areas where the public is recreating. Strict adherence to guidance on application procedures will protect wildlife by maintaining concentrations at a low level, and degradation processes will further decrease concentrations.

RMC-0069-013
Desert Survivors

**Comment:** The herbicides and their break-down residues are dangerous to both animals and humans, and the application of these pesticides to water sources or riparian vegetation is a criminal act. All the more so because there is no notification, no signs at the water sources, no "skull and crossbones" danger signs erected at "treated" sites. If these herbicides or their break-down products get into the groundwater at a "treated site", such pollution of the groundwater is impossible to remove, and the water source and its downstream waters then become toxic.

**Response:** See responses to Comment EMC-0525-012 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, Comment EMC-0584-110 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated, and Comment EMC-0623-016 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

RMC-0106-028
Public Employees for
Environmental
Responsibility

**Comment:** [On] p. [page] 4-28, 4-31 [of the PEIS]. It is stated that "little is known about [the] occurrence, fate, or transport" of 16 percent of the 18 herbicides proposed for use (Imazapyr, Imazapic, and Sulfometuron Methyl). This should be ample grounds for prohibiting their use.

**Response:** Although little is known about the occurrence, fate, or transport of these herbicides in water, the PEIS also notes that these herbicides are not known to be groundwater contaminants and are not known (imazapic) or rarely known (imazapyr and sulfometuron methyl) to be surface water contaminants.

BLM_0001629

RMC-0106-029
Public Employees for
Environmental
Responsibility

**Comment:** No information is provided on the occurrence of potentially harmful inerts or degradates. The inadequate state of knowledge about impacts of the 18 herbicides on water resources is such as to require banning of their use anywhere that a potential for contaminating water, including groundwater, exists.

**Response:** See response to Comment EMC-0585-192 under PEIS Environmental Consequences, Herbicide Effects Analysis for information on inert ingredients. See responses to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment, Comment EMC-0623-017 under PEIS Environmental Consequences, Herbicide Effects Analysis, and Comment RMC-0191-009 under PEIS Environmental Consequences, Herbicide Effects Analysis for information on degradates and formulations. There is considerable knowledge about the impacts of the proposed herbicides on water resources and their fate and transport in water and soil, as discussed in Chapter 4 of the PEIS under Soil Resources and Water Resources and Quality.

RMC-0144-021
Wyoming Game and
Fish Department

**Comment:** We recommend BLM consult with state agency fishery personnel on the need for ephemeral stream buffers. Buffer strips should be an option in the SOP [Standard Operating Procedure] following appropriate consultation.

**Response:** The development of more restrictive, or additional, SOPs is always an option for local offices. The SOPs identified in the PEIS are suggested requirements to be followed during project implementation. The Biological Assessment prepared for the PEIS states that local consultation with National Marine Fisheries Service and/or U.S. Fish and Wildlife Service on the potential impacts on threatened, endangered, and other special status fish species will be required for use of herbicides in riparian areas. At such time, the SOPs may be modified, based on local conditions and information.

RMC-0191-013
Ertz, Brian

**Comment:** I would have hoped that the BLM would have at least taken the time to determine present levels of potentially harmful compounds in waters that may be compounded by the Preferred Alternative then incorporated those findings into their considerations of acceptable toxicity levels given the addition of the Preferred Alternative treatments to ecosystems, RTE [rare, threatened, and endangered] species, and human health.

**Response:** As discussed in Chapter 3 of the PEIS under Water Resources and Quality, water quality on lands administered by the BLM is generally good, except in areas where past mining activity has taken place, and in areas near agricultural or urbanized areas where pesticides and other pollutants have entered the surface water or groundwater. As part of its risk assessments, the BLM evaluated the potential for herbicides to be transported from overland runoff, erosion, and root-zone groundwater runoff (see Concentration Models in the Uncertainty Section of Appendix C of the PEIS). Using this information, the BLM developed application methods, Standard Operating Procedures, and mitigation measures to avoid or minimize risks to aquatic bodies and their organisms from herbicides. No studies by U.S. Geological Survey or others have identified the migration of BLM herbicides into surface water or groundwater in or on BLM lands. Also see responses to Comment RMC-0069-009 under PEIS Alternatives, Monitoring and Comments RMC-0191-009 and RMC-0159-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

BLM_0001630

RESPONSE TO COMMENTS

| | |
|---|---|
| RMC-0210-045<br>MCS Task Force of<br>New Mexico | **Comment:** No herbicides should be applied directly to water.<br><br>**Response:** See responses to Comment EMC-0585-185 and Comment EMC-0585-178 under PEIS Environmental Consequences, Herbicide Effects Analysis. |
| RMC-0228-009<br>Metropolitan Water<br>District of Southern<br>California | **Comment:** The Preferred Alternative (Alternative B) presents a substantial increase in herbicide application, which poses a concurrent increased risk to water quality. Metropolitan is concerned about these risks. The specific impacts to the lower Colorado River and watershed are not clearly delineated in the Draft PEIS. The Colorado River represents a major source of water for Southern California, as well as Nevada and Arizona. Metropolitan requests that practices that can impact drinking water sources be monitored carefully. Thus the monitoring plan must include evaluation feedback to direct, halt, or change herbicide applications that are deleteriously affecting water quality or other resources.<br><br>**Response:** The application of pesticides and herbicides will always be in accordance with manufacturer's recommendations, including careful attention to weather conditions so that applications are not made during windy periods. Percolation into groundwater systems is not likely to occur, due to low infiltration rates and adsorption of chemicals onto soil and clay particles. The slow rate of groundwater flow (a few inches per year to a few feet per year) will allow degradation processes to take place, and lower concentrations to the level that are below recommended limits for the various chemicals. Likewise, surface water protection is assured through proper use of buffers and other measures to keep pesticides out of streams and allow degradation processes. |

**Environmental Consequences, Wetland and Riparian Areas**

| | |
|---|---|
| EMC-0559-004<br>Daniel, Bill | **Comment:** There should be no aerial spraying of herbicides or use in riparian areas. Amphibian species are experiencing a global decline, as are natural fish populations. Use of the proposed herbicides would negatively impact many aquatic species in the region, including Threatened or Endangered species.<br><br>**Response:** See response to Comment EMC-0641-004 under PEIS Environmental Consequences, Wetland and Riparian Areas. |
| EMC-0641-004<br>Idaho Conservation<br>League | **Comment:** Although we support the judicious use of herbicides where safe and appropriate, we are concerned about potential adverse effects of aerial spraying on aquatic environments, particularly on small streams and other shallow water bodies. We do not feel confident that the proposed buffer zones will prevent contamination. We strongly encourage the BLM to consider adopting an alternative that strictly limits the use of aerial and broadcast application in regions containing water bodies.<br><br>**Response:** Based on the data call to field offices and as discussed in Chapter 4 of the PEIS under Wetland and Riparian Areas, only about 10,000 of the 932,000 acres treated using herbicides would be found in wetland and riparian habitats. Of these 10,000 acres, 98% would be treated using ground-based methods. Also see response to Comment RMC-0220c-001 under PEIS Environmental Consequences, Soil Resources. |

**Environmental Consequences, Vegetation**

| | |
|---|---|
| EMC-0088-003<br>Mentzer, Fred | **Comment:** If economical uses can be found for these 'Weeds', wildcrafting can keep them in check. Other plants can also be planted in their space. Milk Thistle has |

BLM_0001631

economic value and is a powerful plant for taking over other 'weeds'. I use it to take over buttercup. Milk Thistle is easy to kill and adds much nutrients and organic matter to the soil. Please do more experimenting before using toxic chemicals as a solution. More jobs are also needed.

**Response:** See response to Comment RMC-0049-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated. Vegetation treatments are often followed by reseeding or planting of other vegetation, however, the BLM does not endorse the planting of known invasive weeds to outcompete other invasive species. The BLM will provide permits for the public to gather plants for personal use.

EMC-0191-001
Frazier, Penny (Goods
From The Woods)

**Comment:** I do not believe the plan has taken into account those who harvest non-timber forest products and the impacts spraying will have upon that land use.

**Response:** The PEIS addresses use of public lands for harvest of non-timber forest products, and assesses the impacts of herbicide use on this land use, as well as on the health of those who could potentially be exposed to herbicides as a result of this land use. This information can be found in Chapter 4 of the PEIS, under the subheadings Paleontological and Cultural Resources, Recreation, and Human Health and Safety. Additional information may also be found in Appendix B of the PEIS, which provides information on the human health risk assessment.

EMC-0203-007
Institute For Culture
and Ecology

**Comment:** The ecological and biological assessments for the draft [P]EIS do not include a discussion of the impacts of spraying herbicides on nontimber forest product productivity. Developing such a discussion requires developing adequate inventories of species being harvested. The agency must consider management alternatives that could be taken to simultaneously achieve the goals for vegetation management with herbicides and the sustainability of harvesting cultures, traditions, and economies.

**Response:** Vegetation management alternatives will be considered before any vegetation treatments analyzed in the Draft EIS and PER are initiated. These alternatives will be developed in accordance with decisions and land allocations contained in the applicable land use plan (see Chapter 1 of the PEIS under NEPA Requirements of the Program). Approximately 8% of all proposed herbicide treatments would occur in Oregon (See Chapter 4 of the section on Social and Economic Values, Economic Activity and Public Revenues Generated from BLM Lands), where the preponderance of non-timber forest products are harvested from BLM-administered forests. Effects on harvesting other (non-timber) vegetation products would depend on the product and the design of specific herbicide treatment projects. Indiscriminate application of herbicides could damage resources or reduce their value. Alternatively, herbicidal control of undesirable, invasive plants could enhance the habitat for desirable species. Public involvement in project planning and environmental review will be encouraged to minimize adverse effects and maximize benefits. Herbicide treatments would follow BLM procedures outlined in BLM Handbook H-9011-1 (*Chemical Pest Control*), and Manuals 1112 (*Safety*), 9011 (*Chemical Pest Control*), and 9015 (*Integrated Weed Management*), and would meet or exceed states' label standards. Herbicide application schedules are designed to minimize potential impacts to non-target plants and animals, while remaining consistent with the objective of the vegetation treatment program. (see Chapter 2 of the PEIS under Herbicide Modes of Action and Treatment Methods).

BLM_0001632

RESPONSE TO COMMENTS

EMC-0203-009
Institute For Culture
and Ecology

**Comment:** In reviewing the reference section only two references for nontimber forest products are listed, neither of which pertain to public lands in the western United States specifically. This suggests the agency has neglected to review the current and historical scholarly literature regarding nontimber forest products.

**Response:** As stated in Chapter 1, this PER does not evaluate vegetation management that is focused primarily on commercial timber or other forest product enhancement or use activities that are not related to improving forest health, hazardous fuel reduction, or work authorized under the Healthy Forests Restoration Act. Herbicide application will be conducted to target invasive and otherwise undesirable plant species and limit impacts on non-target species. Potential impacts to particular plants used locally as special forest products will be considered and addressed when site-specific treatments are proposed. Appendix D (Native American and Alaska Native Resource Uses) and Appendix E (Cultural Resources) of the PER discuss Native Peoples uses of nontimber and other vegetation products.

EMC-0274-002
Noble, Emily A.

**Comment:** How will herbicide affect four-wing saltbush, for instance? That particular plant is supposedly helpful as an actual "fire retardant" I have heard although I do not know about it from personal experience.

**Response:** Four-wing saltbush, *Atriplex canescens* is a native woody shrub. It would react to the mode of action of the selected herbicide and the rate of application. Some woody shrubs are more tolerant of low rates of herbicide than are herbaceous plants. Some four-wing saltbush populations may be vigorous sprouters after top-kill, but studies on rhizomatous fourwing saltbush are lacking.

EMC-0278-015
Lutjens, William
(BLM)

**Comment:** How effective will the BLM be in preventing an increase in expansion rate without the aide of herbicides, especially with weeds like leafy spurge and medusahead which are impractical or impossible to control by mechanical means in many situations?

**Response:** The BLM's Proposed Action and Preferred Alternative (Alternative B) include the use of herbicides to reduce the expansion rate of invasive species. The alternative analysis for Alternative C indicates that without the use of herbicides, control of noxious weeds and invasive species will be more difficult over the long term.

EMC-0338-005
Dow AgroSciences

**Comment:** In Alternative D: No Aerial Applications, it should be noted that aerial applications of herbicides are often the method of control that offers the least disturbance of the area. Mechanical methods, as is mentioned in the PEIS, will often disturb the ground cover, which opens the area to new infestations, and actually facilitates the spread of invasive plants into new habitats.

**Response:** We have included wording indicating that mechanical disturbance could lead to the spread of invasive plants in Chapter 4 of the PEIS under Vegetation, Alternative D – No Aerial Applications.

EMC-0338-009
Dow AgroSciences

**Comment:** These comparisons are not reasonable in some cases, for example comparing buffer distances for drift of imazapic (Table 4-12 [of the Draft PEIS] Buffer Distances to Minimize Vegetation from Off-site Drift of BLM Evaluated Herbicides) and clopyralid (Table 4-14 [of the Draft PEIS] Buffer Distances to Minimize Vegetation from Off-site Drift of Forest Service Evaluated Herbicides) it is apparent that different criteria were used as a basis for these comparisons. The potential for drift

BLM_0001633

is mostly a factor of application equipment including nozzle size, pressure, volume applied per acre and weather conditions at the time of application. How can there be a difference between the typical application rates of 900 ft [feet] for these two compounds (0 ft for imazapic and 900 ft for clopyralid) for sensitive plants? If applied correctly there should be no difference at all between the risks. It is the applicator that makes sure the application targets the site with no or a minimal amount of drift.

**Response:** The AgDrift model did predict similar proportions of each active ingredient remaining at each distance modeled. In other words, a similar percent of the active ingredient drifted to 100 feet or to 900 feet from the application site. However, the amount of active ingredient (i.e., lb/acre) drifting from the application site was not the only factor used to estimate buffer distances. Buffer distances were determined by looking at the potential/predicted impact of the drifted herbicide on non-target species. For active ingredients with lower toxicity thresholds (i.e., more toxic herbicides), the buffer distance was greater than for those with higher toxicity thresholds (i.e., less toxic herbicides).

EMC-0338-010
Dow AgroSciences

**Comment:** Comments about clopyralid: Page 4-54 [of the Draft PEIS] indicates that a "maximum use rate" of clopyralid used in the analysis was 1 lb ai/A [pounds of active ingredient per acre]. There are no uses on the current labels over 0.5 lb ae/A [acid equivalent per acre]. Even though 0.5 lb a.i./A is the maximum amount allowed by the label most applicators use 0.375 lb a.i./A as the maximum amount needed to control many of the target weed species. Further the "typical use rate" of clopyralid is 0.25 lb a.i./A not the 0.375 lb a.i./A used in the calculations. Therefore, any restrictions (buffers, etc) on the use of clopyralid on BLM land should be re-calculated with the maximum amount per acre rate of 0.375 lb a.i. and a typical rate of 0.25 lb a.i./A. If this is not done then at the least the calculations should be re-done using the maximum label rate of 0.5 lb a.i./A.

**Response:** Clopyralid is one of the herbicide active ingredients that was assessed using information from the Forest Service Risk Assessments. Since the beginning of the PEIS, the Forest Service has updated their original clopyralid risk assessment. In the original risk assessment (dated 1999), the maximum application rate was 1.0 lb. a.e./acre. In the 2004 version of the clopyralid risk assessment, the maximum application rate is 0.5 lb. a.e./ac. at the current labels of the formulations that contain clopyralid—Curtail, Reclaim, Redeem, and Transline—state that the maximum application rate allowed on a per acre basis is between 0.375 and 0.5 lb. a.e./A./year. For the Final PEIS, and based on this commentor's concerns, we recalculated the risks associated with a maximum clopyralid application rate of 0.5 lb. a.e/acre. Based on this analysis, the levels of risk (low, medium, high) were the same as those for applications at 1 lb. a.e./acre.

Regarding the typical application rate, 0.375 lb. a.e./A. is the value selected by the Forest Service and fits within our program limits.

EMC-0338-011
Dow AgroSciences

**Comment:** Comments about triclopyr: In Chapter 4, on page 4-59 [of the Draft PEIS] it is noted that a typical application rate of triclopyr would be 1 lb ai/a and that a maximum use rate of 10 lb a.i./A [pounds of active ingredient per acre] was used in some of the modeling. First, the maximum label use rate of either the triclopyr ester or amine labels is 8 lb a.i./A. Therefore any calculations using a rate of 10 lb a.i./A should be re-calculated to be in line with the labels. Second, we wish to make clear the maximum use rate for broadcast use of triclopyr on rangeland sites. The US EPA Reregistration Eligibility Decision (RED, October 1998) set the maximum use rate at 1

BLM_0001634

RESPONSE TO COMMENTS

lb/A; however that was quickly changed to 2 lb ae/A in the attached communication from US EPA to Dow AgroSciences. The 2 lb ae/A [acid equivalent per acre] rate, required that the tolerances in forage grass be raised from 500 ppm to 700 ppm. Data were gathered and submitted to accomplish this change and to support this new use rate, and was published in the Federal Register in 2004. The RED documents are never updated, but the regulation of the molecule continues to evolve over time. Documentation of these changes are attached.

