**Response:** The BLM evaluated the potential for herbicides to drift off-site via air or water and impact non-target plants and other organisms. Based on this analysis, which was done as part of the ecological risk assessment for each herbicide, the BLM developed buffer guidance for each herbicide to minimize the risk of drift affecting organisms outside the treatment area. This information is also provided in the Vegetation, and Fish and Other Aquatic Organisms sections of Chapter 4 of the PEIS, and in the Biological Assessment. Under the Preferred Alternative and alternatives D and E in the PEIS, the BLM would not use atrazine.

RMC-0208-041
California Oak
Foundation

**Comment:** And, while efforts at establishing buffer zones have been viewed as an appropriate solution – and indeed, is identified as a mitigation measure in the Draft PEIS (see e.g. Draft PEIS, at pp. [pages] 2-1 7 to 2-24: 4-23 to 4-35), "small lakes and ponds, often favored by amphibians as breeding sites, are not protected from contamination by buffer zones, and the eggs and tadpoles of the resident species are likely to be exposed to low concentrations of the sprayed chemicals." (Exhibit 25 [provided with the comment].) Therefore, even this accepted mitigation measure is ineffective in some instances.

**Response:** It is possible that some areas used by amphibians could be sprayed. However, effects to eggs and tadpoles could be avoided by conducting pre-project surveys to identify areas with amphibian populations that are susceptible to herbicide spraying; applying herbicides outside of the breeding period; using herbicides of little or no toxicity to amphibians; using herbicide treatment methods (e.g., spot applications) that minimize risks to amphibians; and using non-herbicide treatment methods. These Standard Operating Procedures were discussed in Chapter 2 under Herbicide Treatment Standard Operating Procedures Guide.

RMC-0208-053
California Oak
Foundation

**Comment:** Despite this compelling evidence of the damaging effects of certain active ingredients on amphibians, the Draft PEIS "did not assess risks to amphibians from herbicide treatments." (Draft PEIS, at p. [page] 4-111.) Rather, the BLM appears to rely on the conclusion of the USEPA, which found the data "inconclusive regarding the risks to amphibians from atrazine." (*Ibid.*) That the USEPA found the data inconclusive, however, does not absolve the BLM from considering, as a policy matter, the potential effects of compounded herbicide use in environments inhabited by amphibians.

**Response:** See response to Comment RMC-0208-036 under PEIS Environmental Consequences, Wildlife Resources.

RMC-0213-012
California Native Plant
Society

**Comment:** In addition to direct and cumulative impacts to rare plant species, pesticide use constitutes a significant threat to pollinators of rare plants. Research has shown that pesticide damage to native pollinators—either from direct exposure or from foraging on contaminated plants—can cause significant reductions in seed set. Pesticide use in rangelands and agricultural regions also threatens rare plant survival by reducing pollinator populations. In the case of butterflies and moths, detailed information on host (larval and nectar) food sources is crucial to assess impacts to plants that rely on these species for pollination services. Studies have found that herbicides negatively impact pollinators' eggs as well as their host plants. Herbicide use can have adverse impacts to pollinators necessary for reproduction in native plant populations. Studies have also found that use of herbicides over large landscapes can deplete pollinators that may depend upon exotic species for nectar and pollen in order to survive during migrations.

BLM_0001672

RESPONSE TO COMMENTS

**Response:** Very little information is available on the effect of herbicides on native pollinators. Most information is on the non-native honeybee, which is the subject of most dose-response studies. The BLM proposes to use the conservation measures outlined in the Biological Assessment to protect special status species and federally-listed species. Some of those conservation measures relate to pollinators. At the project level, direct and indirect effects (including effects on pollinators and their larval plants that may be present in the project area) from the proposed action will be analyzed. If it is determined that the proposed action "May Affect" Endangered Species Act-listed species, Section 7 consultation with the U.S. Fish and Wildlife Service and National Marine Fisheries Service will be initiated. Mitigation measures for non-listed special status species will also be incorporated into project designs in an effort to avoid the need to list these species in the future.

RMC-0218-014
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** We are especially concerned about the fate of amphibians, which are experiencing a global decline, in part, scientists suspect, due to herbicide exposure, and about herbicide threats to fish populations. Region Six of the Forest Service found their proposed use of 12 of the 18 herbicides the BLM plans to use would be "likely to adversely affect" almost all federally listed Endangered, Threatened and Sensitive fish species in the region and all commercially important fish species, including salmon, steelhead trout and Bull trout. There should be no herbicide use in riparian areas or aerially.

**Response:** See response to Comment RMC-0159-003 under PEIS Environmental Consequences, Wildlife Resources for a discussion of how herbicides impact amphibians, how this issue is dealt with in the Final PEIS, and what mitigation and other protection measures the BLM would follow to protect amphibians. Only about 1% of herbicide treatments would occur in riparian and other aquatic areas, and in many cases these treatments would occur in areas without amphibians, or involve spot applications that would have limited impact on amphibians.

RMC-0222-099
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Nonlethal effects on amphibians (effects on amphibians other than mortality): The DEIS [Draft PEIS] ([Appendix C on page] C-10) states that "mammals and birds were used as the surrogate species for reptiles and amphibians because of the lack of data for these taxa (fish were used as surrogates for juvenile amphibians)." However, scientific accuracy requires that, at a minimum, available data should be used. For example, a study showing that 2,4-D interferes with normal hormone function and maturation of eggs in frogs should not be omitted. Such a study was conducted by researchers at Willamette University and published in the journal *Molecular Reproduction and Development.* (Stebbins-Boaz et al. 2004) In addition, a study conducted by biologists at Trent University, and the University of Victoria and published in the journal *Environmental Toxicology and Chemistry* showed that environmentally relevant concentrations of Roundup (glyphosate) herbicides caused the development of intersex in frogs. (Howe et al. 2004)

**Response:** The BLM did not include an ecological risk assessment (ERA) of 2,4-D or Roundup® (glyphosate) in Appendix C of the PEIS. The BLM relied on the Forest Service's ERAs for these two herbicides and presented the results of the Forest Service assessments in Chapter 4 of the PEIS. The studies referred to in the comment were published after the Forest Service's ERAs. The BLM evaluated potential endocrine disrupting herbicides in Appendix D of the Final PEIS. Also see response to Comment RMC-0221-070 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

BLM_0001673

RMC-0222-102
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Effects on birds of herbicide damage to habitat: In reference to chlorsulfuron, the DEIS [Draft PEIS] ([page] 4-100) states, "Its use in forested rangeland and other wildlife habitat areas could benefit wildlife over the long term by controlling invasive plant species and the establishment and growth of native plant species that may provide more suitable wildlife habitat and forage." However, the DEIS [Draft PEIS] omits discussion of a series of studies showing that minute of amounts of chlorsulfuron can disrupt the production of seeds and fruits by many species of plants, destroying an important food source for birds. The studies were conducted by researchers at the U.S. Environmental Protection Agency and the University of Oklahoma, and published in the journals *Environmental Science and Technology*, *Pysiologiia Plantarum*, and *Environmental Toxicology and Chemistry*. (Fletcher, Pfleeger, and Ratsch 1993, Fletcher, Pfleeger, and Ratsch 1995, Fletcher, J.S. et al 1996).

**Response:** As noted in Chapter 4 of the PEIS under Vegetation, chlorsulfuron is highly active with only small concentrations needed to kill target plants. It is primarily used on perennial broadleaf weeds and grasses, but can harm non-target vegetation. Thus, the PEIS recommends that chlorsulfuron be applied at the lowest possible dose and with buffer distances of at least 900 feet from non-target plant populations to protect plants used by birds and other wildlife.

RMC-0222-103
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** In addition, the DEIS [Draft PEIS] ([page] 4-102) states that "tebuthiuron is used to thin shrubs, creating a more favorable habitat for shrub-dependent species." However, the DEIS [Draft PEIS] ignores research showing, for example, that lesser prairie-chickens prefer untreated nesting areas to those treated with tebuthiuron. This research was done by scientists at Texas Tech University and published in the journal Great Basin Naturalist. (Haukos and Smith 1989).

**Response:** The PEIS attempted to provide a reasonable review of the literature on herbicide use that showed both the adverse and positive aspects of herbicide use. Thus, not all studies done on wildlife and herbicides were included in the PEIS. However, the PEIS does note in Chapter 4 under Wildlife Resources that tebuthiuron may persist in the soil for several years and injure understory grasses, and that broadcast applications are often not effective. The PEIS cites a study by Doerr and Guthery (1983) in which tebuthiuron controlled shinnery oak without harming forbs required by lesser prairie chickens.

RMC-0222-119
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The following information on the effects of herbicides on sage grouse is excerpted from Rowland (2004), which was not referenced in the DEIS [Draft PEIS].

Until the 1980's, herbicides such as 2,4-D were the most common method of eliminating large blocks of sagebrush (Connelly et al. 2000b). Lands after treatment often were planted with crested wheatgrass or other non-native perennial grasses for livestock forage. Application of herbicides affects all seasonal ranges of sage-grouse (Connelly et al. 2000b), and its effects have been widely reported compared to other land management practices (e.g., Gill 1965, Martin 1970, Carr 1967, Klebenow 1970, Pyrah 1970, Braun and Beck 1976, Rowland and Wisdom 2002).

**Response:** This reference is not cited in the PEIS. However, the PEIS includes more specific information on the adverse and beneficial effects of 2,4-D and other herbicides on sage-grouse and other wildlife in Chapter 4 under Wildlife Resources, Impacts of Herbicide Treatments on Wildlife and Habitat by Ecoregion.

BLM_0001674

RESPONSE TO COMMENTS

| | |
|---|---|
| RMC-0222-120<br>Salvo, Mark<br>(Sagebrush Sea<br>Campaign), Cox,<br>Caroline (Northwest<br>Coalition for<br>Alternatives to<br>Pesticides), and<br>O'Brien, Mary | **Comment:** Spraying of herbicides primarily degrades habitat for sage-grouse by increasing fragmentation and removing shrubs used as nesting cover. Long-term studies in North Park, Colorado, revealed that applying 2,4-D resulted in reduced cover of sagebrush, fewer sagebrush plants and forbs, and lek abandonment (Braun and Beck 1976, 1996). Production of sage-grouse, as measured by percentage young in the harvest and chicks per hen, declined in the 5 yr following treatment but rebounded by 15 year post-treatment (Braun and Beck 1996). Hens with broods avoided sprayed blocks while moving toward traditional brood-rearing habitats (Carr 1967, Carr and Glover 1971). In another study in North Park, in which >120 flocks (>3,000 birds total) were observed during two winters, only 4 flocks were found in altered (by spraying with 2,4-D, plowing, burning, or seeding) sagebrush habitats, although >30% of the study area had been treated (Beck 1977). |

**Response:** See response to Comment RMC-0222-103 under PEIS Environmental Consequences, Wildlife Resources.

| | |
|---|---|
| RMC-0222-122<br>Salvo, Mark<br>(Sagebrush Sea<br>Campaign), Cox,<br>Caroline (Northwest<br>Coalition for<br>Alternatives to<br>Pesticides), and<br>O'Brien, Mary | **Comment:** Herbicides may also be toxic to sage grouse, although sage grouse are not mentioned once in the DEIS [Draft PEIS] Ecological Risk Assessment (DEIS [Draft PEIS] II, Appendix C) or draft Biological Assessment. Wallestad (1975) and Blus et al. (1989) have noted the detrimental effects on sage grouse populations from application of herbicides and pesticides. Besides their acute effects, many herbicides have chronic effects, and may act as endocrine disrupters. Further, sage grouse in areas that have been treated with tebuthiuron (Spike) have been observed engaging in atypical behaviors. For example, during a period when most males were flocking, "one male [was] consistently alone in an area where sagebrush has been treated with Spike" (Brigham 1995). Another male was observed sitting out "in the open" in "the heat of the day" even though a sagebrush provided shade only 50 meters away (Brigham 1995). Although anecdotal, such observations may reflect contaminant mediated behavioral alterations. |

**Response:** Because sage-grouse are not federal threatened or endangered species, they were not covered in the Biological Assessment. The risk assessments primarily focused on impacts to animal guilds, including birds. Again, since sage-grouse are not afforded special protection, they were not included in the rare, threatened, or endangered sections of the risk assessments. However, Chapter 4 of the PEIS and PER under Wildlife Resources include information on the risks and benefits of herbicide and other treatment methods to sage-grouse and other wildlife.

| | |
|---|---|
| RMC-0222-134<br>Salvo, Mark<br>(Sagebrush Sea<br>Campaign), Cox,<br>Caroline (Northwest<br>Coalition for<br>Alternatives to<br>Pesticides), and<br>O'Brien, Mary | **Comment:** As described in these comments and other sources, habitat manipulation (by fire and mechanical methods), herbicides, and land uses, such as livestock grazing, harm sage grouse.<br><br>**Response:** Chapter 4 of the PER and PEIS under Wildlife Resources discusses the adverse and positive impacts of habitat manipulation, including use of fire and herbicides, on sage-grouse. |
| RMC-0230-003<br>Cushman, Robin | **Comment:** Open forest re-growth areas and roadsides are prime environments for butterflies and moths. These lepidoptera utilize a wide range of host and nectar plants, both of which are essential for the successful reproduction and continuation of these animals – in larval and mature stages. Many of the plants your agency deems as competing with trees, hence as being "weeds," are crucial for the life cycle – for |

BLM_0001675

example, Chinkapin is the specific host plant for Golden Hairstreak in the larval stage. Other host plants include: willows, alders, bitter cherry, chokecherry, amelanchier, stinging nettles, salal, Oregon grape, ceanothus, manzanita, ribes, and bearberry. There are even more roadside species that function as host and nectar sources: coltsfoot, grasses, sedges, etc. Have you ever experienced seeing ceanothus vibrating with the feeding larvae? It is amazing!

**Response:** The BLM proposes to use the conservation measures outlined in the Biological Assessment to protect special status species and federally-listed species. Some of those conservation measures relate to pollinators. At the project level, direct and indirect effects (including effects on pollinators and their larval plants that may be present in the project area) from the proposed action will be analyzed, and if it is determined that the proposed action "May Affect" Endangered Species Act-listed species, Section 7 consultation with the U.S. Fish and Wildlife Service and National Marine Fisheries Service will be initiated. Mitigation measures for non-listed special status species will also be incorporated into project design in an effort to avoid the need to list these species in the future. The PEIS/PER also includes a Standard Operating Procedure (see Chapter 2) that requires that damage be minimized to non-target plants by using a selective herbicide and a wick or backpack sprayer.

RMC-0230-004
Cushman, Robin

**Comment:** Massive, indiscriminant spraying in re-growth areas will deprive the lepidoptera of their habitat. A policy of backpack spraying of herbicides that target specific non-native plants would be a healthy compromise. Aerial spraying of more generic herbicides would be a death knell for many species within the sprayed areas.

**Response:** The BLM proposes to use the conservation measures outlined in the Biological Assessment sent to the USFWS as part of Endangered Species Act Section 7 consultation on the PEIS to protect special status and federally-listed species. Some of those conservation measures relate to Lepidoptera and have the potential to be incorporated into project design during the NEPA analysis at the local level. The PEIS/PER also includes a Standard Operating Procedure (see Chapter 2) that requires that damage be minimized to non-target plants by using a selective herbicide and a wick or backpack sprayer.

RMC-0233-011
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Migratory birds would be adversely impacted by these proposed projects, given the estimated 6 million acres proposed to be treated annually. To help meet responsibilities under Executive Order 13186 (Responsibilities of Federal Agencies to Protect Migratory Birds), for the final PEIS/PER, we recommend the BLM evaluate each proposed project for its impacts on migratory birds, specifically the Service's list of Birds of Conservation Concern (2002) and the Partners in Flight priority list species. Specifically, for projects that occur within breeding seasons for migratory birds, we recommend the PER provide for pre-treatment surveys. These would support the pre- and post-monitoring that would be an integral part of the projects. Finally, for the final PEIS/PER, we recommend that a goal of avian habitat improvement be encouraged and designed for each of the proposed project designs. This conceptual approach could result in the development of various pro-active treatment prescriptions that would focus on improving bird habitat.

**Response:** Much of the discussion in Chapter 4 of the PEIS and PER, under Wildlife Resources, focuses on improving habitat for birds, mammals, reptiles and amphibians, and other wildlife. As noted in this section, treatments could have short-term adverse effects on birds, but should provide long-term benefits in terms of improved habitat and a reduced risk of weed infestation and loss of habitat due to wildfire. Standard

BLM_0001676

Operating Procedures and mitigation measures given in Chapter 2 of the PEIS and PER recommend that treatments occur outside of critical periods, including the breeding season for birds when feasible, and that monitoring be conducted to assess the successes and failures of treatments needed to improve treatments over time. The potential effects of vegetation treatments on migratory birds would be evaluated at the local level prior to implementing treatment activities.

RMC-0233-014
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Please use the following information on greater sage-grouse for your final analysis in the final PEIS/PER: Chemical control of sagebrush has resulted in declines of sage-grouse breeding populations through the loss of live sagebrush cover (Connelly et al. 2000). Herbicide treatment also can result in sage-grouse emigration from affected areas (Connelly et al. 2000), and has been documented to have a negative effect on nesting, brood carrying capacity (Klebenow 1970), and winter shrub cover essential for food and thermal cover.

**Response:** Similar information on the adverse effects of herbicides on sagebrush cover and sage-grouse habitat was included in Chapter 4 of the PEIS and PER under Wildlife Resources. However, we have included the Connelly et al. 2000 review mentioned above in the Final PER.

**Environmental Consequences, Livestock**

EMC-0214-016
Vollmer, Jennifer
(BASF)

**Comment:** Effects on livestock, effects on wild horse and burros. As with the effects on wildlife section, these sections are very poorly represented and misleading.

**Response:** The general nature of this comment makes it very difficult to respond. One purpose of a PEIS is to disclose the "potential" impacts of an action that is being considered. In this case the potential impacts are identified, along with potential benefits and mitigation measures that could be useful for avoiding or reducing those impacts. All actions have some potential impact, and although potential impacts are disclosed that does not mean the agency is rejecting that alternative or is prohibited from accepting that alternative. The information in the PEIS is simply used to help the agency consider potential impacts, both adverse and beneficial, and allow the BLM to make an informed decision.

EMC-0338-014
Dow AgroSciences

**Comment:** Comments about risks to large herbivores and livestock: In various places throughout the PEIS, a concern is expressed regarding large herbivores and livestock grazing herbicide treated forage. There appears to be a general misunderstanding on exposure to large herbivores, including livestock, due to the presence of grazing or haying restrictions on the labels. Grazing and haying restrictions are in place to regulate pesticide residues in meat and milk tissue, they are not a function of the herbicide's toxicity to the grazing animal. Any grazing restriction is to ensure residue levels in meat tissue are within the tolerances established by USEPA. Therefore it is erroneous to imply a danger to livestock or large herbivores from grazing treated forage (within the label allowances for range and pasture applications) for triclopyr, picloram, tebuthiuron or other herbicides approved for use on grazed areas.

**Response:** For each chemical used, the label identifies the period of time after which it is safe for grazing animals to return to the treated area. The BLM will communicate with the grazing permittee and follow those label instructions, which require the temporary removal of livestock from the area following treatment. Although the amount of time varies for each chemical, typically livestock can return within 24 to 96 hours. Additional rest from livestock grazing over and above the amount listed for the

BLM_0001677

chemical may be necessary to allow recovery of non-target plants, and to reduce the opportunity for the treated vegetation to reestablish on the site. We have modified the discussions in the PEIS for specific chemicals to make it clear that livestock health would not be affected as a result of exposure to these chemicals at the recommended rates of application, but that restrictions are identified to regulate pesticide residues in meat and milk products.

EMC-0493-002
Blankenship, Jill

**Comment:** But anyways, my question is, I live near Beale Air Force Base in Smartville, California. I see a lot of cattle grazing on what I believe to be BLM land, if you spray after a waiting period will it be safe for the cattle to graze on that land again? Grazing land for ranches is getting scarce; I would hate to see any more lost.

**Response:** Yes. For each chemical used the label identifies the period of time after which it is safe for grazing animals to return to the treated area. The BLM would communicate with grazing permittees and follow label instructions, which could mean temporary removal of livestock from the area. Although the amount of time varies for each chemical, typically livestock can return within 24 to 96 hours.

EMC-0525-010
Western Watersheds
Project

**Comment:** How has this depletion affected livestock patterns of use, acres per AUM [Animal Unit Month], invasion of hazardous fuels like cheatgrass, increased densities of woody vegetation, etc? What are the acres per AUM across vegetation types at present, and how do they compare to stocking rates of good or better ecological condition communities? How many acres per AUM are required to sustain cattle or sheep in the lower salt desert shrub or Wyoming big sagebrush communities, and how does this compare to current stocking rates on these lands?

**Response:** Because of the nature of the comment, it is only possible to respond in very general terms. If land health is degraded, livestock patterns do change. First of all, the livestock themselves may spend less time in degraded areas because forage, and possibly other resources like shade and water, may be less available. In addition, these conditions may result in modification to the permitted season of use and/or the total amount of use measured in AUMs. The question of how may acres per AUM are required to sustain cattle or sheep in lower salt desert shrub or Wyoming big sagebrush communities is difficult to answer because these allocations are very site-specific and can vary from one ecological site to the next depending on soil conditions, climate, slope, etc. The allocations on public lands are often more conservative and prescribe more acres per head of livestock than the suggested stocking rates for good or better ecological condition communities.

EMC-0533-018
EMC-0548-035
Colorado Farm Bureau
Utah Farm Bureau
Federation

**Comment:** BLM should consider how it will carry out its multiple use mandate during treatments under this plan. The proposal to increase the area of treatment has the potential to disrupt or displace existing uses, such as livestock grazing. Suspension of grazing permits for the 2-3 years required for range restoration work could result in many livestock producers being forced out of business. Any proposals in the [P]EIS that consider displacement of livestock grazing permits for any period of time must also consider ways to keep permittees in business during the time that their allotments are treated. These proposals could include providing alternative pastures for grazing during the time that a permittee's allotment is being treated, using vacant allotments for alternative use, using a permittee's livestock to control weeds or reduce fire loads in a nearby sector, or other creative ways to not reduce livestock grazing.

BLM_0001678

**Response:** The BLM does communicate with grazing permittees when planning vegetation management treatments. Notifying the permittee, and providing alternative forage sites for livestock "if possible" were both identified as Standard Operating Procedures in Table 2-5 of the PER. The BLM does consider vacant pastures or allotments when planning vegetation treatment projects, but vacant allotments or forage reserve areas are often not available. The BLM recognizes the potential advantages of using forage reserve areas to help facilitate the needed rest following vegetation treatments, including the potential benefits to grazing permittees by providing more options during the rest period when allotments are unavailable due to vegetation treatment projects, or natural events such as wildfire or drought.

RMC-0040(2)-003
Resource Concepts,
Inc.

**Comment:** Pg [Page] 4-123 [of the Draft PEIS], in the first full paragraph of the page, it is stated that spot treatments of vegetation could be applied at any time. Caution should be taken when treating vegetation adjacent to livestock water sources. Spot treatments should not be applied around water sources in pastures with limited water when livestock are grazing in the pasture. Instead, a standard operation procedure addition could include not allowing treatment of vegetation within close proximity to water sources (especially springs, tanks, ponds, and other developed water sources) while livestock are grazing in water, limited pastures.

**Response:** See response to Comment RMC-0061-003 under PEIS Environmental Consequences, Livestock.

RMC-0040(2)-005
Resource Concepts,
Inc.

**Comment:** Pg 4-126 [of the Draft PEIS], in the paragraph concerning diquat, it was stated that the chemical could be of most concern if used in riparian areas where livestock are exclusively grazing. The document goes on to state that the unlikely scenario of this happening was not modeled. It should be a standard operating procedure, or part of the regulated use on diquat, that diquat will not be used in a riparian pasture while livestock are held in the same riparian pasture. Grazing duration is generally short in most riparian pastures and should allow sufficient time for livestock to be removed from the pasture before diquat treatments are applied.

**Response:** See response to Comment RMC-0061-005 under PEIS Environmental Consequences, Livestock.

RMC-0061-003
Resource Concepts,
Inc.

**Comment:** Pg. [Page] 4-123 [of the Draft PEIS]. In the first full paragraph of the page, it is stated that spot treatments of vegetation could be applied at any time. Caution should be taken when treating vegetation adjacent to livestock water sources. Spot treatments should not be applied around water sources in pastures with limited water when livestock are grazing in the pasture. Instead, a standard operating procedure addition could include not allowing treatment of vegetation within close proximity to water sources (especially springs, tanks, ponds, and other developed water sources) while livestock are grazing in water, limited pastures. Another standard operating procedure for small infestations and large spot treatments should include temporary fencing to prevent livestock from grazing the weed infested area, when optimal herbicide treatment times conflict with grazing plan schedules.

**Response:** The BLM agrees with the majority of this comment, and the text has been revised to reflect the comment. The second suggestion of including temporary fencing as a Standard Operating Procedure has not been included in the text, however. Although temporary fencing may be useful in many situations, it is not appropriate for every situation and therefore is not included as a Standard Operating Procedure.

BLM_0001679

RMC-0061-004
Resource Concepts,
Inc.

**Comment:** Pg [Page] 4-123 [of the PEIS] In the fourth paragraph on this page, herbicide treatments are being proposed to reduce the risk of future catastrophic wildfire for weeds of concern including downy brome, Russian thistle, kochia, oak, and pinyon juniper. Herbicide applications of tebuthiuron or other herbicides could actually increase the risk of catastrophic wildfire. Leaving standing dead trees and tree branches on-site after application of herbicide treatment could result in higher quantities of low moisture fuels that carry fire faster and hotter than live vegetation. Reducing the percentage of live pinyon and juniper trees in an area through chemical treatment should result in less competition for native grass and forb species, which is a benefit of treatment. However, increases in grass, forb, and shrub fuels are expected and can negate the supposed "fuel reduction" purpose behind the treatment. In my opinion, chemical treatment of selected species such as cheatgrass, pinion-juniper, and some other species should only come as a last resort, unless protecting a new seeding from invasive species, for example. Fuels management grazing and biomass harvest plans should be a prerequisite to chemical applications whenever possible.

**Response:** See response to Comment RMC-0069-016 under PEIS Proposed Action and Purpose and Need, Purpose and Need for the Proposed Action.

RMC-0061-005
Resource Concepts,
Inc.

**Comment:** Pg [Page] 4-126 [of the Draft PEIS]. In the paragraph concerning diquat, it was stated that the chemical could be of most concern if used in riparian areas where livestock are exclusively grazing. The document goes on to state that the unlikely scenario of this happening was not modeled. It should be a standard operating procedure, or part of the regulated use on diquat, that diquat will not be used in a riparian pasture while livestock are held in the same riparian pasture. Grazing duration is generally short in most riparian pastures and should allow sufficient time for livestock to be removed from the pasture before diquat treatments are applied.

**Response:** The text has been modified for diquat in the Livestock section of Chapter 4 of the PEIS in response to this comment.

RMC-0061-006
Resource Concepts,
Inc.

