RESPONSE TO COMMENTS

RMC-0106-052
Public Employees for
Environmental
Responsibility

**Comment:** The conditions set to model the effects of a "generalized inert" (p. C-84 [of Appendix C of the Draft PEIS]) are so specific as to make any general use absurd: annual precipitation 50 inches, application area 10 ac [acre], slope 0.05, surface roughness 0.015, erodibility 0.401 tons/ac, vegetation type of weeds, sand soil.

**Response:** The parameters described in the comment reflect the base watershed that was evaluated in the GLEAMS model used in the risk assessments. These parameters were selected for the modeling of inerts in order to provide consistency between the models for inerts and active ingredients. This assessment was done to compare predicted exposure concentrations between an inert additive and the active ingredient. The conditions selected for modeling by GLEAMS are reasonable worst-case conditions, as they are the ones predicted to lead to high runoff and loading to nearby surface waters.

RMC-0106-053
Public Employees for
Environmental
Responsibility

**Comment:** "It is assumed (p. C-84 [of Appendix C of the Draft PEIS]) that toxic inerts would not represent a substantial percentage of the herbicide and that minimal impacts to the environment would result from these inert ingredients." In other words, any potential problem is assumed away. It is acknowledged that evaluating mixtures of toxics is substantially more difficult as many herbicides along with other pesticides and toxic chemicals are present in the environment, and evaluation of cumulative risks is extremely difficult. It is stated (p. C-84 [of Appendix C of the Draft PEIS]) "The composition of such mixtures is highly site-specific, and thus nearly impossible to address at the programmatic level of the EIS." Firstly, what evidence does the BLM have that the composition of mixtures is highly site-specific? If there is any such information it should be cited. If such information doesn't exist, what has the BLM been doing for 20 years? This would seem burdensome in the absence of any information at all—but it didn't stop setting up a highly specific site to evaluate inerts, which may have no replicate in nature let alone in the areas of intended treatment.

**Response:** As detailed in the ecological risk assessments (see the CD that accompanies the Final PEIS), the site-specific issues are predominantly environmental (e.g., climate and soils). Mixtures can also be site-specific with tank mixes and choice of adjuvant and diluent. The BLM is not funded to conduct research on herbicides and relies on the USEPA, U.S. Geological Survey, and others for research. The site used in the inert simulation was chosen because it was most favorable for herbicide migration and was likely to predict higher migration rates than would occur on more arid BLM rangelands. Also see responses to Comment RMC-0159-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives, Comment RMC-0106-046 under PEIS Environmental Consequences, Human Health and Safety, and Comment RMC-0106-052 under PEIS Appendix C, Ecological Risk Assessment.

RMC-0106-054
Public Employees for
Environmental
Responsibility

**Comment:** p. [Page] C-84 to C-85 [of Appendix C of the Draft PEIS]. Adjuvants and tank mixtures throw more variables into the risk assessment, but the case that this program is essentially an uncontrolled experiment on the environment has already been made in the language of the EIS [Draft PEIS] itself.

**Response:** See responses to Comment RMC-0106-053 under PEIS Appendix C, Ecological Risk Assessment, and Comment EMC-0405-012 under PEIS Alternatives, Monitoring.

BLM_0001745

RMC-0122-002
Bowers, Lynn

**Comment:** There are no studies of accumulative or synergistic effects of use of multiple products.

**Response:** For one herbicide (Distinct®, a mixture of dicamba and diflufenzopyr) the mixture of active ingredients was evaluated. A number of tank mixes were also evaluated; see Appendix C under Uncertainty Analysis, Degradates, Inert Ingredients, Adjuvants, and Tank Mixtures, and the ecological risk assessments (see the CD that accompanies the Final PEIS). Also see response to Comment RMC 0159-008 under PEIS Alternatives, Herbicide Active Ingredients Evaluated under the Proposed Alternatives.

### Appendix D – Evaluation of Risks from Degradates, Polyoxyethyleneamine (POEA) and R-11, and Endocrine Disrupting Chemicals

RMC-0106-048
Public Employees for
Environmental
Responsibility

**Comment:** Degradates are discussed in Appendix C [of the Draft PEIS], p.[page] C-83. Degradates of only 9 (50%) of the herbicides proposed for use were examined, and those do not include all possible degradates of the various formulations of the 10 herbicides.

**Response:** We have expanded the discussion of degradates in the Final PEIS in Chapter 4 and in Appendix D of the Final EIS. This information is based on registration documents, discussions with the USEPA and herbicide manufacturers, and a search of readily-available databases for ecological and human health toxicity data on these degradates.

### Appendix E – Protocol for Identifying, Evaluating, and Using New Herbicides

EMC-0331-006
Weed Science Society
of America

**Comment:** The WSSA [Weed Science Society of America] also supports the developed Appendix D [in the Draft PEIS], "Protocol for Identifying, Evaluating and Using New Herbicides" to facilitate evaluation and addition of new chemicals as they become available in the future. However, one change is needed. "Determining the Need for New Herbicides" requires an additional valid reason for considering approval of a new active ingredient of "to expand availability of the number of substitute products to avoid resistance". It is understood this could be covered under "but are not limited to:"

**Response:** The protocol in Appendix E of the Final PEIS identifies factors which could limit efficacy, and availability of substitute products. The BLM considers these factors sufficient to cover the issue of herbicide resistance.

EMC-0338-015
Dow AgroSciences

**Comment:** Comments about the Proposed review of new herbicides, Appendix D [of the Draft PEIS]: The process outlined for approval of a new herbicide or for a new use of a herbicide is lengthy. A more rapid response to use of new pesticides may actually assist with eradication efforts if an invasive plant is found in a new area. Waiting 2 to 3 years for use of a herbicide, that has received approval for registration by the USEPA, would appear to be inconsistent with the mandate set forth in the 1999 Executive Order 13112 issued by the President of the United States to prevent the introduction of invasive species and provide for their control and to minimize the economic, ecological, and human health impacts that invasive species cause. As you are aware, the executive order required the formation of an Invasive Species Council comprised of a number of federal agencies, including BLM, which was tasked to complete a *National Invasive Species Management Plan*. On page 6 of the Plan the Council is tasked to lead, "... development, testing, transfer, and training concerning use of

BLM_0001746

RESPONSE TO COMMENTS

environmentally compatible pesticides and herbicides in controlling invasive species." On page 36 "The Council will review and propose revisions of policies and procedures (i.e., advance approval for quarantine actions, pesticide applications, and other specific control techniques, and interagency agreements that address jurisdictional and budget issues).." New pesticides provide opportunities for a rapid response to new infestations of invasive plants when they are relatively small in size. Failure to use USEPA approved pesticides early in the invasion cycle will likely lead to use of larger amounts of pesticide to control the invasive plants once their population has expanded because of the lack of intervention early in the invasive process. Rapid response is effective in eradicating invasive plants before they Spread. We encourage the BLM to consider a way to respond more rapidly to the use of new EPA registered herbicides.

**Response:** See response to Comment EMC-0566-008 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response.

EMC-0446-034
The Nature
Conservancy

**Comment:** Protocol for Identifying, Evaluating, and using new Herbicides (Appendix D of the Draft PEIS): This protocol should include a requirement for coordination with other resource specialists, including wildlife and fisheries biologists, botanists, and hydrologists, and for consultation with agencies, including U.S. Fish and Wildlife Service and National Marine Fisheries Service on potential effects of new herbicide use on public land to Federally listed and candidate species and migratory birds of conservation concern and with State wildlife agencies on potential effects to state-listed and other special status species.

**Response:** As noted on page E-4 of Appendix E of the Final PEIS, a peer review process would be used during the evaluation of new herbicides. In addition, the risks to federally-listed and proposed species would be evaluated as part of the ecological risk assessment and human health risk assessment. We have added a section under "Special Status Species" that discusses the need to consult with the Services when evaluating and using new herbicides.

FL-0004-009
EMC-0214-048
EMC-0221-012
EMC-0256-002
EMC-0272-002
EMC-0299-002
EMC-0305
EMC-0325-007
EMC-0328
EMC-0332
EMC-0347
EMC-0348
EMC-0368
EMC-0370
EMC-0371
EMC-0376-007
EMC-0382
EMC-0387
EMC-0388
EMC-0390
EMC-0391
EMC-0392

**Comment:** Appendix D [of the Draft PEIS] Protocol for Identifying, Evaluating, and Using New Herbicides. Overall I support this process with one change needed. "Determining the Need for New Herbicides" requires an additional valid reason for considering approval of a new active ingredient of "to expand availability of the number of substitute products to avoid resistance". It is understood this could be covered under "but are not limited to:"

**Response:** The issue of herbicide resistance management is just one of the many different factors that will be taken into consideration, as outlined in Appendix E of the Final PEIS, and is included under the scope of "any other relevant factors."

BLM_0001747

EMC-0393
EMC-0394
EMC-0399
EMC-0400
EMC-0418
EMC-0422
EMC-0427
EMC-0431
EMC-0433
EMC-0438
EMC-0443
EMC-0482
EMC-0483-010
EMC-0501
EMC-0578
EMC-0596

RMC-0101-004
Custer County Board
of Commissioners

**Comment:** We also support the "Protocol for Identifying, Evaluating and Using New Herbicides" to facilitate evaluation and addition of new chemicals as they become available in the future. The process still seems slow at two years-best case scenario, but is much better than what appeared to be "no process" before. We offer as an example the use of Plateau® (imazapic) on BLM lands. The chemical has been on the market for at least five years, has a proven record of being very effective on leafy spurge (Euphorbia esula) one of our major noxious weeds of concern In addition, Plateau® offers less environmental issues, is less expensive to use when compared to other recommended chemicals and opens an additional window of opportunity for control and yet it could not be used because it was not on the approved list!

**Response:** See response to Comment EMC-0566-008 under PEIS Alternatives, Prevention of Weeds and Early Detection and Rapid Response. Imazapic is one of the herbicides considered for use in the PEIS analysis.

## Appendix H – Alaska National Interest Lands Conservation Act (ANILCA) § 810 Analysis of Subsistence Impacts

EMC-0108-002
Banks, Helen

**Comment:** I understand that the area in question includes parts of Alaska, where people depend on wild-gathering of food. To put these people's health at risk, and to introduce toxic substances into the wild in this way, with no knowledge of their long-term impact and interactions, seems reckless, shortsighted and irresponsible to me.

**Response:** The BLM does not plan to use herbicides in Alaska in the near term, and does not plan to use herbicides on more than about 1,000 out of 85.5 million acres annually in Alaska. The BLM conducted an ANILCA Section 810(a) assessment to evaluate the effects of proposed herbicide treatments on foods and other resources used by Alaska Native (see Appendix H of the Final EIS). The conclusion of the assessment was that there would be no significant impacts to subsistence resources. In addition, the assessment noted that the BLM in Alaska would conduct individual, site-specific NEPA analyses for any herbicide treatments that are proposed. In this way, the BLM will be able to define, with local input, the required Standard Operating Procedures and mitigation that will be applied to prevent damage to subsistence plants and animals. For all proposed projects, local communities would be given the opportunity to participate in the planning process and assist with design of proposed treatments.

BLM_0001748

### Appendix I – Restore Native Ecosystems Alternative

EMC-0457-007
Ryan, Eleanor (North
American Butterfly
Association)

**Comment:** We commend especially these specific ideas in Appendix G [of the Draft PEIS]: A. Identification of Hotspots for their diversity of plant and wildlife, and designate these for specific protection. B. Use of mechanical treatment in restoring native vegetation. All of these ideas in Appendix G [of the Draft PEIS] were better alternatives to herbicides. Yes, they are labor intensive but herbicides are also expensive.

**Response:** Special management of plant and wildlife resources is determined at the land use planning level and is outside the scope of this PEIS (refer to Chapter 1, Scope of Analysis, in the PEIS). Identification of special areas would follow established program procedures under land use planning (e.g. regulatory criteria at 43 CFR [Code of Federal Regulations] 1610.7-2 to identify areas of critical environmental concern). The BLM is not aware of any established criteria to determine what comprises a "hot spot" for plant and wildlife diversity. The BLM utilizes an integrated pest management approach to vegetation treatments, and use mechanical treatment to restore native vegetation is one option the agency can and does implement under this framework.

## Vegetation Treatments on Bureau of Land Management Lands in 17 Western States Programmatic Environmental Report

### General Comments and Reponses

EMC-0646-015
Californians for
Alternatives to Toxics

**Comment:** It should be noted that the url given [on page 2-15 of the Draft PER, paragraph 1] here is incorrect, and leads to a dead page. The correct url ends with shtml, not htm

**Response:** The url given in the PER is incorrect. It has been corrected for the Final PER.

EMC-0646-046
Californians for
Alternatives to Toxics

**Comment:** Second, on page PER 2-15, as stated above, the location for reviewing the SERA supporting documents is given as http://www.fs.fed.us/foresthealth/pesticide/risk.htm. Once discovering that this url is a disconnect, I was finally able to link through sera-inc.com. The proper url is http://www.fs.fed.us/foresthealth/pesticide/risk.shtml.

**Response:** We have corrected Chapter 2 of the Final PER to show the correct url.

EMC-0646-047
Californians for
Alternatives to Toxics

**Comment:** Third, upon downloading the SERA 2,4-D RA, the report date of 1998 was noticed. Having already reviewed SERA 1998, we expected SERA 2003a (as cited in the BLM PEIS) to be an update. However, SERA 2003a was the same as SERA 1998, as evidenced by the same TR numbers. The proper citation, as listed in FS IPEIS [Forest Service Invasive Plant EIS] 2005, is SERA 1998 (FS IPEIS 2005 references-22 [U.S. Department of Agriculture Forest Service. 2005. Preventing and Managing Invasive Plants, Final Environmental Impact Statement. U.S. Department of Agriculture Forest Service Pacific Northwest Region. Available at: http://www.fs.fed.us/r6/invasiveplant-eis/.). Though some typos and misprints have no effect on the material, wrong citations can lead to hours of frustrating search looking for something that doesn't exist. This is in violation of NEPA and the APA [Administrative Procedures Act].

BLM_0001749

**Response:** We have revised the references to the Syracuse Environmental Research Associates, Inc., human health and ecological risk assessment of 2,4-D to show that the document was produced in 1998 and not in 2003.

## Purpose of the Environmental Report, Scope of Report

EMC-0584-119
Western Watersheds
Project

**Comment:** We believe you must provide extensive analysis of the impacts of post-fire "salvage" logging or thinning. Is that contemplated under this [P]EIS/PER? If so, what are its impacts to soils, vegetation, weed invasion risks, wildlife habitats, fisheries, recreational and other uses of the affected lands? What have been the impacts to, and what is the condition of, lands where this has occurred in the past?

**Response:** As stated in Chapter 1 under Scope of Report, the PER does not evaluate vegetation management that is focused primarily on commercial timber or other forest product enhancement or use activities that are not related to improving forest health, hazardous fuel reduction, or work authorized under the Healthy Forests Restoration Act. Where removal is determined to be necessary to recreate the native fire regime, to facilitate forest regeneration, or to improve forest or woodland health, all such treatments will be preceded by additional environmental analysis in compliance with the National Environmental Policy Act to disclose the potential environmental effects of biomass removal through post-fire logging or thinning.

## Purpose of the Environmental Report, Federal Laws, Regulations, and Policies that Influence Vegetation Treatments

RMC-0077(2) –002
Lovato, Andrew and
Anhara, and Marise
Korn

**Comment:** Cows should never have been allowed in public forest lands in the first place. The Animal Damage Control and welfare ranching on forest lands has resulted in the decimation of predator species that understandably eat the prey in their protected land and have decimated innocent animals that get caught in traps and poisons by the thousands contributing to wildlife imbalance and extinction. This was on nature that is causing widespread extinction seems the intentional intention of BLM. To get rid of the wild life and forests so that it can become grasslands for cows is an outrage! This ignorance is so dire that I doubt there is any intention to protect the wildlife but only a pathetic, shortsighted effort to line a few ranchers pockets at the expense of all the wildlife in America. All wildlife is already squeezed out and endangered due to human over expansion and these national forests should function as wildlife refuges for these endangered species.

**Response:** Authority to graze livestock on public lands derives from the Taylor Grazing Act of June 28, 1934. The BLM is required by law, regulation, and policy to not contribute toward the extinction or listing of any species and has an affirmative duty to protect and conserve wildlife species. BLM forest management practices do not include conversion of forest resources to grasslands.

## Purpose of the Environmental Report, Interrelationships and Coordination with Agencies

RMC-0144-008
Wyoming Game and
Fish Department

**Comment:** We are also disappointed that vegetation treatments will not be incorporated into approved land use plans as noted in 1-5 of the Treatment [Draft] PER. Over the projected 10-year life span, 6 million acres treated per year, would amount to 60 million acres or roughly 22% of the 262 million acres managed by BLM. We believe this is a significant amount of acreage that has the potential to impact fish and wildlife populations and their habitat. We strongly urge BLM to create a strong partnership and consult with state fish and wildlife agencies prior to

planning or conducting treatments.

**Response:** Land use plan implementation actions often include vegetation treatment activities, which are conducted in conformance with existing land use plans goals and objectives. This PEIS is not a land use planning effort and does not propose any allocations of vegetative resources for treatments; allocations are determined through local land use planning. See Relationships among Land Use, Land Use Planning, Land Health Standards, Ecosystem Functionality, and Vegetation Treatments in Chapter 1 of the PER for a discussion of the interrelationship of the PER, PEIS, and land use planning. All vegetation treatment projects are coordinated at the local field office level and include coordination with state and federal regulatory and resource management agencies. Also see Interrelationships and Coordination with Agencies in Chapter 1 of the PER for a discussion of interrelationships and coordination with agencies.

**Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities**

EMC-0446-008
The Nature
Conservancy

**Comment:** Restoration objectives: Although the Draft PEIS and PER state that 50 percent of the acres planned for treatment will be treated to restore historic fire regimes, these documents do not address specific goals for restoration of historic fire regime or land health condition by ecoregion or plant community type. The PER should distinguish between hazardous fuels treatments, restoration of historic fire regimes, and restoration of plant community health – they are not synonymous and may require different treatment methods to achieve. The assumption made in the PEIS that, "Treatments that remove hazardous fuels from public lands would be expected to benefit the health of plant communities..." does not apply to all or even most circumstances since the health of plant communities depends on many variables, including plant species composition, the amount of existing alteration from the native plant community, and what species and amount of fuels are removed in a given area. We are particularly concerned that the PEIS and PER focus largely on goals for what vegetation, both weeds and fuel, is to be reduced or eliminated. The PEIS and PER and the majority of BLM's older land use plans include few specific descriptions of ecological goals for the desired future condition of the plant community composition and vegetation structure that proposed fuels treatment and other vegetation management projects are designed to achieve.

**Response:** The intent of this document is to provide a broad overview of fire ecology and vegetation treatments that is understandable to the general public. Specific goals for restoration of historic fire regime or land health condition by ecoregion or plant community type will be determined at the land use planning level. Decisions that consider all the factors listed in this comment will be made as each land use plan is updated.

EMC-0446-035
The Nature
Conservancy

**Comment:** Once approved, the PER can be incorporated by reference in the planning, justification, and review of local level projects. In order for it to be useful to assist local planning, the PER needs additional detail in several areas, including restoration goals, monitoring at multiple scales, the need for pre- and post treatment noxious weed and invasive species control, and guidelines for the use and limitations of livestock grazing to control weeds.

**Response:** See response to Comment EMC-0446-071 under PER Vegetation Treatment Programs, Policies, and Methods, Monitoring. See Vegetation Treatment

BLM_0001751

Standard Operating Procedures and Guidelines in Chapter 2 of the PER for a discussion of livestock grazing to control weeds.

EMC-0446-040
The Nature
Conservancy

**Comment:** Purpose and Need: The Draft PER states that the purpose of the BLM's proposed increase in vegetation management treatments is to: "…reduce the risk of wildfire by reducing the occurrence of hazardous fuels…restoring fire-adapted ecosystems, and repairing lands damaged by fire" ([Draft] PER [page] 2-1). Yet the remainder of the document focuses almost exclusively on hazardous fuels reduction. There is insufficient discussion of methods and priorities for the restoration of fire-adapted ecosystems, even though the stated goal for 50 percent of acres to be treated will be to restore historic fire regimes. There is also insufficient discussion of the need, opportunity, and proposed treatments to maintain intact areas that are already in Condition Class I to prevent degradation to higher condition classes.

**Response:** The programs and policies guiding Wildland Fire Management are discussed in Chapter 2 of the PEIS in the section on BLM Programs Responsible for Herbicide Treatments. The methods employed to restore fire-adapted ecosystems are the same as those listed in the PEIS and PER for vegetation treatments. Local site-specific land use plans and activity plans will identify priorities for the local field office. The BLM does need to accomplish treatments in the areas of hazard fuels reduction, restoration of fire-adapted ecosystems, and repair of lands damaged by fire. Estimated needs in all three of these areas helped determine overall treatment needs across the BLM. Further discussion about the appropriate mix of treatments is addressed at the Resource Management Planning level. This is the level at which the land use decisions will be proposed and analyzed, and decisions made. Maintenance of intact areas and Fire Regime Condition Class 1 landscapes is included within the range of treatment activities undertaken by the BLM. This has been clarified in Chapter 4, Assumptions for Analysis.

EMC-0584-049
Western Watersheds
Project

**Comment:** Juniper and other woody vegetation throughout the West have been vilified by the ranching industry. Pinyon-Juniper and juniper on many BLM-managed lands have been greatly fragmented by purposeful fire, escaped prescribed fire and wild fire. BLM has not demonstrated that it can fix the cheatgrass mess it has made in juniper habitats, as with prescribed-fire on lands such as Rice Canyon in the Burley District. Until BLM shows it can show restoration of the many already treated arid sites and return them to good or better ecological condition, BLM should not set out on a course of new disturbance.

**Response:** Adverse effects of the use of fire are described in the Vegetation section of Chapter 4 of the PER under Adverse Effects of Treatments, and effects of fire treatments on pinyon and juniper are described under fire effects for the Temperate Desert Ecoregion of this section. Benefits of treatments using fire are described under Beneficial Effects of Treatments in the Vegetation section of the PER. In the case of wildfire, the BLM authorizes numerous post-wildfire restoration plans on an annual basis. Each restoration project plan that is approved and funded contains a monitoring component to evaluate treatment success and progress towards meeting vegetation or restoration objectives. In the case of prescribed fire, post-treatment monitoring is also a component of the project design. In cases where success in meeting objectives is not demonstrated, the BLM has the flexibility to adjust its vegetation treatment practices to account for the factors influencing project outcomes.

BLM_0001752

RESPONSE TO COMMENTS

EMC-0584-051
Western Watersheds
Project

**Comment:** A careful scientific evaluation and assessment of past BLM "treatments" must be prepared. How many acres have been burned in prescribed fires? What post-fire management was done by BLM? What were the results? What are their current vegetative communities? What past herbiciding has been done by BLM? Where? How many acres? What were the results? How many acres, and where, was post-fire rehab. done? What is the current condition and vegetation of these lands? Please provide maps that adequately depict the above information.

**Response:** Through data requests to field offices, the BLM acquired data on treatments and acreages for current and future planned activities projected over the next 10 years, rather than past activities. Detailed results of past treatments, in many cases, cannot be summarized because monitoring data are often lacking. The BLM states, under Monitoring in Chapter 2 of the PER that many sites treated in the past lack monitoring data for a variety of reasons. The assumptions for analysis and cumulative effects discussion in Chapter 4 of the PEIS, together with Chapter 3, Affected Environment, provide the broad scale baseline of vegetative conditions as it relates to current and future vegetation treatments. The Draft PEIS does not summarize all BLM vegetation treatments or their results that have occurred over the last 50 years.

**Vegetation Treatment Programs, Policies, and Methods, Planning and Management at the Local Level**

EMC-0584-107
Western Watersheds
Project

**Comment:** BLM must assess the status of populations and habitats within the larger landscape area, and determine the likely effect of a fire on special status species and other important biota. BLM must also act to take protective measures – not only on the fire-affected allotments, but also on surrounding lands, and to buffer habitat loss until the habitat that has been lost can be restored.

**Response:** An assessment of the status of populations and habitats and special status species is typically done by BLM field offices. The effects of fire on special status species are discussed in the PER and Biological Assessment; these documents also include measures to protect special status species from fire. The BLM considers the effects of habitat loss when preparing fire management plans.

**Vegetation Treatment Programs, Policies, and Methods, Site Selection and Treatment Priorities**

EMC-0584-055
Western Watersheds
Project

**Comment:** All fuels reduction projects must be based on comprehensive restoration assessments before any reduction takes place.

**Response:** See response to Comment EMC-0584-064 under PER Vegetation Treatment Programs, Policies, and Methods, Site Selection and Treatment Priorities.

EMC-0584-064
Western Watersheds
Project

**Comment:** All fuels reduction projects must be based on comprehensive restoration assessments before any reduction takes place. The DEIS [Draft PEIS]/PER fails to provide any methodology to do so, and completely ignores restoration assessments.

**Response:** The BLM uses the Fire Regime Condition Class (FRCC) process to complete restoration assessments before planning/prioritizing fuel reduction projects. FRCC serves as an interagency measure of vegetation and fire regime departure from historic conditions. It provides the information needed to develop a fuels reduction program that can establish priorities based on the greatest need for restoration (i.e. greatest departure from the historic condition). Chapter 3 of the PER under Vegetation Condition and Fire Regimes provides a description of this process, which

BLM_0001753

is an interagency, standardized tool in support of national-level fire planning and risk assessment efforts. More details can be found at www.nifc.gov/fuels. Also, the land use health assessment process referred to in Chapter 1 of the PER under Relationships among Land Use, Land Use Planning, Land Health Standards, Ecosystem Functionality, and Vegetation Treatments is another methodology used to determine the need to restore vegetation to desired conditions.

RMC-0049-016
Wilson, Robert E.
(University of Nevada Cooperative Extension)

**Comment:** Page 4-3 [of the Draft PER] Practices to minimize herbicide treatment This section needs to talk in depth about how the concepts of Integrated Invasive Weed Management can be incorporated into all other aspects of land management – especially the range and fire programs – of the BLM.

**Response:** See the discussion on integrated vegetation management in Chapter 2 of the Final PEIS and PER. The PER is intended to provide information that can be incorporated into all BLM programs. BLM policy and manuals have integrated the concepts of weed management and other vegetation management into all BLM programs. In integrated pest management programs, herbicides are considered transition tools that enable the manager to manage vegetation and replace them with desirable, competitive vegetation. BLM guidance on herbicide treatments and treatment options are contained in BLM Manual 9011 *Chemical Pest Control*, which recommends selecting the least toxic low-residual herbicide that is effective against the target vegetation and applying it in a judicious manner, and Manual 9015 Integrated Weed Management. Each treatment project is designed and analyzed under NEPA at the site-specific level, taking into account specific ecological conditions.

**Vegetation Treatment Programs, Policies, and Methods, Vegetation Treatment Methods**

EMC-0111-002
Seraphinoff, Mike

**Comment:** I have seen considerable success controlling weeds here by our county road crews using alternative methods, and I have my own experience as an organic farmer, that mechanical means, cover cropping etc. can control most weed problems. I am also aware of the work of Dr. Fred Provenza at Utah State, using selective grazing to control some weed problems. The agency needs to make a real commitment to reducing reliance on herbicides.

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

EMC-0121-004
Gladstone, David

**Comment:** In addition, if it is to use any herbicides, BLM needs to make a specific, measurable commitment to reducing the use of these poisons. It should also contact WSU [Washington State University] and other universities which are researching alternative ways to control invasives.

