January 2013                                     Appendix C



## Vegetation – Prescribed Fire and Mechanical Treatment

**Exhaust Emissions for Diesel-Powered Off-Road Construction Equipment**

**Exhaust Emission Factors for Diesel-Powered Off-Road Construction Equipment**

| HP Range | NR Equipment Type | Emission Rates (g/hp-hr) | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | $N_2O$[1] |
| 300 | Tractors/Loaders/Backhoes | 0.229 | 0.860 | 1.424 | 0.142 | 0.137 | 0.028 | 130.894 | 0.003 | 0.001 |
| 600 | Logging Equip Fell/Bunch/Skidders | 0.134 | 1.039 | 2.622 | 0.145 | 0.141 | 0.069 | 316.331 | 0.002 | 0.006 |
| 6 | Chain Saws < 6 HP (Commercial) | 51.505 | 220.366 | 0.815 | 6.824 | 6.278 | 0.016 | 480.198 | 0.379 | 0.013 |
| 11 | Pumps | 0.339 | 1.935 | 2.263 | 0.284 | 0.256 | 0.055 | 252.848 | 0.005 | 0.002 |
| 600 | Logging Equip Fell/Bunch/Skidders | 0.134 | 1.039 | 2.622 | 0.145 | 0.141 | 0.069 | 316.331 | 0.002 | 0.006 |
| 6 | Chain Saws < 6 HP (Commercial) | 51.505 | 220.366 | 0.815 | 6.824 | 6.278 | 0.016 | 480.198 | 0.379 | 0.013 |

Source: EPA NONROADS 2008a

**Combustive Emission Estimations for Fire Management Activities**

| Activity | Equipment Type | Capacity (hp) | # of Units | Avg. Load Factor (%) | # of Hrs/Day | # of Days/project | # of Projects/Year | Total Hours/Year | Emissions (tons/year) | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | $N_2O$[1] |
| Mechanical Treatments (Hand Work) | Tractor | 200 | 1 | 21 | 12 | 5 | 8 | 0 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 |
| | Skidder | 350 | 2 | 80 | 12 | 5 | 8 | 960 | 3.88E+00 | 3.08E+01 | 7.77E+01 | 4.31E+00 | 4.18E+00 | 2.04E+00 | 9.37E+03 | 5.93E-02 | 1.74E-01 |
| | Chain Saw | 5 | 4 | 70 | 7 | 15 | 8 | 3360 | 6.68E+01 | 2.86E+02 | 1.06E+00 | 8.85E+00 | 8.14E+00 | 2.06E-02 | 6.22E+02 | 4.92E-01 | 1.70E-02 |
| Prescribed Fire | Pump | 10 | 0 | 69 | 0 | 0 | 4 | 0 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 |
| | Skidder | 350 | 0 | 80 | 0 | 0 | 4 | 0 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 |
| | Chain Saw | 5 | 2 | 70 | 4 | 1 | 4 | 32 | 6.36E-01 | 2.72E+00 | 1.01E-02 | 8.42E-02 | 7.75E-02 | 1.97E-04 | 5.93E+00 | 4.88E-03 | 1.62E-04 |
| Total | | | | | | | | | 7.14E+01 | 3.19E+02 | 7.97E+01 | 1.32E+01 | 1.24E+01 | 2.06E+00 | 1.00E+04 | 5.56E-01 | 1.91E-01 |

BLM_0002102

January 2013     Appendix C



## Vegetation – Prescribed Fire and Mechanical Treatment

**Fugitive Dust Emissions Estimation for Road Traffic**

**Emission Factors for Road Traffic**

$$E \ (lb/VMT) = \frac{k \ (s/12)^a (S/30)^d}{(M/0.5)^c} - C$$

$$E_{ext} = E \ (1 - P/365)$$

| Parameter | $PM_{10}$ | $PM_{2.5}$ |
|---|---|---|
| k | 1.8 | 0.18 |
| a | 1 | 1 |
| d | 0.5 | 0.5 |
| c | 0.2 | 0.2 |

| Function/Variable Description | Assumed Value | Reference |
|---|---|---|
| E = size-specific emission factor (lb/VMT) | | |
| $E_{ext}$ = size-specific emission factor extrapolated for natural mitigation (lb/VMT) | | |
| s = surface material silt content (%) | 5.1 | EPA #AQ006 |
| S = mean vehicle speed (mph) | Listed in the table below | |
| C = emission factor for 1980's vehicle fleet exhaust, brake wear, and tire wear (lb/VMT)   $PM_{10}$ | 0.00036 | EPA #AQ006 |
|   $PM_{2.5}$ | 0.00047 | EPA #AQ006 |
| M = surface material moisture content (%) | 2.0 | EPA #AQ006 |
| P = Number of days precip per year | 56 | EPA #AQ006 |

a Source: EPA, AP-42 Volume I, Section 13.2.2 Unpaved Roads, Table 13.2.2-2, Nov. 2006
b Fitzpatrick, M. 1990. *User's Guide: Emission Control Technologies and Emission Factors for Unpaved Road Fugitive Emissions*, EPA/625/5-87/022.  http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=20008SFC.

**Fugitive Dust Emission Estimations for Commuting Vehicles on Unpaved Roads**

| Activity | Equipment Type | Avg. Vehicle Speed (mph) | Round Trip Distance (miles) | # of Round Trips/Activity | Vehicle Miles Traveled/Activity | # of Activities/Year | Total Annual Vehicle Miles | $PM_{10}$ Controlled Em. Factor (lb/VMT) | $PM_{10}$ Emissions (tons/vehicle type) | $PM_{2.5}$ Controlled Em. Factor (lb/VMT) | $PM_{2.5}$ Emissions (tons/vehicle type) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mechanical Treatments (Hand Work) | Support Truck | 35 | 50 | 5 | 250 | 8 | 2000 | 5.25E-01 | 5.25E-01 | 5.22E-02 | 5.22E-02 |
| | Pick-up Truck | 35 | 50 | 5 | 250 | 8 | 2000 | 5.25E-01 | 5.25E-01 | 5.22E-02 | 5.22E-02 |
| | ATV | 15 | 10 | 20 | 200 | 8 | 1600 | 3.43E-01 | 2.75E-01 | 3.41E-01 | 2.73E-02 |
| | Fire Truck | 20 | 20 | 1 | 20 | 4 | 80 | 3.96E-01 | 1.59E-02 | 3.94E-02 | 1.58E-03 |
| | Fuel Truck | 25 | 20 | 1 | 20 | 4 | 80 | 4.43E-01 | 1.77E-02 | 4.41E-02 | 1.76E-03 |
| Prescribed Fires | Water Truck | 20 | 20 | 1 | 20 | 4 | 80 | 3.96E-01 | 1.59E-02 | 3.94E-02 | 1.58E-03 |
| | Support Truck | 30 | 20 | 2 | 40 | 4 | 160 | 4.86E-01 | 3.89E-02 | 4.83E-02 | 3.86E-03 |
| | Pick-up Truck | 30 | 20 | 2 | 40 | 4 | 160 | 4.86E-01 | 3.89E-02 | 4.83E-02 | 3.86E-03 |
| | Total | | | | | | | | 1.45E+00 | | 1.44E-01 |

BLM_0002103

January 2013                                    Appendix C                                    

## Vegetation – Prescribed Fire and Mechanical Treatment

**Exhaust Emissions Estimation for Road Traffic**

**Emission Factors for Commuting Vehicles**

| Project Year | Emission Factors (gm/mile) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | $N_2O$ |
| 2008 | | | | | | | | | |
| LDDT | 0.70 | 0.70 | 0.70 | 0.70 | 0.70 | 0.70 | 0.70 | 0.70 | 0.70 |
| HDDV | 0.85 | 3.80 | 17.02 | 0.77 | 0.70 | 0.06 | 2004.18 | 0.04 | 0.00 |
| ATV | 15.77 | 47.71 | 0.43 | 0.47 | 0.43 | 0.01 | 212.99 | 0.28 | 0.01 |

Source: EPA MOVES 2010, EPA NONROAD 2008a
eN2O factor source: TCR GRP, 2012 Climate Registry Default Emission Factors—Released January 6, 2012

**Combustive Emission Estimations for Commuting Vehicles on Unpaved and Paved Roads**

| Activity | Equipment Type[4] | Class | Round Trip Distance (miles) | # of Round Trips per Activity | Vehicle Miles Traveled /Activity | # of Activities/Year | Total Annual Vehicle Miles Traveled/ Activity | Emissions (ton/year) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | $N_2O$ |
| Mechanical Treatments (Hand Work) | Support Truck | HDDV | 120 | 5 | 600 | 8 | 4,800 | 0.0045 | 0.0201 | 0.0901 | 0.0041 | 0.0037 | 0.0003 | 10.6043 | 0.0002 | 0.0000 |
| | Pick-up Truck | LDDT | 120 | 5 | 600 | 8 | 4,800 | 0.0037 | 0.0037 | 0.0037 | 0.0037 | 0.0037 | 0.0037 | 0.0037 | 0.0037 | 0.0037 |
| | ATV | ATV | 10 | 20 | 200 | 8 | 1,600 | 0.0278 | 0.0841 | 0.0008 | 0.0008 | 0.0008 | 0.0000 | 0.3756 | 0.0005 | 0.0000 |
| Prescribed Fires | Fire Truck | HDDV | 120 | 1 | 120 | 4 | 480 | 0.0004 | 0.0020 | 0.0090 | 0.0004 | 0.0004 | 0.0000 | 1.0604 | 0.0000 | 0.0000 |
| | Fuel Truck | HDDV | 120 | 1 | 120 | 4 | 480 | 0.0004 | 0.0020 | 0.0090 | 0.0004 | 0.0004 | 0.0000 | 1.0604 | 0.0000 | 0.0000 |
| | Water Truck | HDDV | 120 | 1 | 120 | 4 | 480 | 0.0004 | 0.0020 | 0.0090 | 0.0004 | 0.0004 | 0.0000 | 1.0604 | 0.0000 | 0.0000 |
| | Support Truck | HDDV | 120 | 2 | 240 | 4 | 960 | 0.0009 | 0.0040 | 0.0180 | 0.0008 | 0.0007 | 0.0001 | 2.1208 | 0.0000 | 0.0000 |
| | Pick-up Truck | LDDT | 120 | 2 | 240 | 4 | 960 | 0.0007 | 0.0007 | 0.0007 | 0.0007 | 0.0007 | 0.0007 | 0.0007 | 0.0007 | 0.0007 |
| | | | | | | | Total | 0.04 | 0.12 | 0.14 | 0.01 | 0.01 | 0.00 | 16.29 | 0.01 | 0.00 |

BLM_0002104

January 2013                                    Appendix C                                    ENVIRON

## Travel and Transportation Management

**Total Annual Emissions from Comprehensive Travel and Transportation Management Projects (tons/year)**

**Base Year 2008 Emissions (tons/year)**

| Category | Subcategory | Emission Type | Fuel Type | VOC | CO | NO₂ | PM₁₀ | PM2.5 | SO₂ | CO₂ | CH₄ | N₂O | HAPs[a] | CO2eq tons | CO2eq metric tonnes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Travel and Transportation Management | Recreational Vehicles | exhaust | gasoline | 48.0 | 99.5 | 0.81 | 1.6 | 1.4 | 0.015 | 454.4 | 0.6 | 0.012 | 4.8 | 472 | 428 |
| Comprehensive Travel and Transportation Management | Recreational Vehicles | dust | na | - | - | - | 308.1 | 30.6 | - | - | - | - | - | - | - |
| Comprehensive Travel and Transportation Management | Maintenance Equipment | dust | na | - | - | - | 0.0 | 0.0 | - | - | - | - | - | - | - |
| Comprehensive Travel and Transportation Management | Maintenance Equipment | exhaust | diesel | 0.0 | 0.0 | 0.06 | 0.0 | 0.0 | 0.001 | 6.8 | 0.0 | 0.000 | 0.0 | 7 | 6 |
| Comprehensive Travel and Transportation Management | Commuter Vehicles | dust | na | - | - | - | 0.0 | 0.0 | - | - | - | - | - | - | - |
| Comprehensive Travel and Transportation Management | Commuter Vehicles | exhaust | diesel | 0.0 | 0.0 | 0.00 | 0.0 | 0.0 | 0.000 | 0.2 | 0.0 | 0.000 | 0.0 | 0 | 0 |
| **Total** | | | | **48.1** | **99.5** | **0.87** | **309.8** | **32.0** | **0.017** | **461.4** | **0.6** | **0.013** | **4.8** | **479** | **434** |

[a] HAPs = Hazardous Air Pollutants; assumed = VOCs * 0.1

**All Year Emissions (Alternative A & B) (tons/year)**

| Category | Year | Alternative | VOC | CO | NO₂ | PM₁₀ | PM2.5 | SO₂ | CO₂ | CH₄ | N₂O | HAPs[a] | CO2eq tons | CO2eq metric tonnes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Travel and Transportation Management | 2008 | Alt A | 48.1 | 99.5 | 0.87 | 309.8 | 32.0 | 0.017 | 461.4 | 0.6 | 0.013 | 4.8 | 479 | 434 |
| Comprehensive Travel and Transportation Management | 2009 | Alt A | 49.1 | 101.6 | 0.89 | 316.4 | 32.7 | 0.017 | 471.2 | 0.7 | 0.013 | 4.9 | 489 | 444 |
| Comprehensive Travel and Transportation Management | 2010 | Alt A | 50.1 | 103.7 | 0.91 | 323.0 | 33.4 | 0.017 | 481.0 | 0.7 | 0.013 | 5.0 | 499 | 453 |
| Comprehensive Travel and Transportation Management | 2011 | Alt A | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2012 | Alt A | 52.6 | 108.9 | 0.95 | 338.9 | 35.0 | 0.018 | 504.6 | 0.7 | 0.014 | 5.3 | 524 | 475 |
| Comprehensive Travel and Transportation Management | 2013 | Alt A | 54.0 | 111.8 | 0.98 | 348.1 | 36.0 | 0.019 | 518.5 | 0.7 | 0.014 | 5.4 | 538 | 488 |
| Comprehensive Travel and Transportation Management | 2014 | Alt A | 55.4 | 114.8 | 1.00 | 357.4 | 37.0 | 0.019 | 532.3 | 0.7 | 0.014 | 5.5 | 552 | 501 |
| Comprehensive Travel and Transportation Management | 2015 | Alt A | 56.9 | 117.8 | 1.03 | 366.7 | 37.9 | 0.020 | 546.2 | 0.8 | 0.015 | 5.7 | 567 | 514 |
| Comprehensive Travel and Transportation Management | 2016 | Alt A | 58.3 | 120.8 | 1.05 | 376.0 | 38.9 | 0.020 | 560.0 | 0.8 | 0.015 | 5.8 | 581 | 527 |
| Comprehensive Travel and Transportation Management | 2017 | Alt A | 59.8 | 123.8 | 1.08 | 385.3 | 39.8 | 0.021 | 573.8 | 0.8 | 0.016 | 6.0 | 595 | 540 |
| Comprehensive Travel and Transportation Management | 2018 | Alt A | 61.2 | 126.8 | 1.11 | 394.6 | 40.8 | 0.021 | 587.7 | 0.8 | 0.016 | 6.1 | 610 | 553 |
| Comprehensive Travel and Transportation Management | 2019 | Alt A | 62.7 | 129.8 | 1.13 | 403.9 | 41.8 | 0.022 | 601.5 | 0.8 | 0.016 | 6.3 | 624 | 566 |
| Comprehensive Travel and Transportation Management | 2020 | Alt A | 64.1 | 132.7 | 1.16 | 413.2 | 42.7 | 0.022 | 615.4 | 0.9 | 0.017 | 6.4 | 638 | 579 |
| Comprehensive Travel and Transportation Management | 2021 | Alt A | 65.5 | 135.7 | 1.18 | 422.5 | 43.7 | 0.023 | 629.2 | 0.9 | 0.017 | 6.6 | 653 | 592 |
| Comprehensive Travel and Transportation Management | 2022 | Alt A | 67.0 | 138.7 | 1.21 | 431.8 | 44.6 | 0.023 | 643.1 | 0.9 | 0.017 | 6.7 | 667 | 605 |
| Comprehensive Travel and Transportation Management | 2023 | Alt A | 68.4 | 141.7 | 1.24 | 441.1 | 45.6 | 0.024 | 656.9 | 0.9 | 0.018 | 6.8 | 682 | 618 |
| Comprehensive Travel and Transportation Management | 2024 | Alt A | 69.9 | 144.7 | 1.26 | 450.4 | 46.6 | 0.024 | 670.7 | 0.9 | 0.018 | 7.0 | 696 | 632 |
| Comprehensive Travel and Transportation Management | 2025 | Alt A | 71.3 | 147.7 | 1.29 | 459.7 | 47.5 | 0.025 | 684.6 | 0.9 | 0.019 | 7.1 | 710 | 645 |
| Comprehensive Travel and Transportation Management | 2026 | Alt A | 72.7 | 150.6 | 1.31 | 469.0 | 48.5 | 0.025 | 698.4 | 1.0 | 0.019 | 7.3 | 725 | 658 |
| Comprehensive Travel and Transportation Management | 2027 | Alt A | 74.2 | 153.6 | 1.34 | 478.3 | 49.4 | 0.026 | 712.3 | 1.0 | 0.019 | 7.4 | 739 | 671 |
| Comprehensive Travel and Transportation Management | 2028 | Alt A | 75.6 | 156.6 | 1.37 | 487.5 | 50.4 | 0.026 | 726.1 | 1.0 | 0.020 | 7.6 | 753 | 684 |
| Comprehensive Travel and Transportation Management | 2029 | Alt A | 77.1 | 159.6 | 1.39 | 496.8 | 51.4 | 0.027 | 739.9 | 1.0 | 0.020 | 7.7 | 768 | 697 |
| Comprehensive Travel and Transportation Management | 2030 | Alt A | 78.5 | 162.6 | 1.42 | 506.1 | 52.3 | 0.027 | 753.8 | 1.0 | 0.021 | 7.9 | 782 | 710 |
| Comprehensive Travel and Transportation Management | 2008 | Alt B | 48.1 | 99.5 | 0.87 | 309.8 | 32.0 | 0.017 | 461.4 | 0.6 | 0.013 | 4.8 | 479 | 434 |
| Comprehensive Travel and Transportation Management | 2009 | Alt B | 49.1 | 101.6 | 0.89 | 316.4 | 32.7 | 0.017 | 471.2 | 0.7 | 0.013 | 4.9 | 489 | 444 |
| Comprehensive Travel and Transportation Management | 2010 | Alt B | 50.1 | 103.7 | 0.91 | 323.0 | 33.4 | 0.017 | 481.0 | 0.7 | 0.013 | 5.0 | 499 | 453 |
| Comprehensive Travel and Transportation Management | 2011 | Alt B | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2012 | Alt B | 50.4 | 104.4 | 0.91 | 324.9 | 33.6 | 0.017 | 483.9 | 0.7 | 0.013 | 5.0 | 502 | 456 |
| Comprehensive Travel and Transportation Management | 2013 | Alt B | 49.7 | 102.9 | 0.90 | 320.3 | 33.1 | 0.017 | 477.0 | 0.7 | 0.013 | 4.9 | 495 | 449 |
| Comprehensive Travel and Transportation Management | 2014 | Alt B | 49.0 | 101.4 | 0.88 | 315.6 | 32.6 | 0.017 | 470.0 | 0.7 | 0.013 | 4.8 | 488 | 443 |
| Comprehensive Travel and Transportation Management | 2015 | Alt B | 48.2 | 99.9 | 0.87 | 311.0 | 32.2 | 0.017 | 463.1 | 0.6 | 0.013 | 4.8 | 481 | 436 |
| Comprehensive Travel and Transportation Management | 2016 | Alt B | 47.5 | 98.4 | 0.86 | 306.3 | 31.7 | 0.016 | 456.2 | 0.6 | 0.012 | 4.8 | 473 | 430 |
| Comprehensive Travel and Transportation Management | 2017 | Alt B | 46.8 | 96.9 | 0.85 | 301.7 | 31.2 | 0.016 | 449.3 | 0.6 | 0.012 | 4.7 | 466 | 423 |
| Comprehensive Travel and Transportation Management | 2018 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2019 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2020 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2021 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2022 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2023 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2024 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2025 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2026 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2027 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2028 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2029 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |
| Comprehensive Travel and Transportation Management | 2030 | Alt B | 46.1 | 95.4 | 0.83 | 297.0 | 30.7 | 0.016 | 442.4 | 0.6 | 0.012 | 4.6 | 459 | 417 |

C-31

BLM_0002105

January 2013                                                    Appendix C                                         

## Travel and Transportation Management

**Total Annual Emissions from Comprehensive Travel and Transportation Management Projects (tons/year)**

All Year Emissions (Alternative C & D) (tons/year)

| Category | Year | Alternative | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | N2O | HAPs[9] | CO2eq tons | CO2eq metric tonnes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Comprehensive Travel and Transportation Management | 2008 | Alt C | 48.1 | 99.5 | 0.87 | 309.8 | 32.0 | 0.017 | 461.4 | 0.6 | 0.013 | 4.8 | 479 | 434 |
| Comprehensive Travel and Transportation Management | 2009 | Alt C | 49.1 | 101.6 | 0.89 | 316.4 | 32.7 | 0.017 | 471.2 | 0.7 | 0.013 | 4.9 | 489 | 444 |
| Comprehensive Travel and Transportation Management | 2010 | Alt C | 50.1 | 103.7 | 0.91 | 323.0 | 33.4 | 0.017 | 481.0 | 0.7 | 0.013 | 5.0 | 499 | 453 |
| Comprehensive Travel and Transportation Management | 2011 | Alt C | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2012 | Alt C | 52.6 | 108.9 | 0.95 | 338.9 | 35.0 | 0.018 | 504.6 | 0.7 | 0.014 | 5.3 | 524 | 475 |
| Comprehensive Travel and Transportation Management | 2013 | Alt C | 54.0 | 111.8 | 0.98 | 348.1 | 36.0 | 0.019 | 518.5 | 0.7 | 0.014 | 5.4 | 538 | 488 |
| Comprehensive Travel and Transportation Management | 2014 | Alt C | 55.4 | 114.8 | 1.00 | 357.4 | 37.0 | 0.019 | 532.3 | 0.7 | 0.014 | 5.5 | 552 | 501 |
| Comprehensive Travel and Transportation Management | 2015 | Alt C | 56.9 | 117.8 | 1.03 | 366.7 | 37.9 | 0.020 | 546.2 | 0.8 | 0.015 | 5.7 | 567 | 514 |
| Comprehensive Travel and Transportation Management | 2016 | Alt C | 58.3 | 120.8 | 1.05 | 376.0 | 38.9 | 0.020 | 560.0 | 0.8 | 0.015 | 5.8 | 581 | 527 |
| Comprehensive Travel and Transportation Management | 2017 | Alt C | 59.8 | 123.8 | 1.08 | 385.3 | 39.8 | 0.021 | 573.8 | 0.8 | 0.016 | 6.0 | 595 | 540 |
| Comprehensive Travel and Transportation Management | 2018 | Alt C | 61.2 | 126.8 | 1.11 | 394.6 | 40.8 | 0.021 | 587.7 | 0.8 | 0.016 | 6.1 | 610 | 553 |
| Comprehensive Travel and Transportation Management | 2019 | Alt C | 62.7 | 129.8 | 1.13 | 403.9 | 41.8 | 0.022 | 601.5 | 0.8 | 0.016 | 6.3 | 624 | 566 |
| Comprehensive Travel and Transportation Management | 2020 | Alt C | 64.1 | 132.7 | 1.16 | 413.2 | 42.7 | 0.022 | 615.4 | 0.9 | 0.017 | 6.4 | 638 | 579 |
| Comprehensive Travel and Transportation Management | 2021 | Alt C | 65.5 | 135.7 | 1.18 | 422.5 | 43.7 | 0.023 | 629.2 | 0.9 | 0.017 | 6.6 | 653 | 592 |
| Comprehensive Travel and Transportation Management | 2022 | Alt C | 67.0 | 138.7 | 1.21 | 431.8 | 44.6 | 0.023 | 643.1 | 0.9 | 0.017 | 6.7 | 667 | 605 |
| Comprehensive Travel and Transportation Management | 2023 | Alt C | 68.4 | 141.7 | 1.24 | 441.1 | 45.6 | 0.024 | 656.9 | 0.9 | 0.018 | 6.8 | 682 | 618 |
| Comprehensive Travel and Transportation Management | 2024 | Alt C | 69.9 | 144.7 | 1.26 | 450.4 | 46.6 | 0.024 | 670.7 | 0.9 | 0.018 | 7.0 | 696 | 632 |
| Comprehensive Travel and Transportation Management | 2025 | Alt C | 71.3 | 147.7 | 1.29 | 459.7 | 47.5 | 0.025 | 684.6 | 0.9 | 0.019 | 7.1 | 710 | 645 |
| Comprehensive Travel and Transportation Management | 2026 | Alt C | 72.7 | 150.6 | 1.31 | 469.0 | 48.5 | 0.025 | 698.4 | 1.0 | 0.019 | 7.3 | 725 | 658 |
| Comprehensive Travel and Transportation Management | 2027 | Alt C | 74.2 | 153.6 | 1.34 | 478.3 | 49.4 | 0.026 | 712.3 | 1.0 | 0.019 | 7.4 | 739 | 671 |
| Comprehensive Travel and Transportation Management | 2028 | Alt C | 75.6 | 156.6 | 1.37 | 487.5 | 50.4 | 0.026 | 726.1 | 1.0 | 0.020 | 7.6 | 753 | 684 |
| Comprehensive Travel and Transportation Management | 2029 | Alt C | 77.1 | 159.6 | 1.39 | 496.8 | 51.4 | 0.027 | 739.9 | 1.0 | 0.020 | 7.7 | 768 | 697 |
| Comprehensive Travel and Transportation Management | 2030 | Alt C | 78.5 | 162.6 | 1.42 | 506.1 | 52.3 | 0.027 | 753.8 | 1.0 | 0.021 | 7.9 | 782 | 710 |
| Comprehensive Travel and Transportation Management | 2008 | Alt D | 48.1 | 99.5 | 0.87 | 309.8 | 32.0 | 0.017 | 461.4 | 0.6 | 0.013 | 4.8 | 479 | 434 |
| Comprehensive Travel and Transportation Management | 2009 | Alt D | 49.1 | 101.6 | 0.89 | 316.4 | 32.7 | 0.017 | 471.2 | 0.7 | 0.013 | 4.9 | 489 | 444 |
| Comprehensive Travel and Transportation Management | 2010 | Alt D | 50.1 | 103.7 | 0.91 | 323.0 | 33.4 | 0.017 | 481.0 | 0.7 | 0.013 | 5.0 | 499 | 453 |
| Comprehensive Travel and Transportation Management | 2011 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2012 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2013 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2014 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2015 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2016 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2017 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2018 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2019 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2020 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2021 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2022 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2023 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2024 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2025 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2026 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2027 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2028 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2029 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |
| Comprehensive Travel and Transportation Management | 2030 | Alt D | 51.1 | 105.9 | 0.92 | 329.6 | 34.1 | 0.018 | 490.8 | 0.7 | 0.013 | 5.1 | 509 | 462 |

BLM_0002106

January 2013                                             Appendix C                                             ENVIRON

## Travel and Transportation Management

**Activty Inputs**

inputs in yellow highlighted cells

### Alternative Scenarios

| Alternative | Annual Short Term (10-yr) Growth Rate | Annual Long Term (20-yr) Growth Rate | Percent Annual Growth from Base Year 2008 to 2011 |
|---|---|---|---|
| Alternative A | 3% | 3% | 2% |
| Alternative B | -1.5% | 0% | |
| Alternative C | 3% | 3% | |
| Alternative D | 0% | 0% | |

* growth rates based on GJFO and confirmed by Julie Jackson of the Uuncompahgre Field Office

### 2011 Data

| Parameter | ATVs | Motorcyles |
|---|---|---|
| Miles Per Visitor* | 14.4 | 14.4 |
| 2011 Visitors | 89,829 | 42,794 |
| Annual VMT | 1,293,538 | 616,234 |
| Average Speed | 15 | 15 |

Avg of GJFO Estimates, confirmed with Julie Jackson, BLM

| Parameter | Snowmobiles |
|---|---|
| Hours of Operation per Visitor | 4 |
| 2011 Visitors | 11,785 |
| Annual Hours | 47140 |

| Road Maintenance | Grader | backhoe |
|---|---|---|
| Cumulative Length of Roads Maintained per Year by Grader (miles) | 65 | 65 |
| Total # of Operating Hours per Year | 217 | 260 |

green text data is from UFO general survey

| Equipment Type | Capacity (hp) | Total # of Operating Hours |
|---|---|---|
| Grader | 135 | 217 |
| Snowplow | 0 | 0 |

orange text data is from GJFO general survey
blue text data derived from Lander RMP

| | | |
|---|---|---|
| Average Miles of Maintained Road per Road Maintenance Project - Summer | 65 | UFO General Activity Request |
| Average Number of Annual Projects | 1 | UFO General Activity Request |
| Unpaved Emission Control % | 0% | assumed conservatively |

green text data is from UFO general survey

| Parameters for Summer Period | Horsepower per piece of equipment (hp) | # of pieces of equipment type | Average Load Factor (%) | Hours of Operation per Day of Project | Road Length Worked On per Day for Project (miles) |
|---|---|---|---|---|---|
| Grader | 150 | 1 | 0.6 | 10 | 3 |
| Forklift | - | - | | - | - |
| Backhoe | 65 | 1 | 0.21 | 4 | 1 |
| Semi Truck* | 200 | 1 | | 2 | 1 |
| Bobcat | - | - | | - | - |
| Loader | - | - | | - | - |
| Dump Truck | - | - | | - | - |
| Airport Forklift | - | - | | - | - |

*accounted for in on-road emissions
green text data is from UFO general survey
orange text data is from GJFO general survey

BLM_0002107

January 2013                                        Appendix C



**Travel and Transportation Management**

**Activty Inputs**

**Future Year Activity Scaling Factors Relative to 2008**

| Year | Alternative A | Alternative B | Alternative C | Alternative D |
|------|------|------|------|------|
| 2008 | 100% | 100% | 100% | 100% |
| 2009 | 102% | 102% | 102% | 102% |
| 2010 | 104% | 104% | 104% | 104% |
| 2011 | 106% | 106% | 106% | 106% |
| 2012 | 109% | 105% | 109% | 106% |
| 2013 | 112% | 103% | 112% | 106% |
| 2014 | 115% | 102% | 115% | 106% |
| 2015 | 118% | 100% | 118% | 106% |
| 2016 | 121% | 99% | 121% | 106% |
| 2017 | 124% | 97% | 124% | 106% |
| 2018 | 127% | 96% | 127% | 106% |
| 2019 | 130% | 96% | 130% | 106% |
| 2020 | 133% | 96% | 133% | 106% |
| 2021 | 136% | 96% | 136% | 106% |
| 2022 | 139% | 96% | 139% | 106% |
| 2023 | 142% | 96% | 142% | 106% |
| 2024 | 145% | 96% | 145% | 106% |
| 2025 | 148% | 96% | 148% | 106% |
| 2026 | 151% | 96% | 151% | 106% |
| 2027 | 154% | 96% | 154% | 106% |
| 2028 | 157% | 96% | 157% | 106% |
| 2029 | 160% | 96% | 160% | 106% |
| 2030 | 163% | 96% | 163% | 106% |

BLM_0002108

January 2013                                    Appendix C



## Travel and Transportation Management

**Exhaust Emissions from Recreational Vehicle Operation**

**Exhaust Emissions Factors for Recreation Vehicles on Unpaved and Paved Roads**

| HP Range | NR Equipment Type | Emission Rates (g/mile for ATV and MC, g/hp-hr for Snowmobiles) | | | | | | | | |
| | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | $N_2O$[1] |
|---|---|---|---|---|---|---|---|---|---|---|
| not applicable | All Terrain Vehicles | 15.770 | 47.711 | 0.432 | 0.467 | 0.430 | 0.007 | 212.988 | 0.277 | 0.005 |
| not applicable | Motorcycles: Off-Road | 39.221 | 48.797 | 0.321 | 1.393 | 1.282 | 0.007 | 211.986 | 0.396 | 0.007 |
| 75 | Snowmobiles | 38.236 | 89.755 | 0.520 | 0.960 | 0.883 | 0.023 | 686.393 | 0.327 | 0.017 |

1. N2O factor source: 2009 API O&G GHG Methodologies Compendium, Tables 4-13 and 4-17. 130,500 Btu/gallon, 2545 Btu/hp-hr.
Source: EPA NONROADS 2008a

**Combustive Emission Estimations for Recreation Vehicles on Unpaved and Paved Roads - All Project Years**

| Activity | Equipment Type[a] | Class | Total Annual Vehicle Miles Traveled/ Activity -or- Annual Hours for Snowmobiles | Emissions (tons/year) | | | | | | | | |
| | | | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | $N_2O$[a] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Recreation | ATV | All Terrain Vehicles | 1,293,508 | 2.25E+01 | 6.80E+01 | 6.16E-01 | 6.66E-01 | 6.13E-01 | 1.01E-02 | 3.04E+02 | 3.95E-01 | 7.68E-03 |
| | Off-Road Motorcycles | Off-Road Motorcycles | 616,234 | 2.66E+01 | 3.31E+01 | 2.18E-01 | 9.46E-01 | 8.71E-01 | 4.74E-03 | 1.44E+02 | 2.69E-01 | 4.73E-03 |
| | Snowmobiles | Snowmobiles | 47,140 | 1.99E+00 | 4.66E+00 | 2.70E-02 | 4.99E-02 | 4.59E-02 | 1.19E-03 | 3.57E+01 | 1.70E-02 | 8.88E-04 |
| | | | Total | 5.11E+01 | 1.06E+02 | 8.61E-01 | 1.66E+00 | 1.53E+00 | 1.60E-02 | 4.83E+02 | 6.81E-01 | 1.33E-02 |

[a] All recreation vehicles are assumed gasoline-powered. All road maintenance are assumed diesel-powered.
[a] assumes 2 trips on road surface for road maintenance

BLM_0002109

Appendix C



**Travel and Transportation Management**

**Fugitive Dust from Recreational Vehicle Operation**

**Emission Factors for Publicly Accessible Unpaved Roads[a]**

|  | Parameter | $PM_{10}$ | $PM_{2.5}$ |
|---|---|---|---|
| $E \text{ (lb/VMT)} = \dfrac{k\,(s/12)^a\,(S/30)^d}{(M/0.5)^c} - C$ | k | 1.8 | 0.18 |
|  | a | 1 | 1 |
|  | d | 0.5 | 0.5 |
| $E_{ext} = E\,(1 - P/365)$ | c | 0.2 | 0.2 |

| Function/Variable Description | | Assumed Value | Reference |
|---|---|---|---|
| E = size-specific emission factor (lb/VMT) | | | |
| $E_{ext}$ = size-specific emission factor extrapolated for natural mitigation (lb/VMT) | | | |
| s = surface material silt content (%) | | 5.1 | EPA AP-42 Section 13.2.2, Table 13.2.3-1 |
| S = mean vehicle speed (mph) | | | |
| C = emission factor for 1980's vehicle fleet exhaust, brake wear, and tire wear (lb/VMT) | $PM_{2.5}$ | 0.00036 | EPA AP-42 Section 13.2.2, Table 13.2.3-4 |
|  | $PM_{10}$ | 0.00047 | EPA AP-42 Section 13.2.2, Table 13.2.3-4 |
| M = surface material moisture content (%) | | 2.0 | EPA AP-42 Section 13.2.2 |
| P = Number of days precip per year | | 59 | http://www.wrcc.dri.edu, GRAND JUNCTION 6 ESE, COLORADO |
| CE = control percent for applying dust suppressant to unpaved roads [b] | | 0% | assumed conservatively |

[a] Source: EPA, AP-42 Volume I, Section 13.2.2 Unpaved Roads, Table 13.2.2-2, Nov. 2006
[b] Fitzpatrick, M. 1990. User's Guide: Emission Control Technologies and Emission Factors for Unpaved Road Fugitive Emissions, EPA/625/5-87/022.   http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000BSFC.

**Fugitive Dust Emission Estimations for Recreation Vehicles on Unpaved Roads**

| Activity | Equipment Type | Avg. Vehicle Speed (mph) | Total Annual Vehicle Miles | $PM_{10}$ | | | $PM_{2.5}$ | | |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  | Controlled Em. Factor (lb/VMT) | Emissions | | Controlled Em. Factor (lb/VMT) | Emissions | |
|  |  |  |  |  | (tons/vehicle type) | (tons/year) |  | (tons/vehicle type) | (tons/year) |
| Recreation | ATV | 15 | 1,293,538 | 0.34 | 222.03 | 327.81 | 0.03 | 22.03 | 32.53 |
|  | Off-Road Motorcyles | 15 | 616,234 | 0.34 | 105.77 |  | 0.03 | 10.50 |  |
| | | | Total | | 327.81 | | | 32.53 | |

BLM_0002110

January 2013                                         Appendix C



## Travel and Transportation Management

**Dust and Exhaust Emissions for Road Maintenance**

**Estimation of Total and Cumulative Length of Roads by Grader**

| Cumulative Length of Roads Maintained per Year by Grader (miles) | 65.00 |
|---|---|

**Emission Factors for Grader**

| Pollutant | Emission Factor Equation (lb/VMT) | $S^a$ (mph) | Emission Factor (lb/VMT) |
|---|---|---|---|
| $PM_{10}$ | $E = (0.6)(0.051) S^2$ | 5 | 0.765 |
| $PM_{2.5}$ | $E = (0.031)(0.04) S^{2.5}$ | 5 | 0.069 |

$^a$ Assumed a mean vehicle speed (S) of 5 mph
Source: EPA AP-42, Section 11.9, Table 11.9-1

**Fugitive Dust Emissions Estimation for Maintenance Equipment**

| Activity | Equipment | Total # of Operating Hours per Year | Mean Vehicle Speed (mph) | Total Miles Maintained | $PM_{10}$ Em. Factor (lb/VMT) | $PM_{10}$ (tons/year) | $PM_{2.5}$ Em. Factor (lb/VMT) | $PM_{2.5}$ (tons/year) |
|---|---|---|---|---|---|---|---|---|
| Road Maintenance | Grader | 217 | 5 | 65 | 0.765 | 2.49E-02 | 0.069 | 2.25E-03 |
| Road Maintenance | Backhoe | 260 | 5 | 65 | 0.765 | 2.49E-02 | 0.069 | 2.25E-03 |
| | | | | Totals | | 4.97E-02 | | 4.51E-03 |

| HP Range | NR Equipment Type | Emission Rates (g/hp-hr) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | $N_2O^1$ |
| 175 | Graders | 0.210 | 0.889 | 2.598 | 0.200 | 0.194 | 0.069 | 316.105 | 0.003 | 0.003 |
| 75 | Tractors/Loaders/Backhoes | 0.349 | 1.617 | 1.445 | 0.253 | 0.246 | 0.032 | 145.121 | 0.005 | 0.001 |

1. N2O factor source: 2009 API O&G GHG Methodologies Compendium, Tables 4-13 and 4-17. 130,500 Btu/gallon, 2545 Btu/hp-hr.
Source: EPA NONROADS 2008a

**Exhaust Emissions Estimation for Grader or Snowplow**

| Activity | Vehicle Type | Capacity (hp) | Load Factor (%) | Total # of Operating Hours | Emissions (tons/year) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | VOC | CO | $NO_x$ | $PM_{10}$ | $PM_{2.5}$ | $SO_x$ | $CO_2$ | $CH_4$ | $N_2O$ |
| Road Maintenance | Grader | 150 | 59 | 217 | 4.45E-03 | 1.88E-02 | 5.49E-02 | 4.23E-03 | 4.10E-03 | 1.45E-03 | 6.68E+00 | 6.63E-05 | 5.34E-05 |
| | Backhoe | 85 | 21 | 260 | 1.37E-03 | 6.32E-03 | 5.65E-03 | 9.91E-04 | 9.61E-04 | 1.23E-04 | 5.68E-01 | 2.04E-05 | 4.56E-06 |
| | Snowplow | 0 | | 0 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 |
| | | | | Total | 5.81E-03 | 2.51E-02 | 6.06E-02 | 5.22E-03 | 5.07E-03 | 1.58E-03 | 7.25E+00 | 8.67E-05 | 5.80E-05 |

C-37

BLM_0002111



## Travel and Transportation Management

**Dust and Exhaust Emissions for Road Maintenance**

**Emission Factors for Road Traffic**

| | | | Parameter | $PM_{10}$ | $PM_{2.5}$ |
|---|---|---|---|---|---|
| E (lb/VMT) = | $\frac{k (s/12)^a (S/30)^d}{(M/0.5)^c}$ - C | | k | 1.8 | 0.18 |
| | | | a | 1 | 1 |
| | | | d | 0.5 | 0.5 |
| $E_{ext}$ = E (1 - P/365) | | | c | 0.2 | 0.2 |

| Function/Variable Description | | Assumed Value | Reference |
|---|---|---|---|
| E = size-specific emission factor (lb/VMT) | | | |
| $E_{ext}$ = size-specific emission factor extrapolated for natural mitigation (lb/VMT) | | | |
| s = surface material silt content (%) | | 5.1 | EPA AP-42 Section 13.2.2, Table 13.2.2-1 |
| S = mean vehicle speed (mph) | | Listed in the table below | |
| C = emission factor for 1980's vehicle fleet exhaust, brake wear, and tire wear (lb/VMT) | $PM_{2.5}$ | 0.00036 | EPA AP-42 Section 13.2.2, Table 13.2.2-4 |
| | $PM_{10}$ | 0.00047 | EPA AP-42 Section 13.2.2, Table 13.2.2-4 |
| M = surface material moisture content (%) | | 2.0 | EPA AP-42 Section 13.2.2 |
| P = Number of days precip per year | | 59 | http://www.wrcc.dri.edu, GRAND JUNCTION 6 ESE, COLORADO |

[1] Source: EPA, AP-42 Volume I, Section 13.2.2 Unpaved Roads, Table 13.2.2-2, Nov. 2006
[2] Fitzpatrick, M. 1990. User's Guide: Emission Control Technologies and Emission Factors for Unpaved Road Fugitive Emissions, EPA/625/5-87/022.  http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000BSFC.

**Emissions Estimation for Commuting Maintenance Vehicles Road Traffic**

| Activity | Vehicle Type | Avg. Vehicle Speed (mph) | Total Miles Traveled | $PM_{10}$ Em. Factor (lb/VMT) | $PM_{10}$ (tons/year) | $PM_{2.5}$ Em. Factor (lb/VMT) | $PM_{2.5}$ (tons/year) |
|---|---|---|---|---|---|---|---|
| Road Maintenance | Pickup Truck | 35 | 65.00 | 0.52 | 1.70E-02 | 0.05 | 1.70E-03 |
| Road Maintenance | Semi-Truck | 35 | 65.00 | 0.52 | 1.70E-02 | 0.05 | 1.70E-03 |
| | | | Totals | | 3.41E-02 | | 3.39E-03 |

**Exhaust Emission Factors for Commuting Maintenance Vehicles Road Traffic**

| Vehicle Class | Emission Factors (g/mi) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | VOC | CO | $NO_x$ | $PM_{10}$ | $PM_{2.5}$ | SOx | $CO_2$ | $CH_4$ | $N_2O$[a] |
| Light-Duty Diesel Truck | 0.70 | 3.11 | 5.17 | 0.33 | 0.30 | 0.02 | 729.87 | 0.01 | 0.002 |
| Heavy Duty-Duty Diesel Truck | 0.85 | 3.80 | 17.02 | 0.77 | 0.70 | 0.06 | 2004.18 | 0.04 | 0.005 |

Source: MOVES2010a
[a] N2O factor source: 2009 API O&G GHG Methodologies Compendium, Tables 4-13 and 4-17. 130,500 Btu/gallon, 2545 Btu/hp-hr.

**Exhaust Emissions Estimation for Commuting Maintenance Vehicles Road Traffic**

| Activity | Vehicle | | Total Miles Traveled | Emissions (tons/year) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Type | Class | | VOC | CO | $NO_x$ | $PM_{10}$ | $PM_{2.5}$ | $SO_x$ | $CO_2$ | $CH_4$ | $N_2O$ |
| Road Maintenance | Pickup Truck | LDDV | 65.0 | 5.00E-05 | 2.23E-04 | 3.70E-04 | 2.36E-05 | 2.14E-05 | 1.65E-06 | 5.23E-02 | 9.72E-07 | 1.07E-07 |
| Road Maintenance | Pickup Truck | HDDV8 | 65.0 | 6.06E-05 | 2.73E-04 | 1.22E-03 | 5.52E-05 | 5.04E-05 | 4.50E-06 | 1.44E-01 | 2.98E-06 | 3.44E-07 |
| | | Total | | 1.11E-04 | 4.96E-04 | 1.59E-03 | 7.88E-05 | 7.17E-05 | 6.15E-06 | 1.96E-01 | 3.93E-06 | 4.51E-07 |

BLM_0002112

January 2013                                      Appendix C                                      

## Livestock Grazing

**Total Annual Emissions from Livestock Grazing Projects (tons/year)**

**Base Year 2008 Emissions (tons/year)**

| Category | Subcategory | Emission Type | Fuel Type | VOC | CO | NOₓ | PM₁₀ | PM2.5 | SO₂ | CO₂ | CH₄ | N₂O | HAPsᵃ | CO₂ₑq tons | CO₂ₑq metric tonnes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livestock Grazing | Heavy Equipment | dust | na | - | | | 0.206 | 0.026 | | - | | | - | - | - |
| Livestock Grazing | Heavy Equipment | exhaust | diesel | 0.004 | 0.02 | 0.05 | 0.004 | 0.004 | 0.0015 | 6.9 | 0.0001 | 0.0001 | 0.0004 | 7 | 6 |
| Livestock Grazing | Commuting Vehicles | dust | na | - | - | - | 0.376 | 0.037 | - | - | - | - | - | - | - |
| Livestock Grazing | Commuting Vehicles | exhaust | All Terrain Vehicles | 0.000 | 0.00 | 0.00 | 0.000 | 0.000 | 0.0000 | 0.0 | 0.0000 | 0.0000 | 0.0000 | 0 | 0 |
| Livestock Grazing | Commuting Vehicles | exhaust | gasoline | 0.019 | 0.26 | 0.03 | 0.001 | 0.001 | 0.0003 | 8.3 | 0.0011 | 0.0007 | 0.0019 | 9 | 8 |
| Livestock Grazing | Commuting Vehicles | exhaust | diesel | 0.003 | 0.01 | 0.06 | 0.003 | 0.002 | 0.0002 | 6.8 | 0.0001 | 0.0000 | 0.0003 | 7 | 6 |
| Livestock Grazing | Enteric Fermentation | enteric | na | - | | - | - | - | - | - | 1,348 | - | - | 28,308 | 25,688 |
| **Total** | | | | **0.027** | **0.29** | **0.14** | **0.589** | **0.071** | **0.0020** | **22.0** | **1,348** | **0.0008** | **0.0027** | **28,331** | **25,708** |

ᵃ HAPs = Hazardous Air Pollutants; assumed = VOCs * 0.1

**All Year Emissions (Alternative A & B) (tons/year) (forecasted based on estimated AUMs by alternative)**

| Category | Year | Alternative | VOC | CO | NOₓ | PM₁₀ | PM2.5 | SO₂ | CO₂ | CH₄ | N₂O | HAPsᵃ | CO₂ₑq tons | CO₂ₑq metric tonnes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livestock Grazing | 2008 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2009 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2010 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2011 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2012 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2013 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2014 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2015 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2016 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2017 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2018 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2019 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2020 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2021 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2022 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2023 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2024 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2025 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2026 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2027 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2028 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2029 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2030 | Alt A | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2008 | Alt B | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2009 | Alt B | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2010 | Alt B | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2011 | Alt B | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2012 | Alt B | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1,348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2013 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2014 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2015 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2016 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2017 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2018 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2019 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2020 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2021 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2022 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2023 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2024 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2025 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2026 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2027 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2028 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2029 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |
| Livestock Grazing | 2030 | Alt B | 0.024 | 0.26 | 0.12 | 0.525 | 0.063 | 0.0018 | 19.6 | 1,201 | 0.001 | 0.002 | 25,244 | 22,907 |

BLM_0002113

January 2013                                        Appendix C



## Livestock Grazing

**Total Annual Emissions from Livestock Grazing Projects (tons/year)**

All Year Emissions (Alternative C & D) (tons/year) (forecasted based on estimated AUMs by alternative)

| Category | Year | Alternative | VOC | CO | NO$_x$ | PM$_{10}$ | PM2.5 | SO$_2$ | CO$_2$ | CH$_4$ | N$_2$O | HAPs[a] | CO$_{2eq}$ tons | CO$_{2eq}$ metric tonnes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Livestock Grazing | 2008 | Alt C | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1.348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2009 | Alt C | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1.348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2010 | Alt C | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1.348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2011 | Alt C | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1.348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2012 | Alt C | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1.348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2013 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2014 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2015 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2016 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2017 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2018 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2019 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2020 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2021 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2022 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2023 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2024 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2025 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2026 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2027 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2028 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2029 | Alt C | 0.026 | 0.28 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2030 | Alt C | 0.026 | 0.29 | 0.13 | 0.566 | 0.068 | 0.0019 | 21.2 | 1.294 | 0.001 | 0.003 | 27,200 | 24,682 |
| Livestock Grazing | 2008 | Alt D | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1.348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2009 | Alt D | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1.348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2010 | Alt D | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1.348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2011 | Alt D | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1.348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2012 | Alt D | 0.027 | 0.29 | 0.14 | 0.589 | 0.071 | 0.0020 | 22.0 | 1.348 | 0.001 | 0.003 | 28,331 | 25,708 |
| Livestock Grazing | 2013 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2014 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2015 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2016 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2017 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2018 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2019 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2020 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2021 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2022 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2023 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2024 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2025 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2026 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2027 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2028 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2029 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |
| Livestock Grazing | 2030 | Alt D | 0.025 | 0.28 | 0.13 | 0.559 | 0.067 | 0.0019 | 20.9 | 1.280 | 0.001 | 0.003 | 26,898 | 24,408 |

BLM_0002114

January 2013 Appendix C 

## Livestock Grazing

**Activity Inputs**

inputs in yellow highlighted cells

**Alternative Scenarios**

| Alternative | AUMs | Percent Change from Alternative A Over RMP |
|---|---|---|
| Alternative A | 38,364 | 0% |
| Alternative B | 34,184 | -11% |
| Alternative C | 36,833 | -4% |
| Alternative D | 36,424 | -5% |

**Future Year Activity Projections (estimated based on AUMs)**

| Year | Billed Average Annual AUMs | | | |
|---|---|---|---|---|
| | Alternative A | Alternative B | Alternative C | Alternative D |
| 2008 | 100% | 100% | 100% | 100% |
| 2009 | 100% | 100% | 100% | 100% |
| 2010 | 100% | 100% | 100% | 100% |
| 2011 | 100% | 100% | 100% | 100% |
| 2012 | 100% | 100% | 100% | 100% |
| 2013 | 100% | 89% | 96% | 95% |
| 2014 | 100% | 89% | 96% | 95% |
| 2015 | 100% | 89% | 96% | 95% |
| 2016 | 100% | 89% | 96% | 95% |
| 2017 | 100% | 89% | 96% | 95% |
| 2018 | 100% | 89% | 96% | 95% |
| 2019 | 100% | 89% | 96% | 95% |
| 2020 | 100% | 89% | 96% | 95% |
| 2021 | 100% | 89% | 96% | 95% |
| 2022 | 100% | 89% | 96% | 95% |
| 2023 | 100% | 89% | 96% | 95% |
| 2024 | 100% | 89% | 96% | 95% |
| 2025 | 100% | 89% | 96% | 95% |
| 2026 | 100% | 89% | 96% | 95% |
| 2027 | 100% | 89% | 96% | 95% |
| 2028 | 100% | 89% | 96% | 95% |
| 2029 | 100% | 89% | 96% | 95% |
| 2030 | 100% | 89% | 96% | 95% |

**Base Year Data**

**Construction-Fugitive Dust**

| Construction Activity | Total Disturbed Acres/ Year | Source |
|---|---|---|
| Springs | 0.25 | UFO General Activity Request |
| Reservoirs/Pits | 3.00 | UFO General Activity Request |
| Wells | 0.00 | UFO General Activity Request |
| Pipelines | 0.20 | UFO General Activity Request |
| Fences | 0.00 | UFO General Activity Request |
| Reservoirs Maintenance | 3.00 | UFO General Activity Request |

**Construction-Heavy Equipment Exhaust**

| Construction Activity | Equipment Type | Capacity (hp) | # of Units | Avg. Load Factor (%) | # of Hours/Day | # of Days/ Project | # of Projects/ Year |
|---|---|---|---|---|---|---|---|
| Springs | Backhoe | 89 | 1.0 | 60 | 6 | 3 | 1 |
| | Dump Truck | 375 | 1.0 | 50 | 2 | 3 | 1 |
| | Other | | 0.0 | | | 3 | 1 |
| Reservoirs/Pits | Bulldozer | 145 | 1.0 | 50 | 8 | 2 | 1 |
| | Scraper | | 0.0 | | | 2 | 1 |
| | Other | | 0.0 | | | 2 | 1 |
| Wells | Drill Rig | 300 | 1.0 | 60 | 10 | 0 | 0 |
| | Backhoe | 89 | 1.0 | 60 | 6 | 0 | 0 |
| | Water Truck | 330 | 1.0 | 40 | 2 | 0 | 0 |
| | Other | | 0.0 | | | 0 | 0 |
| Pipelines | Dozer | 145 | 1.0 | 80 | 8 | 0 | 0 |
| | Trencher | | 0.0 | | | 0 | 0 |
| | Backhoe | | 0.0 | | | 0 | 0 |
| Fences (Miles/yr.) | Auger Truck | 250 | 1.0 | 50 | 8 | 8 | 1 |
| Reservoir Maintenance | Bulldozer | 145 | 1.0 | 50 | 8 | 2 | 7 |

* Assume activity per project is the same as in Grand Junction but that # projects/year is reduced in D-E due to fewer animals.
blue text data derived from Lander RMP
orange text data is from GJFO general survey
green text data is from UFO general survey

BLM_0002115

January 2013                                              Appendix C



## Livestock Grazing

**Activity Inputs**

| CE = emission control percent for unpaved roads* | 50% | watering |
|---|---|---|

* Assume same percent for D-E as GJ

**Fugitive Dust Emission Estimations for Commuting Vehicle on Unpaved Roads - All Project Years**

| Construction Activity | Equipment Type | Avg. Vehicle Speed (mph) | Round Trip Distance (miles) UNPAVED | # of Round Trips/Project | Round Trip Distance (miles) PAVED+UNPAVED |
|---|---|---|---|---|---|
| Springs | Dump Truck | 30.0 | 25.0 | 2.0 | 145.0 |
| | Tractor-Trailer | 30.0 | 25.0 | 0.0 | 145.0 |
| | Pick-up Truck | 25.0 | 14.0 | 61.0 | 75.0 |
| Reservoirs/Pits | Tractor-Trailer | 30.0 | 25.0 | 10.0 | 145.0 |
| | Pick-up Truck | 32.0 | 17.0 | 16.0 | 100.0 |
| Wells | Drill Truck | 30.0 | 25.0 | 1.0 | 145.0 |
| | Support Truck | 30.0 | 25.0 | 2.0 | 145.0 |
| | Water Truck | 30.0 | 25.0 | 4.0 | 145.0 |
| | Pick-up Truck | 40.0 | 25.0 | 5.0 | 145.0 |
| Pipelines | Tractor-Trailer | 30.0 | 25.0 | 1.0 | 145.0 |
| | Pick-up Truck | 40.0 | 25.0 | 4.0 | 145.0 |
| Fences | Support Truck | 30.0 | 25.0 | 1.0 | 145.0 |
| | Pick-up Truck | 30.0 | 25.0 | 3.0 | 145.0 |
| | ATV | 25.0 | 2.0 | 1.0 | 2.0 |
| Reservoirs Maintenance | Tractor-Trailer | 30.0 | 25.0 | 1.0 | 145.0 |
| | Pick-up Truck | 40.0 | 25.0 | 5.0 | 145.0 |
| Livestock Management | Tractor-Trailer (spring turnout, fall gather) | 40.0 | 15.0 | 1.0 | 85.0 |
| | Pick-up-Trailer (spring calves) | 40.0 | 15.0 | 1.0 | 85.0 |

blue text data derived from Lander RMP

**Methane Emissions from Livestock - All Project Years**

| Livestock Category | Permitted head of animals* | % of year grazing on Federal Lands |
|---|---|---|
| Cattle | 20,182 | 100.0 |
| Horse | 0.0 | 0.0 |
| Buffalo | 0.0 | 0.0 |
| Sheep | 18,182 | 75.0 |

* Sources:
   (1) UFO general survey,
   (2) Ch2_Draft_FF-Review_ToMH_20120411.docx

BLM_0002116

January 2013        Appendix C

 ENVIRON

## Livestock Grazing

**Fugitive Dust from Heavy Construction Operations**

| INPUTS & ASSUMPTIONS | | | |
|---|---|---|---|
| **Description** | **Value** | **Source** | **Notes** |
| TSP Emission Factor | 1.2 | b | Tons TSP/acre-month |
| Conversion factor for TSP to $PM_{10}$ | 0.35 | c | Percentage of TSP |
| Conversion factor for $PM_{10}$ to $PM_{2.5}$ | 0.1 | d | Percentage of $PM_{10}$ |

[a] Fitzpatrick, M. 1990. *User's Guide: Emission Control Technologies and Emission Factors for Unpaved Road Fugitive Emissions*, EPA/625/6-87/022.  http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=20008SFC.

[b] EPA, AP-42, Volume I, Section 13.2.3 Heavy Construction Operations, Jan. 1995 (Errata Feb. 2010)

[c] EPA, AP-42, Volume I, Section 13.2.4 Aggregate Handling and Storage Piles, Nov. 2006
[d] Midwest Research Institute. 2006. *Background Document for Revisions to Fine Fraction Ratios Used for AP-42 Fugitive Dust Emission Factors*. Report prepared for the Western Governors' Association, Western Regional Air Partnership (WRAP), MRI Project No. 110397. November 1, 2006.

**Fugitive Dust Emissions Estimation for Construction Activities - All Project Years**

| Construction Activity | Total Disturbed Acres/ Year | # of Days to Complete/ Year[1] | Emissions (tons/year) | | |
|---|---|---|---|---|---|
| | | | TSP | $PM_{10}$ | $PM_{2.5}$ |
| Springs | 0.25 | 1 | 1.00E-02 | 3.50E-03 | 3.50E-04 |
| Reservoirs/Pits | 3.00 | 1 | 1.20E-01 | 4.20E-02 | 4.20E-03 |
| Wells | 0.00 | 1 | 0.00E+00 | 0.00E+00 | 0.00E+00 |
| Pipelines | 0.20 | 1 | 8.00E-03 | 2.80E-03 | 2.80E-04 |
| Fences | 0.00 | 1 | 0.00E+00 | 0.00E+00 | 0.00E+00 |
| Reservoirs Maintenance | 3.00 | 1 | 1.20E-01 | 4.20E-02 | 4.20E-03 |
| | | Total | 2.58E-01 | 9.03E-02 | 9.03E-03 |

[a] Information from MCFO. Assumes no emissions controls.
1. assumes total acreage is disturbed once annually, so input one day for calculation purposes

**Wind Erosion Associated with Land Disturbance**
*Emission Factors for Industrial Wind Erosion*

| $E$ (tons/year) $=$ | $\dfrac{k \cdot P \cdot M \cdot N}{453.6 \cdot 2000}$ |
|---|---|
| AP-42 Section 13.2.5.3 Equation 2 | |

| Erosion Potential $P$ (g/m2/year) = | $58(U^*-U_t^*)^2 + 25d(U^*-U_t^*)$ |
|---|---|
| for $U^*>U_t^*$; $P=0$ otherwise | AP-42 Section 13.2.5.3 Equation 3 |
| Friction Velocity $U^*$ (m/s) = | $0.053 \, U_{10}^+$ |
| AP-42 Section 13.2.5.3 Equation 4 | |

$P$ = Erosion Potential (gm/m²/yr)    $M$ = Disturbed area (m²)
$U^*$ = Friction velocity (m/s)    $N$ = # of disturbances
$U_t$ = threshold velocity (m/s)    $k$ = 0.5 for $PM_{10}$
$U10$ = fastest wind speed (m/s)    $k$ = 0.075 for $PM_{2.5}$

$U_{10}$ = 23.30      52.12 mph, input value (fastest)
$U_t$-overburden = 1.02      AP-42 Industrial Wind Erosion Table 13.2.5-2. Overburden

**Wind Erosion Emissions - Based on Disturbed Acres**

| | Fastest Mile ($U_{10}$) (m/s) | Max. Friction Velocity ($U^*$) (m/s) | Erosion Potential ($P$) (g/m²/yr) | Annual Disturbed Acres | Disturbed Area ($M$) (m²) | Number of Disturbances ($N$) | $PM_{10}$ Emissions (tons/year) | $PM_{2.5}$ Emissions (tons/year) |
|---|---|---|---|---|---|---|---|---|
| Project Area | 23.30 | 1.23 | 8.05 | 6.45 | 26111.71 | 1.00 | 0.12 | 0.02 |

BLM_0002117

Appendix C   

## Livestock Grazing

**Exhaust Emissions for Diesel-Powered Off-Road Construction Equipment**

Exhaust Emission Factors for Diesel-Powered Off-Road Construction Equipment

| HP Range | NR Equipment | Emission Rates (g/hp-hr) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | N₂O[1] |
| 100 | ers/Loaders/Bad | 0.353 | 1.661 | 1.454 | 0.259 | 0.252 | 0.032 | 145.112 | 0.005 | 0.001 |
| 600 | ff-highway Bac | 0.116 | 0.898 | 2.299 | 0.133 | 0.129 | 0.069 | 318.385 | 0.002 | 0.003 |
| 175 | Crawler Tractor | 0.212 | 0.897 | 2.616 | 0.201 | 0.195 | 0.069 | 318.101 | 0.003 | 0.003 |
| 300 | Bore/Drill Rigs | 0.230 | 0.867 | 2.801 | 0.172 | 0.167 | 0.050 | 227.665 | 0.003 | 0.002 |
| 100 | ers/Loaders/Bad | 0.353 | 1.661 | 1.454 | 0.259 | 0.252 | 0.032 | 145.112 | 0.005 | 0.001 |
| 600 | ff-highway Truc | 0.116 | 0.898 | 2.299 | 0.133 | 0.129 | 0.069 | 318.385 | 0.002 | 0.003 |
| 175 | Crawler Tractor | 0.212 | 0.897 | 2.616 | 0.201 | 0.195 | 0.069 | 318.101 | 0.003 | 0.003 |
| 300 | ff-highway Truc | 0.164 | 0.723 | 2.086 | 0.145 | 0.141 | 0.069 | 318.242 | 0.002 | 0.003 |
| 175 | Crawler Tractor | 0.212 | 0.897 | 2.616 | 0.201 | 0.195 | 0.069 | 318.101 | 0.003 | 0.003 |

Source: EPA NONROADS 2008a

[1] N2O factor source: 2009 API O&G GHG Methodologies Compendium, Tables 4-13 and 4-17. 130,500 Btu/gallon, 2545 Btu/hp-hr.

Combustive Emissions Estimation for Construction Activities

| Construction Activity | Equipment Type | Capacity (hp) | # of Units | Avg. Load Factor (%) | # of Hours/Day | # of Days/ Project | # of Projects/ Year | Total Hours/ Unit/Year | Emissions (tons/year) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | N₂O |
| Springs | Backhoe | 89.0 | 1.0 | 60.0 | 6.0 | 3.0 | 1.0 | 18.0 | 3.74E-04 | 1.76E-03 | 1.54E-03 | 2.75E-04 | 2.67E-04 | 3.34E-05 | 1.54E-01 | 5.57E-06 | 1.24E-06 |
| | Dump Truck | 375.0 | 1.0 | 50.0 | 2.0 | 3.0 | 1.0 | 6.0 | 1.44E-04 | 1.11E-03 | 2.85E-03 | 1.65E-04 | 1.60E-04 | 8.54E-05 | 3.82E-01 | 2.15E-06 | 3.14E-06 |
| Reservoirs/Pits | Bulldozer | 145.0 | 1.0 | 50.0 | 8.0 | 2.0 | 1.0 | 16.0 | 2.71E-04 | 1.15E-03 | 3.34E-03 | 2.57E-04 | 2.49E-04 | 8.79E-05 | 4.04E-01 | 4.04E-06 | 3.23E-06 |
| Fences (Miles/yr.) | Auger Truck | 250.0 | 1.0 | 50.0 | 8.0 | 9.0 | 1.0 | 72.0 | 1.63E-03 | 7.17E-03 | 2.07E-02 | 1.44E-03 | 1.40E-03 | 6.83E-04 | 3.14E+00 | 2.43E-05 | 2.51E-05 |
| Reservoir Maintenance | Bulldozer | 145.0 | 1.0 | 50.0 | 8.0 | 2.0 | 7.0 | 112.0 | 1.90E-03 | 8.03E-03 | 2.34E-02 | 1.80E-03 | 1.74E-03 | 6.16E-04 | 2.83E+00 | 2.83E-05 | 2.26E-05 |
| | | | | | | | Total | | 4.31E-03 | 1.92E-02 | 5.18E-02 | 3.93E-03 | 3.81E-03 | 1.50E-03 | 6.92E+00 | 6.43E-05 | 5.53E-05 |

ᵃ All emissions calculated with year 2008 factors (conservative)

BLM_0002118



## Livestock Grazing

**Fugitive Dust Emissions Estimation for Unpaved Road Traffic**

**Emission Factors for Publicly Accessible Unpaved Roads[a]**

| | | Parameter | PM₁₀ | PM₂.₅ |
|---|---|---|---|---|
| $E \,(lb/VMT) = \dfrac{k\,(s/12)^a\,(S/30)^d}{(M/0.5)^c} - C$ | | k | 1.8 | 0.18 |
| | | a | 1 | 1 |
| | | d | 0.5 | 0.5 |
| $E_{ext} = E\,(1 - P/365)$ | | c | 0.2 | 0.2 |

| Function/Variable Description | | Assumed Value | Reference |
|---|---|---|---|
| E = size-specific emission factor (lb/VMT) | | | |
| $E_{ext}$ = size-specific emission factor extrapolated for natural mitigation (lb/VMT) | | | |
| s = surface material silt content (%) | | 5.1 | EPA AP-42 Section 13.2.2, Table 13.2-1 |
| C = emission factor for 1980's vehicle fleet exhaust, brake wear, and tire wear (lb/VMT) | PM₂.₅ | 0.00036 | EPA AP-42 Section 13.2.2, Table 13.2.2-4 |
| | PM₁₀ | 0.00047 | EPA AP-42 Section 13.2.2, Table 13.2.2-4 |
| M = surface material moisture content (%) | | 2.0 | EPA AP-42 Section 13.2.2 |
| P = Number of days precip per year | | 59 | http://www.wrcc.dri.edu, GRAND JUNCTION 6 ESE, COLORADO |
| CE = emission control percent for unpaved roads | | 50% | |

[a] Source: EPA, AP-42 Volume I, Section 13.2.2 Unpaved Roads, Table 13.2.2-2, Nov. 2006
[b] Fitzpatrick, M. 1990. User's Guide: Emission Control Technologies and Emission Factors for Unpaved Road Fugitive Emissions, EPA/625/6-97/022.  http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=20008SFC.

**Fugitive Dust Emission Estimations for Commuting Vehicle on Unpaved Roads**

| Construction Activity | Equipment Type | Avg. Vehicle Speed (mph) | Round Trip Distance (miles) | # of Round Trips/Project | Total Vehicle Miles/Project | # of Projects/Year | Total Annual Vehicle Miles Traveled | PM₁₀ Controlled Em. Factor (lb/VMT) | PM₁₀ Emissions (tons/vehicle type) | PM₁₀ Emissions (tons/activity) | PM₂.₅ Controlled Em. Factor (lb/VMT) | PM₂.₅ Emissions (tons/vehicle type) | PM₂.₅ Emissions (tons/activity) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Springs | Dump Truck | 30.0 | 25.0 | 2.0 | 50.0 | 1.0 | 50.0 | 0.24 | 6.07E-03 | | 2.42E-02 | 6.04E-04 | |
| | Tractor-Trailer | 30.0 | 25.0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.24 | 0.00E+00 | 1.08E-01 | 2.42E-02 | 0.00E+00 | 1.07E-02 |
| | Pick-up Truck | 29.0 | 14.0 | 61.0 | 854.0 | 1.0 | 854.0 | 0.24 | 1.02E-01 | | 2.37E-02 | 1.01E-02 | |
| Reservoirs/Pits | Tractor-Trailer | 30.0 | 25.0 | 10.0 | 250.0 | 1.0 | 250.0 | 0.24 | 3.04E-02 | 1.07E-01 | 2.42E-02 | 3.02E-03 | 1.07E-02 |
| | Pick-up Truck | 32.0 | 17.0 | 36.0 | 612.0 | 1.0 | 612.0 | 0.25 | 7.67E-02 | | 2.49E-02 | 7.63E-03 | |
| Fences | Support Truck | 30.0 | 25.0 | 1.0 | 25.0 | 1.0 | 25.0 | 0.24 | 3.04E-03 | | 2.42E-02 | 3.02E-04 | |
| | Pick-up Truck | 30.0 | 25.0 | 3.0 | 75.0 | 1.0 | 75.0 | 0.24 | 9.11E-03 | 1.24E-02 | 2.42E-02 | 9.06E-04 | 1.23E-03 |
| | ATV | 25.0 | 2.0 | 1.0 | 2.0 | 1.0 | 2.0 | 0.22 | 2.22E-04 | | 2.20E-02 | 2.20E-05 | |
| Reservoirs Maintenance | Tractor-Trailer | 30.0 | 25.0 | 1.0 | 25.0 | 7.0 | 175.0 | 0.24 | 2.12E-02 | 1.44E-01 | 2.42E-02 | 2.11E-03 | 1.43E-02 |
| | Pick-up Truck | 40.0 | 25.0 | 5.0 | 125.0 | 7.0 | 875.0 | 0.28 | 1.23E-01 | | 2.79E-02 | 1.22E-02 | |
| Livestock Management | Tractor-Trailer (spring turnout, fall gather) | 40.0 | 15.0 | 1.0 | 15.0 | 1.0 | 15.0 | 0.28 | 2.10E-03 | 2.10E-03 | 2.79E-02 | 2.09E-04 | 2.09E-04 |
| | Pick-up-Trailer (spring calves) | 40.0 | 15.0 | 1.0 | 15.0 | 1.0 | 15.0 | 0.28 | 2.10E-03 | 2.10E-03 | 2.79E-02 | 2.09E-04 | 2.09E-04 |
| | | | | | | | **Total** | 3.76E-01 | | | | 3.74E-02 | |

For Livestock management: # of Activities/Year for spring turnout/fall gather = # of truck trips = head of cattle x 1,000 lb/head divided by 40,000 lbs/trailer truck  assume 100% of cattle is semi-trucked
for spring calves:  # cattle - (# of cattle x 5% bulls) - (# of cattle x 15% yearlings) = # of cows = # of calves (assuming each cow gives birth to one calf).  Then assume 90% survival, average weight = 450 lbs and 40,000 lbs per truck load

BLM_0002119



## Livestock Grazing

**Exhaust Emissions Estimation for Road Traffic**

**Emission Factors for Commuting Vehicles**

| Vehicle | Emission Factors (g/mi) | | | | | | | | |
|---------|-----|-----|-----|------|-------|-----|-----|-----|------|
| Class | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | N₂O¹ |
| LDGT2 | 1.29 | 17.37 | 1.98 | 0.06 | 0.04 | 0.02 | 553.11 | 0.07 | 0.045 |
| HDDV | 0.85 | 3.80 | 17.02 | 0.77 | 0.70 | 0.06 | 2004.18 | 0.04 | 0.005 |

Source: EPA MOVES 2010

¹N2O factor source: TCR GRP, 2012 Climate Registry Default Emission Factors – Released January 6, 2012

| Vehicle | | Emission Factors (g/mi) | | | | | | | | |
|---------|-------|-----|-----|-----|------|-------|-----|-----|-----|------|
| Type | Class | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | N₂O¹ |
| ATV | All Terrain Vehicles | 15.77 | 47.71 | 0.43 | 0.47 | 0.43 | 0.01 | 212.99 | 0.28 | 0.01 |

Source: EPA NONROADS 2008a

1. N2O factor source: 2009 API O&G GHG Methodologies Compendium, Tables 4-13 and 4-17. 130,500 Btu/gallon, 2545 Btu/hr.

**Combustive Emission Estimations for Commuting Vehicle on Unpaved and Paved Roads**

| Construction Activity | Equipment Type | Class | Round Trip Distance (miles) | Round Trips/Project | Total Vehicle Miles/Project | # of Projects/Year | Total Annual Vehicle Miles Traveled | Emissions (tons/year) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | N₂O |
| Springs | Dump Truck | HDDV | 145.0 | 2.0 | 290.0 | 1.0 | 290.0 | 2.70E-04 | 1.22E-03 | 5.44E-03 | 2.46E-04 | 2.25E-04 | 2.01E-05 | 6.41E-01 | 1.32E-05 | 1.53E-06 |
| | Tractor-Trailer | HDDV | 145.0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 | 0.00E+00 |
| | Pick-up Truck | LDGT2 | 75.0 | 61.0 | 4575.0 | 1.0 | 4575.0 | 6.52E-03 | 8.76E-02 | 9.96E-03 | 2.97E-04 | 1.90E-04 | 9.92E-05 | 2.79E+00 | 3.67E-04 | 2.27E-04 |
| Reservoirs/Pits | Tractor-Trailer | HDDV | 145.0 | 10.0 | 1450.0 | 1.0 | 1450.0 | 1.35E-03 | 6.08E-03 | 2.72E-02 | 1.23E-03 | 1.12E-03 | 1.00E-04 | 3.20E+00 | 6.60E-05 | 7.67E-06 |
| | Pick-up Truck | LDGT2 | 100.0 | 36.0 | 3600.0 | 1.0 | 3600.0 | 5.13E-03 | 6.89E-02 | 7.84E-03 | 2.34E-04 | 1.50E-04 | 7.80E-05 | 2.19E+00 | 2.89E-04 | 1.79E-04 |
| Fences | Support Truck | HDDV | 145.0 | 1.0 | 145.0 | 1.0 | 145.0 | 1.35E-04 | 6.08E-04 | 2.72E-03 | 1.23E-04 | 1.12E-04 | 1.00E-05 | 3.20E-01 | 6.60E-06 | 7.67E-07 |
| | Pick-up Truck | LDGT2 | 145.0 | 3.0 | 435.0 | 1.0 | 435.0 | 6.20E-04 | 8.33E-03 | 9.47E-04 | 2.82E-05 | 1.81E-05 | 9.43E-06 | 2.65E-01 | 3.49E-05 | 2.16E-05 |
| | ATV | All Terrain Vehicles | 2.0 | 1.0 | 2.0 | 1.0 | 2.0 | 3.48E-05 | 1.05E-04 | 9.53E-07 | 1.03E-06 | 9.48E-07 | 1.56E-08 | 4.70E-04 | 6.10E-07 | 1.19E-08 |
| Reservoirs Maintenance | Tractor-Trailer | HDDV | 145.0 | 1.0 | 145.0 | 7.0 | 1015.0 | 9.47E-04 | 4.26E-03 | 1.90E-02 | 8.63E-04 | 7.86E-04 | 7.03E-05 | 2.24E+00 | 4.62E-05 | 5.37E-06 |
| | Pick-up Truck | LDGT2 | 145.0 | 5.0 | 725.0 | 7.0 | 5075.0 | 7.23E-03 | 9.72E-02 | 1.10E-02 | 3.29E-04 | 2.11E-04 | 1.10E-04 | 3.09E+00 | 4.07E-04 | 2.52E-04 |
| Livestock Management | Tractor-Trailer (spring turnout, fall gather) | HDDV | 85.0 | 1.0 | 85.0 | 1.0 | 85.0 | 7.93E-05 | 3.56E-04 | 1.59E-03 | 7.22E-05 | 6.59E-05 | 5.89E-06 | 1.88E-01 | 3.87E-06 | 4.50E-07 |
| | Pick-up-Trailer (spring calves) | HDDV | 85.0 | 1.0 | 85.0 | 1.0 | 85.0 | 7.93E-05 | 3.56E-04 | 1.59E-03 | 7.22E-05 | 6.59E-05 | 5.89E-06 | 1.88E-01 | 3.87E-06 | 4.50E-07 |
| ATV SUBTOTAL | | | | | | | | 3.48E-05 | 1.05E-04 | 9.53E-07 | 1.03E-06 | 9.48E-07 | 1.56E-08 | 4.70E-04 | 6.10E-07 | 1.19E-08 |
| LDGT2 SUBTOTAL | | | | | | | | 1.95E-02 | 2.62E-01 | 2.98E-02 | 8.88E-04 | 5.68E-04 | 2.97E-04 | 8.34E+00 | 1.10E-03 | 6.80E-04 |
| HDDV SUBTOTAL | | | | | | | | 2.86E-03 | 1.29E-02 | 5.76E-02 | 2.61E-03 | 2.38E-03 | 2.13E-04 | 6.76E+00 | 1.40E-04 | 1.62E-05 |
| TOTAL | | | | | | | | 2.24E-02 | 2.75E-01 | 8.74E-02 | 3.50E-03 | 2.95E-03 | 5.09E-04 | 1.51E+01 | 1.24E-03 | 6.98E-04 |

BLM_0002120

January 2013         Appendix C



**Livestock Grazing**

**Methane Emissions from Enteric Fermentation and Manure Management**

| Methane Emission Factors | | | | | |
|---|---|---|---|---|---|
| Livestock | | Enteric Fermentation (Kg/head/yr) | Enteric Fermentation (lb/head/yr) | Manure Management (Kg/head/yr) | Manure Management (lb/head/yr) |
| Cattle | Includes bulls, yearlings, and calves | 53 | 116.84 | 2 | 4.41 |
| Horse | | 18 | 39.68 | 2.34 | 5.16 |
| Buffalo | | 55 | 121.25 | 5 | 11.02 |
| Sheep | | 8 | 17.64 | 0.28 | 0.62 |

Source: 2006 IPCC Guidelines for National Greenhouse Gas Inventories, Volume 4 Agriculture, Forestry, and Other Land Use, Chapter 10 Emissions From Livestock and Manure Management
Emission factors for Developed Countries, North America, Temperate climate, "Other" (non-dairy) cattle

**Methane Emissions from Livestock - All Project Years**

| Livestock Category | Permitted head of animals | % of year grazing on Federal Lands | Enteric Fermentation emission factor (lb/head/yr) | Annual Methane Emissions from Enteric Fermentation (tons/yr) | Manure Management emission factor (lb/head/yr) | Annual Methane Emissions from Manure Management (tons/yr) | Total Methane Emissions (tons/yr) |
|---|---|---|---|---|---|---|---|
| Cattle | 20182 | 100 | 116.84 | 1179.06 | 4.41 | 44.49 | 1223.56 |
| Horse | 0 | 0 | 39.68 | 0.00 | 5.16 | 0.00 | 0.00 |
| Buffalo | 0 | 0 | 121.25 | 0.00 | 11.02 | 0.00 | 0.00 |
| Sheep | 18182 | 75 | 17.64 | 120.25 | 0.62 | 4.21 | 124.46 |
| | | | | | | **Total Methane emissions** | **1348.02** |

BLM_0002121

January 2013                                    Appendix C



## Lands and Realty ROW

**Total Annual Emissions from Lands and Realty (tons/year)**

**Base Year 2008 Emissions (tons/year)**

| Category | Subcategory | Emission Type | Fuel Type | Annual Emissions (Tons) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | VOC | CO | NO$_x$ | PM$_{10}$ | PM2.5 | SO$_2$ | CO$_2$ | CH$_4$ | N$_2$O | HAPs[a] | CO$_{2eq}$ tons | CO$_{2eq}$ metric tonnes |
| Lands and Realty | Heavy Equipment | dust | na | - | - | - | 20.47 | 2.78 | - | - | - | - | - | - | - |
| Lands and Realty | Heavy Equipment | exhaust | diesel | 0.075 | 0.491 | 1.03 | 0.07 | 0.07 | 0.0243 | 111.72 | 0.0011 | 0.00089 | 0.0075 | 112.02 | 101.65 |
| Lands and Realty | Commuter Vehicles | dust | na | - | - | - | 0.81 | 0.08 | - | - | - | - | - | - | - |
| Lands and Realty | Commuter Vehicles | HDDV exhaust | diesel | 0.004 | 0.019 | 0.09 | 0.00 | 0.00 | 0.0003 | 10.07 | 0.0002 | 0.00002 | 0.0004 | 10.09 | 9.15 |
| Lands and Realty | Commuter Vehicles | LDDT exhaust | diesel | 0.011 | 0.047 | 0.08 | 0.00 | 0.00 | 0.0003 | 11.01 | 0.0002 | 0.00002 | 0.0011 | 11.02 | 10.00 |
| **Total** | | | | 0.090 | 0.557 | 1.19 | 21.16 | 2.92 | 0.0250 | 132.80 | 0.0015 | 0.00094 | 0.0090 | 133.12 | 120.80 |

[a] HAPs = Hazardous Air Pollutants; assumed = VOCs * 0.1

**All Year Emissions (tons/year) (all alternatives assumed to have the same emissions)**

| Category | Year | Alternative | VOC | CO | NO$_x$ | PM$_{10}$ | PM2.5 | SO$_2$ | CO$_2$ | CH$_4$ | N$_2$O | HAPs[a] | CO$_{2eq}$ tons | CO$_{2eq}$ metric tonnes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lands and Realty | 2008 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2009 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2010 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2011 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2012 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2013 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2014 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2015 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2016 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2017 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2018 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2019 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2020 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2021 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2022 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2023 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2024 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2025 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2026 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2027 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2028 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2029 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |
| Lands and Realty | 2030 | All | 0.09 | 0.56 | 1.19 | 21.2 | 2.92 | 0.02 | 133 | 0.002 | 0.001 | 0.009 | 133 | 121 |

BLM_0002122

January 2013　　　　　　　　　　　　　　　　　　　Appendix C　　　　　　　　 ENVIRON

## Lands and Realty ROW

**Activity Inputs**

inputs in yellow highlighted cells

**Alternative Scenarios**

| Alternative | Percent Change From Base Year* |
|---|---|
| Alternative A | 0% |
| Alternative B | 0% |
| Alternative C | 0% |
| Alternative D | 0% |

**Base Year Data**

| Type | No. Projects Per Year | Average Disturbed Area per Project (acres) |
|---|---|---|
| Wind Energy Recovery | 0 | 0 |
| Pipeline Development | 5 | 25 |
| Road Development | 15 | 40 |
| Communication Site Development | 0 | 0 |
| Power Line Development | 5 | 35 |
| Tele & Fiber Optic Line Development | 5 | 10 |
| Tower Installation | 0 | 0 |

| | |
|---|---|
| Average Number of Turbines per Wind Energy Project | 0 |
| Vehicle Generated Dust Control Method | water; MgCl |

| Construction Activity | Annual Tons of Gravel Applied to Surface |
|---|---|
| Gravel Application* | 14,665 |

\* Gravel application is due to road development projects
purple text data is from UFO general survey

**Future Year Activity Scaling Factors**

| Year | Alternative A | Alternative B | Alternative C | Alternative D |
|---|---|---|---|---|
| 2008 | 100% | 100% | 100% | 100% |
| 2009 | 100% | 100% | 100% | 100% |
| 2010 | 100% | 100% | 100% | 100% |
| 2011 | 100% | 100% | 100% | 100% |
| 2012 | 100% | 100% | 100% | 100% |
| 2013 | 100% | 100% | 100% | 100% |
| 2014 | 100% | 100% | 100% | 100% |
| 2015 | 100% | 100% | 100% | 100% |
| 2016 | 100% | 100% | 100% | 100% |
| 2017 | 100% | 100% | 100% | 100% |
| 2018 | 100% | 100% | 100% | 100% |
| 2019 | 100% | 100% | 100% | 100% |
| 2020 | 100% | 100% | 100% | 100% |
| 2021 | 100% | 100% | 100% | 100% |
| 2022 | 100% | 100% | 100% | 100% |
| 2023 | 100% | 100% | 100% | 100% |
| 2024 | 100% | 100% | 100% | 100% |
| 2025 | 100% | 100% | 100% | 100% |
| 2026 | 100% | 100% | 100% | 100% |
| 2027 | 100% | 100% | 100% | 100% |
| 2028 | 100% | 100% | 100% | 100% |
| 2029 | 100% | 100% | 100% | 100% |
| 2030 | 100% | 100% | 100% | 100% |

BLM_0002123

January 2013                                                     Appendix C                                         

## Lands and Realty ROW

Activity Inputs

### Combustive Emission Estimations for Development Activities - All Years

| Activity | Equipment Type | Capacity (hp) | # of Units | Avg. Load Factor (%) | # of Hours/ Day | # of Days/Project |
|---|---|---|---|---|---|---|
| Wind Energy Recovery | Road Grader | 100 | 1 | 80 | 6 | 30 |
| | Bulldozer | 305 | 1 | 50 | 6 | 30 |
| | Excavator | 350 | 1 | 80 | 4 | 30 |
| | Loader | 305 | 1 | 50 | 6 | 30 |
| | Roller/Compactor | 350 | 1 | 80 | 4 | 30 |
| | Backhoe/Trencher | 80 | 1 | 75 | 8 | 30 |
| | Crane | 430 | 1 | 50 | 8 | 30 |
| Pipeline Development | Winch Crawler | 475 | 1 | 80 | 8 | 3 |
| | Spider Plow | 175 | 1 | 80 | 8 | 3 |
| | Backhoe/Trencher | 80 | 1 | 75 | 8 | 3 |
| Road Development | Road Grader | 100 | 1 | 80 | 6 | 5 |
| | Bulldozer | 305 | 1 | 50 | 6 | 5 |
| | Roller/Compactor | 350 | 1 | 80 | 4 | 5 |
| Communication Site Development | Blade | 100 | 1 | 80 | 8 | 3 |
| | Trencher | 175 | 1 | 80 | 8 | 3 |
| | Backhoe | 80 | 1 | 75 | 8 | 3 |
| Power Line Development | Winch Crawler | 475 | 1 | 80 | 8 | 3 |
| | Spider Plow | 175 | 1 | 75 | 8 | 3 |
| Tele & Fiber Optic Line Development* | Winch Crawler | 475 | 1 | 80 | 8 | 3 |
| | Spider Plow | 175 | 1 | 75 | 8 | 3 |
| Tower Installation | Blade | 100 | 1 | 80 | 8 | 3 |
| | Backhoe | 80 | 1 | 75 | 8 | 3 |

\* assumed similar activity to Power Line Development
purple text data is from UFO general survey
blue text data derived from Lander RMP

### Fugitive Dust Emission Estimations for Commuting Vehicles on Unpaved Roads - All Project Years

| Activity | Equipment Type | Avg. Vehicle Speed (mph) | Unpaved Round Trip Distance (miles) | # of Round Trips/Project | Paved Round Trip Distance (miles) |
|---|---|---|---|---|---|
| Wind Energy Recovery | Pick-up Truck | 40 | 30 | 60 | 60 |
| | Dump Truck | 30 | 30 | 80 | 60 |
| | Cement Truck | 30 | 30 | 80 | 60 |
| | Flatbed Truck | 30 | 30 | 80 | 60 |
| | Water Truck | 40 | 30 | 60 | 60 |
| Pipeline Development | Haul Truck | 30 | 30 | 4 | 60 |
| | Pick-up Truck | 40 | 30 | 12 | 60 |
| Roads Development | Haul Truck | 30 | 30 | 12 | 60 |
| | Pick-up Truck | 40 | 30 | 12 | 60 |
| Communication Site Development | Haul Truck | 30 | 30 | 2 | 60 |
| | Pick-up Truck | 40 | 30 | 6 | 60 |
| Power Line Development | Drill/Water Truck | 30 | 30 | 2 | 60 |
| | Pick-up Truck | 40 | 30 | 6 | 60 |
| Tower Establishment | Haul Truck | 30 | 30 | 2 | 60 |
| | Pick-up Truck | 40 | 30 | 6 | 60 |

blue text data derived from Lander RMP

BLM_0002124



## Lands and Realty ROW

**Fugitive Dust Emissions from Heavy Equipment Operations**

| INPUTS & ASSUMPTIONS | | | |
|---|---|---|---|
| Description | Value | Source | Notes |
| Control Efficiency (C) of watering[a] | 0.5 | a | |
| TSP Emission Factor | 1.2 | b | Tons TSP/acre-month |
| Conversion factor for TSP to $PM_{10}$ | 0.35 | c | Percentage of TSP |
| Conversion factor for $PM_{10}$ to $PM_{2.5}$ | 0.1 | d | Percentage of $PM_{10}$ |

[a] Fitzpatrick, M. 1990. *User's Guide: Emission Control Technologies and Emission Factors for Unpaved Road Fugitive Emissions*, EPA/625/5-87/022.  http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000BSFC.

[b] EPA, AP-42, Volume 1, Section 13.2.3 Heavy Construction Operations, Jan. 1995 (Errata Feb. 2010)

[c] EPA, AP-42, Volume I, Section 13.2.4 Aggregate Handling and Storage Piles, Nov. 2006

[d] Midwest Research Institute. 2006. *Background Document for Revisions to Fine Fraction Ratios Used for AP-42 Fugitive Dust Emission Factors*, Report prepared for the Western Governors' Association, Western Regional Air Partnership (WRAP), MRI Project No. 110397, November 1, 2006.

**Fugitive Dust Emission Estimations for Construction Activity - All Project Years**

| Construction Activity | Total Disturbed Acres/Year | # of Days to Complete/ Project[1] | Emissions (tons/year) | | |
|---|---|---|---|---|---|
| | | | TSP | $PM_{10}$ | $PM_{2.5}$ |
| Wind Energy Recovery | 0 | 1 | 0.00 | 0.00 | 0.00 |
| Pipeline Development | 150 | 1 | 3.00 | 1.05 | 0.11 |
| Road Development | 400 | 1 | 8.00 | 2.80 | 0.28 |
| Communication Site Development | 0 | 1 | 0.00 | 0.00 | 0.00 |
| Power Line Construction | 210 | 1 | 4.20 | 1.47 | 0.15 |
| Tele- & Fiber Optic Line Development | 60 | 1 | 1.20 | 0.42 | 0.04 |
| | | | 16.40 | 5.74 | 0.57 |

1. Land surface disturbed one time, so assume one day of disturbance.

*Fugitive Dust from Heavy Construction Drop Operations (Backhoe and Loader)*

| $PM_{10}$ - Material Handling Factor (soil and rock aggregate): | | |
|---|---|---|
| $E(lb/ton) = k(0.0032)^*(((U/5)^*1.3)/((M/2)^*1.4))$ | | |
| mean wind speed (U) = | 3.66 | m/s |
| k (particle size multiplier) = | 0.35 | % |
| M (material moisture conter | 3.4 | % |
| E= | 3.56E-04 | lb/ton |

[^] AP-42 Equation 1 in 13.2.4.3

[^] multipliers and factors shown in 13.2.4.3

| PM2.5 - Material Handling Factor (soil and rock aggregate): | | |
|---|---|---|
| $E(lb/ton) = k(0.0032)^*(((U/5)^*1.3)/((M/2)^*1.4))$ | | |
| mean wind speed (U) = | 3.66 | m/s |
| k (particle size multiplier) = | 0.053 | |
| M (material moisture conter | 3.4 | % |
| E= | 5.38E-05 | lb/ton |

[^] AP-42 Equation 1 in 13.2.4.3

[^] multipliers and factors shown in 13.2.4.3

BLM_0002125



## Lands and Realty ROW

**Fugitive Dust Emissions from Heavy Equipment Operations**

**Fugitive Dust Emission Estimations for Wind Energy Development - Turbine Foundation Construction Drop Operations**

| Construction Activity | Tons of Aggregate Loaded / Turbine Foundation | Number of Turbines/Year | Emissions (tons/year) | |
|---|---|---|---|---|
| | | | $PM_{10}$ | $PM_{2.5}$ |
| Wind Energy Project Turbine Foundation Development | 1164 | 0 | 0.0000 | 0.0000 |

¹ one foundation requires dozer and backhoe moving approximately 582 tons of dirt twice (once to dig hole, then once to fill in)

**Emission factors for Rock Crushing, Concrete Batching or Concrete Loading / Unloading**

| Activity | Emissions Factors (lb/ton) | |
|---|---|---|
| | $PM_{10}$ | $PM_{2.5}$ |
| Cement Truck Unloading | 0.24 | 0.0432 |

¹ concrete batching factors: AP-42 Table 11.12-2
² assume PM2.5 is 13% of PM10

**Fugitive Dust Emission Estimations for Wind Energy Development - Turbine Pad Construction Drop Operations**

| Construction Activity | Total Cubic Feet of Cement Unloaded / Turbine Foundation | Tons of Cement Unloaded / Foundation | Number of Turbines/Year | Emissions (tons/year) | |
|---|---|---|---|---|---|
| | | | | $PM_{10}$ | $PM_{2.5}$ |
| Wind Energy Project Turbine Foundation Development | 8640 | 648 | 0 | 0.00 | 0.00 |

¹ assume concrete density is 150 lbs/cubic feet
² assume 320 cubic yards of concrete is unloaded per turbine foundation

**Emission Factors for Industrial Wind Erosion**

| | |
|---|---|
| E (tons/year) = | $k \times \dfrac{P \times M \times N}{453.6 \times 2000}$ |
| AP-42 Section 13.2.5.3 Equation 2 | |
| Erosion Potential P (g/m2/year) = | $58(U^*-Ut^*)^2 + 25(U^*-Ut^*)$ |
| for U*>Ut*; P=0 otherwise | AP-42 Section 13.2.5.3 Equation 3 |
| Friction Velocity U* (m/s) = | $0.053\ U_{10}^+$ |
| AP-42 Section 13.2.5.3 Equation 4 | |

P = Erosion Potential (gm/m²/yr)      M = Disturbed area (m²)
U* = Friction velocity (m/s)          N = # of disturbances
$U_t$= threshold velocity (m/s)         k = 0.5 for $PM_{10}$
U10 = fastest wind speed (m/s)        k = 0.075 for $PM_{2.5}$

$U_{10}$ = 23.30          52.12 mph, input value (fastest)
$U_t$⁺ overburden = 1.02   AP-42 Industrial Wind Erosion Table 13.2.5-2, Overburden

**Wind Erosion Emissions - Based on Disturbed Acres**

| | | Fastest Mile $(U_{10})$ (m/s) | Max. Friction Velocity (U*) (m/s) | Erosion Potential (P) (g/m²/yr) | Annual Disturbed Acres | Disturbed Area (M) (m²) | Number of Disturbances (N) | $PM_{10}$ Emissions (tons/year) | $PM_{2.5}$ Emissions (tons/year) |
|---|---|---|---|---|---|---|---|---|---|
| | Project Area | 23.30 | 1.23 | 8.05 | 820.00 | 3319628.25 | 1.00 | 14.73 | 2.21 |

**Fugitive Dust Emission Estimations for Road Development - Gravel Drop Operations**

| Construction Activity | Annual Tons of Gravel Applied to Surface | Emissions (tons/year) | |
|---|---|---|---|
| | | $PM_{10}$ | $PM_{2.5}$ |
| Gravel Application | 14.665 | 0.0026 | 0.0004 |

BLM_0002126

January 2013                                      Appendix C



## Lands and Realty ROW

**Exhaust Emissions from Heavy Equipment Operations**

Exhaust Emission Factors for Heavy Equipment

| HP Range | NR Equipment Type | Emission Rates (g/hp-hr) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | N2O[1] |
| 100 | Graders | 0.299 | 2.323 | 2.897 | 0.335 | 0.325 | 0.076 | 350.845 | 0.004 | 0.003 |
| 600 | Crawler Tractors | 0.156 | 1.158 | 2.827 | 0.158 | 0.153 | 0.069 | 316.268 | 0.002 | 0.003 |
| 600 | Excavators | 0.140 | 1.070 | 2.667 | 0.147 | 0.142 | 0.069 | 316.315 | 0.002 | 0.003 |
| 300 | Tractors/Loaders/Backhoes | 0.229 | 0.860 | 1.424 | 0.142 | 0.137 | 0.028 | 130.894 | 0.003 | 0.001 |
| 600 | Rollers | 0.196 | 1.382 | 3.098 | 0.190 | 0.185 | 0.069 | 316.149 | 0.003 | 0.003 |
| 100 | Tractors/Loaders/Backhoes | 0.353 | 1.661 | 1.454 | 0.259 | 0.252 | 0.032 | 145.112 | 0.005 | 0.001 |
| 600 | Cranes | 0.147 | 0.664 | 2.402 | 0.114 | 0.111 | 0.050 | 227.912 | 0.002 | 0.002 |
| 600 | Crawler Tractors | 0.156 | 1.158 | 2.827 | 0.158 | 0.153 | 0.069 | 316.268 | 0.002 | 0.003 |
| 175 | Tractors/Loaders/Backhoes | 0.249 | 0.953 | 1.479 | 0.157 | 0.152 | 0.028 | 130.834 | 0.004 | 0.001 |
| 100 | Tractors/Loaders/Backhoes | 0.353 | 1.661 | 1.454 | 0.259 | 0.252 | 0.032 | 145.112 | 0.005 | 0.001 |
| 100 | Graders | 0.299 | 2.323 | 2.897 | 0.335 | 0.325 | 0.076 | 350.845 | 0.004 | 0.003 |
| 600 | Crawler Tractors | 0.156 | 1.158 | 2.827 | 0.158 | 0.153 | 0.069 | 316.268 | 0.002 | 0.003 |
| 600 | Rollers | 0.196 | 1.382 | 3.098 | 0.190 | 0.185 | 0.069 | 316.149 | 0.003 | 0.003 |
| 100 | Tractors/Loaders/Backhoes | 0.353 | 1.661 | 1.454 | 0.259 | 0.252 | 0.032 | 145.112 | 0.005 | 0.001 |
| 175 | Trenchers | 0.257 | 1.214 | 3.064 | 0.229 | 0.222 | 0.069 | 315.965 | 0.004 | 0.003 |
| 100 | Tractors/Loaders/Backhoes | 0.353 | 1.661 | 1.454 | 0.259 | 0.252 | 0.032 | 145.112 | 0.005 | 0.001 |
| 600 | Crawler Tractors | 0.156 | 1.158 | 2.827 | 0.158 | 0.153 | 0.069 | 316.268 | 0.002 | 0.003 |
| 175 | Tractors/Loaders/Backhoes | 0.249 | 0.953 | 1.479 | 0.157 | 0.152 | 0.028 | 130.834 | 0.004 | 0.001 |
| 600 | Crawler Tractors | 0.156 | 1.158 | 2.827 | 0.158 | 0.153 | 0.069 | 316.268 | 0.002 | 0.003 |
| 175 | Tractors/Loaders/Backhoes | 0.249 | 0.953 | 1.479 | 0.157 | 0.152 | 0.028 | 130.834 | 0.004 | 0.001 |
| 100 | Tractors/Loaders/Backhoes | 0.353 | 1.661 | 1.454 | 0.259 | 0.252 | 0.032 | 145.112 | 0.005 | 0.001 |
| 100 | Tractors/Loaders/Backhoes | 0.353 | 1.661 | 1.454 | 0.259 | 0.252 | 0.032 | 145.112 | 0.005 | 0.001 |

Source: EPA NONROADS 2008a

[1] N2O factor source: 2009 API O&G GHG Methodologies Compendium, Tables 4-13 and 4-17. 130,500 Btu/gallon, 2545 Btu/hp-hr.

BLM_0002127

January 2013                                                          Appendix C                                         

## Lands and Realty ROW

**Exhaust Emissions from Heavy Equipment Operations**

Combustive Emission Estimations for Development Activities - All Years

| Activity | Equipment Type | Capacity (hp) | # of Units | Avg. Load Factor (%) | # of Hours/ Day | # of Days/Project | # of Projects/Year | Total Hours/Year | Emissions (tons/year) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | N₂O |
| Pipeline Development | Winch Crawler | 475 | 1 | 80 | 8 | 3 | 6 | 144 | 9.38E-03 | 6.99E-02 | 1.71E-01 | 9.51E-03 | 9.23E-03 | 4.15E-03 | 1.91E+01 | 1.40E-04 | 1.52E-04 |
| | Spider Plow | 175 | 1 | 80 | 8 | 3 | 6 | 144 | 5.53E-03 | 2.12E-02 | 3.29E-02 | 3.49E-03 | 3.38E-03 | 6.32E-04 | 2.91E+00 | 8.25E-05 | 2.33E-05 |
| | Backhoe/Trencher | 80 | 1 | 75 | 8 | 3 | 6 | 144 | 3.36E-03 | 1.58E-02 | 1.38E-02 | 2.47E-03 | 2.40E-03 | 3.01E-04 | 1.38E+00 | 5.01E-05 | 1.11E-05 |
| Road Development | Road Grader | 100 | 1 | 80 | 6 | 5 | 10 | 300 | 7.90E-03 | 6.15E-02 | 7.66E-02 | 8.86E-03 | 8.60E-03 | 2.02E-03 | 9.28E+00 | 1.18E-04 | 7.43E-05 |
| | Bulldozer | 305 | 1 | 50 | 6 | 5 | 10 | 300 | 7.85E-03 | 5.84E-02 | 1.43E-01 | 7.95E-03 | 7.71E-03 | 3.47E-03 | 1.59E+01 | 1.17E-04 | 1.27E-04 |
| | Roller/Compactor | 350 | 1 | 80 | 4 | 5 | 10 | 200 | 1.21E-02 | 8.53E-02 | 1.91E-01 | 1.18E-02 | 1.14E-02 | 4.25E-03 | 1.95E+01 | 1.80E-04 | 1.56E-04 |
| Power Line Development | Winch Crawler | 475 | 1 | 80 | 8 | 3 | 6 | 144 | 9.38E-03 | 6.99E-02 | 1.71E-01 | 9.51E-03 | 9.23E-03 | 4.15E-03 | 1.91E+01 | 1.40E-04 | 1.52E-04 |
| | Spider Plow | 175 | 1 | 75 | 8 | 3 | 6 | 144 | 5.19E-03 | 1.99E-02 | 3.08E-02 | 3.27E-03 | 3.17E-03 | 5.93E-04 | 2.73E+00 | 7.74E-05 | 2.19E-05 |
| Tele & Fiber Optic Line Development | Winch Crawler | 475 | 1 | 80 | 8 | 3 | 6 | 144 | 9.38E-03 | 6.99E-02 | 1.71E-01 | 9.51E-03 | 9.23E-03 | 4.15E-03 | 1.91E+01 | 1.40E-04 | 1.52E-04 |
| | Spider Plow | 175 | 1 | 75 | 8 | 3 | 6 | 144 | 5.19E-03 | 1.99E-02 | 3.08E-02 | 3.27E-03 | 3.17E-03 | 5.93E-04 | 2.73E+00 | 7.74E-05 | 2.19E-05 |
| Total | | | | | | | | | 7.52E-02 | 4.91E-01 | 1.03E+00 | 6.96E-02 | 6.75E-02 | 2.43E-02 | 1.12E+02 | 1.12E-03 | 8.93E-04 |

Assume 2008 emission factors for all years = conservative estimate

BLM_0002128

January 2013        Appendix C



## Lands and Realty ROW

**Fugitive Dust Emissions Estimation for Road Traffic**

**Emission Factors for Publicly Accessible Unpaved Roads[a]**

| | Parameter | $PM_{10}$ | $PM_{2.5}$ |
|---|---|---|---|
| $E\ (lb/VMT) = \dfrac{k\,(s/12)^a\,(S/30)^d}{(M/0.5)^c} - C$ | k | 1.8 | 0.18 |
| | a | 1 | 1 |
| | d | 0.5 | 0.5 |
| $E_{ext} = E\,(1 - P/365)$ | c | 0.2 | 0.2 |

| **Function/Variable Description** | | Assumed Value | Reference |
|---|---|---|---|
| E = size-specific emission factor (lb/VMT) | | | |
| $E_{ext}$ = size-specific emission factor extrapolated for natural mitigation (lb/VMT) | | | |
| s = surface material silt content (%) | | 5.1 | EPA AP-42 Section 13.2.2, Table 13.2.2-1 |
| S = mean vehicle speed (mph) | | | |
| C = emission factor for 1980's vehicle fleet exhaust, brake wear, and tire wear (lb/VMT) | $PM_{2.5}$ | 0.00036 | EPA AP-42 Section 13.2.2, Table 13.2.2-4 |
| | $PM_{10}$ | 0.00047 | EPA AP-42 Section 13.2.2, Table 13.2.2-4 |
| M = surface material moisture content (%) | | 2.0 | EPA AP-42 Section 13.2.2 |
| P = Number of days precip per year | | 59 | http://www.wrcc.dri.edu, GRAND JUNCTION 6 ESE, COLORADO |
| CE = control percent for applying dust suppressant to unpaved roads [b] | | 50% | |

[a] Source: EPA, AP-42 Volume I, Section 13.2.2 Unpaved Roads, Table 13.2.2-2, Nov. 2006
[b] Fitzpatrick, M. 1990. User's Guide: Emission Control Technologies and Emission Factors for Unpaved Road Fugitive Emissions, EPA/625/5-87/022.   http://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=2000BSFC.

**Fugitive Dust Emission Estimations for Commuting Vehicles on Unpaved Roads**

| Activity | Equipment Type | Avg. Vehicle Speed (mph) | Round Trip Distance (miles) | # of Round Trips/Project | Vehicle Miles Traveled/Project | # of Projects/Year | Total Annual Vehicle Miles | PM₁₀ Controlled Em. Factor (lb/VMT) | PM₁₀ Emissions (tons/vehicle type) | PM₁₀ Emissions (tons/year) | PM₂.₅ Controlled Em. Factor (lb/VMT) | PM₂.₅ Emissions (tons/vehicle type) | PM₂.₅ Emissions (tons/year) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wind Energy Recovery | Pick-up Truck | 40 | 30 | 60 | 1,800 | 0 | 0 | 2.80E-01 | 0.00E+00 | 0.00E+00 | 2.79E-02 | 0.00E+00 | 0.00E+00 |
| | Dump Truck | 30 | 30 | 80 | 2,400 | 0 | 0 | 2.80E-01 | 0.00E+00 | | 2.79E-02 | 0.00E+00 | |
| | Cement Truck | 30 | 30 | 80 | 2,400 | 0 | 0 | 2.80E-01 | 0.00E+00 | | 2.79E-02 | 0.00E+00 | |
| | Flatbed Truck | 30 | 30 | 80 | 2,400 | 0 | 0 | 2.80E-01 | 0.00E+00 | | 2.79E-02 | 0.00E+00 | |
| | Water Truck | 40 | 30 | 60 | 1,800 | 0 | 0 | 2.80E-01 | 0.00E+00 | | 2.79E-02 | 0.00E+00 | |
| Pipeline Development | Haul Truck | 30 | 30 | 4 | 120 | 6 | 720 | 2.80E-01 | 1.01E-01 | 4.04E-01 | 2.79E-02 | 1.00E-02 | 4.02E-02 |
| | Pick-up Truck | 40 | 30 | 12 | 360 | 6 | 2,160 | 2.80E-01 | 3.03E-01 | | 2.79E-02 | 3.01E-02 | |
| Roads Development | Haul Truck | 30 | 30 | 4 | 120 | 10 | 1,200 | 3.94E-04 | 2.36E-04 | 9.46E-04 | 3.02E-04 | 1.81E-04 | 7.24E-04 |
| | Pick-up Truck | 40 | 30 | 12 | 360 | 10 | 3,600 | 3.94E-04 | 7.09E-04 | | 3.02E-04 | 5.43E-04 | |
| Communication Site Development | Haul Truck | 30 | 30 | 2 | 60 | 0 | 0 | 2.80E-01 | 0.00E+00 | 0.00E+00 | 2.79E-02 | 0.00E+00 | 0.00E+00 |
| | Pick-up Truck | 40 | 30 | 6 | 180 | 0 | 0 | 2.80E-01 | 0.00E+00 | | 2.79E-02 | 0.00E+00 | |
| Power Line Development | Drill/Water Truck | 30 | 30 | 2 | 60 | 6 | 360 | 2.80E-01 | 5.05E-02 | 2.02E-01 | 2.79E-02 | 5.02E-03 | 2.01E-02 |
| | Pick-up Truck | 40 | 30 | 6 | 180 | 6 | 1,080 | 2.80E-01 | 1.51E-01 | | 2.79E-02 | 1.51E-02 | |
| Tower Establishment | Haul Truck | 30 | 30 | 2 | 60 | 0 | 0 | 4.86E-01 | 0.00E+00 | 0.00E+00 | 4.83E-02 | 0.00E+00 | 0.00E+00 |
| | Pick-up Truck | 40 | 30 | 6 | 180 | 0 | 0 | 4.86E-01 | 0.00E+00 | | 4.83E-02 | 0.00E+00 | |
| **Total** | | | | | | | | | **6.07E-01** | | | | **6.10E-02** |

BLM_0002129

January 2013                                    Appendix C                                    

**Lands and Realty ROW**

Exhaust Emissions Estimation for Road Traffic

Emission Factors for Commuting Vehicles

| Project Year | Emission Factors (gm/mile) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | N2O[†] |
| 2008 | | | | | | | | | |
| LDDT | 0.70 | 3.11 | 5.17 | 0.33 | 0.30 | 0.02 | 729.67 | 0.01 | 0.002 |
| HDDV | 0.65 | 3.60 | 17.02 | 0.77 | 0.70 | 0.06 | 2004.18 | 0.04 | 0.005 |

Source: EPA MOVES 2010
(IN2O Sulfur source, TCP//RP, 2013 Climate Register Default Emission Factors – Released January 8, 2013)

Combustive Emission Estimations for Commuting Vehicles on Unpaved and Paved Roads

| Activity | Equipment Type[†] | Class | Round Trip Distance (miles) | # of Round Trips/Project | Vehicle Miles Traveled/Project | # of Projects/Year | Total Annual Vehicle Miles Traveled/ Activity | Emissions | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | (tons/vehicle type) | | | | | | | | |
| | | | | | | | | VOC | CO | NOx | PM10 | PM2.5 | SO2 | CO2 | CH4 | N2O |
| Pipeline Development | Haul Truck | HDDV | 60 | 4 | 240 | 6 | 1,440 | 1.34E-03 | 6.04E-03 | 2.70E-02 | 1.22E-03 | 1.12E-03 | 9.97E-05 | 3.18E+00 | 6.56E-05 | 7.62E-06 |
| | Pick-up Truck | LDDT | 60 | 12 | 720 | 6 | 4,320 | 3.33E-03 | 1.48E-02 | 2.46E-02 | 1.57E-03 | 1.42E-03 | 1.10E-04 | 3.48E+00 | 6.46E-05 | 7.14E-06 |
| Roads Development | Haul Truck | HDDV | 60 | 4 | 240 | 10 | 2,400 | 2.24E-03 | 1.01E-02 | 4.50E-02 | 2.04E-03 | 1.86E-03 | 1.66E-04 | 5.30E+00 | 1.09E-04 | 1.27E-05 |
| | Pick-up Truck | LDDT | 60 | 12 | 720 | 10 | 7,200 | 5.54E-03 | 2.47E-02 | 4.10E-02 | 2.61E-03 | 2.37E-03 | 1.83E-04 | 5.79E+00 | 1.08E-04 | 1.19E-05 |
| Power Line Development | Drill/Water Truck | HDDV | 60 | 2 | 120 | 6 | 720 | 6.71E-04 | 3.02E-03 | 1.35E-02 | 6.12E-04 | 5.58E-04 | 4.99E-05 | 1.59E+00 | 3.28E-05 | 3.81E-06 |
| | Pick-up Truck | LDDT | 60 | 6 | 360 | 6 | 2,160 | 1.66E-03 | 7.41E-03 | 1.23E-02 | 7.83E-04 | 7.11E-04 | 5.48E-05 | 1.74E+00 | 3.23E-05 | 3.57E-06 |
| | | | | | | Subtotal HDDV | | 4.25E-03 | 1.91E-02 | 8.56E-02 | 3.88E-03 | 3.53E-03 | 3.16E-04 | 1.01E+01 | 2.08E-04 | 2.41E-05 |
| | | | | | | Subtotal LDDT | | 1.05E-02 | 4.69E-02 | 7.79E-02 | 4.96E-03 | 4.50E-03 | 3.47E-04 | 1.10E+01 | 2.05E-04 | 2.26E-05 |
| | | | | | | Total | | 1.48E-02 | 6.61E-02 | 1.63E-01 | 8.83E-03 | 8.03E-03 | 6.63E-04 | 2.11E+01 | 4.12E-04 | 4.67E-05 |

[†] All vehicles are diesel-powered.

C-56

BLM_0002130

# SW Colorado Bighorn Sheep ROC Data Needs/Assignments

☑ 1. BLM: Spreadsheet and GIS Layer of our rough planning schedule (Robin)

☑ 2. BLM: Combine these to get at when the data are most needed (Frank/Anthony)

3. CPW:  Attributed population/herd layer (Karin et al)

4. CPW: Verification from Dillon Mesa biologist on Year-round, Summer, Winter for Core Herd Home Range  (Brad) CHHR = Summer + Winter for Dillon Mesa

☑ 5. BLM send CPW the sub-model for connector habitat as well as RM layer, will also send contact info (Frank)

☑ 6. CPW & BLM: Rerun of RM BHS Habitat Preference Raster Layer for connector habitat (Habitat Class) and agreement on the input/base layers (Frank/Anthony/Karin/others).  NOC and UFO have current RM suitable habitat layer and statewide BHS overall habitat coverage.

7. CPW & BLM: Run of D BHS Habitat Preference Raster Layer connector (Habitat Class) and agreement on the input/base layer (Frank/Anthony/Karin/others).  Expand to 35km (Karin)

8. CPW: check on herd sizes to include adults only (Andy/others)  Still need some info (Scott)

9. CPW: check on what to use for herd sex ratios (Andy/Julie)

10. BLM & CPW: expand table and data queries to include Gunnison and other planning units on the horizon (Frank/all) Need to add these

11. BLM: Send out new User Guide when available  (Robin)

☑ 12. BLM: exchange adjusted allotment data (Anthony/David)

**Spreadsheet Placeholder(file available in native format)**

**File Name:**                          0_20140116_SW_CO_ROC_Input.xlsx

**ufo- ar**

| | |
|---|---|
| **From:** | Krickbaum, John (Bruce) <bkrickba@blm.gov> |
| **Sent:** | Thursday, July 10, 2014 4:15 PM |
| **To:** | Angie Adams; Kate Krebs |
| **Cc:** | UFO AR |
| **Subject:** | Fwd: Bighorn Model Briefing Paper |
| **Attachments:** | 2014_July03_Bighorn Sheep Risk Modeling Briefing.docx |

Forwarding for your information and for the record.  Washington wants us to run the National bighorn sheep model, instead of the one we developed.  We can not run the national model yet, since it does not have desert bighorn data and habitat in it.  It only has Rocky Mountain, so it does not work for us (the results are not believable).  DOW is working hard at getting the desert bighorn information for the model.

At some point, the National model will be run.  After we get the results, we will see what it means.  With luck, the conclusion will be the same as our local model shows.

--Bruce


Bruce Krickbaum
Planner, Environmental Coordinator
BLM Uncompahgre Field Office
2465 South Townsend Ave.
Montrose, CO 81401
970-240-5384


---------- Forwarded message ----------
From: **Siders, Melissa (Missy)** <msiders@blm.gov>
Date: Thu, Jul 10, 2014 at 3:25 PM
Subject: Re: Bighorn Model Briefing Paper
To: "Stouffer, Megan" <mastouff@blm.gov>
Cc: Robin Sell <rsell@blm.gov>, Barbarar Sharrow <bsharrow@blm.gov>, John Krickbaum <bkrickba@blm.gov>, Collin Ewing <cewing@blm.gov>, "Nisula, Amanda L" <anisula@blm.gov>


Megan,
I had a meeting today with Barb, Collin and Bruce about the bighorn model and the DE RMP.  Attached is the final  Briefing Paper.  Here's some answers to your questions:

- We will be incorporating information from the Briefing Paper into the Bighorn Appendix of the DE Proposed RMP.
- Because DE NCA has domestic sheep within the overlap of the bighorn range, a model is not really necessary to know that there is overlap and potential issues between wild and domestic sheep.  We will move forward, and depending on when additional model runs are completed, may incorporate additional information at a later date.
- We will be moving forward in running the National Model at some point in the near future.  Because model runs for the various populations we have may influence model results in various areas, we will plan on a combined UFO and DE NCA model once we have some of the missing data

1

- o   I will be checking in with CPW biologist Brad Banulis on the status of the desert bighorn suitable habitat map and availability of telemetry data (to better model foray distances)
- o   We would like to discuss with Frank Quamen about the possibility of him helping us run the model

If you would still like to have a call, here are some windows when I could be available next week:
    Tuesday 7/15 8-10
    Wednesday 7/16 8-10, or 4-5
    Maybe Friday 7/18, but not sure of times yet

-Missy


^v^  ^V^  ^v^  ^v^   ^V^  ^v^   ^V^  ^v^  ^v^

**Melissa (Missy) Siders**, Wildlife Biologist
Uncompahgre Field Office
2465 S. Townsend Ave., Montrose, CO 81401
970-240-5332 – office
e-mail:  msiders@blm.gov
^v^  ^v^   ^V^  ^v^   ^V^  ^v^   ^V^  ^v^   ^V^
  *"So fuki de gas, fuki de sol, pund ay bare, way pax do am"*
      If ten people dig, and ten people fill,
   there's a lot of dust, but no work gets done.
      -Wolof Proverb, Senegal, West Africa


On Wed, Jul 2, 2014 at 7:29 AM, Stouffer, Megan <mastouff@blm.gov> wrote:
Hey Missy,

I spoke to Robin and she said she sent you some comments on this paper. I was hoping that when it was finalized that we could send it to Frank Quamen at the NOC and set up a quick call to discuss how this information was/will be incorporated into the D.E. RMP.  He would like to close the loop on that. Please let me know when you think you will have a final version and what your availability is for a call next week.

Best,
Megan


Megan Stouffer
Branch Chief Planning and Assessment
    BLM Colorado State Office
    303-239-3936
    303-912-4266(c)


On Mon, Jun 30, 2014 at 8:27 AM, Siders, Melissa (Missy) <msiders@blm.gov> wrote:
 Robin,

BLM_0002134

Attached is what I've written up on the modeling efforts for the Dominguez-Escalante and Uncompahgre RMP efforts.  Please let me know if that was what you were looking for, or if you see additional edits.  If good, please feel free to send on to Sally Butts (WO).

-Missy

^v^ ^V^ ^v^ ^v^ ^V^ ^v^ ^V^ ^v^ ^v^
**Melissa (Missy) Siders**, Wildlife Biologist
Uncompahgre Field Office
2465 S. Townsend Ave., Montrose, CO 81401
970-240-5332 – office
e-mail:  msiders@blm.gov
^v^ ^v^ ^V^ ^v^ ^V^ ^v^ ^V^ ^v^ ^V^
    *"So fuki de gas, fuki de sol, pund ay bare, way pax do am"*
        If ten people dig, and ten people fill,
      there's a lot of dust, but no work gets done.
          -Wolof Proverb, Senegal, West Africa

BLM_0002135

*Uncompahgre/Dominguez-Escalante Bighorn Sheep Risk Modeling Briefing*

Bighorn sheep are a concern in two BLM Resource Management Plans (RMP): Dominguez-Escalante National Conservation Area (NCA) Resource Management Plan (RMP), and Uncompahgre Field Office RMP revision. Dominguez-Escalante NCA has one population of desert bighorn (Uncompahgre herd [S-62]) within the area. Uncompahgre Field Office (UFO) has six populations that overlap the area: two desert bighorn (Uncompahgre [S-62] and Middle Dolores [S-63]), and four Rocky Mountain (Black Canyon [S-80], Cow Creek/Wetterhorn [S-21], Dillon Mesa [S-80], Snowmass West [S-25]).

<u>December 2011</u>: At the time that BLM UFO began its development of the Probability of Interaction Model (PoIM), there were no existing, standardized approaches to modeling the issue of potential disease transfer between wild and domestic sheep.

<u>Winter/Spring of 2012</u>: The local BLM PoIM model was completed, and Uncompahgre and Dominguez-Escalante RMP alternatives were developed.

<u>January 2013</u>: The Risk of Contact (RoC) model was first described in a Webinar. The description of this model appeared to require data (local radio telemetry location, suitable habitat map) that was not available for many of the bighorn populations involved in the RMP efforts. The RoC model included a CO specific version informed by Colorado Parks and Wildlife (CPW) Rocky Mountain bighorn summer suitable habitat model.

## Dominguez-Escalante RMP:

<u>May 2013</u>: Draft Resource Management Plan and EIS was released.

<u>January 2014</u>: In response to comments for the Draft Dominguez-Escalante RMP, BLM UFO was able to access and run the RoC AcrGIS model add-on. CPW is currently in process of developing a desert bighorn model, and may be available later this year. Even though the Uncompahgre herd is a desert population, the RoC model was run using the CPW Rocky Mountain habitat model.

- The RoC model was run with assistance from CPW biologist, Brad Banulis, to provide some population information (3-year average data, Herd size 157; Herd Sex Ratio Ram 45:Ewe 100) for the Uncompahgre [S-62] bighorn population to use as parameters in the RoC model.
- For the Uncompahgre herd, CPW did not have adequate telemetry data at the time of the RoC model run to conduct the Core Herd Home Range Calculation. We therefore used the CPW home range data provided in Natural Diversity Information Source (NDIS), which was also used for the local BLM PoIM model. With the assistance of CPW biologist (Brad Banulis), we conducted a Foray Probability and Contact analysis using data provided by CPW. Because we did not have adequate telemetry data for this population, we used the models default values for Foray Probability (Ram 0.141, Ewe 0.015).

Given that within the Dominguez-Escalante RMP area domestic sheep allotments and desert bighorn home range overlap greatly, it is not surprising that the results of the RoC and local BLM PoIM model are very similar. In general, allotments that were found to be "High Probability of Interaction" in the local BLM model were labeled "This allotment intersects the home range polygon and is therefore not included in the analysis" which we would equate to "High" in the local BLM model. The average Herd Contact Rate for all allotments analyzed in this RoC model run was 0.038 with a maximum of 0.348 and a minimum of 0.000001.

Two large domestic sheep allotments straddle the Dominguez-Escalante NCA and Uncompahgre FO boundary (US Hwy 50). As a result of comments on the draft plan, these allotments were reanalyzed with both the local BLM PoIM and RoC model. These two large domestic sheep allotments were split at the Dominguez-Escalante NCA/Uncompahgre FO boundary (US Hwy 50) for the proposed plan. For the portions within the Dominguez-Escalante NCA, they at least partially overlap with bighorn range, are considered "High Probability of Interaction" and will be managed accordingly in proposed plan.

Both the PoIM model and the Draft RMP were developed using the best available science, professional judgment and knowledge of the local herd at the time (2011), and is the first big-scale look at the management situation. At the time of future grazing permit renewal for these areas, NEPA analysis will be conducted using more site specific information, any new data and/or new processes to determine the effects and possible changes in management. Because there is some uncertainty for the management of this species, adaptive management has been incorporated into the management prescriptions for the proposed plan. If domestic sheep mitigation measures are not effective at preventing interaction between domestic/wild sheep, then BLM UFO will conduct additional analysis and use the results to determine if/when interaction rates must be reduced via the following adaptive measures:

1) If there are areas of the allotment that are not able to be mitigated, then:
    a) consider removal of area from the allotment currently available for domestic sheep grazing,
    b) combine that portion with adjacent cattle allotment.
2) Convert allotment to cattle.

In the intervening time, an agreement with CPW has been developed to fund and begin a GPS transmitter study on the Uncompahgre bighorn herd, and 14 of the eventual 20 collars have been deployed to date (13 working; 1 failed). Once the plan is finalized and mitigation measures are implemented, new information may drive changes in management in the future.

<u>Fall 2014</u>: Proposed Plan expected to be printed.

## Uncompahgre RMP

At this time, only the BLM PoIM model has been conducted for this RMP revision effort.

The Uncompahgre RMP is still very much in process, with a draft plan expected October 2014.

CPW bighorn data will most probably not be available in time to complete a RoC modeling effort before the draft plan is released to the public. However, BLM plans to complete RoC modeling efforts in the Winter of 2014/15 with cooperation from CPW and incorporate that information into the proposed plan. At that time, models will have to be run for each individual population of bighorn (6), then combined into one model for Risk of Contact.





**Siders, Melissa (Missy) <msiders@blm.gov>**

## Fwd: BHS ROC webinar handouts

**Quamen, Frank <fquamen@blm.gov>**                                                  Wed, Dec 31, 2014 at 3:28 PM
To: "Holland - DNR, Andy" <andy.holland@state.co.us>
Cc: "Sell, Robin" <rsell@blm.gov>, "Banulis - DNR, Brad" <brad.banulis@state.co.us>, Karin Eichhoff - DNR
<karin.eichhoff@state.co.us>, Seth McClean - DNR <seth.mcclean@state.co.us>, "Wait, Scott"
<Scott.Wait@state.co.us>, Stephanie Ferrero <stephanie.ferrero@state.co.us>, julie.mau@state.co.us, "Melissa
(Missy) Siders" <msiders@blm.gov>, David Sinton <dsinton@blm.gov>, arutledge@blm.gov, Michael Schmidt
<mschmidt@blm.gov>, awelsh@blm.gov, tdevaloi@blm.gov, aswinney@blm.gov, dsimon@blm.gov, Joel
Humphries <jhumphries@blm.gov>, Heidi Plank <hplank@blm.gov>, Amanda Ewing <alewing@blm.gov>, "Earl
(Tom) Rinkes" <erinkes@blm.gov>, Anthony Titolo <atitolo@blm.gov>, Brad Petch - DNR
<brad.petch@state.co.us>, Brandon Diamond - DNR <brandon.diamond@state.co.us>, John Broderick - DNR
<john.broderick@state.co.us>, "McLaughlin, Craig" <Craig.McLaughlin@state.co.us>, Codey Carter
<cdcarter@blm.gov>, "Thompson, Jay M" <jmthomps@blm.gov>, Kenneth Schauer <kschauer@blm.gov>,
Nathaniel West <nwest@blm.gov>, Russell Japuntich <rjapunti@blm.gov>, Hilary Boyd <hboyd@blm.gov>, Desa
Ausmus <dausmus@blm.gov>, Darren Long <dlong@blm.gov>, Lisa Belmonte <lbelmont@blm.gov>, Edward
Hollowed <ehollowe@blm.gov>, Sylvia Ringer <sringer@blm.gov>, Shawna Wiser <swiser@blm.gov>, Jamin Grigg -
DNR <Jamin.Grigg@state.co.us>, April Estep <April.Estep@state.co.us>, Brian Dreher
<Brian.Dreher@state.co.us>, Brian Holmes - DNR <Brian.Holmes@state.co.us>, Brian Smith - DNR
<brian.smith@state.co.us>, "Carpenter, Lance" <Lance.Carpenter@state.co.us>, Daniel Neubaum - DNR
<Daniel.Neubaum@state.co.us>, Darby Finley <Darby.Finley@state.co.us>, "Duckett, Stephanie"
<Stephanie.Duckett@state.co.us>, Ed Schmal - DNR <Ed.Schmal@state.co.us>, Evan Phillips - DNR
<Evan.Phillips@state.co.us>, Janet George <Janet.George@state.co.us>, Jonathan Reitz - DNR
<Jonathan.Reitz@state.co.us>, Julie Mao <Julie.Mao@state.co.us>, Kirk Oldham <kirk.oldham@state.co.us>,
"Kraft, Ben" <Ben.Kraft@state.co.us>, Larry Gepfert - DNR <larry.gepfert@state.co.us>, Liza Rossi - DNR
<Liza.Rossi@state.co.us>, Marty Stratman - DNR <marty.stratman@state.co.us>, Michelle Cowardin - DNR
<Michelle.Cowardin@state.co.us>, Mike Sherman - DNR <Mike.Sherman@state.co.us>, Mike Smith - DNR
<Michael.Smith@state.co.us>, Nathan Seward - DNR <Nathan.Seward@state.co.us>, Shannon Schaller - DNR
<shannon.schaller@state.co.us>, Steve Waters - DNR <steve.waters@state.co.us>, "Stiver, Julie"
<Julie.Stiver@state.co.us>, "Vieira, Mark" <Mark.Vieira@state.co.us>, "Vitt, Allen" <Allen.Vitt@state.co.us>,
"Weinmeister, Brad" <Brad.Weinmeister@state.co.us>, Wendy Figueroa - DNR <Wendy.Figueroa@state.co.us>,
"Yost, Jeff" <Jeff.Yost@state.co.us>, Chad Bishop - DNR <Chad.Bishop@state.co.us>, Jon Runge - DNR
<jon.runge@state.co.us>, Mary Lloyd - DNR <mary.lloyd@state.co.us>, Patt Dorsey - DNR
<patt.dorsey@state.co.us>, Dan Prenzlow - DNR <dan.prenzlow@state.co.us>, Steve Yamashita - DNR
<steve.yamashita@state.co.us>, Ron Velarde - DNR <ron.velarde@state.co.us>

Thanks Andy,
That all sounds good. I've updated the table to reflect this guidance and have updated the task list as well. Let
me know if I've missed or mis-characterized anything. It looks like we are making good progress. Thank you
Karin & Anthony for all the work you have been doing the past couple weeks. We got the RM BHS Habitat
Preference Raster Layers from Karin but are unsure if these are final.

Anthony and I created a draft map to show which BLM plans are underway/upcoming and where we may want to
focus. Right now we are focusing on the Uncompahgre Field Office, and Gunnison FO has indicated they would
like to run the RoC model soon as well. The only other plan that I am aware of on the horizon is Royal Gorge,
though from our sheep allotment/occupied habitat overlay, there doesn't appear to be a huge risk of contact in
that FO. Other BLM FOs have either just recently completed RMPs and/or do not have anything scheduled for
awhile, but they (like Gunnison) may want to run the RoC for use in making grazing permitting decisions outside
of the RMP process. I'll leave that up to Colorado BLM.

I look forward to talking to you more on this next week.

Happy New Year!
Frank

BLM_0002139



1/5/2015                        DEPARTMENT OF THE INTERIOR Mail - Fwd: BHS ROC webinar handouts

On Wed, Dec 31, 2014 at 2:14 PM, Holland - DNR, Andy <andy.holland@state.co.us> wrote:
[Quoted text hidden]
[Quoted text hidden]

---

**3 attachments**

**20141231 SW Colorado Bighorn Sheep ROC Data Needs Assignments.docx**
26K

**20141231 SW Colorado Bighorn Sheep ROC Model Input Data Spreadsheet.xlsx**
13K

**CO_Planning_BLM_Grazing_Overlap.pdf**
1089K

BLM_0002140



Webinar

Robin Sell, Frank Quamen (NOC), Anthony, Carla, Shannon (NOC Wildlife Modeling center), Andy (GFO), Michael (TRFO), David Sinton, Ken Holsinger, Brad Banulis (CPW),  San Louis office, Scott Wait (CPW, Durango, Tara (GFO), Darren (Kremling), Julie Mau (CPW Glenwood Springs)

Dillon Mesa/W Elk herd overall range ... adequate for core herd home range.  Brandon Diamond needs to review the polygons.  There are two sub herds in that area.  Population estimate is lumped.  Scott recommends to take the overall, not seasonal or sub herds.  Overall range poly is fairly liberal.  Brandon recommends merging Summer and Winter ranges to use for core herd home range.  This poly may not overlap with UFO.  Need to connect to make it one polygon.    Brad, Brandon, Scott and Karin need to get together to work on ... will try to make poly in next week.

SnowMass West, Julie ... is just the west portion is for the model run that the population numbers. Other portion is the Maroon Bells population (need for GFO).

Send emails directly to biologists cc Scott to verify population polygons and numbers.

CHHR Covers 95% of the area for 95% of the time.

(Need to cut off northern end of middle Dolores based on data Brad gave me.)

1/16/2015                                    DEPARTMENT OF THE INTERIOR Mail - Fwd: webinar info



**Siders, Melissa (Missy) <msiders@blm.gov>**

## Fwd: webinar info

**Sell, Robin** <rsell@blm.gov>                                    Fri, Jan 16, 2015 at 10:06 AM
To: David Sinton <dsinton@blm.gov>, Aaron Rutledge <arutledge@blm.gov>, Michael Schmidt
<mschmidt@blm.gov>, Andrew Welsh <awelsh@blm.gov>, Tara De Valois <tdevaloi@blm.gov>, Amber Swinney
<aswinney@blm.gov>, Douglas Simon <dsimon@blm.gov>, Joel Humphries <jhumphries@blm.gov>, Heidi Plank
<hplank@blm.gov>, Amanda Ewing <alewing@blm.gov>, Andy Holland - DNR <andy.holland@state.co.us>, Brad
Banulis <Brad.Banulis@state.co.us>, "Eichhoff - DNR, Karin" <karin.eichhoff@state.co.us>, Scott Wait
<Scott.Wait@state.co.us>, stephanie.ferrero@state.co.us, "Quamen, Frank R" <fquamen@blm.gov>, Anthony
Titolo <atitolo@blm.gov>, Brad Petch <brad.petch@state.co.us>, Brandon Diamond - DNR
<brandon.diamond@state.co.us>, John Broderick - DNR <john.broderick@state.co.us>, "McLaughlin, Craig"
<Craig.McLaughlin@state.co.us>, Kenneth Schauer <kschauer@blm.gov>, Nathaniel West <nwest@blm.gov>,
Russell Japuntich <rjapunti@blm.gov>, Hilary Boyd <hboyd@blm.gov>, Desa Ausmus <dausmus@blm.gov>,
Darren Long <dlong@blm.gov>, Lisa Belmonte <lbelmont@blm.gov>, Sylvia Ringer <sringer@blm.gov>, Shawna
Wiser <swiser@blm.gov>, Ken Holsinger <kholsing@blm.gov>, "Rogers, Lynae B" <lbroger@blm.gov>, Angela
Losasso <alosasso@blm.gov>, Julie Mao - DNR <Julie.Mao@state.co.us>, "Melissa (Missy) Siders"
<msiders@blm.gov>, Tom Rinkes <rinkes.t@gmail.com>, Kristi Murphy <kmurphy@blm.gov>
Cc: cmccarth01@gmail.com, Bruce Rittenhouse <brittenh@blm.gov>

Hi everyone-

Thanks to all who were able to participate on yesterday's webinar.  Attached are the 2 worksheets that Frank
edited on the screen yesterday - our continued assignments & data spreadsheet for the populations we need to
run for the UFO RMP.  We made tremendous progress on recognizing the further refinements necessary for our
model data inputs.  There is a lot of work to be done in a short timeframe.  Thanks to Tom & Clint for assisting
with this discussion and their expertise on the ROC model. Thanks also to Frank and the Wildlife Lab (Anthony,
Shannon and Carla) from the NOC (BLM National Operations Center) for their help in this process and model
runs.

**CPW is meeting on Tuesday, Jan 20th** to complete the attached table and refine the Core Herd Home Range
(CHHR) polygon for each population iisted.  They will share any completed population sets immediately and have
committed to providing the **entire data set by Friday, Jan. 23rd**.  GIS data will be sent directly to David Sinton
and Anthony Titolo (emails above) so the BLM- UFO and NOC will have the underlying spatial data sets for the
model.  One suggestion if making separate spatial files- *include BLM ROC Model 2015* in title so it is not
confused in future with similar CPW map data. The completed data table should be sent to Missy Siders, Frank
Quamen and Robin Sell.  I will continue to share the data table (and other correspondence) with the entire group.
I will also forward the BHS/disease papers discussed on our webinar in a separate email.

Another reminder: When adding or considering observational data to build or refine the CHHR - an observation of
a group of 5 BHS, should be recorded as 5 individuals (adults only) for model inputs.

Finally- If folks need to be added/deleted from this email list- please let me know.  Anthony- could you share
with Shannon & Carla- I need to get full names.  Brad P.- can you share with Stephanie D. in interim.

Questions, let me know.  Back in office on Tuesday.

Robin
303.239.3723

BLM_0002143

1/16/2015                                      DEPARTMENT OF THE INTERIOR Mail - Fwd: webinar info

**2 attachments**

 **20140114 SW Colorado Bighorn Sheep ROC Data Needs Assignments.docx**
21K

**20140114 SW Colorado Bighorn Sheep ROC Model Input Data Spreadsheet (1) (1).xlsx**
14K

BLM_0002144

| | | Desert Bighorn | | | | | | | | Rocky Mountain Bighorn | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bighorn Sheep RoC Tool v2 Nomenclature** | **CPW Nomenclature** | Uncompahgre/ Dominguez | Black Ridge | **DAU=60** | Middle Dolores | Upper Dolores | **DAU=61** | Black Canyon | Cow Creek/Wetherom | Lake Fork/Pole Mountain | **DAU=21** |
| **HOME RANGE DATA** | **Game Management Unit** | S62 | S56 | S62/S56 | S63 | S64 | S63/S64 | S80 | S21 | S33 | S21/S33 |
| 3.2.1 Bighorn Sheep Telemetry Points used to inform CHHR polygon | CPW Telemetry Points | n/a | Yes | | n/a | n/a | | n/a | n/a | n/a | |
| 3.2.1 Bighorn Sheep Observation Points used to inform CHHR polygon | CPW Observation Points | Yes | Yes | | Yes | Yes | | ? | Yes | Yes | |
| 3.2.1 Bighorn Sheep GPS Points used to inform CHHR polygon | CPW GPS Points | 12 | n/a | | Yes | Yes | | n/a | Yes | Yes | |
| 3.2.1 Bighorn Sheep Core Herd Home Range Polygon Layer SUMMER | CPW Bighorn Summer Range | Summer | Summer | | Summer | Summer | | Summer | Summer | Summer | |
| 3.2.1 Bighorn Sheep Core Herd Home Range Polygon Layer WINTER | CPW Bighorn Winter Range | Winter | Winter | | Winter | Winter | | n/a | Winter | Winter | |
| 3.2.1 Bighorn Sheep Core Herd Home Range Polygon Layer OVERALL | CPW Bighorn Overall Range | Overall | Overall | **Overall** | Overall | Overall | **Overall** | **Overall** | Overall | Overall | **Overall** |
| **FORAY DATA** | | | | | | | | | | | |
| 3.2.2 Habitat Preference Raster Layer (Habitat Class) SUMMER | CPW Suitable Habitat Models? | n/a | n/a | **n/a** | n/a | n/a | **n/a** | Summer | Summer | Summer | **Summer** |
| 3.2.2 Habitat Preference Raster Layer (Habitat Class) WINTER | CPW Suitable Habitat Models? | n/a | n/a | **n/a** | n/a | n/a | **n/a** | n/a | n/a | n/a | **n/a** |
| 3.2.2 Habitat Preference Raster Layer (Habitat Class) YEAR-ROUND | CPW Suitable Habitat Models? | Year-round | Year-round | **Year-round** | Year-round | Year-round | **Year-round** | n/a | n/a | n/a | **n/a** |
| 3.2.2 Habitat Preference Raster Layer (Relative Preference)* | N/A | Default Values | Default Values | **Default Values** | Default Values | Default Values | **Default Values** | **Default Values** | Default Values | Default Values | **Default Values** |
| 4.4.1 Ram & Ewe Distance Distribution File SUMMER | N/A | Summer Default Values | Summer Default Values | **Summer Default Values** | Summer Default Values | Summer Default Values | **Summer Default Values** | **Summer Default Values** | Summer Default Values | Summer Default Values | **Summer Default Values** |
| 4.5.1 Ram & Ewe Distance Distribution File WINTER | N/A | n/a | n/a | **n/a** | n/a | n/a | **n/a** | **n/a** | n/a | n/a | **n/a** |
| 4.5.1 ADULT Herd Size | CPW 3-year average# | 120 | 150 | **270** | 42 | 92 | **134** | 30 | 204 | 100 | **304** |
| 4.5.1 Herd Sex Ratio/Numbers of (Rams:Ewes) | CPW 3-year average | 36:84 | 56:94 | **95:175** | 13:29 | 31:61 | **44:90** | **8:22** | 82:122 | 44:56 | **126:178** |
| Ram Ratio (for reference) | CPW 3-year average | 43.7:100 | 60:100 | 54.4:100 | 44.8:100 | 50:100 | 48.9:100 | 35:100 | 67.9:100 | 67.9:100 | 67.9:100 |
| 4.5.1 Foray Probability SUMMER | | Summer Default Values | Summer Default Values | **Summer Default Values** | Summer Default Values | Summer Default Values | **Summer Default Values** | **Summer Default Values** | Summer Default Values | Summer Default Values | **Summer Default Values** |
| 4.5.1 Foray Probability WINTER | N/A | n/a | n/a | **n/a** | n/a | n/a | **n/a** | **n/a** | n/a | | |

Use BOLD typeface at DAU or GMU level (DAU is used when
polygons are connected and movement connection is known,
otherwise GMU is used

CHHR typically equals CPW Overall polygon; specific seasonal
polygons are only used when specific AND complete
knowledge is possessed.

\*Normally, people use the default values from the ROC User Guide - at this point, use summer default values for everything
\*\*Still need connector habitat and non-habitat

##Default to Rocky Mountain Summer unless CPW has distance estimates for DBHS

Would be critical to look at points independently and then overlay with CHHR
Need to verify data with local biologists!

BLM_0002145

| Bighorn Sheep RoC Tool v2 Nomenclature | CPW Nomenclature: Game Management Unit | Dillon Mesa/W. Elk S54 | Snowmass West S25 | Snowmass East S13 | Taylor River S26 | Fossil Ridge S71 | DAU=23 S26/S71 | Lower Lake Fork S81 | Main Canyon S75 | Battlement Mesa S24 | West Needles S71 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **HOME RANGE DATA** | | | | | | | | | | | |
| 3.2.1 Bighorn Sheep Telemetry Points used to inform CHHR polygon | CPW Telemetry Points | n/a | 20 | n/a | n/a | n/a | | n/a | n/a | n/a | Yes |
| 3.2.1 Bighorn Sheep Observation Points used to inform CHHR polygon | CPW Observation Points | Yes | Yes | Yes | Yes | Yes | | Yes | Yes | Yes | Yes |
| 3.2.1 Bighorn Sheep GPS Points used to inform CHHR polygon | CPW GPS Points | n/a | 13 | 7 | n/a | n/a | | n/a | n/a | n/a | No |
| 3.2.1 Bighorn Sheep Core Herd Home Range Polygon Layer SUMMER | CPW Bighorn Summer Range | Merged Summer/Winter | Summer | Summer Refinement | Summer | Summer | Summer | Summer | Summer | Summer | Summer |
| 3.2.1 Bighorn Sheep Core Herd Home Range Polygon Layer WINTER | CPW Bighorn Winter Range | Merged Summer/Winter | Winter | Winter | Winter | Winter | Winter | Winter | Winter | Winter | Winter |
| 3.2.1 Bighorn Sheep Core Herd Home Range Polygon Layer OVERALL | CPW Bighorn Overall Range | Overall | Overall | Overall | Overall | Overall | Overall | Overall | Overall | Overall | Overall |
| **FORAY DATA** | | | | | | | | | | | |
| 3.2.2 Habitat Preference Raster Layer (Habitat Class) SUMMER | CPW Suitable Habitat Models? | Summer | Summer | Summer | Summer | Summer | Summer | Summer | Summer | Summer | Summer |
| 3.2.2 Habitat Preference Raster Layer (Habitat Class) WINTER | CPW Suitable Habitat Models? | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3.2.2 Habitat Preference Raster Layer (Habitat Class) YEAR-ROUND | CPW Suitable Habitat Models? | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 3.2.2 Habitat Preference Raster Layer (Relative Preference)* | N/A | Default Values | Default Values | Default Values | Default Values | Default Values | Default Values | Default Values | Default Values | Default Values | Default Values |
| 4.4.1 Ram & Ewe Distance Distribution File SUMMER | N/A | Summer Default Values | Default Values | Summer Default Values | Summer Default Values | Summer Default Values | Summer Default Values | Summer Default Values | Summer Default Values | Summer Default Values | Summer Default Values |
| 4.4.1 Ram & Ewe Distance Distribution File WINTER | N/A | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| 4.5.1 ADULT Herd Size | CPW 3-year average# | 90 | 51 | 60 | 30 | 25 | 50 | 10 | 45 | 55 | 45 |
| 4.5.1 Herd Sex Ratio/Numbers of (Rams:Ewes) | CPW 3-year average | 28:62 | 16:35 | 20:40 | 13 | 5 | 20 | 4:6 | 10:35 | 16:39 | 15:30 |
| 4.5.1 Ram Ratio (for reference) | CPW 3-year average | 45:100 | 47.4:100 | 50:100 | 76:100 | 25:100 | 67:100 | 40:100 | 30:100 | 40:100 | 50:100 |
| 4.5.1 Foray Probability SUMMER | | Summer Default Values | Summer Default Values | Summer Default Values | Summer Default Values | Summer Default Values | Summer Default Values | Summer Default Values | Summer Default Values | Default Values | Default Values |
| 4.5.1 Foray Probability WINTER | N/A | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

Use BOLD typeface at DAU or GMU level (DAU is used when
polygons are connected and movement connection is known,
otherwise GMU is used

CHHR typically equals CPW Overall polygon; specific seasonal
polygons are only used when specific AND complete
knowledge is possessed.

*Normally, people use the default values from the ROC User Gu
**Still need connector habitat and non-habitat

##Default to Rocky Mountain Summer unless CPW has distance

Would be critical to look at points independently and then overla
Need to verify data with local biologists!

BLM_0002146

1/26/2015                          DEPARTMENT OF THE INTERIOR Mail - Fwd: webinar info



**Siders, Melissa (Missy) <msiders@blm.gov>**

---

# Fwd: webinar info

---

**Eichhoff - DNR, Karin** <karin.eichhoff@state.co.us>                    Fri, Jan 23, 2015 at 3:18 PM
To: "Siders, Melissa (Missy)" <msiders@blm.gov>, Scott Wait - DNR <scott.wait@state.co.us>, "Sell, Robin A"
<rsell@blm.gov>, Anthony Titolo <atitolo@blm.gov>, "Quamen, Frank R" <fquamen@blm.gov>
Cc: Brad Petch - DNR <brad.petch@state.co.us>, Julie Mao - DNR <julie.mao@state.co.us>, Brandon Diamond -
DNR <brandon.diamond@state.co.us>, Brad Banulis - DNR <brad.banulis@state.co.us>

Hi,
This email is to folks that were identified in previous emails as direct contacts for the GIS data, If others need
the data to run the ROC model, please forward the data and let me know if I should be more inclusive in the
future.

Attached is a zip file with the desert bighorn source habitat model and the BighornRange_ROC_Uncompahgre
shapefile. The desert bighorn habitat model shows the modeled habitat out 35km from desert bighorn overall
range (previously it was only 9 mi). The BighornRange_ROC data is currently complete for the Uncompahgre
Field Office.

Karin

**Karin Eichhoff**
**GIS Analyst**



P 970.472.4326 | F 970.472.4457
317 W. Prospect Rd., Fort Collins, CO 80526
karin.eichhoff@state.co.us  |  cpw.state.co.us
[Quoted text hidden]

---

 **ToBLM20150123.zip**
942K

BLM_0002147

1/23/2015                              DEPARTMENT OF THE INTERIOR Mail - Fwd: webinar info



**Siders, Melissa (Missy) <msiders@blm.gov>**

---

# Fwd: webinar info

**Wait - DNR, Scott** <scott.wait@state.co.us>                    Fri, Jan 23, 2015 at 10:47 AM
To: "Sell, Robin" <rsell@blm.gov>
Cc: David Sinton <dsinton@blm.gov>, Aaron Rutledge <arutledge@blm.gov>, Michael Schmidt
<mschmidt@blm.gov>, Andrew Welsh <awelsh@blm.gov>, Tara De Valois <tdevaloi@blm.gov>, Amber Swinney
<aswinney@blm.gov>, Douglas Simon <dsimon@blm.gov>, Joel Humphries <jhumphries@blm.gov>, Heidi Plank
<hplank@blm.gov>, Amanda Ewing <alewing@blm.gov>, Andy Holland - DNR <andy.holland@state.co.us>, Brad
Banulis <Brad.Banulis@state.co.us>, "Eichhoff - DNR, Karin" <karin.eichhoff@state.co.us>, Stephanie Ferrero
<stephanie.ferrero@state.co.us>, "Quamen, Frank R" <fquamen@blm.gov>, Anthony Titolo <atitolo@blm.gov>,
Brad Petch <brad.petch@state.co.us>, Brandon Diamond - DNR <brandon.diamond@state.co.us>, John Broderick -
DNR <john.broderick@state.co.us>, "McLaughlin, Craig" <Craig.McLaughlin@state.co.us>, Kenneth Schauer
<kschauer@blm.gov>, Nathaniel West <nwest@blm.gov>, Russell Japuntich <rjapunti@blm.gov>, Hilary Boyd
<hboyd@blm.gov>, Desa Ausmus <dausmus@blm.gov>, Darren Long <dlong@blm.gov>, Lisa Belmonte
<lbelmont@blm.gov>, Sylvia Ringer <sringer@blm.gov>, Shawna Wiser <swiser@blm.gov>, Ken Holsinger
<kholsing@blm.gov>, "Rogers, Lynae B" <lbroger@blm.gov>, Angela Losasso <alosasso@blm.gov>, Julie Mao -
DNR <Julie.Mao@state.co.us>, "Melissa (Missy) Siders" <msiders@blm.gov>, Tom Rinkes <rinkes.t@gmail.com>,
Kristi Murphy <kmurphy@blm.gov>, cmccarth01@gmail.com, Bruce Rittenhouse <brittenh@blm.gov>

All- I'm using Robin's email list-
Attached is our completed table of data. In some cases we have combined GMU's into our DAU's to match the
polygons provided, in some cases we have kept data at the GMU level (and the corresponding shapefile will be
identified uniquely)- these are noted by bolding and darker columns.
I've also added columns of GMU data requirements imminently needed for the GUFO analysis, and then for the
SLVFO analysis. Those data will be accumulated and provided soon; but this completes the data requirements
for the UFO.
Karin will be providing the shapefiles today, I think she is still waiting for some final confirmations. In most
cases we have resolved to use the "Overall" layer equals CHHR as the most relevant layer- our "summer" and
"winter" layers have not been consistently mapped (when we lack specific information we tend NOT to map a
feature), and because in cases where we do have detailed information (GPS collars) the overall includes
approximately 90% of the points (therefore the definition of CHHR).
I hope this helps, and we all look forward to continued discussions.


*Scott Wait*
*Southwest Region Senior Biologist*
*970-375-6745*

[Quoted text hidden]

---

 **20150121 SW Colorado Bighorn Sheep ROC Model Input Data Spreadsheet.xlsx**
17K

BLM_0002148



Siders, Melissa (Missy) <msiders@blm.gov>

## Fwd: webinar info

**Eichhoff - DNR, Karin** <karin.eichhoff@state.co.us>                      Mon, Jan 26, 2015 at 4:27 PM
To: "Siders, Melissa (Missy)" <msiders@blm.gov>
Cc: Scott Wait - DNR <scott.wait@state.co.us>, "Sell, Robin A" <rsell@blm.gov>, Anthony Titolo
<atitolo@blm.gov>, "Quamen, Frank R" <fquamen@blm.gov>, Brad Petch - DNR <brad.petch@state.co.us>, Julie
Mao - DNR <julie.mao@state.co.us>, Brandon Diamond - DNR <brandon.diamond@state.co.us>, Brad Banulis -
DNR <brad.banulis@state.co.us>

Hi Missy,
Attached is the desert bighorn habitat model with the three classes (1, 2, 10).

Cheers,
Karin


Karin Eichhoff
GIS Analyst



P 970.472.4326 | F 970.472.4457
317 W. Prospect Rd., Fort Collins, CO 80526
karin.eichhoff@state.co.us | cpw.state.co.us

[Quoted text hidden]

  **DesertBighorn20150126.zip**
2017K

**Spreadsheet Placeholder(file available in native format)**

**File Name:**                          0_20150130_SW CO BighornROCModelData.xlsx

**Spreadsheet Placeholder(file available in native format)**

**File Name:**                    0_20150204 SW_CO_BighornROCInputData.xlsx

# Bighorn RoC Model Webinar

*February 20, 2015*

http://www.mymeetings.com/nc/join.php?sigKey=blm&i=442809195&p=&t=c

Call in:  1-866-851-6906 3887282#

## Participants:

NOC:  Frank Quamen,

BLM:  Missy Siders (UFO), David Sinton (UFO), Robin Sell (COSO),  Tara De Valoi (GFO), Kristi Murphy (GFO), Andy Welsh (GFO)

CPW:  Brad Petch, Brad Banulis, Scott Wait, Stephanie Ferrero

Modelers:  Tom Rinkes

## Issues Running the model

We found an issue where certain allotments would be listed as "intersect the home range polygon. ... not be included in the analysis" in the box that comes up at the beginning of the Contact Analysis run, but then when the table is generated are left out of the table.

 Tom Rinkes will give us the name of person to talk to about bug of dropping allotments (Josh O'Brian: 1-916-317-1594).

Areas of direct overlap and areas outside of the 35km area of analysis end up with the same results (<NULL>) in the data tables.  In order to differentiate the two in our combined population results, areas that had direct overlap were found using a selection:

> *def DirectHit( rate_hrd_cont , notes ):*
>
> *if len(notes) >=1:*
>
> *rate_hrd_cont = 10*
>
> *return rate_hrd_cont*

Then we conducted a manual review for each population run to check for missing allotments that should be labled as "This allotment intersects the home range..."

BLM_0002152

## Results of the individual populations

Briefly reviewed the results of a few populations looking at the foray results

## Results of sum of all populations within UFO

Summation of results is the rate of contact for a bighorn from multiple populations.

Tara suggested that she disagrees with summing the rates from multiple populations.  Shouldn't it be the highest value of the populations?

Depends on the question:  if wanting to know the rate of contact for a bighorn sheep to make contact with an allotment, given the various populations, then it would be additive.  If want to look at the highest risk from a population, you could look at the highest population value.  This would give you the herd that has the highest impact from contact with an allotment.

Could also ask the question of how many herds are impacting a single allotment.

Where have a large allotment, could do analysis on pastures.

## What do numbers mean

Idaho went with the assumption of 4th contact result in disease event,  recognized uncertainty of disease event.  Ranges of 1 in 1, to 1 in 20.

5 Different:  1 to 1, 1 in 4, 1 in 10, 1 in 20, and one more

Disease can be transmitted aerosol up to 20m.

Brad:  Ouray RM herd...all age die off early 1980, did not start to recover until around 2006.  Black Canyon herd ... died out in 1980s; reintroduction, doesn't really get better.  Seems that 20-25 years is the time it takes to recover from infection.

Mike Miller, CPW vet ...

Tom:  need to keep contact rate down for a time long enough for the herd to recover and quit reflecting themselves.  Lamb recruitment improves.

Could look at natural breaks in data for categories?

Look at Cottonwood example.

Include type of livestock in data table

Make columns for different rates of disease

Review of appendix with Tom, Robin, Brad, Scott

Foray dates?  Brad will look up and send to me.

BLM_0002154

Bighorn Mtg

- Missy, David, Brad Banulis (CPW)
- Kristy, Andy, Tara (Gunn)
- Tom Ringcus (Boise)
- Frank @ NOC
- Brad Patch GJ
- Stephanie Ferrero /
- Robin SO

Discussion of how to ~~add~~ show foray risk - contact rates
- use highest risk of contact rate for a single herd instead of adding risks from multiple herds

CPW will be giving numbers - Scott Wait will be contact (for Gunnison)

What do numbers mean w/ regard
to management?

Contact refers to bighorn contact
w/ allotment, not directly w/
domestic sheep

Robin
EA from Idaho
- used every 4th contact w/
allotment results in
disease event
- there is uncertainty in
number of contacts
actually resulting in
disease event

- CPW doesn't have good data on this
except for Ouray area -
had mass die-off in early
80's, took over 20 yrs
to recover

- talk to Mike Miller, CPW vet - Brad will

- Keep contact low enough so wild sheep stop re-infecting themselves
  - 20-25 yrs to have initial disease bearers to die off

  - research ongoing on removing diseased ewes and replacing w/ "clean"

  - saw dramatic increase in lamb production when diseased ewes died off, even when those ewes seemed healthy - weren't producing lambs

How do you use the data to
make decision* documents
(RMP)

UFO will move forward
looking @ contact rates &
disease intervals

→ look @ Cottonwood RMP
supplement for ideas on
how they addressed it

– have been having mgmt
discussions on how to reduce
contacts in the high risk areas
in the 3 permit renewal
areas.

Scott work w/ his group to
get Gunnison FO data
   – David will contact
      him re: needed data

BLM_0002158

Ander will be running
the model

---

Next step for UFO
- look @ contact rates
  and how they change
  results
- read cottonwood
- brief maps
- write up appendix
  for RMP
- use the info for
  permit renewals

→ add type of cattle on
allotment to spreadsheet

→ CPW: BLM would be interested
to hear if CPW folks
have any dif ideas
on contact rates or

natural breaks in
disease, etc

Missy will send appendix
around for review when
done

Frank

BLM_0002160



**Siders, Melissa (Missy) <msiders@blm.gov>**

## Bighorn disease intervals

**Banulis - DNR, Brad** <brad.banulis@state.co.us>                          Thu, Mar 5, 2015 at 10:39 AM
To: "Siders, Melissa (Missy)" <msiders@blm.gov>, "Wait, Scott" <scott.wait@state.co.us>

Hey Missy-
I finally talked to Mike Miller, our state Vet and bighorn disease expert about your questions.  I apologize for
the delay, things at work have been busy and then I have been having to take care of my 3 year old who broke
her finger and just had surgery on Tuesday morning.  Anyways, here is Mike's correspondence about disease
intervals:

Brad --

Thanks for the questions. With respect to the frequency of die-offs vs. viability
risk, perhaps the Tarryall herd history can help answer that: ~45 years lapsed
between the domestic sheep-associated die-off in 1952-3 (this one started with a
grazing allotment on Pikes Peak and then spread to the Tarryall Mountains) and
the domestic sheep-associated die-off in the Tarryall Mountains in 1997-99
(George et al. 2008). It's now been over 15 years and it's still not clear whether
the Tarryall herd will ever recover from the most recent die-off. So I'm not sure
whether that qualifies as "moderate" risk of ultimate extirpation or not...

Perhaps once every 100 years would be more appropriate as a mark for
"moderate" risk. Each die-off seems to have some (small) probability of complete
recovery and some (larger) probability of complete collapse (e.g., Lower Poudre
Canyon, Gribbles Park). Moreover, the recent Montana risk assessment work (J
Wildl Manage 2015; attached) suggests herds with die-offs have a higher risk of
recurrence, so one could argue that the effects are likely to be cumulative
regardless of frequency.

Happy to visit with Missy or the group if it would be helpful.

Cheers,

Mike

 I also talked to Mike and others about foray dates.  For Rocky Mountain bighorns, young rams tend to wander
during the summer months, probably as ewes are lambing and raising new lambs the young rams disperse.
Those young rams are leaving the family groups and may be trying to find other rams or bighorn groups.  There
is also some movement of rams pre-rut and during the rut when rams are trying to find ewe groups for breeding.
As far as Desert bighorn rams go, I can't find a lot of information in the literature.  Based on our collar data, and
Mike's recollection as well, Desert bighorns just move more than Rocky Mountain bighorns do in general and

BLM_0002161

year round.  Their seasonal habitats are not restricted by snow conditions as much as Rockies are.  Also, since Desert bighorns tend to lamb across a longer period of time in the Spring and even year round, the family structure seems more fluid through the year.  That being said, young rams probably disperse from the family groups during lambing and lamb rearing especially in March through June, but then rams probably start looking for ewes again for breeding in July, August, and September.  During the winter in Escalante Canyon, it seems like the bigger ewe groups spend a lot of time with young rams up to 5 and 6 year old rams, but you don't generally see real old rams with ewe groups outside of breeding season.

Hopefully this helps.

Cheers,
Brad


**Brad Banulis**
**Wildlife Biologist**



**COLORADO**
Parks and Wildlife
Department of Natural Resources

P 970.252.6051  |  F 970.252.6053
2300 S. Townsend Ave., Montrose, CO  81401
brad.banulis@state.co.us  |  cpw.state.co.us

[Quoted text hidden]

BLM_0002162



**Siders, Melissa (Missy) <msiders@blm.gov>**

---

## Bighorn disease intervals

---

**Banulis - DNR, Brad** <brad.banulis@state.co.us>                    Thu, Mar 5, 2015 at 1:00 PM
To: "Siders, Melissa (Missy)" <msiders@blm.gov>, Mike Miller - DNR <mike.miller@state.co.us>
Cc: "Wait, Scott" <scott.wait@state.co.us>

Hey Missy-
The breeding dates below are good for Rockies and for Deserts, just with the recognition that for Deserts those are the peak breeding dates with the literature showing breeding year round and that we know breeding has occurred from July through October, based on when we have seen lambs hit the ground.

For foray dates, I would just make a slight modification below:

Rocky Mountain: 6/1-9/30 and 11/1-12/31
Desert:  3/1-9/30, also recognizing that rams move a lot within their occupied habitat year round.

Mike, do these dates seem appropriate to you?

Missy, I did attach the Montana paper as well.  One thing to keep in mind is that private land grazing predominated that landscape over public land allotments associated with the studied bighorn populations.

Let us know if you have any questions.

Thanks,
Brad


**Brad Banulis**
**Wildlife Biologist**

 COLORADO
Parks and Wildlife
Department of Natural Resources

P 970.252.6051  |  F 970.252.6053
2300 S. Townsend Ave., Montrose, CO  81401
brad.banulis@state.co.us  |  cpw.state.co.us


[Quoted text hidden]

---

📄 **jwmg824.pdf**
1240K

BLM_0002163

# Final Report

**COOPERATIVE AGREEMENT NO.  07-FC-40-2555**
**BETWEEN**
**THE UNITED STATES BUREAU OF RECLAMATION**
**AND**
**THE SHAVANO CONSERVATION DISTRICT**
**FOR**
**WORK ASSOCIATED WITH**

## POND LINING TO REDUCE SALT LOADING TO THE UNCOMPAHGRE RIVER

**Project Manager**

# Frederick S. Fisher

Shavano Conservation District
102 Par Place, Suite 4
Montrose, Colorado 81401
Telephone (970) 249-8407
ffisher@frontier.net

BLM_0002164

# Table of Contents

Executive Summary...................................................................................... 3

**Introduction**................................................................................................. 4
      Pond utilization and owner responsibilities
      Data gathering methods and procedures
      Physical examination and observations of pond sites

**Regional Geological and Soils Settings**........................................... 7
      Project area soils
      Western Interior Seaway
      Dakota Sandstone
      Mancos Shale
      Glacial/fluvial deposits

**Description of types of ponds in the Project area**....................... 11

**Common causes of pond seepage**........................................................ 12

**Pond seepage records: salt and loading**.......................................... 14

**Project operational issues**.................................................................... 17
      Human elements
      Hydrological/geologic conditions
      Weather related problems
      Evaporation measurements
      Cost escalation

**Project Conclusions**................................................................................. 19

**Recommendations for future pond projects**.................................. 20

**List of Illustrations**................................................................................. 23

**References**.................................................................................................... 24

**Appendices**
      **Appendix A: Cooperative agreement no. 07-fc-40-2555**............................... 25
      **Appendix B: Shavano Conservation District Proposal**................................. 44
      **Appendix C: General information for all examined ponds**........................... 55
      **Appendix D: Spread Sheets for selected ponds.....See Spread Sheet Folder**
      **Appendix E: Soil descriptions..............................................See Soils Folder**
      **Appendix F: Illustrations.........................................See Illustrations Folder**

BLM_0002165

## Executive Summary

In December 2005 the Bureau of Reclamation (BOR) published a request for proposals focused on salinity control in the upper Colorado River basin above the Hoover Dam. Proposals responding to this request were to reduce salt loading by at least 1,000 tons per year and were to be completed within a three year time period.

The Shavano Conservation District (SCD) submitted a proposal to the BOR that was accepted and scheduled to begin on October 1, 2006. In February, 2007 a cooperative agreement between the BOR and the SCD was signed. The purpose of the SCD Pond Lining Project was to reduce salinity loading by lining ponds located east of the Uncompahgre River on soils derived from the underlying Mancos Shale Formation. The goal of the project was to line approximately 30 acres (wetted area) of ponds which would result in an annual reduction of 6,222 tons of salt in the Colorado River (based on a loading rate of 5.69 tons/acre-foot of seepage). The SCD would solicit interested landowners, measure seepage for each candidate pond, and identify the most cost effective ponds to line.

In 2007 the Project was only able to enlist ten ponds into the program, of which, useable data was obtained from only five. Two ponds were dropped because they were not using UWUA water. Two ponds were on a golf course that changed managers in 2008 and the new manager did not want to continue with the program. One pond was not able to comply with the seepage measurements because of conflicts with irrigation water scheduling. In 2008 fourteen ponds were enrolled into the project and useable data was obtained from eleven. Two ponds were enrolled late in the irrigation year and seepage data could not be obtained because the need to finish crop irrigation before the water was turned off. One pond was dropped because of continued removal of water for irrigation purposes during agreed upon times for seepage measurements.

Two major problems were encountered by the Project: 1) Despite intensive advertising the Project was unable to enlist enough ponds into the program to meet agreed upon goals, and 2) many ponds accumulate significant amounts of silt and require dredging every few years, this activity will destroy any lining long before the anticipated 20 year lifespan of the lining material.

In October 2008 the SCD and BOR jointly decided to terminate the project primarily because of the aforementioned issues. Resolution of these issues were deemed to be unobtainable without additional extensive advertizing of the value of the project and new engineering designs respectively, neither of which were anticipated at the start of the Project.

Possibly the best way to address the issue of salt loading from ponds is to implement a pond retirement program in which pond owners would be paid to abandon their pond by have the it filled with dirt and having the property encumbered so as to prevent any future ponds being established on the property. Such a program would permanently eliminate any salt loading from a given pond; does not involve any O & M by the pond owner; precludes the construction of any new ponds on the property, and requires only minimal engineering. A retirement program, coupled with actions by county officials that would strongly discourage or even prohibit any new pond construction for landscaping purposes (excluding those required for a specific agriculture, industrial, or municipal use), would result in an immediate reduction in salt loading due to the elimination of existing ponds and by not allowing new ponds to be constructed the potential for additional salt loading is minimized.

BLM_0002166

**Introduction**

It has been estimated by the Bureau of Reclamation (BOR, 2004) that ponds on the east side of the Uncompahgre Valley in Montrose County contributed 21,050 tons of salt to the river system in 1999 and the loading grew to about 25,040 tons in 2004. The BOR and NRCS also estimated that Delta County may have about two-thirds the acreage of ponds as Montrose County which could result in an additional loading of 16,800 tons in 2004. These estimates clearly indicate that existing ponds on the east side of the valley are contributing major amounts of salt to the Colorado River system, and unless steps are taken to control seepage from said ponds by lining and also, by Montrose and Delta counties adopting rigorous guidelines for construction of new ponds, the salt loading will increase dramatically. The number and acreage of ponds in Montrose and Delta Counties has markedly increased during the last decade, mostly in association with the rapid population growth taking place in the area. The Bureau of Reclamation (2004) estimated that between 1993 and 1999 the acreage of ponds in the Uncompahgre River drainage area in Montrose County increased at an approximate rate of 5 percent per year. This rate would result in an estimated doubling of the total pond acreage in 15 years. In Delta & Montrose County there are approximately 700 acres of ponds. Of those, an estimated 450-500 acres are seeping enough to materially affect the salt and selenium loading to the Uncompahgre River. Since 1999 the rate of construction of new homes and new subdivisions has steadily increased with many of these new individual landowners and developers utilizing ponds as landscape features and for recreation. Thus it is reasonable to assume that the growth in the number and acreage of ponds is at least, as great as, or even greater than, the 1999 BOR estimate. Some of the new construction is occurring on previously irrigated crop land but significant acreage is on non-irrigated pasture and range lands. Also much of this growth is on the east side of the Uncompahgre Valley which is an area of high salt and selenium loading. The NRCS estimates that seventy-five percent of the ponds constructed in Montrose and Delta Counties are done so without NRCS involvement and minimal engineering design. Many, if not most, of these ponds are seasonal and are dry throughout the winter months when irrigation water is not available. When first filled in the spring these ponds initially will have a large flux of water lost to seepage until the clay soils swell.

4

BLM_0002167

In response to these initial observations the BOR in 2005 announced a request for proposals focused on salinity control in the upper Colorado River basin above the Hoover Dam. Proposals responding to this request were to reduce salt loading by at least 1,000 tons per year and were to be completed within a three year time period.  Funding for successful proposals would be in the range of $1 to $3 million per year and could address a wide range of salinity sources. (*www.usbr.gov/uc/progact/salinity/pdfs/RFP-Salinity2006_2459.pdf*)

The Shavano Conservation District (SCD) submitted a proposal (appendix B)to the BOR that was accepted and scheduled to begin on October 1, 2006.  However funding was not available (due to internal reviews of legal issues by the BOR of various grant proposals) until February 13, 2007. At that time a cooperative agreement (appendix A) between the BOR and the SCD was signed.  The purpose of the SCD Pond Lining Project (hereafter called "the Project") was to reduce salinity loading to the Uncompahgre River by lining ponds located east of the Uncompahgre River on soils derived from the underlying Mancos Shale Formation. The goal of the project was to line approximately 30 acres (wetted area) of ponds which would result in an annual reduction of 6,222 tons of salt in the Colorado River (based on a loading rate of 5.69 tons/acre-foot of seepage).  The SCD would solicit interested landowners, measure seepage for each candidate pond, and identify the most cost effective ponds to line.  Reports detailing the activities, progress, and problems encountered have been submitted quarterly since the start of the project.  The Project is located on all lands serviced by the Uncompahgre Water Users Association lying east of the Uncompahgre River, south of the town of Delta and north of the Town of Colona (fig. 1).

***Pond utilization and owner responsibilities:***  The following information may be useful if future projects are directed at pond lining to reduce selenium.  One of the major issues of the current Project was getting enough people to agree to enroll their pond and allow seepage measurements to be made. A better understanding of why and how people utilize their ponds may help in a future enlistment process. Ponds in the Project area are used for three main reasons; aesthetics, recreation, and practical.  Aesthetically, ponds, as landscape features, can add beauty and tranquility to many sites.  They can also be a major attraction for animals and birds by providing food, cover, and water leading to wide diversity of wildlife in and around even a

BLM_0002168

small pond.  Ponds have many recreational uses such as swimming, boating, fishing, model boats, and waterskiing.  In the project area many ponds are used for practical activities; including commercial fisheries, livestock water, irrigation water storage, irrigation tail- water recirculation, fire fighting water supply, wildlife habitat , flood control,  storm water runoff collection, and as sediment traps for cleaning irrigation water.  A well designed and maintained pond can also enhance the value of property.

Despite the many beneficial uses of ponds there are numerous problems associated with pond ownership.  Before constructing even a small backyard pond, the local county or city planning office should be contacted to see if permits are required. Also a check with the appropriate insurance company may provide additional safety requirements. Before constructing any type of pond considerable thought and research should go into site selection.  When selecting a location the prospective pond owner should be aware of the basic criteria necessary for a site to be suitable for pond construction. These criteria include the safety of the location, the water-holding capacity of the soil, the geologic makeup and topography of the pond site, and the characteristics of the watershed, or drainage area.  It is generally advisable to consult with an engineering firm about the site characteristics.

An important legal issue associated with ponds is liability.  Chief among these are injury or drowning. Ponds attract people, especially children, as such accidents do occur and all pond owners should always have safety precautions as part of the operation and maintenance of any pond on their property.  Only one pond examined by the project had any sort of precautions and equipment related to water rescue.  Other liability issues include embankment failure, water rights infringement, seepage leading to problems on neighboring properties, and failure to obtain proper permits for pond construction.  Also ponds may have health issues that require mitigation. Polluted intake water from fertilizer, pesticide chemicals, selenium, or animal waste can poison livestock.  Mosquito control is often required to reduce exposure to the West Nile virus by humans, horses, dogs, other animals and birds. Sediment loading from silt laden inflow water is a major problem with many ponds in the Project area.

With a few exceptions the operation and maintenance of ponds examined by the Project was minimal.  Fundamental to all ponds are control of sediment, control of burrowing animals,

6

control of tree roots and non-native vegetation (particularly tamarisk), livestock watering management, and seepage control.  Dredging of sediment was perhaps the most common observed practice.

*Data gathering methods and procedures:* Seepage from ponds was measured by using staff gauges graduated to hundredths and marked every foot and every tenth.  The gauges were attached to steel fence posts that were driven into the pond bottom.  The gauges were read on a daily basis when there was no inflow or outflow from the pond.  Ideally the plan was to record seepage for a period of three to four days twice per month.  The plan was difficult to accomplish because of conflicts with irrigation scheduling utilizing water from the pond.  In many cases only one measuring period during a month was recorded.  No measurements were recorded during periods of rainfall.  An attempt was made to use rain gauges however rain gauges available to the project were graduated to read in tenths while the staff gauges were graduated in hundredths. There are no pan evaporation data available in the immediate project area. Thus the project used data from pan evaporation equipment located on Orchard Mesa near Grand Junction, Colorado. There is some uncertainty as to how well the Orchard Mesa pan evaporation data correlates to pond evaporation in the project area. Spread sheets were used to record and compare all data collected from each pond (appendix D).

Other observations at each pond examined by the project included soil types, engineering features (heavy machinery access, dirt disposal and sources), physiographic characteristics, wildlife habitats, types of wildlife and usage of the pond area.  Also noted were overall pond condition and obvious maintenance issues related to seepage, sediment build up, rodent control and livestock access and use, source of water, type and condition of drains, and principal usage of the pond.

### Regional Geological and Soils Setting

#### *Soils*

*Project area soils:*  Surficial deposits west of the Uncompahgre River are largely glacial-fluvial in origin with lesser amounts of sandstone derived alluvium.  The bedrocks underlying these surficial deposits are mostly part of the Dakota Formation which is comprised largely of

BLM_0002170

sandstone units with lesser amounts of siltstone, shale, and minor coal.  The soils in the western area (locally called Mesa soils) are relatively low in soluble salts and make up approximately 60 percent of the irrigated land in the Uncompahgre Valley.  Whereas, and in contrast to the western side of the river, the terrain mainly to the east of the river is composed primarily of Mancos Shale-derived alluvial and residual soils (locally called Adobe soils).  The Adobe soils, most of which lie east of the Uncompahgre River, make up approximately 34 percent of the irrigated acreage in the valley.  Landforms in the valley floor immediately east of and along the Uncompahgre River consist of some basin floor shale remnants and shale-derived residual soils with some areas of alluvial soils where drainage systems enter the main river channel.  East of the basin floor area and further from the river is a moderately large region of dominantly alluvial Adobe soils derived from local Mancos Shale sources. Topographically this area is mostly flat to slightly inclined terrain with some remnant mesas and occasional hills and is the major agriculture area east of the Uncompahgre River.  In places, east of the river, fluvial and glacial-fluvial gravel and cobble beds rest on west dipping shale units of the Mancos Shale Formation (fig. 2).  Further east of the agriculture area the topography is characterized by steeper terrain consisting of low hills formed on the Mancos shale.  With the exception of relatively small areas in local valleys, the hilly country is non- irrigated and the Adobe soils in this area are almost exclusively residual.  In general the Adobe soils are dark grayish brown to yellowish-brown, fine textured silty clay loam, clay loam, silty clay, or clay.  They are moderately to strongly alkaline (pH 8+) and commonly contain concretions of calcium carbonate and veinlets and crystals of calcium sulfate (gypsum). Most of the irrigated agriculture crops on the east side of the basin are grown on soils derived from the weathering of the Mancos Shale.   Observations suggest that selenium is generally present in these soils but is somewhat erratically distributed both geographically and within soil profiles. Geographic distribution of selenium is due in part to differences in selenium concentrations in the parent Mancos shale and also in part to distribution and transportation of selenium by deep percolation waters.

BLM_0002171

*Geology*

**Western Interior Seaway:** Two formations of Late Cretaceous age that crop out in and near the Project area dominate the geology of the Uncompahgre River Valley; the Dakota Sandstone and the overlying Mancos Shale. Cretaceous rocks younger than Mancos, such as the Mesaverde Formation, are present in local areas but were stripped from the Project area by erosion during Tertiary time. North of the Project area the Mancos Shale is partly overlapped by volcanic rocks erupted in middle and late Tertiary time. Both the Dakota Sandstone and the Mancos Shale were deposited in the Western Interior Seaway, also called the Cretaceous Seaway which was a huge inland sea that formed in the mid-Cretaceous period and that transgressed (grew) and regressed (receded) over the roughly 100 million years of its existence. The seaway was created as the Pacific and North American tectonic plates collided, causing the Rocky Mountains to form in western North America. At its largest, it stretched from the Rockies to the Appalachians in the east, some 1000 km wide and from the Canadian Arctic Ocean to the Gulf of Mexico.  At its deepest, it may have been only 800 or 900 meters deep, shallow in terms of seas (figs.3, 4, and 5).

**Dakota Sandstone:** The Dakota Sandstone is very widespread in the western interior of the United States. It is well represented near the Project area. West of the Uncompahgre River where it forms hogbacks, rimrocks, dip slopes and mesa caps.  The Dakota consists mostly of cross bedded sandstone in beds a few inches to several feet thick. The Dakota also contains pebbly conglomerate, shale, mudstone, and locally coal.  Fossil ripple marks, worm burrows, petrified wood, and carbonized plant matter indicate deposition in shallow water. The coal accumulated in a swamp. The upper part of the Dakota interfingers with the lower part of the overlying Mancos Shale. Deposition of the Dakota, therefore, presaged the advance of the Western Interior Seaway across interior of the continent.  The Dakota Sandstone was deposited near shore in relatively shallow water along the western edge of  the Seaway.

**Mancos Shale:** The Mancos Shale is also widespread in the western interior of the United States (fig.6). It flanks or encircles many mountainous uplifts of the region. Being soft and easily eroded, it forms the bottoms of broad valleys and topographic basins. Such valleys are

BLM_0002172

widely utilized for transportation routes, both highways and railroads. (e.g. U.S. Highway 50). Excellent exposures are nearly everywhere in the Uncompahgre Valley as landscapes of barren gray to tan hills. The full thickness of the Mancos Shale is unknown in the Project area. Exploratory oil wells in the region have penetrated more than 4,000 feet of Mancos.  The unweathered shale is dark gray, soft, and often fissile; weathered shale is lighter gray to tan (fig. 7). Much of it swells on wetting and contracts on drying and is very susceptible to landsliding. Large calcareous concretions are not uncommon and in places the Mancos contains beds of fossiliferous fine-grained sandstone.  Gypsum veinlets are also common in many areas. Deposition of the Mancos Shale as mud on the bottom of the relatively shallow water of the interior sea occurred as the sea advanced over the continent.  At one time an expanse of water reached from Arctic Canada to the Gulf of Mexico. As the Mancos accumulated, the sea bottom slowly subsided, so that the water maintained an essentially uniform depth. Finally, however, when the rate of subsidence diminished, delta sediments and beach sands were deposited along the western margins of the inland sea. These deposits comprised the Mesaverde Formation. Vegetation rich swamps and forests that flourished on the low lands created extensive coal deposits along the western margin of the inland sea.  Repeated expansions and withdrawals of the sea characterized the end of the Cretaceous Period.  Also near the end of the Cretaceous Period, crustal warping on a very large scale lifted the area above the sea and drained off the marine waters for the last time. (figs. 4 and 5).  Selenium is known to be concentrated in black shale if a source of selenium is available during the deposition of the shale.  Volcanic ashes, which were erupted during Cretaceous time along the western edge of the seaway during Mancos Shale deposition, often contain selenium, and thus provide the source for selenium concentrations in the parts of the Mancos Shale. Selenium is not present in all units of the Mancos shale but instead is erratically distributed in both a geographic and stratigraphic sense. Geographic distribution of selenium is apparently due in part to differences in selenium concentrations in the parent Mancos shale and also in part to distribution and transportation of selenium by deep percolation waters.

   *Glacial/fluvial deposits:* In many places in the Project area the Mancos shale and the Dakota Sandstone are mantled by surficial sands, gravels, and cobbles of Pleistocene and

BLM_0002173

Quaternary age.  These alluvial deposits are found on terraces and higher erosional surfaces and also on flood plains of the lower river valleys. The San Juan Mountains experienced numerous glaciations in the last 2 million years. The exact number is unknown because the evidence of the earlier glaciations was destroyed by the more recent ones and also by erosion between glacial advances.  Most of the ice of the last glacial advance was gone approximately 15,000 year ago. During each maximum glacial episode, the San Juan Mountains were covered with an ice-field complex covering about 1,900 square miles. The ice field consisted of a thinner layer of ice over the high divides and uplands, with streams of ice radiating out into river valleys.  After the ice left, the lower valleys were filled with large lakes which were subsequently filled with glacial outwash sediments of slit, sand, gravel, and cobbles.  After each glaciation, rivers cut canyons and terraces into the glacial outwash. These reflect the actions of multiple glaciations, where rivers were subjected over thousands of years to changes in discharge and sediment load. When the glaciers began their retreat, the valley floors were choked with sediment, which was being continuously reworked by braided streams across a broad floodplain. When water discharges lessened, single channels formed and slowly carved into bedrock, leaving portions of the abandoned floodplain high and dry.

Ponds constructed in these terraces or flood plain deposits are difficult to seal the bottoms and the embankments may have structural difficulties.  Glacial material is more common in the southern part of the Project area and Mancos derived soils in that area frequently contain fluvial detritus thereby increasing their permeability.  Larger erratics (ice rafted boulders) are also relatively common in the southern part (fig.8).

### Description of types of ponds in the Project area

Only ponds that are perched were candidates for lining by the Project.  Perched ponds are those that are above the water table and not located in a preexisting swamp or permanent (or intermittent) stream.  Three types of ponds are present in Project area; excavated, embankment, or combination (fig. 9).  Most ponds that were examined are combination ponds.  Embankment ponds may be more prone to seepage problems than excavated pond.  However any pond

11

BLM_0002174

constructed whereby the bottom of the pond intercepts bedrock (Mancos or Dakota) will in most cases have leakage problems (figs.10).

## Common causes of pond seepage

Pond leaks may develop from a number of causes. Many leaky pond problems can be prevented by careful site selection. Perhaps the most common cause noted in the Project area was poor construction of the pond bottom and inadequate engineering of the pond embankment (fig. 16) and failure to test the capacity of the soil to hold water. Leaks may also occur around the pond banks or on the pond dam as a result of tree roots or muskrat holes. These leaks can be prevented by removing trees from the pond dam and by discouraging muskrats. In older ponds, leaks sometimes develop from outlet pipes that rust and leak below the water surface.

In some cases, a pond that appears to be losing water may not really be leaking. All ponds lose water to evaporation. Losses due to evaporation can also be noticeable, especially during summer months. Ponds that rely on surface runoff from surrounding land, however, can drop dramatically during dry weather. The maximum loss of water from a pond due to evaporation can be expected on breezy, warm summer days with low humidity. In some ponds in the Project area evaporation was the major reason for water loss.

*Embankment problems:* **(Burrowing Animals):** Leakage may be caused by burrowing animals such as crayfish, muskrats, and beaver, all being the biggest offenders, (but also gophers, prairie dogs, and domestic dogs after rodents)(fig. 11) that dig into embankments and along the shorelines of ponds. Tunnels dug above the water level can decrease structural support of the embankment and increase the risk of washout during flood conditions. This hazard is multiplied in ponds where burrowing animals are abundant and where water levels fluctuate. Rising and falling water levels often stimulate these animals to dig new burrows, increasing the potential for structural damage and water leaks. If large numbers of burrowing animals and extensive tunneling activity are undermining the structural integrity of the dam, several control measures may be effective. Efforts at total eradication may be futile since animals from upstream waters or nearby ponds can migrate considerable distances and will continually invade the pond.

12

BLM_0002175

Therefore, the following control measures should be viewed simply as actions the pond owner can incorporate to reduce excessive numbers of crayfish or muskrats to a level at which structural damage and water leaks will be minimized.

<u>Crayfish</u>: Trapping crayfish is an effective method for control.  The habits of crayfish strongly influence how easily they are caught. Crayfish overwinter in their burrows (fig. 12) in the bottom mud or shoreline banks, emerging as the water warms providing the best time to trap. Another method for preventing high numbers of crayfish is to stock and maintain a population of fish. Trout, bass, catfish, and large bluegills are all predators of crayfish and will reduce excess numbers. Other natural predators that feed heavily on both young and adult crayfish are: amphibians (bullfrogs, salamanders), reptiles (turtles, water snakes), water birds (herons, kingfishers, ducks, geese), and mammals (raccoons, otters, mink).

<u>Muskrats and beaver</u>: Muskrats and beaver can be discouraged from living in a pond by eliminating water plants and shoreline vegetation that provide food and cover for these burrowers. Muskrats prefer to feed on starchy aquatic plants, particularly cattails, bulrushes, reeds, arrowhead, and aquatic grasses. Controlling the growth of these water plants and keeping the pond banks well mowed will limit muskrat populations (fig. 13). Physical barriers to prevent muskrats from tunneling into shorelines and earthen embankments can be used to reduce tunneling. Lining the inner face of the embankment with rock rip-rap, concrete, cement board, or wire screening will discourage digging. However, trapping is probably the most practical method for controlling muskrats and beaver.

***Embankment problems:*** **(Vegetation)**<u>:</u> Trees may also account for some loss of water in a pond.  Water-loving trees, like willows or tamarisk, often grow along the banks of ponds.  The roots of these trees may remove water directly from the pond as they grow, also the roots may provide channel ways for water to follow (figs.14 and 15).  Control is by removing trees from the embankment.

***Poor site choice:***  Pond sites are often chosen on the basis of where in the landscape a pond would look best with no attention to the soil types, topography, water supply and pond drainage system.  In the Project area poor site choice is probably one of the biggest factors associated with a leaky pond.

BLM_0002176

***Lack of engineering:***  Many ponds in the Project area were constructed by the landowners who, in most cases simply dug a hole or pushed up an embankment and filled it with water.  All ponds would benefit greatly if qualified people would have been used in their design and construction (fig. 16). One of the worst situations is if during construction of the pond the underlying bedrock was encountered.  In nearly all cases the bedrock Mancos shale is fractured allowing easy access to deep percolation ground waters.

***Pond operation and use:*** How a pond is used can contribute greatly to seepage problems.  Uncontrolled access by livestock can destroy any lining material and also hoofs can penetrate existing bottom clays or sealants leading to significant leakage.  Fencing should be utilized to allow livestock to drink but restrict their ability to wade in the pond.

***Water management:*** Pond bottoms that are allowed to dry out will lead to cracks being formed in clay rich soils due to shrinkage of the clay minerals.  This can lead to increased seepage until the clays become rehydrated (fig. 17).

***Soil characteristics:***  Soil texture and composition have a major role in controlling rather or not a pond will leak.  In general leakage is restricted by increased clay content.  Thus in the Project area ranked from best pond soil to worst pond soil are;  1) alluvial Mancos shale derived soils, 2) residual Mancos derived soils, 3) residual or alluvial Mancos soil containing sandy or gravel components, 4) sandy soils, 5) sandy soils with gravel, and 6) glacial/fluvial soils.

### Pond seepage records & salt loads

Spread sheets were used to record all pertinent seepage and related pond data collected by the Project for ponds believed to be candidates for lining (appendix C).  Data were not recorded for ponds that dropped out of the project or for ponds where consistent data could not be obtained because of pond owners adding or removing pond waters during agreed upon measurement periods.  The project goal of obtaining seepage data from each pond, over two periods, each of which was three to four days duration, during each month, was not met, mostly because of irrigation demands for the pond water.  As a result data populations shown on the spread sheets are mostly small and erratic and conclusions drawn must be viewed with considerable caution.

BLM_0002177

The lack of interest by pond owners was quite surprising and very few ponds were enlisted in the project; five in 2007 and eleven in 2008.  However, data and observations from a few ponds that were collected in both 2007 and 2008 is useful in understanding seepage characteristics in the Project area.

The Williamson pond located at the extreme southern end of the Project area is a relatively small pond (0.26 acres) that was constructed in residual Mancos soil that contains lenses and discontinuous thin layers of sand and gravel.  Average daily seepage rates over both 2007 and 2008 show a declining pattern of seepage from spring to fall and the amount of seepage for any given month is similar for both 2007 and 2008.  Total salt load is relatively small mainly because of the small size of the pond.  High amounts of sediment contained in pond inflow water are a major problem and the pond requires frequent dredging.  The pond is an example demonstrating that ponds in the southern part of the Project area where glacial/fluvial outwash is more prevalent tend to have higher seepage rates.

The Hill pond located near the center (North - South) of the Project area is also subject to high sediment loads and will need frequent dredging.  Average daily seepage rates range between 0.22 and 0.45 ft/day.  The pond is 0.5 acres in size.  There are no visible signs of leakage through the embankment, nor are there any signs of rodent burrows.  Speculation is that the pond bottom, now mostly covered with silt, intercepts the underlying Mancos shale and water is leaking directly into the deep percolation zone.

Good consistent data was obtained from the Carlson pond mainly because the pond is used strictly for the sport of water skiing.  The pond is not used at all from Sunday night to Thursday night which allowed much more seepage data to be gathered each month.  Average daily seepage rates clustered between 0.02 and 0.05 ft/day.  The pond is the largest (9.1 acres) one enlisted in the Project.  The 2007 calculated salt load is 357 tons of salt and the 2008 load is 503 tons of salt.  Considerable attention is paid to the operation and maintenance of the pond by controlling muskrats, embankment vegetation, crayfish, and water quality.

Franks pond is an embankment pond constructed in alluvial Mancos soil.  It is 1.5 acres in size and is used only for aesthetic purposes and sport fishing.  As such data could be gathered at any time and for longer durations.  Average daily seepage was relatively consistent (0.12 to

BLM_0002178

0.19 ft/day) during the summer of 2008 and somewhat less (0.06 - 0.1 ft/day) during the fall of 2007. The intake water for Franks pond passes through another pond that has considerable aquatic vegetation and is used for a settling basin for his fishing pond. Water in the latter pond is quite clear most of the time.

The Valencia pond is a combination pond used mainly for wildlife habitat. It is fed by irrigation water (when available). Average daily seepage values in 2007 are erratic ranging from 0.31 ft/day in July to 0.08 ft/day in October. In 2008 the average seepage rates are more consistent ranging from 0.17 ft/day in May to 0.11 ft/day in August. In July 2007 the average seepage rate was measured at 0.31 ft/day. In contrast the 2008 reading for July was 0.14 ft/day. The range of the August rates is not as great with the 2007 rate being 0.14 ft/day and the 2008 rate measured at 0.11 ft/day. Wide differences in seepage rates can be interpreted in different ways. Sometime if an embankment is leaking (perhaps because of an animal burrow) and the water level drops below the level of the burrow then seepage rates will decline. It is also possible that water (not accounted for) was added or drained from the pond during the measurement period. The October 2007 seepage rates were consistently low 0.06 to 0.1 ft/day. Lower seepage rates in the fall were observed in nearly all ponds examined by the Project and are believed to reflect the significantly lower water levels in most ponds going into the winter months.

### Pond salt loads (tons/yr)

The following list of salt loads assumes that the seepage rates and average daily salt loads measured and calculated for any given pond can be projected over the entire irrigation year (i.e. 221 days) and assumes a loading rate of 5.69 tons/acre foot of seepage. These assumptions do not take into consideration that irrigation water availability is not the same (i.e., 221 days) for every pond. Indeed it can vary as much as several weeks depending on when the Uncompahgre Valley Water Users turn water into the system and also when the water is turned into specific ditches. Some ponds depend on drain water for their supply which can vary greatly depending on when the fields supplying the water are irrigated. Also not considered is time that ponds may be dry for various periods of time which in some cases is quite frequent. The list does not imply

BLM_0002179

that the highest salt loads are from ponds with high seepage rates.  The Carlson pond for example has relatively low seepage rate but it is quite large (9.1 acre).  In contrast the Williamson pond has relatively high seepage rates but is only 0.26 acres in size.  In short the amount of salt loading from the Project ponds is best considered only as generalized information and should not be taken as indicative of the loading of other ponds in the Project area.

|  | **2007** | **2008** |
|---|---|---|
| **Carlson** | 358 | 578 |
| **Valencia** | 264 | 289 |
| **Franks** | 132 | 251 |
| **Hill** | 264 | 157 |
| **Williamson** | 68 | 101 |
| **Phillips east** | -- | 64 |
| **Jones** | -- | 37 |
| **Bishop east** | -- | 25 |
| **Bishop west** | -- | 13 |
| **Phillips west** | -- | -- |

### Project operational issues

Reports detailing the activities, progress, and problems encountered were submitted quarterly since the start of the project. Four problem issues are outlined below:

1) *Human elements*

Despite considerable advertizing (direct mailing in 2006 and 2007 to over 4000 addresses); posters in all agriculture and hardware outlets in the Montrose, Olathe, and Delta communities; presentations at public meetings; and selected phone and individual solicitations, we were unable to enlist a adequate number (enough to provide a representative measure of seepage) of ponds into the project due to several reasons:

17

BLM_0002180

a) Public apathy (perhaps due to lack of knowledge and interest about salt loading in both local and regional waters)

b) Desire to allow livestock unrestricted access to pond

c) Not willing to have disruption of existing landscaping in the pond area by heavy machinery needed for the lining process

d) Not willing to have their current usage of pond waters (mostly lawn watering, crop irrigation, and livestock use) and irrigation scheduling interrupted

e) Not willing (or in some cases, able) to shut down inflow or outflow from their pond to allow seepage data to be gathered

f) Very little O & M being done on existing ponds which suggests that any newly lined (by the project) ponds would not be well maintained thus jeopardizing the lifespan of the lining material

g) Uncertainty as to the availability of water to fill ponds; in some situations the pond water supply depends on the usage of irrigation water by other people sharing a ditch and also on the amount of drain water coming off other fields.

2) *Hydrological*

Many of the ponds enlisted into the project are subject to considerable sediment loading (fig. 18); enough so, that they require cleaning using heavy equipment every few (~ five) years.  Such equipment use would destroy any lining material.

3) *Weather related*

Difficulty determining water additions to ponds from rainfall.  Mainly because available rain gauges that were less precise than the staff gauges used to measure seepage.  Also, access to some of the ponds was impossible or exceedingly difficult due to the character of Mancos derived soils when wet

4) *Evaporation measurements*: There are no pan evaporation data available in the immediate Project area. Thus the Project used data from pan evaporation equipment located on Orchard Mesa near Grand Junction, Colorado. There

18

BLM_0002181

is some uncertainty as to how well the Orchard Mesa pan evaporation data
correlates to pond evaporation in the Project area.

5) *Cost escalation*:

Cost estimates for the SCD proposal were gathered in late 2005 and the
proposal submitted to the BOR in March 2006.  The proposal was
approved in October 2006 and implemented in February, 2007.
Advertisement and enlistment of pond owners (which began in 2006) and
concurrent seepage measurements, took over a year, before enough data
had been accumulated to evaluate ponds and start lining construction. During the
period between late 2005 and summer 2008 prices of fuel, labor, and materials
skyrocketed, resulting in the obsolescence of the approved budget for the project.

## Project conclusions

In October 2008 the SCD and BOR jointly decided to terminate the project
primarily because of the aforementioned issues.  Resolution of these issues, especially the
human elements and hydrological problem (sediment loading and buildup in ponds) were
deemed to be unobtainable without additional extensive advertizing of the value of the
project and new engineering designs respectively neither of which were anticipated at the
start of the Project.  Measured seepage rates, (with the exception of the Hill pond), were
not great enough to result in salt-loads high enough  to keep the cost at, or less than those
calculated in the project proposal.

BLM_0002182

### Recommendations for future pond projects

Prior to another <u>applied</u> pond lining project, a study should be conducted that examines and develops solutions to the major issues outlined above.  Said study should include the following:

1) The design of a carefully thought-out advertising campaign that would reach at least one half of the pond owners in the proposed project area.  This advertising would provide information to pond owners about salt and selenium loading from ponds which should hopefully lead to a greater participation in a future applied project to line leaky ponds.

2) Develop a statistically valid sampling plan that would provide good estimates of the magnitude of salt and selenium loading from pond seepage.  This is a particularly challenging task because of the numerous independent factors associated with individual ponds.  No two ponds are exactly alike; as such extrapolating between ponds is difficult at best. Any plan for seepage data must be random in nature yet robust enough to include the major factors associated with leaky ponds.

3) Search for and develop as needed, engineering designs specific to the area that would reduce sediment loads in the water supplies to ponds.  (e.g. mechanical filters, traps, diversions, settling basins, and biological filters)
Determine costs of likely methods.  Use demonstration projects for this activity.

4)  Determine methods and costs for lining options that would allow cleaning and still maintain lining integrity.

BLM_0002183

5) Identify sealants that could be used in a pond to reduce seepage.  With the idea that, if needed, the pond could be dredged to remove sediment following which sealants could be re-applied.

6) Utilize digital, automatically reading seepage measurement devices that could be downloaded remotely or physically on a monthly (?) basis.  The cost of this type of equipment would most likely be offset by the greatly reduced time and mileage expenses involved with reading the seepage data manually.  Factor in the following difficulties in obtaining a consistent pattern and frequency of seepage measurements;

      a) Uncertainty associated with the timing and quantity of water available to fill any given pond.

      b) Dry periods that require water to be used for irrigation instead of filling ponds.

      c) Need to use water in ponds to supplement irrigation elsewhere on farm.

      d) Need also to establish precise reading rain gauges at each location where seepage is being measured.  Most rainfall during the summer months is sporadic in timing and not uniform throughout the study area.

7) Explore the cost incentives and possibilities of a pond retirement program. Must consider the loss of wildlife habitat and some type of agreement (or encumbrance on the property) to exclude the construction of any new ponds.

8) Educate city and county officials about the salt and selenium issues associated with ponds with the goal of discouraging new pond construction.

9) Some ponds are allowed to go dry during the irrigation season for various reasons, as such, no salt loading will occur, thus the duration of time the pond is

BLM_0002184

dry must be subtracted from the total number of days in the entire irrigation season.

10) Winter snows and rains may keep clays in the pond bottoms expanded so cracks will not form, thereby reducing the seepage in the early months of the irrigation season (fig. 19). Conversely during dry months the clays will lose water, cracks will form and seepage rates later in the season will be greater. As such, seepage from any given pond will depend to some degree on moisture amounts during the winter months and also during drought periods.

Overall, as project manager for the SCD, I believe the best way to address the issue of salt loading from ponds is to implement a pond retirement program (item 7, above). Such a program would permanently eliminate any salt loading from a given pond; does not involve any O & M by the pond owner; precludes the construction of any new ponds on the property (using an encumbrance on the property that would apply to the current and any future new owners); does not require seepage measurements; requires only minimal engineering; and individual ponds could be eliminated (dirt filled) at any time of the year. A retirement program, coupled with actions by county officials that would strongly discourage or even prohibit any new pond construction for landscaping purposes (excluding those required for a specific agriculture, industrial, or municipal use), would result in an immediate reduction in salt loading due to the elimination of existing ponds and by not allowing new ponds to be constructed the potential for additional salt loading is minimized.

22

# List of Illustrations

Figure 1 -- Pond Project location

Figure 2 -- Cross-section across the Uncompahgre River Valley

Figure 3 -- The Western Interior Seaway

Figure 4 -- The Western Interior Seaway in Late Cretaceous time

Figure 5 -- Geological features of the western margin of the Western Interior Seaway

Figure 6 -- Areas of Mancos Shale in western Colorado

Figure 7 -- Mancos Shale with overlying glacial/fluvial deposits

Figure 8 -- Embankment pond with glacial erratics

Figure 9 -- Types of ponds in the Project area

Figure 10 -- Intake of pond with fractured bedrock bottom

Figure 11 -- Rodent holes further excavated by dogs in pond embankment

Figure 12 -- Crayfish

Figure 13 -- Large embankment pond with excellent O & M

Figure 14 -- Trees on combination pond

Figure 15 -- Cattails on embankment

Figure 16 -- Leaking embankment with standing water at base

Figure 17 -- Mud cracks

Figure 18 -- Sediment loading from irrigation water

Figure 19 -- Pond in winter

BLM_0002186

# References

1) Bureau of Reclamation, 2004; "Lining ponds to reduce salt and selenium loading to the Gunnison River" available at: http://www.usbr.gov/research/science-and-tech/news/LngPndsSelnmLdgReport.pdf

2) Bureau of Reclamation, 1982, Lower Gunnison Basin Unit, Feasibility Report, Hydrosalinity, appendix B, November 1982, 86 p.

3) United States Department of Agriculture, Soil Conservation Service, 1967, Soil Survey, Delta-Montrose Area Colorado, 73 p. plus maps.

4) Butler, D.L., 2001, Effects of piping irrigation laterals on selenium and salt loads, Montrose arroyo basin, western Colorado: U.S. Geological Survey, Water-Resources Investigations Report 01-4204, 14p.

BLM_0002187

# Appendix A

## Cooperative agreement no.  07-fc-40-2555

COOPERATIVE AGREEMENT NO.  07-FC-40-2555
BETWEEN
THE UNITED STATES BUREAU OF RECLAMATION
AND
THE SHAVANO CONSERVATION DISTRICT
FOR
WORK ASSOCIATED WITH
POND LINING TO REDUCE SALT LOADING TO THE UNCOMPAHGRE RIVER

1.  <u>BACKGROUND.</u>   Public Law 104-20, signed July 28, 1995, authorizes the Bureau of Reclamation (Reclamation) to pursue and fund salinity control efforts within the Colorado River Basin.  In December 2005, Reclamation solicited proposals for salinity control efforts within the Upper Colorado River Basin.  The Shavano Conservation District's (SCD) proposal entitled **Pond lining to reduce salt loading to the Uncompahgre River, western Colorado** (copy attached) was submitted under this solicitation and accepted for implementation.

Reclamation will provide funding for work described in the proposal associated with lining leaky, perched (above the water table) ponds within the Federal Uncompahgre Project area east of the Uncompahgre River in Montrose and Delta Counties, Colorado.  The SCD will identify appropriate sites, develop contracts with pond owners, and install liners using local contractors. Pond owners will be responsible for future care and maintenance of the lined ponds. Reclamation will provide limited planning assistance and perform environmental coordination activities.  Upon completion of this agreement, approximately 30 acres (wetted area) of ponds will be lined at yet to be determined locations within the project area described above. The project will result in the annual reduction of approximately 6,222 tons of salt in the Colorado River.

The Uncompahgre Project is a Federal development constructed in the early 1900's for irrigation of approximately 86,000 acres in the lower Uncompahgre River valley.  Approximately 31,000 irrigated acres or 34 percent of the total 86,000 acres lie on the east side of the Uncompahgre River, south of the Gunnison River and consist of soils formed on and from the Mancos Formation, a thick stratum of marine shale. These soils, referred to locally as "adobe soils", are naturally high in salt and selenium content.

2. <u>OBJECTIVE.</u>  The objective of this Agreement is to reduce salinity loading to the Colorado River resulting from seepage from unlined ponds on the east side of the Uncompahgre Project.

3. <u>STATEMENT OF WORK.</u>

    **3.1 General**.  The SCD will initially solicit interested landowners, measure seepage from each candidate pond, and identify the most cost effective ponds to line.  Prior to developing

BLM_0002188

landowner agreements and installing liners, pre-project seepage assumptions will be validated by the SCD and reviewed by Reclamation to assure salinity reductions claims are reasonable. Private contractors will be hired by the SCD to prepare the bottoms of the ponds by grading and adding appropriate fill material to ensure that the lining material is not punctured or torn. Geomembrane liners will be installed and covered with approximately one foot of soil.

Construction under this Agreement will involve lining of privately or publicly owned ponds and will be performed by or under the direction of the SCD with limited technical assistance and oversight provided by Reclamation.

The liners will cover approximately 30 acres (wetted area) of existing perched (above the water table) ponds that have demonstrated, excessive seepage. All ponds selected for lining will have been constructed prior to May 2005 (date of latest pre-proposal aerial photography). All selected ponds will be located within the boundaries of the Uncompahgre Project east of the Uncompahgre River. Measures will be required of landowners to limit or prevent future damage to the liners by livestock and wildlife. Habitat replacement for impacted wetlands will be accomplished concurrently with the lining installation and may be accomplished off site with the approval of the U.S. Fish and Wildlife Service.

Solicitation of interest and Initial selection of ponds for pre-construction data collection is tentatively scheduled to begin in December 2006. Installation of liners is scheduled to start in late calendar year (CY) 2007 and conclude in CY2008. Miscellaneous construction and other activities will continue into CY2009.

Reclamation will provide up to $2,090,800 toward the cost of site screening, data collection, design, environmental compliance activities, liner installation, and habitat replacement under this agreement. Any cost overruns will be the responsibility of SCD.

    **3.2**  <u>**Shavano Conservation District Responsibilities**</u>. The SCD will be responsible for implementing the project in accordance with the proposal attached to this agreement. Specifically, the SCD is responsible for:

        **3.2.1** Conducting required preconstruction and construction activities required for lining the ponds as described in paragraph 3.1. Representative responsibilities include:

            **3.2.1.1** Soliciting interested landowners, selecting candidate ponds and measuring seepage in each, selecting the most cost effective ponds to line, and developing appropriate agreements with each landowner. Seepage measurements shall be done in accordance with technically sound and generally accepted methods. Reclamation review and approval of the selected ponds, typical landowner contract, and the liner design shall be obtained prior to beginning installation of liners.

            **3.2.1.2** Preparing designs, technical specifications and drawings and for liners. All linings will be 30-mil or greater geomembrane material with a minimum 20-year manufacturer guarantee.

            **3.2.1.3** Implementing and/or complying with the environmental commitments contained in National Environmental Policy Act (NEPA) compliance documents to

BLM_0002189

be developed by Reclamation for the project. This will include the SCD developing and implementing a US Fish and Wildlife Service approved wildlife habitat replacement plan. Habitat replacement will be implemented concurrently with installation of liners. Failure to implement concurrent habitat replacement may result in delays in obligating future funding under this agreement.

**3.2.1.4** Acquiring all necessary Federal, state, county, city, and local permits, agreements, etc., to conduct the work associated with lining the ponds as described in Section 3.1.

**3.2.1.5** Administering all subcontracts with private contractors and providing Reclamation information copies of award documents for subcontracts issued. None of the substantive programmatic work under this Agreement may be subcontracted without prior approval of Reclamation. Reclamation reserves the right to review and approve solicitation documents and award packages prior to the award of any subcontract. All solicitations and subcontracts shall be in writing with a copy furnished to Reclamation.

**3.2.1.6** Assuring the appropriate and required personnel, materials, and equipment are used for all activities. The SCD may use their existing equipment; use rental equipment; or, with Reclamation's written approval, purchase equipment for accomplishing the activities described in paragraph 3.1. In order to ensure timely program accomplishments, Reclamation will approve or disapprove equipment purchase requests within ten (10) working days from receipt of such request. Reclamation reserves the right to require the SCD to transfer the title of any capitalized equipment, purchased with Reclamation funds, to Reclamation when (1) the capitalized equipment is no longer needed for the program; or (2) the program is completed. Also, if the SCD chooses to keep title to any non-expendable equipment with a current fair-market value of over $1,000 at the completion of the program, the SCD must reimburse Reclamation for the current fair market value of the equipment, in accordance with OMB Circular A-110. In addition, equipment should be managed in accordance with the standards identified in OMB Circular A-110.

**3.2.1.7** Providing construction quality control including inspection, testing, etc. to assure compliance with drawings and technical specifications. Following installation of each pond liner, the SCD will provide Reclamation with documentation stating liner installation was done in accordance with the drawings and technical specifications. Monitoring of seepage and overall pond operations following project completion will not be required by Reclamation.

**3.2.1.8** Providing construction supervision, administration, and other construction management for all work activities.

**3.2.1.9** Complying with all OSHA safety requirements.

**3.2.1.10** Conducting and/or reviewing all appraisals, if any, with respect to determining property damage claims made upon the SCD or United States arising from work associated with lining the selected ponds. All claims, if any, will be resolved by the SCD.

**3.2.2** Providing a master and quarterly-updated work program plan(s) and schedule(s) to Reclamation, for review and approval. These work program schedules shall

BLM_0002190

contain a complete description of the work to be performed.  During construction, the work schedule will include quantity of work items; estimated unit and total costs; and any other details as needed by Reclamation.  Work items may include, but are not limited to, the costs of labor, materials, equipment, building and storage space rental, real property purchases approved by Reclamation, legal work, superintendence, administration and overhead, insurance required for the construction work, general expenses, inspection, special services, minor and specialty subcontracts, engineering and surveying services, and other significant miscellaneous items.

        3.2.3  Notifying Reclamation at least 14 days in advance of any intended construction starts, and keeping Reclamation informed as to the progress.

        3.2.4  Utilizing contracts that require landowners assume responsibility for performance of all future operation and maintenance of the lined ponds and related features at no additional cost to the Federal Government.  Maintenance shall be in a prompt manner to assure that the Project's salinity control benefits are realized to the best extent possible.

        3.2.5 Supplying Reclamation with site location maps and "construction as-built" drawings of all work performed within the scope of this Agreement.  Marked-up copies of the design drawings for each pond shall be provided within three months of completion of construction.

**3.3  Bureau of Reclamation Responsibilities**. Reclamation will be responsible for:

        3.3.1  Administering this Agreement, which includes, but is not limited to, receiving, processing and making payments due, and providing written approval for any proposed subcontracts.

        3.3.2  Providing review and oversight to ensure the pre-project seepage and salt loading assumptions in the SCD proposal are validated and to ensure that constructed facilities meet long-term salinity reduction goals.  Periodic site visits by Reclamation personnel will be scheduled prior to construction, prior to covering the liner in each pond with soil, and at project completion.

        3.3.3  Providing technical assistance, as requested by the SCD for preconstruction activities.  Representative assistance will include but is not limited to:

        3.3.3.1  Providing technical assistance for pre-construction investigations, including seepage estimation.

        3.3.3.2  Providing NEPA compliance for the project including development of environmental commitments.  As a component of this work, Reclamation will identify wildlife habitat impacts and quantify habitat losses that must be mitigated for each pond. Reclamation will also coordinate cultural resources surveys and concurrence by the State Historic Preservation Officer (SHPO).

        3.3.3.3  Developing and assisting in the implementation of a habitat replacement plan that satisfies the environmental commitments described in the NEPA

28

documents.  Construction of the enhanced habitat replacement features will be performed by the SCD using funding described in paragraph 5 of this Agreement.

           **3.3.4**  Providing the funding, in accordance with paragraph 5, for work associated with lining ponds as described in section 3.1; and reimbursing the SCD for all allowed, allocatable costs and expenditures incurred by the SCD in connection with, growing out of, or pursuing the work described.  The determination of costs properly chargeable hereunder and the amount thereof shall be made by Reclamation in accordance with OMB Circular A-122, "Cost Principles for Non-Profit Organizations".

**4.  PERIOD OF PERFORMANCE.**  The duration of this Agreement shall be from the date of award through December 31, 2009.

**5.  FUNDING.**  The total amount of funding available for work associated with the lining of the selected ponds under this agreement is $2,090,800.  Funds in the amount of $2,052,100 are hereby reserved to cover payments to the SCD which may be due under this Agreement. This amount includes implementation costs for the habitat replacement plan.

The remaining funds in the amount of $38,700 are to be used by Reclamation for technical assistance as requested by SCD and are detailed as follows:

| | |
|---|---|
| Technical assistance for estimating pond seepage | $  2,700 |
| Environmental activities and habitat replacement coordination | $36,000 |

The Reclamation costs shown above are estimates.  Actual costs will be monitored to assure estimated costs are not exceeded.  If the costs are overestimated, Reclamation will not charge against the remaining fund amounts unless additional work is officially requested and negotiated.  Any surplus funding will made available to the SCD to carry out their responsibilities under this agreement.

The total expenditures under this agreement shall not exceed $2,090,800, unless modified under the terms of paragraph 10, MODIFICATIONS.

Funds will be prevalidated and reserved for the SCD (the Recipient) for fiscal year 2007 in the amount of $149,034.  If the SCD does not utilize the entire amount allotted for this fiscal year, the balance will be carried forward for use in the following fiscal year.  Additional reservations will be made for each new fiscal year or as needed for the timely completion of SCD responsibilities as described in paragraph 3.2.

**6.  MISCELLANEOUS PROVISIONS.**

      **6.1  Assignment.**  This Agreement shall not be assignable by any party without the prior written consent of the other parties.  Subject to this limitation on assignment, this Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors, agents and assignees.

BLM_0002192

**6.2  Severability**.  The provisions of this Agreement are severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of the remaining provisions.

**6.3  Authority**.  Each party warrants that the person signing on its behalf has been duly authorized to execute this Agreement on its behalf.

## 7.  PAYMENT POLICY  (Reclamation 11/03)

Acceptance of a financial assistance agreement from Reclamation creates a legal responsibility on the part of the recipient organization to use the funds and property provided in accordance with the terms and conditions of the agreement.  Reclamation has a reversionary interest in the unused balance of funding and in any funds improperly applied.

Payments to recipients are made in accordance with the basic standards and methods stated in the payment regulations at 43 CFR 12.61 or 43 CFR 12.922, as applicable to this agreement.  These requirements are intended to minimize the time elapsing between the transfer of funds from the Federal government and the disbursement of these funds by the recipient.

Payment will be made in advance or by reimbursement as follows:

**7.1  Advance Payment** -- Recipients shall be paid in advance provided (1) they maintain or demonstrate the willingness and ability to maintain procedures to minimize the time elapsing between the transfer of funds and their disbursement by the recipient, (2) they comply with reporting requirements for timely submission of financial status reports, and (3) they impose these same standards on subrecipients.

Advances to recipients shall be limited to the minimum amounts needed and shall be timed to be in accordance with the actual, immediate cash requirements of the recipient in carrying out the purpose of the agreement.  The timing and amount of cash advances shall be as close as administratively feasible (generally no more than 3 days) to actual disbursements for direct program costs and the proportionate share of allowable indirect costs.

**7.2  Reimbursement** -- Reimbursement shall be the preferred method of payment when a recipient (1) does not meet the requirements for advance payment stated above; (2) does not have financial management systems that meet the standards in 43 CFR 12.60 or 43 CFR 12.921, as applicable; or (3) has been converted to payment restrictions for non-compliance with the terms and conditions of the agreement.  Reimbursement is also the preferred method of payment for agreements involving construction.

## 8.  PAYMENT METHOD  (Reclamation 11/03)

**8.1  Electronic Funds Transfer** -- Payments under this agreement will be made to recipients by electronic funds transfer (EFT) unless the recipient qualifies for exemption from this payment method.  Reclamation utilizes the Automated Clearinghouse (ACH) Vendor Express payment system for EFT.  Whether funds are paid in advance or as a reimbursement, the actual payment will be made through Vendor Express.  Vendor Express allows the

30

Government to transfer funds to a recipient=s financial institution along with explanatory information regarding the payment.

**8.2  Enrollment** -- Upon award, recipients will receive a copy of the SF-3881, ACH Vendor/Miscellaneous Payment Enrollment Form.  This form is required to implement the Vendor Express system and to notify Reclamation of any change or corrections to financial institution information.

**8.3  Requesting Payments** -- Requests for advance or reimbursement may be made by the following methods:

**8.3.1  SF-270, Request for Advance or Reimbursement**  On a monthly basis, recipients may submit an original and two copies of a properly certified SF-270 form to the address identified in Block 8, page 1, of this agreement.  For advance payments, this form may be submitted on a monthly basis, at least two weeks prior to the date on which funds are required, and on the basis of expected disbursements for the succeeding month and the amount of Federal funds already on hand.  Requests for reimbursement may be submitted on a monthly basis, or more frequently if authorized by the GCAO.  Requested funds are delivered to the recipient via ACH Vendor Express.  This form is available on the Internet at http://www.whitehouse.gov/omb/grants/grants_forms.html.

**8.3.2  SF-271, Outlay Report and Request for Reimbursement for Construction Programs**  The SF-271 shall be used for construction agreements paid by the reimbursement method, letter of credit, electronic funds transfer, or Treasury check advance, except where the advance is based on periodic requests from the recipient, in which case the SF-270 shall be used.  This request may be submitted on a quarterly basis, but no less frequently than on an annual basis.  Recipients may submit an original and two copies of a properly certified SF-271 form to the address identified in Block 8, page 1, of this agreement. This form is available on the Internet at: http://www.whitehouse.gov/omb/grants/grants_forms.html

**8.3.3  Automated Standard Application for Payments (ASAP)**  Recipients may utilize the Department of Treasury ASAP payment system to request advances or reimbursements.  ASAP is a recipient-initiated payment and information system designed to provide a single point of contact for the request and delivery of Federal funds.  Once a request is made through ASAP, funds are provided to the recipient either through ACH or Fedwire. Further information regarding ASAP may be obtained from the ASAP website at http://www.fms.treas.gov/asap.  Upon award, you will be provided with information regarding enrollment in the ASAP system.

## 9.  <u>REPORTING REQUIREMENTS AND DISTRIBUTION</u>  (Reclamation 11/03)

Failure to comply with the reporting requirements contained in this agreement may be considered a material non-compliance with the terms and conditions of the award. Non-compliance may result in withholding of payments pending receipt of required reports, denying both the use of funds and matching credit for all or part of the cost of the activity or action not in compliance, whole or partial suspension or termination of the agreement, recovery of funds paid under the agreement, withholding of future awards, or other legal remedies.

BLM_0002194

**9.1  Financial Reports**  All financial reports shall be signed by an Authorized Certifying Official for the recipient's organization.  The following forms are available at http://www.whitehouse.gov/omb/grants/grants_forms.html.

**9.1.1  SF-269 or SF-269a, Financial Status Report**  This form is utilized to report total expenditures for the reporting period.  The SF-269 must be used if the recipient is accountable for the use of program income; otherwise, the SF-269a may used.

An original and two copies of this form shall be submitted annually within 30 days following the end of each reporting period.

A final SF-269 or SF-269a shall be submitted within 90 days following completion of the agreement.

**9.1.2  SF-272, Report of Federal Cash Transactions**  This report shall be submitted by recipients that draw down cash advances by means of electronic funds transfer or Treasury check.  Recipients shall identify in the Remarks section the amount of cash advances received in excess of 3 days prior to disbursement and explain actions taken to reduce excess balances.

An original and two copies of this form shall be submitted on a quarterly (but only for those organizations receiving advances of $1 million or more per year) basis within 15 days following the end of the reporting period.

**9.2  Program Performance Reports**

**9.2.1  Interim Reports**  Recipients shall submit an original and two copies of program performance reports on a quarterly basis within 30 days following the end of each reporting period.  Program performance reports shall contain the following:

- A comparison of actual accomplishments with the goals and objectives established for the reporting period;
- Where project output can be quantified, a computation of the cost per unit of output;
- When appropriate, reasons why goals and objectives were not met; and
- Other pertinent information including, when appropriate, analysis and explanation of cost overruns or high unit costs.

**9.2.2 Annual Reports**  An original and two copies of an annual program performance report shall be submitted within 90 days following the end of each year of the agreement.  Copies of this report may be required to be included with any application for continuing support of the agreement.

**9.2.3 Final Report**  An original and two copies of the final program performance report shall be submitted no later than 90 days following the expiration or termination of the agreement.

**9.3  Significant Developments**

BLM_0002195

During the term of the agreement, the recipient must immediately notify the GCAO if any of the following conditions become known:

9.3.1 Problems, delays or adverse conditions which will materially impair their ability to meet the objectives of the agreement;

9.3.2 Favorable developments which enable the recipient to meet time schedules and objectives sooner than or at less cost than projected or to produce more beneficial results than originally planned.

This notification is to include information on the actions taken or contemplated to resolve problems, delays, or adverse conditions, and any assistance needed from Reclamation to help resolve the problem.

### 9.4  Report Distribution

Copies of reports shall be distributed as follows:

|  | GCAO (Block 6, Page 1) | GCAOR (Block 8, Page 1) |
|---|---|---|
| Financial Reports | 1 | 1 |
| Performance Reports | 1 | 1 |
| Significant Developments | 1 | 1 |

## 10.  <u>MODIFICATIONS  (Reclamation 08/03)</u>

Any changes to this agreement shall be made by means of a written modification.  Reclamation may make changes to the agreement by means of a unilateral modification to deal with administrative matters, such as changes in address, no-cost time extensions, the addition of previously agreed upon funding, or deobligation of excess funds at the end of the agreement. Additionally, a unilateral modification may be utilized by Reclamation if it should become necessary to suspend or terminate the agreement in accordance with 43 CFR 12.83 or 43 CFR 12.961, as applicable.

All other changes shall be made by means of a bilateral modification to the agreement.  No oral statement made by any person, or written statement by any person other than the GCAO, shall be allowed in any manner or degree to modify or otherwise effect the terms of the Agreement.

All requests for modification of the Agreement shall be made in writing, provide a full description of the reason for the request, and be sent to the attention of the GCAO.  Any request for project extension shall be made at least 45 days prior to the expiration date of the agreement or the expiration date of any extension period  that may have been previously granted.  Any determination to extend the period of performance or to provide follow-on funding for continuation of a project is solely at the discretion of Reclamation.

## 11.  <u>RECIPIENT'S PROJECT MANAGER (Reclamation 08/03)</u> .  The Recipient's Project Manager for this Agreement shall be:

33

BLM_0002196

Mr. Frederick S. Fisher
Shavano Conservation District
12756 Shavano Valley Road
Montrose CO 81401
Phone: 970-240-1928

**12.   GRANTS AND COOPERATIVE AGREEMENTS OFFICER'S REPRESENTATIVE (GCAOR) (Reclamation 08/03)** .   The GCAOR for this agreement is:

Mr. Michael Baker
Bureau of Reclamation
Western Colorado Area Office - Northern Division
2764 Compass Drive, Suite 106
Grand Junction CO  81506
Telephone: 970-248-0637

The Grants and Cooperative Agreement Officer Representative is authorized to act only on technical matters during the term of this Agreement.  The Grants and Cooperative Agreement Officer Representative and the Recipient's Project Manager shall work closely to insure that all requirements of the Agreement are being met.  The Grants and Cooperative Agreement Officer Representative's responsibilities include, but are not limited to, the following:

- Assist the Recipient concerning the accomplishment of the tasks described in the Agreement;
- Provide information to the Recipient which assists in the interpretation of the tasks; and
- Review, and where required, approve reports and information to be delivered to the Government.

Technical assistance must be within the general scope of the Agreement.  The Grants and Cooperative Agreement Officer Representative does not have the authority to and may not issue any technical assistance which:

- Constitutes an assignment of additional work outside the general scope of the Agreement;
- In any manner causes an increase or decrease in the total estimated cost or the time required for performance; or
- Changes any of the expressed terms, conditions, or specifications.

**13.  FUNDS AVAILABLE FOR PAYMENT  (Reclamation 08/03)**

The Government's obligation under this Agreement is contingent upon the availability of appropriated funds from which payment for Agreement purposes can be made.  No legal liability on the part of the Government for any payment may arise until funds are made available to the GCAO for this Agreement, and until the Recipient receives notice of such availability, to be confirmed in writing to the Recipient by the GCAO.

34

BLM_0002197

Pursuant to the Act of Congress of June 17, 1902 (32 Stat. 388), and acts amendatory thereof or supplementary thereto, all commonly known as Reclamation Law, funds for payment under this agreement are included in the annual Energy and Water Development Appropriation Act. Funding for any optional year of the agreement is contingent upon subsequent Congressional funding.

## 14.  REIMBURSABLE COSTS AND LIMITATIONS  (Reclamation 08/03)

**14.1**   The Recipient shall provide all personnel, services, facilities, equipment, materials and supplies, and perform all travel which may be necessary and appropriate for the proper performance of this Agreement.  Costs so incurred will be paid for as provided herein. Reclamation's obligation to provide funding to the Recipient for costs incurred in these connections shall be limited to the Recipient's direct and indirect costs associated with this Agreement.  All such direct and indirect costs must be determined to be allowable under the regulations contained in 48 CFR Subpart 31.2 or an OMB Cost Principle Circular, as applicable, which are incorporated herein through the General Provisions of this agreement.

**14.2**  The recipient shall not incur costs or obligate funds for any purpose pertaining to operation of the program or activities beyond the expiration date stated in the agreement.  The only costs which are authorized for a period of up to 90 days following the award expiration date are those strictly associated with closeout activities for preparation of the final report.

**14.3**   Reclamation shall not be obligated to provide funding to the Recipient and the Recipient shall not be obligated to continue performance under the Agreement or to incur costs in excess of the costs set forth in the annual project budget unless the GCAO has furnished the Recipient a modification to increase the available funding for the Agreement.

## 15.  BUDGET REVISIONS  (Reclamation 08/03)

The Recipient shall follow the requirements at 43 CFR 12.70(c) or 43 CFR 12.925, as applicable, when making revisions to budget and program plans.  Additionally, approval shall be requested for transfers of amounts budgeted for indirect costs to absorb increases in direct costs, or vice versa.

## 16.  PROCUREMENT STANDARDS  (Reclamation 08/03)

When utilizing Federal funds for the procurement of supplies and other expendable property, equipment, real property, and other services under this agreement, the Recipient shall utilize the Procurement Standards set forth at 43 CFR 12.76 or 43 CFR 12.940 -12.948, as applicable. The Recipient may be required to submit evidence that its procurement procedures are in compliance with the standards stated therein.  Additional guidance for contracting with small and minority firms, and women's business enterprises is included in the General Provisions section of this agreement.

BLM_0002198

## 17.  PROPERTY STANDARDS  (Reclamation 08/03)

All property, equipment and supplies acquired by the Recipient with Federal funds shall be subject to usage, management, and disposal in accordance with the Property Standards at 43 CFR 12.72 - 12.73, or 43 CFR 12.930 - 12.937, as applicable.

## 18  PROPERTY STANDARDS - REAL PROPERTY  (Reclamation 08/03)

In accordance with 43 CFR 12.71 or 43 CFR 12.932, as applicable, if real property is acquired in whole or in part under this agreement, it shall be subject to the following regulations:

**18.1  Title** - Title to real property acquired under this agreement shall vest upon acquisition in the Recipient or Sub-recipient, shall be used for the originally authorized purpose of the project as long as it is needed, and shall not be disposed of or encumbered without Reclamation approval.

**18.2  Disposition** - When the real property is no longer needed for the originally authorized purpose, the Recipient or Sub-recipient shall request disposition instructions from Reclamation.  The instructions shall provide for one of the following alternatives:

**18.2.1  Transfer** -The Recipient may be permitted to transfer the property to another Federally-sponsored project if the Recipient determines that the property is no longer needed for the purpose of the original project.  Use in other projects or programs shall be limited to those that have purposes consistent with those authorized for support by the Department of the Interior.

**18.2.2  Retention of Title** - The Recipient may be allowed to retain the title after compensating Reclamation for that percentage of the current fair market value of the property attributable to the Federal government's financial participation in the project.

**18.2.3  Sale of Property** -The Recipient may be directed to sell the property under guidelines provided by Reclamation, and to compensate Reclamation in an amount calculated by applying Reclamation's percentage of participation in the cost of the original purchase to the proceeds of the sale after deduction of any actual and reasonable selling and fix-up expenses.  When the Recipient is directed to sell the property, sales procedures shall be followed that provide for competition to the extent practicable and result in the highest possible return.

**18.2.4  Transfer of Title** - The Recipient may be directed to transfer title to the Federal Government or to an eligible third-party.  The Recipient shall be entitled to compensation for its attributable percentage of the current fair market value of the property.

## 19.  INSPECTION  (Reclamation 08/03)

Reclamation has the right to inspect and evaluate the work performed or being performed under this agreement, and the premises where the work is being performed, at all reasonable times and in a manner that will not unduly delay the work.  If Reclamation performs inspection or

BLM_0002199

evaluation on the premises of the Recipient or a subrecipient, the Recipient shall furnish and shall require subrecipients to furnish all reasonable facilities and assistance for the safe and convenient performance of these duties.

## 20.  AUDIT  (Reclamation 09/03)

Recipients are responsible for obtaining audits in accordance with the Single Audit Act Amendments of 1996 (31 U.S.C. 7501-7507) and revised OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations."  Audits shall be made by an independent auditor in accordance with generally accepted government auditing standards covering financial audits.  Additional audit requirements applicable to this agreement are found at 43 CFR 12.66 or 43 CFR 12.926, as applicable.  General guidance on the single audit process is included in a pamphlet titled, "Highlights of the Single Audit Process" which is available on the internet at http://www.dot.gov/ost/m60/grant/sincontact.htm.  Additional information on single audits is available from the Federal Audit Clearinghouse at http://harvester.census.gov/sac/.

## 21.  ENFORCEMENT  (Reclamation 08/03)

In accordance with 43 CFR 12.83 or 43 CFR 12.962, as applicable, if the recipient materially fails to comply with any term of this agreement, whether stated in a Federal statute or regulation, an assurance, in a State plan or application, a notice of award, or elsewhere, Reclamation may take one or more of the following actions as appropriate:

      **21.1**  Temporarily withhold cash payments pending correction of the deficiency by the recipient or subrecipient or more severe enforcement action by the awarding agency;

      **21.2**  Disallow (deny both use of funds and any matching credit for) all or part of the cost of the activity or action not in compliance;

      **21.3**  Wholly or partly suspend or terminate the current award for the recipient's or subrecipient's program;

      **21.4**  Withhold further awards for the program; or

      **21.5**  Take other remedies that may be legally available.

## 22.  TERMINATION  (Reclamation 08/03)

In accordance with 43 CFR 12.84 or 43 CFR 12.961, as applicable, and except as provided for in the Enforcement Provision, above, this agreement may be terminated in whole or part only as follows:

      **22.1**  By the awarding agency with the consent of the recipient or subrecipient in which case the two parties shall agree upon the termination conditions, including the effective date and in the case of partial termination, the portion to be terminated, or

BLM_0002200

**22.2**  By the recipient or subrecipient upon written notification to Reclamation, setting forth the reasons for such termination, the effective date, and in the case of partial termination, the portion to be terminated.  However, if, in the case of a partial termination, the awarding agency determines that the remaining portion of the award will not accomplish the purposes for which the award was made, the awarding agency may terminate the award in its entirety under either the Enforcement Provision or paragraph 1 of this Provision.

## 23.  PREAWARD INCURRENCE OF COSTS  (Reclamation 08/03)

The Recipient shall be entitled to have incurred costs for this agreement, in a total amount not to exceed $1,500, for allowable costs incurred on or after October 1, 2006, which if had been incurred after this [agreement OR modification] was entered into, would have been allowable under the provisions of the agreement.  Reimbursement of these costs shall be subject to the funding limitations stated in paragraph 5.

## 24.  DUN AND BRADSTREET (D&B) DATA UNIVERSAL NUMBERING SYSTEM (DUNS) REQUIREMENT  (Reclamation 07/04)

Effective October 1, 2003, applicants for Federal grants or cooperative agreements must provide a D&B DUNS number with their application.  This number is to be included in Block 5 of your SF-424 Application for Federal Assistance (Rev.9-2003), or in Block 6 of previous versions of the SF-424.

If you do not have a DUNS number, one may be obtained at no cost by calling the dedicated toll-free DUNS Number Request Line at 1-866-705-5711, or by going to the DUNS Government Contractor and Grantee website at https://eupdate.dnb.com/requestoptions/government/ccrreg/ .

Individuals who would personally receive a grant or cooperative agreement award from the Federal government, apart from any business or non-profit organization they operate, are exempt from the requirement to provide a DUNS number with their application.  Reclamation must, however, have a DUNS number for payment processing purposes, and will therefore obtain a DUNS number for any individual who is awarded a grant or cooperative agreement.

## 25.  GENERAL PROVISIONS:

### 25.1  Regulations and Guidance

The regulations at 43 CFR, Part 12, Subparts A, C, E, and F, are hereby incorporated by reference as though set forth in full text.  The following Office of Management and Budget (OMB) Circulars, as applicable, and as implemented by 43 CFR Part 12, are also incorporated by reference and made a part of this agreement.  Failure of a recipient to comply with any provision may be the basis for withholding payments for proper charges made by the recipient and for termination of support.  Copies of OMB Circulars are available on the Internet at http://www.whitehouse.gov/omb/grants/grants_circulars.html.  The implementation of the circulars at 43 CFR Part 12 is available at http://www.access.gpo.gov/nara/cfr/cfr-table-search.html#page1.

BLM_0002201

**25.1.1  Agreements with colleges and universities shall be in accordance with the following circulars:**

Circular A-21, revised May 10, 2004, "Cost Principles for Educational Institutions"

Circular A-110, as amended September 30, 1999, "Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations"

Circular A-133, revised June 27, 2003, "Audits of States, Local Governments, and Non-Profit Organizations"

**25.1.2  Agreements with State and local governments shall be in accordance with the provisions of the following circulars:**

Circular A-87, revised May 10, 2004, "Cost Principles for State, Local, and Indian Tribal Governments"

Circular A-102, as amended August 29, 1997, "Grants and Cooperative Agreements with State and Local Governments" (Grants Management Common Rule, Codification by Department of Interior, 43 CFR 12)

Circular A-133, revised June 27, 2003, AAudits of States, Local Governments, and Non-Profit Organizations"

**25.1.3  Agreements made with nonprofit organizations shall be in accordance with the following circulars and provisions:**

Circular A-110, as amended September 30, 1999, "Uniform Administrative Requirements for Grants and Agreements With Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations"

Circular A-122, revised May 10, 2004, ACost Principles for Non-Profit Organizations"

Circular A-133, revised June 27, 2003, AAudits of States, Local Governments, and Non-Profit Organizations@

**25.1.4  All agreements with organizations other than those indicated above** shall be in accordance with the basic principles of OMB Circular A-110, and cost principles shall be in accordance with 48 CFR Subpart 31.2 titled "Contracts with Commercial Organizations" which is available on the Internet at http://www.access.gpo.gov/nara/cfr/cfr-table-search.html#page1.

**25.2  Debarment and Suspension**

The Department of the Interior regulations at 43 CFR 42—Governmentwide Debarment and Suspension (Nonprocurement), which adopt the common rule for the governmentwide system of debarment and suspension for nonprocurement activities, are hereby incorporated by reference

BLM_0002202

and made a part of this agreement.  By entering into this grant or cooperative agreement with the Bureau of Reclamation, the recipient agrees to comply with 43 CFR 42, Subpart C, and agrees to include a similar term or condition in all lower-tier covered transactions.  These regulations are available at http://www.access.gpo.gov/nara/cfr/cfrhtml_00/Title_43/43cfr42_00.html .

### 25.3   Drug-Free Workplace

The Department of the Interior regulations at 43 CFR 43—Governmentwide Requirements for Drug-Free Workplace (Financial Assistance), which adopt the portion of the Drug-Free Workplace Act of 1988 (41 U.S.C. 701 et seq, as amended) applicable to grants and cooperative agreements, are hereby incorporated by reference and made a part of this agreement.  By entering into this grant or cooperative agreement with the Bureau of Reclamation, the recipient agrees to comply with 43 CFR 43, Subpart B, if the recipient is not an individual, or with 43 CFR 43, Subpart C, if the recipient is an individual. These regulations are available at http://www.access.gpo.gov/nara/cfr/cfrhtml_00/Title_43/43cfr43_00.html .

### 25.4   Assurances and Certifications Incorporated by Reference

25.4.1   The provisions of the Assurances, SF 424B or SF 424D as applicable, executed by the Recipient in connection with this agreement shall apply with full force and effect to this agreement as if fully set forth in these General Provisions.  Such Assurances include, but are not limited to, the promise to comply with all applicable Federal statutes and orders relating to nondiscrimination in employment, assistance, and housing; the Hatch Act; Federal wage and hour laws and regulations and work place safety standards; Federal environmental laws and regulations and the Endangered Species Act; and Federal protection of rivers and waterways and historic and archeological preservation.

25.4.2   When required by 43 CFR 18—New Restrictions on Lobbying, recipients shall complete a Certification Regarding Lobbying form.  This certification is incorporated by reference and made a part of this agreement.  These regulations are available at http://www.access.gpo.gov/nara/cfr/cfrhtml_00/Title_43/43cfr18_00.html .

### 25.5   Covenant Against Contingent Fees

The recipient warrants that no person or agency has been employed or retained to solicit or secure this agreement upon an agreement or understanding for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide offices established and maintained by the recipient for the purpose of securing agreements or business.  For breach or violation of this warranty, the Government shall have the right to annul this agreement without liability or, in its discretion, to deduct from the agreement amount, or otherwise recover, the full amount of such commission, percentage, brokerage, or contingent fee.

### 25.6   Contracting with Small and Minority Firms, and Women's Business Enterprises

It is a national policy to award a fair share of contracts to small and minority business firms.  The Department of the Interior is strongly committed to the objectives of this policy and encourages

BLM_0002203

all recipients of its grants and cooperative agreements to take affirmative steps to ensure such fairness.

      **25.6.1.**  The grantee and subgrantee shall take all necessary affirmative steps to assure that minority firms, and women's business enterprises are used when possible.

      **25.6.2.**  Affirmative steps shall include:

      **25.6.2.1**  Placing qualified small and minority businesses and women's business enterprises on solicitation lists;

      **25.6.2.2**  Assuring that small and minority businesses, and women's business enterprises are solicited whenever they are potential sources;

      **25.6.2.3**  Dividing total requirements, when economically feasible, into smaller tasks or quantities to permit maximum participation by small and minority business, and women's business enterprises;

      **25.6.2.4**  Establishing delivery schedules, where the requirement permits, which encourage participation by small and minority business, and women's business enterprises;

      **25.6.2.5**  Using the services and assistance of the Small Business Administration, and the Minority Business Development Agency of the Department of Commerce as appropriate, and

      **25.6.2.6**  Requiring the prime contractor, if subcontracts are to be let, to take the affirmative steps listed in b.(1) through (5) above.

### 25.7  Notice Regarding Buy American Act

In accordance with the annual Energy and Water Development Appropriations Act, please be advised that it is and has been the sense of Congress that, to the greatest extent practicable, all equipment and products purchased with funds made available in this Act should be American-made.  This provision shall remain in effect unless revoked by a future specific act of Congress.

### 25.8  Resolving Disagreements

When entering into a cooperative agreement with a recipient, Reclamation commits itself to working with the recipient in a harmonious manner to achieve the objectives of the project successfully.  When disagreements arise between the parties, they must be resolved according to the procedures discussed below:

      **25.8.1**   Reclamation shall attempt first to resolve disagreements with the recipient through informal discussion among the Grants or Contract Specialist, the Program Officer, and the recipient's Project Director.

BLM_0002204

        **25.8.2**  If the disagreement cannot be resolved through informal discussion between these parties, the Grants Specialist and the Program Officer shall document the nature of the disagreement and bring it to the attention of the Grants Officer.

        **25.8.3**  After reviewing the facts of the disagreement, as presented by the Grants and Program Offices, the Grants Officer will arrange a formal meeting.  If agreement still cannot be reached, the parties will collectively decide on any varied approaches which might be used to resolve the disagreement.  The parties shall be responsible for their individual expenses related to any approach utilized to resolve the disagreement.  If attempts at resolving the disagreement fail, the Chief, Acquisition and Assistance Management Services, or the Regional Director, whichever is applicable, shall make a decision which shall be final and conclusive.

        **25.8.4**  Nothing herein shall be construed to delay or limit Reclamation=s right to take immediate and appropriate action, as set forth at 43 CFR Subpart 12.83 or 12.962, as applicable, in the event of material noncompliance by the recipient, and no attempts at informal resolution shall be necessary.

Any post award issue will be open for resolution in accordance with the above procedures, with the exception of disagreements regarding continuation of the agreement (termination must be in accordance with 43 CFR 12), or other matters specifically addressed by the agreement itself.

### 25.9   Lobbying Restrictions

In accordance with the annual Energy and Water Development Appropriations Act, please be advised that it is and has been the sense of Congress that none of the funds appropriated by this Act may be used in any way, directly or indirectly, to influence Congressional action on any legislation or appropriation matters pending before Congress, other than to communicate to Members of Congress as described in 18 U.S.C. 1913.  This provision shall remain in effect unless revoked by a future specific act of Congress.

### 25.10   Electronic Funds Transfer (EFT)

In accordance with the Debt Collection Improvement Act of 1996, 31 CFR 208, effective January 2, 1999, all Federal payments to recipients must be made by EFT unless a waiver has been granted in accordance with 31 CFR 208.4.  Upon award of a financial assistance agreement, Reclamation will provide the recipient with further instructions for implementation of EFT payments or a certification form to request exemption from EFT.

### 25.11   Endorsement of Commercial Products and Services

In accordance with 43 CFR 12.2(d), this provision applies to grants and cooperative agreements whose principal purpose is a partnership where the recipient contributes resources to promote agency programs, publicize agency activities, assists in fund-raising, or provides assistance to the agency.  If the agreement is awarded to a recipient, other than a State government, a local government, or a federally-recognized Indian tribal government, and the agreement authorizes joint dissemination of information and promotion of activities being supported, the following provision shall be made a term and condition of the award:

BLM_0002205

Recipient shall not publicize or otherwise circulate, promotional material (such as advertisements, sales brochures, press releases, speeches, still and motion pictures, articles, manuscripts or other publications) which states or implies governmental, Departmental, bureau, or government employee endorsement of a product, service or position which the recipient represents.  No release of information relating to this award may state or imply that the Government approves of the recipient's work products, or considers the recipient's work product to be superior to other products or services.

All information submitted for publication or other public releases of information regarding this project shall carry the following disclaimer:

AThe views and conclusions contained in this document are those of the authors and should not be interpreted as representing the opinions or policies of the U.S. Government.  Mention of trade names or commercial products does not constitute their endorsement by the U.S. Government.@

Recipient must obtain prior Government approval for any public information releases concerning this award which refer to the Department of the Interior or any bureau or employee (by name or title).  The specific text, layout photographs, etc.  of the proposed release must be submitted with the request for approval.

A recipient further agrees to include this provision in a subaward to any subrecipient, except for a subaward to a State government, a local government, or to a federally-recognized Indian tribal government.

BLM_0002206

# Appendix B

# PROPOSAL

to

## Bureau of Reclamation
Upper Colorado Region

## Colorado River Basin
Salinity Control Program

**Pond lining to reduce salt loading to the Uncompahgre River, western Colorado**

Proposed by
### Shavano Conservation District
102 Par Place, Suite 4
Montrose, Colorado 81401
Telephone (970) 249-8407, Extension 113

**Project Manager**

Frederick S. Fisher
12756 Shavano Valley Road
Montrose, Colorado 81401-9693
ffisher@frontier.net
(970) 240-1928
(970) 596-2734 (cell)
(970) 249-5718 (fax)

44

BLM_0002207

# Table of Contents

Page

Executive Summary …………………………………………………   3

Introduction ………………………………………………………..   4

Background Data ………………………………………………….   4

    Physiography …………………………………………………   4

    Ponds and Land use ………………………………………....   6

Salinity Control Methods ………………………………………….   8

    Management Plan …………………………………………….   8

        Wildlife Mitigation ………………………………….….   9

Annual Salt Load (tons) Reduction …………………………….....   12

Budget Proposal ……………………………………………….....   13

Risk Analysis ……………………………………………………   14

Signature Page …………………………………………………...   16

Attachment 1 – Documentation and References …………………….   17

Attachment 2 – Project Manager Qualifications …………………….   18

Attachment 3 – SCD salt loading worksheet ………………………..   20

BLM_0002208

## Executive Summary

Montrose and Delta Counties have undergone rapid population growth in the past decade.  New subdivisions developed on vacant land, farmers and ranchers selling off less productive acreages, and division of larger farms and ranches into smaller properties has occurred throughout both counties.  Many of these new landowners are installing ponds for numerous reasons; livestock watering, landscape features, garden/lawn ponds, recreational activities, and aquaculture to name a few.  The Bureau of Reclamation (BOR, 2004) estimated that between 1993 and 1999, the acreage of ponds in the Uncompahgre River drainage area in Montrose County, increased at an approximate rate of 5 percent per year.  This rate would result in an estimated doubling of the total pond acreage in 15 years.  In Delta and Montrose County there are approximately 700 acres of ponds.  Of those, an estimated 450-500 acres are seeping enough to significantly increase the salt and selenium loading to the Uncompahgre River.  Many of the new ponds are being constructed on the east side of the Uncompahgre River Valley; an area mostly underlain by the Mancos Shale with demonstrably high salt-loading properties.  The BOR also estimated that ponds in Montrose and Delta Counties may be contributing as much as 41,840 tons of salt each year to the Colorado River system.

The Shavano Conservation District (SCD) proposes to address this problem by lining ponds on the east side of the Uncompahgre River Valley.  The SCD will solicit landowners with ponds, measure seepage rates and pond characteristics, install geomembrane liners, and document seepage reductions for two years following lining.

Only preexisting ponds will be lined, the ponds must be located on the east side of the Uncompahgre River Valley, the ponds must be "perched" (i.e., above the water table) and leakage of the ponds must be measured by the SCD.  A total of approximately 30 acres (wetted area) of ponds will be lined.  Assuming an average seepage rate of 0.18 $ft^3/ft^2$/day, a salt loading rate of 5.69 tons/acre foot of seepage, and a unit treatment cost of $1.60/$ft^2$, a cost effectiveness value of $31/ton is obtained. By lining 30 acres of ponds, salt loading to the Colorado River system will be reduced by approximately 4,230 tons per year.  The total cost and cost ceiling of the proposed project is $2,090,800 over a three year period.

## Introduction

It has been estimated by the Bureau of Reclamation (BOR, 2004) that ponds on the east side of the Uncompahgre Valley in Montrose County contributed 21,050 tons of salt to the river system in 1999 and the loading grew to about 25,040 tons in 2004.  The BOR and NRCS also estimated that Delta County may have about two-thirds the acreage of ponds as Montrose County which could result in an additional loading of 16,800 tons in 2004.  These estimates clearly indicate that existing ponds on the east side of the valley are contributing major amounts of salt to the Colorado River system, and unless steps are taken to control seepage from said ponds by

BLM_0002209

lining and also, by Montrose and Delta counties adopting rigorous guidelines for construction of new ponds, the salt loading will increase dramatically. The seepage problem is what the Shavano Conservation District (SCD) intends to address.

## Background Data

**Physiography:** The proposed project area (figure 1) is located in the Uncompahgre River Basin between the cities of Montrose and Delta on the east side of the Uncompahgre River Valley. Review of existing soil and geological maps and literature shows that the Uncompahgre River effectively divides its valley into two distinct geologic areas. The surficial deposits west of the river are largely glacial-fluvial in origin with lesser amounts of sandstone derived alluvium. The bedrocks underlying these surficial deposits are part of the Dakota Formation which is comprised largely of sandstone units with lesser amounts of siltstone, shale, and minor coal. The soils in the western area (locally called Mesa soils) are relatively low in soluble salts and make up approximately 60 percent of the irrigated land in the Uncompahgre Valley. Whereas, and in contrast to the western side of the river, the terrain mainly to the east of the river is composed primarily of Mancos Shale-derived alluvial and residual soils (locally called Adobe soils). The Adobe soils make up approximately 34 percent of the irrigated acreage in the valley, most of which lies east of the Uncompahgre River. Landforms in the valley floor immediately east of the Uncompahgre River, consist of some basin floor shale remnants and shale-derived residual soils with some areas of alluvial soils where drainage systems enter the main river channel. East of the basin floor area and further from the river is a moderately large region of dominantly alluvial Adobe soils derived from local Mancos Shale sources. Topographically this area is mostly flat to slightly inclined terrain with some remnant mesas and occasional hills and is the major agriculture area east of the Uncompahgre River. In places, the Adobe soils in this area, are underlain by fluvial and glacial-fluvial gravel and cobble beds which rest on west dipping shale units of the Mancos Shale Formation. Further east of the agriculture area the topography is characterized by steeper terrain consisting of low hills formed on the Mancos shale. With the exception of relatively small areas in local valleys, the hilly country is non- irrigated and the Adobe soils in this area are almost exclusively residual. In general the Adobe soils are dark grayish brown to yellowish-brown, fine textured silty clay loam, clay loam, silty clay, or clay. They are moderately to strongly alkaline (pH 8+) and commonly contain concretions of calcium carbonate and veinlets and crystals of calcium sulfate (gypsum).

**Ponds and Land Use:** The number and acreage of ponds in Montrose and Delta Counties has markedly increased during the last decade, mostly in association with the rapid population growth taking place in the area. The Bureau of Reclamation (2004) estimated that between 1993 and 1999 the acreage of ponds in the Uncompahgre River drainage area in Montrose County increased at an approximate rate of 5 percent per year. This rate would result in an estimated doubling of the total pond acreage in 15 years. In Delta & Montrose County there are approximately 700 acres of ponds. Of those, an estimated 450-500 acres are seeping enough to materially affect the salt and selenium loading to the Uncompahgre River. Many of those ponds

BLM_0002210



**Figure 1** — The Uncompahgre River Basin between Delta and Montrose: Highway 50 approximately parallels the Uncompahgre River on its east side; green areas on both sides of Highway 50 are agriculture land; light gray strip east of the agricultural land is the Mancos shale hill area; Soils to the east of the River are nearly all Adobe soils, soils west of the river are mainly Mesa soils.

are constructed on areas that have never been irrigated. As compared to previously irrigated soils, un-irrigated soils may be contributing up to 34 times more selenium than the irrigated soils.

Since 1999 the rate of construction of new homes and new subdivisions has steadily increased with many of these new individual landowners and developers utilizing ponds as landscape features and for recreation. Thus it is reasonable to assume that the growth in the number and acreage of ponds is at least, as great as or even greater than, the 1999 BOR estimate. Some of the new construction is occurring on previously irrigated crop land but significant acreage is on non-irrigated pasture and range lands. Also much of this growth is on the east side of the Uncompahgre Valley which is an area of high salt and selenium loading. The NRCS estimates that seventy-five percent of the ponds constructed in Montrose and Delta Counties are done so without NRCS involvement and minimal engineering design. Many, if not most, of these ponds are seasonal and are dry throughout the winter months when irrigation water is not available. When first filled in the spring these ponds initially will have a large flux of water lost to seepage until the clay soils swell.

BLM_0002211

### Salinity Control Methods

The project will reduce the loading of salt by installing geomembrane linings in existing perched (above the water table) ponds that have demonstrated seepage.  The project will also prepare the bottoms of the ponds by grading and adding appropriate fill material to ensure that the lining material is not punctured or torn by debris on the bottom.  All of the ponds to be lined are located on the east side of the Uncompahgre Valley and are in either "Adobe" soils or glacial-fluvial material, both of which are underlain by the Mancos Shale Formation.  The SCD will solicit interested landowners, measure seepage in individual ponds, oversee private contractors who will prepare and install the lining, and document seepage reductions.  No new ponds will be constructed by the project and no municipal, industrial, or agriculture waste-water treatment ponds will be eligible for lining by the project.

<u>**Management Plan**</u>:  During the first year of the project the SCD will solicit landowners with ponds by articles in the SCD newsletter, by announcements at public meetings in the area, by posters displayed in businesses, by direct contact, by individual mailings from lists of NRCS cooperators, and by newspaper and radio advertising.   The SCD will respond to interested landowners by visiting their ponds for an initial evaluation.  If the pond is located on the east side of the Uncompahgre River, is a perched (above the water table) pond, and is situated on Mancos derived soil or Mancos detritus or on glacial-fluvial deposits overlying Mancos shale, and if the landowner is agreeable to signing a contract with the SCD, then further evaluation of the pond will be undertaken.  This further evaluation will involve measuring the actual seepage from the pond by use of a double ring permeameter and/or a staff gauge.  Electrical conductivity measurements used for calculation of salinity will also be made from soil samples taken from the bottom of the pond and from the area immediately adjacent to the pond.  In addition, pond usage will be determined, wildlife usage and habitat will be noted, measurements of the pond square footage (wetted area) will be made, an examination of the structural integrity of the embankment and bottom of the pond will be completed.  Also possible causes of leakage will be noted (i.e. – cracks, rodent holes, piping holes, roots, permeable banks, bottoms, or embankments, livestock damage, etc.), and the owner interviewed about current pond management (frequency of filling, source of water, observed wildlife, number of days pond contains water).  This information will be gathered for as many ponds as necessary to meet the projects goal of lining approximately 30 acres of ponds.

<u>Wildlife Mitigation</u>: Ponds with seepage problems may have an associated wetlands area in the vicinity of the pond that was created and maintained by the seepage water.  These wetland areas in places provide vegetation types and cover creating a habitat for a variety of wildlife species that would not be present in the area if the ponds were not seeping.  By lining the pond, seepage would be stopped or greatly reduced and the wetlands dried up.  It is expected that this type of wetlands habitat loss will be the major type of migration required by the project.  It is also expected that wildlife directly associated with the pond (excluding any seepage caused wetlands) will not be affected at all except during the actual time of pond lining construction. At the time of the initial examination of each individual pond for lining consideration, an evaluation of the wildlife usage and habitat will be made by the project with input from NRCS biologists.

BLM_0002212

U. S. Fish and Wildlife (FWS) personnel will also be invited to participate in this evaluation especially in situations where pond seepage has created an adjacent wetlands wildlife habitat. Based on these evaluations and with the agreement of the FWS, mitigation of the loss of wetlands habitat will be done on a basis of two acres of replacement habitat for every one acre of habitat loss due to the reduction in pond seepage.   In some cases mitigation may be done at or near an individual pond site.  However, in other situations, where on-site mitigation is not requested or desired by the landowner and if major pond reconstruction (adding significantly to the wetted pond acreage) would be necessary to accomplish the required mitigation; the required habitat replacement would be added to a total for the entire project.  This total mitigation (excluding that which was done at individual sites) would then be done within Montrose or Delta County in an area and method agreed upon between the SCD, BOR and the FWS.  We estimate that the habitat replacement requirements of the project will be less than 30 acres. The SCD would prefer that these replacement habitat lands (excluding the habitat areas replaced at individual sites) could be found contiguous to other properties in Montrose or Delta Counties currently protected and managed as wildlife habitat.

A committee composed of the project manager, members of the board of supervisors of the SCD, and two members of the Montrose office of the NRCS will rank the suitability of the ponds for lining based on the above information gathered by the project manager assisted by high school students in agriculture vocation classes.  The ponds will be ranked on; 1) the amount of salt-reduction gained by lining; 2) construction challenges and costs related to lining (mostly bottom and embankment repairs); 3)   flexibility of landowners to allow lining at the most advantageous time for the project; and 4) timing of lining construction in respect to completion deadlines for the overall project.  Once the ponds are ranked the owners will be requested to enter into a contract with the SCD for lining of their pond.  The contract will spell out what will be done and will bind the SCD and Landowner to the agreement.  The contract will be drawn up by the SCD attorney.  It will hold the SCD and the BOR harmless for any post-lining events that may be associated with the pond, including but not limited to leakage, lining failure, embankment failure, and environmental changes associated with the pond.  All of the linings being considered for use will be a 30 mil or greater geomembrane material with a minimum 20 year guarantee. The expected life of a pond that is lined by the project is 33 years.  Barring unforeseen delays it is expected that by the end of the first year, most if not all, of the ponds required to meet the project goal will have been evaluated and a contract will be in place with the landowners.

The second year of the project will focus mostly on getting the construction work completed.  All of the construction will be done by private contractors experienced in pond lining and having the necessary equipment to complete the work in a timely manner while meeting all of the specifications required for the job.  Contractors may bid on as many ponds as they want and will be awarded the bid if it is determined that they have the man-power and equipment required for the work.  All BOR regulations regarding the use of minority and small businesses will be followed in awarding the bids.  All of the contractors must be bonded. Because of liability concerns and possible conflicts with contractors, individual landowners will not be allowed to participate in the pond preparation and lining process.  As many ponds as possible that were ranked as favorable for lining will be completed the second year.

BLM_0002213

The third and final year of the project will be directed at completing all of the ponds that are necessary to meet the project goal of lining 30 overall acres of ponds. During this year as many as possible of the ponds that were lined first will be re-evaluated for seepage to directly determine the effectiveness of the lining process. Observations as to wildlife use, vegetation establishment, and landowner satisfaction will also be recorded. Throughout the duration of the project quarterly reports detailing the project activities and financial status will be submitted by the project manager to the appropriate BOR representative. A final report will be submitted at the end of the project after post-lining seepage rates have been determined. Monitoring of seepage and overall pond operations by the SCD will continue for two full years following the project completion of lining a minimum of 30 pond acres.

### Annual Salt Load (tons) Reduction

This project would reduce, by lining approximately 30 acres of ponds, salt loading to the Colorado River system by  4,230 tons per year at a cost effectiveness value of $31 per ton (see attachment 3, SCD worksheet). These numbers are based on the BOR's 2004 report "Lining Ponds to reduce salt and selenium loading to the Gunnison River" (BOR, 2004). It is also based on discussions with the project manager by BOR personnel in the Grand Junction Office. Specific numbers used as directed by the BOR are an assumed seepage rate after lining of $0.07 ft^3/ft^2/day$; a salt loading rate of 5.69 tons/acre foot; a 33 year liner life; a 5.125% interest rate; and 225 days of seepage/year.  In the above referenced report (BOR, 2004), a seepage rate of $0.1 ft^3/ft^2/day$ is recommended for all of the perched ponds in Montrose County, however not all of the perched ponds have significance seepage. The report also provides seepage numbers for ten ponds that were known to have seepage problems. The average seepage rate for those ten ponds was $0.18 ft^3/ft^2/day$.   This project will measure seepage prior to determining which ponds will be lined and only those ponds that are seeping will be candidates for lining. Further the ponds with the greatest seepage rates will be the ones that ranked highest and will be the first to be lined. Therefore we believe the seepage rate of $0.1 ft^3/ft^2/day$ is too conservative and does not apply to this project which is directed at ponds with documented seepage problems. Using the average seepage rate of known problem ponds determined in the above BOR report of $0.18 ft^3/ft^2/day$ and a unit cost per treatment of $1.60/ft^2$ a cost effectiveness value of $31/ton is obtained. The SCD believes that this number is realistic, in that we are targeting seeping ponds and will be measuring and documenting seepage prior to lining.

### Budget Proposal

The total cost for this project and the cost ceiling for lining 30 wetted acres of ponds is estimated to be $2,090,800; which is equal to a cost of $1.60 per square foot of lined pond. Included in that amount are estimated contractor costs (construction and materials) of $1.00/ft $^2$, a habitat mitigation component at 10%, Shavano Conservation District overhead at 10%, consulting (BOR & NRCS, set amount at $15,000), salaries and expenses for the project manager and assistants at $95,000 (over three years), miscellaneous equipment and supplies at $3,000, an inflation rate of 3%, and contingency component of 10%. The contingency component is included because the SCD is concerned about the unpredictable nature of the cost of PVC materials, fuel, and other supplies that are price sensitive to world markets. If these market sensitive supplies were to escalate rapidly, then the contingency component would allow the project to stay within the overall cost ceiling. If prices are relatively stable over the life of the project then any funds allotted for contingencies would be used to line additional acreages of ponds. Discussions with

BLM_0002214

pond lining contractors in the Montrose/Delta/Grand Junction area suggest that total construction cost (including cost of liner, dirt work, liner installation, and covering of the liner) will range between \$0.55 and \$1.50/ft$^2$.  The greatest uncertainty in the estimates made by the contractors is not knowing the amount of dirt that will have to be moved or hauled in to prepare the bottom of the pond for lining and to cover the lining to a depth of approximately one foot.  However, most of the contractors felt that an amount of \$1.50/ft$^2$ would be the maximum needed for almost any situation.  A cost of \$1.00 ft$^2$ seems to be a figure commonly quoted by the contractors as "ball-park".

## Risk Analysis

The project will be designed by the SCD in collaboration with the BOR and the NRCS.  It relies heavily on prior work done by the BOR and the NRCS associated with pond and canal seepage in the Gunnison and Uncompahgre River Basins.  It will use accepted methods of determining seepage, namely staff gauges and double ring permeameters.  The only ponds that will be lined are those demonstrated by the project to have an excessive seepage rate prior to lining.  Only bonded contractors with experience in lining ponds will be used.  Money is available in the budget for consultation by the BOR and/or NRCS on engineering, technical, and wildlife issues.  The SCD has an excellent track record of management and completion of prior grants; specifically the EPA Targeting Grant, #WQC 99-01497 and the EPA Phytoremediation Grant, WQC 01-00057.  The project manager has extensive scientific and technical experience and has successfully designed and managed large (million dollar plus) programs (see attachment 2).  Follow up seepage measurement will be made on the ponds that were lined by the project to determine the effectiveness of the lining in reducing seepage.  In addition to the reduction in salt loading achieved by lining ponds, selenium loading will also be reduced.  Indeed, Butler (2001) suggests that in the Montrose Arroyo area, piping of canals and laterals may have had greater effect on selenium loads than on salt loads in Mancos Shale areas.  Reduction of selenium loading in the Gunnison River Basin is of considerable importance to the recovery of endangered fish in the Colorado River system.

BLM_0002215

**Signature Page**

This proposal is made in response to the Request For Proposals # 06-SF-40-2459 issued by The

United States Bureau of Reclamation.

Signed this _____ day of March, 2006

_____

Thomas Grett, President
Shavano Conservation District
Montrose, Colorado

_____

Frederick S. Fisher
Project Manager
12756 Shavano Valley Road
Montrose, CO 81401

ffisher@frontier.net
(970) 240-1928
(970) 596-2734 (cell)
(970) 249-5718 (fax)

BLM_0002216

**Documentation and References**

5) Bureau of Reclamation, 2004; "Lining ponds to reduce salt and selenium loading to the Gunnison River" available at: http://www.usbr.gov/research/science-and-tech/news/LngPndsSelnmLdgReport.pdf

6) Bureau of Reclamation, 1982, Lower Gunnison Basin Unit, Feasibility Report, Hydrosalinity, appendix B, November 1982, 86 p.

7) United States Department of Agriculture, Soil Conservation Service, 1967, Soil Survey, Delta-Montrose Area Colorado, 73 p. plus maps.

8) Butler, D.L., 2001, Effects of piping irrigation laterals on selenium and salt loads, Montrose arroyo basin, western Colorado: U.S. Geological Survey, Water-Resources Investigations Report 01-4204, 14p.

BLM_0002217

# Appendix C

## Ponds from which data was collected by the project
**(WGS 84 used as the GPS map datum for location coordinates; soil types from the Ridgway soil survey)**

| pond; name soil; &location | size acres | seepage measured 07 | seepage measured 08 | letter I.D. |
|---|---|---|---|---|
| 1) Bishop; west pond<br>N38.49480; W107.80993<br>(soil type -- 701) | 0.2 | No | Yes | A |
| 2) Bishop; east pond<br>N38.49554; W107.80777<br>(soil type -- 701) | 0.16 | No | Yes | B |
| 3) Black Canyon; upper<br>N38.47766; W107.84741<br>(soil type -- 701) | N.S.* | Yes | No | C |
| 4) Black Canyon; lower<br>N38.47680; W107.85408<br>(soil type -- 701) | N.S.* | Yes | No | D |
| 5) Carlson; water ski<br>N38.54214; W107.88808<br>(soil type -- 701 west 2/3 &<br>740 east 1/3) | 9.1 | Yes | Yes | E |
| 6) Franks<br>N38.57122; W107.89406<br>(soil type -- mostly 701<br>with 740 along edges) | 1.5 | Yes | Yes | F |
| 7) Hill<br>N38.55977; W107.88485<br>(soil type -- 701 with some<br>705) | 0.5 | Yes | Yes | G |

55

BLM_0002218

| | | | | |
|---|---|---|---|---|
| **8) Jones**<br>**N38.63654; W107.92643**<br>**(soil type = 705 at pond;**<br>**740 immediately outside**<br>**of pond area)** | **1.18** | **No** | **Yes** | **H** |
| **9) McGee; upper**<br>**N38.35230; W107.77201**<br>**mixed Mancos and glacial/fluvial** | **N.S.*** | **Yes** | **No** | **I** |
| **10) McGee; house**<br>**N38.35149; W107.78078**<br>**mixed Mancos and glacial/fluvial** | **N.S.*** | **Yes** | **No** | **J** |
| **11) Phillips; west**<br>**N38.39461; W107.81128**<br>**(soil type = 708 with some**<br>**701)** | **0.28** | **No** | **Yes** | **K** |
| **12) Phillips; east**<br>**N38.39472; W107.81082**<br>**(soil type = 708 with some**<br>**701)** | **0.12** | **No** | **Yes** | **L** |
| **13) Scharf;**<br>**N38.53176; W107.88682**<br>**(soil types 731 or 730)** | **0.12** | **Yes** | **Yes** | **M** |
| **14) Shearer; west**<br>**N38.42305; W107.83282**<br>**N38.42339; W107.83415**<br>**(soil type = 790 with a**<br>**small area of 722 above**<br>**and 701 across highway)** | **N.S.*** | **No** | **Yes** | **N** |
| **15) Shearer; east**<br>**N38.42305; W107.83282**<br>**N38.42339; W107.83415**<br>**(soil type = 790 with a**<br>**small area of 722 above**<br>**and 701 across highway)** | **N.S.*** | **No** | **Yes** | **O** |
| **16) Tyrone**<br>**N38.62171; W107.93708**<br>**(soil type -- 701)** | **N.S.*** | **No** | **Yes** | **P** |

BLM_0002219

| | | | | |
|---|---|---|---|---|
| **17) Valencia**<br>N38.58708; W107.96551<br>(soil type -- 701) | **1.7** | **Yes** | **Yes** | **Q** |
| **18) Williamson**<br>N38.38395; W107.79810<br>(soil type = 740 beneath<br>pond; 709 around pond) | **0.26** | **Yes** | **Yes** | **R** |

**(N.S.\* - indicates that the pond was not surveyed for size)**
**(soil type numbers refer --  to appendix E which is taken from the new Ridgway Soil Survey)**

Note: Numerous other ponds were examined by the project but were not considered as lining candidates for the following reasons: 1) they were outside of the project boundaries; 2) the owners were not able (willing?) to stop inflow and outflow for periods  long enough to measure seepage (3 to 4 days per month); 3) ponds were an integral part of an irrigation system that required filling and draining on a daily basis; 4) ponds were not perched; 5) owners did not want to have the landscaping around the pond disturbed during the lining process; 6) owners not willing or able to control digging of holes in embankments by muskrats and other rodents; 7) owners wanted to have their ponds lined without any documentation of seepage rates; 8) sedimentation rates were great enough to require dredging of the ponds on a yearly basis; 9) water supply to pond was uncontrolled drainage off neighboring fields; and 10) owners wanted their livestock to have unrestricted access to the ponds.

BLM_0002220



Stockholm Environment Institute, Working Paper 2016-02



# How would phasing out U.S. federal leases for fossil fuel extraction affect CO₂ emissions and 2°C goals?

Peter Erickson and Michael Lazarus

BLM_0002221

SEI - U.S. Seattle Office
1402 Third Avenue, Suite 900
Seattle, WA 98101
USA

Tel: +1 206 547 4000
Web: www.sei-international.org

Author contact:
Peter Erickson,
pete.erickson@sei-us.org

Director of Communications: Robert Watt
Editor: Marion Davis

Cover photo: Onboard the Maersk Developer, operating the Hadrian-5 well for ExxonMobil in the KC-919 field in the Gulf of Mexico. Photo © Robert Seale – Maersk Drilling / Flickr

This publication may be reproduced in whole or in part and in any form for educational or non-profit purposes, without special permission from the copyright holder(s) provided acknowledgement of the source is made. No use of this publication may be made for resale or other commercial purpose, without the written permission of the copyright holder(s).

About SEI Working Papers:
The SEI working paper series aims to expand and accelerate the availability of our research, stimulate discussion, and elicit feedback. SEI working papers are work in progress and typically contain preliminary research, analysis, findings, and recommendations. Many SEI working papers are drafts that will be subsequently revised for a refereed journal or book. Other papers share timely and innovative knowledge that we consider valuable and policy-relevant, but which may not be intended for later publication.

Copyright © May 2016 by Stockholm Environment Institute



**STOCKHOLM ENVIRONMENT INSTITUTE**

**WORKING PAPER NO. 2016-02**

# How would phasing out U.S. federal leases for fossil fuel extraction affect $CO_2$ emissions and 2°C goals?

**Peter Erickson and Michael Lazarus**

Stockholm Environment Institute – U.S. Center

## ABSTRACT

Avoiding dangerous climate change will require a rapid transition away from fossil fuels. By some estimates, a phase-out of global fossil fuel consumption and production – particularly coal and oil – will need to be nearly complete within 50 years. Given the scale of such a transition, nations may need to consider a broad suite of policy approaches that aim not only to reduce fossil fuel demand – the current focus – but also constrain fossil fuel supply growth. In this paper, we examine the potential emissions implications of a supply-side measure under consideration in the U.S.: ceasing to issue new leases for fossil fuel extraction on federal lands and waters, and avoiding renewals of existing leases for resources that are not yet producing. Our analysis finds that under such a policy, U.S. coal production would steadily decline, moving closer to a pathway consistent with a global 2°C temperature limit. Oil and gas extraction would drop as well, but more gradually, as federal lands and waters represent a smaller fraction of national production, and these resources take longer to develop. Phasing out federal leases for fossil fuel extraction could reduce global $CO_2$ emissions by 100 million tonnes per year by 2030, and by greater amounts thereafter. The emissions impact would be comparable to that of other major climate policies under consideration by the Obama administration. Our findings suggest that policy-makers should give greater attention to measures that slow the expansion of fossil fuel supplies.

BLM_0002223

## CONTENTS

1. Introduction ............................................................................................................3
2. Recent trends and outlook for U.S. fossil fuel production .........................................6
3. U.S. fossil fuel production in a 2°C world................................................................9
4. The effect of federal leasing decisions on fossil fuel production .............................11
    4.1 Approach ......................................................................................................11
    4.2 Overall results ...............................................................................................12
    4.3 Coal .............................................................................................................13
    4.4 Gas .............................................................................................................15
    4.5 Oil ...............................................................................................................15
5. Reductions in CO₂ emissions from restricted leasing ..............................................17
    5.1 Coal .............................................................................................................18
    5.2 Oil ...............................................................................................................23
    5.3 Summary and discussion.................................................................................26
6. Conclusions ...........................................................................................................31
Appendix A: Results for cases without the Clean Power Plan .....................................33
Appendix B: Additional sensitivity analyses .............................................................36
    Sensitivity analyses for global oil market .........................................................36
    Sensitivity analyses for the domestic coal market.............................................37
    Sensitivity analyses for export coal market.......................................................39
References .................................................................................................................40

## ACKNOWLEDGEMENTS

The authors thank Jeff Archibald, Mike McCormick, John Larsen, Peter Marsters, Michael Mellish and Spencer Reeder for helpful discussions about data and methodology, Paul Ekins for providing a 2°C scenario for U.S. fossil fuel production, and Ben Schreiber and Marissa Knodel at Friends of the Earth US for supporting this research. Mark Haggerty of Headwaters Economics and Sivan Kartha of SEI-US reviewed this paper, and Adrian Down at SEI-US provided research support.

BLM_0002224

## 1. INTRODUCTION

Avoiding dangerous climate change will require a rapid transition away from fossil fuels. By some estimates, global consumption and production of fossil fuels – particularly coal and oil – will need to end almost entirely within 50 years (Rogelj, Schaeffer, et al. 2015). The Paris Agreement on climate change approved last December asserted world leaders' commitment to strong climate action and urged countries to step up their efforts. While many countries are taking measures to reduce fossil fuel demand – from pricing carbon to promoting low-carbon energy sources – these policies are not advancing at the pace needed.

The need for swifter progress has led to growing interest in adopting supply-side measures as well, measures that more directly aim to slow further investment and growth in fossil fuel production and thereby enable a smoother, more rapid transition to a low-carbon future. In the U.S., one option on the table is to reduce or end the issuance and renewal of U.S. government leases for fossil fuel exploration and extraction on federal lands and offshore. The Obama Administration is considering changes to its coal leasing program in light of concerns about "whether the leasing and production of large quantities of coal… is consistent the Nation's goals to reduce greenhouse gas emissions" (BLM 2016b). The Administration could similarly take climate implications into account in its decisions regarding further federal leases for exploration and extraction of oil and gas resources, a large share of which are offshore.

This paper aims to shed light on the climate implications of future leasing decisions by examining how ceasing further leases would affect coal, oil and gas production, consumption, and global carbon dioxide ($CO_2$) emissions relative to a reference case. It also explores how such decisions might affect progress towards the goal set in Paris of keeping warming "well below 2°C above pre-industrial levels and pursuing efforts to limit the increase to 1.5°C".[1]

The U.S. now produces more fossil fuels than ever. It ranks first in the world in oil and gas production, and second in coal production (BP 2015). Since 2010, U.S. fossil fuel production has grown by 20% in energy terms,[2] due in great part to technology advances in extracting oil and gas from tight and offshore resources (U.S. EIA 2015a). Increased production has helped natural gas eclipse coal as the top fuel for U.S. electricity production, slowing growth in $CO_2$ emissions (U.S. EIA 2015c). And despite current low oil prices, investment in fossil fuel extraction and trade infrastructure continues. For example, investments in new U.S. oil exploration and production infrastructure in 2015 amounted to $100 billion, which is down from an all-time high in 2014 but still among record levels, and is expected to be eclipsed again by 2018 (Rystad Energy 2015). Investments in capital-intensive, high-carbon fuel infrastructure can lock in long-term fuel supplies, while tying communities to fossil revenues, making it more difficult and expensive to later shift to a low-carbon pathway (Erickson et al. 2015).

About a quarter of all U.S. fossil fuels extraction (in energy terms), including two-fifths of all coal, occurs on federal lands and waters (U.S. EIA 2015a).[3] Producers obtain leases for these activities from the U.S. Department of the Interior (DOI) through bids and auctions, and pay fees, rents and royalties that are shared by the federal government and state and tribal governments (see Box 1).

---

[1] See http://unfccc.int/paris_agreement/items/9485.php.

[2] For ease of comparison, much of the analysis in this paper presents coal, oil and gas production in energy equivalent terms, as quadrillion British thermal units (QBtu).

[3] Hereafter we refer simply to "federal lands" to encompass both lands and offshore areas that are subject to federal leasing provisions.

BLM_0002225

**Box 1. Leasing and royalty practices for fossil fuels produced from U.S. federal lands and waters**

The DOI administers fossil fuel production from U.S. federal lands and waters, as well as from lands where the federal government owns the sub-surface mineral rights but another entity owns the surface rights. DOI authority for administering onshore fuels originates from the Mineral Lands Leasing Act of 1920 and its subsequent revisions. For offshore fuels (i.e. those in federal waters), DOI authority originates from the Outer Continental Shelf Lands Act of 1953.

For onshore resources, the process for determining when and where leases occur is generally "bottom-up": interested firms identify eligible parcels and express their interest to the Bureau of Land Management (BLM), the DOI's implementing agency. For oil and gas, the BLM responds to interest by firms by holding a public lease auction, starting at a minimum of $2 per acre. If no bids are received, the lease is offered to the first qualified applicant, with no requirement for a competitive bid. Initial leases are for 10 years.

For coal, a similar process called "lease by application" has been used for all federal coal (including in the Powder River Basin) since 1990. Companies propose specific parcels for sale; the BLM determines fair market value and the maximum amount of coal economically recoverable, and solicits sealed bids. The lease is then awarded to the highest bidder that meets or exceeds fair market value, for at least $100 per acre. Most leases are for parcels adjacent to existing mines (wholly new coal mines are rare), and typically receive only one bid, from the existing mining company. Initial leases are for 20 years.

Offshore oil and gas development is more top-down. DOI creates a five-year leasing plan that outlines a schedule of sales, including size and location of the proposed activities. The DOI's Bureau of Ocean Energy Management (BOEM) then publishes an announcement regarding the lease areas, in consultation with governors and local government officials of affected jurisdictions. Bids are solicited, and the lease is generally awarded to the highest bidder. Initial leases are for 5 years in waters less than 800 meters deep, 7 years in waters 800 to 1,600 meters deep, and 10 years in water depths greater than 1,600 meters.

For all fuels, onshore or offshore, the DOI will extend lease terms as long as the leasing firm continues to produce. In addition to the annual rental payments specified in leases, firms are responsible for future royalty payments of 12.5% of the sale price for onshore oil, gas, and surface coal; 8% for underground coal; and 18.75% (increased from 12.5% in 2007) for offshore oil and gas. The ONRR and BLM have been considering updating the royalty rates (and other associated terms), with the support of President Obama, as expressed in his 2016 State of the Union address.

*Sources: Bureau of Land Management (BLM 2015); Congressional Research Service (Vann 2012; Vann 2014); Department of Interior (DOI 2012); Government Accountability Office (US GAO 2013); Office of Natural Resources Revenue (ONRR 2015b).*

These leasing systems have been in place for generations, and they are a significant source of government revenue, including for local communities. However, government and civil society organizations are beginning to rethink these practices in light of climate and other concerns (BLM 2016b; The White House 2014). In his 2016 State of the Union address, on the heels of the Paris Agreement, President Obama announced his intention "to change the way we manage our oil and coal resources, so that they better reflect the costs they impose on taxpayers and our planet" (Obama 2016). Just days later, the **DOI** announced its intention to prepare a Programmatic Environmental Impact Statement (PEIS) of the federal coal program to, among other goals, consider "adjustments to the scale and pace of leasing", including the possibility of a "declining schedule consistent with the United States' climate goals and commitments" (BLM 2016b). Legislation has also been introduced in Congress to stop all future leasing activity (Merkley et al. 2015; Huffman et al. 2016). In addition, royalty regimes are being re-

BLM_0002226

examined with an eye to eliminating apparent subsidies or possibly applying a carbon charge (Haggerty et al. 2015; Krupnick et al. 2015; BLM 2016a).

The debate about federal fossil fuel leases is complex, involving not only climate considerations, but also questions about broader environmental protection, government revenue, jobs, and the resilience of regional economies that now depend heavily on fossil fuel production (Haggerty 2014). Our analysis focuses on the climate implications, aiming to fill what we see as a critical knowledge gap.

Proposals to end or reform federal fossil fuel leases take what we call a *supply-side* approach to climate policy (Lazarus, Erickson, et al. 2015). Supply-side measures aim to complement demand-side measures, to ensure that energy and climate policies are more coherent and increase the likelihood of achieving climate goals. Yet the implications of supply-side policies remain poorly understood, as do their interactions with demand-side measures.[4] Until recently, few studies have assessed the $CO_2$ emissions impacts of supply-side policies – in stark contrast to the long history of demand-side analyses. Recent studies have examined the $CO_2$ emissions associated with past and current U.S. production (Stratus Consulting 2014) and with fossil fuel resources under federal jurisdiction (Mulvaney et al. 2015). Studies have also looked at the emission implications of specific infrastructure investments (e.g. coal export terminals) or of restricting or increasing production of specific resources (Power and Power 2013; Vulcan/ICF 2016).

Our paper builds on this growing literature, aiming to help answer key questions arising in the current debates over federal leasing. In particular, the paper:

- Reviews recent U.S. fossil fuel production and explores future trends (Section 2);
- Shows how future U.S. fossil fuel extraction might need to decline under a 2°C pathway, consistent with the Paris Agreement;
- Analyzes how fossil fuel production might be affected if the U.S. government stopped issuing new leases (Section 4);
- Estimates how a cessation of federal leasing might affect overall energy use and $CO_2$ emissions (Section 5), taking into account market responses; and
- Examines how a cessation of federal leasing would affect U.S. progress towards a 2°C pathway (Section 6).

This analysis may be useful to policy-makers who are considering how to manage the nations fossil fuel resources in a way that is, in Interior Secretary Sally Jewell's words, "consistent with our climate change objectives" (Jewell 2015; U.S. DOI 2016).

---

[4] For example, future federal coal leasing policy could complement or conflict with efforts to implement the CPP, as both will affect the pace and extent of a transition away from coal in the US power sector.

BLM_0002227

## 2. RECENT TRENDS AND OUTLOOK FOR U.S. FOSSIL FUEL PRODUCTION

U.S. fossil fuel production, which was relatively flat (in energy terms) for decades, has recently seen a substantial increase. Enabled by new technological developments for oil and gas extraction, especially hydraulic fracturing and horizontal drilling, production of these fuels has risen sharply in the last decade. The turnaround has been particularly dramatic for oil, which, after peaking in 1970, had been declining steadily until 2007. Since then, oil production has grown rapidly, overtaking the previous 1970 high (U.S. EIA 2015a). By contrast, coal production peaked around 2008 (U.S. EIA 2015a) and has since declined, due to global oversupply, slowing domestic and international demand, and competition from abundant, lower-cost natural gas supplies.

Table 1 displays fossil fuel production in the U.S. since 1990, by fuel, on federal and non-federal lands (see also Figure 1). The data show that, between 1990 and the mid-2000s, production on federal lands increased, while non-federal production decreased. Since then, however, these trends have reversed. Indeed, the vast majority of growth in U.S. fossil fuel production since 2005 has occurred on non-federal lands, with an increase of 20 QBtu (quadrillion Btu or "Quads"), while federal oil production grew by just 0.2 QBtu. (Federal gas production has declined by nearly 3 QBtu, and all coal production has declined.) As of 2014, an estimated 24% of all U.S. fossil fuels production occurred on federal lands and waters (U.S. EIA 2015a).

**Table 1: U.S. fossil fuel production, 1990-2014, in quadrillion BTU**

| Fossil fuel production | | 1990 | 1995 | 2000 | 2005 | 2010 | 2014 |
|---|---|---|---|---|---|---|---|
| **Coal** | | **22.5** | **22.0** | **22.6** | **23.0** | **21.9** | **20.2** |
| | Federal | 6.1 | 8.0 | 9.3 | 9.1 | 9.2 | 8.1 |
| | Non-federal | 16.3 | 14.0 | 13.3 | 13.9 | 12.7 | 12.1 |
| **Gas** | | **18.3** | **19.1** | **19.7** | **18.6** | **23.4** | **26.6** |
| | Federal | 6.6 | 6.8 | 7.3 | 6.2 | 5.2 | 3.6 |
| | *Of which: offshore* | *5.2* | *4.8* | *4.8* | *3.2* | *2.3* | *1.2* |
| | Non-federal | 11.7 | 12.3 | 12.3 | 12.3 | 18.2 | 22.9 |
| **Oil** | | **17.7** | **16.3** | **15.0** | **13.3** | **14.4** | **22.5** |
| | Federal | 3.0 | 3.6 | 4.4 | 4.4 | 5.2 | 4.6 |
| | *Of which: offshore* | *2.1* | *2.7* | *3.6* | *3.1* | *3.6* | *3.2* |
| | Non-federal | 14.7 | 12.7 | 10.6 | 8.9 | 9.2 | 17.9 |
| **Total** | | **58.5** | **57.4** | **57.2** | **54.9** | **59.7** | **69.2** |
| | Federal | 15.7 | 18.5 | 21.0 | 19.7 | 19.6 | 16.4 |
| | Non-federal | 42.8 | 39.0 | 36.3 | 35.1 | 40.1 | 52.9 |

Source: SEI analysis based on ONRR (2015) and U.S. EIA (2015a).

In recent scenarios, the U.S. Department of Energy projects that U.S. oil and gas production will continue to increase, and coal production will continue to decline. Figure 1 displays both historical (as in Table 1) and future domestic fossil fuel energy production through 2040, as drawn from the U.S. Energy Information Administration's *Clean Power Plan* scenario (U.S. EIA 2015b). This scenario assumes implementation of the Clean Power Plan, which was

BLM_0002228

finalized in October 2015 (U.S. EPA 2015c), and is expected to lead to continued declines in coal use and production over the next decade, followed by a slow rise nearly to current levels.[5]

We use the EIA's Clean Power Plan scenario as the reference case for our analysis. We consider this scenario, among several the EIA developed for its Annual Energy Outlook (see Box 2), to be closest to a "business as usual" case, given finalization of the Clean Power Plan in October 2015, and the assumption of no further policy action or unforeseen technological advancement. (In Appendix A, we consider another reference case without the Clean Power Plan.)

We split the EIA's scenario into fractions extracted on federal vs. non-federal land by assuming that fuel- and region-specific shares of federal (vs. non-federal) production remain constant at recent (2014) levels.[6]

**Figure 1: Historical and future U.S. fossil fuel production, 1990–2040**



*Source: SEI based on ONRR (2015) and U.S. EIA (2015a; 2015b), assuming implementation of the Clean Power Plan.*

---

[5] At the time of this analysis, EIA had conducted an analysis of the draft Clean Power Plan, but not the final plan as placed into law. EIA staff told us in early 2016 that *Annual Energy Outlook 2016* will include the final Clean Power Plan in the reference case, but it was not available in time to inform our analysis. The EIA Clean Power Plan scenario does not extend CPP targets beyond 2030 (the last target date specified in the current plan) and thus emissions begin to rise thereafter. As several aspects of the final Clean Power Plan differ from the draft version, EIA's yet-to-be-released forecasts of fossil fuel production under the final rule could differ from those used here.

[6] We do this by dividing DOI data on federal production (ONRR 2015) by EIA data on total (federal and non-federal) production (U.S. EIA 2015a). We then apply these ratios to forecast region- and fuel-specific production estimates in the Clean Power Plan scenario of the EIA's Annual Energy Outlook (US EIA 2015b).

BLM_0002229

### Box 2: Alternate EIA scenarios of future U.S. fossil fuel production, 1990–2040

The EIA has developed a number of scenarios to explore how U.S. fossil fuel production may evolve (U.S. EIA 2015b; U.S. EIA 2015c). The chart below shows the results of four of these other scenarios, chosen to reflect a wide range of possible outcomes. In addition to the Clean Power Plan case (our study's reference scenario), the scenarios include the lifting of the oil export ban (finalized in late 2015), the possibility of higher future oil and gas production than anticipated, and the possibility that the Clean Power Plan is not implemented (the rule had not yet been finalized at the time of the mid-2015 EIA analyses used here, and it is under legal challenge).

In the EIA assessment, the Clean Power Plan leads to a 20% decline in coal production in 2040 relative to the case without Clean Power Plan, and thus to a decline in overall fossil fuel production. Further advances in oil and gas extraction technology could also result in U.S. fossil fuel production being as much as 40% greater in 2040 than would otherwise be the case, due to even greater increases in oil (70%) and gas (50%) production that also lead to a drop in coal production (20%) due to greater competition from gas.



*Source: U.S. EIA (2015b; 2015c).*

BLM_0002230

## 3. U.S. FOSSIL FUEL PRODUCTION IN A 2°C WORLD

At the Copenhagen Climate Change Conference in 2009, which President Obama attended, world leaders embraced the long-term goal to keep global warming below 2°C above pre-industrial levels.[7] The Paris Agreement further raised ambition, with governments striving to keep warming "well below" 2°C, and agreeing "to pursue efforts to limit temperature increase to 1.5°C".[8] Even with large-scale deployment of bioenergy and carbon capture and storage technologies, scientific assessments show that limiting warming to 2°C, and avoiding dangerous climate tipping points, will require a rapid phase-out of fossil fuels around the world (Rogelj et al. 2011; IPCC 2014; Raupach et al. 2014).

The Paris Agreement makes no reference to fossil fuel *production*, nor is it reflected in the national commitments embedded in the agreement – but clearly, at a global level, producing more fossil fuels is not consistent with simultaneously trying to reduce their use. Yet it is also unclear how production should be phased down: Which countries should curtail production, of what fuels – coal, oil, or gas – and at what rate? For example, would only the most economically attractive resources be extracted, in keeping with emissions constraints and declining fossil fuel demand and prices? Or would political or equity considerations influence where remaining fossil fuel resources might be produced (Lazarus and Tempest 2014; Raupach et al. 2014)?

Though these questions are relatively unexplored, two studies provide scenarios of coal, oil and gas production in a 2°C world with enough detail to estimate how much of that production might occur in the United States. One, the International Energy Agency's *World Energy Outlook*, charts a 2°C ("450") scenario for regional fossil production through 2040 (IEA 2015). The other, published in the journal *Nature*, identifies a least-cost pathway for fossil fuel production under a 2°C scenario through 2050 (McGlade and Ekins 2015).

Each study has its merits and limitations for understanding U.S. fossil fuel production levels consistent with a 2°C goal. The *Nature* study uses a more stringent (and common) definition of a 2°C scenario – one that maintains a 66% chance of limiting warming to this level. It specifies fossil production for the U.S., but may underestimate it, since the study uses a data set from 2010 that misses much of the subsequent boom in U.S. oil and gas production capacity.[9] Accordingly, this scenario may represent a *low* scenario for U.S. fossil fuel production in a 2°C world, at least for oil and gas. (It also does not reflect global equity considerations that might suggest less-developed countries should be allowed to produce a greater share of the total.)

The IEA study starts with 2013 data, and thus better captures the U.S. boom in oil and gas production capacity. However, it uses a weaker definition of a 2°C scenario – a 50% chance of keeping warming below 2°C – and therefore does not curtail fossil fuel production and consumption as rapidly.[10] Together, these factors suggest that IEA's ("450") scenario may a *high* scenario for U.S. production in a 2°C world.

---

[7] See http://unfccc.int/meetings/copenhagen_dec_2009/meeting/6295.php.

[8] See http://unfccc.int/paris_agreement/items/9485.php.

[9] We thank Drs. McGlade and Ekins for providing the U.S. extraction pathway from their analysis.

[10] The IEA reports findings for U.S. fossil fuel production in its New Policies Scenario, but not in its 2°C 450 Scenario, for which it reports fossil fuel production only for OECD Americas, a grouping that includes Canada, Chile, Mexico and the U.S. To impute U.S. results for the 450 Scenario, we adjust the findings for OECD Americas according to the ratio of U.S. to OECD Americas production in the New Policies Scenario. For example, in the New Policies Scenario, U.S. fossil fuel production comprises 91% of OECD Americas coal production in 2040, 50% of oil production, and 71% of gas production, and so we approximate U.S. production in the 450 Scenario as these same fractions of OECD Americas production in IEA's 450 Scenario. Were the marginal source of U.S. resources

Figure 2 shows the projected levels of U.S. fossil fuel production out to 2040 from these two studies, compared with our reference scenario, the EIA's Clean Power Plan case. Between them, these studies suggest **that to be consistent with a 2°C goal, the U.S. would need to cut aggregate fossil fuel production by 40–60% from current levels by 2040**, instead of an anticipated increase of 11% under the Clean Power Plan scenario.

Although scientific understanding of 1.5°C pathways is limited, U.S. fossil fuel production in a 1.5°C world would almost certainly be lower than in the 2°C scenarios. Studies suggest that cumulative global fossil fuel consumption between now and 2050 must be about 40% lower to meet a 1.5°C vs. a 2°C goal (Rogelj, Luderer, et al. 2015; Baer et al. 2013).

**Figure 2: 2°C scenarios of U.S. fossil fuel production, 1990–2040**



*Source: SEI analysis based on U.S. EIA (2015a; 2015b), IEA (2015), and McGlade and Ekins (2015).*

---

to be more or less expensive than the respective marginal sources in other OECD America countries, this approximation could over- or under-estimate, respectively, the cost-efficient level of U.S. production.

BLM_0002232

## 4. THE EFFECT OF FEDERAL LEASING DECISIONS ON FOSSIL FUEL PRODUCTION

To bring U.S. fossil fuel production more closely in line with a 2°C production pathway, the DOI could phase out leasing and/or provide incentives to reduce fossil fuel production on public lands. The DOI intends to consider such measures, at least for coal, as parts of its upcoming review of its coal program (U.S. DOI 2016; BLM 2016b).

To inform these and related discussions, in this section we look at how fossil fuel production would be affected if the DOI stopped issuing new leases for fossil fuel extraction on federal lands and waters, and did not renew any leases on resources that are not yet producing when each lease comes up for renewal.[11]

We look at what such a lease phase-out policy might mean for fossil fuel production on federal lands, and consider how this compares with what might be required to meet the 2°C goal. Except for the restrictions on leasing, we assume that all other factors, such as broader economic trends and policy actions, proceed as in the EIA's Clean Power Plan scenario.

### 4.1 Approach

Before we can analyze the effect of leasing reform on future fossil fuel production, we need to understand trends in expected leasing activity in the absence of any changes to leasing policy. We start with our reference case projection of future fossil fuel production on federal lands and waters, as shown in Figure 1. We then further analyze it to estimate what fraction of production would come from new or renewed leases (that DOE could decide not to issue) instead of existing leases (which must be renewed as long as they are producing).

To estimate future leasing activity for oil and gas, we draw from an extensive database of U.S. oil and gas fields that estimates economics and production from each field over time (Rystad Energy 2015). From this database, we estimate the shares of fuel-, region- and year-specific U.S. production that would arise from existing (already producing), renewed (not yet producing), or new leases, and apply these ratios to our EIA-based reference scenario.[12]

For coal, we estimate future lease dynamics using industry data and guidelines. In particular, we assume that producers will seek new leases at a rate that maintains reserves at a level equal to 15 years of expected production.[13] This is roughly the ratio observed in recent years,[14] and is consistent with ranges, typically 10–20 years, reported by the U.S. Geological Survey (Pierce and Dennen 2009) and coal industry consultants (Miller and Bate 2011). Starting from estimates of existing reserves of federal coal (explained further below), we then assume that producers will seek new leases at rates that maintain reserves equivalent to the next 15 years of expected production (from federal lands) in our reference scenario. We further assume that producers do

---

[11] This closely resembles what seven U.S. Senators proposed in the Keep It in the Ground Act of 2015 (Merkley et al. 2015). It also resembles a permanent version, for all fuels, of the temporary moratorium on new coal leasing implemented by the DOI in early 2016 (U.S. DOI 2016). We assume that in all cases, the moratoria would not affect leases that are already producing fuels, as these leases would automatically continue.

[12] More specifically, we use shares of *Field, License* and *Open* asset designations in Rystad's Base scenario. For oil, we calculate and apply the ratios separately for each year of production for oil from lower 48 offshore deposits (which is strongly federal), in the Rocky Mountain and Dakota states (also strongly federal), natural gas liquids, and all other crude.

[13] Where expected production follows the reference scenario as in Figure 1.

[14] Based on analysis of production (ONRR 2015), reserves (Miller and Bate 2011) and lease (Headwaters Economics 2015) data.

BLM_0002233

not wait to begin mining their newly acquired leases, but extract the same fraction of these new stocks each year as they do of existing stocks.[15]

To estimate starting reserves for the Powder River Basin, we rely on a coal industry report that estimated year-end 2010 reserves of 5.8 billion short tons[16] (Miller and Bate 2011). Outside the Powder River Basin, we rely on a U.S. Government Accountability Office report that estimated year-end 2012 reserves of 0.9 billion short tons (U.S. GAO 2013). We then update these sources to 2015 by debiting the totals based on subsequent actual annual production (ONRR 2015) or incrementing them based on new lease inflow since (Headwaters Economics 2015). In total, this process yields an estimate of total federal coal reserves of 7.1 billion short tons as of the end of 2015.[17]

## 4.2 Overall results

In total, our analysis indicates that, of expected federal fossil fuel production in 2040 (20 QBtu), about two-thirds (13 QBtu) is either not yet under lease or is under lease but not yet producing.[18] Figure 3 shows historical and forecast U.S. fossil fuel production by status of federal lease.

Note especially that, under a 2°C pathway (red shading, just as in Figure 2), U.S. production will need to drop at some point to levels below what is expected on non-federal lands alone. This point comes sooner (after 2017) under McGlade and Ekins' (2015) 2°C scenario, and not until after 2025 under the IEA's less stringent pathway (IEA 2015). However, in either case these findings suggest that, at some point in the next two decades, there is potentially no need for federal fossil fuels in a 2°C pathway. This is not to suggest, however, that under a 2°C pathway, all U.S. fossil fuel production could, or should, shift wholly to non-federal lands; rather it simply illustrates a 2°C pathway will likely require a drop in production far exceeding what is expected from federal lands.

---

[15] Collectively, these assumptions imply that producers from federal lands do not draw down their existing stocks at faster than normal levels. If they did so, they could conceivably maintain production levels through 2035 (under a Clean Power Plan reference case), after which production from federal lands would cease entirely.

[16] Most U.S. coal production data are given in short tons, while $CO_2$ emissions are usually given in metric tons, or tonnes. For clarity, we consistently use "short tons" to refer to the U.S. weight measure, and "tonnes" or Mt (million tonnes) or Gt (gigatonnes, or billion tonnes) when referring to $CO_2$.

[17] This estimate is lower than that reported for 2012 by the GAO, 9.0 billion short tons, for two reasons. First, the GAO describes that its estimate for Wyoming, 8.0 billion short tons, is high by an unknown amount because it includes coal in mines that is not ultimately saleable, because it is along property boundaries or is left in place for structural mine support (U.S. GAO 2013). Second, the inflow of new coal leases since 2012 has been smaller than mine production (ONRR 2015; Headwaters Economics 2015).

[18] As explained in Box 1, the DOI will extend leases as long as the leasing firm continues to produce – but it can refuse to renew leases for resources that are not producing.

BLM_0002234

**Figure 3: Historical and forecast U.S. fossil fuel production, 1990–2040, in energy terms, by status of federal lease**



*Source: SEI analysis based on ONRR (2015), U.S. EIA (2015a; 2015b), assuming implementation of the Clean Power Plan.*

Of the prospective federal fossil fuels from areas not yet leased or producing (orange and dark blue areas in Figure 3), about half is coal. Cumulatively, an estimated 70 QBtu of coal extracted between 2016 and 2040 from federal lands has not yet been leased, whereas 40 QBtu of oil and 30 QBtu of gas has either not yet been leased or is in leases that are not yet producing and are subject to renewal.[19] Findings specific to each fuel follow below.

### 4.3 Coal

Figure 4(a) shows the significant role that coal from newly leased federal lands could play over the next 25 years. Most of the federal coal in already-leased reserves will be extracted by 2040, with the majority of federal coal coming from new leases by 2030.[20]

Cumulatively between 2016 and 2040, 4 billion short tons (70 QBtu) of federal coal will be extracted (mostly, but not exclusively, in the Powder River Basin) from lands not yet under lease. This represents an estimated 7 Gt $CO_2$ of emissions once the coal is combusted.

Under the reference case, total U.S. coal production drops sharply after 2020, then rebounds gradually such that, in 2030, the U.S. produces about 16 QBtu of coal. In a cost-efficient 2°C scenario, however, U.S. coal production would likely need to keep declining rapidly, by more

---

[19] We could not find data on lands leased for coal but not yet producing. Because the production on coal lands could be seen as trivial (i.e., very little infrastructure is needed to extract a minimal amount of saleable coal and therefore prove the lease), we assume that no coal extraction could be avoided by not renewing leases because leaseholders could easily prove production and avoid the non-renewal.

[20] This finding is based on the assumption that producers draw from existing and new leases at the same proportional rates.

BLM_0002235

than half: to 8 QBtu annually under IEA's 2°C scenario by 2030, or 1 QBtu under McGlade and Ekins's 2°C scenario. Compared with these 2°C scenarios, reference case U.S. production is on pace to substantially over-produce coal, such that both federal and non-federal coal supply would need to be reduced to attain a pathway consistent with 2°C.

**Figure 4: Future U.S. fossil fuel production in reference case (by status of federal lease) and under 2°C scenario, 1990–2040**







BLM_0002236

## 4.4 Gas

As shown in Figure 4, of all three fossil fuels, gas has the lowest fraction (less than one-fifth) produced from federal lands and waters. Roughly half of this gas is from lands in Rocky Mountain states, especially Wyoming and Colorado. About a third is from offshore deposits, almost all of which are in the Gulf of Mexico.

Gas (and oil) projects tend to have longer lead times than coal, as companies must first conduct exploratory drilling and put wells or offshore platforms in place. (By contrast, new federal coal leases are often next to existing mines and can be accessed readily with existing equipment.) Accordingly, changes to leasing practices for gas may take many years to affect production. In our analysis, new leases produce only a negligible quantity of gas before 2030. Existing (but not yet producing as of 2015) leases could produce slightly more gas in the near term (e.g. rising to 15% of production by 2030), but their importance diminishes in the longer term.

Between now and 2040, the reference case sees an estimated 30 trillion cubic feet (30 QBtu) of gas will be extracted from federal lands and waters not yet under lease or that are under lease but have not yet started producing. This represents 2 Gt $CO_2$ of emissions once the gas is burned. About two-thirds of this is likely to be from offshore deposits, indicating the growing role of offshore sources of gas. And although most of the offshore gas is still expected to come from Gulf sources through 2040, Pacific and Atlantic sources (notwithstanding the Obama administration's recently announced cancellation of mid-Atlantic lease sales) could take on increasing roles over time, making up 10% of offshore production in 2040 (up from 1% today, all in the Pacific). In the reference case, U.S overall (federal and non-federal) gas production rises gradually through 2040. By contrast, under the 2°C scenarios considered here, U.S. gas production would instead level off and peak in the next 10 years, then decline steadily to about 20 QBtu in 2040, indicating that the role of gas as a "bridge" fuel between coal and renewables in a 2°C world is short-lived. This finding is consistent with that of other studies (Lazarus, Tempest, et al. 2015; Davis and Shearer 2014).

## 4.5 Oil

Slightly more than one-fifth of current and expected U.S. oil extraction is from federal lands and waters. Thus, in contrast to coal, the impact of federal leasing through 2040 is more modest.

Leasing practices for offshore oil, especially in the Gulf of Mexico, could have the largest impact on federal oil extraction, since the Gulf is the source of about 70% of federal oil in the reference case. Most of the remaining oil comes from federal lands in Western states, including New Mexico, Wyoming and North Dakota.

As for gas, the longer lead times for oil projects – especially offshore oil – mean that new leases do not have much impact on oil production until after 2030. However, as production from existing fields declines more rapidly in later years, the importance of new leases grows.

Between 2016 and 2040, the reference case sees an estimated 7 billion barrels (40 QBtu) of oil will be extracted from federal lands and waters that were not under lease as of 2015, or had not yet started producing. This would equal 3 Gt $CO_2$ of emissions once the oil is burned (primarily as vehicle fuel). Over half of this oil is from offshore deposits in the Gulf of Mexico that are already under lease, which indicates that lease *renewal* rather than new leasing practices are likely to be the major determinant of federal oil production through 2040.

Overall, across both federal and non-federal lands and waters, U.S. oil production in the reference case peaks around 2020 at around 28 QBtu, then declines gradually to about 25 QBtu. By contrast, in the IEA 2°C scenario, U.S. oil production would peak at around 25 QBtu and

BLM_0002237

then decline more rapidly, to less than 20 QBtu by 2030; in McGlade and Ekins' 2°C scenario, U.S. oil production would begin declining immediately, to less than 15 QBtu in 2020.

Table 2 summarizes the findings of our analysis of coal, oil, and gas production scenarios, especially the amount of federal fossil fuel extraction that might be avoided by cessation of new leases and by not renewing existing, non-producing leases.

**Table 2: U.S. federal fossil fuel production in reference case and quantities avoided by ceasing new leases and not renewing non-producing leases, 1990–2040, in QBtu**

| Federal fossil fuel production | 2015 | 2020 | 2025 | 2030 | 2035 | 2040 |
|---|---|---|---|---|---|---|
| **Coal** | **7.3** | **6.2** | **5.6** | **5.9** | **6.1** | **6.3** |
| Avoided from non-renewals | – | – | – | – | – | – |
| Avoided from cessation of lease sales | – | (1.5) | (2.2) | (3.1) | (3.9) | (4.7) |
| Avoided (total) | – | (1.5) | (2.2) | (3.1) | (3.9) | (4.7) |
| Avoided, as % of reference case | | (24%) | (40%) | (53%) | (64%) | (74%) |
| **Gas** | **4.6** | **5.7** | **5.8** | **6.6** | **6.7** | **7.0** |
| Avoided from non-renewals | – | (0.0) | (0.3) | (1.0) | (1.1) | (0.8) |
| Avoided from cessation of lease sales | – | (0.0) | (0.1) | (0.3) | (1.6) | (3.3) |
| Avoided (total) | – | (0.0) | (0.4) | (1.3) | (2.7) | (4.1) |
| Avoided, as % of reference case | | (0%) | (6%) | (19%) | (40% | (59%) |
| **Oil** | **4.8** | **6.1** | **5.8** | **6.3** | **6.1** | **6.8** |
| Avoided from non-renewals | – | (0.0) | (0.6) | (1.4) | (1.9) | (1.4) |
| Avoided from cessation of lease sales | – | (0.0) | (0.1) | (0.3) | (1.2) | (3.0) |
| Avoided (total) | – | (0.0) | (0.7) | (1.6) | (3.1) | (4.4) |
| Avoided, as % of reference case | | (1%) | (12%) | (26%) | (51%) | (65%) |
| **Total** | **16.7** | **18.0** | **17.2** | **18.8** | **18.8** | **20.1** |
| Avoided from non-renewals | - | (0.0) | (0.9) | (2.4) | (3.0) | (2.2) |
| Avoided from cessation of lease sales | - | (1.5) | (2.4) | (3.6) | (6.7) | (10.9) |
| Avoided (total) | - | (1.6) | (3.3) | (6.0) | (9.7) | (13.2) |
| Avoided, as % of reference case | | (9%) | (19%) | (32%) | (52%) | (66%) |

*Source: SEI analysis based on sources described in prior charts.*

16

## 5. REDUCTIONS IN $CO_2$ EMISSIONS FROM RESTRICTED LEASING

The prior section examined how fossil fuel production would be affected by ceasing new leases and not renewing existing, non-producing leases. In this section, we assess what this reduction in fuel extraction might mean for energy use and global $CO_2$ emissions.

We characterize these impacts on a net basis, meaning that we estimate the change in global $CO_2$ emissions *after* taking into account how other fuels may substitute for the federal fuels no longer extracted. Accordingly, our analysis directly addresses the potential for carbon leakage, or the whack-a-mole" phenomenon, that has characterized much of the debate around limiting fossil fuel extraction (Roberts 2015; Lazarus, Erickson, et al. 2015). Specifically, we quantify how, in response to reduced supply of federal fossil fuels:

- **Other non-federal fuels of the same type could substitute,** such as if coal from private, tribal, or state lands replaces coal no longer extracted from federal portions of the Powder River Basin. In oil markets, other supplies could come either from non-federal domestic sources, or from other global oil producers.
- **Different fossil fuels could substitute,** such as if, in response to a drop in coal production, U.S. power systems instead used more natural gas for power generation.

We apply economic tools commonly used to assess fuel markets. In each case, these tools consider that a cut in production is a shift in the supply curve for the fuel. Other producers, and consumers, then respond by consuming more or less of different fuels based on the resulting changes in prices. This approach situates our analysis in the broader economic literature on supply and demand for energy, and allows for a relatively straightforward quantification of the potential $CO_2$ effects, since the carbon contents of each fuel (coal, gas, and oil) are well known.[21] However, these tools are incomplete, as they do not capture the potential broader political or economic implications of what would be a high-profile climate measure taken by a major world economy. For example, were the prospective leasing restrictions by DOI to lead other decision-makers or investors to similarly move away from expanding fossil fuel supply, the impacts could be far greater. We will return to this possibility later in the discussion.

We conduct our analysis for the two energy resources – coal and oil – for which reduced federal leasing is likely to have the greatest implication on global $CO_2$ emissions. We do not consider the net $CO_2$ impact of reduced federal leasing for gas: as described in Box 3, it is not clear that changing the availability of natural gas would have a significant impact on $CO_2$ (or total greenhouse gas) emissions, either positive or negative.

We focus on net $CO_2$ emissions impacts in a specific year, 2030, as it serves as a common reference year for future climate action and commitments in the UN climate negotiations, including the Paris Agreement.

In Section 4, we developed estimates of the impact of fossil fuel extraction from federal lands (Table 2) if the DOI were to cease issuing new leases for coal or oil extraction and stop renewing non-producing leases as they come due.[22]

---

[21] We do not conduct analysis of the change in $CO_2$ emissions associated with extracting, processing, or transporting each resource because these impacts are generally small compared to the emissions associated with combustion of the resulting fuel.

[22] As explained in Box 1, lease terms for oil are 10 years onshore or 5, 7, or 10 years for offshore (depending on water depth). It is possible that, should these leases (not producing as of 2015) start producing before the end of the lease term, they would be "held by production" and, by law, automatically renewed. In such a scenario, the estimates

BLM_0002239

**Box 3. Changing the supply of gas has little impact on net $CO_2$ and GHG emissions**

The decision to use coal or gas in power generation depends on the relative price and availability of these fuels, as well as their non-fossil alternatives, such as renewable power. The $CO_2$ implications of changes to gas supply are highly dependent on these dynamics, as well as on economy-wide effects on energy prices and overall energy use.

A number of studies have looked at the relative balance of these effects in assessing the $CO_2$ implications of increased availability of gas in the U.S. (Lazarus et al. 2015). Some indicate a slight $CO_2$ benefit of increased gas availability (Newell and Raimi 2014; Shearer et al. 2014; US EIA 2014), especially if gas tends to displace coal power.  Other studies indicate a slight net increase in $CO_2$ emissions is possible, due increased energy use and displacement of low-carbon energy (Brown, Krupnick, and Walls 2009; US EIA 2014).[1]  A model comparison exercise by the Energy Modeling Forum suggests, on average, no significant $CO_2$ emissions impact over the next few decades, as the "scale" effect of increased overall energy use largely offsets the "substitution" effect of shifting away from coal (Energy Modeling Forum 2013).  Studies looking at gas supply internationally have come to similar conclusions (Lazarus et al. 2015; McJeon et al. 2014).

Given the findings of these studies, we do not ascribe a net $CO_2$ emissions impact to decreased leasing of federal natural gas resources, at least for the time scale we focus on here (through 2040). That said, the leasing decisions considered in this analysis would play out well beyond this time scale. Over the longer-term, natural gas is more likely to compete with low-carbon energy sources, especially if nations such as the U.S. and China continue to move away from coal. Thus, while reduced leasing of federal natural gas resources may have little effect on global $CO_2$ emissions over the next two decades, it could help in easing the longer-term transition to a low-carbon economy.

The effect of expanding natural gas supply on greenhouse emissions other than $CO_2$ will depend on other factors, namely, how much of methane ($CH_4$), a greenhouse gas many times more potent than $CO_2$, leaks to the atmosphere. Methane leakage can occur during fuel extraction (e.g. conventional or unconventional production, including fracking), transportation (e.g. via pipelines), or distribution (e.g. to homes and businesses via metal or plastic pipes.) At leakage rates most commonly suggested in the literature, methane leakage is unlikely to counteract the GHG emissions balance of natural gas relative to other fuels when that gas is used in most stationary energy applications, such as power generation or heat provision (Lazarus et al. 2015).[1] Some suggest that leakage rates and impacts could be much higher (Howarth 2015), especially for shale gas, though such estimates have yet to be widely accepted. We therefore consider that restricting leasing would not have a substantial net GHG emissions impact, just as we do not ascribe it a net $CO_2$-only impact, though we note that further efforts are needed to address methane leakage in natural gas production and distribution.[1]

## 5.1 Coal

U.S. coal markets are particularly complex, given the stock of coal power plants, many of which were built (or were substantially rebuilt) with boilers designed for a specific grade (or even supplier) of coal, thereby limiting the possibilities for substitution among coals from different suppliers (Joskow 1987; Haggerty et al. 2015). For example, a power plant built for the uniquely low-sulfur, sub-bituminous coal from the Powder River Basin may not be able to switch to other coal, at least not without major retrofits (e.g. to coal processing or pollution controls, or

---

of avoided production due to non-renewals in Table 2: could be too high and, accordingly, also the estimates of $CO_2$ impacts in this section. However, nearly all of the production expected from already-held (but not-yet-producing) leases is from offshore oil, and very little of this is expected to start producing before 2025 in Rystad Energy's assessment (Rystad Energy 2015). With a maximum lease term of 10 years, most of these leases would be expected to come up for renewal before 2025, and therefore be subject to non-renewal.

BLM_0002240

potentially, a complete rebuild of the boiler). A simple model of supply and demand, by treating each ton of coal as equivalent in a competitive market, could miss these dynamics and thus likely overestimate the tendency for other coal, with much different characteristics, to substitute for the drop in federal coal. For this reason, a model that represents the costs and fuel requirements of specific power plants and coal resources has distinct advantages that here outweigh the lack of transparency that a simpler model might provide.

Therefore, to assess the response of the U.S. power market to a drop in domestic coal supply, we look to a recent study (which we refer to as the "Vulcan study") that analyzed how changes to federal leasing practices would affect coal consumption and power-sector $CO_2$ emissions in the U.S. (Vulcan/ICF 2016). It is the most recent and comprehensive study we identified that looks at changes to U.S. coal supply, and it is also the most closely aligned with the focus here on coal from all federal lands.[23] It uses the Integrated Planning Model, IPM, a tool also used by the U.S. Environmental Protection Agency (EPA). Furthermore, it takes into account the impact of the Clean Power Plan as well as the specific, power-plant-level dynamics – such as coal grade requirements and the cost of pollution control technologies or other plant retrofits – that would constrain substitution of other coals for the drop in federal coal.[24]

We summarize the results of the Vulcan study in terms of net decrease (or increase) in fuel consumption per unit drop in coal production in the year 2030.[25] The study found that, under the Clean Power Plan, each QBtu of coal no longer supplied (due to lease restrictions) to domestic power markets would be replaced by 0.64 QBtu of other coal, for a net drop in national coal consumption of 0.36 QBtu. Electricity production would remain virtually unchanged, such that gas consumption would increase 0.23 QBtu to make up for the lost coal-based electricity. (Gas power generation is more efficient than coal, thus less gas would be needed to provide an equivalent amount of electricity).[26]

Were the Clean Power Plan not in place, the Vulcan scenario found a larger effect: a net drop in 0.69 QBtu coal for every federal QBtu cut (with gas increasing 0.35 QBtu).

Table 3 summarizes these market responses. The effect under the Clean Power Plan is smaller, as the Plan would already lead power producers who can replace coal with low-cost alternatives

---

[23] Other studies reviewed, including the "North Fork" study (USFS et al. 2015) and the Tongue River Railroad study (OEA 2015), looked at a particular coal going to a more limited market.

[24] As described in the EPA's documentation of the IPM Model, (U.S. EPA 2013), IPM aggregates existing actual power plants into a smaller number of "model plants" with similar characteristics, each of which is modeled individually. For example, IPM models about 759 coal-fired "model plants" to represent 1,003 actual existing coal-fired plants.

[25] The Vulcan study analyzed over a dozen cases that varied in terms of policy considered (royalty rate increases and leasing restrictions), whether and how the Clean Power Plan might be implemented (mass vs. rate basis), and base case assumptions regarding future resource costs (Base Case A vs. Base Case B). To characterize the reduced coal and increased gas consumption per unit of gross drop in coal production (as in Table 3), we looked at the impact of a phasing out coal production by increasing coal prices (by imposing the social cost of carbon on royalty rates), assuming: a) the Clean Power Plan is implemented using a "mass-based" approach in which each state pursues a fixed $CO_2$ emissions target but can trade emissions allowances with other states in regional trading programs; b) fuel and renewable cost projections consistent with the EPA's analysis of the final Clean Power Plan (Base Case B). The Vulcan study also modeled a simpler (and total) phase-out of federal fossil fuel production between 2028 and 2037 due to cessation of new lease issuance, but we do not consider that case here because it uses an older, "Base Case A" with higher renewables costs than forecast by EPA, and because it takes a more simplistic approach to lease phase-out.

[26] Given the much higher average efficiency of gas-fired electricity generation, this amount of gas is sufficient to nearly completely substitute for lost coal-based electricity (i.e. nearly all of the substitution is by gas not renewables), e.g. as shown in Exhibit 118 of the Vulcan study (Vulcan/ICF 2016)

BLM_0002041

to do so, leaving coal generation mostly in places where the relative cost of alternatives is high. As a result, in response to a drop in federal coal, these remaining coal-fired power systems would shift more heavily to other coal supplies, as from the Illinois Basin and Appalachia. (It is also possible that other, non-federal Powder River Basin coal could substitute, were large new mines to be developed on state, tribal, or private lands, though the Vulcan study does not appear to envision such projects being economic at scale to replace the forgone federal coal.)[27] Another reason that the effect under the Clean Power Plan is smaller in the Vulcan analysis is because of interactions between the leasing restrictions and provisions that states must meet specific emission rate goals. To the extent these goals – or more accurately, the policies and measures states put in place to achieve them – are "binding", and states allow for interstate trading of allowances and credits, further $CO_2$ emission reductions beyond those required by the Clean Power Plan may be more difficult to achieve. While increases in coal prices spurred by restricted leasing would lead to further decreases in coal-based generation and emissions, those decreases could be offset by increased gas-based generation and emissions. They could also be offset by reductions in renewable power or energy efficiency, due to the added "headroom" under the cap and associated decreases in allowance or credit prices within and across states (to the extent that state and regional trading is adopted).

**Table 3: Change in net consumption of coal and gas per 1 QBtu decrease in gross production of coal, QBtu basis**

|  | Clean Power Plan case (Reference scenario) | | No Clean Power Plan Case (Alternative reference scenario) | |
|---|---|---|---|---|
|  | Coal | Gas | Coal | Gas |
| Domestic market | -0.36 | 0.23 | -0.69 | 0.35 |
| Export market | -0.30 | 0.07 | -0.30 | 0.07 |

In principle, this effect could be so strong as to nearly eliminate any $CO_2$ emissions reductions from leasing restrictions under the Clean Power Plan. This could happen, for example, if the state emission rate goals assigned by EPA under the Clean Power Plan were "binding" for all states, fully determining power sector $CO_2$ emissions. A fully binding outcome for the Clean Power Plan is not foreseen in the Vulcan analysis used here. If future renewables or gas power costs were to be greater than currently foreseen by the EPA, then the likelihood of such an outcome would increase – a possibility we consider in the sensitivity analysis in Appendix B.

For exports, which are not described in detail in the Vulcan study, we develop and apply a simple model of supply and demand, similar to prior approaches (Power and Power 2013). The EIA expects exports of steam coal, including from federal lands in the Powder River Basin, to rise slowly but steadily over the next two decades. Producers in the Powder River Basin are particularly looking to emerging economies in East and Southeast Asia, especially Korea, where coal demand is still expected to increase (Considine 2015; Leaton et al. 2014; IEA 2015).

Information on the price elasticity of coal demand in Korea and Southeast Asia is sparse, however (Leaton et al. 2014). We assume that, in the long term, this market is roughly as price-

---

[27] For example, were the Otter Creek mine on state and private lands in Montana or the Big Metal Mine on Crow Reservation lands to be developed, the coal supply curve could "flatten", facilitating coal substitution beyond that foreseen in the Vulcan study, decreasing the net effect on coal consumption in Table 3.

BLM_0002242

responsive as Chinese power systems were during their period of rapid growth (Jiao et al. 2009), for an elasticity of demand of -1.12. We assume that the Pacific Coal market is highly competitive, with substantial low-cost supplies from Indonesia and Australia (Aldina 2013), for elasticity of supply of 2.6. Together these assumptions imply that each QBtu of U.S. coal no longer exported to Asian power markets would be replaced with 0.7 QBtu of other coal, for a drop in net coal consumption of 0.3 QBtu (Table 3).[28] Given the limited supply of gas in Asia to substitute, gas would not fully offset this net drop in coal. Based on a meta-analysis of fuel substitution research (Stern 2012), we find that natural gas in these markets would increase by 0.07 QBtu, only partially substituting for the drop in coal consumption.[29]

We now apply the ratios in Table 3 to the gross drop in coal production from cessation of lease issuance (Section 4) to yields estimates of net change in coal and gas consumption. First, however, we make two adjustments to our estimates of the gross drop in coal production.

The first adjustment is simply to exclude metallurgical coal, such as for use in iron and steel mills. Though this coal is much higher-value than coal for energy production (steam coal), it has smaller CO₂ emissions implications. This is because metallurgical coal has few, if any, readily available low-carbon alternatives, so reducing its supply would be unlikely to affect CO₂ emissions substantially. We assume that 7% of the coal extracted goes to metallurgical, not coal, markets, based on national averages from the U.S. EIA (2015b).

The other adjustment involves additional deposits of coal that may be affected by leasing restrictions since in some instances cutting the availability of *federal* coal would also constrain the accessibility or profitability of mining adjacent *non-federal* coal. This could especially be the case in Wyoming, as hundreds of relatively small plots of state lands are entirely contained within federal parcels (Luppens and Scott 2015). These non-federal parcels may not be accessible or economic to extract if federal leasing were restricted (a similar situation may exist with some private lands). The Vulcan study, for example, estimates the associated reduction in non-federal coal to be as much as half the reduction in federal coal (Vulcan/ICF 2016), magnifying the effects of federal lease restrictions. Here, we assume, based on a review of U.S. EIA (2015a) and ONRR (2015) data, that non-federal coal makes up about one-sixth of federal production in Wyoming, and so we increase our estimates of the drop in coal supply from Wyoming by this fraction. (We do not adjust the drop in coal production from other states.)

Together, these adjustments result in an estimated cut in coal supply in 2030 of 2.9 QBtu to domestic markets and 0.3 QBtu to export markets relative to our Clean Power Plan reference scenario.

Applying the ratios in Table 3 to these totals yields estimates of the impacts on net consumption of coal and gas in energy terms (Table 4). Applying standard carbon contents for coal and gas

---

[28] We assume an elasticity of demand of -1.12 (Jiao et al. 2009) and an elasticity of supply of 2.6, as imputed from Wood Mackenzie's coal supply curve (Aldina 2013) at expected consumption levels. Together, and using the equation $E_d/(E_d-E_s)$ as from basic microeconomics (Perloff 2007) and prior studies (Power and Power 2013; Erickson and Lazarus 2014), suggests a net effect on consumption of 0.30. See the next section, on oil, for further discussion of this equation.

[29] We estimated the ratio of increased gas consumption to drop in coal supply by introducing two adjustments to the equation described in the prior footnote. The adjustments are the elasticity of substitution between coal and gas ($E_{cg}$) and the starting ratio of gas to coal consumption ($Q_g/Q_c$), and are applied as follows: $(E_d+E_{cg})/(E_d-E_s)*Q_g/Q_c$. We use Table 4 of Stern's (2012) meta-analysis to estimate $E_{cg}$ in Korea as 1.4. The IEA estimates that the ratio of gas to coal consumption in OECD Asian countries (such as Korea and Japan) in 2030 will be 0.9, and we use this as $Q_g/Q_c$. Were the consumers of exported U.S. coal instead countries with more coal and less gas, such as China or India, the ratio of gas to coal could be much lower and, therefore, also the extent of substitution of gas for coal.

BLM_0002243

(IPCC 2006) yields estimates of the emissions increases or decreases for each fuel in each market (also in Table 4).[30]

**Table 4: Change in net consumption of coal and gas in response to decreased coal production, 2030**

|  | Clean Power Plan Case | | No Clean Power Plan Case | |
|---|---|---|---|---|
|  | Coal | Gas | Coal | Gas |
| **Energy content (QBtu)** |  |  |  |  |
| Domestic market | (1.03) | 0.66 | (3.33) | 1.67 |
| Export market | (0.09) | 0.02 | (0.10) | 0.02 |
| Total | (1.12) | 0.68 | (3.43) | 1.69 |
| **Carbon content (Mt $CO_2$)** |  |  |  |  |
| Domestic market | (99) | 35 | (318) | 88 |
| Export market | (8) | 1 | (10) | 1 |
| Total | (107) | 36 | (328) | 90 |

In our reference case, assuming Clean Power Plan implementation (Table 4), we find that leasing restrictions would reduce $CO_2$ emissions in 2030 from coal by about 107 Mt $CO_2$, but increased use of gas would increase emissions by about 36 Mt $CO_2$, resulting in a net reduction of 71 Mt $CO_2$. Figure 5 illustrates the individual effects that add up to this net reduction. As shown in the chart, leasing restrictions lead to a drop in coal extracted in federal or adjacent lands in 2030 equivalent to 300 Mt $CO_2$. Increased production in the Illinois Basin and (to a lesser extent) Appalachia makes up for about 60% of the lost coal production from federal and adjacent lands. Increased coal prices also lead to some substitution by gas in domestic power systems. Substitution also occurs in export markets, by gas and other coal supplies from countries such as Australia and Indonesia. The net reduction in $CO_2$ emissions, after accounting for all of these effects is, as stated above, 71 Mt $CO_2$ in 2030

---

[30] We do not conduct analysis of the change in $CO_2$ emissions associated with extracting, processing, or transporting each resource because these impacts are generally small compared with the emissions associated with combustion of the resulting fuel.

BLM_0002244

**Figure 5: Impacts of decreased coal production on coal and gas markets, 2030, under the reference (Clean Power Plan) case, CO₂ basis**



## 5.2 Oil

Oil is used primarily in transport, with more than half of current and expected future global oil used as transport fuel, especially for cars and trucks. The remaining portion is split among the industry, buildings and power sectors, though uses in buildings and power are expected to decline (IEA 2015). The oil market is also highly global, with oil readily traded among countries, and substantial infrastructure in place to do so. The U.S. both imports and exports oil, and world and domestic oil prices very closely track each other (U.S. EIA 2016).

For this reason, we expect that changes in U.S. oil production would affect an integrated global oil market, an assumption also made by many other analysts that have looked at changes in U.S. oil supply (Bordoff and Houser 2015; Rajagopal and Plevin 2013; Allaire and Brown 2012; Metcalf 2007; IEc 2012). Though in the past the oil market could be strongly influenced by cartel behavior among a small number of producers, many analysts now see the market as more likely to behave competitively (The Economist 2016; U.S. EIA 2016), meaning that increases or decreases in supply do translate into shifts in prices and, in turn, consumption.[31]

Accordingly, we model the impact of federal leasing policy on the global market as a shift in the global supply curve, just as in our prior assessment of oil markets (Erickson and Lazarus 2014). Assuming the decline in supply is small relative to this global market, the resulting change in consumption can be modeled as a direct function of the change in production, using

---

[31] A shift in supply will only affect consumption if it is not offset by a shift by another large producer, such as a cartel in the Middle East.

BLM_0002245

elasticities of demand (E_d) and supply (E_s) (Erickson and Lazarus 2014) and from basic microeconomics (Perloff 2007), using the following equation:[32]

$$\Delta Consumption \cong \frac{E_d}{E_d - E_s} * \Delta Production$$

(1)

Consistent with our prior work, we use a mid-range estimate of the long-run elasticity of world crude oil demand of -0.2 based on a literature review (Hamilton 2009), and within the range, from -0.072 to -0.3, found by a more recent review (Bordoff and Houser 2015). For the elasticity of supply, we use a value of 0.25 from Rystad Energy's oil supply curve for the year 2030.[33]

Applying these elasticities to equation (1), we estimate that, for each unit of production cut, other oil supplies will substitute for 0.56 QBtu, and that net oil consumption will drop by 0.44 QBtu (Table 5). This result is unaffected by Clean Power Plan implementation, since the law has little impact on oil consumption.

**Table 5: Change in net consumption of oil and substitute fuels per unit decrease in gross production of oil, QBtu basis[34]**

|  | Oil | Substitutes (biofuels, gas and electricity) |
|---|---|---|
| Global market | (0.44) | 0.22 |

Some of this drop in oil consumption will be made up by alternative transport fuels, while some will represent a reduction in overall transportation energy use due to increased vehicle efficiency, transport mode shifts, or other measures. In the long term, other transport fuels (beside oil) may become viable alternatives at scale, including biofuels, compressed natural gas (CNG), or electricity. However, little information exists on the long-term elasticities of substitution between oil and these other transport fuels (Faehn et al. 2016). Furthermore, deployment of these other fuels and their corresponding vehicles will depend not only on fuel economics, but also on national policies (U.S. EIA 2013). Therefore, we look to the International Energy Agency's *World Energy Outlook 2015* (IEA 2015) to inform our estimates of substitution effects. A comparison of *World Energy Outlook 2015* scenarios suggests that, over the next few decades, the effect of price-induced decreases in oil consumption may be split roughly evenly between lower overall energy use and increased use of substitute fuels.[35] As

---

[32] This equation is the same one as that used to model the response to coal exports as described previously. We describe it here for oil in more detail since the flow of oil from U.S. public lands and waters to the global market is many times greater than the flow of coal from public lands to the Pacific coal market.

[33] We measure the slope of Rystad Energy's oil supply curve for 2030 at the expected equilibrium consumption level (99.5 mbpd), and use that to calculate the elasticity. In this range of the cost curve, offshore oil producers in Mexico and Malaysia, and tight oil producers in the U.S., are dominant, suggesting that these could be the marginal producers for oil supply in 2030.

[34] As described in the text, we assume 30% of the substitute fuel is biofuels (50% cut in GHG-intensity relative to oil), and the remainder is electricity and gas (same GHG-intensity as oil).

[35] We estimate this half-half split by looking at the response to oil and other fuel demand in IEA's Low Oil Price scenario relative to their New Policies Scenario. Figure 4.5 of *World Energy Outlook 2015* indicates that for each increase in oil consumption in the Low Oil Price scenario, about half is from higher demand and half is from less fuel switching away from oil (the substitution effect is slightly less than half in earlier years, slightly more in later

BLM_0002246

shown in Table 5, we apply this 50:50 ratio and estimate that for each 0.44 unit drop in oil consumption, the use of substitution fuels will increase by 0.22 units.

We further assume, again drawing from a comparison of *World Energy Outlook 2015* scenarios, that 30% of the fuels that substitute will be biofuels.[36] Though future production methods of biofuels remain in development, we assume that they will be half as GHG-intensive as petroleum-based fuels, on a life-cycle ("well to wheels") basis, and reflecting a higher penetration of second-generation and advanced biofuels in the future.[37]

Beside biofuels, the other fuels that substitute are natural gas (e.g. CNG in vehicles) and electricity (i.e. in electric vehicles). However, these fuels are not yet foreseen to offer, in aggregate across the globe through 2040, substantial GHG emission benefits for transportation uses relative to oil. This is because natural gas (methane) leakage during fueling erodes what would otherwise be a $CO_2$ benefit of gas (Alvarez et al. 2012). Electric vehicles, though they can bring substantial $CO_2$ benefits in regions adding low-carbon electricity, can increase net $CO_2$ emissions if the source of electricity is coal. On average, the IEA finds that, in its reference (New Policies) case, one effect does not clearly outweigh the other (IEA 2015), and so we assume, for simplicity, that *in aggregate,* there is no net $CO_2$ effect in substituting electric for petroleum-fueled vehicles.

Based on these assumptions about the GHG balance of biofuels, gas, and electricity, we estimate that the carbon-intensity of this alternative fuel mix is 85% of the carbon-intensity of oil-based fuels. Were the alternative fuels to be lower-carbon, such as renewable electricity or sustainable, second- or third-generation low-GHG biofuels, then the GHG benefits of reducing oil supply and, in turn, consumption, could be much greater, a possibility we explore further in the sensitivity analysis in Appendix B.

Applying the ratios in Table 3 to the gross oil production cuts from Table 2: (1.6 QBtu) yields estimates of the net increase or decrease in oil and its substitutes (Table ). Further applying standard carbon contents of oil (IPCC 2006) yields estimates of net changes in $CO_2$ emissions.

As shown in Table , cutting oil production from federal lands reduces global $CO_2$ emissions in 2030 from oil consumption by 54 Mt $CO_2$, and leads to an increase in $CO_2$ emissions from other fuels of 23 Mt $CO_2$, for a net emissions benefit of 31 Mt $CO_2$. (Again, Appendix B provides sensitivity analysis.)

**Table 6: Change in net consumption of fuels in response to lower oil production, 2030**

|  | Oil | Substitutes (biofuels, gas, and electricity) |
|---|---|---|
| **Energy content (QBtu)** |  |  |
| Global market | (0.73) | 0.36 |
| **Carbon content (Mt CO₂)** |  |  |
| Global market | (54) | 23 |

---

years). For our analysis, we assume the same dynamic would apply for decreases (rather than increase) in oil consumption.
[36] We derive this by comparing changes in (non-bunker-fuel) global transport energy demand for 2030 in the New Policies Scenario versus the Current Policies Scenario in the *World Energy Outlook 2015* (IEA 2015)
[37] The most widely used biofuel in the U.S., ethanol from corn, offers only modest (if any) GHG emission reductions relative to petroleum fuels, but sugarcane and other cellulosic ethanol and advanced biofuels still under development could cut the $CO_2$-intensity of fuels substantially (U.S. EPA 2010).

BLM_0002247

Figure 6 shows the individual effects that result in this estimated reduction. Leasing restrictions lead to a drop in oil extracted from federal lands and waters in 2030 equivalent to 120 Mt $CO_2$, 85% of which is from offshore oil leases not renewed or issued. Increased production in other global supplies makes up for more than half the lost federal oil production. Increased oil prices also lead to some substitution by other fuels: electricity, CNG and biofuels. The net reduction in $CO_2$ emissions, after accounting for all of these effects is 31 Mt $CO_2$ in 2030, as noted above.

**Figure 6: Impacts of decreased oil production on oil and substitute fuel markets, 2030, under the reference (Clean Power Plan) case, $CO_2$ basis**



### 5.3 Summary and discussion

Table 7 summarizes the net $CO_2$ emissions impacts of the cuts in coal and oil production. In total, we find that, by ceasing to issue new and renewed leases for fossil fuel extraction from federal lands and waters, the DOI could reduce net $CO_2$ emissions by about 100 Mt per year by 2030. Annual emission reductions could well increase over time, as federal fossil fuel production becomes even more dependent after 2030 on yet-to-be issued leases. Furthermore, over time, consumers are likely to be more sensitive to increased fossil fuel prices (Bohi 2013).

BLM_0002248

**Table 7: Change in net consumption of fuels, 2030, in Mt $CO_2$**

|  | Clean Power Plan Case | | | No Clean Power Plan Case | | |
|---|---|---|---|---|---|---|
|  | Impact on same fuel | Impact on substitute fuel(s) | Net | Impact on same fuel | Impact on substitute fuel(s) | Net |
| **Coal** |  |  |  |  |  |  |
| Domestic market | (99) | 35 | (64) | (318) | 88 | (230) |
| Export market | (8) | 1 | (7) | (10) | 1 | (8) |
| Subtotal | (107) | 36 | (71) | (328) | 90 | (238) |
| **Oil** |  |  |  |  |  |  |
| Global market | (54) | 23 | (31) | (54) | 23 | (31) |
| **Total** | (160) | 58 | **-100** | (380) | 110 | **-270** |

*Note: Figures may not add to totals due to rounding.*

Our findings on the $CO_2$ emission savings that could result from leasing restrictions (100 Mt $CO_2$ per year in 2030 with the Clean Power Plan) are comparable to the savings from prominent policy initiatives of the Obama administration. As shown in Figure 7, the EPA's most recent proposed standards for light- and medium-/heavy-duty vehicles are expected to yield 200 Mt and 70 Mt in $CO_2$ savings, respectively, in 2030. The reduction from leasing restrictions is considerably greater than either the emission reductions that the EPA expects to achieve through regulation of the oil and gas industry's own (sector-wide) emissions, or what the BLM expects to achieve from methane restrictions on oil and gas operations on federal land.[38] Only the Clean Power Plan is expected to yield significantly greater emission benefits than potential federal leasing restrictions. In other words, cessation of new and renewed leases could make an important contribution to U.S. climate change mitigation efforts.

---

[38] In addition to the magnitude of greenhouse gas emissions reductions, planners may also consider cost-effectiveness as a criterion. From that perspective, one might prefer to phase out high-cost fossil resources first, which may or may not be federal resources. (For example, deepwater oil is often considered a high-cost oil resource; Powder River Basin coal, however, is generally considered lower-cost coal.)

BLM_0002249

**Figure 7: Comparison of the potential global GHG emissions impact of federal leasing reform and other U.S. government policies, 2030**



*Source: SEI analysis. Estimate of emission reductions other policies adapted from BLM (2016a) and U.S. EPA (2012; 2015a; 2015b).*

Several uncertainties underlie our analysis. We address an important one – the potential reversal of the Clean Power Plan – by conducting our analysis both with and without this policy in place. We find, in this case, that not issuing new leases for coal production could be an important complement to the Clean Power Plan, since ending leasing could phase down federal coal production and, should the Clean Power Plan not be implemented, reduce emissions by 270 Mt $CO_2$ in 2030. This amounts to nearly half of the 610 Mt in $CO_2$ savings that the EPA estimates the Clean Power Plan would achieve in that year.

Our findings are also particularly sensitive to the response of producers and consumers to changes in energy prices that would result from reductions in fossil fuel supply. For example, should coal producers on federal (or non-federal) lands respond to lease restrictions by more rapidly drawing down their reserves, perhaps in anticipation of broader and more ambitious efforts to address U.S. $CO_2$ emissions,[39] the impact in 2030 could be less than we estimate, though in later years, emission reductions could be greater.[40] On the other hand, should cessation of federal leasing send a market signal that leads to further tightening of finance for the coal industry, already in trouble, then coal production could decline even more rapidly. Similarly, should coal power plants be less able to substitute other sources of coal for the Powder River Basin and other federal resources, as at least one analysis has suggested (Haggerty et al. 2015), then the $CO_2$ emission reductions would be greater, as even more power systems would switch to lower-emissions resources such as gas or renewables.

Similar uncertainties affect our estimate of oil market impacts. This estimate is dependent on the responsiveness of other oil suppliers to lower U.S. federal supplies in global markets. Our analysis uses a relatively steeply sloping supply curve (from Rystad Energy) in 2030, with relatively high-cost producers on the margin, such as less-profitable tight oil and offshore-

---

[39] This would be a manifestation of what some have termed the "green paradox" (Sinn 2012).

[40] Vulcan/ICF's (2016) analysis would seem to indicate that this could occur, as producers of federal coal respond to lease restrictions by essentially maintaining (or slightly increase) production over the next decade, only to stop entirely by 2040.

BLM_0002250

producers. If oil production were to experience another surge of unexpected technological advancement, then the supply curve could "flatten" and reduce the impacts of lower federal oil production. Or if future oil production were constrained by unexpected resource declines (such as faster than expected decline rates from tight oil fields), slower technological progress, or other countries taking similar measures to slow future oil production, then the net $CO_2$ emissions impact could be even greater.

To understand the potential impact of these uncertainties, as described in detail in Appendix B, we conduct sensitivity analysis around several of the most important parameters in our analysis: the sensitivity of producers and consumers to shifts in supply and price. At one end of the spectrum, were fossil fuel markets and energy technologies to proceed unencumbered by climate policy, the world might see continued abundance of lower-cost fossil fuel supplies and slower development of low-carbon alternatives (such as renewable power or low-carbon vehicles). In a higher-carbon world, restrictions on federal fossil fuel supply could have less of an impact than we estimate here – as little as 4 Mt $CO_2$ in 2030 under our reference scenario. Restricting supply would have little impact on energy prices (due to higher supply elasticities), and fuel consumers would have fewer cost-competitive alternatives (as reflected in lower demand elasticities).

By contrast, in a lower-carbon world, where other countries take similar steps to limit fossil fuel supply and renewable power and alternative vehicles are even more available, the impacts of federal leasing policy could be greater. Fewer coal and oil producers would be able to step in to make up for the lower supply from U.S. federal lands (lower supply elasticities), and consumers would more readily respond to the price impacts by shifting to lower-carbon alternatives (higher demand elasticities). In such a case, the impact of U.S. leasing restrictions under the reference (Clean Power Plan) case could be twice as high as estimated – 210 Mt $CO_2$. Appendix B describes the assumptions that lead to these low- and high-end results.

Our analysis has thus far focused on overall $CO_2$ emissions impacts, without specifying the jurisdictions where these impacts would occur. The territorial emissions accounting system currently used under the UN climate regime only accounts for emission reductions that occur within each country's own boundaries, creating a political disincentive to adopt climate policies that would yield a large share of their benefits abroad (Erickson and Lazarus 2013).

In this context, it is notable that in our reference case, 30% of the estimated emissions benefit in 2030 of avoiding new federal fossil fuel leases and renewals would occur outside the U.S. Moreover, the majority of the emissions benefit of reduced U.S. oil production in particular would occur in other countries, due to the global nature of oil markets. If reductions in emissions are evenly spread, proportionate to projected oil consumption in 2030, then of the 31 Mt of $CO_2$ reductions, 5 Mt $CO_2$ in savings would occur in the U.S., and 26 Mt $CO_2$ in other countries.

In contrast, because domestic coal markets and prices are relatively distinct, and because most U.S. coal remains in the country, we project that nearly 90% of the emissions benefit of reduced coal supplies would occur within U.S. borders. Still, while the impact we calculate for export markets for 2030 is relatively small (reduction of 7 Mt $CO_2$), the long-term effect may be more significant if these countries are making enduring decisions regarding power infrastructure, and so U.S. leasing restrictions may also help avoid lock-in of long-lived coal-using infrastructure.

It is important to note that while the incremental emissions impact of reduced leasing over the next two decades is non-trivial, the broader, long-term implications with respect to global climate objectives would be more profound. As shown in Section 4, new leases begin to account for a majority of federal fossil fuel production only after 2030, as production from existing

BLM_0002251

leased areas begins to play out. Thus, the incremental emissions impact will be far greater in the longer run.

In addition, a cessation of new federal leases would send a strong signal to other countries, encouraging them to take similar steps. Based only on the straightforward economic tools used here, we estimate that in such a case, with global fossil fuel supply more constrained and low-carbon renewables more available, the impact could be at least twice as high: 210 Mt $CO_2$ in 2030 alone.

Taken together, reduced government licensing and support for fossil fuel production could also help avoid further carbon lock-in in terms of investment in both fossil fuel-using and -producing infrastructure. Phasing out of federal oil supply could help accelerate the development of low-carbon transport options (such as electric vehicles powered by low-carbon electricity). Leases for offshore oil production, estimated to supply as much as three-quarters of U.S. federal oil (chiefly from the Gulf of Mexico), may be especially important as offshore oil production, with its high capital costs, is a key contributor to carbon lock-in, increasing the cost of meeting climate goals and making it harder to transition away from oil later (Erickson et al. 2015).

Finally, by ceasing new leases, the U.S. government would put fossil fuel production on a path to ending completely sometime in the second half of this century. That would be consistent with a long-term goal adopted in the Paris Agreement to achieve net zero greenhouse gas emissions from human activities later in the century, consistent with having a likely chance of keeping warming below 2°C (or 1.5°C).[41]

---

[41] The agreement says "achieve a balance between anthropogenic emissions by sources and removals by sinks of greenhouse gases in the second half of this century, on the basis of equity, and in the context of sustainable development and efforts to eradicate poverty", which translates to net zero emissions.

BLM_0002252

## 6. CONCLUSIONS

Our analysis suggests that future leasing practices in federal lands and waters will play an important role in U.S. efforts to achieve its climate protection goals. Under a business-as-usual scenario, where federal leasing continues unabated, U.S. fossil fuel extraction will continue to rise through 2040, with 40% of coal and a quarter of overall fossil fuel production occurring in federal lands and waters. Should the Clean Power Plan survive legal and legislative challenges, overall coal production is likely to drop. Gas and oil production, however, (assuming a rebound in global oil prices) will likely continue upward, at least in the short term. By 2040, the U.S. could be producing 11% more fossil fuel energy and 7% more fossil fuel carbon than it does today.

At the Paris Climate Change Conference, the U.S. and other governments reaffirmed their commitment to keep warming within 2°C, further noting an intention to pursue a limit of 1.5°C. These goals would appear to call for a far different path for future U.S. fossil fuel production. As we illustrate in Section 3, **a cost-efficient pathway to meeting the 2°C commitment could require total U.S. fossil fuel energy production to decline by 40–60% from current levels by 2040**, and even more so for a 1.5°C goal. The percentage decline would be steeper for coal, and less so for gas, though production of all three fossil fuels would need to drop substantially over this period.

The U.S. has been a world leader in fossil fuel *consumption*, and the country has used this position to play a pivotal role in climate policies that seek to reduce fossil fuel *demand*. The U.S. is also a world leader in fossil fuel *production*, and could play a similar role for fossil fuel *supply*. By taking actions to curb investment in future fossil fuel supply infrastructure, federal policy-makers could limit carbon lock-in, limit the potential for asset stranding, and complement the policies needed to reduce fossil fuel use, such as the Clean Power Plan. In particular, modifying federal policies for leasing lands and waters for fossil fuel extraction – for example, by increasing royalties or removing lands or waters from future availability – could be an important element of a more comprehensive U.S. strategy aimed at fulfilling its long-term climate commitments.

In this paper, we have examined the potential energy and emissions implication of a decision to cease all new leases and non-producing lease renewals for fossil fuel production on federal lands and waters. Our main findings are that such an action could:

- **Send national coal production on a declining pathway**, potentially to levels more consistent with a 2°C pathway for U.S. coal extraction. Such an action could leave 4 billion short tons of federal coal in the ground that otherwise would be combusted between now and 2040, equivalent to about 7 Gt of $CO_2$ emissions.
- **Take longer to play out for oil and gas extraction**, as many oil and gas projects, especially offshore, have substantially longer lead times from lease approval to full production. Stopping leases for these fuels could leave an estimated 7 billion barrels of federal oil (3 Gt $CO_2$) and 30 trillion cubic feet of federal gas (2 Gt $CO_2$) undeveloped between now and 2040.
- **Yield a net $CO_2$ emissions reduction in 2030 of 100 Mt $CO_2$** (relative to reference case levels), substantially more than other U.S. policies under consideration focused on fossil fuel extraction and on par with flagship policies of President Obama's Climate Action Plan, such as fuel standards for cars and trucks. Roughly 70 Mt $CO_2$ of the impact in 2030 would be from reduced coal emissions (especially in the U.S.). We find that the effect of ceasing new coal leases could range from virtually none (were gas generation to increase even more strongly) to 140 Mt $CO_2$ (were other coal supplies to be more limited and renewables able to fully substitute for reduced coal). The

BLM_0002253

remaining decrease of 30 Mt $CO_2$ results from reduced global oil consumption resulting from an end to new leases and renewals (for non-producing areas) for oil production (largely off-shore), an effect that could similarly range from 4 Mt $CO_2$ to 64 Mt $CO_2$, depending on other policies put in place internationally. These emissions impacts would likely increase over time, as new, not-yet-issued federal leases comprise an even greater fraction of national fuel production after 2030.

Many nations are pursuing actions that reduce the demand for fossil fuels, including commitments ("intended nationally determined contributions") registered in the Paris Agreement and the policies that support them. Few nations, however, are pursuing actions to limit fossil fuel supply. Given the goal of limiting warming to 2°C (or 1.5°C) and the corresponding need to transition rapidly away from fossil fuels, many more policy measures need to be on the table than are currently considered. Our analysis here indicates that measures directed at fossil fuel supply – such as a phase-out of leasing federal lands and waters for fossil fuel extraction – could be an important complement to other measures designed to reduce fossil fuel consumption.

BLM_0002254

## APPENDIX A: RESULTS FOR CASES WITHOUT THE CLEAN POWER PLAN

In the main body of this paper, we consider the EIA's Clean Power Plan scenario as the reference case for our analysis of U.S. fossil fuel production. In this appendix, we instead present findings for a reference case without the Clean Power Plan.

**Figure A-1: Historical and forecast U.S. fossil fuel production, 1990–2040, case without the Clean Power Plan**



*Source: SEI analysis based on ONRR (2015) and U.S. EIA (2015a; 2015b), assuming the Clean Power Plan is not implemented.*

**Figure A-2: Historical and forecast U.S. fossil fuel production, by status of federal lease, 1990–2040, case without the Clean Power Plan**



BLM_0002255

**Table A-1: U.S. federal fossil fuel production in reference case (no Clean Power Plan case) and quantities avoided by cessation of new lease sales and non-renewals of non-producing leases, 1990–2040, in QBtu**

| Federal fossil fuel production | 2015 | 2020 | 2025 | 2030 | 2035 | 2040 |
|---|---|---|---|---|---|---|
| **Coal** | **7.3** | **7.9** | **8.4** | **8.3** | **8.0** | **7.9** |
| Avoided from non-renewals | – | – | – | – | – | – |
| Avoided from cessation of lease sales | – | (1.9) | (3.8) | (4.9) | (5.5) | (5.9) |
| Total avoided production | | (1.9) | (3.8) | (4.9) | (5.5) | (5.9) |
| % of reference case production | | (25%) | (45%) | (59%) | (69%) | (75%) |
| **Gas** | **4.6** | **5.5** | **5.8** | **6.7** | **6.7** | **7.1** |
| Avoided from non-renewals | – | (0.0) | (0.3) | (1.0) | (1.1) | (0.8) |
| Avoided from cessation of lease sales | – | (0.0) | (0.1) | (0.3) | (1.6) | (3.4) |
| Total avoided production | | (0.0) | (0.4) | (1.3) | (2.7) | (4.1) |
| % of reference case production | | (0%) | (6%) | (19%) | (40%) | (58%) |
| **Oil** | **4.8** | **6.1** | **5.8** | **6.3** | **6.1** | **6.6** |
| Avoided from non-renewals | – | (0.0) | (0.6) | (1.4) | (1.9) | (1.4) |
| Avoided from cessation of lease sales | – | (0.0) | (0.1) | (0.3) | (1.2) | (2.9) |
| Total avoided production | | (0.0) | (0.7) | (1.6) | (3.1) | (4.3) |
| % of reference case production | | (1%) | (12%) | (26%) | (51%) | (65%) |
| **Total** | **16.7** | **19.6** | **20.0** | **21.3** | **20.9** | **21.6** |
| Avoided from non-renewals | – | (0.0) | (0.8) | (2.4) | (3.0) | (2.2) |
| Avoided from cessation of lease sales | – | (2.0) | (3.9) | (5.4) | (8.3) | (12.1) |
| Total avoided production | | (2.0) | (4.8) | (7.8) | (11.3) | (14.3) |
| % of reference case production | | (10%) | (24%) | (37%) | (54%) | (66%) |

34

BLM_0002256

**Figure A-3: Impacts of decreased coal production on coal and gas markets under the case without the Clean Power Plan, CO₂ basis, 2030**



BLM_0002257

## APPENDIX B: ADDITIONAL SENSITIVITY ANALYSES

The analysis of market impacts and net $CO_2$ emissions impacts in Section 5 focuses on results of a central case, considered either with or without the Clean Power plan in place. That central case foresees coal and oil markets responding in ways consistent with current assessments by Rystad Energy, Wood Mackenzie, the International Energy Agency, and the U.S. Energy Information Administration. However, energy markets could also evolve in other directions, whether due to new policy developments (e.g. more or less-stringent climate policy) or other economic or technical developments (e.g. more or less-constrained fossil fuel resources.)

In this appendix, we look at how the net $CO_2$ impact might change were markets to evolve in different directions. We look especially at the prospective impact of U.S. federal fossil fuel leasing policy under cases where world leaders pursue either a lower-carbon or a higher-carbon world than the current pathway.

In the lower-carbon world, other countries also take similar measures to limit or otherwise move away from fossil fuel extraction, and to increase even further the availability of low-carbon power and other fossil-fuel demanding technologies. In this low-carbon world, coal and oil supply curves are steeper (lower elasticity of supplies), because fewer projects are brought online, not just in the U.S. but also in other major fossil-fuel producing countries poised for expansion (e.g. oil in Brazil, Russia, Canada, Nigeria, Norway). Demand curves are flatter (elasticities of demand are more strongly negative, and elasticities of substitution are higher) because consumers of oil, such as vehicle owners, can more readily purchase electric or other low-carbon-fueled vehicles, and power providers can more readily build and integrate renewable electricity.

By contrast, in the higher-carbon world, just the opposite conditions are present. Fossil fuel production from other U.S. and international resources can expand readily, and so the decline in federal coal (largely Powder River Basin) and federal oil could be made up by other producers with little impact on fuel prices. On the demand side, a high-carbon world would see consumers who are less sensitive to price, as higher-carbon power systems and lifestyles are "locked in", with low-carbon alternatives that are less available and more costly.

Below we explore the implications of these other energy market conditions for each of the energy markets analyzed in this report: the global oil market; the domestic coal market; and the export coal market.

### Sensitivity analyses for global oil market

Table B-1, below, displays sensitivity analysis for oil markets. These cases explore variation in the elasticity of supply from 0.1 to 1 and elasticity of demand from -0.072 to -0.3, both as in a recent literature review and analysis (Bordoff and Houser 2015). The cases also explore variation in the emissions intensity of the fuels that would substitute for oil, based on a higher-carbon fuel mix that is no better than petroleum-based fuels (whether that is petroleum, first generation biofuels, or fossil-powered EVs) and a lower-carbon fuel mix as seen in the IEA's 450 scenario.[42]

---

[42] Specifically, we define the lower-carbon fuel mix here based on the transport fuels that substitute for oil in the IEA's 450 scenario: 60% biofuels, 30% gas, and 10% EVs. At a GHG savings of 50%, 0%, and 100%, respectively, this leads to a fuel mix that is 40% better than petroleum fuels.

BLM_0002258

**Table B-1: Sensitivity in oil market analysis, 2030**

| | Drop in oil production (Qbtu) | Carbon content of crude, MtCO2/Qbtu | Elasticity of: Supply (Es) | Demand (Ed) | Change in net consumption of oil and substitute fuels per unit decrease in gross production of oil — Oil: Ed/(Ed-Es) | Substitutes: (Half of drop in oil) | Emissions intensity of substitute fuel, expresses as ratio of oil-based fuel — Higher-carbon: First gen biofuels, fossil-powered Evs | Base case: 30% second gen biofuels, two-thirds gas and EVs | Lower-carbon: 60% second-gen biofuels, 30% gas, 10% renewable-powered Evs | Net CO2 emissions impacts — Higher-carbon fuel mix $a*b*(c+d*e)$ | Base case fuel mix $a*b*(c+d*f)$ | Lower-carbon fuel mix $a*b*(c+d*g)$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | (a) | (b) | | | (c) | (d) | (e) | (f) | (g) | | | |
| Lower-carbon world | 1.6 | 74.5 | 0.1 | (0.3) | (0.75) | 0.38 | 1.00 | 0.85 | 0.60 | (46) | (52) | (64) |
| | 1.6 | 74.5 | 0.1 | (0.2) | (0.67) | 0.33 | 1.00 | 0.85 | 0.60 | (41) | (47) | (57) |
| | 1.6 | 74.5 | 0.1 | (0.072) | (0.42) | 0.21 | 1.00 | 0.85 | 0.60 | (25) | (29) | (36) |
| | 1.6 | 74.5 | 0.25 | (0.3) | (0.55) | 0.27 | 1.00 | 0.85 | 0.60 | (33) | (38) | (46) |
| Base case | 1.6 | 74.5 | 0.25 | (0.2) | (0.44) | 0.22 | 1.00 | 0.85 | 0.60 | (27) | (31) | (38) |
| | 1.6 | 74.5 | 0.25 | (0.072) | (0.22) | 0.11 | 1.00 | 0.85 | 0.60 | (14) | (16) | (19) |
| | 1.6 | 74.5 | 1 | (0.3) | (0.23) | 0.12 | 1.00 | 0.85 | 0.60 | (14) | (16) | (20) |
| | 1.6 | 74.5 | 1 | (0.2) | (0.17) | 0.08 | 1.00 | 0.85 | 0.60 | (10) | (12) | (14) |
| Higher-carbon world | 1.6 | 74.5 | 1 | (0.072) | (0.07) | 0.03 | 1.00 | 0.85 | 0.60 | (4) | (5) | (6) |

Our base-case estimate of the global emissions impact of restricted federal leasing for oil is 31 Mt CO₂, as described in the main text and shown in Table B-1. The sensitivity analysis indicates that, in a higher-carbon world with relatively unconstrained oil supplies and little demand response, the impact could be as little as 4 Mt CO₂. By contrast, in a low-carbon world where other countries take similar steps to limit oil supply and consumers are more price-sensitive with regard to fuel price, the emissions impact could be twice as high, 64 Mt CO₂.

**Sensitivity analyses for the domestic coal market**

Table B-2 displays sensitivity analysis for domestic coal markets under the case of the Clean Power Plan. For transparency and to better enable comparison to other studies, we conduct our sensitivity analysis here using a simple, elasticity-based approach, using the same equation (equation 1) used for the global oil market and the coal export market. (By contrast, our base case results for the domestic coal market were derived from a run of the IPM model of the U.S. power market.)

To first demonstrate the application of the elasticity-based model to the domestic coal market, we construct a "parameterized base case", using only elasticities, that mimics the results derived from the IPM model. For this case, we use the mid-range long-term elasticity of demand from a recent analysis of long-term markets for PRB coal (Fulton et al. 2015) of -1.5. We derive an elasticity of supply from the same coal supply curve, itself constructed by Wood Mackenzie, that the EPA uses in its version of the IPM model (U.S. EPA 2013), and assuming reference levels of domestic coal consumption. This value is 2.5. Lastly, we assume that gas substitutes fully for any lost coal-based electricity, as Vulcan's IPM-based study (Vulcan/ICF 2016), and that gas power plants operate at an efficiency 1.5 times that of coal-based power (IEA 2014). Using this parameterized model, we calculate net CO₂ impact of 65 Mt CO₂, essentially equal to the full model results (64 Mt CO₂) presented in Section 5 of the main report and repeated in Table B-2.

With this parameterized model faithfully matching the base case, we use it to examine a sensitivity case for a lower-carbon world. We characterize coal demand in a lower-carbon world based on the higher end of the demand-response, elasticity -2, estimated by the same recent analysis of long-term markets for PRB coal used for the parameterized base case (Fulton et al. 2015), and where lower-carbon fuels are much more available and where coal supply is more

BLM_0002259

constrained. Further, in a lower carbon world, the substitute fuels would be low-carbon renewables, not gas, and so we assume that no gas substitutes.[43] In the lower-carbon world, coal supplies would be even more constrained than under the Clean Power Plan (and not just from federal sources), and so we use a lower elasticity of supply of 2.

For the higher-carbon world, we take two approaches. One, as above, is to use an elasticity-based approach. Here, we use a much lower elasticity of demand, -0.13, derived from EIA's own assessment (U.S. EIA 2012). This value reflects the dynamics of the domestic power market in the previous decade (2005–2010), prior to the growth in domestic low-cost natural gas.[44] We use an elasticity of supply of 5 to reflect a more abundant domestic coal market characterized by a flatter supply curve.

The other approach assumes that the Clean Power Plan is fully "binding", meaning that it is the rule's state-specific targets (and corresponding compliance pathways established by the states) that reduce power-sector CO₂ emissions in each trading region to levels below what they would be in the absence of the rule. In such a case, any increase in coal prices resulting from leasing restrictions would have no effect on CO₂ emissions, since any further decreases in coal consumption would be met by equal (in CO₂ terms) increases in gas consumption, as spurred by increases in allowance prices (under mass-based trading) or credit prices (under rate-based trading), and which would also partially displace renewables.

The Clean Power Plan may be most likely to be fully binding if states adopt a national, rather than regional, trading system, since a national system would equalize the costs of compliance and eliminate the possibility that any one state or trading region exceeded its target. The national system would also need not to exceed the targets. The likelihood of this outcome could increase were renewables costs to be higher than currently expected (or gas costs lower). Were renewables costs to be lower, including due to extension of the federal renewable tax credits, this outcome could be less likely.

**Table B-2: Sensitivity in coal market analysis, Clean Power Plan case, 2030**

| | | Carbon contents, Mt CO₂/Qbtu | | Elasticity of: | | | Relative market shares | Change in net consumption of coal and gas per unit decrease in gross production of coal | | Net CO₂ emissions impacts |
|---|---|---|---|---|---|---|---|---|---|---|
| | Drop in coal production (Qbtu) | Coal | Gas | Supply (Es) | Demand (Ed) | Substi-tution | Starting ratio of gas to coal | Coal | Gas | |
| | (a) | (b) | (c) | | | | | (d) | | (e) |
| | | | | | | | | | | a*(b*d+c*e) |
| Lower-carbon world | 2.87 | 95.5 | 53.0 | 2.0 | (2.0) | -- | -- | (0.50) | - | (140) |
| Base case | 2.87 | 95.5 | 53.0 | -- | -- | -- | -- | (0.36) | 0.23 | (64) |
| Parameterized "base case" | 2.87 | 95.5 | 53.0 | 2.50 | (1.5) | | | (0.38) | 0.25 | (65) |
| Higher-carbon world | 2.87 | 95.5 | 53.0 | 5 | (0.13) | 0.20 | 1.5 | (0.03) | 0.02 | (4) |
| Higher-carbon world (w/ CPP binding) | 2.87 | 95.5 | 53.0 | -- | -- | -- | -- | 0 | 0 | 0 |

---

[43] This is equivalent to assuming an elasticity of substitution equivalent to the opposite of the elasticity of demand, or 2, which is, like the elasticity of demand, at the upper end of that found by empirical studies (Stern 2012).

[44] EIA reports an average U.S.-wide elasticity of demand for coal of -0.11. Further, they report an average elasticity of substitution between gas and coal of 0.17. They report an "adjustment parameter" of 0.82 that they state can be used to construct long-term elasticities. We therefore use an adjusted elasticity of demand of -0.11/0.82= -0.13 and an adjusted elasticity of substitution of 0.20. We use the elasticity of substitution to estimate the response of

BLM_0002260

Together, these sensitivity cases display how the impact of restricting federal coal leasing could have much greater or much less impact than we estimate. For example, in a lower-carbon world where coal supply is more constrained and power systems are more sensitive to changes in coal prices (in part because renewable power is more readily available), the impact of restricting leasing could be more than twice as great: an estimated 140 Mt $CO_2$. By contrast, were other supplies of coal to be much less constrained, such as if non-federal coal in the Montana portion of the Powder River Basin (or Illinois Basin or Appalachian coal) were able to readily substitute for the lost federal coal, and if power systems are not very sensitive to coal price (as in the past decade), than the impact of restricted leasing could be very little – only 4 Mt $CO_2$. The impact could even be zero, were the Clean Power Plan to be fully binding.

**Sensitivity analyses for export coal market**

We estimate the emissions impact of restricting federal coal leasing on coal export markets is less, approximately 7 Mt $CO_2$, at least given export quantities as foreseen by EIA. As a result, we do not conduct a detailed quantitative sensitivity analysis here. Instead, we observe simply that in a high-carbon world, plentiful alternative coal supplies from either non-federal suppliers in the Powder River Basin (as above) or other coal exporters or own-markets (e.g. Australia, Indonesia, and China) would be available, and could relatively easily substitute for the lost federal PRB coal. Furthermore, with the constrained gas markets in rapidly expanding power markets in Southeast Asia, switching to alternate fuels may also be constrained, such that the impact of declining exports of federal coal could be less. By contrast, in a low-carbon world, other supplies would be constrained, and renewables more available, and the impact could be greater than 7 Mt $CO_2$.

BLM_0002261

# REFERENCES

Aldina, J. (2013). Canada's role as a global coal supplier. Coal Association of Canada 2013 Conference, Vancouver. http://www.woodmacresearch.com.

Allaire, M. and Brown, S. P. A. (2012). *U.S. Energy Subsidies: Effects on Energy Markets and Carbon Dioxide Emissions.* Prepared for the Pew Charitable Trusts. Resources for the Future, Washington, DC. http://www.pewtrusts.org/en/research-and-analysis/reports/2012/08/13/us-energy-subsidies-effects-on-energy-markets-and-carbon-dioxide-emissions.

Alvarez, R. A., Pacala, S. W., Winebrake, J. J., Chameides, W. L. and Hamburg, S. P. (2012). Greater focus needed on methane leakage from natural gas infrastructure. *Proceedings of the National Academy of Sciences*, 109(17). 6435–40. DOI:10.1073/pnas.1202407109.

Baer, P., Athanasiou, T. and Kartha, S. (2013). *The Three Salient Global Mitigation Pathways Assessed in Light of the IPCC Carbon Budgets.* SEI discussion brief. Stockholm Environment Institute, Somerville, MA, US. http://www.sei-international.org/publications?pid=2424.

BLM (2016a). *Regulatory Impact Analysis for: Revisions to 43 CFR 3100 (Onshore Oil and Gas Leasing) and 43 CFR 3600 (Onshore Oil and Gas Operations), Additions of 43 CFR 3178 (Royalty-Free Use of Lease Production) and 43 CFR 3179 (Waste Prevention and Resource Conservation).* U.S. Department of the Interior, Bureau of Land Management, Washington, DC. http://www.blm.gov/style/medialib/blm/wo/Communications_Directorate/public_affairs/news_release_attachments.Par.11216.File.dat/VF%20Regulatory%20Impact%20Analysis.pdf.

BLM (2016b). *Notice of Intent to Prepare a Programmatic Environmental Impact Statement to Review the Federal Coal Program and to Conduct Public Scoping Meetings.* 81 FR 17720, Document No. 2016-07136. U.S. Department of the Interior, Bureau of Land Management, Washington, DC. https://federalregister.gov/a/2016-07138.

Bohi, D. R. (2013). *Analyzing Demand Behavior: A Study of Energy Elasticities.* Routledge, New York.

Bordoff, J. and Houser, T. (2015). *Navigating the U.S. Oil Export Debate.* Columbia University, Center on Global Energy Policy and Rhodium Group, New York. http://energypolicy.columbia.edu/.

BP (2015). *BP Statistical Review of World Energy June 2015.* London. http://bp.com/statisticalreview.

Considine, T. J. (2015). *A Significant Threat to Coal Exports from the Powder River Basin: The Proposed Default Provision for Federal Coal Royalties.* Conducted for Cloud Peak Energy, Laramie, Wyoming.

Davis, S. J. and Shearer, C. (2014). Climate change: A crack in the natural-gas bridge. *Nature*, 514(7523). 436–37. DOI:10.1038/nature13927.

Erickson, P. and Lazarus, M. (2013). *Accounting for Greenhouse Gas Emissions Associated with the Supply of Fossil Fuels.* SEI discussion brief. Stockholm Environment Institute, Seattle, WA, US. http://www.sei-international.org/publications?pid=2419.

Erickson, P. and Lazarus, M. (2014). Impact of the Keystone XL pipeline on global oil markets and greenhouse gas emissions. *Nature Climate Change*, 4(9). 778–81. DOI:10.1038/nclimate2335.

Erickson, P., Lazarus, M. and Tempest, K. (2015). *Carbon Lock-in from Fossil Fuel Supply Infrastructure.* SEI discussion brief. Stockholm Environment Institute, Seattle, WA, US. http://www.sei-international.org/publications?pid=2805.

Faehn, T., Hagem, C., Lindholt, L., Maeland, S. and Rosendahl, K. E. (2016). Climate policies in a fossil fuel producing country: Demand versus supply side policies. *The Energy Journal*, .

BLM_0002262

Fulton, M., Buckley, T., Koplow, D., Sussams, L. and Grant, A. (2015). *A Framework for Assessing Thermal Coal Production Subsidies*. Energy Transition Advisors, IEEFA, Earth Track, Carbon Tracker Initiative, London. http://www.carbontracker.org/wp-content/uploads/2015/09/Thermal-Coal-Prod-Subsidies-final-12-9.pdf.

Haggerty, M. (2014). *How States Return Revenue to Local Governments from Unconventional Oil Extraction*. Headwaters Economics, Bozeman, MT.

Haggerty, M., Lawson, M. and Pearcy, J. (2015). *Steam Coal at an Arm's Length: An Evaluation of Proposed Reform Options for US Coal Used in Power Generation*. ID 2627865. Social Science Research Network, Rochester, NY. http://papers.ssrn.com/abstract=2627865.

Hamilton, J. D. (2009). Understanding Crude Oil Prices. *The Energy Journal*, 30(2). 179–206. DOI:10.5547/ISSN0195-6574-EJ-Vol30-No2-9.

Headwaters Economics (2015). *Federal Coal Lease Database*. Bozeman, MT. http://headwaterseconomics.org/energy/coal/outcomes-higher-coal-naturalgas-royalties.

Huffman, J., Lieu, T., Honda, M., Lee, B., Johnson, H. C., et al. (2016). *Keep It in the Ground Act of 2016*. HR 4535.

IEA (2014). *World Energy Outlook 2014*. Organisation for Economic Co-operation and Development, Paris. http://www.oecd-ilibrary.org/content/book/weo-2014-en.

IEA (2015). *World Energy Outlook 2015*. Organisation for Economic Co-operation and Development, Paris. http://www.oecd-ilibrary.org/content/book/weo-2015-en.

IEc (2012). *Consumer Surplus and Energy Substitutes for OCS Oil and Gas Production: The Revised Market Simulation Model (MarketSim)*. OCS Study BOEM 2012-024. Industrial Economics Inc. for U.S. Department of the Interior, Bureau of Ocean Energy Management. http://www.boem.gov/uploadedFiles/BOEM/Oil_and_Gas_Energy_Program/Leasing/Five_Year_Program/2012-2017_Five_Year_Program/FinalMarketSim%20Model%20Documentation.pdf.

IPCC (2006). *2006 IPCC Guidelines for National Greenhouse Gas Inventories*. H. Eggleston, L. Buendia, K. Miwa, T. Ngara, and K. Tanabe (eds.). Report by the Task Force on National Greenhouse Gas Inventories of the Intergovernmental Panel on Climate Change. http://www.ipcc-nggip.iges.or.jp/public/2006gl/index.html.

IPCC (2014). Summary for Policymakers. In *Climate Change 2014: Mitigation of Climate Change. Contribution of Working Group III to the Fifth Assessment Report of the Intergovernmental Panel on Climate Change*. O. Edenhofer, R. Pichs-Madruga, Y. Sokona, E. Farahani, S. Kadner, et al. (eds.). Cambridge University Press, Cambridge, UK, and New York. https://www.ipcc.ch/report/ar5/wg3/.

Jewell, S. (2015). *Remarks at the Center for Strategic and International Studies*. Washington, DC. https://www.doi.gov/news/pressreleases/secretary-jewell-offers-vision-for-balanced-prosperous-energy-future.

Jiao, J.-L., Fan, Y. and Wei, Y.-M. (2009). The structural break and elasticity of coal demand in China: empirical findings from 1980-2006. *International Journal of Global Energy Issues*, 31(3). 331–44. DOI:10.1504/IJGEI.2009.027645.

Joskow, P. L. (1987). Contract Duration and Relationship-Specific Investments: Empirical Evidence from Coal Markets. *The American Economic Review*, 77(1). 168–85. http://www.jstor.org/stable/1806736.

Krupnick, A., Darmstadter, J., Richardson, N. and McLaughlin, K. (2015). *Putting a Carbon Charge on Federal Coal: Legal and Economic Issues*. Discussion Paper 15-13. Resources for the Future, Washington, DC. http://www.rff.org/research/publications/putting-carbon-charge-federal-coal-legal-and-economic-issues.

BLM_0002263

Lazarus, M., Erickson, P. and Tempest, K. (2015). *Supply-Side Climate Policy: The Road Less Taken*. 2015–13. Stockholm Environment Institute. http://www.sei-international.org/publications?pid=2835.

Lazarus, M. and Tempest, K. (2014). *Fossil Fuel Supply, Green Growth, and Unburnable Carbon*. SEI Discussion Brief. Stockholm Environment Institute, Seattle, WA, US. http://www.sei-international.org/publications?pid=2454.

Lazarus, M., Tempest, K., Klevnas, P. and Korsbakken, J. I. (2015). *Natural Gas: Guardrails for a Potential Climate Bridge*. Stockholm Environment Institute, Stockholm, Sweden and Seattle, WA, US. http://static.newclimateeconomy.report/wp-content/uploads/2015/05/NCE-SEI-2015-Natural-gas-guardrails-climate-bridge.pdf.

Leaton, J., Capalino, R., Sussams, L., Grant, A., Fulton, M., Henderson, C. and Buckley, T. (2014). *Carbon Supply Cost Curves – Evaluating Financial Risk to Coal Capital Expenditures*. Technical paper. Carbon Tracker Initiative and Energy Transition Advisors, London. http://www.carbontracker.org/wp-content/uploads/2014/09/Carbon-Supply-Coal-ETA.pdf.

Luppens, J. A. and Scott, D. C. (2015). *Coal Geology and Assessment of Coal Resources and Reserves in the Powder River Basin, Wyoming and Montana*. Professional Paper, 1809. U.S. Geological Survey, Reston, VA. http://pubs.er.usgs.gov/publication/pp1809.

McGlade, C. and Ekins, P. (2015). The geographical distribution of fossil fuels unused when limiting global warming to 2°C. *Nature*, 517(7533). 187–90. DOI:10.1038/nature14016.

Merkley, J., Cardin, B., Sanders, B., Boxer, B., Gillibrand, K., Leahy, P. and Warren, E. (2015). *Keep It In The Ground Act of 2015*. S. 2238.

Metcalf, G. E. (2007). Federal tax policy towards energy. In *Tax policy and the economy*. J. M. Poterba (ed.). Vol. 21. MIT Press, Cambridge, MA.

Miller, L. A. and Bate, R. L. (2011). *Powder River Basin Coal Resource and Cost Study: Campbell, Converse and Sheridan Counties, Wyoming Big Horn, Powder River, Rosebud and Treasure Counties, Montana*. Report No. 3155.001. Prepared for Xcel Energy by John T. Boyd Co. https://www.xcelenergy.com/staticfiles/xe/Regulatory/Regulatory%20PDFs/PSCo-ERP-2011/8-Roberts-Exhibit-No-MWR-1.pdf.

Mulvaney, D., Gershenson, A. and Toscher, B. (2015). *The Potential Greenhouse Gas Emissions of U.S. Federal Fossil Fuels*. Prepared by Ecoshift Consulting, for Center for Biological Diversity and Friends of the Earth. http://www.ecoshiftconsulting.com/wp-content/uploads/Potential-Greenhouse-Gas-Emissions-U-S-Federal-Fossil-Fuels.pdf.

Obama, B. (2016). *Remarks of President Barack Obama – State of the Union Address As Delivered*. The White House, Washington, DC. https://www.whitehouse.gov/sotu.

OEA (2015). *Tongue River Railroad Draft Environmental Impact Statement*. Surface Transportation Board Office of Environmental Analysis, Washington, D.C. http://www.tonguerivereis.com/draft_eis.html.

ONRR (2015). *Statistical Information*. Office of Natural Resources Revenue. http://statistics.onrr.gov/.

Perloff, J. M. (2007). *Microeconomics*. 4th ed. Pearson Higher Ed.

Pierce, B. S. and Dennen, K. O., eds. (2009). *The National Coal Resource Assessment Overview*. U.S. Geological Survey Professional Paper. United States Geological Survey, Reston, Virginia. http://pubs.usgs.gov/pp/1625f/.

Power, T. M. and Power, D. S. (2013). *The Impact of Powder River Basin Coal Exports on Global Greenhouse Gas Emissions*. Prepared for The Energy Foundation, Missoula, MT.

BLM_0002264

http://www.powereconconsulting.com/WP/wp-content/uploads/2013/05/GHG-Impact-PRB-Coal-Export-Power-Consulting-May-2013_Final.pdf.

Rajagopal, D. and Plevin, R. J. (2013). Implications of market-mediated emissions and uncertainty for biofuel policies. *Energy Policy*, 56. 75–82. DOI:10.1016/j.enpol.2012.09.076.

Raupach, M. R., Davis, S. J., Peters, G. P., Andrew, R. M., Canadell, J. G., et al. (2014). Sharing a quota on cumulative carbon emissions. *Nature Climate Change*, 4(10). 873–79. DOI:10.1038/nclimate2384.

Roberts, D. (2015). Obama keeps thousands of acres of public land open to coal mining. *Vox*, 5 June. http://www.vox.com/2015/5/29/8687659/public-land-coal-leases.

Rogelj, J., Hare, W., Lowe, J., van Vuuren, D. P., Riahi, K., Matthews, B., Hanaoka, T., Jiang, K. and Meinshausen, M. (2011). Emission pathways consistent with a 2 degree C global temperature limit. *Nature Climate Change*, 1(8). 413–18. DOI:10.1038/nclimate1258.

Rogelj, J., Luderer, G., Pietzcker, R. C., Kriegler, E., Schaeffer, M., Krey, V. and Riahi, K. (2015). Energy system transformations for limiting end-of-century warming to below 1.5 °C. *Nature Climate Change*, 5(6). 519–27. DOI:10.1038/nclimate2572.

Rogelj, J., Schaeffer, M., Meinshausen, M., Knutti, R., Alcamo, J., Riahi, K. and Hare, W. (2015). Zero emission targets as long-term global goals for climate protection. *Environmental Research Letters*, 10(10). 105007. DOI:10.1088/1748-9326/10/10/105007.

Rystad Energy (2015). *UCube, Version 1.18*. Oslo, Norway. http://www.rystadenergy.com/Databases/UCube.

Sinn, H.-W. (2012). *The Green Paradox: A Supply-Side Approach to Global Warming*. The MIT Press, Cambridge, MA, US. https://mitpress.mit.edu/books/green-paradox.

Stern, D. I. (2012). Interfuel Substitution: A Meta-Analysis. *Journal of Economic Surveys*, 26(2). 307–31. DOI:10.1111/j.1467-6419.2010.00646.x.

Stratus Consulting (2014). *Greenhouse Gas Emissions from Fossil Energy Extracted from Federal Lands and Waters: An Update*. Prepared for the Wilderness Society, Washington, DC. https://wilderness.org/sites/default/files/FINAL%20STRATUS%20REPORT.pdf.

The Economist (2016). The oil conundrum. *The Economist*, 23 January. http://www.economist.com/news/briefing/21688919-plunging-prices-have-neither-halted-oil-production-nor-stimulated-surge-global-growth.

The White House (2014). *Draft Guidance to Federal Agencies on Considering GHG Effects Under NEPA*. Council and Environmental Quality. http://www.whitehouse.gov/sites/default/files/docs/nepa_revised_draft_ghg_guidance.pdf.

U.S. DOI (2016). *Secretary Jewell Launches Comprehensive Review of Federal Coal Program*. U.S. Department of the Interior, Washington, DC. https://www.doi.gov/pressreleases/secretary-jewell-launches-comprehensive-review-federal-coal-program.

U.S. EIA (2012). *Fuel Competition in Power Generation and Elasticities of Substitution*. U.S. Energy Information Administration, Washington D.C.

U.S. EIA (2013). *International Energy Outlook 2013*. U.S. Energy Information Administration, Washington, DC. http://www.eia.gov/forecasts/ieo/.

U.S. EIA (2015a). *Monthly Energy Review, January 2015*. U.S. Energy Information Administration, Washington, DC. http://www.eia.gov/totalenergy/data/monthly/.

U.S. EIA (2015b). *Analysis of the Impacts of the Clean Power Plan*. U.S. Energy Information Administration, Washington, DC. http://www.eia.gov/forecasts/aeo/.

BLM_0002265

U.S. EIA (2015c). *U.S. Energy-Related Carbon Dioxide Emissions, 2014*. U.S. Energy Information Administration, Washington, DC. https://www.eia.gov/environment/emissions/carbon/.

U.S. EIA (2016). *What Drives Crude Oil Prices? An Analysis of 7 Factors That Influence Oil Markets, with Chart Data Updated Monthly and Quarterly*. U.S. Energy Information Administration, Washington, DC.

U.S. EPA (2010). *Regulatory Impact Analysis: Renewable Fuel Standard Program*. EPA-420-R-10-006. U.S. Environmental Protection Agency, Washington, DC. https://www.epa.gov/renewable-fuel-standard-program/renewable-fuel-standard-rfs2-final-rule-additional-resources.

U.S. EPA (2012). *Final Rulemaking for 2017-2025 Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards*. EPA-420-R-12-016. Assessment and Standards Division, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, Washington, DC. https://www3.epa.gov/otaq/climate/regs-light-duty.htm.

U.S. EPA (2013). *Documentation for EPA Base Case v.5.13 Using the Integrated Planning Model*. Report No. 450R13002. U.S. Environmental Protection Agency, Washington, DC. http://www2.epa.gov/airmarkets/power-sector-modeling-platform-v513.

U.S. EPA (2015a). *Proposed Rulemaking for Greenhouse Gas Emission Standards and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles – Phase 2*. Draft Regulatory Impact Analysis; EPA-420-D-15-900. Assessment and Standards Division, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, and Office of International Policy, Fuel Economy, and Consumer Programs, National Highway Traffic Safety Administration, U.S. Department of Transportation, Washington, DC. https://www3.epa.gov/otaq/climate/documents/420d15900.pdf.

U.S. EPA (2015b). *Regulatory Impact Analysis of the Proposed Emission Standards for New and Modified Sources in the Oil and Natural Gas Sector*. EPA-452/R-15-002. Office of Air and Radiation, U.S. Environmental Protection Agency, Washington, DC. https://www3.epa.gov/airquality/oilandgas/pdfs/og_prop_ria_081815.pdf.

U.S. EPA (2015c). 40 CFR Part 60: Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units; Final Rule. *Federal Register*, 80(205). 64661–65120. http://www.gpo.gov/fdsys/pkg/FR-2015-10-23/pdf/2015-22842.pdf.

U.S. GAO (2013). *BLM Could Enhance Appraisal Process, More Explicitly Consider Coal Exports, and Provide More Public Information*. Report to Congressional Requesters; GAO-14-140. U.S. Government Accountability Office, Washington, DC.

USFS, BLM, CDNR and OSMRE (2015). *Rulemaking for Colorado Roadless Areas Supplemental Draft Environmental Impact Statement*. U.S. Forest Service (lead agency), Bureau of Land Management, Colorado Department of Natural Resources, Office of Surface Mining Reclamation and Enforcement, Denver, CO. http://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd485194.pdf.

Vulcan/ICF (2016). *Federal Coal Leasing Reform Options: Effects on CO2 Emissions and Energy Markets*. Final Report: Summary of Modeling Results. A Vulcan Philanthropy | Vulcan, Inc. report with analysis supported by ICF International, Fairfax, VA.

BLM_0002266

BLM_0002267

**SEI - Headquarters**
Stockholm
**Sweden**
Tel: +46 8 30 80 44
*Executive Director: Johan L. Kuylenstierna*
info@sei-international.org

*Visitors and packages:*
Linnégatan 87D
115 23 Stockholm, Sweden
*Letters:*
Box 24218
104 51 Stockholm, Sweden

**SEI - Africa**
World Agroforestry Centre
United Nations Avenue, Gigiri
P.O. Box 30677
Nairobi 00100
**Kenya**
Tel: +254 20 722 4886
*Centre Director: Stacey Noel*
info-Africa@sei-international.org

**SEI - Asia**
15th Floor
Witthyakit Building
254 Chulalongkorn University
Chulalongkorn Soi 64
Phyathai Road, Pathumwan
Bangkok 10330
**Thailand**
Tel: +(66) 2 251 4415
*Centre Director: Niall O'Connor*
info-Asia@sei-international.org

**SEI - Oxford**
Florence House
29 Grove Street
Summertown
Oxford, OX2 7JT
**UK**
Tel: +44 1865 42 6316
*Centre Director: Ruth Butterfield*
info-Oxford@sei-international.org

**SEI - Stockholm**
Linnégatan 87D, 115 23 Stockholm
*(See HQ, above, for mailing address)*
**Sweden**
Tel: +46 8 30 80 44
*Centre Director: Jakob Granit*
info-Stockholm@sei-international.org

**SEI - Tallinn**
Lai str 34
10133 Tallinn
**Estonia**
Tel: +372 627 6100
*Centre Director: Tea Nõmmann*
info-Tallinn@sei-international.org

**SEI - U.S.**
*Main Office*
11 Curtis Avenue
Somerville, MA 02144
**USA**
Tel: +1 617 627 3786

*Davis Office*
400 F Street
Davis, CA 95616
**USA**
Tel: +1 530 753 3035

*Seattle Office*
1402 Third Avenue, Suite 900
Seattle, WA 98101
**USA**
Tel: +1 206 547 4000

*Centre Director: Michael Lazarus*
info-US@sei-international.org

**SEI - York**
University of York
Heslington
York, YO10 5DD
**UK**
Tel: +44 1904 32 2897
*Centre Director: Lisa Emberson*
info-York@sei-international.org

# Stockholm Environment Institute

SEI is an independent, international research institute. It has been engaged in environment and development issues at local, national, regional and global policy levels for more than a quarter of a century. SEI supports decision making for sustainable development by bridging science and policy.

## sei-international.org

**Twitter: @SEIresearch, @SEIclimate**

BLM_0002268

Programmatic Biological Opinion Regarding the Effects from the implementation of the revised Resource Management Plan within the Uncompahgre Field Office of the Bureau of Land Management

Species and Critical Habitat (if designated or proposed) Addressed include

Gunnison sage-grouse *Centrocercus minimus and CH*
Clay-loving wild buckwheat *Eriogonum pelinophilum and CH*
Colorado hookless cactus *Sclerocactus glaucus*

Prepared by the
U.S. Fish and Wildlife Service
Western Colorado Office
Grand Junction, Colorado
December 2018

BLM_0002269

## INTRODUCTION

The Proposed Resource Management Plan (RMP) planning area includes approximately 3.1 million acres of lands administered by the Bureau of Land Management (BLM), U.S. Department of Agriculture, Forest Service, National Park Service, State of Colorado lands, and private property.  The decision area is a subset of the planning area, which includes only BLM-administered lands and Federal mineral estate under BLM jurisdiction.  The RMP provides management direction within the decision area (675,800 acres of BLM-administered lands), which includes withdrawn lands, and 971,220 acres of Federal mineral estate under BLM jurisdiction.  Withdrawn lands include the Dominguez – Escalente National Conservation Area and the Gunnison Gorge National Conservation Area (see Figure 1 in biological assessment, page 24).

## CONSULTATION HISTORY

The Service issued two programmatic section 7 biological opinions in western Colorado, analyzing water depletions resulting from the BLM's activities in the Colorado River basin. These consultations include the December 19, 2008, "Programmatic Biological Opinion (PBO) for Water Depletions Associated with the BLM's Fluid Mineral Program within the Upper Colorado River Basin in Colorado" (ES/GJ-6-CO-08-F-0006), and the February 25, 2009, "PBO for Water Depletions Associated with BLM's projects (excluding Fluid Mineral Development within the Upper Colorado River Basin in Colorado" (ES/GJ-6-CO-08-F-0010).  On December 26, 2017, the Service issued a third PBO (TAILS 65413-2008-F-0073-R00l), which superseded PBO number ES/GJ-6-CO-08-F-0006.  Both biological opinions address adverse effects to the Colorado pikeminnow, razorback sucker, humpback chub, and bonytail, and their respective critical habitats, associated with depletions resulting from projects and activities implemented under the revised RMP.  Water depletions resulting from oil and gas exploration and other water development on the UFO fall under the two respective BLM PBOs.  Therefore, BLM has fulfilled their section 7 consultation requirement for water depletion effects to the Colorado River fishes.

In addition, the UFO requested consultation for their Integrated Weed Management Plan, Tails: 06E24100-2013-F-0040 and, livestock grazing on three Field Offices including the UFO, Tails: 06E24100-2012-F-0020.  Service issued two programmatic biological opinions for listed plant species (see tails numbers above), and the Service concurred that the effects of the Integrated weed management plan and livestock grazing would not adversely affect the GUSG, Tails: 06E24100-2013-F-0040 or its designated critical habitat, Tails: 06E24100-2013-F-0040-R001 .

- January 9, 2018—Meeting between the BLM and USFWS to present a general PRMP overview.  The group discussed some specific management, including open off-highway vehicle (OHV) areas and potential conservation measures to reduce effects.
- March 16, 2018—Meeting between the BLM, USFWS, and Environmental Management and Planning Solutions, Inc. (EMPSi; contractor) to review species to be analyzed in the BA.  The group reviewed management actions that could affect listed species and methods for analysis.
- June 14, 2018—Meeting between the BLM, USFWS, and EMPSi to discuss comments

2

on the first draft of the BA and resolve team questions.

During the consultation project, the Service requested clarification of the effects analysis and determinations for the Colorado River fishes, and the greenback linage cutthroat trout.  In an email dated October 25, 2018, BLM revised their determination for all fish species, concluding that implementation of the proposed RMP may affect, but is not likely to adversely affect these species, and in our cover memorandum, concur with the revised determinations.

At the request of the Service, BLM provided a clarification for the biological assessment regarding the federally list plant species potentially affected by PRMP implementation (K. Holsinger, BLM pers comm.).

The Service based this biological opinion on the BA prepared for the proposed action, listing and critical habitat decision documents, information contained in scientific literature, and other sources of information.  For GUSG the BLM used the GUSG Rangewide Conservation Plan (RCP) (GUSG Rangewide Steering Committee (GSRSC) 2005), information contained in scientific literature, and other sources of information.  A complete administrative record of this consultation is on file in the Service's Western Colorado Office, Grand Junction, Colorado.

## BIOLOGICAL OPINION

PROPOSED ACTION

The proposed action consists of implementation of the Proposed Resource Management Plan (RMP) for the Uncompahgre Field Office of the BLM.  The RMP provides strategic guidance for future management of BLM lands managed by the UFO.  The RMP provides a decision-making framework and guides resource management programs, practices, uses, and projects.  The RMP revision does not include specific project and activity decisions.  Those decisions are made later, after more detailed analysis and further public involvement.

Proposed Resource Management Plan

Table 3-1 in the BA (page 3) describes the goals, objectives, and actions by resource and resource use of the RMP that are relevant to the protection of biological resources.  The full RMP and list of best management practices (BMPs) for other resource and resource use programs appear as appendices to the BA (Appendices A and B).  Below is a list of the resources and resource uses described in BA table 3-1 (page 3).  The BA describes the specific goals, objectives, and actions, which we incorporate here by reference.

Special Status Species
Special Status Plants
Special Status Fish and Aquatic Wildlife
Special Status Terrestrial Wildlife
Special Status Terrestrial Wildlife—Western Yellow-Billed Cuckoo
Special Status Terrestrial Wildlife—Gunnison Sage-Grouse
Special Status Terrestrial Wildlife—Mexican Spotted Owl

3

BLM_0002271

Climate
Land Health
Soils and Geology
Water Resources
Vegetation
Areas of Critical Environmental Concern
Fish and Wildlife
Wildland Fire Ecology and Management
Forestry and Woodland Products
Livestock Grazing
Recreation and Travel Management
Lands and Realty
Fluid Leasable Minerals (Oil and Gas and Geothermal Resources)
Mineral Materials and Non-energy Leasable Minerals

**Action Area**

Action area is defined as "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action" (50 CFR § 402.02). The action area for the proposed action consists of the BLM's Uncompahgre Field Office, the 675,800 acres of BLM-administered lands and 971,220 acres of Federal mineral estate within the UFO planning area. Bureau of Land Management manages lands within the Dominguez-Escalante and McInnis Canyons National Conservation Areas by separate RMPs. Therefore, these areas were not included in the UFO RMP revision. The action area includes the area described in the project biological assessment (BA).

**STATUS OF THE SPECIES**

We summarized the species descriptions and life histories below. We incorporated the detailed description of the species and life histories herein, where appropriate, by reference.

Colorado Hookless Cactus

The Service listed the Unita Basin hookless cactus as a threatened species in 1979. On September 15, 2009, the Service officially recognized the taxonomic split of this species into three distinct species, one of which is the Colorado hookless cactus (*Sclerocactus glaucus*) (74 FR 47112). In April 2010, the Service released a recovery outline (Service 2010), which provided an overview of the known information for Colorado hookless cactus and serves to guide recovery efforts, and inform consultation and permitting activities until we approve a comprehensive recovery plan for the species. The Recovery Outline also provided an updated and thorough review of the species' status.

Colorado hookless cactus is a small ball or barrel-shaped cactus endemic to Montrose, Delta, Mesa, and Garfield Counties in western Colorado. This species has two population centers, one associated with the Gunnison River and its tributaries near Delta, Colorado, and the other with the Colorado River and its tributaries near DeBeque, Colorado. During the development of the

4

Recovery Outline, data indicate 98 occurrences totaling with approximately 19,000 individuals (Service 2010). These occurrences cover approximately 1,700 square miles, with an estimated 618,000 acres of potential habitat (Service 2010). Current data indicate 93 element occurrences with approximately 23,000 individuals, however, about one third of the occurrences have very few individuals, and many others are considered historical (NatureServe © 2018).

Colorado hookless cactus grows primarily in the salt desert shrub community on alluvial terraces associated with the Gunnison and Colorado Rivers. Soils commonly consist of Mancos shale often with a thin over layer of alluvium, and range from fine silty clay to coarse gravel with volcanic cobbles and boulders scattered on the surface. Mancos shale communities that favor the cactus have little resilience to disturbance due to soil chemistry and structure and limited available moisture (BLM 2002). The Service did not designate critical habitat for this species.

*Abundance and Viability*

For each occurrence in their database, CNHP assesses the estimated viability of a species or ecological integrity of its community using ranks from A to D for excellent to poor. Of the 98 CNHP occurrences of Colorado hookless cactus, approximately 22 percent are ranked excellent to good (A, B, or BC), 10 percent fair (C), and 6 percent fair to poor (CD or D). The remainder are either considered historic because they have not been confirmed in over 20 years (42 percent, H rank), extirpated (1 percent, E rank), or they could not be ranked for a variety of reasons. The 21 occurrences ranked A or B represent at least 1,000 individuals (Service 2010).

In addition to the known 98 occurrences recorded by CNHP, recent surveys for another project documented more than 6,000 individual plants. These additional 6,000 plants bring the estimated range-wide abundance to approximately 19,000 (FWS 2010). The Colorado Natural Heritage Program would likely rank these 6,000 individuals A-B, with the result that at least 37 percent of the estimated known individuals are in occurrences currently considered viable or ecologically intact.

Clay-loving Wild Buckwheat

The Service listed the clay-loving wild buckwheat as endangered in 1984, with a concurrent critical habitat designation (49 FR 28562). Thought to be confined to one occurrence at the time of listing, the species is currently known from 14 element occurrences totaling approximately 278,600 individuals. There are seven historic element occurrences that have not been revisited to verify continued species presence; based on past estimates, these unverified occurrences may contain 3,500 individuals (74 FR 49835). In 2013, BIO-Logic mapped an estimated 6,350 individuals of clay-loving wild buckwheat on private land within the action area (BIO-Logic 2013). Occupied habitat totaling over 582 acres is distributed across a range of approximately 11.5 miles wide (east to west) and 28.5 miles long (north to south) (74 FR 49835).

Clay-loving wild buckwheat is a low, slow-growing, and long-lived subshrub known only from Delta and Montrose Counties, Colorado. Plants bloom from late May to early September, with fruits maturing from late June through October. Mature clay-loving wild buckwheat plants grow four to eight inches in height, forming a densely branching, and low, rounded subshrub with a

5

BLM_0002273

woody base.  The deciduous leaves are very short and narrow, typically less than one centimeter long and several millimeters wide, and appear needle-like.  Flowers are hermaphroditic, with a mixed mating system requiring an insect vector for pollen transfer (Bowlin et al. 1992).  Large pollinators such as common bees, wasps, flies, and ants have been observed visiting flowers (Tepedino 2009).

Clay-loving wild buckwheat is endemic to clay soils derived from Mancos shales, locally known as adobe soils; these soils are alkaline due to high concentrations of calcium carbonate, are high in selenium, and highly erosive.  The soils display a dramatic shrink-swell capacity, resulting in a lumpy, uncompacted surface that is prone to freeze-thaw expansion.  The soils may be particularly sensitive to compaction when wet.  Within Mancos shale soils, this species occurs in mat saltbrush (*Atriplex corrugate*) or black sagebrush (*Artemisia nova*) dwarf shrublands.  Matt saltbrush and black sagebrush are the dominant species associates; other associates include charming woodyaster (*Xylorhiza venusta*), shadscale saltbrush (*Atriplex confertifolia*), Gardner's saltbrush (*Atriplex gardneri*), and bud sagebrush (*Picrothamnus desertorum*).  Within these communities, buckwheat is typically found in the basin portions of the adobe badland system of draws and ridges, at elevations ranging from 5,180 to 6,350 feet (1,579 to 1,935 meters) (Service 2009).  At a finer scale, plants are often concentrated on the north or east face of small hummocks where snow drifts remain later into the spring.

Critical habitat for clay-loving wild buckwheat consists of approximately 121 acres on two private working ranches near Austin in Delta County, Colorado.  Two conservation easements held by the Colorado West Land Trust (formerly Black Canyon Regional Land Trust) protect the entirety of designated critical habitat.  One purpose of the conservation easements is to conserve clay-loving wild buckwheat populations on the properties (Barger 2018, cited in BA).  At the time of listing, critical habitat encompassed the entire known populations of the species.  We define the primary constituent elements of critical habitat as, those factors associated with the whitish clay soils within the sparsely vegetated badlands of Mancos shale (49 FR 28562).

Gunnison Sage-grouse

*Species Description*

Sage-grouse are the largest grouse in North America.  Sage-grouse (both greater and Gunnison) are most easily identified by their large size, dark brown color, distinctive black bellies, long pointed tails, and association with sagebrush habitats.  They are dimorphic in size, with females being smaller.  Both sexes have yellow-green eye combs, which are less prominent in females.  Sage-grouse are known for their elaborate mating ritual where males congregate on strutting grounds called leks and "dance" to attract a mate.  During the breeding season, males have conspicuous filoplumes (specialized erectile feathers on the neck), and exhibit yellow-green apteria (fleshy bare patches of skin) on their breasts (Schroeder et al. 1999 in 79 FR 69192).  Gunnison sage-grouse are smaller in size, have more white barring in their tail feathers, and have more filoplumes than greater sage-grouse.

*Life History*

6

BLM_0002274

Gunnison and greater sage-grouse depend on a variety of shrub-steppe habitats throughout their life cycle and are considered obligate users of several species of sagebrush (Patterson 1952, p.42; Braun et al. 1976; Schroeder et al. 1999; Connelly et al. 2000; Connelly et al. 2004, Miller et al. in press). Dietary requirements of the two species are also similar, being composed of nearly 100 percent sagebrush in the winter, and forbs and insects as well as sagebrush in the remainder of the year (Wallestad et al. 1975, p. 21; Schroeder et al. 1999, p. 5; Young et al. 2000, p. 452). Gunnison and greater sage-grouse do not possess muscular gizzards and, therefore, lack the ability to grind and digest seeds (Leach and Hensley 1954, p. 389). In addition to serving as a primary year-round food source, sagebrush also provides cover for nests and chicks (Connelly et al. 2000). Thus, sage-grouse distribution is strongly correlated with the distribution of sagebrush habitats (Schroeder et al. 2004, p. 364). Connelly et al. (2000) segregated habitat requirements into four seasons: (1) breeding (2) summer - late brood rearing (3) fall and (4) winter. Depending on habitat availability and proximity, some seasonal habitats may be indistinguishable. The Gunnison Sage-grouse Rangewide Steering Committee (GSRSC) (2005, p. 27-31) segregated habitat requirements into three seasons: (1) breeding (2) summer–late fall and (3) winter. For purposes of this finding, the seasons referenced in GSRSC (2005) are used because that publication deals specifically with GUSG. Sage-grouse exhibit strong site fidelity (loyalty to a particular area) to seasonal habitats, which includes breeding, nesting, brood rearing, and wintering areas, even when the area is no longer of value (Connelly et al. 2004, p. 3-1). Adult sage-grouse rarely switch among these habitats once they have been selected, limiting their adaptability to changes. Sage-grouse distribution is associated with sagebrush (Schroeder et al. 2004 p. 364), although sagebrush is more widely distributed than sage-grouse because sagebrush does not always provide suitable habitat due to fragmentation and degradation (Schroeder et al. 2004, pp. 369, 372).

*Status and Distribution*

The Service listed the GUSG as a threatened species on November 20, 2014 (79 FR 69192). Concurrently, the Service designated 1,429,551 million acres of critical habitat for the species in nine southwestern Colorado counties and two southeastern Utah counties (79 FR 69312). Following is a brief description of the current distribution of the species' range-wide population and trends. A detailed discussion of GUSG taxonomy, the species description, historical distribution, habitat, and life history characteristics can be found in the Service's 12-month finding for the GUSG (75 FR 59804).

Gunnison sage-grouse currently occur in seven widely scattered and isolated populations in Colorado and Utah, occupying 3,795 square kilometers (km2) (1,511 square miles [mi2]) (GSRSC 2005; CDOW 2009a). The seven populations are Gunnison Basin, San Miguel Basin, Monticello–Dove Creek, Piñon Mesa, Crawford, Cerro Summit–Cimarron–Sims Mesa, and Poncha Pass (FR 69192). Trends in the high-male count indicate declines in all populations over the last three years with some increasing since 2011. The largest population, the Gunnison Basin population, while showing variation over the years, has been relatively stable through the 1996-2018 period (CPW 2018). Six of the populations are very small and fragmented (all with less than 40,500 hectares (ha) (100,000 acres [ac]) of habitat likely used by grouse and, less than 50 males counted on leks (communal breeding areas)) (CDOW 2009b; CPW 2018). The San Miguel population is the second largest and comprises six fragmented subpopulations.

7

## ENVIRONMENTAL BASELINE

Regulations implementing the ESA (50 CFR 402.02) define the environmental baseline as the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed State or Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State of private actions which are contemporaneous with the consultation process. The implementing regulations for section 7(a)(2) define the "action area" as all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action (50 *CFR* 402.02).

Colorado Hookless Cactus

*Status of the Species in the Action Area*

Within the action area, the BLM documented 314 distinct Colorado hookless cactus occurrences (i.e. populations) occupying greater than 0.25-acre, and 950 occurrences occupying less than 0.25-acre, (BA, page 30). This does not include the Dominguez-Escalante or Gunnison Gorge National Conservation Areas (NCAs), both of which contain significant occurrences adjacent to the action area. Currently identified Colorado hookless cactus occurrences occupy more than 3,000 acres within the action area (BA, page 30).

Numerous point-in-time population estimates conducted between 2012 and 2017 suggest that historic Element Occurrence Records drastically underestimate the size of the occurrences. Since the publication of the 2010 USFWS Recovery Outline, BLM documents 94 new distinct occurrences within the action area, totaling well over 2,000 individuals. Continued survey is likely to add additional occurrences within the action area.

On November 15, 2012, the Service issued biological opinion number ES/GJ-6-CO-12-F-006. The opinion evaluated the effects of livestock grazing on the Colorado hookless cactus, DeBeque phacelia, and the clay-loving wild buckwheat on three BLM Field Offices including the UFO. The 2012 BO found that grazing activities would cause adverse effects to the Colorado hookless cactus, but that these activities would not jeopardize the continued survival of the cactus. The BLM does not anticipate additional effects to the Colorado Hookless cactus caused by the PRMP implementation. Therefore, this BiOp will not address the effects of livestock grazing on these two species.

*Past and Present Impacts*

The primary threats to Colorado hookless cactus are (Service 2010):
- Natural gas exploration and production
- Pipelines, utilities, and other rights-of-way (ROWs)
- Off-highway vehicle activity
- Livestock grazing and trampling
- Herbicides and pesticides
- Hybridization

8

BLM_0002276

- Illegal human collection
- Potential water developments
- Climate change

Clay-loving wild buckwheat

Clay-loving wild buckwheat has an extremely limited range of approximately 890 acres within the action area, and is at a high risk of habitat loss. Fragmentation of clay-loving wild buckwheat habitat and populations into potentially nonviable sizes is the greatest threat to the species (USFWS 1988). Habitat loss and degradation have resulted from habitat conversion to irrigated agricultural land and residential development, as well as subsequent road building and off-road vehicle use. Other threats include ROWs for utilities and land access, pipelines, and new irrigation canals, which often skirt the bases of clay-loving wild buckwheat habitats (CNHP 2014). As stated in the BA, BLM consulted on two previous actions within the action area for their Integrated Weed Management Plan, and livestock grazing, where the effects of these actions adversely affect the species.

Gunnison Sage-grouse

*Status of the Species within the Action Area*

The action area for the proposed RMP encompasses lands within the UFO including GUSG habitat designated as "occupied," and "unoccupied" critical habitat as described in the final rule (79 FR 69312). Within the UFO, GUSG occur in the Crawford, San Miguel Basin, and Cerro Summit-Cimarron-Sims Mesa population areas. Table 1 displays GUSG designated habitat acerage figures within the respective populations.

Table 1. GUSG Habitat on the Uncompahgre Field Office

| Population | Occupied Critical Habitat | | | Unoccupied Critical Habitat | | |
|---|---|---|---|---|---|---|
| | BLM Surface | Split Estate | Total | BLM Surface | Split Estate | Total |
| CSCSM | 4,526 | 8,332 | 12,858 | 3,888 | 4,375 | 8,262 |
| Crawford | 0 | 0 | 0 | 2,727 | 4,159 | 6,887 |
| Gunnison | 0 | 0 | 0 | 326 | 21 | 347 |
| San Miguel | 821 | 6,790 | 7,610 | 0 | 1,228 | 1,228 |
| **Total** | **5,347** | **15,122** | **20,469** | **6,941** | **9,784** | **16,725** |

The Crawford population is located in Montrose and Delta Counties, about eight miles southwest of the town of Crawford and north of the Gunnison River. The primary area this population uses is west of Poison Spring Gulch to Green Mountain, and between the Gunnison River on the south and Red Canyon on the north. Most of this population falls within the Gunnison Gorge NCA RMP. There are currently five known active leks; BLM-administered land within this area. Colorado Parks and Wildlife (CPW) has monitored these leks for the past 27 years. Recently, the population trend appears to be declining (CPW 2018), CPW augmented this population with 74 birds from Gunnison Basin (2011-2013).

The San Miguel Basin population is patchy and consists of six subpopulations located in Montrose and San Miguel Counties, Colorado.

9

The Cerro Summit-Cimarron and Sims Mesa population consists of two subpopulations. The Sims Mesa area is located approximately seven miles south of Montrose, Colorado. Habitat consists of small patches of sagebrush heavily fragmented by pinyon-juniper woodland, residential and recreational development, and agricultural lands. Land use in the Sims Mesa area is primarily ranching. There is one known lek site in the Sims Mesa subpopulation on BLM-administered land; however, the lek is currently vacant (Phillips pers. comm., cited in BA)

The BLM evaluated habitat in the Cerro Summit-Cimarron in 2015 and Sims Mesa populations in 2016 per the Habitat Assessment Framework (Stiver et al. 2015). The results of the assessments are displayed in Tables 2 and 3 respectively.

Table 2

| Cerro Summit-Cimarron Habitat Assessment Habitat Suitability | | | |
|---|---|---|---|
| Suitability Description | Nesting/Brood Rearing | Winter | Summer |
| Unsuitable | 32 percent | 81 percent | 32 percent |
| Marginal | 52 percent | 15 percent | 20 percent |
| Suitable | 15 percent | 14 percent | 48 percent |

Table 3

| Sims Mesa | | | |
|---|---|---|---|
| Suitability Description | Nesting/Brood Rearing | Winter | Summer |
| Unsuitable | 31 percent | 38 percent | 55 percent |
| Marginal | 60 percent | 40 percent | 43 percent |
| Suitable | 9 percent | 22 percent | 1 percent |

As displayed in the tables, most nesting/brood rearing and winter habitats are marginal or unsuitable for both subpopulations. The Cerro Summit-Cimarron subpopulation has more suitable summer habitat, whereas most summer habitat is unsuitable or marginal for the Sims Mesa subpopulation.

**EFFECTS OF THE ACTION**

Effects of the action refer to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated and interdependent with that action that are added to the environmental baseline. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration. Indirect effects are those that are caused by the proposed action and are later in time, but are still reasonably certain to occur.

The BLM's BA included the following assumptions:

- Effects on listed species can occur from actions that result in direct mortality, loss of habitat or modifications to habitat suitability, and actions that displace individuals or disrupt behavior. Because threatened and endangered species have specific habitat requirements, and their habitats are often diminishing, disturbance of the species or their

10

BLM_0002278

habitat could result in population declines, which could adversely affect viability of local populations.

- The health of threatened and endangered species populations is directly related to the overall health and functional capabilities of upland, aquatic, riparian, and wetland resources, which in turn are a reflection of overall watershed health.
- Ground-disturbing activities could lead to positive or negative modification of habitat and loss or gain of individuals, depending on the nature of the activity, the intensity of the surface disturbance, the amount of area disturbed, the location of the disturbance, and the species affected.
- Species' health, population levels, and habitat conditions fluctuate in response to natural factors. Periods of drought or excessive moisture and outbreaks of diseases that affect species directly or affect habitat (e.g., Ips beetle) would likely affect threatened and endangered species population levels.
- BLM will assess Implementation-level actions on an appropriate spatial and temporal scale. Additional field inventories would likely be needed to determine whether any such species could be present in the action area.
- Manage land uses to maintain or move toward meeting the BLM Colorado Public Land Health Standards (BLM 1997) on a landscape basis. Site-specific analysis would assess whether management actions would contribute to the maintenance or achievement of land health standards or risk causing a decline in land health conditions.
- All permitted activities that may affect federally threatened or endangered species would undergo ESA Section 7 consultation with the Service. Mitigate the effects of activities to ensure that threatened or endangered species would not be jeopardized on a project-specific basis or at a cumulative level.
- The BLM would implement the standard operating procedures and mitigation measures from the UFO Weed Management Strategy. These would mitigate the potential effects from herbicide treatments.
- Success of mitigation depends on the proper implementation of specific protective measures employed. Adaptive management, such as changing techniques, would be used until success is achieved.
- Many of the resources and uses have NSO or CSU stipulations that extend beyond or overlap the NSO or CSU stipulations listed for protection of special status species. Although NSO or CSU stipulations for other resources and uses may offer additional benefits (e.g., reduced erosion, sedimentation, and weed invasion) and indirectly support special status species management, in most cases, these benefits would be negligible or redundant to the protections provided by stipulations for special status species. For these reasons, effects on special status species from NSO or CSU stipulations associated with other resources will only be addressed if they are anticipated to provide substantial additional protection.
- Stipulations, including NSOs, CSUs, TLs, and SSRs, could be excepted, modified, or waived by the BLM Authorized Officer as described and defined in Appendix B of the FEIS. Waivers, exceptions, and modifications are rare in the UFO, and there is no known waiver, exception, or modification that was granted where listed species were present. While BLM assumed they would not grant waivers, exceptions, or modifications unless there were changed conditions or new information leading to the conclusion that there would be no effect on listed species. However, the Service cannot rely of this assumption

11

BLM_0002279

for our effects analysis.

The BA stated that although data on known locations and habitats in the action area are available, the data are neither complete nor comprehensive. The BA considered known and potential species and habitat locations in the analysis. However, the BA also considered the potential for species to occur outside designated critical habitat areas. The BLM quantified effects when possible. In the absence of quantitative data, we applied best professional judgment based on scientific reasoning to determine the severity of effects. Additionally, the analysis of effects are programmatic in scope, which does not address site-specific proposals or projects. Consequently, we describe the general effects to the species of implementing RMP activities.

**Effects of the Action within the Action Area**

Colorado Hookless Cactus and Clay-loving Wild Buckwheat

The proposed action (revised RMP) will not cause additional effects from grazing or weed management beyond the effects documented in previous consultations (see consultation history) Therefore, we will not discuss these effects further. However, adverse effects to these plant species may result from implementation of vegetation management, comprehensive travel and transportation management under the proposed action. Specifically, the designation of routes within the UFO is likely to result in negative effects to these species. In addition, adverse effects to the plants are likely to occur from the presence of wild horses and the issuance of permits to drill on existing leased lands.

Below, we describe the general effects to federally listed plants anticipated by implementation of the PRMP.

Direct mortality can result from crushing, trampling, or physically removing plants. Contact with herbicides or other chemicals may cause direct mortality. Where occurrences of a plant are small, loss of a portion of the plants can compromise its viability. Loss of occurrences can compromise species viability due to reduced genetic diversity and a reduced ability to withstand natural or anthropogenic disturbances.

Trampling or coming in contact with chemicals may result in loss of vigor or reduced reproductive success, but may not always result in mortality. However, reduced vigor, may affect the plant's ability to reproduce and sustain the population. Herbivory can reduce reproductive success, or in some cases result in death. Fugitive dust deposited on federally listed plants may reduce their photosynthetic ability, or the ability of pollinators to transfer pollen between plants.

We define direct habitat loss as the physical destruction or conversion to a condition that no longer supports the species. Direct habitat loss can be short-term or permanent. Surface-disturbing activities, such as construction and use of roads, trails, parking lots, buildings, power poles, wind turbines, and ponds, may result in permanent loss of occupied or potentially occupied habitat. This would reduce the total habitat capable of supporting listed plant populations and fragment remaining populations.

12

BLM_0002280

Short-term, temporary habitat loss can occur with habitat improvement projects, such as those addressing encroaching junipers in sagebrush or salt-desert shrub habitats. Closure or reclamation of disturbed areas may eventually restore lost habitat. However, disturbance can require years or decades for recovery to pre-disturbance condition. If reclamation does not result in habitat suitable for sustaining federally listed plants, habitat may be permanently lost.

Changes in habitat structure - A canopy cover of shrubs offers habitat characteristics that appear to be favorable for several plant species, such as the Colorado hookless cactus, to germinate and establish. Shrubs may protect some plants from herbivory or trampling and may provide improved moisture availability or reduced moisture loss under the canopy. Surface-disturbing activities that significantly reduce the percent canopy cover of shrubs may allow increased herbivory or moisture loss, resulting in decreased vigor or mortality of special status plants.

Competition - Changes in species composition also affect listed plant populations. Proliferation of noxious weeds or other invasive plants may render habitat unsuitable by outcompeting listed plants for water and nutrients or by preventing seedling germination and establishment. Cheatgrass dominated areas appear to inhibit seedling cactus germination, thereby threatening the long-term viability of occupied Colorado hookless cactus habitat. In some cases, increases in canopy cover and density of native species, particularly grasses, can compete with listed plants for limited water and nutrients.

Other species, such as clay-loving wild buckwheat, thrive in environments where vegetation is sparse and competition is low. Increases in vegetation cover (following disturbances, such as fire or seeding) may cause competition with listed plants, resulting in decreased vigor or mortality.

Loss of pollinators or pollinator habitat - Actions that disturb pollinators or that destroy their habitat can have a detrimental effect on plant species. Long-term loss of pollinators can reduce the reproductive ability of these plant species and affect maintenance and genetic diversity of populations.

Habitat fragmentation occurs when contiguous habitat is broken into smaller blocks by surface-disturbing activities and distances between suitable habitat patches increase. Because pollinators fly only limited distances, they are less likely to use small and isolated patches of habitat. Habitat fragmentation can effectively isolate pollinators from federally listed plants. Smaller populations receive fewer pollinator visits, so seed production is lower in small populations.

Small population size decreases reproductive success, increases inbreeding, and loss of genetic variation. As a result, fragmentation may lower population viability and increase local population extinction risk (Kolb 2008). Herbivory does not decrease with population size. Instead, it enforces fragmentation by further reducing the number of flowering individuals (Kolb 2008). Closure and rehabilitation of roads in listed plant habitat may benefit the long-term survival of populations by decreasing habitat fragmentation.

Soil compaction resulting from heavy equipment or vehicle travel may reduce soil pore size,

13

BLM_0002281

inhibit water infiltration, and restrict root penetration, thereby inhibiting maintenance and establishment of special status plants.

Special status plants may be washed away or their roots may be exposed by erosion from surface-disturbing activities, such as blading or bulldozing for roads. Sedimentation may bury listed plants resulting from disturbances upslope of plant populations.

Changes in species composition, either in special status plant habitat or in adjacent plant communities, may alter the natural fire regime to which the plants are adapted. Cheatgrass, a highly flammable annual grass, may drastically increase the fire frequency in special status plant habitat, affecting the survivability and viability of the population.

Habitat restoration can restore hydrologic function, remove invasive species, restore historic fire regimes, alter grazing management, or other methods. However, design of habitat restoration projects for listed plants must focus on the individual plant species and its specific habitat and site conditions. Generalized habitat restoration projects that do not focus on listed plant needs can have negative effects on these species.

At this broad programmatic scale, it is not possible to quantify the loss of plants impacted by implementation of the proposed action. The conservation measures for listed species within the revised RMP should significantly reduce impacts to federally listed plants and critical habitat (as appropriate). We anticipate a low level of mortality of plants relative to the populations of Colorado hookless cactus and the clay-loving wild buckwheat within the UFO. The proposed RMP provides stipulation NSO-22, and manages habitat for federally listed plant species as ROW avoidance that will reduce loss of individual plants. Since designated critical habitat for clay-loving wild buckwheat only occurs on private lands, BLM concluded that implementation of the RMP will not affect critical habitat (BA p. 97).

14

BLM_0002282

Gunnison sage-grouse

Table 4 displays the overlap between some of the activities under the RMPR.

Table 4.

| Resource Management/Allocation | Unoccupied Habitat | Occupied Habitat |
|---|---|---|
| Closed to fluid mineral leasing | 0 | 0 |
| Open to fluid mineral leasing, subject to standard lease terms and conditions | 0 | 0 |
| Open to fluid mineral leasing, subject to NSO stipulation | 2,800 | 20,470 |
| Open to fluid mineral leasing, subject to CSU stipulation | 13,930 | 0 |
| Open to ROW development | 0 | 0 |
| ROW avoidance areas | 6,941 | 5,347 |
| ROW exclusion areas | 1,330 | 0 |
| Habitat management areas | 2,330 | 2,680 |
| Open to livestock grazing | 5,920 | 4,590 |
| Closed to livestock grazing | 1,020 | 760 |
| Acres within SRMAs | 350 | 210 |
| Acres within ERMAs | 1,280 | 0 |

This biological assessment assumes three types of disturbance cause changes to listed fish and wildlife habitats: disruption from casual use, disruption from permitted activities, and disturbance to habitat condition.

Casual uses, such as recreation and motorized vehicle use, are not subject to site-specific environmental review and monitoring requirements. Some species may adapt to disturbances over time and could recolonize disturbed habitats. Effects are more likely to occur in easily accessible areas, where visitation would be high, and in areas open to intensive motorized use. Effects still occur in areas limited to designated routes due to noise disturbance, human presence, potential for weed spread and habitat degradation, and potential for injury or mortality to wildlife from vehicle collisions. In general, the more acres of routes that are designated in the action area, the greater the likelihood of habitat fragmentation and disturbance to species and habitats.

The BA concluded, implementation of the RMP where the following resources or issues occur will not affect the GUSG or its critical habitat: air quality, areas of critical environmental concern, cultural resources, lands with wilderness characteristics, land tenure, paleontological resources, visual resources, National Trails and Byways, Native American Tribal interests, public health and safety, watchable wildlife viewing sites, wild horses, wild and scenic rivers,

15

and wilderness and wilderness study areas. Management of these resources and resource uses do not occur in designated critical habitat, or will not adversely modify designated critical habitat, or disturb Gunnison sage-grouse. Therefore, we will not be further addressed these issues within this biological opinion.

Timing limitation TL-16 prohibits surface use and surface disturbing and disruptive activities within all designated critical habitat from December 1 to March 15. Timing limitation TL-18 prohibits surface use and surface disturbing and disruptive activities within designated occupied critical habitat from March 1 to July 15. These timing limitations also apply to areas outside of designated critical habitat but occupied by GUSG. Stipulation NSO-31 prohibits surface occupancy and use within designated occupied critical habitat, and application of site-specific relocation requirements within occupied but undesignated habitat. The BLM may apply Stipulation CSU-29/SSR-34 to relocate activities within unoccupied designated critical habitat, which could limit surface disturbing activities. The majority of GUSG habitat falls under the ROW avoidance scenario, which allows for surface disturbing activities, and approximately 1,330 acres under ROW exclusion, which prohibits surface disturbing activities.

Sagebrush habitats within the range of GUSG are becoming increasingly fragmented by various changes in land uses and the expansion in the density and distribution of invasive plant species (Oyler-McCance et al. 2001; Schroeder et al. 2004). Based on spatial modeling, a variety of human developments including roads, energy development, residential development, and other factors known to cause habitat decline were correlated with historical loss of range and extirpation of Gunnison and greater sage-grouse (Wisdom et al. 2011). The model indicated that no secure areas (areas where the risk of extirpation appears low) of occupied range are evident for GUSG (Wisdom et al. 2011). Landscapes containing large and contiguous sagebrush patches and sagebrush patches in close proximity had an increased likelihood of sage-grouse persistence (Wisdom et al. 2011).

The decline or loss of lek and brood-rearing habitats can have serious consequences for sage-grouse population viability by reducing reproductive success and recruitment (survival of young to breeding age). Limitations in the quality and quantity of nesting and early brood-rearing habitats, in particular, are especially important because GUSG population dynamics are most sensitive during these life-history stages (GSRSC 2005). Juvenile recruitment is one of the most important demographic factors influencing or limiting sage-grouse population growth rates and viability (Connelly et al. 2004, GSRSC 2005).

Roads

Road impacts to GUSG may include direct habitat loss, direct mortality, barriers to migration corridors or seasonal habitats, facilitation of predation and spread of invasive vegetative species, and other indirect influences such as noise (Forman and Alexander 1998).

Roads fragment GUSG habitat, when birds avoid roads presumably to limit exposure to human activity and predation (Oyler-McCance et al. 2001). The probability of GUSG habitat occupancy (presence based on pellet surveys or sage-grouse observation) was positively correlated with distance to roads and habitat patch size (Oyler-McCance et al. 1999).

16

BLM_0002284

Gunnison sage-grouse may avoid road areas because of noise, visual disturbance, pollutants, and predators moving along roads. These stressors further reduce the amount of functional habitat availability. An unpublished study by Western State Colorado University and CPW in the Gunnison Basin found that anthropogenic noise was significantly higher at leks closer to roads and human activity centers than leks farther from those sources (Piquette et al. 2013). Leks with higher noise levels were associated with lower GUSG male counts and attendance (Piquette et al. 2013). Landscape-scale spatial modeling predicted GUSG nest site selection showed strong avoidance of areas with high road densities of paved highways through primitive roads with 2-wheel drive sedan clearance (i.e. class 1 through 4) within 6.4 km (4 mi) of nest sites (Aldridge et al. 2012). Nest sites also decreased with increased proximity to primary and secondary paved highways (roads classes 1 and 2) (Aldridge et al. 2012). Male greater sage-grouse lek attendance declined within 3 km (1.9 mi) of a deep seam natural gas well haul road where traffic volume exceeded one vehicle per day (Holloran 2005). Younger males will not be drawn to the lek and eventually leks will become inactive if noise from roads interferes with mating displays, and thereby female attendance (Amstrup and Phillips 1977; Braun 1986). However, other information (CPW 2013) suggests GUSG in the Gunnison Basin may be somewhat tolerant of roads, even more heavily used highways and county routes, and the potential direct or indirect effects of those roads.

The presence of roads increases human access and resulting disturbance effects in remote areas (Forman and Alexander 1998; Forman 2000; Connelly et al. 2004). In addition, roads can provide corridors for predators to move into previously unoccupied areas. Some mammalian species known to prey on sage-grouse, such as red fox (*Vulpes vulpes*), raccoons (*Procyon lotor*), and striped skunks (*Mephitis mephitis*), have greatly increased their distribution by dispersing along roads (Forman and Alexander 1998; Forman 2000; Frey and Conover 2006). Corvids (Family Corvidae: crows, ravens, magpies, etc.) also use linear features such as primary and secondary roads as travel routes (Bui 2009), expanding their movements into previously unused regions (Knight and Kawashima 1993; Connelly et al. 2004). Corvids are significant sage-grouse nest predators and were responsible for more than 50 percent of nest predations in Nevada (Coates 2007).

The expansion of road networks also contributes to exotic plant invasions via introduced road fill, vehicle transport, and road maintenance activities (Forman and Alexander 1998; Forman 2000; Gelbard and Belnap 2003; Knick et al. 2003; Connelly et al. 2004). Invasive species are not limited to roadsides, but encroach into surrounding habitats (Forman and Alexander 1998; Forman 2000; Gelbard and Belnap 2003). Upgrading unpaved four-wheel-drive roads to paved roads resulted in increased cover of exotic plant species within the interior of adjacent plant communities (Gelbard and Belnap 2003). This effect was associated with road construction and maintenance activities, and vehicle traffic. The incursion of exotic plants into native sagebrush systems can negatively affect GUSG through habitat losses and conversions.

Powerlines

Depending on the infrastructure design, size, location, and site-specific factors, powerlines can directly affect greater sage-grouse by posing a collision and electrocution hazard (Braun 1998; Connelly et al. 2000) and can have indirect effects by decreasing lek recruitment (Braun et al.

17

BLM_0002285

2002, Walker et al. 2007), increasing predation (Connelly et al. 2004), fragmenting habitat (Braun 1998), and facilitating the invasion of exotic annual plants (Knick et al. 2003; Connelly et al. 2004).

In areas where vegetation is low and the terrain relatively flat, power poles provide an attractive hunting, roosting, and nesting perch for many species of raptors and corvids, known predators of GUSG (Steenhof et al. 1993; Connelly et al. 2000; Manville 2002; Vander Haegen et al. 2002). Power poles increase a raptor's range of vision, allow for greater speed during attacks on prey, and serve as territorial markers (Steenhof et al. 1993; Manville 2002), thereby increasing the likelihood of predation where sage-grouse occur. Golden eagle (*Aquila chryrsaetos*) predation on sage-grouse at leks increased from 26 to 73 percent of the total predation after completion of a transmission line within 200 meters (m) (220 yards (yd)) of an active sage-grouse lek in northeastern Utah (Ellis 1985). The lek was eventually abandoned, and Ellis (1985) concluded that the presence of the powerline resulted in changes in sage-grouse dispersal patterns and caused fragmentation of the habitat.

Powerlines may negatively affect sage-grouse habitats even if raptors are not present. Use of otherwise suitable habitat decreased within 600 m (660 yd) of powerlines (Braun 1998), indicating sage-grouse avoidance of powerlines. Based on those unpublished data, Braun (1998) reported that the presence of powerlines may limit Gunnison and greater sage-grouse use within 1 km (0.6 mi) in otherwise suitable habitat. Based on spatial modeling, the presence of powerlines appears correlated to extirpation of sage-grouse (Wisdom et al. 2011).

Livestock Grazing

Livestock grazing can adversely affect nesting and brood-rearing habitat by decreasing vegetation available for concealment from predators. Decreases in vegetation may result in nest failure, or reduced or lost productivity. Grazing activity may compacts soils, decrease herbaceous abundance, increase erosion, and increase the probability of invasion of exotic plant species (GSRSC 2005). The impacts of livestock operations on GUSG depend upon stocking levels and season of use.

We know that grazing can have negative impacts to sagebrush and consequently to GUSG at local scales. Impacts to sagebrush plant communities as a result of grazing are occurring on a large portion of the range of the species. Given the widespread nature of grazing within the range of GUSG, the potential for population-level impacts exists.

Livestock grazing may also have positive effects on sage-grouse under some habitat conditions. Sage-grouse use grazed meadows significantly more during late summer than ungrazed meadows because grazing stimulated the regrowth of forbs (Evans 1986). Greater sage-grouse sought out and used openings in meadows created by cattle grazing in northern Nevada (Klebenow 1981). In addition, both sheep and goats have been used to control invasive weeds (Mosley 1996 in Connelly et al. 2004; Merritt et al. 2001; Olsen and Wallander 2001) and woody plant encroachment (Riggs and Urness 1989) in sage-grouse habitat.

Implementation of the grazing program is unlikely to result in large-scale detrimental effects to

18

GUSG.  Substantial localized negative effects may occur from over-utilization of forage.  However, on-going monitoring of range conditions will result in the appropriate modification of stocking rate, timing, duration and intensity of grazing in those areas over-utilized by livestock.

Trampling of nests, or nest abandonment may occur due to the presence of livestock.  In addition, flushing of hens from active nests may result in predation of eggs.  We understand the potential for these events to occur on active allotments, but we do not have any means to meaningfully detect or measure these effects, primarily due to low sage-grouse population numbers within the UFO.  In addition, the mere presence of livestock in an area occupied by GUSG may not necessarily result in exposure of the birds to these effects.

Grazing management improvement actions such as fences, corrals, windmills, and stock pond development may result in substantial negative effects to GUSG.  Fences may expose grouse to increased predation risk from avian predators and collisions.

Water developments may alter existing habitat by congregating livestock use in previously unused upland habitat or by lowering water tables associated with riparian areas.  Although water developments can be used to improve overall riparian habitat condition by drawing livestock and wild ungulates away from previously degraded areas, GUSG may be exposed to mosquitoes that may carry West Nile virus (WNV), which has been known to cause population declines in wild bird populations, including sage-grouse (GSRSC 2005).  We are aware of three WNV caused mortalities of captive bred GUSG, so it is reasonable to assume that they are susceptible to the virus based on known infection and mortality in greater sage-grouse.  Therefore, in situations where ponds are developed to provide for livestock water, there is a risk for production of mosquitoes that transmit WNV, resulting in the possible infection, and mortality to GUSG associated with water development project within and near grouse habitat.

Fences

Effects of fencing on sage-grouse include direct mortality through collisions, creation of raptor and corvid perch sites, the potential creation of predator corridors along fences (particularly if a road is maintained next to the fence), incursion of exotic species along the fencing corridor, and habitat decline (Call and Maser 1985; Braun 1998; Connelly et al. 2000; Beck et al. 2003; Knick et al. 2003; Connelly et al. 2004).  However, fences can also benefit GUSG by facilitating the management of livestock forage use and distribution to achieve desired habitat objectives (GSRSC 2005).

Sage-grouse frequently fly low and fast across sagebrush flats, and fences can create a collision hazard resulting in direct mortality (Call and Maser 1985; Christiansen 2009).  Not all fences present the same mortality risk to sage-grouse.  Mortality risk appears to be dependent on a combination of factors including design of fencing, landscape topography, and spatial relationship with seasonal habitats (Christiansen 2009).

Although we expect the impacts of fences to GUSG are similar to those observed in greater sage-grouse, studies on fence strike-related mortality in GUSG are limited.  In 10 years of tracking and studying over 1,000 radio-collared sage-grouse in Colorado, CPW has documented only two

19

strike-related mortalities in GUSG due to fences, including one confirmed case in Poncha Pass attributed to bird release methods, and one unconfirmed case in the Gunnison Basin.

Fence posts create perching places for raptors and corvids, which may increase the ability of these birds to prey on sage-grouse (Braun 1998; Oyler-McCance et al. 2001; Connelly et al. 2004). This impact is potentially significant for sage-grouse reproduction because corvids were responsible for more than 50 percent of greater sage-grouse nest predations in Nevada (Coates 2007). Greater sage-grouse avoidance of habitat adjacent to fences, presumably to minimize the risk of predation, effectively results in habitat fragmentation even if the actual habitat is not removed (Braun 1998). Because of similarities in behavior and habitat use, the response of GUSG should be similar to that observed in greater sage-grouse.

Vegetation Management

Management to improve and protect vegetation conditions throughout the planning area would improve vegetative cover, reduce the likelihood for erosion and sedimentation, and maintain seed banks. Implementation of timing limitations will avoid impacts to GUSG during sensitive periods, avoiding direct effects to GUSG. Vegetation treatments would improve habitat for GUSG in the long-term by providing more opportunities for lekking, nesting, brood rearing, wintering, cover, and foraging. However, in the short-term, vegetation treatments may remove habitat or increase the potential for weed spread. In addition, human disturbance and noise associated with the use of heavy equipment for vegetation removal could temporarily displace GUSG from foraging habitat. Timing restriction in the PRMP will reduce the effects to breeding, nesting, and wintering habitats.

Recreation and Travel Management

Habitat loss, degradation, and fragmentation from roads are a major threat to GUSG (79 FR 69162). Recreation, particularly motorized and mechanized, on or off existing roads and trails can cause disturbance to GUSG at sensitive times of the year, particularly during lekking, nesting early brood rearing, and winter. The road and motorized trail system in motorized suitable areas are not currently under consideration for expansion or substantial alteration of the transportation system. The proposed action eliminates cross-country motorized use in most of the planning area, except in a limited area. We consider restrictions on motorized access to existing roads and trails beneficial, because the risk of flushing nesting grouse and other behavioral impacts or destruction of a nest from cross-country travel will be effectively reduced or eliminated.

Off-highway vehicles would be limited to designated trails on portions of the Kinikin Hills and Dry Creek SRMAs, where GUSG designated critical habitat occurs. Due to the open nature of the landscape, however, this travel management action could be difficult to enforce, and effects on Gunnison sage-grouse designated critical habitat could result.

Open cross-country motorized use would be allowed on 3,950 acres within the action area (54 percent fewer than under current management), which would reduce effects to Gunnison sage-grouse compared to previous management. While areas closed to motorized travel would be reduced compared to current management (880 acres, 93 percent fewer acres than under current

20

BLM_0002288

management), 57,400 acres would be closed to motorized and mechanized travel (30 percent more than under current management) and 613,570 acres would be limited to designated routes (4 times more acres than under current management). Overall, this management would reduce the potential for effects on Gunnison sage-grouse associated with motorized and mechanized travel to a greater extent than under current management.

Lands and Realty

Construction and operation of ROW facilities, such as pipelines, roads, and transmission lines, may result in habitat loss, fragmentation, and degradation. Surface disturbance during construction removes vegetation and important habitat components for GUSG and, in most cases, renders the habitat unsuitable. Rights of way, such as those for roads and industrial facilities, may lead to permanent loss of GUSG habitat. Reclaimed ROWs, such as those for pipelines or buried power lines, may lead to a more short-term loss of habitat. However, following natural succession regimes, sagebrush communities would take 20 to 30 years to return to preconstruction conditions. In addition to removing vegetation, long-term occupancy of structures and facilities leads to direct habitat loss.

Rights-of-way may also lead to habitat fragmentation and degradation. Right of way projects can reduce patch size and increase edge habitats. Since GUSG require large blocks of intact habitat, linear disturbances reduce habitat quality. Surface disturbance can also lead to new weed infestations and spread weeds where infestations already occur. Noxious and invasive weeds are often of lower value to wildlife, and degrade wildlife habitat by reducing optimal cover or food. Sagebrush-steppe communities are among the ecosystems most vulnerable to invasion and degradation by invasive weeds. Not only can invasive species outcompete most native plants when moisture is limited, they can also change site-specific fire ecology and result in the loss of critical shrub communities. The loss and degradation of sagebrush habitat can reduce the carrying capacity of local breeding populations of GUSG, especially in areas where high quality sagebrush habitat is limited (Braun 1998; Connelly et al. 2000). As such, permitted ROW would cause impacts on GUSG and their habitat compared to areas where ROWs are excluded or avoided.

Both the construction and operation phases of ROW projects can lead to disruption impacts. Noise and an increase in human presence during construction may displace GUSG into lower quality habitat and may disrupt breeding and nesting (Holloran 2005). Although construction impacts are generally short term, many impacts would continue during routine maintenance and operation of the ROWs. Gunnison sage-grouse would likely avoid habitat in the vicinity of infrastructure (Holloran et al. 2010), resulting in functional habitat loss. In addition, noise and an increase in traffic during ROW operation and maintenance would disturb and likely displace GUSG (Lyon and Anderson 2003; Holloran 2005). Avoidance of habitat would be most prevalent during levels of high human activity, such as ROW construction. Gunnison sage-grouse may avoid otherwise suitable habitat as the density of roads and infrastructure increases (Holloran 2005). Avian predators, particularly raptors and corvids (i.e., crows, ravens, and magpies), are attracted to overhead utility lines because they provide perches for various activities, including hunting (Avian Power Line Interaction Committee 2006). Increased predation and harassment of GUSG may occur from new ROW projects involving power lines or

21

other tall structures (Connelly et al. 2004). However, the RMP includes management to remove or modify raptor perches, thereby reducing this threat. In addition, road ROWs may increase mammalian predator densities. Construction and operation of ROW facilities may also lead to direct mortality of GUSG. The potential for GUSG mortality from project construction would be low and likely limited to nesting hens or young chicks that have limited mobility. Direct mortality may occur from collisions with turbines, power lines, or meteorological towers or their supporting infrastructure, such as guy wires (Connelly et al. 2004; Beck et al. 2006). In addition, an increase of traffic on roads from ROW maintenance and operations can lead to direct mortality through vehicle collisions.

The RMP includes ROW exclusion areas, which are any areas within a 0.6-mile radius of any sage-grouse lek (Table 4). Additionally, BLM identified all occupied sage-grouse habitat, or areas within a 4-mile radius of sage-grouse leks as ROW avoidance areas. These measures would reduce or eliminate impacts on GUSG and their habitat by restricting new ROWs.

Lands

New ROW authorizations may necessitate the removal of GUSG habitat and may cause other indirect effects. There is no reasonable means available to predict the timing or location of rights-of-way requests, and we are unable to meaningfully predict an approximate habitat impact from such requests. However, we believe that the revised RMP directs the BLM to reduce the negative impacts of such requests, and is unlikely to result in significant losses of GUSG habitat within the planning area. This allows the BLM to require retrofitting of existing power lines with raptor perch deterrents when reauthorizing ROW permits.

Energy and Mineral Development

Fluid Mineral development potential occurs within or near established GUSG populations in the UFO planning area. However, the proposed management plan includes an NSO stipulation within occupied GUSG habitat, which will limit effects to approximately 20,470 acres of occupied critical habitat, and 2,800 acres of unoccupied critical habitat. The Plan also provides a controlled surface use stipulation on approximately 13,930 acres of unoccupied critical habitat, which could avoid of eliminate effects.

We recognize that the PRMP includes exceptions, modifications, and waivers to stipulations, controlled surface uses, and timing limitations. For the purposes of this biological opinion, we assume that the BLM granting of exceptions, modifications, or waivers, to stipulations or controlled surface uses, or timing restrictions within critical habitat for the GUSG will be rare and requires separate section 7 consultation. We make this assumption for the purpose of a simplified effects analysis. It is not possible for to anticipate use of exceptions, modifications, or waivers, therefore we cannot reasonably predict or quantify the negative effects to GUSG or their critical habitat associated with their use. The use of exceptions, modifications, and waivers within critical habitat for the GUSG may require reinitiation of section 7 consultation.

BLM_0002290

Species and Critical Habitat Response to Proposed Action

The nature of such a broad reaching programmatic analysis makes evaluating the species and critical habitat response to the proposed action difficult if not impossible to predict. The revised RMP contains direction to minimize impacts to the GUSG (as described in the proposed plan) thus reducing the potential for adverse effects to the species and its designated critical habitat. However, project level decisions will occur within occupied critical habitat for GUSG that will result in some of the effects detailed previously. Implementation of the revised RMP is likely to result in low levels of adverse effects to GUSG, and equally low levels of effect to designated critical habitat, primarily as indirect effects from project level decisions. However, given the uncertainty of the timing, location, size, and extent of future actions it is not possible to meaningfully quantify adverse effects caused by implementation of the revised RMP at this programmatic scale. Therefore, all subsequent actions that affect GUSG will be subject to future section 7 analysis and consultation requirements.

CUMULATIVE EFFECTS

Cumulative effects include the effects of future State, tribal, local, or private actions that are reasonably certain to occur in the action area considered in this conference opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the ESA.

The planning area occurs within Delta, Gunnison, Mesa, Montrose, Orray, and San Miguel Counties Colorado, which have experienced significant population growth since 1987, and population forecasts expect the growth trend will continue (Colorado Division of Local Government, State Demography Office 2013). As such, we anticipate continued use and development within the planning area. Past, present and reasonably foreseeable future actions and conditions on non-federal lands in the action area that will likely continue to affect Gunnison Sage-Grouse, Colorado hookless cactus, and the Clay-loving wild buckwheat are as follows:

- Mineral exploration and development
- Agricultural development
- ROW and infrastructure development
- Livestock grazing
- Recreation
- Road construction
- Weed invasion and spread
- Wildland fires
- Drought
- Farming

We are not aware of any specific non-Federal actions within the action area that are reasonably certain to occur that will negatively affect the species or critical habitats discussed herein.

23

BLM_0002291

**CONCLUSION**

Colorado Hookless Cactus and Clay-loving Wild Buckwheat

After reviewing the current status of the Colorado hookless cactus and clay-loving wild buckwheat, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's biological opinion that implementation of the RMP, as proposed, is not likely to jeopardize the continued existence of the Colorado hookless cactus and the Clay-loving wild buckwheat.  The Service's rationale is presented below.

Implementation of the revised RMP, including the conservation measures, will reduce multiple threats to the Colorado hookless cactus, and clay-loving wild buckwheat by, significantly curtailing off-road and off-trail  mechanized and motorized travel; implementing standard operating procedures and best management practices; applying No Surface Occupancy (NSO) stipulations; incorporating conservation measures contained in the programmatic grazing BA/BO of November 15, 2012 (BLM, 2012; Service BO number ES/GJ-6-CO-12-F-006); designation of right-of way exclusion and avoidance areas.

The biggest change in the proposed action is the specific designation of routes for motorized travel.  Cross-country motorized travel will not be allowed under the proposed action.

We anticipate a low level of adverse effects to Colorado hookless cactus, and clay-loving wild buckwheat , but the majority of these effects will be widely distributed across cactus habitat in the UFO and likely of low intensity and severity.  Any subsequent action implemented under the revised RMP that may affect the Colorado hookless cactus, clay-loving wild buckwheat or future critical habitat designations must go through separate section 7 consultation.

Gunnison Sage-grouse

After reviewing the current status of the GUSG, the environmental baseline for the action area, the effects of the proposed action, and the cumulative effects, it is the Service's biological opinion that implementation of the RMP, as proposed, is not likely to jeopardize the continued existence of the GUSG.  The Service's rationale is presented below.

Implementation of the RMP, including the conservation measures and use stipulations, will reduce multiple threats to the GUSG and could restore the species to formerly occupied range. We anticipate some low level of adverse effects to GUSG, but the majority of these effects would be widely distributed across GUSG habitat in the UFO and likely be of low intensity and severity.  Any subsequent actions implemented under the revised plan that may affect the GUSG or critical habitat must go through separate section 7 consultations.

**INCIDENTAL TAKE STATEMENT**

Endangered Species implementing regulation 50 CFR § 402.14 (i) (6) states, "for a framework programmatic action, an incidental take statement is not required at the programmatic level; any incidental take resulting from any action subsequently authorized, funded, or carried out under

24

the program will be addressed in subsequent section 7 consultation, as appropriate." Since the proposed RMP constitutes a framework programmatic action, we are not providing an incidental take statement.

**Conservation Recommendations**

Section 7(a)(1) of the ESA directs Federal agencies to utilize their authorities to further the purposes of the ESA by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.

We envision recovery for the Colorado hookless cactus includes sizable, stable populations maintained on conserved suitable habitat, with acceptable levels of connectivity between subpopulations for pollinator movement, gene flow, and seed dispersal. Populations will be maintained to provide sufficient representation, resiliency, and redundancy to ensure a high probability of survival for the foreseeable future. Meeting these goals will require that threats be sufficiently understood and abated. Range-wide monitoring will be necessary.

Recovery outline for the Colorado hookless cactus is as follows:

Recovery needs for Colorado hookless cactus include: (1) survey to accurately document populations and suitable habitat; (2) protect and restore habitat including pollinator habitat and corridors to provide connectivity; and (3) protect individual plants and populations from direct and indirect threats. Specific actions include:

**Surveys and Monitoring**

- Completion of a comprehensive survey throughout the species' range. This would include areas that are not likely to be disturbed. Survey results will provide an accurate population estimate and allow us to identify core population areas so we can more effectively protect the species. This will require evaluation of habitat components likely to support Colorado hookless cactus.

- Surveys also should more accurately delineate the Colorado hookless cactus range relative to other *Sclerocactus* species.

- Locate possible population connectivity corridors.

- Continue ongoing monitoring efforts and expand monitoring to include a larger and more representative sample of occupied sites. This data should improve our understanding of trends.

**Threats Abatement**

- Identify sites in urgent need of habitat protection, set protection priorities, and implement protective measures. In the long run, land management agencies should establish formal land management designations to provide for long-term protection of important populations and habitat.

25

BLM_0002293

- Oil and gas leasing and other mineral extraction activities should avoid occupied sites and other important habitat.
- Develop and implement standard conservation measures to minimize future project and use impacts.
- Coordinate with land management agencies, project proponents, and other partners early in the planning process to limit direct and indirect impacts of planned activities.
- Prevent the collection of Colorado hookless cactus plants from natural populations.

**Research**

- Resolve the taxonomic status of Colorado hookless cactus regarding the species relationship with *S. parviflorus*. Secondarily, this study would assess genetic differences between Colorado hookless cactus populations.
- Continue research into Colorado hookless cactus life history and ecology, including pollinators.
- Study population dynamics and conduct a population viability analysis.
- Encourage investigations that project *Sclerocactus* species' vulnerability and response to climate change.
- Improve our understanding of livestock and native (e.g., rodent) grazing impacts.
- Monitor cactus-borer beetle (*Moneilema semipunctatum*) infestations, and study the relationship of episodic infestations with drought and other environmental factors.

Monitor changes in invasive species prevalence and impacts on Colorado hookless cactus. Additionally, continue to explore approaches to minimize the risk posed by invasives and associated remediation actions.

Recovery Plan for clay-loving wild buckwheat

The recovery plan made the following recommendation to BLM for conservation and moving towards recovery of the clay-loving wild buckwheat. The BLM has completed most if not all of these actions.

Remove threats to the clay-loving wild-buckwheat and secure populations and their ecosystems.

- ➢ Protect populations on land administered by the Bureau of Land Management.
  - Develop a Bureau Habitat Management Plan.
  - Establish Areas of Critical Environmental Concern and/or State Natural Areas on viable sites (completed).
  - Eliminate off-road and all-terrain vehicle use within populations (completed).
  - Designate areas closed to off-road and all-terrain vehicles (completed).
  - Conduct intensive management in problem areas.
  - Consider mineral withdrawals and no-surface-occupancy stipulations for leases (completed.

26

Additional measures identified in the recovery plan include Inventory all potential habitat, monitor populations and habitat, conduct minimum viable population modeling study feasibility of population augmentations if desirable.  It is currently unclear whether these additional measures were completed; however, we recommend continued survey effort and monitoring of populations to determine long-term population trends.

Investigate the advantages of establishing critical habitat on Federal sites.

Gunnison Sage-grouse

The UFO should consider full implementation of the conservation strategy presented in the GUSG Rangewide Conservation Plan.  The purpose of the RCP is to identify measures and strategies to achieve the goal of protecting, enhancing, and conserving GUSG and their habitats.

Range-wide Conservation planning strategies, include, but are not limited to, the following:

1) Protect occupied habitats from permanent loss.  If permanent habitat loss from development (primarily) or conversion is not addressed, successful implementation of all the other conservation strategies is not likely to be successful in conserving GUSG.  An equally important strategy is preventing significant degradation, whatever the cause, of existing habitat that is seasonally important to GUSG.

2) Coordinate with CPW in their effort to stabilize existing populations demographically and genetically through augmentation, and establish new populations in suitable historically occupied habitats (i.e. unoccupied critical habitat).

3) Improve habitat within currently occupied and adjacent potential habitats.

4) Protect suitable unoccupied habitat areas from permanent loss.

5) Improve habitat conditions within unoccupied habitat, which will accommodate item 2 above.

Additional recommendations are as follows:

- Any activity that results in the permanent loss of proposed critical habitat should include mitigation of offset such losses.
- Recreation - Only allow special recreation permits that have neutral or beneficial affects to occupied habitat areas.
- Lands/Realty – Retain public ownership of proposed critical habitat.  Subject to valid, existing rights, co-locate new rights-of-way within existing ROWs
- Range Management - Within proposed critical habitat, incorporate GUSG habitat objectives and management considerations into all BLM grazing allotments through allotment management plans or permit renewals.  Work cooperatively on integrated ranch planning within GUSG habitat so operations with deeded/BLM allotments can be planned as single units.  Design any new structural range improvements and location of

27

supplements (i.e. salt or protein blocks) to conserve, enhance, or restore GUSG habitat through an improved grazing management system relative to GUSG objectives. When developing or modifying water developments, use best management practices to mitigate potential impacts from West Nile virus.

- Fluid Minerals - When considering waivers, exceptions, and modifications within NSO designated areas, we recommend implementing the criteria developed for the Northwest Colorado Greater Sage-Grouse RMPA as follows:

  **Exceptions or modifications may be considered if, in consultation with the State of Colorado, it can be demonstrated that there is no impact on Gunnison sage-grouse based on one of the following:

  1. Topography/areas of non-habitat create an effective barrier to impacts
  2. No additional impacts would be realized above those created by existing major infrastructure (for example, State Highway 50).
  3. The exception or modification precludes or offsets greater potential impacts if the action were proposed on adjacent parcels (for example, due to landownership patterns).

  **In order to approve exceptions or modifications to this lease stipulation, the Authorized Officer must obtain: agreement, including written justification, between the BLM District Managers and CPW that the proposed action satisfies at least one of the criteria listed above

  Waivers - No waivers are authorized unless the area or resource mapped as possessing the attributes protected by the stipulation is determined during collaboration with the State of Colorado to lack those attributes or potential attributes. A 30-day public notice and comment period is required before waiver of a stipulation. Waivers would require BLM State Director approval.

- Incorporate "Available Conservation Measures" and "Overarching Conservation Objectives" found in the GUSG final listing rule (79 FR 69192, p. 69305-69309).

**Reinitiation-Closing Statement**

This concludes formal consultation for the potential effects of the implementation of the revised RMP. As provided in 50 CFR 402.16, reinitiation of formal consultation is required where discretionary Federal agency involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the agency action that may affect listed species or critical habitat in a manner or to an extent not considered in this opinion; (3) the action is subsequently modified in a manner that causes an effect to the listed species or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action (50 CFR §402.16).

28

We appreciate your efforts to ensure the conservation of endangered, threatened, and candidate species.  If you have questions regarding this letter or your responsibilities under the Act, please contact Kurt Broderdorp at the letterhead address or phone 970-628-7186.

29

BLM_0002297

## LITERATURE CITED

Aldridge, C. L., D. J. Saher, T. M. Childers, K. E. Stahlnecker, and Z. H. Bowen. 2012. Crucial nesting habitat for GUSG: a spatially explicit hierarchical approach. Journal of Wildlife Management 76:391-406.

Amstrup, S.C. and R.L. Phillips. 1977. Effects of coal extraction and related development on wildlife populations: Effects of coal strip mining on habitat use, activities and population trends of sharp-tailed grouse (*Pedioecetes phasianellus*). Annual progress report. Denver Wildlife Research Center. U.S. Fish and Wildlife Service. Denver, CO. 37 pp.

Beck, J.L., D.L. Mitchell, and B.D. Maxfield. 2003. Changes in the distribution and status of sage-grouse in Utah. Western North American Naturalist 63:203-214.

Beck, J. L., K. P. Reese, J. W. Connelly, and M. B. Lucia. 2006. Movements and survival of juvenile greater sage-grouse in southeastern Idaho. Wildlife Society Bulletin 34:1070-1078.

BIO-Logic, Inc. Montrose, CO.

Bowlin W. R., V. J. Tepedino, and T. L. Griswold. 1992. The Reproductive Biology of *Eriogonum Pelinophilum*. Proceedings of the Southwestern Rare and Endangered Plant Conferece. Edited by R. Sivinski and K. Lightfoot. New Mexico Forestry and Resources Conservation Division. Energy, Minerals and Natrual Resources Department. Sante Fe, NM. Miscellaneous Publication No. 2. Pages 296-301.

Bureau of Land Management 1997. BLM Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado. BLM, Colorado State Office, Lakewood, Colorado. 186 pp.

Bureau of Land Management, Uncompahgre Field Office (BLM). 2002. North Delta Land Health Assessment. 2001-2002. Montrose, CO. 110 pp.

Braun, C.E. 1986. Changes in sage grouse lek counts with advent of surface coalmining. Proc. Issues and Technology in the Management of Impacted Western Wildlife 2:227-231.

Braun, C.E. 1998. Sage grouse declines in western North America: What are the problems? Proceedings of Western Association of Fish and Wildlife Agencies 78:139-156.

Braun, C.E., M.F. Baker, R.L. Eng, J.W. Gashwiler, and M.H. Schroeder. 1976. Conservation committee report on effects of alteration of sagebrush communities on the associated avifauna. The Wilson Bulletin 88:165-171.

Braun, C.E., O.O. Oedekoven, and C.L. Aldridge. 2002. Oil and gas development in western North America: Effects on sagebrush steppe avifauna with particular emphasis on sage-grouse. Transactions of the North American Wildlife Natural Resources Conference 67. 19 pp.

30

BLM_0002298

Bui, T.D.  2009.  The effects of nest and brood predation by common ravens (*Corvus corax*) on greater sage-grouse (*Centrocercus urophasianus*) in relation to land use in western Wyoming. M.S. Thesis, University of Washington.  48 pp.

Bureau of Land Management (BLM).  1997.  Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado.  U.S. Department of the Interior, Bureau of Land Management.  186 pp.

Call, M.W. and C. Maser.  1985.  Wildlife habitats in managed rangelands - The Great Basin of southeastern Oregon sage grouse.  General Technical Report PNW-187, U.S. Department of Agriculture, Forest Service, La Grande, OR.  30 pp.

Christiansen, T. in litt.  2009.  Fence marking to reduce greater sage-grouse (*Centrocercus urophasianus*) collisions and mortality near Farson, Wyoming - summary of interim results. Wyoming Game and Fish Department.  Unpublished data.  3 pp.

CNHP (Colorado Natural Heritage Program). 2014. *Sclerocactus glaucus* Element Global Rank Report 44168. Fort Collins, Colorado.

Coates, P.S.  2007.  Greater sage-grouse (*Centrocercus urophasianus*) nest predation and incubation behavior.  Ph.D. Thesis, Idaho State University, Boise, ID.  191 pp.

Colorado Division of Wildlife (CDOW).  2009a. Spreadsheet summarizing land ownership by Gunnison sage-grouse population and status.  Submittal to the Service.  5 pp.

Colorado Division of Wildlife (CDOW).  2009b. 2009 CDOW Statewide summary information request.  Submittal to the Service.  157 pp.

Colorado Parks and Wildlife (CPW). 2013. Comments on the proposed rule to list Gunnison sage-grouse as endangered. Submittal to the Service. 26 pp.

Colorado Parks and Wildlife (CPW). 2018.  Unpublished Data of 2018 GUSG Lek Count Data.

Connelly, J. W., H. W. Browers and R. J. Gates. 1988. Seasonal movements of sage grouse in southeastern Idaho.  Journal of Wildlife Management 52: 116-182.

Connelly, J.W., M.A. Schroeder, A.R. Sands, and C.E. Braun.  2000. Guidelines to manage sage grouse populations and their habitats.  Wildlife Society Bulletin 28:967-985.

Connelly, J. W., S. T. Knick, M. A. Schroeder, and S. Stiver.  2004.  Conservation assessment of greater sage-grouse and sagebrush habitats.  Western Association of Fish and Wildlife Agencies. www.wafwa.org.

Ellis, K.L.  1985.  Effects of a new transmission line on distribution and aerial predation of breeding male sage grouse.  Final report, Deseret Generation and Transmission Cooperative, Sandy, UT.  28 pp.

31

BLM_0002299

Evans, C.C. 1986. The relationship of cattle grazing to sage grouse use of meadow habitat on the Sheldon National Wildlife Refuge. MS Thesis, University of Nevada, Reno, NV. 92 pp.

Forman, R.T.T. 2000. Estimate of the area affected ecologically by the road system in the United States. Conservation Biology 14:31-35.

Forman, R.T.T. and L.E. Alexander. 1998. Roads and their major ecological effects. Annual Review of Ecology and Systematics 29:207-231 plus C2.

Frey, N. S. and M. R. Conover. 2006. Habitat use by meso-predators in a corridor environment. Journal of Wildlife Management 70: 1111-1118.

Gelbard, J.L. and J. Belnap. 2003. Roads as conduits for exotic plant invasions in a semiarid landscape. Conservation Biology 17:420-432.

Gunnison Sage-grouse Rangewide Steering Committee (GSRSC). 2005. Gunnison sage-grouse rangewide conservation plan. Colorado Division of Wildlife, Denver, Colorado, USA.

Heil, K.D. and J.M. Porter. 1994. Sclerocactus (Cactaceae): A revision. Haseltonia 2:20-46.

Heil, K.D. and J.M. Porter. 2004. Sclerocactus in Flora of North America. Online at: http://www.efloras.org/florataxon.aspx?flora_id=1&taxon_id=129764. Accessed Dec. 6, 2011.

Holloran M.J. 2005. Greater Sage-Grouse (*Centrocercus urophasianus*) Population Response to Natural Gas Field Development in Western Wyoming. PhD, Department of Zoology and Physiology, December, 2005. 215 pp.

Holloran, M.J., R.C. Kaiser, and W.A. Hubert. 2010. Yearling greater sage-grouse response to energy development in Wyoiming. Journal of Wildlif3e Management 74: 65-72

Klebenow, D.A. 1981. Livestock grazing interactions with sage grouse. Proceedings of the Wildlife-Livestock Relationship Symposium. 113-123 pp.

Knick, S.T., D.S. Dobkin, J.T. Rotenberry, M.A. Schroeder, W.M. Vander Haegen, and C. Van Riper III. 2003. Teetering on the edge or too late? Conservation and research issues for avifauna of sagebrush habitats. Condor 105:611-634.

Knight, R.L. and J.Y. Kawashima. 1993. Responses of raven and red-tailed hawk populations to linear right-of-ways. Journal of Wildlife Management 57:266-271.

Kolb A. 2008. Habitat fragmentation reduces plant fitness by disturbing pollination and modifying response to herbivory. Biological Conservation 141:2540-2549.

Leach, H. R. and A. L. Hensley. (1954). The Sage Grouse in California, with special reference to food habits. Calif. Fish Game no. 40:385-394.

BLM_0002300

Lyon, A.G. and S.H. Anderson.  2003.  Potential gas development impacts on sage grouse nest initiation and movement.  Wildlife Society Bulletin 31:486-491.

Manville, A.M.  2002.  Bird strikes and electrocutions at power lines, communication towers, and wind turbines:  State of the art and state of the science – next steps toward mitigation. International Partners in Flight Conference, Monterey, CA. 28 pp.

Merritt, S., C. Prosser, K. Sedivec, and D. Bangsund.  2001.  Multi-species grazing and leafy spurge.  U.S.D.A.–ARS Team Leafy Spurge Area-Wide IPM Program, Sidney, Montana.  28 pp.

NatureServe.  Copyright © 2018 NatureServe, 4600 N. Fairfax Dr., 7th Floor, Arlington Virginia 22203, U.S.A. All Rights Reserved. Each document delivered from this server or web site may contain other proprietary notices and copyright information relating to that document. The following citation should be used in any published materials which reference the web site.

NatureServe.  2018. NatureServe Explorer: An online encyclopedia of life [web application]. Version 7.1.  NatureServe, Arlington, Virginia.  Available http://explorer.natureserve.org/servlet/NatureServe?searchName=Sclerocactus+glaucus (Accessed: October 25, 2018).

Olsen, B. E., and R. T. Wallander.  2001.  Sheep grazing spotted knapweed and Idaho fescue. Journal of Range Management 54:25-30.

Oyler-McCance, S.J. 1999. Genetic and habitat factors underlying conservation strategies for Gunnison sage-grouse.  Ph.D. Dissertation, Colorado State University, Fort Collins, CO. 162 pp.

Oyler-McCance, S.J., K.P. Burnham, and C.E. Braun.  2001.  Influence of changes in sagebrush on Gunnison sage grouse in southwestern Colorado.  Southwestern Naturalist 46:323-331. Patterson, R.L.  1952.  The sage grouse in Wyoming.  Wyoming Game and Fish Commission, Sage Books Inc., Denver, CO.  344 pp.

Piquette D., D.A. Keck, N. Seward, B. Magee, and P. Magee. 2013. Anthropogenic noise assessment around Gunnison sage-grouse leks within the Gunnison Basin, Colorado. Unpublished data. 20 pp.

Riggs, R.A. and P.J. Urness.  1989.  Effects of goat browsing on gambel oak communities in northern Utah.  Journal of Range Management 42:354-360.

Schroeder, M.A., J.R. Young, and C.E. Braun.  1999.  Sage grouse (*Centrocercus urophasianus*). 28 pages In Poole, A. and F. Gill, eds.  The Birds of North America, No. 425.  The Birds of North America, Inc., Philadelphia, Pennsylvania.

Schroeder, M.A., C.L. Aldridge, A.D. Apa, J.R. Bohne, C.E. Braun, S.D. Bunnell, J.W. Connelly, P.A. Deibert, S.C. Gardner, M.A. Hilliard, G.D. Kobriger, S.M. McAdam, C.W.

33

McCarthy, J.J. McCarthy, D.L. Mitchell, E.V. Rickerson, and S. J. Stiver.  2004.  Distribution of sage-grouse in North America.  Condor 106:363-376.

Steenhof, K., M. N. Kochert, and J. A. Roppe.  1993.  Nesting by raptors and common ravens on electrical transmission line towers. Journal of Wildlife Management 57:271-281.

Stiver, S. J., E. T. Rinkes, D. E. Naugle, P. D. Makela, D. A. Nance, and J. W. Karl. 2015. Sage-Grouse Habitat Assessment Framework: A Multiscale Assessment Tool. Technical Reference 6710-1. Bureau of Land Management and Western Association of Fish and Wildlife Agencies. Denver, Colorado.

Tepedino, V. J. PhD.  2009.  The Pollination Biolgoby of a Peceance Basin Endemic *Physaria obcordata*.  Report prepared for Colorado Natural areas Program, Denver, CO.  25 pp.

US Fish and Wildlife Service.  2010. Recovery Outline for the Colorado Hookless Cactus (*Sclerocactus glaucus*). Colorado Ecological Services Field Office.  17pp.

US Fish and Wildlife Service.  1988.  Recovery Plan for the Clay-loving wild buckwheat.  21pp.

Vander Haegen, W. M., M. A. Schroeder, and R. M. DeGraaf.  2002.  Predation on real and artificial nests in shrubsteppe landscapes fragmented by agriculture.  Condor 104:496-506.

Walker, B.L., D.E. Naugle, and K.E. Doherty.  2007. Greater sage-grouse population response to energy development and habitat loss.  Journal of Wildlife Management 71:2644-2654.

Wallestad, R. O., and J.G. Peterson. 1975. Foods of Adult Sage Grouse in Central Montana. Journal of Wildlife Management. 39 (3): 628-630.

Wisdom, M.J., C.W. Meinke, S.T. Knick, and M.A. Schroeder.  2011.  Factors associated with extirpation of sage-grouse.  Pp. 451–472 in S. T. Knick and J. W. Connelly (editors). Greater Sage-Grouse: ecology and conservation of a landscape species and its habitats. Studies in Avian Biology (vol. 38), University of California Press, Berkeley, CA.

Young, J. R.  1994.  The influence of sexual selection on phenotypic and genetic divergence among sage grouse populations.  Dissertation, Purdue University, West Lafayette, Indiana, USA.

Young, J.R., C.E. Braun, S.J. Oyler-McCance, J.W. Hupp, and T.W. Quinn.  2000.  A new species of sage-grouse (Phasianidae: Centrocercus) from southwestern Colorado.  Wilson Bulletin 112:445-453.

BLM_0002302



# FEDERAL REGISTER

Vol. 77        Tuesday,

No. 128      July 3, 2012

Part II

## Department of Agriculture

Forest Service

36 CFR Part 294
Special Areas; Roadless Area Conservation; Applicability to the National Forests in Colorado; Final Rule

## DEPARTMENT OF AGRICULTURE

**Forest Service**

**36 CFR Part 294**

**RIN 0596–AC74**

**Special Areas; Roadless Area Conservation; Applicability to the National Forests in Colorado**

**AGENCY:** Forest Service, USDA.

**ACTION:** Final rule and record of decision.

---

**SUMMARY:** The U.S. Department of Agriculture (USDA or Department), is adopting a State-specific final rule to provide management direction for conserving and managing approximately 4.2 million acres of Colorado Roadless Areas (CRAs) on National Forest System (NFS) lands. The final Colorado Roadless Rule is a rule that addresses current issues and concerns specific to Colorado. The State of Colorado and Forest Service, working in partnership, have found a balance between conserving roadless area characteristics for future generations and allowing management activities within CRAs that are important to the citizens and economy of the State of Colorado.

**DATES:** This rule is effective July 3, 2012.

**FOR FURTHER INFORMATION CONTACT:** Colorado Roadless Rule Team Leader Ken Tu at (303) 275–5156. Individuals using telecommunication devices for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 between 8 a.m. and 8 p.m. Eastern Standard Time, Monday through Friday.

**SUPPLEMENTARY INFORMATION:** This preamble states the basis and purpose of the rule, which includes responses to comments received on the proposed rule, and serves as the record of decision for this rulemaking. The preamble is organized into the following sections:

- Executive Summary
- Background
- Purpose and Need
- Decision
- Decision Rationale
- Public Involvement
- Tribal Involvement
- Alternatives Considered
- Environmentally Preferable Alternative
- Roadless Area Inventories
- Comments on the Proposed Rule and Changes Made in Response
- Regulatory Certifications

## Executive Summary

The United States Forest Service manages approximately 14,520,000 acres of public lands in Colorado, which are distributed among eight national forests and two national grasslands. These national forests and grasslands are characterized by a diverse array of landscapes, ecosystems, natural resources, and land use activities.

In January 2001, the Roadless Area Conservation Rule (2001 Roadless Rule) was adopted into regulation. The 2001 Roadless Rule has been the subject of litigation for more than a decade, and is now currently in effect. Uncertainty about the future of the 2001 Roadless Rule, along with state-specific concerns, was a key factor that influenced Colorado to initiate a petition to manage roadless areas in Colorado in 2005.

The Department, the Forest Service, and the State of Colorado agree that a need exists to provide management direction for roadless areas in Colorado. In its petition to the Secretary of Agriculture, the State of Colorado indicated a need to develop regulations for the management of Colorado's roadless areas for the following reasons:

- Roadless areas are important because they are, among other things, sources of drinking water, important fish and wildlife habitat, semi-primitive or primitive recreation areas, including motorized and non-motorized recreation opportunities, and naturally appearing landscapes. A need exists to provide for the conservation and management of roadless area characteristics.
- The Department, the Forest Service, and the State of Colorado recognize that timber cutting, sale, or removal and road construction/reconstruction have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area characteristics. Therefore, there is a need to generally prohibit these activities in roadless areas. Some have argued that linear construction zones (LCZs) also need to be restricted.
- A need exists to accommodate state-specific situations and concerns in Colorado's roadless areas. These include the following:
  ○ Reducing the risk of wildfire to communities and municipal water supply systems
  ○ Facilitating exploration and development of coal resources in the North Fork coal mining area
  ○ Permitting construction and maintenance of water conveyance structures
  ○ Restricting LCZs, while permitting access to current and future electrical power lines

  ○ Accommodating existing permitted or allocated ski areas
- There is a need to ensure that Colorado Roadless Areas (CRAs) are accurately mapped.

The major provisions of the proposed rule would establish a system of CRAs with management direction to conserve roadless area characteristics. These areas would replace the roadless areas identified in the 2001 Roadless Rule for national forests in Colorado. The proposed rule conserves roadless area characteristics by prohibiting tree cutting, sale, or removal; road construction and reconstruction; and LCZs, with some limited exceptions. In addition, the rule establishes a system of upper tier acres within CRAs where additional restrictions apply, further limiting exceptions to the prohibitions.

The proposed CRAs encompass approximately 4.19 million acres of NFS land in Colorado, distributed among 363 separate roadless areas. The Colorado Roadless Rule provides for boundary adjustments to be made to CRA boundaries, subject to a public review and comment period, and applicable NEPA or other requirements. In addition, the rule provides for administrative corrections (defined as adjustments to remedy clerical and mapping errors) to upper tier boundaries, subject to a public review and comment period.

The rule adjusted roadless area boundaries from the 2001 inventory in the following ways:

- Correcting mapping errors that primarily resulted from improvements in inventory data and mapping technology.
- Excluding private land.
- Excluding land substantially altered by road construction and timber harvest activities.
- Excluding ski areas under permit or lands allocated in forest plans to ski area development.
- Excluding Congressionally designated lands, such as wilderness and other designations, that take legal precedence over roadless area regulations.
- Including unroaded areas outside IRAs that contain roadless area characteristics.

Official CRA and upper tier locations are contained in a set of maps at the Forest Service national headquarters. The Forest Service national headquarters office would maintain the official map of CRAs, including records of adjustments to such maps, pursuant to the final proposed rule. These maps will be available to the public.

The rule is expected to have a beneficial economic impact of about

$65,000,000 per year, which is not considered to be economically significant under Executive Order (E.O.) 12866, Regulatory Planning and Review. Even though this rule is not considered economically significant, it is considered a significant regulatory action under E.O. 12866 and E.O. 13563.

## Background

On June 8, 2005, then-Governor Bill Owens signed Colorado Senate Bill 05–243 which directed the formation of a 13-person bipartisan task force to make recommendations to the Governor on the appropriate management of CRAs on National Forest Systems in Colorado. The Colorado law also identified the USDA 2001 Roadless Area Conservation Rule (2001 Roadless Rule) as the starting point for the task force. On July 14, 2005, the State of Colorado announced it would submit a petition requesting specific regulatory protections for the inventoried roadless areas within the State.

Colorado's petition (2006 Petition) was submitted by then-Governor Owens on November 13, 2006, to the Secretary of Agriculture for consideration under the Administrative Procedure Act. On April 11, 2007, then-Governor Ritter resubmitted the 2006 petition with additions (2007 Petition). After reviewing the recommendation from the Roadless Area Conservation National Advisory Committee (RACNAC), the Secretary of Agriculture accepted the 2007 Petition on August 24, 2007, and directed the Forest Service to initiate rulemaking based on the petition.

A notice of intent (NOI) to prepare an environmental impact statement (EIS) was published in the **Federal Register** on December 26, 2007, (72 FR 72982). The State of Colorado was granted cooperating agency status in a memorandum of understanding dated January 8, 2008. On July 25, 2008, the Forest Service published the 2008 proposed rule to establish State-specific management direction to provide, within the context of multiple use, lasting protection for roadless areas on NFS land in Colorado (73 FR 43544). A notice of availability for the draft EIS was published on August 1, 2008, (73 FR 44991). The availability of the regulatory risk assessment for the 2008 proposed rule was published on September 18, 2008, (73 FR 54125).

Based on the comments on the 2008 draft EIS and other public involvement efforts, the State requested the USDA postpone further rulemaking efforts until the State considered its 2007 Petition. On August 3, 2009, the State of Colorado sought additional public comment. The State considered the

public comments and submitted a revised petition to the Secretary on April 6, 2010 (2010 Petition).

On April 15, 2011, the Forest Service published a revised proposed rule (76 FR 21272) to provide State-specific direction for the protection of roadless areas on NFS lands in Colorado. A notice of availability for the revised draft EIS (RDEIS) was published on April 29, 2011, (76 FR 24021).

Since the promulgation of the 2001 Roadless Rule, it has been in litigation. The ongoing uncertainty regarding management of roadless areas was a key factor that influenced Governor Bill Owens to initiate a State-specific petition to manage Colorado roadless areas. On October 21, 2011, the U.S. Tenth Circuit Court of Appeals reversed the Wyoming District Court's decision to set aside the 2001 Roadless Rule and remanded the case to the District Court to vacate the permanent injunction. On February 24, 2012, the Tenth Circuit issued a mandate effectuating the October 21, 2011 opinion and requiring the injunction of the 2001 Roadless Rule to be vacated. As of the printing of this final rule, the 2001 Roadless Rule is in effect nationwide, except in Idaho, which has its own State-specific roadless rule.

## Purpose and Need

The Department, Forest Service, and the State of Colorado agree there is a need to establish management direction for the conservation of roadless area values and characteristics in Colorado. In addition, there is a need to ensure that CRAs are accurately mapped. In its petition to the Secretary of Agriculture, the State of Colorado indicated a need to develop State-specific regulations for the management of Colorado's roadless areas.

Roadless areas are, among other things, sources of drinking water, important fish and wildlife habitat, semi-primitive or primitive recreation areas, including motorized and nonmotorized recreation opportunities, and natural-appearing landscapes. There is a need to provide for the conservation and management of roadless area characteristics.

The Department believes tree cutting, sale or removal, and road construction/ reconstruction have the greatest likelihood of altering and fragmenting landscapes, resulting in immediate, long-term loss of roadless area values and characteristics, and there is a need generally to prohibit these activities in roadless areas. Some have argued that linear construction zones (LCZs) also need to be restricted in roadless areas.

The State has indicated flexibility is needed to accommodate State-specific situations and concerns in Colorado's roadless areas. These include: (1) Reducing the risk of wildfire to at-risk communities and municipal water supply systems; (2) facilitating exploration and development of coal resources in the North Fork coal mining area on the Grand Mesa, Uncompahgre, and Gunnison National Forests; (3) permitting the construction and maintenance of water conveyance structures; (4) restricting linear construction zones, while permitting access to current and future electrical power lines and telecommunication lines; and (5) accommodating existing permitted or allocated ski areas.

## Decision

The Department hereby promulgates a regulation establishing CRAs and providing for management of CRAs as described in Alternative 2 of the "Rulemaking for Colorado Roadless Areas Final Environmental Impact Statement," USDA Forest Service, 2012, and the supporting record. This decision is not subject to Forest Service administrative appeal regulations.

## Decision Rationale

Governor Ritter stated in his April 11, 2007 letter to Undersecretary Mark Rey that, "Colorado's roadless areas are a treasure to be enjoyed by the citizens of Colorado and the visitors who come here to recreate and enjoy the natural beauty of our National Forests. Roadless areas provide critical wildlife habitat, clean drinking water, recreation and unmatched scenery. Roadless areas belong to all Americans and are a resource to protect and pass on to future generations." The final rule will provide long-term management of CRAs to ensure roadless area values are passed on to future generations, while providing for Colorado-specific situations and concerns that are important to the citizens and economy of Colorado.

The final rule provides a high level of conservation of roadless area characteristics on approximately 4.2 million acres. The final rule achieves this by establishing prohibitions for tree cutting, road construction and reconstruction, and use of linear construction zones with limited exceptions and establishing upper tier acres. The final rule will be applied to 409,500 acres that were not covered in the 2001 Roadless Rule. It does not establish roadless management direction for 459,100 acres of lands that were associated with the 2001 Roadless Rule that have been determined to be

BLM_0002305

substantially altered and 8,300 acres for ski area management. The final rule provides a higher level of conservation for the designated CRA lands than management direction under either the forest plans or the 2001 Roadless Rule.

The final rule designates 1,219,200 acres of CRAs as upper tier, which are acres where exceptions to road construction and tree cutting are more restrictive and limiting than the 2001 Roadless Rule. Upper tier designations were designed to offset the limited exceptions for Colorado-specific concerns so that the final rule is more protective than the 2001 Roadless Rule.

Generally, the exceptions for Colorado-specific concerns allow for road construction and reconstruction beyond that which are allowed under the 2001 Roadless Rule where roadless acres are within the first 0.5 mile from an at-risk community as described in the definitions section of this final rule (about 250,000 acres) and within the 19,100-acre North Fork coal mining area. Tree cutting allowances in non-upper tier acres in the final rule are similar to the 2001 Roadless Rule, except within a community protection zone (CPZ) as described in the definitions section of this final rule. Tree cutting allowances in upper tier areas are much more restrictive in the final rule as compared to the 2001 Roadless Rule.

The use of LCZs is restricted under the final rule, unlike the 2001 Roadless Rule. The LCZ provisions of the final rule are designed to encourage placement of linear facilities outside of roadless areas to conserve the large tracts of undisturbed lands that roadless areas provide. The final rule also encourages co-locating facilities if they must be constructed within a CRA. Co-locating facilities within CRAs would minimize overall impacts by concentrating infrastructure and associated human activities in previously disturbed areas.

Although it is difficult to directly compare the level of protection afforded by the final rule and the 2001 Roadless Rule, the final rule clearly offers a higher level of conservation of roadless area characteristics within the upper tier acres. In addition, the 2001 Roadless Rule allows management activities to occur on more acres of roadless areas than the final rule does due to the upper tier designation.

*Colorado-Specific Concerns*

*Ski Areas.* Roadless areas provide the scenic backdrop to many of Colorado's 22 ski areas located on public lands managed by the Forest Service. These 22 ski areas received about 11.7 million skier visits during the 2010–2011 ski season.

Colorado skiers spend about $2.6 billion annually, about one third of the annual tourist dollars spent in the State. The roadless area inventory for the 2001 Roadless Rule included portions of either the permit boundary and/or forest plan ski area management allocation for 13 ski areas. The final rule inventory excludes approximately 8,300 acres of permitted ski area boundaries or ski area management allocations from CRAs, which include roadless acres with degraded roadless area characteristics due to the proximity to a major recreational development and is less than 0.2% of the CRAs. This will ensure future ski area expansions within existing permit boundaries and forest plan allocations are not in conflict with desired conditions provided through the final rule and address one of the State-specific concerns identified by the State of Colorado. However, this final rule does not approve any future ski area expansions; any expansion proposal would need site-specific environmental analysis, appropriate public input, and independent approval.

*Energy Development/Infrastructure.* All existing Federal coal leases within CRAs occur in the North Fork Valley near Paonia, Colorado on the Grand Mesa, Uncompahgre, and Gunnison National Forests. Coal from this area meets the Clean Air Act definition for compliant and super-compliant coal, which means it has high energy value and low sulphur, ash and mercury content, making it desirable for electric-generation plants throughout the country. Coal from these existing leases is currently being extracted at three underground mines, which collectively produce about 10 to 15 million tons of coal per year and accounts for about 40% of all the coal production in the State of Colorado. These mines provide about 2,100 jobs (direct, indirect and induced) and $151.1 million annually of direct labor income within Colorado.

The final rule accommodates the continued operation of these three mines by defining an area called the North Fork coal mining area. This area is about 19,100 acres which is less than 0.5% of the CRAs. The North Fork coal mining exception allows for the construction of temporary roads for exploration and surface activities related to coal mining for existing and future coal leases. The final rule does not approve any future coal leases, nor does it make a decision about the leasing availability of any coal within the State. Those decisions would need to undergo separate environmental

analyses, public input, and decision-making.

Many comments were received on the 2008 DEIS and the 2011 RDEIS regarding whether the Currant Creek CRA should be included or excluded from the North Fork coal mining area. About 9,000 acres of the Currant Creek CRA was removed from the North Fork coal mining area in the RDEIS due to important wildlife habitats and juxtaposition of these habitats to nearby habitats. The Colorado Division of Parks and Wildlife reviewed comments regarding the inclusion of Currant Creek to the North Fork coal mining area, including the independent analysis of wildlife resources submitted by a commenter, and remains convinced of the importance of the wildlife habitat values in Currant Creek.

The Department agrees and will not include Currant Creek in the North Fork coal mining area to ensure conservation of these important wildlife habitats. The Department notes that there are no existing coal leases in Currant Creek. The Department reviewed likely scenarios of potential mining within the Currant Creek CRA and determined that the economic effects of including Currant Creek in the North Fork coal mining area would not be realized for more than three decades based on current coal production levels, current mining technologies, the assumption that an adjacent area on non-NFS lands known as Oak Mesa would be mined, and the fact that coal from Currant Creek would not be mined until Oak Mesa was mined out.

Oil and gas resources were another issue that generated substantial public input. Colorado has 8% of all dry natural gas reserves in the U.S., the third largest domestic reserves of onshore dry natural gas behind Texas and Wyoming. In 2009, Colorado wells produced 1.45 trillion cubic feet of natural gas for market, or 7% of U.S. production. In addition, about 28.3 million barrels of oil were produced in Colorado, or 1% of U.S. production. In 2010, of the $287 million in total royalties collected on Federal oil and gas production in Colorado, $117 million was paid to the State of Colorado and $64 million was collected in severance taxes from federal oil and gas production.

Within CRAs, there are about 266,900 acres classified as "moderate to high" oil and gas potential and about 631,600 classified as "high" potential. Projected natural gas and oil production from CRAs with high development potential, although significant, does not change significantly under the final rule. A total of 355 firms affiliated with

oil and gas development and production are located within the affected region, of which 337 are estimated to be small businesses. However, there is no difference in estimated average annual natural gas or oil production between the final rule and the 2001 Rule (baseline conditions). The only difference in natural gas production across alternatives is under forest plans (Alternative 3) where average annual production is estimated to increase by 4 billion cubic feet per year compared to the final rule, which is below the Executive Order 13211 criterion for significant effects of 25 bcf/year. The only difference in oil production across the alternatives is under forest plans (Alternative 3) where oil production is estimated to increase by about seven barrels per day, compared to the final rule, which is an inconsequential difference compared to the E.O. 13211 criterion of 10,000 barrels per day.

The final rule provides for the conservation of roadless area characteristics by prohibiting road construction for future oil and gas leases and requiring a no surface occupancy (NSO) stipulation on all future oil and gas leases within upper tier acres. The final rule balances roadless protection with energy development by allowing continued temporary access across CRAs to explore, develop, and transport products from existing oil and gas leases that do not otherwise prohibit road construction or reconstruction. The 2001 Roadless Rule prohibited road construction to access mineral leases issued after the promulgation of the rule (January 12, 2001). Since 2001, the 2001 Roadless Rule has been subject to legal challenges, and leases have been issued in areas now identified as Colorado Roadless Areas. The Colorado Roadless Rule does not affect the terms or validity of leases existing prior to the promulgation date of the final rule. This rule preserves any surface development rights and limitations on surface development rights existing at the time of adoption of this rule on all oil and gas leases. Although the road prohibitions of the final rule could constrain development of future oil and gas leases within some CRAs, the economic impact of this prohibition would be negligible in the context of total energy production within the State of Colorado. The projected difference in potential natural gas production from CRAs under the final rule is an increase in total recovery of about 19.2 billion cubic feet over 30 years when compared to the existing condition. Averaged over the 30 year period, this represents about 0.1% of the current state-wide annual

production of natural gas in Colorado. For oil production, the final rule would result in a decrease of about 3,500 barrels over 30 years when compared to the existing condition. This averaged over 30 years, is minimal compared to the current annual oil production in Colorado.

The final rule would not restrict road construction to extract locatable minerals, which include metals such as gold, silver, lead, zinc, molybdenum, rare earth minerals, and uranium; non-metallic minerals such as fluorspar, feldspar, and gem stones; and uncommon varieties of sand, stone, gravel, pumice, pumicite, and cinders such as high calcium limestone used for cement. Like the 2001 Roadless Rule, the final rule contains a specific exception for roads provided for by statute which would allow access to develop these mineral resources, which are subject to location under the General Mining Law of 1872, as amended. This law provides United States citizens a possessory right to these minerals, use of the surface for purposes reasonably incident to mining, and a right of reasonable access to these minerals across Federal land. This statutory right also made it unnecessary to include a specific exception for mining roads in the final rule as requested by several commenters. Therefore, operations such as the Henderson Mine in Clear Creek County would not be affected by the final rule prohibitions should operations need to expand into or develop additional mineral resources in the adjacent CRA.

In January, 2009 energy transmission and distribution corridors were designated in 11 Western States, including Colorado, in an interagency effort known as the West-Wide Energy Corridor project. These corridors will facilitate interstate energy transmission and distribution as well as improving reliability, relieving congestion, enhancing the capability of the national grid to deliver electricity, and concentrating these uses. All the designated West-Wide Energy Corridors for oil, gas, and hydrogen pipelines and electric transmission and distribution facilities are located outside of CRAs. Therefore, interstate energy transmission is not expected to be affected by the final rule.

*Water Supply/Infrastructure.* Water in Colorado is used for a variety of downstream purposes including public water supply, agriculture, and industrial uses (including mining/mineral development). Growing populations in Colorado are expected to increase the demand for reliable quantities of high-quality water. Roadless areas contribute

to high quality water through high functioning watersheds, which provide for snow-pack retention and vegetative cover, resulting in reduced downstream sedimentation, lower water temperature, and decreased contaminants. The mountainous areas, where NFS lands are located, receive the highest amounts of precipitation in the State, primarily as snow. More than two-thirds of the water yield in Colorado originates on NFS lands. The streams and lakes within roadless areas generally have good to excellent water quality. Nearly all of the CRAs are located within watersheds that contribute to public supplies of surface or ground water.

Water projects are necessary to store and transport water from its origin in the mountains to where it is needed in downstream cities, towns, and farms. Storing water in mountain reservoirs provides more reliable year-round constant flows enabling distribution of water to places when needed. Water projects also allow for storage of excess water in one year to be saved and used in later years when water may not be as plentiful.

There are numerous reservoirs, diversions, ditches, tunnels and other water conveyance facilities located in CRAs. Access for operation and maintenance of these facilities is important to (1) ensure reliable delivery of needed water supplies to downstream users, and (2) prevent or mitigate failures in the water systems that could cause greater environmental impacts, such as an open ditch clogging with debris that overtops and carves a series of gullies into the hillside. The final rule allows access needed for the construction, reconstruction, or maintenance of authorized water conveyance structures operated pursuant to state decreed water rights.

With the current increased growth in the rural west, in and around the National Forests, the Forest Service anticipates proposals for new reservoirs and associated water conveyance structures on NFS lands. Existing permit holders are already asking for authorization to expand and enlarge existing reservoirs and water conveyance structures. The Department believes these circumstances require flexibility because in some cases, it may be preferable to expand existing facilities where impacts have already occurred than to construct new facilities in a relatively undisturbed area. In most cases, road access would be needed to transport the equipment and materials to complete new water projects or expansions efficiently, which is provided for in the final rule within non-upper tier areas through the road

construction exception and within upper tier areas through the LCZ exception for water rights with a pre-existing water court decree.

*Community Protection.* The ongoing mountain pine beetle epidemic has caused wide-spread tree mortality on more than three million acres across the State of Colorado. About 750,000 acres of this tree mortality has occurred in CRAs. This high level of tree mortality has increased the concern for high-intensity wildfires due to the increased amount of combustible material (fuels). High-intensity wildfires are more difficult to control, have the potential for greater environmental impacts, and increase risks to firefighter and public health and safety.

Colorado has a high number of residences in the vicinity of forests that are at risk of wildfire. The final rule defines the areas up to 1.5 miles of an at-risk community as CPZs if certain ground conditions exist. In some areas, where CRAs are adjacent to at-risk communities, some portion of the CRA's acres fall within the CPZ. Currently, about 250,000 acres of proposed CRAs (6% of total) are within 0.5 miles of an at-risk community, and over one million acres of the proposed CRAs (25% of total) are within 1.5 miles of an at-risk community. The ability to conduct fuel-reduction projects around at-risk communities is a concern and priority for the State of Colorado. Fuel treatments alter fuel profiles so that public and firefighter safety is improved and communities, watersheds, infrastructure, and other at-risk values are less vulnerable to impacts from wildfire. The final rule provides for this by allowing fuel treatments within the CPZs and allowing temporary road construction within 0.5 miles of an at-risk community.

*Linear Construction Zones.* Generally roadless areas are roadless because they are rugged, steep, and remote; the topography and juxtaposition of human developments have historically made going around roadless areas more practical than going through them; and they have limited economic development opportunities. For these reasons, opportunities to construct and the desire to construct linear facilities through roadless areas are expected to be limited. The majority of LCZ use in roadless areas is expected to come from the desire to move resources from inside roadless areas out of roadless areas, such as water, oil and gas. Although limited LCZ use is expected, it is a State-specific concern because the 2001 Roadless Rule does not restrict them and the potential for adverse impacts to roadless characteristics.

The final rule limits the potential impacts by prohibiting the use of LCZs across the 1,219,200 acres designated as upper tier except for reserved and outstanding rights; provided by statute or treaty; or water conveyance structures operated pursuant to a pre-existing water court decree.

The final rule further limits the potential impacts of LCZs by encouraging co-locating linear facilities within CRAs. Co-locating linear facilities would increase the width of the right-of-way, as power lines, pipelines or other linear facilities would parallel but not completely fall within the existing footprint. However, overall impacts would be reduced by concentrating infrastructure and associated human activities. These potential impacts, which would occur at a higher level under the 2001 Roadless Rule, include displacement of wildlife species sensitive to noise and human disturbance; soil compaction and erosion; fragmentation of aquatic and terrestrial habitats; and most notably an increased risk of the spread of invasive species. Many non-native plants establish themselves preferentially along disturbed habitats, which can lead to loss of native plants, loss of quality forage, and lowered reproductive success of native plants and wildlife. Expanding the width of existing right-of-ways would further amplify the magnitude and duration of these effects on roadless area values including fish, wildlife, and rare plants.

The increasingly high level of development that exists outside of roadless and wilderness areas accentuates the function of roadless areas as refugia for aquatic and terrestrial animal species. Refugia provide source populations that are not subject to high levels of angling or hunting pressure or frequent human disturbances, and can repopulate adjacent landscapes. This is why the final rule emphasizes placement of LCZs outside of roadless areas when at all possible. If additional LCZs need to be used in roadless areas, then the emphasis will be on co-locating or widening of existing right-of-ways.

*Other Considerations.* Roadless areas provide for unaltered and high quality fish and wildlife habitat. Based on a U.S. Fish and Wildlife National Survey (2006 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation), it is estimated that hunters and anglers spent about 8,750,000 days hunting and fishing in Colorado expending approximately $1,584,779 million annually; and 1,819,000 people spend about 9,404,000 days watching wildlife expending approximately $1.4

billion annually. Based on the 2006 National Survey, Colorado residents and nonresidents spent about $3.0 billion in 2006 on wildlife recreation within the State. The final rule provides for conservation of native cutthroat trout through a requirement to ensure the native cutthroat trout habitat is not diminished over the long-term and the implementation of water conservation practices. In addition to the final rule protections, native cutthroat trout in Colorado are protected through the Endangered Species Act and/or the National Forest Management Act implementing regulations. Greenback cutthroat trout are listed as Threatened under the Endangered Species Act, and Colorado and Rio Grande cutthroat trout are listed as Sensitive on the Regional Forester's Sensitive Species list. These listings provide a high level of protection for native cutthroat trout in Colorado and provide for special management emphasis. The final rule ensures conservation of roadless area characteristics over the majority of the 4.2 million acres of CRAs, which will provide for wildlife dependent on large tracts of undisturbed land.

Based on a 2009 report by the Colorado Off-Highway Vehicle Coalition, it is estimated that 210,000 Colorado residents and nonresidents participated in the 2006–2007 season's off-highway vehicle recreation in Colorado, expending approximately $784 million. The final rule does not prohibit use of existing authorized motorized trails nor does it prohibit the future development of motorized trails in CRAs (see 36 CFR 294.46(f)). The final rule allows continued motorized trail use of CRAs if determined appropriate through local travel management planning.

*Alternatives Considered.* Alternative 1, the 2001 Roadless Rule and No Action Alternative, was not selected as the final rule because it does not provide for Colorado specific concerns. The 2001 Roadless Rule limits economic opportunities important to the people of Colorado, such as coal development and ski area expansion. The 2001 Roadless Rule also poses a greater risk to communities adjacent to CRAs than the final rule by limiting fuel treatments designed to reduce wildfire intensities; and potentially impacting the efficient management of water needed to ensure an adequate future supply to the State in light of growing demands and increasing fluctuations in precipitation patterns.

Alternative 3, provisions of the Forest Plans, was not selected as the final rule because it does not provide for roadless area conservation to the degree that

Alternative 2 does. Although Alternative 3 does provide greater flexibility to provide for Colorado specific concerns, such as community protection and economic development, Alternative 2 balances Colorado specific concerns with roadless conservation, which is also important to the State. As stated in the purpose and need, roadless areas provide for sources of drinking water, important fish and wildlife habitat, semi-primitive and primitive recreation opportunities, and natural appearing landscapes as well as other attributes. It is important to balance the conservation of these roadless characteristics, while providing for the State-specific concerns, which Alternative 2 does.

Alternative 4 was not selected as the final rule because the amount of upper tier acres and location of those acres limit the ability of the Forest Service to accomplish its management objectives. Approximately 121,600 acres of Alternative 4 upper tier acres are within 0.5 mile of an at-risk community. This upper tier designation would prohibit fuels treatment within the CPZ, which would increase risk to public health and safety. In addition, some of the upper tier acres designated in Alternative 4 are located in areas with existing oil and gas leases, and should those existing leases be developed the designation of these acres as upper tier would be inconsistent with the purpose and desired condition of upper tier designations.

**Public Involvement**

The Forest Service and the State of Colorado have solicited public involvement and comments on the development of a Colorado Roadless Rule. Between the Forest Service and State efforts, there have been five formal public involvement processes, which have resulted in approximately 312,000 public comments. Public involvement efforts of the Forest Service and the State of Colorado included:
• Senate Bill 05–243, signed into Colorado law on June 8, 2005, created and identified a 13-member bipartisan task force. The task force held nine public meetings throughout the State, held six deliberative meetings that were open to the public, and reviewed and considered over 40,000 public comments.
• On December 27, 2007, the Forest Service published a notice of intent in the **Federal Register** to prepare an EIS on roadless area conservation on NFS lands in Colorado (72 FR 72982). The Forest Service also solicited comments from interested parties on the notice of intent from December 27, 2007 through

February 25, 2008. Approximately 88,000 comments were received.
• On July 25, 2008, the Forest Service published a proposed rule to establish State-specific management direction for conserving roadless areas in Colorado (73 FR 43544). A notice of availability for the DEIS was published in the **Federal Register** (73 FR 44991). The availability of the regulatory risk assessment for the proposed rule was published on September 18, 2008 (73 FR 54125). Nine public meetings were held around the State of Colorado and in Washington, DC during the comment period. All comment periods closed on October 23, 2008. In total, approximately 106,000 comments were received.
• The State of Colorado held a comment period from August 3 to October 3, 2009 on a State-modified version of the Colorado Roadless Rule. Approximately 22,000 comments were received.
• On April 15, 2011, the Forest Service published a revised proposed rule (76 FR 21272). A notice of availability for the RDEIS was published in the **Federal Register** (76 FR 24021) on April 29, 2011. Nine public meetings were held around the State of Colorado and in Washington, DC during the comment period. Comment periods closed on July 14, 2011. Approximately 56,000 comments were received.
In addition to the five formal comment periods, the Forest Service and Colorado participated in Roadless Area Conservation National Advisory Committee (RACNAC) meetings that were open to the public in Washington, DC in June of 2007 and January, July and November of 2008. Also, a RACNAC meeting was held in Salt Lake City, Utah in October of 2008. Public comments were accepted at these meetings, which helped the RACNAC develop its December 5, 2008 recommendations to the Secretary of Agriculture.
On May 4, 2012, the notice of availability for the final EIS (FEIS) was published in the **Federal Register** (77 FR 26548). Although the Forest Service did not formally solicit comments, 181 comments were received.

**Tribal Involvement**

The United States has a unique relationship with Indian Tribes as provided in the Constitution of the United States, treaties, and Federal statutes. The relationship extends to the Federal government's management of public lands, and the Forest Service strives to assure that its consultation with Native American Tribes is meaningful and in good faith.

A vital part of the State of Colorado's public process in developing its petition was receiving the recommendations and comments from Native American Tribes. The Governor's office was keenly aware of the spiritual and cultural significance some of these areas hold for the Tribes.

There are two resident Tribes in Colorado, both retaining some of their traditional land base as reservations via a series of treaties, agreements, and laws. The Ute Mountain Ute and Southern Ute Indian Tribes (consisting originally of the Weeminuche, Capote, Tabeguache, and Mouaches Bands) under the Brunot Agreement of 1874 have reserved hunting rights on certain lands in Colorado and retain inherent aboriginal rights throughout their traditional territory. Many other Tribes located outside Colorado maintain tribal interests, including aboriginal and ceded territories, and claim inherent aboriginal rights within the State.

The Forest Service has consulted with Colorado-affiliated Tribes regarding this rulemaking action and analysis process. Information on the proposed Colorado Roadless Rule was provided to the Ute Mountain Ute and Southern Ute Indian Tribes prior to the release of the NOI. The San Juan National Forest staff held meetings with both Tribes to discuss the proposed rule as well as other Forest issues. At these meetings, the Tribes expressed concerns about hunting access and unauthorized roads. Nothing in the final rule changes hunting access or existing rights. The management of unauthorized roads is addressed through travel management processes.

Additionally, an introductory letter and the NOI along with background information on the proposed Colorado Roadless Rule and an offer for additional information or meetings was sent to 25 Tribes based on their current proximity to Colorado, their current use of lands in Colorado, and their historic use of lands within Colorado.

The 2008 Proposed Rule and DEIS were sent to each of these Tribes and each was contacted by phone to determine their level of interest in meeting or obtaining information. The Tribes did not request additional government-to-government involvement, and no formal comments from any of the Tribes were received. A letter was sent to each Tribe outlining the key points of this revised proposed rule, and the Forest Service met with those Tribes requesting further consultation.

In October 2010, the Forest Service met with Tribal members of the Ute Mountain Ute and Southern Ute tribes to obtain information. In April 2011, the Proposed Rule was sent to 25 Tribes

based on their current proximity to Colorado and their current and historic use of lands within Colorado to determine their interest in meeting or obtaining information. Follow-up phone calls were made to each of the 25 Tribes. Additional information was sent to Tribes as requested. The Tribes did not request additional government-to-government involvement, and no formal comments from any of the Tribes were received.

Pursuant to Executive Order 13175 of November 6, 2000, "Consultation and Coordination with Indian Tribal Governments," the Department has assessed the impact of this rule on Indian Tribal Governments and has determined that the proposed rule does not significantly or uniquely affect Indian Tribes. The final rule establishes direction governing the management and protection of CRAs. However, the final rule respects prior existing rights, and it addresses discretionary Forest Service management decisions involving road construction, tree cutting, and some mineral activities. The Department has also determined that the final rule does not impose substantial direct compliance costs on Indian Tribal Governments. The final rule does not mandate tribal participation in roadless management or the planning of activities in CRAs. Rather, the Forest Service officials are obligated by other agency policies to consult early with Tribal governments and to work cooperatively with them where planning issues affect Tribal interests.

### Alternatives Considered

The Forest Service analyzed four alternatives for managing roadless areas in the FEIS. Alternative 1 the No Action Alternative and the 2001 Roadless Rule, continues the use of the 2001 Roadless Rule prohibitions, exceptions and mapping. Alternative 2, selected as the final rule, examines a two tier approach for prohibitions and exceptions designed to protect CRAs. Alternative 3, provisions of Forest Plans, examines reliance on forest plan direction without the 2001 Roadless Rule, to manage roadless areas. Alternative 3 would consist of a Colorado Roadless Rule that exempts the State from the 2001 Roadless Rule. Alternative 4 uses the same parameters for management described in Alternative 2 but includes approximately 2.6 million acres in the upper tier. The only difference between Alternative 2 and 4 is the location and amount of upper tier acres. The FEIS may be found at http://www.fs.usda.gov/goto/coroadlessrule.

### Environmentally Preferable Alternative

The environmentally preferable alternative is the alternative that would best promote the national environmental policy as expressed in Section 101 of the National Environmental Policy Act (NEPA), 42 U.S.C. 4331. Generally this means the alternative that causes the least damage to the biological and physical environment. It means the alternative that best protects, preserves, and enhances historic, cultural, and natural resources. In addition, it means the alternative that attains the widest range of beneficial uses of the environment without degradation, risk to health and safety, or other undesirable or unintended consequences.

All the alternatives presented in the FEIS meet the national environmental policy, as described in Section 101 of NEPA, to varying degrees. All the alternatives provide for safe, healthful, productive and aesthetically and culturally pleasing surroundings, now and into the future, by conserving and managing roadless area characteristics to a varying degree. However, of the four alternatives, Alternative 2 is the environmentally preferable alternative because it best promotes the national environmental policy. Alternative 2 is the environmentally preferable alternative because it attains the widest range of beneficial uses of the environment and achieves a balance between population and resource use while conserving roadless area characteristics. While Alternative 4 would cause the least amount of direct impact to the environment of all the alternatives, Alternative 4 limits activities, such as fuel treatments, that could protect the environment from wildfire. Under Alternative 4, hazardous fuels activities around at-risk communities that would reduce the severity of a wildfire and reduce impacts to watersheds would be limited due to upper tier designations. The higher amount of tree cutting projected for Alternative 2 is a result of hazardous fuel treatments around at-risk communities and is thus limited across the CRAs mainly to the 250,000 acres within the 0.5 mile CPZ. Alternative 4 does not provide as good of a balance between population and resource use, part of the national environmental policy. Alternative 2 provides for community protection and activities that are important to the economic well-being of the citizens of Colorado. Although Alternative 2 has a higher amount of road construction projected, this is mainly a result of allowing temporary roads within the North Fork

coal mining area and within the CPZ. Thus this impact is limited in scope to the 19,100 acres of the North Fork coal mining area and the 250,000 acres within the 0.5 mile CPZ. This limited impact is offset by the 1,219,200 acres designated as upper tier, which would have less activities (tree cutting and road construction/reconstruction) occurring within them than what would occur under the 2001 Roadless Rule (Alternative 1, the No Action Alternative) or the forest plans (Alternative 3). The "Decision Rationale" section describes how the rule provides for these activities as well as why they are important to Colorado. Alternatives 1 and 4 do not provide for these benefits to the degree that Alternative 2 does.

### Roadless Area Inventories

The final rule includes an updated inventory of roadless areas. The 2007 State Petition proposed starting with the inventories used in the 2001 Roadless Rule and updating them as necessary. In some cases, these inventories were conducted in the late 1970's and used mapping technologies that are now outdated. In addition, roads had been constructed in some areas between the time of the original inventories and their use in the 2001 Roadless Rule. The Forest Service has reviewed and updated the old inventories for use in this rulemaking by making technical corrections, removing private property, and making other boundary adjustments, including additions and deletions due to land exchanges. All congressionally-designated areas that overlapped roadless areas have also been removed from the CRA inventory.

During the public comment period on the 2008 Proposed Rule, comments were received on many of the boundaries of individual CRAs. Based on public comment received and work with the Colorado Division of Parks and Wildlife field staff, corrections were made to the inventories used for the 2008 Proposed Rule. Additional administrative corrections were made between the 2011 Proposed Rule and the final rule. Further information on the boundary changes and a description of the uniqueness of each CRA can be found at http://www.fs.usda.gov/goto/coroadlessrule.

Colorado Roadless Area boundaries have been adjusted where they overlap with ski areas that have special use authorizations (6,600 acres) or land use management plan allocations for ski areas that allow for possible future expansion of the permitted area (1,700 acres). Table 1 displays a comparison of

BLM_0002310

2001 Inventoried Roadless Area (IRA) acres and final CRA acres.

TABLE 1—PROPOSED NET CHANGE IN ROADLESS ACRES DESIGNATIONS BY FOREST—INVENTORIED ROADLESS AREA ACRES TO COLORADO ROADLESS AREA ACRES

|  | 2001 Rule total IRA acres with forest plan vintage | IRA acres in Colorado database | IRA acres not included within CRAs | Roadless acres added to CRAs | Total roadless acres to be managed under Colorado rule | Net change between 2001 IRA and CRA acres |
|---|---|---|---|---|---|---|
| Arapaho-Roosevelt ...................... | 391,000 (1997) | 352,500 | 10,800 | 5,400 | 347,100 | (5,400) |
| GMUG ......................................... | 1,127,000 (1979) | 1,058,300 | 281,500 | 124,200 | 901,100 | (157,200) |
| Manti La Sal ............................... | 11,000 (1979) | 11,000 | 3,800 | 500 | 7,700 | (3,300) |
| Pike San Isabel ........................... | 688,000 (1979) | 667,300 | 62,900 | 170,300 | 774,700 | 107,400 |
| Rio Grande .................................. | 530,000 (1996) | 529,000 | 14,200 | 3,800 | 518,600 | (10,400) |
| Routt ........................................... | 442,000 (1998) | 442,300 | 10,400 | 1,700 | 433,600 | (8,800) |
| San Juan ..................................... | 604,000 (1979) | 543,600 | 76,500 | 98,900 | 566,100 | 22,500 |
| White River ................................. | 640,000 (2002) | 639,500 | 7,400 | 4,700 | 636,700 | (2,800) |
| Total, State of Colorado ....... | 4,433,000 | 4,243,600 | 467,400 | 409,500 | 4,185,600 | (58,000) |

Column 2 acres rounded to nearest 1,000 acres; others rounded to nearest 100 acres. Acres do not add due to rounding.

**Comments on the Proposed Rule and Changes Made in Response**

Approximately 56,000 comments were received in response to the proposed rule and RDEIS. The Forest Service considered all substantive comments as part of the rulemaking. The following is a section-by-section description of changes to the final rule as compared to the proposed rule, comments received regarding that section, and the Agency response. A detailed analysis and response to public comment is contained in Appendix H of the FEIS.

§ 294.40  Purpose. No substantive changes were made to this section. Only a minor edit was made to utilize the full name of "Colorado Roadless Areas" rather than CRA because it is the first time this term is used in the rule text.

Comments on the purpose of the rule: Some respondents asked for clarification regarding the intent of the Colorado Roadless Rule.

Response: The intent of the final rule is contained in the FEIS Purpose and Need for Action section in Chapter 1 and in the Purpose and Need section of this preamble. Section 294.40 of the rule states the purpose of the rule is to provide "State-specific direction for protection of roadless areas in Colorado." It also states that the intent is to "protect roadless area characteristics * * * within CRAs."

§ 294.41  Definitions. Four changes were made to the definitions section based on comments received and/or concerns identified by the Forest Service.

(1) The definition of an LCZ was modified to clarify the difference between it and a temporary road. The term "maintain" was added to the

definition of an LCZ to clarify that LCZs could be used to maintain a linear facility as well as install one.

(2) The definition of linear facilities was expanded to include dams.

(3) A definition of a permanent road was added.

(4) The definition of pre-existing water court decree was changed to include decreed water rights that were filed by the promulgation date of the final rule. In addition, the definition was changed to clarify that moving a head gate within a roadless area would not change the status of a pre-existing water court decree.

(5) The definition of Watershed Conservation Practices (WCPs) was added to clarify that all project-level activities within cutthroat trout habitat would apply WCPs.

Comments on the definition of at-risk community: Respondents asked for clarification of the definition of at-risk community.

Response: The final rule utilizes the definition of an at-risk community from the Healthy Forests Restoration Act (HFRA). HFRA defines the term as a community listed in the notice entitled "Wildland Urban Interface Communities Within the Vicinity of Federal Lands That Are at High Risk From Wildfire" (66 FR 751) or as a group of homes and other structures with basic infrastructure and services, such as utilities, and collectively maintained transportation routes, within or adjacent to Federal land in which conditions are conducive to a large-scale wildland fire disturbance event and for which a significant threat to human life or property exists as a result of a wildland fire disturbance event.

Comments on the definition of temporary road: Some respondents requested further discussion and reconsideration of the definition for temporary road, given that temporary roads can impact soil and water resources.

Response: A temporary road is defined as a road necessary for emergency operations or authorized by contract, permit, lease, or other written authorization. A temporary road is not considered a forest road and does not become part of the transportation atlas. Although a temporary road is decommissioned at the end of its authorized use, temporary roads can be in operation for a few years to a decade or more. Temporary roads are not open to public travel. Any temporary roads would be subject to existing forest plan standards and guidelines that protect ecosystem conditions, including water quality. An appendix is included in the FEIS that describes the planning, design, approval, administration, construction, operation, maintenance and decommissioning of temporary roads as they would be applied in CRAs.

§ 294.42  Prohibitions on tree cutting, sale, or removal. No substantive changes were made to this section.

Comments on tree cutting near communities and consultation with the Colorado Division Parks and Wildlife. Some respondents would like to see the Colorado Division of Parks and Wildlife consulted on tree cutting for fuels reduction treatments and ecosystem restoration projections.

Response. The rule offers cooperating agency status to the State of Colorado, which would include the Division of Parks of Wildlife, on all proposed projects and planning activities

BLM_0002311

occurring on CRAs (§ 294.45(b)). Tree cutting for community protection beyond the first 0.5 mile of the CPZ must be consistent with a Community Wildfire Protection Plan, which is generally developed with assistance of State agencies.

*Comments on tree cutting in upper tier.* Many respondents indicated concern over the ability to treat upper tier acres to manage for a multitude of environmental conditions. Some respondents indicated that the rule should include a tree cutting exception in upper tier acres to treat hazardous fuel loads, in areas that supply municipal water systems, to allow wildlife habitat improvements, watershed health, to treat for insects and diseases, acres that are adjacent to ski areas, and for fire suppression, emergencies, and public safety. Other respondents indicated that no tree cutting should occur in upper tier areas.

*Response:* The rule strikes a balance between the need for tree cutting to protect at-risk communities and municipal water supply systems, habitat improvement projects, and ecosystem restoration, and the need to protect roadless area characteristics. Tree cutting for hazardous fuels treatment in upper tier is prohibited; however, the majority of the existing CPZs excluded upper tier acres in the final rule. The Colorado Roadless Rule provides for the State-specific concern of reducing the risk of wildfire to communities, despite the inclusion of 6,100 acres of the 0.5 mile CPZ in upper tier. This composes only about 2% of all the 0.5 mile CPZ, which is minimal, and it is likely that many of these acres would never be treated regardless of whether it is designated upper tier or non-upper tier. We note that although upper tier designation reduces the flexibility for fuel treatment on these particular 6,100 acres due to the limited exceptions, there are about 247,800 acres in the non-upper tier that are located within 0.5 miles of an at-risk community that will have increased flexibility compared to the 2001 Roadless Rule to cut trees and construct roads in order to minimize the risk of fire.

In addition fuel reduction, as well as other objectives, such as watershed protection and insect/disease treatments, can be accomplished through the use of prescribed fire, limbing to reduce ladder fuels, and piling and burning. Fire line construction would be allowed in conjunction with prescribed burning, including incidental tree cutting to ensure effective fire lines. Tree cutting for wildlife habitat improvements in upper tier is prohibited; however,

prescribed fire could be used for terrestrial wildlife habitat improvement. Tree cutting around ski areas is addressed by removal of existing ski area permit boundaries and forest plan allocated ski areas from CRAs.

The only tree cutting allowed in upper tier is incidental to the implementation of a management activity not otherwise prohibited or for personal or administrative use. The responsible official determines if an activity is consistent with a tree cutting exception in upper tier. Examples of activities not otherwise prohibited include but are not limited to trail construction and maintenance; hazard tree removal along trails; fire line construction for wildland fire suppression or prescribed fire; survey and maintenance of property boundaries; maintenance of linear facilities such as existing electrical power lines, water conveyance structures with a pre-existing water court decree, and pipelines; use of LCZs associated with water conveyance structures; or road construction and reconstruction where allowed by the final rule. Tree cutting is allowed for imminent, direct risks to public safety and other emergency situations. Personal use includes activities such as Christmas tree and firewood cutting. Administrative use includes providing materials for activities such as construction of footbridges or fences.

*Comments on tree cutting in roadless areas to treat hazardous fuels.* Many respondents indicated a need to cut trees for hazardous fuel management around communities and to protect infrastructure such as transmission lines and water conveyance facilities.

*Response:* The rule recognizes the need for tree cutting to reduce the risk of wildfire to at-risk communities. It allows tree cutting in non-upper tier within 0.5 miles from the boundary of an at-risk community, or up to 1.5 miles if certain conditions exist and the area is within a Community Wildfire Protection Plan (CWPP). A temporary road may be constructed to facilitate hazardous fuel reduction within 0.5 miles of the boundary of an at-risk community. Tree cutting for protection of linear facilities such as transmission lines and water conveyance facilities is considered to be maintenance of those facilities, which is allowed under the final rule.

In addition, tree cutting is allowed in non-upper tier acres if a significant risk exists to the municipal water supply system or the maintenance of that system. The final rule states that a significant risk exists under conditions in which the history of fire occurrence

and fire hazard and risk indicate a serious likelihood that a wildland fire disturbance event could present a high risk or threat to a municipal water supply system. Examples of determining the risk to municipal water supply systems include the watershed assessments completed by the Front Range Watershed Wildfire Protection Group. These assessments were based on methods used by the Pinchot Institute for Conservation and considered wildfire hazard, flooding, debris flow risk, soil erodibility, and water uses to identify zones of concerns.

*§ 294.43 Prohibition on road construction and reconstruction.* An exception in upper tier CRAs to allow for road construction to protect public health and safety in cases of an imminent threat of flood, fire or other catastrophic event was added. In addition, the word "imminent" was added to this exception as it is applied to non-upper tier CRAs. The timeframe for the term imminent is situational dependent and could vary from hours to years. For example, for a flood or fire, imminent is likely hours but for dam failures, this could mean years. This exception does not constitute permission to engage in routine forest health activities, such as temporary road construction for thinning to reduce mortality due to insect and disease infestation. In addition, the responsible official must ensure conditions outlined in section 294.43, paragraph (b)(3) are met, which will ensure road construction is minimized and permanent roads are rare. Examples of appropriate uses of this exception include but are not limited to: A circumstance in which a road is needed to repair a dam that without intervention would fail and cause the loss of life or property; burned area emergency rehabilitation activities to protect municipal water supply systems; or activities to prevent or mitigate rock fall or a rock slide above a highway that without intervention could result in the loss of life or property.

The phrase "subject to the legal rights identified in 36 CFR 294.43(b)(1)" was added to the provision outlining items the responsible official must determine to utilize one of the two road exceptions for upper tier. This change in paragraph (b)(3) was to make the language consistent with paragraph (c)(2) and to clarify that the determinations made by the responsible official are subject to the legal rights pursuant to reserved or outstanding rights or as provided by statute or treaty in upper tier as well as non-upper tier.

The phrase "technically feasible" has been changed to "feasible" in

paragraphs (b)(3)(i) and (c)(2)(i). This change was made to clarify that the determination of what is feasible includes more factors than just technical issues.

The condition that road construction must be consistent with applicable land management plan direction was added to (b)(3) to make it consistent with paragraph (c)(2) and to clarify that roads must be consistent with forest plan direction in upper tier as well as non-upper tier.

The phrase "extent of the occupied" was added to the provisions regarding whether road construction will diminish, over the long-term, conditions in the water influence zone and in occupied native cutthroat trout habitat (paragraph (b)(3)(iv) and paragraph (c)(2)(iv)). This term was added because almost all perennial streams in CRAs are historic native cutthroat trout habitat and the intent of this provision is not to have it applied to all streams, rather only those with native cutthroat trout within them.

A provision was added that WCPs will be applied for all activities occurring in occupied cutthroat trout habitat. The WCP provision is to highlight that while some activities may appear disruptive to trout habitat and resources in the short-term, over the long-term, WCP techniques and methods are used to ensure that impact to trout habitat is minimized to only what is necessary, and that over time the overall trout habitat is restored and improved. Any project, including trout habitat restoration activities, may have short-term disturbances to roadless area characteristics. The rule includes flexibility to allow such projects to go forward, with WCPs applied, in order to improve or maintain roadless area characteristics and fish habitat conditions over the long-term.

The term authorized use in paragraph (c)(1)(ii) was clarified to include uses authorized under permit, easement or other legal instrument.

The phrase "with the use of the road limited to the water right identified in the pre-existing water court decree" was added to paragraph (c)(1)(iv) to clarify that a road constructed under this exception cannot be used for other uses. In addition, it was clarified that the Regional Forester would determine the need for a temporary road under this provision.

Road decommissioning was added to the title of paragraph (d) and reconstruction was added to the title of paragraph (d)(1) for clarification. In addition, paragraph (d)(2) was modified to clarify that road decommissioning would occur upon termination of the

authorizing instrument if possible. Examples of activities related to road decommissioning was added to paragraph (d)(2) to clarify the concept of road decommissioning.

Three other edits were made for clarification.

(1) In paragraph (c)(1)(ix) the word "or" was added between coal exploration and coal related surface activities to allow for only one purpose for road construction and not both purposes.

(2) In paragraph (d)(4)(ii) the words "an authorization issued under" were removed because they were not necessary.

(3) In paragraph (d)(1) the words "to the extent practicable" were removed because they were not necessary.

*Comments on road construction and reconstruction.* Many respondents expressed concerns regarding access in upper tier areas for the operation, maintenance or development of water supply systems, for access to private properties, for mining and recreation and for grazing permit holders. Some respondents wanted additional exceptions and others wanted to eliminate exceptions for road construction altogether.

*Response:* The rule strikes a balance between the need for roads for community protection, existing rights, economic interests, and the need to protect roadless area characteristics. Currently, there are no forest roads within CRAs, and it is the intent of the rule to limit road construction. Any road constructed under any of the exceptions in the rule will not provide public access, whether these roads are within upper tier portions of CRAs or not. The rule prohibits road construction in upper tier acres for the development of a future water supply structures but allows for development using a LCZ. In addition, areas with high potential for future water development projects were excluded from the areas designated as upper tier, reducing the potential limitations on future water supply projects.

The rule provides for roads needed pursuant to reserved or outstanding rights, or as provided for by statute or treaty. "Reserved or outstanding rights" is a legal term of art that deals with a class of real property rights conveyed through sale or exchange. "Reserved rights" are property interests held back when land is conveyed between parties, such as split estate surface/subsurface conveyances. "Outstanding rights" are third party rights in real property retained when the property is transferred or acquired. The "reserved or outstanding right" exception is

intended to apply only when the agency lacks the authority or discretion to prohibit roads because the roads were reserved or outstanding prior to federal acquisition of the property. This reserved and outstanding exception would not provide the legal basis to access State created water rights as the State grant of a water right is not a reserved or outstanding right. Instead, access to State water rights on federal lands would occur in accordance with federal statutes, such as the Federal Land Policy and Management Act.

The rule provides for an exception for road construction to accommodate public health and safety concerns, which would include necessary reconstruction or maintenance of water conveyance structures in cases of emergency situations that threaten life or property. In addition, the rule allows motorized and non-motorized access into CRAs and does not affect reasonable exercise of reserved, outstanding, statutory, or treaty rights for access, occupancy and use of NFS lands within CRAs when the Agency lacks legal discretion to forbid such activities, for example exploration and mining of locatable minerals under the 1872 Mining Law.

Comments were received indicating the need for an exception in all roadless acres to allow for post-fire recovery efforts. Burned area emergency rehabilitation activities to protect roads, private property or municipal water supply systems would be an appropriate use under the public health and safety exception. An example of this could be the need for a temporary road to construct sediment traps and check dams to control debris flows that could block culverts or jam bridges or damage reservoir capacity after a fire.

One comment pointed out an inconsistency in the construct of the regulatory language between paragraph (b)(2) and paragraph (c)(2) of the proposed rule (paragraph (b)(2) is now (b)(3) in the final rule), expressing concern that it could be construed as an attempt to preclude roads for activities under the 1872 Mining Law in upper tier acres. In response, the final rule adds language to current paragraph (b)(3) to make it consistent with the wording of paragraph (c)(2) and reflects that the determinations to be made by the responsible official under both paragraphs are subject to the legal rights pursuant to reserved or outstanding rights, or as provided for by statute or treaty. The final rule also modified the language in paragraph (c)(2) to clarify its reference to the legal rights provided for in paragraph (c)(1) and that determinations are made by the

responsible official. These changes underscore that the right of reasonable access to locatable mineral exploration and development is not affected by the final rule or any of the alternatives analyzed in the FEIS, regardless of roadless designation as upper tier acres or non-upper tier acres.

*Comments on line officer authority for use of road construction exceptions.* Some respondents indicated that there should be limitations to the discretionary authority granted to line officers (responsible officials) especially concerning road construction and reconstruction in upper tier acres.

*Response:* The final rule limits the responsible official discretion by providing a narrow range of activities that are permitted in CRAs and several determinations must be made for road construction or reconstruction to be allowed. In addition, the Forest Service has very limited discretion for the two exceptions for road construction or reconstruction in upper tier. The exception for reserved or outstanding rights or as provided by statute or treaty means the Forest Service has limited authority to deny access. Examples of this include Revised Statute 2477 rights; access to inholdings under the Alaska National Interest Lands Conservation Act (ANILCA); access to locatable minerals under the General Mining Law of 1872; response actions under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA); Federal Aid Highway project authorized pursuant to Title 23 of the United States Code; or Federal Railroad project authorized pursuant to Title 49 of the United States Code.

The other exception for road construction or reconstruction in upper tier is for roads needed to protect public health and safety in cases of an imminent threat of flood, fire or other catastrophic event that without intervention would cause the loss of life or property. This exception is anticipated to be applied infrequently because threats to life or property are relatively infrequent. Limiting the discretion of a responsible official for these types of cases could result in greater loss of life or property.

Many of the exceptions would require a Regional Forester's determination on whether a proposed activity is consistent with the final rule. Activities allowed under the final rule which were not allowed under the 2001 Rule and the use of LCZs would require a Regional Forester determination. This higher level of review will provide for greater consistency on the implementation of the rule.

*Comment on constructing roads for coal mining.* Some respondents specifically commented that there should be no exception for road construction for coal mining.

*Response.* The final rule includes an exception to the prohibitions on road construction associated with coal mining only in the North Fork coal mining area. Coal mining is a valuable economic consideration to the State of Colorado and to many communities around the North Fork coal mining area. Roads are necessary for exploration and other coal related activities. Some of the areas within the North Fork coal mining area are under lease and others are not. Coal-related roads are used only by the coal operator and agency personnel, and are not open to the general public.

Experience in the West Elk IRA on the Grand Mesa, Uncompahgre, Gunnison National Forests shows that decommissioning roads by obliteration, along with land reclamation, effectively restores these underground mined areas.

*Comment on road decommissioning.* Some respondents requested that the rule provide more direction for road decommissioning.

*Response.* The final rule provides the broad programmatic requirement of road decommissioning in paragraph (d)(2). Providing specific requirements of road decommissioning in a programmatic regulation is problematic due to the high variability of ground conditions and road situations that could be encountered across 4.2 million acres. Defining road decommissioning restrictions at the programmatic level limits the flexibility needed to address specific and possibly unique purposes for temporary roads in a variety of landscapes. This type of direction is generally best provided as Forest Service handbook direction, guidance, or in a site-specific decision in which each unique situation can be assessed. The FEIS includes Appendix F, page F–5 specifically, which outlines temporary road decommissioning requirements based on Forest Service manual and handbook. This section of the appendix describes direction for road decommissioning that would apply to temporary roads in CRAs.

*§ 294.44  Prohibition on linear construction zones.* This section was reorganized into an upper tier section, paragraph (b), and non-upper tier section, paragraph (c), to accommodate limiting the use of linear construction zones in upper tier. Under the final rule, LCZs are limited in upper tier to just two circumstances: (1) Reserved or outstanding rights, or as provided by statute or treaty; and (2) for water

conveyance structures pursuant to a pre-existing water court decree.

Paragraph (b) was changed from "the Regional Forester may authorize a linear construction zone" to "the Regional Forester determines a linear construction zone is needed". This change was made to parallel other Regional Forester determination language in the final rule and to clarify that this determination is not a formal decision under the National Environmental Policy Act (NEPA).

The phrase "technically feasible" has been changed to "feasible" in paragraph (d)(1). This change was made to clarify that the determination of what is feasible includes more factors than just technical issues.

The phrase "extent of the occupied" was added to the provision regarding whether LCZs will diminish, over the long-term, conditions in the water influence zone and in occupied native cutthroat trout habitat. This word was added for the same reasons described in the parallel language for road construction and reconstruction in § 294.43.

Provisions were added including LCZs would be no wider than its intended use; reclamation of LCZs will not diminish roadless area characteristics; and WCPs will be applied for all activities occurring in occupied cutthroat trout habitat. The WCP provision parallels the road provision and has been added for the same reasons, to minimize short-term impact with the long-term objective of restoring or improving native cutthroat trout habitat.

The phrase "while conserving roadless area characteristics over the long-term" was added to paragraph (e) to clarify that decommissioning of LCZs needs to be conducted in a manner that minimizes impacts to roadless area characteristics over the long-term.

*Comment on linear construction zones.* Some respondents indicated that LCZs should be prohibited in upper tier and others indicated that no LCZs should be allowed under the rule. Others offered various suggested limitations or exceptions for the use of LCZs for a variety of management activities. Some respondents were concerned about the rule's affect to maintenance, development and expansion of reservoirs and oil and gas development.

*Response.* Linear construction zones were not prohibited under the 2001 Roadless Rule. One of the State-specific concerns is to restrict the use of LCZs, while permitting access to current and future electrical power lines and meeting the other State-specific

BLM_0002314

concerns. Linear construction zones are prohibited under the Colorado Roadless Rule with specific exceptions if a responsible official determines that the LCZ meets certain conditions.

The rule accommodates the development and expansion of reservoirs by the use of road construction (in non-upper tier acreage) or LCZs (in all CRA acreage) where the water right has been filed with the State prior to July 3, 2012. Future known reservoir locations are not within upper tier acreage, acknowledging the fact that for the most part, a road will not need to be constructed in upper tier for development of a reservoir.

The rule provides that the Regional Forester may authorize an LCZ for construction, reconstruction, and maintenance of existing or future authorized electrical power and communication lines within non-upper tier acres if there is no opportunity for the project to be implemented outside the CRA without causing substantially greater environmental damage. In doing this the Forest Service and the State of Colorado seek a balance between protecting roadless area characteristics and accommodating State-specific concerns. LCZs for electric power and communication lines are not allowed within upper tier acres.

The rule prohibits oil and gas pipelines within CRAs, except on oil and gas leases within CRAs where surface use is allowed and for leases outside of CRAs that need to connect to infrastructure within a CRA. Surface use would not be allowed on any new leases issued in upper tier acres, so pipelines would not be allowed. Pipelines would be allowed for new leases in non-upper tier acres where the forest plan allows surface occupancy. However, it is anticipated that there would be few new leases actually issued in non-upper tier areas as they would have to be developed by directional drilling from locations outside of CRAs. The limited applicability of the LCZ exception in the rule is a reasonable approach to addressing the issues of preventing the loss of roadless area characteristics and preventing the loss of opportunity to feasibly transport oil and gas resources using pipelines. The LCZ exceptions are allowed because water development is critical to Colorado and many other western states; energy sources need to be connected to the electrical grid, and oil and gas developments need pipelines for product removal. Within upper tier acres, LCZs are only allowed for oil and gas leases existing as of July 3, 2012 that allow surface occupancy.

Some commenters indicated a desire to utilize existing disturbed areas as

much as possible for future linear facilities. Nothing in the final rule would prohibit an LCZ being routed through a previously used LCZ. In addition, the rule encourages utilization of previously disturbed areas as provided in section 294.44, paragraph (e), which requires LCZs to minimize ground disturbance, including the placement within existing right-of-ways where feasible. Also, section 294.46, paragraph (d)(6) encourages co-location of oil and gas linear facilities, consistent with health and safety standards, within areas of existing areas of disturbance. However, industry standards for separation of utilities or other factors could reduce the ability to do so.

*Comments on Regional Forester determinations for LCZ:* Some respondents indicated that the Regional Forester should not have determinations for LCZ decisions.

*Response.* The final rule includes Regional Forester determination for LCZs to ensure a level of consistency. This is of particular importance with LCZs because of the potential overlap of certain aspects of an LCZ and a temporary road. Both are utilized by motorized vehicles to move from one point to another on a temporary basis. However, key differences exist that separate the two, including location selection, design, and use. Generally, the location of a temporary road is defined largely by the desired end points with substantial discretion of road location in between the end points. On the other hand, the location of an LCZ on the landscape is often constrained by the linear facility requirements, which limits the discretion of where an LCZ can be put. For example, it is difficult and often impractical to design a pipeline with a sharp turn. However a temporary road can be designed to go around obstacles and areas of concerns more readily.

Both LCZs and temporary roads need to consider environmental/resource conditions and safety issues during design. However, traffic requirements, level of service, traffic management, user efficiency, stopping distance, and surfacing are rarely considered in the design of an LCZ. Rather construction right-of-way width is a main consideration for LCZ design, which includes the determination of how much surface disturbance is needed to install or maintain the linear facility. Often an LCZ is created at the same time it is being used. For example, a pipeline being constructed across flat ground, an LCZ can be "developed" as the trench is being dug. In this example, no construction is needed to "use" the LCZ. In contrast, temporary roads are

constructed prior to use. Gradients of LCZs, especially for power lines, are often much steeper than would typically be found on a temporary road.

Due to the relatively new concept of LCZs and the potential for confusion with temporary roads, it was deemed important to centralize the determination for use of LCZs in CRAs with the Regional Forester. This would also facilitate identification of any additional guidance needed to ensure resource protection as well as appropriate use of LCZs. Regional Forester determination is a review process designed to be separate from the NEPA process. The Regional Forester is required to review the project but will not be the "responsible official" in the NEPA context.

*Comment on linear construction zone decommissioning.* Some respondents were concerned that the LCZ decommissioning direction was not addressing roadless area characteristics over the long-term.

*Response.* The language "while conserving roadless area characteristics over the long-term" was added to (c) to address the need to reclaim the affected landscape but also retain and or improve the roadless area characteristics.

*§ 294.45  Environmental documentation.* The sentence in paragraph (a) that states "proposals that substantially alter the undeveloped character of a Colorado Roadless Area require an EIS" was changed to "proposed actions that would significantly alter the undeveloped character of a Colorado Roadless Area would require an EIS". This change was made so the final rule is consistent with the Agency's environmental policies for EISs as described in FSH 1909.15.21.

The words "subject to this rule that would" were added in paragraph (b) to read: "* * *all proposed projects and planning activities subject to this rule that would be implemented on lands within CRAs* * *" This change was made because the intent of offering the cooperating agency status to the State is to ensure consistent implementation of the final rule. Many projects, such as trail construction projects or reissuance of a grazing permit, are not subject to the final rule and therefore, may not be appropriate for State involvement.

*Comments on "substantially alter" definition:* Some respondents requested that the definition of "substantially alter" should be clarified in the context of certain activities.

*Response.* There no longer is a need to define "substantially alter" in the final rule because the term has been replaced with "significantly alter." This

change was made so paragraph (a) is consistent with agency policy and regulations on when an EIS is required. The term "significantly" is defined in 40 CFR 1508.27.

§ 294.46   *Other activities.* A new paragraph was inserted, paragraph (a), to address the concern regarding the modification of a water right. This change was needed to clarify that a water right with a pre-existing water court decree could be modified and still be accommodated by the exceptions in the final rule for water conveyance structures despite having a new filing date.

Sentences were added to paragraph (b) to clarify that the intent of the rule is to maintain the status quo in terms of existing leases, including surface development rights, and limitations on surface developments. The final rule does not validate nor invalidate any existing leases.

A new paragraph was inserted, paragraph (c), to require a no surface occupancy stipulation for oil and gas leases issued within upper tier after the promulgation date of the final rule. This provision was added to provide greater protection for upper tier acres.

In paragraph (d) the phrase "and consistent with lease rights" was added to clarify that the conditions (d)(1) to (d)(8) must be consistent with the existing lease rights to be applied to the surface use plan of operation.

In paragraph (d)(3) the text "to the extent practical" was removed, as it was determined to be not necessary. Also, "topography" was removed and "surface conditions" was replaced with "surface and or operational conditions" for clarification.

In paragraphs (d)(1), (d)(4), (d)(5) and (d)(6) the qualifying language "to the extent possible" and "to the extent feasible" were removed as not necessary.

Paragraph (d)(8) was changed from "utilize the best available technology" to "consider the best available technology". This change was made because the Forest Service does not have the authority to mandate the use of best available technology, which is a Clean Air Act term used in the context of limiting pollutant discharges.

*Comments on water conveyance structures.* Comments were received requesting that the rule allow for the construction and maintenance of existing and future water conveyance structures in response to future and pre-existing water rights.

*Response.* The rule does not confer any right to existing or future use of water or occupancy of NFS lands within the State of Colorado. Such rights must be acquired in accordance with applicable State and Federal laws. The final rule exempts activities associated with conditional and absolute water rights decreed by the Colorado Water Courts prior to promulgation of the final rule. In addition, the final rule accommodates modification of water rights with a pre-existing water court decree.

*Comments requesting no surface occupancy in upper tier:* Some respondents requested the rule require no surface occupancy in upper tier acres.

*Response.* Based on public comments that were received and additional analysis, prohibiting surface occupancy in upper tier acres was added to the preferred alternative in the FEIS and is part of the final rule.

*Comments on oil and gas.* Many responses were received concerning various aspects of oil and gas development and the rule. Some respondents requested that roadless areas that have high potential for oil and gas development be excluded from roadless area protection or that exceptions for oil and gas be provided to allow for development. Other respondents felt the rule should prohibit oil and gas leasing, or exceptions for roads for leasing, within CRAs. Still other respondents requested that the rule prohibit road construction specifically on leases issued after the 2001 Roadless Rule was promulgated.

*Response.* Roadless inventory procedures follow Forest Service Handbook 1909.12, Land Management Handbook procedures. Whether or not an area is identified as having high mineral potential is not an inventory criterion and a high potential for mineral occurrence does not always equate to a high potential for mineral development. The purpose of the rule was to provide for the management of roadless areas, not to prohibit oil and gas leasing. Under the rule, existing legal oil and gas leases as of the date of the final rule can continue to operate under their lease stipulations. The 2001 Roadless Rule prohibited road construction to access mineral leases issued after the promulgation of the rule (January 12, 2001). Since 2001, the 2001 Roadless Rule has been subject to legal challenges, and leases have been issued in areas now identified as Colorado Roadless Areas. The Colorado Roadless Rule does not affect the terms or validity of leases existing prior to the promulgation date of the final rule. This rule preserves any surface development rights and limitations on surface development rights existing at the time of adoption of this rule on all oil and gas leases.

However, in response to public comment, the rule has been modified to include stipulations for no-surface occupancy for new oil and gas leases (leases issued after the promulgation date of the final rule) within the upper tier. Under the rule, leasing could still occur, but occupancy of the surface with roads, wellpads, or other infrastructure within the upper tier is prohibited. In non-upper tier areas, surface occupancy but not road construction would still be allowed for new oil and gas leases.

The final rule does not distinguish whether existing oil and gas leases were issued before or after the original promulgation date of the 2001 Roadless Rule. Forest Service actions concerning leases issued within roadless areas in Colorado since promulgation of the 2001 Roadless Rule were done in compliance with all legal requirements and forest plans/leasing decisions in effect at the time consent was provided to the BLM. Once issued by the BLM, leases grant the exclusive right to drill for, extract, remove, and dispose of all the oil and gas from the lease, subject to terms and stipulations made as part of the lease. For purposes of the FEIS, all existing oil and gas leases within roadless areas, including post-2001 leases, are considered to be "existing authorizations". None of the alternatives in the FEIS restrict or prohibit activities associated with existing authorizations, including the construction of temporary roads and pipelines reasonably necessary to exercise lease rights.

All oil and gas leases issued by the BLM are considered valid regardless of whether they were issued before or after the 2001 Roadless Rule. If an existing lease is found at a later date to be invalid through a court of law, then any rights associated with that particular lease, including surface occupancy rights, would not be provided for by the final rule.

§ 294.47   *Modifications and administrative corrections.* No substantive comments specifically related to modifications and administrative corrections of the rule were received. However, the Forest Service recognized a need to be able to correct boundaries for upper tier designations. Therefore, paragraph (b) for administrative correction to boundaries was modified to include the ability to correct upper tier boundaries based on clerical errors or improvements in mapping technology.

§ 294.48   *Scope and applicability.* No changes were made to this section. No substantive comments were specifically related to scope and applicability.

§ 294.49  List of designated Colorado Roadless Areas. No substantive comments were received specifically related to the list of designated CRAs. However, a column was added to the list of CRAs to indicate which CRA includes upper tier acres. This change was made to clarify locations of upper tier.

Comments received related to the rule but not to a particular section. Many comments were received related to the rule but not specific to a particular provision or section of the rule. For example, the designation of upper tier acres and the North Fork coal mining area is not specifically addressed in the provisions of the rule but certainly an important outcome of the final rule. The following sections summarize those comments.

Based on public comments, the amount of upper tier acres designated was increased to about 1,219,200 acres. This change was needed to balance the conservation of roadless area characteristics with activities to provide for State-specific concerns. In addition, the North Fork coal mining area was reduced to 19,100 acres based on additional consideration of potential mineable coal.

Comments on the authority of the Secretary to make rules. There were concerns expressed that there is no congressionally approved authority for designation of upper tier acres and that a future Secretary could change the prohibitions and exceptions in the current rule.

Response. The Constitution provides the fundamental basis for control, acquisition, disposition, use and management of all federally owned lands, including NFS lands. Article IV, Section 3, paragraph 2 of the Constitution provides: The Congress shall have power to dispose of and make all needful rules and regulations respecting the Territory or other property belonging to the United States. Congress has authorized the Secretary of Agriculture to manage NFS lands under conditions described in various acts, including the Organic Administration Act of 1897 and the Multiple-Use Sustained Yield Act of 1960. The Organic Administration Act of 1897 provides the Secretary of Agriculture with the authority to make "rules and regulations" that will provide protection from fire and depredation, regulate occupancy and use, and preserve the forest from destruction. The Secretary of Agriculture has the authority to make rules and regulations such as the Colorado Roadless Rule and future Secretaries will also have the authority to make, or change, such rules.

Comments on multiple uses. Some respondents requested that the rule address recreation and management of recreational areas and areas of multiple uses.

Response. The Agency's mission is to manage multiple uses across NFS lands, including developed and dispersed recreation opportunities. The rule restricts only tree cutting, sale, and removal; road construction and reconstruction; and LCZs (with some exceptions) in CRAs. None of the alternatives affect access or use of existing roads and trails, including motorized travel on roads and trails, nor do they regulate recreational activities such as hunting, fishing, hiking, camping, mountain biking, summer/winter motorized recreation and skiing.

Comments on protection of resources: Comments were received that the Forest Service should increase protection on a variety of resources including, but not limited to: Municipal water supplies, cold water resources, fisheries, big game habitat, wildlife viability, etc.

Response. One of the primary purposes of the Colorado Roadless Rule is the conservation of roadless area characteristics, which includes sources of public drinking water and diversity of plants and animals, as well as other resources. The provisions of the final rule provide for an increased level of conservation of roadless area characteristics while balancing State-specific concerns, when compared to Alternatives 1 or 3.

Comments to modify the rule to expand, reduce, or eliminate upper tier designations. Many comments were received regarding upper tier designation in the rule. Respondents either favor the designation of upper tier acres or oppose the designation of any upper tier areas in the rule. Some respondents indicated that there is a need for more upper tier acres to increase protection for fish and wildlife habitats and Colorado's recreational resources. Some comments suggested substantially increasing the number of acres within the upper tier, while others consider the upper tier "de facto wilderness" and therefore inappropriate. Some comments suggested provisions that would allow for expansion of the upper tier in the future. Respondents in favor of the upper tier often had specific suggestions on CRAs to be included in upper tier. Some respondents suggested removing all upper tier acres from the Colorado Roadless Rule.

Response. Upper tier acres are a subset of the CRAs which have limited exceptions to provide a high-level of conservation. Upper tier acres in the rule represent areas with the highest-quality roadless area characteristics where there are no known conflicts, or limited conflicts, such as existing oil and gas leases, existing or future coal leases, known water conveyance structures or the high likelihood of future development needs for water development. A common theme heard from the public was to allow tree cutting and minimal road construction to reduce the risk of a high severity wildfire threatening Colorado's at-risk communities within upper tier acres. Therefore, the majority of the upper tier acres were removed from CPZs in the final rule. The designation of upper tier is distributed among all of the forests in the final rule.

The final rule increases the amount of upper tier to about 1,219,200 acres (29% of CRAs) for the final rule, which is about 657,000 acres more than what was proposed action in the RDEIS. The Department, Forest Service and State of Colorado agreed that an increase in the amount of upper tier acres provides a better balance of protection and uses. Substantially more upper tier acres than have been designated for the final rule could hinder the Forest Service's ability to provide for State-specific concerns. Substantially less upper tier acres than have been proposed in the RDEIS would not offset the greater flexibility the final rule provides for the State-specific concerns.

Upper tier acres are not a designation of de facto wilderness. Upper tier only restricts tree cutting, road construction and use of LCZs. Upper tier allows for the use of motorized and mechanized equipment, while official wilderness does not. Upper tier allows for motorized recreation, including future development of off-highway vehicle trails; official wilderness prohibits motorized recreation. Upper tier prohibitions can be modified through rulemaking, while wilderness changes require an act of Congress.

Comment. The Forest Service should reconsider upper-tier restrictions, including their overlap with CPZs, to ensure that options are available for fuels and forest health treatments.

Response. In response to public comments, the final rule excludes the majority of upper tier acres from the CPZ. Not all CPZs were excluded from upper tier designation due to topography, forest plan desired conditions, and manageability of an area.

Comments on Currant Creek CRA and the North Fork coal mining area. Many respondents had concerns regarding Currant Creek CRA and the North Fork coal mining area. Some respondents felt

that the rule should exclude Currant Creek from the North Fork coal mining area, while others felt the rule should include Currant Creek in the North Fork coal mining area. Some respondents felt the rule should not reduce the size of the North Fork coal mining area. Some respondents felt the rule should revise road construction provisions related to the North Fork coal mining area.

*Response.* After consideration of public input and additional analyses, the final rule excludes the Currant Creek CRA from the North Fork coal mining area. Therefore, no roads will be constructed in the Currant Creek CRA related to coal mining activities. The residual North Fork coal mining area includes 19,100 acres where temporary roads can be constructed for coal related activities. The Forest Service consulted with BLM and State agencies, and considered information on the presence and mineability of coal resources in Currant Creek CRA and adjacent areas. The Forest Service also weighed public input and economic factors, information on wildlife resources, and the best available geologic information available from the United States Geological Survey (USGS), Colorado Geological Survey, and BLM when making determinations on the boundaries of the North Fork coal mining area.

Currant Creek CRA was not added to the North Fork coal mining area due to the presence of high priority habitat as identified by the Colorado Division of Parks and Wildlife, the juxtaposition of these habitats to adjacent important habitat, and the need to maintain contiguous areas insulated from roads and fragmentation. In addition, Currant Creek CRA was not added because it is a relatively unique roadless area due to its low elevation and the potential that road development for coal mining activities could displace the two elk herds currently utilizing this area increasing wildlife-human conflicts.

*Comments regarding effect to mining interests.* Some respondents suggested modifying the roadless area boundaries to exclude the Henderson Mine and other mining interests, because it may prevent their ability to develop future potential sites and respond in the case of emergencies. Additionally, some respondents are concerned that the proposed rule will prohibit mineral extraction, such as quarries to construct roads and highways.

*Response.* The rule does not prohibit mineral extraction or the development of mineral material sites. Any person prospecting, locating, and developing mineral resources on NFS lands under the 1872 mining law has a statutory right of reasonable access for those

purposes. Roads that are reasonably necessary for an activity conducted under the 1872 mining law are provided for by statute, and therefore exempt from the road construction and reconstruction prohibitions of the rule. With the right of access preserved under the rule, it was not necessary to exclude any unpatented mining claims from designated roadless areas. Road construction and reconstruction are allowed under the rule for emergency situations that threaten human life and property.

*Comments regarding modification of the West Needles CRA boundary near Durango Mountain Resort.* A commenter requested that the West Needles CRA boundary be modified to exclude activities permitted to the Durango Mountain Resort ski area.

*Response.* The Forest Service reviewed the activities authorized under the current Durango Mountain Resort ski area permit against the boundary of the West Needles CRA. Authorized activities on the east side of Highway 550 include a proposed sleigh/ accessible trail, a nordic ski trail system, and a trailhead. The trailhead and associated parking are outside of the West Needles CRA. Portions of the proposed sleigh/accessible trail and nordic ski trail system are within the West Needles CRA. Construction and maintenance of the proposed sleigh/ accessible trail and nordic trail system as authorized by the September 2008 Record of Decision for the Durango Mountain Resorts 2008 Improvement Plan are not prohibited under the Colorado Roadless Rule. Future tree cutting needed to construct or maintain these trails could occur under the exception for tree cutting incidental to the implementation of a management activity not otherwise prohibited. For these reasons, the Forest Service did not see the need to change the boundary of the West Needles CRA.

## Regulatory Certifications

### Regulatory Planning and Review

The final rule was reviewed under USDA procedures, E.O. 12866 issued September 30, 1993 as amended by E.O. 13497 on Regulatory Planning and Review, and the major rule provisions of the Small Business Regulatory Enforcement and Fairness Act (5 U.S.C. 800). Executive Orders 13563 and 12866 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety

effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. These executive orders require that agencies conduct a regulatory analysis for economically significant regulatory actions. Economically significant regulatory actions are those that have an annual effect on the economy of $100 million or more or adversely affect the economy or economic sectors. Total annual output associated with oil, gas, and coal production in the affected areas is projected to be approximately $760 million under the final rule, compared to $694 million under baseline conditions, implying the annual incremental monetized impact of the final rule is an increase of $65 million per year for total oil, gas, and coal output. The monetized economic impacts for the final rule are therefore estimated to be less than $100 million per year. However, this rule has been designated a significant regulatory action although not economically significant, under section 3(f) of Executive Order 12866. Accordingly, the rule has been reviewed by the Office of Management and Budget. This final rule is not expected to interfere with an action taken or planned by another agency, or to raise new legal or policy issues. This action will not alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients of such programs.

The benefits, costs, and distributional effects of four alternatives are analyzed over a 15-year time period. The four alternatives evaluated are referred to as follows: Alternative 1—the 2001 Roadless Rule; Alternative 2—the final Colorado Roadless Rule (final rule); Alternative 3—provisions of Forest Plans; and Alternative 4—a modified version of Alternative 2 with additional upper tier acreage. The baseline condition for regulatory impact analysis is the 2001 Roadless Rule (Alternative 1). The final rule is programmatic in nature and intended to guide future development of proposed actions in CRAs. The final rule is intended to provide greater management flexibility under certain circumstances to address unique and local land management challenges, while continuing to conserve roadless area characteristics. Increased management flexibility is primarily needed to reduce hazardous fuels around at-risk communities, to allow access to coal reserves in the North Fork coal mining area, and to

allow access to future water conveyances.

The final rule does not authorize the implementation of any ground-disturbing activities, but rather it describes circumstances under which several activities may be allowed or restricted in CRAs. Before authorizing land use activities in roadless areas, the Forest Service must complete a more detailed and site-specific environmental analysis pursuant to NEPA and its implementing regulations.

Because the final rule does not prescribe site-specific activities, it is difficult to predict changes in benefits and costs or other changes under the different alternatives. It should also be emphasized that the types of benefits derived from uses of roadless areas in Colorado are far ranging and include a number of non-market and non-use benefit categories that are difficult to measure in monetary terms. As a consequence, benefits are not monetized, nor are net present values or benefit cost ratios estimated. Instead, increases and losses in benefits are discussed separately for each resource area in a quantitative or qualitative manner. Benefits and costs are organized and discussed in the context of local land management challenges or concerns ('local challenges') and 'roadless area characteristics' in an effort to remain consistent with the overall purpose of the final rule, recognizing that benefits associated with local challenges may trigger or overlap with benefits associated with roadless area characteristics in some cases (e.g., forest health). Access and designations for motorized versus non-motorized recreation is a topic raised in comments, however, the final rule does not provide direction on where and when off-highway vehicle use would be permissible and makes clear that travel planning-related actions should be addressed through travel management planning and individual forest plans.

Distributional effects or economic impacts, in terms of jobs and labor income, are quantified for the oil and gas and the coal sectors for an economic area consisting of five Colorado counties (Delta, Garfield, Mesa, Montrose, and Rio Blanco) using a regional impact model. Fiscal impacts (i.e., mineral lease payments) are estimated for counties where changes in mineral activity are expected to be physically located (Delta, Garfield, Gunnison, Mesa, and Pitkin). The distributional effects associated with reducing wildfire hazard are characterized by estimating the extent to which CPZ areas (i.e., 0.5 to 1.5 mile buffer areas surrounding at-risk communities from wildfire) overlap CRAs where tree cutting for fuel treatments has been identified as being likely to occur. Distributional effects or economic impacts are not evaluated for other economic sectors (e.g., timber harvest, recreation) due to evidence presented in Tables 2 and 3 suggesting that the extent or magnitude of changes in output or services are not sufficient to cause significant changes in jobs and income for those economic sectors.

Details about the environmental effects of the final rule can be found in the FEIS. Effects on opportunities for small entities under the final rule are discussed in the context of Executive Order 13272 regarding proper consideration of small entities and the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), which amended the Regulatory Flexibility Act (5 U.S.C. 601 et.seq.).

The results of the regulatory impact assessment for the final rule are summarized in the following tables. Table 2 provides information related to roadless area acreage, road miles, and tree cutting. Table 3 summarizes the potential benefits (i.e., protection of roadless area characteristics and values) and costs (i.e., local resource challenges, agency costs) of Alternatives 1, 2, 3 and 4. Table 4 summarizes distributional effects and economic impacts of the proposed rule and alternatives.

TABLE 2—FRAMEWORK FOR ANALYSIS: COMPARISON OF ROADLESS AREA ACREAGE, ROAD MILES, AND TREE CUTTING

| | Alternative 1—2001 Roadless Rule (baseline condition) | Alternative 2—Final Rule | Alternative 3—forest plans | Alternative 4—proposed rule with public identified upper tier acres [1] |
|---|---|---|---|---|
| Roadless Area Acreage [2] .. | IRAs = 4,243,600 acres (4.24 million acres). | CRAs = 4,186,000 acres (4.19 million acres). Upper Tier CRAs = 1,219,200 acres. | IRAs = 4,243,600 acres .... ........................................ | CRAs = 4,186,000 acres (4.19 million acres). Upper Tier CRAs = 2,614,200 acres. |
| Roadless Acres in Upper Tier. | Not applicable ................... | 1,219,200 acres ................ | Not applicable ................... | 2,614,200 acres. |
| Total Existing Authorized Road Miles in Roadless Areas [3]. | 1,235 miles in IRAs ........... | 0 miles in CRAs ................ | 1,235 miles ........................ | 0 miles in CRAs. |
| Road Construction and Re-construction Projected in the Analysis Area. | 13.8 miles/year (11 miles in IRAs). | 19.7 miles/year (16 in CRAs). 5.9 miles/year more than 2001 Roadless Rule. | 25.8 miles/year .................. 12.0 miles/year more than 2001 Roadless Rule. | 17.9 miles/year (14 in CRAs). 4.1 miles/year more than 2001 Roadless Rule. |
| Tree cutting Projected in the Analysis Area. | 2,670 acres/year (1,520 acres within IRAs). | 7,320 acres/year (5,970 acres within CRAs, ma-jority within CPZs). 4,650 acres/year more than 2001 Roadless Rule. | 17,380 acres/year ............. 14,710 acres/year more than 2001 Roadless Rule. | 3,140 acres/year (1,790 acres within CRAs). 470 acres/year more than 2001 Roadless Rule. |

[1] Alternative 4 is the same as Alternative 2 with the exception that more roadless areas are assigned to the upper tier restrictions.
[2] The total analysis area is approximately 4.65 million acres and is the same across all four alternatives.
[3] Approximately 117 miles of roads are projected to be decommissioned in IRAs and 0 miles decommissioned in CRAs.

BLM_0002319

TABLE 3—COMPARISON OF THE FINAL RULE AND ALTERNATIVE 4 WITH BASELINE CONDITIONS

| Issue or affected resource | Alternative 1— 2001 Roadless Rule (baseline condition) | Alternative 2— Final rule | Alternative 3— Forest plans | Alternative 4— proposed rule with public identified upper tier acres |
|---|---|---|---|---|
| **Local Challenges and Resources: Roadless Area Management** | | | | |
| Fire and Fuels (Hazardous Fuel Reductions). | Tree cutting projected for 890 acres per year in the analysis area to reduce hazardous fuels (30 acres of which are within IRAs substantially altered acres); this amounts to 1% of average annual fuel treatments on all NFS lands in Colorado. Least flexibility to conduct hazardous fuel reduction and reduce fire hazard around at-risk communities and municipal water supply systems. | Tree cutting projected for 5,510 acres per year in the analysis area to reduce fuels (4,900 of which are within CRAs, mostly with the CPZ); this amounts to 9% of annual fuel treatments on all NFS lands in CO and is 4,620 acres more than the 2001 rule and 7,869 acres less than forest plans. More flexibility than the 2001 rule (and Alternative 4) to conduct hazardous fuel reduction and reduce fire risk to communities and municipal water supply systems. Less flexibility than forest plans. Limited amounts of the CRAs within either the 0.5 or 1.5 mile CPZs are in the upper tier acres. | Tree cutting projected for 13,350 acres per year in the analysis area to reduce fuels; this amounts to 21% of annual fuel treatments on all NFS lands in CO. Greatest flexibility to conduct hazardous fuel reduction and reduce fire risk to communities and municipal water supply systems. Options available for fuel reduction include prescribed fire, mechanical treatment, and road construction as needed to facilitate treatment. | Tree cutting projected for 2,000 acres per year in the analysis area to reduce fuels (1,390 of which are within CRAs, mostly within the CPZ); this amounts to 3% of annual fuel treatments on all NFS lands in CO and is 110 acres more than the 2001 rule and 11,350 less than forest plans. Within the CRAs that are non-upper tier acres, the flexibility to conduct hazardous fuel reduction and reduce fire risk to communities and municipal water supply systems is identical to the final rule. Greater amount of upper tier acres with tree cutting prohibited results in least number of acres for tree cutting for fuels reduction. Unable to conduct hazardous fuels reduction on 48% of 0.5 mile CPZ and 52% of 1.5 mile CPZ due to upper tier acre prohibitions. |
| Forest Health including reduced risk from Insect and Disease Outbreaks. | Forest health treatments are limited to some degree due to the characteristics and locations of roadless areas, as well as economic viability of treatments, under all alternatives. Most or large portions of roadless areas will remain unmanaged (i.e., with no treatments) under the alternatives and baseline conditions. Roadless areas that remain unmanaged will likely continue to depart from desired conditions. Declines in forest health would result in some landscapes being less resilient to large-scale insect and disease outbreaks. | | | |
| | Fewest opportunities to improve forest health. Tree cutting for treatment purposes is projected for 2,670 acres per year. | Greater opportunity to improve forest health compared to the 2001 rule and Alternative 4 but lower than forest plans. Tree cutting for treatment purposes projected for 7,320 acres per year (4,650 acres more than the 2001 rule and 10,060 acres less than forest plans). Increased likelihood of achieving management objectives in CPZs but similar to Alternative 1 outside of CPZs. | Greatest opportunity and flexibility to improve forest health. Tree cutting for treatment purposes projected for 17,380 acres per year. Higher likelihood of achieving management objectives. | Similar effects compared to the final rule but slight decrease in opportunities to improve forest health due to restrictions on tree-cutting in upper tier roadless areas. Tree-cutting for treatment purposes projected for 3,140 acres per year (470 acres more than the 2001 rule and 14,240 less than forest plans). Increased likelihood of achieving management objectives in CPZs but similar to Alternative 1 outside of CPZs. |

BLM_0002320

TABLE 3—COMPARISON OF THE FINAL RULE AND ALTERNATIVE 4 WITH BASELINE CONDITIONS—Continued

| Issue or affected resource | Alternative 1—2001 Roadless Rule (baseline condition) | Alternative 2—Final rule | Alternative 3—Forest plans | Alternative 4—proposed rule with public identified upper tier acres |
|---|---|---|---|---|
| Timber ............................... | Reduction in allowable sale quantity (ASQ) estimates, may occur. However, foreseeable timber production (volume of timber sold) is well below the ASQ and is expected to remain so under the alternatives and baseline conditions. Therefore, timber supplies outside of roadless areas are available to substitute for decreases in timber availability within roadless. Timber output is expected to vary only by location (i.e., proportion of cutting occurring within versus outside of roadless areas). Tree cutting (sale or removal) in the roadless analysis area is projected to occur in association with treatments on 2,670, 7,320, 17,380, and 3,140 acres per year respectively under the 2001 rule, the final rule, forest plans, and Alternative 4 respectively. Average annual treatment acreage on all NFS land is not expected to be affected substantially by the alternatives. | | | |
| Oil and Gas ....................... | Projections are for approximately 732 oil and gas wells drilled in the analysis area with access to 1,276 bcfg over a 15-year period [wells produce for 30 yrs] (same for the final rule and Alternative 4). Projected development activities within IRAs over 15 years: 143 miles of road, 705 wells, 146 well pads. | Projections are for approximately 732 oil and gas wells drilled in the analysis area with access to 1,276 bcfg over a 15-year period [wells produce for 30 yrs] (same for the 2001 rule and Alternative 4). Projected development activities within IRAs over 15 years: 146 miles of road, 715 wells, 162 well pads. | Projections are for approximately 819 oil and gas wells in the analysis area with access to 1,384 bcfg over a 15-year period [wells produce for 30 yrs], providing slightly more opportunity compares to the other alternatives. Projected development activities within IRAs over 15 years: 159 miles of road, 787 wells. 160 well pads. | Same as Alternative 2. |
| Coal (North Fork mining area). | Projections are for 16 miles of new roads in the analysis area, of which 7 are in IRAs. Foreseeable production opportunities would be limited to 8,600 acres of accessible coal reserves (157 million tons). Approximately 7,100 acres out of 8,600 acres are leased (5,900 leased acres are within IRAs), and 1,500 acres are unleased. A total of 2,700 acres out of 8,600 acres are outside of IRAs. | Projections are for 52 miles of new roads in the analysis area, of which 50 are in CRAs. Reduces restrictions on access to potential coal resources in CRAs compared to the 2001 rule, but is more restrictive than forest plans (limits new roads to the North Fork coal mining area). Foreseeable production opportunities are estimated to be 19,125 acres of accessible reserves (504 million tons) of which 7,100 acres are leased (4,000 leased acres are within CRAs) and 12,025 acres are unleased. A total of 15,025 out of 19,125 acres are outside of CRAs. Accessible reserves are 347 million tons greater than the 2001 rule and 211 million tons less than forest plans. | Projections are for 73 miles of new roads in the analysis area, of which 64 are in areas that overlap IRAs. Least restrictive on access to potential coal resources in IRAs compared to the other two alternatives. Foreseeable production opportunities are estimated to be 715 million tons of reserves on 36,400 acres of accessible reserves, of which 7,100 are leased (5,900 leased acres within IRAs) and 29,300 acres are unleased. A total of 32,400 out of 36,400 acres are outside of IRAs. | Same as the final rule. |
| Geothermal ........................ | Opportunities for geothermal development in roadless areas would not occur under the final rule, Alternative 4, or the 2001 rule due to new road prohibitions. Opportunities for some geothermal development in roadless areas may occur under forest plans as most land management plans allow new roads in roadless areas for this purpose. However, there are no current leases on NFS lands in Colorado. | | | |
| Public Safety ...................... | The final rule, Alternative 3, and Alternative 4, as well as baseline conditions provide adequate flexibility to respond to emergency situations or major threats to public health and safety in roadless areas (refer to features common to all alternatives). In contrast, the potential for accidents and safety hazards increases as the amount of activity and traffic increases, The Forest Service will continue to respond to wildfires, chemical or oil spills, abandoned mine hazards, road-design hazards, hazard trees, and other similar situations. Roads for this purpose must be temporary under the final rule, and would be expected to be temporary under the 2001 rule and forest plans. | | | |

TABLE 3—COMPARISON OF THE FINAL RULE AND ALTERNATIVE 4 WITH BASELINE CONDITIONS—Continued

| Issue or affected resource | Alternative 1—2001 Roadless Rule (baseline condition) | Alternative 2—Final rule | Alternative 3—Forest plans | Alternative 4—proposed rule with public identified upper tier acres |
|---|---|---|---|---|
| | Road construction or re-construction is allowed in IRAs where needed to: Address road safety hazards and imminent threats of flood, fire, and other catastrophic events that may threaten loss of life or property. | Road construction permissions are similar to the 2001 rule within both standard tier and upper tier acres. | Same as the 2001 rule, per agency regulations and policy directives. | Same as the final rule within both standard and upper tier acres. |
| Special Uses: Non-recreational (pipelines, electrical or telecommunication lines, water conveyances). | Special use authorizations issued prior to the effective date of rulemaking would be unaffected under the alternatives and baseline conditions. | | | |
| | Future special use authorizations in IRAs would generally prohibit road construction, but there would be no prohibition on the use of LCZs. 3.2 miles per year of LCZs projected. | Future special use authorizations in CRAs would generally prohibit road construction. Limited exceptions for the construction of LCZ for future oil and gas pipelines, electrical power lines or telecommunication lines, and water conveyance structures in CRAs. LCZs for future oil and gas pipelines, electrical power lines and telecommunication lines would be prohibited in upper tier. 3.2 miles per year of LCZs projected. | Future special use authorizations would generally allow for road construction; except where prohibited under forest plans. There would be no prohibition on the construction of LCZs, for future electrical power lines or tele-communication lines, water conveyance structures or oil and gas pipelines. 3.6 miles per year of LCZs projected. | More restrictions than Alternative 2, due to the greater proportion of upper tier acres. 3.2 miles per year of LCZs. |
| Developed Ski Areas | Least opportunities for ski area development and expansion. Road construction and tree cutting permitted on 6,600 acres within IRA boundaries and also under permit prior to the effective date of this rule. Roads and tree cutting would be prohibited in 1,700 acres of ski areas allocated under forest plans but outside of existing permits. | Greater opportunity for ski area development and expansion than the 2001 rule. Opportunities similar to forest plans except expansion of ski areas into roadless areas through plan amendments not permitted under the final rule. Road construction and tree cutting permitted on 6,600 acres under permit as well as the additional 1,700 acres of ski areas allocated under forest plans and located outside existing permits that would not be allowed under the 2001 rule. | Same as the final rule, recognizing that Forest plans can be amended or revised to expand ski area allocations beyond the current allocation. | Same as the final rule. |
| Other Developed Recreation. | Effects on developed recreation opportunities are not projected to differ substantially across alternatives compared to baseline conditions. | | | |
| Livestock Management | None of the projected activities in roadless areas that vary by alternative would be likely to have any substantial beneficial or adverse impacts on livestock management operations in roadless area grazing allotments. | | | |
| Saleable and Locatable Minerals. | Impacts and differences in impacts to or from these resources are found to be minimal or insignificant across alternatives. There are no effects to the statutory right of reasonable access to prospect, explore and develop locatable minerals under any alternative or baseline conditions. There will be no roads for saleable mineral development except under forest plans if road construction is allowed, although need is expected to be minimal. | | | |

BLM_0002322

TABLE 3—COMPARISON OF THE FINAL RULE AND ALTERNATIVE 4 WITH BASELINE CONDITIONS—Continued

| Issue or affected resource | Alternative 1— 2001 Roadless Rule (baseline condition) | Alternative 2— Final rule | Alternative 3— Forest plans | Alternative 4— proposed rule with public identified upper tier acres |
|---|---|---|---|---|
| **Roadless Area Characteristics and Values** | | | | |
| Scenic Quality .................... | Projected activity levels (e.g., tree cutting) occur on relatively small percentages of total roadless area under the alternatives compared to baseline conditions. | | | |
| | Maintains the most IRA acreage at high to very high scenic integrity levels where it exists. However, many substantially altered IRAs would continue to exhibit low scenic integrity. | Greater percentages of roadless areas would retain high to very high scenic integrity compared to the 2001 rule due to removal of substantially altered areas under the final rule. Retains majority of CRAs at high or very high integrity, including CRAs in upper tiers; the scenic integrity of some areas would be reduced by the roads and road-related activities projected as likely to occur in CRAs. Lower risk to scenic integrity compared to forest plans. New unroaded areas would add to areas protected for high scenic integrity compared to the 2001 rule. More opportunities for treatments to contribute to scenic quality in long-run compared to the 2001 rule. | Highest risk to scenic integrity, as more unroaded acres may shift to a moderate to low scenic integrity as a result of projected road and tree cutting activities. Greater opportunities for treatments may contribute more to high quality scenic levels in the long-term. | Similar to the final rule within CRAs that are not upper tier. Greater assurances about preserving high quality scenic levels in upper tier acres, compared to the final rule. |
| Wilderness and Other Congressionally Designated Areas. | No major difference among the alternatives and baseline conditions related to the risk of adverse effects on congressionally designated areas. There would be no potential direct effect on these areas as they are outside the roadless areas that are the subject of each alternative. Effects on areas recommended as wilderness would not differ across alternatives and baseline conditions as land management plans generally prohibit road construction and tree cutting and removal activities in those areas. | | | |
| | Indirect effects on wilderness area characteristics or experience from activities in adjacent roadless areas are expected to be low and similar to the 2001 rule because projected activities are not expected to occur adjacent to wilderness area boundaries. Unlike the 2001 rule, the final rule provides opportunities to establish uniform management approaches for recommended wilderness through placement of roadless areas in upper tier. | Higher risk of indirect adverse effects on wilderness experience from activities in the analysis area due to higher likelihood that activities could occur adjacent to wilderness boundaries. | Effects similar to the final rule and the 2001 rule. Greater opportunity to establish uniform management approaches for recommended wilderness through placement of roadless areas in upper tier. | |
| Soil ..................................... | No major difference among alternatives related to the risk of soil impacts. The 2001 rule and Alternative 4 would have the least risk of adverse effects, and the final rule would have a slightly higher risk than the 2001 rule but lower than forest plans. However, these differences are expected to be small in magnitude and spread over a wide geographic area. Most of the potential effects would be mitigated by site-specific mitigation measures. The risk of post-fire soil erosion under the final rule may be higher compared to forest plans and lower relative to the 2001 rule as a result of projected levels of fuel treatments. | | | |
| Water Quality, Quantity, and Stream Flow. | Projected activities under the alternatives and baseline conditions are unlikely to contribute to water quality impairment (i.e., exceeding water quality standards) due to adverse effects being mitigated through the use of site-specific Watershed Conservation Practices, Best Management Practices, and other mitigation measures and regulatory (Clean Water Act) permit requirements, as well as compliance with wetland regulations (E.O. 11990 and Section 404(b)(1) guidelines. Water quantity effects expected to be minimal as the area of tree-cutting on any one watershed affected is likely to be small. | | | |

TABLE 3—COMPARISON OF THE FINAL RULE AND ALTERNATIVE 4 WITH BASELINE CONDITIONS—Continued

| Issue or affected resource | Alternative 1—2001 Roadless Rule (baseline condition) | Alternative 2—Final rule | Alternative 3—Forest plans | Alternative 4—proposed rule with public identified upper tier acres |
|---|---|---|---|---|
| | Lowest risk of direct adverse effects from tree cutting and road construction. Slightly greater potential for adverse effects from severe fire to water supplies. | Slightly greater risk of direct adverse effects from tree cutting and road construction compared to the 2001 rule, but lower compared to forest plans. Fewer restrictions on fuel treatments and slightly lower potential for adverse effects to water supplies from fire compared to the 2001 rule, but slightly higher potential compared to forest plans. | Higher risk of direct adverse effects from tree cutting and road construction. Least restrictions on fuel treatments and slightly lowest potential for adverse effects from severe fire. | Similar to the final rule though slightly lower direct risk due to more upper tier acres. More restrictions on fuel treatments and slightly greater risk to water supplies from severe fire, compared to the final rule and forest plans. |
| Air Resources .................... | Differences in effects on air quality do not substantially differ between the alternatives and baseline conditions. Atmospheric emissions within the analysis area are not expected to increase to a level that would be likely to exceed State or Federal air quality standards. Potential for smoke related impacts under the final rule would be only slightly lower than the 2001 rule and slightly greater than forest plans. | | | |
| Threatened Endangered or Sensitive Plants. | No direct adverse impacts to threatened or endangered plants because no road construction or tree cutting, sale or removal is projected to occur where threatened or endangered plants exist. Site specific design criteria and mitigation measures are expected to minimize risk. Individual sensitive plants may be affected by projected activities, however, none of the alternatives or baseline conditions are expected to result in the loss of viability, nor cause a trend toward Federal listing of sensitive species. | | | |
| | Least risk of adverse impacts to sensitive plants, including threats from invasives. | More potential risk of adverse impacts to sensitive plants, including threats from invasives, compared to the 2001 rule but less risk than forest plans. | Greatest risk of adverse impacts to sensitive plants, including threats from invasives. | More risk of adverse impacts to sensitive plants compared to the 2001 rule, including threats from invasives; but less risk than the final rule or forest plans. |
| Aquatic Species and Habitat (also includes Threatened Endangered or Sensitive). | No measurable declines are expected on threatened and endangered (T&E) species, sensitive species, and MIS population trends; downstream T&E species; or wetlands and riparian areas under the alternatives or baseline conditions due to the assumption that mitigation measures and best management practices would help avoid or minimize impacts from the projected activities. | | | |
| | Greatest level of protection and least risk of adverse impacts. Provides most protection of cutthroat trout (similar to Alternative 4). | Some limited potential for reduced protection and increased risk of adverse impacts compared to the 2001 rule and Alternative 4 (but less risk than forest plans). Provides greater protection for cutthroat trout compared to forest plans. | Least amount of protection and greatest potential for adverse impacts. | Greatest level of protection and least risk for adverse impacts. Provides most protection of cutthroat trout (similar to the final rule). |
| | | Increasing amounts of fuel reduction and forest health treatments under the final rule and forest plans could have long-term beneficial effects on aquatic habitat and species, compared to the 2001 rule. | | |
| Terrestrial Species and Habitat (also includes Threatened, Endangered or Sensitive). | For the final rule, Alternative 3, Alternative 4, and baseline conditions, site-specific design criteria and mitigation measures are expected to avoid or minimize adverse effects from projected tree-cutting and road construction; projected activities are not likely to adversely affect federally listed species or designated critical habitat, nor result in the loss of viability or cause a trend toward Federal listing for sensitive species. Given the large acreage afforded roadless protection under the final rule, Alternative 4, and the 2001 rule, any changes in population trends for MIS would likely be an increase above current Forest Plan projections. | | | |

TABLE 3—COMPARISON OF THE FINAL RULE AND ALTERNATIVE 4 WITH BASELINE CONDITIONS—Continued

| Issue or affected resource | Alternative 1— 2001 Roadless Rule (baseline condition) | Alternative 2— Final rule | Alternative 3— Forest plans | Alternative 4— proposed rule with public identified upper tier acres |
|---|---|---|---|---|
| | Least risk to terrestrial species and habitat from projected tree-cutting and road construction. | Increased risk to terrestrial species and habitat from projected tree-cutting and road construction compared to the 2001 rule and Alternative 4 (though effects are expected to be minimal and short-lived). More opportunities for tree-cutting (when combined with prescribed fire) to improve habitat and reduce potential for adverse effects from severe wildfire compared to the 2001 rule, but fewer opportunities compared to forest plans. Updated inventory of roadless areas provides higher quality portfolio of wildlife habitat within roadless areas compared to the 2001 rule. | Greatest risk to terrestrial species and habitat from projected tree-cutting and road construction. Greatest opportunity for tree-cutting (in combination with prescribed fire) to improve habitat and reduce adverse effects from severe wildfire. | Reduced risk to terrestrial species and habitat from projected activities, compared to the 2001 rule and the final rule. Reduced opportunity for tree-cutting to improve habitat and reduce adverse effects from severe wildfire compared to forest plans and the final rule. Updated inventory of roadless areas provides higher quality portfolio of wildlife habitat within roadless areas compared to the 2001 rule. |
| Diversity of Plant and Animal Communities. | The value of roadless areas in conserving plant and animal diversity is likely to increase as habitat loss and habitat degradation increase in scope and magnitude in lands outside of roadless areas. Opportunities for protected large contiguous blocks of secure habitat, biological strongholds, and habitat connectivity would be greatest for the 2001 rule and lowest under forest plans. Increasing opportunities for treatments under Alternative 4, the final rule, and forest plans respectively to address hazardous fuels and ecosystem restoration may have beneficial effects on long-term diversity compared to the 2001 rule. | | | |
| Invasive Plants ................. | Site-specific design criteria and mitigation measures are expected to minimize risk. The magnitude and extent of spread of invasives in roadless areas would be relatively small under the alternatives and baseline conditions. | | | |
| | Lowest risk of spread due to low projections of road construction or tree cutting. | Intermediate risk of spread, higher than the 2001 rule and Alternative 4, but less than forest plans, due to greater projections of road construction or tree cutting. | Substantially greater risk of spread due to the greatest projections for road construction, tree cutting, fuels management, and future oil, gas, and coal activities compared to other alternatives. | Slightly higher risk of spread than the 2001 rule but less than the final rule and forest plans due to lower projections of road construction and tree cutting. |
| Recreation—Primitive and Semi-Primitive Recreation Settings and Opportunities. | Tree cutting activity is projected to occur on only a small percentage of roadless areas over 15 years under the alternatives and baseline conditions. Dispersed recreation opportunities (including hunting and fishing) are therefore not expected to change under the final rule and Alternative 4, but feelings of remoteness and solitude may change for periods of time in areas where activity occurs compared to the 2001 rule. | | | |

BLM_0002325

TABLE 3—COMPARISON OF THE FINAL RULE AND ALTERNATIVE 4 WITH BASELINE CONDITIONS—Continued

| Issue or affected resource | Alternative 1— 2001 Roadless Rule (baseline condition) | Alternative 2— Final rule | Alternative 3— Forest plans | Alternative 4— proposed rule with public identified upper tier acres |
|---|---|---|---|---|
| | Likely to retain a high proportion of IRA acreage in a primitive or semi-primitive setting. The substantially altered areas and developed ski areas in IRAs may continue to appear inconsistent with semi-primitive characteristics expected in roadless areas. The newly identified roadless acres (409,500 acres) where road construction and tree cutting are projected to occur but are not within the IRAs could shift to less primitive settings. | Likely to retain a high proportion of CRA acreage in a primitive or semi-primitive setting; although some CRA acres would shift toward roaded natural settings in areas where the most roads, tree-cutting, and energy operations are projected in CRAs. By not including substantially altered areas and developed ski areas in CRAs and adding newly identified roadless areas to CRAs, the CRAs would appear more consistent with semi-primitive characteristics expected in roadless areas, compared to less consistency within IRAs under the 2001 rule. | Greatest risk of shifts from primitive/semi-primitive settings to roaded natural settings in areas where the most tree cutting, roads, or energy operations are projected to occur. . | Likely to retain greatest greater proportion of CRA acreage in primitive/semi-primitive setting compared to the final rule given slight reductions in construction and tree cutting activity and larger percent of CRAs in upper tier. By not including substantially altered areas and developed ski areas in CRAs and adding unroaded areas to CRAs, the CRAs would appear more consistent with semi-primitive characteristics expected in roadless areas compared to less consistency within IRAs under the 2001 rule. |
| Outfitters and Guides (recreation). | Out of 1,390 recreational special use permits authorized on NFS lands in Colorado, 1,066 are associated with outfitters and guides, some of which are likely to operate in roadless areas. The final rule, Alternative 4, and baseline conditions are expected to have negligible adverse effects on recreational special uses, including outfitter and guide opportunities, based on the projected magnitude and distribution of reasonably foreseeable activities. Limitations on road construction and tree cutting under any alternative would not be likely to affect ability to obtain or use a recreation use authorization. | | | |
| Cultural and Heritage Resources. | Site-specific inventories, design criteria, and mitigation measures are expected to minimize risk. Under the final rule, Alternative 3, Alternative 4, and baseline conditions, there may be small, localized impacts from a number of ongoing activities. The magnitude of human activities in roadless areas would continue to be much lower than on other NFS lands. | | | |
| | Least risk of damage to cultural and heritage resources due to lowest projected amounts of tree-cutting and road construction. | Intermediate risk of damage to cultural and heritage resources because of higher projected tree cutting and road construction, compared to the 2001 rule, but lower risk than forest plans. | Highest risk of damage to cultural and heritage resources because of highest projected amounts of tree cutting and road construction. | Same as the final rule. |
| Geological and Paleontological Resources. | None of the projected activities in roadless areas that vary across alternatives and baseline conditions would be likely to adversely affect geological or paleontological resources, which would be avoided or otherwise protected from potential adverse impacts. Management of these resources does not require road construction or tree cutting and would be the same under the alternatives and baseline conditions. | | | |
| Climate Change ................ | Future emission of GHGs associated with projected activities under the alternatives and baseline conditions are too speculative for estimation. Potential releases of greenhouse gases due to the net effect of energy development and changes in wildfire conditions might be highest for forest plans and lowest for the 2001 rule, with the final rule being less than forest plans but more than the 2001 rule. Strategy options for adapting to climate change are more restrictive under the 2001 rule and Alternative 4, more flexible under the final rule, and most flexible under forest plans. | | | |

BLM_0002326

TABLE 3—COMPARISON OF THE FINAL RULE AND ALTERNATIVE 4 WITH BASELINE CONDITIONS—Continued

| Issue or affected resource | Alternative 1— 2001 Roadless Rule (baseline condition) | Alternative 2— Final rule | Alternative 3— Forest plans | Alternative 4— proposed rule with public identified upper tier acres |
|---|---|---|---|---|
| **Agency Costs** | | | | |
| Vegetation and Fuel Treatments. | Treatments are likely to be less efficient and more costly in IRAs. | Decreased flexibility to achieve management objectives in critical insect and disease areas compared to forest plans (but increased flexibility compared to the 2001 rule). Decreased ability to strategically and cost effectively locate treatments and improve efficiency as compared to forest plans but increased treatment cost effectiveness compared to the 2001 rule. | Capacity to shift the greatest amount of treatment acreage into roadless areas; increased efficiency, cost effectiveness and timeliness of wildfire suppression response as well as fuel reductions in CPZs compared to the final rule and Alternative 4. | Management flexibility is similar to the final rule, but projected treatment amounts are lower due to constraints imposed by more upper tier acreage under Alternative 4. |
| Other Costs ........................ | Administrative costs are estimated to not change. Emphasis on road decommissioning and temporary roads is expected to ease demands on maintenance backlog. Overall need to address invasive plants is expected to remain relatively constant across alternatives and baseline conditions. Although new roads can contribute to the spread of invasive plants, roads can also be an asset in helping to cost effectively control invasive populations. | | | |

TABLE 4—SUMMARY OF DISTRIBUTIONAL EFFECTS AND ECONOMIC IMPACTS OF THE FINAL RULE AND ALTERNATIVES

| | Alternative 1— 2001 Roadless Rule (no action) | Alternative 2— Final rule | Alternative 3— Forest plans | Alternative 4— Proposed rule with public identified upper tier acres |
|---|---|---|---|---|
| Leaseable Minerals: Coal, Oil and Gas—Output Value, Jobs and Income (2009$) Contributed[1]. | $694 million/yr Output. 2,100 Jobs supported. $147 million per year Labor Income. | *$760 million/yr Output* * $33 million/yr less than forest plans. * $66 million/yr greater than the 2001 rule. *2,300 Jobs supported* * 100 fewer jobs than forest plans. * 200 more jobs than the 2001 rule. *$164 million/year Labor Income* * $5 million/yr less than forest plans. * $17 million/yr more than the 2001 rule. | $793 million/yr Output. 2,400 Jobs supported. $169 million per year Labor Income. | Same as the final rule. |
| Revenue Sharing: Mineral Lease Payments and Tax Revenues per year (2009$)[2]. | State Total: $28.8 million Energy-Affected Counties: $5.9 million. All other CO Counties: $2.9 million. | *State Total: $31.2 million* * $1.4 million less than forest plans. * $2.4 million more than the 2001 rule. *Energy-Affected Counties: $6.2 million* * $0.4 million less than forest plans. * $0.3 more than the 2001 rule. *All other CO Counties: $3.2 million* * $0.1 million less than forest plans. * $0.3 more than the 2001 rule. | State Total: $32.6 million Energy-Affected Counties: $6.6 million. All other CO Counties: $3.3 million. | Same as the final rule. |

BLM_0002327

TABLE 4—SUMMARY OF DISTRIBUTIONAL EFFECTS AND ECONOMIC IMPACTS OF THE FINAL RULE AND ALTERNATIVES—Continued

| | Alternative 1—<br>2001 Roadless Rule<br>(no action) | Alternative 2—<br>Final rule | Alternative 3—<br>Forest plans | Alternative 4—<br>Proposed rule with public<br>identified upper tier acres |
|---|---|---|---|---|
| Values at risk: Number of Counties Where Potential for Fuel Treatments in CPZs may Increase or Decrease Compared to Alternative 3 and Baseline Conditions [3]. | In comparison to forest plans:<br>Decrease: 13 counties.<br>Increase: 0 county. | In comparison to forest plans:<br>Decrease: 2 counties.<br>Increase: 2 counties.<br>In comparison to the 2001 rule:<br>Decrease: 1 county.<br>Increase: 13 counties. | In comparison to 2001 rule:<br>Decrease: 0 counties.<br>Increase: 13 counties. | In comparison to forest plans:<br>Decrease: 16 counties.<br>Increase: 2 counties.<br>In comparison to 2001 rule:<br>Decrease: 6 counties.<br>Increase: 13 counties. |

[1] Jobs and income contributed annually (2009 dollars) based on projected levels of coal, oil, and gas production and regional economic modeling multipliers derived from an IMPLAN model representing the five counties where employment effects are assumed to occur (Delta, Garfield, Mesa, Montrose, and Rio Blanco).

[2] Payments consist of property tax receipts from coal, oil, and gas production; State distribution of severance taxes and Federal royalties. Energy-affected counties are Delta, Garfield, Gunnison, Mesa, and Pitkin counties. Changes in payments associated with the Secure Rural Schools and Self Determination Act and Payments in Lieu of Taxes (PILT) are not expected to change significantly.

[3] CPZs = community protection zones (0.5 to 1.5 mile buffer area surrounding communities that have been identified as being at-risk to wildfire. "Potential for fuel treatments" implies that at least one CPZ area in a county overlaps with an IRA or CRA where tree cutting has at least a low likelihood of occurring, according to national forest unit field staff.

*Proper Consideration of Small Entities*

The final rule has also been considered in light of Executive Order 13272 (E.O. 13272) regarding proper consideration of small entities and the SBREFA, which amended the Regulatory Flexibility Act (5 U.S.C. 601 *et. seq.*). The Forest Service has determined that this action will not have a significant economic impact on a substantial number of small entities as defined by the E.O. 13272 and SBREFA, because the final rule does not directly subject small entities to regulatory requirements. Therefore, an initial regulatory flexibility analysis is not required for this final rule. However, given public interest in the final rule's potential effects on small entities, including rural counties and economies, and efforts to be consistent with related rule-making analysis in the past, the indirect effects or reasonably foreseeable losses in potential small entity opportunities resulting from the final rule are analyzed.

For small businesses affiliated with most industry sectors involved with activities in roadless areas (e.g., coal, oil and gas), there are minimal differences between the final rule and baseline or no-action condition (2001 Roadless Rule). As a result, there is little or no potential for significant adverse economic impacts to small businesses under the final rule relative to baseline conditions.

There are about 1,390 recreation special use permits currently authorized within National Forest System lands in Colorado of which a large majority are small businesses, and 1,066 (77%) are associated with outfitter and guide permits, some of which are likely to operate within roadless areas. However,

there is no difference between alternatives with respect to recreation special use authorizations in roadless areas, because limitations on road construction and tree cutting under any alternative would not be likely to affect ability to obtain or use recreation use authorizations. Impacts under the final rule compared to the baseline condition are not expected to be significant due to the small percentage of acreage affected and roads constructed per year spread across more than 4 million acres of CRAs. It is also noted that a significant percentage of road construction and tree cutting activity will occur within or near the CPZs where primitive or semi-primitive settings may already be affected. Timber sales and harvest levels for Colorado national forests as a whole are projected to be similar during the 15-year analysis period across the alternatives.

Flat and declining budgets imply the percentage of harvest from roadless areas may change under the alternatives, but aggregate volumes across all NFS land in Colorado are expected to remain relatively unchanged, on average based on budget, implying little potential for adverse impacts to small entities.

For leasable minerals associated with energy resources (coal, oil and gas), changes in output are projected across alternatives. More than 95 percent of the firms associated with these sectors can be classified as "small"; as defined by Small Business Administration standards. Any changes in oil and gas, or coal development or production can, therefore, have an effect on small business opportunities in these sectors. A five-county region has been defined to model the economic impacts associated with energy resources (Delta, Garfield,

Mesa, Montrose, and Rio Blanco counties). A total of 355 firms associated with oil and gas, and coal development and extraction are estimated to be located within this region, of which 95% are likely to be small (337 firms). However, energy resource sector jobs (i.e. jobs associated with oil, gas and coal development) within this five-county area, supported annually by projected activity within roadless areas, are estimated to increase from 2,100 under the 2001 Roadless Rule alternative to 2,300 jobs under the final rule (as well as Alternative 4). Estimated jobs eventually decrease from 2,400 under Alternative 3 to 2,300 under the final rule. Labor income for oil, gas and coal sectors increases by a similar degree from $147 million per year under the 2001 rule to $164 million under the final rule; estimated labor income decreases from $169 million under forest plans to $164 million under the final rule. Estimated job and labor income contributions for oil, gas and coal sectors are equivalent for the final rule and Alternative 4. These results indicate that the final rule will not have significant adverse impacts to small entities associated with energy resource development and extraction relative to Alternative 1.

For all other economic sectors considered, changes in resource outputs are not projected to be significant to the extent that adverse impacts to small entities could occur in aggregate or within regions.

Among 64 counties in the state of Colorado, 36 counties (56%) are considered to be small governments (population less than 50,000). These 36 counties are considered to be small rural counties having NFS lands within

BLM_0002328