Danin, A., and M.B. Barbour. 1982. Microsuccession of cryptogams and phanerogams in the Dead Sea Area, Israel. Flora 172: 173-179.

Danin, A., Y. Bar-Or, I. Dor, and T. Yisraeli. 1989. The role of cyanobacteria in stabilization of sand dunes in southern Israel. Ecologia Mediterranea 15: 55-64.

Danin, A., and D.H. Yaalon. 1980. Trapping of silt and clay by lichens and bryophytes in the desert environment of the Dead Sea region. Bat Sheva Seminar on Approaches and Methods in Paleoclimatic Research with Emphasis on Aridic Areas, Jerusalem, Israel. 32 Pp.

Daubenmire, R. 1959. A canopy-coverage method of vegetational analysis. Northwest Science 33: 43-64.

Daubenmire, R. 1970. Steppe vegetation of Washington. Agricultural Experiment Station Technical Bulletin No. 62, Washington State University, Pullman. 131 Pp.

de Soyza, A.G., W.G. Whitford, and J.E. Herrick. 1997. Sensitivity testing of indicators of ecosystem health. Ecosystem Monitoring 3: 44-53.

DeBolt, A., and B. McCune. 1993. Lichens of Glacier National Park, Montana. The Bryologist 96: 192-204.

Dobrowolski, J.P. 1994. *In situ* estimation of effective hydraulic conductivity to improve erosion modeling for rangeland conditions. In: Variability of Rangeland Water Erosion Processes. SSSA Publication 38. Soil Science Society of America, Madison, WI. Pages 83-91.

Doyen, J.T., and W.F. Tschinkel. 1974. Population size, microgeographic distribution and habitat separation in some tenebrionid beetles. Annals of the Entomological Society of America 67: 617-626.

Dregne, H.E. 1983. Desertification of Arid Lands. Harwood Academic Publishers, New York. Pages 1-15.

Dulieu, D., A. Gaston, and J. Darley. 1977. La dégradation des pâturages de la région de N'Djamena (Républic du Tchad) en relation avec la présence de Cyanophycees psammophiles: Étude préliminaire. Revue d'Élevage et de Médicine Vétérinaire en Pays Tropicaux 30: 181-190.

Dunkerley, D.L., and K.J. Brown. 1995. Runoff and runon areas in a patterned chenopod shrubland, arid western New South Wales, Australia: characteristics and origin. Journal of Arid Environments 30: 41-55.

BLM_0005065

Eckert, R.E., Jr., F.F., M.S. Meurisse, and J.L. Stephens. 1986. Effects of soil-surface morphology on emergence and survival of seedlings in big sagebrush communities. Journal of Range Management 39: 414-420.

Eldridge, D.J. 1993a. Cryptogam cover and soil surface condition: effects on hydrology on a semiarid woodland soil. Arid Soil Research and Rehabilitation 7: 203-217.

Eldridge, D.J. 1993b. Cryptogams, vascular plants and soil hydrological relations: some preliminary results from the semiarid woodlands of eastern Australia. Great Basin Naturalist 53: 48-58.

Eldridge, D.J. 1996. Distribution and floristics of terricolous lichens in soil crusts in arid and semi-arid New South Wales, Australia. Australian Journal of Botany 44: 581-599.

Eldridge, D.J. 1998. Trampling of microphytic crusts on calcareous soils and its impact on erosion under rain-impacted flow. Catena 33: 221-239.

Eldridge, D.J. 1999. Dynamics of moss- and lichen-dominated soil crusts in a patterned *Callitris glaucophylla* woodland in eastern Australia. Acta Oecologica 20: 159-170.

Eldridge, D.J., and R.A. Bradstock. 1994. The effect of time since fire on the cover and composition of cryptogamic soil crusts on a eucalypt shrubland soil. Cunninghamia 3: 521-527.

Eldridge, D.J., and J. Ferris. 1999. Recovery of populations of the soil lichen *Psora crenata* after disturbance in arid South Australia. The Rangeland Journal 21: 194.

Eldridge, D.J., and R.S.B. Greene. 1994. Microbiotic soil crusts: a review of their roles in soil and ecological processes in the rangelands of Australia. Australian Journal of Soil Research 32: 389-415.

Eldridge, D.J., and T.B. Koen. 1998. Cover and floristics of microphytic soil crusts in relation to indices of landscape health. Plant Ecology 137: 101-114.

Eldridge, D.J., and R. Rosentreter. 1999. Morphological groups: a framework for monitoring microphytic crusts in arid landscapes. Journal of Arid Environments 41: 11-25.

Eldridge, D.J., and M.E. Tozer. 1995. Determining quadrat numbers for sampling terricolous lichens on heterogeneous semi-arid landscapes. Australian Lichenological Newsletter 37: 35-37.

Eldridge, D.J., and M.E. Tozer. 1996. Distribution and floristics of bryophytes in soil crusts in semi-arid and arid eastern Australia. Australian Journal of Botany 44: 223-247.

BLM_0005066

Eldridge, D.J., E. Zaady, and M. Shachak. 2000. Infiltration through three contrasting biological soil crusts in patterned landscapes in the Negev, Israel. Catena 40: 323-336.

Eskew, D.L., and I.P. Ting. 1978. Nitrogen fixation by legumes and blue-green algal-lichen crusts in a Colorado desert environment. American Journal of Botany 65: 850-856.

Ettershank, G., J. Ettershank, M. Bryant, and W. Whitford. 1978. Effects of nitrogen fertilization on primary production in a Chihuahuan desert ecosystem. Journal of Arid Environments 1: 135-139.

Evans, R.D., and J. Belnap. 1999. Long-term consequences of disturbance on nitrogen-cycling in an arid grassland. Ecology. 80: 150-160.

Evans, R.D., and J.R. Ehleringer. 1993. A break in the nitrogen cycle in aridlands? Evidence from $^{15}N$ of soils. Oecologia 94: 314-317.

Farnsworth, R.B., E.M. Romney, and A. Wallace. 1976. Implications of symbiotic nitrogen fixation by desert plants. Great Basin Naturalist 36: 65-80.

Faust, W.F. 1970. The effect of algal-mold crusts on the hydrologic processes of infiltration, runoff, and soil erosion under simulated rainfall conditions. Unpublished thesis, University of Arizona, Tucson. 60 Pp.

Faust, W.F. 1971. Blue-green algal effects on some hydrologic processes at the soil surface. In: Hydrology and Water Resources in Arizona and the Southwest. Proceedings from the 1971 meetings of the Arizona Section American Water Resource Association and Hydrology Section of the Arizona Academy of Sciences, Tempe, Arizona. Pages 99-105.

Fisher, R.F., M.J. Jenkens, and W.F. Fisher. 1987. Fire in the prairie-forest mosaic of Devils Tower National Monument. American Midland Naturalist 117: 250-257.

Fletcher, J.E., and W.P. Martin. 1948. Some effects of algae and molds in the raincrust of desert soils. Ecology 29: 95-100.

Friedel, M.H., and G.N. Bastin. 1988. Photographic standards for estimating comparative yield in arid rangelands. Australian Rangeland Journal 10: 34-48.

Friedel, M.H., V.H. Chewings, and G.N. Basin. 1988. The use of comparative yield and dry-weight-rank techniques for monitoring arid rangeland. Journal of Range Management 41: 430-435.

Friedmann, E.I., and M. Galun. 1974. Desert algae, lichens and fungi. In: Brown, G.W., ed. Desert Biology. Academic Press, New York. Pages 165-212.

BLM_0005067

Friedmann, E.I., and R. Ocampo-Paus. 1976. Endolithic blue-green algae in the Dry Valley: primary producers in the Antarctic Desert ecosystem. Science 193: 1247-1249.

Fryberger, S.C., C.J. Schenk, and L.F. Krystinik. 1988. Stokes surfaces and the effects of near surface groundwater-table on aeolian deposition. Sedimentology 35: 21-41.

Gadkari, D. 1988. Effect of some photosynthesis-inhibiting herbicides on growth and nitrogenase activity of a new isolate of cyanobacteria, *Nostoc* G3. Journal of Basic Microbiology 28: 419-426.

Galun, M., P. Burbrick, and J. Garty. 1982. Structural and metabolic diversity of two desert lichen populations. Journal of the Hattori Botanical Laboratory 53: 321-324.

Garcia-Pichel, F., and J. Belnap. 1996. The microenvironments and microscale productivity of cyanobacterial desert crusts. Journal of Phycology 32: 774-782.

Gayel, A.G., and E.A. Shtina. 1974. Algae on the sands of arid regions and their role in soil formation. Soviet Soil Science 6: 311-319.

Gillette, D.A., and J.P. Dobrowolski. 1993. Soil crust formation by dust deposition at Shaartuz, Tadzhik, S.S.R. Atmospheric Environment 27A: 2519-2525.

Goudie, A.S. 1978. Dust storms and their geomorphological implications. Journal of Arid Environments 1: 291-310.

Graetz, R.D., and D.J. Tongway. 1986. Influence of grazing management on vegetation, soil structure and nutrient distribution and the infiltration of applied rainfall in a semi-arid chenopod shrubland. Australian Journal of Ecology 11: 347-360.

Green, D. 1992. Rangeland assessment. In: New South Wales Proceedings of the 7th Biennial Conference, Australian Rangeland Society, Cobar, New South Wales. Pages 267-268.

Greene, R.S.B., C.J. Chartes, and K.C. Hodgkinson. 1990. The effects of fire on the soil in a degraded semi-arid woodland. I. Cryptogam cover and physical and micromorphological properties. Australian Journal of Soil Research 28: 755-777.

Gutterman, Y. 1994. Strategies of seed dispersal and germination in plants inhabiting deserts. The Botanical Review 60: 373-425.

Hansen, D. J., W. K. Ostler, and D. B. Hall. 1999. The transition from Mojave Desert to Great Basin Desert on the Nevada Test Site. In: McArthur, E. D., W. K. Ostler, and C. L. Wambolt, compilers. Proceedings: Shrubland Ecotones. Proceedings RMRS-P-11. USDA Forest Service, Rocky Mountain Research Station, Ogden, UT. Pages 148-158.

BLM_0005068

Hansen, E.S. 1997. Studies of the lichen flora of coastal areas in Central West Greenland. Nova Hedwigia 64: 505-523.

Harper, K.T., and J. Belnap. In press. The influence of biological soil crusts on mineral uptake by associated seed plants. Journal of Arid Environments.

Harper, K.T., and J.R. Marble. 1988. A role for nonvascular plants in management of arid and semiarid rangeland. In: Tueller, P.T., ed. Vegetation Science Applications for Rangeland Analysis and Management. Kluwer Academic Publishers, Dordrecht. Pages 135-169.

Harper, K.T., and R.L. Pendleton. 1993. Cyanobacteria and cyanolichens: can they enhance availability of essential minerals for higher plants? Great Basin Naturalist 53: 59-72.

Harper, K.T., and L.L. St. Clair. 1985. Cryptogamic soil crusts on arid and semiarid rangelands in Utah: effects of seedling establishment and soil stability. Final report, Bureau of Land Management, Utah State Office, Salt Lake City. 32 Pp.

Henriksson, L.E., and E.J. DaSilva. 1978. Effects of some inorganic elements on nitrogen-fixation in blue-green algae and some ecological aspects of pollution. Zeitschrift fur Allgemeine Mikrobiologie 18: 487-494.

Hironaka, M., M.A. Fosberg, and A.H. Winward. 1983. Sagebrush-grass habitat types of southern Idaho. University of Idaho Forest, Wildlife and Range Experiment Station Bulletin No. 35. University of Idaho, Moscow. 44 Pp.

Holechek, J.L., R.D. Pieper, and C.H. Herbel. 1989. Range Management Principles and Practices. Prentice Hall, Engelwood-Cliffs, NJ.

Hurlbert, S.H. 1984. Pseudoreplication and the design of ecological field experiments. Ecological Monographs 54: 168-198.

James, D.W., and J.J. Jurinak. 1978. Nitrogen fertilization of dominant plants in the northeastern Great Basin desert. In: West, N.E. and J.J. Skujins, eds. Nitrogen in Desert Ecosystems, US/IBP Synthesis Series 9. Dowden Hutchinson and Ross, Stroudsberg, PA. Pages 219-231.

Jeffries, D.L. 1989. The vegetation, soil, and cryptogamic crusts of blackbrush communities in the Kapairowits Basin. Unpublished dissertation, Arizona State University, Tempe. 157 Pp.

Jeffries, D.L., and J.M. Klopatek. 1987. Effects of grazing on the vegetation of the blackbrush association. Journal of Range Management 40: 390-392.

BLM_0005069

Jeffries, D.L., J.M. Klopatek, S.O. Link, and H. Bolton, Jr. 1992. Acetylene reduction by cryptogamic crusts from a blackbrush community as related to resaturation and dehydration. Soil Biology and Biochemistry 24: 1101-1105.

Jeffries, D.L., S.O. Link, and J.M. Klopatek. 1993a. $CO_2$ fluxes of cryptogamic crusts. I. Response to resaturation. New Phytologist 125: 163-174.

Jeffries, D.L., S.O. Link, and J.M. Klopatek. 1993b. $CO_2$ fluxes of cryptogamic crusts. II. Response to dehydration. New Phytologist 125: 391-396.

Johansen, J.R. 1993. Cryptogamic crusts of semiarid and arid lands of North America. Journal of Phycology 29: 140-147.

Johansen, J.R., J. Ashley, and W.R. Rayburn. 1993. The effects of rangefire on soil algal crusts in semiarid shrub-steppe of the Lower Columbia Basin and their subsequent recovery. Great Basin Naturalist 53: 73-88.

Johansen, J.R., and S.R. Rushforth. 1985. Cryptogamic crusts: seasonal variation in algae populations in the Tinctic Mountains, Juab County, Utah, USA. Great Basin Naturalist 45: 14-21.

Johansen, J.R., S.R. Rushforth, and J.D. Brotherson. 1981. Sub-aerial algae of Navajo National Monument, Arizona. Great Basin Naturalist 41: 433-439.

Johansen, J.R., and L.L. St. Clair. 1986. Cryptogamic soil crusts: recovery from grazing near Camp Floyd State Park, Utah., U.S.A. Great Basin Naturalist 46: 632-640.

Johansen, J.R., L.L. St. Clair, B.L. Webb, and G.T. Nebeker. 1984. Recovery patterns of cryptogamic soil crusts in desert rangelands following fire disturbance. The Bryologist 87: 238-243.

Jones, K., and W.D.P. Stewart. 1969. Nitrogen turnover in marine and brackish habitats. III. Production of extracellular N by *Calothrix*. Journal of Marine Biology Association (United Kingdom) 49: 475-488.

Jungerius, P.D., and F. van der Meulen. 1988. Erosion processes in a dune landscape along the Dutch coast. Catena 15: 217-228.

Kaltenecker, J.H. 1997. The recovery of microbiotic crusts following post-fire rehabilitation on rangelands of the western Snake River Plain. Unpublished thesis, Boise State University, Boise, ID. 99 Pp.

Kaltenecker, J., and M. Wicklow-Howard. 1994. Microbiotic soil crusts in sagebrush habitats of southern Idaho. Contract Report. On file with: Interior Columbia Basin Ecosystem Management Project, Walla Walla, WA. 48 Pp.

BLM_0005070

Kaltenecker, J.H., M. Wicklow-Howard, and M. Pellant. 1999a. Biological soil crusts: natural barriers to *Bromus tectorum* L. establishment in the northern Great Basin, USA. In: Eldridge, D., and D. Freudenberger, eds. Proceedings of the VI International Rangeland Congress, Aitkenvale, Queensland, Australia. Pages 109-111.

Kaltenecker, J.H., M. Wicklow-Howard, and R. Rosentreter. 1997. Microbiotic crusts of the Lemhi Resource Area and their effect on soil-water relationships in sites recovering from long-term grazing. Unpublished report submitted to the USDI Bureau of Land Management, Salmon, ID. 58 Pp.

Kaltenecker, J.H., M. Wicklow-Howard, and R. Rosentreter. 1999b. Biological soil crusts in three sagebrush communities recovering from a century of livestock trampling. In: McArthur, E.D., W.K. Ostler, and C.L. Wambolt, comps. Proceedings: Shrubland Ecotones. Proceedings RMRS-P-11. USDA Forest Service, Rocky Mountain Research Station. Pages 222-226.

Kidron, G.J., D.H. Yaalon, and A. Vonshak. 1999. Two different causes for runoff initiation on microbiotic crusts: hydrophobicity and pore clogging. Soil Science 164: 18-27.

Kinnell, P.I.A., C.J. Chartres, and C.L. Watson. 1990. The effects of fire on the soil in a degraded semi-arid woodland. II. Susceptibility of the soil to erosion by shallow rain-impacted flow. Australian Journal of Soil Research 28: 755-777.

Kleiner, E.F., and K.T. Harper. 1972. Environment and community organization in grasslands of Canyonlands National Park. Ecology 53: 299-309.

Kleiner, E.F., and K.T. Harper. 1977a. Occurrence of four major perennial grasses in relation to edaphic factors in a pristine community. Journal of Range Management 30: 286-289.

Kleiner, E.F., and K.T. Harper. 1977b. Soil properties in relation to cryptogamic ground cover in Canyonlands National Park. Journal of Range Management 30: 203-205.

Klopatek, J.M. 1992. Cryptogamic crusts as potential indicators of disturbance in semi-arid landscapes. In: McKenzie, D.H., D.E. Hyatt, and V.J. McDonald, eds. Ecological Indicators. Elsevier Applied Science, New York. Pages 773-786.

Ladyman, J.A.R., and E. Muldavin. 1994. A study of the terricolous cryptogam and other ground cover in low disturbance pinyon-juniper woodlands in New Mexico. Unpublished report to the USDA Forest Service, Albuquerque, NM.

Ladyman, J.A.R., and E. Muldavin. 1996. Terrestrial cryptogams of pinyon-juniper woodlands in the southwestern United States: a review. General Technical Report RM-GTR-280. USDA Forest Service, Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO. 33 Pp.

ninety-nine

Biological Soil Crusts:
Ecology & Management

BLM_0005071

Ladyman, J.A.R., E. Muldavin, R. Fletcher, and E. Aldon. 1994. An examination of three mesas to compare and contrast the relationships between terrestrial cryptogam and vascular plant cover. American Academy for the Advancement of Science. In: Proceedings, Southwestern and Rocky Mountain Division 70th Abstract 57: 25.

Lamb, I.M., and A. Ward. 1974. A preliminary conspectus of the species attributed to the imperfect lichen genus *Leprocaulon* Nyl. Journal of the Hattori Botanical Laboratory 38: 499-553.

Lange, O.L. 1980. Moisture content and $CO_2$ exchange of lichens. I. Influence of temperature on moisture-dependent net photosynthesis and dark respiration in *Ramalina maciformis*. Oecologia 45: 82-87.

Lange, O.L., J. Belnap, H. Reichenberger, and A. Meyer. 1997. Photosynthesis of green algal soil crust lichens from arid lands in southern Utah, USA: role of water content on light and temperature responses of $CO_2$ exchange. Flora 192: 1-15.

Lange, O.L., G. Kidron, B. Buedel, A. Meyer, E. Kilian, and A. Abeliovich. 1992. Taxonomic composition and photosynthetic characteristics of the "biological soil crusts" covering sand dunes in the western Negev Desert. Functional Ecology 6: 519-527.

Lange, O.L., A. Meyer, H. Zellner, and U. Heber. 1994. Photosynthesis and water relations of lichen soil-crusts: Field measurements in the coastal fog zone of the Namib Desert. Functional Ecology 8: 253-264.

Lange, W. 1974. Chelating agents and blue-green algae. Canadian Journal of Microbiology 20: 1311-1321.

Larmuth, J. 1978. Temperatures beneath stones used as daytime retreats by desert animals. Journal of Arid Environments 1: 35-40.

Larsen, K.D. 1995. Effects of microbiotic crusts on the germination and establishment of three range grasses. Unpublished thesis, Boise State University, Boise, ID. 86 Pp.

Lemos, P., and J.F. Lutz. 1957. Soil crusting and some factors affecting it. Soil Science Society of America Proceedings 21: 485-491.

Lesica, P., and J.S. Shelley. 1992. Effects of cryptogamic soil crust on the population dynamics of *Arabis fecunda* (Brassicaceae). American Midland Naturalist 128: 53-60.

Lewin, R.A. 1956. Extracellular polysaccharides of green algae. Canadian Journal of Microbiology 2: 665-673.

Leys, J.F., and D.J. Eldridge. 1998. Influence of cryptogamic crust to wind erosion on sand and loam rangeland soils. Earth Surface Processes and Landforms 23: 963-974.

BLM_0005072

Looman, J. 1964. The distribution of some lichen communities in the prairie provinces and adjacent parts of the Great Plains. The Bryologist 67: 210-224.

Loope, W.L., and G.F. Gifford. 1972. Influence of a soil microfloral crust on select properties of soils under pinyon-juniper in southeastern Utah. Journal of Soil Water and Conservation 27: 164-167.

Ludwig, J.A., and D.J. Tongway. 1992. Monitoring the condition of Australian arid lands: linked plant-soil indicators. In: McKenzie, D.H., D.E. Hyatt, and V.J. McDonald, eds. Ecological Indicators. Elsevier Applied Science, New York. Pages 765-772.

Mabbutt, J.A., and P.C. Fanning. 1987. Vegetation banding in arid Western Australia. Journal of Arid Environments 12: 41-59.

MacGregor, A.N., and D.E. Johnson. 1971. Capacity of desert algal crusts to fix atmospheric nitrogen. Soil Science Society of America Proceedings 35: 843-844.

Mack, R.N., and J.N. Thompson. 1982. Evolution in steppe with few large, hooved mammals. The American Naturalist 119: 757-773.

Magee, W.E., and R.H. Burris. 1954. Fixation of $N_2$ and utilization of combined nitrogen by *Nostoc muscorum*. American Journal of Botany 41: 777-782.

Marathe, K.V. 1972. Role of some blue-green algae in soil aggregation. In: Desikachary, T.V., ed. Taxonomy and Biology of Blue-green Algae. University of Madrias, India. Pages 328-331.

Marble, J.R., and K.T. Harper. 1989. Effect of timing of grazing on soil-surface cryptogamic communities in Great Basin low-shrub desert: A preliminary report. Great Basin Naturalist 49: 104-107.

Marowitch, J., M.R.T. Dale, and J. Hoddinott. 1988. The effect of crude oil and oil spill chemicals on nitrogen fixation in the cyanobacteria *Nostoc* sp. Environmental Pollution 51: 75-83.

Martin, P.S. 1975. Vanishings, and future of the prairie. Geoscience and Man 10: 39-49.

Mayland, H.F., and T.H. McIntosh. 1966. Availability of biologically fixed atmospheric nitrogen-15 to higher plants. Nature 209: 421-422.

Mayland, H.F., T.H. McIntosh, and W.H. Fuller. 1966. Fixation of isotopic nitrogen in a semi-arid soil by algal crust organisms. Soil Science Society of America Proceedings 30: 56-60.

BLM_0005073

McArthur, E.D., E.M. Romney, S.D. Smith, and P.T. Tueller, comps. 1990. Proceedings—Symposium on Cheatgrass Invasion, Shrub Die-off, and Other Aspects of Shrub Biology and Management. General Technical Report INT-276. USDA Forest Service, Intermountain Research Station, Ogden, UT. 351 Pp.

McCune, B. 1992. Components of error in predictions of species compositional change. Journal of Vegetation Science 3: 27-34.

McCune, B. 1993. Gradients in epiphyte biomass in three *Pseudotsuga-Tsuga* forests of different ages in western Oregon and Washington. The Bryologist 96: 405-411.

McCune, B. 1998. Lichens of granitic peaks in the Bitterroot Range, Montana and Idaho, USA. In: Glenn, M.G., R.C. Harris, R. Dirig, and M.S. Cole, eds. Lichenographia Thomsoniana: North American Lichenology in Honor of John W. Thomson. Mycotaxon, Ithaca, NY. Pages 281-294.

McCune, B., and J. A. Antos. 1982. Epiphyte communities of the Swan Valley, Montana. The Bryologist 85: 1-12.

McCune, B., and P. Lesica. 1992. The trade-off between species capture and quantitative accuracy in ecological inventory of lichens and bryophytes in forests in Montana. The Bryologist 95: 296-304.

McCune, B., and R. Rosentreter. 1992. Distribution and abundance of a rare lichen species, *Texosporium sancti-jacobi*. The Bryologist 95: 329-333.

McCune, B., and R. Rosentreter. 1995. Field key to soil lichens of central and eastern Oregon. Unpublished report, Oregon State University and USDI Bureau of Land Management. 9 Pp.

McIlvanie, S.K. 1942. Grass seedling establishment and productivity-overgrazed vs. protected range soils. Ecology 23: 228-231.

McKenna-Neuman, C., C.D. Maxwell, and J.W. Boulton. 1996. Wind transport of sand surfaces crusted with photoautotrophic microorganisms. Catena 27: 229-247.

Megharaj, M., K. Venkateswarlu, and A.S. Rao. 1988. Effect of insecticides and phenolics on nitrogen fixation by *Nostoc linckia*. Bulletin of Environmental Contamination and Toxicology 41: 277-281.

Memmott, K.L., V.J. Anderson, and S.B. Monsen. 1998. Seasonal grazing impact on cryptogamic crusts in a cold desert ecosystem. Journal of Range Management 51: 547-550.

BLM_0005074

Metting, F.B. 1981. The systematics and ecology of soil algae. Botanical Review 47: 195-312.

Meyer, S.E., and E. Garcia-Moya. 1989. Plant community patterns and soil moisture regime in gypsum grasslands of north central Mexico. Journal of Arid Environments 16: 147-155.

Miller, R. F., T. J. Svejcar, and N. E. West. 1994. Implications of livestock grazing in the Intermountain sagebrush region: plant composition. In: Vavra, M., W. A. Laycock, and R. D. Pieper, eds. Ecological Implications of Livestock Herbivory in the West. Society for Range Management, Denver, CO. Pages 101-146.

Milton, S.J., W.R.J. Dean, and R.P. Ellis. 1998. Rangeland health assessment: a practical guide for ranchers in arid Karoo shrublands. Journal of Arid Environments 39: 253-265.

Mouat, D.A., C.F. Hutchinson, and B.C. McClure. 1995. Introduction: desertification in developed countries. Environmental Monitoring and Assessment 37: 1-4.

Mucher, H.J., C.J. Chartres, D.J. Tongway, and R.S.B. Greene. 1988. Micromorphology and significance of the surface crusts of soils in rangelands near Cobar, Australia. Geoderma 42: 227-244.

Nash, T.H., III. 1996. Lichen Biology. Cambridge University Press, Cambridge. 303 Pp.

Nash, T.H., III, O.L. Lange, and L. Kappen. 1982. Photosynthetic patterns of Sonoran Desert lichens. II. A multivariate laboratory analysis. Flora 172: 419-426.

Nash, T.H., III, and T.J. Moser. 1982. Vegetation and physiological patterns of lichens in North American deserts. Journal of the Hattori Botanical Laboratory 53: 331-336.

Nash, T.H., III, and M.R. Sommerfeld. 1981. Elemental concentrations in lichens in the area of the Four Corners power plant, New Mexico. Environmental and Experimental Botany 21: 153-162.

National Research Council. 1994. Rangeland health—new methods to classify, inventory, and monitor rangelands. National Academy Press, Washington, DC. 180 Pp.

Nobel, P.S., E. Quero, and H. Linares. 1988. Differential growth response of agaves to nitrogen, phosphorus, potassium, and boron applications. Journal of Plant Nutrition 11: 1683-1700.

Paerl, H.W. 1990. Physiological ecology and regulation of $N_2$ fixation in natural waters. Advanced Microbial Ecology 2: 305-344.

BLM_0005075

Parmenter, R.R., and T.R. Van Devender. 1995. Diversity, spatial variation, and functional roles of vertebrates in the desert grassland. In: McClaran, M.P., and T.R. Van Devender, eds. Desert Grasslands. University of Arizona Press, Tucson. Pages 196-229.

Paul, E.A., and P.E. Clark. 1996. Soil Microbiology and Biochemistry. Academic Press, New York. 340 Pp.

Pearson, H.W., G. Malin, and R. Howsley. 1981. Physiological studies on *in vitro* nitrogenase activity by axenic cultures of *Microcoleus chthonoplastes*. British Phycology Journal 16: 139-143.

Pellant, M. 1996. Use of indicators to qualitatively assess rangeland health. In: West, N.E., ed. Proceedings of the Fifth International Rangeland Congress. Society for Range Management, Denver, CO. Pages 434-435.

Pendleton, R.L., and S.D. Warren. 1995. Effects of cryptobiotic soil crusts and VA mycorrhizal inoculation on growth of five rangeland plant species. In: West, N.E., ed. Proceedings of the Fifth International Rangeland Congress. Society for Range Management, Salt Lake City, UT. Pages 436-437.

Peterjohn, W.T., and W.H. Schlesinger. 1990. Nitrogen loss from deserts in the south-western United States. Biogeochem 10: 67-79.

Peters, E.F., and S.C. Bunting. 1994. Fire conditions pre-and post-occurrence of annual grasses on the Snake River Plain. In: Monsen, S.B., and S.G. Kitchen, eds. Proceedings—Ecology and Management of Annual Rangelands. General Technical Report INT-GTR-313. USDA Forest Service, Intermountain Research Station, Ogden, UT. Pages 31-36.

Phillips, S.L., and J. Belnap. 1998. Shifting carbon dynamics due to the effects of *Bromus tectorum* invasion on biological soil crusts. Ecological Bulletin 79: 205.

Pickard, J., and R.D. Seppelt. 1984. Phytogeography of Antarctica. Journal of Biogeography 11: 83-102.

Ponzetti, J., B. Youtie, D. Salzer, and T. Kimes. 1998. The effects of fire and herbicides on microbiotic crust dynamics in high desert ecosystems. Unpublished report submitted to the U.S. Geological Survey, Biological Resources Division, Forest and Rangeland Ecosystem Science Center, Portland, OR. 89 Pp.

Prasad, R.B.V., P.S. Dhanaraj, and V.V.S. Narayana Rao. 1984. Effects of insecticides on soil microorganisms. In: Lal, R., ed. Insecticide Microbiology. Springer-Verlag, New York. Pages 169-202.

BLM_0005076

Prasse, R. 1999. Experimentelle Untersuchungen an Gefaesspflanzenpopulationen auf verschiedenen Gelaendeoberflaechen in einem Sandwuestengebiet (Experimental studies with populations of vascular plants on different soil surfaces in a sand desert area). Universitdtsverlag Rasch, Osnabrueck, Germany. 121 Pp.

Rajvanshi, V., L.L. St. Clair, B.L. Webb, and C.N. Newberry. 1998. The terricolous lichen flora of the San Rafael Swell, Emery County, Utah, U.S.A. In: Glenn, M.G., R.C. Harris, R. Dirig, and M.S. Cole, eds. Lichenographia Thomsoniana: North American Lichenology in Honor of John W. Thomson. Mycotaxon, Ithaca, NY. Pages 399-406.

Reisiegl, H. 1964. Zur Systematic und Okologie alpiner Bodenalgen. Österreichischen Botanischen Zeitschrift 111: 402-499.

Rimer, R.L., and R.D. Evans. 1997. The impact of disturbance and an invasion of grass species on N mineralization in a cold-desert system. Ecological Bulletin 78: 303.

Rogers, R.W. 1972. Soil surface lichens in arid and subarid south-eastern Australia. Australian Journal of Botany 20: 301-316.

Rogers, R.W. 1977. Lichens of hot arid and semi-arid lands. In: Seaward, M.R.D., ed. Lichen Ecology. Academic Press, New York. Pages 211-252.

Rogers, R.W. 1994. Zonation of the liverwort *Riccia* in a temporary watercourse in subtropical semi-arid Australia. Australian Journal of Botany 42: 659-662.

Rogers, R.W., and R.T. Lange. 1971. Lichen populations on arid soil crusts around sheep watering places in South Australia. Oikos 22: 93-100.

Romney, E.M., A. Wallace, and R.B. Hunter. 1978. Plant response to nitrogen fertilization in the northern Mojave Desert and its relationship to water manipulation. In: West, N.E. and J.J. Skujins, eds. Nitrogen in Desert Ecosystems. US/IBP Synthesis Series 9. Dowden Hutchinson and Ross, Stroudsberg, PA. Pages 232-243.

Rosentreter, R. 1984. The synecology of the epiphytic lichen *Xanthoria fallax* (Hepp) Arn. occurring on the three subspecies of *Artemisia tridentata* Nutt. Unpublished dissertation, University of Montana, Missoula. 182 Pp.

Rosentreter, R. 1986. Compositional patterns within a rabbitbrush *(Chrysothamnus)* community of the Idaho Snake River Plain. In: McArthur, E. D., and B. L. Welch, comps. Proceedings—Symposium on the Biology of *Artemisia* and *Chrysothamnus*. General Technical Report INT-200. USDA Forest Service, Intermountain Research Station, Ogden, UT. Pages 273-277.

BLM_0005077

Rosentreter, R. 1994. Displacement of rare plants by exotic grasses. In: Monsen, S.B., and S.G. Kitchen, comps. Proceedings—Ecology and Management of Annual Rangelands. General Technical Report INT-GTR-313. USDA Forest Service, Intermountain Research Station, Ogden, UT. Pages 170-175.

Rosentreter, R. 1998. Notes on the *Aspicilia reptans* complex, with descriptions of two new species. In: Glenn, M.G., R.C. Harris, R. Dirig, and M.S. Cole, eds. Lichenographia Thomsoniana: North American Lichenology in Honor of John W. Thomson. Mycotaxon, Ithaca, NY. Pages 163-170.

Rosentreter, R., A. DeBolt, and C.C. Bratt. 1988. Curation of soil lichens. Evansia 5: 23-26.

Rosentreter, R., and B. McCune. 1992. Vagrant *Dermatocarpon* in western North America. The Bryologist 95: 15-19.

Rutin, J. 1983. Erosional processes on a coastal sand dune, De Blink, Noordwijkerhout. Publication of the Physical Geography and Soils Laboratory, University of Amsterdam, No. 35. 144 Pp.

Rychert, R.C., and J. Skujins. 1974. Nitrogen fixation by blue-green algae-lichen crusts in the Great Basin Desert. Soil Science Society of America Proceedings 38: 768-771.

Rychert, R.C., J. Skujins, D. Sorensen, and D. Porcella. 1978. Nitrogen fixation by lichens and free-living microorganisms in deserts. In: West, N.E. and J.J. Skujins, eds. Nitrogen Fixation in Desert Ecosystems. Dowden, Hutchinson and Ross, Stroudsburg, PA. Pages 20-30.

Sagan, C., O.B. Toon, and J.B. Pollack. 1979. Anthropogenic albedo changes and the earth's climate. Science 206: 1363-1368.

St. Clair, L.L., J.R. Johansen, and S.R. Rushforth. 1993. Lichens of soil crust communities in the Intermountain area of the western United States. Great Basin Naturalist 53: 5-12.

St. Clair, L.L., and R.B. Warrick. 1987. *Acarospora nodulosa* (Duf.) Hue. var. *nodulosa*: a new record for North America. The Bryologist 90: 48-49.

St. Clair, L.L., B.L. Webb, J.R. Johansen, and G.T. Nebeker. 1984. Cryptogamic soil crusts: enhancement of seedling establishment in disturbed and undisturbed areas. Reclamation and Revegetation Research 3: 129-136.

Savory, A. 1988. Holistic Resource Management. Island Press, Covelo, CA. 564 Pp.

BLM_0005078

Schlichting, H.E., Jr. 1969. The importance of airborne algae and protozoa. Journal of the Air Pollution Control Association 19: 946-951.

Schulten, J.A. 1985. Soil aggregation by cryptogams of a sand prairie. American Journal of Botany 72: 1657-1661.

Sheridan, R.P. 1979. Impact of emissions from coal-fired electricity generating facilities on $N_2$-fixing lichens. The Bryologist 83: 54-58.

Shields, L.M., and L.W. Durrell. 1964. Algae in relation to soil fertility. The Botanical Review 30: 92-128.

Silvester, W.B., R. Parsons, and P.W. Watt. 1996. Direct measurement of release and assimilation of ammonia in the *Gunnera-Nostoc* symbiosis. New Phytologist 132: 617-625.

Stanley, R.J. 1983. Soils and vegetation: An assessment of current status. In: Messer, J., and B. Mosley, eds. What future for Australia's Arid Land? Australian Conservation Foundation, Canberra. Pages 8-18.

Stebbins, G.L. 1981. Coevolution of grasses and herbivores. Annals of the Missouri Botanical Garden 68: 75-86.

Stewart, W.D.P. 1967. Transfer of biologically fixed nitrogen in a sand dune slack region. Nature 214: 603-604.

Stoddart, L.A., A.D. Smith, and T.W. Box. 1943. Range Management. McGraw-Hill, New York. 532 Pp.

Stoddart, L.A., A.D. Smith, and T.W. Box. 1975. Range Management. McGraw Hill, New York. 532 Pp.

Tchoupopnou, E. 1989. Experimental studies of rain splash erosion from soil microphytic crusts on Utah rangelands. Unpublished thesis, Utah State University, Logan.

Terry, R.E., and S.J. Burns. 1987. Nitrogen fixation in cryptogamic soil crusts as affected by disturbance. USDA Forest Service, Intermountain Research Station, Reno, NV. Pages 369-372.

Thackett, J.L., and R.W. Pearson. 1965. Some characteristics of soil crusts formed by simulated rainfall. Soil Science Society of America Proceedings 99: 407-413.

Thurow, T.L. 1991. Hydrology and erosion. In: Heitschmidt, R.K., and J.W. Stuth, eds. Grazing Management: An Ecological Perspective. Timber Press, Portland, OR. Pages 151-152.

Biological Soil Crusts:
Ecology & Management

BLM_0005079

Timdal, E. 1986. A revision of *Psora* (Lecideaceae) in North America. The Bryologist 89: 253-275.

Timdal, E. 1990. Gypsoplacaceae and *Gypsoplaca*, a new family and genus of squamiform lichens. Contributions to Lichenology, Bibliotheca Lichenologica 38: 419-427.

Tongway, D.J. 1994. Rangeland Soil Condition Assessment Manual. CSIRO Publishing, Melbourne, Australia. 69 Pp.

Tongway, D.J., and N. Hindley. 1995. Manual for assessment of soil condition of tropical grasslands. CSIRO, Canberra, Australia. 60 Pp.

Tongway, D.J., and J.A. Ludwig. 1990. Vegetation and soil patterning of semi-arid mulga lands of eastern Australia. Australian Journal of Ecology 15: 23-34.

Tongway, D.J., and E.L. Smith. 1989. Soil surface features as indicators of rangeland site productivity. Australian Rangeland Journal 11: 15-20.

Tueller, P.T. 1988. Application of Plant Sciences to Rangeland Management and Inventory. Martinus Nijhoff/W. Junk, Amsterdam. Pages 135-169.

USDA. 1937. Range Plant Handbook. U.S. Government Printing Office, Washington, DC. 816 Pp.

USDI. 1996. Sampling Vegetation Attributes, Interagency Technical Reference. USDI Bureau of Land Management, Denver, CO. 163 Pp.

USDI. 1997. National Resource Inventory, Colorado Pilot Handbook. USDI Bureau of Land Management, Denver, CO. 81 Pp.

Verrecchia, E., A. Yair, G.J. Kidron, and K. Verrecchia. 1995. Physical properties of the psammophile cryptogamic crust and their consequences to the water regime of sandy soils, north-western Negev Desert, Israel. Journal of Arid Environments 29: 427-437.

Walker, B.H. 1979. Game ranching in Africa. In: Walker, B.H., ed. Management of Semi-arid Ecosystems. Elsevier Science Publishing Company, Amsterdam. Pages 53-81.

Wallwork, J.A. 1982. Desert Soil Fauna. Praeger Scientific Publishers, London. 296 Pp.

Webb, R.H., and H.G. Wilshire. 1983. Environmental effects of off-road vehicles: impacts and management in arid regions. In: Springer Series on Environmental Management, Springer-Verlag, New York. 534 Pp.

West, N.E. 1988. Intermountain deserts, shrub steppes, and woodlands. In: Barbour, M.G., and W.D. Billings, eds. North American Terestrial Vegetation. Cambridge University Press, New York. Pages 201-320.

BLM_0005080

West, N.E. 1990. Structure and function of soil microphytic crusts in wildland ecosystems of arid and semi-arid regions. Advances in Ecological Research 20: 179-223.

West, N.E. 1994. Effects of fire on salt-desert shrub rangelands. In: Monsen, S.B., and S.G. Kitchen, eds. Proceedings—Ecology and Management of Annual Rangelands. General Technical Report INT-GTR-313. USDA Forest Service, Intermountain Research Station, Ogden, UT. Pages 170-175.

Whisenant, S.G. 1990. Changing fire frequencies on Idaho's Snake River Plains: ecological and management implications. In: McArthur, E.D., E.M. Romney, S.D. Smith, and P.T. Tueller, eds. Proceedings—Symposium on Cheatgrass Invasion, Shrub Die-off, and Other Aspects of Shrub Biology and Management. General Technical Report INT-276. USDA Forest Service, Intermountain Research Station, Ogden, UT. Pages 4-10.

Whisenant, S.G., and D.J. Tongway. 1996. Repairing mesoscale processes during restoration. In: West, N.E., ed. Proceedings of the Fifth International Rangeland Congress. Society for Range Management, Denver, CO. Pages 62-64.

Williams, J.D. 1993. Influence of microphytic crusts on selected soil physical and hydrologic properties in the Hartnet Draw, Capitol Reef National Park, Utah. Unpublished dissertation, Utah State University, Logan. 170 Pp.

Williams, J.D., J.P. Dobrowolski, and N.E. West. 1995a. Microphytic crust influence on interrill erosion and infiltration capacity. Transactions of the American Society of Agricultural Engineers 38: 139-146.

Williams, J.D., J.P. Dobrowolski, N.E. West, and D.A. Gillette. 1995b. Microphytic crust influences on wind erosion. Transactions of the American Society of Agricultural Engineers 38: 131-137.

Wilshire, H. 1983. The impact of vehicles on desert soil stabilizers. In: Webb, R.H., and H.G. Wilshire, eds. Environmental Effects of Off-Road Vehicles: Impacts and Management in Arid Regions. Springer-Verlag, New York. Pages 31-51.

Winward, A.H. 1980. Taxonomy and ecology of sagebrush in Oregon. Station Bulletin No. 642, Oregon State University, Corvallis. 15 Pp.

Wood, M.K., R.E. Eckert, Jr., W.H. Blackburn, and F.F. Peterson. 1982. Influence of crusting soil surfaces on emergence and establishment of crested wheatgrass, squirreltail, Thurber needlegrass, and fourwing saltbush. Journal of Range Management 35: 282-287.

Biological Soil Crusts:
Ecology & Management

BLM_0005081

Wright, H.A., L.F. Neuenschwander, and C.M. Britton. 1979. The role and use of fire in sagebrush-grass and pinyon-juniper plant communities: a state-of-the-art review. General Technical Report INT-58. USDA Forest Service, Intermountain Forest and Range Experiment Station, Ogden, UT. 48 Pp.

Wullstein, L.H. 1989. Evaluation and significance of associative dinitrogen fixation for arid soil rehabilitation. Arid Soil Research and Rehabilitation 3: 259-265.

Yair, A. 1990. Runoff generation in a sandy area—the Nizzana sands, western Negev, Israel. Earth Surface Processes and Landforms 15: 597-609.

Youtie, B., J. Ponzetti, and D. Salzer. 1999. Fire and herbicides for exotic annual grass control: effects on native plants and microbiotic soil organisms. In: Eldridge, D., and D. Freudenberger, eds. Proceedings of the VI International Rangeland Congress, Aitkenvale, Queensland, Australia. Pages 590-591.

Zaady, E., Y. Gutterman, and B. Boeken. 1997. The germination of mucilaginous seeds of *Plantago coronopus*, *Reboudia pinnata*, and *Carrichtera annua* on cyanobacterial soil crusts from the Negev Desert. Plant and Soil 190: 247-252.

BLM_0005082

# REPORT DOCUMENTATION PAGE

Form Approved
OMB No. 0704-0188

Pubic reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Washington Headquarters Services, Directorate for information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503.

| 1. AGENCY USE ONLY (Leave Blank) | 1. REPORT DATE | 1. REPORT TYPE AND DATES COVERED |
|---|---|---|
| | January 2001 | Final |

| 1. TITLE AND SUBTITLE | 1. FUNDING NUMBERS |
|---|---|
| TR-1730-2 – Biological Soil Crusts: Ecology and Management | |

**1. AUTHOR(S)**
Jayne Belnap, Julie Hilty Kaltenecker, Roger Rosentreter, John Williams, Steve Leonard, David Eldridge

| 2. PERFORMING ORGANIZATION NAMES(S) AND ADDRESS(ES) | 1. PERFORMING ORGANIZATION REPORT NUMBER |
|---|---|
| U.S. Department of the Interior Bureau of Land Management National Science and Technology Center P.O. Box 25047 Denver, CO 80225-0047 | BLM/ID/ST-01/001+1730 |

| 1. SPONSORING/MONITORING AGENCY NAME(S) AND ADDRESS(ES) | 1. SPONSORING/MONITORING AGENCY REPORT NUMBER |
|---|---|
| | |

**1. SUPPLEMENTARY NOTES**

| 12a. DISTRIBUTION/AVAILABILITY STATEMENT | 12b. DISTRIBUTION CODE |
|---|---|
| | |

**13. ABSTRACT** (Maximum 200 words)

This technical reference presents a review of current scientific knowledge on the ecology of biological soil crusts, then integrates this information into a discussion on monitoring and management of arid and semiarid lands in the western United States. The document begins with a discussion on the composition, structure, and distribution of biological crusts relative to environmental factors such as climate and soil characteristics. This information is then synthesized into guidelines on development of monitoring strategies as well as site-specific management prescriptions regarding livestock, recreation, and other multiple-use activities. The material is presented from a practical and applied management perspective and is summerized in numerous tables and figures.

| 14. SUBJECT TERMS | 14. NUMBER OF PAGES |
|---|---|
| Biological Soil Crusts, Soils, Stability, Hydrology, Nutrient Cycling, Disturbance, Management, Monitoring, Ecology | 119 + covers |
| | 15. PRICE CODE |

| 14. SECURITY CLASSIFICATION OF REPORT | 14. SECURITY CLASSIFICATION OF THIS PAGE | 14. SECURITY CLASSIFICATION OF ABSTRACT | 14. LIMITATION OF ABSTRACT |
|---|---|---|---|
| Unclassified | Unclassified | Unclassified | UL |

NSN 7540-01-280-5500

Standard Form 298 (Rev. 2-89)
Prescribed by ANSI STd. Z39-18
298-102

BLM_0005083



Home > About AMLs

**HOME**    **ABOUT AMLS**    **EXTENT OF PROBLEM**    **STAYING SAFE**    **WHAT'S BEING DONE**    **PARTNERS**

## About AMLs

Abandoned mine lands are those lands, waters, and surrounding watersheds contaminated or scarred by the extraction, beneficiation or processing of coal, ores and minerals. Abandoned mine lands include areas where mining or processing activity is determined to have ceased.

AMLs exist across private, mixed, and federal lands adding to the complexity of the issue. A number of federal statutes address environmental contamination issues associated with AMLs. Federal statutory authority is spread among several agencies with no one agency having overall statutory responsibility. Ensuring that appropriate authorities are used at AML sites will work to facilitate cleanup.

There are many types of mines, each with their own unique characteristics, making cleanup efforts varied, both in terms of cost and approach. The three main types are *coal, hardrock, and uranium.*

### Abandoned Coal Mines



Most abandoned coal mines are found in the East and tend to be small to medium-sized. Sixty percent of these mines can be found in just three states: West Virginia, Pennsylvania, and Kentucky. Larger sites are found in the West, though in much smaller numbers. Most abandoned coal mines are located on State-owned land. These sites also tend to be in closer proximity to populated areas. Many times, homes and other buildings have been constructed on top of underground mine workings and subsidence can become a problem.

The Office of Surface Mining Reclamation and Enforcement (OSM), within the Department of the Interior, is the primary Federal agency responsible for abandoned coal mine reclamation. A national program, established by 1977 law, is in place that includes an inventory of high priority sites, a reclamation fee paid by the coal mining industry, and a funding mechanism comprised largely of grants to States and Indian tribes with approved programs. Priority focus is on sites posing health and safety hazards.

There is an inventory of high priority abandoned coal mines maintained jointly by OSM and program States and Tribes.

### Abandoned Hardrock Mines



These are primarily ores and metals (e.g. gold, silver, copper, lead, zinc, nickel). Most are small to medium in size, though there are a handful of large, significant sites. These sites are predominately in the West, which gave rise to the establishment of cities and towns during homesteading (Westward population expansion). The majority sits on or adjacent to Federal lands and often involve "mixed-ownership." Many of these sites have been "patented" to mining claimants and are now on private lands.

No single national AML program exists; rather, several authorities and multiple departments and agencies address hardrock AML sites as part of broader programs. Similarly, funding for remediation projects is spread among separate appropriations for participating departments and agencies. Federal and State agencies are doing more than ever before to display their spatial data and exchange information. Data from the former U.S. Bureau of Mines and the U.S. Geological Survey provide the foundation of most hardrock mine inventories.

There is a "polluter pays" principle that requires the Federal government, where possible, to compel responsible parties to clean up their sites or help cover the costs. Priorities focus on water quality and sites involving release or potential release of hazardous substances.

### Abandoned Uranium Mines



The uranium mining industry began in the 1940s primarily to produce uranium for weapons and later for nuclear fuel. Although there are about 4,000 mines with documented production, a database compiled by EPA, with information provided by other federal, state, and tribal agencies, includes 15,000 mine locations with uranium occurrence in 14 western states. Most of those locations are found in Colorado , Utah, New Mexico, Arizona, and Wyoming, with about 75% of those on federal and tribal lands.

The majority of these sites were conventional (open pit and underground) mines. The mining of uranium ores by both underground and surface methods produces large amounts of bulk waste

**Quick Links**

Report a Mine

Contractors & Volunteers

Legislation

Meetings and Events

Resources

**News**

**MSHA Stay Out! Stay Alive! Fatal Accident Summaries for 2013**

**June 13, 2013 Oversight Hearing on "Mining in America: The Administration's Use of Claim Maintenance Feeds and Cleanup of Abandoned Mine Lands" webcast**

**House of Representatives Proposed Bill 2467: Abandoned Mine Lands Cleanup and Taxpayer Fairness Act**

BLM_0005084

material, including bore hole drill cuttings, excavated top soil, barren overburden rock, weakly uranium-enriched waste rock, and subgrade ores (or protore). At some abandoned mine sites, ore enriched with uranium was left on site when prices fell, while transfer stations at some distance from remote mines may contain residual radioactive soil and rock without any visible facilities to mark their location. 

While most pose minimal radiation risk to the public, since exposure is most likely to be short and intermittent (e.g., visitation, recreation), they may pose other physical safety risks.

## Other mines

There are a plethora of other kinds of mines such as iron and phosphate, and there are thousands of sand, gravel, and clay pits and quarries that are not addressed by Federal abandoned mine lands programs. Contact your State and local authorities if you are seeking information about these sites.

Extent of Problem >

Home    About AMLs    Staying Safe    Extent of Problem    What's Being Done    Partners    Contact Us
This is an official U.S. Government website managed by the Bureau of Land Management.
Last updated: Tuesday, September 24, 2013

       

BLM_0005085

Form 1221-2
(June 1969)



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

MANUAL TRANSMITTAL SHEET

| Release |
|---|
| 8-24 |
| Date |
| 4/5/84 |

Subject

8400 - VISUAL RESOURCE MANAGEMENT

1. <u>Explanation of Material Transmitted</u>:  This release completely revises Manual Section 8400.

2. <u>Reports Required</u>:  None.

3. <u>Material Superseded</u>:  Manual pages superseded by this release are listed under "REMOVE" below.  No other directives are superseded.

4. <u>Filing Instructions</u>:  File as directed below.

| <u>REMOVE</u> | <u>INSERT</u> |
|---|---|
| All of 8400 (Rels. 8-4) | 8400 |
| (Total:  11 sheets) | (Total:  9 sheets) |

Neil F. Morck
Deputy Director, Lands and Renewable Resources

BLM_0005086

## 8400 - VISUAL RESOURCE MANAGEMENT

### Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibility
.05  References
.06  Policy
.07  Overview of Visual Resource Management System

Glossary of Terms

Illustrations
1.  Visual Resource Management System for BLM

Bibliography

8410 - VISUAL RESOURCE INVENTORY AND EVALUATION

8420 - (Unassigned)

8430 - APPLICATION OF VISUAL RESOURCE MANAGEMENT PRINCIPLES TO PROJECT
        PLANNING AND DESIGN

8440 - ENVIRONMENTAL ASSESSMENT

8450 - REHABILITATION AND ENHANCEMENT OF THE VISUAL RESOURCES (Reserved)

8460 - MONITORING AND COMPLIANCE FOR VISUAL RESOURCES (Reserved)

.01

.01  Purpose.  This section describes the overall policy direction for
Visual Resource Management (VRM) in the Bureau of Land Management (BLM).

.02  Objectives.  The objective of Visual Resource Management is to manage
public lands in a manner which will protect the quality of the scenic
(visual) values of these lands.

.03  Authority.

   A.  Federal Land Policy and Management Act of 1976, 43 U.S.C. 1701 et.
seq.;

      1.  Section 102(a)(8).  States that " . . . the public lands be
managed in a manner that will protect the quality of the . . . scenic . . .
values . . . ."

      2.  Section 103 (c).  Identifies "scenic values" as one of the
resources for which public land should be managed.

      3.  Section 201(a).  States that  "The Secretary shall prepare and
maintain on a continuing basis an inventory of all public lands and their
resources and other values (including . . . scenic values) . . . ."

      4.  Section 505(a).  Requires that "Each right-of-way shall contain
terms and conditions which will . . . minimize damage to the scenic and
esthetic values . . . ."

   B.  National Environmental Policy Act of 1969, 43 U.S.C. 4321 et. seq.;

      1.  Section 101(b).  Requires measures be taken to " . . . assure for
all Americans . . . esthetically pleasing surroundings . . . ."

      2.  Section 102.  Requires agencies to "Utilize a systematic,
interdisciplinary approach which will ensure the integrated use of
. . . Environmental Design Arts in the planning and decisionmaking . . . ."

   C.  Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. 1201
et. seq.;

      1.  Section 102(d).  Requires that measures be taken to " . . .
assure that surface coal mining operations are so conducted as to protect
the environment."

.04  Responsibility.

   A.  Director:

      1.  Lead responsibility for VRM functions in the Bureau is assigned
to the Recreation program.  This includes the development of policy,
guidelines, training, and overall coordination.

BLM MANUAL                                          Rel. 8-24
Supersedes Rel. 8-4                                 4/5/84

.04A2

8400 – VISUAL RESOURCE MANAGEMENT

2.  Each program (i.e., Range, Forestry, Minerals, Lands, etc.) involved in resource development work is responsible for protecting visual values.  This includes ensuring that (1) personnel in each program who are involved in activities which affect visual values are properly trained in visual management techniques; (2) visual values are adequately considered in all management activities; and (3) adequate guidance and funding is available to accomplish these purposes.

B.  State Director:

1.  Implements BLM policy and provides statewide program coordination and guidance for managing visual resources on public lands.

2.  Provides a statewide VRM training program to maintain skill levels for personnel involved in activities which affect visual values.

3.  Assigns the coordination of VRM within the State to one person and ensures that the person is properly trained.

4.  Maintains at least one person within the State who has the capability and expertise to provide visual design assistance on major projects and to conduct VRM training.

C.  District Manager:

1.  Provides Districtwide program coordination and guidance for managing visual resources on public lands.

2.  Ensures that all District personnel involved in management activities which affect visual values are properly trained in visual management techniques.

3.  Provides technical assistance to Resource Area Offices on visual management applications.

4.  Designates one person within the District to coordinate the VRM functions and ensures that the person is properly trained.

D.  Area Manager:

1.  Prepares and maintains on a continuing basis an inventory of visual values on public lands and ensures that these values are adequately considered in the land-use planning and decisionmaking processes.

2.  Ensures that visual impacts are minimized in all resource development activities including non-BLM initiated projects.

3.  Assigns the coordination of VRM to one person and ensures that the person is properly trained.

.04D4

8400 - VISUAL RESOURCE MANAGEMENT

4.  Ensures that all Resource Area personnel involved in surface
disturbing activities are trained in VRM techniques.

.05  References.

A.  BLM Manual 8410.

B.  BLM Manual 8431.

.06  Policy.

A.  The Bureau has a basic stewardship responsibility to identify and
protect visual values on public lands.  The basic policy parameters for
accomplishing this task are as follows:

1.  The Bureau shall prepare and maintain on a continuing basis an
inventory of visual values on all public lands.  Priority for new inventory
shall be given to those areas where it is needed for issue resolution in
RMP's or in those areas where a project is proposed and an inventory does
not exist or needs updating.  The goal is to have a completed VRM inventory
for each RMP effort.  The level of detail should vary with the relative
value of the visual resources within the planning area.

2.  Visual management objectives (classes) are developed through the
RMP process for all Bureau lands.  The approved VRM objectives shall result
from, and conform with, the resource allocation decisions made in RMP's.

3.  Interim visual management objectives are established where a
project is proposed and there are no RMP (or MFP) approved VRM objectives.
These objectives are developed using the guidelines in Manual Section 8410
and must conform with the land use allocations setforth in the RMP which
covers the project area.  The establishment of interim VRM objectives will
not require a plan amendment unless the project itself requires one.

4.  The approved VRM objectives (classes) provide the visual
management standards for the design and development of future projects and
for rehabilitation of existing projects.

5.  Visual design considerations shall be incorporated into all
surface disturbing projects regardless of size or potential impact.
Emphasis shall be placed on providing these inputs during the initial
planning and design phase so as to minimize costly redesign and mitigation
at later phases of project design and development.  Ensuring early visual
design inputs into non-Bureau initiated projects in many cases is beyond
Bureau control.  However, every effort should be made to inform potential
applicants of the visual management objectives so they can adequately
incorporate visual design considerations into their initial planning and
design efforts.

BLM_0005090

.06A6

8400 – VISUAL RESOURCE MANAGEMENT

6. The contrast rating process (Manual Section 8431) is used as a visual design tool in project design and as a project assessment tool during environmental review. Contrast ratings are required for proposed projects in highly sensitive areas or high impact projects, but may also be used for other projects where it would appear to be the most effective design or assessment tool. A brief narrative visual assessment is completed for all other projects which require an environmental assessment or environmental impact statement.

7. Ensure that project monitoring efforts include timely and thorough compliance evaluations, especially during the construction phase, to ensure that visual management provisions are effectively carried out.

B. Visual resource management is a management responsibility shared by all resource programs (Section .04A.2).

C. VRM training shall be conducted in each District and Resource Area to maintain skill levels for VRM coordinators and project coordinators. Emphasis shall be placed on improving design skills so that visual design considerations will be incorporated into all project proposals beginning with initial planning and design.

.07  Overview of Visual Resource Management System.

A. The VRM System. Public lands have a variety of visual values. These different values warrant different levels of management. Because it is neither desirable nor practical to provide the same level of management for all visual resources, it is necessary to systematically identify and evaluate these values (Illustration 1) to determine the appropriate level of management. Visual values are identified through the VRM inventory (Manual Section 8410) and are considered with other resource values in the Resource Management Planning (RMP) process. Visual management objectives are established in RMP's in conformance with the land use allocations made in the plan. These area specific objectives provide the standards for planning, designing, and evaluating future management projects. The contrast rating system (Manual Section 8431) provides a systematic means to evaluate proposed projects and determine whether these projects conform with the approved VRM objectives. It also provides a means to identify mitigating measures that can be taken to minimize adverse visual impacts. The VRM system, therefore, provides a means: to identify visual values; to establish objectives through the RMP process for managing these values; and to provide timely inputs into proposed surface disturbing projects to ensure that these objectives are met.

BLM_0005091

.07B

8400 - VISUAL RESOURCE MANAGEMENT

B.  Use of Basic Landscape Design Principles.  Assigning values to
visual resources is a subjective process.  The phrase, "beauty is in the
eye of the beholder," is often quoted to emphasize the subjectivity in
determining scenic values.  Yet, researchers have found consistent levels
of agreement among individuals asked to evaluate visual quality.
Designers have used the basic design elements of form, line, color, and
texture to describe and evaluate landscapes for hundreds of years.
Modifications in a landscape which repeat the landscape's basic elements
are said to be in harmony with their surroundings.  Modifications which do
not harmonize often look out of place and are said to contrast or stand out
in unpleasing ways.  These basic design elements and concepts have been
incorporated into the VRM system to lend objectivity, integrity, and
consistency to the process.  The VRM system is designed to separate the
existing landscape and the proposed project into their features and
elements and to compare each part against the other in order to identify
those parts which are not in harmony.  Then, ways are sought to bring them
back into harmony.  An understanding of basic design principles and how
they relate to the appearance of projects is essential in order to minimize
visual impacts.  The references listed in the Bibliography provide source
information on environmental design concepts and techniques and their
application in minimizing visual impacts.  The information generated
through the VRM system is to be used as a guide.  The decision on the
amount of visual change that is acceptable is made by the field manager.

BLM_0005092

8400 – VISUAL RESOURCE MANAGEMENT

## Glossary of Terms

### – A –

(a)esthetics:  relates to the pleasurable characteristics of a physical
   environment as perceived through the five senses of sight, sound, smell,
   taste, and touch.

adverse visual impact:  any modification in land forms, water bodies, or
   vegetation, or any introduction of structures, which negatively
   interrupts the visual character of the landscape and disrupts the
   harmony of the basic elements (i.e., form, line, color, and texture).

angle of observation:  the angle, both vertical and horizontal, between a
   viewer's line of sight and the landscape being viewed.

areas of critical environmental concern (ACEC's) for scenic values:
   areas within the public lands where special management attention is
   required to protect or prevent irreparable damage to important scenic
   values.

### – B –

background distance zone:  the visible area of a landscape which lies
   beyond the foreground-middleground.  Usually from a minimum of 3 to 5
   miles to a maximum of about 15 miles from a travel route, use area, or
   other observer point.  Atmospheric conditions in some areas may limit
   the maximum to about 8 miles or less.

basic elements:  the four design elements (form, line, color, and texture)
   which determine how the character of a landscape is perceived.

### – C –

characteristic:  a distinguishing trait, feature, or quality.

characteristic landscape:  the established landscape within an area being
   viewed.  This does not necessarily mean a naturalistic character.  It
   could refer to an agricultural setting, an urban landscape, a primarily
   natural environment, or a combination of these types.

computer graphics:  visual displays of information produced by an electronic
   computer.  This includes both hard-copy and screen displays.

contrast:  opposition or unlikeness of different forms, lines, colors, or
   textures in a landscape.

contrast rating:  a method of analyzing the potential visual impacts of
   proposed management activities.

8400 - VISUAL RESOURCE MANAGEMENT


cultural modification:  any man-caused change in the land form, water form,
    vegetation, or the addition of a structure which creates a visual
    contrast in the basic elements (form, line, color, texture) of the
    naturalistic character of a landscape.

- D -

distance zones:  a subdivision of the landscape as viewed from an observer
    position.  The subdivision (zones) includes foreground-middleground,
    background, and seldom seen.

- E -

easement, scenic:  a right to make use of land to protect the scenic values.

enhancement:  a management action designed to improve visual quality.

- F -

foreground-middleground distance zones:  the area visible from a travel
    route, use area, or other observation point to a distance of 3 to 5
    miles.  The outer boundary of this zone is defined as the point where
    the texture and form of individual plants are no longer apparent in the
    landscape.  Vegetation is apparent only in patterns or outline.

form:  the mass or shape of an object or objects which appear unified, such
    as a vegetative opening in a forest, a cliff formation, or a water tank.

- H -

harmony:  a combination of parts into a pleasing or orderly whole:
    congruity; a state of agreement or proportionate arrangement of form,
    line, color, and texture.

- I -

interdisciplinary team:  a group of individuals with different training,
    representing the physical sciences, social sciences, and environmental
    design arts, assembled to solve a problem or perform a task.  The members
    of the team proceed to a solution with frequent interaction so that each
    discipline may provide insights to any stage of the problem and
    disciplines may combine to provide new solutions.

BLM_0005094

8400 - VISUAL RESOURCE MANAGEMENT

- K -

key observation point (KOP):  one or a series of points on a travel route
     or at a use area or a potential use area, where the view of a management
     activity would be most revealing.

- L -

landscape character:  the arrangement of a particular landscape as formed
     by the variety and intensity of the landscape features and the four basic
     elements of form, line, color, and texture.  These factors give the area
     a distinctive quality which distinguishes it from its immediate
     surroundings.

landscape features:  the land and water form, vegetation, and structures
     which compose the characteristic landscape.

lighting:
     back lighting:  a situation where the light source is coming from behind
          the object being viewed.  Objects are generally in shadow with
          highlighted edge.

     front lighting:  a situation where the light source is coming from behind
          the observer and shining directly upon the area being viewed.

     side lighting:  a situation where the light source is coming from the
          side of a scene or object being viewed.  It is usually the most
          critical for revealing contrast.

line:  the path, real or imagined, that the eye follows when perceiving
     abrupt differences in form, color, or texture.  Within landscapes, lines
     may be found as ridges, skylines, structures, changes in vegetative
     types, or individual trees and branches.

- M -

management activity:  a surface disturbing activity undertaken on the
     landscape for the purpose of harvesting, traversing, transporting,
     protecting, changing, replenishing, or otherwise using resources.

mitigation measures:  methods or procedures designed to reduce or lessen
     the adverse impacts caused by management activities.

multidisciplinary team:  a group of specialists with different backgrounds,
     assembled to solve a problem.  The problem is broken into pieces and
     each specialist works on a portion of the problem.  Partial solutions
     are then linked together to provide the final solutions.

BLM_0005095

8400 – VISUAL RESOURCE MANAGEMENT


– N –

naturalistic character:  a landscape setting where the basic elements are
    displayed in a composition that appears unaltered by man.

– O –

observer position:  the placement and relationship of a viewer to the
    landscape which is being viewed.

– P –

photomontage:  the technique of combining in a single photographic
    composition, parts of different photographs by superimposition.

physiographic province:  an extensive portion of the landscape normally
    encompassing many hundreds of square miles, which portrays similar
    qualities of soil, rock, slope, and vegetation of the same geomorphic
    origin (Fenneman 1946, Sahrhaftig 1975).

– R –

rehabilitation:  a management alternative and/or practice which restores
    landscapes to a desired scenic quality.

– S –

scale:  the proportionate size relationship between an object and the
    surroundings in which the object is placed.

scenery:  the aggregate of features that give character to a landscape.

scenic area:  an area whose landscape character exhibits a high degree of
    variety and harmony among the basic elements which results in a pleasant
    landscape to view.

scenic quality:  the relative worth of a landscape from a visual perception
    point of view.

scenic quality evaluation key factors:  the seven factors (landform,
    vegetation, water, color, adjacent scenery, scarcity, and cultural
    modifications) used to evaluate the scenic quality of a landscape.

scenic quality ratings:  the relative scenic quality (A, B, or C) assigned
    a landscape by applying the scenic quality evaluation key factors;
    scenic quality A being the highest rating, B a moderate rating, and C
    the lowest rating.

BLM_0005096

8400 - VISUAL RESOURCE MANAGEMENT

scenic quality rating unit:  a portion of the landscape which displays
   primarily homogeneous visual characteristics of the basic landscape
   features (land and water form, vegetation, and structures).

scenic values:  (refer to scenic quality and scenic quality ratings).

seen area:  that portion of the landscape which is visible from roads,
   trails, rivers, campgrounds, communities, or other key observation
   positions.

seldom seen distance zone:  portions of the landscape which are generally
   not visible from key observation points, or portions which are visible
   but more than 15 miles distance.

sensitivity levels:  measures (e.g., high, medium, and low) of public
   concern for the maintenance of scenic quality.

simulation:  a realistic visual portrayal which demonstrates the perceivable
   changes in landscape features caused by a proposed management activity.
   This is done through the use of photography, artwork, computer graphics,
   and other such techniques.

- T -

texture:  the visual manifestations of the interplay of light and shadow
   created by the variations in the surface of an object or landscape.

- U -

use volume:  the total volume of visitor use each segment of a travel
   route or use area receives.

- V -

variables:  factors influencing visual perception including distance, angle
   of observation, time, size or scale, season of the year, light, and
   atmospheric conditions.

variety:  the state or quality of being varied and having the absence
   of monotony or sameness.

viewshed:  the landscape that can be directly seen under favorable
   atmospheric conditions, from a viewpoint or along a transportation
   corridor.

visual contrast:  (see contrast).

Glossary, Page 6

8400 - VISUAL RESOURCE MANAGEMENT

<u>visual quality</u>:  (see scenic quality).

<u>visual resources</u>:  the visible physical features on a landscape (e.g., land, water, vegetation, animals, structures, and other features).

<u>visual resource management classes</u>:  categories assigned to public lands based on scenic quality, sensitivity level, and distance zones.  There are four classes.  Each class has an objective which prescribes the amount of change allowed in the characteristic landscape.

<u>visual resource management (VRM)</u>:  the inventory and planning actions taken to identify visual values and to establish objectives for managing those values; and the management actions taken to achieve the visual management objectives.

<u>visual resource management LOGO</u>:

<u>visual values</u>:  (see scenic quality).

BLM MANUAL
Supersedes Rel. 8-4

Rel. 8-24
4/5/84

BLM_0005098

Ilustration 1
(.07)

8400 - VISUAL RESOURCE MANAGEMENT
Visual Resource Management System for BLM



BLM_0005099

8400 – VISUAL RESOURCE MANAGEMENT

## Bibliography

<u>BOOKS</u>

Appleyard, Donald; Lynch, Kevin; and Meyer, John R.   <u>The View from the Road</u>.
M.I.T. Press, Cambridge; 1964.

Litton, R. B. Jr.   <u>Aesthetic Demension of the Landscape</u>.   University Press,
1972.

McHarg, Ian L.   <u>Design with Nature</u>.   The Natural History Press, Garden City,
The Natural History Press, Garden City, New York; 1969.

Rutledge, Albert J.   <u>Anatomy of a Park</u>.   McGraw Hill Book Company, New York;
1971.

Simonds, John O.   <u>Earthscape</u>.   McGraw Hill Book Company, New York; 1978.

Simonds, John O.   <u>Landscape Architecture</u>.   F. W. Dodge Corporation, New York;
1961.


<u>MAGAZINES</u>

<u>Landscape Architecture</u>.   Louisville:   The Publication Board of the American
Society of Landscape Architects, published bi-monthly.

<u>Landscape Journal</u>.   Madison:   The University of Wisconsin Press, published
twice yearly.


<u>GOVERNMENT PUBLICATIONS</u>

USDA FOREST SERVICE

<u>Descriptive Approaches to Landscape Analysis</u>:   (R.B. Litton, Jr.), 1979.

<u>Forest Landscape Description and Inventories; A Basis for Land Planning
and Design</u>:   (R.B. Litton, Jr.) Research Paper Number PS W-49, 1968.

<u>Landscape Control Points; A Procedure for Predicting and Monitoring
Visual Impacts</u>:   (R.B. Litton, Jr.) General Technical Report Number
PSW-91, 1973.

<u>National Forest Landscape Management, Volume 1</u>:   (Agriculture Handbook
434).   U.S. Government Printing Office, Washington, D.C.; 1973.

<u>National Forest Landscape Management, Volume 2, Chapter 1, The Visual
Management System</u>:   (Agriculture Handbook 462).   U.S. Government
Printing Office, Washington, D.C.; 1974.

Bibliography, Page 2

## 8400 – VISUAL RESOURCE MANAGEMENT

National Forest Landscape Management, Volume 2, Chapter 2, Utilities:
   (Agriculture Handbook 478).  U.S. Government Printing Office,
   Washington, D.C.; 1975.

National Forest Landscape Management, Volume 2, Chapter 3, Range:
   (Agriculture Handbook 484).  U.S. Government Printing Office,
   Washington, D.C.; 1977.

National Forest Landscape Management, Volume 2, Chapter 4, Roads:
   (Agriculture Handbook 483).  U.S. Government Printing Office,
   Washington, D.C.; 1977.

National Forest Landscape Management, Volume 2, Chapter 5, Timber:
   (Agriculture Handbook 559).  U.S. Government Printing Office,
   Washington, D.C.; 1980.

Our National Landscape – Annotated Bibliography and Expertise Index:
   Special Publication 3279.  Berkeley:  Pacific Southwest Forest and Range
   Experiment Station, 1981.

Proceedings of Our National Landscape:  A Conference on Applied Techniques
   for Analysis and Management of the Visual Resource (General Technical
   Report PSW-35).  Berkeley:  Pacific Southwest Forest and Range Experiment
   Station, 1979.

### USDI BUREAU OF LAND MANAGEMENT

Visual Resource Management Program.  U.S. Government Printing Office,
   Washington, D.C.; 1980.

Visual Simulation Techniques.  U.S. Government Printing Office,
   Washington, D.C.; 1980.

Form 1221-2
(June 1969)



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Release:
 9-390
Date:
10/21/2011

MANUAL TRANSMITTAL SHEET

Subject

9113 – Roads Manual (Public)

1. Explanation of Materials Transmitted:

This is an update of current manual and handbook on Roads; with the creation of Handbook 2 for Condition Assessment Protocols.  Attached is the Manual Section only, per Directives instructions. Handbooks 1 and 2 are under separate clearance sheets for each.

2. Reports Required: None.

3. Material Superceded:  The material superseded by this Manual Release is listed under "REMOVE" below.

4. Filing Instructions:

REMOVE                        INSERT

9113 – Roads                    9113 – Roads Electronic Version
(Rel. 9-247)


(Total:  83 Sheets)            (Total:  17 Sheets)


/s/ Janine Velasco
Assistant Director, Business and Fiscal Resources

TC-1

9113 – ROADS

Table of Contents

.01 Purpose

.02 Objectives

.03 Authority

.04 Responsibility

.05 Policy

.06 Scope of Road Program


.1  Road Program Management
    .11 Road Inventory and Condition
        A.  Route Numbers
        B.  BLM Transportation System
    .12 Functional Classification
        A.    Collector Roads
        B.    Local Roads
        C.    Resource Roads
    .13 Average Daily Traffic (ADT)
    .14 Emergency Relief for Federally Owned Roads (ERFO)
    .15 Use of Bureau Funds on Non-Bureau Controlled Roads
.2  Road Standards
    .21 Development of Geometric Standards
    .22 Relationship Between Standards and Design Element Values
    .23 Geometric Standards
    .24 Loadings
    .25 Structure Widths
    .26 Vertical Clearance
    .27 Horizontal Clearance
    .28 Traffic Control Signs and Markers
    .29 Easement Widths
.3  Road Project Planning
    .31 Route Analysis
        A.  Management Requirements
        B.  Feasible Route Locations
        C.  Route Selection Review
        D.  Field Review

BLM MANUAL                                          Rel. No. 9-390
Supersedes 9-247                                    Date:  10/21/2011

BLM_0005103

TC-2

## 9113 – ROADS

    E.  Report
  .32  Route Selection
.4  Design
.5  Construction
  .51  Signing
  .52  Inspections
.6  Maintenance
  .61  Maintenance Management
  .62  Maintenance Intensities – Transportation System Assets

Appendix **A** – Maintenance Intensities

Handbooks
    H-9113-1     Roads Design Handbook
    H-9113-2     BLM Roads National Inventory and Condition Assessment Guidance
             & Instructions

BLM_0005104

.01

## 9113 – ROADS

.01  Purpose.  This Manual Section provides for: inventory, functional classification, condition assessment, and establishment of maintenance intensities of the Bureau's roads for incorporation into the Bureau Planning System; Bureau road standards; and guidelines for road project planning, design, construction, and maintenance.

.02 Objectives.  The objectives are to:

    A.  Identify the role each organizational unit plays in providing engineering expertise for the management of BLM road programs.  Provide direction for appropriate coordination with other organizations.

    B.  Provide direction for safe and adequate BLM roads for users.

    C.   Provide adequate information to ensure that planning, design, construction, maintenance and condition assessment activities for road projects meet BLM needs and are performed in an acceptable manner.

.03  Authority.  See also Manual Sections 9100.03 – Facility Planning, Design, Construction, and Maintenance - Authority, 9103.03 – Facility Construction - Authority, and 9104 – .03 - Facility Maintenance – Authority.  The authority for providing road facilities is contained in the Federal Land Policy and Management Act of 1976 (FLPMA), as amended.  Authorities affecting planning, design, construction, maintenance, and condition assessment of roads include:

    A.  Federal Highway Act of 1962, as amended.

    B.  Highway Beautification Act of 1965, as amended.

    C.  Highway Safety Act of 1966, as revised.

    D.  Surface Transportation Act of 1978, as amended.

    E.  Surface Transportation Assistance Act of 1982.

    F.  Government Performance and Results Act of 1993 (GPRA).

.04  Responsibility.  The responsibilities described below are commensurate with those approved functional statements and Manual Sections 9100.04, 9103.04, 9104.04 and 9110.04.

    A.  The Chief, Division of Business Services, as exercised through the Chief, Engineering and Asset Management Policy Branch, is responsible for:

BLM_0005105

.04A1

## 9113 – ROADS

1. Providing Bureau-wide leadership and guidance for planning, design, construction, maintenance, and condition assessment of roads associated with managing public lands.

2. Establishing Bureau-wide road standards.

3. Developing Bureau-wide systems and standards for road inventory, road classification, and maintenance intensities.

4. Providing overall direction and quality of the Bureau Facilities Asset Management System (FAMS) database for the BLM roads inventory.

5. Coordinating with other Federal agencies, national interest groups, and road associations to ensure that Bureau interests are represented and that the Bureau is kept abreast of the newest developments regarding road-related activities.

B. The Chief, Branch of Engineering and Asset Management, National Operations Center (NOC), is responsible for:

1. Providing stewardship of the Bureau FAMS database for the BLM roads inventory.

2. Providing technical manual and handbook updates and revisions for approval and issuance by WO.

3. Providing technical engineering support to the WO/State/Field Offices, when requested.

4. Providing Contracting Officer's Representative services, on Indefinite Delivery/Indefinite Quantity Architectural and Engineering contracts, when requested on State planning, design, construction, maintenance, and condition assessment projects.

C. The State Engineer in each State is responsible for:

1. Providing State-wide leadership and guidance for planning, design, construction, maintenance, and condition assessment of roads associated with managing public lands within their geographic area of responsibility.

2. Providing overall direction and quality of the State FAMS database for the BLM roads inventory.

BLM_0005106

.04C3

## 9113 – ROADS

3. Ensuring that personnel assigned to road design, construction inspection, and condition assessment duties receive training and are otherwise qualified.

4. Ensuring all road designs are reviewed and approved by qualified individuals before construction work begins.

5. Coordinating with State Department of Transportation, Federal Highway Administration (FHWA) Regional and Division officials, and various other organizations as necessary to ensure that the statewide road program interests are represented.

D. The District Manager or Field Manager, as appropriate, is responsible for:

1. Coordinating an interdisciplinary review and approval of all route selections for new or relocated routes.

2. Making determinations on the location of new or relocated roads based on environmental and route analysis reports generated by the interdisciplinary review team.

3. Ensuring the overall quality of the District/Field Office FAMS database for the BLM roads inventory.

4. Ensuring that proposed roads are designed and constructed to BLM road standards or approved plan/permit.

E. The District Engineer, Field Engineer, Zone Engineer, or other engineer as designated by the responsible line manager, is responsible for:

1. Accomplishing assigned road project tasks, such as inventory work, condition assessments, designs, design reviews, in a timely manner, within budget, and in conformity with this Manual Section.

2. Assigning construction inspection tasks only to those personnel who have completed the required training or are otherwise qualified.

3. Recommending training for local personnel to ensure that road design and construction inspection capabilities meet the District or Field Office needs.

.04E4

9113 – ROADS

4. Coordinating with County road officials, State Department of Transportation (DOT) officials and other appropriate officials to ensure the District or Field Office road program interests are represented.

5. Coordinating with field personnel to ensure road inventories and condition assessments are accomplished in a timely manner and that the data is properly input into the FAMS database.

.05  Policy.  It is Bureau policy that:

A. Bureau roads must be designed and maintained to an appropriate standard no higher than necessary to accommodate their intended functions; and planning, design, construction, maintenance, and condition assessment activities must be consistent with national policies for safety, esthetics, protection, and preservation of cultural, historic, wildlife, and scenic values, and accessibility for the physically challenged.

B. Bureau roads are for use, development, protection, and administration of public lands and resources, and, though administered by a public agency, and "generally open to use by the general public," are not currently designated as public roads.  Bureau roads are subject to rules and regulations of the Secretary of the Interior, and, although public use is generally allowed, roads may be closed or use restricted to fulfill management objectives such as protecting public health and safety, preserving resources, or in support of security issues. Bureau roads may also be subject to State and other Federal regulations as necessary to protect public health and safety.

Reclamations/decommissionings, closures, and use restrictions, except for emergency reasons, are identified prior to construction or through the Land Use Planning Process.  Bureau roads which no longer support management objectives are to be reclaimed/decommissioned.

C. Continuous coordination with other agencies and public road authorities is undertaken to assure that land use, resources, and public interests are represented and that Bureau road management actions and activities are appropriate.

D. The location, design, construction, and maintenance of roads crossing public lands must comply with all applicable Federal laws.

.05E

BLM_0005108

9113 – ROADS

E.  All roads controlled by the Bureau must meet appropriate Bureau road standards, whether or not they are constructed by Bureau initiative.

F.  All Bureau road designers must be qualified.  Roads constructed by non-governmental entities across public lands must be designed by or under the direction of a licensed professional engineer when the Field Manager identifies road safety and resource protection issues warranting an engineering design.  Issues the Field Manager should take into consideration include average daily traffic, design speed, topography, soil types, and anticipated amount of use by the public.

G.  The acquisition of easements may not be initiated until a route analysis has been completed and approved by the appropriate District or Field Office Manager.  Technical approval of easement surveys, easement plats, and legal descriptions for acquisitions is delegated through the State Director and the appropriate line manager to the District or Field Office Engineer or the Chief Cadastral Surveyor.  If there are no qualified Field Office Engineers, then delegation of authority goes to the next highest organizational level in engineering.

H.  Comprehensive Condition Assessments of Bureau roads are performed on a ten-year cycle and inspected after events such as severe storms to determine emergency actions or priority maintenance needs.  These roads do not include roads which fall within the boundaries of administrative and recreation sites.  Roads within these boundaries are assessed during the recreation/administrative site assessments.

.06  Scope of Road Program.  The management of public lands and resources is affected by continually changing social, economic, and political needs.  As management objectives change, road needs could also change.  An effective program to provide a road system needed to support these changing management objectives must be predicated on current and future needs and must allocate limited resources by the most effective method.  A current inventory of assets and a method of measuring their adequacy are basic to managing a road system.  The FAMS has been designated as the central repository of all BLM required road condition and inventory data.

.1

BLM_0005109

# 9113 – ROADS

.1 <u>Road Program Management</u>.  The management of the road program requires data collection, information dissemination, and inter- and intra- Bureau coordination to determine the need to construct, improve, maintain, acquire, transfer jurisdiction, restrict use, or close and reclaim/decommission certain roads.  Coordination is particularly important, since most Bureau roads affect or are affected by resource management decisions or by road management decisions made by other organizations.

.11  Road Inventory and Condition.  The Bureau's official inventory of roads is contained within the FAMS.  Guidance on conducting Bureau road condition assessments is contained within H-9113-2 - Roads Condition Assessment Protocols.

A.  Route Numbers.  Use the same route number throughout the length of the route.  Do not duplicate route numbers within the State.  The State Office may assign blocks of numbers to each District or Field Office to assure that no duplication occurs.  Numbers are assigned by the District or Field Office in which the route originates and continues into the other resource area or District or Field Office jurisdiction if the route crosses a boundary.

B.  BLM's Transportation System.  Changes to the BLM's transportation system, as recorded in FAMS, may occur as part of the formal evaluation and designation process through one of four events:

a.  Record of Decision (ROD) – for a Resource Management/Environmental Impact Statement (RMP/EIS) or an amendment of an RMP/EIS.

b.  Decision of Record for an Activity Plan, Plan Amendment/Environmental Assessment (EA).

c.  Federal Register Notice Action (under authority of 43 CFR 8341.2, 8364.1, 8365.1-6, or 9268.3) that has a follow-up land-use planning action and associated NEPA action.

d.  Management decision of appropriate routes in an area that has been designated open to off-highway vehicle use.

.12  Functional Classification.  The Bureau categorizes its roads as Collector Roads, Local Roads, and Resource Roads.

A.  Collector Roads.  These Bureau roads normally provide primary access to large blocks of land, and connect with or are extensions of a public road system.  Collector roads accommodate mixed traffic and serve many uses.  They generally receive the highest volume of traffic

.12A

BLM MANUAL                                                      Rel. No. 9-390
Supersedes 9-247                                        Date:  10/21/2011

BLM_0005110

9113 – ROADS

of all the roads in the Bureau system.  User cost, safety, comfort, and travel time are primary road management considerations.  Collector roads usually require application of the highest standards used by the Bureau.  As a result, they have the potential for creating substantial environmental impacts and often require complex mitigation procedures.

B.  Local Roads.  These Bureau roads normally serve a smaller area than collectors, and connect to collectors or public road systems.  Local roads receive lower volumes, carry fewer traffic types, and generally serve fewer uses.  User cost, comfort, and travel time are secondary to construction and maintenance cost considerations.  Low volume local roads in mountainous terrain, where operating speed is reduced by effect of terrain, may be single lane roads with turnouts.  Environmental impacts are reduced as steeper grades, sharper curves, and lower design speeds than would be permissible on collector roads are allowable.

C.  Resource Roads.  These Bureau roads normally are spur roads that provide point access and connect to local or collector roads.  They carry very low volume and accommodate only one or two types of use.  Use restrictions are applied to prevent conflicts between users needing the road and users attracted to the road.  The location and design of these roads are governed by environmental compatibility and minimizing Bureau costs, with minimal consideration for user cost, comfort, or travel time.

.13  Average Daily Traffic (ADT).  For Bureau purpose, the average daily traffic (ADT) is defined as the annual traffic divided by 365 or by the actual number of days the road is open to traffic.  The amount of traffic is determined by the number of vehicles passing a point, regardless of the direction of travel.  ADT provides some criteria for geometric standards and is used for justifications and in the design of structural elements.  ADT is used as one of the factors in determining the functional classification.  In determining ADT, consider Seasonal Average Daily Traffic (SADT), such as during hunting season, may necessitate a higher geometric design standard for the road and a seasonally adjusted higher level of maintenance.  Functional classification then determines the appropriate geometric standards.

.14  Emergency Relief for Federally Owned Roads (ERFO).  The FHWA has responsibility to administer the Emergency Relief for Federally Owned

.14

BLM_0005111

9113 – ROADS

Roads (ERFO) program.  Refer to the FHWA "Emergency Relief for Federally Owned Roads, Disaster Assistance Manual" for guidance on timelines, coordination, and funding.  The ERFO Program is intended to help pay the unusually heavy expenses associated with the repair and reconstruction of Federal roads and bridges seriously damaged by a natural disaster over a wide area of catastrophic failure.  Restoration in-kind to pre-disaster conditions is expected to be the predominant type of repair.

.15 Use of Bureau Funds on Non-Bureau Controlled Roads.  Appropriated Bureau funds may not be used to construct, improve, or maintain roads not owned or controlled by the Bureau, or otherwise authorized.

.2 Road Standards.  Standards are values established to ensure adequate uniformity and quality of all roads constructed on lands administered by the Bureau.  These standards are applied to all Bureau or non-Bureau initiated road construction, and are used to determine the sufficiency of existing roads.

.21 Development of Geometric Standards.  To determine the appropriate design application, road functional classification should be used.  The American Society of Civil Engineers "Local Low Volume Roads and Streets" manual contains information that relates to the Bureau's low-volume roads.  The American Association of State Highway and Transportation Officials (AASHTO) "A Policy on Geometric Design of Highways and Streets" is applicable for some of the Bureau roads. In addition, it contains a section addressing 'Special Purpose Roads,' including recreation and resource development roads that may also be applicable to some of the Bureau roads.  AASHTO "Guidelines for Geometric Design of Very Low-Volume Local Roads (ADT<400)" is also applicable for some of the Bureau's roads.  Since AASHTO geometric standards for low-volume, low-speed, single-lane roads, and unpaved roads are not always applicable to Bureau roads, coordination with other agencies in addition to those listed above, continues to be the best source of information for the development of realistic standards.

.22 Relationship Between Standards and Design Element Values.  The values for curve radii, vertical curve lengths, sight distance, superelevation rates, and runoff lengths are closely related to design speed.  The designer must utilize design element values appropriate to the standard.  See H-9113-1 - Road Design Handbook.

.23

BLM_0005112

9113 – ROADS

.23   Geometric Standards.  Design speed, traveled way widths, and maximum grades for various combinations of estimated average daily traffic (ADT), functional classification, and terrain types are shown below.

GEOMETRIC STANDARDS FOR BUREAU ROADS

| Functional Classification | Est. 20 Yr. ADT | Terrain | Design Speed | | Traveled Way Width | | Maximum Grade | |
|---|---|---|---|---|---|---|---|---|
| | | | Pref. | Min. | Pref. | Min. | Pref. | Max. |
| Resource | Less Than 20 | Level & Rolling | 30 | * | 14 | * | 8 | 10* |
| | | Mountainous | 15 | * | 14 | * | 8 | 16* |
| Local | Less Than 100 | Level & Rolling | 40 | 30 | 20 | 20 | 6 | 10 |
| | | Mountainous | 20 | 15 | 14 | 12 | 8 | 15 |
| | More Than 75 | Level & Rolling | 50 | 40 | 24 | 20 | 6 | 10 |
| | | Mountainous | 30 | 15 | 24 | 20 | 8 | 14 |
| Collector | 50 - 100 | Level & Rolling | 50 | 30 | 24 | 20 | 6 | 8 |
| | | Mountainous | 30 | 20 | 20 | 20 | 8 | 12 |
| | More Than 100 | Level & Rolling | 50 | 40 | 24 | 20 | 6 | 8 |
| | | Mountainous | 30 | 20 | 24 | 20 | 8 | 12 |

Note:  Design speeds and surface widths chosen are limited to values shown, except that greater widths are allowed when oversized traffic justifies wider widths.
* If preferred design, speed, traveled way width, and maximum grade are not feasible for specific resource roads, alternative values are determined by the State Engineer.

.24   Loadings.  Design roads and structures for H-20 or HS-20 loadings, as appropriate, and as specified by the AASHTO. Designs with heavier loadings will be used if the road is used by overweight traffic from adjacent roads.

.25   Structure Widths.  Bridges, culverts, tunnels, cattleguards, and other structures must have a minimum curb-to-curb or rail-to-rail width (whichever is less) of 14 feet for single lane roads and 24 feet for double lane roads, but in all cases not less than the nominal width of the adjacent traveled way as measured at right angles to the road centerline.

.26

BLM_0005113

9113 – ROADS

.26     Vertical Clearance.  Overhead vertical clearance must be a minimum of 16-feet from the traveled way elevation.  See H-9113-1 - Road Design Handbook.

.27     Horizontal Clearance.  A horizontal clearance of 4-feet from edge of roadway is recommended.  See H-9113-1 - Road Design Handbook.

.28     Traffic Control Signs and Markers.  Signs and markers placed on or adjacent to the roadway to regulate, inform, or guide vehicle occupants must conform to the requirements of Manual Section 9130 – Sign Manual and the latest version of FHWA's Manual on Uniform Traffic Control Devices (MUTCD). However, compliance with new releases and updates to the MUTCD (i.e. sign reflectivity requirements) will be accomplished via normal maintenance and component replacement, or otherwise directed by the Washington Office.

.29     Easement Widths.  The width of easements for Bureau roads is limited to the minimum width necessary for construction and maintenance operations, and for user safety. A minimum width of 50-feet or the width of construction plus 10-feet on each side (whichever is greater) is generally required. Maintain uniform widths through varying ownerships or legal subdivisions whenever possible, rather than allowing frequent width changes

.3  Road Project Planning.  Road project planning ensures that the project provides safe and adequate service to the user and is compatible with environmental values. Prior to final selection of a route, alternative locations and environmental factors must be analyzed.

.31     Route Analysis.  Perform a route analysis to identify feasible routes that satisfy the required road function. In cases where an existing road could be acquired, the existing road is an alternative and is assessed with other feasible routes. This ensures that the selected route best meets management needs and is not a short-term solution.

        A. Management Requirements.  Identify the anticipated vehicle type and traffic volume to include additional traffic that may be attracted to the new route.  Identify the functional classification of the road and specific locations that the road must serve. Map any areas that the road must not penetrate because of withdrawals, easements, private lands, or reservations, and identify any other special considerations or constraints on selection of feasible routes.

BLM_0005114

.31B

9113 – ROADS

B.  Feasible Route Locations.  Plot feasible route locations (those that meet management requirements and the appropriate road standards) on a topographic map. Make route locations as wide as possible, as this gives the greatest freedom in selecting the alignment to ensure free traffic flow, minimal impact on the environment, and relative economy of construction and maintenance.

C.  Route Selection Review.  Determine the most desirable route locations and analyze these locations for the Field review. Document the reasons for eliminating the less desirable feasible route locations (or portions thereof) from further consideration in the analysis report.

D.  Field Review.  Perform an in-depth field review for each feasible location. Prior to field review, affected private land must be identified and appropriate documented permission secured to perform any needed survey work, soil borings, etc. For each feasible location, consider environmental impacts, resource value impacts, user cost, safety, construction and maintenance costs, acquisition costs (if applicable), suitability of soil and geology for construction, and any other factors relevant to choosing the best locations. If an existing road is to be acquired, consider construction costs necessary to meet appropriate road standards.

E.  Report. Upon completing the field review listed above, the team prepares a report for management review and approval.

.32  Route Selection.  Using the route analysis report and any required environmental analysis, the District/Field Office Manager selects the location. If the route analysis report or the environmental analysis addresses special problems, the selection decision may include specific mitigation requirements or limitations that must be addressed in the design.

.4  Design.  Final design work, whether "in-house," by another agency or by an architectural and engineering firm commences when project planning is complete and the project has been programmed and funded in an approved Annual Work Plan. Work on non-Bureau road designs should normally not begin until the preliminary location has been approved and the road stipulations have been provided to the applicant. Bureau road standards are provided in .2 of this Manual Section and the design guides found in H-9113-1 – Road Design Handbook.

BLM_0005115

.4

<div align="center">9113 – ROADS</div>

Designer Qualifications.  Any road designer and reviewer assigned responsibility for the design and/or review of any road must have a working knowledge of highway engineering principles and procedures, and have satisfactorily completed a college or other approved road design course.

All "in-house" designs must receive an independent technical review by a qualified road designer. The State Engineer reviews and determines the procedures and organizational level for such reviews.  Roads designed by non-Bureau personnel are approved for technical correctness by a qualified registered engineer or another agency's design chief, and are reviewed by the State Engineer, qualified District engineering personnel, or a qualified reviewer appointed by the District Engineer, to assure that the design meets the appropriate Bureau road standards.

Approved Road Design Courses. Satisfactory completion of the following are acceptable for qualifying BLM road design personnel:

1. U.S. Forest Service Basic and Advanced Road Design Courses.

2. University Level Engineering Curriculum Road Design Courses.

3. Other qualifications approved by the State Engineer.

.5  Construction.  See Manual 9103 - Facility Construction.

.51  Signing.  Roads under construction are required to be signed according to the current edition of the FHWA "Manual of Uniform Traffic Control Devices."

.52  Inspections.  Construction inspection must be done by qualified inspectors regardless of the method of construction, such as force account, contract, timber sale, etc.  See Manual 9103 – Facility Construction.

.6  Maintenance.  See Manual 9104 - Facility Maintenance.

.61    Maintenance Management.  Follow guidance in Manual 9104 -  Facility Maintenance for the establishment of a maintenance management program.

.62  Maintenance Intensities – Transportation System Assets  BLM route Maintenance Intensities provide guidance for appropriate "standards of care" to recognized routes within the BLM.  Recognized routes by definition include Roads, Primitive Roads, and Trails carried as assets within the BLM FAMS.

BLM_0005116

.62

9113 – ROADS

Maintenance Intensities provide consistent objectives and standards for the care and maintenance of BLM routes based on identified management objectives. Maintenance Intensities are consistent with land-use planning management objectives (for example, natural, cultural, recreation setting, and visual). Maintenance Intensities provide operational guidance to field personnel on the appropriate intensity, frequency, and type of maintenance activities that should be undertaken to keep the route in acceptable condition and provide guidance for the minimum standards of care for the annual maintenance of a route.

Maintenance Intensities do not describe route geometry, route types, types of use or other physical or managerial characteristics of the route. Those terms are addressed as other descriptive attributes to a route.

Maintenance Intensities provide a range of management objectives and standards. See Appendix A – Maintenance Intensities.

APP 1 PG 1

## Appendix A - Maintenance Intensities

### Level 0

Maintenance Description:  Existing routes that will no longer be maintained and no
longer be declared a route. Routes identified as Level 0 are identified for removal
from the Transportation System entirely.

Maintenance Objectives:
- No planned annual maintenance.
- Meet identified environmental needs.
- No preventative maintenance or planned annual maintenance activities.

Maintenance Funds:  No annual maintenance funds.

### Level 1

Maintenance Description:  Routes where minimum (low intensity) maintenance is
required to protect adjacent lands and resource values.  These roads may be
impassable for extended periods of time.

Maintenance Objectives:
- Low (Minimal) maintenance intensity.
- Emphasis is given to maintaining drainage and runoff patterns as needed to
  protect adjacent lands.  Grading, brushing, or slide removal is not performed
  unless route bed drainage is being adversely affected, causing erosion.
- Meet identified resource management objectives.
- Perform maintenance as necessary to protect adjacent lands and resource values.
- No preventative maintenance.
- Planned maintenance activities limited to environmental and resource
  protection.
- Route surface and other physical features are not maintained for regular traffic.

Maintenance Funds:  Maintenance funds provided to address environmental
and resource protection requirements.  No maintenance funds provided to
perform preventative maintenance.

### Level 2 *Reserved for Possible Future Use*

### Level 3

Maintenance Description:  Routes requiring moderate maintenance due to low volume
use (for example, seasonally or year-round for commercial, recreational, or
administrative access).  Maintenance Intensities may not provide year-round
access but are intended to generally provide resources appropriate to keep the
route in use for the majority of the year.

Maintenance Objectives:
- Medium (Moderate) maintenance intensity.
- Drainage structures will be maintained as needed.  Surface maintenance will be

APP 1 PG 2

BLM_0005118

9113 – ROADS

conducted to provide a reasonable level of riding comfort at prudent speeds for the route conditions and intended use.  Brushing is conducted as needed to improve sight distance when appropriate for management uses.  Landslides adversely affecting drainage receive high priority for removal; otherwise, they will be removed on a scheduled basis.
• Meet identified environmental needs.
• Generally maintained for year-round traffic.
• Perform annual maintenance necessary to protect adjacent lands and resource values.
• Perform preventative maintenance as required to generally keep the route in acceptable condition.
• Planned maintenance activities should include environmental and resource protection efforts, annual route surface.
• Route surface and other physical features are maintained for regular traffic.

Maintenance Funds:  Maintenance funds provided to preserve the route in the current condition, perform planned preventive maintenance activities on a scheduled basis, and address environmental and resource protection requirements.

**Level 4** *Reserved for Possible Future Use*

**Level 5**

Maintenance Description:  Route for high (maximum) maintenance due to year-round needs, high volume of traffic, or significant use.  Also may include route identified through management objectives as requiring high intensities of maintenance or to be maintained open on a year-round basis.

Maintenance Objectives:
• High (Maximum) maintenance intensity.
• The entire route will be maintained at least annually. Problems will be repaired as discovered. These routes may be closed or have limited access due to weather conditions but are generally intended for year-round use.
• Meet identified environmental needs.
• Generally maintained for year-round traffic.
• Perform annual maintenance necessary to protect adjacent lands and resource values.
• Perform preventative maintenance as required to generally keep the route in acceptable condition.
• Planned maintenance activities should include environmental and resource protection efforts, annual route surface.
• Route surface and other physical features are maintained for regular traffic

Maintenance Funds: Maintenance funds provided to preserve the route in the current condition, perform planned preventative maintenance activities on a scheduled basis, and address environmental and resource protection requirements.

BLM_0005119

# SAN JUAN/SAN MIGUEL PLANNING AREA

## RESOURCE MANAGEMENT PLAN



## U.S. Department of the Interior
**Bureau of Land Management**
**Montrose District, Colorado**
**SEPTEMBER 1985**



BLM_0005120



# United States Department of the Interior

**BUREAU OF LAND MANAGEMENT**
San Juan Resource Area
Federal Building
701 Camino del Rio
Durango, Colorado 81301

IN REPLY
REFER TO:

December 1985

Enclosed is a copy of the final RECORD OF DECISION and SAN JUAN-SAN MIGUEL RESOURCE MANAGEMENT PLAN (RMP).  The final plan was announced in September 1985 and represents over two years of effort, including identification of issues, gathering of resource data, development of alternatives, and consideration of environmental impacts -- along with numerous opportunities for public review and comment.

The plan now becomes the basic guide for management of nearly one million acres of public lands administered by the Bureau of Land Management in southwestern Colorado.

We are pleased to provide this copy, with a map of the entire planning area, for your reference; and we extend our appreciation for your cooperation and assistance during the planning process.

Sincerely yours,

David J. Miller
Area Manager

Enclosure
San Juan-San Miguel RMP and Map

BLM_0005121

# RECORD OF DECISION

## FOR

## SAN JUAN-SAN MIGUEL RESOURCE MANAGEMENT PLAN

## AND

## FINAL ENVIRONMENTAL IMPACT STATEMENT

**Prepared by**

## U.S. DEPARTMENT OF THE INTERIOR

## BUREAU OF LAND MANAGEMENT

## MONTROSE DISTRICT, COLORADO

## SAN JUAN RESOURCE AREA

## AND

## UNCOMPAHGRE BASIN RESOURCE AREA

September 1985

State Director
Colorado State Office

# RECORD OF DECISION
## San Juan-San Miguel Resource Management Plan

### San Juan Resource Area
### Durango, Colorado

### and
### Uncompahgre Basin Resource Area
### Montrose, Colorado

This document records the decisions reached by the Bureau of Land Management (BLM) for managing 994,000 surface acres of public land and 297,000 subsurface acres in the San Juan and Uncompahgre Basin Resource Areas.

## Decision

The decision is hereby made to approve the attached plan as the resource management plan (RMP) for the San Juan Resource Area and a portion of the Uncompahgre Basin Resource Area. This plan was prepared under the regulations for implementing the Federal Land Policy and Management Act (FLPMA) of 1976 (43 CFR 1600). An environmental impact statement (EIS) was prepared for this plan in compliance with the National Environmental Policy Act (NEPA) of 1969. This plan is identical to the one set forth in the proposed plan and associated final EIS published in December 1984, except where the BLM Director made changes through decisions in response to various public protests.

## Major Actions Included in the RMP/EIS:

- Seventy-one (71) Allotment Management Plans (AMPs) will be developed on approximately 810,000 acres. In the long term, livestock use is projected to increase to 73,601 AUMs or 13 percent above current active preference. The plan will result in beneficial, long-term impacts to livestock operators because of increases in livestock production.

- Wildlife habitat will be managed to support the current population levels of 20,000 deer and 1,600 elk, subject to the availability of manpower and funds to complete necessary wildlife habitat improvements. Pronghorn antelope should increase to 300 animals and the reintroduction of 300 bighorn sheep in the Dolores River Canyon will be allowed. Protective stipulations for threatened and endangered (T&E) species will be provided. Terrestrial wildlife habitat conditions should improve significantly, covering the majority of the planning area. T&E species will benefit from the provided protection.

- Aquatic and riparian habitat will be improved on the following rivers and their tributaries (in priority order): the upper San Miguel, the upper Dolores, and the lower San Miguel. Long-term positive impacts on 94 miles of aquatic and riparian habitat could be realized. Intensive livestock and wildlife management will improve an additional 306 miles of habitat.

- Management of the Silverton Special Recreation Management Area (SRMA) will continue. The Dolores River Canyon will also be managed as an SRMA. Recreation management plans for both SRMAs will be developed. The McElmo Research Natural Area will be designated; and the proposed mineral withdrawal of the area would be removed.

- The Dolores River Canyon Wilderness Study Area (WSA) (approx. 28,539 acres) will be recommended preliminarily suitable for wilderness designation. Cross, Cahone and Squaw/Papoose Canyons, Weber and Menefee Mountains, McKenna Peak, and Tabeguache Creek WSAs (approximately 73,971 acres) will be recommended nonsuitable for wilderness designation. All eight WSAs will continue to be managed under BLM interim management policies for wilderness study areas until Congress reaches a decision on their final status.

- Ninety-three (93) percent of the total acreage available for oil and gas leasing will be open to development with standard lease stipulations. Approximately four percent will be open to development with additional lease stipulations calling for no surface occupancy and to protect wildlife, cultural resources, and recreation values. Less than three percent of the total acreage would be closed to leasing because of recommending the Dolores River Canyon WSA as suitable for wilderness. Approximately 34,000 acres (3%) of the area would be closed to mineral entry. An estimated 46,000 acres (amounting to 1.5 billion tons) of the Durango Known Recoverable Coal Resource Area (KRCRA) and 1,480 acres (or 26.6 million tons) of the Nucla KRCRA will be available for coal leasing; but the East Cortez KRCRA will not be available for leasing or development during the term of this plan.

- Designation of the 156,000-acre Anasazi Culture Multiple Use Area as an Area of Critical Environmental Concern (ACEC) will have long-term positive impacts to cultural resources. The plan will provide continued protection and management to important cultural sites and areas. Overall, long-term benefits will occur because of the protective withdrawals and stipulations to mineral development. Within this ACEC, a 440 acre area will be designated as the McElmo Research Natural Area. The Tabeguache Creek area will be designated as an Outstanding Natural Area.

BLM_0005123

- Land disposal actions (through sale, exchange, or title transfer) will be allowed on approximately 21,700 acres or 2.2 percent of the public lands in the planning area, resulting in long-term impacts that will improve the efficiency of management on all BLM-retained lands.

- Intensive timber management on approximately 10,960 acres will be provided. The estimated allowable harvest would be 6.5 million board feet (MMBF) per decade. An additional 42,130 acres will be managed to provide woodland products, allowing for an estimated allowable harvest of 6.4 MMBF (12,000 cords) per decade. Over the long term, improved management could result in increased wood fiber production.

- Intensive watershed management practices on approximately 65,000 acres will be implemented to reduce erosion and sediment yields. To reduce salinity in the Colorado River, 46,000 acres will be intensively managed. Long-term significant decreases in erosion, sediment, and salinity yields should occur; and municipal and domestic water sources would be protected.

- Off-Road Vehicle (ORV) use on public lands will be designated as: 79 percent open (782,000 acres); 11 percent limited (109,000 acres); and 10 percent closed (103,000 acres).

**Major Modifications to the Final RMP/EIS:**

- A wild horse herd consisting of an average of 50 horses will be maintained on the Spring Creek Basin rangeland. All wild horses will be removed from the Naturita Ridge area. This decision responds to a desire by the public to maintain a wild horse herd in southwestern Colorado, while minimizing conflicts with other resources and users of the public lands.

- The tract of public land along the Dolores River (T.48 N., R. 18 W., Section 11) will be removed from the disposal emphasis category. Multiple use benefits appear to be significant enough to maintain this tract in public ownership to be managed for those benefits.

- If wilderness status is not conferred on the Dolores River Canyon WSA by Congress, prescriptions for management of the Coyote Wash portion will be reassessed through the plan amendment process and associated public participation.

- The Coal Unsuitability Analysis report dated September 1984 will be revised as follows:

The exceptions listed under Criterion Number 16 on page 39 of the report are eliminated for all three areas. The exception analyses on page 41 are removed from the Nucla KRCRA and the heading "Exception Analysis" is removed from the Durango KRCRA. The paragraph under this heading for the Durango KRCRA is modified to read, "Pending additional information, the study areas should be considered suitable for further coal

lease consideration due to this criterion. Those portions of the area crossed by water sources supplying water to off-study area floodplains should be considered unsuitable for further coal lease consideration to the boundaries of the 100-year flood stage level."

"Any proposed activities in or adjacent to the floodplains will require approval from BLM on a site-specific basis after consultation with the U.S. Geological Survey."

The analysis portion of Criterion Number 19 on page 42, under the Durango KRCRA will be changed to read, "Those portions of the KRCRA falling within the above-mentioned alluvial valley floors should be designated unsuitable for surface mining operations, but should receive further consideration for coal leasing where mining operations would be by subsurface methods." The exceptions for all three areas on page 44 are eliminated. The exception analysis for all three areas are removed except the last paragraph under the Durango KRCRA will remain with the addition of the word "potential". It reads as follows, "Any proposed activity in or adjacent to the potential alluvial valley floors will require approval from BLM on a site-specific basis after consultation with the state of Colorado."

These modifications are a result of protests BLM received on the proposed plan.

Final plan decisions, terms, and conditions are described in detail in Chapter Two of the resource management plan.

**Consistency**

This plan is consistent with the plans, programs, and policies of other Federal agencies and of State and local governments.

**Alternatives Considered**

Four alternatives for managing the resources were considered: Current Management, Resource Conservation, Resource Utilization, and Preferred.

The Current Management Alternative emphasized current management direction, policies, and existing land use plans. It was the No Action Alternative required by the National Environmental Policy Act.

The Resource Conservation Alternative emphasized nonconsumptive natural resource values. This was the environmentally preferred alternative.

The Resource Utilization Alternative emphasized consumptive use of the resources in the planning area.

The Preferred Alternative (called the Proposed Plan in the Final Resource Management Plan and Environmental Impact Statement (RMP/EIS) dated December 1984) balances

BLM_0005124

competing demands by providing goods and services while protecting important environmental values.

**Mitigation and Monitoring**

All practicable measures will be taken to mitigate adverse impacts. These measures are discussed in the plan and the final RMP/EIS. Mitigation measures will be strictly enforced during implementation. Monitoring will indicate how effective these measures are in minimizing environmental impacts. Additional measures to protect the environment may be taken during or following monitoring, if warranted.

**Public Involvement**

The views of the public have been sought throughout the planning and decision making process. Public participation in the process is summarized in Chapter One of the resource management plan.

SEP 5   1985
_____
(Date)

_____
Kannon Richards
Colorado State Director
Bureau of Land Management

v

# SAN JUAN-SAN MIGUEL RESOURCE MANAGEMENT PLAN

Prepared by

## U.S. DEPARTMENT OF THE INTERIOR

## BUREAU OF LAND MANAGEMENT

## MONTROSE DISTRICT, COLORADO

## SAN JUAN RESOURCE AREA

## AND

## UNCOMPAHGRE BASIN RESOURCE AREA

September 1985

State Director

Colorado State Office

vii

BLM_0005126

# TABLE OF CONTENTS

Page

Chapter 1. Introduction ................................................................. 1

Purpose and Need ...................................................................... 1
Setting ............................................................................... 1
Implementation ....................................................................... 1
Mitigation and Monitoring ............................................................. 2
Maintenance .......................................................................... 2
Amendments and Revisions ............................................................. 2
Valid Existing Rights ................................................................. 2
Public Involvement and Intergovernmental/Interagency Coordination ..................... 2
Administrative Actions ................................................................ 2

Chapter 2. Resource Decisions ......................................................... 5

Introduction .......................................................................... 5
Livestock Grazing Management ......................................................... 5
Wildlife Management .................................................................. 12
Recreation ........................................................................... 13
Wilderness ........................................................................... 14
Minerals Management .................................................................. 16
Cultural Resources .................................................................... 18
Lands Program ........................................................................ 20
Wild Horse Management ............................................................... 21
Timber Management ................................................................... 21
Soil and Water Management ............................................................ 22
Area of Critical Environmental Concern ................................................ 23

Appendices

Appendix One. Multiple Use Emphasis Areas ............................................ 25
Appendix Two. Oil and Gas Leasing Stipulations ........................................ 60
Appendix Three. ORV Limitations ...................................................... 66

## LIST OF TABLES

Table 1. Summary of Allotments ......................................................... 7
Table 2. Seasonal Wildlife Restrictions .................................................. 12
Table 3. Wilderness Suitability Recommendations .......................................... 15
Table 4. Unsuitability Criteria for Surface Coal Mining (Summary) .......................... 19
Table 5. Areas Unsuitable for All Methods of Mining (Summary) ............................ 19

BLM_0005127

## MAP LIST

1.  San Juan – San Miguel Resource Management Plan - East

2.  San Juan – San Miguel Resource Management Plan  - West

BLM_0005128

# Chapter 1

## INTRODUCTION

This plan contains the decisions on all land use proposals presented in the December 1984 final environmental impact statement. It describes, in general terms, the implementation, monitoring, and amendment processes.

The plan does not present information on environmental consequences, rationale, consistency, or the effects of the management. This information was previously covered in the draft and final environmental impact statements.

In addition to this plan, a rangeland program summary and a wilderness study report are being prepared. The wilderness study report will identify the preliminary recommendations for each wilderness study area. The report, along with a final environmental impact statement on the wilderness portion of the plan, will be submitted to Congress for action. The rangeland program summary will summarize the livestock grazing management program and grazing decisions reached through this plan and consultation with affected parties. The rangeland program summary will describe which selective management category each allotment falls into and give a proposed schedule for issuance of grazing decisions. It will also detail the studies and actions to be taken to determine proposed stocking rates for those allotments where stocking rates are not known.

## PURPOSE AND NEED

In the late 1960s and early 1970s, the BLM conducted several planning efforts on small sub-units of what is now the San Juan-San Miguel Planning Area. These planning efforts resulted in several management framework plans (MFPs) that provided management direction for various resources and resource problems.

Because of new legislation, changing policies and new land use conflicts and opportunities, there was a need to consolidate, revise and update the decisions made in the old MFPs. This new planning effort replaced earlier MFPs, and included portions of the resource area not covered in previous planning efforts and is called a resource management plan (RMP).

The Bureau's principal authority to manage public lands is found in the Taylor Grazing Act of 1934, the Federal Land Policy and Management Act of 1976, and the Public Rangelands Improvement Act of 1978. Through these authorities, BLM is responsible for managing resources on public lands in a manner that maintains or improves them.

This resource management plan is written in compliance with the National Environmental Policy Act of 1969, the Council on Environmental Quality regulations and in specific response to litigation in the Natural Resources Defense Council et al. versus Roger C. B. Morton et al. 1973 (U.S. District Court for the District of Columbia, ref. Case No. 1983-73).

In addition to meeting the previously mentioned requirements, this plan satisfies the BLM's policy to (1) identify lands suitable for wilderness designation (the study phase of BLM's wilderness review process); (2) identify lands with potential for coal leasing (43 CFR, Part 3400); (3) respond to the court mandate (Natural Resources Defense Council et al. versus Watt (Civil Action 1983-75)) requiring the BLM to complete a livestock grazing environmental impact statement; (4) identify public land as open, closed, or limited for off-road vehicle (ORV) use (Executive Order 11989); and (5) manage and control wild horses and burros to "maintain a thriving natural ecological balance and multiple-use relationship" on the public lands (Wild Free-Roaming Horse and Burro Act of 1971).

The intent of this resource management plan is to anticipate and plan for the public needs from BLM lands in the San Juan and Uncompahgre Basin Resource Areas.

Unless otherwise specified, the decisions made in this land use plan apply only to public lands administered by the Bureau of Land Management.

## SETTING

The planning area in southwestern Colorado considered in this RMP is comprised of public lands in Montrose, Montezuma, La Plata, Dolores, Archuleta, San Juan, San Miguel, and Mesa counties in Colorado. In addition, parts of Rio Arriba County, New Mexico, and San Juan County, Utah, are contained in the planning area. The area contains approximately 994,000 acres of public land, with an additional 297,000 subsurface (mineral) acres. The vast majority of the public lands are contained in the northwest and southwest portions of the planning area. The land pattern strongly influences land management options. The population of the area is centered in the southern portion of the area (Cortez and Durango) away from the large blocks of public land.

The San Juan Resource Area has total multiple use planning responsibility for the New Mexico portion of the planning area. The portions of San Juan County, Utah, in the planning area are Cross and Squaw/Papoose canyons, two wilderness study areas (WSAs) that are adjacent to Colorado's WSAs. Planning for these areas relates only to their suitability or nonsuitability for wilderness.

## IMPLEMENTATION

Decisions in this plan will be implemented over a period of years and must be tied to the BLM budgeting process. Therefore, priorities have been established for each resource to guide the order of implementation. The priorities for each program will be reviewed annually to help develop the annual work plan commitments for the coming year. The priorities

1

may be revised based upon new administrative policy, new Departmental directives, or new Bureau goals. The priorities of implementation are presented, by resource, in Chapter 2.

## MITIGATION AND MONITORING

The resource management plan incorporates measures for mitigating undesirable environmental effects. These measures will be applied during implementation of the RMP. In some cases, additional mitigation will be applied during activity planning.

The effects of implementing the RMP will be monitored and evaluated on a periodic basis to assure the desired results are being achieved. Individual resources will be monitored as explained in Chapter 2 of this document. Monitoring will determine whether actions are consistent with current policy, whether original assumptions were correctly applied and impacts correctly predicted, whether mitigation measures are satisfactory, whether significant changes have been made in related plans of other Federal agencies or State and local governments, or whether new data is of significance to the plan. Monitoring will also help to establish long-term use and resource condition trends and provide valuable information for future planning.

## MAINTENANCE

This plan will be maintained as necessary to reflect minor changes in data. Maintenance will be limited to refining or documenting a previously approved decision. It shall not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the plan. Maintenance will be documented in supporting records. Formal public involvement will not be necessary to maintain the plan.

## AMENDMENTS AND REVISIONS

This plan may be amended or revised if major changes are necessary. Monitoring and evaluation findings, new data, new or revised policy, a change in circumstances or a proposed action resulting in a change in the scope, terms, or conditions of the plan, would warrant an amendment or revision. An amendment will be analyzed either in an environmental assessment or an environmental impact statement. The public and other agencies will be included in the amendment and revision processes.

## VALID EXISTING RIGHTS

This plan does not repeal valid existing rights on public lands. Valid existing rights are those claims or rights to public land that take precedence over the actions in this plan. As an example, a mining claim located prior to the preparation of this plan in an area withdrawn from mineral entry through the plan may be valid. Valid existing rights may be held by other Federal agencies or by private individuals or companies. Valid existing rights may also pertain to oil and gas leases, rights-of-way (ROWs), and water rights.

## PUBLIC INVOLVEMENT AND INTERGOVERNMENTAL/INTERAGENCY COORDINATION

Public particiation and consultation was encouraged and sought throughtout the development of this plan. The planning process was officially initiated through a public notice in the January 5, 1980 Federal Register. This notice invited the general public as well as other Federal, State and local government agencies to identify major planning issues and to submit other comments or concerns regarding the planning effort to the BLM.

The final list of planning issues and criteria was sent to the public in the June 1983 issue of San Juan Resource Area Bulltin. Three meetings were held in June 1983 to discuss the grazing allotment categorization process with livestock users. A newsletter, with approximately 800 people on the mailing list, has been sent out quarterly since the spring of 1983 to keep the public informed of planning actions. Three public workshops were held in September 1983 to discuss the planning alternatives.

Numerous other coordination meetings, telephone calls, personal contacts, etc. were held to obtain recommendations and assistance in identifying issues, gathering data, and analyzing the impacts of alternative land uses.

The draft RMP/EIS was filed with the Environmental Protection Agency on April 20, 1984. Notice of availability of the draft document and a series of public hearings was published on April 25, 1984 in the Federal Register. The public was also provided 90 days (April 28 to July 28) in which to comment on the draft RMP/EIS. The following public hearings were held to obtain public input into wilderness recommendations.

| | |
|---|---|
| Durango, Colorado | June 25 |
| Cortez, Colorado | June 26 |
| Nucla, Colorado | June 27 |
| Golden, Colorado | June 28 |
| Monticello, Utah | July 2 |

A total of 124 written and verbal comments were received during the 90 day comment period. Responses were prepared and published in the final EIS and proposed RMP.

Notice of availability of the final EIS including the proposed plan was published on December 14, 1984, in the Federal Register. This notice announced a 30 day protest period from December 14, 1984 to January 14, 1985. The Bureau received 55 protests to the plan, 49 dealing with the wild horse issue and six dealing with other aspects of the plan. All protests were resolved through decisions by the Director to each of the protestors.

## ADMINISTRATIVE ACTIONS

Administrative actions are the day-to-day transactions required to serve the public and to provide optimal use of

BLM_0005130

the resources. These actions are in conformance with the plan and their continued implementation will not result in significant environmental impacts. These and other administrative actions will be conducted at the resource area, district, or State office. The degree to which these actions are carried out will be based upon BLM policy, available personnel, and funding levels.

BLM_0005131

# Chapter 2

## RESOURCE DECISIONS

### INTRODUCTION

This chapter describes the proposed actions contained in the final resource management plan/environmental impact statement (RMP/EIS). It outlines the decisions on all the land use recommendations including rationale proposed in the Final Environmental Impact Statement (FEIS). It also contains, by resource program, monitoring, implementation priorities, and required support.

The implementation priorities will guide the order in which projects are implemented. These priorities will be tied to the budget process. The number one priority for each resource will always be to maintain its base program. This includes funding normal operating costs, completing administrative duties, and responding to public inquiries. The plan outlines monitoring programs for evaluating the effectiveness of plan proposals such as forage allocations and wildlife improvements. Monitoring will determine whether assumptions were correctly applied and impacts correctly predicted. Monitoring will also help to establish long-term use and resource condition trends for the resource area, and will provide valuable information for future planning. Support will show what assistance will be necessary from other resources, job skills, and agencies to implement the planned actions described in the resource management plan.

Appendix One contains the multiple use emphasis area descriptions which will be used as the guidelines for management of the planning area. Inserted in this plan is the final map for the planning area showing the multiple use emphasis areas.

### LIVESTOCK GRAZING MANAGEMENT

#### Resource Objectives

**General.** The planning area is a complex ecosystem composed of plant and animal communities and basic soil types, all responsive in one way or another to natural processes such as rain, wind, sunlight, and man's activities. No single element in the range ecosystem is so readily managed and with such far reaching effects as is vegetation. Consequently, maintaining or improving the vegetation component of this ecosystem is the key to enhancing the resource values of the planning area to permit a balanced mix of uses to ensure sustained yield. The components of the rangeland program are familiar ones; they have been part of the program for some years. The main emphasis of the range program is considered in the following components:

**Allotment Categorization.** All grazing allotments in the planning area have been assigned to one of three management categories based on present conditions, potential for improvement, whether other resource conflicts exist, and what opportunities exist for positive economic return on public investments. The management category for an allotment may be changed when resource conditions change, or when new data becomes available.

The "M" category allotments generally will be managed to maintain current satisfactory resource conditions; "I" allotments generally will be managed to improve resource conditions; and "C" allotments will receive custodial management to prevent resource deterioration.

#### Planned Management Actions

**Allotment-Specific Management Actions for the Improvement ("I") Category.** Multiple use management actions have been developed for each allotment in the "I" category (see Appendix Nine in the Draft RMP). Future management actions, including developing AMPs, will be tailored to meet these objectives after consultation with livestock operators.

**Allotment Management Plans (AMPs).** Implementing the recommended actions for the planning area is guided by a series of functional activity plans, which include habitat management plans (HMPs) for wildlife, and AMPs for livestock grazing. Each plan explicitly details planned programs and management actions designed to accomplish proper land and resource management for the full mix of public uses. Specifically, AMPs, prepared in consultation, cooperation, and coordination with the operator or other affected interests, are documents which prescribe the manner in and extent to which livestock grazing is conducted and managed to meet multiple use, sustained yield, economic and other needs and objectives as determined through the land use plan. Existing AMPs will be revised as necessary and new AMPs developed on 71 priority allotments (see Table 1).

**Monitoring.** A detailed monitoring and evaluation plan has been completed. This allotment-specific plan specified the type, frequency, and schedule for monitoring and evaluation. This plan is available in the San Juan Resource Area Office. When undesirable and unintended changes in resource values are discovered and the causes are determined, corrective action will be taken. BLM Manual 4430 and regulations discuss the applications of rangeland monitoring in more detail.

**Livestock Use Adjustments.** Livestock use adjustments are most often made by changing one or more of the following: the kind or class of livestock grazing the allotment, the season of use, the stocking rate, or the grazing pattern. While most livestock use adjustments will occur in the "I" allotments, use adjustments may also occur for allotments in "C" and "M" categories.

Approximately 64,200 animal unit months (AUMs) may be authorized to 176 permittees in the short term until agreements are reached or decisions are made on grazing

BLM_0005132

capacity. All livestock use adjustments will be implemented through documented mutual agreement or by decision. When livestock use adjustments are implemented by decision, it will be based on operator consultation, range survey data, and resource monitoring. Current BLM policy emphasizes the use of a systematic monitoring program to verify the need for livestock adjustments proposed on the basis of one-time inventory data.

The Federal regulations that govern changes in allocation of livestock forage provide specific direction for livestock use adjustments (43 CFR 4110.3-1 and 43 CFR 4110.3-2). The regulations (43 CFR 4ll0.3-3) specify that permanent increases or suspensions of preference "shall be implemented over a five year period unless, after consultation with affected interests, an agreement is reached to implement the adjustment in less than five years.

If data acceptable to the BLM Area Manager are available, an initial reduction shall be taken on the effective date of the decision. The balance of the reductions would be taken in the third and fifth years following the effective date of the decision. If data are not available to support the initial reduction, a decision will be issued identifying the data needed and procedures to be used for arriving at the adjustments. Adjustments based on the additional data shall be implemented by agreement or decision that will initiate the 5-year implementation period.

**Range Improvements.** Typical range improvements and the general procedures to be followed in implementing them are described in Appendix Nine-F in the Draft RMP. The extent, location, and timing of such actions will be based on the allotment-specific management objectives adopted through the AMP process, interdisciplinary development and review of proposed actions, contributions from operators and others, and BLM funding capability.

All allotments in which range improvement funds are to be spent will be subjected to an economic analysis, which will be used to develop a final priority ranking of allotments to commit the range improvement funds that are needed to implement activity plans.

**Grazing Systems.** Types of systems to be implemented will be developed in cooperation with the livestock operator and based on considering the following factors: allotment-specific management actions (see Appendix Nine-D and Nine-I-1 in the Draft RMP); resource characteristics, including vegetation potential and water availability; general management actions; operators needs; and implementation costs. Typical grazing systems available for consideration are described in Appendix Nine-C in the Draft RMP.

**Unallotted Tracts.** Unallotted tracts generally will remain available for future livestock grazing, as provided for in the BLM grazing regulations (43 CFR 4110 and 43 CFR 4130). However, certain tracts not currently authorized for grazing use will remain unallotted.

## Critical Grazing Period

Spring use by domestic livestock in select "I" category allotments will not be permitted on native ranges during the critical period of early growth unless a grazing system is implemented that provides critical period rest once every three years, or a spring use pasture is developed to absorb grazing use in meeting the rest requirements. Grazing use during any portion of the critical period will be limited to no more than 30 percent of the active preference and no more than 50 percent utilization of key forage species' current season growth. See Table 1 for specific periods by allotment.

## Rationale

Current policy directs the BLM to focus available funding and manpower on those areas where problems and conflicts exist. The inventory conducted in preparation for this RMP was designed to assess the current condition and identify problem areas. From the information available, each allotment was placed in one of three categories: "I" Improve, "M" Maintain, or "C" Custodial. Attention will be focused on the "I" allotments with second priority on those "M" allotments where less critical problems exist and finally the "C" allotments when conflicts arise.

This action which is the same as the Proposed Plan described in the Final RMP/EIS for the range program, was selected to achieve the resource area's range management goals in a reasonable period of time with acceptable environ- mental impacts.

## Implementation Priorities

1. Continue the routine range management program in the resource areas (issuance of permits and bills, transfers, day to day business, etc).

2. Achieve the grazing management resource objectives as stated previously under Resource Objectives and Recommendations in this document. This is dependent upon receiving sufficient funding to complete range improvements and adequate staffing to implement grazing systems, supervise grazing use and monitoring resource changes.

3. First priority for rangeland improvements will be given to "I" category allotments with "M" and "C" category allotments being of a lower priority. Implementation priority is subject to change based upon changes in resource conditions, project redesign, or private contributions by individual operators.

6

BLM_0005133

**Table 1. Summary of Allotments**

| Allot. no. | Allotment name | Mgmt. status | Total public acres | Critical period |
|---|---|---|---|---|
| The following allotments suitable for Cattle, Horses, or Sheep. | | | | |
| 7000 | Upper Disappointment | M | 1,996 | |
| 7001 | Mailbox Park | I | 6,611 | 4/15 - 5/15 |
| 7002 | Gypsum Gap | I | 2,895 | 4/15 - 5/15 |
| 7003 | Lee Lands | C | 2,062 | |
| 7004 | Dolores Canyon | M | 2,891 | |
| 7005 | Salt Arroyo | I | 10,956 | 4/15 - 5/15 |
| 7006 | Gyp Ridge | I | 3,155 | 4/15 - 5/15 |
| 7007 | Uncompahgre Bench | M | 13,702 | |
| 7008 | Twenty-five Mesa | I | 5,373 | 4/15 - 5/15 |
| 7009 | East Summit Mesa | C | 119 | |
| 7010 | Wickson Draw | I | 4,441 | 4/15 - 5/15 |
| 7011 | Ayers Individual | M | 4,593 | |
| 7012 | Lion Canyon | C | 313 | |
| 7013 | San Miguel River | C | 937 | |
| 7014 | Mesa Creek | I | 60,257 | 4/15 - 5/15 |
| 7015 | Bush Canyon | M | 4,997 | |
| 7016 | Dry Creek Basin | I | 38,486 | 4/15 - 5/15 |
| 7017 | McKenna Peak | M | 1,025 | |
| 7018 | Maverick Draw | I | 1,993 | 4/15 - 5/15 |
| 7019 | Summit Point | C | 1,691 | |
| 7020 | Roc Creek | C | 1,268 | |
| 7021 | Rawlings Individual | C | 353 | |
| 7022 | Burn Canyon | I | 1,788 | 4/15 - 5/15 |
| 7023 | Sharp Canyon | I | 162 | |
| 7024 | Lillylands-West | M | 2,387 | |
| 7025 | Island Mesa | I | 25,180 | 5/1 - 5/30 |
| 7026 | La Sal Creek | C | 179 | |
| 7027 | Coke Ovens | I | 7,660 | 4/15 - 5/15 |
| 7028 | Warden Draw | I | 4,225 | 5/1 - 5/30 |
| 7029 | Lone Mesa | M | 1,421 | |
| 7031 | Tabeguache Creek | I | 17,912 | 4/15 - 5/15 |
| 7032 | Sawtooth | I | 23,236 | 4/15 - 5/15 |
| 7033 | Buckeye | M | 835 | |
| 7034 | Slick Rock | I | 26,831 | 4/15 - 5/15 |
| 7035 | Naturita Ridge | I | 10,555 | 4/15 - 5/15 |
| 7036 | Disappointment | I | 61,515 | 4/15 - 5/15 |
| 7037 | Davis Mesa | I | 2,956 | 4/15 - 5/15 |
| 7038 | Spud Patch | M | 9,150 | |
| 7039 | Ute Ranch | I | 33,275 | 4/15 - 5/15 |
| 7040 | Pinion | C | 541 | |
| 7041 | Young-DOW | I | 12,237 | |
| 7042 | Dobie Canyon Individual | I | 2,647 | 4/15 - 5/15 |
| 7043 | South Mountain | C | 881 | |
| 7044 | Lion Creek Basin | M | 5,247 | |
| 7045 | Horse Park | I | 6,647 | 4/15 - 5/15 |
| 7046 | Indian Valley | I | 18,346 | 4/15 - 5/15 |
| 7047 | Home Bench | C | 1,496 | |
| 7048 | Wray Mesa | I | 48,797 | 4/15 - 5/15 |
| 7049 | Desert Claim | C | 1,680 | |
| 7050 | Plateau | C | 353 | |

7

BLM_0005134

Table 1. Summary of Allotments (cont.)

| Allot. no. | Allotment name | Mgmt. status | Total public acres | Critical period |
|---|---|---|---|---|
| 7051 | Belmear Mountain | C | 411 | |
| 7052 | Ryman Creek | C | 621 | |
| 7053 | Bull Canyon | I | 34,165 | 4/15 - 5/15 |
| 7054 | Taylor | C | 3,740 | |
| 7055 | Nelson | I | 3,229 | 5/1 - 5/30 |
| 7056 | Spring Creek | I | 16,630 | 4/15 - 5/15 |
| 7057 | RCA | I | 17,255 | 4/15 - 5/15 |
| 7058 | Warden Draw | C | 260 | |
| 7059 | Beards Corner | C | 880 | |
| 7060 | Beaver Canyon | C | 840 | |
| 7075 | Lavender Exchange of Use | C | 1,169 | |
| 7076 | Houser | M | 3,163 | |
| 7077 | First Park | C | 148 | |
| 7078 | Feedlot | C | 510 | |
| 7079 | River | C | 1,300 | |
| 7080 | Rowher Canyon | C | 680 | |
| 7081 | Swain Bench | I | 5,422 | 4/15 - 5/15 |
| 7085 | Pocket Individual | C | 1,375 | |
| 7086 | Horse Bench | C | 610 | |
| 7087 | Colombo | C | 215 | |
| 7088 | Sundown | C | 1,743 | |
| 7100 | Carpenter Ridge Common | M | 7,135 | |
| 7101 | East Paradox Common | I | 16,255 | 3/1 - 4/15 |
| 7102 | Sunrise Gulch Common | C | 1,597 | |
| 7103 | Third Park Common | M | 4,270 | |
| 7104 | Spencer Lake | C | 920 | |
| 7105 | Second Park | C | 750 | |
| 7106 | Tuttle Draw | C | 1,231 | |
| 7107 | Coal Canyon | M | 5,391 | |
| 7200 | River | C | 2,225 | |
| 7201 | Lillylands | I | 7,136 | 4/15 - 5/15 |
| 7202 | Upper Maverick Draw | C | 488 | |
| 7203 | Naturita Canyon | C | 630 | |
| 7204 | Beaver Rim | C | 67 | |
| 7205 | Leopard Creek | C | 391 | |
| 7206 | McKee Draw | I | 1,562 | 4/15 - 5/15 |
| 7207 | Big Bear Creek | C | 542 | |
| 7208 | Upper Mail Box | M | 1,429 | |
| 7209 | Hamilton Mesa | C | 410 | |
| 7210 | Little Maverick Draw | M | 1,078 | |
| 7211 | Beaver Canyon | C | 314 | |
| 7212 | Unallotted | C | 120 | |
| 7213 | Unallotted | C | 500 | |
| 7214 | Rincone | C | 2,280 | |
| 7215 | Cone | M | 3,243 | |
| 7216 | San Miguel Rim | M | 679 | |
| 7217 | Sawpit Individual | C | 1,194 | |
| 7218 | Norwood Hill | C | 144 | |
| 7219 | Bolinger Ditch | C | 349 | |

BLM_0005135

Table 1. Summary of Allotments (cont.)

| Allot. no. | Allotment name | Mgmt. status | Total public acres | Critical period |
|---|---|---|---|---|
| 7220 | Williams Ditch | C | 57 | |
| 7221 | Duroy | C | 3,244 | |
| 7222 | Coventry | I | 841 | 4/15 - 5/15 |
| 7223 | Little Baldy | M | 1,900 | |
| 7224 | High Mesa | M | 992 | |
| 7225 | Oak Hill | C | 42 | |
| 7226 | Summer Camp Creek | C | 120 | |
| 7227 | Redvale | C | 402 | |
| 7251 | Sawdust Gulch | C | 280 | |
| 7252 | Buck Canyon | C | 10 | |
| 7253 | Alder Creek | C | 120 | |
| 7300 | Dry Park | I | 4,112 | 4/15 - 5/15 |
| 7301 | Horsefly Common | M | 449 | |
| 7302 | Uncompahgre Common | M | 387 | |
| 7303 | Barkelew Draw Common | I | 5,971 | 4/15 - 5/15 |
| 7305 | Beaver Mesa | M | 1,143 | |
| 7306 | Unallotted | C | 560 | |
| 8000 | Unallotted | C | 80 | |
| 8002 | Squaw Canyon | I | 4,765 | 4/15 - 5/15 |
| 8003 | Big Canyon | I | 1,916 | 4/15 - 5/15 |
| 8004 | Dolores River | I | 18,334 | 4/15 - 5/15 |
| 8005 | Sheep Point AMP | M | 4,541 | |
| 8006 | Todd Individual | C | 488 | |
| 8007 | Cross Canyon | I | 29,528 | 4/15 - 5/15 |
| 8008 | Unallotted | M | 788 | |
| 8009 | Hovenweep Canyon | I | 6,122 | 4/15 - 5/15 |
| 8011 | Lower McElmo | I | 8,662 | 4/15 - 5/15 |
| 8012 | Cahone Mesa AMP | M | 22,925 | |
| 8013 | Individual | I | 22,699 | 4/15 - 5/15 |
| 8014 | Alkali | M | 794 | |
| 8016 | McCabe | C | 40 | |
| 8017 | Weber Canyon | C | 40 | |
| 8018 | Yellowjacket | I | 5,727 | 4/15 - 5/15 |
| 8019 | Cannonball | I | 2,829 | 4/15 - 5/15 |
| 8020 | Burro Point AMP | I | 9,519 | 4/15 - 5/15 |
| 8021 | Rock Creek | M | 2,443 | |
| 8022 | Sand Canyon | C | 377 | |
| 8023 | Sand Canyon | C | 2,264 | |
| 8024 | Trail Canyon | M | 5,173 | |
| 8025 | Aztec Canyon | M | 1,830 | |
| 8026 | Mathias | C | 218 | |
| 8027 | Gawith | C | 1,017 | |
| 8028 | Mud Creek | C | 1,979 | |
| 8029 | Hurst | C | 370 | |
| 8030 | Bement | C | 480 | |
| 8031 | Noland | C | 260 | |
| 8032 | N. Menefee Mountain | C | 505 | |
| 8033 | Veach | I | 6,135 | 4/15 - 5/15 |
| 8034 | Willow Creek | C | 880 | |

BLM_0005136

Table 1. Summary of Allotments (cont.)

| Allot. no. | Allotment name | Mgmt. status | Total public acres | Critical period |
|---|---|---|---|---|
| 8035 | Hamilton Mesa | I | 7,577 | 4/15 - 5/15 |
| 8036 | Schuster | C | 294 | |
| 8037 | Ute Mountain | C | 334 | |
| 8038 | Monument | C | 620 | |
| 8039 | Lower Aztec Canyon | M | 500 | |
| 8040 | Unallotted | M | 972 | |
| 8041 | Burro Individual | M | 327 | |
| 8042 | Mancos River | M | 899 | |
| 8043 | West Weber Mountain | C | 3,227 | |
| 8044 | Unallotted | C | 708 | |
| 8045 | Doerfer | C | 975 | |
| 8046 | East Canyon | C | 2,350 | |
| 8047 | Flint Rock Point | C | 340 | |
| 8048 | Redd Lease | M | 3,294 | |
| 8049 | Ayers | C | 200 | |
| 8050 | Unallotted | C | 100 | |
| 8052 | Individual | M | 2,567 | |
| 8053 | Mesa Verde | M | 5,585 | |
| 8055 | Goodman Gulch | C | 319 | |
| 8056 | Individual | C | 40 | |
| 8057 | Yellowjacket Canyon | I | 2,563 | 4/15 - 5/15 |
| 8058 | Plateau Creek | C | 890 | |
| 8059 | Davis | C | 40 | |
| 8061 | Robb Individual | C | 30 | |
| 8063 | Sandrock | M | 6,276 | |
| 8064 | Upper Trail Canyon | C | 160 | |
| 8065 | Papoose Canyon | M | 1,085 | |
| 8066 | Flodine Park | I | 4,723 | 4/15 - 5/15 |
| 8067 | Unallotted | C | 487 | |
| 8068 | Snyder | M | 1,199 | |
| 8070 | Dove Creek AMP | M | 3,520 | |
| 8400 | Canby | C | 86 | |
| 8401 | Mahan | M | 639 | |
| 8402 | Unallotted | C | 440 | |
| 8403 | Boggs | M | 2,187 | |
| 8404 | Greer | C | 579 | |
| 8405 | Montoya | C | 227 | |
| 8406 | Scott Individual | C | 40 | |
| 8407 | Huntington | C | 714 | |
| 8408 | Patcheck | C | 343 | |
| 8409 | Lightner | M | 633 | |
| 8411 | Jenkins | C | 80 | |
| 8412 | Palmer | C | 745 | |
| 8413 | Cherry Creek | M | 618 | |
| 8414 | Unallotted | C | 360 | |
| 8415 | Elderado | C | 270 | |
| 8416 | Florida River | C | 857 | |
| 8417 | Unallotted | C | 170 | |
| 8418 | Unallotted | C | 250 | |
| 8419 | Unallotted | C | 210 | |

BLM_0005137

Table 1. Summary of Allotments (cont.)

| Allot. no. | Allotment name | Mgmt. status | Total public acres | Critical period |
|---|---|---|---|---|
| 8420 | Unallotted | C | 92 | |
| 8427 | Unallotted | C | 414 | |
| 8428 | Unallotted | C | 280 | |
| 8429 | Wallace Gulch | M | 1,847 | |
| 8430 | Former Keyes | C | 160 | |
| 8431 | Unallotted | C | 400 | |
| 8432 | Mankins | C | 200 | |
| 8435 | Unallotted | C | 566 | |
| 8437 | Unallotted | C | 26 | |
| 8438 | Dutton Park | C | 40 | |
| 8439 | Unallotted | C | 240 | |
| 8440 | Unallotted | C | 160 | |
| 8443 | Individual | C | 160 | |
| 8444 | Coyote Park | C | 80 | |
| 8445 | Coyote Park | C | 80 | |
| 8446 | Gomez | M | 400 | |
| 8447 | Archuleta Mesa | C | 160 | |
| 8448 | Archuleta Mesa | M | 1,309 | |
| 8449 | Manuel Cruz Estate | C | 91 | |
| 8450 | Section 15 | M | 746 | |
| 8451 | Bigbee Brothers | M | 831 | |
| 8452 | Chromo Mountain | M | 430 | |
| 8453 | Martinez | C | 46 | |
| 8454 | Bramwell | C | 215 | |
| 8455 | Individual | C | 160 | |
| 8456 | Vigil-Abeyta | M | 1,317 | |
| 8457 | Upper Vigil | M | 232 | |
| 8458 | Crowley | C | 200 | |
| 8460 | Canby | C | 40 | |
| 8461 | Section 15 | C | 133 | |
| 8462 | Section 15 | M | 931 | |
| 8463 | Vigil Mesa | M | 1,052 | |
| 8464 | Macht | C | 40 | |

The following allotments suitable for Horses or Sheep only.

| *8900 | Cement Creek | M | 4,181 | |
| *8901 | Gladstone | M | 2,325 | |
| *8902 | Eureka | M | 6,221 | |
| *8903 | Animas River | M | 3,072 | |
| *8904 | Unallotted | M | 1,377 | |
| *8906 | Molas Lake | M | 1,876 | |
| *8907 | Deer Park | M | 5,082 | |
| *8908 | American Basin | M | 2,650 | |
| *8909 | Minnie Gulch | M | 3,100 | |
| *8910 | Elk Creek | M | 949 | |
| *8911 | Maggie Gulch | M | 6,100 | |

*Silverton allotments were previously covered in the Gunnison Basin-American Flats/Silverton EIS 1982. Source: BLM Data 1984.

BLM_0005138

## WILDLIFE MANAGEMENT

The Federal Land Policy and Management Act (FLPMA) of 1976 chartered BLM with the responsibility of maintaining or enhancing the fish and wildlife habitats that occur on the public lands.

### Resource Objectives

Bureau-wide the BLM operates under a number of general wildlife habitat management objectives. Each objective is mandated and(or) supported by specific Federal regulation or legislation. The BLM wildlife habitat management program places special emphasis on, but is not limited to the protection, maintenance and enhancement of:

Crucial habitats for big game, upland game birds and waterfowl.

Crucial habitats for nongame species of special interest and concern to
state or other Federal agencies.

Wetland and riparian habitats.

Existing or potential fisheries habitat.

Habitat for state or Federally listed threatened and(or) endangered species.

These commitments to the wildlife resources may vary by the level of effort devoted to each element within the program. The level of effort undertaken annually is dependent upon national priorities and the availability of funding and manpower to effectively complete the workload.

The level and intensity of wildlife habitat management activities presented in this action have been selected based on feasibility, opportunity, need and associated impacts by other resource programs.

Fish and wildlife habitat will continue to be evaluated on a case-by-case basis as a part of project level planning. Such evaluation will consider the significance of the proposed project and the sensitivity of fish and wildlife habitat in the affected area. Stipulations will be attached as appropriate to assure that projects are compatible with management objectives established in the RMP for fish and wildlife habitat. Habitat improvement projects will be implemented where necessary to stabilize and(or) improve unsatisfactory or declining habitat condition. Such projects will be identified through habitat management plans (HMPs) or coordinated resource management activity plans.

**Seasonal Restrictions.** Seasonal restrictions will continue to be applied where they are needed to mitigate the impacts of human activities on important seasonal wildlife habitat. The major types of seasonal wildlife habitat and the time periods when restrictions may be needed are shown in Table 2.

**Threatened, Endangered, and Sensitive Species Habitat.** No activities will be permitted in threatened, endangered, or sensitive species habitat that would jeopardize their continued existence.

The Colorado Division of Wildlife (CDOW) and the U.S. Fish and Wildlife Service (USFWS) will be consulted prior to implementing projects that may affect threatened and endangered species' habitat. If such a situation is determined through the BLM biologic assessment process, then consultation with the USFWS will be initiated as per Section 7 of the Endangered Species Act of 1973, as amended.

### Table 2. Seasonal Wildlife Restrictions

| Habitat | Restricted period |
|---|---|
| Elk and mule deer winter range | 12/1 - 4/15 |
| Elk calving grounds | 5/1 - 7/15 |
| Eagles' winter concentration area | 12/1 - 4/15 |
| Sage grouse strutting grounds | 3/15 - 5/15 |
| Peregrine Falcon Habitat | 3/1 - 9/1 |

### Planned Actions

**Terrestrial Wildlife Habitat.** Sufficient forage and cover will be provided for wildlife on their seasonal habitat. Forage and cover requirements will be incorporated into AMPs and will be specific to primary wildlife use areas. Generally, range improvements will be designed to achieve both wildlife and range objectives.

A goal of this land use plan (subject to the availability of manpower and funds to complete necessary wildlife habitat improvements) will be to manage the habitat for current levels of deer and elk (20,000 and 1,600, respectively). Monitoring the vegetative resource may indicate wildlife reductions may be needed in localized areas to maintain use within the carrying capacity. The reductions may be shared with domestic livestock depending on monitoring results. Manage for 300 head of pronghorn antelope and allow for reintroducing (not to exceed a total of 300) bighorn sheep in the Dolores River Canyon. Continue present management of Perins Peak and Paradox peregrine falcon eyries. Provide protective oil and gas leasing stipulations for bald eagle roosts and winter eagle concentration areas. Reintroduce river otters in the upper Dolores River. Complete necessary improvements and HMPs necessary for implementation. The following riparian areas should be managed to improve aquatic and(or) riparian habitat; Roc, North Mesa, South Mesa, La Sal and Dry creeks; the East and West forks of Dry Creek Canyon; and Cross, Cow, Cahone, Hovenweep, and Bridge canyons.

**Aquatic and Riparian Habitat.** Objectives to protect or improve aquatic and riparian habitat will become part of AMPs and HMPs. Management actions within flood plains and wetlands will include measures to preserve, protect, and, if necessary, restore their natural functions (as required by Executive Orders 11988 and 11990). Management techniques will be used to minimize degradation of aquatic and riparian

12

habitats. Bridges and culvert installations will be designed to maintain adequate passages for fish. Wildlife reintroductions and fish stocking proposals will be evaluated and recommendations will be made to the CDOW.

Improve aquatic and riparian habitat on these areas listed in priority order: the upper San Miguel River and its tributaries (44 miles), the upper Dolores River and its tributaries (30 miles), and the lower San Miguel River and its tributaries (20 miles). Develop needed HMPs and improvements for implementation (including monitoring plans).

### Habitat Management Plans

Development of habitat management plans for key species and their related habitat will occur over the term of the plan. Completion of these plans will be dependent upon need, availability of funding, and manpower. Several key habitats in which plans might be developed include: big game winter ranges; winter raptor concentration areas; aquatic/riparian habitats; bighorn sheep habitat; pronghorn antelope habitat; and threatened and endangered (T&E) species habitat. Priority will generally be given to the development of a habitat management plan for T&E species.

### Rationale

Management of wildlife habitat will generally be maintained or enhanced throughout the planning area by the implementation of this plan. T&E species will be protected and the habitat generally enhanced through the implementation of habitat management plans. Funding and manpower appear to be the major limiting resource. At present funding levels it would require 20 years to implement the management program outlined in the RMP.

### Monitoring

All monitoring will be conducted according to BLM manuals and policies. A detailed wildlife monitoring plan has been developed for the planning area and is available in the BLM Montrose District and San Juan Resource Area offices.

### Implementation Priorities

1. Monitor, maintain or improve sensitive habitats for threatened or endangered species. Upon identification of an occupied habitat area or introduction of any T&E species into an area, a Habitat Management Plan would be initiated as funding is available.

Monitor, maintain or improve crucial winter ranges for pronghorn antelope, elk, and mule deer focusing initially on the "I" and "M" category grazing allotments.

Monitor, maintain or improve known, active fisheries habitat. This effort will focus initially on the San Miguel and Dolores rivers and their major tributaries.

Monitor, maintain or improve winter raptor concentration areas.

2. Maintain all existing wildlife habitat improvement facilities. This effort will focus on guzzlers, exclosures, and vegetation treatments.

3. Maintain or improve riparian habitat to good or excellent ecological condition, utilizing acceptable grazing systems and fencing where needed.

4. Initiate development of new wildlife habitat management plans and related enhancement projects.

### Support

Monitoring for all wildlife species will be closely coordinated with the CDOW and the USFWS. Any action having a potential effect on T&E species habitat will be brought to the attention of the USFWS, who will be consulted to render an opinion in accordance with Section 7 of the Endangered Species Act.

Development of habitat management plans for terrestrial and aquatic species will be closely coordinated with CDOW, the U.S. Forest Service, and where appropriate USFWS.

Project development will require input from all resource programs to assess impacts through the environmental process. Purchasing support, contracting, survey, design, and project inspection support will be required.

### RECREATION

### Resource Objectives

**General.** A wide range of outdoor recreation opportunities will continue to be provided for all segments of the public, commensurate with demand. Trails and other means of public access will continue to be maintained and developed where necessary to enhance recreation opportunities and allow public use. Developed recreation facilities receiving the heaviest use will receive first priority for operational and maintenance funds. Sites that cannot be maintained to acceptable health and safety standards will be closed until deficiencies are corrected.

Recreation opportunities will continue to be evaluated on a case-by-case basis as a part of project level planning. Such evaluation will consider the significance of the proposed project and the sensitivity of recreation resources in the affected area. Stipulations will be attached as appropriate to assure that activities are compatible with recreation management objectives. Development will only occur when an identified need cannot or is not being provided by the private sector.

**Travel Planning and Motorized Vehicle Use.** Travel planning, including the designation of areas open, limited, and closed to motorized vehicle access, will remain a priority for public land. Public land within areas identified as open to motorized vehicle use generally will remain available for such use subject to existing laws and regulations. Public land within areas identified as limited to motorized vehicle use generally

13

will receive priority attention. Major limited categories include: areas limited except for existing (or designated) roads (or ways) and trails, and other limitations as needed by management objectives.

Public land within areas identified as closed to motorized vehicle use will be closed yearlong to all forms of motorized vehicle use. Exceptions may be allowed in WSAs based on applying BLM's *Interim Management Policy* (BLM Revised, July 12, 1983).

### Planned Actions

Continue intensive recreation management of the Silverton Special Recreation Management Area (SRMA). Provide for a blend of settings and opportunities that tend toward the resource-dependent end of the BLM's Recreation Opportunity Spectrum (ROS) system. Allow local communities to provide for facility-dependent settings and opportunities. Provide increased semiprimitive, motorized opportunities with some primitive, semiprimitive, nonmotorized, and roaded natural settings and management objectives. Continue off-road vehicle (ORV) management in the Silverton SRMA as per existing management area framework plan (1981). Develop and implement a recreation area management plan (RAMP) for the Silverton SRMA that outlines specific needs for recreation resource, visitor, and facilities management.

Manage the Dolores River Canyon as a SRMA as per classifications determined by BLM's ROS system. Manage the Dolores River from the Bradfield Bridge to Dove Creek pump station for its semiprimitive nonmotorized recreation setting opportunities and from Dove Creek pump station to Disappointment Creek for its semiprimitive motorized setting opportunities. Also manage the river from Disappointment Creek to Gypsum Valley Bridge for its rural setting opportunities and from Gypsum Valley Bridge to Bedrock for its primitive ROS values and settings. Determine carrying capacities for the river corridor consistent with specific ROS setting classifications. Develop a RAMP for the river that outlines specific management goals, objectives, and specific recreation resource, visitor, and facilities management needs.

Manage Weber and Menefee mountains for their semiprimitive recreation values. Both areas would be closed to ORVs and managed under VRM Class II standards.

The McElmo Research Natural Area will be managed for research values but revocation of the mineral withdrawal will occur. No surface occupancy stipulations for oil and gas leasing will be continued.

Implement an off-road vehicle management program as per that described in Appendix Three.

### Rationale

Implementation of the recreation management plans for the Dolores River and Silverton SRMAs will provide for much needed management of these special resources. Available funding and personnel are currently inadequate to manage the resource and provide public facilities.

### Monitoring

The condition of the recreation lands and sites will be periodically inspected to determine levels of resource damage occurring. Visitor use will be sampled using various methods, including road and trail counters and visitor registers. Recreation area management plans will be reviewed periodically to determine if revisions are necessary due to changing conditions.

### Implementation Priorities

The Special Recreation Management Areas (Dolores and Silverton) will be the first priority for available funding and personnel. The Extensive Recreation Management Area will receive second priority for funding.

### Support

Cooperation and coordination with the U.S. Forest Service, U.S. Bureau of Reclamation, and counties will be required to implement the RAMPs. Project development will require input from all resource programs to assess impacts through the environmental process. Additionally, purchasing support, contracting, survey, design, and project inspection support will be required.

## WILDERNESS

Section 603 of the Federal Land Policy and Management Act of 1976 directs the Secretary of the Interior to review areas of 5,000 acres or more of the public lands determined to have wilderness characteristics and to report to the President his recommendations as to the suitability of each area for preservation as wilderness. The Secretary is required to report his recommendations to the President by October 21, 1991, and the President is required to report his recommendations to Congress by October 21, 1993. Congress ultimately decides whether to designate areas as wilderness.

Completion of this Record of Decision for the San Juan/San Miguel Final RMP/EIS approves the planning decisions for all resources, however, all wilderness study areas (WSAs) covered in this RMP will be addressed further in a separate legislative Final EIS and wilderness suitability report (WSR) to be transmitted to the Secretary of Interior. The Secretary signs a Record of Decision when he signs and transmits that WSR to the President.

### Resource Objectives and Planned Actions

This plan recommends 28,539 acres of Dolores River Canyon be recommended preliminarily suitable for wilderness designation. The remaining seven WSAs (Tabeguache Creek, McKenna Peak, Squaw/Papoose, Cross, and Cahone Canyons, Weber and Menefee mountains) are recommended as nonsuitable for wilderness designation. Table 3 displays the WSAs and acres for each WSA.

14

**Table 3. Wilderness Suitability Recommendations**

| Study area | Acreage recommended preliminarily suitable | Acreage recommended nonsuitable |
|---|---|---|
| Cahone Canyon (CO-030-265D) | | 9,040 |
| Cross Canyon (CO-030-265; UT-060-229) | | 12,742 |
| Dolores River Canyon (CO-030-290) | 28,539* | 913 |
| McKenna Peak (CO-030-286) | | 19,562 |
| Menefee Mountain (CO-030-251) | | 7,129 |
| Squaw/Papoose Canyon (CO-030-265A; UT-060-227) | | 11,287 |
| Tabeguache Creek (CO-030-300) | | 7,908 |
| Weber Mountain (CO-030-252) | | 6,303 |
| Total | 28,539 | 74,844 |

*This figure includes 822 acres added for manageability.

If Congress selects this proposal, multiple use management (as further defined for the appropriate emphasis areas) will become the resource management objective for the seven nonsuitable WSAs. In the Dolores River Canyon, the objective will be to manage the area to preserve the wilderness values while allowing other resource uses only where such use will not cause damage to or loss of wilderness values. Pending Congressional action, all WSAs will be managed under BLM's Interim Management Policy.

## Rationale

**Suitable—Dolores River Canyon WSA.** If wilderness status is not conferred on the Dolores River Canyon WSA by congress, prescriptions for management of the Coyote Wash portion will be reassessed through the plan amendment process and associated public participation. The Dolores River Canyon WSA is being recommended as preliminarily suitable for wilderness designation, primarily because it possesses highly outstanding characteristics for primitive and unconfined recreation, solitude, and naturalness, as well as scenic grandeur and superb wilderness characteristics. It is a nationally unique area and is worthy of preservation in its natural state. The nationally significant values associated with Dolores River Canyon WSA include:

(1) Formerly a Wild and Scenic River candidate as recommended by an interagency study report in 1976 and recommended to Congress for protection on several occasions;

(2) Outstanding primitive and unconfined recreation opportunities associated with the river, canyons, and mesas;

(3) Unique plant and animal communities found within the WSA that contain threatened and endangered species habitat; and

(4) Extremely diverse topography and geology that create outstanding scenery, vistas and excellent solitude opportunities.

This unique combination of factors, found only in the Dolores River Canyon WSA, creates the specific need and rational for BLM to recommend this area as preliminarily suitable for wilderness designation.

A total of 28,539 acres is recommended. The boundaries are those shown for the Wilderness Manageability Alternativve and Preferred Alternative in the Draft *Wilderness Technical Supplement* (April 1984). A wilderness management plan will be developed following the area's designation by Congress.

**Nonsuitable—Specific Rationale—Cross, Cahone, and Squaw/Papoose Canyon WSAs.** Cross, Cahone, and Squaw/Papoose canyon WSAs are recommended as nonsuitable for wilderness designation based on the following reasons:

(1) All three WSAs have manageability problems because of numerous pre-FLPMA oil and gas leases, encumbering an average of approximately 42 percent of the public land within these WSAs; they also contain numerous mining claims. There is a moderate to high probability that some of the pre-FLPMA leases or mining claims will be developed during the term of the plan.

(2) They do not contain nationally significant values (scenery, T&E habitat, and recreation) unique enough for wilderness designation. Although their cultural resources are unique, these cultural values, along with the other primary values identified (roadless, wildlife, etc.), will be properly managed in consonance with other resources including livestock grazing, aquatic/riparian habitat, and minerals.

15

BLM_0005142

**Nonsuitable—Specific Rationale—Weber and Menefee Mountain, McKenna Peak, and Tabeguache Creek WSAs.** Weber and Menefee mountains, McKenna Peak, and Tabeguache Creek WSAs are recommended as nonsuitable for wilderness designation based on the following reasons:

(1) The values contained in each area (i.e., scenery, wildlife habitat, etc.) are not nationally significant enough for inclusion in the National Wilderness Preservation System (NWPS). While they may be locally or, in some cases regionally important, to be suitable for recommendation, BLM feels these areas should contain a substantial amount of nationally significant values to be recommended for inclusion in the NWPS.

(2) The management proposed by BLM is the most appropriate use of the land and would protect the sensitive resources found in each area. (3) The majority of the primary values identified (roadless, visual, wildlife habitat, etc.) by the public can be managed in a nonwilderness alternative management scheme through professional application of the principles of multiple use management.

(4) Weber Mountain WSA has four pre-FLPMA oil and gas leases with known oil and gas production (a known geologic structure for oil and gas is located at its northern boundary), which raises concerns as to its future management. Developing these leases (which has a low to moderate probability to occur) would severely affect the values contained in the area.

(5) Tabeguache Creek WSA is a sensitive area ecologically and archaeologically. Protecting the wildlife and archaeological values can be accomplished by designating the canyon as an Outstanding Natural Area (ONA). Recreation use may be incompatible with this proposed management direction. Visitor use of the area may be limited only to educational and scientific purposes; a management plan will be written after the area is designated an ONA and will consider those uses. The integrity of the main canyon will also be protected by an ORV closure and no surface occupancy stipulations for oil and gas leasing.

(6) These four WSAs would not significantly expand wilderness opportunities within a day's driving time of major population centers, because there are significant designated wilderness areas in the immediate region (see Appendix Three-A of the *Draft Wilderness Technical Supplement*).

These seven areas met the basic definition of WSAs and were therefore identified as WSAs; however, they do not contain nationally significant values to the same degree, extent, or combination of those found in the Dolores River Canyon WSA, or other WSAs previously recommended in Colorado's BLM districts.

Therefore, it is BLM's recommendation that these seven WSAs do not warrant inclusion into the NWPS; they would be managed under BLM's Interim Management Policy for WSAs until the wilderness review process is completed. If recommendations presented in this Final EIS are adopted, the areas would be managed as follows.

| WSA | Recommendations |
|---|---|
| 1. Cahone Canyon | Cultural resources, livestock grazing, aquatic/riparian habitat improvements, oil and gas leasing (primarily no surface occupancy stipulations) and ORV closures. |
| 2. Cross Canyon | Same as Cahone Canyon. |
| 3. McKenna Peak | Watershed and wildlife values, livestock grazing, and ORV restrictions (existing road and trails). |
| 4. Menefee Mountain | Recreation (semiprimitive, nonmotorized), wildlife values, ORV closures, and oil and gas leasing (primarily no surface occupancy stipulations). |
| 5. Squaw/Papoose Canyon | Same as Cross and Cahone canyons. |
| 6. Tabeguache Creek | Cultural resources, aquatic/riparian values, oil and gas leasing (primarily no surface occupancy stipulations) and ORV closures. |
| 7. Weber Mountain | Same as Menefee Mountain. |

## Monitoring

Until Congress makes its decision on whether or not to designate an area as wilderness, BLM's Interim Management Policy will be followed and the WSAs will be patrolled periodically to detect and prevent unauthorized actions which could impair the suitability of such areas for preservation as wilderness. Following Congressional action, a wilderness management plan will be prepared for any area designated as wilderness and a monitoring plan will be included.

## Implementation Priorities

None

## Support

Routine checks will be conducted in conjunction with other activities. Mineral surveys by the U.S. Geological Survey and the U.S. Bureau of Mines will be required for WSAs recommended as preliminarily suitable for wilderness designation as requested by the BLM Director. Fire management support will be needed for management of natural fire in meeting the resource objective.

## MINERALS MANAGEMENT

### Energy and Minerals Program

The following principles will guide BLM in managing mineral resources on public lands (per BLM instruction Memorandum No. 84-568, dated June 28, 1984).

16

1.   Except for Congressional withdrawals, public lands shall remain open and available for mineral exploration and development unless withdrawal or other administrative action is clearly justified in the national interest.

2.   BLM actively encourages and facilitates the development by private industry of public land mineral resources so that national and local needs are satisfied and economically and environmentally sound exploration, extraction, and reclamation practices are provided.

3.   BLM will process mineral patent applications, permits, operating plans, mineral exchanges, leases, and other use authorizations for public lands in a timely and efficient manner.

4.   BLM's land use plans and multiple use management decisions will recognize that mineral exploration and development can occur concurrently or sequentially with other resource uses. BLM further recognizes that land use planning is a dynamic process and decisions will be updated as new data are evaluated.

5.   Land use plans will reflect geologic, energy, and mineral values on public lands through more effective data assessment of those values.

6.   BLM will monitor saleable and leasable mineral operations to ensure proper resource recovery and evaluation, production verification, diligence and inspection, and enforcement of the lease, sale, or permit terms. BLM will ensure receipt of fair market value for minerals commodities unless otherwise provided for by statute.

7.   BLM will maintain effective professional, technical, and managerial personnel knowledgable in mineral exploration and development.

## Resource Objectives

**Oil and Gas Leasing.**   As a general rule, public land is available for oil and gas leasing. In many areas, oil and gas leases will be issued without special lease stipulations. In highly sensitive areas, where special stipulations or information notices are not sufficient to protect important surface resource values, no surface occupancy stipulations will be implemented. Stipulations and information notices are located in Appendix Two.

**Locatable Minerals.**   All public land is open to mineral entry and development unless previously withdrawn (i.e., wilderness, administrative withdrawals, etc.). Mineral exploration and development on public land will be regulated under 43 CFR 3800 to prevent unnecessary and undue degradation of the land.

**Common Variety Mineral Materials.**   Applications for removing common variety mineral materials, including sand and gravel, will continue to be processed on a case-by-case basis. Stipulations to protect important surface values will be

attached based on interdisciplinary review of each proposal.

**Coal.**   The Federal coal leasing process is just beginning with completion of this land use plan. A site-specific activity plan for lease tracts will then be developed. This site-specific data will be used in a regional coal EIS or leasing by application that will be developed to identify impacts and mitigations.

## Coal Unsuitability Criteria and Surface Owner Consultation

BLM is required to review areas containing Federal coal to determine which lands are unsuitable for all or certain stipulated methods of coal mining. BLM procedures for assessing unsuitability are defined in the planning regulations (43 CFR 1601.6-6) and coal regulations (43 CFR 3461). The 20 criteria addressing unsuitability for the surface mining of coal were applied to the Nucla, East Cortez, and Durango Known Recoverable Coal Resource Areas (KRCRAs; see Tables 4 and 5). The Nucla KRCRA includes 2,080 acres; East Cortez KRCRA, 2,840 acres; and Durango KRCRA, 143,780 acres (82,440 acres, BLM; 61,340 acres, U.S. Forest Service). The complete assessment report is available in the San Juan Resource Area Office.

Surface owners in the planning area, located along the coal outcrop from Durango to the Lemon-Vallecito area, were consulted for their preferences for or against surface mining on their lands where the Federal government holds the mineral estate.

The responses indicating opposition to surface mining expressed varying concerns, including water quality, maintaining the natural setting, other general environmental factors, and numerous private homes and subdivisions located over the mineral resources. More than 80 percent of surface owners contacted (in the Texas Creek, Bear Creek, Wilson Gulch, and Los Pinos River areas—all east of Durango) were opposed to surface mining of Federally owned coal. Federal regulations require that, where a significant number of surface owners in an area have expressed a preference against surface mining, that area shall be considered acceptable for further consideration only for development by underground mining techniques. At the present, these areas will be considered as unsuitable for future surface mining due to surface owner preferences. The area involved is all private surface/Federal minerals and surface mineable coal; it represents less than 1.4 percent of the Durango KRCRA.

## Planned Actions

Continue oil and gas leasing subject to environmental stipulations. Lands open to development without special lease stipulations will be provided on approximately 1,196,000 acres; lands open to development with lease stipulations (no surface occupancy) on approximately 29,000 acres (see Appendix Two).

BLM_0005144

Continue cooperative management to protect surface resources on the Department of Energy (DOE) uranium lease tracts. Provide for necessary permits for sand and gravel, including possibly 400 acres of Ewing Mesa. Provide protective stipulations to protect the unique fossils in the Placerville area. Approximately 1,480 acres in the Nucla KRCRA (26.6 million tons) and 46,000 acres in the Durango KRCRA (1.5 billion tons) would be available for further consideration for coal leasing.

The East Cortez KRCRA presently will not be available for coal leasing; it will be managed under a wildlife emphasis. This area did not receive an expression of interest when a call was made in 1983. The coal present is not of sufficient quality and quantity to be more than locally significant. BLM is also focusing the possible future coal development in other areas where previous coal development has occurred. The wildlife values are significant due to adjacent private land development. The KRCRA could still be considered for leasing in the future, subject to a plan amendment being completed or its being reevaluated in a future RMP revision.

## Rationale

This action was selected because it will allow the BLM to comply with the multiple use mandates established by FLPMA and the 43 CFR 1600 regulations governing multiple use planning. Furthermore, it will allow the BLM to comply fully with the Surface Mining Coal Reclamation Act (SMCRA) and the 43 CFR 3400 regulations established to govern the Federal coal management program. This type of management will allow the oil and gas industry a reasonable opportunity to lease and explore, while protecting the various other resources present and provide a greater degree of protection for especially sensitive areas.

## Monitoring

BLM will monitor restrictions placed on any mineral (coal, oil and gas) activities within the resource area.

## Implementation Priorities

Due to the lack of knowledge where development may occur, no implementation priorities will be developed.

## Support

Cadastral survey support will be needed to locate land boundaries. Cultural reports will be required on all coal, oil and gas leases. District or State office support will be required where stipulations are to be applied.

## CULTURAL RESOURCES

### Resource Objectives

In addition to specific areas identified in the plan alternatives, cultural resources will continue to be inventoried and evaluated as part of project level planning.

Recommendations will be generated from the evaluations and will consider all impacts to the proposed projects and the important cultural resources in the affected areas. Stipulations will be attached to assure that projects are compatible with management objectives for cultural resources. Avoidance will continue to be the primary measure used.

## Planned Actions

Manage the Anasazi Heritage Center as a cultural resource focal point for BLM in southwestern Colorado as an integral part of San Juan Resource Area's Cultural Resource Program. Provide for cultural management of Lowry, Dominguez-Escalante, and Cannonball ruins; McLean Basin Towers; Squaw/Papoose, Bull, Sand, Cahone, Cross, and East Rock canyons; Painted Hand Ruin and Petroglyphs; Dolores Cave; Tabeguache Pueblo and Tabeguache Canyon; Indian Henry's Cabin; Hanging Flume, Lightning Tree Tower Group; and Hamilton, Cow, and Mockingbird mesas. Cultural Resource Management Plans (CRMPs) should be developed to outline specific management objectives for each site or area.

Provide protective oil and gas (no surface occupancy) stipulations on Sand, Cahone, Cross, Squaw/Papoose, Tabeguache, and East Rock canyons; Cannonball, Easter, Seven Towers, Lowry, and Dominguez-Escalante ruins, Lightning Tree Tower, Battle Rock, Hovenweep buffer, McLean Basin Towers and Painted Hand Petroglyphs. Withdraw from mineral entry and provide for no surface occupancy for oil and gas leasing on Painted Hand Ruin, Dolores Cave, Tabeguache Pueblo, Bull Canyon Rockshelter, and Indian Henry's Cabin.

Limit public access in Mockingbird Mesa, Bull Canyon, and Indian Henry's Cabin to foot or horse only and restrict vehicle access to authorized vehicles only. Close Cross, Cahone, and Squaw/Papoose canyons to all ORV use. Acquire easement into Sand Canyon and administrative access into Cannonball Mesa and Yellowjacket Canyon.

Manage Tabeguache Canyon as an Outstanding Natural Area. The area will be closed to ORVs and no surface occupancy stipulations will be provided in the immediate canyon.

## Rationale

Management of these nationally significant cultural resources is a major program in this planning area. Protection, interpretation, and stabilization of these resources will be undertaken as funds and personnel are available.

## Monitoring

The cultural resources will be monitored through the use of patrols during heavy public use periods and, if needed, law enforcement agents to protect the resource from vandalism. Periodic aircraft flights, ground and vehicle patrols will be used year-round to reduce or prevent pothunting. Major sites will be periodically inspected to document damage and anticipate future stabilization needs.

BLM_0005145

**Table 4. Unsuitability Criteria for Surface Coal Mining (Summary)**

| Criteria no. | Criteria name | Exception application | Unsuitable acres | | |
|---|---|---|---|---|---|
| | | | Durango KRCRA | Nucla KRCRA | East Cortez KRCRA |
| 1 | Federal Land Systems | No | | | |
| 2 | Rights-of-Way | Yes | | | |
| 3 | Buffer Zones | Yes | | | |
| 4 | Wilderness | Yes | 10,440 | | |
| 5 | Scenic Federal Lands | No | | | |
| 6 | Scientific Study Areas | No | | | |
| 7 | Cultural Resources | Yes | | | |
| 8 | Natural Areas | No | | | |
| 9 | Federally Endangered Species | Yes | | | 160 |
| 10 | State Endangered Species | Yes | | | |
| 11 | Eagle Nest Sites | Yes | | | |
| 12 | Eagle Concentration Areas | Yes | | | |
| 13 | Falcon Nest Sites | Yes | | | |
| 14 | Migratory Birds | Yes | | | |
| 15 | State Resident Fish & Wildlife | Yes | | | |
| 16 | Floodplains | No | 1,240 | 280 | |
| 17 | Municipal Watersheds | No | | | |
| 18 | National Resource Waters | No | | | |
| 19 | Alluvial Valley Floors | No | 1,240* | 280* | 560 |
| 20 | State Proposed Criteria | No | | | |
| | Surface Owner Consultation | | | 1,720 | |
| | Total unsuitable acres (with no duplication) | | 13,400 | 280 | 720 |
| | Total acres in KRCRA | | 143,780 | 2,080 | 2,840 |
| | Percent of total KRCRA | | 9 | 13 | 25 |

*Same acreage as shown in No. 16. Source: BLM Data 1983.

**Table 5. Areas Unsuitable for All Methods of Mining (Summary)**

| Criteria no. | Criteria name | Acreage | | |
|---|---|---|---|---|
| | | Durango KRCRA | Nucla KRCRA | East Cortez KRCRA |
| 4 | Wilderness | 10,440 | | |
| 16 | Floodplains | | 280 | |
| 19 | Alluvial Valley Floors | | 280* | 560 |
| | Total acreages with no duplication | 10,440 | 280 | 560 |
| | Percent of total KRCRA | 7 | 13 | 20 |

*Same acreage as shown in No. 16. Source: BLM Data 1983.

19

BLM_0005146

## Implementation Priorities

1. Continue to implement the base program for the cultural resources (i.e., field clearances, issue permits, etc.).

2. Complete monitoring of resources to limit damage to cultural resources.

3. Implement stabilization to prevent deterioration of cultural resources.

4. Complete and implement management plans for the significant sites identified in the area.

## LANDS PROGRAM

### Resource Objectives

**Land Tenure Adjustments.** Public land will be made available for land sales or exchanges or both. Disposal of the public lands may be accomplished by sale, exchange, State Indemnity Selection, or title transfer pursuant to any applicable Federal authority. Transfers to other public agencies will be considered where management efficiency would result. Adjustments involving sales or exchanges or both may be permitted.

Certain parcels (according to FLPMA) of public land will be considered for sale, exchange or title transfer when (1) the lands are determined to be not needed for a Federal project or a resource management activity; (2) retention of the lands is not in the national interest; or (3) management of the lands by BLM is not cost efficient.

The various criteria for land ownership adjustments will be considered in land reports and environmental assessments prepared for specific adjustment proposals. The criteria for adjustments is both legislatively required and resource oriented. Major factors to be evaluated include; threatened and endangered and sensitive species habitat; wetland and riparian areas; fisheries; nesting and breeding habitat for critical wildlife; key big game habitats (seasonal); developed recreation sites and recreation access; municipal watersheds; energy and potential for minerals; sites that are eligible for inclusion on the National Register of Historic Places; legal land surveys, wilderness and areas being studied for designation as wilderness; and other statutorily authorized designations.

Other factors include degree of public access; the amount of public investments in facilities or improvements and the potential for recovering those investments; difficulty or cost of administration; the degree of suitability for management by another Federal agency; significance in stabilizing local business, social and economic conditions, and lifestyles; authorized land users, including Recreation and Public Purposes (R & PP) leases, withdrawals, or other leases or permits.

Two more factors are: (1) consistency with cooperative agreements and plans of other agencies, and (2) suitability and need for change in land ownership including community expansion or economic development, such as industrial, residential, or agricultural (other than grazing) development.

**Land Laws and Policies.** The lands program in the planning area is primarily concerned with the authorization of uses on the public lands by others, including private parties, state, county, and other federal agencies. The objective is to ensure compatibility of the various multiple uses with environmental protection of natural resources.

**New Withdrawals.** Process new withdrawals on a case-by-case basis, using existing guidance to determine if formal withdrawal is needed.

**Withdrawal Review.** Reviewing other agency withdrawals that will be continued, modified, or revoked will be completed by 1991. Upon revocation or modification, part or all of the withdrawn land will revert to BLM management. Current BLM policy is to minimize the acreage of public land withdrawn from mining and mineral leasing, and, where applicable, to replace existing withdrawals with ROWs, leases, permits, or cooperative agreements.

**Utility and Transportation Corridors.** In general, public land is available for utility and transportation corridor development, however, applicants will be encouraged to locate new facilities within existing corridors to the greatest extent possible. Public land within areas identified as unsuitable will not be available for utility and transportation corridors. Deviations from existing corridors may be permitted based on considering: types of and needs for the proposed facilities; conflicts with other resource values and uses, including potential values and uses; and availability of alternative routes and(or) mitigation measures.

**Access.** BLM will make every reasonable effort to provide primary access to private landowners (via FLMPA Rights-of-Way) when such access will not cause significant, adverse impacts to other resources. County road standards will be required when the resource manager feels environmental impacts can in no other way be mitigated. However, BLM will not grant additional rights-of-way when reasonable access already exists unless there is a compelling public need.

When a number of potential landowners could benefit from road or vehicle access across the public lands, counties and private developers will be encouraged to develop public access in such areas.

### Planned Actions

Through sales, exchanges, or any other title transfer means, dispose of approximately 21,700 acres throughout the planning area, as indicated on the Plan Map; this includes small, unmanageable, isolated parcels of land with limited public value scattered throughout the area and Archuleta Mesa.

BLM_0005147

## Rationale

Adjustment in the pattern of public land and minerals ownership within the resource area will: (1) allow for more efficient and economic management; (2) facilitate acquisition of lands with higher public values and uses; and (3) facilitate implementation of other recommendations within this and other planning documents.

## Monitoring

Land tenure adjustment actions are monitored through the use of environmental assessments, which are written on every proposed action. In addition, a 60-day public comment period is required between the notification of a land disposal action and the actual disposal.

## Implementation Priorities

Public land actions will be accomplished according to the following priority:

(1) Take action (by exchange, sale or other methods) on those exchange and sale proposals currently on file that meet disposal and(or) acquisition objectives previously described.

(2) Dispose of (by exchange, sale or other methods) those lands identified as suitable for transfer.

## Support

Support, including completion of cadastral surveys, appraisal reports, mineral rights reports, and cultural resource surveys will be needed for parcels of public land identified for disposal, and those lands which the Bureau seeks to acquire.

## WILD HORSE MANAGEMENT

### Resource Objectives and Planned Action

The BLM has determined it would be reasonable to manage a wild horse herd with an average number of 50 horses on the Spring Creek Basin area and to totally remove all wild horses from the Naturita Ridge herd area. Public opinion strongly supports this decision. The Spring Creek Basin herd, to range in numbers between a low of 35 and a high of 65 animals, would be compatible with multiple use objectives for the area and would not inflict significant, adverse effects on the vegetation, soils and water resources once a herd management plan was in place. This herd would supplement public viewing opportunities of the Little Bookcliffs and Sand Wash Basin herds.

### Rationale

Managing this one herd with animal numbers controlled would be a reasonable investment of public funds, would not cause significant environmental degradation, and would provide public viewing opportunities.

## Monitoring

Monitoring will continue, both animal and resource, prior to and after a herd management plan is implemented.

### Implementation Priorities

Totally remove the Naturita herd and remove excess animals from the Spring Creek Basin area as soon as funds and personnel are available.

### Support

Support will be needed by BLM personnel to contract the removals, feed the horses after removal, and to place the horses in the Adopt-A-Horse program. In addition, support will be needed to manage the horses and implement the herd management plan.

## TIMBER MANAGEMENT

### Resource Objective

Public land within forest management areas will be available for a full range of forest management activities. Major forest activity plans generally will be required prior to initiating those activities in such areas. Pending completion of the activity plan, timber and woodland stand treatments will be evaluated by an environmental assessment and implemented on a case-by-case basis.

Forested areas within other emphasis areas will also be available for a full range of forest management activities; plans will be modified to be compatible with the management emphasis areas. Firewood harvesting will be permitted on most accessible forest land available for harvesting forest products.

### Planned Actions

Provide intensive timber management on approximately 10,960 acres. Estimated allowable harvest would be 6.5 MMBF per decade. An additional 42,130 acres would be managed to provide woodland products (firewood, posts, poles, etc.). Estimated allowable harvest would be 6.4 MMBF (12,800 cords) per decade.

### Rationale

This action will allow continued small negotiated sales and occasional advertised sales to meet the local demand for timber products. This type of timber management will allow a reasonable harvest of timber products while protecting other resource values such as watershed and wildlife habitat.

### Monitoring

Monitoring will consist of annual inspections of forested lands for possible trespass and designated protection areas for possible insect infestations or disease epidemics. Areas of intensive timber management will be monitored after harvest to ensure that areas are reforested within the five years allowed.

BLM_0005148

## Implementation Priorities

Commercial forest and protection area designations made in this plan will become effective upon its approval.

Saw timber, firewood, post and pole sales and road construction are examples of specific actions to be taken. The majority of these sales will be negotiated sales. Manuals, policy and District Office guidance on small timber sales will offer specific direction for implementing these actions. Implementation priorities are as follows:

1. Monitor designated protection areas. 2. Investigate all trespass and epidemics reported by resource area personnel and take appropriate action.

3. Attempt to accommodate requests made by the public for the sale of forest products.

4. Prepare and advertise timber sales identified in the annual work plan.

## Support

Cadastral survey and engineering support will be needed on an intermittent basis for the purpose of design and layout of timber sales and access roads. Fire protection support will be needed to protect the forest values. On occasion, acquisition of legal access to public land will be needed to open areas to commercially harvest forest lands.

## SOIL AND WATER MANAGEMENT

### Resource Objective

Soil and water resources will continue to be evaluated in activity planning or on a case-by-case basis as part of project level planning. Such an evaluation will consider the significance of the proposed projects and the sensitivity of soil and water resources in the affected areas. Stipulations will be attached as appropriate to ensure compatibility of projects to soil and water resource management. Soils will be managed to maintain productivity and to minimize erosion.

Water quality will be maintained or improved in accordance with State and Federal laws and approved standards, including consultation with State agencies on proposed projects that may significantly affect water quality. Management actions on public land within municipal watersheds will be designed to protect water quality and quantity. Management activities in aquatic and riparian areas will be designed to maintain or, where possible, improve riparian habitat condition. Roads and utility corridors will avoid aquatic and riparian areas to the extent practicable.

### Planned Actions

Provide protective management on 4,700 acres in the Boulder Gulch watershed to protect water quality for Silverton. Protect water quality in aquifers used for domestic and municipal purposes in the Dry Creek Basin and Tabeguache Creek watersheds.

Manage 65,000 acres in the following watersheds to reduce erosion and sediment yield: Disappointment, Big Gypsum, and Paradox valleys and Dry Creek Basin. Manage 46,000 acres in Disappointment Valley to reduce salt (salinity) loading into the Colorado River.

Develop watershed management plans for all accelerated erosion, salinity, riparian, and other water quality improvement areas detailing specific management goals and actions. Reclaim five pollution sources (for heavy metals) in the Upper Animas River drainage.

### Rationale

The protection of municipal watersheds, reductions in erosion and salinity levels, and improvement of water quality are all actions which compliment the BLM's laws, regulations, and policy concerning conservation of our national resources.

### Monitoring

All monitoring will be conducted according to BLM policy and manuals subject to available funding and personnel.

### Implementation Priorities

Recommendations concerning municipal watersheds will go into effect upon approval of the plan. All other actions will be completed as funds and personnel are available.

## AREA OF CRITICAL ENVIRONMENTAL CONCERN (ACEC)

### Resource Objectives and Planned Actions

The public land west of Cortez (approx. 156,000 acres) is designated as an ACEC. Private lands within the ACEC would not be affected by the proposed designation. The Anasazi Culture Multiple Use Area contains important cultural, mineral, recreation, range, backcountry values, and wildlife resources. It represents the focus of the northern Anasazi development, with more than 100 sites per square mile in many areas, representing the highest known archaeologic site density per acre of any area in the nation. The total number of sites on public lands here is estimated at nearly 20,000, many covering 10 acres or more. Large oil and gas and $CO_2$ reserves (Sand Canyon KGS) are also contained within the area. Private industry has made a multimillion dollar investment in these $CO_2$ resources, with a project life of more than 30 years. The public land within the ACEC provides forage used by livestock and wildlife. The increased mineral development presents a challenge to BLM to provide high quality habitat for livestock and wildlife dependent upon public lands. Population growth places increased pressure for recreation pursuits on public lands. These opportunities need to be provided, while emphasizing cultural and mineral values.

Management of the public lands within the ACEC will

be intensified under this proposal. Detailed activity plans will be developed, closer monitoring of the surface-disturbing activities will be undertaken, and additional manpower and money will be requested to more intensively manage this significant area.

## Rationale

Designation of the Anasazi Culture Multiple Use Area as an ACEC will focus greater attention on the significant mineral, cultural, and other multiple use values contained in the area.

## Monitoring

All monitoring will be conducted as per direction and policy for each of the various resource programs.

## Implementation Priorities

See the other multiple use programs for priorities of implementation.

23

BLM_0005150

# APPENDIX ONE

## EMPHASIS AREAS/MANAGEMENT GUIDANCE

### Introduction

The San Juan/San Miguel Resource Management Plan (RMP) defines the long-term direction for managing the public lands and minerals within the planning area. The RMP also defines the overall direction and required activities to achieve the desired resource conditions and is composed of two principle parts: (a) multiple use emphasis areas that describe the various management practices and guidelines to be used in administering the public lands and minerals, and (b) a resource management map that shows the various emphasis areas and boundaries for future management. Table 1-1 was developed in response to public issues and management concerns and how available, suitable, and capable the land and its resources are.

Implementing this land use plan is the key to translating the goals, management practices, and guidelines stated in the plan into on-the-ground results. It will be put into effect through budgeting and annual work plan processes, which supplement the land use plan by making the adjustments needed to reflect current priorities within the overall plan direction.

The RMP/EIS is a general planning document and describes goals and objectives in general terms only. Detailed activity plans and associated environmental assessments will be written prior to implementation of projects. The RMP will be used as a guide outlining major goals and objectives for activity plans. Tasks needed to implement activity plans will be placed in priority order through the annual work plan process.

### Implementation

Table 1-1 consists of direction concerning activities needed to implement the goals and objectives of the particular emphasis area. Specific limits and constraints may be defined within emphasis areas to ensure objectives are achieved.

Land use planning is not a process whereby every possible future use of the public land can be forecast and taken into account in an RMP. However, the emphasis areas can be used to determine compatibility with possible future uses of the public land and minerals. For example, as possible future uses arise, they will be compared to the management emphasis on a given area and relative compatibility will be determined; if the uses are compatible, they would be allowed.

Uses that are found to be incompatible could require any of the following actions: (1) land use plan amendments, (2) mitigation to bring the uses within the goals and objectives of the emphasis area, (3) relocation to another area where the proposed uses would be compatible with the given emphasis for that area, and (4) denial of proposal.

This land use plan will be used as direction for decisions made in the immediate future in the planning area. When necessary, revisions will be completed based upon monitoring and evaluation, new data, new or revised policy, and changes in circumstances affecting the entire or major portions of the plan. Revisions will comply with all of the requirements of these regulations for preparing and approving the original RMP.

BLM_0005151

**Table 1-1. Management Guidance for Emphasis Areas**

**Management Guidance for Area A: Emphasis on Livestock Management**

Management direction will emphasize increasing forage and livestock production on a sustained yield basis. Emphasis is upon increasing forage, red meat and animal fiber production, and improving forage composition and watershed conditions. Significant investments may be made in livestock improvements which will be multiple use oriented (i.e., wildlife, watershed, etc.). Investments for other resources will be minimal, although resource management activities compatible with livestock production will continue. Dispersed recreation opportunities will continue. Woodland products and timber will be made available. Wildlife habitat development generally will not be emphasized. Fire will be utilized to enhance forage production.

**Management Direction for Other Resource Values**

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Protect & manage important cultural resource properties. | |
| Recreation | Manage for dispersed recreation as the primary recreation activity. Permit yearlong, nonmotorized recreation activities throughout the area. Allow motorized, off-road vehicle (ORV) use. Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | |
| Wildlife | Maintain or improve wildlife habitat through interdisciplinary design of range improvement projects & diversity of native vegetation types. Allow compatible wildlife introductions or reintroductions or habitat improvements. Limit investments of wildlife program funds unless opportunity for substantial benefits to wildlife resources can be realized. Aquatic/riparian resources will receive special consideration at the activity planning stage to ensure maintenance or improvement of these resources. | All perennial streams within the planning area that have the potential of providing quality fisheries &(or) riparian habitat (approx. 400 mi have been identified) should receive special management consideration through the activity planning process & monitoring systems to maintain, improve, or enhance resource conditions associated with aquatic/riparian habitat.

Allow CDOW to introduce chukar & expand the pronghorn antelope herds. Other game species would be allowed if site-specific analysis indicates that significant conflicts with livestock will not occur. In all vegetation types, 5% to 15% of the existing vegetation should be maintained as leave |

26

BLM_0005152

Livestock Management
Area A (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
| --- | --- | --- |
| | | strips or islands interspersed throughout the project areas to maintain dispersed, ecologic communities for wildlife. |
| Livestock Management | Manage suitable vegetation types for increased, sustained live-stock production. One goal is to improve range condition & productivity on native range-land. Use improved management systems such as rest-rotation & deferred-rotation, if appro-priate. Invest in range improve-ments necessary to implement management systems. | Develop 71 AMPs (810,000 acres). |
| Forestry | Manage woodland products & timber to enhance range resources & for insect & disease control. | Provide reasonable opportunity to salvage forest products prior to & following range habitat improvement treatments. |
| | Timber species should be managed at a stocking level that main-tains moderate to high herbage production. Utilize woodland products to the maximum extent practicable through commercial sales under the principle of sustained yield. Manage aspen forest types to perpetuate aspen, using even-aged silviculture. Limit clearcuts in aspen to a maximum of 40 acres or the size of an aspen clone, whichever is smaller. | Provide legal & physical access to vegetation treatments to facilitate salvage of forest products when feasible. |
| Minerals | Allow mineral development in all areas not withdrawn from entry. Provide protective stipulations to limit impacts to livestock improve-ments or management practices. | |
| Lands | Allow for disposal of parcels of public land that do not signifi-cantly affect livestock manage-ment. Major utility corridors would be allowed with protective stipulations to prevent or limit impacts to range management. Allow | |

27

BLM_0005153

Livestock Management
Area A (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
| --- | --- | --- |
| | other land actions, when there is a clear & significant public need, when they will result in minimal adverse impacts, or when they will be beneficial to grazing management. | |
| | Acquire or exchange lands when live-stock management opportunities will be enhanced. | |
| Soils and Water | Maintain soil productivity, mini-mize man-caused soil erosion & strive to achieve adequate vegeta-tion cover for watershed protection & plant vigor. Maintain water quality & quantity for multiple resource management. Secure suf-ficient water rights to provide for livestock management needs. | |
| Fire | Provide level of protection from wildfire that will result in least total cost & will gener-ally enhance range management values. Use prescribed fire when possible to enhance forage production. | Continue & expand (where appropriate) the limited fire suppression plan to enhance vegetation conditions for livestock grazing. |
| Access | Provide administrative access to public land to enhance management of the range resource. Provide maintenance of roads in the BLM transportation plan to minimum standards for user safety. | Acquire access to the following grazing allotments: 7016, 8011, 8013, 8018, & 8019. |

BLM_0005154

## Management Guidance for Area B: Emphasis on Wildlife

Management direction will emphasize achieving and maintaining the best possible habitat conditions for fisheries and wildlife. Emphasis will be upon increasing aquatic and terrestrial wildlife numbers within habitat capability, improving stream and watershed conditions and providing a high degree of vegetation diversity. Investments for wildlife habitat improvements could be high in certain areas. Woodland products and timber will be available. Dispersed recreation opportunities will continue. Livestock management will be of an intensity that will utilize available forage and maintain forage vigor while not degrading wildlife habitat. The season-of-use may be changed or the numbers of livestock may be reduced in some areas.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Protect & manage important cultural resource properties. | |
| Recreation | Manage for dispersed recreation as the primary recreation activity. Permit yearlong, non-motorized recreation activities throughout the area, except restrict recreation use to resolve people & wildlife conflicts, favoring wildlife in such cases. Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | Continue vehicle closure on Perins Peak & Animas Mountain area.<br><br>Continue seasonal (April 1-July 15) closure to public access at Perins Peak peregrine falcon eyrie. |
| Wildlife | Intensively manage for optimal terrestrial & aquatic/riparian wildlife habitat. Maintain or improve historically occupied or potentially suitable threatened & endangered (T&E) species habitat. Maintain or improve habitat for sensitive plant & wildlife species & "migratory bird species of high Federal interest." Provide for necessary investments to enhance wildlife habitat. Cooperate with CDOW for funding of habitat improvement projects & also cooperate with CDOW on the reintroduction program. | Terrestrial<br><br>Manage big game for the following numbers of animals, subject to monitoring results & availability of funds & personnel to implement needed improvements:<br>20,000 mule deer<br>1,600 elk<br>300 antelope<br>300 bighorn sheep<br><br>Continue management of Perins Peak & Paradox peregrine falcon eyries.<br>Continue management of bald eagle nests & winter eagle concentration areas.<br><br>Animas Mountain should be managed for its wildlife values (winter range) & maintained in a primitive state.<br><br>Complete habitat improvements. Invest wildlife funds for |

29

BLM_0005155

Wildlife
Area B (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | | structural improvements & vegetation restoration projects to improve high priority riparian habitat at the following drainages: Roc, North & South Mesa, La Sal, & Dry creeks (East & West Fork, Dry Creek Canyon) & Cross, Cow, Cahone, Hovenweep, & Bridge canyons. |
| | | Continue to monitor & provide protection for endangered candidate & sensitive plant species in Paradox Valley & Spring Creek. |
| | | Aquatic/Riparian |
| | | Reestablish river otters in the Dolores River. |
| | | Improve or enhance aquatic/ riparian habitat on the following priority areas: |
| | | -Upper San Miguel River & its tributaries (44 miles)<br>-Upper Dolores River (30 miles)<br>-Lower San Miguel & its tributaries (20 miles) |
| | | Develop aquatic/riparian HMPs for these three priority areas (including intensive monitoring plans). |
| Livestock Management | Manage suitable vegetation types under low to moderate intensity for livestock production, with intent to utilize available forage & maintain forage vigor, while not degrading wildlife habitat. Constrain range treatment projects in size, layout & type with intent to enhance wildlife & livestock forage, vegetation & habitat diversity. Reduce number of livestock and change season-of-use where needed to provide sufficient forage for wildlife & to protect | Limit total utilization of forage species current year's growth. Livestock use should be limited where necessary to protect highly preferred species of plants. Maintain an overall cover/forage ratio of 40:60. Limit width of vegetation openings to approx. 150 to 200 yards in big game winter ranges. In pinyon-juniper & shrub vegetation types, retain 35% to 40% of original cover when completing vegetation . |

30

BLM_0005156

Wildlife
Area B (continued)

| Resource/<br>Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | aquatic/riparian resources, especially on big game winter & spring ranges. | |
| Forestry | Manage forest lands to enhance wildlife resource. Plan wood product sales in wildlife areas to improve big game forage & other wildlife needs. | Provide reasonable opportunity to salvage forest products prior to & following habitat improvement treatments.<br><br>Provide legal & physical access to vegetation treatments to facilitate salvage of forest products when feasible. |
| Minerals | Allow mineral development in all areas not withdrawn from entry. Provide protective stipulations to limit impacts to wildlife habitat or species. Limit &(or) provide protective stipulations for mineral development on habitat for T&E species. | Continue present leasing stipulations with changes for wildlife winter ranges & eagle concentration areas as shown in the Resource Conservation Alternative. |
| Lands | Allow for disposal of parcels of public land not determined to be significant & manageable for wildlife habitat. Major utility corridors would generally be excluded except on a case-by-case basis depending on site-specific impacts of the proposal. Acquire or exchange land when management opportunities for wildlife are enhanced. Acquire fishing easements on acreages associated with priority streams. Allow other land actions, when there is a clear & significant public need, when they will result in minimal adverse impacts, or when they are beneficial to wildlife. | Pursue exchange of public lands to enhance wildlife values in Dry Creek Basin. Primary consideration for exchange should be given to CDOW; however, other opportunities which may enhance wildlife values will not be dismissed. |
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion & strive to achieve adequate vegetation cover for watershed protection & plant vigor. Maintain or improve water quality & quantity for multiple use resource needs. Maintain minimum instream | |

31

BLM_0005157

Wildlife
Area B (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | flows for wildlife & fishery needs. | |
| Fire | Provide the level of protection from wildfire that will result in least total cost & will generally enhance wildlife management values. Use prescribed fire when possible to enhance wildlife habitat. | |
| Access | Provide administrative access to public land for managing wildlife habitat. Provide very little or no maintenance to roads. Close & reclaim any abandoned or poorly designed roads. Acquire public access where needed to allow wildlife-related recreation (including hunting & fishing in underutilized areas). | Acquire access to Chromo Mesa to enhance all management & public hunting opportunities. Acquire administrative access to Roc Creek. |

22

BLM_0005158

## Management Guidance for Area C: Emphasis on Recreation

BLM's recreation program is structured to the intensity and type of recreation management required. There are two primary types of recreation management situations that are recognized and which guide the direction of management emphasis in the RMP area. The first, special recreation management areas (SRMAs), occurs where recreation is defined and recognized as *the* principal management objective. The second situation, extensive recreation management areas (ERMAs), occurs where recreation is not the principal management objective but may be an issue or concern of some significance in multiple use management for the area, which is consistent with BLM's role in accommodating the dispersed, largely unstructured recreation that typifies the large expanses of public land in the San Juan RMP area.

The primary management goal is to ensure the continued availability of outdoor recreation opportunities which the public seek and which are *not* readily available from other public or private entities. Secondary goals include protecting resources, meeting legal requirements for visitor health and safety, and mitigating resource user conflicts involving recreation.

Recreation objectives are to provide dispersed and resource-dependent types of recreation opportunities such as cross-country skiing, hunting, hiking, boating, jeeping, and fishing and to deal with the limited number of situations which require special or more intensive types of recreation management. Decreases in nonrecreational outputs may occur. Investments will be concentrated in SRMAs and in those ERMAs where these recreation program goals apply.

Management objectives would include major investments in facilities and visitor management. Where recreation is not the principal management objective, management direction will largely emphasize the provision of access and visitor information.

## Management Direction for Other Resource Values

| Resource/Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Develop & protect suitable cultural resource properties for public enjoyment through such practices as interpretive signing, stabilization, etc. | Emphasize cultural resource values & semiprimitive recreation opportunities in Cross, Cahone, Squaw/Papoose, Dolores River, & Tabeguache Creek canyons. |
| Visual | Preserve scenic values, enhance viewing opportunities & increase variety, where appropriate. Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | Manage key travel routes in Silverton SRMA under VRM Class II guidelines. Manage upper portion of Dolores (Bradfield Bridge to Disappointment Creek-41 mi) under VRM Class II guidelines. Manage from Disappointment Creek to Gypsum Valley Bridge under VRM Class III guidelines. |
| | | Manage Weber & Menefee as VRM Class II. |
| | | Manage Tabeguache Canyon area as Outstanding Natural Area. |
| | | Public land along boundary of Mesa Verde National Park (from entrance road west) & along San Miguel River from its upper reaches to Naturita, Colorado, should be managed under VRM Class II guidelines. |

BLM_0005159

Recreation
Area C (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Recreation | Manage for a variety of recreation opportunities consistent with classifications determined in Recreational Opportunity Spectrum (ROS) inventories. Provide necessary visitor management services & facilities required to meet recreation program goals. Manage the Dolores River as an SRMA for water-based recreation opportunities. The entire Silverton portion of the planning area should also be managed as an SRMA for its wide variety of recreation values & opportunities. | Continue management of the Silverton SRMA (45,000 acres). |
| | | Develop a Recreation Management Plan for Silverton SRMA that outlines specific needs for visitor management facilities. |
| | | Continue ORV plan in Silverton as per existing MFP & USFS planning direction. ORV designations within land obtained from USFS northeast of Silverton.—Motorized use within area is limited to BLM road Nos. 4511, 4512, & 4514. Designations will be implemented with on-the-ground informational signing program that utilizes white arrow concept. Limitations are consistent with designations made in BLM's 1981 Off-Road Vehicle Designations for Gunnison Basin planning area & with recommendations originally made for area in Draft San Juan National Forest Land & Resource Management Plan (USFS 1983). |
| | | Upon completing McPhee Dam & reservoir & after realizing useable downstream recreation flows, manage 94 miles of Dolores River SRMA as per classifications determined by BLM's ROS system. Manage Dolores River from the Bradfield Bridge to Dove Creek pump station for its semiprimitive nonmotorized recreation setting opportunities; from Dove Creek pump station to Disappointment Creek for its semiprimitive motorized setting opportunities; from Disappointment Creek to Gypsum Valley Bridge for its rural settings; & from Gypsum Valley Bridge to Bedrock for its primitive values & settings. |

34

Recreation   —.
Area C (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | | Determine carrying capacities for river corridor by specific ROS setting. Develop Recreation Area Management Plan that addresses & emphasizes cooperative & concurrent recreation management efforts of USFS & Bureau of Reclamation's dam & reservoir operations. The management plan must also address recreation carrying capacity, visitor use & preferences, & permits. Close Dolores SRMA to ORV use. |
| | | Weber & Menefee mountains would be managed for their semiprimitive recreation values. Both areas would be closed to ORVs. |
| Wildlife | Manage aquatic & terrestrial wildlife habitat to provide frequent wildlife sightings, recreational hunting & fishing, diverse vegetation cover, etc. Continue to provide necessary management for T&E species. Other wildlife values will be managed as long as they do not conflict with recreation or cultural values. | Allow for introduction of bighorn sheep & river otters in Dolores River. Improve fishery values on Dolores & San Miguel (including Beaver & Fall creeks) rivers to improve their recreation values. Also improve recreation access to Beaver Creek & San Miguel River. |
| | | Manage McElmo RNA to protect for scientific research. Remove the mineral withdrawal but continue the no surface occupancy stipulations for oil & gas leasing. |
| Livestock Management | Manage livestock under reduced intensity to utilize available forage & maintain plant vigor while not degrading recreation values. Do not attempt to maintain or improve forage composition & production through range vegetation treatments with exception of prescribed fire where appropriate. Use "rustic" range improvements near developed recreation areas. | Manage livestock grazing to make it compatible with recreation use. |
| Forestry | Manage lands suitable for timber & woodland production to enhance recreational opportun- | Allow no regulated sales of wood products in the Silverton SRMA, except to control disease & |

35

Recreation
Area C (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | ities & to maintain healthy stand conditions. | insect outbreaks where necessary. Allow no sales of wood products in the Dolores River SRMA. |
| Minerals | Manage mineral development to limit conflict with management of high recreational values. When possible, schedule activities so conflicts are minimized between recreational & mineral activities. Ensure site rehabilitation activities follow operating plans & address recreation management objectives. | Provide for no surface occupancy stipulations for mineral leasing in the Dolores River SRMA (from the Bradfield Bridge to the confluence with Disappointment Creek & from Big Gypsum Valley to 1 mi above Bedrock).<br><br>Provide for no surface occupancy stipulations for oil & gas leasing in Weber & Menefee mountains. |
| Lands | Allow for disposal of parcels of public land not needed for recreation management. Major utility corridors will not be allowed. Other land actions will be allowed if they are designed to meet the established recreation management objectives, or when there is a clear & significant public need. Acquire or exchange land when opportunities for recreation management will be enhanced. | If needed, allow major corridors to cross the Dolores River between Disappointment Creek & the Big Gypsum Valley Bridge. |
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion & strive to achieve adequate vegetation cover for watershed protection & plant vigor. Maintain or improve water quality & quantity for multiple use resource needs. Secure sufficient water rights to provide for recreation management needs. | |
| Fire | Utilize fire management techniques that maintain long-term recreation quality objectives. Suppression of wildfires will generally occur but prescribed fire will be allowed if it will meet or exceed recreation | |

36

Recreation
Area C (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | objectives. | |
| Access | Provide public access to the public lands to enhance the recreation values. Provide a moderate level of maintenance on primary roads to promote user safety. Minimal levels of maintenance will be provided on secondary roads. | Assist in acquiring easements & fee title at sites as recommended in Dolores Downstream Recreation Site Plan Report. Acquire &(or) improve access to Beaver Creek for recreational pursuits. |

## Management Guidance for Area D: Emphasis On Wilderness

Management direction will allow for wilderness management in accordance with the Wilderness Act of 1964. The objective of management is to provide predominantly untrammeled, natural environments for the physical, biologic and social components of wilderness. The physical and biologic components are managed so that natural processes are unimpeded by human activities or use. Natural processes, including naturally occurring fire, soil erosion, and insect and disease cycles, proceed unrestricted by man. Emphasize high levels of solitude, few party encounters, and high opportunities for challenge, risk and self-reliance. Human travel is cross-country or by use of a trail system. Recreation use will be consistent with wilderness resource management or will be restricted and prohibited when or where needed.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Allow no development of cultural resources (other than stabiliza- tion) for recreation purposes. Allow use of cultural resource properties for religious or research purposes only when such use will not degrade wilderness values. | Protect & interpret unique & significant values in the Dolores River Canyon WSA. |
| Recreation | Allow opportunities for primi- tive & unconfined recreation activities featuring solitude; the chance to experience unmodi- fied, natural ecosystems; & to travel cross-country in an environment where success or failure is directly dependent on ability, knowledge & initiative; but in a way to prevent deterio- | Provide for primitive (non- motorized) river running acti- vities compatible with wilder- ness resource in the Dolores River Canyon WSA. Establish visual Class I low contrast design standards for Dolores River Canyon WSA. |

37

BLM_0005163

Wilderness
Area D (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | rating the wilderness resource. ORV use is not allowed. | |
| | Manage recreation use to provide users with experiences & psychological outcomes expected in wilderness/primitive setting. Control social & physical carrying capacity to provide such outcome. | |
| | Establish site-specific visual quality objectives & design guide lines for landscape development projects during activity planning. | |
| Wilderness | Manage any recommended WSAs per the Wilderness Act of 1964. | Recommend the Dolores River Canyon WSA for wilderness designation. |
| Wildlife | Permit fish & wildlife research or inventories. Allow natural distribution & population of vegetation & wildlife species indigenous to area to maintain natural balance with each other, their habitats, & man. Provide for nonimpairing wildlife improvement to improve terrestrial or aquatic/riparian habitat. | Allow nonimpairing aquatic/ riparian improvements & introduction or reintroduction of bighorn sheep & river otters into the Dolores River Canyon WSA. Provide protection for sensitive plant species & relic Great Basin grassland plant associations in the Coyote Wash area of Dolores Canyon. |
| Livestock Management | Manage for improved range condition. Do not use vegetation manipulations to improve forage production. Emphasize primitive, natural material for water developments & range structures that are approved in wilderness management plan. | |
| Forestry | Allow no harvesting of forest products. Available forest land will remain in the commercial forest lands base until the area has been designated as wilderness. | |
| Minerals | Administer all mineral activity as required by Section 4(d) of the Wilderness Act of 1964. Deny | |

38

Wilderness
Area D (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | issuance of any future mineral leases within the wilderness area. | |
| Lands | Acquire or exchange private lands & subsurface mineral estates within wilderness areas that will enhance wilderness values or manageability. Allow no utility corridors & no new facilities except those author-ized through Wilderness Act provisions. Remove any exist-ing, nonconforming structures unless they are determined to be of cultural or historic value or necessary for adminis-tering the area. | Acquire easements between Bed-rock & the northern boundary of the Dolores River Canyon WSA to improve its management. Coordinate these acquisition efforts with recommendations that are detailed in the Dolores Downstream Site Selec-tion Report, which recommends acquisition & development of a boating access site (to be con-structed as part of the Dolores Project—McPhee Dam) near Bed-rock Bridge. |
| | | Do not renew Federal Energy Regulatory Commission's (FERC) powersite classifications on the Dolores River Canyon WSA when reviewed. |
| Soils and Water | Stabilize & rehabilitate man-caused disturbances if identi-fied in a wilderness management plan. Maintain or improve water quality & quantity through non-impairing means. | |
| Fire | Perpetuate & maintain ecosystems within wilderness by natural occurrence of fire, insects, & disease. Suppression may be taken on man-caused fires, fires threatening human life & prop-erty, or fires which threaten to escape from wilderness to adja-cent areas with more restrictive fire prescriptions. | |
| Access | Allow no motorized ORV use. Trail construction for foot &(or) horseback will be addressed in a wilderness management plan. | Close ways in the Dolores River Canyon WSA. |

BLM_0005165

## Management Guidance for Area E: Emphasis on Mineral Development

Management direction will emphasize mineral development on the public lands. Mineral values indicate significant reserves of valuable minerals are present and development is either currently ongoing or will occur within the near future. Other resource uses will occur to the extent they are compatible with mineral development. Limited expenditures of public resources will be used on developing the present land resources. Livestock grazing will continue, wildlife habitat will be maintained where feasible, and cultural resources will receive the protection currently afforded by law.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Protect & manage important cultural resource properties. | |
| Recreation | Provide recreation opportunities that do not conflict with mineral development. Allow motorized ORV use. | |
| | Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | |
| Wildlife | Protect T&E species & maintain or improve their habitat. Provide for minimal investments to enhance key wildlife species. | Continue present leasing stipulations with changes to wildlife winter ranges & eagle concentration areas. |
| Livestock Management | Manage suitable vegetation types under moderate intensity for livestock production, with the intent to use available forage & maintain forage vigor. | |
| | Reduce the number and/or season-of-use for livestock where needed to minimize impacts to mineral operations & revegetation efforts or to minimize erosion from site. Limit range improvements on areas designated for mineral development to protect investments. Adjust livestock use as land is removed from production for mineral purposes. | |
| Forestry | Allow for the sale or disposal of forest products or timber that may be lost in mineral development or that is needed | |

40

Mineral Development
Area E (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | for managing the resource. Meet demand without degradation or conflict. | |
| Minerals | Allow mineral development on all areas not specifically excluded from development. Provide protective stipulations to limit impacts to other resource values. | Continue oil, gas, & $CO_2$ operations throughout planning area (183,000 acres in areas designated as KGSs). |
| | | Continue cooperative management to protect surface resources on 19,800 acres of DOE lease tracts. |
| | | Continue approved operations of 4,500 acres of hard rock mining under 43 CFR 3809 regulations. |
| | | Continue sodium lease (120 acres). |
| | | Continue sand & gravel operations (880 acres). In addition, 400 acres on Ewing Mesa would be available for development for sand & gravel. |
| | | Provide protective management of the unique fossils in the Placerville area through the use of stipulations on a case-by-case basis in environmental documents. |
| | | Allow coal leasing on 1,480 acres in the Nucla KRCRA & 46,000 acres in the Durango KRCRA.* |
| Lands | Allow for disposal of parcels of public land not needed for mineral development. Major utility corridors will be | |

* The priority of these areas was determined based on 1983 coal data & indications of interest by industry. The remaining coal lands determined to be suitable or identified as priorities for future leasing will be managed for other multiple use considerations. These lands would be made available for future leasing only when the coal priority areas had been depleted or a significant demand was expressed that could not be met by the existing coal priority area.

41

BLM_0005167

Mineral Development
Area E (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | allowed as long as they don't conflict with mineral development. Allow other land actions as long as they don't limit mineral development, or when there is a clear & significant public need. Acquire or exchange land & subsurface mineral estate when mineral development will be enhanced. | |
| Soils and Water | Maintain soil productivity & minimize soil erosion through rehabilitation efforts when mineral activities cease. Maintain water quality & quantity when possible for resource needs. | |
| Fire | Provide a level of protection from wildfire resulting in the least total cost & protection of mineral developments on the public lands. | |
| Access | Provide or maintain public access minimizing impacts to mineral development. Work with mineral developers to assure roads are maintained for public safety. | |

BLM_0005168

### Management Guidance for Area F: Emphasis on Cultural Resources

Management direction will emphasize the preservation, management, and use of the cultural resource properties found within the area. Emphasis will be on protecting the soil, vegetation, and wildlife resources to enhance the natural environment of the area and hence the cultural resource setting. Mineral resources will be developed while constrained by existing laws, policy and regulations pertaining to cultural resources. Other resource and land management activities will be constrained to avoid conflict with preservation, development, and protection objectives.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Manage cultural resources for protection, preservation, investigation, & public use (i.e., development & inter-pretation), where appropriate. | Manage the Anasazi Heritage Center as focal point for the cultural program for public lands.<br><br>Emphasize management & develop cultural management plans on the following cultural sites/areas:<br>Bull Canyon<br>Cahone Canyon<br>Cannonball Ruin<br>Cow Mesa<br>Cross Canyon<br>Dolores Cave<br>Dominguez-Escalante Ruins<br>East Rock Canyon<br>Hamilton Mesa<br>Hanging Flume<br>Indian Henry's Cabin<br>Lightning Tree Tower Group<br>Lowry Ruin<br>McLean Basin Towers<br>Mockingbird Mesa<br>Painted Hand Petroglyphs<br>Painted Hand Ruin<br>Sand Canyon<br>Squaw/Papoose Canyon<br>Tabeguache Canyon<br>Tabeguache Pueblo |
| Recreation | Make areas available for day use activities, where feas-ible. Construct public con-venience developments such as restrooms, observation areas, or interpretative trails. Provide input into develop-ment & operation of Anasazi Heritage Center. Develop public or visitor management plans for areas.<br><br>Establish site-specific visual | Manage Cross, Cahone, Squaw/Papoose & Tabeguache Creek canyons under VRM Class II standards, close to ORVs, & provide for semiprimitive non-motorized recreation opportuni-ties in the above areas.<br><br>Manage the Tabeguache Canyon cultural emphasis area as an Outstanding Natural Area.<br><br>Develop recreation activity |

43

BLM_0005169

Cultural
Area F (continued)

| Resource/<br>Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | quality objectives & design guidelines for interpretation & visitor management during activity planning. | management plans for Lowry & Dominguez-Escalante cultural sites. |
| Wildlife | Protect & maintain wildlife habitat. Where feasible, complete wildlife habitat improvements to enhance wildlife viewing in association with cultural values. Continue to manage T&E species habitat to protect the species. | |
| Livestock Management | When necessary, reduce or control livestock grazing to protect cultural resources. | |
| Forestry | Allow removal of forest products only when compatible with cultural, wildlife, or recreation values or when done to improve safety. | |
| Minerals | Pursue withdrawal from mineral entry on any important cultural properties. In the event withdrawal is not made (& on areas not withdrawn), supervise the activities of claimants, lessees, & permittees to ensure minimum impacts on cultural values. Use no surface occupancy stipulations to protect important cultural values. | Continue present protection & no surface occupancy stipulations for oil & gas on Sand & East Rock canyons; Cannonball, Lowry, Lightning Tree Tower, Hovenweep buffer, Battle Rock, Easter Ruin, Seven Towers Ruin, Dominguez-Escalante Ruins, McLean Basin Towers; & Painted Hand Petroglyphs.<br><br>Withdraw from mineral entry & provide for no surface occupancy stipulations for oil & gas leasing on Painted Hand Ruin, Bull Canyon Rockshelter, Dolores Cave, Tabeguache Pueblo, & Indian Henry's Cabin. |

44

BLM_0005170

Cultural
Area F (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | | Provide for no surface occupancy stipulations for oil & gas leasing on Cahone, Cross, Squaw/ Papoose, & Tabeguache canyons to protect cultural values. |
| Lands | Allow no disposal of public land where significant cultural values are involved. Major utility corridors (powerlines of 115 kV & above & pipelines 6″ in diameter & above) would generally not be allowed. Allow other land actions to occur when they would result in minimal adverse impact, when they will be beneficial to cultural resource management, or when there is a clear & significant public need. Acquire or exchange land when cultural management will be enchanced. | |
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion & stabilize & rehabilitate areas with severe man-caused soil erosion. Maintain water quality & quantity. Apply for water rights & protect riparian zones on springs associated with cultural sites. | |
| Fire | Provide level of protection on all fires that will protect the cultural resource values. | |
| Access | Provide administrative access to public land to enhance the management of the cultural resource. Provide public access to some of the cultural areas where public use will be managed. Provide maintenance of roads to a level of minimum standards for user safety. Close roads when necessary to limit access to protect cultural values. | Limit public access to Mockingbird Mesa, Bull Canyon Rockshelter, Sand & East Rock canyons, & Indian Henry's Cabin to foot or horse only & limit vehicle access to authorized vehicles only. Acquire easement into Sand Canyon area. Acquire administrative access into Cannonball Mesa & Yellowjacket Canyon |

BLM_0005171

**Management Guidance for Area G:**
**Emphasis on General Natural Resource Management**

Management direction for these areas will consist of general multiple use as prescribed in the Federal Land Policy and Management Act (FLPMA) of 1976. The resource values contained in these areas are not significant to the degree that a dominant use exists. Management guidance will consist of existing laws, policy, and manuals concerning each resource program.

**Management Direction for Other Resource Values**

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Manage cultural resource proper-ties in accordance with applic-able laws, regulations & public interest. | |
| | Provide for dispersed types of recreation opportunities. Utilize sign, maps, etc., to help manage the dispersed use. Allow ORV use. | |
| | Establish site-specific visual quality objectives & design guide-lines for landscape development projects during activity planning. | |
| Wildlife | Protect T&E species & maintain or improve their habitat. Manage all other habitat to provide satisfactory conditions. | |
| Livestock Management | Manage vegetation so it maintains itself satisfactorily with a gen-erally upward trend. | |
| Forestry | Provide a sustained yield of forest products consistent with land capability, suitability, protection needs, & other resource values. | |
| Minerals | Provide for mineral development in all areas not withdrawn from mineral entry. Provide protec-tive stipulations to limit impacts to other resource values. | |
| Lands | Allow for disposal of parcels of public land not needed for re-source management. Acquire or exchange land when resource man-agement opportunities will be enhanced. Major utility corri-dors would be allowed with pro-tective stipulations to prevent or limit adverse impacts to | |

46

BLM_0005172

General Management
Area G (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | other resource values. Allow other land actions to occur with appropriate stipulations, or when there is a clear & significant public need. | |
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion & strive to achieve adequate vegetation cover for watershed protection & plant vigor. Maintain water quality & quantity for resource needs. Secure sufficient water rights to provide for resource management. | |
| Fire | Provide a level of protection from wildfire that will result in the least total cost & will generally enhance resource conditions of the vegetation. Use prescribed fire when possible to enhance resource conditions. | |
| Access | Provide administrative & public access, where possible. Maintain roads to a level of minimum standards for public safety. | |

47

BLM_0005173

### Management Guidance for Area H: Emphasis on Public Land Disposal

Management of these areas will be for the disposal of the public lands; these areas will be subject to additional screening and clearances before any tracts identified for disposal in this plan may be transferred from BLM control. These activities include mineral assessment, cultural resource clearances, environmental analysis, appraisal and similar site-specific actions. Little or no public funds will be spent on these tracts for resource management; funds would only be spent to correct public health and safety problems or to correct severe resource deterioration we cannot allow to continue.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Provide cultural resource inventories & clearances so disposal of the tracts can occur. Pending disposal, manage the cultural resources under present laws & regulations. | |
| Recreation | Provide for very limited dispersed recreation activity. Allow motorized ORV use. | Consider disposal of the Indian Springs site to CDOW as part of their Mike Young property management. Also consider CDOW cooperatively managing those heavily used hunter camp sites along the road between Miramonte Reservoir & Indian Springs (near Hamilton Mesa). |
| | Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | |
| Wildlife | Provide for T&E species inventories & clearance prior to disposal. | |
| Livestock Management | Allow limited management of the rangeland to occur. Spend no public funds on rangeland improvements. Complete procedural notifications to grazing permittees. | |
| Forestry | Allow timber to be harvested & forest products to be used. | |
| Minerals | Continue to manage the mineral program for development. Retain all mineral rights unless an exception can be documented for transferring the mineral rights. | Transfer all mineral rights with the surface unless: (1) mineral values can be documented to justify retaining the mineral rights, or (2) transferring the mineral rights is prevented by law or regulation. |
| Lands | Provide for disposal of the public lands. Major utility corridors would be allowed. Allow other land actions to proceed, especially when there is a clear & significant public need. | Allow approx. 21,700 acres for land disposal (through sales, exchanges, or any other title transfer means). |

48

Disposal
Area H (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion & maintain a minimum amount of vegetation cover for watershed protection. | |
| | Maintain present water quality & quantity. Do not acquire water rights for resource needs unless an exception can be documented. Land disposals must be in conformance with Executive Order (E.O.) 11988 - Floodplain Management. | |
| Fire | Provide for a limited level of fire management. Suppress wildfires which may be threatening adjacent private, state or Federal property. | |
| Access | Acquire no access to these tracts unless an exception can be documented. Provide very little or no maintenance of roads. Reserve access rights across parcels when needed for public or resource management. | |

**Management Guidance for Area I: Emphasis on Wild Horses**

    Management direction will emphasize managing the wild horse herd at an average of 50 animals on public land by providing necessary forage and water. Some investments would probably occur to enhance the habitat for the horses and also to reduce conflicts with other uses in the area. A wild horse management plan will be developed. Reducing livestock and possibly wildlife may need to occur to maintain forage production and vigor. Dispersed recreation, including wild horse viewing, will continue. Woodland products will be made available on a limited basis. Fire will be used to enhance forage production.

**Management Direction for Other Resource Values**

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Protect important cultural resource properties. | |
| Recreation | Manage for dispersed recreation as the primary recreation ac- | |

49

BLM_0005175

Wild Horses
Area I (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | tivity. Encourage nonmotorized recreation activities such as wild horse viewing, hiking, etc. | |
| | Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | |
| Wildlife | Protect T&E species & maintain or improve their habitat. Provide minimal investments to enhance key wildlife species. | |
| Livestock Management | Manage livestock to reduce or eliminate conflicts with wild horses. Maintain forage in fair condition with an upward trend. All livestock waters should be provided year round. Reduce numbers and/or season-of-use to eliminate forage competition. Assure that all range projects are compatible with wild horse use. Restrict licensing of domestic horses in wild horse areas. | |
| Wild Horses | Develop a site-specific management plan for the wild horses. Develop necessary improvements (fences, waters, vegetation treatments, etc.) for the long-term management of the herd. Maintain forage in a fair condition with an upward trend. | Manage for approximately 50 wild horses in the Spring Creek area. Remove all wild horses from the Naturita Ridge area. |
| Forestry | Manage the forest lands to enhance the vegetation condition for the wild horses & for insect & disease control. | |
| Minerals | Allow mineral development in all areas not withdrawn from mineral entry. Provide protective stipulations to limit impacts to wild horses. | |
| Lands | Allow for disposal of parcels of public land not needed for wild | |

50

BLM_0005176

Wild Horses
Area I (continued)

| Resource/<br>Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | horse management. Major utility corridors would be allowed with protective stipulations to prevent or limit impacts to the wild horses. Allow other land actions, including acquisition or exchange, when they will result in minimal adverse impacts, when they will be beneficial to wild horse management, or when there is a clear & significant public need. | |
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion & strive to achieve vegetation cover for watershed protection & plant vigor.<br><br>Maintain water quality & quantity for resource needs. Secure water rights to provide for management needs. | |
| Fire | Provide a level of protection from wildfire that will result in the least total cost & that will generally enhance wild horse management. Use prescribed fire when possible to enhance vegetation production. | |
| Access | Provide administrative & public access to public land to enhance wild horse viewing & management. Provide maintenance of roads to a level of minimum standards for user safety. Limit ORV use to existing roads & trails where Emphasis Area I overlaps with Emphasis Area K. | |

BLM_0005177

### Management Guidance for Area J:
### Emphasis on Forestry and Wood Products

This guidance is designed to increase the production and utilization of wood fiber, firewood, post and poles. Emphasis is on improved wood production and utilization resulting in extensive modification of tree and other vegetation cover. Investments may be made for forest management activities. Investments (in other emphasis areas) that are commensurate with level wood fiber production will be made. Opportunities will generally be moderate for wildlife management and for dispersed recreation. Livestock grazing will occur; however, disruptions may occur due to timber management actions or objectives.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Protect important cultural resource properties. | |
| Recreation | Manage for dispersed recreation as the primary recreation activity. Allow motorized ORV use. | |
| | Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | |
| Wildlife | Protect T&E species & maintain or improve their habitat. Provide investments to enhance wildlife species which will benefit from uneven-aged timber management. | Coordinate efforts on a case-by-case basis to ensure aquatic/ riparian resources are protected &, in some cases, improved. |
| Livestock Management | Allow livestock grazing on those areas & at times of the year when it will have no negative effects on timber management operations & objectives for the area. | |
| | Range vegetation treatments will generally not be allowed in timber areas. Range improvements will be designed to minimize conflicts with forest emphasis. | |
| Forestry | Manage lands suitable for timber production. Invest necessary funds to provide for intensive management of the forest resource. Provide firewood, Christmas trees, & other wood products. | Manage timber and woodland species on all available & capable lands with a combination of even & uneven-age systems. Manage aspen under an even-age system. Limit open patchcuts to 20 acres or less in commercial forest types & |

BLM_0005178

Forestry
Area J (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | | 40 acres in woodland types. Regenerate all patchcuts, shelterwood, & selection harvest cuts, naturally or artificially, within 15 years. Continue management of all operable woodland & commercial sawtimber in other emphasis areas. |
| | | Manage approx. 10,960 acres for intensive forest management. Estimated allowable harvest would be 6.5 MMBF per decade. |
| | | Manage approx. 42,130 acres to provide woodland products (firewood, posts, poles, etc.). Estimated allowable harvest would be 6.4 MMBF (12,800 cords) per decade. |
| Minerals | Allow mineral development in all areas not withdrawn from mineral entry. Provide protective stipulations to limit impacts to the forest resource. | |
| Lands | Allow for disposal of public land parcels not needed for forest management. Acquire or exchange lands when forest management will be enhanced. Major utility corridors would generally not be allowed in commercial forests but would be allowed in woodland; exceptions could occur with specific analysis. Allow other land actions when they will result in minimal adverse impacts, when they will be beneficial to forest management, or when there is a clear & significant public need. | |
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion & ensure utilization of forestry practices which will provide for minimal soil losses. Maintain water quality & quantity | |

53

BLM_0005179

Forestry
Area J (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | for resource needs. Timber harvesting & associated activities will be conducted in a manner that will not degrade the water quality (from both point & non-point sources) below the Colorado Department of Health & Water Quality Standards & Classifications. | |
| Fire | Provide a level of protection from wildfire that will result in least total cost & will enhance forest resources. Use prescribed fire when possible to enhance forest management objectives. | |
| Access | Provide administrative &, where needed, public access to public land to enhance forest management. Provide necessary maintenance of roads to ensure timber management practices can occur as planned. | |

## Management Guidance for Area K: Emphasis on Soils and Water

Management direction will emphasize improving water quality and soil stability. Resource data indicates significant water quality problems exist in some areas and management action may improve the existing situation. In addition, soil erosion on fragile soils can be reduced through intensive management practices. Other resource uses will occur to the extent they are compatible with the water and soil program direction for specific areas. Surface-disturbing activities may be limited or denied to improve resource conditions. Livestock grazing will be allowed but possibly at a reduced level; ORV use would be limited or excluded. Other resources, such as wildlife, cultural, etc., would be protected or enhanced under this emphasis area.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Protect important cultural resource properties. | |
| Recreation | Manage for dispersed recreation as the primary recreation activity. Permit yearlong, non-motorized recreation activi- | Limit ORV use to existing roads & trails in the Disappointment Valley emphasis area. |

54

Soils and Water
Area K (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | ties throughout the area. | |
| | Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | |
| Wildlife | Protect T&E & sensitive species habitat. Maintain or improve wildlife habitat through inter-disciplinary design of water or vegetation improvements & maintenance of diversity of vegetation. | |
| | Allow wildlife habitat improvements compatible with the goals of the soil & water program for specific areas. | |
| Livestock Management | Manage suitable vegetation types under low to moderate intensity for livestock production with the intent to use available forage & maintain plant vigor. Reduce the number and/or season-of-use for livestock where needed to achieve soil & water program objectives. Maintain or improve range condition through soil & water improvements & diversifying the vegetation. | Develop a grazing system for use in Disappointment Valley which will improve vegetative cover, reduce erosion and salinity of runof by protecting key forage species during the critical spring growing season. |
| Forestry | Manage forest products & woodlands to meet goals & objectives of the soil & water program for specific areas. | |
| Minerals | Allow for mineral development on all areas not specifically withdrawn from development. Provide protective stipulations to limit impacts to other resource values. | |
| Lands | Allow for disposal of parcels of land not identified for soil & water management. Acquire or exchange land when soil & water management will be enhanced. Major | |

55

BLM_0005181

Soils and Water
Area K (continued)

| Resource/<br>Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | utility corridors will be allowed but would be subjected to restric-tive stipulations to protect fragile soil & water quality. Allow other land actions when they will result in minimal adverse impacts, when they will be bene-ficial to soils & water manage-ment, or when there is a clear & significant public need. | |
| Wild Horses | Manage the Spring Creek Basin wild horse herd to limit utilization of key forage species, thus improv-ing vegetative conditions, reducing erosion, & maintaining watershed conditions. | |
| Soils and Water | Maintain or improve water quality & quantity. Develop necessary erosion control structures, vegetation improve-ments, or salinity reduction measures to improve water quality. | Protect 4,700 acres in Boulder Gulch watershed to ensure water quality for Silverton.<br><br>Protect water quality in aquifers used for domestic & municipal purposes in the Dry Creek Basin & Tabeguache Creek watersheds. |
| | Develop necessary soil protec-tion measures to reduce or pre-vent future accelerated erosion from fragile sites. Maintain or improve soil productivity, minimize man-caused erosion & maintain vegetation for water-shed protection & plant vigor. | Manage 65,000 acres in the following watersheds to reduce erosion & sediment yield:<br><br>  Big Gypsum Valley<br>  Disappointment Valley<br>  Dry Creek Basin<br>  Paradox Valley<br><br>Develop watershed management plans for all erosion prone & saline areas.<br><br>Reclaim 5 pollution sources (heavy metals) in the Upper Animas River drainage.<br><br>Manage 46,000 acres in Disap-pointment Valley to reduce sediment & salt to the Colorado River. |

56

Soils and Water
Area K (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Fire | Provide level of protection from wildfire that will result in least total cost & will generally enhance soil & water values. Use prescribed fire when possible to enhance soil or water conditions. | |
| Access | Provide administrative access to public land for management of the soil & water resources. Provide maintenance to roads or trails to reduce erosion. | |

### Management Guidance for Area L:

### Emphasis on Areas of Critical Environmental Concern (ACECs)

Management direction will emphasize areas of public land where special management attention is required. This management should be completed without unnecessarily or unreasonably restricting public land users from purposes compatible with such protection.

The proposed Anasazi Culture Multiple Use Area ACEC contains important cultural, mineral, recreation, range, and wildlife resources. The area represents the focus of the northern Anasazi development, with more than 100 sites per square mile in many areas, representing the highest known archaeologic site density per acre of any area in the nation. The total number of sites on public lands is estimated at nearly 20,000. Many sites cover 10 acres or more. Large oil and gas and carbon dioxide ($CO_2$) reserves are also contained within the area. Shell Oil Company has made extensive financial investment in the $CO_2$ resources, with a project life of more than 30 years. Public lands within the ACEC provide forage used by livestock and wildlife. Increased mineral development presents a challenge to BLM to provide high quality habitat for livestock and wildlife dependent on public lands. Population growth places increased pressure for recreation pursuits on public lands. These opportunities need to be provided, while emphasizing cultural and mineral values.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Manage prehistoric or historic values where appropriate. | Manage the Anasazi Heritage Center as a focal point for cultural resources in the area. |
| | Provide intensive protection of cultural resources from vandals & pothunters through increased surveillance & law enforcement. Intensify public education for | Emphasize cultural management on the following areas:  Cahone Canyon  Cannonball Ruin |

57

ACECs
Area L (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | interpretation & recognition of the sensitivity of the resource. Provide for intensive inventory & evaluation of the cultural resources to more effectively provide protection. A cultural monitor may be required on all surface-disturbing activities to protect subsurface resources. | Cow Mesa<br>Cross Canyon<br>East Rock Canyon<br>Escalante-Dominguez Ruins<br>Hamilton Mesa<br>Lightning Tree Tower<br>Lowry Ruin<br>McLean Basin Towers<br>Mockingbird Mesa<br>Painted Hand Petroglyphs<br>Painted Hand Ruin<br>Sand Canyon<br>Squaw/Papoose Canyon |
| | | Develop an ACEC Management Plan with specific guidelines for management of the area. |
| Recreation | Manage recreational opportunities according to ACEC guidelines. | Close Cross, Cahone, & Squaw/ Papoose canyons to ORVs. Provide semiprimitive nonmotorized recreation opportunities. |
| | Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | Manage Cross, Cahone, & Squaw/ Papoose canyons under VRM Class II guidelines. |
| | | Manage the McElmo Research Natural Area for its special research value. |
| Wildlife | Manage important or critical habitat for T&E, sensitive, or species of special importance to maintain a viable population level of each species. | Invest wildlife funds for structural improvements & vegetation restoration projects to improve the following high priority riparian habitats: Cross, Cow, Cahone, Hovenweep, & Bridge canyons. |
| Livestock Management | Manage livestock under low to moderate intensity to use available forage & maintain plant vigor while not degrading any present ACEC values. | Develop & implement AMPs on "I" & "M" category allotments within ACECs. Consider cultural, mineral, wildlife, & recreation values during development. |
| Forestry | Manage lands suitable for timber & woodland production to enhance ACEC values & to maintain healthy stands. | |
| Minerals | Manage mineral development to limit conflict with present | Continue present protection & no surface occupancy stipula- |

58

BLM_0005184

ACECs
Area L (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
| --- | --- | --- |
| | ACEC values. When possible, schedule activities so conflicts are minimized & site rehabilitation is addressed within ACEC guidelines. Some mineral development may need to be limited or excluded for proper ACEC management. | tions for oil & gas leasing on Battle Rock; Easter Ruin; Sand & East Rock canyons; Cannonball, Lowry, Lightning Tree Tower, Seven Towers & Dominguez-Escalante ruins; Hovenweep buffer; McLean Basin Towers; & Painted Hand Petroglyphs.<br><br>Provide for no surface occupancy stipulations for oil & gas leasing on: Cahone, Cross, & Squaw/ Papoose canyons & Painted Hand Ruin. |
| Lands | Disposal of isolated tracts not needed for future public land management & that do not contain important resource values may be accomplished after site-specific reviews on a case-by-case basis.<br><br>Major utility corridors will be considered on a case-by-case basis. Acquisition, exchange & other lands actions will be allowed only if they are designed to meet the ACEC management objective, or when there is a clear & significant public need. | |
| Soils and Water | Maintain soil productivity, minimize man-caused erosion, & maintain vegetation condition & plant vigor for watershed protection. Maintain water quality & quantity for resource needs. | |
| Fire | Use fire management techniques that maintain the ACEC values. Wildfire suppression would generally not occur unless needed to protect ACEC values. | |
| Access | Provide administrative & public access where needed for ACEC management. Maintenance will be provided on only those roads needed for management purposes. | Limit public access in Mockingbird Mesa, Sand & East Rock canyons to foot or horse only & restrict vehicle access to authorized vehicles only. Acquire administrative access into Sand & Yellowjacket canyons & Cannonball Mesa. |

BLM_0005185

# APPENDIX TWO

### Oil and Gas Lease Information Notices and Stipulations
### Within the San Juan/San Miguel Planning Area

Inside a separate ring binder on file at the San Juan Resource Area, Montrose District, and the Colorado State Office are CSO forms 3100-65 (A) and (B) (organized by ranges) for all public land within the area.

Form 3100-65 (A) was completed for all ranges in the area containing Federal minerals. Standard stipulation blocks were checked for all sections containing mineral rights (regardless of the amount of land in the section). If other resource values were present in the section, then additional columns may be checked. If in a given range and township only one special stipulation applied to a variety of sections, then that column may be checked and a stipulation noted in the space provided below. This stipulation would apply to all sections checked.

Form 3100-65 (B) was completed for all sections in the township and range needing additional clarification. The restriction column of the form is used to reference the user to this section which contains the specific stipulations and supporting narrative for the restriction. The referencing for the user will take the following form.

> The restriction will read:
> Stipulation NO. 1
>
> Stipulation number one refers to this section which
> contains all lease stipulations and information notices
> to be used.

The following oil and gas lease information notices and stipulations have been developed from impact assessment associated with the Final EIS:

1. **Mule Deer and Elk Crucial Winter Ranges**

   **Information Notice:** To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be allowed only from April 16 to November 30 on crucial mule deer and elk winter ranges. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by BLM's Authorized Officer.

   **Narrative:** These areas (248,890 acres) are crucial mule deer and elk winter ranges, key concentration areas that support and sustain a large percentage of the total wintering populations. They are extremely important for animal survival during harsh winters. Disturbance may place unnecessary stress on wintering big game herds and cause undue mortality of mature animals and the following season's fawn and calf crop (see FEIS, Fig. 2-3).

2. **Sage Grouse Strutting Grounds**

   **Information Notice:** To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be allowed only from May 16 to March 14 on sage grouse strutting grounds. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by BLM's Authorized Officer.

   **Narrative:** Strutting activities in these areas (2,920 acres) are a crucial period in the life cycle of sage grouse. Human disturbance or harassment during this time may disrupt the breeding cycle and result in a decline in population (see FEIS, Fig. 2-4).

3. **Bald Eagle Winter Concentration Areas - (under the Bald and Golden Eagle Protection Act and Threatened and Endangered Species Act)**

   **Stipulation:** To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be allowed only during the period from April 16 to November 30 on bald eagle winter concentration areas. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by BLM's Authorized Officer.

BLM_0005186

**Narrative:** These areas (53,020 acres) have been identified as roosting, perching, or feeding areas for bald eagles. Human intrusion into these areas could lead to illegally shooting the birds or causing the birds to abandon the area. Excessive surface disturbance could cause the destruction of primary feeding areas (see FEIS, Fig. 2-4).

4. **Critical Peregrine Falcon Nesting Habitat (Perins Peak and Mesa Verde National Park)**

**Stipulation:** No Surface Occupancy. Operations on these lands will not be approved in order to protect critical peregrine falcon habitat.

**Narrative:** This land (2,600 acres) has been identified as critical habitat for peregrine falcons, a Federally listed endangered species. Human intrusion into these areas could lead to illegally shooting of birds or could cause birds to abandon the area. Disturbances during the nesting period could cause missed feedings of young with subsequent mortality (see FEIS, Fig. 2-4).

5. **Important Peregrine Falcon Nesting Habitat (Paradox Valley Area)**

**Stipulation:** To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be allowed only from September 1 to February 28 on important peregrine falcon habitat. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by the Authorized Officer.

**Narrative:** This land (2,160 acres) has been identified as critical habitat for peregrine falcons, a Federally listed endangered species. Human intrusion into these areas could lead to illegally shooting of birds or could cause birds to abandon the area. Disturbances during the nesting period could cause missed feedings of young with subsequent mortality (see FEIS, Fig. 2-4).

6. **Elk Calving Area**

**Information Notice:** To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be allowed only from July 16 to April 30 on elk calving areas. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by BLM's Authorized Officer.

**Narrative:** These important areas (9,700 acres) have been identified by BLM and DOW. The reproductive season is a crucial period in the life cycle of these species. Disturbances during this period may create unnecessary stress and reduce herd productivity (see FEIS, Fig. 2-3).

7. **Dolores River Canyon**

**Stipulation:** The Dolores River Canyon is receiving special management for its significant recreational and visual values. No surface occupancy on the described lands will be approved unless it is shown to the satisfaction of the authorized officer that the objectives of such special management can still be met.

**Narrative:** These portions of the Dolores River Canyon (21,600 acres) contain significant recreational and visual values. The no surface occupancy stipulation is meant to protect the main portion and viewshed of the Dolores River Canyon. The viewshed is portrayed on the maps on file in the San Juan Resource Area. Operations proposed on the described lands will not be approved, unless it is shown to BLM's Authorized Officer's satisfaction that the stipulation objective can still be met.

8. **McElmo Research Natural Area (RNA)**(400 acres)

**Stipulation:** The McElmo Research Natural Area is receiving special management for its important habitat for rare species of flora and fauna. No surface occupancy on the described lands will be approved unless it is shown to the satisfaction of the authorized officer that the objectives of such special management can still be met.

**Narrative:** This RNA contains important habitat for rare species of flora and fauna. Disturbance could disrupt ongoing research in the area.

9. **Menefee and Weber Mountains**

**Stipulation:** Menefee and Weber Mountains are receiving special management for their important recreational and visual values. No surface occupancy on the described lands will be approved unless it is shown to the satisfaction of the authorized officer that the objectives of such special management can still be met.

BLM_0005187

**Narrative:**   These two mountains (encompassing 8,720 acres) contain unique roadless, backcountry values. Lying within view of Mesa Verde National Park, these extremely steep and rugged mountains have been closed to off-road vehicles. To protect these values, the public lands will be leased but with a no surface occupancy stipulation. Operations proposed on the described lands will not be approved unless it is shown to BLM's Authorized Officer's satisfaction that the stipulation objective can still be met.

10.   **Sand and East Rock Canyons** (5,880 acres)

**Stipulation:**   The Sand and East Rock Canyon areas are receiving special management for their important archeological values. No surface occupancy on the described lands will be approved unless it is shown to the satisfaction of the authorized officer that the objectives of such special management can still be met.

**Narrative:**   This area was nominated to the NRHP in 1977 but has not yet been acted upon. BLM's San Juan Resource Area Office has a copy of this nomination as submitted. The sites included in these canyons qualify for eligibility to the National Register under criteria (a) and (d) (see FEIS, Table 4-2). The information they may yield is related to the final Anasazi occupations. Many of the sites possess unique astronomical associations and pose defensive orientations. Special operating stipulations and NSO stipulations have been in effect in these canyons since they were proposed for protective withdrawal in 1972. Due to the topographically prohibitive nature of much of the canyon area, access has been limited and many of the significant cultural values remain minimally disturbed. Where vehicle access has occurred, site monitoring has revealed accelerated structural deterioration, erosion, and vandalism. The NSO stipulation will eliminate the detrimental effects of vehicle access into the area and maintain the integrity and association of the cultural values free from added intrusion and setting alteration. Under 43 CFR Public Land Order No. 6563 (effective August 22, 1984), Sand Canyon Archaeological Site (4,886 acres) was withdrawn from surface entry and mining to protect the archaeological values for 20 years (however, the lands will remain open to mineral leasing).

11.   **Cannonball Ruin** (80 acres)

**Stipulation:**   No Surface Occupancy. Operations on these lands will not be approved in order to protect the Cannonball Ruin Archeological site.

**Narrative:**   This complex is currently withdrawn from all mineral entry and was recognized regionally and nationally as important in the archaeologic literature as early as 1919. Cannonball Ruin has been nominated to the NRHP, under criteria (c) and (d) (see FEIS, Table 4-2) as it is an established research site and is representative of the large canyon head pueblotype complex. NSO stipulations are necessary to avoid direct physical damage to this ruin complex and significant scientific data loss.

12.   **Lowry Ruin & Associations** (240 acres)

**Stipulation:**   No Surface Occupancy. Operations on these lands will not be approved in order to protect the Lowry Ruin Archeological site.

**Narrative:**   This site is a National Historic Landmark, is currently listed on the NRHP, and is under a protective withdrawal. A NSO stipulation would continue to protect the site and its associated surroundings, which are also considered eligible to the NRHP under criteria (a), (c), and (d) (see FEIS, Table 4-2).

13.   **Dominguez-Escalante Ruins** (40 acres)

**Stipulation:**   No Surface Occupancy. Operations on these lands will not be approved in order to protect the Dominguez-Escalante Ruins Archeological site and the Anasazi Heritage Center.

**Narrative:**   Escalante Ruin is listed on the NRHP and the Dominguez-Escalante complex (associated with the ruin) is in the process of formal eligibility determination. The area encompassing this complex is currently protected by an administrative withdrawal and is the site of the Anasazi Heritage Center to be completed in the fall of 1985. A NSO stipulation is in effect to protect the site.

14.   **Tabeguache Cave II and Tabeguache Canyon** (560 acres)

**Stipulation:**   No Surface Occupancy. Operations on these lands will not be approved in order to protect the Tabeguache Canyon Archeological site.

**Narrative:**   Tabeguache Cave II lies within Tabeguache Canyon, where research has contributed significant information

BLM_0005188

about the prehistory of the area (criteria a and d) (see FEIS, Table 4-2). A high potential for such additional data at numerous sites within the canyon exists. The eligibility of this canyon to the NRHP has been evaluated and supported based on existing research data. A portion of the area has been proposed for status as an Outstanding Natural Area (ONA) and is confined topographically. There is currently no vehicle access into much of the canyon and, as a result, many sites remain in pristine condition. Occupancy of the canyon by oil and gas leasing operations and the associated access would destroy much of the scientific value of the sites within the canyon, their association, and their setting—all important values that qualify this district for National Register listing. A NSO stipulation is necessary to protect these values.

15. **Dolores Cave** (60 acres)

   **Stipulation:** No Surface Occupancy. Operations on these lands will not be approved in order to protect the Dolores Cave Archeological site.

   **Narrative:** This site has been researched and possesses data that make it eligible to the NRHP under criteria (a) and (d) (see FEIS, Table 4-2). The site has not been formally nominated due to both a lack of budget and personnel. A NSO stipulation will protect the shelter and immediate area from physical damage.

16. **Bull Canyon Rockshelter** (5 acres)

   **Stipulation:** No Surface Occupancy. Operations on these lands will not be approved in order to protect the Bull Canyon Rockshelter Archeological site.

   **Narrative:** This site has been evaluated and is considered eligible to the NRHP under criteria (c) and (d) (see FEIS, Table 4-2), evidencing a rare and important paleoindian occupation. A NSO stipulation will protect the physical remains of this site.

17. **Tabeguache Pueblo** (120 acres)

   **Stipulation:** No Surface Occupancy. Operations on these lands will not be approved in order to protect the Tabeguache Pueblo Archeological site.

   **Narrative:** Information gained from research done at this site (120 acres) qualifies it for NRHP listing under criteria (c) and (d) (see FEIS, Table 4-2). A NSO stipulation will protect the site and its immediate associations from intrusion and physical damage.

18. **McLean Basin Towers** (80 acres)

   **Stipulation:** No Surface Occupancy. Operations on these lands will not be approved in order to protect the McLean Basin Towers Archeological site.

   **Narrative:** This site has been proposed for nomination to the NRHP under criteria (c) and (d) (see FEIS, Table 4-2), and is currently under a protective withdrawal. A NSO stipulation continues to protect the site and immediate area from damage.

19. **Squaw/Papoose, Cross, and Cahone Canyons** (23,420 acres)

   **Stipulation:** The Squaw/Papoose, Cross, and Cahone Canyon areas are receiving special management for their important Archeological values. No surface occupancy on the described lands will be approved unless it is shown to the satisfaction of the authorized officer that the objectives of such special management can still be met.

   **Narrative:** These areas, together with Cow Mesa, are topographically constrained areas of unique and nationally significant cultural values. A wide range of site types and prehistoric and historic uses are represented in these canyon and mesa habitats. Of the recorded sites in the canyon and Cow Mesa areas, more than 90 percent are considered eligible or potentially eligible under criteria (a), (c), and (d) (see FEIS, Table 4-2). Potentially eligible sites have surface indications of being significant, but final determination must be made by testing or excavation. The NSO stipulation proposed here would preserve the integrity and association of the Anasazi sites and cultural resource (prehistoric and historic) settings in the last remaining undisturbed canyons and mesa tops used by the Anasazi on public land in southwest Colorado. Analysis of the relationships between prehistoric sites and the progression of historic Euro-American and Native American sites in these canyons have immense scientific and public value. The absence or alteration of this setting and association will destroy many of the qualities that qualify them for NRHP listing.

20. **Painted Hand Petroglyphs** (120 acres)

BLM_0005189

**Stipulation:** No Surface Occupancy. Operations on these lands will not be approved in order to protect the Painted Hand Petroglyphs Archeological site.

**Narrative:** This site is considered eligible to the NRHP under criteria (c) and (d) (see FEIS, Table 4-2). It currently is protected from mineral entry by an administrative withdrawal. The NSO stipulation would preserve the site from disturbance and intrusion.

21. **Painted Hand Ruin** (80 acres)

**Stipulation:** No Surface Occupancy. Operations on these lands will not be approved in order to protect the Painted Hand Ruin Archeological site.

**Narrative:** A NSO stipulation on this site is needed to protect its physical remains and relevant habitat. Painted Hand Ruin has been evaluated as eligible for the NRHP under criterion (d) (see FEIS, Table 4-2).

22. **Indian Henry's Cabin** (160 acres)

**Stipulation:** No Surface Occupancy. Operations on these lands will not be approved in order to protect the Indian Henry's Cabin Archeological site.

**Narrative:** This historic site is considered eligible to the NRHP under criterion (b) (see FEIS, Table 4-2). A NSO stipulation will protect the area occupied by this historic figure.

23. **Lightning Tree Tower Group** (160 acres)

**Stipulation:** No Surface Occupancy. Operations on these lands will not be approved in order to protect the Lightning Tree Tower Group Archeological site.

**Narrative:** This interrelated complex of Anasazi sites has been evaluated as eligible for the NRHP under criteria (c) and (d) (see FEIS, Table 4-2). A NSO stipulation on this site complex will protect it from physical impacts and will also maintain its integrity.

24. **Buffer for Hovenweep National Monument** (600 acres)

**Stipulation:** The area adjoining the Horseshoe House/Holly House segment of the Hovenweep National Monument is receiving special management to protect the setting of the archeological resource. No surface occupancy on the described lands will be approved unless it is shown to the satisfaction of the authorized officer that the objectives of such special management can still be met.

**Narrative:** This 1/4-mile wide corridor surrounding the Horseshoe House/Holly House segment of Hovenweep National Monument is proposed for a NSO stipulation to protect the setting of this significant archaeologic resource (currently managed by the National Park Service).

25. **Battle Rock** (40 acres)

**Stipulation:** No Surface Occupancy. Operations on these lands will not be approved in order to protect the Battle Rock Archeological site.

**Narrative:** A NSO stipulation is necessary to protect this area of significant cultural value. A large sandstone monolith rising several hundred feet above the McElmo drainage floodplain, this rock is mentioned in local Apache and Navajo folklore and as such is an established Native American cultural site. Battle Rock is considered eligible to the NRHP under criteria (a) and (d) (see FEIS, Table 4-2). (In addition, BLM is also mandated by the 1979 Archaeological Resources Protection Act to preserve all sites sacred to Native American groups.)

26. **Easter Ruin** (80 acres)

**Stipulation:** No Surface Occupancy. Operations on these lands will not be approved in order to protect the Easter Ruin Archeological site.

**Narrative:** This large pueblo site is considered eligible to the NRHP under criteria (c) and (d) (see FEIS, Table 4-2) and is proposed for NSO stipulations to protect the physical remains of the site and its canyon associations.

27. **Seven Towers Ruin Group** (40 acres)

64

**Stipulation:**   No Surface Occupancy. Operations on these lands will not be approved in order to protect the Seven Towers Ruin Group Archeological site.

**Narrative:**   This group of related archaeologic sites lies on Mockingbird Mesa and is considered eligible for inclusion on the NRHP under criteria (c) and (d) (see FEIS, Table 4-2) and as a related part of the Mockingbird Mesa Archaeological District. A NSO stipulation would protect the large ruin at the canyonhead and its associated sites and features from physical damage.

BLM_0005191

# APPENDIX THREE

## ORV Limitations

| Limitation | Plan (acres) |
|---|---|
| Open | 786,439 |
| Limited to Designated Roads and Trails | |
| Recreation | |
| Silverton SRMA | 51,180 |
| Cultural | |
| Mockingbird Mesa | 5,327 |
| Bull Canyon | 5 |
| Indian Henry's Cabin | 160 |
| Sand and East Rock canyons | 5,880 |
| Soils and Water | |
| Disappointment Valley | 46,000 |
| Subtotal | 108,552 |
| Closed | |
| Recreation | |
| Dolores SRMA | 22,464 |
| Weber Mountain | 4,680 |
| Menefee Mountain | 4,040 |
| Wilderness | |
| Dolores WSA | 28,539 |
| Cultural | |
| Cross Canyon | 13,913 |
| Cahone Canyon | 9,498 |
| Squaw/Papoose Canyon | 8,415 |
| Tabeguache Creek Canyon | 3,200 |
| Wildlife | |
| Perins Peak/Animas Mtn. | 3,200 |
| Subtotal | 99,009 |
| Total | 994,000 |

66

BLM_0005192

Form 1221-2
(June 1969)



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

Release:
 9-389
Date:
10/21/2011

MANUAL TRANSMITTAL SHEET

Subject

H-9113 – 2 – Roads National Inventory and Condition Assessment
Guidance & Instructions Handbook

1. <u>Explanation of Materials Transmitted</u>:

This is an update of current manual and handbook on Roads; with the creation of Handbook 2 for
Condition Assessment Protocols.  Attached is the Manual Section Handbook 2 only, per Directives
instructions.  The Manual Section 9113 and Handbook 1 are under separate clearance sheets for each.

2. <u>Reports Required</u>: None.

3. <u>Material Superceded</u>:  The material superseded by this Handbook Release is listed
under "REMOVE" below.

4. <u>Filing Instructions</u>:

| REMOVE | INSERT |
|---|---|
| H-9113 – 2- Roads<br>(Rel. 9-250) | H-9113-2 Roads National Inventory<br>and Condition Assessment Guidance<br>& Instructions Road Design<br>Electronic Version |
| (Total:  17 Sheets) | (Total:  40 Sheets) |

/s/ Janine Velasco
Assistant Director, Business and Fiscal Resources

BLM_0005193

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

# Table of Contents

.1  Introduction

.2  Background

.3  Process

.4  Inspector Qualifications

.5  Project Phases

.6  Conducting the Inventory & Condition Assessment for BLM Roads
.61  Phase I – Inventory & Assessment Planning
    A.  General
    B.  Specific Tasks
    C.  Summary – Phase I Inventory & Assessment Planning
.62  Phase II – On-Site Data Collection
    A.  General
    B.  Specific Tasks
    C.  On-Site Data Collection Tools
    D.  Road Designation, Location & Name
    E.  Road Segmentation
    F.  On-Site Measurement for Inventory
    G.  On-Site Measurement for Deferred Maintenance
    H.  On-Site Inspection Protocols
    I.  Field Assessment Checklist
    J.  Summary – Phase II On-Site Data Collection
.63  Phase III – In Office Data Entry
    A.  General
    B.  Specific Tasks
    C.  Summary – Phase III In Office Data Entry
.64  Phase VI – Data Quality Assurance & Review
    A.  General
    B.  Specific Tasks
    C.  Summary Phase VI Quality Assurance & Review

Appendix A – Road Condition Assessment Form
Appendix B – Guidance of Terrain Types

BLM HANDBOOK                                        Rel. No. 9-389
Supersedes 9-250                              Date:  10/21/2011

BLM_0005194

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

.1  Introduction.

This handbook provides the Bureau of Land Management (BLM)'s standard process for the inventory and condition assessment of BLM roads as defined in Manual Section 9100 – Facilities Planning, Design, Construction, and Maintenance.

All BLM roads are required to complete a baseline comprehensive condition assessment that includes Geographical Information System (GIS) spatial data as well as BLM asset management system inventory and condition assessment information tabular data.  Roads are excluded that have been identified by each state not to be condition assessed based on the following reasons:
- Physically inaccessible
- Not a BLM road
- Environmental Hazard
- Isolated and extremely remote
- Roads in storage (Western Oregon)
- Condition assessment problems, noted and transmitted to BLM COTR.

BLM Roads should be re-inspected on a regular interval (not to exceed 10 years) in accordance with the BLM's overall asset management program, utilizing the provided methodology (GIS spatial information is generally not collected during re-inspections unless a specific need for updated information has been identified).

New roads entering the BLM asset management system are also required to complete the inventory and assessment process prior to their entry into the BLM asset management system.

.2  Background.

The BLM is required to annually report the inventory and physical condition of its transportation infrastructure systems.

Consistency and integrity of information and process is essential to the BLM's ability to accomplish that objective and be directly linked to the effectiveness of the BLM's asset management program.

In order to provide a reasonable, consistent, and auditable process, BLM must:

1. Create a maintainable inventory of roads.
2. Support a condition assessment program that determines road condition and needs.
3. Develop reasonable cost estimates to correct any deferred maintenance deficiencies.
4. Work uniformly and consistently across the BLM road inventory.
5. Provide a cost effective auditable approach to managing BLM roads.

BLM_0005195

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

.3  Process.

This handbook describes the methodology and approach for use in the inspection of all BLM roads irrespective of whether the inventory and assessment is accomplished by BLM personnel or outside support (other federal agencies or contract).
The typical condition assessment contains several distinct phases which are illustrated below.
Small scale assessments may inherently combine steps for efficiency of the effort and will dictate the appropriate assignment of roles and responsibilities, however the process itself (inventory and condition assessment standards) should not be modified regardless of road length, surface type, or geographical location.



.4  Inspector Qualifications.

Road inventory and assessment should be accomplished by individuals experienced in the construction, maintenance, and repair of rural road systems.  The road inspection process requires a mix of driving and walking with physical inspection of culverts and other appurtenances as necessary.

Inspectors must be able to recognize and accurately record the required inventory items and condition assessment deficiencies as described and in general adhere to the prescribed process.

- BLM Road Inspectors – Individuals accomplishing the road inspection process must be approved by the State Engineer with jurisdiction over the roads.

- Non-BLM Road Inspectors – Qualifications should be included as part of the scope of work or memorandum of agreement and conform to the requirements outlined previously.

BLM_0005196

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

.5  Project Phases.

The typical road assessment project contains several distinct project phases. Individual phases may be accomplished by the same individual or by a team of personnel depending on the scale and complexity of the assessment effort.

Phase I – Inventory and Assessment Planning - The planning phase consists of data gathering and schedule coordination. An Assessment Leader will work with the BLM State Engineer and Field Office personnel to collect mapping, begin/end points of road segments, land ownership change locations, segment change locations, and other pertinent information on each road segment to be inventoried and assessed. The Assessment Leader will transfer the collected data to the Field Assessment Personnel. The Assessment Leader will also provide scheduling coordination for assessment personnel and BLM Field Office staff.  The Assessment Leader is responsible for determining the need for special tools or equipment required by the Field Assessment Personnel to carry out the work in the field.

Phase II - On-Site Data Collection - On-site data collection will be accomplished by approved personnel. They will traverse all the roads identified for inventory and assessment and accomplish the required data collection and condition assessment.  It is desirable to have a BLM Field Office staff member accompany assessment personnel whenever possible.

Phase III - In-Office Data Entry and Computations - Data collected on-site will be downloaded at the designated office location for data cleansing and computations. GIS spatial data will be validated and updated to BLM data standards. Previously developed deferred maintenance unit costs and current replacement value unit costs will be applied to deficiencies observed and road segments inventoried.

Phase IV - Data Quality Review - Completed inventory and condition assessment information will be independently reviewed in the office for conformance with BLM requirements.  Spatial data, tabular data, photos, and required supporting documentation should all be reviewed as an integrated package prior to delivery to the BLM.

Delivery of Data to BLM - Completed inventory and condition assessment information will be provided to the BLM in electronic format for validation by the BLM and entry into the BLM's asset management system.

.6  Conducting an Inventory & Condition Assessment for BLM Roads.

This section provides detailed guidance for the completion of each of the four project phases associated with completing an inventory and condition assessment for BLM roads.

BLM_0005197

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

The official inventory of roads resides within the BLM asset management system and each road has a unique identifier within that system. Roads and road segments are named by the BLM States and naming conventions vary across the system.

BLM roads are comprised of road segments which are continuous sections of road with consistent surface type, dimension, jurisdiction, maintenance intensity, and general construction standards conforming to the BLM standard definition of a road (reference Manual Section 9100 – Facility Planning, Design, Construction, and Maintenance).

BLM road inventory and condition assessments are accomplished at the road segment. Each road segment is tracked, inventoried and assessed individually within the BLM asset management system.

.61 Phase I - Inventory and Assessment Planning. The inventory and assessment planning phase validates the current road inventory contained within the BLM asset management system and establishes the work plan for on-site data collection.

    A. General. The Assessment Leader will prepare a field assessment schedule identifying all the roads planned for inventory and assessment and provide it to the designated BLM contact in advance of beginning on-site data collection (Field Work).

    The Assessment Leader will gather all available information concerning the roads to be assessed, such as road maps, begin/end points, land ownership information, previous assessments, and spatial data. Base information including road segment name, unique identifier, maintenance information, surface type, and road limits will be downloaded from BLM's asset management system and provided to the assessment team as part of the planning package.

    Road segmentation, categorization, asset class, and related inventory decisions should be made by the BLM Field Office prior to the inspection process to maximize the efficiency of the on-site data collection.

    Corrections to the road inventory should be completed by authorized BLM personnel within the BLM asset management system to maintain consistency between the inventory, condition assessment process and baseline data.

    Roads that are extremely distant or remote from the Field Office should be reviewed with BLM personnel to determine the viability of inclusion into the assessment effort. In general, all asphalt surfaced roads should be assessed regardless of distance. Aggregate and naturally surfaced roads should be assessed if they are less than one hour drive time from adjacent roads identified for assessment. A list of roads (and their associated road segments) recommended for exclusion due to remoteness should be forwarded to the State Engineer for approval at the conclusion of the planning process. Road segments recommended for exclusion should not exceed 5 percent of the total road inventory (based on lane miles).

    Roads in storage status as defined in the Bureau's asset management system are not currently open, operated, or maintained, but may be reopened at a future date. Storage roads are not

BLM HANDBOOK                    5              Rel. No. 9-389
Supersedes 9-250                               Date:  10/21/2011

BLM_0005198

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

required to have Comprehensive Condition Assessments until they are placed in an operational status and maintained.  Storage status should not be used for seasonally closed roads, which would remain open in operating statue through their normal seasonal closures.

BLM State or Field Offices may have existing GIS (spatial) information that conforms to BLM requirements.  If existing data is available, it may be utilized in lieu of collecting new GIS data with the prior approval of the State Engineer and BLM National Data Steward.

The Assessment Leader will coordinate with local BLM staff to determine if special equipment or procedures are required by assessment personnel for work in that area. A safety briefing for assessment personnel will also be scheduled prior to conducting the field assessment.  Safety briefings will be reviewed and documented.

B.  The Assessment Leader will complete the following tasks prior to commencing on-site data collection:

1. Obtain a current inventory of all roads to be inspected from the BLM asset management system (typically conducted on a Field Office basis).
2. Schedule a roads inventory and condition assessment planning session with the assigned local BLM Point of Contact (POC).

3. Provide the local BLM POC a list of requested information (maps, maintenance information, access issues, previous inspections, construction projects, seasonal concerns, jurisdictional issues, availability of GIS data, etc) for assembly prior to scheduled planning session.

4. Meet with the local BLM POC to develop the work-plan for the identified roads.
   - Update inventory as necessary to reflect field conditions
   - Establish seasonal issues and a safety plan
   - Review existing roads information
   - Validate compliance of selected roads to BLM Manual Section 9113 – Roads.
   - Identify roads that may be considered remote, inaccessible, or placed in storage status and evaluate the feasibility of assessment.  If roads are recommended for exclusion, summarize and provide the recommendation to the State Engineer for concurrence.  (In general, roads recommended for exclusion should not exceed five percent of the total lane miles.)
   - Determine road segmentation requirements if current road segments are not consistent in their basic definition (road, primitive road, trail), surface type, jurisdiction, maintenance intensity, or general construction and segment in accordance with BLM guidance.
   - Develop a recommended work-plan/field schedule for the inspection process. Document rationale/decisions that influence work flow or any determination to forgo inventory and condition assessment of a particular road.
   - Develop a safety plan and determine if special equipment is required.

BLM_0005199

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

     5.  Obtain concurrence from the local BLM POC on the work-plan.

     6.  Provide the work-plan to assessment personnel.

C.  Summary – Phase I: Inventory and Assessment Planning.  In summary, the following tasks will be performed in the office by the Assessment Leader, with assistance from BLM staff, to prepare for on-site (field) data collection:
- Prepare field schedule.
- Collect road maps and other pertinent data.
- Prepare a listing of road and road segment information (unique id, name, surface type, location, map coordinates, etc).
- Prepare a listing of road and road segments recommended for exclusion and obtain approval from the State Engineer (unique id, name, surface type, location, map coordinates, etc.).
- Determine road segmentation updates (begin/end points, land ownership and surface type changes).
- Determine if special equipment is required.
- Schedule safety briefing.
- Document work plan decisions and rationale for assessment personnel.

.62 Phase II – On-Site Data Collection. The on-site data collection phase implements the inventory and assessment work-plan to complete the field portion of the roads assessment program.  It requires assessment personnel to conduct a field visual assessment (FVA) of all the road segments within the work-plan.

A.  General. On-Site data collection may be accomplished by BLM personnel, other agencies, or contractor personnel as long as it is completed in accordance with standard BLM methodology and practice.  On-Site data collection is generally accomplished from a vehicle driven across all accessible road segments by the assessment personnel using the work-plan developed in Phase I – Inventory and Assessment Planning.

B.  Specific Tasks.  Assessment personnel will complete the following tasks as part of the site data collection Phase.

     1.  Review work-plan from Phase I.

     2.  Contact local BLM POC and schedule on-site data collection event(s).

     3.  Complete logistics for assessment personnel (transportation, lodging, etc).

     4.  Prepare work data.  See paragraph C – On-Site Data Collection Tools.

     5.  Prepare Tool List (typical tool list provided below).

BLM_0005200

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

6.   Mobilize at the Local Field Office.

7.   In-Brief with Local BLM POC.

8.   Execute Work-Plan by completing inventory and condition assessment for identified roads.

   a.   Existing/Re-inspections - Collect GIS (spatial), inventory, and condition assessment (tabular) information for all Baseline Comprehensive Condition Assessments on each Road Segment (unless GIS data has already been completed and validated).

   b.   Collect inventory and condition assessment information for all comprehensive re-inspections on each Road Segment.

   c.   New/Baseline - Collect GIS (spatial), Inventory, and condition assessment (tabular) information for all Baseline Comprehensive Condition Assessments on new Road Segments (unless GIS data has already been completed and validated).

   d.   Document deviations from the established work-plan including rationale and modification.

   e.   Document additional segmentation requirements based on segmentation guidance.  See paragraph E. Road Segmentation.

   f.   Upload/transfer data to the office in accordance with the work-plan.

   g.   Follow established access, safety, and communication plan.

9.   At the conclusion of the work-plan, meet with local BLM POC and conduct an Out-Brief

C.   On-Site Data Collection Tools.   The list below is provided as a general reference for assessment personnel.   Specific tools necessary for the inventory and condition assessment of roads in a specific location will be included as part of the work-plan.
   - Clipboard and notepaper
   - Computer and accessories such as spare batteries and power charger
   - Digital camera and accessories
   - GPS Device meeting current BLM data requirements
   - 25' measuring tape
   - Rock hammer
   - Safety equipment (fire extinguisher, flares, reflective vests, first aid kit)

D.   Road Designation, Location, and Name.  Road designation, unique identifier, road name and road begin / end points will be provided by BLM Field Office staff.  If the begin / end point of a road is not

BLM_0005201

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

known when the assessment personnel begin their work, the point will default to the example shown below.

*Default begin/end point:* At an intersection with a road, the beginning point of the BLM road will be at the edge of travel lane of the intersecting road along the centerline of the BLM road.



Road route designations and road names will be provided by the BLM and may vary from state to state.

The BLM-designated Maintenance Intensity will be provided by BLM staff, but will not influence the road segment assessment process. Known locations of surface type and land ownership changes will be mapped in the office.



Asphalt Surface        Native Material        Gravel Surface

E.  Road Segmentation.  Road segment designations will be pre-determined in the office using the information at hand. States will provide GPS coordinates of legal jurisdiction/agreement segment breaks for use by assessment personnel.

Road segments must be homogeneous in nature. Therefore, a change in road surface type, or width of lanes (one-lane ≤ 15', two-lanes > 15' in width) will signal a change in road segment.  The previous example road will have three segments as shown below. If a gravel road segment has an asphalt apron at its intersection with an asphalt road, it will still be considered one segment, and not divided into two segments.

On unpaved road surfaces, short portions of the road may vary in width for pull-out areas, wide turns/curves, intersections, cattle guard gates, and turn-around areas. The width change of a road must be greater than four feet and continue for a minimum distance of 1/10[th] mile for a segment change to occur.

BLM_0005202

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK



Road segments will begin/end when private property, state land, or any non-BLM land is encountered as shown in the following diagram unless the BLM has easement or jurisdiction of the road. If assessment personnel are uncertain about jurisdiction, they should note the location of the questionable segment in the data file with a GPS point and a comment note and continue assessing the road portion as a single segment.



If a road is barricaded, the assessment personnel will make every effort possible to reach the road from the other side of the property in order to complete the road segment inventory and assessment. Some roads may not connect, leaving the remaining segment inaccessible. Inaccessible roads should be noted with a GPS comment before proceeding on to the next road segment.

F.  On-Site Measurements for Inventory. Assessment personnel are required to perform seven basic tasks during the course of the on-site inventory data collection:

    1.   Validate surface type and width for each road segment designation. All data will be based on a coordinate system, not road mile markers.  However, if a GPS unit is not available, note mile markers.

    2.   Note predominate terrain type (flat, rolling, or mountainous).

BLM_0005203

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

3. Note if the road segment should be considered a "primitive road" based on Manual Section 9100 – Facility Planning, Design, Construction, and Planning).

4. GPS road centerline at specified interval (interval not to exceed 25 feet).

5. GPS locations of potential segmentation changes based on surface type and width changes.

6. Take digital photos of typical road.

   a. Begin/end of road (note: end photo looking back onto road).

   b. potential health and safety items.

7. Identify and GPS potential health and safety items and location.

Photos will be taken in landscape view and developed in .jpeg format. The photo number given by the digital camera will be recorded into the photo number field in the inventory database.

Potential health and safety deferred maintenance items are those that may pose a serious threat to public or BLM employee health and safety. Potential health and safety items include such things as road washouts, damaged guardrail, falling rocks and collapsed culverts. Potential health and safety events are not always points – they may be noted as lengths or areas. All potential health and safety items will be inventoried so that BLM officials can locate the item.

G. On-Site Measurement for Deferred Maintenance.  Assessment personnel will identify and quantify deferred maintenance on all road segments as well as appurtenances located along the road segment (cattle guards, signage, rails, etc.) in accordance with the BLM standard included in this Manual Section.

Each road segment will be assessed for deferred maintenance items. Deferred maintenance is defined as maintenance that was not performed when it should have been or was scheduled to be and which is put off or delayed for a future period. Deferred maintenance includes items such as culvert cleanout and repair, aggregate replacement, and medium to severe potholes and ruts.

Deferred maintenance does not include items that were not originally constructed (e.g., if ditches were not originally constructed for the road segment, they can not become a deferred maintenance item).

Annual maintenance is defined as the maintenance tasks accomplished on a regular basis to keep assets in acceptable condition. Grading of low-severity ruts, minor culvert maintenance, potholes and roadside brushing of light vegetation are examples of annual maintenance and are not to be recorded as deferred maintenance.

BLM_0005204

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

Likewise, component renewal items, such as programmed overlays, are not considered deferred maintenance unless the condition of the road is not currently acceptable and an overlay is needed immediately.

The type of assessment to be used is the Field Visual Assessment method.  The following features will be inspected and assessed from the inspection vehicle along the entire length of the road segment:
- Cross Section/Positive Drainage
- Ditch Condition
- Corrugations/Wash Boarding

- Potholes
- Ruts
- Loose Aggregate (gravel roads)
- Missing Aggregate (gravel roads)
- Cracking (paved roads)
- Vegetation Removal
- Rock Slides/Fallen Debris
- Other Appurtenances
  - Signs
  - Cattleguards
  - Gates
  - Low water crossings
  - Culverts

Deficiencies on these features will be noted on assessment forms as the vehicle proceeds along the road segment. At the end of the segment, deficiencies noted will be tallied and saved for each road segment. (Note:  deferred maintenance is collected on appurtenances but they are not inventoried or spatially located.)

Culvert condition will be inspected and assessed on every fourth culvert, starting at the second culvert on each segment found in the field. For culvert inspection, the Assessment Personnel will get out of the vehicle and physically inspect the culvert for deficiencies. Results of the culvert inspections (roughly ¼ of all culverts) must be converted by multiplying the deficiencies by a factor of 4 to represent the entire road segment.  Culvert deficiencies will also be tallied at the end of the road segment and saved.

H.  On-Site Inspection Protocols.  The method of estimating and recording each of the deficiencies is discussed on the following pages. Each deficiency will also be assigned a severity level of medium or high. (Low-severity indicates annual maintenance needs). Different severity levels may exist within the same segment resulting in multiple entries of a single deficiency. *The severity level is based on the perception of the field inspector while driving the road segment.* For example, a pothole will be rated as medium or high severity based on the inspector's view from the vehicle – the inspector will not physically measure the depth of the pot hole to determine its severity.

BLM HANDBOOK                              12                      Rel. No. 9-389
Supersedes 9-250                                                 Date:  10/21/2011

BLM_0005205

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

Linear estimations for cross section, ditch, corrugations, ruts, vegetation removal, loose or missing aggregate, and cracking will be made from the inspection vehicle rather than physically measuring the deficiency with a tape measure. A quick reference guide has been provided at the end of this section.

Cross Section/Positive Drainage.

BLM roads may have three types of drainage: Longitudinal drainage (water drains in the direction of the road), cross slope drainage (water is drained across the road surface) and crowned road drainage (roads that have a crown where water drains from the center to the road edge).  Assessment of cross section will be made by noting if there is positive drainage for the road surface.  Corrective actions for improper cross section will be either grading of high areas or filling of low areas. A cross section deficiency will be noted in the field as an estimate of the length, width and depth of the area to be graded or filled.



Positive Cross slope

Crowned Cross section

Positive Cross slope

Longitudinal drainage

BLM_0005206

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

Ditch Condition.

Poor drainage due to an inadequate ditch section may cause water to pond and weaken the road bed. Ditch deficiency is estimated in linear feet parallel to the centerline of the road. The maximum length of ditch condition deficiency is two times the length of the road segment. Low severity drainage distress is characterized by evidence of ponding water in the ditches and overgrowth or debris in the ditches. Low severity is considered annual maintenance and will not be assessed as a deficiency. Medium severity includes low severity conditions plus erosion of the ditches into the edge of the road. Medium severity will be calculated as deferred maintenance. At the highest severity, ditch deficiency includes evidence of ponding water, water running across the road, overgrowth or debris in the ditches and severe erosion of the ditches into the road surface.

Existing ditches will be assessed for deferred maintenance/cleaning even if it is evident that the ditch does not outlet anywhere or have positive drainage (i.e. would quickly silt back in). If a ditch was "built" and is half full, it will have deferred maintenance assigned. Deferred maintenance will be assigned even if it is evident that the ditch was filled in by improper road maintenance grading. A ditch may also have erosion problems and require fill material. Inspectors will note the severity of the condition as well as the length, width and depth of ditch cleaning or fill.



*(Source: USACE Technical Manual 5-626)*



Excessive erosion of the ditch

BLM_0005207

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

Culvert Condition.

Poor drainage may also result from blocked or crushed culverts.   The following diagrams provide guidance for deferred maintenance items and areas to be noted, as well as the corrective action to be captured for each deficiency. If a road intersects the road being assessed, and the intersecting road has a culvert that lies in line (in the ditch) with the road being assessed, the culvert is not considered part of the road being assessed – it is part of the intersecting road.

In addition to visual inspection of culverts, the field crew will test metal culverts for rust pitting with a rock hammer or similar tool. If significant rust is encountered on the pipe interior, the pipe will be replaced.



Crushed from road weight - Replace pipe



Length = measured length of existing pipe
Depth = <6', 6-14', >14'
Diameter = measured diameter of existing pipe



Inlet crushed - Replace inlet



Length = 6' if pipe is larger than 24" diameter; replace entire length of pipe if diameter is 24" or less
Depth = <6', 6-14', >14'
Diameter = measured diameter of existing pipe

BLM_0005208

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

The minimum replacement for a crushed inlet is 6 feet of pipe if the diameter is greater than 24 inches and the entire length of pipe if the diameter is 24 inches or less.  These are just guidelines to follow, actual estimates may differ.



Outlet Crushed - Replace Outlet

Length = 6' if pipe is larger than 24" diameter; replace entire length of pipe, if diameter is 24" or less
Depth = <6', 6-14', >14'
Diameter = measured diameter of existing pipe





Reattach outlet drain
Reattach pipe – 1 each

BLM_0005209

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK



Inlet >1/2 Full

Outlet buried

Pipe buried - Replace pipe



Length = measured length of existing pipe
Depth = <6', 6-14', >14'
Diameter = measured diameter of existing pipe



Inlet Buried

Outlet >1/2 full

Pipe Buried - Replace pipe



Length = measured length of existing pipe
Depth = <6', 6-14', >14'
Diameter = measured diameter of existing pipe

BLM_0005210

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK





Outlet > 1/2 full - Replace pipe

Length = measured length of existing pipe
Depth = <6', 6-14', >14'
Diameter = measured diameter of existing pipe





Inlet > 1/2 full - Replace pipe

Length = measured length of existing pipe
Depth = <6', 6-14', >14'
Diameter = measured diameter of existing pipe

BLM_0005211

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK



Inlet Clear

Outlet 1/4 - 1/2 full

Outlet 1/4 - 1/2 full - Clean pipe

Clean out pipe – 1 each



Inlet 1/4 - 1/2 full

Outlet clear

Inlet 1/4 - 1/2 full - clean out

Clean out pipe – 1 each

Inlet clear

Outlet < 1/4 full

Outlet < 1/4 full - No action

No action – do not collect information

BLM_0005212

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK



No action – do not collect information



No action – do not collect information



No Cover over Pipe – Replace Surfacing

Aggregate replacement or grading for natural surfaces

All culverts should be covered by a minimum of 1 foot or ½ the culvert diameter of fill, whichever is greater.

BLM_0005213

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

The following photographs provide additional guidance about the types of deferred maintenance that may be encountered when assessing culverts.



PUNCTURED – REPLACE PIPE

BLM_0005214

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK



RUSTED – REPLACE PIPE

Corrugations.

Corrugations are closely spaced ridges and valleys at fairly regular intervals perpendicular to the direction of travel. This type of distress is usually caused by traffic and is formed in areas of acceleration or deceleration. Corrugations are estimated in square feet of surface area and cannot exceed the total area of the road segment.

At a low severity level, the corrugations are small and are considered to be annual maintenance. At medium severity levels, corrugations will cause an uncomfortable ride. Corrugations of high severity will pull the steering wheel in the driver's hands and cause the assessment personnel to proceed at a slower pace.

The following photograph shows a natural surfaced road with severe corrugations.



BLM_0005215

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

Potholes.

Potholes are bowl-shaped depressions in the road surface produced when traffic and weather conditions wear away small pieces of the surface material. Potholes are estimated by counting the number found on the road segment and recording them by severity level. Potholes are assumed to be 2' in diameter for estimating purposes.

Low severity potholes are considered annual maintenance items and data will not be collected for them. Medium severity potholes are noticeable when driving. High severity potholes will jolt the inspection vehicle if driven over.

The following photograph provides an example of potholes in an asphalt surface.



BLM_0005216

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

Ruts.
A rut is a permanent surface deformation that is typically in a vehicle wheel path parallel to the road centerline. Ruts may also occur perpendicular to the road. Ruts are estimated in square feet of surface area. Low severity level ruts are considered to be annual maintenance items and information will not be collected. Medium severity ruts provide an uncomfortable ride.  High severity ruts provide a rough ride in the inspection vehicle and cause the inspection personnel to proceed at a slower pace.

The following photographs show natural surfaced roads with severe rutting.



BLM_0005217

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

Loose Aggregate (gravel roads).

Over time, traffic will dislodge aggregate away from the normal road wheel path and cause it to form berms at the edge of the road. Aggregate can also be depleted from the road surface by weathering and drainage erosion. Loose aggregate is estimated in square feet of aggregate berm. Low severity berms are annual maintenance items with no data collection required. Medium severity berms create a wheel path that is noticeable to the driver when passing over it. Aggregate berms of high severity are difficult for a vehicle to maneuver over.

Missing Aggregate (gravel roads).

Aggregate roads may be made of limestone, "pit run", or other local crushed aggregate. A general indication of whether aggregate replacement is required is visually noticeable areas of "lost" rock. Replacement of lost aggregate will be estimated by square feet. Field inspection notes should indicate whether a full depth replacement (6") or aggregate overlay (3") is needed. The photograph below illustrates a road with missing aggregate.
(Note: For road segments in Western Oregon, if there is evidence that the depth of road base plus aggregate is less than 12", an overlay or replacement will be noted for the *entire* road segment.)



Cracking (paved roads).

Several types of cracking may occur on paved roads depending on subsurface conditions, traffic loading, and pavement type/thickness. Common types of surface distress cracking for asphalt pavements are shown

BLM_0005218

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

in the following table. Cracking distress is estimated in either linear feet or square feet of surface deformation.

| Pavement Type | Distress Type | Description |
|---|---|---|
| Asphalt | Block Cracking | A pattern of cracks that divides the pavement into approximately rectangular pieces. |
| | Fatigue Cracking | Occurs in areas subjected to repeated traffic loadings. Can be a series of interconnected cracks in early stages of development. Develops into many-sided, sharp-angled pieces, usually less than 1 foot on the longest side. Fully develops into an alligator pattern in most severe stages. |
| | Raveling | Wearing away of the pavement surface caused by the dislodging of aggregate particles and loss of asphalt binder. |





BLM_0005219

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

Vegetation Removal.

Vegetation removal will be estimated in linear feet along the road shoulders and/or centerline and in square feet at culvert inlet/outlets. Along the road, low severity indicates some encroachment of the road shoulder, medium indicates encroachment to the road travel edge, and high severity indicates encroachment into the travel way.  Vegetation removal is also captured for vegetation in a ditch or near a drainage inlet.  Light vegetation along the roadside is considered annual maintenance. Likewise, tumbleweeds are a seasonal issue and are treated as an annual maintenance item.

Trees blocking the drainage ditch of a road or encroaching into the road are estimated per each for trunk size less than approximately 6" in diameter and greater than approximately 6" in diameter.  The following photographs illustrate vegetation control items.



BLM_0005220

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

Other Appurtenances.

Cattleguards and adjacent gates will be inspected for deferred maintenance. Inspections will note missing grates, missing wings, or the need to reset the cattleguard to grade.

Low water crossings and water bars will be noted if concrete or asphalt replacement is needed or if gravel needs to be re-graded.

Damaged or missing signs are counted as road deficiencies.

These deficiencies are reported as deferred maintenance on the road segment however these items are not inventoried.

BLM_0005221

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE & INSTRUCTIONS HANDBOOK

The following table provides a quick reference to deficiencies estimated in the field and deferred maintenance corrective actions.

| Road Protocol Conditions | Deferred Maintenance | Standard Measurements | Corrective Action |
|---|---|---|---|
| Cross Section / Positive Drainage | Low areas | Length, Width, Depth | Fill - embankment |
| | High areas | Length, Width , Depth | Grading |
| Ditch Condition | Ditch silted in | Length, Width, Depth | Ditch cleaning - remove material. |
| | Excessively eroded ditch | Length, Width, Depth | Fill-embankment - add material to eroded area. |
| Culvert Condition | Buried Pipe | Length, Diameter, Depth | Replace pipe |
| | Full of Debris | Length, Diameter, Depth | Replace pipe |
| | Crushed | Length, Diameter, Depth | Replace pipe |
| | <1/2 full of debris | Quantity (number of pipes to clean) | Clean Pipe |
| | 1/2+ full of debris | Length, Diameter, Depth | Replace pipe |
| | Inlet / Outlet crushed | Length, Diameter, and depth | Replace Inlet / Outlet - 6' if diameter > 24". Replace pipe, if diameter 24" or less. |
| | No cover over pipe | Length, Width and Depth | Replace surface material |
| Corrugations | Washboarding/corrugations | Length, Width and Severity Level | Grading |
| Potholes | Potholes - Natural | Number and average depth( 4-6" or >6") | Grading |
| | Potholes - Aggregate | Number and average depth( 4-6" or >6") | Aggregate replacement |
| | Potholes - Asphalt | Number and average depth( 4-6" or >6") | Machine patching |
| Ruts | Rutting - Natural | Length, Width and Severity Level | Grading |
| | Rutting - Aggregate | Length, Width and Severity Level | Aggregate replacement |
| | Rutting - Asphalt | Length, Width and Severity Level | Machine patching |
| Loose Aggregate | Loose Aggregate | Length, Width | Grading |
| Missing Aggregate | Missing Aggregate | Length, Width (Depth is 3") | Aggregate Overlay |
| Missing Aggregate | Missing Aggregate | Length, Width (Depth is 6") | Aggregate Replacement |

BLM_0005222

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

| Road Protocol Conditions | Deferred Maintenance | Standard Measurements | Corrective Action |
|---|---|---|---|
| Cracking (paved roads) | Block Cracking | Length | Crack Sealing |
| | Fatigue Cracking | Length and Width | Chip seal or Sealcoat |
| | Raveling | Length and Width | Bituminous Machine Patching |
| Vegetation Removal | Vegetation hand clearing | Length and Width | Brush removal with hand saw |
| | Vegetation at culvert inlet/outlet | Each | Brush removal with hand saw |
| | Brush Mowing | Length and Width | Clearing, brush mowing with tractor |
| | Tree Removal < 6" | Quantity – Each | Remove selective trees |
| | Tree Removal > 6" | Quantity – Each | Remove selective trees |
| **Other Appurtenances** | | | |
| Cattleguard | Replace wing(s) | Quantity – Each | Replace Cattleguard wings |
| | Replace entire cattleguard (8x14) | Quantity – Each | Replace entire Cattleguard (wings, base, grate, etc.) |
| | Repair wing(s) | Quantity – Each | Repair wings (reattach, etc) |
| | Cleaning | Quantity - Each | Clean cattleguard |
| | Missing/Damaged Gates | Quantity – Each | Replace gates |
| Guardrail | Damaged Guardrail | Length | Replace Guardrail |
| Signage | Damaged or Missing Sign | Quantity - Each | Replace Sign |

*Field Data Entry*

A paper form (Appendix A - Road Condition Assessment Form) is used to capture deficiencies found on the road segment. At the end of each road segment, deficiencies are tallied and saved.

BLM_0005223

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

I.  Field Assessment Checklist.  The following checklist is provided to promote field work that is organized and efficient. The checklist emphasizes the need for the Field Assessment Personnel to establish a clear and repeatable work routine each time they begin and end the Assessment of any given road. These steps are not all inclusive, but do represent the minimum that is required. Establishing a repeatable routine is the most effective way to eliminate errors and omissions and to increase efficiencies.

☐ Obtain your assessment schedule and any background information available on each road listed on the schedule. Confirm all travel arrangements.

☐ Contact and verify the schedule with the PM, Assessment Leader, and/or the BLM Field Office personnel. Arrange to meet BLM staff as they are to accompany the Assessment Personnel.

☐ Assemble the required tools and equipment to conduct the onsite inventory and assessment work.

☐ Ensure that all electronic equipment is functioning prior to leaving the home base.

☐ Review the schedule to determine the roads to be assessed that day.

☐ Arrange for pickup or rendezvous of escorts.

☐ Once at the site, follow detailed instructions provided for gathering and entering data.

☐ Remember to take photos and GPS shots as required (baseline versus re-inspection).

☐ Review data gathered for assessment for completeness prior to leaving a road segment..

☐ Document inaccessible roads and rationale for no-inspection.

☐ Document roads that do not appear to meet road definition (Manual Section 9113 - Roads).

J.  Summary of Tasks Phase II - On-Site Data Collection.  Tasks to be completed in the field include:
- Inventory of the entire length of all road segments (name, length, width, surface type, terrain, primitive road).
- Identification of potential health and safety items on the entire length of all road segments.
- Measurement of road deficiencies.
- Identify inaccessible/Not Inspected Road Segments and Rationale.
- Identify road segments that do not meet BLM Road Definition (Manual Section 9113 - Roads).

.63 Phase III – In-Office Data Entry.   Phase III requires assessment personnel to complete the inventory and assessment process through a review of the collected information, alignment of GIS spatial data, photos, inventory, and deferred maintenance information.  Office staff will review the data for completeness and communicate any missing data elements to assessment personnel.  Assessment personnel will review their road segment information posted in the holding database when they return to the office. They are responsible for the completeness and correctness of all data gathered.

BLM_0005224

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

A.  General.  In-Office Data Entry may be completed by the assessment personnel or a combination of office staff and assessment personnel as necessary to complete the data requirements.  In-Office Data Entry includes:

- Inventory
    - GIS spatial data (collected with a GPS device) review and cleanup
    - Attachment of Road photos to Roads
    - Review of Road and Road Segment Inventory data and alignment with GIS Spatial Information

- Condition Assessment
    - Validate quantities for each deficiency
    - Validate appropriate cost models were attached to each deficiency
    - Validate deficiencies are connected to the appropriate road segment
    - Follow-up with Local BLM POC on Critical Health and Safety

B.  Specific Tasks.  Assessment personnel (which would generally include personnel from Phase II as well as office support staff) will complete the following tasks:

1.  Review on-site data collected under Phase II.

2.  Validate GIS spatial data aligns with road segments in work-plan (Phase I).

3.  Clean up GIS spatial data (extra data points, lack of coverage, etc.) to produce good GIS linework.

4.  Create "bridge" spatial segments if necessary to provide continuous segments.

5.  Review inventory and deferred maintenance data for accuracy and completeness utilizing the BLM Deferred Maintenance Costing System.

6.  Validate appropriate deferred maintenance cost models are attached to each deficiency.

7.  Attach recommended Asset Classification and associated CRV Model.

8.  Create ad-hoc cost estimates to correct deficiencies if required.

9.  Review office data and develop integrated work product (combination of GIS spatial data, tabular inventory data, photos, and deferred maintenance data) for each road segment.

C.  Summary – Phase III – In-Office Data Entry.  At the conclusion of in-office data entry assessment personnel will have a complete roads inventory and condition assessment product that has been reviewed and determined to be complete by assessment personnel.  Tasks that will have been completed include:
- Completed GIS spatial data compliant with BLM GIS data standards (if required)

BLM_0005225

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE & INSTRUCTIONS HANDBOOK

- Completed Inventory requirements for roads assigned within the work-plan
- Determined deferred maintenance requirements for each road segment
- Integrated all work products into a result suitable for independent quality review

.64  Phase IV Data Quality Assurance and Review.  Phase IV will be accomplished by individuals who were not involved in Phase II and Phase III.  The independent review is intended to validate the quality and completeness of the information collected during the previous Phases.  The independent review is <u>not</u> intended to imply acceptance by the BLM, but rather validate that all the required work products are complete and prepared for submittal to the BLM.

A.  General.  This effort should generally be accomplished by knowledgeable personnel (ideally assessment personnel not involved with the specific effort or Field Office) and also reviewed by the Assessment Leader.  At the conclusion of this Phase, the Assessment is complete and should be ready for delivery/transfer to the BLM POC.

B.  Specific Tasks.  Tasks to be completed in this phase include:
1. Review of field notes against database.

2. Review of GPS road spatial information in GIS system.

3. Review of Inventory database fields for completeness.

4. Review of deferred maintenance calculations for reasonableness.

5. Validation of selected Asset Class/Cost Code and associated CRV model.

6. Review of Integrated Work product.

7. Review of Road Segments not inspected and associated rationale.

8. Development of Submittal package for the completed work plan:

   - For all baseline road segments identified for inventory and assessment
     - GIS Spatial data in BLM specified format
     - Road Segment Inventory complete in specified format
     - Photos attached to inventory in specified format
     - Appropriate Cost Model and CRV data in specified format
     - Deferred maintenance deficiencies in specified format

   - For all baseline recommended new road segments
     - GIS Spatial data in BLM specified format
     - Road Segment Inventory complete in specified format
     - Photos attached to inventory in specified format
     - Appropriate Cost Model and CRV data in specified format

BLM_0005226

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

- Deferred maintenance deficiencies in specified format

  - For all re-inspected road segments
    - Road Segment Inventory complete in specified format
    - Photos attached to inventory in specified format
    - Appropriate Cost Model and CRV data in specified format
    - Deferred maintenance deficiencies in specified format

9. Submit data to BLM for review and acceptance.

C.  Summary – Phase IV – Quality Assurance and Review.  At the conclusion of the quality assurance and review (Phase IV) deliverables should be complete in accordance with the work-plan and BLM inspection standards and ready for review and acceptance testing by the BLM.  Deliverables should be provided electronically in accordance with the work plan and statement of work.  Partial submittals should only occur when they are part of the work-plan and partial submittals still require a complete set of data for each road segment.

The completed submittal will have been independently reviewed and approved for submittal to the BLM POC in the specified format and delivered, constituting the end of the work-effort for specific work plan (note individual field offices may include multiple work plans and a work plan may be as simple as a single road or as complex as an entire BLM Field Office inventory of roads).

BLM_0005227

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

# APPENDIX A – ROAD CONDITION ASSESSMENT FORM

BLM_0005228

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

BLM_0005229

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE & INSTRUCTIONS HANDBOOK



## ROAD CONDITION ASSESSMENT FORM

| Deficiency Types | Quantification | | Severity | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Unit of Measure | Capture QTY | Low | | Medium | | High | |
| | | | EA | Total | EA | Total | EA | Total |
| **Ditch Condition** | **LF** | **Each 100 LF** | **N/A** | **N/A** | **1" Depth  3'Width** | | **2" Depth  3'Width** | |
| Cut – Ditch Clearing (length, width and depth) | LF | Each 100 LF | N/A | N/A | | | | |
| Fill – Ditch Clearing (length, width, and depth) | LF | Each 100 LF | N/A | N/A | | | | |
| **Vegetation Removal** | | | **N/A** | **N/A** | | | | |
| Along Roadway (assume 3" width) | | | | | | | | |
| At Culver Inlet/Outlet | | | | | | | | |
| Brush Mowing (assume 3" width) | | | | | | | | |
| Tree Removal (< 6" diam.) | | | | | | | | |
| Tree Removal (3" to 6" diam.) | | | | | | | | |
| **Ruts** | **LF** | **Each 10 LF** | **N/A** | **N/A** | **4" – 6" Depth** | | **6" + Depth** | |
| Ruts ( assume 9" – 12" width) | LF | Each 10 LF | N/A | N/A | | | | |
| **Potholes** | **EA** | **EA** | **N/A** | **N/A** | **4" – 6" Depth** | | **6" + Depth** | |
| Potholes (assume 2' diam.) | EA | EA | N/A | N/A | | | | |
| **Missing Aggregate** | **LF** | **Each 100 LF** | **N/A** | **N/A** | **Overlay 3"** | | **Full Depth 6"** | |
| Missing Aggregate (assume width of roadway) | LF | Each 100 LF | N/A | N/A | | | | |
| **Loose Aggregate** | **LF** | **Each 10 LF** | **N/A** | **N/A** | | | | |
| Loose Aggregate (assume 3' to 4'width) | LF | Each 10 LF | N/A | N/A | | | | |
| **Corrugations/Washboarding** | **LF** | **Each 10 LF** | **N/A** | **N/A** | **4" – 6" Depth** | | **6" + Depth** | |
| Corrugations/Washboarding (assume width of road) | LF | Each 10 LF | N/A | N/A | | | | |
| **Cross Section/Positive Drainage** | **SF** | **Each 100 SF** | **N/A** | **N/A** | **1" Depth  3" Width** | | **2" Depth 3" Width** | |
| Fill – Embankment | SF | Each 100 SF | N/A | N/A | | | | |
| Cut - Excavation | SF | Each 100 SF | N/A | N/A | | | | |
| Washout | SF | Each 25 SF | N/A | N/A | | | | |

| Culvert Condition | Diameter | Length | Type | Depth | Condition/Corrective Action (buried pipe, debris level, crushed pipe or inlet/outlet, no pipe cover) |
|---|---|---|---|---|---|
| 1    2    3    4 | | | | | |
| 1    2    3    4 | | | | | |
| 1    2    3    4 | | | | | |
| 1    2    3    4 | | | | | |
| 1    2    3    4 | | | | | |
| 1    2    3    4 | | | | | |
| 1    2    3    4 | | | | | |

| Other Appurtenances (signs, gates, cattleguards, low water crossing, guardrail) | Length | Width | N/A | N/A | Quantity (EA and SF length for guardrails) | Condition/Corrective Action |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Bituminous Repair (Paved Roadways) | | | N/A | N/A | Seal Coat/ Crack Sealing | Bituminous Overlay 3" |
|---|---|---|---|---|---|---|
| Asphalt Overlay | SF | Each 25 SF | | | | |
| Fatigue Cracking | SF | Each 25 SF | | | | |
| Block Cracking | LF | Each 10 LF | | | | |
| Alligator/Transverse Cracking | SF | Each 25 SF | | | | |
| Raveling (at edge 1'width) | LF | Each 10 LF | | | | |
| Potholes (assume 2'diam.6" depth) | EA | EA | | | | |

**Potential Critical Health and Safety Items:**

**Comments:**

| | | | |
|---|---|---|---|
| **ROAD NAME:** | | **ASSESSORS:** | |
| **ROAD LOC NUM** | **SEGMENT LOC NUM** | **BEGIN MILEPOST:** | **END MILEPOST:** |
| **STATE & DISTRICT:** | **COUNTY:** | **BEGIN ODOMETER:** | **END ODOMETER:** |
| **DATE:** | | **SURFACE TYPE:** | |
| **BEGIN INSPECTION TIME:** | **END INSPECTION TIME:** | **SURFACE WIDTH:** | |
| **BEGIN SEGMENT** | | | |

BLM_0005230

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE & INSTRUCTIONS HANDBOOK

| PHOTO: | | END SEGMENT PHOTO: | | | |
|---|---|---|---|---|---|

BLM_0005231

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE & INSTRUCTIONS HANDBOOK

## APPENDIX B – GUIDANCE ON TERRAIN TYPES

Guidance on Terrain Types.

The following examples are to be used to determine the terrain type for a road segment. Each road segment will have only one 'average' terrain type.

Flat Terrain

Road segments in flat terrain (<15% side slopes) have little elevation deviation from the surrounding area. These road segments may be elevated or depressed slightly and are commonly found in open plains areas. Road in flat terrain would require only minimal earthwork in construction.

Example of road segment in flat terrain:



Rolling Terrain

Road segments in rolling terrain (16 – 30% side slopes) will deviate an average of 3 feet from the surrounding land. Earthwork required to construct a road in rolling terrain will average 3 feet of cut or fill height.

Example of road segment in cut in rolling terrain:



Example of road segment in fill in rolling terrain:



BLM HANDBOOK                           0                           Rel. No. 9-389
Supersedes 9-250                                        Date:  10/21/2011

BLM_0005232

H-9113-2 ROADS NATIONAL INVENTORY AND CONDITION ASSESSMENT GUIDANCE
& INSTRUCTIONS HANDBOOK

Mountainous Terrain

Road segments in mountainous terrain (>30% side slopes) are characterized by steep back slopes and fore slopes. Typically, construction of roads in mountainous terrains will be more costly due to increased excavation or fill heights and difficulties of transporting equipment and materials to the road site.

Example of road segment in mountainous terrain:



BLM_0005233

Bureau of Land Management

Visual Resource Management

# Visual Resource Inventory



# BLM Manual Handbook 8410-1

BLM_0005234

1

H-8410-1 – VISUAL RESOURCE INVENTORY

I. <u>General Guidance</u>.

   A. <u>Overview</u>. The visual resource inventory process provides BLM
managers with a means for determining visual values. The inventory
consists of a scenic quality evaluation, sensitivity level analysis, and a
delineation of distance zones. Based on these three factors,
BLM-administered lands are placed into one of four visual resource
inventory classes. These <u>inventory</u> classes represent the relative value of
the visual resources. Classes I and II being the most valued, Class III
representing a moderate value, and Class IV being of least value. The
inventory classes provide the basis for considering visual values in the
resource management planning (RMP) process. Visual resource <u>management</u>
classes are established through the RMP process for all BLM-administered
lands (see also Manual 1625.3). During the RMP process, the class
boundaries are adjusted as necessary to reflect the resource allocation
decisions made in RMP's. Visual management objectives are established for
each class. (See Section VB.)

   B. <u>Implementation Options</u>. The detail of the inventory will vary with
the visual character of the landscapes being inventoried. For example, the
flat, colorless, and barren mancos shale area in southeastern Utah should
not be given the same treatment as the rugged and colorful formations of
the Colorado River area. Sensitive areas such as those near major highways
or communities or adjacent to national parks should be given special
treatment. It may be necessary to modify or make adaptions to the
inventory system in such places as Alaska where the resource
characteristics and the land-use patterns are significantly different from
those in the Western States. These adaptations must (1) provide a more
cost-effective way to complete a quality inventory, and (2) keep the
conceptual framework of the Visual Resource Management (VRM) system intact.

   C. <u>Material Storage</u>. All visual resource inventory rating forms,
overlays, slides, and written material should be filed in the Resource Area
Office.

BLM_0005235

2

H-8410-1 - VISUAL RESOURCE INVENTORY

II.  Scenic Quality Evaluation.  Scenic quality is a measure of the visual appeal of a tract of land.  In the visual resource inventory process, public lands are given an A, B, or C rating based on the apparent scenic quality which is determined using seven key factors:  landform, vegetation, water, color, adjacent scenery, scarcity, and cultural modifications (see Illustrations 1, 2, 3, and 4).  During the rating process, each of these factors are ranked on a comparative basis with similar features within the physiographic province.  Use the physiographic provinces as delineated by Fenneman (see Illustrations 5 and 6) to the extent possible.  The boundaries of these provinces may be refined to fit local situations.  The "Ecoregions of the United States" by R. C. Bailey may be helpful in making these refinements.  An important premise of the evaluation is that all public lands have scenic value, but areas with the most variety and most harmonious composition have the greatest scenic value.  Another important concept is that the evaluation of scenic quality is done in relationship to the natural landscape.  This does not mean that man-made features within a landscape necessarily detract from the scenic value.  Man-made features that compliment the natural landscape may enhance the scenic value.  Evaluations should avoid any bias against man-made modification to natural landscape.

A.  Delineating Scenic Quality Rating Units (SQRU's).  The planning area is subdivided into scenic quality rating units for rating purposes.  Rating areas are delineated on a basis of:  like physiographic characteristics; similar visual patterns, texture, color, variety, etc.; and areas which have similar impacts from man-made modifications.  The size of SQRU's may vary from several thousand acres to 100 or less acres, depending on the homogeneity of the landscape features and the detail desired in the inventory.  Normally, more detailed attention will be given to highly scenic areas or areas of known high sensitivity.  Map and number each SQRU on an overlay as shown in illustration 7.

B.  Evaluating Scenic Quality.  It is recommended that an interdiscipli- nary team do the evaluations.  Ideally, one team member should have an environmental design arts background.  All participants should have an understanding of the visual resource inventory system and be familiar with the areas to be evaluated.  Evaluate each SQRU by observing the area from several important viewpoints.  Scores should reflect the evaluator's overall impression of the area.  After evaluating all the SQRU's, show the scenic ratings on the scenic quality overlay (see Illustration 7).  Record the ratings on the Scenic Quality Rating Summary - Bureau Form 8400-5 (see Illustration 4).  Bureau Form 8400-1 (see Illustration 3) may be used as a worksheet for completing each scenic quality evaluation.  A photographic record should be maintained for the area.  Photographs and completed evaluation forms should be filed for future reference.

BLM_0005236

H-8410-1 - VISUAL RESOURCE INVENTORY

III.  Sensitivity Level Analysis.  Sensitivity levels are a measure of public concern for scenic quality.  Public lands are assigned high, medium, or low sensitivity levels by analyzing the various indicators of public concern.

   A.  Factors to Consider.

      1.  Type of Users.  Visual sensitivity will vary with the type of users.  Recreational sightseers may be highly sensitive to any changes in visual quality, whereas workers who pass through the area on a regular basis may not be as sensitive to change.

      2.  Amount of Use.  Areas seen and used by large numbers of people are potentially more sensitive.  Protection of visual values usually becomes more important as the number of viewers increase.

      3.  Public Interest.  The visual quality of an area may be of concern to local, State, or National groups.  Indicators of this concern are usually expressed in public meetings, letters, newspaper or magazine articles, newsletters, land-use plans, etc.  Public controversy created in response to proposed activities that would change the landscape character should also be considered.

      4.  Adjacent Land Uses.  The interrelationship with land uses in adjacent lands can effect the visual sensitivity of an area.  For example, an area within the viewshed of a residential area may be very sensitive, whereas an area surrounded by commercially developed lands may not be visually sensitive.

      5.  Special Areas.  Management objectives for special areas such as Natural Areas, Wilderness Areas or Wilderness Study Areas, Wild and Scenic Rivers, Scenic Areas, Scenic Roads or Trails, and Areas of Critical Environmental Concern (ACEC), frequently require special consideration for the protection of the visual values.  This does not necessarily mean that these areas are scenic, but rather that one of the management objectives may be to preserve the natural landscape setting.  The management objectives for these areas may be used as a basis for assigning sensitivity levels.

      6.  Other Factors.  Consider any other information such as research or studies that includes indicators of visual sensitivity.

   B.  Delineation of Sensitivity Level Rating Units (SLRU's).  There is no standard procedure for delineating SLRU's.  The boundaries will depend on the factor that is driving the sensitivity consideration.  Consequently, a thorough review of the factors referred to in IIIA should be completed before any attempt is made to delineate SLRU's.  Distance zone may also play an important role in identifying the SLRU boundaries.

BLM_0005237

4

H-8410-1 - VISUAL RESOURCE INVENTORY

C.  Documentation Requirements.

1.  Narrative.  Prepare a summary statement with the essential facts and rationale to support the conclusions reached on sensitivity levels. The format for presenting this information is optional.  As a minimum, the summary data must be entered on Form 8400-6 (see Illustration 8).  Backup information used to evaluate each of the factors should be maintained with the inventory record.

2.  Map Overlay.  Prepare an overlay (see Illustration 9) showing the sensitivity rating units and ratings.

D.  Completion of Sensitivity Rating.  The instructions for completing the sensitivity ratings are shown in Illustration 8.  Ideally, the rating should be done as a team effort involving the Area or District VRM Coordinator, Area Manager, and at least one other staff person.  If timing or funding will not allow this approach, the rating may be done by the VRM coordinator and reviewed by the Area Manager.  Management should be in agreement on the summary rating for each SLRU.

IV.  Distance Zones.  Landscapes are subdivided into 3 distance zones based on relative visibility from travel routes or observation points.  The 3 zones are:  foreground-middleground, background, seldom seen.  The fore-ground-middleground (fm) zone includes areas seen from highways, rivers, or other viewing locations which are less than 3 to 5 miles away.  Seen areas beyond the foreground-middleground zone but usually less than 15 miles away are in the background (bg) zone.  Areas not seen as foreground-middleground or background (i.e., hidden from view) are in the seldom-seen (ss) zone.

A.  Mapping Distance Zones.  Prepare a distance zone overlay (see Illustration 10) using a base map common to the scenic quality base map. Distance zones are determined in the field by actually traveling along each route and observing the area that can be viewed.  If the route is a highway or trail, it should be traveled in both directions, unless it is a one-way route.  River use usually is one way; however, if there is up-river travel, it too should be evaluated from both directions.  If a vehicle or boat is used for this field survey, it is best to have both a driver and an observer.  Distance zones should be mapped for all areas.  While they are not necessary to determine classes in Class A scenic areas or for areas with low sensitivity levels, distance zones can provide valuable data during the RMP process when adjustments to VRM classes are made to resolve resource allocation conflicts.

BLM_0005238

5

H-8410-1 - VISUAL RESOURCE INVENTORY

1.  Foreground-Middleground Zone.  This is the area that can be seen from each travel route for a distance of 3 to 5 miles where management activities might be viewed in detail.  The outer boundary of this distance zone is defined as the point where the texture and form of individual plants are no longer apparent in the landscape.  In some areas, atmospheric conditions can reduce visibility and shorten the distances normally covered by each zone.  Also, where the foreground-middleground zone from one travel route overlaps the background from another route, use only the foreground-middleground designation.

2.  Background Zone.  This is the remaining area which can be seen from each travel route to approximately 15 miles.  Do not include areas in the background which are so far distant that the only thing discernible is the form or outline.  In order to be included within this distance zone, vegetation should be visible at least as patterns of light and dark.

3.  Seldom-Seen Zone.  These are areas that are not visible within the foreground-middleground and background zones and areas beyond the background zones.

B.  Coordinating Distance Zones Delineation and Sensitivity Level Analyses.  It is recommended that distance zones be delineated before the sensitivity analysis is done.  The distance zone delineations provide valuable information that can be very useful in the sensitivity analysis. For example, the foreground-middleground zones are more visible to the public and changes are more noticeable and are more likely to trigger public concern.  Also, the boundaries of the distance zones are very useful in helping to establish sensitivity rating units.

V.  Visual Resource Classes and Objectives.

A.  Purposes of Visual Resource Classes.  Visual resource classes are categories assigned to public lands which serves two purposes:  (1) an inventory tool that portrays the relative value of the visual resources, and (2) a management tool that portrays the visual management objectives. There are four classes (I, II, III, and IV).

BLM_0005239

6

H-8410-1 - VISUAL RESOURCE INVENTORY


1. **Visual Resource Inventory Classes.** Visual resource inventory classes are assigned through the inventory process. Class I is assigned to those areas where a management decision has been made previously to maintain a natural landscape. This includes areas such as national wilderness areas, the wild section of national wild and scenic rivers, and other congressionally and administratively designated areas where decisions have been made to preserve a natural landscape. Classes II, III, and IV are assigned based on a combination of scenic quality, sensitivity level, and distance zones. This is accomplished by combining the 3 overlays for scenic quality, sensitivity levels, and distance zones and using the guidelines shown in Illustration 11 to assign the proper class. The end product is a visual resource inventory class overlay as shown in Illustration 12. Inventory classes are informational in nature and provide the basis for considering visual values in the RMP process. They do not establish management direction and should not be used as a basis for constraining or limiting surface disturbing activities.


2. **Visual Resource Management Classes.** Visual resource management classes are assigned through RMP's. The assignment of visual management classes is ultimately based on the management decisions made in RMP's. However, visual values must be considered throughout the RMP process. All actions proposed during the RMP process that would result in surface disturbances must consider the importance of the visual values and the impacts the project may have on these values. Management decisions in the RMP must reflect the value of visual resources. In fact, the value of the visual resource may be the driving force for some management decisions. For example, highly scenic areas which need special management attention may be designated as scenic Areas of Critical Environmental Concern and classified as VRM Class I based on the importance of the visual values. A map is developed in each RMP showing the approved visual resource management classes.


B. **Objectives for Visual Resource Classes.**


1. **Class I Objective.** The objective of this class is to preserve the existing character of the landscape. This class provides for natural ecological changes; however, it does not preclude very limited management activity. The level of change to the characteristic landscape should be very low and must not attract attention.


2. **Class II Objective.** The objective of this class is to retain the existing character of the landscape. The level of change to the characteristic landscape should be low. Management activities may be seen, but should not attract the attention of the casual observer. Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

BLM_0005240

H-8410-1 - VISUAL RESOURCE INVENTORY

3.  Class III Objective.  The objective of this class is to partially retain the existing character of the landscape.  The level of change to the characteristic landscape should be moderate.  Management activities may attract attention but should not dominate the view of the casual observer.  Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

4.  Class IV Objective.  The objective of this class is to provide for management activities which require major modification of the existing character of the landscape.  The level of change to the characteristic landscape can be high.  These management activities may dominate the view and be the major focus of viewer attention.  However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating the basic elements.

C.  Rehabilitation Areas.  Areas in need of rehabilitation from a visual standpoint should be flagged during the inventory process.  The level of rehabilitation will be determined through the RMP process by assigning the VRM class approved for that particular area.

D.  Interim VRM Classes and Objectives.  Interim visual management classes are established where a project is proposed and there are no RMP approved VRM objectives.  These classes are developed using the guidelines in Section I to V and must conform with the land-use allocations set forth in the RMP which covers the project area.  The establishment of interim VRM classes will not require a RMP amendment, unless the project that is driving the evaluation requires one.

BLM_0005241

Illustration 1
(II)

H-8410-1 - VISUAL RESOURSE INVENTORY

Scenic Quality - Explanation of Rating Criteria

## landform

Topography becomes more interesting as it gets steeper or more massive, or more severely or universally sculptured. Outstanding landforms may be monumental, as the Grand Canyon, the Sawtooth Mountain Range in Idaho, the Wrangell Mountain Range in Alaska, or they may be exceedingly artistic and subtle as certain badlands, pinnacles, arches, and other extraordinary formations.

## vegetation

Give primary consideration to the variety of patterns, forms, and textures created by plant life. Consider short-lived displays when they are known to be recurring or spectacular. Consider also smaller scale vegetational features which add striking and intriguing detail elements to the landscape (e.g., gnarled or windbeaten trees, and joshua trees).

## water

That ingredient which adds movement or serenity to a scene. The degree to which water dominates the scene is the primary considera- tion in selecting the rating score.

## color

Consider the overall color(s) of the basic components of the landscape (e.g., soil, rock, vegetation, etc.) as they appear during seasons or periods of high use. Key factors to use when rating "color" are variety, contrast, and harmony.

## adjacent scenery

Degree to which scenery outside the scenery unit being rated enhances the overall impression of the scenery within the rating unit. The distance which adjacent scenery will influence scenery within the rating unit will normally range from 0-5 miles, depending upon the characteristics of the topography, the vegetative cover, and other such factors. This factor is generally applied to units which would normally rate very low in score, but the influence of the adjacent unit would enhance the visual quality and raise the score.

## scarcity

This factor provides an opportunity to give added importance to one or all of the scenic features that appear to be relatively unique or rare within one physiographic region. There may also be cases where a separate evaluation of each of the key factors does not give a true picture of the overall scenic quality of an area. Often it is a number of not so spectacular elements in the proper combination that produces the most pleasing and memorable scenery - the scarcity factor can be used to recognize this type of area and give it the added emphasis it needs.

## cultural modifications

Cultural modifications in the landform/water, vegetation, and addition of structures should be considered and may detract from the scenery in the form of a negative intrusion or complement or improve the scenic quality of a unit. Rate accordingly.

Rel. 8-28
1/17/86

BLM_0005242

Illustration 2
(II)

H-8410-1 - VISUAL RESOURCE INVENTORY

Scenic Quality - Inventory and Evaluation Chart

# SCENIC QUALITY
## INVENTORY AND EVALUATION CHART

### INSTRUCTIONS

**Purpose:** To rate the visual quality of the scenic resource on all BLM managed lands.

**How to Identify Scenic Value:** All Bureau lands have scenic value.

**How to Determine Minimum Suitability:** All BLM lands are rated for scenic values. Also rate adjacent or inter- mingling non-BLM lands within the planning unit.

**When to Evaluate Scenic Quality:** Rate for scenery under the most critical conditions (i.e., highest user period or season of use, sidelight, proper atmospheric conditions, etc.).

**How to Delineate Rating Areas:** Consider the following factors when delineating rating areas.

1. Like physiographic characteristics (i.e., land form, vegetation, etc.).

2. Similar visual patterns, texture, color, variety, etc.

3. Areas which have a similar impact from cultural modifications (i.e., roads, historical and other structures, mining operations, or other surface disturbances).

**Explanation of Criteria:** (See Illustration L)

**NOTE:** Values for each rating criteria are maximum and minimum scores only. It is also possible to assign scores within these ranges.

| key factors | rating criteria and score | | |
|---|---|---|---|
| **landform** | High vertical relief as expressed in prominent cliffs, spires, or massive rock outcrops; or severe surface variation or highly eroded formations including major badlands or dune systems; or detail features dominant and exceptionally striking and intriguing such as glaciers.  **5** | Steep canyons, mesas, buttes, cinder cones, and drumlins; or interesting erosional patterns or variety in size and shape of landforms; or detail features which are interesting though not dominant or exceptional.  **3** | Low rolling hills, foothills, or flat valley bottoms; or few or no interesting landscape features.  **1** |
| **vegetation** | A variety of vegetative types as expressed in interesting forms, textures, and patterns.  **5** | Some variety of vegetation, but only one or two major types.  **3** | Little or no variety or contrast in vegetation.  **1** |
| **water** | Clear and clean appearing, still, or cascading white water, any of which are a dominant factor in the landscape.  **5** | Flowing, or still, but not dominant in the landscape.  **3** | Absent, or present, but not noticeable.  **0** |
| **color** | Rich color combinations, variety or vivid color; or pleasing contrasts in the soil, rock, vegetation, water or snow fields.  **5** | Some intensity or variety in colors and contrast of the soil, rock, and vegetation, but not a dominant scenic element.  **3** | Subtle color variations, contrast, or interest; generally mute tones.  **1** |
| **influence of adjacent scenery** | Adjacent scenery greatly enhances visual quality.  **5** | Adjacent scenery moderately enhances overall visual quality.  **3** | Adjacent scenery has little or no influence on overall visual quality.  **0** |
| **scarcity** | One of a kind; or unusually memorable, or very rare within region. Consistent chance for exceptional wildlife or wildflower viewing, etc.  1/  **5+** | Distinctive, though somewhat similar to others within the region.  **3** | Interesting within its setting, but fairly common within the region.  **1** |
| **cultural modifications** | Modifications add favorably to visual variety while promoting visual harmony.  **2** | Modifications add little or no visual variety to the area, and introduce no discordant elements.  **0** | Modifications add variety but are very discordant and promote strong disharmony.  **−4** |

## SCENIC QUALITY
**A = 19 or more**
**B = 12–18**
**C = 11 or less**

1/ A rating of greater than 5 can be given but must be supported by written justification.

BLM_0005243

Illustration 3, Page 1
(Form 8400-1)
H-8410-1 - VISUAL RESOURCE INVENTORY                      (II)

Scenic Quality Field Inventory Form

Form 8400-1
(September 1985)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**SCENIC QUALITY FIELD INVENTORY**

Date  Aug. 15, 1985

District  Moab

Resource Area  Grand

Scenic quality rating unit  024

1. Evaluators *(names)*  Bob Tumwater, Russ Grimes, Pete Jordon

### 2. LANDSCAPE CHARACTER *(Feature)*

| | a. LANDFORM/WATER | b. VEGETATION | c. STRUCTURE *(General)* |
|---|---|---|---|
| FORM | deeply cut side canyons with vertical walls leading into flat open valley w/slow meandering river | simple forms created by patterns in vegetation | oval, elongated, and linear. |
| LINE | horizontal & vertical in cliff formations, jagged ridge lines, and meandering river | irregular, indistinct | rounded, vertical |
| COLOR | oranges and greys dominant, deep blue in settling pond | dark green in river bottom, grey elsewhere | light green & grey |
| TEXTURE | Course | medium grain, sparse, and uneven random | uneven |

3. Narrative  This SQRU includes the flat and meandering river bed of the Colorado River and the deeply dissected canyons to the north. It differs in landform and vegetation from the surrounding areas. The rock formations and topography are fairly common in the physiographic province but it is uncommon to have a river flowing through this type of landscape. The potash plant which lies in the middle of this area is a major visual intrusion which can be seen from several overlooks and the river.

### 4. SCORE *(Circle Appropriate Level)* *

| | HIGH | MEDIUM | LOW | EXPLANATION OR RATIONALE |
|---|---|---|---|---|
| a. Landform | 5 (4) | 3 | 1 | |
| b. Vegetation | 5 | 3 (2) | 1 | |
| c. Water | (5) | 3 | 0 | |
| d. Color | (5) | 3 | 1 | |
| e. Adjacent Scenery | 5 (4) | 3 | 0 | See explanation on reverse |
| f. Scarcity | 5+ | (3) | 1 | |
| g. Cultural Modification | 2 | 0 | (-3) -4 | |
| **TOTALS** | 18 + 5 + (-3) = 20 | | | |

**SCENIC QUALITY CLASSIFICATION**

☑ A – 19 or more

☐ B – 12-18

☐ C – 11 or less

*(Instructions on reverse)*

BLM MANUAL

Rel. 8-28
1/17/86

Illustration 3, Page 2

H-8410-1 - VISUAL RESOURCE INVENTORY

Scenic Quality Field Inventory Form

### INSTRUCTIONS

Following are the instructions for completing the form. The numbers correspond with the item numbers on the form.

1. **Evaluators.** List the names of the persons involved in the rating.

2. **Landscape Character.** Briefly describe the major features and elements in the landscape. Refer to illustrations 4, 5, 6, and 7 of the BLM Handbook 1-8431-1 for guidelines on the terminology to be used to describe the elements.

3. **Narrative.** Briefly describe the general character of the landscape as it relates to the immediate surroundings and to similar landscape features within the physiographic province.

4. **Scores.** Rate the scenic quality using the criteria and guidelines in the BLM Handbook 1-8410-1 Section II. Record the scores by circling the appropriate numbers. If the rating more appropriately falls between the listed numbers, write in the desired number and circle it. For example, if the desired number for "color" falls between 3 and 5, write in the number 4 and circle it. Explain any unusual factors affecting a rating under the "explanation and rationale" column. If more space is needed, continue the explanation on this page. After the ratings are completed total the scores and check the appropriate classification block.

Comments on 4f-Adjacent scenry. The high scenic rating value of "4" was given to this factor because of the high scenic of the surrounding areas that can be seen from within the SGRW. These scenic areas include Behind-the-Rocks area, Canyonlands country, and the La Sal mountains.

BLM_0005245

Form 8400-5
(May 1984)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

SCENIC QUALITY RATING SUMMARY

H-8410-1 – VISUAL RESOURCE INVENTORY

Scenic Quality Rating Summary

Illustration 4
(Form 8400-5)
(II)

Date  Aug. 16, 1985

District  Moab

Resource Area  Grand

1. Evaluators (names)  Bob Tunwater, Les Grimes, Pete Jordon

| SCENIC QUALITY RATING UNITS (1) | (2) Landform | (3) Vegetation | (4) Water | (5) Color | (6) Adjacent Scenery | (7) Scarcity | (8) Cultural Modification | (9) Total Score | (10) Scenic Quality Rating | EXPLANATION (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 3 | 1 | 5 | 4 | 2 | 2 | 0 | 20 | A | colorful waterway |
| 002 | 3 | 3 | 0 | 1 | 2 | 2 | 0 | 11 | C | rolling hills, colorless, little veg. |
| 003 | 2 | 1 | 0 | 2 | 2 | 2 | 0 | 10 | C | flat, colorless, barren |
| 004 | 1 | 0 | 3 | 3 | 2 | 1 | 0 | 10 | C | water, scenic cliffs, barren |
| 005 | 4 | 3 | 4 | 2 | 3 | 3 | 0 | 19 | A | water, scenic cliffs, & interesting veg. |
| 006 | 1 | 1 | 0 | 2 | 4 | 1 | 0 | 18 | B | scenic cliffs |
| 007 | 4 | 4 | 5 | 3 | 2 | 0 | 2 | 22 | A | flat, colorless, barren |
| 008 | 3 | 3 | 0 | 3 | 3 | 3 | 0 | 15 | B | water, riverside veg., colorful cliffs |
| 009 | 3 | 2 | 0 | 2 | 1 | 2 | 0 | 10 | C | good mixture of color, topo, & veg. |
| 010 | 1 | 2 | 0 | 2 | 3 | 2 | 0 | 10 | C | rugged but otherwise monotonous  monotonous but good view of N.P. |

INSTRUCTIONS

Form is used in conjunction with the Scenic Quality Inventory and Evaluation Chart.

BLM MANUAL

Rel. 8-28
1/17/86

BLM_0005246

Illustration 5

(II)

H-8410-1 - VISUAL RESOURCE INVENTORY

Physiographic Province Map - Continental United States



BLM_0005247

Illustration 6
(II)

H-8410-1 – VISUAL RESOURCE INVENTORY

Physiographic Province Map – Alaska



BLM_0005248

Illustration 7

(IIA)

H-8410-1 – VISUAL RESOURCE INVENTORY

Scenic Quality Overlay





BLM_0005249

H-8410-1 – VISUAL RESOURCE INVENTORY

Sensitivity Level Rating Sheet

Form 8400-6
(September 1985)

**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

**SENSITIVITY LEVEL RATING SHEET**

Date *Aug. 15, 1985*

District *Moab*

Resource Area *Grand*

1. Evaluators (*names*)

*Bob Tumwater, Russ Grimes, Pete Jordon*

| SENSITIVITY LEVEL RATING UNIT (1) | Type of User (2) | Amount of Use (3) | Public Interest (4) | Adjacent Land Uses (5) | Special Area (6) | Other Factors (7) | Overall Rating (8) | EXPLANATION (9) |
|---|---|---|---|---|---|---|---|---|
| 001 | H | H | H | H | H | – | H | within f/m zone of I-70 & U163 |
| 002 | H | L | m | L | H | – | H | visible from river & floatboat users. |
| 003 | L | L | L | L | L | – | L | isolated area with low scenic values |
| 004 | H | m | H | m | m | – | H | f/m zone for State Park entrance road. |

(Instructions on reverse)

Rel. 8-28
1/17/86

BLM MANUAL

Illustration 8, Page 2

H-8410-1 - VISUAL RESOURCE INVENTORY

Sensitivity Level Rating Sheet

### INSTRUCTIONS

Steps in the Sensitivity Level Analysis

1. Divide the inventory area into logical sensitivity rating units.

2. Analyze the factors which indicate visual sensitivity.

3. For each rating unit, rate each factor as high, moderate, or low using the following outline as a general guide:

   a. *Type of Users.* Maintenance of visual quality is:

     — a major concern for most users ........................................................... High

     — a moderate concern for most users ...................................................... Moderate

     — a low concern for most users ............................................................. Low

   b. *Amount of use.* Maintenance of visual quality becomes more important as the level of use increases(see table below):

     — high level of use ........................................................................... High

     — moderate level of use ..................................................................... Moderate

     — low level of use ........................................................................... Low

   c. *Public Interest.* Maintenance of visual quality is:

     — a major public issue ...................................................................... High

     — a moderate public issue ................................................................... Moderate

     — a minor public issue ...................................................................... Low

   d. *Adjacent Land Uses.* Maintenance of visual quality to sustain adjacent land use objectives is:

     — very important ............................................................................. High

     — moderately important ..................................................................... Moderate

     — slightly important ......................................................................... Low

   e. *Special Area.* Maintenance of visual quality to sustain Special Area management objectives is:

     — very important ............................................................................. High

     — moderately important ..................................................................... Moderate

     — slightly important ......................................................................... Low

4. Determine the over-all sensitivity level for each rating unit. This is a judgmental process which requires a careful analysis of all the above factors. Review the ratings given to each factor and analyze the relationship between factors. A high rating in any one factor does not necessarily mean that the over-all sensitivity level rating should be high. For example, the rating for "type of users" might be high but the "amount of use" might be low. Consequently, the over-all rating could be low or moderate. Management should be involved in this rating process.

5. Record the ratings and explanation on the sensitivity level rating sheet.

| TABLE FOR CLASSIFYING AMOUNT OF USE | | |
|---|---|---|
| TYPE AREA | HIGH | MODERATE | LOW |
| Roads & Highways<br>Rivers & Trails<br>Recreation Sites | Greater than 45,000 visits/yr.<br>Greater than 20,000 visits/yr.<br>Greater than 10,000 visitor days/yr. | 5,000-45,000 visits/yr.<br>2,000-20,000 visits/yr.<br>2,000-10,000 visitor days/yr. | Lesser than 5,000 visits/yr.<br>Lesser than 2,000 visits/yr.<br>Lesser than visitor 2,000 days/yr. |

BLM_0005251

Illustration 9
(IIIC2)

H-8410-1 - VISUAL RESOURCE INVENTORY

Sensitivity Level Overlay



LEGEND

High

Medium

Low

BIG FLAT SQUAW PARK
west planning unit
bureau of land management

0 miles    5 miles    10

BLM MANUAL

Rel. 8-28
1/17/86

BLM_0005252

Illustration 10
(IVA)

H-8410-1 - VISUAL RESOURCE INVENTORY

Distance Zone Overlay



LEGEND

Foreground-Middleground

Background

Seldom Seen



BIG FLAT SQUAW PARK
west planning unit
bureau of land management

0miles    5miles    10

BLM MANUAL

Rel. 8-28
1/17/86

BLM_0005253

Illustration 11

(VA 1)

H-8410-1 – VISUAL RESOURCE INVENTORY

Determining Visual Resource Inventory Classes

A. Basis for Determining Visual Resource Inventory Classes

1. Class I.  Class I is assigned to all special areas where the current management situations requires maintaining a natural environment essentially unaltered by man.

2. Classes II, III, and VI.  These classes are assigned based on combinations of scenic quality, sensitivity levels, and distance zones as shown in the following matrix:

Visual Sensitivity Levels

|  |  | High | | | Medium | | | Low |  |
|---|---|---|---|---|---|---|---|---|---|
|  |  | I : | I : | I | I : | I : | I | I |  |
| Special Areas |  | | | | | | | | *if adjacent area is |
|  | A | II | II | II | II | II | II | II | Class III or lower |
| Scenic | B | II | III | III/IV* | III | IV | IV | IV | assign Class III, if |
| Quality | C | III | IV | IV | IV | IV | IV | IV | higher assign class IV |
|  |  | f/m | b | s/s | f/m | b | s/s | s/s |  |

Distance Zones

B. How to Map Visual Resource Inventory Classes II, III, and IV.

Mapping inventory classes can be cumbersome and time consumming if not done in a systematic manner.  Many systems have been developed to do this task.  One that has been used effectively is:

Step I: Code each of the 3 overlays as follows:

| Scenic Quality | A | B | C |
| Sensitivity Levels | High | Moderate | Low |
| Distance Zones | f/m | b | s/s |

Step 2: Copy the codes from the overlays on to a single new overlay.

Step 3: Delineate the boundaries of the inventory classes on a new overlay using the following information as a guide:

Class II - 4 or more lines (i.e., )

Class III - 3 lines (i.e. )

Class IV - 2 lines or less.

BLM MANUAL

Rel. 8-28
1/17/86

BLM_0005254

Illustration 12

(VA1)

H-8410-1 - VISUAL RESOURCE INVENTORY

Visual Resource Inventory Class Overlay



Rel. 8-28
1/17/86

BLM_0005255

Form 1221-2
(June 1969)



**UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT**

MANUAL TRANSMITTAL SHEET

| Release |
|---|
| 8-30 |
| **Date** |
| 1/17/86 |

Subject

### H-8431-1 - VISUAL RESOURCE CONTRAST RATING

1. <u>**Explanation of Material Transmitted:**</u>  This Handbook revises the "how-to-do-it" guidance from Manual 8431.  The policy and procedures are placed in the revised Manual Section 8431.

2. <u>Reports Required</u>:  None.

3. <u>Materials Superseded</u>:  Manual pages superseded by this release are listed under "REMOVE" below.  No other directives are superseded.

4. <u>Filing Instructions</u>:  File as directed below, immediately following the Manual Section material.

<u>REMOVE</u>:                    <u>INSERT</u>:

None                    All of H-8431-1

(Total:  16 Sheets)

*Ronald L. Kuhlman*

Ronald L. Kuhlman

**Deputy Director, Lands and Renewable Resources**
Acting

Bureau of Land Management

Visual Resource Management

# Visual Resource Contrast Rating



# BLM Manual Handbook 8431-1

BLM_0005257

# H-8431-1 - VISUAL RESOURCE CONTRAST RATING

## Table of Contents

I. Introduction
   A. Overview

II. Steps in the Contrast Rating Process
   A. Obtain Project Description
   B. Identify VRM Objectives
   C. Select Key Observation Points (KOP's)
   D. Prepare Visual Simulations
   E. Complete the Contrast Rating

III. Requirements for Completing the Contrast Rating Worksheet
   A. Project Information (Section A)
   B. Descriptions (Sections B and C)
   C. Categorizing Projects Under Features (Sections B and C)
   D. Contrast Rating (Section D)
      1. Selecting the Timeframe
      2. Rating the Degree of Contrast (Section D1)
      3. Determining Whether VRM Objectives Are Met (Section D2)
      4. Developing Additional Mitigating Measures (Section D3)

Illustrations
1. Example of Visual Simulation Technique
2. Visual Contrast Rating Worksheet (Form 8400-4)
3. Description of the Element FORM
4. Description of the Element LINE
5. Description of the Element COLOR
6. Description of the Element TEXTURE
7. Description of the Variable SCALE
8. Description of the Variable SPACE

Appendices
1. Project Description Guidelines
2. VRM Class Objectives
3. A Sample List of Design Techniques for Mitigating Visual Impacts

Rel. 8-30
1/17/86

BLM_0005258

H-8431-1 – VISUAL RESOURCE CONTRAST RATING

I. <u>Introduction</u>.

   A. <u>Overview</u>.  The contrast rating system is a systematic process used
by the Bureau of Land Management (BLM) to analyze potential visual impacts
of proposed projects and activities.  It is primarily intended to assist
Bureau personnel who are not formally trained in the design arts to apply
the basic principles of design in the resolution of visual impacts.  It is
not intended to be the only means of resolving these impacts.  It should be
used as a guide, tempered by common sense, to ensure that every attempt is
made to minimize potential visual impacts.  The basic philosophy underlying
the system is:  The degree to which a management activity affects the
visual quality of a landscape depends on the visual contrast created
between a  project and the existing landscape.  The contrast can be
measured by comparing the project features with the major features in the
existing landscape.  The basic design elements of form, line, color, and
texture are used to make this comparison and to describe the visual
contrast created by the project.  This assessment process provides a means
for determining visual impacts and for identifying measures to mitigate
these impacts.

II. <u>Steps in the Contrast Rating Process</u>.

   A. <u>Obtain Project Description</u>.  To effectively evaluate the visual
impacts of a proposed project, a detailed project description is needed.
Appendix 1 provides guidance on the type of information needed.  The level
of detail required in the description should be commensurate with the type
of project proposed.  This information is usually supplied by the project
sponsor for BLM-initiated projects or by the applicant for non-Bureau of
Land Management initiated projects.

   B. <u>Identify VRM Objectives</u>.  Use the RMP generated objectives when
available.  Where there are no RMP approved objectives, interim Visual
Resource Management (VRM) classes will be developed using the guidelines in
Handbook H-8410-1 except:  (1) The inventory will be limited to the area
affected by the project; and (2) the VRM classes will reflect the
management decision made in existing RMP's.  An RMP amendment is not
required unless the project that is driving the evaluation requires an
amendment.

BLM_0005259

2

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

C. <u>Select Key Observation Points (KOP's)</u>.  The contrast rating is done from the most critical viewpoints.  This is usually along commonly traveled routes or at other likely observation points.  Factors that should be considered in selecting KOP's are; angle of observation, number of viewers, length of time the project is in view, relative project size, season of use, and light conditions (see Section IIID2b for a more detailed description of these factors).  Linear projects such as powerlines should be rated from several viewpoints representing:

- Most critical viewpoints, e.g., views from communities, road crossings.
- Typical views encountered in representative landscapes, if not covered by critical viewpoints.
- Any special project or landscape features such as skyline crossings, river crossings, substations, etc.

D. <u>Prepare Visual Simulations</u>.  Visual simulations are an invaluable tool in effectively evaluating the impacts of a proposed project (see Illustration 1).  Simulations are strongly recommended for potentially high impact projects.  The level of sophistication should be commensurate with the quality of the visual resource and the severity of the anticipated impact.  Simulations are extremely important to portray the relative scale and extent of a project.  They also help public groups visualize and respond to development proposals, making public participation in the planning process more effective.  The BLM publication <u>Visual Simulation Techniques</u> should be consulted for the appropriate simulation methods.

E. <u>Complete the Contrast Rating</u>.  Complete contrast rating from key observation point(s) using Bureau Form 8400-4 - Visual Contrast Rating Worksheet (see Illustration 2).

III. <u>Requirements for Completing the Contrast Rating Worksheet</u>.

A. <u>Project Information (Section A)</u>.  Complete the background information requested.  It is important to precisely record the location of the KOP.  A sketch of the KOP/project location should be shown in the "location" block.  If several different key observation points are used for the project evaluation, give each viewpoint a separate number for reference purposes.

B. <u>Descriptions (Sections B and C)</u>.  To properly assess the contrasts between the proposed and existing situation, it is necessary to break each down into the basic features (i.e., landform/water, vegetation, and structures) and basic elements (i.e., form, line, color, and texture) so that the specific features and elements that cause contrast can be accurately identified.  When describing the project, be sure to include approved mitigating measures.  Refer to Illustrations 3, 4, 5, and 6 for the suggested vocabulary for describing characteristic landscapes and the proposed projects.

BLM_0005260

3

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

C. Categorizing Projects Under Features (Sections B and C). It is sometimes difficult to determine which type feature a project fits under. Use the following as a guide to categorize projects:

| Landform/Water Features | Vegetative Features | Structural Features |
|---|---|---|
| Roads | Timber Harvests | Transmission Lines |
| Mining | Grazing Systems | Generation Plants |
| Gravel Pits | Vegetative Manipulations | Oil and Gas Developments |
| Landfills | | Recreation Facilities |
| Water Impoundments | | Water Tanks |
| | | Microwave Stations |
| | | Buildings |

D. Contrast Rating (Section D). The actual rating should be completed in the field from the KOP(s). It can be done as a team effort or individually, depending on the sensitivity and impacts of the project and the availability of personnel (see Manual Section 8431.12). If done as a team, it is best to do the ratings individually and then compare ratings. A simulation should be available to show scale, relative placement of disturbing features, and other important information necessary to complete an objective rating.

   1. Selecting the Timeframe. Projects may be rated on either a short-term or long-term basis. Short-term is through the first 5 years and long-term is through the life of the project. If the project has significantly different short-term and long-term effects, two contrast ratings should be completed using two separate forms. Check the appropriate block under section D on the rating form to indicate the term of the rating.

   2. Rating the Degree of Contrast (Section D1). Using the matrix provided in section D of the form, rate the degree of contrast. Be sure to include the proposed mitigating measures and standard stipulations in the rating. The rating is completed by determining the degree of contrast (i.e., strong, moderate, weak, or none) for each element. Use the following general criteria and factors when rating the degree of contrast:

      a. Degree of Contrast Criteria.

| Degree of Contrast | Criteria |
|---|---|
| None . . . . . . . . | The element contrast is not visible or perceived. |
| Weak . . . . . . . . | The element contrast can be seen but does not attract attention. |
| Moderate . . . . . | The element contrast begins to attract attention and begins to dominate the characteristic landscape. |
| Strong . . . . . . . | The element contrast demands attention, will not be overlooked, and is dominant in the landscape. |

Rel. 8-30
1/17/86

BLM_0005261

4

H-8431-1 – VISUAL RESOURCE CONTRAST RATING

      b.  Factors to be considered.  Consider the following factors when applying the criteria (see also Illustrations 3, 4, 5, and 6):

      (1)  Distance.  The contrast created by a project usually is less as viewing distance increases.

      (2)  Angle of Observation.  The apparent size of a project is directly related to the angle between the viewer's line-of-sight and the slope upon which the project is to take place.  As this angle nears 90 degrees (vertical and horizontal), the maximum area is viewable.

      (3)  Length of Time the Project Is in View.  If the viewer has only a brief glimpse of the project, the contrast may not be of great concern.  If, however, the project is subject to view for a long period, as from an overlook, the contrast may be very significant.

      (4)  Relative Size or Scale.  The contrast created by the project is directly related to its size and scale as compared to the surroundings in which it is placed (see Illustration 7).

      (5)  Season of Use.  Contrast ratings should consider the physical conditions that exist during the heaviest or most critical visitor use season, such as snow cover and tree defoliation during the winter, leaf color in the fall, and lush vegetation and flowering in the spring.

      (6)  Light Conditions.  The amount of contrast can be substantially affected by the light conditions.  The direction and angle of lighting can affect color intensity, reflection, shadow, form, texture, and many other visual aspects of the landscape.  Light conditions during heavy use periods must be a consideration in contrast ratings.

      (7)  Recovery Time.  The amount of time required for successful revegetation should be considered.  Few projects meet the VRM management objectives during construction activities.  Recovery usually takes several years and goes through several phrases (e.g., bare ground to grasses, to shrubs, to trees, etc.).  It may be necessary to conduct contrast ratings for each of the phases that extend over long time periods.  Those conducting contrast rating should verify the probability and timing of vegetative recovery.

      (8)  Spatial Relationships.  The spacial relationship within a landscape is a major factor in determining the degree of contrast (see Illustration 8).

      (9)  Atmospheric Conditions.  The visibility of projects due to atmospheric conditions such as air pollution or natural haze should be considered.

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

(10) Motion.  Movement such as waterfalls, vehicles, or plumes draw attention to a project.

c.  General Guidance for Accessing Contrast.

(1) Form.  Contrast in form results from changes in the shape and mass of landforms or structures.  The degree of change depends on how dissimilar the introduced forms are to those continuing to exist in the landscape.

(2) Line.  Contrasts in line results from changes in edge types and interruption or introduction of edges, bands, and silhouette lines.  New lines may differ in their subelements (boldness, complexity, and orientation) from existing lines.

(3) Color.  Changes in value and hue tend to create the greatest contrast.  Other factors such as chroma, reflectivity, color temperature, may also increase the contrast.

(4) Texture.  Noticeable contrast in texture usually stems from differences in the grain, density, and internal contrast.  Other factors such as irregularity and directional patterns of texture may affect the rating.

3.  Determining Whether VRM Objectives are Met (Section D2). Compare the contrast ratings with the objectives for the approved VRM Class (see Appendix 2 for definitions of VRM classes).  For comparative purposes, the four levels of contrast (i.e., none, weak, moderate, and strong) roughly correspond with classes I, II, III, and IV, respectively.  This means that a "strong" contrast rating may be acceptable in a class IV area but probably would not meet the VRM objectives for a class III area.  In making these comparisons, one must also look at the cumulative effect of all the contrast ratings.  Certain combinations of ratings may indicate there is a stronger overall contrast than the individual ratings show.  For example, several "moderate" ratings when viewed in combination may warrant an overall "strong" rating.  This is a judgmental call that must be documented on the back side of the form.  If the rater checks the "no" block on the form, indicating the VRM objectives are not met, the reasons for not meeting the objectives must also be documented on the back of the form.

BLM_0005263

6

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

    4.  Developing Additional Mitigating Measures (Section D3).
Since the overall VRM goal is to minimize visual impacts, mitigating
measures should be prepared for all adverse contrasts that can be reduced.
This includes reduction of contrast in projects which have met the VRM
objectives.  Mitigating measures should be written so they can easily be
extracted and used as stipulations in leases, permits, contracts, etc.
When preparing mitigating measures, keep in mind the concepts of strategic
location (in less visible and less sensitive areas), minimizing
disturbance, and repetition of the basic elements (form, line, color, and
texture).  Also make sure that mitigating measures are realistic (i.e., do
not propose revegetation where the probability of success is very low).
Other suggestions for reducing contrast are shown in Appendix 3.  The
publications listed in the bibliography of Manual Section 8400 also provide
additional guidance on mitigating measures.

Illustration 1
(IID)

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

Example of Visual Simulation Technique

 existing site

 proposed project

 project modified

BLM_0005265

H-8431-1 – VISUAL RESOURCE CONTRAST RATING

Visual Contrast Rating Worksheet

Form 8400-4
(September 1985)

**UNITED STATES**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF LAND MANAGEMENT**

**VISUAL CONTRAST RATING WORKSHEET**

Date _Aug 15, 1985_

District _Moab_

Resource Area _Grand_

Activity (program) _Oil & Gas_

## SECTION A. PROJECT INFORMATION

1. Project Name _Well Site #136_

2. Key Observation Point _#15 on Hatch Pt. Rd._

3. VRM Class _Class II_

4. Location
Township _27S_
Range _21 E_
Section _24_

5. Location Sketch

_Hatch pt. Rd_
_The KNOB LOOP_  _X KOP_
_North_  _O well site_

## SECTION B. CHARACTERISTIC LANDSCAPE DESCRIPTION

| | 1. LAND/WATER | 2. VEGETATION | 3. STRUCTURES |
|---|---|---|---|
| FORM | flat to rolling terrain | simple forms created by vegetative patterns | — |
| LINE | horizontal & diagonal | weak & undulating | — |
| COLOR | dark tans to orange | light to dark green, mottled | — |
| TEXTURE | smooth | smooth to course | — |

## SECTION C. PROPOSED ACTIVITY DESCRIPTION

| | 1. LAND/WATER | 2. VEGETATION | 3. STRUCTURES |
|---|---|---|---|
| FORM | flat | geometric & linear forms created by clearings | cylindrical, geometric, & angular |
| LINE | horizontal (pad) curved (road) | strong irregular lines created by edge effect of clearings & roads | vertical, horizontal, & angular |
| COLOR | tan | light green | tan |
| TEXTURE | fine to smooth | patchy | course |

## SECTION D. CONTRAST RATING ☐ SHORT TERM ☐ LONG TERM

| 1. DEGREE OF CONTRAST | FEATURES | | | | | | | | | | | | 2. Does project design meet visual resource management objectives? ☐ Yes ☒ No (Explain on reverse side) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LAND/WATER BODY (1) | | | | VEGETATION (2) | | | | STRUCTURES (3) | | | | |
| | Strong | Moderate | Weak | None | Strong | Moderate | Weak | None | Strong | Moderate | Weak | None | 3. Additional mitigating measures recommended ☒ Yes ☐ No (Explain on reverse side) |
| ELEMENTS Form | | ✓ | | | | ✓ | | | | | ✓ | | Evaluator's Names          Date |
| Line | | ✓ | | | | ✓ | | | | | ✓ | | Bob Tumwater          Aug. 15, 1985 |
| Color | | | ✓ | | | | ✓ | | | | ✓ | | Russ Crimes |
| Texture | | | ✓ | | | ✓ | | | | | ✓ | | Pete Jordon |

BLM MANUAL

Rel. 8-30
1/17/86

BLM_0005266

Illustration 2, Page 2

H-8431-1 – VISUAL RESOURCE CONTRAST RATING

Visual Contrast Rating Worksheet

| SECTION D. (Continued) |
|---|

Comments from item 2.

The strong line created by the clearing for the road and the drill pad creates a contrast that will attract attention.

Additional Mitigating Measures (See item 3)

1. Relocate access road off from ridge.
2. Revegetate the edge of the drill pad with random clumps of trees and shrubs to break up the flat horizontal line.

BLM MANUAL

Rel. 8-30
1/17/86

BLM_0005267

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

Description of the Element FORM

# Element FORM

## definition

The mass or shape of an object or of objects which appear unified.

## types

**2-Dimensional Shape** - the presence of an area or areas which contrast in color and/or texture from adjacent areas creating a two-dimensional shape in the landscape.



**3-Dimensional Mass** - the volume of a landform, natural object, or manmade structure in the landscape.



## subelements

**Geometry** - the extent to which a form approaches a standard geometrical figure of two or three dimensions e.g., square, circle, triangle, cube, sphere, cone, etc.



**Complexity** - the degree of simplicity or intricacy of a form. Simpler forms tend to be regular, and complex forms to be irregular.



**Orientation** - the relationship of the form to the horizontal axis of the landscape (e.g., vertical, horizontal, diagonal, nondirectional), or to the points of the compass (e.g., north-south, ENE-WSW).

## suggested vocabulary

| | |
|---|---|
| Bold/definite/indistinct | Diverse/numerous/few |
| Prominent | Large/small |
| Flat/rolling/rugged | Convex/concave |
| Rounded/angular | Circular/ovat |
| Rough/smooth | Square/rectangular/rhomboid |
| Jagged/domed/flattened | Triangular/trapezoid |
| Steep/moderate/gentle | Linear/parallel/curving |
| Solid/transparent | Conical/cylindrical/cubic |
| Simple/complex | Pyramidal/spherical |
| Amorphous/geometric | Contrasting/compatible |
| Regular/irregular | Vertical/horizontal/diagonal |
| Narrow/wide | Nondirectional |
| Long/short/tall | Symmetrical/asymmetrical |
| High/low | Strip/block/patch |

BLM MANUAL

BLM_0005268

Illustration 3, Page 2

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

Description of the Element FORM

## dominance

Forms that are bold, regular, solid or vertical tend to be dominant in the landscape.

## variable effects

**Viewing Angle** – the visual proportions of forms change with the direction and angle of viewing, due to perspective effects. Two-dimensional forms become foreshortened with lower observer positions and oblique viewing angles. Three-dimensional forms appear to diminish towards the horizon, especially with oblique viewing angles. 

**Lighting** – frontlighting and backlighting tend to flatten three-dimensional forms. Backlighting may emphasize two-dimensional silhouettes. Sidelighting enhances three-dimensional effect.

**Movement** – the eye is attracted to movement in the landscape, e.g., such changing forms as waterfalls, steam from cooling towers, or smoke plumes.

BLM_0005269

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

Description of the Element LINE

## Element LINE

### definition

The path, real or imagined, that the eye follows when perceiving abrupt differences in form, color, or texture or when objects are aligned in a one-dimensional sequence. Usually evident as the edge of shapes or masses in the landscape.

### types

Edge- the boundary along which two contrasting areas are related and joined together--the outline of a two-dimensional shape on the land surface.

BUTT EDGE – the simple sharp edge between two contrasting areas.



DIGITATE EDGE – the complex indented edge between two interlocking and contrasting areas.



TRANSITIONAL EDGE – the presence of one or more band(s) connecting two contrasting areas, forming a transitional stage between the two.



DIFFUSE EDGE – soft edge formed by a gradation between two contrasting areas.



Band – contrasting linear form with two roughly parallel edges dividing an area in two.



Silhouette-line – the outline of a mass seen against a backdrop. The skyline is the silhouette-line of the land against the sky.



BLM_0005270

Illustration 4, Page 2

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

Description of the Element LINE

## subelements

**Boldness** – the visual strength of a line. Smooth, long and sweeping lines are stronger than lines formed by the overlapping of numerous forms, e.g., treetops; edges between strongly contrasting colors, e.g., skylines are bolder than those between similar colors.



**Complexity** – the degree of simplicity or intricacy of a line, determined by the variety of directions it follows; skylines in rugged terrain are more complex than on flat plains.

 

**Orientation** – the overall relationship of the line to the (horizontal) axis of the landscape or to compass bearings.

## suggested vocabulary

| | |
|---|---|
| Bold/weak | Complex/simple |
| Regular/irregular | Soft/hard |
| Straight/curving | Broken/continuous |
| Diagonal/horizontal/vertical | Concave/Convex |
| Angular/subangular | Converging/diverging |
| Jagged/rugged/smooth | Parallel/perpendicular |
| Undulating/flowing | Geometric/circular/semicircular |

## dominance

Bold vertical lines which interrupt the skyline tend to dominate weak horizontal lines.

## variable effects

**Distance** – the strength of a line can decrease with distance due to atmospheric haze.

**Atmospheric Conditions** – clouds, fog, haze, snow can obliterate skylines.

**Lighting** – frontlighting flattens form and reduces line strength. Often only the skyline remains evident (e.g., mountain ranges). Sidelighting accentuates the silhouette-lines of separate forms. Backlighting blends together forms of equal distance into one outline. In mountain ranges, the ridgelines delineate overlapping flat silhouettes.

BLM_0005271

H-8431-1 VISUAL RESOURCE CONTRAST RATING

Description of the Element COLOR

## Element COLOR

### definition

The property of reflecting light of a particular intensity and wavelength (or mixture of wavelengths), to which the eye is sensitive. It is the major visual property of surfaces.

### subelements

Hue – the aspect of color which we know by particular names, e.g., red, blue, orange, and which forms the visible spectrum. A given hue or color tint is caused by a particular wavelength.

Value – the degree of lightness or darkness, caused by the intensity of light being reflected, ranging from black to white.

Chroma – the degree of color saturation or brilliance, determined by the mixture of light rays. It is the degree of grayness in a color, ranging from pure (high chroma) to dull (low chroma).

### suggested vocabulary

o Hues – red, yellow, brown, olive gray, reddish brown, etc. (See Munsell color books for precise terms.)
o Primary colors – red, blue, yellow.
o Secondary colors – green, orange, violet.
o Tertiary colors – mixtures of secondary colors.
o Value – dark to light.
o Chroma – brilliant, pure, saturated, dull, grayish.
o Color temperature – warm to cold, temperature is caused by hue. Red, yellow, brown, and orange are considered warm and sunny. Blues and greens are cool and shady.
o Vivid color – usually primary or secondary colors, with high chroma.
o Subtle color – colors or mixtures which are delicate, usually tertiary or low chroma colors.
o Luminous color – emitting its own light.
o Glare – reflection of high intensity light (very high value).
o Pastel color – delicate "soft" color of high value but low chroma.
o Monotone – the sameness or uniformity of color.
o Color harmony – the assortment of combinations of colors which readily and pleasantly blend with each other.

### dominance

With other things equal, light, warm, bright colors in a scene will "advance" and tend to dominate dark, cool, dull colors which "retreat." Dark next to light tends to attract the eye and become a visual focal point.

BLM_0005272

Illustration 5, Page 2

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

Description of the Element COLOR



### variable effects

**Distance** – atmospheric perspective, due to scattering of light by dust particles, makes colors become paler, lower in chroma, and bluer as viewing distance increases. High value colors tend to remain most recognizable over great distances.

**Atmospheric Conditions** – haze, fog, dust, rain, etc., may cause atmospheric perspective to become extreme, even over short viewing distances. Compared with sunshine, clouds reduce value and chroma.

**Lighting Direction** – objects which are frontlit (i.e., illuminated from the front, behind the observer) appear paler and brighter than those which are backlit (i.e., illuminated from behind).

**Time of Day** – illuminated surfaces tend to become paler during midday sun and to become darker and redder early and late.

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

Description of the Element TEXTURE

# Element TEXTURE

## definition

The aggregation of small forms or color mixtures into a continuous surface pattern; the aggregated parts are enough that they do not appear as discrete objects in the composition of the scene.

## type

**Color Mixture (mottling)** – intrinsic surface color contrasts of very small scale in relation to the perceived mass may be due to hue, chroma, or value, alone or in combination.

**Light and Shade** – the color contrast particularly in value, created by differences in lighting on a varied surface or repeated forms. It consists of the repetition of a lit side, shaded side, and the shadow cast.

## subelements

**Grain** – the relative dimensions of the surface variations, ranging from large (coarse texture, e.g., coniferous forest) to small (fine texture, e.g., grassland).



fine     medium     coarse

**Density** – the spacing of surface variations creating the texture.



sparse     medium     dense

**Regularity** – the degree of uniform recurrence and symmetrical arrangement of the surface variation. Based on density distribution (uniform vs. variable) and spatial arrangement (ordered vs. random).



uneven/random     even/ordered     even/random     gradation

**Internal Contrast** – the degree of contrast in colors or values creating the texture.

 

BLM_0005274

Illustration 6, Page 2

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

Description of the Element TEXTURE

### suggested vocabulary

| | |
|---|---|
| Coarse/medium/fine | Glossy/matte |
| Smooth/rough | Striated |
| Uniform/patchy/gradational | Scattered |
| Directional/nondirectional | Dotted |
| Discontinuous/continuous | Clumped |
| Random/ordered | Striped |
| Contrasty/subtle | Stippled |
| Dense/sparse | Granular |

### dominance

Coarse and contrasty textures tend to dominate fine-grained textures of low internal contrast.

### variable effects

Distance - Internal contrast and the apparent grain of the texture is lessened with distance--coarse textures of coniferous forest may remain visible at up to 8-10 miles, while fine textures of grassland may disappear within 1/4 mile of the observer.

Atmospheric Conditions - haze, cloud, dust, etc., reduce the distance at which textures disappear and lose internal contrast.

Illumination - light and shade textures are most obvious in side-lighting and when light intensity is strong, casting distinct dark shadows. Strong side-lighting increases distance-range within which textures remain visible.



BLM_0005275

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

Description of the Variable SCALE

## SCALE

### definition

The proportionate size relationship between an object and the surroundings in which it is placed.

### types

**Absolute Scale** – the absolute size of an object obtained by relating the size of the object to a definitely designated standard, (i.e., measurements).



**Relative Scale** – the relative size of objects, the apparent size relationship between landscape components and their surroundings.



### subelements

**Proportion of landscape setting** ( scale dominance) – the scale of an object relative to the visible expanse of the landscape which forms its setting.

**Scale contrast** – the scale of an object relative to other distinct objects or areas in the landscape.

**Proportion of field-of-view** – the scale of an object relative to the total field-of-view accepted by the human eye or camera.

BLM_0005276

Description of the Variable SCALE

## variable effects

**Distance** – the apparent size of an object decreases with distance from the observer.

**Spatial Enclosure** – the size of the enclosing space inversely affects an object's relative scale—small spaces make objects appear larger.

**Viewing Angle** – the apparent scale of an object in the landscape is affected by the observer's angle of view in two ways:

(1) perspective foreshortening reduces the apparent size of surfaces of areas or objects, when seen obliquely or at low viewing angles.

(2) by increasing an object's elevation in relation to the observer's position, the object's relative scale tends to increase.

**Atmospheric Conditions** – increased haziness may increase the apparent scale of the landscape's space by obscuring its boundaries.

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

Description of the Variable SPACE

## SPACE

### definition

The spatial qualities of a landscape are determined by the three-dimensional arrangement of objects and voids.

### subelements

Landscape Composition - the arrangement of objects and voids in the landscape can be categorized by their spatial composition:

PANORAMIC - a broad horizontal composition, with no apparent limits to the view. Includes plains, expanses of water, and distant mountain ranges. Sky and foreground elements may occupy much of the scene.



ENCLOSED - the space is bounded by an enclosing facade of cliffs, slopes, or forest edge, creating "wall" and "floor" elements.



FEATURE - a composition dominated by a distinct object or cluster of objects such as a waterfall, prominent landform, or tree.



FOCAL - converging lines in the landscape or progressions of aligned objects lead the eye to a focal area in the scene.



CANOPIED - the scene within or at the edge of a forest, where branches and foliage above eyelevel create a canopy or "ceiling."



Some compositions, especially those which are distinctly focal, enclosed, or feature-oriented, are more vulnerable to modifications than others, depending upon how strongly the spatial configuration draws the eye to certain locations.

BLM_0005278

Illustration 8, Page 2

H-8431-1 – VISUAL RESOURCE CONTRAST RATING

Description of the Variable SPACE

**Spatial Position** – the elevation and location of objects in the landscape relative to topography affect their prominence: high and exposed positions are more prominent than low obscured positions.


plain


valley floor


slope-toe


side-slope


plateau/bench


ridge-top

**Backdrop** – the backdrop against which an object is seen affects its visual contrast. Modifications seen against the sky or water are usually more prominent than against a land backdrop.

## variable effects

**Observer Position** – the position of the observer relative to the landscape may be described as:


inferior (below)


normal


superior (above)

A change in position can affect the observer's perceptions of degree of enclosure and an object's degree of spatial dominance. Inferior positions may increase both apparent degree of enclosure and spatial dominance.

**Distance** – the observer's proximity to elements will affect perception of their spatial importance. Longer viewing distances tend to reduce the impression of spatial enclosure and dominance.



BLM_0005279

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

## Project Description Guidelines

Project proposals, whether site-specific, corridor, or large-scale, must be described using plans, sketches, simulations, or narratives in sufficient detail so that the expected changes in the landscape features (landform/water, vegetation, and structures) can be visualized.  If a proposal does not contain sufficient detailed information, it must be obtained or the assumptions clearly documented.  Use the following checklist as a guide when identifying the information needed for each proposal:

1. General.

    a.  Type of project.
    b.  Specific location(s).
    c.  Proposed methods of operation from preplanning and design through project completion.
    d.  Size and magnitude.
    e.  Time period of operation, including specific phasing and discrete operations.
    f.  Specific committed standard operational procedures of proposal.
    g.  Projected ultimate land use and adjacent land use.

2. Specific.

    a.  Feature:  Landform and Water.

        (1)  Exact location of undertaking, and depth of excavation and fill (horizontal, vertical, and slope).
        (2)  Color of the exposed soils, subsoils, bedrock, overburden, or fill material when major excavations or fills are anticipated.
        (3)  Anticipated water coloration where reservoir, tailing areas, etc., are planned.
        (4)  Timing and duration of exposed excavation or fill.
        (5)  Methods of operation, how long each phase of the operation will last.
        (6)  Reshaping after use, including final landform appearance (grades, slopes, drainage patterns).
        (7)  Anticipated ultimate use.

    b.  Feature:  Vegetation.

        (1)  Exact location and method of vegetative manipulation (extent of clearing and modification).
        (2)  Size and magnitude of change.
        (3)  Type, location, method, quantity, and timing of replanting and/or reseeding.

BLM_0005280

Appendix 1, Page 2

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

c. Feature: Structures.

   (1) Exact locations where structures are to be placed within the project area.
   (2) Design of structures.
     (a) Size and type.
     (b) Form.
     (c) Texture(s) and color(s) of exterior materials and construction method to be used).
   (3) Life expectancy.
   (4) Operations and maintenance (schedule and methods).

BLM MANUAL

Rel. 8-30
1/17/86

BLM_0005281

Appendix 2
(III D3)

H-8431-1 - VISUAL RESOURCE CONTRAST RATING

## VRM Class Objectives

Class I Objective.  The objective of this class is to preserve the existing character of the landscape.  This class provides for natural ecological changes; however, it does not preclude very limited management activity. The level of change to the characteristic landscape should be very low and must not attract attention.

Class II Objective.  The objective of this class is to retain the existing character of the landscape.  The level of change to the characteristic landscape should be low.  Management activities may be seen, but should not attract the attention of the casual observer.  Any changes must repeat the basic elements of form, line, color, and texture found in the predominant natural features of the characteristic landscape.

Class III Objective.  The objective of this class is to partially retain the existing character of the landscape.  The level of change to the characteristic landscape should be moderate.  Management activities may attract attention but should not dominate the view of the casual observer. Changes should repeat the basic elements found in the predominant natural features of the characteristic landscape.

Class IV Objective.  The objective of this class is to provide for management activities which require major modification of the existing character of the landscape.  The level of change to the characteristic landscape can be high.  These management activities may dominate the view and be the major focus of viewer attention.  However, every attempt should be made to minimize the impact of these activities through careful location, minimal disturbance, and repeating the basic elements.

BLM MANUAL

Rel. 8-30
1/17/86

BLM_0005282

H-8431-1 – VISUAL RESOURCE CONTRAST RATING

## A Sample List of Design Techniques for Mitigating Visual Impacts

A. **LANDFORM/WATER BODY.**

   (1) **Reduce Size of Cut and Fill Slopes.**  Consider:

      (a)  relocating to an area with less slope.
      (b)  changing road width, grade, etc.
      (c)  changing alignment to follow existing grades.
      (d)  prohibiting dumping of excess material on downhill slopes.

   (2) **Reduce Earthwork Contrasts.**  Consider:

      (a)  rounding and/or warping slopes.
      (b)  retaining rocks, trees, drainages, etc.
      (c)  toning down freshly broken rock faces with asphalt emulsion
         spray or with gray paint.
      (d)  adding mulch, hydromulch, or topsoil.
      (e)  shaping cuts and fills to appear as natural forms.
      (f)  cutting rock areas so forms are irregular.
      (g)  designing to take advantage of natural screens (i.e.,
         vegetation, land forms).
      (h)  grass seeding of cuts and fills.

   (3) **Maintain the Integrity of Topographic Units.**  Consider:

      (a)  locating projects away from prominent topographic features.
      (b)  designing projects to blend with topographic forms in shape and
         placement.

B. **VEGETATION.**

   (1) **Retain Existing Vegetation.**  Consider:

      (a)  using retaining walls on fill slopes.
      (b)  reducing surface disturbance.
      (c)  protecting roots from damage during excavations.

   (2) **Enhance Revegetation.**  Consider:

      (a)  mulching cleared areas.
      (b)  controlling planting times.
      (c)  furrowing slopes.
      (d)  planting holes on cut/fill slopes.
      (e)  choosing native plant species.
      (f)  stockpiling and reusing topsoil.
      (g)  fertilizing, mulching, and watering vegetation.

BLM_0005283

Appendix 3, Page 2

### H-8431-1 – VISUAL RESOURCE CONTRAST RATING

(3) **Minimize Impact on Existing Vegetation.**  Consider:

   (a)  partial cut instead of clear cut.
   (b)  using irregular clearing shapes.
   (c)  feathering/thinning edges.
   (d)  disposing of all slash.
   (e)  controlling construction access.
   (f)  utilizing existing roads.
   (g)  limiting work within construction area.
   (h)  selecting type of equipment to be used.
   (i)  minimizing clearing size (i.e., strip only where necessary).
   (j)  grass seeding of cleared areas.

(4) **Maintain the Integrity of Vegetative Units.**  Consider:

   (a)  utilizing the edge effect for structure placement along natural vegetative breaks.

## C. STRUCTURES.

(1) **Minimize the Number of Visible Structures.**

(2) **Minimize Structure Contrast.**  Consider:

   (a)  using earth-tone paints and stains.
   (b)  using cor-ten steel (self-weathering).
   (c)  treating wood for self-weathering.
   (d)  using natural stone surfaces.
   (e)  burying all or part of the structure.
   (f)  selecting paint finishes with low levels of reflectivity (i.e., flat or semi-gloss).

(3) **Redesign Structures that do not Blend/Fit.**  Consider:

   (a)  using rustic designs and native building materials.
   (b)  using natural appearing forms to complement landscape character (use special designs only as a last resort).
   (c)  relocating structure.

(4) **Minimize Impact of Utility Crossings.**  Consider:

   (a)  making crossings at right angles.
   (b)  setting back structures at a maximum distance from the crossing.
   (c)  leaving vegetation along the roadside.
   (d)  minimizing viewing time.
   (e)  utilizing natural screening.

BLM_0005284

H-8431-1 – VISUAL RESOURCE CONTRAST RATING

(5)  <u>Recognize the Value and Limitations of Color</u>.  Consider:

    (a)  that color (hue) is most effective within 1,000 feet.
         Beyond that point color becomes more difficult
         to distinguish and tone or value determines
         visibility and resulting visual contrast.
    (b)  that using color has limited effectiveness (in the
         background distance zone) in reducing visual impacts on
         structures that are silhouetted against the sky.
    (c)  painting structures somewhat darker than the
         adjacent landscape to compensate for the effects
         of shade and shadow.
    (d)  selecting color to blend with the land and not the sky.

BLM_0005285

# GRAZING ADMINISTRATION

# Grazing Management



## BLM Manual Handbook H-4120-1

BLM_0005286

TC-1

H-4120-1 - GRAZING MANAGEMENT

**Page**

.1  Cooperative Management Agreements (RESERVED). . . . . . . . . . . .  1

.2  Allotment Management Plans (AMP's). . . . . . . . . . . . . . . . .  4
  .21  Use of AMP's . . . . . . . . . . . . . . . . . . . . . . . . .  4
    A.  Relationship to Land-Use Plans and Rangeland Program
        Summaries. . . . . . . . . . . . . . . . . . . . . . . .  4
    B.  Components of AMP's. . . . . . . . . . . . . . . . . . . .  4
    C.  Consultation . . . . . . . . . . . . . . . . . . . . . . .  4
    D.  Interdisciplinary Coordination . . . . . . . . . . . . . .  4
    E.  Consultation with Advisory Boards. . . . . . . . . . . . .  4
    F.  Private and State Lands in AMP's . . . . . . . . . . . . .  4
    G.  Other Agency Coordination. . . . . . . . . . . . . . . . .  5
    H.  AMP Investment Analysis. . . . . . . . . . . . . . . . . .  5
    I.  Environmental Assessment . . . . . . . . . . . . . . . . .  5
    J.  Incorporating AMP's into Grazing Permits and Leases. . . .  5
    K.  Implementing AMP's . . . . . . . . . . . . . . . . . . . .  5
    L.  Revising AMP's . . . . . . . . . . . . . . . . . . . . . .  5

.3  Range Improvements. . . . . . . . . . . . . . . . . . . . . . . .  6
  .31  Conditions for Range Improvements. . . . . . . . . . . . . . .  6
    A.  Land-Use Plans . . . . . . . . . . . . . . . . . . . . . .  6
    B.  Special Considerations . . . . . . . . . . . . . . . . . .  6
    C.  Environmental Assessment . . . . . . . . . . . . . . . . .  6
    D.  Authorizing Range Improvements . . . . . . . . . . . . . .  6
    E.  Requiring Range Improvements . . . . . . . . . . . . . . .  7
    F.  Maintenance. . . . . . . . . . . . . . . . . . . . . . . .  7
    G.  Range Betterment Funds . . . . . . . . . . . . . . . . . .  7
  .32  Cooperative Agreements . . . . . . . . . . . . . . . . . . . .  8
    A.  Signature by Cooperator(s) . . . . . . . . . . . . . . . .  8
  .33  Range Improvement Permit . . . . . . . . . . . . . . . . . . .  8
  .34  Standards, Design, and Stipulations. . . . . . . . . . . . . .  9
  .35  Assignment of Range Improvements . . . . . . . . . . . . . . .  9
  .36  Removal and Compensation for Loss of Range Improvements. . . .  9
    A.  Removal Authorization. . . . . . . . . . . . . . . . . . .  9
    B.  Ordered Removal. . . . . . . . . . . . . . . . . . . . . .  9
    C.  Compensation . . . . . . . . . . . . . . . . . . . . . . .  9
    D.  Salvage. . . . . . . . . . . . . . . . . . . . . . . . . . 10
    E.  Reimbursement for Range Improvements . . . . . . . . . . . 10

BLM_0005287

TC-2

## H-4120-1 - GRAZING MANAGEMENT

Page

.37  Contribution . . . . . . . . . . . . . . . . . . . . . . . 10
   A.  Encouraging Contributions. . . . . . . . . . . . . . . 10
   B.  Requiring Contributions. . . . . . . . . . . . . . . . 10
   C.  Maintenance Responsibilities . . . . . . . . . . . . . 11
   D.  Documenting Contributions. . . . . . . . . . . . . . . 12
.38  Priorities for Investments in Range Improvements . . . . . 12
   A.  First Priority for Investments . . . . . . . . . . . . 12
   B.  Second Priority for Investments. . . . . . . . . . . . 12
   C.  Exceptions . . . . . . . . . . . . . . . . . . . . . . 12

.4  Special Rules . . . . . . . . . . . . . . . . . . . . . . . 13
.41  Initiation of Special Rules. . . . . . . . . . . . . . . . 13
   A.  Recommendation to the Director . . . . . . . . . . . . 13
   B.  Director's Approval to Publish Proposed Special Rule . . . . 13
.42  Publication of Proposed Special Rule in the Federal Register . 13
.43  Public Review and Analysis of Comments . . . . . . . . . . 13
.44  Publication of Final Special Rule in the Federal Register. . . 14
.45  Implementation of Special Rules. . . . . . . . . . . . . . 14

.5  Cooperation in Management . . . . . . . . . . . . . . . . . 15
.51  Cooperation with Associations of Stockmen. . . . . . . . . 15
   A.  Local Associations of Stockmen . . . . . . . . . . . . 15
   B.  Farmers Home Administration (FHA) Grazing Associations . . . 15
   C.  Cooperative State Grazing Districts. . . . . . . . . . 15
.52  Cooperation with Government Agencies . . . . . . . . . . . 16
   A.  Federal Agencies . . . . . . . . . . . . . . . . . . . 16
   B.  State, County, and City Governments. . . . . . . . . . 16
.53  Cooperation with National, State, County, and Local
    Rangeland User Organizations . . . . . . . . . . . . . 16
   A.  National and State . . . . . . . . . . . . . . . . . . 16
   B.  County and Local . . . . . . . . . . . . . . . . . . . 16
.54  Interdistrict Cooperation. . . . . . . . . . . . . . . . . 16
.55  Cooperative Management Where no Forage is Allocated to
    Livestock. . . . . . . . . . . . . . . . . . . . . . . 17
   A.  Conditions . . . . . . . . . . . . . . . . . . . . . . 17
   B.  Management Agreements. . . . . . . . . . . . . . . . . 17

Illustrations
1.  Cooperative Agreement for Range Improvements (Form 4120-6)
2.  Range Improvement Permit (Form 4120-7)
3.  Assignment of Range Improvements (Form 4120-8)
4.  Proffer of Monetary Contributions (Form 4120-9)

BLM_0005288

1

H-4120-1 - GRAZING MANAGEMENT

.1   <u>Cooperative Management Agreements</u>. (RESERVED.)

"This Page Intentionally Blank"

BLM_0005289

Case No. 1:20-cv-02484-MSK   Document 27-6   filed 04/27/21   USDC Colorado   pg 226 of 436

2

"This Page Intentionally Blank"

BLM_0005290

1

H-4120-1 - GRAZING MANAGEMENT

.1  Cooperative Management Agreements.  The authorized officer may enter into a cooperative management agreement (CMA) with a permittee, lessee, or association when the livestock operator has demonstrated exemplary rangeland management practices.  (See 43 CFR 4120.1(a).)  Other criteria for use in deciding when to enter into a CMA are found in .11C below.  The agreement must establish objectives, responsibilities, and performance standards of the cooperating parties in managing and using the public lands for livestock grazing.  (See 43 CFR 4120.1(a)(1).)  The agreement must provide for flexibility (within the terms and conditions of the agreement) for the cooperator to make livestock grazing decisions on the allotment.

.11  Use of CMA's.

A.  Documentation.  A CMA is a formal, written agreement between the BLM and a permittee or lessee that recognizes the cooperator as the steward of an allotment.  The agreement must establish the duties and performance standards of the cooperator and the BLM for managing livestock grazing in the allotment. These objectives may include improvement of fish and wildlife habitat, wild horse or burro habitat, watershed conditions, recreation opportunities, or any other authorized use or value of the public lands.  Allotment objectives, and the cooperators' management flexibility are documented in the agreement.

The agreement must provide for the periodic evaluation by the authorized officer to determine the cooperators performance and effectiveness of grazing practices in achieving the specific management objectives.  (See 43 CFR 4120.1 (c).)

The agreement does not give the cooperator the authority to exclude or limit other authorized uses of the public lands nor does it exempt persons from laws and regulations governing public land use.  Range improvements constructed by the cooperator must be approved by the BLM prior to construction to assure their consistency with management objectives.

B.  Nominations and Selection for CMA's.  The authorized officer requests District Grazing Advisory Boards, Multiple-Use Advisory Councils, Soil Conservation Districts, State and Federal Wildlife Agencies, Conservation Groups, and other public land interest groups, and individuals to nominate permittees or lessees for CMA's.  These same interest groups may be requested to comment on the nominated or potential CMA's.  District Grazing Advisory Boards and Multiple Use Advisory Councils are asked to review the nominations and to recommend approval of the agreements.  Where an Advisory Board or Council does not exist, or if the authorized officer believes it would enhance the objectivity of the selection process, another group may be asked to review the nominations.

C.  Criteria for Implementing CMA's.  Permittees or lessees using "M" category allotments are eligible for CMA's when it is in the best interest of sound land-use management.  (See Manual Section 1621.)  Additional criteria are:

Rel. 4-73
6/20/84

BLM_0005291

2

H-4120-1 - GRAZING MANAGEMENT

- A final livestock grazing environmental impact statement has been completed and the associated land-use plan for the area has been approved. Exceptions to this criterion may occur where allotments are known to be in good to excellent condition and without resource use conflicts.

- The present cooperator has operated on the allotment for sufficient time to have demonstrated good rangeland management practices and to be recognized by others as a responsible land steward.

- Agreement can be reached between the BLM and the cooperator on the objectives, terms, and conditions of the CMA.

- The District Grazing Advisory Board and Multiple-Use Advisory Council (where formed) recommend approval of the agreement with the cooperator.

- The cooperator agrees to contribute toward the construction of range improvements. The BLM may provide total or partial funding for the improvements when their construction is within District priorities.

D.  Relation of CMA's to Land-Use Plans.  CMA's must be consistent with, and incorporate by reference, all applicable provisions of existing land-use plans and the terms of the authorization issued to the cooperator to graze livestock on the allotment(s).  (See 43 CFR 4120.1(a)(2).)

E.  Relation of CMA's to Allotment Management Plans (AMP's).  Permittees or lessees selected for CMA's may be operating under an AMP.  The CMA may incorporate the objectives of the AMP, but must provide the permittee/lessee with special recognition and an opportunity to exercise additional management flexibility.

F.  Tenure.  CMA's have a tenure period of 10 years, and at the discretion of the authorized officer, may be renewed.  (See 43 CFR 4120.1(b)). CMA's must receive joint evaluation at the end of the first 5 years to determine if the management objectives are being met.  Results of that evaluation should be made available to interested parties requesting the results.  If that evaluation shows that the objectives are being successfully met, a new CMA and 10-year permit or lease is issued.  If the objectives are not being met, the cooperator is allowed a reasonable time to make the necessary adjustments to comply with the objectives before the agreement terminates.  Failure of the cooperator to meet the terms and conditions of the CMA may be a basis for cancellation of the CMA.

Rel. 4-73
6/20/84

BLM_0005292

H-4120-1 - GRAZING MANAGEMENT

"This Page Intentionally Blank"

BLM_0005293

4

H-4120-1 - GRAZING MANAGEMENT

.2  <u>Allotment Management Plans</u>.  The AMP's are documents which prescribe the manner in and extent to which livestock grazing is conducted and managed to meet multiple use, sustained yield, economic, and other needs and objectives as determined through land-use plans.  (See 43 CFR 4100.0-5 and 4120.2.)

.21  Use of AMP's.  The level of an AMP may vary from a simple documentation of existing management to a complex plan for grazing management and range improvement, depending on resource conditions and the objectives for management.  The authorized officer must ensure that the objectives, decisions, and actions reflected in land-use plans and rangeland program summaries guide and control the development of AMP's.

A.  Relationship to Land-Use Plans and Rangeland Program Summaries. The authorized officer must ensure that the objectives, decisions, and actions reflected in land-use plans and rangeland program summaries (RPS) guide and control the development of AMP's.

B.  Components of AMP's.  As a minimum, the AMP's must contain information on resource management objectives, descriptions of grazing practices, range improvements (as needed to implement the grazing practices), flexibility, monitoring, and evaluation.  It may also be desirable to include a brief discussion on specific arrangements for consultation and coordination with the permittee or lessee and other interests.

C.  Consultation.  As required by Section 8 of the Public Rangelands Improvement Act (PRIA) of 1978, AMP's are prepared or revised in careful and considered consultation, coordination, and cooperation with the affected permittees or lessees; the State (if there are State-owned lands in the allotment); other landowners who may be affected; and other affected interests.  (See 43 CFR 4120.2(a).)

D.  Interdisciplinary Coordination.  The AMP's must be prepared with the appropriate participation by the various resource specialists.  Early interdisciplinary participation in AMP development will ensure that resource management objectives identified in land-use plans are properly considered in the selection of allotment specific management actions.  In addition, such participation provides a means of identifying mitigating measures to avoid or minimize adverse impacts on other resources and values.

E.  Consultation with Advisory Boards.  Grazing advisory boards must be given an opportunity to provide advice and recommendations concerning the development of AMP's.

F.  Private and State Lands in AMP's.  Careful consideration should be given to the inclusion of private and State lands in AMP's.

BLM_0005294

3

H-4120-1 – GRAZING MANAGEMENT

G. <u>Transfer of Agreements</u>. CMA's may be transferred by operation of law, e.g., inheritance or probation of a will. If the cooperating party is a corporation or partnership, the CMA may, upon notice to the authorized officer, also be transferred as an incident to any change of less than 100 percent in the business organization. All other transfers of CMA's are prohibited, and must result in their automatic termination. (See 43 CFR 4120.1(d).)

BLM_0005295

4

H-4120-1 – GRAZING MANAGEMENT

.2  Allotment Management Plans.  The AMP's are documents which prescribe the manner in and extent to which livestock grazing is conducted and managed to meet multiple use, sustained yield, economic, and other needs and objectives as determined through land-use plans.   (See 43 CFR 4100.0-5 and 4120.2.)

.21  Use of AMP's.  The level of an AMP may vary from a simple documentation of existing management to a complex plan for grazing management and range improvement, depending on resource conditions and the objectives for management.  The authorized officer must ensure that the objectives, decisions, and actions reflected in land-use plans and rangeland program summaries guide and control the development of AMP's.

A.  Relationship to Land-Use Plans and Rangeland Program Summaries.  The authorized officer must ensure that the objectives, decisions, and actions reflected in land-use plans and rangeland program summaries (RPS) guide and control the development of AMP's.

B.  Components of AMP's.  As a minimum, the AMP's must contain information on resource management objectives, descriptions of grazing practices, range improvements (as needed to implement the grazing practices), flexibility, monitoring, and evaluation.  It may also be desirable to include a brief discussion on specific arrangements for consultation and coordination with the permittee or lessee and other interests.

C.  Consultation.  As required by Section 8 of the Public Rangelands Improvement Act (PRIA) of 1978, AMP's are prepared or revised in careful and considered consultation, coordination, and cooperation with the affected permittees or lessees; the State (if there are State-owned lands in the allotment); other land owners who may be affected; and other affected interests.  (See 43 CFR 4120.2(a).)

D.  Interdisciplinary Coordination.  The AMP's must be prepared with the appropriate participation by the various resource specialists.  Early interdisciplinary participation in AMP development will ensure that resource management objectives identified in land-use plans are properly considered in the selection of allotment specific management actions.  In addition, such participation provides a means of identifying mitigating measures to avoid or minimize adverse impacts on other resources and values.

E.  Consultation with Advisory Boards.  Grazing advisory boards must be given an opportunity to provide advice and recommendations concerning the development of AMP's.

F.  Private and State Lands in AMP's.  Careful consideration should be given to the inclusion of private and State lands in AMP's.

BLM_0005296

H-4120-1 - GRAZING MANAGEMENT

G.  Other Agency Coordination.  Other resource management agencies with management responsibilities, expertise, or interest in the range resource must be consulted as appropriate during the development of AMP's.

H.  AMP Investment Analysis.  An economic (benefit/cost) analysis must be conducted concurrently with the preparation of each AMP that involves an investment.  (See BLM Manual Section 9521.3.)

I.  Environmental Assessment.  New AMP's are approved and implemented when an environmental impact statement has been prepared for the livestock grazing program for the area.  If the actions to be included in an AMP (including supporting range improvements), have not been analyzed in an EIS, the authorized officer assesses environmental concerns using categorical exclusions, programmatic environmental assessments, or site-specific environmental assessments.

J.  Incorporating AMP's into Grazing Permits and Leases.  All grazing permits or leases incorporating AMP's contain the normal operation in terms of the kind and numbers of livestock, periods of use, and animal unit months (AUM's) grazed during the grazing fee year.  Other terms and conditions of the AMP are incorporated into the permit or lease by reference in a stipulation.

Incorporating AMP's into Existing Grazing Permits or Leases.  If grazing permits or leases have been issued prior to the preparation of AMP's, the authorized officer incorporates the terms and conditions of the completed AMP's into the grazing permits or leases through agreement.

Issuing Decisions to Incorporate Grazing Management Systems into a New Grazing Permit or Lease.  If the permittee or lessee refuses to accept a new permit or lease containing the terms and conditions of an AMP, the authorized officer issues a decision incorporating a grazing management system(s) in the permit or lease to be offered.  The decision must be issued in accordance with the procedures set forth in 43 CFR 4160.

K.  Implementing AMP's.  AMP's are considered implemented when they have been incorporated into the permit or lease through acceptance by the permittee or lessee of an offered permit or lease containing the terms and conditions of the AMP.  However, AMP's may not always be fully operational until the supporting improvements and the grazing system have been initiated.  Interim terms and conditions required to prevent resource damage and minimize conflicts until AMP's are fully operational may be incorporated into permits and leases.

L.  Revising AMP's.  The AMP's must be reviewed periodically to determine their effectiveness in improving or maintaining resource conditions in the allotment.  The AMP's are revised when evaluations indicate that the grazing management actions are not accomplishing AMP objectives or when the revision would correct operational deficiencies.

Case No. 1:20-cv-02484-MSK   Document 27-6   filed 04/27/21   USDC Colorado   pg 234 of 436

6

.3  Range Improvements.  The BLM's range improvement program uses structures, developments, and treatments in concert with grazing management to rehabilitate, protect, and improve the public lands; arrest range deterioration; and improve forage condition, fish and wildlife habitat, wild horse and burro habitat, watershed protection, livestock production, and other resource parameters in harmony with resource management objectives.  Permittees or lessees who fail to comply with any of the provisions of 43 CFR 4120.3 and/or any requirements or stipulations of specific Cooperative Agreements or Range Improvement Permits are subject to penalty action under 43 CFR 4170.

.31  Conditions for Range Improvements.  The BLM encourages range improvements to achieve resource management objectives.

A.  Land-Use Plans.  Land-use plans provide guidance for identifying the objectives for resource management and improvement actions on the public lands.  Permanent range improvements ordinarily are not placed on public lands when land-use plans indicate that these lands are encumbered or are scheduled for disposal.  However, if it is necessary to place range improvements on these lands, a right-of-way must be reserved and recorded under Section 507 of the Federal Land Policy and Management Act of 1976, to ensure protection of the Government's investment.

B.  Special Considerations.  To the maximum extent feasible, all range improvements must be planned, designed, constructed, and maintained in a way that enhances the broadest possible range of multiple-use values.  The installation, construction, reconstruction, or maintenance of range improvements must be consistent with the requirements and objectives established for special management areas such as wilderness areas, wilderness study areas, areas of critical environmental concern, designated recreation areas, off-road vehicle designations, or natural areas.  Fencing and water developments are planned to ensure that they either enhance or not degrade fish, wildlife, or wild horse and burro habitat or populations.

C.  Environmental Assessment.  The authorized officer considers environmental factors through categorical exclusions, programmatic environmental assessments, or site-specific environmental assessments.  When an assessment demonstrates that an improvement will not have a significant impact, that improvement may be implemented prior to completion of a grazing EIS.

D.  Authorizing Range Improvements.  Except for those placed on the public lands exclusively by the BLM, range improvements must be authorized by either a Cooperative Agreement for Range Improvements (Form 4120-6, Illustration 1) or by a Range Improvement Permit (Form 4120-7, Illustration 2).  (See 43 CFR 4120.3-1(b).)  Removal of range improvements must also be authorized.  (See 43 CFR 4120.3-6(a).)

BLM_0005298

H-4120-1 – GRAZING MANAGEMENT

Range Improvements on Private and State Land. An easement or right of way, using Form 2130-5, Grant of Easement or Right-of-Way, from the appropriate landowners must be obtained before placing BLM-owned range improvements on private or State land. (See Manual Section 2130.1D.)

E. Requiring Range Improvements. The authorized officer may require a permittee or lessee to install range improvements on the public lands in an allotment with two or more permittees or lessees and/or to meet the terms and conditions of an agreement. (See 43 CFR 4120.3-1(d).)

F. Maintenance. Maintenance responsibilities for range improvements are assigned to the primary beneficiary(ies) of such improvements.

G. Range Betterment Funds. Congress directed in the Federal Land Policy and Management Act of 1976 that 50 percent of all monies received by the United States as grazing fees be credited to a separate account in the Treasury. This is the Range Betterment Fund. These funds must be used for on-the-ground rehabilitation, protection, and improvement of the public lands that will arrest rangeland deterioration and improve forage conditions with resulting benefits to wildlife, watershed protection, and livestock production. Range betterment funds are distributed to Districts in proportion to grazing fees collected by each District. State Directors have the latitude to redistribute portions of the range betterment funds in consideration of prior commitments, resource conditions, and investment economy. No limits are set on the percentage of funds that may be redistributed each year, but the amounts received by an office during a 5-year period must equal that District's entitlement for the 5 years. Proposed redistributions, with justification, must be included in the annual work plan (AWP) submission and approved by the Director. The justification must reflect pertinent results of consultation with rangeland users, State and Federal agencies, and other interests.

Grazing Advisory Boards. Where District Grazing Advisory Boards have been established, the authorized officer seeks their advice on the use of range betterment funds. Where District Grazing Advisory Boards do not exist, the authorized officer may consult with range users or other advisory entities on the use of these funds. The use of Advisory Boards is guided by 43 CFR 1784.

BLM_0005299

8

H-4120-1 – GRAZING MANAGEMENT

Purpose. Range betterment funds may be used for all forms of rangeland rehabilitation, protection, and improvement, including, but not limited to, seeding, reseeding, fence construction, weed control, water development, and fish and wildlife habitat enhancement. Range betterment funds may be used for installing, modifying, and removing improvements. This includes design, survey, materials, equipment, labor, and supervision of such projects. Use of range betterment funds for other actions or projects is not specifically precluded, but such use must be justified to arrest rangeland deterioration and/or improve forage conditions for wildlife, watershed protection, or livestock production. Range betterment funds must not be used for maintenance of improvements after fiscal year 1984.

.32 Cooperative Agreements. Any person may enter into a cooperative agreement for the installation, use, maintenance, and/or modification of range improvements needed to achieve management objectives. The Cooperative Agreements (Form 4120-6) are used to authorize such improvements. The agreement must specify the division of costs or labor, or both, between the United States and the cooperator(s). Title to structural or removable improvements must be shared by the United States and cooperator(s) in proportion to the actual amount of the respective contribution to the initial construction. Title of nonstructural or nonremovables must be in the United States. (See 43 CFR 4120.3-2.) A cooperative agreement conveys no right, title, or interest in any lands or resources held by the United States. (See 43 CFR 4120.3-1(e).)

A. Signature by Cooperator(s). Cooperative agreements must be signed by the cooperator(s) and approved by the authorized officer prior to inclusion of the project covered by the agreement in the annual work plan.

.33 Range Improvement Permits. Range Improvement Permits (Form 4120-7) are used to authorize range improvements in circumstances where no Federal funds are provided, the improvement is removable, and the benefits are primarily to livestock. (See 43 CFR 4120.3-3(a).) Improvements must meet the same multiple-use and construction standards as those constructed solely or cooperatively by BLM. The permittee or lessee must assume project maintenance. The title to removable range improvements authorized under range improvement permits is in the name of the permittee or lessee. (See 43 CFR 4120.3-3(b).) The use by livestock of stock ponds or wells, or wells authorized by a range improvement permit, must be controlled by the permittee or lessee holding the range improvement permit. (See 43 CFR 4120.3-3(c).) Range improvement permits convey no right, title, or interest held by the United States in any lands or resources and are issued at the discretion of the authorized officer. (See 43 CFR 4120.3-1(e).)

BLM_0005300

H-4120-1 - GRAZING MANAGEMENT

.34 <u>Standards, Design, and Stipulations</u>. Cooperative agreements and range improvement permits must specify the standards, design, construction, and maintenance criteria for the range improvements and other additional conditions and stipulations or modifications deemed necessary by the authorized officer. (See 43 CFR 4120.3-4.) Where an existing range improvement is significantly inconsistent with established design criteria, the authorized officer may require modification of the cooperative agreement or permit to reflect standards that the improvement must meet.

.35 <u>Assignment of Range Improvements</u>. Permittee or lessee interest in range improvements must be assigned to the new permittee or lessee on Assignment of Range Improvements (Form 4120-8, Illustration 3), when there is a transfer of grazing preference. This form is attached to the Grazing Application - Preference Summary and Transfer (Form 4130-1a). (See H-4130-1.) The grazing regulations require that the transferee agree to pay the transferor the fair market value of the authorized improvements as of the date of the transfer before the assignment can be made. In the absence of an agreement, the authorized officer determines the fair market value of the improvements. (See 43 CFR 4120.3-5.)

.36 <u>Removal and Compensation for Loss of Range Improvements</u>.

A. <u>Removal Authorization</u>. Range improvements must not be removed from the public lands without authorization. (See 43 CFR 4120.3-6(a).) This pertains to range improvements authorized under range improvement permits and to those authorized under cooperative agreements.

B. <u>Ordered Removal</u>. Range improvements which are installed in an unauthorized manner or which are no longer helping to achieve land-use plans or allotment goals and objectives should be removed from the public lands. Where these range improvements are owned by permittees or lessees under the terms and conditions of range improvement permits, the authorized officer may require the permittee or lessee to remove them. (See 43 CFR 4120.3-6(b).) The authorized officer may also require permittees or lessees to remove range improvements installed on the public lands without authorization. Decisions cancelling authorizations and ordering removal of range improvements within a specified time are issued under 43 CFR 4160.

C. <u>Compensation</u>. Cooperators in range improvements are entitled to reasonable compensation from the United States for the adjusted value of their interest in authorized permanent range improvements when grazing permits or grazing leases are cancelled in order to devote the public lands covered by the permit or leases to another public purpose, including disposal. (See 43 CFR 4120.3-6(c).) Permanent range improvements are those which cannot be reasonably removed from the land. Compensation must not exceed the fair market value of the terminated portion of the permittees' or lessees' interest in the range improvements. (See 43 CFR 4120.3-6(c).) When decisions regarding compensation become final, compensation is paid with funds appropriated for that purpose. Where a range improvement is authorized by a range improvement permit, the livestock operator may elect to salvage materials and perform rehabilitation measures rather than be compensated for the adjusted value. (See 43 CFR 4120.3-6(c).)

BLM_0005301

10

H-4120-1 - GRAZING MANAGEMENT

D. Salvage. When range improvement authorizations are cancelled, the permittees or lessees must be allowed 180 days from the date of cancellation to salvage material owned by them or to perform rehabilitation measures necessitated by the removal. (See 43 CFR 4120.3-6(d).) Extensions may be granted at the discretion of the authorized officer.

E. Reimbursement for Range Improvements. The purchaser of lands to be disposed of is responsible for compensating the permittee or lessee for range improvements on those lands. The authorized officer must ensure that proof of the compensation is provided. If agreement cannot be reached on the value of the range improvements, the authorized officer determines their adjusted value(s).

.37 Contributions. The authorized officer may accept contributions of labor, material, equipment, or money for administration, protection, and improvement of the public lands necessary to achieve the objectives of sound rangeland management. (See 43 CFR 4120.3-7.)

A. Encouraging Contributions. Permittee or lessee involvement in the installation, modification, and maintenance of range improvements through contributions of labor, material, equipment, and/or money is desirable and encouraged. Contributions may also be accepted from other individuals, agencies, or groups for installation, modification, and maintenance of range improvements. The authorized officer may accept contributions under the authority of Sections 9 and 10 of the Taylor Grazing Act and Section 307(c) of the Federal Land Policy and Management Act of 1976. Contributions are accepted on a cooperative basis only and are identified with a specific project or management plan.

B. Requiring Contributions. Contributions for range improvements are only required where urgent problems dictate action and other funding sources do not exist or are not appropriate. Contributions may be required to obtain equitable support from permittees or lessees in a group allotment where the majority of the permittees or lessees support contributions for range improvements, but the minority do not, or enforce the terms of a mutual agreement.

BLM_0005302

H-4120-1 - GRAZING MANAGEMENT

C. Maintenance Responsibilities. Maintenance of range improvements must be performed in a timely manner to assure that improvements remain in a usable condition and serve the purpose for which they were intended. The authorized officer may require permittees or lessees to maintain and/or modify range improvements used in connection with all livestock operations on the public lands. (See 43 CFR 4120.3-1(c).)

Assigning Maintenance Responsibilities. The authorized officer should assign the responsibility for maintaining structural range improvements to the primary beneficiaries of the improvements so that those receiving the benefits share in the costs. Permittees, lessees, or other individuals, groups, corporations, or associations deriving direct and significant benefits from structural improvements are assigned maintenance responsibilities. Significant benefits constitute 50 percent or more of the benefits received. Where less than half of the benefits are attributable to a single use, but substantial benefits are received by one or more users, maintenance responsibilities should be negotiated on a proportionate cost basis. In most cases, BLM assumes maintenance responsibilities for nonstructural improvements. Cooperative agreements documenting shared maintenance responsibilities must clearly depict each cooperators proportionate costs. When maintenance responsibilities have been assigned to a permittee or lessee, either through agreement or by decision, the requirement is stipulated as a term and condition on a grazing permit or lease. Failure to maintain the improvement in a usable condition may be cause for cancellation of the grazing permit or lease under 43 CFR 4160.

Operation Costs. Permittees or lessees usually are responsible for providing costs for the operation and use of range improvements. If the authorized officer requires the operation of range improvements when the permittee or lessee would not normally use the improvement for livestock management (i.e., water developments in rest pastures, or range improvements only used by livestock during seasonal grazing periods) operation costs are shared on a proportionate basis.

Reconstruction Costs. Reconstruction is defined as the rebuilding of an improvement after it has been damaged or has deteriorated to the point that repair constitutes more than half of the cost of new construction. Providing costs for reconstruction of range improvements is the responsibility of the owner of the range improvement, unless reconstruction is required due to failure of the cooperator to perform maintenance as agreed, in which case the cooperator must provide the costs of reconstruction.

Modification Costs. Costs of modifying a range improvement are the responsibility of the party requesting the modifications.

Vandalism. Costs for maintenance due to vandalism are the responsibility of the owner of the range improvement.

BLM_0005303

12

H-4120-1 - GRAZING MANAGEMENT

D.  Documenting Contributions.  Contributions are documented by a Proffer of Monetary Contribution (Form 4120-9, Illustration 4) and deposited in the 7100 account.  Monetary and other contributions of labor and materials will be documented by cooperative agreement and by the range improvement project system.

.38  Priorities for Investments in Range Improvements.  The authorized officer must invest appropriated funds in a cost-effective and orderly manner according to established priorities.

A.  First Priority for Investments.  Appropriated funds available for investment in range improvements (other than range betterment funds after FY 1984) must be allocated first to the maintenance of improvements that continue to serve a valid purpose or objective and for which the authorized officer has maintenance responsibility.

B.  Second Priority for Investments.  The second priority for investment of appropriated funds in range improvements is for the design, and construction of new range improvements that conform to a specific activity plan for the area.  Once an AMP is incorporated into a permit or lease, a mutual commitment exists between the BLM and permittee, lessee, or other cooperator to full operation of the plan.  Appropriated funds in subsequent years should be available for the full operation of implemented plans.

C.  Exceptions.  On a case-by-case basis, the authorized officer may make exceptions to the established priorities for investing appropriated funds.

BLM_0005304

H-4120-1 - GRAZING MANAGEMENT

.4 <u>Special Rules</u>. Special conditions may be encountered in the Field which cannot be resolved satisfactorily under existing regulations and which would not be general enough in character to warrant an amendment to the regulations. When local conditions warrant, State Directors may recommend the adoption of a special rule to achieve resource management objectives. (See 43 CFR 4120.4.)

.41 <u>Initiation of Special Rules</u>. A special rule may be proposed initially by Area or District Managers who have identified unique or unusual situations which are not adequately covered under the grazing administration regulations.

A. <u>Recommendation to the Director</u>. If a State Director determines that a special rule is necessary, a recommendation is sent to the Director (WO-220). The State Director's recommendation includes: The proposed special rule, suggested preamble containing background information and a statement of need, a determination of affects, and an environmental assessment.

B. <u>Director's Approval to Publish Proposed Special Rule</u>. The Director reviews the proposed special rule and either approves it for publication in the <u>Federal Register</u>, identifies modifications to make it acceptable for publication, or rejects the proposal.

.42 <u>Publication of Proposed Special Rule in the Federal Register</u>. The Director publishes the proposed special rule in the <u>Federal Register</u>, allowing at least 60 days for public review and comment. The <u>Federal Register</u> Notice requests that comments be sent to the originating State Director. Notice must be published in a newspaper for the local area during the 60-day period.

.43 <u>Public Review and Analysis of Comments</u>. Ample opportunity must be provided for public review and comment. State Directors may hold public meetings and make contacts with user groups or individuals, as appropriate, during the 60-day comment period. Following the public comment period, the State Director analyzes the public comments and prepares a response to each of the comments suitable for publication as a preamble to the special rule. Changes to the special rule in response to public comments may be made by State Directors. The final special rule and preamble are forwarded to the Director.

14

## H-4120-1 – GRAZING MANAGEMENT

.44  <u>Publication of Final Special Rule in the Federal Register</u>.  The
Director reviews the State Director's analysis of public comments and, if in
concurrence, publishes the final special rule in the <u>Federal Register</u>.

.45  <u>Implementation of Special Rules</u>.  Action under the special rule may
be initiated on the date the final rule becomes effective, as stated in the
<u>Federal Register</u> final rulemaking publication.  State Directors should give
the special rule local publicity, as appropriate.  State Directors may hold
public or user group meetings and contact individuals, as necessary, to
implement a special rule.  Permittees or lessees authorized to graze live-
stock within the area affected by the special rule must be furnished copies
of the rule.

BLM_0005306

H-4120-1 - GRAZING MANAGEMENT

.5 <u>Cooperation in Management.</u>  The authorized officer should work with the appropriate county, State, and national organizations and other public and private agencies and individuals to provide cooperative rangeland management on intermingled public, private, and State land.  The authorized officer should maintain an exchange of information with other Government agencies and with all institutions and organizations that are interested in management of rangeland resources.  Coordinated resource management plans are an excellent tool for obtaining cooperation with other agencies and interest groups.

.51 <u>Cooperation with Associations of Stockmen.</u>  The authorized officer recognizes and cooperates with organized groups of stockmen.  Such groups are often useful in assisting with range improvement work, coordinating the exchange of information on resource conditions and needs, controlling unauthorized grazing use, arbitrating disputes on bulls or age of young livestock, and coordinating the handling of livestock such as movement between pastures in accordance with a grazing system.

A.  <u>Local Associations of Stockmen.</u>  Grazing permittees and/or lessees may organize local associations based on community, area of use, or other common interests.  As appropriate, the authorized officer continues to recognize those associations organized in the past to aid in the orderly administration of the public lands.

B.  <u>Farmers Home Administration (FHA) Grazing Associations.</u>  Cooperation with these associations is subject to the overall Agency Memorandum of Understanding (MOU) between BLM and FHA at the national level, and the MOU developed between BLM, FHA, and the grazing association at the local level.

C.  <u>Cooperative State Grazing Districts.</u>  Cooperative State Grazing Districts are unique to Montana.  These Districts were established under the Grass Conservation Act passed by the Montana State Legislature.  The BLM's relationship with these Districts are governed by an MOU signed by the BLM State Director of Montana and the Director of the Montana Department of Natural Resources and Conservation.  Individual cooperative agreements may be signed with each Cooperative State Grazing District by the appropriate District Manager.  These cooperative agreements provide an opportunity to identify and cope with unique operational problems peculiar to individual State Districts.

BLM_0005307

16

H-4120-1 - GRAZING MANAGEMENT


.52  Cooperation with Government Agencies.

A.  Federal Agencies.  Agencywide MOU's between the BLM and other
Agencies and entities may be entered into by the Director.

Local Agency MOU's.  State Directors may enter into local MOU's
with their counterparts in other Federal Agencies.  Such MOU's must be con-
sistent with agencywide MOU's and with BLM and Departmental policy.  State
Manual supplements should contain all local Agency MOU's pertaining to
grazing administration.

Administration of Withdrawn Lands.  Lands under the jurisdiction
of other Federal Agencies are occasionally administered for grazing by the
BLM.  The withdrawing order (usually Departmental) specifies policies for
grazing administration and the agreements developed with the holding
Agencies specifying lease or permit stipulations.  At the very minimum, each
grazing lease or permit involving withdrawn lands must provide for
cancellation, if required by the holding Agency.

B.  State, County, and City Governments.  Where necessary, MOU's may
be developed to support cooperative management with State, county, and city
Governments.  State Manual Supplements may contain all cooperative agree-
ments and memoranda developed with the State, county, and city Governments
pertaining to grazing administration.

.53  Cooperation with National, State, County, and Local Rangeland User
Organizations.

A.  National and State.  The Director and State Directors, or their
representatives, should maintain close working relationships with State and
national rangeland user organizations.

B.  County and Local.  District Managers and Area Managers should work
with county and local rangeland user organizations to promote a cooperative
approach to public rangeland management.

.54  Interdistrict Cooperation.  District Managers may develop agreements
to solve grazing and related problems which occur along common boundaries.

BLM_0005308

Case No. 1:20-cv-02484-MSK   Document 27-6   filed 04/27/21   USDC Colorado   pg 245 of 436

H-4120-1 - GRAZING MANAGEMENT

.55  Cooperative Management Where no Forage is Allocated to Livestock.

    A.  Conditions.  Areas where forage is present, but is allocated to uses or values other than livestock grazing, may require special consideration for cooperation in management.  For example, this situation may develop where small amounts of public lands are scattered among privately controlled lands and wildlife or other resource values or needs are high.  If the surrounding privately controlled lands are grazed by livestock and it is impractical to fence or otherwise exclude livestock from the public lands, a management agreement may be negotiated with the livestock operator.

    B.  Management Agreements.  Such agreements should reserve the vegetation on the public lands for the specific purpose identified in the land-use plan, recognize that some incidental livestock grazing may occur on the public lands, provide for specific actions by the livestock operator which will mitigate the effects of the livestock grazing on the value for which the allocation was made, include a provision for monitoring to ensure the rangeland condition prescribed in the agreement is achieved and/or maintained, and provide for cancellation or modification, as appropriate.  No grazing permit or lease is issued and no grazing fee is charged.

Illustration 1, Page 1
Form 4120-6
(.31D)

H-4120-1 – GRAZING MANAGEMENT

Cooperative Agreement for Range Improvements

Form 4120–6
(January 1982)

FORM APPROVED
OMB NO. 1004–0068
Expires: January 31, 1983

| FOR BLM USE ONLY | | |
|---|---|---|
| State . . . . . . . . . | O Z | |
| Office . . . . . . . . . | O 2 5 | |
| Expires | | EXTENDED TO |
| 5/31/90 | | |
| Job Number(s) | | |
| 40836 | | |

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**COOPERATIVE AGREEMENT**
FOR RANGE IMPROVEMENTS

*INSTRUCTIONS* – Cooperator(s) to receive original, and one copy each to the District case or lease file and District job file.

Job Name(s)
*Lincoln Hills Pasture Fence*

1. I, (We)  *George Mason*  of  *Kingman, Arizona* ,
   *Phillip Montgomery*  of  *Kingman, Arizona*

   of ,

and   of ,

hereinafter called cooperator(s) and the United States of America, by the Bureau of Land Management, hereinafter called the Bureau, for and in consideration of the mutual benefits hereinder, and in accordance with the Taylor Grazing Act (43 U.S.C. 315, 315a–r), as amended, the National Soil Conservation Act (16 U.S.C. 590a–q(1)), as amended, the Federal Land Policy and Management Act (43 U.S.C. 1701, et. seq.), and the Public Rangelands Improvement Act (43 U.S.C. 1904) do enter into this cooperative agreement for the construction and/or maintenance of range improvements, installation of conservation works or establishment of conservation practices, hereinafter referred to collectively as improvements, for the benefit of the public lands and of the cooperator(s).

2. The improvements known as the  *Lincoln Hills Pasture Fence*

   [X] will be  [ ] are  located upon:  ¼, Sec(s). *8,16,17* , T. *3 6 N* , R. *8 W* ,
   *Salt River*  Meridian, County of *Mohave* , State of *Arizona* .

3. IT IS MUTUALLY AGREED:

   (a) The parties hereto will furnish labor, materials, and equipment as required, the total cost or value not to exceed the amount listed below for each of the parties respectively for the initial construction and/or installation of the improvements indicated in paragraph 2.

| NAME(s) OF COOPERATOR(s) | ITEMS | TOTAL COST OR VALUE |
|---|---|---|
| *George Mason* | *materials, labor & equip. for ¾ mult. fence* | $ *1500 00* |
| *Phillip Montgomery* | *materials, labor & equip for ¾ mult. fence* | *1500 00* |
| | | |
| | | |
| BUREAU OF LAND MANAGEMENT | | |
| | AGGREGATE COST | $ *3000 00* |

BLM MANUAL

Rel. 4–73
6/20/84

BLM_0005310

Illustration 1, Page 2

H-4120-1 – GRAZING MANAGEMENT

Cooperative Agreement for Range Improvements

(b) Upon notice from the authorized officer of the Bureau, cooperator(s) will promptly supply labor, materials, and equipment as specified in paragraph 3(a) as required. Contributed materials in excess of the amount required shall be returned to the contributor. Equipment contributed shall be returned promptly following completion of the work. Work will be conducted under the supervision and direction of the authorized officer and shall be pursued with diligence until completed.

4(a) The cooperator(s) shall be liable, jointly and severally, for the repair and maintenance of the improvements following completion, in good and serviceable condition. The cooperator(s), without further notice from the authorized officer shall do the necessary work promptly. If work is not performed as necessary, the authorized officer shall notify the cooperator(s) and specify a period within which to complete the work as required.

(b) In event the cooperator(s) default in the repair and maintenance of the improvements the authorized officer may do or cause such work to be done for and in behalf of the cooperator(s); and the necessary cost and expense thereof shall become a charge and obligation upon and shall be paid by the cooperator(s). It is further understood in case of default that any grazing permit or lease may be cancelled and may not be renewed or extended or any assignment thereof may not be approved unless and until all charges and costs owed by the cooperator(s) hereunder shall have been paid; and provided that the Bureau may pursue such other remedies, legal or administrative, as may be authorized.

(c) Repair and maintenance, as herein required, shall mean normal upkeep and maintenance necessary to preserve, protect, and prolong the useful life of the improvements, but shall not include major repairs where the damage is due to floods, earthquakes, or other acts of God, or fire not the result of fault or negligence of the cooperator(s) as determined by the authorized officer.

5. IT IS FURTHER AGREED:

(a) Title to the said improvements in place, together with all labor and materials furnished by either party and used in the construction and maintenance thereof, shall be in the United States of America. The improvements may be removed, in whole or in part, during the term of this agreement or any extension thereof, by mutual consent of the parties or by direction of the authorized officer; such removal shall be made by the cooperator(s), or by the Bureau at its option. Upon removal of the improvements, any salvageable materials, after deducting an amount to compensate for the actual cost of removal, shall be available for distribution to the parties then subject to this agree-

ment in proportion to the actual amount of their respective contributions to the initial construction of the improvements. The parties shall take possession and remove their portion of the salvaged materials within one hundred and eighty (180) days after first notification in writing that such material is available; upon failure to do so within the time allowed, the materials shall be deemed to have been abandoned and title thereto shall thereupon vest in the United States.

(b) During the course of salvaging material, the United States assumes no responsibility for the protection or preservation of said material.

6. If the cooperator(s) shall assign or transfer any grazing permit or lease embracing the lands upon which the improvements are constructed or in connection with which they are used, the cooperator(s) shall include in such assignment or transfer his interest in this Cooperative Agreement. Before the assignee or transferee will be recognized as successor to the cooperator(s)'s interest hereunder, such assignee or transferee will be required by the authorized officer to accept an assignment of this agreement and agree to be bound by the provisions respecting the use and maintenance of the improvements.

7. The cooperator(s) use of the improvements will be in conformance with any special conditions, the grazing permit(s) or lease(s), and regulations of the Secretary of the Interior.

8. This agreement shall not accord to cooperator(s) any preference, privilege, or consideration with respect to any grazing permit or lease not expressly provided herein or in the rules and regulations governing such grazing permit or lease.

9. Items 2, 3, and 4(a) of this agreement may be modified or cancelled by written agreement of the parties, which agreement shall become a part hereof.

10. This contract is subject to the provisions of Executive Order No. 11246 of September 24, 1965, as amended, which sets forth the nondiscrimination clauses. A copy of this order may be obtained from the authorized officer.

11. This agreement shall remain in effect indefinitely from date of signature unless (1) sooner terminated by mutual written consent of the parties, or (2) is terminated by the authorized officer after notice in writing because of the cooperator(s) default or violation, or (3) is terminated by the authorized officer after notice in writing because the improvements are not compatible with adopted land use plans or classification under the public land laws.

BLM_0005311

H-4120-1 – GRAZING MANAGEMENT

Cooperative Agreement for Range Improvements

---

12. Special conditions

This fence shall be constructed with: metal posts placed 16-1/2 feet apart; stretch panels with wood posts at least every one-fourth mile; gates at each of the two places where roads cross the fenceline and at each end of the fence; one wire stay between posts; and four barbed wires spaced 16, 6, 8, and 12 inches from the ground up, with the top wire no higher than 42 inches above the ground.

The fence will be built along a line to be flagged by BLM personnel in consultation with Mr. Mason and Mr. Montgomery and will be completed no later than September 15, 1980. Mr. Mason will be responsible for initial construction and maintenance of the more northerly 3/4 mile of fence beginning at the SW corner of the NE 1/4 NE 1/4 of Section 17 and ending at approximately the center of Section 8. Mr. Montgomery will be responsible for the more southerly 3/4 mile of fence beginning at the SW corner of the NE 1/4 NE 1/4 of Section 17 and ending at approximately the NE corner of the SW 1/4 SW 1/4 of Section 16.

COOPERATOR(S)                                    THE UNITED STATES OF AMERICA

_George Mason_        _5/31/80_          State of _Arizona_
(Signature)              (Date)

_Phillip Montgomery_   _5/31/80_         District _Phoenix_
(Signature)              (Date)

_____       _____         By _Robert G. Monroe_
(Signature)              (Date)               (Signature)

_____       _____         _Area Manager_
(Signature)              (Date)               (Title)

_____       _____         _5/31/80_
(Signature)              (Date)               (Date)

BLM_0005312

Illustration 1, Page 4

H-4120-1 - GRAZING MANAGEMENT

Cooperative Agreement for Range Improvements



LOCATION PLAT

Scale: _1_ inches equals one mile

1. Information is collected to document the specific participation of each cooperator in the range improvement project to be accomplished. This information includes the location by legal description, and the kind and amount of participation such as labor, materials, maintenance, or funds.

2. The information is used in the form of an agreement to participate. By signature, each cooperator agrees to participate in the manner specifically described on the cooperative agreement form.

3. Participation in cooperative agreements is voluntary and are focused on range improvement projects designed to improve range conditions or facilitate the use of rangeland resources by livestock. Once the agreement is signed, the agreed upon participation is required.

GPO 833-818

Illustration 2, Page 1
Form 4120-7
(.31D)

H-4120-1 – GRAZING MANAGEMENT

Range Improvement Permit

Form 4120-7
(November 1983)

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

**RANGE IMPROVEMENT PERMIT**

Sections 4 and 15 of the Taylor Grazing Act, Section 11 of the
Alaska Grazing Act, and Section 302 of the Federal Land
Policy and Management Act

FORM APPROVED
OMB NO. 1004-0019
Expires July 31, 1983

FOR BLM USE ONLY

| | | |
|---|---|---|
| State . . . . . . . . . . . . . | U | T |
| Office . . . . . . . . . . | O | 4 4 |
| Grazing Record No. . . . . . | 4 4 3 5 | |
| Allotment No. . . . . . . . . | 4 9 6 2 | |
| Job Number Assigned . . . . . | 8 9 7 1 | |
| Date filed | | |

Name (last, first, middle initial)

*Harold M. Recker*

Address (include zip code)

*P.O. Box 847
Cedar City, Utah 84720*

Applies for a permit to [X] construct, maintain, and use    [ ] maintain and use  in connection with his authorized grazing privileges, the following-described improvement on public lands.

*Corral - Approximately 200' x 100'*

The purpose, need, and use for such improvement is as follows:

*To handle cattle (brand, vaccinate, etc) when moved from pasture to pasture*

The improvement is to be located in *NE¼ NE¼ NW¼*

Section *5* , Township *16S* , Range *5W* , *Salt Lake* Meridian,
County of *Iron* , State of *Utah* . The location is
shown on the diagram on the reverse hereof. *Specifications for the improvement accompany this application.*

[X] Estimated cost of improvement is: $ *300.00* , labor; $ *300.00* , material which will be paid or furnished by the applicant.

[ ] Estimated present value of the improvement is $

A permit is hereby issued subject to the following conditions:

1. The permit shall cover only such portions of range improvements as are actually located upon public lands.

2. The permit does not convey right, title, or interest in any lands or resources held by the United States.

3. The permit is subject to cancellation in whole or in part if the lands or portions thereof are disposed of or devoted to a public purpose which precludes livestock grazing.

4. The permittee will be responsible for properly maintaining the improvement in good working order and in an aesthetic state. The permittee will comply with the laws of the State within which the improvements are located.

5. Any public lands or impounded waters will be available for wildlife use and open to the public for hunting and fishing in accordance with State regulations. Such lands and water will also be open for other authorized public use to the extent that such use is consistent with the multiple-use management objectives for the area.

6. Compliance by the permittee with the construction specifications attached and any special condition made a part of the permit.    Special conditions and/or specifications attached:
[ ] Yes  [X] No.

7. The permit is subject to modification or cancellation if the improvement no longer serves the purpose for which it was installed or if the improvement is not compatible with the multiple-use objectives for the area.   The permit is subject to cancellation if the permittee does not comply with the regulations under whi h the improvement is authorized.

8. If the permit is for construction of any improvement, it shall become void without further notice if it is not completed by

*8/15/84*

Within thirty (30) days after completion of the improvement, the permittee *must* advise the authorized officer in writing: (a) the date the job was completed; and (b) the cost of the job, specifying separately the cost of labor and materials.

9. This permit is subject to the provisions of Executive Order No. 11246 of September 24, 1965, as amended, which set forth the nondiscrimination clauses.   A copy of this order may be obtained from the authorized officer.

Signature of Applicant

*Harold M. Recker*

Date *5/15/84*

Title 18 U.S.C. Section 1001, makes it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.

Approved by Authorized Officer

*Lindsay Miller, Area Manager*

Date issued *5/29/84*

*(Continued on reverse)*

Rel. 4-73
6/20/84

BLM_0005314

Illustration 2, Page 2

H-4120-1 - GRAZING MANAGEMENT

Range Improvement Permit



LOCATION PLAT

Sec. *5* , T. *16S* , R. *5W* , *Salt Lake* Mer.

On unsurveyed lands, use U.S.G.S. quadrangles, sketch maps, etc., as attachment to show improvement location

Scale *4 inches* equals one mile

**TO BE FILLED IN UPON COMPLETION OF IMPROVEMENT**

This improvement has been completed satisfactorily on *5/25/* , 19*84* , at a cost of $ *186.⁵⁰* for materials and $ *120.⁰⁰* for labor, in accordance with conditions of the permit.

| Date of inspection | Signature of Inspecting Officer | Job number assigned |
|---|---|---|
| *6/3/84* | *Alan M. Farrel, Range Conservationist* | *8971* |

INSTRUCTIONS

Application *must* be typed or printed plainly in ink.   Submit in *triplicate* (3) to the Bureau of Land Management District Office.

Upon approval of the application, the original is returned to the applicant and one copy each to the District case file and to the District job file.

NOTICE

The Privacy Act of 1974 and the regulation in 43 CFR 2.48(d) provide that you be furnished the following information in connection with information required by this permit.

AUTHORITY: 43 U.S.C. 315, 316, and 1181d.

PRINCIPAL PURPOSE: The information is to be used to process this application.

ROUTINE USES: (1) The determination of the applicant's requirements and meet to construct or maintain improvements on public lands.  (2) Documentation for public information in support of

notations made on land status records for the management, disposal, and use of public lands and resources.  (3) Transfer to appropriate Federal agencies when concurrence is required prior to granting a right in public lands or resources.  (4)(5) Information from the record and/or the record will be transferred to appropriate Federal, State, local or foreign agencies, when relevant to civil, criminal or regulatory investigations or prosecutions.

EFFECT OF NOT PROVIDING INFORMATION: Disclosure of the information is voluntary.  If all the information is not provided, this application may be rejected.

The Paperwork Reduction Act of 1980 (44 U.S.C. 3501 et seq.) requires us to inform you that:

Information is being collected to document the purpose, need, and other information for construction of range improvements on the public lands.

Information will be used to authorize the construction, maintenance, and use of range improvements.

Response to this request is voluntary.

GPO 841-527

Rel. 4-73
6/20/84

BLM_0005315

Illustration 3
Form 4120-8
(.35)

H-4120-1 - GRAZING MANAGEMENT

Assignment of Range Improvements

| Form 4120-8<br>(January 1980)<br>(formerly 7330-9) | UNITED STATES<br>DEPARTMENT OF THE INTERIOR<br>BUREAU OF LAND MANAGEMENT | FOR BLM USE ONLY | | |
|---|---|---|---|---|
| | | State . . . . . . . | U | T |
| | **ASSIGNMENT OF RANGE IMPROVEMENTS** | Office . . . . . . . | O 4 | 4 |
| *INSTRUCTIONS* – Prepare four copies. Submit original to assignor and one copy each to the assignee, case or lease file, and District job file. | | Grazing Record No. . . | 4 4 | 3 5 |

I HEREBY ASSIGN all my right, title, and interest to *(name of assignee)*

*April M. Baker*

☐ Cooperative Agreements (Form 4120-6) and/or ☒ Rangeland Improvement Permit (Form 4120-7) approved by the Bureau of Land Management for job(s) listed below , in and to the following

| JOB | | | |
|---|---|---|---|
| NUMBER | TYPE ** | NAME | LOCATION* |
| 8971 | P | Decker Corral | NE¼ NE¼ NW¼, Section 5, T. 16 S, R. 5 W. |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| Date | Signature of Assignor |
|---|---|
| 1/30/80 | Harold C. Decker |

I, *April M. Baker* , assignee named in the above assignment of ☐ Cooperative Agreements ☒ Permits do hereby agree to be fully bound by all the terms and provisions of the said ☐ Cooperative Agreements ☒ Permits and the regulations under which they were issued to the same extent and in the same manner as the assignor herein.

*April M. Baker*
(Assignee's Signature)

1/30/80
(Date)

Assignment approved 1/31/80
(Date)

By Andrew M. Miller, Area Manager
(Signature)

* Give legal description     ** Type of authorization   A = Cooperative Agreement;     P = Permit          GPO 854-262

BLM MANUAL

Rel. 4-73
6/20/84

BLM_0005316

Illustration 4
Form 4120-9
(.37D)

H-4120-1 – GRAZING MANAGEMENT

Proffer of Monetary Contribution

| Form 4120-9 (January 1980) (formerly 7330–8) | UNITED STATES DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT | State . . . . . . . . | A Z |
|---|---|---|---|
| | | Office . . . . . . . . | 0 1 4 |
| | **PROFFER OF MONETARY CONTRIBUTION** | **INSTRUCTIONS** Submit one copy to each contributor, District grazing case file, and District job file. | |

| I. Name(s) | Address(es) *(include zip code)* |
|---|---|
| Peter H. Kaufman | P.O. Box 372 St. George, Utah  84770 |
| Percy A. Morgan | 1025 Central Ave. St. George, Utah 84770 |

do hereby contribute the sum of $ *500.00* to the Bureau of Land Management. Contributions are made under the provisions of Section 9 of the Taylor Grazing Act (43 U.S.C. 315h), as amended, and Section 307(c) of the Federal Land Policy and Management Act (43 U.S.C. 1737). Specifically this contribution is for the purpose of *

*adding one 10 ft. ring tank and 200 ft. of plastic pipe to the Red Rock Pipeline to provide water to the Willow Pasture of the Cottonwood Allotment*

| II. The unexpended balance, if any, remaining after completion of the work described in the paragraph above shall be: [X] Returned to the contributor(s) [ ] Used for general purposes * | III. Contribution, made payable to the Bureau of Land Management, is attached in the form of *(specify check, money order, etc.)* *check* | |
|---|---|---|
| Signature of Contributor *Peter H. Kaufman* | Title *(as applicable)* *Permittee* | Date *6/17/79* |
| Signature of Contributor *Percy A. Morgan* | Title *(as applicable)* *Manager, Four Star Ranches* | Date *6/17/79* |
| Signature of Contributor | Title *(as applicable)* | Date |
| Signature of Contributor | Title *(as applicable)* | Date |

Accepted in behalf of the Secretary of the Interior for deposit in the Treasury of the United States and for expenditure for the purpose specified herein

| Signature of Authorized Officer *Paul L. Wretz* | Title *District Manager* | Date *6/17/79* |
|---|---|---|

* Contributions for general purposes are accepted to help pay for the expenses of construction or application of conservation and range improvement projects in general, or for the payment of expenses incident to the administration, use, protection, and improvement of lands in the district where this contribution is received. Such contributions shall *not* be used for specific administrative purposes, such as the payment of salaries of named individuals or positions, or the performance of specific functions by such individuals, or the maintenance of offices at particular locations unless approved by the Director. The contribution shall *not* be used for any purpose at variance with existing Bureau policy, regulation, or law regarding the development, conservation, and use of the public lands.

GPO 854–263

BLM MANUAL

Rel. 4–73
6/20/84

BLM_0005317



# RECORD OF DECISION AND RESOURCE MANAGEMENT PLAN GLENWOOD SPRINGS RESOURCE AREA

## (REVISED 1988)

# U.S. DEPARTMENT OF THE INTERIOR BUREAU OF LAND MANAGEMENT GRAND JUNCTION DISTRICT, COLORADO

BLM_0005318

 **United States Department of the Interior** 

BUREAU OF LAND MANAGEMENT
GRAND JUNCTION DISTRICT
764 HORIZON DRIVE
GRAND JUNCTION, COLORADO 81506

In Reply Refer To:
1610

NOTICE

This is the second edition of the Glenwood Springs Resource Management Plan/Record of Decision. This edition incorporates maintenance changes that have occurred through the period of January 1984 to June 30, 1988. All changes to the original document are shown in italics. However, the maps have not been revised, so land status, as an example, is not current.

Sincerely,

Bruce Conrad
District Manager

BLM_0005319

GLENWOOD SPRINGS RESOURCE MANAGEMENT PLAN

RECORD OF DECISION

Prepared by

BUREAU OF LAND MANAGEMENT
U. S. DEPARTMENT OF THE INTERIOR

January 1984

State Director (Acting)
Colorado State Office

BLM_0005320

RECORD OF DECISION

Glenwood Springs Resource Management Plan
Glenwood Springs Resource Area
Glenwood Springs, Colorado

This resource management plan documents the decisions reached by the Bureau of Land Management (BLM) on managing 566,000 acres of public land in the Glenwood Springs Resource Area. Major decisions are to--

- maintain or increase existing wildlife populations,

- stabilize grazing operations,

- recommend 10,118 acres as suitable for wilderness designation,

- protect critical watersheds near Glenwood Springs, Rifle, and New Castle and erosion hazard areas scattered throughout the resource area,

- protect the visual resources throughout the resource area, especially along the Interstate 70 and Highway 82 travel corridors and in Thompson Creek, Bull Gulch, and Deep Creek,

- leave the majority of the resource area open for mineral exploration and development, but restrict mineral development in some areas having other important and unique resource values,

- harvest timber at current levels,

- ensure the continued availability of outdoor recreational opportunities not readily available from other sources, reduce impacts of recreational use, and continue management of the upper Colorado River for floatboating use,

- dispose of 15,500 acres of mostly small, isolated, and difficult to manage public land, and

- designate 393,615 acres as open, 152,001 acres as limited, and 20,426 acres as closed to motorized vehicle use.


Alternatives Considered


Four alternatives for managing the resources were considered: Continuation of Current Management, Resource Protection, Economic Development, and Preferred.

The Continuation of Current Management Alternative emphasized a level of management similar to the current level. It was the No Action Alternative required by the National Environmental Policy Act.

iii

BLM_0005321

The Resource Protection Alternative emphasized protection of natural settings and protection and enhancement of fragile and unique resources.

The Economic Development Alternative emphasized development of resources that generate or produce goods, services, employment, and income.

The Preferred Alternative (called the Proposed Plan in the final environmental impact statement) emphasized protection of fragile and unique resources and production and development of renewable and nonrenewable resources.  This alternative is the environmentally preferable alternative and the one that has been selected as the Glenwood Springs Resource Management Plan.

Mitigation Measures

All practicable measures will be taken to mitigate adverse impacts.  These measures will be strictly enforced during implementation.  Monitoring will tell how effective these measures are in minimizing environmental impacts. Therefore, additional measures to protect the environment may be taken during or following monitoring.

| January 3, 1984 | Bob Moore ( Acting ) |
| --- | --- |
| Date | George C. Francis |
| | Colorado State Director |
| | Bureau of Land Management |

iv

# CONTENTS

CHAPTER 1, INTRODUCTION  ..................................................... 3
   PURPOSE AND NEED  .......................................................... 3
   DESCRIPTION OF THE PLANNING AREA  ....................................... 3
   IMPLEMENTATION  ........................................................... 3
   MONITORING  ............................................................... 5
   MAINTENANCE  .............................................................. 5
   AMENDMENTS AND REVISIONS  ............................................... 5
   VALID EXISTING RIGHTS  ..................................................... 5
   ADMINISTRATIVE ACTIONS  .................................................. 5

CHAPTER 2, RESOURCE DECISIONS  ............................................ 9
   INTRODUCTION ............................................................. 9
   DESCRIPTION OF THE PLANNED ACTIONS  ..................................... 9
      Air Quality Management  ..................................................... 9
      Water Quality Management  .................................................. 9
      Water Yield Management  .................................................... 11
      Critical Watershed Areas  ................................................... 11
      Minerals Management  ...................................................... 14
      Aquatic Habitat Management  ................................................ 15
      Terrestrial Habitat Management  ............................................. 18
      Livestock Grazing Management  .............................................. 20
      Forest Management  ........................................................ 31
      Recreation Resource Management  ........................................... 34
      Cultural Resource Management  .............................................. 36
      Paleontological Resource Management  ....................................... 36
      Wilderness Management  .................................................... 37
      Visual Resource Management  ............................................... 38
      Land Tenure Adjustments  ................................................... 39
      Off-Road Vehicle Management  ............................................... 40
      Transportation Management  ................................................. 40
      Utility and Communication Facility Management  .............................. 41
      Fire Management  .......................................................... 44
   SUPPORT  ................................................................. 45

APPENDIXES (see note on Divider)  ..............................................  43
   APPENDIX A.   POSSIBLE MANAGEMENT PRACTICES  ......................... 45
   APPENDIX B.   REQUIRED MANAGEMENT STIPULATIONS  ..................... 51
   APPENDIX C.   RECREATION OPPORTUNITY SPECTRUM CLASSES  ............ 53
   APPENDIX D.   CONSIDERATIONS USED IN DETERMINING
                     LAND TENURE ADJUSTMENTS  ................................. 55

GLOSSARY  ................................................................... 59

BLM_0005323

# MAP LIST

1. Setting and Land Use

2. Water Quality Management

3. Water Yield Management

4. Critical Watershed Areas

5. Minerals Management

6. Aquatic Habitat Management

7. Terrestrial Habitat Management

8. Livestock Grazing Allotments

9. Forest Management

10. Recreation Opportunity Spectrum Settings

11. Recreation Resource Management

12. Wilderness Management

13. Areas of Critical Environmental Concern

14. Visual Resource Management

15. Land Tenure Adjustments

16. Off-Road Vehicle Management

17. Transportation Management

18. Utility and Communication Facility Management

19. Fire Management

BLM_0005324

# CHAPTER 1

# INTRODUCTION

BLM_0005325

# CHAPTER 1

# INTRODUCTION

This plan contains the decisions on all land use proposals presented in the June 1983 final environmental impact statement. It describes in general terms the implementation, monitoring, and amendment processes and tells how each resource will be managed, the order in which projects will be carried out, and what support will be needed.

This plan does not present information on environmental consequences, rationale, consistency, or effects of the management. This information was previously covered in the draft and final environmental impact statements, which may be obtained by contacting the Glenwood Springs Resource Area office.

In addition to this plan, a rangeland program summary and a wilderness study report are being prepared. The wilderness study report will identify the preliminary recommendations for each wilderness study area. The report, along with a final environmental impact statement on the wilderness portion of the plan, will be submitted to Congress for action. The rangeland program summary will summarize the livestock grazing management program and grazing decisions reached through this plan and consultation with affected parties. The rangeland program summary will describe which selective management category each allotment falls into and give a proposed schedule for issuance of grazing decisions where stocking rates are known. It will also detail the studies and actions to be taken to determine proposed stocking rates for those allotments where stocking rates are not known.

## PURPOSE AND NEED

This plan provides a broad framework for multiple use management on public land. This plan makes land use allocations, sets broad production goals, and protects important resource values.

In addition to meeting the requirements in the *Federal Land Policy and Management Act of 1976* for land use planning (43 CFR, Part 1600), this plan satisfies the BLM's policy to (1) identify lands suitable for wilderness designation (the study phase of BLM's wilderness review process); (2) identify lands with potential for coal leasing (43 CFR, Part 3400); (3) respond to the court mandate (Natural Resources Defense Council et al. versus Watt (Civil

Action 1983-75)) requiring the BLM to complete a livestock grazing environmental impact statement; and (4) identify public land as open, closed, or limited for off-road vehicle use (Executive Order 11989).

## DESCRIPTION OF THE PLANNING AREA

The Glenwood Springs Resource Area is located in west central Colorado 85 miles east of the BLM Grand Junction District Office (Fig. 1-1). It is bordered on the north and east by the BLM Craig District and the White River National Forest, on the south by the White River and Grand Mesa National Forests and the BLM Grand Junction Resource Area, and on the west by the BLM Grand Junction Resource Area.

The land ownership pattern is fragmented and stretches about 100 miles from west to east and 60 miles from north to south. The area lies primarily within Garfield, Eagle, and Pitkin Counties with smaller parts in Routt, Rio Blanco, and Mesa Counties. Approximately 1,280,000 acres of public, state, and private lands lie within the resource area boundaries. Public land accounts for 566,042 of these acres. Figure 1-2, located at the end of this document, shows land status.

## IMPLEMENTATION

Decisions in the plan will be implemented over a period of years and must be tied to the BLM budgeting process. Therefore, priorities have been established for each resource to guide the order of implementation. The priorities link the planned actions in the resource management plan with the budget process. Priorities for each program will be reviewed annually to help develop the annual work plan commitments for the coming year. The priorities may be revised based upon new administrative policy, new Departmental directions, or new Bureau goals. The priorities of implementation are presented by resource in Chapter 2.

3

Chapter 1, Introduction

# FIGURE 1-1
## LOCATION MAP



COLORADO

4

BLM_0005327

Monitoring

Activity plans and environmental assessments may be required prior to conducting specific actions such as timber harvesting. For example, forest management plans will show specific project locations; describe and analyze the impacts of specific actions associated with development, operation, and rehabilitation of the project; and compare project costs with project benefits.

# MONITORING

This plan will be monitored and evaluated every four years and at other times as appropriate, based upon the sensitivity of the resources to the decisions involved. This type of monitoring will be conducted to review the plan as a whole to determine the need for revision or amendment. Specific actions within the plan must also be monitored. Individual resources will be monitored as explained in Chapter 2. This type of monitoring will determine whether actions are consistent with current policy, whether original assumptions were correctly applied and impacts correctly predicted, whether mitigation measures are satisfactory, whether significant changes have been made in related plans of other federal agencies or state or local governments, or whether new data is of significance to the plan. Monitoring will also help to establish long-term use and resource condition trends and provide valuable information for future planning. Ultimately, monitoring and evaluation will determine whether there is sufficient cause to warrant maintenance, amendment, or revision of the plan.

# MAINTENANCE

This plan will be maintained as necessary to reflect minor changes in data. This maintenance will be limited to refining or documenting a previously approved decision. It shall not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the plan. Maintenance will be documented in supporting records. Formal public involvement will not be necessary to maintain the plan.

# AMENDMENTS AND REVISIONS

This plan may be amended or revised if major changes are necessary. Monitoring and evaluation findings, new data, new or revised policy, a change in circumstances or a proposed action that may result in a change in the scope, terms, or conditions of the plan would warrant an amendment or revision. An amendment will be analyzed either in an environmental assessment or an environmental impact statement. The public and other agencies will be included in the amendment and revision processes.

# VALID EXISTING RIGHTS

This plan may not repeal valid existing rights on public lands. Valid existing rights are those claims or rights to public land that take precedence over the actions in this plan. As an example, a mining claim issued prior to the preparation of this plan in an area withdrawn from mineral entry through the plan may be valid. Valid existing rights may be held by other federal agencies or by private individuals or companies. Valid existing rights may also pertain to oil and gas leases, rights-of-way, and water rights.

# ADMINISTRATIVE ACTIONS

Various types of administrative actions will require special attention beyond the scope of this plan. Administrative actions are the day-to-day transactions required to serve the public and to provide optimal use of the resources. These actions are in conformance with the plan. They include issuance of permits for fuelwood, sawtimber, Christmas trees, and competitive and commercial recreation activities; lands actions, including issuance of grants, leases, permits, and resolution of trespass; facility maintenance; law enforcement; enforcement and monitoring of permit stipulations; cadastral surveys to determine legal land ownership; and engineering support to assist in mapping, designing, and implementing projects. These and other administrative actions will be conducted at the resource area, district, or state offices. The degree to which these actions are carried out will be based upon BLM policy, available personnel, and funding levels.

BLM_0005328

# CHAPTER 2

# RESOURCE DECISIONS

**Chapter 2 has been rewritten and updated and as such is 8 pages longer than the 1984 version. Due to time limitations, the appendixes have not been renumbered.**

BLM_0005329

# Chapter 2

# Resource Decisions

## Introduction

This chapter describes the resource management plan. It provides specific information about each resource. Throughout this chapter, references are made to maps that display planned actions by resource. These maps are located at the end of this plan.

## Description of Planned Actions

This section describes the planned actions, tells what support will be needed, and sets priorities for implementing the planned actions. The priorities were set based on public demands, administration policy, and Department of Interior and BLM directives. Therefore, these priorities may be revised as policy and directives change. The number one priority for each resource is maintaining its base program. This includes funding normal operating costs, completing administrative duties, and handling public inquiries. Please note that priorities were not established for implementing some resources, as their planned actions either will be implemented through approval of the plan or will require additional internal planning and coordination. For example, visual resource management classes shown on Map 13 became effective upon approval of this plan and, therefore, have no priority for implementation.

## Air Quality Management

### Objective

To limit air quality degradation in the resource area by ensuring public land use activities are in compliance with federal, state, and local legislation.

### Planned Management Actions

Inventory air quality to establish a baseline from which changes associated with BLM or other agency proposals can be determined. Ensure proposals comply with all applicable local, state, and federal regulations to limit air quality degradation.

### Support

Technical support for inventory and compliance will be required from air quality specialists in the Colorado State Department of Health, Air Pollution Control Division; U.S. Environmental Protection Agency, Region VIII; and the U.S. Forest Service, Region II.

### Implementation and Monitoring

Site-specific project plans for proposals affecting public and adjacent lands will be reviewed for compliance with existing air quality laws and policies protecting these areas. BLM proposals will be analyzed in environmental assessments. Mitigation will be incorporated into project proposals when necessary to reduce air quality degradation.

### Priorities of Implementation

None.

## Water Quality Management

### Objective

To maintain or improve existing water quality in the resource area where possible.

### Planned Management Actions

Prepare a water quality monitoring plan to (1) locate the source of water quality problems in four known problem areas, (2) gather baseline infor-

BLM_0005330

## Chapter 2, Resource Decisions

area, and (3) determine the effects of planned vegetation treatment on water quality.

Investigate four areas shown on Map 1 to identify the origins of existing water quality problems. Once identified, take actions to correct or reduce the problems originating on public land using techniques listed in Appendix A. These areas and their water quality problems are listed below:

**Divide Creek.** High levels of sediment, bacteria, and salinity; and high alkalinity concentration.

**Horse, Willow, and Poison Creeks.** High levels of sediment and salinity; high water temperatures; high manganese and sulfate levels; poor riparian vegetation; poor channel stability; low dissolved oxygen levels; and very high erosion hazard.

**Upper Colorado River.** High sediment, bacteria, and salinity; high water temperature; and low dissolved oxygen levels.

**Milk and Alkali Creeks.** High sediment and salinity; and poor benthic diversity.

Maintain or improve water quality on remaining public land outside these water quality management areas by including site-specific mitigation measures in other resource projects having the potential to affect water quality.

Comply with water quality guidelines developed in 208 region plans and with state water quality standards.

### Support

Engineering support will be required in the design and construction of projects for protection of water quality. Erosion control structures will require, at a minimum, the filing of a permit with the Colorado State Engineer. Water rights will be required for perennial streams, on reservoirs over 10 acre-feet in size, or on dams taller than 15 feet.

### Implementation and Monitoring

The water quality monitoring technique will vary by purpose. Monitoring to locate the source of water quality problems in problem areas will involve sampling at different points along the watershed and during different flow regimes. If individual problem sources exist on public land and can be remedied efficiently through BLM management, activity plans will be prepared to detail the necessary management.

Monitoring to gather existing water quality information will involve establishing sampling sites at Horse, Milk, and East Divide Creeks. Streams already monitored by other agencies, which will also prove useful for the baseline monitoring effort, include Northwater, East Middle Fork Parachute, East Fork Parachute, and Ben Good Creeks, all on the Naval Oil Shale Reserve west of Rifle.

Monitoring to determine the effects of planned vegetation treatments will involve monitoring either above or below project sites or in paired watersheds and will be conducted both before and after project implementation. Monitoring of projects will be conducted only when projects could significantly affect water quality or where watershed conditions (erosion hazard, slope, channel stability, soil stability, and the like) are sensitive to surface disturbance. Sampling frequency will depend on the type of monitoring conducted. Samples will be collected in water quality problem and baseline areas 5 to 10 times a year. Samples will be collected on no more than one or two watersheds per year in vegetation treatment areas.

### Priorities of Implementation

**Priority 1.** Prepare a water quality monitoring plan to guide water quality management on all public land in the resource area for the duration of the resource management plan.

**Priority 2.** Monitor and investigate water quality problem areas; monitor strategic sites throughout the resource area; monitor vegetation treatment areas.

Investigate water quality problem areas in sequence. The following criteria will dictate the sequence.

○ Severity of the water quality problem.

○ Its importance for implementation of surface-disturbing activities by other management programs.

○ The degree of public attention focused on the area.

Of the four water quality problem areas, the Milk and Alkali Creek watersheds and the Horse, Willow, and Poison Creek area have the highest priority because of the severity of the problems and the public attention that has been focused

10

BLM_0005331

## Description of Planned Actions

on the areas. Probably no more than one or two areas would be investigated at any one time.

## Water Yield Management

### Objective

To increase water yield throughout the resource area through forest management practices and through treatment of mountain brush vegetation types to improve livestock and big game forage.

### Planned Management Actions

Achieve water yield objectives by including, to the extent possible, design features in other resource activity project proposals that increase water yield. Projects that can be designed to increase water yield include mountain brush (oakbrush being the main component) treatment (by mechanical manipulation or by burning) to increase forage for livestock and wildlife, commercial forest harvest, and aspen and spruce-fir harvest (Map 2). Design features that can be incorporated in these programs are listed in Appendix A.

Conduct an experiment on the Naval Oil Shale Reserve west of Rifle to determine both the quantity and timing of increases in water yield that can be expected from harvesting aspen.

### Support

Fire management support will be needed for managing natural fire in areas where water yield objectives can be met through fire management.

### Implementation and Monitoring

A research proposal will be prepared for the water yield experiment. This proposal will detail the location, treatment technique, length of the study, monitoring, equipment, manpower, budget requirements, and the criteria by which the experiment will be judged a success or failure. Other interested parties will be invited to participate in the experiment.

The only monitoring that will be conducted specifically for water yield is the initial water yield experiment on the Naval Oil Shale Reserve. Water quality monitoring will be conducted during

implementation of aspen treatments once the study is completed, assuming results are favorable.

### Priorities of Implementation

None.

## Critical Watershed Areas

### Objective

To protect the municipal watersheds providing domestic water for the communities of Rifle and New Castle, to manage debris flow hazard zones adjacent to Glenwood springs, and to protect watershed conditions in erosion hazard areas.

### Planned Management Actions

Take measures to protect 5,858 acres of municipal watersheds, 7,126 acres of debris flow hazard zones, and 50,200 acres of erosion hazard areas. Restrict motorized vehicle use, vegetation manipulations, timber harvesting, mineral development, fire, livestock grazing, and utility development in these areas as shown in Table 1.

In addition, designate the debris flow hazard zones adjacent to Glenwood springs as an area of critical environmental concern (ACEC) and manage as follows:

1. Limit motorized vehicle travel year round to designated roads and trails.

2. Prohibit vegetation manipulations to increase forage and water yield.

3. Prohibit timber harvesting.

4. Prohibit surface facilities for oil and gas development.

5. Designate as a sensitive area for utilities development.

6. Limit livestock use to light grazing.

Also include the area in a fire exclusion zone and extinguish all fires immediately. Work closely with the city of Glenwood Springs to implement applicable recommendations arising from the city's debris flow study.

Critical watershed locations are shown on Map 3.

11

BLM_0005332

**Chapter 2, Resource Decisions**

Table 1. Summary of Planned Actions on Critical Watershed Areas

| Action | MW [1] | DFHZ [2] | EHA [3] |
|---|---|---|---|
| Acres closed to off-road vehicle use (Map 15) | 0 | 0 | 0 |
| Motorized vehicle travel limited to existing roads and trails during late spring (Map 15) | 0 | 0 | 8,500 |
| Motorized vehicle travel limited to existing roads and trails year round (Map 15) | 0 | 0 | 41,700 |
| Motorized vehicle travel limited to designated roads and trails year round (Map 15) | 5,858 | 7,126 | 0 |
| Vegetation manipulations to increase forage and water prohibited | yes | yes | no |
| Timber harvesting prohibited | no[4] | yes | no |
| Oil and gas leasing prohibited | no | no | no |
| Oil and gas surface facilities prohibited | yes | yes | no |
| Included in fire exclusion zone | yes | yes | no |
| Suitability designation for utilities development (Map 17) | Sensitive | Sensitive | Open |
| Livestock grazing limited to light grazing | no | yes | no |
| Designated as an ACEC | no | yes | no |

[1] MW — Municipal watersheds

[2] DFHZ — Debris flow hazard zone

[3] EHA — Erosion hazard area

[4] One stand of pinyon-juniper on less than 40 percent slope in the Rifle municipal watershed can be harvested.

**Support**

Fire management support will be needed for management of natural fire in meeting the resource objectives and for the protection of critical watershed values.

Engineering support will be needed to design measures for reducing runoff and soil loss in debris flow hazard zones.

**Implementation and Monitoring**

Recommendations to protect municipal watersheds and off-road vehicle recommendations to protect erosion hazard areas went into effect upon approval of this plan.

Recommendations to protect the debris flow hazard zones went into effect upon approval of this plan. In addition, the debris flow study contracted by the city of Glenwood Springs includes a number of recommendations that apply to public land. The BLM will work closely with the city to ensure rapid and efficient implementation of practical recommendations.

12

BLM_0005333

## Description of Planned Actions

### Table 2.   Summary of Lands
### Open and Closed to Mineral Development

| Category | Acres | Percent of Resource Area |
|---|---|---|
| Open to Mineral Location | 515,481 | 91 |
| Closed to Mineral Location | 50,561 | 9 |
| Preliminarily Suitable Wilderness [1] | 10,400 | |
| Reclamation Project [2] | 435 | |
| Thompson Creek Natural Environment Area | 4,286 | |
| Recreation Sites | 250 | |
| Public Water Reserves [2] | 6,990 | |
| Recreation and Public Purpose [2] | 40 | |
| Oil shale Withdrawal [2] | 25,600 | |
| Deep Creek Recreation Management Area [1] | 2,560 | |
| Open to Oil and Gas Leasing | 554,682 | 98 |
| Closed to Oil and Gas Leasing | 11,360 | 2 |
| Preliminarily Suitable wilderness [1] | 10,400 | |
| Thompson Creek Natural Environment Area | 960 | |
| Open to Oil and Gas Surface Occupancy | 520,996 | 92 |
| Closed to Oil and Gas Surface Occupancy | 45,046 | 8 |
| Thompson Creek Natural Environment Area | 3,326 | |
| Fryingpan, Roaring Fork, Eagle, Crystal, and Colorado River Corridors | 21,200 | |
| Rifle Mountain Park and Rifle Fish Hatchery | 1,360 | |
| Hack Lake Recreation Management Area [1] | 3,480 | |
| Deep Creek Recreation Management Area [1] | 2,560 | |
| Municipal Watersheds [1] | 5,960 | |
| Glenwood Springs Debris Flow Hazard Zone [1] | 7,160 | |
| Open to Mineral Sales | 548,796 | 97 |
| Closed to Mineral Sales | 17,246 | 3 |
| Preliminarily Suitable Wilderness [1] | 10,400 | |
| Thompson Creek Natural Environment Area | 4,286 | |
| Deep Creek Recreation Management Area | 2,560 | |

[1] Acreage figures based on legal subdivision boundaries

[2] These figures reflect acreage adjustments resulting from an ongoing analysis and review of withdrawals and reserved lands.

For the debris flow hazard zone above the unincorporated area west of Glenwood Springs not included in the debris flow study, the BLM will work with the public to derive measures to reduce the debris flow hazard. Measures that apply to public land will be subject to environmental and feasibility analysis and, assuming these are favorable, will be implemented as funding becomes available.

### Priorities of Implementation

None.

BLM_0005334

## Chapter 2, Resource Decisions

## Minerals Management

### Objective

To maintain the maximum amount of public land available for exploration and development of minerals.

### Planned Management Actions

Continue withdrawals for other uses not compatible with mineral development. Continue existing constraints placed on mineral activities by other resources.

Place constraints on mineral activities to protect high value recreation resources, wilderness resources, critical wildlife habitat, and water resources (critical watersheds). Existing and additional constraints are described in Table 2 and shown on Map 4.

Periodically review the need for restrictions on minerals.

Submit a withdrawal proposal to the Secretary of the Interior to withdraw the Deep Creek and Thompson Creek areas for recreation purposes, thus excluding mineral development in these areas.

Designate approximately 28,520 acres in the Hogback Coal Field as acceptable for further consideration for coal leasing based on a coal unsuitability review. Designate approximately 1,560 acres as unacceptable for coal leasing based on multiple use conflicts as explained in the 1978 coal update of the Glenwood Springs Management Framework Plan.

Continue to allow mineral exploration and development on lands not withdrawn for other uses or restricted to mineral activity.

### Support

Cadastral survey support will be needed to locate public land boundaries.

### Implementation and Monitoring

Restrictions on oil and gas activities and restrictions on mineral sales went into effect upon approval of this plan. Plan approval also constituted a continuation of all existing restrictions on mineral development. Withdrawal of the Deep Creek and Thompson Creek areas for recreation purposes will require a formal withdrawal under Secretarial order.

The restrictions on mineral development in the wilderness study areas will become effective only if Congress designates the areas as wilderness. Pending this determination, the areas will be subject to BLM's *Interim Management Policy and Guidelines for Lands Under Wilderness Review.* In the event Congress does not designate the Hack Lake or Bull Gulch areas as wilderness, they will be closed to oil and gas surface occupancy.

**Locatable Minerals.** BLM approval will not be needed for prospectors to claim and develop locatable minerals on areas open to mineral location if proposed actions disturb 5 acres or less per year. However, notification will be required. Prospectors proposing to disturb more than 5 acres per year will be required to submit a plan of operations under *43 CFR 3809, Surface Management of Public Lands under U.S. Mining Laws.*

**Leasable Minerals.** Mineral reports and environmental assessments will be prepared for all applications to prospect and develop geothermal, potassium, and other leasable minerals except oil and gas. Development that will not significantly conflict with environmental, economic, or social values will be encouraged.

Oil and gas development will occur on areas identified in the plan as open to leasing. Site-specific stipulations required to mitigate impacts of development will be included in oil and gas leases and in permits to drill.

Areas identified as suitable for further consideration for coal leasing will enter the formal coal leasing process. The first step will be to ask for industry interest in possible coal leasing on the Grand Hogback. Lease tracts will be delineated and tract profile reports written for areas where interest is received. The regional coal team will rank the tracts for high, medium, and low leasing potential. The team will group the tracts and prepare a regional environmental impact statement for those tracts and other tracts identified throughout the coal region. The coal team will then make recommendations on tract leasing to the Secretary of the Interior who will make the final decision on lease tracts and lease sale schedules.

**Salable Minerals.** Salable minerals (moss rock, top soil, sand and gravel, scoria, fill dirt, etc.) will be primarily purchased from established common

BLM_0005335

## Description of Planned Actions

use areas. Mineral reports and environmental assessments will be prepared on all government agency and individual applications to extract salable minerals outside of common use areas. Operations not in conflict with environmental, social, or economic values will be encouraged.

### Priorities of Implementation

None.

## Aquatic Habitat Management

### Objective

To increase fish production and recreational fishing use on streams having more than one-half mile of continuous flow across public land and on lakes surrounded by at least 40 acres of public land. (Only streams and lakes with existing or easily obtainable public access and either an existing or potential fishery qualify for management.)

### Planned Management Actions

Monitor and/or improve aquatic habitat of streams and lakes identified on Map 5 and listed in Table 3. (Appendix A lists management actions that can be used to improve fisheries.) Monitor the streams and lakes on public land not recommended for improvement for changes in aquatic conditions. Improve those found to be in a declining condition as funding and manpower becomes available. Coordinate with the Colorado Division of Wildlife to establish minimum streamflow or pool levels for streams and lakes proposed for management where filings do not currently exist.

Fish management emphasis in the resource area is primarily on Colorado River cutthroat, brook, and rainbow trout; however, other cold and warm water game and nongame fish species that exist in the resource area will benefit from the planned actions.

### Support

Water rights will have to be secured for minimum streamflows and pool levels. Assistance from the Colorado Division of Wildlife will be required for implementation of habitat improvement projects, fish stocking and introduction, minimum streamflow and pool level filings, and stream monitoring. Engineering and hydrologic support will be required for project design and construction. Fire management support will be needed for management of natural fire in meeting the resource objectives and for the protection of unique and fragile aquatic habitat areas. Cooperation with livestock operators will be essential in some areas to effectively manage riparian habitat.

### Implementation and Monitoring

Streams will be monitored to ensure maintenance of water quality and riparian condition and to evaluate the effectiveness of stream improvement practices. This monitoring will include riparian habitat conditions and trend; water quality, quantity, and temperature; fish production; pool and riffle ratios; and bank stability. The order in which streams will be monitored will be based on expected impacts and scheduled habitat improvements. Funding availability will be an important factor in determining how many and what streams will be improved or monitored. Assistance from the Colorado Division of Wildlife for funding and manpower will be essential for a successful management program.

### Priorities of Implementation

**Priority 1.** Monitor, maintain, or improve aquatic habitat on streams and lakes containing threatened or endangered species (*razorback sucker*).

Monitor, maintain, or improve aquatic habitat on streams and lakes having good fishery values. (Must have good access; fair to good fishery values; cross at least 1/2 mile of public land; or, in the case of lakes, be surrounded by at least 40 acres of public land.) Priorities will be based on streams and lakes having the most problems and the greatest opportunity for improvement or return for dollars spent.

**Priority 2.** Monitor and maintain aquatic habitat on streams and lakes having little or not fishery values.

15

BLM_0005336

### Table 3.   Summary of Planned Fisheries Actions

| Number[1] and Name | Habitat Improvements | | Monitor | | Area of Critical Environmental Concern | | Minimum Stream-flow | Filings Pool Level | Access Required (miles)[2] |
|---|---|---|---|---|---|---|---|---|---|
| | Miles | Surface Acres | Miles | Surface Acres | Miles | Surface Acres | | | |
| **King Mountain Capability Unit** | | | | | | | | | |
| 1. Cedar Creek | | | 0.6 | | | | | | |
| 2. Rock Creek | | | 3.1 | | | | | | |
| 3. Egeria Creek | | | 7.6 | | | | X | | 7.6 |
| 4. Deep Creek | | | 3.9 | | | | | | |
| 5. Cabin Creek | | | 1.4 | | | | | | |
| 6. Sunnyside Creek | | | 2.0 | | | | | | |
| 7. Willow Creek | | | 0.5 | | | | | | |
| 8. Hack Lake | | 2.0 | *2.0* | | | | | X | |
| 9. Sheep Creek West Fork | 2.7 | | *22.7* | | | | X | | |
| 10. Sheep Creek | | | 0.5 | | | | | | |
| 11. Sweetwater Creek | | | 0.5 | | | | | | |
| 12. Derby Creek | | | 0.8 | | | | | | |
| 13. Horse Lake | | | 2.1 | | | | | X | |
| 14. Red Dirt Creek | 1.0 | | *21.0* | | | | X | | |
| 15. Upper Colorado River | 25.1 | | *25.1* | | | | X | | |
| **Castle Peak Capability Unit** | | | | | | | | | |
| 16. Piney River | | | 1.6 | | | | | | |
| 17. Castle Creek | 2.9 | | *2.9* | | | | X | | 2.9 |
| 18. Edges Lake | | 3.0 | *3.0* | | | | | X | |
| 19. Catamount Creek | 2.0 | | *2.0* | | | | X | | 2.0 |
| 20. Norman Creek | 1.2 | | *1.2* | | | | X | | |
| **Eagle-Vail Capability Unit** | | | | | | | | | |
| 21. Eagle River | 5.0 | | *5.0* | | | | | | |
| 22. * Frost Creek | | | 0.7 | | | | | | |
| 23. Salt Creek | | | 0.2 | | | | | | |
| 24. Cottonwood Creek | | | 0.8 | | | | | | |
| 25. Abrams Creek | 1.9 | | *1.9* | | | | X[3] | | 1.9 |
| **Roaring Fork Capability Unit** | | | | | | | | | |
| 26. Prince Creek | | | 1.3 | | | | | | |
| 27. Thompson Creek | | | 2.5 | | | | | | |
| 28. Thomas Creek | | | 0.8 | | | | | | |
| 29. Crystal River | | | | | | | | | |
| 30. Sopris Creek West | | | 1.3 | | | | | | |
| 31. Sopris Creek East | | | 0.6 | | | | | | |
| 32. Snowmass Creek | | | 0.2 | | | | | | |
| 33. * Red Canyon Creek | | | 0.5 | | | | | | |
| 34. Fryingpan River | | | 2.9 | | | | | | |
| 35. * Coulter Creek West | | | 1.9 | | | | | | |
| 36. Cattle Creek | 0.5 | | 0.9 | | | | X | | |
| 37. Fourmile Creek | | | | | | | | | |
| 38. Thompson Creek North | | | 2.3 | | | | | | |
| 39. Threemile Creek | | | 0.3 | | | | | | |
| 40. Roaring Fork River | | | 1.2 | | | | | | |
| 41. * Mesa Creek | | | 0.6 | | | | | | |
| 42. Mitchell Creek | | | 0.8 | | | | | | |
| 43. Colorado River | | | 1.0 | | | | | | |

16

BLM_0005337

Table 3.   Summary of Planned Fisheries Actions (continued)

| Number [1] and Name | Habitat Improvements | | Monitor | | Area of Critical Environmental Concern | | Minimum Stream-flow | Filings Pool Level | Access Required (miles) [2] |
|---|---|---|---|---|---|---|---|---|---|
| | Miles | Surface Acres | Miles | Surface Acres | Miles | Surface Acres | | | |
| **Garfield Capability Unit** | | | | | | | | | |
| 44. Rifle Creek | | | 0.6 | | | | | | |
| 45. Elk Creek Main | | | 0.2 | | | | | | |
| 46. Harris Gulch | | | 1.9 | | | | | | |
| 47. Butler Creek | | | 1.8 | | | | | | |
| 48. Rifle Creek Middle | | | 1.8 | | | | | | |
| 49. George Creek | | | 0.8 | | | | | | |
| 50. Rifle Creek East | | | 0.3 | | | | | | |
| 51. Piceance Creek | | | 0.5 | | | | | | |
| 52. Harris Reservoir | | | | 12.0 | | | | | |
| 53. Elk Creek East | | | 0.1 | | | | | | |
| 54. Keyser Creek | | | 0.9 | | | | | | |
| 55. * Dry Possum Creek | | | 0.4 | | | | | | |
| 56. Canyon Creek East | | | 2.0 | | | | | | |
| 57. Possum Creek | 0.1 | | 4.6 | | | | X | | 4.7 |
| 58. Canyon Creek | | 1.4 | | | | | | | |
| 59. Colorado River | | | 1.8 | | | | | | |
| 60. Wallace Creek North | | | 0.9 | | | | | | |
| 61. Wallace Creek | | | 1.2 | | | | | | |
| 62. Battlement Creek | | | 1.0 | | | | | | |
| 63. Cache Creek | | | | | | | | | |
| 64. * Baldy Creek | 1.0 | | 1.0 | | | | X | | |
| 65. Garfield Creek | | | 0.3 | | | | | | |
| 66. Second Anvil Creek [4] | 1.0 | | *1.0* | | | | | | |
| 67. Parachute Creek, East Middle Fork [4] | 1.2 | | *1.2* | | | | | | |
| 68. Northwater Creek [4] | 3.2 | | *3.2* | | | | | | |
| 69. Parachute Creek, East Fork [4] | 6.4 | | *6.4* | | | | | | |
| 70. Trapper Creek [4] | 2.3 | | 3.4 | | | | | | 5.7 |
| 71. Fravert Reservoir | | | | | | | | | |
| 72. JQS Gulch [4] | 0.5 | | 0.9 | | | | | | |
| 73. First Water Gulch | | | 0.6 | | | | | | |
| 74. First Anvil Creek [4] | 1.0 | | 1.5 | | | | | | |
| 75. Lower Colorado River | | | 1.0 | | | | | | |
| **TOTAL** | 60.2 | 5.0 | *127.8* | 19.1 | 0 | 0 | 11 | 3 | 24.8 |

**Bold Italics** Represent Changes to the 1984 Record of Decision

[1] This number corresponds to the number shown on Map 5.

[2] The miles of stream that would require additional legal access for public use.

[3] Below the diversion at **NW/SW/ Section 30** T. 5 S., R. 84 W., 6th P.M.

[4] Management of these streams is outlined in the BLM **Naval Oil Shale Reserve Aquatic Habitat Management Plan.**

* These streams have potential as a fishery but presently do not support a fish population.

BLM_0005338

## Chapter 2, Resource Decisions

## Terrestrial Habitat Management

### Objectives

To provide approximately 57,933 animal unit months (AUMs) of big game forage (the amount needed to meet Colorado Division of Wildlife big game population goals in 1988), to improve existing wildlife habitat conditions, and to increase wildlife species diversity.

### Planned Management Actions

Allocate approximately 50 percent (46,210 AUMs) of the existing forage on public land in the resource area to big game and livestock. The portion of this forage allocated to big game will slightly exceed the estimated existing use (5-year average) of 45,120 AUMs. Make available the remaining 50 percent of existing forage and all nonforage vegetation habitat for other game and nongame wildlife species.

Treat 19,840 acres of vegetation over a 20-year period (990 acres per year) to increase forage production for big game. This production is needed to meet existing big game needs on areas currently having forage shortfalls. Allocate the expected increase of 6,383 AUMs of forage to big game. Treat additional vegetation to increase forage beyond the needs of existing big game only after existing demand is satisfied.

Prohibit livestock grazing on some crucial big game winter ranges after October 15 or when browse use by livestock reaches 20 percent (whichever occurs first) and on summer and some winter ranges after November 15 to reduce competition between these species. *These changes will be made when the allotment is transferred to a new permittee or the current permittee volunteers to accept these changes.* Make available for introductions of sage and sharptail grouse, turkey, peregrine falcon, *bighorn sheep,* and river otter. Identify the Grand Hogback between Rifle Gap and Monument Peak as a possible bighorn sheep introduction area. Acquire additional information to determine the most suitable location for an introduction. Develop and improve water sources and riparian and waterfowl habitat where needed. Limit off-road vehicle use on 75,463 acres of crucial winter range (see Map 15) *where problems or conflicts exist.*

Parcels of public land totaling 9,710 acres have been identified as suitable for cooperative management with the Colorado Division of Wildlife. If possible, turn over administration of public land within cooperative management areas (the lower Colorado River is one of these areas) to the Colorado Division of Wildlife. Designate the lower Colorado River as an area of critical environmental concern (ACEC) to protect important riparian and wildlife values. Species of concern using the lower Colorado River include the bald eagle, great blue heron, waterfowl (especially Canada geese), resident species such as mule deer and other riparian-dependent species, and threatened and endangered fish such as the razorback sucker and, possibly, the humpback chub. Designate the lower Colorado River as a sensitive area for the placement of utility facilities.

Manage the Lower Colorado River ACEC as follows:

- Identify for cooperative management with Colorado Division of Wildlife.
- Designate as sensitive for utility and communication facilities.
- Enhance habitat through cottonwood, willow and shrub plantings as well as grass and forb seedings.
- Create additional wetland/riparian/pond habitat through sand and gravel mining.
- *May* exclude livestock grazing with fencing.
- Designate areas where certain types of development will enhance habitat values, buffer zones around crucial habitat features where limited development can occur, and exclude areas where any development will be detrimental to the existing wildlife needs.
- Apply for seasonal restrictions on development proposed for areas near crucial habitats.
- Place artificial nest boxes for Canada geese.
- Place artificial perches for bald eagles.

Table 4 shows the major actions planned for terrestrial habitat management. Locations are shown on Map 6.

### Support

Fire management support will be needed for the planning and implementation of prescribed fire

18

# Description of Planned Actions

## Table 4. Summary of Terrestrial Wildlife Planned Management Actions

| Action | AUMs | Acres |
|---|---|---|
| Initial allocation of existing forage | 46,210 | |
| Vegetation manipulated to increase wildlife forage over a 20-year period | | 19,840 |
| Expected increases in forage | 6,383 | |
| Total projected allocation in 20 years | 52,593 [1] | |
| Crucial big game winter range limited to off-road vehicle use (Map 15) | | 75,463 |
| Habitat planned for cooperative management with Colorado Division of Wildlife (Map 6) | | 9,710 |
| Habitat planned as an area of critical environmental concern (Map 6) | | unknown |

[1] This is 5,340 AUMs short of the estimated AUMs needed to meet the Colorado Division of Wildlife's population goals for 1988.

and the management of natural fire in meeting wildlife resource objectives. Engineering, hydrologic, soils, range, and archaeological support will be required for project design and construction. Water rights will have to be secured for all water developments. Assistance from the Colorado Division of Wildlife will be required for activity plan development, implementation of habitat improvement projects, wildlife introductions, habitat monitoring, and cooperative management of public land. U.S. Forest Service cooperation will be needed for implementation of some habitat improvement projects such as prescribed burns. Acquisition of legal access to public land will be needed to open areas to terrestrial habitat management (see Map 16).

### Implementation and Monitoring

Habitat management plans (HMPs) will be written for selected areas of wildlife habitat. The plans will include detailed information on species emphasis, management objectives, constraints, planned actions, coordination with other programs and agencies, environmental analysis, implementation schedule and cost analysis and evaluation procedures. Priorities will be determined by need (shortage of forage, conflict with livestock, and so on) and opportunity or potential for improvement.

An HMP will be written to define big game management opportunities in the Sweetwater-Burns area and the upper Colorado River (Game Management Units 25, 26, 34). If a decision is made to introduce bighorn sheep on the Grand Hogback, a herd management plan will be written to supplement the Piceance Basin HMP prior to the herd size reaching 75. Other management plans will be developed following implementation of these plans.

Implementation of cooperative management recommendations on public lands and wildlife introductions will be dependent on cooperation and input from the Colorado Division of Wildlife.

Sensitive habitats such as crucial big game winter range will be monitored for forage production, habitat condition changes, and effectiveness of improvements. Monitoring studies will include browse use and pellet group transects. Wildlife habitat monitoring will enable BLM to make big game population adjustment recommendations to the Colorado Division of Wildlife.

Decision on forage allocation and seasonal use restrictions will be made after monitoring described in livestock grazing management.

### Priorities of Implementation

**Priority 1.** Monitor, maintain, or improve habitat for threatened or endangered species (bald eagle, peregrine falcon).

Monitor, maintain, or improve winter range for mule deer and elk. Focus priorities for specific treatment areas on those game management units having the greatest problems, the most potential, or both.

**Priority 2.** Monitor, maintain, or improve riparian habitat as identified in the resource management plan.

**Priority 3.** Monitor, maintain, or improve habitat for other wildlife species of high interest such as sage grouse and great blue heron. Sensitivity, visibility, and the economic value to local communities will aid in determination of species and habitat priorities.

19

BLM_0005340

## Chapter 2, Resource Decisions

## Livestock Grazing Management

### Objective

To provide 56,885 animal-unit months (AUMs) of livestock forage to accommodate active livestock preference. Active livestock preference is that portion of the total preference for which grazing use may be authorized (see Glossary).

### Planned Management Actions

**Level of Management.** Intensively manage the following allotments, either alone or in combination with adjacent allotments:

**Garfield Capability Unit** — 8009, 8017, 8018, 8026, 8039, 8046, 8105*, 8106, 8107, 8213*, 8218, 8219, 8220, 8221, 8222*, 8908*, 8909, 8910*

**Roaring Fork Capability Unit** — 8334, 8335, 8336, 8341, 8342

**Eagle-Vail Capability Unit** — 8501, 8502, 8504, 8506, 8734*

**Castle Peak Capability Unit** — 8601*, 8606, 8616, 8619, 8620, 8639, 8641, 8642*, 8643*, 8730*, 8731*, 8732*, 8733*, 8735*

**King Mountain Capability Unit** — 8506

NOTE: * Allotment is presently managed under an allotment management plan (AMP). (Allotment boundaries are shown on Map 7.)

Construct facilities such as springs, reservoirs, fences, corrals, and livestock trails where necessary to control and distribute livestock. Appendix A lists range improvement techniques that can be used. Table 5 shows the number of projects associated with a typical 5,000-acre allotment.

Figures in Table 5 are based on averages of the eight existing allotment management plans in the resource area. They are for a complete AMP and do not differentiate between existing and proposed improvements. Most allotment boundaries are shared with adjacent allotments and are presently fenced. Total miles of fence will depend on number of pastures and natural barriers. Water developments will depend on availability and distribution of springs and potential reservoirsites. Cattleguards will be used on well-travelled roads. Stocktrails to aid in livestock movement will be needed wherever dense vegetation or steep slopes exist.

**Forage Allocation.** Initially, allocate 37,852 AUMs of existing forage for livestock use (Table 6).

Allocate existing forage proportionately to livestock and big game, the criterion being active preference for livestock and 5-year average demand for big game. Both will be constrained by initial stocking rate limitations. Allocate all available forage on allotments in big game winter range unavailable to livestock because of stocking rate limitations or slope restrictions to big game. Forage available above active preference and 5-year average on big game summer ranges will be available for wildlife but limited by allotment to Colorado Division of Wildlife goals. (Summer range is not limiting to big game; therefore, allocating forage beyond Colorado Division of Wildlife population goals in summer range will be unnecessary since winter range is what limits herd size.)

Allocate additional forage produced through vegetation manipulation on wildlife winter range first to big game to meet existing use (5-year average) and then to livestock up to active preference. On summer range, allocate additional forage to livestock first.

Table 5.   Typical Allotment Range Improvement Projects

| Fence (miles) | Cattleguard | Corral | Stocktrail (miles) | Reservoir | Spring | Pipeline (miles) | Vegetation Manipulation (acres) | Seeding (acres) |
|---|---|---|---|---|---|---|---|---|
| 10 | 1 | 1 | .25 | 5 | 5 | .75 | 400 | 100 |

20

BLM_0005341

## Description of Planned Actions

### Table 6.   Summary of Livestock Forage Allocation

| Allocation | AUMs | Percent Change from Existing Preference | Percent Change from Active Preference |
|---|---|---|---|
| Existing use | 37,488 | | |
| Initial allocation | 37,852 | +1 | −33 |
| Expected increase from vegetation manipulation | 12,742 | | |
| Projected allocation — existing plus expected increases | 50,594 | +35 | −11 |
| Additional forage from unallotted allotments | 756 | | |

Following initial allocation, manipulate 27,800 acres of vegetation on 98 allotments to increase livestock forage by 12,742 AUMs using vegetation manipulation techniques listed in Appendix A. The resultant total projected allocation will be 50,594 AUMs. The 27,800 acres identified for manipulation was determined from range site potential and soil suitability and adjusted according to the livestock forage goal by allotment. In addition, make 756 AUMs on 24 unallotted allotments available for livestock use. Table 7 shows allocation by allotment for both livestock and wildlife. Additionally, any increases in forage due only to improved grazing management will be allocated to livestock.

**Season-of-Use Adjustments.** Adjust the seasons of use on 53 allotments.

*October 15 cut-off date (wildlife crucial winter range)* — 8005, 8011, 8012, 8103, 8207, 8112, 8115, 8117, 8118, 8120, 8121, 8125, 8213, 8218, 8219, 8316, 8321, 8322, 8331, 8342, 8343, 8349, 8352, 8504, 8506, 8602, 8612, 8632, 8635, 8642, 8647, 8649, 8654, 8655, 8657, 8658, 8659, 8661, 8667, 8668, 8672, 8901, 8907, 8920.

*November 15 cut-off date (wildlife winter and summer range)* — 8506, 8601, 8653, 8656, 8662, 8663, 8665, 8666, 8701.

*These changes will be made when the allotment is transferred to a new permittee or the current permittee volunteers to accept these changes.*

Spring turnout dates for many allotments are presently determined annually based on range readiness. Place more emphasis on range readiness during implementation of the plan with adjustments based on monitoring if turnout dates are found to be consistently early.

### Support

Engineering and fire management support will be required for project layout, design, and implementation. The U.S. Forest Service and Colorado Division of Wildlife will be consulted on allotments managed cooperatively and projects of mutual benefit, especially prescribed burns. Water rights will have to be secured for all water developments. Acquisition of legal access to public land will be needed to open areas to livestock grazing management (see Map 16).

### Implementation and Monitoring

Implementing and monitoring the livestock grazing portion of this plan will require several separate actions that overlap in time, some of which are already underway. These actions include (1) allotment categorization; (2) grazing use decisions and monitoring to determine stock rates; (3) AMPs; and (4) monitoring to determine if selective management (allotment categorization) criteria are being met.

**Allotment Categorization.** Concurrent with the implementation of this plan, grazing allotments are being placed into one of three categories that define intensity of management: (1) *maintain* current satisfactory condition, (2) *improve* current unsatisfactory condition, and (3) manage *custodially* while protecting existing resource values. These categories will help to concentrate grazing

21

Table 7. Livestock and Wildlife Preference, Use, and Allocation by Allotment[1]
(in animal-unit months)

| Allotment Number and Name | Livestock | | | | | Wildlife | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Preference | | Existing Use (5-Year Average)[3] | Initial Allocation[2] | Projected Allocation[4] | Objective[5] | Existing Use (5-Year Average)[6] | Initial Allocation[2] | Projected Allocation[4] |
| | Total | Active | | | | | | | |
| **Garfield Capability Unit** | | | | | | | | | |
| 8001 Sample | 5 | 5 | 15 | 5 | 5 | 30 | 21 | 51 | 51 |
| 8002 Reed | 50 | 49 | 0 | 28 | 49 | 37 | 27 | 65 | 65 |
| 8003 Kissel | 44 | 44 | 24 | 36 | 36 | 122 | 102 | 170 | 170 |
| 8004 Boven Isolated Tracts | 44 | 38 | 35 | 23 | 23 | 14 | 10 | 14 | 14 |
| 8005 Doak | 309 | 83 | 63 | 51 | 83 | 27 | 21 | 27 | 27 |
| 8006 Cedar Mountain | 265 | 255 | 129 | 255 | 255 | 430 | 337 | 430 | 430 |
| 8007 Rifle | 157 | 76 | 15 | 76 | 76 | 220 | 157 | 220 | 220 |
| 8008 Jackson | 31 | 31 | 6 | 6 | 31 | 23 | 17 | 23 | 23 |
| 8009 Weaver | 900 | 300 | 180 | 162 | 162 | 731 | 558 | 314 | 554 |
| 8010 East Cedar Mountain | 829 | 128 | 96 | 96 | 108 | 311 | 217 | 164 | 217 |
| 8011 Middle Rifle | 65 | 60 | 35 | 47 | 47 | 85 | 69 | 85 | 85 |
| 8012 Brush Creek Common | 890 | 871 | 275 | 119 | 871 | 1,182 | 932 | 846 | 932 |
| 8013 Harris Gulch | 1,200 | 1,138 | 275 | 142 | 538 | 323 | 247 | 314 | 314 |
| 8014 Graham | 26 | 26 | 24 | 26 | 26 | 24 | 22 | 24 | 24 |
| 8015 Hayden | 88 | 88 | 88 | 23 | 97 | 35 | 29 | 38 | 38 |
| 8016 Southwest Rifle Creek | 400 | 371 | 53 | 93 | 371 | 230 | 192 | 230 | 230 |
| 8017 Lundgren-Hogback | 229 | 121 | 86 | 58 | 121 | 155 | 109 | 155 | 155 |
| 8018 Horse Mountain-Brush Creek | 885 | 620 | 365 | 368 | 457 | 1,043 | 790 | 444 | 790 |
| 8019 Morrow | 125 | 74 | 59 | 17 | 49 | 37 | 31 | 37 | 37 |
| 8020 Coal Mine | 14 | 4 | | 1 | 1 | 4 | 3 | 4 | 4 |
| 8021 Watts | 375 | 183 | 183 | 128 | 183 | 116 | 89 | 63 | 89 |
| 8022 Simpson and Nichols | 380 | 105 | 105 | 43 | 105 | 67 | 56 | 76 | 76 |
| 8023 Government Creek Isolated | 10 | 8 | 8 | 4 | 4 | 7 | 5 | 2 | 2 |
| 8024 Dryden | 234 | 88 | 88 | 45 | 88 | 222 | 174 | 141 | 174 |
| 8025 Dodo | 36 | 18 | 29 | 18 | 36 | 333 | 258 | 227 | 258 |
| 8026 Hogback Common | 490 | 350 | 265 | 120 | 236 | 202 | 141 | 147 | 147 |
| 8027 Roberts | 22 | 22 | 18 | 7 | 7 | 23 | 19 | 6 | 6 |
| 8028 Red Mountain | 60 | 44 | 29 | 44 | 44 | 106 | 73 | 93 | 93 |
| 8029 Pretti-Roberts | 414 | 394 | 124 | 60 | 60 | 199 | 138 | 89 | 89 |
| 8030 Castle | 150 | 60 | 40 | 51 | 51 | 115 | 76 | 65 | 65 |
| 8031 Hill | 43 | 43 | 34 | 18 | 18 | 43 | 28 | 27 | 27 |
| 8032 Elk Park Common | 292 | 271 | 29 | 103 | 197 | 222 | 155 | 110 | 155 |
| 8033 Brosius Gulch | 118 | 75 | 30 | 42 | 42 | 136 | 94 | 59 | 59 |
| 8034 Harvey Gap 1 | 54 | 54 | 8 | 19 | 19 | 36 | 25 | 21 | 21 |
| 8035 Harvey Gap 2 | 180 | 180 | 16 | 90 | 90 | 229 | 159 | 80 | 80 |
| 8036 Jewell | 48 | 29 | 32 | 27 | 27 | 45 | 28 | 24 | 24 |
| 8037 Scutter Gulch | 36 | 16 | 16 | 15 | 15 | 37 | 23 | 22 | 22 |
| 8038 Vittrer | 7 | 4 | 4 | 2 | 2 | 8 | 5 | 2 | 2 |
| 8039 Government Creek Common | 991 | 991 | 296 | 356 | 655 | 735 | 501 | 434 | 501 |
| 8040 Middle Elk | | | | | 0 | 137 | 98 | 98 | 98 |

22

BLM_0005343

Table 7.  Livestock and Wildlife Preference, Use, and Allocation by Allotment--Continued

| Allotment Number and Name | Livestock | | | | | Wildlife | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Preference | | Existing Use (5-Year Average)[2] | Initial Allocation[3] | Projected Allocation[4] | Objective[5] | Existing Use (5-Year Average)[2] | Initial Allocation[3] | Projected Allocation[4] |
| | Total | Active | | | | | | | |
| 8041 Andgee | | | | 14 | 14 | 79 | 55 | 66 | 66 |
| 8042 Chirp | | | | 18 | 18 | 32 | 24 | 42 | 42 |
| 8043 Butler Creek | | | | 62 | 62 | 82 | 60 | 122 | 122 |
| 8044 Rifle Gap | | | | 181 | 181 | 212 | 152 | 454 | 454 |
| 8045 North Hogback | | | | 37 | 37 | 94 | 59 | 96 | 96 |
| 8046 Jackson Galch | 150 | 150 | 90 | 124 | 150 | 156 | 130 | 127 | 130 |
| 8201 Kaiser Kells Hole | 18 | 18 | 23 | 18 | 18 | 63 | 54 | 63 | 63 |
| 8202 Possum Creek | 417 | 417 | 266 | 280 | 417 | 132 | 107 | 132 | 132 |
| 8203 Storm King | 272 | 272 | 178 | 272 | 272 | 403 | 328 | 403 | 403 |
| 8204 Storm King-Dolan Galch | | | | 7 | 7 | 21 | 17 | 21 | 21 |
| 8207 Canyon Creek | 146 | 146 | 130 | 146 | 146 | 111 | 91 | 111 | 111 |
| 8208 Bearvallow and Jolley | 304 | 304 | 507 | 262 | 304 | 337 | 293 | 703 | 703 |
| 8209 Bearvallow-Jolley-Harris | 159 | 159 | 114 | 104 | 159 | 360 | 277 | 361 | 361 |
| 8210 Boiler Creek | 70 | 70 | 85 | 70 | 70 | 314 | 242 | 504 | 504 |
| 8259 Possum Creek Driveway | | | | 5 | 27 | 59 | 47 | 108 | 108 |
| 8228 Canyon Creek | 51 | 51 | 51 | 37 | 37 | 64 | 53 | 265 | 265 |
| 8101 Kann Mesa | 56 | 56 | 8 | 40 | 56 | 98 | 76 | 55 | 76 |
| 8102 Whitman | 182 | 63 | 63 | 50 | 63 | 71 | 54 | 54 | 54 |
| 8103 Oates | 38 | 38 | 19 | 38 | 38 | 96 | 69 | 64 | 64 |
| 8104 Beaver-Mann Common | 1,348 | 632 | 596 | 458 | 632 | 217 | 171 | 217 | 217 |
| 8105 East Divide Common | 3,368 | 2,331 | 947 | 2,271 | 2,331 | 974 | 763 | 1,378 | 1,378 |
| 8106 Scott | 165 | 120 | 44 | 85 | 85 | 55 | 43 | 88 | 88 |
| 8107 Dean Galch | 126 | 126 | 76 | 53 | 78 | 66 | 50 | 66 | 66 |
| 8108 Smith | 150 | 98 | 98 | 19 | 98 | 17 | 13 | 17 | 17 |
| 8109 Barr | | | | 4 | 4 | 24 | 18 | 22 | 22 |
| 8110 Kinney Brothers Individual | 13 | 6 | 4 | 4 | 4 | 5 | 4 | 5 | 5 |
| 8111 Shideler | 14 | 14 | 14 | 11 | 11 | 17 | 14 | 14 | 14 |
| 8112 Grass Mesa | 120 | 58 | 57 | 36 | 36 | 88 | 66 | 155 | 155 |
| 8113 Beaver Creek | 41 | 41 | 41 | 41 | 41 | 30 | 27 | 30 | 30 |
| 8115 Couey 1 | 4 | 4 | 4 | 3 | 3 | 15 | 14 | 11 | 11 |
| 8116 Shideler Individual | 8 | 8 | 8 | 4 | 4 | 10 | 10 | 6 | 6 |
| 8117 Pitman | 309 | 146 | 140 | 146 | 146 | 60 | 49 | 60 | 60 |
| 8118 Couey 2 | 18 | 18 | 17 | 18 | 18 | 4 | 3 | 20 | 20 |
| 8119 Porcupine Common | 495 | 279 | 219 | 194 | 288 | 89 | 68 | 89 | 89 |
| 8120 Porcupine Individual | 28 | 28 | 0 | 7 | 7 | 10 | 7 | 10 | 10 |
| 8121 Spruce Galch Common | 174 | 174 | 97 | 174 | 174 | 69 | 52 | 69 | 69 |
| 8122 Smith | | | | 10 | 77 | 13 | 11 | 27 | 27 |
| 8123 Hoagland | 30 | 17 | 17 | 17 | 17 | 26 | 20 | 24 | 24 |
| 8124 Battlement Creek Common | 274 | 221 | 152 | 221 | 221 | 146 | 115 | 146 | 146 |
| 8125 Dry Creek Pete and Bill | 430 | 372 | 207 | 340 | 372 | 403 | 312 | 763 | 763 |
| 8126 Pole Creek and Cottonwood | 122 | 115 | 79 | 96 | 115 | 139 | 108 | 86 | 108 |
| 8127 Dry Hollow-Reservoir Galch | 923 | 759 | 401 | 501 | 759 | 486 | 387 | 628 | 628 |
| 8128 Middle Mann Creek | 546 | 163 | 158 | 163 | 163 | 89 | 71 | 259 | 259 |

BLM_0005344

Table 7.  Livestock and Wildlife Preference, Use, and Allocation by Allotment--Continued

| | Livestock | | | | | Wildlife | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Preference | | Existing Use (5-Year Average)[2] | Initial Allocation[3] | Projected Allocation[4] | Objective[5] | Existing Use (5-Year Average)[6] | Initial Allocation[3] | Projected Allocation[4] |
| Allotment Number and Name | Total | Active | | | | | | | |
| 8129 Upper Wallace Common | 160 | 160 | 91 | 160 | 160 | 194 | 156 | 194 | 194 |
| 8130 Alkali Creek Common | 391 | 200 | 133 | 84 | 128 | 178 | 140 | 96 | 140 |
| 8131 Alkali Gulch | 246 | 160 | 113 | 53 | 53 | 127 | 95 | 77 | 77 |
| 8213 Vulcan | 161 | 161 | 118 | 98 | 161 | 120 | 93 | 219 | 219 |
| 8214 Alkali Creek | | | | 130 | 168 | 28 | 23 | 28 | 28 |
| 8215 Larsen | 8 | 8 | 6 | 8 | 8 | 7 | 6 | 7 | 7 |
| 8216 Delaney | 60 | 60 | 42 | 60 | 60 | 23 | 19 | 23 | 23 |
| 8222 Upper Garfield Common | 2,375 | 1,496 | 1,031 | 624 | 1,496 | 197 | 172 | 197 | 197 |
| 8223 Larson (exchange of use) | | | | | | 7 | 6 | 7 | 7 |
| 8224 Hilton-Porter Common | 180 | 180 | 182 | 158 | 158 | 86 | 67 | 59 | 59 |
| 8225 Hilton 1 | 95 | 95 | 76 | 53 | 53 | 50 | 39 | 45 | 45 |
| 8226 Hilton 2 | 7 | 7 | 6 | 7 | 7 | 3 | 3 | 3 | 3 |
| 8227 Skeen | 25 | 25 | 15 | 5 | 5 | 15 | 15 | 10 | 10 |
| 8229 BWJ-Forest | 40 | 40 | 40 | 40 | 40 | | | | |
| 8901 Magpie Creek | 76 | 56 | 46 | 56 | 56 | 169 | 121 | 169 | 169 |
| 8902 Webster Park | 700 | 700 | 309 | 566 | 700 | 678 | 482 | 393 | 482 |
| 8903 Hubbard Mesa | 830 | 760 | 382 | 248 | 262 | 594 | 427 | 292 | 427 |
| 8904 Home Ranch | 232 | 0 | 0 | 33 | 33 | 89 | 63 | 22 | 59 |
| 8905 Doodlebug | 45 | 45 | 27 | 37 | 37 | 37 | 28 | 37 | 37 |
| 8907 Rees | 687 | 475 | 275 | 475 | 475 | 367 | 268 | 313 | 313 |
| 8908 JQS Common | 5,493 | 3,963 | 2,624 | 1,484 | 3,963 | 506 | 380 | 506 | 506 |
| 8909 Clough-Alber | 1,926 | 1,090 | 724 | 1,090 | 1,090 | 258 | 193 | 258 | 258 |
| 8910 East Fork Common | 3,393 | 2,540 | 1,707 | 1,227 | 2,540 | 404 | 302 | 404 | 404 |
| 8912 Sharrade Park | 40 | 23 | 0 | 23 | 23 | 225 | 160 | 195 | 195 |
| 8913 Mahaffey Summer | 1,110 | 684 | 456 | 505 | 684 | 122 | 92 | 122 | 122 |
| 8914 Old Mountain | 654 | 399 | 245 | 198 | 399 | 60 | 45 | 60 | 60 |
| 8916 Crawford and Kerlee | 10 | 10 | 8 | 0 | 0 | 35 | 26 | 137 | 137 |
| 8917 Starkey Gulch | 77 | 77 | 61 | 1 | 1 | 9 | 9 | 29 | 29 |
| 8918 Wheeler Gulch | | | | 8 | 8 | 48 | 37 | 52 | 52 |
| 8919 Callahan Mountain Common | 188 | 96 | 30 | 80 | 80 | 172 | 124 | 101 | 101 |
| 8920 Riley Gulch | 123 | 123 | 87 | 51 | 123 | 44 | 34 | 100 | 100 |
| 8922 Smith Gulch | 200 | 200 | 121 | 142 | 169 | 222 | 156 | 111 | 156 |
| 8923 Mahaffey Winter 1 and 2 | | | | | | | | | |
| 8924 Mahaffey Winter 3 | 1,577 | 678 | 617 | 668 | 668 | 324 | 234 | 783 | 783 |
| Subtotal | 42,174 | 29,272 | 17,745 | 17,842 | 26,810 | 19,315 | 14,633 | 18,492 | 19,754 |
| Roaring Fork Capability Unit | | | | | | | | | |
| 8205 Mitchell-Oasis | 154 | 154 | 130 | 154 | 154 | 175 | 140 | 175 | 175 |
| 8206 Oasis Creek | 100 | 100 | 58 | 100 | 100 | 105 | 86 | 105 | 105 |
| 8212 Paradise Creek | 200 | 200 | 200 | 200 | 200 | 240 | 151 | 240 | 240 |

24

Table 7.  Livestock and Wildlife Preference, Use, and Allocation by Allotment--Continued

| Allotment Number and Name | Livestock | | | | | Wildlife | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Preference | | Existing Use (5-Year Average)[2] | Initial Allocation[3] | Projected Allocation[4] | Objec-tive[5] | Existing Use (5-Year Average)[6] | Initial Allocation[3] | Projected Allocation[4] |
| | Total | Active | | | | | | | |
| 8217 South Canyon | 300 | 300 | 135 | 231 | 300 | 129 | 94 | 129 | 129 |
| 8301 Cottonwood | 552 | 552 | 264 | 119 | 346 | 80 | 64 | 80 | 80 |
| 8302 Cattle Creek Driveway | 333 | 180 | 175 | 98 | 180 | 33 | 26 | 26 | 26 |
| 8303 Bianco | 6 | 6 | 6 | 6 | 6 | 5 | 4 | 5 | 5 |
| 8304 Upper Place | 24 | 24 | 3 | 20 | 20 | 3 | 3 | 3 | 3 |
| 8305 Squires | 3 | 3 | 3 | 3 | 3 | 8 | 8 | 8 | 8 |
| 8306 Gould | 101 | 101 | 43 | 82 | 82 | 37 | 30 | 35 | 35 |
| 8307 Coryell | 13 | 13 | 8 | 13 | 13 | 10 | 8 | 10 | 10 |
| 8308 Driveway Common | 300 | 300 | 123 | 194 | 300 | 160 | 133 | 133 | 133 |
| 8311 Prectel | 60 | 60 | 12 | 16 | 46 | 11 | 9 | 34 | 34 |
| 8312 Hopkins | 20 | 20 | 20 | 20 | 20 | 27 | 26 | 27 | 27 |
| 8313 Lookout Mountain | 338 | 301 | 0 | 301 | 301 | 123 | 100 | 110 | 110 |
| 8314 Henschkel | | | | 28 | 28 | 30 | 21 | 21 | 21 |
| 8315 Boyal | 10 | 10 | 10 | 10 | 10 | 10 | 7 | 7 | 7 |
| 8316 West Basalt Mountain | 295 | 286 | 186 | 169 | 286 | 524 | 394 | 233 | 394 |
| 8317 Raff Ranch | 24 | 24 | 12 | 9 | 24 | 89 | 64 | 23 | 64 |
| 8318 Badlands | 75 | 75 | 0 | 33 | 75 | 253 | 179 | 77 | 179 |
| 8319 Petre | | | | 33 | 33 | 207 | 146 | 80 | 128 |
| 8320 Sutey | 55 | 55 | 44 | 22 | 55 | 344 | 246 | 102 | 246 |
| 8321 Strook Individual | 73 | 54 | 1 | 13 | 40 | 137 | 97 | 24 | 97 |
| 8322 Rodgers | 19 | 19 | 4 | 8 | 19 | 33 | 25 | 10 | 25 |
| 8323 Diamond Flats Common | 589 | 589 | 242 | 232 | 431 | 89 | 59 | 268 | 268 |
| 8324 Driveway | 386 | 386 | 170 | 114 | 293 | 38 | 25 | 38 | 38 |
| 8325 Spear | | | | 21 | 21 | 61 | 38 | 97 | 97 |
| 8326 Motz | | | | 26 | 26 | 37 | 23 | 82 | 82 |
| 8328 Wheatley | 121 | 84 | 29 | 42 | 55 | 600 | 469 | 241 | 469 |
| 8329 Pender | 67 | 67 | 60 | 67 | 67 | 99 | 64 | 137 | 137 |
| 8330 Light Hill | | | | 88 | 88 | 283 | 161 | 249 | 249 |
| 8331 Light | 472 | 262 | 167 | 262 | 262 | 277 | 182 | 458 | 458 |
| 8332 Kent | | | | 21 | 21 | 138 | 94 | 63 | 63 |
| 8333 Christensen | | | | 0 | 0 | 204 | 141 | 85 | 141 |
| 8334 Crown Common | 388 | 344 | 329 | 344 | 344 | 563 | 368 | 568 | 568 |
| 8335 Crown | 590 | 267 | 90 | 236 | 267 | 548 | 360 | 312 | 360 |
| 8336 Wasten Homestead Common | 249 | 243 | 241 | 107 | 243 | 178 | 115 | 143 | 143 |
| 8337 Crown Individual | 256 | 151 | 75 | 122 | 151 | 254 | 166 | 134 | 166 |
| 8338 Driveway Common | 93 | 93 | 88 | 32 | 93 | 18 | 13 | 18 | 18 |
| 8339 Pender Individual | 65 | 65 | 65 | 59 | 59 | 109 | 73 | 73 | 73 |
| 8340 Cerise | 180 | 108 | 43 | 108 | 108 | 70 | 46 | 118 | 118 |
| 8341 Prince Creek | 570 | 337 | 160 | 238 | 337 | 495 | 322 | 327 | 327 |
| 8342 Crystal River | 750 | 445 | 89 | 264 | 445 | 883 | 566 | 335 | 566 |
| 8343 Thompson Creek | 254 | 243 | 0 | 158 | 243 | 553 | 353 | 360 | 360 |
| 8344 Mount Sopris | 32 | 32 | 31 | 32 | 32 | 115 | 74 | 69 | 69 |
| 8345 Prince | | | | 3 | | 13 | 10 | 10 | 10 |

25

Table 7.  Livestock and Wildlife Preference, Use, and Allocation by Allotment--Continued

| Allotment Number and Name | Livestock | | | | | Wildlife | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Preference | | Existing Use (5-Year Average)[2] | Initial Allocation[3] | Projected Allocation[4] | Objective[5] | Existing Use (5-Year Average)[6] | Initial Allocation[3] | Projected Allocation[4] |
| | Total | Active | | | | | | | |
| 8346 Thomas | 83 | 83 | 79 | 83 | 83 | 156 | 101 | 168 | 168 |
| 8347 Potato Bill | 16 | 16 | 13 | 16 | 16 | 14 | 9 | 14 | 14 |
| 8348 North Thompson Creek Common | 757 | 593 | 457 | 288 | 593 | 648 | 412 | 473 | 473 |
| 8349 Red Canyon | 90 | 90 | 68 | 12 | 56 | 158 | 124 | 134 | 134 |
| 8350 Little Woody Creek | 99 | 99 | 77 | 23 | 55 | 258 | 200 | 190 | 200 |
| 8351 Williams Hill | | | | 0 | 0 | 246 | 169 | 79 | 169 |
| 8352 Stevenson | 90 | 90 | 54 | 63 | 90 | 520 | 330 | 239 | 330 |
| 8353 Smith | | | | 45 | 45 | 57 | 36 | 117 | 117 |
| 8401 Besancon Creek | | | | 1 | 1 | 4 | 4 | 5 | 5 |
| 8402 Cantly Homestead | 17 | 17 | 17 | 17 | 17 | 17 | 11 | 17 | 17 |
| 8411 Snowmass Creek | | | | 13 | 13 | 2 | 2 | 1 | 1 |
| Subtotal | 9,309 | 7,581 | 4,095 | 4,819 | 7,029 | 10,478 | 7,181 | 7,319 | 8,689 |
| Eagle-Vail Capability Unit | | | | | | | | | |
| 8501 Third Gulch | 25 | 25 | 25 | 25 | 25 | 61 | 45 | 45 | 45 |
| 8502 East Hardscrabble Common | 870 | 870 | 685 | 870 | 870 | 1,041 | 868 | 1,041 | 1,041 |
| 8503 Brush Creek | 9 | 9 | 3 | 9 | 9 | 6 | 4 | 4 | 4 |
| 8504 West Hardscrabble | 1,171 | 1,157 | 822 | 800 | 845 | 2,141 | 1,660 | 1,150 | 1,660 |
| 8505 Eagle River | 16 | 16 | 12 | 10 | 10 | 11 | 10 | 6 | 6 |
| 8506 Cottonwood Creek Etc. | 787 | 787 | 747 | 787 | 787 | 825 | 616 | 825 | 825 |
| 8507 Red Hill Common | 778 | 628 | 583 | 598 | 628 | 1,430 | 1,114 | 1,430 | 1,430 |
| 8508 Cottonwood Creek | 80 | 80 | 80 | 32 | 80 | 28 | 21 | 21 | 21 |
| 8706 State Bridge | 487 | 487 | 132 | 394 | 481 | | | | |
| 8707 Ute Creek | 430 | 266 | 106 | 250 | 266 | 546 | 430 | 407 | 430 |
| 8710 Wolcott Isolated Tract | 174 | 40 | 16 | 30 | 30 | 10 | 7 | 17 | 17 |
| 8712 North Bellyache | 180 | 180 | 180 | 130 | 180 | 387 | 295 | 212 | 295 |
| 8718 Lake Creek | 18 | 18 | 11 | 9 | 9 | 17 | 14 | 7 | 7 |
| 8719 Horse Creek | 44 | 44 | 44 | 28 | 28 | 26 | 21 | 13 | 13 |
| 8721 Salt Creek-Bellyache | 368 | 249 | 241 | 132 | 184 | 849 | 670 | 358 | 670 |
| 8722 Salt Creek-Forest | 153 | 64 | 56 | 29 | 64 | 55 | 43 | 88 | 88 |
| 8723 Falk | 9 | 9 | 9 | 9 | 9 | 16 | 13 | 45 | 45 |
| 8727 Squaw Creek | | | | 10 | 10 | 15 | 11 | 11 | 11 |
| 8728 Red Canyon | | | | 22 | 22 | 40 | 33 | 29 | 29 |
| 8734 Bellyache | 18 | 18 | 2 | 7 | 7 | 40 | 30 | 41 | 41 |
| Subtotal | 5,617 | 4,947 | 3,754 | 4,149 | 4,512 | 7,544 | 5,905 | 5,750 | 6,678 |

BLM_0005347

Table 7.  Livestock and Wildlife Preference, Use, and Allocation by Allotment--Continued

| | Livestock | | | | | Wildlife | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Preference | | Existing Use (5-Year Average)[2] | Initial Allocation[3] | Projected Allocation[4] | Objec-tive[5] | Existing Use (5-Year Average)[6] | Initial Allocation[3] | Projected Allocation[4] |
| Allotment Number and Name | Total | Active | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Castle Peak Capability Unit** | | | | | | | | | |
| 8601  East Castle | 2,316 | 2,316 | 2,799 | 2,316 | 2,316 | 318 | 273 | 318 | 318 |
| 8605  River-Catamount | 75 | 75 | 75 | 75 | 75 | 141 | 114 | 123 | 123 |
| 8606  Piskey | 545 | 430 | 155 | 430 | 430 | 524 | 419 | 524 | 524 |
| 8607  Wheelock Individual Large | 43 | 43 | 18 | 43 | 43 | 4 | 4 | 4 | 4 |
| 8608  Wheelock Individual Small | 9 | 9 | 5 | 9 | 9 | 1 | 1 | 1 | 1 |
| 8609  Castle Creek Individual | 170 | 170 | 170 | 170 | 170 | 18 | 15 | 18 | 18 |
| 8616  Deer Pen | 900 | 900 | 406 | 703 | 757 | 351 | 303 | 454 | 454 |
| 8617  Newcomer | 4 | 4 | 4 | 4 | 4 | 10 | 9 | 16 | 16 |
| 8619  Catamount Common | 1,012 | 1,012 | 1,012 | 1,012 | 1,012 | 494 | 481 | 494 | 494 |
| 8620  West Castle Common | 396 | 396 | 396 | 396 | 396 | 591 | 499 | 591 | 591 |
| 8621  Castle | | | | 15 | 15 | 20 | 17 | 20 | 20 |
| 8622  West Castle Peak | | | | 7 | 7 | 9 | 8 | 9 | 9 |
| 8623  East Castle Peak | 48 | 48 | 21 | 48 | 48 | 16 | 13 | 13 | 13 |
| 8625  Bull Gulch Common | 886 | 642 | 360 | 642 | 642 | 623 | 576 | 908 | 908 |
| 8638  Riky Creek | 112 | 112 | 38 | 112 | 112 | 100 | 80 | 116 | 116 |
| 8639  Upper Cottonwood | 149 | 149 | 171 | 149 | 149 | 39 | 31 | 39 | 39 |
| 8641  Greenhorn | 500 | 500 | 517 | 500 | 500 | 642 | 520 | 534 | 573 |
| 8642  Trail Gulch | 655 | 321 | 128 | 321 | 321 | 651 | 573 | 1,012 | 1,012 |
| 8643  Blowout | 535 | 535 | 379 | 535 | 535 | 683 | 558 | 683 | 683 |
| 8701  Piney Creek | 45 | 45 | 10 | 13 | 13 | 25 | 25 | 27 | 27 |
| 8702  Wolcott | 487 | 487 | 132 | 394 | 481 | 523 | 429 | 354 | 429 |
| 8729  Pocket | | | | 0 | 0 | 292 | 234 | 168 | 189 |
| 8730  Bocco Mountain | 290 | 290 | 250 | 254 | 254 | 505 | 342 | 223 | 254 |
| 8731  Cabin Gulch | 340 | 340 | 336 | 240 | 340 | 117 | 94 | 68 | 94 |
| 8732  Diamond J | 26 | 26 | 3 | 19 | 26 | 86 | 68 | 20 | 68 |
| 8733  Domantle | 65 | 65 | 52 | 36 | 65 | 8 | 7 | 7 | 7 |
| 8735  Hells Hole | 34 | 34 | 8 | 29 | 29 | 62 | 49 | 49 | 49 |
| Subtotal | 9,582 | 8,949 | 7,445 | 8,472 | 8,649 | 6,856 | 5,745 | 6,793 | 7,033 |
| **King Mountain Capability Unit** | | | | | | | | | |
| 8506  Cottonwood Creek (Burnt Ridge) | 168 | 168 | 168 | 152 | 168 | 383 | 356 | 323 | 356 |
| 8602  L and H Individual | 76 | 76 | 30 | 29 | 29 | 307 | 264 | 105 | 192 |
| 8603  Tepee Creek | 27 | 27 | 27 | 8 | 8 | 569 | 489 | 146 | 183 |
| 8610  East Sunnyside | 20 | 20 | 19 | 4 | 4 | 38 | 33 | 5 | 5 |
| 8611  Sunnyside Individual | 100 | 100 | 100 | 62 | 62 | 1,087 | 960 | 441 | 488 |
| 8612  West Sunnyside | 24 | 24 | 23 | 19 | 19 | 45 | 38 | 29 | 29 |
| 8613  Sunnyside | 25 | 25 | 25 | 15 | 15 | 467 | 395 | 214 | 302 |

27

BLM_0005348

Table 7. Livestock and Wildlife Preference, Use, and Allocation by Allotment--Continued

| Allotment Number and Name | Livestock | | | | | Wildlife | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Preference | | Existing Use (5-Year Average)[2] | Initial Allocation[3] | Projected Allocation[4] | Objective[5] | Existing Use (5-Year Average)[6] | Initial Allocation[3] | Projected Allocation[4] |
| | Total | Active | | | | | | | |
| 8614 Spring Creek | 125 | 125 | 125 | 60 | 60 | 275 | 225 | 111 | 166 |
| 8615 River Common | 125 | 38 | 38 | 38 | 38 | 595 | 406 | 373 | 429 |
| 8618 Derby Ridge | 100 | 40 | 27 | 28 | 28 | 25 | 23 | 16 | 16 |
| 8626 Red Dirt | 50 | 50 | 50 | 43 | 50 | 528 | 456 | 387 | 456 |
| 8627 Sugarloaf | 50 | 50 | 24 | 50 | 50 | 30 | 27 | 30 | 30 |
| 8628 Sheep Creek (Colorado Division of Wildlife) | | | | 125 | 125 | 956 | 861 | 790 | 790 |
| 8629 Willow Creek | 126 | 126 | 57 | 62 | 62 | 769 | 648 | 327 | 467 |
| 8630 Irrigated Land-Trail Gulch | 132 | 132 | 79 | 132 | 132 | 2 | 5 | 0 | 0 |
| 8631 Horse Creek | 76 | 76 | 16 | 30 | 30 | 603 | 504 | 199 | 199 |
| 8632 Upper Little Sheep Creek | 338 | 153 | 71 | 77 | 134 | 92 | 46 | 20 | 46 |
| 8633 Upper Hack Creek | 384 | 300 | 120 | 300 | 300 | 350 | 313 | 350 | 350 |
| 8634 Three Springs | 60 | 60 | 48 | 50 | 60 | 196 | 147 | 121 | 147 |
| 8635 Mooney | 30 | 30 | 24 | 22 | 22 | 35 | 26 | 19 | 19 |
| 8636 McKeen Creek | 105 | 105 | 84 | 92 | 92 | 24 | 20 | 24 | 24 |
| 8637 South McKeen Creek | 8 | 8 | 4 | 8 | 8 | 5 | 4 | 5 | 5 |
| 8644 Moniger Ridge | 34 | 34 | 26 | 34 | 34 | 116 | 86 | 63 | 63 |
| 8645 Upper and Lower Jack Spring | 50 | 50 | 47 | 22 | 22 | 7 | 7 | 7 | 7 |
| 8646 Moniger Ridge Skiff | 27 | 27 | 27 | 27 | 27 | 34 | 27 | 34 | 34 |
| 8647 Onion Ridge | 930 | 477 | 372 | 203 | 477 | 1,602 | 1,282 | 551 | 1,282 |
| 8648 Upper Coffeepot | 72 | 72 | 44 | 40 | 72 | 54 | 50 | 54 | 54 |
| 8649 Lower Coffeepot | 394 | 324 | 224 | 207 | 324 | 774 | 689 | 440 | 689 |
| 8652 McCoy | | | | 0 | 0 | 87 | 75 | 18 | 18 |
| 8653 Albertson | 186 | 186 | 186 | 35 | 35 | 62 | 58 | 58 | 58 |
| 8654 Benton | 162 | 162 | 162 | 162 | 162 | 279 | 245 | 270 | 270 |
| 8655 Dude | 4 | 4 | 4 | 1 | 1 | 52 | 44 | 12 | 12 |
| 8656 Gates | 13 | 13 | 13 | 10 | 10 | 9 | 8 | 6 | 6 |
| 8657 Hastings | 7 | 7 | 7 | 3 | 3 | 56 | 47 | 20 | 20 |
| 8658 Holt | 105 | 105 | 105 | 81 | 81 | 209 | 190 | 161 | 182 |
| 8659 Horn | 249 | 249 | 249 | 96 | 96 | 126 | 109 | 42 | 109 |
| 8660 Antelope Creek | 50 | 50 | 50 | 50 | 50 | | | | |
| 8661 L and H | 293 | 293 | 293 | 111 | 293 | 820 | 727 | 316 | 727 |
| 8662 Black Mountain | 109 | 109 | 109 | 32 | 109 | 25 | 21 | 25 | 25 |
| 8663 McSween | 53 | 53 | 53 | 53 | 53 | 93 | 84 | 93 | 93 |
| 8665 Strubi | 30 | 30 | 30 | 30 | 30 | 15 | 13 | 15 | 15 |
| 8673 Egeria Creek | 29 | 29 | 29 | 29 | 29 | | | | |
| 8666 King Mountain | 459 | 459 | 459 | 71 | 274 | 422 | 359 | 262 | 359 |
| 8667 Bambi | 42 | 42 | 42 | 42 | 42 | 105 | 85 | 320 | 320 |
| 8668 Copper Spar | 211 | 211 | 211 | 138 | 138 | 133 | 115 | 160 | 160 |

BLM_0005349

Table 7.  Livestock and Wildlife Preference, Use, and Allocation by Allotment--Continued

| Allotment Number and Name | Livestock | | | | | Wildlife | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Preference | | Existing Use (5-Year Average)[2] | Initial Allocation[3] | Projected Allocation[4] | Objec- tive[5] | Existing Use (5-Year Average)[6] | Initial Allocation[3] | Projected Allocation[4] |
| | Total | Active | | | | | | | |
| 8695  Old 8660 and 8670 | | | | 45 | 45 | 3 | 2 | | |
| 8672  Lmark | 127 | 127 | 127 | 59 | 59 | 723 | 578 | 269 | 461 |
| Subtotal | 5,785 | 4,846 | 4,028 | 2,817 | 3,801 | 13,145 | 11,187 | 7,231 | 9,661 |
| TOTAL 72,467 | 55,585 | 37,067 | 38,149 | 50,801 | 57,338 | 44,651 | 45,585 | 51,815 | |

[1] Allotment changes and deletions are detailed in the Rangeland Program Summary (RPS) of May 1984 and the first update to the RPS dated June 1987.

[2] The 5-year average licensed use from 1975-79

[3] Initial allocation of existing forage to livestock or wildlife.

[4] Allocation of existing forage plus estimated additional forage expected from vegetation manipulation.

[5] Colorado Division of Wildlife Goals for 1988.

[6] Estimated average wildlife populations in 1976-80.

29

BLM_0005350

## Chapter 2, Resource Decisions

management actions where they are most needed to improve the basic resources or resolve serious resource use conflicts.

The categories will govern the order in which improvement projects are undertaken and allotment management plans written. First priority will be allotments in *improve* category; second, in *maintain* category; and third, *custodial* category.

The five standard criteria being used to categorize allotments are range condition, resource potential and present productivity, presence of resource use conflicts or controversy, opportunity for positive economic return on public investments, and present management situation. Comments solicited from the general public, ranchers, and the District's Grazing Advisory Board were used to help refine the BLM's five standard criteria to fit the local situation and to develop other site-specific criteria.

### Maintain Category Criteria:

- Present range condition is satisfactory.

- Allotments have moderate or high resource production potential and are producing near their potential (or trend is moving in that direction).

- No serious resource-use conflicts or controversy exists.

- Opportunities may exist for positive economic return from public investments.

- Present management appears satisfactory.

- Other criteria appropriate to environmental impact statement area.

### Improve Category Criteria:

- Present range condition is unsatisfactory.

- Allotments have moderate to high resource production potential and are producing at low to moderate levels.

- Serious resource-use conflicts or controversy exists.

- Opportunities exist for positive economic return from public investments.

- Present management appears unsatisfactory.

- Other criteria appropriate to environmental impact statement area.

### Custodial Category Criteria:

- Present range condition is not a factor.

- Allotments have low resource production potential and are producing near their potential.

- Limited resource-use conflicts or controversy exist.

- Opportunities for positive economic return from public investments do not exist or are constrained by technological or economic factors.

- Present management appears satisfactory or is the only logical practice under existing resource conditions.

- Other criteria appropriate to environmental impact statement area.

**Grazing Decisions and Monitoring.** Soil Vegetation Inventory Method (SVIM) and Initial Stocking Rate programs were used to develop BLM estimated initial stocking rates for each allotment. Prior to issuing grazing decisions, permittees will be consulted to decide how their allotments are categorized and explain the criteria used. Initial stocking rates for each allotment based on estimated initial stocking rates, average licensed use, and active preference will also be determined at that time.

If no adjustments in stocking rate are necessary or if reductions are mutually agreed upon, the BLM will issue the final grazing decision without monitoring. However, in cases of disagreement, the BLM will issue an initial decision and monitor the allotment to determine the proper stocking rate prior to issuing the final decision. The initial decision and the monitoring program to arrive at the stocking rate will be published in a rangeland program summary.

After stocking rates are determined, increases or suspension of grazing preference will be implemented over a 5-year period (after consultation with affected permittees and other affected interests) unless an agreement is reached to implement in less than 5 years. Suspension of preference will be implemented through documented agreement or by decision. The initial reduction will be taken on the effective date of the agreement or decision, with the balance taken in the third and fifth years.

Monitoring studies to establish stocking rates will include forage use, actual use reports from each permittee, and climate. The utilization studies will include browse use in wildlife ranges. Pellet group transects might also be used to help

30

BLM_0005351

## Description of Planned Actions

determine wildlife use in the area. Trend and utilization transects are already established on 38 allotments. Browse transects are in place on 17 allotments.

**Allotment Management Plans.** AMPs prescribing grazing management activities will be written and implemented on allotments in accordance with priorities established in this plan. AMPs will establish objectives for managing soil, vegetation, and water resources to improve or maintain resource conditions and resolve livestock grazing management problems consistent with land use plan objectives and constraints. The AMPs will specify the terms, conditions, and methods or practices permitted to meet the requirements of the key plant species, prevent soil disturbance, and meet water quality requirements within the allotments. The sophistication of an AMP may vary depending on resource conditions and the objectives of other resources identified in this plan. AMPs will include the limits of flexibility within which permittees or lessees can adjust their grazing operation without prior approval from the authorized officer and specify the types and amount of range improvements that will be necessary to support livestock grazing activities. All AMPs will be periodically evaluated to determine whether resource management plan and AMP objectives are being achieved and to assess resource conditions. AMPs may be revised if the evaluation shows that the objectives are not being achieved.

**Monitoring for Selective Management Criteria.** A supervision and monitoring plan will be developed to ensure that allotments within each category — maintain, improve, and custodial — are checked periodically to determine resource conditions and whether criteria are still being met.

### Priorities of Implementation

**Priority 1.** Issue final grazing decision where no reductions are required or reductions are negotiated.

**Priority 2.** Monitor allotments to establish stocking rates where BLM data indicate reductions in levels of grazing are necessary or data are inconclusive.

**Priority 3.** Implement AMPs according to selective management policy. Place all allotments within three categories — improve, maintain, or custodial — based on five standard criteria:

- Range condition.
- Resource potential and present productivity.
- Presence of resource use conflicts and controversy.
- Opportunity for positive economic returns.
- Present management situation.

Priorities for AMP implementation are as follows:

1. Complete partially completed AMPs.
2. Improve category allotments.
3. Maintain category allotments.
4. Custodial category allotments.

## Forest Management

### Objective

To manage all suitable commercial forest land and woodland to meet sawtimber and fuelwood demand and maintain stand productivity.

### Planned Management Actions

Manage 17,905 acres of commercial forest land and 82,407 acres of woodland (Table 8). Map 8 shows locations of forest land suitable for management.

The estimated annual allowable woodland harvest of 6,465 cords includes aspen and subalpine fir fuelwood for which little demand has been realized. Since the present domestic and commercial demand for fuelwood (1,800 cords annually) has been limited almost exclusively to pinyon-juniper, it is expected that actual harvests will be considerably less than 6,465 cords. However, the harvest level of 6,465 cords is presented as an optimum level for a sustained yield woodland management program. The fuelwood *and wood products* market and demand for domestic wood will guide the actual harvest of woodland products. It is assumed that the majority of fuelwood sold will consist of pinyon-juniper based on past demands. Initial sales of *aspen* will be considered in an attempt to spur the aspen market and improve wildlife habitat and possibly result in temporary increases in water yields.

31

BLM_0005352

## Chapter 2, Resource Decisions

### Table 8.   Summary of Planned Forest Management Actions

| Planned Management Actions | Commercial Forest Land [1] | | Woodland [2] | |
|---|---|---|---|---|
| | (acres) | (million board feet) | (acres) | (cords) |
| Suitable for management | 17,905 | | 82,470 | |
| Unsuitable for management [3] | 27,735 | | 131,840 | |
| Annual allowable harvest | | 1.8 | | 6,465 |

[1] Includes lodgepole pine, Engelmann spruce, Douglas-fir, and ponderosa pine.

[2] Includes pinyon pine and juniper (3,535 cords), aspen (2,790 cords), and subalpine fir (140 cords).

[3] Based on multiple use and timber production capability classification restrictions.

Note: With the completion of the timber production capability classification, revision in the annual allowable harvest may be necessary.

Manage all forest land supporting commercial forest land and woodland species, including the five forest management units (King Mountain, Black Mountain, Castle Peak, Seven Hermits and Naval Oil Shale Reserve). Major commercial species include lodgepole pine, Engelmann spruce, Douglas-fir, and ponderosa pine (commercial forest land) and pinyon and juniper (woodland). Aspen and subalpine fir are not currently considered major commercial species.

Manage forest land to minimize losses of, or damage to, forest resources from insects and disease. Practices that will be used in managing the suitable forest land are listed in Appendix A. Multiple use and timber production capability classification restrictions prohibiting the harvesting of both commercial forest land and woodland are shown in Table 9.

### Table 9.   Commercial Forest Land and Woodland Multiple Use Restrictions

| Capability Unit | Acres | Reason Unsuitable for Harvest |
|---|---|---|
| Garfield | 71,085 | Municipal watersheds; debris flow hazard zone; highly erosive soils; recreational non-motorized zones |
| Roaring Fork | 12,945 | Debris flow hazard zones; Thompson Creek Natural Environment Area; Eagle Mountain Wilderness Study Area; highly erosive soils |
| Eagle-Vail | 14,005 | Highly erosive soils |
| Castle Peak | 34,910 | Bull Gulch Wilderness Study Area; highly erosive soils |
| King Mountain | 26,630 | Hack Lake Wilderness Study Area and recreational non-motorized zone; Deep Creek Area of Critical Environmental Concern; highly erosive soils |
| Total | 159,575 | |

BLM_0005353

# Description of Planned Actions

## Support

Cadastral survey and engineering support will be needed to help design and lay out timber sales and access roads. Specific support needs are itemized in the resource area 5-year timber sale plan which is on file in the resource area office. This sale plan is updated annually. Fire management support will be needed for management of natural fire in meeting forest management resource objectives. Acquisition of legal access to public land will be needed to open areas to commercial forest land management (Map 16). Acquisition of legal access to public land to open areas for fuelwood will only be pursued if the access also benefits other resource values.

## Implementation and Monitoring

Land use allocations planned for forest management became effective upon approval of this plan.

Activity plans will define the resources on the unit, state specific management objectives, specify planned actions, coordinate various resource values, and identify harvest levels, cutting cycles, and silvicultural practices for the commercial forest or woodland resource.

Sawtimber and fuelwood sales, timber stand improvement, reforestation, and road construction are examples of specific actions proposed in activity plans. Manuals and policy will offer specific guidance for implementing these actions. Environmental assessments and forest management plans will further identify project implementation and mitigation measures.

Periodic forest inventories will be conducted in an effort to monitor the forest and woodland resources. Inventory data will be incorporated into activity plans and will assist in defining the allowable harvest base.

Monitoring of these projects will ensure proper implementation. The basic process of monitoring for forestry practices involves on-site inspection of the project. Generally, a pre-work conference is conducted to familiarize the contractor or purchaser with the project area, contract requirements, and other project specifics. During the project life, periodic inspections of the work performance and progress are conducted by the forester. At the end of the project, a final inspection is generally conducted to check for work quality and proper completion of all contract requirements. An assessment of the project is made at that point, and recommendations for amending future like projects are made to ensure future successes and streamlining.

Commercial forest and woodland products will be offered for sale. Competitive bidding will be the common method for selling commercial sawtimber and fuelwood. Fuelwood, posts, poles, wildings, and Christmas tree permits will also be sold to the general public.

## Priorities of Implementation

**Priority 1.** Revise existing forest management plans to reflect management decisions of the resource management plan (Black Mountain, King Mountain, Hardscrabble plans).

Continue the implementation of existing forest management plans.

**Priority 2.** Prepare forest management plans on the two remaining forest management units (Castle Peak and Oil Shale).

Prepare woodland management plans for large tracts of manageable woodland. Factors considered when determining the priority of management areas include:

• Accessibility to markets.

• Demand for woodland products.

• Opportunities to complement other resources.

**Priority 3.** Prepare timber sale and fuelwood sale plans for remaining isolated tracts of forested land requiring management actions. No forest or woodland management plan will be necessary for these areas unless a long-term intensive management program is to be implemented. The following items will aid in the determination of priorities for implementation of these tracts:

• Accessibility.

• Stand conditions.

• Demand for forest products.

• Species in the area.

• Needs of other resource programs.

BLM_0005354

## Chapter 2, Resource Decisions

## Recreation Resource Management

### Objective

To ensure the continued availability of outdoor recreational opportunities which the public seeks and which are not readily available from other sources, to reduce the impacts of recreational use on fragile and unique resource values, and to provide for visitor safety.

### Planned Management Actions

Manage recreation resources and activities throughout the resource area. Adopt recreation opportunity spectrum (ROS) management classes as shown on Map 9 and described in Appendix C. Review future project proposals to determine whether or not planned management actions are consistent with the class to identify possible mitigation measures. Each class also indicates the type of recreational setting one can expect to find in the area.

Table 10 shows the acreage within each ROS class.

### Table 10. Summary of Recreation Opportunity Spectrum (ROS) Classes

| ROS Class | Acres | Percent of Total |
|---|---|---|
| Primitive | 722 | 0.1 |
| Semi-primitive non-motorized | 17,768 | 3.2 |
| Semi-primitive motorized | 276,713 | 48.9 |
| Roaded natural | 237,147 | 41.9 |
| Semi-urban | 33,045 | 5.8 |
| Urban | 647 | 0.1 |

Submit withdrawal proposal to the Secretary of the Interior to withdraw the Deep Creek and Thompson Creek areas for recreation purposes.

Close 2,560 acres in Deep Creek to oil and gas surface facilities and mineral sales and close 3,480 acres in Hack Lake and 9,778 acres in Bull Gulch to oil and gas surface facilities.

Identify Bull Gulch, Hack Lake, the upper Colorado River, and Deep Creek as recreation management areas (RMAs). Designate Thompson Creek as a natural environment area *and area of critical environmental concern.* Maintain existing recreational facilities as long as they remain cost effective. Develop new recreational facilities to meet present and future demands, protect resource values, and provide for visitor safety. Table 11 lists existing and proposed facilities and designations which are displayed on Map 10.

Acquire legal access to most large public land parcels to open public land to public use (Map 16).

### Support

Fire support will be needed for managing natural fire in meeting recreation resource objectives and for protecting unique and fragile recreation resources. Cadastral and engineering support will be needed to lay out and design access roads. Acquisition of legal access to public land will be needed to open areas to recreation management.

Cooperation and coordination with the Colorado Division of Parks and Recreation; the U.S. Forest Service; Garfield, Pitkin, and Eagle Counties; and adjacent cities will be needed for the development and maintenance of proposed trails and snowmobile parking areas. Engineering will be required for design and construction of recreational facilities. Cadastral survey and appraisal will be necessary for acquisition of private land.

A cooperative agreement will be needed with the owner of the property near Sheep Gulch to use the area as a river access area.

### Implementation and Monitoring

ROS classes became effective upon approval of this plan. Recreation management plans will be prepared for special RMAs and designated areas; existing management plans will be revised, if necessary, to be consistent with this plan. Site plans will be prepared for new facility developments. These plans will include detailed engineering, site location, cost-benefit analysis, and detailed environmental analyses of the proposal.

The condition of recreation sites, including resource damage, will be inspected periodically. Visitor use will be sampled using various methods,

34

## Description of Planned Actions

### Table 11.   Planned Designations and Recreational Facilities

| Designation, Facility, or Service | Existing | Proposed |
|---|---|---|
| Number of developed sites (campgrounds, overlook, highway rest stops) | 4 | 5 |
| Number of undeveloped recreation sites | 1 | |
| Number of developed river access sites | 3 | 6 |
| Number of undeveloped river access sites | 1 | |
| Number of trails | 2 | 5 |
| Number of trailheads | 0 | 6 |
| Number of primitive recreation sites | 0 | 7 |
| Number of snowmobile parking areas | 0 | 4 |
| Acres identified as recreation management areas | 0 | *15,335* |
| (Bull Gulch) | 0 | *9,852* |
| (Hack Lake) | 0 | *3,102* |
| (Deep Creek) | 0 | *2,380* |
| Thompson Creek Natural Environment Area, *an Area of Critical Environmental Concern,* (acres) | 4,286 | 4,286 |
| Permit program for commercial and competitive floatboating use | yes | yes |
| Upper Colorado River Special Recreation Management Area | yes | yes |
| Acquisition of private land | no | yes[1] |
| Number of off-road vehicle use areas | 0 | 1[2] |
| Number of interpretive overlooks | 0 | 1 |

[1] Approximate location:  Twin Bridges.

[2] Acreage not yet determined.

including selected road and trail traffic counters and visitor registers. Recreation management plans will be reviewed periodically to determine if revisions are necessary because of changing conditions.

**Priorities of Implementation**

*The following types of areas will be given highest priority for management:*

* *Areas having Congressional mandates.*

* *Rivers and water-based recreation where BLM has clear jurisdiction.*

* *Areas with outstanding resource demand which cannot be satisfied by other private or government entities.* ● *Areas where capacity is regularly exceeded and significant resource values are threatened.*

Management priorities in the resource area are:

*Priority 1. Manage the Upper Colorado River Special Recreation RMA, first, to provide scarce recreational opportunities not available elsewhere and, second, to reduce resource damage, solve visitor*

*health and safety problems, and mitigate conflicts. (Special RMAs are areas where recreation is the principal management objective.)*

*Priority 2. Manage extensive RMAs to provide visitor information, minimal sanitation facilities, and access. Also manage extensive RMAs to resolve management issues and for off-road vehicle (ORV) use. (Extensive RMAs are areas where recreation is not the principal management objective but an issue of some significance.)*

*Consider the following when setting specific priorities in extensive RMAs:*

* *The number of people served or benefited.*

* *The need to manage visitor use.*

* *The health and safety of the visitor.*

* *The need for resource protection.*

*Adjust priorities as necessary. For example, acquire public access at the same time that access is acquired for a timber sale, even though that public access need is not a priority 1 recreation need.*

35

# Chapter 2, Resource Decisions

*Priority 3. Manage the Thompson Creek Special RMA, first, to provide scarce recreational opportunities not available elsewhere and, second, to reduce resource damage, solve visitor health and safety problems, and mitigate conflicts.*

## Cultural Resource Management

### Objective

To protect the cultural and historical values in the resource area from accidental or intentional destruction and give special protection to high value cultural resource sites.

### Planned Management Actions

Nominate approximately 4,178 acres known as the Blue Hill Archaeological District for designation on the *National Register of Historic Places* and designate as an area of critical environmental concern. This designation is made because of a large number of archaeological sites located within the area have the potential to yield information important to the prehistory of north-central Colorado. Manage the area as follows: designate as a sensitive zone for utility and communication facilities, designate as a fire exclusion zone, and restrict off-road vehicles to existing roads and trails. Classify the area as a critical watershed because of the soil erosion hazard.

Actively manage selected sites identified as having high value for management as outlined in the Glenwood Springs Cultural Resource Management Guide. Manage the remaining sites as prescribed by law and policy to protect cultural resource values.

Inventory project areas for cultural resources prior to project approval. Take measures to protect any cultural resources found.

### Support

Fire management will be needed for management of natural fire in meeting cultural resource objectives.

### Implementation and Monitoring

See Priorities of Implementation.

### Priorities of Implementation

**Priority 1.** In accordance with existing policy, consider cultural resources on all earth-disturbing projects. Use the predictive model when appropriate. Field examinations may not be required when the model indicates that no cultural resources are located in the project area.

**Priority 2.** Actively manage high priority sites according to the Glenwood springs cultural resource Management Guide:  record sites, collect data, monitor to update condition and priority of sites, stabilize deteriorating sites, and excavate eroding sites.

Consider the following when setting priorities:

o   The capability of the site to yield information important to the prehistory or history of the nation, state, or local area.

o   The fragile or eroding condition of the site. Sites with fragile or exposed features may take priority over stable sites. Examples are rock art, wickiups, eagle traps, scaffolds, and sites with eroding features.

**Priority 3.** Annually write overviews and summaries of cultural resource management efforts, including an overview of the archaeology of the Glenwood Springs Resource Area.

## Paleontological Resource Management

### Objective

To manage the paleontological resource program as required by law and policy to protect significant paleontological values.

### Planned Management Actions

Inventory projects for paleontological resources in areas of high paleontological values prior to project approval. Take measures to protect any significant paleontological resources found.

BLM_0005357

# Description of Planned Actions

## Support

No support will be required.

## Implementation and Monitoring

In areas requiring inventory, a survey will be conducted prior to approval of projects involving surface disturbance.

## Priorities of Implementation

None.

# Wilderness Management

## Objective

To determine the suitability or nonsuitability of wilderness study areas (WSAs) for wilderness designation.

## Planned Management Actions

Map 11 shows the identified WSAs and the suitability recommendations. Table 12 shows the acreage in each WSA that will be recommended as preliminarily suitable and nonsuitable for wilderness designation.

## Table 12.  Summary of Wilderness Preliminary Recommendations (in acres)

| Wilderness Study Area [1] | Suitable | Nonsuitable |
|---|---|---|
| Eagle Mountain [2] | 330 | 0 |
| Hack Lake [3] | 10 | 3,350 |
| Bull Gulch [4] | 9,778 | 4,586 |
| Castle Peak | 0 | 11,940 |
| Total | 10,118 | 19,876 |

[1] Includes areas considered for wilderness designation under Sections 202 and 603 of the *Federal Land Policy and Management Act of 1976.*

[2] Would be added to the existing Maroon Bells-Snowmass Wilderness administered by the U.S. Forest Service.

[3] Would be added to the existing Flat Tops Wilderness administered by the U.S. Forest Service.

[4] The Bull Gulch boundary was modified to exclude 636 acres of state-owned minerals.

Recommend 9,778 acres in Bull Gulch WSA as preliminarily suitable for wilderness designation (under Section 603 of the *Federal Land Policy and Management Act of 1976* (FLPMA) pending mineral survey.

Recommend 330 acres in Eagle Mountain WSA and 10 acres in Hack Lake WSA as preliminarily suitable for wilderness designation (under Section 202 of FLPMA) pending mineral survey.

Recommend 16,526 acres (4,586 in Bull Gulch and 11,940 acres in Castle Peak) as preliminarily nonsuitable for wilderness designation under Section 603 of FLPMA. These areas will be managed under *Interim Management Policy and Guidelines for Lands Under Wilderness Review* pending Congressional action.

Release 3,350 acres of Hack Lake WSA from further wilderness consideration. *This acreage will continue to be managed under the Interim Management Policy until further notice.*

Recommend administration of the Eagle Mountain WSA and the preliminarily suitable portion of Hack Lake WSA for transfer to the U.S. Forest Service upon designation as wilderness.

Recommend the 636 acres excluded from the Bull Gulch WSA as a suitable addition to the Bull Gulch Wilderness (should it be designated by Congress) provided the state-owned minerals can be exchanged. The State of Colorado has indicated a willingness to make such exchanges in BLM wilderness areas (State of Colorado Board of Land Commissioners 1983). *This acreage will continue to be managed under the Interim Management Policy until further notice.*

## Support

Mineral surveys by the U.S. Geological Survey and the U.S. Bureau of Mines will be required for WSAs recommended as preliminarily suitable for wilderness designation as requested by the BLM Director. Fire management support will be needed for management of natural fire in meeting the resource objective and for the protection of unique and fragile resources.

BLM_0005358

## Chapter 2, Resource Decisions

### Implementation and Monitoring

The nonsuitable portion of the Hack Lake WSA was released from further wilderness consideration and managed for other resource values upon approval of this plan *but is subject to Interim Management Policy restriction until further notice.* The suitable portion of the Hack Lake WSA and the entire Eagle Mountain, Bull Gulch, and Castle Peak WSAs will continue to be included in the wilderness review process.

A wilderness study report identifying the preliminary recommendations for each WSA will be prepared and submitted to Congress. A final environmental impact statement on the wilderness portion of this plan will be prepared and will accompany the wilderness study report. Following Congressional action, a wilderness plan will be prepared for any area designated as wilderness by Congress. Those areas not designated will be managed for other values as identified under this plan.

Until Congress makes its decision on whether or not to designate an area as wilderness, the BLM will manage WSAs studied under Section 603 of FLPMA "so as not to impair the suitability of such areas for preservation as wilderness." The policy and guidance for this management is contained in the BLM's *Interim Management Policy and Guidelines for Lands Under Wilderness Review.* Current BLM policy is to similarly protect WSAs studied under Section 202 of FLPMA that are being considered for wilderness designation.

Planned projects in WSAs will be evaluated to ensure compliance with interim management policy. WSAs will be patrolled periodically to detect and prevent unauthorized actions.

### Priorities of Implementation.

None.

## Visual Resource Management

### Objectives

To maintain existing visual quality throughout the resource area and protect unique and fragile resource values.

### Planned Management Actions

Designate visual resource management (VRM) classes as shown on Map 13. Manage visual resources on public land according to the objectives for each class. Table 13 shows the approximate acreage within each class

### Table 13.   Summary of Visual Resource Management Classes

| Class | Acres | Percent of Resource Area |
|---|---|---|
| Class I | 13,470 | 2 |
| Class II | 225,106 | 40 |
| Class III | 149,112 | 26 |
| Class IV | 176,690 | 31 |
| Class V | 1,664 | 1 |

Review future project proposals to determine whether or not proposed management actions are consistent with the designated VRM classes to identify possible mitigation measures.

Designate Deep Creek (*2,380* acres) and Bull Gulch (6,714 acres) as areas of critical environmental concern (Map 12) and manage as follows:

#### Deep Creek

- Designate as unsuitable for utility and communication facilities.

- Manage under visual resource management Class I objectives.

- Identify as a recreation management area.

- Identify as a potential peregrine falcon introduction site.

- Prohibit vegetation manipulations for livestock, wildlife, and timber management.

#### Bull Gulch

- Designate as unsuitable for utility and communication facilities.

- Close the area to off-road vehicle use.

- Designate as fire management zone-ecosystem management area.

- Identify as a recreation management area.

BLM_0005359

## Description of Planned Actions

Manage these areas and the Thompson Creek Natural Environment Area under Class I objectives.

Do not identify specific visual modifications for rehabilitation.

### Support

Fire management support will be needed for management of natural fire in meeting the resource objective and for the protection of unique and fragile resources.

### Implementation and Monitoring

All VRM classes became effective upon approval of this plan. Planned projects will be evaluated to determine whether they are compatible with the designated VRM class. Measures will be taken to mitigate adverse visual impacts. Incompatible projects whose impacts cannot be mitigated may be rejected.

Approved projects will be monitored to ensure compliance with mitigation measures, including rehabilitation.

### Priorities of Implementation

None.

## Land Tenure Adjustments

### Objective

*To increase overall efficiency and effectiveness of public land management by identifying public land suitable for disposal through public sale (Category I lands) and suitable for continued management under multiple use concepts (Category II lands).*

### Planned Management Actions

*Manage 15,500 acres as Category I lands suitable for disposal through sale, exchange, State selections, and Recreation and Public Purpose Act purchases.*

*Manage 550,542 acres as Category II lands, the land base to be managed under multiple use principles, which is not suitable for disposal*

*through public sale. On a case-by-case basis, disposal of category II lands would be considered through exchange, boundary adjustment, State selection, Recreation and Public Purpose Act purchase, or other appropriate statutory authority, providing such disposal is consistent with management efficiency and effectiveness under multiple use principles for the specific area.*

*Manage 62,780 acres of Category II lands as cooperative management areas where multiple use principles are influenced by other adjacent or interested governmental agencies. Cooperative management areas can be managed through cooperative agreements, memorandums of understanding, or withdrawals. They can also be exchanged with other government agencies if exchange best meets management objectives and public needs.*

### Table 14.   Summary of Land Tenure Adjustment Categories

| Category | Acres | Percent of Resource Area |
|---|---|---|
| *Category I Lands* | *15,500* | *2.7* |
| *Category II Lands* | *550,542* | *97.3* |
| *(Public Lands)* | *(487,762)* | *(86.2)* |
| *(Cooperative Management Areas)* | *(62,780)* | *(11.1)* |

### Support

Support will be needed for conducting cadastral surveys and appraisal reports to locate and estimate the value of public land identified for disposal.

### Implementation and Monitoring

Recommendations for land tenure management zones were adopted upon plan approval.

The amount and location of public land within disposal zones offered for sale annually will be determined by Congressional appropriations for a land sale program, the priority set for the sale program, staffing, and other work loads. Probably no more than 7,000 acres will be offered for sale

39

BLM_0005360

## Chapter 2, Resource Decisions

in any given year, and disposal program objectives probably will be achieved within two to five years. Site-specific environmental assessments will be written for proposed disposal actions prior to land sales. A 45-day public comment period is required between the notification of a land sale and the actual sale.

### Priorities of Implementation

Appendix D outlines management considerations to be used in retention zones. Following are the priorities for disposal. To increase efficiency in administering the land sales program, lands will be offered in geographic sale units.

**Priority 1.** Parcels within or adjacent to existing or approved residential development on private land.

**Priority 2.** Parcels with the fewest encumbrances — grazing leases, mining claims, and the like.

**Priority 3.** Parcels where an offering would result in other public benefits.

**Priority 4.** Parcels where interest has been expressed and those most likely to result in a consummated sale.

**Priority 5.** Parcels where interest has been expressed and those most likely to result in a consummated sale.

## Off-Road Vehicle Management

### Objective

To protect fragile and unique resource values from damage by off-road vehicle (ORV) use and to provide ORV use opportunities where appropriate.

### Planned Management Actions

Leave *397,946* (*70* percent) of public land open to motorized vehicle use (Map 15.)

Close *19,620* acres (*4* percent) to motorized vehicle use.

Limit motorized vehicle use to existing roads and trails, designated roads and trails, and certain seasons of use on *148,476* (*26* percent).

Search for and designate a suitable area near Parachute/Battlement Mesa for intensive motorized vehicle use. Designations will be in effect year round except for the seasonal limitations (Map 15).

Closures and limitations will not apply to federal, state, and local law enforcement officers; members of organized rescue or fire-fighting forces in the performance of official duties; or persons with a permit specifically authorizing the otherwise prohibited use.

### Support

Law enforcement support will be needed to enforce closures and limitations.

### Implementation and Monitoring

All ORV designations went into effect upon approval of this plan. An implementation plan will be prepared to define the specific actions (for example, signs, barriers, and identification of roads and trails on which use is allowed in areas limited to designated roads and trails) needed to implement the ORV decisions. Notices describing the ORV designations will be published in the *Federal Register* and in local newspapers. Maps showing the designations will be printed and made available to the public. *Complete the ORV designation process within one year.*

Closed and limited areas will be monitored for compliance with designations. Open and limited areas will be monitored to ensure no unacceptable resource damage occurs. Additional restrictions will be placed on ORV use that causes unacceptable damage.

### Priorities of Implementation

None.

## Transportation Management

### Objective

To provide access to public land by acquiring those legal rights on nonpublic land that are essential to implement BLM planned actions.

BLM_0005361

# Description of Planned Actions

## Planned Management Actions

Acquire legal access into areas of public land where legal access does not exist (Map 16).

Use and improve existing roads and trails (Map 16) in these areas where feasible. construct new roads and trails where none exist or where existing roads and trails are inadequate for BLM needs. (Comply with road construction standards and designs listed in BLM Manual 9113.) Maintain 258 miles of road and 48 miles of trail — the amount needed to serve the area.

## Support

Cadastral survey for boundary determination and corner identification will be necessary to accurately plot easement locations. Appraisal reports will be needed to identify acquisition costs. Cartographic support will be needed for plat preparation. Legal support will be needed from the solicitor's and U.S. Attorney's offices for title and acquisition problems.

## Implementation and Monitoring

Prior to implementation, a route analysis of each access acquisition proposal will identify feasible alternate routes. The route analysis will consider environmental impacts, user costs, safety, construction and maintenance costs, acquisition costs (if applicable), suitability of soil and geology for construction, and any other factors relevant to selection of the location.

BLM personnel will monitor all road and trail construction, maintenance, and improvement to ensure road standards are followed and unnecessary impacts to the environment are avoided.

All right-of-way applications made by outside parties for roads or trails on public land will be reviewed and compared with the resource management plan. When appropriate, applications compatible with identified access needs may require reciprocal easements across the applicant's land to provide access to public land.

## Priorities of Implementation

Table 15 shows the order in which easements will be acquired. The order is based on a cumulative point system as explained below:

Forestry, wildlife, livestock grazing, recreation, and critical watersheds identified needed easements and then set priorities for acquiring those easements. Priorities were based on demand (public served), amount of public land that would become available, input from other agencies, scarcity of the resource, and individual resource management program implementation schedules.

The individual priorities were then statistically weighted to give equal value to differing numbers of needs and prioritized on a cumulative point basis.

Priorities will be adjusted when opportunities arise to obtain reciprocal easements providing access with time and money savings to the government.

# Utility and Communication Facility Management

## Objective

To respond, in a timely manner, to requests for utility and communication facility authorizations on public land while considering environmental, social, economic, and interagency concerns.

## Planned Management Actions

Designate 443,993 acres (78 percent) of public land suitable for consideration, 101,293 acres (18 percent) sensitive, and 20,756 acres (4 percent) unsuitable for utilities and communication facilities development. The sensitive acreage does not include visual resource management Class II areas shown on Map 13 or public land along the Colorado River where location of public land is in question. Suitable, sensitive, and unsuitable zones are shown on Map 17.

Suitable zones are areas where no restrictive resource values have been identified. Sensitive zones are areas where existing resource values must be mitigated prior to location of utilities or communication facilities. Unsuitable zones are areas where existing fragile or unique resource values preclude location of utilities and communication facilities. Table 16 shows the resource values that contributed to designation of these zones.

41

BLM_0005362

Table 15.   Order of Easement Acquisition

| Access | Benefiting Resource | | | | | Cumulative Points |
|---|---|---|---|---|---|---|
| | Forestry | Critical Watersheds | Recreation | Wildlife | Livestock Grazing | |
| Northwest Castle | + | + | + | + | + | 1,983 |
| North Castle | + | + | + | + | + | 1,857 |
| Hardscrabble | + | + | + | + | + | 1,806 |
| Pisgah | | + | + | + | + | 1,243 |
| Holgate Mesa | + | | + | + | + | 989 |
| Rifle Gap | + | + | + | + | | 976 |
| Storm King | + | | + | + | + | 975 |
| West Elk | + | | + | + | + | 895 |
| Consolidated | + | | | + | + | 864 |
| Dry Hollow | + | + | | + | + | 824 |
| Twin Bridges | | | + | + | | 792 |
| Dry Creek | + | + | + | + | + | 727 |
| Posey Creek | + | + | | + | + | 718 |
| Alkali Creek | + | + | + | + | | 711 |
| Rifle Falls | + | | | + | + | 672 |
| Tom Creek | + | | | + | | 670 |
| Flatiron | + | | | + | + | 600 |
| Jackson Gulch | + | | | + | + | 562 |
| Center Mountain | + | + | + | + | + | 552 |
| 32-Mile Gulch | + | | | + | | 548 |
| Red Hill | + | | | + | | 512 |
| Horse Mountain | + | | + | + | | 510 |
| Uncle Bob | + | + | | + | + | 476 |
| Canyon Creek | + | + | | + | | 466 |
| Thompson Creek | | + | + | | | 462 |
| Wallace Creek | + | | + | + | | 442 |
| Hughes | + | | | + | | 434 |
| Burns | | | + | + | | 411 |
| Mamm | + | | + | + | | 401 |
| North Elk | | | | + | + | 396 |
| State Bridge | | | + | | | 378 |
| Basalt | + | | | + | | 354 |
| North Basalt | | | | + | | 300 |
| Fisher Creek | + | | | + | | 242 |
| Devils Gulch | + | | | + | | 94 |
| Salt Creek | | | + | + | | 57 |
| Paradise Creek | | | | + | | 48 |

+= Resource programs benefiting from access acquisition

BLM_0005363

**Table 16.   Resources Contributing to Identification of Management Zones for Utility and Communication Facilities**

| Symbol on Map | Value Present | Designation |
|---|---|---|
| | **Wildlife** | |
| BE/BH | Bald eagle/blue heron high-use areas, (nest, perch, and roost trees) | Sensitive |
| SG | Sage grouse strutting grounds | Sensitive |
| SG | Sage grouse winter-use and brood areas | Sensitive |
| EC | Elk calving areas | Sensitive |
| P | Peregrine falcon introduction areas | Sensitive |
| R | Raptor concentration areas | Sensitive |
| AH | Aquatic habitat | Sensitive |
| | Riparian areas (not shown on map) | Sensitive |
| BS | Bighorn sheep study area | Sensitive |
| RO | River otter introduction area | Sensitive |
| | **Recreation** | |
| SPNM | Primitive and semi-primitive non-motorized areas | Sensitive |
| RS | Recreation sites | Sensitive |
| SRMA | Special recreation management areas | Sensitive |
| NEA | Thompson Creek Natural Environment Area | Unsuitable |
| PNV | Primitive and natural values | Unsuitable |
| | **Wilderness** | |
| WSA | Wilderness study areas identified preliminarily suitable for wilderness | Unsuitable |
| WSA | Wilderness study areas recommended nonsuitable for wilderness will be managed under BLM's *Interim Management Policy and Guidelines for Lands Under Wilderness Review* (December 1979) | Sensitive |
| | **Hydrology** | |
| GDF | Glenwood Springs debris flow hazard zone | Sensitive |
| MW | Municipal watersheds | Sensitive |
| | Floodplains (not shown on map) | Sensitive |
| | Wetlands (not shown on map) | Sensitive |
| | **Visual** | |
| | Sensitive viewsheds, visual resource management Class I areas (see the Visual Resource Management section and Map 13) | Unsuitable |
| | Sensitive viewsheds, visual resource management Class II areas (see the Visual Resource Management section and Map 13) | Sensitive |
| | **Cultural Values** | |
| BHAD | Blue Hill Archaeological District | Sensitive |
| | **Vegetation** | |
| SP | Sensitive plant species, areas of known occurrence | Sensitive |

43

## Chapter 2, Resource Decisions

Designate Monument Peak, Castle Peak, Doghead Mountain, Sunlight Mountain (in conjunction with the White River National Forest), Bellyache Ridge, and Lookout Mountain as communication sites and prepare management plans.

### Support

Engineering support will be needed for analysis of proposed projects. Appraisal staff support will be needed for valuation of rights-of-way.

### Implementation and Monitoring

Upon approval of this plan, unsuitable, sensitive, and suitable zones became effective. This plan will be provided to applicants for land use authorizations to use in designing their proposed facilities.

In all zones, locations of proposals adjacent to compatible existing facilities or upgrading of existing facilities will be encouraged.

This plan will be used to determine general locations for major utility systems. Applications for land use authorizations will be compared with the zones and then processed on a case-by-case basis as outlined in BLM regulations.

**Unsuitable Zones.** Applications within unsuitable zones will be rejected, except where valid existing rights require granting of authorization.

**Sensitive Zones.** Applications within sensitive zones will be considered only if mitigation measures can reduce the potential impacts of the proposal on the identified sensitive resource. All approved authorizations will include stipulations to mitigate impacts to sensitive resources and site-specific impacts associated with the proposed facility. If impacts cannot be mitigated, applications will be approved in another suitable location or rejected.

**Suitable Zones.** Applications for proposals within suitable for consideration zones will be processed on a case-by-case basis as outlined in BLM regulations. All approved authorizations will include stipulations to mitigate site-specific impacts associated with the proposed facility. If site-specific impacts cannot be mitigated, applications will be approved in another suitable location or rejected.

### Priorities of Implementation

None.

### Fire Management

#### Objective

To reduce losses, complement resource management objectives, and sustain the productivity of the biological ecosystems through fire management.

#### Planned Management Actions

Designate three zones (Map 18 and Table 17) within the resource area for management of wildfire — fire exclusion, fire management, and *limited suppression.*

### Table 17.   Fire Management Zones

| Zone | Acres | Percent of Resource Area |
|------|-------|--------------------------|
| Fire Exclusion Zone | *19,600* | 3 |
| Fire Management Zone | *494,000* | 88 |
| Limited Suppression Zone | *52,000* | 9 |

In fire exclusion zones, take immediate actions to suppress all wildfire to protect life, property, and resource values. If needed, develop hazard reduction projects and prevention programs to reduce the risk of wildfire occurring.

In fire management zones, use wildfire when appropriate to maintain natural ecosystems or manipulate vegetation types. Within this zone, evaluate possible detrimental and beneficial impacts, burning conditions, and location of each fire to determine suppression techniques needed to control the fire.

*In fire maintenance zones, use wildfire as a natural force in manipulating vegetation types. Within this zones, evaluate possible detrimental and beneficial impacts and burning conditions to determine containment techniques.*

44

## Description of Planned Actions

**Support**

Support will be needed from the U.S. Forest Service, Colorado State Forest Service, BLM's *Western Slope Fire Coordination Center*, and local fire districts for presuppression and suppression planning and equipment.

**Implementation and Monitoring**

A fire management plan will be written for the fire management zones. Specific zone boundaries and fire management prescriptions will be identified to meet the Objectives for the zones based on resource values within the zone.

**Implementation of Priorities**

**Priority 1** — Fire Exclusion Zone. Consider the following in fire exclusion zones.

- Human health and safety.
- Potential fire hazard.
- Potential economic loss due to fire.

**Priority 2** — *Fire Management Zone. Consider the following in fire management zones.*

- Human health and safety.
- Potential fire hazard.
- *Importance of resource values present.*
- Potential economic loss due to fire.

**Priority 3** — *Limited Suppression Zone.* Consider the following in *fire maintenance zones.*

- Human health and safety.
- Potential fire hazard.
- Importance of resource values present.

# SUPPORT

This section identifies the cumulative support needed to implement the plan. The support requests are relatively general but will be refined as annual work plans are prepared and approved. The support information is displayed in Table 18.

45

BLM_0005366

Table 18.   Cumulative Support Needs

| Support | Resource | Remarks |
|---|---|---|
| Appraisal | Terrestrial Habitat Management | Appraisals will be required for access needs identified in Table 15. |
| | Forest Management | Appraisals will be required for access needs identified in Table 15. |
| | | Access will be required to Castle Peak, Hardscrabble, and the Naval Oil Shale Reserve to facilitate the commercial forestry program. |
| | Recreation Resource Management | Appraisals will be required for access needs identified in Table 15. |
| | Land Tenure Adjustments | Prior to FY89, appraisals will be required for all disposal tracts identified on Map 14. |
| Cadastral Survey | Minerals Management | Ongoing mineral disposal actions may require identification of public land boundaries. |
| | | Coal tract delineation currently scheduled for FY87 will require cadastral support in the Hogback region. |
| | | Cadastral support will be required for access needs identified in Table 15. |
| | Forest Management | Additional support may be required to locate public land boundaries association with specific timber sales. |
| | Recreation Resource Management | Cadastral support will be required for access needs identified in Table 15. |
| | Wilderness | Cadastral support will be needed to identify designated wilderness boundaries. |
| | Land Tenure Adjustments | Tracts 30, 36, 109, 169, and 205 will require cadastral surveys prior to disposal. |
| | | Cadastral surveys will be needed for identification of public land boundaries in the Elk Creek and Roaring Fork Valley areas to avoid potential conflicts and unauthorized use associated with anticipated private land development. |
| | | Trespass occupancy resolution may additionally require cadastral support. |
| | Transportation Management | Cadastral surveys will be needed for easement locations. |
| Engineering | Critical Watersheds | Detention ponds and ditches proposed by the city of Glenwood Springs for the debris flow hazard zone will require review by the engineering staff. |
| | Aquatic Habitat Management | Engineering design and review will be required for habitat improvement structures identified in the appendixes. |
| | Terrestrial Habitat Management | Annually, specific projects including fences and water facilities will require engineering design and review. |
| | Livestock Grazing Management | Annually, specific projects including fences and water facilities will require engineering design and review. |
| | Forest Management | Engineering support will be required for road layout and design for timber access roads. |
| | Recreation Resource Management | Engineering support will be required for road layout and design for recreation access roads. |
| | Utility and Communication Facility Management | Annually, engineering reviews will be required for specific right-of-way actions. |
| | Transportation | Engineering survey and design will be required for all proposed easements identified on Map 16. |
| Fire Management | All Resources | Suppression forces will be required to implement decisions made for each of the fire management zones — fire exclusion, *fire management, and limited suppression.* |
| Mineral Surveys | Wilderness Management | Mineral surveys will be required in all wilderness study areas. |
| Water Rights | Water Quality | Some erosion control structures will require Colorado State Engineer permits, water rights, or both. |
| | Aquatic Habitat Management | Establishment of minimum streamflows and pool levels will require acquisition of water rights. |
| | Terrestrial Habitat Management | All BLM water developments will require acquisition of water rights. |
| | Livestock Grazing Management | All BLM water developments will require acquisition of water rights. |

46

BLM_0005367

Case No. 1:20-cv-02484-MSK   Document 27-6   filed 04/27/21   USDC Colorado   pg 304 of 436

# APPENDIXES

**Chapter 2 has been rewritten and updated and as such is 8 pages longer than the 1984 version. Due to time limitations, the appendixes have not been renumbered.**

BLM_0005368

# APPENDIX A

# POSSIBLE MANAGEMENT PRACTICES

Following are lists of possible practices that could be used in the management of the various resources. These lists should not be considered comprehensive lists of all management practices.

# WATER QUALITY

## BACTERIA CONTROLS

1. Livestock and wildlife management:
   reduced stocking
   fencing
   water developments
   other range improvements
   buffer zones in riparian areas
2. Construction of sanitary facilities in heavy use recreation areas

## SEDIMENT AND SALINITY CONTROLS

1. Land treatment:
   conversion of sagebrush to grass
   ripping, pitting, contour furrows, and trenches
   revegetation and rehabilitation of disturbed areas
   rehabilitation or improvement of riparian areas
2. Control Structures:
   water bars
   gully plugs
   water spreaders
   retention/detention dams
   gabions
   jetties
3. Management Consideration:
   proper livestock and wildlife grazing management
   adequate drainage and protection on all roads and surface disturbances

timber management controls

fire management controls

# TEMPERATURE AND DISSOLVED OXYGEN CONTROLS

improve riparian vegetation

increase base flow levels

# WATER YIELD

## BIG SAGEBRUSH ZONE

Water yield could be increased by converting shrub-type vegetation into grasses and forbs. Type conversion could be conducted by burning, plowing disking, or spraying. The technique selected would depend on conditions at the site.

Snowfence construction is a second feasible technique for increasing water yield from the sagebrush zone. Good fence sites have—

1. ridge crest locations,
2. upslope or level windward approach to the fence,
3. good orientation to prevailing drifting winds,
4. upslope or level terrain to the lee of the accumulation area,
5. at least 500 feet of contributing area,
6. little natural accumulation upwind of the fence, and
7. northerly to northeasterly exposure.

At good sites, from 60 to 120 feet of fence would be needed to produce an extra acre-foot of snowmelt, based on fences 10 to 12 feet tall, 40 percent fence density, and bottom gaps of 2 to 4 feet. At such sites, the melt season would be prolonged 1 to 3 weeks.

45

## Appendix A

## MOUNTAIN BRUSH ZONE

Water yield in the mountain brush zone can be increased by type conversion to grasses and forbs. Mountain brush control can be conducted through a number of approaches. It can be clearcut or it can be patch cut in order to preserve and enhance wildlife habitat. It can also be controlled by burning, cutting, or spraying. The effects from burning or cutting will be shorter lived than those from spraying due to rapid shrub regrowth.

## PHREATOPHYTE INFESTATION AREAS

Management for maximum water yield in this zone would involve eradication of saltcedar and replacement with less water consumptive species, e.g., willows. Saltcedar can be removed by root-plowing or antitranspirant sprays.

## MIXED CONIFER ZONE

Highest increases in water yield from the mixed conifer zone result when the forest is harvested in a system of small forest openings. An optimum pattern of snow accumulation results when openings are (1) less than eight tree heights in diameter, (2) interspersed so that they are five to eight tree heights apart, and (3) protected from wind. Maximum water yield results when approximately 40 percent of the watershed is occupied by these small openings and 60 percent is left uncut.

## ASPEN ZONE

Water yield management in the aspen zone can be conducted either by type conversion to grassland or by patch cutting in a manner similar to that in the mixed conifer zone. In both the aspen and mixed conifer zones, windrowing slash can augment water yield by providing an area protected from the wind which enables snowdrifts to build up. The decision to windrow slash is an option that is open for water yield management but may not be economically feasible.

## CRITICAL WATERSHED AREAS

Management practices that could be useful in protecting critical watersheds follow:

Access road construction

Alternative water source development

Brush control

Buffer strips

Contour furrows and trenches

Critical area planting

Debris basins

Dikes

Fencing

Firebreaks

Floodwater control structures

Grazing land mechanical treatments

Livestock exclusion

Planned grazing systems

Pond sealing or lining

Range seeding

Rehabilitation of disturbed areas

Rehabilitation or improvement of wetland areas

Spring development

Stocktrail and walkway development

Stream channel stabilization

Streambank protection

Tree planting

Trough or tank installation

Waterspreading

Wildlife upland habitat management

Wildlife watering facilities

Woodland improved harvesting

No development

Development with mitigation measures

BLM_0005370

**Possible Management Practices**

# AQUATIC HABITAT

## HABITAT IMPROVEMENT MEASURES

**Reservoir Flood Basins:**

Selective clearing

Brush shelters

Tire shelters

Other fish shelters

Exposed area planting

Raised spillways

**Reservoir Conservation Pools:**

Stage filling

Fluctuation control

Seasonal manipulation

Minimum pools

Aeration-destratification

**Dam Discharge Systems:**

Low-level intakes

Multi-level intakes

Spillway deflectors

Stilling basins

**Streamflows, Riffles and Pools:**

Minimum flows

Fluctuation control

Reregulating dams

Maximum flows

Current deflectors

Check dams

Other instream devices

Artificial meanders

Isolated oxbows

## POPULATION IMPROVEMENT MEASURES

**Fish Propagation:**

Fish hatcheries

Nursery and rearing ponds

Nursery cove barriers

Spawning bottom and marsh

Spawning riffles

Artificial spawning channels

**Fish Passage:**

Trap and haul systems

Fishways

Conduits and culverts

Turbine bypasses

**Fish Stocking and Control:**

Fish stocking

Fish screens

Barrier dams

Other control devices

Fish eradication

# GRAZING SYSTEMS

Livestock are selective grazers. The most palatable plants and the most accessible areas are grazed first and heaviest. Plants grazed heavily one year are usualy grazed heavily the following year, which leads to their gradual loss. This is also the trend for the preferred areas. When forage production of the most desirable plants falls below their needs, livestock will start grazing the less desirable species or areas, which leads to an ever enlarging area of range deterioration (Stoddart, Smith, and Box 1975; Hormay 1970). Grazing systems are prescribed in allotment management plans (AMPs) to regulate livestock grazing, to alleviate a particular problem, or give a desired result.

The harmful effects of selective grazing of preferred plants can be reduced by resting the range at appropriate intervals. An allotment is usually fenced into pastures to control pasture grazing and

47

## Appendix A

pasture resting. A grazing formula is tailored for each allotment; the number of pastures and amount and timing of pasture grazing and resting are based on key forage plant physiological needs, existing range conditions, and potential for improvement.

Grazing treatments are the building blocks of the grazing formula or grazing system. Treatments specify periods of grazing use or rest from grazing for a specific reason during the year. Selected treatments are then chosen for each allotment, depending on the goal for the allotment, and applied to the pastures in a formula which becomes the system. The following descriptions of treatments includes dates of plant phenological occurrences. The dates used are typical for the resource area but could vary by allotment based on elevation, climate, and key species used. The letter designation of treatments is used only for differentiation and enumeration.

### Treatment A

Treatment A consists of grazing a pasture for livestock production in the spring (5/01 to 6/15) and then resting the pasture for the remainder of the year. Grazing may extend to the flowering of key species (mid-July) to support livestock while allowing for treatment B in other pastures.

### Treatment B

Treatment B consists of resting or deferring a pasture from livestock grazing until after the key species flower (mid-July) and then allowing it to be grazed by livestock to the end of the grazing season. By the time the pasture is grazed, plants have completed over half their food storage for the season and have extended roots. This is especially useful following treatment D, as it allows new seedlings time to develop grazing tolerance.

### Treatment C

Treatment C consists of resting or deferring pasture from livestock grazing until after seedripe of the key grass and forbs species and then allowing it to be grazed by livestock to the end of the grazing season. Seedripe occurs from around the end of July to mid-August. By that time, winter carbohydrate storage should be adequate in most key plants and seed should have matured sufficiently to produce seedlings (the trampling by livestock would aid in the planting of seeds). With this treatment, growing season rest is provided for all plants.

### Treatment D

Treatment D consists of resting a pasture from livestock grazing for the entire year. This allows the seeds to germinate and plants to store carbohydrate reserves, extend roots and increase vigor. It often follows treatment C to take advantage of seeds buried by trampling.

### Treatment E

Treatment E consists of resting a pasture from livestock grazing during the growing season and then allowing it to be grazed by livestock during the winter and early spring. This is primarily winter sheep use on shrub rangelands.

### Treatment F

Treatment F consists of grazing the pasture for the entire grazing period of the allotment.

## REST-ROTATION GRAZING

Under a rest-rotation grazing system, grazing is deferred on various parts of an allotment during succeeding years, and the deferred parts are allowed complete rest for one or more years (Society for Range Management 1974). The allotment is divided into two or more pastures, usually with comparable grazing capacities. Each pasture is systematically grazed and rested, providing for livestock production and other resource values, while simultaneously maintaining or improving the vegetation cover, hence providing greater protection of the soil resource against wind and water erosion (Hormay 1970; Ratliff et al. 1972).

Rest rotation grazing systems may include several treatments depending upon the objectives for the allotment and the number of pastures. Rest-rotation grazing is a useful system to aid in the rehabilitation of depleted rangelands.

## DEFERRED GRAZING

Deferred grazing is delay or discontinuance of grazing on an area for an adequate period of time to provide for plant reproduction, establishment of new plants, or restoration of vigor of existing plants (Society for Range Management 1974).

To be most effective, deferment should be used in conjunction with some other type of grazing

BLM_0005372

## Possible Management Practices

system, such as rotation to make a deferred-rotation system.

## DEFERRED-ROTATION GRAZING

Deferred rotation is the discontinuance of grazing on various parts of an allotment in succeeding years. This allows each part or pasture to rest successively during the growing season to permit seed production, establishment of seedlings, and restoration of plant vigor (Society for Range Management 1974). One or more pastures are grazed during the spring, while the remaining one or more pastures are rested until after seed ripe of key species and then grazed. Deferred-rotation grazing differs from rest-rotation grazing in that there is no yearlong rest provided for any part of the allotment.

Deferred rotation grazing systems are useful for minor improvement or maintenance of range condition.

## SEASONAL GRAZING

Seasonal grazing is restricted to a specific season (Society for Range Management 1974). Allotments are not necessarily divided into pastures but are grazed at a moderate rate during the same period of time each year, for instance, from 7/1 to 9/15 annually. Seasonal grazing could be proposed on allotments or pastures with a moderate stocking rate usually for short periods (2 to 3 weeks) during spring and longer periods for late summer and fall.

## RANGE IMPROVEMENTS

## VEGETATION MANIPULATIONS

### Mechanical Plant Control

Anchor chaining

Cabling

Bulldozing, disking

### Herbicidal Control (ground and air)

### Prescribed Burning

## REVEGETATING DISTURBED AREAS

### Reseeding

Natural reseeding

Broadcast reseeding

Drilling

Transplanting

## RANGE FACILITIES

### Water Developments

Watersavers (catchments)

Spring developments

Reservoirs

Pipeline systems

Wells

### Water Spreading or Concentrating

Contour furrowing and trenching

Pitting

### Livestock Management Facilites

Cattle guards

Fences

Corrals

Stock trails

## FOREST MANAGEMENT

## PRODUCTIVE FOREST LAND SPECIES

### Lodgepole Pine

Clearcutting

Shelterwood/group selection cutting

49

BLM_0005373

## Appendix A

**Spruce/Fir**

Clearcutting

Shelterwood/group selection cutting

**Douglas-Fir**

Clearcutting

Shelterwood/selection cutting

**Aspen**

Clearcutting

**Ponderosa Pine**

Clearcutting

Shelterwood/selection cutting

# WOODLAND SPECIES

**Pinyon Pine and Juniper**

Selection cutting

Seed tree cutting

Clearcutting

## CULTURAL RESOURCES

PRESERVE

RESTORE OR STABILIZE

ANALYZE OR EXCAVATE—RECORD FOR ARCHIVES

DINTERPRET

PATROL

ACKNOWLEDGE AND USE DATA—NO FURTHER ACTION NECESSARY

UPGRADE DATA AND RESEARCH—EVALUATE

PROTECT AND MAINTAIN

DEMOLITION

# FIRE MANAGEMENT

## SUPPRESSION EQUIPMENT

**Power Equipment**

Plows

Rotary trencher

Pumper

Portable equipment

Fixed-wing support aircraft

Fixed-wing tactical aircraft

Helicopters

BLM_0005374

# APPENDIX B

# REQUIRED MANAGEMENT STIPULATIONS

These stipulations will be included in project designs and are considered standard operating procedures.

## AIR QUALITY MANAGEMENT STIPULATIONS

1. Controlled burns and any other open burning will comply with BLM Manual Section 7723, *Air Quality Maintenance Requirements*, to minimize air quality impacts from resulting particulates.

2. Necessary stipulations protecting air quality from development will be included in leases, rights-of-way, and other BLM use permits.

3. All applicable local, state, and federal air quality policies, regulations, and statutes will be followed.

## AQUATIC AND RIPARIAN HABITAT STIPULATIONS

1. Surface-disturbing activities will be restricted in or near riparian areas.

2. Fences should be constructed to minimize impact to significant riparian and aquatic habitat.

3. Equipment will not be allowed to move up or down stream channels. Heavy equipment will cross streams only at designated or constructed crossings with culverts and bridges designed to allow upstream migration of fish.

4. Fire retardant will not be dropped within 100 yards of any wetland riparian area. Drops of retardant will be made parallel to and not across drainages.

5. Fire lines, angular or perpendicular to a drainage, will not be allowed within 300 feet of a drainage to reduce soil movement into the drainage system.

6. If visitor use causes adverse impacts on critical riparian habitat, the visitor use will be reduced until the vegetative conditions are restored.

## TERRESTRIAL HABITAT STIPULATIONS

1. Timber harvesting haul roads will be seasonally or permanently closed following timber harvesting if disturbance to big game becomes excessive.

2. Roadways, landings, and other heavily-disturbed sites will be reclaimed by establishing a ground cover.

3. Adequate snags for cavity-dwelling wildlife species will be left at forest edges, adjacent to aquatic and riparian areas, and near clearcut boundaries.

4. Buffers will be maintained around raptor nest sites.

5. In wooded areas, clearcuts will be restricted to 40 acres or less in size, limited in width to 400 yards, and irregular in shape to enhance edge effect. Adequate thermal and hiding cover for deer and elk will be retained in or adjacent to treatment areas.

6. Forty percent of an elk summer range will be maintained in a forested type with a 75 percent tree canopy.

7. Conifer and aspen harvesting will be prohibited in elk calving areas, and a buffer zone will be provided around these areas. Within the buffer zone, timber harvesting will be prohibited between May 1 and June 15.

8. Harvesting in aspen woodland will be prohibited from May 1 to July 15 unless on-site inspection reveals that fawning deer will not likely be disturbed.

9. Pinyon-juniper woodland harvesting occurring in crucial big game winter range will be restricted from January 16 to April 30 if determined to be detrimental to big game.

10. Powerlines will be constructed as described in *Suggested Practices for Raptor Protection or Powerlines—the State of the Art 1981*.

11. On reservoirs one-half surface acre or larger in size, fencing will be included to provide for development of aquatic and riparian habitat vegetation. Where fencing is included, water will be piped to drinking tanks or water gaps

BLM_0005375

## Appendix B

provided to facilitate livestock watering. When feasible, islands will be included as part of the reservoir development.

12. Spring boxes and waterlines with wildlife escape ramps will be installed at all spring developments to provide water for livestock drinking tanks. Seep areas will be fenced at the spring source, and overflow water will be piped to small fenced retention ponds, where feasible, to create riparian habitat.

13. Normally, allotment boundary and road right-of-way fences will be four-strand barbed wire with spacing 16, 6, 8, and 12 inches. Interior pasture fences will generally be three-strand barbed wire with spacing 16, 10, and 12 inches unless special circumstances required a tighter fence. Wire spacings will be from the ground up.

14. The *Recommended Guidelines for the Maintenance of Sage Grouse Habitat* promulgated by the Western Association of State Game and Fish Commissioners will be followed when planning and conducting sagebrush control projects within occupied sage grouse habitat. Major points in the guidelines include consultation with the Division of Wildlife, protection of breeding complexes (and nesting areas), winter concentation areas, and design of control areas.

15. Areas receiving moderate to high soil disturbance during treatment or an understory ground cover less than 10 percent will be seeded with a mixture of grass, forb, and browse species. Livestock grazing will be prohibited on all seeded areas for two growing seasons.

16. New roads or trails leading to or on treatment areas normally will be physically closed following completion of the project. Activities occurring during the winter or early spring will be completed in the shortest period and number of seasons possible in critical deer and elk winter range.

17. Roads will be constructed as outlined in BLM Manual 9143.

52

BLM_0005376

# APPENDIX C

# RECREATION OPPORTUNITY SPECTRUM (ROS) CLASSES

Table C-1 describes each of the six ROS classes in terms of (1) experience opportunities, (2) setting opportunities, and (3) activity opportunities. These descriptors provide a general overview of the opportunities included in each class. These overview statements do not describe each class in detail but rather provide a point of departure from which the planner or manager can develop more precise prescriptions for each class based on specific situations encountered in field operations. The listing of activity opportunities is provided for illustrative purposes. It is not an all-inclusive list of activity opportunities on the public lands.

TABLE C-1.  RECREATION OPPORTUNITY SPECTRUM CLASS DECRIPTIONS

| Opportunity Class | Experience Opportunity | Setting Opportunity | Activity Opportunity |
|---|---|---|---|
| Primitive | Opportunity for isolation from the sights and sounds of man, to feel a part of the natural environment, to have a high degree of challenge and risk, and to use outdoor skills. | Area is characterized by essentially unmodified natural environment of fairly large size. Concentration of users is very low and evidence of other users is minimal. The area is managed to be essentially free from evidence of man-induced restrictions and controls. Only facilities essential for resource protection are used. No facilities for comfort or convenience of the user are provided. Spacing of groups is informal and dispersed to minimize contacts between groups. Motorized use within the area is not permitted. | Camping, hiking, climbing, enjoying scenery or natural features, nature study, photography, spelunking, hunting (big game, small game, upland birds, waterfowl) ski touring and snowshoeing, swimming, diving (skin and scuba), fishing, canoeing, sailing, and river running (non-motorized craft). |
| Semi-Primitive Non-motorized | Some opportunity for isolation from the sights and sounds of man, but not as important as for primitive opportunities. Opportunity to have high degree of interaction with the natural environment, to have moderate challenge and risk, and to use outdoor skills. | Area is characterized by a predominantly unmodified natural environment of moderate to large size. Concentration of users is low. Is often evidence of other area users is present. On-site controls and restrictions may be present but are subtle. Facilities are provided only for the protection of resource values and the safety of users. Formal spacing of groups may be made to disperse use and limit contacts between groups. Motorized use is not permitted. | Camping, hiking, climbing, enjoying scenery or natural features, nature study, photography, spelunking, hunting (big game, small game, upland birds, waterfowl), ski touring and snowshoeing, swimming, diving (skin and scuba), fishing, canoeing, sailing, and river running (non-motorized craft). |
| Semi-Primitive Motorized | Some opportunity for isolation from the sights and sounds of man, but not as important as for primitive opportunities. Opportunity to have high degree of interaction with the natural environment, to have moderate challenge and risk, and to use outdoor skills. Explicit opportunity to use motorized equipment while in the area. | Area is characterized by a predominantly unmodified natural environment of moderate to large size. Concentration of users is low, but often there is evidence of other area users present. On-site controls and restrictions may be present, but are subtle. Facilities are provided for the protection of resource values and safety of users only. Formal spacing of groups may be made to disperse use and limit contacts between groups. Motorized use is permitted. | Same as the above, plus the following: off-road vehicle use, four-wheel drive, dune buggy, dirt bike, snowmobile, power boating. |

53

BLM_0005377

# Appendix C

TABLE C-1. RECREATION OPPORTUNITY SPECTRUM CLASS DECRIPTIONS—Continued

| Opportunity Class | Experience Opportunity | Setting Opportunity | Activity Opportunity |
|---|---|---|---|
| Roaded Natural | About equal opportunities for affili-ation with other user groups and for isolation from sights and sounds of man. Opportunity to have a high degree of interaction with the natural environment. Challenge and risk opportunities are not very important except in specific challenging activities. Practice of outdoor skills may be important. Opportunities for both motorized and non-motorized rec-reation are present. | Area is charterized by a generally natural environment with moder-ate evidence of the sights and sounds of man. Resource modifi-cation and use practices are evi-dent but harmonize with the natu-ral environment. Concentration of users is low to moderate with facilities sometimes provided for group activity. On-site controls and restrictions offer a sense of security. Rustic facilities are pro-vided for user convenience as well as for safety and resource protection. Conventional motor-ized use is provided for in con-struction standards and design of facilities. | All activities listed previously plus the following: picnicking, rock col-lecting, wood gathering, auto touring, downhill skiing, snowplay, ice skating, water skiing and other water sports, hand gliding, interpretive use, rustic resorts and organized camps. |
| Semi-Urban (also called Rural) | Opportunities to experience affili-ation with individuals and groups are prevalent as is the conven-ience of sites and opportunities. These factors are generally more important than the natural setting. Opportunities for wildland chal-lenges. Risk taking and testing of outdoor skills are unimportant, except in those activities involv-ing challenge and risk. | Area is characterized by substan-tially modified natural environ-ment. Resource modification and use practices are obvious. Signs and sounds of man are readily evident and the concentration of users is often moderate to high. A considerable number of facili-ties are designed for use by a large number of people. Facilities are often provided for specific ac-tivities. Developed sites, roads and trails are designed for mod-erate to high use. Moderate den-sities are provided far away from developed sites. Facilities for in-tensive motorized use are availa-ble. | All activities used previously plus the following: competitive games, spectator sports, bicycling, jog-ging, outdoor concerts, and modern resorts. |
| Urban | Opportunities to experience affili-ation with individuals and groups are prevalent as is the conven-ience of sites and opportunities. Experiencing the natural environ-ment and the use of outdoor skills are largely unimportant. | Area is characterized by a highly modified environment, although the background may have natural elements. Vegetation is often exotic and manicured. Soil may be protected by surfacing. Sights and sounds of man, on-site, pre-dominate. Large numbers of users can be expected. Modern facilities are provided for the use and convenience of a large number of people. Controls and restrictions are obvious and nu-merous. Facilities for high intensi-ty motor use and parking are present with forms of mass tran-sit often available. | All activities listed previously |

54

BLM_0005378

# APPENDIX D

# CONSIDERATIONS USED IN DETERMINING LAND TENURE ADJUSTMENTS

## RETENTION OR MULTIPLE USE ZONE

### Definition

Tracts or combinations of tracts of public land or interests in land that are retained in public ownership and are managed under the principles of multiple-use and sustained yield.

### Considerations

a. Well-blocked tracts of public land.

b. Tracts controlling access to other public lands (except for easements or patent reservations).

c. Areas where community expansion is not expected.

d. Manageable tracts (defined by such factors as access, resource values, compatibility with BLM mission).

e. Areas where public demand for disposal is minimal.

f. Areas valuable for resource programs and protection/management.

g. Areas identified in state and local governments' land-use plans as suitable for public ownership.

h. Areas not in conflict with existing planned intensive development.

### Exceptions

a. Recreation and public purpose (R&PP) applications for patents.

b. Resolution of unintentional trespass both occupancy and agricultural.

c. Selection by the state of in-lieu lands.

d. Critical needs for energy development.

e. Lands critical for community expansion.

f. Mining claims to patent.

g. Land exchanges where the public value of the land that is acquired meet or exceed the public value of the land that is disposed of.

h. Land identified in future surveys, including omitted land, where one or more of the disposal zone considerations are met.

i. Land adjacent to existing agricultural, residential, industrial, or commercial land where public ownership interfaces with the logical development of that land.

j. Land containing crucial big game winter range or other resources whose values could best be managed by other federal or state agencies for public use.

## COOPERATIVE MANAGEMENT (WITHIN RETENTION ZONE)

### Definition

Tracts or combinations of tracts of public land or interests in lands which may or may not be interspersed with private, state, or other agency lands or interests in lands, where several agencies have varying responsibilities for management.

### Considerations

a. Special withdrawals and reserves, i.e., Naval Oil Shale Reserve.

b. Broken land pattern with similar management goals among federal, state, or private owners.

c. Public land needed to support or add to other agency or state needs, i.e., Colorado River corridor.

### Exceptions

a. Retention for full management responsibility by BLM or disposal through sale or exchange

55

BLM_0005379

## Appendix D

could occur when cooperative management is no longer required.

b. Disposal through exchange could occur where all parties would benefit.

## Methods for Cooperative Management

a. Cooperative agreements.

b. Memoranda of understanding.

c. Partial withdrawals.

d. Scenic easements.

# DISPOSAL ZONE

## Definition

Tracts or combinations of tracts of public land or interests in land that are suitable for conveyance out of federal ownership under existing laws and regulations.

## Considerations

a. Isolated and small land parcels.

b. Difficult and expensive to manage (no access, cost benefit low) lands.

c. Tracts not suitable for management by another federal department or agency.

d. Tracts that would serve important public objectives that could not be achieved prudently and feasibly on land other than public land and which outweighed other public objectives that would be served by retaining in public ownership.

Important public objectives include community needs: urban, suburban, and residential,

Industrial and commercial,

Agricultural,

Recreation and other public purposes

e. Long-term public benefits weighed against more immediate or local benefits.

f. Tracts identified in state and local land-use plans as suitable for disposal.

g. Lands identified by public proposals.

## Exceptions

a. Where fragile or unique resource values are known and the tract cannot be efficiently managed by another agency.

b. Where disposal would adversely affect management of adjacent lands by other agencies, i.e., Forest Service, State.

c. Where needs exist for R&PP leases, i.e., landfills, detention centers.

d. Where access to other public lands would be cut off (easements or patent reservations might be used).

## Methods for Disposal

a. Sales.

b. State selection.

c. State and private exchange.

d. Recreation and public purpose.

e. Desert land entry.

f. Indian allotments.

g. Conveyance of federal minerals under private surface.

h. Color-of-title.

i. Carey Act.

j. Forest Service exchange or boundary adjustment.

BLM_0005380

# GLOSSARY

BLM_0005381

# GLOSSARY

ACRE-FOOT. The quantity of water or other material required to cover 1 acre to a depth of 1 foot or a volume of 43,560 cubic feet.

ACTIVE PREFERENCE. That portion of the total preference for which grazing use may be authorized. See also Total Preference.

ACTUAL USE. The use made of forage on any area by livestock and/or wildlife without reference to permitted or recommended use.

ALLOTMENT. An area designated and managed for grazing of livestock.

ALLOTTEE. Holder of a license or permit for grazing on an allotment. A permittee.

ALLOTMENT MANAGEMENT PLAN (AMP). A concisely written program of livestock grazing management for a specific grazing allotment.

ALLOWABLE HARVEST. The amount of forest products that can be harvested annually or periodically from a specified area over a stated period in accordance with the objectives of sustained-yield management. The allowable harvest includes all planned timber and fuelwood harvest volumes exclusive of such products as Christmas trees, branches, and cones.

ANIMAL UNIT (AU). One mature (1,000 pound) cow or the equivalent based upon average daily forage consumption of 26 pounds dry matter.

ANIMAL-UNIT MONTH (AUM). The amount of forage required by an animal unit for one month (800 pounds air dry forage for cattle or 160 pounds for domestic sheep). Tenure of one animal unit for one month.

BACKGROUND. The area visible from a travel route, use area, or other observer position usually from a minimum of 3 to 5 miles or a maximum of about 15 miles.

BROWSE. The part of a leaf and twig growth of shrubs, woody vines, and trees used by animals for consumption.

CATCHMENT. A structure built to collect and retain water.

CLEARCUTTING. An even-aged silvicultural system in which the old crop is cleared at one time; regeneration is generally natural through seeding from adjacent stands or from cone-bearing slash.

COMMERCIAL FOREST LAND. Forest land that is capable of yielding at least 20 cubic feet of wood per acre per year of commercial coniferous tree species. Lodgepole pine, Engelman spruce, Douglas-fir, and ponderosa pine comprise this group in the Glenwood Springs Resource area.

CONTRAST. The effect of a striking difference in the form, line, color, or texture of the landscape features within the area being viewed.

CRUCIAL WINTER RANGE. That portion of the winter range to which a wildlife species is confined during periods of heaviest snow cover.

CULTURAL MODIFICATION. Any man-caused change in the land or water form or vegetation or the addition of a structure that creates a visual contrast in the basic elements (form, line, color, texture) of the naturalistic character of a landscape.

CULTURAL RESOURCES. The fragile and nonrenewable remains of human activity, occupation, or endeavor that were of importance in human events.

EASEMENT. A right acquired by the United States to use or control private property for a road, trail, or other specified purpose.

ENDANGERED SPECIES. Any species in danger of extinction throughout all or a significant portion of its ranges.

EROSION CONDITION CLASS. A classification system for ranking soil erosion in increments of 20 points: 0-20 = stable; 21-40 = slight; 41-60 = moderate; 61-80 = critical; and 81-100 = severe.

EXISTING USE (livestock). The 5-year average licensed livestock use from 1975-1979.

FORAGE. All browse and herbaceous foods that are available to grazing animals.

FOREGROUND-MIDDLEGROUND. The area visible from a travel route, use area, or other observer position to a distance of 3 to 5 miles.

FOREST LAND. All land that supports trees having a 10 percent or greater crown closure, now or potentially. This includes woodland, commercial forest land, and noncommercial forest land, provided the minimum crown closure standard is met.

GRAZING PREFERENCE. See Total Preference.

GROUND WATER. The part of subsurface water that completely saturates the rocks and is under hydrostatic pressure.

HABITAT. A specific set of physical conditions that surround a single species, a group of species, or a large community. In wildlife management, the major components of habitat are food, water, cover, and living space.

MITIGATION. The alleviation or lessening of possible adverse effects of an action on a resource by application of appropriate protective measures or adequate scientific study.

NATIONAL REGISTER OF HISTORIC PLACES. The official list, established by the Historic Preservation Act of 1966, of the nation's cultural resources worthy of preservation.

OFF-ROAD VEHICLE (ORV). Any motorized vehicle capable of or designed for travel on or immediately over land, water, or other natural terrain.

OFF-ROAD VEHICLE DESIGNATIONS.

OPEN. Designated areas and trails where off-road vehicles may be operated (subject to operating regulations and vehicle standards set forth in BLM Manuals 8341 and 8343).

LIMITED. Designated areas and trails where the use of off-road vehicles is subject to restrictions such as limiting the number or types or vehicles allowed, dates and times of use (seasonal restrictions), limiting use to existing roads and trails, or limiting use to designated roads and trails. Under the designated roads and trails designation, use would be allowed only on roads and trails that are signed for use. Combinations of restrictions are possible such as limiting use to certain types of vehicles during certain times of the year.

CLOSED. Designated areas and trails where the use of off-road vehicles is permanently or temporarily prohibited. Emergency use of vehicles is allowed.

PALEONTOLOGY. A science dealing with the life of past geological periods as known from fossil remains.

PRODUCTIVE FOREST LAND. Forest land that is capable of yielding at least 20 cubic feet of wood per acre per year of any tree species.

PUBLIC LAND. Land administered by the Bureau of Land Management.

RECREATION MANAGEMENT AREA. Area of public land that is the basic land unit for recreation management.

RECREATION OPPORTUNITY SPECTRUM (ROS). A continuum used to characterize recreation opportunities in terms of setting, activity, and experience opportunities. (See Appendix E for description of specific classes.)

RIPARIAN. Situated on or pertaining to the bank of a river, stream, or other body of water. Normally used to refer to the plants of all types that grow rooted in the watertable of streams, ponds, and springs.

SCENIC QUALITY. The degree of harmony, contrast, and variety within a landscape.

STAND. An aggregation of trees or other growth occupying a specific area and sufficiently uniform in composition (species), age, arrangement, and condition to be distinguished from the forest or other growth on adjoining areas.

SUITABLE COMMERCIAL FOREST LAND. Commercial forest land determined to be suitable for timber production based

59

BLM_0005382

# Glossary

on the timber production capability classifications and multiple-use (resource management plan) constraints.

SUITABLE WOODLAND. Woodland having the ability to provide wood products and not withdrawn from such use.

SURFACE FACILITIES. All structures such as drill pads, buildings, well heads, and so forth, commonly used in the production of oil and gas.

SUSPENDED PREFERENCE. That portion of the total preference that is placed in a suspended category because the preference exceeds the present available livestock grazing capacity. Suspended non-use.

THREATENED SPECIES. Any species likely to become endangered within the foreseeable future throughout all or a significant portion of its range.

TIMBER PRODUCTION CAPABILITY CLASSIFICATION (TPCC). The process of partitioning forest land into major classes indicating relative suitability to provide timber on a sustained-yield basis.

TOTAL PREFERENCE. The total number of animal-unit months of livestock grazing on public land apportioned and attached to base property owned or controlled by a permittee or leasee.

UNALLOTTED ALLOTMENT. Allotment where a previous permittee has relinquished preference or BLM has cancelled preference. Not currently used by livestock.

UNSUITABLE COMMERCIAL FOREST LAND. Commercial forest land determined to be unsuitable for timber production based on the timber production capability classifications and multiple-use (resource management plan) constraints.

UNSUITABLE WOODLAND. Woodland withdrawn for uses other than production of wood products based on the timber production capability classifications and multiple-use (resource management plan) constraints.

VEGETATION MANIPULATION. Alteration of present vegetation by using fire, plowing, spraying, or other means to manipulate natural successional trends.

VEGETATION TYPE. A plant community with immediately distinguishable characteristics based upon and named after the apparent dominant plant species.

VISUAL RESOURCE. Land, water, vegetation, animal, and other visible features.

VISUAL RESOURCE MANAGEMENT (VRM). The planning, designing, and implementation of management objectives to provide acceptable levels of visual impacts for all BLM resource management activities.

VISUAL RESOURCE MANAGEMENT CLASSES. The degree of acceptable visual change within a characteristic landscape. A class is based upon the physical and sociological characteristics of any given homogeneous area and serves as a management objective.

CLASS I areas (preservation) provide for natural ecological changes only. This class includes primitive areas, some natural areas, some wild and scenic rivers, and other similar sites where landscape modification activities should be restricted.

CLASS II (retention of the landscape character) includes areas where changes in any of the basic elements (form, line, color, or texture) caused by management activity should not be evident in the characteristic landscape.

CLASS III (partial retention of the landscape character) includes areas where changes in the basic elements (form, line, color, or texture) caused by a management activity may be evident in the characteristic landscape. However, the changes should remain subordinate to the visual strength of the existing character.

CLASS IV (modification of the landscape character) includes areas where changes may subordinate the original composition and character; however, they should reflect what could be a natural occurrence within the characteristic landscape.

CLASS V (rehabilitation or enhancement of the landscape character) includes areas where change is needed. This class applies to areas where the landscape character has been so disturbed that rehabilitation is needed. This class would apply to areas where the quality class has been reduced because of unacceptable intrusions. It should be considered an interim short-term classification until one of the other classes can be reached through rehabilitation or enhancement.

URBAN. Extensively developed residential or industrial areas where VRM objectives are not assigned.

VISUAL SENSITIVITY. Degree of concern expressed by the user toward scenic quality and existing or proposed visual change in a particular characteristic landscape.

WILDERNESS. An area formally designated by Congress as a part of the National Wilderness Preservation System.

WILDERNESS CHARACTERISTICS. The definition contained in Section 2(c) of the *Wilderness Act* (78 Stat. 891).

WILDERNESS STUDY AREA. A roadless area having wilderness characteristics and, thus, having potential as a wilderness.

WOODLAND. Land producing trees that are typically utilized as nonsawtimber products and sold in units other than board feet. Woodland is that forest land that is not included in the commercial forest land allowable cut base. Woodland can include both commercial and noncommercial forest land. Pinyon pine, juniper, aspen, and subalpine fir comprise the woodland type in the Glenwood Springs Resource Area.

BLM_0005383

# MAPS

BLM_0005384

# 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

## Table of Contents

.01  Purpose
.02  Objectives
.03  Authority
.04  Responsibilities
.05  References
.06  Policy

.1  Characteristics of ACEC's
   .11  Identification Criteria
     A.  Relevance
     B.  Importance
   .12  Special Management Attention

.2  Analysis and Designation Procedures
   .21  Identifying Potential ACEC's
     A.  Compile A List of Areas To Be Considered
     B.  Obtain Information and Data on Relevance and Importance
     C.  Evaluate Each Resource or Hazard to Determine If It Meets Both the Relevance and Importance Criteria
     D.  Areas Dropped From Further Consideration for ACEC Designation
     E.  Provide Temporary Management of Potential ACEC, If Necessary
   .22  Develop Management Prescriptions for Potential ACEC's
     A.  Identify Factors Which Influence Management Prescriptions
     B.  Incorporate Management Prescriptions For Potential ACEC Into Appropriate Alternatives
     C.  Analyzing Effects of the Prescriptions
   .23  Designating ACEC's
     A.  Select Preferred Alternative
     B.  Review Public Comments on Proposed ACEC Designations and Management Prescriptions
     C.  Approve ACEC Designation

.3  Public Notice and ACEC Documentation Standards
   .31  Notice of Intent
   .32  Special Notice Requirement For Plans Involving ACEC's
   .33  RMP or Plan Amendment
     A.  Name, Location, and Size of ACEC
     B.  Description of the Value, Resource, System, or Hazard
     C.  Provision For Special Management Attention
     D.  Relation to Wilderness Study Areas
     E.  Rationale For Designating or Not Designating
     F.  Areas Dropped From Consideration For ACEC Designation

BLM_0005385

TC-2

## 1613 – AREAS OF CRITICAL ENVIRONMENTAL CONCERN

.4  Opportunities for Public Involvement
   .41  Nomination of Potential ACEC's
   .42  Comment on Analysis of Potential ACEC's
   .43  Protest of Proposed ACEC Designations

.5  Relationship of ACEC's to Other Designations
   .51  Congressional Designations
   .52  Secretarial Designations Made By Other Agencies
   .53  Other BLM Designations and Management Areas
      A.  Existing BLM Special Area Designations
      B.  Other Management Areas
      C.  Special Management Areas Avoided

.6  Monitoring and Management of ACEC's
   .61  ACEC Implementation Schedules
   .62  ACEC Activity Plans
   .63  ACEC Monitoring
   .64  Conformance Determinations and NEPA Review
   .65  Annual Status Report on ACEC's

BLM_0005386

.01

## 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

.01  Purpose.  This Manual Section provides policy and procedural guidance on the identification, evaluation and designation of areas of critical environmental concern (ACEC's) in the development, revision, and amendment of resource management plans (RMP's) and amendments of management framework plans not yet replaced by RMP's.  It also clarifies the relationship of ACEC's to other designations and provides procedural guidance on the monitoring and management of ACEC's.

.02  Objectives.  ACEC designations highlight areas where special management attention is needed to protect, and prevent irreparable damage to, important historic, cultural, and scenic values, fish, or wildlife resources or other natural systems or processes; or to protect human life and safety from natural hazards.  The ACEC designation indicates to the public that the BLM recognizes that an area has significant values and has established special management measures to protect those values.  In addition designation also serves as a reminder that significant value(s) or resource(s) exist which must be accommodated when future management actions and land use proposals are considered near or within an ACEC.  Designation may also support a funding priority.

.03  Authority.  The Federal Land Policy and Management Act (FLPMA) provides for ACEC designation and establishes national policy for the protection of public land areas of critical environmental concern.  Section 202(c)(3) of the FLPMA mandates the agency to give priority to the designation and protection of ACEC's in the development and revision of land use plans.  The BLM's planning regulations (43 CFR 1610.7-2) establish the process and procedural requirements for the designation of ACEC's in resource management plans and in plan amendments.

.04  Responsibilities.  See BLM Manual Section 1601.04.

.05  References.

  A.  BLM Manual Section 1621.  Designations of soil and water related ACEC's (Manual Section 1621.21) and scenic ACEC's (Manual Section 1621.41) are identified as possible determinations made in resource management planning supplemental program guidance for environmental resources.

  B.  BLM Manual Section 1622.  Designation of a priority habitat ACEC is identified as a possible determination made in resource management planning supplemental program guidance for renewable resources (Manual Section 1622.11).

  C.  BLM Manual Section 1623.  Designation of a cultural resource ACEC is identified as a possible determination made in resource management planning (Manual Section 1623.1).  Designations of research natural areas (RNA's), outstanding natural areas (ONA's), and natural hazard areas (NHA's) as ACEC's are identified as possible determinations made in resource management planning supplemental program guidance for land resources (Manual Section 1623.31).

BLM_0005387

.06

## 1613 – AREAS OF CRITICAL ENVIRONMENTAL CONCERN

.06 <u>Policy</u>. The FLPMA requires that priority shall be given to the designation and protection of ACEC's. The ACEC's are identified, evaluated, and designated through BLM's resource management planning process. An ACEC designation is the principal BLM designation for public lands where special management is required to protect important natural, cultural and scenic resources or to identify natural hazards. Therefore, BLM managers will give precedence to the identification, evaluation, and designation of areas which require "special management attention" during resource management planning. An ACEC designation will not be used as a substitute for wilderness suitability recommendations.

BLM_0005388

.1

## 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

### .1  Characteristics of ACEC's.

.11  Identification Criteria.  To be considered as a potential ACEC and analyzed in resource management plan alternatives, an area must meet the criteria of relevance and importance, as established and defined in 43 CFR 1610.7-2.

A.  Relevance.  An area meets the "relevance" criterion if it contains one or more of the following:

1.  A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans).

2.  A fish and wildlife resource (including but not limited to habitat for endangered, sensitive or threatened species, or habitat essential for maintaining species diversity).

3.  A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features).

4.  Natural hazards (including but not limited to areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs).  A hazard caused by human action may meet the relevance criteria if it is determined through the resource management planning process that it has become part of a natural process.

B.  Importance.  The value, resource, system, process, or hazard described above must have substantial significance and values in order to satisfy the "importance" criteria.  This generally means that the value, resource, system, process, or hazard is characterized by one or more of the following:

1.  Has more than locally significant qualities which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.

2.  Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.

3.  Has been recognized as warranting protection in order to satisfy national priority concerns or to carry out the mandates of FLPMA.

4.  Has qualities which warrant highlighting in order to satisfy public or management concerns about safety and public welfare.

5.  Poses a significant threat to human life and safety or to property.

BLM_0005389

.12

## 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

.12  <u>Special Management Attention</u>.  To be designated as an ACEC, an area must require special management attention to protect the important and relevant values.  Therefore, areas which have important and relevant resource values and for which special management attention is prescribed are to be designated as ACEC's using the procedures set forth in this section.  "Special management attention" refers to management prescriptions developed during preparation of an RMP or amendment expressly to protect the important and relevant values of an area from the potential effects of actions permitted by the RMP, including proposed actions deemed to be in conformance with the terms, conditions, and decisions of the RMP.  These are management measures which would not be necessary and prescribed if the critical and important features were not present.  That is, they would not be prescribed in the absence of the designation.  (In other words, the concept of special management is relative.)  A management prescription is considered to be special if it is unique to the area involved and includes terms and conditions specifically to protect the important and relevant value(s) occurring on that area.  For example, a seasonal use stipulation on permits or other use authorizations may be prescribed specifically to protect an ACEC value.  Special management attention also includes any plan provision intended to protect life and safety from natural hazards.  Management prescriptions providing special management attention should include more detail than prescriptions for other areas and should establish priority for implementation.  Special management often provides for consultation and coordination with identified groups and/or experts having interest or expertise in the affected values.

BLM_0005390

.2

1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

.2  Analysis and Designation Procedures.  Designation of ACEC's are only done through the resource management planning process, either in the resource management plan itself or in a plan amendment.  Procedural guidance on the nine resource management planning actions is set forth in BLM Manual Section 1616.  Specific guidance on the identification, evaluation, and designation of ACEC's in resource management planning is described below:

.21  Identifying Potential ACEC's.  All areas which meet the relevance and importance criteria must be identified as potential ACEC's and fully considered for designation and management in resource management planning. Potential ACEC's are identified as early as possible in the planning process. However, new information or evidence about the relevance and importance of resources or hazards may be submitted by the public or identified by the BLM at any time.

A.  Compile A List of Areas To Be Considered.  Areas to be considered in the identification of potential ACEC's include:

1.  Existing ACEC's.  Existing ACEC's are subject to reconsideration when plans are revised.  Other existing designations must be reviewed, consistent with the standards of .53, to identify those which meet the relevance and importance criteria.

2.  Areas recommended for ACEC consideration.

a.  External nominations.  Members of the public or other agencies may nominate (i.e., recommend) an area for consideration as a potential ACEC. Such nomination/recommendation should be submitted early in the process, preferably during issue identification (BLM Manual Section 1616.1) and in comments on issues identified in the notice of intent (NOI), although they be submitted at any time.  There are no formal or special procedures associated with nominations/recommendations submitted by the public or other agencies, i.e., there are no forms or other submission requirements for identifying potential ACEC's.  (See .41 below.)

b.  Internal nominations.  The BLM personnel are encouraged to recommend areas for consideration as a potential ACEC which appear to meet the relevance and importance criteria.

3.  Areas identified through inventory and monitoring.  An area may be identified for consideration as an ACEC at any time if, as a result of inventory and data gathering, there is evidence the area may meet the relevance and importance criteria (BLM Manual Section 1616.3).

4.  Adjacent designations of other Federal and State agencies. Public lands adjacent to designations of other Federal and State agencies must be reviewed to determine if the special values upon which the adjacent designation was based extend into the planning area and meet the relevance and importance criteria.

.21B

# 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

B.  Obtain Information and Data on Relevance and Importance.
Information on relevance and importance will usually be obtained from
inventory and data collection and in comments received in response to the NOI
and the proposed planning criteria (BLM Manual Section 1616.1, 1616.2 and
1616.3).  Information on relevance and importance is actively sought during
planning to aid the evaluation of potential ACEC areas.

1.  Evidence of relevance and importance may be derived from non-BLM
sources or from the judgement of specialists qualified by knowledge, training
or experience to comment on the area or resource in question.  Evidence of
more-than-local significance of resource values or conditions include, but is
not limited to, written comments and expert opinions from officials
representing regional or national interests or inclusion of an area on an
official State, regional, national or international listing.

2.  Non-BLM sources of information include, but are not limited to,
other Federal agencies; State or local governments; international
organizations or programs; State historic or natural heritage programs;
universities and other research institutions; conservation organizations; and
public interest groups.  Information about resources on adjacent non public
lands may also be needed for evaluating the relevance and importance of
resource values or hazards on public lands.

C.  Evaluate Each Resource or Hazard to Determine if it Meets Both the
Relevance and Importance Criteria.  This initial evaluation is accomplished by
an interdisciplinary team as part of the analysis of the management situation
during the resource management planning process (BLM Manual Section 1616.4).
The Area Manager, with District Manager concurrence, approves the relevance
and importance evaluations.  An area meeting the criteria is identified as a
potential ACEC appropriate for further evaluation in the RMP process and
perhaps temporary management.  Normally, the relevance and importance of
resource or hazards associated with an existing ACEC are reevaluated only when
new information or changed circumstances or the results of monitoring
establish the need.

D.  Areas Dropped From Further Consideration For ACEC Designation.  When
an area is found not to meet the relevance and importance criteria, the
analysis supporting that conclusion must be incorporated into the plan and
associated environmental document.  The management prescriptions which are
eventually established in the plan for such areas shall reflect consideration
of the identified values.  The public may comment on the management
prescriptions for areas dropped from further consideration when the draft RMP
or plan amendment is released for review and comment (1613.23B.1).  If an area
is being evaluated as a result of a public nomination and it is determined
that the area should not be considered further, the nominator should be
notified that the area does not meet the required criteria.

BLM_0005392

.21E

### 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

E. __Provide Temporary Management of Potential ACEC, if Necessary__. If an area is identified for consideration as an ACEC and a planning effort is not underway or imminent, the District Manager or Area Manager must make a preliminary evaluation on a timely basis to determine if the relevance and importance criteria are met. If so, the District Manager must initiate either a plan amendment to further evaluate the potential ACEC or provide temporary management until an evaluation is completed through resource management planning. Temporary management includes those reasonable measures necessary to protect human life and safety or significant resource values from degradation until the area is fully evaluated through the resource management planning process.

.22  __Develop Management Prescriptions for Potential ACEC's__. Management prescriptions must be developed for all potential ACEC's. At least one prescription for each potential ACEC must be developed which provides special management attention.

A.  __Identify Factors Which Influence Management Prescriptions__. These factors will vary based on the planning issues and resources in the planning area. They are primarily identified and evaluated during the analysis of the management situation (BLM Manual Section 1616.4). These factors are important in the development of management prescriptions for potential ACEC's. Factors to consider include, but are not limited to, the following:

1.  Conditions or trends of the potential ACEC. What is the current condition of the resource(s) or hazard involved? What is the trend in its condition? Can degradation be stopped? Is it reversible? What is the capability of the resource or hazard in terms of the level and type of use it can sustain without risk or threat?

2.  Relationship to other resources or activities. What measures can be taken to reduce the adverse effects of other resource uses on the potential ACEC? Are resource uses contributing to the degradation of or threatening the existence of the important and relevant values? What land and resource uses would be compatible and under what conditions should they be conducted or permitted in order to protect the relevant and important values? What uses or actions would not be compatible with protection of the identified values even when conditioned? Considering the objectives of the RMP alternative, do the values of other resources outweigh the need for protection of the important and relevant values?

3.  Opportunities for protection and/or restoration of potential ACEC values. What measures can be taken to protect the potential ACEC value(s) without restricting other resource uses? Is it feasible to protect the resource value(s) or reduce or minimize threats from hazards?

Rel. 1-1541
9/29/88

BLM_0005393

.22A4

## 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

4. Wisdom of highlighting the resource. Is it wise to highlight the potential ACEC? Will highlighting achieve some management objective or enhance the area's value? Or will increased public awareness of the area accelerate its degradation?

5. Boundary Review. The boundary of a prospective ACEC is closely reviewed. This review examines surrounding or adjacent public lands and considers likely management requirements and their feasibility. Appropriate adjustments are identified. When a prospective ACEC is located in close proximity to another prospective ACEC, consideration is given to consolidation during boundary review. In some situations, a combination of different kinds of prospective ACEC values may add to the importance of the area as a whole and influence boundary locations.

6. Relationship to non-BLM designations. Is the potential ACEC included in an area recommended for designation (or already designated), e.g., a Wild and Scenic River? Will (or does) management under the other designation afford sufficient protection of potential ACEC values?

7. Opportunities for management by another agency. Are there, in terms of the public interest, any other public agencies or private organizations that could manage the resource value(s) associated with the potential ACEC more effectively than the BLM? Is it appropriate to consider the transfer of the potential ACEC to a another Federal, State or local agency?

8. Relationship to existing rights. What is the status of existing mining claims or pre-FLPMA leases? How will existing rights affect management of the resource or hazard?

B. Incorporate Management Prescriptions for Potential ACEC into Appropriate Alternatives. During the formulation of alternatives, management prescriptions for potential ACEC's are fully developed (BLM Manual Section 1616.5). Management prescriptions will generally vary across the plan alternatives. If there is no controversy or issue raised regarding the management of a potential ACEC, it may not be necessary to develop a range of management alternatives. In other words, the management prescription may not vary significantly across alternatives. A potential ACEC (or portion thereof) must be shown as recommended for designation in any or all alternatives in the draft RMP in which special management attention is prescribed to protect the resource or to minimize hazard to human life and safety. Because special management attention must be prescribed in at least one plan alternative, each potential ACEC will appear as a recommended ACEC in at least one plan alternative. When the designation and special management provisions of an existing ACEC are compatible without change in all alternatives, the procedures set forth in Manual Section 1618.22 Restatement of Decisions must be followed. If, however, there are issues associated with the management of the potential ACEC, the alternatives analyzed in detail shall reflect a reasonable range of management prescriptions for the potential ACEC. Management prescriptions may vary in a number of ways:

BLM_0005394

.22B1

1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

1.  Degree or intensity of management attention.  The management prescription for a potential ACEC may vary across the alternatives from no special management attention to intensive special management attention. Variations in management measures may reflect different mixes of allowable uses in or adjacent to the potential ACEC or constraints on uses. Situations in which no special management attention would be prescribed (and therefore no designation) include those in which the allowable uses being prescribed for the vicinity could not result in harmful effects to the important and relevant resource values and those in which the alternative would necessitate the sacrifice of the potential ACEC values to achieve other purposes.

2.  Size of area to receive special management attention.  In some cases, boundaries may be varied to provide more or less protection of the resource or to accommodate different management prescriptions.  The size of a proposed ACEC shall be as necessary to protect life and safety or the important and relevant values within the context of the set of management prescriptions for public lands in the vicinity which would be established by each RMP alternative.

3.  Term of special management attention.  Usually, ACEC's are designated for the life of the RMP.  However, it may be appropriate for the ACEC to be established for a shorter period of time.  Such a short-term ACEC would be appropriate when conditions and circumstances justifying the special management are expected to be temporary.  In such instances, the management prescription for the ACEC must contain a clear description of the conditions under which the ACEC designation will expire and the change in management prescriptions which will apply.  No subsequent public notice of the expiration is required if the original public notice adequately described the term and nature of conditions.

C.  Analyzing Effects of the Prescriptions.  Designation of an ACEC will not produce effects which can be analyzed.  However, the management prescription for the ACEC (i.e. the special management attention) will result in effects.  Experience has shown that controversy over proposed ACEC designation is often based on differing perceptions of the anticipated effects of that designation.  Therefore, the likelihood of controversy can be reduced by conducting a thorough and well-documented estimation of effects analysis.

.23  Designating ACEC's.  Designation is based on whether or not a potential ACEC requires special management attention in the selected plan alternative.

A.  Select Preferred Alternative.  After completing the analysis of the effects of each alternative (BLM Manual Section 1616.6), the manager selects the preferred plan alternative which best meets the planning criteria and the guidance applicable to the area (BLM Manual Section 1616.7).  The preferred alternative reflects the BLM's proposals for designation and management of ACEC's.

Rel. 1-1541
9/29/88

BLM_0005395

.23B

# 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

B.  Review Public Comments on Proposed ACEC Designations and Management Prescriptions.  Public review of ACEC designations and management prescriptions must be accomplished in accordance with BLM Manual Section 1616.7 and 1616.8 and 43 CFR 1610.7-2.  Public notice requirements for RMP's and plan amendments involving potential or proposed ACEC's are set forth at .33 below.  The public may comment on any aspect of the ACEC analysis including the relevance and importance evaluation, the projected need for special management attention, and the analysis of impacts of allowable resource uses on the values of proposed ACEC's as well as the impact of ACEC management prescriptions or limitations on other resource uses.  The BLM reviews public comments and makes changes as necessary.  The BLM then notifies the public of the availability of the proposed RMP or plan amendment and the environmental analysis associated with each.

C.  Approve ACEC Designation.  Approval, by the State Director, of the proposed plan or plan amendment officially designates ACEC's (43 CFR 1610.7-2).

BLM_0005396

.3

# 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

.3 Public Notice and ACEC Documentation Standards.

.31 Notice of Intent. Guidelines on the general notice required at the outset of the planning process inviting public participation are set forth in BLM Manual Section 1614.3. Areas identified during preplanning for consideration as an ACEC, if any, must be described in the NOI. Any anticipated issues related to the consideration of ACEC's should be described too. Existing ACEC's and related designations, particularly if they are associated with any preliminary issues, shall also be identified in the NOI so that the public has an opportunity to participate in their reevaluation. The NOI should invite the public to nominate or recommend areas for ACEC consideration.

.32 Special Notice Requirement for Plans Involving ACEC's. The planning regulations require special notice in the Federal Register for RMP's or plan amendments involving proposed ACEC's (43 CFR 1610.7-2). The notice must provide for at least a 60-day public comment period. The notice must describe proposed ACEC's included in the BLM's preferred alternative and specify resource use limitations, if any which would occur. The notice should also identify potential ACEC's (those areas which satisfy the relevance and importance criteria) which are not proposed for ACEC designation in the preferred alternative. For RMP's and EIS level plan amendments, the notice is issued by the BLM when the draft RMP or plan amendment is published and the associated EIS is filed with the Environmental Protection Agency (EPA) and made available for public comment. The ACEC notice requirements should be incorporated in a notice of availability when the BLM elects to publish its own notice. For environmental assessment level plan amendments, the notice is published sufficiently early enough to afford the public timely notice and opportunity for meaningful input and involvement in the analysis and evaluation.

.33 RMP or Plan Amendment. Proposed ACEC's and their associated management prescriptions must be identified and fully described in proposed RMP's and plan amendments released for public review. Management activities associated with an ACEC are usually described in greater detail than resource management activities not associated with an ACEC. General guidance on the display and presentation of planning determinations as multiple use prescriptions and plan elements are set forth in BLM Manual Section 1602.23. For each proposed ACEC, the plan or plan amendment shall contain:

BLM_0005397

.33A

# 1613 – AREAS OF CRITICAL ENVIRONMENTAL CONCERN

A.  <u>Name, Location, and Size of ACEC</u>.  ACEC's should be given a name. The name given an ACEC is usually based on the resource or value determined to warrant special management or on a particular physical feature of an area.  In order to provide more specific management guidance and/or to retain the relationship with Federal or State heritage programs, existing names or titles should be incorporated into the name of the ACEC, i.e., the terms research natural area, outstanding natural area, natural hazard area, or other formal or established titles should normally be a part of the ACEC name.  This will provide consistency and enhance recognition and understanding by the public (e.g., Salmon Spawning Research Natural Area ACEC, Palomino Landslide ACEC, Grand Mesa National Natural Landmark ACEC).  The RMP or plan amendment must describe the proposed boundaries of the ACEC including the total acreage for each alternative studied in detail.  The boundaries of each ACEC should be delineated as clearly as possible on a map included in the plan.

B.  <u>Description of the Value, Resource, System, or Hazard</u>.  The value, resource, system, or hazard which warrants special management attention under the ACEC provisions must be described.  This description should clearly indicate why the area is considered relevant and important.

C.  <u>Provision for Special Management Attention</u>.  Management activities and anticipated future uses considered compatible with the purposes of an ACEC designation, and those considered incompatible, must be described as part of the multiple use prescription developed for each alternative studied in detail (BLM Manual Section 1602.23A).  Key planning and management information unique to the ACEC, including proposed special management terms and conditions, must be described as an ACEC element in the plan (draft or proposed) whenever an ACEC is proposed for designation (BLM Manual Section 1602.23B).  "Special" actions which must be taken after approval of the RMP must be described, such as acquiring inholding and access, setting up an interpretive center, withdrawing an area from mineral entry, establishing special stipulations to be attached to authorizing actions, or conducting more detailed activity planning.  Given the level of public interest in specific ACEC's, it may be desirable to prepare a brochure for each ACEC, based on the plan element, which contains the following information:  description of the ACEC including values; location map; summary of the applicable RMP provisions; summary of measures to be initiated by the BLM with estimated costs and priority of implementation; other measures to be carried out; and the standards and intervals for monitoring in accordance with the provisions of 43 CFR 1610.4-9.

D.  <u>Relation to Wilderness Study Areas</u>.  ACEC's may be designated within wilderness areas.  ACEC designation shall not to be used as a substitute for a wilderness suitability recommendation.  If an ACEC is proposed within or adjacent to a Wilderness Study Area (WSA), the RMP or plan amendment shall provide a clear description of the relationship of the ACEC to the recommendations being made for the WSA.  The relationship shall be described to the level of detail required to avoid misunderstanding or misinterpretation by the public.

Rel. 1-1541
9/29/88

BLM_0005398

.33E

## 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

E.  Rationale for Designating or Not Designating.  The rationale for ACEC designations in the preferred alternative must be discussed.  The rationale for not proposing designation of a potential ACEC in the preferred alternative must also be provided.  In other words, if the proposed plan does not call for special management attention of a potential ACEC in the preferred alternative (and therefore, it is not proposed for designation), the reasons for the decision not to provide special management attention must be clearly set forth.  The reasons may include:

1.  Special management attention is not required to protect the potential ACEC because standard or routine management prescriptions are sufficient to protect the resource or value from risks or threats of damage/degradation.  (That is, the same management prescriptions would have been provided for the area in the absence of the important and relevant values.)

2.  The area is being proposed for designation under another statutory authority, e.g., Wilderness, and requires no management attention differing from that afforded the entire designation.

3.  The manager has concluded that no special management attention is justified either because exposure to risks of damage or threats to safety is greater if the area is designated or there are no reasonable special management actions which can be taken to protect the resource from irreparable damage or to restore it to a viable condition.

F.  Areas Dropped From Consideration For ACEC Designation.  Areas which were nominated or recommended for consideration as an ACEC but which did not qualify as relevant and important must be identified and the rationale for not considering them described (1613.21D.).

BLM_0005399

BLM_0005400

.4

1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

.4  Opportunities for Public Involvement.  Public involvement is important in the identification, evaluation, and designation of an ACEC.  The following guidance highlights some of the opportunities for public involvement.

.41  Nomination of Potential ACEC's.  The public has an opportunity to submit nominations or recommendations for areas to be considered for ACEC designation.  Such recommendations are actively solicited at the beginning of a planning effort.  However, nominations may be made at any time and must receive a preliminary evaluation to determine if they meet the relevance and importance criteria and, therefore, warrant further consideration in the planning process.  The public should be advised that nominations should be accompanied by descriptive materials, maps, and evidence of the relevance and importance of the resources or hazards in order to facilitate a timely evaluation.

.42  Comment on Analysis of Potential ACEC's.  The public has an opportunity to comment on BLM's assessment of relevance and importance criteria as well as alternative management prescriptions for ACEC's (and supporting analyses) when the draft RMP or plan amendment is made available for public review.  The public may also comment on areas the BLM has determined do not meet the criteria.  The public should be encouraged to focus their comments on the proposed management of the area rather than on whether or not the area is proposed for designation.

.43  Protest of Proposed ACEC Designations.  The public has an opportunity to protest ACEC designations and management prescriptions identified in a proposed RMP or plan amendment.  (See protest procedures set forth in BLM Manual Section 1617.2.)

BLM_0005401

BLM_0005402

.5

## 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

.5  Relationship of ACEC's to Other Designations.  The ACEC designation is the principal BLM designation for public lands "where special management is required to protect important natural, cultural, and scenic resources and to identify natural hazards."  The relationship between ACEC's and the wide range of other public land designations is described below:

.51  Congressional Designations.  Congress has reserved the right to approve additions to the National Wilderness System, National Historic/Scenic Trails System, and National Wild and Scenic Rivers System and to congressionally designate public land areas as National Recreation Areas and National Conservation Areas.  A potential ACEC may be contained within or overlap one of the above designations provided that the ACEC designation is necessary to protect a resource or value.  For example, there are numerous ACEC's within the statutorily-designated California Desert Conservation Area. If, however, the management attention provided under the Congressional designation is adequate to protect a resource or value, it is not necessary or appropriate to designate it as an ACEC.

.52  Secretarial Designations Made By Other Agencies.  The Secretary of the Interior is statutorily authorized to designate areas administered by other Interior agencies.  Examples include Critical Habitat Areas (Fish and Wildlife Service), National Historic/Natural Landmarks (National Park Service), National Scenic Areas (National Park Service), and Man-and-the-Biosphere Reserves (National Park Service).  One or more of these designations may have already been made within the planning area prior to initiation of the resource management planning process.  Recommendation for such designations may also result from the planning process.  A potential ACEC may be contained within or overlap one of the above designations provided that the ACEC designation is necessary to protect the resource or value.  In such an event, close coordination with the other agency should be accomplished during preparation of the RMP.  If, however, the management attention provided under another agency's designation is adequate to protect the resource or value, it is not necessary or appropriate to designate it as an ACEC.

.53  Other BLM Designations And Management Areas.

A.  Existing BLM Special Area Designations.  Areas previously designated by the BLM under 43 CFR Parts 2070, 8223, and 8352, and authorities other than FLPMA must be reviewed in subsequent RMP's or plan amendments using the procedures identified in this Manual Section.  Designations made under previous or archaic regulations and/or expired authorities will remain in effect until they are reviewed during scheduled resource management planning. If such areas are then determined to warrant designation as ACEC's, they should be renamed in accordance with Section 1613.33A.

BLM_0005403

.53B

## 1613 – AREAS OF CRITICAL ENVIRONMENTAL CONCERN

B. <u>Other Management Areas</u>.  The general planning authority of the FLPMA (Section 202) and other specific authorities are the basis of land use allocations which result in the identification of areas for specific purposes. Examples include special recreation management areas, right-of-way corridors, areas recommended suitable/unsuitable for wilderness designation,, grazing allotment categories, wild horse herd management areas, off-road vehicle designations, areas designated unsuitable for all or certain types of surface coal mining, and many other determinations set forth in the supplemental program guidance for resource management planning.  (See Manual Sections 1620–1623.)  These areas or types of land use allocations should not be confused as designation under the ACEC concept.  They may, however, be incorporated into an ACEC or vice versa.

C. <u>Special Management Areas Avoided</u>.  Use of the terms "special area" or "special management area" are to be avoided.  These terms are relative and have little useful meaning.  This is required to avoid ambiguities and to provide an appropriate context to BLM designation of areas requiring special management attention, consistent with designation authority under the FLPMA and the planning regulations (43 CFR 1610.7).  The ACEC procedures set forth in this guidance must be used as a basis for future designations of ONA's, RNA's, NHA's, and other areas requiring special management attention in the sense used in the ACEC provisions of FLPMA.  (Note:  Supplemental program guidance for resource management planning provides for the designation of ONA's, RNA's, and NHA's as ACEC's.).

BLM_0005404

.6

1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

.6 <u>Monitoring and Management of ACEC's</u>.  The FLPMA requires the BLM to give priority to the designation and protection of ACEC's.  Protection is afforded by implementing management prescriptions set forth in the approved RMP or plan amendment.  Followup monitoring is also essential for ensuring the protection of ACEC values and resources.  General guidance on implementing resource management plans or amendments is set forth in Manual Section 1617.3.  General guidance on monitoring is set forth in Manual Section 1616.9.  Given the FLPMA mandate that the BLM give priority to the designation and protection of ACEC's, implementation and monitoring of ACEC's is also subject to the following requirements and guidelines.

.61 <u>ACEC Implementation Schedules</u>.  An implementation schedule must be prepared for each ACEC.  Such schedules shall identify the priority, sequence, and costs of implementing activities associated with protection of the ACEC resources or values, including monitoring activities.  The schedule may be incorporated into other documents such as an implementation schedule for the entire resource management plan.  However, activities associated with the protection of ACEC resources or values must be clearly identified.  The ACEC implementation schedule shall be maintained and used as a basis for tracking and reporting on ACEC implementation.

.62 <u>ACEC Activity Plans</u>.  Site-specific and more detailed activity plans for ACEC's may be prepared where circumstances warrant.  However, activity plans for ACEC's are not required.  The specific RMP requirement to describe in the plan the general management practices, allowable uses and constraints, including mitigation measures identified to protect the designated ACEC, often negate the need for activity planning.  Generally the RMP or plan amendment will identify activity planning needs, if any, in the discussion of the ACEC management prescription.  The preparation of such plans is guided by applicable resource program requirements in conformance with management prescriptions of the plan.  The resource value(s) associated with the ACEC determines what activity plan guidance applies.  If multiple program activities are involved in a particular ACEC, a coordinated or combined activity plan would be prepared (see Manual Section 1619).

Rel. 1-1541
9/29/88

BLM_0005405

.63

# 1613 - AREAS OF CRITICAL ENVIRONMENTAL CONCERN

.63  **ACEC Monitoring.**  ACEC monitoring is part of the monitoring provisions in the RMP.  The BLM's planning regulations prescribe that the RMP shall establish intervals and standards for monitoring.  The intervals and standards are to be based on the sensitivity of the resources.  In the case of ACEC's, the resources are assumed to be sensitive.  Therefore, careful monitoring is critical--not only to ensure that protection of the identified resource values occurs, but also to keep the managing official aware of how well the RMP provisions are accomplishing their objectives.  By so doing, the need, if any, for modification to the RMP will be identified early so that the protection is accomplished and unnecessary measures are not applied.  In the case of the ACEC's, it is particularly important that the monitoring measures be systematic and structured so that the managing official is informed on a timely basis of any significant changes in the related plans of other Federal agencies, State or local governments, or Indian tribes.  In accordance with 40 CFR 1505.3 (d), the managing official shall, upon request, make available to the public the results of monitoring.

.64  **Conformance Determinations and NEPA Compliance.**  All actions to be conducted or authorized by a BLM official must be in conformance with the provisions of the RMP as defined in 43 CFR 1601.0-5(b).  Whenever an ACEC may be affected by the implementation of an authorized or permitted activity, the decision instrument authorizing the specific action must include a description of the special management measures to be applied.  An environmental analysis for a proposed action which might affect an ACEC must identify impacts, if any, on the ACEC and must incorporate by reference the pertinent portions of the EIS prepared for the RMP.

.65  **Annual Status Report on ACEC's.**  Annually the State Director is required to report to the Director (760) on progress in implementing and monitoring ACEC's in order to track accomplishments in managing ACEC's and to provide an available base of information for responding to Congressional and other inquiries.  The report will cover management measures undertaken and completed during the previous fiscal year as well as proposed management measures to be initiated in the next fiscal year.  The report, to be provided to the Director (760) by October 15 of each year, must include, as a minimum, the following information for each ACEC:  name of the ACEC; size (in hectares and acres); date of designation; identification of applicable land use plan; relevant and important values being protected; implementation actions accomplished during the previous fiscal year; whether or not an activity plan is deemed necessary and, if so, whether or not it has been prepared; and, scheduled implementation measures for the ensuing fiscal year.  The report should utilize a tabular format to the extent possible and be organized by District and Resource Area.  Its timely submission is critical.

Rel. 1-1541
9/29/88

BLM_0005406

**July 1989**



**UNCOMPAHGRE BASIN**
**Resource Management Plan**
**and Record of Decision**

U.S. Department of the Interior
Bureau of Land Management
Montrose District, Colorado
Uncompahgre Basin Resource Area

BLM_0005407

# RECORD OF DECISION

# UNCOMPAHGRE BASIN
# RESOURCE MANAGEMENT PLAN

**U. S. Department of the Interior**
**Bureau of Land Management**
**Montrose District**
**Uncompahgre Basin Resource Area**

BLM_0005408

# RECORD OF DECISION

## UNCOMPAHGRE BASIN
## RESOURCE MANAGEMENT PLAN

This document records the decisions reached by the Bureau of Land Management (BLM) for managing 483,077 surface acres of public land and 755,923 acres (including those beneath the surface acres) of federal mineral estate within the approximately 1.38 million acre Uncompahgre Basin Planning Area.

## DECISION

The Uncompahgre Basin Resource Management Plan (RMP) as described in Chapter Two of the attached RMP is approved. The plan was prepared under the regulations for implementing the Federal Land Policy and Management Act (FLPMA) of 1976 (43 CFR 1600). An environmental impact statement was prepared for this plan in compliance with the National Environmental Policy Act (NEPA) of 1969. The plan described in Chapter Two of the attached RMP reflects the proposed plan as set forth in the proposed plan and associated final environmental impact statement published in September 1988.

## ALTERNATIVES CONSIDERED

Four alternatives for managing the resources within the planning area were considered in the development of the plan. These were identified as the Continuation of Current Management Alternative, the Production Alternative, the Conservation Alternative, and the Preferred Alternative. Each alternative was described and analyzed in the draft RMP/EIS and proposed RMP/final environmental impact statement.

The Continuation of Current Management Alternative maintained present management direction utilizing existing Management Framework Plan decisions. This alternative was the No Action Alternative required by the National Environmental Policy Act.

The Production Alternative was designed to continue multiple-use management of the public lands with the objective of promoting the development, production, and transportation of those resources which provide minerals, food, timber and fiber.

The Conservation Alternative was designed to continue multiple-use management of the public lands with the objective of promoting conservation and protection of resources such as wilderness, cultural sites, wildlife habitats, watersheds, and recreation areas.

The Preferred Alternative was developed based on an analysis of the other three alternatives. It was modified as a result of public input and became the Proposed Plan accompanied by the final environmental impact statement. The Proposed Plan (Preferred Alternative) is the environmentally preferable alternative. No protests were received on this proposed plan/Final EIS and it has been selected as the Uncompahgre Basin Resource Management Plan. This alternative (as well as the other alternatives) proposes areas for special designations. The

iii

BLM_0005409

final decision, as described in Chapter Two of the attached RMP, selects four areas for special designation. These areas are the Escalante Canyon ACEC (Management Unit 12) 1895 acres; the Fairview RNA/ACEC (Management Unit 13) 377 acres, the Needle Rock ONA/ACEC.

(Mangement Unit 14) 80 acres and the Adobe Badlands ONA/ACEC (Management Unit 15) 6783 acres.

## MITIGATION

The RMP has been designed to avoid or minimize adverse environmental effects to the extent possible. Specific mitigation measures are described by management unit in Chapter Two of the attached RMP.

## MONITORING

A monitoring program which includes two levels of monitoring has been developed for the RMP. The first level of monitoring is designed to track the implementation of the plan and is outlined in Chapter One of the RMP. The second level of monitoring is designed to assure that the desired results of the plan are being achieved and to identify needed management changes if they are not. This second level is described in Chapter Three of the attached plan by resource.

## PUBLIC INVOLVEMENT

The views of the public have been sought throughout the planning and decision-making process. Public participation is summarized in Chapter One of the RMP.

## CONSISTENCY

The plan is consistent with plans and policies of state and local governments, of other federal agencies, and of the Department of the Interior.

## AVAILABILITY OF THE PLAN

Copies of the Uncompahgre Basin Resource Management Plan are available from the Area Manager, Bureau of Land Management, Uncompahgre Basin Resource Area, 2505 South Townsend Avenue, Montrose, Colorado 81401, telephone (303) 249-7791. Copies may also be obtained from the BLM Montrose District Office, 2465 S. Townsend Avenue, Montrose, Colorado 81401 or from the BLM Colorado State Office, 2850 Youngfield Street, Lakewood, Colorado 80215.

July 26, 1989
Date

Colorado State Director
Bureau of Land Management

iv

BLM_0005410

# UNCOMPAHGRE BASIN

# RESOURCE MANAGEMENT PLAN

Prepared by

**U. S. Department of the Interior**
**Bureau of Land Management**
**Colorado State Office**
**Montrose District**
**Uncompahgre Basin Resource Area**

Colorado State Director
Bureau of Land Management

**July 26, 1989**

Date

BLM_0005411

# TABLE OF CONTENTS

**CHAPTER ONE - INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Purpose and need . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Relationship to other BLM Planning Levels . . . . . . . . . . . . . . . . . . . . . . . . 1
    Setting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Implementation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Monitoring . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Amendments and Revisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Valid Existing Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Public Involvement and Intergovernmental/Interagency Coordination . . . 5
    Planning Issues and Associated Resource Decisions . . . . . . . . . . . . . . . . 7

**CHAPTER TWO - UNCOMPAHGRE BASIN RESOURCE**
      **MANAGEMENT DECISIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    Assumptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Standard Management Direction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    Disposal of Public Lands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Management Unit 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    Management Unit 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Management Unit 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    Management Unit 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    Management Unit 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Management Unit 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    Management Unit 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    Management Unit 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Management Unit 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Management Unit 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    Management Unit 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    Management Unit 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Management Unit 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Management Unit 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    Management Unit 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    Management Unit 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

BLM_0005412

## CHAPTER THREE.- SUMMARY OF MANAGEMENT DECISIONS.
### BY RESOURCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Lands Program** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Air Quality** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Mineral Resources** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**Soil and Water Resources** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Riparian/Aquatic Systems** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Threatened and Endangered Species** . . . . . . . . . . . . . . . . . . . . . . . . 34
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**Wildlife Habitat** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
    Implementation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**Livestock Grazing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

**Forestry** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**Recreation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

BLM_0005413

**Off-Road Vehicle Management** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Cultural Resources** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Paleontological Resources** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Visual Resources** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**Wilderness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**Fire** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Implementation Priority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

APPENDIX A - Stipulations for Oil and Gas Leases . . . . . . . . . . . . . . . . 43

APPENDIX B - Coal Planning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

APPENDIX C - Off-Road Vehicle Management . . . . . . . . . . . . . . . . . . . . 49

APPENDIX D - Fire Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

APPENDIX E - Special Designations . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

BLM_0005414

**MAP LIST**

Resource Management Plan

BLM_0005415

# CHAPTER ONE

# INTRODUCTION

This Resource Management Plan (RMP) contains the land use decisions, terms, and conditions for guiding future management actions within the Uncompahgre Basin Planning Area. All uses and activities within this area shall conform to the decisions, terms, and conditions, described in this plan.

The RMP describes implementation priorities by resource as well as monitoring which will track plan implementation and effectiveness. The RMP also outlines the modification process should changes to present decisions be needed.

In addition to this RMP, a final wilderness environmental impact statement (EIS) and wilderness study report (WSR) are being prepared. The final EIS and WSR will be submitted to Congress for legislative action.

## PURPOSE AND NEED

The primary purpose of the RMP is to update and integrate the BLM's land use planning for the area into a single, comprehensive land use plan providing the overall framework for managing and allocating public land resources in the Uncompahgre Basin planning area over the next ten to twelve years.

In addition to identifying management direction within the planning area, the RMP meets several specific objectives. It (1) identifies federal coal lands that are acceptable for further leasing consideration, acceptable for further leasing consideration with stipulations, or unacceptable for leasing; (2) analyzes the suitability of three Wilderness Study Areas (WSAs) for inclusion into the National Wilderness Preservation System (NWPS); and (3) identifies public land to be designated as open, closed, or limited to off-road vehicle use.

## RELATIONSHIP TO OTHER BLM PLANNING LEVELS

Development of a RMP occurs within the framework of the BLM planning system. The planning system is subdivided into three distinct tiers for operational purposes: policy planning, land use planning, and activities or program-specific planning. The Council on Environmental Quality regulations provided for tiering to aid compliance with the National Environmental Policy Act (40 CFR 1500-1508). This plan satisfies the requirements for the land-use tier of planning.

## SETTING

The Uncompahgre Basin planning area is a geographic division of the Uncompahgre Basin Resource Area (UBRA) of the BLM's Montrose District. The planning area is located in west-central Colorado in portions of Delta, Gunnison, Mesa, Montrose, and Ouray counties (See Figure 1-1). It is bordered in part by the Grand Mesa, Uncompahgre, and Gunnison National Forests. Figure 1-2 depicts the planning area boundaries.

The planning area encompasses approximately 1.38 million acres. The BLM has administrative responsibility for the public lands and resources on 483,077 surface acres and 755,923 acres of subsurface federal mineral estate. Table 1 details surface and subsurface ownership within the planning area by county.

1

**Chapter One**

# COLORADO



Planning Area

**Figure 1-1**

2

# UNCOMPAHGRE BASIN
# PLANNING AREA



Adobe Badlands WSA

Gunnison Gorge WSA

Camel Back WSA

Wilderness Study Areas

Figure 1-2

N

0   5   10   20 MILES

3

BLM_0005418

## Table 1
## OWNERSHIP STATUS IN THE PLANNING AREA
## IN ACRES OF SURFACE AND SUBSURFACE ESTATE

| | COUNTY | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | DELTA | GUNNISON | MESA | MONTROSE | OURAY | TOTAL |
| **1. SURFACE ESTATE** | | | | | | |
| FEDERAL LAND[1] | | | | | | |
| BLM | 181,187 | 13,515 | 14,190 | 248,750 | 25,435 | 483,077 |
| USFS | - | 140 | - | - | - | 140 |
| NPS | - | - | - | 12,990 | - | 12,990 |
| STATE LAND[2] | | | | | | |
| DOW | 4,332 | - | - | 3,338 | 4,547 | 12,217 |
| OTHER | - | - | - | - | 680 | 680 |
| PRIVATE LAND | 326,207 | 55,512 | 1,912 | 326,282 | 163,615 | 873,528 |
| TOTAL SURFACE ACRES | 511,726 | 69,167 | 16,102 | 591,360 | 194,277 | 1,382,632 |
| **2. SUBSURFACE ESTATE[3]** | | | | | | |
| FEDERAL ESTATE | | | | | | |
| ALL MINERALS | 247,712 | 42,742 | 14,255 | 337,447 | 45,972 | 688,128 |
| COAL | 16,080 | 11,432 | - | 16,495 | 4,852 | 48,859 |
| OIL, GAS, AND COAL | 3,060 | 1,422 | - | 1,270 | 2,200 | 7,952 |
| OIL AND GAS | 4,370 | - | - | 4,002 | 2,282 | 10,654 |
| 3/4 FEDERAL MINERALS | 130 | - | - | 200 | - | 330 |
| TOTAL ACRES OF FEDERAL SUBSURFACE | 271,352 | 55,596 | 14,255 | 359,414 | 55,306 | 755,923 |

[1] BLM = Bureau of Land Management; USFS = U.S. Forest Service; NPS = National Park Service

[2] DOW = Colorado Division of Wildlife

[3] The BLM administers subsurface federal estate underlying private, state, and other federal lands.

BLM_0005419

## IMPLEMENTATION

Decisions in the RMP will be implemented over a period of years and must be tied to the BLM budgeting process. Therefore, priorities have been established for each resource to guide the order of implementation. The priorities for each program will be reviewed annually to help develop the annual work plan commitments for the coming year. The priorities may be revised based upon new administrative policy, new Departmental directives, or new Bureau goals. The priorities of implementation are presented, by resource, in Chapter Three.

## MONITORING

The RMP will be monitored to determine its implementation status and its effectiveness in meeting desired results. An annual status report, which summarizes implementation tasks completed and implementation problems encountered, will be prepared. The status report will also document plan maintenance items, adjustments and revisions which have been completed, and will be available upon request. Individual resources will be monitored as outlined in Chapter Three of this document.

## MAINTENANCE

The RMP will be maintained as necessary to reflect minor changes in data. Maintenance will be limited to refining or documenting a previously approved decision. It shall not expand the scope of resource uses or restrictions or change the terms, conditions, and decisions of the plan. Maintenance will be documented in the annual status report. Formal public involvement will not be necessary to maintain the RMP.

## AMENDMENTS AND REVISIONS

The RMP may be amended or revised if major changes are necessary. Monitoring and evaluation findings, new data, new or revised policy, or a proposed action resulting in a change in the scope, terms, or conditions of the plan, would warrant an amendment or revision. An amendment will be analyzed either in an environmental assessment or an environmental impact statement. The public and other agencies will be included in the amendment and revision processes.

## VALID EXISTING RIGHTS

The RMP does not repeal valid existing rights on public lands. Valid existing rights are those claims or rights to public land that take precedence over the actions in this plan. As an example, a mining claim located prior to the preparation of this plan in an area withdrawn from mineral entry through the plan may be valid. Valid existing rights may be held by other federal agencies or by private individuals or companies.

## PUBLIC INVOLVEMENT AND INTERGOVERNMENTAL/INTERAGENCY COORDINATION

Throughout the planning process, concerns and interests of all publics were addressed in a variety of public participation activities. The area manager, RMP team leader, and team members met with county commissioners, special interest groups, the Montrose BLM District Advisory Council (representatives who advise the District Manager on local public land issues), and other concerned citizens.

On July 28, 1983, a Notice of Intent was submitted to the Federal Register. This notice began the formal planning process. Invitations to participate in the planning process were sent to individuals, organizations, agencies, special interest groups, the media, business interests, academic institutions, and individuals. The general public was informed through news releases.

All publics were invited to attend a series of public scoping meetings held in August 1983 in Montrose, Delta, and Hotchkiss. The purpose of the meetings was to explain the objectives and

BLM_0005420

Chapter One                                                                                                Introduction

goals of the RMP and identify resource management issues. Issue statements and comments were accepted from the public by mail and at the scoping meetings. Land tenure adjustments, off-road vehicle use, and recreation, wilderness, and forestry issues received the most response.

The first RMP newsletter was published in March 1985 and mailed to about 700 addresses. A second newsletter was published and mailed in December 1985.

The public was invited to comment on three draft resource management alternatives (the Continuation of Current Management, Production, and Conservation alternatives) at a series of Open House Meetings held in Montrose, Delta, and Paonia in January 1986. Comments received were considered in finalizing these alternatives and in formulating the BLM's Preferred Alternative.

The draft RMP/EIS was filed with the Environmental Protection Agency in July of 1987.

Notice of availability of the draft and announcement of public hearings was published in the Federal Register on August 7, 1987; page 29445. The public was provided a 90-day comment period on the Draft RMP/EIS.

News releases also provided information concerning the Draft RMP/EIS and the public hearings which were held in Hotchkiss, Colorado, on September 22, 1987; in Lakewood, Colorado, On September 24, 1987; and in Montrose, Colorado, on September 29, 1987.

Fifty-one (51) persons testified at the public hearings. One hundred and seventy-three (173) persons, groups, or agencies submitted written comments. Both comments and responses were published in the Proposed RMP/Final EIS.

Notice of availability of the Proposed RMP/Final EIS was published in the Federal Register on October 7, 1988; page 39538. This notice announced a 30-day protest period. No protests were received.

BLM_0005421

**Introduction** Chapter One

## Planning Issues and Associated Resource Decisions
### (All other resource decisions are identified in Chapter 2)

| RESOURCE | PLANNING ISSUE | RESOURCE DECISION |
|---|---|---|
| LANDS | 1. Identify lands suitable for disposal or lands that should be retained in public ownership. | A total of 143 tracts of public land totalling 11,026 acres are identified for further consideration for disposal. The remaining 472,050 will be retained in public ownership. |
| | 2. Identify non-federal lands that would best serve public needs and interests if in public ownership. | If available, private lands may be acquired in Management Units 1, 2, 4, 7, 9, 11 (see page 29 for acquisition criteria) |
| COAL | 3. Identify those areas within the Paonia/Somerset and Bookcliffs coal areas which would be suitable for further leasing consideration. Determine areas where coal development could result in conflicts with water needs and/or water rights. Categorize lease areas with consideration for potential development problems and management conflicts. | 83,334 acres of Federal coal estate in the Paonia/Somerset Cimarron Ridge and Bookcliffs coal areas are identified as suitable for further coal leasing consideration. |
| WATER QUALITY (SALINITY) | 4. Identify major source areas contributing to the salinity problem in the Colorado River drainage. Determine uses that contribute salinity and develop measures to curtail the problem. | Public lands totalling 26,547 acres will be intensively managed to reduce salinity loads in the Colorado River drainage. |
| FORESTRY | 5. Identify those woodlands in the planning area which will be managed predominantly for either forage production or woodland products. | Commercial forest on 3,127 acres and suitable woodlands on 24,255 acres would be intensively managed for forest products. Seasonal restrictions would apply on 1,606 acres of commercial forest. |

BLM_0005422

**Chapter One**                                                                      Introduction

| RESOURCE | PLANNING ISSUE | RESOURCE DECISION |
|---|---|---|
| RECREATION | 6. Determine if development of the proposed Storm King Peak Ski areas would be compatible with wildlife habitat, timber production, and coal production. | The Storm King Peak area will be managed to enhance its use as an elk calving area. |
| OFF-ROAD VEHICLE USE | 7. Considering resource values and current recreation activities and use, delineate ORV areas within the planning area with open or closed or limited designation. Identify any restrictions to be applied in areas recommended for limited use. | A total of 224,276 acres is open to ORV use and 38,600 acres is closed to ORV use. Vehicle use on 56,974 acres is limited to designated roads and trails yearlong and another 163,227 acres has seasonal limited designations. |
| WILDERNESS | 8. Determine if any of the three WSAs, or portions thereof, should be recommended as suitable for inclusion in the National Wilderness Preservation System. Identify alternative management for those areas not recommended for wilderness designation. | Recommend the Gunnison Gorge WSA (21,038 acres) as suitable for wilderness designation. Recommend both the Camelback WSA (10,402 acres) and the Adobe Badlands WSA (10,425 acres) as non-suitable for wilderness designation.<br><br>Manage the Camelback area with emphasis on riparian/aquatic system management, wildlife habitat, and livestock grazing. Close the entire area to ORV use. Manage 6,783 acres of the Adobe Badlands WSA as an ONA/ACEC to protect the scenic qualities and T&E plants, and to reduce active erosion. Manage the remainder of the Adobe Badlands WSA (3,642 acres) as wildlife habitat. |

BLM_0005423

# CHAPTER TWO

## THE UNCOMPAHGRE BASIN RESOURCE MANAGEMENT DECISIONS

Chapter Two displays the land use decisions by Management Unit (A management unit is a geographically defined area which will be managed for a stated objective). It identifies the management objective for each unit and describes the management actions which will be allowed, limited, or excluded to meet the stated objective. It is the Proposed Plan as described in the Proposed RMP/Final EIS.

A map identifying the location or locations of each Management Unit is provided in the pocket inside the back cover. Crucial deer and elk winter range and bald eagle hunting habitat are identified on unpublished maps located in the Uncompahgre Basin Resource Area Office.

### ASSUMPTIONS

1. All actions will comply with current state and federal regulations, standards, and policies.

2. Site-specific activity plans will be developed or revised, if necessary, to provide detailed management guidance for all management units except the general resource management unit.

3. Site-specific Environmental Analyses (EAs) and Environmental Impact Statements (EISs) if required, will be developed for all management plans and projects within the planning area. Emphasis will be placed on analyzing plans and/or projects comprehensively for each management unit.

4. Lands cases generated by other agencies, individuals, and entities will be analyzed and processed on a case-by-case basis in accordance with guidance provided by this plan.

5. Recreation and Public Purposes Act (R&PP) land use classifications currently under lease will be retained with the exception of the Delta County and Montrose County landfills.

6. All Wilderness Study Areas (WSAs) will be managed to be consistent with the Wilderness Interim Management Policy until the final Congressional decision on wilderness designation or non-designation is made.

7. All areas designated as an Outstanding Natural Area (ONA) or a Research Natural Area (RNA) are also designated as Areas of Critical Environmental Concern (ACEC).

### STANDARD MANAGEMENT DIRECTION

Some resource management programs will be standard throughout the planning area under the RMP. Unless changes in or additions to standard management directions are specifically addressed in the management prescription for each management unit, these resources, programs, and activities will be managed as follows:

**Air Quality.** Activities and projects on public land will comply with applicable local, state, and federal air quality regulations. Mitigation to minimize air quality degradation will be incorporated into project proposals as appropriate.

**Coal.** Federal coal estate will be identified as acceptable for further leasing consideration.

**Oil, Gas, and Geothermal Resources.** Federal oil, gas, and geothermal estate on both federal surface and split-estate lands will be open to leasing with standard lease terms. Other con-

9

**Chapter Two**                                            Management Decisions

ditions for leasing such as no surface occupancy and seasonal stipulations (see Appendix A) are assigned in each management unit prescription; special stipulations and conditions also apply to federal surface and split-estate lands. Any special stipulations (i.e., seasonal closures) prescribed for a management unit will also apply to seismic and drilling activities.

Resource information for split-estate lands, upon which the recommended stipulations are based, has not been verified by the BLM. Verification will occur during review of Applications for Permit to Drill (APDs). On-site inspection and consultation with the surface owner and operator may reveal that (1) the impacts addressed by the stipulation will be avoided or mitigated to an acceptable level, or (2) the resources of concern are not present. Upon either of these determinations by the Authorized Officer, the stipulations can be waived, modified, or excepted without public notice other than that provided for the APD. Consultation with the surface owner also requires the consideration of private uses of the surface. If, after on-site inspection and consultation, it is determined by the Authorized Officer that conditions necessary to avoid impacts to private resources would adversely impact the public resources addressed by these stipulations, the impacts will be assessed. If, based upon such assessment, the Authorized Officer makes a decision to substantially change or waive one or more stipulations, a 30-day public review period will be provided in addition to the public notice period for receipt of the APD. (These two 30-day notice and review periods may overlap.)

**Locatable Minerals.**  All existing withdrawals that segregate federal mineral estate from location and entry under the general mining laws will be recommended for retention. Federal mineral estate in areas not under withdrawal will be open to entry and location.

**Mineral Materials.**  Federal mineral estate will be open to disposal of mineral materials.

**Soils and Water Resources.**  Water quality and erosion conditions will be inventoried and monitored.  Measures designed to minimize erosion and water quality deterioration will be required in site specific plans for surface-disturbing land use activities.  The area will be open to land treatments and development of in-channel structures and project facilities.

**Riparian/Aquatic Systems.**  Riparian zones and aquatic habitats will be inventoried and monitored where necessary to provide information to determine proper management. Vegetation conditions and streambank cover will be maintained or improved.  Measures designed to minimize site-specific riparian and aquatic deterioration will be required in site specific plans for surface-disturbing land use activities.

**Threatened and Endangered Species.**  Threatened and endangered species and unique plant associations will be inventoried and monitored where necessary to provide information to determine proper management. Clearances will be conducted on all proposed surface-disturbing activities and the U.S. Fish and Wildlife Service (USFWS) will be consulted as required.  Measures designed to protect threatened and endangered species and their habitat will be required in all land use activity plans.  Supplemental releases and reintroduction of federal and state listed endangered, threatened, and candidate species may be authorized following environmental analysis and consultation with the USFWS, the Colorado Division of Wildlife (DOW), and other affected parties.

**Wildlife Habitat.**  Wildlife forage allocations will remain at current levels until studies determine adjustments are needed to achieve management objectives.  Additional forage allocations will be divided equally between wildlife and livestock grazing.  Wildlife habitat monitoring studies will be established and/or maintained on all crucial winter ranges.  The planning area will be open to land treatments and project facility development. Existing wildlife facilities and land

10

BLM_0005425

**Management Decisions**                                    **Chapter Two**

treatments will be maintained. Supplemental releases and reintroduction of native or naturalized fish and wildlife species (excluding federal or state listed endangered, threatened, or candidate species) may be authorized by the District Manager following environmental analysis.

**Livestock Grazing.** Suitable public lands will be available for livestock grazing use. Livestock utilization will be managed at current forage allocation levels until studies indicate adjustments are needed to achieve management objectives. New or additional available forage will be divided equally between livestock and wildlife. Existing livestock facilities will be maintained. Existing allotment management plans (AMPs) will be updated as needed and new AMPs will be developed. New livestock facilities and land treatment projects will be developed if needed to achieve AMP objectives. Vegetation condition and trend monitoring studies will be established and/or maintained. Maximum sustained livestock utilization levels of key forage species will be 50 percent. Allotment categorization will determine management and monitoring intensity.

**Forestry.** Suitable commercial forest lands and pinyon-juniper woodlands will be managed for sustained yield production within the allowable cut restrictions determined by the Timber Production Capabilities Classification (TPCC) inventory.

**Recreation.** Public lands will be managed for extensive and diverse recreational use.

**Off-Road Vehicles.** Public lands will be open to off-road vehicle (ORV) use.

**Cultural Resources.** Cultural and historical sites will be inventoried. Clearances will be conducted on sites of all proposed surface-disturbing activities. Measures designed to protect cultural and historical resources will be developed in consultation with the Advisory Council on Historic Preservation and the State

Historic Preservation Officer and will be required in all land use activity plans.

**Paleontological Resources.** Paleontological resources will be inventoried and appropriate protective measures will be developed if necessary.

**Visual Resources.** Public lands will be managed under current visual resource management (VRM) classifications and guidelines.

**Major Utilities.** Public lands will be open to development of major utility facilities. Stipulations and mitigating measures will be developed on a case-by-case basis.

**Powersite Withdrawals.** Pending determination of potential, existing powersite withdrawals will be maintained. These lands will not be subject to further consideration for disposal. No significant long-term investments will be made on these lands unless the investment could be recovered prior to development.

**Access.** In addition to the specific access needs identified in the management unit prescriptions, the access needs identified in the resource area's transportation plan will be acquired as opportunities arise.

**Fire Management.** Any fire which occurs in a fire use category area before a prescribed burn plan is approved, or which is not within the limits of the prescription, or which threatens life or property will be suppressed as a conditional suppression area fire.

## DISPOSAL OF PUBLIC LANDS

A total of 143 tracts of public land totalling 11,026 acres have been identified for further consideration for disposal through sale or exchange under the RMP.

BLM_0005426

**Chapter Two**                                                       **Management Decisions**

Prior to disposal, resources within identified tracts will be managed according to the management prescription for the management unit in which they are located. Minimal funds, if any, will be spent on improvements on these lands. Federal mineral estate will be conveyed with surface estate where it would be in the public interest.

## Table 2
## MANAGEMENT UNITS

| MANAGEMENT UNIT | ACRES OF PUBLIC SURFACE | PERCENTAGE OF THE PLANNING AREA [1] | IMPORTANT RESOURCES, VALUES, OR LAND USES |
|---|---|---|---|
| 1 | 186,810 | 39% | Livestock grazing, wildlife habitat, recreation, woodlands |
| 2 | 67,320 | 14% | Wildlife habitat, coal, woodlands |
| 3 | 47,607 | 10% | Woodlands, wildlife habitat, livestock grazing |
| 4 | 40,792 | 8% | Recreation, soils, woodlands |
| 5 | 24,177 | 5% | Soils, recreation, oil and gas |
| 6 | 21,038 | 4% | Wilderness, recreation, T&E species |
| 7 | 17,232 | 4% | Coal, wildlife habitat |
| 8 | 8,942 | 2% | Recreation, soils |
| 9 | 6,320 | 1% | Riparian/aquatic habitat, livestock grazing |
| 10 | 3,292 | Less than 1% | Wildlife habitat, coal, recreation, commercial timber |
| 11 | 1,990 | Less than 1% | Wildlife habitat, recreation |
| 12 | 1,895 | Less than 1% | Recreation, T&E species |
| 13 | 377 | Less than 1% | T&E species, soils |
| 14 | 80 | Less than 1% | Recreation, scientific values |
| 15 | 6,783 | 1% | T&E species, scenic values, soils |
| 16 | 48,422 | 10% | General land uses |

[1] Percentages are rounded to whole numbers.

BLM_0005427

Management Decisions

Chapter Two

## MANAGEMENT UNIT 1

186,810 Acres of Public Surface; 39 percent of the Planning Area

Management Unit 1 consists of 186,810 acres of public land located primarily on the northeast-facing slopes of the Uncompahgre Plateau north of Colorado Highway 90. The area's range of elevations gives it a high value for both summer and winter livestock grazing.

Public lands within the management unit will be managed as "I" category (150,114 acres), "M" category (25,727 acres), and "C" category (8,950 acres) grazing allotments. Also, 2,019 acres that are presently unallotted for livestock use will be available for grazing application.

The management unit will be managed to improve vegetation conditions and forage availability for livestock grazing. Land treatment projects and other facilities designed to improve livestock forage and distribution will be developed. Intensive monitoring studies will be established and maintained on all "I" and "M" category allotments. Existing AMPs will be updated as needed and new AMPs will be developed for allotments without plans. As additional forage becomes available, livestock will have priority for allocation. Relinquished, cancelled, or acquired livestock grazing permits will be reissued according to regulations.

**Oil and Gas.** Federal oil and gas estate will be open to leasing. Seasonal stipulations on seismic and drilling activities will be in effect from December 1 through April 30 on 64,815 acres (federal surface) and 560 acres (split-estate) of crucial deer and elk winter range, and on 3,757 acres (federal surface) and 63 acres (split-estate) used by bald eagles for hunting habitat. Variances to this seasonal stipulation may be granted (see Appendix A).

**Locatable Minerals.** The Bureau of Reclamation (BOR) withdrawal on Fruitland Mesa and both the BOR Dominguez withdrawal and the

BLM powersite classifications along the Gunnison River downstream of Delta will be recommended for revocation to allow for mineral exploration and development, facilitate resource management, and permit long-term land use planning.

**Soils and Water Resources.** Non-conflicting (does not conflict with the objective of the management unit) erosion control objectives, projects, and mitigating measures will be incorporated into new and existing AMPs. In-channel structures and land treatment projects designed to reduce runoff and soil erosion will be developed.

**Wildlife Habitat.** Non-conflicting wildlife habitat management objectives, projects, and mitigating measures will be incorporated into new and existing AMPs. Existing wildlife habitat projects will be maintained. Bighorn sheep may be transplanted into the Winter Mesa area if they will not conflict with current and future livestock grazing forage allocations. Wildlife will have first priority for all additional forage made available as a result of rangeland improvement projects designed to improve wildlife habitat funded by non-BLM sources.

**Forestry.** Woodland harvest areas will be managed for increased forage production and will be compatible with AMPs.

**Recreation.** River access will be developed at the Escalante Bridge. Maps and informational materials on river use will be provided. The BLM will manage recreation use in a manner that will minimize recreational impacts on interspersed and adjacent private land.

**Off-Road Vehicles.** A total of 7,240 acres in the Winter Mesa/Roubideau Creek area will be closed to ORV use. Vehicle use on crucial deer and elk winter range (64,815 acres) will be limited to designated roads and trails from December 1 through April 30 if necessary to reduce stress on wintering deer and elk. The remainder of the management unit will be open to ORV use.

13

**Chapter Two**                                                                                    Management Decisions

**Cultural Resources.** A total of 5,848 acres of public land between Colorado Highway 90 and the Big Sandy Wash will undergo a Class III cultural inventory to determine the significance and location of high-value archeological sites. Upon completion of the inventory and data analysis, some of these sites may be assigned a special designation and a management plan may be developed.

**Visual Resources.** The management unit will be managed under VRM Class III guidelines, except for Escalante Canyon which will be managed under VRM Class II guidelines to protect its scenic qualities.

**Acquisition of Non-Federal Lands.** If they are available, non-federal lands that would improve livestock management and increase crucial deer and elk winter range may be acquired.

**Access.** Public road access will be acquired into the Olathe Reservoir area for hunting and other recreational purposes. Public trail access will be acquired on the McCarty Trail in lower Escalante Canyon to provide additional access into the Dominguez Canyon WSA.

**Fire Management.** A total of 97,543 acres of public land will be managed under the fire suppression category, with 8,657 acres identified for intensive suppression and 88,886 acres identified for conditional suppression. A total of 89,267 acres will be managed under the fire-use category where fire will be utilized as a management tool. Planned or natural ignitions meeting pre-determined prescriptions will be allowed on these areas.

## MANAGEMENT UNIT 2

67,320 Acres of Public Surface; 14 percent of the Planning Area

Management Unit 2 consists of 67,320 acres of public land located primarily on the southern end of the Uncompahgre Plateau and in the lower

elevations of the North Fork Valley. These areas have large wintering deer and elk populations. Approximately half of the management unit is considered crucial deer and elk winter range. A portion of the unit, in the Camel Back/Roubideau Creek area, is suitable habitat for desert bighorn sheep.

The management unit will be managed to improve the areas' capabilities to support wintering deer, elk, and bighorn sheep populations. Land treatment projects and other facilities designed to improve the quality and quantity of winter habitat will be developed. Wildlife will have first priority for all additional forage made available as a result of BLM habitat improvement projects. All other land uses will be permitted if they will not degrade the areas' winter range capabilities. Disturbances will be minimized from December 1 through April 30 on crucial deer and elk winter range (37,007 acres). Habitat in the Camel Back/Roubideau Creek area will be available for possible introduction of desert bighorn sheep.

**Coal.** Federal coal estate will be open to leasing. Within crucial deer and elk winter range, seasonal stipulations on new road and facility construction may be necessary from December 1 through April 30 to reduce stress on wintering deer and elk.

**Oil and Gas.** Federal oil and gas estate will be open to leasing. Within crucial deer and elk winter range (37,007 acres of federal surface and 8,850 acres of split-estate), seasonal stipulations on seismic and drilling activities will be in effect from December 1 through April 30 to reduce stress on wintering deer and elk. Variances to this seasonal stipulation may be granted (see Appendix A).

**Mineral Materials.** Federal mineral estate will be open to disposal of mineral materials. Within crucial deer and elk winter range, seasonal restrictions on disposal activities may be necessary from December 1 through April 30 to reduce stress on wintering deer and elk.

14

**Management Decisions**                                            **Chapter Two**

**Soils and Water Resources.** Non-conflicting erosion control objectives, projects, and mitigation measures will be incorporated into new wildlife habitat management plans (HMPs). Land treatment and erosion control projects will be permitted if they are compatible with wildlife habitat management objectives.

**Livestock Grazing.** Livestock grazing will continue at current forage allocation levels and seasons of use unless studies determine adjustments are needed. Livestock will have first priority for all additional forage made available as a result of livestock operator-funded rangeland improvement projects. Non-conflicting livestock management objectives, projects, and mitigating measures will be incorporated into new wildlife HMPs. Facility development and land treatment projects will be permitted if they would be compatible with wildlife habitat management objectives.

**Forestry.** The management unit will be available for woodland product harvests. On 37,007 acres of crucial deer and elk winter range, seasonal restrictions on harvest may be necessary from December 1 through April 30 to reduce stress on wintering deer and elk. Woodland harvest will be designed to increase forage production and will be compatible with wildlife habitat management objectives.

**Off-Road Vehicles.** A total of 2,482 acres in the Camel Back/upper Roubideau Creek drainage area will be closed to ORV use. Vehicle use in the remainder of the management unit will be limited to designated roads and trails from December 1 through April 30. Variances to this seasonal limitation may be granted if ORV use would not result in any negative impacts on wintering deer and elk.

**Visual Resources.** The management unit will be managed under VRM Class III guidelines.

**Major Utilities.** The management unit will be open to development of major utility facilities. Within crucial deer and elk winter range, con-

struction activities may be restricted from December 1 through April 30 if necessary to reduce stress on wintering deer and elk.

**Acquisition of Non-Federal Lands.** If they are available, non-federal lands that are necessary for effective management of crucial deer and elk winter range ay be acquired.

**Access.** Public access will be acquired into the McDonald Mesa, Roatcap-Jay Creek, Spaulding Peak/Dry Creek, Oak Mesa, and Oak Ridge areas for hunting and other recreational uses, wildlife habitat management, and timber and woodlands management.

**Fire Management.** A total of 53,502 acres of public surface will be managed under the fire suppression category, with 48,118 acres identified for intensive suppression and 5,384 acres identified for conditional suppression. A total of 13,818 acres will be managed under the fire-use category where fire will be utilized as a management tool. Planned or natural ignitions meeting pre-determined prescriptions will be allowed in these areas.

## MANAGEMENT UNIT 3

47,607 Acres of Public Surface; 10 percent of the Planning Area

Management Unit 3 consists of 47,607 acres of public land located primarily on the northeast-facing slopes of the Uncompahgre Plateau. The management unit contains some of the most productive pinyon-juniper woodland sites in the planning area which are used extensively for livestock grazing and are valuable deer and elk habitat.

The management unit will be managed for sustained yield production of the woodland resource within the allowable cut restrictions determined by the TPCC inventory (23,206 acres).

15

BLM_0005430

**Oil and Gas.** Federal oil and gas estate will be open to leasing. A seasonal stipulation on seismic and drilling activities will be in effect on crucial deer and elk winter range (28,552 acres of federal surface and 25 acres of split-estate) from December 1 through April 30 if necessary to reduce stress on wintering deer and elk. Variances to this seasonal stipulation may be granted (see Appendix A).

**Soils and Water Resources.** Non-conflicting erosion control objectives, projects, and mitigating measures will be incorporated into new forest management plans (FMPs). Existing erosion control projects will be maintained and new projects developed if they will not decrease the woodland base.

**Wildlife Habitat.** Non-conflicting wildlife habitat management objectives, projects, and mitigating measures will be incorporated into new FMPs. Existing wildlife habitat projects will be maintained and new projects developed if they will not decrease the woodland base.

**Livestock Grazing.** Non-conflicting livestock grazing management objectives, projects, and mitigating measures will be incorporated into new FMPs. Existing livestock projects will be maintained and new projects developed if they will not decrease the woodland base.

**Off-Road Vehicles.** The management unit will be open to ORV use except in crucial deer and elk winter range (28,552 acres) where vehicle use will be limited to designated roads and trails from December 1 through April 30 if necessary to reduce stress on wintering deer and elk. Use of ORVs for woodland management and harvest purposes will be authorized year-round.

**Access.** Public access will be acquired into the Beaver Hill and Linscott Canyon areas for woodland harvest and recreation purposes.

**Fire Management.** A total of 25,162 acres of public land will be managed under the fire suppression category, with 21,187 acres identified for intensive suppression and 3,975 acres identified for conditional suppression. A total of 22,445 acres will be managed under the fire-use category where fire will be utilized as a management tool. Planned or natural ignitions meeting pre-determined prescriptions will be allowed on these areas.

## MANAGEMENT UNIT 4

40,792 Acres of Public Surface; 8 percent of the Planning Area

Management Unit 4 consists of the 40,792 acres of public lands surrounding the Gunnison Gorge. The management unit is characterized by a diversity of landscapes and high-value recreation opportunities. The need to protect both the quality and diversity of recreation opportunities and to facilitate recreation use will be recognized as important during the formulation of management decisions affecting the area.

The management unit will be managed as the Gunnison Gorge Special Recreation Management Area (SRMA). Maps, interpretive materials, and facilities will be developed. Recreation use will be monitored and possibly restricted as necessary to protect natural features and recreation opportunities.

Lands in the Peach Valley area (15,610 acres) will be managed for ORV recreation opportunities. A minimum of restrictions would be placed on surface-disturbing activities and a high concentration of recreation users will be permitted within this area.

Motorized access to the remainder of the management unit (25,182 acres) will be limited to designated road and trails, the majority of which are primitive in character. This area will be managed to maintain a predominantly natural environment with low but evident human concentrations and impacts.

BLM_0005431

**Management Decisions**                                                    **Chapter Two**

**Oil and Gas.** Federal oil and gas estate will be open to leasing. A seasonal stipulation on seismic and drilling activities will be in effect from December 1 through April 30 on crucial deer and elk winter range (8,077 acres of federal surface and 280 acres of split-estate). Variances in this seasonal restriction may be granted (see Appendix A).

**Locatable Minerals.** Federal mineral estate will be open to entry and location. The BLM protective withdrawal (PLO 5261; September 15, 1972) will be revoked and the BOR withdrawal on Fruitland Mesa will be recommended for revocation. Revoking these mineral withdrawals will allow for mineral exploration and development, facilitate resource management, and permit long-term land use planning.

**Soils and Water Resources.** The Elephant Skin Wash salinity control project will be maintained to reduce saline runoff. Elephant Skin Wash will be protected from surface-disturbing activities.

**Wildlife Habitat.** Bighorn sheep habitat in the Smith Fork Canyon (2,250 acres) will be monitored and protected. Activities and land uses that are consistent with maintaining the necessary forage and isolated habitat requirements of bighorn sheep will be permitted.

**Livestock Grazing.** Livestock grazing will continue at current forage allocation levels and seasons of use unless studies indicate that adjustments are needed. The 140-acre Gunnison Forks habitat management area will remain unallotted for livestock grazing. Livestock forage utilization will be limited to 35 percent in the Elephant Skin Wash area (2,370 acres) if necessary to protect soils by maintaining an optimum basal ground cover.

**Forestry.** A 1,255-acre portion (in the Black Ridge area) of the 2,500 acres of harvestable woodlands within the management unit will be available for harvest. This area will be closed to harvest from December 1 through April 30 to protect crucial deer and elk winter range. The remaining harvestable woodlands (1,245 acres) will be closed to harvest.

**Off-Road Vehicles.** A total of 15,610 acres in the Peach Valley area will be open to ORV use. To protect natural and scenic values, vehicle use in the Elephant Skin Wash area and the remainder of the management unit will be limited to designated roads and trails yearlong.

**Visual Resources.** The 15,610 acres open to ORV use will be managed under VRM Class IV guidelines.

**Major Utilities.** A total of 2,462 acres in the Smiths Mountain and Gunnison Forks areas will be open to but not preferred for development of new major utility facilities. These lands may be utilized for major utility development if there are no feasible alternatives. The remainder of the management unit will be closed to new major utility development to protect natural and scenic values.

**Acquisition of non-Federal lands.** Actions will be initiated to acquire 2,200 acres of non-federal lands as identified in the Gunnison Gorge Recreation Area Management Plan (RAMP), that are necessary to facilitate public access and enhance recreational values.

**Access.** Public access will be acquired along the Gunnison Gorge rim southwest of the Gunnison Forks and from Colorado Highway 92 to the Gunnison River in the Austin area for recreation purposes.

**Fire Management.** A total of 26,070 acres of public land will be managed under the fire suppression category and identified as conditional suppression areas. A total of 14,722 acres will be managed under the fire-use category where fire will be utilized as a management tool. Planned or natural ignitions meeting pre-determined prescriptions will be allowed on these areas.

17

**Chapter Two**                                     **Management Decisions**

## MANAGEMENT UNIT 5

24,177 Acres of Public Surface; 5 percent of the Planning Area

Management Unit 5, totalling 24,177 acres, consists of Mancos shale hills commonly known as the "adobes". These highly erodible soils, combined with a lack of protective vegetation, can produce sediment loads in local watersheds that are high in salinity. High precipitation runoff rates from the adobes contribute to overall salinity levels in the Upper Colorado River Basin. Salinity yields are increased within localized areas due to increased erosion from surface disturbing activities including ORV use and livestock grazing.

The management unit will be managed to reduce salinity loads in the Upper Colorado River Basin. In-channel structures and land treatment projects designed to reduce runoff, erosion, and sedimentation will be developed, and surface protection measures will be implemented. Forage utilization will be managed to achieve the basal ground cover objectives identified in Table 3. Surface-disturbing activities will be curtailed from March 1 through May 31 when saturated soils are most vulnerable to damage. Activities and other land uses which are consistent with maintaining the soil and vegetative conditions necessary to reduce erosion and salt contributions to the river basin will be permitted.

### Table 3
### OBJECTIVES FOR PERCENT GROUND COVER WITHIN MANAGEMENT UNIT 5

| RANGE SITE | LOCATION | PERCENT BASAL GROUND COVER |
|---|---|---|
| Stony saltdesert | North of Delta | 10 |
| Clayey saltdesert | South of Hotchkiss | 10 |
| Salt flats | South of Hotchkiss | 7 |
| Clayey saltdesert | Bone Mesa | 10 |

**Oil and Gas.** Federal oil and gas estate will be open to leasing. A seasonal stipulation on seismic and drilling activities will be in effect from March 1 through May 31 to protect erodible and saline soils on 24,177 acres of federal surface and 4,155 acres of split-estate. Variances to this seasonal stipulation may be granted (see Appendix A).

**Mineral Materials.** Federal mineral estate will be open to mineral material activities except from March 1 through May 31 if necessary to protect wet soils.

**Livestock Grazing.** Livestock grazing will be allowed except from March 20 to range readiness to protect plant species during the spring growth period, and to prevent soil disturbance when saturated soils are most vulnerable to damage. If the basal ground cover is less than the objectives identified in Table 3 livestock forage utilization will be managed at 35 percent of key forage species to increase basal ground cover.

**Off-Road Vehicles.** To protect highly saline soils, vehicle use in the entire management unit will be limited to designated roads and trails yearlong.

**Major Utilities.** The management unit will be open to development of major utility facilities but no surface-disturbing activities will be permitted

18

BLM_0005433

**Management Decisions**                                                 **Chapter Two**

from March 1 through May 31 if necessary to protect wet soils.

**Fire Management.** A total of 22,992 acres of public land will be managed under the fire suppression category and identified as conditional suppression areas. A total of 1,185 acres will be managed under the fire-use category where fire will be utilized as a management tool. Planned or natural ignitions meeting pre-determined prescriptions will be allowed on these areas.

## MANAGEMENT UNIT 6

21,038 Acres of Public Surface; 4 percent of the Planning Area

Management Unit 6 is the Gunnison Gorge WSA (CO-030-388). The WSA, totalling 21,038 acres, will be recommended as preliminarily suitable for wilderness designation. Until a final Congressional decision on wilderness designation or non-designation is made, the Gunnison Gorge WSA will be managed according to the Wilderness Interim Management Policy and the Gunnison Gorge RAMP.

During the wilderness intensive inventory, the Gunnison Gorge was determined to meet the wilderness size requirement of at least 5,000 acres, to be natural, and to provide outstanding opportunities for solitude and primitive/unconfined recreation. The scenic and wilderness canyon complex of the area has received considerable publicity and public interest. If designated as wilderness by Congress, activities and land uses that are consistent with preserving the natural condition and wilderness character of the area would be permitted.

**Air Quality.** The management unit would be managed within federal air quality Class II guidelines unless the State of Colorado reclassifies the area, or other areas, as a result of procedures prescribed in the Clean Air Act as amended in 1977. Under other state authorities, the Gunnison Gorge WSA is currently managed

as a Category I area where more restrictive sulfur dioxide requirements apply.

**Oil and Gas.** Federal oil and gas estate would be closed to future leasing. There are no pre-FLPMA leases in the WSA. Development of any post-FLPMA leases in would be permitted only if activities would result in no impairment of wilderness characteristics.

**Locatable Minerals.** The management unit would be closed to mineral entry and location except for pre-FLPMA claims determined to have valid discoveries. The majority of the area (74 percent) is presently withdrawn from mineral entry.

**Mineral Materials.** The management unit would be closed to disposal of mineral materials.

**Soils and Water Resources.** Where natural recovery is unlikely, deteriorated watershed conditions would be restored if life, property, or wilderness values are threatened, or if serious depreciation of important environmental qualities outside the wilderness area is evident. Revegetation efforts would be limited to use of native or naturalized species. Whenever feasible, non-motorized access and project development methods would be required. Approval of the BLM Director would be required for all watershed restoration projects.

**Threatened and Endangered Species.** Threatened and endangered species research and habitat improvement would be permitted if activities are consistent with protection of wilderness values. Habitat would be managed for federally-listed bald eagles and peregrine falcons and state-listed river otters. Recreation use would be restricted if necessary for the protection of threatened and endangered species.

**Wildlife Habitat.** Wildlife habitat would be managed to allow for natural distribution, numbers, and interaction of indigenous wildlife and fish species. Developed facilities, if necessary for the continued existence or welfare of a wildlife

19

BLM_0005434

species, would be permissible if wilderness characteristics would not be impaired. Bighorn sheep habitat and deer and elk winter range would be managed in cooperation with the Colorado DOW. Supplemental releases of bighorn sheep would be permitted as identified in the 1986 reintroduction plan or its future amendments.

**Livestock Grazing.** Livestock grazing and facility maintenance would be managed at levels and conditions established prior to wilderness designation. New rangeland improvements would be permissible if determined to be necessary for rangeland and/or wilderness protection.

**Forestry.** Woodland harvest and/or management would be permitted only for control of insects and disease if determined necessary to protect resources outside the management unit. There is a total of 337 acres of productive woodlands within the WSA that would be unavailable for harvest.

**Recreation.** Recreation use would be regulated as necessary to protect wilderness values. Highest priority would be given to low-impact recreation activities that could not be accommodated outside the wilderness environment. Opportunities for non-motorized recreation in a predominantly natural environment would be maintained. Facilities, improvements, and signs would be limited to those necessary to protect wilderness resources along with public health and safety. Permits would be required for all commercial recreation uses and, if necessary to protect wilderness values, for all non-commercial recreationists. Hunting, fishing, and recreational trapping would be permitted.

The river corridor would be managed to maintain very low human group concentrations and little overall evidence of human use. River-boating use would be limited to six to ten group encounters per day with no more than two (as per the 1988 Gunnison Gorge RAMP) commercially-outfitted trip allowed per day. Allocations between private and commercial river-boating use

would be made if necessary to protect wilderness values or to emphasize opportunities for specific recreational experiences such as self-reliance as opposed to guided and outfitted experiences.

**Off-Road Vehicles.** Vehicle use in general would be eliminated from the management unit. Vehicle use would be permitted in certain circumstances involving valid existing rights, livestock grazing, fire suppression, life-threatening emergencies, and wilderness area administration. The rugged canyon area has few vehicular access routes.

**Cultural and Paleontological Resources.** In most instances, cultural and paleontological resources would be subject to the forces of nature in the same manner as other wilderness resources. Study or management would not entail excavation, stabilization, or interpretation. Exceptions may be granted by the BLM State Director for unusually significant cultural or paleontological resources.

**Visual Resources.** The management unit would be managed under VRM Class I guidelines.

**Major Utilities.** The management unit would be closed to development of utility facilities. The area is not within the lands identified as needed for future major utility development in the 1980 and 1985 Western Regional Utility Corridor Study(s).

**Hydroelectric Development.** Several hydroelectric projects have been proposed for development on the Gunnison River which would be within or affect the WSA. Protective withdrawals have restricted major on-the-ground evaluations by the proponents. The existing powersite reserves and BOR withdrawals affecting the Gunnison Gorge would be recommended for revocation. However, the final determination on the status of these withdrawals will be made by the President and Congress.

**Management Decisions**

**Access.** Public access to the WSA boundary in the Red Canyon area would be identified for acquisition.

**Agricultural Development.** No agricultural or related development would be permitted within the management unit. The BLM would recommend revocation of the portion of the BOR Fruitland Mesa withdrawal that is within the WSA.

**Fire Management.** A total of 21,038 acres would be managed under the fire-use category where fire would be utilized as a management tool. Only natural ignitions meeting pre-determined prescriptions would be allowed in this area.

## MANAGEMENT UNIT 7

17,232 Acres of Public Surface; 4 percent of the Planning Area

Management Unit 7 consists of 54,474 acres of federal coal estate within the planning area and 1,756 acres of federal coal estate outside of the planning area. A 17,232-acre portion of this federal coal estate underlies federal surface estate.

The management unit will be managed for both existing and potential coal development. Development of existing coal leases will continue, and unleased federal coal will be identified as acceptable for further coal leasing consideration with a minimum of multiple-use restrictions. Activities and land uses that are consistent with maintaining existing coal operations and the potential for coal development will be permitted.

**Oil and Gas.** Federal oil and gas estate will be open to leasing. A seasonal stipulation on seismic and drilling activities will be in effect from December 1 through April 30 on 1,730 acres (federal surface) of crucial deer and elk winter range, and on 1,637 acres of federal surface and 630 acres of split-estate lands used as hunting habitat by bald eagles. Variances in these

seasonal stipulations may be granted (see Appendix A).

**Riparian/Aquatic Systems.** Riparian/aquatic zones up to one-quarter mile wide will be protected. Activities that disturb these areas could be approved on a site-specific basis after consultation with affected entities and development of mitigating measures.

**Wildlife Habitat.** Wildlife will have priority for forage allocations on crucial deer and elk winter range (1,730 acres).

**Forestry.** All commercial forest lands and pinyon-juniper woodlands that are suitable for harvest will be managed for sustained yield production within allowable cut restrictions determined by the TPCC inventory.

**Off-Road Vehicles.** Vehicle use in the riparian zones associated with Bear and Roatcap creeks will be limited to designated roads and trails yearlong. Vehicle use in crucial deer and elk winter range (1,730 acres) will be limited to designated roads and trails from December 1 through April 30 if necessary to reduce stress on wintering deer and elk.

**Major Utilities.** Corridors one-quarter mile wide and located on each side of Colorado Highway 133 will be open to development of major utility facilities. The remainder of the area would be closed to major utility facilities except for those needed for coal development. This management would greatly reduce the long-term conflicts between new utility facilities and the potential surface effects of coal mine subsidence.

**Acquisition of Non-Federal Lands.** If they are available, non-federal lands that are necessary for effective management of riparian zones along with crucial deer and elk winter range may be acquired.

**Fire Management.** A total of 14,910 acres of public land will be managed under the fire sup-

BLM_0005436

pression category and identified as intensive suppression areas. A total of 2,322 acres will be managed under the fire-use category where fire would be utilized as a management tool. Planned or natural ignitions meeting pre-determined prescriptions will be allowed on this area.

## MANAGEMENT UNIT 8

8,942 Acres of Public Surface; 2 percent of the Planning Area

Management Unit 8 is 8,942 acres of public land northeast of Delta that consists of Mancos shale (adobe badlands) hills with little vegetative cover. The area is suitable and utilized for ORV recreation. ORV activities typically involve local residents and occur during the spring, fall, and winter.

The management unit will be managed as open to ORV use. Recreational and competitive ORV use and a high concentration of recreation users will be permitted within the management unit. Facilities such as informational signs and motor-cycle loading ramps may be developed if constructed and maintained to BLM standards by local ORV organizations. A minimum of restrictions will be placed on surface-disturbing activities that do not impede or endanger ORV recreationists.

Prior to management of the area for ORV use, an inventory will be conducted to identify threatened and endangered plant populations. The management unit's proposed boundary will be adjusted to exclude threatened and endangered plants. If plants or plant communities cannot be excluded from the management unit, protective fencing or other measures will be implemented to protect the plants. The USFWS will be consulted.

**Livestock Grazing.** Grazing use will continue in the management unit but construction of facilities, such as livestock control fences, that

create safety hazards or impede free vehicle use will not be permitted.

**Visual Resources.** The management unit will be managed under VRM Class IV guidelines.

**Major Utilities.** The management unit will be open to development of major utility facilities.

**Fire Management.** A total of 8,942 acres of public land will be managed under the fire suppression category and identified as conditional suppression areas.

## MANAGEMENT UNIT 9

6,320 Acres of Public Surface; 1 percent of the the Planning Area

The public land riparian zones that comprise Management Unit 9 occur throughout the planning area and are generally associated with perennial or intermittent streams. These areas (6,320 acres) have a very high productive capability and are very important in maintaining the water quality of the adjacent streams.

The management unit will be managed to restore and enhance riparian vegetation along 40 miles of streams. Objectives and projects designed to accelerate improvement of species diversity, streambank cover and stability, and instream structure, and to raise the water table will be incorporated into existing activity plans or developed in new riparian/aquatic system management plans. All areas will be intensively monitored for vegetation, aquatic habitat, and erosion conditions.

**Coal.** Coal development will be considered on a site-specific basis after consultation with affected entities and formulation of mitigating measures.

**Mineral Materials.** Federal mineral estate will be closed to disposal of mineral materials except

BLM_0005437

**Management Decisions**                                    **Chapter Two**

for sales which would result in negligible or no impacts to the riparian and aquatic systems.

**Soils and Water Resources.** Non-conflicting erosion control and water quality improvement objectives and projects will be incorporated into new riparian/aquatic system management plans.

**Wildlife Habitat.** Non-conflicting wildlife habitat management objectives, projects, and mitigating measures will be incorporated into new riparian/aquatic system management plans.

**Livestock Grazing.** Livestock grazing use will be permitted in riparian zones except from March 1 through range readiness, during which time it would be eliminated to accelerate improvement of riparian vegetation. To improve the condition of riparian zones, management practices and principles will be established in activity plans. Utilization of 35 percent by weight of key forage species will be used as a general guidance for improvement; this may vary depending on the individual riparian system. Trailing use will be limited as much as possible and confined to established roads. Trailing livestock will not be permitted to bed in riparian zones unless absolutely necessary.

**Forestry.** Woodland product harvests will not be permitted in the management unit.

**Off-Road Vehicles.** A total of 680 acres in Roubideau and Potter creeks will be closed to ORV use. Vehicle use in the remainder of the management unit will be limited to designated roads and trails yearlong.

**Major Utilities.** The management unit will be open to development of major utility facilities. Surface-disturbing activities which would have long-term adverse effects on riparian/aquatic systems will be prohibited.

**Acquisition of Non-Federal Lands.** If they are available, non-federal lands that are necessary for effective management of riparian/aquatic systems may be acquired.

**Access.** Public access will be acquired into the Terror Creek area for project development and recreation purposes. The Potter Creek road (five miles) and the Dry Fork of Escalante Creek road (two miles) will be closed and rehabilitated and removed from the transportation plan.

**Fire Management.** A total of 3,082 acres of public land will be managed under the fire suppression category, with 1,607 acres identified for intensive suppression and 1,475 acres identified for conditional suppression. A total of 3,238 acres will be managed under the fire-use category where fire will be utilized as a management tool. Planned or natural ignitions meeting pre-determined prescriptions will be allowed on these areas.

## MANAGEMENT UNIT 10

3,292 Acres of Public Surface; less than 1 percent of the Planning Area

Management Unit 10 consists of two tracts in the High Park/Storm King Peak area 20 miles southeast of Montrose. The management unit (3,292 acres of public land) ranges from 8,500 feet to over 10,000 feet in elevation, and is used extensively as an elk calving area in the spring. The largest commercial timber stands in the planning area exist in this unit.

The management unit will be managed to enhance its use as an elk calving area. Any disturbance during the calving season (May 1 through June 15) will be limited as much as possible. Habitat in elk calving areas will be improved, and wildlife will have first priority for allocation of new forage.

**Oil and Gas.** Federal oil and gas estate (3,292 acres of federal surface and 1,423 acres of split-estate lands) will be open to leasing with a seasonal stipulation on seismic and drilling activities in effect from May 1 through June 15 to prevent disturbance of calving elk. Variances to

23

BLM_0005438

this seasonal stipulation may be granted (see Appendix A).

**Soils and Water Resources.** Stipulations designed to maintain soil stability and prevent soil slumping will be incorporated into plans for all surface-disturbing land use activities.

**Forestry.** Skid trails and other roads will be closed and rehabilitated; main haul roads will remain available for public use.

**Off-Road Vehicles.** The management unit will be open to ORV use except during the elk calving season when all roads will be closed. Access for maintenance of the existing communications site will be permitted at all times.

**Major Utilities.** Public lands will be open to development of major utility facilities but no surface-disturbing activities will be permitted during the elk calving season.

**Acquisition of Non-Federal Lands.** If they are available, non-federal lands that would expand elk calving areas and improve extensive recreational opportunities may be acquired.

**Access.** Public access will be acquired into the Storm King and High Park areas for timber harvest and extensive recreation purposes.

**Fire Management.** A total of 3,292 acres of public land will be managed under the fire suppression category and identified as intensive suppression areas.

## MANAGEMENT UNIT 11

1,990 Acres of Public Surface; less than 1 percent of the Planning Area

Management Unit 11 is comprised of 1,990 acres of public land adjacent to the Gunnison River west of Delta. It adjoins the Escalante State Wildlife Area which is administered by the Colorado DOW. The management unit presently receives considerable use by waterfowl as nesting and resting habitat. Additional management and minor developments could enhance its potential for increased use as waterfowl habitat.

The management unit will be managed as waterfowl habitat. Adequate cover, wetlands, and nesting structures will be provided. Disturbance will be minimized during the breeding and nesting season (March 15 through June 30). Activities and land uses that are consistent with maintaining waterfowl habitat characteristics will be permitted. The BLM will coordinate management of the area with the DOW.

**Oil and Gas.** Federal oil and gas estate (1,990 acres of federal surface and 150 acres of split-estate lands) will be open to leasing with seasonal stipulations on seismic and drilling activities in effect from March 15 through June 30 to protect waterfowl habitat, and from December 1 through April 30 on habitat used for hunting by bald eagles. Variances to the seasonal stipulations may be granted (see Appendix A).

**Locatable Minerals.** The BOR withdrawal and the BLM powersite classifications in this management unit will be recommended for revocation and opening to permit mineral exploration and development, facilitate resource management, and permit long-term land use planning. Federal mineral estate will be opened to entry and location.

**Mineral Materials.** Federal mineral estate will be open to disposal of mineral materials except during the waterfowl nesting season.

**Acquisition of Non-Federal Lands.** If they area available, non-federal lands that are necessary to increase waterfowl habitat and facilitate development and management of the area may be acquired.

**Fire Management.** The entire management unit (1,990 acres) will be managed under the fire suppression category and identified as a conditional suppression area.

24

## MANAGEMENT UNIT 12

1,895 Acres of Public Surface; less than 1 percent of the Planning Area

Management Unit 12 is 1,895 acres of public land in Escalante Canyon approximately six miles southwest of the Gunnison River. Several listed plant species and two unique plant associations occur in the management unit. The area also receives significant recreational use due to its scenic qualities and the presence of eroded potholes in Escalante Creek.

The management unit is designated as the Escalante Canyon Area of Critical Environmental Concern (ACEC). This designation will enhance management and protection of the listed plant species and unique plant associations, and will improve the public's awareness of the recreational hazards of the Escalante potholes. Plan monitoring studies will be developed and activities designed to improve these plants' habitat conditions will be initiated. Surface-disturbing activities will be restricted. Informational signs identifying potential recreational hazards will be provided. Camping will be limited to designated areas.

**Oil and Gas.** Federal oil and gas estate will remain open to leasing with a no surface occupancy stipulation.

**Locatable Minerals.** The management unit will be withdrawn from entry and location for locatable minerals.

**Mineral Materials.** The management unit will be closed to disposal of mineral materials to protect the potential habitats of listed species and unique plant associations.

**Livestock Grazing.** Livestock grazing will continue at current levels unless studies determine threatened and endangered plant species and unique plant associations or their potential habitats are being degraded.

**Forestry.** To prevent accidental destruction of listed species and unique plant associations, woodland harvests will not be permitted.

**Off-Road Vehicles.** To prevent accidental destruction of listed species and unique plant associations, vehicle use within the management unit will be limited to designated roads and trails yearlong.

**Visual Resources.** The management unit will be managed under VRM Class II guidelines to maintain its scenic qualities.

**Major Utilities.** The management unit will be closed to development of major utilities to prevent accidental destruction of listed species and unique plant associations, and to maintain its scenic qualities.

**Fire Management.** All 1,895 acres of public surface in the management unit will be managed under the fire-use category where fire will be utilized as a management tool. Planned or natural ignitions meeting pre-determined prescriptions will be allowed.

## MANAGEMENT UNIT 13

377 Acres of Public Surface; less than 1 percent of the Planning Area

Management Unit 13 consists of two tracts totalling 377 acres of public land eight miles east of Montrose. The smaller tract is north of Highway 50 and the larger tract is south of the highway. The tracts contain the largest population of the endangered clay-loving wild buckwheat in the planning area and also have significant populations of Montrose penstemon, a candidate species.

The entire management unit is designated as the Fairview Research Natural Area/Area of Critical Environmental Concern (RNA/ACEC). Plant monitoring studies will be developed in cooperation with the Colorado Natural Areas Program

BLM_0005440

and actions designed to improve habitat conditions will be initiated. Surface-disturbing activities will be restricted to protect the threatened and endangered species and their potential habitat.

**Oil and Gas.** Federal oil and gas estate will remain open to leasing with a no surface occupancy stipulation.

**Locatable Minerals.** The management unit will be withdrawn from entry and location for locatable minerals.

**Mineral Materials.** The management unit will be closed to disposal of mineral materials to prevent accidental destruction of threatened or endangered plant species or their potential habitat.

**Livestock Grazing.** Livestock grazing will continue at current levels unless studies determine threatened and endangered plant species or their potential habitats are being degraded.

**Off-Road Vehicles.** To prevent accidental destruction of threatened or endangered plant species or their potential habitat, the management unit will be closed to ORV use.

**Major Utilities.** The management unit will be open to development of major utility facilities, except pipelines, so long as there will be no disturbance of threatened or endangered plant species or their potential habitat.

**Fire Management.** The management unit (377 acres) will be managed under the fire suppression category and identified for conditional suppression.

## MANAGEMENT UNIT 14

80 Acres of Public Surface; less than 1 percent of the Planning Area

Management Unit 14 is an 80-acres site consisting mainly of a volcanic structure with high-value scientific, interpretive, and scenic characteristics. A shelter facility and interpretive nature trail have been developed in the area. Needle Rock is part of the Colorado Natural Areas Program and is one of the significant public land geologic features in Colorado as identified by the BLM's Geologic Advisory Group.

The entire management unit is designated as the Needle Rock Outstanding Natural Area/Area of Critical Environmental Concern (ONA/ACEC). This designation precludes all surface-disturbing activities that are not consistent with management of the area for natural, scenic, and educational values. The area will be managed to protect these values and for recreation opportunities (sightseeing, picnicking, and geologic study) in a roaded but natural environment. A management plan will be developed.

**Oil and Gas.** Federal oil and gas estate will remain open to leasing with a no surface occupancy stipulation.

**Locatable Minerals.** The management unit will remain withdrawn from entry and location for locatable minerals.

**Mineral Materials.** The management unit will be closed to disposal of mineral materials.

**Livestock Grazing.** The management unit will remain unallotted for livestock grazing use.

**Off-Road Vehicles.** Vehicle use within the management unit will be limited to designated roads and trails yearlong.

**Visual Resources.** The management unit will be managed under VRM Class I guidelines.

**Major Utilities.** The management unit will be closed to development of major utility facilities.

BLM_0005441

**Fire Management.** The entire management unit will be managed under the fire suppression category and identified as an intensive suppression area.

## MANAGEMENT UNIT 15

6,783 Acres of Public Surface; 1 percent of the Planning Area

Management Unit 15 consists of 6,783 acres of public land approximately three miles northwest of Delta, Colorado. This area, commonly known as "the adobes", consists of Mancos shale hills and flats which, through wind and water erosion, have formed unique scenic formations. The unit's soils are highly erodible and saline. Spring and summer storms frequently result in high sediment loads and very saline runoff.

The management unit also contains populations of the threatened Uinta Basin hookless cactus and is potential habitat for the endangered clay-loving wild buckwheat and the candidate Montrose penstemon.

The entire management unit is designated as the Adobe Badlands Outstanding Natural Area/Area of Critical Environmental Concern (ONA/ACEC). The area will be managed to protect its unique scenic qualities and threatened and endangered species' habitats, and to reduce active erosion.

The management unit will be protected from surface-disturbing activities which degrade the area's scenic qualities and accelerate erosion. A complete inventory for threatened and endangered species will be conducted. Forage utilization will be managed to achieve a basal groundcover of 10 percent.

**Coal.** Federal coal estate will be closed to leasing.

**Oil and Gas.** Federal oil and gas estate will remain open to leasing with a no surface occupancy stipulation.

**Mineral Materials.** The management unit will be closed to the disposal of mineral materials.

**Soils and Water Resources.** Erosion and salinity control measures will not utilize structures or land treatments which would alter scenic values.

**Threatened and Endangered Species.** A complete inventory for threatened and endangered species will be conducted. Research and monitoring studies will be established.

**Wildlife Habitat.** Wildlife forage allocations will remain at current levels. No additional forage allocations will be made. To protect scenic values, no new habitat improvement projects or maintenance of existing projects will be permitted.

**Livestock Grazing.** Livestock grazing will continue at current levels unless studies determine threatened and endangered plant species or their potential habitat are being degraded. If basal groundcover is less than 10 percent, livestock forage utilization will be managed at 35 percent utilization of key forage species. No additional forage allocations will be made. To protect scenic values, no new livestock improvement projects or maintenance of existing projects will be permitted.

**Recreation.** The unit will be managed for primitive non-motorized recreational use.

**Off-Road Vehicles.** The unit will be closed to ORV use to protect the scenic qualities and to prevent accidental destruction of threatened and endangered plant species and their potential habitat.

**Visual Resources.** To maintain its scenic qualities, the unit will be managed under VRM Class I guidelines.

BLM_0005442

**Major Utilities.** The unit will be closed to the development of major utility facilities to prevent accidental destruction of threatened and endangered species and to maintain its scenic qualities.

**Fire Management.** The unit will be managed under the fire suppression category and identified for conditional suppression.

## MANAGEMENT UNIT 16

48,422 Acres of Public Surface; 10 percent of the Planning Area

In general, the public lands in Management Unit 16 (48,422 acres) will be managed according to the policy assumptions and standard resource program management guidance developed for the RMP. No activity plans will be written and no major BLM-funded projects or facilities will be developed within this area. Habitat, vegetation, and other resource studies will be minimal. Specific resource management in this area will be prescribed as follows:

**Oil and Gas.** Federal oil and gas estate will be open to leasing. A seasonal stipulation on seismic and drilling activities will be in effect from December 1 through April 30 on 1,042 acres of federal surface along the Gunnison and North Fork of the Gunnison rivers that are used by bald eagles as hunting habitat. Variances to the seasonal stipulation may be granted (see Appendix A).

**Locatable Minerals.** The BOR withdrawals on Fruitland Mesa and along the Gunnison River downstream of Delta will be recommended for revocation to allow for mineral exploration and development, facilitate resource management, permit long-term land use planning, and allow for disposal of 806 acres of public land on Fruitland Mesa. Withdrawals on all other lands identified for disposal will be recommended for revocation. Portions of withdrawals in the management unit which will be affected, are those associated with 108 acres of the Paonia Project, 37 acres of the Gunnison/Arkansas Project, 72 acres of the Uncompahgre Valley Project, and 25 acres along the East Canal. Federal mineral estate will be open to entry and location after the withdrawal is revoked.

**Forestry.** The reserved federal timber (123 acres) on 160 acres of land deeded to the Girl Scouts of America will be removed from the timber base and not considered for harvest. The management and harvest of this timber would be inconsistent with use of the land as a Girl Scout camp.

**Off-Road Vehicles.** Public lands within the management unit will be open to ORV use.

**Fire Management.** A total of 48,422 acres of public land will be managed under the fire suppression category, with 12,401 acres identified for intensive suppression and 36,021 acres identified for conditional suppression.

BLM_0005443

# CHAPTER THREE

# SUMMARY OF MANAGEMENT DECISIONS BY RESOURCE.

Chapter Three summarizes the RMP by resource and describes the monitoring of resource conditions needed to determine the effectiveness of the plan. Monitoring will also provide valuable resource information which will be used to guide future planning. Chapter Three also identifies (1) present implementation priorities by resource and (2) any non-BLM support needed to implement the planned actions. Although not identified in this chapter, the number one priority for all resource programs is to maintain each resource's base program. This includes normal administrative duties as well as responding to public inquiries and requests.

## LANDS PROGRAM

### Management (Disposal, Acquisition, Access, Major Utilities)

#### Disposal

One hundred forty-three (143) tracts totalling 11,026 acres are identified for further consideration for disposal. The remaining 472,051 acres of public land managed by the BLM will be retained in federal ownership. Until they are disposed of, potential disposal tracts will be managed according to the management prescription for the management unit in which they occur.

#### Acquisition

Private lands, if available, may be acquired in Management Unit 1 to improve livestock grazing management or to increase crucial deer and elk winter range; Management Unit 2 to increase crucial deer and elk winter range; Management Unit 4 to improve recreational opportunities; Management 7 to improve riparian management or to increase crucial deer and elk winter range; Management Unit 9 to improve riparian management; and in Management Unit 11 to increase waterfowl nesting habitat.

#### Access

Public trail access will be acquired into the Dominquez WSA via the McCarty Trail to provide public access to the southeast portion of the WSA.

Public road access will be acquired into the following areas: Olathe Reservoir for hunting and recreation; McDonald Mesa, Roatcap-Jay Creek, Spaulding Peak-Dry Creek, Oak Mesa and Oak Ridge for hunting, recreation, wildlife habitat management and woodland harvest; Beaver Hill-Linscott Canyon for woodland harvest and recreation; the southwest side of the Gunnison River at the Gunnison Forks and the Gunnison River at Austin for recreation; Red Canyon for public access to the Gunnison Gorge WSA; Terror Creek for livestock administration and recreation; Storm King-High Park for commercial timber harvest and recreation.

Two miles of the Dry Fork of the Escalante Canyon Road will be closed to improve riparian vegetation.

Five miles of the Potter Creek Road will be closed to improve riparian vegetation.

#### Major Utilities

Since there are no significant resource conflicts Management Units 1, 3, 8, 11, and 16 will be open

29

to major utility development with minimal stipulations.

Management Unit 2 will be open to major utility development with possible restrictions on construction activities from December 1 through April 30 within crucial deer and elk winter range to protect crucial deer and elk winter range from disturbance.

Management Unit 4 will be closed to major utility development except for the Smith Mountain-Gunnison Forks area which would only be open if no other feasible alternatives can be found to protect the areas scenic quality.

Management Unit 5 will be open to major utility development with possible restrictions on surface-disturbing activities from March 1 through May 31 to protect wet saline soils.

Management Units 6, 12, 14, and 15 are closed to major utility development.

Management Unit 6 is closed to maintain its wilderness values.
Management Units 12, 14, and 15 are closed to protect their scenic quality.

Management Unit 7 will be closed to major utility development except for one-quarter mile either side of Highway 133 to preclude potential conflicts with coal leasing and extraction.

Management Unit 9 will be open to major utility development except no surface-disturbing activities which will have long-term adverse effects will be permitted to protect riparian vegetation.

Management Unit 10 will be open to major utility development except no surface-disturbing activities will be permitted from May 1 through June 15 to protect calving elk.

Management Unit 13 will be open to major utility development except pipelines and any surface disturbance which would affect threatened or endangered plant species or their potential habitat.

## Implementation Priority

*Priority 1.* Prepare BLM protective withdrawal orders withdrawing from mineral entry and location in the following areas:

a. Portions of Management Unit 6 not currently under withdrawal
b. Management Unit 12
c. Management Unit 13
d. Management Unit 14

*Priority 2.* Prepare necessary documents to remove the BLM protective withdrawal on those lands in Management Unit 4 currently under withdrawal.

*Priority 3.* Complete route analysis and acquire public access into the following areas:

a. Olathe Reservoir
b. Oak Mesa
c. Storm King-High Park
d. Beaver Hill-Linscott Canyon
e. McCarty Trail
f. Roatcap-Jay Creek
g. Spaulding Peak-Dry Creek
h. Red Canyon
i. Oak Ridge
j. Terror Creek
k. McDonald Mesa
l. Gunnison River at Austin
m. southwest side of the Gunnison River at Gunnison Forks

*Priority 4.* Transfer reserved timber rights on 160 acres to the Girl Scouts of America.

*Priority 5.* Process the transfer of the two landfill R&PP leases to Montrose County and Delta County.

*Priority 6.* Close and remove from the transportation plan five miles of the Potter Creek road and two miles of the Dry Fork of the Escalante road.

*Priority 7.* Work with the Bureau of Reclamation in lifting the existing BOR withdrawals for the

30

BLM_0005445

Dominguez project and Fruitland Mesa project, and BOR withdrawals on identified potential disposal tracts.

*Priority 8.* Once all necessary reports have been completed, begin processing tracts which have passed through the disposal screens.

*Priority 9.* Acquire identified private lands as opportunities arise.

## Support

A great deal of cooperation will be needed with Delta County on the road closures; with the Bureau of Reclamation in lifting BOR withdrawals; and with Montrose County and Delta County in transferring the R&PP leases.

## AIR QUALITY

### Management

Present air quality standards will be adhered to throughout the entire planning area. This is required by law.

### Implementation Priority

*Priority 1.* Assist other agencies in obtaining baseline air quality data.

*Priority 2.* Incorporate mitigation into any project proposal which would degrade air quality.

### Support

Support will be needed from the State of Colorado, Department of Health, Air Pollution Control Division; the U.S. Environmental Protection Agency; the U.S. Forest Service; and the National Park Service.

## MINERAL RESOURCES

### Management

### Coal

Since there are no significant resource conflicts Management Units 1, 3, 4, 7, 8, and 16 are acceptable for further leasing consideration with no special restrictions.

Management Unit 2 will be acceptable for further leasing consideration with possible restrictions on surface-disturbing activities from December 1 through April 30 on crucial deer and elk winter range to protect crucial deer and elk winter range from disturbance.

Management Unit 5 will be acceptable for further leasing consideration with possible restrictions on surface-disturbing activities from March 1 through May 31 to prevent excessive erosion on wet saline soils.

Management Units 6 and 15 will be closed to leasing.

Management Unit 6 will be closed to protect its wilderness values.
Management Unit 15 will be closed to protect its scenic quality.

Management Unit 9 may be acceptable for further leasing consideration on a site-specific basis after consultation with affected entities and formulation of mitigating measures designed to protect riparian vegetation.

Management Unit 10 will be acceptable for further leasing consideration with possible restriction on any disturbances from May 1 through June 15 to protect elk calving areas.

Management Unit 11 will be acceptable for further leasing consideration with possible restrictions on any disturbance from March 15 through June 30 to protect nesting waterfowl.

Management Units 12, 13, and 14 are acceptable for further leasing consideration with pos-

BLM_0005446

sible restrictions on surface-disturbing activities to protect threatened, endangered, or unique species and their potential habitat, and to protect scenic values.

## Oil and Gas

Management Units 1, 2, 3, 4, 7, and 16 are open to oil and gas leasing with seasonal stipulations from December 1 through April 30 on crucial deer and elk winter range and on bald eagle hunting habitat to protect crucial deer and elk winter range and bald eagle hunting habitat from disturbance.

Management Unit 5 will be open to oil and gas leasing with seasonal stipulations from March 1 through May 31 to protect wet saline soils.

Management Unit 6 is closed to oil and gas leasing to protect its wilderness values.

Since there are no significant resource conflicts Management Units 8 and 9 are open to oil and gas leasing with only standard stipulations.

Management Unit 10 will be open to oil and gas leasing with seasonal stipulations from May 1 through June 15 to protect elk calving areas.

Management Unit 11 will be open to oil and gas leasing with seasonal stipulations from March 15 through June 30 to protect nesting waterfowl, and from December 1 through April 30 on bald eagle hunting habitat to protect bald eagle hunting habitat from disturbance.

Management Units 12, 13, 14, and 15 are open to oil and gas leasing with a no surface occupancy stipulation to protect threatened and endangered species habitat and the areas scenic quality.

## Locatable Minerals

Management Units 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 15, and 16 are open to mineral entry and location due to the lack of resource conflicts. Existing

BLM and BOR withdrawals will be recommended for lifting as they are no longer needed.

Management Units 6, 12, 13, and 14 are closed to mineral entry and location. These units will be placed under a BLM protective withdrawal.

Management Unit 6 is closed to protect its wilderness values.
Management Units 12 and 13 are closed to protect threatened, endangered and unique plant habitat.
Management Unit 14 is closed to protect its scenic quality.

## Mineral Materials

Since there are no significant resource conflicts Management Units 1, 3, 4, 7, 8, 10, and 16 are open to mineral material disposal.

Management Unit 2 is open to mineral material disposal with possible restrictions on surface-disturbing activities from December 1 through April 30 on crucial deer and elk winter range to protect crucial deer and elk winter range from disturbance.

Management Unit 5 is open to mineral material disposal with possible restrictions on surface-disturbing activities from March 1 through May 31 on wet saline soils to protect wet saline soils from rutting and erosion.

Management Units 6, 9, 12, 13, 14, and 15 are closed to mineral material disposal.

Management Unit 6 is closed to protect its wilderness values.
Management Unit 9 is closed to protect riparian vegetation.
Management Units 12 and 13 are closed to protect threatened, endangered and unique plant habitat.
Management Units 14 and 15 are closed to protect their scenic quality.

BLM_0005447

**Decisions by Resource**

Management Unit 11 is open to mineral material disposal with possible restrictions on any disturbance from March 15 through June 30 to protect nesting waterfowl.

### Implementation Priority

Priority 1. Revise oil and gas stipulations sheets.

*Priority 2.* Prepare a map of areas requiring a plan of operation (areas open to entry and location but closed to ORV).

*Priority 3.* Prepare mineral reports on acreages of federal mineral estate to be withdrawn:

a. Portions of Management Unit 6 presently not withdrawn.
b. Management Unit 12
c. Management Unit 13
d. Management Unit 14

*Priority 4.* Prepare a map of special coal lease stipulation areas.

*Priority 5.* Establish common use mineral material areas and revise the Umbrella Mineral Materials E.A.

*Priority 6.* Prepare mineral reports on the potential disposal tracts.

### Support

Support will be needed from the Regional Coal Team in identifying tracts for coal leasing.

## SOIL AND WATER RESOURCES

### Management

Water quality and erosion conditions will continue to be monitored throughout the planning area to establish baseline conditions, identify problem areas and to measure changes due to

management actions. Management Units 1, 2, 3, 7, 8, 9, 10, 11, 12, 13, 14, and 15 are available for erosion and salinity control objectives and projects which do not conflict with the primary objectives of each of these management units.

Management Unit 4 will be available for erosion and salinity control objectives and projects designed to reduce erosion and salinity. The Elephant Skin Salinity Control Project will be maintained and protected from disturbance to extend the projects effectiveness.

Watershed Management objectives will be developed for Management Unit 5. The objectives will be designed to reduce downstream salinity.

Projects will be developed in Management Unit 6 only if life, property, or wilderness values are threatened to protect the areas wilderness values. Director approval is needed for any projects.

Management Unit 16 will not be available for any project development due to the low potential economic return.

### Implementation Priority

*Priority 1.* Maintain existing water quality and erosion monitoring studies.

*Priority 2.* Amend the Elephant Skin Salinity Control Plan to conform to this RMP.

*Priority 3.* Determine existing basal ground cover on:

a. The Elephant Skin project area
b. Management Unit 15
c. Management Unit 5

*Priority 4.* Develop Watershed Management objectives on Management Unit 5.

*Priority 5.* Implement Watershed Management Plans.

33

BLM_0005448

### Support

Support will be needed from the Colorado Water Quality Control Division and the Environmental Protection Agency.

## RIPARIAN/AQUATIC SYSTEMS

### Management

Management Units 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, and 16 will continue to be inventoried and monitored as per BLM policy. Riparian vegetation condition will, at a minimum, be maintained or preferably improved. Measures designed to mitigate adverse riparian impacts will be required for all surface-disturbing activities.

Riparian Improvement Plans will be prepared for Management Unit 9. These plans will be designed to improve riparian vegetation condition in these areas. This intensive management is designed to accelerate riparian improvement.

### Implementation Priority

*Priority 1.* Maintain existing studies designed to monitor riparian vegetation trends.

*Priority 2.* Inventory riparian vegetation condition on the following streams:

a. Cottonwood Creek
b. Spring Creek
c. Escalante Creek
d. Terror Creek
e. Jay Creek
f. Current Creek
g. Dry fork of Escalante Creek
h. remaining riparian areas

*Priority 3.* Update existing AMPs, HMPs, RAMPs, and WMPs to incorporate riparian objectives if needed.

*Priority 4.* Establish new studies in Management Unit 9 designed to determine the best means of riparian improvement.

*Priority 5.* Prepare riparian improvement plans on:

a. Roubideau Creek and its tributaries
b. remaining creeks in Management Unit 9

*Priority 6.* Physically close and rehabilitate the the Potter Creek and Dry Fork of Escalante Creek.

### Support

No support will be needed.

## THREATENED AND ENDANGERED SPECIES

### Management

Clearances and mitigation for threatened and endangered species will be required for all surface-disturbing activities throughout the planning area. This is required by law.

Management Units 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 14, and 16 will have measures designed to protect threatened and endangered species and their habitat incorporated into all activity plans. This management will further enhance threatened and endangered species protection.

Management Unit 8 will be inventoried for threatened and endangered species and its boundary adjusted to exclude any located plants. This management will eliminate any potential destruction of threatened and endangered plants.

Management Unit 12 is designated an Area of Critical Environmental Concern (ACEC) and Management Unit 15 is designated an Outstanding Natural Area/Area of Critical Environmental

BLM_0005449

Decisions by Resource                                    **Chapter Three**

Concern (ONA/ACEC) in part due to the occurrence of several threatened and endangered species and unique plant associations. Management plans will be developed for these areas and intensive studies established to increase our basic knowledge about these threatened and endangered species.

Management Unit 13 is designated a Research Natural Area/Area of Critical Environmental Concern (RNA/ACEC). A management plan will be developed for this area and intensive studies established to increase basic knowledge about these threatened and endangered species.

## Implementation Priority

*Priority 1.* Conduct a threatened and endangered species inventory of Management Unit 8.

*Priority 2.* Prepare the management plan for Management Unit 13 and assist the preparation of a management plan for Management Unit 12.

*Priority 3.* Establish studies in Management Units 12 and 13 designed to determine how best to increase plant frequency.

*Priority 4.* Conduct a threatened and endangered species inventory in Management Unit 15.

*Priority 5.* Conduct threatened and endangered species clearances on potential disposal tracts.

*Priority 6.* Continue general monitoring of threatened and endangered species.

## Support

Support is needed from the U.S. Fish and Wildlife Service and the Colorado Natural Areas Program.

## WILDLIFE HABITAT

## Management

Additional forage will be available in Management Unit 1 for wildlife only. If not needed by livestock to increase forage available for livestock grazing. Non-conflicting wildlife objectives and projects will be incorporated into existing allotment management plans to eliminate the need for multiple activity plans. Desert bighorn sheep will be permitted on Winter Mesa if it is determined there would be no conflict with livestock. This will increase population numbers, re-establish this species in previously occupied habitat and insure species viability in this area.

Wildlife will have priority for any additional forage in Management Unit 2. Habitat management plans will be developed to improve winter range. Desert bighorn sheep may be reintroduced into the Camel Back-Roubideau area to increase population numbers and provide genetic diversity.

Management Units 3, 4, 5, 8, 9, 11, 12, 13, 14, and 15 will have habitat trend studies established on all crucial deer and elk winter range to monitor habitat changes. Additional forage will be divided equally between wildlife and livestock to provide forage for both resources. Supplemental releases and reintroduction of wildlife species may be authorized to increase population numbers.

Bighorn sheep will be protected and habitat improved in Management Unit 4 to enhance habitat conditions and increase population numbers.

Management Unit 6 will be managed for a natural distribution of wildlife populations to protect the areas wilderness values. Additional supplemental releases of bighorn sheep will be permitted to increase population numbers and enhance genetic viability.

Wildlife will have priority for any additional forage in Management Unit 7 to increase available forage on public land.

35

BLM_0005450

**Chapter Three**                                    Decisions by Resource

Wildlife will have priority for any additional forage in Management Unit 10 to increase available forage. A habitat management plan will be prepared to improve elk calving habitat.

Management Unit 11 will be managed to improve waterfowl nesting habitat. This will be accomplished in cooperation with the adjoining Colorado DOW Wildlife Area.

No additional forage in Management Unit 15 will be allocated, no existing projects will be maintained, and no new projects will be developed. This management will protect the areas scenic qualities.

### Implementation

*Priority 1.* Cooperate with the Colorado DOW on supplemental releases of bighorn sheep into the Gunnison Gorge.

*Priority 2.* Establish and maintain monitoring studies on crucial deer and elk winter range to determine habitat condition and trend.

*Priority 3.* Cooperate with the Colorado DOW on reintroduction of desert bighorn sheep into the Camel Back area.

*Priority 4.* Prepare habitat management plans in the following areas:

a. Baldy Peak
b. Jumbo Mountain-McDonald Mesa
c. Grand Mesa
d. Management Unit 11
e. Uncompahgre Plateau
f. Billy Creek
g. Management Unit 10

*Priority 5.* Incorporate the Gunnison Forks HMP into the Gunnison Gorge RAMP.

### Support

Support is needed from the Colorado Division of Wildlife.

### LIVESTOCK GRAZING

#### Management

Management Units 3, 8, 11, 12, 13, and 16 will maintain current forage allocations for livestock grazing until studies determine adjustments are needed. Additional forage will be divided equally between livestock grazing and wildlife to provide forage for both resources. Livestock grazing will be limited to 50 percent utilization of key forage species to permit sustained forage capacity.

Management Unit 1 will be intensively managed to improve vegetation conditions and livestock forage. Livestock grazing will have first priority for any additional forage to increase forage available for livestock grazing. Allotment management plans will be prepared to identify grazing management practices. Any unallotted areas or relinquished permits will be reissued to permit livestock grazing.

In Management Unit 2 any proposed projects must be compatible with wildlife objectives. Additional forage will be available for livestock use only if not needed by wildlife.

In Management Unit 3 no projects will be permitted which would reduce the woodland base. This management will increase production of woodland products.

In Management Unit 4 livestock grazing will be limited to 35 percent utilization of key forage species in the Elephant Skin Salinity Control Project if needed to obtain optimum cover. No grazing will be permitted in the Gunnison Forks HMP area in order to eliminate livestock-recreation conflicts.

In Management Unit 5 additional forage will be divided equally between livestock grazing and wildlife to provide forage for both resources. No livestock will be permitted from March 20 to range readiness to protect wet saline soils. Livestock use will be limited to 35 percent utiliza-

BLM_0005451

tion of key forage species until basal ground cover objectives are attained to reduce erosion.

In Management Unit 6 livestock grazing and project maintenance will be limited to levels and conditions established prior to wilderness designation to protect the areas wilderness values. New projects may be authorized if necessary for rangeland and/or wilderness protection.

Any additional forage in Management Unit 7 will be allocated to wildlife to increase available forage on public land.

No fences or other projects which would impede ORV use will be permitted in Management Unit 8 to eliminate ORV hazards.

No livestock grazing will be allowed in Management Unit 9 from March 1 to range readiness to accelerate riparian vegetation improvement. Livestock grazing may be limited to 35 percent utilization of key forage species to increase riparian cover. Trailing use will be confined to established roads and limited as much as possible. No bedding livestock will be permitted in riparian areas to reduce bank disturbance.

Wildlife will have first priority for any additional forage in Management Unit 10 to increase available forage.

In Management Units 12 and 13 livestock grazing will continue at current levels unless studies determine threatened or endangered or unique species and their potential habitat are being adversely affected. This is designed to protect threatened, endangered and unique species from potential livestock destruction.

Management Unit 14 will be closed to livestock use to protect its scenic qualities.

Livestock grazing will continue at current levels in Management Unit 15 unless studies determine threatened and endangered species and their potential habitat are being adversely affected. This is designed to protect threatened and en-

dangered species from potential livestock destruction. Livestock grazing use will be limited to 35 percent utilization of key forage species until basal ground cover objectives are attained to increase cover thereby reducing erosion. No additional forage allocations for livestock will be made. No existing projects will be maintained and no new projects will be developed to protect the areas scenic qualities.

## Implementation Priority

*Priority 1.* Continue existing vegetation trend studies.

*Priority 2.* Increase monitoring of actual livestock trailing use of Management Unit 9:

   a. Roubideau Creek
   b. Roatcap-Jay Creek
   c. Remaining riparian areas in Management Unit 9

*Priority 3.* Establish and maintain vegetation condition studies in Management Unit 1.

*Priority 4.* Limit grazing permits on allotments containing potential disposal tracts to one year. Adjust AUM allocations as tracts are exchanged or sold.

*Priority 5.* Change livestock season of use in Management Units 5 and 9 to exclude livestock grazing from March 1 to range readiness.

*Priority 6.* Evaluate and update existing AMPs to reflect decisions in this RMP.

*Priority 7.* Develop new AMPs on grazing allotments without current plans in Management Unit 1.

*Priority 8.* Implement new AMPs as funds become available.

## Support

Support is needed from the Montrose District Grazing Advisory Board.

BLM_0005452

**Chapter Three**

# FORESTRY

## Management

In Management Unit 1 the forest resource will be managed to increase livestock forage.

In Management Unit 2 the forest resource will be managed to improve wildlife habitat with possible restrictions on surface-disturbing activities from December 1 through April 30 on crucial deer and elk winter range to protect crucial deer and elk winter range and its use from disturbance.

In Management Unit 3 the forest resource would be intensively managed for woodland product harvest within sustained yield production limits to increase available woodland products. Forest Management Plans would be prepared and, if needed, plantations established to increase forest product availability.

In Management Unit 4 the only area open to woodland product harvest is 1,255 acres in the Black Ridge area. This area may have restrictions on surface-disturbing activities from December 1 through April 30 within crucial deer and elk winter range to protect crucial deer and elk winter range from disturbance.

Management Units 5, 7, 8, 11, 13, 15, and 16 will be managed for sustained yield production of forest products to meet current and future demands for woodland products.

Management Unit 6 will not be available for woodland harvest except for insect or disease control efforts to protect its wilderness values.

Management Units 9, 12, and 14 are closed to harvest.

Management Unit 9 is closed to protect riparian vegetation.
Management Units 12 and 14 are closed to protect their scenic values.

Management Unit 10 will have timber and woodland harvests designed to improve elk calving habitat.

## Implementation Priority

*Priority 1.* Rewrite the Umbrella Forest Products environmental assessment to conform to this RMP.

*Priority 2.* Assist in the preparation of a management plan for Management Unit 10.

*Priority 3.* Prepare Forest Management Plans for the following areas:

a. Jones Draw
b. Highway 90
c. North Escalante
d. Lee Point
e. Beaver Hill
f. Dirty George
g. Youngs Peak
h. Sawmill Mesa
i. West Transfer Road
j. Dry Creek
k. Government Springs
l. Loghill

## Support

Support is needed from the Colorado Division of Wildlife.

# RECREATION

## Management

River access will be developed at the Escalante Bridge site in Management Unit 1 to provide an improved landing area. Maps and informational pamphlets will be prepared to limit boater landowner conflicts along the lower Gunnison River between Delta and Bridgeport.

BLM_0005453

Management Units 2, 3, 5, 7, 9, 10, 11, 13, and 16 will be managed for extensive recreational use to meet public demands for dispersed recreation.

Management Unit 4 will be managed for recreational use. The Peach Valley area will be managed predominately for ORV use while the remainder will be managed for its natural primitive values. This management is designed to meet a wide variety of recreational demands.

Management Unit 6 will be managed for low impact non-motorized recreational use. Permits may be required for commercial and non-commercial use. The Gunnison River will be managed for six to ten group encounters per day, with only two (as per the 1988 Gunnison Gorge RAMP) commercial trips per day. This management is designed to protect the areas wilderness values.

Management Unit 8 will be developed for intensive ORV use. Loading ramps and informational signs will be constructed. This management will provide ORV users an area with limited hazards.

Management Unit 12 will be designated an Area of Critical Environmental Concern (ACEC) to protect the areas threatened and endangered species and recreational values. Informational signs and warnings will be posted at the Potholes to inform the public of the hazards.

Management Unit 14 will be designated an Outstanding Natural Area/Area of Critical Environmental Concern (ONA/ACEC) to protect the areas scenic qualities. A management plan will be prepared.

Management Unit 15 will be designated an Outstanding Natural Area (ONA/ACEC) to protect the areas threatened and endangered species and scenic qualities. A management plan will be prepared to manage the area for its primitive, non-motorized recreational values.

## Implementation Priority

Priority 1. Revise the Gunnison Gorge RAMP or prepare an RMP amendment to bring these two documents into conformance.

Priority 2. Implement the Gunnison Gorge RAMP.

Priority 3. Prepare and implement a management plan for Management Unit 14.

Priority 4. Prepare maps and informational pamphlets for the lower Gunnison River.

Priority 5. Construct a ramp at the Escalante Bridge.

Priority 6. Prepare and implement a management plan for Management Unit 12.

Priority 7. Prepare and implement a management plan for Management Unit 8.

Priority 8. Prepare and implement a management plan for Management Unit 15.

Priority 9. Construct the McCarty Trail trailhead.

## Support

No support will be needed.

# OFF-ROAD VEHICLE MANAGEMENT

## Management

See the map in Appendix C.

## Implementation Priority

Priority 1. Signing and public informational maps.

**Chapter Three**                                                    Decisions by Resource

### Support

No support will be needed.

## CULTURAL RESOURCES

### Management

Clearances and mitigation for cultural resources will be required for all surface-disturbing activities throughout the planning area. This is required by law.

Management Unit 1 will have a Class III cultural inventory conducted on 5,800 acres between Highway 90 and Sandy Wash to identify the presence of cultural resources and determine the areas cultural significance.

Management Units 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, and 16 will have measures designed to protect cultural sites incorporated into all activity plans. This is required by law.

### Implementation Priority

*Priority 1.* Survey all potential disposal tracts.

*Priority 2.* Conduct a Class III survey on 5,800 acres in Management Unit 1.

*Priority 3.* Identify other sensitive areas based on modeling.

### Support

Support will be needed from the Colorado State Historic Preservation Officer.

## PALEONTOLOGICAL RESOURCES

### Management

Protective measures will be developed as this resource is discovered. Little is known about this

resource in this area. As information is obtained specific management will be identified.

### Implementation Priority

No implementation is scheduled.

### Support

No support will be needed.

## VISUAL RESOURCES

### Management

Management Unit 1 will be managed under VRM Class III, except for Escalante Canyon which will be Class II to protect its scenic qualities.

Management Unit 2 will be managed under VRM Class III to protect its scenic qualities while permitting some intrusion.

Management Units 3, 5, 7, 9, 10, 11, 13, and 16 will be managed under the existing VRM classifications as no changes were deemed necessary.

Management Unit 4 will be managed under the existing VRM classes, except for open ORV areas which will be managed under VRM Class IV to allow substantial change.

Management Unit 6, 14, and 15 will be managed under VRM Class I to protect the area's scenic qualities.

Management Unit 8 will be managed under VRM Class IV to allow substantial change.

Management Unit 12 will be managed under VRM Class II to protect its scenic qualities.

### Implementation Priority

40

BLM_0005455

Decisions by Resource                                           **Chapter Three**

No implementation is scheduled.

**Support**

No support will be needed.

## WILDERNESS

### Management

Management Unit 6 will be recommended as suitable for wilderness designation to protect its wilderness values.

### Implementation Priority

*Priority 1.* Prepare the Final Wilderness EIS

*Priority 2.* Prepare the Wilderness Study Report for each of the three Wilderness Study Areas.

## FIRE

### Management

Fire will be managed as displayed on the map in Appendix D. This management is based on resource conditions, proximity of private development and risk of fire spread.

### Implementation Priority

No implementation is scheduled.

### Support

No support will be needed.

BLM_0005456

# APPENDIX A

# STIPULATIONS FOR OIL AND GAS LEASES

The following stipulations will be added to future oil and gas leases on both federal surface and split-estate lands where assigned for each management unit (see beginning page 146). The actual wording of these stipulations may be adjusted at the time of leasing to reflect future legislation, court decisions or policy changes; however, the protection standards contained in these stipulations will be maintained. Any change to the protection content of the stipulation would require an amendment to the RMP/EIS.

## 1. Highly Erodible and/or Saline Soil Areas

**Stipulation:** To protect watersheds from salinity infusions and to protect highly erodible soil areas where low soil productivity would prolong or disallow revegetation, all development activities (exploration, drilling, etc.) will be allowed only from June 1 through February 28. Exceptions to this limitation may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description).

**Reasons for Exceptions:** This stipulation may be waived, excepted, or modified by the Authorized Officer if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on salinity and highly erodible soil areas. The stipulation will not be waived, excepted, or modified if it is determined that the activity would cause accelerated erosion that would result in excessive amounts of salinity being contributed to the Colorado River. Variances could be allowed if soils are not saturated during the typical high soil moisture period when these these soils are most susceptible to damage (March 1 through May 31), or if impacts could be mitigated, or if site-specific conditions do not warrant the stipulation (small amount of disturbance, short duration of operations, etc.).

Resource information for split-estate lands has not been verified by the BLM. Verification will occur during review of Applications for Permit to Drill (APD's). On-site inspection and consultation with the surface owner and operator may reveal that (1) the impacts addressed by the stipulation will be avoided or mitigated to an acceptable level, or (2) the resources of concern are not present. Upon either of these determinations by the Authorized Office, the stipulations can be waived, modified, or excepted without public notice other than that provided for the APD. If, after on-site inspection and consultation with the private surface landowner, it is determined by the Authorized Officer that conditions necessary to avoid impacts to private resources would adversely impact the public resources addressed by these stipulations, the impacts will be assessed. If, based upon such assessment, the Authorized Officer makes a decision to substantially change or waive one or more stipulations, a 30-day public review period will be provided in addition to the public notice period for receipt of the APD. (These two 30-day notice and review periods may overlap.)

## 2. Threatened, Endangered, Candidate, and Sensitive Plant Areas

**Stipulation:** To protect the threatened, endangered, candidate, and sensitive plants and their potential habitat within the Escalante Canyon Area of Critical Environmental Concern and the Fairview Research Natural Area, an area of critical environmental concern, no surface occupancy will be permitted in these areas. Excep-

43

Appendix

tions to this restriction may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description).

**Reasons for Exceptions:** This stipulation may be waived, excepted, or modified by the Authorized Officer is the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on threatened, endangered, candidate, and sensitive plants and their potential habitats within these areas.

### 3. Bald Eagle Winter Concentration Areas

**Stipulation:** To protect bald eagles from activities that would cause abandonment of winter concentration areas, all development activities (exploration, drilling, etc.) will only be allowed in these areas from May 1 through November 30. Exceptions to this limitation may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description).

**Reasons for Exceptions:** This stipulation may be waived, excepted, or modified by the Authorized Officer if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on wintering bald eagles.

Resource information for split-estate lands has not been verified by the BLM. Verification will occur during review of Applications for Permit to Drill (APDs). On-site inspection and consultation with the surface owner and operator may reveal that (1) the impacts addressed by the stipulation will be avoided or mitigated to an acceptable level, or (2) the resources of concern are not present. Upon either of these determinations by the Authorized Officer, the stipulations can be waived, modified, or excepted without public notice other than that provided for the APD. If, after on-site inspection and consultation with the private surface landowner, it is determined by the Authorized Officer that conditions

necessary to avoid impacts to private resources would adversely impact the public resources addressed by these stipulations, the impacts will be assessed. If, based upon such assessment, the Authorized Officer makes a decision to substantially change or waive one or more stipulations, a 30-day public review period will be provided in addition to the public notice period for receipt of the APD. (These two 30-day notice and review periods may overlap.)

### 4. Crucial Deer and Elk Winter Ranges

**Stipulation:** To protect crucial deer and elk winter ranges from activities that would cause these species to abandon areas of crucial winter forage and cover for less suitable ranges, all development activities (exploration, drilling, etc.) will only be allowed from May 1 through November 30. Exceptions to this limitation may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description).

**Reasons for Exceptions:** This stipulation may be waived, excepted, or modified by the Authorized Officer if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on deer and elk utilization of crucial winter ranges. Variances could be allowed if these crucial ranges are not being utilized due to mild winter conditions or temporary changes in winter range utilization, or if impacts could be mitigated, or if site-specific conditions do not warrant the stipulation (small amount of disturbance, short duration of operations, etc.).

Resource information for split-estate lands has not been verified by the BLM. Verification will occur during review of Applications for Permit to Drill (APDs). On-site inspection and consultation with the surface owner and operator may reveal that (1) the impacts addressed by the stipulation will be avoided or mitigated to an acceptable level, or (2) the resources of concern are not present. Upon either of these determinations by the Authorized Officer, the stipulations

44

can be waived, modified, or excepted without public notice other than that provided for the APD. If, after on-site inspection and consultation with the private surface landowner, it is determined by the Authorized Officer that conditions necessary to avoid impacts to private resources would adversely impact the public resources addressed by these stipulations, the impacts will be assessed. If, based upon such assessment, the Authorized Officer makes a decision to substantially change or waive one or more stipulations, a 30-day public review period will be provided in addition to the public notice period for receipt of the APD. (These two 30-day notice and review periods may overlap.)

### 5. Elk Calving Areas

**Stipulation:** To protect elk calving areas from activities that would force elk to abandon these areas during critical calving periods, all development activities (exploration, drilling, etc.) will only be allowed from July 16 through April 14. Exceptions to this limitation may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description.

**Reasons for Exceptions:** This stipulation may be waived, excepted, or modified by the Authorized Officer if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on deer and elk utilization of crucial winter ranges.

Resource information for split-estate lands has not been verified by the BLM. Verification will occur during review of Applications for Permit to Drill (APDs). On-site inspection and consultation with the surface owner and operator may reveal that (1) the impacts addressed by the stipulation will be avoided or mitigated to an acceptable level, or (2) the resources of concern are not present. Upon either of these determinations by the Authorized Officer, the stipulations can be waived, modified, or excepted without public notice other than that provided for the

APD. If, after on-site inspection and consultation with the private surface landowner, it is determined by the Authorized Officer that conditions necessary to avoid impacts to private resources would adversely impact the public resources addressed by these stipulations, the impacts will be assessed. If, based upon such assessment, the Authorized Officer makes a decision to substantially change or waive one or more stipulations, a 30-day public review period will be provided in addition to the public notice period for receipt of the APD. (These two 30-day notice and review periods may overlap.)

### 6. Waterfowl Habitat

**Stipulation:** To protect waterfowl from activities that would alter breeding behavior, increase the incidence of nest abandonment, and decrease breeding success, all development activities (exploration, drilling, etc.) will only be allowed in waterfowl habitats from July 1 through March 14. Exceptions to this limitation may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description).

**Reasons for Exceptions:** This stipulation may be waived, excepted, or modified by the Authorized Officer if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on breeding and nesting waterfowl. Variances could be allowed if these breeding habitats are not being utilized, or if impacts could be mitigated, or if site-specific conditions do not warrant the stipulation (few individuals affected, short duration of operations, etc.).

Resource information for split-estate lands has not been verified by the BLM. Verification will occur during review of Applications for Permit to Drill (APDs). On-site inspection and consultation with the surface owner and operator may reveal that (1) the impacts addressed by the stipulation will be avoided or mitigated to an acceptable level, or (2) the resources of concern

BLM_0005459

Appendix

are not present. Upon either of these determinations by the Authorized Officer, the stipulations can be waived, modified, or excepted without public notice other than that provided for the APD. If, after on-site inspection and consultation with the private surface landowner, it is determined by the Authorized Officer that conditions necessary to avoid impacts to private resources would adversely impact the public resources addressed by these stipulations, the impacts will be assessed. If, based upon such assessment, the Authorized Officer makes a decision to substantially change or waive one or more stipulations, a 30-day public review period will be provided in addition to the public notice period for receipt of the APD. (These two 30-day notice and review periods may overlap.)

### 7. Outstanding Natural Areas/Areas of Critical Environmental Concern

Stipulation: To protect the scenic, natural, and scientific values of the Adobe Badlands Outstanding Natural Area/Area of Critical Environmental Concern, and the Needle Rock Outstanding Natural Area/Area of Critical Environmental Concern, no surface occupancy will be permitted within these areas. Exceptions to this restriction may be authorized in writing by the BLM's Authorized Officer. The affected portions of this lease are (legal description).

Reasons for Exceptions: This stipulation may be waived, excepted, or modified by the Authorized Officer if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts on the scenic, natural, and scientific values of these areas.

### 8. Wilderness Study Areas

Stipulation: Wilderness Protection Stipulation Form CSO 3000-1 (July 1980) is attached per Washington Office Instruction Memo No. 80-509 (5/12/80). This memo implements the Interim Management Policy and Guidelines for Land Under Wilderness Review (12/12/79) and amendments).

Reasons for Exceptions: This stipulation will be attached to all leases involving lands within WSAs, and will apply until these lands are released from WSA status.

46

BLM_0005460

# APPENDIX B

# COAL PLANNING

The following is a summary of the Coal planning process for the Uncompahgre Basin RMP. Detailed and specific information is available in the Coal Unsuitability Report. This report is available at the Uncompahgre Basin Resource Area Office and the Montrose District Office.

The Federal Coal Leasing Amendment Act of 1976 outlines procedures for leasing and development of federally-owned coal lands. This Act requires that coal leasing be compatible with land use allocations outlines in comprehensive land use plans. The Surface Mining Control and Reclamation Act of 1977 established federal standards for regulating surface mining and reclamation activities on federal, state, and private lands. The Department of Interior has incorporated these Acts into regulations requiring the analysis of four coal planning screens during land use planning. Documented in Title 43, Code of Federal Regulations-Part 3420.1 (43 CFR 3420.1), these planning screens are applied to determine the leaseability of federal coal lands.

The first screen (coal development potential) eliminates federal coal lands that have little or no coal development potential. The second screen (coal unsuitability review) eliminates lands that have sensitive resources. The third screen (multiple-use tradeoffs) eliminates lands that have resources considered more important than coal or identifies lands where special stipulations are required to protect important resources. The fourth screen (surface owner consultation) eliminates private land with federal coal based on the landowner's opposition to surface mining.

The first coal planning screen was completed prior to 1980 when the U.S. Geological Survey (USGS) identified as coal planning areas all the federal coal lands within the region that have coal development potential. The Bookcliffs (965 acres), Paonia/Somerset (94,960 acres), and Cimarron Ridge (14,134 acres) coal planning areas were identified within the Uncompahgre Basin planning area.

Federal coal lands passing through the first coal planning screen are subject to application of the 20 coal unsuitability criteria in the second coal planning screen. These 20 criteria, outlines in Title 43, Code of Federal Regulations-Part 3461.1 (43 CFR 3461.1), are a uniform national standard to insure that 20 specific resources and land uses are not foregone by coal mining. Federal coal lands not meeting the standards required by each criterion are determined to be unsuitable for coal leasing. A number of criteria have exemptions and exceptions. Application of these exemptions and exceptions may allow certain types of coal mining.

A total of 20,945 acres of federal coal lands are presently leased and were not subject to the second coal planning screen as per 43 CFR 3461.4-2. An additional 5,718 acres of presently leased federal coal lands were previously determined to be suitable as identified in the following documents: the North Fork MFP as amended; and the environmental assessments for the West Elk Coal Company Coal Lease Modification Application (Serial Number D-044569), the Colorado Westmoreland, Inc., and Western Slope Carbon, Inc., Short-Term Competitive Coal Lease Applications (Serial Numbers C-27432 and C-27103), and the Grand Mesa Properties Company Coal Lease Modification Application (Serial Number D-055156).

47

Appendix

All portions of the coal planning areas within the Uncompahgre Basin planning area that are not leased for coal development are undergoing the second coal planning screen in concurrence with this RMP/EIS. These unleased federal coal lands total 83,396 acres in the Bookcliffs and Paonia/Somerset coal planning areas.

Based on initial application of the 20 criteria, 82,827 acres were determined to be acceptable for further coal leasing consideration. Of these lands, 15,662 acres were determined to be suitable only with specified constraints. Lands determined to be unsuitable for further leasing consideration total 569 acres. No exemptions were determined to apply within the review area. Prior to the leasing of a federal coal tract, the results of this coal planning screen will be reviewed on a site-specific basis to determine if any changes are necessary in the application of the 20 criteria.

Public lands that have resources determined to be more important than coal development are either protected by special stipulations or eliminated from coal leasing consideration in the third coal planning screen. These multiple-use trade-off determinations are made during the RMP/EIS process. This RMP/EIS fulfills the requirements of the third coal planning screen for all of the federal coal within the planning area, including existing leased lands.

The fourth coal planning screen requires consultation with the owners of split-estate lands when federal coal is being considered for leasing and surface mining techniques are considered likely. This coal planning screen was determined to not apply to the coal planning areas within the Uncompahgre Basin planning area as no surface mining of significant amounts of coal is anticipated.

Information derived from completion of these four coal planning screens is forwarded to the appropriate interagency Regional Coal Team.

BLM_0005462

# APPENDIX C

## OFF-ROAD VEHICLE MANAGEMENT
### Map #1



 **CLOSED:** Areas Which Are Closed
to Off-road Vehicle Use Year-round.

49

Scale: 1″ = 10 Miles

BLM_0005463

## APPENDIX C

### OFF-ROAD VEHICLE MANAGEMENT
Map #2



**LIMITED:** Areas Where Vehicle Use Will Be Limited to Designated Roads and Trails, Either Seasonally or Year-round.



Scale: 1" = 10 Miles

50

BLM_0005464

# APPENDIX D
## Fire Suppression Category
## Conditional Suppression Areas



**MAP D - 1**

51

**Scale: 1" = 10 Miles**

# APPENDIX D

# Fire Suppression Category
# Intensive Suppression Areas



**MAP D - 2**

52

**Scale: 1" = 10 Miles**

BLM_0005466

# APPENDIX D
# Fire Use Category
# Planned or Natural Ignitions



**MAP D - 3**

53

Scale: 1" = 10 Miles

# APPENDIX D
# Fire Use Category
# Natural Ignitions Only



**MAP D - 4**

54

Scale: 1" = 10 Miles

BLM_0005468

# APPENDIX E

# SPECIAL DESIGNATIONS

## Escalante Canyon ACEC (Management Unit 12)

A 1,895-acre portion of Escalante Canyon located west of Delta, Colorado is designated as the Escalante Canyon Area of Critical Environmental Concern. Specifically, this area is located in T. 51 N., R. 13 W., sections 19, 20, 21, 22, 27, 28, 29, and 30, New Mexico Principal Meridian.

This area contains several federally-listed threatened and endangered plant species and two unique plant associations. The area also receives significant recreational use.

Threatened and endangered plant monitoring studies will be developed and habitat improvement activities initiated. Information signs identifying potential recreational hazards will be provided. Oil and gas leases will have a no surface occupancy stipulation, the area will be withdrawn from entry and location for locatable minerals, and all surface-disturbing activities will be restricted to protect and enhance listed and unique plant habitat.

## Fairview RNA/ACEC (Management Unit 13)

An area comprised of two tracts totalling 377 acres located eight miles east of Montrose, Colorado, is designated as the Fairview Research Natural Area/Area of Critical Environmental Concern. Specifically, this area is located in T. 49 N., R. 8 W., section 18 and 19; T. 48 N., R. 8 W., section 6; and T. 48 N., R. 9 W., section 1, New Mexico Principal Meridian.

The tracts contain a large population of a listed endangered species and significant populations of a candidate species.

Plant monitoring studies will be developed in cooperation with the Colorado Natural Areas Program and actions designed to improve habitat conditions initiated. Oil and gas leases will have a no surface occupancy stipulation, the area will be withdrawn from entry and location for locatable minerals and all surface-disturbing activities will be restricted to protect and enhance endangered species habitats.

## Needle Rock ONA/ACEC (Management Unit 14)

An 80-acre site located northeast of Crawford, Colorado, is designated as the Needle Rock Outstanding Natural Area/Area of Critical Environmental Concern. Specifically, this area is located in T. 15 S., R. 91 W., section 27, 6th Principal Meridian.

This site consists mainly of a volcanic geological structure with high-value scientific, interpretive, and scenic characteristics.

The area will be managed to protect the scientific and scenic qualities of this site. Oil and gas leases will contain a no surface occupancy stipulation, the area will remain withdrawn from entry and location for locatable minerals, and the area will be managed under VRM Class I guidelines.

## Adobe Badlands ONA/ACEC (Management Unit 15)

A 6,783-acre area located approximately three miles northwest of Delta, Colorado, is designated as the Adobe Badlands Outstanding Natural Area/Area of Critical Environmental Concern. Specifically, this area is located in T. 14 S., R. 96 W., sections 8, 9, 10, 14, 15, 16, 21, 22, 23, 24, 25, 26, 27, 28, 33, 34, 35, and 36; and

BLM_0005469

Appendix

T. 15 S., R. 96 W., sections 2, 3, and 4, 6th Principal Meridian.

This area consists of Mancos shale hills and flats which, through wind and water erosion, have formed unique scenic formations. The area's soils are highly erodible and saline, resulting in high sediment loads and very saline runoff. The area also contains known and potential habitat for several endangered and threatened plant species.

The area will be managed to protect its unique scenic qualities, improve threatened and endangered species habitat, and reduce active erosion. Oil and gas leases will contain a no surface occupancy stipulation; forage utilization will be limited if necessary to reduce erosion rates; and the area will be protected from surface-disturbing activities which would degrade scenic qualities or accelerate erosion.

56

☆ U. S. GOVERNMENT PRINTING OFFICE: 1989—673-223/00,105 REGION NO. 8

BLM_0005470

# UNCOMPAHGRE BASIN WILDERNESS





## FINAL ENVIRONMENTAL IMPACT STATEMENT

*U.S. DEPARTMENT OF THE INTERIOR*
*BUREAU OF LAND MANAGEMENT*

*MONTROSE DISTRICT*
*UNCOMPAHGRE BASIN RESOURCE AREA*

1989

BLM_0005471

BLM_0005472

IN REPLY REFER TO:

8520 (161)

# United States Department of the Interior

### BUREAU OF LAND MANAGEMENT
COLORADO STATE OFFICE
2850 YOUNGFIELD STREET
LAKEWOOD, COLORADO 80215

NOTICE

The Final Environmental Impact Statement (FEIS) on the Uncompahgre Basin Resource Area and the Gunnison Gorge, Camel Back, and Adobe Badlands Wilderness Study Areas (WSAs) has been completed. This FEIS incorporates public and other government agency review comments which were received during the public review period. Reviewer's comments were made at public hearings and by letter. These comments and BLM's responses are included within this document.

The FEIS is not the decision-making document. A Record of Decision in the form of a Wilderness Study Report will be prepared for signature by the Secretary of the Interior. The recommendations as to the suitability of the WSAs discussed in the FEIS for designation as wilderness will be presented in this Wilderness Study Report. The Secretary will review this report and then submit his recommendations to the President by 1991. The President then has two years to submit his recommendations to the Congress for their action. Only the Congress can decide which areas will be designated wilderness.

On behalf of my staff, I want to express my appreciation for the time and effort so many people took in commenting on each of the WSAs.

Sincerely,

H. Robert Moore
State Director

BLM_0005473

BLM_0005474

**United States Department of the Interior**
**Bureau of Land Management**

# FINAL WILDERNESS
# ENVIRONMENTAL IMPACT STATEMENT
## for the
## UNCOMPAHGRE BASIN RESOURCE AREA
## MONTROSE DISTRICT, COLORADO

**Prepared By:**

**Uncompahgre Basin Resource Area**
**Bureau of Land Mangement**

_Bob Moore_
**State Director, Colorado**

_September 27, 1989_
Date

BLM_0005475

BLM_0005476

# WILDERNESS

# ENVIRONMENTAL IMPACT STATEMENT

# FOR THE

# UNCOMPAHGRE BASIN RESOURCE AREA

# MONTROSE, COLORADO

Draft ( )   Final (X)

U.S. Department of the Interior, Bureau of Land Management

1. **TYPE OF ACTION**:  Administrative ( )   Legislative (X)

2. **ABSTRACT**: This final environmental impact statement (FEIS) analyzes and describes the environmental, social, and economic effects of designating or not designating as wilderness, three wilderness study areas (WSAs) in the Uncompahgre Basin Resource Area.  The study areas are Gunnison Gorge (21,038 acres), Camel Back (10,402 acres), and Adobe Badlands (10,425 acres). The All Wilderness and No Wilderness Alternatives were considered for each WSA.  In addition, an Enhanced All Wilderness Alternative was developed as the Proposed Action for the Gunnison Gorge WSA.  The Proposed Action, which was identified after the environmental analysis, recommends the entire Gunnison Gorge WSA, plus an additional 1,040 acres, (22,078 acres total) as preliminarily suitable for wilderness designation.  The entire Camel Back WSA and Adobe Badlands WSA are recommended nonsuitable for wilderness designation.

3. **For further information, contact:**

   Allan Belt, Area Manager
   Bureau of Land Management
   Uncompahgre Basin Resource Area
   2505 South Townsend Avenue
   Montrose, Colorado  81401

   Telephone: (303) 249-7791

4. **Date statement made available to EPA and to the public:**

   Draft - June, 1987

   Final -

iii

BLM_0005477

BLM_0005478

# TABLE OF CONTENTS

**SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**CHAPTER 1 - Introduction and Planning** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Purpose and Need . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Wilderness Review Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Scope of Issues to be Addressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Issues Analyzed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    Gunnison Gorge WSA (CO-030-388) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Camel Back WSA (CO-030-353) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    Adobe Badlands WSA (CO-030-370B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Additional Concerns Considered for all WSAs but not
    Analyzed in this WEIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Changes from the Draft RMP/EIS, Draft WTS, and Final RMP/EIS . . . . . . . . . . . . . . . . . . . . . . 18

    Gunnison Gorge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    Camel Back . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    Adobe Badlands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Alternatives Considered but Dropped from Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
No Action Alternative - All WSAs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Partial Wilderness Alternatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    Gunnison Gorge WSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Camel Back WSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    Adobe Badlands WSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Enhanced All Wilderness Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**CHAPTER 2 - Description of the Proposed Action and Alternatives** . . . . . . . . . . . . . . . . . . . . . . 24

Present Management Direction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Management Alternatives for each WSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
    Gunnison Gorge WSA (CO-030-388) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        Enhanced All Wilderness Alternative (Proposed Action) . . . . . . . . . . . . . . . . . . . . . . 25
        All Wilderness Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        No Wilderness Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    Camel Back WSA (CO-030-353) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        No Wilderness Alternative (Proposed Action) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        All Wilderness Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    Adobe Badlands WSA (CO-030-370B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        No Wilderness Alternative (Proposed Action) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        All Wilderness Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
Comparative Analysis of Impacts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

BLM_0005479

**CHAPTER THREE - Affected Environment** .................................................. 55

  Gunnison Gorge WSA (CO-030-388) ...................................................... 55

    Location ............................................................................... 55
    Topography ........................................................................... 55
    Geology ............................................................................... 55
    Soils ................................................................................... 57
    Vegetation ............................................................................ 57
    Wilderness Values .................................................................... 57
    Wildlife Resources .................................................................... 58
    Recreation ............................................................................ 58
    Mineral Resources .................................................................... 59
    Grazing Resources .................................................................... 60
    Cultural Resources ................................................................... 61
    Paleontological Resources ............................................................ 61
    Woodland Resources ................................................................. 61
    Water Resources ..................................................................... 61
    Lands ................................................................................. 61
    Access ................................................................................ 61

  Camel Back WSA (CO-030-353) ......................................................... 61

    Location ............................................................................... 61
    Topography ........................................................................... 61
    Geology ............................................................................... 63
    Soils ................................................................................... 63
    Vegetation ............................................................................ 63
    Wilderness Resources ................................................................ 63
    Wildlife Resources .................................................................... 63
    Threatened and Endangered Species ................................................. 64
    Recreation Resources ................................................................ 64
    Mineral Resources .................................................................... 64
    Grazing Resources .................................................................... 64
    Cultural Resources ................................................................... 66
    Paleontological Resources ............................................................ 66
    Water Resources ..................................................................... 66
    Woodlands Resources ................................................................ 66
    Lands ................................................................................. 67
    Access ................................................................................ 67

  Adobe Badlands WSA (CO-030-370B) .................................................. 67

    Location ............................................................................... 67
    Topography ........................................................................... 67
    Geology ............................................................................... 67
    Soils ................................................................................... 67
    Vegetation ............................................................................ 67
    Wilderness Values .................................................................... 67
    Wildlife Resources .................................................................... 69
    Threatened and Endangered Species ................................................. 69
    Recreation Resources ................................................................ 69
    Mineral Resources .................................................................... 69
    Livestock Grazing .................................................................... 70
    Cultural Resources ................................................................... 72

BLM_0005480

Paleontological Resources  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
Woodland Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
Lands  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
Access  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

## CHAPTER 4 - Environmental Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Gunnison Gorge WSA (CO-030-388)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Enhanced All Wilderness Alternative (Proposed Action)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
All Wilderness Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
No Wilderness Alternative  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Camel Back WSA (CO-030-353) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

No Wilderness Alternative (Proposed Action)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
All Wilderness Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Adobe Badlands WSA (C0-030-370B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

No Wilderness Alternative (Proposed Action)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
All Wilderness Alternative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

## CHAPTER FIVE - Consultation and Coordination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

Document Preparation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
Consultation and Coordination Prior to the Draft RMP/EIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
Public Participation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
Distribution List  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
Public Comments and Responses on the Draft Wilderness Environmental
  Impact Statement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
Part 1 - Oral Testimony and Responses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
Part 2 - Written Comments and Responses  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

## APPENDIX A - List of Preparers  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Tables and Maps

Lists of Tables

Table 1-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Table 1-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
Table 2-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Table 3-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
Table 3-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
Table 3-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
Table 3-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
Table 3-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
Table 5-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
Table 5-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
Table 5-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

BLM_0005481

Table 5-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106
Table 5-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

List of Maps

Map 1-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Map 1-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Map 1-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
Map 2-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
Map 2-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Map 2-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Map 2-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
Map 2-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
Map 2-6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
Map 2-7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
Map 3-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
Map 3-2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
Map 3-3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

BLM_0005482

# SUMMARY

## INTRODUCTION

This Wilderness Environmental Impact Statement (WEIS) is an analysis of the effects of designation or nondesignation as wilderness of 42,905 acres of public land in three Wilderness Study Areas (WSAs) located in west central Colorado.

This WEIS was prepared in response to section 603 of the Federal Land Policy and Management Act (FLPMA) which directs the Bureau of Land Management (BLM) to inventory, study and report to Congress, through the Secretary of the Interior and the President, those public lands suitable for preservation as wilderness.

The Proposed Action presented in this WEIS recommends the entire Gunnison Gorge WSA (21,038 acres) plus an additional 880 acres adjacent to the WSA, and 160 acres of private mineral estate or 22,078 total acres, as suitable for wilderness designation. The Proposed Action also recommends the entire Camel Back WSA (10,402 acres) and the entire Adobe Badlands WSA (10,425 acres) as nonsuitable for wilderness designation.

## ENVIRONMENTAL IMPACT ISSUES

Before preparation of this EIS, a scoping process was conducted to determine specific environmental concerns and impacts which could result from wilderness designation or nondesignation.

The significant environmental issues identified as common to all three WSAs include: (1) impacts on wilderness values, (2) impacts on wildlife habitat and populations, and (3) impacts on recreation opportunities and use. In addition to these issues, the impacts on energy and mineral exploration and development are examined for the Gunnison Gorge and Adobe Badlands WSAs, and the impacts on livestock grazing are addressed for the Camel Back.

## ALTERNATIVES ADDRESSED

An All Wilderness and a No Wilderness alternative are examined for each of the three WSAs. An Enhanced All Wilderness alternative has been added in this final WEIS as the new Proposed Action for the Gunnison Gorge WSA.

The Enhanced All Wilderness alternative for the Gunnison Gorge proposes that an additional 1,040 acres be added to the WSA and discusses the management actions and impacts relative to that addition. The All Wilderness Alternative analyzes the impacts of designating each of the three WSAs as wilderness. The No Wilderness Alternative discusses impacts of not designating any of the three areas as wilderness.

## ALTERNATIVES AND SIGNIFICANT IMPACTS BY WSA

### GUNNISON GORGE WSA (CO-030-388)

\* **Enhanced All Wilderness Alternative (Proposed Action)**

The Proposed Action recommends that approximately 21,918 acres, which include the entire Gunnison Gorge WSA (21,038 acres) plus and an additional 880 acres in the Gunnison Gorge canyon and Smith Fork tributary, be added to the National Wilderness Preservation System (NWPS). This alternative also proposes acquiring 160 acres of private mineral estate within the WSA and including it in the wilderness area. Approximately total 22,078 acres would be proposed for designation.

Wilderness designation would expand the adjacent Black Canyon of the Gunnison Wilderness Area and provide statutory, long-term protection for wilderness values on 22,078 acres. Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained.

1

BLM_0005483

Habitat and forage conditions would be maintained for the area's present yearlong population of 50 to 60 bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Closure of an additional 5,793 acres to mineral entry would eliminate the possibility of habitat disturbance by mineral exploration activities in those areas. Restrictions on recreational use would reduce stress on both game and nongame species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population.

Recreational use would increase by 2,000 user days, or 40 percent, from the present level of 5,000 user days to 7,000 user days. Outstanding opportunities for high quality wilderness recreation activities would be maintained. Permit systems would limit the amount and degree of recreation use.

An additional 5,443 acres within the WSA, 690 acres in Smith Fork Canyon, and 160 acres of acquired private mineral estate (5,793 acres total) would be closed to mineral entry, location, and leasing. There would be no impacts on energy or mineral production, leasing, or disposal since no activity is projected.

**\* All Wilderness Alternative**

Under this alternative, approximately 21,198 acres would be proposed for designation, including the entire 21,038 acres of the Gunnison Gorge WSA, and 160 acres of acquired private mineral estate located within the WSA. Management actions and impacts for the All Wilderness Alternative for the Gunnison Gorge would be essentially the same as those described for the Enhanced All Wilderness. The only difference between these alternatives is that the All Wilderness alternative does not propose inclusion and wilderness designation of the 880 acres in the Gunnison Gorge canyon and Smith Fork tributary, and therefore, does not present management actions or analyze impacts for that area.

Wilderness designation would expand the adjacent Black Canyon of the Gunnison Wilderness Area and provide statutory, long-term protection for wilderness values on 21,198 acres. Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained.

Habitat and forage conditions would be maintained for the area's present yearlong

population of 50 to 60 bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Closure of an additional 5,603 acres to mineral entry would eliminate the possibility of habitat disturbance by mineral exploration activities in those areas. Restrictions on recreational use would reduce stress on both game and non-game species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population.

Recreational use would increase by 2,000 user days, or 40 percent, from the present level of 5,000 user days to 7,000 user days. Outstanding opportunities for high quality wilderness recreation activities would be maintained. Permit systems would limit the amount and degree of recreational use.

An additional 5,443 acres within the WSA and 160 acres of acquired private mineral estate (5,603 acres total) would be closed to mineral entry, location, and leasing. There would be no impacts on energy or mineral development, leasing, or disposal since no activity is projected.

**\* No Wilderness Alternative**

Under this alternative, the entire 21,038 acres of the Gunnison Gorge WSA would be recommended as nonsuitable for wilderness designation. The area would continue to be managed to maintain a wilderness setting for primitive, non-motorized recreational activities, as directed by the Uncompahgre Basin Resource Management Plan (RMP) and the Gunnison Gorge Recreation Area Management Plan (RAMP) and RAMP Addition.

Naturalness and scenic values would continue to be administratively protected by the ORV closure of the entire area, the mineral withdrawal on 15,595 acres, and the enforcement of low impact camping regulations. Mineral exploration and assessment work would decrease naturalness on two to eight acres outside the withdrawal area over a 20 to 30 year period. Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained.

Habitat and forage conditions would be maintained for the area's present yearlong population of 50 to 60 bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Mineral exploration and assessment activities would result in two to eight acres of habitat

2

disturbance over a 20 to 30 year period. Restrictions on recreational use would reduce stress on both game and nongame species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population.

Recreational use would increase by 2,000 user days, or 40 percent, from the present level of 5,000 user days to 7,000 user days. Outstanding opportunities for high quality wilderness recreation activities would be maintained. Permit systems would limit the amount and degree of recreational use.

Approximately 5,603 acres would remain open to mineral entry and location, but no activity beyond exploration is projected due to low potential for development. The entire area would be open to leasing but no exploration or production is anticipated due to low potential for development.

## CAMEL BACK WSA (CO-030-353)

### * No Wilderness Alternative (Proposed Action)

Under the Proposed Action, the entire 10,402 acres are recommended as nonsuitable for wilderness designation. Approximately 7,240 acres would be managed for livestock grazing and 2,482 acres would be managed for deer and elk winter range. Improvement of riparian habitat would be emphasized on 680 acres.

The area would be closed to recreational ORV use to protect scenic values, to prevent accidental destruction of threatened and endangered plants, to protect riparian areas, and to reduce active erosion. Some restricted motorized vehicle use would be allowed the grazing permittee(s) and the BLM for administrative access.

Wilderness values would remain largely unchanged on 10,402 acres. Opportunities for solitude, and primitive, unconfined types of recreation use would be increased by recreational ORV closures in the WSA. Twelve range improvement projects would slightly degrade naturalness on approximately one-quarter acre (10,800 square feet) of total area.

Habitat and forage conditions would be maintained for the area's present yearlong population of 33 deer, and an additional 292 deer and 28 elk during the winter. ORV closures, range improvements and management actions to improve vegetative conditions would result in an overall improvement in herd condition and a gradual increase of 8 to 12 animals in the resident deer herd and 8 to 15 animals in the winter deer herd size.

Recreational use would decrease by 250 user days, or 50 percent, from the present level of 500 user days to 250 user days as a result of ORV closures. Approximately 300 motorized recreational user days would be eliminated, and use would shift from predominately motorized use to nonmotorized primitive use. The overall quality of recreational use would remain high.

Livestock grazing would be precluded from March 1 through range readiness and trailing use would be limited in riparian areas, resulting in increased trailing time and operating costs. Four stock reservoirs and eight depression ponds would be constructed to increase water supplies and redistribute concentrated grazing use away from riparian areas. Grazing allocations would continue at the present level of 514 AUMs, but could be reduced by 150 to 200 AUMS as a result of implementing a 35 percent utilization limit to further improve riparian conditions.

### * All Wilderness Alternative

The entire 10,402 acres would be recommended suitable for wilderness designation. This alternative also proposes acquiring a 160 acre private inholding and including it into the wilderness.

Wilderness designation would provide statutory, long-term protection for wilderness values on 10,562 acres. Opportunities for solitude and primitive, unconfined types of recreation would be increased by the elimination of ORV use in the WSA. Four range improvement projects would slightly degrade naturalness on approximately 5,200 square feet of total area.

Habitat and forage conditions would be maintained for the area's present yearlong population of 33 deer, and an additional 292 deer and 28 elk during the winter. ORV closures, range improvements and management actions to improve vegetative conditions would result in an

3

overall improvement in herd condition and a gradual increase of 8 to 12 animals in the resident deer herd and 8 to 15 animals in the winter deer herd size. Habitat conditions necessary for a possible desert bighorn sheep reintroduction would be maintained, and possibly improved.

Recreational use would increase by 100 user days, or 20 percent, from the present level of 500 user days to 600 user days. Approximately 300 motorized recreational user days would be eliminated by ORV closures, and use would shift from predominately motorized use to non-motorized primitive use. The overall quality of use would remain high.

Livestock grazing would be precluded from March 1 through range readiness and trailing use would be limited in riparian areas, resulting in increased trailing time and operating costs. Four stock reservoirs would be constructed to increase water supplies and redistribute concentrated grazing use away from riparian areas. Eight depression ponds would not be constructed. Grazing allocations would continue at the present level of 514 AUMs, but could be reduced by 150 to 200 AUMS as a result of implementing a 35 percent utilization limit to further improve riparian conditions.

## ADOBE BADLANDS WSA (C0-030-370B)

### * No Wilderness Alternative(Proposed Action)

Under the Proposed Action, the entire 10,425 acres are recommended as nonsuitable for wilderness designation. The area would be divided into three management units and managed under multiple use objectives to: (1) protect an area designated ONA\ACEC (6,783 acres), (2) improve wildlife habitat (1,927 acres), and, (3) control salinity contributions to the Colorado River System (1,715 acres).

Wilderness values would remain essentially unchanged on 6,783 acres within the ONA\ACEC, but would be slightly degraded on 3,642 acres by ORV use. Naturalness would be irretrievably lost on approximately 140 acres as a result of a wildlife habitat treatment. Exploration activities for two to five oil or gas wells would degrade wilderness values on a total of four to ten acres over the next 20 to 30 years.

Seasonal restrictions on ORV use would reduce stress and maintain crucial winter range on 1,927 acres for 76 deer and 35 elk. Improved forage conditions on 140 acres could result in improvement in overall herd condition and a gradual increase of 5 to 7 deer and 2 to 4 elk over the long term. ORV closures on 6,783 acres and yearlong limitations on 1,715 acres would reduce stress and maintain habitat and forage conditions for approximately 30 resident pronghorn.

Recreational use would decrease by 400 user days, or 80 percent, from the present level of 500 user days to 100 user days. Approximately 400 motorized recreational user days would be displaced to adjacent areas as a result of ORV closures within the ONA/ACEC (6,783 acres). Opportunities for ORV use would be slightly impacted by yearlong restrictions on 1,715 acres and seasonal limitations on 1,927 acres. Use would shift from predominately motorized recreational activities to primitive recreational activities within the ONA/ACEC.

The entire 10,425 acres would be open for locatable mineral exploration but no development or production is anticipated due to the area's lack of mineral potential and lack of present and future demand. There would be no impacts on oil or gas production as a result of no surface occupancy stipulations on 6,783 acres in the ONA/ACEC or seasonal stipulations on 1,927 acres of crucial winter range since no exploration or production is anticipated within those areas. Seasonal stipulations on 1,715 acres would increase oil and gas exploration costs for two to five wells, however, there would be no impacts on production since none is projected. There would be no impacts on coal production since no activity is projected.

### * All Wilderness Alternative

The entire 10,425 acres would be recommended for wilderness designation.

Wilderness designation would provide statutory, long-term protection for wilderness values on 10,425 acres. Opportunities for solitude and primitive, unconfined types of recreation would be increased by the elimination of ORV use in the WSA.

Closing the entire area to ORV use and oil and gas exploration would reduce stress and maintain existing habitat and forage conditions for the

4

yearlong population of 30 pronghorn antelope, and 76 deer and 35 elk during the winter. The inability to implement a land treatment project could result in short-term shortages of forage and increased stress during severe winters, and, over the long term, a reduction in herd vigor and the possible loss of 15 to 20 deer and 8 to 10 elk over the long term.

Recreational use would increase by 100 user days, or 20 percent, from the present level of 500 user days to 600 user days. Approximately 450 motorized user days would be displaced to adjacent areas. Use of the area would shift from less primitive, motorized recreational activities to primitive, nonmotorized recreational activities.

The entire 10,425 acres would be closed to energy and mineral exploration and production. There would be no impacts on mineral production since no activity is projected due to the area's lack of mineral potential and the lack of present and future demand. No exploratory oil or gas wells would be drilled; however, there would be no impacts on production since none is projected. There would be no impacts on coal production since no activity is anticipated.

5

BLM_0005487

BLM_0005488

# CHAPTER 1

# INTRODUCTION AND PLANNING PROCESS

## PURPOSE AND NEED

The Federal Land Policy and Management Act of 1976 (FLPMA) mandates the Bureau of Land Management (BLM) to manage public lands and their resources under the principles of multiple use and sustained yield. Wilderness values are identified as part of the spectrum of multiple resource values and uses considered in the land use planning process.

Section 603 of FLPMA directed the BLM to inventory and study all public lands and identify those lands suitable for inclusion in the National Wilderness Preservation System (NWPS). Lands with wilderness characteristics, identified as Wilderness Study Areas or WSAs, must then be analyzed, through a wilderness review process, to determine their preliminary suitability or nonsuitability for designation as wilderness areas.

This document analyzes the environmental impacts of either designating or not designating 42,905 acres in three wilderness study areas in Colorado as wilderness. The WSAs discussed in this EIS include the Gunnison Gorge (WSA CO-030-388, 21,038 acres), Camel Back (WSA CO-030-353, 10,402 acres), and Adobe Badlands (WSA CO-030-370B, 10,425 acres).

The proposed action in this document recommends the entire 21,038 acres in the Gunnison Gorge WSA, plus an additional 880 acres adjacent to the WSA, and 160 acres of private mineral estate (22,078 total acres), for wilderness designation and the entire 20,827 acres in the Camel Back and the Adobe Badlands WSAs as nonsuitable for designation.

The recommendations for the WSAs presented in this EIS will be reported through the Director of the BLM to the Secretary of the Interior, and through the Secretary of the Interior to the President, who will make his recommendation to Congress. Congress will then decide whether the WSAs should be designated as wilderness or released and managed for uses other than wilderness.

## LOCATION

The three study areas are located in the Uncompahgre Basin Resource Area (UBRA), Montrose BLM District, in westcentral Colorado, near Delta, Colorado. Acreage figures for the WSAs under study are depicted in Table 1-1.

In addition, the Dominguez Canyon (WSA CO-030-363/CO-070-150) is located in both the Uncompahgre Basin planning area and the adjacent Grand Junction BLM District. Its management was addressed in the Grand Junction Resource Area RMP/EIS of 1985 and is, therefore, not included in this analysis.

BLM_0005489

**Table 1-1**

### WILDERNESS STUDY AREAS ANALYZED IN THIS EIS

| Wilderness Study Area | BLM Wilderness Inventory Number | Public Land Acreage | County | Location of WSA |
|---|---|---|---|---|
| Camel Back | CO-030-353 | 10,402 | Montrose | 9 miles southwest of Delta, Colorado |
| Adobe Badlands | CO-030-370B | 10,425 | Delta | 3 miles northwest of Delta, Colorado |
| Gunnison Gorge | CO-030-388 | 21,038 | Montrose/Delta | 10 miles east of Delta, Colorado |

# WILDERNESS REVIEW PROCESS

To carry out the wilderness mandate of Section 603 of FLPMA, the BLM developed a wilderness review process consisting of three phases: inventory, study, and reporting.

## INVENTORY

The inventory phase identified and designated as WSAs those public lands that possess wilderness characteristics as defined by Congress in the Wilderness Act of 1964. In Section 2(c) of that Act, Congress states that wilderness is essentially an area of undeveloped federal land in a natural condition, without permanent improvements or human habitation, which has outstanding opportunities for solitude or primitive and unconfined types of recreation. Such areas may contain ecological, geological, or other features of scenic, scientific, educational, or historical value.

The inventory of wilderness values in the planning area was completed in December 1980. Within the Uncompahgre Basin planning area, a total of 41,865 acres in three geographic regions were found to contain wilderness values. These areas were identified as the Gunnison Gorge, Camel Back, and Adobe Badlands WSAs. The locations of these WSAs are shown in Map 1-1 and Map 1-2. The WSA acreages in Table 1-1 were generated by a computerized mapping system which produces a higher degree of accuracy and, therefore, vary somewhat from the figures used in the inventory process.

The proposed Gunnison Gorge WSA was formally appealed to the Interior Board of Land Appeals (IBLA) by the City of Delta on February 2, 1981. On December 31, 1981, the IBLA affirmed the Colorado BLM State Director's decision that the Gunnison Gorge be designated a WSA. No appeals were filed on the proposed Camel Back and Adobe Badlands WSAs and both were designated as WSAs in December 1980.

## STUDY

The study phase involved the process of determining, through careful analysis, whether a WSA is more suitable for wilderness designation or more suitable for other uses, considering all values, resources, and possible uses of the public lands.

BLM_0005490

# COLORADO



 Planning Area

**Map 1-1**
**Location of the WSA's**

8

BLM_0005491



# UNCOMPAHGRE BASIN PLANNING AREA

Map 1-2
Location Map

BLM_0005492

Guidance for the wilderness study process comes from the following sources:

- The BLM's Wilderness Study Policy
- The National Environmental Policy Act
- The Wilderness Act of 1964
- The BLM's Wilderness Management Policy
- The BLM's planning regulations.

The Draft Uncompahgre Basin Resource Management Plan and Environmental Impact Statement (RMP/EIS) was completed in June 1987. Included with this RMP/EIS was a draft wilderness EIS which was identified as the Draft Wilderness Technical Supplement (WTS). The Draft WTS described in detail the various management alternatives, their impacts and the BLM's preferred management alternative for each of the three WSAs.

Three formal public hearings were held during the 90-day public comment period ending November 5, 1987. Fifty one people testified at the hearings which were held in Hotchkiss, Lakewood, and Montrose, Colorado. In addition to the oral comments on the Draft RMP/EIS and WTS from these hearings, one hundred and seventy three persons, groups, or state, federal, and local agencies submitted written comments. All of the comments received have been reviewed and considered in the preparation of the Uncompahgre Basin Proposed Resource Management Plan and Final Environmental Impact Statement (RMP/FEIS), and this Final Wilderness Environmental Impact Statement (WEIS).

The Proposed RMP/FEIS was made available to the public in September, 1988. That document included the BLM's preliminary recommendations for the three WSAs. The study phase for these three WSAs is being continued through this WEIS and a separate Wilderness Study Report (WSR) that accompanies it.

## REPORTING

The reporting phase begins after the completion of the draft EIS. A Wilderness Study Report (WSR) is prepared which will include all WSAs in the State of Colorado. Site Specific reports will be prepared for each WSA and included in the WSR. A mineral survey is conducted by the U.S. Geological Survey (USGS) and the Bureau of

Mines for each area recommended suitable. Reports on all wilderness study areas must reach the President by October 21, 1991. The President must make his recommendations to Congress within two years after receipt. Congress has the sole authority for designating any federal land as wilderness.

## INTERIM MANAGEMENT

Until Congress acts, the BLM's Interim Management Policy and Guidelines for Lands Under Wilderness Review (1987) serves as the principal document for managing the three WSAs in the Uncompahgre Resource Area. The goal of the interim management policy is to ensure that the wilderness characteristics inherent to each WSA are unimpaired at the time Congress makes it final decision regarding designation, subject to any valid existing rights.

## SCOPE OF ISSUES TO BE ADDRESSED

A series of scoping and issue identification planning meetings was held in August and September 1983. These public meetings were used to identify issues, solicit resource data and other input, and explain the planning process and wilderness review process that would be used to develop the Uncompahgre Basin RMP/EIS and its supplemental documents, including the Wilderness Technical Supplement, the draft of this document.

A second series of open house meetings was held in January 1986 to present the proposed management alternatives for the planning area and for each of the WSAs. Public input pertaining to the preferred alternative and any additional information on alternatives not addressed was solicited at these meetings.

As required by FLPMA, recommendations are made in all wilderness management alternatives regarding the suitability or nonsuitability of each WSA for designation as wilderness. This document addresses issues related to wilderness suitability or nonsuitability which were generated by the public, by the BLM staff, and by federal, state, and local governments and agencies. These issues reflect concerns identified during the scoping process and the public comment period on the Draft RMP/EIS.

BLM_0005493

# ISSUES ANALYZED

Table 1-2 summarizes the results of scoping and identifies the impact topics addressed for each of the WSAs in this Wilderness EIS (WEIS). These environmental issues or impact topics were used to organize and direct the analysis of impacts presented in Chapter 4, "Environmental Consequences." All of the impact topics are described below for each individual WSA. Also described for each WSA are additional concerns previously considered for analysis but determined not to be impact topics for the reasons given.

## Table 1-2

### IMPACT TOPICS ADDRESSED FOR WILDERNESS STUDY AREAS IN THIS WEIS

| WSA | Wilderness Values | Wildlife Habitat & Populations | Recreation Opportunities & Use | Energy & Mineral Exploration & Prod. | Livestock Grazing |
|---|---|---|---|---|---|
| Gunnison Gorge | X | X | X | X | |
| Camel Back | X | X | X | | X |
| Adobe Badlands | X | X | X | X | |

## GUNNISON GORGE WSA (CO-030-388)

The following issues have been identified for the Gunnison Gorge WSA:

1. Impacts on Wilderness Values
2. Impacts on Wildlife Habitat and Populations
3. Impacts on Recreation Opportunities and Use
4. Impacts on Energy and Mineral Exploration and Production

1. **Impacts on Wilderness Values:** The wilderness values of naturalness, outstanding opportunities for solitude and primitive recreation, and various special features of the WSA could benefit from the long-term protection afforded by wilderness designation. Whitewater boating and other recreational uses would be limited, under wilderness and no wilderness, to protect the naturalness and other resource values of the river and canyon. Wilderness values could also be affected by mineral exploration activities which would be allowed in some areas, if the area is not designated. The degree to which designation or nondesignation would affect wilderness values is an issue for analysis in this EIS.

2. **Impacts on Wildlife Habitat and Populations:** There is some concern that wilderness designation is essential to protect habitat in the Gunnison Gorge primarily for the resident deer and bighorn sheep populations, and for wintering deer and elk. Under both wilderness and no wilderness, recreation use, which is the most impacting to these resources, would be limited to preserve wilderness values and provide needed protection for all terrestrial and aquatic wildlife habitat and populations. Under no wilderness, habitat may also be disturbed by mineral exploration activities. The impacts of designation or nondesignation on wildlife habitat and populations is an issue for analysis in this EIS.

11

### 3. Impacts on Recreation Opportunities and Use:
There is some concern that wilderness designation would impact private and commercial whitewater boating and other recreation opportunities and use in the Gunnison Gorge. Under wilderness and no wilderness alternatives, recreation use would be limited under permit systems to protect wilderness values and outstanding opportunities for primitive recreation. Increases in recreation use are expected under all management alternatives. There would be no change in ORV recreational use since this type of use would be precluded under any alternative. The impact of wilderness designation or non-designation on recreation opportunities and use is an issue for analysis in this EIS.

### 4. Impacts on Energy and Mineral Exploration and Production:
If designated as wilderness, the entire WSA (21,038 acres) would be withdrawn from future energy and mineral exploration, leasing, and development. Under non-designation, the BLM's protective withdrawal would continue to close 15,595 acres in the WSA to locatable mineral work. Mineral entry and location would be allowed on 5,443 acres not protected under the withdrawal, and oil and gas leasing would be allowed throughout the entire WSA. The degree to which energy and mineral exploration and development would be affected under designation or nondesignation is an issue for analysis in this EIS.

Other concerns considered for the Gunnison Gorge WSA but later dropped from analysis include:

### * Impacts on Hydroelectric Power Development:
In 1972, Public Land Order (P.L.O.) 5261 (Federal Register, Vol. 37, No. 186), in recognition of the Gunnison Gorge area's unique resources, established a withdrawal to provide "protection of scenic and geological features and public recreation values." P.L.O. 5261 withdrew approximately 24,000 acres of the newly established Gunnison Gorge Recreation Lands from mineral entry and all forms of appropriation under the public land laws. These lands constitute a "reservation," as described in Section 4(e) of the Federal Power Act. Section 4(e) states that any hydroelectric project which is licensed within a "reservation" must be found to be consistent with the purpose for which that reservation was created.

In 1982, approximately 21,038 acres within the "reservation" were designated a Wilderness Study Area (WSA). Until Congress makes a final determination on wilderness designation, management of the WSA is subject to the regulations set forth in the BLM's Interim Management Policy and Guidelines for Lands Under Wilderness Review (IMP), and in 43 CFR Subpart 3802, which establishes procedures to prevent impairment of the suitability of lands under wilderness review. If the Gunnison Gorge is designated wilderness, only the President would be able to authorize water developments in the area.

In addition to the proposed wilderness designation, the entire 13.5 linear miles of the Gunnison River in the WSA have also been recommended for inclusion into the National Wild and Scenic River System (NWSRS). Although there has been no formal designation by Congress, the BLM manages the Gunnison River and its corridor as "eligible" for inclusion according to the guidelines of the Wild and Scenic River Act. Inclusion of the river into the NWSRS would preclude the construction of any projects in the area that would diminish outstanding values within the eligible river segment.

The City of Delta, and the Colorado-Ute Electric Association (CUEA) presently hold conditional water storage rights on the Gunnison River for potential hydroelectric developments, and at one time had preliminary permits from the Federal Energy Regulatory Commission (FERC) to study the feasibility of projects they had proposed in or adjacent to the WSA. However, due to the economic downturn in the coal industry, and the subsequent lack of demand for additional water storage for hydroelectrical generation capacities, the feasibility of these projects was never demonstrated, and the permits were allowed to expire. No further applications for permits or licenses have been submitted, and both entities have proposed trading their rights for absolute water storage rights in the Blue Mesa Reservoir.

The Pittsburg and Midway Coal Mining Company also holds a conditional water decree on the Gunnison River, and previously proposed a hydroelectric project within the WSA. However, Pittsburg and Midway has never made application for a preliminary permit to determine the feasibility of the project, and in March 1988, the company donated approximately 20,000 acre-feet of its 162,700 acre feet water right to The Nature Conservancy. The company has also proposed trading the remainder of its storage rights for storage and consumptive use in the

BLM_0005495

proposed Dominguez Project downstream on the Gunnison River. At this time, there has been no decision regarding this trade, and the company continues to hold storage rights for approximately 142,700 acre feet.

The Nature Conservancy is presently negotiating an agreement to convert its donated storage right into a direct flow, or instream flow right, in order to maintain a minimum flow of 300 cubic feet per second (cfs.) through the Gunnison River canyon.

If the WSA is not designated wilderness, the area would continue to be managed under the Gunnison Gorge Recreation Management Plan and Addition to the RAMP (RAMP, 1985, 1988) to "protect its unique scenic and geologic features, and to provide primitive and semi-primitive recreational opportunities." The protective withdrawal under P.L.O. 5261 will remain in effect. The Gunnison River and its corridor would continue to be managed for inclusion into the NWSRS.

It is the BLM's belief that any water developments proposed under nondesignation would be determined by the Secretary of Interior to be inconsistent with the intent of P.L.O. 5261, Section 4(e) of the Federal Power Act, and with the management objectives of the RAMP and the Wild and Scenic River Act.

To date, the economic feasibility of any of these projects has not been established. Based on the lack of demonstrated demand for power and economic feasibility, as well as inconsistency with the purposes for which the Gunnison Gorge Recreation Lands were established, it is BLM's projection that no hydroelectric projects would be developed in or adjacent to the Gunnison Gorge.

Since it is projected that hydroelectric projects would not be built regardless of designation, this issue has been dropped from further analysis in this WEIS.

* **Impacts on Cultural Resources:** Consultation with the State Historic Preservation Officer during the scoping and review process indicated that the Gunnison Gorge WSA does not contain any cultural resource sites eligible for listing on the National Register of Historic Places. The entire WSA (21,038 acres) has undergone an intensive field inventory for cultural resource. The

sixty-three sites that were inventoried consist predominately of lithic scatters, some campsites and historic trails, and cabin remnants.

All cultural sites are protected under the National Historic Preservation Act (NHPA) and the Archeological Resource Protection ACT (ARPA), and any proposed management actions must comply with these and other legal mandates for their protection. In addition, since ORV use would be precluded throughout the entire WSA under any alternative, these sites would be further protected from accidental destruction by ORV use.

Because the significance of the cultural sites in the WSA is low, and because no activities are projected under any alternative that would impact these sites, this issue has been dropped from further analysis in this EIS.

* **Impacts on Riparian Habitat:** Riparian habitat in the Gunnison Gorge is impacted predominately by recreation use by fishers, campers, and floatboaters. A site-specific wilderness management plan for the Gunnison Gorge would be developed which included guidelines and management actions designed to prevent degradation to riparian habitat caused by other resource activities or by visitor use, and when necessary, allow for the restoration of deteriorated sites to an acceptable condition. Guidance under the Gunnison Gorge Recreation Area Management Plan (RAMP) provides the same protection for riparian areas. Since there would be no difference in riparian habitat management in the Gunnison Gorge under any alternative, this issue has been dropped from further analysis in this EIS.

* **Impacts on Livestock Management:** There is some concern that wilderness designation would prohibit or restrict grazing in the WSA. Portions of four livestock grazing allotments lie within the WSA boundary. The estimated 662 AUMs of livestock forage presently allocated on these areas would not change under any alternative. There are no existing range facilities in the WSA, and no facilities or range improvement projects are proposed in the RMP. No motorized use has been associated with grazing management within the WSA and none is expected in the future.

There are no grazing allotments or range facilities within the 880 acres of the Gunnison

13

Gorge canyon and Smith Fork tributary which are proposed for inclusion under the Enhanced All Wilderness Alternative. No range projects or future allocations of AUMS are planned for this area.

Since there would be no change in livestock management in the Gunnison Gorge WSA under the All Wilderness or No Wilderness alternatives, or in the lands proposed for inclusion under the Enhanced All Wilderness alternative, this issue has been dropped from further analysis in this EIS.

# CAMEL BACK WSA (CO-030-353)

Impact Topics Addressed for Camel Back WSA include the following:

1. Impacts on Wilderness Values
2. Impacts on Wildlife Habitat and Populations
3. Impacts on Recreational Opportunities and Use
4. Impacts on Livestock Grazing

**1. Impacts on Wilderness Values:** Wilderness designation would provide long-term, statutory protection for the naturalness, outstanding opportunities for solitude and primitive recreation, and other wilderness values of the WSA. Under nonwilderness, these values would be protected primarily by ORV and riparian closures. The construction of range improvement projects, permissible under wilderness and nonwilderness guidelines, could degrade naturalness in small areas. Changes in overall recreation use, under either alternative, may also affect opportunities for solitude and primitive, unconfined recreation. The degree to which wilderness values would be protected or impacted under designation or nondesignation is an issue for analysis in this EIS.

**2. Impacts on Wildlife Habitat and Populations:** Management under either alternative would preclude ORV use in the WSA thus protecting valuable winter range for deer, elk, and bighorn sheep. Restrictions on livestock grazing in riparian areas, proposed under both alternatives, would also improve habitat conditions. It is projected that four range improvement projects, which could affect wildlife habitat conditions in some areas, would be permitted under wilderness and nonwilderness management, and an additional eight projects would be constructed if the area was not designated. The degree to which designation or nondesignation would affect wildlife habitat and populations is an issue for analysis in this EIS.

**3. Impacts on Recreation Opportunities and Use:** Opportunities for recreational ORV use would be eliminated in the WSA under both wilderness and nonwilderness management alternatives and opportunities for primitive recreation would increase. Visitor use in the area would rise as a direct result of increased publicity and interest over designation. Under nondesignation; however, use would be expected to decrease as a result eliminating motorized use in the area. The degree to which designation or nondesignation would affect overall visitation and/or the opportunities for ORV use in the WSA is an issue for analysis in this EIS.

**4. Impacts on Livestock Grazing:** Wilderness designation would affect intensive livestock grazing management by precluding the development of proposed range improvement projects and by restricting grazing in riparian areas. Management objectives under nondesignation would allow the development of these projects but still restrict grazing use in riparian areas. The degree to which livestock grazing management would be affected by designation or nondesignation is an issue for analysis in this EIS.

Other potential impact topics considered for the Camel Back WSA but later dropped from this analysis include:

**\* Impacts on Energy and Mineral Exploration and Production:** Wilderness designation would preclude energy and mineral exploration and production in the WSA. Under nonwilderness management, the area would be open for exploration and development subject to seasonal restrictions. Approximately 680 acres of riparian areas would be closed to disposal.

There are no coal leases in the WSA, and no coal beds of commercial value in the area. There are no oil or gas leases, and the sedimentary formations found within the WSA have only a low potential for deposits of oil and gas. There are also no mining claims on record within the WSA, and the potential for locatable minerals is low. Given the area's lack of mineral resources, no energy or mineral exploration or production is anticipated.

BLM_0005497

Although mineral materials, such as rip-rap rock, sand, and gravel do occur in the area, no disposal activity is projected under either alternative. There is currently no demand for these materials in the WSA and such materials are plentiful and more easily accessible throughout most of the surrounding area.

Since wilderness designation or nondesignation would not have any effect on energy or mineral exploration and production in the WSA, this issue has been dropped from further analysis in this EIS.

* **Impacts on Riparian Habitat:** Riparian habitat in the Camel Back WSA is impacted predominately by ORV use and livestock grazing. There are currently no riparian improvement projects in the WSA, and none are proposed under the wilderness or no wilderness alternatives. Proposed management actions to inventory and monitor riparian habitat and to improve vegetative conditions and streambank cover by restricting grazing use in riparian areas from March 1 to range readiness, would be implemented under both wilderness and no wilderness alternatives.

Trailing use will be confined to established trails and ways, and limited as much as possible. No bedding livestock will be permitted in riparian areas to reduce bank disturbance. Under both alternatives, livestock grazing in riparian areas may be limited to 35 percent utilization of key forage species if determined necessary to increase riparian cover, but would only be implemented when other methods (i.e., change of season of use, limiting trailing use, etc.) are determined unsuccessful. In addition, ORV use would be precluded throughout the entire area under both alternatives, thus providing additional protection for vulnerable areas.

Since there would be no difference in riparian habitat management in the Camel Back under any alternative, this issue has been dropped from further analysis in this EIS.

* **Impacts on Cultural Resources:** Only 3 percent, or approximately 300 acres, of the WSA have undergone intensive field inventory for cultural resources, and to date, three sites have been recorded. One of these sites, a Ute hunting blind, has been determined to be "field eligible" for listing on the National Register of Historic Places (NRHP) by BLM personnel. Although there has

been no formal eligibility determination or nomination to the NRHP, the site is being managed as eligible and protected via avoidance. No surface-disturbing activities would be authorized at or in the vicinity of the site under either the proposed (No Wilderness) action or the All Wilderness alternative.

All existing and potential sites in the WSA are protected under the National Historic Preservation Act (NHPA) and the Archeological Resource Protection ACT (ARPA), and all proposed BLM management actions for the area must comply with these and other legal mandates. Cultural clearances have already been conducted for the stock reservoirs which are proposed under both wilderness and nonwilderness management alternatives for Camel Back. In addition, ORV use would be precluded under both alternatives, thus reducing the potential for damage to any sites.

Since the protection and management of cultural resources in the Camel Back would be the same regardless of wilderness designation or nondesignation, and since no impacts are projected under any management alternative which could affect the status of the hunting blind, or other potential sites in the WSA, this issue has been dropped from further analysis in this EIS.

## ADOBE BADLANDS WSA (CO-030-370B)

The following issues have been identified for the Adobe Badlands WSA:

1. **Impacts on Wilderness Values**
2. **Impacts of Wildlife Habitat and Populations**
3. **Impacts on Recreation Opportunities and Use**
4. **Impacts on Energy and Mineral Exploration and Development**

1. **Impacts on Wilderness Values:** The wilderness values of naturalness, opportunities for solitude and primitive recreation, and various special features of the WSA could benefit from the long-term protection afforded by wilderness designation. Increased recreation use as a result of designation could affect these values. Management under nonwilderness would protect these values on 6,783 acres, designated an Outstanding Natural Area and area of critical environmental concern (ONA/ACEC), with ORV closures and restrictions on energy and mineral explora-

BLM_0005498

tion and development. However, wilderness values in the remainder of the WSA (3,642 acres) may be impacted by ORV use and/or energy and mineral exploration. The degree to which designation or nondesignation would affect wilderness values in the Adobe Badlands is an issue for analysis in this EIS.

**2. Impacts on Wildlife Habitat and Populations:** Wildlife habitat and populations in the Adobe Badlands could be affected by resource management actions under nondesignation which would allow ORV use and/or energy and mineral exploration in designated areas. In addition, wilderness designation would preclude the construction of one currently proposed wildlife habitat improvement project, and would also prohibit or restrict the development of any future projects. The impact of wilderness designation or nondesignation on wildlife habitat and populations, therefore, is an issue for analysis in this EIS.

**3. Impacts on Recreation Opportunities and Use:** Wilderness designation would eliminate opportunities for ORV use in the entire WSA (10,425 acres). Opportunities for primitive, wilderness recreation would increase. Recreation use in the area would increase as a result of increased publicity and interest over designation. Under nondesignation, opportunities for ORV use would be forgone on 6,783 acres, limited year-long on 1,715 acres and restricted seasonally on 1,927 acres. Total recreational use in the area is expected to decrease as a result of these management actions. The degree to which designation or nondesignation would affect overall visitation and/or the opportunities for ORV use in the WSA is an issue for analysis in this EIS.

**4. Impacts on Energy and Mineral Exploration and Production:** Under wilderness designation, the entire WSA (10,425 acres) would be withdrawn from energy and mineral exploration and development. Management objectives under nondesignation would restrict energy and mineral exploration and development in designated wildlife habitat areas and in the ONA/ACEC (6,783 acres) but allow mineral leasing, entry, and location throughout the entire WSA. The impact of wilderness designation on potential energy and mineral exploration and production is an issue for analysis in this EIS.

Other potential impact topics considered for the Adobe Badlands WSA but later dropped from analysis include:

**\* Impacts on Salinity Controls:** There are no existing salinity control projects in the WSA and no projects or treatments are proposed under wilderness or nonwilderness alternatives. There are also no impacts anticipated, under either alternative, which would affect salinity control objectives in the WSA. Wilderness designation would preclude any surface disturbing activities, such as ORV use and energy or mineral activities. These activities would also be precluded, or restricted under nonwilderness management objectives. In addition, restrictions on livestock grazing in designated salinity control areas would be implemented under either alternative. Since there would be no difference in the management objectives for saline areas in the WSA under either alternative, this issue has been dropped from further analysis in this EIS.

**\* Impacts on Livestock Grazing:** Three livestock grazing allotments are located within the boundaries of the WSA. The estimated 878 AUMs of winter sheep use presently allocated on these allotments would not change under wilderness or nonwilderness management unless studies determine adjustments are needed. There are no existing range facilities within the WSA, and no facilities or range improvement projects were proposed in the RMP.

Grazing would be eliminated from March 20 to range readiness on 1,715 acres of saline soils under either alternative, however, this limitation on spring use is not expected to have a measurable affect on overall livestock use. In addition, no motorized use has been associated with grazing management within the WSA, and none is expected in the future. Since there would be no difference in livestock management as a result of designation or nondesignation, this issue has been dropped from further analysis in this EIS.

**\* Impacts on Cultural Resources:** Consultation with the State Historic Preservation Officer during the scoping process confirmed that there are no cultural sites recorded in the Adobe Badlands WSA to date. Although only about 5 percent, or 521 acres, of the WSA have undergone intensive field inventory for cultural resources, it is the BLM's opinion that the potential for cultural resources in the Adobe Badlands is low, due to the nature of the environment and the lack of adequate resources, such as perennial water sources, necessary for sustained occupation and utilization of the area.

BLM_0005499

Any sites which may be discovered in the future would be protected under the National Historic Preservation Act (NHPA) and the Archeological Resource Protection Act (ARPA), and all proposed BLM management actions for the area must comply with these and other legal mandates. If designated wilderness, there will be no ORV use or other surface disturbing activities in the WSA. Visitation is expected to increase by only 100 visitor days, from 500 to 600 user days, and no impacts to cultural sites are anticipated.

Under non-wilderness management, ORV use would be precluded on 6,783 acres and limited on the remaining 3,642 acres. As a result of these restrictions on ORV use, visitation is expected to decrease by 400 user days, thus reducing the possibility of damage to any potential sites. In addition, any wildlife improvement projects or energy exploration activities proposed under nonwilderness, would require clearances and/or mitigation for cultural resources prior to authorization.

Since the potential for cultural sites in the Adobe Badlands is low, and since there are no impacts projected as a result of ORV use, visitation, or other management actions under any alternative which would affect future sites discovered in the WSA, this issue has been dropped from further analysis in this WEIS.

## ADDITIONAL CONCERNS CONSIDERED FOR ALL WSAs BUT NOT ANALYZED IN THIS WEIS

The following additional concerns which involve all three WSAs, were considered for analysis but determined not to be impact issues for the reasons stated.

* **Impacts on Air Quality Classification:** There is some public concern regarding the interaction between wilderness designation and air quality classification. The wilderness management policy states that, "the BLM will manage designated wilderness areas as Class II unless they are reclassified by the State as a result of the procedures prescribed in the Clean Air Act (as amended, 1977)." Even if the areas are not designated as wilderness, no activities are expected which would have any measurable impacts on air quality. The issue of impacts on air quality classification was therefore not analyzed in detail in this EIS.

* **Impacts on Timber or Woodland Production:** While there are no stands of commercial timber within any of the three WSAs, the Adobe Badlands and Gunnison Gorge WSAs do contain some areas of pinyon-juniper woodlands that meet the criteria for inclusion in the woodland inventory base, and are, therefore, suitable for harvesting.

Wilderness management would preclude harvesting of the approximately 337 acres of pinyon-juniper woodlands in the Gunnison Gorge. These woodlands are currently closed and would continue to be closed to harvesting under the RMP and Gunnison Gorge RAMP in order to protect the area's wilderness qualities. Management under the Proposed Action (No Wilderness) would allow harvests on the approximately 86 acres of woodlands within the Adobe Badlands, however, no activity is anticipated.

There is no current interest in harvesting any the sites in the WSAs, and no future interest in production is anticipated due to the low quality, remoteness and distance of these stands from local markets, and the infeasibility of developing access to these areas. In addition, these stands comprise only 0.6 percent of the approximately 76,000 acres of manageable pinyon-juniper woodlands on federal lands within the Uncompahgre Valley. An additional 30,000 to 35,000 acres of woodlands occur on private and state lands in the area. All of these sites are more readily available to supply any existing or potential demand, thus eliminating the need for marginal sites located within the WSAs. Since it is projected that these sites will never be harvested, this issue has been dropped from further analysis in this EIS.

* **Impacts on Social and Economic Conditions:** There is some public concern regarding social and economic impacts from wilderness designation or nondesignation The WSAs comprise a total of 8.6 percent of the public land acres within the planning area. None of the management alternatives described would alter county economies or the economy of the planning area as a whole by more than one percent. The issue of impacts on social and economic conditions was therefore not analyzed in detail in this EIS.

* **Impacts on Threatened and Endangered Species:** Threatened, endangered, and candidate species are present in all three of the WSAs and all have potential habitat for additional

BLM_0005500