species. Written communication with the USFWS, as required by the Section 7 Interagency Cooperative Regulations (50 CFR 402,43 FR 870), was completed during the scoping process and through the development of the Uncompahgre Basin RMP/EIS. In their response to the Draft RMP/EIS and WTS, (see Comment Letter No. 7, Chapter 5), FWS suggested that informal consultation continue as specific actions are planned in the resource area and that formal consultation be initiated only when the BLM makes a "may affect" determination for an action and any proposed or listed species and their critical habitat.

Wilderness designation of the three WSAs would protect and preserve wilderness values and threatened and endangered species populations and their habitat. Under no wilderness, any surface-disturbing activities, such as energy or mineral exploration or range or wildlife improvement projects would be subject to applicable laws and regulations requiring clearances and mitigation and formal consultation with the USFWS. In addition, in all of the WSAs, species and habitat would be further protected from accidental destruction by ORV closures or restrictions.

Since management under wilderness or no wilderness would provide protection for threatened and endangered species populations or their habitat in all of the WSAs, this impact topic was dropped from further analysis in the EIS.

**\* Impacts on Water Rights:** Concerns were raised regarding how water rights would be affected by wilderness designation or nondesignation. This concern resulted, in part, from the uncertainty as to whether or not water rights for wilderness were reserved when Congress created the National Wilderness Preservation System. On July 26, 1988, the Attorney General concurred with the Department of Interior Solicitor's opinion that Congress did not intend to reserve Federal water rights for wilderness purposes when it created the NWPS. This issue is not an environmental issue that is appropriate for analysis in this EIS, but essentially a legal matter separate from the environmental review process. For these reasons, the issue was dropped from further analysis.

**\* Impacts on Major Utility Development:** Major utility development would be excluded in all WSAs designated as wilderness. Impacts which would result under nondesignation would be negligible as none of the WSAs are identified as being needed for utility corridors in the 1980 Western Regional Utility Corridor Study and more economically feasible routes exist over less rugged terrain. The issue of major utility development has not been carried forward for more detailed analysis in this EIS.

**\* Impacts on Predator Control:** The BLM's wilderness management policy provides for predator control within designated wilderness areas. Wilderness designation could only limit the method of control, and this is not expected to affect predator control objectives. The issue of impacts on predator control was therefore not analyzed in detail in this EIS.

# CHANGES FROM THE DRAFT RMP/EIS, DRAFT WTS, AND FINAL RMP/EIS

Four alternatives were analyzed for each of the three WSAs in the draft of this document which was a Wilderness Technical Supplement (WTS) to the Draft Uncompahgre Basin Resource Management Plan/ Environmental Impact Statement (RMP/EIS). In the WTS, these alternatives corresponded to overall resource management alternatives that incorporated four wilderness management options: Proposed Action, No Action, All Wilderness, and No Wilderness.

# GUNNISON GORGE

The Proposed Action (All Wilderness Alternative) for the Gunnison Gorge WSA presented in the Draft WTS recommended several boundary adjustments to the original WSA boundary described in the Final Wilderness Inventory of November 1980. Map 1-3 shows these adjustments to the original WSA boundary as presented in the All Wilderness Alternative in the WTS.

In 1982, approximately 480 acres of private land were acquired by the BLM through a land exchange. Approximately 291 acres of this acquired land (Parcels A and B in Map 1-3) contain wilderness values were recommended for inclusion in the Gunnison Gorge WSA. Other recommended adjustments to the WSA boundary were the inclusion of 61 acres (Parcel C) at the mouth of Smith Fork Canyon, and the exclusion of 26 acres (Parcel D) at the southern end of the WSA. These adjustments, which resulted in a net increase of 326 acres, were mainly refinements of the boundary following more thorough

18



## GUNNISON GORGE

### CO - 030 - 388

........... WSA Boundary

──── Adjusted Recommended WSA Boundary  (21,038)



Areas Included  (352 acres)

Area Excluded  (26 acres)

Enhanced All Wilderness Addition  (880 acres)



**Map 1-3**
Gunnison Gorge - Adjustment to Recommended WSA Boundary

BLM_0005502

investigations of the WSA's topographic features and its manageability potential.

There were no further changes made in the Proposed Action for the Gunnison Gorge when it was incorporated into the Preferred Alternative in the Draft RMP/EIS or Proposed Action of the Final RMP/EIS. However, due to the completion of the Gunnison Gorge Recreation Area Management Plan (RAMP), and in response to internal BLM review, the Proposed Action in this document differs from the Preferred Alternative in the Draft RMP/EIS, and the Proposed Action in both the Draft WTS and the Final RMP/EIS.

An Enhanced All Wilderness Alternative has been added as the new Proposed Action in this Final Wilderness EIS (FEIS). This new alternative incorporates the boundary adjustments described in the Proposed Action, All Wilderness Alternative in the Draft WTS, and proposes the addition of 880 acres in Smith Fork canyon (T. 15 S., R. 39 W., portions of Sections 19, 20, 29, and 30). Figure 1-3 shows the additional acres in Smith Fork canyon proposed for inclusion under the Enhanced All Wilderness Alternative.

The addition of this acreage would further enhance the manageability of the Gunnison Gorge as wilderness because it includes lands identified in the Gunnison Gorge RAMP as closed to ORVs, and, with the exception of a now closed vehicle way which could be reclaimed, the area is primarily natural in character. These lands would additionally enhance the wilderness resource by including lands within the Gunnison Gorge canyon and its tributary, the Smith Fork. The proposed boundary would include these lands up to a cliff top and would thus preclude potential nonconforming uses which might affect wilderness values on the adjacent lands.

## CAMEL BACK

In the draft WTS, the Proposed Action alternative was a variation of the No Wilderness Alternative for the Camel Back WSA. This proposed action was incorporated into the Preferred Alternative presented in the Draft RMP/EIS.

Due to changes as a result of responses to public comments and internal BLM review, the Proposed Action for the Camel Back presented in the Final RMP/EIS and this WEIS differs from the Preferred Alternative addressed in the Draft

RMP/EIS. The WTS also contained a number of errors in the discussion of livestock grazing management for the Camel Back, which have been corrected in this document.

For the purposes of this WEIS, therefore, the Proposed Action for the Camel Back is the No Wilderness Alternative which has been modified to include the changes or corrections listed below. A number of these changes also affect the All Wilderness alternative, and have been noted as such.

1) The entire Camel Back area (10,402 acres) would be closed to recreational ORV use and managed with emphasis on livestock grazing management (7,240) and wildlife habitat management (2,482). Improvement of riparian habitat would be emphasized on 680 acres, mainly in Roubideau and Potter creeks drainages. This change was based on the needs to prevent accidental destruction of threatened and endangered plants as a result of ORV use, to protect visual qualities, and to reduce active erosion in riparian areas. Some restricted motorized vehicle use would be allowed the grazing permittee(s) and the BLM for administrative access.

2) In order to be consistent with changes in the Final RMP/EIS, the discussions of livestock management alternatives and actions for both the Proposed Action (No Wilderness) and the All Wilderness alternatives for Camel Back have been changed and no longer propose a reduction in the amount of AUMS allocated in the WSA. This reduction was incorrectly described in Chapter 2 of the WTS as a proposed management action, instead of being analyzed in Chapter 4 as a potential impact of restricting livestock utilization to 35 percent of key forage species in riparian areas.

Under both the Proposed Action (No Wilderness) and All Wilderness alternatives presented in this WEIS, grazing would be precluded in riparian areas from March 1 through range readiness. As in the Final RMP/EIS, utilization of 35 percent by weight of key forage species will be used as a general guidance for improvement, under both alternatives, and would only be implemented when other methods (i.e., change of season of use, limiting trailing, etc.) are determined unsuccessful.

BLM_0005503

3) There are four stock reservoirs proposed under both the No Wilderness and All Wilderness Alternatives for the Camel Back. The WTS stated that "two reservoirs would possibly be constructed, under all the alternatives, to achieve the AMP objective of improving livestock distribution".

4) The Proposed Action in this WEIS also proposes that an additional eight depression ponds be developed in the Camel Back area. This proposed addition of facilities is the result of internal BLM review and decision after the completion of the Final RMP/EIS.

5) The description of current livestock grazing management in the Camel Back presented in Chapter 3, Affected Environment, of the WTS stated that there were two grazing allotments within the WSA with a total of 680 AUMs of allocated grazing use. There is presently just one allotment in the WSA on which a total of 514 AUMs of spring and fall cattle use is authorized. The only other allotment in the WSA was relinquished from grazing use in June 1986, and is proposed as a wildlife management area under the No Wilderness alternative in this WEIS. The 166 AUMS formerly authorized on this allotment are not proposed for reallocation within the WSA.

# ADOBE BADLANDS

In the draft WTS, the Proposed Action alternative was a variation of the No Wilderness Alternative for the Adobe Badlands WSA. This proposed action was incorporated into the Preferred Alternative for resource management presented in the Draft RMP/EIS.

Due to changes as a result of responses to public comments and internal BLM review, the Proposed Action for the Adobe Badlands presented in the Final RMP/EIS and this document differs from the Preferred Alternative addressed in the Draft RMP/EIS.

For the purposes of this WEIS, therefore, the Proposed Action for the Adobe Badlands is the No Wilderness Alternative which has been modified to include the changes listed below.

1) The major portion (6,783 acres) of the Adobe Badlands area would be managed as an Outstanding Natural Area, and Area of Critical Environmental Concern (ONA/ACEC) to protect its scenic qualities, to provide for primitive nonmotorized recreation opportunities and use, to protect threatened and endangered species, and to reduce active erosion. Approximately 1,927 acres would be managed as wildlife habitat, and the remaining 1,715 acres would be managed as a salinity control area.

2) Leasing conditions for oil, gas, and geothermal resources for the Adobe Badlands ONA/ACEC (6,783 acres) were changed from standard lease terms with a seasonal restriction to leasing with no surface occupancy. This change was based on public comments and management's concern for protection of the resource values within special management areas.

3) The Adobe Badlands ONA/ACEC (6,783 acres), previously open for disposal of mineral materials with a seasonal (spring) restriction, would be closed to disposal of mineral materials to protect the values within the ONA/ACEC and also because mineral materials are readily available elsewhere in the planning area.

**Additional Changes**

Prior to the preparation of this WEIS, the only available information on mineral potential in the WSAs was the Geological, Energy, and Mineral (GEM) reports. The data from these reports was summarized for the three WSAs in Chapter 3, "Affected Environment," in the Draft WTS.

The Federal Land Policy and Management Act (FLPMA, 1976) requires that the U. S. Geological Survey (USGS) and the U. S. Bureau of Mines (USBM) conduct mineral surveys on all WSAs recommended suitable for wilderness designation. In September, 1988, the USGS/USBM conducted extensive geological, geophysical, and geochemical investigations in the Gunnison Gorge WSA to determine the area's mineral resource values. Since the results of these studies were not published until May 1989, they were not available at the time of writing the WTS or the Final RMP/EIS.

Discussions on mineral resources for the Gunnison Gorge in this WEIS have been updated to reflect the information contained in the USGS/USBM report, (U.S. Geological Survey Bul-

BLM_0005504

letin Number 1715-D, "Mineral Resources of the Gunnison Gorge Wilderness Study Area, Montrose and Delta Counties, Colorado,"(U.S. Government Printing Office, 1989). According to this most recent study, the Gunnison Gorge has only a "low mineral and energy resource potential," not a "moderate favorability for accumulation of mineral resources," as previously stated in the GEM report.

Since the Adobe Badlands and the Camel Back WSAs are not recommended for wilderness designation, no USGS-USBM reports have been completed for these areas.

## ALTERNATIVES CONSIDERED BUT DROPPED FROM ANALYSIS

### NO ACTION ALTERNATIVE - ALL WSAs

A "No Action" alternative was considered in detail for each of the WSAs in the WTS. This alternative was presented to represent conditions that would probably result if the WSAs were not designated wilderness and if management and resource use continued according to the direction prescribed in the previous land use planning documents.

At the time of that writing, there were four Management Framework Plans, or MFPSs, that covered the Uncompahgre Basin Planning Area. The Gunnison Gorge MFP was completed in 1969, the Escalante and Cimarron MFPs in 1971, and the North Fork MFP was completed in 1974 and amended in 1977 and 1981.

With the publication of the record of decision for the Final Uncompahgre Basin Resource Area RMP/EIS (USDI, BLM, approved 1989), the RMP replaced the MFPs, thus providing new management direction for the future. As a result of that record of decision, the No Action alternative was no longer viable as it did not represent current planning decisions. For the purposes of this final EIS, the No Wilderness alternative is also the "No Action" alternative.

## PARTIAL WILDERNESS ALTERNATIVES

### GUNNISON GORGE WSA

Partial wilderness alternatives for the Gunnison Gorge WSA were considered early in the scoping process, but none were found to be reasonable. There are no isolated conflicts found in only specific portions of the WSA which could be resolved by a partial wilderness alternative, nor does any portion of the WSA pose any management concerns not present in the rest of the WSA. After considerable BLM review, it was decided that management of the Gunnison Gorge would be enhanced by adding lands to the WSA, and not by reducing the size of the area. As a result of this decision, the Enhanced All Wilderness Alternative has been added as the new Proposed Action for the Gunnison Gorge WSA.

### CAMEL BACK WSA

A partial wilderness alternative was considered, but eliminated from detailed analysis because of the size and topography of the WSA. The boundaries of the WSA are defined primarily by existing roads and ways and/or perennial stream drainages. Reducing the acreage of the WSA would result in arbitrary boundaries along mesa tops and would eliminate wilderness attributes, provided by the steep sideslopes and streams, without resolving any resource conflicts.

The majority of the resource conflicts in the area involve recreational ORV use. Under the revised Proposed Action for Camel Back, the entire 10,402 acres would be closed to ORV use. This closure would provide protection for the area's important scenic values, threatened and endangered plants, crucial wildlife habitat, and riparian areas, without reducing the size of the area.

### ADOBE BADLANDS WSA

A partial wilderness alternative was suggested for approximately 6,783 acres, (67 percent

22

BLM_0005505

of the WSA), of the most outstanding Mancos shale "badlands" formations within the Adobe Badlands WSA. This alternative was based on the needs to protect the important scenic qualities, prevent active erosion, and to prevent accidental destruction of threatened and endangered species by ORV use in this area.

In response to this suggestion, the Proposed Action (No Wilderness Alternative) for the Adobe Badlands in this FEIS has been modified and now proposes an ONA/ACEC designation for the 6,783 acres of "badlands." This ONA/ACEC designation would provide essentially the same protection as wilderness designation for the area's special resources and wilderness values, by precluding any surface-disturbing activities, such as ORV use and energy and mineral development.

The only differences between the two designations would be that mineral and energy exploration would be allowed in the ONA/ACEC and not in the wilderness, and wilderness designation would provide statutory, rather than administrative protection for wilderness values. However, there are currently no oil and gas leases within the WSA, and no energy exploration is anticipated at this time for the area. If an interest in oil and gas leasing develops in the future, the ONA/ACEC's wilderness values would be protected by no surface occupancy stipulations.

There are no known mineral deposits in the WSA and no mineral exploration or development is projected. The ONA/ACEC would be also closed to coal leasing and to mineral disposal, however, there are no coal reserves within its boundaries, and no disposal activity is projected.

Since no energy or mineral activity is projected for the ONA/ACEC under either alternative, and since the wilderness qualities of the area would be equally protected under both wilderness or nonwilderness management alternatives, a partial wilderness alternative was not needed and, therefore, not analyzed in this WEIS.

# ENHANCED ALL WILDERNESS ALTERNATIVES

## CAMEL BACK WSA

No enhanced alternatives were developed for the Camel Back WSA because there were no conflicts or questions of manageability which could be resolved by expanding the WSA. In most cases, any reasonable expansion would involve lands identified during the wilderness inventory as lacking in sufficient wilderness characteristics for inclusion into the WSA. The All Wilderness Alternative for Camel Back includes a proposal to acquire a 160 acre private inholding located in the eastcentral portion of the WSA. The small size of this inholding, however, does not merit its consideration for acquisition under a separate enhanced alternative.

## ADOBE BADLANDS WSA

There were no reasonable enhanced alternatives considered for the Adobe Badlands WSA. There are no non-public land inholdings in the area and no manageability concerns or resource conflicts which could be resolved by expanding the WSA. In most cases, expanded boundaries would include only private lands, with limited wilderness characteristics, which would have to be acquired from a willing landowner through sale, exchange, or donation.

BLM_0005506

# CHAPTER 2

# DESCRIPTION OF THE PROPOSED ACTION AND ALTERNATIVES

This chapter describes and analyzes the Proposed Action and management alternatives that have been developed for each of the three WSAs in the Uncompahgre Basin planning area. The Proposed Action is the BLM's Preferred Alternative. It recommends the Gunnison Gorge WSA and the additional acreage as described in the Enhanced All Wilderness Alternative as suitable for wilderness designation and the Camel Back and Adobe Badlands WSAs as nonsuitable for designation.

A summary of present management direction is presented, followed by a brief description of the general emphasis of each management alternative. Since the exact pattern of future actions within the WSAs cannot be predicted with certainty, assumptions were made to allow the analysis of impacts under the various alternatives. These assumptions are the basis for impacts identified in this EIS. They are not to be considered as management proposals or plans, but rather as feasible patterns of activities which could occur under the proposed action or the alternatives considered.

## ALL WILDERNESS ALTERNATIVE

The All Wilderness Alternative identifies how each WSA would be managed as wilderness. Under this alternative, public land designated by Congress would be managed for recreational, educational, conservational, scenic, scientific, and historic uses in accordance with the BLM's Wilderness Management Policy and the Wilderness Act of 1964. Site-specific wilderness management plans would be developed for such areas within two years after designation. Management objectives would provide long-term benefits by preserving land on which natural ecologic processes continue with little or no human interference. Recreation uses would be consistent with wilderness management and would emphasize opportunities for challenge, solitude, and primitive and unconfined recreation.

Under the All Wilderness Alternative, each WSA would be recommended as suitable for wilderness designation in its entirety.

## ENHANCED ALL WILDERNESS ALTERNATIVE - Gunnison Gorge WSA

Management guidance under the Enhanced All Wilderness Alternative for the Gunnison Gorge would be essentially the same as that described for the All Wilderness Alternative, but would extend the protection of the long-term benefits of wilderness designation to the proposed additional 880 acres in the Gunnison Gorge canyon and Smith Fork tributary.

## NO WILDERNESS ALTERNATIVE

The No Wilderness Alternative is equivalent to the No Action Alternative required by the National Environmental Policy Act and BLM's Wilderness Study Policy. Under this alternative, each WSA would be recommended as nonsuitable for wilderness designation. The Gunnison Gorge would continue to be managed to protect its wilderness qualities under the RMP and RAMP. The Adobe Badlands and Camel Back WSAs would be managed for uses other than wilderness as prescribed by the Uncompahgre Basin RMP.

## PRESENT MANAGEMENT DIRECTION

The Federal Land Policy and Management Act of 1976 (FLPMA) directs the Secretary of the Interior to manage the WSAs in a manner so as not to impair the suitability of such areas for preservation as wilderness, subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree that mining and grazing were being conducted on the date of FLPMA.

24

BLM_0005507

Since the passage of FLPMA, these WSAs have been managed to protect their wilderness values, initially under the Colorado BLM's interim management policy, and since 1979 under the BLM's Interim Management Policy and Guidelines for Lands Under Wilderness Review (IMP).

Prior to the passage of FLPMA, a Secretarial Order in 1972 formally designated the Gunnison Gorge Recreation Lands in recognition of the area's unique recreational, scenic, geologic, and wildlife values. At that time, 24,000 acres of the Gunnison River canyon area were withdrawn from mineral entry but not from mineral leasing. The Gunnison Gorge WSA is within these designated Recreation Lands.

In 1979, the Gunnison Wild and Scenic River Study Report and EIS was completed. It recommended that 26 of the 29 miles of the Gunnison River be designated as "Wild" through both the Gunnison Gorge (BLM) and the Black Canyon of the Gunnison National Monument (NPS). In 1985, the Gunnison Gorge Recreation Area Management Plan (RAMP) was completed, and in 1988, the Gunnison Gorge Recreation Area Management Plan Addition was completed. The Gunnison Gorge WSA is within the area managed under the RAMP and the RAMP Addition.

No special designations have been considered, in the past, for the Camel Back WSA or the Adobe Badlands WSA.

## MANAGEMENT ALTERNATIVES FOR EACH WSA

The following section describes the specific alternatives as analyzed for each WSA.

## GUNNISON GORGE WSA (CO-030-388)

Three management alternatives were developed and analyzed for the Gunnison Gorge WSA: designating the entire WSA and an additional 880 acres as wilderness (Enhanced All Wilderness), designating the entire WSA as wilderness (All Wilderness) and designating none of the area as wilderness (No Wilderness).

## ENHANCED ALL WILDERNESS ALTERNATIVE (Proposed Action)

Map 2-1 delineates the boundary of the Enhanced All Wilderness Alternative.

The Enhanced All Wilderness Alternative replaces the former All Wilderness Alternative as the Proposed Action in this document. This new alternative recommends that the 21,038 acres of the WSA with the boundary adjustments described in Chapter 1 (Changes from the Draft RMP/EIS, Draft WTS, and Final RMP/EIS), plus an additional 880 acres in Smith Fork Canyon be designated as wilderness.

This alternative also proposes acquiring the 160 acres of private mineral estate located under the NE-1/4 SE-1/4, Section 30, and the S-1/2 NW-1/4; NW-1/4 SW-1/4, Section 29. T. 51 N., R. 8 W. This area is shown as a split estate in Figure 2-1.

If designated as wilderness, the entire area (22,078 acres total) would be managed in accordance with the BLM's Wilderness Management Policy (September 1981) and the Wilderness Act of 1964. The Gunnison River corridor would continue to be managed for its free-flowing river values and for its potential designation as a wild and scenic river.

The entire WSA and the proposed addition areas have been closed to ORV use, the landing of aircraft, and bicycles since 1985 to protect and preserve the natural features. Approximately 15,595 acres of the WSA and approximately 690 acres in the proposed Smith Fork addition have been closed to mineral entry and location under a recreation withdrawal since 1972. The entire WSA is currently closed to oil and gas leasing and to disposal of saleable mineral materials.

**Wildlife Management:** Wildlife forage allocations would be managed at current levels to support the area's present yearlong population of 75 reintroduced bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. A final release of 20 to 25 bighorn sheep is planned for late summer 1989 in accordance with the 1986 cooperative BLM and the Colorado Division of Wildlife (DOW) reintroduction plan.

The only existing wildlife development project within the WSA is the Nicholas Brothers'

BLM_0005508

26

# GUNNISON GORGE

## CO - 030 - 388

━━━━━  **Enhanced All Wilderness Boundary**

**Map 2-1**
**Gunnison Gorge - Proposed Action**
**Enchanced All Wilderness Alternative**



KILOMETERS
MILES

BLM_0005509

Spring, located in the SESW of Section 12, T. 50 N., R. 9 W. The spring, which covers approximately 50 square feet, was developed as a supplemental water source for deer, bighorn sheep, and chukar. Regular maintenance of the spring is accomplished by non-impairing means.

Existing habitat conditions are protected by the ORV closure of the entire area and the recreation withdrawal of 15,595 acres from mineral entry and location. Management of the area will consist of an intensified level of monitoring of population levels and documenting changes in habitat conditions. Monitoring will be accomplished primarily through periodic ground surveys and observations. Annual winter elk counts and monitoring of the bighorn population sheep will continue to be conducted with the use of helicopter or fixed-winged aircraft flights, in cooperation with the Division of Wildlife, and in compliance with wilderness management guidelines. Approximately three to five, one-hour long flights a year would be flown over the area.

The only wildlife improvements projected at this time are the installation of two wildlife guzzlers in Smith Fork Canyon to provide supplemental water sources for bighorn sheep, chukar, and other wildlife populations. Although the exact location of these guzzlers is undetermined at this time, it is likely that both sites will be within the acreage proposed for addition to the WSA under this alternative. The two guzzlers would each cover approximately 100 square feet and would be built to be substantially unnoticeable. Clearances for threatened and endangered species and cultural resources would be conducted prior to construction. Construction and maintenance of the guzzlers would be by non-impairing means.

**Recreation Management:** The present recreational use in the Gorge is estimated at 5,000 user days annually, consisting of 2,500 user days of whitewater boating use and 2,500 user days of non-boating, primitive use.

Under this alternative, recreational use would continue to be managed to maintain a wilderness setting for primitive, nonmotorized recreational activities such as whitewater boating, fishing, hiking, hunting, photography, horseback riding, and sight-seeing.

The entire WSA and the proposed additional acreage in Smith Fork Canyon have been closed to ORV use, the landing of aircraft, and bicycle use since 1985. There are no existing recreational facilities, other than hiking and horseback trails, and approximately 15 primitive campsites, within the WSA, and no additional facilities are planned.

Campsites and hiking trails would continue to be monitored for resource damage throughout the season by frequent foot and boat patrols. Low impact camping regulations for all users would be enforced throughout the WSA.

The recreational carrying capacity of the Gunnison River corridor within the WSA has been set at 75 persons per day. Use in this area would continue to be managed for a maximum of six group encounters per day with other floating parties on the river, and no more than ten combined encounters per day between floating parties and parties on shore. River use by commercial outfitters is presently allocated to a maximum of two commercial launches per day. Maximum group size for both commercial and private launches is twelve persons.

Permits are currently required for all commercial users, including whitewater, walk-in fishing, and hunting outfitters. It is projected that a private boater permit system would be implemented to effectively manage river use in the wilderness area. When initiated, private groups would be limited to four launches per day. In addition, a permit system for walk-in private users would also be implemented if needed to further restrict private use in order to protect wilderness values.

Although maximum recreational use on a daily basis is limited under this alternative, it is projected that annual use in the area would increase approximately 40 percent from the present 5,000 user days to 7,000 user days (3,500 user days of whitewater boating and 3,500 user days of non-boating primitive use) as a result of increased publicity and interest. The major increases are expected to be in private boating and walk-in fisher use.

Current use of the area in Smith Fork Canyon proposed for inclusion under this alternative is predominately day use by walk-in fishers, and by rafters that hike or swim in the canyon. No significant increase in recreation use is expected as a result of incorporating this area into the wilderness.

27

BLM_0005510

**Energy and Minerals Management:** Approximately 15,595 acres of the WSA and approximately 690 acres in the proposed Smith Fork addition have been closed to mineral entry and location under a recreation withdrawal since 1972. Under this alternative, the 5,443 acres in the WSA and approximately 190 acres in the Smith Fork addition currently outside the withdrawal, and the 160 acres of acquired private mineral estate (5,793 acres total) would be also be withdrawn from energy or mineral exploration, leasing, entry and location, subject to valid existing rights. The lands currently closed to mineral entry and location and those additional lands which would be closed under this alternative are shown in Map 2-2.

There are currently 18 post-FLPMA placer gold claims in the southern one-third of the WSA, outside the withdrawal. There have been no validity examinations conducted on any of these claims, and no development activity has occurred to date. According to the findings in the U.S. Geological Survey and U.S. Bureau of Mines report, although small amounts of gold do occur in this area, the entire Gunnison Gorge WSA has only a low mineral resource potential for base and precious metals, and there are no known mineral deposits in the area.

Management under this alternative would preclude any new surface disturbing activity. Further development or extraction would only be permitted on claims proven before designation to be valid. For the purpose of analysis, it is projected that the existing claims are purely speculative, and would not prove valid. Therefore, no further mineral development would occur.

The WSA is currently closed to leasing. There are no coal leases within the WSA and no geologic structures that produce minable coal. There are no oil and gas leases and no known occurrences of oil or gas in the study area or surrounding area. Due to the absence sedimentary structures which favor the accumulation of oil and gas, the oil and gas potential of the WSA is rated as zero. Therefore, no interest in exploration or development is anticipated.

The area is presently closed to disposal of saleable mineral materials, and there is no current or foreseeable demand for these materials which are plentiful and more easily accessed elsewhere in the planning area.

No energy or mineral activity is projected in the Smith Fork addition. Approximately 70 percent of the area is currently closed to mineral entry and location. There are no existing claims or leases in the entire area and none are anticipated due to the low potential for development. The area lacks any of the geologic formations which would indicate favorable mineral or energy potential.

**Watershed Management:** Riparian and watershed conditions throughout the entire area would be protected by wilderness guidelines that prevent degradation caused by other resource activities or by visitor use, and when necessary, allow deteriorated sites to return to a natural condition. No specific projects are proposed.

**Cultural Resources Management:** None of the sixty-three sites (see Chapter 3) in the WSA are eligible for listing on the National Register of Historic Places. All existing sites, as well as any sites discovered in the future, are ensured protection under federal law. In most instances, cultural resources would be subject to the forces of nature in the same manner as other wilderness resources. No cultural resource projects are planned, and study or management of any sites would not entail excavation, stabilization, or interpretation. Clearances for cultural resources would be conducted prior to the construction of the two wildlife guzzlers in Smith Fork Canyon.

**Threatened and Endangered Species Management:** The WSA contains one known occurrence of the threatened Uinta Basin hookless cactus (*Sclerocactus glaucus*) and has habitat suitable for additional threatened and endangered plant species (see Chapter 3). The area also provides winter habitat for bald eagles and supports a reintroduced population of river otters, listed as endangered by the state and as a candidate for federal listing under the Endangered Species Act (Category 2). Clearance for the two wildlife guzzlers in Smith Fork Canyon would be conducted prior to construction. Any activities which may affect threatened and endangered species or their potential habitat within the WSA, would be subject to federal and state laws which require formal consultation with the USFWS, prior to approval.

**Forest and Woodland Resources Management:** There is no commercial timber in the WSA or in Smith Fork Canyon, and the entire area has only a low economic potential for woodland harvesting. The approximately 337 acres of produc-

BLM_0005511



## GUNNISON GORGE
## CO - 030 - 388

━━━━━ **Enhanced All Wilderness Boundary** ⬛N➤

 Lands Currently Closed to Mineral Entry and Location
Under BLM Protective Withdrawl

 Lands Within Smith Fork Addition Closed to Mineral Entry
and Location Under Enhanced All Wilderness Alternative
Only

⬤ Post - FLPMA  Placer Claims

▥ Lands Within WSA Closed to Mineral Entry and Location Under
Enhanced All Wilderness and  All Wilderness Alternatives

▨ Private Mineral Estate  to be Acquired and Closed to
Mineral Entry and Location Under Ehanced All Wilderness
and All Wilderness Alternatives



## Map 2-2
## Gunnison Gorge - Energy And Mineral Management

29

BLM_0005512

tive pinyon-juniper woodlands within the WSA have been closed to harvesting since 1985 to protect wilderness qualities. Woodland harvesting and management would be permitted only for control of insects and disease if determined necessary to protect resources outside the WSA.

**Livestock Grazing Management:** There would be no change in the 662 AUMs of sheep and cattle use currently authorized within the WSA. There are no existing range projects in the area, and no facilities or improvements are planned. There are no grazing allotments or range facilities in the Smith Fork Canyon area.

**Aquatic Resources Management:** The Gold Medal trout fishery and other aquatic resources of the Gunnison River would continue to be managed in cooperation with the Colorado Division of Wildlife (DOW). No significant changes in management are projected and no projects are planned.

## ALL WILDERNESS ALTERNATIVE

Map 2-1 delineates the boundary for the All Wilderness Alternative for the Gunnison Gorge.

As in the Proposed Action, this alternative recommends the 21,038 acres of the WSA as suitable for wilderness designation, and proposes acquiring the 160 acres of private mineral estate located under the NE-1/4 SE-1/4, Section 30, and the S-1/2 NW-1/4; NW-1/4 SW-1/4, Section 29, T. 51 N., R. 8 W.

As in the Proposed Action, if the area (21,198 acres total) is designated as wilderness, it would be managed in accordance with the BLM's Wilderness Management Policy (September 1981) and the Wilderness Act of 1964. The Gunnison River corridor would continue to be managed for its free-flowing river values and for its potential designation as a wild and scenic river.

Unlike the Proposed action, however, this alternative does not propose incorporating the additional 880 acres in Smith Fork canyon into the wilderness area. This area would be subject to the management actions described in the Uncompahgre Basin Final RMP for Management Unit 4, the Gunnison Gorge Special Recreation Management Area (SRMA). Under those guidelines, the area would be open for energy and mineral exploration and development, however, no activity is projected in the Smith Fork area

since the potential for energy or mineral development is low.

The entire area would continue to be closed to ORV use, the landing of aircraft, and bicycles. Recreation use would be monitored and possibly restricted to protect natural features and recreation opportunities in the area and in the adjacent WSA. No wildlife habitat projects are projected and no livestock management actions are proposed for the area.

**Wildlife Management:** As in the Proposed Action, wildlife forage allocations would be managed at current levels to support the area's present yearlong population of 75 introduced bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Supplemental releases of another 20 to 25 bighorn sheep would be permitted.

As in the Proposed Action, management of the area will consist of an intensified level of monitoring of population levels and documenting changes in habitat conditions. Monitoring will be accomplished primarily through periodic ground surveys and observations. Annual winter elk counts and monitoring of the bighorn population sheep will continue to be conducted with the use of helicopter or fixed-winged aircraft flights, in cooperation with the Division of Wildlife, and in compliance with wilderness management guidelines. Approximately three to five, one-hour long flights a year would be flown over the area.

Unlike the Proposed Action, the location sites for the two privately funded wildlife guzzlers in Smith Fork Canyon would be outside the proposed WSA boundary. Construction or maintenance of these guzzlers, therefore, would not be subject to wilderness criteria. Clearances for threatened and endangered species and cultural resources would be conducted prior to construction.

**Recreation Management:** The management actions described below for this All Wilderness alternative are the same as those of the Proposed Action.

Recreational use would continue to be managed to maintain a wilderness setting for primitive, nonmotorized recreational activities. The entire WSA, has been closed to ORV use, the landing of aircraft, and bicycle use since 1985.

BLM_0005513

No additional recreational facilities or improvements are planned.

Campsites and hiking trails would continue to be monitored for resource damage throughout the season by frequent foot and boat patrols. Low impact camping regulations for all users would be enforced throughout the WSA.

The recreational carrying capacity of the Gunnison River corridor within the WSA would continue to be set at 75 persons per day. Use in this area would continue to be managed for a maximum of six group encounters per day with other floating parties on the river, and no more than ten combined encounters per day between floating parties and parties on shore. River use by commercial outfitters is presently allocated to a maximum of two commercial launches per day. Maximum group size for both commercial and private launches is twelve persons.

Permits are currently required for all commercial users, including whitewater, walk-in fishing, and hunting outfitters. It is projected that a private boater permit system would be implemented to effectively manage river use in the wilderness area. When initiated, private groups would be limited to four launches per day. In addition, a permit system for walk-in private users would also be implemented if needed to further restrict private use in order to protect wilderness values.

Although maximum recreational use on a daily basis is limited under this alternative, it is projected that annual use in the area would increase approximately 40 percent from the present 5,000 user days to 7,000 user days (3,500 user days of whitewater boating and 3,500 user days of non-boating primitive use) as a result of increased publicity and interest. The major increases are expected to be in private boating and walk-in fisher use.

**Energy and Minerals Management:** Under this alternative, all of the federal mineral estate in the WSA including the 15,595 acres currently withdrawn from mineral entry and location, the 5,443 acres outside the existing withdrawal, and the 160 acres of acquired private mineral estate (21,198 acres total) would be closed to energy and mineral exploration, leasing, entry and location, and disposal, subject to valid existing rights.

There are currently 18 post-FLPMA placer gold claims in the southern one-third of the WSA, outside the withdrawal. There have been no validity examinations conducted on any of these claims, and no development activity has occurred to date. According to the findings in the U.S. Geological Survey and U.S. Bureau of Mines report, although small amounts of gold do occur in this area, the entire Gunnison Gorge WSA has only a low mineral resource potential for base and precious metals, and there are no known mineral deposits in the area.

As in the Proposed Action, management under this alternative would preclude any new surface disturbing activity. Further development or extraction would only be permitted on claims proven before designation to be valid. For the purpose of analysis, it is projected that the existing claims, are purely speculative, and would not prove valid. Therefore, no further mineral development would occur.

As in the Proposed Action, the WSA would remain closed to leasing. There are no coal leases within the WSA and no geologic structures that produce minable coal. There are no oil and gas leases and no known occurrences of oil or gas in the study area or surrounding area. Due to the absence sedimentary structures which favor the accumulation of oil and gas, the oil and gas potential of the WSA is rated as zero. Therefore, no interest in exploration or development is anticipated.

As in the Proposed Action, although the area would remain closed to disposal of saleable mineral material, there is no current or foreseeable demand for these materials which are plentiful and more easily accessed elsewhere in the planning area.

**Watershed Management:** Riparian and watershed conditions throughout the area would be protected by wilderness guidelines that prevent degradation caused by other resource activities or by visitor use, and when necessary, allow deteriorated sites to return to a natural condition. No specific projects.

**Cultural Resources Management:** None of the sixty-three sites (see Chapter 3) in the WSA are eligible for listing on the National Register of Historic Places. All existing sites, as well as any sites discovered in the future, are ensured protection under federal law. In most instances, cultural

31

resources would be subject to the forces of nature in the same manner as other wilderness resources. No cultural resource projects are planned, and study or management of any sites would not entail excavation, stabilization, or interpretation.

**Threatened and Endangered Species Management:** The WSA contains one known occurrence of the threatened Uinta Basin hookless cactus (*Sclerocactus glaucus*) and has habitat suitable for additional threatened and endangered plant species (see Chapter 3). The area also provides winter habitat for bald eagles and supports a reintroduced population of river otters, listed as endangered by the state and as a candidate for federal listing under the Endangered Species Act (Category 2). Although no projects are proposed at this time within the WSA, any activities which may affect threatened and endangered species or their potential habitat within the WSA, would be subject to federal and state laws which require formal consultation with the USFWS, prior to approval.

**Forest and Woodland Resources Management:** There is no commercial timber in the WSA, and the area has only a low economic potential for woodland harvesting. The approximately 337 acres of productive pinyon-juniper woodlands within the WSA have been closed to harvesting since 1985 to protect wilderness qualities. Woodland harvesting and management would be permitted only for control of insects and disease if determined necessary to protect resources outside the WSA.

**Livestock Grazing Management:** There would be no change in the 662 AUMs of sheep and cattle use currently authorized within the WSA. There are no existing range projects in the area, and no facilities or improvements are planned.

**Aquatic Resources Management:** The Gold Medal trout fishery and other aquatic resources of the Gunnison River would continue to be managed in cooperation with the Colorado Division of Wildlife (DOW). No significant changes in management are projected and no projects are planned.

## NO WILDERNESS ALTERNATIVE

Under the No Wilderness Alternative, the entire 21,038 acre Gunnison Gorge WSA would be

recommended as nonsuitable for wilderness designation. The area would be managed according to the Gunnison Gorge RAMP and the RMP, for low-impact, nonmotorized recreational use. The area would remain closed to ORV use, woodland harvesting, the landing of aircraft, and bicycles to preserve and protect its natural features.

This alternative does not propose acquiring the 160 acres of private mineral estate located within the WSA.

**Wildlife Management:** As in the Proposed Action, wildlife forage allocations would be managed at current levels to support the area's present yearlong population of 75 reintroduced introduced bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. A final release of 20 to 25 bighorn sheep is planned for late summer 1989 in accordance with the 1986 cooperative BLM and DOW reintroduction plan.

As in the Proposed Action, existing habitat conditions would be protected by the ORV closure of the entire area and the recreation withdrawal of 15,595 acres from mineral entry and location.

Management of the area will consist of an intensified level of monitoring of population levels and documenting changes in habitat conditions. Monitoring will be accomplished primarily through periodic ground surveys and observations. Annual winter elk counts and monitoring of the bighorn population sheep will continue to be conducted with the use of helicopter or fixed-winged aircraft flights, in cooperation with the Division of Wildlife, and in compliance with RMP and RAMP guidelines. Approximately three to five, one-hour long flights a year would be flown over the area.

Although no BLM wildlife projects are planned at this time, the construction and maintenance of two wildlife guzzlers, and any future wildlife facilities or improvement projects, which are consistent with the RAMP, would not be subject to wilderness management criteria.

**Recreation Management:** The management actions described below for this No Wilderness alternative are the same as those of the Proposed Action.

32

As under wilderness guidelines, recreational use in the Gunnison Gorge would continue to be managed under the RAMP and RMP to maintain a wilderness setting for primitive, nonmotorized recreational activities such as whitewater boating, fishing, hiking, hunting, photography, horseback riding, and sight-seeing. The entire area would continue to be closed to ORV use, the landing of aircraft, and bicycle use. No additional recreation facilities or improvements are planned.

Campsites and hiking trails would continue to be monitored for resource damage throughout the season by frequent foot and boat patrols. Low impact camping regulations for all users would be enforced throughout the WSA.

As in the Proposed Action, the recreational carrying capacity of the Gunnison River corridor within the WSA would continue to be set at 75 persons per day. Use in this area would continue to be managed for a maximum of six group encounters per day with other floating parties on the river, and no more than ten combined encounters per day between floating parties and parties on shore. River use by commercial outfitters is presently allocated to a maximum of two commercial launches per day. Maximum group size for both commercial and private launches is twelve persons.

Permits are currently required for all commercial users, including whitewater, walk-in fishing, and hunting outfitters. It is projected that a private boater permit system would be implemented to effectively manage river use. When initiated, private groups would be limited to four launches per day. In addition, a permit system for walk-in private users would also be implemented if needed to further restrict private use in order to protect wilderness values.

As in the Proposed Action, although maximum recreational use on a daily basis is limited under this alternative, it is projected that annual use in the area would increase approximately 40 percent from the present 5,000 user days to 7,000 user days (3,500 user days of whitewater boating and 3,500 user days of non-boating primitive use) as a result of increased publicity and interest. The major increases are expected to be in private boating and walk-in fisher use.

**Energy and Minerals Management:** The BLM's protective withdrawal, which closes approximately 15,595 acres, or 76 percent of the area, to mineral entry and location, would be retained. Unlike the Proposed Action, approximately 5,603 acres, or 26 percent of the area, would be open to mineral entry and location.

There are currently 18 post-FLPMA placer gold claims in the southern one-third of the WSA, outside the withdrawal. According to the findings in the U.S. Geological Survey and U.S. Bureau of Mines report, small amounts of gold do occur in this area. It is anticipated that there will be some exploration activity and assessment work on at least one to four existing claims and six to eight new claims in this area over the next 20 to 30 years. Surface disturbance from exploration activity is not expected to exceed 2 to 8 acres, including access development.

Since the entire Gunnison Gorge WSA has only a low mineral resource potential for base and precious metals, and there are no known mineral deposits in the area, it is projected that these claims would be purely speculative and would not prove valid, and that no further development would occur.

Unlike the Proposed Action, the entire area (21,038 acres) would be open to coal, oil, and gas leasing. There are no coal leases within the WSA and no geologic structures that produce minable coal. There are no oil and gas leases and no known occurrences of oil or gas in the study area or surrounding area. Due to the absence sedimentary structures which favor the accumulation of oil and gas, the oil and gas potential of the WSA is rated as zero. Therefore, no interest in exploration or development is anticipated.

As in the Proposed Action, the area would remain closed to disposal of saleable mineral material. There is no current or foreseeable demand for these materials which are plentiful and more easily accessed elsewhere in the planning area, therefore, no activity is projected.

**Watershed Management:** Riparian and watershed conditions throughout the area would be protected by RAMP and RMP guidelines that prevent degradation caused by other resource activities or by visitor use, and when necessary, allow deteriorated sites to return to a natural condition. No specific projects are proposed.

BLM_0005516

**Cultural Resources Management:** None of the sixty-three sites (see Chapter 3) in the WSA are eligible for listing on the National Register of Historic Places. All existing sites, as well as any sites discovered in the future, are ensured protection under federal law. In most instances, cultural resources would be subject to the forces of nature in the same manner as other wilderness resources. No cultural resource projects are planned, and study or management of any sites would not entail excavation, stabilization, or interpretation. Clearances for cultural resources would be conducted prior to any surface-disturbing mineral exploration or assessment activities, and any sites found would be avoided. No cultural resource projects are planned.

**Threatened and Endangered Species Management:** The WSA contains one known occurrence of the threatened Uinta Basin hookless cactus (*Sclerocactus glaucus*) and has habitat suitable for additional threatened and endangered plant species (see Chapter 3). The area also provides winter habitat for bald eagles and supports a reintroduced population of river otters, listed as endangered by the state and as a candidate for federal listing under the Endangered Species Act (Category 2). Clearances would be conducted prior to any surface-disturbing mineral exploration or assessment activities. Any activities which may affect threatened and endangered species or their potential habitat within the WSA, would be subject to federal and state laws which require formal consultation with the USFWS, prior to approval.

**Forest and Woodland Resources Management:** There is no commercial timber in the WSA and the area has only a low economic potential for woodland harvesting. The approximately 337 acres of productive pinyon-juniper woodlands within the WSA have been closed to harvesting since 1985 to protect wilderness qualities, and would continue to be closed under RMP management. Woodland harvesting and management would be permitted only for control of insects and disease if determined necessary to protect resources outside the WSA.

**Livestock Grazing Management:** There would be no change in the 662 AUMs of sheep and cattle use currently authorized within the WSA. There are no existing range projects in the area, and no facilities or improvements are planned.

**Aquatic Resources Management:** The Gold Medal trout fishery and other aquatic resources of the Gunnison River would continue to be managed in cooperation with the Colorado Division of Wildlife (DOW). No significant changes in management are projected and no projects are planned.

Table 2-1 is a summary of impacts by alternative for the Gunnison Gorge WSA.

# CAMEL BACK WSA (CO-030-353)

Two management alternatives were developed and analyzed for the Camel Back WSA: designating none of the areas as wilderness (No Wilderness) and designating the entire area as wilderness (All Wilderness).

## NO WILDERNESS ALTERNATIVE (Proposed Action)

Under the No Wilderness Alternative, the entire Camel Back WSA (10,402 acres) is recommended as nonsuitable for wilderness designation and will be managed under multiple use guidance of the RMP, without special consideration for wilderness values. Part of the area (7,240 acres) will be managed for livestock grazing and 2,482 acres will be managed for wildlife habitat. Improvement of the riparian habitat will be emphasized on 680 acres, mainly in the Roubideau Creek and Potter Creek drainages.

The entire area will be closed to recreational ORV use to protect scenic values, to prevent accidental destruction of threatened and endangered plants, to protect riparian areas, and to reduce active erosion. However, some restricted motorized vehicle use would be allowed the grazing permittee(s) and the BLM for administrative access.

The 160 acre private inholding, which is located within the eastcentral portion of the WSA, will not be acquired.

Map 2-3 delineates the boundaries of the Camel Back WSA, and shows the areas proposed for livestock, wildlife, and riparian management under the No Wilderness Alternative.

34

BLM_0005517



# CAMEL BACK

## CO -030 - 353

——————— WSA Boundary
▓▓▓▓▓▓▓ Potter Creek Road
- - - - - - - Winter Mesa Way

||||||||| Livestock Grazing
▭▭▭▭ Wildlife Habitat
▓▓▓▓ Riparian Habitat
▭▭▭▭ Private Land

**N**

KILOMETERS  1  0  1  2  3  4  5  6  7  8
MILES       1  0  1  2  3  4  5

**Map 2-3
Camel Back - Proposed Action**

35

BLM_0005518

**Wildlife Management:** Wildlife forage allocations would be managed at current levels to support the area's present yearlong populations of 33 deer, and an additional 292 deer and 28 elk during the winter. There are currently no wildlife projects in the entire WSA, and no specific habitat improvement projects were proposed in the RMP.

Approximately 2,482 acres in the Camel Back Ridge and Upper Roubideau Creek drainage areas, located in the southeastern portion of the WSA, would be managed to maintain the area's capabilities to support wintering deer, elk, and a possible reintroduced population of 40 to 80 desert bighorn sheep. This wildlife management area was officially relinquished from grazing use in 1986, and there are no existing allotments or facilities in the area.

The area is potential habitat for desert bighorn sheep, but the reintroduction process is only in the planning stage with suitability studies still needed before any specific bighorn habitat improvement projects or reintroduction can be proposed. Existing habitat conditions throughout the WSA will be protected by recreational ORV closures and restrictions on livestock grazing in riparian areas. Wildlife will have priority for any additional forage which becomes available in this area.

Management in the wildlife area will consist primarily of an intensified level of monitoring of population levels and documenting changes in habitat and range conditions which are achieved through the grazing management program. Although monitoring will be accomplished primarily through the use of ground surveys, it is projected that at least three aerial surveys will be conducted each year for the purposes of documenting numbers and locations of wintering deer and elk herds, and to monitor distribution patterns of the bighorn sheep when they are reintroduced into the area. These flights would be accomplished with the use of fixed-wing aircraft, and would be less than one hour in duration.

Although none are proposed, non-conflicting wildlife habitat management objectives, projects, and any mitigating measures would be incorporated into new or existing allotment Management Plans (AMPs) throughout the remainder of the WSA managed primarily for livestock (7,240 acres).

Additional forage will be available for wildlife only if not needed by livestock. Bighorn sheep could be transplanted into the Winter Mesa area if suitability studies prove positive, and if their use would not conflict with current and future livestock grazing forage allocations.

**Recreation Management:** The present recreational use in the area is estimated at 500 user days annually, consisting of 300 motorized recreational user days and 200 nonmotorized, semi-primitive recreational user days. The majority (80 percent) of the current use in the WSA is by hunters on Winter Mesa that access the area via an unmaintained vehicle way that extends approximately 6 miles into the WSA. Approximately 60 user days of ATV and motorcycle use currently occurs along Roubideau Creek in the eastern portion of the WSA. Opportunities for horseback riding and hiking are provided by approximately 5 miles of stock trails, the Winter Mesa way, and cross-country travel.

Management under the RMP will close the entire area to recreational ORV use to protect scenic values, to prevent accidental destruction of threatened and endangered plants, to protect riparian areas, and to reduce active erosion. As a result, 300 motorized recreational user days will be eliminated and future opportunities for ORV use would be forgone on 10,402 acres. Recreational use of the area will shift from predominately motorized recreation use to nonmotorized, semi-primitive recreational use consisting of hiking, hunting, horseback riding, photographic and sight-seeing opportunities in a predominately natural setting.

Vehicle access to the area will be further restricted by a riparian closure of the Potter Creek Road, an unimproved jeep trail that borders approximately 5 miles of the WSA's western boundary. Ninety percent of the use on this road is for hunter access into the WSA.

Any authorized BLM or grazing permittee ORV use in the area would be restricted to designated trails and ways, or BLM approved cross-country travel routes. This use of motorized vehicles would generally be fewer than six trips per year.

There are currently no recreational projects or facilities in the area, and no additional facilities, other than signs delineating ORV closures are planned. It is projected that an annual decrease

BLM_0005519

of 300 user days of motorized recreational use, and an increase of 50 user days of primitive recreational use will result from management actions which preclude motorized recreational use in the area. These changes represent a 50 percent decrease from the present level of use.

**Livestock Grazing Management:** Under this alternative, approximately 7,240 acres will be managed primarily for livestock grazing under a deferred rotation system for cattle during spring and fall. Livestock forage allocations are expected to remain at the current level of 514 AUMs of spring and fall cattle use on the one allotment in the area. Allotment management plans (AMPs) will be prepared to identify specific grazing management practices.

Grazing use in the 680 acres of riparian areas will be precluded from March 1 through range readiness, to protect new spring growth and prevent erosion of wet soils, and thus accelerate the improvement of riparian vegetation. Livestock grazing may be further limited to 35 percent utilization by weight of key forage species if determined necessary to increase riparian cover. Trailing use would be limited as much as possible and confined to established trails and ways. No bedding livestock will be permitted in riparian areas to reduce bank disturbance.

Existing range facilities include 1.25 miles of fence, five miles of stock trails, one water catchment development which covers one third acre, and three stock reservoirs, each covering approximately 1,300 square feet. All of these developments, with the exception of the stock trails, are located on Winter Mesa in the central portion of the area, and are accessed via the Winter Mesa Way. Map 2-4 shows the locations of these existing range facilities.

Under this alternative, the use of motorized vehicles and equipment in connection with range management activities would be allowed. This use would be infrequent, generally fewer than six times a year, and would consist primarily of the permittees and BLM administrative personnel driving a pickup into the area on designated ways to maintain facilities and monitor stock distribution.

Proposed plans include the construction of four stock reservoirs and eight depression ponds to achieve AMP objectives of improving livestock forage and distribution. The final decision as to

which projects would be developed, and their exact location, would be determined following the preparation of an Environmental Assessment (EA) for each project on in an AMP. Map 2-4 shows the approximate locations of these proposed reservoirs and depression ponds.

The four stock reservoirs would be located on Winter Mesa, and would be small, covering approximately 1,300 square feet each, with a holding capacity of one-quarter acre-foot of water. A bulldozer would be used in their construction. Approximately 1.7 miles of paths for the bulldozer, from the existing vehicle way on Winter Mesa to the reservoir sites, would be cleared for threatened and endangered plants and cultural sites. The bulldozer would be moved into the sites with its blade raised in order to minimize ground disturbance. The total ground disturbance for construction of the four reservoirs is not expected to exceed 5,200 square feet. No permanent or temporary roads would be constructed.

The sites for the eight depression ponds would be dispersed throughout the remainder of the grazing management area, with two ponds located on the westside bench of Criswell drainage, three on the westside bench above Roubideau Creek, and three on the eastside bench above Potter Creek (see Map 2-4). These ponds would each cover approximately 700 square feet, and would hold approximately one-tenth of an acre-foot of water. The eight sites will be cleared for threatened and endangered species and cultural resources prior to construction. The total ground disturbance for construction of the eight depression ponds is not expected to exceed 5,600 square feet.

Due to the inaccessible nature of the terrain (cliff walls and highly erodible slopes) and the high costs involved in constructing vehicle access to the sites, these depression ponds would be constructed using dynamite charges instead of heavy equipment. Some additional hand tool labor may be required for finishing and maintenance of these ponds but no mechanical equipment would be used.

Livestock would have first priority for any additional forage made available as a result of management actions within the grazing management area (7,240 acres). Within the wildlife management area (2,482 acres), additionally forage will be available for livestock use only if not needed by wildlife. In riparian areas (680 acres),

37



# CAMEL BACK WSA



**Map 2-4**
**Camel Back - Grazing Management**

BLM_0005521

additional forage would be divided equally between wildlife and livestock.

**Riparian Habitat Management:** Improvement of the riparian habitat would be emphasized on 680 acres, mainly in the Roubideau and Potter creeks drainages, primarily through preclusion of recreational ORV use and management restrictions on livestock grazing. Although no specific projects are planned, these areas would be intensively monitored for vegetation, aquatic habitat, and erosion conditions.

**Energy and Mineral Management:** No energy or mineral activity is anticipated due to the area's lack of mining claims and oil or gas leases, the lack of demand for mineral materials in the area, and the low potential for any energy of mineral development.

**Cultural Resources Management:** All existing and potential sites are protected under federal law and BLM mandates. Present management of the only known significant site, a Ute hunting blind, is in compliance with eligibility requirements of the NHPA (see Chapter 3), and the site is being managed via avoidance. Clearances for cultural resources would be conducted prior to the construction of the twelve range projects, and any sites found would be avoided.

**Threatened and Endangered Species Management:** There are no known populations of threatened or endangered animal species within the Camel Back WSA. There is a known population of the endangered spineless hedgehog cactus (*Echinocereus triglochidiatus var. inermis*) within the Camel Back WSA. In addition, the WSA contains potential habitat for the threatened Uinta Basin hookless cactus (*Sclerocactus glaucus*) and the Grand Junction milkvetch (*Astragalus linifolius*), a candidate for listing under the Endangered Species Act (Category 2). These existing and potential habitat sites are protected under federal or state laws. Clearances would be conducted prior to the construction of the twelve range projects, and any activities associated with their construction, which may affect threatened and endangered species or their potential habitat within the WSA, would be subject to federal and state laws which require formal consultation with the USFWS, prior to approval.

## ALL WILDERNESS ALTERNATIVE

Under the All Wilderness Alternative, the entire Camel Back WSA (10,402 acres) would be recommended as suitable for wilderness designation. This alternative proposes acquiring the 160 acre private inholding, which is located within the eastcentral portion of the WSA, through exchange, donation, or purchase and incorporating it into the designated wilderness.

If designated as wilderness, the entire 10,562 acres would be managed according to the BLM's Wilderness Management Policy and the Wilderness Act of 1964 to protect and preserve its wilderness values.

**Wildlife Management:** As in the Proposed Action, wildlife forage allocations would be managed at current levels to support the area's present yearlong population of 33 deer, and an additional 292 deer and 28 elk during the winter.

As in the Proposed Action, current habitat conditions throughout the WSA would be protected by ORV closures and restriction on livestock grazing in riparian areas. Potential habitat in the Camel Back/Roubideau Creek area and on Winter Mesa would be available for the reintroduction of 40 to 80 desert bighorn sheep if suitability studies prove positive.

Monitoring of wildlife populations in the WSA would be accomplished primarily through the use of ground surveys. However, it is projected that at least three aerial surveys will be conducted each year for the purposes of documenting numbers and locations of wintering deer and elk herds, and to monitor distribution patterns of the bighorn sheep when they are reintroduced into the area. These flights would be accomplished with the use of fixed-winged aircraft, and would be less than one hour in duration.

Unlike the Proposed Action, wildlife would have allocation priority throughout the WSA for any additional forage made available as a result of any wilderness approved management action.

**Recreation Management:** Under All Wilderness management, the entire WSA would be closed to ORV use to protect wilderness values. As in the Proposed Action, there would be a shift from predominately motorized recreation use to primitive recreation use within the WSA. Except for some motorized use by BLM and grazing per-

BLM_0005522

mittees, the area would be managed for non-motorized, semi-primitive recreational use, consisting of hiking, hunting, horseback riding, photographic, and sight-seeing opportunities, in a predominately natural setting.

As in the Proposed Action, vehicle access to the area would be further restricted by a riparian closure of the Potter Creek Road. Ninety percent of the use on this road is for hunter access into the WSA.

Authorized BLM or grazing permittee ORV use in the area would be restricted to designated trails and ways, or BLM approved cross-country travel routes. This use of motorized vehicles would generally be fewer than six trips per year.

Although no improvements or projects are anticipated, recreational facilities and signs would be limited to those necessary to protect wilderness resources along with public health and safety of persons within the area.

As in the Proposed Action, 300 motorized recreational user days, would be eliminated and future opportunities for ORV use would be forgone on 10,402 acres. Unlike the Proposed Action, however, increased publicity and interest over wilderness designation, in addition to the shift in types of recreational use, is expected to result in an initial increase from the present level of 200 primitive user days to 300, and a gradual increase up to 600 primitive user days. These changes in amount and type of use represent a 20 percent increase (from 500 to 600 user days) in overall visitation.

**Livestock Grazing Management:** As in the Proposed Action, livestock grazing would be managed under a deferred rotation system for cattle during spring and fall. Under this alternative, livestock forage allocations would be limited to the amount of use occurring at the time of designation, which is expected to be the current level of 514 AUMs.

As in the Proposed Action, grazing use in the 680 acres of riparian areas will be precluded from March 1 through range readiness, to protect new spring growth and prevent erosion of wet soils, and thus accelerate the improvement of riparian vegetation. Trailing use would be limited as much as possible and confined to established trails and ways. No bedding livestock will be permitted in riparian areas to reduce bank disturbance.

As in the Proposed Action, livestock grazing may be further limited to 35 percent utilization by weight of key forage species if determined necessary to increase riparian cover. This utilization limit would only be implemented when other methods of improving riparian vegetation (i.e., changing season of use, limiting trailing time, etc.) prove unsuccessful.

The use of motorized vehicles and equipment in connection with range management activities would be allowed, where practical alternatives do not exist. This use would be infrequent, generally fewer than six times a year, and would consist primarily of the permittees and BLM administrative personnel driving a pickup truck into the area on designated ways to maintain facilities and monitor stock distribution.

Unlike the Proposed Action, the construction of the four stock reservoirs and eight depression ponds would only be allowed if they were determined by management to be necessary for the purpose of protecting and managing range and/or wilderness resources. The criteria for those decisions would be analyzed through an allotment management plan (AMP) and an Environmental Assessment (EA).

It is projected that under this alternative, the four reservoirs on Winter Mesa would be constructed as their primary objective is to redistribute concentrated grazing use from the riparian areas of the canyon bottoms to the mesa top where there is less impact potential, and not to accommodate increased livestock use. Should these four reservoirs prove effective, the water catchment facility, which covers approximately one-third of an acre at the southern end of Winter Mesa (see Figure 2-4), would be removed, as it would no longer be needed, and the area would be allowed to return to a natural condition. The eight depression ponds would not be constructed.

The use of a bulldozer would be allowed for the construction of the four reservoirs, subject to the BLM's Wilderness Management Policy. Approximately 1.7 miles of paths for the bulldozer, from the existing vehicle way on Winter Mesa to the reservoir sites, would be cleared for threatened and endangered plants and cultural sites. The bulldozer would be moved into the

BLM_0005523

sites with its blade raised in order to minimize ground disturbance. The total ground disturbance for construction of the four reservoirs is not expected to exceed 5,200 square feet. No permanent or temporary roads would be constructed. Any maintenance of these reservoirs would be done by non-impairing means.

Unlike the Proposed Action, wildlife would have allocation priority throughout the WSA if any additional forage is made available as a result of any wilderness approved management action.

**Riparian Habitat Management:** Improvement of the riparian habitat would be emphasized on 680 acres, mainly in the Roubideau and Potter creeks drainages, primarily through preclusion of recreational ORV use and management restrictions on livestock grazing. Although no specific projects are planned, these areas would be intensively monitored for vegetation, aquatic habitat, and erosion conditions.

**Energy and Mineral Management:** No energy or mineral activity is anticipated due to the area's lack of mining claims and oil or gas leases, the lack of demand for mineral materials in the area, and the low potential for any energy of mineral development.

**Cultural Resources Management:** All existing and potential sites are protected under federal law and BLM mandates. Present management of the only known significant site, a Ute hunting blind, is in compliance with eligibility requirements of the NHPA (see Chapter 3), and would be managed via avoidance. Clearances for cultural resources would be conducted prior to the construction of the four stock reservoirs, and any sites found would be avoided.

**Threatened and Endangered Species Management:** There are no known populations of threatened or endangered animal species within the Camel Back WSA. There is a known population of the endangered spineless hedgehog cactus (*Echinocereus triglochidiatus var. inermis*) within the Camel Back WSA. In addition, the WSA contains potential habitat for the threatened Uinta Basin hookless cactus (*Sclerocactus glaucus*) and the Grand Junction milkvetch (*Astragalus linifolius*), a candidate for listing under the Endangered Species Act (Category 2). These existing and potential habitat sites are protected under federal or state laws. Clearances would be conducted prior to the construction of the four stock reservoirs, and

any activities associated with their construction, which may affect threatened and endangered species or their potential habitat within the WSA, would be subject to federal and state laws which require formal consultation with the USFWS, prior to approval.

Table 2-1 is a summary of impacts by alternative for the Camel Back WSA.

# ADOBE BADLANDS WSA (CO-030-370B)

Two management alternatives were developed and analyzed for the Adobe Badlands WSA: designating none of the area as wilderness (No Wilderness) and designating the entire area as wilderness (All Wilderness).

## NO WILDERNESS ALTERNATIVE (Proposed Action)

Under the No Wilderness Alternative, the entire Adobe Badlands WSA (10,425 acres) is recommended as nonsuitable for wilderness designation. Under management by the RMP, the area would be divided into three management units as described below and shown in Map 2-5.

* *UNIT A: Outstanding Natural Area and Area of Critical Environmental Concern (ONA/ACEC)*

Approximately 6,783 acres in the southern two-thirds of the area would be designated an ONA/ACEC and managed to protect the area's unique landscape, to provide for primitive, nonmotorized recreation opportunities and use, to protect threatened and endangered plants, and to reduce active erosion. An ONA/ACEC management plan would be prepared for this area.

A complete inventory for threatened and endangered plant species would be conducted, and research and monitoring studies would be established. There are known populations of the threatened Uinta Basin hookless cactus (*Sclerocactus glaucus*) within the WSA as well as potential habitat for other endangered or threatened plant species (see Chapter 3). These known populations of cactus and potential habitat sites will be protected under federal and state laws, and under the

41



# ADOBE BADLANDS
## CO - 030 - 3703B

──────── **WSA Boundary**

<u>PROPOSED MANAGEMENT UNITS</u>



Unit A: Outstanding Natural Area / Area of
Critical Environmental Concern (6,783 acres)
Unit B: Wildlife Management Area (1,927)
Unit C: Salinity Control Area (1,715 acres)

**Map 2-5**
**Adobe Badlands - Proposed Action**

42

BLM_0005525

ONA/ACEC designation, which would preclude all surface-disturbing activities in this unit. No threatened or endangered animals species are known to inhabit the WSA.

* UNIT B: *Wildlife Management Area*

Approximately 1,927 acres in the northern portion of the area would be managed primarily to improve the quality and quantity of crucial deer and elk winter range. Disturbances would be minimized from December 1 through April 30 to protect habitat conditions and reduce stress on wintering animals. A Habitat Management Plan (HMP) would be prepared for this area. Any activities which may affect threatened and endangered species or their potential habitat within the area would be subject to federal and state laws which require formal consultation with the USFWS, prior to approval.

* UNIT C: *Salinity Control Area*

Approximately 1,715 acres of highly erodible saline soils along the western and northern boundary of the ONA/ACEC would be managed to control salinity contributions to the Colorado River System. No specific salinity projects are proposed for this area at this time. Surface-disturbing activities would be curtailed from March 1 through May 31 when saturated soils are most vulnerable to damage. Management would consist primarily of monitoring and documenting changes in soils conditions that could result from proposed recreation and energy and mineral management actions.

Any activities which may affect threatened and endangered species or their potential habitat within the area would be subject to federal and state laws which require formal consultation with the USFWS, prior to approval.

**Wildlife Management:** Wildlife habitat would be available throughout the three management units in the WSA to support the present year-long population of 30 pronghorn, and an additional 76 deer and 35 elk during the winter. Specific wildlife management actions for the three management units are described below.

* *Management Unit A:* Wildlife habitat, primarily for pronghorn, would be protected by ORV

closures, and closures to mineral material disposal. There are currently no wildlife improvement projects in this area and, to protect scenic values, no new habitat improvement projects would be permitted. Wildlife forage allocations would remain at current levels unless studies determine threatened and endangered plant species or their potential habitat are being degraded. No new forage allocations would be made.

* *Management Unit B:* There are no existing wildlife improvement projects in this area. Land treatment projects and water facilities that are designed to improve winter habitat conditions would be allowed. Proposed plans call for one land treatment project to improve winter forage conditions. The project would consist of five to seven 20 acre parcels where pinyon-juniper trees would be felled and scattered by means of commercial fuelwood sales. The entire project would be confined to the NE-1/4 of Section 5, T. 14 S., R. 96 W., and accessed by two temporary roads totalling approximately two miles in length. The area would be cleared for threatened and endangered species and cultural resources prior to construction.

Wildlife would have priority for all additional forage made available as a result of this BLM habitat improvement project. The location of the project is shown in Map 2-6.

All other land uses would be permitted if they would not degrade the winter range capabilities. Oil and gas leases would have seasonal stipulations on exploration activities, and coal leases would have restrictions on new road and facility construction in effect from December 1 through April 30, to reduce stress on wintering animals. These seasonal restrictions would also apply to any mineral disposal activities.

ORV use would be limited to designated roads and trails from December 1 through April 30 to reduce stress on wintering animals and minimize habitat disturbance.

* *Management Unit C:* Forage allocations for pronghorn and wintering deer and elk would remain at current levels. There are no wildlife habitat improvement projects in this management unit, and none are proposed in the RMP. It is projected that exploration activities for oil

43





**ADOBE BADLANDS**
**CO - 030 -370b**

— WSA Boundary
⊠ Coal Deposits
● Placer Claims

**Management Units**

▥ Open to Mineral Entry and Location , NSO,
Closed to Coal Leasing and Mineral Material Disposal

▤ Open to Energy and Mineral Exploration and Development
(Seasonal Restrictions -December 1 thru April 30)

▨ Open to Energy and Mineral Exploration and Development
(Seasonal Restrictions - March 1 thru May 31)

KILOMETERS
MILES

**Map 2-6**
**Adobe Badlands - Energy And Minerals Management**

44

BLM_0005527

and gas would disturb three to five acres of wildlife habitat in this area.

**Recreation Management:** Under this alternative, the entire area would be managed for extensive primitive and semi-primitive recreational use in a predominately natural setting. There are no recreation facilities in the WSA and no facilities or projects, other than some regulatory signs, are proposed. Annual recreation use is expected to decrease 80 percent from the present 500 user days, (450 motorized user days and 50 primitive user days), to 100 user days (50 motorized uses days and 50 primitive user days).

ORV use in the three management areas would be subject to the following closures and restrictions:

*   *Management Unit A:* The unit would be closed to ORV use to protect scenic qualities, to provide opportunities for semi-primitive non-motorized recreational use, to prevent accidental destruction of threatened and endangered plant species and their potential habitat, and to reduce active erosion. Approximately 400 user days of motorized use would be forgone. Nonmotorized, primitive use in the area is expected to increase from the present level of 50 user days to 100 user days. An ONA/ACEC management plan will be prepared to manage the area for its primitive, non-motorized recreational values.

*   *Management Unit B:* ORV use would be limited to designated roads and trails seasonally from December 1 through April 30 on 1,927 acres, to protect crucial wildlife winter range and reduce stress on deer and elk herds. Unrestricted ORV use would be allowed from May 1 through November 30. Current use in this area consists of approximately 25 user days of motorized use by hunters. No significant changes in use are anticipated.

*   *Management Unit C:* ORV use would be limited to designated road and trails year long to protect highly erodible saline soils. Current use in this area is consists of approximately 25 user days of recreational ORV use. No significant changes in use are anticipated.

**Energy and Minerals Management:** Although no exploration or production is anticipated, the entire WSA would be open to entry and location for minerals. There are ap-

proximately 75 placer mining claims within the WSA boundary on which no validity exams have been conducted. There has been no ground disturbing activities associated with the annual assessment work on these claims in the past, and none is anticipated in the future. There are no known mineral deposits in the WSA, and the potential for locatable minerals is low. Given the low mineral potential in the WSA and the lack of activity on the existing claims, it is projected that the claims are purely speculative and would not prove to be valid, therefore, no additional interest or activity is anticipated.

The area's coal potential is low, except on approximately 507 acres in the the northern portions of the wildlife management area (Unit B), where there is an estimated 21 million tons of moderate to high development potential coal reserves. Development of this coal is not expected, however, due to the lack of industry interest and demand, the economic infeasibility of developing these reserve, the lack of transportation access, and the absence of producing mines in the general area.

All of the pre-FLPMA oil and gas leases have expired, and there are currently no oil and gas leases within the WSA. According to the Gem report, the geologic environment of the area indicates moderate favorability for the accumulation of oil and gas. The economic potential for oil and gas production is presently unknown, however, based on past unproductive drilling efforts, it is assumed to be low.

Although some additional oil and gas exploration is expected to occur within management Unit C, no production is anticipated, due to low potential for development. Any future oil and gas exploration activities would be subject to the restrictions described below for the three management areas. Specific restrictions or closures for coal leasing and mineral material disposal are also described for the units where applicable.

Map 2-7 depicts the boundaries of the management units and shows the locations of the placer claims and coal deposits within the WSA.

*   *Management Unit A:* The ONA/ACEC would have a no surface occupancy stipulation on oil and gas leases to protect it from surface-disturbing activities that would degrade the area's scenic qualities and accelerate erosion.

45



# ADOBE BADLANDS
## CO - 030 - 370 b

━━━━━ WSA Boundary

 Wildlife Improvement Project Area
(Approximately 140 acres)


N



**Map 2-7**
**Adobe Badlands - Wildlife Management**
46

BLM_0005529

Approximately 3,263 acres which are beyond the limits of directional drilling, would be un-available for exploration. Given these restric-tions and limitations on mineral activities, no exploration or production is anticipated in this area.

The unit would also be closed to coal leasing and to mineral material disposal, however, there are no coal reserves within its boun-daries, and no disposal activity is projected since there is no demand for materials in this area, and these materials are plentiful and more easily accessed elsewhere in the plan-ning area.

* *Management Unit B:* Oil and gas leases on crucial deer and elk winter range would be subject to seasonal stipulations which preclude all seismic and drilling activities from December 1 through April 30 in order to reduce stress on wintering big game. New road and facility construction for coal leasing would also be restricted, and mineral material disposal would be precluded from December 1 through April 30 to reduce stress on winter-ing big game and minimize habitat distur-bance. No mineral or energy exploration is anticipated in this unit, because of its remote-ness, and the restrictions and limitations on mineral and energy activities.

No activity is projected for saleable minerals since there is no demand for materials in this area, and these materials are plentiful and more easily accessed elsewhere in the plan-ning area.

* Management Unit C: Oil and gas leases would have a seasonal stipulation on seismic and drilling activities in effect from March 1 through May 31 to protect erodible saline soils. Some additional oil and gas exploration is expected to occur within this unit, which has the least restrictions on energy activities, and is easily accessible via boundary roads. It is estimated that two to five exploratory oil or gas wells would be drilled over the next 20 to 30 year period. However, surface disturbances, as a result of exploration activities, are not ex-pected to exceed four to ten acres, including access development. No energy develop-ment beyond exploration is anticipated, however, based on past unproductive drilling efforts and lack of industry interest.

The unit would be open to coal leasing and to disposal of mineral materials, subject to restrictions from March 1 through May 31, to protect erodible and saline soils. No explora-tion or development of coal is anticipated, however, due to low potential for production. No activity is projected for saleable minerals since there is no demand for materials in this area, and these materials are plentiful and more easily accessed elsewhere in the plan-ning area.

**Livestock Grazing Management:** There would be no change in the 878 AUMs of winter sheep use presently allocated on three grazing al-lotments in the WSA. There are no existing range facilities in the WSA, and no projects are proposed in the RMP. There has been no ORV use associated with grazing management in the area and none is anticipated in the future. Graz-ing would be eliminated from March 1 through range readiness to reduce soil compaction and erosion of wet, saline soils. This restriction would not have a measurable affect on overall livestock use, and no other changes in range management are proposed.

**Forest and Woodland Resources Manage-ment:** Although harvests would be allowed on the approximately 86 acres of pinyon-juniper woodlands within the wildlife management area (Unit B), no activity is anticipated due to the limited area which would be available for harvest-ing, the remoteness of these stands, and the lack of economic feasibility for production.

**Cultural Resources Management:** There are no known cultural sites within the WSA. Clearances for cultural resources would be con-ducted prior to the construction of the wildlife im-provement project in Unit B, and any surface-dis-turbing energy or mineral activities, and any sites found would be avoided. All sites which may be discovered in the future would be protected by federal law and BLM mandates.

## ALL WILDERNESS ALTERNATIVE

Under the All Wilderness Alternative, the en-tire Adobe Badlands WSA (10,425 acres) would be recommended as suitable for wilderness designation. If designated as wilderness, the area would be managed according to the BLM's Wilderness Management Policy and the Wilder-ness Act of 1964 to protect and preserve its wilderness values.

47

**Wildlife Management:** As in the Proposed Action, wildlife habitat would be available to support the area's present population of 30 resident pronghorn and 76 deer and elk during the wintering would be maintained. Wildlife forage allocations would remain at current levels throughout the entire WSA unless studies determine threatened or endangered plant species or their potential habitat are being degraded.

Unlike the Proposed Action, management would consist primarily of an intensified level of monitoring wildlife population levels and documenting changes in habitat conditions, through the use of ground surveys and observations. The one wildlife habitat treatment project on approximately 140 acres in the upper portion of the WSA would not be implemented.

**Recreation Management:** The present recreational use in the area is estimated at 500 user days annually, 450 of which are motorized user days. Unlike the Proposed Action, recreational use would be managed to maintain a wilderness setting for primitive, nonmotorized recreational activities such as hiking, hunting, photography, and horseback riding.

The entire WSA (10,425 acres) would be closed to ORV use to protect wilderness values. Approximately 450 user days of motorized recreational use would be forgone.

Annual recreational use in the WSA would increase 20 percent from the present 500 user days to 600 user days, and there would be a shift from motorized recreation to more primitive nonmotorized recreation. No recreational projects are proposed for the area.

**Energy and Minerals Management:** Unlike the Proposed Action, all of the federal mineral estate in the WSA would be withdrawn from exploration, leasing, entry and location, and disposal.

There are currently about 75 existing placer claims within the WSA on which no validity examinations have been conducted and no activity has occurred to date. Further development or extraction would only be permitted on those claims proven to be valid before designation. There are no known mineral deposits in the WSA, and the potential for locatable minerals is low. Given the low mineral potential in the WSA and the lack of activity on the existing claims, it is projected that the claims are purely speculative and would not

prove to be valid, therefore, no additional interest or activity is anticipated.

The entire WSA area would be closed to coal, oil and gas exploration and leasing under this alternative. All of the pre-FLPMA oil and gas leases have expired, and there are currently no oil or gas leases, or coal leases in the WSA.

The area would be closed to disposal of mineral materials; however, there is currently no demand for saleables in the WSA, and no interest or activity is projected.

**Livestock Grazing Management:** There would be no change in the 878 AUMs of winter sheep use presently allocated on three grazing allotments in the WSA. There are no existing range facilities in the WSA, and no projects are proposed in the RMP. There has been no ORV use associated with grazing management in the area and none is anticipated in the future. Grazing would be eliminated from March 1 through range readiness to reduce soil compaction and erosion of wet, saline soils. This restriction would not have a measurable affect on overall livestock use, and no other changes in range management are proposed.

**Forest and Woodland Resources Management:** Wilderness designation would preclude harvesting on the approximately 86 acres of pinyon-juniper woodlands within the wildlife management area (Unit B). However, no activity is anticipated due to the limited area which would be available for harvesting, the remoteness of these stands, and the lack of economic feasibility for production.

**Cultural Resources Management:** Because there are no known cultural resource sites within the WSA, no activity or projects are projected. Any sites which may be discovered in the future would be protected by federal law and BLM mandates, and by wilderness designation which would preclude any surface-disturbing activities in the area.

# COMPARATIVE ANALYSIS OF IMPACTS

Table 2-1 provides a comparative summary of the impacts which would result from the management actions proposed under each of the alternatives for the three WSAs.

BLM_0005531

Table 2-1

# SUMMARY OF IMPACTS
# GUNNISON GORGE WSA (CO-030-388)

| IMPACT TOPICS | PROPOSED ACTION ENHANCED ALL WILDERNESS ALTERNATIVE | ALL WILDERNESS ALTERNATIVE | NO WILDERNESS ALTERNATIVE |
|---|---|---|---|
| IMPACTS ON WILDERNESS VALUES | Wilderness designation would expand the adjacent Black Canyon of the Gunnison Wilderness Area and provide statutory, long-term protection for wilderness values on 22,078 acres. Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained. | Wilderness designation would expand the adjacent Black Canyon of the Gunnison Wilderness Area and provide statutory, long-term protection for wilderness values on 21,198 acres. Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained. | Naturalness and scenic values would continued to be administratively protected by the ORV closure of the area, the mineral withdrawal on 15,595 acres, and the enforcement of low impact camping regulation. Mineral exploration and assessment work would decrease naturalness on approximately 2-8 acres outside the withdrawal area over the next 20-30 years. |
| IMPACTS ON WILDLIFE HABITAT AND POPULATIONS | Habitat and forage conditions would be maintained for the area's present yearlong population of 50 to 60 bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Closure of an additional 5,793 acres to mineral entry would eliminate the possibility of habitat disturbance by mineral exploration activities in those areas. Restrictions on recreational use would reduce stress on both game and non-game species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep populations. | Habitat and forage conditions would be maintained for the area's present yearlong population of 50 to 60 bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Closure of an additional 5,603 acres to mineral entry would eliminate the possibility of habitat disturbance by mineral exploration activities in those areas. Restrictions on recreational use would reduce stress on both game and non-game species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population. | Habitat and forage conditions would be maintained for the area's present yearlong population of 50 to 60 bighorn sheep and 35 deer and 125 elk during the winter. Mineral exploration and assessment activities would result in less than 2-8 acres of habitat disturbance over the next 20-30 years. Restrictions on recreational use would reduce stress on both game and non-game species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population. |

49

BLM_0005532

| IMPACT TOPICS | PROPOSED ACTION ENCHANCED ALL WILDERNESS ALTERNATIVE | ALL WILDERNESS ALTERNATIVE | NO WILDERNESS ALTERNATIVE |
|---|---|---|---|
| IMPACTS ON RECREATION-AL OPPORTUN-ITIES AND USE | Recreational use would increase by 2,000 user days, or 40 percent, from the present level of 5,000 user days to 7,000 user days. Out standing opportunities for high quality wilderness recreation activities would be maintained. Permit systems would limit the amount and degree of recreation use. | Recreation use would increase by 2,000 user days, or 40 percent, from the present level of 5,000 user days to 7,000 user days. Outstanding opportunities for high quality wilderness recreation activities would be maintained. Permit systems would limit the amount and degree of recreation use. | Recreational use would increase by 2,000 user days, or 40 percent, from the present level of 5,000 user days to 7,000 user days. Outstanding opportunities for high quality wilderness recreation activities owould be maintained. Permit systems would limit the amount and degree of recreation use. |
| IMPACTS ON ENERGY AND MINERAL EXPLORATION AND PRO-DUCTION | An additional 5,443 acres within the WSA, 690 acres in Smith Fork Canyon, and 160 acres of acquired private mineral estate (5,793 acres total) would be closed to mineral entry, location, and leasing. There would be no impacts on energy or mineral production, leasing, or disposal since no activity is projected. | An additional 5,443 acres within the WSA and 160 acres of acquired private mineral estate (5,603 acres total) would be closed to mineral entry, location, and leasing. There would be no impacts on energy or mineral production, leasing, or disposal since no activity is projected. | Approximately 5,603 acres would remain open to mineral entry but no activity beyond exploration is projected due to low potential for development. The entire area would be open to leasing but no exploration or production is anticipated due to low potential for development. |

50

BLM_0005533

Table 2-1 (continued)

## SUMMARY OF IMPACTS
## CAMEL BACK WSA (CO-030-353)

| IMPACT TOPICS | PROPOSED ACTION NO WILDERNESS ALTERNATIVE | ALL WILDERNESS ALTERNATIVE |
|---|---|---|
| IMPACTS ON WILDERNESS VALUES | Wilderness values would remain largely unchanged on 10,402 acres. Opportunities for solitude, and primitive, unconfined types of recreation use would be increased by recreational ORV closures in the WSA. Twelve range improvement projects would slightly degrade naturalness on approximately one-quarter acre (20,800 square feet) of total area. | Wilderness designation would provide statutory, long-term protection for wilderness values on 10,402 acres. Opportunities for solitude and primitive, unconfined types of recreation would be increased by recreational ORV closures in the WSA. Eight range improvement projects would slightly degrade naturalness on approximately 5,200 square feet of total area. |
| IMPACTS ON WILDLIFE HABITAT AND POPULATIONS | Habitat and forage conditions would be maintained for the area's present yearlong population of 33 deer, and an additional 292 deer and 28 elk during the winter. ORV closures, range improvement and management actions to improve vegetative conditions would result in an overall improvement in herd condition and a gradual increase of 8 to 12 animals in the resident deer herd and 8 to 15 animals in the winter deer herd size. Habitat conditions necessary for a desert bighorn sheep reintroduction would be maintained, and possibly improved. | Habitat and forage conditions would be maintained for the area's present yearlong population of 33 deer, and an additional 292 deer and 28 elk during the winter. ORV closures, range improvements and management actions to improve vegetative conditions would result in an overall improvement in herd condition and a gradual increase of 8 to 12 animals in the resident deer herd and 8 to 15 animals in the winter deer herd size. Habitat conditions necessary for a desert bighorn sheep reintroduction would be maintained, and possibly improved. |

BLM_0005534

| IMPACT TOPICS | PROPOSED ACTION NO WILDERNESS ALTERNATIVE | ALL WILDERNESS ALTERNATIVE |
|---|---|---|
| IMPACTS ON RECREA-TION OPPORTUNITIES AND USE | Recreational use would decrease by 250 user days, or 50 percent, from the present level of 500 user days to 250 user days, as a result of ORV closures. Approximately 300 motorized recreational user days would be eliminated, and use would shift from predominately motorized use to non-motorized primitive use. The overall quality of recreational use would remain high. | Recreational use would increase by 100 user days, or 20 percent, from the present level of 500 user days to 600 user days, as a result of designation. Approximately 300 motorized recreational user days would be eliminated, and use would shift from predominately motorized use to non-motorized primitive use. The overall quality of recreational use would remain high. |
| IMPACTS ON LIVE-STOCKGRAZING AND MANAGEMENT | Livestock grazing would be precluded from March 1 through range readiness and trailing use would be limited in riparian areas, resulting in increased trailing time and operating costs. Four stock reservoirs and eight depression ponds would be constructed to increase water supplies and redistribute concentrated grazing use away from riparian areas. Grazing allocations would continue at the present level of 514 AUMs, but could be reduced by 150 to p 200 AUMs as a result of implementing a 35 percent utilization limit to further improve riparian conditions. | Livestock grazing would be precluded from March 1 through range readiness and trailing use would be limited in riparian areas, resulting in increased trailing time and operating costs. Four stock reservoirs would be constructed to increase water supplies and redistribute concentrated grazing use away from riparian areas. Eight depression ponds would not be constructed. Grazing allocations would continue at the present level of 514 AUMs, but could be reduced by 150 to 200 AUMs as a result of implementing a 35 percent utilization limit to further improve riparian conditions. |

52

BLM_0005535

Table 2-1 (continued)

# SUMMARY OF IMPACTS
# ADOBE BADLANDS WSA (CO-030-370B)

| IMPACT TOPICS | PROPOSED ACTION NO WILDERNESS ALTERNATIVE | ALL WILDERNESS ALTERNATIVE |
|---|---|---|
| IMPACTS ON WILDERNESS VALUES | Wilderness values would remain essentially unchanged on 6,783 acres within the ONA/ACEC, but would be slightly reduced on 3,642 acres by ORV use. Naturalness would be irretrievably lost on approximately 145 acres as a result of a wildlife habitat treatment and exploration activities for two oil or gas wells. | Wilderness designation would provide statutory, long-term protection for wilderness values on 10,425 acres. Opportunities for solitude and primitive, unconfined types of recreation would be increased by the elimination of ORV use in the WSA. |
| IMPACTS ON WILDLIFE HABITAT AND POPULATIONS | Seasonal restrictions on ORV use would reduce stress and maintain crucial winter range on 1,927 acres for 76 deer and 35 elk. Improved forage conditions on 140 acres could result in improvement in overall herd condition and gradual increase of 5 to 7 deer and 2 to 4 elk over the long term. ORV closures on 6,783 acres and yearlong limitations on 1,715 acres would reduce stress and maintain habitat and forage conditions for approximately 30 resident pronghorn. | Closing the entire area to ORV use and oil and gas exploration would reduce stress and maintain existing habitat and forage conditions for the yearlong population of 30 pronghorn antelope, and 76 deer and 35 elk during the winter. The inability to implement a land treatment project could result in short-term shortages of forage and increased stress during severe winters, and, over the long term, a reduction in herd vigor and the possible loss of 15 to 20 deer and 8 to 10 elk over the long term. |

53

BLM_0005536

| IMPACT TOPICS | PROPOSED ACTION<br>NO WILDERNESS<br>ALTERNATIVE | ALL WILDERNESS<br>ALTERNATIVE |
|---|---|---|
| IMPACTS ON RECREATION OPPORTUNITIES AND USE | Recreational use would decrease by 400 user days, or 80 percent, from the present level of 500 user days to 100 user days would be eliminated by ORV closures within the ONA/ACEC (6,783 acres), but would be recovered on adjacent areas. Opportunities for ORV use would be slightly impacted by yearlong restrictions on 1,715 acres and seasonal limitations on 1,927 acres. Use would shift from predominately motorized recreational activities to primitive recreational activities within the ONA/ACEC. | Recreational use would increase by 100 user days, or 20 percent, from the present level of 500 user days to 600 user days. Approximately 450 motorized user days wousld be displaced to adjacent areas. Use of the area would shift from less primitive, motorized recreational activities to primitive, non-motorized recreational activities. |
| IMPACTS ON ENERGY AND MINERAL EXPLORATION AND PRODUCTION | The entire 10,425 acres would be open for locatable mineral exploration but no development or production is anticipated due to the area's lack of mineral potential and lack of present and future demand. There would be no impacts on oil or gas production as a result of no surface occupancy stipulations on 6,783 acres in the ONA/ACEC or seasonal stipulations on 1,927 acres of crucial winter range since no exploration or production is anticipated within those areas. Seasonal stipulations on 1,715 acres would increase oil and gas exploration costs for two to five wells; however, there would be no impacts on production since none is projected. There would be no impacts on coal production since no activity is projected. | The entire 10,425 acres would be closed to energy and mineral exploration and production. There would be no impacts on mineral production since no activity is projected due to the area's lack of mineral potential and the lack of present and future demand. There would be no impacts on coal production since no activity is anticipated. No exploratory oil or gas wells would be drilled; however, there would be no impacts on production since none is projected. |

54

BLM_0005537

BLM_0005538

# CHAPTER THREE

# AFFECTED ENVIRONMENT

This chapter describes the general environmental setting of the three WSAs and details the specific resource values that could be affected by actions proposed in the alternatives presented in Chapter 2.

## GUNNISON GORGE WSA (CO-030-388)

### Location

The Gunnison Gorge WSA is located in Montrose and Delta counties, in southwestern Colorado, approximately ten miles east of Delta and seven miles northeast of Montrose. The WSA contains 21,038 acres of public land. The southeastern boundary of the WSA is contiguous with the Black Canyon of the Gunnison National Monument. Map 3-1 is a map of the Gunnison Gorge WSA showing the land status of the area.

The WSA is a geologic continuation of the Black Canyon of the Gunnison. The Gunnison Gorge, however, offers a greater diversity of plant and animal communities than the adjacent monument.

The segment of the Gunnison River flowing through the WSA and the Black Canyon of the Gunnison National Monument has been studied for inclusion into the National Wild and Scenic River Systems. The final EIS, completed by the NPS in September 1979, recommended that 26.2 miles, including 13.5 miles administered by the BLM, be designated a wild river.

### Topography

The Gunnison Gorge WSA is primarily the lower, northern end of the Black Canyon of the Gunnison River. It is a broad, spacious outer canyon with a steep, narrow inner gorge. The depth from the rim of the inner gorge to the river varies from 400 to 800 feet; its width ranges from 800 feet to a quarter of a mile. The depth from the rim of the outer canyon to the river varies from 1,000 to 2,000 feet; its width is approximately two miles.

Three major tributary canyons cut significant drainages to the river. The largest, the Smith Fork, rises to the east in the West Elk Mountains and maintains a perennial flow, though much of its water is diverted for irrigation. The Smith Fork drops through a series of cascades and falls into the Gunnison Gorge. Red Canyon is a very narrow, sheer-walled canyon entering the Gunnison Gorge from the east in the center of the WSA. Chukar Canyon dissects the southern end of the WSA. Numerous small washes and canyons enter the gorge throughout its length, creating a very rugged and diverse topography. The inner gorge is inaccessible except by foot and horse trails.

### Geology

The Gunnison Gorge WSA is in the heart of the Gunnison Uplift. The western boundary of the uplift is a well-defined monocline, the southern boundary is defined by the Cimarron Fault, and the eastern boundary is characterized by gentle slopes. The initial uplift occurred during the Laramide orogeny. The area was then subjected to erosion, followed by burial with debris from volcanic activity in the West Elk and San Juan mountain ranges.

Subsequent uplift occurred and the Gunnison River was established in the Precambrian rock. A combination of water/sediment erosion action and gradual uplift movement carved the spectacular gorge through the colorful strata. The rock units in the WSA consist of deformed Precambrian gneisses, schists, and felsic intrusive rocks overlain by Jurassic and Cretaceous sediments.

BLM_0005539

# GUNNISON GORGE WSA
## CO-030-388

– – – – WSA Boundary
————— Adjusted WSA Boundary

Public Lands (Administered By
Bureau of Land Management) . . . . .

National Parks and Monuments . . . .

Patented Lands . . . . . . . . . . . . .

**Split Estate** . . . . . . . . . . . . .

MILES 1            0            1            2            3

**CONTOUR INTERVAL 50 METERS**

**Map 3-1**
**Gunnison Gorge - Status Map**

56

BLM_0005540

## Soils

The steep canyon sideslopes are comprised of poorly developed, well-drained, stony loam Torriorthent soils of variable depth and sandstone rock outcrop. Gentler sideslopes and uplands have shallow, well-drained, loamy Kech and Lazear soils and rock outcrop. Areas of moderately deep, loamy Progresso soil occur on these gentler slopes. Narrow strips of sandy or gravelly alluvium occur along portions of the river bottom.

## Vegetation

Vegetation within the Gunnison Gorge WSA is primarily pinyon-juniper woodlands on the rims and benches and riparian vegetation along the river. The riparian type is composed primarily of tall grasses, reeds, and shrubs. The outer gorge and rim areas also support desert-type grasses, shrubs, and cacti.

## Wilderness Values

*Naturalness.* The Gunnison Gorge WSA is primarily natural in character. The few minor human imprints within the WSA are ways or trails, some mining activity, a small stock pond, and a few old wood and stone structures which add historical value to the area rather than impair its naturalness. The seven ways (totalling 5 miles) in the WSA are sets of tracks which have revegetated and are not substantially noticeable.

One-half mile of an old bull-dozed trail is visible only in the immediate vicinity. Erosion and natural revegetation have almost obliterated these trails. All of these trails could be rehabilitated if necessary. The old adits, mine shafts, and exploration prospects have an insignificant effect on the naturalness of the area.

*Solitude.* The Gunnison Gorge WSA provides outstanding opportunities for solitude. Factors affecting solitude include vegetation cover, topography, size and configuration of the area, and difficulty of access. Topographic screening is the main factor in the deep, narrow inner gorge. The rugged terrain and scattered pinyon-juniper woodlands of the outer canyon and rim areas contribute to opportunities for solitude.

*Primitive and Unconfined Recreation.* The Gunnison Gorge WSA provides numerous oppor-

tunities for primitive and unconfined recreation. Fishing on the Gunnison River is excellent. Hiking and backpacking are facilitated by three trails which descend from the outer rim to the river. The river provides a challenging and unique experience for whitewater boaters. The many vantage points, geologic features, and historical and archeological sites are ideal for photographers, sightseers, and other recreationists.

*Supplemental Values.* There are numerous supplemental values which enhance the wilderness quality of the Gunnison Gorge WSA.

*Proposed Wild and Scenic River.* Although the Gunnison River does have major upstream impoundments, it is free-flowing through the Monument and WSA, and its length is sufficient to provide a meaningful experience for floatboaters. There is an adequate volume of high quality water to permit full enjoyment of water-related recreational activities. The river's watershed and shoreline are primitive and relatively inaccessible, and posses outstanding scenic, geologic, recreational, and wildlife values.

Due to these exceptional attributes, approximately 26 miles of the Gunnison River, in the Black Canyon National Monument and through the WSA, have been proposed for inclusion into the National Wild and Scenic River System (NWSRS) as a wild river. President Carter administratively endorsed the Gunnison for inclusion into the NWSRS in 1979 when he forwarded the Wild and Scenic River Report on the river to Congress for a final decision.

Although there has been no formal designation by Congress, the BLM manages the Gunnison river and its corridor as "eligible" for inclusion according to the guidelines of the Wild and Scenic River Act.

*Wildlife Resources.* The Gunnison River and canyon area provide high quality wildlife habitat for a wide variety of terrestrial and aquatic species, including a number of threatened, endangered, or sensitive animal species, such as river otters and bald eagles. The gorge is hunting habitat for peregrine falcons. Confirmed resident raptors include golden eagles, prairie falcons, kestrels, red-tailed hawks, and turkey vultures. Wintering

57

BLM_0005541

waterfowl concentrate in the gorge. The canyon is excellent bighorn sheep habitat.

*Gold Medal Fishery.* The Gunnison River also provides exceptional fishing opportunities as evidenced by it's designation as a Class I Fishery Resource (Gold Medal Trout Fishery) by the Colorado DOW.

*Educational Values.* The WSA is geologically interesting and contains several archeological and historical sites that provide excellent educational opportunities.

*Scenic Quality.* The Gunnison Gorge WSA contains the most outstanding scenic features in the area, with colorful exposed Precambrian and sandstone formations supporting pinyon-juniper woodlands.

## Wildlife Resources

*Terrestrial Wildlife.* The Gunnison Gorge WSA currently supports 35 mule deer yearlong, and an additional 579 deer and 125 elk during the winter. Approximately 2,977 acres of the WSA including areas in Red Canyon, Ute Park, and Black Ridge, have been identified as crucial deer and elk winter range.

The Colorado Division of Wildlife (DOW) has reintroduced bighorn sheep into the area and much of the suitable habitat for this species is within the Gunnison Gorge WSA. The DOW estimates the current resident population of bighorn to be 75 animals. Reproduction has been documented by DOW and BLM personnel.

The WSA also provides habitat for mountain lions, coyotes, bobcats, ringtail cats, rabbits, several species of raptors, and numerous other small mammals and birds, including the introduced Chukar partridge.

The only existing wildlife development within the WSA is the Nicholas Brother's Spring, located in the SESW of Section 12, T. 50 N., R. 9 W. The spring, which covers approximately 50 square feet, was developed as a supplemental water source for deer, bighorn sheep, and chukar.

*Aquatic Wildlife and Fisheries.* The estimated 14 miles of the Gunnison River in the WSA provide excellent habitat for a number of aquatic wildlife species, such as beaver, mink, and the reintroduced river otter. Observations have revealed that the lower one-third of the Gorge also serves as a resting area and refuge for thousands of ducks in mid-winter, as well as a nesting area for geese.

The 26-mile portion of the Gunnison River, from the upstream boundary of the Black Canyon National Monument, to the North Fork confluence, (including approximately 14 miles within the WSA), was designated a Gold Medal Trout River by the DOW in 1972. The major game species in the river are Eastern brook, German brown, northern pike, and rainbow trout. Nongame species, such as suckers, also exist. Results of a 1988 DOW electroshocking revealed the density of brown and rainbow trout 40 cm (16 inches) or larger in the Duncan-Ute Section of the Gunnison to be 600 fish per mile.

*Threatened and Endangered Species.* There is one known occurrence of the threatened Uinta Basin hookless cactus (*Sclerocactus glaucus*) within the Gunnison Gorge WSA. The area has the potential of supporting additional populations of hookless cactus as well as the endangered clay-loving wild buckwheat (*Eriogonum pelinophilum*). Montrose penstemon (Penstemon retrorsus) and Delta lomatium (*Lomatium concinnum*), candidates for federal listing under the Endangered Species Act (Category 2), could also occur in the area.

BLM inventories indicate the Gunnison Gorge WSA is a concentration area for an estimated 30 to 40 wintering bald eagles. Peregrine falcons are not known to inhabit the WSA, but do occupy the adjacent National Monument. The WSA is within the hunting radius of an existing peregrine falcon eyrie located in the National Monument.

River otters, listed as endangered by the state and as a candidate for federal listing under the Endangered Species Act (Category 2), were reintroduced into the Gunnison River in the late 1970s. Although some reproduction has been documented, the size of the present population is unknown.

## Recreation

Two of the most outstanding recreational opportunities in the Gunnison Gorge WSA are trout fishing and whitewater boating. Other activities include hiking, backpacking, rock climbing, and

BLM_0005542

horseback riding. The scenic quality of the colorful double canyon provides excellent photographic and sightseeing opportunities.

Recreation opportunities exist in a non-motorized and largely natural setting. The present recreational use in the Gunnison Gorge WSA is estimated at 5,000 user days annually, consisting of 2,500 user days of whitewater boating use and 2,500 user days of non-boating, primitive use, primarily walk-in fishing and horseback use.

*River Corridor Recreation Management.* The Gunnison Gorge RAMP and RAMP Addition (1985, 1988) provide specific guidance for management of recreation within the Gunnison River corridor.

Permits are currently required for all commercial users, including rafting, walk-in fishing, and hunting outfitters. Campsites and hiking trails are monitored for resource damage by frequent foot and boat patrols. Low impact camping regulations are enforced throughout the WSA by BLM patrols.

Six commercial river outfitters were selected by a bid and prospectus method in 1988 to participate in multi-year permits. These outfitters provide a range of boating activities from one-day whitewater trips to 3-day guided fishing trips. Rafts are used predominately by both commercial and private boaters, however, the use of kayaks and whitewater canoes is increasing, especially among private users.

The recreational carrying capacity of the Gunnison River corridor within the WSA has been set at 75 persons per day. Floatboating use on the Gunnison is monitored and managed, through the use campsite sign-ins and patrols, for a maximum of six group encounters per day with other floating parties, and no more than ten combined encounters per day between floating parties and parties on shore. Commercial river outfitters launches are limited to a maximum of two per day. The target figure for private launches is a maximum of four per day. Maximum group size for both commercial and private launches in twelve persons. All boaters are checked for required safety, first-aid, and repair equipment, as well as for porta-potties and firepans.

The DOW is responsible for licensing fishers and enforcing the Gold Medal regulations which restrict fishing to flys and lures only and stipulate size and catch limits. Fishing access to the river in the WSA is via four trails originating on the upper rim. Data provided by trail registers is used to compile statistics on day and overnight use by fishers and other nonboaters in the WSA.

## Mineral Resources

Approximately 15,595 acres, or 74 percent of the WSA have been closed to mineral entry and location under a recreation withdrawal since 1972. Other than some staking of placer claims in the southern portion of the WSA, there has been no energy or mineral activity occurring within the 5,443 acres which remain open to mineral entry and location.

In 1988, the U.S. Geological Survey (USGS) and the U.S. Bureau of Mines (USBM) conducted mineral surveys in the Gunnison Gorge WSA to determine if the area had any mineral values. The results of these extensive geological, geophysical, and geochemical investigations were published in the U.S. Geological Survey Bulletin Number 1715-D, "Mineral Resources of the Gunnison Gorge Wilderness Study Area, Montrose and Delta Counties, Colorado,"(U.S. Government Printing Office, 1989). The information presented in this section is a summary of that report.

According to USGS/USBM report, the entire study area has a low mineral and energy resource potential for undiscovered base metals (copper, lead, and zinc), precious metals (gold and silver), uranium, and geothermal sources. Geophysical studies failed to identify any structures that may be related to any mineral-deposit-forming processes.

The only evidence of mining activity in the area is a block of eighteen unpatented claims in the southern part of the WSA (see Figure 2-2). These claims, which encompass about four square miles, are mostly over Mancos Shale, and were presumably staked for gold. Assay results indicate that small amounts of gold do occur in this area. Although this finding may prompt future speculation and exploration for gold in this easily accessible area, it is unlikely that any production would occur based on the entire WSA's low mineral potential.

Vast quantities of gypsum occur in the Wanakah Formation, which unlies approximately 60 percent of the study area. The gypsum,

59

however, was identified in the study as being an "inferred subeconomic resource" of low development potential. According to the report, the gypsum would be uneconomical to mine because it occurs in relatively thin beds with generally thick overburdens which make mining cost prohibitive. The remoteness of these beds from markets also make transportation costs prohibitive. There is currently no demand for gypsum in the area and USBM studies indicate that domestic, as well as foreign supplies of this commodity are enormous.

Coal occurs locally in the Dakota Sandstone which crops out over about six square miles in the study area. However, due to the thin and discontinuous nature of these coal seams, the coal in the Gunnison Gorge is not considered to be an economic resource. Therefore, no leasing or production of coal is anticipated.

Special attention was given in the survey to the Morrison Formation which underlies approximately 40 percent of the study area. Although this formation contains vanadium and uranium deposits in other parts of western Colorado, none of the samples taken from the Gorge contained measurable amounts of uranium or vanadium, and there are no known occurrences of these minerals in or near the study area.

Although sedimentary formations found in the WSA have produced oil and gas in other parts of southwestern Colorado, there are no known oil and gas occurrences in the study area or surrounding area. Due to the absence of hydrocarbon source beds, which provide favorable structures for the accumulation of oil and gas, the oil and gas potential of the WSA is rated as zero.

Some of the sandstone rocks of the study area could be used for common construction purposes. However, these rocks have no unique characteristics to make them more desirable than similar rocks outside the area that are closer to markets.

## Grazing Resources

Portions of four grazing allotments, totaling approximately 14,919 acres, lie within the Gunnison Gorge WSA (see Table 3-1). A total of 662 AUMs are authorized in these allotments for sheep and cattle use during the spring, fall, and winter. There are no existing range projects or facilities within the WSA boundary. Approximately 6,119 acres of the inner gorge are considered unsuitable for livestock grazing due to the steep slopes and low forage production.

**Table 3-1**

### GRAZING ALLOTMENTS IN THE GUNNISON GORGE WSA

| Grazing Allotment | Acreage by Allotment | AUMs by Allotment |
|---|---|---|
| Allotment 5008 | 4,739 | 300 |
| Allotment 5017 | 7,570 | 228 |
| Allotment 5020 | 2,200 | 115 |
| Allotment 5022 | 410 | 19 |
| Total acreage: | 21,038 | |
| Allotted acreage: | 14,919 | 662 |
| Unallotted acreage: | 6,119 | 0 |

60

## Cultural Resources

The entire WSA (21,038 acres) has undergone an intensive field inventory for cultural resources. The sixty-three sites that were inventoried consist predominately of lithic scatters, some campsites and historic trails, and cabins. None of the sites have been determined eligible for listing on the National Register of Historic Places.

It is believed that the area served as a seasonal (spring/fall) occupation area for early people of the Uncompahgre Plateau from about 3,000 B.C. until well into historic times. Anasazi, Fremont and late Paleo hunters, and Shoshone and Utes are all believed to have used the area. The potential for cultural resources in this area is considered moderate.

## Paleontological Resources

There are no known paleontological sites within the WSA. The Morrison formation, which outcrops extensively throughout the outer canyon segments, has high potential for scientifically significant fossils, especially vertebrates such as dinosaurs and mammals. Other formations show evidence of fossilization but the presence of scientifically valuable fossils has not been established.

## Woodland Resources

There are no stands of commercial saw timber within the Gunnison Gorge WSA. There is a total of 337 acres of productive pinyon-juniper woodlands scattered throughout the Gunnison Gorge WSA. These woodlands are not available for harvesting since the WSA is currently closed to woodland harvesting under the RMP and the RAMP in order to protect its wilderness values.

## Water Resources

The Gunnison River is the prominent water resource in the Gunnison Gorge WSA. Tributary streams are almost entirely diverted for irrigation purposes and springs are rare. The Bureau of Reclamation (BOR) administers a series of dams and reservoirs upstream and attempts to maintain a minimum flow of 300 cubic feet per second (cfs) in the river. During high spring/summer runoff, flows generally exceed 300 cfs, at times reaching 10,000 cfs. The Gunnison River carries an average 207 parts per million of total dissolved solids, which is equivalent to 167,000 tons per year. Generally, the water is mildly alkaline, turbidity is low, and water quality is good.

## Lands

The Delta/Montrose county line crosses the center of the Gunnison Gorge WSA from east to west. There are 160 acres of private mineral estate lands located in the NE- SE-, Section 30, and the S-, NW-; NW- SW-, Section 29. T. 51 N., R. 8 W. These lands, shown as a split estate in Figure 3-1, have been identified for acquisition under the Proposed (Enhanced All Wilderness) Alternative and the All Wilderness. There are no private land inholdings within the WSA and much of the surrounding private land is in a natural state. With the exception of 5,443 acres, the area is under a BLM withdrawal for the "protection of scenic and geological features and public recreation values." There are no public utility facilities in the area.

## Access

Unimproved dirt roads off county roads on the east and west sides of the canyon provide access to the Gunnison Gorge WSA. The roads on the west side have legal public access. Only one of the three roads on the east side has legal public access.

# CAMEL BACK WSA (CO-030-353)

## Location

The Camel Back WSA is in southwestern Colorado in northwestern Montrose County, approximately nine miles southwest of Delta and 20 miles northwest of Montrose. The WSA contains 10,402 acres of public land and a 160-acre private inholding, and, except for a 2.25 mile section, is bordered by public lands. Its southern boundary is contiguous with the Uncompahgre National Forest. Map 3-2 is a map of the Camel Back WSA.

## Topography

The Camel Back WSA is characterized by a series of deep canyons, long mesas, and buttes. The largest mesa is Winter Mesa with a maximum elevation of 7,000 feet.

61

BLM_0005545



Camel Back
Status Map

CAMEL BACK WSA
CO-030-353
—————— *WSA Boundary*

Map 3-2

62

BLM_0005546

## Geology

The Camel Back WSA is on the eastern edge of the Uncompahgre Plateau. The plateau, composed primarily of mesozoic sandstones, is underlain by a block of Precambrian granite which faulted and uplifted several thousand feet. The overlying geologic formations drape over the faults into a monocline. Rocks outcropping in the WSA are the Triassic Chinle formation; the Jurassic Entrada, Summerville, and Morrison formations; and the Cretaceous Dakota formation. Precambrian rocks are overlain by Triassic rocks and do not outcrop within the WSA. The Paleozoic rock sequence is missing as the area was a topographic highland during deposition of Paleozoic units.

## Soils

The steep sideslopes of the mesas and canyons of the Camel Back WSA are primarily sandstone rock outcrop, loose stones, and shallow, well-drained, sandy loam Kech soils. Kech soils also occur on convex slopes, ridge crests, and gentler sideslopes. Deep, well-drained Lonti and Potts soils occur on benches and valley sideslopes. The alluvial bottoms of the larger drainages have deep, somewhat poorly-drained soils that support riparian vegetation.

## Vegetation

The canyon bottoms of the Camel Back WSA are typical riparian areas with a grass and forb understory beneath cottonwoods, willows, tamarisk, and skunkbush. Ponderosa pine and Douglas fir occur in the overstory in the upper reaches of the canyons. Slopes are vegetated with sparse pinyon-juniper and sagebrush. Mesa tops are pinyon-juniper woodlands with sagebrush and grassland parks, some of which are fairly large.

## Wilderness Resources

*Naturalness.* The dominating geomorphic features of the Camel Back WSA are canyons, mesas, and the Camel Back ridge. Human imprints on the area include one 4.5 mile long way, three small stock ponds, each covering approximately 1,300 square feet, one water catchment which covers approximately one third of an acre, and 1.25 miles of fence. The approximately 6 miles of way on Winter Mesa are not maintained and would return to a natural condition with

elimination of vehicle use. None of these imprints are substantially noticeable nor do they significantly impair the naturalness of the area.

*Solitude.* Opportunities for solitude in the Camel Back WSA are extensive due to a variety of factors, including difficulty of access. Vegetation and topographic screening produce feelings of intimacy and isolation in the canyons and in the thick stands of pinyon-juniper on the mesas. Where vegetation is sparse, the topography, size, and configuration of the area promote solitude.

*Primitive and Unconfined Recreation.* The Camel Back WSA provides numerous opportunities for primitive and unconfined recreation. The canyons and gulches provide easy to moderate cross-country hiking and horseback riding routes, while the steeper slopes offer more challenging hiking and rock climbing opportunities. The streams have produced alluvial deposits that provide excellent secluded camping spots. Hunting is an historic use of the area. The many vantage points from the rims and mesas, and the canyons and geologic formations provide opportunities for photographers, sightseers, and other recreationists.

*Supplemental Values.* There are some supplemental values which enhance the wilderness quality of the Camel Back WSA. The high mesas and canyon rims afford panoramas of distant mountain ranges as well as views of immense gorges.

## Wildlife Resources

Approximately 73 percent of the Camel Back WSA is crucial deer and elk winter range. The area currently supports 33 mule deer yearlong, and an additional 292 deer and 28 elk during the winter. Deer are the most abundant, with density levels of 25 animals per square mile during the winter (December through April). The canyon areas are important habitat for coyotes, raccoons, mountain lions, rabbits, and numerous non-game birds.

Approximately 19 miles of aquatic and riparian habitat are provided by perennial creeks (Potter and Roubideau), which lie within or immediately adjacent to the Camel Back WSA. Roubideau Creek contains both game fish,(predominately brook trout), and non-game species (minnows, suckers, sunfish). Only non-game dace are found in Potter Creek.

63

BLM_0005547

## Threatened and Endangered Species

There is a population of the endangered spineless hedgehog cactus (*Echinocereus triglochidiatus var. inermis*) within the Camel Back WSA. Although no plants have been discovered, the threatened Uinta Basin hookless cactus (*Sclerocactus glaucus*), may occur on lower elevation benches. The Grand Junction milkvetch (*Astragalus linifolius*), a candidate for listing under the Endangered Species Act (Category 2), occurs in the area. There are no known populations of threatened or endangered animal species within the Camel Back WSA.

## Recreation Resources

Recreational activities in the Camel Back WSA include hunting, hiking, backpacking, horseback riding, photography and ORV use. The area's geologic features and scenic attractions offer photographic and sightseeing opportunities. It is estimated that recreational use in the WSA is currently 500 user days annually, consisting of 300 motorized user days and 200 non-motorized user days of semi-primitive recreation.

## Mineral Resources

Table 3-2 summarizes data taken from the Geological, Energy and Minerals (GEM) Report for the Camel Back WSA (Phase 1: GEM Resource Assessment for Region 4, Colorado Plateau, Dominguez Canyon/Adobe Badlands/Camel Back Area, GRA 6, 1983, MSME/Wallaby Enterprises), on the mineral potential of leasable, locatable, and saleable minerals in the WSA. According to the GEM report, there are no known mineral deposits in the WSA. The area has only a low favorability for the accumulation of locatable minerals, including base metals (copper, lead, and zinc) and precious metals (gold and silver), and, as such, a poor economic potential for production. There are no unpatented or patented mining claims located in the WSA.

Uranium and vanadium deposits are known to occur in the Morrison and Chinle geologic formations which are present in the WSA and throughout western Colorado and eastern Utah. Based on the extensive presence of these formations in the WSA, the GEM reports states that the geologic environment of the WSA indicates moderate favorability for the accumulation of uranium and vanadium. However, no uranium-vanadium deposits are known to occur within the boundaries of the WSA.

There are no oil and gas leases within the WSA. Although sedimentary formations found within the WSA have produced oil and gas in other regions of southwestern Colorado, the GEM report indicates only low favorability for oil and gas deposits. This low rating is due primarily to the shallowness of the sedimentary rock structure found in the Camel Back, which is unfavorable for the accumulation oil and gas in any marketable quantities. Although coal normally occurs in outcrops of Dakota formations, such as those found extensively in the WSA, there are no known coal seams of commercial value.

The GEM report states that the Wingate Sandstone formations in the Camel Back area indicate high favorability for the accumulation of dimension stone, which could be used for construction purposes. No demand for these rocks is expected, however, since these rocks have no unique characteristics that would make them more desirable than similar rocks outside the area that are more accessible and closer to existing markets.

## Grazing Resources

The Winter Mesa allotment (No. 4010) is the only grazing allotment within the boundary of the Camel Back WSA (see Table 3-3). A total of 514 AUMs of spring and fall cattle use is authorized on this allotment, which comprises approximately 7,695 acres, or 76 percent of the WSA. The only other allotment in the WSA, the Canal Allotment (No. 4012), was officially relinquished from grazing use in June 1986. The approximately 2,707 acres of this allotment is being managed as a wildlife management area. The 166 AUMs formerly authorized on the Canal allotment have not been reallocated within the WSA.

Existing range facilities include 1.25 miles of fence, five miles of stock trails, one water catchment development which covers one third acre, and three stock reservoirs, each covering approximately 1,300 square feet. All of these developments, with the exception of the stock trails, are located on Winter Mesa in the central portion of the area, and are accessed via the Winter Mesa Way. The Winter Mesa allotment and existing range facilities are shown in Figure 2-4 in Chapter 2.

64

Table 3-2

## MINERAL POTENTIAL OF THE CAMEL BACK WILDERNESS STUDY AREA

**Mineral Resources**
**Leaseable Minerals**

| | |
|---|---|
| Oil and gas | 2A |
| Coal | 2B |
| Geothermal | 2B |

**Locatable Minerals**

| | |
|---|---|
| Precious metals | 2B |
| Base metals | 2B |
| Uranium/vanadium | 3B |
| Gypsum | 1C |

**Saleable Minerals**

| | |
|---|---|
| Dimension stone | 4D |
| Mica, quartz, feldspar | 1C |
| Clays | 1C |

<u>Classification Scheme:</u>

1.  The geologic environment and the inferred geologic processes do not indicate favorability for accumulation of mineral resources.
2.  The geologic environment and the inferred geologic processes indicate low favorability for accumulation of mineral resources.
3.  The geologic environment, the inferred geologic processes, and the reported mineral occurrences indicate moderate favorability for accumulation of mineral resources.
4.  The geologic environment, the inferred geologic processes, the reported mineral occurrences, and the known mines or deposits indicate high favorability for accumulation of mineral resources.

<u>Level of Confidence Scheme</u>:

A.  The available data are either insufficient and/or cannot be considered as direct evidence to support or refute the possible existence of mineral resources within the respective area.
B.  The available data provide indirect evidence to support or refute the possible existence of mineral resources.
C.  The available data provide direct evidence, but are quantitatively minimal, to support or refute the possible existence of mineral resources.
D.  The available data provide abundant direct and indirect evidence to support or refute the possible existence of mineral resources.

Source:  Phase I - GEM Reports GRA 6.

65

BLM_0005549

**Table 3-3**

## GRAZING ALLOTMENTS IN THE CAMEL BACK WSA

| Grazing Allotment | Acreage by Allotment | AUMs by Allotment |
|---|---|---|
| Allotment 4010 | 7,695 | 514 |

| | Acreage by Allotment | AUMs by Allotment |
|---|---|---|
| Total acreage: | 10,402 | |
| Allotted acreage: | 7,695 | 680 |
| Unallotted acreage: | 2,707 | 0 |

## Cultural Resources

Archaeologically sensitive and unique sites do exist in the Uncompahgre Plateau area; however, only 3 percent, or approximately 300 acres of the 10,425 acre WSA have undergone an intensive field inventory for cultural resources. Given such limited data, it is impossible to assess the potential for or the significance of the area's cultural values. Therefore, due to the limited area inventoried for cultural resources, the potential for cultural sites in the Camel Back WSA is considered to be unknown.

To date, three sites have been recorded in the study area; two were isolated artifacts and one was a Ute hunting blind. The hunting blind has been determined "field eligible" for listing on the National Register of Historic Places (NRHP) by BLM personnel. Although there has been no formal eligibility determination or nomination to the NRHP, the site is being managed as eligible and protected via avoidance.

## Paleontological Resources

There are no known paleontological sites within the Camel Back WSA. The Morrison formation has high potential for scientifically significant fossils, especially for vertebrates such as dinosaurs and mammals. The other formations show evidence of fossilization but the presence of scientifically valuable fossils has not been established.

## Water Resources

Roubideau and Potter creeks are perennial streams running through the WSA. During the runoff season the chemical water quality is predominantly a calcium bicarbonate type; an increase in sodium occurs during low flows. Total dissolved solids (TDS) commonly range in the hundreds of parts per million. Sediment yields can generally be expected to vary from 0.5 to 3.0 tons per acre annually. Water from these streams is used for irrigation and stock watering purposes.

There is no data available quantifying biological quality of surface water in the WSA. It is assumed that most surface waters are contaminated with biological pathogens and could pose a threat to humans if consumed before being treated. No springs are known to exist within the Camel Back WSA.

There is an average of approximately 12 inches of precipitation annually; roughly half is snowfall. Due to steep canyons, exposed bedrock, and orientation of the drainages, the potential for flash flooding is high.

## Woodlands Resources

There are no commercially valuable sawtimber stands in the Camel Back WSA. The pinyon-juniper woodlands that dominate the mesa tops do not qualify for inclusion in the planning area's

BLM_0005550

woodland inventory base, and therefore, would not be designated for harvesting.

## Lands

The Camel Back WSA is located entirely within Montrose County. There are eight public water reserves and several livestock facilities in the area. There are no public utility facilities in the area. Private lands within the WSA boundary include one tract of 160 acres located along the eastern border of the WSA. Another 160 acres of private land lie between the Uncompahgre National Forest and the WSA; this tract is not included within the WSA boundary.

## Access

Unimproved dirt roads off maintained county roads provide access to the Camel Back WSA. The unimproved Winter Mesa Way and Potter Creek Road are used most often as public access routes.

# ADOBE BADLANDS WSA (CO-030-370B)

## Location

The Adobe Badlands WSA is located in western Delta County in southwestern Colorado, approximately three miles northwest of Delta and 1.5 miles north of U.S. Highway 50. The WSA contains 10,425 acres of public land with no non-public inholding. The area is surrounded by public and non-public lands. Its northern border is contiguous with the Grand Mesa National Forest. Map 3-3 is a map of the Adobe Badlands WSA.

## Topography

Approximately 8,498 acres, or 82 percent, of the Adobe Badlands WSA is composed of the badlands-type Mancos shale formations known locally as the "adobes". The topography of the area is characterized by abrupt sloping hills dissected by rugged serpentine canyons. The northern 18 percent of the WSA characterized by the relatively steep foothills of Grand Mesa, vegetated in pinyon-juniper.

## Geology

The Adobe Badlands WSA is on the northern edge of the Gunnison Uplift and the southern boundary of the Piceance Basin. Cretaceous Mancos shale, a marine dark-grey silty clay shale, outcrops in approximately 95 percent of the WSA. The Cretaceous Mesaverde formation, consisting of shale, coal, and sandstone beds, is exposed in the remaining 5 percent of the area.

## Soils

The "adobe badlands" that dominate the WSA are steep, bare Mancos shale outcrop hills. The alluvial bottoms and fans are deep, well-drained, moderately saline, silty clay loam Billings soils. Shallow, strongly saline Chipeta soils occur on some uplands. Deep and moderately deep, slightly saline soils occur in outwash alluvium in the northern portion of the WSA.

The silty clay loams which predominate the Adobe Badlands are derived from the Mancos shale formations. The high runoff potential of these soils are augmented by sparse vegetation and steep badlands topography. Such highly erodible soils could potentially produce sediment yields of ten tons per acre annually. The average is six tons per acre annually. The salt content of these saline soils is approximately 3 percent by weight, resulting in an average annual salt yield of 950 to 1,900 tons from the WSA.

## Vegetation

The southern 82 percent or 8,498 acres of the Adobe Badlands WSA is sparsely vegetated with low saltbush, desert trumpet, and buckwheat. The northern 1,927 acres of the WSA is heavily vegetated with pinyon-juniper woodlands and small, scattered grassland parks.

## Wilderness Values

*Naturalness.* Geologically, the Adobe Badlands WSA is highly varied and diversified. The majority, or 65 percent, of the WSA consists of badland-type formations, or "adobe" hills, where coloration changes abruptly with shifts in lighting. The upper portion, or approximately one-third, of the Adobe Badlands WSA is characterized rolling,

BLM_0005551



**Map 3-3**

BLM_0005552

rugged pinyon-juniper foothills cut by numerous, small drainages. Human imprints in the area are minor. Four vehicle ways totalling 2.5 miles can be found within the area but these are either hidden by topographic relief or are revegetating and are substantially unnoticeable. Motorcycle use is visible in the lower badlands due to the sparse vegetation and fairly steep topography.

*Solitude.* The Adobe Badlands WSA provides many opportunities for solitude. The intricate, maze-like badlands and upper elevation pinyon-juniper vegetation effectively screen visitors from sights and sounds and foster a feeling of seclusion. The upward sloping topography offers sweeping vistas of the lower badlands as well as Grand Mesa, the Uncompahgre Plateau, and the San Juan Mountains and evoke feelings of solitude and remoteness.

*Primitive and Unconfined Recreation.* The relatively large size and topographic diversity of the Adobe Badlands WSA enhance the area's opportunities for primitive and unconfined recreation. The WSA offers yearlong opportunities for hiking, backpacking, horseback riding, photography, and sightseeing. The upper woodland areas also provide excellent hunting opportunities.

*Supplemental Values.* The Adobe Badlands WSA contains some supplemental values which enhance its wilderness qualities. The WSA's relatively low elevation, mild winters, and close proximity to the City of Delta make it accessible year-round. The geological and topographical features of the Mancos shale combined with the desert-type ecology provide excellent scenic and educational opportunities.

## Wildlife Resources

The Adobe Badlands WSA provides year-round habitat for 30 antelope and supports 76 deer and 35 elk during the winter. Approximately 1,927 acres in the northern portion of the WSA is considered crucial deer and elk winter range. Winter (December through April) deer density levels are high at 61 animals per square mile. Prairie dogs, pronghorn, rabbits, badgers, coyotes, bobcats, kestrels, red-tailed hawks, and golden eagles all use the WSA.

## Threatened and Endangered Species

The threatened Uinta Basin hookless cactus (*Sclerocactus glaucus*) is the only federally-listed plant species known to occur within the Adobe Badlands WSA. The endangered spineless hedgehog cactus (*Echinocereus triglochidiatus var. inermis*), the endangered clay-loving wild buckwheat (*Eriogonum pelinophilum*), and Montrose penstemon (*Penstemon retrorsus*), which is a candidate for listing under the Endangered Species Act (Category 2), could potentially occur within the WSA.

There are no identified threatened and endangered animal species known to inhabit the WSA.

## Recreation Resources

The Adobe Badlands WSA provides recreational opportunities such as hiking, horseback riding, hunting, photography, and ORV use. The present recreational use is estimated at 500 visitor days annually, 450 of which are motorized use days.

## Mineral Resources

Table 3-4 summarizes data taken from the Geological, Energy and Minerals (GEM Report for the Adobe Badlands WSA (Phase 1: GEM Resource Assessment for Region 4, Colorado Plateau, Dominguez Canyon/Adobe Badlands/Camel Back Area, GRA 6, 1983, MSME/Wallaby Enterprises). According to the report, there are no known mineral deposits in the WSA. The area has only a low favorability for the accumulation locatable minerals. There are approximately 75 placer mining claims scattered throughout the WSA. These claims, which are shown in Figure 2-7, were located in 1982 and 1984 and no activity has occurred on them to date.

Uranium and vanadium deposits are known to occur in the Morrison and Chinle geologic formations throughout western Colorado and eastern Utah. These Morrison and Chinle formations underlie the Adobe Badlands WSA at depths of approximately 3,000 to 4,000 feet below the

BLM_0005553

surface. Due to the depths of these formations; however, the uranium and vanadium occurring in the WSA has been rated as having low potential for development. At present, no uranium-vanadium deposits are known to occur within the boundaries of the WSA.

Approximately 507 acres of the northern portion of the Adobe Badlands WSA lie within the Bookcliffs coal planning area. The Mesaverde formations in this area are estimated to contain approximately 21 million tons of moderate to high development potential coal reserves. Although coal of this type has been mined extensively using underground methods in the Cedaredge and North Fork areas, there are no leases within the WSA. The nearest producing coal mine (idle since 1984) is the Red Canyon Mine, approximately ten miles to the northeast.

According to the GEM Report, however, the geologic environment of the area indicates moderate favorability for the accumulation of oil and gas. Although there are no Known Geologic Structures (KGSs) within the WSA, three KGSs are within six miles of the WSA boundary. Mancos Shale formations, found extensively in the WSA, have yielded production of oil and gas five miles to the east of the area. The economic potential for production within the WSA is unknown at this time, and there are presently no oil and gas leases in the study area. Four oil and gas wells that were drilled immediately outside the WSA were dry holes.

## Livestock Grazing

Three livestock grazing allotments are located within the boundaries of the Adobe Badlands WSA (see Table 3-5). A total of approximately 878 AUMs of winter sheep use is authorized on these allotments. There are no range facilities within the boundaries of the WSA.

70

BLM_0005554

Table 3-4

## MINERAL POTENTIAL OF THE ADOBE BADLANDS WILDERNESS STUDY AREA

| Mineral Resources | |
|---|---|
| **Leaseable Minerals** | |
| Oil and gas | 3C |
| Coal | 1A |
| Geothermal | 3B |
| **Locatable Minerals** | |
| Precious metals | 2B |
| Base metals | 2B |
| Uranium/vanadium | 2B |
| Gypsum | 2B |
| **Saleable Minerals** | |
| Dimension stone | 1C |
| Mica, quartz, feldspar | 1C |
| Clays | 4D |

**Classification Scheme:**

1. The geologic environment and the inferred geologic processes do not indicate favorability for accumulation of mineral resources.
2. The geologic environment and the inferred geologic processes indicate low favorability for accumulation of mineral resources.
3. The geologic environment, the inferred geologic processes, and the reported mineral occurrences indicate moderate favorability for accumulation of mineral resources.
4. The geologic environment, the inferred geologic processes, the reported mineral occurrences, and the known mines or deposits indicate high favorability for accumulation of mineral resources.

**Level of Confidence Scheme:**

A. The available data are either insufficient and/or cannot be considered as direct evidence to support or refute the possible existence of mineral resources within the respective area.
B. The available data provide indirect evidence to support or refute the possible existence of mineral resources.
C. The available data provide direct evidence, but are quantitatively minimal, to support or refute the possible existence of mineral resources.
D. The available data provide abundant direct and indirect evidence to support or refute the possible existence of mineral resources.

Source:  Phase I - GEM Reports GRA 6.

71

BLM_0005555

Table 3-5

## GRAZING ALLOTMENT IN THE ADOBE BADLANDS WSA

| Grazing Allotment | Acreage by Allotment | AUMs by Allotment |
|---|---|---|
| Allotment 4017 | 4,649 | 513 |
| Allotment 4019 | 3,600 | 285 |
| Allotment 4022 | 2,176 | 80 |
| Total acreage: | 10,425 | |
| Allotted acreage: | 10,425 | 878 |
| Unallotted acreage: | 0 | 0 |

## Cultural Resources

Approximately 521 acres, or about 5 percent, of the Adobe Badlands WSA have undergone an intensive field inventory for cultural resources. No sites have been recorded in the area to date. The potential for cultural resources is considered low, due to the nature of the environment and the lack of adequate resources, such as perennial water sources, necessary for sustained occupation and utilization of the area.

## Paleontological Resources

There are no known paleontological sites within the Adobe Badlands WSA, and the presence of scientifically valuable fossils has not been established. However, geologic formations in the area show evidence of fossilization and shells are common throughout the Mancos shale deposits.

## Woodland Resources

There are no commercial saw timber stands in the Adobe Badlands WSA. Approximately 86 acres, or .04 percent of the approximately 1,927 acres of pinyon-juniper woodlands located within the northern portion of the WSA have been identified as suitable for sustained yield production, and are included in the planning area's woodland inventory base.

## Lands

The entire Adobe Badlands WSA is within Delta County. There are no private inholdings in the WSA, nor are there any withdrawals or rights-of-way. The WSA is bordered on the north by the Grand Mesa National Forest.

## Access

Access to the Adobe Badlands WSA is via a county road on the east side. An unimproved road on the western boundary also provides legal access to the area.

72

# CHAPTER 4

# ENVIRONMENTAL CONSEQUENCES

This chapter evaluates the environmental consequences of implementing the management actions for each of the alternatives presented in Chapter 2. Only the specific environmental issues or impact topics that were identified during the scoping process in Chapter 1 are discussed and analyzed here.

Any unavoidable adverse impacts, irreversible/irretrievable resource commitments, and short-term use versus long-term productivity are identified in the discussion of the appropriate impact topic, rather than in a separate section of this document.

A comparative summary of the impacts for all the management alternatives for each of the WSAs is presented in Table 2-1.

## GUNNISON GORGE WSA (CO-030-388)

### ENHANCED ALL WILDERNESS ALTERNATIVE (PROPOSED ACTION)

The Proposed Action for the Gunnison Gorge WSA is the Enhanced All Wilderness Alternative. Under the Proposed Action, the entire 21,038 acres of the WSA, plus an additional 880 acres in the Gunnison Gorge canyon and Smith Fork tributary, would be recommended as suitable for wilderness designation. This alternative also proposes the acquiring 160 acres of private mineral estate within the WSA and including it in the wilderness area. The entire area (22,078 acres) would be managed to protect and preserve its wilderness values.

**Impacts on Wilderness Values.** Designating the Gunnison Gorge WSA and the additional lands (22,078 acres) as wilderness would provide long-term statutory protection for the area's outstanding wilderness values. These values include naturalness, outstanding opportunities for solitude, outstanding opportunities for primitive and unconfined recreation and the supplemental values provided by the free-flowing Gunnison

River ecosystem and its environs that posses outstanding scenic, geologic, recreational, and wildlife resources.

Designating the Gunnison Gorge WSA as wilderness would expand the contiguous Black Canyon of the Gunnison Wilderness Area (11,180 acres), which is administered by the NPS. Wilderness designation would preserve the Black Canyon/Gunnison Gorge system as one geologic, ecologic, and physiographic unit.

Current uses of the 880 acres in Smith Fork Canyon, proposed for inclusion under this alternative, are compatible with wilderness and are not projected to change. These uses consist primarily of primitive recreational activities, including hiking, horseback riding, and sight-seeing. The area is identified in the Gunnison Gorge RAMP as closed to ORVs and is primarily natural in character. Addition of this acreage would further enhance the wilderness resource by including lands with wilderness characteristics and precluding potential future nonconforming uses which might affect wilderness values on the adjacent WSA lands.

BLM currently manages the surface of the 160 acres of private mineral estate proposed for inclusion under this alternative. Management of this area is consistent with wilderness management and is not projected to change. Although no private mineral exploration or production activity is projected at this time, official designation would be the only method to assure long term protection of the wilderness values on this acreage.

Closure of an additional 5,793 acres to further mineral entry and location would preserve the naturalness and scenic values on those and the adjacent areas.

Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained by existing and proposed management actions that restrict the amount and degree of increased recreational use expected by commer-

BLM_0005557

cial and private users. An increase of 2,000 user days in whitewater boating and walk-in fisher use would result in some additional contact among visitors, and some small resource damage caused by overuse of popular camping and fishing sites. However, this increase in visitation is not expected to significantly alter the visitor's ability to find solitude or impact the naturalness of the WSA.

The use of helicopters or fixed winged aircraft for monitoring wildlife populations would have minimal affects on solitude since these flights would be infrequent (three to five times a year), short in duration (less than one hour), and would normally occur during times of low visitation.

The development of the two guzzler projects in Smith Fork Canyon would have negligible impacts on wilderness values since they would disturb minimal area (less than 200 square feet total), would be constructed by non-impairing means, and would be located to be substantially unnoticeable.

**Conclusion.** Wilderness designation would expand the adjacent Black Canyon of the Gunnison Wilderness Area and provide statutory, long-term protection for wilderness values on 22,078 acres. Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained.

**Impacts on Deer, Elk, and Bighorn Sheep Habitat and Populations.** Continuing wildlife forage allocations at current levels would be sufficient for the area's present yearlong population of 75 reintroduced bighorn sheep, 35 deer, and an additional 579 deer and 125 elk during the winter. The proposed release of 20 to 25 bighorn sheep would not be affected by wilderness designation.

Habitat conditions are currently protected by the ORV closure of the entire WSA and additional lands (22,078 acres), and by the mineral withdrawal on 15,595 acres within the WSA and on approximately 690 acres in the proposed Smith Fork addition. Closure of the remaining 5,793 acres in the WSA and the additional lands to mineral entry and location would eliminate the possibility of habitat disturbance by mineral activity in those areas. There would be no impacts on wildlife as a result of coal, oil, or gas activities since the entire area is currently closed to leasing and there are no exiting leases in the WSA, and

the area would continue to be withdrawn under wilderness.

Construction of two wildlife guzzlers in the Smith Fork addition area would alter habitat conditions on less than 200 square feet. The supplemental water sources provided by the guzzlers would ultimately benefit both big game and non-game species, and possibly help to extend suitable home range for bighorn sheep. The sheep, in particular, would benefit from decreased stress by being able to water undisturbed and away from recreationists that hike and swim in the Smith Fork area.

The use of helicopters or fixed winged aircraft for monitoring wildlife populations would have only temporary disrupting affects on wildlife since these flights would be infrequent (three to five times a year), and short in duration (less than one hour).

Restrictions on the amount and degree of increased recreation use would help to reduce stress on both game and non-game species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population.

No significant changes in wildlife populations are anticipated; however, as a result of any proposed management actions.

**Conclusion.** Habitat and forage conditions would be maintained for the area's present yearlong population of 50 to 60 bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Closure of an additional 5,793 acres to mineral entry would eliminate the possibility of habitat disturbance by mineral exploration activities in those areas. Restrictions on recreational use would reduce stress on both game and nongame species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population.

**Impacts on Recreation Opportunities and Use.** The present recreational use in the area is estimated at 5,000 user days annually, consisting of 2,500 user days of whitewater boating and 2,500 user days of non-boating primitive use. Although maximum recreational use on a daily basis is limited under this alternative, it is projected that annual use in the area would increase approximately 40 percent from the present 5,000 user days to 7,000 user days (3,500

BLM_0005558

user days of whitewater boating and 3,500 user days of non-boating primitive use) as a result of increased publicity and interest. The major increases would be expected in private boating and walk-in fisher use. There would be no impact on motorized recreation use since the area is currently closed to ORV use.

Continuing the existing recreation management of the WSA would maintain the area's outstanding opportunities for primitive wilderness recreation and afford maximum protection for the high quality of recreation. Managing use in the river corridor for a maximum of six group encounters per day with other floating parties on the river, and no more than ten combined encounters per day between floating parties and parties on shore, would continue to benefit persons seeking wilderness whitewater boating experiences and reduce conflicts between boaters and other users.

There would be no change in the amount of commercial use presently under permit in the Gunnison Gorge, as a result of wilderness designation.

Implementing a private boater permit system and restricting private boaters to four launches per day would benefit those seeking wilderness experiences by limiting overall boater use. However, this increased regulation of use would result in inconvenience for users who would have to secure a permit prior to launching and for those who are unable to obtain a permit for the days requested.

Implementing a permit system for all horseback and walk-in users would also benefit those seeking a high quality wilderness experience at the expense of those seeking recreation experiences in an environment predominately free of restrictions on the amount and type of use permitted.

There would be no significant impacts to recreation as a result of incorporating approximately 880 acres in Smith Fork Canyon into the wilderness area. Any increased use in this area would be attributable to the overall rise in visitation expected throughout the WSA, and not as a direct result of incorporating it into the wilderness area.

**Conclusion.** Recreational use would increase by 2,000 user days, or 40 percent, from

the present level of 5,000 user days to 7,000 user days. Outstanding opportunities for high quality wilderness recreation activities would be maintained. Permit systems would limit the amount and degree of recreational use.

**Impacts on Energy and Mineral Exploration and Production.** Approximately 15,595 acres, or 76 percent, of the WSA and approximately 690 acres in the proposed Smith Fork addition have been closed to mineral entry and location under a recreation withdrawal since 1972. Under this alternative, the 5,443 acres in the WSA and approximately 190 acres in the Smith Fork addition currently outside the withdrawal, and the 160 acres of acquired private mineral estate (approximately 5,793 acres total) would be also be withdrawn from energy or mineral exploration, leasing, entry and location, subject to valid existing rights.

The impacts of withdrawing these additional areas from mineral entry and location would be limited to exploration. Although the WSA has only a low mineral potential for base and precious metals, some additional exploration for gold and assessment work on the 18 existing placer claims would have been expected in the southern portion of the WSA previously open to mineral entry and location. It is estimated that, due to the closure of the additional 5,443 acres within the WSA, at least six to eight requests for new claims, and one to four opportunities for additional assessment work on an existing claim would be forgone over the next 20 to 30 year period.

Since there are no known mineral deposits in the WSA and the potential for production is low, it is projected that all the claims in the WSA are purely speculative and would not prove valid. Since further development or extraction would only be permitted on claims proven to be valid before designation, no additional mineral development activities would occur. Therefore, there would be no impacts on mineral production.

Since the entire WSA is currently closed to leasing and there are no existing leases in the area, there would be no impacts on coal, oil, or gas leasing or production.

There would also be no impacts on disposal of saleable mineral materials. The area is currently closed to disposal and there is no current or foreseeable demand for these materials which

BLM_0005559

are more easily accessed elsewhere in the planning area.

Incorporating 880 acres in Smith Fork Canyon into the wilderness area would not affect energy or mineral exploration or production. The majority (690 acres) of this area has been closed to mineral entry and location since 1972. There are no existing claims or leases in the entire area and no energy or mineral activity is projected due to the low potential for development.

**Conclusion.** An additional 5,443 acres within the WSA, 190 acres in Smith Fork Canyon, and 160 acres of acquired private mineral estate (5,793 acres total) would be closed to mineral entry, location, and leasing. There would be no impacts on energy or mineral leasing or production since no activity is projected.

## ALL WILDERNESS ALTERNATIVE

Under the All Wilderness Alternative, all 21,038 acres of the Gunnison Gorge WSA would be recommended as suitable for wilderness designation. As in the Proposed Action, this alternative proposes acquiring the 160 acres of private mineral estate and incorporating it into the wilderness area (21,198 acres total).

Unlike the Proposed Action, however, this alternative does not propose incorporating an additional 880 acres in Smith Fork Canyon into the wilderness area.

**Impacts on Wilderness Values.** Designating the Gunnison Gorge WSA and the 160 acres of acquired private mineral estate (21,198 acres total) as wilderness would provide statutory, long-term protection for the area's outstanding wilderness values. These values include naturalness, outstanding opportunities for solitude, outstanding opportunities for primitive and unconfined recreation and the supplemental values provided by the freeflowing Gunnison River ecosystem and its environs that posses outstanding scenic, geologic, recreational, and wildlife resources.

Designating the Gunnison Gorge WSA as wilderness would also expand the contiguous Black Canyon of the Gunnison Wilderness Area (11,180 acres), which is administered by the NPS. Wilderness designation would preserve the Black Canyon/Gunnison Gorge system as one geologic, ecologic, and physiographic unit.

BLM currently manages the surface of the 160 acres of private mineral estate proposed for inclusion under this alternative. Management of this area is consistent with wilderness management and is not projected to change. Although no private mineral exploration or production activity is projected at this time, official designation would be the only method to assure long term protection of the wilderness values on this serrate.

Closure of an additional 5,603 acres in the WSA not currently under the BLM withdrawal to further mineral entry and location would preserve the naturalness and scenic values on those and the adjacent areas.

Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained by existing and proposed management actions that restrict the amount and degree of increased recreational use expected by commercial and private users. An increase of 2,000 user days in whitewater boating and walk-in fisher use would result in some additional contact among visitors, and some small resource damage caused by overuse of popular camping and fishing sites. However, this increase in visitation is not expected to significantly alter the visitor's ability to find solitude or impact the naturalness of the WSA.

The use of helicopters or fixed winged aircraft for monitoring wildlife populations would have minimal affects on solitude since these flights would be infrequent (three to five times a year), short in duration (less than one hour), and would normally occur during times of low visitation.

**Conclusion.** Wilderness designation would expand the adjacent Black Canyon of the Gunnison Wilderness Area and provide statutory, long-term protection for wilderness values on 21,198 acres. Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained.

**Impacts on Deer, Elk, and Bighorn Sheep Habitat and Populations.** Continuing wildlife forage allocations at current levels would be sufficient for the area's present yearlong population of 75 reintroduced bighorn sheep, 35 deer, and an additional 579 deer and 125 elk during the winter. The proposed release of 20 to 25 bighorn sheep would not be affected by wilderness designation.

76

Habitat conditions are currently protected by an ORV closure of the entire WSA and the mineral withdrawal on 15,595 acres. Closure of the remaining 5,443 acres in the WSA and the 160 acres of acquired private mineral estate (5,603 acres total) to mineral entry and location would assure habitat protection in those areas. There would be no additional impacts on wildlife as a result of coal, oil, or gas leasing, or disposal of mineral materials, since the area is currently closed to these activities and no interest is projected.

There would be no change in wildlife utilization of the two guzzlers in Smith Fork Canyon if they were located outside the area's proposed boundary. The supplemental water sources provided by these guzzlers would still benefit both big game and non-game species in the area, and possibly help to extend suitable home range for bighorn sheep. The bighorn sheep, in particular, would benefit from decreased stress by being able to water undisturbed and away from recreationists that hike and/or swim in the Smith Fork.

The use of helicopters or fixed winged aircraft for monitoring wildlife populations would have only temporary disrupting affects on wildlife since these flights would be infrequent (three to five times a year), and short in duration (less than one hour).

Restrictions on the amount and degree of increased recreation use would help to reduce stress on both game and non-game species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population.

No significant changes in wildlife populations are anticipated as a result of any proposed management actions.

**Conclusion.** Habitat and forage conditions would be maintained for the area's present year-long population of 50 to 60 bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Closure of an additional 5,603 acres to mineral entry would eliminate the possibility of habitat disturbance by mineral exploration activities in those areas. Restrictions on recreational use would reduce stress on both game and non-game species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population.

**Impacts on Recreation Opportunities and Use.** The present recreational use in the area is estimated at 5,000 user days annually, consisting of 2,500 user days of whitewater boating and 2,500 user days of non-boating primitive use. Although recreational use would be limited under this alternative, overall use would be expected to increase approximately 40 percent to 7,000 user days (3,500 boating and 3,500 non-boating), as a result of increased publicity and interest. The major increases would be expected in private boating and walk-in fisher use. There would be no impact on motorized recreation use since the area is currently closed to ORV use.

Continuing the existing recreation management of the WSA would maintain the area's outstanding opportunities for primitive wilderness recreation and afford maximum protection for the high quality of recreation. Managing use in the river corridor for a maximum of six group encounters per day with other floating parties on the river, and no more than ten combined encounters per day between floating parties and parties on shore, would continue to benefit persons seeking wilderness whitewater boating experiences and reduce conflicts between boaters and other users.

There would be no change in the amount of commercial use presently under permit in the Gunnison Gorge, as a result of wilderness designation.

Implementing a private boater permit system and restricting private boaters to four launches per day would benefit those seeking wilderness experiences by limiting overall boater use. However, this increased regulation of use would result in inconvenience for users who would have to secure a permit prior to launching and for those who are unable to obtain a permit for the days requested.

Implementing a permit system for all horseback and walk-in users would also benefit those seeking a high quality wilderness experience at the expense of those seeking recreation experiences in an environment predominately free of restrictions on the amount and type of use permitted.

**Conclusion.** Recreational use would increase by 2,000 user days, or 40 percent, from the present level of 5,000 user days to 7,000 user days. Outstanding opportunities for high quality

BLM_0005561

wilderness recreation activities would be maintained. Permit systems would limit the amount and degree of recreational use.

**Impacts on Energy and Mineral Exploration and Production.** Approximately 15,595 acres, or 76 percent, of the WSA have been closed to mineral entry and location under a recreation withdrawal since 1972. Under this alternative, the 5,443 acres in the WSA currently outside the withdrawal, and the 160 acres of acquired private mineral estate (approximately 5,603 acres total) would be also be withdrawn from energy or mineral exploration, leasing, entry and location, subject to valid existing rights.

The impacts of withdrawing these additional areas from mineral entry and location would be limited to exploration. Although the WSA has only a low mineral potential for base and precious metals, some additional exploration for gold and assessment work on the 18 existing placer claims would have been expected in the southern portion of the WSA previously open to mineral entry and location. It is estimated that, due to the closure of the additional 5,443 acres within the WSA, at least six to eight requests for new claims, and one to four opportunities for additional assessment work on an existing claim would be forgone over the next 20 to 30 year period.

Since there are no known mineral deposits in the WSA and the potential for production is low, it is projected that all the claims in the WSA are purely speculative and would not prove valid. Since further development or extraction would only be permitted on claims proven to be valid before designation, no additional mineral development activities would occur. Therefore, there would be no impacts on mineral production.

There would be no impacts on coal, oil, or gas leasing since the area is currently closed to leasing and there are no existing leases in the area.

There would also be no impact on disposal of saleable mineral materials. The area is currently closed to disposal and there is no current or foreseeable demand for these materials which are more easily accessed elsewhere in the planning area.

**Conclusion.** An additional 5,443 acres within the WSA and 160 acres of acquired private mineral estate (5,603 acres total) would be closed to mineral entry, location, and leasing. There would be no impacts on energy or mineral development, leasing, or disposal since no activity is projected.

## NO WILDERNESS ALTERNATIVE

Under the No Wilderness Alternative, all 21,038 acres of the Gunnison Gorge WSA would be recommended as nonsuitable for wilderness designation. Management guidance would be the Gunnison Gorge Recreation Area Management Plan (RAMP). The area would be managed for primitive and semi-primitive recreation and sight-seeing opportunities. The river portion would be managed for its potential designation as a wild and scenic river.

**Impacts on Wilderness Values.** Not designating the 21,038 acres of public land in the Gunnison Gorge WSA as wilderness would prevent the permanent protection of the area's wilderness values. Statutory protection of the wilderness values of the Black Canyon/Gunnison Gorge system as one geologic, ecologic, and physiographic unit would not be achieved.

Not acquiring the 160 acres of private mineral estate is not expected to significantly affect the wilderness values on that property or throughout the WSA. Although access roads and development of this land could result in major adverse impacts and essentially the loss of wilderness values, there is currently no demand for developing this area and no future demand is anticipated.

Currently there are 18 post-FLPMA lode claims in the southern portion of the WSA. It is anticipated that there will be further exploration activity and assessment work on at least one to four existing claims and six to eight new claims in this area over the next 20 to 30 years. Surface disturbance from exploration activity is not expected to exceed 2 to 8 acres, including access development.

Naturalness and scenic values would continue to be protected by the ORV closure of the entire area, the mineral withdrawal on 15,595 acres, and the enforcement of low impact camping regulations.

Naturalness would be slightly degraded on a total of 2 to 8 acres over the next 20 to 30 years as a result of mineral exploration and assessment work on new or existing placer claims in areas

78

BLM_0005562

outside the withdrawal (5,443 acres). Since no further development or extraction of minerals is anticipated due to low mineral potential, these areas would eventually return to a near-natural state. No additional impacts to wilderness values from energy or mineral development are projected.

Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained by existing and proposed management actions that restrict the amount and degree of increased recreational use expected by commercial and private users. An increase of 2,000 user days in white-water boating and walk-in fisher use would result in some additional contact among visitors, and some small resource damage caused by overuse of popular camping and fishing sites. However, this increase in visitation is not expected to significantly alter the visitor's ability to find solitude or impact the naturalness of the WSA.

The use of helicopters or fixed winged aircraft for monitoring wildlife populations would have minimal affects on solitude since these flights would be infrequent (three to five times a year), and short in duration (less than one hour).

**Conclusion.** Naturalness and scenic values would continue to be administratively protected by the ORV closure of the entire area, the mineral withdrawal on 15,595 acres, and the enforcement of low impact camping regulations. Mineral exploration and assessment work would decrease naturalness on two to eight acres outside the withdrawal area over a 20 to 30 year period.

**Impacts on Deer, Elk, and Bighorn Sheep Habitat and Populations.** Existing habitat conditions for the area's present yearlong populations of 35 deer, 75 reintroduced bighorn sheep, and an additional 579 deer and 125 elk during the winter, would be protected by the ORV closure of the entire area, and the mineral withdrawal on 15,595 acres. The proposed release of 20 to 25 bighorn sheep would still take place under this alternative.

There would be no long-term impacts to wildlife as a result of allowing mineral entry and location on 5,443 acres located outside the withdrawal area. Exploration and assessment activities on new or existing claims in these areas would result in two to eights acres of habitat dis-

turbance in these areas over the next 20 to 30 years.

Based on the low mineral potential of the entire area, it is projected that these claims would be purely speculative and would not prove valid. Since no additional impacts from development or extraction would occur, the areas would eventually return to a near-natural state and be utilized by wildlife.

There would be no impacts on wildlife as a result of allowing coal, oil, or gas leasing in the entire area since there are currently no leases in the WSA and none are anticipated due to low development potential.

No significant changes in wildlife populations are anticipated as a result of increased recreation use.

**Conclusion.** Habitat and forage conditions would be maintained for the area's present year-long population of 50 to 60 bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Mineral exploration and assessment activities would result in two to eight acres of habitat disturbance over a 20 to 30 year period. Restrictions on recreational use would reduce stress on both game and nongame species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population.

**Impacts on Recreation Opportunities and Use.** The present recreational use in the area is estimated at 5,000 user days annually, consisting of 2,500 user days of whitewater boating and 2,500 user days of non-boating primitive use. Although recreational use would be limited under this alternative, overall use would be expected to increase approximately 40 percent to 7,000 user days (3,500 boating and 3,500 non-boating), as a result of increased publicity and interest. The major increases would be expected in private boating and walk-in fisher use. There would be no impact on motorized recreation use since the area is currently closed to ORV use.

Continuing the existing recreation management of the WSA would maintain the area's outstanding opportunities for primitive wilderness recreation and afford maximum protection for the high quality of recreation. Managing use in the river corridor for a maximum of six group encounters per day with other floating parties on the

BLM_0005563

river, and no more than ten combined encounters per day between floating parties and parties on shore, would continue to benefit persons seeking wilderness whitewater boating experiences and reduce conflicts between boaters and other users.

There would be no change in the amount of commercial use presently under permit in the Gunnison Gorge.

Implementing a private boater permit system and restricting private boaters to four launches per day would benefit those seeking wilderness experiences by limiting overall boater use. However, this increased regulation of use would result in inconvenience for users who would have to secure a permit prior to launching and for those who are unable to obtain a permit for the days requested.

Implementing a permit system for all horseback and walk-in users would also benefit those seeking a high quality wilderness experience at the expense of those seeking recreation experiences in an environment predominately free of restrictions on the amount and type of use permitted.

**Conclusion.** Recreational use would increase by 2,000 user days, or 40 percent, from the present level of 5,000 user days to 7,000 user days. Outstanding opportunities for high quality primitive recreation activities would be maintained. Permit systems would limit the amount and degree of recreational use.

**Impacts on Energy and Mineral Exploration and Production.** There would be no significant impacts from retaining the protective mineral withdrawal on 15,595 acres or approximately 76 percent of the area since there are currently no claims in that area and no interest in exploration is projected. Mineral entry and location would continue to be allowed on the 5,603 acres outside the withdrawal.

There are currently eighteen post-FLPMA placer gold claims in the southern portion of the WSA outside the withdrawal. It is estimated that, under this alternative, there will be further exploration activity and assessment work on at least one to four existing claims and six to eight new claims in this area outside the withdrawal over the next 20 to 30 years. Surface disturbance from this ac-

tivity is not expected to exceed 2 to 8 acres, including access development.

Since there are no known mineral deposits in the WSA and the potential for production is low, it is projected that all the claims in the WSA are purely speculative and would not prove valid, no additional mineral development activities would occur. Therefore, there would be no impacts on mineral production.

There would be no impacts as a result of allowing coal, oil, or gas leasing in the entire area since there are currently no leases in the WSA and none are anticipated due to low development potential.

There would also be no impact on disposal of saleable mineral materials. The area is currently closed to disposal, and there is no current or foreseeable demand for these materials which are more easily accessed elsewhere in the planning area.

**Conclusion.** Approximately 5,603 acres would remain open to mineral entry and location, but no activity beyond exploration is projected due to low potential for development. The entire area would be open to leasing but no exploration or production is anticipated due to low potential for development.

# CAMEL BACK WSA (CO-030-353)

## NO WILDERNESS ALTERNATIVE (PROPOSED ACTION)

Under the Proposed Action, all 10,402 acres of The Camel Back WSA are recommended as nonsuitable for wilderness designation. The area will be managed to improve deer and elk winter range (2,482 acres), to improve livestock forage (7,240 acres), and to improve riparian vegetation (680 acres).

**Impacts on Wilderness Values.** Under this alternative, the Camel Back area will be managed under multiple use guidance of the RMP without special consideration for wilderness values. Those values include naturalness, outstanding opportunities for solitude, primitive, unconfined recreation, and supplemental values.

BLM_0005564

Naturalness would be partially protected by management actions which preclude recreational ORV use in the entire area to protect scenic values, to prevent accidental destruction of threatened and endangered plants, to protect riparian areas, and to reduce active erosion. Precluding grazing from March 1 to range readiness, and limiting trailing use, in riparian areas would provide additional protection of the naturalness on 680 acres.

Closing the entire WSA to recreational ORV use and and eliminating vehicle access (primarily for hunters) along five miles of the area's western boundary to protect riparian habitat, would increase the opportunities for solitude and primitive recreation, and protect the area's pristine canyons and mesas from degradation caused by motorized recreational use.

Naturalness would be slightly degraded on approximately one-quarter acre (10,800 square feet) of total area as a result of the construction of four stock reservoirs and eight depression ponds. The sights and sounds associated with range construction activities at the four reservoir sites on Winter Mesa, and the use of dynamite charges for the construction of the remaining eight depression ponds, would slightly degrade solitude and primitive recreational opportunities for short intervals in those areas.

The visual impacts of these twelve projects would be negligible since no permanent roads would be constructed, and the reservoirs and depression ponds would be fairly small and the impacts localized.

Motorized use by the grazing permittee and the BLM is not expected to impact wilderness values as this use would be only occasional, fewer than six times a year, short in duration, and restricted to existing trails and ways. Such infrequent use on these trails and ways is not expected to affect their gradual return to a near-natural condition.

The use of fixed-wing aircraft for monitoring wildlife populations would have minimal affects on solitude since these flights would be infrequent (three times a year) and short in duration (less than one hour).

**Conclusion.** Wilderness values would remain largely unchanged on 10,402 acres. Opportunities for solitude, and primitive, unconfined

types of recreation use would be increased by recreational ORV closures in the WSA. Twelve range improvement projects would slightly degrade naturalness on approximately one-quarter acre (10,800 square feet) of total area.

**Impacts on Deer, Elk, and Bighorn Sheep Habitat and Populations.** Wildlife forage allocations and habitat would be maintained to support the area's present yearlong population of 33 deer, and an additional 292 deer and 28 elk during the winter. Recreational ORV closures throughout the entire area (10,402 acres) to protect scenic values, to prevent accidental destruction of threatened and endangered plants, to protect riparian areas, and to reduce active erosion, would reduce stress, minimize habitat disturbance, and possibly improve current forage conditions for resident and wintering big game.

Closure of the Potter Creek Road on the western boundary of the area to protect riparian habitat would also reduce stress on big game animals by restricting hunter vehicle access in that area. In addition, the ORV closures would help to maintain, and possibly improve, suitability conditions necessary for a bighorn sheep reintroduction.

Although construction activities for four stock reservoirs and eight depression ponds would be scheduled to avoid conflicts with wildlife, there would be temporary displacement of animals and habitat disturbance on approximately one-quarter acre of total surface area. The negative impacts would be negligible, however, given the small amount of total area affected, and the animals would gradually return and utilize the area.

Both big game and non-game species would ultimately benefit from increased water supplies, improved forage conditions in riparian areas, and decreased competition with livestock as a result of these range projects. In addition, grazing restrictions in riparian areas to protect new spring growth and prevent erosion of wet soils, would improve big game forage at a time when food reserves are low and females are pregnant.

These positive impacts could result in an increase in areas suitable for bighorn reintroduction, and a gradual improvement in the overall condition and health of the existing big game populations. Over the long term, there would be a 25 to 30 percent increase (eight to twelve

81

animals) in the resident deer population and a three to five percent increase (eight to fifteen animals) in the winter deer population. No significant change in elk herd size is anticipated.

The use of fixed-winged aircraft for monitoring wildlife populations would have only temporary disrupting affects on wildlife since these flights would be infrequent (three times a year), and short in duration (less than one hour).

Motorized use by the grazing permittee would have only a temporary disrupting affect on wildlife populations and habitat. Since this use would be only occasional, fewer than six times a year, and restricted to existing trails and ways, it is not expected to affect the gradual return of any disturbed areas to a near-natural condition.

**Conclusion.** Habitat and forage conditions would be maintained for the area's present year-long population of 33 deer, and an additional 292 deer and 28 elk during the winter. ORV closures, range improvements and management actions to improve vegetative conditions would result in an overall improvement in herd condition and a gradual increase of 8 to 12 animals in the resident deer herd and 8 to 15 animals in the winter deer herd size. Habitat conditions necessary for a possible desert bighorn sheep reintroduction would be maintained, and possibly improved.

**Impacts on Recreation Opportunities and Use.** The present recreational use in the area is estimated at 500 user days annually, consisting of 300 motorized recreational user days and 200 nonmotorized, primitive recreational user days. Under this alternative, recreational use in the area would shift from predominately motorized use to nonmotorized primitive use resulting in a 50 percent decrease in use from the present 500 user days (300 motorized and 200 nonmotorized) to 250 nonmotorized user days.

The riparian closure of the Potter Creek Road and the closure of the entire area to recreational ORV use to protect scenic values, to prevent accidental destruction of threatened and endangered plants, to protect riparian areas, and to reduce active erosion, would result in a decrease of approximately 250 motorized hunter days within the area. The loss of those motorized hunter days and approximately 50 user days of ATV and motorcycle use would be recovered in areas adjacent to the WSA.

Opportunities for hiking, horseback riding, hunting, photography, and other semi-primitive recreational use would be increased throughout the WSA by the elimination of motorized recreational use. These opportunities, and their associated quality of use, would be degraded for short intervals by the construction activities in the vicinity of the range reservoirs and ponds sites. However, the overall quality of recreational use in the area would remain high.

**Conclusion.** Recreational use would decrease by 250 user days, or 50 percent, from the present level of 500 user days to 250 user days as a result of ORV closures. Approximately 300 motorized recreational user days would be eliminated, and use would shift from predominately motorized use to nonmotorized primitive use. The overall quality of recreational use would remain high.

**Impacts on Livestock Grazing and Management.** Livestock grazing management will not be affected by closing the entire area (10,402 acres) to recreational ORV use or from the riparian closure of the Potter Creek Road. Occasional (approximately 6 times a year) authorized motorized vehicle and equipment use would be allowed the grazing permittee and the BLM to maintain and monitor existing range facilities and to construct new projects.

Precluding livestock grazing on 680 acres from March 1 through range readiness to protect new spring growth and prevent erosion could shift some livestock use to the fall and result in increased conflicts between livestock grazing and hunting use. These conflicts would be minimal, however, since recreational ORV closures throughout the WSA and a riparian closure on the Potter Creek Road would reduce hunting use in the entire area by restricting vehicle access.

Limiting trailing use and restricting livestock utilization to 35 percent of key forage species on 680 of riparian areas would require the livestock operators to spend up to 10 additional workdays each year pushing stock along and out of the riparian zones. The construction of four stock reservoirs and eight depression ponds at dispersed sites throughout the WSA would help to redistribute concentrated grazing use from the riparian areas to the mesa top and benches.

Although no change in the current level of 514 AUMs is anticipated, forage allocations could

82

be reduced by 150 to 200 AUMs as a result of implementing the 35 percent utilization limit in order to increase riparian cover.

**Conclusion.** Livestock grazing would be precluded from March 1 through range readiness and trailing use would be limited in riparian areas, resulting in increased trailing time and operating costs. Four stock reservoirs and eight depression ponds would be constructed to increase water supplies and redistribute concentrated grazing use away from riparian areas. Grazing allocations would continue at the present level of 514 AUMs, but could be reduced by 150 to 200 AUMs as a result of implementing a 35 percent utilization limit to further improve riparian conditions.

# ALL WILDERNESS ALTERNATIVE

Under the All Wilderness Alternative, all 10,402 acres of the Camel Back WSA, plus a 160 acre inholding would be recommended as suitable for wilderness designation. The entire 10,562 acres would be managed to protect and preserve its wilderness values.

**Impacts on Wilderness Values.** Designating the 10,402 acres of public land in the Camel Back WSA as wilderness would provide permanent protection for the naturalness, opportunities for solitude, opportunities for primitive and unconfined recreation, and supplemental values.

Current uses of the 160 acre private inholding identified for inclusion under this alternative, are compatible with wilderness and are not projected to change. Official designation would eliminate any possibility that non-wilderness uses on this inholding would change the character of the surrounding wilderness values in the future.

Naturalness and scenic values would be protected throughout the WSA by ORV closures to protect wilderness values. Precluding grazing from March 1 to range readiness, and limiting trailing use, in riparian areas would provide additional protection of the naturalness on 680 acres.

Closing the entire WSA to recreational ORV use and eliminating vehicle access (primarily for hunters) along five miles of the area's western boundary to protect riparian habitat, would increase the opportunities for solitude and primitive recreation, and protect the area's pristine canyons and mesas from degradation caused by motorized recreational use.

Authorized motorized use by the grazing permittee is not expected to significantly impact these values as this use would be only occasional, short in duration, and restricted to existing trails and ways. Such infrequent use on these trails and ways is not expected to affect their gradual return to a near-natural condition.

Naturalness would be slightly degraded on approximately 5,200 square feet of total area as a result of the construction of four stock reservoirs on Winter Mesa. The sights and sounds associated with the construction activities would degrade solitude and primitive recreational opportunities for short intervals in those areas.

The visual impacts of these projects would be negligible since no permanent roads would be constructed, and the reservoirs would be fairly small and the impacts localized. In addition, if the reservoirs are successful in redistributing livestock use, the water catchment facility, which covers approximately one-third of an acre on Winter Mesa, would be removed and the area rehabilitated to a near-natural condition.

The use of fixed-winged aircraft for monitoring wildlife populations would have minimal affects on solitude since these flights would be infrequent (three times a year) and short in duration (less than one hour).

**Conclusion.** Wilderness designation would provide statutory, long-term protection for wilderness values on 10,562 acres. Opportunities for solitude and primitive, unconfined types of recreation would be increased by the elimination of ORV use in the WSA. Four range improvement projects would slightly degrade naturalness on approximately 5,200 square feet of total area.

**Impacts on Deer, Elk, and Bighorn Sheep Habitat and Populations.** ORV closures throughout the WSA to protect wilderness values, would reduce stress and maintain habitat and current forage conditions for the area's present yearlong population of 33 deer, and an additional 292 deer and 28 elk during winter.

Closure of the Potter Creek Road on the western boundary of the area to protect riparian habitat would also reduce stress on big game

83

animals by eliminating hunter vehicle access In that area. These closures would also help to maintain, and possibly improve, suitability conditions necessary for a bighorn sheep reintroduction.

Although construction activities for four stock reservoirs would be scheduled to avoid any undo conflicts with wildlife, there would be some temporary displacement of animals and habitat disturbance on approximately 5,200 square feet. The negative impacts would be negligible; however, and wildlife would ultimately benefit from increased water supplies, improved forage conditions in riparian areas, and decreased competition with livestock as a result of these range projects.

Grazing restrictions in riparian areas to protect new spring growth and prevent erosion of wet soils, would improve big game forage at a time when food reserves are low and females are pregnant.

These positive impacts could result in a gradual improvement in the overall condition and health of the existing big game populations. Over the long term, there would be a 25 to 30 percent increase (eight to twelve animals) in the resident deer population and a three to five percent increase (eight to fifteen animals) in the winter deer population. No significant change in elk herd size is anticipated.

No additional significant impacts are anticipated as a result of giving wildlife priority for any additional forage which became available as a result of any wildlife or range improvements or management actions.

The removal of the water catchment facility on Winter Mesa would not significantly impact wildlife in the area since water would still be provided by the four stock reservoirs, and the area involved is small (approximately one-third acre). The eight depression ponds, forgone under this alternative, would have been helpful in extending the potential suitable bighorn range, but they would not have been considered essential for a reintroduction. Deer and elk would not be significantly impacted whether these ponds were constructed or not, as they are not as dependent as livestock on supplemental water sources.

The use of helicopters or fixed-wing aircraft for monitoring wildlife populations would have only temporary disrupting affects on wildlife since these flights would be infrequent (three times a year), and short in duration (less than one hour).

Motorized use by the grazing permittee would have only a temporary disrupting affect on wildlife populations and habitat. Since this use would be only occasional, fewer than six times a year, and restricted to existing trails and ways, it is not expected to affect the gradual return of any disturbed areas to a near-natural condition.

**Conclusion.** Habitat and forage conditions would be maintained for the area's present year-long population of 33 deer, and an additional 292 deer and 28 elk during the winter. ORV closures, range improvements and management actions to improve vegetative conditions would result in an overall improvement in herd condition and a gradual increase of 8 to 12 animals in the resident deer herd and 8 to 15 animals in the winter deer herd size. Habitat conditions necessary for a possible desert bighorn sheep reintroduction would be maintained, and possibly improved.

**Impacts on Recreation Opportunities and Use.** The present recreational use in the area is estimated at 500 user days annually, consisting of 300 motorized recreational user days and 200 nonmotorized, primitive recreational user days. Under this alternative, recreational use in the area would shift from predominately motorized use to nonmotorized primitive use.

The riparian closure of the Potter Creek Road and the closure of the Winter Mesa Way to protect wilderness scenic values would result in a decrease of approximately 250 motorized hunter days within the area. Increased publicity and interest over wilderness designation is expected to result in an initial increase from 200 primitive user days to 300, and a gradual increase up to 600 primitive user days. These changes in amount and type of use represent a 20 percent increase (from 500 to 600 user days) in overall visitation.

The loss of 250 motorized hunter days and approximately 50 user days of ATV and motorcycle use would be recovered in areas adjacent to the WSA. The present opportunities for hiking, horseback riding, hunting, photography, and other primitive recreational use would be slightly

84

enhanced by the elimination of motorized recreational use, but would not be significantly affected by an increase of 400 primitive recreation use days. The majority of this use (75 percent) would be day use, with limited impact potential, and use would be dispersed throughout the WSA, unlike the present motorized use which is concentrated on Winter Mesa and along the Potter Creek Road.

The opportunities for primitive recreation, and their associated quality of use, would be slightly degraded by the construction activities in the vicinity of the four stock reservoir sites on Winter Mesa. However, these impacts would be isolated and temporary, and would not significantly affect the overall high quality of recreational use in the WSA.

**Conclusion.** Recreational use would increase by 100 user days, or 20 percent, from the present level of 500 user days to 600 user days. Approximately 300 motorized recreational user days would be eliminated by ORV closures, and use would shift from predominately motorized use to non-motorized primitive use. The overall quality of use would remain high.

**Impacts on Livestock Grazing and Management.** There would be no significant impacts on livestock grazing management as a result of the closure of the entire area to recreational ORV use or from the riparian closure of the Potter Creek Road. Authorized motorized vehicle and equipment use would continue to be allowed for the grazing permittee to maintain and monitor existing range facilities and to construct new ones, subject to the Wilderness Management Policy.

Precluding livestock grazing on 680 acres from March 1 through range readiness to protect new spring growth and prevent erosion could shift some livestock use to the fall and result in increased conflicts between livestock grazing and hunting use. These conflicts would be minimal, however, since recreational ORV closures throughout the WSA and a riparian closure on the Potter Creek Road would reduce hunting use in the entire area by restricting vehicle access. This limitation on spring use is not expected to have a measurable affect on overall livestock use.

Limiting trailing use and restricting livestock utilization to 35 percent of key forage species on 680 of riparian areas would require the livestock operators to spend up to 10 additional workdays each year pushing stock along and out of the riparian zones, thus increasing trailing time and operating costs.

The limit of 35 percent utilization has been proposed as a general guideline for improvement in riparian areas and would only be implemented when other methods of improving riparian vegetation prove unsuccessful. Although no change in the current level of 514 AUMs is anticipated, forage allocations could be reduced by 150 to 200 AUMs as a result of implementing the 35 percent utilization limit if other proposed management actions do not adequately protect riparian conditions.

It is projected that the four stock reservoirs on Winter Mesa would meet Wilderness Management criteria for resource protection and would be constructed. These reservoirs would help to relieve the impacts imposed on the operators by redistributing concentrated grazing use from the riparian areas to the mesa top and benches.

The impacts of not constructing the eight depression ponds would be negligible, as long as the four reservoirs on Winter Mesa are constructed. These ponds would have served primarily as convenient, intermediary sources of water between the riparian areas of the canyon bottoms and the stock reservoirs on Winter Mesa. They would have been helpful, but not as essential as the reservoirs for redistributing concentrated stock use.

**Conclusion.** Livestock grazing would be precluded from March 1 through range readiness and trailing use would be limited in riparian areas, resulting in increased trailing time and operating costs. Four stock reservoirs would be constructed to increase water supplies and redistribute concentrated grazing use away from riparian areas. Eight depression ponds would not be constructed. Grazing allocations would continue at the present level of 514 AUMs, but could be reduced by 150 to 200 AUMs as a result of implementing a 35 percent utilization limit to further improve riparian conditions.

85

BLM_0005569

# ADOBE BADLANDS WSA (C0-030-370B)

## NO WILDERNESS ALTERNATIVE (PROPOSED ACTION)

Under the Proposed Action, all 10,425 acres of the Adobe Badlands WSA are be recommended as nonsuitable for wilderness designation. The area would be divided into three management units as shown in Figure 2-3. Approximately 6,783 acres would be designated as the Adobe Badlands ONA/ACEC (Unit A) and managed to protect the area's unique landscape, to provide for semi-primitive, nonmotorized recreation opportunities and use, to protect threatened and endangered plants, and to reduce active erosion and salinity contributions to the Colorado River system. The upper 1,927 acres would be managed as a Wildlife Management Area (Unit B). The remaining 1,715 acres would be managed as a Salinity Control Area (Unit C) with seasonal restrictions on ORV use, grazing, oil and gas leasing, and mineral activities to control active erosion and reduce salinity contributions.

**Impacts on Wilderness Values.** Not designating the 10,425 acres in the Adobe Badlands WSA as wilderness would prevent the permanent protection of existing wilderness values. Under this alternative, the Adobe Badlands would be managed under multiple use guidance of the RMP without special consideration for wilderness values. Those values include naturalness, outstanding opportunities for solitude and primitive, unconfined recreation, and the supplemental values which are provided by the area's unique Mancos shale formations and unspoiled landscapes.

The opportunities for primitive, unconfined recreation use would remain essentially unchanged on 6,783 acres within the ONA/ACEC (Unit A). Existing wilderness values would be protected by ORV closures and the preclusion of any potential surface-disturbing activities, such as energy and mineral exploration and development, or wildlife improvement projects.

Opportunities for solitude within the ONA/ACEC would be slightly degraded as a result of the reduction in size of the area closed to ORV use and other surface-disturbing activities, and by the increase of 50 user days of primitive recreational use expected in this area.

Naturalness would be irretrievably lost on approximately 140 acres within the 1,927 acres of crucial deer and elk winter range (Unit B) as a result of a land treatment project to improve the quality and quantity of winter forage. The activity associated with this project would also degrade solitude for short intervals.

Naturalness, solitude, and opportunities for primitive, unconfined recreation in Unit B would be reduced by ORV use, which would be limited to designated roads and trails from December 1 through April 30, but allowed without restrictions from May 1 through November 30.

The wilderness values of naturalness, solitude, and opportunities for primitive, unconfined recreation on 1,715 acres in the salinity control area (Unit C) would also be slightly reduced by ORV use which would be allowed year long, but restricted to designated roads and trails.

It is projected that exploration activities for two to five oil or gas wells in Unit C would degrade the wilderness values on a total of four to ten acres over the next 20 to 30 year period. Although the WSA is considered moderately favorable for oil and gas accumulation, no development is anticipated based on the low potential for production, past unproductive drilling efforts, and the lack of industry interest. Since no additional impacts from energy and mineral activities or other management actions are anticipated for this management unit, these areas would eventually return to a semi-natural state.

**Conclusion.** Wilderness values would remain essentially unchanged on 6,783 acres within the ONA\ACEC, but would be slightly degraded on 3,642 acres by ORV use. Naturalness would be irretrievably lost on approximately 145 acres as a result of a wildlife habitat treatment and oil and gas exploration activities.

**Impacts on Deer, Elk, and Pronghorn Habitat and Populations.** The ORV closure of 6,783 acres of pronghorn range within the ONA/ACEC (Unit A) would reduce stress and maintain habitat for the estimated 30 resident pronghorn. There will be no significant impacts to wildlife in this area from oil or gas leasing, coal leasing, or other mineral activities as no exploration or development is anticipated, and the area is closed to mineral material disposal. No significant change in herd size is expected as a result of any proposed management actions.

86

BLM_0005570

Restricting ORV use within the wildlife management area (Unit B) to designated roads and trails from December 1 through April 30, would minimize habitat disturbance and reduce stress on the area's present winter populations of 76 deer and 35 elk. Allowing unrestricted ORV use in this unit from May 1 through November 30 would result in some habitat disturbance and stress on resident wildlife. However, less than 50 user days of ORV use is projected for this area, and the use will occur at a time when deer and elk least utilize the area. No additional impacts to big game or other wildlife in this area from oil or gas leasing, coal leasing or other mineral activities as no exploration or development is anticipated.

The fuelwood cutting activities associated with one land treatment project to improve big game winter forage in Unit B would temporarily displace deer and elk at least 1/2 mile onto adjacent areas surrounding five to seven 20-acre parcels. No long-term adverse impacts to big game animals would result from the construction of this project, however, since no disturbances would be allowed during the time when deer and elk most utilize the area (December 1 through April 30), and since the affected acreage is only 7 percent of the available wildlife area and there is sufficient forage and cover on adjacent areas to absorb additional animals in the short-term.

Long-term benefits of the project would be the assurance of critical winter forage in sufficient quantity and quality to support the present big game populations, particularly during severe winters. In addition, since wildlife would have first priority on any additional forage that would result from this project, there could be a gradual improvement in the overall condition and health of the herd and a possible increase of five to seven deer and two to four elk over the long term.

Limiting ORV use to designated roads and trails year long on 1,715 acres within the salinity control area (Unit C) would benefit pronghorn by reducing stress and protecting forage, particularly during the winter and early spring when food reserves are low.

Exploration activities for two to five oil or gas wells within Unit C would temporarily displace pronghorn, increase stress, and decrease habitat on four to ten acres. Given the pronghorn's ability to adapt to human activity, and that the affected acreage represents only a fraction (.06 percent) of its potential range in the WSA, there will be no long-term impacts to the present pronghorn

population in this area as a result of these activities. In addition, since no additional impacts from oil or gas production are anticipated, these disturbed areas would eventually return to a near-natural state and be utilized by the pronghorn.

**Conclusion.** Seasonal restrictions on ORV use would reduce stress and maintain crucial winter range on 1,927 acres for 76 deer and 35 elk. Improved forage conditions on 140 acres could result in improvement in overall herd condition and a gradual increase of 5 to 7 deer and 2 to 4 elk over the long term. ORV closures on 6,783 acres and yearlong limitations on 1,715 acres would reduce stress and maintain habitat and forage conditions for approximately 30 resident pronghorn.

**Impacts on Recreation Opportunities and Use.** Recreational use of the entire area would decrease 80 percent from the present 500 user days (450 motorized and 50 nonmotorized) to 100 user days (50 motorized and 50 nonmotorized) over the long-term. Use in the majority of the WSA would shift from less primitive or motorized recreational activities to primitive recreational activities.

The opportunities for hiking, horseback riding, hunting, photography, and other primitive recreational use would remain essentially unchanged on 6,783 acres within the ONA/ACEC (Unit A). However, the overall quality of use currently associated with these activities would be slightly degraded as a result of the reduction in size of the area closed to ORV use and any other surface-disturbing activities, and by an increase of 50 user days of primitive recreational use expected in this area.

Opportunities for ORV use within Unit A would be forgone as a result of an ORV closure to protect scenic qualities and landscape features, and to prevent damage to threatened or endangered plant species and their potential habitat. This closure would result in an annual decrease of 400 user days of motorized recreational use. The impacts on motorized use within the WSA would be offset by relocating this use to an 8,942 acre ORV open area less than one mile east of the Adobe Badlands WSA.

Opportunities for non-motorized, semi-primitive recreational opportunities would maintained on the remaining 3,624 acres of the WSA. However, opportunities for ORV use in these

87

BLM_0005571

areas would be slightly reduced by seasonal restrictions. These restrictions would limit motorized use to designated roads and trails from December 1 through April 1 on 1,927 acres (Unit B) to reduce stress on wintering big game, and year long on 1,715 acres (Unit C) to protect erodible saline soils.

**Conclusion.** Recreational use would decrease by 400 user days, or 80 percent, from the present level of 500 user days to 100 user days. Approximately 400 motorized recreational user days would be displaced to adjacent areas as a result of ORV closures within the ONA/ACEC (6,783 acres). Opportunities for ORV use would be slightly impacted by yearlong restrictions on 1,715 acres and seasonal limitations on 1,927 acres. Use would shift from predominately motorized recreational activities to primitive recreational activities within the ONA/ACEC.

**Impacts on Mineral and Energy Exploration.** There are no coal resources within the 6,783 acres of the ONA/ACEC which would be closed to leasing. The coal potential for the remainder of the WSA is considered low except on approximately 507 acres in the northern portions of the wildlife management area (Unit B), where there is an estimated 21 million tons of moderate to high potential coal. This coal would be available for leasing, however, no exploration or production is anticipated due to the lack of economic feasibility and industry interest in leasing, and the lack of transportation access. In addition, the coal is not contiguous to any existing leases and is not expected to be needed to maintain mining operations in the future.

There would be no impacts on oil and gas production as a result of no surface occupancy stipulations and ORV closures on 6,783 acres within the ONA/ACEC (Unit A), since no exploration or development is anticipated for this unit.

There would also be no impacts on oil and gas production as a result of seasonal stipulations on exploration on 1,927 acres within the wildlife management area (Unit B), since no exploration or development is anticipated for this unit.

Seasonal stipulations on 1,715 acres within the salinity control area (Unit C) would result in increased drilling costs and scheduling inconveniences for the two to five exploratory wells projected for this area. These stipulations would have no effect on production; however, since

none is anticipated. Although the geologic structures in the area have a moderate favorability for oil and gas accumulation, all the exploratory wells drilled within or adjacent to the WSA were abandoned after no significant amounts of oil or gas were discovered.

There would be no impacts on mineral exploration and development as a result of allowing entry and location throughout the entire WSA since no additional mineral activity is projected. No validity exams have been conducted and no activity has occurred to date on the approximately 75 placer mining claims in the WSA. However, since there are no known mineral deposits in the WSA, and the potential for locatable minerals is low, these claims are projected to be purely speculative and would not prove valid.

There would be no impacts on production of mineral materials as a result of closing 6,783 acres in Unit One to disposal of mineral materials or from allowing disposal on 3,642 acres, within management Units B and C, subject to seasonal restrictions. There is presently no demand for mineral materials in the WSA, and none is expected because of the rough terrain and availability of like materials at numerous nearby sites.

**Conclusion.** The entire 10,425 acres would be open for locatable mineral exploration but no development or production is anticipated due to the area's lack of mineral potential and lack of present and future demand. There would be no impacts on oil or gas production as a result of no surface occupancy stipulations on 6,783 acres in the ONA/ACEC or seasonal stipulations on 1,927 acres of crucial winter range since no exploration or production is anticipated within those areas. Seasonal stipulations on 1,715 acres would increase oil and gas exploration costs for two to five wells; however, there would be no impacts on production since none is projected. There would be no impacts on coal production since no activity is projected.

## ALL WILDERNESS ALTERNATIVE

Under the All Wilderness Alternative, all 10,425 acres of the Adobe Badlands WSA would be recommended as suitable for wilderness designation. The area would be managed to protect and preserve its wilderness values.

88

BLM_0005572

**Impacts on Wilderness Values.** Wilderness designation would provide long-term, statutory protection for the naturalness, opportunities for solitude, opportunities for primitive and unconfined recreation, and the supplemental values provided by the area's unique Mancos shale formations and unspoiled landscapes throughout the WSA.

Naturalness and scenic values would be protected throughout the WSA by ORV closures, the withdrawal of the area from energy or mineral exploration and development, and the preclusion of projects determined to be wilderness-impairing.

Closing the WSA to ORV use, would eliminate 450 motorized use days and the sounds and visual impacts associated with that use. As a result, there would be increased opportunities for solitude and primitive, unconfined recreation and areas currently disturbed by ORV use would be allowed to return to a more natural condition.

There would be no significant impacts to wilderness values as a result of an increase of 550 primitive recreation user days. The majority of this use (95%) would be day use, consisting primarily of sight-seeing, hiking and horseback riding, with limited impact potential. In addition, use would be dispersed throughout the WSA, unlike the present motorized use which is concentrated in the southern and eastern sections of the area.

**Conclusion.** Wilderness designation would provide statutory, longterm protection for wilderness values on 10,425 acres. Opportunities for solitude and primitive, unconfined types of recreation would be increased by the elimination of ORV use in the WSA.

**Impacts on Deer, Elk, and Pronghorn Habitat and Populations.** Closing the entire WSA to ORV use, energy and mineral exploration and development, and precluding wilderness impairing projects would reduce stress and maintain the existing habitat conditions for the area's present population of 30 pronghorn and 76 deer and 35 elk during the winter.

There are no existing wildlife or range projects in the entire area, and none are proposed in the RMP for the remainder of the WSA. Wildlife and livestock forage allocations would remain at current levels on the pronghorn range, and no significant increase or decrease in pronghorn population numbers or livestock AUMs is expected.

Under this alternative; however, the land treatment project for improving big game winter range would be foregone because it would impair wilderness values on 140 acres. The preclusion of this project result in short-term shortages of forage and increased stress during severe winters, and, over the long term, a reduction in herd vigor and the possible loss of 15 to 20 deer and 8 to 10 elk over the long term.

**Conclusion.** Closing the entire area to ORV use and oil and gas exploration would reduce stress and maintain existing habitat and forage conditions for the yearlong population of 30 pronghorn antelope, and 76 deer and 35 elk during the winter. The inability to implement a land treatment project could result in short-term shortages of forage and increased stress during severe winters, and, over the long term, a reduction in herd vigor and the possible loss of 15 to 20 deer and 8 to 10 elk over the long term.

**Impacts on Recreation Opportunities and Use.** The present recreational use in the area is estimated at 500 user days annually, 450 of which are motorized user days. Increased publicity and interest over wilderness designation is expected to result in a increase from the present level of 50 primitive user days to 600 primitive use days over the long term. These changes in amount and type of use represent a 20 percent net increase (from 500 to 600 user days) in overall visitation.

Precluding ORV use on the entire 10,425 acres of the WSA would result in a shift from predominately motorized recreation use to primitive recreation use within the WSA, and an initial decrease of 450 user days of motorized recreation use. The impacts of precluding motorized use within the WSA would be offset by relocating this use to an 8,942 acre ORV open area less than one mile east of the Adobe Badlands WSA.

The present opportunities for primitive recreation would be slightly enhanced by the elimination of motorized use, but would not be significantly affected by an increase of 550 primitive recreation use days. The majority of this use (95 percent) would be day use, with limited impact potential, and use would be dispersed throughout the WSA, unlike the present motorized use which is concentrated in the

89

BLM_0005573

southern and eastern sections of the area. Management under wilderness guidelines would provide maximum protection for the high quality of all recreation use within the WSA.

**Conclusion:** Recreational use would increase by 100 user days, or 20 percent, from the present level of 500 user days to 600 user days. Approximately 450 motorized user days would be displaced to adjacent areas. Use of the area would shift from less primitive, motorized recreational activities to primitive, nonmotorized recreational activities.

**Impacts on Mineral and Energy Exploration and Production:** Under the All Wilderness Alternative, all of the federal mineral estate in the Adobe Badlands WSA would be withdrawn from exploration, leasing, entry and location, and disposal.

There would be no impacts on coal production as a result of withdrawing an estimated 21 million tons of moderate to high potential coal from further leasing consideration. No exploration or production of this coal is anticipated due to the lack of economic feasibility and industry interest in leasing, and the lack of transportation access. In addition, the coal is not contiguous to any existing leases and is not expected to be needed to maintain mining operations in the future.

Precluding mineral exploration in the entire WSA would have no affect on mineral production since none is projected. There are currently about 75 existing placer claims within the WSA on which no validity examinations have been conducted and no activity has occurred to date. Further development or extraction would only be permitted on those claims proven before designation to be valid. Since there are no known locatable minerals within the WSA, and the potential for locatable minerals is low, these claims are projected to be purely speculative and would not prove to be valid. Therefore, no production would occur.

The impacts of withdrawing the entire WSA from oil and gas leasing would be limited to exploration. Under this alternative, the two to five exploratory wells would not be developed. No oil or gas production would be forgone, however, since no development beyond exploration is anticipated. Although the entire WSA is considered moderately valuable for oil and gas, there has been no recent industry interest in the area and all four exploratory wells that were drilled adjacent to the WSA were unproductive. All of the pre-FLPMA oil and gas leases have expired and there are currently no oil or gas leases in the WSA.

There would be no impacts as a result of closing the entire WSA to disposal of mineral materials. There is presently no demand for mineral materials in the WSA, and none is expected because of the rough terrain and availability of like materials at numerous nearby sites.

**Conclusion:** The entire 10,425 acres would be closed to energy and mineral exploration and production. There would be no impacts on mineral production since no activity is projected due to the area's lack of mineral potential and the lack of present and future demand. No exploratory oil or gas wells would be drilled; however, there would be no impacts on production since none is projected. There would be no impacts on coal production since no activity is anticipated.

90

# CHAPTER FIVE

# CONSULTATION AND COORDINATION

## DOCUMENT PREPARATION

The draft of this Final Wilderness Environmental Impact Statement was prepared as a Wilderness Technical Supplement (WTS) to the Draft Uncompahgre Basin Resource Management Plan/Environmental Impact Statement (RMP/EIS).

These documents were prepared by specialists from the BLM's Montrose District and Uncompahgre Basin Resource Area with assistance from the Colorado State Office. A list of the preparers of these documents is provided in Appendix A.

## CONSULTATION AND COORDINATION PRIOR TO THE DRAFT RMP/EIS

During preparation of the Draft RMP/EIS and the Draft WTS, federal agencies, state and local governments and agencies, interest groups, and individuals were contacted for information and data gathering purposes. A partial listing of these contacts follows:

### FEDERAL AGENCIES

Environmental Protection Agency
National Park Service
U.S. Forest Service

### COLORADO STATE AGENCIES

Division of Wildlife
District 10 Regional Planning Commission

### COUNTY GOVERNMENTS AND AGENCIES

#### Delta County

Board of County Commissioners
Planning Department

#### Montrose County

Board of County Commissioners
Planning Department

#### Ouray County

Board of County Commissioners
Planning Department

#### Gunnison County

Board of County Commissioners
Planning Department

### INTEREST GROUPS AND ORGANIZATIONS

Chipeta Chapter, Colorado Archeological Society
Colorado Historical Society
Colorado Ute Electric Association
Delta-Montrose Electric Association
The Nature Conservancy
Nickens and Associates
Sierra Club, Uncompahgre Group
Uncompahgre Valley Association
Western Colorado Congress

### ADVISORY COUNCILS

Montrose BLM District Advisory Council

### INDIVIDUALS

Douglas D. Scott, Archeologist
John Horn, Archeologist
Bill Harris, Archeologist

BLM_0005575

# PUBLIC PARTICIPATION

Throughout the planning process, concerns and interests of all publics were addressed in a variety of public participation activities. The area manager, RMP team leader, and team members met with county commissioners, environmental and interest groups, the Montrose BLM District advisory council (representatives who advise the District Manager on local public land issues), and concerned citizens.

On July 28, 1983, a Notice of Intent was submitted to the Federal Register. This notice began the formal planning process. Invitations to participate in the planning process were sent to individuals, organizations, agencies, special interest groups, the media, business interests, academic institutions, and individuals. The general public was informed through news releases.

All publics were invited to attend a series of public scoping meetings held in August 1983 in Montrose, Delta, and Hotchkiss. The purpose of the meetings was to explain the objectives and goals of the RMP and identify resource management issues. Issue statements and comments were accepted from the public by mail and at the scoping meetings. Land tenure adjustments, off-road vehicle use, and recreation, wilderness, and forestry issues generated the most response.

The first RMP newsletter was published in March 1985 and mailed to about 700 addresses. A second newsletter was published and mailed out in December 1985.

# DISTRIBUTION LIST

Comments on the Draft RMP/EIS and the Draft WTS were requested from the following agencies and organizations in addition to approximately 500 individuals and businesses. A partial list of recipients is provided below. All responding agencies, groups, and organizations who commented on wilderness related issues are identified with an asterisk (*).

## FEDERAL AGENCIES

### Department of Interior

Bureau of Mines*
Bureau of Reclamation*
Fish and Wildlife Service*
Geological Survey*
National Park Service*
Black Canyon of the Gunnison National Monument
Minerals, Water, and Air Quality Office

### Department of Agriculture

Forest Service
Supervisor's Office; Grand Mesa-Uncompahgre-Gunnison N.F.*
Ouray Ranger District
Paonia Ranger District
Soil Conservation Service
Delta Conservation District
Shavano Conservation District

### Department of Energy

Western Area Power Administration
Department of Defense
U.S. Air Force*

### Other Federal Agencies

Environmental Protection Agency*
Federal Highway Administration
Advisory Council on Historic Preservation

92

## COLORADO STATE AGENCIES

Department of Agriculture
Department of Natural Resources*
Division of Parks and Outdoor Recreation
Division of Wildlife
Colorado Natural Areas Program
Mined Land Reclamation Board
Natural Heritage Inventory
............................................................
    XT1 = State Clearinghouse
State Historic Preservation Officer
District 10 Regional Planning Commission1

## CONGRESSIONAL AND LEGISLATIVE OFFICES

Distribution was made to the offices of Senator William L. Armstrong, Senator Timothy E. Wirth, and Congressman Ben Nighthorse Campbell, and to the offices of State Senators Robert DeNier and Robert Pastore, and State Representatives Ed Carpenter and Margaret Masson.

## COUNTY GOVERNMENTS AND AGENCIES

**Delta County**

Board of County Commissioners
Planning Commission
Planning Department

**Montrose County**

Board of County Commissioners
Planning Commission

**Ouray County**

Board of County Commissioners
Land Use Administrator

**Gunnison County**

Board of County Commissioners
Planning Commission

**Mesa County**

Board of County Commissioners
Policy and Research Office

## MUNICIPAL GOVERNMENTS

City of Delta*
City of Montrose
Town of Cedaredge
Town of Crawford
Town of Hotchkiss
Town of Olathe
Town of Orchard City
Town of Ouray
Town of Paonia
Town of Ridgway

## INTEREST GROUPS, ORGANIZATIONS, AND BUSINESSES

American Wilderness Alliance
Audubon Society, Western Colorado Chapter
Chipeta Chapter, Colorado Archaeology Society
Club 20
Colorado Archeological Society*
Colorado Environmental Coalition*
Colorado Historical Society
Colorado Mining Association
Colorado Mountain Club*
Colorado Native Plant Society*
Colorado Open Space Council
Colorado Trail Riders
Colorado Ute Electric Association*
Colorado Westmoreland, Inc.
Continental Divide Trail Society
Delta County Livestock Association*
Ducks Unlimited, Montrose Chapter
Far Flung Adventures*
Grand Junction Geological Society
Gunnison County Stockgrowers' Association
Gunnison River Coalition
League of Women Voters
Minerals Exploration Coalition*
Montrose County Chamber of Commerce
Montrose District Advisory Council*
Musser Ranches*
National Council of Public Land Users
National Parks and Conservation Association*

93

National Wildlife Federation
Natural Resources Defense Council
The Nature Conservancy
North Fork Woolgrowers' Association
Ouray County Alliance
Ouray County Cattlemen's Association
Paonia Chamber of Commerce
Richards and Richards*
Rocky Mountain Oil and Gas Association*
Sierra Club, Rocky Mountain Chapter*
Sierra Club, Southwest Office*
Sierra Club, Uncompahgre Group
Society for Range Management
Southern Ute Tribe
Trout Unlimited, Montrose Chapter
Uncompahgre Valley Livestock Association
United Four Wheel Drive Association
Ute Mountain Tribe
Western Colorado Congress
Western Organization of Resource Councils
Western Slope Energy Research Center
Western Slope Woolgrowers' Association
Western Small Miners' Association
The Wilderness Society
Wildlife Management Institute
The Wildlife Society

## INDIVIDUALS

Carl E. Conner*
Susan Detweiler*
Michael G. Goodman, et. al.*
Josephine M. Gore*
Richard W. and Deborah R. Gore*
Mrs. Robert Gray*
Marv and Judy Kieca*
Danni L. Langdon*
Jack Musser*
Lorna F. Orth, et. al.*
Kate Palmer*
Dan Roberts*
Gordon Rodda*
Dr. T. Scott*
Lee and Helen Tunget*

## DISTRIBUTION OF THE RMP/FEIS

The Proposed Resource Management Plan and Final Environmental Resource Statement

(RMP/FEIS) was sent to approximately 900 addresses, including all the addresses to which the Draft RMP/EIS was sent. The original distribution for the Draft RMP/EIS was expanded to include those individuals, organizations, and agencies who testified at the public hearings, submitted written comments, or requested copies of the draft.

## DISTRIBUTION OF THIS WILDERNESS FEIS

This wilderness FEIS is being sent to the updated RMP/FEIS mailing list, which includes all entities that testified or submitted letters relating to the wilderness issue.

## PUBLIC COMMENTS AND RESPONSES ON THE DRAFT WILDERNESS ENVIRONMENTAL IMPACT STATEMENT

### INTRODUCTION

This section has been divided into two parts. Part one contains excerpts from the oral testimony of three public hearings held in September 1987, to elicit response to the Draft Uncompahgre Basin Resource Management Plan and Environmental Impact Statement (RMP/EIS) and the Wilderness Technical Supplement (WTS). The entire transcripts of these hearings, along with the BLM's responses to all comments on the Draft RMP/EIS and the WTS are provided in the Uncompahgre Basin Proposed Resource Management Plan and Final Environmental Impact Statement (September, 1988).

Part two contains comment letters from individuals, private organizations, and federal state and local agencies which were received during the 90-day public comment period extending from August 7, 1987 through November 5, 1987. All of these letters, along with the BLM's response to comments on the Draft RMP/EIS and the WTS are provided in the Uncompahgre Basin Proposed Resource Management Plan and Final Environmental Impact Statement (September, 1988).

All of the verbal and written comments received have been reviewed and considered in the preparation of the Uncompahgre Basin Proposed Resource Management Plan and Final

BLM_0005578

Final Environmental Impact Statement (RMP/FEIS), and this Final Wilderness Environmental Impact Statement (WEIS).

# PART 1 - ORAL TESTIMONY AND RESPONSES

Table 5-1 provides a list of the forty-five persons who commented on the Wilderness Technical Supplement at the public hearings held in Hotchkiss (September 22, 1987), Lakewood (September 24, 1987), and Montrose (September 29, 1987). The majority of these commentors did not address specific wilderness issues, but rather stated a preference for or against wilderness, or questioned the BLM's rationale for not proposing wilderness designation for the Camel Back and Adobe Badlands WSAs.

Therefore, due to the nature and similarity of the comments received, and in order to avoid redundancy in our reply, only those portions of the transcripts which contain comments on the adequacy of the RMP/EIS or the WTS, or address specific wilderness management issues or impacts, have been reprinted in this document. The speakers whose comments are addressed in this WEIS are identified in Table 5-1 by an asterisk (*).

BLM_0005579

Table 5-1

## PERSONS WHO COMMENTED ON WILDERNESS ISSUES AT THE PUBLIC HEARINGS

### HOTCHKISS, COLORADO, SEPTEMBER 22, 1987

L.T. Magnum; City of Delta;  Delta, Colorado *
W.N. Brunner; Paonia, Colorado *
David Johnston; Paonia, Colorado
John B. Benjamin; Hotchkiss, Colorado
Caleb Gates; Paonia, Colorado
Stephen F. Hinchman; Paonia, Colorado *
Mark Paigen; Paonia, Colorado
Gerrie Wolf; Cedaredge, Colorado *
Hank Hotze; Gunnison River Expeditions, Hotchkiss, Colorado
Robin Nicholoff; Hotchkiss, Colorado *
John Groome; Paonia, Colorado

### LAKEWOOD, COLORADO, SEPTEMBER 24, 1987

John Stansfield; Sierra Club, Pikes Peak Group; Monument, Colorado
Carl Gerity; Quinn Coal Company; Golden, Colorado
Bill Foreman; Boulder, Colorado *
Kirk Cunningham; Boulder, Colorado
Todd Robertson; Denver, Colorado
Earl Jones; Boulder, Colorado
Karin Molliver; Boulder, Colorado *
Rocky Smith; Denver, Colorado
Allison Graves; CU Wilderness Study Group, Boulder, Colorado *
Steve Pettit; Boulder, Colorado
Bruce Robson; Boulder, Colorado
Roz McClellan; Boulder, Colorado *
Norm Mullen; Boulder, Colorado
Marty Walter; Boulder, Colorado
Eleanor Von Bargen; Colorado Native Plant Society; Denver, Colorado
Scott Hatfield; Boulder, Colorado
Dave Allured; Boulder, Colorado
Donald Thompson; Denver, Colorado
Polly Mills; Boulder, Colorado
Jennie Spencer; CU Environmental Center; Boulder, Colorado
Kirk Koepsel; Colorado Environmental Coalition; Denver, Colorado

### MONTROSE COLORADO, SEPTEMBER 29, 1987

Melvin Thomas Gore; Delta, Colorado
Jo Gore; Delta, Colorado
Mark Pearson; Sierra Club, Rocky Mountain Chapter; Grand Junction, Colorado

96

Les Hamilton; Uncompahgre Cattle Company; Delta, Colorado

John Musser; Delta, Colorado

Walter Rule; Ouray, Colorado

Linda Delman; Montrose, Colorado *

Stuart Krebs; Montrose, Colorado

John Baldus; Western Colorado Congress and Uncompahgre Valley Association; Montrose, Colorado

Dave Seymour; Uncompahgre Livestock Association; Olathe, Colorado

Deborah Gore; Olathe, Colorado

Richard Gore; Olathe, Colorado *

(*)Denotes speakers whose comments are specifically addressed in this WEIS.

97

BLM_0005581

\*   **Speaker No. 1 - Bill Brunner, Paonia,
Colorado**

**Comment No. 1** - The plan describes the wilderness characteristic of three wilderness areas in the district, and then doesn't recommend two of them for wilderness designation. And it did not explain to my satisfaction why Camel Back and the Adobe Badlands are dropped from being proposed as a wilderness area without really saying why.

**AUTHOR'S NOTE:** In addition to this specific comment, approximately thirty-one additional oral comments were received which requested an explanation of why the BLM is not recommending the Camel Back and Adobe Badlands WSAs for wilderness designation.

The Gunnison Gorge, Camel Back, and the Adobe Badlands public lands were identified as Wilderness Study Areas (WSAs) during the Wilderness Review Process in response to Section 603 of the Federal Land Policy and Management Act of 1976 (see Chapter 1 for details). Subsequent decisions concerning wilderness recommendations for these WSAs were developed and analyzed in the RMP/EIS. The purpose of this Final Wilderness Environmental Impact Statement (WEIS) is to present these proposed recommendations for each of the WSAs, along with other management alternatives, and to discuss the potential environmental impacts which could result from either designating or not designating these areas as wilderness.

It is not the intention of either the RMP/EIS or this document to provide justification or rationalization for BLM management recommendations or decisions. The rationale for recommending designation or nondesignation will be presented in Wilderness Study Report (WSR) which will be prepared for each WSA, and made available to the public at a later date. The final decision on designation will be made by Congress, regardless of BLM's recommendations.

However, since so many of the oral and written comments questioned our non-wilderness recommendations for the Camel Back and Adobe Badlands WSAs, we have provided the following response to address these concerns.

**Response No. 1** - All three WSAs addressed in the plan meet the requirements to be studied and considered for wilderness. However, addi-

tional factors such as potential land uses, enhancement of the National Wilderness Preservation System (NWPS), actual wilderness values of the areas, impacts to other resources, and other available management options all play an important role in deciding if an area should be recommended for designation.

**Camel Back WSA:** The BLM recognizes that the Camel Back area meets the minimum wilderness criteria, but does not feel that the area's wilderness qualities, although possibly important on a local or regional scale, are significant enough to warrant inclusion in the NWPS. The Dominguez WSA (73,568 acres) and the Gunnison Gorge WSA (21,038 acres) have both been recommended as suitable for wilderness designation; both of these WSAs are within short driving distances of regional population centers so wilderness designation of the Camel Back WSA would not significantly expand wilderness opportunities in this area. The visual resources in the WSA are similar in appearance to other plateau region canyons. Roubideau Canyon has some outstanding features with moderate visual sensitivity, but nothing to really set the area apart.

Along with the important natural and scenic values, the area is also important as a wildlife habitat, for grazing purposes, and as habitat for threatened and endangered plants species. Under the Proposed Action presented in this WEIS, approximately 7,240 acres would be managed for livestock grazing and 2,482 acres would be managed primarily for wildlife habitat. Improvement of riparian habitat would be emphasized on 680 acres.

The Proposed Action also includes a recommendation that the entire Camel Back area (10,402 acres) would be closed to recreational ORV use to prevent accidental destruction of threatened and endangered plants, to protect visual qualities, and to reduce active erosion. The BLM feels that it can manage these areas for these purposes more effectively under the guidance of multiple use and still protect the area's important resource values and preserve them for future generations.

**Adobe Badlands WSA:** The BLM also recognizes that the Adobe Badlands area meets the minimum wilderness criteria, but does not feel the area's wilderness qualities are significant enough to warrant inclusion in the NWPS. Shale-type badlands are presently represented in the NWPS by the Bisti and De-na-zin wilderness

98

areas in New Mexico, both of which are similar in appearance to and within a day's driving distance of the Adobe Badlands WSA.

Although the wilderness qualities of the Adobe Badlands are not significant enough to warrant designation as wilderness, it is felt that the area's interesting landforms, threatened and endangered plants, and other values are deserving of some form of protection. The Proposed Plan presented in this WEIS recommends that 6,783 acres of the WSA which contain these values be designated as the Adobe Badlands Outstanding Natural Area and Area of Critical Environmental Concern (ONA/ACEC). In addition, approximately 1,927 acres of in the northern portion of the area would be designated a Wildlife Management Area and managed primarily to improve the quality and quantity crucial deer and elk winter range. Approximately 1,715 acres of highly erodible saline soils throughout the remainder of the area would be managed to control salinity contributions to the Colorado River system. The BLM feels that it can manage these areas for these purposes more effectively under the guidance of multiple use and still protect the area's important resource values and preserve them for future generations.

**\* Speaker No. 2 - L. T. Magnum, Mayor of the City of Delta, Delta, Colorado**

**Comment No. 2** - As you refer to in your draft of June '87 of the Uncompahgre Basin and Wilderness Technical Supplement, the City of Delta does have some water rights in the Gunnison Gorge, and I would just like to say that we have been working with Congressman Ben Nighthorse Campbell's group to resolve some problems of our water rights in that canyon to try to make it into a national park instead of a national monument. This does not address what they plan to do with the City of Delta's water rights. And we happen to known that they are valid water rights, and we don't think that you can do some of these things that you are proposing to do here until you mitigate the question of what you propose to do with our water rights.

**Response No. 2** - The BLM has dropped the discussion of water rights and hydroelectric power development in the Gunnison Gorge from analysis in this WEIS for the following reasons:

1) On July 26, 1988, the Attorney General concurred with the Department of Interior

Solicitor's opinion that Congress did not intend to reserve Federal water rights for wilderness purposes when it created the NWPS. This issue is not an environmental issue that is appropriate for analysis in this EIS, but essentially a legal matter separate from the environmental review process. For these reasons, the issue was dropped from further analysis.

2) It is BLM's projection that no hydroelectric projects would be developed in or adjacent to the Gunnison Gorge, and as such, has dropped the issue of hydroelectric power development from further analysis in this document. The BLM bases its projection on the lack of demonstrated demand for power and economic feasibility as well as the inconsistency of such projects with the purposes for which the Gunnison Gorge Recreation Lands were established. Please see Chapter 1, "Issues Analyzed," for a further discussion of "Impacts on Hydroelectric Power Development" for the Gunnison Gorge WSA.

**\* Speaker No. 3 - Stephen F. Hinchman, Paonia, Colorado**

**Comment No. 3** - I quote from your book. "Not designating the Camel Back WSA as wilderness would lead to a gradual decline of the wilderness values throughout the WSA, primarily as a result of increased ORV use."

**Response No. 3** - The Proposed Action for the Camel Back WSA in this WEIS has been changed. It now recommends that the entire Camel Back area (10,402 acres) be closed to recreational ORV use. This change was based on the needs to prevent accidental destruction of threatened and endangered plants as a result of ORV use, to protect visual qualities, and to reduce active erosion.

**\* Speaker No. 4 - Gerrie Wolf, Cedaredge, Colorado**

**Comment No. 4** - So I can't really speak too much about the Gunnison Gorge, but I do not like any more wilderness areas... and our State has an abundance of wilderness areas now.

**Response No. 4** - The Gunnison Gorge WSA contains outstanding geologic, ecologic, scenic, and wilderness values. The area provides a wilderness whitewater boating opportunity not available in most other wilderness areas. If desig-

BLM_0005583

nated, this area would complement the adjacent National Park Service designated wilderness area. There is local and regional public and political support for designation of the Gunnison Gorge as wilderness.

* **Speaker No. 5 - Robin Nicholoff, Hotchkiss, Colorado**

**Comment No. 5** - This document, however, is totalling lacking in such specificity, and consequently is probably in violation of the Federal Land Policy Management Act of 1976.

**Response No. 5** - The RMP is a general land use plan that establishes land use allocations. The BLM feels this plan provides the general objectives and guidance needed to manage the public lands. Based on the direction in the RMP, specific activity plans which will identify objectives, mitigating measures, and specific management actions will be developed for the various resources and resource uses. The Wilderness Technical Supplement (WTS) is an integral part of the RMP which specifically details wilderness evaluations, analyses, and considerations.

* **Speaker No. 6 - Bill Foreman, Boulder, Colorado**

**Comment No. 6** - One thing that was stated in the opening comments was that water quality is being impacted by the utilization in the area. It's pretty obvious that wilderness designation would help protect these areas (Camel Back and Adobe Badlands) from over-grazing and off-road vehicle use. And that's probably two of the major reasons why the soil is ending up in the water and the like, and the vegetation is being eroded.

**Response No. 6** - The Proposed Action (No Wilderness) for the Camel Back WSA in this WEIS has been changed. It now recommends that the entire Camel Back area (10,402 acres) be closed to recreational ORV use to prevent accidental destruction of threatened and endangered plants as a result of ORV use, to protect visual qualities, and to reduce active erosion.

The BLM's livestock management program is designed to eliminate overgrazing and to improve vegetation condition. No increase in grazing use is projected under any management alternative for the Camel Back area. Under both the Proposed No Wilderness and All Wilderness alter-

natives for Camel Back, livestock grazing would be precluded from March 1 through range readiness on 680 acres of riparian areas. In addition, trailing use would be limited as much as possible and confined to established trails and ways, and trailing livestock would not be permitted to bed in riparian areas. The BLM anticipates that these management actions will accelerate the improvement of riparian vegetation and prevent erosion of wet soils in the Camel Back WSA.

The Proposed Action (No Wilderness Alternative) for the Adobe Badlands recommends that approximately 6,783 acres of the area would be designated an ONA/ACEC and managed to protect the area's unique landscape, to provide for primitive, nonmotorized recreation opportunities and use, to reduce active erosion, and to protect the threatened and endangered plants which occur within its boundaries. The ONA/ACEC would also be closed to ORV use. Seasonal stipulations on ORV use and other surface-disturbing activities would protect 1,927 acres of crucial deer and elk winter range and 1,715 acres of highly erodible saline soils in the remainder of the area. No increase in grazing use is projected under any management alternative.

* **Speaker No. 7 - Karin Molliver, Boulder, Colorado**

**Comment No. 7** - In addition, in each of these areas (Camel Back and Adobe Badlands) there's an endangered species of cactus which would really benefit from wilderness designation. You stated in the management plan that whether these areas were designated wilderness or not would have no effect on the status of these species. I have a hard time imagining that ORVs and increased grazing wouldn't have an affect on these endangered species.

**Response No. 7** - The Proposed Action (No Wilderness Alternative) for the Camel Back WSA in this WEIS has been changed. It now recommends that the entire Camel Back area (10,402 acres) be closed to recreational ORV use. This change was based on the needs to prevent accidental destruction of threatened and endangered plants as a result of ORV use, to protect visual qualities, and to reduce active erosion.

The Proposed Action (No Wilderness Alternative) for the Adobe Badlands recommends that approximately 6,783 acres of the area would be designated an ONA/ACEC and managed to

100

protect the area's unique landscape, to provide for primitive, nonmotorized recreation opportunities and use, to reduce active erosion, and to protect the threatened and endangered plants which occur primarily within its boundaries. A complete inventory for threatened and endangered species would be conducted and research and monitoring studies would be established. The ONA/ACEC would also be closed to ORV use. Specific studies designed to monitor long-term trends and to detect impacts from livestock grazing and ORV use would also be established for areas outside the ONA/ACEC if determined necessary.

Public land administered by the BLM is managed for multiple use. Livestock grazing is a legitimate use of public land and can be managed to avoid detrimental effects on sensitive areas. No increase in grazing use is projected under any management alternative for the Camel Back or the Adobe Badlands WSAs.

In addition to the management actions described above, any projects or activities permitted under nondesignation that could adversely affect threatened and endangered species would be subject to applicable laws and regulations requiring clearance and mitigation and consultation with the U. S. Fish and Wildlife Service.

* **Speaker No. 8 - Allison Graves, CU Wilderness Study Group, Boulder, Colorado**

**Comment No. 8** - On the areas of critical environmental concern I would like to recommend no surface occupancy, no stock grazing, and mineral withdrawal, total mineral withdrawal.

**Response No. 8** - The text in the Final RMP/EIS and this WEIS has been changed. The Adobe Badlands ONA/ACEC, previously open for disposal of mineral materials with a seasonal (spring) restriction, would be closed to disposal. In addition, leasing conditions for oil, gas, and geothermal resources for the ONA/ACEC were changed from standard lease terms with a seasonal restriction to leasing with no surface occupancy. This change was based on public comments and management's concern for protection of the resource values within special management areas. The ONA/ACEC would also be closed to coal leasing. Although the entire Adobe Badlands area would be open to mineral entry and location, there are no known mineral deposits within the ONA/ACEC. Due to the low potential

for mineral development, no exploration or development is anticipated.

Public land administered by the BLM is managed for multiple use. Livestock grazing is a legitimate use of public land and can be managed to avoid detrimental effects on sensitive areas. There are currently no range facilities within the ONA/ACEC, and no projects are proposed in the RMP. There would be no change in grazing use on the grazing allotments within the ONA/ACEC.

* **Speaker No. 9 - Roz McClellan, Boulder, Colorado**

**Comment No. 9** - But I think opening them (Camel Back and the Adobe Badlands) up to ORV (use) is just going to outweigh any advantages of being able to improve vegetation.

**Response No. 9** - Under the Proposed Management Plan, approximately 6,783 acres within the Adobe Badlands WSA and the entire 10,402 acres of the Camel Back WSA would be closed to ORV use even though they were not recommended for wilderness designation. Seasonal stipulations on ORV use and other surfacedisturbing activities would protect soil and vegetation conditions on the remaining 3,642 acres of the Adobe Badlands.

* **Speaker No. 10 - Linda Delman, Montrose, Colorado**

**Comment No. 10** - And I think that it would be a wonderful opportunity to preserve some of these archeological sites, or at least mitigate the damages. If we had more of these wilderness areas in this kind of environment, like Adobe Badlands and Camel Back, because with the lack of motorized vehicles I think we have an opportunity to at least preserve what's there long enough to survey and see what it is.

**Response No. 10** - Cultural and paleontological resources are protected by numerous laws and regulations. Present management of the only known significant site in the Camel Back WSA is in compliance with eligibility requirements of the National Historic Preservation Act (NHPA). There are presently no known cultural or paleontological sites in the Adobes Badlands WSA. Avoidance or mitigation measures would be implemented prior to authorizing any management action or to mitigate adverse effects to cultural resources caused by surface-disturbing activities

101

BLM_0005585

such as ORV use.  In addition, approximately 6,783 acres of the Adobe Badlands ONA/ACEC and the entire 10,402 acres of the Camel Back WSA would be closed to ORV use even though they were not recommended for wilderness designation.

* **Speaker No. 11 - Richard Gore, Olathe, Colorado**

**Comment No. 11** - And I'm really upset about the 35 percent limited use on the riparian, and the (reduction of) 200 AUMs, that would just mean the drift over of our cattle to get to our summer grazing where we spend four and a half months.  Them cattle generate a lot of income and stuff for the towns of Delta and Montrose.

**Response No. 11 -**

**AUTHOR'S NOTE:** Discussions of livestock management actions for the three WSAs which were presented in the RMP/EIS and WTS have been revised in this WEIS.  After additional internal BLM review, it was determined that livestock grazing and management in the Gunnison Gorge and Adobe Badlands WSAs would not appreciably change as a result of proposed management practices under any of the alternatives.  Consequently, the issue of impacts on livestock management in the Gunnison Gorge and the Adobe Badlands WSAs has been dropped from further analysis in this WEIS.  Discussions of livestock management alternatives and actions for the Camel Back WSA have also been modified, and no longer propose a reduction in the amount of AUMs currently allotted within the area under any alternative.  (Please see Chapter 1, Changes From the Draft RMP/EIS, Draft WTS, and Final RMP/EIS for details regarding these revisions).

Under both the No Wilderness and the All Wilderness alternatives for the Camel Back WSA, the limit of 35 percent utilization has been proposed as a general guideline for the improvement of vegetation in riparian areas and would only be implemented when other methods are determined unsuccessful.  A reduction of 200 AUMs is not a proposed management action, but rather an anticipated impact which could result from implementing a 35 percent utilization limit.  The BLM has a substantial amount of information which supports even more severe restrictions than those in the Proposed Action.  However, based on current conditions of riparian areas, it is felt that substantial improvement would be ob-

tained through other methods (i.e., changing season of use, limiting trailing use, etc.) and that the 35 percent utilization limit would probably never be implemented.

## PART 2 - WRITTEN COMMENTS AND RESPONSES

In addition to the oral testimony provided by the speakers at the public hearings, one hundred seventy-three (173) persons, groups, or agencies submitted written comments on the Draft RMP/EIS.  Approximately one hundred and thirty (130) of these letters contained comments relating to wilderness issues.

All of the comment letters that were received from federal, state, and local government agencies and from interest groups and organizations have been reproduced in the pages that follow, but we have responded in this document only to those comments that are related to wilderness issues.  Table 5-2 lists these government agencies and organizations, and gives the number of their comment letter.

As was done with the hearing transcripts, only those letters from individuals which contain comments on the adequacy of the RMP/EIS or the WTS, or address specific wilderness management issues or impacts, have been reprinted in this document.  Table 5-3 identifies these individuals and gives the number of their comment letter.

Table 5-4 lists the names of fifty-four individuals from whom we received letters which requested an explanation of the BLM's rationale for not recommending the Camel Back and the Adobe Badlands WSAs for wilderness designation.  These letters all cited the wilderness characteristics and the lack of resource conflicts in the WSAs as justification for wilderness designation.  However, since they did not contain any specific comments on wilderness related issues or impacts, they have not been individually addressed in this document.  Instead, a representative sample of these letters has been included, as Comment Letter No. 45, and a response provided.

An additional forty-eight letters were received from persons that just stated a preference either for or against designation of the WSAs, or asked that the BLM reconsider their recommendations for a specific WSA.  The majority of these letters

BLM_0005586

were form letters with multiple signatures. Since these letters did not contain any specific comments on wilderness impacts or give supportive statements for their preference, they have not been individually addressed in this document. Instead, representative samples of these letters either for or against wilderness designation have been included, as Comment Letters No. 46, 47, and 48, at the end of this section.

**Table 5-2**

**FEDERAL, STATE, LOCAL GOVERNMENT AGENCIES, AND INTERESTS GROUPS AND ORGANIZATIONS WHO SUBMITTED WRITTEN COMMENTS ON THE WILDERNESS TECHNICAL SUPPLEMENT**

| COMMENT LETTER NUMBER | COMMENTOR |
|---|---|
| 1 | Bureau of Reclamation; Upper Colorado Regional Office; Salt Lake City, Utah |
| 2 | U.S. Geological Survey; Assistant Director for Engineering Geology; Reston, Virginia |
| 3 | Bureau of Mines; Intermountain Field Operations Center; Denver, Colorado |
| 4 | National Park Service; Rocky Mountain Region; Denver, Colorado |
| 5 | U.S. Forest Service; Grand Mesa-Uncompahgre-Gunnison National Forests; Delta, Colorado |
| 6 | U.S. Air Force; Regional Civil Engineer, Central Region; Dallas, Texas |
| 7 | U.S. Fish and Wildlife Service; Fish and Wildlife Enhancement; Grand Junction, Colorado |
| 8 | Environmental Protection Agency; Region 8; Denver, Colorado |
| 9 | Colorado Department of Natural Resources; Office of the Executive Director; Denver, Colorado |
| 10 | City of Delta; John R. Kappa, City Attorney; Montrose, Colorado |
| 11 | BLM Montrose District Advisory Council; Clay V. Bader, Chairman; Montrose, Colorado |
| 12 | BLM Montrose District Grazing Advisory Board; James Suckla, Chairman; Cortez, Colorado |
| 13 | Sierra Club Southwest Office; John Bradley; Boulder, Colorado |
| 14 | Colorado Mountain Club; Babs Schmerler; Montrose, Colorado |
| 15 | Colorado Archaeological Society, Chipeta Chapter; Bill Harris; Montrose, Colorado |
| 16 | Colorado Environmental Coalition; Kirk Koepsel; Denver, Colorado |

103

BLM_0005587

**Table 5-2 (continued)**

| COMMENT LETTER NUMBER | COMMENTOR |
|---|---|
| 17 | Rocky Mountain Oil and Gas Association; Jess Cooper; Denver, Colorado |
| 18 | Minerals Exploration Coalition; John D. Wells; Lakewood, Colorado |
| 19 | Audubon Society of Western Colorado; Richard Levad; Grand Junction, Colorado |
| 20 | Sierra Club, Rocky Mountain Chapter; Kirk Cunningham; Boulder, Colorado |
| 21 | Delta County Livestock Association; John Botti; Crawford, Colorado |
| 22 | Sierra Club, Rocky Mountain Chapter; Mark Pearson; Grand Junction, Colorado |
| 23 | Colorado Native Plant Society; Susan S. Martin; Fort Collins, Colorado |
| 24 | National Parks and Conservation Association; Terri Martin; Salt Lake City, Utah |
| 25 | Far Flung Adventures; Tracy Blashill; Ouray, Colorado |
| 26 | Richards and Richards; Shawn Mock; Nucla, Colorado |
| 27 | Richards and Richards; Shawn Mock; Nucla, Colorado |
| 28 | Campbell Cattle Company; David L. and Helen A. Campbell; Delta, Colorado |
| 29 | Colorado Westmoreland, Inc.; Environmental Specialist; Paonia, Colorado |
| 30 | Musser Ranches; John A. Musser; Delta, Colorado |
| 31 | Colorado Ute Electric Association, Inc.; Environmental Services; Montrose, Colorado |
| 32 | Chevron U.S.A., Inc.; Legislative and Regulatory Affairs; Denver, Colorado |

BLM_0005588

**TABLE 5-3**

## PERSONS WHOSE COMMENT LETTERS APPEAR IN THIS WEIS

| COMMENT LETTER NUMBER | COMMENTOR |
|---|---|
| 33 | Jack Musser; Delta, Colorado |
| 34 | Marv and Judy Kieca; Castle Rock, Colorado |
| 35 | Dan Roberts; Grand Junction, Colorado |
| 36 | Gordon Rodda; Knoxville, Tennessee |
| 37 | Josephine M. Gore; Delta, Colorado |
| 38 | Richard W. and Deborah R. Gore; Olathe, Colorado |
| 39 | Kate Palmer; Boulder, Colorado |
| 40 | Carl E. Conner; Grand Junction, Colorado |
| 41 | Danni L. Langdon; Grand Junction, Colorado |
| 42 | Richard W. and Deborah R. Gore; Olathe, Colorado |
| 43 | Lee and Helen Tunget; Olathe, Colorado |
| 44 | Mrs. Robert Gray; Delta, Colorado |
| 45 | Susan Detweiler; Boulder, Colorado |
| 46 | Dr. T. Scott; Fort Collins, Colorado |
| 47 | Lorna F. Orth, et. al.; Olathe, Colorado |
| 48 | Michael G. Goodman, et. al.; Olathe, Montrose, Delta, and Grand Junction, Colorado |

105

BLM_0005589

TABLE 5-4

PERSONS WHOSE LETTERS REQUESTED BLM'S RATIONALE
FOR NOT PROPOSING CAMEL BACK AND ADOBE BADLANDS
FOR WILDERNESS DESIGNATION *

*NOTE:  A representative sample of these letters has been included as Comment Letter No. 45.

Chuck Shepard; Mancos, Colorado
Everett V. Carter; Cedaredge, Colorado
Kurt Johnson; Boulder, Colorado
Nina Johnson; Boulder, Colorado
Claire C. Poole, Psy.D.; Denver, Colorado
John Spezia; Steamboat Springs, Colorado
Tony Merten; Lakewood, Colorado
John Czarnecki; Lakewood, Colorado
Richard Kilbury; Albuquerque, New Mexico
William A. Coates; Cascade, Colorado
Jon Tourville; Colorado Springs, Colorado
Chris Seitz; Salina, Kansas
Janna J. Harper; Black Hawk, Colorado
Julie M. Emerson; Littleton, Colorado
Chuck Worley; Cedaredge, Colorado
Eric D. and Ellen B. Braaten; Denver, Colorado
Harry Kuperberg; Boulder, Colorado
Roger Hedlund; Winter Park, Colorado
Mary Sealing; Fruita, Colorado
Timothy J. Cunningham; Boulder, Colorado
Mark Meeks; Denver, Colorado
Jane Schleimer; Boulder, Colorado
Mike Campbell; Oak Creek, Colorado
Edward G. Talbot; Arvada, Colorado
Andrew McConkey; Boulder, Colorado
Nic Korte; Grand Junction, Colorado
Diane Kelly; Evergreen, Colorado
L. Yael Stein; Gunnison, Colorado
Carl Will; Gardner, Colorado
Suzanne Fairchild; Arvada, Colorado
David Rubin; Lynnfield, Massachusetts
J. Zevalking; NO ADDRESS AVAILABLE
Lynda Poff; Phillipsburg, New Jersey
Marc Kriewaldt; Boulder, Colorado
Jessica Wachtel; Boulder, Colorado
David W. Ownby; Boulder, Colorado
Penelope Crocker; Grand Junction, Colorado
S.J. Clark; Niwot, Colorado

106

BLM_0005590

Table 5-4 (continued)

Scott Hatfield; Boulder, Colorado
Laurie Thayer; Boulder, Colorado
Sarah Crum; Collbran, Colorado
Kerry Whitford; Boulder, Colorado
Margaret Orjias; Olathe, Colorado
Rodney Wilson; Cortez, Colorado
Patrick Muckleroy; Gunnison, Colorado
Michael G. Figgs; Boulder, Colorado
Harry B. Vaughan; Cedaredge, Colorado
Laura and Ray Wynfield; Lafayette, Colorado
Lawrence A. Papp; Parker, Colorado
Susan S. Martin, Ph.D.; Fort Collins,
Susan Detweiler; Boulder, Colorado
Lewis McCool; Durango, Colorado
Kathy Hands; Boulder, Colorado
Anne Ellegood; Boulder, Colorado

107

BLM_0005591

**Table 5-5**

## PERSONS WHOSE LETTERS STATED A PREFERENCE
## FOR OR AGAINST WILDERNESS DESIGNATION OF THE WSAs

The following persons requested that the BLM propose the Camel Back, Adobe Badlands, and the Gunnison Gorge for wilderness designation.  A representative sample of these letters has been included as Comment Letter No. 46.

Jan Hose; Aspen, Colorado
Michele K. Whitaker; Wheatridge, Colorado
Paul E. and Virginia D. Lappala; Carbondale, Colorado
Greg McKennis; Glenwood Springs, Colorado
Charla Hathaway Palmer; Steamboat Springs, Colorado
W. Rodney McKinnon; Montrose,
Dr. Thomas Scott; Fort Collins, Colorado
William J. Tembrock et al.; Hotchkiss, Colorado
Victoria and William Coe; Durango, Colorado
Jon Sirkis; Boulder, Colorado
Lorraine Lane; Denver, Colorado
Harley Orahood; Grand Junction, Colorado
Bruce Berger; Aspen, Colorado
Mark N. Williams; Grand Junction, Colorado
Jack R. Williams; Florissant, Colorado
John M. Kuzmiak; Pueblo, Colorado
Peter Schertz; Gardner, Colorado
Mark W. Hamrick; Boulder, Colorado
Thomas Keyes; Denver, Colorado
Betty Nickerson Elwell; LaVeta, Colorado
Gerd Von Glinsk; Eldorado Springs, Colorado
Margot Smit; Denver, Colorado
Scott Robinson; Boulder, Colorado
Dave Hamilton; LaVeta, Colorado
Henry G. Wright; Durango, Colorado
Eric Reische; Boulder, Colorado
Eleanor Von Bargen; Denver, Colorado
Bella Conner; Grand Junction, Colorado
Myrna P. Steinkamp, Ph.D.; Fort Collins, Colorado
Bryan R. Jones; Boulder, Colorado

108

BLM_0005592

**Table 5-5 (continued)**

The following persons agreed with the BLM's No Wilderness recommendation for the Camel Back and Adobe Badlands WSAs, and the All Wilderness recommendation for the Gunnison Gorge WSA. An asterisk (*) indicates a form letter with multiple signatures. The number in parentheses indicates the total number of signatures which accompanied these letters. A representative sample of the form letter has been included as Comment Letter No. 47.

> M. Thomas Gore, D.V.M.; Delta, Colorado
> George C. Calhoun; Delta, Colorado
> * Kenneth E. and Cheri W. Pettis; Olathe, Colorado (2)
> * Richard and Gary Dickerson; Olathe, Colorado (2)
> * Leonard L. and Helen M. Burch; Olathe, Colorado (2)
> * Karla Tschoepe; Paonia, Colorado (1)
> * Bill Campbell; Delta, Colorado (1)
> * Lorna F. Orth et al.; Olathe, Colorado (3)
> * Wanda and Larry Boyd; Delta, Colorado

The following persons agreed with the BLM's No Wilderness recommendation for the Camel Back and Adobes Badlands WSAs, but opposed the All Wilderness recommendation for the Gunnison Gorge. An asterisk (*) indicates a form letter with multiple signatures. The number in parentheses indicates the total number of signatures which accompanied these letters. A representative sample of the form letter has been included as Comment Letter No. 48.

> * Mr. and Mrs. William Byers et. al; Delta, Colorado (3)
> * Alford L. Gray and Patricia Harris; (2)
> * Al Hahn; Delta, Colorado (1)
> * Gary W. Cooper; Montrose, Colorado (1)
> * Kale and Shirley Deutsch; Delta, Colorado (2)
> * Melvin K. Beach; Delta, Colorado (1)
> * Myles Standish et al.; Olathe, Colorado (4)
> * Michael G. Goodman et al.; Olathe, Colorado (15)
> * Lew and Margene Oswald; Broomfield and Margene Oswald; Broomfield, Colorado (2)

109



United States Department of the Interior

BUREAU OF RECLAMATION
UPPER COLORADO REGIONAL OFFICE
P.O. BOX 11568
SALT LAKE CITY, UTAH 84147

IN REPLY
REFER TO: UC-152

OCT 14 1987

Memorandum

To:    Mr. Robert E. Vecchia, RMP Team Leader, Bureau of Land Management,
       Uncompahgre Basin Resource Area, 2505 South Townsend Avenue,
       Montrose, Colorado  81401

From:  Regional Director
       Bureau of Reclamation

Subject:  Review of Bureau of Land Management Draft Environmental Impact
          Statement for Uncompahgre Basin Resource Management Plan and
          Wilderness Technical Supplement (DES 87/20)

Our office has reviewed the subject documents and has prepared the attached
comments.

Attachment

---

Comments on Uncompahgre Basin Resource
Management Plan and EIS

General

Page 2-10:  Recent unpublished studies associated with the Uncompahgre
            Hydropower Project indicate that the range and population of the
            endangered plant Eriogonum pelinophilum, may be greater than
            indicated in Table 2-6.  When these studies are published we will
            furnish the information to the Bureau Land Management (BLM).

Page 2-14:  In Table 2-11 it is not clear what area "Gunnison River No. 3"
            refers to.  The same comment applies to the terms "South Fork
            Gunnison River No.1 and No. 2" and "Uncompahgre River No. 4".

Page 2-21:  Withdrawals:  The management of the power site withdrawals is
            currently handled by BLM on Crystal and Dominguez.  The Crystal
            power site withdrawal should be turned over to the Bureau of
            Reclamation (Reclamation).  The Dominguez power site withdrawal
            should be kept by BLM for future development as Reclamation is
            relinquishing its withdrawals on the Dominguez project at this
            time.  If there are any questions on withdrawals or rights-of-way,
            please contact Steve Schieswohl or Bill Ellison in our Grand
            Junction Projects Office at FTS 322-9217.

Page 3-2:  Off-Road Vehicle Designations:  The off-road vehicle designation
           for all Reclamation lands (withdrawn or otherwise) is that the
           lands are closed to off-road use and off-road vehicles unless
           specifically opened.  It would enhance management of Reclamation
           project withdrawals if they were so designated on BLM maps.

Management Alternatives

Continuation of Current Management Alternatives
(Alternative "A")

Page 3-3:  Livestock Grazing:  Grazing permits that involve withdrawn lands
           should be reviewed and in most cases adjusted to restrict grazing
           on developed Reclamation facilities and recreation areas.  This
           should be handled on a case by case basis.

Map "A":

Considerations below are listed separately by Reclamation project name.  Any
proposed disposal of lands that are withdrawn by Reclamation and Reclamation
intends to retain under the Withdrawal Review program, should not be disposed
of unless the BLM wants to dispose of them to Reclamation.  If the disposal is
to Reclamation, absolute fee title would be required to protect project
features from mining activities.  Most comments have been accompanied by the
proper legal description.  In some cases, however, we have not included a
description because of the length.  Descriptions for all Reclamation lands are
available from Reclamation Withdrawal Review reports or from Reclamation's

110

1

Grand Junction Projects Office.

A1.   The Reclamation withdrawals between the Black Canyon and Curecanti area
      in Sections 4, 9, 10, 11, 14, and 23, T49N, R7W, are not properly marked
      on the map.  These lands were withdrawn for the Uncompahgre Project and
      the Aspinall Storage Unit of the Colorado River Storage Project (CRSP).
      The withdrawal in Sections 10, 11, 14, and 23 are for the CRSP and the
      withdrawals in Sections 4 and 9 are for the Uncompahgre Project.

A2.   The Reclamation withdrawal on Fruitgrowers Reservoir should be shown to
      include the water surface.  This withdrawal is not subject to
      relinquishment.  Reclamation also has title to the reservoir easement at
      Fruitgrowers Reservoir.

A3.   The 40 acres in the NW¼SW¼ of Section 34, T46N, R8W should also be shown
      as withdrawn for the Dallas Creek Project.

A4.   On the Paonia Project, lands are withdrawn in the SE¼NE¼NE¼ of Section
      18, T13S, R90W, but are not shown as withdrawn.  In the SE¼NE¼E¼ and the
      NE¼NE¼SE¼ of Section 13, T14S, R93W, the withdrawal is not plotted
      correctly.  The tracts identified for disposal in T14S, R93W, Section 22;
      and T14S, R92W, Sections 3 and 17, are not subject to relinquishment and
      disposal is not compatible with project purposes.

      The SW¼SW¼ of Section 3, T14S, R91W, is questionable as to being public
      land.  Reclamation acquired an easement from the private owner
      (Overman, H.E.) in about 1950, and if the land is in fact private, the
      RMP maps need to be changed.  If the land is public, Reclamation will be
      requesting a linear withdrawal to match the dimensions of our existing
      easement.  A withdrawal would be consistent with our other land status
      agreements with the BLM on the Fire Mountain Canal.

A5.   As both the Dominguez and Fruitland Mesa Projects are being proposed for
      relinquishment in their entirety, we did not review the plotting or
      disposal recommendations for parcels withdrawn for these projects.

A6.   The withdrawals for the Uncompahgre Project need to be corrected on the
      map as follows:

      The following parcels should be shown as withdrawn:

      The NE¼NE¼SE¼ of Section 13, in T15S, R95W, (it may be shown this way,
      but the map scale makes it hard to see); the 5 acre tract of the
      SW¼SW¼NW¼SW¼, the SE¼SE¼NE¼SW¼, and the NW¼SW¼NW¼SE¼ of
      Section 36, T15S, R95W; the 10 acre tract of the SW¼NE¼SW¼ of Section 30,
      T51N, R7W; the 15 acres of the E2N2E2NE4SW4 and the E2E2NE4SW4 of Section
      36 of T50N, R11W.  Also, the lands next to the inside the Black Canyon
      National Monument need to be mentioned in item A1 above.

Certain withdrawals on the South, West, Montrose and Delta canals were
inadvertently relinquished without Reclamation retaining a linear withdrawal
for project facilities.  Measures to correct this problem are being worked on
at this time.  In the interim, any land disposals should retain a linear
withdrawal for all structures, canals, diversion dams, large laterals such as

---

1

the CQ lateral on the Montrose and Delta system, or other major facilities,
and right-of-way for all laterals.

PRODUCTION ALTERNATIVE
(ALTERNATIVE "B")

All recommendations made under the Withdrawal Review are to remain the same
with the exception of approximately 130 acres at the far west end of the
Paonia State Recreation Area which Reclamation is in the process of proposing
for relinquishment.

The Dominguez and Fruitland Mesa withdrawal reviews are proposed to be
completed this fiscal year.

Visual resource objectives for all Reclamation recreation areas including the
entire proposed Curecanti National Recreation Area; the Ridgway, Crawford and
Paonia State Recreation Areas; and the Fruitgrowers area should all be high
scenic quality and high sensitivity.  The proposed Curecanti National
Recreation Area, Paonia, and Fruitgrowers areas should be added to Table 2-16.

The withdrawals section on page 2-21 indicates that Reclamation withdrawals
segregate the lands from the general mining laws.  It was the intent and
practice of all Reclamation withdrawals to segregate the lands from all of the
public entry laws.  Under the FLPMA Withdrawal Review program, Reclamation is
relinquishing all but the bare necessity of its withdrawn lands, and those
lands being retained will be managed with the intent to restrict all surface
occupancies that are contrary to Reclamation project purposes.

The withdrawal table on page 2-22 should be changed to include all Reclamation
purposes such as recreation, flood control, soil and moisture conservation, or
state only "Reclamation purposes".  As it now reads it may be construed to
mean the listed purposes are the only Reclamation purposes and this is not
true.

Map "B"

Considerations below are listed separately by Reclamation Project name.  Any
proposed disposal of lands that are withdrawn by Reclamation and that
Reclamation intends to retain under the Withdrawal Review program, should not
be disposed of unless the BLM wants to dispose of them to Reclamation.  If the
disposal is to Reclamation, absolute fee title would be required to protect
project features from mining activities.

B1.   The Reclamation withdrawals between the Black Canyon and Curecanti areas
      in Section 4, 9, 10, 11, 14, and 23, T49N, R7W, are not properly marked
      on the map.  These lands were withdrawn for the Uncompahgre Project and
      the Aspinall Storage Unit of the CRSP.  The withdrawal in Sections 10,
      11, 14, and 23 are for the CRSP and the withdrawals in Sections 4 and 9
      are for the Uncompahgre Project.  The portion of Section 8 that is
      proposed for disposal is planned  for relinquishment and is therefore
      approved for disposal.

BLM_0005595

1

B2.   Comments same as A2.

B3.   The 40 acres in the NW4SW4 of Section 34, T46N, R8W should also be shown
      as withdrawn for the Dallas Creek Project.

      Lands shown for disposal in T47N, R8W in Ouray County north of Cow Creek
      are important big game winter range  and should not be disposed of unless
      to the Colorado Division of Wildlife.  These lands are in the vicinity of
      lands acquired for wildlife habitat replacement under the Dallas Creek
      Project.

B4.   Comments same as A4.  Also, the disposal recommendations for the
      following parcels are not compatible with project purposes unless a
      linear withdrawal is first granted: T14S, R92W, Section 3, NE4SE4; T14S,
      R92W, Section 17, N2SW4NW4; and T14S, R93W, Section 22, about 55 acres.

B5.   Comments same as A5.

B6.   Comments same as A6.  In addition, the recommendations for disposal on
      the following tracts should be changed to retention:
      The SE4SW4 of Section 26, T49N, R8W; the NW4SW4 of Section 11, T48N,
      R10W; the two tracts in Section 12, T48N, R8W; and the apparent disposal
      (the lands to the east are actually marked) of Section 36, T50N, R11W.

CONSERVATION ALTERNATIVE

MAP "C"

Considerations below are listed separately by Reclamation Project name. Any
proposed disposal of lands that are withdrawn and that Reclamation intends to
retain under the Withdrawal Review program, should not be disposed of unless
the BLM wants to dispose of them to Reclamation.  If the disposal is to
Reclamation, absolute fee title would be required to protect project features
from mining activities.

C1.   Comments same as A1.

C2.   Comments same as A2.

C3.   The 40 acres in the NW4SW4 of Section 34, T46N, R8W should also be shown
      as withdrawn for the Dallas Creek Project.

C4.   Comments same as A4.

C5.   Comments same as A5.

C6.   Comments same as A6.

---

1

PREFERRED ALTERNATIVE

Map "D":

Considerations below are listed separately by Reclamation Project name.  Any
proposed disposal of lands that are withdrawn and that Reclamation intends to
retain under the Withdrawal Review program, should not be disposed of unless
the BLM wants to dispose of them to Reclamation.  If the disposal is to
Reclamation, absolute fee title would be required to protect project features
from mining activities.

D1.   Comments same as A1

D2.   Comments same as A2.

D3.   Comments same as B3.

D4.   Comments same as B4.

D5.   Comments same as A5.

D6.   Comments same as B6.

                    Comments on Uncompahgre Basin
                    Wilderness Technical Supplement

1  Designation of the Gunnison Gorge Wilderness Study Area as Wilderness could
   affect certain management practices and these effects should be discussed in
   the final EIS.

   First, helicopters, small airplanes, and outboard motors are used as inventory
   tools by the Colorado Division of Wildlife for managing the Gunnison River
   fishery and waterfowl populations.  Secondly, rescue operations are
   occasionally conducted in the canyon by helicopter.

2  On page 4-13 the minimum flow that Reclamation attempts to maintain is
   300 cfs rather than 200 cfs.

   On page 4-13 it is stated that there is approximately 750,000 acre-feet of
   water available from Blue Mesa Reservoir.  The correct figure is 50,000-60,000
   acre-feet annually.

---

## Responses to Letter No. 1

1. The use of mechanized equipment in a wilderness area is not necessarily
precluded by designation, but is subject to the conditions set forth in the
BLM's Wilderness Management Policy (Chapter III, Section K, 4) which state
that "mechanized or motorized equipment may be used for wilderness
research, and other wilderness-enhancing purposes where no other
alternatives exist and where such use is the minimum necessary for
administration of the area as wilderness and will not degrade the area's
wilderness character. Instances could include wildlife transplants or fish
stocking by the State Division of Wildlife (DOW). State Director approval
is required." These situations would be specifically addressed in the wilderness
management plan that would be developed for designated wilderness areas.
The Policy also allows for the use of motorized and mechanical equipment or
transport when "an emergency condition exists which involves the health
and safety of visitors."

Chapter 2 identifies the occasional use of helicopters by the BLM and DOW
in the Gunnison Gorge for wildlife management, and analyzes the effects
of that use in Chapter 4.

2. Thank you for your comments. These errors have been corrected.

BLM_0005596



2

**United States Department of the Interior**
GEOLOGICAL SURVEY
RESTON, VA. 22092

In Reply Refer To:
WGS-Mail Stop 423
DES 87/20                                    OCT 19 1987

Memorandum

To:      Bureau of Land Management, Uncompahgre Basin Resource Area,
         Montrose, Colorado

From:    Assistant Director for Engineering Geology

Subject: Review of draft management plan/environmental statement for the
         Uncompahgre Basin planning area, Colorado

We have reviewed the statement as requested in the letter included in the
document.

The analysis should indicate criteria to be used in permitting mining and
disposal of mineral materials on alluvial valley floors and flood plains.
Mitigation of related impacts should be addressed.  The analyses of cumu-
lative impacts should include long-term effects of aquifer mining and
accidental release of saline formation waters into freshwater aquifers.
Such contamination may occur long after oil and gas test and production
wells are abandoned as well as during operations such as hydraulic fracturing,
injection of formation waters, and enhanced recovery.  Ground-water impacts
to be avoided during secondary and/or enhanced recovery methods involving
injection and well pressurizing should be included in the analysis.

                                   James F. Devine

Copy to:  District Chief, WRD, Lakewood, Colorado

**Response to Letter No. 2**
Thank you for your comments.



3

**United States Department of the Interior**
BUREAU OF MINES
P. O. BOX 25086
BUILDING 20, DENVER FEDERAL CENTER
DENVER, COLORADO 80225
Intermountain Field Operations Center

October 21, 1987

Memorandum

To:      Robert E. Vecchia, RMP Team Leader, Bureau of Land Management,
         Uncompahgre Basin Resource Area, 2505 South Townsend Avenue,
         Montrose, Colorado 81401

From:    Chief, Intermountain Field Operations Center

Subject: Review of the Draft Resource Management Plan/Environmental Impact
         Statement for the Uncompahgre Basin Resource Area, Delta, Gunnison,
         Mesa, Montrose, and Ouray Counties, Colorado

As requested, Bureau of Mines personnel have reviewed the subject documents
regarding proposed management of 483,077 acres of Federal land and 755,923
acres of subsurface federal mineral estate, including three wilderness study
areas (WSA's) (41,865 acres), in western Colorado.  Our comments pertain to
the discussion of mineral resources and assessment of impacts under the plan.

Four multiple-use management alternatives are presented in the DEIS.  Differ-
ences between the four proposals vary considerably in the amount of acreage
open to mineral entry and to oil and gas, coal, and geothermal leasing.  From
a mineral-development standpoint, the Production Alternative is the more
favorable of the plans described.  In comparison to the Preferred Alternative,
it makes about 30,000 more acres available to mineral entry and about 196,000
more to oil and gas and geothermal leasing; the acreage open to coal leasing
is the same under both alternatives.

1 | In the "Affected Environment" section, the discussion of oil, gas, and geo-
thermal resources (p. 2-3 of the main document) assumes that the lack of
past or present production of these commodities implies a low probability for
future discoveries.  We believe that such an assumption may not be valid
because seismic work and exploration drilling have been limited in the resource
area.  We suggest the Affected Environment Section of subsequent versions
of the document be modified to better explain the relationship between the
assumption of low productivity of future discoveries and the lack of explora-
tion activity in the area.

**Response to Letter No. 3**
1. Thank you for your comment. The "Affected Environment" (Chapter 3) discussion
   on mineral resources for each of the WSAs has been modified to better reflect
   this relationship.

BLM_0005597

3

The geology and mineral resource descriptions in the Wilderness Technical Supplement tend to discuss only the surface geology of the WSA's. We believe that formations at depth should be discussed as well. For example, the Adobe Badlands WSA is underlain by the Morrison and Chinle Formations, both of which are major hosts for uranium deposits in other areas. Uranium, however, is not discussed in the Mineral Resources section (p. 3-10). We believe that the lack of a discussion of the uranium potential in the Morrison and Chinle Formations is an oversight that should be corrected in future versions of the document.

**2**

The Bureau of Mines currently is conducting a mineral land assessment study of Gunnison Gorge WSA, but has no current study of either Adobe Badlands WSA or Camel Back WSA.

**3**

Thank you for the opportunity to comment on this document.

T. William Cochran

2. In response to your comment, a discussion of the uranium potential in the Morrison and Chinle Formations has been added to the Mineral Resources section for the Adobe Badlands in Chapter 3.

3. The mineral resources description for the Gunnison Gorge has been updated to reflect the data presented in your mineral land assessment study, (U. S. Geological Survey Bulletin 1715, "Mineral Resources of the Gunnison Gorge Wilderness Study Area, Montrose and Delta Counties, Colorado"). Thank you for this comprehensive and informative document.

2

---



**4**

United States Department of the Interior

NATIONAL PARK SERVICE
ROCKY MOUNTAIN REGIONAL OFFICE
11795 W. Alameda Parkway
P.O. Box 25287
Denver, Colorado 80225-0287

IN REPLY REFER TO:

L7619 (RMR-PP)

OCT 29 1987

Memorandum

To:        Robert E. Vecchia, Resource Management Plan Team Leader,
           Bureau of Land Management, Montrose, Colorado

From:      Associate Regional Director, Planning and Resource Preservation,
           Rocky Mountain Region

Subject:   Review of Draft Uncompahgre Basin Resource Management Plan/
           Environmental Impact Statement and Draft Uncompahgre Basin
           Planning Area Wilderness Technical Supplement        (DE: 87/20)

Our comments on the subject draft Resource Management Plan/Environmental Impact Statement (RMP/EIS) follow. Review of the document was made relatively easy due to several factors:

1. The draft RMP/EIS is very well written.

2. The number of alternatives (four) and the orderly presentation of material made it convenient to compare impacts of alternatives.

3. The three alternatives other than the proposed plan are analyzed as thoroughly as the Preferred Alternative.

We recognize the Bureau of Land Management's (BLM) multiple-use approach to land management, but we would like to see more concern for National Park Service (NPS) interests in specific portions of the Preferred Alternative.

**1**

1. The Preferred Alternative appears to reflect a concern for wilderness values—both on BLM-administered lands and on lands administered by the NPS. We note that the Gunnison Gorge Wilderness Study Area (WSA) would be recommended for designation as wilderness; the Adobe Badlands WSA would not be recommended for designation, but there would be restrictions on surface-disturbing activities and no off-road vehicle use there. However, we believe that the Adobe Badlands WSA is deserving of wilderness status and should not be rejected for designation because of plans to implement salinity control measures. Efforts to reduce salinity should be concentrated in the agricultural areas where increased salt loading is caused by agricultural practices.

2. Some BLM-administered lands near the northeast and northwest boundaries of Black Canyon of the Gunnison National Monument are designated as potential exchange tracts under the Preferred Alternative. As the draft RMP/EIS is

Response to Letter No. 4

1. The BLM's Proposed Action for the Adobe Badlands WSA does not contain any specific salinity control measures which would be significantly impacted by wilderness designation or nondesignation. Under the Proposed Action, 6,783 acres would be designated an ONA/ACEC, 1,927 acres would be managed primarily as wildlife habitat, and 1,715 acres would be managed as a salinity control area. The BLM feels that it can manage these areas for these purposes effectively under the guidance of multiple use and still protect the area's important resource values and preserve them for future generations.



BLM_0005598

4

2

revised, we would like to see these lands either deleted as potential exchange tracts or have provision for scenic easement language that would ride with the deed(s) conveying the exchange tracts. These BLM-administered lands form an important backdrop to the viewsheds looking north from the monument's south rim.

3. The four land status maps included with the draft RMP/EIS, after page 43 of the Appendix, need to be revised to show correct NPS boundaries. The maps show the Black Canyon of the Gunnison National Monument boundaries as they existed years ago; the monument boundaries have since expanded. The maps fail to show the considerable portion of Curecanti National Recreation Area that occurs in the Uncompahgre Basin Planning Area. As a good reference for correcting the maps, we recommend the BLM Edition (1985) of the Paonia Quadrangle topographic map.

Thank you for the opportunity to review the generally well-prepared draft RMP/EIS.

Richard A. Strait

---



United States
Department of
Agriculture

Forest
Service

Grand Mesa, Uncompahgre and
Gunnison National Forest
Phone: (303) 874-7691

2250 Highway 50
Delta, Colorado
81416

Reply to: 1950

Date: ⌐NOV - 2 1987

Mr. Robert E. Vecchia, RMP Team Leader
Bureau of Land Management
Uncompahgre Basin Resource Area
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Vecchia:

We have reviewed the draft Resource Management Plan for the Uncompahgre Basin Resource Area. As you can see from the comments of the District Rangers which follow, we are unsure of where the fire management strategies are to be applied. Consequently, we are unable to determine if they would be compatible with fire management efforts on adjacent National Forest System lands. We recommend that some additional coordination be done in this respect.

**Paonia Ranger District**

In reviewing the above referenced plan, we found the proposed management units compatible with ours, both in terms of location and management emphasis/direction. The only concern we surfaced dealt with the application of the three proposed wildfire suppression strategies. From the information available for review, it was not possible to determine the geographical locations at which the various strategies would be applied and whether or not they were compatible with fire management efforts on adjacent FS lands. I suggest we review the proposed fire management with the BLM at the Forest level just to be sure we do not have any significant inconsistencies.

**Ouray Ranger District**

BLM's management areas D1, D2 and D3 are adjacent to our management prescriptions 4B and 5A on the Uncompahgre Plateau. Management emphasis and direction are compatible.

None of the access acquisition proposals on the Plateau would have an effect on NF lands. Closing Potter Creek will have no effect. Dry Fork Escalante Road will not be closed according to Gene Vecchia. BLM's D9 management areas and emphasis are compatible with our 9A prescriptions although our map doesn't have them identified.

FS-6200-28(7-82)

Response to Letter No. 5

Thank you for your comments.

BLM_0005599



5

BLM's D10 Management area in the Cimarron Ridge country is adjacent to 2A, 4B, 5B and 6B. These appear to be compatible also. The access to High Park would improve access to the NF. Storm King Ski Area would not have an effect on NF as it would be located in the northernmost unit.

The D15 management area adjacent to NF on High Mesa would be open to OHV's. This is adjacent to a restricted travel area on N.F.

The location of the BLM's proposed three fire management strategies also need to be identified on this end of the Forest.

Other than the fire management item, we have not identified any significant additional concerns. We appreciate the opportunity for this review.

Sincerely,

For: RAYMOND J. EVANS
Forest Supervisor

cc:   Regional Forester
      Chief (Director, Environmental Coordination)



FS-5200-28(7-82)

---



6

DEPARTMENT OF THE AIR FORCE
AIR FORCE REGIONAL CIVIL ENGINEER CENTRAL REGION
1114 COMMERCE STREET
DALLAS, TEXAS 7524

1 in October 1987

RECEIVED
MONTROSE   OCT 19 1987   BLM
COLO.

Mr. Robert S. Schmidt
Montrose District Manager
Bureau of Land Management
Montrose District Office
2465 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Schmidt

This is in response to your request for comments on the Draft Planning Area Wilderness Technical Supplement for the Uncompahgre Basin Planning Area located in southwest Colorado.

1   We continue to support the overall wilderness area concept. While actual conflicts between Air Force flying areas/routes and the proposed wilderness area do not exist at the present time, routes and airspace requirements of the military do change frequently. Mission requirements, fuel costs, and environmental constraints all act on the decision to locate a military training activity. In particular, low altitude high speed flight, because of general aviation and population pressures, has been relegated to those areas least accessible and sparsely inhabited. For this reason, it is requested that you give full consideration to the extent to which a wilderness designation might adversely effect or restrict use of low altitude airspace by the Air Force. If restrictions are placed upon these military overflights, the negative impact on training and readiness will force the Air Force to object to that wilderness designation.

We hope this information is useful in your planning process. We thank you for the documentation previously provided and look forward to continued communication with your office. Our staff project officer is Mr. Raymond Bruntmyer, telephone (214) 653-3341.

Sincerely

JOHN A. MILLER, Lt Colonel, USAF
Director
Environmental Planning Division

Copy to:
HQ USAF/LEEY

**Response to Letter No. 6**

1. An interagency agreement between the Department of Interior and the FAA established an "advisory" to all aircraft to maintain a minimum altitude of 2,000 feet over designated wilderness areas. Since this is an advisory only, it would not preclude the military from conducting low level flights. However, the BLM would appreciate the opportunity to coordinate with the appropriate military office on issues concerning low-level flights of military aircraft over BLM's designated wilderness areas.

116



United States Department of the Interior

FISH AND WILDLIFE SERVICE
529 25½ Road, Suite B-113
Grand Junction, Colorado 81505



7

IN REPLY REFER TO:

(FWE)
MEMORANDUM

November 5, 1987

To:     RMP Team Leader, Bureau of Land Management
        Uncompahgre Basin Resources Area, Montrose, Colorado

From:   Acting State Supervisor, Fish and Wildlife Enhancement
        Fish and Wildlife Service, Grand Junction, Colorado

Subject: Draft Uncompahgre Basin Resources Management
         Plan/Environmental Impact Statements and the
         Draft Uncompahgre Basin Planning Area Wilderness
         Technical Supplement

General Comments

We have reviewed the referenced Resources Management
Plan/Environmental Impact Statement and related Wilderness
Technical Supplement.  The Endangered Species Act (Act) requires
that an action agency consider possible impacts to proposed and
listed species and their critical habitats to determine if any
proposed plan may effect such species or habitat areas.  Should
the Bureau of Land Management make a "may affect" determination,
then formal consultation should be initiated.  Management
proposals  identified in the plan seem, at this time, too general
to make a "may/may not affect" determination for any species with
certainty.  It is our suggestion that informal consultation
continue as specific actions are planned for the resources area
rather than trying to make a blanket determination for the broad
Resources Management Plan.  By consulting on a case-by-case
basis, we will know exactly what action is being considered and
will have the advantage of the latest biological knowledge for
the species involved, as well as important habitats such as
wetlands and riparian zones.

1

Specific Comments

Page 2-10, Table 2-6.  Endangered, threatened, candidate, or
sensitive plant species.

    The habitat descriptions for the spineless hedgehog cactus
    and Uinta Basin hookless cactus are reversed.  Based on new
    locations discovered by Jim Ferguson last field season the
    habitat description for the Delta lomatium should be
    expanded to include mid-altitude mancos shale in association
    with pinyon-juniper.  The Wetherill milkvetch (Astragalus

wetherillii), a plant on State List 3 and which will be
added as a federal candidate in the next update, should be
added to Table 2-6.  Its habitat is clay hills in
association with pinyon-juniper and sagebrush.  Estimated
populations include four collections from the Uncompahgre
Resources Area, and the estimated acerage of occurence is
unknown.

Page 2-12, Table 2-8.  Endangered, threatened, and candidate
animal species.

    The river otter, Lutra canadensis sonorae, is a federal
    candidate species.

Page 3-30.  Disposal of public lands.

    We recommend that public wildlife values be considered prior
    to any disposal of public lands.

Page 3-31, 37.  Oil and gas.

    The Service would appreciate involvement in any variance to
    seasonal stipulations on lands used by bald eagles for
    hunting habitat.

Page 4-50.  Impacts on riparian zones.

    The Service would appreciate involvement prior to the
    approval of any disturbances to riparian zones.

Page 4-51.  Impacts on threatened and endangered species.

    The Service would appreciate involvement prior to any
    mineral resources managment that might affect wintering
    bald eagles.  Appropriate consultation may be necessary if
    offroad recreational vehicles use affect the Uinta Basin
    hookless cactus or if the disposal of public lands affects
    any threatened or endangered species.

P4-52.  Impacts on terrestrial wildlife.

    The Service would appreciate notification of the potential
    loss of any raptor nesting habitat.

Response to Letter No. 7

1. As suggested in your letter, the BLM will continue to consult on an informal
   basis with the Fish and Wildlife Service whenever specific projects are
   developed for the Camel Back or Adobe Badlands areas, and during the
   preparation of the Wilderness Management Plan for the Gunnison Gorge.

BLM_0005601

7

Thank you for the opportunity to provide our comments prior to
completion of the draft. Again, we would appreciate the
opportunity to comment when specific actions are completed.

*Richard P. Krueger*

cc:  ANE-Denver
     FWE-SLC
     Reading File
     Official File

DGober:dm:11-5-87    (blauncom  F:user 5)

---



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION VIII
999  18th STREET—SUITE 500
DENVER, COLORADO  80202-2405

Ref: 8PM-EP

**NOV 05 1987**

Robert E. Vecchia, RMP Team Leader
Bureau of Land Management
Uncompahgre Basin Resource Area
2505 South Townsend Avenue
Montrose, Colorado  81401

RE:  Draft Uncompahgre Basin Resource
     Management Plan and Environmental
     Impact Statement (RMP/EIS), and
     Wilderness Technical Supplement

Dear Mr. Vecchia:

In accordance with the National Environmental Policy Act (NEPA) and our
responsibilities under Section 309 of the Clean Air Act, the Region VIII
office of the Environmental Protection Agency (EPA) has reviewed the
referenced documents. The EPA appreciated the opportunity to meet with you
and other BLM staff at Montrose in March, 1985. The meeting was followed up
by EPA's scoping concerns for the project which were sent on May 3, 1985. In
addition to environmental conditions and effects, our review is also focused
on the RMP as a "framework for managing and allocating public land resources"
and it's importance in establishing "management direction" (page 1-1). Our
enclosed detailed comments are intended to make a constructive contribution to
the management direction.

Based on our concerns and the criteria EPA has established to rate
adequacy of draft EISs, we have rated this draft EIS as category EC-2
(environmental concerns – insufficient information). A summary of our EIS
ratings definitions is enclosed. We commend the inclusion of management
units; initiatives on aquatic and riparian monitoring; and the emphasis on
salinity, riparian, and aquatic systems. However, our enclosed comments
address insufficiencies and recommendations that we feel are appropriate at
the RMP level of planning, regarding:

o   the description of consistency with water quality standards
    (existing/designated beneficial uses, use protection criteria and
    antidegradation requirements) and the Federal/State water quality
    management programs,

o   the framework of measures, criteria, and indices that would be used,
    e.g., physical measures (such as channel and streambank stability),
    chemical criteria, and biological indices, for implementing water quality
    standards (WQS)/aquatic resource protection under the Clean Water Act
    (CWA) and Federal Land Policy and Management Act,

8

---

BLM_0005602

2

8

- o consistency of analysis of effects on aquatic resources/beneficial uses in relation to applicable statutes,

- o a framework for CWA/WQS monitoring,

- o additional guidance and documentation for protection of riparian and wetland values,

- o planning of range management to support multiple rangeland values under applicable statutes,

- o need for consistent Areas of Critical Environmental Concern (ACEC) recommendations by Alternative, and plans for ACECs that are adequate to assure resource protection,

- o compliance with the Endangered Species Act,

- o and inclusion of more specific plans for coordination and implementation, among other items, in an implementation chapter or appendix.

Several features of the Conservation Alternative are identified, that would also help provide a stronger, more aggressive resource management program.

A statewide antidegradation policy is an important part of State WQS. EPA's WQS regulation requires that, at a minimum, state policy ensure that existing instream uses and the level of water quality necessary to protect the existing uses be maintained and protected (40 CFR Part 131.12). This provision applies to all waters of the state. Furthermore, the state policy must establish additional measures for protection of certain high quality waters (waters where ambient quality exceeds that needed to protect the "fishable/swimmable" uses) and waters which may constitute outstanding national or state resource waters. At present, there is a difference in the way the federal and state regulations identify high quality waters. Under the current state regulation (5CCR 3.1.8 (3)), High Quality Class II waters ". . . shall be maintained and protected at their existing quality unless the Commission chooses, after full intergovernmental coordination and public participation, to allow lower water quality as a result of necessary and justifiable economic or social development". In Colorado, this level of protection is applied only to water designated by Colorado's Water Quality Control Commission (WQCC) as High Quality Class II waters. EPA's regulation would not distinguish between those waters designated High Quality Class II by the state and those that are, by definition, high quality. EPA has approved the current state antidegradation standard in the past. However, based on changes embodied in EPA's new water quality standards regulation, the WQCC has begun a review of the present standards and expects to complete the review process in mid 1988. We encourage the BLM to be part of this process and be aware of the applicability of any new requirements that may apply to BLM streams. The State of Colorado contact person is Dennis Anderson in Denver (331-4571) and the EPA contact is William Wuerthele (FTS 564-1586 or commercial 293-1586).

8

3

We would appreciate the opportunity to discuss with the BLM its proposed responses and RMP/EIS revisions relating to EPA concerns prior to the RMP/final EIS. Based on experience reviewing these documents, such a coordination process would be beneficial in helping address our concerns. Please contact Douglas Lofstedt of my staff as needed for further EPA coordination at 303-293-1717 or FTS 564-1717.

Sincerely,

Robert R. DeSpain, Chief
Environmental Policy Branch
Policy and Management Division

Enclosures

cc: Neil F. Morck, Colorado BLM State Director
    David Williams, Office of Planning and Environmental Coordination, BLM Washington Office
    Jon Scherschligt, Colorado Department of Health
    Rick Krueger, USF&WS, Grand Junction
    Laurie Mathews, Colorado Department of Natural Resources
    William Dickerson, EPA Office of Federal Activities

119

BLM_0005603

EPA DETAILED COMMENTS ON THE BLM DRAFT
UNCOMPAHGRE BASIN RESOURCE MANAGEMENT PLAN AND
ENVIRONMENTAL IMPACT STATEMENT (RMP/EIS),
AND WILDERNESS TECHNICAL SUPPLEMENT

**Aquatic Resources, Watershed Management**

Our review of plans for water quality and aquatic resource integrity is
based on consistency with:

o   Colorado's water quality standards (WQS) and water quality management
    program,

o   Executive Orders (EOs) 11752 and 12088 and Clean Water Act Section 313
    requirements for Federal agency leadership to "protect and enhance the
    quality of . . . water . . . resources" (EO 11752) through meeting
    applicable standards,

o   requirements for RMP consistency with "officially approved or adopted
    resource related plans, and the policies and programs contained therein,
    of other Federal agencies, State and local governments" in 43 CFR Part
    1610.3-2;

o   Federal Land Policy and Management Act (FLPMA) policies to "protect the
    quality of ecological, environmental, . . . and . . . water resource
    . . . values" (Section 102(a)(8)), to meet applicable State and Federal
    "pollution control laws" and water pollution "standards or implementation
    plans" (Section 202(c)(8)), and "to prevent unnecessary or undue
    degradation of the lands" (Section 302(b)),

o   the Clean Water Act (CWA) objective to "achieve and maintain physical,
    chemical, and biological integrity of the nation's waters"
    (Section 101(a)),

o   and "NONPOINT SOURCE CONTROLS AND WATER QUALITY STANDARDS" guidance
    (August 19, 1987) from Chapter 2 of EPA's Water Quality Standards
    Handbook.

The draft RMP/EIS proposes impacts to aquatic resources from several
activities.

1)  Locatable mineral activities could "result in water quality degradation",
    "increase sediment and salinity loads in local surface waters", and
    "could result in heavy metal contamination from mine water discharge and
    spoil-pile runoff" (page 4-49).

2)  Oil and gas activities "would increase sediment and salinity yields in
    local surface waters" (page 4-49).

3)  "Road construction and extraction of mineral materials would increase
    sediment and salt loads in local surface waters", and could alter
    "natural stream channels" and "surface water flows" (page 4-49).

---

4)  Forest management activities "could cause increased sedimentation, bank
    degradation, and water temperatures, and decreased streambank cover"
    (page 4-54).

5)  ORV management would leave aquatic habitat areas "subject to degradation"
    (page 4-54).

The preferred Alternative would also require "measures designed to minimize
erosion and water quality deterioration" and "minimize site-specific riparian
and aquatic deterioration" would be in plans for surface disturbing activities
(page 3-29).

In response to these potential effects and/or violations of WQS, we found
that the RMP/EIS provides an insufficient framework of planning, management,
and monitoring requirements to implement CWA and FLPMA requirements. What
measures, criteria, and indices will be used, e.g., physical measures (such as
channel and streambank stability), chemical criteria, and biological? What
does "minimize" mean? BLM's policy for managing activities, including mining
under the 1872 Mining Law, to meet WQS/beneficial uses needs to be clearly
defined in the text. Consistency with the State water quality/nonpoint source
(NPS) control program should be addressed (the discussion on page 2-6 only
addresses BLM coordination in locating and identifying NPS pollutants).
Similar concerns are raised by plans to prohibit utility projects "which would
have long-term adverse effects on riparian/aquatic systems" (page 3-38), and
to have "short-term sediment yield increases" from vegetation treatments (page
4-49). What are allowable short-term impacts? How long? The methods to be
used in the activity plan NEPA documents to predict effects on WQS/beneficial
uses should also be described in the RMP/EIS.

There are several other questions of RMP/EIS consistency with the above
(even though compliance with federal and state water quality standards was a
planning criterion (page 1-5)).

o   We would like to see the affected environment chapter establish more
    clearly the existing WQS, including designated beneficial uses and
    antidegradation requirements, and status and trends (to the extent of
    available information) similar to the discussion of air quality
    standards. Also, we suggest that Chapters Two, Three, and Four address
    water quality, WQS, and aquatic systems/habitat in an integrated manner
    in aquatic resource sections. The aquatic resource requirements of the
    CWA and FLPMA should be described as part of the planning framework and
    objectives.

o   We commend the BLM for including aquatic habitat conditions (page 2-14)
    and plans for intensively managing 70 miles of stream "to restore and
    protect aquatic habitats" (page 5-6). Does the amount of planned
    improvement conflict with the amounts stated in Chapter Four? For
    example, 40 miles of improvement is planned under the riparian program
    and 60 miles is planned under the grazing management program (page 4-53).

---

BLM_0005604

What are at least the general aquatic life/habitat standards and/or objectives to be achieved (page 3-44)? One management concern is to "Identify high potential fisheries requiring improvement and mangement" (page 1-7). Consistency with the CWA should be provided since the CWA does not distinguish between degree of aquatic life potential (Section 101(a)). Fisheries improvement plans should: correlate to impairments of WQS; include consultation with the Colorado Department of Health (CDOH) (since it administers WQS); and be consistent with CDOH priorities. If "existing condition" is maintained "on the balance of the aquatic habitat" (page 4-53), will any existing WQS violations be perpetuated? We like the strong approach to managing the riparian aquatic resources presented in Management Units C-4 and C-18 (pages 3-20, 26, and 27).

1 o The intent to improve "Aquatic habitat, . . . streambank stability, and water quality . . . for fair to good condition " in the Camel Back WSA appears commendable (Wilderness Technical Supplement page S-1). What are the measures for "good" condition under the CWA/WQS? It is not clear how results under non-wilderness management would be better or equal to that under wilderness management.

o Sources of drinking water from BLM lands are mentioned on page 2-6. What are the existing drinking water problems (if any), potential impacting activities, and water quality improvements needed?

o Numerous references to impacts to "local surface waters" are made. What is "local"? Protection under the CWA and FLPMA should be referenced.

o We suggest that oil and gas management requirements be included for Management Unit D-9 (page 3-38).

Control of soil erosion remains another concern. Of the 94,110 acres with erosion data, over 85,000 acres have either moderately or severely "accelerated erosion" (page 2-4). Several areas have severe gully erosion (page 2-5). However, BLM proposes to have erosion control projects "if compatible" with livestock grazing and woodland production activities (page 3-43). This proposed policy is exemplified, for example, by plans to manage grazing to "increase sediment and salinity yields far above normal" for some areas (page 4-50). A reference to CWA compliance is not made. We believe that providing erosion and sedimentation control is a basic land stewardship responsibility even if it conflicts with grazing, timbering, and other uses. We ask that the RMP/Final EIS contain a more clearly defined action plan to address areas of accelerated erosion and to prevent new erosion problems. This action plan should also specify more detailed direction for erosion control priority in new and existing allotment management plans (AMPs). Also, it is not clear why erosion control projects would not be compatible with wildlife winter range and riparian management (page 3-43). We found that the disclosure of impacts on aquatic habitat from soil resource management to be insufficient on page 4-53 (only in-channel structures are briefly discussed).

## Response to Letter No. 8

1. The statements in the WTS to which you refer has been deleted in this final WEIS. There is presently no data quantifying the biological quality of surface water in the WSA to be "fair," therefore, we are unable to assume that any management actions would result in improvement of water quality from "fair to good." Although it is projected that restrictions on livestock grazing in riparian areas and the elimination of ORV use in the Camel Back, proposed under both wilderness and no wilderness alternatives, will result in improvement in riparian conditions in the WSA, the specific impacts of these management actions are unquantifiable at this time. However, since the management of riparian areas under non-wilderness management would be the same as that under wilderness, the impacts would also be the same, and not "better or equal to that under wilderness management", as previously stated in the WTS."

   Existing water quality standards are established by the State of Colorado. Information on these standards is available at the BLM's Montrose District Office.

It is unclear why livestock grazing use would be resticted on only 39,410 acres (page 3-45). Apparently, plans to implement AMPs contain questions on adequacy since erosion rates would be reduced "if" AMP objectives are net (pages 4-48 and 49). The RMP/EIS should include guidance for correcting readily observable problems that do not require long-term monitoring. The Conservation Alternative seems to be more sensitive and aggressive for range stewardship.

We ask that the coal unsuitability report be included in the RMP/EIS.

The draft RMP/EIS discusses the significant aquifers and provides a qualitative review of the water quality of each zone (page 2-7). Since the alternatives analysis addresses only surface water, it appears that trends and projected effects are not considered to be of major importance under the RMP. We encourage much more site-specific detail for the appropriate projects.

Riparian Areas and Wetlands

The draft RMP/EIS appears to provide a strong, general basis for the riparian area/wetland management program by:

1) continuing to inventory and monitor riparian areas,

2) improving the vegetation conditions on 6,320 acres of land "by implementing special protective and restorative measures" (page 3-43), and

3) by maintaining or improving "riparian zones in the remainder of the planning area" (page 3-43).

We have several concerns that we would like to have addressed in order to achieve more detailed management guidance in the RMP. We suggest a thorough description of how vegetation condition meets: 1) the BLM Riparian Area Management Policy "to achieve a healthy and productive ecological condition for maximum long-term benefits"; 2) the riparian values noted in the Policy's background statements; and 3) the Executive Order 11988 an 11990 (Floodplain Management and Protection of Wetlands, respectively) requirements to preserve, protect, and restore the natural functions of such areas. What are the specific standards/guidelines for improvement and protection of condition? How are the objectives consistent with CWA/WQS objectives? Are there to be any demonstration areas? Also, we ask that the Water Quality Control Division of the CDOH be informed of the priority areas of treatment so they can be incorporated into the CWA Section 319 NPS assessment report.

The Preferred Alternative either would or could allow various activities in areas of riparian/wetland/aquatic systems.

o "Approximately 4,000 acres of riparian zones would be opened to mineral exploration" with lifting of existing mineral withdrawals (page 4-50). Associated surface disturbance "would lead to increased sedimentation and streambank instability on 25 stream miles of aquatic habitat" (page 4-53).

o Some riparian areas would apparently be left "open to ORV use" and "would be subject to degradation" (page 4-54).

o Coal development could be considered (page 3-38).

o Forest management activities would take place with up to 60 to 100 acres of riparian vegetation being degraded (page 4-51).

5

8

Consistency of the above management direction with existing policies and executive orders should be documented. We found the draft RMP/EIS to lack sufficient criteria and standards for WQS/aquatic resource protection activities. Without such criteria and standards, for example, we support the Conservation Alternative which would withdraw riparian zones from mineral entry (page 4-32). Formulation of mitigation measures for impacts of coal development is mentioned on page 3-38. The final RMP/EIS should state BLM's riparian/wetland/aquatic resource impacts mitigation policies, e.g., avoidance, restoration, compensation, etc., for riparian areas. It appears that leaving some areas open to ORV use contradicts the Preferred Alternative direction on page 3-43 under which most riparian areas would be improved with at least maintenance of existing condition for the rest.

The action alternatives rely heavily on intensive grazing management to improve riparian areas. We request more documentation of actual planned grazing management tools. This documentation should include more information on experience in using grazing management without riparian fencing to achieve adequate improvement and protection of multiple riparian values.

Table 2-5 lists 1,034 acres of riparian vegetation type. Much larger amounts of riparian zones are mentioned elsewhere. What is the correct amount of riparian area?

## Monitoring and Evaluation

The draft RMP makes several references to monitoring. RMP implementation will be monitored (page 1-1). "Water quality . . . would be inventoried and monitored" (page 3-29). The riparian zones would have intensive "aquatic habitat" monitoring (page 3-38). While we commend these planned initiatives, we request that the document go farther in describing the comprehensive CWA monitoring program in an appendix or monitoring chapter. The monitoring program (not plans for each activity) should include such information as: (1) goals and objectives, (2) types of surveys (ambient, intensive) or assessments to be used, (3) parameters to be monitored, (4) management and environmental indicators (e.g., aquatic habitat, sediment delivery), (5) monitoring methodologies, (6) mechanisms for monitoring implementation and adequacy of best management practices; (7) the person/position responsible for monitoring, and (8) the feedback loop to achieve timely modification to activities. Refer to our scoping letter for other components. It would provide the basic framework for CWA monitoring (including WQS/beneficial uses) in the Resource Area. However, there is no assurance that this monitoring framework has been established. Groundwater monitoring should also be included as needed. The other agencies and public should be able to review and comment on this framework in the RMP/EIS. The RMP direction would then be applied in site-specific detail. The RMP monitoring program would help meet 43 CFR Part 1610.4-9 requirements that the "proposed plan" establish "intervals and standards" that "shall provide for evaluation to determine whether mitigation measures are satisfactory." We could not find the existing violations or risk of potential violations of the CWA? Are there going to be reference streams? When are the water quality inventories and monitoring to be done (page 5-3)? How are they designed to document protection of WQS beneficial uses, status, and trends?

6

8

Even though compliance with WQS is a planning criterion (page 1-5), it is not clear what is included in implementation monitoring regarding CWA/WQS compliance, and aquatic resources.

## Areas of Critical Environmental Concern (ACECs)

The RMP/EIS alternatives contain different ACEC recommendations (Table 3-8). It is our position that the ACECs should be the same areas and size; for all action alternatives. Either they are or are not valid ACECs under FLPMA regardless of what the RMP/EIS alternative is. Management practices may vary by alternative, however, in order to reach the same ACEC protection objectives. Consequently, consistency with FLPMA requirements to "give priority to the designation and protection of ACECs (Section 202(c)(3))is not clear. If areas where watershed, soils, WQS, wetlands, riparian areas, or municipal water supply concerns were considered, what management requirements will substitute for ACEC designation? We would like to see an appendix that describes all potential ACECs recommended by BLM staff or others, reasoning for not recommending any particular area (if any) in the RMP/EIS, and any special management the area(s) may need. Also, we believe that management plans (including inter-agency and public review) are needed for all ACECs; however, it is not clear that such plans are to be done.

## Threatened and Endangered Species

The preferred alternative would have a commendable intent to "Require measures to protect T & E species, individuals, and habitats in plans for all surface disturbing activities" (page 3-43). However, this intent appears to be contradicted in Chapter Four where statements are made that the preferred alternative would "seriously accelerate destruction of the Uinta Basin hookless cactus" (a threatened species) in the North being ORV area, and result in a "loss of 10,000 acres of potential habitat for the Uinta Basin hookless cactus and Delta lomatium due to recreational ORV use" (pages 4-51 and 52). We would like to see additional direction/documentation for the RMP action alternatives for compliance with Endangered Species Act requirements for doing everything possible to conserve such species (Sections 2(c)(1) and 3(3)). We would like to see the impact analysis address in more depth both indirect and cumulative impacts under 40 CFR Parts 1500.7 and 8 (with a distinction between the two). For example, the section on cumulative impacts briefly addresses impacts to potential habitat, rather than existing species and their habitat. Also, what is the basis for determining priority of ORV use over protecting T & E and/or candidate or sensitive species?

## Other Concerns

The BLM states that there is some coordination with the State in locating and identifying WQS "water pollutant sources", and that input to the State's biennial water quality assessment under CWA Section 319 is made. We would like to see in RMP/EIS implementation chapter or appendix recognize action to be taken in response to existing/potential impairments identified in the 305(b) assessment, and the inter-agency coordination and consultation strategy for WQS-related programs. The RMP should identify procedures that will be used to ensure consistency with water quality management plans for the area.

122

BLM_0005606

7

8

The new Clean Water Act amendments were passed in February 1987. A primary concern is the new NPS control program (Section 319). BLM cannot match other federal (EPA) dollars, but allottees, private land owners, and private organizations can and do plan to participate in the program. Some of this work may be done on BLM lands. How will BLM participate in work on mixed-ownership watersheds to improve water quality? BLM is asked to provide an assessment of condition of their water bodies to the State as part of the assessment phase of the Section 319 management program. Additionally, the State will be identifying in its Section 319 management program the rather large programs/projects that it plans to review under Executive Order 12372 for consistency with the State's NPS management program. BLM involvement in this process should be described. The State of Colorado contact person for the NPS program is Greg Parsons in Denver (331-4756).

We suggest that the implementation chapter or appendix list the specific inventories, assessments, and management plans/projects to be done (in priority order) along with anticipated costs and schedule for completion. Of particular concern to EPA to have included are: NPS/aquatic life assessments; watershed and related management plans; salinity control plans; cooperative management plans; wetland and riparian area inventory and management plans; and groundwater studies. We feel that the RMP/EIS should address the commitment of the Resource Area office to annually request the funds needed to implement these projects. What is the linkage of the budgeting process to implementation of RMP-identified projects?

Extensive site-specific project planning and impact analysis/disclosure under NEPA will be done under this broad RMP/EIS. We believe that there will be a continuing need for public and other agency involvement in planning some of these projects (rather than just having the analyses available in the BLM office). The strategy for this involvement remains unclear and should also be addressed in more detail in an implementation chapter or appendix.

---

STATE OF COLORADO   ROY ROMER, Governor

9

## DEPARTMENT OF NATURAL RESOURCES

1313 Sherman St., Room 718, Denver, Colorado 80203   866-3311

Geological Survey
Board of Land Commissioners
Mined Land Reclamation
Division of Mines
Oil and Gas Conservation Commission
Division of Parks & Outdoor Recreation
Soil Conservation Board
Water Conservation Board
Division of Water Resources
Division of Wildlife



November 5, 1987

Robert E. Vecchia
Bureau of Land Management
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Vecchia:

State agencies have completed the review of the Draft Uncompahgre Basin Resource Management Plan and Environmental Impact Statement. We offer the following comments on the management alternatives and their effects on the important resources of the area.

### Wildlife

From the perspective of wildlife and wildlife recreation, the Division of Wildlife prefers the Conservation Alternative. This alternative would best conserve and protect wilderness, wildlife habitats, watersheds and riparian areas. This high level of natural resource conservation is justified in light of the significant economic values of wildlife and recreation in western Colorado.

1 | The Division, in cooperation with the Bureau of Land Management (BLM), has a bighorn sheep reintroduction program currently underway in the Gunnison Gorge. The two agencies should make arrangements to continue and enhance this program.

2 | The Gunnison Gorge area is a Gold Medal fishery which should be maintained and enhanced. Protection of the surrounding watershed and associated resources are necessary to protect the fishery. The Conservation Alternative emphasizes this protection; however, other management options are available and should be considered if this management is not selected.

Protection of the most critical wildlife habitats in the Uncompahgre Resource Area, riparian areas and big game winter range, is essential. The proximity of BLM public lands to private lands at the lower elevations maximizes available opportunities to enhance these critical wildlife ranges. The Conservation Alternative will not consider disposal of public lands. Rather, private land exchanges would be emphasized to obtain crucial big game winter ranges, riparian zones, and waterfowl areas. Public access to public lands would be acquired.

## Responses to Letter No. 9

1. The BLM appreciates the opportunity to coordinate with the Division of Wildlife on all wildlife concerns in the Gunnison Gorge, as well as throughout the resource area. Thank you for your continued cooperation in these matters.

2. In the Draft RMP/EIS, watershed protection for the Gunnison River through the Gunnison Gorge was identical in both the Conservation and Preferred alternatives. In this WEIS, the Preferred alternative has been incorporated into the Proposed Action (Enhanced All Wilderness Alternative) for the Gunnison Gorge. No changes in watershed management actions are proposed under any alternative.

BLM_0005607

9

The importance of riparian habitat warrants its careful analysis and management. The number of acres of riparian habitat is not consistently referenced in the RMP. Riparian habitat is shown as 1034 acres (2-8), 6,320 acres (4-54), and 4000 acres (4-54). It is imperative to analyze potential impacts on an accurate number of riparian acres.

The DEIS lists the principal proposed riparian restoration management actions as:

1)   limit forage utilization to 35% on 6320 acres (4-51);

2)   "intensive" grazing management on 5125 acres(4-51);

3)   removal of grazing from March 1 to May 15 (4-54); and

4)   reduction of livestock allocation by 200 AUMs on several grazing allotments (4-54).

The EIS should describe how each of these measures would contribute to the restoration of riparian areas. For example, how will the reduction of 200 AUMs on seven allotments improve riparian areas? Grazing should be restricted in all riparian areas at all times of the year, since recruitment of native woody vegetation will be nonexistent in riparian improvement areas unless grazing is removed.

## Minerals and Energy Resources

The state has no significant disagreement with the preferred alternative with regard to mineral and energy resource development. The Mesa Verde coals in the Paonia area will ultimately be the most economic to produce. The preferred alternative allows mining to occur in this area. The Dakota coals which are thin and have not been economic to date are also reserved for future production if conditions warrant. Reservation of the Gunnison Gorge area for wilderness will not significantly affect the ultimate coal production of the area.

There has been limited oil and gas exploration in the area to date. There is methane potential in the Muddy Creek area near Paonia. The preferred alternative allows development of these resources when feasible. Finally, sand and gravel in the Mancos shale area is surface minable in the Adobe Flats area and the preferred alternative allows production of this resource in the future.

## Recreation

The discussion on recreation is very general and does not include information on the types and levels of current recreation use. This information would assist in assessing how well the preferred alternative responds to multiple use demands. Under the preferred alternative 82 percent of the resource area is open to offroad vehicle use. The plan should describe the demand for this use and tailor access to the area accordingly, rather than allowing virtually unrestricted use and corresponding impact throughout the entire area.

## Wilderness

9

We support the recommendation in the plan of 21,038 acres of Gunnison Gorge for wilderness designation. This land is a geologic continuation of the Black Canyon of the Gunnison containing spectacular waterfalls and offering outstanding fishing, hiking and river boating challenges.

3  The Camel Back Wilderness study area also has outstanding wilderness attributes. Its colorful deep canyons and mesas create vast panoramic vistas and extensive recreation opportunities. As the DEIS states, mineral development in the area is unlikely over either the short or long term. This area appears deserving of designation although the Division of Wildlife is concerned that access for management and recreation purposes be provided. At the same time, the proliferation of roads similar to that which has occurred in nearby areas should be avoided. We would like to see this issue cooperatively worked out to allow eventual designation of the Camel Back area.

## Special Management Areas

The EIS should present information on remnant or relict plant communities in the resource area, including those suitable for special management consideration. Recent data indicate the presence of high-quality riparian vegetation along the Uncompahgre River (T47N R8W5 32 NE1/4 SE1/4) and upland vegetation in Wells Gulch (T45 R 3E, portions of sections 18,19,20,30 and T14S R 93W, portions of sections 26 and 35). The Colorado Natural Areas Program will work with BLM to identify and evaluate appropriate high quality vegetation sites for special management consideration.

We recommend that each special management area contain information and management provisions on all relevant alternative uses of the sites: 1) grazing, 2) ORV use, 3) camping-public access, 4) utility corridors and 5) mineral entry. This is necessary to protect important features of each area. For example, livestock use in the proposed Escalante Canyon ACEC has severely degraded Sclerocactus glaucus (federal-threatened) populations, yet no special provisions for grazing are presented.

The RMP should include discussion of the 1986 recommendations of the BLM Geologic Advisory Group. Recommendations included the designation of 1800 acres of Chukar Canyon and recognition of the Ute Indian fault zone within the proposed Gunnison Gorge recreation Area. The EIS should indicate the proposed change in status for Needle Rock from a BLM Research Natural Area to an Outstanding Natural Area as supported by the advisory group.

## Water

Any impact of coal management, locatable minerals management or oil and gas management which would injure an adjudicated water right, will have to be mitigated by a plan for augmentation approved in Water Court prior to the occurrence of the injury.

3. The Proposed Action (No Wilderness) for the Camel Back WSA in this WEIS has been changed. It now recommends that the entire Camel Back area (10,402 acres) be closed to recreational ORV use to prevent accidental destruction of threatened and endangered plants as a result of ORV use, to protect visual qualities, and to reduce active erosion. However, some motorized vehicle use would be allowed the grazing permittee(s) and for administrative access. Any authorized motorized use would be restricted to existing trails and ways.

BLM_0005608

9

Rules requiring casing of oil and gas wells and mineral test holes
would help minimize aquifer mixing and ground water degradation.
Plugging and capping of test holes are governed by the Colorado Mined
Land Reclamation Rules and Regulations.

Threatened and Endangered Species

Lands having populations of federally threatened or endangered
plant species should not be released from federal ownership. Populations
of clay-loving wild buckwheat have been documented at both disposal
tracts mentioned specifically on page 4-52. Descriptions of additional
disposal tracts (3,890 acres) should be made available for review.

Potential habitat for endangered plant species should be surveyed
before oil and gas or mineral resource development occurs and avoidance
stipulations applied to known populations. Threatened or endangered
species in livestock or ORV areas should also be monitored to assess
grazing impacts and loss due to ORV use or collecting. In particular,
the document should discuss how development of the North Delta ORV use
area will impact critical habitat for the Uinta Basin hookless cactus and
potential habitat of clay-loving wild buckwheat and Delta lomentium.

Management practices should be implemented which enhance habitats
for special interest species which have been historically impacted by
agricultural development in the Fruitland Mesa area, such as sage
grouse. The Division of Wildlife will assist in identifying such
management practices.

We appreciate the opportunity to review your draft management plan
and look forward to continued cooperation with BLM as decisions
implementing these plans are made.

Sincerely,

DENNIS W. DONALD
Acting Executive Director

DWD:nsh:7153

cc:  State Agency Reviewers

---

# STATE OF COLORADO

9

COLORADO NATURAL AREAS PROGRAM
Department of Natural Resources
1313 Sherman Street, Room 718
Denver, Colorado 80203
Phone: (303) 866-3311

Roy Romer
Governor
Clyde O. Martz
Executive Director
David W. Kuntz
Program Director

December 23, 1987

Mr. Gene Vecchia
Bureau of Land Management
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Gene:

I want to correct and clarify the comments submitted by the
Colorado Department of Natural Resources in the November 5, 1987 letter
for the Colorado Natural Areas Program on the draft Uncompahgre Resource
Area Management Plan and Environmental Impact Statement.

Information contained in the special management areas section on
page 3, paragraph 3 is erroneous -- legal descriptions are wrong and the
specific reference to Wells Gulch should be deleted. The first paragraph
in the special management areas section should read as follows:

The EIS should indicate that a systematic survey for relict or
remnant plant communities has not been conducted in the Uncompahgre
Resource Area. A number of areas, including several riparian
sites, may qualify for future special management consideration.
The Colorado Natural Areas Program will work with BLM to identify
and evaluate appropriately qualified vegetation sites for special
management.

I hope that this clarifies any confusion concerning our recom-
mendations. I apologize for sending you incorrect information. Please
call me if you have any questions on our revised recommendations. Best
wishes for the new year.

Sincerely,

David W. Kuntz
Director
Colorado Natural Areas Program

DWK:cat:8441

COLORADO NATURAL AREAS COUNCIL

125

**JOHN R. KAPPA**
Attorney at Law
P.O. Box 790
Montrose, CO 81402
(303) 249-4534

10

November 4, 1987

Mr. Robert E. Vecchia
RMP Team Leader
Bureau of Land Management
Uncompahgre Basin Resource Area
2505 S. Townsend Avenue
Montrose, CO 81401

RE: Draft Uncompahgre Basin RMP/EIS and WTS

Gentlemen:

The City of Delta hereby submits the following comments concerning the draft RMP/EIS and WTS for the Uncompahgre Basin Planning Area.

1. Generally the documents fail to adequately identify and discuss the development of hydro power resources on the Gunnison River and in the Gunnison Gorge as a specific resource or planning issue.

1 | 2. The description in the discussion of the Gunnison Gorge WSA on page 2-20 is devoid of any analysis of potential power projects.

3. The Wilderness Technical Supplement is totally inadequate and inaccurate concerning its analysis of hydro electric projects within the Gunnison Gorge by making the following unsubstantiated and erroneous assumptions.

   A. Economic feasibility of these hydro projects is low.

   B. The projects will not be developed.

   C. The impact due to precluding development is negligible.

   D. If the projects are developed, positive impacts will be negligible.

2 | 4. The failure to analyze the social and economic impacts of wilderness designation is erroneous. Preclusion of hydro power and water projects will have a dramatic adverse economic effect.

DEL 2/15

## Responses to Letter No. 10

1. The points raised in your letter were given careful consideration during the preparation of this final WEIS. However, as discussed in the Scoping section, it is BLM's projection that no hydroelectric projects would be developed in or adjacent to the Gunnison Gorge regardless of whether or not the area is designated wilderness. The BLM bases its projection on the lack of demonstrated demand for power and economic feasibility as well as the inconsistency of such projects with the purposes for which the Gunnison Gorge Recreation Lands were established. Consequently, the issue of hydroelectric power development was eliminated from further analysis in this document.

Please see Chapter 1, "Issues Analyzed," for a detailed discussion of "Impacts on Hydroelectric Power Development" for the Gunnison Gorge WSA.

---

10

Mr. Robert Vecchia
Page 2
November 4, 1987

5. The discussion of City of Delta water rights decrees on the Gunnison in the Gorge on pages 3-15 and 3-16 of the WTS is incomplete because it does not recognize that the City's decree is also for consumptive uses for municipal and industrial purposes.

6. The discussion on page 3-16 of the WTS concerning the alternative proposals for development is misleading. Such proposals are being considered in consideration with the legislation to create a Black Canyon National Park and Wild and Scenic River. Under the Wild and Scenic Rivers Act, the City of Delta is entitled to just compensation for what amounts to a taking of its water rights. The City has been willing to discuss alternatives to development of its project in the context of the Black Canyon National Park proposal because it recognizes that other benefits will accrue to the City from that proposal. The amount of water proposed to be traded to the City as compensation clearly demonstrates (understated as it is) the considerable value of the City's water rights.

2 | 7. The conclusion on page 4-12 of the WTS that the impact of not being able to develop hydro electric power projects is negligible is totally erroneous for the following reasons:

   A. Notwithstanding the exception for presidential action, wilderness designation will preclude any possibility of developing the projects.

   B. Wilderness designation will make it virtually impossible for the City of Delta to perform the necessary due diligence work in order to keep its conditional rights in the Gorge. This will result in substantial detrimental economic effects.

   C. The City of Delta will lose the many thousands of dollars it has invested already in these water rights and will lose the potential benefits from the eventual development of its project.

   D. The conditional water rights in and of themselves are very valuable. Loss of these rights will allow projects such as the City of Aurora's Transmountain Diversion Project to obtain decrees for unappropriated water which otherwise may not be available. This will result in all of the very substantial impacts related to such a transmountain diversion project.

DEL 2/15

2. Wilderness designation would not affect the City of Delta's water rights. Please see Chapter 1, "Additional Concerns Considered for All WSA's," for a further discussion of water rights.

BLM_0005610

10

Mr. Robert Vecchia
Page 3
November 4, 1987

2 | E.  Such conditional rights have value to developers of water
       rights who might want to develop other projects but need
       to promote the priority of their rights by purchasing
       rights such as the City of Delta and thereafter
       abandoning them to the stream or transferring them.  Such
       value is eliminated by the Wilderness proposals.

3 | 8.  The documents also ignore the fact that development of hydro
       electric power would not carry with it many of the adverse
       environmental effects associated with coal or nuclear power.

                              Very truly yours,

                              CITY OF DELTA

                              John R. Kappa
                              Delta City Attorney

JRK/vl

3. An analysis of these matters would go far beyond the scope of this WEIS, which
   deals with the environmental impacts of designating or not designating each
   WSA as part of the NWPS.

DEL 2/15

11

Robert E. Vecchia, RMP Team Leader
BLM, Uncompahgre Basin Resource Area
2505 South Townsend Avenue
Montrose, Colorado  81401

Dear Mr. Vecchia,

     The Montrose District Advisory Council submits the following two
resolutions (as adopted October 29, 1987) for your consideration in the
RMP process.

     RESOLUTION 1:  The BLM should recommend that the Gunnison Gorge be
     made a Wilderness Area to be administered by the BLM.

     RESOLUTION 2:  The BLM should adopt the preferred alternative after
     reviewing and resolving the following issues:

          A.  The plan should identify specific management measures for
              riparian areas, and should better define riparian zones.

          B.  Camelback and Adobe Badlands WSAs should be reconsidered for
              wilderness recommendations.

          C.  More attention should be focused on managing future
              increases in off-road vehicle use.

          D.  The RMP should identify trade-offs and show economic data
              dealing with land and water management proposals.

          E.  Study areas (natural, undisturbed ecosystems) should be
              established.

          F.  The location of the proposed right-of-way corridor should be
              given a closer look.

                              Sincerely,

                              Clay V. Bader, Chairman
                              Montrose District Advisory Council

Response to Letter No. 11
Thank you for your comments.

127

BLM_0005611

**12**



Bureau of Land Management
2465 S. Townsend
Montrose Co. 81402
District manager
Dear Sir.

The Montrose Grazing Board
unanimously voted to authorize James
Siebel - Chairman of the board. To draft
a letter opposing the reduction to 35%
use on the Uncompahgre E.I.S. and
to recommend moderation in critical
Riparian areas. the permittees not
affected by Riparian areas to maintain
full grazing preferences or AUM's.

Board member Jack Musser requested
some of the areas and felt we were
justified to make that recommendation.

Sincerely,

Montrose Grazing Board
James Siebel

### Response to Letter No. 12

Thank you for your comments.

AUTHOR'S NOTE: Discussions of livestock management actions for the three WSAs which were presented in the RMP/EIS and WTS have been revised in this WEIS. After additional internal BLM review, it was determined that livestock grazing and management in the Gunnison Gorge and Adobe Badlands WSAs would not appreciably change as a result of proposed management practices under any of the alternatives. Consequently, the issue of impacts on livestock management in the Gunnison Gorge and the Adobe Badlands WSAs has been dropped from further analysis in this WEIS. Discussions of livestock management alternatives and actions for the Camel Back WSA have also been modified, and no longer propose a reduction in the amount of AUMs currently allotted within the area under any alternative. (Please see Chapter 1, Changes From the Draft RMP/EIS, Draft WTS, and Final RMP/EIS for details regarding these revisions).

---

**13**



**SIERRA CLUB SOUTHWEST OFFICE**

601 Canyon
Boulder, Colorado 80302
303•449•5595

September 17, 1987

Gene Vecchia
RMP Team Leader
Bureau of Land Management
2505 S. Townsend Ave.
Montrose, CO 81401

Dear Mr. Vecchia,

I have read your wilderness recommendations for three desert roadless area which is contained in your draft Uncompahgre Basin Resource Management Plan.

I would like to thank you for recommending all 21,038 acres of the Gunnison Gorge Wilderness Study Area for Wilderness protection. This will help increase the chances of the Gunnison River to be considered as a Wild River under the Wild and Scenic Rivers Act. Because this area will be protected as a wilderness, thousands of visitors will still be able to enjoy the beauty and the recreational benefits of this area in the future.

I do feel that the BLM needs to reconsider recommendations for Camel Back and Adobe Badlands as a wilderness. I do not understand that BLM's approach to their ideas of management of a shrinking resource such as wilderness. Camel Back and Adobe Badlands are just a few of the potential wildernesses left on the plateau. According to BLM's reports, there are absolutely no resource conflicts with wilderness designation in these areas. In Camel Back, BLM has mentioned that there are no timber or mineral conflicts. There are four dry oil and gas wells which has been drilled nearby Adobe Badlands, which indicates a low potential for minerals. Both areas contain many species of plants and animals which are considered endangered under old management. There is no telling how many more species will become endangered in the near future if nothing is done to protect them.

### Response to Letter No. 13

Thank you for your comments.

AUTHOR'S NOTE: In addition to this specific comment, approximately fifty-four additional written comments were received from individuals who requested an explanation of why the BLM is not recommending the Camel Back and Adobe Badlands WSAs for wilderness designation (please see also Letter No. 45). The names of these persons are listed in Table 5-4.

The Gunnison Gorge, Camel Back, and the Adobe Badlands public lands were identified as Wilderness Study Areas (WSAs) during the Wilderness Review Process in response to Section 603 of the Federal Land Policy and Management Act of 1976 (see Chapter 1 for details). Subsequent decisions concerning wilderness recommendations for these WSAs were developed and analyzed in the RMP/EIS. The purpose of this Final Wilderness Environmental Impact Statement (WEIS) is to present these proposed recommendations for each of the WSAs, along with other management alternatives, and to discuss the potential environmental impacts which could result from either designating or not designating these areas as wilderness.

It is not the intention of either the RMP/EIS or this document to provide justification or rationalization for BLM management recommendations or decisions. The reasons for recommendations of designation or nondesignation will be presented in Wilderness Study Report (WSR) which will be prepared for each WSA, and made available to the public at a later date. The final decision on designation will be made by Congress, regardless of BLM's recommendations.

However, since so many of the oral and written comments questioned our non-wilderness recommendations for the Camel Back and Adobe Badlands WSAs, we have provided the following response to address these concerns. All three WSAs addressed in the plan meet the requirements to be studied and considered for wilderness. However, additional factors such as potential land uses, enhancement of the National Wilderness Preservation System (NWPS) and actual wilderness values of the areas, impacts to other resources, and other available management options all play an important role in deciding if an area should be recommended for designation.

Camel Back WSA: The BLM recognizes that the Camel Back area meets the minimum wilderness criteria, but does not feel that the area's wilderness qualities, although possibly important on a local or regional scale, are significant enough to warrant inclusion in the NWPS. The Dominguez WSA (73,568 acres) and the Gunnison Gorge WSA (21,038 acres) have both been recommended as suitable for wilderness designation; both of these WSAs are within short driving distances of regional population centers so wilderness designation of the Camel Back WSA would not significantly expand wilderness opportunities in this area. The visual resources in the WSA are similar in appearance to other plateau region canyons. Roubideau Canyon has some outstanding features with moderate visual sensitivity, but nothing to really set the area apart.



BLM_0005612

13

I feel that the BLM needs to reconsider their recommendations that the Camel Back and Adobe Badlands as a non- wilderness area.

Thank You,

John Bradley
Internship
Southwest Office

Along with the important natural and scenic values, the area is also important as a wildlife habitat, for grazing purposes, and as habitat for threatened and endangered plants species. Under the Proposed Action presented in this WEIS, approximately 7,240 acres would be managed for livestock grazing and 2,482 acres would be managed primarily for wildlife habitat. Improvement of riparian habitat would be emphasized on 880 acres. The Proposed Action also includes a recommendation that the entire Camel Back area (10,402 acres) would be closed to recreational ORV use to prevent accidental destruction of threatened and endangered plants, to protect visual qualities, and to reduce active erosion. The BLM feels that it can manage these areas for these purposes more effectively under the guidance of multiple use and still protect the area's important resource values and preserve them for future generations.

Adobe Badlands WSA. The BLM also recognizes that the Adobe Badlands area meets the minimum wilderness criteria, but does not feel the area's wilderness qualities are significant enough to warrant inclusion in the NWPS. Shale-type badlands are presently represented in the NWPS by the Bisti and De-na-zin wilderness areas in New Mexico, both of which are similar in appearance to and within a day's driving distance of the Adobe Badlands WSA.

Although the wilderness qualities of the Adobe Badlands are not significant enough to warrant designation as wilderness, it is felt that the area's interesting landforms, threatened and endangered plants, and other values are deserving of some form of protection. The Proposed Plan presented in this WEIS recommends that 6,783 acres of the WSA which contain these values be designated as the Adobe Badlands Outstanding Natural Area and Area of Critical Environmental Concern (ONA/ACEC). In addition, approximately 1,927 acres of in the northern portion of the area would be designated a Wildlife Management Area and managed primarily to improve the quality and quantity crucial deer and elk winter range. Approximately 1,715 acres of highly erodible saline soils throughout the remainder of the area would be managed to control salinity contributions to the Colorado River system.

The BLM feels that it can manage these areas for these purposes effectively under the guidance of multiple use and still protect the area's important resource values and preserve them for future generations.

---

14

540 N. 5th St.
Montrose, CO 81401
Sept. 25, 1987

Gene Vecchia
RMP Team Leader
Bureau of Land Management
2505 S. Townsend Ave.
Montrose, CO 81401

Dear Gene

As I will be unable to attend the September 29th hearing regarding wilderness recommendations in the draft Uncompahgre Basin Resource Management Plan, I would like to take this opportunity to comment on the plan. First, I would like to thank the BLM for recommending all 21,038 acres of the Gunnison Gorge Wilderness Study Area for wilderness protection. Secondly I would like to request that Camel Back (Roubideau Canyon) also be designated as wilderness. This status would benefit several endangered plant species as well as big game herd. The fact that this area has a resource conflicts further argument

1

BLM_0005613

14

1 | to its being designated as wilderness.
Third, I would like to ask that the BLM recommend the Adobe Badlands for wilderness status as well. This area contains Uinta Basin hookless cactus, an endangered species, and has a low potential for minerals. There is no timber and, since the BLM intends to close the area to ORVs, there is no reason why this area should not be designated as wilderness.

Fourth, I oppose the BLM's stance on the Storm King ski area site. The impact on elk calving habitat as well as mule deer fawning is too great and the 5-year grace period for developers is preposterous.

I hope you will take my input into consideration.

Sincerely
Babs Schmeder
Colorado Mountain Club
Conservation Chair
for the Western Slope

**Response to Letter No. 14**

1. Please see response to Letter No. 13.

---

THE COLORADO ARCHAEOLOGICAL SOCIETY

15

*Publishers of Southwestern Lore*

October 20, 1987

Gene Vecchia
RMP Team Leader
Bureau of Land Management
2505 S. Townsend Ave.
Montrose, CO 81401

Dear Mr. Vecchia,

I represent the Chipeta Chapter of the Colorado Archaeological Society, and presented verbal comments on the BLM's Draft RMP for the Uncompahgre Basin at the September 29, 1987 hearing in Montrose. I won't repeat verbatim what I said that evening since it is part of the official record, but would like to make additional comments on several key points.

The members of the archaeological community in the Montrose area are extremely concerned about the current rate of destruction of archaeological resources. The law enforcement approach to cultural resource management has limited value. Innovative approaches must be developed, and public education concerning cultural resource appreciation and preservation should receive high priority. The Draft RMP, Preferred Alternative takes the right, first step, but much more can be done. Some recommendations are listed below.

1) Conduct an intensive archaeological resource survey on BLM lands between Highway 90 and Roubideau Creek.

2) Publish a booklet that interprets the prehistory of the Uncompahgre Basin based on archaeological studies done in the area. The booklet should be easy-to-read, well-illustrated, include reasoning for

**Response to Letter No. 15**

Thank you for your comments.

BLM_0005614

15

resource preservation and be sold for a nominal fee to cover the
cost of printing.

3) An interpretive prehistory display should be assembled with repre-
sentative types of artifacts from the basin and include photographs,
charts and resource preservation information. The display could be
housed at the Ute Museum, Montrose County Historical Museum or other
high-profile facility.

4) Develop presentation that could be shown to tourists, local civic
groups and schools on archaeological topics.

5) Actively pursue mitigation of damaged archaeological sites.

6) Involve local groups interested in prehistoric and historic resources
with the implementation of the above recommendations.

7) Patrol areas that contain high site densities and monitor site
damage and conditions.

8) Restrict ORV use in high site density areas to existing jeep roads
and close jeep roads that aren't necessary.

In conclusion, I would like to emphasize that the BLM has a timely
oppurtunity to address the cultural resource management problem. Your
decisions concerning the RMP will set the tone for future generations and
hopefully preserve the unique cultural resources of the Uncompahgre Basin.

Sincerely,

Bill Harris

Bill Harris

16



colorado
environmental
coalition
2239 E. Colfax Ave. · Denver CO 80206-1399 · 390-0466

Robert E. Vecchia
RMP Team Leader
Bureau of Land Management
Uncompahgro Basin Resource Area
2505 South Townsend Avenue
Montrose, Colorado 81401

October 23, 1987

Dear Mr. Vecchia,

I would like to make comments on behalf of the Colorado Environ-
mental Coalition in regards to the Uncompahgre Basin Resource
Management Plan. The Colorado Environmental Coalition was formed
in 1965 to work for protection of Colorado's environment. The
organization has 40 member groups with a combined membership of
over 35,000 people.

Overall, we found the plan to be very vague. It did not really
quantify the impacts. The plan uses subjective terms, such as
"substantial," "potentially improve," etc. instead of quantifed
data. We view these subjective comments on impacts as being
poorly conceived and we want actual numbers to allow the public
to better understand the impacts.

Coal

One of the most disturbing aspects of the preferred alternative's
coal leasing proposal is the area open to coal leasing. 83,334
acres are open to further leasing consideration. Under the
current management alternative, which we would more readily
support, the acreage open to coal leasing would be 20,737 acres.
This is a much more realistic figure considering current and
foreseeable market trends. This would also allow for better
protection of the environmental quality of the North Fork Valley
because the BLM could select the areas, which would be the least
harmed by coal production, for further consideration.

The Plan found only 569 acres of land out of the 83,396 acres in
the coal planning units to be unsuitable for further leasing
consideration using the unsuitability criteria. This is obvious-
ly a very narrow interpretation of the unsuitability criteria.
Substantial acreage in the North Fork drainage should be found
unsuitable on the Scenic Areas criterion alone. Alluvial valley
floors are also located in the coal leasing area. It would seem
to be appropriate that the EIS devote a section or an appendix to
the lands that have been eliminated from further consideration

1

BLM_0005615

16

Under the unsuitability criteria, and explain the methodology used for determining unsuitability. This is one of the few RMPs where the reader is not provided with this basic information. A good example of where an area should have been found unsuitable under the Scenic Areas criterion is the higher elevations of the Adobe Badlands WSA. This badlands area is obviously one of the most scenic areas in the Uncompahgre Basin Resource Area. A reevaluation of the unsuitability criteria obviously needs to occur in the Final EIS.

The plan inadequately addresses multiple-use trade-offs. The only discussion of multiple-use trade-offs occurs on page 1-9, stating "These multiple-use trade-off determinations are made during the RMP-EIS process." It appears that the only multiple-use trade-offs made were by letting uses other than coal production occur on lands that did not contain producable coal reserves. An example of a BLM Resource Management Plan that did examine multiple-use trade-offs is the North Dakota RMP and EIS. We recommend that you take a close look at this document when preparing the final EIS.

The Federal Coal Management Program EIS of 1979 also requires that thresholds be established on impacts to a variety of other resources. Since this concept was not superceded by anything in the 1984 Supplement to the EIS, it is still in effect. We maintain that the RMP must address thresholds particularly for wildlife and socioeconomic capabilities of the surrounding area.

The Secretarial Issue Document of 1986 requires that the RMP assess the coal development potential of the area. The reason that this should be covered in the RMP is so that leasing levels can be in line with demand levels. The Uncompahgre Basin RMP states on page 4-44 that "The possible leasing of up to 5,730 million tons of coal would far exceed demand over the life of this plan as the 1985 coal production from Delta and Gunnison counties was 2.2 million tons and optimistic annual coal production forecasts for this area range from 4.5 to 7.35 million tons for the years 1990 to 2000." The plan continues on page 4-45 to state that "this [preferred] alternative is not anticipated to impact coal production levels over the life span of the plan." The Plan blatantly ignores the realistic coal development potential of the area, and needs to be reworked.

The Secretarial Issue Document (1986) also requires the BLM to give "increased emphasis" to six criteria that other agencies, the CPTA, and public interest groups wanted added to the 20 unsuitability criteria. Among these other criteria are effects coal mining will have on wetlands/riparian habitat, sole-source aquifers, lands adjacent to Class I air quality areas,

2

16

reclaimability and buffer zones around National Park Service areas. None of these criteria were examined thoroughly in the Plan. In fact, the plan only briefly mentions riparian areas and makes the following statement in regards to aquifers on page 4-63. "The mining of coal and locatable minerals could result in the permanent and irreversible loss of ground water though diversion and subsidence," which we find totally unacceptable. Basically, the BLM needs to conduct not only a much more thorough investigation into these six criteria, but also into the entire federal coal management program in the Resource Area.

Oil and Gas

The section on oil and gas impacts is inadequate. The court case of Connore v. Burford states "comprehensive analysis of cumulative impacts on several oil and gas activities must be done before a single activity can proceed." The Preferred Alternative of the Plan dedicates only seven paragraphs to the impacts of oil and gas leasing and only one of those paragraphs deals with cumulative impacts. No leasing was recommended only for the Gunnison Gorge, an area recommended for Wilderness. No Surface Occupancy was recommended for the Needle Rock Outstanding Natural Area. It appears that the BLM has chosen to ignore its legal mandate under Connore v. Burford. Another section of judge's decision is applicable here, stating that federal agencies "have intiated a pattern of procrastination, not examination of environmental concerns." The BLM is capable of doing an adequate job of assessing impacts, so why not do it? The Plan should also mandate that all ACECs and other natural areas receive for a minimum No Surface Occupancy stipulations.

Tract Disposal

The BLM has not outlined sufficient criteria for determining tracts available for disposal. This can be seen through some of the tracts slated for disposal such as the West Dallas Creek tract (T.44 N. R.9 W. Sections 4 & 9). This area receives heavy recreational use and is located on a county highway. The tract is located on one of the main access points to the Mt. Sneffels Wilderness Area, and obviously should be slated for retention. Another poor selection as a disposal tract is the Baldy Peak Area (T.45 N. R.8 W. Section 36). Baldy Peak is a former Wilderness Study Area, which has the potential to be a future addition to the Big Blue Wilderness Area. The Muddy Creek tracts above Paonia Reservoir also have heavy recreational use. The tract provides important public access points along Colorado Highway 133.

Obviously, the Uncompahgre Basin Resource Area has not devised

3

BLM_0005616

16

adequate criteria for determining tract disposal. The Grand
Junction RMP included 17 criteria which would automatically
warrant retention of the tract. The criteria are as follows:

1. Wilderness areas and wilderness study areas
2. National conservation areas
3. Wild and scenic rivers and wild and scenic study rivers
4. National or historic trails
5. Natural or research natural areas
6. Designated areas of cultural or natural history
7. Designated areas of critical environmental concern
8. Designated wild horse preserves
9. Other congressionally designated areas
10. Threatened or endangered species habitat areas
11. Riparian habitat areas
12. Valuable recreation areas
13. Wetland Areas as defined in Executive Order 11990 5/77
14. Flood plain areas (100 year) as defined in Executive
    Order 11988 5/24/77
15. Large blocks of land that are suitable for multiple use
    management
16. Lands containing water sources with valid existing water
    rights held by the BLM
17. Critical big game winter range

There are also criteria for areas with high mineral potential.
We maintain that the criteria used in the Grand Junction RMP is
much more useful and thorough than the 5 criteria used in the
Uncompahgre RMP presented on page 1-6.

Changes in Management Prescriptions

We recommend the following changes in the mandates for the pre-
ferred management prescriptions, in addition to the comments made
through the rest of the letter:

The D-6 management prescription should include a recommendation
to acquire land in Red Canyon in order to have a more logical and
ecologically sound boundary for the proposed Gunnison Gorge
Wilderness Area.

We commend the BLM on realizing the significance of the Riparian
areas within the Resource Area, but feel the agency has not gone
far enough in insuring the protection of riparian areas in the
plan. The D-9 prescription needs to allow the agency to imple-
ment a policy which will improve the quality and vitality of ri-
parian areas. We support stricter limits for livestock use in
these fragile areas, since livestock is probably the single
greatest cause of deterioration of riparian habitat. The Plan,

4

Responses to Letter No. 16

1. The private mineral estate land in Red Canyon is identified for acquisition under
the Proposed Action for the Gunnison Gorge WSA in Chapter 2 of this
document. The Gunnison Gorge Recreation Area Management Plan (July
1985) also identifies these tracts for acquisition.

16

however, must address the site specific impacts of coal develop-
ment on riparian and aquatic areas as required in the Secretarial
Issue Document (1986). Mineral development can also have signi-
ficant impact of riparian areas, thus this mineral development
(including oil and gas as well as coal) should be minimized.

We oppose the ski area proposed for Storm King Mountain under the
D-10 management prescription. The D-10 area should be managed
for elk habitat, and timber harvesting should be prohibited. As
Storm King is not only fantastic elk habitat, it is also an
important scenic vista for much of the upper Uncompahgre Valley.
The natural character of the area should also be maintained for
this reason.

We have serious concerns for the resource uses which would be
permitted in the D-12 and D-13 management prescriptions.
Escalante Canyon is being recommended for an Area of Critical
Environmental Concern and Fairview is being recommended for a
Research Natural Area because of their outstanding biological
characteristics. It is amazing that the BLM realizes the signi-
ficance of these areas, but allows potentially destructive ac-
tivities to these lifeforms to occur in these areas. The BLM
should prohibit grazing in all ACECs, RNAs, and ONAs. Livestock
have the ability of destroying the rare plants that are found in
these areas. A Mineral withdrawl should also be placed on the
areas to prevent potentially destructive mining and the possible
converting of important lands to private lands using the claim
and patent system. A No Surface Occupancy stipulation should
placed on all oil and gas leases which may cover the area to
protect the areas from damage due to oil and gas development.
The BLM should also strictly control recreation especially in the
Escalante Canyon ACEC. Camping and bathing should be banned.
Uncontrolled recreational use can also damage the endangered
plant species.

Wilderness

The Colorado Environmental Coalition supports the designation of
the Camelback, Adobe Badlands and Gunnison Gorge as Wilderness.
All three areas easily qualify for Wilderness protection and are
deserving of designation.

Gunnison Gorge

The Gunnison Gorge is one of the premiere primitive recreational
areas in the state. The area receives substantial boating,
hiking and fishing use. Gunnison Gorge is immediately downstream
from the Black Canyon of the Gunnison National Monument's Wilder-
ness area, and would make an excellent addition to this area.

5

133

BLM_0005617

16

The Gunnison River has also been recommended for Wild River designation under the Wild and Scenic Rivers Act through the Gorge. The Gunnison Gorge is obviously one of the highest candidates for wilderness protection in the state of Colorado.

Adobe Badlands

These Mancos Shale badlands, located just a few miles north of Delta, are among the most scenic places in the resource area. The badlands provide excellent vistas and are habitat for the endangered Uinta Basin hookless cactus. Since four oil and gas wells have been drilled near Adobe Badlands and all have been dry, the area also has low oil and gas development potential. Other conflicts with wilderness designation are also low. The BLM states in the plan that it intends to prohibit off road vehicle use in the area. If designated as wilderness, Adobe Badlands would diversify Delta's recreational opportunities and improve its tourist economy. The BLM does not really have a rationale for not recommending the Adobe Badlands for wilderness, and needs to reevaluate this decision.

Camelback

Camelback has absolutely no conflicts to wilderness designation. Wilderness designation would be compatible with the current management of the area. The Uncompahgre Plateau is one of the major landforms of western Colorado, but not one acre of it has been designated wilderness. Although officials of the BLM have often claimed that Dominguez Canyon proposed wilderness to the north of Camelback is almost identical to Camelback, we have found the areas to be quite different. Camelback has a much greater diversity of rock formations that are not present in Dominguez Canyon, making the areas look much different. Camelback contains habitat for the endangered spineless hedgehog cactus and the rare Grand Junction milkvetch. The area is being considered for desert bighorn sheep reintroduction and for improvement of its riparian habitat in this plan. Both of these activities would be consistent with wilderness designation. Camelback is rare among BLM Wilderness Study Areas in that it also has a well developed network of trails making the area ideal for backcountry recreational use. The BLM has obviously erred in its recommendation of Camelback and should support the area for Wilderness designation.

ORV Use

The BLM has not effectively dealt with Off Road Vehicle (ORV) use in the plan. The prospect of having 82% of the resource area open to uncontrolled ORV use is frightening. We support substan-

6

2. Please see response to Letter No. 13.

16

tial reductions in the amounts of land, where ORV use would be permitted. It is especially disturbing to see the D-8 management prescription (geared to ORV use) being located in habitat for the endangered Uinta Basin hookless cactus. This is obviously in violation of the Endangered Species Act. The plan admits that ORV use will have substantial adverse impact on soils, water, and vegetation. Much greater restraints must be implemented for ORV use.

Utility Corridors

Although existing utility corridors were described in the plan (p. 2-24), no information was provided on where new utility corridors would be permitted. We support delineation of where utility corridors would be permitted. Restriction should be placed on all Wilderness Study Areas, Outstanding Natural Areas, Research Natural Areas, and Areas of Critical Environmental Concern prohibiting utility corridors.

Threatened and Endangered Species

It appears from the lack of information in the plan that the BLM has not conducted a survey of its lands to identify areas which contain threatened and endangered species. The plan should include in the plan a mandate for conducting a study for not only threatened and endangered species habitat but also to identify remnant plant communities. Provisions should be made to amend the plan when this information has been collected.

We appreciate this opportunity to comment on the plan, and hope that the agency will be responsive to our suggestions. Dramatic changes need to occur in order to make this plan acceptable.

Sincerely yours,

*Kirk Koepsel*

Kirk Koepsel
Public Lands Coordinator

7

134

17



1860 Lincoln Street, Suite 404 • Denver, Colorado 80295
303/860-0099

October 29, 1987

Mr. Robert Vecchia
RMP Team Leader
Uncompahgre Basin Resource Area
Bureau of Land Management
2502 South Townsend Avenue
Montrose, CO 81401:

Dear Mr. Vecchia:

On behalf of the Rocky Mountain Oil and Gas Association (RMOGA), I would
like to offer the following comments on the Draft Uncompahgre Basin Resource
Management Plan (RMP) and Environmental Impact Statement (EIS). RMOGA is a
trade association with hundreds of members who account for more than 90% of the
oil and gas exploration, production and transportation activities in the Rocky
Mountain West. Consequently, we review all draft plans in this region to
determine whether they provide equitable and reasonable treatment of mineral
resources.

We would like to commend the BLM on its preparation of a clear, concise
Draft RMP and EIS. We believe the plan as proposed represents a balanced
approach to land management planning which adheres to the multiple-use concept
mandated by Bureau policy. Moreover, the BLM's decisions are readily displayed
and are easily understood by the reader. The use of oil and gas stipulations to
protect other resource values appears to be reasonable, unbiased, and not
designed to unduly constrain oil and gas activities in favor of other values.

We are disturbed by the lack of information displayed in the DEIS regarding
oil and gas activities. We believe that in order to have a totally defensible
document, the BLM must include a general description of what is involved when
oil and gas activities are conducted on public lands. Specifically, the
procedures and regulations which industry and the BLM must comply with regarding
leasing, exploration and production activities should be generically discussed
in the document itself, or in an appendix. Such discussion informs the public
on how oil and gas activities are allowed to occur on public lands, and the
process by which such activities are mitigated and approved.

**Response to Letter No. 17**
Thank you for your comments.

---

17

October 29, 1987

Mr. Robert Vecchia
RMP Team Leader
Uncompahgre Basin Resource Area
Bureau of Land Management

page two

In conclusion, RMOGA supports the Preferred Alternative as proposed by the
BLM. However, we believe it is critical for the BLM to adopt our recommendation
to include a general discussion of what takes place during oil and gas
activities, and the procedures by which these activities are allowed to occur.

We appreciate the opportunity to provide our comments. If you have any
questions or would like to discuss our comments in greater detail, please do not
hesitate to contact us.

Sincerely,

Jess Cooper
Executive Vice President

JC:cw

BLM_0005619



**MEC**

**MINERALS EXPLORATION COALITION**

*Minerals Advocate to Public Policy*

Mailing Address:
Box 193
767 South Jason Court
Lakewood, Colorado 80228
(303) 232-4310

Reply to:
☐ Lakewood, Colorado

☐ L.C. Lee

Washington Representative
L. Courtland Lee
3614 West Street
Landover, Maryland 20785
(301) 322-5782

**18**

October 29, 1987

Robert E. Vecchia
RMP Team Leader
Bureau of Land Management
Uncompahgre Basin Resource Area
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Vecchia:

The following comments constitute the response of the Minerals Exploration Coalition (MEC) to the Uncompahgre Basin Resource Management Plan and Draft Environmental Impact Statement (DEIS). The MEC represents companies and individuals engaged in exploration for locatable minerals on the federal lands.

The MEC supports the management goals of multiple use, giving consideration to all renewable and nonrenewable resources, including minerals.

We do not believe that sufficient minerals data has been collected or weight given to mineral resources to allow fair consideration of minerals in the management plan. Without a complete set of data on the mineral resources showing the location and extent of past and current mineral production and potential for future exploration and production, the importance of these minerals to the citizens of Colorado and the United States cannot be recognized. While the areas of past mineral production and areas with potential for future production are mentioned in a general way on pages 2-3 and 2-4 a map showing location and extent of these areas was not prepared. No rating of the mineral potential is shown for areas outside the WSAs. Within the WSAs, maps showing the location of the areas rated is lacking.

The absence of mineral data in comparison with the data on other resources is particularly evident when one considers the economic data shown in Table F-1, Appendix F, page A-19. This table shows that, except for government, minerals provide the largest source of personal income to the citizens of the region. Detailed information for some resources is included in the appendix but not for minerals. How can the largest source of non-government income be omitted?

The Minerals Exploration Coalition opposes the inclusion of areas of high and moderate mineral potential in wilderness areas because the opportunity to explore for and produce minerals is prohibited in wilderness areas, except where prior existing rights can be shown. The boundaries of the wilderness study areas that include moderate or high mineral potential should be changed to exclude the mineralized areas or the WSA should not be recommended for wilderness designation.

1 |

Page 2
October 29, 1987
BLM

**18**

The Geology, Energy and Minerals (GEM) reports are cited as the basis for the determinations of mineral potential in the WSAs in the wilderness supplement. No reference is made to the required mineral surveys conducted by the U. S. Geological Survey and U. S. Bureau of Mines. The USGS-USBM minerals information should be available before wilderness decisions are made.

To show that mineral activities will be allowed on most (generally in excess of 90 percent) of the land, thereby implying that most of the mineralized land will open, is misleading when considering the lands to be withdrawn under the various alternatives. Minerals are unevenly distributed, therefore, without specific information on the location of the minerals one cannot determine the impact on the mineral industry of these proposed withdrawals.

We have not made a select of our preferred alternative because without adequate minerals we cannot make an intelligent choice.

Thank you for the opportunity to comment on this plan.

Sincerely,

*John O. Wells*

John O. Wells,
President

## Response to Letter No. 18

1. Prior to the preparation of this WEIS, the only available information on mineral potential in the WSAs was the GEM reports. The USGS-USBM mineral reports, to which you refer in your letter, are only done for those WSAs recommended as suitable for wilderness designation by the BLM. Since the publication of the Wilderness Technical Supplement (WTS), a detailed USGS-USBM mineral survey has been completed on the Gunnison Gorge WSA, and the results are summarized in Chapter 3. According to this most recent study, the Gunnison Gorge has only a "low mineral and energy resource potential," not a "moderate favorability for accumulation of mineral resources," as previously stated in the GEM report. Since the Adobe Badlands and the Camel Back WSAs are not recommended for wilderness designation, no USGS-USBM reports have been completed for these areas. Tables 3-1 and 3-2 provide a summary of the GEM reports for the Adobe Badlands and Camel Back WSAs, and indicate that both areas have only low to moderate potential for leasable and locatable minerals.

BLM_0005620

19

The AUDUBON SOCIETY
of Western Colorado

Post Office Box 1
Grand Junction, Colorado 81502

Robert E. Vecchia
RMP Team Leader
Bureau of Land Management
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Sir:

The Audubon Society of Western Colorado appreciates the
opportunity to comment on the Uncompahgre Basin  RMP and
EIS. We offer the following comments and suggestions:

1. We believe the conservation alternative rather than the
preferred alternative would better serve the national
interest in almost every detail. We applaud your decisions
which incorporate elements of the conservation alternative
into the preferred alternative.

2. The conservation alternative recommends a wilderness
designation for the Adobe Badland WSA and for the Camel Back
WSA, but the preferred alternative does not include this
recommendation. We believe this omission is a mistake. We
support any action which will enhance the preservation of
wilderness values, as this designation would.  The economic
advantages gained by not designating these areas as
wilderness are short-term and negligible in comparison.

3. If the Camel Back area is not to be designated as
wilderness, off-road vehicle use in the area should be
prohibited nevertheless.  The EIS states that ORV use would
be the primary cause of decline in wilderness values under
the preferred alternative. This alternative provides enough
area for ORV use without allowing such use to destroy the
wilderness value of the Camel Back WSA.

## Responses to Letter No. 19

1. Please see response to Letter No. 13.

2. Due to changes as a result of responses to public comments and internal BLM
review, the Proposed Action for the Camel Back WSA presented in the Final
RMP/EIS and this document differs from the Preferred Alternative addressed
in the Draft RMP/EIS. The Proposed Action in this WEIS reflects the RMP
decision that the entire Camel Back area (10,402 acres) will be closed to
recreational ORV use to prevent accidental destruction of threatened and
endangered plants, to protect visual qualities, and to reduce active erosion.
(Please see Chapter 1, Changes from the Draft RMP/EIS, Draft WTS, and
Final RMP/EIS for details.)

19

The preferred alternative also aims to "minimize
disturbance" in this area to enhance habitat for
introduction of bighorn sheep; allowing ORV use would
certainly hamper this goal. Further, although the preferred
alternative provides for bighorn habitat management, it
fails to allocate forage for these animals. This failure
could easily lead to the failure of the re-introduction.

4. The preferred alternative for the Camel Back area is
confusing.  The map for this alternative seems to label the
area "D-1," which "would be managed to improve vegetation
conditions and forage availability for livestock grazing."
The description of Management Unit D-1, under the
sub-heading "Soils and Water Resources," states that
"non-conflicting erosion control objectives, projects and
mitigating measures would be incorporated."  The
"Comparison of Alternatives" chart, however, states that
the plan is to "manage the Camel Back area with emphasis on
riparian/aquatic system management, wildlife habitat and
livestock grazing."  We hope that the real priority is that
described in this chart (if a wilderness designation is not
forthcoming). At any rate, the designation needs to be
clarified.

5. The preferred alternative takes the second-best
approach to managing the Adobe Badlands area north of Delta.
It is wise to put soil erosion control as the primary
objective.  Wilderness designation for the WSA within the
area, however, would also meet that objective and would
protect wilderness values as well.

6. The Wilderness Technical Supplement states that "the
Proposed Action is based on an overall evaluation of
wilderness values, analysis of conflicts with other
resources, consideration of social and economic factors, and
consistency with other plans."  None of these evaluations,
analyses, or considerations are discussed in the RMP.  It is
impossible for the public to provide adequate input on RMP
decisions when the bases for these decisions are unknown.
An analysis of the alternatives, such as that provided in
the USFS RARE II EIS, would be most helpful.  Because the
Uncompahgre Basin plan contains no much analysis, it seems
reasonable to request an amendment that includes this
information and time for the public to respond to it.

Sincerely yours,

Richard Levad

Richard Levad
Conservation Committee
Audubon Society of Western Colorado

3. Under the Preferred Alternative in the Draft RMP/EIS, the Camel Back WSA
becomes part of Management Units D-1, D-2, and D-9. Management for these
units corresponds to and is consistent with the management direction outlined
in Table 3-8 that document.

4. Thank you for your comments.

5. Please see response to Letter No. 13.

137

**Sierra Club**
Rocky Mountain Chapter

20

TO EXPLORE, ENJOY AND PRESERVE THE NATION'S
FORESTS, WATERS, WILDLIFE AND WILDERNESS...

Robert E. Vecchia
Bureau of Land Management
Uncompahgre Resource Area
2505 S. Townsend Ave.
Montrose, CO, 81401
Nov. 1, 1987

Dear Sir:

The following comments on water quality/soils/riparian aspects of the Uncompahgre Draft RMP and EIS are made on behalf of the Rocky Mountain Chapter.

This draft document correctly indicates that parts of (85%) the Resource Area are plagued by moderate to severe soil erosion, leading to a substantial contribution to salinity levels in the Upper Colorado River Basin, as well as sediment. The document correctly states that about half of the dissolved and suspended water pollution is due to human activities, particularly poor grazing practices, mining, and ORV use.

The projected impacts on water resources of the Preferred Alternative also appear to be candid and correct, although the discussion of the impacts in the text is by no means clear. Impacts that are especially important to us are: permitted grazing on 39,000 acres of highly saline and erodible soils during the spring season, year-long ORV use

2239 E. Colfax Avenue, Denver, CO 80206   303/321-8292

20

on 25,000 acres of highly erodible and saline soils, and cancelling withdrawals for mineral exploration on 4,000 acres of riparian habitat. Our reason for these concerns may be stated succinctly: Clean water is probably (with the possible exception of fossil fuels) the most economically important "output" from the Uncompahgre Resource Area. In comparison, ORV and other recreation, locatable minerals, and grazing are insignificant in the context of the whole Colorado River Basin. In this context, grazing, ORV recreation etc. are of local value only, whereas decreases in water quality/pure waters adversely affect the ecology of the basin and the well-being of millions of people. Therefore, the BLM must be much more aggressive in limiting uses that adversely impact soils/water/riparian habitat. Since the EIS appears to give at least a zeroth-order approximation to a proper discussion of impacts, we urge the BLM to make the following changes in its management plan:

A. Reconsider the permitted season-of-use for livestock utilization of riparian acres and erodible areas in general. The March through May restrictions may not allow sufficient time for soil moisture and vegetative growth to decrease. Studies in other areas have shown that less than 10% soil moisture is necessary to prevent bank damage and soil compaction (see: Draft Technical Reference on Grazing Management in Riparian Areas, Sept. 1987, Gene Reich, BLM, Grand Junction District), and that this level of soil moisture is not reached until late July, on average.

B. Grazing and ORV use should be absolute prohibited on saline and easily erodible soils. A possible exception might be for certain grazing systems, but if, and only if, the permittee and the agency, through a credible monitoring program, can demonstrate to the public that the particular grazing system employed can increase the extent and vigor of ground cover and decrease erosion.

C. Minerals exploration and development, whether leased or placer, must not be permitted in or near stream channels under any conditions. The BLM must not withdraw existing withdrawals protecting stream channels and should initiate new withdrawals if these are necessary to protect water quality and stream hydrology.

Despite numerous deficiencies in the Uncompahgre RA Plan and EIS as a planning document, one aspect that can be applauded is the creation of "emphasis areas" for riparian habitat management.

**Response to Letter No. 20**
Thank you for your comments.

BLM_0005622

20

Provided that reasonable measures are taken by the BLM to protect
soils and riparian zones in its grazing and ORV management
programs, the Rocky Mountain Chapter would like to express its
willingness to explore volunteer stream-restoration projects
with the RA-staff, as we have done in other areas.

Thank you for your consideration of these opinions.

Sincerely,

Kirk Cunningham
Conservation Chairman
680 Tantra Dr.
Boulder, Co, 80303

21



DELTA
COUNTY
LIVESTOCK
ASSOCIATION

November 4, 1987

ROBERT E. VECCHIA, RMP TEAM LEADER
Bureau of Land Management
Uncompahgre Basin Resource Area
2505 South Townsend Avenue
Montrose, CO 81401

FROM:   DELTA COUNTY LIVESTOCK ASSOCIATION
John Botti, President
R. 1 Box 14
Crawford, CO 81415

SUBJECT:  UNCOMPAHGRE BASIN RESOURCE MANAGEMENT PLAN - COMMENTS

The Delta County Livestock Association is in agreement that the Camel Back,
the Adobe Badlands and the Gunnison Gorge should continue to be managed
as they now are by the BLM and prefer the no action alternative.

1  The 10,402 acre Camel Back area should continue, as it now is, under mul-
tiple use management.  The area does not have the suitability for a Wilder-
ness designation.  The management plan now implemented is working well
and the vegetation has already increased along the Roubideau River and
Potter and Monitor Creeks.

For several months each year these streams are dry.  Damage by flash flood-
ing governs plant growth along stream beds, not grazing by livestock.  Be-
cause of the terrain, this area is subject to several flash floods each
year.

2  Introducing big horn sheep into the area would only compete with the deer
and elk now using these winter ranges.  Private lands would be overrun by
these animals needing forage in the winter.

3  The 680 AUMs allocated for livestock grazing should remain unchanged.

Neither is the Adobe Badlands suitable for Wilderness.  All these natural
resources should be utilized under multiple use and the 878 AUMs allocated
to livestock grazing should remain the same.

The Gunnison Gorge should also continue under multiple use.  Proper manage-
ment increases riparian habitat.  The 662 AUMs currently allocated for
livestock grazing should not change.

One reason these lands are being suggested as Wilderness Areas is because
the rancher appreciates the land and its value to the area.  Thus they
have properly utilized and managed them in cooperation with the BLM.

Responses to Letter No. 21
1. Thank you for your comment.
2. Prior to reintroduction of desert bighorn sheep into the Camel Back area, a
sitespecific environmental analysis which would identify potential impacts
would be completed. The reintroduction of desert bighorn sheep into similar
habitat in Dominguez Canyon in 1983 has not resulted in detectable conflicts
with livestock, big game, or riparian vegetation.

Although bighorn sheep would use the streams as water sources, they would
not remain in those areas where dense vegetation inhibits their ability to
recognize predators and hazards.

3. The decreases in AUMs in the Camel Back and Adobe Badlands WSAs are
not proposed reductions, but anticipated impacts which could result from
implementing the 35 percent utilization restriction that is part of the
management prescriptions for riparian and salinity areas. No change in current
forage allocations are projected for either area.

139

BLM_0005623

**Sierra Club**
Rocky Mountain Chapter

... TO EXPLORE, ENJOY AND PRESERVE THE NATION'S
FORESTS, WATERS, WILDLIFE AND WILDERNESS.

22

November 3, 1987

Gene Vecchia
RMP Team Leader
Bureau of Land Management
Uncompahgre Basin Resource Area
2505 South Townsend Ave.
Montrose, CO  81401

Dear Gene:

Enclosed are comments for the Rocky Mountain Chapter of the Sierra
Club on the Draft Uncompahgre Basin Resource Management Plan and EIS,
and the accompanying Wilderness Technical Supplement (WTS). The
Sierra Club currently has over 8,300 members in Colorado, many of whom
make recreational use of the public lands administered by BLM in the
Uncompahgre Basin Resource Area.

**WILDERNESS**

The Sierra Club has several generic concerns with BLM's analysis of
wilderness resources in the DEIS and WTS. A major concern appears on
the very first page of the WTS (S-1) where BLM notes that "multiple-
1   use management would continue" with non-wilderness designation of
Camel Back WSA. Is BLM aware that wilderness, and the resources it
protects, is a form of multiple use? Is BLM aware that the Wilderness
Act itself (Section 4(a)(1) of PL 88-577) specifically amends the
Multiple-Use Sustained-Yield Act to note that wilderness is not
inconsistent with multiple-use ?

Another concern centers on the presentation of information. Nowhere
is any rationale given for BLM's wilderness recommendations, some of
2   which seem to fly in the face of reality. It would tremendously
improve the ability of the public to intelligently comment on BLM's
management proposals if we had some inkling of the thinking behind
these proposals.

The Sierra Club strongly endorses the BLM's preferred alternative
recommending all of Gunnison Gorge WSA for wilderness designation.
Wilderness designation will greatly enhance BLM's previous
recommendation of the Gunnison River through the WSA for Wild and
Scenic River protection, and will also provide added impetus to
ongoing efforts to secure legislation that formally designates both
the river as Wild and Scenic and the WSA as wilderness.

2239 E. Colfax Avenue, Denver, CO 80206   303 / 321-8292

---

**Responses to Letter No. 22**

1. The BLM's statement that "multiple-use management would continue" within
the Camel Back and Adobe Badlands WSAs, was not meant to suggest that
wilderness is not a valid resource in the full spectrum of multiple-use
management. In the glossary of the draft Wilderness Technical Supplement
it states:

MULTIPLE-USE. Management of the various surface and subsurface resources
so that they are jointly utilized in the manner that will best meet the present
and future needs of the public, without permanent impairment of the
productivity of the land or the quality of the environment.

The BLM's statement means that under the Preferred Alternative, as under the
All Wilderness Alternative, the public lands would continue to be managed
under this multiple-use concept.

2. Please see Response to Letter No. 13.

---

Sierra Club Comments
November 3, 1987
Page 2

BLM's unsuitable recommendation for Camel Back is, however, appears
to us to be without merit. The Wilderness Technical Supplement makes
clear that there are no resource development conflicts with timber or
mineral resources. Similarly, the current inaccessibility of the area
has thus far insulated it from significant conflicts with ORV use. On
the other hand, there is an impressive array of wilderness dependent
values present in the WSA, as BLM itself has noted. These include
3   crucial big game winter range, habitat for threatened and endangered
species such as golden and bald eagles as well as rare plants and
plant associations, a substantial perennial stream, the Ben Lowe Cabin
historic site, stunning scenery, and uncommon geologic features such
as hoodoos. By anyone's definition, Camel Back has all of the
requisite requirements for a wilderness, and few conflicting resource
demands. The area also faces likely future degradation of its
wilderness values without wilderness designation, as the WTS notes, in
the form of intrusions by ORVs such as all-terrain-vehicles. All of
these, coupled with the excellent manageability of the area due to its
compact topographic boundaries, indicate that BLM should recommend
Camel Back as suitable for wilderness designation.

One particularly unique aspect of Camel Back is its position as an
integral part of the longest intact roadless drainage on the entire
Uncompahgre Plateau. The 7 or 8 miles of Roubideau Creek within the
WSA, when combined the 15 miles of undeveloped canyon on the adjacent
upstream National Forest, make this drainage the only continuous,
roadless drainage that comprises the full range of ecosystems present
4   on the Uncompahgre Plateau, from the aspen-spruce forests of the
divide to the sparse desolation of the uplands above the lower
canyon. How does BLM consider the value of a unit such as Camel Back
which is unique in its contribution to protecting an entire
ecosystem? Surely, ecosystem protection is one of the greatest
priorities of the National Wilderness Preservation System, and Camel
Back is a rarity in providing such a distinctive opportunity on a
landform (the Uncompahgre Plateau) which currently has no designated
wilderness. Has BLM taken the non-wilderness designation of the
Roubideau RARE II area to mean that Congress opposes wilderness
protection for this drainage? If BLM has, then it is in violation of
Congressional intent as spelled out in the Committee report which
accompanied the 1980 Colorado Wilderness Act.

The only potential conflict with wilderness designation of Camel Back
that was identified at public hearings was with livestock grazing,
primarily over the issue of finding additional water sources for
livestock outside of the Roubideau Creek riparian area. First of all,
the Sierra Club strongly supports the reduction in forage utilization
to 35 percent on 1,400 acres of riparian zones in the WSA (WTS at 2-
2). It is obvious to even the most casual observer that the Roubideau
Creek riparian zone has been thoroughly trashed by livestock use. The
ranchers present at the Montrose hearing indicated that they thought

---

3. Please see Response No. 2 to Letter No. 19.

4. Public Law 96-560, which released the U.S. Forest Service's Roubideau Rare
II area from wilderness consideration, did not make any determination on
adjacent lands administered by the BLM.
Please see also Response to Letter No. 13.

BLM_0005624

22

Sierra Club Comments
November 3, 1987
Page 3

this would be a hardship on them, though it might be easily
implemented through more active management of the livestock herds in
the riparian zone rather than simply leaving the livestock to slowly
drift along the creek. Some of these ranchers also indicated that
this hardship could be greatly relieved if additional water sources
were made available on Winter Mesa. If, indeed, the primary conflict
with wilderness designation of Camel Back is the issue of grazing in
the riparian zone of Anubideau Creek (though this does not appear to
be the case since BLM is proposing a reduction even in the no
wilderness alternative), then BLM would be remiss in not considering
an alternative in the WTB that proposes wilderness designation for the
majority or all of the WSA while providing for additional water
sources for livestock on Winter Mesa.  Will BLM consider such an
alternative?

What is the meaning of the statement that grazing allocation on Camel
Back will be reduced from 600 AUMs to 400 AUMS, "which would be
managed under an intensive grazing system"? Does BLM intend to
implement an HMH intensive grazing system for these allotments?

The Sierra Club supports wilderness designation for Adobe Badlands
WSA.  As with Camel Back, there are no substantive reasons for BLM's
nonsuitable recommendation given in the DEIS or WTS.  Mineral, timber,
livestock grazing, and ORV conflicts are all minimal or nonexistent.
Wilderness designation of Adobe Badlands would greatly enhance the
diversity of the National Wilderness Preservation System by
incorporating an area of Mancos Shale badlands.  In the other
instances in Colorado where BLM has had the opportunity to protect an
example of such an ecosystem, most notably in McKenna Peak WSA and
Little Bookcliffs WSA, BLM has similarly failed to act on behalf of
wilderness diversity.  Is there any inherent reason why Mancos Shale
badlands are unsuitable as wilderness that BLM has not told us?

COAL.

The DEIS does not seem to offer much of a range in the alternatives
for future coal leasing. With the exception of the current management
alternative, all of the alternatives propose the same amount of
acreage available for future leasing (+/- 500 acres). This seems
particularly inappropriate since the RMP/DEIS notes at 1-9 that the
RMP-EIS process is when multiple-use trade-off determination is to be
made.  It is hard to believe that in the Conservation Alternative, for
example, that development of coal outweighs other resources as often
as it does in the production alternative. While BLM may have actual
control over only the minerals on these lands, BLM cannot ignore the
impact that coal development might have on wildlife, water quality,
and other such resources offsite.  The alternatives need to be revised
to reflect this.

5. An alternative that would recommend the Camel Back WSA as wilderness with
provisions for water development on Winter Mesa is not needed. Under the
BLM's Wilderness Management Policy, new rangeland improvements may be
allowed if determined to be necessary for the purpose of resource protection.

6. Please see Response to Letter No. 13.

7. Mancos shale badlands are not inherently unsuitable for wilderness designation.
The Adobe Badlands area will be managed as an Outstanding Natural Area,
set aside to preserve unique geologic features and threatened and endangered
plants.

22

Sierra Club Comments
November 3, 1987
Page 4

STORM KING PEAK SKI AREA SITE

The RMP/DEIS is completely inadequate with respect to its treatment of
the proposed Storm King Peak Ski Area.  BLM fails all over itself
trying to get of the way of making any sort of a decision about the
most appropriate resource use of Storm King Peak. BLM's self-
direction in the RMP/DEIS (1-5) states that it should determine
whether "development of Storm King Peak Ski area would be compatible
with wildlife habitat, timber production, and coal production." The
decision in the proposed RMP comes nowhere near fulfilling this
criterion. Instead, BLM offers up some silly scheme to allow
development of the ski area for five years hence, after which BLM
might change its mind and not allow development.  What kind of
management guidance is that?  The RMP is fairly specific about the
impacts of the proposed ski area on wildlife, noting that the ski area
would eliminate useable elk calving habitat and impact mule deer
fawning (4-54).  That seems a fairly clear statement concerning
compatibility of the ski area with wildlife habitat.  BLM should make
a definite management decision based on this information, either in
favor of the ski area or opposed to it.  The Sierra Club urges BLM to
oppose the ski area, and to reject it by finding it to be an
incompatible use of Storm King Peak in the context of multiple-use
resource trade-offs in the RMP.  We wonder why BLM seems so intent on
satisfying the ski area proponent since not a peep of support was
offered at any of the public hearings for the proposed ski area, and
since the proponents were not even interested enough in the
proceedings to attend any of the hearings.

We would also submit that if BLM insists on accomodating this phantom
ski area proponent, then BLM should demand evidence of financial
capability from the proponent.

On one final note, the RMP/DEIS has a significant oversight in failing
to include in the Preferred Alternative "Impacts on Terrestrial
Wildlife Habitat from Recreation Management" (4-52) any mention of the
impacts to elk and mule deer from development of the proposed Storm
King Peak ski area.

RECREATON

We commend BLM for incorporating the excellent work that has already
been done in developing the Gunnison Gorge Special Recreation
Management Area into the proposed RMP (3-34).  However, what is the
rationale for revoking the mineral withdrawal for these same lands?
We doubt that there is any great clamoring for exploration and
development of these lands, so why the revocation?  Despite their low
mineral potential, there still exists the possibility for claims to be
staked and surface development to occur that would have an adverse

BLM_0005625

22

Sierra Club Comments
November 3, 1987
Page 5

impact on the dominant recreational values present.  And how in the
world can BLM claim that revoking the mineral withdrawal and opening
these lands to the hackneyed approach of the 1872 Mining Law enhances
"long-term land use planning"?  That's got to be double-speak if
anything is!  Leaving the Gunnison Gorge SRMA closed to mineral
development is as certain a form of long-term land use planning as one
could devise.

The Sierra Club supports BLM's recognition of the growing demand for
river recreation through its proposal to enhance river access for the
lower Gunnison River at Escalante Bridge and to provide informational
materials on river use (RMP/DEIS at 3-32).

LAND DISPOSAL

The Sierra Club finds the stated criterion for assessing the potential
for disposal of public lands (RMP/DEIS at 1-6) greatly lacking in
their protection of the public interest.  The approach taken by the
Grand Junction Resource Area in the Grand Junction RMP, listing 17
criteria that would automatically warrant retention of tracts of
public land, provides far greater protection for public interests.
The Uncompahgre Basin RMP should adopt a similar set of criteria.

Several of the tracts identified for potential disposal do not meet
the criteria for disposal as stated in the RMP/DEIS.  One such tract
is the public land along West Dallas Creek (T.44N.,R.9W., sections 4 &
9).  This tract possess significant public values in the form of
riparian habitat and recreational opportunities.  It is located on a
county road that provides access to the Mt. Sneffels wilderness, and
it provides for public camping areas in a valley that is almost
entirely otherwise controlled by private interests.  We do not see any
circumstances under which this tract should be passed out of public
ownership.

Two other tracts include the former Baldy Peak WSA (T.45N.,R.8W.,
section 36) and a tract along Cow Creek (T.45N.,R.7W., sections 9 and
16).  Both of these should only be disposed of if passed on to the
U.S. Forest Service.  Baldy Peak represents a potential addition to
the existing Big Blue Wilderness, while the Cow Creek tract offers
public access to the creek amidst one of the most scenic and popular
locales in the Uncompahgre Mountains.

RIPARIAN HABITAT

The Sierra Club supports BLM's recognition of the importance of
riparian zones through its development of the "D-9" management
presciption in the preferred alternative.

22

Sierra Club Comments
November 3, 1987
Page 6

TRANSPORTATION

We support BLM's proposed closure of the Potter Creek road and the Dry
Fork of Escalante Creek road (RMP/DEIS at 3-38).  There are far too
many roads on the Uncompahgre Plateau at present.  Closure of these
should enhance wildlife habitat as well as provide for greater
primitive recreation opportunities.

The RMP/DEIS should incorporate an analysis of the impacts of blanket
RS2477 Right-of-Way grants to Delta and Montrose counties.  The RMP is
the appropriate document for evaluation of the transportation needs of
the Resource Area, and since RS2477 grants are a significant component
of access to and through public lands, they should be included in the
RMP.  Any grants given to the counties should be limited to the width
of the actual use at the time of the enactment of FLPMA in 1976.  BLM
might also be aware of the fact that its procedure for allocation of
RS2477 grants is currently under litigation in federal court in two
states, Alaska and Utah.

We appreciate the opportunity to comment on the proposed RMP and DEIS,
and look forward to your consideration of these comments.

Sincerely,

Mark Pearson

Mark Pearson
Chair, Rocky Mountain Chapter, Sierra Club
P.O. Box 284
Grand Junction, CO 81502

BLM_0005626

23

**COLORADO NATIVE PLANT SOCIETY**
P.O. BOX 200 • FORT COLLINS, COLORADO 80522

...dedicated to the appreciation and conservation
of the Colorado native flora

November 1, 1987

Mr. Robert Vecchia, RMP Team Leader
Bureau of Land Management
Uncompahgre Basin Resource Area
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Vecchia,

The Colorado Native Plant Society submits the following comments on the Draft Uncompahgre Basin Resource Management Plan and EIS. We have conducted a number of field trips in the Resource Area, and are aware of the important botanical resources present.

Each of our reviewers commented, independently, on the difficulty of reviewing this document because of its format. Information is so badly scattered, with frequent inconsistencies, that comparison among alternatives is difficult. This plus inadequate delineation of Management Units on the very poor maps makes it nearly impossible to evaluate recommendations for a given area. We also note that the impact statements (Chapter Four) are written to present primarily favorable aspects, and negative impacts are minimized or (mostly) ignored. Table 4-21, a subjective "comparison of alternative impacts," is absurd. The draft RMP should be thoroughly revised and reissued as a second draft, with additional opportunity for comment provided.

We appreciate the RMP's recognition of the threatened, endangered, candidate, and BLM-sensitive plant species present in the Resource Area. The special vegetation resources of Escalante Canyon are acknowledged, but no recognition or consideration is given to state-sensitive plants or remnant plant communities elsewhere in the Resource Area. This omission should be rectified by consultation with the state Natural Areas Program. The draft RMP is seriously deficient in this respect, inasmuch as the existence of such resources should affect proposed management in several Management Units, and may warrant designation of additional Special Management Areas.

Because of its significance as habitat for a number of these valuable plant resources, it is vital that sizeable areas of adobe badlands be maintained in essentially undisturbed condition. It is simply unacceptable that the Preferred Alternative proposes to allow ORV use that "...would reduce potential habitat of threatened and endangered species and unique plant associations" (p. 4-63), and in addition to cause "...a loss of 10,000 acres of potential habitat for the Uinta Basin hookless cactus and Delta lomatium" (p.4-53). We fail to see how this plan can be reconciled with the Endangered Species Act's provisions requiring you to protect listed plants.

23

Mr. Vecchia
-page 2-

The final RMP must be changed to omit the proposed North Delta ORV use area, development of which will destroy many such plants.

The impact of ORV use on Mancos shales is undeniable; such use must be prohibited, not merely restricted, in additional areas. Closure of only 62 of the Resource Area to ORVs is insufficient. Additional closures would benefit not only plant resources, but would reduce the adverse impacts that the proposed levels of ORV use admittedly will have on air quality (page 4-44), soils (4-48), water resources (4-50), riparian zones (4-50), T and E species (4-51), wildlife habitat (negative impacts of open ORV use not listed, p. 4-52 and 4-54), cultural resources (4-54), livestock grazing (4-54), and visual resources (4-58).

The limited but highly significant riparian vegetation of the Resource Area receives insufficient attention in the Draft RMP. The final plan should more clearly identify this important habitat, and spell out management tools that will be employed to restore and maintain it. The very small acreage involved (inconsistently described as 1,034 acres (Table 2-5, page 2-8; 6,320 acres (page 4-54); 11,455 acres (6,330 + 5,125, page 4-51)) and the importance of this component of the ecosystem warrant total exclusion of grazing. Seasonal limitations, partial AUM reductions, or forage utilization limits on grazing are not sufficient for restoration or continued existence of quality riparian areas.

We support designation of the Escalante Canyon ACEC, the Fairview RNA, and the Needle Rock ACEC/ONA, but management plans for these areas are not specified in sufficient detail. Management Unit D-12, the Escalante Canyon ACEC, should be enlarged to encompass additional lands along Escalante Creek. This area requires restrictions on livestock grazing to prevent damage to the federally listed and other unique botanical resources. Other management provisions should be listed in specific detail for each site.

1 | In addition to our support of recommendation of the Gunnison Gorge WSA, we also ask that Adobe Badlands and Camel Back be recommended as suitable for wilderness designation. We find absolutely no justification in the draft RMP for exclusion of the latter two areas. The DRMP clearly states that their exclusion "...would prevent the permanent protection of existing wilderness values, including pristine environments and outstanding opportunities for primitive and unconfined recreation" (page 4-58); why, then, are these "existing wilderness values" not to be recommended for wilderness protection? Please reconsider, and include both Adobe Badlands and Camel Back as recommended for wilderness status.

We also ask that the statement of intent to require measures to protect threatened and endangered species in land use activity plans (page 3-2) be amplified to clarify that this intent also includes BLM-sensitive and state-sensitive plant species and plant associations.

**Response to Letter No. 23**

1. Please see Response to Letter 13.

BLM_0005627

23

Mr. Vecchis
-page 3-

Finally, we strenuously oppose disposal of any public lands on which
federally listed or candidate plant species occur (page 4-52). The final
RMP should state unequivocally that a thorough survey for such plants will
be made on any parcel proposed for disposal, and that no disposal of land
containing listed or candidate plants will occur. It is vital that these
sites remain public property.

Thank you for the opportunity to review and comment on the Draft RMP. We
would be glad to cooperate in any possible way to perpetuate the unique
botanical values of the Uncompahgre Resource Area, which we consider a very
special part of Colorado.

Sincerely yours,

*Susan S. Martin*

Susan S. Martin
Conservation Committee Chair

---

24



November 4, 1987

Robert E. Vecchia
RMP Team Leader
Bureau of Land Management
Uncompahgre Basin Resource Area
2505 South Townsend Avenue
Montrose, CO 81401

Dear Mr. Vecchia:

The National Parks and Conservation Association appreciates
the opportunity to submit comments on the Uncompahgre Basin
Resource Management Plan. NPCA is a national, nonprofit
organization devoted to the protection of national parks and
related resources with about 55,000 members nationwide.

Wilderness

We support BLM's recommendation to recommend all 21,039
acres of the Gunnison Gorge Wilderness Study Area for wilderness
protection. Without question, the Gunnison Gorge is one of the
premier candidate wilderness areas in the state of Colorado. We
commend BLM for its all wilderness recommendation for the
Gunnison Gorge.

We recommend that BLM recommend the Adobe Badlands for
wilderness. Your documents provide no compelling rationale why
this area should not be recommended for wilderness designation.
Resource conflicts appear to be minimal, especially since BLM
states in the plan that it intends to prohibit off road vehicle
use in the area. Designation of the Adobe Badlands would add to
the area's protected wilderness and recreational opportunities.
We encourage BLM to reevaluate its recommendation for the Adobe
Badlands WSA.

1

We also encourage the BLM to recommend Camel Back WSA for
wilderness designation. Camel Back is one of a limited number
of undisturbed areas still existing on the Uncompahgre Plateau.
From our review of BLM documents, we perceive no resource
conflicts with wilderness designation of this area. Rather, the
area's scenic, recreational and wildlife values make it a
deserving area for wilderness designation. We urge BLM to
reconsider its no-wilderness recommendation for Camel Back.

**Responses to Letter No. 24**

1. Please see Response to Letter 13.

National Parks and Conservation Association
1015 Thirty-First Street, N.W., Washington, D.C. 20007
Telephone (202) 944-8530

BLM_0005628

24

### Areas of Critical Concern

The Federal Land Policy and Management Act (FLPMA) requires BLM to "give priority to the designation of Areas of Critical Environmental Concern." FLPMA defines ACECs as "areas within the public lands where special management attention is required . . . to protect and prevent irrreparable damage to important historic, cultural or scenic values, fish and wildlife resources or other natural systems or processes . . ."

BLM fails to comply with FLPMA's requirements regarding ACECs in the Uncompahgre Resource Management Plan. While the Conservation Alternative and Preferred Alternative recommend designation one relatively small ACEC, the Plan fails to provide any analysis of other potential ACEC candidate areas. This failure leaves NPCA with the impression that BLM didn't complete such an analysis. This is particularly true because other areas exist in the Resource Area which include "important historic, cultural or scenic values, fish and wildlife resources or other natural systems or processes." Some examples include all or portions of the three WSAs and all or portions of the Gunnison Gorge Recreation Area. The BLM should include a more complete analysis of ACEC candidate areas in the Final Plan.

### Oil and Gas

The BLM fails to provide adequate analysis of oil and gas issues in the draft RMP. In Connors v. Burford the court said, "comprehensive analysis of cumulative impacts of several oil and gas activities must be done before a single activity can proceed." A cumulative effects analysis is not provided.

We do support BLM's no leasing recommendation for the Gunnison Gorge, but recommend that it be expanded to include the entire Gunnison Gorge Recreation Area.

### Disposal of Lands

BLM identifies several areas for disposal with high recreational values and use, including the Muddy Creek tracts above the Paonia Reservoir, lands on Baldy Peak and the West Dallas Creek tract. We encourage the BLM to revise its criteria for identification of disposal lands to rule out high recreation value or use area. Similarly, lands with wilderness values, historic values, cultural resources or values, wildlife resources or values should not be identified for disposal.

---

24

### Red Canyon

2 ⌈ We encourage the BLM to identify the acquisition of land in Red Canyon to provide for a more logical and ecologically sound boundary for the proposed Gunnison Gorge.

### ORV Use

In order to adequately protect public land resources and meet its stewardship responsibility, BLM should limit vehicles to existing roads, except in limited "closed" and "open" areas. Areas open to off-road vehicle travel are clearly sacrifice areas. Vegetation, soils, wildlife habitat, and scenic values and unavoidably harmed. In fact the Plan admits that ORV use will have substantial adverse impact on soils, water, and vegetation. We encourage BLM to revise its ORV recommendations in the final RMP.

We appreciate your attention to our concerns. Please keep us informed of progress on the Plan.

Sincerely,

Terri Martin

Terri Martin
Rocky Mountain Regional Representative
National Parks and Conservation Association
PO Box 1563, Salt Lake City, Utah 84110
801-532-4796

2. Please see Response No. 1 to Letter No. 16.

BLM_0005629

**Far Flung Adventures**

Box 168 · Ouray, Colorado 81427 · (303) 325-4640

25

Bureau Of Land Management
Uncompahgre Resource Area
Attn: Jon Searing and Staff

Dear Jon,

After reading the first draft of the Resource Area Management Plan concerning the Gunnison Gorge, there are several points I feel should be reconsidered.

We offer a safe, "resource aware" service to our customers as do other outfitters on the gorge. I feel very strongly about protecting the gorge and have written numerous letters endorsing "Wilderness and Wild And Scenic Designation". Below are the points that need to be re-examined:

1. In your Uncompahgre Basin Resource Management Plan and Environmental Impact Statement "Prefered Alternative" Draft One, the BLM recommends that the Gunnison Gorge be designated "Wilderness Area". I support this recommendation 100%, but I want Camel Back WSA and Adobe Badlands WSA included in the BLM recommendation to be designated "Wilderness Area". These two areas are ecologically unique and  delicate to this area. Please make an environmentally progressive and wise decision for other federal agencies to follow. Recommend that Camel Back and Adobe Badlands are suitable for "Wilderness Designation".

2. I support, through whatever channels are nessary, for BLM staff in the field to have more power of enforcement, in order for private and commercial users to better adhere to BLM regulations.

3. I feel the BLM is making a regretable mistake by not automatically making fire-pans and porta-potty systems mandatory for all overnight river trips.

During the '87 season I noticed a marked increase in human waste in camping areas and numerous ground fire-rings. I would use firepans and porta-potties whether they were mandatory or not, but unfortunately that isn't the prevailing attitude amoung some private users. Make firepans and porta-potties mandatory!

4. Private and commercial launches should be split 50-50. That is 3 private launches and 3 commercial launches. Private boaters have every right to float a section on their own, provided they do so in a "low impact" method.

Commercial boaters equally have the right to launch availability. Commercial out-fitters, provided they operate "resource aware and responsible" trips provide a viable safe and low impact service. For customers who' want and have a right to experience the Gorge Area on a primative, pristine level, outfitters provide the means. These outfitters provide a needed boost to many Western Colorado communities by bringing much needed tourism dollars to west slope areas.

5. Include the season of '87 in consideration of this final draft towards your allo-cation plan for the Gunnison Gorge season of 1988. As I wrote to you in a previous letter concerning just this matter, '87 was our first season as the tros corporation.

*Putting People and Rivers Together*

---

**Response to Letter No. 25**

1. Please see Response to Letter 13.
2. These concerns have been addressed in the Addition to the Gunnison Gorge Recreation Area Management Plan.

---

**Far Flung Adventures**

Box 168 · Ouray, Colorado 81427 · (303) 325-4640

25

of Far Flung Adventures. We made a substancial investment in operating a business on the Gunnison  Gorge, above and beyond Bureau Of Land Managements regulations and stipu-lations for commercial outfitters. I'm speaking for other outfitters as well in this matter.

Trying to regulate use on the Gunnison Gorge by lengthening the hike from a parking area to the put-in on the river by a mile, or closing the trail to horsepack-ing is only "treating the symptom". A permit system for boaters is a viable method to regulate over-use on the gorge.

We are anxious to work together with you on a management plan that can strike a balance between commercial/private use and maintain the integrity of this marvelous section of river.

Yours for the river,

Tracy Blashill

*Putting People and Rivers Together*

BLM_0005630

26

Date:

Robert E. Vecchia
RMP Team Leader - BLM
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Vecchia,

The following are my comments on the Uncompahgre Basin Wilderness Technical Supplement:

I (do) (do not) Agree with the BLM's Proposed Action, the All Wilderness Alternative, for the Gunnison Gorge Wilderness Study Area.

The Camel Back and Adobe Badlands Wilderness Study Areas will benefit most from the No Wilderness Alternative. This alternative best exemplifies the multiple-use management. Site-specific objectives can be mitigated through the Allotment Management Plans.

Signed:

*Shawn Mock*
*Richards & Richards*
*Nucla, Colo 81424*

## Response to Letter No. 26

Thank you for your comment. Your preference has been noted.

AUTHOR'S NOTE: In addition to this letter, we received sixteen additional letters signed by forty-three persons who agreed with the BLM's No Wilderness recommendation for Camel Back and Adobe Badlands WSAs. Thirty-one of these individuals also opposed wilderness designation for the Gunnison Gorge WSA. Please see Table 5-5.

27

Date: 10-15-87

Robert E. Vecchia
RMP Team Leader - BLM
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Vecchia,

The following are my comments concerning the Uncompahgre Basin Resource Management Plan and Environmental Impact Statement:

The best alternative offered to support the multiple-use objective, with the fewest detriments to livestock grazing, is the 'Continuation of Current Management.'

Under this policy, through Allotment Management Plans, the objectives to enhance livestock grazing and wildlife and riparian habitats, control erosion and salinity, utilize mineral and forest products, and protect our diverse recreation interests can be met on a site-specific basis.

Signed:

*Shawn Mock*
*Richards & Richards*
*Nucla, Colo 81424*

## Response to Letter No. 27

Thank you for your comments.

BLM_0005631

Date: November 3, 1987

Campbell Cattle Co.
1127-25 Road Rd.
Delta, Colorado 81416

28

Robert E. Vecchia
RMP Team Leader - BLM
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Vecchia,

The following are my comments concerning the Uncompahgre Basin Resource Management Plan and Environmental Impact Statement:

The best alternative offered to support the multiple-use objective, with the fewest detriments to livestock grazing, is the 'Continuation of Current Management.'

Under this policy, through Allotment Management Plans, the objectives to enhance livestock grazing and wildlife and riparian habitats, control erosion and salinity, utilize mineral and forest products, and protect our diverse recreation interests can be met on a site-specific basis.

As cattle producers- we know that our industry has had several bad years and that if we are to continue raising beef that we need to work with the BLM and Forest Service to keep up the numbers of Cattle and be able to prudently graze our public lands.

Any wilderness will affect the senior citizens who Cannot walk or ride horseback into these areas, but like hire and enjoy a day on a weekend drawing thru. The people who use wood for heating, the recreationists and us Cattlemen would like to keep these areas as they are! We would like to see these Areas used to Continue to be used [?] privileges of future generations.

Land & [?] respect.

Helen A. Campbell
for Campbell Cattle Co.

**Response to Letter No. 28**
Thank you for your comments.

---

**COLORADO WESTMORELAND INC.**

29

P.O. Box 1299 Paonia, Colorado 81428 ☐ 303-527-4135

November 2, 1987

Mr. Robert E. Vecchia, RMP Team Leader
Bureau of Land Management
Uncompahgre Resource Area
2505 South Townsend Avenue
Montrose, CO  81401

RE:  COMMENTS ON DRAFT UNCOMPAHGRE BASIN RESOURCE
     MANAGEMENT PLAN & ENVIRONMENTAL IMPACT STATEMENT

Dear Mr. Vecchia:

Colorado Westmoreland Inc. (CWI) supports the continuation of the 26 existing coal leases as proposed in each of the four alternatives presented in the Bureau of Land Management's Draft Uncompahgre Basin Resource Management Plan & Environmental Impact Statement. As CWI currently holds four federal coal leases, continuation of these existing leases is critical to CWI's ongoing operation.

Though local coal industries are presently suffering in depressed markets, in the long-term, coal markets are projected to improve. CWI also supports the identification of additional acreages of federal coal estate within the Uncompahgre Basin for future coal leasing as proposed in the "Production Alternative" and "Preferred Alternative".

CWI appreciates this opportunity to comment on the Draft Uncompahgre Basin Resource Management Plan & Environmental Impact Statement. Please feel free to contact me should you have any questions.

Sincerely,

COLORADO WESTMORELAND INC.

Kathleen G. Welt

Kathleen G. Welt
Environmental Specialist

KGW:lec

**Response to Letter No. 29**
Thank you for your commments.

BLM_0005632

**30**

## MUSSER RANCHES
701 650 Escalante
Delta, Colorado 81416
—
Telephone: (303) 874-7372

October 30, 1987

Robert E. Vecchia, RMP Team Leader
Bureau of Land Management
Uncompahgre Basin Resource Area
2505 South Townsend Avenue,
Montrose, CO 81401

Dear Mr. Vecchia:

The Draft Uncompahgre Basin Management Plan/Environmental Impact State-
ment attends to many man hours of research and assimilation of materials. It
is very apparent that this study has been imposed by persons or groups who are
not really familiar with the work that has been done by the BLM or the improve-
ment of the BLM lands over the last half century. These same people are not
open minded to present research methods of range improvement. Our family, for
over a century, has been a user of part of the area that this study encompasses,
and, in fact, they were instrumental in helping set up the BLM. The area with
which we are best acquainted has improved a hundred fold since the BLM was
implemented, and we feel it would be an injustice to change many of the present
management techniques that are showing great improvement, not only in grazing
conditions, but riparian habitat, wildlife habitat, and recreation.

The following are some of our comments on the Uncompahgre Basin Draft
RMP/EIS.

CURRENT MANAGEMENT IMPACTS   page 4-7   Impacts from Livestock Grazing Manage-
ment——3rd sentence: "——aquatic habitat would be maintained at less than
optimum conditions or would deteriorate over the long-term due to trampling and
excessive livestock utilization of streambank vegetation." On area 4-2 there is
little if any evidence to prove this statement. Under present management, stream
banks, as well as all areas not adjacent to streams have improved considerably.
Livestock grazing conditions are improving, wild life habitat is improving, . .
riparian habitat is improving and I would recommend continuation of the present
management plan with cooperation between DOW, ranchers, and the BLM working
together to further improve conditions.

MANAGEMENT UNIT D-18 page 3-27   CONSERVATION ALTERNATIVE   and
MANAGEMENT UNIT D-4   page 3-20                                   Livestock Grazing
"Livestock movements would be restricted, if necessary, to reduce trailing and
surface disturbance in riparian zones. Livestock use would be limited to 55
percent utilization by weight of key forage species and eliminated from March 1
through May 31."

Through Holistic Resource Management, it has been proven that livestock
grazing throughout the year improves riparian habitat. Willows that are grazed
in the spring flourish and grow more vigorously than those that are not spring



Response to Letter No. 30

Thank you for your comments.

---

**30**

Musser RMP/EIS

grazed. We have evidenced this on our private land. For a more stable habitat,
a variety of grazers is beneficial. Livestock tend to graze grasses more than
do game animals. When grasses are not grazed sufficiently, the old grass smothers
the plant roots and the plants eventually die out. Brush then takes over, brush
alone cannot hold the stream banks as well as grasses, and more erosion takes place.

This is very evident along the lower Escalante Creek in an area that has
had little or no livestock grazing for the past 50 years. Stream banks are per-
pendicular and adjacent areas that once were small meadow type lands are now
covered with brush that is too thick to be used by game animals. Instead they
feed extensively in nearby irrigated pastures.

In the Little Dominguez Canyon, while it was grazed moderately, wild life
found refuge and was abundant. During the past few years the canyon has had
little or no use by livestock. The brush has become so entangled it is almost
impossible for the recreationists to get through this creek and there is little
evidence of any wildlife even though it is used by neither livestock nor rec-
reationists.

Ranchers in the upper Escalante (Unit D-18) use the BLM very lightly, but
for economic reasons it is vital that there be no restrictions on trailing of
livestock between these ranches——ranches that provide a great deal more excellent
riparian habitat than does the BLM——ranches that are used heavily by both deer
and elk as well as livestock.

Quote: "——limited to 55 percent utilization by weight of key forage
species" This phrase appears frequently throughout the RMP/EIS. How can 55
percent be determined when inadequate records, or no records, have been kept to
show what one hundred percent is. What does this mean? Does this mean 55 per-
cent of the vegetation that was in the area fifty years ago, five years ago, or
before the start of the grazing season? Who is going to know what 100 percent
was. To implement many of the ideas set forth in the RMP, huge amounts of
money will have to be allocated for monitoring and policing. These ideas
certainly are not in keeping with reduction of government spending.

MANAGEMENT UNIT D-12   PREFERRED ALTERNATIVE   page 3-40
"The management unit would be designated as the Escalante Canyon Area of Critical
Environmental Concern (ACEC). Livestock grazing is not permitted.
MANAGEMENT UNIT D-2 CONSERVATION ALTERNATIVE   page 3-17 2nd paragraph " The
management unit would be designated as the Escalante Canyon Research Natural
Area (RNA)." This is the same area as designated ACEC in Preferred Alternative.
Under Livestock Grazing: "Livestock grazing would be eliminated in the manage-
ment unit." Quote: "——in order to eliminate injury to livestock grazing in order to
protect the listed plant species and unique plant associations in shears. The
unique plant associations are all located in ries that are completely inaccess-
ible to livestock or even to wildlife. Private lands adjacent to the (RNA) have
been intensely grazed for nearly a century. However, there are hillsides where
the Grand Junction milkvetch is constantly increasing to the point of its over
crowding other forbs and grasses. Apparently ranches and wildlife find the
plant unpalatable, or undesirable, but their trampling, as with so many plants,
help to propagate the species. There is data indicating that livestock do not
graze any of the listed plant species. This is further illustrated by the fact
that, before the implementation of the BLM, the area was a natural drift for
untold numbers of livestock and therefore was extremely overgrazed.

"After present management, vegetation, including many species of native
grasses and forbs, has been improved considerably. It is very evident,
since the listed plant species are present in this area, they have either held
their own or possibly have evolved under present conditions.

BLM_0005633

Kuser RMP/EIS                                                                   Page 3

**30**

At the same time, it is very evident that ORV use will have to be curtailed as there are several areas that have been denuded by ORV use and human trampling.

In order for the ranches in the area to be efficient, livestock need to have at least a drift through this BLM. If ranches are not efficient, they will be sold for uses other than ranching. This will cut down on forage available to the wildlife, and the increased use of the area for recreationists will cause further deterioration of the environment. In this canyon, wildlife is very much dependent on the irrigated ranches not only for food, but for the privacy that is necessary to sustain wildlife.

The management of each allotment should be considered on an individual basis. For example, the riparian habitat (D-9 preferred alternative) does not have the same qualities or problems at elevations above 7000 feet in some of the areas that occur below 5000 feet elevation in other areas.

If ranchers are forced to curtail their grazing use on the BLM, many of them will be forced out of their livestock operations. While this is exactly what many of the would-be environmentalists are pushing for, if the livestock operators are forced out of business, there will be deterioration of the ranges even for wildlife because livestock is an important and compatible part of the ecosystem. Contrary to popular opinion, 60% of the wildlife in the United States, outside of Alaska, is very dependent upon private land. Our public lands lack a vital supply of food, water, and the privacy needed for a desired wildlife population.

For - continued improvement of range quality, we strongly urge the CONTIN-UATION OF THE PRESENT MANAGEMENT PLAN with emphasis on cooperation and under-standing between the affected parties—whether the areas of concern are air quality, grazing, wildlife habitat, or mining etc. Thank you for the opportunity to reply to the Draft RMP/EIS.

Sincerely,

*for John A. Musser*

Kusser Ranches

---

**31**

**Colorado-Ute Electric Association, Inc.**

P.O. Box 1149
Montrose, Colorado 81402
(303) 249-4501

November 4, 1987

Robert E. Vecchia
RMP Team Leader
United States Department of the Interior
Bureau of Land Management
Uncompahgre Basin Resource Area
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Vecchia:

Draft Uncompahgre Basin Resource Management Plan

Colorado-Ute Electric Association, Inc. is an electric gener-ation and transmission cooperative headquartered in Montrose, Colorado. It operates on a non-profit basis and provides whole-sale electric service on an "all-requirements" basis to 14 retail electric distribution cooperative members who serve 191,000 cus-tomers in parts or all of 48 of the state's 63 counties. Colorado-Ute owns electrical facilities, land and water rights in and near the BLM managed lands covered by the current draft Resource Manage-ment Plan. Colorado-Ute submits the following comments concerning the Draft Uncompahgre Basin Resource Management Plan and Environ-mental Impact Statement.

Gunnison Gorge Wilderness Study Area (WSA)

The impact to Colorado-Ute of wilderness designation for the Gunnison Gorge WSA would not be negligible as has been stated on page 4-12 of the Wilderness Technical Supplement (WTS). The conditional water decrees (72,000 acre feet of conditional water rights) that Colorado-Ute owns on the Gunnison River are very valuable property rights. These decrees are senior to the entire Curecanti Project, including Blue Mesa Reservoir and are valued up to $7 million. If the Gunnison Gorge WSA is designated wilderness, the full potential value of Colorado-Ute's water rights in and near be realized. The Tri-County Reservoir right is decreed for three separate locations. The value of the original location, just downstream of the confluence with the North Fork, would be virtually eliminated. Two newer decreed locations further downstream would be restricted so that the full amount of decreed storage could not be realized.

**1**

**Responses to Letter No. 31**

1. Wilderness designation would not affect the Colorado-Ute's water rights. Please see Chapter 1, "Additional Concerns Considered for All WSA's," for a further discussion of water rights.

BLM_0005634

31

Mr. Vecchia                    -2-                  November 4, 1987

2  The WTS also incorrectly describes the benefits and alternatives to Colorado-Ute's project. A reservoir constructed on the Gunnison River would provide Colorado-Ute benefits in addition to more generating capacity, which cannot be replaced by constructing coal-fired generation. As suggested on page 4-12 of the WTS. The operational flexibility of hydroelectric generation offers power system peaking and regulation benefits that cannot be obtained from coal-fired generation. In addition, a reservoir would provide a water supply for a downstream coal-fired generating station.

3  It has been the consensus of the advisory committee studying the possible designation of a Black Canyon National Park and Scenic Recreation Area that the loss of that use of the water rights owned by Colorado-Ute and the City of Delta, and Colorado-Ute's associated hydroelectric project, should be mitigated. The final Uncompahgre Basin RMP and EIS should address how Colorado-Ute and others with development rights to be impacted, will be compensated for the water right development potential that would be lost as a result of wilderness designation.

4  Colorado-Ute also has concerns resulting from the effect the Gunnison Gorge being designated as a wilderness area has on area economic development opportunities. One ramification is that once it is designated wilderness, there are those who would strive to have the area classified as a Class I area under the federal Clean Air Act. Such designation would severly restrict economic development opportunities for communities in the North Fork and Uncompahore Valleys. This would be an unfortunate spin-off from a wilderness designation, where as, if the area were not designated wilderness, it could be managed to protect its scenic and other valued resources, and economic development opportunities would not be lost to communities in the surrounding area.

Management Unit D-7

Colorado-Ute disagrees with the proposed management of major utilities in management unit D-7. A large geographic area (50,854 acres) is proposed to be closed to utility development to reduce conflicts between utilities and potential surface effects of coal mine subsidence. Colorado-Ute believes this action is unnecessary since the existing lines in the area are room and pillar operations which typically cause little surface subsidence. If a transmission line were needed in this management unit, any potential subsidence problems could be addressed in the BLM permitting

2. Discussions of a coal-fired generating plant have been deleted from this document. Please see Chapter 1, "Issues Analyzed," for a detailed discussion of "Impacts on Hydroelectric Power Development" for the Gunnison Gorge WSA.

3. Please see Response No. 1.

4. There is a common misconception that recommendation and designation of new wilderness areas is automatically tied to restrictive federal Prevention of Significant Deterioration (PSD) Class I air quality status. There is no such connection. Certain existing national parks and wilderness areas were designated as mandatory Class I areas by Congress in the 1977 Clean Air Act Amendments, but since then each state is and has been responsible for any redesignation. Since 1977, several areas in Colorado have been designated wilderness but none have been redesignated as PSD Class I. The state of Colorado identifies air quality areas as Category I, II, and III; the sulfur dioxide limitations in the state categories are identical to those established for federal PSD Class I, II, and III areas. In 1977, the Gunnison Gorge Recreation Area was designated a Colorado Category I area; it remains a federal PSD Class II area.

---

31

Mr. Vecchia                    -3-                  November 4, 1987

process. We are also concerned about the potential public opposition, due to visual concerns, in routing a line in the proposed 0.5 mile wide corridor centered on Colorado Highway 133. The RMP should be flexible enough to allow consideration of other potential corridors during scoping and permitting of any future lines in that area.

General Comments

The analysis of the impacts of major utility development in the RMP appears to have been heavily influenced by the 1980 Western Regional Corridor Study. This study is over seven years old and is only a planning tool. Projects requiring electric service either on a local or regional level can develop or change rapidly. We do not agree with your assumption on page 4-56 "closure or restrictions on lands not identified as being needed (in 1980 Western Regional Corridor Study) for utility facilities would be assumed to have a negligible impact on local and regional major utility development". The need for and predictibility of utility development is much more dynamic than has been portrayed.

Colorado-Ute does not believe it is necessary or appropriate to prohibit siting transmission lines in riparian zones (See p. 4-51). In many of the narrow canyons in the area it would be possible to span the riparian zone or just trim the vegetation that would interfere with conductor clearance.

Colorado-Ute does not believe utilities and their associated access are currently stressing or would stress wildlife in the North Fork area (See p. 4-53 Impacts on Terrestrial Wildlife Habitat). The benefits of confining utility facilities to existing corridors along major roads have been overstated. If necessary, gates or barriers can be used to restrict access to protect wildlife, and can be addressed as BLM permit conditions, when appropriate.

Thank you for this opportunity to comment on the Draft Uncompahgre Basin Resource Management Plan. Please contact me if you have questions concerning these comments.

Very truly yours,

Jerry A. Walker

Jerry A. Walker, Manager
Environmental Services

JAW/MAR:gr

151

BLM_0005635

32

**Chevron** Chevron U.S.A. Inc.
6400 South Fiddler's Green Circle, Englewood, CO 80111, P. O. Box 599, Denver, CO 80201

Lisa Fleche Mercier
Staff Analyst
Legislative and Regulatory Affairs

November 5, 1987

Draft EIS and Resource Management Plan
Uncompahgre Basin Resource Area

Mr. Robert Vecchia, RMP Team Leader
Uncompahgre Basin Resource Area
Bureau of Land Management
2505 S. Townsend Avenue
Montrose, CO 81401

Dear Mr. Vecchia:

Pursuant to my phone conversation with you last week, please accept my comments on your draft EIS and RMP, even though you will have received them after November 5. As you recall, I had phoned your office for ten days and was not able to get through due to your phone number having been changed. On October 26, I finally wrote you a letter requesting a copy of the draft. In a subsequent phone conversation, you said that you would accept my comments as long as they were postmarked by November 5.

Chevron commends your RMP team for preparing such a clean, understandable document. We believe that your decisions are justified and presented in a logical concise manner.

We also support your preferred alternative. Under that alternative, your use of oil and gas stipulations seem reasonable, equitable, and unbiased.

However, Chevron does have one suggestion that we believe would make your document more defensible. Possibly the appropriate place would be in Chapter 3, "Consultation and Coordination." We believe that it is important that the public be informed with a general description of the process involved when oil and gas activities are conducted on public lands. Specifically, it seems that it would be important to emphasize that the public will have future opportunities to comment on proposed oil and gas activities, and to give them a general idea of the procedures and regulations that industry and the BLM must comply with before we can lease or engage in exploratory or production activities.

Thank you for your consideration of these comments.

Sincerely,

_Lisa Mercier_

LFM:js

Northern Region – Exploration, Land and Production

**Response to Letter No. 32**
Thank you for your comments.

---

33

701 650 Road
Delta, Colorado 81416
November 1, 1987

Mr. Robert E. Vecchia, RMP Leader
Bureau of Land Management
2505 South Townsend Ave.
Montrose, CO 81401

Dear Mr. Vecchia:

The personnel in the Montrose office of the BLM have spent considerable time and effort on the Draft RMP/EIS for the Uncompahgre Basin Resource Area and I want to commend them for the quality of the document. It is too bad that only a comparatively small number of the citizens of the United States, most of whom have never seen this area, have demanded this study which required a great deal of time and money that could have been used for some worthwhile endeavor.

1    I think the study team for making the right decision on the Camel Back WSA and the Adobe Badlands WSA. We already have too many of these areas set aside, and we are over a hundred years too late to have real wilderness areas. As the Junction Gorge is concerned, it is already too well advertised to be of any value as is so called wilderness. However, it seems unnecessary to reduce the livestock grazing in these areas that are showing improvement under present grazing conditions.

2    Throughout the Draft RMP/EIS, the riparian zones are to be "limited to 35 percent utilization of key forage species and eliminated from March 1 through May 31", for livestock grazing. Why not use the lower elevation stream areas in the spring when livestock use will invigorate the willows along the stream banks? Anytime a stream in a desert area is excluded from livestock use, the riparian zone will deteriorate. If livestock are excluded from any area, the big game will move out of that same area. The two regulations seem to need each other.

3    As far as putting a percentage of use on so called "key species", I challenge
4    this also. There is no such thing as a "key species". This is just a cliche used by some to make an impression on the layman. No plant species is more of a key than is any other species. As far as percentage of utilization, this is another thing that is very questionable. It would be more practical to classify use as: light, moderate or heavy. This makes more sense since no one knows what 100 percent vegetation by weight was, or is, in any given area before any grazing occurs.

In the more than 50 years since the passage of the Taylor Grazing Act, there has generally been a continual reduction of livestock numbers over the whole area of the Uncompahgre Basin Resource Area. If by proposed management, as set forth in this RMP/EIS, we are going to see so much improvement, then the past reduction of livestock use has been to no avail. Why not change and get out of the "reduction rut" and try something such as the Holistic Resource Management. This is being proven to be advantageous in other areas.

**Response to Letter No. 33**
1. Livestock grazing would normally be reduced only when monitoring studies show the need for such adjustment and after Bureau resource management objectives are considered. BLM also determines long term improvement from monitoring studies and presently does not have specific data showing the area-wide improvement the commentor noted.

2. Spring livestock use is generally regarded as detrimental to vegetation unless rotational or rest grazing practices are applied. Certainly, other grazing management approaches such as Holistic Resource Management suggested elsewhere in the letter by the commentor warrant consideration. We do not have specific data that suggests spring grazing by livestock will invigorate willows nor do we have evidence that indicates riparian zones will deteriorate without livestock use.

3. BLM uses key species as a part of its rangeland monitoring program which is designed to determine whether specific livestock grazing management or broader resource objectives are being met. The BLM Technical Reference (TR4400-1, section 5.13) defines key species as those species that are generally an important component of a plant community. Key species serve as indicators of change and may or may not be forage species (depending on objectives). More than one key species may be selected for an area. . . and should be tied directly to management objectives in land use plans, or coordinated resource management and activity plans (such as AMPs).

   Occasionally a plant species may be more important than another particularly if it is tied to management objectives and or plays an integral role in a fragile and important ecosystem. Willow species in local riparian areas are a good example.

4. When appropriate, BLM classifies grazing use by categories. There are specific monitoring studies designed to determine this (BLM Technical Reference TR4400-3). These studies are designed to provide estimates of the percent forage removed by grazing animals. Typically grazed and ungrazed plants are examined; some techniques actually measure or weigh plants to help give an indication of the degree of grazing use.

   Normally, utilization data is evaluated along with climatic and trend data available before adjustments in use are considered. Specific utilization levels serve as guidelines and often give early indications that management objectives are not being achieved.

BLM_0005636

**33**

Concerning the endangered species and livestock use, the endangered species have survived more than a century of livestock use and are still here. Maybe these species need livestock or large ungulates in order to propagate, but due to people pressure, there will never again be populations of big game animals large enough to take the place of livestock.

While I am not well acquainted with the whole Uncompahgre Basin Resource Area, I am very familiar with the Escalante Canyon area and, to a lesser degree, with the Roubideau Canyon. I visited the lower Roubideau Canyon recently and was very impressed with the improved conditions that have taken place in the area over the past eight years. The vegetative cover in both areas has shown great improvement in recent years which proves that the present management is working there. Let's not change a plan that is proven to be beneficial. I see no reason for restriction nor reduction of livestock use in either area.

There are more than 175 permitted livestock users in the Uncompahgre Basin Resource Area. These users are spending many thousands of dollars of their own money trying to improve these public lands. This money is over and above their grazing fees, and this shows that these people are the real conservationists. They are doing something to make their area a better place.

I believe that everyone wants the same thing, to improve the resource area, and if we all work together there is no telling what can be accomplished. Why not have the recreationist pay to use the public land and why not have the DOW pay a grazing fee?

In closing, let me remind everyone that in this area where the greatest percent of the land area is public land, the ranchers depend upon the continued use of these public lands, but to an even greater extent, the wildlife are dependent upon the livestock use and the feed and privary offered by the private lands.

Sincerely,

Jack Musser

**34**

9-24-87

Dear Mr. Vecchia,

We are writing to inform you of our feelings on the wilderness recommendations of three areas in the Montrose BLM district. We frequently use wilderness areas of the state for backpacking trips. We have hiked in all but two wilderness areas of the state. We are very concerned about the future of "wilderness" in our nation.

We are happy to hear that the BLM is proposing to protect the Gunnison Gorge area. This area with its proximimity to the Black Canyon of the Gunnison National Monument and 13 miles of the Gunnison River will make a wonderful addition to the other areas in the state.

1 | The Camel Back area seems to fall into wilderness consideration and we would like to know your reasons for not recommending this area. We understand that there are no resource conflicts and that grazing is to be cut back in this area to protect the riparian
2 | zone. Why not protect the entire 10,402 acres with a wilderness designation? We would like to see this area of the Uncompahgre Plateau saved before it is too late. Please explain your stand on this.

3 | We also ask you to recommend the Adobe Badlands for wilderness as it has sweeping vistas and is home to an endangered cactus. This area has little resource potential and it would be nice to have an area that is in contrast to our mountains and riparian wilderness areas.

We thank you for your time in considering our views on this matter.

Sincerely,

Marv Kieca
Judy Kieca
201 S. Wilcox
Castle Rock, CO 80104

**Response to Letter No. 34**

1. Please see Response to Letter No. 13

2. In the Proposed Action for the Camel Back area, the limit of 35 percent utilization has been proposed as a general guideline for improvement in riparian areas and would only be implemented when other methods of improving riparian vegetation prove unsuccessful. A reduction of 200 AUMs is not a proposed management action, but rather an anticipated impact which could result from implementing a 35 percent utilization limit.

3. Please see Response to Letter No. 13.

BLM_0005637

35

207-29Rd.
Grand Junction, Co. 81503
September 22, 1987

Gene Vecchia
RMP Team Leader
BLM
2505 S. Townsend Ave.
Montrose, Co. 81401

Dear Mr. Vecchia,

As a citizen of western Colorado and an avid outdoorsman I would like to offer my thanks and congratulations to you and the BLM for the wilderness designation recommendation for the Gunnison Gorge Wilderness Study Area. If the recommendation is accepted an invaluable and irreplaceable part of the west will have been saved from further exploitation and will have been afforded the necessary protection so that future generations may too enjoy its splendor.

1 | To my consternation though I understand that in your draft for the Uncompahgre Basin RMP that you have failed to include of the Camel Back Study Area for wilderness protection. I find this very disturbing and the decision borders on the ludicrous. A public accounting for this decision is certainly in order, especially in light of the BLM's admission that there are no resource conflicts with wilderness designation for the area. That such an incredibly diverse and beautiful area as the Uncompahgre Plateau has no designated wilderness areas is in itself a disgrace. At hand lies the opportunity to rectify this situation, albeit in a very small way. I ask that the Camel Back Area be given wilderness designation, to do otherwise would be a travesty.

Another discrepancy in the report I would like to address is the exclusion of the Adobe Badlands from wilderness designation. Again, this decision is uncomprehensible. Those familiar with the area know any resource conflict is virtually non-existent while the beauty and solitude offered are quite unique. Most of the Dobies have been severely and recklessly abused for generations; surely at least this very small part deserves the protection afforded by wilderness designation. Again, I must ask the BLM to publicly explain its' decision in this matter and ask that the decision be sensibly reversed.

The issue of the Storm King Ski Area Site is also very disturbing to me. By the BLM's own admission the ski area would eliminate a critical elk calving habitat and mule deer fawning area. In a time of ever increasing pressure upon big game populations by hunters and development how you can rationalize the sacrifice of this habitat is beyond me. As both a hunter and a conservationist I find the decision to allow a 5-year grace period in which development would proceed to be absolutely indefensible. In a time when all long range forecasts for the ski industry say the sport faces declining numbers because of the aging of the baby-boomers it becomes all the more ridiculous to sacrifice such an important area to the short-term profits of a few developers. I ask that this decision, too, be reversed for the sake of all long term interests and values.

Another area of personal concern is the off-the-road-vehicle use on public lands. This situation is entirely out of hand. No area is safe from the

---

page 2,                                35

2 | misuse and destruction by these ORV's. Is there no set of existing regulations covering this growing problem? If not, why not? Granted, a powerful lobby exists that would oppose any restrictions but surely in the light of the ever increasing damage being done to lands under BLM management the BLM itself should draw up, at least, minimal guidelines.

I would suggest that because the evidence is so overwhelming that the users of ATV's and dirt bikes are unable, or unwilling, to use public lands in a responsible manner that they be banned entirely. At the very least they should be restricted to existing roadways only, with stiff fines for any offenders. 4wd's should be restricted to the roadways also, with the same penalties against offenders. I know enforcement would be difficult, at best, but, as on Forest Service lands where restrictions are in force, the simple posting of restrictions would, in most cases, reduce the damage considerably.

Thank you for your time and consideration. I would appreciate hearing from you regarding these issues.

Yours truly,

Ben Roberts

cc. Congressman Ben Campbell

---

Response to Letter No. 35

1. Please see Response to Letter No. 13.

2. The BLM recognizes ORV use as a valid recreational use of the public land wherever it is compatible with established resource management objectives. The regulations governing ORV use on public lands are contained in Section 8342 of the BLM Manual which states that "all public lands must be designated as open, limited, or closed to ORV use to meet public demand or needs, to protect resources and the safety of public land users, and to minimize conflicts among the various public land users."

Restrictions on ORV use are based on protecting natural resources and preventing conflicts with other public land uses. Where ORV use would cause excessive damage to resources or where conflicts with other uses are anticipated, areas were recommended for closure to or limitations on ORV use. If the effects from ORV use were not considered to be significant, the areas were recommended to be open to ORV use. The BLM also recognizes the problems and impacts which result from unauthorized ORV use and is taking measures to correct this abuse. The Uncompahgre Basin Resource Area began posting Limited, Closed, and Open signs in the Gunnison Gorge Recreation Lands and other recreational use areas in 1988 and will continue these efforts through 1989. As stated in your letter, however, enforcement of ORV regulations is difficult; vandalism and theft of these signs has been a constant and costly management problem. However, the BLM hopes to minimize these problems by closing additional areas to ORV use where significant problems have occurred, and by providing for increased patrols and enforcement of regulations in the field.

154

BLM_0005638

36

17 Sept '87
Rt. 10, Rock Cr. Rd.
Knoxville, TN 37920

Robert L. Vecchie, RMP Team Leader
BLM, Uncompahgre Basin R. A.
2505 S Townsend
Montrose   CO 81401

Dear Mr. Vecchie,

Please include this letter as part of the record on the Uncompahgre Basin RMP/EIS. In general I was impressed with the quality of your planning effort, although some of the statistics were maddeningly imprecise. For example, the remark that a specific action "would result in a less than 1% decrease in salinity in the Colorado River system" (paraphrased) is almost worthless. A 1% decrease in the entire river's load would be a major victory. On the other hand, "less than 1%" could mean anything. Also on p 4-10 of the WTS is the prediction that a 50 to 500% decrease in sediment yields. Come on. A 500% decrease? Does that mean that stopping ORV use will actually extract sediment (produce up to minus 400%?) from the river?

In general I support the Conservation alternative and urge you to incorporate it. In particular the Gunnison Gorge should be protected at all costs. The ducks, geese (I saw one in the Gorge near the Ute trail crossing in about 1973), deer, elk, bighorns, and solitude seekers need a protected river. Serious consideration is protected the Camel Back but it is also warranted. Winter range like that won't be around a generation hence if you don't protect it.

Sincerely,
Gordon Rodda

## Response to Letter No. 36

1. Salinity reduction efforts in the Colorado River Basin are assessed by changes in the salinity levels in the lower Colrado River. While we agree that a one percent reduction in salinity would be significant, we are unable at this time to quantify the impacts of such a reduction. Based on the limited data available at this time, we can only project a range for decreases in sediment yields.

37

November 4, 1987

Robert E. Vecchia
Bureau of Land Management
2505 South Townsend Avenue
Montrose, CO  81401

Dear Sir:

I am in agreement that the Camel Back should continue to be managed by the BLM as it now is. I prefer the no action alternative.

For many years the Multiple Use Act has worked for the preservation of this area. The forage is harvested yearly by wildlife and livestock to help feed the hungry world. At no time have these uses interfered with recreational uses of these lands.

1. This area does not lend itself to wilderness. There are roads in the area and some fencing. The land is managed as it should be and the area is accessible to the general public.

2. I was brought up on the theory that Public Lands were for Multiple Use. With proper management, these lands will provide us with food and fibre for all time to come, but we must be allowed to properly manage livestock grazing. Fences must be kept, stock ponds properly maintained and the range properly utilized to prevent overgrazing and forest fires.

3. Reducing livestock grazing in the so called riparian zones would defeat the purpose of a riparian habitat. Many riparian species of vegetation are of low palatability to livestock. Streambanks in this area are unstable and water turbidity will occur in the absence of livestock use.

Many flash floods come down these canyons each year as evidenced by the rocks and sandy washes. These streams usually dry up during the summer and when flooding occurs there is no way to hold the sandy, rocky dry banks. Some areas are definitely too dry for vegetation and definitely does not lend itself to streambank stability.

4. Reduction of AUMs would defeat the purpose of a riparian zone when properly managed. Vegetation and the canyon areas has improved many times over in the few years since a riparian habitat was first introduced, even though the AUMs have remained the same. Riparian habitat properly managed should increase available forage.

5. Bighorn sheep should not be introduced into the area. Lack of adequate winter forage should preclude this. Private land in the area would, of necessity, have to support these animals especially in the winter months.

- 1 -

## Response to Letter No. 37

1. All of the WSAs addressed in the Draft RMP/EIS and Draft WTS meet the criteria provided by Congress in the Wilderness Act of 1964. However, the BLM does agree with your comment that the area's wilderness qualities are not significant enough to warrant inclusion in the National Wilderness Preservation System, and as such, has proposed that the Camel Back area remain under multiple-use management of the RMP.

2. Livestock grazing is permitted in designated wilderness areas to the extent established prior to wilderness designation. Under the BLM's Interim Management Policy, new permanent range improvements (i.e. stock reservoirs) may be approved for the purpose of enhancing wilderness values by better protecting the rangeland in a natural condition. Under the BLMs Wilderness Management Policy, such rangeland improvements may be allowed if determined to be necessary for the purpose of resource protection. Under the All Wilderness Alternative for Camel Back, it is projected that certain proposed water development projects will meet wilderness criteria for construction. In addition, where practical alternatives do not exist, maintenance of the facilities existing in the area prior to wilderness designation would be accomplished with the occasional use of motorized equipment.

Under the Proposed Action (No Wilderness Alternative) for Camel Back, authorized motorized vehicle and equipment use would be allowed the grazing permittee and the BLM to maintain and monitor existing range facilities and to construct new projects. The area would be closed to recreational ORV use.

3. The term "riparian" is defined on page A-39 of the Draft RMP/EIS. Year-round surface water is not necessary to maintain healthy riparian vegetation. Under both wilderness and no wilderness management, livestock grazing would be precluded on 680 acres of riparian areas from March 1 through range readiness to protect new spring growth and prevent erosion. This limitation on spring use is not expected to have a measurable affect on overall livestock use. The limit of 35 percent utilization would be used when other methods of improving riparian vegetation have been unsuccessful. The BLM has a substantial amount of information which supports even more severe restrictions than those in the Proposed Action. However, based on current conditions of riparian areas, it is felt that substantial improvement would be obtained through other methods (i.e, changing season of use, limiting trailing use, etc.) and that the 35 percent utilization limit would probably never be implemented.

4. The decrease in AUMs is not a proposed action for the Camel Back, but rather an anticipated impact which would result from implementing the 35 percent utilization restriction. No change in the current level of 514 AUMs is anticipated at this time.

5. Please see Response 2 to Letter No. 21.

BLM_0005639

37

It would appear that livestock grazing has been given practically all the credit for increased erosion and for the destruction of habitats of big game and non game species. These statements are biased and founded without fact.

All these natural resources should be utilized thru a practical and beneficial program, not locked up for the exclusive use of hikers, back packers and the affluent few with ride on their hands.

The young, too, grow old. They also will be denied access to roadless areas in their declining years when they are no longer able to walk or back pack long distances.

The need to continue Multiple Use management of all Public Lands will provide forage for wildlife and livestock, minerals for energy development and protection of watersheds, the most valuable resource of all.

The west has a valid existing right to keep these Public Lands open for all to use and enjoy. Creating wilderness areas does not guarantee these lands for the enjoyment of future generations. Proper management does.

*Josephine M. Gore*
Josephine M. Gore
445 Hwy 348
Delta, Colorado

- 2 -

38

Date; November 5,1987

Robert E. Vecchia
RMP Team Leader - BLM
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Vecchia,

The following are my comments concerning the Uncompahgre Basin Resource Management Plan and Environmental Impact Statement;

The best alternative offered to support the multiple-use objective, with the fewest detriments to livestock grazing, is the 'Continuation of Current Management.'

Under this policy, through Allotment Management Plans, the objectives to enhance livestock grazing and wildlife and riparian habitats, control erosion and salinity, utilize mineral and forest products, and protect our diverse recreation interests can be met on a site-specific basis.

A few additional comments and concerns are;

We support the Bureau's position to continue your fact-finding process underway for the Storm King ski development. Only when you and those involved can analyze all the facts and impacts can a valid decision be reached. The Uncompahgre Valley could certainly benefit from the diversity of income generated by this. - But our concerns are the same as others', ie.,Is the area in question now, or historically,a grazing allotment?, and- Will the lack of this elk habitat adversly affect the surrounding uses, both on public and private lands?

We also have concerns about off road vehicle use. We support only the Current Management Alternative but there are areas which need to be under more strict restrictions from this activity. ~especially during crucial erosive periods, and while wildlife is under winter stress.

1 | Throughout the draft are references to introducing desert sheep to the Camel Back area. We object to this proposal. Because; 1. The only reliable water for this area is the Roubideau and Criswell creeks. Both are designated riparian zone habitats, and it has been suggested that limiting useage in these zones will improve them. Introducing more animal units to directly conflict with the historical use of cattle grazing and the crucial deer winter range is defeating our range management objectives.2. The revenues derived from the grazing permits and deer hunting activities historically and are now progressive and dependable. This area is presently a study area for mountain lion with no hunting or trapping of them allowed.(Their numbers are increasing.) There are also coyotes there year around, and bear to the South in the summer months. With these obstacles it is certain to take years for the herd (band?) to produce enough trophy-size animals for harvest. The money, time, and man-hours alloted for this could be better spent.
Signed;

continued on next page

*Richard W. Fr*
56850 Sun Rd.
Olathe, Co. 81425

Responses to Letter No.38
1. Please see Response 2 to Letter No. 21.

156

BLM_0005640

38

page 2. of comments on the BLM Uncompahgre Basin Resource Management Plan and
Environmental Impact Statement by Richard and Deborah Gore.

With the concerns on hand in association with the Division of Wildlife Agency we have
a question, what percent of the hunting license fees from the DOW are distributed back
to each area's forest service and BLM offices? In the majority, it is the agencies and
the livestock permittees who pay for and do improvements on public lands which also
benefit all wildlife and hunters.

2  Our greatest objection throughout the RMP draft comes from the references of
limiting utilization in the riparian zones to 35%. First of all, it is not clear if the
existing livestock allotted have to share that percentage with the area's wildlife.
Since most, if not all, designated riparian zones are in arid country where other de-
pendable water sources are non-existant all wildlife and livestock are forced to use
them together. As with any watering area, the game and livestock will first use the
accessable feed nearest the water. As that is topped off and fouled they will use further
away. Most of these riparian zones are in deep canyon bottoms which obviously hampers
this natural migration. Therefore, without water on the benches or mesa tops the animals
3  invariably use more than 35% before they even touch the rest of the allotment.
Our objective is for better distribution over all. Through the continuation of current
management of range improvements such as stock ponds and catchments we are doing what
we can to relieve use in the creek bottoms.-But because of varried rain fall these
alternatives are not dependable each year.
   We disagree with the problems cited in the riparian zones as being caused by
"over grazing". In this arid area the major detrimental effect is water.(Either the
lack of, or the excess of.)The extrodinary forces of the spring run-offs and the more
damaging flash floods move tons of crucial soil, greases, woody plants, and even trees
each year. It is proven that the time of use is one of the greatest factors. The other is water availability
for a particular plant type is one of the greatest factors. The other is water availability
for the plant to start healthy growth, and to recover after use. Our base ranch, at the
confluence of Dry Creek and Coal Creek, was homesteaded in 1895. It has had cattle
and horses on it each and every year since then.Our livestock are along these creeks
from early November through May or June each year. -This would include the dormant and
crucial growing seasons for most plants. (Perhaps the attached photos will be beneficial.)
In our opinion, the difference between our 'private land' riparian zone and that in
Soubideau Canyon is not the number of, or even the timing of livestock impact,,,it is
surface and sub-surface water availability. (And flooding.) Factors the 35% limitation
will have no effect on!

Again, the Continuation of Current Management is the only Alternative we accept.

Thank you for your consideration of these comments.

*Deborah L Gore*
36550 Lou Rd.
Olathe, Colorado 81425

The photos are available for review at the BLM office.

2. The 35 percent utilization limit proposed in the RMP would be the upper limit
for livestock utilization only. There is no evidence at present to indicate that
big game animals concentrate in, or make substantial use, woody riparian
vegetation within the planning area. The greatest concentration of animals
occurs during the winter months; however, snow cover reduces big game
dependence on free water sources, and the animals do not concentrate in
riparian areas. Improved water sources on the bench areas would improve
wildlife habitat and distribution during the warmer months, but most of these
sources would be frozen during the winter.

3. Both the Proposed Action and the All Wilderness Alternative for Camel Back
propose the development of additional stock reservoirs on Winter Mesa to
improve the distribution of livestock in the area.

---

39

P.O. Box 7291
Boulder, CO 80306
9/13/87

Dear Mr. Vecchia-
    I have spent time hiking and kayaking
in The Gunnison Gorge and strongly urge That
1   it be designated a wilderness area. I also
support, strongly, The elimination of grazing and
2   The introduction of bighorn sheep in The
badlands areas. I would like to see all
3   ORV use stopped

Sincerely,
Kate Palmer

## Response to Letter No. 39

1. Public land administered by the BLM is managed for multiple-use. Livestock
grazing is a legitimate use of public land and can be managed to avoid
detrimental effects on sensitive areas. The BLM's livestock management
program is designed to eliminate overgrazing and to improve vegetation
conditions.

2. The badlands areas are not suitable habitat for bighorn sheep.

3. Please see Response No. 2 to Letter No. 35.

BLM_0005641

7 Chardonnay Court
Grand Junction, CO 81503
3 November 1987

40

Gene Vecchia
RMP Team Leader
Bureau of Land Management
2505 S. Townsend Avenue
Montrose, CO 81401

Dear Mr. Vecchia:

I offer the following comments regarding the Uncompahgre Basin Resource Management Plan and Environmental Impact Statement and Wilderness Technical Supplement.

1. The document is generally well-written--thorough and without the usual obscurities!

2. BLM's recommendation of wilderness for the Gunnison Gorge is laudable. The gorge is geologically spectacular and offers year-round opportunities for primitive and non-confined recreation.

**1** 3. There are no resource conflicts with respect to Camel Back, yet BLM has failed to recommend any of the WSA for wilderness designation! On what was this recommendation based?

**2** 4. Adobe Badlands WSA, as described by BLM on p. 3-11, "includes the most outstanding Mancos shale mesa formations found in the planning area," and presents no resource conflicts that would preclude wilderness designation. So why was this WSA given a non-wilderness recommendation?

**3** 5. The cultural resource density within the Gunnison Gorge WSA computes at .003/acre, and the potential for cultural resources is evaluated as "moderate." The cultural resource density within the Camel Back WSA computes at .01/acre, and the potential for cultural resources is evaluated as "low to moderate." Please explain the justification for these evaluations and this discrepancy.

6. While a site density of .01/acre may be "low" in some contexts (e.g., south-western Colorado), it is not "low" in west-central Colorado. Furthermore, I don't know which 3 percent of the Camel Back WSA has been inventoried, but I am dubious about site-frequency predictions made from such small samples. This area contains three perennial creeks and is topographically similar to the Dominguez and Escalante areas, both of which have proven to be extremely archaeologically sensitive.

**4** 7. It is stated on p. 4-57 that "High-value cultural sites on these acres could be protected by special designations." How?

---

Response to Letter No. 40

1. Please see Response to Letter No. 13

2. Mancos shale badlands are not inherently suitable or unsuitable for wilderness designation. Such shale-type badlands are presently represented in the NWPS by the Bisti and De-na-zin wilderness areas in New Mexico. The BLM agrees that the outstanding badland formations found within the Adobe Badlands do merit special protection, and has proposed that the majority of the area which includes these formations (6,783 acres) be designated an ONA/ACEC (Outstanding Natural Area and Area of Critical Environmental Concern.)

3. The discussion of cultural resources in the Camel Back WSA (Affected Environment) has been changed following additional consultation with the resource specialists regarding your comment. The discussion on cultural resources for the Camel Back WSA (Chapter 3, Affected Environment) now states that "only 3 percent, or approximately 300 acres of the 10,402 acre WSA have under intensive field inventory for cultural resources. Given such limited data, it is impossible to assess the potential for or the significance of the area's cultural values. Therefore, due to the limited area inventoried for cultural resources, the potential for cultural sites in the Camel Back WSA is considered to be unknown."

As pointed out in your letter, archaeologically sensitive and unique sites do exist in the Uncompahgre Plateau area. One such site within the Camel Back WSA, a Ute Indian hunting blind, has been determined to be "field eligible" for listing on the National Register of Historic Places (NRHP) by BLM personnel. Although there has been no formal eligibility determination or nomination to the NRHP, this site is being managed as eligible and protected via avoidance. No surface-disturbing activities would be authorized at or in the vicinity of the site under either the proposed (No Wilderness) action or the All Wilderness alternative.

Federal legislation outlines procedures for agency management of all cultural sites. Proposed actions and BLM management activities and plans must comply with these and other legal mandates. Avoidance or mitigation measures would be implemented prior to authorizing any development action or to mitigate any other adverse effects to cultural sites in all the WSAs.

4. In addition to the protection afforded all cultural sites under the National Historic Preservation Act (NHPA) and the Archeological Resource Protection Act (ARPA), significant cultural sites would be assigned an appropriate designation such as Conservation for Future Study or Public Education use. The activity plans developed for these areas would identify the specific measures that would be needed to protect the areas' cultural values.

Specific high-value cultural sites may be eligible for administrative protection as a National Historic Place or Landmark, or as an Area of Critical Environmental Concern (ACEC). Protective BLM withdrawals may also be applied to larger areas which have considerable potential for discovery of cultural sites.

---

Gene Vecchia
Bureau of Land Management
p.2

40

8. Having almost 90 percent of the resource area open to ORV use is preposterous! Such non-management of these vehicles encourages ecological degradation, soil erosion, and the destruction of archaeological sites.

9. The Storm King Ski Area is NOT NEEDED--the present crop of ski areas can barely make a go of it, so WHY develop another? However, the elk DO NEED their calving grounds, and the deer their fawning areas. No development activity should be allowed during the 5-year grace period proposed by BLM.

Thank you for considering my comments.

Sincerely,

Danni Langdon

Danni L. Langdon

BLM_0005642

**41**

2832 Unaweep Avenue
Grand Junction, CO 81503
3 November 1987

Gene Vecchia
RMP Team Leader
Bureau of Land Management
2505 S. Townsend Avenue
Montrose, CO 81401

Dear Mr. Vecchia:

I would like to make the following comments regarding the Uncompahgre Basin Resource Management Plan and Environmental Impact Statement and Wilderness Technical Supplement.

1. I support BLM's recommendation for wilderness designation for the Gunnison Gorge. However, I am also in favor of similar designations for the Adobe Badlands and Camel Back WSA's, as this region of Colorado has very few wilderness areas that are accessible during any season but late spring/summer. There are no resource conflicts with respect to Adobe Badlands or Camel Back; why has BLM not recommended them for wilderness?

2. Please explain why the BLM considers the potential for cultural resources in the Camel Back WSA "low to moderate."

3. How would high-value cultural sites be protected by "special designations"?

4. The Storm King Ski Area is unnecessary; I urge you to disallow the developers from proceeding with any further plans during the 5-year grace period.

Thank you for considering my comments.

Sincerely,

Carl E. Conner

Carl E. Conner

**Response to Letter No. 41**

1. Please see Response to Letter No. 13.
2. Please see Response No. 3 to Letter No. 40.
3. Please see Response No. 4 to Letter No. 40.

---

**42**

Date: November 5, 1987

Robert E. Vecchia
RMP Team Leader - BLM
2505 South Townsend Avenue
Montrose, Colorado  81401

Dear Mr. Vecchia,

The following are my comments on the Uncompahgre Basin Wilderness Technical Supplement:

I (do) (do not) agree with the BLM's Proposed Action, the All Wilderness Alternative, for the Gunnison Gorge Wilderness Study Area.

The Camel Back and Adobe Badlands Wilderness Study Areas will benefit most from the No Wilderness Alternative. This alternative best exemplifies the multiple-use management. Site-specific objectives can be mitigated through the Allotment Management Plans.

Richard and I are true natives of this area. Our families, for two and three generations before us, evolved their livelihoods in the Camel Back, Winter Mesa, and Roubideau Creek area. It is written in stone in the Roubideau where my great-great Uncle and friends spent Christmas day in 1884. He was a cattle rancher who worked this very area. The next generation saw my great Uncle's brother-in-law homesteading the Ben Lowe place in the canyon, which is still in our family's ownership. The years of 1920 and 1928 saw my Grandfather, and Richard's Grandfather, holding grazing permits in these adjoining areas. (These same permits are still held by our family members or us.) We grew up learning the history of this area from the actual people who first 'settled' it. This Roubideau Canyon shaped their livlihoods, their lives, and their persons. (As it still does ours, today.)

Through our heritage and knowing and living with the majestic beauty, the defiant ruggedness, the severe forces of flooding, and the extremes of weather causes us to truely understand and greatly appreciate this area. It is our home, our 'back yard', and we love it. The Camel Back terrain has defied change for, at least, over a hundred years of 'civilization'. And it still demands the same respect and offers the same subjects for appreciation,,,without a title.

1. We need more water development on the top and benches of Winter Mesa to better manage our entire grazing allotment. There would also be great, long term benefits from chaining or timbering and reseeding in the saddle area between Winter and 7H Mesas. The road across the top of Winter Mesa is essential for catchment and fence repairs, and has been necessary for transporting sick and injured livestock. It is heavily used for big game hunting, recreationists, and some Division of Wildlife activities. With these factors in mind, therefore, our preference is only the No Wilderness Alternative for the Camel Back WSA.

Thank you for your consideration of these comments.
Signed,

Richard Mc Poe
Deborah R. Poe
56850 Jam Rd.
Olath, Co. 81425

**Response to Letter No. 42**

1. Please see also Response No. 2 to Letter No. 37. Wilderness designation of the Camel Back would preclude recreational ORV use throughout the WSA (10,402 acres) to protect wilderness values. Under the Proposed Action (No Wilderness) for Camel Back, the entire area will be closed to recreational ORV use to protect scenic values, to prevent accidental destruction of threatened and endangered plants, to protect riparian areas, and to reduce active erosion. Under both alternatives, vehicle access to the area would be further restricted by a riparian closure of the Potter Creek Road, on the area's western boundary. It is projected that these ORV closures will result in an annual decrease of approximately 250 motorized hunter days and approximately 50 user days of ATV and motorcycle use within the area. The loss of these motorized user days would be recovered in areas adjacent to the WSA.

As discussed in Chapter 2, management under the RMP would allow some authorized motorized vehicle use by the grazing permittee in the Camel Back for the construction and maintenance of range facilities, and in emergency situations, such as rescuing sick animals. Wilderness management guidelines, would also allow the use of motorized equipment, for the maintenance and construction of range facilities, and for emergency purposes, where practical alternatives do not exist.

BLM_0005643

**43**

Date;

Robert E. Vecchia
RMP Team Leader - BLM
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Vecchia,

The following are my comments on the Uncompahgre Basin Wilderness Technical Supplement:

I (do) (do not) agree with the BLM's Proposed Action, the All Wilderness Alternative, for the Gunnison Gorge Wilderness Study Area.

The Camel Back and Adobe Badlands Wilderness Study Areas will benefit most from the No Wilderness Alternative. This alternative best exemplifies the multiple-use management. Site-specific objectives can be mitigated through the Allotment Management Plans.

We feel that the land is for everyones use and that stock and wildlife can get along Together and a wilderness areas grow up with out anything to eat it and could be bad if a fire got started and you couldn't take a auto into it. We would hike to see people take care of our fores and the wildlife and plants but we think that all people should have dcess to all forest. The elderly can walls or bike horses To see all this beauty

Signed;

*Leo Tungel*

*Helen Tungel*

**Response to Letter No. 43**

1. It is BLM's policy to allow natural fires to burn within a wilderness area as long as they do not threaten life, property, or resource values on adjacent lands. However, where such fires do threaten these values, they will be suppressed with whatever methods and equipment are deemed necessary, with preference given to those methods and equipment which would least alter the landscape or disturb the land surface.

   The use of motorized equipment and mechanical transport uses for firesuppression will be specifically addressed in a wilderness area's Fire Management Plan.

---

**44**

Robert E Vecchia
Rmp Team Leader - BLM
2505 South Townsend Ave.
Montrose, Colo 81401

Dear Mr Vecchia,
   The best alternative offered to support the multiple-use objective with the fewest detriments to livestock grazing, is the "Continuation of Current Management."
   I strongly oppose all Wilderness Areas. We need our cattle industry. As far as any damage to the area by cattle I have seen areas hundreds of Cattle graze on and pass through with no ill effects, only tramped in seed and fertilizer, also less fire hazard because it is grazed.
   I have also seen where only a handful of people camp or pass through with cans, glass, plastic and general trash left cluttering the area for years to

**Response to Letter No. 44**

1. The Federal Land Policy and Management Act of 1976 (FLPMA) mandates the BLM to manage public lands and their resources under the prinlciples of multiple use and sustained yield. Wilderness values are considered as part of the spectrum of multiple resource values and uses considered in the land use planning process.

   This WEIS was prepared in response to Section 603 of FLPMA which directs the BLM to inventory and study all public lands and identify those lands suitable for inclusion in the National Wilderness Preservation System (NWPS). The Gunnison Gorge, Camel Back, and the Adobe Badlands Wilderness Study Areas are to be studied as Wilderness Study Areas.

   Section 4(d)(4)(2) of the Wilderness Act provides for continued livestock grazing where established prior to designating the area as wilderness. The objective of livestock management in wilderness is to: "Utilize the forage resource in conformity with established wilderness objectives for each area and the BLM grazing regulations (43 CFR 4100), and through practical, reasonable, and uniform application of the congressional guidelines and policy."

BLM_0005644

44

*Control # 49*

come. ⊗ The cattle people have managed these lands for years and do take care of the land. They have respect for it. Please see fit to back them.

Mrs Robert Gray
4390 Cedar Rd
Delta, Colo 81416

45

23 October 1987

Dear Gene Vecchia,

First I want to thank you for recommending the Gunnison Gorge area for Wilderness designation. It is very important that we preserve intact significant areas of desert ecosystems.

I do not understand why you did not recommend the Camel Back area for Wilderness protection as well. The BLM even said that there are absolutely no resource conflicts with wilderness designation of the area. The Uncompahgre Plateau is one of Colorado's major landforms, yet none of it is protected as Wilderness. I would like to know why. There are several endangered plant species in the area and big game herds that would benefit from wilderness protection.

I also want to know why you have chosen not to recommend the Adobe Badlands for Wilderness designation. Obviously there are no trees there for the timber industry, and the four dry oil and gas well prove the low potential for mineral development. There are no significant conflicts for wilderness designation.

Please manage Storm King Mountain for elk. There are more than enough ski areas (and I am a skier) in Colorado, and wildlife habitat is an ever-dimishing resource. The BLM says that the ski development would totally eliminate the elk calving grounds as well as impact mule deer fawning areas. The plan to give the developers a five year "grace period" in which they may proceed with the ski area is ludicrous. After five years of working on the resort, it will be very convenient for you to allow them to continue since they will have put so much money into it. This sounds like a roundabout way to avoid dealing with an issue that needs to be confronted and dealt with now, while we still have undisturbed ecosystems left.

Please don't be afraid to take a stand in favor of protecting the wide-open spaces that make the American West what it is. I would appreciate your response to these issues.

Sincerely,
Susan Detweiler
Susan Detweiler
64 Willard
Boulder, CO 80310

1

**Response to Letter No. 45**
1. Please see Response to Letter No. 13.

BLM_0005645

46

9-25-87

Gene Vecchia —
I have been advised that
BLM has recommended
Gunnison Gorge for wilderness
protection. BLM is to be
commended highly for
taking this position.
I hope you will decide
to take a similar position
on Camel Back (Roubideau
Canyon) and the Adobe
Badlands.

Thomas O, Scott

Dr T Scott
2629 Adriel Dr
Ft Collins Co
80524

**Response to Letter No. 46**
1. Thank you for your comments. Your preference has been noted.

47

Date: Nov 14 – 1987

Robert E. Vecchia
RMP Team Leader – BLM
2505 South Townsend Avenue
Montrose, Colorado 81401

Dear Mr. Vecchia,

The following are my comments on the Uncompahgre Basin Wilderness Technical Supplement:

I (do) (agree) agree with the BLM's Proposed Action, the All Wilderness Alternative,
for the Gunnison Gorge Wilderness Study Area.

The Camel Back and Adobe Badlands Wilderness Study Areas will benefit most from the
No Wilderness Alternative. This alternative best exemplifies the multiple-use management.
Site-specific objectives can be mitigated through the Allotment Management Plans.

**Response to Letter No. 47**
1. Thank you for your comments. Your preference has been noted.

Signed: Laura J. Orth – 6515-5300 Rd. Olathe, Col. 81425
Thomas D. Orth – 6515-5300 Road – Olathe Col.
Carri Lou Orth – P.O. Box 27, Olathe, Colo. 81425

BLM_0005646

48

Date:

Robert E. Vecchia
RMP Team Leader - BLM
2505 South Townsend Avenue
Montrose, Colorado  81401

Dear Mr. Vecchia,

The following are my comments on the Uncompahgre Basin Wilderness Technical Supplement:

I ▆▆ (do not) agree with the BLM's Proposed Action, the All Wilderness Alternative, for the Gunnison Gorge Wilderness Study Area.

The Camel Back and Adobe Badlands Wilderness Study Areas will benefit most from the No Wilderness Alternative. This alternative best exemplifies the multiple-use management. Site-specific objectives can be mitigated through the Allotment Management Plans.

Signed,

**Response to Letter No. 48**

1. Thank you for your comments. Your preference has been noted.

BLM_0005647

BLM_0005648

# APPENDIX A

# LIST OF PREPARERS

ROBERT V. CARRUTHERS, Area Manager

B.S. Forestry, University of Montana.

Experience: 1 year area manager, BLM, Montrose, Colorado; 11 years area manager, BLM, Medford, Oregon; 1 year ATROW specialist, BLM, Colorado State Office, Denver, Colorado; 8 years forester-fire control, BLM, Montrose, Colorado; 4 years forester-fire control, BLM, Craig, Colorado; 4 years forester-fire control, BLM, Lewistown, Montana; 1 year forester, BLM, Missoula, Montana.

ROBERT E. VECCHIA, Team Leader - RMP/EIS and WTS
B.S. Forest and Range Management, Colorado State University.

Experience: 2-1/2 years team leader, RMP/EIS staff, BLM, Montrose, Colorado; 2-1/2 years staff supervisor, BLM, Montrose; 9-1/2 years area manager, BLM, Alamosa, Colorado; 6 years area manager, BLM, Montrose, Colorado; 4 years range conservationist, BLM, Montrose.

SCOTT F. ARCHER, Air Quality and Climate

B.S. Environmental Science and Chemistry, Northern Arizona University.

Experience: 5-1/2 years air resource specialist, BLM, Colorado State Office, Denver, Colorado; 4-1/2 years consultant, Environmental Protection Agency, Las Vegas, Nevada.

JEFF CAMERON, Aquatic Biology

B.A. Fisheries, California State University at Sacramento; 2 years graduate school Aquatic Ecology and Entomology, Oregon State University.

Experience: 8 years fisheries biologist, BLM, Montrose, Colorado; 3 years fisheries biologist, BLM, Coos Bay, Oregon; 3 years forest and aquatic entomology, U.S. Forest Service, Corvallis, Oregon.

JOHN A. DAVIS, Lands and Realty

A.A. Rend Lake Junior College, Illinois; B.S. Recreation Resource Management and Planning, Southern Illinois University; M.S. Resource Management and Planning, Southern Illinois University. Experience: 6 years realty specialist, BLM, Montrose, Colorado; 5 years recreation planner, BLM, Glenwood Springs, Colorado.

JAMES R. FERGUSON, Wildlife and T&E Species

B.S. Wildlife Management, Delaware State College.

Experience: 7 years wildlife biologist, BLM, Montrose, Colorado; 2 years wildlife biologist, BLM, Hanksville, Utah; 2 years resource planner, BLM, Richfield, Utah.

BLM_0005649

LARRY FRAZIER, Forestry

B.S. Forest Resource Management, California State University at Humboldt.

Experience: 1-1/2 years forester, BLM, Montrose, Colorado; 3 years branch chief of administrative services, BLM, Montrose; 3 years YACC work coordinator, BLM, Redding, California; 2 years forester, BLM, Redding; 2 years forester, U.S. Forest Service, Mt. Shasta, California.

THOMAS GEY, Forestry

B.S. Forest Management, University of California at Berkeley.

Experience: 2 years realty specialist, BLM, Kingman, Arizona; 5 years forester, BLM, Montrose, Colorado.

PATRICIA L. HAWKINS, Clerk-Typist

Experience: 1 year word processing operator, RMP/EIS staff, BLM, Montrose; Colorado; 8 months receptionist, Montrose County Social Services, Montrose; 1 year nursery attendant, First Church of the Nazarene, Montrose; 6 months clerk, Circle K Convenience Store, Montrose; 1-1/2 years cook, Montrose County Jail, Montrose.

ROY A. HAYES, Access and Transportation

Experience: 10 years access and transportation rights-of-way specialist, BLM, Montrose, Colorado; 5 years district engineer, BLM, Shoshone, Idaho; 5 years civil engineering technician, BLM, Boise, Idaho.

RON D. HUNTLEY, Vegetation and Livestock Grazing

B.S. Range Management, Arizona State University.

Experience: 7 years range conservationist, BLM, Montrose, Colorado; 2 years range survey, BLM, Socorro, New Mexico.

JOHN R. KALISH, Technical Coordinator - RMP/EIS and WTS

B.S. Wildlife Biology, University of Missouri.

Experience: 1-1/2 years technical coordinator (physical sciences), RMP/EIS staff, BLM, Montrose, Colorado; 5-1/2 years outdoor recreation planner, BLM, St. George, Utah.

LYNN D. LEWIS, Geology and Minerals

B.S. Geology, University of Wyoming.

Experience: 9 years geologist, BLM, Montrose, Colorado; 1 year geologist, Federal Energy Regulatory Commission, Washington, D.C.

FRANCISCO J. MENDOZA, Visual Resources

B.S. Landscape Architecture, University of Arizona.

Experience: 5-1/2 years landscape architect, BLM, Montrose, Colorado; 3 years outdoor recreation planner, National Park Service (HCRS), Denver, Colorado.

BLM_0005650

STEVE MOORE, Economics

B.A. History, University of Santa Clara, California; M.S. Agricultural Economics, Colorado State University.

Experience: 7 years economist, BLM, Grand Junction, Colorado; 1 year economist, U.S. Senate Washington, D.C.; 4 years economist, Agriculture Stabilization and Conservation Service, Washington, D.C.

DENNIS M. MURPHY, Water Resources

A.A. Business Administration, Burlington County Community College, New Jersey; B.S. Forestry/Watershed Management, Utah State University; 1 year graduate school Hydrology, Utah State University.

Experience: 9 years hydrologist, BLM, Montrose, Colorado; 1 year forestry technician, Utah State University, Logan, Utah.

GAYLE VOSS RETTMANN, Clerk-Typist

Experience: 2 months word processing operator, RMP/EIS staff, BLM, Montrose, Colorado; 3 years word processing operator, BLM, Craig, Colorado; 2 years co-teacher, Craig Middle School and High School, Craig; 1 year secretary-administrative assistant, United Presbyterian Church, Montrose, Colorado; 1 year steno-typist, City of Montrose, Montrose; 1 year steno-typist, Montrose Regional Library, Montrose; 2 years clerk-typist, Fort Lewis College Library, Durango, Colorado.

CHARLES G. ROMANIELLO, Economist/Technical Coordinator - RMP/EIS and WTS

M.S. Agricultural Economics, University of Arizona.

Experience: 1-1/2 years economist, BLM, Colorado State Office, Denver, Colorado; 4 years economist, BLM, Montrose, Colorado; 1-1/2 years Foreign Agricultural Service; 2 years economist, University of Arizona, Tucson, Arizona.

JON WESLEY SERING, Recreation and Wilderness

B.A. Geography, California State University at Long Beach; M.S. Geography/Wildland Recreation Management, University of Idaho.

Experience: 8-1/2 years wilderness, river, and recreation planner, BLM, Montrose, Colorado; 1-1/2 years wilderness and recreation planner, BLM, Riverside, California; 4 years wilderness ranger, U.S. Forest Service, Lone Pine, California; 3 years wilderness ranger, USFS, Aspen, Colorado; 1-1/2 years wilderness ranger, USFS, Questa, New Mexico.

YVONNE KUTA SMITH, Writer/Editor - RMP/EIS and WTS

Experience: 2-1/2 years technical editor, RMP/EIS staff, BLM, Montrose, Colorado; 4 years area administrative services, BLM, Montrose; 4 years word processing operator, planning staff, BLM, Montrose; 6 months typesetting operator, daily newspaper publication, Montrose; 6 months editorial assistant/clerk, daily newspaper publication, Montrose.

BLM_0005651

LARRY TAYLOR, Fire Management

B.S. Forest and Range Management, Utah State University.

Experience: 3 years fire management officer, BLM, Montrose, Colorado.

KAREN S. TUCKER-LEAK, Recreation, Technical Coordinator, Writer/Editor - Final WEIS

B.S. Natural Resources Management, California Polytechnic State University, San Luis Obispo, California

Experience:  Recreation Planner, 8 months technical coordinator, writer/editor, WEIS staff, BLM, Montrose, Colorado;  2-1/2 years recreation technician, BLM, Montrose;  2 years range and wildlife technician, U. S. Forest Service, Dolores, Colorado; 1-1/2 years recreation technician, U. S. National Park Service, Kings Canyon, California.

ROBERT P. VLAHOS, Technical Coordinator - RMP/EIS and WTS

B.S. Range and Forest Management, Colorado State University.

Experience: 2 years technical coordinator (biological sciences), RMP/EIS staff, BLM, Montrose, Colorado; 3 years supervisory range conservationist, BLM, Montrose; 3 years supervisory range conservationist, BLM, Farmington, New Mexico; 5 years range conservationist, BLM, Farmington.

W. MAX WITKIND, Cultural Resources

B.S. Technical Journalism, Colorado State University; M.A. Anthropology (Archeology), Colorado State University.

Experience: 2 years supervisory/district archeologist, BLM, Durango/Montrose, Colorado; 5 years district archeologist, Army Corps of Engineers, Little Rock, Arkansas; 8 years assistant professor of anthropology, San Antonio College, San Antonio, Texas; 6 years research consultant, University of Texas at San Antonio, San Antonio; 6 years field director, Southern Texas Archeological Society, San Antonio.

WILLIAM YPSILANTIS, Soils

B.S. Forest Management, Michigan Technological University; M.S. Forest Soils, University of Idaho.

Experience: 7 years soil scientist, BLM, Montrose, Colorado; 3 years soil scientist, BLM, Winnemucca, Nevada; 2 years municipal forester, Detroit Parks and Recreation Department, Detroit, Michigan.

☆ U.S. GOVERNMENT PRINTING OFFICE: 1990—773-066/21,000 REGION NO. 8

BLM_0005652

BLM_0005653

**UNITED STATES DEPARTMENT OF THE INTERIOR**

**BUREAU OF LAND MANAGEMENT**

UNCOMPAHGRE BASIN RESOURCE AREA
2502 South Townsend Avenue
Montrose, Colorado   81401

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE $300



FOURTH CLASS MAIL
POSTAGE AND FEES PAID
U.S. DEPARTMENT OF THE INTERIOR
PERMIT NO. G-76

BLM_0005654

# Public Lands: USA (Use, Share, Appreciate)

TC-1

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

Table of Contents

.01   Purpose
.02   Objectives
.03   Authorities
.04   Responsibility
.05   References
.06   Policy
.07   File and Records Maintenance
.08   Program Relationships

Glossary of Terms

BLM_0005655

.01

### 8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

.01  <u>Purpose</u>.  This Manual Section is intended to provide an easily accessible reference source within the BLM Manual system for general information and general policy on BLM's various coordination, consultation, and fiduciary responsibilities with respect to Native American cultural and religious concerns; to clarify legal relationships between BLM and Native American groups relative to such concerns; and to bring attention to administrative and management issues arising from those responsibilities and relationships.  This Manual Section does not provide operational policy or procedures for individual management programs and administrative processes.  Such policy and procedures are covered in specific directives under the appropriate subject-function code.

.02  <u>Objectives</u>.

   A.  Inform managers and staffs of the responsibilities of various BLM programs for ensuring that Native American issues and concerns are given equitable and legally adequate consideration during decision making.

   B.  Describe the special legal entitlements of tribal governments and other Native American groups relative to management of the public lands and public land resources.

   C.  Promote regular exchange of information among programs having responsibilities for identifying and considering Native American issues and concerns.

   D.  Provide guidance for collecting, evaluating, applying, and protecting sensitive information relating to Native American concerns.

   E.  Recognize the Bureau's ongoing fiduciary responsibility toward Native American resource development and protection programs on Indian lands.

BLM_0005656

.03

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

.03 <u>Authorities</u>.

A. <u>General Authorities</u>.

1. <u>National Environmental Policy Act of 1969</u> ("NEPA"; P.L. 91-190; 83 Stat. 852; 42 U.S.C. 4321) establishes national policy for protection and enhancement of the human environment.  Part of the function of the Federal Government, as stated in the Act, is to "preserve important . . . cultural . . . aspects of our national heritage and maintain whenever possible an environment which supports diversity and variety of individual choice."

2. <u>Federal Land Policy and Management Act of 1976</u> ("FLPMA"; P.L. 94-579; 90 Stat. 2743; 43 U.S.C. 1701) requires coordination with Indian tribes, as well as with other Federal agencies and State and local governments, in the preparation and maintenance of an inventory of the public lands and their various resource and other values; in the development and maintenance of long-range plans providing for the use of the public lands; and in the management of the public lands.

3. <u>Alaska National Interest Lands Conservation Act of 1980</u> (P.L. 96-487; 94 Stat. 2371; 16 U.S.C. 3101) establishes various conservation system units in Alaska to preserve lands and waters with nationally significant values, including historic, archaeological, and cultural values.  The Act directs that, consistent with the conservation of healthy populations of fish and wildlife, utilization of public lands in Alaska is to cause the least impact on rural residents who depend on subsistence uses of the resources of such lands.  The Act also authorizes the Secretary, upon request, to advise, assist, and provide expertise to a Native corporation or group for preservation, display, and interpretation of cultural resources, and to provide training in identification, recovery, preservation, demonstration, and management of cultural resources.

BLM_0005657

.03B

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

B.  <u>Authorities Specific to Native Americans</u>

1.  <u>American Indian Religious Freedom Act of 1978</u> ("AIRFA";
P.L. 95-341; 92 Stat. 469; 42 U.S.C. 1996) resolves that it shall
be the policy of the United States to protect and preserve for
the American Indian, Eskimo, Aleut, and Native Hawaiian the
inherent right of freedom to believe, express, and exercise their
traditional religions, including but not limited to access to
religious sites, use and possession of sacred objects, and
freedom to worship through ceremonials and traditional rites.
Federal agencies are directed to evaluate their policies and
procedures to determine if changes are needed to ensure that such
rights and freedoms are not disrupted by agency practices.  The
Act, a specific expression of First Amendment guarantees of
religious freedom, is not implemented by regulations.  (Note:  A
U.S. Court of Appeals has determined that there is a compliance
element in the American Indian Religious Freedom Act, requiring
that the views of Indian leaders be obtained and considered when
a proposed land use might conflict with traditional Indian
religious beliefs or practices, and that unnecessary interference
with Indian religious practices be avoided during project
implementation, but specifying that conflict need not necessarily
bar Federal agencies from adopting proposed land uses in the
public interest.  <u>Wilson</u> v. <u>Block</u>, 708 F.2d 735, 747 (D.C. Cir.
1983)).

2.  <u>Indian Reorganization Act of 1934</u> (P.L. 73-576; 48
Stat. 984; 25 U.S.C. 461) establishes tribal self government for
many Indian communities.  The Act further provides for the
adoption of tribal constitutions and the incorporation of tribal
governments.  Tribal governments, so constituted, have primary
jurisdiction over the lands of the tribe and are empowered to
negotiate with Federal, State and local governments in all
matters affecting the tribe.  Pursuant to this Act, tribal
governments are judicially considered to hold sovereign immunity
in all governmental matters affecting the tribe (425 US 903, 96
S.Ct. 1492, 47 L.Ed2d. 752 (1976)).

3.  <u>Indian Self Determination and Education Assistance Act</u>
<u>of 1975</u> (P.L. 93-638; 88 Stat. 2203; 25 U.S.C. 450) provides
direct and primary authority to tribal governments to contract
and regulate programs and services, and also provides authority
for tribal governments to acquire lands adjacent to reservations
for purposes of the Act.

BLM_0005658

.03B4

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

4.  <u>Alaska Native Claims Settlement Act of 1971</u> (P.L.
92-203; 85 Stat. 688; 43 U.S.C. 1601) establishes a "fair and
just settlement of all claims by Natives and Native groups in
Alaska, based on aboriginal land claims," with the settlements to
be "accomplished rapidly, with certainty, in conformity with the
real economic and social needs of Natives . . . [and] with
maximum participation by Natives in decisions affecting their
rights and property . . . ."

5.  <u>Indian Mineral Development Act of 1982</u> (P.L. 97-382; 96
Stat. 1938; 25 U.S.C. 2101) provides authority to Indian tribes
to develop mineral resources, and to enter into joint venture
agreements, operating agreements, and leases.  The Act conveys
and extends tribal authority to regulate and cooperate with
private and governmental entities in the development of tribal
energy and nonenergy mineral resources.  Related authorities that
give BLM direct involvement in mineral operations on allotments
and tribal lands, respectively, include the Act of March 3, 1909,
as amended (P.L. 60-315; 35 Stat. 783; P.L. 84-255; 69 Stat. 540;
25 U.S.C. 396), and the Act of May 11, 1938 (P.L. 75-506; 52
Stat. 347; 25 U.S.C. 396a).

6.  <u>Indian General Allotment Act of 1887</u> as amended (R.S.
Chap. 119; 24 Stat. 389; 25 U.S.C. 334) provides for the
allotment of lands to individual Indians for the purpose of
settlement and subsistence through pastoral pursuits.  Similar
provisions were made for Alaska Natives in a 1906 Act (P.L.
59-171; 34 Stat. 197; 48 U.S.C. 357).

C.  <u>Authorities Specific to Cultural Resources</u>.

1.  <u>National Historic Preservation Act of 1966</u> (P.L.
89-665; 80 Stat. 915; 16 U.S.C. 470) addresses preservation of
historic properties, including historical, archaeological, and
architectural districts, sites, buildings, structures, and
objects that are eligible for the National Register of Historic
Places.  In some cases such properties may be eligible partly or
wholly because of historical importance to Native Americans,
including traditional religious and cultural importance.  Federal
agencies must take into account effects of their undertakings on
eligible properties.  A 1980 amendment to the Act (P.L. 96-515;
94 Stat. 3000; 16 U.S.C. 470a note) directs the Secretary in
cooperation with the American Folklife Center of the Library of
Congress to explore ways to preserve and conserve intangible
elements of our cultural heritage and to encourage continuation
of diverse cultural traditions (see .03C3 below).

BLM_0005659

.03C2

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


2.  Archaeological Resources Protection Act of 1979 (P.L.
96-95; 93 Stat. 721; 16 U.S.C. 470aa) provides for the protection
and management of archaeological resources, and specifically
requires notification of the affected Indian tribe if
archaeological investigations proposed in a permit application
would result in harm to or destruction of any location considered
by the tribe to have religious or cultural importance.  The Act
directs consideration of the American Indian Religious Freedom
Act (see .03B1 above) in the promulgation of uniform regulations
for the Act.

3.  American Folklife Preservation Act of 1976 (P.L.
94-201; 86 Stat. 1129; 20 U.S.C. 2101) creates the American
Folklife Center in the Library of Congress and directs the Center
to preserve and present American folklife through internal and
cooperative programs.  (See .03C1 above.)

D.  Treaties.  Treaties constitute negotiated settlements
between sovereign parties, and as such hold a unique status in
defining Federal obligations toward Indian tribes.  Rights
reserved to Indian tribes vary significantly from treaty to
treaty.  Hunting, fishing, and gathering rights and certain other
land uses are the most common rights reserved through treaty.
Tribes often refer to treaties in representing their interests
and validating their position in contacts with Federal agencies.
While BLM managers and appropriate professional staffs should be
aware of the terms of relevant treaties, the BLM's specific
responsibilities are defined through Federal law and regulations.

.04  Responsibility.

A.  Director and Deputy Director have overall responsibility
for establishing, implementing, and evaluating policy for meeting
BLM's Native American coordination responsibilities.

B.  Assistant Directors for Land and Renewable Resources,
Energy and Mineral Resources, and Support Services, acting
through their respective divisions and staffs as appropriate to
the resource programs or administrative processes involved, are
jointly responsible for developing the specific program- or
process-related guidance, procedures, and directives needed to
ensure that Native American coordination is carried out
consistently among the BLM's various programs and offices.

BLM_0005660

.04C

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

   C.  <u>Chief, Division of Recreation, Cultural, and Wilderness
Resources and Chief, Branch of Recreation and Cultural Resources</u>,
are responsible for leading affected divisions and staffs in
developing, reviewing, and revising BLM's national level Native
American coordination and consultation policy and procedures, and
for maintaining contacts with other Federal bureaus, agencies,
and departmental offices in Washington, D.C., regarding the
proper consideration of Native American concerns.

   D.  <u>State Directors</u>, within their respective jurisdictions,
are responsible for:

      1.  Directing the accomplishment of Native American
coordination and consultation responsibilities.

      2.  Developing technical and policy guidance, information,
strategies, procedures, and directives as required.

      3.  Establishing and maintaining contacts with other
regional level Federal bureaus, agencies, and departmental
offices regarding Native American concerns.

      4.  Developing and distributing to District Offices
listings of federally recognized Indian tribes, and other Native
American groups as appropriate, residing within their areas of
administrative jurisdiction.

   E.  <u>District Managers or Area Managers</u>, as appropriate, are
responsible for:

      1.  Identifying Indian tribes, Indian groups that have
petitioned the Secretary for recognition as Indian tribes, and
other Native American groups that have aboriginal and/or historic
ties to lands under their administrative jurisdiction, regardless
of where the tribe or group currently resides.

      2.  Identifying Native American concerns relating to BLM
plans, actions, and programs within their respective areas of
jurisdiction.

      3.  Giving adequate consideration to identified Native
American concerns.

BLM MANUAL                                            Rel. 8-58
                                                      1/26/90

.04F

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


F.  Cultural Resource Specialists, in consultation with other knowledgeable staff, are responsible for providing professionally sound information, recommendations, and advice to managers regarding traditional Native American uses of public lands, Native American traditional lifeway values, and cultural properties that may be associated with those values.

G.  All Personnel are responsible for ensuring that their actions and recommendations do not overlook Native American concerns; for reporting to appropriate officials any Native American concerns that are identified to them; and for assisting in the BLM's execution of its Native American coordination and consultation responsibilities.

.05  References.

A.  BLM Manual Sections 1601, 1602, 1611, 1612, 1613, 1614, and 1615.

B.  BLM Manual Section 1790 and Handbook H-1790-1.

C.  BLM Manual Section 8111.

.06  Policy.  It is the policy of the BLM to:

A.  Recognize traditional Native American cultural and religious values as an important, living part of our Nation's heritage, and develop the capability to address adequately any potential disruption of the traditional expression or maintenance of these values that might result from BLM land use decisions.

B.  Coordinate and consult regularly with appropriate Native American groups to identify and consider their concerns in BLM land use planning and decision making, and document fully all coordination and consultation efforts.

C.  Review proposed land use planning decisions and other major BLM decisions for consistency with tribal land use and resource allocation plans (including Alaska Native village or regional corporation plans, as applicable).

D.  Participate in developing consistent interagency guidance, procedures, and expertise to address Native American and tribal government policies and programs.

E.  Avoid unnecessary interference with Native American religious practices.

BLM_0005662

.06F

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

    F.  Protect sensitive and confidential information about Native American values, practices, and specific locations with which they are associated from disclosure to the public, to the greatest degree possible under law and regulation.

.07  <u>File and Records Maintenance</u>.  See BLM Manual Section 1272 - Records Disposition; Manual Section 1602 - Plan Documentation and Records; Handbook H-1790-1 - National Environmental Policy Act Handbook; and Manual Section 8111 - Cultural Resource Inventory and Evaluation.

.08  <u>Program Relationships</u>.

    A.  <u>Relationship to BLM Programs</u>.  While specific instances of Native American coordination and consultation may focus on particular lands and resources and a single BLM management program, Native American concerns will frequently cross-cut program boundaries and involve several programs simultaneously. The BLM's land use planning system and environmental review process, which generally operate at a level above individual programs and actions and which include effective mechanisms for public participation, are well suited to identifying and addressing Native American issues and concerns.

    1.  <u>Relationship to General Administrative Procedures</u>. Land use planning and environmental review shall be the principal procedural systems for giving Native American cultural and religious issues due consideration, including the opportunity for direct input from those affected.  During the collection and evaluation of land use and resource information, before the preparation of land use plans and environmental documents, responsible managers and staff shall employ appropriate techniques to ensure the identification and consideration of Native American cultural and religious values potentially affected by BLM land use decisions.  At a minimum, Native American cultural and religious issues shall be addressed during public participation and inventory steps, as outlined below:

    a.  <u>Public Participation</u>.  Native American issues and concerns shall be identified, to the extent possible, through standard public participation techniques (e.g., scoping, public notices, and informational mailings).  In addition, managers shall establish any additional effective means necessary for notifying Native American groups of any proposed actions which may affect traditional religious or cultural practices.  In some cases this may necessitate direct face-to-face communication with persons such as traditional religious practitioners who are not official governmental representatives of affected groups.

BLM MANUAL                                                    Rel. 8-58
                                                             1/26/90

BLM_0005663

.08A1b

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

b.  Inventory.  At the initiation of planning and
environmental review, interdisciplinary teams should be used to
define and consider Native American issues and conflicts as they
apply to various proposed program decisions and actions.

(1)  Special techniques may be needed to identify
relevant information.  These techniques may include:

(a)  Review of ethnohistoric and ethnographic
literature.

(b)  Interviews with knowledgeable members of the
Native American community, who may or may not be official
representatives of the tribal government or Native corporation.

(c)  Problem-oriented ethnographic field work
focusing on Native American cultural and religious values.

(2)  Interviews and ethnographic field work should be
limited to cases where little or no information exists on the
specific Native American communities.  Before any proposed
ethnographic field work or related long-term data collection
projects are begun, they must be reviewed by BLM planning and
resource management personnel and approved by the responsible
manager, and they must also be reviewed and approved by
appropriate official representatives of the specific Native
American communities where field work would be conducted.  The
BLM must observe appropriate safeguards for collection and use
of, and access to, potentially sensitive information acquired
through interviews and direct ethnographic techniques.  This may
include locational information and the names of interview
subjects or other contacts who are not official governmental
representatives of affected groups.

c.  Consideration During Decision Making.  Managers
shall ensure that information on Native American religious and
cultural issues receives good faith consideration during decision
making, and that BLM decisions do not unduly or unnecessarily
burden the pursuit of traditional religion or traditional
lifeways.

d.  Consultation and Consistency Review.  As part of its
responsibilities under Sec. 202(c)(9) of FLPMA as implemented by
43 CFR 1610.3-2, the BLM shall, to the extent practicable, ensure
consistency with affected Native American tribal or corporate
land use and resource allocation plans.  Native American cultural
and religious issues shall be part of this consistency review.

BLM MANUAL                                          Rel. 8-58
                                                    1/26/90

.08A1e

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

e. Special Designations. Designation of Areas of Critical Environmental Concern, nomination to the National Register of Historic Places, recommendation to the Secretary for designation of National Historic Landmarks, and other appropriate forms of special recognition may be proposed and should be considered as potential means for ensuring continuing attention to Native American cultural concerns.

f. Documentation. Environmental impact statements and environmental assessments should ordinarily serve as the primary documentation of the identification steps taken and the consideration given to Native American cultural and religious concerns. When determining the need for NEPA review, care must be taken not to overlook the potential impact of the proposed BLM action on Native American cultural or religious values. If for any reason a NEPA document will not be prepared, an appropriate non-NEPA document should be used to substantiate identification and consideration of Native American concerns.

g. Agreements. Written agreements, such as Memoranda of Understanding between the BLM and Native American groups, may be considered for development where needed to define relationships, issues of concern, contacts, and coordination and consultation procedures.

2. Relationship to Specific BLM Resource Management Programs. While identification and consideration of Native American cultural and religious concerns occur during land use planning and environmental review, rather than during day-to-day program operations, program staff are responsible for assisting managers in recognizing potential program conflicts with identified concerns, and for ensuring that day-to-day operations follow steps decided on in land use plans and NEPA documents.

a. Lands. Lands actions that would change the ownership or the use of public lands may require attention to Native American concerns. Land tenure adjustments, withdrawals, and occupancy and use authorizations may require particular consideration of Native American needs and requests (e.g., continued access for religious practices or traditional uses, tribal land base expansion). Some Lands actions, such as allotments and trust land annexations, pertain only to Native American applicants. These applications shall be processed in the same manner as other (over-the-counter) applications and proposals made by non-Native citizens, unless specified and prioritized in an approved land use plan or amendment. Applications submitted by tribal governments can be presumed to meet coordination and consultation requirements.

BLM_0005665

.08A2b

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


        b.  <u>Minerals</u>.  Native American concerns should be
considered when mineral development is proposed within areas
having traditional cultural or religious importance.  For
example, the lessee may be required to design operations on an
oil and gas lease in a manner that preserves access to a
traditional use area, or stipulations may be included in a
geothermal lease to protect sacred hot springs.  The BLM also
administers mineral leases and other mineral activities for
certain allotted and unallotted Indian lands in accordance with
authorities in .03B5, above, as implemented by 25 CFR Parts 211-
214 and Part 216.  Such mineral administration is not subject to
coordination and consultation under this Manual Section.

        c.  <u>Rangeland</u>.  Due consideration must be given to
Indian tribal rights established by treaties, and to requests by
tribes consistent with such rights, in the administration of the
grazing management and range improvement programs.  For example,
grazing season of use may need to be adjusted to accommodate
traditional use of certain resources.  Similarly, proposed
vegetation treatments such as burning, chaining, spraying, and
seeding may need to be weighed in terms of tribal needs for
maintenance of traditional plant use zones.

        d.  <u>Forestry</u>.  Proposed resource allocations and use
authorizations should be sensitive to Native American
requirements for the noncommercial use of renewable forest and
woodland products (e.g., firewood, house logs, food plants,
medicinal plants, ritual plants), and should accommodate demand
when possible.  Monitoring may be needed to evaluate such uses.
Discretionary forest and woodland management activities (e.g.,
herbicide spraying, commercial pinyon nut harvesting) should
involve tribal input, as appropriate.  Special authorizations
relating to subsistence uses in Alaska will follow developed
policy in that State.

        e.  <u>Wildlife and Fisheries</u>.  Where treaties provide for
usual and accustomed uses of fish and wildlife in ceded or other
lands, habitat management plans and improvement projects should
give priority consideration to providing benefits for species
traditionally used by affected tribes.  Native American concerns
should be considered also when developing management plans and
recovery plans for species valued for nonsubsistence reasons
(e.g., eagles).

BLM_0005666

.08A2f

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

     f.  <u>Soil, Water, and Air</u>.  Any proposed action that would affect water use must provide for Native American water requirements in accordance with established treaty rights and as confirmed by the responsible State water right authority or pertinent legal decisions.  Native American water rights based on reserved water rights are not covered by State law but in many cases have been perfected under State water right adjudications.  Where reserved rights are not certain, it may be necessary to clarify these rights through the Office of the Solicitor.

     g.  <u>Cultural Resources</u>.  Cultural resource inventory and evaluation, use allocations, National Register nominations, use permits, public interpretation, and protection projects may require consultation with Native American groups as appropriate to the nature of the cultural resources or the areas affected.  For example, identification of tribal traditional lifeway values and public land cultural properties associated with those values, and preparation of ethnological/sociological elements in class I inventories may include participation by tribal consultants and tribal review for accuracy and sufficiency.

     h.  <u>Recreation</u>.  Native American cultural and religious concerns should be considered when collecting recreation inventory information, preparing recreation management plans, establishing use limitations, and processing special recreation use permits.  For example, visual resource management classification should account for landscapes with attributed sacredness; seasonal off-road vehicle limitations might be necessary when traditional uses could be disrupted; and areas used for subsistence or ritual activities might need to have organized recreation use channeled away from them.  Programs and materials for interpreting areas or subjects related to traditional Native American cultures and practices should consider and incorporate the perspectives of the Native Americans as appropriate.

     i.  <u>Wilderness</u>.  Wilderness study reports and wilderness management plans should recognize areas used historically for Native American traditional activities, such as gathering medicinal plants and conducting religious ceremonies.  Access by elders or other traditionalists who may require motorized transportation should be given special consideration.  Although wilderness designation may protect traditional use areas from incompatible use or development, designation and management as wilderness may also have the unintended effect of disrupting established traditional uses.  Potential conflicts should be identified and considered early in the process, and avoided as

BLM_0005667

much as possible.

BLM_0005668

.08B

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

B.  Relationship to Other Federal Agencies.

      1.  Planning.  In the review of other Federal agencies'
land use plans under Section 202(c)(9) of FLPMA and 43 CFR
1610.3-2, special attention should be given to consistent
interagency recognition and consideration of Native American
issues and concerns.

      2.  Environmental Review.  When BLM acts as lead agency for
the environmental review of a proposed action that would affect
other agencies' lands, BLM is responsible for identifying Native
American concerns and issues for all potentially affected lands,
through consultation with cooperating agencies, through the NEPA
scoping process, and through other appropriate information
gathering methods.

      3.  Exchange of Information.  The BLM and other Federal
agencies should routinely share pertinent nonconfidential
information about Native American concerns and issues.  Sensitive
information obtained under promise of confidentiality may not be
shared without explicit permission from its source.

      4.  Cooperation.  The BLM should explore opportunities with
other Federal agencies to foster and improve opportunities for
tribal governments and other Native American groups to enter into
cooperative agreements (e.g., education, training,
interpretation, museum work/curation, basic data collection, and
ethnographic inventory) with Federal agencies.  Potentially
sensitive programs which may involve several agency jurisdictions
should be coordinated to the greatest degree possible (e.g., Wild
and Scenic River designations in areas of Native fisheries).

C.  Relationship to State and Local Governments.

      1.  Consistency.  In addition to land use planning
consistency under Section 202(c)(9) of FLPMA and 43 CFR 1610.3-2,
the BLM shall ensure that its policies and procedures are
consistent, to the extent allowed by Federal law, with State and
local government requirements relating to Native American
concerns.  The BLM should implement its programs, as they relate
to Native American concerns, as consistently as practical with
State and local laws and ordinances.  However, where Federal
lands are concerned, Federal law has precedence over State and
local law.

      2.  Exchange of Information.  The BLM should share
information relating to Native American issues and concerns with
State and local governments in the same manner and with the same

BLM MANUAL                                          Rel. 8-58
                                                    1/26/90

BLM_0005669

limitations as outlined in .08B3 above.

BLM_0005670

.08D

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

D.  Relationship to Native American Governments.

    1.  Federally Recognized Tribes.  The governments of
federally recognized tribes are the legal representatives for
ensuring that tribal members may exercise rights and privileges
held through treaties, executive orders, and agreements with the
United States, both on and off reservations.  The special legal
status of tribal governments requires that official relations
with BLM, including coordination and consultation pursuant to
this Manual Section, be conducted on a government-to-government
basis.  Authorities and responsibilities of specific tribal
governments are defined in the constitutions and bylaws of the
individual tribes.

    2.  Alaska Native Corporations.  The BLM in Alaska relates
to regional profit and nonprofit Native corporations established
under provisions of the Alaska Native Claims Settlement Act (see
.03B4 above) as the primary units for Native American
coordination and consultation concerning certain lands and
planning issues.  The BLM also coordinates with the regional
profit and nonprofit Native corporations to identify any
additional needs for involving Alaska Native groups in
coordination and consultation.

    E.  Relationship to Native American Advocacy Groups.  The BLM
notifies and considers the views of groups advocating positions
of general interest to Native Americans in the same manner as it
notifies and considers the views of other advocacy or special
interest groups.  The concerns of these groups are considered
through BLM's normal land use planning and NEPA compliance
processes.

BLM MANUAL                                      Rel. 8-58
                                                1/26/90

BLM_0005671

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


<u>Glossary of Terms</u>

(See also Manual Section 8100, Glossary of Terms.)

-E-

<u>ethnography</u>:  structured and systematic, fieldwork-based study
    and description of specific cultures.

<u>ethnohistory</u>:  study of a cultural group's past based on the
    group's own historical record, especially oral tradition.

-F-

<u>fiduciary responsibility</u>:  the trust responsibility of the United
    States, executed through the Secretary of the Interior, to
    uphold obligations of the Federal Government to Native
    American groups.  Court decisions have interpreted this
    responsibility to extend to all Federal agencies.  For BLM,
    this obligation requires a reasonable and good faith effort
    to identify and consider, and to carry out programs in a
    manner sensitive to and consistent with, Native American
    concerns and tribal government planning and resource
    management programs.

-G-

<u>government-to-government relationship</u>:  the formal relationship
    that exists between agencies of the Federal Government and
    tribal governments under the laws of the United States.
    Tribal governments are considered domestic sovereignties
    with primary and independent jurisdiction (in most cases)
    over tribal lands.  Concerning BLM actions, the same level
    of consideration and consistency review provided to other
    agencies or governmental jurisdictions must be afforded to
    Indian tribes.

-I-

<u>Indian group</u>:  any Indian aggregation within the conterminous
    United States, which the Secretary of the Interior has not
    recognized as possessing tribal status.

<u>Indian lands</u>:  lands held in trust by the United States for
    individual Indians or tribes, or lands titled to individual
    Indians or tribes subject to Federal restrictions against
    alienation or encumbrance.

BLM MANUAL                                          Rel. 8-58
                                                    1/26/90

BLM_0005672

BLM MANUAL                                             Rel. 8-58
                                                       1/26/90

BLM_0005673

Glossary, Page 2

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


Indian tribe:  any Indian group in the conterminous United States
      that the Secretary of the Interior recognizes as possessing
      tribal status (listed annually in the Federal Register).

-N-

Native American:  a member of any of the indigenous cultural
      groups of the western hemisphere, including American
      Indians, Alaska Natives, Native Hawaiians, and other
      indigenous peoples.

-R-

reservation:  lands acquired in ownership by Indian tribal
      governments through aboriginal possession, treaty, act of
      Congress, Executive action (including action by the
      Secretary of the Interior pursuant to certain statutes),
      and/or by action of a colony, State, or foreign nation.

reserved rights:  those rights not specifically ceded in a treaty
      or agreement are considered to be reserved consistent with
      the purposes of the United States and the Indians entering
      into a transaction or formal relationship.  Rights may
      include hunting, fishing, and gathering privileges, or water
      and other resource use guarantees.

-S-

subsistence use:  the customary and traditional use by Native
      Americans of renewable resources on the public lands.  For
      Alaska, specific statutory definition of "subsistence uses"
      is ". . . the customary and traditional uses by rural Alaska
      residents of wild renewable resources for direct personal or
      family consumption as food, shelter, clothing, tools, or
      transportation; for the making and selling of handicraft
      articles out of non-edible by-products of fish and wildlife
      resources taken for personal or family consumption; for
      barter, or sharing for personal or family consumption; and
      for customary trade."

-T-

tradition:  longstanding, socially conveyed, customary patterns
      of thought, cultural expression, and behavior, such as
      religious beliefs and practices, social customs, and land or
      resource uses.  Traditions are shared generally within a
      social and/or cultural group and span generations.

BLM MANUAL                                          Rel. 8-58
                                                    1/26/90

BLM_0005674

BLM MANUAL                                          Rel. 8-58
                                                     1/26/90

BLM_0005675

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


traditional:  conforming to tradition.

treaty:  a formal agreement between the United States and one or
     more Native American groups.  Typically, these agreements
     ceded lands to the United States, reserving certain rights,
     privileges, and/or lands to the Native American signatories.

tribal government:  the formal representative governing body of a
     reservation or Indian community (as defined in 25 CFR 61 and
     published annually in the Federal Register).

tribe:  (See "Indian tribe.")

trust responsibility:  the same as "fiduciary responsibility" for
     purposes of this manual section.  (See "fiduciary
     responsibility.")

BLM_0005676



*Resource Services*

**United States Department of the Interior
Bureau of Land Management**

**Colorado State Office**                    **January 1991**

# COLORADO
## OIL AND GAS LEASING
## AND DEVELOPMENT

### FINAL ENVIRONMENTAL IMPACT STATEMENT



BLM_0005677

Any person who participated in the plan amendment process and has an interest which is or may be adversely affected may protest approval of the proposed plan amendments. Protests must be filed in accordance with the planning regulations, 43 CFR 1610.5-2. These regulations require that protests be in writing and sent to the Director (760), Bureau of Land Management, Room 909, Premier Bldg., 1725 I Street, NW, Washington, D.C. 20240. Protests must be postmarked within 30 days of the date the Environmental Protection Agency published the notice of receipt of the final EIS in the *Federal Register*.

A protest shall include the following information:

• The name, mailing address, telephone number, and interest of the person filing the protest.

• A statement of the issue or issues being protested.

• A statement of the part or parts of the plan amendments being protested.

• A copy of all documents addressing the issue or issues that were submitted during the planning process by the protesting party, or an indication of the date the issue or issues were discussed for the record.

• A concise statement explaining why the proposed decision is believed to be wrong.

At the end of the 30-day protest period and after the Governor's consistency review, the proposed amendment, excluding any portions under protest, will become final. Approval will be withheld on any portion of the proposed amendment under protest until final action has been completed on such protest.

BLM_0005678



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
COLORADO STATE OFFICE
2850 YOUNGFIELD STREET
LAKEWOOD, COLORADO 80215-7076



Dear Reader,

Enclosed is the final environmental impact statement (EIS) and proposed resource management plan (RMP) amendment for the Glenwood Springs, Kremmling, and Little Snake Resource Areas, and the Northeast and San Juan/San Miguel Planning Areas. The proposed plan amendments are a refinement of the proposed action presented in the draft RMP amendment and EIS published in 1990.

We have attempted to be responsive to all comments. Many of the comments contributed significantly to the proposed action which we believe represents a balanced approach to management of all resource values. To our knowledge, this is the first time that BLM has combined amendments to five RMPs in one EIS. This has presented BLM with a unique challenge, which I believe we have met admirably.

Following completion of a Governor's consistency review and a protest period, individual records of decision and amendments for each of the five RMPs will be issued. This will not occur before May 1991. Please indicate on the enclosed card which plan amendments you would like to review, or call the number shown on the document title page.

We appreciate the time and effort you have expended to be involved in this process. Your continued participation is essential if we are to achieve wise management of our public lands and resources.

Sincerely,

*Tom Walker*

H. Robert Moore
State Director

Enclosures (2)

BLM_0005679

# COLORADO

## OIL AND GAS LEASING AND DEVELOPMENT

## ENVIRONMENTAL IMPACT STATEMENT

Draft ( )          Final (X)

Lead Agency:  Department of the Interior, Bureau of Land Management

Cooperating Agency:  Department of Agriculture, Forest Service

Type of Action:          Administrative (X)          Legislative ( )

This is the Final Environmental Impact Statement and Proposed Resource Management Plan Amendment for the Glenwood Springs, Kremmling, and Little Snake Resource Areas, and the Northeast and San Juan/San Miguel Planning Areas in the State of Colorado.  This EIS contains amendments to the oil and gas leasing and development decisions contained in the Resource Management Plans for the five areas.  It corrects errors made in the draft RMP amendment/EIS.  It also makes changes to the draft RMP amendment/EIS Proposed Action based on public comment.

For further information:          Jim Rhett, Project Manager
                                        Bureau of Land Management
                                        Colorado State Office
                                        Branch of Fluid Minerals
                                        2850 Youngfield Street
                                        Lakewood, CO 80215
                                        Telephone:  303/239-3770

Protests due:  March 4, 1991

Date Released:  February 1, 1991

Distribution List:  see attached

BLM_0005680

# DISTRIBUTION LIST

The following agencies and interest groups
were sent copies of the Draft and Final
RMP/EIS.

## Federal Agencies

Forest Service
Corps of Engineers
Air Force
Bureau of Reclamation
Bureau of Mines
Department of Energy
Environmental Protection Agency
Minerals Management Service
National Park Service
Department of the Interior
Geological Survey
Congressional Representatives

## Colorado State Agencies

Colo. State Clearing House
Department of Natural Resources
State Land Board
Governors' Office
Colorado State University
University of Colorado

## Local Governments

Colorado Counties, Inc.
Douglas Creek Soil Conservation District
White River Soil Conservation District
Northwest Colorado Council of
  Governments
Colo. River Water Conservation District
Assoc. Governments of NW Colorado
Routt County Planning

## Other Organizations

Aspen Wilderness Workshop
Colo. River Woolgrowers
Colo. Timber Industry Assoc.
Nucla-San Miguel Basin Forum
Rocky Mtn. Conservation Fund
Colo. Wildlife Federation
Colo. Cattlemen's Assoc.
Friends of the Earth
Independent Petroleum Assoc. of Mountain
  States

National Wildlife Federatic
Natural Resources Defense
Sierra Club
Trail Ridge Rock & Miner
University of the Wilderne
Club 20
Colorado Environmental C
Colo. Native Plant Society
Environmental Defense Fu
Grand Canyon Trust
Nature Conservancy
Rocky Mountain Oil & Ga
Routt-Moffat Woolgrower
Uintah Mountain Club
Western Colorado Congre
Wilderness Society
American Wilderness Allia
Aspen Wilderness Worksh
Colo. Mountain Club
Colo. Chapter of Wildlife

Numerous companies and
expressing interest were s
both the draft and final RI

BLM_0005681

The Continuation of Present Management (No Action) Alternative analyzes the impact of the way BLM is doing business today.

The Standard Terms and Conditions Alternative would be the minimum that the BLM could legally implement. Leases would not have stipulations but COAs would be imposed on individual permits to protect such resources as big game winter ranges, steep slopes, fragile soils, etc. Resources not already protected by federal laws would be protected by COAs, or in the case of ACECs, no leases would be issued.

The public review period began May 14, 1990, and ended on August 17, 1990. Three public meetings were held to receive oral comments. They were as follows: July 2, 1990, in Grand Junction, July 9 in Denver, and July 16 in Durango. Comments were received from a total of 130 individuals and agencies. The BLM has responded to over 300 comments in the Final EIS. Major areas of concern are the lack of a wider spread of alternatives and the lack of an alternative that proposes no leasing over the entire Study Area. There is concern that the BLM will not enforce the lease stipulations or will exempt the lessee from adherence. The lack of numerous, large, foldout maps was the concern of both industry and the environmental groups. Some disagreed with the impacts to wildlife and also the cumulative impact section.

S-2

BLM_0005683

# TABLE OF CONTENTS

CHAPTER 1      PURPOSE AND NEED
Introduction .........................................................................1-1
Purpose and Need...................................................................1-1
Location ..............................................................................1-2
Relationship to BLM Policies, Plans, and Programs ...........................1-2
Relationship to Non-BLM Policies, Plans
 and Programs .......................................................................1-4
Existing Rights ......................................................................1-5
Authorizing Actions.................................................................1-6
EIS Scoping Process and Issues ..................................................1-6

CHAPTER 2      ALTERNATIVES
Introduction .........................................................................2-1
Potential of Development of Oil and Gas.........................................2-2
Alternatives...........................................................................2-3
- Mitigative Measures Common to All ...........................................2-3
- Proposed Action ...................................................................2-5
- Continuation of Present Management Alternative.............................2-22
- Standard Terms & Conditions Alternative......................................2-22
Alternative  Comparison............................................................2-23

CHAPTER 3      AFFECTED ENVIRONMENT
Introduction .........................................................................3-1
Climate & Air Quality..............................................................3-1
Vegetation ...........................................................................3-6
Livestock Grazing...................................................................3-10
Wildlife ..............................................................................3-10
Wild   Horses.........................................................................3-17
Soils   ................................................................................3-17
Water  ................................................................................3-17
Forestry..............................................................................3-18
Recreation ...........................................................................3-20
Visual ................................................................................3-22
Cultural ..............................................................................3-23
Paleontology .........................................................................3-24
Wilderness ...........................................................................3-25
Lands and Realty Actions ..........................................................3-26
Transportation .......................................................................3-27
Social and Economic................................................................3-27
Areas of Critical Environmental Concern.........................................3-32
Minerals ..............................................................................3-32

CHAPTER 4      ENVIRONMENTAL CONSEQUENCES
Introduction .........................................................................4-1
Climate & Air Quality..............................................................4-1
Vegetation ...........................................................................4-1
Livestock Grazing...................................................................4-2
Wildlife ..............................................................................4-3
Wild   Horses.........................................................................4-10
Soils   ................................................................................4-11
Water  ................................................................................4-13
Forestry..............................................................................4-15
Recreation ...........................................................................4-15
Visual ................................................................................4-18
Cultural ..............................................................................4-18
Paleontology .........................................................................4-19
Wilderness ...........................................................................4-19
Lands and Realty Actions ..........................................................4-20
Transportation .......................................................................4-20
Social and Economic................................................................4-21
Areas of Critical Environmental Concern.........................................4-23
Minerals ..............................................................................4-25
Cumulative Impacts..................................................................4-27

# CHAPTER ONE

# PURPOSE AND NEED

BLM_0005686

# CHAPTER ONE

# PURPOSE AND NEED

## INTRODUCTION

This chapter describes why the Bureau of Land Management (BLM) is preparing this Environmental Impact Statement (EIS) and amending the oil and gas leasing decisions in five Resource Management Plans (RMPs). It further describes the purpose and need for leasing federal mineral estate for oil and gas development, locations within Colorado included in this EIS, relationships with other plans and programs, the planning process to be used in reaching leasing decisions, and the issues that have been raised with this Proposed Action.

## PURPOSE AND NEED

The BLM, as agent for the Secretary of the Interior, has responsibility for leasing and managing the oil and gas resource where the mineral estate is federally owned. This is referred to as the federal mineral estate. For many years, concern has been expressed that BLM's oil and gas leasing process may not adequately comply with the National Environmental Policy Act (NEPA) requirements to analyze and disclose the cumulative impacts of oil and gas activities. During the last few years, conflicting court decisions have resulted in uncertainty. To resolve this issue, BLM officials consulted with representatives of environmental groups and the oil and gas industry to help revise BLM's environmental analysis standards for oil and gas leasing decisions which are made in the Resource Management Plan (RMP). This resulted in issuance of a new BLM manual guidance during the fall of 1987 titled, *Supplemental Program Guidance for Fluid Minerals.* At the time this guidance was issued, BLM within Colorado had six RMPs near completion or completed. To achieve compliance with the new standards in a reasonable time frame, it was decided to amend five of the RMPs in this document. The Piceance Basin RMP will be amended separately.

The five RMP/EIS's addressed in this EIS are: Glenwood Springs, Kremmling, Little Snake, Northeast, and San Juan/San Miguel. See Table 1-1. The RMPs encompass over five million acres of federal mineral estate, most of which underlies federal lands administered by the BLM. The leasing decisions described in the RMP/EIS's will be revised to conform to current policies and conditions. The most significant change is to incorporate, in a more systematic manner, a cumulative impact analysis which is based on a reasonable foreseeable estimate of future oil and gas activity. This requirement is described in BLM Manual section 1624.2.

This EIS examines the existing oil and gas leasing decisions made in the five RMPs in light of the potential for development and the reasonably foreseeable development described in Appendix B, and summarized in Chapter 2. The existing management decisions are analyzed for site-specific and cumulative impacts. Where this new analysis determines higher or lower impacts, increased or reduced mitigation is considered for inclusion in the Proposed Action.

For more than 100 years, it has been federal policy to make lands available for mineral exploration and development. The Arab oil embargo of the early 1970s emphasized the desirability of reducing U.S. dependence on imported oil. Although the federal mineral estate, known reserves, and existing production of oil and gas within the areas depicted in this EIS represent only a small proportion of the U.S. total production, reserves, and owned mineral estate, it is

**TABLE 1-1.  RESOURCE MANAGEMENT PLANS/ENVIRONMENTAL IMPACT STATEMENTS (RMP/EIS)**

| Resource Area | Date of Approval |
|---|---|
| Glenwood Springs | January 3, 1984 |
| Kremmling | December 19, 1984 |
| Little Snake | April 26, 1989 |
| Northeast | September 16, 1986 |
| San Juan/San Miguel | September 5, 1985 |

BLM_0005687

## CHAPTER ONE

nonetheless important. This is especially true to Colorado. Development of the oil and gas resource has historically been an integral part of the state and local economies in Colorado. Although the rate of development has declined in recent years, it is expected to continue to be an important economic factor, affecting state and local communities and the Rocky Mountain Region.

## LOCATION

The Study Area includes all public lands and mineral estate within the Glenwood Springs Resource Area (GSRA); Kremmling Resource Area (KRA); Little Snake Resource Area (LSRA); Northeast Resource Area and a portion of the Royal Gorge Resource Area (referred to as the Northeast Planning Area (NPA)); and San Juan Resource Area and a portion of the Uncompahgre Basin Resource Area (referred to as the San Juan/San Miguel Planning Area (SJ/SMPA)). See Map 1-1.

The Study Area encompasses over 3.2 million acres of BLM-administered surface lands and over 5 million acres of federal oil and gas mineral estate. See Table 1-2.

The map scale used in this plan is chosen to facilitate public recognition of general resource localities. The cost to print maps at a different scale which would allow for greater detail in identifying resource and stipulation location is prohibitive when two factors are considered. First, maps used for locating resources are dynamic; continuing inventories and new information result in constant changes. The greater graphic specificity and detailed information which is possible by using a larger scale map is valid for only a short time after the maps are printed. Second, the maps in this document are for the purpose of helping the reader, that is, the decision maker and the interested public, understand the nature of the proposed action and the alternatives. The map scale

chosen achieves this purpose by graphically providing a general sense of the location of the resources in question. No greater scale is needed to understand generally for each resource/planning area the spacial relationships between the oil and gas resources and the various types of stipulations considered.

Each Resource Area Office has the detailed, larger scale working maps and/or files that are used for management and inventory purposes. Anyone requiring information about specific localities, or areas too small to be clearly defined on the plan amendment maps, or large areas whose boundaries may be indistinct at this scale, should contact the appropriate Resource Area Office. An additional reason for contacting the Resource Area Office is to check on the latest status of some boundaries. The protective measures discussed in this plan would be applied as required by the plan decisions, and as new inventories show the expansion or contraction of some resources, for example, elk crucial winter habitat, the area of applicability will change. Information about the specific applicability of lease stipulations to individual parcels of land is also available in the Colorado State Office, at least in a text format.

## RELATIONSHIP TO BLM POLICIES, PLANS, AND PROGRAMS

The decisions as to which lands will be leased and how they will be leased for oil and gas development are being made through a plan amendment process. This involves the following nine steps: 1) Issue identification. This step was initiated by public notices and included open houses requesting public input to help focus the process on those issues of concern related to BLM's management of oil and gas development. 2) Planning Criteria. Based on the issues identified, appropriate parameters and the scope of the analysis were determined. 3) Inventory. Data necessary to make informed decisions was collected. 4) Management Situation Analysis. The existing situation was described and an analysis prepared

**TABLE 1-2.   STUDY AREA**

|  | Surface acres | Total Federal Mineral Estate[1] |
|---|---|---|
| Glenwood Springs Resource Area | 516,000 | 725,000 |
| Kremmling Resource Area | 386,000 | 651,000 |
| Little Snake Resource Area | 1,317,000 | 1,878,000 |
| Northeast Planning Area | 32,000 | 600,000 |
| San Juan/San Miguel Planning Area | 994,000 | 1,291,000 |
| TOTALS | 3,245,000 | 5,145,000 |

[1] Includes surface acres.

1-2

BLM_0005688



**Map 1-1**
**EIS STUDY AREA**

BLM_0005689

**CHAPTER ONE**

to identify management opportunities and
limitations. 5) Alternative Formulation.
Each alternative analyzed was a complete and
implementable set of decisions providing
different responses to the issues. 6)
Estimation of Effects. The environmental
impacts of each alternative are described and
possible mitigation measures are identified.
7) Select Alternative. The product of this
step was a proposed plan amendment and
draft EIS which BLM provided for public
review and comment. 8) Select Plan
Amendment. Using the public comments
received, the State Director selected the
amendment disclosed in this document,
which is then subject to a 60-day Governor's
consistency review, and a 30-day protest
period. 9) Monitoring and Evaluation.
Implementation of the leasing decisions is
tracked and their effectiveness is periodically
monitored to determine if changes are
needed.

The 1920 Mineral Leasing Act, as amended,
authorizes the Secretary of the Interior to
lease oil and gas resources on all public
domain and acquired lands. Lands excluded
from such leasing by legislation or secretarial
policy are listed in the Code of Federal
Regulations (CFR) title 43, part 3100.0-3.
The excluded lands include units of the
National Park System; Indian reservations;
Naval Oil Shale Reserve; incorporated cities,
towns, and villages; and lands recommended
for wilderness designation, wilderness study
area (WSA) and lands within the national
Wilderness Preservation System.

The WSAs included in this EIS are generally
protected by a No Leasing stipulation. Some
portions of the WSAs were leased prior to the
WSA designation. The pre-WSA leases are
still valid and may be developed under the
BLM's Interim Management Guidelines.
Congress will make a determination on the
final designation of the WSAs. If Congress
decides not to designate an area as
wilderness, it will be managed under
guidelines published by BLM in the
respective Final Wilderness EIS and Record
of Decision for each Resource Area.

Because this amendment involves five
separate RMPs which were approved over a
five-year period, there are some differences
in how this amendment relates to these
existing land use plans. In 1982, a series of

Environmental Assessments (EAs) were
prepared by BLM which addressed oil and
gas leasing on public lands throughout
Colorado. These EAs documented leasing
decisions for virtually every tract of public
land and eliminated the need for reviews at
field offices of each proposed lease. This
documentation was prepared by each
Resource Area Office and provided to the
Colorado State Office where leases are
issued. The Glenwood Springs and
Kremmling RMPs updated these existing
EAs, which were retained to provide
direction for leasing. The San Juan/San
Miguel and the Northeast RMPs revisited all
leasing decisions and replaced these earlier
EAs. In the case of the Northeast RMP,
much of what was pertinent from the 1982
EA was updated and included in what was
termed a "Technical Report" to the RMP.
For the Little Snake RMP, BLM initially
intended to use this same process; however,
before this RMP was approved, the new
standards, described earlier, necessitated that
the RMP be amended. Oil and gas leasing
decisions in the current RMPs have been
compared to the reasonably foreseeable
development (RFD) scenarios in this EIS and
new decisions have been formulated. These
new decisions amend the existing RMPs, and
replace all earlier planning and environmental
documents which serve as a basis for leasing
decisions.

## RELATIONSHIP TO NON-BLM
## POLICIES, PLANS, AND
## PROGRAMS

This plan will not make decisions for mineral
resources not administered by BLM within
the Study Areas. Leasing decisions for
federal minerals not administered by the BLM
will be made by the appropriate agency in
cooperation with the BLM.

To reduce or avoid conflicts between
administrative agencies, the planning
documents for adjoining lands have been
reviewed, and where appropriate, that
information has been used in developing the
Proposed Action analyzed in this EIS.

Lands administered by the Department of
Agriculture, U.S. Forest Service (USFS)
will have leasing decisions made in a USFS
Land and Resource Management Plan/EIS.
The BLM is a cooperating agency providing

1-4

BLM_0005690

**PURPOSE AND NEED**

oil and gas expertise to the USFS EIS Team preparing these plans. BLM provides the USFS with projections of future oil and gas activity and impact analyses of subsurface construction.

The USFS plans analyze impacts from oil and gas leasing and development to National Forest System Lands and describe where the USFS will or will not consent to lease. The BLM plan for a Resource Area will look at the cumulative impacts of the Proposed Action on all lands within that Resource Area, but the specific impacts of leasing and development on National Forest Lands will be analyzed in the USFS plan.

The BLM is responsible for the leasing and development of lands administered by the National Park Service that are eligible for that purpose. However, all National Parks and Monuments are withdrawn by law, and National Recreation Areas are withdrawn by regulation from mineral leasing. This EIS will not analyze leasing of these lands, but will analyze impacts to these lands from leasing adjacent federal mineral estate. For that reason, the BLM consulted the National Park Service in preparation of this plan amendment.

The BLM is coordinating with the U.S. Fish and Wildlife Service (USFWS) under the Endangered Species Act. The USFWS has determined that consultation is not required for any listed species other than fish. The current plan is for the BLM and the USFWS to enter into consultation to determine the effect of water consumption on listed fish species. The BLM has identified the amount of water consumption for the Proposed Action. Mitigation will be in the form of payments to the USFWS to purchase water rights.

The BLM has a memorandum of understanding with the Colorado Oil and Gas Conservation Commission (COGCC) and a long standing, day-to-day working relationship between the COGCC staff and the BLM mineral resource staff. The working relationship consists of staff level communications related to technical requirements for drilling wells in Colorado. This includes spacing of wells, draining oil and gas reservoirs, analysis and mitigation of impacts to groundwater, and other mineral resources (non-oil and gas). The relationship

of the BLM and COGCC is based on the COGCC's authority over oil and gas operations in the state of Colorado.

The BLM relationships with county governments in Colorado are based on memoranda of understanding with the local counties and/or with Colorado Counties Incorporated. These memoranda contain such details as what BLM-administered actions the county should be notified of, and when the notification should take place. Necessary county/BLM coordination and joint action may also be defined. Copies of these county/BLM agreements are on file for public review in the appropriate Resource Area Office.

The BLM has a cooperative agreement with the Colorado Division of Wildlife (CDOW) concerning wildlife management. Under this agreement, the BLM and CDOW cooperate on numerous actions that affect wildlife habitat and populations. The CDOW has been consulted throughout the regular RMP process in each of the five resource areas and also during development of this EIS and RMP amendment.

The BLM leases federal minerals that lie beneath private surface (split estate). The private landowner is notified when the minerals are leased and when an Application for Permit to Drill (APD) is filed. The landowner is invited to attend the on-site inspection and his needs and desires are considered when the decision is made to approve the APD. The needs of the landowner are also considered if and when a plan of development is reviewed so that field development considers the private surface and the resources. The BLM has the authority to require the same mitigation on the private surface as it does on federal lands. This ensures the private landowner of protection when the underlying federal minerals are extracted.

## EXISTING RIGHTS

Oil and gas leases issued by the BLM at the direction of Congress (1920 Mineral Leasing Act as amended) are contractual agreements between the U.S. and the lessee. New management practices and techniques are incorporated in existing lease management so long as they are compatible with the lease rights granted. The lease rights granted

BLM_0005691

## CHAPTER ONE

consist of the right to occupy as much of the lease surface as is reasonable for the extraction of the resource and the right to remove the resource (oil and/or gas). When these two rights must be restricted, a stipulation is written and becomes part of the lease. One example of such a restriction is the denial of the surface for a specified period of time (for a discussion of Timing Limitation Stipulations, see Appendix E). The standard lease terms allow the Authorized Officer to require reasonable measures to mitigate adverse impacts from proposed operations. For example, the Authorized Officer may deny use of the surface for up to 60 days. This plan amendment will not amend valid existing rights. New management practices, identified in the Proposed Action, that do not violate existing rights will be used in managing existing leases in the form of Conditions of Approval (Appendices D and F).

## AUTHORIZING ACTIONS

To lease federal oil and gas, a decision must be reached by the BLM as to which lands to lease and whether stipulations are necessary for the protection of the environment and other resources. If a decision is reached to lease under one of the alternatives in this EIS, additional actions will be required before on-ground operations begin. These actions begin when a lessee submits an Application for Permit to Drill (APD). APDs are posted in the public rooms of the local BLM offices and in the public room of the BLM Colorado State Office in Denver. If the action is on U.S. Forest Service lands, the APDs are also posted in the appropriate Forest Service office.

When applications are received, an on-the-ground (on-site) inspection is scheduled and the appropriate agencies are invited to attend. The county government, Colorado Division of Wildlife, and the surface owner or manager are notified of the Proposed Action. The lessee shows the group where each facility will be constructed and appropriate changes or modifications are made on the spot. Information is gathered by the BLM for an environmental assessment (EA) that will be written. For each action, conformance with the RMP and compliance with NEPA is certified. Lease operations must conform with the decisions in the RMP. The EA is tiered from this EIS. If any

impacts to threatened or endangered species are identified during the EA process, the USFWS will be contacted and appropriate review and consultation will begin. If any impacts or decisions need to be added to the existing RMP, an analysis will be conducted to determine if a plan amendment is necessary. When the number of wells identified in the RFD for a resource/planning area have been authorized, an environmental analysis will be completed to determine if the impacts identified in this EIS have been reached or exceeded. This analysis will determine if new leasing decisions are necessary. Prior to the APD approval, a clearance for cultural and paleontological resources, and threatened and endangered species must be completed. These clearances are to be performed by approved individuals with the appropriate qualifications.

When the EA has been completed and the necessary clearances are received and verified, the APD is approved and issued. Then actual construction can begin. The same process is used if the lessee submits a Sundry Notice or Right-of-Way (ROW) application. Sundry Notices are used to apply for activities other than the drilling of a well, i.e., repair, fracturing, repairing casing, etc. ROWs are used to authorize wells, roads, pipelines, and production facilities on public lands outside oil and gas lease boundaries.

Geophysical exploration (seismograph activities) on public lands is reviewed and authorized through a Notice of Intent submitted by the operator.

## EIS SCOPING PROCESS AND ISSUES

The BLM announced their intent to prepare an EIS and solicited comments from the public. The announcement appeared in the *Federal Register* on March 13, 1989, and in local news media.

Public meetings were held during the 30-day comment period in Walden, Craig, Glenwood Springs, Durango, and Denver. Meetings were also held with Colorado Department of Natural Resources agencies and several environmental groups and industry representatives. Ten letters were received during the scoping process. The issues and concerns that were expressed are

BLM_0005692

**PURPOSE AND NEED**

summarized below.   Scoping documents, containing more detail, are on file in each of the five BLM Resource Area Offices participating in preparation of this EIS.

Scoping issues that will be discussed are categorized and shown below.

• Identify impacts on water, visual resources, threatened and endangered species

• Consider buffer zones around sensitive areas

• Identify procedures in the leasing and development of oil and gas

• Analyze rehabilitation program

• Analyze road construction standards

• Discuss road closure policy

• Trace off-site impacts

• Trace impacts to the point of insignificance

• Coordinate planning with neighboring agencies

• Analyze compliance and monitoring programs

• Identify and analyze any hazardous waste issues

• Consider certain areas for No Leasing-- This list is available in each Resource Area Office.

BLM_0005693

# CHAPTER TWO

# ALTERNATIVES

## INTRODUCTION

Three alternatives have been developed to address issues where oil and gas development may be a concern. Using an assessment of the potential of development (POD), the three alternatives, which differ in terms of mitigative requirements, are analyzed to determine the reasonably foreseeable development (RFD) of the oil and gas resource within the Study Area. In turn, the RFD is used to assess impacts expected to occur with each alternative.

The regulations of the Council on Environmental Quality at section 1502.14, Title 40, of the Code of Federal Regulations, require that an Environmental Impact Statement (EIS) "rigorously explore and objectively evaluate all reasonable alternatives. . . ." The BLM believes the three alternatives presented provide an adequate range of reasonable proposals and options to make a well informed choice.

The BLM has elected to eliminate from detailed study a Resource or Planning Areawide No Leasing alternative. The Mineral Leasing Act gives the Secretary of the Interior discretionary authority to issue oil and gas leases. A No Lease decision is made where it is determined that oil and gas leasing is not in the public's interest. However, the Secretary cannot be arbitrary and capricious in making such a decision. A No Lease decision is reached only after careful consideration of conflicting resource values and uses and environmental consequences.

It is the policy of the BLM that lands are generally available for oil and gas leasing where measures can be taken to mitigate conflicts and environmental consequences to an acceptable level. Given the nature and success of such mitigation, and the multiple use mandate of the Federal Land Policy and Management Act, a No Lease decision covering all lands in each of the entire Resource or Planning Areas included in this EIS would be arbitrary and capricious.

Therefore, a No Lease alternative is unreasonable. Rather, No Leasing was considered and analyzed on a more site-specific basis as a part of the analyzed alternatives. Where it was determined that even the most restrictive mitigation available, i.e., No Surface Occupancy, will not adequately mitigate conflicts or environmental consequences, so that leasing is not in the public's interest, a No Leasing decision is considered.

The reasonable alternatives considered in this EIS are as follows:

• The **Proposed Action Alternative** is to lease oil and gas with Standard Terms and Conditions, and additional leasing stipulations to further protect resources and values beyond the level of protection in the Standard Terms and Conditions. These additional stipulations will be derived from the existing stipulations (those contained in the Continuation of Present Management Alternative) and ones newly developed during this plan amendment. This alternative contains the management prescriptions that local managers believe to be the best balance of past practices, and new prescriptions developed from public and internal suggestions during the scoping for this plan.

• The **Continuation of Present Management Alternative** would lease oil and gas resources with Standard Terms and Conditions, and the stipulations currently in use (Appendix C shows the standard terms and conditions and Appendix G lists necessary stipulations in current use). The purpose of analyzing this alternative is to determine if any changes are needed in the present management decisions, and to predict what will occur over the next 20 years in oil and gas development if there were no changes in current management.

• The **Standard Terms and Conditions Alternative** consists of leasing for oil and gas with only the standard terms and conditions. The Standard Terms and

BLM_0005694

## CHAPTER TWO

Conditions are required by law and regulation and are attached to every oil and gas lease regardless of other considerations (Appendix C). This is the most simplistic alternative that can be reasonably analyzed. This alternative is potentially the least restrictive leasing program the BLM would be permitted by law to implement.

Appendix A gives a detailed description of oil and gas operations from preliminary exploration, through drilling of individual wells and development of a field, to final abandonment of the wells. An understanding of oil field operations and the BLM management practices required in oil and gas production is critical to the analysis of environmental impacts.

In addition to this EIS, an environmental assessment (EA) will be completed on each Application for Permit to Drill (APD) or group of APDs. If the analysis in the EA determines that the lease stipulations are not required to prevent impacts, the EA will determine the applicability of exceptions and will document and recommend the use of exceptions. Alternative mitigation may be developed and added to the APD in the form of COAs. Conformance to this EIS will also be determined in the EA.

## THE POTENTIAL OF DEVELOPMENT (POD) FOR OIL AND GAS RESOURCES

Assumptions for the POD of oil and gas resources in the Study Area over the next 20 years (beginning with 1989) are outlined in Appendix B. These assumptions are necessary for a meaningful and reasoned analysis of the cumulative impacts resulting from oil and gas leasing and development. The assumptions are based on statistical analysis of historical development. The projected number of wells have been increased in some cases to account for increased activity and new interest in coal bed methane that was

not reflected in historical trends. This increase will also allow a safety factor in forecasts of activities and impact assessment.

Table 2-1 shows the numbers of wells projected for each Resource/Planning Area by potential development region. All potential development regions are not present in all Planning or Resource Areas (e.g., Region 1 for Northeast and San Juan/San Miguel Planning Areas). Potential development regions are shown in Appendix B.

**Region 1**--No potential for oil and gas development: Absence of source rock, thermal maturation, or reservoir rock prohibiting oil and/or gas occurrence.

**Region 2**--Low potential for oil and gas development: Specific indications that one or more of the following are not present: source rock, thermal maturation, or reservoir strata possessing permeability and/or porosity, and traps.

**Region 3**-- Moderate potential for oil and gas development: Geophysical or geological indication that the following are present: source rock, thermal maturation, reservoir strata possessing permeability and/or porosity, and traps.

**Region 4**--High potential for oil and gas development: Contains oil and gas source rock, thermal maturation, reservoir strata possessing permeability and/or porosity, and traps or part of an oil and gas play as defined by the U. S. Geological Survey (Open File Report 88-373 or related publication).

TABLE 2-1.  PROJECTED NUMBER OF WELLS

|  | GSRA | KRA | LSRA | NPA | SJ/SMPA |
|---|---|---|---|---|---|
| Wildcat Wells |  |  |  |  |  |
| Region 1 | 0 | 0 | 1 | NA | NA |
| Region 2 | 2 | 8 | 1 | 1 | 5 |
| Region 3 | 4 | 2 | 8 | 10 | 40 |
| Region 4 | 22 | 30 | 281 | 106 | 104 |
| Subtotal | 28 | 40 | 291 | 117 | 149 |
| Development Wells |  |  |  |  |  |
| Region 1 | 0 | 0 | 0 | NA | NA |
| Region 2 | 4 | 14 | 0 | 1 | 8 |
| Region 3 | 8 | 4 | 8 | 10 | 60 |
| Region 4 | 50 | 50 | 251 | 110 | 136 |
| Subtotal | 62 | 68 | 259 | 121 | 204 |
| TOTAL | 90 | 108 | 550 | 238 | 353 |

NA--Not Applicable - This Potential Development Region is not present in this planning area.

BLM_0005695

TABLE 2-2.   FIELDS

|  | GSRA | KRA | LSRA | NPA | SJ/SMPA |
|---|---|---|---|---|---|
| New Fields | 4 | 6 | 12 | 0 | 17 |
| Average Size[1] | 4 | 3 | 7 | NA | 4 |
| Wells Per Section | 2 | 4 | 3 | 6 | 3 |

[1] Average Size in ideal Sections.  A Section is equal to 640 acres, and is one mile square.
NA--Not Applicable - No fields projected.

The impacts of geophysical exploration, and oil and gas exploration and development have been analyzed for each resource listed. The cumulative impacts of these operations on any one resource are shown in Chapter 4. Analysis of the rate of development (the number of wells drilled in any given year) was made by the resource specialist based on the greatest expected impact to the resource. Therefore, this scenario was developed from the well numbers, location, etc., that are displayed in the POD (Appendix B) for each area.

Coal-bed methane development has been considered along with other oil and gas development for Glenwood Springs Resource Area (GSRA), Little Snake Resource Area (LSRA), and San Juan/San Miguel Planning Area (SJ/SMPA). At this time, no coal-bed methane development is anticipated for Kremmling Resource Area (KRA) and Northeast Planning Area (NPA).

GSRA and NPA increased the number of wells projected from that shown in the POD due to recent expanded activity. In GSRA, most of the recent activity is in coal-bed methane development.

Fields

Development may also be viewed in terms of the expected concentration of wells. The anticipated number of wells would not be distributed uniformly across the Study Area. Wells would be concentrated in "fields." Table 2-2 shows the anticipated concentration of new field development in each Resource/Planning Area.

It should be noted that in NPA, federal land comprises such a small proportion of overall anticipated development that it is unlikely a new field would involve any BLM-administered surface or more than five to 30 percent of the mineral estate. New field development in the NPA would be primarily in the jurisdiction of the state of Colorado.

## ALTERNATIVES

### Mitigative Measures Common to All Alternatives

BLM lease form 3100-11, Offer to Lease and Lease for Oil and Gas, contains lease terms and conditions. The terms cover such items as bonding, rental and/or royalty, inspections, safety, and protection of other resources. Specifically, Section 6 of the lease terms establishes general requirements for conducting operations on the lease and is referred to as the "Standard" lease term for protection of surface resources. This section, in conjunction with the regulations in 43 CFR 3100 and applicable Notices to Lessees and Oil and Gas Onshore Orders, provides latitude for modification of siting (i.e., relocation of the proposed well up to 200 meters), facility design, timing of operation (i.e., no operations up to 60 days), and requirements for interim and final reclamation measures. The standard lease term specifically requires that prior to conducting any surface-disturbing activities, the lessee/operator will contact and receive approval from the BLM, and the lessee may be required to complete minor inventories and/or short-term special studies.

It is not possible to anticipate the entire spectrum of activities which could be proposed; therefore, other practices not identified in specific mitigation could be applied in particular situations. In addition, new advances in technology and reclamation practices are continually being developed. These advances could result in providing the needed resource protection through means other than those identified in this plan. The BLM will take whatever action it deems necessary for the protection of other resources so long as such protection is reasonable and does not infringe upon the rights granted to the lessee. Reasonableness is defined by the relative importance of the resources in question and the propriety of the mitigation required. Reasonableness is determined in each case on its merits and in

2-3

**CHAPTER TWO**

accordance with the decisions from this plan and the Resource Area RMP/EIS. The rights granted to the lessee are only those necessary for the extraction of the oil and/or gas resource.

Restrictions applied to field operations by federal regulation, based on applicable laws and Section 6 of the lease instrument (See Appendix C), are found in the Code of Federal Regulations (CFR), Part 43 sub-part 3100. These regulations give the Authorized Officer authority to determine how field operations are conducted. Since federal regulation makes these requirements mandatory, they are not repeated in the leasing stipulations. Some requirements may be noted in lease notices for special emphasis. Leasing stipulations developed in this EIS are not applicable to existing leases. Analysis of impacts have taken these existing leases into account.

The various resources and values within each Resource/Planning Area are inventoried (inventory is an ongoing, almost continuous effort) and analyzed to determine what impacts oil and gas development may have. Impacts are viewed both in terms of positive and negative impacts, both to and from oil and gas development. Once impacts are identified, analysis is made to determine what (if any) mitigative or protective measures might be applied to prevent or reduce those negative impacts. The mitigative and/or protective measures must then be transformed into the necessary legal language to be effectively applied to field operations. Mitigation is accomplished by requiring an oil and gas lessee to do (or not do) certain things, such as building roads in such a way as to decrease soil erosion. This mitigation is accomplished by appending the requirement to the operational field application (such as an Application for Permit to Drill). In this plan, these requirements are referred to as Conditions of Approval (COAs). BLM's authority to impose these requirements is derived from specific legislation (1920 Mineral Leasing Act, as amended) and the resulting federal regulation. In some cases, the only way to adequately protect a resource/value from development impacts is to so severely restrict the operation as to deny the lessee some, or all, of the rights granted in the lease. In these cases, since a lease is a binding contract, it is necessary to stipulate the lease in such a way prior to the sale that

the government reserves additional rights over and above those normally reserved in a lease. The stipulations placed on the lease are then carried through the approval of the field operation as part of the lessee's plan of operations.

An example of this process in action might be that observation has shown elk gather, during severe winters, in protected areas that have forage available with minimum digging in the deep snow. Another study shows that elk generally avoid humans and human activity (operating machinery such as drill rigs, for example). Observation of past oil and gas field development may have also shown that when a well is drilled in one of these areas, during a severe winter, the elk are effectively denied that part of the crucial winter range. The impacts of displacing these animals may be: 1) direct--some animals die of starvation or stress induced by the deep-snow migration to another protected area; 2) indirect--animals in adjacent crucial winter range may starve due to the increased feeding pressure from the displaced herd, or the displaced herd may impact other environments, such as a rancher's winter pasture; or 3) cumulative-- several drilling operations or a combination of drilling and other (non-oil and gas) operations will displace several groups from their crucial winter range resulting in an even more severe impact to the overall herd or other resources (vegetation, livestock, etc.).

Mitigative measures discussed in this section would be applied to oil and gas exploration and development activities under all of the three alternatives. These mitigative measures, referred to as COAs, are used to mitigate impacts to the environment, public health, and safety. The Authorized Officer would choose among these measures to mitigate environmental impacts identified on a site-specific basis at the field development stage. Authority to apply COAs stems from and must be consistent with the lease rights granted. BLM may not give a lease holder the right to extract minerals, and then at the time of development, require mitigation not specified in the lease that would disallow part, or all, of the mineral extraction. Reasonable measures under lease rights are defined in CFR 3101.1-2 as allowing the movement of a proposed well up to 200 meters and restriction of timing of the operation by as much as 60 days.

2-4

BLM_0005697

# ALTERNATIVES

COAs are attached to all surface-disturbing activities. These would most commonly include Applications for Permit to Drill (APDs), Sundry Notices, applications for rights-of-way, and Notices of Intent (NOI) for geophysical operations. These COAs are used on a site-specific basis at the discretion of the Authorized Officer. COAs are applied to specific sites for the protection of resources that would otherwise be impacted by that operation. A given COA is always applied to protect a resource affected by the specific operation being approved even on existing leases. COAs common to all alternatives are listed in Appendix D.

Stipulations less restrictive than those chosen for the three alternatives were considered and determined to be insufficient to protect the resource. More restrictive stipulations were also considered, but found to be unnecessary for the protection of the resource. An example of these considerations are stipulations in the Proposed Action Alternative to protect wildlife habitat by timing limitations. The habitat could be protected by not leasing the area or by not allowing surface occupancy year round. These levels of restriction do not add to the protection afforded by the timing limitation. The timing limitation stipulation will protect the habitat from impacts associated with drilling, and construction of roads and pads during the season when it is in use by the wildlife. Less restrictive measures might include shorter closure periods, screening operations from view or hearing of the animals, and/or re-location (less than 200 meters) of operations from areas most used by the wildlife. These measures would not protect the habitat as well as the timing limitation.

## Proposed Action Alternative

The Proposed Action was developed from analysis of the Continuation of Present Management and the Standard Terms and Condition Alternatives. It provides appropriate mitigative measures for protecting resource concerns and uses, while allowing oil and gas leasing and development with a minimum of restrictions.

Many impacts are adequately mitigated by COAs attached to field operation approvals and by stipulations attached to the lease. If an impact cannot be sufficiently mitigated

under the Standard Terms and Conditions, the stipulations used under present management were analyzed for effectiveness. If the existing lease stipulation was sufficient, it was carried forward in the Proposed Action. If the necessary stipulation was not found, or found to be inadequate, a new stipulation or COA was developed for the Proposed Action. Tables 2-6, 2-9, 2-12, and 2-15 show the availability of federal lands for leasing within the five Resource/Planning Areas under this alternative.

This Plan Amendment will make leasing decisions for all federal oil and gas mineral estate in the Planning Area that is subject to the Mineral Leasing Act with the exception of National Forest System lands. The Forest Service, in coordination with the BLM, will make leasing decisions for Forest Service lands in their Forest and Resource Management Plans. Many of these plans are presently being revised. The BLM plan amendment will analyze both specific and cumulative impacts of the Proposed Action on adjacent National Forest System lands. The analysis also considers specific and cumulative impacts on adjacent nonfederal lands (private, state) and federal lands exempt from the Mineral Leasing Act (e.g., National Park Service lands and Wilderness).

Reasonable Foreseeable Development

The restrictive measures imposed by the COAs and lease stipulations under the Proposed Action Alternative would increase the cost of lease operations (through additional cost of inventories, monitoring, more costly construction methods, use of directional drilling, etc.), but would not change overall development from that predicted in the POD (Appendix B). The projected number of wells to be drilled and the acres disturbed are the same under this alternative as in Table 2-1.

In the Proposed Action Alternative, some total acreage figures have increased from those shown in the Continuation of Present Management Alternative. The increase is due to the fact that some Resource Management Plan/Environmental Impact Statements (RMP/EIS) did not analyze some areas for leasing, preferring to give them "case-by-case" study if interest was shown in leasing. This was particularly true of split-estate lands (private surface/federal minerals). The

BLM_0005698

## CHAPTER TWO

Proposed Action Alternative analyzes all
federal and split-estate lands within the Study
Area except those discussed in Chapter 1.

Lease Stipulations

Stipulations may be attached to oil and gas
leases issued under this alternative. New
stipulations can not be attached to existing
leases without the consent of the lessee;
however, stipulations previously attached to
those leases are retained as long as the lease
is valid. The majority of federal leases issued
in Colorado expire with no operation
occurring. If the acreage involved in these
expired leases is re-offered for sale, it will be
with the new stipulations attached. The
Proposed Action stipulations for each
Planning Area are listed in Appendix E.

Appendix E represents the mitigation
determined to be necessary to protect
resource uses or values by modifying or
limiting the standard rights granted to a
lessee. With respect to the timing of
operations, for example, necessary mitigation
measures are closures for surface use and
occupancy exceeding 60 consecutive days.
Because such closures exceed the reasonable
measures the Authorized Officer may take at
the time operations are proposed (see section
6 of the lease form, Appendix C, and 43
CFR 3101.1-2), a stipulation is required to
modify the lease rights. See Maps 2-1
to 2-15.

The lease grants the right to occupy the
surface and the right to extract the resource
(oil and/or gas). The "rights" constitute
property rights and are entitled to the same
benefits. The BLM may restrict even these
rights, but it must be done by stipulation
attached to the lease document prior to
issuance. An example of a restriction to the
lease rights would be a Timing Limitation or
No Surface Occupancy stipulation (see the
Introduction to Appendix E for a discussion
of stipulations).

In some cases, the way in which the BLM
would allow oil and gas development is so
restrictive as to affect the lessee's right to
occupy the surface. In these cases, a
Controlled Surface Use stipulation is
appended to the lease (see Appendix E for a
discussion of the CSU stipulations). These
stipulations allow for surface occupancy but
only under very specific conditions.

The standard lease form makes it clear that
the lessee must comply with all laws (such as
the Endangered Species Act) regardless of
when the law was enacted and regardless of
the effect it may have on the rights granted.
The lessee must also comply with all
regulations, Oil and Gas Onshore orders,
lease terms, attached stipulations, etc.,
including those put into effect after the lease
was issued so long as they do not conflict
with the lease rights. An example of a
regulation that would conflict with existing
rights would be one which denied surface
occupancy. However, if the lease had
originally had a No Surface Occupancy
stipulation attached, a new regulation denying
surface use would not be in conflict with that
lease.

Impacts from existing leases under the
Proposed Action Alternative would be the
same, or less, as those described for Present
Management and Standard Terms and
Conditions Alternatives. Leases issued prior
to the respective Resource Management Plans
would have impacts similar to those
described in the Standard Terms and
Conditions Alternative, except where
stipulations are attached.

Conditions of Approval

The mitigative measures common to all
alternatives (Appendix D), will be considered
in determining well site locations and
developing COAs to attach to NOIs, APDs,
and associated rights-of-way before approval
under the Proposed Action. These measures
and the COAs shown in Appendix F will be
applied by the Authorized Officer as
appropriate on a case-by-case basis. Not all
COAs would apply to every field operation.
Only those needed in a particular case will be
used. COAs could be modified or created to
meet specific needs, but the protection level
envisioned in these COAs would be
maintained.

The COAs in Appendices D and F include
timing limitations of 60 days or less. Such
reasonable measures are enforced at the time
operations are proposed under the authority
of the regulations and lease terms (see section
6 of the lease form, Appendix C, and 43
CFR 3101.1-2). No lease stipulation is
required to ensure mitigation where timing is
limited by 60 days or less, or location is
moved 200 meters or less. However, as a

BLM_0005699



## GLENWOOD SPRINGS RESOURCE AREA



Resource Area Boundary

No Leasing

No Surface Occupancy

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

Scale 1:1,000,000
1 inch equals Approximately 16 miles



**Map 2-1**



2-7

BLM_0005700



## GLENWOOD SPRINGS RESOURCE AREA

 **Resource Area Boundary**

Timing Limitations

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High



Scale 1:1,000,000
1 inch equals Approximately 16 miles

**Map 2-2**



2-8

BLM_0005701



## GLENWOOD SPRINGS RESOURCE AREA



Resource Area Boundary

Controlled Surface Use

**All perennial streams are covered by CSU.**

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

Scale 1:1,000,000
1 inch equals Approximately 16 miles



**Map 2-3**

2-9

BLM_0005702



**KREMMLING RESOURCE AREA**

Resource Area Boundary

No Leasing

No Surface Occupancy

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

**Map 2-4**

SCALE
in miles

0          10          20

2-10

BLM_0005703



# KREMMLING RESOURCE AREA

Resource Area Boundary

Timing Limitations

Oil and Gas Potential
1 - None,
2 - Low
3 - Moderate
4 - High

**Map 2-5**

SCALE
in miles

0          10          20

2-11

BLM_0005704



KREMMLING RESOURCE AREA

Resource Area Boundary

Controlled Surface Use

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

Map 2-6

SCALE
in miles

0          10          20

2-12

BLM_0005705



**LITTLE SNAKE RESOURCE AREA**

Map 2-7
2-13

Resource Area Boundary

No Leasing

No Surface Occupancy

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

COLORADO

Scale 1:1,000,000
1 inch equals Approximately 16 miles

10   0   10   20   30   40 Miles

10   0   10   20   30   40   50 Kilometers

N

BLM_0005706



Map 2-8

2-14

LITTLE SNAKE RESOURCE AREA

Resource Area Boundary

Timing Limitations

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

C O L O R A D O

Scale 1:1,000,000
1 inch equals Approximately 16 miles

40 Miles

Kilometers

N

BLM_0005707



**LITTLE SNAKE RESOURCE AREA**

Resource Area Boundary

Controlled Surface Use

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

COLORADO

Scale 1:1,000,000
1 inch equals Approximately 16 miles

10    0    10    20    30    40 Miles

10    0    10    20    30    40    50 Kilometers

N

Map 2-9

2-15

BLM_0005708



## NORTHEAST PLANNING AREA

Planning Area Boundary

No Leasing

No Surface Occupancy

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

**Map 2-10**

2-16

BLM_0005709



## NORTHEAST PLANNING AREA

Planning Area Boundary

Timing Limitations

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

**Map 2-11**

2-17

BLM_0005710



## NORTHEAST PLANNING AREA

Planning Area Boundary

Controlled Surface Use

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

**Map 2-12**

2-18

BLM_0005711



SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

No Leasing

No Surface Occupancy

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

Map 2-13

2-19



SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

Timing Limitations

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

Map 2-14

2-20

BLM_0005713



## SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

Controlled Surface Use

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

Controlled Surface Use is applied to over 500,000 acres at widely scattered locations throughout the Planning Area.

Map 2-15

2-21

BLM_0005714

## CHAPTER TWO

matter of policy, where resource uses or values requiring short timing limitations exist on the ground such that overlap would result in a closure of the lease exceeding 60 consecutive days, the Colorado BLM will develop a lease timing stipulation identifying all the known resource use/value conflicts. If a COA is used to mitigate for certain resources such as wildlife limitations, a lease notice may be used to identify such known restrictions at the time of lease issuance (see Appendix E).

### Continuation of Present Management Alternative

The Continuation of Present Management Alternative would manage oil and gas leasing, exploration, and development in accordance with decisions and mitigative measures presently in use in the applicable Resource Management Plan (RMP). Tables 2-4, 2-7, 2-10, 2-13, and 2-16 show federal lands available for leasing by Planning Area under the Continuation of Present Management Alternative. This alternative is considered a "no action" alternative because there would be no change from the way the oil and gas resource is currently managed.

Reasonable Foreseeable Development

The projected number of wells to be drilled and acres disturbed are the same under this alternative as in Table 2-1.

Lease Stipulations

Where necessary, the appropriate stipulation is attached to leases when they are offered for sale. The stipulations presently in use are listed by Resource/Planning Area in Appendix G.

Conditions of Approval

In addition to those mitigative measures common to all alternatives, COAs will be considered in determining well site locations and developing mitigation to be attached to NOIs, APDs, and associated rights-of-way before approval under this alternative. These measures will be applied by the Authorized Officer as appropriate on a case-by-case basis. Not all COAs would apply to every field operation. Only those needed in a

particular case will be used. The wording of a COA could be modified to meet the needs of local situations, but the protection level envisioned in these COAs will be maintained. The COAs are displayed in Appendices D and H.

### Standard Terms and Conditions Alternative

The Standard Terms and Conditions Alternative analyzes environmental impacts of leasing most of federal oil and gas mineral estate within the affected Resource/Planning Areas, with the exception of those lands withdrawn by law. A copy of the oil and gas lease (Form 3100-11, June 1988), which contains the standard terms and conditions, is provided in Appendix C. Under this alternative, no special stipulations would be attached to new oil and gas leases. If the BLM were to select this alternative, a no leasing designation would be placed on certain areas that contain sensitive or unique resources. Tables 2-5, 2-8, 2-11, 2-14 and 2-17 display the amount of acreage that would be under the no leasing designation. Appendix C contains a list of the areas that would be protected by a no leasing designation should this alternative be selected.

Reasonable Foreseeable Development

The RFD would not change from that predicted in Table 2-1. The EIS analysis did not try to predict the number of wells that may be foregone in the other alternatives because of discretionary no leasing or no surface occupancy stipulations. Sufficient data is not available to determine where drilling interest may occur in specific areas, therefore, the projections are the same for all alternatives.

Conditions of Approval

In addition to those mitigative measures common to all alternatives for each Planning Area, COAs will be considered in determining well site locations and developing mitigation to be attached to NOIs, APDs, and associated rights-of-way. These measures would be applied by the Authorized Officer on a case-by-case basis. Not all COAs would apply to every field

2-22

BLM_0005715

operation. Only those needed in a particular case would be used. The wording of a COA may be modified to meet the needs of local situations, but the protection level envisioned in these COAs will be maintained. The COAs are displayed in Appendices D and F.

## ALTERNATIVE COMPARISON

### Proposed Action

Overall vegetation loss could be 17,900 acres which is 1/2 of one percent of the BLM lands in the Study Area. Less than 1/2 of one percent of the livestock forage would be lost. Minor amounts of livestock disturbance could cause a slight drop in calf/lamb crops. There would be a slight loss of forage--1/2 of one percent. Minor amounts of human disturbance are not considered significant. Raptors may be subjected to minor amounts of human disturbance. If the disturbance occurs during the nesting season, minor amounts of losses could occur to the population. Human disturbance would have short-term impacts on the wild horses. Soil erosion would increase but is not considered to be significant. The increased erosion would result in increased sediment and salinity. These increases would be long-term and minor.

Small increases in vehicle traffic and manmade intrusions would degrade the aesthetics to a slight degree. Cultural resources would be subject to increased vandalism due to the improved access, but at at the same time, more information would be made available due to the increases in surveys. Exploration and development costs would increase for the oil and gas operators due to the constraints placed upon them. The rate of development may be slightly slower but the overall effort would not be impacted. The amount of reduction is not considered significant and is not quantifiable at this time.

### Continuation of Present Management Alternative

The impacts of this alternative are in addition to those listed for the Proposed Action. The impacts to the wildlife may be slightly more due to human disturbances. Impacts to wild horses would be slightly more under this alternative as compared to the Proposed Action.

### Standard Terms and Conditions Alternative

The impacts of this alternative are in addition to those listed above the Continuation of Present Management Alternative. The impacts to wildlife would be more substantial. Disturbances during various critical periods would cause losses of fawns/calves and new roads into isolated areas would increase the overall human disturbance factors. Disturbances to raptors during some portion of their critical periods are more probable. High erosion would occur on fragile soil areas which would also increase sedimentation and siltation.

Table 2-19 provides a summary of impacts by resource for each alternative.

BLM_0005716

**CHAPTER TWO**

TABLE  2-3.  PROPOSED ACTION ALTERNATIVE (GSRA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 7,400 | 19,790 | 14,370 | 18,740 | 60,300 |
| Controlled Surface Use | 3,840 | 113,320 | 236,210 | 73,520 | 426,890 |
| Timing Limitation | 0 | 104,600 | 473,800 | 30,000 | 608,400 |
| NSO | 6,006 | 54,722 | 47,396 | 53,524 | 161,648 |
| No Lease (WSA)[1] | 0 | 0 | 27,280 | 0 | 27,280 |
| No Lease (Discretionary) | 0 | 0 | 0 | 0 | 0 |
| Total[2] | 17,246 | 292,432 | 799,056 | 175,784 | 1,284,518 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness
designation.
[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal
acreage shown next to "Total" for each area.

TABLE  2-4.  CONTINUATION OF PRESENT MANAGEMENT ALTERNATIVE (GSRA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 17,640 | 68,280 | 41,980 | 47,276 | 175,176 |
| Controlled Surface Use | 0 | 0 | 0 | 0 | 0 |
| Timing Limitation | 0 | 163,160 | 292,780 | 181,560 | 637,500 |
| NSO | 0 | 26,426 | 13,580 | 5,040 | 45,046 |
| No Lease (WSA)[1] | 0 | 0 | 27,280 | 0 | 27,280 |
| No Lease (Discretionary) | 0 | 960 | 0 | 0 | 960 |
| Total[2] | 17,640 | 258,826 | 375,620 | 233,876 | 885,962 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness
designation.
[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal
acreage shown next to "Total" for each area.

TABLE  2-5.  STANDARD TERMS AND CONDITIONS ALTERNATIVE (GSRA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 12,840 | 142,739 | 294,745 | 121,387 | 571,711 |
| Controlled Surface Use | 0 | 0 | 0 | 0 | 0 |
| Timing Limitation | 0 | 0 | 0 | 0 | 0 |
| NSO | 0 | 0 | 0 | 0 | 0 |
| No Lease (WSA)[1] | 0 | 0 | 27,280 | 0 | 27,280 |
| No Lease (Discretionary) | 1,462 | 15,110 | 5,452 | 15,676 | 37,700 |
| Total[2] | 14,302 | 157,849 | 327,477 | 137,063 | 636,691 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness
designation.
[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal
acreage shown next to "Total" for each area.

BLM_0005717

TABLE 2-6. PROPOSED ACTION ALTERNATIVE (KRA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 73,620 | 232,560 | 44,320 | 29,700 | 380,200 |
| Controlled Surface Use | 5,000 | 12,700 | 3,000 | 1,600 | 22,300 |
| Timing Limitation | 64,000 | 63,090 | 26,400 | 71,115 | 224,605 |
| NSO | 7,380 | 11,010 | 1,200 | 8,185 | 27,775 |
| No Lease (WSA)[1] | 0 | 9,415 | 80 | 0 | 9,495 |
| No Lease (Discretionary) | 0 | 625 | 0 | 0 | 625 |
| Total[2] | 150,000 | 329,400 | 75,000 | 110,600 | 665,000 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.
[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

TABLE 2-7. CONTINUATION OF PRESENT MANAGEMENT ALTERNATIVE (KRA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 88,997 | 256,830 | 61,522 | 58,942 | 466,291 |
| Controlled Surface Use | 0 | 0 | 0 | 0 | 0 |
| Timing Limitation | 53,000 | 55,000 | 10,000 | 48,000 | 166,000 |
| NSO | 4,003 | 2,130 | 398 | 2,058 | 8,589 |
| No Lease (WSA)[1] | 0 | 9,415 | 80 | 0 | 9,495 |
| No Lease (Discretionary) | 0 | 625 | 0 | 0 | 625 |
| Total[2] | 146,000 | 324,000 | 72,000 | 109,000 | 651,000 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.
[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

TABLE 2-8. STANDARD TERMS AND CONDITIONS ALTERNATIVE (KRA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 140,430 | 313,843 | 71,442 | 108,690 | 634,405 |
| Controlled Surface Use | 0 | 0 | 0 | 0 | 0 |
| Timing Limitation | 0 | 0 | 0 | 0 | 0 |
| NSO | 0 | 0 | 0 | 0 | 0 |
| No Lease (WSA)[1] | 0 | 9,415 | 80 | 0 | 9,495 |
| No Lease (Discretionary) | 5,570 | 822 | 398 | 310 | 7,100 |
| Total[2] | 146,000 | 324,080 | 71,920 | 109,000 | 651,000 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.
[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

BLM_0005718

## CHAPTER TWO

TABLE 2-9. PROPOSED ACTION ALTERNATIVE (LSRA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 12,050 | 75,870 | 302,850 | 374,840 | 765,610 |
| Controlled Surface Use | 6,590 | 69,920 | 45,350 | 266,790 | 388,650 |
| Timing Limitation | 2,900 | 7,970 | 140,200 | 709,150 | 860,220 |
| NSO | 89 | 514 | 12,011 | 45,280 | 57,894 |
| No Lease (WSA)[1] | 0 | 27,380 | 8,000 | 0 | 35,380 |
| No Lease (Discretionary) | 0 | 0 | 0 | 0 | 0 |
| Total[2] | 21,629 | 181,654 | 508,411 | 1,396,060 | 2,107,754 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.

[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

TABLE 2-10. CONTINUATION OF PRESENT MANAGEMENT ALTERNATIVE (LSRA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 12,050 | 70,890 | 342,940 | 245,480 | 671,360 |
| Controlled Surface Use | 6,590 | 69,920 | 45,350 | 266,790 | 388,650 |
| Timing Limitation | 2,900 | 7,970 | 79,150 | 839,150 | 929,170 |
| NSO | 0 | 580 | 13,560 | 60,600 | 74,740 |
| No Lease (WSA)[1] | 0 | 27,380 | 8,000 | 0 | 35,380 |
| No Lease (Discretionary) | 0 | 0 | 0 | 0 | 0 |
| Total[2] | 21,540 | 176,740 | 489,000 | 1,412,020 | 1,878,000 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.

[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

TABLE 2-11. STANDARD TERMS AND CONDITIONS ALTERNATIVE (LSRA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 21,300 | 127,320 | 408,700 | 1,245,435 | 1,802,755 |
| Controlled Surface Use | 0 | 0 | 0 | 0 | 0 |
| Timing Limitation | 0 | 0 | 0 | 0 | 0 |
| NSO | 0 | 0 | 10,500 | 3,580 | 14,080 |
| No Lease (WSA)[1] | 0 | 27,380 | 8,000 | 0 | 35,380 |
| No Lease (Discretionary) | 270 | 0 | 22,800 | 2,715 | 25,785 |
| Total[2] | 21,570 | 154,700 | 450,000 | 1,251,730 | 1,878,000 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.

[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

BLM_0005719

**ALTERNATIVES**

TABLE   2-12.   PROPOSED ACTION ALTERNATIVE (NPA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 10,000 | 50,000 | 20,000 | 160,000 | 240,000 |
| Controlled Surface Use | 90,000 | 0 | 0 | 0 | 90,000 |
| Timing Limitation | 10,000 | 1,000 | 10,000 | 70,000 | 91,000 |
| NSO | 45,600 | 1,300 | 13,000 | 65,100 | 125,000 |
| No Lease (WSA)[1] | 0 | 0 | 1,000 | 0 | 1,000 |
| No Lease (Discretionary) | 0 | 10,000 | 80,000 | 35,000 | 125,000 |
| Total[2] | 155,600 | 62,300 | 124,000 | 330,100 | 672,000 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.

[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

TABLE   2-13.   CONTINUATION OF PRESENT MANAGEMENT ALTERNATIVE (NPA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 114,000 | 60,000 | 100,000 | 220,000 | 494,000 |
| Controlled Surface Use | 0 | 0 | 0 | 0 | 0 |
| Timing Limitation | 1,000 | 1,000 | 8,000 | 70,000 | 80,000 |
| NSO | 1,000 | 1,000 | 3,000 | 10,000 | 15,000 |
| No Lease (WSA)[1] | 0 | 0 | 1,000 | 0 | 1,000 |
| No Lease (Discretionary) | 0 | 0 | 0 | 10,000 | 10,000 |
| Total[2] | 116,000 | 62,000 | 112,000 | 310,000 | 600,000 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.

[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

TABLE   2-14.   STANDARD TERMS AND CONDITIONS ALTERNATIVE (NPA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

|  | POTENTIAL | | | | |
|---|---|---|---|---|---|
|  | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 101,000 | 32,000 | 11,000 | 255,000 | 399,000 |
| Controlled Surface Use | 0 | 0 | 0 | 0 | 0 |
| Timing Limitation | 0 | 0 | 0 | 0 | 0 |
| NSO | 0 | 0 | 0 | 0 | 0 |
| No Lease (WSA)[1] | 0 | 0 | 1,000 | 0 | 1,000 |
| No Lease (Discretionary) | 15,000 | 30,000 | 100,000 | 55,000 | 200,000 |
| Total[2] | 116,000 | 62,000 | 112,000 | 310,000 | 600,000 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.

[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

BLM_0005720

## CHAPTER TWO

TABLE 2-15. PROPOSED ACTION ALTERNATIVE (SJ/SMPA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

| | POTENTIAL | | | | |
|---|---|---|---|---|---|
| | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 322,180 | 103,633 | 117,082 | 178,977 | 721,872 |
| Controlled Surface Use | 271,840 | 93,040 | 134,850 | 65,280 | 565,010 |
| Timing Limitation | 107,050 | 25,887 | 93,635 | 118,826 | 345,398 |
| NSO | 4,540 | 1,000 | 33,918 | 70,670 | 110,128 |
| No Lease (WSA)[1] | 7,908 | 2,560 | 54,459 | 38,225 | 103,152 |
| No Lease (Discretionary) | 0 | 0 | 0 | 0 | 0 |
| Total[2] | 713,518 | 226,120 | 433,944 | 471,978 | 1,845,560 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.
[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

TABLE 2-16. CONTINUATION OF PRESENT MANAGEMENT ALTERNATIVE (SJ/SMPA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

| | POTENTIAL | | | | |
|---|---|---|---|---|---|
| | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 326,400 | 100,893 | 152,320 | 261,120 | 840,733 |
| Controlled Surface Use | 0 | 0 | 0 | 0 | 0 |
| Timing Limitation | 130,208 | 27,387 | 102,437 | 103,678 | 363,710 |
| NSO | 600 | 0 | 13,350 | 16,475 | 30,425 |
| No Lease (WSA)[1] | 7,908 | 2,560 | 54,459 | 38,225 | 103,152 |
| No Lease (Discretionary) | 0 | 0 | 0 | 0 | 0 |
| Total[2] | 465,116 | 130,840 | 322,566 | 419,498 | 1,338,020 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.
[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

TABLE 2-17. STANDARD TERMS AND CONDITIONS ALTERNATIVE (SJ/SMPA)
AVAILABILITY OF LANDS (IN ACRES) FOR FLUID MINERAL LEASING

| | POTENTIAL | | | | |
|---|---|---|---|---|---|
| | NONE | LOW | MEDIUM | HIGH | TOTAL |
| Standard Lease Terms | 452,004 | 127,960 | 232,549 | 300,303 | 1,112,816 |
| Controlled Surface Use | 0 | 0 | 0 | 0 | 0 |
| Timing Limitation | 0 | 0 | 0 | 0 | 0 |
| NSO | 0 | 0 | 0 | 0 | 0 |
| No Lease (WSA)[1] | 7,908 | 2,560 | 54,459 | 38,225 | 103,152 |
| No Lease (Discretionary) | 600 | 320 | 14,350 | 59,762 | 75,032 |
| Total[2] | 460,512 | 130,840 | 301,358 | 398,290 | 1,291,000 |

[1] Interim Management for all Wilderness Study Areas is "No Lease" until Congress acts on wilderness designation.
[2] Some stipulations overlap, therefore, the total of all six categories may add up to more than the total federal acreage shown next to "Total" for each area.

BLM_0005721

**ALTERNATIVES**

TABLE 2-18.   PROPOSED ACTION--NO SURFACE OCCUPANCY

| | ACRES |
|---|---|
| **GSRA** | |
| Major River Corridors | 42,148 |
| Rifle Falls Fish and Glenwood Springs Fish Hatcheries | 15,200 |
| Hack Lake | 3,480 |
| Rifle Mt. Park | 400 |
| Sunlight Peak Area | 1,900 |
| Municipal Watersheds | 5,960 |
| Thompson Creek | 4,286 |
| Bull Gulch | 10,214 |
| Deep Creek | 4,400 |
| Glenwood Springs Debris Hazard Zone | 7,160 |
| Garfield Creek State Wildlife Area | 12,520 |
| Basalt State Wildlife Area | 4,460 |
| West Rifle Creek State Wildlife Area | 1,160 |
| Raptor Nests | 45,000 |
| Sage Grouse Leks | 3,360 |
| **KRA** | |
| Kerr Coal Mine | 400 |
| Sage Grouse Leks | 10,000 |
| Raptor Nests | 6,000 |
| Water Fowl Areas | 3,000 |
| Special Status Plants | 1,240 |
| Ammonite ACEC | 200 |
| North Park Phacilia ACEC | 300 |
| Windy Gap RMA | 400 |
| Colorado River SRMA | 4,870 |
| North Sand Hills SRMA | 1,325 |
| Sulfur Range District Administrative Site | 40 |
| **LSRA** | |
| Sage Grouse Lek | 2,400 |
| Raptor Nests | 28,560 |
| Peregrine Falcon Nest | 40 |
| Bald Eagle Roost | 1,200 |
| Sand Hill Crane Habitat | 240 |
| Little Yampa SRMA | 19,840 |
| Cedar Mt. SRMA | 880 |
| Steamboat and Pearl Lake State Parks | 384 |
| Cross Mountain Canyon ACEC | 3,000 |
| Limestone Ridge ACEC | 1,350 |
| **NPA** | |
| I-70 Corridor | 10,000 |
| State, County, and City Parks | 15,000 |
| Reservoir and Railroad Rights-of-way | 30,000 |
| Reservoir and River Riparian Areas | 30,000* |
| Wildlife Area (Includes Grouse, Raptors, Bald Eagles, Peregrine Falcon, Waterfowl, and Shorebirds) | 40,000* |

2-29

BLM_0005722

**CHAPTER TWO**

TABLE 2-18.   (continued)

| SJ/SMPA | |
|---|---:|
| Cannonball Ruin | 80 |
| Lowery Ruins & Associations | 880 |
| Dominguez-Escalante Ruins | 55 |
| Tabeguache Cave II and Tabeguache Canyon | 3,200 |
| Dolores Cave | 60 |
| Tabeguache Pueblo | 200 |
| McLean Basin Towers and Associations | 200 |
| Painted Hand Petroglyphs | 240 |
| Painted Hand Ruin | 160 |
| Indian Henry's Cabin | 280 |
| Lighting Tree Tower Group | 200 |
| Battle Rock | 40 |
| Easter Ruin | 160 |
| Seven Towers Ruin Group | 120 |
| Hovenweep Canyon | 3,400 |
| East Cortez | 6,420 |
| Goodman Canyon and Goodman Point Buffer Zones | 1,560 |
| Bass Ruin Complex | 500 |
| Sandstone Canyon | 2,840 |
| Brewer Well Complex | 590 |
| Yellow Jacket Canyon | 5,120 |
| Basin Wickiup Village | 400 |
| Woods Canyon | 980 |
| Bridge Canyon | 1,120 |
| Porter Ruin | 120 |
| Upper Ruin Canyon | 640 |
| Bowdish Canyon | 1,000 |
| Sand and East Rock Canyon | 5,880 |
| Squaw/Papoose, Cross, and Cahone Canyons | 28,464 |
| Hovenweep National Monument Cooperative Management Strategies Area | 600 |
| Cutthroat Castle Buffer Zone | 320 |
| Dolores River Canyon | 22,464 |
| Bridge Canyon (McElmo) RNA | 443 |
| Menefee and Weber Mountains | 13,432 |
| Horse Range Mesa Paleontological Site | 40 |
| Sage Grouse Leks | 960 |
| (Perins Peak/Mesa Verde) | 2,600 |
| Raptors | 1,160 |
| Bald Eagle Nest and Roost Sites | 3,240 |

*Some overlap in Wildlife and Riparian Areas

BLM_0005723

**ALTERNATIVES**

TABLE 2-19.   ALTERNATIVE COMPARISON

| Resource | Alternative | | |
|---|---|---|---|
| | Proposed Action | Continuation of Present Management[1] | Standard Terms and Conditions[2] |
| Climate and Air Quality | Very minor, local | - | - |
| Vegetation | 17,900 acres disturbed | - | - |
| Livestock Grazing | Minor disturbance, 1,800 AUMs lost | - | - |
| Wildlife | Minor loss of habitat. Increased harassment "may affect" T&E fish. | + | + |
| Wild Horses | Minor disturbance | - | + |
| Soils | Minor short-term losses, increased erosion | - | + |
| Water | Minor increases in sediment and salinity | - | + |
| Forestry | Insignificant losses | - | - |
| Recreation | Minor disturbances | - | - |
| Visual | Minor, local | - | - |
| Cultural | Increased surveys, minor losses | - | - |
| Paleontology | Increased surveys, minor losses | - | - |
| Wilderness | None | - | - |
| Lands and Realty Actions | None | - | - |
| Transportation | Increased access | - | - |
| Social and Economic | Insignificant | - | - |
| Areas of Critical Environmental Concern | None | - | - |
| Minerals | Loss of oil and gas resource, slightly higher recovery costs, minor loss of coal recovery | + | + |

[1]   (-) - Same degree of impact as Proposed Action.
    (+) - Greater impact than Proposed Action.

[2]   (-) - Same degree of impact as Continuation of Present Management.
    (+) - Greater impact than Continuation of Present Management

BLM_0005724

# CHAPTER THREE

# AFFECTED ENVIRONMENT

BLM_0005725

# CHAPTER THREE

# AFFECTED ENVIRONMENT

## INTRODUCTION

This chapter describes the affected environment in the Study Area. The Study Area consists of the five areas described in Chapter 1 that correspond to coverage of the five Resource Management Plan/Environmental Impact Statements (RMP/EIS) being amended: Glenwood Springs Resource Area (GSRA), Kremmling Resource Area (KRA), Little Snake Resource Area (LSRA), Northeast Planning Area (NPA), and the San Juan/San Miguel Planning Area (SJ/SMPA).

Generally, the environmental resources described are those that may be affected by the Proposed Action or one of the other alternatives. At times, an environmental resource will be described to give the reviewer a clearer picture of the setting, or to make a link between two affected resources. Several environmental resources will not be discussed because they will not be impacted and are not necessary for a clear picture of the Study Area.

Descriptions of environmental resources are organized with an overview section containing a general description applicable to the entire Study Area. This is followed by more detailed descriptions tied to specific areas when necessary for an understanding of impacts or mitigating measures.

Readers interested in details of a particular environmental resource or wishing additional information about a particular Resource Area, should consult with Resource Area Offices. These offices have the current (maintained) and more detailed RMP/EIS's which are available for public review.

## CLIMATE AND AIR QUALITY

Climate Overview

The Study Area is comprised of a highland climatic type in the mountainous regions and a continental, cold steppe climate type in the remainder of the Study Area (where most BLM-administered lands are located.)

The highland climatic type is dominated by its mountainous topography. This complex topography causes considerable variation in site-specific temperature, precipitation, and surface winds. Temperatures are much colder than lowlands at similar latitudes, and may become frigid when cold air drains into mountain valleys. Freezing temperatures are possible throughout the year. Annual precipitation is highly variable, due primarily to the orographic effect of local topography. Precipitation is greatest on the windward side, with amounts increasing dramatically with elevation. Snowfall is possible throughout the year, with accumulation increasing with elevation. Diurnal up- and down-valley winds predominate. Mountain inversions may form and last for several days.

The continental, cold steppe climate type is typified by low to moderate precipitation which occurs mostly in summer. The amount of precipitation varies greatly from year to year. Evaporation is moderate to high. There is a wide temperature variation from cold winters and hot summers. There are four distinct seasons; spring occurs suddenly and warms quickly. Extremely frigid conditions and blizzards can occur, but severe weather conditions such as floods and damaging hail are rare. Tornadoes occasionally occur in the eastern most portion of the Study Area. Winter inversions are common and may last for several days.

BLM_0005726

## CHAPTER THREE

Although atmospheric mixing varies throughout the Study Area, dispersion is normally good in spring and summer, but limited in the winter. Inversions are formed under stable conditions, trapping pollutants within a layer of air. Moderate summer inversions are typical during the evening and dissipate at dawn. Winter inversions are stronger and last longer. Inversions are enhanced by weak pressure gradients, cold clear nights, snow cover, and basin topography.

Climate Condition by Resource/Planning Area

The following Resource/Planning Area descriptions are necessarily broad generalizations of very complex climatic conditions (PEDCO Environmental, Inc. 1981). Tables J-1, J-2, and J-3 (Appendix J) provide monitored data for specific locations within each area. However, this data can not be extrapolated throughout the Study Area. Map 3-1 shows annual average precipitation throughout Colorado. Site-specific monitoring is necessary to determine local climatic conditions.

### Glenwood Springs Resource Area

Average annual precipitation ranges from ten to 30 inches, which may occur anytime throughout the year. January temperatures range from an average minimum temperature of ten degrees Fahrenheit (F) to an average maximum temperature of 35 degrees F. July temperatures typically average from 45 (minimum) to 85 (maximum) degrees F. Frost-free periods normally last two to three months. Winds occur mostly along the river drainages, and winter inversions are common in the mountain valleys.

### Kremmling Resource Area

Average annual precipitation is ten to 25 inches, with a small peak due to summer thundershowers. January temperatures range from an average minimum temperature of zero degrees F to an average maximum temperature of 32 degrees F. July temperatures typically average from 35 (minimum) to 80 (maximum) degrees F. Frost-free periods normally last less than two months. Cold air drainage makes the mountain valleys frigid in winter, and enhances strong winter inversions.

### Little Snake Resource Area

Average annual precipitation varies from ten to 16 inches, occurring uniformly throughout the year. January temperatures range from an average minimum temperature of zero degrees F to an average maximum temperature of 32 degrees F. July temperatures typically average from 45 (minimum) to 85 (maximum) degrees F. Frost-free periods normally last two to three months. Pressure gradient (synoptic) winds predominate, and large-scale, persistent inversions may occur in winter.

### Northeast Planning Area

Average annual precipitation is ten to 20 inches along the plains, and up to 30 inches in the foothills, occurring mostly due to summer thunderstorms. January temperatures range from an average minimum temperature of 15 degrees F to an average maximum temperature of 45 degrees F. July temperatures typically average from 60 (minimum) to 90 (maximum) degrees F along the plains, and 45 to 80 in the foothills. Frost-free periods normally last three to five months. In winter, heavy snows may occur during up-slope storms, and unusually warm temperatures may occur due to down-slope (Chinook) winds.

### San Juan/San Miguel Planning Area

Climatic conditions are highly variable, ranging from desert conditions in the extreme southwest to alpine conditions in the high mountain locations. Average annual precipitation ranges from eight to 30 inches, occurring mostly in the summer due to convective thunderstorms. January temperatures range from an average minimum temperature of zero to ten degrees F, to an average maximum temperature of 40 degrees F. July temperatures typically average from 50 (minimum) to 90 (maximum) degrees F at lower elevations, and from 40 (minimum) to 75 (maximum) degrees F in the mountains. Frost-free periods vary from less than one to three months.

3-2

BLM_0005727

# ANNUAL PRECIPITATION - COLORADO
## (inches)



MAP 3-1

3-3

BLM_0005728

## CHAPTER THREE

### Air Quality Overview

The existing air quality throughout much of the Study Area is unknown; little monitoring data are available for most pollutants.However, in the undeveloped regions of the western United States, ambient pollutant levels are expected to be near or below the measurable limits. Locations vulnerable to decreasing air quality from extensive development include immediate operation areas (mining operations, power plants, etc.) and local population centers (automobile exhaust, residential wood smoke, etc.). Noise levels are site-specific and vary continuously.

### Air Quality Regulations

National ambient air quality standards (Table J-4, Appendix J) limit the amount of specific pollutants allowed in the atmosphere: carbon monoxide (CO), lead (PB), nitrogen dioxide (NO2), ozone (O3), sulfur dioxide (SO2), and particulate matter (total suspended particulates-TSP and inhalable particulates-PM10). State standards include these parameters, but may also be more stringent. The standards protect health (primary standards) and welfare (secondary standards).

Areas which consistently violate federal standards because of man-caused activities are classified as "nonattainment" areas, and must implement a plan to reduce ambient concentrations below the maximum pollution standards. Under EPA's "Fugitive Dust Policy," areas which violate the TSP standards, but lack significant industrial particulate sources and have a population less than 25,000, are designated as "unclassified" (neither "attainment" nor "nonattainment"). "Unclassified" areas are generally exempt from following the Clean Air Act offset provisions, retrofit controls, and new source control requirements established for "nonattainment" areas.

Through the Clean Air Act Amendments of 1977, Congress established a system for the Prevention of Significant Deterioration (PSD) of "attainment" and "unclassified" areas. Areas are classified by the additional amounts of NO2, SO2, and TSP degradation which would be allowed. PSD Class I areas, predominantly National Parks and certain Wilderness Areas, have the greatest

limitations; virtually any degradation would be significant. Areas where moderate, controlled growth can take place were designated as PSD Class II. PSD Class III areas allow the greatest degree of impacts. The state of Colorado has established a similar system of Category 1, 2, and 3 areas. PSD Class I regulations also address the potential for impacts to Air Quality Related Values (AQRVs). These AQRVs include visibility, odors, and impacts to flora, fauna, soils, water, geologic, and cultural structures. A possible source of impact to AQRVs is acid precipitation. Map 3-2 shows the locations of PSD Class I, Colorado Category 1, and nonattainment areas in Colorado.

### Existing Air Quality

A discussion of existing air quality conditions in the Study Area is necessarily a broad generalization of very complex air quality conditions. Since this information can not be extrapolated throughout each Resource/Planning Area, site-specific monitoring is necessary to determine local conditions. Estimates of air pollutant concentrations are provided in Table J-5, Appendix J (Chick 1989).

For most pollutants, the Study Area has been designated as either "attainment" or "unclassified." The primary exception is urban pollution around isolated tracts within the NPA, and high inhalable particulate levels due to residential wood burning in some urban and rural towns. Except for these areas, BLM-administered lands are classified PSD Class II.

Particulate matter concentrations are expected to be higher near industrial areas, towns, and unpaved roads. Inhalable particulate levels are high in areas with significant combustion sources (urban areas, industrial facilities, residential wood smoke). Throughout Colorado, six areas are believed to exceed the inhalable particulate standards, and 11 additional areas are conducting monitoring to determine if the standards are exceeded.

Similarly, total suspended particulate levels may be high due to wind blown dust in arid locations, or from combustion sources.

3-4

BLM_0005729

# SPECIAL STATUS AIR QUALITY AREAS



BLM_0005730

## CHAPTER THREE

Eight areas exceed the public health standard; 11 areas exceed the public welfare standard. Carbon monoxide levels exceed the standard along the Front Range, and nitrogen dioxide and ozone standard are exceeded in the Denver metropolitan area. Lead and sulfur dioxide levels are well within the standards throughout the state. Visibility and acid precipitation are monitored at isolated locations in the Study Area.

## VEGETATION

A wide range of vegetative types occur on public lands and surface lands overlying the federal mineral estate within the Study Area. The potential of locating threatened and endangered plant species in each of the areas will increase as inventories are completed. Presently, three of the five areas contain listed species and all but one, the NPA, contain federally-listed candidate species.

A federal candidate species is one that is being studied to determine if it is eligible to be listed as either threatened or endangered. A list of special status plant species and their occurrence by Resource/Planning Area is shown in Table 3-1. Special status species include federally-listed threatened and endangered species and federal candidate species (see Appendix P). Species that are listed as threatened or endangered are protected under the Endangered Species Act

TABLE 3-1. A LIST OF SPECIAL STATUS PLANT SPECIES AND THEIR COMMON OCCURRENCE AMONG THE RESOURCE/PLANNING AREAS

| COMMON NAME | SCIENTIFIC NAME | STATUS | OCCURRENCE |
|---|---|---|---|
| Uinta Basin hookless cactus | Sclerocactus glaucus | FT | GSRA,SJ/SMPA |
| North Park phacelia | Phacelia formosula | FE | KRA |
| Osterhout milkvetch | Astragalus osterhoutii | FT | KRA |
| Penland beardtongue | Penstemon penlandii | FT | KRA |
| Mancos milkvetch | Astragalus humillimus | FE | SJ/SMPA |
| Knowlton cactus | Pediocactus knowltonii | FE | SJ/SMPA |
| Spineless hedgehog cactus | Echinocereus triglochidiatus | FE | SJ/SMPA |
| Mesa Verde cactus | Sclerocactus mesae-verdae | FT | SJ/SMPA |
| Harrington beardtongue | Penstemon harringtonii | FC | GSRA,KRA |
| Parachute beardtongue | Penstemon debilis | FC | GSRA |
| Phacelia | Phacelia submutica | FC | GSRA |
| Penland eutrema | Eutrema penlandii | FC | KRA |
| Hamilton milkvetch | Astragalus hamiltonii | FC | LSRA |
| Ownbey thistle | Cirsium ownbeyi | FC | LSRA |
| Gibbins penstemon | Penstemon gibbensii | FC | LSRA |
| Mancos columbine | Aquilegia micrantha | FC | SJ/SMPA |
| Cronquist milkvetch | Astragulus cronquistii | FC | SJ/SMPA |
| Schmoll milkvetch | Astragalus schmolliae | FC | SJ/SMPA |
| Mancos saltbush | Atriplex pleiantha | FC | SJ/SMPA |
| Kachina daisy | Erigeron kachinensis | FC | SJ/SMPA |
| Pagosa gilia | Ipomopsis polyantha | FC | SJ/SMPA |
| Frosty bladerpod | Lesquerella pruinosa | FC | SJ/SMPA |
| Paradox lupine | Lupinus crassus | FC | SJ/SMPA |
| Dolores Skeleton plant | Lygodesmia doloresensis | FC | SJ/SMPA |
| Porter's needlegrass | Ptilagrostis porteri | FC | KRA |
| Small flowered beardtongue | Penstemon parviflorus | FC | SJ/SMPA |
| Mesa Verde stickseed | Hackelia gracilenta | FC | SJ/SMPA |
| Wetherill milkvetch | Astragalus wetherillii | FC | LSRA |

Codes:
FE = Federally endangered species
FT = Federally threatened species
FC = Federal candidate species

BLM_0005731

AFFECTED ENVIRONMENT

(ESA). Although candidate species are not protected by the ESA, they are afforded protection through BLM policy.

The Colorado Natural Areas Program (CNAP) maintains a list of plant species of special concern to the state of Colorado. These species are not protected by state statute but are provided appropriate protection by the BLM.

The major vegetative types on public lands are described by Resource/Planning Area.

## Glenwood Springs Resource Area

Major vegetative types occurring in this area include: mountain shrub--20 percent, semi-desert shrub--27 percent, conifer woodland--39 percent, conifer forest--six percent, and broadleaf tree/riparian--seven percent. Grasslands and riparian areas also occur on public lands, but they make up one percent.

The mountain shrub community is composed primarily of oakbrush and service berry. It provides a very important source of food and cover especially during the fall, winter, and spring months for many species of wildlife, and nongame species. This habitat type is currently being lost to housing development on private lands.

The semi-desert shrub community is composed primarily of sagebrush, with lesser amounts of greasewood and saltbush.

The conifer community is composed of two distinct habitat types--conifer forest (spruce-fir) and conifer woodland (pinyon-juniper). The conifer forest provides thermal and hiding cover and some food during the summer months for wildlife, and nesting habitat for a variety of birds and small mammals. The conifer woodland habitat type provides very important winter thermal and hiding cover and food for many wildlife species. Changes occur in the conifer habitats as a result of fuel wood cutting, timber harvesting, pine beetle infestations, and urban development.

Aspen stands and riparian-related species such as cottonwood, willow, grass, and forb are a small but significant vegetative type. Aspen stands provide food and cover for a wide variety of wildlife and livestock. Elk calving areas in this Resource Area are almost always associated with aspen benches. Riparian-related vegetation provides essential food, cover, and nesting habitat for many aquatic and semi-aquatic wildlife species. Although insignificant in overall acreage, it is used by about 75 percent of the wildlife species sometime during their life cycle and provides soil stabilization.

In this Resource Area, most of the riparian habitat occurs on private land along the major rivers and their tributaries. The most important riparian habitat on public land occurs along the Colorado River from Glenwood Springs west to the Resource Area boundary. Throughout the Resource Area, some riparian habitat has been severely impacted by road construction, gravel extraction, water diversions, and livestock grazing.

The following plant species are known or suspected to occur in the Resource Area. All of the listed plants are protected by the BLM. Appendix K contains a complete list of all federal and state species. They are shown on Map K-1 (Appendix K). An Ex-Candidate species is one that was previously considered by the U.S. Fish and Wildlife Service (USFWS) as a candidate for either threatened or endangered status but was found to be abundant and not in immediate danger.

## Kremmling Resource Area

There are 13 distinct vegetative types, four of which account for more than 90 percent of the total vegetative cover in the Resource Area. These four types include sagebrush (58 percent), irrigated meadow (14 percent), lodgepole pine (13 percent), and quaking aspen (7 percent). There is a consistent trend in the distribution of the four major vegetative communities throughout North Park and Middle Park. The lower elevation basins are dominated by steppe vegetation, consisting primarily of rolling sagebrush hills and alluvial terraces formerly converted from sagebrush to irrigated meadow. At the higher elevations, this steppe vegetation gives way to expansive forested areas dominated by lodgepole pine. Sagebrush communities constitute the most characteristic vegetation of the drier valley, terrace, bench, and foothill terrain, which ranges between 7,000 and 10,000 feet in elevation.

BLM_0005732

## CHAPTER THREE

Although riparian vegetative types account for only about one percent of the total land coverage, they are one of the most important ecological components of the local environment. They provide water and shade for domestic livestock, valuable nesting areas for raptors and other birds, and food and cover for many species of riparian communities. They often form a complex biotic network with the streams along which they are found. This riparian/stream interaction is necessary to maintain acceptable water quality and suitable habitat for fish and other aquatic organisms.

Poisonous plants are prevalent throughout the Resource Area, although few areas contain concentrations of poisonous species large enough to seriously threaten livestock or wildlife.

### Little Snake Resource Area

Eleven different vegetative types, based on major plant communities, have been identified within the Resource Area. Estimated acreages for these are shown in Table 3-2. Improved pastures, sprayed areas, burns, and other manipulated (treated) sites are included in the acreages for each vegetative type.

No federally-listed endangered or threatened plant species are known to occur in the Resource Area. However, four species that are candidates for listing as endangered occur in Moffat County.

The Resource Area also contains a number of plants on the Colorado BLM sensitive plants list, all of which are usually found in somewhat remote, isolated, and relatively inaccessible areas (see Table L-1,

TABLE 3-2. ESTIMATED PLANT COMMUNITY ACREAGES

| Community Type | Acres |
|---|---|
| Sagebrush | 711,900 |
| Salt Shrub | 137,400 |
| Pinyon-Juniper | 244,700 |
| Greasewood | 28,100 |
| Conifers | 23,700 |
| Aspen | 14,300 |
| Mountain Shrub | 16,100 |
| Grasslands | 5,600 |
| Riparian | 3,000 |
| Badlands | 22,000 |
| Miscellaneous Landforms | 48,400 |

Note: acreage figures are approximate.

Appendix L). Potential habitat for these sensitive plants are not completely inventoried.

### Northeast Planning Area

The vegetative communities existing on public lands or subsurface estate in the Planning Area has never been completely inventoried and mapped. Major vegetative types occurring are plains grasslands, foothills grasslands, riparian, and forest lands. Croplands are widespread. The plains grasslands are primarily shortgrass in the western portion dominated by blue grama and buffalo grass. Eastward the vegetation changes to a sandsage-bluestem prairie of medium tall grasses with small shrubs. Dominate species include bluestems, prairie sandreed, and sand sage. Foothills grassland and mountain shrub lands occupy the transition zones between plains grassland and forest types. Grassland types are typified by various wheatgrasses, brome, needlegrass, and several forbs. Various shrubs are also common, including mountain mahogany and Gambel's Oak. Riparian vegetation occurs along streams, drainage ways, and around reservoirs. Large streams and flood plains support overstories of cottonwoods and understories of willows, water tolerant grasses, and sedges. Willows are also found along narrow stream channels and in the foothills. Alder often occurs in association with willows.

No known threatened or endangered species exist on public lands in the Planning Area. The extent to which such plants may occur on private or state lands overlying federal mineral estate has not been inventoried.

### San Juan/San Miguel Planning Area

This area contains seven major vegetative types (see Table 3-2). Of these, three types account for 87 percent of the vegetation present--(1) pinyon-juniper woodland (60 percent), (2) sagebrush-grassland complex (18 percent), and (3) salt desert shrub (nine percent).

Riparian vegetation is present throughout the Planning Area in association with river bottoms and other perennial and intermittent streams. Totalling less than one percent of

3-8

BLM_0005733

**AFFECTED ENVIRONMENT**

the land acreage in the area, riparian vegetation still is a vital ecological component of the environment. It provides many valuable and diverse habitat features essential to many species of terrestrial and aquatic wildlife. Overall, the riparian vegetative type has a high potential for recovery and improvement following disturbance.

Sagebrush-grassland community is the major vegetative type in the upper valleys and basins with terrain ranging between 5,000 and 7,500 feet in elevation. Large areas in this vegetation complex are classified as crucial winter range for several big game species. Areas at higher elevations with higher precipitation and deeper soils have a good potential for recovery and revegetation subsequent to disturbance.

Salt desert shrub community is confined to elevations between 4,500 and 6,000 feet. These communities are characterized by soils with high salt content and have a limited potential for vegetation production, recovery, and revegetation following disturbance.

Mountain shrub community is confined to the upper foothill zone and the lower edge of higher mountain topography. Elevation ranges between 6,000 and 9,000 feet. The mountain shrub type is typified by vegetative species that are important forage and cover for many wildlife species. Most mountain shrub communities are located on steep slopes within a broken topography; thus, the revegetation potential is limited.

Pinyon-juniper community is found between 5,000 and 7,800 feet in elevation. This vegetative type contains important cover and forage for many wildlife species. Large contiguous blocks of operable pinyon-juniper woodland pose a reclamation problem because of the long growing rotation (150 years). Stands of poor commercial value typically occur on more marginal soils and in areas of lower precipitation, which limits the revegetation and reclamation potential.

Conifer forest, predominantly ponderosa pine and Engelmann spruce-subalpine fir, constitutes five percent of the total land acreage in the Planning Area. Ponderosa pine, found from 7,800 feet to 9,000 feet in elevation, is a valuable timber resource and also important habitat for many wildlife species. Because it occurs on deeper soils and higher precipitation areas, the reclamation potential in ponderosa pine type is good. Spruce-fir occurs from 9,000 to 11,000 feet in elevation. However, the high elevation and difficult access limited the use of the forest type in the past, but it is presently emerging as one of the more important timber resources.

Alpine tundra communities provide important big game summer forage. They constitute four percent of the Planning Area and are found between 11,000 feet and 14,000 feet in elevation. Alpine tundra communities consist of many high altitude species of sedges, grasses, forbs, and shrubs. Many areas above timberline are steep, rocky, and essentially devoid of vegetation. Due to the high altitude, short growing season, and

TABLE 3-3.  VEGETATION TYPES AND SUBTYPES--SAN JUAN/SAN MIGUEL PLANNING AREA

| Type | Acreage (percent of total vegetation) | Subtype |
|---|---|---|
| Pinyon-juniper woodland | *599,800 (60) | Pinyon pine & juniper |
| Conifer forest | 52,800 (5) | Ponderosa pine, Engelmann spruce-subalpine fir, & Douglas-fir |
| Sagebrush-grassland | 181,800 (18) | Big & black sagebrush, winterfat, short, mid, and tall grass spp. |
| Salt desert shrub | 88,400 (9) | Shadscale, mat & four-wing saltbush, & black greasewood |
| Mountain shrub | 24,400 (3) | Oakbrush, mountain mahogany, service berry, willows, & bitterbrush |
| Alpine tundra | 40,000 (4) | Sedges & high altitude grass spp. & forb spp. |
| Riparian | 6,800 (1) | Sedges, rushes, willows, cottonwood alder, and birch |
| Total acreage | 994,000 | |

*This figure includes 4,500 acres of aspen.
Source: BLM Data, 1989.

BLM_0005734

**CHAPTER THREE**

poorly developed soils, the reclamation potential in the alpine tundra type is seriously limited.

## LIVESTOCK GRAZING

Livestock grazing is a widespread use of the public lands. Although most western Colorado ranchers obtain only a small proportion (20 percent or less) of their annual forage requirements from the public lands, these lands fill an important niche in their operations. Typically, public lands are used for spring and fall grazing. Ranchers winter their livestock on their private property and then move them onto public lands in the spring enroute to higher elevation National Forest lands where they graze during the summer. In fall, the livestock are moved back again onto public lands enroute to private land for the winter season. Some BLM lands are used for grazing in the summer and others are used as winter grazing. Use of public land is important because it allows ranchers a place to graze their livestock where they need to rest their privately-owned irrigated meadows for producing hay to be fed during the winter.

In northwest Colorado, the public lands are used mostly as winter sheep and cattle ranges. Sheep are usually moved to Forest Service permits after lambing on public lands, while cattle generally remain on summer BLM permits.

The following table displays the numbers of operators, animal unit months (AUMs), acres of public land grazed, and numbers of livestock grazed. The numbers of livestock are approximate and will vary considerably depending on length of seasons.

As indicated in Table 3-4, a significant amount of sheep use occurs within the GSRA, LSRA, and SJ/SMPA. In these areas, public lands provide spring lambing

areas. These are areas where the livestock operator can distribute sheep herds in a manner conducive to lambing. These lambing areas range from 500 to 34,000 acres. In the LSRA, for example, there are about 440,000 acres used for lambing.

## WILDLIFE

Habitat management emphasis is placed on fish and wildlife species as determined by their by legal status (special status species), esthetics, biological diversity, and commercial value that are of interest to the public and other federal and state agencies. BLM public land is essential in providing habitat requirements for over 650 species of fish and wildlife. For most wildlife species, specialized habitats are required for carrying out certain biological functions and if lost or altered, would adversely affect these species. These habitats are defined as crucial areas and are commonly referred to as winter ranges, birthing areas, migration routes, breeding grounds (leks), nesting, and roost sites.

Fish and wildlife information specific to a Resource Area is presented in Appendices K-M. Additional wildlife species' distribution maps can be reviewed at the Resource Area Office. These distribution maps are contained within the Wildlife Section of each Resource Management Plan prepared for that Resource Area administrated unit.

A list of special status animal species and their occurrence by Resource Area is shown in Table 3-5. Special status species include federally listed threatened and endangered species and other species of plants and animals of special concern (see Appendix P). Federal candidate species have no legal protection under the Endangered Species Act (ESA). In order to carry out the BLM's responsibilities of the ESA, it is our policy to avoid actions that may impact federally listed

**TABLE 3-4. LIVESTOCK GRAZING**

| | Glenwood Springs | Kremmling | Little Snake | Northeast | San Juan/ San Miguel |
|---|---|---|---|---|---|
| Acres of Public Land Grazed | 516,000 | 355,798 | 1,317,000 | 5,308 | 937,000 |
| Number of Operators | 172 | 148 | 254 | 26 | 176 |
| Total AUMs | 56,885 | 42,395 | 166,895 | 936 | 64,233 |
| Number of Livestock | | | | | |
| Cattle | 12,889 | 30,000 | 17,000 | 90 | 13,328 |
| Sheep | 9,326 | 200 | 95,000 | 0 | 12,847 |
| Horses | 7 | 70 | 990 | 0 | 161 |

BLM_0005735

## AFFECTED ENVIRONMENT

TABLE 3-5.  A LIST OF FEDERAL SPECIAL STATUS ANIMAL SPECIES AND COMMON OCCURRENCE AMONG THE FIVE RESOURCE/PLANNING AREAS

| COMMON NAME | SCIENTIFIC NAME | STATUS | OCCURRENCE |
|---|---|---|---|
| Bald eagle | Haliaeetus leucocephalus | FE,S | All |
| Peregrine falcon | Falco peregrinus | FE,S | All |
| Black-footed ferret | Mustela nigripes | FE | Unknown |
| Colorado squawfish | Ptychocheilus lucius | FE,S | KRA,LSRA |
| Humpback chub | Gila cypha | FE,S | KRA,LSRA |
| Bonytail chub | Gila elegans | FE,S | KRA,LSRA |
| Razorback sucker | Xyrauchen texanus | FC,S | GSRA,LSRA |
| Colorado cutthroat trout | Salmo clarki pleuriticus | FC,S | GSRA,KRA |
| Boreal western toad | Bufo boreas boreas | FC | KRA,SJ/SMPA |
| White-face ibis | Plegadis chihi | FC | KRA,NPA,SJ/SMPA |
| River otter | Lutra canadensis sonorae | FC,S | SJ/SMPA |
| North American lynx | Felis lynx canadensis | FC,S | KRA,SJ/SMPA |
| North American wolverine | Gulo gulo luscus | FC,S | KRA,SJ/SMPA |
| Preble's meadow jumping mouse | Zapus hudsonius preblei | FC | NPA |
| Mountain plover | Charadrius montanus | FC | NPA |
| Long-billed curlew | Numenius americana | FC | NPA,SJ/SMPA |
| Colorado burrowing mayfly | Ephemera compar | FC | NPA |
| Lost Ethmiid moth | Ethmia monachella | FC | NPA |
| Regal fritillary butterfly | Speyeria idalia | FC | NPA |
| Southwestern willow aycatcher | Empidonax trailii | FC | SJ/SMPA |
| Texas horned lizard | Phrynosoma cornutum | FC | SJ/SMPA |
| Swift fox | Vulpes velox | FC | KRA, SJ/SMPA |
| Stevens' tortricid moth | Decodes stevensi | FC | NPA |
| Mexican spotted owl | Strix occidentalis lucida | PL | SJ/SMPA |
| Ferruginous hawk | Buteo regalis | FC | KRA,LSRA,NPA,SJ/SMPA |
| Greater sandhill crane | Grus canadensis tabida | S | LSRA |

FE = Federally endangered species
FC = Federal candidate species
PL = Proposed for listing
FT = Federally threatened species
S  = State listed species
All = All five Resource/Planning Areas.

candidate species and state listed species contributing to the need for future listing of a species as threatened or endangered.

## Glenwood Springs Resource Area

Big Game

Mule deer and elk are the most common big game species in the area. BLM public lands in the Resource Area supports a significant portion of the wintering population of mule deer and elk. Approximately 400,000 acres of deer winter range is on public land of which 208,000 acres is considered to be crucial winter habitat.  In the Castle Peak and Eagle-Vail areas, a major migration route is classified as crucial habitat.  Approximately 3,500 mule deer migrate from summer range in the Gore Mountain Range to winter range in the Gypsum and Eagle areas.

Elk populations have increased from the early 1960s to 1987. There was an overall increase of 128 percent in the last 30 years. Estimated elk winter range on the public land is 304,000 acres of which 155,000 acres is considered crucial winter habitat.

Rocky Mountain bighorn sheep reintroduction began in 1975 and currently, 26,000 acres of public lands are occupied by bighorn sheep or is considered as potential habitat.

3-11

BLM_0005736

## CHAPTER THREE

### Birds

Sage grouse can be found near Debeque, in much of Eagle County, and in southern Routt County. The majority of the population in Eagle County is totally dependent on public lands for all of their habitat requirements. The most crucial habitats are the wintering, strutting (leks) and brood rearing habitats. Limiting factors to the population are a loss/declining condition of the winter and brood rearing habitat.

Waterfowl are primarily found in wetland areas. Most wetland occur as river bottoms, resulting in waterfowl populations being closely associated with riverine systems.

The more common raptors that breed and nest in the area are prairie falcons, red-tailed hawks, northern harriers, and golden eagles. Precipitous rock formations, large trees, and mountain meadows provide suitable nesting habitat for these species. The numerous songbirds and small mammal populations provide the prey base available to these raptors. Woodland nesting species such as goshawks, Coopers hawks, and sharp-shinned hawks are common in the forested area. For these various raptor species, 214 nest sites have been documented in the Resource Area.

### Aquatic Habitat

Aquatic and riparian habitat of portions of 56 streams (totaling 126 miles) and five lakes occur on public land and support a fishery resource. In addition, six streams (5.1 miles of public land frontage) that do not presently support a fishery have potential for introducing a fishery. The most productive fisheries occur in the Colorado, Roaring Fork, Eagle, Fryingpan, Piney, and Crystal Rivers, which make up about 32 percent of the total public land stream frontage providing an existing fishery. A relatively minor amount of the total miles of rivers and streams in the Resource Area occurs on public land. Most streams tributary to the major rivers sustain a self-perpetuating fishery or are stocked regularly by the Colorado Division of Wildlife.

### Special Status Species

The bald eagle, a federally listed species are common throughout the winter months.

Three historic bald eagle nests are located in the Resource Area, two of which occur on public land. Several sightings of peregrine falcons have been reported in the past; however, no active nests are known at this time. A number of known historic nest sites exist in the Resource Area, and several potential nesting sites for peregrine falcon introduction have been identified on public land.

Six of the known active heron nest sites in Colorado occur along the Colorado River within the Resource Area, with a majority of this use occurring from New Castle west to the Resource Area boundary.

Historically, the squawfish, humpback chub, and bony-tailed chub were thought to inhabit the Colorado River as far east as Rifle. Presently, none of these species are thought to occur in the Resource Area. All three species are listed as both federal and state endangered species. The razorback sucker, although once inhabiting the Colorado River as far east as Rifle, is thought now to occur only as far east as Rulison. This species is classified federally as a candidate species and as endangered by the state. The Colorado River cutthroat trout, once listed as threatened by the state is now classified federally as a candidate and as a State Species of Special Concern. Current information indicates that this species is located in nine streams and one lake on public land in the Resource Area. Appendix K, Table K-1, lists the streams and stream mileage on public lands where the Colorado River cutthroat trout occurs, the year sampled, and the rating.

## Kremmling Resource Area

### Big Game

Mule deer, pronghorn antelope, and elk are the most common large mammals found in the area. Mule deer and elk occupy higher elevations, usually forested habitat, during summer and then migrate to lower elevation sagebrush dominant ridges and slopes to winter. BLM public lands provide the vast majority of winter range available to deer and elk in the Resource Area. Pronghorn antelope are found in North Park (including the Laramie River drainage) and in portions of Middle Park.

BLM_0005737

## AFFECTED ENVIRONMENT

Winter ranges for elk, mule deer, and pronghorn antelope are crucial in maintaining wintering populations and are located on sagebrush dominant ridges and south-facing slopes at lower elevations throughout the Resource Area.

### Birds

Upland game birds common to the Resource Area include blue grouse and sage grouse. Blue grouse are widely distributed throughout the higher elevation woodlands and mountain meadows. Sage grouse occupy the lower elevation sagebrush-dominant rangelands throughout the Resource Area. Sage grouse depend almost entirely on the sagebrush ecosystem for successful breeding, nesting, and winter survival. The North Park sage grouse population has been extensively studied for the past ten years. The breeding and courtship areas are called leks and have been found to be essential in maintaining sage grouse populations. There are approximately 40 known leks in the Resource Area on public lands. The majority of the leks occur in North Park. Associated within a two-mile radius of these leks are important nesting areas (Schoenberg 1982).

The numerous streams, rivers, reservoirs, ponds, and associated riparian vegetation provide excellent habitat for a wide variety of waterfowl and shorebirds. Puddle ducks, including mallards, pintail, gadwall, greenwinged teal, and American widgeon, are common throughout the aquatic habitats in the Resource Area. North Park is particularly important because its waterfowl production is the second highest of any area in Colorado. Shorebirds are common in association with the numerous water bodies. Greater sandhill cranes known to nest in the southwest quadrant of North Park. Killdeers, American avocets, willets, and Wilson's phalaropes are among the more common shorebirds found.

Common raptors are prairie falcons, red-tailed hawks, northern harriers, and golden eagles that breed and nest in the area. Precipitous rock formations, large trees, and mountain meadows provide suitable nesting habitat for these species. The numerous songbirds and small mammal populations provide the prey base available to these raptors. Woodland nesting species such as

goshawks, Coopers hawks, and sharp-shinned hawks are common in the forested areas.

### Aquatic Habitat

The fishery resource in both streams and lakes contain naturally reproducing populations of game fish. Limited fish stocking occurs in reservoirs by the Colorado Division of Wildlife. Major fish species are rainbows, cutthroat, and brook trout with a lesser number of brown trout.

### Special Status Species

The bald eagle, an endangered species, is a fairly common winter resident along the Colorado River and several major tributaries in Middle Park. Migrant bald eagles are observed annually in North Park and occasionally in the Laramie River drainage. Peregrine falcons are observed in migration in Middle Park and North Park; however, no established use has been recorded even though apparent suitable habitat exists. Crucial habitats for bald eagles and peregrine falcons are not known to occur in the Resource Area. The Colorado squawfish, humpback chub, and bonytail chub may occur in the Resource Area; however, these threatened and endangered species have not been recently recorded. Federal candidate species that may occur are the Colorado cutthroat trout, Boreal western toad, white-faced ibis, and ferruginous hawk.

## Little Snake Resource Area

### Big Game

The primary big game species in the Resource Area are elk, mule deer, and pronghorn antelope. Most elk populations within the area are migratory. Summer ranges occur at the higher elevations in the aspen and conifer habitat types of the Cold Spring and Douglas Mountain area and in the Routt and White River National Forests. In the fall, elk move to the lower elevations occupying mountain shrub and sagebrush wintering habitats. Small resident elk herds occur on Cold Spring Mountain and in the Middle Mountain-Diamond Peak area. Crucial winter ranges for elk are located south and west of Craig in Williams Fork Mountains and Williams Fork River drainage and extend westward along the Yampa River,

3-13

BLM_0005738

## CHAPTER THREE

including Iles and Duffy Mountains and Axial Basin. Northeast of Craig, elk severe winter range extends from the Battle Mountain-Slater area westward to Fourmile Creek and south to Fortification Creek and Cottonwood Gulch.

Mule deer are common in nearly all habitat types. Many migrate between aspen/conifer summer ranges and sagebrush/mountain shrub winter ranges. Some occupy shrub lands year-round. The majority of public land in the Resource Area is considered to be wintering habitat for mule deer because of snow depths that limit forage availability. Crucial deer winter ranges are located along the lower Williams Fork drainage and the Yampa River drainage, from its confluence with Williams Fork to the Little Snake River, including Isles Mountain, Duffy Mountain, Little Yampa Canyon, Axial Basin, the foothills of Juniper Mountain, and Cross Mountain. The range continues up the east side of the Little Snake River and incorporates Godiva Rim and the northern Great Divide area and lower Scandinavian Gulch. Another crucial winter range is located in the Big Gulch-Cottonwood Gulch and Fortification Creek area northeast of Craig.

Pronghorn antelope are common year-round throughout the lower elevation habitats that consist primarily of sagebrush, saltbush, and greasewood. Some herds are migratory and move to winter concentration areas. Movement patterns may be influenced and altered by man-made barriers such as fences, roads, and canals. Crucial winter range includes much of the Sand Wash area and along the entire length of the Little Snake River within about two to five miles on either side of the river channel. It also extends to the lower Fourmile Creek and West Timberlake Creek drainages.

### Birds

Upland game bird species include sage grouse, sharp-tailed grouse, blue grouse, and chukar partridge. Sage grouse occur throughout the sagebrush habitat and are dependent on sagebrush for food and cover. The large contiguous stands of sagebrush contains the largest population of sage grouse in Colorado. Sage grouse concentrate on strutting grounds or leks which they use annually for mating displays. Strutting grounds, wintering areas, and nesting and brooding areas are crucial to population survival. There are 126 total known strutting grounds in the Resource Area of which 38 are on public land. Most nesting activity takes place within a two mile radius of the lek making such areas biologically important for sage grouse.

Sharp-tailed grouse occur in the eastern one-third of the Resource Area and are frequently associated with agricultural land. Like sage grouse, sharp-tailed grouse breeding, nesting, and brood rearing are associated with leks or dancing grounds. There are 31 known leks on public lands within the Resource Area

Excellent habitat for raptors exist because of the low human densities coupled with quality nesting habitats and abundant prey species. The northwestern corner of the Resource Area north of the Yampa River and west of the Little Snake River contains considerable high quality habitat, however, less than ten percent of the area has been formally surveyed. Currently, 1,201 raptor nests have been documented. Most common raptor species are golden eagle, ferruginous hawk, red-tail hawk, prairie falcon and several species of owls.

### Aquatic Habitat

There are about 150 miles of perennial streams and rivers that include the Yampa, Williams Fork, and Little Snake Rivers, and Beaver, Willow, Talamantes, and Vermillion Creeks. Game fish are limited primarily to the Yampa River, which supports catfish, pike, and brown trout; and Beaver Creek, which contains brown, brook, and cutthroat trout. The Yampa River ranges from poor to average in fisheries quality in the Resource Area according to the Colorado Division of Wildlife stream rating (Sealing 1981). Beaver Creek is considered above average and is one of the few natural trout fisheries in the Resource Area. Riparian communities, although limited in quantity and quality, provide habitat for a large number of wildlife species and represent a highly important resource within the Resource Area.

### Special Status Species

The bald eagle, American peregrine falcon, Colorado squawfish and humpback chub are

3-14

BLM_0005739

## AFFECTED ENVIRONMENT

the known federally listed threatened and endangered to occur on public land.

The Yampa and Little Snake Rivers provide habitat for the Colorado squawfish and humpback chub. The razorback sucker, which is listed by the state of Colorado as threatened and is proposed for federal listing as endangered, is known to occur in the lower 13 miles of the Yampa River (Tyus and Karp 1989). The Colorado squawfish is distributed in the mainstream Yampa River from its mouth upstream to Craig, Colorado, and approximately 14 miles up the Little Snake River. In the summer of 1990, however, one adult squawfish was found in the Little Snake River in Wyoming just downstream from the town of Baggs (H. Tyus, personal communication). Humpback chubs are found in canyon-bound habitats in the lower 56 miles of the Yampa River, which includes Cross Mountain Canyon, and in the lower 10 miles of the Little Snake River.

The black-footed ferret, an endangered species, is often reported as being sighted, however these sightings have not been confirmed. The abundance of prairie dog colonies in the western portion of the Resource Area is potential habitat for the reintroduction of the black-footed ferret. Current habitat suitability studies and evaluations are being conducted for the potential reintroduction of the black-footed ferret by BLM, Colorado Division of Wildlife, and U.S. Fish and Wildlife Service.

The bald eagle is a winter resident and occasionally breeds within the Resource Area. Currently, two bald eagle nests are known to be active. Winter roost sites are located along the Little Snake, Yampa, and Williams Fork Rivers in the riparian cottonwood trees. A total of 17 documented roost sites are located along the Yampa River from just below its confluence with the Williams Fork River downstream to about the town of Sunbeam. Sites are located on BLM, National Park Service, and private lands.

The American peregrine falcon is known to nest within Dinosaur National Monument and Cross Mountain. One active eyrie has been occupied every year since it was documented in 1987.

Crucial habitat for a state listed endangered bird, the greater sandhill crane, occurs in Routt and Moffat Counties. This bird nests along willow lined drainages in the riparian habitat. Approximately 700 acres of BLM land along Willow Creek and Red Creek, south of Steamboat Lake in northeastern Routt County, is crucial habitat for feeding, dancing, and nesting activities of the sandhill crane.

## Northeast Planning Area

### Big Game

Mule deer, white-tailed deer, pronghorn antelope, elk, and Rocky Mountain bighorn sheep are the most common big game species found on public land. Crucial winter range for mule deer as well as winter range for elk occurs along the Front Range.

### Birds

The large irrigation reservoirs along the South Platte River are important for many nongame bird species including white pelicans, great blue herons, double crested cormorants, snowy egrets, cattle egrets, and black-crowned night herons. Common raptor species are golden eagles, Swainson's hawks, red-tailed hawks, marsh hawks, and in the winter, rough-legged hawks.

### Aquatic Habitat

Several plains reservoirs contain a cold and warm water fisheries. The major species are bass, walleye, catfish, perch, and crappie. Several streams along the Front Range support cold water fisheries. The major species are brook, brown, and rainbow trout. The major waterways going through public land are Clear Creek, Bard Creek, Mill Creek, Fall River, Deer Creek, South Boulder Creek, and Left Hand Creek.

### Special Status Species

Two federally listed endangered species, the bald eagle and peregrine falcon, are known to migrate through the Resource Area.

The South Platte River drainage and associated reservoirs are crucial winter habitat area for bald eagles. The mid-winter survey along the South Platte River drainage usually results in observing between 60 and 80 bald eagles. Potential peregrine falcon eyrie sites

BLM_0005740

**CHAPTER THREE**

occur along the Front Range. Cathedral Spires, a currently unoccupied historical eyrie, occurs on public land along the North Fork of the South Platte River.

Two state threatened fish, the orangethroat darter and the Arkansas darter, occur in the Resource Area. The Arkansas darter is found in Big Sandy Creek, and the orangethroat darter in the Republican and Arikaree Rivers. The greater prairie chicken, a state endangered species, inhabits areas in Yuma and Logan Counties that are subject to leasing of federal mineral estate.

## San Juan/San Miguel Planning Area

### Big Game

Mule deer and elk are found as year-round residents on public land with large wintering concentration of deer and elk in the northwest portion of the Resource Area. Both species tend to migrate between forested lands at higher elevations in the spring and summer to woodlands at lower elevations in the fall and winter. Average herd densities are relatively low in summer (two-three deer/square mile) due to the large amount of available habitat. Winter herd densities may exceed 200 deer per square mile on some crucial winter ranges because snow depths limit habitat availability. Migration between winter and summer ranges may exceed 50 miles in this region.

### Birds

Sage and blue grouse, chukar, quail, wild turkey, ptarmigan, and pheasant are present in small numbers and scattered throughout the Resource Area. Pheasants are mainly dependent on nearby agricultural land, while the others are associated with native rangeland, alpine, and forest type habitats. Sage grouse leks and nesting habitat have been identified in the vicinities of Dry Creek Basin and Miramonte Reservoir.

### Aquatic Habitat

There are an estimated 500 miles of stream habitat on public lands. The Dolores River has an estimated 120 miles of aquatic and riparian habitat, San Miguel River has 25 miles, and the Animas River nearly 16 miles of aquatic resources. The remaining miles of stream habitat are principally those tributaries

associated with these three major drainages. The current aquatic habitat condition ratings for 144 miles of stream habitat are shown in Table M-2, Appendix M. The major game species observed in the streams was rainbow trout. Some of the streams also contained brook, brown, and cutthroat trout. Other species included suckers, shiners, cottids, and some species that remain unidentified.

### Special Status Species

Bald eagles, federally listed endangered species, have historically nested along the rivers in the Resource Area. The impoundment of rivers and development of storage reservoirs has created additional nesting habitat. Two nest sites have been identified on public lands, but potential habitat exists in several areas (near Vallecito and Lemon reservoirs northeast of Durango and near Summit Lake, north of Mancos). Most bald eagle activity on public land occurs from November through April when birds from northern states migrate into the area. The largest concentration of bald eagles are in the Disappointment Valley and Dry Creek Basin. Communal roosts are found in the San Miguel River canyon.

The American peregrine falcon, a federally listed endangered species, is common to the Resource Area. At least eight nesting sites are known. Two of these sites have ongoing falcon reintroduction programs and a third site is under consideration for possible reintroduction efforts (Chimney Rock, Durango, and Mesa Verde sites) (Langlois 1983).

The extreme eastern portion of the Resource Area and most of the Silverton area are included in the migration route of the Grays Lake whooping crane flock along with the greater sandhill cranes. The sandhill cranes are being used to foster whooping cranes in an experimental program to assist the recovery of the whooping crane species. Greater sandhill cranes, a Colorado endangered species, once nested in the Silverton Planning Area in willow-lined drainages and meadows up to 9,500-foot elevation. Occupied nesting ranges have been reduced to the northwestern part of the state.

Mexican spotted owls have been reported to occur at Mesa Verde in ponderosa pine and

BLM_0005741

## AFFECTED ENVIRONMENT

Douglas-fir habitat (G. Craig, CDOW, personal communication 1983). Similar habitat sites occur on Weber and Menefee mountains, in the Dolores River Canyon, and near Durango. Limited inventories have been conducted for this species in the Resource Area.

River otters, federal candidate species, were known to have occurred in the Dolores and San Miguel River drainages. River otters have been introduced to the Piedra River and the Dolores River by the Colorado Division of Wildlife.

## WILD HORSES

LSRA and SJ/SMPA are the only two areas that contain wild horses.

The LSRA currently manages a wild horse herd, amounting to several bands within the Sand Wash Basin. The herd level objective is to control and maintain approximately 160 horses. The herd management area is predominantly public lands. A total of 157,630 acres are included in the area, of which 154,940 acres are public lands (see Map L-1, Appendix L). The herd consisted of 279 horses in March of 1988, which were in small bands of five to 20 horses, located throughout the basin. Historically the annual horse numbers have fluctuated to a large extent. The census data in Table L-2 (Appendix L) has been gathered since 1971.

Wild horses are found in the SJ/SMPA at the southeast end of Disappointment Valley in Spring Creek Basin (see Map M-3,. Appendix M) which contains 35,000 acres, of which 27,000 acres (77 percent) are public lands. The herd has steadily increased from 24 head in 1971 to 65 head in 1989. One hundred-twenty head were gathered in the Spring Creek Basin area in 1985. The area was then restocked with 35 head. Currently there are approximately 80 head in the Spring Creek Basin area. Management goal for this area is an average herd size of 50 head.

## SOILS

The soils in the Study Area are highly variable in texture, depth, fertility, and age. Young soils are found in drainage ways where deposition occurs and on unstable slopes where erosion is taking place. Older soils occur on stable uplands and in higher

precipitation areas reflected by increased vegetative cover. Texture varies from fine clays, which are generally high in salts, to coarse sands, which may be wind deposited. Depth varies from shallow soils (a few inches), as on ridges and steep side slopes, to deep soils (greater than 60 inches), as found in alluvial drainages. Soil fertility may be reflected by the vegetative cover. Those with a sparse vegetative cover are not considered to be fertile soils, and the soil building processes are very slow. Those with a dense vegetative cover reflect higher fertility and faster soil building processes.

The spring thaw is when the soils are most susceptible to damage from vehicle travel or construction activities. Activities during this period could cause problems in the reclamation of a disturbed area. Increases in erosion and sedimentation are more likely during the spring thaw and periods of high runoff.

Steep, infertile and high salt content soils are classified as fragile soils. Major areas of fragile soils have been identified in the LSRA. These areas include the Danforth Hills, side slopes along drainage ways in the Vermillion Creek, Sand Wash, and the Little Snake River watersheds, and badlands throughout the Resource Area. Examples of what may happen when fragile soils are disturbed can be observed in the Danforth Hills area, where massive landsliding has occurred on side slopes associated with drill pads and access roads.

Several potential prime farmland sites exist within the Study Area. These areas exhibit very high soil productivity potential and are eligible for special designation and protection. Special stipulations on surface-disturbing activities are used to prevent any unnecessary disturbance.

## WATER

The Study Area encompasses portions of the following river basins: Colorado, North Platte, South Platte, and Green. Average annual precipitation over these basins range from 30 inches in some mountainous areas to less than 12 inches at lower elevations. Water yields range from 0.1 inch of runoff to a high of over 20 inches. The average from public lands is two inches or less. Peak flow on the main tributaries typically occurs in

3-17

BLM_0005742

**CHAPTER THREE**

May and June due to spring snowmelt.
Intense summer thunderstorms result in peak
flows on small tributaries and cause locally
severe flooding and debris flow.

Water quality is most often affected by the
geologic formations that contribute
significantly to the salinity of several basins.
The most notable is the Colorado River
Basin. Sedimentary rocks, such as the
Mancos Shale, Eagle Valley Evaporite, and
Green River, contain highly soluble minerals
that are easily leached by water passing over
or through them. Water quality
measurements by the BLM indicate salinities
(TDS) as high as 2,500 milligrams per liter
(mg/l). This is five times the recommended
drinking water standard of 500 mg/l. Values
up to 1,000 mg/l have been found to be
harmless for human consumption. Salinity
problems occur throughout the Study Area
except for the KRA. In the KRA, many of
the BLM lands are near the headwaters. The
headwaters flow over insoluble geologic
formations and have low salinity. There are
limited areas where saline springs and soluble
geologic formations contribute to salinity
problems.

Sediment yield can vary from a low of less
than 1/4 ton/acre/year to a high of 8.4
tons/acres/year. The overall average is
probably one ton/acre/year. Erosion is more
severe where ground cover is sparse.

Several critical watersheds are within the
GSRA. These are the municipal watersheds
for the cities of Rifle and New Castle. A
flow hazard zone around Glenwood Springs
is the other critical watershed. These areas
require special stipulations on any surface-
disturbing activity.

Most public land watersheds provide
important groundwater recharge and
discharge areas. These areas contribute
significantly to baseflow to the local streams
and river. The majority of the groundwater
resources have not been developed. Some
development has occurred by municipalities
and agricultural interest.

Groundwater salinity is generally higher than
surface water because it moves slower and is
in contact with soluble minerals much longer.
As an example, the Eagle River (GSRA)
received 34 percent of its annual discharge
from groundwater inflow and 58 percent of
its salt load from that same groundwater

inflow. Ranchers and farmers also use
groundwater for both domestic and
agricultural use.

The NPA has two major groundwater
regions: the South Platte River Basin and the
Northern High Plains. The South Platte
River Basin is comprised of two very
dissimilar regions: the high, rugged
mountainous headwaters to the west and the
low precipitation plains to the east. The
Northern High Plains of extreme eastern
Colorado are dissimilar to most of the water
basins in Colorado in that no streams or
rivers which cross it begin in the mountains.
The two river systems which drain the area,
Republican-Arkansas and the Smokey Hill,
leave their headwaters located approximately
70 miles east of the mountains. The relative
lack of surface water availability in these two
regions and the abundance of the
groundwater resources has resulted in
extensive development of this resource
throughout the area.

It has been estimated that upwards of 130
million acre feet of recoverable groundwater
can be expected within the South Platte River
Basin. However, due to the large size and
varying structural conditions found within the
basin, the amounts of water yielded from any
one aquifer can vary considerably within
short distances.

The principle aquifer underlying the Northern
High Plains is the Ogallala. It has about 80
million acre-feet of recoverable groundwater.
The water is generally suitable for domestic
and irrigation proposes with concentrations
of dissolved solids ranging from 100 to 500
mg/l.

# FORESTRY

Each Resource/Planning Area supports small
but active forestry programs. Both
sawtimber and firewood sales are made in
each area, except in the NPA where only
commercial and family firewood are sold.
The following describes the forest resources
in each area.

## Glenwood Springs Resource Area

The GSRA has approximately 45,640 acres
of productive forest land that supports
Engelmann spruce-subalpine fir (49 percent),

3-18

BLM_0005743

## AFFECTED ENVIRONMENT

lodgepole pine (38 percent), Douglas-fir (11 percent), aspen (11 percent), ponderosa pine (two percent), and subalpine (one percent).

The forest, in general, is healthy with the majority of stands in a mature or over mature condition. The Resource Area also supports approximately 214,310 acres of pinyon pine (44 percent) and juniper (44 percent), considered to be woodlands. An estimated 75 acres of pinyon pine and juniper are harvested annually. Annual woodland harvest averages 1,000 cords of commercial fuel wood and 500 cords of fuel wood sold under public-use permits. The pinyon-juniper forest is typified by stands of all ages and conditions but is generally exemplified by slow-growing mature stands.

### Kremmling Resource Area

In the KRA, the three major forest types are lodgepole pine, aspen, and pinyon-juniper. Lodgepole pine is found throughout most of the mountainous slopes between 8,000 and 10,000 feet. It is the most important and intensively-managed productive forest type. Four other coniferous forest types that occur in scattered pockets throughout the Resource Area are the spruce-fir, Douglas fir, ponderosa pine, and limber pine. Each of these types accounts for less than one percent of the total vegetative cover, and therefore, are not intensively managed.

Stands of quaking aspen are found on mountain slopes at nearly all elevations and under a wide range of conditions. Aspen stands have largely been maintained and preserved for their scenic, recreational, wildlife, and grazing values. However, a waferboard factory, built in Kremmling in 1983, utilizes aspen trees that generally average larger than eight inches in diameter at breast height. The pinyon-juniper vegetative type is almost exclusively confined to the drier, warmer foothills in the southwest part of the Resource Area. Commercial pinyon-juniper trees are used for firewood and fence posts.

### Little Snake Resource Area

In the LSRA, four major forest or woodland types occupy a total of 160,420 acres. These include pinyon-juniper woodlands, ponderosa pine, lodgepole pine, and aspen.

Pinyon-juniper woodland is the dominant forest type, occurring on approximately 127,730 acres in the western portion of the Resource Area. Current use of this type is for commercial and noncommercial harvest of fuel wood, fence posts, and poles.

Lodgepole pine occurs on approximately 6,800 acres. The largest concentrations of lodgepole are found adjacent to the Routt National Forest on the east side of the Resource Area and in the Diamond Peak-Middle Mountain area in the northwest corner of the Resource Area. Much of the commercial sized lodgepole is infected with mountain pine beetle and dwarf mistletoe, causing heavy mortality in sawtimber stands and dramatic growth reduction in post/pole size classes. Current use of this type is for commercial and noncommercial harvest of house logs, fuel wood, posts, and poles.

Isolated remnant stands of ponderosa pine occur on about 11,590 acres of Douglas Mountain in the southwest portion of the Resource Area. The average age of most of the sawtimber-size ponderosa is in excess of 250 years. This old age, coupled with mountain pine beetle infestation, is responsible for the present high rate of mortality of the species. Current uses include commercial harvest for sawlogs and fuel wood and noncommercial harvest of fuel wood. Aspen occurs in pure stands or mixed with lodgepole pine at elevations above 7,000 feet, and occupies approximately 14,300 acres. Current use of aspen is for noncommercial harvest of fuel wood.

### Northeast Planning Area

Forested lands in the NPA are found along the Front Range. The predominate tree species are ponderosa pine, Douglas fir, and lodgepole pine, with limber pine, sub-alpine fir, and Englemann spruce also occurring. Timber sales are small and well defined. Most of the wood is used for firewood, with about half being cut by individuals for personal use.

### San Juan/San Miguel Planning Area

The SJ/SMPA contains 44,200 acres of commercial forest base with the predominant commercial species being ponderosa pine, Englemann spruce, and Douglas-fir (see

3-19

BLM_0005744

TABLE 3-6. SPECIAL RECREATION MANAGEMENT AREAS

| Location | Name | Size (acres) | Annual Visitor Days | Major Activities/Features/Sites |
|---|---|---|---|---|
| Glenwood Springs | Upper Colorado River | 13,144 | 8,540 | Whitewater boating/ Spectacular canyons/Fishing |
| | Bull Gulch | 9,900 | 710 | Hiking/Wildlife viewing |
| | Hack Lake | 3,100 | 1,390 | Fishing/Hiking |
| | Deep Creek | 2,400 | 1,870 | Hiking/Caving/Fishing |
| | Eagle River | 1,800 | 15,465 | Fishing/Whitewater boating |
| | Thompson Creek | 4,300 | 1,070 | Hiking/Wildlife viewing/ Nature study |
| Kremmling | Upper Colorado River | 4,870 | 36,375 | Whitewater boating/ Spectacular canyons/ Developed campground/Fishing |
| | North Sand Hills | 700 | 3,670 | Off-highway vehicles/Sand dunes/Cultural resources |
| Little Snake | Upper Yampa River | 19,800 | 7,150 | Fishing/Flatwater boating/ Waterfowl viewing |
| San Juan/San Miguel | Anasazi | 156,000 | 12,620 | Viewing cultural ruins/Off-highway vehicles |
| | Alpine Triangle | 54,000 | 118,825 | Off-highway vehicles/Alpine scenery/ Historic ruins/ Camping/ Hiking |
| | Dolores River | 22,464 | 11,720 | Whitewater boating/ Fishing/ Camping/ Spectacular canyons |

Source: Recreation Information Management System (RIMS).

Map M-4, Appendix M). An estimated 9,540 acres or 22 percent of all the commercial forest base within the Planning Area are available for timber production. The remaining 34,660 acres are considered nonsuitable because of extreme topography, fragile soils, and recreational withdrawals.

Woodland species presently occupy approximately 600,000 acres of the SJ/SMPA. Approximately 67,000 acres of the woodland forests could be classified as productive, operable, and capable of being intensively managed. Under current management, no woodland acres are identified as being under intensive management. Most woodland activities have been implemented with an objective to improve range conditions. The demand for woodland products within the Planning Area has been estimated at 1,000 cords of fuel wood and 3,000 posts annually.

## RECREATION

Throughout the Study Area, outdoor recreation is an important component of local economies (see Social and Economic section). Public lands and lands overlying federal mineral ownership provide an important resource for a wide variety of recreational activities. Some of the more significant activities that may be impacted by oil and gas development are discussed. Throughout the Study Area, demand for recreational opportunities is expected to increase.

The BLM manages two types of recreational situations on public lands. Most of the public lands are managed to maintain a freedom of recreational choice with a minimum of regulatory constraints. There are few BLM recreational facilities or supervisory efforts on these lands. These areas are sometimes referred to as Extensive Recreation Management Areas (ERMAs). Where the nature of the resource attracts intensive recreational use, public lands may be managed as a Special Recreation Management Area (SRMA). These are areas where BLM makes major investments in recreational facilities and visitor assistance. Specific management direction in a SRMA is formulated by the BLM to provide for resource protection and public health, safety, and enjoyment. SRMAs within the Study Area are listed in Table 3-6.

### Glenwood Springs Resource Area

The GSRA, in addition to the SRMAs shown on Map K-10 (Appendix K) and described in Table 3-6, provides a variety of outdoor recreational opportunities and settings. This area is becoming increasingly well known for its many caves. Also, within the area are several destination resorts including Vail, Aspen, Snowmass, and Glenwood Springs which add to the recreational character and to the demand on public lands as well. State and local parks sometimes occur on lands overlying federal mineral ownership. An example of this occurs at Rifle Mountain Park. This 400-acre park receives heavy use by local residents for community gatherings, camping, hiking, and fishing.

### Kremmling Resource Area

The KRA contains an abundance of outdoor recreational opportunities. Major attractions include Rocky Mountain National Park, Arapaho National Recreation Area, several national forest wilderness areas, several major reservoirs, and the upper Colorado River. With the exception of the upper Colorado River and North Sand Hills, the major recreational features are located on lands managed by agencies other than BLM. The BLM-managed lands do play a significant supplemental role in the regional recreational setting.

In North Park, the BLM-administered lands comprise a majority of the basin and are mostly rolling, open sage country useful for dispersed recreation. In Middle Park, the BLM-administered lands are usually adjacent to national forest, except around Kremmling and along the Colorado River, and provide both access and "spill over" room for the more heavily-used areas. In addition, these public lands provide opportunities for activities such as rockhounding, off-highway vehicle (OHV) use, and wildlife viewing and hunting.

### Little Snake Resource Area

The public lands within the LSRA boundaries provide significant recreational opportunities and supplement the other better known federal agency lands such as Dinosaur National Monument, the Routt National Forest, and Browns Park National Wildlife Refuge, which all provide for a variety of recreational activities in a variety of environmental settings. Parts of the Mount Zirkel and Flat Tops Wilderness Areas lie within the area and provide undeveloped, primitive types of recreational experiences. The Steamboat Springs ski area and Steamboat Lake State Park, on the other hand, provide developed recreational areas with intensive use, as do the various towns within the Resource Area.

The BLM-administered lands generally add another dimension to the recreational opportunities available by providing unrestricted settings for a variety of dispersed recreational activities. Activities now occurring on the public lands include hunting, camping, floatboating, rockhounding/collecting, picnicking, fishing, hiking, backpacking, horseback riding, nature study, viewing wildlife, viewing cultural/historical sights, sightseeing, photography, snowmobiling, cross-country skiing, and OHV use, among others. The Yampa River has been proposed for Wild and Scenic River study.

Hunting is currently the dominant recreational activity on the public lands throughout the Resource Area. It attracts people from around the nation, giving this area national significance. Big game hunting (deer, elk, antelope) and sage grouse hunting make up the majority of use on public lands. Small game hunting (rabbit, other upland game birds, varmints, etc.) accounts for only 20 to 30 percent of the total hunting use.

### Northeast Planning Area

The NPA includes the most populated area of Colorado; however, the small quantity of public land and the scattered nature of the tracts have resulted in little dependence on BLM for recreation. Some scattered tracts of public lands are being transferred to local governments for recreational use. Because of its proximity to population centers along the Front Range, heavy recreational use is made of open space and park lands managed by state, county, and local governments. Many of these park lands contain federally-owned minerals or contain areas of federal land leased under provisions of the Recreation and Public Purpose (R&PP) Act. In either case, BLM may analyze their suitability for oil and gas leasing. Examples of such park lands include Golden Gate Canyon State Park, the

## CHAPTER THREE

city of Boulder, and Boulder County-managed open space, and Denver Mountain Parks.

### San Juan/San Miguel Planning Area

Within the SJ/SMPA, the Dolores River, from McPhee Dam to Bedrock (104 miles) has become one of the more popular boating rivers in the Southwest. In 1976, most of this river segment was recommended as suitable for Wild and Scenic River designation (33 miles classified as wild, 20 miles scenic, and 41 miles recreational), however, Congress has not yet acted.

Also the Animas River (from Silverton to Ruby Creek) is on the Nationwide Rivers inventory of potential wild, scenic, and recreational rivers, and the Animas River Valley has been identified as a potential National Natural Landmark.

The Alpine Triangle SRMA is unique because it provides a full range of recreation setting opportunities (from primitive to urban), with an equally wide distribution and public availability for activities such as wilderness recreation, jeeping, mountain climbing, backpacking, cross country skiing, historic and geologic interpretation, fishing, hunting, and scenic viewing on an area unparalleled in all of BLM's public lands. SRMAs within the Planning Area are display on Map M-5 Appendix M).

The remainder of the Planning Area provides dispersed, unstructured recreational use and opportunities. Significant public funds have been invested in the Dolores Overlook, Anasazi Heritage Center, and Lowry Ruin. These BLM facilities receive a large number of visitors.

## VISUAL

To determine visual resource values, public lands are evaluated and placed into visual resource management (VRM) classes during the Resource Management Planning (or plan amendment) process. Each VRM management class is then managed for the following objectives:

Class I--Preserve the existing character of the landscape. The level of change should be very low and must not attract attention.

Class II--Retain the existing character of the landscape. The level of change should be low and management activities may be seen but should not attract attention.

Class III--Partially retain the existing character of the landscape. The level of change should be moderate and management activities may attract attention but should not dominate.

Class IV--Provide for activities which require major modification of the landscape. The level of change can be high.

### Glenwood Springs Resource Area

The most unique scenic and sensitive areas of public land are identified for VRM Class I objectives to preserve the existing character of the landscape. In the GSRA, these include the Deep Creek, Bull Gulch and Thompson Creek areas, which are designated Areas of Critical Environmental Concern (ACEC) to protect scenic values. In addition, there are other areas, particularly along the I-70 corridor, that are managed for VRM Class II objectives to retain the existing landscape character (see Map K-11, Appendix K). Within these areas, management activities, including oil and gas development, may be seen but should not attract the attention of the casual observer.

### Kremmling Resource Area

In the KRA the majority of public lands provide the foreground and middle ground landscapes to scenic mountain vistas when viewed from major travel routes such as US Highway 40. Public lands along these travel routes and along the Colorado River are managed for VRM Class II objectives. The remainder of the public lands within the Resource Area is managed for VRM Class III and Class IV objectives.

### Little Snake Resource Area

The outstanding scenic areas in LSRA, which are highly visible in the foreground along travel routes, populated areas, and in extensive recreation areas, were designated for VRM Class II objectives to retain the natural landscape character. These areas include slopes facing U.S. Highway 40, the Yampa River, along several state highways, and county and BLM roads.

BLM_0005747

### Northeast Planning Area

Because of the amount of private land involved in the NPA, a visual resource inventory has not been done, and VRM classifications are made when activities are proposed.  In general, the public lands in the eastern plains (where oil and gas development potential is considered medium and high) are managed for VRM Class III and Class IV objectives.  Some public lands along travel routes such as the I-70 corridor and adjacent to state, county, or local parklands are managed for VRM Class II objectives.   These lands generally are considered to have little oil and gas development potential.

### San Juan/San Miguel Planning Area

Within the SJ/SMPA, approximately 96,000 acres of public land are important landscape areas.  The Dolores River Canyon WSA is managed consistent with VRM Class I objectives.  Areas managed for VRM Class II objectives include:  the Dolores River Canyon from Bradfield Bridge to Disappointment Creek; Weber and Menefee Mountains; public lands along the boundary of Mesa Verde National Park; public lands along the San Miguel River; key travel routes in the Silverton area;  and Cross, Cahone, Squaw/Papoose, and Tabeguache Creek Canyons (see Map M-6, Appendix M).

## CULTURAL RESOURCES

In Colorado there are two types of cultural resources found on public lands:  prehistoric and historic.

Prehistoric cultural resources, both known and unknown, can include, but are not limited to, the following list: lithic scatters, hunting sites, kill/butchering sites, hunting racks, quarry sites, temporary camps, pueblos, agricultural terraces, towers and rockshelters, extended camps, pit houses, wickiups, granaries, cists, process areas, burial sites, petroglyph-pictograph panels, trails, race tracks, vapor caves, villages, manufacturing sites, vision quest sites, and isolated artifacts.  These resources were used during the past 10,000 to 15,000 years by peoples of the Paleo-Indian, Archaic,

Anasazi, Fremont, and proto-historic native peoples.

Historic sites, both known and unknown, can contain a prehistoric element.  Historic sites can include:  trails, forts, toll and wagon roads, resorts, bridges, homesteads, ranches, railroads, towns, mines, mills, and schools.  These sites are associated with farming, ranching, mining, commerce, and exploration activities that occurred during the late 18th, 19th, and 20th centuries.

Of particular concern are Native American sacred/religious places.  A Native American sacred/religious place is a location that has traditionally been considered important to an Indian Tribe or member thereof, because of a religious event which happened there.  The sacred/religious place may have played a part in life-cycle rituals of individuals, may contain specific natural products which are of cultural or religious importance, may figure in or is mentioned in myths and sacred, songs, may be considered the dwelling place or embodiment of spiritual beings, may be conducive to communication with spiritual beings, or may have other specific and continuing significance in Indian religion or culture.  Such places may be considered important to entire Indian tribes or groups of tribes, or may be considered important to smaller segments of Indian populations, such as chapters, clans, families, or individuals.  (Sacred places may be protected under the provisions of 36 CFR 60.4 and the American Indian Religious Freedom Act (AIRFA)).  No such sites have been identified within the Study Area, but such sites are likely to exist especially within the SJ/SMPA.

Based on present data, the following sites or areas are either listed or considered to be of National Register of Historic Places quality, and represent significant values that warrant protection from potentially destructive disturbance.  There is significant potential that new cultural resource inventories conducted in advance of surface-disturbing activities will identify more cultural resources that will qualify for National Register listing.  In addition, many known sites have not been evaluated.

BLM_0005748

**CHAPTER THREE**

**Glenwood Springs Resource Area**
  • Blue Hill Archaeological District
    (4,178 acres)
**Kremmling Resource Area**
  • Windy Gap Cultural Resource
    Management Area (398 acres)
**Little Snake Resource Area**
  • Irish Canyon Petroglyphs (80 acres)
**Northeast Planning Area**
  • Georgetown - Silver Plume National
    Historic District
  • Central City National Historic District
  • Switzerland Trail (Railroad) Historic
    District
**San Juan/San Miguel Planning
Area** (see Map M-7, Appendix M)
  • Lowry Ruin National Historic
    Landmark and Associations (880 acres,
    280 acres split estate)
  • Sand and East Rock Canyons
    (5,880 acres)
  • Cannonball Ruin (80 acres)
  • Dominguez-Escalante Ruins and
    Anasazi Heritage Center (55 acres)
  • Tabeguache Cave II and Tabeguache
    Canyon (3,200 acres)
  • Dolores Cave (60 acres)
  • Tabeguache Pueblo (200 acres)
  • McLean Basin Towers and Associations
    (200 acres)
  • Squaw/Papoose, Cross/Ruin, and
    Cahone Canyons and Cow Mesa
    (28,464 acres)
  • Painted Hand Petroglyphs and
    Associations (240 acres)
  • Painted Hand Ruin (160 acres,
    40 acres split estate)
  • Indian Henry's Cabin and Associations
    (280 acres)
  • Lightning Tree Tower Group
    (200 acres)
  • Hamilton Mesa (5,018 acres)
  • Battle Rock (40 acres)
  • Easter Ruin (160 acres,
    80 acres split estate)
  • Seven Towers Ruin Group (120 acres)
  • Bull Canyon Rockshelter (5 acres)
  • Hanging Flume (7 acres)
  • Mockingbird Mesa 1/ (6,603 acres)
  • Hovenweep Canyon 1/ (3,400 acres,
    980 acres split estate)
  • East Cortez (6,420 acres,
    480 acres split estate)
  • Goodman Canyon and Goodman Point
    Buffer Zone 1/ (1,560 acres, 295 acres
    split estate)

  • Cutthroat Castle Ruin Group Buffer
    Zone (320 acres)
  • Bass Ruin Complex 1/ (500 acres)
  • Sandstone Canyon 1/ (2,840 acres,
  • Brewer Well Complex 1/ (590 acres,
  • Yellowjacket Canyon 1/ (5,120 acres,
    1,640 acres split estate)
  • Basin Wickiup Village (400 acres,
    160 acres split estate)
  • Woods Canyon 1/ (980 acres)
  • Bridge Canyon 1/ (1,120 acres,
    155 acres split estate)
  • Albert Porter Ruin 1/ (120 acres,
    80 acres split estate)
  • Upper Ruin Canyon 1/ (640 acres,
    60 acres split estate)
  • Bowdish Canyon (1,000 acres)
  • Silverton Historic District
    (34,000 acres)
  • Dolores River Canyon (50,900 acres)

1/ All or parts of these designated areas are within the McElmo Dome Unitized area for carbon dioxide (CO2). All leases within the unitized area are currently held by production and will not expire until approximately two years after the termination of the unit. If additional production is established during the two year period, those individual leases will continue to be held by production. Therefore, no new leasing will take place within this area until after the unit has terminated.

## PALEONTOLOGY

Fossils occur in many geological formations throughout Colorado. These formations are classified into categories that indicate the likelihood of significant fossil occurrence. Those geological formations which are known to contain significant vertebrate, invertebrate, and plant fossils include, but are not limited to, the following.

### Glenwood Springs Resource Area
  • Wasatch - early horses, rhinoceroses,
    birds, rare primates, and crocodiles
    (see Map K-12, Appendix K)

3-24

## AFFECTED ENVIRONMENT

### Kremmling Resource Area
- North Park - mammals
- Troublesome - mammals
- Morrison - dinosaurs
- Sandstone Members of the Pierre Shale -- ammonites

### Little Snake Resource Area
- Morrison - dinosaurs
- Mesaverde
- Green River
- Wasatch
- Browns Park

### Northeast Planning Area
- Tertiary Sediments
- Morrison - dinosaurs
- Dakota - vertebrate tracks

### San Juan/San Miguel Planning Area
- San Jose - vertebrate (mammals)
- Mancos Shale - invertebrates
- Dolores - flowering plants
- Morrison - vertebrates, dinosaurs, and invertebrates
- Chinle - vertebrate (fish) and plants
- Mesaverde - invertebrates
- Burro Canyon and Dakota Sandstone-- plant and invertebrate
- Animas - plant
- Cutler - vertebrate

## WILDERNESS

Wilderness resources on BLM-administered public lands were identified through inventories completed in 1980. Areas found to possess wilderness characteristics were identified as wilderness study areas (WSAs). These areas are managed under interim management guidelines that prohibit activities which might impair wilderness values pending a decision on wilderness designation by Congress. The Federal Land Policy and Management Act (FLPMA) provides that by 1991 the Secretary of the Interior will recommend to the President and Congress those areas that should be designated.

Interim management of WSAs is further constrained by provision of the Federal Onshore Oil and Gas Leasing Reform Act of 1987 which prohibits leasing WSAs. Exceptions to this prohibition may only be

made to prevent drainage of the federal oil and gas resource and then only with a No Surface Occupancy stipulation to prevent impairment of wilderness values.

Table 3-7 displays by Resource/Planning Area, each WSA, its size, and wilderness suitability recommendation. For example, the GSRA contains four WSAs, totalling 27,280 acres. Three of these WSAs, totalling 10,754 acres, are recommended for Congressional wilderness designation. The Castle Peak WSA, and part of the Bull Gulch WSA are not recommended for wilderness because of conflict with other resource management actions. Whether recommended suitable or not, all WSAs are under interim wilderness management to protect their wilderness qualities (see Maps K-13, N-1, L-2, M-8).

Cross Mountain (located in LSRA), while closed to leasing under BLM's interim management policy, is recommended to be opened to leasing with No Surface Occupancy allowed. This is because of the unique topography which is possibly conducive to directional drilling.

There are no designated wilderness areas or wilderness study areas managed by BLM in the NPA. However, there are split estate lands containing federal minerals managed by BLM adjacent to the Indian Peaks Wilderness Area which is managed by the Arapaho-Roosevelt National Forest. The potential of development (POD) for oil and gas near Indian Peaks is considered to be low.

3-25

**CHAPTER THREE**

TABLE 3-7.   WILDERNESS STUDY AREAS

| Location | WSA Name | Size (acres) | Recommendation |
|---|---|---|---|
| Glenwood Springs Resource Area | Eagle Mountain | 330 | Suitable |
| | Hack Lake | 10 | Suitable |
| | Bull Gulch | 10,414 | Suitable |
| | | 4,586 | Non-Suitable |
| | Castle Peak | 11,940 | Non-Suitable |
| | Totals | 10,754 | Suitable |
| | | 16,526 | Non-Suitable |
| | | 27,280 | |
| Kremmling Resource Area | Troublesome | 8,250 | Non-Suitable |
| | Platte River Contiguous | 30 | Suitable |
| | Totals | 30 | Suitable |
| | | 8,250 | Non-Suitable |
| | | 8,280 | |
| Little Snake Resource Area | Cross Mountain | 14,081 | Suitable |
| | Diamond Breaks | 31,480 | Suitable |
| | West Cold Spring | 17,682 | Non-Suitable |
| | Ant Hills | 4,354 | Non-Suitable |
| | Chew Winter Camp | 1,320 | Non-Suitable |
| | Peterson Draw | 5,160 | Non-Suitable |
| | Vale of Tears | 7,420 | Non-Suitable |
| | Totals | 45,561 | Suitable |
| | | 35,936 | Non-Suitable |
| | | 81,497 | |
| Northeast Planning Area | None | | |
| San Juan/San Miguel Planning Area | Cahone Canyon | 8,960 | Non-Suitable |
| | Cross Canyon | 12,588 | Non-Suitable |
| | Dolores River Canyon | 29,415 | Suitable |
| | McKenna Peak | 19,562 | Non-Suitable |
| | Menefee Mountain | 7,129 | Non-Suitable |
| | Squaw/Papoose Canyon | 11,287 | Non-Suitable |
| | Tabeguache Creek | 7,908 | Suitable |
| | Weber Mountain | 6,303 | Non-Suitable |
| | Totals | 37,323 | Suitable |
| | | 65,829 | Non-Suitable |
| | | 103,152 | |
| Study Area Totals | 93,032 | Suitable | |
| | 126,541 | Non-Suitable | |
| | 219,573 | | |

# LANDS AND REALTY ACTIONS

The land ownership pattern varies from large blocks of public lands, to areas where federal ownership is limited to small (less than 40 acres) scattered parcels of land. Public lands and federal mineral estate comprise about one-third to one-half of the land area within each Resource/Planning Area, except in the NPA where it comprises less than three percent. The proportion of land potentially available for federal leasing is therefore locally significant in all but the NPA. However, even in the NPA, there are large blocks of split estate where the federal

3-26

BLM_0005751

## AFFECTED ENVIRONMENT

government owns the oil and gas resource
underlying private or state-owned lands.

Various types of land-use authorizations are
scattered throughout the public lands. These
include linear rights-of-way, such as
pipelines, power and telephone lines and
roads; site-type rights-of-way, such as
communication sites; leases under the
Recreation and Public Purposes Act (R&PP);
and leases/permits under Section 302
FLPMA. BLM's existing land use plans
either identify corridors suitable for linear
rights-of-way, or they use a "zoning"
approach to identify area suitable or
unsuitable for rights-of-way placement.
Certain lands within the NPA are rights-of-
way which were granted for railroads and
reservoir purposes. The BLM retains or has
acquired the mineral rights under some of
these lands, and is empowered to lease such
mineral rights under the Act of May 21,
1930. Most of the railroad rights-of-way are
generally 200 feet wide with railroad tracks in
the center. Irrigation rights-of-way can vary
in size, but are ordinarily for the purposes of
constructed reservoirs. Some have additional
values of recreation use and wildlife use, as
well as the storage of irrigation water.

The greatest number of existing
authorizations are related to linear rights-of-
way, including some for major facilities such
as power transmission lines, oil and gas
transportation pipelines, and state or federal
highways. Gathering system pipeline rights-
of-way are generally concentrated in specific
areas associated with energy development.

In some areas, the BLM has mineral rights
under private surface property for which the
Department of Defense (DOD) has obtained a
right-of-way from the private surface owner
for "Missile Cable" installation. The BLM
has no direct authority over such rights-of-
way and the leasing rights of the BLM are not
legally bound by these subsequent rights-of-
way, however the BLM policy is to try to
protect the DOD interest to the extent possible
by warning oil and gas lessees of their
existence and recommending they contact the
DOD. This can only be done to the extent
that DOD furnishes the missile cable
locations.

## TRANSPORTATION

Primary access within the Study Area is
furnished by interstate highways, state
highways, county roads, and public access
roads. The majority of public lands are
accessible to the general public via one of the
above mentioned roads. Some areas do have
significant amounts of BLM lands that are not
accessible due to steep terrain, lack of
maintained roads, or lack of legal access
across private lands. Approximately 90
percent of the BLM roads in the areas are not
maintained on a regular basis.

## SOCIAL AND ECONOMIC

### Glenwood Springs Resource Area

The area most likely to incur socioeconomic
impacts from oil and gas development in the
GSRA includes Mesa and Garfield Counties.
While virtually all of the drilling and
production would occur in central Garfield
County, most of the locally supplied labor,
equipment, and materials would come from
Mesa County. The Grand Junction area has
historically been a center for the oil and gas
industry in western Colorado. Despite the
turndown in activity in recent years, a
number of oil and gas service and supply
companies continue to work out of Grand
Junction and the area can be expected to
remain an industry hub through most
foreseeable levels of development.
However, unless levels of development in the
next 20 years approach that of the early
1980s, the better part of the labor and
equipment required will come from dispersed
locations outside the area of impact, e.g.,
Casper, Farmington, Denver. This will
considerably lessen the local socioeconomic
impact of field development. The eastern and
southern portions of the GSRA, Eagle and
Pitkin Counties, can be expected to receive
little or no impact and have been excluded
from this analysis.

Table O-1 in Appendix O shows recent trends
in population, employment, and income in
Mesa and Garfield Counties. The changes
that the GSRA incurred between 1977 and
1982 are a result of the boom brought on by
the development of energy fuels, including
oil and gas, in the area. The changes since
then are the product of the downturn in prices

3-27

BLM_0005752

## CHAPTER THREE

of energy fuels. While employment and income related to the oil and gas industry cannot be calculated with any exactness at the county level, it is possible to estimate those figures. A 1980 survey (McKean, Weber, and Ericson 1981) indicated that about 5.5 percent of Mesa County's employment was directly or indirectly tied to the oil and gas industry. Assuming that ratio is still good, approximately 2,400 Mesa County jobs are today tied to the industry. Both the percentage and the total for Garfield County are much lower.

Production in the two-county area averaged just under 11 million mcf during 1980 to 1988 from an average of 310 producing wells. The low point was 1987's 6.6 million mcf, which was 41 percent less than the high of 1982, 15.4 million mcf.

## Kremmling Resource Area

The KRA, for social and economic analysis, consists of Grand and Jackson Counties. Where BLM-controlled resources are located outside of those two counties--in adjacent portions of Eagle, Larimer, and Summit Counties--the resources are included in the analysis, but their use is treated as affecting only the two-county area.

Population

The Resource Area has experienced a rapid rate of population growth since 1970, in contrast to a relatively slow increase during the previous decade (Table O-2, Appendix O). The rate at which people have moved in to the Resource Area from 1970 to 1980 has been almost double that at which they have moved into the state. However, as might be expected, most of the growth has occurred in Grand County.

Economic developments readily explain the way population is distributed. Almost 90 percent of the growth since 1970 has occurred in two areas--the strip from Winter Park to Granby and western Grand County. In the latter case, the bulk of the growth has concentrated in or adjacent to the town of Kremmling. Northern and south-central Grand County have gained relatively few people. The period of 1980-87 reflects a slower rate of population growth for the Resource Area. In fact, Jackson County has experienced an 11 percent decrease in population for this period.

Recreation, including recreation homes, accounts for the largest part of the increase, which is in the eastern Grand County strip. The traditional elements of the economy--ranching and the timber industry--have had little effect, or a negative one, on population levels and distribution.

Employment and Income

In the last few years, a small amount of growth has occurred in the total labor force and in employment in the Resource Area (Table O-3, Appendix O). However, most of the growth has taken place in Grand County. From 1975 to 1987, the Resource Area's rate of increase has trailed that of the state as a whole. The unemployment rate remains below that of the state. Employment figures for the individual industry groups illustrate recent trends in the area's economy (Tables O-4 thru O-7, Appendix O). Personal income figures have shown nearly the same trends as employment (Tables O-8 thru O-11, Appendix O).

Local Government Finance

Rough measures of the adequacy of local funding sources are provided by assessed valuation per capita and retail sales per capita figures (see Table O-12, Appendix O). The figures show that both counties and the towns of Fraser/Winter Park and Grand Lake should have sufficient tax bases for their needs. Fraser, Winter Park, Granby, and Grand Lake also have large volumes of retail sales because of their role as resort centers. The other communities lack these advantages and must operate from more limited local resources.

Probably the most significant impact on local government finances from BLM actions would come from increased capital improvement needs caused by population growth. Conversely, reduced population would increase the burden of any existing debt on remaining residents. It should be noted that rapid population growth can quickly require capital spending in excess of the resources of most local governments. In which case, their only recourse is to seek financial assistance from state and federal programs.

BLM_0005753

## AFFECTED ENVIRONMENT

Social Analysis

For social analysis, the KRA will consider
Jackson and Grand Counties, omitting small
portions of Larimer, Eagle, and Summit
Counties.

The present social environments of the region
cannot be understood without consideration
of its history, geography, topography,
climate, and location relative to the eastern
slope population centers. There are three
separate areas described below.

Jackson County, with the single incorporated
town of Walden, is set in North Park, a high
cold valley separated from the rest of
Colorado by high mountain passes and
opening to Wyoming on the north.
Ranching, lumbering, and mining are its
main economic bases. A mountainous
section of Larimer County lying across the
Medicine Bow Range in this region orients to
Wyoming and is virtually unpopulated.

Grand County consists of an east-west
natural division of Middle Park, separated by
Byers Canyon. Kremmling is the only
population centering the western portion, a
rugged ranching valley somewhat lower than
North Park in elevation. It is separated from
northwest Colorado by high passes, but open
southward through Blue River Valley.
Portions of Eagle and Summit Counties are
found in this section.

Eastern Grand County has a T-formation of
small towns: Hot Sulphur Springs on the
west; Grand Lake on the north; and
Tabernash, Fraser and Winter Park on the
south, with Granby as the central hub.
Eastern Grand County accesses eastern,
southern, and northern Colorado only by
high passes. Trail Ridge Road from Grand
Lake is closed except for a few months in
summer. (The two natural divisions of
Middle Park correspond also to the Census
Bureau Kremmling and Granby divisions.)

## Little Snake Resource Area

### Economics

The affected area of the economic analysis for
LSRA is limited to Moffat and Routt
Counties in Colorado. Since economic data
is available only in county units, the
economic analysis is defined in terms of these
units. In each category, data is the most
current available from the source listed.

### Employment and Income

Figures for comparison of employment are
shown in Tables O-13 and O-14 (Appendix
O). The figures are by place of residence and
do not factor commuting. For this reason,
they will differ from most other employment
and income figures.

The economies of the two affected counties
of the area are based on mining, agriculture,
and trade. However, Routt County has
skiing and related seasonal resort activities as
its principal economic activity. Coal is the
leading economic mineral in both Moffat and
Routt Counties, and there are coal-fired
electric power plants in both Moffat and
Routt Counties.

Agriculture, primarily livestock production,
remains an important industry in both
counties. However, it has become small
numerically compared to the other major
sectors.

The principal center of tourism is Steamboat
Springs, which is a year-round resort.
Hunting remains a viable seasonal industry in
the area.

### Minerals

Coal and coal-driven power production
accounts for significant employment as well
as contributing to greater personal income for
the Resource Area. As Table O-15
(Appendix O) indicates, 15.3 percent of all
employment and 20.2 percent of all personal
income were derived from coal and other
mineral production in 1985.

### Agriculture

Livestock production is the principal
agricultural commodity. Crop production is
dominated by hay for livestock feed.
Individual proprietor's average 1982 and
1984 livestock and crop earnings are shown
in Table O-16 (Appendix O).

### Recreation

Hunting, camping, fishing, and sightseeing
continue to grow in terms of revenue
generated. In 1980, these four categories

BLM_0005754

## CHAPTER THREE

accounted for $41.4 million; by 1985, revenue was $48.4 million. These four sectors accounted for 30 percent of all recreation revenue in 1980 and 26 percent in 1982. The percentage decline occurred because of marked growth in the ski sector from 1980 to 1987. Although the ski industry does not directly affect BLM lands, its income generation is so large that it must be mentioned. In 1982, skiing activities accounted for $73.8 million; by 1986, revenue was $111.9 million.

### Population

Figures for 1986 reveal a concentration of population in two cities, Craig and Steamboat Springs, with growth occurring between the two cities and in the satellite towns of Oak Creek and Hayden. Both Craig and Steamboat Springs serve as local trade and business centers. Regional trade, business, manufacturing, communication, and service centers are located in Grand Junction and Denver. See Table O-17 (Appendix O) for population figures.

### Housing

Vacancy rates were approximately 23 percent in Moffat County and 14 percent in Routt County in 1986. Demand for new and existing homes in Moffat County, particularly Craig, has fallen considerably since 1980. Accordingly, prices for homes are starting to decline. Demand for new and existing homes in Routt County, especially Steamboat Springs, is moderate because the town is a growing ski resort. Vacancy levels listed in Table O-18 (Appendix O) should be read with caution, particularly data for Steamboat Springs, because vacancy levels do not indicate whether housing units are occupied year-round or are seasonal. Also, the rates for Moffat County do not indicate physical condition of the properties.

### Local Government Finances

In Colorado, communities generally obtain most of their revenues locally. Previous studies in this area have shown that local sources account for 65 to 95 percent of total community revenues. This large dependence on local revenue sources means that the communities can be highly impacted by developments that affect their tax base. Local school districts, however, are becoming less dependent on locally generated revenues because of state equalization formulas.

Rough measures of local funding sources are provided by the per capita figures on assessed valuation and sales taxes in Tables O-19, O-20, O-21 (Appendix O). They indicate that, in general, the larger municipalities have more substantial property and sales tax bases, but that these and school districts' tax bases vary considerably. Those municipalities and school districts that have strong tax bases--generally because they are either business, mining, or tourist centers-- are in a better position to handle additional financial impacts.

Presently, municipalities and special districts are restricted by state law in increasing revenue to fund programs. For example, statutes impose a seven percent limit on annual increases in property tax revenues and a four percent limit on combined municipal and county sales tax rates. However, Moffat County has only a two percent sales tax rate, and Routt County has no sales tax at all. Therefore, municipalities in these two counties have some leeway to increase revenues.

Table O-22 (Appendix O) presents 1985 monies generated in the two counties as a result of federal leasing of minerals, and the amount returned to state and local governments. The two counties generated just under 20 million dollars in 1985 from rentals and royalties of public lands. The counties' share of generated royalties and rentals is subject to 34-63 Colorado Revised Statute, which subjects the 50 percent federal return to distribution approval of the state legislature.

BLM also generates revenue from the Taylor Grazing Act, which produced a gross revenue of $150,140 in 1985 in Moffat County and $58,907 in Routt County. Under Section 10 of the Act, $22,521 was returned to Moffat County and $8,836 to Routt County.

### Perceptions and Attitudes

Craig District BLM constantly acts in a highly politically-charged social environment because of the history of the region, the variety of resources and land management options, and the large proportion of

BLM_0005755

subsurface and surface land under federal control in the district.

When the BLM was formed, absorbing the Grazing Service, new responsibilities for land management were added beyond the monitoring of grazing use. The new management responsibilities included both renewable resources (range, forests, wildlife, air, and water) and nonrenewable resources (soils, minerals). The BLM became concerned with managing the land for recreation, minerals extraction, forestry, wildlife habitat, agriculture, and a variety of other uses in addition to grazing. Perceptions of excessive governmental control became common among ranchers.

This expanded diversity of roles of BLM in land-use planning is of particular significance at the national level because of the environment-versus-development controversy that exploded in the late 1960s and has continued ever since, becoming one of the primary present national political and social issues. The LSRA occupies a significant position in this controversy.

Community Settings and Conditions

Craig and Maybell in Moffat County, and Hayden, Milner, Steamboat Springs, Oak Creek, Phippsburg, and Yampa in Routt County, lie within the LSRA. Maybell, Milner, and Phippsburg are unincorporated but socially close-knit communities in which virtually all interaction, including the making of "official" community decisions, is informal.

## Northeast Planning Area

Except for several small communities on the Front Range, BLM management does not significantly influence local revenue and infrastructure in the NPA. The most important aspect is the distribution of oil and gas royalties, and payment-in-lieu-of-tax payments. However, local and district revenues are obtained primarily from local sources (e.g., property tax). Other resource contributions include grazing leases, dispersed recreation, fuel wood, and consumptive and nonconsumptive uses of wildlife.

A majority of Colorado's population is in the northeast part of the state, 72 percent of the state's population lives along the Front Range

from El Paso to Larimer County. In contrast, the eastern plains in the Planning Area constitute seven percent of the total population.

The counties east of the Front Range are primarily farming and ranching, and many communities serve as stops along major highways. Activities associated with oil and gas exploration and development such as construction and supplying laborers, are important to many of the small towns near the oil and gas fields. These small towns include New Raymen, Fort Morgan, and Wray. Much of the economies in the counties west of Denver are tourist based. The military and state colleges are important contributors to the economies of the Front Range and Weld County. The Denver area is the regional headquarters of many large business, as well as a large retail base. It also attracts a large number of tourists.

## San Juan/San Miguel Planning Area

The affected area of the economic analysis is limited to seven counties in Colorado. The total 1986 population of these counties was approximately 84,325. Table O-23 (Appendix O) shows the 1980 and 1986 population, per capita income and number of persons employed by county and state. Population growth may be seen in all counties except Dolores and San Juan. All of the counties in the Planning Area have a notably lower per capita income than the Colorado average. Table O-24 (Appendix O) shows county employment by economic sector. The service sector, retail trade, government, and agriculture are the larger sources of employment in the area.

Recreation

The Planning Area derives significant economic benefit from expenditures made for recreation activities, many of which are not currently quantifiable--hiking, camping, and backpacking. However, numerical data do exist for fishing, hunting, whitewater boating, archaeological viewing and interpretation, and generalized tourist travel in the area.

BLM_0005756

## CHAPTER THREE

Tourist Expenditures in General

Tourist travel is an important contributor to the Planning Area economy. Tourist expenditures in 1987 totaled $208 million creating employment for 5,634 people. Table O-25 (Appendix O) shows the 1987 impact of tourist expenditures to the counties in the Planning Area.

White Water Boating

The Dolores River is extensively used for whitewater boating. A 1987 estimate of 10,000 recreation visitor days was made for the Dolores. Expenditures for whitewater boating are estimated at $1.2 million annually within the Planning Area.

Fishing and Hunting

Fishing and hunting activity in the area contribute considerable primary and secondary expenditures to the economy of the region. Table O-26 (Appendix O) shows county primary expenditure data by category.

Many residents value the rural character of the area as an important part of their lifestyles. An appreciation for the wide-open spaces, natural values, solitude, and personal freedom is generally found. Outside control of land or any kind of outside interference is generally resented.

## AREAS OF CRITICAL ENVIRONMENTAL CONCERN

Some areas of BLM-administered lands are managed to protect or enhance particular, special, or unique values. The areas are formally designated as Areas of Critical Environmental Concern (ACEC). More specific information concerning each ACEC is available in the respective Resource Area Office (see Maps K-14, N-2, L-3, M-9).

## MINERAL RESOURCES

Mining has been an integral part of Colorado since Man arrived in the region. Native Americans utilized clays for paint and pottery. They used flint and chert to make projectile points, and semi-precious stones and native metals for ornaments. With the arrival of Europeans, mining activity increased markedly. Presently, there is active or proposed extraction of a wide variety of minerals in the Study Area. Table 3-9 shows the mineral resources currently known to be in minable concentration in each of the five Resource/Planning Areas.

Geologic Setting

Rocks ranging throughout the geologic time sequence from Precambrian to Recent are represented in the Study Area (see Generalized Geologic Stratigraphic Charts, Figure 3-1). The complex tectonic and depositional activity responsible for the

TABLE 3-8.  SPECIAL MANAGEMENT AREAS

| RA/PA | ACEC Name | Critical Resource | Acres |
|---|---|---|---|
| GSRA | Thompson Creek | Recreation/Visual | 4,286 |
| GSRA | Bull Gulch | Recreation/Visual | 10,214 |
| GSRA | Deep Creek | Recreation/Visual | 2,470 |
| GSRA | Blue Hill | Cultural | 4,178 |
| GSRA | Debris Hazard | Hazard Area | 7,126 |
| GSRA | Lower Colorado River | Riparian | 9,000 |
| KRA | Ammonite Site | Paleontology | 197 |
| KRA | Phacelia Site | T&E Plants | 310 |
| LSRA | Irish Canyon | Scenic/Plants/Cultural | 11,680 |
| LSRA | Lookout Mountain | T&E Plants | 6,500 |
| LSRA | Cross Mountain | Scenic/T&E Plants | 3,000 |
| LSRA | Limestone Ridge | Scenic/T&E Plants | 1,350 |
| SJ/SMPA | Anasazi Culture | Cultural | 156,000 |
| SJ/SMPA | McElmo | Rare Flora & Fauna | 443 |
| SJ/SMPA | Tabeguache Creek | Scenic | 440 |

BLM_0005757

**Fig. 3-1** COLORADO STRATIGRAPHIC NOMENCLATURE CHART



COMPILED BY R.H. PEARL

SOURCE OF DATA: CROSS SECTIONS, ATLAS OF THE ROCKY MOUNTAIN REGION

3-33

BLM_0005758

## CHAPTER THREE

spectacular mountain ranges, valleys, basins, and the high plains of Colorado are the same processes that have left some of the richest mineral deposits in the world. The principle structural features in Colorado are shown on Map 3-3.

### Oil and Gas

The first oil well was drilled in Colorado in 1862 near Florence in Fremont County. Oil and gas development spread rapidly across the state. First to the northeast, Denver-Julesburg Basin (NPA), then to the west slope. Many fields developed prior to 1920 are on lands patented under the General Mining Law of 1872. With the passage of the 1920 Mineral Leasing Act, fields have been developed on public lands with leases issued by the Department of the Interior.

Drilling and production in the Study Area are characterized as moderate compared with the western United States. New and refined exploration concepts and technology have resulted in geological interpretations that indicate a potential for the existence of new fields and the expansion of some existing ones. A detailed description of the oil and gas resources and the potential for development for the entire Study Area is found in Appendix B.

### Coal

Federal coal leasing has slowed to a level necessary for maintenance of existing mines. This down-turn in coal mining is due to several factors, chief among which has been the dramatic drop in coal prices since 1982.

Federal coal is leased under provisions of the 1920 Mineral Leasing Act, as amended. An environmental impact statement, in compliance with the National Environmental Policy Act of 1969, is prepared for each lease tract as applications are submitted. Coal resources within the five Resource/Planning Areas are described in the respective RMP/EIS.

### Uranium and Vanadium

Uranium resources are found in abundance in all five Resource/Planning Areas. Uranium has been mined in quantity from the Browns Park Formation in LSRA, between Maybell and Lay. It has also been mined from the

principal uranium and vanadium producing region in the state, the "Uravan Mineral Belt." The Belt extends from Gateway through Uravan to Slick Rock in the SJ/SMPA. Presently, SJ/SMPA is the only area with active uranium and vanadium mining. Renewed interest in vanadium seems to be the main reason.

### Precious Metals

Historically, gold and silver have been mined in all five Planning/Resource Areas. Presently, gold is mined in the SJ/SMPA and NPA. Numerous claims are located in all five Planning/Resource Areas and interest has been expressed in reopening or beginning new operations in some of the areas.
### Base Metals

Small, scattered deposits of base metals, including copper, lead, zinc, tungsten, molybdenum, iron, and manganese are found in all five Planning/Resource Areas. These deposits are found in igneous and Paleozoic age sedimentary rocks. Presently, there are no mining operations proposed for any of these deposits on BLM lands.

### Limestone

Chemical grade limestone is found in GSRA and LSRA. High calcium limestone of this type is in demand for use in cleaning power plant flues and control of rock dust in coal mines. Mining of this resource is presently taking place on BLM-administered lands in the GSRA. Some marble deposits are known in GSRA; however, no mining operations are proposed.

### Stone, Sand, and Clay

Sand, gravel, decorative stone, scoria, and clay occur throughout the Study Area. Sand, gravel, and scoria are primarily used in road construction, while decorative stone is used mainly for construction. Clay deposits within the Planning/Resource Areas have been used in the past as a source of commercial bentonite or for manufacture of brick and tile. Quarrying operations for these materials exists in all areas.

3-34

BLM_0005759





**Map 3-3** Principal structural and tectonic features of Colorado

BLM_0005760

## CHAPTER THREE

TABLE 3-9.   MINERALS PRESENT IN POTENTIALLY MINABLE CONCENTRATIONS

| Mineral | Glenwood Springs | Kremmling | Little Snake | Northeast | San Juan/San Miguel |
|---|---|---|---|---|---|
| Carbon Dioxide | | X | | | X |
| Coal | X | X | X | X | X |
| Natural Gas | X | X | X | X | X |
| Geothermal | X | X | X | | X |
| Oil | X | X | X | X | X |
| Oil Shale | X | | | | |
| Gold | X | X | X | X | X |
| Silver | | X | X | X | X |
| Lead | | | X | X | X |
| Copper | X | X | X | X | X |
| Iron | | | X | | |
| Zinc | | | X | X | X |
| Tungsten | | | | X | X |
| Molybdenum | | | | X | |
| Uranium | X | X | X | X | X |
| Vanadium | X | X | X | X | X |
| Manganese | X | | | | |
| Gypsum | X | | | X | X |
| Potassium | X | | | | |
| Sodium | X | | | | X |
| Limestone | X | | X | | |
| Marble | X | | | | |
| Fluorite | | X | | | |
| Sand (Construction) | X | X | X | X | X |
| Sand (Refractory) | | | X | | |
| Clay (Bentonite) | | | | X | |
| Clay (Common) | | | X | X | X |
| Clay (Shale) | | | | X | |
| Clay (Refractory) | | | | X | |
| Clay (Pottery) | | | | X | |
| Scoria | X | | X | | |
| Decorative Stone | X | | X | X | X |
| Gravel | X | X | X | X | X |
| Top Soil | X | | | | |
| Fill Dirt | X | | | | X |

Geothermal

Geothermal resources occur in GSRA, KRA, LSRA, and SJ/SMPA.  Presently there is one geothermal lease on BLM-administered lands in the GSRA.

Gypsum

Approximately 500,000 tons of gypsum are mined annually in GSRA.  Minable concentrations of gypsum are available in all of the areas except LSRA and KRA.

Oil Shale

Oil shale deposits occur in western GSRA. While proposals have been made to produce oil from these deposits in the past, there are no current operations proposed, and none are anticipated during the life of this plan.

3-36

BLM_0005761

# CHAPTER FOUR

# ENVIRONMENTAL CONSEQUENCES

BLM_0005762

# CHAPTER FOUR

# ENVIRONMENTAL CONSEQUENCES

## INTRODUCTION

This chapter describes the impacts of the various alternatives on specific environmental components. The only environmental components described are those that may be affected by one or more of the alternatives.

The analysis was completed using the following assumptions:

• The oil and gas activity would occur as described in Chapter 2--Proposed Action Alternative and Appendices A and B.
• The laws and regulations will not change substantially over the next 20 years.
• All lease terms and conditions will be adhered to and that they are effective in mitigating impacts.
• Reclamation procedures will be completed and will be successful.
• There will not be any major shifts in the BLM's land management plans, policies, or emphasis.
• Development of coal-bed methane was considered in the production of the Potential of Development (PODs) for the GSRA, LSRA, and SJ/SMPA.

## CLIMATE AND AIR QUALITY

Climate will not be impacted. Impacts to air quality will be very minor, short-term, and very localized.

### San Juan/San Miguel Planning Area

Coal-bed methane development in the Fruitland Formation of the San Juan Resource Area concerns many local individuals and groups. One concern expressed involves potential problems arising from methane liberated to the atmosphere from the coal beds as a result of

development. If significant methane is liberated from the outcrop to the atmosphere, there is the potential for adverse impacts. Impacts might include pollution of shallow groundwater aquifers and streams. At present, there is no data to support a conclusion that coal gas development has or will increase gas liberation at the outcrop. However, in order to build a data base, the San Juan Resource Area Office will require operators of federal wells in proximity to the outcrop area to monitor (and report to the BLM the results) changes in soil gas content (see COA, Appendix F).

## VEGETATION

### All Alternatives

Conducting preliminary exploration (seismic operations) would cause the loss of some vegetation. Vegetation would be crushed by vehicles on the line, and therefore, the loss would be minimal and short-term in nature. Overland travel off existing roads for seismic exploration during wet soil conditions would increase the degree of vegetation destruction.

Construction of access roads and drill pads for drilling wildcat wells would result in the loss of approximately ten acres of vegetation per well site. With proper reclamation following completion of drilling activities, this loss of vegetation would be short-term, assuming that reclamation success would take approximately three to five years. There is a likelihood that undesirable weeds would invade the disturbed ground at some point before reclamation is complete.

On the sites where wildcat wells become discovery wells, the loss of vegetation due to access roads and drill pads would become more long-term due to the relative permanence (in excess of 15 years) of these installations. Although as much as 1/2 of the two-acre drill pad may be reclaimed at the

4-1

BLM_0005763

## CHAPTER FOUR

time of developing a permanent well site, additional road, pipeline, and other facility development would increase the actual loss of vegetation associated with each well. The maximum amount of vegetation that could be lost over the 20-year period amounts to approximately 17,900 acres. This is 1/2 of one percent of the total BLM land in the Study Area and is not considered to be a significant cumulative impact. No locally significant impacts to vegetation were identified after mitigation.

Impacts to riparian and wetland habitats would not be significant. Development within these critical areas will be avoided by use of a Controlled Surface Use stipulation, where necessary, and by developing Conditions of Approval (COAs) during predrill inspections. Well site locations could be moved up to 200 meters to avoid construction in riparian and wetland areas.

To comply with requirements of the Endangered Species Act, all oil and gas activities would be cleared for species occurrence at the operational stage on a case-by-case basis rather than at the leasing stage. This ensures that each site with the potential for threatened and endangered (T&E) species would be inventoried and site locations changed to avoid any discovered species. Locations larger than 40 acres with known T&E (or candidate) species are protected with No Surface Occupancy stipulations on the lease. Short of no leasing, the No Surface Occupancy stipulation is the only method of protecting the large (40 acres or more) areas of known populations and high concentrations.

It has been determined through analysis that the Proposed Action Alternative will not have an effect on any of the threatened or endangered species found in the Study Area.

On split estate lands, the vegetation impacts could be more significant. Reclamation requirements on private surface lands are negotiated with the landowner and the oil and gas operator. For this reason, there is no certainty that the land would be returned to its former condition. In the absence of successful reclamation, these damaged areas could become infested with noxious, poisonous, or other undesirable weeds. Erosion and sedimentation could also increase considerably. BLM also has the authority and responsibility to require reclamation if the private surface owner requests assistance or if negative impacts are expected even though they will not affect BLM lands.

# LIVESTOCK GRAZING

## All Alternatives

Seismic activities have the potential to affect subsurface water flows if activities are conducted too close to existing springs and water wells. Viborseis operations can easily operate at distances of 300 feet without damage to the resource. Operations using large explosive charges, greater than 40 pounds, can typically occur at a distance of 1/4 mile while small charges can be allowed even closer. All of these operations could be considered at closer distances if the contractor can demonstrate the resource will be protected.

An Application for Permit to Drill (APD) condition requiring cattle guards to be installed in fences leading into pastures would prevent livestock from wandering out whenever gates are left open during extensive truck or equipment activity. Increased traffic deaths are more likely with sheep than with cattle.

Temporary forage loss would continue as long as the access roads and drill pads were in use. However, APD conditions for reclamation requiring recontouring and revegetation of these sites would restore forage production. The revegetation process would include eliminating livestock use for up to two growing seasons. This could cause a disruption in the normal grazing use of an area. The severity of the disruption depends upon each specific situation. Poisonous or noxious weeds introduced during the drilling operations could be eliminated through APD conditions requiring their control.

The potential development of livestock water encountered during the drilling operations could be ensured through APD Conditions of Approval that require BLM notification of any aquifers which have the potential for development. APD Conditions of Approval can provide water to the BLM for development as a livestock water well.

4-2

BLM_0005764

## ENVIRONMENTAL CONSEQUENCES

If full development occurred in the Study Area, as described in Chapter 2, 1,800 animal unit months (AUM) of livestock forage could be lost over the 20 years. This is only 1/2 of one percent of the total for the Study Area and is considered insignificant.

## WILDLIFE

### Proposed Action Alternative

Impacts to fish and wildlife from oil and gas leasing and subsequent geophysical exploration and oil and gas exploration and development are categorized as either direct or indirect. Direct impacts consist of actions that affect individual fish and wildlife animals and result in immediate mortality, such as vehicle collisions and the destruction of a nest when occupied by young animals. Indirect impacts are activities that affect animal behavior, animal dispersion, or a reduction in habitat quality and quantity.

The indirect impacts resulting in the loss of habitat through oil and gas leasing and associated surface disturbance over a 20-year period is estimated at 17,900 acres. The total disturbed acres in any given year is dependent upon the amount of oil and gas exploration and development. If oil and gas activities are scattered over a large area and outside of crucial habitat areas, the total disturbed acres in any given year would not, by itself, have a significant impact. If oil and gas activities were concentrated in a small area over an extended period, detectable significant impacts would be anticipated. Field development with a concentrated number of wells could cause significant direct and indirect impacts.

The magnitude of the impacts is dependent upon the time of year, location, amount of surface disturbance, sensitivity of the wildlife species involved, and duration of human activities associated with oil and gas development and operation. Oil and gas activities may have an additional subtle but important effect on wildlife often overlooked during impact assessment (Bromley 1985). Deviations from normal activity patterns and habitat use may have profound effects on the energy budget, and therefore, the welfare and productivity of an animal (Burton and Hudson, 1978 in Bromley 1985). Negative effects of environmental disruptions (flight, avoidance, interference with movement) raise the energy cost of living at the expense of energy needed for reproduction and growth (Geist 1970 in Bromley 1985). These effects would be most significant during the breeding, nesting, raising of young, and critical seasons (winter, spring) when animals are already under substantial stress.

Several measures can be taken to avoid and minimize wildlife impacts from oil and gas exploration and development activities. Mitigation by avoidance can be used to restrict activities during a sensitive or critical portion of an animal life cycle in the form of seasonal lease stipulations. Oil and gas development and production activities cause habitat losses, shifts in distribution, and long-term displacement which could affect wildlife populations. To make energy development and fish and wildlife habitat resources compatible, consideration is given to minimize impacts on fish and wildlife crucial or sensitive areas through the use of special timing limitation stipulations and Conditions of Approval. Appendix E contains specific wildlife mitigation in the form of lease stipulations applicable to all five Resource Areas. Other forms of mitigation are reclamation, replacement of habitats, habitat improvement, and impact minimization in unavoidable situations. Appendices D and F contain the COAs that will be utilized to minimize wildlife and fisheries impacts for threatened and endangered species, and to protect sensitive and crucial habitats when appropriate. Some activities associated with oil and gas may not be mitigated in the short term and residual impacts may persist despite mitigative efforts.

Protection of perennial water impoundments and streams, and/or the riparian vegetational zone is very critical. Riparian and wetlands represent less than one percent of the total BLM-managed lands in the state and are the most productive and important ecosystem found on the public lands. Disruptions or loss of riparian vegetation or systems would have an accumulative effect on all other resource uses and values. Characteristically, riparian and wetland areas display greater plant and animal diversity than other adjoining ecosystem. It is estimated that 80 percent of the fish and wildlife species found on public land are dependent on these crucial habitat areas for shelter, escape cover, food, nesting, raising young, and other biological functions as well as migratory corridors.

BLM_0005765

## CHAPTER FOUR

Healthy riparian systems are also recognized for filtering out sediments, purifying water, and contributing to aquifer recharge and flows.

To protect riparian systems, a Condition of Approval on proposed operations would be applied to restrict oil and gas exploration and development activities to an area beyond the riparian vegetation zone. A Controlled Surface Use stipulation would be applied to protect riparian areas when relocation up to 200 meters would not provide adequate riparian and wetland resource protection because of the juxtaposition of steep slopes and/or erosive soils are located within the acceptable area of granting rights-of-way for roads, pipelines, and storage facilities.

Impacts to wildlife including aquatic habitat under this alternative should be insignificant with the application of all appropriate mitigation listed in Appendices D, E, and F. Although impacts are thought to be insignificant, there would be some unavoidable loss of important habitat in localized areas with significant impacts to individual animals within a fish and wildlife population. Harassment of wildlife would be expected to increase with oil and gas exploration and development. Road closures would reduce but not eliminate disturbance to wildlife because of use of the roads through oil and gas activities.

### Big Game

Disturbances associated with seismographic activity during noncritical periods of an animal's life cycle seldom cause significant impacts. Seismic activities are of short duration with minimal habitat disturbance. Affected animals are temporarily displaced and normally return after the activity ceased with no mortality expected or any other permanent adverse consequences. Seismic work associated with helicopters and blasting during critical periods of an animal's live cycle (i.e., birthing and wintering areas) would have a greater impact by forcing the animals to disperse into marginal habitat. In crucial winter habitat areas, surface explosions along with an increase in vehicular traffic or helicopter usage could result in displacement of big game animals from preferred feeding areas. Additional movements during critical winter periods produces stress that could affect population

dynamics (Stubbs and Markham 1979 in Hay 1985). Female big game animals with young appear to be more restricted than other groups with high potential for increased mortality due to predation, accidents, or diseases if movements are frequent and unusual (Knight 1980).

Impacts from exploratory drilling would be somewhat more pronounced than seismic because the period of disturbance is longer, causing greater periods of avoidance and displacement. Animals could be displaced from traditional use areas into marginal habitat areas along with decreased survival of young. Studies of elk response to oil well drilling activities are inconclusive with some indication that elk are displaced away from the activities (Johnson and Lockman 1980) and that elk become habituated to the activity (Knight 1980). In a $CO_2$ development project in Colorado, a significant shift occurred in elk distribution around the drill sites which were located within an elk calving area (Brekke 1988). Smith and Bloomfield 1980, (in Hay 1985) reported increased harassment of big game animals on areas critical to breeding, reproduction, or survival during stress periods in Alberta.

Oil and gas development and production within big game crucial winter habitat and birthing habitat has the greatest potential for impacts through both loss of habitat and displacement of animals during critical stress periods. Because drilling activity would be restricted to noncritical periods and outside of designated management areas through seasonal limitation stipulations, disturbance to wildlife would be minimized. Avoidance and no occupancy in crucial habitats during sensitive periods in big game species' life cycle are recommended to reduce intense stress (Stubbs and Markham 1979; Smith and Bloomfield 1980; Washington Dept. of Game 1980; USDI-BLM 1979; USDA-Forest Service 1982; in Hay 1985) (Hurley and Irwin 1985) (Irby et al., 1987) (Brekke 1988).

Some loss of habitat, such as that resulting from a single producing or exploratory well, is not expected to cause a significant impact when proposed seasonal restrictions and stipulations are implemented. The continual human activities and associated facilities with several producing wells could have a significant impact, depending on the type and

4-4

BLM_0005766

## ENVIRONMENTAL CONSEQUENCES

level of activity, the habitat affected, geography, and other pertinent factors. These impacts will be reduced or eliminated by the combination of timing limitation stipulations and other mitigation possible through application and enforcement of the standard lease terms and the regulations. Subsequent mitigation would be identified from the environmental analysis conducted on APDs or completed for the development of a field. Such mitigation might include: relocation of surface disturbing activities; co-location of surface activities to reduce habitat loss; closure of oil and gas roads to all but essential oil and gas personnel; control of the rate of development to reduce activity in a given area at any one time; and other measures determined necessary from a subsequent analysis.

Potential significant impacts for oil and gas activities on mountain lion and black bear populations would most likely be restricted localized areas. Both of these species characteristically utilize large home ranges and occur at relatively low densities.

New road construction into previously unroaded or isolated areas is another aspect of oil and gas exploration and development that could significantly impact all big game species. Such relatively undisturbed areas serve as sanctuaries in which animals can seek refuge from human activities, hence reducing stress during critical times of their life cycle. As public access to these areas becomes easier and more widespread, animals become more vulnerable to human harassment. The primary concern would be with seismic operations, wildcat wells, or new field development. Road kills of deer and elk would increase above existing levels due to increased vehicle traffic along well-traveled roads, especially those associated with field development. These potential impacts have been mitigated through the various COAs and lease stipulations found in Appendices D, E, and F.

### Birds

Impacts to birds from oil and gas exploration and production activities could result in nest abandonment, destruction of nests, and elimination of essential habitat components i.e., roosting areas, prey species, shelter, breeding areas. Seismographic and drilling activities during periods of egg laying and incubation could cause birds to abandon nests. Behavioral responses of birds are significantly influenced by increased human activity. The failure of parent birds to return to eggs or young is unpredictable (Fyfe and Olendorff 1976). The response of raptors to human interference varies for different species and individual birds of the same species. Nest abandonment is most likely to occur just prior to egg-laying. Later in the nesting cycle, in addition to abandonment, females flushing from a nest can crack eggs or injure young. Late in the nesting period, disturbance is unlikely to cause abandonment but the young birds may attempt to fly before they are ready, causing injury or death. Other problems associated with disturbance to nesting raptors include cooling or overheating of eggs, chilling of young birds, and missed feedings, as the mother remains away from the nest because of human presence.

Long-term changes in species composition could result with birds being less tolerant of disturbance over time (Anderson, et al. 1990). The differences in response to human activity among individuals within a species may also occur with some individuals tolerating or habituating to a higher level of activity than others (Anderson, et al. 1989). Implications and potential impacts to raptors are shifts in home ranges with an increase in the size of the area used and more frequent daily movements (Anderson, et al. 1990).

Raptors are very sensitive to human disturbance activity during the egg-laying and incubation, especially the ferruginous hawks (Stalmaster, et al. 1982). Disturbance during nesting could lead to nest abandonment or parents spending more time away from the nest, thereby jeopardizing survival of young (Olendorff, et al. 1980, in Hay 1985). Fraser, et al. 1979 (in Hay 1985) reported nesting bald eagles flushing from human activity at a mean distance of 457 meters, ranging from 57 meters to 991 meters. Human activity should be restricted one month prior to nest site selection to one month after hatching for the bald eagle with a no occupancy restriction within one-quarter mile radius of the occupied nest (BLM 1986 and Grier et al. 1982). Protection of bald eagle communal winter roost from all disturbances is recommended with a buffer zone of one-half mile. Depending upon the surface disturbance activity and the amount of

BLM_0005767

## CHAPTER FOUR

visual screening between the activity and roost site, bald eagles may tolerate a lesser distance. The minimum recommended distance is one-quarter mile (Grier 1982) to one-mile buffer zone (Jenkins 1982 in Hay 1985).

Sage grouse winter and breeding seasons are the periods when significant impacts would be expected to occur. Sage grouse are almost entirely dependent upon sagebrush for food and cover, especially in the winter. Only sagebrush of a certain density, height, and type appear to be suitable as winter habitat, therefore, they are concentrated during the winter and extremely susceptible to disturbance. Braun (1987) stated that "with the discovery of oil and development of oil and gas resources, especially in the 1930s and 1940s, impacts of energy development on wildlife resources in Western North America increased. The magnitude of these impacts is mostly unknown but obviously sage grouse and other wildlife were impacted." Studies in North Park, Colorado, (Colorado Division of Wildlife, unpublished data) suggest that sage grouse populations, as measured by counting males on leks, decreased dramatically during initial stages of oil field development. The decrease is related to loss of habitat caused by site preparation, road development, and associated human activities. The effects of oil and gas exploration without development are not well studied.

Leks (courtships areas), the spatial sagebrush vegetation surrounding the lek, and wintering areas are essential habitat components in maintaining quality sage grouse habitat. A lek site is the major activity center for sage grouse during courtship, breeding, nesting, and brood rearing. A study in the Gunnison Basin (Hupp 1984) found that five radio-marked female sage grouse nested at a mean distance of 4.2 km away from the lek with a range from 0.7 to 8.2 km. Results of research by Wallestad and Pyrah in Montana (BLM 1979) showed that 68 percent of all radio-marked sage grouse hens nested within a 1.5 miles of a lek, with the greatest distance being 5.7 miles. Based on these studies where the majority of sage grouse nesting occurred within a 1.5 to 2.5 mile radius of the lek, and based on recommendations for protecting nesting habitat by the Western States Sage Grouse Committee (Autenrieth, et al. 1982), any activity that disrupts strutting or active nests could result in significant changes to the localized population and long-term changes to sage grouse populations.

Impacts to greater prairie chickens (listed as a Colorado endangered species) and their habitats can occur anytime of the year. However, the most significant impacts would occur during mating (mid-February to early June) and nesting (April to early July) in the vicinity of the leks (within a 1-1/2 mile radius). Lek sites are generally on open ridges, grassy knolls, or slight rises in topography where vegetation is sparse.

Greater prairie chickens require tall to mid-grass prairies adjacent to their leks. The majority of the nests are located in taller and denser than average grassy vegetation within 1-1/2 miles of a lek. These leks and the adjacent grasslands are essential to the continued existence of this species in Colorado.

In order to protect sage grouse and prairie chickens, a Condition of Approval will be applied to proposed operations requiring relocation to avoid nesting habitat during the nesting period. This will provide necessary protection for nesting grouse. As an early alert and to assist in the planning of operations, a lease notice will be attached to leases with leks to advise the lessees of the nesting habitat concern. The Condition of Approval will be applied wherever habitat is identified, whether or not a notice is attached to the lease. For the prevention of possible destruction of lek site, a No Surface Occupancy stipulation is required for all oil and gas exploration and development activities within one-quarter mile of the lek (BLM Wyoming 1979, and BLM Wyoming 1982 in Hay 1985).

Assessment of impacts on waterfowl, shorebirds, and other birds from oil and gas exploration and development are less known. The effects of human activities are greater than the seismic explosions and equipment noises. Activities adjacent to waterfowl nesting areas could cause nest abandonment and decreased hatching success, especially sandhill cranes, swans, and geese (Barry and Spencer 1976 in Hay 1985). Small birds, such as passerine, are not directly impacted from oil and gas activities. Indirect impacts

4-6

BLM_0005768

## ENVIRONMENTAL CONSEQUENCES

could occur if isolated habitat areas are significantly altered.

No Surface Occupancy stipulations are utilized to protect major waterfowl and shorebird production areas. Timing Limitation stipulations are used to protect greater sandhill crane and white pelican nesting habitats. The Controlled Surface Use stipulation for riparian vegetation zones will also help protect habitat used by waterfowl, shorebirds, and other birds.

### Aquatic Habitat

Impacts to localized riparian and aquatic habitats would result from increased sedimentation through oil and gas construction activities. Sediment would cover gravel beds on the stream bottom resulting in loss of habitat for macroinvertebrates which serve as a primary food source for most fish species. In addition, gravel beds serve as spawning areas and are necessary for successful reproduction by many fish species. Any spill of hazardous material resulting from exploration or development that ended up in a drainage would have a significant impact on fish or other animal and plant species.

Any surface disturbance activity in the riparian vegetation zone could have a significant impact. The destruction of riparian plants, alteration in drainage patterns, and water flows could reduce the usability of the habitat area by fish and wildlife species. The protection of these crucial habitat areas are being mitigated by avoidance of habitat.

### Special Status Species

All oil and gas development and production activities are subjected to the provisions of the Endangered Species Act. To comply with requirements of the Endangered Species Act, all oil and gas activities would be cleared for species occurrence at the operational stage (APDs) on a case-by-case basis rather than at the leasing stage with the exception for endangered Colorado River fishes. The effects of impoundments and water depletion from the Colorado River and its tributaries would have a "may affect" finding for the listed and proposed fish species. The required consultation and conferencing under the Endangered Species Act is in progress.

The U.S. Fish and Wildlife Service (USFWS) has determined that any depletion of water in the Colorado River will further endanger listed fish species. A fund has been set up to acquire water rights for the purpose of establishing river flows which will sustain the endangered populations. The USFWS requires that any depletion, no matter how small, necessitates a contribution of $10.23 to the fund for each acre foot of water deleted from the drainage.

The USFWS has defined "depletion" as water which would contribute to the river flow if not intercepted and not returned to the system.

For the four affected Planning Areas, the BLM estimates the depletion volume to be less than 10 acre feet annually. The depletion is more than off-set by the 1,100 acre feet of nontributary formation water contributed annually to the Basin from the Isles Dome Field in the Little Snake Resource Area. Accordingly, no contributions need be made to the Colorado River Fund for oil and gas operations.

The potential exists that additional inventories will be required to document the presence or absence of special status plants. These inventories will be conducted prior to issuance of an APD where the unknown potential for special status plants to occur may exist based on soils and associated plant communities. Specific inventories may be required in oil and gas leased areas prior to any development. Provisions in the oil and gas lease provide for requiring inventories to relocate oil and gas activities to avoid threatened, endangered, and proposed listed federal species of plants and animals. Locations of previously inventoried threatened and endangered and federal candidate species are afforded protected through seasonal timing and No Surface Occupancy stipulations on the lease. It has been determined through evaluating the potential impacts from oil and gas leasing activities and with the application of stipulations that the Proposed Action would have an "no affect" on threatened and endangered species with the exception of endangered Colorado River fish.

Recovery efforts for the black-footed ferret would be conducted within the provisions of the Endangered Species Act (Sections 4, 7,

BLM_0005769

## CHAPTER FOUR

and 10 of the Act), Black-footed Ferret
Recovery Plan, and general guidelines
identified in the Special Lease Notices for Oil
and Gas Development, Appendix E. If
additional protection is necessary in prairie
dog ecosystems managed for the recovery of
the black-footed ferret, additional protection
measures will be developed in the Surface
Use Plan of Operations as added Conditions
of Approval on applications for permit to drill
(APDs), Sundry Notices, and rights-of-way
permits.

### Continuation of Present Management Alternative

Under the Continuation of Present
Management Alternative, existing protection
measures for crucial wildlife and fish habitat
are not as effective as they could be. As new
information was received on areas with
known potential for oil and gas development
along with updated wildlife surveys,
additional protection measures were needed
to mitigate known or potential fish and
wildlife impacts.

Without the additional timing limitations and
No Surface Occupancy stipulations, direct
and indirect impacts could result from oil and
gas exploration and production activities to
(1) big game species on crucial winter habitat
and birthing areas during periods when these
animals are most vulnerable to induced stress
from human activities; (2) intrusion of human
activity and oil and gas development
equipment in areas of sage grouse leks
(courtship areas) and nesting habitat around
the lek; and (3) inadequate buffer zones
around raptor nesting sites to prevent nest
abandonment and mortality of young.
Significant impacts could occur if the 60-day
delay restriction were not long enough to
cover these critical periods.

Significant impacts could result from oil and
gas exploration and development activities to
big game species during birthing and on
crucial winter habitat areas because the timing
limitations are insufficient or absent to delay
activities that would reduce stress during
these critical periods. The loss of crucial big
game habitat could occur along with induced
stress causing direct impacts on big game
herd productivity and displacement into
marginal habitats. The direct lost of escape
cover and increased human harassment as a
result of enhanced public access into remote

areas could lead to displacement and loss of
solitude to those big game species that are
less tolerant to human activities. Mortality
could occur from increased stress as these
animals strive to avoid disturbance activities.

Detrimental impacts on bird productivity
could result from intolerable human-related
oil and gas activities that occur within
established buffer zones around nest sites.
Seasonal timing and distance restrictions
reduce nest abandonment and the potential
destruction of habitat components needed for
successful nesting and brood rearing of
young for raptors, and other bird species
such as sage grouse, waterfowl, and
shorebirds.

Under this alternative, limited protection
measures for riparian and wetland areas were
considered. Disturbance in or near the
riparian, wetland, and aquatic zones would
have a detrimental effect on water quality and
those habitat components provided for fish
and wildlife species.

Oil and gas exploration and development
activities would be not be permitted that
would jeopardize the continued existence of
threatened, endangered, and sensitive species
and their habitat.

### Standard Terms and Conditions Alternative

Wildlife habitat would be protected from
disturbance under the standard lease terms by
specific conditions applied to oil and gas
activities (APDs, rights-of-way, and seismic
notices of intent) at the time of permit
application. The types of mitigation
measures would depend upon the specific
habitat and project proposal involved. The
locations of fish and wildlife habitat will be
protected from human-induced surface-
disturbing activities to the extent such
protection does not unduly hinder or preclude
the exercise of valid existing rights. The area
of protection will include the actual locations
and, if present, adjacent sites critical to the
habitat or species in question. Crucial
habitats of special status species, upon which
analysis determines protection to be
necessary, shall be protected by requiring
relocation or rerouting of proposed well sites,
pipelines, roads, and other surface facilities.

4-8

BLM_0005770

## ENVIRONMENTAL CONSEQUENCES

Standard lease terms would not allow BLM to mitigate all of the most detrimental impacts to crucial fish and wildlife habitat from oil and gas development. Detrimental impacts that could occur under this alternative include: (1) disturbance to big game birthing habitat and crucial winter range habitat; (2) new road construction into unroaded or isolated areas; (3) disturbance to sage grouse leks, nesting habitat, and winter habitats; (4) disturbance to nesting raptors, waterfowl, and great blue heron; (5) impacts to aquatic and riparian/wetlands. Significant impacts resulting from oil and gas development could occur to big game species during their birthing season and during the crucial winter seasons if the 60-day delay restriction were not long enough to cover these periods. Increased stress and harassment on big game species would occur without seasonal limitation protection during the winter months. Crucial winter range habitat would be lost without replacement.

New road construction into unroaded or isolated areas would cause loss of escape cover and result in increased legal and illegal harvest of game animals. This could lead to significant long-term losses to all fish and wildlife species and their habitat. Areas with seasonal road closures that restrict public access may help control animal harassment. Oil and gas development within crucial winter habitat could result in both loss of habitat and displacement of animals. Small losses of habitat, such as that resulting from a single exploratory well, would not have a significant effect on the availability of crucial habitat. However, the cumulative impact of this action, in conjunction with other unrelated activities, could have locally significant impacts.

Field development, on the other hand, could result in substantial loss of habitat and disturbance would occur during the critical winter period. Mortality could result from the increased stress as animals attempt to avoid disturbance. Oil and gas development within traditional big game calving or fawning areas would cause animals to move to adjacent marginal habitat. Traditional areas are preferred because of the existence of optimal conditions for the highest rate of survival of newborn animals. Many of the displaced animals would probably proceed with calving or fawning in marginal habitat; however, increased mortality of newborn

animals would be significant. Disturbance to sage grouse winter, nesting, breeding, and brood rearing habitat could result in significant impacts to sage grouse leks and nesting habitat. The breeding complex area (lek and nesting habitat) needs to be protected along with crucial winter habitat to afford adequate protection to sage grouse. Maintenance of the sage grouse habitat under this alternative would be significantly impacted. Disturbance to nesting raptors could result in significant long-term reductions in raptor production and populations.

## Conclusions

Significant unavoidable adverse impacts could occur under the Standard Terms and Conditions Alternative. Substantial long-term cumulative population losses would be expected for big game, sage grouse, waterfowl, great blue heron, and raptors because of disturbance to crucial habitat during the winter and breeding seasons. Population losses of fish and wildlife species would affect recreational related opportunities such as hunting and wildlife viewing. This, in turn, would affect local and regional economics dependent upon these recreational related opportunities and tourism. Seasonal stipulations in the Continuation of Present Management and Proposed Action Alternatives could reduce impacts of oil and gas activities to the aforementioned species or habitat. Impacts to big game species through construction of roads into isolated or previous roadless areas could result in increased stress on these animals during critical phases of the animal's life cycle from human presence and harassment along with habitat disturbance. Mitigation to reduce these potential impacts are identified under the Proposed Action Alternative but would remain unchanged under the Continuation of Present Management Alternative.

Under all alternatives, unavoidable adverse impacts could result from disturbance to crucial habitats. Through implementation of the mitigation measures under the Proposed Action Alternative, these adverse impacts are insignificant. The proximity and density of surface disturbance and the continuous human harassment in an oil field development make it impossible to mitigate all impacts. In this situation, some long-term loss and irreversible and irretrievable commitments of

BLM_0005771

**CHAPTER FOUR**

wildlife resources would occur, but no significant losses in wildlife populations or habitat would be expected. The accumulation of short-term impact disturbances could potentially impact the long-term productivity for most wildlife species. Unavoidable adverse impacts could also occur where protection measures are inadequate or impacts are unknown. This situation could be reduced by monitoring restrictions and conducting on-site inspection of all APDs.

# WILD HORSES

## General

Wild horses try to avoid motor vehicle movement and human activities within their range. It is logical to assume that they would continue this behavior and that the effect on their patterns of movement and areas of preferred habitat would relate directly to the magnitude of the disturbance and development activity.

During winter months, oil and gas development could have significant impacts on wild horses. Traffic and drilling activities could force the wild horses into less desirable grazing areas resulting in increased winter kills and lowered foaling percentages. The severity of the impacts would depend on the amount of drilling conducted in the winter.

An increase in oil and gas activity within the wild horse range would result in a reduction in the quantity and quality of their forage and habitat. Development of oil and gas facilities would reduce available forage as well as allow for less palatable forage for the wild horses. For every ten surface acres disturbed on the wild horse range, approximately one AUM of forage would be lost. This would not be significant with the expected level of development and reclamation.

Living space for the wild horses would be reduced by the actual number of surface acres disturbed and cleared. Development of areas around watering sites, south slopes, and windswept ridges, which are areas of high wild horse winter concentration, would impact the wild horses to a greater extent than development in other areas. As the available habitat is reduced, competition for the remaining habitat would increase between wild horses, livestock, and wildlife. Increased competition would result in:

(1) a decrease in either the number of large herbivores, or (2) overgrazed range land, or (3) both. With reclamation practices, this should not be significant. Increased wild horse roundups may be necessary to keep the wild horse herds closer to the herd level objectives.

## Proposed Action Alternative

### Little Snake Resource Area

The Proposed Action Alternative would allow the wild horse herd continued use of its watering areas by restricting the location of oil and gas development activities, or providing water where it could be used by the horses. The application of these mitigations would protect the herd from seismic exploration and wildcat exploration wells. Should a field be discovered, some impacts may still occur to the herd from that level of human activity. Increased road access could result in impacts similar to those identified for big game.

### San Juan/San Miguel Planning Area

### All Alternatives

A wild horse herd, averaging 50 head, will be maintained in the Spring Creek Herd Management Area. The reproductive season is a crucial period in the life cycle of these animals. Disturbances during this period may create unnecessary stress and reduce herd productivity. In order to minimize effects on the horse herd during foaling periods, a seasonal stipulation will be attached to any newly issued leases. (See Appendix E.)

The following types of mitigation would be applied as conditions of APD approval:

• Avoidance conditions to avoid water sources used by wild horses.

• Surface disturbance would be kept to the minimum necessary for oil and gas exploration and development.

• All pits would be fenced to prevent entry by the horses.

• Avoidance conditions would locate exploration and development activities away from windswept ridges and pinyon-juniper

4-10

BLM_0005772

## ENVIRONMENTAL CONSEQUENCES

areas. This will help to assure availability of winter forage and year-round shelter.

Operational conditions such as, but not limited to, those outlined above would be applied to seismic exploration activities as well, if necessary.

### Continuation of Present Management and Standard Terms and Conditions Alternatives

Potential impacts to the wild horse herd would remain under these alternatives. Loss of winter forage and shelter would result when windswept ridges and pinon-juniper areas would not be avoided under the standard terms of the oil and gas lease. An increase in human activity would not be mitigated under this alternative because traffic and drilling operations throughout the year would force horses into less productive grazing areas.

### Conclusions

Any impediment to free movement within the wild horse herd area is a significant adverse impact. Wild horse movement would be affected by oil and gas activities and facilities, also by the increase in vehicle and human activity associated with the oil and gas activities. Disturbance in areas preferred by wild horses would have the greatest impact within their established traditional range. Horses may abandon their traditional patterns of movement and areas of preferred habitat in order to avoid human activities. Since the wild horses occupy the most desirable areas for wild horse habitation, oil and gas exploration and development activities in these areas would force wild horse bands into less desirable areas.

Oil and gas development activities would result in short-term abandonment of wild horse habitat in and adjacent to the development site during exploration. Long-term abandonment would result if production is obtained and permanent facilities were installed. In general, impacts from individual or wildcat wells would be not impact long-term productivity.

## SOILS

### All Alternatives

Exploration and field development will have a direct impact on soils physically disturbed. This would be limited primarily to those areas where vegetation is removed or destroyed. The impacts would be of three types: (1) physical removal, mixing, or burying of surface soils, (2) damage or destruction of soil properties in place, or (3) drilling and production wastes are mixed into the soil.

The first impact would be caused by site preparation for well pads, related structures, roads, excessive erosion, and slope failures. This would destroy the soil texture, mix the soil horizons, and cause a short-term reduction in the potential productivity of the soils. Revegetating these disturbed areas would initiate the process of creating new soil structure and soil horizons. The revegetation rate will probably be slow due to low rain fall. The initial soil productivity would be influenced by organic matter incorporated in the mix, the length of storage before revegetation, and health of soil microflora.

The second impact would be soil compaction. This would be caused by vehicle or machinery travel with wide ranges in the amount of compaction. The compaction would decrease water and air infiltration into the soil profile, and thus, reduce soil productivity. Where compaction is severe, soil vegetative productivity would be virtually eliminated in the short term without mechanical treatment to reduce the compaction.

Minor short-term losses to soils would occur because of erosion. These short-term losses are lessened in magnitude by reclamation measures. These short-term impacts, as well as specific soil problem areas, are protected through COAs utilized on specific exploration and development authorizations. Specific reclamation measures (such as waterbarring, contouring, seeding, etc.) would be developed and applied on a site-specific basis. These COAs would mitigate impacts to soil resources to insignificant levels. Most of the adverse impacts to soil resources would be mitigated by applying the present COAs.

BLM_0005773

## CHAPTER FOUR

The third impact that could occur is when drilling fluids, mud, additives, etc., are mixed with the soils during backfilling and reclamation. If these substances are mixed into the rooting zone of the plants, they could inhibit the plants from reaching their full potential. If the mixing is severe, plant growth could be severely limited. During the production phase, the discharge of saline water into the soils or drainages could result in elevated levels of salt which would lead to changes in the vegetative community, or in severe cases, loss of all vegetative cover. Losses of vegetative cover could result in increased erosion and sedimentation. The Condition of Approval that governs the disposal of drilling fluids will prevent the above described impacts.

### Proposed Action and Continuation of Present Management Alternatives

In LSRA, large areas of fragile soils occur in existing oil and gas fields. With no BLM-imposed surface restrictions, future oil and gas development is expected on the fragile areas. Based on the reasonably foreseeable level of development (RFD) assumptions, approximately 15 percent of new development could occur in major fragile soil areas, including the Danforth Hills, Temple Canyon, Maudlin Gulch, Wilson Creek, and areas within the Vermillion Creek watershed. Fifteen percent would equate to approximately 39 new development wells and 44 exploration wells, or a total of 1,853 acres of new disturbance over a 20-year period. The actual disturbance could be more or less depending on the existence and discovery of oil or gas resources.

Disturbance of 1,853 acres on fragile soils would be a significant adverse impact in terms of soil productivity loss and in soil loss itself. A typical undisturbed side slope in the Vermillion Creek area has a soil loss rate of approximately 1.6 tons/acre/year. After disturbance, assuming all the vegetation has been removed, the rate of soil loss would increase to about 4.7 tons/acre/year. Likewise, a typical side slope in the Danforth Hills area would undergo an increase in soil erosion rates, from 0.6 tons/acre/year to 5.0 tons/acre/year, due to surface disturbance. These soil erosion rates are most likely underestimated for potential erosion increase because they do not take into account the

massive types of erosion activity, such as landsliding, gullying, and soil piping, which normally take place on fragile soils. If these assumptions are correct, soil erosion might be increased by as much as 3.5 percent within the 200,000 acre fragile soil areas.

This impact is mitigated under the Continuation of Present Management and Proposed Action Alternatives through the use of performance objectives attached to the lease.

The performance objectives are as follows:

I. Maintain the soil productivity of the site.

II. Protect off-site areas by preventing accelerated erosion (such as landsliding, gullying, rilling, piping, etc.) from occurring.

III. Protect water quality and quantity of adjacent surface groundwater sources.

IV. Select the best possible site for development in order to reduce the impact to the soil and water resources.

Although surface disturbances associated with oil and gas activities will cause unavoidable adverse impacts in the form of increased erosion rates, many of the impacts would be mitigated by erosion control COAs. With careful application of the COAs, soil erosion can be effectively controlled on nonfragile sites under all the alternatives.

In addition to the impacts outlined above, slope angle is a critical factor in well site and road location. As slope angle increases, there is greater potential for erosion and mass wasting. Slopes greater than 40 percent (e.g., four feet of rise in 10 feet of run) are considered critical in terms of increased erosion and potential for soil instability for construction purposes. A Controlled Surface Use stipulation is attached to many leases under current management and under the Proposed Action alternative would be attached to all leases in the Study Area. The stipulation requires special construction techniques be applied to all construction on slopes of 40 percent or greater.

4-12

BLM_0005774

## ENVIRONMENTAL CONSEQUENCES

### Standard Terms and Conditions Alternative

Under this alternative, fragile soils, particularly those occurring adjacent to existing development fields, would not be protected, resulting in irreversible and irretrievable soil losses. In addition, long-term productivity of the soil would be lost on these sites. The loss of soil and site productivity in fragile areas would be a highly significant impact.

## WATER

### All Alternatives

Activities associated with oil and gas exploration and development could have adverse impacts on surface waters. The most adverse impacts would probably occur in perennial streams within or adjacent to fragile soil areas. High rates of soil erosion from disturbance of fragile sites would result in increased sediment and salinity loads within the affected streams. Increases in sediment loads would also lead to increases in stream bank erosion and instability. Although the increases in sediment and salinity yields from surface disturbances cannot be calculated, it is believed that they would be adverse and long-term, based on magnitude of soil erosion that could occur from these activities. Current Colorado Department of Health water quality standards for chlorides and sulphates could be exceeded if high increases in salinity occurred.

Outside of the fragile soil areas, short- and long-term adverse impacts to surface waters would occur from surface disturbances associated with oil and gas wells. Again, impacts would consist mainly of increases in sediment and salinity loads from the erosion of barren surfaces. Because exploration well sites would be reclaimed within a three-year period, sediment and salinity increases generally would be short term and not significant. Long-term sediment and salinity increases would result in field development situations from barren areas (mainly roads and pads). Disruption of normal flows from wells and springs could occur from seismic activity in close proximity to the well or spring. This flow disruption could either be an increase or decrease.

Waste fluids associated with oil and gas operations would present another potentially adverse impact to surface waters. Reserve pit and/or produced water fluids could percolate from unlined pits into nearby surface waters, possibly degrading water quality. Occasionally reserve pit fluids may contain very small amounts of toxic elements used in drilling muds, such as chromium (hexavalent) and other heavy metals. Handling, use, and disposal of any and all hazardous or toxic substances must be in accordance with the applicable regulatory requirements. Other agencies such as EPA, OSHA, and State Health Department have standards and guidelines as to the proper handling of these materials. Note that drilling and production fluids are exempt from the Resource Conservation and Recovery Act (RCRA), but not necessarily from the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). Nothing required by BLM shall reduce or remove those standards. Proper disposition of those types of materials is expected. Drilling fluids may also have high salt concentrations. Produced waters may contain high concentrations of salts (particularly sodium and chloride), heavy metals, and aromatic hydrocarbons such as benzene and toluene.

If these fluids contaminate the subsoils, the capillary action (upward) movement of these fluids could evaporate on the surface leaving salts on the surface.

The Potential of Development (Appendix B) estimates that 1,339 oil and gas wells will be drilled over the next 20 years. This could disturb 17,900 acres over the same period. Depending on the proximity of these disturbed areas to the surface waters in the Study Area, sedimentation and possibly salinity impacts could occur degrading water quality. Further water quality impacts could occur from reserve pit and/or produced water leakage and percolation. However, specific impacts to water resources are determined by individual analysis of the drill sites and other operations. With the application of COAs to individual field operations, these impacts are minimized or eliminated.

Shallow groundwater may also be affected by the drilling of water source wells and monitoring wells, cathodic protection holes, geophysical shot holes, and core test holes.

BLM_0005775

## CHAPTER FOUR

All of these holes must be so constructed as to preclude the interzonal migration (cross-flow) of fluids from one zone to another. In general, this is achieved through proper casing, grouting, and plugging designs. Any well bores which allow interzonal flows or artesian flows to the surface are required to be repaired or properly plugged immediately.

Oil and gas operators are regulated to protect freshwater zones with a total dissolved solids (TDS) concentration of 10,000 mg/l or less. This is generally accomplished by correct placement of casing, cement, packers, and /or other downhole devices.

Recent increased coal-bed methane development in GSRA, LSRA, and SJ/SMPA has given rise to environmental issues related to groundwater: including the effects of withdrawing water from the coal seams, the need to dispose of that water, and the liberation of absorbed gas which becomes free to migrate.

The presence of hydrocarbons has been detected in shallow aquifers just south of the SJ/SMPA in the vicinity of Bondad, Colorado, and Cedar Hill, New Mexico. Currently it is not known if the contamination is naturally occurring or man-induced. Several entities are currently conducting studies of the area to attempt to ascertain the extent of the contamination and its source(s). The potential for hydrocarbon and saltwater contamination of shallow aquifers by migration through improperly installed or deteriorating well casing exists anywhere wells are drilled. Sound operating practices (see Appendix A) generally preclude the undesirable migration of fluids in well bores. Occasionally, however, problems do arise which jeopardize or breach the integrity of a well bore. When problems are suspected through monitoring or detected by undesirable impacts, remedial work becomes necessary. Current regulations and onshore orders require prompt reparative action whenever a problem is documented for a well or facility for which BLM has responsibility.

Development of coal-bed methane wells generally includes withdrawal of appreciable amounts of water from sub-surface coal seams (beds). If shallow aquifers above are in communication with the coal beds, some depletion of those overlying aquifers may occur. In the San Juan Basin, thick shales which are generally impermeable lie between the coals and the shallow aquifers. The presence of these shales combined with the depth differential between the coals and the overlying useable aquifers likely preclude the loss of shallow groundwater. In addition, evidence such as differences in pressure, water type, and water quality between the coal-beds and adjacent (overlying and underlying) formations, indicate that the coals are a closed geologic system and most likely are not in communication with one another. However, if communication were to exist this could be detected by analysis of the produced water which would change in quality and type to more closely resemble the shallow water composition. Additionally, minor subsidence may occur as a result of producing the coal bed waters which could serve to reduce the porosity and permeability reducing the entrance of outside waters to the coals. This potential subsidence would be minor and it is extremely doubtful that the small amount of thickness reduction due to water withdrawal and coal shrinkage effects would traverse the thick overlying strata and be expressed at the surface, or would at least be immeasurably small.

Water disposal into deep wells will not cause adverse impacts to shallow useable aquifers. Evaporation ponds are an alternative disposal method which, if properly constructed, provides an environmentally safe method of water disposal.

## Proposed Action and Continuation of Present Management Alternatives

### Glenwood Springs Resource Area

The Continuation of Present Management and Proposed Action Alternatives call for No Surface Occupancy leasing stipulations on 21,218 acres of public lands on the Colorado, Fryingpan, Eagle, Piney, Crystal, and Roaring Fork River corridors. Additionally, the municipal watersheds for Rifle (Beaver Creek) and New Castle (East Elk Creek) have No Surface Occupancy stipulations, as does the 7,126 acre flow hazard zone around Glenwood Springs. The watershed for two fish hatcheries also have protective stipulations. These limitations will afford adequate protection of the water resources in these areas.

4-14

## ENVIRONMENTAL CONSEQUENCES

### Kremmling Resource Area

The Colorado River corridor is unavailable for leasing.

### Little Snake Resource Area

The Continuation of Present Management and Proposed Action Alternatives call for a Controlled Surface Use lease stipulation to protect fragile soil areas. This stipulation, with its performance standards, would protect surface waters from sediment and salinity impacts associated with surface disturbance on these specific soils (see Soils section).

### Northeast Planning Area

No Surface Occupancy stipulations would protect reservoir rights-of-way and riparian zones under both the Continuation of Present Management and Proposed Action Alternatives.

## FORESTRY

### All Alternatives

Road and well pad development could have both beneficial and adverse impacts on forest resources. Beneficial impacts could include construction of access roads to forested stands which were previously inaccessible and the replacement of old, decadent trees by young, vigorous seedlings, possibly of a more desirable species. Adverse impacts would result from the long-term removal of forested tracts from timber and woodland production. Increased demand could be placed on the forested areas for products like fuel wood, posts and poles, and Christmas trees. Increased trespass for harvesting of these same products would also be anticipated.

Construction or improvement of access roads in the well field to areas which are proposed or which have the potential, for future forest product harvest would reduce the costs of commercial logging operations on these tracts. Due to the relatively high cost of road construction and the small size of some sales, well field road construction would result in a significant cost savings to the lumber and fuel wood industry for commercial harvesting in these areas.

Road, well pad, and gathering line construction in the well field would remove forest resources. Assuming that all forest products removed would be recovered and utilized, these changes in forest resources would not result in significant adverse impacts to forest economics. If local loggers are given the clearing work, the local forest industry would receive a beneficial economic impact.

Long-term productivity, however, would be slightly reduced by the semi-permanent nature of well field operations in forested areas. Reclamation of well pads and right-of-way corridors from construction to operational widths would help mitigate this long-term effect, but on some forest and woodland sites regeneration would be unlikely. On favorable sites, it would take between 75 and 100 years in commercial forest lands and up to 200 years in pinyon-juniper woodlands for trees to attain harvestable size in the reclaimed areas. This is not considered to be significant.

It is estimated that no more than one percent of the forest land or woodlands in the Study Area will be impacted by oil and gas development activities during the 20-year planning period.

## RECREATION

### Proposed Action Alternative

Exploration and most drilling activities would have relatively insignificant and short-term impacts on recreationists. The exception would be in fields where intensive oil and gas development occurs. In developed oil and gas fields, permanent support facilities would tend to cause a shift from resource-dependent recreation (primitive) to facility-dependent recreation (modern urban). The primitive and semi-primitive recreation settings would never return to their original settings, even with rehabilitation. The cumulative effect would be a decline in the area available to users who prefer undeveloped settings and an increase in area to users who prefer more developed types of settings in which to engage in various activities. Providing physical access to areas currently isolated from public use would help offset some of the loss of area and would generally be considered a benefit except in areas being managed to provide primitive and semi-

4-15

BLM_0005777

## CHAPTER FOUR

primitive nonmotorized recreation. Some
undeveloped campsites may be affected by
placement of oil and gas facilities. These
impacts would be important to those users
who prefer primitive and semi-primitive
settings to engage in such activities as
hunting, hiking, viewing, floatboating, and
backpacking, but would only occur in and
near those areas where field development
occurs.

Field development is anticipated to occupy
less than five percent of the land within each
Resource and Planning Area.

### Glenwood Springs Resource Area

The semi-primitive nonmotorized area around
Sunlight Peak may be affected by road
construction if fields develop nearby. The
high increase in vehicle traffic, and human
presence will reduce the semi-primitive
qualities such as isolation, low amounts of
noise, and low density of human activity.

The No Surface Occupancy stipulation would
prevent impacts to recreation and visual
values. This stipulation would also prevent
impacts to caves found in the upper strata of
the cave bearing formation: cave resource
values which may exist below the subsurface
elevation of 5,600 feet would not be
protected.

### Kremmling Resource Area

No disturbance is projected and impacts to
recreation are unlikely in POD area 1. In
POD areas 2 and 3, a disturbance of 73 acres
at any given time would not interfere with
dispersed recreation. In POD area 4, a
projected disturbance of 1,090 acres at any
one time would normally present an impact to
recreational use, however, existing
recreational use in this area is presently
minimal and dispersed. Activities that would
be displaced are driving off-highway vehicles
(OHVs), and antelope and small game
hunting. COAs would not be adequate to
mitigate impacts on public lands within the
Upper Colorado River SMRA and North
Sand Hills SMRA. SRMAs would be
protected with No Surface Occupancy
stipulations and only adjacent lands would be
subject to development.

### Little Snake Resource Area

Adverse impacts to recreational settings could
be mitigated to an acceptable level with the
use of appropriate COAs designed to
minimize impacts to recreational values.
These include ensuring that key access routes
previously available to the user public are not
unnecessarily blocked, and in certain
situations, arranging for the retention of
access roads in the abandonment phase where
such retention would provide public access to
previously inaccessible areas. No Surface
Occupancy stipulations would protect the
Little Yampa/Juniper Canyon Special
Recreation Management Area (SRMA), the
Cedar Mountain unit, Steamboat Lake State
Park, and Pearl Lake State Recreation Area.

### Northeast Planning Area

Special stipulations requiring No Surface
Occupancy within major reservoir rights-of-
way and a seasonal closure at Sterling
Reservoir will protect the major intensive
recreation areas in the medium to high
potential areas. Since most drilling is
expected to occur on split estate lands,
hunting and viewing wildlife are the only
recreational activities that may be impacted.
Field development could cause big game
species to discontinue using the area, and
local hunting success and viewing
opportunities would decrease.

### San Juan/San Miguel Planning Area

Adverse impacts from oil and gas activities
are not anticipated. Intensively used
recreation areas such as the public lands
along the Dolores River and the Dolores
River Canyon Wilderness Study Area (WSA)
are protected with a No Surface Occupancy
stipulation. Similarly, the Weber and
Menefee Mountains primitive recreation areas
are protected by their WSA status, which if
they are not designated wilderness, would
revert to No Surface Occupancy. The
Tabeguache Canyon Outstanding Natural
Area (ONA) and the Tabeguache Pueblo are
protected from adverse impact by No Surface
Occupancy stipulations.

BLM_0005778

## ENVIRONMENTAL CONSEQUENCES

### Continuation of Present Management Alternative

Impacts from this alternative would be the same as those described under the Proposed Action Alternative with the exception of that shown below.

### Glenwood Springs Resource Area

The existing No Surface Occupancy does not encompass portions of the area with outstanding recreation, visual, and cave resource values, and therefore, some of these values would not be protected from oil and gas activities. Additionally, No Surface Occupancy would not protect caves because slant drilling into the area's subsurface would occur from outside the NSO boundary.

### Standard Terms and Conditions Alternative

### Glenwood Springs Resource Area

Impacts would be similar to those described for the Proposed Action Alternative. Exploration and development activities in Field #8 in the headwaters of Thompson Creek could increase erosion which could increase sedimentation downstream in the Thompson Creek Area of Critical Environmental Concern (ACEC), possibly affecting the aquatic habitat and degrading the recreational fishing opportunities in the stream. Field development is not expected to occur in the other SRMAs within the Resource Area, so adverse impacts to recreationists are unlikely.

### Kremmling Resource Area

Impacts to recreationists would be the same as described for the Proposed Action Alternative with the following additions.

North Sand Hills

The North Sand Hills SRMA is within POD area 2 where 22 wells are projected with a disturbance of 232 acres over the next 20 years. Should the projected 57 acres of disturbance at any one time be located within the SRMA, impacts to the recreation setting and experience would be significant. In the long term, vehicle access may be increased with the construction of roads associated with oil and gas development, but areas now intensively used for camping, hunting, and operating off-highway vehicles (OHVs) would be lost to oil and gas development and activity. Impacts to scenic values, causing a shift from semi-primitive motorized to a modern urban setting would cause a decline in use from 6,000 OHV visits and 1,000 camping visits to less than 500 OHV and 50 camping visits. This would not only cause a loss of unique recreational opportunities available in the North Sand Hills, but would increase pressure and lead to significant impacts on the East Sand Hills Natural Area which is managed by the Colorado State Department of Parks and Outdoor Recreation. Enforcement and compliance with an existing OHV closure in the East Sand Hills would be difficult due to the loss of motorized recreational opportunities in BLM's North Sand Hills. Conflicts between nonmotorized recreationists who presently use the East Sand Hills and motorized recreationists who presently use North Sand Hills would increase as both user groups are concentrated into the East Sand Hills Natural Area. Problems associated with access to East Sand Hills would occur since the most reasonable vehicle route involves access through a privately owned ranch.

Upon completion and termination of oil and gas development in the North Sand Hills, reclamation would not be totally successful in returning the area to its natural semi-primitive setting. Some visual impacts and modifications to the landscape would be permanent, causing a loss of recreational opportunities. Visitor use could return to predevelopment levels, but the experience would change from the undeveloped (semi-primitive) to the developed (rural or urban). COAs would not mitigate anticipated impacts.

Upper Colorado River

The Upper Colorado River SRMA is within POD area 1 where no wells or disturbance are projected over the next 20 years. However, public lands would remain open to leasing and there is potential for surface disturbance.

Depending upon the location and type of development, impacts to recreation resources could be significant. Public lands adjacent to the Upper Colorado River receive intensive use, primarily during the spring and summer floatboating and fishing season. Intensive oil and gas development could cause a shift from

4-17

BLM_0005779

## CHAPTER FOUR

semi-primitive and roaded-open-county settings and experiences to those of rural and modern urban.

### Little Snake Resource Area

Impacts would be similar to those described for the Proposed Action Alternative. Adverse impacts to changes in recreational settings could be mitigated to an acceptable level except in Little Yampa/Juniper Canyon SRMA, the Cedar Mountain area, Steamboat Lake State Park, and Pearl Lake State Recreation Area. Impacts caused by oil and gas development could degrade the values which qualified these areas for special recreation management emphasis.

Those areas impacted by oil and gas development could be lost to public recreational use for the life of the field (30-40 years). The loss of semi-primitive recreational settings and opportunities in the Little Yampa Canyon/Juniper Canyon SRMA, and the loss of settings and locally unique opportunities for environmental education, hiking, and viewing in the Cedar Mountain area, would be significant adverse impacts.

### Northeast Planning Area

Impacts would be similar to those described for the Proposed Action Alternative. In addition, impacts associated with drilling could occur adjacent to the shoreline, swimming areas, campgrounds, and boat launching facilities.

### San Juan/San Miguel Planning Area

Impacts would be the same as those described for the Proposed Action Alternative, except public lands protected by No Surface Occupancy stipulations could be adversely impacted should field development occur on or adjacent to them. This includes the non-WSA portion of the Dolores River, the Tabeguache Canyon ONA, and the Tabeguache Pueblo.

## VISUAL

### All Alternatives

Oil and gas exploration and development could have an adverse effect on the visual resources. There may be some operations

which, regardless of mitigation, may be visible. This may conflict with the management objectives in certain VRM classes. The majority of impacts on the visual resources will be insignificant and short-term. Some facilities with full field development would be considered long-term and significant, depending on the visual class.

## CULTURAL

### All Alternatives

Regardless of possible development levels, there are both positive and negative cumulative impacts upon cultural resources. Development of federal oil and gas resources in previously undeveloped areas would mean that more areas that have not undergone Class III survey inventory would be surveyed. This would provide more information related to past human activities in the Study Area. Oil and gas development has been a positive factor in data collection.

The use of, and adherence to, prescribed conditions will mitigate direct impacts to cultural resources. Negative aspects of development deal mainly with secondary impacts. As more development takes place, more access to otherwise inaccessible areas is created. This will increase the potential for impacts to identified and unidentified cultural resources resulting from vandalism (McAllister 1988 and Nickens, et al. 1981).

If the appropriate sequence of cultural resource management practices are followed during oil and gas development phases and for any ground-disturbing activity associated with oil and gas operations, major impacts to the cultural resources can be mitigated.

### Proposed Action Alternative

The use of a No Surface Occupancy stipulation in critical cultural resource areas in KRA and SJ/SMPA would limit potential impacts. Some cultural resources are subsurface and not easily recognized on the surface. Even with a Class III survey, it is likely that the cultural resources would not be discovered until construction activities begin.

BLM_0005780

**ENVIRONMENTAL CONSEQUENCES**

### Continuation of Present Management Alternative

The impacts to the cultural resources would be essentially the same as those described in the Proposed Action Alternative.

### Standard Terms and Conditions Alternative

Under this alternative, cultural resources would be managed under the applicable laws which require that cultural resources be identified and an assessment of impacts be made prior to surface disturbance. As National Register eligible sites are discovered, impacts to them would be mitigated by avoidance or excavation and recordation.

## PALEONTOLOGY

### All Alternatives

Oil and gas development could disturb surface exposure of geologic formations bearing fossils. This disturbance would be in the form of a direct impact, such as a drill pad excavation or from the increased accessibility of a fossil locality by the construction of an access road. In some rare cases, the surface exposure of a formation is the last remnant of that formation. In these cases, it may be desirable to protect significant fossils within this remnant formation from disturbance. In other cases, the fossils may be distributed throughout a massive formation, but the significance of the fossils requires protection of the entire formation. In most cases, preservation of individual outcrops is unimportant, either because of the lack of significance, the wide distribution, or the absence of fossils.

Existing law will protect significant fossils from adverse impacts by oil and gas development when the fossils are identified. Oil and gas development, as with other kinds of development, will also follow the guidelines set forth in the Colorado Supplement, Number 8270, to the BLM Manual.

Under all alternatives, prior to approval of an APD, identified sites must either be proven to have no significant fossils or appropriate mitigative measures must be taken. For areas of 40 acres or less, mitigation would usually

mean avoidance of the site. If a site could not be avoided and if the disturbed area is significant, it would have to be excavated or the resource otherwise protected. This protection is provided in the Standard Terms and Conditions of all oil and gas leases. Leases in areas designed for protection would also carry a No Surface Occupancy stipulation. This stipulation is used on the Cretaceous Ammonite site in the KRA.

The small percent of unavoidable loss would be an irreversible and irretrievable commitment of the resource. The unavoidable loss is insignificant in relationship to the widespread distribution of the resource.

## WILDERNESS

### Proposed Action and Continuation of Present Management Alternatives

Impacts to wilderness could occur on WSAs that had leases issued prior to prohibitions against leasing in WSAs. It is considered unlikely that any development activity will occur on these leases.

Impacts to wilderness could also occur to WSAs and established wilderness areas if development activities were to take place on adjacent lands. Should development activities be proposed, the COAs would be utilized to minimize or prevent impairment of wilderness values.

A portion of the Troublesome WSA within the KRA surrounds approximately 625 acres of split estate with federal minerals. Drilling and development operations on this property would impair the wilderness qualities of the adjacent WSA and would limit future management options within the WSA. A No Lease stipulation will be utilized on the split estate to maintain the wilderness qualities of the Troublesome WSA.

Congressional designation of areas as wilderness will remove these areas from leasing as required by the Federal Onshore Oil and Gas Leasing Reform Act of 1987 (FOOGLRA). Areas that are not designated as wilderness will be leased in conformance with the decision made in the applicable Resource Management Plan.

4-19

## CHAPTER FOUR

### Standard Lease Terms Alternative

The impacts of this alternative will be the same as described above until Congress designates wilderness areas in Colorado. Following Congressional decision, those areas not designated will be open to leasing and development.

## LANDS AND REALTY ACTIONS

### All Alternatives

Lease development and production requires construction of roads to allow increased access to wells, treatment and storage facilities, and for the construction and maintenance of pipelines, electric power lines, and communication facilities. Electric power lines may be constructed to service wells (pumping equipment), tank batteries, communication, and production facilities. Numerous pipelines would be constructed to transport oil and gas from the wells to gathering stations and treatment facilities. Additional facilities may include storage yards, camp facilities, and airstrips.

Existing facilities may or may not be affected by lease development and production, depending on the location and placement of new oil and gas facilities. Linear-type facilities such as roads, pipelines, and power lines have the greatest potential to be impacted, primarily during construction, maintenance, and reclamation activities of new oil and gas facilities. Some examples of potential impacts are: (1) placement of a well pad may necessitate realignment of short segments of roads or power lines as a result of topography (narrow valleys, ridges); (2) trenching for pipeline construction across a road could interrupt use of the road; (3) construction of a buried pipeline across an existing pipe could expose and possibly rupture the pipe causing a spill; and (4) road maintenance activities could expose and possibly rupture a buried pipeline. These impacts are rare and usually short term because compliance with construction and safety standards generally prevents such impacts, and damage is promptly repaired.

Placement of oil and gas related surface facilities, particularly the linear facilities such as roads, power lines and pipelines, could cumulatively tend to dominate the land use,

especially in areas where these facilities are concentrated. This could tend to dictate location of future facilities as well as limit other authorized uses or users.

## TRANSPORTATION

### All Alternatives

New oil and gas drilling activity will result in construction of new access roads to the specific locations. When new oil or gas fields are discovered and developed, or existing fields are expanded, roads are usually constructed to each new site as needed.

On occasion, road development for oil and gas development results in improved vehicular access into an area whose resources are fragile and could be critically harmed by improved access by the general public. In these instances, BLM may require the lessee to install a locked gate to restrict access to administrative access (BLM and its licensees and permittees only). This may result in some negative reaction from the public, mainly recreationists, who previously were allowed primitive access into the area.

If a location proves to be a dry hole, the roadway would be closed and rehabilitated unless public benefit would be realized by leaving the road open for either public or administrative use. If roads are retained rather than rehabilitated, increased costs of road maintenance must be borne by the BLM. Even if maintained, these roads may fall to a lower standard. If the roads are not maintained, they may become unusable or contribute to soil displacement, loss of surface vegetation, and increased sediment due to runoff.

If a producing well is found, the road would be upgraded by providing proper drainage and/or resurfacing the road for all-weather use in order to provide year-round well access. This road upgrading would provide drainage through waterbars or culverts, road ditching, and some spot gravel surfacing in soft areas.

BLM's road construction standards are utilized in the designing of access roads to well locations. These standards have proven to be effective in the mitigation of erosion

BLM_0005782

**ENVIRONMENTAL CONSEQUENCES**

problems that could arise from improperly
constructed roads.

# SOCIAL AND ECONOMIC

## All Alternatives

### Glenwood Springs Resource Area

Projected oil and gas development in the
GSRA indicates that, under all alternatives,
90 gas wells would be drilled in the next 20
years. Seventy-two would be drilled in the
high potential area of central Garfield County
and 18 in the rest of the Resource Area. An
assumed success rate of 70 percent would
eventually yield total annual production of
2.1 million mcf, equivalent to about 20
percent of the annual average during the
1980s.

The U.S. Forest Service (USFS) economic
input-output model (IMPLAN) of Colorado
was used to estimate the indirect and induced
economic impacts of oil and gas development
in the Economic Study Area (ESA). The
model uses a 1977 data base. Economic
sectors were updated using 1982
employment/output and sales/output ratios.
The data used by the economic model are not
directly comparable with Bureau of Economic
Analysis (BEA) statistics. For consistency,
BEA statistics are used. Only employment
multipliers are used from the state model.

Whether development occurred at an even
rate of about five wells per year or all at once
during a short period of time, economic
impacts would be negligible. The activity
required to drill five wells a year would
sustain total employment of only five work
years and total income of $153,000. Both
figures are less than 1/10 of one percent of
the 1987 numbers for Garfield County alone.
Even if all 90 wells were drilled in one year,
the resultant 94 work years and $2.7 million
in annual income would amount to less than
one percent of the 1987 Garfield County
totals.

Most of the local impact would be felt in
Mesa County and the greater part of total
employment and income effects would be
dispersed throughout the Rocky Mountain
region, further diminishing the strength of the
impacts. Certain businesses--motels,
restaurants, local contractors, and service
companies--would undoubtedly feel the

benefits of increased local expenditures by
drilling companies. However, the effect
would not be sustained nor would it be
consistent.

The total government revenue generated
could eventually be sizeable but still not
significant. Sixty-three producing wells (70
percent of the 90 drilled) would yield
annually over $500,000 in federal royalties,
about $175,000 in Colorado severance taxes
and another $175,000 in local property taxes.
The county's share of federal royalties,
$135,000, combined with the property taxes
of $175,000, would amount to 2.6 percent of
Garfield County's total 1987 revenue.

### Kremmling Resource Area

USFS economic input-output model of
Colorado was used to estimate the indirect
and induced economic impacts of oil and gas
development in the ESA. The model uses a
1977 data base. Economic sectors were
updated using 1982 employment/output and
sales/output ratios. The data used by the
economic model are not directly comparable
with BEA statistics. For consistency, BEA
statistics are used. Only employment
multipliers are used from the state model.

The economic analysis is based upon the
assumption presented under the RFD section
of this document. For the purpose of this
analysis, we assumed that price would be
"sufficient" to support development and
exploration of 108 new wells over the next
20 years. In other words, the analysis
assumes two scenarios: (1) 64 new wells
will be operating by the year 2010 and an
average of five wells are drilled per year, (2)
the second scenario assumes 64 new wells by
year 2010 and 108 wells are explored that
year.

Since a Colorado State model was used and
is not specific to the ESA, only an estimate
can be made as to how much of the impact
will occur in the ESA area. In most cases,
the impact will be less than the total
projected.

Oil and gas developments, as projected in the
"Reasonable Foreseeable Development
Assumptions," would not cause significant
economic impacts to the region. Significant
impacts are defined as changes in population,

BLM_0005783

## CHAPTER FOUR

employment, and income greater than 10 percent.

Employment

Scenario (1). The labor force would expand by less than one percent in the ESA. This increase would not be a significant as defined above.

Scenario (2). The labor force would expand by not more than 2.4 percent in the ESA.

Income

No significant impact in either personal or labor income would occur.

Population

Table O-27 (Appendix O) presents population impacts.

## Little Snake Resource Area

For the economic analysis, base projections were calculated for Routt and Moffat Counties, using the preceding activities selected from the Basic Activity System of the State of Colorado's Planning and Assessment System (PAS).

Use of the PAS affords a common base of methodology, data, and assumptions and still allows flexibility for local judgment. This system is, therefore, the basis of our methodology. Oil and gas development in northwest Colorado, as projected in the RFD, would not cause significant economic impacts to the region. Significant impacts are defined as changes in population, housing, income, infrastructure, etc., greater than 10 percent.

Development of oil and gas in the LSRA is and will continue to be a function of price. World crude oil price is the driving force behind supply and demand. For the purpose of this analysis, we will assume that price will be "sufficient" to support the development of 550 new wells over the next 20 years. The economic analysis is based upon the assumptions presented under the "Reasonably Foreseeable Development Assumptions" section of this document.

Employment

Expansion of the labor force by less than one percent would occur in both Routt and Moffat counties. The Routt County labor force would increase by 41 persons and Moffat by 143 through the year to 2000. This would not be a significant impact as defined above.

Income

No significant impacts in either personal or labor income would occur. Routt County would have both personal and labor income increases of less than one percent, while Moffat County would see a two percent increase in both personal and labor income.

Housing

Vacancy rates between 9 and 27 percent exist in communities in the region, indicating a housing surplus. Communities could absorb growth from 9 to 27 percent without significant impacts.

Population

An increased population of 76 persons in Routt County and 293 in Moffat County is expected as a result of development. Table O-28 (Appendix O) presents population impacts.

## Northeast Planning Area

Impacts

Oil and gas production benefits local economies in several different ways:

a) Increased direct local employment with the company.

b) Increased local income and employment from:

1) Additional purchases from local businesses and contractors by the oil company.

2) Additional purchases from local businesses by company employees.

c) Increased tax base from:

4-22

BLM_0005784

## ENVIRONMENTAL CONSEQUENCES

1) Fifty percent of all royalties and public land rentals are redistributed to the county involved, Colorado Water Conservation Board, and Public School Fund.

2) Increased property tax revenues.

The extent of these benefits vary. Initial exploration leads to a temporary income benefit to the community. If a discovery is made, these effects are more lasting. Possible negative impacts on a local community are primarily increased demand on local infrastructures brought about by new employees and business activities. None of the alternatives would have a significant income effect on the area if 238 wells were drilled over 20 years.

None of the alternatives will lead to significant population changes in the NPA. It is estimated that the urban Front Range would have greater than four additional jobs created for every $1,000,000 of oil and gas produced. This includes the oil and gas employees, company operations, and other employment from expenditures in the area. In contrast, oil and gas activity on the rural Eastern Plains would probably generate less than four jobs per $1,000,000 locally (although it would be greater if spin-off jobs in urban areas were included). In either case, anticipated effects are expected to be minimal.

There will be no significant differences between the three alternatives in royalty revenue to the federal, state, and local governments, or in the personal income generated. (Approximately 121 producing wells will be drilled on federal minerals in 20 years.)

### San Juan/San Miguel Planning Area

USFS economic input-output model of Colorado was used to estimate the indirect and induced economic impacts of oil and gas development in the ESA. The model uses a 1977 data base. Economic sectors were updated using 1982 employment/output and sales/output ratios. The data used by the economic model are not directly comparable with BEA statistics. For consistency, BEA statistics are used. Only employment multipliers are used from the state model.

The economic analysis is based upon the assumptions presented under the RFD section

of this document. For the purpose of this analysis, we assumed that price would be "sufficient" to support development and exploration of 353 new wells over the next 20 years. In other words, the analysis assumes two scenarios for each alternative. (1) At most 150 new wells will be operating by the year 2010 and an average of 18 wells are drilled per year. (2) The second scenario assumes 150 new wells by year 2010 and 353 wells are explored in one year. (However, this magnitude of exploration is unlikely to occur in one year.)

Since a Colorado State model was used and is not specific to the ESA, only an estimate can be made as to how much of the impact will occur in the ESA area. In most cases the impact will be less than the total projected.

Oil and gas developments, as projected in the Reasonable Foreseeable Development Assumptions would not cause significant economic impacts to the region. Significant impacts are defined as changes in population, employment, and income greater than 10 percent.

Employment

Scenario (1) The labor force would expand by less than one percent in the ESA. This increase would not be a significant impact as defined above.

Scenario (2) The labor force would expand by not more than 2.4 percent in the ESA.

Income

No significant impacts in either personal or labor income would occur.

Population

Tables O-29 to O-31 present population impacts for all the alternatives.

## AREAS OF CRITICAL ENVIRONMENTAL CONCERN

Recreation, cultural, riparian, paleontological, sensitive plant, and scenic values, and hazardous areas would be protected on the Areas of Critical

BLM_0005785

## CHAPTER FOUR

Environmental Concern (ACECs) discussed
in Chapter 3 and listed on Table 4-1.

**TABLE 4-1.   SPECIAL MANAGEMENT AREAS--LEASE RESTRICTIONS**

| NAME | DESIGNATION | LEASE RESTRICTIONS | ACRES |
|---|---|---|---|
| GSRA | | | |
| Major River Corridors (includes Upper Colo. & Eagle River SRMAs | | NSO | 42,148 |
| Rifle Falls & Glenwood Springs Fish Hatcheries | | NSO | 15,200 |
| Deep Creek | ACEC/SRMA/ Cave Resource/ VRM Class I | NSO | 4,400 |
| Bull Gulch | ACEC/SRMA/ VRM Class I | Lease Notice | 9,900 |
| Thompson Creek | ACEC/SRMA/ VRM Class I | NSO | 4,286 |
| Hack Lake | SRMA | NSO | 3,480 |
| Rifle Mountain Park | State Park | NSO | 400 |
| Sunlight Peak Area | | NSO | 1,900 |
| Municipal Watersheds | Critical Watershed | NSO | 5,960 |
| Glenwood Springs Debris Flow Hazard Zone | Critical Watershed | NSO | 7,160 |
| Garfield Creek State Wildlife Area | Colorado State Wildlife Area | NSO | 12,520 |
| Basalt State Wildlife Area | Colorado State Wildlife Area | NSO | 4,460 |
| West Rifle Creek State Wildlife Area | Colorado State Wildlife Area | NSO | 1,160 |
| KRA | | | |
| Ammonite Site | ACEC | NSO | 200 |
| Phacelia Site | ACEC | NSO | 300 |
| LSRA | | | |
| Irish Canyon | ACEC | Avoidance Stipulation | 11,680 |
| Lookout Mountain | ACEC | Avoidance Stipulation | 6,500 |
| Cross Mountain Canyon | ACEC | NSO | 3,000 |
| Limestone Ridge | ACEC/RNA | NSO | 1,350 |
| SJ/SMPA | | | |
| Anasazi Cultural Multiple Use Area | ACEC | Avoidance Stipulation | |
| Bull Canyon Rockshelter | | NSO | 5 |
| Tabeguache Pueblo | | NSO | 200 |
| Squaw/Papoose, Cross, and Cahone Canyons | | NSO | 28,464 |
| Painted Hand Ruin | | NSO | 160 |
| Easter Ruin | | NSO | 160 |
| Seven Towers Ruin Group | | NSO | 120 |
| Lighting Tree Tower Group | | NSO | 200 |
| McLean Basin Towers | | NSO | 200 |
| Lowry Ruins & Associations | | NSO | 880 |
| Dominguez-Escalante Ruins | | NSO | 55 |
| Dolores Cave | | NSO | 60 |
| Indian Henry's Cabin | | NSO | 280 |
| Battle Rock | | NSO | 40 |

BLM_0005786

TABLE 4-1. (continued)

| | | | |
|---|---|---|---|
| Hovenweep Buffer Zone | | NSO | 600 |
| Painted Hand Petroglyphs | | NSO | 240 |
| Hovenweep Canyon | | NSO | 3,400 |
| East Cortez | | NSO | 6,420 |
| Goodman Canyon and Goodman Point Buffer Zones | | NSO | 1,560 |
| Cutthroat Castle Buffer Zone | | NSO | 320 |
| Bass Ruin Complex | | NSO | 500 |
| Sandstone Canyon | | NSO | 2,840 |
| Brewer Well Complex | | NSO | 590 |
| Yellow Jacket Canyon | | NSO | 5,120 |
| Basin Wickiup Village | | NSO | 400 |
| Woods Canyon | | NSO | 980 |
| Bridge Canyon | | NSO | 1,120 |
| Porter Ruin | | NSO | 120 |
| Upper Ruin Canyon | | NSO | 640 |
| Bowdish Canyon | | NSO | 1,000 |
| Sand and East Rock Canyon | ACEC | NSO | 5,880 |
| Cannonball Ruin | ACEC | NSO | 80 |
| Bridge Canyon (McElmo) | RNA | NSO | 443 |
| Tabeguache Cave II and Canyon | | NSO | 3,200 |

## Proposed Action Alternative

This alternative would protect areas of special concern from injurious effects of oil and gas development through the use of No Surface Occupancy and/or surface restriction stipulations.

The lease restrictions shown in Table 4-1 are the most restrictive of the mitigative measures prescribed under the Proposed Action Alternative. These restrictions are described in more detail in the RMP/EIS for each special area. The RMP/EIS also describes alternative mitigative measures under changed conditions, such as stipulation waivers or exemptions, or legislative changes (some ACECs may be managed as wilderness upon Congressional designation).

## Continuation of Present Management Alternative

This alternative would protect Areas of Critical Environmental Concern through the use of No Surface Occupancy stipulations on oil and gas leasing.

## Standard Terms and Conditions Alternative

This alternative would protect the Areas of Critical Environmental Concern through the use of No Leasing.

# MINERALS

## All Alternatives

### Oil and Gas

The RFD projects that as many as 1,789 new wells could be drilled throughout the Study Area. The most favorable conditions for exploration and development of oil and gas would be with as few restrictions as possible.

Oil and gas lessees face numerous environmental obligations in order to comply with applicable laws and regulations. These are incorporated into the lease form (Section 6) and require that oil and gas development must occur in a manner which provides reasonable protection for other energy and mineral resources (coal, fluid minerals, locatable minerals, mineral materials, and non-energy leasable minerals); environmental resources (air, soil, water, vegetation, and visual resources); renewable resources (fish and wildlife habitat, forests

BLM_0005787

## CHAPTER FOUR

and woodlands, livestock grazing, and wild horses); and land-use resources (cultural resources, natural areas, recreation, rights-of-way, and wilderness). Discretionary lease stipulations for mitigation of disturbance to environmental resources, energy and mineral resources (other than oil and gas), renewable resources, land-use resources, and support services brings about even greater impacts to oil and gas development. These restrictions can be seasonal restrictions, avoidance stipulations, performance standards, No Surface Occupancy stipulations, or no new leasing.

Application of standard lease terms would not result in any significant irretrievable, or unavoidable impacts to oil and gas. No discretionary lease stipulations have been identified for the protection of other minerals.

The designation of WSAs as wilderness would result in impacts to oil and gas ranging from the loss of some rental income to the irreversible and irretrievable losses of oil and gas resources and the associated royalty income. The magnitude of the loss would depend on the resources available in the particular WSA.

When combining the numerous forms of leasing restrictions or discretionary mitigation with the myriad of resources, it is evident that the Proposed Action and Continuation of Present Management Alternatives would have an adverse impact on oil and gas development. Drilling costs would increase as a result of directional drilling requirements in avoidance or NSO areas. Seasonal restrictions could result in access times being too short for effective exploration and development programs. Performance standards could also increase the cost of exploration and drilling. The cumulative impact of lease restrictions could hinder or prevent oil and gas development in certain locations. In light of this, oil and gas development would be least impacted by allowing lessees to operate under the standard lease terms along with any nondiscretionary mitigation that is currently in effect. This would allow for a more simplified and comprehensive development of oil and gas resources while still promoting the protection of other resources. It should be noted that any discretionary mitigation decided upon in this document would apply only to new leases and not to existing leases.

Any energy and mineral resources or freshwater zones encountered in the wellbore require additional plugs, cement, and casing for adequate protection. With respect to some minerals, such as oil shale, special protective measures are required in known mineral areas. (See description of drilling operations in Appendix A.)

The leasing and production of oil, natural gas, coal-bed methane, and carbon dioxide reserves would result in irreversible and irretrievable losses of the resources that are extracted and the resources that would remain in the ground as unrecoverable. The extent of these impacts would vary greatly depending on particular reservoirs and development methods.

Other Minerals

Required mitigation embodied in section 6 of the standard lease terms and further defined in the Code of Federal Regulations will protect other minerals penetrated by oil and gas wellbores (see description of drilling operations in the Exploratory Drilling section, Appendix A). This mitigation is enforced through review and COAs which monitor and adjust locations, cementing, and plugging programs in order to protect these resources. These actions are taken on APDs, Sundry Notices, and Rights-of-Way approvals.

The potential exists for conflicts between coal and oil and gas leases. Longwall and open pit mining operations are continuous excavations. Well bores drilled into or through mined coal seams ahead of these operations cause reorienting of the mine to avoid conflicts. If mine plans are not altered, there exists the possibility of the mining operation destroying the well and/or the well leaking flammable and toxic gases into the mine endangering the miners. If the mine path is altered, large quantities of coal may be left in place never to be recovered.

Room and pillar mining operations are better equipped to deal with by-passing well bores. However, some additional coal will be left in place since larger than normal protective pillars are left around the well. The presence of wells also limits use of explosives within certain distances of the well. The loss of coal in room and pillar mines as a result of faster oil and gas extraction is felt to be an acceptable resource conservation trade-off.

BLM_0005788

## ENVIRONMENTAL CONSEQUENCES

Stipulations and Conditions of Approval will be employed to mitigate the conflicts between oil and gas operations and coal recovery. This mitigation has been developed in the interest of conservation of resources to ensure the maximum recovery of these important natural resources.

Where an existing oil and gas lease is within the area of an approved surface mine plan, approval of an APD will be deferred until mining is complete. Where oil and gas operations are proposed and then deferred, a suspension of operations and production of the oil and gas lease will be considered. New oil and gas leases will be issued within the area of an approved surface mine plan with a No Surface Occupancy stipulation. The stipulation will contain a waiver provision allowing for the drilling of a well under certain conditions.

For oil and gas leases outside the area of an approved mine plan but within an area identified as having the potential for surface mining, the oil and gas operator will be notified by a Condition of Approval when an APD is approved that the well will have to be plugged under certain conditions. A suspension of operations and production will be considered in such a circumstance. New leases in such areas will not be stipulated; conflicts will be addressed in the same manner as existing leases.

Conflicts between oil and gas leases and underground mines require a different approach. Where an existing oil and gas lease is within the area of an approve underground mine plan, a Condition of Approval will be attached to an APD requiring the plugging of the well under certain conditions. A suspension of the operations and production for the oil and gas lease will be considered. The same Condition of Approval will be applied to APDs filed on existing and new leases in areas outside the area of an approved mine plan but within an area identified as having the potential for underground mining.

New leases within the area of an approved underground mine plan will be issued with a Controlled Surface Use stipulation. The stipulation will require possible relocation of proposed oil and gas operations outside the mine plan area or to accommodate room and pillar mining operations. The stipulation would contain a waiver provision allowing for the drilling of a well subject to certain conditions.

Potential coal/oil and gas conflict areas include the Sand Wash Basin margin and along the Axial Basin Anticline in the LSRA, the northern San Juan Basin margin in the San Juan Resource Area, the Piceance Basin side of the Grand Hogback in the GSRA, and North Park in the KRA.

## CUMULATIVE IMPACTS

This section describes the cumulative impacts that are anticipated to occur. It is greatly expanded from the cumulative impact descriptions provided in the draft EIS. Cumulative impacts are defined in the Council on Environmental Quality (CEQ) regulations 40 CFR 1508.7 as ". . . the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions."

To determine cumulative impacts, BLM analysts added the impacts of this Proposed Action, i.e., oil and gas development, with the impacts of all other BLM management activities and authorizations on the public lands within the Study Area. In addition, land use trends and significant actions anticipated to occur on other lands within the Study Area are considered. Only impacts of the Proposed Action are described, because the reasonably foreseeable levels of oil and gas development did not vary significantly between alternatives. The resulting impact descriptions are displayed by environmental component for each Resource/Planning Area. This was done in anticipation that if impacts are significant, it will be in the context of the Resource or Planning Area and not the Study Area (the five affected areas combined) or the state as a whole.

The analysis revealed that most environmental components would be impacted similarly, but not significantly within each of the Resource/Planning Areas. The major concern is the amount of surface disturbance resulting from oil and gas activity when added to all other surface disturbing activities, and the impacts this may cause to

BLM_0005789

## CHAPTER FOUR

various resources, most notably wildlife habitat.

The amounts of surface disturbance that are anticipated will have an insignificant impact on forage for livestock, wild horses, and on soil and water resources. Any impacts to these environmental components will be local and short term as described in previous sections of this chapter. Similarly, impacts to forest resources, recreation uses, visual resources, wilderness values, land use authorizations, social and economic conditions and other mineral development is expected to be local and short term.

Except for the urbanizing area along the Front Range within the Northeast Planning Area, air quality is expected to remain good. In this area, the contribution of federal oil and gas leasing and development to air quality degradation is virtually non-existent. In the other Resource/Planning areas pollutants including dust, smoke and other emissions resulting from oil and gas activities will be short term and localized and will not be cumulatively significant.

Most surface disturbance on the public lands is expected to result from vegetation manipulation and other projects designed primarily to improve forage for livestock or habitat for wildlife. Vegetation manipulation and forest management actions change plant succession and occasionally the landscape, however, there are little or no residual impacts when the area has revegetated. In most vegetation types including sagebrush where most of the manipulation is planned, it is considered to take one to five years to

revegetate as shown in the tables that follow for the Resource/Planning areas.

### Glenwood Springs Resource Area

Table 4-2 lists the cumulative surface disturbance anticipated to occur over the next twenty years and the residual (unreclaimed) disturbance.

During the next twenty years, oil and gas development is expected to add about 1.6 percent (1,090 acres) to the total area of public lands disturbed from all management actions and causes (68,220 acres). This amounts to just over 13 percent of the Resource Area that are expected to incur some surface disturbance during this period. This level of disturbance is similar to what has been occurring within the area. For this reason, the cumulative impacts to most environmental components have been and will continue to be insignificant.

Private lands are continuing to be developed with growth in the recreation, tourism, mining, and logging industries. For example, 82 percent of the anticipated oil and gas development will occur on private lands. This amounts to approximately 4,970 acres of disturbance over the next 20 years. While all development taken together amounts to only a minor percentage of the total lands with the Resource Area, much of it is occurring on big game winter range. Many winter ranges are now either at or approaching carrying capacity and additional

TABLE 4-2.  CUMULATIVE SURFACE IMPACTS--GLENWOOD SPRINGS RESOURCE AREA

| Action/Cause | Total Surface Disturbance for next 20 Years (in acres) | Residual Impacts After Mitigation (1-5 years after impacts in acres) |
|---|---|---|
| Vegetation Manipulation | 27,800 | 0 |
| Other Livestock Projects--fences, springs, reservoirs, wells, pipelines | 280 | 50 |
| Forest Management | 2,000 | 25 |
| Wildlife Projects | 20,040 | 200 |
| Recreation Facilities | 0 | 0 |
| Rights-of-way, power lines, ditches, roads | 750 | 600 |
| Mining and Other Projects | 260 | 180 |
| Hazardous Material Spills, Wildfire, and other unanticipated events | 16,000 | 0 |
| Oil and Gas Impacts | 1,090 | 79 |
| Totals | 68,220 | 1,134 |

4-28

BLM_0005790

## ENVIRONMENTAL CONSEQUENCES

loss compounds the potential for problems. A continuing and likely increasing impact will be game damage on private lands.

### Kremmling Resource Area

Table 4-3 lists the cumulative surface disturbance anticipated to occur during the next twenty years, and the residual (unreclaimed) disturbance.

During the next twenty years, oil and gas activity may result in disturbance to approximately 2,050 acres representing 3.1 percent of the total area disturbed on public lands. Oil and gas activity on private lands is anticipated to impact a similar amount of land. In either case, the amount of land disturbed is insignificant. In total, less than 17 percent of public land is expected to incur surface disturbance during this time period. The largest amounts of surface disturbance involve vegetation manipulation of big sagebrush. To the extent that oil and gas activity also occurs on lands with big sagebrush, critical habitat for mule deer and pronghorn may be disturbed. In addition, sage grouse habitat and populations may be reduced as may habitat and populations of non-game species dependent on the sagebrush ecosystem.

A portion of the 4,090 acres of residual impacts from all surface disturbance would be on private property, however assuming all of this unreclaimed disturbance was on public lands it would amount to about 1 percent,

with oil and gas activity contributing about 30 percent of the total. The impacts of this surface disturbance spread over all the public lands in the Resource Area are not considered significant.

### Little Snake Resource Area

Table 4-4 lists the cumulative surface disturbance anticipated to occur during the next twenty years, and the residual (unreclaimed) disturbance.

During the next twenty years, oil and gas activities when added to all other management actions may result in surface disturbance to 87,425 acres which is just under seven percent of the public lands within the Resource Area. The portion attributable to oil and gas will be about 12,350 acres, or about 14 percent of the total. On private lands, the amount of disturbance is expected to be similar, because about one half of the projected development will be on private land.

Oil and gas development is expected to cause more than half of the unreclaimed surface disturbance (land occupied by more or less permanent facilities such as roads, pump jacks, storage tanks etc. are considered unreclaimed). The total area of residual impact from all causes and actions is about two tenths of one percent and is therefore not considered significant.

TABLE 4-3.   CUMULATIVE SURFACE IMPACTS--KREMMLING RESOURCE AREA

| Action/Cause | Total Surface Disturbance for next 20 Years (in acres) | Residual Impacts After Mitigation (1-5 years after impacts in acres) |
|---|---|---|
| Vegetation Manipulation | 45,200 | 0 |
| Other Livestock Projects--fences, springs, reservoirs, wells, pipelines | 150 | 30 |
| Forest Management | 4,000 | 50 |
| Wildlife Projects | 10,000 | 200 |
| Recreation Facilities | 50 | 50 |
| Rights-of-way, power lines, ditches, roads | 2,200 | 1,100 |
| Muddy Creek Reservoir (includes private property, where majority of impacts occur) | 1,450 | 1,450 |
| Hazardous Material Spills and other unanticipated events | 100 | 10 |
| Oil and Gas Impacts | 2,044 | 1,200 |
| Totals | 66,894 | 4,090 |

4-29

BLM_0005791

## CHAPTER FOUR

TABLE 4-4.  CUMULATIVE SURFACE IMPACTS--LITTLE SNAKE RESOURCE AREA

| Action/Cause | Total Surface Disturbance for next 20 Years (in acres) | Residual Impacts After Mitigation (1-5 years after impacts in acres) |
|---|---|---|
| Vegetation Manipulation | 50,000 | 0 |
| Other Livestock Projects--fences, springs, reservoirs, wells, pipelines | 1,475 | 300 |
| Forest Management | 500 | 0 |
| Wildlife Projects | 20,000 | 200 |
| Recreation Facilities | 100 | 100 |
| Rights-of-way, power lines, ditches, roads | 2,000 | 500 |
| Coal Mining | 1,000 | 500 |
| Hazardous Material Spills and other unanticipated events | 0 | 0 |
| Oil and Gas Impacts | 12,350 | 3,200 |
| Totals | 87,425 | 5,600 |

## Northeast Planning Area

In this Planning Area, BLM has surface management of only about 32,000 acres consisting largely of small scattered parcels. BLM management actions and authorizations are insignificant in terms of cumulative impacts within the 21 million-acre Planning Area. For this reason, a table comparable to those displayed for the other Resource/Planning Areas was not developed.

Over a twenty year period, oil and gas exploration and production on federal leases is expected to disturb 848 acres. Most, if not all, will occur on 443,000 acres of split estate land where the surface is in non-federal ownership. Historically, only .68 percent of the wells drilled have been on the federal mineral estate, exclusive of the Pawnee National Grasslands. In total therefore, about 84,200 acres may be disturbed by oil and gas activities during the next twenty years. This is insignificant in relation to the almost 21 million acres within the Planning Area, however, most of this surface disturbance will be concentrated where fields are developed.

Within the Northeast Planning Area, other surface disturbing activities are taking place at a rapid rate. Urban areas are expanding at approximately two acres per hour and the new international airport being constructed northeast of Denver will further accelerate this trend. In this expanding urban fringe, particularly in Weld and Adams counties, oil and gas caused surface disturbance, although a minor part of the total, will further exacerbate the trend of converting privately owned farm and ranch land to other uses.

## San Juan/San Miguel Planning Area

Table 4-5 lists the cumulative surface disturbance anticipated to occur during the next twenty years, and the residual (unreclaimed) disturbance.

During the next twenty years oil and gas exploration and production activity is expected to add approximately 2 percent (1,430 acres) to the total public lands that will incur disturbance (84,660 acres). This amounts to about 8.5 percent of the public lands within the Planning Area. Considering the total area, this small amount of disturbance is not considered significant, however the potential cumulative impact on cultural resources is a concern.

Inventories conducted in preparation for oil and gas work is expected to result in the recordation of approximately 18,000 cultural sites that are eligible or potentially eligible to the National Register of Historic Places. The use of the No Surface Occupancy stipulation for cultural resource protection reduces the number of impacted eligible or potentially eligible sites from about 18,000 sites to 2,000 sites, by eliminating new access routes into areas with high cultural site densities. Eighteen thousand sites represent almost 22 percent of the total number of eligible or potentially eligible sites likely to be identified

4-30

BLM_0005792

## ENVIRONMENTAL CONSEQUENCES

TABLE 4-5. CUMULATIVE SURFACE IMPACTS--SAN JUAN/SAN MIGUEL PLANNING AREA

| Action/Cause | Total Surface Disturbance for next 20 Years (in acres) | Residual Impacts After Mitigation (1-5 years after impacts in acres) |
|---|---|---|
| Vegetation Manipulation | 57,800 | 100 |
| Other Livestock Projects--fences, springs, reservoirs, wells, pipelines | 475 | 75 |
| Forest Management | 1,800 | 30 |
| Wildlife Projects | 20,000 | 400 |
| Recreation Facilities | 100 | 100 |
| Rights-of-way, power lines, ditches, roads | 3,000 | 1,500 |
| Hazardous Material Spills and other unanticipated events | 55 | 5 |
| Oil and Gas Impacts | 1,430 | 410 |
| Totals | 84,660 | 2,620 |

during inventories of the public lands during this time period.

Although the potential is low, these sites are at risk should they not be identified in advance of the surface-disturbing activity. Also, significant impacts can occur to cultural sites over time due to increases in access to sites brought about by additional roads and trails. This is particularly true for oil and gas operations as these developments are expected to occur in the highest cultural site density areas. The Final San Juan/San Miguel Resource Management Plan and Environmental Impact Statement discusses these potential impacts in more detail on pages 63-66.

The residual (unreclaimed) surface disturbance of 2,620 acres represents just over one-quarter of one percent of the total public land acreage in the Planning Area. Oil and gas activity will contribute approximately 16 percent to the total residual impact.

BLM_0005793

# CHAPTER FIVE

# CONSULTATION AND COORDINATION

BLM_0005794

# CHAPTER FIVE

# CONSULTATION AND COORDINATION

## REVIEW OF THE DRAFT EIS

The Draft EIS was filed with the Environmental Protection Agency on May 4, 1990. The notice of availability was published in the May 10, 1990, issue of the *Federal Register*. The notice was made available to the news media in the State of Colorado. Copies of the DEIS were mailed to federal, state, and local government agencies and to interested organizations and individuals. Copies of the DEIS were available upon request and public review copies were available throughout Colorado. The public comment period of 90 days ended on August 17, 1990.

Public hearings were held in Grand Junction, Denver, and Durango on July 2, 9, and 16, 1990, respectively.

## RESPONSE TO COMMENTS

All letters and testimony were reviewed and considered in preparation of the FEIS. Comments which addressed the adequacy of the DEIS received a response. Each commentor was assigned an index number. Commentors are listed on Table 5-1. Commentors 1 through 100 and 129 and 130 submitted comments in writing: Commentors 105 through 128 testified at the hearings.

Comment letters are identified in Table 5-2. The letters are displayed in Appendix Q.

Comments were paraphrased and combined to reduce the bulk. Comments were also grouped by Chapter and Appendix. The commentor index number is shown following the comment. The response for each comment identifies that the text of the EIS was changed or provides the rationale for why the comment did not require a text change. Comments are shown by environmental component in the same order they appear in the Table of Contents.

Comment letter number one is an announcement that was sent out by the Colorado Environmental Coalition to its members. The BLM received 76 letters that contained the five comments shown in the announcement. Instead of reproducing all 76 letters, the BLM chose to publish just the announcement and identify all 76 commentors.

BLM_0005795

Table 5-1.  List of Commentors on Colorado Oil and Gas Leasing Draft EIS

| NAME | COMMENT NUMBER |
|---|---|
| 1.  Jacqueline Mintener | 20,21,22,37,38 |
| 2.  Jean Shapiro | 20,21,22,37,38 |
| 3.  Doug (? - illegible) | 20.21,22,37,38 |
| 4.  Stephen Repile | 20,21,22,37,38 |
| 5.  Kathryn Allen | 20,21,22,37,38 |
| 6.  John Bermingham | 20,21,22,37,38 |
| 7.  Malcolm Rea | 20,21,22,37,38 |
| 8.  Theo Waller | 20,21,22,37,38 |
| 9.  Stephen & Laurel Higgens | 20.21,22,37,38 |
| 10. John Reed | 20,21,22,37,38 |
| 11. Henry Hite | 20,21,22,37,38 |
| 12. Lorraine Lane | 20,21,22,37,38 |
| 13. Linda Melos | 20,21,22,37,38 |
| 14. Elizabeth Otto | 20,21,22,37,38 |
| 15. Gwen Hoffnagle | 20,21,22,37,38 |
| 16. Bruce Berger | 20,21,22,37,38 |
| 17. Jeffrey Trull | 20,21,22,37,38 |
| 18. Jennifer Kitchel | 20,21,22,37,38 |
| 19. Iva Peacock | 20,21,22,37,38 |
| 20. Richard Eversole | 20,21,22,37,38 |
| 21. William Folger | 20,21,22,37,38 |
| 22. Jan Seaman | 20,21,22,37,38 |
| 23. Karin White | 20,21,22,37,38 |
| 24. Evelyn Keith | 20,21,22,37,38 |
| 25. Marjorie Darling | 20,21,22,37,38 |
| 26. Frank & Ruth Harold | 20,21,22,37,38 |
| 27. David Bryant | 20,21,22,37,38 |
| 28. Maureen Keilty | 20,21,22,37,38 |
| 29. Cora Smyth | 20,21,22,37,38 |
| 30. Charles Swan | 20,21,22,37,38 |
| 31. Roz McClellan | 20,21,22,37,38 |
| 32. Barbara Brayton | 20,21,22,37,38 |
| 33. Cindy Lagace | 20,21,22,37,38 |
| 34. Daphne Peirce | 20,21,22,37,38 |
| 35. Jason Smolka | 20,21,22,37,38 |
| 36. Babs Schmerler | 20,21,22,37,38 |
| 37. Alice White | 20,21,22,37,38 |
| 38. Felice Rhiannon | 20,21,22,37,38 |
| 39. Larry Spiegel | 20,21,22,37,38 |
| 40. Glenn Barney | 20,21,22,37,38 |
| 41. Paul & Virginia Lappala | 20,21,22,37,38 |
| 42. Lorraine Lane | 20,21,22,37,38 |
| 43. Joanne Boudreaux | 20,21,22,37,38 |
| 44. Michelle Holcome | 20.21.22.37.38 |
| 45. S. Smith | 20,21,22,37,38 |
| 46. Dave Lomas | 20,21,22,37,38 |
| 47. Lyle Tautfest | 20,21,22,37,38 |

5-2

**TABLE 5-1   (continued)**

| | |
|---|---|
| 48. Maggie Smith | 20,21,22,37,38 |
| 49. Nina Johnson | 20,21,22,37,38 |
| 50. John Ritchey | 20,21,22,37,38 |
| 51. Kirk Vogel | 20,21,22,37,38 |
| 52. David Mork | 20,21,22,37,38 |
| 53. Lynn & Larry Threlfall | 20,21,22,37,38 |
| 54. Steve Goochman | 20,21,22,37,38 |
| 55. Donald Thompson | 20,21,22,37,38 |
| 56. Mike Cockrell | 20,21,22,37,38 |
| 57. Robert White | 20,21,22,37,38 |
| 58. Bettie Burton | 20,21,22,37,38 |
| 59. Mary Harris | 20,21,22,37,38 |
| 60. Charla Palmer | 20,21,22,37,38 |
| 61. Michael Adams | 20,21,22,37,38 |
| 62. Judith Dome | 20,21,22,37,38 |
| 63. Kenneth Warn | 20,21,22,37,38 |
| 64. Sue Pienciak | 20,21,22,37,38 |
| 65. Michael Kelly | 20,21,22,37,38 |
| 66. Robert Winslow/Marilyn Leftwick | 20,21,22,37,38 |
| 67. Kenneth Warn | 20,21,22,37,38 |
| 68. Michael Yadlowsky | 20,21,22,37,38 |
| 69. Mary Smelker | 20,21,22,37,38 |
| 70. Beverly and Tony Baker | 20,21,22,37,38 |
| 71. Wilderness Society | 20,21,22,37,38 |
| 72. Dave and Lauren Naslund | 6,20,21,22,37,38, |
| 73. Wilbur Boldt | 38 |
| 74. Dorothy Gumaer | 20,22 |
| 75. John Dominque | 20,22 |
| 76. Mark Pearson | 7,15,23-27,51,145 |
| 77. Sierra Club | 26,204,205,214 |
| 78. National Wildlife Federation | 26,44,64,89,157,228 |
| 79. Mobil Exploration | 50,156,186,187,213 |
| 80. Dean Visitainer | 233,234 |
| 81. Colorado Env. Coalition | 3,26,27,43,73,155,228,234 |
| 82. Trapper Mining | 143,224-226 |
| 83. Kirk Koepsel | 4,26,27,39-41,75-79,90,267 |
| 84. Int. Assoc. of Geo. Contr. | 238,241,243-245,255-257 |
| 85. CGG Proprietary Data | 238,241,243-245,255-257 |
| 86. ROMOGA | 5,27,42,45,46,48,49,50,57,58,61,144,154,162,163, 185,186,188,232,246,247,251-254,257,268,277,283 |
| 87. Wildlife Society | 65,174 |
| 88. Env. Prot. Agency | 46,52,115-118,153,181,198,211,212 |
| 89. Poulson, et al | 61 |
| 90. US Forest Service | 59,62,63,66,67,68,72,82-84,87,92-97,101,105,106, 131,152,164,165,167-173,177,179,182-184,189-191, 194,195,223,227,229-231,235,240,242,275,281,282 |

BLM_0005797

**TABLE 5-1** (continued)

| | |
|---|---|
| 91. Nat. Park Service | 2,30,31,36,86,98,107-109,113,114,119,120,121,123, 125,126,128,130,132,159,180,199,200,201,210,218- 222,228,266,278,287 |
| 92. Colo. Dept. of Nat. Res. | 10,11,29,32,33,35,60,81,85,88,91,99,100,102,103, 113,122,124,129,149,151,160,161,175,176,196,202, 236,237,263-265,272,274,276,279,280,284 |
| 93. Texaco | 1,27,46,47,50,61,146,148,160 |
| 94. Amoco | 258-262,269,277 |
| 95. Chevron | 14,17,18,27,28,50,57,69,147, 185,250 |
| 96. US Fish & Wildlife | 16,34,104,110-112,142,178, 192,193,248,271,286 |
| 97. Sierra Club | 13,70,197,209 |
| 98. Raftopoulos Ranches | 71,74 |
| 99. US Forest Service | 12,27,46,50,80,127,203,208, 239,249,270 |
| 100. U.S. Bureau of Mines | None |
| 101. Dale Doose | None |
| 102. U.S. Dept. of the Air Force | None |
| 103. Corps of Engineers | None |
| 104. Kathy Zarlingo | 21,22 |
| 105. Neil Bradford | 22 |
| 106. Danni Langdon | 21,56 |
| 107. Bill Prather | 35 |
| 108. Mark Pearson | 7,15,23-27,51,145 |
| 109. Don Thompson | 20-22 |
| 110. Kirk Cunningham | 20,21,26 |
| 111. Rocky Smith | 20 |
| 112. Marty Walter | 21,26 |
| 113. Lee Baker | 24 |
| 114. Roger Flynn | 21,26,24 |
| 115. Roz McClellan | 26 |
| 116. Paul Zogg | 20,26 |
| 117. Todd Robertson | 21,22 |
| 118. Jan Hardin | 20,21 |
| 119. Casye Mulligan | 22 |
| 120. Wilbur Boldt | None |
| 121. Alissa Salmore | 21 |
| 122. Julius Dahne | 21,53 |
| 123. L.G. Truby | 8,54,134-137,207,216,217 |
| 124. Carl Weston | 9,133,138-141,206,215 |
| 125. Mark Rinnert | 6,55 |
| 126. Patty Schuler | 158 |
| 127. Jan Neleigh | None |
| 128. Chuck Jones | 19 |
| 129. Rebecca Dunn | 20-22,37,38 |
| 130. Cyprus Empire | 224,225 |

BLM_0005798

Table 5-2. Comment Documents

| AUTHOR | CONTROL # | COMMENT # |
|---|---|---|
| Colo. Env. Coal. | 1 | 20,21,22,37,38 |
| Sierra Club | 2 | 7,15,23-27,51,145 |
| G.J. Hearings | 3 | 21,24,27,56,145,234 |
| Denver Hearings | 4 | 24,26,53 |
| Durango Hearings | 5 | 6,8,9,19,54,55,133-141,158,206,207,215-217 |
| Sierra Club | 6 | 26,204,205,214 |
| Nat. Wldlf. Fed. | 7 | 26,44,64,89,157,228 |
| Mobil Expl. | 8 | 50,156,186,187,213 |
| Dean Visintainer | 9 | 233,234 |
| Colo. Env. Coal. | 10 | 3,26,27,43,73,155,228,234 |
| Trapper Mining | 11 | 143,224-226 |
| Kirk Koepsel | 12 | 4,26,27,39-41,75-79,90,267 |
| CGG Prop. Data | 13 | 238,241,243-245,255-257 |
| ROMOGA | 14 | 5,27,42,45,46,48-50,57,58,61,144,154,162, 163,185,186,188,232,246,247, 251-254,257, 268,277,283 |
| Wildlife Soc. | 15 | 65,174 |
| Env. Prot. Agency | 16 | 46,52,115-118,153,181,198,211,212 |
| Poulson,et al | 17 | 61 |
| US Forest Service | 18 | 59,62,63,66-68,72,82-84,87,92-97,101,105, 106,131,152,164,165,167-173, 177,179, 182-184,189-191,194,195,223,227,229-231, 235,240,242,275,281,282 |
| Nat. Park Service | 19 | 2,30,31,36,86,98,107,108,109,113,114,119, 120,121,123,125,126,128,130,132,159,180, 199-201,210,218-222,228,266,278,287 |
| Dept. of Natural Res. | 20 | 10,11,29,32,33,35,60,81,85,88,91,99,100,102, 103,113,122,124,129,149-151,160,161, 175,176,196,202,236,237, 263-265,272-274, 276,279,280,284 |
| Texaco | 21 | 1,27,46,47,50,61,146,148 |
| Amoco | 22 | 258-262,269,277 |
| Chevron | 23 | 14,17,18,27,28,50,57,69,47,250,285 |
| USFWS | 24 | 16,34,104,110-112,147,178,192,193,248, 271,286 |
| Sierra Club | 25 | 13,70,197,209 |
| Raftopoulos Ranches | 26 | 71,74 |
| USFS | 27 | 12,27,46,50,80,127,203,208,239,249,270 |
| Cyprus Empire | 28 | 224,225 |

BLM_0005799

**CHAPTER FIVE**

# COMMENTS AND RESPONSES

## Chapter 1 Comments

1. **Comment:** Although we commend your efforts to combine several plan amendments into one document, this should have been done in a more logical and coordinated fashion. The document includes a number of discrepancies and is very confusing. (93)

   **Response:** See revised text.

2. **Comment:** Page 1-2. We recommend that the last two sentences be deleted since the issue of protective leasing in the case of drainage is not resolved, and too much detail would be needed to adequately explain the complexities of the issue. (91)

   **Response:** See revised text.

3. **Comment:** CEC strongly disagrees with the statement on page 1-2 of the DEIS which says, "In order to protect the United States from loss of revenues resulting from the drainage of oil and gas under lands closed to leasing, the Secretary of the Interior has authority to issue protective leases within areas otherwise unavailable for leasing." (81)

   **Response:** The scope of the plan amendment/EIS does not extend to lands excepted from leasing under the Mineral Leasing Act. Therefore, this statement has been removed in the final. The Regional Solicitor of the Department of the Interior has provided us with an opinion outlining the Secretary's authority to issue protective leases for such lands. However, if this authority is required, NEPA compliance will be achieved on a site-specific basis for the affected lands.

4. **Comment:** The Colorado State Office of BLM has a chronic problem of not placing proper stipulations on leases. (83)

   **Response:** The Colorado State Office record is quite good in respect to properly applying stipulations. The comment is not supported by the facts in the record.

5. **Comment:** RMOGA never received notification of the BLM's public meetings on the subject DEIS. Since we were not informed of the meetings, we could not have representatives attend. We are sure that the BLM's failure to notify RMOGA was an oversight. We would hope, however, that the BLM is not relying solely upon press releases to provide public notification of meetings. Mailing lists should be compiled and used to inform interested parties of future activities. (86)

   **Response:** RMOGA received a notice in the mail two weeks prior to the meetings and twelve notices were delivered to your office by a team member.

BLM_0005800

## CONSULTATION AND COORDINATION

6.  Comment:   How is the BLM going to insure that the EIS is followed and that it works. (72,125)

    Response:   These plan decisions are subject to continuous monitoring to ensure that adequate resource protection is provided. Such monitoring would trigger a new analysis to determine if another plan amendment is necessary. Also see response to comment #7.

7.  Comment:   BLM needs a system that will assure that the decisions in the EIS are implemented. (76, 108)

    Response:   We agree, and have been working for the past two years to improve our system. BLM Colorado's record is better in this regard than it may appear considering the hundreds of parcels being offered for lease and the dozens of different protective stipulations that may be applied. In the past three years, less than one percent of posted sale parcels have had to be revised.

8.  Comment:   What is the legal reference for the BLM allowing the state of Colorado to set the spacing on wells. (123)

    Response:   By Memorandum of Understanding, the BLM utilizes the expertise of the Colorado Oil and Gas Conservation Commission (COGCC) to conduct spacing hearings and determine recommended spacing. This arrangement has worked well because of its efficiency and convenience for the state and federal government and oil and gas operators. However, both the BLM and the COGCC recognize that the BLM has the legal authority for establishing spacing on federal and Indian lands.

9.  Comment:   The EIS should evaluate the ability of the Colorado Oil and Gas Commission to carry out its responsibilities. (124)

    Response:   It is not the responsibility of the BLM to evaluate the ability of the COGCC to carry out its legally mandated responsibilities. This EIS analyzes the impacts of BLM decisions; it is not appropriate or reasonable to analyze the actions or capabilities of other agencies.

10. Comment:   The treatment of leasing within the state parks, recreation areas, natural areas, and research natural areas is somewhat ambiguous, but seems generally governed by No Surface Occupancy stipulations. In addition to imposing such a limitation, BLM should coordinate leasing and development activities with the Division of Parks and Outdoor Recreation. (92)

    Response:   Concur--this has been accomplished on a local basis.

11. Comment:   It would be desirable if the MOU between BLM and the COGCC included wildlife mitigation and other protective environmental agreements as well as mining agreements. (92)

    Response:   BLM has agreements with other state agencies charged with the responsibility for wildlife and environmental protection.

5-7

BLM_0005801