**Response:** Triclopyr is one of the herbicides that was assessed using information from the Forest Service risk assessments, with the March 15, 2003 document stating that the "maximum use rate" analyzed was 10 lbs. a.e./acre and the "average application rate" analyzed was 1.0 lb. a.e./acre. For the Draft PEIS, we concurred with these values, rather than running an analysis on values that would reflect the limits associated with the label. The commenter is correct in pointing out that the maximum use rate on the label is 8.0 lbs. a.e/acre. For the Final PEIS, we recalculated the risks, this time using a maximum application rate of 8.0 lbs. a.e/acre. Based on this analysis, the levels of risk (low, medium, high) were the same as those predicted for applications at 10 lbs. a.e./acre.

EMC-0338-012
Dow AgroSciences

**Comment:** An error was found on the Garlon 4 label where a limitation of 1.5 lb a.i./A was allowed on rangeland. This has been removed from the label since the maximum for broadcast use on rangeland is 2 lb a.i./A as noted above. The new label will allow for individual plant applications such as basal or cut surface treatments to be used on any use site listed on the label at a maximum use rate of 8 lb/A. These types of applications are made directly to ungrazed parts of plants and, therefore, are not restricted by the grazing maximum rate of 2 lb a.i./A but rather are limited only by the maximum label rate of 8 lb a.i./A.

**Response:** The BLM recognizes that labels of pesticides are fluid documents that can change over time as new research is submitted in support of proposed changes. The label on each particular container of pesticide is the label that that governs its use. As the newly labeled containers of pesticide make their way into the distribution channel, the label modifications will be part of the application procedures. Such is the case with the Garlon 4® formulation. End users with current labeled containers with the 1.5 quarts restriction are required, by law, to follow this restriction. As the new labeled container arrives in the users' hands, the modified restrictions will be followed.

EMC-0525-009
Western Watersheds
Project

**Comment:** Desertification can be both a patchy destruction, often exacerbated by drought, as well as the impoverishment of ecosystems within deserts. The [P]EIS must assess the levels and degree of desertification that have occurred across the [P]EIS area. This is necessary to understand the capability and suitability of these lands for livestock grazing, the productivity and carrying capacity of these lands for grazing, the current or likely future extent of cheatgrass and other hazardous fuels problems linked to desertification and livestock or other degradation, the need for treatments and the type of treatments that may best be applied, the risks associated with treatments, and the likely effectiveness or success of any treatments undertaken under the [P]EIS/PER. The effects of alternatives, their ability to meet any objectives, and the ability of actions under the [P]EIS to maintain, enhance or restore habitats and populations of special status and other important species and native plant communities depend on the current environmental conditions of the lands where they would be applied. For example, how has the extensive depletion of understories in many areas of Wyoming big sagebrush vegetation or Utah juniper affected the degree and rate of desertification processes across the [P]EIS area, and altered the potential of a site to recover from any

BLM_0001635

treatment disturbance that may be imposed under the [P]EIS?

**Response:** The PEIS and PER provide an assessment of the adverse and beneficial effects of treatments under general land use and environmental scenarios likely to occur in the West. The ecological risk assessments evaluate more detailed land condition scenarios (e.g., soil type, moisture, vegetation type, slope, erodibility); the reader should consult these assessments to understand how herbicide treatments might behave under conditions of drought, limited vegetation, etc. Also see response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0525-177
Western Watersheds
Project

**Comment:** BLM's [P]EIS/PER aggressive treatment disturbance to mature and old growth plant communities will only serve to accelerate habitat fragmentation and degradation.

**Response:** See response to Comment EMC-0525-165 under PEIS Environmental Consequences, Wildlife Resources. The focus of the PEIS and PER was on treatments to control invasive species and weeds, and to reduce hazardous fuels. Efforts to reduce wildfire risk should help preserve mature and old growth plant communities while efforts to improve ecosystem health should reduce fragmentation and land degradation.

EMC-0525-178
Western Watersheds
Project

**Comment:** The [P]EIS never reveals that the primary plant communities being dubbed hazardous fuels and targeted for 'treatment' across BLM and Forest Service lands across the West are primarily old growth and mature native vegetation communities upon which many rare and declining species rely. Thus, the treatment and herbicide actions that disturb these vegetation communities instead of having BLM's claimed rosy outcomes, will further endanger sagebrush and juniper dependent species, and have deleterious watershed-level impacts affecting such species as Lahontan cutthroat trout or bull trout. Without providing necessary data on not just broad vegetation types where it contemplates treatment, but also how it characterizes "hazardous fuels" and vegetation to be targeted, no honest Weed [P]EIS analysis or adequate BA [Biological Assessment] for spraying and treatments can be provided.

**Response:** The PEIS only addressed vegetation treatments on BLM-administered lands; the Forest Service is responsible for management of vegetation on Forest Service-administered lands. Over 85% of treatments would occur in the Temperate Desert and Temperate Steppe ecoregions, where nearly all treatments would focus on shrubs, grasses, and perennial forb weed species. The majority of treatments would focus on controlling and removing weeds and other invasive vegetation and reducing the risk of wildfire through hazardous fuels treatments. These treatments would generally benefit mature vegetation by removing competing vegetation and reducing the threat of a catastrophic wildfire that kills or harms mature vegetation. The definition of hazardous fuels is given in the PEIS and PER in Chapter 1 under Terminology. Information of specific types and ages of vegetation to be treated would be provided for individual projects at the local level.

EMC-0553-010
Callihan, Robert H.

**Comment:** The draft [P]EIS correctly points out the propensity of sulfometuron-methyl to injure sensitive crops, but fails to identify ways to manage risks posed by this exceptionally phytotoxic herbicide; it does deserve more attention than most other highly potent herbicides. Failure to exercise such cautions is the reason for the reaction against all Sulfonylurea herbicides. Whereas the unusual potency of sulfometuron, picloram, and certain other herbicides the BLM proposes to use, is such that they deserve authoritative prescriptions and extraordinary attention to job specifications to

BLM_0001636

RESPONSE TO COMMENTS

avoid injury to off-target crop species, their use should not be abandoned. There are thousands of acres, particularly in isolated temperate desert and steppe regions, in which these could be aerially applied without endangering crops, but a quarter-mile upslope from row-crop farms is not among them. I recommend that the final decision address administration of the use of such tools.

**Response:** The PEIS identifies the rationale for analyzing the toxicity and environmental fate of sulfometuron methyl in this document. Chapter 4 of the PEIS, for each resource discussed, identifies specific ways to manage risks associated with the use of sulfometuron methyl.

EMC-0553-011
Callihan, Robert H.

**Comment:** The draft EIS wrongly implies that all ALS [acetolactate synthase] inhibitor herbicides are of comparable phytotoxicity (e.g. table 2-8; Vol [Volume] 1 p. [page] 4-115 [of the Draft PEIS]). They vary greatly in level of phytotoxicity and in spectrum of selectivity; the document should point out that fact.

**Response:** As noted under each herbicide discussion in the Vegetation section in Chapter 4 of the PEIS, the phytotoxicity and selectivity of ALS-inhibitor herbicides do vary.

EMC-0553-012
Callihan, Robert H.

**Comment:** No RQs [risk quotients] or LOCs [levels of concern] were cited or suggested for even one agricultural crop species; those crops are not so much as named in the document, though nearly 300 other plant species are, on pages A-1 to A-6 [of Appendix A of the Draft PEIS]; nor does the document acknowledge them even to the extent of mentioning exclusion of consideration of risks to crops. Perhaps this is because the preparer considered agricultural species of little significance in the environment, or to put it another way, not of any "special status" such as is designated to the list of nearly 2000 species of plants and animals on pages H-1 to H-44 [of Appendix H of the Draft PEIS]. Considering the close association of many BLM land with sensitive irrigated crops, the BLM's history of crop injury, and the nearly absolute human dependence on crops, more recognition should have been given to risks to crops of the irrigated West, as well as to ornamentals near farmsteads and urban areas. Granted, the BLM does not, in practice, entirely ignore that risk, but that's not the point; I recommend that the final draft or decision refer to this matter.

**Response:** The BLM did not evaluate crops because crops are not grown on BLM lands. However, the BLM did look at potential impacts to cropland plants as well as other non-target plants under Non-target Plants in the Vegetation section of Chapter 4 of the PEIS. Where agricultural crops are grown in proximity to BLM lands, they are typically hay and other grass species. The BLM's pesticide use proposal process has special considerations for use near crop areas. As part of the required Pesticide Use Proposal, any proposed herbicide application requires the BLM to identify "Sensitive Aspects and Precautions" associated with the proposed action, which would include cropland areas. Also see response to Comment EMC-0336-003 under PEIS Environmental Consequences, Air Quality. Note that private landowners use herbicides extensively for management of pasture and other agricultural crops.

EMC-0562-014
The Lands Council

**Comment:** The Lands Council members are concerned about the effect of herbicides on biodiversity as well as the aesthetic value of native plant species. Evidence exists that herbicides may create conditions more hospitable to invasive species than those that were present before the chemicals were used.

BLM_0001637

**Response:** See response to Comment EMC-0646-172 under PEIS Environmental Consequences, Vegetation.

EMC-0562-015
The Lands Council

**Comment:** Use of herbicides where non-native weed plants already occur frequently results in a reproductive advantage for non-native species, which then expand rapidly due to the lack of competition. In a short period, this can result in an exponential increase in non-native plants. *See* Wooten and Renwyck 2001; www.kettlerange.org/weeds. Support for this is found in literature and is very relevant to the issue at hand. For example in 1996, McDonald and Everest of the USFS Pacific Southwest Research Station, found that cheatgrass populations, not observed in the study plots at the beginning of a study, exploded in an herbicide-treated plot (at 743,667 plants per acre with 22% foliar cover) where it was 6 times greater in number of plants and more than 7 times greater in foliar cover than in the control plot (130,300 plants per acre, 3% foliar cover) two years after treatment. A study done by the British Columbia Ministry of Forests Research Program in the Upper McKay Creek near Lillooet, B.C. found that the choice of herbicides can have a profound effect on the plant species content and diversity many years after treatment. *See* http://www.for.gov.bc.ca/hfd/pubs/Docs/Lmh45.htm. ("The abundance of several low shrub species (black twinberry, black gooseberry, thimbleberry, trailing raspberry, red raspberry, birch-leaved spirea, and black huckleberry) was reduced for nine years following application of glyphosate.") As this report further observes, "Plant communities naturally change over time, but sudden shifts in structure and composition may negatively affect the availability of food for wildlife." The BLM must take these comments into evidence in consideration of its range of preferred alternatives.

**Response:** The following statement is made in the document cited by the commentor (Risky Business: Invasive Species Management on National Forests, Wooten and Renwyck 2001; www.kettlerange.org/weeds): "Invasive species management is a serious undertaking, with high potential for economic and resource losses and impacts. Such projects require prior disclosure of likely effects in order to insure that programs are effective, and remain within the limitations of policies and regulations."

The goal of the BLM's vegetation management program is not to create a situation where non-native species are enhanced through the application of an herbicide. Rather, as stated in Chapter 2 of the PER, the BLM's vegetation management program goals are, ". . . to manage vegetation to sustain the condition of healthy lands, and where land conditions have degraded, to restore desirable vegetation to more healthy conditions."

It is correct to expect that invasive species would become the dominant species if the management option resulted in only limited control of targeted species, or while severely damaging the non-targeted species. If properly carried out, however, management of a non-native weed species stresses or controls the weed with minimal impact on the native or desirable species. The study noted in the commentor's response, a study done by the British Columbia Ministry of Forest Research Program on the use of an herbicide, stresses the importance of understanding three things: the species targeted for management, the site where the management activity is to take place, and the characteristics of the herbicide selected. Through the preparation of a site-specific analysis and Pesticide Use Proposal, the issues of concern brought up by the commenter will be addressed.

BLM_0001638

RESPONSE TO COMMENTS

EMC-0566-005
Western Society of
Weed Science

**Comment:** One implication for Alternative B that may cause concern is that the use of herbicides around Threatened & Endangered (T&E) species is always harmful to the organism. However, the judicious use of herbicides can benefit T&E species by controlling noxious and invasive weeds that adversely alter habitats making them less suitable for T&E organisms. There are herbicides that control specific noxious or invasive plants (selective herbicides) without harming T&E species. Generalizations that herbicides should not be used around T&E species ignore the potential value of herbicides to help restore T&E habitats. In addition, the spread of invasive plants is a greater threat to some T&E species than the use of a selective herbicide. For example, use of herbicides that control sensitive invasive broadleaf species could be used around T&E grass species. Both Dr. Rod Lym, North Dakota State University, and Dr. Joe DiTomaso, University of California, have conducted field research that support this beneficial effect of herbicides in improving or preserving T&E habitat quality. Additionally, some measure of unintentional damage to T&E species should be articulated where non-herbicidal approaches are taken. Mechanical removal of invasive plants will likely disturb habitats and possibly physically damage T&E species.

**Response:** The discussion of potential effects to special status species (including threatened and endangered species) in the PEIS includes negative effects as well as benefits. Additional analysis of potential positive and negative effects of proposed treatments on threatened and endangered species, and species proposed for listing (TEP), is provided in the Biological Assessment (BA). The PER and BA also address the potential negative effects to these species associated with non-herbicide treatment methods. The BLM recognizes that many of these species can benefit from vegetation treatments, but at the same time steps must be taken to ensure that the treatments do not harm populations of these species. As applicable, the threats associated with invasive plants are discussed in background sections for individual species in the BA. Conservation measures developed in the BA consider the benefits to TEP species from treatments that improve habitat quality while not harming populations. For example, some conservation measures restrict certain types of treatments, except under circumstances in which the treatments are specifically designed to maintain or improve the existing population. Treatments specifically designed to improve TEP species populations will be analyzed in more detail at the local level.

EMC-0585-121
Western Watersheds
Project

**Comment:** Nowhere has BLM ever assessed the environmental impacts, including cumulative effects, of the large-scale removal of vegetation for use in biomass/biofuel. Any export of nutrients as biomass must also be assessed in relation to annual nutrient export and removal by domestic livestock from nearly all BLM lands. There is also greater risk of no long term restoration, or recovery of native vegetation occurring with nutrient export in biomass.

**Response:** See response to Comment EMC-0584-066 under PER Effects of Vegetation Treatments, Vegetation.

EMC-0585-214
Western Watersheds
Project

**Comment:** BLM ignores a critical link between forbs/broad-leaved plants and insect production. In the arid West, many more species of insects and a much greater diversity of insects are produced in association with forbs. By killing broad-leaved insect-producing plants with herbicides, BLM not only would alter protective vegetative cover (increasing likelihood of predation of parent, and nestlings/eggs, as well as greatly diminish food supplies for insect-dependent young birds (both altricial passerines or precocial young such as sage grouse.

BLM_0001639

**Response:** The scenario described in the comment is possible. However, invasive species are not native diets for native insects, and invasive plants are crowding out native forbs, which are the diet of native insects and support a food chain for avian species. The BLM seeks to replace invasive weeds with native or non-native, non-invasive plants. A discussion of the risks to grouse and their chicks is provided in the Wildlife Resources section of Chapter 4 of the PEIS.

EMC-0585-220
Western Watersheds
Project

**Comment:** BLM also ignores link between pollinators and rare plants. Rare plant species dependent on insect pollinators may be significantly harmed by herbicide use.

**Response:** The text of the PEIS has been changed in response to this concern. See the analysis of effects to vegetation in Chapter 4, under the Special Status Species subheading.

EMC-0619-004
Bellovary, Christopher

**Comment:** The PEIS for this project entirely fails to adequately identify and address the potential impacts to native plants and animals from the proposed herbicide spraying, despite the fact that the proposed action could devastate many native plants and animal species, and could easily result in detrimental changes to entire ecosystems. The directly affected habitats include many rare, threatened and endangered species, and due to wind drift, watershed drainage, and other ecological connections, the effects will likely extend far beyond the areas being sprayed. 16 USC [United States Code] § 1532(3) [a.k.a. Endangered Species Act § 3(3)] requires that federal agencies use "all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."