**Comment:** Pg. 4-130 [of the Draft PEIS]. In the paragraph regarding Triclopyr, there is a statement that it is important to limit exposure of cattle and horses to triclopyr sprayed vegetation until residual activity has tapered off. A time frame should be given indicating a typical time for removal of livestock from treated rangelands. If treatment areas are small, they should be temporarily fenced, or scheduled during a period of rest in the standard grazing system for the allotment affected.

**Response:** The label for this product indicates that all livestock except for lactating dairy animals can graze at any time, but they do recommend that livestock be withdrawn from grazing treated forage 3 days prior to slaughter. The Livestock section of Chapter 4 of the PEIS under Triclopyr was modified to reflect these recommendations.

RMC-0115-003
Maple, Susan

**Comment:** You mention cattle grazing lands that are in BLM acres, what effect do these herbicides have on our beef steer?

**Response:** The potential effects of herbicide use on livestock are discussed in the Chapter 4 of the PEIS under Livestock. This discussion includes Standard Operating Procedures and mitigation measures designed to reduce impacts to livestock. In general, the timing of herbicide application can be scheduled to occur when livestock are not present, or livestock can be specifically removed when herbicide is applied to reduce the potential effects on livestock. Each chemical prescribes a period of time

BLM_0001680

RESPONSE TO COMMENTS

when grazing animals are allowed to return to the treated area. Although the period of time varies depending on the chemical applied, in general grazing animals can safely return within a few days.

RMC-0164-015
Wyoming Department
of Agriculture

**Comment:** The only herbicide the WDA [Wyoming Department of Agriculture] has concern with is diquat. The use of this product could be detrimental to cattle grazing on BLM lands post-application. Pesticides with diquat as the active ingredient typically have label restrictions on grazing, and the use of the treated area as food crop. Therefore, we request diquat only be used in areas or situations where livestock will not be exposed to treated vegetation. However, it is evident that the application of diquat at the labeled rate, will have little to-no effect on the environment, and therefore we support its inclusion on the BLM approved pesticide list.

**Response:** See response to Comment RMC-0061-003 under PEIS Environmental Consequences, Livestock.

RMC-0222-036
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The DEIS [Draft PEIS] does estimate that more herbicide use will mean more livestock grazing potential ([page] 4-123): "In cases where herbicide treatments are able to reduce the cover of noxious and unpalatable weeds on grazed lands, this would create short- and long-term benefits to livestock by increasing the quality of forage" [emphasis added].; However, the DEIS [Draft PEIS] then claims that analyzing whether more livestock grazing will mean even more herbicide use is beyond the scope of the DEIS [Draft PEIS] ([page] 2-12: "…restrictions on [livestock grazing] would only be considered to the extent that they are consistent with BLM vegetation and land use management practices"). Thus, the DEIS [Draft PEIS] discusses the linkage of herbicide use to increased livestock forage, but refuses to consider the link of livestock grazing to increased herbicide use.

**Response:** See response to Comment RMC-0080-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients. The analysis under Summary of Herbicide Impacts in the Livestock section of Chapter 4 of the PEIS is correct. Reducing the cover of noxious and unpalatable weeds would increase the quality of the forage. It does not necessarily follow that increased quality of forage leads to increased livestock grazing activity. See response to Comment RMC-0222-035 under PEIS Proposed Action and Purpose and Need, Scope of Analysis. There is no established relationship between livestock grazing use and herbicide use.

**Environmental Consequences, Wild Horses and Burros**

EMC-0585-104
Western Watersheds
Project

**Comment:** [Page] ES-5 [of the Draft PEIS] mentions Diquat in relation to wild horses, and wrongly concludes they are "unlikely" to be exposed to it. Wild horses may seek out limited desert water sources, and they eat water cress and other aquatic plants (K. Schultsmeier, per comm. to Fite). If the only water source for wild horses is sprayed, exposure would be certain. Here, as throughout the [P]EIS and PER, BLM ignores the realities of wild arid landscapes.

**Response:** The Final PEIS at page ES-5 summarizes the direct and indirect impacts to livestock and wild horses from herbicide use. The risk assessment identifies diquat as being toxic to these animals; however, frequent exposure of livestock and wild horses to diquat would be unlikely, since it is applied as an aquatic herbicide. Diquat is typically applied to large water bodies, such as streams, rivers, and large ponds or lakes with interconnectivity. It is used to control invasive species such as giant

BLM_0001681

salvinia, which is found in the Colorado River system and has the potential to spread throughout the aquatic system. Water sources for livestock and wild horses in arid environments are usually localized spring sources and seeps, which are not typically treated with herbicides, including aquatic herbicides such as diquat. See the Standard Operating Procedures in Table 2-5 of Chapter 2 of the PER for buffer distances for terrestrial herbicide applications around all water sources. The BLM agrees that if the only water source for wild horses were treated with diquat, exposure of the animals to diquat would be certain. This scenario, as an accidental spill or direct application, was modeled in the risk assessment, which determined that it would not result in the frequent exposure necessary to have a toxic effect on the animal. Furthermore, this scenario is unlikely, since desert water sources utilized by grazing animals are not typically sources of invasive plant infestations with the potential to spread into other areas or systems. Therefore, it is highly unlikely that a treatment program using diquat would target such a water source, as speculated. In the event a treatment program was identified in which an aquatic herbicide could affect grazing animal water sources, appropriate mitigation of impacts to the grazing animals would be identified in the site-specific NEPA analysis, and mitigation would be implemented to protect the animals from direct or indirect exposure.

EMC-0585-249
Western Watersheds
Project

**Comment:** What we have been seeing happen is that BLM is purposefully rounding up/clearing off horses in advance of the "hazardous fuels" projects that are already being conducted. This appears to be aimed at allowing domestic livestock to get all the grass and weeds that grow up after their haz fuels/weed "treatments". Yet, the stocking rate of domestic livestock on the treated lands is not changed. Nowhere is there an analysis of how the ecological balance is affected by significant reductions in horse numbers accompanying treatments, and only a year or 2 removal of livestock and only from the immediate area of the treatment – if even that occurs.

**Response:** In planning hazardous fuels treatment projects, the BLM identifies specific vegetation management goals and objectives to be accomplished as a result of the treatment, as well as any interim management actions necessary to assure those goals and objectives are attained. These management actions may include resting an area from livestock or wild horse or burro use for a period of time, temporary fencing, or other actions. As stated in Chapter 1, Purpose and Need, these site-specific actions are addressed in National Environmental Policy Act documents prepared by local BLM offices and tiered to this document.

EMC-0585-250
Western Watersheds
Project

**Comment:** No assessment is provided of the lethal infrastructure (to horses) that may accompany treatments. For example, Nevada BLM has recently killed wild horses by constructing fences around GBRI [Great Basin Restoration Initiative] cheatgrass "treatments" that cut wild horses off from water. Fences and other impediments to wild and free roaming horses are common accompaniments to BLM "treatments". Fences shift or alter horse use, force them into sub-optimal habitats, heighten conflicts with livestock or wildlife, and may cause injury or death by entanglement.

**Response:** The BLM is required to undertake management activities with the goal of maintaining free-roaming behavior of wild horses and burros. In considering interim management actions to protect vegetation treatment areas, BLM assesses the site-specific impacts of these actions, such as fencing, removal of livestock grazing, etc. together with the direct, indirect and cumulative impacts of the project. As noted in Chapter 1, Purpose and Need, site-specific impacts, including impacts to the wild and free roaming behavior of wild horses and burros, are analyzed in a site-specific National Environmental Policy Act document prepared by local BLM offices and

BLM_0001682

tiered to this document.

RMC-0211-023
Ghandi, Theresa Marie
K.

**Comment:** BLM's plan to remove wild horses during herbicide application did not seem practical. What is the plan for the 240,000 antelope in Wyoming the endangered prairie dogs, bison and migrating birds that can not read the herbicide labels, accepting liability in deciding to eat herbicide contaminated food sources that have been safe in the past? This is a big assumption.

**Response:** As noted under Standard Operating Procedures in Chapter 2 of the PEIS, the BLM would try to remove wild horses and burros from a treatment area, if feasible. More importantly, the BLM would focus on using herbicides and herbicide treatment methods with the least impact to wildlife. Thus, risk assessments were conducted by the BLM to determine which herbicides were most safe to use around wildlife, including special status species. As noted in Chapter 4 of the PEIS under Wildlife Resources, and in the Biological Assessment, additional restrictions would be placed on herbicide use by the BLM in areas with species of concern.

### Environmental Consequences, Paleontological and Cultural Resources

EMC-0203-003
Institute For Culture
and Ecology

**Comment:** The vegetation treatments and [P]EIS reports inadequately address impacts to thousands of tribal and nontribal people who gather nontimber forest products (NTFP) (aka [also known as] Special Forest Products) in the region for commercial, subsistence, and recreational purposes. This is true for both Native American tribal users and nontribal rural and urban users. For example, impacts are not addressed for the pinon seed (aka pinenut) industry, the native seed collection industry, the wild medicinals industry, and for recreational users who are generally under the assumption that products they gather on public lands are free of chemicals. Nontimber forest products occurring in these areas include hundreds of species (processed into thousands of products) including native seeds, edible foods, medicinal plants, decorative products and plants harvested for saps, resins, and fragrances. The cultural value as well as the economic value of these products in the areas covered by the EIS is known to be highly significant to individuals and communities. They are significant culturally and economically, for full-time harvesters and businesses as well as the occasional harvester. As an example the NTFP species database at www.ifcae.org/ntfp/ lists 472 commercially harvested species for Colorado alone. However, the EIS does not adequately discuss these values, nor does it include a sufficient discussion of the impacts of the proposed vegetation treatment policy on either the economic or cultural values of NTFP harvesting.

**Response:** The Final PEIS and PER provide discussions of the effects of treatments in Chapter 4 in the section on Paleontological and Cultural Resources and Human Health and Safety and in Appendix D of the PER (Native American and Alaska Native Resource Uses). The PEIS and PER provide a broad assessment of the impacts of BLM vegetation treatment activities on nontimber forest products that are harvested by Native Americans and others. However, the BLM will consult on the impacts of specific treatment projects on the various NTFPs that are harvested and used by members of the tribal communities as a part of the federal government's government-to-government relationship with the Tribes and their members.

EMC-0621-002
Alliance of Forest
Workers and
Harvesters

**Comment:** The Draft PEIS and PER inadequately address impacts to thousands of tribal and nontribal people who gather nontimber forest products (NTFP) (aka [also known as] Special Forest Products) in the region for commercial, subsistence, and recreational purposes. This is true for both Native American tribal users and nontribal

BLM_0001683

rural and urban users. Nontimber forest products occurring in these areas include hundreds of species (processed into thousands of products), including native seeds, edible foods, medicinal plants, decorative products and plants harvested for saps, resins, and fragrances. Both the cultural and economic value of these products in the areas covered by the Draft PEIS is known to be highly significant to individuals and communities. They are significant culturally and economically for Native American or cultural harvesters, subsistence harvesters, full-time harvesters and businesses, as well as for the occasional harvester. However, the Draft PEIS does not adequately discuss these values, nor does it include a sufficient discussion of the impacts of the proposed vegetation treatment policy on either the economic or cultural values of NTFP harvesting.

**Response:** See responses to Comment EMC-0621-006 under PEIS Environmental Consequences, Vegetation, and EMC-0203-003 under Environmental Consequences, Paleontology and Cultural Resources. Also see Chapter 5 in the PEIS under Government-to-government Consultation and Appendixes D and E in the PER, which discuss Native American and Alaska Native Resource Use and Cultural Resources. The BLM consulted with the tribes (see Appendix G of the Final PEIS) to identify culturally and economically important vegetation resources. The economic benefits of NTFP products is provided in Chapter 4 of the PEIS and PER under Social and Economic Values. It is anticipated that treatments that improve ecosystem health would benefit NTFP quality, abundance, and value.

EMC-0643-034
California Indian
Basketweavers
Association

**Comment:** A recent study in California, conducted by the California Department of Pesticide Regulation, examined herbicide residues on plants of importance to Native Americans resulting from forest plantation spraying (Ando et al. 2003). One thing that became clear to us after analysis of the data was that the residues found on forest plants used by Indian people exceeded the EPA residue tolerances set for the same chemicals used on crop plants--certain fruits, berries, herbs, and grains. These residues were exceeded by many times, sometimes hundreds or even thousands of times, the amounts of residue that are allowed on foods you could buy in the grocery store. The EPA regulatory system fails to provide the same level of protection for traditionally used plants gathered by Indian people, on public lands.

**Response:** USEPA tolerances are established partially based on the percentage of the food item in the average diet. The forestry items listed in Ando et al. (2003) are not listed in tolerances because of their specialized subsistence use. Hence, the Ando et al. (2003) paper does not claim that USEPA tolerances are exceeded. Some of the BLM exposure scenarios did show risk associated with Native American use of plants, notably for diquat. However, diquat would only be used in aquatic bodies. Thus, the risk of Native Americans coming into contact with diquat would be minor.

EMC-0643-048
California Indian
Basketweavers
Association

**Comment:** Also, the DEIS [Draft PEIS] claims that impacts to Native Americans are further mitigated because "Three of the four herbicides proposed for use are relatively harmless to native peoples and other human receptors." (p. [page] 2-34, Table 2-8 [of the Draft PEIS]). This statement is without factual basis and is misleading. The preparers of the DEIS [Draft PEIS] have confused a lack of published studies with a lack of harm. As noted under the discussion of Monsanto and glyphosate (see Attachment 4 [provided with the comment]), it is not factual to state that any of the chemicals are "relatively harmless to native peoples." Further, the DEIS [Draft PEIS] states that 70% of applications will be 2,4-D, picloram, tebuthiuron, or diuron--all of which are moderate to highly toxic chemicals.

BLM_0001684

RESPONSE TO COMMENTS

**Response:** The BLM proposes to use diflufenzopyr, diquat, imazapic, and fluridone. Risks to Native Americans were rated as none to low for these herbicides (see Human Health and Safety and Table 4-28 in Chapter 4 of the PEIS). 2,4-D and tebuthiuron are rated as moderately toxic under several exposure scenarios, and glyphosate and diuron are rated as slightly toxic via ingestion, and picloram is rated as slightly toxic via exposure by consumption of contaminated water (see Tables 4-28 and 4-30 in PEIS Chapter 4).

EMC-0643-058
California Indian
Basketweavers
Association

**Comment:** We note that impacts to plant materials used by Native American people for maintenance of tribal cultural traditions may occur anywhere on BLM lands. Impacts to these resources are not limited to known gathering areas. Indian people may gather plants for traditional uses anywhere where such plants are found to occur naturally. Thus, the possibility of impacts to Native people through exposure to chemicals is a certain outcome from this proposal, with direct impacts to culture through the loss of native plant materials, resulting in significant impacts that are not been mitigated in this DEIS [Draft PEIS].

**Response:** This comment raises issues recognized in the PEIS with regard to the potential for impacts to plant materials used by Native Americans. However, the PEIS is a broad-scale document and does not consider specific effects to Native Americans and traditional resources, which must be identified and addressed by following appropriate consultation and mitigation at the project level, as discussed in Chapter 2 of the PEIS in the sections on Special Precautions (Cultural Resources) and Coordination and Education. As discussed in Chapter 4 of the PEIS under Cultural Resources, although short-term losses in Native American plant resources may occur as a result of treatments, it is anticipated that native plant resources would improve over the long term, to the benefit of Native people. Also see response to Comment EMC-0643-044 under PEIS Alternatives, Mitigation.

EMC-0643-059
California Indian
Basketweavers
Association

**Comment:** The DEIS [Draft PEIS] has failed to accurately analyze the impacts to Native American health and culture and has not mitigated impacts to an acceptable level. The DEIS makes claims that are not supported by the record and has failed to demonstrate that the benefits of herbicide use outweigh the harm from their use.

**Response:** See response to Comment EMC-0643-043 under PEIS Environmental Consequences, Cumulative Effects Analysis.

**Environmental Consequences, Visual Resources**

EMC-0139-008
Troutman, Doug

**Comment:** The VRM [Visual Resource Management] statement that "domestic animals are common and expected" does not improve the public view of the land. Deer, elk, pronghorn, wild horses, these excite the recreation or casual visitor, not more cows and cow poop! VRM quality is highly degraded by livestock and "range improvement" projects. Degraded, trampled streams and lakeshores are not positive VRM management. Water features are the most critical VRM issue, and rare on BLM lands, which makes their preservation from livestock abuse very critical.

**Response:** We agree that livestock may degrade VRM quality. We have revised the text in Chapter 4 of the PER under Effects of Beneficial Effects of Treatments as follows:

"The controlled use of domestic animals to contain undesirable vegetation may create a short-term visual impact associated with trampling and consumption of vegetation.

BLM_0001685

These impacts would be dealt with on a case by case basis and mitigated as appropriate at the project level. The visual effects of containment by domestic animals would be short term in nature and would create a positive visual effect with the regrowth of desirable vegetation in a healthy, productive condition."

EMC-0214-017
Vollmer, Jennifer
(BASF)

**Comment:** Effects on Visual Resources. This section does not take in to account that a new herbicide in the Preferred Alternative is applied pre-emergence to the vegetation to be controlled, meaning no unsightly dead vegetation. Compared to the No Action Alternative where the vegetation treatment will need to be a post-emergence non-selective herbicide, burning, or disking, leaving an unsightly landscape to achieve lesser results. Under the No Action Alternative fewer acres may be treated, but that means hundreds of thousands of acres left in their unsightly state.

**Response:** Each of the alternatives involves a range of methods both pre-emergence and post-emergence. The visual contrast of the proposed method will be analyzed at the project level and visual Standard Operating Procedures will be applied. The visual impacts of dead zones, prescribed fire and other methods as well as the impacts of leaving an area untreated are covered in Chapter 4 under Visual Resources. The short-term visual impacts of the preferred alternative will generate larger dead zones than those that would be generated under Alternative A because more acres of existing undesirable vegetation would be treated.

**Environmental Consequences, Wilderness and Special Areas**

EMC-0220-005
Friends of the Inyo

**Comment:** We are especially concerned about and strongly opposed to any use of aerial application and increased application within units of the National Landscape Conservation System, most notably designated Wilderness Study Areas [WSAs]. As the BLM is aware, "preservation of wilderness values within a WSA is paramount and should be the primary consideration when evaluating any proposed action or use that may conflict with or be adverse to those wilderness values. The concept of considering wilderness values first asserts, with few exceptions (e.g., valid existing rights, grandfathered rights, etc.), that wilderness resource management objectives within a WSA should take precedence over all other resource management program objectives" (WSA Interim Management Policy H-8550-1). Large-scale application of herbicide to "manage" vegetation within a WSA seem wholly counter to the BLM's legal requirements to manage.

**Response:** The use of aerial application and other large-scale applications of herbicides in wilderness study areas is addressed in BLM Handbook H8550-1. It specifies a very constrained set of circumstances under which such use would be permitted. Such use is in accordance with the legal requirements set forth in the Federal Land Policy and Management Act. Other components of the National Landscape Conservation System, such as National Monuments and National Conservation Areas, have individual land use plans (Resource Management Plans) that provide decisions on how herbicides may or may not be used to meet the requirements of their specific enabling legislation.

EMC-0139-009
Troutman, Doug

**Comment:** Wilderness management should include prescribed fire, but whether in wilderness or WSAs [Wilderness Study Areas], mechanical and chemical treatments should only be used in emergencies where infestations are starting. Removal of livestock from these areas should be immediate if weeds threaten!

BLM_0001686

**Response:** The BLM considers the use of chemical or mechanical treatments as preventative management. Treating infestations only after they emerge is often too late. Proper management of stock levels and periods of use (seasons, length of use), will prevent encroachment of invasive species. Proper management can involve immediate removal of livestock but it can also involve other alternatives. The BLM prefers that controls using prescribed fire be minimized, and other measures taken if possible.

EMC-0513-019
The Wilderness
Society

**Comment:** By their very nature, herbicides pose a substantial risk of changing the character of ecosystems. Based on the law and policy governing the need to protect the naturalness of lands with wilderness values, BLM should prioritize using methods to control vegetation that function most like natural systems.

**Response:** BLM Manual 8560 – Management of Designated Wilderness Areas and BLM Handbook H8550-1 – Interim Management Policy and Guidelines for Lands Under Wilderness Review establish the methods and priorities to be used to protect the wilderness value of naturalness in wilderness and WSAs.

EMC-0513-023
The Wilderness
Society

**Comment:** The language in the Vegetation Treatments [Draft] PEIS does not contain a sufficient analysis of the risks of using herbicides in Wilderness, WSAs or lands with wilderness characteristics. For instance, in comparing the different management alternatives, the PEIS concludes that the Preferred Alternative will have the greatest adverse impacts, including temporary closures of Wilderness, but then also claims that visitors could simply be displaced. Vegetation Treatments {Draft} PEIS, Table 2-8, p. [page] 2-35. The [Draft] PEIS also concludes that there would be greater ecosystem benefits, since use of herbicides will be "most likely" to control weeds and other invasive species. [Draft] PEIS, Table 2-8, p. [page] 2-35. However, this comparison does not adequately account for the need to first ensure that there is no workable alternative to chemical applications, for the importance of temporary impacts to wilderness values, or for the importance in preserving both the naturalness of Wilderness and the opportunity for use and enjoyment of Wilderness.

**Response:** See responses to Comment EMC-0513-022 under PEIS Alternatives, Wilderness Areas, Comment EMC-0513-024 under PEIS Environmental Consequences, Cumulative Effects Analysis, and Comment RMC-0057-005 under PEIS Environmental Consequences, Wilderness and Special Areas.

EMC-0513-025
The Wilderness
Society

**Comment:** The Standard Operating Procedures for Applying Pesticides reference the relevant BLM policies on management of Wilderness and WSAs, but do not specifically set out the requirement for a determination that there is "no effective alternative" and that the action is needed to maintain the natural ecosystem, and do not even mention wilderness management plans. Vegetation Treatments PEIS, Table 2-6, p. 2-19 [of the Draft PEIS]. The Standard Operating Procedures also contain no reference to applicable BLM policy for management of lands with wilderness characteristics.

**Response:** Reference to BLM policies is given in Table 2-8 of Chapter 2 of the PEIS in the first column of the table and in Chapter 4 under Wilderness and Special Areas. It is assumed that the BLM would follow applicable plans, policies and laws when conducting vegetation treatments; therefore, elements of the plans, policies, and laws are not included in Table 2-8 or Chapter 4. Compliance with plans, policies, or laws is discussed in more detail in Chapter 1 of the PEIS.

BLM_0001687

EMC-0513-027
The Wilderness
Society

**Comment:** The PEIS must acknowledge the need to apply a "no effective alternative" and "minimum tool" analysis that takes into account the potential effects of herbicide treatments on both the naturalness and freedom from human control that are an essential part of wilderness values. In applying these standards, the agency will need to balance valid goals for restoring naturalness against the risk of destroying wilderness characteristics, assessing the type of disturbance required and the varying impacts, both short and long term, on wilderness values.

**Response:** See responses to Comment RMC-0057-005, Comment EMC-0513-025, and Comment EMC-0513-032 under PEIS Environmental Consequences, Wilderness and Special Areas.

EMC-0513-031
The Wilderness
Society

**Comment:** The analysis of direct, indirect and cumulative effects of use of herbicides in the Vegetation Treatments PEIS must be revised to: 1) properly account for the importance of temporary degradation of wilderness values; 2) acknowledge and assess the risks associated with use of herbicides on lands with wilderness characteristics (designated Wilderness, WSAs, or lands not formally designated) and the potential for destroying both their naturalness and freedom from human control, and 3) fully consider the potential effects of using herbicides on the lands with wilderness characteristics both on those lands and on the larger ecosystem and/or adjacent lands by answering the following threshold questions: a) is restoration necessary to re-establish natural systems and restore the wilderness characteristics of the area; b) will the proposed restoration lead to a natural balance rather than a cycle of ongoing human intervention; c) are the wilderness characteristics of the area substantially degraded or on a clear trajectory of degradation that will continue without human intervention; d) is the area with wilderness characteristics critical to the function of the larger ecosystem outside the area, and is its unnatural condition a threat to the integrity of the larger landscape; e) are there especially rare or valued natural elements within the area with wilderness characteristics that are at risk without intervention?

**Response:** The direct, indirect, and cumulative effects of herbicide treatments are covered in Chapter 4 of the PEIS and PER under Wilderness and Special Areas. The suggested analysis identified in number 3 of the comment would typically occur at the project level and during NEPA analysis at the local level.

EMC-0513-032
The Wilderness
Society

**Comment:** Section 2 of the Vegetation Treatments PEIS must contain clear prescriptions requiring that: 1) any use of herbicides in Wilderness areas is authorized by the applicable wilderness management plan; 2) no use of herbicides in Wilderness areas, WSAs [wilderness study areas] or lands with wilderness characteristics will be authorized unless there has been a determination that there is no effective alternative and that the use is necessary in order to preserve the natural functions of the ecosystem; 3) the "minimum tool" policy will be applied in assessing the use of herbicides in Wilderness, WSAs or lands with wilderness characteristics, including consideration of whether herbicides are the least damaging to wilderness values temporarily or permanently; 4) prior to permitting use of herbicides, the agency should inventory the wilderness characteristics of the lands proposed for treatment and protect lands with wilderness characteristics as recommended above.

**Response:** As discussed in Chapter 4 of the PEIS and PER under Wilderness and Special Areas, the BLM would comply with guidance in wilderness management plans, manuals, and handbooks; would only use herbicide treatments if they do not adversely affect wilderness values; would follow the "minimum tool" policy; and would consider, and inventory if necessary, the wilderness characteristics of the lands before conducting treatments. BLM guidelines prohibit activities that degrade the

BLM_0001688

quality, character, or integrity of wilderness and special areas. An important objective of vegetation treatments would be to preserve or improve ecosystem values.

**EMC-0585-124**
**Western Watersheds**
**Project**

**Comment:** Any treatments in Wilderness should employ minimal disturbances, and this [P]EIS should have established a protocol for doing this, but has not.

**Response:** A discussion of Standard Operating Procedures to reduce disturbance in Wilderness has been included in Chapter 4 of the PEIS and PER under Wilderness, Standard Operating Procedures.

**RMC-0053-002**
**Alderson, George and**
**Frances**

**Comment:** We oppose the inclusion of BLM-administered national monuments and national conservation areas among the lands to be sprayed with herbicides. We believe broad herbicide treatments are not consistent with the mandates in the laws and presidential proclamations that establish those special units. Those lands have been designated for protection of nature and the processes that sustain a natural ecosystem.

**Response:** The use of herbicides in BLM national monuments is subject to the requirement to protect the objects of scientific and historic interest for which these areas were established. Herbicide use can occur if the aforementioned objects are protected. National conservation areas are established by law, and there are different requirements for managing each area. The use of herbicides could be permitted if it was consistent with the enabling legislation for a specific area.

**RMC-0057-005**
**California Wilderness**
**Coalition**

**Comment:** The CWC [California Wilderness Coalition] opposes mechanical treatments in existing wilderness areas and wilderness study areas. In addition, the BLM manages thousands of acres of wilderness quality land that are wild in character but not included in existing wilderness study areas or designated wilderness areas. These wild places are not appropriate for mechanical treatments.