**Response:** See response to Comment EMC-0076-002 under PEIS Alternatives, Herbicide Modes of Action and Treatment Methods. The PER discusses non-herbicide treatment methods the BLM would use to treat vegetation; only approximately 16% of BLM-administered lands would be treated using herbicides. The BLM works closely with researchers, and even funds research associated with the different management options available for addressing invasive species on BLM-administered lands at several universities, including the University of California at Davis, Colorado State University, University of Wyoming, Montana State University, University of Idaho, Washington State University, Oregon State University, University of Arizona, New Mexico State University, and Utah State University.

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0159-002<br>Tepfer, Gary | **Comment:** There are very good alternatives that the BLM should be getting serious about employing widely. The most effective is hand eradication. This is also good for rural economies where there are few living wage jobs and widespread unemployment among youth. This work is actually healthy for the workers as opposed to potentially dangerous to their health. |

**Response:** The BLM proposes to use a variety of treatment methods in addition to the use of herbicides, as discussed in the response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation. Much of the non-herbicide related work is done by private contractors. In addition, the BLM and other federal, state, and local agencies actively recruit and use schoolchildren and other volunteers to help with vegetation removal. Volunteer opportunities with the BLM can be found at: http://www.blm.gov/volunteer/, while information useful to teachers and students can be found at: http://www.blm.gov/education/LearningLandscapes/explorers/lifetime/invasive.html.

| | |
|---|---|
| EMC-0161-011<br>Richards, Vivien | **Comment:** Non-herbicide vegetation treatment options are available! The proposed actions appear to meet financial needs of chemical companies and other large corporate interests, rather than for support ecological integrity and public interests. I worry about the long-term costs of all these pesticide applications, particularly those to the environment, the natural area, and the people who live near and use BLM public lands and natural areas. |

**Response:** See responses to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation, and Comment EMC-0026-003 under PEIS Environmental Consequences, How the Effects of the Alternatives Were Estimated.

| | |
|---|---|
| EMC-0162-002<br>Anderson, Shelly | **Comment:** There are natural and less invasive and less dangerous methods of controlling noxious weeds. A blow torch will kill vegetation without harmful residue. Goats can be confined to an area until the noxious weeds are killed. Certainly the spread of weeds would be preferable to poisoning our environment even further. |

**Response:** See response to Comment RMC-0003-005 under PER Vegetation Treatment Programs, Policies, and Methods, Revegetation.

| | |
|---|---|
| EMC-0446-058<br>The Nature<br>Conservancy | **Comment:** All of the tools identified for vegetative treatments (fire, mechanical, etc.) may be needed and appropriate in varying degrees. However, the restoration outcomes relative to each tool are poorly defined. This section of the PER should include additional detail on specific objectives for the use of each vegetative treatment type in order for this material to be useful when incorporated by reference at some later date into local project reviews. |

**Response:** Restoration outcomes for any particular vegetation treatment may be met through a variety of treatment methods and tools within an integrated vegetation management framework. Restoration outcomes relative to each tool are established through the site-specific project design at the time the vegetation treatment is proposed, depending on the local circumstances and site-specific goals. The Vegetation Treatment Methods section of Chapter 2 of the PER describe the general range of objectives appropriate for each tool. Chapter 4 of the PER describes the general range of effects on public land resources associated with application of each tool or method.

BLM_0001755

RMC-0057-015
California Wilderness
Coalition

**Comment:** The Vegetation Treatment Method Selection should include a consideration of an area's proximity to existing communities. Areas that are not immediately adjacent to existing communities should be considered appropriate for fire treatments instead of mechanical treatments.

**Response:** The text of the PER has been changed in response to this concern. See the Vegetation Treatment Methods section of Chapter 2. The decision to use fire instead of, or in addition to, another treatment method will depend on a variety of factors; the proximity of the treatment area to human lives and property is only one factor that will be considered when making this decision.

RMC-0170-004
Carson Forest Watch

**Comment:** Backpack, portable propane torches are an effective method successfully used in the Northwest we would urge the BLM to include. They are cost-effective.

**Response:** The BLM utilizes these tools successfully where they are appropriate. See Vegetation Treatment Methods in Chapter 2 of the PER, which describes the use of backpack sprayers and propane torches.

**Vegetation Treatment Programs, Policies, and Methods, Fire Use**

EMC-0584-053
Western Watersheds
Project

**Comment:** BLM must provide information on the risks of prescribed fire escape, or raging out of control. This has happened repeatedly on Ely BLM lands, including near Cherry Creek in 2005.

**Response:** Implementation of prescribed fires does lead to the possibility that there may be some fires that exceed prescription and need to be suppressed. For the BLM, this occurs less than one percent of the time. The BLM does go to great lengths to ensure that fires do not escape, and always has contingency plans in place to suppress the fire if the need arises.

EMC-0641-016
Idaho Conservation
League

**Comment:** We support the careful use of fire to manage noxious weed infestations so long as it is used to reestablish historic fire regimes and it is accompanied by the replanting of native vegetation. Disturbance from fire can serve as a vector for the spread of certain noxious weeds. The use of fire thus also needs to be accompanied by a strict monitoring program designed to ensure the rapid detection and containment of noxious and invasive weed species in order to ensure re-infestation.

**Response:** Chapter 2 of the PER and PEIS under Prevention and Early Detection of Weeds acknowledges that weeds colonize highly disturbed ground as well as degraded plant communities or even intact communities. It reiterates that the BLM is required to develop a noxious weed risk assessment when an action may introduce or spread noxious weeds, that modification of actions must take place to reduce likelihood of infestations when the risk is determined to be moderate or high and that control measures to be implemented be identified if weeds do infest the site.

The Fire Monitoring and Inventory System (FIREMON), an interagency standardized monitoring tool, is the primary process used post-fire to detect infestations, as well as document fire effects, assess ecosystem damage and benefit, evaluate the success or failure of a burn, and appraise the potential for future treatments. The FIREMON project's primary objective is to establish a standard fire effects monitoring and inventory protocol. More information can be found on FIREMON at www.fire.org.

BLM_0001756

RESPONSE TO COMMENTS

Vegetation Treatment Programs, Policies, and Methods, Mechanical Treatment

EMC-0115-008
Steele, Mark

**Comment:** I observed chaining activities, quite by accident, last November, 2004, at Jim Sage Mountain on the Idaho/Utah border while on a late season archery hunt for mule deer. Jim Sage had recent fires on the mountain and the flats. Those areas had massive and total and near total cheatgrass invasions. I left the area as chaining began and voiced concerns from a livestock person's views that the chained areas would become immediately invaded with cheatgrass [downy brome] because of the seedbeds surrounding them. I returned a year later on Dec. 24, 2005 to the same area. I could not get to all of the chained areas because of the road conditions, but every parcel that I could view was covered with cheatgrass as one would have expected. This is the part that makes absolutely no sense to me with my background in grazing, spraying weeds, and establishing CRP [Conservation Reserve Program] ground: Why would the BLM knowingly disturb thousands of more acres of established juniper, native grasses, and sage that are right next to recent fire burns that are choked with cheatgrass? The outcome is that those additional acres will now also have to be treated at some large expense and questionable success in addition to the already burned acres. And even if it is done right and reseeded with native species, it will be a number of years before livestock can again or should be put into such grazing units. That will greatly impact the very users that BLM is trying to help. I urge the BLM to halt any further land disturbances, such as chaining, until we can get a handle on the invaded acres of weeds we already have. If we determine it is in everyone's interest to eliminate 300-year-old junipers, don't do it with a chain, but use a chainsaw. Have the fire crews start thinning them in their down time, not clear cutting them. They were selling for about $5 each in our neighborhood for fence posts and they last forever. Those actions would be a lot more cost effective than helicopter spraying of herbicides and then aerial seeding and fertilizing after tearing the surface up with chaining.

**Response:** The BLM agrees that surrounding vegetation and presence of existing invasive species, such as downy brome, should be considered when selecting sites and appropriate methods for vegetation management. These are considered primarily at the local level during project level planning, within the direction set in our Resource Management Plans and under the authority and guidelines discussed at the beginning of Chapter 2 of the PER, which outlines the national strategies and reasons for vegetation management on BLM lands. The beginning of Chapter 2 describes the direction used in selecting sites for resource and vegetation management. The general criteria used to select the appropriate treatment methods, discussed in Chapter 2 under Vegetation Treatment Methods, include historic and current site conditions, need for subsequent revegetation, success of past restoration treatments conducted under similar conditions, and cost effectiveness. Chaining is only one of several mechanical treatments available; other types of treatments such as manual or chemical are often also considered when planning projects. Table 2-5 of the PER provides Standard Operating Procedures that can be used to help prevent invasion of unwanted species associated with vegetation management activities, including avoiding the use of chaining in areas where it is not considered appropriate (e.g., areas with less than 6 to 9 inches rainfall and where downy brome is present). However, there is research indicating that chaining can be an effective tool in vegetation management, as discussed under Mechanical Treatment in the Vegetation Treatment Methods section of Chapter 2 of the PER. Project proposals and site-specific mitigation measures can also be designed to minimize the impacts of surface disturbance, such as choosing manual or chemical treatment methods rather than mechanical methods on more sensitive sites. Vegetation management in areas with known infestations of downy

BLM_0001757

brome can be difficult. Chapter 4 of the PER under Vegetation discusses the potential impacts of mechanical treatments in evergreen woodlands such as pinyon-juniper. The BLM also recognizes that there is a need to learn from past mistakes, and in Chapter 2 under Monitoring discusses monitoring and the need to improve monitoring and record keeping in order to improve restoration efforts, especially in difficult areas like those dominated by cheatgrass.

EMC-0405-009
Hoover, Victoria N.

**Comment:** Mechanical treatments are a serious problem. While the publicity regarding this document centers mainly on herbicides, the actual proposals in this EIS to use mechanical treatments broadly could cause even much more devastation to natural ecosystems westwide. That so much of the document's discussion concerns chemicals effectively obscures the fact that most of what is planned is mechanical. In spite of claims to the contrary, such mechanical treatments are designed to provide one single benefit, namely to cattle grazers, while ruthlessly sacrificing natural, native ecosystems that provide essential benefits to wildlife. These other treatments, mostly chaining, would increase from 500,000 acres to 6 million acres per year on BLM lands under the PER.

**Response:** During preparation of the PEIS and PER, BLM field offices were asked to provide information on the types of vegetation treatment projects they planned to conduct during the next decade. Field offices provided information on the type of vegetation to be treated, treatment method, number of acres to be treated, location, etc. Based on this information, it was determined that mechanical treatments would occur on about 2.2 million acres annually, and of these chaining would occur on about 130,000 acres annually. Over a third of the mechanical treatments would consist of drill seeding, which would result in minimal disturbance to the soil and would lead to revegetation of the site. Mowing and tilling would each comprise about 10% of mechanical treatments. Treatments that substantially alter the soil, including blading, dozing, and plowing would comprise only about 10% of mechanical treatments.

EMC-0584-061
Western Watersheds
Project

**Comment:** BLM should focus on use of mechanical methods of weed control that have been identified as effective in current scientific literature (mowing, spot fire (flamer), weed eaters, mulching).

**Response:** The BLM will focus on mechanical and other methods of weed control that have been identified as effective in the current scientific literature, and in the field based on prior treatments by the BLM.

**Vegetation Treatment Programs, Policies, and Methods, Biological Control**

EMC-0027-007
McNeel, Hank

**Comment:** Page 2-12, Second Column, Paragraph 3 [Draft PER]. You should also include [the] duration that domestic animals are in an area by closely watching the stage of utilization of both the target and the non-target vegetation present. Also you need to stress the importance of proper management techniques in this program in order for this practice to work correctly. Often times overall management practices need to be altered in order for any vegetation management practice to be successful.

**Response:** The Final PER discusses the need to observe the utilization of target and non-target species, and to properly manage grazing animals for livestock control to be effective.

RESPONSE TO COMMENTS

| | |
|---|---|
| EMC-0148-003<br>Rosenzweig, Marcie A. | **Comment:** Dr. Hudson Glimp of the University of Nevada, Reno, has presented wonderful programs on the use of grazing animals in the elimination of weed and invasive species and the improvement of habitat for native birds and grazing species. I urge the BLM to contact Dr. Glimp and access his collection of paradigms that work. |

**Response:** As discussed in Chapter 2 of the PER, domestic animals were identified as a biological control method to be used to control weeds and other invasive species.

| | |
|---|---|
| EMC-0226-001<br>Ernst, Harley L. | **Comment:** What Manage Grazing Plan is being used for noxious weeds and grass improvement? |

**Response:** A specific grazing management plan that could be used to control noxious weeds and improve native vegetation in every situation could not be described at this level of analysis. This document acknowledges the potential to use grazing by domestic animals to help accomplish these goals, but the details of such a plan would need to be developed at the site-specific level. The grazing plan would need to consider the targeted plant's sensitivity to grazing at various times during the year, the palatability and/or toxicity of the targeted plant to the species of grazing animal being considered for use, and the potential affects of prescribed grazing on other resources, such as soils, the desired native vegetation, or habitat for threatened or endangered species. The grazing plan would need to specify grazing by a particular species of animal during a specific season of use, and would likely specify the use of fencing, herding, or some other method needed to concentrate the use on the plant species targeted for control.

| | |
|---|---|
| EMC-0315-008<br>Arizona Game and<br>Fish Department | **Comment:** We recommend the BLM use domestic grazing animals as a means of vegetation treatment with caution. While certain grazing systems can and do provide benefit to certain plant communities, our experience in arid ecosystems is less than satisfactory. Additionally, due to disease concerns, use of domestic sheep and/or goats is not acceptable in areas inhabited by bighorn sheep, or in any adjacent area where the potential for any contact with bighorn sheep could occur. |

**Response:** The use of domestic grazing animals as a means of vegetation treatment references using "prescribed grazing" designed to address specific vegetation management needs. While we recognize the potential for the impacts identified in this comment, as well as additional impacts, in many situations "prescribed grazing" could be used to address vegetation management needs. This programmatic analysis allows for the use of domestic animals to control undesirable vegetation, but the site-specific analysis must address the potential adverse impacts, document the potential for success using this treatment, and compare the treatment with other options available.

| | |
|---|---|
| EMC-0446-060<br>The Nature<br>Conservancy | **Comment:** Livestock grazing: Biological control as described in the PER includes the use of livestock for the control of unwanted vegetation. We do not believe that it is appropriate to categorize livestock grazing as a "biocontrol" option ([Draft] PER [page] 2-12), although it may be appropriate to discuss it as a possible "cultural control" technique. "Classical" biocontrol targets a non-native pest species with one or more (non-native) species of host-specific biocontrol agents from the pest species native range. Livestock grazing does not fit this definition, since these vertebrate grazers are not host-specific, feeding instead on many species, rather than just one or a few. Livestock species are not native to the same regions as many of the weed and invasive plant species they might be used to control. While goats have been used |

BLM_0001759

successfully in some parts of Colorado to control weeds, the areas treated had extremely high levels of weed infestation and the goats were controlled by a herder who ensured that they grazed only in designated local areas, for relatively short periods and at high grazing intensities. As the PER points out, without proper management controls and significant herding effort, livestock grazing can result in the increase of unpalatable, non-native species at the expense of native species or other desirable forage species.

**Response:** The use of livestock as a tool for specific vegetation control should not be confused with classical biological control. The biological control of weeds is broadly defined as the use of an agent, a complex of agents, or biological processes to bring about weed suppression. All forms of microbial and microbial organisms are considered as biological control agents. Examples of biological control agents include, but are not limited to arthropods (insects and mites), plant pathogens (fungi, bacteria, viruses, and nematodes), fish, birds, and other animals. "Biologically-based weed management is a much broader category of approaches that may include gene modification, genetic processes, and gene products. Human activities intended to remove weeds directly or indirectly, such as hand-weeding and burning, deliberate uses of plant competition, allelopathy, and cultural and soil management practices that alter the biotic balance of soil are considered important adjuncts to biological control in integrated weed management systems." We agree that grazing animals would have to be closely controlled to make sure that the targeted vegetation would be harmed while the potential for adverse impacts to more desirable vegetation or other resources is minimized. Also see response to Comment EMC-0446-061 under PER Vegetation Treatment Programs, Policies, and Methods, Treatment-specific Standard Operating Procedures and Guidelines.

EMC-0446-062
The Nature
Conservancy

**Comment:** Biological control agents: The only requirement in the Draft PER for the use of biocontrol agents (insects, mites, pathogens) is that the agents be approved by USDA-APHIS [Animal and Plant Health Inspection Service]. We recommend that the BLM utilize a more rigorous approval process with stronger guidelines for release of biocontrol agents on public land. Before releasing a biocontrol agent, the BLM should be able to demonstrate that the proposed agent is effective on the target weeds, that the agent is documented to have limited impact on off-target species, and that there exists a plan for long-term monitoring of impacts on the targeted weed(s) and on desirable species. There are dozens of biocontrol agents available for release for the control of certain knapweeds and Canada thistle, for example, but none that have been documented to actually contain or reduce populations of these weeds. Post-release monitoring of biocontrol should not only measure the survival of biocontrol agents, but also their effectiveness on target weeds and off-target impacts.

**Response:** The permitting for importing and releasing biological control agents to control weeds in the United States is the responsibility of the USDA-APHIS, and triggers compliance with the NEPA and the Endangered Species Act. The BLM accepts that the process utilized by APHIS provides sufficient guidelines to address the commentor's questions about efficacy and specificity. The process used by APHIS to test and approve biological control organisms is rigorous and designed to address the commentor's concerns, as discussed in Chapter 2 of the PER under Biological Control in the Vegetation Treatment Methods section.

EMC-0446-064
The Nature
Conservancy

**Comment:** The use of livestock as a "cultural" practice should be evaluated separately and comprehensively from other targeted biocontrol agents. As described the use of livestock grazing does not appear to be targeted or controlled through

BLM_0001760

herding and could likely result in overgrazing of native species ([Draft] PER [page] 2-21). Additional SOPs [Standard Operating Procedures] are needed to provide guidelines on where livestock grazing in specific plant communities (e.g. sagebrush) would adversely affect wildlife species (e.g. sage-grouse). True biocontrols should have additional SOP's to protect closely related native vegetation, non-native plant communities utilized by Special Status animal species, etc.

**Response:** The BLM agrees that using livestock to contain or control undesirable vegetation requires careful planning and execution to be successful. The Draft PER, under Biological Control in the section on Vegetation Treatment Methods, specifically identifies the need to consider other multiple use objectives, and identifies use of herders, fencing, and placement of mineral blocks as potential methods to restrict grazing to the targeted vegetation. For most resources addressed in Chapter 4 of the PER, livestock treatments are discussed separately from other biological organisms, because there are different effects associated with the two types of treatments. However, cultural controls typically include preventive measures, rather than use of livestock. The PER only identifies the potential to use livestock to control undesirable vegetation, with general SOPs applying to all projects that could occur in all plant communities. At this level of analysis, it is not feasible to anticipate every potential situation and identify necessary mitigation. The specific practices needed to successfully use this livestock grazing as a treatment method would be identified in the site-specific analysis developed for a specific vegetation control project.

EMC-0512-006
Hells Canyon
Preservation Council

**Comment:** Bio-controls should not be released in the wild without stringent testing to ensure no damage to native plants will occur.

**Response:** See response to Comment EMC-0446-062 under PER Vegetation Treatment Programs, Policies, and Methods, Biological Control.

EMC-0548-033
Utah Farm Bureau
Federation

**Comment:** BLM might consider changing the tradition grazing patterns in areas dominated by cheat grass [downy brome]. Allowing permittees to graze earlier those pastures dominated by cheat grass would allow better utilization by livestock while pro-actively addressing unwanted wildfires.

**Response:** The BLM has authorized this kind of change to address specific situations. Making these kinds of changes in the season requires careful planning to address potential impacts to the remaining perennial vegetation, as well as other resources. To be successful, grazing these areas earlier usually requires the animals to be removed early enough to reduce the impacts on perennial vegetation that generally initiates growth later than the downy brome. Although this technique cannot be applied in every situation, changes in the season of use to address downy brome invasion is an option that has and can be considered, but potential benefits must be weighed against the potential for creating additional impacts to other resources.

EMC-0553-007
Callihan, Robert H.

**Comment:** Use of biological controls, including grazing animals (p. [page] 2-12-13 [of the Draft PER]), is well summarized, but omits a significant point. The draft fails to acknowledge that, even though the weeds may be significantly suppressed, biological controls do not prevent seed dispersal and expansion of infestations, and their use therefore does not protect adjacent areas against invasion, and does not constitute compliance with the noxious weed laws of most states. This omission should be corrected.

BLM_0001761

**Response:** Depending on the targeted species and the biological control agent, suppression or stressing as presented in Chapter 2 of the Programmatic Environmental Report can be the result of a reduction in seed produced. Reduced seed production corresponds to reduced seed dispersal, which results in a reduction in expansion.

EMC-0559-007
Daniel, Bill

**Comment:** Biocontrols are exotic organisms that should not be released in the wild without stringent testing to ensure they will not decimate native plants.

**Response:** Biological control agents currently used by the BLM have been tested by the USDA Agricultural Research Service to ensure that they are host specific and will feed only on the target plant and not on crops, native flora, or endangered or threatened plant species. A discussion of the process required to use biocontrol agents in the U.S. is discussed in Chapter 2 of the PER under Biological Control.

EMC-0584-056
Western Watersheds
Project

**Comment:** Livestock (cattle and sheep) should not be used as a "tool" or termed a "biological control". They are only a temporary, stop-gap measure and simply mowing weeds to ground level does not address the fundamental problem of eliminating weeds, and getting native species to grow. Native species will not recover if sites are grazed by livestock. In fact, the extreme disturbance caused by livestock will make sites more fire prone, harm remaining native species, increase likelihood of new or accelerated weed invasions, and increase disturbance to, or competition with, native wildlife. In most instances, it would be just as effective to mow weeds as to use livestock, and would have far less impacts to soils. Plus, the possibility of introduction of new weedy species as a result of livestock disturbance would be minimized. BLM should examine the appalling fire history of the Jarbidge Field Office and assess how seeding of crested wheatgrass, harmful levels of livestock use, high stocking rates, etc. – have resulted in extensive and large acreage fires.

**Response:** Livestock grazing and other biological controls generally do not eliminate undesirable vegetation by themselves, but can be effectively used to control reproduction, and when used in conjunction with other control methods can help to eliminate the targeted vegetation. Grazing must be carefully planned to avoid impacts to other resources, but if carefully timed may be used to impact undesirable vegetation while minimizing the effects on native species or other resources. Grazing is less labor intensive and in many cases is less expensive than mowing or manually removing the targeted vegetation. Seeding of crested wheatgrass can have impacts to native plant communities. In many cases these seedings have resisted reestablishment of sagebrush or other shrub species, but crested wheatgrass has not often been associated with increased frequency or intensity of wildfires. In most situations, crested wheatgrass seedings are more likely to reduce the frequency and intensity of fires rather than increase them as stated in this comment. In some situations improper grazing can promote changes in a the plant community, such as increases in downy brome that can lead to more frequent wildfires. In general, however, grazing removes grass and other vegetation (fine fuels) and therefore is more often associated with reducing rather than increasing fire intensity and frequency.

EMC-0585-048
Western Watersheds
Project

**Comment:** At the same time that BLM described grazing as a biological treatment, it refuses to deal with changes in grazing regimes as treatments that reduce causal factors of weed, hazardous fuels, or other ecological problems.

**Response:** Grazing animals (including, but not limited to goats, sheep, livestock, llamas, and alpacas) can be used effectively as biological control agents in vegetation

BLM_0001762

RESPONSE TO COMMENTS

treatment projects. Changes in grazing practices for permitted livestock grazing activities are addressed through the livestock grazing regulations at 43 CFR [Code of Federal Regulations] 4100.

EMC-0592-001
Peacock, Delores (Dog Valley Ranch)

**Comment:** Why not use Goats to control the weed and weed problem? I have goats and have found they really like weed over grass. They also can be used as a means to build fire brakes and such.

**Response:** See response to Comment EMC-0148-003 under PER Vegetation Treatment Programs, Policies, and Methods, Biological Control.

EMC-0641-014
Idaho Conservation League

**Comment:** Though we support the use of grazing as a biological control under certain conditions, the BLM should utilize this type of treatment very cautiously as grazing activities can contribute to the spread of noxious weeds and can be incredibly detrimental to ecosystem health. The PEIS needs to consider the cumulative impacts of grazing and associated management activities on native vegetation, water quality, soil conservation, and ecosystem integrity. Grazing on wetlands and in riparian areas should be minimal, and the BLM needs to establish appropriate buffer zones to protect streams from sedimentation and to maintain riparian ecosystem integrity. In addition, we feel that the proposed use of livestock for 60% of biological treatments is excessive. The BLM should consider alternatives that rely less on livestock and more on other biological controls in combination with other types of treatment and prevention techniques.

**Response:** The BLM agrees that using livestock to contain or control undesirable vegetation requires careful planning and execution to be successful. The PER under Biological Control in the Vegetation Treatment Methods section specifically identifies the need to consider other multiple use objectives, and identifies the use of herders, fencing and placement of mineral blocks as potential methods to restrict grazing to the targeted vegetation. Table 2-5 (Vegetation Treatment Methods Standard Operating Procedures and Guidelines) identifies the need to minimize the use of grazing within riparian and wetland areas due to the potential to cause unintended impacts in those sensitive areas. Cumulative impacts are analyzed in the Cumulative Effects section of Chapter 4 of the PEIS, and impacts of grazing are discussed in relation to the identified resources in that section. The 60% figure is only an estimate. Although the use of livestock for 60% of the acres treated with biological control may sound excessive, in reality it may not be. In some situations livestock may be used in a very targeted "prescribed grazing" management plan where grazing for a very specific time period is used to help control undesirable vegetation on a relatively small site. There may be other more frequent situations where existing grazing permits are adjusted to help manage vegetation over an entire pasture or allotment. Situations where the season of use is modified to allow grazing earlier when downy brome might be more vulnerable to grazing, and then removing the livestock later in the spring when perennial grasses initiate their growth and they would be more sensitive to grazing impacts would be an example of this more frequent situation. Because these situations (where adjustment in a grazing permit is used to help influence the plant community) affect an entire allotment or pasture, the acreage affected is far greater than that under most biological treatments. If these situations are considered as biological control, then the 60% figure may actually be low.

BLM_0001763

EMC-0641-015
Idaho Conservation
League

**Comment:** The BLM must carefully consider a variety of factors when deciding how, where, and when to utilize grazing as a biological control including the species of livestock to be used, season, and intensity and duration of grazing, all of which significantly impact the effectiveness of livestock grazing at controlling noxious weed infestations. Additionally, steps must be taken to ensure that livestock do not unintentionally spread weed seeds. One method of minimizing such spread is to avoid grazing during flowering and seeding stages. Livestock should also be allowed ample time to pass all seeds through their digestive systems before being released into uninfested areas.

**Response:** The BLM agrees with this comment, and the PER identifies many of these same factors under the Biological Control in the section on Vegetation Treatment Methods and in Table 2-5 (Vegetation Treatment Methods Standard Operating Procedures and Guidelines).

RMC-0050-002
Sierra Club Rocky
Mountain Chapter

**Comment:** As far as we can tell from perusing the document, there is no mention of, or plan for the use of, insect predators to control the exotics that can be controlled by them.

**Response:** Use of insect predators to control exotics is a form of biological control. Biological control is one of the treatment methods used by the BLM to manage vegetation. Use of biological control and its potential effects on resources is discussed throughout the Final PER.