**Response:** The BLM has adequately identified and addressed the potential impacts to native plants and animals in Chapter 4 of the PEIS. Ecological risk assessments were used to predict risks to native plant and animal species, and were used to develop appropriate conservation and mitigation measures. Conservation measures for threatened and endangered species, which are presented in the Biological Assessment, are especially protective, and are intended to avoid adverse health effects to threatened endangered species as a result of herbicide application.

EMC-0621-006
Alliance of Forest
Workers and
Harvesters

**Comment:** The ecological and biological assessments for the Draft PEIS do not include a discussion of the impacts of spraying herbicides on nontimber forest product productivity. Such a discussion requires developing adequate inventories of species being harvested. The agency must consider management alternatives that could be taken to simultaneously achieve the goals for vegetation management with herbicides and the sustainability of harvesting cultures, traditions, and economies.

**Response:** The focus of the PEIS and PER was on treatments to control invasive species and weeds, and to reduce hazardous fuels. The PEIS discusses impacts to different vegetation groups in Chapter 4 under Vegetation and Wildlife Resources. The effects of herbicides on vegetation used by Native Americans and Alaska Natives are discussed in Chapter 4 of the PEIS under Paleontological and Cultural Resources. The ecological risk assessments evaluated risks to different vegetation groups, including forest vegetation, from application of herbicides. This information was used in preparing Chapter 4 of the PEIS and PER.

BLM_0001640

RESPONSE TO COMMENTS

EMC-0621-008
Alliance of Forest
Workers and
Harvesters

**Comment:** In reviewing the reference section, only two references for nontimber forest products are listed, neither of which pertain specifically to public lands in the western United States. This suggests the agency has neglected to review the current and historical scholarly literature regarding nontimber forest products.

**Response:** A discussion of the importance of non-timber forest products on public lands was provided in Chapter 3 of the PEIS and PER under Vegetation, Non-timber Forest Products. Also see response to Comment EMC-0621-006 under PEIS Environmental Consequences, Vegetation. The PEIS attempted to provide a reasonable review of the literature on herbicide use that showed both the adverse and positive aspects of herbicide use.

EMC-0626-006
Scotts Miracle-Gro
Company

**Comment:** In addition, the efficacy of imazapyr for grassland restoration has been documented and BLM should include this information in its PEIS. Masters and Nissen,[3] Masters et al.,[4] and Stougaard et al.[5] [references provided with comment response] evaluated the utility of imazapyr and other imidazolinone herbicides for the restoration of Great Plains grasslands and leafy spurge-infested rangelands.

**Response:** Within the PEIS, the use of imazapyr as an herbicide that has activity on aggressive invasive species, such as leafy spurge, is referenced in the Vegetation section of Chapter 4 of the PEIS. Within the imidazolinone chemistry, only imazapic, and imazapyr have current registrations that would allow for their use on BLM-administered lands, with imazapyr already approved for use and imazapic being part of the PEIS, as spelled out in Chapter 2.

EMC-0638-001
Kuczora, Carol

**Comment:** Defoliating defeats the purpose of protecting against wildfire. It invites sun-dependent flammable annual grasses and other invasive and less desirable plants such as poison oak, thistles, and other noxious weeds susceptible to ignition and spreading fire. This plan is a big mistake.

**Response:** Fuels treatments are not focused on defoliating vegetation (removing leaves), but at reducing the density of small diameter fuels, especially ladder fuels that can move fire into the canopy. The concept that when a stand is opened up it will result in reduced surface moisture and thus increased flammability is not necessarily true across all vegetation types, in all climate categories, at all times of the year. Land use and projects plans may propose site-specific management actions, including successive treatments or maintenance treatments, following an initial fuel treatment. In some areas, microclimatic conditions could temporarily become somewhat drier between successive treatments of a single project or during actual treatments. These site-specific changes are more transitory and occur at a smaller scale than changes that would occur following a wildfire.

It is true that invasive species can move into any disturbed or degraded plant community. That is why noxious weed assessments are done before treatments are implemented and revegetation after disturbance is determined during the site-specific project planning process. Poison oak is a native species that will be a component of plant communities where it is found, whether disturbed or not.

EMC-0640-022
Animal Welfare
Institute

**Comment:** The PEIS, PER, and associated documents also fail to delineate what method of treatment (herbicidal or non-herbicidal) will be used in each identified ecoregion to address the specific management needs identified in the purpose and needs statement. For example, while the BLM estimates the number or percentage of acres that may be treated with herbicides in each ecoregion if the proposed action is

BLM_0001641

implemented, it fails to disclose what percentage of the ecoregion-specific area will be treated to address the reduction in hazardous fuels, restoration of fire damaged land, control of weeds and invasive species, and the manipulation of vegetation to benefit fish and wildlife habitat. Similarly, though reducing hazardous fuels in the wildland-urban interface is deemed to be of great importance to the BLM in its introductory information, there is no explanation of what management technique will be used and where it will be used to address this concern. While such specifics may be part of a regional or more localized plan, incorporating such data in programmatic documents – even if the data could only be presented as estimates – would be valuable to the public to better understand for what purpose each treatment technique will be used within the various ecoregions.

**Response:** Some of this information is available in the PER. We have included text in the Vegetation section of Chapter 4 of the Final PER and PEIS under Program Goals by Ecoregion that discusses the percentage of acres proposed for treatment by treatment goal by ecoregion.

EMC-0646-166
Californians for
Alternatives to Toxics

**Comment:** The Draft PEIS/PER fails in its analysis of the effects of the treatments that may be used to combat invasive plants and conduct vegetation management. Evidence exists, for example, that herbicides use may create conditions more hospitable to invasive species than were present before the chemicals were applied. CATs [Californians for Alternatives to Toxics] is concerned that by spraying herbicides on almost a million acres (more than tripling current application acreage), the BLM will be increasing potential invasive species infestations, rather than reducing them. This is contrary to and exactly the opposite of the BLM's stated project objectives for the PEIS. This evidence and indirect/cumulative effects of the proposed actions must be analyzed by the BLM in the PEIS.

**Response:** See response to Comment EMC-0646-169 under PEIS Environmental Consequences, Vegetation.

EMC-0646-167
Californians for
Alternatives to Toxics

**Comment:** Several studies have confirmed that increased nutrient availability, in the form of excessive dead organic matter, can favor non-indigenous annual species where natural nutrient levels may be insufficient. For example, increases in nitrogen (i.e. the widening of the C:N [carbon to nitrogen] ratio) have shown to provide a competitive advantage to annuals such as cheatgrass that germinate much earlier in the season than native grasses (personal communication USGS [U.S. Geological Survey], Corvallis, Oregon). If the BLM follows through with the proposed large scale increase of herbicide spraying, lots of plants will die, leaving an unnatural amount of dead organic matter on the ground, changing natural nutrient levels, and thus creating an unnatural advantage for unwanted exotic species.

**Response:** The spread, colonization, and establishment of an invasive/exotic species is a product of many differing factors, including the nutrient levels of the site being infested. When treating downy brome, one of the management options to consider would be the application of an herbicide. The management of invasive grass species under the BLM vegetation management program involves the use of preemergence herbicidal activity, which prevents the selected grass species from emerging, thereby reducing the total amount of dry matter present. Postemergence application of herbicides is done when the grasses are small, reducing the potential dry matter associated with mature and senescent plants. It is recognized that drying induced by herbicide use creates dry matter, but the vegetation will also end up dry and brittle as a result of its natural life cycle. The critical point is the correct use of the herbicides as a

BLM_0001642

RESPONSE TO COMMENTS

component of an integrated management approach, taking into account the different management strategies associated with the particular target species.

EMC-0646-168
Californians for
Alternatives to Toxics

**Comment:** Cheatgrass [downy brome], for example, is not necessarily only encouraged by soil disturbance. It is more sensitive to light availability (Zouhar 2003). Increased spraying, especially wide spread aerial spraying, will kill large swaths of vegetation and drastically increase light availability. Decreases in adjacent canopy cover will introduce the invasion promoter of light that would provide suitable habitat for cheatgrass establishment (Zouhar 2003). The BLM cannot allow any treatment method (like herbicide spraying) that will just increase invasive species infestations. The BLM is proposing to spray invasives, but the spraying may actually create conditions more favorable to invasives rather than native species. This has the potential to become a continuous spraying loop.

**Response:** Other references reviewed by the BLM provide information about downy brome that differs from the points from Zouhar 2003 raised in this comment:

1. Downy brome seeds germinate best in the dark or in diffuse light – Young, Jim. 2000. *Bromus tectorum* L. In: Bossard, Carla C.; Randall, John M.; Hoshovsky, Marc C., eds. Invasive plants of California's wildlands. Berkeley, CA: University of California Press: 76-80. [Reference Number 492]

2. In drier environments downy brome requires environmental conditions less harsh than those of bare soil and must be covered by soil or litter. Young, James A.; Evans, Raymond A.; Major, J. 1972. Alien plants in the Great Basin. Journal of Range Management. 25: 194-201. [Reference 488]; Evans, Raymond A.; Young, James A. 1972. Microsite requirements for establishment of annual rangeland weeds. Weed Science. 20(4): 350-356. [Reference 142]; Evans, Raymond A.; Young, James A. 1987. Seedbed microenvironment, seedling recruitment, and plant establishment on rangelands. In: Frasier, Gary W.; Evans, Raymond A., eds. Seed and seedbed ecology of rangeland plants: proceedings of symposium; 1987 April 21-23; Tucson, AZ. Washington, DC: U.S. Department of Agriculture, Agricultural Research Service: 212-220. [Reference 146]

3. Establishment of downy brome seedlings is favored by large amounts of plant mulch. Evans. Raymond A.; Young, James A. 1970. Plant litter and establishment of alien annual weed species in rangeland communities. Weed Science. 18(6): 697-703. [Reference 141]

4. Downy brome invasion may be accelerated by disturbance, but disturbance is not required for downy brome establishment. Goodrich, Sherel. 1999. Multiple use management based on diversity of capabilities and values within pinyon-juniper woodlands. In: Monsen, Stephen B.; Stevens, Richard, compilers. Proceedings: ecology and management of pinyon-juniper communities within the Interior West: Sustaining and restoring a diverse ecosystem; 1997 September 15-18; Provo, UT. Proceedings RMRS-P-9. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station: 164-171. [Reference 166]; Meyer, Susan E.; Garvin, Susan C.; Beckstead, Julie. 2001. Factors mediating cheatgrass invasion of intact salt desert shrubland. In: McArthur, E. Durant; Fairbanks, Daniel J., compilers. Shrubland ecosystem genetics and biodiversity: proceedings; 2000 June 13-15; Provo, UT. Proc. RMRS-P-21. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station: 224-232. [Reference 287]

5. Downy brome can also thrive in areas that have little or no history of cultivation or grazing by domestic livestock. Driscoll, Richard S. 1964. A relict area in the central Oregon juniper zone. Ecology. 45(2): 345-353. [Reference 126]; Emmerich, F. L.; Tipton, F. H.; Young, J. A. 1993. Cheatgrass: changing perspectives and management strategies. Rangelands. 15(1): 37-40. [Reference 137]; Goodrich, Sherel; Gale, Natalie.

BLM_0001643

1999. Cheatgrass frequency at two relic sites within the pinyon-juniper belt of Red Canyon. In: Monsen, Stephen B.; Stevens, Richard, compilers. Proceedings: ecology and management of pinyon-juniper communities within the Interior West: Sustaining and restoring a diverse ecosystem; 1997 September 15-18: Provo, UT. Proceedings RMRS-P-9. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station: 69-71. [Reference 167]; Goodrich, Sherel; McArthur, E. Durant; Winward, Alma H. 1999. Sagebrush ecotones and average annual precipitation. In: McArthur, E. Durant; Ostler, W. Kent; Wambolt, Carl L., compilers. Proceedings: shrubland ecotones; 1998 August 12-14; Ephraim, UT. Proceedings RMRS-P-11. Ogden, UT: U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station: 88-94. [Reference 168]; Kindschy, Robert R. 1994. Pristine vegetation of the Jordan Crater kipukas: 1978-91. In: Monsen, Stephen B.; Kitchen, Stanley G., compilers. Proceedings – ecology and management of annual rangelands; 1992 May 18-22; Boise, ID. Gen. Tech. Rep. INT-GTR-313. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Research Station: 85-88. [Reference 231]; Mosely, Jeffrey C.; Bunting, Stephen C.; Manoukian, Mark E. 1999. Cheatgrass. In: Sheley, Roger L.; Petroff, Janet K., eds. Biology and management of noxious rangeland weeds. Corvallis, OR: Oregon State University Press: 175-188. [Reference 307]; Svejcar, Tony; Tausch, Robin. 1991. Anaho Island, Nevada: a relict area dominated by annual invader species. Rangelands. 13(5): 233-236. [Reference 410]; Tausch, Robin J.; Svejcar, Tony; Burkhardt, J. Wayne. 1994. Patterns of annual grass dominance on Anaho Island: implications for Great Basin vegetation management. In: Monsen, Stephen B.; Kitchen, Stanley G., compilers. Proceedings – ecology and management of annual rangelands; 1992 May 18-22; Boise, ID. Gen. Tech. Rep. INT- GTR-313. Ogden, UT: U.S. Department of Agriculture, Forest Service, Intermountain Research Station: 120-125. [Reference 415]

As with downy brome, the management of invasive species involves an understanding of the ecological characteristics of the species identified for management. By correctly identifying such characteristics an effective management plan can be developed. The purpose of the PEIS is to provide a broad comprehensive background source of information on which any necessary subsequent environmental analysis can be tiered. Specific concerns regarding the use of a particular herbicide will be addressed during the site-specific analysis. Chapter 2 of the PER further addresses how the different management options will be integrated into an overall management program in order to meet the goals of the vegetation management program.

EMC-0646-169
Californians for
Alternatives to Toxics

**Comment:** Use of herbicides where non-native weed plants already occur frequently results in a reproductive advantage for non-native species, which then expand rapidly due to the lack of competition. In a short period of time, this can result in an exponential increase in non-native plants (Wooten and Renwyck 2001). The BLM fails to provide analysis of such information in the Draft PEIS, and it is found in the literature and very relevant to the issue at hand.

**Response:** Any treatment (not just herbicide) to remove non-natives may stimulate non-natives to expand, mostly due to disturbance of the seedbank in the soil. Herbicide treatment actually is less disturbing in this regard. It is true that continuous use of a broadcast herbicide can aid in selection for herbicide tolerant species, which may or may not be invasive, but the initial step in planning any vegetation project is to assess and plan for revegetation of openings created by the proposed treatment. Revegetation Standard Operating Procedures are discussed under Revegetation in Chapter 2 of the PER.

BLM_0001644

RESPONSE TO COMMENTS

EMC-0646-172
Californians for
Alternatives to Toxics

**Comment:** That herbicides appear to be a disturbance factor that actually encourages invasive species to colonize and spread in herbicide-treated areas clearly must be analyzed in the PEIS.

**Response:** The colonization and spread of a particular invasive species is the product of several factors, including, but not limited to, the species in question and the environmental characteristics of the site of potential infestation. Certain invasive species are aggressive and will invade an area regardless of whether it has had a disturbance event or not. In addition, different vegetation communities vary in their natural ability to resist invasion by non-native species. The analysis of potential for associated impacts from herbicide applications would occur at the site-specific level prior to treatment.

EMC-0646-175
Californians for
Alternatives to Toxics

**Comment:** CATs [Californians for Alternatives to Toxics] contends that the proposed action of widespread spraying of herbicides to kill unwanted vegetation will result in increased fired dangers from standing dead biomass and exotic species invasions post spraying. Killing large amounts of the brush and other weeds with herbicides will undoubtedly increase light availability in heavy brush areas and thus increase potential noxious weed and invasive species habitat.

**Response:** Following integrated weed management procedures, most herbicide treatments will be combined with other methods, including removal of treated fuels mechanically or by prescribed fire. These methods include revegetation of areas where gaps have been created to prevent invasive species establishment. If herbicides can control invasive plants that have disrupted fire regimes and provide a competitive edge to native species that do not disrupt fire regimes, then wildland fire risk will be reduced.

EMC-0646-176
Californians for
Alternatives to Toxics

**Comment:** The BLM has failed to discuss in the PEIS cheatgrass' ability to indirectly benefit from herbicides and proliferate in disturbed herbicide sprayed areas, and then to create an additional major fire threats.

**Response:** As the commentor notes, downy brome (cheatgrass) is an aggressive colonizer of disturbed sites. Should an area dominated by downy brome be sprayed with an herbicide, it would be one formulated specifically for treating annual grasses. If no native plants are available to reinhabit the site, then downy brome is quite likely to become reestablished. That is why spraying of downy brome is done to release existing native plants, especially in areas where a native seedbank still exists, or natives are seeded after the downy brome has been killed. Revegetating a site with native plants is a primary goal following the spraying of downy brome with an herbicide.