**Response:** As discussed in Chapter 4 of the PEIS under Wilderness and Special Areas, the BLM would use the "minimum tool" to treat vegetation, and would use the minimum amount of mechanical equipment. In addition, the BLM State Director would have to approve or disapprove the use of motorized equipment and mechanical transport in writing by letter and a Decision Notice on a one-time, case-by-case basis. This process should discourage the use of mechanical equipment in wilderness and special areas.

**RMC-0057-009**
**California Wilderness**
**Coalition**

**Comment:** The D[raft] PEIS fails to consider that the use of heavy machinery for mechanical treatments will likely create de facto off road vehicle routes and lead to unauthorized motorized recreation that can jeopardize wilderness values, wildlife habitat, and water quality. Mechanical treatments will jeopardize the non-motorized recreation uses during and after treatment periods. During the application of mechanical treatments, the use of heavy machinery will disrupt wildlife habitat and recreational activity. After mechanical treatments are implemented, the heavy machinery used for such treatments is likely to leave permanent trails that could encourage unauthorized motorized use and jeopardize the isolation, serenity and peacefulness of non-motorized recreation areas.

**Response:** See response to Comment RMC-0057-005 under PEIS Environmental Consequences, Wilderness and Special Areas.

BLM_0001689

RMC-0123-002
Robinson, Edith and
James

**Comment:** We are alarmed to read that herbicides could be used in BLM's national monuments, and possibly in other units of the National Landscape Conservation System such as national conservation areas. All those areas should be excluded absolutely from this herbicide program. Surely widespread use of the herbicides would be in violation of the laws and proclamations that reserved those lands for conservation of nature.

**Response:** The use of herbicides is not specifically prohibited in any of the proclamations or laws that established BLM's national monuments and national conservation areas. Such use could be authorized as long as it can be demonstrated that the requirements of the proclamation or law are being met. Also see response to Comment RMC-0053-002 under PEIS Environmental Consequences, Wilderness and Special Areas.

## Environmental Consequences, Recreation

EMC-0585-196
Western Watersheds
Project

**Comment:** BLM also utterly fails to put the importance of recreational experiences and wild lands to the public in proper perspective. People visit public lands to seek solitude, peace, quiet, and get away from civilization and pollution. People also engage in arduous activities such as backpacking, bike riding, running, etc. on public lands. Exposure to herbicides that may trigger asthma attacks or chemical sensitivities, result in feelings of malaise, headache or nausea -- or simply stink up an area with an offensive chemical smell -- are antithetical to the public lands recreational experience.

**Response:** These types of adverse impacts to the wilderness and recreational experience from the use of herbicides and other treatment methods were discussed in Chapter 4 of the PEIS and PER under Wilderness and Special Areas and Recreation. These sections also noted that large expanses of downy brome, or areas recently burned by wildfires, would also have adverse impacts on the wilderness and recreational experiences, and that efforts to improve vegetation should benefit these visitor experiences over the long term.

## Environmental Consequences, Social and Economic Values

EMC-0093-003
Barrett, Anne Albrecht

**Comment:** Any "herbiciding" is overkill in my mind, when so many viable alternatives are readily available. PLUS, the $ monetary savings to me, the tax payer would be enormous! This money could pay for more rangers and firefighters and other areas of great need within BLM.

**Response:** The BLM considered several vegetation treatment alternatives, including Alternative C, which did not allow for the use of herbicides. As noted for this and other alternatives, the use of herbicides has both adverse and beneficial effects, but is anticipated to comprise only about 16% of all vegetation treatments; prescribed fire, and manual, mechanical, and biological control methods would comprise the remaining 84% of treatments. Based on analysis provided in Chapter 4 of the PER under Social and Economic Values, Beneficial Effects of Treatments, Treatment Expenditures by the BLM, costs for treating with herbicides are generally less than for mechanical and manual methods, but more than for prescribed fire and biological control.

EMC-0196-008
Lamberts, Frances

**Comment:** I am aware that procurement of pesticides can be multiple times more costly, in financial terms, than procurement of biological treatment agents, while their unwanted, harmful impacts on public health and our environment (e.g. bird and

BLM_0001690

fisheries losses, water contamination, pollinator insects and other losses) run into the billions of dollars every year. From the taxpayer viewpoint, therefore, the less costly alternatives are certainly preferable, especially as they redress causative ecosystem disturbances and are more effective in the longer term.

**Response:** Comment noted. As noted in Chapter 2 of the PEIS under Vegetation Treatment Planning and Management, Site Selection Priorities, the BLM would consider nonchemical modes of treatment before considering treatments using herbicides where feasible.

EMC-0203-006
Institute For Culture
and Ecology

**Comment:** Herbicide spraying will likely have an adverse impact on minorities and economically disadvantaged populations and thus is subject to Executive Order 12898 on environmental justice. The current [P]EIS draft does not include an environmental justice analysis, and such an analysis needs to be included in the final [P]EIS. That environmental justice analysis must include a discussion of the mitigation measures that will need to be implemented to address any adverse impacts on minorities or economically disadvantaged populations.

**Response:** See response to Comment EMC-0621-005 under PEIS Environmental Consequences, Social and Economic Values.

EMC-0203-008
Institute For Culture
and Ecology

**Comment:** The current draft [P]EIS does not include an assessment of whether the proposed actions comply with the Small Business Regulatory Fairness Act, including such provisions as informing the Chief Counsel for the Small Business Administration on the potential impacts of the decision on existing and future nontimber forest product small businesses. Such an assessment needs to be included in the final [P]EIS.

**Response:** The Small Business Regulatory Fairness Act applies to federal agencies that regulate activities of small businesses. The BLM does not have regulatory authority or jurisdiction over small businesses and is not proposing any decisions or rulemaking that would regulate small business activities.

EMC-0220-007
Friends of the Inyo

**Comment:** The PEIS states that "treatments would benefit local communities by providing jobs and income." We must ask, how much greater would these potential benefits be if the "vegetation management" goals proposed to be achieved through the use of synthetic herbicides were achieved through other means, such as the use of specialized livestock and grazing rotations to reduce exotic grasses, the employment of large restoration crews to physically remove exotic species such as tamarisk, and the reduction of fire danger by manually creating strategic fire breaks around communities with hand crews rather than killing large swaths of vegetation with herbicides in the back of beyond?

**Response:** Under an integrated pest management program, all methods and techniques of vegetation treatments are considered, including the techniques described in this comment. BLM utilizes crews to remove tamarisk by hand or mechanically, and livestock such as sheep, goats and llamas are commonly used around local communities to reduce hazardous fuels. Fuel breaks are typically constructed through non-herbicidal mechanical means and not through vegetative treatment using herbicides. The potential effects from the use of all these non-herbicide methods are described in the analysis of Alternative C (No Use of herbicides) under Social and Economic Values in Chapter 4 of the PEIS. Non-herbicide treatment methods are described in Chapter 2, and the costs associated with treating vegetation using other methods are addressed in Chapter 4 (under Social and Economic Values) of the PER.

BLM_0001691

The PEIS specifically assesses the economic impacts from herbicide use. The economic benefits from the use of all methods of treatments are discussed in the Cumulative Effects section of Chapter 4 of the PEIS.

EMC-0220-008
Friends of the Inyo

**Comment:** The BLM must abandon is tired practice of justifying unsustainable land management strategies with meager, short-term local economic gains. Large-scale herbicide application benefits the economies of large chemical corporations more than a few short term and toxic application jobs. Employing able-bodied Americans to actively restore and steward their public lands would create more jobs than any herbicide project. It goes without saying that those "local benefits" may be outweighed by a future of unknown consequences.

**Response:** The PEIS does not propose large scale herbicide applications in the manner described, nor does the BLM justify its land management strategies or approval of herbicide projects based on potential employment or local economic gains. Effects on a local economy from BLM activities are disclosures required under NEPA, not reasons for undertaking an activity.

EMC-0317-006
Malmberg, Tony

**Comment:** Another consideration is supporting the local community with tax dollars. Money spent on chemicals is gone out of our community. Using animals to graze the plants builds wealth for the citizens of out community. But even more important, it builds the wealth of the biological community. Why not build an alternative program for grazers to get paid for effective grazing management rather than pay for poisoning the land?

**Response:** The BLM has no authority under its regulations at 43 Code of Federal Regulations 4100 to pay grazers (permittees) for effective grazing management. Grazing animals can be utilized for vegetation control in certain limited situations. However, across 17 western states, grazing alone cannot accomplish the extent of hazardous fuels reduction and vegetation control required to meet the Purpose and Need for the Proposed Action (see Chapter 1 of the PEIS). The hazardous fuels and vegetation in many areas of the western United States, and Alaska in particular, cannot appropriately be treated through grazing due to a variety of factors including but not limited to climate, terrain, water, accessibility, vegetation palatability (or lack of), dead fuels, woody species and trees not consumed by grazing animals, discretionary closures to grazing in areas of special management or restrictions such as Wilderness, Wilderness Study Areas, critical threatened and endangered species habitat, as well as community environs making up the wildland urban interface (WUI). Biological and cultural control of vegetation under an integrated pest management framework is discussed under Vegetation Treatment Methods in Chapter 2 of the PER.

EMC-0584-080
Western Watersheds
Project

**Comment:** BLM must provide an adequate cost: benefit analysis of all actions. For example, what are the costs vs. the benefits of spending $100 an acre to treat/restore lands where livestock grazing will again soon resume?

**Response:** See Impacts Assessment Assumptions in the Social and Economic Values section of Chapter 4 of the PEIS for a discussion of the scope and assumptions for the economic analysis. A cost-benefit analysis of all BLM actions is beyond the scope of this PEIS and cannot be provided at this programmatic scale for all public lands in 17 states. The analysis cited in the example would be properly completed at the site-specific level at the time a project is proposed.

BLM_0001692

RESPONSE TO COMMENTS

EMC-0584-081
Western Watersheds
Project

**Comment:** What are the costs to recreational uses of public lands of large-scale treatments? We have been repeatedly contacted by hunters, hikers and birdwatchers who have had recreational outings − or favorite recreational sites - ruined by BLM "treatments". What impact do such losses have on the local and regional economy?

**Response:** See response to Comment EMC-0584-080 under PEIS Environmental Consequences, Social and Economic Values. The costs to recreational uses of a large scale treatment would be assessed at the site-specific project level NEPA analysis. The BLM is not aware of recreational sites ruined through vegetation treatments. The impact to recreational opportunities from herbicide use is discussed in the Recreation and Cumulative Effects (Recreation) sections of Chapter 4 of the PEIS.

EMC-0584-082
Western Watersheds
Project

**Comment:** [I]n BLM's flawed Burley FO [Field Office] Jim Sage EA [Environmental Assessment], BLM planned to spend 6 million dollars to kill junipers "hazardous fuels" across an entire mountain range, despite widespread weed problems throughout the lower and middle elevations, and BLM grazing proposals underway would have increased grazing on the "treated" lands. Thus, taxpayers would have been funding increased livestock forage under the guise of fuels projects, while receiving only tiny amounts of grazing fee dollars in return. This is just the type of thing that we fear will occur under [P]EIS/PER.

**Response:** The Burley FO Jim Sage EA is not within the scale of this PEIS analysis. Comments on a specific EA should be directed to the appropriate Field Office and made in relation to the Proposed Action and Purpose and Need for that project. The Purpose and Need for the Proposed Action, which is given in Chapter 1 of the PEIS, does not include increasing grazing use under the guise of fuels projects. Fuels reduction projects do not preclude the continued authorized grazing use or other uses on the lands on which the fuels treatments are implemented.

EMC-0584-083
Western Watersheds
Project

**Comment:** BLM must adequately analyze a full range of alternatives based on sound economics. All alternatives should include use of federal fire funds to purchase grazing permits and permanently remove livestock from degraded lands, as this is a very foreseeable action during the life of this plan. We support an alternative that uses preventive measures and passive restoration techniques, addresses causal agents of fire/fuels/vegetation problems such as livestock and ORV [off-road vehicle] use, and which minimizes risks of invasive species spread stemming from any treatment that is applied.

**Response:** Congress determines how federal fire funds are used. Use of federal fire funds to purchase grazing permits and permanently remove livestock from degraded lands is outside the scope of the analysis of this PEIS and would violate provisions of the annual Appropriations Acts passed by Congress, unless the Act(s) specifically direct the BLM to use appropriated funds for this purpose. See response to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding causes and vectors of weed spread, and Comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope of Analysis regarding limitations on public land uses.

EMC-0584-117
Western Watersheds
Project

**Comment:** A complete analysis of the costs and benefits of spray/treatments must be provide. What is the per-acre dollar cost of all actions under all alternatives? What are the ecological costs/benefits of these actions?

BLM_0001693

**Response:** The economic analysis is discussed in Chapter 4 of the PEIS under Social and Economic Values and Cumulative Effects (Social and Economic Values) sections. Relative estimates of costs and benefits are provided in the analysis in these sections. See the Introduction and Impact Assessment Assumptions in the Social and Economic Values section of Chapter 4 regarding the limitations and assumptions for economic analysis contained in the PEIS.

EMC-0585-253
Western Watersheds
Project

**Comment:** Nowhere in this [P]EIS is there a fair or accurate accounting of the value, including the economic value, of the native vegetation to be killed, altered or destroyed by the proposed treatments.

**Response:** Vegetation treatments considered in this PEIS are typically accomplished on public lands that are degraded or have been disturbed or altered by fire or invasive and noxious weed species. As such, the native vegetation component is typically minimal or already nonexistent at the time of treatment in most cases. Effects to non-target vegetation from herbicide applications are described under Vegetation Resources in Chapter 4 of the PEIS. The value of native vegetation that may be lost through treatments is not calculable at this scale of analysis, as there is no information on specific projects and their locations, nor the extent of any native vegetation component that could potentially be affected by a treatment. In addition, the metrics for valuation of native vegetation are variable across vegetation types and ecoregions. For example, native timber in the Northwest states would have a different valuation as compared to sagebrush dominated rangelands in the interior west, or tundra grasslands in the Arctic.

EMC-0606-008
Johnson, Kathy

**Comment:** How many tons of herbicides would this equate to and what would be its cost and the cost of the application? Who would be responsible for any ill effects of these applications?

**Response:** The BLM applies an average of 137,612 pounds of herbicide annually on lands it administers. The cost of application depends on the type of application, the density of the infestation being treated, the area being treated, and several other factors. As for liability of the application, any situation involving damage will be analyzed and investigated to determine among other things, the extent of and responsibility for damage.

EMC-0621-005
Alliance of Forest
Workers and
Harvesters

**Comment:** Herbicide spraying will likely have an adverse impact on minorities and economically disadvantaged populations and thus is subject to Executive Order 12898 on environmental justice. The current Draft PEIS does not include an environmental justice analysis, and such an analysis needs to be included in the final PEIS. That environmental justice analysis must include a discussion of the mitigation measures that will need to be implemented to address any adverse impacts on minorities or economically disadvantaged populations.

**Response:** An environmental justice analysis was included in Chapter 4 of the PEIS and PER under Social and Economic Values, Environmental Justice. As noted in this section, it is difficult to determine if minority or low income populations would be disproportionately affected at the programmatic level of analysis in the PEIS and PER. Thus, analysis of effects to these populations would be done at the local level for each project. Issues specific to Native Americans and Alaska Natives have been addressed in the Cultural and Paleontological and Human Health and Safety sections in Chapter 4 of the PEIS and PER.

BLM_0001694

EMC-0621-007
Alliance of Forest
Workers and
Harvesters

**Comment:** The current Draft PEIS does not include an assessment of whether the proposed actions comply with the Small Business Regulatory Fairness Act, including such provisions as informing the Chief Counsel for the Small Business Administration of the potential impacts of the decision on Existing and future nontimber forest product small businesses. Such an assessment needs to be included in the final PEIS.

**Response:** See response to Comment EMC-0203-008 under PEIS Environmental Consequences, Social and Economic Values.

EMC-0630-006
Porter, Mark C.
(Wallowa Resources)

**Comment:** Quantifying the impacts that noxious weed can have is also critical to evaluating the environmental impact of each of the alternatives. Stating that X number of acres will be treated per alternative implies that there are acres that will not be treated. Without attempting to calculate the impact of those untreated (and therefore spreading) weeds on the landscape, the environmental analysis is incomplete. Similarly, the increase in the cost per acre of weed control by alternative (i.e. due to the lack of ability to use aerial treatments) with budgets that are not connected to need, means less acres are treated. These are environmental impacts that are not well addressed in the [P]EIS.

**Response:** The PEIS appropriately assesses the environmental impacts of the use of herbicides in vegetation treatments on humans and public land resources. Quantifying acres of treatments with herbicides provides a comparison of the relative impacts of herbicide use among the alternatives. The environmental impacts of not treating acres of treatable vegetation with herbicides are assessed in the analysis of Alternative C in Chapter 4 of the PEIS. The analyses contained in Chapter 4 also address the treatment of fewer acres by alternative due to the constraints outlined in the alternative (e.g., no use of herbicides, no aerial spraying, no use of acetolactate synthase-inhibiting herbicides).

FXC-0071-023
Campbell, Bruce

**Comment:** The documents admit environmental justice concerns due to Native American uses impacted and Latino workers often involved in herbicide spraying, thus violating Executive Order 12898 on Environmental Justice.

**Response:** The BLM recognized that these groups, and in particular Native Americans, could face additional concerns related to the use of herbicides, primarily through application of herbicides and use of native plants. The risks to Native Americans were addressed in Chapter 4 of the PEIS under Paleontological and Cultural Resources and Human Health and Safety, and in the herbicide-specific human health risk assessments. Also see response to Comment EMC-0621-005 under PEIS Environmental Consequences, Social and Economic Values.

PHC-005-010
K. Fite

**Comment:** And I guess I just wonder, how much will this cost? Is there anywhere in these documents where we have a real and honest assessment of the cost, not only of the chemicals but also of this massive array of treatments? I do know that, for example, in Urban Interface Projects that we have been involved in Nevada in the Nevada in the Mt. Wilson area, BLM was proposing to spend 10 to 12 million dollars, at least, over three to four years to treat 50 square miles of public land. Of course, they weren't anywhere near any urban areas, a lot of them, but it was just a way to spend fire money and increase livestock forage. And that was eventually settles through litigation.

**Response:** The estimated costs for treating vegetation using the different methods and for each alternative are given in Chapter 4 of the PEIS and PER under Social and

BLM_0001695

Economic Values.

RMC-0049-021
Wilson, Robert E.
(University of Nevada
Cooperative Extension)

**Comment:** Alternatives C, D, and E greatly increase costs to the federal government and decrease the effectiveness of the invasive weed management program. As such, the effect of increased infestations of invasive weeds on the environment needs to be included in this [P]EIS and the effects of those increased costs and decreased effectiveness need to be addressed in this [P]EIS.

**Response:** The economic analysis addressing costs to the federal government associated with the use of herbicides, by alternative, is found in Chapter 4 of the PEIS under Impacts by Alternative in the Social and Economic Values section (see expenditures under each alternative). Only Alternative C (No use of Herbicides) indicates the potential for loss of effectiveness in treating invasive species. The environmental and economic impacts of the continued spread of invasive species are addressed under the various resource programs in the analysis of Alternative C in Chapter 4 of the PEIS.

RMC-0055-006
Lamberts, Frances

**Comment:** I am aware that procurement of pesticides can be multiple times more costly, in financial terms, than procurement of biological treatment agents, while their unwanted, harmful impacts on public health and our environment (e.g. bird and fisheries losses, water contamination, pollinator insects and other losses) run into the billions of dollars every year. From the taxpayer viewpoint, therefore, the less costly alternatives are certainly preferable, especially as they redress causative ecosystem disturbances and are more effective in the longer term.

**Response:** As discussed in Chapter 4 of the PEIS and PER, each treatment method has adverse and beneficial effects in terms of direct impacts to the environment and human health, and in terms of long-term success in controlling invasive vegetation and reducing hazardous fuels that lead to wildfires. For example, human health may be at greater risk from herbicides than biological control organisms, but herbicides are generally more effective in controlling large areas of weed infestations than biological control organisms. If weeds spread over large areas, human health and social well-being would likely be harmed. Thus, one must consider both short-term and long-term costs, which is often difficult to do for many resource values. Also see response to Comment EMC-0093-003 under PEIS Environmental Consequences, Social and Economic Values.

RMC-0200-001
Lindsay, Dianne

**Comment:** The PEIS/PER fails to consider the real cost when stating that herbicides offer a resource efficient means of treating vegetation. [1] The most resource efficient means is prevention, by limiting resource extraction. [2] The unconsidered monetary costs are: litigation with sick people who will be exposed to these chemicals, and communities who do not accept degraded water and soil; increased costs of clean water is not resource efficient; and increased health care costs for people exposed to chemicals - when it is preventable- is not an efficient use of my taxpayer resources. [3] The unconsidered non-monetary costs are increases in illness and anxiety over risk of serious illness; loss of wild untouched areas, contamination of soil and water, and loss of wildlife, plants, and the other living organisms that are usually overlooked - that build soil, and generally support a healthy ecosystem. It is not efficient to lose the elements of nature that we depend on.

**Response:** Comment noted. The Draft PEIS does not make the statement that herbicides offer a resource efficient means of treating vegetation. See Response to comment RMC-0055-004 under PEIS Proposed Action and Purpose and Need, Scope

BLM_0001696

of Analysis regarding limitations on uses of public lands.

RMC-0204-021
Wroney, Jan (Gaia
Vision/Canaries Who
Sing)

**Comment:** When I read on page Exec-7 that "Alternative 5 has the lowest cost per acre of any alternative, but it also offers no new employment opportunities" (couched in tones of remorse), I became justifiably nervous about the possibility that there are hidden goals involved in this BLM Vegetation Treatment program. Is the unstated goal of this program to create new jobs? If the program will cause environmental damage and then has to "mitigate" the damages, it will also create new jobs. If the program can also cause human health effects, the medical community will flourish too. If a good proportion of the medical effects are fatal, the morticians will thrive nicely too. If species can be forced into extinction, the scientists will surely have to study the problem. If the water is contaminated, someone will have to devise a way to decontaminate it. Is the hidden goal to increase jobs and economic prosperity? If it is, no wonder it is not stated. To propose activities that would cause suffering to the Earth's creatures, human or non-human, to cause the destruction of the Earth's forms, to cause permanent, irreversible damage all in the name of short term (human) economic gain would surely appear suspect, if not criminal, in the light of day.

**Response:** This comment was previously submitted to the BLM in 1990 in relation to a different EIS and has been addressed in that analysis. This PEIS does not have an equivalent Alternative 5, nor has the statement to which the comment refers been made in this PEIS. Therefore, this comment cannot be responded in the context of the analysis presented in this PEIS. The Purpose and Need for the PEIS are stated in Chapter 1 under Purpose and Need for the Proposed Action. Job creation is not a goal of this PEIS.

RMC-0221-009
Center for Biological
Diversity

**Comment:** The Center [for Biological Diversity] also questions the economic analysis, or lack thereof, for the proposed action. The D[raft] PEIS fails to identify and disclose the costs of the proposed project, both in terms of supplies and labor, and in terms of the potential loss of vital ecosystem services such as clean air, water, and soils. The BLM attempts to let itself off the hook for preparing a comprehensive economic analysis by stating "Concerned individuals should rest assured that more detailed, site-specific analyses would be conducted during the development of actual projects for the use of herbicides." The costs of the proposed action are potentially enormous, the public has a right to know the up-front cash outlays that will be required as well as the potential long-term costs that may be incurred by disrupting or destroying essential ecosystem functions on public lands.

**Response:** See the Introduction in the Social and Economic Values section of Chapter 4 of the PEIS concerning the limitations presented by the scale of analysis of the PEIS. The sentence preceding the one quoted in the comment states: The EIS is programmatic in nature and very broad in scale. A programmatic analysis at this scale does not permit the completion of detailed, quantitative social and economic analysis. Therefore, only general effects and trends will be addressed..." See the Impact Assessment Assumptions of this section for a discussion of the impact assessment assumptions used in the analysis. Also see Incomplete and Unavailable Information under How the Effects of the Alternatives were Estimated in Chapter 4 of the PEIS. The amount of supply and labor to treat vegetation is unknown at this scale in the absence of site-specific proposals across 17 western states. The cost of attempting to acquire this information at this scale of analysis would be exorbitant and would not significantly contribute further to the understanding of impacts relative to the decision to be made—which USEPA herbicides would be available for use by the BLM and under what circumstances. The BLM does not appropriate or allocate funds as "up-

BLM_0001697

front cash outlays." Vegetation treatments are funded through normal resource program budget processes. The Purpose and Need of the PEIS is to improve ecosystem health, not disrupt and destroy ecosystem function. The general trend predicted in the PEIS is a long-term improvement in ecosystem health under the Preferred Alternative (Alternative B).

## Environmental Consequences, Human Health and Safety

EMC-0001-005
Sachau, B.

**Comment:** The effect on [people is enormously costly] in terms of medical treatment, injury, and death.

**Response:** A discussion of the effects of herbicides and other treatment methods on human health was provided in Chapter 4 of the PEIS and PER under Human Health and Safety. In addition, the BLM and Forest Service conducted human health risk assessments for herbicides evaluated in the PEIS.

EMC-0007-001
Grace, Joanne

**Comment:** I lived in the Denny area of California the summer of 1979, as a result of the spraying of 24D and other poisons used in by the US forest service, many of my friends miscarried, there were also children born with severe cleft palates, and one baby born without a skull. This from a very small population of river and mountain people, trying to live off the land. I thought I had missed that unfortunate situation with my unborn child, however, when my son who was born in march 1978 developed leukemia at age 10, I realized my son was killed before he was even born. There are numerous studies linking 24D and the exposure Vietnam vets received, and an increase risk of leukemia in their children. Please, to prove beyond a doubt will never happen, because the study would need to purposefully expose innocents and determine the increase cancer.

**Response:** While it is true that exposure to 2,4-D and other pesticides has resulted in harmful health effects, these health effects are usually caused by prolonged exposure or exposure to high concentrations of these chemicals. If the herbicides are used at low concentrations and in a controlled manner, harmful health effects to people are very unlikely to result. Risk assessments, which are based on extensive toxicology studies, identify concentrations of chemicals at which no health effects have been observed either in people or laboratory animals. If a risk assessment indicates that a chemical can be safely used, it is very unlikely that any harmful effects would be seen from occasional exposure. The risk associated with exposure to these chemicals is typically less than potential risks associated with exposure to typical household products, such as cleaning products.

EMC-0011-006
Kiernan, Barbara

**Comment:** Since the use of toxic chemicals, on public land, poses a threat to public health and the environment, and is especially harmful to young children and those with compromised immune systems, I hope you can use alternate, non-toxic, means to achieve your goals.

**Response:** See response to Comment EMC-0007-001 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0022-002
Matheson, Paula

**Comment:** Synthetic herbicides are not healthy for humans or animals and are implicated in some 200 diseases and conditions, including Parkinson's Disease and cancer. It makes no sense to increase the use of these known health hazards.

BLM_0001698

**Response:** The ability of a chemical to cause harmful health effects is a function of how much of that chemical someone is exposed to, and for how long. Risk assessments identify concentrations of chemicals and exposure conditions that will not pose health risks to people. A herbicide used in an appropriate and controlled manner is unlikely to result in health effects.