RMC-0217-023
Sierra Club Utah
Chapter

**Comment:** In the PER the BLM is also confused about some problems related to invasive species and plant community composition and the relationship to wildlife habitat. A successful treatment program can enhance habitat for wildlife. For example, cattle and sheep feeding in the spring and early summer can thin understory forbs and grasses, reducing competition for light, nutrients, and water for desirable shrub species. The shrub species will increase their vegetative output for winter browsing by deer and other wildlife (USDI BLM 1991a) [[Draft] PER [page] 2-12]. Yet this describes the precise problem for many kinds of wildlife – the loss of adequate understory vegetation. This is the problem with degraded sage grouse habitat. This is also part of the reason fire no longer functions properly in the landscape. The proper mix of fuels is no longer available to sustain low intensity-low severity fires because of commercial livestock grazing. The BLM fails to not properly the effect of grazing on wildlife habitat and fails to note one of the causes (and thus the origin for the need to "treat") of fire suppression.

**Response:** The ability of the land to sustain low intensity and low severity fires is primarily the result of fire exclusion policies over the last 100 years allowing build-up of hazardous fuels, not commercial livestock grazing. Commercial livestock grazing occurs primarily in rangeland situations of the Interior West and Southwest. Many of the ecoregions addressed in this PEIS are comprised of vegetation communities that are not regularly grazed by livestock and have not had significant livestock grazing in the past (timber, tundra, boreal forest, evergreen deciduous, etc.). Thus, fire behavior cannot be generally attributed to this one activity as a cause of catastrophic fire. See Scope of Analysis in Chapter 1 of the PEIS. The effects of livestock grazing on wildlife habitat are beyond the scope of analysis of this PEIS.

BLM_0001764

RESPONSE TO COMMENTS

| | |
|---|---|
| RMC-0218-003<br>Blue Mountains<br>Biodiversity Project,<br>League of Wilderness<br>Defenders | **Comment:** Non-chemical manipulation includes the release of exotic biocontrol insects that have generally not been tested for their appetite for native plants.<br><br>**Response:** See response to Comment EMC-0446-062 under PER Vegetation Treatment Programs, Policies, and Methods, Biological Control. |
| RMC-0218-018<br>Blue Mountains<br>Biodiversity Project,<br>League of Wilderness<br>Defenders | **Comment:** Biocontrols are exotic organisms that should not be released in the wild without stringent testing to ensure they will not decimate native plants.<br><br>**Response:** See response to Comment EMC-0446-062 under PER Vegetation Treatment Programs, Policies, and Methods, Biological Control. |

**Vegetation Treatment Programs, Policies, and Methods, Vegetation Treatment Standard Operating Procedures and Guidelines**

| | |
|---|---|
| RMC-0217-028<br>Sierra Club Utah<br>Chapter | **Comment:** Another example of a failure of the BLM to identify the impacts of various treatments can be found in Table 2-4 [in Chapter 2 of the Draft PER], Vegetation Treatment Methods Standard Operating Procedures and Guidelines. The contents of the columns for Biological Treatments, Mechanical Treatments, and Manual Treatments should have many more common entries. This is especially true for impacts to soil resources. For instance all three treatments should contain concerns about soil disturbances, soil compaction, and leaving plant debris behind for mulch. This also points to the absurdity of using livestock for treatment since this technique would not leave plant debris behind. Why would it be desirable to leave plant debris behind for some treatment techniques and not with others. The PER or PEIS should explain this in full.<br><br>**Response:** Table 2-5 of the Final PER identifies common Standard Operating Procedures (SOPs) used by the BLM; however, the list is not all-inclusive. Additional SOPs would be identified at the local level. Leaving plant debris was identified as an important SOP for several treatment methods, but not biological control. The commentor is correct in that use of livestock might not result in much plant debris being left behind. Thus, using livestock to create mulch was not identified as an SOP in Table 2-5 of the Final PER. |

**Vegetation Treatment Programs, Policies, and Methods, Revegetation**

| | |
|---|---|
| EMC-0584-094<br>Western Watersheds<br>Project | **Comment:** Sagebrush and other appropriate native shrubs (winterfat, shadscale, rabbitbrush) must be included in all post-treatment seedings, and repeated efforts must be made to establish native shrub cover, due to its importance to many native wildlife species.<br><br>**Response:** See responses to Comment EMC-0584-077 under PEIS Alternatives, Herbicide Treatment Planning, and Comment EMC-0584-092 under PEIS Alternatives, Herbicide Treatment Planning. The Native Plant Materials Development program includes sagebrush and native shrubs. |
| RMC-0003-005<br>West, Robin | **Comment:** These safe weed-removal practices include, but are not limited to fire, manual, cultural, and biological control methods. Instead of wasting taxpayer money on toxic chemicals that themselves destroy ecosystems, and instead of wasting taxpayer dollars on the ever increasing cost of fossil-fuel powered methods of reduction, please consider sane, healthy and life-enhancing non-depleting methods of doing your job. |

BLM_0001765

**Response:** As discussed in the PEIS and PER, the BLM would use prescribed fire and mechanical, manual, and biological control methods, in addition to the use of herbicides. Only about 16% of acres would be treated using herbicides, and these treatments would often occur where the use of herbicides is more cost-effective than other methods and has minimal environmental risk.

**Vegetation Treatment Programs, Policies, and Methods, Treatment-specific Standard Operating Procedures and Guidelines**

EMC-0139-011
Troutman, Doug

**Comment:** Keeping livestock off burned areas for a minimum of five years, not two growing seasons, will do more than coming in with chemicals to irradicate weeds livestock bring into the burn area. When the Cook Well area burned here a number of years ago, upwind were native seed sources, and cheatgrass/pepperweed. Post fire, the regrowth was almost totally favored native bunchgrasses, no weeds! Cattle were brought in after the "second growing season", and left to nuke the area. The site was then left with nothing but cheat, pepperweed, and other noxious species. Fire didn't damage the area, cows did.

**Response:** Post-fire management of grazing can significantly affect the resulting plant community. Although the PEIS team cannot address the specific example described in this comment, some invasive species including species we consider to be weeds, are usually present at least temporarily following a disturbance such as fire, with or without the presence of livestock grazing. Poor livestock management could exacerbate weed problems; however, removal of livestock for 5 years would not be necessary in all cases. The BLM has used two growing seasons of rest as the basic standard, and in many cases that amount of rest following the burn has been adequate. However, depending on the specific situation (plant community present before the burn, precipitation available following the burn etc.), more or less than two growing seasons may be appropriate. If grazing following the rest period is excessive, the resulting plant community is likely to be inferior to the site's potential, regardless of how long of a rest follows the burn.

EMC-0315-005
Arizona Game and
Fish Department

**Comment:** The use of prescribed fire is the [Arizona Game and Fish] Department's preferred alternative for vegetation treatments outside of the Sonoran and Mojave Desert ecozones. Fires timed to provide low-intensity, mosaic burns are preferred. We recognize fire may be ineffective in achieving management goals for areas dominated by cheatgrass and other invasive species, and that alternatives need to be explored. We strongly recommend that post-fire management include an appropriate level of grazing deferment, preferably at least two growing seasons.

**Response:** These comments are in agreement with current BLM policy. The need to restrict livestock grazing is identified in Table 2-5 (Vegetation Treatment Methods Standard Operating Procedures and Guidelines in the Final PER). Current BLM policy recommends that prescribed burns be rested for two growing seasons following treatment; however, the period of rest can be shorter or longer if there are valid reasons for prescribing a different rest period.

EMC-0446-055
The Nature
Conservancy

**Comment:** Restoration of fire-adapted ecosystems on public land should also be a primary objective of any proposed increase in the use of prescribed fire. More clearly articulating this goal in the PER will assist local field offices in designing appropriate projects. Maintenance of landscapes in Fire Regime Condition Class [FRCC] 1 should also be identified as a high priority in the fire use section. It is not currently identified as an objective. In addition, there is a specific need for both pre- and post-

BLM_0001766

fire monitoring of invasive species to determine the need for herbicide use or other control methods in both burned area rehabilitation projects and prescribed fire treatment areas.

**Response:** The objective of restoration of fire-adapted ecosystems is articulated in the policy guidance identified in the Program Objectives and Goals section of Chapter 1 of the PER. Maintenance of favorable vegetative conditions is also described on in Chapter 2 of the PER under Site Selection and Treatment Priorities. The BLM agrees that maintenance of landscapes within FRCC 1 is an important objective relative to fire use. Additional text has been added to both the Treatment Priorities and Fire Use sections to clarify this important objective.

EMC-0446-061
The Nature
Conservancy

**Comment:** The PER provides only general discussion of what management controls are needed to ensure positive benefits from livestock grazing used to control weeds. The discussion of the benefits of livestock grazing to wildlife habitat is too brief and simplistic to be either useful or accurate. While livestock grazing, in some situations, may benefit certain, shrub-browsing species (e.g. deer), it can have an equal negative benefit on species needing forbs and grasses under those shrubs for food and shelter (e.g. sage grouse). There are no standard operating procedures or guidelines offered to protect wildlife species or habitats from excessive livestock use ([Draft] PER [page] 2-26). While we recognize that livestock grazing can be used as a tool for weed control in some specific, controlled situations, it is misleading to include it as part of the general biocontrol discussion. We recommend that livestock grazing be discussed in its own management section for cultural practices with a careful discussion of appropriate situations for its use as a weed control measure, and specific parameters and guidelines for its control in weed management practice. Included should be a discussion of the potential negative impacts to native plant species and wildlife and fish habitat from excessive or improper livestock grazing use.

**Response:** The PEIS team agrees that the discussion of the use of livestock grazing was too brief and we have modified the discussion under Biological Control in the section on Vegetation Treatment Methods and in Table 2-5 (Vegetation Treatment Methods Standard Operating Procedures and Guidelines) of the Final PER. There is potential for using specifically planned "prescribed livestock grazing" to help control undesirable vegetation, and current research may lead to more opportunities to use this practice in the future. This analysis is not intended to support a decision to use a specific method of treatment; it only documents the possibility of using livestock grazing as well as other various treatments alternatives. Therefore, considering livestock grazing with the other biological controls should be acceptable. Prior to project approval, additional site-specific analysis would be accomplished to compare the site-specific impacts of various alternatives, and develop any needed mitigation measures. In the site-specific analysis it may be necessary to analyze livestock grazing separate from other biological control alternatives to help compare and contrast those alternatives.

EMC-0446-065
The Nature
Conservancy

**Comment:** SOPs [Standard Operating Procedures] and Guidelines for vegetation should be presented by plant community and ecoregion specific for each treatment type and should follow guidelines developed through other BLM strategies, including conservation and recovery plans, such as the BLM's National Sage-Grouse Strategy. For example no additional fire should be allowed in sagebrush communities invaded by or likely to be invaded by downy brome, however, higher intensity fire may be appropriate for other plant communities where low frequency/high intensity fire was the historic pattern.

BLM_0001767

**Response**: Many of the SOPs and guidelines are general practices that apply to multiple plant communities and ecoregions and are therefore, presented together. Specific SOPs and guidelines for vegetation management have also been developed as part of BLM policies and directives. Land use planning and the fire management planning process are used to determine where use of fire is appropriate or inappropriate. See Scope of Analysis in Chapter 1 of the PEIS. Determining land use allocations are outside the scope of this PEIS. The information presented in this PEIS and PER will be available to field offices for incorporation into their local planning, and for determination of which SOPs and guidelines are appropriate for their particular plant communities and ecoregion.

EMC-0446-066
The Nature
Conservancy

**Comment:** Additional SOPs [Standard Operating Procedures] and Guidelines should be provided for all treatment methods based upon BLM guidance for sagebrush and other shrub and grass habitats, including: 1) Guidance for the Management of Sagebrush Plant Communities for Sage-grouse Conservation (BLM November 2004) mandatory guideline (1.4.1) from National Sage-grouse Strategy (BLM IM 2005-024); 2) Management Guidelines for Sagebrush (Artemesia) in Western United States (BLM 2002); and 3) Guidance for Addressing Sagebrush Habitat Conservation in BLM Land Use Plans.

**Response:** These documents were reviewed during preparation of the PEIS and PER. We have included additional Standard Operating Procedures and guidelines from these documents in the Final PEIS and PER.

EMC-0584-063
Western Watersheds
Project

**Comment:** All off-road travel should be minimized during any mechanical treatment. The Draft PEIS/PER fails to take necessary measures to do this.

**Response:** As discussed in Table 2-5 of the Final PER, several Standard Operating Procedures have been identified to minimize the effects of mechanical treatments to soil, vegetation, and other resources. The BLM minimizes off-road travel associated with all treatments where feasible, but given that many mechanical treatments occur in areas that are off-road, some disturbance to off-road areas is likely during mechanical treatments.

EMC-0584-067
Western Watersheds
Project

**Comment:** Nowhere does the [P]EIS/PER address the acreage, location or expected impacts of biomass under the proposed actions.

**Response:** See response to Comment EMC-0585-051 under PEIS Alternatives, Determination of Treatment Acreages. Without knowledge of the exact location of treatment, time of year, and biomass that would exist at the time of treatment, it would be difficult to estimate impacts to biomass under the proposed treatment program.

EMC-0584-099
Western Watersheds
Project

**Comment:** Livestock Facilities: Post-treatment actions/EFR [Emergency Fire Rehabilitation] must sharply limit the use of federal fire funds in construction of post-fire livestock facilities. BLM's typical response to fire/treatment is to place a fence, often permanent, around the perimeter of the disturbed area, and often to develop additional water facilities outside the fenced/treated/burned area. These actions (fences that often become permanent, new water facilities) are not part of post-fire/post-treatment rehab, they are part of livestock management on surrounding lands. Such projects inflict, in an unplanned and unnecessary manner, a new array of disturbances to wildlife habitats already impacted by fire disturbance. Existing pasture fences should be used, and new fences should not be built.

BLM_0001768

RESPONSE TO COMMENTS

**Response:** The use of Emergency Fire Rehabilitation funding to construct water developments outside of the burned area is not a typical response by the BLM. However, if the fire damaged a water source or an existing fence, reconstruction of those facilities may be accomplished as part of the fire rehabilitation effort. When considering new facilities to control grazing following a burn, the BLM does try to use existing fencing when possible, but depending on the size and location of the fire, the existing fencing is not always a useful and/or reasonable alternative for controlling grazing. In many cases, temporary electric fencing is used to restrict grazing following a fire, although temporary electric fencing can be less effective in some situations and does not provide adequate protection for the site. Additionally, the BLM believes that in some situations the fence used to protect the burned area would also be useful for improving livestock management and distribution even after the burned area has initially recovered following the fire. Improvements in the plant community that can be sustained over longer periods may indicate that the more permanent fence has a better benefit/cost ratio when considered over the longer term. In these situations, a permanent fence may be constructed, after considering potential impacts to other resources, and after considering the use of existing fences and/or more temporary and less costly fencing alternatives.

EMC-0584-104
Western Watersheds
Project

**Comment:** AUMs [Animal Unit Months] Should Not Be Shifted Elsewhere: BLM should not shift AUMs from treated lands to other areas. All AUMs from burned lands should be placed in temporary suspension until rehab, or restoration, success occurs.

**Response:** If there are other public lands where additional grazing use is available within existing grazing permits or leases, livestock grazing could be shifted to those areas without creating any new or unnecessary impacts. However, this use must not occur on areas where livestock grazing has not been authorized, or be inconsistent with the current permitted use, without further analysis to identify the potential impacts of this additional grazing use. In these alternate areas, the potential impacts of grazing would have been analyzed and assessed previously, so additional analysis for authorization would not be necessary. Decisions about whether other public lands could accommodate the grazing use displaced from the treatment or burned area would be made by the local manager, based on site-specific conditions and issues.

EMC-0584-105
Western Watersheds
Project

**Comment:** Regrettably, in some recent post-fire documents, BLM has merely been shifting livestock use elsewhere, and thus impacts of livestock on watersheds, wildlife, habitat, etc. are magnified and amplified to the detriment of native species and the ecosystems upon which they depend. BLM has never assessed the impacts of these shifted AUMs [Animal Unit Months].

**Response:** See response to Comment EMC-0584-104 under PER Vegetation Treatment Programs, Policies, and Methods, Treatment-specific Standard Operating Procedures and Guidelines.

RMC-0040(1)-004
Resource Concepts,
Inc.

**Comment:** Pg. [Page] 2-23, in Table 2-4 [of the Draft PER] Vegetation Treatment Methods Standard Operating Procedures and Guidelines, soil resources section, one of the Mechanical and Manual SOPs [Standard Operating Procedures] is to leave plant debris on site to serve as mulch. This SOP is not always appropriate, especially when treatments are occurring for fuels management purposes. By leaving plant debris on site, treatments could actually increase the fuel hazard. This SOP should rarely if ever be used within Wildland-Urban Interface (WUI) areas. Secondly, this SOP does not allow for successful programs such as Fuels for Schools and other rural

BLM_0001769

economic development or stewardship contracting activities to occur. Some plant materials (biomass) could be utilized as a valuable renewable energy source. Additionally, leaving mulch materials on-site could change species composition to favor grasses and shrubs, while reducing occurrence of both annual and perennial forbs (Resource Concepts, Inc. 2004; Benson Glimp, and Perryman, 2005). Both annual and perennial forbs are important forage for sage grouse. Also, leaving downed or even chipped pinyon material could attract pinyon ips beetles if chipped between April and October (Bureau of Land Management 2004).

**Response:** The Standard Operating Procedures and Guidelines found in Table 2-5 of the Final PER and discussed under Treatment-specific Standard Operating Procedures and Guidelines of the PER are designed to give an overview of practices that should be <u>considered</u> [underline added for emphasis] when designing and implementing a vegetation treatment project on public lands managed by the BLM. Not every procedure or guideline would be appropriate for all projects at all times, but all should at least be considered and evaluated against all the others when designing projects.

Leaving some material behind to act as mulch in a WUI fuels reduction project is likely appropriate, depending on the type of material, how much is left, and where it is left. Reducing the amount of burnable material to an acceptable level would be the goal of such a project. Removing all material and leaving soils bare and prone to erosion would probably not be an acceptable consequence of such a project.

This SOP is not in conflict with programs such as Fuels for Schools, as it is not desirable to remove all biomass from an area to provide it for schools at the expense of all other resources. Only that amount of material deemed to be excess would be removed. Some could be left behind to help provide soil stability. The amount of biomass left behind and its composition would have to be evaluated for its effect on other resources, such as sage-grouse habitat and other wildlife habitat.

RMC-0040(1)-005
Resource Concepts,
Inc.

**Comment:** Pg. [Page] 2-23, in Table 2-4 Vegetation Treatment Methods Standard Operating Procedures and Guidelines [in the Draft PER], water resources section, one of the Mechanical SOPs [Standard Operating Procedures] is to maintain a minimum 25 foot buffer near streams and wetlands. There may be many cases when leaving a 25-foot buffer does not meet the objectives of fuel reduction projects, for example in instances where a community evacuation route is also adjacent to a stream. A qualified specialist should determine an appropriate buffer width based upon site-specific conditions, instead of making 25 feet the standard width for an SOP.

**Response:** Table 2-5 of the Final PER provides SOPs and guidelines that are appropriate for the associated method for most BLM projects. Local field offices would have the opportunity to develop different buffer widths during development of local projects, and their recommendations would be subject to public review before implementation.

RMC-0040(1)-006
Resource Concepts,
Inc.

**Comment:** In the Fire Use SOPs [Standard Operating Procedures] in the same section [Table 2-4 of the Draft PER], light application of fire in riparian areas is not always possible if a buffer must be maintained between treated areas and streams and wetlands, especially since many riparian areas in the West are less than 25 feet in width.

**Response:** Buffers along riparian areas typically refer to the removal of large trees, not the realm of all possible management activities. Prescribed burns, one form of

BLM_0001770

RESPONSE TO COMMENTS

treatment, are often undertaken in riparian areas to reduce concentrations of fuels, and to stimulate beneficial riparian vegetation, which can protect and enhance the health of a particular riparian area. As the commentor suggests, a light application of fire is not always possible or desirable in all riparian areas, but it is not necessarily precluded and it should be considered along with all the other SOPs, and evaluated for applicability depending on the project-specific circumstances.

RMC-0040(1)-010
Resource Concepts,
Inc.

**Comment:** Pg [Page] 2-28 [of the Draft PER], typos in Table 2-4, cultural resources, in the SOP [Standard Operating Procedure] on consulting with tribes for the mechanical and manual treatments.

**Response:** These errors have been corrected in the Final PER.

RMC-0222-140
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** In addition to myriad nonnative species that have spread across public lands, the BLM is also rightly concerned about the spread of native pinyon pine and juniper trees into sagebrush habitats. Fire is identified as a tool to control encroaching pinyon-juniper ([Draft] PER: [page] 4-75). However, the BLM does not direct that areas be rested from livestock grazing following a burn to allow for proper recovery. Miller et al. (2005) (another reference missing from the DEIS [Draft PEIS]/PER) notes that (1) livestock grazing is primarily to blame for pinyon-juniper encroachment onto western landscapes and (2) livestock should be (at least temporarily) excluded from areas where juniper has been burned to allow grasses, forbs and sagebrush to recover following a prescribed burn. If livestock are not excluded from burned areas, then they will continue to remove emerging grasses and forbs, damage sagebrush and disturb the soil, creating conditions that encouraged pinyon-juniper encroachment in the first place.

**Response:** Domestic livestock can enhance conditions that would encourage the introduction or spread of pinyon pine and juniper, but there are also numerous situations where these species have increased and expanded their range even though livestock are not a contributing factor. Livestock grazing is usually temporarily removed following a prescribed burn to allow recovery and establishment of desirable grass species and other native vegetation. Current Bureau policy recommends that prescribed burns be rested for two growing seasons following treatment, however the period of rest can be shorter or longer if there are valid reasons for prescribing a different rest period. The Final PER identifies the possibility of livestock restrictions in areas treated with fire in Table 2-5 (Vegetation Treatment Methods Standard Operating Procedures and Guidelines). However, we have added discussions of post-treatment livestock grazing management to better identify these actions within the documents.

**Vegetation Treatment Programs, Policies, and Methods, Monitoring**

EMC-0446-071
The Nature
Conservancy

**Comment:** Mitigation/Monitoring: This PER will be incorporated by reference into local fuels treatment projects. Given the recent emphasis on multiple agency treatments and monitoring protocols, it would be appropriate to detail a common fuels treatment monitoring program that will apply at the landscape scale and include actions by multiple agencies and multiple treatment methods. The information contained on p. 2-32 of the [Draft] PER briefly describes current monitoring practices but provides no guidelines to field offices in developing additional monitoring strategies need for the proposed increased scale of vegetation treatment practices. We believe that an adequate monitoring strategy would include a discussion of regional and plant community goals by ecoregion and a discussion of how to integrate

BLM_0001771

monitoring at a landscape scale to include multiple types of vegetation management treatments conducted by multiple agencies.

**Response:** The Fire Monitoring and Inventory System (FIREMON), an interagency standardized monitoring tool, is the primary process used post-fire to detect infestations as well as document fire effects; assess ecosystem damage and benefit; evaluate the success or failure of a burn; and appraise the potential for future treatments. The FIREMON project's primary objective is to establish a standard fire effects monitoring and inventory protocol. More information can be found on FIREMON at www.fire.org. FIREMON, together with the Fire Regime Condition Class (FRCC) process and LANDFIRE, provides a means of assessing and monitoring at the landscape scale. Also see response to Comment EMC-0446-050 under PEIS Alternatives, Site Selection Methods for a discussion of ecologically-based goals for restoration.

EMC-0446-072
The Nature
Conservancy

**Comment:** Adaptive management is more than monitoring the effectiveness of site-level activities. There are no measures offered at the West-wide or ecoregion scale to determine if programmatic goals are being reached. An adaptive management process should be in place to ensure large-scale goals are being reached, and to describe what will trigger a change in programmatic strategy ([Draft] PER [page] 2-32). As described in our general comments and comments specific to the PEIS, LANDFIRE data (http://www.landfire.gov) can be used to help design and populate an effective and efficient monitoring protocol.

**Response:** Based on guidance for Department of Interior agencies, adaptive management is defined as "a system of management practices based on clearly identified outcomes, monitoring to determine if management actions are meeting outcomes, and if not, facilitating management changes that will best ensure that outcomes are met or to re-evaluate the outcomes." This definition was included in the BLM Planning Handbook. Standardized interagency protocols, including Fire Regime Condition Class, LANDFIRE and FIREMON, provide the basis for landscape-level monitoring that provides the information needed for adaptive management. Between these tools and authorities such as the Healthy Forest Restoration Act, which requires monitoring of authorized treatments, more landscape level management and monitoring at multiple scales is taking place. We have also included this definition in the glossary for the PEIS and PER.

EMC-0584-118
Western Watersheds
Project

**Comment:** BLM must also assess impacts of poor pre-fire land conditions and management on the outcomes of any post-fire recovery, and of the likelihood of success of any post-fire rehab.

**Response:** See responses to Comment EMC-0584-051 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities, and Comment EMC-0584-011 under PEIS Alternatives, Monitoring.

EMC-0585-045
Western Watersheds
Project

**Comment:** BLM mixes two different types of organisms under the rubric of "biological control" – placing unspecific cattle and sheep grazing in with biological control insects that target specific weed species. We believe it is inappropriate to lump highly selective insects that target specific plants (appropriately termed "biological control") in with broad spectrum grazers and browsers such as domestic cattle that are often responsible for causing the damage to native vegetation lands such that weeds invade and "treatment" is deemed necessary. We fear BLM may be

BLM_0001772

RESPONSE TO COMMENTS

using this terminology to open the door to use fire funds to pay ranchers for grazing livestock (biological control by BLM's definition) on public lands. Just how many acres does BLM plan to "treat" with cattle or sheep? Where? What will the ecological impacts be? What will be the cumulative impacts of "treating" and grazing on watersheds, important, special status and T&E [threatened and endangered] species, recreational uses, etc?

**Response:** Livestock are living organisms, and thus would fall into the category of "Biological Control." However, most of the resource discussions in Chapter 4 of the PER separate out the assessment of impacts associated with livestock from those associated with insects and other biological control organisms. Livestock would be used to treat approximately two-thirds of the approximately 450,000 acres of lands treated using biological controls. The effects of using livestock on the different resources described in the PER are discussed in Chapter 4. The cumulative effects of using livestock to treat vegetation are discussed in Chapter 4 of the PEIS.

**Public Land Resources, Air Quality**

EMC-0446-039
The Nature
Conservancy

**Comment:** The PER should discuss barriers to success of the strategy to the extent necessary to ensure they don't restrict successful implementation of the goals. For example, the PER should discuss where air quality regulations might restrict the use of prescribed fire or where the lack of fire capacity might limit BLM's ability to implement restoration opportunities and how these limitations will be addressed.

**Response:** Air quality and smoke management considerations are presented under Air Quality in Chapter 3 of the PER. Any limitations encountered through application of air quality regulations or the lack of fire capacity would be addressed at the local project level through contingency planning.

**Public Land Resources, Vegetation, Fire Ecology**

EMC-0446-044
The Nature
Conservancy

**Comment:** Ecological Justification and Intent of Fuels Treatments: General descriptions of fire regimes ([Draft] PER [pages] 3-22 through 3-42) do not describe historically fire-independent types, like many desert plant communities, where fire frequencies have increased due to species invasions and altered ignition patterns as a result of human development. These fire-independent regimes are addressed in detailed descriptions of fire regimes in the desert ecoregions and how they've been altered, but the general descriptions and purpose and need sections of the [Draft] PER seem to imply that all western ecosystems are fire-adapted in some way.