EMC-0646-177
Californians for
Alternatives to Toxics

**Comment:** The BLM needs to take a long and honest look at the potential for creating that which they say they are trying to avoid, tinder dry forests and grasslands, thick with both living and dead ladder fuels. In essence that is exactly what will be created by the preferred alternative. In truth the only way to avoid this is to cut unwanted brush, either mechanically, or by hand, leave it on the ground to discourage new brush growth and noxious weed invasion, and restock the area the following planting season. This would provide jobs, give greater protection to wildlife, provide erosion protection, and create a healthier soil profile. The brush would decompose faster than dead brush left standing. A selective re-cut 2 to 3 years later would allow for release. The beneficial aspects of brush (soil and nitrogen production, wildlife feed and habitat) would allow for a faster growing and healthier forest.

BLM_0001645

**Response:** When vegetation is treated and killed during a fuels treatment, a secondary treatment is planned to remove any remaining dead plant material. Depending on site-specific habitat requirements needed to meet objectives for other resources, such as wildlife, some level of woody debris is left. This debris provides the beneficial aspects mentioned in the comment. Brush not needed to meet these objectives would create the same level of fuel hazard as if left standing, but would be drier. The only difference is the change in placement of the fuel. An analysis of the site variables involved during local level project design will determine to what extent fuels must be removed, chipped, or handpiled and burned, as well as the need for planting. The potential to provide jobs will exist no matter what the follow-up treatment may be.

EMC-0646-179
Californians for
Alternatives to Toxics

**Comment:** With cheatgrass spread comes the lengthening of the fire season and increase in numbers of fires, the very same fires that the BLM's PEIS is suppose to avoid. This invasive greatly impacts ecosystem functioning causing changes in fire regimes including increased fire frequency and extent, often to the point where native species cannot recover (D'Antonio et al 2002, Brooks et al 2004, Young and Clements 2005). The Tahoe National Forest wrote in the Cottonwood FEIS (2005) "The biggest threat the project area faces from cheatgrass is repeated stand replacing fires...Cheatgrass dominated communities tend to burn more frequently and can shorten the fire return interval, thus effectively hampering the recovery of native vegetation (Personal communication, Young, 2002)."

**Response:** See responses to Comment FXC-0071-021 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, and Comment RMC-0042-054 under PEIS Proposed Action and Purpose and Need, Purpose and Need for the Proposed Action.

EMC0646-180
Californians for
Alternatives to Toxics

**Comment:** The probability of increased fires due to cheatgrass [downy brome] proliferation is not part of the effects or alternative analysis and thus fails to fully inform the decision maker. The frequent fires associated with cheatgrass infestations, as well as all the dead brush left standing from the herbicide spraying has the likely potential to wipe out a vast areas of public lands, and render this project a huge waste of BLM resources and tax payer money.

**Response:** See Fire Ecology for the Temperate Desert Ecoregion under Fire Ecology and Vegetation by Ecoregion in the PER for a description of the downy brome affected environment. See Table 4-5 under Vegetation in Chapter 4 of the PER for a discussion on the effects of fire treatments on downy brome. When vegetation is treated and killed during a fuels treatment, regardless of the method used, a secondary treatment is planned to remove any remaining dead plant material.

EMC-0646-182
Californians for
Alternatives to Toxics

**Comment:** The factors contributing to the proliferation of existing weed populations and the establishment of new populations have been described above. The advent of increased light availability and soil disturbance to sprayed areas sets the stage for this advancement of invasive weeds. The use of herbicides is unwarranted as its current proposed application would not accomplish the desired goals. In addition, it is feared that the proposed fuels reduction treatments would promote further weed establishment and increase the area of existing weed populations, resulting in future proposals for even more widespread herbicide treatment to control an escalating weed problem. Until further exploration of intensive weed management is considered, the use of herbicide, as described in the PEIS, is futile, insufficient and exposes the public lands to vast amounts of toxics unnecessarily.

BLM_0001646

RESPONSE TO COMMENTS

**Response:** Integrated weed management is expanded on in Chapter 2 of the PEIS and PER under Vegetation Treatment Standard Operating Procedures and Guidelines. The Prevention of Weeds and Early Detection and Rapid Response section reiterates that the BLM is required to develop a noxious weed risk assessment when an action may introduce or spread noxious weeds, that modification of actions must take place to reduce likelihood of infestations when the risk is determined to be moderate or high, and that control measures to be implemented be identified if weeds do infest the site. This direction is required under BLM Manual 9015 (*Integrated Weed Management*). Direction on determining treatment method is found in BLM policy in BLM Manual 9011 (*Chemical Pest Control*). Integrated weed management will be used as the decision process for determining appropriate treatments and appropriate revegetation at the site-specific, local level. The very factors mentioned in the comment will be taken into account when designing a treatment project.

EMC-0646-222
Californians for
Alternatives to Toxics

**Comment:** In addition to the proliferation of vegetation, the fuels treatment areas will experience reduced surface fuel moisture and increased flammability (Countryman 1955 as cited in Weatherspoon 1996). The greater the stand opening, the more pronounced the change in microclimate is likely to be. Increased ladder fuels and decreased surface fuel moisture can be a catastrophic combination. These effects must be analyzed within the PEIS (or PER).

**Response:** The concept that when a stand is opened up it will result in reduced surface moisture and thus increased flammability is not necessarily true across all vegetation types, all climate categories, or all times of the year. Land use and project plans may propose site-specific management actions, including successive treatments or maintenance treatments, following an initial fuel treatment. In some areas, microclimatic conditions could temporarily become somewhat drier between successive treatments of a single project or during actual treatments. These site-specific changes are more transitory and occur at a smaller scale than changes that would occur following a wildfire.

The concept is less applicable to dry site ponderosa pine stands in the inland northwest that have been encroached upon by short-needled conifers. In these areas, in late summer and early fall before the onset of fall rains, the forest floor is dry regardless of whether short-needled conifers are present. Should a fire occur, these short needled conifers would contribute to the fire's intensity because they are ladder fuels. Therefore, the goal of many treatments in dry-site ponderosa pine areas is to reduce encroachment by short-needled conifers, in order to lessen wildfire intensity and preserve the pines. Effects of short-needled conifer removal would be evaluated in a site-specific environmental assessment.

RMC-0040(2)-004
Resource Concepts,
Inc.

**Comment:** Pg [Page] 4-123 [of the Draft PEIS], in the fourth paragraph on this page, herbicide treatments are being proposed to reduce the risk of future catastrophic wildfire for weeds of concern including downy brome, Russian thistle, kochia, oak, and pinyon/juniper. Herbicide applications of tebuthiuron or other herbicides could actually increase the risk of catastrophic wildfire. Leaving standing dead trees and tree branches on-site after application of herbicide treatment could result in higher quantities of low-moisture fuels that carry fire faster than live vegetation. Reducing the percentage of live pinyon and juniper trees in an area through chemical treatment should result in less competition for native grass and forb species, which is a benefit of treatment. However, increases in grass, forb, and shrub fuels are expected and can negate the supposed fuel reduction purpose behind the treatment.

BLM_0001647

**Response:** The BLM does not agree with this comment. In some cases herbicides are applied to prevent emergence of the plant to begin with. In cases where plants are treated and killed, a secondary treatment is planned to remove any remaining dead plant material. After the initial treatments, monitoring and follow-up treatments (which can be of any type, not necessarily chemical), if necessary, will occur. Also see response to Comment RMC-0069-016 under PEIS Proposed Action and Purpose and Need, Purpose and Need for the Proposed Action.

RMC-0042-084
Asher, Jerry

**Comment:** "Today, the rapid expansion of invasive species (that includes animals. Do you mean plants?) across public lands is one of the primary threats to ecosystem health…". (first para [paragraph] pg [page] 4-42 [of the Draft PEIS]). The word threat tells the reader that maybe the weeds will keep expanding. Is there any doubt that they will keep expanding.

**Response:** The text of the PEIS has been changed for clarity in response to this comment. See the section on Vegetation in Chapter 4.

RMC-0042-085
Asher, Jerry

**Comment:** Delete threat and change sentence to read: "Today the rapid expansion of invasive plants across public lands is causing massive and often permanent (with today's economics and technology) damage to ecosystem health and is one of the greatest challenges to ecosystem management"

**Response:** The text of the PEIS has been changed for clarity in response to this comment. See the section on Vegetation in Chapter 4.

RMC-0042-086
Asher, Jerry

**Comment:** The first [P]EIS full para. [paragraph] pg. [page] 4-65, needs to be more accurate. Replace likely spread with will spread. Insert "permanent" before "damage".… And, add "steep rocky terrain" in the "e.g. parenthetical para.

**Response:** The text of the PEIS has been revised in response to this comment. See the discussion of impacts to vegetation under Alternative C, in Chapter 4, under the Vegetation subheading.

RMC-0106-030
Public Employees for
Environmental
Responsibility

**Comment:** It is stated that "In the majority of cases, toxicological data do not exist for the specific plant receptors of concern. Consequently, toxicological data for surrogate species…were evaluated and used to establish quantitative benchmarks…for the ecological receptors of concern." In addition (p. [page] 4-45 [of the Draft PEIS]) most of the assessments relate to crop plants, not native species. Considering the fact that the BLM and the USFS [U.S. Forest Service] have been conducting herbicidal treatments on public lands for two decades, this indirect approach to risk assessment for the particular herbicides in question should by now have been replaced with real, relevant data.

**Response:** There are several thousands of species on public lands in the western U.S. Toxicity studies are typically performed on a few species of principal economic interest; for herbicide toxicity studies these species include crops and selected animal species. Interspecies extrapolation is a standard practice in toxicology and risk assessment. See responses to Comment EMC-0640-037 and Comment EMC-0585-199 under PEIS Environmental Consequences, Herbicide Effects Analysis.

BLM_0001648

RMC-0106-032
Public Employees for
Environmental
Responsibility

**Comment:** p. [Page] 4-45 [of the Draft PEIS]. Under Non-target Plants, an incident of extensive crop damage from use of Sulfometuron Methyl (Oust® formulation) is described as resulting from drift. This is apparently incorrect as reports indicate it was caused by wind erosion of sprayed burn areas, spreading ash contaminated by the herbicide. Label instructions apparently call for application before rain, but, although the season was right, the weather did not cooperate. This event should provide a heads-up warning that use of this herbicide in burn areas should not be allowed—unless the BLM improves its weather forecasting.

**Response:** The text under Impacts Common to All Treatments (Non-target Plants) in the Vegetation Section of Chapter 4 of the PEIS has been revised to correctly describe the factors that resulted in crop damage. Further guidance on the application of Oust® under Impacts of BLM-evaluated Herbicides, Sulfometuron Methyl.

RMC-0144-022
Wyoming Game and
Fish Department

**Comment:** [Page] 4-45 [of the Draft PEIS]: We recommend adding post treatment management as another factor relative to the success of the treatments over both the short and long-term.

**Response:** See text added to Impacts Common to All Treatments in the Vegetation section of Chapter 4 of the Final PEIS concerning the role of post-treatment maintenance activities in short- and long-term success of vegetation treatments.

RMC-0200-011
Lindsay, Dianne

**Comment:** The PEIS fails to use the most recent information regarding forest health. The use of herbicides to kill all but the conifers greatly reduces the soil building capabilities of other very important trees and plants.

**Response:** The use of herbicides to kill all but conifers is not the BLM's main intent. Under the proposed program of work outlined in the PEIS and PER, herbicides would be used primarily to control non-native species, such as downy brome and tamarisk, and invasive native species that have invaded native shrub and grasslands due to the exclusion of fire, such as juniper. Also, see Vegetation Treatment Planning and Management in Chapter 2 of the PEIS. Land use plans guide land use and vegetation management decisions within the geographic area they cover, and provide specific goals, standards, and objectives to apply to vegetation treatment projects and activities. The overriding goal is to treat vegetation on lands only where necessary, and to prioritize treatment methods based on their effectiveness and likelihood of having minimal impacts on the environment. Also see response to Comment EMC-0584-066 under PER Effects of Vegetation Treatments, Vegetation.

RMC-0208-018
California Oak
Foundation

**Comment:** The BLM's proposal to increase the use of herbicides on its lands adjacent to oak woodlands will only further accelerate the loss of this essential habitat.

**Response:** See response to Comment RMC-0208-003 under PEIS Alternatives, Vegetation Treatment Planning and Management.

RMC-0208-023
California Oak
Foundation

**Comment:** The PEIS fails to disclose the extent to which the BLM's use of herbicides on its lands in California will impact the state's oak woodland habitats. Indeed, the PEIS provides the public with virtually no information by which it can determine the extent to which the BLM's proposed use of herbicides will impact this vital resource. And, although the Draft PEIS contemplates additional NEPA documents will be prepared at the local level that will address specific areas to be treated and assess potential effects, the time to assess these impacts at the regional level is now. Otherwise, the current NEPA review process is an empty exercise that allows the BLM

BLM_0001649

to charge ahead with a massive program to vastly increased use of herbicides but without assessing whether that increased use could potentially effect resources, including oak woodlands, and specifically including oak woodlands in California.

**Response:** The PEIS discusses potential impacts from the program to oak woodlands in California and other western states in Chapter 4 under Vegetation Resources. In California, treatments would be limited in oak woodlands and would focus on weedy species. However, more detailed information on impacts to woodlands is best assessed once the project is developed and potential treatment methods identified. This information would be addressed on a site-specific basis, using information that is provided in this broad programmatic document.

RMC-0213-006
California Native Plant Society

**Comment:** The sulfonylurea herbicides such as sulfometuron methyl (Oust®) and chlorsulfuron (Glean®) are known to cause significant reductions in fruit and seed production in a variety of plant species, even at 1000 times lower than the recommended application rate. Current EPA registration requirements do not include testing for reproductive effects, yet more than 230 formulations containing these chemicals had been registered by 1987. Reproductive damage to rare plant populations could severely threaten rare and endangered species' long-term survival. Although rare plant species have been directly impacted by this herbicide, no monitoring has been done to determine whether surviving individuals have been reproductively affected, even though these impacts could lead to severe impacts to the species as a whole.

**Response:** Actually, USEPA-mandated registration tests do measure plant reproductive endpoints, including germination and seed emergence. While improper herbicide use may pose a risk to rare plants, these plants are being crowded out by invasive weeds; proper herbicide application is intended to help restore native plants. The Biological Assessment discusses the risks to threatened and endangered plants from herbicide use, and provides Standard Operating Procedures and mitigation measures to help avoid or reduce these risks.

RMC-0213-013
California Native Plant Society

**Comment:** CNPS [California Native Plant Society] is concerned about native plants that provide important food sources for birds, deer, and other wildlife. The impacts to rare plants described above, especially from chlorsulfuron and sulfometuron methyl, are of concern because reproductive damage to food-source plants is likely to have detrimental effects for animal species that rely on these plants for food. Of particular concern are threatened, endangered, and sensitive species, and we believe that these potential negative impacts must be considered in any proposed use of herbicides, but especially aerial and broadcast ground spray plans.

**Response:** The potential indirect effects to wildlife associated with impacts to plants that serve as a source of food are discussed in Chapter 4 of the PEIS, under the Wildlife Resources subheading. In addition, the Biological Assessment provides background information on all threatened, endangered, and proposed for listing (TEP) wildlife species, including specific diet needs that must be maintained in order for the species to survive. Protection of habitat was considered when developing conservation measures for special status species. In addition, there are conservation measures specific to rare plant species, including those that are important components of wildlife habitat. At the local level, development of treatment programs and the analysis of their potential effects will be more detailed as far as which special status species and associated habitat could potentially be affected by treatments. This information will be used to develop additional conservation measures, as appropriate.

BLM_0001650

RMC-0218-045
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** We are also concerned that there are references in the DEIS [Draft PEIS] to setting back the successional stage of "rangeland" and forest to an earlier successional stage through the use of herbicides – for what? So that livestock graze on grasses rather than sagebrush and the sage grouse is eliminated as a restriction on livestock use? So that trees are more "vigorous" to grow for timber uses and "decadent" old growth habitat is eliminated, along with old growth-dependent species? This is not fulfilling the full public use and enjoyment mandate for public lands, which should not be managed as commercial private enterprises.

**Response:** A large percentage of BLM-administered lands evolved with repeated fires. Fire was a predominant factor in creating successional stages that provided the broad mosaic of habitat to which many native wildlife species are adapted. Where the exclusion of fire has altered the native plant community mosaic, treatments may be used to create conditions that more closely resemble the native plant community, including early several stages where they are uncharacteristically underrepresented, as compared to the native plant community.