EMC-0058-002
White, Kathryn C.

**Comment:** Mounting research indicates that our environment and our very bodies are becoming ever more inundated with toxic chemicals and that this chemical overload may be at least in part responsible for increasing rates of a number of serious diseases. Several of the herbicides proposed by the BLM in the Programmatic EIS have been linked to serious health concerns.

**Response:** See response to Comment EMC-0022-002 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0061-003
Stuckman, Scott

**Comment:** In addition to acute or short-term health effects, many of these pesticides are also known to cause reproductive and developmental problems including birth defects; neurological problems; and cancer.

**Response:** All of these effects are considered in a risk assessment. The safe dose identified in a risk assessment is a dose that has not been associated with health effects, and also incorporates additional safety factors.

EMC-0062-002
Walters, Scott

**Comment:** I have a strong, noticeable reaction to herbicide, which has prompted me to do a large amount of reading and research on the subject. Such symptoms are commonly listed in the MSDS of these products, but even people with these reactions seldom make the connection to which products, of the thousands we're routinely exposed, are responsible for their headaches, fatigue, etc.

**Response:** Health effects from exposure to herbicides typically occur after exposure to high concentrations. If herbicides are applied at low levels and under controlled conditions, it is unlikely that people would experience harmful effects, although there may be people who are extremely sensitive to a large number of different chemicals.

EMC-0075-001
Pearce, Mary

**Comment:** Please help end the use of pesticides that cause such horrific birth defects, especially for baby boys. The effects on women and girls are sad increases in cancers, especially of the reproductive system.

**Response:** The herbicides proposed for use by the BLM have been extensively studied in well-defined toxicology studies. The amounts and application methods proposed for use have not been associated with harmful health effects in animals or humans.

EMC-0075-003
Pearce, Mary

**Comment:** I was so distressed to hear of plans for widespread use of these man-made endocrine disrupters. The manufacture and transportation of these substances exposes workers and innocents on the highways to terrible risk.

**Response:** The BLM conducted an analysis for the Final PEIS to determine whether herbicides proposed for use by the BLM have the potential to be endocrine disruptors; see Appendix D. Also see response to Comment EMC-0075-001 under PEIS Environmental Consequences, Human Health and Safety.

BLM_0001699

EMC-0080-006
Winfree, Robin

**Comment:** People and animals who live near application sites exhibit serious health effects, and those who live near the places where these substances are manufactured have worse health problems.

**Response:** The commentor did not provide data to back up these claims. The BLM prepared a human health risk assessment (see Appendix B of the PEIS) that evaluated the risks to humans from the use of herbicides, including herbicide spray drift. The BLM would implement Standard Operating Procedures and mitigation measures, including posting treatment areas to prohibit entry, to ensure that risks to humans from herbicide applications are none to low.

EMC-0087-001
Talpai, Ayala

**Comment:** I hear you plan to increase the use of pesticides to deal with invasive plant problems. Please don't do that. They cause cancer (documentation provided upon request). Moreover, a neighbor has 2 daughters with malformed reproductive organs-- they were just small when an 80-acre clearcut next door was heavily sprayed.

**Response:** See responses to Comment EMC-0075-003 and Comment FL-0001-003 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0133-002
Ryan, Stephanie

**Comment:** These chemicals are toxic and bio-accumulative, meaning they do not go away or dissolve, rather accumulate til they reach thresholds are irreversibly harmful to the well being of all. Cancer, neurological disorders, immune systems failures, learning disabilities are being traced to the over use of chemicals in our environment. Please take a leadership role in reversing the tide of these practices.

**Response:** The BLM has a process to adopt newer, less toxic herbicides and this PEIS is part of the ongoing process. Also see responses to Comment EMC-0032-002 and Comment RMC-0221-070 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, and Comment FL-0001-003 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0145-004
Wahl, Mark

**Comment:** Additionally, handlers of the pesticides have been shown to have more sterility and other endocrine disruptions; certainly this would be amplified in this kind of huge program.

**Response:** The USEPA evaluates and registers herbicides according to a health-based standard. The USEPA is responsible for ensuring that the product is handled in a safe manner. This is usually done through the product label, which states the precautions that must be taken as well as how and where to apply a certain herbicide. If these rules are followed, it is unlikely that workers would face health effects. Also see response to Comment EMC-0075-003 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0181-004
Artley, Richard

**Comment:** My family and I love to go berry picking. Our favorite spot is on public land managed by the BLM. How will the BLM react when one of my children eats a berry that has been soaked in poison? How will the BLM react when one of their aerial poison drops is blown by the wind into a creek or lake and all the aquatic life dies? Will the BLM guarantee to me that this will never happen?

**Response:** The purpose of the PEIS is to manage vegetation on public lands, including millions of acres of lands infested with noxious weeds that are replacing native species, including native berry bushes. With the exception of diquat, which is an aquatic herbicide and is not sprayed on terrestrial vegetation, no risks from herbicides

BLM_0001700

RESPONSE TO COMMENTS

were predicted. The BLM will post herbicide treatment areas prior to spraying, as discussed in Chapter 2 of the PEIS under Coordination and Education, to notify the public of areas to be sprayed and spray dates.

**EMC-0185-002**
**Sverdlove, Jill**

**Comment:** The cutting edge research that I have been a part of has recently proven that one in four people are genetically susceptible to debilitating toxic injury, from things like even small amounts of "drifting" pesticides because of the difference in how we metabolize toxins. Exposure to low levels over time, through air, water, food, etc or one massive exposure is all we need to become disabled, which I am now.

**Response:** The research referenced by the commentor is not cited. The BLM evaluated exposure via drift in its ecological risk assessment (ERA) exposure scenarios. ERAs predicted no risks for exposure via air and certain food items, except for low risk from diquat at the maximum application rate. The BLM will post herbicide treatment areas to help people avoid these areas until it is safe to re-enter and will limit applications to typical rates, where feasible. Also see responses to Comment EMC-0327-006 and Comment EMC-0181-004 under PEIS Environmental Consequences, Human Health and Safety.

**EMC-0185-005**
**Sverdlove, Jill**

**Comment:** And now there is this awful, sadly ignorant and uninformed plan that will take that [open space and hiking and camping] away for me and the millions of others...not to mention the fact that 25% of the people affected will also then be permanently disabled. Most people and doctors have yet to make the connection but the rise in asthma, allergy, chronic illnesses, and cancer is clear and proven to be related to pesticides. There is plenty of information out there - from the tribe that was split up, one exposed to pesticides and one not, and how all the exposed children showed mental disorders or deficiencies.

**Response:** The reference mentioned is not cited. None of the herbicides the BLM uses or proposes to use are listed as carcinogens by the USEPA. See response to Comment EMC-0336-005 under PEIS, Environmental Consequences, Human Health and Safety.

**EMC-0197-003**
**Sierra, Claire**

**Comment:** Please, please please, look into the impact on pesticides and herbicides that are implicated in increased rates of illness such as cancer and immune diseases. The statistics are convincing! (depending on where you get your information, likely you are reading reports that say otherwise.).

**Response:** Cancer and other health endpoints were evaluated in the risk assessments. None of the herbicides in the risk assessments are identified in USEPA's Integrated Risk Information System as being carcinogens, or referenced as being carcinogens in data provided by USEPA's Office of Pesticides  In accordance with USEPA guidelines, cancer tests are done by evaluating two rodent species that are exposed to high doses of the herbicide. Also see response to Comment EMC-0185-005 under PEIS Environmental Consequences, Human Health and Safety.

**EMC-0233-007**
**Dyber, Kenneth James**

**Comment:** There has also been a dramatic increase in childhood leukemia since the introduction and widespread use of these chemicals. Cancer has been linked to multiple herbicides and pesticides in numerous publications as well.

**Response:** See response to Comment EMC-0197-003 under PEIS Environmental Consequences, Human Health and Safety.

BLM_0001701

EMC-0244-002
Montagne, Joan

**Comment:** I believe the health hazards to humans is something that has be shown to be a proven fact. Cancer is found in direct correlation to where herbicides have been sprayed even if the federal government has declared them "safe". Chemicals of this lethal dose to kill vegetation also kills humans and other living things.

**Response:** See response to Comment EMC-0197-003 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0308-006
Damus, Marilyn

**Comment:** I also want to point out that what safety testing has been done has most likely been on health adult males. What about our children, with their smaller bodies and less developed immune systems? What about those among us who have a genetic weakness that makes them susceptible to severe health problems upon exposure to minute amounts of the these toxic products? There is increasing evidence that the high degree of asthma, ADHD [Attention Deficit Hyperactivity Disorder], learning disabilities, cancer and other problems we see in our school children and our adult population is the result of exposure to more and more toxic chemicals.

**Response:** The risk assessments evaluated children. The USEPA toxicity factors do address variable response rates in a population. Because of the lack of appropriate toxicity studies in humans, toxicity studies are generally conducted on two rodent species, which are given doses of chemicals much higher than humans would be exposed to. Dose levels that do not cause any effects in these species are then divided by multiple safety factors to arrive at a safe dose in humans that accounts for sensitive populations, such as children and the elderly. Also see response to Comment EMC-0197-003 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0310-002
Morris, John

**Comment:** Most pointedly, due to this possible risk to humans, I would like to recommend that the PEIS include neurotoxicity and neuroendocrine measures in risk assessment of new herbicides.

**Response:** All effects reported in the information provided by the USEPA were considered in the BLM's human health risk assessments, including those associated with neurotoxicity and developmental toxicity.

EMC-0324-011
Rachel Carson Council

**Comment:** The herbicide 2,4-D has been associated with a cancer, non Hodgkins lymphoma, in people who regularly contact pesticides in the garden, golf course, and farm. According to a human health source, 2,4-D has been associated with irritation to the skin, eyes, and with intestinal problems. (USEPA, Recognition and Management of Pesticide Poisoning, 5th edition) For agricultural workers the no-entry time for areas treated with 2,4-D can be up to 48 hours.

**Response:** The BLM relied on the Forest Service human health risk assessment (http://www.fs.fed.us/foresthealth/pesticide/risk_assessments/091702_24d.pdf) for the BLM's analysis of effects from the use of 2,4-D. Chapter 3 of this assessment discusses the types of adverse effects from use of 2,4-D. These effects are also discussed in the PEIS in Chapter 4 under Human Health and Safety, and in Appendix B. The USEPA's 2005 Reregistration Eligibility Decision for 2,4-D has concluded there is no basis for the claim that 2,4-D is associated with lymphoma or any cancer.

EMC-0327-005
Firstenberg, Arthur

**Comment:** The Rehabilitation Act reads:

No otherwise qualified individual with a disability in the United States shall, solely by reason of his disability, be excluded from participation in, be denied the benefits of, or

BLM_0001702

be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive Agency. *29 U.S.C § 794.*

The BLM must ensure the accessibility of its public lands to persons with disabilities. It must ensure that persons with MCS [multiple chemical sensitivity] are not excluded, and it must do a qualitative and quantitative assessment of the impact of this proposal on this large population. The BLM has not done this.

**Response:** A recognized disability is a requirement for bringing suit under the Americans with Disabilities Act (ADA) (*See* 42 U.S.C. § 12112(a) (2006)), and the Rehabilitation Act provides the same basic framework for claims as the ADA. *See* 29 U.S.C. § 701 (2006). There is no precedent recognizing MCS as a disability. Courts considering what constitutes a disability under the ADA provide helpful guidance for those suffering from MCS who are bringing claims under other statutes, such as the Rehabilitation Act. *See Homeyer v. Stanley Tulchin Assoc., Inc.*, 91 F.3d 959, 962 (7th Cir. 1996); *Whillock v. Delta Air Lines, Inc.*, 926 F. Supp. 1555, 1562 (N.D. Ga. 1995), aff'd, 86 F.3d 1171 (11th Cir. 1996). A great number of courts have refused to allow expert testimony regarding MCS because it lacks scientific reliability, thereby failing to meet the standards for expert opinion testimony established by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-95 (1993). *See Texler v. County of Summit Bd. of Mental Retardation,* 1994 U.S. App. LEXIS 14421 (6th Cir. 1994); *Gabbard v. Linn-Benton Hous. Auth.,* 219 F. Supp. 2d 1130 (D. Or. 2002); *Coffey v. County of Hennepin,* 23 F. Supp. 2d 1081 (D. Minn. 1998); *Frank v. New York,* 972 F. Supp. 130 (N.D. N.Y. 1997); *Carlin v. Rfe Indus.,* 1995 U.S. Dist. LEXIS 19035 (N.D. N.Y. 1995); *Summers v. Missouri Pac. R.R.,* 897 F. Supp. 533 (E.D. Okla. 1995). Therefore, the courthouse door has been mostly closed to consideration of MCS as a disability. However, even in the few cases where courts have found that "even if" sufferers of MCS were disabled, the accommodations which they requested were unreasonable as a matter of law. *Patrick v. Southern Co. Serv.,* 910 F.Supp. 566, 567 (N.D. Ala. 1996); *Whillock v. Delta Air Lines, Inc.,* 926 F.Supp. 1555, 1556 (N.D. Ga. 1995).

Since MCS is not a legally recognized disability, the BLM need not specifically address how those with this disorder will continue to have access to public lands.

EMC-0327-006
Firstenberg, Arthur

**Comment:** The sections on "Human Health and Safety" in the Draft PEIS and the Draft PER make no mention of persons with MCS [multiple chemical sensitivity]. Standard morbidity and mortality data do not apply to this population, who have a sensitivity to most herbicides that is orders of magnitude greater than the sensitivity of the average person. The only mention I could find anywhere in the BLM documents to varying sensitivities in human populations is, in one single sentence, a statement that the impact on "children and the elderly" was considered. The impact on persons with MCS is entirely different, and of a different order of magnitude.

**Response:** The U.S. Department of Labor Occupational Safety and Health Administration (OSHA) states that MCS patients often report non-specific symptoms from exposure to low-levels of chemical, biological, or physical agents. There seems to be no single stimuli or predictor of reactions. The American College of Occupational and Environmental Medicine "supports the position that the relationship of MCS to environmental contaminants remains unproven. No scientific basis currently exists for investigating, regulating or managing the environment with the goal of minimizing the incidence or severity of MCS." The BLM does not take a

BLM_0001703

position of whether MCS exists or not, but that it is impossible to evaluate at this time. The BLM conducted the risk assessments using currently available methodology and toxicity information.

EMC-0327-007
Firstenberg, Arthur

**Comment:** In assessing the effects of the BLM's proposals on this population, it must consult with appropriate experts. It must quantify their threshold of harmful effect from the herbicides which are planned to be used, the length of time a treated area will remain inaccessible to this population, and the methods and duration of planned public notification that an area has been treated. If the proposal violates the accessibility requirements of the Rehabilitation Act, the BLM must choose Alternative C – No Use of Herbicides.

**Response:** BLM has used the latest available toxicity factors in its risk assessments that considered a variety of receptors. The BLM consulted with appropriate experts, including USEPA and other federal agencies (see Appendix B in the PEIS; Human Health Risk Assessment Overview) and has quantified the risk to human health and the environment in the risk assessments (see Chapter 4 of the PEIS and ecological risk assessments found in the CD that accompanies the Final PEIS). The BLM will post herbicide treatment areas. Also see response to Comment EMC-0181-004 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0336-005
Tipps, Betsy L.

**Comment:** Just during my lifetime, I have seen a huge rise in cancer, asthma, Alzheimer's, Parkinson's, lupus and other autoimmune diseases, and many other terrible disorders. Many of these disorders strike younger and younger people every year. Childhood cancer, asthma, learning disabilities, developmental disorders, attention deficit disorder, attention deficit hyperactivity disorder, and autism are at levels unheard of when I was a child or even a young adult. Reproductive vitality is at the lowest level ever observed in our country. More and more, science is linking the great rise in human health problems in our country to the toxic brew of products produced and used by Americans each and every day. In one study, more than a hundred toxic chemicals were found in the blood of unborn children whose mothers had only average exposure to toxic chemicals. Another study, in California, showed approximately 100-500 toxic chemicals stored in the fat cells of people enrolled in the study; the thing that was most surprising about this study was the people who volunteered for the study ate only natural and organic foods, used no chemicals in their homes, and actively did what they could to avoid exposure to toxins. Another study, done in the Santa Barbara, California area, looked at toxic chemical accumulation in a single average family. The frequency and number of chemicals was shocking and scary, even to scientists who had expected the worst. At some point, we need to need to say enough and find safer means of accomplishing what we want or feel we need to do. For herbicides and pesticides, that time is now.

**Response:** The BLM assessed the risks to humans and the environment from using 18 herbicides and found that risks were generally none to low. For scenarios in which risks would be higher, the BLM proposed Standard Operating Procedures and mitigation measures to reduce these risks to an acceptable level. The use of herbicides is but one treatment method available to the BLM, and only about 16% of BLM-administered lands would be treated using herbicides. As discussed in the PER, over two-thirds of lands would be treated using prescribed fire and mechanical methods. Other treatment methods would include manual and biological control methods.

EMC-0397-003
Bird, Deanna

**Comment:** I'm not a chemist but I do know that herbicides act at the cellular level. How safe are they to developing fetuses? Safety for women and children are not

BLM_0001704

measures made in the laboratory and remain unknowns. Why are there increases in autoimmune diseases and asthma within the human populations, especially children? Is it possible that there is a connection? Is it prudent to gamble with the health and well-being of the public by increasing timber yield for the forest products industry? I say it is not.

**Response:** Reproductive and developmental effects are examined in pesticide registration toxicology tests. The BLM used all known effects data in its risk assessments.

EMC-0432-002
Keys, Paula

**Comment:** Scientists know what causes 75 to 90% of all cancers and yet refuse to curb the use of pesticides and herbicides that are the root cause.

**Response:** See response to Comment EMC-0197-003 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0585- 073
Western Watersheds
Project

**Comment:** BLM claims ([page] ES-2 [of the Draft PEIS]) that old EISs serve as basis for assuming that risks to humans are not significant – based on evaluations done for old EISs. Yet, not only was the data for the chemicals used in that time insufficient, so was the data for the treatments under these old EISs.

**Response:** Appendix B of the PEIS (Human Health Risk Assessment) provides an evaluation of five currently-available herbicide active ingredients that were evaluated in earlier EISs, but not in recent BLM or Forest Service human health risk assessments. As noted, use of more recent toxicity information for these herbicides would have shown few differences for two herbicides, and greater risks for three herbicides. For two of the herbicides with greater risks (diuron and triclopyr), risks were already found unacceptable in the earlier EISs; thus, the conclusions of the risk assessment remain the same. The third herbicide, simazine, has not been used by the BLM since at least 1997, and would not be available to the BLM under the action alternatives.

EMC-0585-179
Western Watersheds
Project

**Comment:** [Appendix] B ([page] B-35 [of the Draft PEIS]) assumes limited public exposure, discounting the fact that many of the treatments are proposed to take place at WUIs [wildland urban interfaces] inhabited by people, and that herbicide-contamination of ground or surface water in the arid West can result in long-term exposure to chemicals.

**Response:** Based on a data call to BLM field offices, about 500 acres would be treated in the wildland urban interface using herbicides, out of an estimated 932,000 total acres of herbicide treatments. Although additional acres may be treated in the WUI using herbicides, it is unlikely that many would be given the potential risks to inhabitants near public lands.

EMC-0585-184
Western Watersheds
Project

**Comment:** We are also very concerned that inhalation risks from drift or accidental exposure of the public are not part of the "public receptor" analysis.

**Response:** Inhalation risks from drift, and accidental exposure, such as a direct spill, were evaluated for all public receptors. Also see response to Comment EMC-0185-002 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0587-004
Jones, Donna

**Comment:** Please consider the effects of just one of the chemicals you propose to use. http://www.mindfully.org/Pesticide/Monsanto-Roundup-Cancer.htm   Monsanto  has

BLM_0001705

long claimed this product has little or no side effects and does not persist in the environment. Yet I personally have known over a dozen individuals who have dealt with lymphoma, leukemia, etc. All had regular exposure to herbicides. One of my brothers is one of the fortunate survivors of this disease. Three others I've known have since died. Do you realize that the highest incident of leukemia is found in farm workers and others with herbicide exposure? The second highest incidence is among those who work with paints and solvents. My brother has worked with produce in the grocery store setting for over 20 years.

**Response:** All of the BLM herbicides have been tested for carcinogenicity in comprehensive animal studies and are not carcinogenic. Also see response to Comment EMC-0197-003 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0590-019
Western Slope
Environmental
Resource Council

**Comment:** Humans are exposed to toxics via inhalation, ingestion, and dermal contact. The ENSR [Exposure Assessment] identifies and categorizes public receptors with potential for exposures as: Hiker/Hunters, Berry Pickers, Anglers, child and Adult Swimmers, Child and Adult Nearby Residents, and Child and Adult Native Americans. Since children are especially susceptible to the toxic effects of chemicals, it is appropriate that they be considered separately for analysis purposes, along with other at-risk populations including the elderly, pregnant and nursing mothers, the chronically ill, the chemically sensitive, and the immunocompromised. However, any human is at risk to the effects of pesticides, and the most risk-averse approach to preventing exposures would be to avoid any and all use of the herbicides listed in the proposal.

**Response:** BLM agrees that there are sensitive subpopulations to address. It is standard practice to evaluate children and reproductive effects, which was done in the risk assessments. See response to Comment EMC-0336-002 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

EMC-0621-009
Alliance of Forest
Workers and
Harvesters

**Comment:** Forest workers and NTFP [Non-timber Forest Product] harvesters work and harvest in forests where herbicides will be applied. These workers/harvesters will be affected by direct exposure or by entering sprayed areas after applications. We have witnessed in the case of Basket Weavers who process their materials by hand and through their mouths that these chemicals contribute to a high rate of cancer. What protections are you going to put in place for these harvesters and workers? Again we refer to Executive Order 12898 on Environmental Justice. This environmental justice analysis must be included in the final PEIS.

**Response:** The BLM assessed exposure to berry pickers, Native Americans, hikers, fishers, and swimmers. The only risks predicted were low risks to these receptors from diquat applications at the maximum application rate. None of the BLM herbicides are listed by the USEPA as being carcinogens. Mitigation measures and Standard Operating Procedures to reduce risk to workers and harvesters are provided in Tables 2.6 and 2.7 in Chapter 2 of the PEIS. Also see response to Comment EMC-0197-003 under PEIS Environmental Consequences, Human Health and Safety.

EMC-0638-003
Kuczora, Carol

**Comment:** The common broadleaf poison 2,4-D and other chlorophenoxy compounds, including its contaminants such as 2,4,5-T and dioxin, are known to be teratogenic. They also are associated with soft tissue sarcomas, chloracne, porphyria, liver damage, polyneuopathies, psychiatric disturbances, paralysis, and ventricular fibrillation. Species differ in sensitivity, dogs being more sensitive than other

BLM_0001706

RESPONSE TO COMMENTS

experimental animals. (Casarett and Doull's Toxicology, 1986.).

**Response:** This reference is out-of-date and out-of-context. These effects are associated with the dioxin contaminant of 2,4,5-T, another chlorophenoxy herbicide. 2,4,5-T is banned by the USEPA and is not used or planned for use by the BLM. The potential for a chemical to cause toxic effects depends on the dose to which people are exposed. The BLM risk assessments use information on exposure and dose to determine the levels at which harmful effects would not be expected. Also see response to FXC-0071-025 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0643-041
California Indian
Basketweavers
Association

**Comment:** The preparers of the DEIS [Draft PEIS] make identical unfounded and inaccurate claims: "For both workers and members of the general public, there were no risks at the typical or maximum application rate" for glyphosate (p. [page] 4-185 [of the Draft PEIS]). The [Final] [P]EIS must remove this type of language and provide a truthful analysis of the risks to Native Americans and to other people from exposures to the full formulations of glyphosate products, not simply the active ingredient.

**Response:** The sentence has been revised to note that there was low risk in one (drinking contaminated water at maximum application rate) of 24 exposure scenarios; other application scenarios posed no risk based on the Forest Service risk assessment for glyphosate and using BLM application rates. The comment does not cite any specific scientific studies or indicate what the risks associated with use of glyphosate are. Also see response to Comment EMC-0643-034 under PEIS Environmental Consequences, Paleontological and Cultural Resources concerning Native American exposures.

EMC-0643-068
California Indian
Basketweavers
Association

**Comment:** The DEIS [Draft PEIS] makes repeated claims about harm to human health resulting from invasive species. These claims purport to offset any environmental or health harm from the use of herbicides. The BLM must document by citation to scientific literature any such claims about harm from invasive species to human health.

**Response:** Invasive species do not generally affect human health, but instead out-compete native species. The BLM has tried to balance the growing and massive infestation of invasive weeds on public lands throughout the West with spot treatment of herbicides. There are risks from using herbicides just as there are with other forms of vegetation control, but the risks of proper application are generally none or low. As noted in Chapter 4 of the PEIS under Human Health and Safety, invasive species can be poisonous to humans if ingested, can cause rashes and shock if applied to the skin of a sensitive person, and their plant parts (brambles, thorns, penetrating seeds) can cause harm and discomfort to humans.

FL-0001-003

**Comment:** In addition to acute or short-term health effects, many of these pesticides are also known to cause reproductive and developmental problems including birth defects; neurological problems; and cancer.

**Response:** The risk assessment approach evaluates noncancer effects based on a safe dose that has not been associated with health effects, and incorporates additional safety factors. The safe dose considers reproductive and developmental problems. Cancer effects are evaluated using a cancer slope factor to estimate the probability of contracting cancer. If the probability of contracting cancer is insignificant, then exposure to that chemical is considered acceptable. A limited number of the BLM

BLM_0001707

chemicals are considered potentially carcinogenic, including diuron and simazine. Both cancer and noncancer effects were considered, when applicable.

FXC-0071-013
Campbell, Bruce

**Comment:** Was there any study of possible impacts from contamination of a hiking and plant-gathering pregnant woman by aerial or other herbicide Spraying? If not, why not? Also, asthma rates have skyrocketed in recent decades. Do any of the evaluations take into account a child with asthma exposed to aerial or other herbicide Spraying?

**Response:** The PEIS and BLM risk assessments clearly show that exposure of hikers and berry-pickers to herbicides were evaluated, as were reproductive effects, and there are no risks associated with any of the herbicides except for diquat. The toxicity studies used in the risk assessment include reproductive and developmental toxicity studies conducted in animals. Also see responses to Comments EMC-0181-004 and EMC-0185-002 under PEIS Environmental Consequences, Human Health and Safety.

FXC-0071-017
Campbell, Bruce

**Comment:** Has BLM examined any studies regarding the volatilization of herbicide residue (either as a part of brown-and-burn operations or perhaps in regards to a wildlife following herbicide applications) since the 1991 footnote mentioned on page 4-133 of the Draft Programmatic ER? If so, what did they indicate? Also, it should be pointed out that herbicides make vegetation drier and thus could easily increase fire danger and risk of catastrophic fire. Was the drying effect of herbicides on vegetation taken into account in either the Draft Programmatic EIS or the Draft PER? Why or why not?

**Response:** Herbicide manufacturers (as well as independent researchers) continually analyze and report the potential for volatilization and photodecomposition of their formulations. Any future use of herbicides would consider the most recent information regarding their use and behavior.