**Response:** It would be difficult to say that fires never occurred historically in these plant communities, as many of them produce fine fuels that could carry surface fire during high precipitation years, particularly if wet years occurred in sequence. Information on the effects of altered fire regimes in plant communities where fire was not historically common is provided in the description of the subtropical Desert Ecoregion under Fire Ecology and Vegetation by Ecoregion in the Vegetation section of Chapter 3 of the PER. In the description of the Subtropical Desert Ecoregion, we state: "Although major fires were not historically common in this region due to the wide spacing between plants and sparse fuels, the invasion of fire-prone species (e.g. red brome, downy brome, and buffelgrass) has shortened the fire interval in some areas, resulting in significant changes in plant communities." We later state: "In many areas of the Mojave and Sonoran deserts plant communities are too sparse during most years to adequately carry a prescribed burn. Therefore, this type of

BLM_0001773

treatment would not be suitable for these areas. In areas that have increased fuel loading as a result of invasive annuals like red brome, prescribed fire would negatively affect plant communities by encouraging the further spread of these invasive species. In the denser desert shrubland, where there is an adequate amount of fuel to support a fire, many shrubs, trees, and cacti could be severely affected by burning, as these species are not adapted to fire. Paloverde, burroweed, bursage, broom snakewood, ocotillo, and creosotebush are examples of desert species that can suffer high mortality rates from burning." In addition, we state: "Prior to 1900, fires in paloverde-cactus shrub were not considered to be important and occurred mainly in the restricted desert grasslands." We also include information on the increased frequency and size of fire in paloverde-cactus shrub caused by exotic grasses.

EMC-0446-047
The Nature
Conservancy

**Comment:** The references provided on biodiversity mostly discuss the effects of fire on forested ecosystems, a small proportion of BLM-managed public land. Fred Sampson in *Prairie Conservation* (1996) concludes that the forces affecting biodiversity are complex and include forces operating at multiple temporal and spatial scales including topography, climate, competition, drought, and herbivory, as well as fire. Much of the description of vegetation communities and related fire processes also focuses on forest communities (including eastern species such as longleaf pine, shortleaf pine, red pine, Eastern red cedar, jack pine, and red maple) rather than describing plant communities most commonly found on western BLM public land: woodlands, perennial and deciduous shrublands and perennial grassland and desert ecosystems. We recommend including additional material on fire history and the effects of fire on sagebrush and saltbush shrublands, juniper woodlands, perennial grasslands and other plant communities proposed for treatment in order to better display potential effects of treating these habitats.

**Response:** The purpose of the PER is to provide support for the cumulative effects analysis, and to provide information onto which local planning documents can be tiered. We agree that the discussions on fire history and effects are brief. However, the level of detail requested in this comment is not appropriate for a general environmental review. Additionally, there is very little published information about fire history and historical fire regimes in non-forested habitats because there is no way to date past fires if trees are not present. The Brown (2000) reference cited does contain a review of available literature on fire regimes and effects on most plant communities of the U. S., including sagebrush and saltbrush shrublands, juniper woodlands, and perennial grasslands. Detailed information on fire history and effects is generally included in project plans, or incorporated by reference.

EMC-0446-048
The Nature
Conservancy

**Comment:** The PER provides no evidence that high frequency/low severity fire regimes produce more diversity in all habitat types, particularly those managed by the BLM, than low frequency/high severity regimes. Biodiversity in a given area is dependent on more than fire regime. Heavy grazing following a fire can counteract any benefits to a plant community gained by burning. The focus of fire management should be on maintaining and restoring native fire *dynamics*, whatever *they* are ([Draft] PER [page] 3-22) rather than on maintaining the same type of regime (high frequency/low severity) for all habitats. Fire is presented as a factor that 'alters" successional pathways ([Draft] PER [page] 3-22). However, in fire-dependent and fire-influenced systems, natural fire dynamics are a part of the natural successional process (through evolution of fire-adapted species) and should not be considered apart from it.

BLM_0001774

**Response:** The PER does recognize the importance of variability in fire regimes. In Ecological Process that Underlie the Effects of Fire on Flora (Biodiversity) in the Vegetation section of Chapter 3, the PER states that "Variability of fire regimes in time and space creates the most diverse complexes of species. Thus, landscapes having fires with high variability in timing, intensity, pattern, and frequency tend to have the greatest diversity in ecosystem components (Swanson et al 1990)." It is unclear which statement(s) led to the deduction that the BLM proposes maintenance of high frequency/low severity fire regimes for all habitats. This is not appropriate for plant communities that historically had long fire return intervals. The text of the PER in the section on Ecological Processes (Successional Pathways) regarding how fire influences the rate of successions has been revised to address this comment.

We have revised the wording in the Final PER in Chapter 3 under Ecological Processes that Underlie the Effects of Fire on Flora (Successional Pathways) to address some of your concerns.

FXC-0075-005
Citizens for Fire Safety Sanity

**Comment:** The BLM is greatly ignorant about the current research regarding measures to prevent fire. We encourage you to start consulting the scientific literature which is concluding that "flammability" of native plants has little to do with the occurrence of wildfires. The factors that do contribute to wildlife include amount of dry fuels that build up, plant architecture, weather, particularly wind, proximity to human habitation and most importantly, human behavior.

**Response:** The BLM has been a partner in fire research efforts, most recently the Joint Fire Science program, which has supported applied research projects since 1999. The BLM has also been a leader in preventing unwanted wildfires for some years, and is cognizant of the various methods that can be employed to reduce the number of unwanted human-caused ignitions. Collaborative efforts initiated under the National Fire Plan have strengthened and expanded prevention programs. The commenter is correct in listing some of the many factors that contribute to the occurrence of wildfires. Lightning, however, is the cause of most wildfires on BLM-administered lands. The ultimate purpose of treating fuels in many locations is to protect various values, whether they be human or natural, from the risk of wildfire, whatever its cause. Preventing human-caused fires is one tactic that will help protect these values, but there are other tactics that can be used as well, depending on circumstances.

RMC-0049-009
Wilson, Robert E.
(University of Nevada Cooperative Extension)

**Comment:** Page 3-29 [of the Draft PER] Fire Ecology – This section is an oversimplification, and in some cases an inaccurate description, of the ecological factors involved. Secession is a complex processes that we have not fully learned to appreciate. Overgrazing in the late 1800's and fire suppression for the past 90 years have had more impact on most of the west than is indicated in this brief description of fire ecology. A reference to "State & Transition" succession models would be a much more defendable description than the section as it is currently written.

**Response:** The intent of this document is to provide a broad overview of fire ecology that is understandable to the general public. More detailed descriptions of processes in individual systems would be appropriate for inclusion in Land Use Plans and project-scale documents. State and transition models are a difficult concept. The lack of science on fire regimes in non-forested vegetation types only allows state and transition models to approximate plant succession in rangelands.

BLM_0001775

RMC-0049-010
Wilson, Robert E.
(University of Nevada
Cooperative
Extension)

**Comment:** Page 3-30 2nd paragraph [of the [Draft] PER]; emphasized that downy brome can be out-competed with adequate precipitation or by the 2nd year. This statement is usually inaccurate if sufficient downy brome is present to carry a fire in the second year or in subsequent years before perennial vegetation has had an opportunity to produce reproductive propagules. The 4th paragraph is inaccurate. "The major human influence on pinyon-juniper woodlands and fire's role in these ecosystems has been ranching." While the 1800's overgrazing is accurate, most of the fire suppression of 1940-present has been management action by the agencies. Paragraph 7 is inaccurate in that it does not address PJ [pinyon-juniper] encroachment into grass/shrub rangelands. This encroachment has occurred primarily because of the fire suppression of the past 90 years and has allowed trees to proliferate on soils where the PJ woodlands are not sustainable. This omission is a major error to this discussion.

**Response:** We agree with the first comment regarding downy brome, but we do not think the discussion in the text is misleading. There is obviously variation in the way different sites respond after fire, depending on the site, the amount of downy brome in the seed bank, and such factors as precipitation; the discussion was attempting to capture how this variation may occur. More discussion on downy brome can be found in Chapter 4 in the Vegetation section.

The second comment regarding grazing can be interpreted in a number of ways. The paragraph says that ranching is the main influence, but then goes on to state that fire suppression by land management is also a culprit.

There is a statement in paragraph 4 discussing the establishment of juniper woodlands in many rangelands. A more detailed discussion of pinyon juniper encroachment can be found in Chapter 4 in the Vegetation section.

EMC-0446-046
The Nature
Conservancy

**Comment:** The Draft PER states that, "Biodiversity can be increased by fire and reduced by eliminating fire…" ([Draft] PER [page] 3-21). While that may be true in certain circumstances, the converse can also be true in ecosystems that are not fire-adapted or in fire-dependent ecosystems with too frequent (e.g. systems invaded and dominated by downy brome, *Bromus tectorum*, and red brome, *Bromus rubens*) or too severe fires (systems in the southeastern U.S. invaded and dominated by cogongrass, *Imperata spp.*). We question the basis for the implication that biodiversity has a direct relationship to variation in fire frequency and seasonality throughout the West.

**Response:** The Ecological Processes that Underlie the Effects of Fire on Flora (Biodiversity) in the Vegetation section of Chapter 3 of the PER addresses the concern about ecosystems dominated by invasive annual bromes: "However, biodiversity can be reduced when fires occur much more frequently than they did under the historical fire regime." This statement also applies to cogongrass, a rhizomatous grass that replaces native species and can lead to fires of higher frequency and intensity (rate of heat release). Whether the accumulation of layers of cogongrass litter can also result in more frequent fires that are of higher severity (effects on the ecosystem, both above and belowground) is not known.

BLM_0001776

RESPONSE TO COMMENTS

**Public Land Resources, Vegetation, Vegetation Condition, and Fire Regimes**

EMC-0446-041
The Nature
Conservancy

**Comment:** Hazardous fuels treatments and restoration of historic fire regimes are not necessarily compatible actions and the PER should clearly distinguish this fact. Meeting the goals for one does not automatically meet the goals for the other. Vegetation management can include a wide spectrum of activities. Some, but not all, vegetation management actions will reduce fuels and have beneficial restoration impacts. Some will be focused only on hazard fuel reduction, while others will focus solely on ecosystem restoration. The PER should address the full spectrum of actions and impacts of each action. For example, the PER should describe how the BLM would prioritize treatments if the characteristic fire regime consists of stand-replacing fire, rather than assuming that all fire regimes are similar. The BLM should also address how ecologically-based criteria will be integrated into BLM's decision-making on fuels treatment, fire regime restoration and other treatment goals in order to achieve their stated objective of land health restoration ([Draft] PER pp. [pages] 3-21-42).

**Response:** We agree with the premise you lay out regarding hazardous fuels treatments in relation to restoration of historic fire regimes. However, as noted in response to Comment EMC-0446-008 under PER Vegetation Treatment Programs, Policies, and Methods, Programs, Policies, and Initiatives Influencing Vegetation Treatment Activities, these are decisions that need to be made at the Land Use Planning level and project implementation level. It is beyond the scope of the PER to make decisions on treatment types or levels.

EMC-0446-049
The Nature
Conservancy

**Comment:** The need for increased fuels treatment is based substantially upon the Forest Service's 2000 FRCC [Fire Regime Condition Class] assessment ([Draft] PER [page] 1-6). The current FRCC is less accurate in shrub and grass community types, which make up the majority of BLM-managed habitats and was not designed to identify project-level work. Field offices, in coordination with adjacent landowners, should be required to complete additional FRCC assessments based on current vegetation mapping before planning projects to transition FRCC 3 areas to FRCC 1. The PER should include the process that the BLM will use to update its estimates of treatment needs based on newer FRCC mapping that is currently underway (LANDFIRE mapping project). We believe that the coarse scale FRCC data currently under development as part of LANDFIRE should be considered one key criterion for assessing current fire regime conditions and determining larger-scale treatment priorities.

**Response:** Fire Regime Condition Class serves as an interagency measure of vegetation and fire regime departure. As such, it is one consideration in fuels management and project-level planning. It is important to recognize that FRCC can be characterized at multiple scales. Published in 2002, the first national FRCC map was published in a Forest Service General Technical Report (Schmidt, K.M., J.P. Menakis, C.C. Hardy, W.J. Hann, and D.L. Bunnell, D.L. 2002. Development of Coarse-Scale Spatial Data for Wildland Fire and Fuel Management. General Technical Report RMRS-GTR-87. Fort Collins, Colorado). The intended applications of this summary were state and regional-scale comparisons, not project planning. To further refine this map, the Rapid Assessment phase of LANDFIRE recently completed a revised national FRCC layer. This map has been included in the Final PEIS and PER and replaces the first national FRCC map included in the Draft PEIS and PER. While the Rapid Assessment map better characterizes FRCC for non-forested vegetation, it is intended for broad-scale interpretations. Upon completion of

BLM_0001777

all LANDFIRE National data layers, an FRCC map will be delivered for each of the mapping zones making up the United States, Alaska, and Hawaii. Again, the application of these data will be for broad-scale comparisons, not site-specific planning. For local planning efforts where FRCC is used in project development, a more specific FRCC analysis should be done. Tools available for local FRCC analysis include the FRCC Standard Landscape methodology, FRCC Standard Landscape software, and FRCC Standard Landscape Geospatial Mapping method. These tools are further explained in *the Interagency Fire Regime Condition Class Guidebook* (Hann, W.J., D. Havlina, and A. Shlisky. 2005. *Interagency Fire Regime Condition Class Guidebook*, Version 1.2.).

The FRCC concept is currently applied in several BLM planning processes. FRCC is an important element in Fire Management Plans, in projects implemented under the authority of the *Healthy Forests Restoration Act* (2003), in Land Use Planning efforts, and in describing ecological conditions at multiple scales. It is not the sole consideration used in project development, but one factor considered in addition to urban interface, habitats, land health, and other resource values. We agree that when assessed at the appropriate scale using the appropriate method, FRCC is a meaningful tool describing fire regime conditions and informing project development.

**Public Land Resources, Paleontological and Cultural Resources**

RMC-0049-013
Wilson, Robert E.
(University of Nevada Cooperative Extension)

**Comment:** Page 3-63 [of the Draft PER] The effect of herbivory by bison and other grazing animals (including insects, rodents, and rabbits) is part of this environment with subsequent effects from that use, especially when in concentrated numbers for long periods of time.

**Response:** Comment noted. Historically, the effects of grazing animals upon the landscape was spread over the western U.S., and impacts to soil and other resources were likely less than occurs today in areas where herbivores are more concentrated.

RMC-0049-014
Wilson, Robert E.
(University of Nevada Cooperative Extension)

**Comment:** Page 3-65 6th paragraph [of the Draft PER]. The sentence: "However, no lands were withdrawn from public domain to form these public lands." is incorrect.

**Response:** This sentence has been revised for clarity in the final PER. See the European Settlement Resources section in Chapter 3.

**Public Land Resources, Social and Economic Values**

RMC-0049-015
Wilson, Robert E.
(University of Nevada Cooperative Extension)

**Comment:** Page 3-77 Last paragraph [of the Draft PER] – This needed to be addressed also in other areas talking about changes that are occurring in vegetation composition elsewhere in the document.

**Response:** See responses to Comment RMC-0144-020 under PEIS Affected Environments, Comment EMC-0585-036 and Comment EMC-0585-034 under PEIS Affected Environments, Vegetation, and Comment RMC-0042-010 under PEIS Proposed Action and Purpose and Need, Purpose and Need for the Proposed Action.

**Effects of Vegetation Treatments, Subsequent Analysis before Projects are Initiated**

EMC-0584-054
Western Watersheds Project

**Comment:** Prior to conducting any prescribed burn, BLM must establish a methodology to thoroughly consider and analyze, in an open NEPA process with full public comment and review periods, the following: Long-term damage to microbiotic

BLM_0001778

RESPONSE TO COMMENTS

crusts, soil erosion through wind and runoff events, long-term loss of nutrients from already nutrient-deficient landscapes, loss of native species, radionuclide levels in surrounding vegetation, interrelation between prescribed burns and other "treatments" on neighboring federal/state/private lands, increased risks of exotic species invasions, impacts on habitat for native wildlife, indigenous uses of plants that may impacts, air quality impacts. We are very concerned that BLM may initiate a program of widespread "prescribed" burns on lands that have been, and continue to be, seriously damaged by livestock grazing and other abuses, and which will are very vulnerable to exotic invasions in post-fire environments.

**Response:** See response to Comment RMC-0221-047 under PEIS Proposed Action and Purpose and Need, NEPA Requirements of the Program.

### Effects of Vegetation Treatments, Air Quality

EMC-0505-021
U.S. Environmental
Protection Agency

**Comment:** Emissions Inventory: A). The emission inventory (EI) chapter [Chapter 4 of the Draft PER] and EI methods appear to be consistent with typical EI practices. However, there have been some recent method refinements that have been made to visibility and PM [particulate matter] models that would improve the methodology used by BLM. The Agency would welcome the opportunity to work with BLM on refining its emission inventory. B). Supporting information is needed to justify all of the emission rates in section 3.3. For example, in Table 2-1 [in Chapter 2 of the Draft PER], for Fairbanks, the TSP [total suspended particles] emission rate for prescribed burns is 1.7 E+04 (-350 thousand tons). The same value is used for PM10 [particulate matter less than 10 microns in diameter] and a lesser value for PM2.5 [particulate matter less than 2.5 microns in diameter].

**Response:** The BLM has reviewed USEPA's most recent revisions to the *Compilation of Air Pollution Emission Factors, AP-42, Fifth Edition* (including *Volume I: Stationary Point and Area Sources,* and *Volume II: Mobile Sources*), as well as *Exhaust Emission Factors for Nonroad Engine Modeling – Spark Ignition,* and determined that only the latter has been modified to estimate lower emissions from newer chain saw technology than those estimated in the PER. However, USEPA does state that *AP-42, Volume II: Mobile Sources* is no longer maintained. Given the minor contribution that assumed chain saw emissions add to the total overall emission inventory, and since the values used in the PER are slightly greater than those that may occur in the future (a conservative assumption), there is no need to refine the emission inventory. "Supporting information [needed] to justify all of the emission rates " is detailed in the *Annual Emissions Inventory for BLM Vegetation Treatment Methods – Final Report* (ENSR 2005a), and used as described in *Air Quality Modeling for BLM Vegetation Treatment Methods – Final Report* (ENSR 2005m). Analysis assumptions included in ENSR (2005a) were referenced to USDI BLM (2003) as well as the *Development of Emissions Inventory Method for Wildland Fire* (Battye and Battye 2002). The same wildland fire emission rates were assumed for TSP and $PM_{10}$, although separate rates were provided for $PM_{2.5}$. For example, the hourly $TSP/PM_{10}$ emission rates used in the Fairbanks, Alaska, example modeling (reported as 1.07E+04 in Table 3-1 of ENSR 2005m) were calculated as follows:

1)  A 24-hour burn duration was calculated to consume 100,000 tons of fuel based on 2,000 acres burned with a 100 ton per acre fuel loading and a 50 percent consumption rate (2,000 x 100 x 0.50 = 100,000);
2)  A day/night weighted flaming phase adjustment factor of 0.475 was calculated based on 60 percent flaming for nine hours per day plus 40

BLM_0001779

percent flaming for fifteen hours per day ( $[9/24 \times 0.60] + [15/24 \times 0.40] =$ 0.475), and a similar day/night weighted smoldering phase adjustment factor of 0.525 was calculated based on 40 percent flaming for nine hours per day plus 60 percent flaming for fifteen hours per day ( $[9/24 \times 0.40] + [15/24 \times 0.60] = 0.525$);

3) Based on Battye and Battye (2002), the flaming phase would emit 665,000 pounds of $TSP/PM_{10}$ based on 100,000 tons of fuel at 47.5 percent flaming phase and a 14 pound $TSP/PM_{10}$ emission rate per ton of fuel burned ($100,000 \times 0.475 \times 14 = 665,000$). Similarly, the smoldering phase would emit 1,365,000 pounds of $TSP/PM_{10}$ based on 100,000 tons of fuel at 52.5 percent flaming phase and a 26 pound $TSP/PM_{10}$ emission rate per ton of fuel burned ($100,000 \times 0.525 \times 26 = 1,365,000$), resulting in a total of 2,030,000 pounds of $TSP/PM_{10}$ emitted during each burn day ($665,000 + 1,365,000 = 2,030,000$);

4) Finally, a total $TSP/PM_{10}$ hourly emission rate of 1.07E+04 grams per second is calculated based on 453.6 grams per pound and 86,400 seconds per day conversion factors ($2,030,000 \times 453.6/86,400 = 1,066$).

Similar calculations were made for other locations, prescribed fire assumptions, and emission sources. Detailed Microsoft Excel© spreadsheets that include emission calculations are available upon request.

EMC-0505-022
U.S. Environmental
Protection Agency

**Comment:** Air Quality Modeling: In Table 4.3 [of the Draft PER], the CALPUFF-lite concentrations are mostly less than background and this is unusual. There are insufficient data to determine why CALPUFF generated these results. This should be addressed in the final PEIS [Final PER].

**Response:** Table 4-3 of the Draft PER presents the direct concentration estimates for particulate matter for typical, but hypothetical (example) emission scenarios for each of five treatment methods at six representative locations throughout the western United States, as detailed in the *Annual Emissions Inventory for BLM Vegetation Treatment Methods – Final Report* (ENSR 2005a). As stated in the PER (Page 4-7), "As shown in Table 4-3, predicted short-term and annual particulate matter effects at each of six example locations were extremely small (< 0.1 [$\mu g/m^3$]) for all treatments other than prescribed fire. Even for prescribed fire, short-term and annual impacts were less than 1.3 $\mu g/m^3$ for all locations except for Fairbanks, Alaska, where 24-hour TSP and $PM_{10}$ were predicted to be as high as 38 $\mu g/m^3$ (34 $\mu g/m^3$ 24-hour $PM_{2.5}$). Assuming a rural background 24-hour $PM_{2.5}$ concentration of 30 $\mu g/m^3$, the total concentration of 64 $\mu g/m^3$ would approach the applicable $PM_{2.5}$ National Ambient Air Quality Standard (NAAQS) of 65 $\mu g/m^3$. In all instances, particulate matter [impacts] due to the five treatment methods would not exceed the applicable NAAQS at any of the six locations, based on the assumptions of the analyses (ENSR 2005a)." In addition, USEPA's short-term particulate matter NAAQS is based upon 98th Percentile (high) modeled values, corresponding to the "maximum eighth highest" value. Since the Fairbanks, Alaska, example assumes less than 8 days of operation, it is unlikely even the hypothetical (example) modeled impact would violate the NAAQS.

EMC-0505-023
U.S. Environmental
Protection Agency

**Comment:** For the 6 locations modeled in the BLM report only one year of meteorological data was used. Although one year of data is adequate to facilitate a CALPUFF run, Appendix W recommends that 5 years of National Weather Service (NWS) or 3 years of mesoscale meteorological data should be used (see Appendix W language below). In addition, according to Table 4-1 of the report, the maximum

BLM_0001780

potential impact period for each location is 6 days or less, with the exception of the biological treatment period (30 days). Due to the persistence of some synoptic features, a single year of NWS meteorological data does not adequately capture the variation of meteorological conditions at these locations. Because the requisite meteorological data is readily available, we suggest that BLM consider running the CALPUFF model with a more extensive data set for inclusion in the final [P]EIS [Final PER].

**Response:** As stated in the Draft PER under Air Quality, the purpose of the PER is to disclose "the general impacts on the environment of using non-herbicide treatment methods, including fire use, and mechanical, manual, and biological control methods, to treat hazardous fuels, invasive species, and other unwanted or competing vegetation." For air quality, the PER analyzed and disclosed current and proposed annual air pollutant emissions for five different treatment methods. Similarly, the PEIS air quality analysis was prepared subject to Council on Environmental Quality regulations to analyze and disclose potential impacts from five alternative methods of Herbicide Treatment, including "No Use of Herbicides." Tables 4-2 through 4-5 of the Final PEIS estimate annual emissions of six air pollutants by state and alternative. Given the lack of specific proposed activities (location, timing, amount, conditions, etc.), it is not possible to further quantify potential air quality impacts. However, as stated in the *Annual Emissions Inventory for BLM Vegetation Treatment Methods – Final Report* (ENSR 2005a) "The purpose of this report is to provide modeled concentration estimates of particulate matter for typical, but hypothetical (example) emission scenarios for each of the five treatment methods at six representative locations throughout the western United States." For this purpose, 1 year of meteorological data is adequate to provide examples of potential air quality impacts; "a more extensive data set for inclusion in the final [P]EIS" is neither necessary nor beneficial. It should be noted that maximum direct predicted hypothetical (example) particulate matter modeling result in the PEIS ($0.0082$ $\mu g/m^3$ 24-hour $PM_{10}$ assumed for Medford, Oregon) was insignificant (the applicable NAAQS is 65 $\mu g/m^3$); all other hypothetical particulate matter modeling results were much less.

EMC-0505-024
U.S. Environmental
Protection Agency

**Comment:** In a related matter, modeling guidance in Appendix W states "For Long Transport situations (subsection 6.2.3) and for complex wind situations (paragraph 7.2.8(a)), if only NWS [National Weather Station] or comparable standard meteorological observations are employed, five years of meteorological data (within and near the modeling domain) which is readily available should be used. Consecutive years from the most recent, readily available 5-year period are preferred. Less than five, but at least three, years of meteorological data (need not be consecutive) may be used if mesoscale meteorological fields are available, as discussed in paragraph 8.3(d). These mesoscale meteorological fields should be used in conjunction with available standard NWS or comparable meteorological observations within and near the modeling domain."

**Response:** The USEPA's *Guideline on Air Quality Models* (also published as Appendix W of 40 CFR Part 51) addresses the regulatory application of air quality models for assessing criteria pollutants under the Clean Air Act, and is used by the USEPA, states, and industry to prepare and review new source permits and State Implementation Plan revisions. The hypothetical ("example") emission scenario analyses prepared for the PEIS and PER are not subject to the Appendix W guideline; therefore, there is no requirement that "Less than five, but at least three, years of meteorological data" be used.

BLM_0001781

EMC-0505-025
U.S. Environmental
Protection Agency

**Comment:** The final PEIS should clarify the following values in Table 2-1 (of ENSR 2005a). For example, the surface roughness for Glasgow, Montana, is 0.04 m. This is a value that is only slightly higher than the value of surface roughness over very smooth surfaces such as water.

**Response:** Table 2-1 of ENSR (2005a) is correct. The "Applied roughness length" for "Grassland" of 0.04 m, used in the PCRAMMET meteorological data preprocessor, is based on Sheih *et al* (1979).

EMC-0505-027
U.S. Environmental
Protection Agency

**Comment:** The Agency recommends that BLM eliminate modeling for TSP because there is not a TSP NAAQS [total suspended particle National Ambient Air Quality Standard], and recommends that BLM focus on the PM10 [particulate matter less than 10 microns in diameter] and PM2.5 [particulate matter less than 2.5 microns in diameter] NAAQS.

**Response:** ENSR (2005b) quantified annual emissions of several air pollutants (carbon monoxide [CO], carbon dioxide [$CO_2$], nitrous oxides [NOx], TSP, $PM_{10}$, $PM_{2.5}$, lead, sulfur dioxide [$SO_2$], and volatile organic compounds [VOCs]) to provide the decision-maker and the general public a basis for comparing potential air quality impacts from five different vegetation treatment methods (including five alternatives for herbicide use). ENSR (2005a) provided modeled concentration estimates of particulate matter (including TSP, $PM_{10}$, and $PM_{2.5}$) for typical, but hypothetical emission scenarios for each of the five treatment methods at six representative locations throughout the western United States. The BLM not only "focuses" on NAAQS criteria pollutants, but also discusses ambient air quality standards (including TSP) and other pollutants of interest (such as $CO_2$ and VOCs).

EMC-0505-029
U.S. Environmental
Protection Agency

**Comment:** EPA recently proposed lowering the 24-hour PM2.5 NAAQS [particulate matter less than 2.5 microns in diameter National Ambient Air Quality Standard] to 35 µg/m$^3$. Based on the modeling results presented in Table 4-3, the modeled emissions for the 24-hour PM2.5 NAAQS (63.54 µg/m$^3$) from a prescribed fire in Fairbanks, Alaska, would exceed the proposed new 24-hour PM2.5 NAAQS.