RMC-0222-100
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Nonlethal effects on plants (effects on plants other than mortality): Although the DEIS [Draft PEIS] claims that in the evaluation of herbicide effects on nontarget plants the assessment endpoints include "adverse direct effects on growth, reproduction, or other ecologically important sublethal processes," the DEIS [Draft PEIS] omits important recent research in this area. For example, the DEIS [Draft PEIS] omits evaluation of recent research showing nonlethal effects of 2,4-D occur at exposure levels far below normal application rates. A recent study published in the journal *Mutation Research* showed that concentrations of 2,4-D "that did not have any visible physiological effects" caused genetic damage in plants. The study was conducted by biologists at the University of Lethbridge. (Folkowski et al 2003)

**Response:** The BLM relied on the Forest Service's ecological risk assessment (ERA) for 2,4-D (Syracuse Environmental Research Associates, Inc. 1998; full reference in PEIS Reference section). The study referred to in the comment was published after the Forest Service's ERA. However, the toxicity analyses in the PEIS focus on sublethal effects that are likely to reduce plant populations (e.g., growth and reproduction impacts). It is difficult to determine whether observations of genetic effects would produce adverse impacts to the individual plants (since no physiological impacts were observed) or to the larger plant population.

RMC-0222-101
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The DEIS [Draft PEIS] omits evaluation of a series of studies that showed glyphosate increases the frequency of disease in a variety of non-target plants. These diseases include fusarium head blight in cereal crops, sudden death syndrome in soybeans, root rot in sugarcane, and white mold in soybeans. The studies were conducted by scientists at Agriculture and Agri-Food Canada, Iowa State University, Louisiana State University, and Michigan State University, and were published in the *Canadian Journal of Plant Pathology*, *Phytopathology*, and the *Agronomy Journal*. (Hanson and Fernandez 2003, Sanogo, Yang, and Scherm 2000, Dissanayake, Hoy, and Griffin 1998, and Nelson, Renner, and Hammerschmidt 2002)

**Response:** The plant toxicity analyses in the PEIS focus on sublethal effects such as growth and reproduction. It is recognized that land managers may need to consider other potential adverse effects (e.g., fungal infection) in the timing and selection of herbicide to be applied.

BLM_0001651

**Environmental Consequences, Fish and Other Aquatic Organisms**

EMC-0585-221
Western Watersheds
Project

**Comment:** BLM fails to provide data and analysis of impacts to springsnails and aquatic insects.

**Response:** Springsnails and aquatic insects are aquatic invertebrates. At the programmatic level, the BLM provides risk assessment data for aquatic invertebrates in Appendix C and analyzes potential impacts to aquatic invertebrates from herbicide treatments in Chapter 4 of the PEIS, under the subheading Fish and Other Aquatic Organisms. In addition, the Biological Assessment addresses the potential effects of treatments on threatened, endangered, and proposed for listing aquatic invertebrates.

EMC-0601-002
Kampmeyer, Al

**Comment:** Do you know about fish uptake of herbicides and pesticides when these chemicals are introduced into their waters?

**Response:** Chemical-specific effects information can be found in Chapter 4 of the PEIS under Fish and Other Aquatic Organisms, as well as on the USEPA's website at http://www.epa.gov/pesticides/ecosystem/ecorisk.htm. The Ecological Risk Assessment in Appendix C of the PEIS includes a detailed discussion of the ecological effects of these chemicals on fish and the aquatic environment. The Biological Assessment that was prepared for the PEIS describes the effects of herbicide treatments on federally-listed endangered and threatened fish and aquatic invertebrates and their critical habitats.

EMC-0643-079
California Indian
Basketweavers
Association

**Comment:** Triclopyr BEE [butoxyethyl ester], diuron, and tebuthiuron products are among those under a court ordered restriction for use in listed salmonid habitat; similar precaution is needed for non-listed species. Court ordered restrictions on the use of these products are not found on product labels and were not addressed in the D[raft] EIS. Currently, these three herbicides cannot be applied within 20 yards of federally listed salmonid bearing streams or within 100 yards in the case of aerial application. *Washington Toxics Coalition et al. v. EPA, Ninth Circuit Court of Appeals, 2005.* Similar cautionary restrictions are necessary for non-listed aquatic species, including amphibians.

**Response:** Buffers for non special status species fish and aquatic invertebrates are identified in Chapter 4 of the PEIS in Table 4-19. The buffers identified are as conservative as those for special status fish species (see Table 4-21) for all herbicide applications, except for diuron at the maximum application rate via high boom. In this case, the high-boom buffer for special status fish is more conservative than the buffer for non special status fish.

The ecological risk assessments developed for this PEIS typically did not assess risks to amphibians from herbicide treatments. Based on guidance from the Council on Environmental Quality, when information is incomplete or unavailable, the PEIS states the level of information available, the relevance of the information, and the potential impacts derived from that information. The PEIS assumed that risks to fish represent risks to aquatic amphibians (see Chapter 4 under Special Status Wildlife Species in the Wildlife Resources section). This assumption is supported by a study by Berrill and Bertram (Berrill, M., and S. Bertram. 1997. Effects of Pesticides on Amphibian Embryos and Larvae. Pages 233-245 *in* Amphibians in Decline: Canadian Studies of a Global Problem (D.M. Greene, ed.). Society for the Study of Amphibians and Reptiles), which states that "aquatic stages of amphibians are generally comparable to fresh-water fish in their vulnerability to exposure to low levels of pesticides." Under

BLM_0001652

RESPONSE TO COMMENTS

the Preferred Alternative, more herbicide options are available to the BLM for use, which increases the ability of the BLM to use herbicides with less potential for impact to amphibians and their habitat. In addition, the BLM could use other treatment methods, such as mechanical or manual methods, in areas with sensitive species.

EMC-0646-084
Californians for
Alternatives to Toxics

**Comment:** A 2005 study from Marc has verified their earlier findings. POEA [polyoxyethylene-alkylamine] facilitates the toxic effects of the AI [active ingredient] glyphosate, as well as providing it's own toxicity.

"The adverse effect on transcription involves the commercial product and therefore is the result of a combination of the formulation products. The contribution of glyphosate to the adverse effect of Roundup was investigated and demonstrated by two lines of evidence. On the one hand, four different glyphosate-based formulations provoked a delay in hatching at glyphosate concentration within similar range. On the second hand, an additional effect on hatching was observed when a threshold amount of Roundup was supplemented with pure glyphosate. However, our results do not exclude a contribution of the formulation products to the Roundup effect: first, because permeabilizing agents are required for glyphosate effect as a herbicide (Williams et al., 2000) or as a cell cycle deregulator (Marc et al., 2002), for the intracellular access of the chemical to its molecular targets. Second, because the major component of Roundup, polyoxyethylene amine (POEA), was found to be highly toxic to the embryos and led to lethality. Such higher toxicity of POEA compared to Roundup has been observed on other aquatic organisms (Tsui and Chu, 2003). Altogether, the adverse effect of Roundup on hatching is due, at least in part, to the active herbicide component glyphosate, which reaches its intracellular molecular target through the synergic effects of the formulation ingredients. Regarding the potential human health concern, it is important to note that glyphosate is never sprayed for herbicide usage without the formulation compounds (Williams et al., 2000)" (Marc et al 2005). There is a wealth of studies and information available concerning the toxicity of the inert surfactant POEA in certain glyphosate formulations. What has been presented here is only the tip of the iceberg.

**Response:** Based on public comment and additional analysis, the BLM proposes to either avoid using any glyphosate formulations with POEA, which may be the toxic component in glyphosate, or seek to use the formulation with the lowest amount of POEA available. Also see response to Comment RMC-0106-037 under PEIS Environmental Consequences, Fish and Other Aquatic Organisms.

RMC-0106-034
Public Employees for
Environmental
Responsibility

**Comment:** [Pages] 4-74 to 4-75 [of the Draft PEIS]. The characterization of risk assessment (Step [bullet] 4) as "quantitative" is grossly misleading as the resultant risk category assignment is the result of artificial manipulation of toxicological unknowns, surrogates, and guesswork about predicted environmental concentrations. The whole assessment protocol covers only part of the potential problems—leaving out inerts and degradates. It further assumes that SOPs [Standard Operating Procedures], label instructions will be followed, and that applications will be "typical."

**Response:** The risk assessments are quantitative; they project numeric estimates of risk. See response to Comment EMC-0585-192 under PEIS Environmental Consequences, Herbicide Effects Analysis for information on inert ingredients. See responses to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment, Comment EMC-0623-017 under PEIS Environmental Consequences, Herbicide Effects Analysis, and Comment RMC-0191-009 under PEIS Environmental Consequences, Herbicide Effects Analysis for information on degradates and

BLM_0001653

formulations. The mitigating and performance measures in herbicide application, including training, site reviews on application rates and delivery, and contractor oversight, are designed to ensure proper use, as discussed in response to Comment EMC-0267-002 under PEIS Proposed Action and Purpose and Need, Federal Laws, Regulations, and Policies that Influence Vegetation Treatments.

RMC-0106-035
Public Employees for Environmental Responsibility

**Comment** [Page] 4-72 to 4-87 [of the Draft PEIS], Impacts of individual herbicides. No information is provided on herbicide formulations to be used, or on inerts and degradates. The assessments are larded with qualitative terms such as tendency, appreciable, likelihood, minimal, majority, normal use, appropriate use, typical application, normal application scenario, relative toxicity, plausible, appear, and the like.

**Response:** See response to Comment EMC-0585-192 under PEIS Environmental Consequences, Herbicide Effects Analysis for information on inert ingredients. See responses to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment, Comment EMC-0623-017 under PEIS Environmental Consequences, Herbicide Effects Analysis, and Comment RMC-0191-009 under PEIS Environmental Consequences, Herbicide Effects Analysis for information on degradates and formulations.

RMC-0106-036
Public Employees for Environmental Responsibility

**Comment:** p. 4-81. Under Overdrive, benefits to aquatic organisms are claimed "…if it is used…selectively…provided herbicide use is seen as an acceptable vegetation treatment method in these sensitive areas." This proviso indicates that Overdrive should not be used at all.

**Response:** The BLM examined Overdrive®, which is comprised of two active ingredients—diflufenzopyr and dicamba. The herbicide is selective and systemic, and has a low residence time in water bodies and a low bioconcentration potential. Diflufenzopyr and dicamba application does not pose a risk to fish or aquatic invertebrates under the application scenarios analyzed in the ecological risk assessments prepared for these herbicides (see the ecological risk assessments on the CD included with the Final PEIS). In addition, there is no implication that this herbicide will be applied directly to water, since it is not USEPA-registered for aquatic applications at this time. The risks analyzed were associated with the potential for this herbicide to be exposed to an aquatic environment through some unforeseen pathway, as identified in the PEIS Appendix C, Ecological Risk Assessment.

RMC-0106-037
Public Employees for Environmental Responsibility

**Comment:** [Page] 4-83 [of the Draft PEIS]. It is stated that "some formulations (of glyphosate) are more toxic to fish than technical grade glyphosate." It is incumbent on the DPEIS [Draft PEIS] to identify these and to provide direction on selection of the least harmful formulation. It is likely that this problem applies also to various commercial formulations of other herbicides. The DPEIS [Draft PEIS] must a) evaluate all commercial formulations to establish least harmful mixtures, and b) provide unequivocal guidance on selection.

**Response:** Polyoxyethylene-alkylamine (POEA) is the only inert compound of known aquatic toxicity in glyphosate formulations. The BLM has evaluated a number of glyphosate formulations for content of POEA; see Appendix D in the Final PEIS. The BLM proposes to either avoid using any glyphosate formulations with POEA or use glyphosate formulations that have the least amount of POEA.

BLM_0001654

RESPONSE TO COMMENTS

RMC-0222-098
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Nonlethal effects on fish (effects on fish other than mortality): the DEIS [Draft PEIS] ([page] 4-82) states, in reference to 2,4-D, "Routine acute and chronic exposure scenarios do not result in risk to fish." However, the DEIS [Draft PEIS] omits research published in the journal *Marine Environmental Research* by scientists from the University of Maryland showing concentrations as low as ten parts per billion cause proliferation of peroxisomes in fish. (Ackers, Johnston, and Haasch, 2000) In addition, the DEIS [Draft PEIS] (4-86) states with respect to picloram, "An acute LC50 value for trout ranges from 0.8 mg/L to 19.3 mg/L." However, the DEIS [Draft PEIS] omits research showing that concentrations as low as 0.04 mg/L reduce the size and survival of trout fry. This research was published by D. F. Woodward at the U.S. Fish and Wildlife Service in the Journal of the Fisheries Research Board of Canada. (Woodward, 1976)

**Response:** The BLM relied on the Forest Service's ERA [ecological risk assessment] for 2,4-D (Syracuse Environmental Research Associates, Inc. 1998; full reference in PEIS Reference section). The study referred to in the comment was published after the Forest Service's ERA. However, toxicity analyses in the PEIS focus on sublethal effects that are likely to reduce fish populations (e.g., growth and reproduction impacts). Although peroxisome proliferation was observed at the 10 ppb [parts per billion] level after 21 days, the study did not determine whether this level would produce long-term or irreversible adverse impacts to the individual fish or to the larger fish population. The Woodward study was referenced and considered in the toxicity review for fish in the picloram ERA conducted for the Forest Service (Syracuse Environmental Research Associates, Inc. 2003b; full reference in PEIS Reference section). The data presented by Woodward was not considered in the 1995 Re-registration Eligibility Decision (RED) for picloram and was not necessarily consistent with other studies reviewed in the Forest Service ERA. Woodward prepared stock solutions in acetone rather than water, did not monitor picloram concentrations in all test solutions, and did not include an acetone control in the evaluation. USEPA Office of Prevention, Pesticides, and Toxic Substances (U.S. Environmental Protection Agency. 1996. Ecological Effects Test Guidelines OPPTS 850.1400 Fish Early-Life Stage Toxicity Test. Office of Prevention, Pesticides and Toxic Substances. EPA 712–C–96–121. April. Available at: http://www.epa.gov/opptsfrs/publications/OPPTS_Harmonized/850_Ecological_Effects_Test_Guidelines/Drafts/850-1400.pdf). Test guidelines for fish early life stage toxicity studies require the use of a solvent-only control because the solvent can impact the test organism directly and can impact the uptake of the test compound by the organism. The Woodward study would not be classified as acceptable using the test criteria and was therefore not used as the basis of the fish toxicity value in the Forest Service ERA.

**Environmental Consequences, Wildlife Resources**

EMC-0046-002
Picone, Chris

**Comment:** The pesticides that would be used include persistent and mobile chemicals, including known developmental and reproductive toxins. Recent research on amphibians has shown that these same pesticides can cause developmental abnormalities and mortality at concentrations formerly thought safe, such as 1 part per billion. I assume you are aware of the recent literature in this area.

**Response:** The BLM is aware of these studies, including studies that have shown effects at 0.1 parts per billion (atrazine). Two herbicides used by the BLM or available for use, atrazine and glyphosate, have been identified as being potentially harmful to amphibians. However, the BLM has not used atrazine since 1990s, and under

BLM_0001655

Alternatives B (Preferred Alternative), D, and E (see Chapter 2 of the PEIS, Description of the Alternatives), the BLM would not use atrazine on BLM-administered lands in the future. Risks to amphibians associated with glyphosate are primarily associated with two adjuvants: R-11 and polyoxyethylene-alkylamine (POEA). As discussed under Mitigation in Chapter 2, and Wildlife Resources in Chapter 4, the BLM proposes to not use glyphosate formulations that include R-11 in the future, and would either avoid using any formulations with POEA, or seek to use the formulation with the lowest amount of POEA available, to reduce risks to amphibians. We have expanded the discussion of effects of herbicides on amphibians in the Final PEIS under Wildlife Resources and Cumulative Effects Analysis (Wildlife Resources) in Chapter 4 of the PEIS to address concerns related to the use of herbicides on BLM-administered lands and the potential for herbicides to adversely affect amphibians.

EMC-0214-015
Vollmer, Jennifer
(BASF)

**Comment:** The claim that "All treatments could kill or harm wildlife and adversely impact their habitats," is false, unless it is the actual application – tractor running over grouse or planes crashing in to herds of elk – that is being referred to. What incidences can be sited where any of the purposed terrestrial herbicides, used according to label directions, have killed or harmed wildlife? Examples for herbicide benefits to wildlife are numerous and are mainly attributed to increasing or rehabilitating habitat. Benefits versus adverse impacts are misleading for all alternatives. Example: No action alternative would have greater impact than the Purposed alternative due to the number of applications that would be needed to accomplish the same vegetation management. In addition, less acres treated means greater adverse impact to those lands that are left to further degrade due to lack of tools for beneficial treatment. The section also neglects to quantify the benefits versus adverse effects. Example: on a scale of 0 to 100, Where Wildlife Benefits for the Purposed action may be "87", adverse effects may be "4", as compared to No Action Alternative where Benefits may be "34", adverse effects "3.9".