Herbicide treated vegetation is treated like any other debris created by fuel treatment operations. In those cases where plants are treated and killed by herbicide, a secondary treatment is planned to remove any remaining dead plant material. After the initial treatments, monitoring and follow-up treatments (which can be of any type, and not necessarily chemical) will occur if necessary. The management of invasive grass species under the BLM vegetation management program involves the use of a preemergence herbicide (imazapic), which prevents the selected grass species from emerging, thereby reducing the total amount of dry matter present. Postemergence application of herbicides is done when the grasses are small, reducing the amount of dry matter associated with mature and senescent plants. It is recognized that drying induced by herbicide use creates dry matter, but the vegetation will also end up dry and brittle as a result of its natural life cycle.

Also see response to Comment EMC-0646-175 under PEIS Environmental Consequences, Vegetation on the drying effect of herbicides on vegetation and http://www.bugwood.caes.uga.edu/factsheets/98-021.html for information on the air quality considerations of fire and herbicides.

RMC-0068-007
Damus, Marilyn D.

**Comment:** I also want to point out that what safety testing has been done has most likely been on health adult males. What about our children, with their smaller bodies and less developed immune systems? What about those among us who have a genetic weakness that makes them susceptible to severe health problems upon exposure to minute amounts of these toxic products? There is increasing evidence that the high degree of asthma, ADHD [Attention Deficit Hyperactivity Disorder], learning

BLM_0001708

disabilities, cancer and other problems we see in our school children and our adult population is the result of exposure to more and more toxic chemicals.

**Response:** The human health risk assessment (HHRA) evaluated children as a receptor because of their smaller body weight and higher metabolic rate and reproductive effects (pregnant women and birth outcome). Risk assessments do take into account the endpoints mentioned in the comment, including cancer, if they have been identified in animal testing.

RMC-0089-001
Hardebeck, Larry J.

**Comment:** I am especially concerned about the aerial applications you have planned, which will cause the chemicals to be spread far and wide. Just look at what happened on the BLM test plots in Idaho where they used OUST, a supposedly safe chemical manufactured by Du Pont. The safety studies on the chemicals you are proposing are not thorough enough to demonstrate their safety for all members of our society, and they certainly do not address the long-term repercussions that may occur down the road (say 20 years), for example, cancer of various types, autoimmune disease, etc.

**Response:** Risks from aerial application were generally higher for human health and ecological receptors due to the larger areas affected. Drift and leaching was specifically evaluated, and under most herbicide-receptor scenarios there was no risk or low risk associated with typical application rates. Also see response to comment EMC-0185-005 under PEIS Environmental Consequences, Human Health and Safety.

RMC-0106-046
Public Employees for
Environmental
Responsibility

**Comment:** P. 4-174 [of the Draft PEIS]. The findings from review of inerts for 6 a.i.s [active ingredients] cited on p. [page] 4-174 are not consistent with those cited in Appendix C, p. C-83 [of the Draft PEIS]. Appendix C states that inerts for 9 herbicide a.i.s (6 in the PDEIS [Draft PEIS]) were evaluated in terms of the USEPA listings (again ignoring the subdivisions of List 4), finding 12 inerts in List 3 (6 in the PDEIS [Draft PEIS]) and over 50 in List 4 (29 in PDEIS [Draft PEIS]). In addition, Appendix C indicates that 9 inerts were not found on the USEPA lists.

**Response:** The comment is correct. The BLM revised the wording in Chapter 4 of the Final PEIS under BLM Human Health Risk Assessment Methodology in the Human Health and Safety section to provide the correct number of inert ingredients for the herbicides analyzed as part of the human health risk assessment.

RMC-0106-057
Public Employees for
Environmental
Responsibility

**Comment:** P. [Page] 4-193 [of the Draft PEIS]. 4 of the 6 mitigations are permissive, and one is after-the-fact evaluation and therefore not a mitigation.

**Response:** See response to Comment RMC-0144-005 under PEIS General Comments and Responses.

RMC-0159-015
Proctor, Gradey

**Comment:** At present application rates, workers would be at serious risk when using diquat, 2, 4-d, bromacil, diuron, hexazinone, and tebuthiuron. As it even states in the [P]EIS, the preferred alternative contains the most risk to applicators. It is disgusting that this is what you would choose to impose on your staff.

**Response:** Risks are none to low at typical application levels for all 17 scenarios, except 2 scenarios involving mixers of diquat. There are risks associated with all occupations. Pesticide worker safety, training, and use of protective clothing is regulated by the USEPA and Occupational Safety and Health Administration (OSHA) to maintain levels of safety.

BLM_0001709

RMC-0200-004
Lindsay, Dianne

**Comment:** The PEIS/PER fails to include a comparison of the risks to human life between the risk of wildfire and the risk of chemically induced illnesses. The statistics should include the actual statistics which enumerate the human illnesses from exposure to these chemicals.

**Response:** The PEIS discusses the risks to human health from the use of herbicides in the Human Health and Safety section of Chapter 4. The risks to humans from fire, smoke, and herbicides in brown-and-burn operations are discussed in Chapter 4 of the PER under Human Health and Safety. The BLM is not aware of statistical data that show the number of human illnesses associated with herbicide treatments on BLM-administered lands.

The state of the science and existing methodology do not permit estimates of the number of health effects because one needs to have actual, defined populations and exposures. The PEIS uses USEPA methodology with hypothetical application scenarios to project hypothetical risks to exposed persons. Most BLM applications are in remote locations where there are no residents and few or no visitors. Similarly, risk of wildfire is very site-specific. Herbicides are primarily used to control invasive weeds and should not be equated with reducing wildfire risk.

The BLM's actions (including use authorizations) must comply with applicable local, state, tribal, and federal air quality laws, regulations, standards and implementation plans. Therefore, potential air quality impacts are managed below scientifically based and legally enforced regulatory significance thresholds, which are designated at levels with an adequate margin of safety necessary to protect public health, including the health of those individuals most sensitive to the effects of air pollution, such as asthmatics, children, and the elderly. Statistical risk-based analyses are developed and used by the USEPA when establishing and periodically reviewing such standards (see http://www.epa.gov/ttn/naaqs/ ).

RMC-0200-006
Lindsay, Dianne

**Comment:** The [Draft] PEIS/PER fails to list the full scope of human health risks. Monetary health care increases shared by everyone for increasing treatment of kidney, liver, lung, and skin problems; The worry, grief, depression and financial stress to those families affected' [and] the mental anguish of friends and neighbors who, as taxpayers and voters feel responsible for their suffering and want to find ways to stop dumping poisons of all kinds into our lives.

**Response:** See response to Comment EMC-0336-002 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

RMC-0200-009
Lindsay, Dianne

**Comment:** The [Draft] PEIS/PER fails to use comprehensive studies. The research cites "a study" or "3 studies" on mice, rats, rabbits, dogs, birds. I saw no human health statistics re the increasing numbers of people who have diseases and problems which are linked to petrochemicals in our environment. I saw no wildlife studies or reference to the statistics on species extinction. I saw no statistics re cumulative affects. How can any study be relevant that leaves this out?

**Response:** The PEIS evaluates only selected types of a small category of chemicals—specific herbicides—and does not attempt to assess the risk of all petrochemicals in the environment. There are few studies definitively linking exposure to any of the BLM listed herbicides to human health effects; those that satisfy USEPA scientists have been used in the toxicity factors developed by the USEPA's Office of Pesticides. Numerous toxicological studies on laboratory animals are cited. For many reasons, it is

BLM_0001710

RESPONSE TO COMMENTS

impossible to perform controlled studies on "wildlife" in a wild environment. It is also difficult to draw conclusions on dose and effect from epidemiological studies in people. Considerable emphasis was placed on rare, threatened, and endangered species in the ecological risk assessments. Effects of mixtures (e.g. tank mixes, Overdrive® (dicamba plus diflufenzopyr)) were also included. Also see response to Comment RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

RMC-0210-001
MCS Task Force of
New Mexico

**Comment:** The draft PEIS fails to analyze the human health impacts of herbicides to chemically sensitive individuals, even though the need to do so was identified in scoping comments. "Respondents suggested that at-risk groups like infants, elderly, sick people, and people with sensitivities to chemicals be specifically addressed" ([Draft] PEIS 4-172).

**Response:** There is no existing methodology to evaluate risk to chemically sensitive individuals, but children and reproductive effects (pregnant women and the fetus) were evaluated.

RMC-0210-002
MCS Task Force of
New Mexico

**Comment:** The omission of analyzing potential adverse impacts to chemically sensitive individuals, as well as other vulnerable populations such as infants, unborn children/pregnant women, people with asthma and other respiratory conditions, and those with other chronic conditions in the draft PEIS is one reason the risk assessments vastly underestimate the potential human risks from herbicide exposure and are invalid.

**Response:** See response to Comment RMC-0210-001 under PEIS Environmental Consequences, Human Health and Safety.

RMC-0210-003
MCS Task Force of
New Mexico

**Comment:** Only analyzing impacts to an average child (age and sex unspecified) is insufficient to account for impacts to other populations, especially those who are more vulnerable to herbicides. For example, unborn children are highly susceptible to chemical exposures, particularly during critical periods of development. In addition, it appears the risk assessment for the hypothetical 35 kilogram child only treated the child as a small adult and did not take into account the increased vulnerability of children due to, among other things, their developing nervous and other systems and decreased ability to detoxify toxic chemicals.

**Response:** The USEPA's toxicity values are not constructed for different age levels. The USEPA reference dose includes any developmental, neurological, or reproductive effects.

RMC-0210-014
MCS Task Force of
New Mexico

**Comment:** Similarly, the presence of herbicides on public lands can block access for people disabled with MCS [multiple chemical sensitivity]. Public lands are required to be accessible for all people with disabilities, including those with MCS. Therefore, the use of herbicides may, in some cases, violate the Americans with Disabilities Act.

**Response:** See response to Comment EMC-0327-005 under Environmental Consequences, Human Health. See Standard Operating Procedures in Table 2-6 in Chapter 2 of the PEIS regarding public notification requirements for herbicide application projects.

BLM_0001711

RMC-0210-018
MCS Task Force of
New Mexico

**Comment:** The bottom line is the draft PEIS should have analyzed the potential impact of herbicide exposures to people with chemical sensitivities, as well as other vulnerable populations. This should have included an estimate of the dose required to elicit an adverse response as well as the nature of the responses for each population.

**Response:** See responses to Comments RMC-0210-001 and RMC-0210-002 under PEIS Environmental Consequences, Human Health and Safety.

RMC-0210-019
MCS Task Force of
New Mexico

**Comment:** There also should have been an acknowledgement of the extremely wide range of sensitivity to herbicides, even among people who are chemically sensitive. That is, some people are only mildly affected by herbicides, while others are so exquisitely sensitive to herbicides they can react severely to even minute traces. The risk assessment in the draft PEIS used a factor of 10 to account for intraspecies variability ([Draft] PEIS [page] B-57 [of Appendix B]), but this is far off the mark.

**Response:** The safety factor is not intended to address quantitatively chemically sensitive persons; however, safety factors often consider inter-individual variability. This factor of 10 has been recommended by USEPA as being health-protective. Also see responses to Comment RMC-0210-001 under PEIS Environmental Consequences, Human Health and Safety, and Comment EMC-0327-006 under Environmental Consequences, Human Health.

RMC-0210-020
MCS Task Force of
New Mexico

**Comment:** Based on the cumulative experience of people with chemical sensitivities and a growing body of research on variations in the human genome, gene expression, and vulnerability to toxic exposures, the true range of human variability is probably closer to 5 to 10 orders of magnitude. Thus, the assumptions used in the risk assessments led to vastly underestimating the risk to human health, rather than "to an exaggeration of the real risks," as claimed ([Draft] PEIS [page] 4-178).

**Response:** See response to Comment EMC-0327-005 under Environmental Consequences, Human Health.

RMC-0211-003
Ghandi, Theresa Marie
K.

**Comment:** I find the PEIS estimates of exposure to herbicides by Native American receptors and human receptors living and working outside in areas to be sprayed grossly lacking in a realistic understanding of the amount of time subsistence living in gathering native plants and berries, fishing and such activities as sheep herding actually involve time spent and contact with vegetation and water in the proposed Spraying areas. The PEIS estimates of low exposure rates combined with proposed use of herbicides that are proven endocrine disrupters is a plan for the extinction of Native American Receptors (i.e. humans) rather than a plan to reduce wildfires.

**Response:** The comment does not refer to specific exposure assumptions (e.g. ingestion rate, exposure duration, frequency). Regardless, the BLM risk assessments used highly conservative exposure assumptions for Native American subsistence use based on work by Harper et al. (2002; see reference in PEIS). Some people are more sensitive to herbicides than others, which is true for any toxicant. The variability in the sensitivity in humans is also seen in effects on laboratory animals. Toxicity testing analyzes effects on samples of populations to determine statistical effects in the dose-response curve. The exposure assumptions used in the risk assessment were derived from toxicity studies and information provided by the USEPA. The BLM will post herbicide treatment areas prior to spraying, as discussed in Chapter 2 of the PEIS under Coordination and Education, to notify the public of areas to be sprayed and spray dates. Also see response to Comment EMC-0327-005 under Environmental

BLM_0001712

RESPONSE TO COMMENTS

Consequences, Human Health.

RMC-0211-034
Ghandi, Theresa Marie
K.

**Comment:** Assuming that "Native American receptors (adults and children) are assumed to be potentially exposed to herbicides via dermal contact with spray, dermal contact with sprayed foliage, ingestion of drinking water from sprayed ponds, ingestion of berries containing spray, dermal contact with water in sprayed ponds and ingestion of fish from sprayed ponds" (6a) is just wrong. Then to assume that "Native American receptors will experience exposure only three hours a day of subsistence activities in gathering berries" (6b) obviously knows very little about subsistence activities and has grossly underestimated exposure. Assuming contact with foliage for two hours a day is not realistic for sheep herders or others who work and play outside. Harming the living spaces, hunting, gathering places and in general the environment of Native American Reservations is economic and racial injustice and potential genocide.

**Response:** The first sentence is unclear. In response to the second sentence, the BLM assumed a comprehensive set of exposure scenarios for the Native American, as listed in the first sentence of the comment. The exposure time of 3 hours per day is taken from the peer-reviewed literature: Harper, B.L., B. Flett, S. Harris, C. Abeyta and F. Kirschner. 2002. The Spokane Tribe's multipathway subsistence exposure scenario and screening level RME. Risk Analysis: 22(3): 513-526. The assumption used by the BLM is that an individual would contact foliage 3 hours per day for every day of the year and that sheepherders would contact vegetation for 2 hours per day per year.

RMC-0211-035
Ghandi, Theresa Marie
K.

**Comment:** As one who has gathered berries for native seeds I have never gone out picking for less than three hours a day. Other pickers with better health pick from dawn until dark. BLM assumptions are greatly underestimated. The PEIS underestimates on Native American receptors could be taken as a plan for genocide. Endocrine disruption from herbicides decreases fertility, sperm counts and quality of health, especially when it comes from the air on to the land, prairies, deserts and Continental Divide Basin (the largest unfenced land mass in the United States), vegetation, multiple wildlife and aquatic species into ponds, lakes, streams, aquifers and groundwater. This is a gross violation of human rights and class injustice to poison the vegetation, land, water, air, aquatic and wildlife where Native Americans make their homes.

**Response:** See responses to Comment RMC-0211-034 under PEIS Environmental Consequences, Human Health and Safety, Comment RMC-0211-018 under PEIS Environmental Consequences, Herbicide Effects Analysis.

RMC-0216-008
Neff, Jack

**Comment:** If the BLM is permitted to carry out the Vegetation Management Plan For 17 Western States, people will be hurt, employees, visitors, travelers and nearby residents and any livestock with cancer risk, health problems, on-the-job injuries and monetary losses. For example, BLM asserts that "Accidental scenarios involving dermal contact with a sprayed waterbody or a waterbody into which herbicide was spilled did not result in risk to swimmers." (second paragraph preceding Table 4-27[of the Draft PEIS]). This statement is a lie and in conflict with proven medical consequences of the nine active ingredients (2,4-D, chlorsulfuron, clopyralid, glyphosate, hexazinone, imazapyr, metsulfuron methyl, picloram, and triclopyr) desired by BLM.

**Response:** The accidental scenario was evaluated using USEPA-approved risk assessment techniques. The second sentence refers specifically to sulfometuron methyl. Risk calculation showed that a one-time accidental exposure to sulfometuron

BLM_0001713

methyl in a water body receiving a spill from a truck or a helicopter would not result in unacceptable risks. Risks to swimmers from other herbicides proposed for use by the BLM were none, except for diquat, which poses a low risk to swimmers under an accidental spray scenario. Also see response to Comment EMC-0336-002 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

RMC-0218-056
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** There doesn't appear to be a safety plan established for human exposure to herbicides in either the [Draft] PEIS or Human Health Assessment appendix [B in the Draft PEIS].

**Response:** No safety plan per se is required. The BLM will post herbicide treatment areas prior to spraying, as discussed in Chapter 2 of the PEIS under Coordination and Education, to notify the public of areas to be sprayed and spray dates.

RMC-0222-105
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Occupational hazards: The D[raft] EIS ([page] 4-173) states that human health risks are based on "both acute (short-term) and chronic (long-term) toxicity information." However, the DEIS [Draft PEIS] omits health risks identified through epidemiological studies of people exposed to herbicides occupationally. For example, occupational exposure to 2,4-D has been associated with genetic damage, changes in levels of sex hormones, and increased incidence of cancer. These studies were conducted by researchers from the University of Minnesota and the University of Saskatchewan and published in the journals *Environmental Health Perspectives* and *Cancer Epidemiology, Biomarkers and Prevention.* (Gerry et al 2001 and McDuffie at al. 2001)

**Response:** The risk assessment evaluates toxicology studies to identify doses that are unlikely to pose health effects even after long-term exposure. In many epidemiology studies, it is difficult to determine exactly the concentrations of chemicals to which people were exposed. It is possible that the workers in these studies were exposed to higher concentrations of herbicides than are being proposed for use.

RMC-0222-106
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Occupational exposure to glyphosate is associated with increased incidence of cancer in a series of studies. The studies were conducted by scientists at the University of Saskatchewan, Örebro University, and the National Cancer Institute, and published in the journals *Cancer Epidemiology, Biomarkers and Prevention, Leukemia and Lymphoma,* and *Occupational and Environmental Medicine.* (McDuffie et al 2001, Hardell, Eriksson, and Nordström 2002, DeRoos et al 2003)

**Response:** See responses to Comment RMC-0222-105 and Comment FL-0001-003 under PEIS Environmental Consequences, Human Health and Safety.

RMC-0227-004
U.S. Department of
Interior Bureau of
Indian Affairs

**Comment:** Additionally, although the [P]EIS relays that beneficial results, including the reduction of wildfire risk and reduction or elimination of non-native or invasive plant competitors, can be achieved from application of herbicides, and appears to be the overwhelming goal of the analysis presented in the [P]EIS, we encourage careful consideration of the health and public safety risks of neighboring tribal and surrounding communities in the planning efforts for these vegetation treatment projects.

**Response:** See responses to Comment FXC-0071-023 under PEIS Environmental Consequences, Social and Economic Values, and Comment EMC-0001-005 and Comment EMC-0585-179 under PEIS Environmental Consequences, Human Health and Safety.

BLM_0001714

RESPONSE TO COMMENTS

**Environmental Consequences, Cumulative Effects Analysis**

EMC-0446-068
The Nature
Conservancy

**Comment:** The cumulative effects section developed for both the PEIS and PER appears to underestimate the potential effects of treating 25 percent of BLM-managed public land over the next 10 years. Included should be a discussion of potential unintended consequences of using the wrong treatment method in areas that are already highly altered by past human uses and management practices, the potential cumulative effect of treating multiple areas within one ecoregion with different treatment methods, and the potential cumulative effects to fish, wildlife, native plant communities and water resources of the combined proposed treatments over the next decade.

**Response:** See Structure of the Cumulative Effects Analysis in the Cumulative Effects Analysis section of Chapter 4 of the Final PEIS. The cumulative impacts analysis projects out 50 years, not 10 years, and takes into account multiple treatments in ecoregions using multiple treatment methods for all public lands resources. The PER provides information and context for the cumulative analysis contained in the PEIS. The PER does not have a specific cumulative effects analysis associated with it. Little to no data exists on potential unintended consequences of using the wrong treatment method for any given project. The PEIS assumes, based on an integrated weed management framework that any treatment methods proposed would be appropriate for the specific situation and objectives to be met, resulting in minimal to no unintended consequences. In addition, through the analytical step down process to comply with NEPA, each treatment project is analyzed at the site-specific level and mitigation is proposed for identified impacts, which would minimize the risk of unintended consequences.

EMC-0446-069
The Nature
Conservancy

**Comment:** The section describing cumulative effects on vegetation ([Draft] PEIS [pages] 4-206-207) does not adequately indicate the potential effect of the large number of prescribed fire treatments in the Temperate Desert Ecoregion, particularly as it relates to fire and downy brome interaction. The potential does exist for significant negative ecological impacts and these are not clearly noted.

**Response:** Site-specific analysis in project-related Environmental Assessments should preclude fire treatments in woody plant dominated communities with a significant potential to become dominated by downy brome. In situations where loss of native understory has occurred, such as in pinyon-juniper invasion areas, and prescribed fire is desired to remove woody vegetation after mechanical treatments, analysis should show that reseeding and possibly application of a selective herbicide may be necessary to restore desired native species.

EMC-0446-070
The Nature
Conservancy

**Comment:** Page 4-198 of the [Draft] PEIS indicates that fuels reduction and increased prescribed fire may ultimately result in less total emissions due to the effective reduction of wildfires by these treatments. This is a positive aspect of proactive fuels management often overlooked by regulators. Increased wildland fire use will likely result in more local emission and haze in Alaska, including impacts to wilderness viewsheds. While long term emission levels may stay near current levels (PEIS 4-199), the increased level of wildland fire use could result in significant short-term haze events such as those in the summer of 2004. These potential effects should be discussed in the cumulative effects section on air quality.

**Response:** Chapter 4 of the PEIS under Cumulative Effects Analysis notes that overall smoke emissions may be less if emissions from prescribed fires are less than emissions

BLM_0001715

that would have occurred from wildfires in treated areas. We have included text in this discussion in the Final PEIS on the potential for significant short-term haze events from wildfire.

EMC-0513-024
The Wilderness
Society

**Comment:** The cumulative impacts analysis similarly concludes that short-term impacts would be greatest under the Preferred Alternative, but does not give adequate weight to these impacts in light of the applicable management policies. [Draft] PEIS, Table 2-8, p. [page] 2-36. As noted above, the minimum tool requirement dictates that any treatment "should be the one that least degrades wilderness values temporarily or permanently." H-8560, Section .13. (emphasis added). Because selection of the Preferred Alternative improperly discounts the temporary degradation of wilderness values, in violation of the "minimum tool" policy, it is not in compliance with BLM's Wilderness management policy. Further, none of these impacts specifically discusses the risks associated with use of herbicides on lands with wilderness characteristics and the potential for destroying that character, which is also inconsistent with BLM policy to inventory for and protect lands with wilderness characteristics.

**Response:** See response to Comment RMC-0057-005 under PEIS Environmental Consequences, Wilderness and Special Areas. Use of mechanized equipment in wilderness areas could occur under all alternatives. The risks to wilderness and other special areas from herbicides are discussed primarily in Chapter 4 of the PEIS under Wilderness and Special Areas. This section notes that herbicide use could affect wilderness characteristics over the short term. It also notes that weeds and other invasive vegetation, and wildfires can affect wilderness characteristics and that these effects must be considered before implementing an herbicide treatment program.

EMC-0525-049
Western Watersheds
Project

**Comment:** As BLM's proposed "treatments" and herbiciding will increase fragmentation (see also Knick et al. 2003, Connelly et al. 2004), these species habitats and populations will only be increasingly harmed In the short, mid and long terms.

**Response:** It is the belief of the BLM and other federal land management agencies that activities to restore native habitat and reduce the risk of wildfire and spread of weeds, will reduce, not increase, fragmentation, as discussed in Chapter 4 of the PEIS under Cumulative Effects Analysis, Wildlife Resources.

EMC-0584-071
Western Watersheds
Project

**Comment:** The actions of the [P]EIS will have large-scale effects, ranging from increased sedimentation of bull trout and redband trout streams to major fragmentation of sage grouse, Brewer's sparrow, pygmy rabbit, pinyon jay and other declining species habitats. The [P]EIS fails to address this fragmentation, on top of the fragmentation that already exists – see, for example, the analysis of fragmentation on the Sage Grouse Conservation Assessment (Connelly et al. 2004). The [P]EIS is lacking in basic information on soil stability, erosion hazard, wind and water erosion risks, etc. related to lands proposed for treatment. This is critical for understanding likely sedimentation into streams, site soil stability post-treatment, likelihood of increased gullying, and other factors. Special status species habitats are faced with a broad array of escalating synergistic and cumulative impacts to habitats and populations – ranging from development of new livestock infrastructure and expanded water-hauling to energy developments such as wind or geothermal and associated roading and disturbance across public and private lands of southern Idaho.

**Response:** The Cumulative Effects Analysis in Chapter 4 of the PEIS discusses how the effects of treatments proposed in the PEIS, including fragmentation, would be cumulative with the effects of other actions on and off public lands. The PEIS provides

RESPONSE TO COMMENTS

basic information on soil condition, wind and water erosion risks, sedimentation, etc., appropriate for analysis at the programmatic level. Project-specific effects would be identified during analysis at the local level.

EMC-0585-039
Western Watersheds
Project

**Comment:** BLM refers to improvement in land conditions, based on its own BLM 2005 report. This report and its methodology, should have been made available as part of the [P]EIS effort. We have searched in vain for it on BLM's website.

**Response:** The report is entitled "Public Land Statistics" and can be found on the internet at: http://www.blm.gov/natacq/pls05/. This link is for the 2005 statistics.

EMC-0585-041
Western Watersheds
Project

**Comment:** In order to understand the "improved" conditions, a reader must be told if all BLM land is lumped in that summary, and if previous summaries to which this may be compared include such areas as Alaska. Note: the [P]EIS states Alaska lands are largely pristine, so how heavily weighted any analysis is with Alaska lands data must be fully revealed.

**Response:** It is unclear from the comment letter which resource is referenced in terms of improved conditions, but we assume it relates to information on rangeland quality given in the Wildlife Resources section in Chapter 3 of the PEIS and PER, since Wetland and Riparian resources were discussed in terms of Alaska and other states. The improved conditions discussed under Wildlife Resources reflect conditions on rangelands. Of the 165 million acres of rangelands, all but 5 million acres are in the continental United States. Only rangeland acres in the continental U.S. have been inventoried for habitat quality.

EMC-0590-028
Western Slope
Environmental
Resource Council

**Comment:** Thus, management actions by the BLM should be analyzed in a broader context that includes and considers other possible herbicide applications that could contribute to cumulative effects on receptor organisms in an area.

**Response:** The Cumulative Effects Analysis is in Chapter 4 of the PEIS. Consideration of other management actions and activities on public and private lands across the west including other possible herbicide applications, is subsumed in this analysis.