**Response:** In the January 17, 2006 Federal Register, the USEPA published its proposal to lower the 24-hour $PM_{2.5}$ NAAQS from 65 to 35 µg/m$^3$, retaining the annual $PM_{2.5}$ NAAQS of 15 µg/m$^3$, retaining the 24-hour $PM_{10}$ NAAQS at 150 µg/m$^3$, and, revoking the annual $PM_{10}$ NAAQS. The USEPA also requested comment on various other standards for $PM_{10}$ and $PM_{2.5}$, including using other standards or retaining the current NAAQS. The USEPA issued final standards on September 21, 2006.

Both the PEIS and PER (Chapter 4 under Air Quality) have disclosed and analyzed a detailed air pollutant emission inventory to compare potential air quality impacts among proposed vegetation treatment methods. In addition, concentration estimates of particulate matter for typical, but hypothetical emission scenarios (ENSR 2005a) were prepared to demonstrate how future quantitative air quality impacts can be evaluated once site-specific activities are actually proposed. Given the minimal predicted direct particulate matter impacts, if the 24-hour $PM_{2.5}$ NAAQS is eventually set to 35 µg/m$^3$, the hypothetical scenarios would not cause significant, adverse air quality impacts. The hypothetical modeled impacts (including the Fairbanks, Alaska, example) are the 1[st] maximum predicted values. The USEPA's short-term particulate matter NAAQS is based upon the 98[th] Percentile (high) modeled values, corresponding to the "maximum eighth highest" value. Since the Fairbanks, Alaska,

BLM_0001782

RESPONSE TO COMMENTS

example assumes less than eight days of operation, it is unlikely even the hypothetical modeled impact would violate a more restrictive 24-hour $PM_{2.5}$ NAAQS. Finally, even if the 24-hour $PM_{2.5}$ NAAQS is eventually lowered, and a site-specific prescribed burn was predicted to exceed the new NAAQS, it is likely the ultimate operational conditions would be modified from those assumed in this analysis (i.e., shorter burn duration, smaller individual burns, more aggressive "mop-up," etc.).

**Effects of Vegetation Treatments, Soil Resources**

RMC-0222-086
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Example: Differing Direction for Biological Soil Crusts.

The Restoration Alternative [Alternative_E] provides the following detailed directions for biological soil crusts: (DEIS [Draft PEIS]: [page] G-8): Action- Prevention 3. Reduce spread of invasive weeds caused by domestic livestock grazing: …avoid grazing in systems still containing a strong component of native perennials, biological soil crusts, or other features known to act as natural barriers to invasion or increase of invasive exotic species. (DEIS [Draft PEIS]: [page] G-12): GOAL- Prevention 6 - Biological soil crusts shall be maintained as a partial shield preventing establishment or spread of invasive exotic species. Action – Prevention 35 - Using existing data, map and describe the presence and integrity of biological soil crusts at the Ecoregion and watershed levels within the 16 western states; locally develop maps at the subwatershed level. Action- Prevention 36 – Prepare and implement a general plan for damaged biological soil crusts. Action- Prevention 37 - Prohibit livestock grazing for at least five years following a fire in areas capable of maintaining biological soil crusts. Return of livestock will be delayed past five years if significant recovery of the biological soil crust has not occurred. (DEIS [Draft PEIS]: [page] G-14): Action- Restoration 20 - Consideration of the following must be documented prior to prescribed burns, if relevant: 1. long-term damage to biological soil crusts…

In contrast, the following vague statements constitute the sole PER direction for biological soil crusts: (D[raft] PER: [page] 2-22): [During manual treatments]: Minimize damage to soil crusts. [During use of domestic livestock for vegetation management:] Minimize use of domestic animals if removal of vegetation may cause significant soil erosion or impact biological soil crusts. (D[raft] PER: [page] 2-23) [During mechanical treatments]: Minimize damage to soil crusts. These differing directions for biological soil crusts are one example that reveals that significant impacts and significant linkages with promotion of invasive species will be associated with the vegetation treatments proposed in the PER. This necessitates the preparation of an EIS.

**Response:** See Appendix I of the Final PEIS regarding analysis of the Restoration Alternative. The standard operating procedures listed in Table 2-5 of the Final PER are accepted practices and explicit. The guidance for manual and mechanical treatments in this table state: Minimize damage to *biological* soil crusts (emphasis added). The PER does not prescribe how effects are to be minimized at this programmatic level, as specific mitigation of impacts to biological crusts is determined at the project and site-specific level. The requirements for biological soil crusts, as proposed in the Restoration Alternative, include actions that are beyond the scope of the PEIS analysis.

BLM_0001783

**Effects of Vegetation Treatments, Water Quality and Quantity**

RMC-0233-034
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The relative use of water by tamarisk as compared to native species remains inconclusive. Studies (McDonnell et al., 2004; Glenn and Nagler, 2005) have shown that water use by tamarisk depends on many factors, including multiple environmental variables, time of year, and life stage of the plant. The Service recommends the final PEIS/PER provide more evidence/research to support this claim other than the USFS [U.S. Forest Service] unsubstantiated claim. We recommend that the BLM take a more circumspect approach that reflects the questions and unknowns about this topic.

**Response:** It is because of the variability associated with numerous species and site-specific conditions that the PEIS has remained at a broad programmatic level. At the local level, factors such as those suggested in the comment will be assessed, along with the impacts besides water use that tamarisk is causing to the native plant community when determining the appropriate treatment for the species.

**Effects of Vegetation Treatments, Wetlands and Riparian Areas**

RMC-0233-035
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The draft PER states that approximately 9,000 acres of wetland and riparian habitat would be treated annually, using insects as the biological control method. There is no specific discussion, however, of using the tamarisk leaf beetle *(Diorhabda elongata),* nor the potential effects from its use. For the final PEIS/PER, we recommend an expanded discussion on the tamarisk leaf beetle, particularly regarding the need for post-treatment revegetation to mitigate loss of habitat and to prevent re-invasion by tamarisk or other non-native species.

**Response:** See response to Comment EMC-0446-062 under PER Vegetation Treatment Programs, Policies, and Methods, Biological Control. The commentor's issues regarding the tamarisk leaf beetle *(Diorhabda elongate)* will be addressed on a site-specific basis, using information provided in the PER.

RMC-0233-036
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** It is unclear in the D[raft] PEIS/PER if livestock will he used to control vegetation in wetland and riparian areas. On page 4-26 [of the Draft PER], the PER states, "...no livestock would be used ..." whereas on page 4-28 it states, "... there would be some use of livestock." Please clarify this for the final PEIS/PER.

**Response:** The statements referenced in the comment have been edited for clarity under Adverse Effects of Treatments and Effects of Biological Treatments in the Wetland and Riparian Areas section of the Final PER. There are no current plans to use livestock to control undesirable vegetation within wetland and riparian habitats, and any future plans to use livestock within these habitats would require extra attention to avoid potential impacts to the native riparian vegetation and physical characteristics of the stream channel or wetland. Although the opportunities to use grazing animals within wetland and riparian areas may be more limited, there is at least some potential for using domestic grazing animals to help control vegetation in these habitats, and the document has been revised to identify that possibility.

RMC-0233-039
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The text states "Sensitive sites, such as wet meadows and riparian areas should be protected from excessive grazing". The Service suggests that the BLM expand and further describe the methods to he used to protect these sensitive areas from excessive grazing in the final PEIS/PER.

BLM_0001784

RESPONSE TO COMMENTS

> **Response:** When using domestic animals to control invasive plants it would be necessary to ensure the protection of wet meadows, riparian areas or other sensitive sites. This would most likely be accomplished through either temporary or permanent fencing, or herding. This section was revised to more clearly discuss the use of "prescribed grazing" as a specific treatment designed to control vegetation.

**Effects of Vegetation Treatments, Vegetation**

EMC-0446-037
The Nature
Conservancy

**Comment:** The PER should describe positive vegetative objectives by plant community and ecosystem as well as what plant species and fuel loads projects are trying to remove. The PER should state what plant community and structure the BLM is trying to achieve by their proposed vegetation treatments in specific plant communities and ecosystems.

**Response:** The PER discusses the beneficial effects of treatments in the section entitled Beneficial Effects of Treatments under each resource in Chapter 4. Benefits and objectives by plant community are described in the Vegetation section, and more specifically in the Wildlife Resources section, of Chapter 4 of the PER. We have also revised Table 2-2 in Chapter 2 of the Final PER that lists target species for treatments in different habitat types.

EMC-0446-051
The Nature
Conservancy

**Comment:** The PER states that 70 percent of Fire Regime Condition Class 3 occurs in Temperate Desert Ecoregion, that over half of fuels reduction projects will occur there, and that the treatments that will be most frequently used are prescribed fire and mechanical treatments (chaining, plowing, disking, etc.). Information in the report does not appear to support the need for treatment or these methods of treatment. Many of these communities have been invaded by invasive species that have made them highly susceptible to wildfire and increased the fire frequency in many areas. For example, in large areas of the Temperate Desert Ecoregion downy brome (*Bromus tectorum*) invasion has led to, or threatens to lead to, sharply increased fire frequencies and subsequent devastation of native plant and animal communities. Sagebrush communities, the perennial shrub plant community that makes up 75 percent of this ecoregion, has a fire return frequency of 50-100 years ([Draft] PER [page] 4-34). Sagebrush is typically killed during a burn and most species require 30-50 years to return to dominance on the site. The PER states that fires at intervals of less than 30-50 year cycles would adversely affect native communities and that on sites with invasive annual grasses, such as downy brome, prescribed fire would likewise negatively affect sagebrush communities. It is not clear how additional prescribed fire will benefit these community types, since downy brome and other invasive species that provide the hazardous fuels in these communities will increase with increased fire and native species such as sagebrush will be killed.

**Response:** In part, a large number of acres in this ecoregion would be treated using fire and other methods because the majority of BLM-administered lands and Fire Regime Condition Class 3 lands occur in this ecoregion. Although all treatment methods would be used in this ecoregion, BLM land managers recognize that prescribed fire or other methods may not be appropriate for all treatment situations. Prescribed fire can harm sagebrush communities, but when conducted with other treatments, including mechanical pre-thinning, prescribed fire, and seeding with native vegetation can reduce the amount of downy brome found in or near sagebrush communities. Also, there is a significant grassland component in the Temperate Desert Ecoregion that is greatly reduced from historic levels. Chapter 3 of the PER under Vegetation describes how turn-of-the-century grazing and management

BLM_0001785

practices have led to degraded grass and shrublands and significant increases in pinyon juniper woodlands at the expense of shrublands and grasslands. It also describes how some shrublands have been reduced in sagebrush with increased components of rabbitbrush, horsebrush, and broom snakeweed. What land managers have tried to do in more recent times is to learn from those past mistakes, and with improved technology and planning, and to conduct better restoration treatments in order to improve conditions of the grasslands and shrublands in the Temperate Desert Ecoregion. Improved grazing practices coupled with prescribed fire, mechanical, and chemical treatments are used to control undesirable vegetation components, and then areas are seeded to help establish and maintain desired perennial species. Prescribed fire would be most useful in areas where the desired plant community was perennial grassland, and that would over time become dominated by shrubs. Many of these treatments would also be used to create fuel breaks and protected areas around communities to reduce more intense burning fuels such as pinyon and juniper.

EMC-0446-052
The Nature
Conservancy

**Comment:** Mechanical treatments without a substantial investment in reseeding with native species, including native shrubs, will likewise not benefit these communities [temperate desert communities that have been invaded by invasive species]. The [Draft] PER states that while mechanical treatments may increase grass production in the short term, they would have adverse effects to native shrublands over the long term ([Draft] PER [page] 4-45). The PER should more explicitly analyze and display the trade-offs being made between short-term benefits and long-term harm to these ecosystems and the many species that depend upon these shrublands. The level of investment in native seed production appears to be inadequate to support the needs of these proposed vegetation treatments as well as the Burned Area Emergency Rehabilitation program.

**Response:** The Vegetation and Wildlife Resources sections of Chapter 4 of the PEIS discuss some of the short- and long-term trade-offs of modifying plant communities using vegetation treatments. Additional information is provided in the Cumulative Effects Analysis section of Chapter 4 of the PEIS. The trade-off between losing weedy and other invasive plant communities and gaining native plant communities is analyzed in more detail at the local level. Also see responses to Comment MC-0584-012, Comment EMC-0584-092, and Comment EMC-0584-095 under PEIS Alternatives, Herbicide Treatment Planning for the level of investment in seed production.

EMC-0446-053
The Nature
Conservancy

**Comment:** Two references to fire return intervals for the pinyon-juniper community appear to contradict each other, one stating that the return interval is 100-200 years and another (from 1924) stating 10-30 years. Those two figures are not reconciled but cause quite different results when looking at departure intervals for this plant community. The PER states that, "In pinyon-juniper communities that have been altered by past land use, burning could negatively affect native plant species" ([Draft] PER [page] 4-36) while pointing out in Chapter 3 [of the Draft PER] that most of these communities have been altered by past land use. The issues that were raised under item #4 above regarding reference conditions and interactions between fire and local vegetation also apply to this issue. More specific consideration of the interaction of fire with native shrubs and downy brome should be included, including an analysis of potential undesirable effects and guidelines for appropriate fire use in different shrub/invasive plant situations.

**Response:** The text of the Final PER under Vegetation has been changed in response to these concerns. See the Vegetation sections discussing pinyon-juniper communities

BLM_0001786

RESPONSE TO COMMENTS

in Chapters 3 and 4. Also see responses to Comment EMC-0446-051 and Comment EMC-0446-052 under PER Effects of Vegetation Treatments, Vegetation.

EMC-0446-054
The Nature
Conservancy

**Comment:** The Draft PER calls for substantial increases in the amount of vegetation that will be treated with both prescribed and wildland fire, up to 2.1 million acres each year. The Nature Conservancy strongly supports the use of fire as a management tool, where appropriate, as it is an important and natural ecological factor in many vegetation types and ecoregions. The Draft PER calls for increases in the use of fire "primarily for historic fire regimes and to control wildfires in the WUI [wildland urban interface]" ([see] p. 1-6 [of the Draft PER]), however it targets 63 percent of fire treatments in the Temperate Desert Ecoregion, with nearly half (48 percent) in evergreen shrublands. Chapter 3 of the PER discusses the historic increase of fire frequency and severity in these same shrublands. It is not clear that the appropriate plant community is being targeted for these treatments.

**Response:** In Chapter 1 of the PER under Determination of Treatment Acreages, HFR refers to "hazardous fuels reduction" (acronym defined on under Terminology in Chapter 1 of the PER), not "historic fire regime." Chapter 3 mentions that junipers were historically restricted to shallow, rocky soils and rough topography by occasional fire in sagebrush grass. The data that were collected from field offices did not differentiate between burning in pure sagebrush grass and burning in sagebrush grass with conifer encroachment. Some percentage of the prescribed fire in evergreen shrublands of the Temperate Desert Ecoregion is for control of pinyon and especially juniper that has encroached into highly productive mountain big sagebrush communities. If these communities still have a remnant understory of native species, they can often recover on their own without additional treatments. Analysis performed at a more site-specific level should limit prescribed fire use in lower elevation sagebrush sites dominated by Wyoming big, basin big, or low sagebrush, that are more likely to be dominated by downy brome after fire. As stated in Chapter 4 of the PER under Beneficial Effects of Chemical Treatments in the Vegetation section, the focus of treatments in the Temperate Desert Ecosystem is to benefit sage-grouse and other wildlife. Such treatments would occur as part of the 1 million acres treated to restore ecosystem health (see Determination of Treatment Acreages in Chapter 1 of the PER). The PER does acknowledge that treatments in evergreen shrublands on sites with a large component on invasive annual grasses could negatively affect evergreen shrublands. However, some level of restoration could be attempted if followed by intensive monitoring and revegetation. As stated in Chapter 4 of the PER under Beneficial Effects of Chemical Treatments in the Vegetation section, the success of treatments would depend on numerous factors, and could require the use of a combination of methods to combat undesirable species. Chapter 2 of the PER under Prevention of Weeds and Early Detection and Rapid Response acknowledges that weeds colonize highly disturbed ground as well as degraded plant communities or even intact communities. It reiterates that the BLM is required to develop a noxious weed risk assessment when an action may introduce or spread noxious weeds, that modification of actions must take place to reduce the likelihood of infestations when the risk is determined to be moderate or high, and that control measures to be implemented must be identified if weeds do infest the site. This direction as well as direction for monitoring post-treatment is part of BLM policy in BLM Manual 9011.

EMC-0446-059
The Nature
Conservancy

**Comment:** The BLM is proposing to treat 2.2 million acres of public land each year using mechanical treatments including tilling, plowing, chaining, drilling, seeding and other means. Eighty percent of all mechanical treatments will occur in the Temperate

BLM_0001787

Desert Ecoregion; forty-one percent in evergreen shrubland with the target being woody species such as sagebrush ([Draft] PER [page] 4-43). The rationale for these treatments is not clear unless it is to temporarily increase forage production. These shrublands have historically been adversely affected by previous mechanical treatments, invasion of noxious species and increased fire frequency. The PER concludes that these treatments could have adverse effects to native evergreen shrublands over the long term ([Draft] PER [page] 4-45). Additional analysis and discussion of the trade-offs being made between short-term benefits and long-term negative effects on this ecosystem and the species it supports should be presented, since there appears to be a high likelihood that special status species, such as sage grouse could be affected by targeting treatments toward sagebrush in this ecoregion.

**Response:** The primary reason for proposing treatment of 2.2 million acres each year on public lands is Presidential and Congressional mandates to reduce the risk of wildfires and improve ecosystem health in publicly managed forest and rangelands, as discussed in Chapters 1 and 2 of the PER. Chapter 3 of the PER contains a description of the Temperate Desert Ecoregion, and a discussion of the current condition of many rangelands and woodlands in this ecoregion, which have been altered by invasion of non-native species, exclusion of fire, and past management activities. Chapter 4 of the PER, under Effects of Mechanical Treatments in the Vegetation Section, states that 41% of treatments would occur in evergreen shrubland communities and 18% in evergreen woodlands, but that these treatments would not target woody species such as sagebrush for removal. The discussion in Chapter 4 also states that the primary mechanical treatment proposed is drill seeding, which is used in restoring degraded sites, such as those that have been invaded by annual grasses following wildfires. There may be some instances where mechanical treatments would be used specifically to control or reduce sagebrush in order to reduce fuel loading or create fuel breaks around communities or provide for more landscape diversity for wildlife or forage. Other likely treatment scenarios include mechanical treatments in woodlands that have encroached on former shrublands or are heavily infested by insects to reduce hazardous fuel cover and restore shrubland habitat. Where resource management planning and local objectives require repeated treatments of evergreen shrublands to meet resource objectives, mechanical methods could have adverse effects to native communities over the long term. Land use plans guide land use and vegetation management decisions within a geographic area and provide specific goals, standards, and objectives to apply to vegetation treatment projects (see Vegetation Treatment Planning and Management, Site Selection and Treatment Priorities in Chapter 2 of the PER). Site-specific analyses will be used to determine the best way to meet resource objectives while minimizing unintended impacts to natural resources. The overriding goal is to restore desirable vegetation based on site-specific analyses, which include assessment of site potential, land health and current conditions, causes of existing degradation, and likely effectiveness of treatments.

EMC-0503-017
John Day-Snake
Resource Advisory
Council

**Comment:** We [the John Day/Snake Resource Advisory Council] like the use of ecosystem divisions in the report to discuss vegetation treatments. The BLM lands within our RAC [Resource Advisory Council] area are located in the Temperate Desert Ecoregion. The document states that 60% of fire treatments would occur in these vegetation types although the review of fire effects in the report state that in the evergreen shrubland (sagebrush types) repeated fires in less than 30 to 50 years would generally have an adverse affect on native communities with an increase of annual grasses. We want to emphasize that those using prescribed burning should proceed with caution in these sagebrush and juniper communities with tendencies for non-

BLM_0001788

RESPONSE TO COMMENTS

native annual grasses to dominate. Monitoring is essential.

**Response:** Fire treatments are one of a suite of treatments that would be used to restore Temperate Desert communities. Over half of the manual treatments an overwhelming majority of the mechanical treatments, and over 70% of the acres treated using herbicides would be in the Temperate Desert. The BLM is aware of the risks associated with use of fire in sagebrush communities, and would take them into account when developing vegetation treatment programs. For instance, prescribed fires may be timed to occur before downy brome produces seeds, and may be combined with reseeding to encourage establishment of more desirable species. For more information about monitoring, please see the Monitoring section of Chapter 2 of the Final PER. We have included additional information on monitoring objectives and requirements that was not included in the Draft PER.

EMC-0584-066
Western Watersheds
Project

**Comment:** Use of material for biomass fuels should not be allowed. Biomass projects export nutrients from often nutrient-deficient sites, and reduce litter and ground cover, leading to greater site aridity. Biomass removal results in removal of woody debris and other important habitats for native wildfire, or plant materials that may be important for watershed stabilization, and that ultimately provides in-stream habitat structure for aquatic species, including TES [threatened, endangered, and sensitive] fish species. Biomass use is an extractive, commercial use of public lands with widespread harmful ecological impacts.

**Response:** The program analyzed in the PER would utilize only a portion of the woody residue that is in excess of the levels necessary to maintain natural functions. The BLM Biomass Utilization Strategy (implemented through Instructional Memorandum No. 2005-192) has established the requirements that biomass will be offered for 50% of mechanical fuels treatments by Fiscal Year 2008. Where treatment includes removing biomass, best management practices will be applied that leave an appropriate amount of down woody to maintain ecological functions, such as nutrient cycling, wildlife habitat, and the native fire regime. These practices include avoiding whole tree removal, scattering tree tops, and prescribed burning following biomass removal to release nutrients from needles, twigs, and limbs left on site. Research has shown that the preponderance of nutrients is retained in needles, twigs, and small limbs rather than tree boles.

RMC-0040(1)-013
Resource Concepts,
Inc.

**Comment:** Pg. 4-45 [of the Draft PER], the section on the effects of mechanical treatments in the Temperate Desert Ecoregion includes a statement that mechanical treatments which do not uproot vegetation would have little effect on plant species composition, other than an increase in cover of herbaceous species. The document goes on to state that shrubs would resprout fairly quickly. Big sagebrush does not resprout after mowing treatments, but rabbitbrush, desert peach, and ephedra species do. This type of treatment would favor a change in species composition toward rabbitbrush rather than sagebrush. In general, mechanical mowing treatments are not completely effective at killing sagebrush plants (Davis 1983). In this case, sagebrush plants surviving mechanical treatments will continue to grow and provide a seed source, but they do not resprout. Also mowing treatments would change species composition to favor herbaceous species rather than shrub species for several years.

**Response:** Thank you for the additional information and clarifications. The text of the PER has been changed to include your information, as follows: "Mechanical treatments that do not uproot vegetation would have little overall effect on understory plant species composition. However, compositional changes to overstory shrub

BLM_0001789

species may occur, as certain shrub species are more adapted to this type of disturbance and would resprout readily, while others must reseed themselves from shrubs that survive treatment or from adjacent areas. Mowing treatments would favor herbaceous species rather than shrubs. However, mowing is generally not considered to be useful for long-term control of sagebrush, as the effects last less than 5 years (Davis 1983) and in general little overall effect on plant species composition would be expected in the long term."

RMC-0040(1)-014
Resource Concepts, Inc.

**Comment:** Pg. [Page] 4-50 [of the Draft PER], only six percent of the annual graminoid or forb subclass in the Temperate Desert region is proposed for biological control methods. The document does not address the use of livestock grazing to control cheatgrass in monoculture stands or areas of dense infestation. This biological control method must be addressed in this section and added as a treatment method in the Temperate Desert ecoregion, even though BLM managers did not propose this treatment during the scoping of the document. Studies are underway in Nevada that will demonstrate the value and purpose for livestock grazing to occur on cheatgrass range as a means of cheatgrass control and wildfire presuppression.

**Response:** The data in Table 4-12 of the PER represents projected treatments and are somewhat based on historic use of these different tools. The 6% figure in this table does not represent a cap, but is our best estimate based on projected future treatments (see Determination of Treatment Acreages in Chapter 1 of the PER). This table contains information on treatments such as "prescribed grazing," which are specifically designed to control targeted invasive species or other undesirable vegetation, and changes in permitted actions (such as changes in the livestock grazing season of use on an ongoing grazing permit) are likely not fully represented by these figures. If new research reinforces the use of livestock to control downy brome and other fuels, that information will be taken into account as the BLM develops site-specific plans, and the use of domestic livestock through either "prescribed grazing" or "permitted grazing" will likely increase.

RMC-0049-017
Wilson, Robert E.
(University of Nevada Cooperative Extension)

**Comment:** Page 4-35 [of the draft PER] The lack of information in Table 4-5 [of the Draft PER] leads the reader to inaccurate or incomplete conclusions. For example: Why is a particular species enhanced by fire? This is key information needed to address how a manager will address weed infestations following fire. It is currently information I have not seen included in BARE [Burned Area Emergency Response] team analysis.

**Response:** There is much more specific information on fire effects than is appropriate for this general overview. More detailed information on the effects of fire on all but one of these species (cogongrass) can be found in the Fire Effects Information System (http://www.fs.fed.us/database/feis/welcome.htm). More detailed explanations of postfire vegetation recovery mechanisms can be found in Miller 2000 (Miller, M. 2000. Fire autecology. Chapter 2 *in* Wildland fire in ecosystems: effects of fire on flora [J.K. Brown and J.K. Smith, Jane Kapler, eds.] General Technical Report RMRS-GTR-42. U.S. Department of Agriculture, Forest Service, Rocky Mountain Research Station. Ogden, Utah).

Given that the recovery mechanisms and prefire abundance and condition of native plants and weedy species are known, the effects of a particular fire can be inferred from knowledge of the fire's intensity and severity, and the size of patches created. These factors control the impact of the fire on the plant's reproductive capacity, and determine the postfire environment, both of which can influence the duration of fire

BLM_0001790

RESPONSE TO COMMENTS

effects on each species.

RMC-0081-004
Arizona Game and
Fish Department

**Comment:** The use of prescribed fire is the Department's preferred alternative for vegetation treatments outside of the Sonoran and Mojave Desert ecozones. Fires timed to provide low-intensity, mosaic burns are preferred. We recognize fire may be ineffective in achieving management goals for areas dominated by cheatgrass [downy brome] and other invasive species, and that alternatives need to be explored. We strongly recommend that post-fire management include an appropriate level of grazing deferment, preferably at least two growing seasons.

**Response:** The BLM will take all available site-specific information into account when developing treatment programs. In many cases where fire is used, low-intensity, mosaic burns will likely be preferred by the BLM. The presence of downy brome on a site will also been taken into account. In some cases, another treatment may be selected, or prescribed fires may be timed to occur before downy brome produces seeds, and combined with reseeding to encourage establishment of more desirable species.

Chapter 2 of the PER, under Vegetation Treatment Standard Operating Procedures and Guidelines, lists the BLM's Standard Operating Procedure to avoid grazing by domestic and wild animals on treatment sites until vegetation is well established. The appropriate length of time would be determined at the local level when developing treatment programs.

RMC-0081-008
Arizona Game and
Fish Department

**Comment:** Herbicide application alone, or combined with other treatments has proved effective in reducing noxious vegetation. Currently some application of this methodology, combined with mechanical control, is being used with some success in southeastern Arizona to restore Chihuahuan desert grasslands. We request close coordination between the BLM and the Department occur prior to application of herbicides due to the potential negative affects these may have on fish, wildlife, and/or native plant species.