**Response:** As stated, herbicide treatments could kill or harm wildlife and adversely impact their habitats, as demonstrated for most herbicides in the risk assessments (although risks were very small for some herbicides). By the very nature of the treatment, vegetation will be altered by herbicide treatments, thus impacting habitat that was used by wildlife prior to treatment. Although it is difficult to quantify the costs and benefits of treatments, a comparison of costs and benefits for all treatment methods, including herbicides, was provided in the PER, and also discussed in detail in the Cumulative Effects Analysis of the PEIS. As noted in the text, treatments could be quite beneficial for some wildlife species, and may be much greater under the Preferred Alternative than the No Action Alternative. However, for species that depend upon the vegetation that is treated, costs would likely outweigh benefits and would be greater under the Preferred Alternative than the No Action Alternative.

EMC-0238-004
California Partners in
Flight

**Comment:** While CalPIF [California Partners in Flight] does not support the adoption of Alternative E [in the Draft PEIS], we share some of the concerns over the widespread use of herbicides that Alternative E attempts to address. One component of Alternative E that we believe should be incorporated as part of Alternative B is the adoption of amphibian area avoidance measures. Under Alternative E, herbicide use is not encouraged in areas populated by amphibians. We believe that is a wise measure to adopt as part of any Alternative. There is concern today about significant declines in numbers of amphibians encountered on public lands and elsewhere. One of the potential causes for those declines is the chemicals that amphibians are exposed to. CalPIF believes the evidence that chemical exposure contributes to declines in

BLM_0001656

amphibian populations is significant enough to justify avoiding the use of herbicides in and around riparian and wetland areas that support amphibians. Areas supporting amphibians are also important feeding and nesting areas for land birds that may also be vulnerable to herbicide exposure. Amphibians also represent a prey base that supports birds and other terrestrial species. For those reasons and others we think it a wise and modest measure to incorporate Alternative E's amphibian area avoidance measures into the final planning document.

At the same time, CalPIF is not espousing the elimination of herbicides in areas where amphibians may reside. Riparian areas are some of the most severely invaded habitats in the West. To completely exclude herbicides as a tool is not prudent when it can be shown for specific project areas that other tools are not practical, are likely to be unsuccessful, or may cause more damage to the habitat than can be justified. We recommend that the final planning document emphasize the avoidance of herbicide use in areas populated by amphibians. Manual or mechanical measures to remove invasive species should be given priority, and only when such measures are shown to be ineffective or not practical should herbicides be used in those areas – and then only by crews using a targeted approach. In that respect we agree with the emphasis in Alternative E that herbicide treatments must be of lower priority than non-chemical treatments in areas where the use of herbicide may impact riparian or wetland areas. Under no circumstance should chemicals be applied aerially in areas known to be populated by amphibians. We recommend that the final planning document emphasize the use of non-aerial application techniques where there is a risk that herbicides will be applied to water, either directly or through drift.

**Response:** The PEIS recommends buffer zones near aquatic bodies to protect plants, fish, and wildlife in the Standard Operating Procedures from ground-based and aerial spraying. Additional measures to protect amphibians are given in Table 2-9, Mitigation Measures. These measures include providing additional protection to all terrestrial animals by following mitigation identified in the Biological Assessment to protect species of concern. As noted in Chapter 4 of the PEIS under Wetland and Riparian Areas, Alternative D, 98% of all treatments associated with wetland and riparian areas would be ground-based, based on information provided by field offices. Thus, risks from aerial spraying would minor. In addition, the BLM only plans to treat about 10,000 acres of wetland and riparian habitat using herbicides annually; another 20,000 acres would be treated annually using other methods.

EMC-0238-007
California Partners in
Flight

**Comment:** The use of 2-4D is of concern for CalPIF, perhaps more so than with any other of the active ingredients listed for use under the Alternatives. 2-4D poses a high exposure risk for some categories of wildlife. We recommend that 2-4D not be applied aerially unless there is absolutely no other practical means for its application, and where the use of the other available active ingredients has little chance for success.

**Response:** See response to Comment RMC-0159-014 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. As discussed under Site Selection Priorities in Chapter 2 of the PEIS, the BLM would first use non-chemical methods where feasible, and would use herbicides only after considering their effectiveness and potential for impacts on the environment. The BLM would also follow Standard Operating Procedures and mitigation discussed in Chapter 2 to minimize or avoid risks associated with the use of 2,4-D and other herbicides proposed for use by the BLM.

BLM_0001657

EMC-0239-002
Kimmel, Reida

**Comment:** Researchers are now finding that herbicides, even the older, "safer" chemicals like atrazine and Roundup, have adverse, or deadly, effects on wildlife, especially invertebrate species and cold blooded vertebrates. In addition, the use of herbicides will harm native species struggling to compete with the invasive plants.

**Response:** All chemicals may potentially have adverse effects on organisms; it is the dose that determines whether it is adverse or not. Herbicide application is done in such a way to minimize the exposure (the dose) of herbicide on non-target organisms. Herbicides are intended to protect native species from the competition from invasive species. This is done using careful application of herbicides so that they target invasive plants.

EMC-0257-005
Lockridge, Ross

**Comment:** Weed Out Round-Up: The worldwide die-off of amphibians has been partly attributed to the "properly applied" and "safe" Monsanto herbicide, Round-up (see article, study & discussions in the Notes). Yet Round-up mixed with Arsenal is said to be "successful". The recent discovery in 2005 that there are far-reaching impacts from the use of Round-up upon frogs is evidence that caution is needed. What don't we yet know about Garlon 4 and Arsenal?

**Response:** RoundUp$^{®}$ contains the herbicide active ingredient glyphosate. As suggested by the commentor, glyphosate may be harmful to amphibians, although harmful effects may be attributable to two compounds, R-11 and POEA, found in formulations containing glyphosate. As discussed under Comment EMC-0046-002 under PEIS Environmental Consequences, Wildlife Resources, the BLM would severely limit or prohibit use of glyphosate formulations containing R-11 or polyoxyethylene-alkylamine (POEA). Garlon 4$^{®}$ contains the herbicide active ingredient triclopyr, while Arsenal$^{®}$ contains the active ingredient imazapyr. Although risk assessments done for the PEIS found that imazapyr should not be harmful to aquatic organisms under most application scenarios, risks were greater with applications of triclopyr. As discussed under Mitigation in Chapter 2 of the PEIS, the BLM would strive to apply triclopyr at typical rather than maximum application rates, and would continue to monitor the scientific literature to determine if triclopyr, imazapyr, or other herbicides used or proposed for use by the BLM cause harm to amphibians. Under Alternative B, the BLM would treat only about 10,000 acres of wetlands annually using herbicides under the Preferred Alternative, and 2,4-D, glyphosate, picloram, and tebuthiuron would comprise the majority of herbicide use.

EMC-0324-007
Rachel Carson Council

**Comment:** When present in a formulation with surfactants, glyphosate can be highly toxic to certain frog species. Frogs or toad populations living and reproducing in the areas treated by aerial spraying of glyphosate formulations could be adversely affected by such applications. Amphibians can reproduce in shallow pools that can be vulnerable to overspraying with glyphosate formulations. According to Dr. R. Relyea, "Anyone spraying pesticides from an airplane would probably not avoid such puddles because they appear to be inconsequential." (Hileman, B., "Common Herbicide Kills Tadpoles," Ecotoxicology, V83, #15, April 11, 2005) Much more testing needs to be performed on all formulations and their additives before they can be considered as not posing a threat to these types of wildlife.

**Response:** See response to Comment EMC-0046-002 under PEIS Environmental Consequences, Wildlife Resources.

EMC-0324-018
Rachel Carson Council

**Comment:** The immune system is very important for wildlife in protecting them from disease, including some conditions that can spread to humans, the so-called zoonoses.

BLM_0001658

There is evidence that exposure to 2,4-D in combination with picloram can decrease the mammalian immune response. Combinations of 2,4-D and picloram have been used to control vegetation and both are listed as intended for use by BLM. The combination has been tested for adverse effects on immune function in laboratory animals. The exposure of laboratory mice to a product mixture with active ingredients consisting of 94% 2,4-D and 6% picloram by weight was found to generate results suggesting that chronic exposure to the formulation at normal application levels may cause immune dysfunction. (Blakley, BR, "Effect of Roundup and Tordon 202C Herbicides on Antibody Production in Mice," Vet Human Toxicol., 39 (4), August 1997). Livestock may be at risk from such applications on their grazing lands.

**Response:** See responses to Comment EMC-0640-036 under Environmental Consequences, Wildlife Resources, and Comment RMC-0222-104 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0338-013
Dow AgroSciences

**Comment:** In the risk characterization it appears that tebuthiuron is generally assumed to be applied as a liquid spray, yet the formulation most commonly applied to rangeland is a granular pellet, Spike 20P™. The use of a pellet dramatically affects the risk assessment regarding drift and off-site effects to non-target organisms. Drift would be minimal with Spike 20P, and pellets would not pose any risk to pollinating insects since the pellets fall onto the soil allowing for little deposition on foliage. The $LD_{50}$ [lethal dose at which half of organisms die] on honeybees is > 100ug/bee, which is in the least toxic [US] EPA category for insect toxicity. Therefore, it is incorrect to assume low to moderate risk for pollinating insects from tebuthiuron.

**Response:** The BLM recognizes that there is a difference between the liquid and granular formulations of the tebuthiuron as it relates to many application parameters. In order to assess risk, however, the situation posing the greatest risk was selected for analysis (i.e., the liquid formulation, rather than the granular formulation of tebuthiuron). Results of the analysis are presented in Appendix C of the PEIS under the heading Non-target Species Risk Characterization for Tebuthiuron. As the commenter points out, data from USEPA indicates that the $LD_{50}$ for the honeybee is greater than 100 micrograms/bee. This information is acknowledged in the tebuthiuron ecological risk assessment, which cites a report from the Department of Energy stating that the $LD_{50}$ for the honeybee is 30 micrograms/bee. In order to run a more conservative risk analysis, the 30 micrograms/bee value was selected as the Toxic Reference Value (TRV) for tebuthiuron and the honeybee.

EMC-0364-003
Noble, Emily

**Comment:** I am also concerned about the immune systems of birds now that they can be vectors for very serious diseases humans can catch. What is the official word out (if any) on this situation?

**Response:** This comment is beyond the scope of the PEIS.

EMC-0457-004
Ryan, Eleanor (North American Butterfly Association)

**Comment:** The Elimination of Dwarf Mistletoe. The elimination of trees with dwarf mistletoe is contrary the health of the butterfly population in the forest. Three species of butterflies use dwarf mistletoe as their obligatory host plant. Great Purple Hairstreak (Atildes halesus) Exists in CO, NM, NV, TX, OK, OR. The mistletoe species Phoradendron is the specific host plant for this butterfly. This is found especially on oaks and cottonwoods. Of greater concern in Conifer forests, the following butterflies use dwarf mistletoe on conifers as obligatory host plants. Thicket Hairstreak (Callophrys spinetorum). Exists in WA, OR, CA, ID, MT, NV, CO, UT, AZ, NM,. Obligate use of the mistletoe Arceuthobium of species vaginatium, americorum,

BLM_0001659

tsugense, abietum, and campylopoduim. Each of these mistletoes grows on a specific conifer including true firs (Abies), Ponderosa Pine, Lodgepole Pine, Western Yellow Pine, Douglas Fir, and Hemlock. Johnson's Hairstreak (Callophrys johnsoni) Only exists in WA, OR, and CA. The host mistletoe is Arceuthobium tsugense and abietinum growing on Hemlock and Abies fir. In WA and OR it has a habitat preference for ancient forest which has led to its extirpation in much of its former range. I didn't see this listed in the biologically sensitive species but clearly it is rare. These butterflies benefit from the preservation of the above mistletoe species on BLM land. Please include these butterflies in vegetative planning considerations.

**Response:** The BLM proposes to use the conservation measures outlined in the Biological Assessment to protect sensitive and federally-listed species. Potential impacts from individual projects will be subject to NEPA analysis, and impacts to BLM special status species will be assessed. Project design criteria will be used to minimize impacts. The BLM will also conduct local surveys for species of concern before implementing any vegetation treatment projects, as discussed under Special Precautions (Special Status Species) in Chapter 2 of the PEIS and PER.

EMC-0457-005
Ryan, Eleanor (North American Butterfly Association)

**Comment:** Twelve species of Blue Butterflies are "listed". You probably know that many of these butterflies are tended by ants. The Larva of the Butterflies may actually be cared for in the ant colony. What does herbicide spraying do to these important ant colonies?

**Response:** There is little extant information or studies on the effects of herbicides on ant colonies. Typically, insecticides lethally affect insects, but no insecticides are proposed for use to treat vegetation under this PEIS. The PEIS assesses the effects of herbicides on pollinating insects and aquatic invertebrates. Refer to Appendix C (Ecological Risk Assessment) of the PEIS. The honeybee was considered the most sensitive insect for the purposes of analysis in the risk assessment, which concludes that only imazapic poses a low toxicity hazard to terrestrial invertebrates. In general, herbicides act on vegetation and do not significantly affect insects as an insecticide would.

EMC-0525-053
Western Watersheds Project

**Comment:** Thus, for many of these birds, the very actions that BLM proposes under the [P]EIS and PER are Threats, and when conducted in the past, have destroyed, altered and fragmented habitats. These threats (livestock grazing, herbiciding, chaining, fire, mowing and other alteration of sagebrush and other native vegetation communities) have not been honestly addressed by BLM in the [P]EIS or PER. Since best Available Science recognizes them as Threats, (see also Knick et al. 2003, Connelly et al. 2004).

**Response:** The PEIS and PER discuss both the adverse effects and benefits of the treatments in Chapter 4. Also see response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0525-067
Western Watersheds Project

**Comment:** It is WWP's [Western Watershed Project's] experience that BLM constantly ignores the importance of these habitats, and knowingly conducts projects to purposefully destroy them so as to increase livestock forage on depleted lands. As an example, the very small areas of Utah juniper and Utah juniper and pinyon pine in SE Idaho are the only places in Idaho where several species of birds occur. A report (CD: Pinyon-juniper and Juniper Birds", prepared by Red Willow Research for the Idaho Department of Fish and Game), documented importance of intact riparian and

BLM_0001660

pinyon-juniper habitats for several bird species of concern.

**Response:** The PEIS and PER note in Chapter 4 under Wildlife Resources that pinyon-juniper woodlands provide important habitat for wildlife, but can also form dense stands, or crowd out more desirable vegetation, reducing their value to wildlife. The adverse effects and benefits of pinyon-juniper treatments would be evaluated at the local level before conducting pinyon-juniper removal.

EMC-0525-091
Western Watersheds
Project

**Comment:** It is critical that BLM examine the already complex interspersion of plant communities across the landscape. Sagebrush communities often exist as complex mosaics with inherent natural diversity (Montana Department of Fish, Wildlife and Parks 1995, Welch and Criddle 2003). BLM fails to address the inherent complexity and complex interspersion of vegetation across the landscape, and instead claims that its artificially imposed chaining and other disturbance is necessary to create more of a mosaic, or for greater diversity.

**Response:** Much of the discussion in Chapter 4 of the PEIS and PER under Vegetation and Wildlife Resources focuses on the importance of a mosaic of cover types (e.g., openings interspersed with vegetation of varying size and species composition). Although Condition Class 1 lands likely have a good mosaic of cover types (see Vegetation Condition and Fire Regimes in the Vegetation section of Chapter 3 of the PEIS), lands that have been altered may be dominated by only 1 or a few cover types and may have poor vegetative structure and complexity. The purpose of treatments is to improve the complexity and structure of plant communities in degraded areas to improve habitat for wildlife.

EMC-0525-135
Western Watersheds
Project

**Comment:** BLM must assess how the presence of cheatgrass may affect special status species. For example, how do cheatgrass-dominated understories and interspaces affect reptile species occurrence and abundance - (lizards may be prey species for small mammals)? How does cheatgrass affect the pygmy rabbit? Which of BLM's proposed treatment disturbances maximize chances of increased cheatgrass dominance of understories?