EMC-0606-006
Johnson, Kathy

**Comment:** "provide a cumulative impact analysis of the use of chemical herbicides in conjunction with other treatment methods." Shouldn't this be the first thing done before anything else is even thought of?

**Response:** The focus of the PEIS is on herbicide treatments, as discussed in Chapter 1 under Organization of the Vegetation Treatment Assessments. Thus, most of the focus of the effects analysis in Chapter 4 of the PEIS is on herbicide use. However, because the BLM uses several methods to control vegetation, the agency also examined the effects of an integrated weed management program in the Cumulative Effects Analysis in Chapter 4 of the PEIS.

EMC-0643-015
California Indian
Basketweavers
Association

**Comment:** Proper use of ecological information requires an analysis of the relationship between historical and current lands uses and the stated problem (unwanted vegetation changes, degraded ecosystems, declining numbers of diverse wildlife and native plants). Over the last century, the following activities have been common on BLM lands: grazing by non-native livestock, frequently at unsustainable levels; seeding with non-native invasive grasses that have become established on millions of acres (sometimes aerially via airplane); use of herbicides to kill native

BLM_0001717

sagebrush and other native vegetation; chaining and bulldozing to remove native species; unregulated off highway and recreational vehicle use in non-roaded areas; mining and energy extraction; and fire suppression policies that do not mimic the natural fire disturbance regime. None of these facts are disputable; they are documented in history books and the administrative records of the agency. These legacy and on-going impacts are inextricably related to the degraded status of desirable native vegetation currently existing in the area, and inextricably tied to the stated need for the vegetation treatments/restoration the BLM now acknowledges.

**Response:** See Chapter 3, Affected Environment, and Chapter 4, Cumulative Effects Analysis, for a discussion of the historic context of current vegetation conditions.

EMC-0643-035
California Indian
Basketweavers
Association

**Comment:** The DEIS [Draft PEIS] did not address long term or cumulative effects from the tripling of herbicide use in the assessment area relative to the issue of endocrine disruption from the chemicals proposed for use. Most of these chemicals that have not even been tested for their potential effects as endocrine disruptors but even existing knowledge was ignored by the BLM and was not analyzed in the DEIS [Draft PEIS]. NEPA requires cumulative impact analysis in light of past, present, and reasonably foreseeable future actions regardless of what agency, person, or company/corporation undertakes such other actions (40 CFR [Code of Federal Regulations] § 1508.7).

**Response:** See response to Comment EMC-0643-030 under PEIS Environmental Consequences, Herbicide Effects Analysis, and Comment RMC-0200-008 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated for the effects of endocrine disruption. This information has been incorporated into the Cumulative Effects Analysis in Chapter 4 of the PEIS.

EMC-0643-043
California Indian
Basketweavers
Association

**Comment:** The DEIS [Draft PEIS] has failed to accurately analyze the impacts to Native American culture and has not mitigated those impacts. The DEIS [Draft PEIS] makes claims that are not supported by the record. Cumulative effects to Native people were not accurately documented. In addition to the cumulative effects deficiencies of the DEIS [Draft PEIS] discussed relative to endocrine disruptor chemicals, chemical mixtures, and degradates, the DEIS [Draft PEIS] did not accurately document the *cumulative and long term effects* to Native people and their cultural practices from potential exposure to herbicides from this project, in addition to other avenues of exposure to chemicals from the high use of herbicides on private lands, contamination of private water systems, wells, and springs used by Native or other people in the region, in light of past, present, and reasonably foreseeable future actions regardless of what agency, person, or company/corporation undertakes such other actions, as required by NEPA (40 CFR [Code of Federal Regulations] § 1508.7).

**Response:** The potential cumulative effects of herbicide use on traditional cultural resources and human health have been addressed in Chapter 4, Cumulative Effects Analysis. Specific effects on specific communities and resources are not within the scope of this broad-scale PEIS, and will be addressed when specific projects are proposed.

EMC-0643-051
California Indian
Basketweavers
Association

**Comment:** The DEIS [Draft PEIS] fails to properly assess the cumulative impact of dioxins in the environment from the high use of 2,4-D by the BLM in the past, present, and future. We are particularly concerned about exposures to dioxins from 2,4-D through the food supply (i.e., bioaccumulation from feed), as EPA has determined that for most U.S. residents, the largest exposure to dioxins is through the food we

BLM_0001718

consume, particularly meat (beef, chicken, fish) and dairy products. Since the risk quotient calculation (RQ) was based EPA's label recommendations for 2,4-D uses on food crops, the risk assessment prepared by SERA may significantly underestimate dioxin contamination in meat produced on rangeland, where much of BLM uses occur. The EPA acknowledged:

"The risk assessment has relied on the 2,4-D Master Label for application rates. As noted previously, there are a number of currently registered 2,4-D products which include higher application rates [e.g., rangeland] than those modeled in this assessment and hence the risk associated with these application rates would be greater" (US EPA 2004b). Further, the EPA also notes the potential for underestimating risk through testing active ingredients solely without evaluating the impacts from testing full formulation products, in other words, as a mixture: "[M]ost toxicity testing has been conducted using technical forms of 2,4-D, while 2,4-D is typically applied in the field in an end use product mixed with surfactants, inert ingredients and other pesticides. Often, toxicity testing with an end use product may result in lower endpoints (i.e., greater toxicity) for risk assessment" (*ibid*). Further, other chemically similar herbicides are part of nearly every 2,4-D product (e.g., MCPP-p, 2,4-DP, and dicamba). EPA's own analysis showed that phenoxy acid equivalent application rates are often twice the application rates of 2,4-D alone, and sometimes exceed the highest application rates considered in the 2,4-D risk assessment (EPA 2004c.). In California alone in 2004, 523,725 pounds of 2,4-D were reported used (California Department of Pesticide Regulation 2004 PUR). Because of these issues, we believe the BLM DEIS [Draft PEIS] is flawed and fails to accurately disclose the real risks of the use of 2,4-D on public lands. As noted, the EIS claims that 70% of herbicides used under the Preferred Alternative will be 2,4-D, picloram, tebuthiuron, or diuron. These cumulative impacts and sources for risk assessment error must be corrected in the [Final] [P]EIS.

**Response:** See response to Comment FXC-0071-025 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0643-052
California Indian
Basketweavers
Association

**Comment:** Picloram is not registered for use in California and this gross oversight must be corrected in the EIS. Picloram, like 2,4-D, is a source of dioxin in the environment. To date, the EPA has failed to release a cumulative impacts analysis of the human health effects of dioxins. The BLM is not exempt from evaluating the cumulative impact of dioxin containing herbicides on public lands. Although both picloram, 2,4-D, dicamba, and diflufenzopyr + dicamba are sources of dioxin, the DEIS [Draft PEIS] fails to evaluate this cumulative impact.

**Response:** Picloram is not registered for use in California and the BLM would be unable to use picloram in California until it is registered for use in that state. Picloram has trace amounts of hexachlorobenzene; see response to Comment RMC-0173-007 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives. For 2,4-D, see response to Comment FXC-0071-025 under PEIS Environmental Consequences, Herbicide Effects Analysis.

EMC-0643-056
California Indian
Basketweavers
Association

**Comment:** We do not believe that these uses [of diuron in the environment] are sustainable, and we believe that the high cumulative impact of the use of diuron in California demonstrates that the current regulatory system is not protective of human health and the environment. We do not have data for areas outside of California. However, the BLM is not exempt from acquiring these types of quantitative cumulative data in order to accurately assess the impacts of increasing the use of

BLM_0001719

diuron and other herbicides on public lands.

**Response:** Based on the BLM's pesticide use reports, the BLM has not used diuron in California since at least Fiscal Year 2001, and thus has not contributed to the amount of diuron found in the soil and water of California since at least 2001. The BLM has developed several mitigation measures (see Human Health and Safety in Chapter 4 of the PEIS) to reduce the risks to humans from the use of diuron.

EMC-0643-072
California Indian
Basketweavers
Association

**Comment:** While the BLM proposes to forego the use of atrazine in this [P]EIS, its high use on private timber lands and elsewhere outside of California increases the importance of *unpolluted habitat* on BLM and national forest lands for these species. 59,461 pounds of atrazine were applied in California in 2003, and over half of that was on forest lands (30,101 pounds), primarily private timber lands in the state. We do not know what the statistics are for other states. These statistics must be displayed in the [P]EIS.

**Response:** The risks to resources on public lands administered by the BLM from applications of herbicides on private lands is considered in the Cumulative Effects Analysis section of Chapter 4 of the PEIS. At this time, the BLM is not proposing to use atrazine. Statistics on its use on private lands is outside the scope of this programmatic analysis. Where appropriate, statistics on herbicide use at the state level are provided as examples in the impact analysis. The BLM can work with nearby landowners to discourage them from taking actions that could harm resources on public lands. However, if an action off-site is approved through the federal, state, or local impact analysis and permitting process, the BLM has limited ability stop actions that occur on nearby lands.

EMC-0643-075
California Indian
Basketweavers
Association

**Comment:** The cumulative impact of these sources of impacts to wildlife as well as the impacts on surface and groundwater drinking water supplies, from the full formulation (mixture) of the herbicide products proposed for use and for their degradates (Kolpin et al 1998, 2004) must be evaluated in this [P]EIS. The role of unpolluted lands remaining as natural habitat and refuge for imperiled wildlife is underscored by the real statistics regarding pesticide use. The DEIS [Draft PEIS] fails to incorporate real life quantitative information in its cumulative effects analysis.

**Response:** See response to Comment EMC-0646-017 under PEIS Environmental Consequences, Herbicide Effects Analysis for information on the analysis of formulations and degradates. We have incorporated qualitative information into Chapter 4 under resource sections and in the Cumulative Effects Analysis section where possible. Because it was challenging to find qualitative information for effects over the 17-state area, the effects analysis was often limited to a smaller region. We did expand upon the discussion of herbicide use from all sources in the Cumulative Effects Analysis in the Final PEIS.

EMC-0646-164
Californians for
Alternatives to Toxics

**Comment:** The PEIS fails across the board to identify cumulative impacts to human health and the environment that may arise from the proposed program. The example we use is the impact of pesticide applications that may be undertaken in the same watershed or which in some other manner may interact with herbicide applications undertaken by BLM. Such considerations must be part of the analysis so that the relevant agencies may be alerted to potential impacts on endangered species, under the ESA [Endangered Species Act] and to satisfy cumulative impacts analysis required under NEPA.

BLM_0001720

RESPONSE TO COMMENTS

**Response:** The BLM modeled exposures to a surface water body using a wide variety of conservative fate and transport parameters and buffer distances. The BLM examined the effect of tank mixes. For the routine exposure scenario, the BLM assumed multiple applications and surface water exposures resulting from drift. The Cumulative Effects section of Chapter 4 of the Final PEIS discusses the potential for impacts from herbicide applications from multiple sources. The Biological Assessment provides information on cumulative effects to threatened and endangered species, as does the PEIS. However, it is not possible to predict and evaluate all the potential combinations of treatments that could occur within a watershed at the programmatic level of analysis. Such an analysis would be done by field offices prior to project implementation.

EMC-0646-165
Californians for
Alternatives to Toxics

**Comment:** We attach maps of sections of Riverside County (Attachment C [provided with the comment]) and Monterey County (Attachment D) in California compiled by CATs [Californians for Alternatives to Toxics] from data recorded by California Department of Pesticide Regulation (CDPR) that indicate BLM managed land adjacent to or within the water or air shed of pesticide applications reported to the CDPR. Also attached are descriptions of the pesticides reported to be used within these areas (Table 1 - Monterey County and Table 2 - Riverside County; both given as attachments). Table 1 indicates that 1,395,407 pounds of pesticide active ingredients and 2,468,769 pounds of pesticide products were used in near BLM-managed lands in Monterey County; Table 2 indicates 1,908.760 pounds of active ingredient and 3,601,818 pounds of product were reported used in Riverside County near BLM-managed lands. Given that pesticide use is demonstrated by this data to be occurring, sometimes at significant rates, near BLM-managed lands which may be subject to pesticide application under the program, analysis of cumulative is required.

**Response:** Data on pesticide and herbicide use by the BLM are provided by each field office. BLM-administered lands in Monterey County are under the jurisdiction of the Hollister Field Office, which also manages lands in 12 other counties. During 2005, the Hollister Field Office treated 268 acres and applied 8 pounds of glyphosate and 3.8 pounds of triclopyr. In 2004, the office treated 42 acres using 12.4 pounds of glyphosate.

BLM-administered lands within Riverside Country are under the jurisdiction of the Palm Springs Field Office. BLM-administered lands under the jurisdiction of this field office are also found in four other counties. During 2005, the field office treated 80 acres using 40.5 pounds of glyphosate, and 20 pounds of imazapyr. During 2004, the office treated 200 acres using 243 pounds of glyphosate.

A discussion of BLM use of herbicides in the context of herbicide use from all sources has been included in Chapter 4 of the Final PEIS in the Cumulative Effects Analysis.

EMC-0646-174
Californians for
Alternatives to Toxics

**Comment:** Lacking an analysis of the impacts over the long-term that may be expected from the use of various herbicides on non-target plant species composition and abundance, and lacking adequate guidance for which herbicides and other treatment options are suited or not suited for various ecological conditions common on BLM lands covered by the PEIS, the PEIS cannot serve as an appropriate tiering document for future decisions regarding invasive species as it is currently written.

**Response:** Long-term effects of herbicide use are described in the Cumulative Effects Analysis section of Chapter 4 of the PEIS. No measurable long-term or cumulative effects on non-target plant species composition and abundance are expected from the

BLM_0001721

use of herbicides. Direct spray herbicide treatments are focused on target species, and indirect effects to the composition and abundance of non-target plants are expected to be insignificant compared to the long-term effects of the continued and uncontrolled displacement of native vegetation by invasive species and other unwanted vegetation. BLM guidance on herbicide treatments and treatment options is contained in BLM Manuals 9011 *Chemical Pest Control*, and Manual 9015 *Integrated Weed Management*. Each treatment project is designed and analyzed under NEPA at the site-specific level, taking into account specific ecological conditions. The PEIS provides the appropriate level of analysis to serve as an effective tiering document for future vegetation treatment projects and programs.

EMC-0646-233
Californians for
Alternatives to Toxics

**Comment:** The BLM has failed to analyze the cumulative impacts of annually spraying 932,000 acres with herbicides in the Draft PEIS. This vast amount of repeated herbicides spraying has the potential to cause significant harm to the natural environment, soils, water quality, native vegetation, wildlife, fish, and human health as it works its way through the food chain and web of life. It is essential that the PEIS include analyses of the cumulative impacts, including not only those of the active ingredients, but also breakdown products, surfactants, inerts, adjuvants, additives, and everything else that will be entering our ecosystems as a result of herbicide applications. Cumulative impacts analysis must include analysis of past, present, and future herbicide impacts.

**Response:** The Cumulative Effects Analysis is in Chapter 4 of the PEIS. See Appendixes B, C, and D of the Final PEIS for the risk analysis of herbicide active ingredients and associated by-products.

RMC-0042-078
Asher, Jerry

**Comment:** Under Cumulative Effects, pg [page] 2-32: "Habitat loss *would* continue..." Great wording! Much more actual, on the ground reality like that is needed. Replace *could*, *likely* and other similar words with active, concrete terms that match what is actually happening and will, without a doubt, continue to happen.

**Response:** See response to Comment RMC-0144-005 under General Comments and Responses.

RMC-0144-024
Wyoming Game and
Fish Department

**Comment:** We believe cumulative effects analyses cannot be adequately evaluated since other program vegetation treatments were not included. At a minimum, we would like assurances that all vegetation treatments in watersheds over the past 25 to 50 years will be included in project activity proposals.

**Response:** Each vegetation treatment project is required to comply with NEPA prior to approval for implementation. The NEPA analysis includes consideration of cumulative effects in each case. The cumulative effects area is defined specifically for each project based on the resources present and whether there are predicted impacts to a resource. The extent to which past projects in a watershed are considered in the NEPA analysis for a particular vegetation treatment is determined at the time of the analysis, based on the relevance of previous projects' impacts to the proposed project's predicted impacts.

RMC-0208-005
California Oak
Foundation

**Comment:** Furthermore, the cumulative impact analysis in the Draft PEIS is deficient. Specifically, the document fails to properly assess the current and historic use of herbicides and pesticides in California. Numerous studies document the use of these chemicals and their destructive effects on various species inhabiting oak woodlands, but the Draft PEIS fails to incorporate this information. Accordingly, the Draft PEIS

BLM_0001722

fails to assess the cumulative effects of applying herbicides to BLM managed land adjacent to non-BLM managed land where herbicide and pesticide use has been pervasive. Ariel drift, groundwater seepage, stormwater runoff, and other factors will cause the application of herbicides on BLM land to contaminate adjacent land and water. And, because much of this adjacent non-BLM managed land has historically been treated with herbicides and other pesticides, the BLM's proposed use of herbicides on its land will exacerbate the current levels of these chemicals in the environment. The omission of this analysis represents a serious flaw in the Draft PEIS.

**Response:** The PEIS assesses cumulative impacts across a 17-state area, including Alaska, rather than providing individual state-specific cumulative impact analyses. Analysis of cumulative effects of herbicide use in California would be properly accomplished at a more regional level with a state-specific EIS analysis, similar to the 1988 California Vegetation Management Final EIS. Data on herbicide use for California and other western states by the BLM and other herbicide users has been included in the Cumulative Effects Analysis section of Chapter 4 of the Final PEIS. Data for California indicate that the BLM's use is less than 0.02% of the total for the entire state, and does not significantly contribute to the overall usage of herbicides in the state. In addition, several BLM field offices in California have no record of herbicide applications. Therefore, there is no basis to conclude that the BLM's use would exacerbate current levels of herbicides in the environment without specificity about where applications have actually occurred.

RMC-0208-056
California Oak
Foundation

**Comment:** The Draft PEIS fails to adequately catalog the current and historic use of herbicides and pesticides in California. Nowhere, for example, does the PEIS discuss the amount of accumulated herbicides and pesticides in any of California's ecosystems, though this information is readily available. (See *ante*, Exhibit 13 [provided with the comment] ["in 1998, 5.9 million kilograms of active ingredients pesticides . . . were sprayed" in the San Joaquin Valley"]; Exhibit 10 [anywhere from 64,000 to 2.4 million pounds of atrazine annually pollute the Nation's water resources].) Instead, the Draft PEIS addresses only the past effects of "human-caused disturbance factors, including natural resource extraction, recreation, dams and diversions, road construction, agriculture, urbanization, and fire exclusion." (Draft PEIS, at p. [page] 4-203; see also pp. [pages] 4-207 to 4-208 [same past effects discussed for fish and other aquatic organisms].) Strangely, the Draft PEIS fails even to discuss historic herbicide use in the discussion of past effects on vegetation. (Draft PEIS, at pp. 4-205 to 4-206.) Here, again, the Draft PEIS focuses instead on non-chemical effects, such as introduction of invasive, non-native.

**Response:** The BLM treated 2,264 acres in California during 2005. Approximately 2,077 pounds of herbicide active ingredient were used, and the herbicides used most often included triclopyr (967 pounds active ingredient), 2,4-D (406 pounds), glyphosate (327 pounds), and clopyralid (294 pounds). A discussion of the BLM's use of herbicides in the context of herbicide use by all sources has been included in the Cumulative Effects Analysis in Chapter 4 of the Final PEIS.

RMC-0208-059
California Oak
Foundation

**Comment:** Unfortunately, the Draft PEIS is wholly deficient in assessing these potential cumulative impacts. Rather than approaching the problem from the perspective of contributing additional toxins to an already severely impacted environment, the BLM views the possible effects of its herbicide use in isolation. Indeed, for each impact assessment, whether it is for potential impacts to water quality, wetland and riparian areas, vegetation, fish and aquatic invertebrates, or wildlife resources, the Draft PEIS does not discuss in any significant detail the current levels of

BLM_0001723

herbicide and pesticide use in California, the historic use of herbicides and pesticides in California, or the synergistic effects of multiple active-ingredient herbicide and pesticide use in California.

**Response:** See response to Comment RMC-0208-056 under PEIS Environmental Consequences, Cumulative Effects Analysis.

RMC-0208-062
California Oak
Foundation

**Comment:** Moreover, the alternatives discussed all propose herbicide use on BLM lands within California. Given the extent to which California has already been affected by persistent herbicide and pesticide contamination, it seems reasonable to conclude that herbicide and pesticide use within California constitutes a "regional-scale trend." Therefore, as a policy issue, the proposed addition of herbicides that would result from the BLM's vegetation management plan must be assessed as an aggravation of the already existing problem in California. This Draft PEIS is deficient in addressing this problem, and its cumulative impact analysis suffers as a result.

**Response:** See response to Comment RMC-0208-056 under PEIS Environmental Consequences, Cumulative Effects Analysis.

RMC-0210-037
MCS Task Force of
New Mexico

**Comment:** The cumulative effects analysis describes rather vague comparisons among the alternatives, with regard to their impacts on air, water, soil, and other resources, without providing information about the past, present, and anticipated use of pesticides and other toxic chemicals applied on and near BLM land. The presence of these chemicals would be the most obvious contributors to cumulative effects related to herbicide use by the BLM.

**Response:** A discussion of the BLM's use of herbicides, in the context of herbicide use from all sources, is included in Chapter 4 of the PEIS under the Cumulative Effects Analysis.

RMC-0210-039
MCS Task Force of
New Mexico

**Comment:** The assessment of the amounts and kinds of toxic chemicals used by BLM and other industries operating on BLM land, such as ranching, timber, mining, and oil & gas development, should have been provided for each state.

**Response:** See response to Comment RMC-0210-037 under PEIS Environmental Consequences, Cumulative Effects Analysis.

RMC-0213-022
California Native Plant
Society

**Comment:** It is necessary to include a full report and accounting in this [P]EIS of the actual acreage, quantity, formulations of the herbicides used, and the number of years to date that herbicides have been used in order to kill sagebrush and other native vegetation on BLM lands in the western region. We ask that the EIS include direct, indirect, and cumulative effects analysis of these types of effects resulting from herbicide use listed above.

**Response:** See response to Comment RMC-0210-037 under PEIS Environmental Consequences, Cumulative Effects Analysis.

RMC-0214-005
Natural Resources
Defense Council and
National Wildlife
Federation

**Comment:** The current analysis only provides general and formless observations that do little to describe the potential cumulative effects. Given the inadequacies of this D[raft] PEIS, the current proposal could well have the opposite effect from the desired result. Indeed, it is NRDC's [Natural Resources Defense Council's] conviction that the current alternative proposed in the D[raft] PEIS will likely cause a variety of collateral harms to the physical environment. Given that the proposed actions in the D[raft] PEIS

BLM_0001724

incorporate such large scale measures and involve such an extensive geographic area it is evident that the BLM has not been able to adequately ascertain the extent of the impacts in this document.

**Response:** The cumulative effects analysis provides a basis for describing how past activities have led to current conditions on public lands, and how proposed treatments along with other non-treatment-related activities, could affect public lands in the short and long term. The level of analysis is appropriate for a programmatic document and for treatments that would affect up to 2% of public lands annually (about 0.3% of public lands annually for herbicide treatments). Given that many treatments would occur on the same land over multiple years, the actual amount of land impacted annually would be even less.

RMC-0218-015
Blue Mountains
Biodiversity Project,
League of Wilderness
Defenders

**Comment:** There is great cause for concern about cumulative impacts to sage grouse from both proposed herbicide use in their habitat and planned clearing and burning of sagebrush.

**Response:** The direct, indirect, and cumulative effects (both adverse and beneficial) to sage-grouse from herbicide use are discussed in Chapter 4 of the PEIS under Wildlife Resources, and under Cumulative Effects Analysis, Wildlife Resources.

RMC-0221-066
Center for Biological
Diversity

**Comment:** Rather than deferring cumulative impacts analyses on specific populations to the site-specific level, these are exactly the type of analyses that are appropriate and necessary in a programmatic EIS, particularly with the proposed wide-spread application and aerial spraying. Unfortunately, the documents offer no comprehensive analysis of any of the cumulative effects of the proposed action on the plants and animals of the project area.

**Response:** See response to Comment RMC-0218-015 under PEIS Environmental Consequences, Cumulative Effects Analysis. The cumulative effects of the proposed and alternative actions on plants are discussed in Chapter 4 of the PEIS under Vegetation and Wetland and Riparian Areas. Aerial applications of herbicides would occur on about 0.2% of public lands annually.

RMC-0222-004
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The occurrence or non-occurrence of other vegetative treatments (including passive treatments and prevention measures) and activities (e.g.., livestock grazing, ORV [off-road vehicle] use) are so inextricably linked to increased or decreased herbicide use that they must be thoroughly aired in a cumulative beneficial and adverse effects analysis. The DEIS [Draft PEIS] fails to do this.

**Response:** The cumulative beneficial and adverse effects of other treatment methods were discussed in Chapter 4 of the PEIS under Cumulative Effects Analysis. This analysis assumes that Standard Operating Procedures, passive treatments and prevention measures, and restoration, as discussed in Chapter 2 of the PEIS and PER, would be implemented under all alternatives. Also see responses to Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, Comment RMC-0222-059 under EIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response, and Comment RMC-0214-029 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

RMC-0222-014
Salvo, Mark
(Sagebrush Sea

**Comment:** Additionally, the DEIS [Draft PEIS] "cumulative analysis" fails to analyze the cumulative results of linking herbicide use with prevention, other passive and active treatments and/or native seedings on BLM and other sites. When prevention is

BLM_0001725

| | |
|---|---|
| Campaign), Cox, Caroline (Northwest Coalition for Alternatives to Pesticides), and O'Brien, Mary | linked with herbicide treatments, for instance, the beneficial cumulative results could be both less weed invasion and less subsequent herbicide use. Although at times the BLM has administratively ordered passive restoration (e.g., route closures, temporary or permanent cattle exclusion) in conjunction with herbicide use, the combination of these is not analyzed in the cumulative effects analysis.

**Response:** See response to Comment RMC-0222-004 under PEIS Environmental Consequences, Cumulative Effects Analysis. |
| RMC-0222-049 Salvo, Mark (Sagebrush Sea Campaign), Cox, Caroline (Northwest Coalition for Alternatives to Pesticides), and O'Brien, Mary | **Comment:** First and foremost, the DEIS [Draft PEIS] fails to analyze the beneficial and adverse cumulative impacts of when herbicide use has and has not been 1) linked to management that prevents the conditions that favor invasives species; 2) linked with non-chemical treatments; or 3) linked with native species revegetation.

**Response:** See response to Comment RMC-0222-004 under PEIS Environmental Consequences, Cumulative Effects Analysis. |
| RMC-0222-051 Salvo, Mark (Sagebrush Sea Campaign), Cox, Caroline (Northwest Coalition for Alternatives to Pesticides), and O'Brien, Mary | **Comment:** The cumulative impacts section ([of the Draft PEIS pages 4-194 through 2 [4]-246) is riddled with unreferenced conclusions, false assumptions, and failure to consider impacts of present and reasonable foreseeable future actions, as well as the different cumulative impacts that would result from implementing the Restoration Alternative.