**Response:** It is the BLM's intent to continue to coordinate with agencies regarding proposed vegetation treatments. As stated in Chapter 1 of the PEIS, the potential effects of herbicides on various resources will be analyzed at the regional, state, and/or project level as appropriate. The public and agencies will have an opportunity to participate in the environmental review process during the development and analysis of local vegetation management programs.

RMC-0222-087
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** As a non-NEPA document, the PER "gets away" with making claims minus scientific evidence. This reveals the lack of "equivalence" of the PER to a NEPA document. Example: Herbicides in sagebrush As noted later in these comments [page 28] in the case study regarding sagebrush and invasive species treatments in sage grouse habitats, there is a far more complicated relationship between herbicide and other sagebrush community treatments and sage grouse habitat that the simplistic conclusion that herbicide use leads to native vegetation ([Draft] PER [page] 4-53: notes in italics added):

The use of herbicides would benefit plant communities [i.e., apparently without regard to whether the plant communities are exotic European livestock forage pastures] with weed infestations by decreasing the growth, seed production, and competitiveness of target plants, thereby releasing native species from competitive pressures (e.g. water, nutrient, and space availability) and aiding in their

BLM_0001791

reestablishment. [This assumes, without evidence, that it is competitive pressures and not trampling, compaction, or other pressures that is reducing or eliminating the native species and favoring invasive species.] The degree of benefit to native communities would depend on the toxicity of the herbicide to the target species, and its effects on non-target species as well as the success of the treatments over both the short and long term. [The preceding is tautological: "The degree of benefit to native communities would depend on…the success of the treatments."] Some treatments are very successful at removing weeds over the short term but are not successful at promoting the establishment of native species in their place. In such cases, seeding of native plant species would be beneficial. [Neither the PER not the DEIS estimate what acreage would require seeding of native plant species; the amount of native seed this would require, nor the demonstrated success of such seedings under various habitat conditions] The success of treatments would depend on numerous factors, and could require the use of a combination of methods to combat undesirable species [Neither the PER nor DEIS estimate what acreage will require "a combination of methods" or what methods will be involved in those combinations.]

There are no references offered for the above conclusions, and yet there is no effective way for scientists or others to challenge the conclusions, because the report is free of NEPA requirements for accuracy.

**Response:** The PER summarizes information available from various scientific sources including information summarized in previous EISs undertaken by the agency. The list of references used in the development of the PER are found in Chapter 5 of the PER. See also responses to Comment RMC-0222-003 under Proposed Action and Purpose and Need, Scope of Analysis, Comment RMC-0222-005 under PEIS Proposed Action and Purpose and Need, Organization of the Vegetation Treatments Assessments, and Comment RMC-0222-082 under PEIS Proposed Action and Purpose and Need, Scope of Analysis for an explanation of the acres used and the relationship of the PER to the PEIS.

In regard to the success of treatments, numerous examples of successes in restoring native plant communities are documented for the public on several agency websites related to implementing the *National Fire Plan* and *Healthy Forest Restoration Act*. The BLM's Legacy Program also outlines the success of past treatments implemented over 25 years ago. BLM partners in Cooperative Weed Management Areas (CWMAs), such as the Montana Tri-State Weed Management Area, document accomplishments and successes in habitat restoration in their annual operating plans, also available on the Internet. Recent examples of accomplishments for the BLM from 2001 through 2006 are summarized in the U.S. Department of Interior's Sustaining Landscapes and Habitat for Wildlife through Cooperative Conservation. Mark Shaefer, Deputy Assistant Secretary for Water and Science, testifying before the Senate Committee on Environment and Public Works in 1999 summarized BLM accomplishments for 1998 in completing 465 projects to improve 1,460 miles of stream corridors and wetlands, completed assessments of over 5,000 miles of streams and 20,000 acres of wetlands, and maintained 694 riparian and wetland improvement projects. In 2004, the Office and Management and Budget generally concluded the Habitat Restoration activities of the BLM were Moderately Effective for habitat restoration activities (available at: http://www.whitehouse.gov/omb/budget/fy2006/pma/interior.pdf.

BLM_0001792

RMC-0222-138
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** Ironically, while claiming that grazing management cannot be addressed in the PER, the BLM includes "livestock" as a "public land resource" (akin to water, wildlife, wilderness and other public values) ([Draft] PER: [page] 3-55) that will benefit from vegetation treatments described in the invasive species management. Livestock grazing is also identified as a tool for managing invasive species, even though grazing is a vector for invasive weeds ([Draft] PER: [page] 4-88).

**Response:** See response to Comment RMC-0080-004 under PEIS Alternatives, Alternative E - No Use of Sulfonylurea and other Acetolactate Synthase-inhibiting Active Ingredients. With proper management and authorizations, grazing animals can be an effective tool in reducing hazardous fuels and maintaining the vegetative character of an area. The use of grazing animals for vegetative control is distinct from livestock grazing under the Taylor Grazing Act.

RMC-0233-038
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The D[raft] PEIS/PER states that "most of the mechanical treatments in evergreen shrubland would involve tilling or plowing of sagebrush, followed by seeding or drilling". The Service has concerns regarding the proposed use of seeding in fragile evergreen shrubland habitats. By seeding areas, the BLM may inadvertently introduce invasive weeds to otherwise "weed-free" areas. Please reconsider this action in the final PEIS/PER.

**Response:** Table 2-5 in Chapter 2 of the Final PER contains Standard Operating Procedures for revegetation activities. Prevention actions include the use of weed-free seed, hay, pellets, mulch, fill, gravel, soil, and mineral materials on public lands. Other measures listed in the table include power washing of equipment. BLM Manual direction (1742-1 and 1745) and subsequent policy direction (IM No. 2006-073) provide guidance on introduction of non-native species and use of weed-free seed on BLM-administered lands. Current policy requires testing of seed for noxious weeds and other invasive species of concern before accepting seed orders as a means of complying with internal guidance, state seed laws, and the Federal Seed Act 7 USC 1551-1611. These measures are all designed to minimize the risk of introducing invasive species through revegetation and seeding activities.

RMC-0233-040
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** While there may be specific habitats for which it is true, there is no clear biological basis to support the general statement suggesting long-term benefits of prescribed fire on plants through reduction of fuel buildup. This is particularly the case in the arid west throughout which cheatgrass (downy brome; *Bromus tectorum*) is established and which spreads more readily with fire. Furthermore, this widely-distributed invasive grass increases the likelihood of future fire ignition where dense stands are established, increasing the likelihood of establishing even denser stands of cheatgrass.

**Response:** Although there are some situations in which prescribed fire may not be beneficial in vegetation management (e.g., some areas with downy brome), as discussed in Chapter 3 of the PER, Vegetation, Ecological Processes that Underlie the Effects of Fire on Flora, prescribed fire can be important in restoring more normal fire regimes and reducing fuels buildup. In areas infested with downy brome, several treatment methods, early burning, and reseeding may be needed.

BLM_0001793

**Effects of Vegetation Treatments, Fish and Other Aquatic Organisms**

RMC-0233-024
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The loss of allochthonous materials should be addressed more directly. In the effects section, BLM refers to the loss of allochthonous materials by removing plant material in a round-about way (5-11 "limit populations of terrestrial and aquatic insects"). We would suggest adding language discussing a change in the energy dynamics of the stream. This may be good (i.e. removing evergreen palms and replacing with deciduous ash) and allow more material to be blown in, etc.; however, impacts to the riparian system could affect nutrient dynamics which drive primary production and can ultimately affect aquatic listed species.

**Response:** The text of the PER and Biological Assessment (BA) have been changed to include the recommended information on nutrient dynamics. See Chapter 5 of the BA, under Effects Common to All Treatment Methods, and Chapter 4 of the PER, under Effects to Special Status Fish and Other Aquatic Organisms.

**Effects of Vegetation Treatments, Wildlife Resources**

EMC-0234-020
Dremann, Craig

**Comment:** The BLM document is relying on ancient supporting documents, like that on page 4-84 [of the Draft PER]: "Burning at 3- to 5-year intervals restores vigor and retards succession to optimize habitat for prairie chickens (Kirsch 1974)," --- theories that haven't proved out in practice for the last three decades.

**Response:** We have reviewed additional sources on burning and prairie chicken nesting and lekking habitat and found that some studies concur with the results presented above, while others disagree. We have presented both perspectives in the revised discussion of burning and prairie chicken habitat in Chapter 4 of the Final PER under Wildlife Resources.

RMC-0081-007
Arizona Game and
Fish Department

**Comment:** We recommend the BLM use domestic grazing animals as a means of vegetation treatment with caution. While certain grazing systems can and do provide benefit to certain plant communities, our experience in arid ecosystems is less than satisfactory. Additionally, due to disease concerns, use of domestic sheep and/or goats is not acceptable in areas inhabited by bighorn sheep, or in any adjacent area where the potential for any contact with bighorn sheep could occur.

**Response:** The BLM would consider potential effects to plant communities and ecosystems when developing treatment programs at the local level. The site conditions and the risks to native communities would be considered carefully. As stated in Chapter 4 of the PER, 90% of biological control treatments including those involving domestic animals, would occur in the Temperate Steppe and Mediterranean ecoregions, rather than arid desert ecosystems.

The potential for domestic grazing animals to adversely affect bighorn sheep is discussed in the Biological Assessment (BA). The BA requires that the BLM implement the following conservation measure to reduce risks for transfer of viruses, parasites, and bacteria from domestic sheep to bighorn sheep: "Do not use domestic animals as a vegetation treatment in bighorn sheep habitat."

RMC-0144-012
Wyoming Game and
Fish Department

**Comment:** Page 4-72 [of the Draft PER] statement: "The Wildlife Management Program, a sub-program under the Wildlife and Fisheries Management Program, is responsible for wildlife management on public lands." We request a clarification of this statement as the majority of wildlife management authority resides with the states

BLM_0001794

and is the responsibility of state fish and wildlife agencies. We again recommend additional development of a strong partnership in consultation and collaboration with state fish and wildlife agencies during the planning, development, execution and monitoring of vegetation treatments. We would also like assurances that current MOUs [Memoranda of Understanding] by and between state BLM offices and state agencies will be honored.

**Response:** The BLM is responsible for wildlife habitat management on public lands, while state fish and wildlife agencies manage animal populations (i.e., through harvest regulations) on public lands, but also have an interest in how BLM habitat management actions affect wildlife populations. As discussed in Chapter 1 of the PER, Interrelationships and Coordination with Agencies, the BLM coordinates closely with other local, state, and federal agencies in the management of fish and wildlife habitat, and would continue to abide by previous MOUs developed with these agencies.

RMC-0222-123
Salvo, Mark
(Sagebrush Sea
Campaign), Cox,
Caroline (Northwest
Coalition for
Alternatives to
Pesticides), and
O'Brien, Mary

**Comment:** The following information on effects of fire on sage grouse is excerpted from Rowland (2004), which was not referenced in the PER.

Prescribed fire has been used not only to remove sagebrush, primarily to enhance livestock forage, but also with the expressed goal of improving habitat conditions for sage-grouse and other wildlife (Klebenow 1973). Although some studies have demonstrated neutral or even positive effects on sage-grouse habitats from fire (e.g., Martin 1990, Fischer 1994, Pyle and Crawford 1996, Crawford and Davis 2002), others have documented population declines and long-term habitat degradation (Connelly et al. 2000$a$, Nelle et al. 2000). While some short-term benefits, such as increases in annual forbs, may accrue from prescribed burning, nesting cover in particular may be reduced and thus become less sustainable (Wrobleksi 1999, Nelle et al. 2000). A 9-yr [year] study in southeastern Idaho examined lek attendance in relation to prescribed burning and suggested that declines in breeding populations of sage-grouse were more severe following fire (Connelly et al. 2000$a$). The study area was Wyoming big sagebrush/bluebunch wheatgrass (*Pseudoroegneria spicata*) site, with 23 cm [centimeter] average annual precipitation. Four years of pre-treatment data were obtained before a 5,000-ha [hectare] portion was burned; nearly 60% of the sagebrush was eliminated, leaving a mosaic of sagebrush and grassland types. Although declines in lek attendance occurred throughout the study in both treatment and control sites, declines were greater in the burned area. Following the burn, the number of active leks declined 58%, from 12 to 5, in the treatment versus 35%, from 17 to 11, in the control. Furthermore, the mean number of males/lek postburn was 6 in the treatment versus 17 in the control, whereas these variable values had been similar at both sites prior to treatment. Attendance at the major leks following fire declined 90% at the treatment site versus 63% at the control.

**Response:** Information similar to that provided in the comment is given in Chapter 4 of the PER under Wildlife Resources. Also see response to Comment EMC-0585-211 under PEIS Environmental Consequences, Wildlife Resources. However, we have included additional information on the effects of burning on sage-grouse habitat in the Final PER.

BLM_0001795

RMC-0233-013
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Based on calculations using data provided in the draft PER and draft Biological Assessment, approximately 3,960,000 acres of temperate desert ecoregion (which includes sagebrush) would be treated on an annual basis using fire, mechanical treatments and herbicide applications. This is nearly two-thirds of all the annual treatments across all BLM lands. We are concerned at this time that only very general effects to species dependent on these habitats were provided in the D[raft] PEIS. Even though the Service has determined that the greater sage-grouse *(Centrocercus urophasianus)* is unwarranted for listing at this time, we continue to have concerns regarding sage-grouse population status, trends and threats, as well as concerns for other sagebrush obligates. We urge the BLM to use extreme caution in proposed application of vegetation management in sagebrush ecosystems in the final PEIS/PER so as to not further exacerbate causes of decline for this species, and other sagebrush obligates.

**Response:** As discussed in the PER under Vegetation, Adverse Effects of Treatments, approximately 50% of treatments would occur in the Temperate Desert Ecoregion. As discussed in Chapter 4 of the PER, the BLM recognizes that treatments have both beneficial and adverse affects on species using sagebrush habitats, including sage-grouse. Improving habitat for sagebrush obligate species is an important goal of vegetation management in this ecoregion, and the BLM would strive to implement projects that meet program objectives—control invasive species and reduce hazardous fuels—while also improving habitat for wildlife.

RMC-0233-015
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Mechanical treatments, if carefully designed and executed, can be beneficial to sage-grouse by improving herbaceous cover, forb production, and resprouting of sagebrush (Braun 1998). However, adverse effects have also been documented (Connelly et al. 2000). Mechanical treatments in blocks greater than 100 ha [hectare] (247 ac [acres]), or of any size seeded with exotic grasses, degrade sage-grouse habitat by altering the structure and composition of the vegetative community (Braun 1998).

**Response:** The PER under Wildlife Resources discusses the need to keep treatment blocks generally about 250 acres or less to ensure a mosaic of habitat types and minimize habitat fragmentation. We have included the information discussed above in the Final PER under Wildlife Resources, Effects of Mechanical and Manual Treatments.

**Effects of Vegetation Treatments, Livestock**

RMC-0217-025
Sierra Club Utah
Chapter

**Comment:** The BLM is also confused about the effects of livestock grazing on exotic plants. "Domestic animals, such as cattle, sheep, or goats, control the top-growth of certain non-native invasive and noxious weeds which can help to waken the plants, and reduce the reproduction potential. ([Draft] PER [page] 2-12) This seems to happen magically to non-native invasive and noxious weeds but not to native plants. The BLM never acknowledges that grazing harms all plants in the same way it harms any plants such as exotics or weeds.

**Response:** The PER does not suggest that authorized grazing would automatically result in control of invasive or noxious species. The use of domestic animals to control undesirable vegetation implies "prescribed grazing" specifically designed to control a particular invasive species (grazing would occur during a period of time when it is most likely to damage the undesirable vegetation, and animals would be concentrated on the area of infestation). "Prescribed grazing" is a viable option in

BLM_0001796

many, although certainly not all, situations. For instance, if both undesirable and desirable plant species were present and vulnerable to grazing at approximately the same times, the use of domestic livestock to help control the undesirable vegetation would not be very effective. As discussed under Biological Control in the section on Vegetation Treatment Methods, the potential effects to desirable competing species are identified, and if deemed necessary, restriction of grazing during critical growth periods for these species is recommended. The potential for overgrazing desired vegetation, rather than the undesirable vegetation, is also identified. Statements indicating that domestic animals would likely affect non-target vegetation or other resources are also found under the Effects of Biological Treatments in the Vegetation and Wildlife Resources sections of Chapter 4 of the PER. The PEIS team did acknowledge that grazing can affect both undesirable and desirable plants, but if carefully timed and planned, "prescribed grazing" can be used to help control undesirable vegetation in some situations.

RMC-0217-027
Sierra Club Utah
Chapter

**Comment:** Many weed species are less palatable than desired vegetation, so the animals may overgraze desired vegetation rather than the weeds. ([Draft] PER [page] 2-12). This is another piece of magic. Suddenly the livestock are no longer going to eat the non-native and noxious weeds noted just a few paragraphs earlier. In fact this is again one of the serious flaws in assuming that livestock can perform any kind weed control. Unless someone leads the cattle or sheep from plant to plant and forces it to eat the less desirable species it will not happen.

**Response:** Concerning livestock control of non-native invasive species, the PER states that domestic animals control the top growth of "certain" non-native invasive and noxious weeds. Some undesirable species can be affected by grazing, but other undesirable species may not be readily controlled by livestock grazing. Therefore, although using domestic animals to graze undesirable vegetation is a viable option in some situations, it would not be effective in all situations and must be evaluated on a site-by-site basis. Using domestic animals to graze undesirable vegetation requires careful planning and knowledge of both the undesirable plant species and the species of animal being used to help control that vegetation. There will continue to be many situations in which the use of domestic animals to control vegetation would be ineffective, and could result in adverse impacts to other resources. Recent research, however, indicates that animals can be "conditioned" or trained to consume some undesirable plant species in greater quantities without causing significant impacts to the more desirable vegetation. This research may improve our ability to use domestic grazing animals to control vegetation in the future.

## Effects of Vegetation Treatments, Wilderness and Special Areas

RMC-0057-008
California Wilderness
Coalition

**Comment:** Before mechanical treatments are used managers should consider whether the area is managed for motorized or non-motorized recreation (such as those managed under a semi-primitive non-motorized recreational opportunity spectrum) should not be subjected to mechanical treatments.

**Response:** The purpose of this PEIS is to provide broad environmental analysis and information for vegetation treatments that can be used by local BLM field offices to support local land-use planning. Land use plans, developed with public input, will analyze the various vegetation treatment methods suitable for specific areas. Mechanical treatments in areas where the setting character is managed to provide a semi-primitive non-motorized recreation experience generally would not be allowed. The authorized officer could use one of the other methods available, such as

BLM_0001797

prescribed fire, manual, or biological treatments for this area.

Mechanical treatments may be appropriate in areas where a decision has been made to restrict recreation access to non-motorized modes. Generally the recreation opportunity spectrum is meant to apply to the management of recreation activities, which may differ significantly in nature and impact from a mechanical treatment being applied for purposes other than recreation. Recreation and other resources must be considered on a site-specific basis in the process of making a decision to apply mechanical treatments.

RMC-0057-011
California Wilderness
Coalition

**Comment:** The D[raft] PEIS [Draft PER] states "The focus of the PER is not to restrict, limit, or eliminate FLPMA [Federal Land Policy Management Act]-authorized activities as a means to restore land health" ([page] 1-6 [of the Draft PER]). Yet by allowing mechanical treatments in areas with wilderness characteristics, the plan is likely to encourage motorized uses that are inconsistent with land use plans. As a result, the plan will negatively impact non-motorized recreation in areas that were planned as such in local land use plans.

**Response:** All proposed projects are required to be in conformance and consistent with local land use plans. Effects of treatments under any method, including mechanical, to areas with wilderness characteristics, would be addressed in site-specific NEPA analysis at the time the project is proposed.

RMC-0144-013
Wyoming Game and
Fish Department

**Comment:** [PER page] 3-107 Should add Wyoming Wilderness Study Areas.

**Response:** Map 3-12 has been revised in the PEIS and PER to show Wilderness Study Areas in Wyoming.

# Biological Assessment for Vegetation Treatments on Bureau of Land Management Lands in 17 Western States

EMC-0238-006
California Partners in
Flight

**Comment:** In analyzing risks of exposure from the various active ingredients proposed for use under the Alternatives, the Biological Assessment [BA] lists a risk to large ungulates and others from long-term exposure when animals spend significant time foraging within a treated area. To minimize the opportunity for such risk, we recommend that large target areas be treated in a mosaic pattern, treating an area multiple times if necessary, to decrease the likelihood that animals will forage on treated vegetation for an extended period of time.

**Response:** The PEIS recognizes the risks to large mammals from consuming large quantities of grass that has been treated with certain herbicides. The mitigation presented in the PEIS includes several measures to minimize impacts to wildlife that forage on grass, including minimizing the size of application areas for certain herbicides, applying certain herbicides only at the typical application rate, limiting application of certain herbicides to spot treatments in rangeland and wildlife habitat areas, and not applying certain herbicides in rangelands at all. In addition, the PEIS presents additional mitigation for threatened, endangered, and sensitive (TES) wildlife species that is based on the mitigation presented in the Biological Assessment and is more protective. These mitigation measures include (but are not limited to) not broadcast spraying many of the herbicides proposed for use in habitats used by TES large ungulates. At the local level, treatment programs will be planned to minimize

BLM_0001798

effects to any large ungulates that may be present, using these mitigation measures as a guideline. Additional mitigation may be developed at the local level, as appropriate. The decision to treat areas in a mosaic pattern, should it be appropriate, would be made at the local level.

EMC-0274-003
Noble, Emily A.

**Comment:** How will herbicides affect endangered species? Is this an effort to shut up those birdlovers who cherish rare and not-so-rare species?

**Response:** The BLM cooperated extensively with the U.S. Fish and Wildlife Service and National Marine Fisheries Service (Services) during development of the PEIS, PER, ecological risk assessment protocol, and ecological risk assessments. Members of these agencies participated in several meetings and on weekly calls for nearly a year during development of the risk assessment protocol to ensure that their concerns regarding threatened and endangered species and other species of concern were addressed. The BLM prepared a Biological Assessment (BA) to accompany the PEIS, which addressed the effects of treatments on threatened and endangered species. The Services reviewed the BA and made a determination of the likely effects to threatened and endangered species and species proposed for listing from the proposed vegetation treatments.

EMC-0525-024
Western Watersheds
Project

**Comment:** The [P]EIS, PER, Biological Assessment, Risk Assessment and all other documents ignore the realities of the current ecological conditions and status of native biota across arid BLM lands. Instead, BLM blindly proposes more of the same activities that have caused these conditions and species declines in the first place! No effort is made to assess, in a biologically meaningful way, the direct, indirect and cumulative impacts of the [P]EIS/PER on small, isolated populations of declining native special status and T&E [threatened and endangered] species in fragmented landscapes.

**Response:** The direct, indirect, and cumulative impacts of treatments on special status populations is discussed in most detail in the Biological Assessment (BA), and a summary is provided in Chapter 4 of the PEIS and PER. Factors leading to fragmentation, and the role herbicides and other treatments would play in reducing fragmentation, are discussed in the Cumulative Effects Analysis in Chapter 4 of the PEIS. Loss and fragmentation of habitat has contributed to the decline of some species, as discussed in the BA. However, public lands provide large blocks of habitat that are impacted minimally by human activities. These lands reduce fragmentation and contribute to the protection and conservation of sensitive species.

EMC-0585-236
Western Watersheds
Project

**Comment:** The wording in the Intro of the Weed BA [Biological Assessment], really twists the mind. The increase in treatments is described as the "Proposed Action". Yet, there has never been any NEPA review of the Proposed Action, which treats much more acreage than was ever proposed to be treated before, or assessed in the old stack of NEPA docs. The "treatment" covered by the BA is not just herbicide treatment - it is all methods of killing trees and shrubs such as sagebrush.

**Response:** The BA is required under the Endangered Species Act for federal actions that have the potential to impact listed species, and species proposed for listing. Non-herbicide treatment methods were not evaluated in the PEIS because they have been analyzed in earlier NEPA EISs. However, the Services felt that to adequately address impacts to listed and proposed species under the Endangered Species Act, especially since a BA was not prepared as part of the earlier EISs, an assessment of potential impacts to species from all treatment methods was needed under the ESA to meet

BLM_0001799

consultation requirements.

EMC-0585-237
Western Watersheds
Project

**Comment:** BA [Biological Assessment] at [page] 1-1: "At the time earlier EISs were completed, the BLM was proposing to treat only about 16% of the total acreage that would be treated under the program that is now being proposed". This exposes the fallacy of the BLM claim that the old EISs covered the effects of the non-herbicide vegetation treatments to be conducted.

**Response:** The previous EISs addressed the use and effects of non-herbicide treatments in the areas for which the EISs were developed. The use of non-herbicide methods in an integrated pest management framework has been affirmed in all past EIS records of decision, based on impact analysis. This PEIS does not propose any new decisions relative to the use of non-herbicide treatments. The determination of acres assessed in this PEIS is discussed under Determination of Treatment Acres in Chapter 1 of the PER. Although the acres identified for analysis exceed estimates of earlier EISs, the actual number of acres treated is dependant upon the goals and objectives identified in individual land use plans, many of which are still in place since the previous EISs were developed. This PEIS does not authorize specific treatments nor increase the rate of treatments over current implementation. The impacts relative to non-herbicide treatments are estimated to be the same as the impacts identified in previous EISs.

EMC-0585-238
Western Watersheds
Project

**Comment:** BLM has prepared the BA [Biological Assessment] to be used just like the Programmatic Risk Assessment – to provide ESA [Endangered Species Act] consultation coverage for all of these greatly expanded actions that have never undergone NEPA.

**Response:** As noted for Comment EMC-0585-236 under Biological Assessment, non-herbicide treatment actions were evaluated in earlier EISs. However, BAs to address the potential effects of BLM treatments to listed and proposed species were not done concurrently with earlier EISs. Thus, at the request of the Services, the BLM evaluated all treatment methods as part of the BA.

RMC-0208-027
California Oak
Foundation

**Comment:** Although the Draft BA [Biological Assessment] addresses some of these special status species, it omits at least four that are known to inhabit oak woodlands. Specifically, the Draft BA failed to include discussion of the following endangered species: the long-toed salamander (*Ambystoma macrodactylum*); the loggerhead shrike (*Lanius ludovicianus*); the little pocket mouse (*Perognathus longimembris*); and the mountain beaver (*Aplodontia rufa*). Based on these omissions alone, the Draft BA is inadequate. (City of Sausalito v. O'Neill (9th Cir. 2004) 386 F.3d 1186, 1216 [explaining that appellate courts "will find a biological assessment inadequate only if the agency 'entirely failed to consider an important aspect of the problem' "].) Moreover, these endangered species are only those species associated with oak woodlands. It seems likely that if the BA failed to account for these species, it failed to account for endangered or threatened species that inhabit other ecosystems. This constitutes a deficiency in the Draft BA and the Draft PEIS. *(Ibid.)*

**Response:** These four listed species—the long-toed salamander (*Ambystoma macrodactylum croceum* ), the San Clemente loggerhead shrike (*Lanius ludovicianus mearnsi*), the little pocket mouse (*Perognathus longimembris pacificus*), and the mountain beaver (*Aplodontia rufa nigra*)—do not reside on BLM-administered lands and were not identified nor included in the species list provided by the U.S. Fish and Wildlife Service for the consultation.

BLM_0001800

RMC-0233-019
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Blanket statements regarding buffers may not always be appropriate. Some taxonomic groups of plants are more susceptible to herbicide effects and may require larger buffers as protection from herbicide drift. Often these sensitivities are included on the herbicide label; i.e., legumes are particularly susceptible to Milestone. In some cases they are not on the label; i.e., the Crassulaceae as a group are generally highly susceptible to glyphosate. This information is difficult to compile because it is often based on anecdotal experience under field conditions; however some attempt should be made to differentiate buffers for specific groups of plants, where possible, and this information should be added to the BA [Biological Assessment] as general guidance to field offices. For the Final PEIS/PER, please include an allowance for field offices to be allowed the flexibility of customizing buffers based on their site conditions if sufficient technical information or field experience is available to support the buffer size.