**Response:** Because downy brome (cheatgrass) is not native to North America, it is expected to have limited habitat value for native special status species. Although weeds do provide seeds, other forage, and cover for some wildlife, the intent of BLM vegetation treatments is to reduce or eliminate invasive species to promote native plant species diversity and foster a healthy ecosystem. It is not the intent of the BLM to conduct any treatment activities that foster the growth of downy brome or other weeds and nonnative species.

EMC-0525-165
Western Watersheds
Project

**Comment:** An increasing body of science demonstrates that fences are harmful to sage grouse and many other species of native wildlife, and that sage grouse may avoid use of areas near fences. BLM's post-treatment actions may in fact further fragment habitats beyond removal of vegetation, and rendering patches of remaining untreated or native vegetation unusable by grouse, while creating extended wasteland areas in their surroundings, causing expanded environmental harm.

**Response:** The Cumulative Effects Analysis, Wildlife Resources, in Chapter 4 of the PEIS discusses the need to restore native vegetation and link islands of habitat to reduce habitat fragmentation. This section also discusses the need to remove fencing and other barriers to encourage wildlife movement among habitats. It is possible that treatment actions may further fragment habitats short term, but as sites are revegetated

BLM_0001661

it would become less likely that islands of good habitat would be surrounded by less desirable habitat.

EMC-0559-003
Daniel, Bill

**Comment:** Protect the Sage grouse by banning herbicide use and sagebrush clearing in their habitats.

**Response:** Vegetation treatments that open up dense stands of sagebrush, including mechanical and prescribed fire treatments, benefit sage-grouse by providing areas for leks and increasing forb production that benefits adults and young. Use of herbicides can benefit sage-grouse if the treatments remove weeds and are followed by revegetation of treatment sites with forb and grass seed mixtures. A more detailed discussion of adverse effects and benefits of treatments to sage-grouse and other wildlife is given in Chapter 4 of the PER under Wildlife Resources.

EMC-0585-210
Western Watersheds
Project

**Comment:** The sub-lethal effects of herbicide use on wildlife (biochemical disruption) may greatly increase their vulnerability to predation, their ability to find food, etc. BLM fails to describe the real environmental setting that exists for wildlife in wild land settings, and the many sub-lethal or mortality-related effects of herbicides or other chemical (degradates), and the great uncertainty that exists in understanding effects of chemical use o wild land settings. See, for example, "Factors influencing estimation of pesticide-related wildlife mortality" http://www.abcbirds.org/pesticides/Pesticidemortalityestimation.htm, "The influence of the natural history of the poisoned species on search strategy encompasses factors such as physiology, life cycle, and behavior. Laboratory and field studies show adult songbirds to be 2 to 137 times less sensitive to OP [organophosphate] insecticides than their nestlings". How are nestling songbirds affected by the various herbicides to be used??? How might herbicides inflict sub-lethal effects on adults, and reduce their ability to provide forage for nestlings?

**Response:** See Section 4.1.5 (Identification of Risk Characterization Endpoints) of the ecological risk assessments (available on the CD that accompanies the PEIS). It is typical that adults are less sensitive than juveniles, and some of the surrogate species used represent sub-adults. Herbicides could inflict sub-lethal effects on adults and reduce their ability to take care of their young. However, by not treating vegetation, habitat could be lost or degraded, or result in a catastrophic fire that would be harmful or cause death to young and adults. To protect juvenile birds, the BLM would avoid treating vegetation using herbicides during time-sensitive periods, such as nesting (see Table 2-8 in PEIS Chapter 2).

EMC-0585-211
Western Watersheds
Project

**Comment:** BLM also fails to assess both: effects of loss or cover or food resulting from herbicide application (especially as BLM plans to use many non-specific herbicides). Not only may reproduction be directly impaired through chemical actions, loss of food and cover may result in fewer young being produced, and predation mortality being greater.

**Response:** The adverse effects and benefits of using herbicides on wildlife and their habitats are discussed in Chapter 4 of the PEIS under Wildlife Resources. For example, this section notes that herbicides may cause loss of nesting and brood habitat for sage-grouse, and that picloram can damage sensitive grasses as well as broadleaf plants, and can substantially alter wildlife diets. In general, non-specific herbicides would primarily be used in areas where removal of most or all vegetation is desirable, such as along rights-of-ways and roadways. Herbicides that treat only certain types of grasses, forbs, or shrubs would be used most often for habitat improvement treatments.

BLM_0001662

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0585-213<br>Western Watersheds<br>Project | **Comment:** BLM ignores analysis of impacts of herbicides (and all their components and breakdown products) on bird eggs. If birds eggs are sprayed (as would happen if incubating parents are flushed by spray application or are off foraging), how does this affect developing embryos? Will hatching success be affected? Will developing embryos be killed? What might the indirect effects of chemicals and their breakdown products be on eggs or nestlings? |

**Response:** Certain pesticides can harm the developing embryo; however, no such information was found for the BLM herbicides. Vegetative cover would provide some protection to nests and eggs. The potential for loss of eggs and young could exist if loss of vegetative cover from herbicide treatment were to make eggs or young more susceptible to predation. Also see response to Comment EMC-0585-210 under PEIS Environmental Consequences, Wildlife Resources.

| | |
|---|---|
| EMC-0585-216<br>Western Watersheds<br>Project | **Comment:** If BLM was serious about protecting many wildlife and TES [threatened, endangered, and sensitive] species, this EIS would mandate no treatment during nesting/birthing season, or in specific targeted treatment of invasives only. |

**Response:** Timing of vegetation treatments is determined at the project-specific level through site-specific NEPA analysis. Restrictions on treatments during critical breeding periods for wildlife are taken into consideration in the NEPA analysis. The BLM will follow all Standard Operating Procedures and mitigation identified in the PEIS, as well as any additional mitigation requirements identified through the site-specific NEPA analysis and any applicable Endangered Species Act consultation. In addition, BLM policies regarding migratory bird nesting would be followed to prevent unintentional disturbance to these species during critical periods in their life cycle.

| | |
|---|---|
| EMC-0590-018<br>Western Slope<br>Environmental<br>Resource Council | **Comment:** The ENSR Exposure Assessment that is part of the PER identifies the components of an exposure pathway that results in human exposures at points of contact, following release of chemicals to the environment and transport via an environmental medium (e.g. air, water, soil). While the focus is on human "receptors", there exist in our county both plant and other animal "receptors" that are also at risk of exposures due to chemical applications. Pesticides have been shown to be harmful to a multitude of animals, including fish, turtles, amphibians, birds, butterflies and moths, mammals, reptiles, and beneficial insects. Animals can be exposed by eating other contaminated plants, insects or animals, by inhalation, absorption through skin, or drinking or bathing in contaminated water. |

**Response:** The BLM conducted ecological risk assessments to assess the risks to plants and animals from the herbicides used and proposed for use by the BLM. Risk assessments were included on the CD that accompanied the Draft (and Final) PEIS. The BLM also used several risk assessments prepared by the Forest Service to assess risks to plants and animals. As part of the risk assessments, the BLM evaluated the different pathways by which plants and animals could be exposed to herbicides, including absorption through skin or leaves, consumption of contaminated plants, insects, or animals, inhalation, or ingestion of contaminated water.

| | |
|---|---|
| EMC-0623-018<br>Defenders of Wildlife | **Comment:** Include better evaluation of wildlife impacts, including impacts to nontarget species that might be important wildlife habitat or feeding species. For instance there is evidence the tebuthiuron can negatively impact sage grouse for up to ten years following application. All herbicide use must consider potential direct and indirect impacts to the full suite of wildlife in the proposed area, particularly federal or state listed species, declining species and species of concern. |

BLM_0001663

**Response:** A discussion of impacts to nontarget species, including vegetation, aquatic resources, and other wildlife is given in Chapter 4 of the PEIS under each of these respective sections. Information on the risks of each herbicide to different taxa of wildlife is given in the Wildlife Resources section of Chapter 4, and in more detail in the risk assessments prepared for each herbicide. Direct and indirect impacts to wildlife species of concern are discussed in Chapter 4 under Wildlife Resources, and in greater detail in the Biological Assessment that accompanied the PEIS and PER.

EMC-0640-030
Animal Welfare
Institute

**Comment:** The BLM must clearly delineate, using the best available science, the impacts of invasive exotic species on wildlife (including protected species) and wildlife habitat before implementing management treatments to resolve the problem. These suggested evidentiary needs are not intended to hinder BLM management efforts or to promote the continued expansion of invasive exotic species across the western United States. Rather, they are intended to ensure that the invasive exotic species are indeed harming wildlife, to ensure that the BLM remains accountable for its actions, to focus BLM resources on areas where there is a specific and resolvable problem, and to ensure BLM considers the impact of its actions on native species who may have adapted to living with the invasive exotic species before implementing its proposed treatments.

**Response:** The PEIS and PER note in Chapter 4 under Wildlife Resources that invasive species harm some wildlife species, but also provide benefits for other species. The adverse effects and benefits of treating vegetation, including the removal of weeds or other invasive vegetation, would be considered when developing site-specific plans to ensure that there is a net benefit to wildlife from the vegetation treatment project.

EMC-0640-036
Animal Welfare
Institute

**Comment:** The BLM's assessment of the potential impact of the proposed herbicides on wildlife (including fish, amphibians, invertebrates, and protected species) is insufficient and likely does not represent a full and fair evaluation of such impacts. These assessment data are the product primarily of toxicity tests apparently required by the EPA to register herbicidal products for use in the field, to determine application rates, and to determine impacts to both target and non-target species.

**Response:** The BLM conducted state-of-the-science ecological risk assessments (ERAs) to evaluate the potential impacts to wildlife from the use of herbicides. The BLM worked closely with risk assessment scientists with USEPA, National Marine Fisheries Service, and U.S. Fish and Wildlife Service to develop the BLM risk assessment methodology. Sources of information used in the ERAs included product registration information, the scientific literature, BLM local experience, and modeling. Information from the ERAs was used in the PEIS to assess adverse and beneficial impacts to wildlife and their habitat, including special status species, at a level of analysis appropriate for a PEIS. No fish or wildlife would be targeted for treatment, although their habitats would be treated. Additional analysis will be conducted at the field level prior to project implementation, where site characteristics and species can be better evaluated.

EMC-0640-34
Animal Welfare
Institute

**Comment:** The BLM, at a minimum, should have attempted to construct models to assess the impact of its proposed program by vegetation treatment method used and by ecoregion to help those commenting on the PEIS and associated documents quantify the potential impact to species or other ecosystem components. As currently written, all the PEIS provides to facilitate an evaluation of the quantitative impact of herbicidal and non-herbicidal treatments on wildlife are scores of no effect, low effect, moderate

BLM_0001664

effect, high effect, or not evaluated. While such scores may be accurate, it would be more valuable to those reviewing the PEIS and associated documents to be able to quantify the meaning of, for example, a high effect of a particular herbicide in a particular environment.

**Response:** See response to Comment EMC-0525-111 under PEIS Proposed Action and Purpose and Need, Scope of Analysis.

EMC-0643-022
California Indian
Basketweavers
Association

**Comment:** Recently a team of scientists from University of California, Berkeley, found highly significant increases in adverse effects to tadpoles exposed to mixtures of pesticides at low concentrations. Frog tadpoles were exposed to nine pesticides and herbicides individually, and to mixtures with all nine chemicals. While an average of 4 percent of the tadpoles died when exposed to a single pesticide, an average of 35 percent of the tadpoles died when subjected to mixtures. The frogs developed an array of health problems also, including meningitis, because the chemicals suppressed their immune systems. They also took longer to complete the transformation from tadpole to frog, which reduces their chances of survival (Hayes et al. 2006). In the paper, published in January, 2006 in the journal *Environmental Health Perspectives*, the authors conclude: "the current study revealed that estimating ecological risk and the impact of pesticides on amphibians using studies that examine single pesticides at high concentrations, only, may lead to *gross underestimations of the role of pesticides in amphibian decline*."(emphasis added).

**Response:** The Hayes et al. (2006) study did find that a mixture of nine pesticides resulted in greater effects than effects from each herbicide alone. However, when testing each herbicide alone, the authors used 0.1 parts per billion (ppb) of the herbicide. When testing the mixture, the authors combined 0.1 parts per billion of each herbicide, resulting in a mixture of 0.9 ppb herbicide. As suggested by LeBlanc and Wang (LeBlanc, G. A., and G. Wang. 2006; Chemical Mixtures: Greater-than-Additive Effects. Environmental Health Perspectives 114; available at: http://www.ehponline.org/docs/2006/9188/letter.html), adverse effects to herbicides associated with the mixture may have been the result of a higher concentration of herbicides, not due to a synergistic effect (but also see Hayes, T. 2006. Chemical Mixtures: Hayes Responds. Environmental Health Perspectives 114). Of interest, only one of the compounds tested, atrazine, has been used by the BLM in the past (atrazine has not been used by the BLM for several years) or is proposed for use in the future, and under alternatives B (Preferred Alternative), D, and E (see Chapter 2 of the PEIS, Description of the Alternatives) would not be used on BLM-administered lands. The discussion of effects of herbicides on amphibians has been expanded in the Final PEIS under Wildlife Resources and Cumulative Effects Analysis (Wildlife Resources) in Chapter 4 of the PEIS to address concerns related to the use of herbicides on BLM-administered lands and the potential to adversely affect amphibians.

EMC-0643-036
California Indian
Basketweavers
Association

**Comment:** The DEIS [Draft PEIS] did not include any research and analysis of impacts to wildlife from herbicides due to inter-species variability. Recent studies demonstrate the likelihood of serious harm resulting from extrapolation from a limited number of test organisms in laboratory settings. For example, researchers at University of Pennsylvania found that different species of frogs react differently to the same chemical exposures. For example, in Relyea 2005a, Roundup exposure at realistic concentrations killed all leopard and gray tree frog tadpoles and 98 percent of wood frog tadpoles, but did not significantly effect spring peeper and American toad tadpoles. The DEIS [Draft PEIS] did not include any analysis or provide evidence for this type of environmental impact.

BLM_0001665

**Response:** The toxicity reference values did encompass interspecies variability in several ways. For each ecological risk assessment (ERA), out of the 17 ecological receptor categories, 10 used a Level of Concern (LOC) adjustment (also known as an uncertainty factor) from 2 to 20 to address uncertainties including interspecies variability (the ERAs are included on the CD that accompanies the PEIS; also see Appendix C of the PEIS). Of the remaining seven receptor categories that did not use an uncertainty factor, four were for plants, and three were for chronic risk to birds, mammals, and aquatic invertebrates, respectively, where there is less likelihood of underestimating effects levels. In addition, interspecies variability was evaluated in the uncertainty analyses of the risk assessments. An uncertainty factor of 10 generally addresses up to 95% of the variability among species.

EMC-0643-070
California Indian
Basketweavers
Association

**Comment:** The DEIS [Draft PEIS] fails to accurately document cumulative impacts from the use of pesticides at this scale. The [P]EIS must include an ecological risk assessment that captures the impacts to wildlife species from herbicide uses occurring on private lands and from other sources that may cumulatively pose a threat to their continued viability. The high amount of herbicides used on private timber lands, agricultural lands, from roadside or rights-of-way clearing, and private range lands presents a cumulative risk issue for all native frogs and amphibians, pollinators, avian shrub-dependent species, deer, and other wildlife.

**Response:** Because some wildlife travel long distances and may be exposed to herbicides from many areas, quantifying this effect is extremely difficult because the types, amounts, and characteristics of the herbicides that wildlife would be exposed to on non-public lands are unknown. The BLM would comply with Standard Operating Procedures and mitigation in the PEIS to reduce risks to wildlife while they use public lands. In addition, many of the herbicides used by the BLM degrade rapidly and/or are excreted by wildlife, and most do not bioaccumulate (see herbicide ecological risk assessments). We have included a discussion of these risks, however, in Chapter 4 of the Final PEIS, under Cumulative Effects Analysis, Wildlife Resources.

EMC-0643-076
California Indian
Basketweavers
Association

**Comment:** Insufficient data relative to species in project area. Research has shown that different species react very differently to the same chemical exposures. For example, in Relyea 2005a, Roundup exposure at realistic concentrations killed all leopard and gray tree frog tadpoles and 98 percent of wood frog tadpoles, but did not significantly effect spraying peeper and American toad tadpoles. The DEIS [Draft PEIS] relies upon laboratory to ecosystem extrapolation. The DEIS [Draft PEIS] does not contain available relevant data for assessing impacts for amphibians.