**Response:** The cumulative impact analysis is appropriate for the scale of this programmatic analysis, follows Council on Environmental Quality guidance, and considers past, present, and reasonably foreseeable future actions relative to vegetation treatments. See Appendix I of the Final PEIS for the BLM policy analysis of the Restoration Alternative. The pertinent information of this proposal is incorporated in Alternative E and is analyzed in Chapter 4 of the PEIS and conclusions discussed in the cumulative impact analysis. |
| RMC-0222-052 Salvo, Mark (Sagebrush Sea Campaign), Cox, Caroline (Northwest Coalition for Alternatives to Pesticides), and O'Brien, Mary | **Comment:** Since the DEIS [Draft PEIS] fails to analyze the Restoration Alternative, it fails to analyze the cumulative effects of the class of actions combining prevention treatments, active and passive direct treatments, and revegetation with native species.

**Response:** The cumulative effects analysis, found under Cumulative Effects Analysis in Chapter 4 of the PEIS, considers the cumulative effects of an integrated weed management approach to vegetation control. |
| RMC-0222-053 Salvo, Mark (Sagebrush Sea Campaign), Cox, Caroline (Northwest Coalition for Alternatives to Pesticides), and O'Brien, Mary | **Comment:** At [page] 4-194, the DEIS [Draft PEIS] states that the class of actions that will be analyzed are "all vegetation treatment methods used by the BLM." This is inappropriate, as the BLM should be analyzing all treatment methods they could reasonably be using (e.g., as in the Restoration Alternative), not just those they are currently using.

**Response:** See response to Comment RMC-0222-004 under PEIS Environmental Consequences, Cumulative Effects Analysis. |

BLM_0001726

RESPONSE TO COMMENTS

RMC-0222-054
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The DEIS [Draft PEIS] notes ([page] 4-199) that grazing and ORV [off-road vehicle] use cause cumulative impacts to soils and notes the lack of inventory and monitoring data available to determine the status of soil condition. However, the DEIS [Draft PEIS] fails to analyze the comparative cumulative effects on soil of the Restoration Alternative's linkage of prevention treatments, active and passive direct restoration treatments, and native revegetation.

**Response:** See response to Comment RMC-0222-004 under PEIS Environmental Consequences, Cumulative Effects Analysis.

RMC-0222-064
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The DEIS [Draft PEIS] later states ([page] 4-207): Alternative E places greater emphasis on passive restoration than the other alternatives. Passive restoration is often considered a critical first step in successful restoration of degraded areas since anthropogenic activities that are causing degradation or preventing recovery are halted. Under Alternative E, recovery of vegetation through passive management is expected to take longer than under alternatives A, B or D, where active management through treatments such as seeding with native species, establishing intermediate vegetation to control erosion, and use of pre-emergent herbicides to prevent weed establishment would be expected to promote faster recovery. [emphasis added]

This shows that Alternative E is not based on the Restoration Alternative, which does explicitly engage active management through treatments such as seeding with native species, establishing intermediate vegetation to control erosion, and using pre-emergent herbicides to prevent weed establishment. The above statement also misrepresents Alternative B (of the Draft PEIS on page 2-11), which does not provide for seeding with native species or use of intermediate vegetation.

**Response:** The Final EIS has been revised in Chapter 4 under Cumulative Effects Analysis, Vegetation, to note that recovery of vegetation through passive management may take longer than more active management regardless of alternative used, since all five alternatives include both passive and active management. As noted in Chapter 2, the use of native species for revegetation is the preferred method under all alternatives, but may not always be the best method. If it takes a long time to restore vegetation on an area using native vegetation, or native seed is not available resulting in soil erosion and/or recovery of weeds and other invasive species, restoration that relies solely on native vegetation could be a failure. By having the option to use non-native species, the BLM can protect soil and habitat during the period when native vegetation becomes established, providing long-term benefits to the land. Also see response to Comment EMC-0646-230 under PEIS Alternatives, Herbicide Treatment Planning.

RMC-0222-065
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The cumulative impacts section formulaically equated long-term success with number of acres treated. This is unwarranted and unsupportable, given the combination of approaches allowed in Alternative E, and the failure to analyze the Restoration Alternative, which requires linkage of prevention treatments, active and passive direct treatments, and native revegetation (if revegetation is needed). For instance the DEIS [Draft PEIS] claims (emphases added): 1) "Based on number of acres treated….long-term improvements to wetland and riparian area function and productivity would be greatest under the Preferred Alternative, and least under the No Action Alternative" ([page] 4-204); 2) "Based on the number of acres treated long-term improvements to hydrologic function and water quality would be greatest under the Preferred Alternative, and least under the No Action Alternative" ([page]4-203); 3) "Based on number of acres treated ...long-term improvements to vegetation would be greatest under the Preferred Alternative, and least under the No Action Alternative"

BLM_0001727

([page] 4-207); 4) "Based on number of acres treated, long-term improvements to the health and productivity of aquatic organisms would be greatest under the Preferred Alternative, and least under the No Action Alternative" ([page] 4-209); 5) "Based on number of acres treated...long-term improvements to wildlife and habitat would be greatest under the Preferred Alternative, and least under the No Action Alternative" [page] (4-214); 6) "Based on number of acres treated...long-term improvements to domestic livestock would be greatest under the Preferred Alternative, and least under the No Action Alternative" ([page] 4-216); 7) "Based on number of acres treated...long-term improvements to the wild horses and burros would be greatest under the Preferred Alternative, and least under the No Action Alternative" ([page] 4-218); 8) "Based on number of acres treated...long-term improvements to the visual qualities of public lands would be greatest under the Preferred Alternative, and least under the No Action Alternative" ([page] 4-224); and 9) "Based on number of acres treated...long-term improvements to the wilderness and special areas should be greatest under the Preferred Alternative, and least under the No Action Alternative" ([page] 4-226).

**Response:** Each alternative provides for a combination of approaches and also leaves the types and levels of activities that would be conducted on public lands at the discretion of local field offices. Thus, to help with the assessment of the magnitude of impacts and to ensure that we are comparing "oranges-to-oranges," it is necessary to assume that if treatment activities were similar, adverse effects and benefits would be related to the amount of area treated. It is true that each project is unique and costs and benefits from treatments would be unique to each project. However, analysis at this scale is not possible at the programmatic level.

RMC-0222-078
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Many statements in the cumulative impacts section [of the Draft PEIS] have no reference to underlying data. A few examples include: 1) "Approximately 4% of rangeland on public lands is achieving desired condition." ([page] 4-200); 2) "In a study of the Interior Columbia Basin, approximately 92% of federally-administered lands had none to low soil disturbance" ([page] 4-200); and 3) "...25% of wetlands on public lands in the lower 48 states are not functioning properly (USDI BLM 2005d), while 52% of riparian areas are considered non-functional, or functioning at risk. The poorest functioning riparian areas are found in the southwest and Montana, while most riparian areas in Alaska, Colorado, and Utah function properly." ([page] 4-202). In the above quote, presumably the claim that most riparian areas function properly is Utah is drawn from "USDI BLM 2005d" which refers to "Public Land Statistics Fiscal Year 2004," which is hardly a scientific reference for the claim that most Utah riparian areas function properly.

**Response:** References for statements 1 (USDI BLM 2005d) and 2 (USDA Forest Service and USDI BLM 2000) have been provided in the Final EIS. The comment is correct in presuming that USDI BLM 2005d is the source for the information in statement 3. This reference cites studies conducted by the BLM to assess the condition of public lands.

RMC-0222-079
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to

**Comment:** The DEIS [Draft PEIS] refers ([page] 4-196) to a "PER scoping process" as related to cumulative effects for protection of Threatened and Endangered species. As the Programmatic Environmental Report (PER) is not being developed under NEPA, there is no "scoping process"

**Response:** The text has been revised in the Final EIS to read "...and the PEIS scoping process..."

BLM_0001728

RESPONSE TO COMMENTS

RMC-0222-080
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Likewise, the DEIS [Draft PEIS] claims ([page] 4-198): Thus, the proposed action, which includes over 4.3 million acres of fire use and mechanical treatments, in addition to 1.7 million acres of treatments using other methods, would be expected to provide greater improvement in ecosystem function and air quality than is projected under current treatment methods. This is an unreferenced and unsupportable conclusion, given that the treatments on the 4.3 million acres are being proposed in a report which is not being developed under NEPA, and thus the public has no legal access to challenge the scientific accuracy of its conclusions.

**Response:** The statement is a conclusion based on the modeling accomplished by the U.S. Forest Service (Hahn et al. 2002) which is cited at the beginning of the paragraph. The PER is a supporting document to the NEPA analysis. There are no proposals for vegetation treatments in the PER, only disclosure of the effects of treatments on vegetation across a variety of ecoregions. See response to Comment RMC-0222-005 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments regarding the acre figures utilized in the PER.

RMC-0222-081
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The DEIS [Draft PEIS] inaccurately assumes that cumulative impacts at the site-specific level will be addressed. The DEIS [Draft PEIS] states ([on page] 4-197): Ground-disturbing activities on public lands are conducted only after any necessary site-specific NEPA analysis has been completed. Such analyses are required to describe the cumulative impacts of the site-specific alternatives on adjacent lands and resources, and on the watershed. This provides opportunities to detect and minimize cumulative environmental effects that cannot be specifically determined at the broad level of this PEIS. This implies that livestock grazing and ORV [off-road vehicle] use (the two most widespread ground-disturbing activities on BLM lands) are analyzed for cumulative impacts on the watershed or other resources at the site-specific level. In fact, the BLM does not undertake cumulative impacts analyses for these two ongoing ground-disturbing activities and on January 25, 2006 is proposing to allow grazing permits to be issued without any NEPA analysis (USDI 2006), which means no cumulative analysis will be required, no consideration of alternatives to the grazing terms, and no scientific accountability.

**Response:** BLM policy is to conduct NEPA at the site-specific level for all federal actions. This requirement extends to all aspects of the CEQ [Council on Environmental Quality] regulations at 40 CFR [Code of Federal Regulations] 1500-1508 and includes the requirement to conduct cumulative effects analysis. The BLM does not imply which resources would be considered in any given analysis, as that is determined at the time of the analysis and in relation to the specific proposed action. The reference of USDI 2006 refers to a Federal Register notice for a proposed draft categorical exclusion for livestock grazing permit renewals that was released after publication of the Draft PEIS and is independent of this project. Categorical exclusions are actions that by definition (40 CFR 1508.4) are not significant individually or cumulatively. Issuance of livestock grazing permits is beyond the scope of the PEIS.

RMC-0222-135
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest

**Comment:** The DEIS [Draft PEIS]/PER fail to address the individual cumulative negative impacts of herbicide use, fire, and livestock grazing on sage grouse, or their contributions to the spread of invasive species; and the agency's refusal to address livestock grazing and other land uses as the cause of invasive species spread will worsen habitat conditions for sage grouse.

BLM_0001729

Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Response:** The cumulative effects analysis did not focus on a few species, but focused primarily on past, present, and future effects on habitat values and wildlife health, since conditions of both would impact wildlife populations. However, there is specific discussion in Chapter 4 of the PEIS under Cumulative Effects Analysis, Wildlife Resources, of how past livestock grazing has impacted habitat for sage-grouse, and on the need to manage livestock grazing to improve wildlife habitat.

RMC-0233-016
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Few studies have directly addressed the effect of livestock grazing on sage-grouse (Beck and Mitchell 2000, Wambolt et al. 2002), and there is little direct experimental evidence linking specific grazing practices to sage-grouse population levels (Braun 1987, Connelly and Braun 1997). However, it has been demonstrated that the reduction of grass heights due to livestock grazing of sage-grouse nesting and brood-rearing areas negatively affects nesting success by reducing cover necessary for predator avoidance (Gregg et al. 1994; Delong et al. 1995; Connelly et al. 2000). In addition, livestock consumption of forbs may reduce food availability for sage-grouse. This information suggests that grazing by livestock could reduce the suitability of breeding and brood-rearing habitat, subsequently negatively affecting sage-grouse populations (Braun 1987, Dobkin 1995, Beck and Mitchell 2000). For more information on the effects of vegetation treatment on sage-grouse, please see 70 FR 2255, January 12, 2005.

**Response:** Information on the effects of livestock grazing on sage-grouse habitat was provided in Chapter 4 of the PEIS under Wildlife Resources, and under Cumulative Effects Analysis, Wildlife Resources. However, as discussed for Comment RMC-0126-002 under PEIS Proposed Action and Purpose and Need, Scope of Analysis, the focus of the PEIS is on vegetation treatments, not livestock grazing.

RMC-0106-058
Public Employees for
Environmental
Responsibility

**Comment:** This section [cumulative impacts] ignores inerts and degradates.

**Response:** The Cumulative Effects Analysis in Chapter 4 of the PEIS focused on the adverse and beneficial effects of herbicides in general, although examples of specific herbicide use were also given. More detailed information on the effects of individual herbicides was given in each resource section earlier in Chapter 4. A more detailed discussion of the risks from inerts and degradates is given in Appendix C of the PEIS under Degradates, Inert Ingredients, Adjuvants, and Tank Mixtures, and in a similar section in the ecological risk assessment prepared for each herbicide and included on the CD that accompanies the PEIS. Also see response to Comment RMC-0221-070 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

**Consultation and Coordination – General Issues**

PHC-006-005
H. McNeel

**Comment:** One thing that did concern me was the lack of time and public awareness some people had to review this document for this hearing tonight, because I do know that some of the county weed districts contacted me today, which I felt they should have contacted the BLM as to why they hadn't heard about it until the last two or three days.

**Response:** See response to Comment EMC-0025-001 under PEIS Consultation and Coordination, Public Involvement.

BLM_0001730

**Consultation and Coordination, Public Involvement**

EMC-0025-001
Petroleum Association
of Wyoming

**Comment:** On behalf of the Petroleum Association of Wyoming and our members, we respectfully request a 30-day extension of the comment period on the recently published Draft PEIS on Vegetation Treatments on BLM lands.

**Response:** The BLM extended the comment period an additional 30 days until February 10, 2006.

EMC-0027-011
McNeel, Hank

**Comment:** I also feel that the BLM needs to make a much greater effort in making the public aware of this PEIS. The only way I found out about it was when Richard Lee telephoned me to ask some questions about BLM Pesticide Certification. Then I saw the announcement for the public hearing the next day in the Billings Gazette. Some of the BLM Cooperators mainly County Weed Districts did not know until Dec. 6, 2005 that this PEIS was out and the Public Hearing was Dec. 7, 2005 here in Montana. How are you going to gain support from your cooperators and the general public if this occurs.

**Response:** The Draft PEIS release was announced in the Federal Register on November 10, 2005. In addition, national, state, and local press releases were issued to coincide with the release of the Draft PEIS and to announce the public hearing schedule. Press releases are not guaranteed to be printed by local or regional news services.

EMC-0186-002
Society of American
Foresters

**Comment:** The draft Programmatic Environmental Impact Statement is quite extensive and covers a large area of forestland owned by the BLM. The Society of American Foresters (SAF) is a professional organization that represents 15,000 forest managers, researchers, and educators across the country who have a great interest in the sustainable, long-term management of forests, including BLM lands. SAF would like to offer thorough comments on this draft and for this reason requests a 30 day extension of the deadline for public comments. While a 60-day comment period is adequate in many circumstances, given there are three Federal holidays that occur between the dates of November 10 and January 9, 2005, I feel that a 30-day extension is a reasonable request.

**Response:** See response to Comment EMC-0025-001 under PEIS Consultation and Coordination, Public Involvement.

EMC-0193-001
Animal Welfare
Institute

**Comment:** On behalf of the Animal Welfare Institute (AWI), I am writing to request that the Bureau of Land Management provide a 60-day extension in the deadline for comments on the Programmatic Vegetation Treatments Environmental Impact Statement, Programmatic Environmental Report, and associated documents (hereafter Vegetation Treatments Environmental Documents). If granted, this request would extend the comment deadline from January 9, 2006 to Thursday, March 9, 2006.

**Response:** See response to Comment EMC-0025-001 under PEIS Consultation and Coordination, Public Involvement.

EMC-0203-004
Institute For Culture
and Ecology

**Comment:** It is unclear to what extent the Bureau of Land Management has met National Environmental Policy Act scoping requirements for soliciting input from a broad spectrum of stakeholders, including nontimber forest product harvesters and buyers. Our research indicates that failure to include NTFP (nontimber forest products) harvesters and buyers is likely to result in forest management decisions that are

BLM_0001731

socially inequitable, difficult and costly to enforce, and undermine stewardship practices.

**Response:** The scoping process is described in Chapter 5 of the PEIS, Consultation and Coordination. The PEIS was broadly scoped in late 2001 and early 2002, and included three Federal Register notices and eighteen public meetings held across the west in nearly all states considered in the analysis. The scoping period ran from October 12, 2001 through March 29th, 2002, for a total of 168 days. Scoping comments continued to be received until May 30th, 2002—an additional 2 months— for a total of nearly 7 months of public scoping. Few, if any, comments were received from NFTP harvesters and buyers during this time. As a point of clarification, the PEIS does not propose forest management decisions.

EMC-0203-005
Institute For Culture
and Ecology

**Comment:** The lack of participation in public comment by NTFP (nontimber forest products) harvesters should not be construed with their lack of existence or concern over the impacts of management activities like spraying to their livelihoods. The spirit of NEPA scoping and other government requirements for public participation demands that the agency use the appropriate methods for ensuring broad-based participation. Such methods may require the skills of social scientists or similarly qualified individuals to implement and could include ethnographic work, rapid rural appraisals, and the establishment of information networks with hard to reach populations.

**Response:** The BLM consulted with tribes and indigenous people of Alaska, as discussed in Chapter 5 of the PEIS (Consultation and Coordination). In addition, the BLM sent letters to tribal organizations in the western U.S. and Alaska asking for their assistance with the PEIS. This letter, responses to the letter, and mailing list are provided in Appendix G (Tribal and Agency Consultation) of the PEIS. As a component of the PER, the BLM and its consultants compiled two reports on Native American and Alaska Native Resource Uses: Native American and Alaska Native Resource Uses (see Appendix D) and Cultural Resources (see Appendix E). These reports include ethnographic overviews by state and cultural areas.

EMC-0259-001
Green, Jeanne

**Comment:** Please extend the comment period on aerial spraying of pesticides/herbicides in 17 western states.

**Response:** See response to Comment EMC-0025-001 under PEIS Consultation and Coordination, Public Involvement regarding the length of the public comment period.

EMC-0321-002
Embudo Valley
Environmental
Monitoring Group

**Comment:** We are extremely and very seriously concerned with the public notification process. Although we are a community that has a potential for profound impact, we have not been adequately informed by the government agency that is proposing this risk -laden and sub sequentially disastrous plan. For this reason alone, we request a 30-day extension of the public comment period.

**Response:** See response to Comment EMC-0025-001 under PEIS Consultation and Coordination, Public Involvement.

EMC-0503-005
John Day-Snake
Resource Advisory
Council

**Comment:** The timing of the release for these documents is poor, and does not give adequate review for a document that took several years to write, is hundreds of pages long and very complex. It does the BLM a disservice to expect meaningful comments when the comment period includes major holidays for everyone.

RESPONSE TO COMMENTS

**Response:** The BLM is aware that major holidays occurred during the 60-day public comment period. An additional 30 days of public comment were allowed after the holiday season to provide the public more time to review the Draft PEIS.

EMC-0503-006
John Day-Snake
Resource Advisory
Council

**Comment:** It is difficult to review such large documents without a hard copy. We appreciate the assistance of the BLM to provide a couple hard copies to our sub-committee members but the general public does not have access to the document except through the internet or CD. We further feel that the BLM should provide an electronic search mechanism to the CD version of the two documents such that members of the public and agency personnel can easily search this very large document.

**Response:** The documents on the CDs were provided in Adobe Portable Document Format (pdf). Adobe pdf reader allows one to search for information in pdf documents using keywords.

EMC-0606-005
Johnson, Kathy

**Comment:** Public meetings. Why was there a public meeting held in WA DC? The public in that city isn't even involved!! In fact, that whole side of the country isn't even involved!

**Response:** Because the PEIS is a national programmatic document, the BLM held initial scoping meetings in Washington, D.C., to solicit comments from the public, federal agencies, and nongovernment organizations at the national level. The public was invited to participate in public scoping, regardless of the part of the country involved. The BLM followed with public hearings with the release of the Draft PEIS/PER.

EMC-0621-003
Alliance of Forest
Workers and
Harvesters

**Comment:** It is unclear to what extent the Bureau of Land Management has met National Environmental Policy Act scoping requirements for soliciting input from a broad spectrum of stakeholders, including multicultural nontimber forest product harvesters and buyers. As we have witnessed before, failure to include NTFP [nontimber forest products] harvesters and buyers is likely to result in forest management decisions that are socially inequitable, difficult and costly to enforce, and undermine stewardship practices.

**Response:** As discussed in Chapter 5 of the PEIS, the BLM conducted scoping from October 12, 2001, through March 29, 2002. Scoping meetings were held in 21 cities and towns throughout the western U.S., including Alaska, and in Washington, D.C. Information on the meetings and scoping process was provided in local newspapers, on the BLM website, and via mail to individuals on the mailing list. In addition, the BLM sent a letter to all tribal governments within the western U.S. and Alaska describing the project and asking for their concerns regarding the proposed project. The BLM also invited tribes to call if they had questions or wanted to set up individual meetings.

EMC-0621-004
Alliance of Forest
Workers and
Harvesters

**Comment:** The lack of participation in public comment by NTFP harvesters and forest workers should not be construed as their lack of existence or concern over the impacts of management activities, such as herbicide spraying, on their livelihoods and health. The spirit of NEPA scoping and other government requirements for public participation demands that the agency use the appropriate methods for ensuring broad-based participation. This process must include NTFP harvesters and forest workers.

**Response:** See response to Comment EMC-0621-003 under PEIS Consultation and Coordination, Public Involvement.

BLM_0001733

EMC-0640-002
Animal Welfare
Institute

**Comment:** The Animal Welfare Institute (AWI) submits the following comments on the Vegetation Treatments Using Herbicides on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Impact Statement (PEIS). Because of the failure of the Bureau of Land Management (BLM) to provide for a sufficient opportunity for public comments on its proposed vegetation management program, the length of the documents prepared to evaluate the impacts of the program, and because of the complexity of the issues under analysis, these comments are largely limited to the PEIS. While there may be reference to the Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Report (PER) and Draft Biological Assessment in these comments, the BLM did not provide sufficient time to allow for a comprehensive analysis of these documents or the other documents (i.e. human and ecological risk assessment reports) relevant to this issue.

**Response:** See response to Comment EMC-0025-001 under PEIS Consultation and Coordination, Public Involvement regarding the length of the public comment period.

EMC-0640-012
Animal Welfare
Institute

**Comment:** The BLM has failed to provide sufficient opportunity for public comment. While AWI [Animal Welfare Institute] appreciates the BLM's decision to extend the comment deadline on the PEIS by 30 days from January 9, 2006 to February 10, 2006, a total of approximately 90 days to review, analyze, and prepare substantive comments on the PEIS, PER, and other documents is wholly inadequate. This lack of opportunity for the public to participate in this important decision-making process is particularly troubling considering that the PEIS, PER, and other relevant documents consist of well over 1500 pages of text, analysis, and information. In addition, given the complexity of the subject matter, including highly technical information about a variety of herbicides, their potential impacts to human health, wildlife health, and the environment, and the complicated human health and ecological risk assessment reviews, a 90-day comment period is simply insufficient to expect the public to have a legitimate opportunity to participate in this process. As public participation is a cornerstone of the National Environmental Policy Act (NEPA) process, the BLM erred in not providing a minimum of 180 days for the public to comment on this proposed program.

**Response:** See response to Comment EMC-0025-001 under PEIS Consultation and Coordination, Public Involvement regarding the length of the public comment period.

EMC-0640-014
Animal Welfare
Institute

**Comment:** Moreover, public participation in this process should not require the hiring of a cadre of experts to provide substantive and informed public comment. Few interest groups or concerned citizens have the financial resources to pay for such an expert review and, frankly, should not have to do so if the BLM complied with NEPA and based its comment deadline on the complexity of the subject matter and the length of the documents prepared to assess the environmental impacts of the proposed action.

**Response:** See response to Comment EMC-0025-001 under PEIS Consultation and Coordination, Public Involvement regarding the length of the public comment period. The BLM deems the length of the public comment period appropriate for the complexity of the PEIS.

EMC-0640-016
Animal Welfare
Institute

**Comment:** If the BLM elects – as it should -- to reopen the comment period for, at least, another 90 days, it should also schedule public hearings or information sessions throughout the western United States to explain its proposals to concerned citizens, to provide opportunity for the public to question various experts to clarify certain issues or impacts associated with the proposals, and to collect public testimony in regard to the impact of the proposed action.

BLM_0001734

RESPONSE TO COMMENTS

**Response:** Formal public hearings were announced in the federal register, local newspapers, and press releases, and held in nine locations across the West during the initial 60-day comment period. The comment period was then extended for another thirty days for a total of 90 days. The BLM has determined that opening a second 90-day public comment period and holding additional public meetings was not necessary based on the breadth of substantive comments received on the Draft PEIS/PER.

FXC-0008-001
CropLife America -
Trade Association

**Comment:** This letter is to request a 30-day extension of the public comment period on the Programmatic Vegetation Treatments EIS and Programmatic Environmental Report that began November 10, 2005 and is scheduled to close on January 9, 2006.

**Response:** See response to Comment EMC-0025-001 under PEIS Consultation and Coordination, Public Involvement.

RMC-0073-004
Bryson, Anna

**Comment:** The public comment period was so short and poorly advertised that none of my 25 devoted environmentally aware friends had heard anything about this proposal. This lack of communication is unacceptable in our Democracy. The public comment period must be extended and well advertised.

**Response:** See responses to Comments EMC-0621-003 and EMC-0025-001 under PEIS Consultation and Coordination, Public Involvement.

RMC-0077(2)-004
Lovato, Andrew and
Anhara, and Marise
Korn

**Comment:** I request an extension of the hearings to do a proper environmental impact statement.

**Response:** See response to Comment EMC-0025-001 under PEIS Consultation and Coordination, Public Involvement.

RMC-0216-004
Neff, Jack

**Comment:** Firstly, I take exception to the amount of time allowed for public comment. The initial notice of a 30-day public comment period was extended to a 60-day public comment period. Even a 60-day public comment period is insufficient for the public to satisfactorily ascertain the risks with a $1.1 billion annual BLM plan calling for the brewing of a toxic stew in a kettle of porous public lands and related airborne, groundwater, riparian habitats.

**Response:** The BLM deems the length of the public comment period sufficient for this PEIS. Department of Interior regulations require at least a 45-day comment period for EISs. The public comment period was set at 60 days beginning November 10, 2005 through January 9, 2006 (FR 2005). At the request of the public, the comment period was extended an additional 30 days until February 10, 2006. No additional comment extension requests were received by the end of the second comment period; therefore, the comment period was closed at that time, for a total of 90 days public comment.