**Response:** The buffer distances provided in the Conservation Measures section for plants are based on conservative models and are intended to provide broad-level guidance for preventing impacts to non-target threatened, endangered, and proposed for listing (TEP) plants. Surrogate plants species for risk assessments were selected from classes of plants most susceptible to the herbicide being analyzed, and Toxicity Reference Values for TEP plants were developed conservatively using highly sensitive endpoints (such as germination). Although buffers derived from risk assessments are intended to be protective of all TEP plant species, they do not consider all information about individual species or site conditions at the project level. It is intended that such information will be considered when conservation measures are developed at the local level. As stated in the effects summary, additional conservation measures would also need to be developed by local offices and developed into site-specific BAs in order to ensure a determination of not likely to adversely affect. The text of the BA has been changed to include modification of the conservation measures presented in the BA, as appropriate.

RMC-0233-021
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** We offer the following information for your final BA [Biological Assessment] on the Aquatics Section for this project: A) Spray herbicide applications should have adequate zones and not applied during a time that would impact spawning for each individual species. This would include run-off from seasonal events (including summer monsoons), B) Vegetation control activities should not result in an altered aquatic habitat. Alterations to aquatic habitat that should be considered include changes in sedimentation, nutrient availability, light and thermal load.

**Response:** The conservation measures presented in Chapter 5 of the BA incorporate the provided recommendations. These measures have been developed as the minimum steps that would be required to prevent impacts to aquatic species and their habitats. Additional conservation measures would be developed at the local level, as appropriate, based on more specific knowledge of the habitat and life history of the suite of listed species that could be affected by proposed treatment programs.

RMC-0233-022
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Overall, the species accounts for Nevada species were very good. The Service's field office in southern Nevada can provide some additional references for the Ash Meadows naucorid. We suggest they use and include updated census data for aquatic species in southern Nevada from the Nevada Department of Wildlife.

**Response:** Given its breadth and the time spent compiling information in the Biological Assessment (BA), it contains some outdated information, as an exhaustive

BLM_0001801

literature review for each species was not feasible. It would be impossible for the BLM to continually update the information for every species in the BA. However, the BLM believes that the information contained in the BA is suitable for a programmatic analysis of effects. Since all aquatic species were lumped together for the effects analysis, additional census information would not have a bearing on this analysis. However, updated information will be included into species accounts done for BAs at the project level and the BLM will contact local and state fish and wildlife agencies for assistance in completing biological assessments at the local level.

RMC-0233-023
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** All pupfish were combined and the section is not as thorough as, for example, the springfish sections. The section should be expanded for consistency sake. The Owens pupfish varies greatly from the Devils Hole pupfish. It will be difficult to show effects to any pupfish in Nevada from BLM activities other than residual effects within the food chain; however, there are Ash Meadows Amargosa pupfish on BLM lands in Nevada.

**Response:** The text of the Final Biological Assessment has been changed in response to this comment. Pupfish have been covered in more detail. See the appropriate pupfish background sections in Chapter 5.

RMC-0233-026, 028
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** There are no known occurrences for the Western prairie fringed orchid (*Plantanthera praeclara*) in Montana or Wyoming or pallid sturgeon (*Scaphirhynchus albus*) in Colorado or Wyoming. Additionally, the piping plover (*Charadrius melodus*) and interior least tern (*Sterna antillarum*) are only migrants in Wyoming and do not nest there. However, impacts to these species could still occur from activities in Wyoming if any management activities result in depletion to the South Platte River system (e.g. water drafting for fire management) This is also true for the whooping crane (*Grus americana*) and bald eagle (*Haliaeetus leucocephalus*). There are no known occurrences of the American burying beetle (*Nicrophorus americanus*) in Wyoming.

**Response:** The states listed in the table refer to the location of local BLM offices. In most cases the office state is equivalent to the state in which the species occurs. In some cases, however, the local office administers BLM lands in more than one state. As explained in footnote #1 to Table 1-1 of the Biological Assessment (BA), in these cases, a species may occur in one or more of these states, and may not occur in the same state as the BLM office. The western prairie fringed orchid, pallid sturgeon, piping plover, interior least tern, and American burying beetle occur in Nebraska (which falls under the Wyoming office). In response to this comment, Colorado has been removed from the pallid sturgeon line in Table 1-1 of the Final BA. The whooping crane and bald eagle appear in Wyoming, according to the USFWS Threatened and Endangered Species System Web Site.

RMC-0233-027
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The humpback chub (*Gila cypha*), bonytail chub (*Gila elegans*), Colorado pikeminnow (*Ptychocheilus lucius*) and razorback sucker (*Xyrauchen texanus*) do not occur in Wyoming. However, impacts to these species could still occur from activities in Wyoming if any management activities result in a depletion to the Green River system, including the Little Snake River of the Colorado River system (e.g. water drafting for fire management).

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See footnote #1 in Table 1-1 of the BA.

BLM_0001802

RESPONSE TO COMMENTS

RMC-0233-029
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Critical Habitat for the desert yellowhead (*Yermo xanthocephalus*) is present on BLM lands in the amount of 360 acres.

**Response:** Table 1-1 of the Final Biological Assessment (BA) has been changed in response to this comment.

RMC-0233-030
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** There is an approved recovery plan for the Kendall Warm Springs dace (*Rhinichthys osculus thermal*) (USFWS, 1982).

**Response:** Table 1-1 of the Final Biological Assessment (BA) has been changed in response to this comment.

RMC-0233-031
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The whooping crane has been extirpated from Wyoming. We also suggest the BLM delete the paragraph regarding the Grays Lake whooping crane flock as that flock has been extirpated (page 6-87 [of the Biological Assessment]).

**Response:** See responses to Comment RMC-0233-027 under the Biological Assessment and Comment RMC-0233-029 under the Biological Assessment. The whooping crane occurs in Nebraska, which falls under the Wyoming office. The text of the Final Biological Assessment has been changed in response to this comment. See the whooping crane background section in Chapter 6 of the BA.

RMC-0233-032
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** There are five geographic recovery plans written for the bald eagle. For Wyoming and Montana please refer to "Recovery Plan for the Pacific Bald Eagle," (USFWS, 1986). For Colorado and Utah, refer to the "Northern States Bald Eagle Recovery Plan," (USFWS, 1983).

**Response:** Table 1-1 of the Final Biological Assessment (BA) has been changed in response to this comment. Local BLM offices will consult whichever recovery plan is geographically applicable when doing ESA [Endangered Species Act] consultation at the project level.

RMC-0233-033
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The gray wolf (*Canis lupus*) is listed as experimental nonessential throughout Wyoming and portions of Montana and Idaho, i.e. the Yellowstone and central Idaho nonessential experimental populations (NEPs) (FR [Federal Register] Volume 70, No. 4, 2005). However, for purposes of Section 7 consultation, the gray wolf is considered threatened on any National Park or National Wildlife Refuge within these two NEPs. In Colorado, Utah, and the rest of Montana it is listed as Endangered.

**Response:** Table 1-1 of the Final Biological Assessment (BA) has been changed in response to this comment. Because the state-by-state listing status for the gray wolf is complex and confusing, the table has been revised so that the states of concern are presented without their associated listing status. Local BLM offices will determine which wolf Distinct Population Segments or experimental, non-essential populations would potentially be affected by proposed treatment programs.

RMC-0233-037
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The information regarding blowout penstemon *(Penstemon haydenii)* is outdated. While this species does occur in Nebraska, it was also discovered in Wyoming in 2000. The plant's current known range in Wyoming consists of the Ferris dunes area in northwest Carbon County where the plant is restricted to two habitat types: steep, northwest facing slopes of active sand dunes with less than 5 percent vegetative cover; and on north facing sandy slopes, on the lee side of active

BLM_0001803

blowouts with 25-40 percent vegetative cover. Recent surveys have indicated that systematic surveys are warranted in all lower elevations (below 6700 feet) in Wyoming where sand blowout features are located. Threats to the plant occur when sand dunes are removed or are overly disturbed by vehicular traffic.

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the blowout penstemon background section in Chapter 4 of the BA.

RMC-0233-041
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** There is not an adequate biological basis provided to support the assumed plant responses to fire in Table 4-1 (Biological Assessment), especially the beneficial effects assumed for the blowout penstemon, Colorado butterfly plant *(Gaura neomexicana var. coloradensis)*, and Ute ladies'-tresses orchid (Spiranthes diluvialis). These species may have an equal likelihood of experiencing adverse effects due to fire as a result of habitat condition, species biology, life-stage of plants present and that stage's response to fire, plant community at specific location, and land management. Based on information provided, an adverse effect should be assumed for these species.

**Response:** Table 4-1 in the Final Biological Assessment (BA) has been changed in response to these concerns.

RMC-0233-042
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Refer to the Recovery Plan for the Endangered and Threatened Species of Ash Meadows, Nevada (http://ecos.fws.gov/docs/recovery_plans/1990/900928d.pdf) for better biological information for Ash Meadows endemic species. The additional information for Amargosa niterwort is incorrect. The niterwort is generally found adjacent to the active stream channel in the Carson Slough and appears to be adapted to periodic disturbance related to flooding and sediment deposition. Characterizing both the Amargosa niterwort and Ash meadows milkvetch as part of a climax community is not appropriate given their habitat dynamics. These communities have very little, if any, serial succession as classically defined. Additional information provided for the Ash Meadows milkvetch, Ash Meadows sunray, and Ash Meadows blazing star is also inaccurate. These species are also found in upland areas not directly associated with springs and spring flows from the Ash Meadows aquifer. See the Ash Meadows Recovery Plan and update the threats to all species. An additional threat to the spring loving centaury, Ash Meadows ivesia, Ash Meadows gumplant, Ash Meadows blazing star, Ash Meadows sunray includes competition with non native plant species.

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See Table 4-1 and the background sections for the Ash Meadows plant species in Chapter 4 of the BA.

RMC-0233-044
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Based on the lack of site specific details regarding project implementation and the lack of a biological support regarding assumptions about potential project related impacts to plants, we do not believe that the proposed Conservation Measures identified for plants reduce the level of impact to a "not likely to adversely effect" determination. To ensure this. Additional Conservation Measures would need to be developed for these species on a site-specific basis.

**Response:** The BLM submitted the Biological Assessment to the Services as part of consultation for the proposed vegetation treatment program. They will determine if additional conservation measures are needed to ensure a "not likely to adversely

BLM_0001804

RESPONSE TO COMMENTS

affect" determination for plants.

| | |
|---|---|
| RMC-0233-045<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** Statement should be reworded "Where seeding is warranted, bare areas should be seeded as soon as possible after treatment ...." Many herbicides have residual effects on seed germination and seedling establishment. Reseeding and any revegetation activities following herbicide treatment should take this into account. Using "as soon as appropriate" would be better wording. |
| | **Response:** The suggested rewording has been incorporated in the Biological Assessment. The BLM follows current policy, uses the best available science, and relies on the professional judgment of employees in making determinations on when seedings take place. |
| RMC-0233-047<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** Third sentence states "....but maintains good numbers of [Pahranagat roundtail chub] adults in a single microhabitat in the lower portion of the natural channel (Hardy 1982)." This statement is inaccurate. The last survey (2001) indicated a population no larger than 17 individuals. The population is very susceptible to extirpation in the wild. |
| | **Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the Pahranagat roundtail chub background section in Chapter 5 of the BA. |
| RMC-0233-049<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** Replace last sentence with "[Woundfin] Spawning occurs April to July, depending upon the timing of snow melt runoff, which should be during the period of declining flows." |
| | **Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the woundfin background section in Chapter 5 of the BA. |
| RMC-0233-050<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** Increased turbidity may affect [Mohave tui chub] larvae or juveniles but adults appear to tolerate turbidity. |
| | **Response:** The subject of this comment is not clear. The page number given in the comment (5-29) does not contain a discussion of the Mohave tui chub, as indicated. |
| RMC-0233-051<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** Main threats [to the Nevada speckled dace] include predation by tilapia, and habitat loss due to declining water flows. The species is restricted by its cold water intolerance. |
| | **Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the Nevada speckled dace background section in Chapter 5 of the BA. |
| RMC-0233-052<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** The habitat of the Kendall Warm Springs Dace (*Rhinchthys osculus thermalis*) is currently owned and managed by the USFS [U.S. Forest Service], Bridger Teton National Forest. Therefore, this species should be removed from the analysis of effects, or the BLM should clarify if vegetation treatments would be occurring on lands where there will be potential affects to hydrology on USFS lands. |

BLM_0001805

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the Kendall Warm Springs dace background section in Chapter 5 of the BA.

RMC-0233-053
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The BA [Biological Assessment] states that "a fire capable of consuming a large amount of vegetation and exposing a large area of bare soil would likely result in a surge of nutrients into the aquatic system. This temporary increase in nutrients could temporarily benefit many TEP [threatened, endangered, and proposed] fish species by increasing food production" (page 5-56 [of the Draft BA]). While there may be long-term benefits of nutrient loading of aquatic systems after prescribed fire, or other vegetation methods, we believe that the BA does not adequately address the short term, direct and indirect effects of the proposed vegetation treatment methods on threatened, endangered and proposed aquatic species. Gresswell (1999) summarizes the results of numerous research reports which have identified direct and indirect effects to aquatic species from vegetation treatments. We request this information be incorporated into the analysis of direct and indirect physical, chemical and biological effects of vegetation treatments to those threatened, endangered and proposed species and included in the final BA for the final PEIS/PER.

**Response:** The direct and indirect effects of fire on aquatic habitats and species in Greswell (1999) are discussed in the Draft BA. Biomass reduction and sedimentation are discussed under Effects Common to All Treatment Methods, and the other effects specific to fire are discussed under the Prescribed Fire Treatments subheading. Additional information from the Gresswell paper has been incorporated into the effects analysis of the Final BA, Chapter 5.

RMC-0233-054
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** This section seems directed towards salmon. We would recommend in the basins that do not contain trout but have other sensitive aquatics; that ground disturbing activities would be considered on a case-by-case basis and BMPs would be implemented to ensure minimal erosion or impact to the aquatic habitat. Insects and mollusks may not have a specific date where they are more sensitive to disturbance, and many of the fish in the desert have longer breeding/larvae periods (i.e. springfish).

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the Conservation Measures section in Chapter 5 of the BA.

RMC-0233-055
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The draft BA [Biological Assessment] states that "within riparian areas, do not fuel/refuel equipment, store fuel, or perform equipment maintenance (locate all fueling and fuel storage areas, as well as service landings outside of protected riparian areas)." The Service recommends revised wording for this statement as presented: "Within 150 feet of wetlands or riparian areas, do not fuel/refuel equipment, store fuel, or perform equipment maintenance (locate all fueling and fuel storage areas, as well as service landings outside of protected riparian areas)."

**Response:** The text of the Final BA has been changed in response to this comment. See the Conservation Measures section in Chapter 5 of the BA.

BLM_0001806

RESPONSE TO COMMENTS

RMC-0233-056
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** We question the need for fertilizer in desert habitats, and it generally should not be used in this habitat. Additionally, excess nitrogen in runoff can cause algal blooms and eutrophication in aquatic systems.

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the Conservation Measures section in Chapter 5 of the BA.

RMC-0233-057
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Several of the bullets say the same thing. Appropriate dispersion techniques used for range management should be employed to prevent damage to riparian areas but increase weed control. This includes judicial placement of saltblocks, troughs, fencing. This should be analyzed on a case-by-case. If it is deemed that livestock will negatively impact a riparian area, then it would he logical to exclude them. If placement of these items would enhance the weed-control effectiveness without damaging the riparian system (erosion, etc.), then they should not be excluded.

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the Conservation Measures section in Chapter 5 of the BA.

RMC-0233-058
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The current distribution of the Wyoming toad is limited to Mortenson Lake National Wildlife Refuge (MLNWR) and possibly Hutton Lake National Wildlife Refuge (HLNWR). The toad was also recently reintroduced to a small research project site in the Laramie Plains (2003) and on private land in Centennial, Wyoming (June 2005) as a result of a Safe Harbor Agreement dated August 2004. Current recommendations call for surveys when proposed projects occur within 1 mile of any border of MLNWR or HLNWR during the toad's active season (May through September). Please incorporate new occupied sites as they become established into the guidelines for the final PEIS/PER. We request the BLM insure that current recovery efforts would not be impacted by the proposed vegetation management actions, and that proposed activities would not limit recovery opportunities for this species in the final PEIS/PER.

**Response:** The text of the Final Biological Assessment (BA) has been changed to include the information provided in the first part of this comment. See the background section on the Wyoming toad in Chapter 6 of the BA. The BLM will take current recommendations about where all TEP (threatened, endangered, and protected) amphibians/reptiles may occur into account when conducting surveys prior to treatments. As discussed under Background in the BA, information presented in the document is likely to change over time. Any new sites that become established by the Wyoming toad in the future will be considered during consultations at the local level prior to vegetation treatments. At the local level, the BLM will take into account recovery efforts for all species when developing its treatment programs.

RMC-0233-059
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The use of prescribed fire in the Mojave Desert has not been considered a tool to benefit desert tortoise habitat. The Mojave desert scrub plant community is not fire-adapted and does not recover for many years following fire. Therefore, we recommend that prescribed fires do not occur in desert tortoise habitat. The fourth sentence under *Indirect Effects* is inaccurate; desert tortoises do not require open, grassy areas.

BLM_0001807

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the sections on indirect effects of prescribed fire treatments on amphibians and reptiles, and conservation measures for amphibians and reptiles, in Chapter 6 of the BA.

RMC-0233-060
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** [Page 6-37 of the Draft Biological Assessment] States "data pertaining to contact of herbicides with reptiles is unavailable"; however, the last sentence in the paragraph states "that it is assumed that the analysis is adequate for reptiles and amphibians." Herbicides identified in the document that may result in adverse health effects should not be considered for large-scale application in desert tortoise habitat.

**Response:** The text of the Final Biological Assessment (BA) has been changed for clarity in response to this concern. See the section on the effects of herbicides on amphibians and reptiles in Chapter 6. Herbicides that have been identified as potentially causing adverse health effects to terrestrial vertebrates will not be considered for large-scale application in desert tortoise habitat. The Conservation Measures section for amphibians and reptiles lists the minimum that would be required of the BLM to prevent adverse effects to the desert tortoise and other species. Measures include restrictions on broadcast spraying herbicides with the potential to cause adverse health effects to the desert tortoise under any exposure scenario. See the Conservation Measures section for amphibians and reptiles in Chapter 6 of the BA for more information.

RMC-0233-061
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Further, we recommend that BLM develop and implement a study to determine what effects may occur as a result of direct contact or ingestion of herbicides that may be used in desert tortoise habitat.

**Response:** The risk assessments were intended to determine the potential for adverse effects to reptiles from dermal contact with herbicides and ingestion of contaminated vegetation. The BLM acknowledges that data on the effects of herbicides on herpetofauna are minimal, but conservative assumptions and uncertainty factors are used in risk assessments to overestimate risks so that the results will be sufficient for developing mitigation to protect listed herpetofauna, such as the desert tortoise. The BLM estimates that herbicide use will be relatively low in subtropical desert habitats (herbicide treatments are planned for just over 5,000 acres). The conservation measures listed in Chapter 6 of the Biological Assessment (BA) are the minimum steps the BLM would have to take to ensure protection of the desert tortoise and other listed species. When specific treatment programs are developed at the local level, it may be determined during impacts analysis and consultation with the Services that additional mitigation measures are necessary.

As discussed in Chapter 2 of the PEIS and PER under Special Status Species, "before any vegetation treatment or ground disturbance occurs, BLM policy requires a survey of the project site for species listed or proposed for listing, or special status species". This is done by a qualified biologist consulting state and local databases, and visiting the site at the appropriate season. If a proposed project may affect a proposed or listed species or its critical habitat, the BLM consults with the USFWS and/or NMFS. A project with a "may affect, likely to adversely affect" determination requires formal consultation and receives a Biological Opinion from the USFWS and/or NMFS. A project with a "may affect, not likely to adversely affect" determination requires informal consultation and receives a concurrence letter from USFWS and/or NMFS.

BLM_0001808

RESPONSE TO COMMENTS

RMC-0233-063
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Please include footnotes or additional text that references the section in the final [P]EIS where a reader can find the more detailed information. Please include a statement in Table 6-2 [of the Biological Assessment] to reference the D[raft] PEIS section, which explains "effects to terrestrial vertebrates from the herbicides would depend on the product used, if more than one product is used, if the products are combined, how often the product(s) would be applied, the application method of the herbicide(s), and when the application(s) would occur.

**Response:** The PEIS does not contain more detailed information about effects of herbicides on threatened and endangered species. The PEIS discusses effects to wildlife in general (which is based on less protective risk categories). However, the text of the Final Biological Assessment (BA) has been modified to direct the reader to Chapter 2 of the BA and Appendix C of the PEIS, which do contain more detailed information about the risk assessment process. In addition, tables that summarize the risk assessment results as predicted effects on different types of species (throughout Chapters 4, 5, and 6 of the BA) have been modified to clarify the information that is being presented.

RMC-0233-064
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Please correct the information in Table 6-2 [of the Draft Biological Assessment] for the "No effects" characterization under the "Direct Spray" and "Dermal Contact with Sprayed Vegetation" columns. This pertains to grassland birds and also to mammals. The section of the final PEIS where the information used in determining the "No effects" characterization to terrestrial vertebrates should be referenced in the table. Similarly, the "Adverse effects/No effects" characterization in the "Direct Spray" column of Table 6-2 should be clarified or the appropriate section in the final EIS referenced. It is unknown if this characterization is describing acute effects, chronic effects, or both. If effects characterization is only for acute effects, the Table should state this in the title or the table headings. If chronic effects are not addressed the document should state why chronic effects are not addressed.

**Response:** Tables 6-1 through 6-5 and the section on ecological risk assessment methodology in Chapter 2 have been clarified in the Final Biological Assessment (BA).

RMC-0233-065
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** If chronic effects are addressed in the "Adverse effects/No effects" characterization, then the table needs to clarify what type of chronic effect is affected (e.g. reproduction, growth, etc.).

**Response:** The Final Biological Assessment (BA) refers the reader to the ecological risk assessments for more information. Types of chronic effects vary by chemical and surrogate species, and it is outside the scope of the BA to discuss them. The BA analysis considers any level of risk (acute or chronic) to correspond to an unacceptable adverse effect to the species in question; therefore conservation measures have been designed to avoid all potential risks.

RMC-0233-067
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The herbicides are listed in Table 6-2 [of the Biological Assessment] by chemical name except for the herbicide Overdrive (the trade name). Please provide consistency in the table, and list the chemical name as sodium salt of diflufenzopyr for this herbicide in the final PEIS. Herbicide toxicity information for effects to reptile and amphibians is lacking in the draft PEI[S]. Amphibians, in particular, are often more sensitive than mammals and birds to chemicals because of respiration through their skin. Therefore, the general classification of "No effects" to terrestrial vertebrates, if this table includes effects to amphibians and reptiles, is incorrect for

BLM_0001809

many of the herbicides. We suggest that unless specific information is available for all terrestrial vertebrate groups (e.g., mammals, birds, and reptiles/amphibians), the herbicide cannot be assumed to have no effects.

**Response:** On March 3, 1999, the USEPA announced approval of applications to conditionally register the following products:
USEPA Registration Number – 7969-157: Diflufenzopyr – Technical Herbicide – Acid formulation; USEPA Registration Number – 7969-151: Diflufenzopyr – Sodium Salt (93%); and USEPA Registration Number – 7969-150: Distinct® = Diflufenzopyr – Sodium Salt (21.4%) and Dicamba – Sodium Salt (55%)

Of the three products, only the diflufenzopyr + dicamba has received full registration and was originally registered for use in field corn and non-crop areas, being sold under the trade name Distinct®. As the registration process proceeded, diflufenzopyr + dicamba expanded its label to include application onto pasture, hay, and rangeland situations. These, along with the noncropland sites were placed under the trade name Overdrive® (which has the same EPA Registration Number as Distinct®) in 2004, with the cropland applications remaining under the trade name Distinct®, along with applications in what are identified as fallow and fence line areas. Therefore, the common name of the herbicide Overdrive® is diflufenzopyr + dicamba.

See responses to Comment EMC-0643-077 under PEIS Environmental Consequences, Wildlife Resources, Comment EMC-0643-079 under PEIS Environmental Consequences, Fish and Other Aquatic Organisms, and Comment EMC-0046-002 under PEIS Environmental Consequences, Wildlife Resources regarding the effects of herbicides to amphibians and how this issue is addressed in the Final PEIS. As noted in these comments, amphibians are similar to fish in their response to herbicides. Thus, risks to amphibians from use of herbicides has been modified in the Final PEIS and Biological Assessment, as needed, to show risks based on risks to fish rather than risks to other terrestrial animals.

RMC-0233-068
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** We recommend that the BLM coordinate with the Service to design a study to evaluate the potential direct and indirect effects of herbicide use on the desert tortoise. In the absence of information on the potential effects of herbicides on the desert tortoise, including persistence of herbicides on forage plants, we recommend that applications be applied when desert tortoises are less active (e.g., November through February). Desert tortoise burrows should be avoided to the greatest extent possible during herbicide treatments.

**Response:** Any herbicide treatments applied within desert tortoise habitat will be required to comply with all existing desert tortoise protocols (timing, burrow avoidance, pre-surveys, etc.) and will be subject to Endangered Species Act Section 7 consultation with the U.S. Fish and Wildlife Service (USFWS). Herbicides would only be applied to target vegetation according to specific terms and conditions as set forth by the USFWS for the protection of the desert tortoise and its habitat.

RMC-0233-069
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The species [Yuma clapper rail] is also present in southwest Utah along the Virgin River and in Nevada along the Virgin and Colorado Rivers.

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the Yuma clapper rail background section in Chapter 6 of the BA.

BLM_0001810

RESPONSE TO COMMENTS

| | |
|---|---|
| RMC-0233-070<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** Workers removing vegetation could also destroy nests.<br><br>**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the section on direct and indirect effects of manual treatment methods on the Yuma clapper rail in Chapter 6 of the BA. |
| RMC-0233-071<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** Inaccurate statement- "Most birds [Yuma clapper rails] would likely flee the site and so avoid direct exposure to herbicides during treatment"..." Birds that have not fledged are not able to flee and will receive direct exposure.<br><br>**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the section on direct effects of manual treatment methods on the Yuma clapper rail in Chapter 6 of the BA. |
| RMC-0233-072<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** We would not recommend fire treatments in Yuma clapper rail habitat since fire often favors establishment of invasive species.<br><br>**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the Conservation Measures section for the Yuma clapper rail in Chapter 6 of the BA. |
| RMC-0233-073<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** We recommend using the final recovery plan (August 2002) as the main source [for the southwestern will flycatcher] as it contains the most up to date information for this species.<br><br>**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the southwestern willow flycatcher background section in Chapter 6 of the BA. |
| RMC-0233-074<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** Last paragraph. This information [for the southwestern willow flycatcher] is out of date. Critical habitat was redesignated on October 19, 2005, and now includes 737 river miles of habitat in Nevada and Utah.<br><br>**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the southwestern willow flycatcher background section in Chapter 6 and Table 1-1 in Chapter 1 of the BA. |
| RMC-0233-075<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** Southwestern willow flycatcher and Bells vireo are neotropical migrants so there will be no direct mortality if burns occur in the winter.<br><br>**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the section on direct effects of prescribed fire on the least Bell's vireo, Inyo California towhee, and southwestern willow flycatcher in Chapter 6 of the BA. |
| RMC-0233-076<br>U.S. Fish and Wildlife<br>Service Region 6<br>California/Nevada<br>Operations Office | **Comment:** Manual removal without proper clearance surveys could result in destruction of the nest and any eggs [of the least Bell's vireo, Inyo California towhee, and southwestern willow flycatcher].<br><br>**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the section on direct and indirect effects of manual treatment methods on the least Bell's vireo, Inyo California towhee, and southwestern willow flycatcher in Chapter 6 of the BA. |

BLM_0001811

RMC-0233-077
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Released biological control agents could potentially compete with native species or affect prey species in some way [for the least Bell's vireo, Inyo California towhee, and southwestern willow flycatcher].