**Response:** There are several thousands of species present on BLM lands. It is impossible to perform risk assessments for them all, so indicator receptor categories were used based on taxonomic and trophic or feeding guild considerations. To address uncertainties from interspecies extrapolation, see response to Comment EMC-0585-199 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0643-077
California Indian
Basketweavers
Association

**Comment:** Berrill et al. (1993) tested the formulations of triclopyr to determine their impacts on frogs and concluded, "Ranid tadpoles are likely to be paralyzed or killed by residues of the ester formulation [BEE or Garlon 4] of triclopyr that could occur in small ponds as a result of forest management spraying programs. Paralysis is likely to render tadpoles more vulnerable to predation, and when it is associated with slower growth it could also reduce later reproductive fitness." The DEIS [Draft PEIS] fails to adequately mitigate for impacts to amphibians.

BLM_0001666

**Response:** In response to concerns brought up by the public during the Draft PEIS review, the discussion of effects of herbicides on amphibians has been expanded in the Final PEIS under Wildlife Resources and Cumulative Effects Analysis (Wildlife Resources) in Chapter 4 of the PEIS to address concerns related to the use of herbicides on BLM-administered lands and the potential to adversely affect amphibians. See responses to Comment RMC-0205-018 under PEIS Alternatives, Special Precautions, and Comment EMC-0257-005 under PEIS Environmental Consequences, Wildlife Resources for a discussion of the effects of triclopyr on amphibians and BLM practices that would be implemented to protect amphibians in areas where triclopyr is used. Interestingly, the authors cited in the comment found that hexazinone had no effect on frog embryos or tadpoles, which is consistent with the results of the risk assessment for hexazinone done by the Forest Service and summarized under Fish and Other Aquatic Resources in Chapter 4 of the PEIS. Also see Comment EMC-0643-079 under PEIS Environmental Consequences, Fish and Other Aquatic Organisms for information on a study by Berrill and Bertram (1997) in which they noted that "aquatic stages of amphibians are generally comparable to fresh-water fish in their vulnerability to exposure to low levels of pesticides" and a discussion of measures the BLM would implement to protect fish and other aquatic organisms from herbicide applications.

RMC-0049-023
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment** Page 2-13 Alternative E [of the Draft PEIS] does not address effects on amphibians, but then none of the alternatives adequately address the effects of the invasive species on amphibian populations.

**Response:** The focus of the PEIS and PER were on the effects of treatments on the resources, rather than how the lack of treatment [i.e., spread of invasives] would affect resources (especially since all alternatives involve some level of treatment using several treatment methods). Additional information on the effects of herbicides and other treatment methods and the spread of invasive vegetation on amphibians has been included in the Final PEIS and PER in Chapter 4 under Wildlife Resources.

RMC-0095-005
New Mexico
Department of Game
and Fish

**Comment:** The first of these two major omissions is that the PDEIS fails to address the potential lethal impacts to amphibians from glyphosate, one of the herbicides proposed for use by the Preferred Alternative, and which is also currently used. Recent research has demonstrated that Roundup, a glyphosate formulation, applied at the manufacturer's recommended rate. may cause extremely high rates of mortality to anuran amphibians (frogs) at both the larval (aquatic tadpole) and post-metamorphic (terrestrial adult and juvenile) stages, which could lead to population declines (Relyea 2005a, b, c). Therefore, we request that additional information be included to address these potential impacts, and that modified or additional standard operating procedures and mitigation actions be considered in light of this research.

**Response:** See responses to Comment EMC-0643-077 under PEIS Environmental Consequences, Wildlife Resources, and Comment EMC-0643-079 under PEIS Environmental Consequences, Fish and Other Aquatic Organisms. Several references to the risks to amphibians, including tadpoles, from the use of herbicides, including glyphosate, were included in Chapter 4 of the PEIS under Wildlife Resources. The Final Biological Assessment and PEIS recommended under mitigation for herbicide treatment impacts that glyphosate be using sparingly or not at all in habitats used by amphibians. In addition, the BLM proposes to avoid using glyphosate formulations containing R-11 or polyoxyethylene-alkylamine (POEA), as discussed in Comment EMC-0257-005 under PEIS Environmental Consequences, Wildlife Resources.

BLM_0001667

RMC-0095-006
New Mexico
Department of Game
and Fish

**Comment:** Ecological research has also established that many pesticides (including herbicides) can adversely affect amphibian behavior, growth and reproduction (Bridges 1997, 1999, Hayes et al. 2002, *in* Relyea 2005c). However, the PDEIS does not identify, analyze or address any of these potential impacts of proposed herbicide uses on amphibians, as indicated by these studies.

**Response:** See responses to Comment EMC-0643-077 under PEIS Environmental Consequences, Wildlife Resources and Comment EMC-0643-079 under PEIS Environmental Consequences, Fish and Other Aquatic Organisms.

RMC-0106-011
Public Employees for
Environmental
Responsibility

**Comment:** It is appropriately recognized (p. [page] 4-99 [of the Draft PEIS]) that there is a potential for herbicides to "...harm wildlife individuals, populations, or species"—whether "used properly or improperly." [emphasis added]. It is further stated (p. [page] 4-24 [of the Draft PEIS]) that misapplications caused by failure to follow label instructions are the leading cause of impacts on nontarget resources. Therefore, assessments based entirely on the assumptions that herbicide label instructions and Standard Operating Procedures are followed, are incomplete (p. 4-190 to 4-191 [of the Draft PEIS]). Potential and likely impacts of improper use must be assessed—this goes well beyond the "accident" scenarios set up in the D[raft] PEIS. The analysis should address likely impacts if label and SOP [Standard Operating Procedure] instructions are not followed—presumably the herbicide manufacturer has quantitative information on which to base label limits. The extent of what is not known to make such assessments must be completely spelled out. This identifies the extent to which the BLM proposes to continue running uncontrolled experiments on the environment, and should greatly restrict application of all herbicides to situations of special, documented need for chemical treatment with legally defensible oversight.

**Response:** The BLM identified worst-case scenarios (accidental spill scenarios), evaluated their risks, and identified SOPs and mitigating measures to prevent spills and accidents. The worker accidental spill scenario for the human health risk assessment assumes that the worker's skin is exposed to the herbicide, while the public receptor spill scenario assumes that an individual is accidentally sprayed. Both scenarios are conservative. For more information, see Appendix B (Human Health Risk Assessment) of the PEIS under Occupation Receptors and Public Receptors in the Exposure Assessment section, and Appendix C (Ecological Risk Assessment) under Non-target Species Exposure Characterization.

RMC-0106-038
Public Employees for
Environmental
Responsibility

**Comment:** [What] if the SOPs [Standard Operating Procedures] are not adhered to [on pages 4-96 and 4-97 of the Draft PEIS]?

**Response:** The BLM intends to follow all SOPs listed in the PEIS that apply to treatment activities conducted by the BLM.

RMC-0106-039
Public Employees for
Environmental
Responsibility

**Comment:** [On] p. [page] 4-116 [of the Draft PEIS], 3 of 5 mitigations are permissive, which experience shows are rarely employed.

**Response:** Two of the five mitigations are permissive. Currently, the BLM can apply the herbicides identified in these two mitigations (except Overdrive®) over large areas and using broadcast methods. These mitigations allow this activity to continue, based on the analysis of risks to wildlife, but encourage the BLM to reduce risks to wildlife by limiting the application area and using spot treatment methods.

BLM_0001668

RESPONSE TO COMMENTS

RMC-0113-003
Grewal, Martha

**Comment:** One of my most exciting bird sightings was when I saw a flock of pinyon jays working through a stand of pinyon/juniper trees near Buena Vista Colorado. The only other sighting I've had of the pinyon jay was a few weeks ago near my home in Cedaredge Colorado, as they were feeding on the junipers. So I am concerned to read that the BLM is going to remove the pinyon/juniper forest. Other birds I have found in the pj forest are the brown creeper, pygmy nuthatch and bushtit. I understand that they might be a fire hazard, but I am at a loss to justify the removal of these trees for that reason.

**Response:** As discussed in Chapter 4 of the PEIS under Impacts of Herbicide Treatments on Wildlife and Habitat by Ecoregion, Subtropical Desert, "healthy pinyon-juniper woodlands, with a full complement of understory grasses, forbs, and shrubs, provide excellent wildlife habitat. However, in many areas, pinyon-juniper has increased in density to the point that understory vegetation is excluded, to the detriment of wildlife." In addition, broad-scale herbicide use in pinyon-juniper woodlands has not been popular over the past several decades, especially when used to open up pinyon-juniper stands. The possibility of destroying midstory shrubs that are important food sources is a major disadvantage to herbicide use. As noted, the BLM would remove pinyon-juniper trees where there would be benefits to wildlife and would avoid treatments in healthy pinyon-juniper woodlands.

RMC-0115-002
Maple, Susan

**Comment:** My first thoughts are for the effects these sprays or powders?, will have on our wildlife and the reproduction of their young. Then there's the concerns of the grasses that a lot of these animals depend on for food and what do they use for sustenance when you kill it all off?

**Response:** The effects to wildlife from herbicide treatments were discussed in Chapter 4 of the PEIS under Vegetation and Wildlife Resources. Although the BLM recognizes there would be short-term impacts to wildlife and their habitats, the intent of treatments is to improve habitat for wildlife over the long term, leading to increases in wildlife production and numbers.

RMC-0129-003
Noble, E.A.

**Comment:** What do you estimate to be the costs incurred by effects of aerial Spraying on the immune systems of birds in this day of West Nile virus and bird flu? Has any scientific literature in Asia shown evidence of massive use of herbicide/pesticide? We know about the initial cover-up of the water supply for cities near the river in China. Do we have any known evidence of the causes of weakening birds' immune systems correlated with West Nile and the bird flu? DDT certainly affected birds: why not currently 'cides?

**Response:** The BLM is not aware of any such literature. This is speculation and is beyond the scope of the PEIS.

RMC-0159-003
Proctor, Gradey

**Comment:** Amphibians are already experiencing a global decline, in part, scientists say, due to herbicide exposure. (Amphibians uptake oxygen through the skin, which allows these chemicals to be spread throughout their bodies). This is also the case with fish. In fact, the Region 6 District of the US Forest Service found that 12 of the 18 herbicides the BLM plans to use "likely to adversely effect" almost all federally Threatened, Endangered, and Sensitive species.

**Response:** See responses to Comment EMC-0643-077 and Comment EMC-0046-002 under PEIS Environmental Consequences, Wildlife Resources and Comment EMC-0643-079 under PEIS Environmental Consequences, Fish and Other Aquatic

BLM_0001669

Organisms regarding effects of herbicides to amphibians and how this issue is addressed in the Final PEIS. The Biological Assessment (BA) prepared in support of the PEIS/PER addresses the potential effects of herbicides on threatened and endangered species. According to risk assessments, and as summarized in the BA, many of the herbicides proposed for use by the BLM would potentially have an adverse effect on listed species. For this reason, conservation measures have been developed to avoid risks associated with herbicide use. These conservation measures are presented in the BA and incorporated into the mitigation measures found in the PEIS. When determining conservation measures, the BA takes into account the declining populations of certain species, as well as the levels of herbicide exposure that would be harmful to these species. Additional conservation measures would be developed at the local level, as appropriate.

RMC-0200-010
Lindsay, Dianne

**Comment:** The PEIS fails to show value for animals. It follows that spraying wildlife forage areas is of little or no concern in this proposal; the consciousness is consistent with research that is cited from work that is completed by administering poisons to helpless research animals.

**Response:** Chapter 4 of the PEIS under Wildlife Resources discusses the adverse effects and benefits of herbicide treatments on wildlife habitat, including forage and cover. As discussed in Appendix C of the PEIS under Uncertainty Analysis, Toxicity Data Available, most toxicological data is for laboratory test organisms. The reasons for selecting these organisms rather than wildlife are provided in this section.

RMC-0208-028
California Oak
Foundation

**Comment:** The Draft PEIS does not include all the state and federally protected species likely inhabiting BLM-owned land or land adjacent to BLM-owned land in its catalog of Special Status Species. (See Draft PEIS, App. H.) That short-coming indicates a failure by the BLM to adequately analyze the impacts of its proposed use of herbicides within California's oak woodland habitats. Based on this data, a far greater number of species are likely to be affected by the anticipated use of herbicides on BLM lands within oak woodland habitats, and the Draft PEIS does not sufficiently address this fact.

**Response:** The BLM received a list of federally-listed species and species proposed for listing from the U.S. Fish and Wildlife Service and National Marine Fisheries Service to use in consultation. This list contained all of the listed species known or suspected to occur on BLM-administered lands in the program area as of September 2005. The BLM also queried all BLM State Endangered Species Coordinators for any additional species that may have not been included on the lists provided by the Services. The Biological Assessment acknowledges that such a list can be fluid. It is important to recognize that because the PEIS and Biological Assessment are programmatic and addresses species over such a wide geographic range, information on species, listing status, and critical habitat is likely to change over time. However, the Biological Assessment is still able to provide guidance for local BLM offices, since effects analyses are done largely by group of species, rather than individual species. Most importantly, consultation is still required at the local, site-specific level. Therefore projects such as those suggested in the oak woodlands would require this additional level of consultation.

RMC-0208-034
California Oak
Foundation

**Comment:** Moreover, all four of these active ingredients, hexazinone, 2,4-D, triclopyr, and [glyphosate] are specifically designed to kill plants, which certainly has the potential for significant environmental impacts in the short and long term to both native flora and wildlife species that rely on such flora for forage and habitat. This

BLM_0001670

RESPONSE TO COMMENTS

impact is particularly pernicious for oaks, which in some cases are the direct targets of the herbicide use. (See e.g. Draft PEIS at pp. [pages] 4-63, 4-112; Draft PER at p. [page] 4-42). Obviously, the intended destruction of native oaks will impact the oak woodland ecosystem, which, as discussed above, is home to numerous endangered, threatened, or protected species or species of concern. The effect of BLM's proposed herbicide use within or near these ecosystems must therefore be assessed in terms of potential to impact ESA [Endangered Species Act] species and their habitats.

**Response:** All herbicides are designed to kill vegetation, and thus can harm vegetation used as habitat for wildlife. However, most of the herbicides used by the BLM or proposed for use, are selective and kill only certain types of plants and would have less harm on wildlife habitat (except the habitat of those species that use the vegetation being treated). Herbicides would not be used to destroy oaks, but if used in oak woodlands, would likely be used to improve range habitat by reducing weed infestations.

RMC-0208-036
California Oak
Foundation

**Comment:** The PEIS also is deficient for failing to assess the potential of different herbicides to interact cumulatively and/or synergistically in both the aquatic and terrestrial environments. (Exhibit 29. [exhibits provided with comment]) Research suggests that these cumulative and synergistic effects are responsible, at least in part, for the precipitous decline in yellow-legged frogs and the Yosemite toad over that last two decades. (Exhibits 30 & 31.) Indeed, these studies show that frogs and toads are susceptible to environmental contaminants, even at low Levels (Exhibits 11, 13, 22, 24, 32, 33, 34), and that environmental contaminants may disrupt amphibian endocrine functions (Exhibits 11 & 13), increase the risk of disease by harming amphibians' natural immune system from viruses, fungi and bacteria (Exhibit 24), and/or disrupt the natural food chain by killing algae or aquatic invertebrates (Exhibit 23).

**Response:** The BLM has reviewed these and other documents and recognizes that herbicides may be harmful to amphibians and other organisms. In response to concerns from the public, the discussion on effects of herbicides on amphibians has been expanded in Chapter 4 of the Final PEIS under Wildlife Resources and Cumulative Effects Analysis (Wildlife Resources) to include information cited above and from other sources on the potential for herbicides to act synergistically and cumulatively and harm amphibians. Also see responses to Comment EMC-0643-077 under PEIS Environmental Consequences, Wildlife Resources and Comment EMC-0643-079 under PEIS Environmental Consequences, Fish and Other Aquatic Organisms for a discussion of measures the BLM would use to protect amphibians from herbicides.

RMC-0208-037
California Oak
Foundation

**Comment:** Additionally, the PEIS fails to adequately address the extent to which BLM's proposed herbicide use will effect regions outside of the application zone. Several studies on pesticide and herbicide drift reveal that application of these toxic active ingredients impacts more area than just the application target. For example, patterns of decline among the federally protected red-legged frog indicate that pesticide drift may be playing a role in that species' decline in the Sierra Nevada. (Exhibit 23 ["wind-born agrochemicals may be an important factor in declines of the California red-legged frog." Note: exhibits provided with comment].) Indeed, concern for herbicide impacts to amphibians led the U.S. Forest Service to conclude that herbicides may not be applied within 500 feet of any yellow-legged-frog and Yosemite toad habitat. (Exhibit 35.) Moreover, recent U.S. Forest Service decisions have declined to allow the use of hexazinone and atrazine due to the likelihood that these persistent and mobile chemicals will find their way into aquatic environments. *(Ibid.)*

BLM_0001671