**Consultation and Coordination, Government-to-Government Consultation**

EMC-0047-002
Alaska Inter-Tribal
Council

**Comment:** AITC [Alaska Inter-Tribal Council] recently learned that the BLM, is requesting comments by Jan 9, 2006 on herbicide use on the vegetation relied upon for subsistence by the indigenous people of Alaska. We further understand that no public hearings have been held nor are scheduled to be held in Alaska on this matter. This matter is far too important not to include Alaska's tribal governments in the public process.

BLM_0001735

**Response:** As a federal land management agency, the BLM is bound by the provisions of Title VIII, Section 810 of the "Alaska National Interest Lands Conservation Act" (ANILCA) regarding subsistence matters. The Alaska State Office of the BLM ensures that the residents of rural Alaska who rely on subsistence for their livelihood will be consulted on any proposed vegetation treatment. An ANILCA Section 810 analysis of subsistence impacts from the proposed vegetation treatments program has been included in the Final PEIS in Appendix H. Also see response to Comment EMC-0203-006 under PEIS Environmental Consequences, Social and Economic Values.

EMC-0047-003
Alaska Inter-Tribal
Council

**Comment:** AITC [the Alaska Inter-Tribal Council] strongly urges the rescission of this deadline until after the BLM and its cooperating agencies, including the USFWS [U.S. Fish and Wildlife Service] and the US Department of Defense conform to the requirements of E.O. [Executive Order] 12898 on Environmental Justice and E.O. 13175 on government to government relations with federally recognized Tribal governments.

**Response:** The comment deadline was extended for an additional 30 days to February 10, 2006. The BLM does not have any cooperating agencies on this PEIS project. The BLM held scoping meetings in Anchorage, Alaska in March of 2002, which was announced in the Federal Register and through local media releases.   No representatives from AITC nor any other Native American or tribal interests were present at the scoping meetings. Based on lack on public attendance, the decision was made to not hold public hearings in Alaska for the Draft PEIS.

Executive Order 13175 requires that agencies ensure meaningful and timely input by tribal officials in the development of regulatory policies that have tribal implications. Exec. Order No. 13175 § 5, 65 Fed. Reg. 67249 (Nov. 6, 2000).

The BLM followed the BLM Handbook H-8160-1 *General Procedural Guidance for Native American Consultation* and the BLM Manual 8160, *Native American Coordination and Consultation*, which provide guidance for consultation with Native groups about land use planning and environmental review (USDI BLM 1994). These documents recognize the special sovereign status of Native American Indian tribes as well as treaty-reserved rights that some small groups possess. This consultation process was initiated in 2002 by correspondence sent to over 200 Native Alaskan tribes, and was done specifically to meet the requirements of Executive Order No. 13175. Appendix D of the PER addresses Native American and Alaskan resource uses. In addition, the BLM conducted an ANILCA (Alaska National Interest Lands Conservation Act) Section 810 analysis as part of the Final PEIS (see Appendix H). Site-specific consultation with affected tribal interests will also occur at such time as a project is proposed. Also see Chapter 5 of the PEIS, Consultation and Coordination.

Executive Order 12898 requires that "to the greatest extent practicable and permitted by law," each federal agency shall make "achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its activities on minority populations and low-income populations of the United States…" Executive Order No. 12898 § 1-101, 59 Fed. Reg. 7629 (Feb. 11, 1994). See Chapter 4 of the PEIS, Social and Economic Values, for discussion of Environmental Justice.

EMC-0047-004
Alaska Inter-Tribal
Council

**Comment:** Tribal members all across Alaska depend directly on subsistence gathering and hunting on federal lands. This right is protected by international law and the provisions of ANILCA [Alaska National Interest Lands Conservation Act] as well as

BLM_0001736

RESPONSE TO COMMENTS

the above executive orders. Contamination of food sources of the indigenous people is a serious matter for the tribal governments that should be recognized directly by the federal government through one on one meeting in the communities adjacent to the impacted federal lands. Publication in the federal register of actions directly related to protected indigenous subsistence activities is wholly inadequate for Tribes with little access to the internet or awareness of meetings and decisions held thousands of miles from the impacted traditional lands.

**Response:** See response to Comment EMC-0047-003 under PEIS Consultation and Coordination, Government-to-government Consultation. Also see Appendix H in the Final PEIS for the Native Alaskan subsistence analysis required under Section 810 of ANILCA.

Council on Environmental Quality (CEQ) regulations provides guidelines for public involvement in the NEPA process. These regulations state that agencies shall make *diligent efforts* to involve the public in preparing and implementing their NEPA procedures. 40 C.F.R. § 1506.6 (2006). Agencies are also mandated to provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so those affected will be informed (*Id.* § 1506.6(b)), as well as to hold or sponsor public hearings and meetings whenever appropriate (*Id.* § 1506.6(c)) and to solicit "appropriate" information from the public (*Id.* § 1506.6(d)). The BLM complied with these requirements by holding scoping meetings in twelve western states in which written comments were solicited. Notice of these scoping meetings and requests for public comments were provided in the Federal Register, and also in state local newspapers. *Id.* Finally, it is also mandatory for an agency to mail notice to those who have requested notice. *Id.* § 1506.6(b)(1). The BLM received 1,034 requests to be placed on the project mailing list and responded. See Chapter 5 of the PEIS, Consultation and Coordination.

CEQ regulations set out different notice requirements depending on whether the effects of the proposed action are of national or local concern. In cases where actions are of national concern, specified notice requirements are mandatory. Agencies must publish notice in the Federal Register and mail to national organizations "reasonably expected to be interested in the matter." *Id.* § 1506.6(b)(2). Because the PEIS is of national scope, the BLM properly published notice in the Federal Register, and mailed the notice to national organizations that fit the description of the aforementioned regulation (see Chapter 5 of the PEIS, Consultation and Coordination). In addition, CEQ regulations set out requirements for cases where the proposed action has "effects of primarily local concern." *Id.* § 1506.6(b)(3)(i-ix). In actions where effects are of local concern, notice requirements are permissive and *may* include: notice to state clearinghouses, Indian tribes, following the affected state's notice procedures, publication in local newspapers, notice through other local media, notice to potentially interested community organizations, publications in local newsletters, direct mailing to owners and occupants of nearby affected property, and posting of notice on and off the site where the action is to be located. *Id.* Because the PEIS is of local concern, the BLM provided notice in the form of newsletters, published notice of scoping meetings in local newspapers, notified affected states, and mailed letters to Indian tribes during the consultation process (see Chapter 5 of the PEIS, Consultation and Coordination; also see Appendix C of the PEIS).

Courts have not been willing to impose requirements beyond those of the CEQ regulations. *See Envtl. Coalition of Ojai v. Brown*, 72 F.3d 1411, 1415 (9th Cir. 1995) ("If the CEQ intended to impose additional notice requirements, it would have

BLM_0001737

expressly provided so." ). The Ninth Circuit Court stated that for matters of national concern, the CEQ regulations mandate notice in the Federal Register and mailed notice to interested national organizations. 40 C.F.R. (Code of Federal Regulations) § 1506.6(b)(2). *Id*. The court also stated that while the CEQ regulations mandate public notice in matters of local concern, they do not mandate any particular *form* of notice. 40 C.F.R. § 1506.6(b). *Id*. The methods of notice listed in 40 C.F.R. § 1506.6(b)(3) (local concern) are merely permissive. *Id*.

EMC-0047-005
Alaska Inter-Tribal
Council

**Comment:** The Alaska Inter-Tribal Council respectfully requests that all tribes in the region, as sovereigns concerned about herbicide activities on traditional lands, must be directly notified and provided government to government consultation on such action before the public notice process. The Alaska Inter-Tribal Council requests that the Executive Order on Environmental Justice and government to government relations be acknowledged and implemented and that the public comment and review process cease until such time as the Tribal governments have been afforded meaningful participation.

**Response:** The Alaska State Office of BLM has the responsibility for conducting tribal consultation as a part of the government-to-government relationship that the federal government has with the Alaska Native Groups. The BLM State Director and his staff will accommodate any inquiries relative to the PEIS or any other BLM activity. The BLM cannot halt the receipt and review of comments from the public, but will make every effort to reach Tribal entities that have concerns and comments regarding vegetation treatments. Also see response to Comment EMC-0047-002 under PEIS Consultation and Coordination, Government-to-government Consultation.

**Consultation and Coordination, List of Preparers of the Programmatic EIS**

EMC-0411-008
Schroyer, Don L.

**Comment:** How many BLM Professionals (estimated) participated in compiling the BLM Vegetation Treatments [P]EIS & [Programmatic] Environmental Report?

**Response:** A list of preparers of the PEIS and PER is given in Chapter 5 of the PEIS under List of Preparers of the Programmatic EIS in Table 5-1.

RMC-0106-061
Public Employees for
Environmental
Responsibility

**Comment:** It is important to separate preparers, consultants, and reviewers in the List of Preparers. The advice of consultants and reviewers can be ignored. The public has the right to know who exactly prepared the documents under review and what their qualifications are.

**Response:** All individuals listed in Chapter 5 of the PEIS under List of Preparers of the Programmatic EIS in Table 5-1 contributed to the preparation of the PEIS and PER. Their areas of expertise, years of experience, and highest degree obtained are also given in the table.

**References**

RMC-0217-019
Sierra Club Utah
Chapter

**Comment:** The BLM fails to use the scientific information at its disposal and even fails to use or acknowledge information from some of the references used in the PEIS. As an example to PEIS lists this reference in Chapter 6:

Belsky, A.J., and J.L. Gelbard. 2000. Livestock Grazing and Weed Invasions in the Arid West. Oregon Natural Desert Association. Bend, Oregon.

BLM_0001738

RESPONSE TO COMMENTS

The PEIS does not show how the information from this reference illuminated the analysis of the PEIS. Beyond a doubt this article does include information that is crucial to management of invasive plants and weeds on the public lands. Chapter 6 also lists several references from Jayne Belnap. The one most crucial to the problem of weeds does not receive any discussion I could find in the PEIS. Other references should also have been included in the material pertinent to the problem of invasive species and weeds. Perhaps one of the most crucial is Anderson, Jay, and Richard Inouye. 2001. Landscape-scale changes in plant species abundance and biodiversity of a sagebrush steppe over 45 years. Ecological Monographs 71(4):531-556. This references an actual reduction in an invasive plant in Idaho. The portion of Idaho is similar to the most of the terrain the BLM appears to plan to treat under this PEIS.

**Response:** The reference to Belsky and Gelbard (2000) was included in Chapter 4 of the PER under Water Quality and Quantity, but was not included in Chapter 4 of the PEIS; we have removed this reference from Chapter 6, References, in the PEIS. The Jayne Belnap references were included in the PEIS in Chapter 3 and 4, primarily in discussions pertaining to Soil Resources. We have included the Anderson and Inouye (2001) reference in the Final PEIS.

**Glossary**

EMC-0005-008
Wichita County
Noxious Weed
Department

**Comment:** I also feel strongly that a plant species should not have to be made noxious on either the Federal, or a state's Noxious Weed List before control measures are taken. I feel that "Invasive Species" should be adequate to begin control measures. I also do not feel that vegetation labeled as "invasive" should have a blanket control policy as what could be determined to be "invasive" in one region could be determined to be a desirable in another region due to climate and growing conditions.

**Response:** See response to Comment RMC-0221-007 under PEIS Glossary.

EMC-0005-009
Wichita County
Noxious Weed
Department

**Comment:** I also feel strongly that a non-native species should never have the distinction of ever being placed on a threatened or endangered species list. Here in Kansas there are 14 weeds listed on our state's Noxious Weed List. Only 2 are native to the United States. I realize this point isn't included in this [P]EIS, however I feel it should be addressed at some point, and since this [P]EIS is already being done, this may be a prudent time to look into some of these issues.

**Response:** State noxious weed lists are legal determinations that may include any weed species (native or non-native) that meet the state's noxious classification criteria. The Endangered Species Act only lists native species that meet the standard for threatened or endangered status.

EMC-0027-006
McNeel, Hank

**Comment:** Page 1 [of Chapter 1 of the PEIS] – Terminology. Counties can also designate a plant species as a Noxious Weed within their county. Federal Agencies should also be controlling those species within the designated county that declared it noxious. I feel that this should also be included within this PEIS.

**Response:** See response to Comment RMC-0221-007 under PEIS Glossary.

EMC-0446-043
The Nature
Conservancy

**Comment:** Definition of Hazardous Fuels: In the Draft PEIS and throughout the PER there is frequent reference to hazardous fuels, but there does not appear to be a clear description of what these entail. According to the Draft PER definition, hazardous fuels can be interpreted as any vegetation that may burn when someone does not want

BLM_0001739

it to burn. It is not clear who will determine what are hazardous fuels in a given project area and what is natural plant community structure. A more precise definition would assist in understanding proposed treatments and providing guidance to project design.

**Response:** The BLM uses the National Wildfire Coordinating Group definition of hazardous fuels: "a fuel complex defined by kind, arrangement, volume, condition, and location that forms a special threat of ignition and resistance to control." Not all vegetation can be considered to be hazardous at all locations, life-stages, or times of the year. Both natural plant communities and introduced or invasive vegetation could be considered hazardous, depending on their kind, arrangement, etc., as well as their proximity to values at risk. Those who come together to prepare community wildfire protection plans or similar efforts will determine what fuels or vegetation are hazardous for the specific community in question. An interdisciplinary team of resource specialists will determine, as part of the NEPA process, what non-wildland urban interface fuels can be considered hazardous as they prepare project-specific environmental documents.

EMC-0505-013
U.S. Environmental
Protection Agency

**Comment:** BLM is a partner with other federal agencies in developing and implementing Integrated Vegetation Management (IVM), and for consistency across agencies we suggest that the terms IPM [integrated pest management] or IVM be defined in this document. EPA recommends adding IPM and IVM to the glossary and use those references when referring to the decision framework for managing pests on BLM lands, including in the Executive Summary.

Integrated Pest Management is, according to the National Road Map for Integrated Pest Management (May 17, 2004, http://www.ipmcenters.org/Docs/IPMRoadMap.pdf) "...a long-standing, science-based, decision-making process that identifies and reduces risks from pests and pest management related strategies. It coordinates the use of pest biology, environmental information, and available technology to prevent unacceptable levels of pest damage by the most economical means, while posing the least possible risk to people, property, resources, and the environment. IPM provides an effective strategy for managing pests in all arenas from developed agricultural, residential, and public areas to wild lands. IPM serves as an umbrella to provide an effective, all encompassing, low-risk approach to protect resources and people from pests." Integrated Vegetation Management is a subset of IPM used to manage vegetation.

**Response:** We have included additional information on IPM and IVM in Chapter 2 of the PEIS and PER. Definitions for IPM and IVM will be included in the glossary of the PEIS and PER.

EMC-0584-027
Western Watersheds
Project

**Comment:** If BLM plans on using this term [hazardous fuels] in its analysis, we ask for a careful and scientific description of the basis for its use. For example, Idaho Falls BLM engaged consultants to prepare an EA [Environmental Assessment] for "hazardous fuels reduction" in Sands Checkerboard. We are uncertain just what the hazard is here. Who or what is threatened by the woody vegetation termed hazardous fuels? Is cheatgrass a "hazardous fuel"? We certainly think this term is far more apt for cheatgrass than it is for most other vegetation situation where BLM applies it. BLM must develop a methodology to prioritize any "treatments' of hazardous fuels. This is necessary to most effectively spend scarce taxpayer dollars, best protect habitations and areas that are truly "at risk". Instead of spending hundreds of thousands of dollars planning 6-10 million dollars or more of "treatments" in the Jim Sage Area, or drastic "treatment" of the entire Samaria Mountain Range, These projects are primarily aimed at killing woody vegetation to promote livestock grazing. BLM must use a sound

BLM_0001740

RESPONSE TO COMMENTS

methodology to determine needs for treatment – and focus should always be on the areas within approx. 1/8 mile of actual interfaces with human habitation.

**Response:** See response to Comment EMC-0585-049 under PEIS Glossary.

EMC-0585-035
Western Watersheds
Project

**Comment:** [BLM failed to] define what, exactly, constitutes an "infestation", as used in the Table. Is it the presence of a few plants, a percentage of ground cover, what? Throughout, BLM fails to define terms used, or when it does, concocts a definition (as the EIS definition of invasive species) that is at odds with scientific uses.

**Response:** In reviewing several selected definitions, the following are identified:

1. Infestation:

a. The Standard Pesticide User's Guide – 4th Edition," Bert L. Bohmont, 1997, Prentice Hall: "Infestation – Pests that are found in an area or location where they are not wanted."

b. University of California-Davis – UC-IPM Online: "Infestation – The presence of a large number of pest organisms in an area or field, on the surface of a host or anything that might contact a host, or in the soil."

c. Gempler's IPM Almanac – IPM Glossary: "Infestation – A troublesome invasion of pests within a particular area."

d. USEPA – Terminology Reference System: "Pest Infestation – 1) The occurrence of one or more pest species in an area or location where their numbers and impact are currently or potentially at intolerable levels. 2) A sudden increase in destructiveness or population numbers of a pest species in a given area."

2. Invasive Species:

a. Executive Order 13112: "Invasive Species – Means an alien species whose introduction does or is likely to cause economic or environmental harm or harm to human health." The term "Alien Species – means, with respect to a particular ecosystem, any species, including its seed, eggs, spores, or other biological material capable of propagating that species, that is not native to that ecosystem."

b. USEPA – Terminology Reference System: "Invasive Species – Means an alien species whose introduction does or is likely to cause economic or environmental harm or harm to human health." The term "Alien Species – means, with respect to a particular ecosystem, any species, including its seed, eggs, spores, or other biological material capable of propagating that species, that is not native to that ecosystem."

EMC-0585-044
Western Watersheds
Project

**Comment:** BLM's terminology (1-2) and other terms and definitions used in this process are not supported by science, and no basis is provided for its aberrant definitions of terms such as "selective" – BLM absurdly claims that chemicals that kill or weaken nearly all broadleaf plants are "selective"; BLM defines "weeds" as plants that interfere with management objectives.

**Response:** The BLM disagrees. The terms and definitions used in this PEIS include those used by federal agencies as well as academia. The following terms used by the BLM are found in the following references: The definition presented in Chapter 1 of the Programmatic Environmental Report (PER) for "weed" is the definition that is supported by the Weed Science Society of America, along with publications such as *Weeds of the Wes* (Thomas D. Whitson, Burrill, Larry C., Dewey, Steven A., Cudney, David W., Nelson, B.E., Lee, Richard D., and Parker, Robert, Grand Teton Lithography, Jackson, Wyoming.) Regarding the definition of "selective herbicide," the BLM uses the definition used by USEPA Terminology Reference System: "A

BLM_0001741

chemical designed to affect only certain types of pests, leaving other plants and animals unharmed." This term will be added to the glossary chapters of both the PER and the PEIS.

EMC-0585-049
Western Watersheds
Project

**Comment:** Example of vague definitions: The definition provided for "hazardous fuels" is so loose and broad that it is essentially meaningless. What is meant by "a special threat of ignition and resistance to control"? How is this better described, and quantified? How does nonhazardous fuel compare to hazardous fuel? What are 'normal' fuel loadings or characteristics for vegetation types and ecosystems covered by this [P]EIS?

**Response:** The National Wildfire Coordinating Group defines hazardous fuels similarly, as "a fuel complex defined by kind, arrangement, volume, condition, and location that forms a special threat of ignition and resistance to control." Not all vegetation can be considered to be hazardous at all locations, life-stages or times of the year. Both natural plant communities as well as introduced or invasive vegetation could be determined to be hazardous, however, depending on its kind, arrangement, etc., as well as its proximity to values at risk. Those who come together to prepare Community Wildlife Protection Plans or similar efforts will determine what fuels or vegetation are hazardous for the specific community in question. An interdisciplinary team of resource specialists will determine as part of the NEPA process what non-wildland urban interface fuels can be considered hazardous as they prepare a project specific environmental document.

EMC-0585-054
Western Watersheds
Project

**Comment:** As most of the treatments are slated for Nevada, Idaho, Wyoming and Oregon, the number and "risk" of hazardous fuels at any WUIs [wildland urban interfaces] must be assessed. What is BLM using as its WUIs? Each individual ranch? Abandoned habitations in the middle of nowhere? Many arid land ranches are embedded in irrigated ag., and are already severely overgrazed with no hazardous fuels in proximity to dwellings. Understanding how BLM defines interfacing lands, and the characteristics of WUIs and land areas to be treated is critical to understanding the environmental effects of treatments. It is also essential for a reader of the [P]EIS to understand the necessity of treatment.

**Response:** The PEIS and PER provide a definition of WUI in the Glossary. WUI has been defined in A Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment 10-year Comprehensive Strategy Implementation Plan (USDI and USDA 2002) and Protecting People and Natural Resources, A Cohesive Fuels Treatment Strategy (USDI and USDA 2006) as "the line, area or zone, where structures and other human development meet or intermingle with undeveloped wildland or vegetative fuel." The other way a WUI boundary can be determined is through the development of a Community Wildfire Protection Plan (CWPP). These plans are developed by local communities, with participation by state and local wildland fire agencies. Critical infrastructure such as powerlines, roadways, or critical watersheds may be incorporated into a WUI defined as part of a CWPP. CWPPs allow for a localized definition of WUI to be developed. Guidance for defining WUI is also provided in the *Healthy Forests Restoration Act of 2003* to be used in the absence of a CWPP. The variation in WUI definition across the country allows local issues to drive WUI definitions, but makes national mapping of WUI difficult.

EMC-0585-113
Western Watersheds
Project

**Comment:** [Page] 1-2 [of the Draft PEIS]. Definitions. Even BLM's invasive plants definition has significant flaws as it wrongly includes native species, blends management "actively controlled by management interventions", and is deeply

BLM_0001742

RESPONSE TO COMMENTS

confusing.

**Response:** See response to Comment EMC-0585-035 under PEIS Glossary.

EMC-0585-115
Western Watersheds
Project

**Comment:** "Invasive species" means an alien species whose introduction does or is likely to cause economic or environmental harm or harm to human health.

"Alien species" means, with respect to a particular ecosystem, any species, including its seeds, eggs, spores, or other biological material capable of propagating that species, that is not native to that ecosystem.

**Response:** See response to Comment EMC-0585-035 under PEIS Glossary.

EMC-0585-116
Western Watersheds
Project

**Comment:** We believe BLM is using a twisted, unaccepted and scientifically untenable definition of invasive species in order to justify killing large areas of woody native vegetation, such as pinyon pine in Nevada or western juniper in Oregon or California. For example, BLM in Nevada claims pinyon is an invasive species.

**Response:** See response to Comment EMC-0585-035 under PEIS Glossary.

PHC-006-002
H. McNeel

**Comment:** I would like to make a few comments like on the terminology on noxious weeds. I think the terminology that you used was for federal and state agency designated. One thing I think needs to be addressed is counties can also designate a noxious weed within their county. I would like to see that added.

**Response:** See response to Comment EMC-0291-002 under PEIS Alternatives, Vegetation Treatment Planning and Management.

RMC-0221-007
Center for Biological
Diversity

**Comment:** The Center also has serious concerns about the definitions of "invasives" and "weeds" as used in the D[raft] PEIS and the D[raft] PER. It is unclear whether native plant species have been classified as invasives or weeds in areas where they are considered undesirable for certain economic interests such as grazing. Some native species have boom and bust reproductive cycles that replenish the seed bank and play an important role in succession and soil stabilization, but, for example, are not desirable as forage for livestock. The BLM should not be playing politics with ecology; all proposed treatments should be limited to non-native noxious species.

**Response:** See the discussion on Noxious Weeds and other Invasive Vegetation in the Vegetation section of Chapter 3 of the PEIS. The BLM follows the federal noxious weed lists, and recognizes state and county weeds lists. Definitions of invasive plants and noxious weeds are provided in Chapter 7, Glossary.

**Appendix B – Human Health Risk Assessment**

EMC-0646-045
Californians for
Alternatives to Toxics

**Comment:** First, on page PEIS B-1 [Appendix B of Draft PEIS] and C-1 [Appendix C of Draft PEIS], you state that the more recent document, the invasive plant EIS, USDA Forest Service (FS) 2004, will be used as the main supporting document. This document, however, is cited in your bibliography as USDA FS 2005a, which is the correct citation date, as the FEIS was released in April 2005. To avoid confusion, this document will be cited here as FS IPEIS 2005.

**Response:** We have made corrections to these appendixes in the Final PEIS to note that the Final EIS was published in 2005.

BLM_0001743

**Appendix C – Ecological Risk Assessment**

EMC-0553-009
Callihan, Robert H.

**Comment:** The text in Vol. 2 [of the Draft PEIS] under "Non-Target Species Effects Characterization", "Terrestrial Species Effects Characterization", on page C-28 of volume 1 [of Appendix C of the Draft PEIS], says that "response of weed species to sulfometuron-methyl may be more severe than for crop species". Weed scientists familiar with the herbicide, as well as experienced BLM practitioners, would recognize that as an oddly erroneous, misleading suggestion; it should be corrected.

**Response:** Sulfometuron methyl is not registered for cropland use, thus there is little information comparing the responses of non-target cropland species and weed species to sulfometuron methyl. We have revised the text in Appendix C to reflect this lack of information.

RMC-0106-049
Public Employees for
Environmental
Responsibility

**Comment:** It is stated that "Degradates may be more or less mobile and more or less toxic in the environment than their source herbicides," which "makes prediction of potential impacts challenging." This is especially so since the BLM doesn't know the characteristics of the vast majority of possible degradates. It is possible, as noted on p. C-83 [of Appendix C of the Draft PEIS], that "a less toxic, but more mobile bioaccumulative, or persistent degradate may have greater adverse impact due to residual concentrations in the environment." This being the case, why has the BLM not undertaken studies to find out what residuals occur from the last 20 years of herbicidal treatment?

**Response:** See response to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment. The BLM relied on the USEPA, as the federal agency designated to regulate pesticides, for information on herbicides. The U.S. Geological Survey samples surface waters throughout the United States for pesticide residues.

RMC-0106-050
Public Employees for
Environmental
Responsibility

**Comment:** It is stated (p. C-83 [of Appendix C of the Draft PEIS]) that recent studies indicate 70% of degradates had similar or reduced toxicity to fish, daphnids, and algae than their parent pesticides; this study did not deal with terrestrial species. P. C-83 further states "However. 4.2% of the degradates were more than an order of magnitude more toxic than the parent pesticide, with a few instances of acute toxicity values below 1 mg/L. Thus, "The lack of data on the toxicity of degradates of the specific herbicides [proposed to be used?] represents a source of uncertainty in the risk assessment." This is a gross understatement.

**Response:** See response to Comment RMC-0106-048 under PEIS Appendix C, Ecological Risk Assessment.

RMC-0106-051
Public Employees for
Environmental
Responsibility

**Comment:** It is admitted (p. C-84 [of Appendix C of the Draft PEIS]) that List 3 and unlisted inerts (21 in all) may have moderate to high toxicity to aquatic species—how about terrestrial species, and how about degradates of the inerts?

**Response:** The likelihood that the List 3 and unlisted inerts would all have moderate to high toxicity to terrestrial or aquatic species is very low. Little information was found on degradates of inerts. Also see responses to Comment RMC-0210-021 under PEIS Environmental Consequences, Herbicide Effects Analysis, and Comment RMC-0106-004 under PEIS Alternatives, Monitoring.

BLM_0001744