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the section on direct and indirect effects of biological control agents on the least Bell's vireo, Inyo California towhee, and southwestern willow flycatcher in Chapter 6 of the BA.

RMC-0233-078
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Replanting or reseeding treated areas with native species after treatments may be needed to speed up the creation of suitable habitat [for the southwestern willow flycatcher]. Adjust spatial and temporal scales of treatments so not all suitable habitat in any given year is affected. On large projects, revegetation of affected areas should also be timed to replace

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the Conservation Measures section for the southwestern willow flycatcher in Chapter 6 of the BA. The final portion of the comment has not been addressed, since it is incomplete and its intent could not be ascertained.

RMC-0233-079
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The draft BA [Biological Assessment] does not adequately analyze the direct effects of the proposed treatment methods to bald eagles during the breeding/nesting season. With the exception of biological control treatments, all proposed methods of vegetation treatment include some level of human activity within the treatment area. Extensive research exists documenting the heightened sensitivity of breeding and nesting bald eagles to human disturbance (Greater Yellowstone Bald Eagle Working Group (GYBEWG) 1996, Montana Bald Eagle Working Group (MBEWG) 1994), Weekes 1974, Mathisen 1968). Responses to human disturbance vary and may include short term, temporal, or spatial avoidance of the disturbance, to total reproductive failure and abandonment of breeding areas (GYBEWG 1996, Anthony et al. 1995, MBEWG 1994, Stalmaster and Newman 1978). Human disturbances can still be problematic later in the season and result in premature fledging (Grier 1969). Please utilize this information for the final BA.

**Response:** The text of the Final BA has been changed in response to this comment. See the discussion of effects to bald eagles in Chapter 6 of the BA.

RMC-0233-080
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The draft BA [Biological Assessment] identifies a 0.5 mile buffer distance for bald eagle nest sites and a 0.25 mile buffer for winter roost sites (page 6-94 [of the Draft BA]). Since this BA addresses proposed vegetation treatments across 17 States, all of which are within the range of the bald eagle, we do not believe that the proposed buffer distances are appropriate across such varied nesting habitats. The Service recommends that the programmatic conservation measures for bald eagle nest sites start with 1 mile buffer for active bald eagle nests in open country. Then in more heavily forested or mountainous areas, where the line-of-sight distance from the nest is shorter, this buffer distance could potentially be reduced (see Stalmaster and Newman 1978, USFWS 1986). For bald eagle communal winter roosts, we recommend that disturbance be restricted within 1 mile of known communal winter roosts during the period of November 1 to April 1. Additionally, we recommend that ground disturbing activities be prohibited within 0.5 mile of active roost sites year round. Please utilize this information for the final BA.

BLM_0001812

**Response:** The text of the Final BA has been changed in response to this comment. See the Conservation Measures section for the bald eagle in Chapter 6 of the BA.

RMC-0233-081
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Terrestrial vertebrates include grassland birds and therefore, effects to terrestrial grassland birds from the use of herbicides should be addressed in the final BA [Biological Assessment]. Effects to grassland birds from herbicide use often are different than effects to terrestrial mammals.

**Response:** The effects of grassland birds from the use of herbicides are addressed in applicable sections of Chapter 6 of the Final BA. Table 6-2 of the BA summarizes the effects associated with dermal exposure to the various herbicides, and Table 6-4 of the BA summarizes the effects associated with dietary exposure to the various herbicides. For dermal exposure scenarios, small mammals were used to represent all terrestrial vertebrate species because they are the type of vertebrate that is most sensitive to herbicide exposure under laboratory conditions. For dietary exposure scenarios, a surrogate bird species with the same type of diet as the species in question was used.

RMC-0233-082
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Pygmy rabbits *(Brachylagus idahoensis)* occur throughout the Great Basin. While the Service has written a negative 90-day finding for a petition to list this species throughout its range, we remain concerned with the status of any sagebrush obligate species. Therefore, we strongly encourage that the mitigation measures for this species (page 6-100, [Draft] Biological Assessment) be applied across the entire species range, and not be limited to Washington State in the final PEIS/PER.

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the Conservation Measures section for the pygmy rabbit in Chapter 6 of the BA.

RMC-0233-084 to 087
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** While the conservation measures for Preble's meadow jumping mouse *(Zapus hudsonius preblei)* (Preble's) and other rodents are likely to reduce the severity of project effects, they do not appear adequate to reduce the effects to Preble's to a level considered insignificant or discountable. Therefore, based on the information provided, we would not be able to concur with a determination of not likely to adversely affect Preble's. The nature of an "access route" is unclear on page 6-123 [of the Draft Biological Assessment (BA)]. If these will be routes cleared of vegetation to facilitate vehicle travel through areas of occupied Preble's habitat, they are likely to adversely affect Preble's though direct mortality from equipment operation and vehicle use, habitat loss and displacement, disruption of travel corridors, and increased risk of predation during the time period for which the access route is in place (through access route restoration to native vegetation). The amount and duration of vegetation removal within occupied Preble's habitat is unclear on page 6-121 [of the Draft BA]. If significant percentages of available cover and forage are unavailable when Preble's emerges from hibernation, an adverse effect to the mouse can be anticipated. Conservation measures to reduce the potential for adverse effects to Preble's from grazing, if used as a biological control treatment, have not been identified on (pp. [page] 6-123 [of the Draft BA]). Therefore, we are concerned that grazing, if used for vegetation management, could result in habitat degradation and, thus, an adverse effect to Preble's through habitat loss and displacement, as well as increased predation risk and disruption of travel corridors.

BLM_0001813

**Response:** The text of the Final BA has been changed in response to this concern. See the Conservation Measures section for the Preble's meadow jumping mouse in Chapter 6 of the BA.

RMC-0233-089
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Only reduction of hazardous fuels would be expected to benefit grizzly Bears (*Ursus arctos horribilis*) by reducing the likelihood of a future catastrophic fire (page 6-133 [of the Biological Assessment (BA)]). Domestic animals that are used to control weeds may attract grizzly bears and result in human/bear conflicts (page 6-134 [of the BA]). We recommend that domestic grazers not be used to control weeds in areas with grizzly bear activity.

**Response:** The text of the BA has been changed in response to this comment. See the sections pertaining to the grizzly bear in Chapter 6 of the BA that discuss indirect effects common to all treatments, indirect effects of domestic animals, and conservation measures.

RMC-0233-090
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Conservation measures to avoid or minimize potential project effects to grizzly bears (page 6-135 [of the Draft Biological Assessment (BA)]) should include the enforcement of food storage and garbage disposal stipulations. In addition, contractors should be aware of, and provide to their employees and subcontractors, information on the protected status of the grizzly bear and on appropriate personal safety measures and behavior in grizzly bear habitat.

**Response:** The text of the Final BA has been changed in response to this comment. See the Conservation Measures section for the grizzly bear in Chapter 6 of the BA.

RMC-0233-092
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Effects of the proposed prescribed fire on Canada lynx *(Lynx canadensis)* is discussed on pages 6-138 through 6-140 [of the Draft Biological Assessment (BA)]. As discussed in the Canada Lynx Conservation Assessment and Strategy (Ruediger et al. 2000), denning habitat within a lynx analysis unit (LAU) should generally be larger than 5 acres and comprise at least 10 percent of lynx habitat. If there is less than 10 percent lynx habitat in an LAU, vegetation treatments that delay development of denning habitat structure should be deferred. Habitat connectivity within and between LAUs should be protected.

**Response:** The text of the Final BA has been changed in response to this comment. See the Conservation Measures section for the Canada lynx in Chapter 6 of the BA.

RMC-0233-093
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** Black-footed ferrets *(Mustela nigripes)* are dependent on prairie dogs for food. Please include a discussion of the loss of prey base on this species as indirect effects of all proposed vegetation management options in the final PEIS/PER. We also encourage the BLM to protect all prairie dog towns for their value to the prairie ecosystem and the myriad of species that rely on them in their proposed actions. We further encourage you to analyze potentially disturbed prairie dog towns for their value to future black-footed ferret reintroduction.

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the section on Effects of Vegetation Treatments on Kangaroo Rats, the Utah Prairie Dog, and the Black-footed Ferret in Chapter 6.

Protection of prairie dog towns for their value to prairie ecosystems would be addressed by the BLM at the local level, should one or more prairie dog towns occur in or near an area scheduled for treatments. While reintroduction of the black-footed

BLM_0001814

ferret is outside the scope of this PEIS/PER/BA, the BLM could consider this potential value of prairie dog towns at the local level.

RMC-0233-091
U.S. Fish and Wildlife
Service Region 6
California/Nevada
Operations Office

**Comment:** The Service/Region 6 recommends that your proposed actions comply with the Interagency Grizzly Bear Guidelines (1986) and the Final Conservation Strategy for the Grizzly Bear in the Yellowstone Ecosystem (2003).

**Response:** The text of the Final Biological Assessment (BA) has been changed in response to this comment. See the Conservation Measures section for the grizzly bear in Chapter 6 of the BA.

GPO  U.S. GOVERNMENT PRINTING OFFICE: 2007 — 660-087 / 11004 Region No. 8

BLM_0001815



*The*
**Bureau**
*of* **Land Management**
*Today*

**Our Vision**
To enhance the quality of life for all citizens through the balanced stewardship of America's public lands and resources.

**Our Mission**
To sustain the health, diversity, and productivity of the public lands for the use and enjoyment of present and future generations.

**Our Values**
To serve with honesty, integrity, accountability, respect, courage, and commitment to make a difference.

**Our Priorities**
To improve the health and productivity of the land to support the BLM multiple-use mission.

To cultivate community-based conservation, citizen-centered stewardship, and partnership through consultation, cooperation, and communication.

To respect, value, and support our employees, giving them resources and opportunities to succeed.

To pursue excellence in business practices, improve accountability to our stakeholders, and deliver better service to our customers.

BLM_0001816

Bureau of Land Management
Vegetation EIS
P.O. Box 12000
Reno, NV 89520-0006
Tel: 775-861-6645
Web site address: *www.blm.gov*

Bureau of Land Management
Rangeland, Soils, Water, and Air Group
DOI/BLM WO-220, 201LS
1849 C Street, NW
Washington, DC 20240



Cover Photos and Photo Credits

1. Arrowleaf balsamroot (*Balsamorhiza sagittata*) in bloom near Elko, Nevada
   (courtesy of Stan White, Bureau of Land Management Volunteer)

2. Helicopter spraying (courtesy of Keith Duncan, New Mexico State University
   Cooperative Extension Service)

3. All-terrain vehicle spraying (courtesy of L. D. Walker, Bureau of Land
   Management)

4. Herbicide spraying using a llama (courtesy of Cindy Lair, Colorado State
   Department of Agriculture)

Covers, spines, and CD labels layout and design provided by the BLM National Science
and Technology Center.

BLM/WO/GI-07/009+6711

BLM_0001817

# Programmatic Biological Assessment

# Effects to Listed Plant Species from the Bureau of Land Management Livestock Grazing Program:

## Colorado hookless cactus *(Sclerocactus glaucus)*

## Clay-loving wild buckwheat *(Eriogonum pelinophilum)*

## Debeque phacelia *(Phacelia submutica)*

**May 8, 2012**

*Submitted to:*

U.S. Department of the Interior
Fish and Wildlife Service
Western Colorado Ecological Services Field Office
764 Horizon Drive, Bldg B
Grand Junction, Colorado 81506-3946

*Submitted by:*

U.S. Department of the Interior
Bureau of Land Management

Colorado River Valley Field Office
2300 River Frontage Road
Silt, Colorado, 81652

Grand Junction Field Office
2815 H Road
Grand Junction, Colorado, 81506

Uncompahgre Field Office
2465 South Townsend Avenue
Montrose, Colorado, 81401

BLM_0001818

*Programmatic Biological Assessment: Effects to Listed Plant Species from the BLM Livestock Grazing Program*

*This document was prepared for the Bureau of Land Management by:*



970.252.4374
125 Colorado Avenue, Suite B
Montrose, Colorado, 81401

ii

BLM_0001819

*Programmatic Biological Assessment: Effects to Listed Plant Species from the BLM Livestock Grazing Program*

# Table of Contents

Acronyms and Abbreviations Found in the Text .................................................................. vi
Summary of Determinations ............................................................................................... vii
I. Introduction ...................................................................................................................... 1
    Background and Purpose ................................................................................................ 1
    Biological Assessment Scope ......................................................................................... 1
II. Proposed Action .............................................................................................................. 1
    Description of the Proposed Action ............................................................................... 1
    Conservation Measures .................................................................................................. 5
III. Interrelated and Interdependent Actions ....................................................................... 8
IV. Action Area .................................................................................................................... 8
    Occupied Habitat ........................................................................................................... 9
    Allotted Lands Inside the Action Area ........................................................................ 10
    Modeled Potential Range ............................................................................................. 10
V. Consultation History ..................................................................................................... 11
    Statewide Resource Management Plan Consultation ................................................... 11
    Colona LHA Unit Grazing Permit Renewal Consultation .......................................... 11
    Escalante LHA Unit Grazing Permit Renewal Consultation ....................................... 11
    BLM Livestock Grazing Programmatic Consultation ................................................. 12
VI. Status of the Species and Critical Habitat within the Action Area ............................. 13
    Colorado Hookless Cactus ........................................................................................... 13
        Habitat ..................................................................................................................... 13
        Species Description and Life History ...................................................................... 14
        Abundance and Viability ........................................................................................ 14
        Land Ownership and Special Management Designations ........................................ 15
        Demography ............................................................................................................ 15
        Land Health Assessments ....................................................................................... 16
        Threats ..................................................................................................................... 18
    Clay-loving Wild Buckwheat ...................................................................................... 18
        Habitat ..................................................................................................................... 18
        Species Description and Life History ...................................................................... 19
        Abundance and Viability ........................................................................................ 19
        Land Ownership and Special Management Designations ........................................ 19
        Demography ............................................................................................................ 20
        Land Health Assessments ....................................................................................... 20
        Threats ..................................................................................................................... 21
    Clay-loving Wild Buckwheat Designated Critical Habitat ......................................... 21
        Primary Constituent Elements ................................................................................ 21
        Status of the Primary Constituent Elements ........................................................... 21
        Land Ownership and Special Management Designations ........................................ 21
        Land Health Assessments ....................................................................................... 21
        Threats ..................................................................................................................... 22
    Debeque Phacelia ......................................................................................................... 22
        Habitat ..................................................................................................................... 22
        Species Description and Life History ...................................................................... 22
        Abundance and Viability ........................................................................................ 23

BLM_0001820

*Programmatic Biological Assessment: Effects to Listed Plant Species from the BLM Livestock Grazing Program*

Land Ownership and Special Management Designations ...................................................... 23
Demography ................................................................................................................................ 23
Land Health Assessments .......................................................................................................... 24
Threats ......................................................................................................................................... 24
Debeque Phacelia Proposed Critical Habitat ............................................................................. 24
Primary Constituent Elements ................................................................................................... 24
Status of the Primary Constituent Elements ............................................................................. 25
Land Ownership and Special Management Designations ...................................................... 25
Land Health Assessments .......................................................................................................... 25
Threats ......................................................................................................................................... 26
VII. Environmental Baseline ............................................................................................................. 26
Utility Lines ..................................................................................................................................... 27
Natural Gas Development ............................................................................................................... 27
Water Developments ....................................................................................................................... 28
Military Training .............................................................................................................................. 28
Road Construction and Highway Expansion .................................................................................. 29
Livestock Grazing ........................................................................................................................... 29
Agricultural and Residential Development ..................................................................................... 30
Off-road Vehicle Use and Other Recreational Activities ............................................................... 31
Illegal Collection of Plants ............................................................................................................. 31
Herbivory and Trampling by Wildlife ............................................................................................ 31
Climate Change ............................................................................................................................... 32
VIII. Effects Analysis ........................................................................................................................ 32
An Overview of Effects from Livestock Grazing to Soils and Terrestrial Vegetation ............ 32
Herbivory ...................................................................................................................................... 32
Trampling ...................................................................................................................................... 33
Nutrient Deposition ...................................................................................................................... 33
Seed Dispersal and the Relationship between Livestock Grazing and Weed Invasions ....... 33
An Overview of Effects from Livestock Grazing Operational Activities to Soils and Terrestrial
Vegetation .................................................................................................................................... 34
Direct and Indirect Effects from the Proposed Action ............................................................... 35
Colorado Hookless Cactus ........................................................................................................ 35
Documented Effects and Service-evaluated Threat Level ................................................... 35
Effects from the Proposed Action ......................................................................................... 36
Clay-loving Wild Buckwheat .................................................................................................... 37
Documented Effects and Service-evaluated Threat Level ................................................... 37
Effects from the Proposed Action ......................................................................................... 38
Clay-loving Wild Buckwheat Designated Critical Habitat .................................................... 40
Documented Effects and Service-evaluated Threat Level ................................................... 40
Effects from the Proposed Action ......................................................................................... 41
Debeque Phacelia ...................................................................................................................... 41
Documented Effects and Service-evaluated Threat Level ................................................... 41
Effects from the Proposed Action ......................................................................................... 42
Debeque Phacelia Proposed Critical Habitat .......................................................................... 44
Documented Effects and Service-evaluated Threat Level ................................................... 44
Effects from the Proposed Action ......................................................................................... 44

BLM_0001821

*Programmatic Biological Assessment: Effects to Listed Plant Species from the BLM Livestock Grazing Program*

Effects from Interrelated and Interdependent Actions ........................................................... 45
Cumulative Effects ................................................................................................................ 45
Summary of Effects from the Proposed Action ..................................................................... 46
IX. Effects Determination .......................................................................................................... 47
Colorado Hookless Cactus ..................................................................................................... 47
Clay-loving Wild Buckwheat ................................................................................................. 47
Clay-loving Wild Buckwheat Designated Critical Habitat .................................................... 48
Debeque Phacelia ................................................................................................................... 48
Debeque Phacelia Proposed Critical Habitat ......................................................................... 48
X. References .............................................................................................................................. 49
Appendix I – Figures ................................................................................................................. 58
Appendix II – Tables ................................................................................................................. 59
Table A. Allotments Inside the Action Area
Table B. Allotments Outside the Action Area but Inside the Potential Ranges for the Species

## LIST OF TABLES IN THE TEXT

Table 1. Current Extent of Livestock Grazing in the Action Area ............................................... 10
Table 2. Estimated Existing Roads (miles) in the Action Area .................................................... 29
Table 3. Estimated Existing Range Improvements on BLM Lands in the Action Area .............. 30

v

BLM_0001822

*Programmatic Biological Assessment: Effects to Listed Plant Species from the BLM Livestock Grazing Program*

## Acronyms and Abbreviations Found in the Text

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| AUM | Animal Unit Month |
| BA | Biological Assessment |
| BLM | Bureau of Land Management |
| CNAP | Colorado Natural Areas Program |
| CNHP | Colorado Natural Heritage Program |
| CPW | Colorado State Parks and Wildlife |
| CRVFO | Colorado River Valley Field Office |
| DBG | Denver Botanic Gardens |
| DENCA | Dominguez-Escalante National Conservation Area |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act |
| GGNCA | Gunnison Gorge National Conservation Area |
| GJFO | Grand Junction Field Office |
| IWMP | Integrated Weed Management Plan |
| LHA | (Public) Land Health Assessment |
| NEPA | National Environmental Policy Act |
| ORV | Off-road Vehicle |
| PBA | Programmatic Biological Assessment |
| PCE | Primary Constituent Element |
| PEIS | Programmatic Environmental Impact Statement |
| RNA | Research Natural Area |
| ROW | Right(s)-of-way |
| Service | U.S. Fish and Wildlife Service |
| SWA | State Wildlife Area |
| TES | Threatened, Endangered, and Sensitive |
| TNC | The Nature Conservancy |
| UFO | Uncompahgre Field Office |
| WBP | Warranted but precluded |

BLM_0001823

# Summary of Determinations

Based upon the analysis in this Biological Assessment, livestock grazing permitted by the Bureau of Land Management Colorado River Valley, Grand Junction, and Uncompahgre Field Offices "may affect, is likely to adversely affect" Colorado hookless cactus *(Sclerocactus glaucus)*, clay-loving wild buckwheat *(Eriogonum pelinophilum)*, clay-loving wild buckwheat critical habitat, and Debeque phacelia *(Phacelia submutica)*. Proposed critical habitat for Debeque phacelia will not be adversely modified or destroyed as a result of the proposed action. The proposed action "may affect, is likely to adversely affect" Debeque phacelia critical habitat when and if it becomes designated.

BLM_0001824

# I. Introduction

## Background and Purpose

Section 7 of the Endangered Species Act (ESA) requires federal agencies to consult with the U.S. Fish and Wildlife Service (Service) on actions that they permit, license, fund, or otherwise authorize to ensure that actions do not jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of critical habitat. In accordance with this provision, the Bureau of Land Management (BLM) has determined that formal consultation with the Service is necessary to ensure that BLM-authorized livestock grazing is in compliance with the ESA. In particular, BLM is concerned about effects of grazing on three federally listed plant species and their critical habitat: the threatened Colorado hookless cactus *(Sclerocactus glaucus)*; the endangered clay-loving wild buckwheat *(Eriogonum pelinophilum)* and its designated critical habitat; and the threatened Debeque phacelia *(Phacelia submutica)* and its proposed critical habitat. The listing rules or review and recovery documents for all three species have identified grazing and attendant activities such as trampling and bedding as threats. The entire range of all three species is encompassed by the Colorado River Valley (CRVFO), Grand Junction (GJFO), and Uncompahgre Field Office (UFO). By preparing this biological assessment (BA) and initiating section 7 consultation with the Service, these offices of the BLM intend to determine potential effects from their livestock grazing program on these species and their critical habitat, and develop a set of conservation measures to minimize and remediate such effects in occupied habitat.

## Biological Assessment Scope

This is a focused programmatic biological assessment (PBA). It addresses the BLM livestock grazing program administered in the CRVFO, GJFO, and UFO. The assessment focuses on effects from BLM-authorized grazing and attendant activities on Colorado hookless cactus, clay-loving wild buckwheat, Debeque phacelia, and their critical habitat, and does not consider other federally listed species having the potential to be affected by the BLM livestock grazing program. Other BLM-authorized activities that may affect these species are not addressed in this document. Effects from BLM-authorized grazing on other listed or proposed species would be addressed in a separate consultation process, as would effects on the three focal species of BLM-authorized activities unrelated to livestock grazing.

# II. Proposed Action

## Description of the Proposed Action

The proposed action is the livestock grazing program administered by the BLM CRVFO, GJFO, and UFO within the known range of the Colorado hookless cactus, Debeque phacelia, and clay-loving wild buckwheat. BLM administers their livestock grazing program as part of its multiple use and sustained yield mandate established under the Federal Land Policy and Management Act (FLPMA) of 1976 (43 USC 1752). The program includes grazing as well as related operational and monitoring activities such as range improvement construction and maintenance (fences,

1

corrals, reservoirs, unimproved access routes, etc.), livestock trailing, watering, salting, bedding, and utilization and trend monitoring.

Public grazing land is divided into allotments. Allotments may include both public and private land. Allotment use is managed in a permitting program that is designed to meet the mandates of the Taylor Grazing Act of 1934 (43 USC 315, as amended). Allotments are assigned a class of livestock, stocking rate, and use period, and are permitted at a given number of animal unit months (AUMs). The terms and conditions of each allotment are set forth in the permit and the permittee is assessed a grazing fee. Routine trailing of livestock onto, off of, or within an allotment, and other activities secondary to grazing are included as terms and conditions of the grazing permit. Trailing by one livestock operator across allotments for which he/she does not hold the grazing permit is managed separately under a trailing permit program, and is referred to as permitted trailing. Permitted trails on BLM surface are shown in Appendix I, Figure 1.

The BLM has the authority to issue grazing permits for a period not to exceed 10 years. Grazing permit renewal must undergo environmental review under the National Environmental Policy Act (NEPA). If an application to renew a permit cannot be fully processed through NEPA before the current grazing permit expires, and the new permit to be issued contains the same terms and conditions, including the length of the permit period, as the expiring grazing permit, the issuance of the renewed permit may be accomplished through the authority provided in the Appropriations Act for that year (BLM CO IM-2012-002). According to the Taylor Act, "during periods of range depletion due to severe drought or other natural causes", the BLM may "remit, reduce, refund in whole or part, or postpone payment of grazing fees" for the duration of the emergency (§ 315b).

The *Colorado Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado* became effective for all BLM lands in Colorado on February 12, 1997. There are five Public Land Health standards that prescribe the resource conditions needed to sustain public land health and apply to all uses of public lands including livestock grazing (Box 1). Standard 4 applies specifically to special status, threatened, and endangered species and their habitats. The *Guidelines for Livestock Grazing Management* set forth the best management practices that BLM routinely employs to maintain or achieve the Public Land Health Standards; these are presented in Box 2.

Grazing allotments are managed to meet or exceed the Public Land Health Standards. As part of the planning and permitting process allotments are evaluated to determine whether rangeland health meets, meets with problems, or does not meet the five standards. Land Health Assessments (LHAs) are typically conducted on a landscape or watershed scale via sampling, but where threatened or endangered species are of concern, site-specific assessments are made whenever feasible. If a standard is not met on an allotment or a portion of an allotment, BLM then determines the causal factors for not meeting the standard. If existing livestock grazing management or level of use is determined to be a significant causal factor for not achieving standards or not making significant progress toward achieving rangeland health, the authorized officer must take appropriate action as soon as practicable but no later than the beginning of the next grazing year to bring grazing activities into conformance with grazing guidelines or to modify them so that significant progress can be made towards achieving Land Health Standards (BLM 4180 Manual, Sec IIID). Management actions may include reductions in AUMs, change of season, change in pasture rotation system, movement of water and salt blocks, fencing, or

2

BLM_0001826

*Programmatic Biological Assessment: Effects to Listed Plant Species from the BLM Livestock Grazing Program*

construction of additional water developments. These measures are included as terms and conditions of the renewed permit.

Inventory and monitoring data is collected on a regular basis as needed to determine achievement of Land Health Standards, or progress toward achieving those standards (BLM 4180 Manual, Sec IIIG). Monitoring methods include utilization and vegetation trend monitoring. Utilization monitoring is conducted to monitor forage use and livestock distribution. Trend monitoring is used to assess changes in cover and composition in the plant communities over time (BLM 1999b, 1999c). BLM-authorized monitoring aimed specifically at quantifying effects from livestock grazing to clay-loving wild buckwheat is underway and is described in more detail below in *Status of the Species and Critical Habitat within the Action Area*. Results from this monitoring program and any other similar programs done in the future will be used to inform BLM management of livestock grazing in occupied habitat for the three focal species.

---

**Box 1. BLM Standards for Public Land Health**

**Standard 1:** Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff.

**Standard 2:** Riparian systems associated with both running and standing water function properly and have the ability to recover from major disturbance such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and bio-diversity. Water quality is improved or maintained. Stable soils store and release water slowly.

**Standard 3:** Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species' and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes.

**Standard 4:** Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities.

**Standard 5:** The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and anti-degradation requirements set forth under State law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act.

---

BLM_0001827