## CHAPTER FIVE

| | | |
|---|---|---|
| 12. | Comment: | A diagram and short discussion of how the decisions being made in this document relate to the overall process might be useful. The same type of discussion is applicable to how the EIS process works. What happens next when this document is approved might answer some questions. The Proposed Action, purpose and need, and decisions to be made are somewhat obscure and require careful reading. (99) |
| | Response: | See revised text. |
| 13. | Comment: | The high amount of acreage open to leasing for oil and gas development shows an unbalanced management plan. Favoring the demands of oil and gas companies over other land users is apparent. (97) |
| | Response: | See revised Standard Terms and Conditions Alternative. |
| 14. | Comment: | We have some serious concerns about your draft EIS. First, the acreage figures throughout the document need to be reexamined, since many discrepancies between the acreage figures are present. (95) |
| | Response: | See revised text. |
| 15. | Comment: | Are the public participation requirements those required by BLM's planning and NEPA regulations? (108) |
| | Response: | The public participation in the review of a waiver, exception, or modification is contained in BLM's general onshore oil and gas leasing regulations (43 CFR 3101). |
| 16. | Comment: | Our June 16, 1989, memorandum discussed the importance of the Section 7 consultation process. However, we no not find any attention to the Section 7 process anywhere in the EIS. This should be corrected. (96) |
| | Response: | See Chapter 1, Relationship to Non-BLM Policies, Plans, and Programs. |
| 17. | Comment: | For all of the proposed changes to the RMPs, you need to justify why such changes are necessary or desirable. (95) |
| | Response: | See revised text. |
| 18. | Comment: | We believe the document would be easier to understand if, for the Proposed Action, you would summarize in one place all of the major changes that are proposed in the five RMPs. (95) |
| | Response: | See revised text. |
| 19. | Comment: | What leases will the Proposed Action affect? (128) |
| | Response: | The Proposed Action will only affect those leases that are issued after the Record of Decision is signed. This is currently scheduled to occur in March 1991. |

BLM_0005802

## CONSULTATION AND COORDINATION

# Chapter 2 Comments

20. Comment: The following areas should be given No Lease status:
a. Areas of Critical Environmental Concern (ACECs)
b. All wetland, riparian, and aquatic areas
c. Critical winter range, calving/fawning areas, and migration corridors
d. Habitat for endangered species
e. Cultural sites
f. Developed and primitive recreation areas. (1 thru 72, 74, 75, 109, 110, 111, 116, 118, 129)

Response: All of the mentioned areas were individually studied to determine the proper protection. No leasing is not the most compatible answer in all cases. Leases with No Surface Occupancy or Timing Limitations can, in most cases, adequately protect the resources. See also response to comment #21 and #23.

21. Comment: These areas should be given No Lease status:
a. Vermillion Basin, including the Irish Canyon ACEC and Lookout Mountain ACEC.
b. Sunlight Peak in the GSRA
c. Anasazi ACEC in the SJ/SMRA (1 thru 72, 104, 106, 109, 110, 112, 114, 117, 118, 121, 122, 129)

Response: a. These areas were addressed in the Little Snake Resource Management Plan. BLM has determined that avoidance stipulations on Irish Canyon and Lookout Mountain will adequately protect the resource. Please review the Little Snake RMP for a complete analysis of the rationale for protection of Irish Canyon and Lookout Mountain ACECs. (Draft RMP pages 2-61 and 2-62, and Appendix 22).

b. No Lease status is not needed to protect semi-primitive-nonmotorized recreation and visual values in the Sunlight Peak area. The No Surface Occupancy stipulation under the Proposed Action would prevent impacts which could impair these values. Road construction would be precluded

c. The Multiple Use ACEC in SJRA is not just for cultural resources (Anasazi) management. It was designated for its mineral, recreation, range, and wildlife values also. The ACEC designation was meant to be a lever for more intensive management and greater funding--not to deny or restrict mineral development, but to channel it away from sensitive areas and manage it more intensively. In addition, the No Lease alternative is not an option for this area as most leases in the area are held by production for longer than the term of the RMP/EIS. Also, much of the ACEC is covered by the McElmo Dome Unit. The existing leases would not expire during the period of time covered by the RMP/EIS, and therefore, would not be subject to a "Lease" or "No Lease" decision.

BLM_0005803

## CHAPTER FIVE

22. Comment: The No Surface Occupancy (NSO) stipulation is not effective. The BLM routinely grants waivers to this stipulation, thus rendering it ineffective. (1 thru 72, 74, 75, 77, 104, 105, 108, 109, 117, 119, 129)

    Response: The BLM grants waivers to the NSO stipulation only when it can be shown that no significant impacts will occur. An environmental analysis is conducted and the management objectives for the specific area are checked to make sure they will still be met if the waiver is granted. We are not aware of any waivers ever being granted in the state of Colorado.

23. Comment: All ACECs, RNAs, and SRMAs should be placed under No Leasing. There is not justification for not doing so. No impacts to the industry have been identified that would prevent this. (76, 108)

    Response: These areas can be adequately protected with NSO. The BLM requirements are that the least restrictive stipulations be applied that will still adequately protect the resources. The No Leasing stipulation does not offer any more protection to surface resources than the No Surface Occupancy. The different resources may require different types of protection, i.e., visual resources are protected differently than big game resources. Therefore, one answer is not correct for all.

24. Comment: The BLM should identify more areas of No Leasing. With the BLM's ability to waive stipulations, the only way we can be assured of resource protection is with No Leasing. (76, 108, 114)

    Response: The Standard Terms and Conditions Alternative does contain more No Leasing acreage than described in the DEIS. The BLM must ensure that the management objectives are met and that there will not be any significant impacts prior to waiving a stipulation. An environmental analysis is also required and an opportunity provided for public review.

25. Comment: The BLM should place all of the identified cultural sites in the SJ/SMPA in a No Leasing category instead of NSO. The NSO stipulation is too easy for the BLM's Authorized Officer to waive. (76, 108)

    Response: NSO designations are for the purpose of protecting resources and are not waived if there is still a resource to be protected. The NSO designations in Appendix E are the appropriate action and does not justify "No Leasing" of those areas. We have reviewed the section and have determined that there should be no exception criterion for Items 2 through 36. Revised text in Appendix E.

26. Comment: The EIS does not have an adequate range of alternatives. There should be one alternative that has a larger No Leasing category. (76, 77, 78, 81, 83, 110, 112, 114, 115, 116)

    Response: See revised text.

27. Comment: The BLM should include more detailed maps in the EIS. (76, 81, 83, 86, 93, 95, 99)

    Response: More detailed maps would cause numerous problems. The resources and the constraints used to protect them are viable and subject to constant changes. If the BLM distributed detailed maps, they could be out of date as quickly as they could be printed. Detailed maps are available in each BLM office and copies can be obtained by contacting the appropriate office.

BLM_0005804

## CONSULTATION AND COORDINATION

28.   Comment:    We believe the discussion of mitigation measures that will be used under all
                  the alternatives, on page 2-3, uses an inflammatory and unrealistic example
                  by discussing the terrible effects of oil and gas activities on elk if the BLM
                  did not manage the situation. Since the BLM does control and monitor our
                  activities, this discussion is unrealistic, serves no purpose, and should be
                  deleted. (95)

      Response:   The statement explained that this was an example. It was not an attempt to
                  portray the ordinary situation.

29.   Comment:    The Timing Limitation stipulation does not always apply to maintenance
                  activities, especially in emergency situations. Damage to wildlife habitat
                  under these circumstances should be addressed and stipulations proposed for
                  mitigating losses. (92)

      Response:   The impacts to wildlife from oil and gas maintenance and emergency
                  activities are so minor that they may be handled without a special lease
                  stipulation. These impacts were analyzed when the Timing Limitation
                  stipulations were developed and no stipulation is necessary to deal with
                  them.

30.   Comment:    The text explaining Table 2-3 should clearly state that federal lands not
                  available for leasing, such as lands within NPS units, are not included in the
                  table. (91)

      Response:   See Chapter 1, Relationship to Non-BLM Policies, Plans, and Programs.
                  These were clearly identified.

31.   Comment:    We note from Tables 2-3 and 2-4 that the Proposed Action would result in
                  fewer restrictions on fewer acres in the Little Snake Resource Area (LSRA)
                  than would the "No Action" alternative. We were not able to determine on
                  which lands exploration and development would be less constrained. (91)

      Response:   The level of resource protection under current management versus the
                  Proposed Action will not change for exploration and development. The
                  major change from the acreages in Table 2-3 and 2-4 was from new data
                  added for wildlife mitigation throughout the Resource Area which ultimately
                  reduced the number of acres requiring restrictions. It would be impossible
                  to project where the exploration and development would take place within
                  the LSRA. The analysis in Appendix B is the best estimate we could make
                  of potential development.

32.   Comment:    More discussion of Tables 2-3, 2-4, and 2-5 would help differentiate
                  between the three alternatives. (92)

      Response:   See revised text.

33.   Comment:    The comparison of alternatives should discuss other wildlife besides raptors.
                  (92)

      Response:   See revised text.

34.   Comment:    Based on this table only, there appears to be only minor differences between
                  the three plans. It is not clear what advantage the proposed amendment has
                  to resource protection or the administration of oil and gas leasing. (96)

      Response:   See revised text.

BLM_0005805

**CHAPTER FIVE**

| | | |
|---|---|---|
| 35. | Comment: | The impact of the second alternative, Continuation of Present Management, on wildlife will be different from the proposed alternative and the table should reflect this. In addition, why would wild horses experience "losses" when wildlife are only "disturbed"?  (92) |
| | Response: | See revised text. |
| 36. | Comment: | Table 2-6 indicates that all the alternatives evaluated are clustered in the middle of the spectrum.  We would like to see additional stipulations that provide for increased protection in the areas of visual and air quality.  (91) |
| | Response: | Mitigation is designed to protect visual resources and air quality in accordance with predicted impacts and existing laws and regulations. |
| 37. | Comment: | The best way to protect critical resources is to close the lands to leasing and not issue leases with stipulations.  (1 through 72, 129) |
| | Response: | This is not always true.  An example would be the case of a nesting raptor can be protected with a timing stipulation.  The raptor would not be present the remainder of the year so the physical presence of a drill rig would not cause any harm.  Total exclusion of surface activity is not the answer in all cases. |
| 38. | Comment: | BLM is failing to protect desert canyons, important river corridors, critical wildlife habitat, and endangered plant species.  (1 through 73, 129) |
| | Response: | River corridors are protected with stipulations designed for the riparian vegetation, wetlands, and water quality.  Critical wildlife habitat is protected by Controlled Surface Use, Timing Limitation, and No Surface Occupancy stipulations.  Endangered plant species are always protected by whatever restriction is required.  Desert canyons are not protected per se.  If an important or sensitive resource is located in the canyon, it will be protected. |
| 39. | Comment: | I recommend that a NSO stipulation, at a minimum, be placed on all lands with slopes over 40 percent and on all fragile soil areas.  (83) |
| | Response: | We believe that the Controlled Surface Use stipulations (Appendix E) adequately mitigate impacts on steep slops and fragile soils. |
| 40. | Comment: | The plan has Controlled Surface Use stipulations for fragile soil areas in TWO of the five resource areas.  Why do the other three resource areas not have this protection?  (83) |
| | Response: | They have analyzed the situation and decided to apply the appropriate COAs to the APD and accomplish the necessary mitigation, i.e., prevent erosion/disturbance on fragile soils.  The fragile soil stipulation has been adopted by the NPA also. |
| 41. | Comment: | Controlled Surface Use stips are very weak.  NSO or No Lease would provide proper protection for ACECs.  (83) |
| | Response: | Controlled Surface Use is effective mitigation for certain ACECs.  Most ACECs are mitigated with a No Surface Occupancy stipulation. |
| 42. | Comment: | DEIS focuses only upon the opportunity to heavily restrict oil and gas activities without adequate justification.  (86) |
| | Response: | The document is supposed to analyze the impacts of the Proposed Action and develop mitigation for those impacts. |

BLM_0005806

## CONSULTATION AND COORDINATION

43.   Comment:   CEC insists that the BLM consider the No Lease option on a parcel by parcel basis on all of its lands covered by this DEIS.  (81)

Response:   A parcel by parcel analysis would be impossible.  The huge amount of repetitions is not feasible and we must look at entire ecosystems not just 40 acres.

44.   Comment:   This DEIS fails to adequately consider the No Leasing alternative, in violation of the National Environmental Policy Act (NEPA) and Bob Marshall Alliance v. Hodel, 852F.2d 1223 (9th Cir. 1988).  (78)

Response:   See revised text.

45.   Comment:   By arbitrarily increasing the projected level of development far beyond what would be considered reasonable, the level of impacts are also arbitrarily increased.  Consequently, lease and operating restrictions would also be increased in an effort to provide "adequate" protection to surface resources in accordance with the impact analysis.  (86)

Response:   See revised text.

46.   Comment:   The number of wells drilled must not be the deciding factor whether further NEPA analysis is required.  If the level of impacts analyzed in the document has not been reached, even if twice as many wells have been drilled than predicted, the NEPA document should still be valid.  (86, 88, 93, 99)

Response:   See revised text.

47.   Comment:   In the Little Snake Resource Area, the BLM predicts that 550 wells will be drilled over the next 20 years based on historical data.  Yet the BLM almost doubled its projections to 1,000 wells, creating a "worst case scenario".  (93)

Response:   See revised text.

48.   Comment:   There should be no need to double the number of projected wells to ensure a long life for the NEPA documentation.  (86)

Response:   The Resource Areas did increase the number of wells in most cases due to the recent increased interest and activity in both natural gas and coal bed methane that was not reflected in the historical projections.

49.   Comment:   The BLM is required by regulation and policy to justify the use of more restrictive stipulations over less restrictive stipulations.  The BLM indicates on page 2-4 it has complied with this direction.  However, the evidence presented in the DEIS does not indicate that this is true.  In fact, the analysis indicates there is no need even for the restrictive stipulations that are currently in use throughout the five resource areas.  (86)

Response:   See revised text.

50.   Comment:   We object to the use of "worst case development" scenarios when referring to future oil and gas development.  The BLM should use "reasonably foreseeable development."  (79, 86, 93, 95, 99)

Response:   The appropriate sections have been revised.

BLM_0005807

## CHAPTER FIVE

51. Comment: BLM should require a 30-day public review period when exceptions to leasing stipulations are granted. (76, 108)

    Response: This is the requirement for some modifications of stipulations. Waivers of stipulations require plan amendments, which incorporate public reviews. Stipulation exceptions require plan conformance and an environmental review. Public review is not routinely warranted nor required.

52. Comment: Casing design and drilling methods have been adopted to avoid certain environmental and geological problems. A brief statement describing the problem and the solution would be helpful, rather than citing "industry standard procedures or techniques." These statements convey little to the reader unfamiliar with this industry. (88)

    Response: See revised text (Appendix A).

53. Comment: There should be a discussion of horizontal drilling and its impacts. (122)

    Response: See revised text.

54. Comment: BLM should consider the New Mexico method of well casing up to the surface and water monitoring wells. (123)

    Response: This proposal is thought to be unacceptable by the BLM because of difficulties in placing the cement top exactly in the desired position and the allowance of drilling fluid contaminated cement to remain in the hole rather than circulating it out as is generally the case when the annular space is completely filled. In addition, the open (uncemented) zone(s) would be able to communicate (or crossflow) which may be detrimental. Finally, casing corrosion is greatly reduced by the cement sheath around it, and if a 200-foot zone was left uncemented, corrosion would become a significant factor.

55. Comment: BLM should consider buying back the oil and gas leases. (125)

    Response: This action requires a specific act of Congress and a special appropriation of funds to pay for the lease. In the past, Congress has not been receptive to these proposals.

56. Comment: What procedures will be used to control noxious/poisonous weeds? (106)

    Response: Conditions of Approval, such as that shown on page D-14 of the DEIS, are written into approvals in areas with weed problems. The operator is required to control weeds. The method is often mechanical, however, if chemicals are to be used, prior approval by the Authorized Officer must be obtained.

57. Comment: Another quandary regarding the GSRA is the staggering increase in restrictive stipulations proposed in the Preferred Alternative. How can the BLM possibly justify an increase of No Surface Occupancy (NSO) stipulations from 45,046 acres to a whopping 365,419 acres? This would leave a total of 332,173 acres, less than half the Resource Area, available for lease with any type of surface occupancy. (86, 95)

BLM_0005808

## CONSULTATION AND COORDINATION

Response:    Two hundred twenty five thousand, one hundred six acres have been eliminated from NSO. This leaves approximately 161,648 acres covered as NSO. Many of the NSO stipulations for protection of individual resources overlap each other. The increase in NSO is used to protect the following: rivers, Rifle Mt. Park & Glenwood fish hatcheries, Bull Gulch ACEC, Colorado River SRMA, Eagle River SRMA, Sunlight Peak area, Hack Lake, Thompson Creek ACEC, Deep Creek ACEC, raptor nests, and sage grouse leks.

58.  Comment:    Current management allows leasing with surface occupancy on over 90 percent of the Resource Area. To make matters worse, the BLM proposed Controlled Surface Use stipulations on 670,000 acres, as well as Timing Limitations on over 717,000 acres. These restrictive stipulations appear to be proposed for application at least twice on every acre available to leasing with surface occupancy. The GSRA management appears intent on paralyzing any type of oil and gas problem in the area. (86)

Response:    The stipulations are necessary to protect resources. There are five major river corridors (Colorado, Eagle, Crystal, Frying Pan, Roaring Fork) along with the I-70 corridor (from one end of the RA to the other) that require stipulations for protection of wildlife, riparian, recreation, and visual resources.

59.  Comment:    The Timing Limitation stipulation relative to big game allows for "operation and maintenance" of production facilities. What does this mean? Capability for redrilling a well? (90)

Response:    The passage referenced should state that "routine operation, maintenance, and emergency operations would be allowed." Routine operation would not include deepening a well. Routine operations are generally those performed by one or two people from a pick-up truck type vehicle or an oil hauling truck. The various types of "routine" operations associated with a given type of production are considered at the APD approval stage and if operations affecting stipulated wildlife more than described in this EIS are anticipated, a decision will be made at that time as to what limits to place on such operations. If impacts will exceed RMP amendments, the plan may need to be further amended, or mitigation incorporated into the APD, etc.

60.  Comment:    While we do not believe that an EIS should accompany each lease, these off-site impacts should be considered on a site-specific basis during subsequent stages of the approval process. (92)

Response:    Concur--as stated, a site-specific environmental analysis is written on each APD.

61.  Comment:    We are opposed to the proposed stipulation which would require oil and gas lessees to compensate for the loss of crucial habitat, as proposed by the Glenwood Springs Resource Area. Compensation could be required either on-site or off-site--decision for which would be made on a case-by-case basis. (86, 89, 93)

Response:    We concur that the stipulation as shown in the DEIS is not necessary for resource protection. See revised text.

BLM_0005809

## CHAPTER FIVE

62. Comment: Will BLM require "minor inventories" by a qualified botanist at the time of year these species can be identified during the site-specific environmental analysis phase for APDs under all leases? If not, BLM should state how it will provide protection under this "policy." (90)

   Response: The BLM requires surveys by its own staff or one by an approved consulting firm.

63. Comment: A No Surface Occupancy stipulation should be used to mitigate potential significant impacts resulting from loss of mountain shrub habitat. This recommendation is also relevant to riparian vegetation which is also not protected under any of the Alternatives. (90)

   Response: Riparian/wetland zones are protected with a 500-foot buffer zone. NSO stipulations are used in some areas, i.e., Colorado River SRMA. Relocating well pads 200 meters and developing COAs to meet the specific resource needs will provide adequate protection.

64. Comment: Colorado BLM places undue reliance on seasonal stipulations (which do not apply to operation and maintenance phase of oil and gas activities); Conditions of Approval (which are not always attached to drilling permits); and No Surface Occupancy stipulations (which are subject to waiver, modification and exception) in protection of wildlife habitat and other resources. Moreover, all these stipulations require and assume that enforcement will be effective, and we have legitimate doubts as to BLM's ability to provide the necessary oversight. (78)

   Response: We believe the necessary systems are in place to ensure application and enforcement of necessary mitigation. These systems have been more fully described in the final. The plan decision reflects our confidence that the mitigation is justified, necessary, and will be applied and enforced. Failure to apply and enforce mitigation required by the plan would be a violation of the plan and could render the lease or APD invalid.

65. Comment: There appears to be inconsistencies among RAs regarding lease restrictions pertaining to ungulate fawning/calving habitats. Mule deer, common to all RAs, are not listed by any RA as a species needing any protection during periods critical to reproduction. (87)

   Response: See uniform stipulation, Appendix E, which applies to all Resource Areas.

66. Comment: No Surface Occupancy stipulation #1 for protection on breeding habitat only includes a one-quarter mile buffer zone around the lek (strutting ground) when "nesting activity takes place within two miles of strutting grounds." How does this stipulation protect sage grouse populations? (90)

   Response: See uniform seasonal limitation for sage grouse, Appendix E.

67. Comment: The DEIS states that "Species of High Federal Interest are protected either with stipulations or COAs." Please define "Species of High Federal Interest." The stipulations provided in the DEIS do not protect all of the Federal Candidate species. (90)

   Response: BLM will add appropriate COAs when the APD is approved in order to protect the resource present.

BLM_0005810

## CONSULTATION AND COORDINATION

68. Comment: The ability to place protective measures on wildlife habitat after a lease is issued is severely limited. Please explain how COAs would be used to require that pads and roads not be allowed in large wetland habitats (i.e., wet meadows, riparian areas, etc.). (90)

    Response: Our ability to protect wildlife habitat after lease issuance is very broad. First, through our analysis and stipulation of the lease contract, and secondly, through requirements in all lease documents to comply with law and regulation. Example of laws that most often affect operations are the 1979 Archaeological Resource Protection Act (ARPA) and the 1973 Endangered Species Conservation Act, as amended, just to name two. The BLM has authority to require any measure reasonable to comply with law. That authority is contained in the lease document (see DEIS Appendix C, page 2, Figure C-1, first paragraph of the last block section of Form 3100-11 [June, 1988]). For those wildlife species not specified in a leasing stipulation or protected by specific legislation, the BLM has authority under Section 6 (of the lease form referenced above) to require reasonable mitigation and/or inventory as needed to protect "other" (i.e., non-oil and gas) resources. This regulatory authority is further defined in 43 CFR 3101.1-2 (see quotation in DEIS, Page C-1).

69. Comment: Another serious concern with the proposed stipulation is its vague wording-- how are "adverse impacts" going to be defined and predicted in advance? Such vague wording will very likely lead to confusion and the unwarranted use of this stipulation. (95)

    Response: See revised Appendix E.

70. Comment: No Surface Occupancy stipulations are cited as the method for protecting crucial wildlife areas and vegetation. It is our understanding that these stipulations are frequently waived at the request of developers and consequently offer little real protection. If an area is to be truly protected, it should not be leased. NSO stipulations should not be waived. (97)

    Response: Your understanding is incorrect. The BLM in Colorado has never waived a wildlife NSO stipulation. Upon request of the operator, the Authorized Officer may grant an exception to an NSO stipulation based upon criteria described in the appendix covering stipulations. Waiver of an NSO stipulation would require a plan amendment with appropriate public notice.

71. Comment: We are extremely anxious due to restrictions being placed on exploration, drilling and development activities during the time that wildlife are having their young, yet there are no similar stipulations to protect livestock or critical lambing and calving grounds for the same justifications. (98)

    Response: According to BLM policy, a lease stipulation is not necessary for resource protection where a Timing Limitation is 60 days or less, or where you desire to relocate the proposed operation 200 meters or less. Such mitigation is within the definition of reasonable measures, an Authorized Officer may deem necessary to protect other resource values or uses under the terms of the lease (specifically, section 6 of the standard lease form) and the regulations at 43 CFR 3101.1-2. This is a very clear demarcation between when a lease stipulation is required and when alternative mitigation can be equally effective.

    The BLM has afforded protection to lambing areas under Conditions of Approval (COAs) in Appendix F. (See page F-1 of the DEIS.) These COAs will be attached to Applications for Permit to Drill. Lessees will be

BLM_0005811

## CHAPTER FIVE

notified of the COAs by lease notices at the time of lease issuance. This same policy applies to wildlife mitigation where conflicts occur for less than 60 days. See page F-1 Appendix F for COAs common to two or more Resource Areas.

72.  Comment:    Where is compliance with 404 b(1) guidelines of the Clean Water Act and Federal Executive Orders which provide direction to BLM for protection of floodplains, etc.? (90)

     Response:    Oil and gas operators are required by both the terms of the lease and the COAs of the permit to drill to comply with all other federal regulations and state and local requirements. This requirement included compliance with the U.S. Army Corp of Engineer's permits for structures involving navigable streams (see lease term in Appendix C and "Other Agency Approvals" in Appendix D).

73.  Comment:    Use of stipulations to protect high value surface resource lands, especially the NSO stipulation, does not avoid the conflict between oil and gas and other resources, it only delays the day that tough decisions will have to be made. (81)

     Response:    NSO has been chosen to allow multiple use. Protection of other resources can be protected if no surface disturbing activities are allowed.

74.  Comment:    Our conclusion was that whenever any planning was to be made concerning federal minerals covered by fee surfaces that those landowners would be contacted for their input. (98)

     Response:    Under the Federal Land Policy and Management Act of 1976 (FLPMA), the BLM is responsible for public lands which also includes the mineral estate under private surface. In discharging its FLPMA duties on split estate lands, the BLM must consider the management of the federal minerals (exploration and development). When BLM authorizes exploration and/or development, they must consider environmental impacts to the lease and adjacent lands under the National Environmental Policy Act (NEPA). These impacts may require mitigation on split estate at either the lease stage or development stage. The level of federal mitigation will be determined by the BLM through coordination with the surface owner.

                  Your concern about being involved in the planning process is valid. The BLM is required to involve the public in all of our planning documents. This oil and gas EIS included public involvement at the scoping meetings which were announced in the *Federal Register* on March 13, 1989. The BLM has also requested public comments on the DEIS which you commented on. The final EIS will also be sent to you.

75.  Comment:    Why have Irish Canyon ACEC and Lookout Mountain ACEC not been given the same degree of protection (NSO stipulations) as the other ACECs that were set aside to protect sensitive plant communities? (83)

     Response:    BLM determined avoidance stipulations will provide adequate protection to the resource. Site-specific inventories will be required prior to a surface-disturbing activity. We determined that oil and gas leasing and development can occur without damage to sensitive plant communities. A complete analysis of the rationale for protecting the ACECs can be found in the Little Snake RMP. (See Appendix 22 of the Draft RMP and also pages 2-61 and 2-62.

BLM_0005812

## CONSULTATION AND COORDINATION

76. Comment: The BLM should require that any company drilling in this area must pay for BLM surveillance and protection of cultural sites. (83)

    Response: BLM does not routinely perform surveillance operations. We do require the operator to hire an approved cultural resource contractor for inventory and monitoring when necessary.

77. Comment: The plan does not treat all SRMAs equally. The KRA has NSO stipulation for its SRMAs. (83)

    Response: Each SMRA is unique and is protected with its own unique mitigation.

78. Comment: No mention in the plan is made for the Eagle River SRMA. Has this area been given a NSO stipulation? (83)

    Response: The Eagle River SRMA is proposed for a NSO stipulation, but was inadvertently omitted from the listing. This SRMA has been included in the list for NSO stipulation.

79. Comment: The plan claims that all areas over 40 acres designed for protection of paleontological resources will receive a NSO stipulation. This plan, however, does not provide a list of these areas. (83)

    Response: Last sentence of paragraph 4; PALEONTOLOGY, All Alternatives, was rewritten to read "This stipulation is used on leases issued in the Cretaceous Ammonite site in the KRA."

# Chapter 3 Comments

80. Comment: Is there any old growth timber that could become an issue? (99)

    Response: No.

81. Comment: Add more information about the semi-desert shrub community like those of other community types. It comprises 20 percent of the vegetation in the GSRA and is important wildlife habitat. (92)

    Response: The amount of information in Chapter 3 is directly related to the significance of the impacts. No significant impacts were identified, therefore, the description is adequate.

82. Comment: Does the definition of "riparian community" include wetlands? (90)

    Response: Yes

83 Comment: Wetland locations are not identified in the DEIS for the GSRA. How will these habitats be protected by BLM and how will 404 b (1) guidelines under the Clean Water Act interface? (90)

BLM_0005813

**CHAPTER FIVE**

|          |           |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                        |
|----------|-----------|------|

    Response:    An inventory of riparian and wetland areas was carried out from 1977 to 1979 in the GSRA. Although this did not cover 100 percent of the wetland/riparian areas, it is fairly complete. This information is available in the GSRA office. The stipulation requiring protection of an area extending 500 feet from the edge of the riparian/wetland and upland should protect most of these sites. Like the analysis required by 404 b (1) guidelines under the Clean Water Act, BLM will not allow drilling activities where practical alternatives exist. Again, the riparian/wetland protection stipulation should virtually eliminate adverse impacts.

84.    Comment:    Clarification is needed on definition of "irrigated meadow" which is one of the four major vegetation types described (13 percent) in the KRA. Please state whether these meadows are considered wetlands, and if so, by what agency. (90)

    Response:    The 14 percent "irrigated meadow" is not considered true wetlands within the KRA. These meadows or croplands were sagebrush areas that have been converted to hay pasture. These areas produce the stable hay grasses which provide critical winter feed for domestic livestock.

85.    Comment:    Vegetated communities listed on Table 3-3 should be discussed in the narrative to highlight importance of each as is done for the other resource areas. (92)

    Response:    See revised text.

86.    Comment:    Table 3-4 should be amended. Rare plant inventories in Dinosaur National Monument have identified nearly 40 species of special concern. Those which are federal candidate species, in addition to the species listed in Table 3-4, include park rockcress (*Arabis vivariensis*) and alcove bog-orchid (*Habenaria zothcina*). Some other Category 1 and 2 species may occur in the Little Snake Resource Area, most notably Ladies' tresses orchid (*Spiranthes diluvialis*) and rock hymenoxys (*Hymenoxys lapidicola*). (91)

    Response:    It should be noted that BLM sensitive plants consist of only those plants known to occur on public lands (BLM surface) within the LSRA. You reference the rare plants inventories in Dinosaur National Monument, these inventories have not established the existence of additional species on the LSRA.

87.    Comment:    The DEIS states that "riparian communities, although limited in quantity and quality, provide habitat for a large number of wildlife species and represent a highly important resource within the Resource Area." The FEIS needs to clarify why the "quality" of the riparian vegetation community is "limited." Is it due to grazing, water diversions, etc.? (90)

    Response:    The statement of riparian communities are limited is a factual statement about the overall riparian communities in the LSRA. These communities will not be impacted by the Proposed Action. It would be beyond the scope of this document to determine the condition of the riparian communities or what contributed to the condition.

88.    Comment:    The discussion on livestock grazing is inadequate and should be expanded to compare this use on the five Resource Areas. The impact of leasing on livestock use is considerably greater than that on air quality, yet climate and air quality receives three pages of narrative. (92)

    Response:    See revised text.

5-20

BLM_0005814

## CONSULTATION AND COORDINATION

89.  Comment:   In some cases, BLM is unaware of the wildlife resources on some of the
lands open to leasing in the Study Area. (78)

Response:   The BLM admits it does not know the location of every species or individual
on over 3 million acres. It is doubtful if anyone knows, or will ever know,
all of the different species' exact location at any given point in time. Wildlife
tend to wander over large areas constantly and to claim that their location is
known would be highly suspect.

90.  Comment:   I also understand a very unusual species of fish is found in the Cross and
Cahone Canyons. No mention of this fish is made in the report. (83)

Response:   A fish species has been captured in Cross Canyon that is currently being
analyzed by Colorado Division of Wildlife (CDOW). The CDOW has
indicted that "the fish appears to be a *Fundulus zebrinus* with a highly
unusual color pattern." No mention is made of this particular fish because it
is not yet known if it is a new species or a variety of a known species.

91.  Comment:   More explanation of "crucial habitat" is needed. How does this relate to
CDOW's WRIS definition of "critical habitat?" Winter concentration areas
are very important but are not mentioned here. (92)

Response:   Crucial winter habitat include severe big game winter range or other
definable winter ranges as mapped by the CDOW. Big game winter
concentrations occur on public land and are included in crucial winter habitat
areas.

92.  Comment:   Habitat may be a limiting factor to black bear populations in the Kremmling
(one percent of total habitat) and Glenwood Springs (20 percent) Resource
Areas. Cumulative adverse impacts due to loss of habitat and displacement
during the late summer-fall period may be significant. (90)

Response:   See revised text.

93.  Comment:   Since a complete inventory of critical wildlife habitats has not been
conducted, explain how these areas will be protected from road and other
associated construction-related impacts due to development of oil and gas
leases. (90)

Response:   Crucial wildlife habitat areas have been identified within each Resource
Area, and appropriate mitigation has been proposed.

94.  Comment:   Since BLM has not conducted an inventory which defines locations for these
species and no special stipulations are provided in Appendix E to protect
unknown sites, BLM should state how it proposes to afford these plant
populations protection from development. (90)

Response:   All T&E species are fully protected by the Endangered Species Act which is
a part of the oil and gas lease. Inventories during the appropriate time of the
year will be required.

95.  Comment:   Due to the data gaps for emphasis species, how will new crucial habitats
discovered during the site-specific environmental analysis process required
for APDs be protected? (90)

5-21

BLM_0005815

## CHAPTER FIVE

| | | |
|---|---|---|
| | Response: | During the environmental analysis on the APD, newly discovered habitat can be protected with COAs under the authority of the Endangered Species Act which is a part of the lease. Other habitats would be protected under Conditions of Approval. |

96. Comment: Will discovery of a sage grouse strutting lek during the APD field review trigger an amendment to the EIS? (90)

   Response: Additional information on sage grouse leks will not result in amending Resource Management Plans.

97. Comment: The DEIS describes the KRA as providing "habitat for approximately 310 species of animals, including 220 birds, 60 mammals, 20 fish, seven amphibians, one reptile and three domestic herbivores." Yet, the DEIS only describes crucial habitats for big game, upland game birds, waterfowl, and raptors. (90)

   Response: The KRA addressed the crucial habitats where large scale projects could impact concentration areas of big game, upland game birds, waterfowl, and raptors. Other wildlife species are mobile or widespread over diverse habitats and are not expected to be impacted. The Proposed Action would impact less than one percent of the KRA and many potential impacts can be avoided with COAs developed at time of project design and review.

98. Comment: The Affected Environment section does not mention other small species which may be rare or sensitive. One such species is the spotted bat (*Euderma maculatum*), whose status is largely unknown. The only known records of this species in Colorado are in or near Dinosaur National Monument. (91)

   Response: Only those wildlife species that have the potential to be significantly affected by oil and gas development were discussed in the Affected Environment. Because the spotted bat is rare and the only known records of the species are in areas that have a very low probability for oil and gas development, it was determined that there is an extremely low potential for impact.

99. Comment: Important bird species include bobwhite quail, turkey, and pheasant. (92)

   Response: These bird species were not considered to be significantly impacted from oil and gas exploration and development activities because of their life cycle habitat requirements and distribution.

100. Comment: The discussion of big game animals should be expanded to highlight important habitat on BLM land. (92)

   Response: Big game habitat areas are delineated on maps available at the Resource Area Office.

101. Comment: The DEIS identifies current uses of BLM land, yet fails to analyze cumulative effects to wildlife and other resources resulting from additional impacts associated with oil and gas leasing development. (90)

   Response: See revised text.

102. Comment: The last paragraph on page 3-6 is poorly written with no lead into T&E plant species. Classification is needed. (92)

   Response: See revised text.

BLM_0005816

## CONSULTATION AND COORDINATION

103. Comment:     A paragraph explaining T&E species in the KRA is needed to complement Table 3-2. Are state listed plant species of special concern inventoried by the Resource Areas? (92)

Response:     See revised text.

104. Comment:     The threatened and endangered species section should receive consistent treatment for each planning area. For example, there should be a table for each resource area, similar to Table 3-90 prepared for the Northeast Planning Area. Each planning area should include those lists of species provided by the FWS to the BLM on June 16, 1989. The razorback sucker was proposed for federal listing on May 22, 1990, and is therefore no longer a candidate species. (96)

Response:     See revised text.

105. Comment:     It is unclear how BLM is planning to protect instream habitats for A and B populations of Colorado River cutthroat trout when development is not restricted in these watersheds or in the riparian zones. (90)

Response:     All T&E species are protected by the Endangered Species Act. Watersheds and riparian zones are protected by various mitigative measures (see Appendices D and E).

106. Comment:     Federal candidate species which occur within the KRA include Colorado cutthroat trout, Boreal western toad, white faced ibis, and ferruginous hawk. BLM should state how it will protect potential habitat for these species. There is no mechanism to protect their habitats if discovered during the APD review process. (90)

Response:     Habitats for Colorado cutthroat trout (streams), Boreal western toad and white faced ibis (both riparian) can be avoided by 200 meters during the development or review of the surface use plan of the APD. There is a NSO stipulation for ferruginous hawk nests.

107. Comment:     Table 3-8 fails to include the peregrine falcon (*Falco peregrinus*). There is at least one documented site which has been occupied since 1988. This information should also be included in the discussion of threatened and endangered species. (91)

Response:     See revised text.

108. Comment:     In the discussion of the bald eagle (*Haliaeetus leucocephalus*), the document should note that significant roosts occur in Lily Park on BLM, NPS, and private lands. (91)

Response:     See revised text.

109. Comment:     The discussion on endangered fish should be expanded to reflect the proposed listing of the razorback sucker (*Xyrauchen texanus*) as endangered. The humpback chub (*Gila cypha*) has been reported in Cross Mountain Canyon and in the lower reaches of the Little Snake River. We suggest that the Colorado Division of Wildlife (Tom Nessler, 303/484-3836) and the Fish and Wildlife Service (Dr. Harold Tyus, 801/789-0354) be contacted to acquire the most recent information on the location and status of the endangered fishes. (91)

Response:     See revised text.

5-23

BLM_0005817

## CHAPTER FIVE

110. Comment:     The process of identifying potential black-footed ferret reintroduction sites will occur throughout all of Colorado. Consequently, we believe this paragraph should recognize the evaluation of candidate sites will eventually occur in all of the planning areas discussed in the EIS, not only northwest Colorado. Prairie dog abundance may be more than adequate to support black-footed ferrets in many other Resource Areas. (96)

Response:     The LSRA is the only area involved in this EIS where the potential exists for black-footed ferret reintroductions, based on current information.

111. Comment:     We recommend NSOs for the Osterhout milkvetch and Penland beardtongue in the KRA, and the Gibbens beardtongue in the LSRA. Maps showing the recommended NSOs are attached. These species have been adequately surveyed and known populations of high concentrations delineated. (96)

Response:     These populations in KRA will be added to the NSO stipulations. Known plant populations for candidate species will be surveyed by a competent botanist to establish locations prior to any authorized activity. The populations will be protected as detailed under conditions of approval.

112. Comment:     We have published a new candidate plant list February 21, 1990, in the *Federal Register* (55 FR 6184). Since we sent you a previous species list on this project on June 16, 1989, we are therefore sending you an updated plant candidate list. (96)

Response:     See revised text.

113. Comment:     The document notes that the "Mexican spotted owl has been reported in Mesa Verde." The spotted owl (*Strix occidentalis*) has been found within Mesa Verde National Park by the Forest Service Region 2 Spotted Owl Survey Team. With this confirmed observation of spotted owls within the park, there is the possibility that the spotted owl may also be found on Weber and Menefee Mountains. Justification exists for a formal survey of the Weber and Menefee Mountains Wilderness Study Area (WSA) as spotted owl habitat. (91, 92)

Response:     There was a survey done in 1984 on Menefee Mountain for spotted owls. This survey revealed the presence of the species. However, Menefee and Weber Mountains are currently in a "No Lease" status due to the WSAs. At the time that Congress designates wilderness, if Menefee and Weber Mountains are not designated, they will become No Surface Occupancy (NSO) areas. Therefore, if leases are issued on either mountain, lease development will have to occur by occupying the surface outside the designated NSO boundary. Because no occupancy is proposed to be allowed on either mountain, there is no justification at this time to conduct a formal survey.

5-24

BLM_0005818

## CONSULTATION AND COORDINATION

114. Comment: The discussion on threatened and endangered species mentions only vertebrates. There is no reference to threatened and endangered plant or invertebrate species or the status of respective candidate species. Of specific concern are several candidate plant species that may be found in the Weber and Menefee Mountain areas near Mesa Verde National Park. Species that should be evaluated include:
- Mesa Verde false forget-me-not (*Hackelia gracilenta*)
- Mancos milkvetch (*Astragalus humillimus*)
- Small flowered pensteman (*Penstemon parviflorus*)
- Spurless Mancos columbie (*Aquilegia micrantha mancosana*)
These are just four of an extensive list of plant species that should be surveyed prior to any land status change or leasing in the area. (91)

Response: T&E plants are listed in Table 3-6. This list was supplied by U.S. Fish and Wildlife Service. Small flowered penstemon is the only species not listed. Menefee and Weber Mountains are designated as NSO areas. Therefore, these species would not be impacted.

115. Comment: Additional clarification and documentation needs to be provided before it is reasonable to assume that no route of communication exists between shallow aquifers and coals at depth. The geology of the area basin margins needs to be documented. (88)

Response: The relationship between shallow aquifers and coals at depth (eg., Fruitland coal) are extensively studied and continue to be studied. To date, there are no indications of communication of groundwater or gas between the Fruitland Formation and any known shallow aquifer. There are many hydrocarbon sources in the San Juan Basin and some shallow sources, as well as biologically generated gas may be the source of gasses found in some local water wells.

116. Comment: What are the current and anticipated uses of the deep, bedrock aquifers in the project areas? (88)

Response: Waste water injection is the only use presently being made of the deepest aquifers in the San Juan Basin because the water in these aquifers (notably the Morrison Formation sands) is too saline for other uses.

117. Comment: Other than groundwater salinity values, what additional ambient water quality values are available? (88)

Response: Ambient water quality values are available in Resource Area files for a number of constituents. These statistics are supplied by agencies other than the BLM or by oil company drilling and completion reports. Listing of all ambient water quality data in this document would be costly and add nothing to comprehension of adverse impacts of oil and gas development on groundwater.

118. Comment: In general, this document provides inadequate documentation of current groundwater hydrology without which is is not possible to adequately document the nature of the physical system under consideration. Current water quality data is also lacking in this document. Without such information, it is difficult to reach an informed decision as to the reasonableness of the levels of impacts anticipated as a result of project activities. (88)

Response: See revised text.

BLM_0005819

**CHAPTER FIVE**

119. Comment:   We recommend that the Hovenweep Cooperative Management Strategies area and Dinosaur National Monument's Harpers Corner Road area be added to the Class II VRM listing, and that the Mesa Verde rim be moved to the Class I VRM listing. (91)

Response:   Changing VRM designations is outside the scope of this plan amendment/EIS. The San Juan/San Miguel RMP is scheduled for updating in 1995, at which time, the issue could be revisited. In addition, this area is the "East Cortez" NSO area and no surface disturbing activities would be allowed to take place in the area. Dinosaur National Monument's Harpers Corner Road is outside of the area under analysis in this document.

120. Comment:   Mesa Verde National Park is designated as a Class I area under the Clean Air Act of 1977, as amended. The DEIS lists the visual air quality of the BLM lands along the border of the park as "VRM Class II." The VRM classes as listed, even though explained, are confusing. They could be read as Air Quality Act designations. This is confusing to use and likely confusing the the general public. (91)

Response:   Nothing in the DEIS discusses "visual air quality" of BLM lands. VRM class guidelines dictate levels and locations of surface disturbance. Activities in Class II areas must be "may be seen but should not attract attention" to the casual observer. Air quality has nothing to do with VRM. The DEIS has two separate headings which discuss the separate resources.

121. Comment:   There are several maps included in the document, but only a very few identify NPS units or other areas of NPS concern. We recommend that these areas be included in all appropriate maps in the final EIS. (91)

Response:   The NPS areas will not be subjected to impacts, and therefore, were not included.

122. Comment:   Maps should show the name of the Resource Area and be included on all maps of that Resource Area. (92)

Response:   See revised maps.

123. Comment:   Map 3-2 incorrectly delineates the boundary of Rocky Mountain National Park. The map shows the pre-1980 boundary. (91)

Response:   See revised map.

124. Comment:   The wild and scenic river study for the Yampa River has been completed. (92)

Response:   A formal study for the portions of the Yampa River within BLM's jurisdiction has not been completed. These segments have been inventoried and are listed in "The Nationwide Rivers Inventory" as suitable for study. The BLM plans to do this study as soon as funding becomes available.

125. Comment:   Page 3-40 notes that the Yampa River constitutes a sensitive visual resource. We recommend expanding this section to note that Dinosaur National Monument and adjacent lands are also quite sensitive and vulnerable to degradation of visual resource and values. Oil and gas development adjacent to the Dinosaur National Monument could severely diminish the value of views from the park. (91)

BLM_0005820

## CONSULTATION AND COORDINATION

Response: Lands adjacent to Dinosaur Monument, including views from the Monument, have been placed in a VRM management class. The Little Snake RMP provides for protection of the visual resources. Oil and gas development within these lands will not be allowed to degrade the established VRM management class. Impacting the visual resource of Dinosaur National Monument should not be a concern as the mineral estate within the Monument is not subject to the Mineral Leasing Act.

126. Comment: The cultural resources addressed in this section are specific to site that are listed on the National Register of Historic Places. The four separate cultural sites located in the Colorado portion of Hovenweep National Monument were not included in the list provided. In fact, the existence of the park was not addressed in the cultural resource section at all. Except for the passing reference to No Surface Occupancy (NSO) made in Table 4-1 on page 4-21, the existence and location of Hovenweep sites within Colorado were not addressed. (91)

Response: BLM does not manage National Park Service lands and therefore has no authority to plan for them nor responsibility to manage them. The NSO stipulations are for BLM-managed segments around the monument sites and are considerations provided for NPS management goals (primarily visual) for the monument areas. The NSO designated buffer zones around these sites certainly recognize their existence.

127. Comment: Some of the wilderness study areas may be adjacent to the old RARE II or roadless areas on the National Forests. The BLM and FS should coordinate the study of these areas to ensure that topographical boundaries are considered and not agency boundaries. (99)

Response: This has occurred on the local level.

128. Comment: The map locations of Weber and Menefee Mountains have been reversed. (91)

Response: See revised map.

129. Comment: New Raymer is misspelled on page 3-58. (92)

Response: Concur.

130. Comment: The Area of Critical Environmental Concern (ACEC) located on Map 3-30 should be extended eastward to include the North Rim Escarpment north of Mesa Verde National Park. (91)

Response: The ACEC will not be extended to include the North Rim Escarpment of Mesa Verde. The area listed as "East Cortez" on page 3-45, in Table 4-1 on page 4-21, and in Appendix E on page E-5 covers the lands under the North Rim of Mesa Verde.

131. Comment: An oversight in Chapter 3 is the lack of identification of caves as an issue. (90)

Response: The Federal Cave Resources Protection Act of 1988 (PL 100-691) requires the BLM to protect significant caves. Cave bearing areas in the GSRA exist in limestone and dolomite geologic formations. These areas are in low potential areas for oil and gas. Caves were identified as a value in the Deep Creek SRMA/ACEC. These caves would be protected in the Proposed Action alternative with No Surface or Subsurface Occupancy stipulations.

5-27

BLM_0005821

**CHAPTER FIVE**

| | | |
|---|---|---|
| 132. | Comment: | Table 3-11 note that several WSAs are recommended as non-suitable for wilderness designation. A change in action away from the current WSA management would allow for oil and gas development and impact he resources or values of nearby NPS units. We do not believe that the document provides the rationale for these recommendations and we question their validity. (91) |
| | Response: | The recommendations for non-suitable designation was presented and analyzed in the appropriate Wilderness EIS that has been completed in each BLM District. |
| 133. | Comment: | The EIS does not differentiate between coal bed methane and natural gas. (124) |
| | Response: | Coal bed methane is a natural gas which is produced using the same technology as other natural gasses. We have added a new section to the DEIS, Appendix B, which discusses in more detail various types of oil and gas production, including methane. |

# Chapter 4 Comments

| | | |
|---|---|---|
| 134. | Comment: | Near Cedar Hill and Bondad there are 180 water wells and 57 have hydrocarbons in them from the coal bed methane gas. (123) |
| | Response: | Freshwater aquifers are not depleted or impacted by oil and gas drilling. Aquifers are cased and cemented across to prevent loss of oil or gas to the aquifer and to keep from having to handle quantities of water getting into the produced fluids. The cementing off of freshwater zones is also done to prevent any pollution of the groundwater. |
| 135. | Comment: | The BLM needs to discuss depletion of the aquifers and mitigation (123) |
| | Response: | See revised text. |
| 136. | Comment: | The EIS needs to address the problem of fracturing out of the intended zone. (123) |
| | Response: | See revised text. |
| 137. | Comment: | BLM should analyze the fact that water depletion actually allows gas production. (123) |
| | Response: | See revised text. |
| 138. | Comment: | EIS did not address gas migration due to hydrostatic pressures. (124) |
| | Response: | See revised text. |
| 139. | Comment: | Need additional studies to measure gas migration and also water migration. (124) |
| | Response: | See revised text. |
| 140. | Comment: | Disposal of toxic wastes was not described and it should be. (124) |
| | Response: | See revised text. |

BLM_0005822

## CONSULTATION AND COORDINATION

141. Comment: What are the impacts of a cathodic well that punctures a water course? (124)

    Response: To date, BLM has not approved any cathodic protection wells on any public lands within the Planning Area. If BLM were to receive an application for such approval, an analysis of local groundwater conditions would be made to determine if the cathode could be placed so as not to affect local groundwater. The same principles applied to approval of oil or gas wells would be applied to a cathodic well.

142. Comment: We recommend changes to the EIS to recognize the implications the ferret reintroduction process may have on the management of prairie dogs on BLM lands. (96)

    Response: See revised text.

143. Comment: In an area of existing oil wells, a coal company could pre-negotiate an agreement, realize those costs beforehand, then make economic decisions on the project. At least their mining plans could include the loss of coal around the wells. The oil company would have the first in time, first in right priority. (82)

    Response: See revised text.

144. Comment: Environmental Consequences, needlessly exaggerates and/or misrepresents potential effects of oil an gas exploration and development activities on surface resource values. Neither standard nor special stipulations are explained or discussed; yet they are designed to significantly reduce or eliminate nearly all of the impacts identified. (86)

    Response: See revised text.

145. Comment: The Proposed Action violates NEPA requirements to analyze the environmental impacts of the oil and gas leasing prior to leasing because of its lax treatment of exception criteria. The EIS does not analyze impacts of surface disturbing activities on the NSO areas. If an exception is granted, the impacts are not analyzed and no public review is required. (76,108).

    Response: Refer to Appendices D, E, and F for revised exception criteria which are much more specific. If an exception is considered, the NEPA analysis will be done at that time and all impacts will be identified. It is impossible to identify impacts at this time without any proposals to consider for exceptions.

146. Comment: Environmental Consequences exaggerates the potential effects of oil and gas activity on other resource values. Standard and special stipulations are designed to mitigate environmental consequences, yet this was never discussed. (93)

    Response: See revised text.

147. Comment: Chapter 4, "Environmental Consequences," exaggerates and misrepresents the impacts from oil and gas activities because it does not discuss the requirements and protections provided through the use of standard and special lease stipulations. (95)

    Response: See revised text.

5-29

BLM_0005823

## CHAPTER FIVE

148. Comment:     The DEIS appears to be heavily weighted in favor of non-commodity uses such as wildlife habitat, cultural resources, and recreation. (93)

      Response:    The BLM is required to manage all resources. We have attempted to protect "non-commodity" resources and at the same time provide adequate availability for recovery of "commodity" resources.

149. Comment:     The Final EIS should also describe how impacts associated with oil and gas drilling and production will be monitored. (92)

      Response:    See revised Appendix A.

150. Comment:     It should also explain how mitigation can be modified, if necessary, to reduce unexpected impacts to the environment. (92)

      Response:    Concur, see the explanation in the DEIS, Appendix D, page D-1, the second and third paragraphs.

151. Comment:     We recommend that the Final EIS acknowledge and evaluate potential "off-site" impacts to sensitive or important areas, or that it include a commitment to complete such an investigation before drilling begins. (92)

      Response:    See revised text.

152. Comment:     The DEIS states that impacts to riparian and wetland habitats would not be significant." This conclusion is based on avoidance of development in these critical areas through the use of Conditions of Approval (COAs) during predrill inspections. This would include moving well site locations up to 200 meters to avoid construction in riparian and wetland. This conclusion that impacts would not be significant is without basis. (90)

      Response:    See revised text.

153. Comment:     The BLM has made assumptions of no or minor impacts in a number of areas in this document. Where such assumptions have been made, often inductively, no methods have been incorporated for monitoring to insure that the levels of impact anticipated are actually achieved. (88)

      Response:    The BLM currently, and will continue, monitors all impacts of all actions that occur on public lands.

154. Comment:     We object to the BLM's failure to discuss potential effects which could reasonably occur during seismic activities. (86)

      Response:    See revised text,

155. Comment:     What is not known is what the impacts on a specific parcel will be. How can the public and BLM land mangers make informed decisions on whether a particular parcel should be open to oil and gas development if the impacts to this particular parcel are not known? When looking at the impacts on a specific site, the BLM must consider all stages of development through full-field production. (81)

      Response:    Impacts through full field production were considered. Site specific impacts can only be determined when a site specific proposal is received. These site specific impacts are analyzed when an APD is submitted.

BLM_0005824

## CONSULTATION AND COORDINATION

156. Comment:   We are concerned that the BLM did not consider in this DEIS the impact of surface management oil and gas exploration and production. It seems the DEIS heavily restricts oil and gas activities through surface management without adequate justification as suggested in the SPG. (79)

Response:   See revised text.

157. Comment:   A recent report by the Interior Department's Inspector General seriously challenges BLM's assumptions regarding effectiveness of mitigation and reclamation. (78)

Response:   The Colorado BLM record for mitigation and reclamation is excellent. The IG found no problems in the resource area visited in Colorado, and we would expect the same results from similar reviews elsewhere in Colorado.

158. Comment:   What effect does the PSD classification have on the SJ/SMRA. (126)

Response:   The DEIS states ". . . Congress established a system for the Prevention of Significant Deterioration (PSD) of "attainment" and "unclassified" areas. Areas are classified by the additional amounts of $NO_2$, $SO_2$, and TSP degradation which would be allowed" (page 3-4 paragraph 4). The specific incremental amounts of pollutants allowed the baseline are listed in Table J-4 (page J-3). Within the San Juan/San Miguel Resource Area, Mesa Verde National Park and a portion of the Weminuche Wilderness (as of August 7, 1977) are PSD Class I Areas. In addition to the specified Class I increments, Class I Areas also have provisions to protect "Air Quality Related Values" such as visibility, atmospheric deposition, noise, etc. Telluride and Pagosa Springs have a high probability of being nonattainment areas for $PM10$. The remainder of the Resource Area is designated PSD Class II.

159. Comment:   The air quality analysis in the Draft Environmental Impact Statement (DEIS) is inadequate. Individual oil wells can be major sources of air pollution, generating more than 250 tons per year of one or more regulated pollutants such as sulfur dioxide, hydrogen sulfide, nitrogen oxides, volatile organic compounds, and carbon monoxide. Nitrogen oxides and volatile organic compounds combine in sunlight to form ozone. The preferred alternative projects the opening of as many as 47 new oil fields an up to 1,789 new oil wells in the study area. The DEIS concludes that this development would have "very minor, short-term, and very localized" impacts on air quality. There is no mention of control technology to reduce the emissions of air pollutants, nor is there any mitigating measure or requirement to use that technology. (91)

Since some or many of the 1,789 wells may be developed near class I or II, or category I or II areas, the final EIS should include an analysis of the potential air pollution impacts on these areas and their resources, as well as required control measures that will reduce the air pollution impacts. Mitigation measures that clearly describe the application of appropriate air pollution control technology should also be included in the final EIS. (91)

BLM_0005825

## CHAPTER FIVE

Response:    The DEIS clearly states (page 1-5, paragraph 6) ,"If a decision is reached to lease under one of the alternatives in this EIS, additional actions will be required before on-ground operations begin.  These actions include the submission of Applications for Permit to Drill (APD), Applications for Rights-of-Way (ROW), and Sundry Notices for other field operations. Development activities subsequent to leasing will have additional NEPA documentation prepared to assess site specific impacts within the range of significance identified in the plan."  It is not possible to identify all potential air quality impacts (nor specify appropriate control technology) from a proposed oil and gas well until detailed information is available concerning that well (location, terrain, production, sulfur content, etc.).  Under all circumstances, applicable federal, state and local air pollution standards (including PSD Class and Colorado Category I and II requirements) will be met, as required in FLPMA and the Clean Air Act.

160.  Comment:    "Very minor, local impacts" should be defined in light of the potential cumulative impacts of the proposed development. (92)

Response:    It is anticipated that potential air quality impacts from further proposed oil and gas development will be well within federal, state and local standards, and it is unlikely that potential impacts would have cumulative effects.

161.  Comment:    It would be helpful to know the number of acres of forest land impacted by oil and gas development.  (92)

Response:    There are 107,000 acres of commercial forest in the entire Study Area.  Less than one percent (1,070 acres) could be impacted.

162.  Comment:    It is unclear how the BLM arrived at the conclusion that approximately 78.8 acres (25 acres of which would be reclaimed) would be disturbed in any given year. (86)

Response:    See revised text.

163.  Comment:    On page 4-1, it is stated that wildcat wells would result in the loss of approximately 10 acres of vegetation per well, or a total of 19,200 acres (from 1,920 wells) over a 20-year period.  Yet page 4-22 states identifies the projected number of wells as 1,789.  The discrepancies do not end there. (86)

Response:    See revised text.

164.  Comment:    pg. 4-1 Vegetation (5th paragraph). The DEIS states that "to comply with requirements of the Endangered Species Act, all oil and gas activities would be cleared for species occurrence at the operational stage on a case-by-case basis rather that at the leasing stage."  This appears to contradict the statements made on page 1-5 (2nd paragraph) that "This EIS will serve as the Biological Assessment when the Final EIS is published.  The U.S. Fish and Wildlife Service do an additional Consultation under Section 7 of the Endangered Species Act on individual leases where T and E species occur? (90)

Response:    BLM will ensure that there will be no effect on T&E species.  BLM does not receive a site specific proposal until the APD is filed.  An environmental assessment is prepared and impacts to T&E species are analyzed.  The FWS is consulted at that time if there is any question as to effect or no effect.

BLM_0005826

## CONSULTATION AND COORDINATION

165. Comment:    pg. 4-1 Vegetation (3rd paragraph) The DEIS identifies the maximum
amount of vegetation that could be lost over 20 years form oil and gas
leasing as 19,200 acres. The DEIS concludes that "this is not considered to
be a significant cumulative impact." The basis of this conclusion is
questionable when information on proportional impacts to the various
vegetation communities is lacking. (90)

   Response:    Critical vegetative types are protected by stipulations and COAs, therefore no
significant impacts are anticipated.

166. Comment:    The potential loss of the mountain shrub type should be addressed in
Chapter 4, specifically for this Resource Area, under Cumulative Impacts as
oil and gas development would have a significant impact on wildlife
dependent species. (90)

   Response:    Anticipated impacts in the mountain shrub community would be negligible
and no special stipulations are necessary. Reference to this plant community
will be deleted.

167. Comment:    If these vegetative communities are so valuable for wildlife, the DEIS should
analyze potential impacts from oil and gas leasing in Chapter 4. Adverse
impacts from other existing uses (road building, construction, gravel
extraction, water diversions and livestock grazing) should be analyzed under
"Cumulative Impacts" in Chapter 4. (90)

   Response:    See revised text.

168. Comment:    The EIS should state how additional adverse impacts to riparian from oil and
gas leasing and development will affect its value and function for wildlife,
water quality, and channel stabilization. (90)

   Response:    See revised text.

169. Comment:    How would road construction be conditioned to protect riparian and wetland
communities when filling of these area may be required to reach pad sites?
(90)

   Response:    Site specific engineering techniques will be used that result in the least
impacts to riparian and wetland areas.

170. Comment:    The DEIS does not have adequate analysis of impacts to riparian, wetlands,
and aquatic habitats from use of this large quantity of water. Consequently,
adverse impacts to fish and wildlife were not analyzed. (90)

   Response:    See revised text

171. Comment:    pg. 4-6 Continuation of Present Management Alternative (3rd paragraph)
The DEIS states that "2) disturbance to aquatic and riparian areas, resulting
in minor losses of both fish and wildlife habitat" would remain unmitigated
under this alternative. The analyses used in the DEIS do not support the
conclusion that "minor losses" would occur. (90)

   Response:    See revised text.

BLM_0005827

**CHAPTER FIVE**

172. Comment:    pg. 4-5 Aquatic/Wetlands/Riparian Habitats  The DEIS states that potentially significant impacts to these habitats "would be minimized by limiting surface-disturbing activities within 500 feet of riparian wetland zones."  If this is a mitigation measure, explain why there is no No Surface Occupancy or other stipulation provided in the DIES to protect these habitats. (90)

   Response:    No Surface Occupancy is not necessary.  Appropriate mitigation is possible under the terms of the lease (Appendices D and F).

173. Comment:    The DEIS describes how winter range, severe winter range, and crucial habitat acreage has been reduced in the past ten years and give projected loss due to development of private lands.  Oil and gas leasing on BLM lands and potential significant impacts, due to the loss of additional habitat, should be addressed in the DEIS. (90)

   Response:    See revised text.

174. Comment:    We consider the stipulations for mitigating direct losses of wildlife habitat and values to be inadequate.  Only the Glenwood Springs RA (pg. 4-3) proposed stipulations requiring compensation for losses of crucial habitats. (87)

   Response:    See revised text .

175. Comment:    Disturbance to wildlife should not automatically be considered an indirect impact.  Oil and gas activity can and does have a direct impact through disturbance especially during nesting and birthing seasons. (92)

   Response:    In the framework of the definition used, direct impacts are defined as affected individual animals that result in immediate mortality.  All other impacts are considered to be indirect.

176. Comment:    All Resource Areas should have lease stipulations requiring the oil and gas lessee to compensate for the loss of crucial habitat.  A map of big game crucial habitat in all Resource Areas would be helpful. (92)

   Response:    A stipulation requiring the lessee to compensate for loss of habitat is not necessary.  See revised text.

177. Comment:    pg. 4-4 (1st paragraph) Following the rationale as described in the DEIS, the reduction of big game winter range from oil and gas development cannot be mitigated through compensatory off-site habitat enhancement.  This is due to shrub regeneration time of 15 to 20 years. (90)

   Response:    Shrub regeneration was considered in the impact analysis.

BLM_0005828

## CONSULTATION AND COORDINATION

178. Comment: pg. 4-5, Right-hand column: What is ". . . the protection for T and E species." We believe it is premature to say that significant impacts to threatened and endangered species will not occur. Based on current inventories, there are 62,000 acres of prairie dog habitat in the Little Snake Resource Area. We are not aware of similar inventories in the other resource areas but suspect significant prairie dog acres in the San Juan/San Miguel Planning Area also. Consequently, we believe this section should recognize the guidelines for Oil and Gas Activities in Prairie Dog Ecosystems Managed for Black-footed Ferret Recovery being prepared by the Fish and Wildlife Service. It is not clear to us how the application of appropriate mitigation listed in Appendix D will preclude significant impacts. The key language in Appendix D, page D-7, development rights are not unduly hindered or precluded." (96)

Response: Because development will be highly dispersed, there will be no significant impact on black-footed ferret reintroduction efforts. A special lease notice concerning the potential for black-footed ferret reintroduction is contained in Appendix E.

179. Comment: pg. 4-5 Threatened and Endangered Species and Species of High Federal Interest The DIES states that "all leases contain the protection for Threatened and Endangered species." Threatened and Endangered species are protected under the Endangered Species Act, not oil and gas leases. (90)

Response: The oil and gas lease incorporates the Endangered Species Act and requires adherence. See Appendix C.

180. Comment: Page 4-2. This page states that "It has been determined through analysis that the Proposed Action Alternative will not have an effect on any of the threatened or endangered species found in the study area." This statement may be incorrect since inventories for the study area are incomplete and the document later states on page D-7 that protection of endangered, threatened, and sensitive plants would only be "to the extent such protection does not unduly hinder or preclude exercising valid existing rights " and "to the degree that existing development rights are not unduly hindered or precluded." Perhaps we did not find it, but we also did not see the analysis which might support the no affect statement. (91)

Response: See revised text

181. Comment: Anticipated impacts to wildlife are not sufficiently documented. (88)

Response: See revised text

182. Comment: Further loss of mountain shrub habitat from oil and gas development on dependent wildlife species is not analyzed for any of the alternatives or under cumulative impacts in Chapter 4 under Environmental Consequences. This is a deficiency that should be addressed in FEIS. (90)

Response: See revised text

183. Comment: BLM's analysis for this EIS is inadequate under NEPA as it only analyzes impacts to sport/game species (deer, elk, sage grouse) and a few federal threatened and endangered species. (90)

Response: Impact analysis is only for significant impacts to fish and wildlife habitat. Other fish and wildlife species not analyzed are not considered to be significantly impacted.

BLM_0005829

## CHAPTER FIVE

184. **Comment:** With BLM's emphasis on only four wildlife species groups within this Resource Area, analysis of potentially significant adverse impacts to more localized rare species cannot be accomplished. (90)

   **Response:** No localized, rare species have been identified that could not be protected by either relocating proposed operations up to 200 meters or using a seasonal Timing Limitation of 60 days.

185. **Comment:** The level of oil and gas activity by the BLM does not support the claim that ungulates would be forced to compete for winter range due to oil and gas operations. Competition for winter range would more likely stem from overpopulation. (86)

   **Response:** Oil and gas development may have locally significant impacts, especially when considered cumulatively with other development on private, state, and other federal lands in the area of concern. When dealing with big game winter range, if an area is at carrying capacity, and a surface disturbing activity reduces that carrying capacity for big game, impacts to habitat on adjoining winter ranges can be reduced either by replacing the habitat values lost or by reducing the number of animals dependent upon the lost habitat. There are many problems associated with reduction in big game numbers which may cause a like reduction in the economy of the state of Colorado.

186. **Comment:** The DEIS states that a direct loss of 960 acres of habitat in any given year could be expected from oil and gas activity. This loss would not be significant to wildlife in the study area because less than .003 percent of the acres in the study area would be affected. (79, 86)

   **Response:** It is stated in Chapter 4 (Wildlife) that this is not a significant impact when taken by itself.

187. **Comment:** We feel the requirement to compensate for loss of crucial habitat is unjust. The BLM justifies the stipulation because competition among ungulates may occur as a result of a reduction in big game winter ranges, however, we feel the problem is overpopulation of ungulates that exceed the range carrying capacity. (79)

   **Response:** See response to Comment #61.

188. **Comment:** The DEIS implies that oil and gas activities would require the use of an entire winter range, thereby forcing elk to move to an adjacent winter range. Elk may move a short distance to avoid human activity, but the situation described by the BLM appears excessive and should be verified and documented in a study. (86)

   **Response:** See revised text.

189. **Comment:** Caves are critical habitat for both Federal Candidate and State listed Species of Special Concern (bats), as well as providing habitat for endemic species of invertebrates. An analysis of potential impacts from oil and gas leasing should be conducted and a special stipulation requiring No Surface Occupancy buffer zones established. (90)

   **Response:** We concur with the need to analyze the potential impacts from oil and gas exploration and development on cave habitat and associated fauna. Until this analysis is completed, it would be premature to impose a No Surface Occupancy lease stipulation. The method of protection, if any is necessary, should be derived through the analysis. At the present time, the BLM has a

5-36

BLM_0005830

## CONSULTATION AND COORDINATION

limited inventory of caves. Those that are known could be identified and appropriate mitigation applied, as well as protecting areas unsurveyed but thought to have the potential geologic characteristics necessary for cave formation. Cave resource values have been identified in the Deep Creek ACEC/SRMA/VRM Class I/Cave Resource Area. The existing and proposed No Surface Occupancy and No Subsurface Occupancy stipulations will protect known cave resource values.

190. Comment: Although the CDOW has identified public lands within the Kremmling Resource Area as crucial habitat for greater sandhill cranes, potential impacts from oil and gas leasing on this habitat is not addressed in Chapter 4 under this Resource Area analysis for cumulative impacts. (90)

Response: See revised text.

191. Comment: It is also unclear how measures such as "a field inspection by a qualified individual of every APD and seismic location" will mitigate for impacts to currently unknown raptor nests when a pad location can only be moved up to 200 meters and a 1/4 mile buffer zone around a nest would be required to protect it. (90)

Response: We would protect newly discovered resources to the maximum extent possible under the terms of the lease.

192. Comment: The most efficient way to handle the many small depletions from individual wells would be to make an estimate of total depletion for the four resource areas in the upper Colorado River Basin covered in the EIS. This estimate could be based on the Assumptions for the Potential of Development already presented in Appendix B. (96)

Response: See revised text.

193. Comment: The Fish and Wildlife Service believes that major causes for the decline of the Colorado squawfish, humpback chub, bonytail chub, and the recently proposed razorback sucker, include the effect of impoundments and water depletion from the Colorado River and its tributaries such as the San Juan. Since oil and gas drilling involves a depletion of water, we believe that any action made possible by your Oil and Gas Leasing EIS that causes a depletion of water from the upper Colorado River basin should prompt a "may effect" finding for the listed and proposed fishes and necessitate consultation and conference under the Endangered species Act. (96)

Response: See revised text.

194. Comment: page 4-7 Conclusions Conclusions reached in the summary section for Chapter 4 are not supported by the analyses and mitigation measures presented in the DEIS. (90)

Response: See revised text.

195. Comment: Define "these species" on Page 4-7. Where are the "crucial habitats where cumulative impacts may already be limiting production?" This information is not provided in the DEIS. (90)

Response: See revised text.

BLM_0005831

## CHAPTER FIVE

196. Comment:   On page 4-7, 5th paragraph, the first sentence, "important" should be changed to wildlife. This would avoid the confusion between important habitats and crucial habitats mentioned in the last sentence. (92)

Response:   See revised text.

197. Comment:   The statement (pg. 4-8) "Some long term loss and irreversible and irretrievable commitments of wildlife resources would occur, but no significant losses in wildlife populations or habitat would be expected" is open to question. How much is "significant?" (97)

Response:   See definition of significant.

198. Comment:   The first paragraph on page 4-10 fails to mention any anticipated adverse impacts associated with oil and gas exploration and development activities. (88)

Response:   We disagree. The first paragraph on page 4-10 of the DEIS covers minor erosional losses and mitigation of that loss. We consider even this minor erosion due to oil and gas operations to be sufficiently adverse to warrant mitigation.

199. Comment:   Page 4-15. In the discussion of Environmental Consequences related to cultural resources, there is at least one apparent contradiction. Citing Nickens, et al. (1981), the document notes an increased potential for impacts to identified and unidentified sites. The very next paragraph suggests that major impacts to cultural resources are unlikely. We suggest that the document be expanded, with consideration of Grady (1984, Environmental Factors in Archaeological Site Locations, Colorado Bureau of Land Management Cultural Resource Series, No. 9, Northwest Colorado Prehistoric Context, Denver) to more clearly delineate the magnitude of potential impacts to both surface and subsurface sites. (91)

Response:   It is stated that increase impacts may occur but these will not be significant. No additional discussion or analysis is necessary.

200. Comment:   Page 4-15. Visual impacts to NPS units could be reduced by developing a visual protection zone around roads at Dinosaur National Monument and the Hovenweep Cooperative Management Strategies area. (91)

Response:   The NSO stipulation for the Hovenweep National Monument Resource Protection Zone has been identified for this purpose.

201. Comment:   Page 4-16. The narrative on paleontology is not sufficient to ensure the reader that paleontological resources are adequately protected. The document notes that "identified sites must either be proven to have no significant fossils." What constitutes an "identified site?" (91)

Response:   As defined by the Colorado Supplemental Manual 8270, an "identified site" is one that has been recorded, evaluated, and if appropriate, protected. There are also areas that contain many sites that have been identified as fossil bearing places. These formations will also be surveyed, as needed, and protected.

BLM_0005832

## CONSULTATION AND COORDINATION

202. Comment:     Page 4-17 of the document discusses the construction of access roads to the
                  locations of oil and gas development. The Bureau of Land Management
                  should be aware that access permits from the Department of Highways are
                  required for any new access point onto State highways. This information
                  should be included in the Final EIS. (92)

     Response:    We are aware of this requirement. The majority of the anticipated oil field
                  access roads will access existing BLM roads. However, in the case of both
                  county roads and state highways, operators are required to obtain all
                  necessary access permits and to fulfill the obligations of those permits.

203. Comment:     Page 4-24. Although the cumulative effects of wildcat wells are generally
                  insignificant, do field developments have effects that may be significant in
                  some areas, for example, visuals or wildlife habitat? If the fields are only a
                  few wells, the effect would be small. However, a large field of 50 wells
                  could be significant. (99)

     Response:    Your assumptions are correct and are addressed on page 4-24 of the DEIS.
                  However, we are not projecting field development of as much as 50 wells in
                  any Planning Area. Field development is discussed on page 2-2 and 2-3 of
                  the DEIS. The greatest field development anticipated is about 21 wells in
                  Little Snake Resource Area (Table 2-2, DEIS).

204. Comment:     The soils in AVF's tend to transmit groundwater rapidly. Any contaminated
                  water from drilling operations will tend to enter water faster in this case.
                  (77)

     Response:    Drilling fluids are contained on location for the express purpose of
                  separating them from fresh water. When drilling operations are located on
                  alluvial or porous soils, drilling fluid pits are lined to prevent entry into
                  groundwaters, and constructed so as to prevent mixing with surface water.

205. Comment:     Road building in the soft and easily-erodible soils of alluvial valleys is one
                  of the historical causes of arroyo initiation and propagation. If no roads
                  exist in an AVF, then don't build a new one! (77)

     Response:    Oil and gas roads are sited by specialists. Alluvial valley bottoms as well as
                  vegetation, wildlife, slope elevation, and other conditions are all considered
                  in the location of a road. In general, alluvial valleys are avoided due to the
                  several potential problems that can arise from placement of roads in these
                  areas.

206. Comment:     Roads associated with the oil and gas industry should be included in the
                  non-point source program. (124)

     Response:    All non-point sources of pollution are covered in the program. That includes
                  roads used by the oil and gas industry.

207. Comment:     The EIS should discuss impact mitigation of the waste water. (123)

     Response:    "Waste water" is handled in one of several ways depending on its make-up.
                  Non-hazardous waste water is evaporated naturally from the drill-site pit
                  prior to pit closure. Hazardous pit fluids are hauled to appropriate disposal
                  sites. Generally, these are commercial hazardous waste disposal sites. A
                  recent BLM Washington Office notice has been added to approved APDs
                  and is added to this documents "Conditions of Approval for all Alternatives"
                  (Appendix D, APDS, Notification, DEIS).

5-39

## CHAPTER FIVE

208. Comment: Are there any plans for monitoring sediment loads, wildlife populations, etc., to determine the effects of oil and gas activities? (99)

Response: The BLM monitors all resources for impacts from all types of development as budget and other workloads allow. BLM specialists also acquire information gathered by such agencies as the Colorado Division of Wildlife and U.S. Geological Survey (to name only two). Data gathered from all sources is analyzed to determine impacts from the various permitted activities on public lands.

209. Comment: Migration of methane into adjacent water sources is a very real threat as is the depletion of overlying aquifers. We believe that it is likely to occur and would have a significant effect on water quality. (97)

Response: See revised text.

210. Comment: We note the document references several of the above listed streams but we were unable to identify the impacts that oil and gas developments would have on these streams and their outstandingly remarkable values. (91)

Response: No impacts were identified.

211. Comment: The nature of the liquid wastes proposed for deep well disposal needed to be documented, as well as the characteristics of the formations being considered for this purpose. (88)

Response: Deep well disposal is approved or denied by the Colorado Oil and Gas Conservation Commission under primacy of the Environmental Protection Agency. It would be inappropriate for this document to address authority not granted the BLM.

212. Comment: Additional information relative to the proposed method for handling and disposing of water waste fluids (page 4-11), and anticipated dynamics around the percolation of such fluids from proposed reserve pits is needed. (88)

Response: See revised text.

213. Comment: We are unaware of any situation where seismic disrupts normal water aquifers or altered subsurface water flows which "result in reduced flows or even the loss of all water in existing spring or water wells." (79)

Response: See revised text.

214. Comment: It is not possible to require that all waste water from the drilling be trucked away for disposal in these surface water sensitive environments? (77)

Response: The vast majority of water used in drilling operations is evaporated prior to pit closure. Only in a small percentage of cases where toxic continents are used in the drilling fluids are the drilling muds trucked to disposal sites. Other methods, such as on-site neutralization or extraction, are also employed.

215. Comment: Disposal of toxic wastes was ignored and the impacts not discussed. (124)

Response: Waste fluids are discussed under "WATER" in Chapter 4. The handling of wastes, including toxic wastes, is discussed in Appendices A and D.

BLM_0005834

# CONSULTATION AND COORDINATION

217. Comment: What about mitigation for the possibility of subsidence. (123)

Response: All drilling programs are reviewed and approved/denied by a petroleum engineer. Part of that review is the analysis of the casing program. The integrity of the well construction and the fluid withdrawal rates determine subsidence. Both are analyzed and monitored to prevent subsidence. However, primarily because of the consolidated rock overlying reservoirs in Colorado, there are no subsidence problems associated with any BLM wells.

218. Comment: BLM needs to address the problem of companies that fracture 2 to 3 times the allowable pressures or beyond the intended zone. (123)

Response: The "allowable" referenced is based on state requirement for water disposal well, not production formation fracturing operation. The purpose of the State requirement is to prevent the breakdown of water disposal formation by injection pressure. The purpose of a formation fracture operation is the opposite, i.e., to break (or reservoir). In addition to our requirements, the drilling company has a large financial inducement to stay within zone in that propagating fractures beyond the reservoir would be a waste of time and money. Such fractures would not help production and could hurt it. For that reason, fracture engineers monitor pressures carefully, and halt the fracture job at the first sign of falling pressure.

219. Comment: Dinosaur National Monument The document notes that areas adjacent to Dinosaur National Monument are rated as having low potential for development. Given that this rating is the lowest potential identified in the Little Snake Resource Area and given further the low number of exploratory wells projected in this rating area, closure of the areas adjacent to the park should have minimal impact on potential production of oil and gas from the Resource Area as a whole. The potential impacts to park resources and resource values far outweigh this low potential for oil and gas development. (91)

Response: BLM is required by law to provide for multiple use of the federal estate, both mineral and surface. This Colorado Oil and Gas Leasing EIS provides for leasing and development of the oil and gas estate in an environmentally sound manner. Impacts of oil and gas development are analyzed in this document and mitigation identified which will reduce identified impacts to an acceptable level. There have been no impacts or justification identified which would support your suggested closure. A closure for reasons other than identified and substantiated impact to resources is beyond the scope of this document.

220. Comment: Many of these National Natural Landmarks (NNL) are located in or near potential lease areas. Because of their significance and because Federal Agencies are responsible for considering impacts to NNL under Section 102 (2) (c) of the National Environmental Policy Act, we would appreciate consideration for these resources. (91)

Response: There will not be any impacts to these areas.

221. Comment: Significant paleontological materials that will be impacted should be collected, prepared, stored, and placed in an acceptable repository. Burial or similar actions are not acceptable "otherwise protected" actions. (91)

Response: Scientifically important paleontological materials will be collected and curated as stated in the Colorado Supplemental Manual 8270, Paleontological Resource Management.

5-41

BLM_0005835

## CHAPTER FIVE

222. Comment:    The paleontology section concludes with the statement that "The unavoidable loss is insignificant in relationship to the widespread distribution of the resource." We suggest that this statement may be refuted by the significance of recent fossil finds in Dinosaur National Monument and elsewhere in western Colorado and eastern Utah. Some of the recent discoveries are classified a microfossils but, in spite of their small size, they have resulted in new prehistoric species and significant new gains in paleontological knowledge. (91)

Response:    It is Bureau policy (8270 Manual) that in areas of known sensitivity for significant fossils, a survey will be completed prior to development. If fossils are found to be scientifically important, they will be mitigated either through project redesign or excavation.

223. Comment:    In light of recent discoveries and considering that existing surveys are far from complete, we recommend a survey of all areas that will be subjected to surface disturbance. The survey could identify and assess the significance of surface materials. In those formations known to bear significant fossils, it might also be wise to survey materials disturbed by subsurface operations. (91)

Response:    A survey of all areas may not be appropriate depending on the geological nature of the area. In some cases, there are very few fossil bearing areas and they would not be subject to a survey. However, in known fossil producing areas (Class I), a survey is required. In areas suspected of bearing paleontological materials, a survey will be recommended as per the Colorado Supplemental Manual 8270.

224. Comment:    The Transportation issue has not been addressed in sufficient detail to analyze short and long-term impacts to BLM-managed lands. (90)

Response:    See revised text.

225. Comment:    A coal company faces safety, production, and economic impacts if oil wells are drilled on their mining area. (82, 130)

Response:    See revised text.

226. Comment:    Underground mines also are not exempt from problems created by wells. They will be faced with the same abandonment problems or leaving a large reserve of coal un-mined. This would be particularly difficult for a modern longwall operation to deal with a well. Moving a longwall set up to avoid a well is very expensive and may not be feasible at all. (82, 130)

Response:    See revised text.

227. Comment:    If an oil and gas well is drilled in the path of our planned mining operations, numerous problems result. Under Colorado Mined Land Reclamation Division regulations (4.08.4(7)(b)), blasting cannot be conducted within 500 feet of a facility such as an oil or gas well or a pipeline unless a variance can be obtained. The federal office of Surface Mining regulations (30 CFR, 816.67(d) and 817.67 (d)) limit blasting in the area of facilities such as an oil or gas well or pipeline. (82, 130)

Response:    See revised text.

BLM_0005836

## CONSULTATION AND COORDINATION

228. Comment: Cumulative Impacts: Chapter 4 The Cumulative Impact section should be expanded upon. BLM has limited the scope of the EIS to cumulative impacts on BLM lands and to impacts associated with only oil and gas leasing. (90)

Response: This section has been revised. The cumulative impacts cover all activities on lands within the respective Resource/Planning Area.

229. Comment: The evaluation in the DEIS of cumulative impacts of oil and gas activities in combination with other activities on these lands is inadequate. (78, 81, 91)

Response: See revised text.

230. Comment: Does BLM's cumulative analysis exclude adjacent private and split-estate · lands? (90)

Response: The cumulative impacts do include private and split estate lands. See Chapter 4, Cumulative Impacts section.

231. Comment: It seems that prior to reaching a conclusion on "significance," an analysis of cumulative impacts for all land uses on major vegetative community types for both adjacent private, split-estate, and federal lands should be analyzed. With the information presented in the DEIS, there is no basis for this conclusion. (90)

Response: See revised text.

232. Comment: The potential added impact from oil and gas leasing should be addressed for the alternatives and under the cumulative impacts section in Chapter 4. (90)

Response: See revised text.

233. Comment: No issues relating to the impacts on opportunities to explore for and develop oil and gas which could result from surface management were addressed in the DEIS. (86)

Response: The impacts to oil and gas development are discussed on page 4-22 of the DEIS.

234. Comment: On split estate this document does not address the problems of lambing and calving on private lands, yet wildlife is granted relief. (80)

Response: According to BLM policy, a lease stipulation is not necessary for resource protection where a Timing Limitation is 60 days or less, or where you desire to relocate the proposed operation 200 meters or less. Such mitigation is within the definition of reasonable measures an Authorized Officer may deem necessary to protect other resource values or uses under the terms of the lease (specifically, section 6 of the standard lease from) and the regulations at 43 CFR 3101.1-2. This is a very clear demarcation between when a lease stipulation is required and when alternative mitigation can be equally effective.

The BLM has afforded protection to lambing areas under Conditions of Approval in Appendix F (see page F-1 of the Draft EIS). These COAs will be attached to lease notices at the time of lease issuance. This same policy applies to wildlife mitigation where conflicts occur for less than 60 days, a COA is used; however, a stipulation is required for lease restrictions greater than 60 days.

5-43

BLM_0005837

**CHAPTER FIVE**

235. Comment: In Chapter 4, page 2, a paragraph on reclamation on split estate leaves the private landowner with little or no control over revegetation and water erosion from drilling pads. (80, 81, 107)

     Response: The private landowner is given the option to have the land reclaimed. BLM will enforce the revegetation and erosion control if requested.

# Chapter 5 Comment

236. Comment: The records of coordination with the U.S. Fish and Wildlife Service under the Endangered Species Act and with the U.S. Army Corps of Engineers for potential impacts to riparian and wetlands under Section 404 of the Clean Water Act need to be included. (90)

     Response: These are included in Chapter 1, Relationship to Non-BLM Policies, Plans, and Programs.

# Chapter 7 Comments

237. Comment: The definition of mitigation should also include avoiding and compensating which today are considered essential to the mitigation process. (92)

     Response: The definition of mitigation has been changed to include avoiding and compensating for resource losses.

238. Comment: Did the state of Colorado have input to BLM's state list of sensitive species? Where is this document available? (92)

     Response: The sensitive species should have indicated it listed only plant species, not animals.

# Appendix A Comments

239. Comment: Appendix A description of seismic operations is out-dated and needs revision. (84, 85)

     Response: See revised text.

240. Comment: Appendix A appears to be generalized oil and gas operations and could be confused with the Proposed Action alternative. (99)

     Response: Appendix A, as revised for the FEIS, is an accurate representation of the Proposed Action.

241. Comment: Geological Exploration can be considered a "connected action" under NEPA and potential impacts to BLM resources should be analyzed under this EIS. (90)

     Response: See revised text.

BLM_0005838

## CONSULTATION AND COORDINATION

242. Comment: The description for this chapter needs to be contemplated with regard to the pending changes in the Notice of Intent (NOI) system. Those potential changes from the Washington office may cause this portion along with other areas of the document, to need rewriting. (84, 85)

   Response: We are not aware of significant changes which are imminent. Additionally, the analysis and decisions in this document can be based only upon the policies, procedures, etc., in place at the time the document is prepared. We cannot anticipate the shape and impact of possible changes in policies, etc.

243. Comment: The DEIS states that "Five thousand to 15,000 gallons of water may be needed for mixing drilling mud, cleaning equipment, cooling engines, etc. A surface pipeline may be laid to a stream or a water well, or the water may be trucked to the site from ponds or streams in the area." As this statement follows the preceding paragraph which discusses construction of one well pad, it is assumed that this water use figure is for each well. (90)

   Response: See revised text.

244. Comment: The Washington office is currently dealing with the explosives issue in a way that corrects the misunderstandings inherent in "loaded shotholes shall not be left unattended." Their language states: loaded shotholes shall not be left unsecured according to ATF techniques. Powder magazines should be stored and handled according to ATF standards and not in conflict with any other applicable federal, state, or local regulations. (85)

   Response: See revised text.

245. Comment: Threatened, endangered and sensitive species: Is it not possible to argue that the whole resource area is potential habitat? We would suggest that a map showing those areas of concern be circulated so that operators may see potential concerns in advance. (85)

   Response: See revised text.

246. Comment: E. Construction: Paragraph 5, "However . . . within 1/4 mile to springs, wells or impoundments. . ." Vibroseis is a safe, controllable energy source that is used in heavily populated downtown areas. To restrict that source from springs 1/4 miles is unnecessary. Studies have been done which show that 50 lbs. of explosives may be detonated within 250' of springs with no effect. Likewise, vibroseis operations need only limit themselves to such distances as allow the driver safe passage around the well or other physical barrier. (85)

   Response: See revised text.

247. Comment: Because the industry regularly backfills and tamps holes before shooting, no geophysical operations today create "small craters." (86)

   Response: See revised text.

BLM_0005839

**CHAPTER FIVE**

# Appendix B Comments

248.  Comment:    Appendix B maps and other information provided by each resource area should be standardized.  (86)

    Response:    See revised Appendix.

249.  Comment:    According to the table, the LSRA could realize the greatest surface disturbance of all the planning areas evaluated.  Development in prairie dog towns prior to their evaluation for black-footed ferret recovery could compromise potential reintroduction proposals.  (96)

    Response:    Because development will be highly dispersed, there will be no significant impact on black-footed ferret reintroduction efforts.  A special lease notice concerning the potential for black-footed ferret reintroduction is contained in Appendix E.

250.  Comment:    Appendix B--Some of the data and maps are difficult to understand.  Are they needed for the document?  (99)

    Response:    See revised text.

251.  Comment:    The figures throughout Appendix B need to be reexamined.  It is inconsistent and confusing.  Furthermore, the maps and data provided by each resource area should be standardized so they are all on the the same scale, and are using the same definition of high, medium, low, and unknown potential.  (95)

    Response:    See revised text.

252.  Comment:    Appendix B contains assumptions for the Potential of Development which consist of average disturbances, projected number of wells, and total acres disturbed.  The appendix is extremely confusing and requires extensive clarification.  (86)

    Response:    See revised text.

253.  Comment:    The narrative describing the potential for development in the GSRA indicates that 54 wells would be drilled in the area over the next 20 years.  Using the information in Table B-1, one would calculate that an average of 34.7 acres would be disturbed per year and a total of 694 acres would be disturbed over 20 years.  Yet, Table B-3 indicates that a total of 78.8 acres would be disturbed each year (25 acres would be reclaimed, leaving 53.8 ares per year), and Table B-4 indicates that 836 acres would be disturbed over 20 years.  Such discrepancies must either be eliminated or fully explained.  (86)

    Response:    The figures in Table B-1 are an indication of the average surface disturbance associated with each projected well.  Table B-1 gives no figures related to time.

BLM_0005840

## CONSULTATION AND COORDINATION

254. Comment:    The information on Table B-3 does not coincide with that shown on Table B-4. According to the information displayed in Table B-3, approximately 180,164 acres could be disturbed over a 20-year period. Yet Table B-4 indicates a total of 20,219 acres would be disturbed over 20 years. The BLM should verify, correct if necessary, or explain in greater detail how these figures were derived. (86)

Response:    You are apparently incorrectly reading Table B-3 (DEIS). Table B-3 is designed to show the average number of acres which we anticipate being disturbed during any given one-year time period. This figure includes disturbance that may exist for all 20 years and that which may exist for only a few months. The purpose of Table B-4 is to show the total number of acres disturbed (productive and reclaimed) during the next 20 years.

255. Comment:    According to Table B-4, these miscellaneous figures constitute the total additional disturbance expected over the life of the plan. This distinction must be made on Table B-1. (86)

Response:    We concur. The "Miscellaneous" column in Table B-1 refers to a total disturbance figure while the other columns refer to disturbance per well. The "Misc." has been dropped from Table B-1. The figure for Glenwood Springs, "Misc.," Table B-4 has been changed from "0" to "100."

# Appendix D Comments

256. Comment:    Misc. How many of these areas exist? Why is there a 24-hour restriction? Is there no happy medium which allows both users access during different parts of the day? There must be a reasonable alternative. (85)

Response:    See revised text.

257. Comment:    Appendix D is not accurate and needs to be revised. (84, 85)

Response:    See revised text.

258. Comment:    Appendix D, Geophysical Operations, requires operators to perform Class III cultural resource inventories on all portions of seismic lines which cross BLM surface. This far exceeds the requirements of Section 106 of the National Historic Preservation Act. A Class III inventory is required only if there is a strong indication that sites exist which would be eligible for inclusion in the National Register of Historic Places (84, 85, 86)

Response:    A Class III cultural resources inventory is required by Bureau policy and the National Historic Preservation Act whenever a "federal undertaking" occurs. Section 106 requires consultation with the State Historic Preservation Officer and in that process, a Class III inventory may be required. The matter of site indication is irrelevant under Section 106's "federal undertaking" provision.

259. Comment:    Explosives: the restriction that "loaded shotholes not be left unattended" is somewhat confusing. The reason is that there may be short intervals between when the shothole was loaded and when it is detonated that the hole is unattended. (94)

Response:    See revised text.

BLM_0005841

## CHAPTER FIVE

260. Comment:   Production:  One requirement in the section states that rock surfacing will be required for all-weather operations.  This requirement is not necessary in all situations.  (94)

    Response:   As stated in the Introduction to Appendix D, "COAs are not added to applications if they are unnecessary (do not apply to the case in question) . . ."  The COAs listed in Appendices D, F, H, and I are intended to show the reader examples of mitigative measures applied to approved applications.

261. Comment:   Another area of concern is the requirement that appropriate noise mitigation will be employed if the well is located within 2,500 feet of a residence.  A half mile radius to employ this rule is excessive.  There are a multitude of conditions that could affect noise on a given residence.  (94)

    Response:   The concern is noted.  In cases where operations are to be located within 2,500 feet of a residence, all factors are analyzed prior to APD approval.  Mitigation of the impact is based on that analysis.

262. Comment:   Resources (other than oil and gas) - A paragraph states that water wells drilled to provide water will be offered to the BLM after use and that water rights will be held by the BLM.  It is important that the statement be added that BLM also assume all legal responsibility for the well after assuming ownership.  This is an important aspect that must be documented for future records maintained by the state of Colorado.  (94)

    Response:   See revised text.

263. Comment:   Cultural Resources:  within this section there are numerous references to a 500' setback of seismic activities from cultural resources.  In reviewing the restriction, there appears to be no flexibility provided in modifying this restriction.  (94)

    Response:   It is Bureau policy that flexibility is part of the APD and/or seismic process.  The 500-foot setback rule generally pertains to sensitive cultural resources such as standing structures.  It is applied at the discretion of the field manager who may waive this rule if cultural resources are not endangered by seismic activities.

264. Comment:   The official title of Area Supervisors is now Area Wildlife Managers.  (92)

    Response:   Concur.

265. Comment:   T&E animal species should also be included along with the discussion of T&E plants.  (92)

    Response:   See revised text.

266. Comment:   Have raptor and sandhill crane nests been inventoried, and will there be an opportunity to include such information after an APD or other action is granted:  Nest sites are dynamic and may require protection after-the-fact of issuance of the necessary permits.  (92)

    Response:   Existing inventory information is used as available and additional information is collected as time and funds permit.  Protection measures will be taken to the extent that the valid existing lease rights are not violated.

BLM_0005842

## CONSULTATION AND COORDINATION

267. Comment:    We recommend that the Conditions of Approval regarding pipelines be amended to include requirements for automatic shut-off values, double wall pipe, and response teams in each instance a pipeline crosses the Yampa River or any other stream where spills have the potential to impact endangered fishes. (91)

Response:    Your recommendation will be reviewed for possible inclusion in lease operations, however, it would be pointed out that pipelines crossing such major drainages as the Yampa River are not within the scope of this document. Those lease operations covered by this EIS contain provisions for protection of streams and there is in place a notification and response process for handling spills.

# Appendix E Comments

268. Comment:    Why did Appendix E fail to include avoidance stipulations for the Anasazi Cultural Multiple Use ACEC? (83)

Response:    NSO designations have been placed on specific locations that need special protection. We cannot prohibit oil and gas exploration and development in the ACEC area because the existing leases are held by production and the area is under the McElmo Dome Production Unit.

269. Comment:    Appendix E identifies lease stipulations which will be considered for application in accordance with the Proposed Action. In many cases, exception criteria are identified; however, in some cases they are not. While it is stated that even where no exception criterion is identified exceptions will be considered on a case-by-case basis, this statement should be more prominently displayed in the appendix to avoid possible future conflicts. (86)

Response:    See revised text.

270. Comment:    Appendix E. I. No Surface Occupancy Stipulations: two specific areas of concern exist with this section. One deal with the restriction regarding raptor nests. The stipulation states that a 1/4-mile setback will be required for certain species of raptors. Exception criterion is listed which includes evidence of permanent abandonment. (94)

Response:    See revised text.

271. Comment:    Appendix E--How are overlapping stipulations managed? Presumably, the most restrictive stipulation will be applied. The possibility and desirability of standardized leases between the BLM and FS to eliminate inconsistencies across boundaries has been discussed. The Montana BLM stipulations appear to be a good start, and we should pursue this opportunity in the near future. (99)

Response:    All appropriate stipulations are attached to the lease as required even if they overlap. The reason for this policy is that some restrictions may be waived, excepted or modified at the time of field operation. In which case, a less restrictive measure may still apply even though a more restrictive one was excepted. We concur with stipulation standardization. Colorado BLM, as well as Region 2 Forest Service, use the Rocky Mountain Regional Coordinating Committee Uniform Format (see revised text, Appendix E).

BLM_0005843

## CHAPTER FIVE

272. Comment:  No Surface Occupancy. Until black-footed ferret recovery potential has been evaluated in each planning area, and reintroduction decision documents are in place, we believe all prairie dog towns in each planning area should be designated NSO. According to the peregrine falcon recovery plan for the Rocky Mountain Southwest Populations, recovery task number 1221 asks that permanent disturbances be prohibited within one mile of falcon nesting cliffs. We believe the NSO stipulation should adopt this recommendation. (96)

     Response:  The draft "Guidelines for oil and gas activities in prairie dog ecosystems managed for black-footed ferret recovery," Feb. 1990, prepared by U.S. Fish and Wildlife Service, Denver, did not recommend or even suggest the need for a NSO within the general guidelines.

273. Comment:  Usually a 1/2 mile radius from the nests of these raptor species is necessary for their protection. This distance should be consistent with that given on page E-6. For T&E species, recovery plan guidelines should be conditions of the lease rather than BLM general stipulations. (92)

     Response:  All raptor nests are protected from destruction through a uniform NSO stipulation of a one-eighth mile radius of the next site. The one-half mile radius is a Timing Limitation to protect the nest from human-associated activities from February 1 to August 15. All T&E species are protected by the Endangered Species Act with a notice to this effect in all oil and gas lease offers.

274. Comment:  Please discuss your criteria for permanent abandonment of nests. (92)

     Response:  The permanent nest abandonment exception criterion has been reworded to: during years when a nest site is unoccupied or unoccupied by or after May 15, the seasonal limitation may be suspended.

275. Comment:  A two-mile radius from the lek is necessary to protect grouse breeding habitat as explained on pages 3-24 and 4-4. (92)

     Response:  See revised text.

276. Comment:  A stipulation affording protection to riparian and wetland areas should be included. Why are only wetlands protected by a stipulation? (90)

     Response:  See Appendix D.

277. Comment:  CDOW's Garfield Creek State Wildlife Area should be covered under a No Surface Occupancy stipulation because of its importance as an ecological unit. (92)

     Response:  This was an oversight and is corrected in the Final EIS. In addition, we feel that the CDOW's Toner Creek Property should also be protected in similar fashion and is added to the final EIS.

BLM_0005844

## CONSULTATION AND COORDINATION

278. Comment: An exception criterion identified for several NSO stipulations in the GSRA on page E-3 would require operators to "eliminate" drill rig and other equipment noise. This requirement is excessive and virtually impossible to achieve. We recommend the word "eliminate" be replaced with the word "reduce," which is more reasonable (86, 94)

Response: Drill rig and other equipment noise could not be eliminated at the source, but would be substantially unnoticeable in the noise sensitive areas. Sensitive areas would be identified at the time a specific drilling/operation site is proposed. If no sensitive areas are identified, the exception would be granted. If a sensitive area is identified, relocation or other mitigation to reduce noise would be required. If the noise impact cannot be eliminated, the exception would not be granted to protect the sensitive areas.

279. Comment: We support the No Surface Occupancy stipulation for the Hovenweep Cooperative Management Strategy area. This stipulation should also include the Goodman Point and Cutthroat Castle resource protection zone areas. (91)

Response: The NSO stipulation proposed for Goodman Canyon and the Goodman Point Buffer Zones includes the federal mineral estate lands surrounding Goodman Point Ruin. A NSO designation on the lands surrounding Cutthroat Castle was inadvertently overlooked. A buffer zone of 320 acres will be added.

280. Comment: The radius for lek/nesting habitat for grouse should be two miles. (92)

Response: See revised text.

281. Comment: Bald eagle nesting activity is nearly year-round in some areas with resident birds. Special stipulations may be needed in the areas. (92)

Response: Bald eagle nesting habitat is protected from human-associated activities from December 15 to June 15. This Timing Limitation measure restricts human activity one month prior to nesting selection for courtship and nest building activities and one month after eggs are hatched.

282. Comment: Timing Limitation stipulations presented on pages E-6 and E-7 should be revised to include the word "known" before the words "Winter Habitat, Crucial Winter Range, etc." (90)

Response: If the areas are not known, they cannot be delineated.

283. Comment: The DEIS states that "The CSU stipulation is less restrictive than the NSO or TL stipulations, which prohibit all occupancy and use on all portions of a lease for all or portions of a year." This statement is not true as the TL stipulation allows for operation and maintenance within critical time periods. (90)

Response: See revised text.

BLM_0005845

**CHAPTER FIVE**

284. Comment:

Both the LSRA and GSRA would impose a Controlled Surface Use stipulation for the protection of fragile soils. Several performance objectives are identified which are designed to ensure soil productivity. This special stipulation is not necessary because fragile soils are adequately protected by standard terms and conditions of the lease. There is no need to overburden the lessee with excessive restrictions. (86)

Response:

Fragile soils are not adequately protected under the standard terms and conditions of the lease. Once a lease is granted, the lessee has a right to develop that lease and cannot be forced to relocate operations more than 200 meters within the lease to avoid fragile areas. If the entire lease were located on fragile soils, fragile soils would unavoidably be disturbed. The Controlled Surface Use stipulation is designed to "warn" the lessee prior to the time of lease issuance that fragile soils exist on the lease and may require special measures for protection over and above measures normally taken in accordance with the standard terms and conditions. If the lessee cannot meet the Controlled Surface Use stipulations, no surface disturbance will be allowed on the site. The characteristics of fragile soils and why they require these special Controlled Surface Use stipulations are explained in Chapters 3 and 4.

285. Comment:

The Controlled Surface Use stipulations outlined by the GSRA should be applied to all Resource Areas. (92)

Response:

See revised text.

# Appendix F Comment

286. Comment:

In Appendix F, it is stated that one of the Conditions of Approval for the GSRA and LSRA in fragile soil areas is: Before reserve pits, production pits, or emergency pits can be reclaimed, all residue will be removed and trucked off-site to an approval disposal site." Other alternatives must be considered. (95)

Response:

See revised text.

# Appendix L Comments

287. Comment:

A threatened and endangered species animal list needs to be added here. There should be a similar appendix for the Kremmling and Northeast Planning Areas. (96)

Response:

Chapter 3 has a table showing T&E species occurrence by Resource Area.

288. Comment:

Table L-1 should be updated to include the results of the 1987-1989 surveys conducted by the Colorado Natural Areas Program near Dinosaur National Monument. A copy of the summary table from that research is enclosed. (91)

Response:

The list will be updated as more current information becomes available. We are currently awaiting receipt of a new list from the Colorado Natural Areas Program.

BLM_0005846

# CHAPTER SIX

# LIST OF PREPARERS

BLM_0005847

# CHAPTER SIX

# LIST OF PREPARERS

The following list displays the various individuals who have contributed to this EIS, their home office, and field of expertise.

## Core Team

H. Robert Moore, State Director
Frank A. Salwerowicz, DSD, Mineral Resources
Gregory Shoop, Chief, Branch of Fluid Minerals
Bob Kline, EIS Team Leader
Jim Rhett, Minerals Tech. Coordinator
Glenn Wallace, Planning Tech. Coordinator
Barbara Perkins, Writer/Editor
Dan Sokal, GSRA Coordinator
Rich McClure, KRA Coordinator
Duane Johnson, LSRA Coordinator
Jim Perry, NERA Coordinator
Bob Kershaw, SJRA Coordinator

## Team Members

| Name | Office | Assignment |
|---|---|---|
| Scott F. Archer | CSO | Climate and Air Quality |
| Jeanette Pranzo | CSO | Socioeconomics for KRA, SJ/SMPA |
| Kermit Witherbee | CSO | PODs |
| Lee Upham | CSO | Wildlife |
| Dan Sokal | GSRA | Project Coordinator |
| Gene Ligon | GSRA | Range |
| Bob Elderkin | GSRA | Soils and Review |
| Leonard Coleman | GSRA | Wildlife |
| Bill Kight | GSRA | Cultural/Paleontology |
| Francisco Mendoza | GSRA | Recreation/Visual/Wilderness |
| George Rice | GJDO | Geology |
| Jim Scheidt | GJDO | Hydrology |
| Steve Moore | GJDO | Socioeconomics |
| Rich McClure | KRA | Project Coordinator |
| Bruce Asbjorn | KRA | Range |
| Charles Cesar | KRA | Wildlife |
| Paula Ledford | KRA | Hydrology |
| Larry Lichthardt | KRA | Range |
| Steve McCallie | KRA | Forestry |
| Richard Rosene | KRA | Forestry/Recreation |
| Dick Thompson | KRA | Range |
| Frank Rupp | KRA | Cultural/Paleontology |
| Steve Romoff | KRA | Recreation |

6-1

BLM_0005848

## CHAPTER SIX

| | | |
|---|---|---|
| Fred Conrath | CDO | Geology |
| Terry Loyer | CDO | Project Coordinator |
| | | |
| Duane Johnson | LSRA | Project Coordinator |
| Dave Hillberry | LSRA | Wild Horses |
| Kelly Sparks | LSRA | Range |
| Mike Albee | LSRA | Wildlife |
| Marilyn Kastens | LSRA | Hydrology and Soils |
| Brian Naze | LSRA | Cultural/Paleontology |
| Mike Zaidlicz | LSRA | Recreation and Forestry |
| Craig Haynes | LSRA | Lands |
| Janet Hook | LSRA | Geology |
| | | |
| Mitch Wainwright | NERA | Project Coordinator |
| Jim Perry | NERA | Project Coordinator |
| | | |
| Bob Kershaw | SJRA | Project Coordinator |
| Kristie Arrington | SJRA | Cultural/Paleontology |
| John Castellano | SJRA | Wildlife |
| Tom Christensen | SJRA | Forestry/Recreation |
| Cliff Giffen | SJRA | Range |
| Robert Stanger | SJRA | Range |
| Kathryn Bulinski | SJRA | Lands |
| Kent Hoffman | SJRA | Geology |
| Jim Lovato | SJRA | Minerals |

BLM_0005849

# CHAPTER SEVEN

# ACRONYMS/ GLOSSARY

BLM_0005850

# CHAPTER SEVEN

# ACRONYMS/GLOSSARY

## ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| AIRFA | American Indian Religious Freedom Act |
| APD | Application for Permit to Drill |
| AQRV | Air Quality Related Values |
| AUM | Animal Unit Month |
| BEA | Bureau of Economic Analysis |
| BLM | Bureau of Land Management |
| BO | Barrels of oil |
| CDOW | Colorado Division of Wildlife |
| CFR | Code of Federal Regulations |
| CEQ | Council on Environmental Quality |
| CNAP | Colorado Natural Areas Program |
| COA | Condition of Approval |
| COGCC | Colorado Oil and Gas Conservation Commission |
| CSU | Controlled Surface Use |
| DAP | Dolores Archaeological Project |
| DAU | Data Analysis Unit |
| DEIS | Draft Environmental Impact Statement |
| DOD | Department of Defense |
| DOE | Department of Energy |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ERMA | Extensive Recreation Management Area |
| ESA | Endangered Species Act |
| FLPMA | Federal Land Policy and Management Act |
| FOOGLRA | Federal Onshore Oil and Gas Leasing Act of 1987 |
| GSRA | Glenwood Springs Resource Area |
| IHICS | Integrated Habitat Inventory and Classification System |
| KRA | Kremmling Resource Area |
| KRCRA | Known Recoverable Coal Resource Area |
| LSRA | Little Snake Resource Area |
| LSRMP | Little Snake Resource Management Plan |
| MCF | 1,000 cubic feet |
| NEPA | National Environmental Policy Act |
| NERA | Northeast Resource Area |
| NOI | Notice of Intent |
| NPA | Northeast Planning Area |

| | |
|---|---|
| NRHP | National Register of Historic Places |
| NSO | No Surface Occupancy |
| NTL | Notice to Lessees |
| NWCCOG | Northwest Colorado Council of Governments |
| NWPS | National Wilderness Preservation System |
| OHV | Off-Highway Vehicles |
| ONA | Outstanding Natural Area |
| PA | Plan Amendment |
| PAS | Planning and Assessment System |
| POD | Potential of Development |
| PSD | Prevention of Significant Deterioration |
| PV | Prospectively valuable |
| R&PP | Recreation and Public Purposes Act |
| RFD | Reasonably Foreseeable Development |
| RMP | Resource Management Plan |
| RNA | Research Natural Area |
| ROW | Right-of-Way |
| SCS | Soil Conservation Service |
| SJRA | San Juan Resource Area |
| SJ/SMPA | San Juan/San Miguel Planning Area |
| SRMA | Special Recreation Management Area |
| SSF | Soil Surface Factor |
| T&E | Threatened and Endangered |
| TDS | Total Dissolved Solids |
| TSP | Total Suspended Particulates |
| USFS | U.S. Forest Service |
| USFWS | U.S. Fish and Wildlife Service |
| USGS | U.S. Geological Survey |
| USLE | Universal Soil Loss Equation |
| VRM | Visual Resource Management |
| WRIS | Wildlife Resource Information System |
| WSA | Wilderness Study Area |

BLM_0005851

## CHAPTER SEVEN

## GLOSSARY

ABANDONMENT. Abandonment is plugging a well, removal of installations, and termination of operations for production from a well. Conclusively, abandoned unpatented oil placer mining claims are subject to conversion into a noncompetitive oil and gas lease pursuant to the Federal Oil and Gas Royalty Management Act of 1982 (30 U.S.C. 188(f)).

AIR QUALITY CLASSES. Classifications established under the Prevention of Significant Deterioration portion of the Clean Air Act which limits the amount of air pollution considered significant within an area. Class I applies to areas where almost any change in air quality would be significant; Class II applies to areas where the deterioration normally accompanying moderate well-controlled growth would be permitted; and Class III applies to areas where industrial deterioration would generally be allowed.

ALLUVIAL SOIL. A soil developing from recently deposited alluvium and exhibiting essentially no horizon development or modification of the recently deposited materials.

ALLUVIUM. Clay, silt, sand, gravel, or other rock materials transported by flowing water. Deposited in comparatively recent geologic time as sorted or semi-sorted sediment in riverbeds, estuaries, floodplains, lakes and shores, and in fans at the base of mountain slopes.

ANIMAL UNIT MONTH (AUM). The amount of forage necessary to sustain one cow and one calf or its equivalent for one month.

ANTICLINE. A fold, generally convex upward, whose core contains the stratigraphically older rocks.

APPLICATION. A written request, petition, or offer to lease lands for the purpose of oil and gas exploration and/or the right of extraction.

AQUATIC. Living or growing in or on the water.

AREA OF CRITICAL ENVIRONMENTAL CONCERN (ACEC). An area established through the planning process as provided in FLPMA where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values; or to fish and wildlife resources or other natural systems or processes; or to protect life and afford safety from natural hazards.

BASIN. (a) A depressed area with no surface outlet. (b) A low in the Earth's crust, of tectonic origin, in which the sediments have accumulated.

BIG GAME. Larger species of wildlife that are hunted, such as elk, deer, bighorn sheep, and pronghorn antelope.

CANDIDATE SPECIES. Any species not yet officially listed but which are undergoing a status review or are proposed for listing according to *Federal Register* notices published by the Secretary of the Interior or the Secretary of Commerce.

CONDITION OF APPROVAL (COA). Conditions or provisions (requirements) under which an Application for a Permit to Drill or a Sundry Notice is approved.

CONTROLLED SURFACE USE (CSU). Use and occupancy is allowed (unless restricted by another stipulation), but identified resource values require special operational constrains that may modify the lease rights. CSU is used for operating guidance, not as a substitute for the NSO or Timing stipulations.

CRUCIAL HABITAT. A biological feature, that if lost, would adversely affect the species.

CULTURAL RESOURCES. Those fragile and non-renewable remains of human activity, occupation, or endeavor reflected in districts, sites, structures, buildings, objects, artifacts, ruins, works of art, architecture, and natural features that were of importance in human events.

7-2

BLM_0005852

## ACRONYMS/GLOSSARY

CULTURAL RESOURCES INVENTORY CLASSES.

CLASS I. An existing data survey. This is an inventory of a study area to (1) provide a narrative overview of cultural resources by using existing information, and (2) compile existing cultural resources site record data on which to base the development of the BLM's site record system.

CLASS II. A sampling field inventory designed to locate, from surface and exposed profile indications, all cultural resource sites within a portion of an area so that an estimate can be made of the cultural resources for the entire area.

CLASS III. An intensive field inventory designed to locate, from surface and exposed profile indications, all cultural resource sites in an area. Upon its completion, no further cultural resources inventory work is normally needed.

CUMULATIVE IMPACTS. The collective and aggregate impacts of all actions affecting a particular resource.

DIASTROPHISM. A general term for all movement of the crust produced by tectonic processes, including the formation of ocean basins, continents, plateaus, and mountain ranges.

DIRECTIONAL DRILLING. Drilling borehole wherein course of hole is planned before drilling. Such holes are usually drilled with rotary equipment at an angle to the vertical and are useful in avoiding obstacles or in reaching side areas or mineral estate beneath restricted surface.

DIVERSITY. The relative abundance of wildlife species, plant species, communities, habitats, or habitat features per unit of area.

EASEMENT. Right afforded a person or agency to make limited use of another's real property for access or other purposes.

ENDANGERED SPECIES. Any species which is in danger of extinction throughout all or a significant portion of its range.

ENVIRONMENTAL ASSESSMENT (EA). A concise public document prepared to provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact. It includes a brief discussion of the need for the proposal, alternatives considered, environmental impact of the proposed action and alternatives, and a list of agencies and individuals consulted.

ENVIRONMENTAL IMPACT STATEMENT (EIS). A formal public document prepared to analyze the impacts on the environment of a proposed project or action and released for comment and review. An EIS must meet the requirements of NEPA, CEQ guidelines, and directives of the agency responsible for the proposed project or action.

EXCEPTION. Case-by-case exemption from a lease stipulation. The stipulation continues to apply to all other sites within the leasehold to which the restrictive criteria applies.

FACIES. The aspect, appearance, and characteristics of a rock unit, usually reflecting the conditions of its origin; especially as differentiating the unit from adjacent or associated units.

FAULT. A fracture or zone of fractures along which there has been displacement of the sides relative to one another parallel to the fracture.

FEDERAL LAND POLICY AND MANAGEMENT ACT OF 1976 (FLPMA). Public Law 94-579 signed by the President on October 21, 1976. Establishes public land policy for management of lands administered by the Bureau of Land Management. FLPMA specifies several key directions for the Bureau, notably (1) management on the basis of multiple-use and sustained yield, (2) land use plans prepared to guide management actions, (3) public lands for the protection, development, and enhancement of resources, (4) public lands retained in federal ownership, and (5) public participation utilized in reaching management decisions.

FOLD. A curve or bend of a planar structure such as rock strata, bedding planes, foliation, or cleavage. A fold is usually a product of deformation, although its definition is descriptive and not of genetic and may include primary structures.

FORAGE. All browse and herbaceous foods that are available to grazing animals.

BLM_0005853

## CHAPTER SEVEN

FOREST MANAGEMENT. The application of business methods and technical forestry principles to the operation of a forest property.

FORMATION. A body of rock identifies by lithic characteristics and stratigraphic position; it is prevailingly but not necessarily tabular, and is mappable at the Earth's surface or traceable in the subsurface (NACSN, 1983, Art. 24).

FOSSIL. The remains or traces of an organisms or assemblage of organisms which have been preserved by natural processes in the earth's crust exclusive of organisms which have been buried since the beginning of historic time. Minerals, such a soil and gas, coal, oil shale, bitumen, lignite, asphaltum, and tar sands, phosphate, limestone, · diatomaceous earth, uranium and vanadium, while they may be of biologic origin, are not here considered "fossils." Fossils of scientific value may occur within or in association with such materials.

FRAGILE SOIL. A soil that is especially vulnerable to erosion or deterioration due to its physical characteristics and/or location. Disturbance to the surface or the vegetative cover can initiate a rapid cycle of loss and destruction of the soil material, structure, and ability to sustain a biotic community.

GEOPHYSICS. Study of the Earth by quantitative physical methods.

GRANITE WASH TRAP. Granite wash is a sandstone formed by weathered granite basement rock. Granite is composed of coarse, sand-size crystals that weather to from a sandstone covering the flanks of buried granite mountains and hills. Source rocks occur deeper, along the flanks.

GRAZING SYSTEM. Scheduled grazing use and non-use of an allotment to reach identified goals or objectives by improving the quality and quantity of vegetation.

GROUNDCOVER. The area of ground surface occupied by the stem(s) of a range plant, as contrasted with the full spread of its herbage or foliage, generally measured at one inch above soil level.

GROWING SEASON. Generally, the period of the year during which the temperature of vegetation remains sufficiently high to allow plant growth.

HABITAT. A specific set of physical conditions that surround a single species, a group of species, or a large community. In wildlife management, the major components of habitat are considered to be food, water, cover, and living space.

HYDROCARBON. Any organic compound, gaseous, liquid, or solid, consisting solely of carbon and hydrogen.

IGNEOUS. Said of a rock or mineral that solidified from molten or partly molten material.

IMPACT. The effect, influence, alteration, or imprint caused by an action.

INTERMONTAINE. Situated between or surrounded by mountains, mountain ranges, or mountainous regions.

INVERTEBRATE. An animal lacking a backbone or spinal column.

KNOWN GEOLOGIC STRUCTURES (KGS). A trap in which an accumulation of oil and gas has been discovered by drilling and which is determined to be productive. Its limits include all acreage that is presumptively productive (43 CFR 3100.0-5(a)).

LAND TREATMENT. All methods of artificial range improvement and soil stabilization such as reseeding, brush control (chemical and mechanical), pitting, furrowing, water spreading, etc.

LEASABLE MINERAL. Oil, gas, sodium, potassium, phosphate, coal, oil shale, tar sands, and asphaltic materials.

LEASE. A contract in legal form that provides for the right to develop and produce oil and gas resources for a specific period of time under certain agreed-upon terms and conditions.

BLM_0005854

## ACRONYMS/GLOSSARY

LEASE NOTICE. Provides more detailed information concerning limitations that already exist in law, lease terms, regulations, or operational orders. A Lease Notice also addresses special items the lessee would consider when planning operations, but does not impose new or additional restrictions.

LEASE STIPULATIONS. Additional specific terms and conditions that change the manner in which operation may be conducted on a lease, or modify the lease rights granted.

LEASABLE MINERALS. Those minerals or materials designated as leasable under the Mineral Leasing Act of 1920. They include coal, phosphate, asphalt, sulphur, potassium and sodium minerals, and oil and gas. Geothermal resources are also leasable under the Geothermal Steam Act of 1970.

LOCATABLE MINERALS. Minerals or materials subject to claim and development under the Mining Law of 1872, as amended. Generally includes metallic minerals such as gold and silver, and other materials not subject to lease or sale (some bentonites, limestone, talc, some zeolites, etc.).

LOCATION. Perfecting the right to a mining claim by discovery of a valuable mineral, monumenting the corners, completing discovery work, posting a notice of location, and recording the claim.

LONG-TERM. Long-term impacts would occur over a 20-year period.

MINERAL ENTRY. Claiming public lands (administered by the BLM) under the Mining Law of 1872 for the purpose of exploiting minerals. May also refer to mineral exploration and development under the mineral leasing laws and the Material Sale Act of 1947.

MINERAL ESTATE (MINERAL RIGHTS). The ownership of minerals, including rights necessary for access, exploration, development, mining, ore dressing, and transportation operations.

MINERAL MATERIALS. Common varieties of sand, building stone, gravel, clay, moss rock, etc., obtainable under the Minerals Act of 1947, as amended.

MINING LAW OF 1872. Provides for claiming and gaining title to locatable minerals on public lands. Also referred to as the "General Mining Laws" or "Mining Laws."

MITIGATION. Alleviation or lessening of possible adverse effects on a resource by applying appropriate protective measures. Adverse effects can be rectified by either repairing, rehabilitating, or restoring affected environment and through compensation of the adverse effects by replacing or providing substitute resources or environments.

MODIFICATION. Fundamental change to the provisions of a lease stipulation, either temporarily or for the term of the lease. A modification may, therefore, include an exemption from or alteration to a stipulated requirement. Depending on the specific modification, the stipulation may or may not apply to all other sites within the leasehold to which the restrictive criteria applied.

MONOCLINE. A geologic structure in which the strata are all inclined in the same direction at a uniform angle of dip.

MULTIPLE-USE. Management of the various surface and subsurface resources so that they are jointly utilized in the manner that will best meet the present and future needs of the public, without permanent impairment of the productivity of the land or the quality of the environment.

NATIONAL ENVIRONMENTAL POLICY ACT OF 1969 (NEPA). Public Law 91-190. Establishes environmental policy for the nation. Among other items, NEPA requires federal agencies to consider environmental values in decision-making processes.

NATIONAL REGISTER OF HISTORIC PLACES (NATIONAL REGISTER, NRHP). A listing of architectural, historical, archaeological, and cultural sites of local, state, or national significance, established by the Historic Preservation Act of 1966 and maintained by the National Park Service.

NO SURFACE DISTURBANCE. Defined on a case-by-case basis when the activity plan for an area is developed. In general, an activity would be allowed so long as it does not interfere with the management objectives of the area.

BLM_0005855

## CHAPTER SEVEN

NO SURFACE OCCUPANCY (NSO). A fluid mineral leasing stipulation that prohibits occupancy or disturbance on all or part of the lease surface in order to protect special values or uses. Lessees may exploit the oil and gas or geothermal resources under leases restricted by this stipulation through use of directional drilling from sites outside the no surface occupancy area.

NOTICE TO LESSEES (NTL). A written notice issued by the Authorized Officer. These notices implement regulation and operating orders, and serve as instructions on specific item(s) of importance within a State, District, or Area.

OFF-HIGHWAY VEHICLE (OHV). Any motorized vehicle capable of or designed for travel on or immediately over land, water, or other natural terrain.

OFF-ROAD VEHICLE DESIGNATIONS.

CLOSED. Designated areas and trails where the use of off-road vehicles is permanently or temporarily prohibited. Emergency use of vehicles is allowed.

LIMITED. Designated areas and trails where the use of off-road vehicles is subject to restrictions such as limiting the number or types of vehicles allowed, dates and times of use (seasonal restrictions), limiting use to existing roads and trails, or limiting use to designated roads and trails. Under the designated roads and trails designation, use would be allowed only on roads and trails that are signed for use. Combinations of restrictions, such as limiting use to certain types of vehicles during certain times of the year, are possible.

OPEN. Designated areas and trails where off-road vehicles may be operated (subject to operating regulations and vehicle standards set forth in BLM Manuals 8341 and 8343).

ONLAP. An overlap characterized by the regular and progressive pinching out, toward the margins or shores of a depositional basin, of the sedimentary units within a conformable sequence of rocks, in which the boundary of each unit is transgressed by the next overlying unit and each unit in turn terminates farther from the point of reference.

ONLAP SANDS TRAP. Onlap sands are beach sands that were deposited on an unconformity surface as sea level rose. Numerous buttress sand can occur along a single unconformity and each can from a pool.

OVERSTORY. That portion of a plant community consisting of the taller plants on the site; the forest or woodland canopy.

PALEONTOLOGICAL RESOURCE. A site containing non-human life of past geological periods, usually in the form of fossil remains.

PATENT. A grant made to an individual or group conveying fee simple title to selected public lands.

PATENTED CLAIM. A claim on which title has passed from the federal government to the mining claimant under the Mining Law of 1872.

PLANNING AREA. The geographical area for which land use and resource management plans are developed and maintained.

PRIMITIVE. Areas that are almost completely free of management controls lying more than three miles from the nearest point of motor vehicle access, unmodified landscapes and little evidence of other people.

PUBLIC LAND. Any land and interest in land (outside of Alaska) owned by the United States and administered by the Secretary of the Interior through the Bureau of Land Management (BLM).

RAPTOR. Bird of prey with sharp talons and strongly curved beaks, e.g., hawks, owls, vultures, eagles.

RECLAMATION. Returning disturbed lands to a form and productivity that will be ecologically balanced and in conformity with a predetermined land management plan.

RECREATION AND PUBLIC PURPOSES ACT (R&PP). This Act authorizes the Secretary of the Interior to lease or convey public lands for recreational and public purposes under specified conditions to states or their political subdivisions, and to nonprofit corporations and associations.

BLM_0005856

RESOURCE AREA. A geographic portion of a BLM District that is the smallest administrative subdivision in the BLM.

RESOURCE MANAGEMENT PLAN (RMP). A land use plan that establishes land use allocations, multiple-use guidelines, and management objectives for a given planning area. The RMP planning system has been used by the BLM since about 1980.

RIPARIAN. Riparian areas are a form of wetland transition between permanently saturated wetlands and upland areas. These areas exhibit vegetation or physical characteristics reflective of permanent surface or subsurface water influence. Normally describes plants of all types that grow rooted in the water table or subirrigation zone of streams, ponds, and springs.

RIPARIAN/AQUATIC SYSTEM. Interacting system between aquatic and terrestrial situations. Identified by a stream channel and distinctive vegetation that requires or tolerates free or unbound water.

RIPARIAN ZONE. An area encompassing riparian and adjacent vegetation.

ROADLESS. Refers to the absence of roads that have been constructed and maintained by mechanical means to ensure regular and continuous use.

ROADS. Vehicle routes which have been improved and maintained by mechanical means to ensure relatively regular and continuous use. (A way maintained strictly by the passage of vehicles does not constitute a road.)

SALINITY. Refers to the solids such as sodium chloride (table salt) and alkali metals that are dissolved in water. Often in non-saltwater areas, total dissolved solids is used as an equivalent.

SCOPING PROCESS. An early and open public participation process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action.

SEDIMENT YIELD. The amount of sediment produced in a watershed, expressed as tons, acre-feet, or cubic yards of sediment per unit of drainage area per year.

SEMIPRIMITIVE. Areas that have very few management controls lying between 1/2 mile and three miles from the nearest point of motor vehicle access, excepting four-wheel drive roads and trails, with mostly natural landscapes and some evidences of other people.

SHEET EROSION. The removal of a fairly uniform layer of soil from the land surface by runoff water.

SHORT-TIME. In this document, refers to the 10- to 12-year life of the plan. Short-term impacts would occur within that time period.

SHUT-IN. An oil or gas well that is capable of production but is temporarily not producing.

SIGNIFICANT. An action that is analyzed in the context of the proposed action and the severity of the effects either beneficial or adverse. The degree of significant is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance exist which the effects on the quality of the human environment are likely to be highly controversial.

SPECIAL RECREATION MANAGEMENT AREA (SRMA). An area that possesses outstanding recreation resources or where recreation use causes significant user conflicts, visitor safety problems, or resource damage.

SPLIT ESTATE. Lands where the owner of the mineral rights and the surface owner are not the same party in interest. The most common split estate is Federal ownership of mineral rights and other interest ownership of the surface. Where such a condition occurs, the Federal Government can lease the oil and gas rights without surface owner consent.

STIPULATION. A provision that modifies standard lease rights and is attached to and made a part of the lease.

STREAM BANK (and CHANNEL) EROSION. The removal, transport, deposition, recutting, and bed load movement of material in streams by concentrated water flows.

BLM_0005857

## CHAPTER SEVEN

STUDY AREA. Refers to all the Resource Areas and Planning Areas covered in this EIS collectively.

SUITABILITY. As used in the Wilderness Act and in the Federal Land Policy and Management Act refers to a recommendation by the Secretary of the Interior or the Secretary of Agriculture that certain federal lands satisfy the definition of wilderness in the Wilderness Act and have been found appropriate for designation as wilderness on the basis of an analysis of the existing and potential uses of the land.

SUNDRY NOTICE. Standard form to notify or approve well operations subsequent to Application for Permit to Drill, in accordance with BLM regulations.

SUPPLEMENTAL VALUES. Resources associated with wilderness which contribute to the quality of wilderness areas.

SURFACE MANAGEMENT AGENCY. Any agency outside of the Department of the Interior with jurisdiction over the surface overlying federally owned minerals.

SUSTAINED YIELD. The achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple-use.

SYNCLINE. A fold of which the core contains the stratigraphically younger rocks; it is generally concave upward.

TECTONICS. A branch of geology dealing with the broad architecture of the outer part of the Earth, that is the regional assembling of structural or deformational features, a study of their mutual relations, origin, and historical evolution.

TERRESTRIAL. Living or growing in or on the land.

THREATENED SPECIES. Any species or a significant population of that species likely to become endangered within the foreseeable future throughout all or a significant portion of its range.

THRUST FAULT. A fault with a dip of 45 degrees or less over much of its extent, on which the hanging wall (overlying side) appears to have moved upward relative to the footwall (underlying side).

TIMBER. Standing trees, downed trees, or logs which are capable of being measured in board feet.

TIMING LIMITATION (SEASONAL RESTRICTION). Prohibits surface use during specified time periods to protect identified resource values. The stipulation does not apply to the operation and maintenance of production facilities unless the findings of analysis demonstrate the continued need for such mitigation and that less stringent, project-specific mitigation measures would be insufficient.

TOTAL DISSOLVED SOLIDS (TDS). Salt, or an aggregate of carbonates, bicarbonates, chlorides, sulfates, phosphates, and nitrates of calcium, magnesium, manganese, sodium, potassium, and other cations that form salts.

TRAP. Any barrier to the upward movement of oil or gas, allowing either or both to accumulate. A trap includes a reservoir rock and an overlying or updip impermeable roof rock; the contact between these is concave as viewed from below. See also: definitions of types of stratigraphic traps below.

TRESPASS. Any unauthorized use of public land.

UNCONFORMITY. A substantial break or gap in the geologic record where a rock unit is overlain by another that is not next in stratigraphic succession, such as an interruption in the continuity of a depositional sequence of sedimentary rocks or a break between eroded igneous rocks and younger sedimentary strata.

UNDERSTORY. That portion of a plant community growing underneath the taller plants on the site.

UNIVERSAL SOIL LOSS EQUATION (USLE). A formula for predicting soil loss resulting from sheet and rill erosion caused by rainfall.

7-8

BLM_0005858

## ACRONYMS/GLOSSARY

UPDIP PINCH OUT OF SANDSTONE TRAP. An updip pinch of wedge out of a sandstone in shale forms a trap. These are common in coastal plains where updip is landward. They tend to be small traps. If uplift caused dip, the trap type is combination.

UTILIZATION. The proportion of current year's forage production that was consumed or destroyed by grazing animals; usually expressed as a percentage.

VALID EXISTING RIGHTS. Legal interests that attach to a land or mineral estate that cannot be divested from the estate until that interest expires or is relinquished.

VANDALISM. Willful or malicious destruction or defacement of public property; e.g., cultural or paleontological resources.

VEGETATION MANIPULATION. Planned alteration of vegetation communities through use of prescribed fire, plowing, herbicide spraying, or other means to gain desired changes in forage availability, wildlife cover, etc.

VEGETATION TYPE. A plant community with immediately distinguishable characteristics based upon and named after the apparent dominant plant species.

VERTEBRATE. An animal having a backbone or spinal column.

VISUAL RESOURCES. The visible physical features on a landscape (topography, water, vegetation, animals, structures, and other features) that comprise the scenery of the area.

VISUAL RESOURCE MANAGEMENT (VRM). The inventory and planning actions taken to identify visual resource values and to establish objectives for managing those values, and the management actions taken to achieve the visual resource management objectives.

VISUAL RESOURCE MANAGEMENT CLASSES. VRM classes identify the degree of acceptable visual change within a particular landscape. A classification is assigned to public lands based on the guidelines established for scenic quality, visual sensitivity, and visibility.

VRM CLASS I. This classification preserves the existing characteristic landscape and allows for natural ecological changes only. Includes Congressionally authorized areas (wilderness) and areas approved through the RMP where landscape modification activities should be restricted.

VRM CLASS II. This classification retains the existing characteristic landscape. The level of change in any of the basic landscape elements due (form, line, color, texture) to management activities should be low and not evident.

VRM CLASS III. This classification partially retains the existing characteristic landscape. The level of change in any of the basic landscape elements due to management activities may be moderate and evident.

VRM CLASS IV. This classification provides for major modifications of the characteristic landscape. The level of change in the basic landscape elements due to management activities can be high. Such activities may dominate the landscape and be the major focus of viewer attention.

VRM CLASS V. This classification applies to areas where the characteristic landscape has been so disturbed that rehabilitation is needed. Generally considered an interim short-term classification until rehabilitation or enhancement is completed.

VISUAL SENSITIVITY. Visual sensitivity levels are a measure of public concern for scenic quality and existing or proposed visual change.

WAIVER. Permanent exemption from a lease stipulation. The stipulation no longer applies anywhere within the leasehold.

WILDERNESS. An area formally designated by Congress as a part of the National Wilderness Preservation System.

WILDERNESS CHARACTERISTICS. Identified by Congress in the Wilderness Act of 1964; namely, size, naturalness, outstanding opportunities for solitude or a primitive and unconfined type of recreation, and supplemental values such as geological, archaeological, historical, ecological, scenic, or other features.

7-9

BLM_0005859

## CHAPTER SEVEN

WILDERNESS INVENTORY. An evaluation of the public land in the form of a written description and a map showing those lands that meet the wilderness criteria as established under Section 603(a) of FLPMA and Section 2(c) of the Wilderness Act. The lands meeting the criteria will be referred to as WSAs.

WILDERNESS MANAGEMENT POLICY. Policy document prescribing the general objectives, policies, and specific activity guidance applicable to all designated BLM wilderness areas. Specific management objectives, requirements, and decisions implementing administrative practices and visitor activities in individual wilderness areas are developed and described in the wilderness management plan for each unit.

WILDERNESS STUDY AREA (WSA). An area determined to have wilderness characteristics. Wilderness Study Areas will be subject to interdisciplinary analysis through BLM land use planning system and public comment to determine wilderness suitability. Suitable areas will be recommended to the President and Congress for designation as wilderness.

WITHDRAWAL. An action which restricts the use of public land and segregates the land from the operation of some or all of the public land and mineral laws. Withdrawals are also used to transfer jurisdiction of management of public lands to other federal agencies.

BLM_0005860

# CHAPTER EIGHT

# REFERENCES

BLM_0005861

# CHAPTER EIGHT

# REFERENCES

Andersen, D. E., Rongstad, O. J., and Mytton, W. R., 1989. Response of Nesting Red-tailed Hawks to Helicopter Overflights. Condor 91:296-299.

Anthony, R. G., et al., 1983. Proceeding of a Workshop on Habitat Management for Nesting and Roosting Bald Eagles in the Western United States, Oregon State University, Corvallis, OR.

Autenrieth, R., Molini, W., and Braun, C., 1982. Western State Sage Grouse Committee, Sage Grouse Management Practices, Technical Bulletin No. 1, Twin Falls, ID. 42 pp.

Behnke, R. J. and Bensen, D. E., 1980. Endangered and Threatened Fishes of the Upper Colorado River Basin. Cooperative Extension Service, Colorado State University, Bulletin 503A, 34 pp.

Boettcher, A. J., 1972. Groundwater Occurrence in Northern and Central Parts of Western Colorado. Colorado Water Resources, Circular 15, Colorado Water Conservation Board, Denver, CO.

Braun, C. E., 1987. Current Issues in Sage Grouse Management. Presented at the Western Association of Fish and Wildlife Agencies meeting, Portland, OR. 10 pp.

Brekke, E. B., 1988. Using GIS to Determine the Effects of CO2 Development on Elk Calving in South-central Colorado. Bureau of Land Management Technical Note 381. 35 pp.

Bromley, M., 1985. Wildlife Management Implications of Petroleum Exploration and Development in Wildland Environments. General Technical Report INT-91, Ogden, UT, U.S. Department of Agriculture, Forest Service, Intermountain Research Station, 42 pp.

Bureau of Land Management (U.S. Department of the Interior), 1978. The Effects of Surface Disturbance on the Salinity of Public Lands in the Upper Colorado River Basin--1977 Status Report, Denver, CO.

Bureau of Land Management (U.S. Department of the Interior), 1979. Habitat Requirements and Management Recommendations for Sage Grouse. BLM Technical Note. 37 pp.

Bureau of Land Management (U.S. Department of the Interior), 1983. Green River - Hams Fork Coal Region, Round II, Draft Environmental Statement. Colorado State Office, Denver, CO.

Bureau of Land Management (U.S. Department of the Interior), 1986. Montana Bald Eagle Management Plan. Prepared by Montana Bald Eagle Working Group. Montana State Office, Billings, MT. 61 pp.

Bureau of Land Management (U.S. Department of the Interior), 1989. Cultural Resource Class I Automated Data Base.

Bureau of Land Management (U.S. Department of the Interior), Recreation Information Management System (RIMS) Automated Data Base.

Chick, N. D., 1989. Personal Correspondence to Scott F. Archer (dated August 3, 1989), Colorado Department of Health, Air Pollution Control Division, Denver, CO.

8-1

BLM_0005862

## CHAPTER EIGHT

Choate, R., Jurich, D., and Saulnier, G. J., Jr.,
1984. Geologic Overview, Coal
Deposits, and Potential for Methane
Recovery from Coal Beds, Piceance
Basin -- Colorado, in Rightmire, C.T.,
and Others, eds., Coal Bed Methane
Resources of the United States:
American Association of Geol. Studies
in Geology 17:223-251.

Colorado Climate Center, 1984. Colorado
Annual Precipitation: 1951-1980
(Map). Colorado State University.
Fort Collins, CO.

Colorado Division of Wildlife, 1978. Essential
Habitat for Threatened and Endangered
Species in Colorado in 1978.

Colorado Oil and Gas Conservation
Commission, 1988. 1987 Oil and Gas
Statistics for the State of Colorado,
129-135.

Craig, G., 1983. Personal Communication.
Colorado Division of Wildlife, Division
Office, Denver, CO.

Donaldson, J. C. and MacMillan, L., 1980. Oil
and Gas: History of Development and
Principal Fields in Colorado, in
Colorado Geology, H.C. Kent and K.W.
Porter, eds., Rocky Mountain
Association of Geologists, 1980
Symposium, 175-189.

EDAW, Inc., 1980. Application for License;
Project no. 2757, Juniper-Cross
Mountain Project, Exhibit W-
environmental Report. Prepared for the
Colorado River Water Conservation
District and Colorado-Ute Electric
Assoc. Inc.

Elmore, W. and Beschta, R. L., 1987. Riparian
Areas: Perceptions in Management,
Rangelands 9(6): 260-265.

Fyfe, R. W. and Olendorff, R. R., 1976.
Minimizing the Dangers of Nesting
Studies to Raptors and Other Sensitive
Species. Occasional Paper Number 23,
Canadian Wildlife Service, Edmonton,
Alberta.

Gardner, E. S., Jr., 1988. Forecasting with
Exponential Trends. Lotus 4(3):27-29.

Gresh, H., 1981. Personal Communication.
Colorado Division of Wildlife,
Durango, CO.

Grier, J. W., et al., 1982. Northern States Bald
Eagle Recovery Plan. USDI, Fish and
Wildlife Service. 111 pp.

Hail, W. J., Jr., 1965. Geology of Northwestern
North Park, Colorado. U.S. Geological
Survey Bulletin 1188:133 pp.

Hay, K. and Ad Hoc Oil and Gas Committee,
1985. State and Federal Guidelines for
Protecting Fish and Wildlife Resources
in Areas of Oil and Gas Development,
International Association of Fish and
Wildlife Agencies.

Huffman, Jr., A. C., 1988. Petroleum Geology
and Hydrocarbon Plays of the San Juan
Basin Petroleum Province. U.S.
Geological Survey Open-File Report
87-450 B.

Hupp, J., 1984. Sage Grouse Distribution and
Habitat Use in the Gunnison Basin, Job
Progress Report, Colorado Project
#W-37-R-37, Work Plan 3, Job 15.
21 pp.

Hurley, K. P. and Irwin, L. L., 1985.
Mitigation of Energy Development on
Rocky Mountain Bighorn Sheep Ranges
in Wyoming. In proceeding of Issues
and Technology in the Management of
Impacted Western Wildlife, Thorne
Ecological Institute, Glenwood Springs,
CO. 123-127.

Irby, L. R., et al., 1987. Management of Mule
Deer in Relation to Oil and Gas
Development in Montana's Overthrust
Belt. In proceeding of Issues and
Technology in the Management of
Impacted Western Wildlife, Thorne
Ecological Institute, Colorado Springs,
CO 113-121.

Johnson, B. K. and Lockman, D., 1981.
Response of Elk During Calving to Oil
and Gas Drilling Activity in Synder
Basin, Wyoming. Proceedings 1981 Elk
Workshop. Wyoming Game and Fish
Dept. 14 pp.

BLM_0005863

# REFERENCES

Johnson, R. C., and Nuccio, V. F., 1986. Structured and Thermal History of the Piceance Creek Basin, Western Colorado, in relation to Hydrocarbon Occurrence in the Mesaverde Group, in Spencer, C.W., and Mast, R.F., eds., Geology of Tight Gas Reservoirs. American Association of Geol. Studies in Geology, 24:165-203.

Knight, J. E. Jr., 1980. Effects of Hydrocarbon Development on Elk Movements and Distribution in Northern Michigan. Ph. D. Dissertation. Univ. of Michigan. Ann Arbor, MI.

Langlois, D., 1983. Personal Communication. Colorado Division of Wildlife, Regional Office, Montrose, CO.

Law, B. E., 1988. Geological Framework and Hydrocarbon Plays in the Southwestern Wyoming Basins Province. USGS Open-File Report 88-450 F.

Leecraft, J., 1983. A Dictionary of Petroleum Terms, 3rd Edition, Petroleum Extension Service, Division of Continuing Education, The University of Texas at Austin.

Lyle, D., 1988. Seasoned Veterans Surviving Slump: Western Oil World, Dec. 1988, 13-24.

Maughan, E. K., 1988. Geology and Petroleum Potential, Colorado Park Basin Province, North-Central Colorado. U.S. Geological Survey Open-File Report 88-450 E.

McAllister, M. E., 1988. Areas and Issues in Future Research on Archaeological Resource Protection, in Tools to Manage the Past: Research Priorities for Cultural Resources Management in the Southwest. Technical Report RM-164, U.S. Forest Service Rocky Mountain Forest and Range Experiment Station, Fort Collins, CO.

McKean, J. R , Weber, J. C., and Ericson, 1981. An Input-Output Study of the Kremmling Region of Western Colorado. Colorado State University, Fort Collins, CO.

Merewether, E. A., 1987. Oil and Gas Plays of the Las Animas Arch, Southwestern Colorado. U.S. Geological Survey Open-File Report 87-450 D.

Motz, B., 1989. Personal Communication. Colorado Division of Wildlife, Durango Area Office, Durango, CO.

Newton, W. A., 1957. North and Middle Parks as an Oil Province. Rocky Mountain Association of Geologists Guidebook, 9th Annual Field Conference, North and Middle Park Basins, Colorado, 104-108.

Newton, W. A., 1987. Oil and Gas Statistics. Colorado Oil and Gas Conservation Commission.

Nickens, P. R., Larralde, S. L., and Tucker, G. C., 1981. A Survey of Vandalism to Archaeological Resources. Cultural Resource Series. Colorado State Office, Bureau of Land Management, Denver, CO.

Nuccio, V. F., and Schenk, C. J., 1986. Thermal Maturity and Hydrocarbon Source-Rock Potential of the Eagle Basin, Northwestern Colorado, in Stone, D.S., ed., New Interpretations of Northwest Colorado Geology: Rocky Mountain Association of Geol., 259-264.

Park, G. M., 1977. Oil Potential of Mesozoic Sediments beneath the Independence Mountain Thrust Fault, North Park, Colorado, in Exploration Frontiers of the Central and Southern Rockies, Harry K. Veal, ed., Rocky Mountain Association of Geologists, 1977 Symposium, 61-66.

PEDCO Environmental, Inc., 1981. Colorado's Climate, Meteorology, and Air Quality. Prepared for U.S. Department of the Interior, Bureau of Land Management, under contract no. YA-553-CT0-98, Denver, CO.

Pennwell Publishing Co., 1984. Oil and Gas Field Classifier, 2nd Edition, Tulsa, Oklahoma, Pennwell Publishing Co.

BLM_0005864

## CHAPTER EIGHT

Peterson, J. A., and Hite, R. J., 1969. Pennsylvanian Evaporite-Carbonate Cycles and their Relation to Petroleum Occurrence, Southern Rocky Mountains. American Association of Petroleum Geology Bulletin, 53(4):884-908.

Powers, R. B., 1988. Region 3, Colorado Plateau Basin and Range, in National Assessment of Undiscovered Conventional Oil and Gas Resources. U.S. Geological Survey, Open File Report 88-373.

Price, D. and T. Arnow, 1974. Summary Appraisals of the Nation's Groundwater Resources, Upper Colorado Region. U.S. Geological Survey Professional Paper 813-C, 40 pp.

Rightmire, C. T., and Choate, R., 1986. Coal Bed Methane and Tight Gas Sands Interrelations, in Spencer, C.W., and Mast, R.F., eds., Geology of Tight Gas Reservoirs: American Association of Geol. Studies in Geology 24:87-110.

Rountree, R., 1984. Rocky Mountain Oil History, Hart Publications Inc., Denver, CO.

Scanlon, A. H., 1983. Oil and Gas Fields Map of Colorado, Map Series 22, Colorado Geological Survey, Dept. of Natural Resources.

Schoenberg, T. J., 1982. Sage Grouse Movements and Habitat Selection in North Park, Colorado. M.S. Thesis, Colorado State University, Fort Collins, CO. 86 pp.

Sealing, C., 1981. Regional Fishery Inventory, Northwest Region Fishery Inventory, Lake and Stream Inventory Summary. Colorado Division of Wildlife, Grand Junction, CO.

Snyder, C. T., et al., 1976. Effects of Off-Road Vehicle Use on the Hydrology and Landscape of Arid Environments in Central and Southern California. USDI, Geological Survey, Denver, CO.

Spencer, C. W., and Wilson, R. J., 1988. Petroleum Geology and Principal Exploration Plays in the Uinta-Piceance-Eagle Basins Province, Utah and Colorado. U.S. Geological Survey Open File Report 88-450-G, 35 pp.

Stalmaster, M. V., et al., 1982. Management of Nesting Ferruginous Hawks in Relation to Coal Development in Colorado and Utah. In proceeding of Issues and Technology in the Management of Impacted Western Wildlife, Thorne Ecological Institute, Steamboat Springs, CO, 205-209.

Tyus, H. M., and Karp, C. A., 1989. Habitat Use and Streamflow Needs of Rare and Endangered Fishes, Yampa River, Colorado. U.S. Fish and Wildlife Service, Biol. Report 89(14) 27.

U.S. Department of Commerce, 1982. Climatological Data - Colorado Annual Summary. National Oceanic and Atmospheric Administration, Environmental Data Service, Asheville, NC.

Voegeli, P. T., 1965. Ground-Water Resources of North Park and Middle Park Colorado--A Reconnaissance. Geological Survey Water-Supply Paper 1809-G.

Wellborn, R. E., 1977. Structural Style in Relation to Oil and Gas Exploration in North Park-Middle Park Basin, Colorado, in Exploration Frontiers of the Central and Southern Rockies, Harry K. Veal, ed., Rocky Mountain Association of Geologists, 1977 Symposium, 41-60.

BLM_0005865

# APPENDIX A

# PROPOSED ACTION

BLM_0005866

# APPENDIX A

# PROPOSED ACTION

## BLM AUTHORITY AND RESPONSIBILITIES FOR OIL AND GAS OPERATIONS

The BLM has responsibility for environmental protection, public health, and safety related to oil and gas operations on public lands. There are three pieces of legislation that give primary direction to the BLM for these operations: the Mineral Leasing Act of 1920, as amended, the National Environmental Policy Act of 1969 (NEPA), and the Federal Land Policy Management Act of 1976 (FLPMA). There is other legislation that affects various aspects of development. Most notably, these include laws to protect cultural resources and endangered species.

The law which directs the BLM to make public land available for development of oil and gas resources is the Mineral Leasing Act. This legislation directs the BLM to make all public land available for oil and gas development with the exception of specific lands, such as National Parks, which are listed in the Act or its amendments.

The National Environmental Policy Act of 1969 (NEPA) directs all federal agencies to analyze and disclose to the public the impacts of major federal actions. Oil and gas leasing is a major federal action by definition. The BLM prepares an environmental impact statement (EIS) to fulfill the mandate of NEPA (hence, this document).

The Federal Land Policy and Management Act of 1976 (FLPMA) instructs the BLM to prepare and disclose to the public its plans for the public lands under its jurisdiction. Since the Mineral Leasing Act requires us to make public land available for leasing and since the leasing could lead to development that may have impacts on the environment, all three pieces of legislation are tied together in a workable process to accomplish the Congressional intent. The primary focus of the process for oil and gas development is the BLM Resource Management Plan/Environmental Impact Statement (RMP/EIS). Within the RMP, plans are disclosed for development/conservation of oil and gas (as well as all other resources and values). The RMP also serves to analyze and disclose the environmental impacts of the projected development.

Once decisions have been reached through the planning process as to what lands are available for leasing and under what conditions, they are offered for sale at auction. Those people interested in purchasing oil and gas leases may nominate a parcel, or the BLM may offer parcels of its choosing. In either case, the proposed parcel must conform to the RMP decisions and be offered for sale at a public auction. Those parcels which do not sell at the auction are available for non-competitive sale for a two-year period thereafter.

Management decisions are incorporated in the lease document as stipulations and notices before it is issued. Public notice of the sale (which includes the list of parcels offered, their location, and the stipulations to be attached) is given 45 days prior to the sale. Significant change to the stipulations made after the lease is issued is also posted for public notice for 30 days prior to making the change.

The purchaser of a lease at the auction must bid at least two dollars per acre. The bonus bid must be paid at the sale and the rental is due at the beginning of each new year as long as the lease is held and is not producing. Leases purchased at auction may be held for five years without production. Leases purchased non-competitively after the auction may be held in non-producing status for ten years. If the lessee establishes production, a royalty of twelve and one-half percent must be paid to the government. Half of that money is returned to the state and county of origin for their use. The other half goes into the federal treasury earmarked for reclamation

A-1

BLM_0005867

## APPENDIX A

projects, the National Forest System, National Park Service, etc.

Separate from leasing actions, geophysical explorationists may explore for oil and gas on public land. Geophysical exploration on public land requires approval of the methods employed and mitigation of impacts. The BLM Resource Area Office must receive a copy of the Notice of Intent to perform geophysical operations. The exploration plan is analyzed for conformance with the Resource Area Resource Management Plan/EIS and mitigative measures and reclamation requirements are attached to the approval. BLM specialists examine the Notice of Intent (the plan of operations) and the site, or "line," to be explored, as well as the RMP in determining appropriate mitigative measures and reclamation requirements.

The majority of geophysical exploration operations conducted on public lands are done by exploration companies. Some are associated with petroleum producers, many are not. Geophysical exploration operations may also be conducted on a lease held by the lessee with the same requirements for mitigation of impacts and reclamation. (See further discussion of oil and gas exploration below.)

A well must be drilled in order to produce oil and/or gas from the lease. Before drilling a well, the lessee, or an operator for the lessee, must file an Application for Permit to Drill (APD). The operator must file the application with the District or Resource Area Office in which the action will take place. The application must include a plan for the drilling of the well and a plan for the protection of the surface and environment. The drilling plan contains information as to the depth of the well, how it will be constructed, how groundwater and other mineral resources will be protected, and how blow-outs and other emergencies will be prevented or dealt with. The surface use plan covers such concerns as the location and amount of surface disturbance and how that disturbance will be reduced or eliminated. It covers mitigation of impacts to wildlife, cultural resources, vegetation, soil, surface water, and other land uses and values. Each resource/value is evaluated in light of the RMP decisions. The operator is responsible for incorporating all RMP decisions in the proposed APD. If the

APD does not have the appropriate information and mitigation incorporated, the application may be modified or rejected. In most APDs in Colorado, the few RMP decisions not incorporated by the operator are attached to the approved application by the BLM as Conditions of Approval (COAs).

At a minimum, each APD is reviewed by a BLM geologist, petroleum engineer, and surface reclamation specialist and by the Authorizing Officer (Area or District Manager). The geologist evaluates the need for groundwater and other mineral resource protection and the structural competency of casing point formations. The petroleum engineer evaluates the drilling plan, the well construction, and the safety of the operation. The surface reclamation specialist evaluates the surface plan, checks the proposal against the RMP and other guidance, conducts the on-site inspection, analyzes impacts, proposes mitigation, and writes the Environmental Assessment (EA). The surface reclamation specialist also calls upon other expertise as needed in the analysis of impacts and recommendation of mitigation and reclamation requirements. For example, the BLM archaeologist would recommend any needed mitigation for impacts to cultural resources.

APD information is posted in the local authorizing office for a 30-day public notice period. The APD may not be approved until the comment period has expired. Each lease where an APD is proposed is checked to see if a bond has been posted to cover abandonment of the well should the lessee/operator default on their obligations under the lease. Each application is evaluated as described above, and subjected to a field inspection of all proposed disturbed areas. Appropriate, site-specific mitigation is then attached to the APD as COAs. A cultural resource inventory is conducted for each APD, and a report sent to the Resource Area archaeologist for evaluation. In designated areas, endangered species or other inventories may be conducted. The proposal is subjected to a National Environmental Policy Act (NEPA) review (an EA) that checks for conformance with the RMP and determines whether or not there is a need for additional review (i.e., an expanded EA or Environmental Impact Statement). EAs are prepared for all APDs on federal lands in

A-2

## PROPOSED ACTION

Colorado. When all impacts are analyzed, all necessary mitigation incorporated, and the public notice period expired, the APD may be approved.

In cases where the proposed well is obviously part of a larger field development, and such development has not already been scrutinized by a NEPA document other than the RMP, a "field development" EA is prepared. This EA looks at conformance of the specific field development with the general development analyzed in the RMP. As with the APD EA, an EIS is prepared if the projected field development does not conform with the analysis of field development in the RMP.

Over the life of a field, other operations, such as construction of power lines, pipelines, use of secondary and tertiary recovery methods, and other production facilities may become necessary. Each new surface disturbance is subjected to the same RMP test. Each is analyzed to determine impacts and mitigation. New ideas and technology are incorporated into new mitigative measures as they become available and when they do not impact the lease rights granted. New ideas and technology may also require amendment or maintenance of the RMP/EIS prior to use as mitigation.

As the well(s) plays out and comes to the end of its usefulness, it is abandoned and the disturbed area reclaimed. The operator must submit an abandonment notice for approval. The notice is evaluated by a petroleum engineer to determine that the well will be plugged so as to protect freshwater zones, other mineral resources, and the surface from contamination by any oil or gas that might leak up from the depleted reservoir or other fluids and gases up hole or on the surface that could migrate through the old well bore (and casing if left in place) to harm other resources. The surface reclamation specialist checks the final reclamation proposal to insure it is in accordance with the original APD requirements, and, in some cases, incorporates the latest methods of reclamation. Reclamation is required to restore the well site, road, and other disturbances to as original (or better) a condition as possible. The surface reclamation specialist also inspects the location once or twice at approximately one-year intervals to monitor the progress of

reclamation. If the reclamation does not meet the requirement set out in the APD, the operator will re-do those portions necessary to complete the goals for the reclaimed area. The well will continue to be monitored until the surface reclamation specialist is satisfied that the reclamation has succeeded and the location is stable.

The BLM authority to require reclamation has only existed since the passage of the Federal Land Policy Management Act of 1976. Wells abandoned prior to that time were reclaimed haphazardly at best and primarily as gratis by the companies involved. These older un-reclaimed sites are reclaimed by the BLM as the need arises and money is available. In the majority of cases "natural reclamation" has stabilized and revegetated the site. An attempt to further reclaim the location at this time would do more harm than good. We only reclaim such locations when a serious erosional or other problem has developed. Some unreclaimed locations are reclaimed by a new lessee as part of a new lease agreement.

Field operations are inspected by the BLM to assure accountability of royalties, and compliance with the lease and permit safety and environmental requirements. Field inspections are made to wells at the pre-drill, construction, drilling, and production phases. Inspections are also made at the plugging of the well, during reclamation, and periodically thereafter as necessary to insure the reclamation is effective. Petroleum engineering technicians and surface reclamation specialists have primary responsibility for field inspections, however, other specialists may inspect wells as needed. Typically these specialists include petroleum engineers, geologists, archaeologists, wildlife biologists, range conservationists, and others.

The primary function of the petroleum engineering technician is to account for accurate and complete measurement of production. They perform inspections to check the installation and calibration of measuring devices such as tanks for oil and flow meters for gas. Petroleum engineering technicians also inspect for environmental, public health, and safety concerns.

Operators are required to submit monthly production reports which go to the Minerals

A-3

BLM_0005869

## APPENDIX A

Management Service (MMS) and are available to the BLM inspectors electronically. The BLM verifies the report in the field and the MMS verifies the royalty payment. The two agencies work together to insure that all production is accounted for and royalty is paid.

Operations which fall within the jurisdiction of other federal or state and local agencies may also be field inspected by those agencies. The BLM has several agreements with other agencies that specify conditions where the BLM will notify the agency of violations within that agency's jurisdiction and in turn the agency will notify the BLM of violations within its jurisdiction.

## Oil and Gas Exploration and Development

Oil and gas exploration and development activities progress through five phases that are, in part, sequential and may overlap in time: preliminary exploration, exploratory drilling, development, production, and abandonment. Leases are obtained before the second phase (exploratory drilling).

## Preliminary Exploration

Petroleum exploration occurs in unexplored portions of areas where petroleum is known or thought to occur in commercial quantities. An area where petroleum is thought to occur in commercial quantities is known as a frontier or rank wildcat area. With declining known oil and gas supplies, it has become profitable to explore for oil and gas in less promising geological provinces and in areas where the climate, terrain, depth of deposits, and other obstacles have discouraged previous efforts. Increasingly sophisticated exploration techniques, improved oil and gas drilling, and transportation technologies have also enhanced prospects for locating, extracting, and marketing petroleum resources.

## Geological Exploration

Where the bedrock geology of an area is well exposed, it is often possible to predict where oil might gather. The potential traps (anticlines, faults, or formations with varying porosity) can sometimes be located with the aid of published geologic maps, aerial photos, and landsat imagery. Occasionally,

additional data will be gathered by aircraft. Low altitude reconnaissance flights, frequently at elevations of 100 to 500 feet, help identify rock outcrops that can be studied later on the ground. Next, one or more geologists may examine and sample the rock outcrops in the area and map the surface geology. Geological exploration can be performed with little surface damage; four-wheel drive pickups, motorcycles, or all terrain vehicles can be used to cover the area.

## Geophysical Exploration

Subsurface geology is not always accurately indicated by surface outcroppings. In such cases, geophysical prospecting methods are used to define subsurface structure. Three geophysical survey techniques can be used to define subsurface characteristics through measurements of the gravitational field, the magnetic field, and seismic reflections.

Gravity and magnetic surveys indirectly measure course subsurface structure. The field work involves small portable units which are easily transported via light off-road vehicles, such as four-wheel drive pickups and jeeps, or aircraft. Off-road vehicle traffic is common in these two types of surveys. Sometimes, small holes (approximately one inch by two inches by two inches) are hand dug for instrument placement at the survey measure points. These two surveys can make measurements along defined lines but it is more common to have a grid of discrete measurement stations.

Seismic reflection surveys are the most common of the geophysical methods and produce the most detailed subsurface information. The seismic method detects subsurface geologic structural information by producing a source wave at or near the surface that bounces off subsurface layers. The "echoes" or seismic reflections are recorded as a function of time. The deeper the subsurface reflecting layer, the later in time it is detected. The weak seismic reflections are detected at the surface by arrays (groups) of seismometers or geophones that are very similar to microphones. The geophone electrical signals are sent by a connecting cable to the Recorder unit where the signals are amplified and then recorded on a multi-track magnetic tape.

BLM_0005870

**PROPOSED ACTION**

The tape is later sent to a computing center where it is rearranged and computer enhanced to present the subsurface reflections in a graphic picture called a Seismic Section. The seismic reflections are very weak requiring very sensitive geophones. While the geophones can "hear" the desired reflections, they also detect:

• cars and trucks,
• people and animals moving about,
• water wells pumping,
• airplanes (at tens of thousands of feet in the air),
• trains (many miles away),
• the wind blowing, and
• trees and shrubs moving in the wind.

Any of these other activities can produce a "noise" at the geophone which often is stronger than the desired seismic reflections.

The seismic reflection method needs the seismic source and geophone arrays along a straight line. Sometimes it is possible to work along existing roads if the roads are straight. Where practical, existing roads are used to facilitate access to the seismic operations. The geophone arrays are normally straight along the line length. However, in difficult seismic data areas, they may have considerable width. To understand the subsurface structures in three dimensions, it is necessary to have seismic lines recorded in a "cross" or line gridded pattern. The grid spacing between lines can be from a fraction of a mile apart to many miles apart depending on the exploration purpose. The exploration purpose will also determine what latitude, if any, there is in moving these lines.

The work of a seismic crew begins with the Permit Agent obtaining permits from private landowners and government agencies. The survey crew next places pin flags and other markers at uniform intervals along the seismic line and carefully measures the markers in relation to precisely known geographic locations. For a shot hole explosive seismic source, drilling rigs will be working on the seismic line. When the complete seismic line is ready, the geophone crew arrives and places the geophones in arrays in precise locations to the flagging and lay connecting cables between the geophone arrays and the recorder unit. After the seismic reflection data is recorded, the geophone crew picks up all the geophones

and connecting cables and cleans up the seismic line. Most of these individual steps involve one or more equipment trucks to travel the seismic line if the terrain is driveable.

The seismic reflection method is usually referred to by the type of seismic source. The most common seismic sources are vibrator, shot hole explosive, and surface explosive.

The geophysicist, in determining the seismic exploration program parameters, will pick the most appropriate seismic source based on the depth of exploration interest and the degree of detail needed to define the subsurface structure.

Vibrator Source

The vibrator method uses a 4x4 or 4x6 wheel drive truck or buggy mounted hydraulic vibrator source. Their primary physical feature is a pad (about four feet square) that is slowly lowered from the center of the truck or buggy to make contact with the ground. Connected to the pad is the Reaction Mass. The Reaction Mass is moved a few inches up and down hydraulically in a carefully controlled manner to send a seismic source wave into the ground.

The vibrator is a weak seismic source and requires two to eight vibrators working together to create detectable reflections. Since it is a weak source, it has been used successfully to gather seismic reflection information in difficult high population areas such as Los Angeles and Paris.

To be able to use the vibrator source method, it is required that the seismic line goes along a straight road, or if cross country, over gentle, rolling driveable terrain.

Conventional Drilled Shot Hole Source

The shot hole explosive source requires the drilling of a hole to a predetermined depth, placing explosives at the bottom of the hole and back filling the hole with cuttings if the hole is air filled, or bentonite chips if the hole is naturally water filled.

Shot hole drilling depths will range normally from 25 to 200 feet. The explosive charge size can range from five to fifty pounds. The

A-5

BLM_0005871

## APPENDIX A

hole diameter is typically two to six inches. The drill rigs are most often truck or buggy mounted. Cuttings from drilling the hole are normally scattered by hand near the shot hole or put back in the shot hole after explosive charge placement. Proper preplugging of the shot hole with tamped cuttings or bentonite chips prevent the view commonly shown in the movies of holes "blowing out." There are some special source testing situations which need the detonation of charges in open holes. A shot hole that "blows out" causes a very poor seismic source wave which is very detrimental to the seismic reflection method. Detonation of a properly preplugged shot hole will create the best seismic source wave and cause no surface disturbance.

Portable Drilled Shot Hole Source

Special limited depth drill rigs can be moved in pieces by a helicopter. Helicopter portable drills are used where access limitations or topography restraints prevent use of conventional truck or buggy mounted drill rigs. This is a very expensive option which also places significant limits on the depth of drilling, and consequently, the size of the explosive charge. These limits can severely restrict the reflection methods ability to define subsurface structures.

Surface Explosive Source

The surface explosive source method involves placing puds (pouches) of explosives on a number of stakes driven into the ground. This is also called the Poulter method, named after its developer.

The explosive puds range in size from a pound to five pounds. The stakes are typically four to eight feet in height. The number of stakes used in the source array can range from a few to the more common ten. Occasionally the explosives are placed on the ground or snow, but this is a less effective source wave technique. Use of tall (six foot) stakes or placing the explosives on the surface of deep snow results in little visible surface disturbance, in contrast to the noise level of the detonations. The surface explosive method is very mobile. Generally 4x4 vehicles are used for transportation, although it can be supported with animal pack teams or helicopters.

Mini-hole Explosive Source

The mini-hole explosive source can be used in favorable conditions. A very small portable unit is use to drill a number (a source array) of small diameter shallow holes. The holes are usually two-to-three inches in diameter, drilled to depths of five-to-fifteen feet and each hole loaded with a small, one pound or less, explosive charge. These holes are detonated simultaneously to produce a seismic source wave. However, this method is usually limited to defining shallow subsurface structures, and therefore, can not often be substituted for the significantly more effective deep shot holes.

A given area may be explored several times by the same or different companies over a period of time. Multiple exploration is undertaken for a variety of reasons--first attempts may have been unsuccessful, the depth of exploration interest may have changed, other competitive companies want their own information, or improved techniques and/or equipment are used.

All the work required to obtain exploration seismic data does not guarantee that the data will indicate any necessary subsurface structures--let alone a subsurface structure containing hydrocarbons. For the explorationist, the unfortunate reality is that obtaining seismic data most often leads to the decision that an area does not have adequate subsurface structures or structures containing economic hydrocarbons and therefore no drilling will follow.

## TYPES OF OIL AND GAS DRILLING AND PRODUCTION

Oil and gas wells are drilled primarily with rotary drilling rigs. The rigs use mud or compressed air as a medium to cool the drilling tools, carry cuttings to the surface, and, in the case of mud, to stabilize the drilled hole. In the early days of drilling, the "cable tool" rig was the predominant method of drilling. Cable tools were largely replaced by rotary rigs in the 1950s. Some of the oldest wells still producing in Colorado were drilled with cable tool rigs.

The method of drilling is generally the same regardless of the target production. The depth of the target usually has more to do with the method of drilling than the type of

BLM_0005872

**PROPOSED ACTION**

production. In general, deeper wells require larger rigs which in turn require larger drill pads. Because oil is more valuable than gas, gas wells tend to be shallower in depth. The reason being that deeper wells cost more and the lower profitability of gas production means they do not bear the higher cost of deeper wells. The size of the anticipated production also has a bearing on the expense a given production will bear. For example, a very large gas producing reservoir may better bear the cost of deeper drilling than a shallow, low producing oil reservoir. But, all else being the same deeper reservoirs cost more to develop than shallow ones.

The biggest differences among the various types of oil and gas wells occur in the production phase of operations. The same basic rotary drilling methods are used for drilling all types of oil and gas wells.

## Oil and Gas Co-Production

Reservoirs that produce both oil and natural gas require the siting of facilities for the production, clean-up, and storage and/or transportation of the products on location (i.e., the well pad). If the well produces naturally, that is the gas and oil flow to the surface under natural pressures, only a series of pipes and valves at the well "head" are required to regulate the flow of product to the surface. If there is no, or insufficient, natural pressure, a pump is installed to lift the product to the surface. Once the oil and gas comes to the surface, it travels through pipes to separation equipment where water and gases such as carbon dioxide are removed, and the gas and oil are separated. The water and oil are piped to respective storage facilities and the gas put into a transmission pipeline. In a few cases, separation/clean-up and/or storage facilities are located off of the well pad for common use by more than one well. But, in the great majority of the wells in the Study Area, all facilities are located on the same pad on which the well was drilled.

Gas is transported to market through a net-work of gathering pipelines from each well to a transmission line. The gathering system usually consists of pipe of two-to-four inches in diameter which is laid on the ground or buried several feet below the surface. BLM most often requires that lines be laid near the access road or buried under it to save additional surface disturbance. Measurement

of gas is usually through a differential pressure recorder on the well pad.

Oil is produced into tanks either on the well pad or a common tank near the well. The oil is measured for sale from these tanks and transported to distribution points by special truck. In the case of some highly productive fields, oil carrying pipelines may be laid to a distribution point or refinery. In these cases, there is a network of pipelines to each well similar to that for the gas gathering system. The oil gathering lines are usually four to six inches in diameter, and measurement is either through a sales tank or a sales meter attached to the line.

In some areas, hydrogen sulfide (also known as H2S or sour gas) may be found with the hydrocarbon production. In these cases, special stainless steel pipe is used to contain the production until the hydrogen-sulfide can be separated from the hydrocarbons. The hydrogen sulfide is disposed of by incineration or neutralized by sulfur extraction.

## Oil Production

Typically, oil is produced in association with water and gas; however, in some cases oil is produced with almost no water or associated gas. The facilities to produce such oil are the same as those described above without the equipment for gas clean-up and measurement.

## Dry Gas Production

Dry gas is a term applied to any natural gas produced without oil. It usually has some water associated and may have a small amount of light liquid hydrocarbons, called "drip" or condensate. Dry gas wells typically have only a "christmas tree" or valve/gauge assembly, showing above ground. Production facilities may include a pit or tank for the collection of separated produced water and a small tank for the storage of the liquid hydrocarbons. As with oil and gas production, there is a gathering pipeline and sales meter for gas distribution.

BLM_0005873

## APPENDIX A

### Carbon Dioxide Production

Carbon dioxide is produced in a manner similar to dry gas. But, carbon dioxide, in combination with water, may form carbonic acid which is very corrosive. Therefore, the produced gas must be "cleaned," that is have the impurities removed, as soon as possible after it reaches the surface. For that reason, stainless steel piping is used from well head to separator, and separators are placed as close as possible to the well head. Usually a single large separator is located so as to service several wells. The use of some stainless steel pipe and common separators are the two most distinguishing surface features of carbon dioxide production.

### Coal Bed Methane Production

Methane is commonly found in association with coal. It is produced either from the coal beds themselves or from nearby reservoir rock to which it has migrated from coal beds. It is produced by the same drilling and production techniques as other gases. The one difference between coal bed methane coal bed methane and other natural gas production is that where it is produced with associated water, the water production begins at a relatively high rate and declines to a very small amount over the first two to three years while the gas production increases inversely. If production is interrupted, that is the well is "turned off" or shut down, upon re-start the water-gas ratio will be approximately the same as when the well was first produced. This phenomenon means that a great deal of water must again be produced before economic gas production is re-established. Not all coal bed methane production involves large amounts of produced water. Initial tests in Little Snake Resource Area, for example, indicate only minor associated water.

### Exploratory Drilling

Drilling does not begin until a lease has been acquired by the operator. When preliminary investigations are favorable and warrant further exploration, exploratory drilling may be justified. Stratigraphic tests and wildcat tests are the two types of exploratory drill holes.

"Strat" tests involve drilling relatively shallow holes to supplement seismic data.

These tests aid in revealing the nature of near-surface structural features. The holes are usually from 100 to several thousand feet deep, and are drilled primarily by rotary drill rigs. As the rock is drilled, the resulting rock chips are brought to the surface by a high-pressure airflow or circulating drilling mud. Samples of these chips are collected, bagged, and identified as to depth of origin. They are then studied by a geologist to determine such data as rock type, age, and formation.

Truck-mounted drilling equipment for strat tests is fairly mobile; therefore, roads and trails to test sites on level solid ground are temporary and involve minimal construction. In hilly or mountainous areas, more road building is necessary.

Generally, access roads are bladed 12 to 14 feet wide and are not crowned or ditched. Some roads may simply be surface scraped; i.e., vegetation is clipped off next to the soil surface. Other roads may require cuts in excess of 20 feet and fills exceeding ten feet. Strat tests requiring a large amount of construction (i.e., several acres of cut and fill described previously) are unusual since construction costs may outweigh the information gained.

A space of about one-half acre or less is leveled and cleared of vegetation for the average drill site. If high pressure air is used to remove rock chips or rock cuttings, rock dust may be emitted to the air when samples are not being collected. If mud is used as a drilling fluid, mud pits may be dug; more commonly, portable mud tanks are used. Usually one to three days are required to drill the test holes, depending on depth to and hardness of the bedrock. In areas with shallow, high-pressure, water bearing zones, casing may be required to keep water out of the hole.

After the surface and subsurface geological studies, the seismic, and other geophysical surveys, comes the evaluation of the prospect. Only by drilling a wildcat well (a well drilled in unproved territory) will the oil company know if the rocks in the prospect they have identified contain oil or gas.

Nationally, about one in 16 wildcat wells produces significant amounts of oil or gas. Locally, success ratios may be as high as one in ten.

BLM_0005874

**PROPOSED ACTION**

The deeper wells may require several months or more to complete; shallower wells up to a few thousand feet deep may be completed in as little as a few weeks. As a general rule, the deeper the test, the larger the drilling rig and facilities required.

Prior to approval for drilling, on-site inspections are conducted with the proposed drill pad and access road staked out, to assess potential impacts and attach appropriate mitigative conditions to the permit to drill. A drill "pad" (well site) from one to four acres in size is then cleared of all vegetation, and leveled for the drill rig, mud pumps, mud (or reserve) pit, generators, pipe rack, and tool house. Topsoil and native vegetation is usually removed and stockpiled for use in the reclamation process. The mud pit may be lined with plastic or bentonite to prevent fluid loss or prevent contamination of water resources. Other facilities such as storage tanks for water and fuel are located on the pad or are positioned nearby on a separate cleared area. If the well site is not large enough for the equipment required to rig-up (prepare the drilling rig for operation), a separate staging area may be constructed. Staging areas are usually no larger than 200 feet by 200 feet and may simply be a wide flat spot along the access road on which vehicles and equipment are parked.

Five thousand to 15,000 gallons of water a day may be needed for mixing drilling mud, cleaning equipment, cooling engines, etc, for each well. A surface pipeline may be laid to a stream or a water well, or the water may be trucked to the site from ponds or streams in the area.

The rigs are very large and may be moved in pieces. In some instances, rigs can be moved short distances on level terrain with little or no dismantling of equipment which will shorten the tearing-down and rigging-up time. Moving a dismantled rig involves use of heavy trucking equipment for transportation, and crews to erect the rig. Gross weight of vehicles may run in excess of 80,000 lbs.

In order to move a drill rig and well service equipment from one site to another, and to allow access to each site, temporary roads may be built. These roads are generally 16-to-18 feet wide (driving surface) and may be as short as 200 feet or as long as ten miles or more. Bulldozers, graders, and other types of heavy equipment are used to construct and maintain temporary wildcat roads.

The start of a well is called "spudding in." A short piece of tubing called conductor pipe is forced into the ground (sometimes with a piledriver), and cemented in place. This keeps surface sand and dirt from sloughing into the well hole. Next, the regular drill bit and drill string (the column of drill pipe) take over. These pass vertically through a heavy steel turntable (the rotary table) on the derrick floor and the conductor pipe. The rotary table is geared to one or more engines, and rotates the drill string and bit. As the bit bores deeper into the earth, the drill string is lengthened by adding more pipe to the upper end. (See Figure A-1).

Once the hole reaches a depth of several hundred feet, another string of pipe (the surface casing) is set inside the conductor pipe and cemented in place by pumping cement between the casing and hole wall. Surface casing acts as a safety device to protect freshwater zones (aquifers) from drilling fluid contamination. To prevent the well from "blowing out" in the event the drill bit hits a high pressure zone, "blowout preventers" (large metal rams) are installed around the surface casing just below the derrick floor. These rams will close around, crushing the drill string and sealing the well in the event of a blowout.

After setting the surface casing, drilling resumes using a smaller diameter bit. Depending on well conditions, additional strings of casings (intermediate casing) may be run (installed) before the well reaches the objective depth (total depth or "T.D.").

During drilling, a mixture of water, clay, and chemical additives known as "mud" are continuously pumped down the drill pipe. It exits through holes in the bit and returns to the surface outside the drill pipe. As the mud circulates, it cleans and cools the bit and carries the rock chips (cuttings) to the surface. It also helps to seal off the sides of the hole (thus preventing cave-ins), and to control the pressure of any water, gas, or oil encountered by the drill bit.

The mud is the first line of defense against a possible blow-out since it is used to control pressure. It is for this reason that a pit full of

A-9



1. Well is initially started with an oversized bit and drilled up to 50 feet deep. A large-diameter pipe known as a conductor pipe is lowered into the hole to keep surface soil from sluffing into the hole while the surface casing hole is being drilled out.

2. Cement is placed in the annulus (the space between the well hole and the pipe or between a smaller and larger pipe).

3. Surface casing hole is drilled out from inside the conductor pipe to a predetermined depth typically about 10% of the total depth.

4. Surface casing is lowered into the hole.

A-10

BLM_0005876



5. Cement is pumped down the surface casing and forced up the outside through the annulus. The cement is used to hold the surface casing in place. It protects shallow fresh water and other mineral zones.



6. The well is deepened using a bit smaller than the surface casing. The well is now drilled to its' final depth. In deep wells, intermediate casing is set before drilling to the final depth.



7. The intermediate casing, or production casing is lowered into the hole. Cement is pumped down the casing and up the outside through the annulus to seal the casing in place. This cement will also isolate and protect all hydrocarbon-bearing zones, fresh water zones, and other zones of interest.



8. Once the production casing is in place, perforations are made through the casing and cement into the producing formation. Techniques are then used to increase the flow of oil and gas into the well. Production tubing is hung down the well to the producing zone. Oil and gas flow into the well and either flow or are pumped up the production tubing to the surface.

A-11

BLM_0005877

## APPENDIX A

"reserve" mud (the reserve pit) is maintained on location. The reserve mud is used in emergencies to restore the proper drilling environment when radical or unexpected changes in down-hole pressure are encountered.

The cuttings are separated from the mud and sampled so that geologists can note and analyze (log) the various strata through which the bit is passing. The rest of the cuttings pass into the reserve pit as waste. Some holes are drilled at least partially with compressed air which serves the same purpose as drilling mud of cooling and cleaning the bit and evacuating the cuttings from the hole.

During or at completion of drilling activity, the well is logged. Logging means measuring with geophysical instruments the physical characteristics of the rock formations and associated fluids through which the borehole passed. These instruments are lowered to the bottom of the well, and slowly raised to the surface while recording data. Other measuring procedures include the drill stem test, in which pressures are recorded and fluid samples taken from zones of interest. After studying the data from those logs and tests, the geologist and/or petroleum engineer decide if the well will produce petroleum.

If the well did not encounter oil and gas, it is plugged with cement and abandoned. The well pad and access road are recontoured and revegetated.

If the well will produce, casing is run to the producing zone and cemented in place. A proper cementing of the production casing string is required to provide coverage and prevent interzonal communication between oil and gas horizons and usable water zones. Initially, this is accomplished by placement of steel casing from the ground surface to a depth generally ranging between 200 and 1,000 feet . The actual length of this "surface casing" is dependent on factors such as depth of freshwater zones, anticipated formation pressures, and the length of the next smaller casing to be set. The annular space between the borehole and the exterior of the surface casing is required to be filled with cement. Cement is pumped down the casing and around the bottom until cement is returned to the surface outside of the casing. This

ensures cement completely fills the annular space and precludes interzonal migration of formation fluids (i.e., groundwater). Following the placement of surface casing, the hole is drilled deeper and more casing is installed. Cement is placed in a similar fashion to the surface pipe, however, a quantity of cement sufficient to cover and isolate only those zones having hydrocarbons, usable water, or other mineral values.

The exception to this is coal-bed methane wells in the SJ/SMPA. In order to ensure isolation and protection of all zones between the surface and total depth, cement is required to be circulated from bottom to top on the production casing as well as on the surface casing. If cement is not circulated to surface, shallow water may not be protected.

If the determination is made that water monitoring wells are necessary in a given area, a separate borehole specifically designed as a monitoring well should be completed. Logical placement of a monitoring well would be in a protected location at the edge or just off of the well pad (generally 100-200 feet from producing well bore). It should be noted also that monitoring wells and other relatively shallow boreholes have often had adverse impacts on the most critical groundwater source due to interzonal flows and introduction of bacteria and other contaminants into the system. The drill rig is usually replaced by a smaller rig that is used for the final phase of completing the well.

### Development

If a wildcat well becomes a discovery well (a well that yields commercial quantities of oil or gas), development wells will be drilled to confirm the discovery, to establish the extent of the field, and to efficiently drain the reservoir. The procedures for drilling development wells are about the same as for wildcats, except there is usually less subsurface sampling, testing, and evaluation. If formation pressure can raise oil to the surface, the well will be completed as a flowing well. Several downhole acid or fracture treatments may be necessary to enhance the formation permeability to make the well flow.

When a well is "acidized," this refers to the process of placing acid in the well bore

BLM_0005878

across the productive interval which causes the solution of some of the mineral materials (eg., calicide, dolorite, etc.) which reside around the pore space. Upon solution and removal of these minerals, porosity and permeability are enhanced. When a well is hydro-fractured, it simply means fluid, usually gelled water, is pumped down the well, through perforations in the casing and into the formation. Pumping pressures are increased to the point where the formation fractures or breaks, and the sand is added to the injection fluid to "prop-open" the crack once the pressure is released. The pressures required to fracture a given formation is generally quite predictable based on rock type and depth. For some formations, especially coals, abnormally high pressures are required to fracture them. Pressures, volumes, and rates are all measured and monitored during the fracture process. These parameters provide information as to how the formation is behaving and if the fracture is propagating within the desired interval (i.e., staying in zone). This is especially true in coals, as sustained "high" injection pressure indicates the fracture is moving through the coal. If pressures fall off, it indicates the fracture has extended beyond the coals and the operation can be halted. In addition to using the foregoing parameters to monitor fracture behavior, other methods for fracture geometry and extent available (eg., tracer and tiltimeter surveys). Control is maintained throughout the fracture operation.

A free-flowing well is simply closed off with an assembly of valves, pipes, and fittings (called a christmas tree) to control the flow of oil and gas to other production facilities. A gas well may be flared for a short period to measure the amount of gas per day the well can produce, then shut in or connected to a gas pipeline.

If the well is not free-flowing, it will be necessary to use artificial lift (pump) methods. These are explained, along with well production equipment and procedures, in the following section on production. After a pump is installed, the well may be tested for days or months to see if it is economically justifiable to produce the well and to drill additional development wells. During this phase, more detailed seismic work may be run to assist in precisely locating the petroleum reservoir and to improve previous seismic work.

Coal-bed methane wells generally require artificial lift to remove formation water which reduces the confining pressure causing gas to be released (desorbed) from the coals. Once the gas is freed from the coal surfaces, it moves toward the "pressure sink" which is the well bore. Once gas is liberated, it flows preferentially to the water (i.e., relative permeability is higher for gas); thereby reducing water production rates and increasing gas production rates. It is expected that in many cases the artificial lift equipment will no longer be necessary once sufficient gas flow is established.

As with wildcat wells, field development well locations will be surveyed. A well spacing pattern must be established by the state, with approval of the BLM. (See Figure A-2).

Oil well spacing for production from federal leases is usually a minimum of 40 acres. Most gas well spacing for production from federal leases uses units of 160, 320, and 640 acres per well. Spacing for both oil and gas wells is based on the characteristics of the producing formation. If a field is producing from more than one formation, the surface location of the wells may be much closer than one per 40 acres. Once well spacing has been approved, development of the lease proceeds.

During the development stage, the road system of the area is greatly expanded. Once it is known which wells produce and their potential productive life, a permanent road system can be designed and built. Because it often takes several years to develop a field and determine field boundaries, the permanent road system is usually built in segments. Since the roads in an expanding and developing field are built in segments, many temporary roads (built initially for wildcats or development) end up as long-term (in excess of 15 years) main access or haul roads. The planning of temporary roads for wildcats and development wells is done with road conversion to long term in mind.

Since development wells have longer life spans than wildcat wells, access roads for development wells are better planned, designed, and constructed. Access roads are normally limited to one main route to serve

BLM_0005879

**Figure A-2.  Oil and Gas Spacing for a Standard 640-Acre Section.  Wells must stay at least 200' inside lease boundary line.**  △ Ideally spaced well.



1.  640-acre spacing

2.  320-acre spacing ("stand-up")

3.  320-acre spacing ("lay-down")

4.  160-acre spacing

5.  80-acre spacing ("stand-up")

6.  80-acre spacing ("lay-down")

7.  40-acre spacing

A-14

BLM_0005880

**PROPOSED ACTION**

the lease areas, with a maintained side road to each well. Upgrading of temporary roads may include ditching, draining, installing culverts, graveling, crowning, or capping the roadbed. The amount of surface area needed for roads would be similar to that for temporary roads mentioned earlier, and would also be dependent on topography and loads to be transported over it. Generally, main access roads are 20-to-24 feet wide and side roads are 14-to-18 feet wide. These dimensions are for the driving surface of the road and not the maximum surface disturbance associated with ditches, back cuts, or fills. The difference in disturbance is simply a matter of topography. Surface disturbance in excess of 130 feet is not unusual in steep terrain (slopes exceeding 30 percent).

When an oil field is developed on the current minimum spacing pattern of 40 acres per well, the wells are 1,320 feet apart in both north-south and east-west directions. If a section (one square mile) is developed with 16 wells, at least four miles of access roads are built. In mountainous terrain, the length of access roads may be increased since steep slopes, deep canyons, and unstable soil areas must often be circumvented in order to construct stable access to the wells.

Surface use in a gas field may be similar to an oil field (though usually less) even though the spacing of wells is usually 160 acres. Though a 160-acre spacing requires only four wells per section, the associated pipeline system often has similar initial surface requirements (acreage of surface disturbance).

In addition to roads, other surface uses for development drilling may include flowlines; storage tank batteries; facilities to separate oil, gas and water (separators and treaters); and injection wells for salt water disposal. Some of the facilities may be installed at each producing well site, and others at places situated to serve several wells. These facilities are discussed more in the following production section.

Surface use in an oil and gas field may be affected by unitization of the leaseholds. In many areas with federal lands, an exploratory unit is formed before a wildcat is drilled. The boundary of the unit is based on geologic data. The developers unitize the field by entering into an agreement to develop and generate it as a unit, without regard to separate ownerships. Costs and benefits are allocated according to agreed terms.

Unitization reduces the surface-use requirements because all wells are operated as though on a single lease. Duplication of field processing facilities is minimized because development operations are planned and conducted by a single unit operator, often resulting in fewer wells.

The rate of development well drilling depends on whether the field is operated on an individual lease basis or unitized, the probability of profitable production, the availability of drilling equipment, protective drilling requirements (drilling requirements to protect federal land from subsurface petroleum drainage by off-setting nonfederal wells), and the degree to which limits of the field are known. The most important development rate factor may be the quantity of production. If the discovery well has a high rate of production and substantial reserves, development drilling usually proceeds at a fairly rapid pace. If there is some question whether reserves are sufficient to warrant additional wells, development drilling may occur at a much slower pace. An evaluation period to observe production performance may follow between the drilling of successive wells.

Development on an individual lease basis usually proceeds more rapidly than under unitization, since each lessee must drill his own well to obtain production from the field. On a unitized basis, however, all owners within the participating area share in a well's production regardless of whose lease the well is on. Spacing requirements are not applicable to unit wells. The unit is developed on whatever the operator considers to be the optimal spacing pattern to maximize recovery.

As mentioned earlier, drilling in an undeveloped part of a lease to prevent drainage of petroleum to an offset well on an adjoining lease (protective drilling) is frequently required in fields of intermingled federal and privately owned land. The terms of federal leases require such drilling if the

A-15

BLM_0005881

## APPENDIX A

offset well is on nonfederal lands, or on federal lands leased at a lower royalty rate.

Many fields go through several development phases. A field may be considered fully developed and produce for several years, then a well may be drilled to a deeper pay zone. Discovery of a new pay zone in an existing field is a "pool" discovery, as distinguished from a new field discovery. A pool discovery may lead to the drilling of additional wells--often from the same drilling pad as existing wells--with the boreholes separated only by feet or inches. Existing wells may also be drilled deeper.

Usually four-to-six inch diameter pipelines transport the petroleum between the well, the treating and separating facilities, and central collection points. These lines can be on the surface, buried, or elevated. Most pipelines in the Planning Areas are buried.

Trucking and pipelining are the two methods used separately or in conjunction to transport oil out of a lease or unitized area. Trucking is used to transport crude oil from small fields where installation of pipelines is not economical and the natural gas in the field is not economically marketable. It is not practical to truck natural gas.

Pipelines are the most common way to transport oil and gas. If a field has substantial amounts of natural gas, separate pipelines will be necessary for oil and gas. Pipelines move the oil from gathering stations to refineries. As existing fields increase production or new fields begin production, new pipelines may be needed. These new lines usually vary in size from four to 16 inches in diameter, and range in length from a few miles to tie into an existing pipeline, to hundreds of miles to supply a refinery. Construction of a pipeline requires excavating and hauling equipment, a temporary and/or permanent road, possibly pumping stations, clearing the right-of-way of vegetation, and possibly blasting.

Natural gas pipelines transport gas from the wells (gathering or flow lines) to a trunk line then to the main transmission line from the area. Flow lines are usually two-to-four inches in diameter and may or may not be buried. Trunk lines are generally six-to-eight inches in diameter and are buried, as are transmission lines which vary in diameter

from ten-to-36 inches. The area required to construct a pipeline varies from about 15 inches wide (for a two-to-four inch surface line) to greater than 75 feet for the larger diameter transmission lines (24-to-36 inches). Surface disturbance is primarily dependent on size of the line and topography of the area on which the line is being constructed.

Compressor stations may be necessary to increase production pressure to the same level as pipeline pressure. The stations vary in size from approximately one acre to as much as twenty acres for a very large compressor system.

Construction techniques for natural gas lines are similar to those used for oil pipelines.

### Production

Production in an oil field begins just after the discovery well is completed and is usually concurrent with development operations. Temporary facilities may be used at first, but as development proceeds and reservoir limits are determined, permanent facilities are installed. The extent of such facilities is dictated by the number of producing wells, expected production, volume of gas and water produced with the oil, the number of leases, and whether the field is to be developed on a unitized basis.

The primary means of removing oil from a well in the Planning Areas is by pumping jacks (familiar horsehead devices). The pumps are powered by electric motors (power lines required) or if there is sufficient casinghead gas (natural gas produced with the pumped oil), or another gas source is available, it may be used to fuel internal combustion engines.

Some wells drilled in the area produce sufficient water that must be disposed of during the operation of the well. Although most produced waters are brackish to highly saline, some are fresh enough for beneficial use. If water is to be discharged, it must meet certain water quality standards. Because water may not come from the treating and separating facilities completely free of oil, oil skimmer pits may be established between separating facilities and surface discharge.

A-16

BLM_0005882

**PROPOSED ACTION**

Another method of disposing of wastewater is through subsurface injection. In Colorado, injection disposal wells are authorized by the Colorado Oil and Gas Conservation Commission (COGCC) under primacy of the U.S. Environmental Protection Agency. BLM engineers review the proposal for impacts to other minerals and groundwater, but have no approval authority over the well or target zone. When water is disposed of underground, it is always introduced into a formation containing water of equal or poorer quality. It may be injected into the producing zone from which it came or into other producing zones. In some cases, it could reduce the field's productivity and may be prohibited by state regulation or mutual agreement of operators. In some fields, dry holes or depleted producing wells are used for salt water disposal, but occasionally new wells are drilled for disposal purposes. Cement is squeezed between the casing and sides of the well to prevent the salt water from migrating up or down from the injection zone into other formations.

Underground oil is under pressure in practically all reservoirs. This pressure is usually transmitted to the oil through gas or water in the reservoir with the oil. When oil is pumped out of the well, pressure is reduced in the reservoir around the drill hole. This allows the gas or water in the reservoir to push more oil into the space next to the well. A reservoir that has mostly gas pushing the oil is called "gas drive," and one that has mostly water pushing the oil is called "water drive." Oil that is recovered under these natural pressures is considered primary production. Primary production accounts for about 25 percent of the oil in a reservoir.

Methods of increasing recovery from reservoirs generally involve pumping additional water or gas into the reservoir to maintain or increase the reservoir pressure. This process is called secondary recovery. Recently, the trend has been to institute secondary recovery processes very early in the development of a field. Surface disturbance from a water flooding recovery system is similar to drilling and development of an oil and gas well itself, i.e., a drill pad and access road are constructed and water pipelines may be built. Surface use is increased substantially since as many as four injection wells may be used for each oil well in the field (there are many different patterns

as well as many other methods of secondary recovery).

Tertiary recovery methods increase recovery rates by lowering the viscosity of the oil either by heating it or by injecting chemicals into the reservoir so that the oil flows more easily. Heating of reservoir oil can be accomplished by injecting steam into the reservoir. Tertiary recovery methods are not yet widely used in this area. By the year 2000, ultimate recovery (including secondary and tertiary recovery) from any given oil reservoir is expected to average 40 percent nationally.

Crude oil is usually transferred from the wells to tank storage facilities (a tank battery) before it is transported from the lease. If it contains gas and water, they are separated before the oil is stored in the tank battery. The treating and separating facilities are usually located at a storage tank battery on or near the well site.

After the oil, gas, and water are separated, the oil is piped to storage tanks located on or near the lease. There are normally at least two tanks; so that one tank can be filling as the contents of the other are measured, sold, and transported. The number and size of tanks vary with the rate of production on the lease, and with the extent of automation in gauging the volume and sampling the quality of the tank's contents.

## Horizontal Drilling

The recent development of horizontal drilling holds promise of further reductions in disturbance of surface resources and values. Use of directional, horizontal, and multiple-completion drilling technology could further reduce the number of surface locations and provide greater flexibility in siting locations. These techniques will also increase production and ultimately lower costs of production. However, there are many problems with these techniques yet to be solved before they will come into wide spread use. The two most pressing of these problems in Colorado at the moment are interference with spacing patterns and the cost of the operations. Most industry experts agree that the latter will be solved through additional experience and some additional technical advances. The problem of spacing

A-17

BLM_0005883

## APPENDIX A

patterns for horizontal holes more directly involves federal and state policy.

Current spacing patterns are based on the most efficient recovery of the resource. Spacing patterns in Colorado are set by the COGCC. Spacing patterns on federal lands are also set by the COGCC, but with the concurrence of the BLM, who has the responsibility for federal lands. If the BLM and state government were to set different spacing patterns, the result would be unsolvable drainage conflicts, lost revenues, and lost resource. It could also mean the drilling of more wells than are necessary as competing companies developed reservoirs under differing jurisdictions.

In Colorado, most fields are developed on a 40, 80, 160, 320, or 640 acre pattern (see Figure A-2). Forty acres is the spacing pattern authorized for all unspaced areas. However, most new field operators apply for larger spacing based on reservoir characteristics soon after field discovery. The spacing pattern is based on the calculated area of reservoir rock which one well can drain. The calculations are based on conventional, that is vertical, wells.

Horizontal wells are drilled to the producing formation, or close to it, then proceed horizontally through the producing formation. The advantage to these wells is that much more of the reservoir rock is exposed to the bore hole, and therefore, more product may be produced through one well. In addition, more than one horizontal hole may be extended from the same vertical bore or even from the horizontal portion of the bore, thereby limiting additional surface use. Spacing patterns frequently must be adjusted to permit this type of development.

For example, a field with 40-acre spacing may have one horizontal well drilled in the northwest quarter of the northwest quarter with the horizontal portion running east all the way to the northeast quarter of the northeast quarter. This well would penetrate and produce all four of the northern tier of well spaces, thereby eliminating the need to drill three wells. The elimination of the need to drill three wells would require federal and state approval to circumvent the spacing order. Real life examples may get much more complicated than this one.

In many cases, such as the simple example given above, the oil and gas operator may have to apply for a variance to the state spacing order. Both the BLM and COGCC are committed to working with industry on these problems to take full advantage of the new technology.

## Abandonment

The life span of fields varies because of the unique characteristics of any given field. Reserves, reservoir characteristics, the nature of the petroleum, subsurface geology, and political, economic, and environmental constraints all affect a field's life span from discovery to abandonment. The life of a typical field is 15 to 25 years. Abandonment of individual wells may start early in a field's life and reach a maximum when the field is depleted.

Well plugging and abandonment requirements vary with the rock formations, subsurface water, well site, and the well. In all cases, all formations bearing useable-quality water, oil, gas, or geothermal resources, and/or prospectively valuable deposits of minerals will be protected. Generally, in a dry (never produced) well, the hole below the casing is filled with heavy drilling mud, a cement plug is installed at bottom of the casing, the casing is filled with heavy mud, and a cement cap is installed on top. A pipe monument giving the location, lease number, operator, and name of the well is required unless waived by the Authorized Officer. If waived, the casing may be cut off and capped below ground level. Protection of aquifers and known oil and gas producing formations may require placement of additional cement plugs.

In some cases, wells that formerly produced are plugged as soon as they are depleted. In other cases, depleted wells are not plugged immediately but are allowed to stand idle for possible later use in a secondary recovery program. Truck-mounted equipment is used to plug former producing wells. In addition to the measures required for a dry hole, plugging of a depleted producing well requires a cement plug in the perforated section in the producing zone. If the casing is salvaged, a cement plug is put across the casing stub. The cement pumpjack foundations are removed or buried below ground level. Surface flow and injection

A-18

BLM_0005884

**PROPOSED ACTION**

lines are removed, but buried pipelines are usually left in place and plugged at intervals as a safety measure.

After plugging, the drilling rig is removed and the surface, including the reserve mud pit, is restored to the requirements of the surface management agency. This may involve the use of dozers and graders to recontour those disturbed areas associated with the drill pad plus the access road to the particular pad. The reserve pit (the part of the mud pit in which a reserve supply of drilling fluid and/or water is stored) must be evaporated or pumped dry, and filled with soil material stockpiled where the site was prepared. There will be little leakage if the pit was lined with plastic or bentonite. The area will be reshaped to a useful layout that will allow revegetation to take place, restore the landform as near as possible to its original contour, and minimize erosion. After grading the subsoil and spreading the stockpiled topsoil, the site is seeded with a grass mixture that will establish a good growth. A fence may be erected to protect the site until revegetation is complete, particularly in livestock concentration areas.

A-19

BLM_0005885

# APPENDIX B

# POTENTIAL OF DEVELOPMENT

BLM_0005886

# APPENDIX B

# POTENTIAL OF DEVELOPMENT

Assumptions for the Potential of Development (POD) consist of average disturbances, projected number of wells, and total acres disturbed. The tables below display these assumptions for the five Planning Areas.

Miscellaneous acres include off-site facilities such as tank batteries, camp facilities, gathering stations, air strips, and helicopter pads.

The acreages shown in Table B-1 are derived from the following average dimensions for roads and transmission lines.

The total number of acres that will be disturbed over the life of the plan is derived by using the number of new wells forecasted and the average number of acres disturbed per well. Table B-3 displays the total estimated acreage in a disturbed condition at any time during the life of the plan. Table B-4 displays the total estimated acreage disturbed over the life of the plan (20 years).

B-1

BLM_0005887

TABLE B-1.  AVERAGE DISTURBANCES PER WELL (ACRES)

|  | Drill Pad | Roads | Transmission Lines |
|---|---|---|---|
| Glenwood Springs | 1.5 | 4 | 5.5 |
| Kremmling | 2 | 8 | 8 |
| Little Snake | 2 | 8 | 12 |
| Northeast | 2 | 1 | 0.5 |
| San Juan/San Miguel | 1.6 | 1.5 | 0.9 |

TABLE B-2.  AVERAGE DIMENSIONS FOR ROADS AND TRANSMISSION LINES

|  | ROADS | | TRANSMISSION LINES | |
|---|---|---|---|---|
|  | length(mi) | width(ft) | length(mi) | width(ft) |
| Glenwood Springs | 1 | 30 | 1 | 45 |
| Kremmling | 2 | 30 | 2 | 30 |
| Little Snake | 2 | 30 | 2 | 50 |
| Northeast | 0.25 | 30 | 0.25 | 20 |
| San Juan/San Miguel | 0.5 | 25 | 0.5 | 15 |

TABLE B-3.  TOTAL ESTIMATED ACREAGE IN A DISTURBED CONDITION AT ANY TIME DURING THE LIFE OF PLAN

|  | Glenwood Springs | Kremmling | Little Snake | Northeast | San Juan/ San Miguel |
|---|---|---|---|---|---|
| Region 1 | 0 | 0 | 3 | 0 | 0 |
| Region 2 | 48 | 274 | 3 | 4 | 35 |
| Region 3 | 95 | 78 | 203 | 40 | 264 |
| Region 4 | 587 | 981 | 6,450 | 441 | 607 |
| Misc. | 0 | 5 | 13 | 5 | 1 |
| Total | 730 | 1,338 | 6,672 | 490 | 907 |
| Reclaimed | 228 | 492 | 1,990 | 147 | 272 |

TABLE B-4.  TOTAL ACREAGE DISTURBED (20 YEARS) OVER LIFE OF PLAN

|  | Glenwood Springs | Kremmling | Little Snake | Northeast | San Juan/ San Miguel |
|---|---|---|---|---|---|
| Region 1 | 0 | 0 | 57 | 0 | 0 |
| Region 2 | 65 | 396 | 57 | 7 | 52 |
| Region 3 | 130 | 108 | 352 | 70 | 400 |
| Region 4 | 795 | 1,440 | 11,634 | 756 | 960 |
| Misc. | 100 | 100 | 250 | 15 | 18 |
| Total | 1,090 | 2,044 | 12,350 | 848 | 1,430 |

B-2

BLM_0005888

## POTENTIAL OF DEVELOPMENT

### OIL AND GAS POTENTIAL AND REASONABLE FORESEEABLE DEVELOPMENT OF THE GLENWOOD SPRINGS RESOURCE AREA

### INTRODUCTION

The Glenwood Springs Resource Area (GSRA) is situated within both the Piceance and Eagle structural basins (Figure 1). The Eagle basin is a structurally complex Pennsylvanian-age depositional basin that is located east of the southern Piceance basin (Peterson and Hite 1969). The Piceance basin is an asymmetrical kidney shaped basin that is bounded on the east by the Grand Hogback and separated from the Eagle basin by the White River uplift. The basin is deepest on the east where it is estimated to contain over 20,000 feet of Phanerozoic sediments.

### PROSPECTIVELY VALUABLE FOR OIL AND GAS

Land classified as prospectively valuable (PV) for oil and gas is based on criteria described in Appendix 1. PV lands for oil and gas in the GSRA are shown in Figure 2 and generally include lands that have a minimum of 1,000 feet of sedimentary rock, favorable structural setting, and minimum evidence of potential for the occurrence of oil and gas. Areas not designated as PV are rated as having no potential.

### OIL AND GAS POTENTIAL

Oil and gas potential rating criteria are described in Appendix 2 and are the basis for the ratings described below. In general, areas defined by the U.S. Geological Survey (USGS) as a play have a high potential for oil and gas.

Eagle Basin

The Eagle Basin is stratigraphically similar to the Paradox basin of the four-corners region to the southwest. However, the oil and gas potential is quite different when the tectonic and thermal histories are compared (Spencer and Wilson 1988). The oil potential is considered to be low based on the paleogeothermal and oil generation studies conducted by Nuccio and Schenk (1986). They found that most of the Paleozoic rocks

within the basin have a very high thermal maturity and concluded that oil generated would have been either escaped or be found in late Paleozoic or Jurassic reservoirs. That information, coupled with the basin stratigraphy and structure, lack of large areas of younger source rocks, and drilling history are the basis for the moderate potential rating.

Piceance Basin

Two conventional and two unconventional gas plays are present within the Piceance basin portion of the GSRA. The conventional plays are the Uinta-Piceance Upper Cretaceous and Uinta-Piceance Tertiary gas plays, while the unconventional gas plays are Piceance basin tight gas sands and Cretaceous coal bed methane (Figures 3-6).

Figure 3 is an oil and gas potential map for the conventional Upper Cretaceous gas play. As can be seen, the entire Piceance basin portion, from the Grand Hogback west, has a high potential; while the remainder of the Resource Area has no potential.

The conventional Tertiary gas play is illustrated in Figure 4. High potential occurs within the play boundary. A moderate potential is assigned to those lands within the Piceance basin defined by the contact between the Wasatch Formation and underlying Mesaverde Group. The remainder of the Resource Area has no potential owing to the absence of Tertiary Wasatch sediments.

The area designed by the Federal Energy Regulatory Commission eligible for tight gas production price incentives is shown in Figure 5. This designation is for gas produced from the lower Mesaverde Group marginal-marine sandstone. This area has a high potential, while the remainder of the Piceance basin within the Resource Area has a moderate potential.

Coal bed methane resources of the southern Piceance basin has been studied extensively (Choate, Jurich, and Saulnier 1984; Johnson and Nuccio 1986; Rightmire and Choate 1986). Areas rated as having low through high potentials for coal bed methane production are shown in Figure 6. The remainder of the Resource Area is rated as having no potential (Figure 7). The low

BLM_0005889

## APPENDIX B

through high potential area is based on criteria developed by Choate, Jurich, and Saulnier (1986), and is described in their article.

## OIL AND GAS ACTIVITY

Historical Background:

Several dry holes were drilled in the Resource Area prior to the 1950s, however, gas exploration and development accelerated through the 1950s, peaked during 1959 through 1961, 1980 through 1982, and again in 1985 to the present (Table 1; Figure 8). The present activity is due to Barrett Resources Company's exploration and development of the Parachute and Grand Valley fields in Garfield County.

All production has been from nine fields (Figure 9), in the Piceance basin from reservoirs in the Upper Cretaceous Mesaverde Group and the Tertiary Wasatch Formation. Production has been continuous since 1956 with the discovery of gas in both the Divide Creek and Rulison fields. Table 2 illustrates development wells and wildcat wells completed on BLM, U.S.Forest Service (USFS), and Fee/State lands. This table shows that approximately 18 percent of wells have been drilled on BLM lands, 18 percent of wells on the National Forests, and 64 percent on nonfederal lands.

Cumulative production of all the fields, through 1987, has been 16,074 barrels of oil (BO) and 80,497,787 thousand cubic feet (MCF) of gas (Table 3). During the same period, cumulative production from federal wells has been 1,285 BO and 3,921,341 MCF of gas (Table 4). Production from federal lands represents about 4.9 percent of the total production from the Resource Area.

Exploratory drilling in the Eagle Basin has resulted in 13 dry holes since 1947 with the last well abandoned in 1980.

## PRESENT ACTIVITY

Exploration and development activity has generally declined from the high in 1980-1981 for conventional reservoirs. However, tax incentives for the development of coal-bed methane has resulted in maintaining a fairly high level of overall activity.

Reasonably Foreseeable Development Activity:

Historical trends, USGS estimates, present activity, and professional judgment were the key ingredients in formulating the reasonably foreseeable development scenario for oil and gas activity in the GSRA.

Spacing units for gas wells are set by the Colorado Oil and Gas Conservation Commission (COGCC). While the BLM is not bound by their spacing unit sizes, they are usually recognized. Within the Resource Area, Tertiary Wasatch gas wells are usually spaced on 160 acres and the Mesaverde gas wells are spaced on 320 to 640 acre units.

The U.S. Geological Survey (Spencer and Wilson 1988) estimated the number of gas fields not yet discovered in the Uinta-Piceance Tertiary and Uinta-Piceance Upper Cretaceous conventional gas plays at 5 percent and 95 percent probability confidence limits (Table 5). These estimates are for the discovery of fields having a recoverable reserve of 6 billion cubic feet of gas (BCF). Since that portion of the Resource Area within the Uinta-Piceance gas play area is less than 10 percent, an estimate of the number of fields that may be discovered is a best guess estimate.

A six BCF gas field in the Wasatch, which is spaced in 160-acre units and has an average recoverable reserve of .75 BCFG would require eight wells and 1,280 acres. A Mesaverde well, on the other hand, is generally spaced on 320- to 640-acre units and has recoverable reserves of one to two BCFG. A six BCFG field producing from the Mesaverde would vary in size from 960 acres to 3,840 acres with three to 12 wells respectively.

Based on the USGS estimates, the above data translates to one to three Wasatch and three to six Upper Cretaceous Mesaverde fields yet to be discovered. At a minimum it would be expected, at a success rate of 75 percent that 11 to 33 wells would be drilled to discover and develop one to three Wasatch fields, and 12 to 96 wells to develop three to six Mesaverde fields.

With the distribution of BLM lands, present field development, and 18 percent of the wells drilled on BLM lands, approximately

B-4

**POTENTIAL OF DEVELOPMENT**

five to 24 wells projected to be drilled on BLM lands to develop the four to nine fields of minimum size. This probably represents a conservative estimate, considering Barrett's plans for development of Wasatch and Mesaverde gas. If Barrett were to follow through with its plans to drill 200 wells in the continued development of the Grand Valley and Parachute fields, as well as explore the Mobil leases, it would result in approximately 36 wells drilled on BLM lands.

Forecasting Activity Based on Historical Trends

Since 1950, a total of 253 wells have been completed within the Piceance Basin of the Resource Area. Future oil and gas activity is difficult to predict, however, a sudden increase in the demand for gas or an increase in price could trigger a large exploration and development program throughout the Piceance Basin very rapidly. Evaluation of past activity and professional judgment indicates that it is reasonable to expect at least one cycle of increased drilling activity during the next 20 years.

Trend analysis and statistical forecasting based on historical activity indicate approximately 300 wells will be completed during the period 1989 through 2010. This includes both wildcat and development wells in the Piceance Basin. Of those, 54 or 18 percent are expected to be drilled on BLM lands.

It seems reasonable to expect up to 36 wells to be drilled within the Tertiary conventional gas and Upper Cretaceous conventional gas plays, with an additional 18 wells drilled outside of the play areas on BLM lands.

B-5

BLM_0005891



**GLENWOOD SPRINGS RESOURCE AREA**



Resource Area Boundary

Piceance Basin

Eagle Basin

Scale 1:1,000,000
1 inch equals Approximately 16 miles

**Figure 1**    **Major Structural Elements**



B-6

BLM_0005892



## GLENWOOD SPRINGS RESOURCE AREA

Resource Area Boundary

 Valuable for Oil and Gas

Scale 1:1,000,000
1 inch equals Approximately 16 miles

| 10 | 0 | 10 | 20 | 30 | 40 Miles |
|---|---|---|---|---|---|

| 10 | 0 | 10 | 20 | 30 | 40 | 50 | Kilometers |



**Figure 2      Prospectively Valuable Lands**

B-7



**GLENWOOD SPRINGS RESOURCE AREA**

━━━━━  Resource Area Boundary

Play



Scale 1:1,000,000
1 inch equals Approximately 16 miles



**Figure 3    Uinta-Piceance Basin Upper Cretaceous
Conventional Gas Play**

B-8



**GLENWOOD SPRINGS RESOURCE AREA**

 Resource Area Boundary

 Play

Scale 1:1,000,000
1 inch equals Approximately 16 miles



**Figure 4**     **Uinta-Piceance Basin Tertiary Conventional Gas Play**

B-9



Figure 5.—Areas in the Uinta and Piceance basins designated as eligible for receiving tight gas production incentive prices by the Federal Energy Regulatory Commission (Modified from Finley, 1984, his fig. 74).

BLM_0005896



**Figure 6** —Piceance Basin coalbed methane target area.

B-11

BLM_0005897



## GLENWOOD SPRINGS RESOURCE AREA

━━━━━  Resource Area Boundary

1 - None
2 - Low
3 - Moderate
4 - High



Scale 1:1,000,000
1 inch equals Approximately 16 miles



**Figure 7    Oil and Gas Potential**

B-12

BLM_0005898

**Figure 8.   Graph of oil and gas activity
by mineral ownership.**



B-13

BLM_0005899



## GLENWOOD SPRINGS RESOURCE AREA

  Resource Area Boundary

  Field

Scale 1:1,000,000
1 inch equals Approximately 16 miles

**Figure 9     Oil and Gas Fields**

B-14

BLM_0005900

TABLE 1. GLENWOOD SPRINGS OIL AND GAS DRILLING HISTORY
(1950 - 1988)

| YEAR | BLM D&A | BLM PWR | BLM T | FS D&A | FS PWR | FS T | FED D&A | FED PWR | FED T | FEE D&A | FEE PWR | FEE T | TOTAL D&A | TOTAL PWR | T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1950 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 3 | 0 | 3 | 4 | 0 | 4 |
| 1951 | 1 | 0 | 1 | 1 | 0 | 1 | 2 | 0 | 2 | 0 | 0 | 0 | 2 | 0 | 2 |
| 1952 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1953 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1954 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 |
| 1955 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1956 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 2 | 2 |
| 1957 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 2 | 2 | 1 | 2 | 3 | 1 | 4 | 5 |
| 1958 | 0 | 0 | 0 | 0 | 4 | 4 | 0 | 4 | 4 | 0 | 0 | 0 | 0 | 4 | 4 |
| 1959 | 0 | 4 | 4 | 0 | 2 | 2 | 0 | 6 | 6 | 1 | 6 | 7 | 1 | 12 | 13 |
| 1960 | 0 | 1 | 1 | 0 | 5 | 5 | 0 | 6 | 6 | 4 | 6 | 10 | 4 | 12 | 16 |
| 1961 | 0 | 2 | 2 | 3 | 0 | 3 | 3 | 2 | 5 | 5 | 3 | 8 | 8 | 5 | 13 |
| 1962 | 1 | 2 | 3 | 0 | 1 | 1 | 1 | 3 | 4 | 2 | 0 | 2 | 3 | 3 | 6 |
| 1963 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 3 | 2 | 1 | 3 |
| 1964 | 2 | 0 | 2 | 1 | 2 | 3 | 3 | 2 | 5 | 0 | 0 | 0 | 3 | 2 | 5 |
| 1965 | 1 | 0 | 1 | 1 | 5 | 6 | 2 | 5 | 7 | 0 | 1 | 1 | 2 | 6 | 8 |
| 1966 | 0 | 2 | 2 | 2 | 2 | 4 | 2 | 4 | 6 | 1 | 1 | 2 | 3 | 5 | 8 |
| 1967 | 0 | 0 | 0 | 1 | 3 | 4 | 1 | 3 | 4 | 0 | 0 | 0 | 1 | 3 | 4 |
| 1968 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 |
| 1969 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 | 3 | 0 | 3 |
| 1970 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 2 | 0 | 2 |
| 1971 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 |
| 1972 | 1 | 1 | 2 | 0 | 0 | 0 | 1 | 1 | 2 | 0 | 1 | 1 | 1 | 2 | 3 |
| 1973 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 2 | 2 | 1 | 3 |
| 1974 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 4 | 5 | 1 | 4 | 5 |
| 1975 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 |
| 1976 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 1 |
| 1977 | 0 | 0 | 0 | 2 | 0 | 2 | 2 | 0 | 2 | 1 | 1 | 2 | 3 | 1 | 4 |
| 1978 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 2 | 1 | 1 | 2 |
| 1979 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 3 | 4 | 1 | 3 | 4 |
| 1980 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 16 | 16 | 0 | 18 | 18 |
| 1981 | 0 | 2 | 2 | 1 | 0 | 1 | 1 | 2 | 3 | 0 | 13 | 13 | 1 | 15 | 16 |
| 1982 | 1 | 3 | 4 | 0 | 0 | 0 | 1 | 3 | 4 | 1 | 10 | 11 | 2 | 13 | 15 |
| 1983 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 2 | 2 | 2 | 2 | 4 | 2 | 4 | 6 |
| 1984 | 0 | 2 | 2 | 0 | 1 | 1 | 0 | 3 | 3 | 2 | 0 | 2 | 2 | 3 | 5 |
| 1985 | 0 | 2 | 2 | 0 | 1 | 1 | 0 | 3 | 3 | 2 | 7 | 9 | 2 | 10 | 12 |
| 1986 | 0 | 2 | 2 | 0 | 1 | 1 | 0 | 3 | 3 | 1 | 12 | 13 | 1 | 15 | 16 |
| 1987 | 0 | 6 | 6 | 0 | 1 | 1 | 0 | 7 | 7 | 0 | 18 | 18 | 0 | 25 | 25 |
| 1988 | 0 | 3 | 3 | 1 | 0 | 1 | 1 | 3 | 4 | 1 | 11 | 12 | 2 | 14 | 16 |
| Totals==> | 9 | 37 | 46 | 14 | 32 | 46 | 23 | 69 | 92 | 39 | 122 | 161 | 62 | 191 | 253 |

B-15

BLM_0005901

TABLE 2.  FIELD WELL SUMMARY FOR GLENWOOD SPRINGS RESOURCE AREA
          (includes Grand Valley Field wells in GWRA)

| FIELD | FS | | BLM | | FEE/STATE | | TOTAL | | | |
|-------|-----|--------|-----|--------|-----|--------|-----|--------|-------|-----------|
| | D&A | PWR/SI | D&A | PWR/SI | D&A | PWR/SI | D&A | PWR/SI | TOTAL | SUCCESS % |
| Baldy Creek | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 | 2 | 100.00% |
| Divide Creek | 2 | 23 | 0 | 1 | 3 | 3 | 5 | 27 | 32 | 84.38% |
| Hells Gulch | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 100.00% |
| Horsethief Creek | 0 | 0 | 1 | 0 | 1 | 1 | 2 | 1 | 3 | 33.33% |
| Grand Valley | 0 | 0 | 0 | 7 | 0 | 9 | 0 | 16 | 16 | 100.00% |
| Mam Creek | 0 | 0 | 0 | 0 | 1 | 3 | 1 | 3 | 4 | 75.00% |
| Parachute | 0 | 0 | 0 | 2 | 0 | 27 | 0 | 29 | 29 | 100.00% |
| Rulison | 0 | 0 | 0 | 18 | 7 | 57 | 7 | 75 | 82 | 91.46% |
| Wolf Creek | 5 | 9 | 0 | 0 | 0 | 0 | 5 | 9 | 14 | 64.29% |
| Wildcat | 4 | 4 | 7 | 10 | 29 | 23 | 40 | 37 | 77 | 48.05% |
| TOTALS========> | 11 | 36 | 8 | 40 | 41 | 124 | 60 | 200 | 260 | 76.92% |

B-16

BLM_0005902

TABLE 3.   CUMULATITIVE PRODUCTION
          (TO 1-1-88)
          FOR OIL AND GAS FIELDS
          GLENWOOD SPRINGS RESOURCE AREA

| FIELD | FORMATION | SIW | PRW | 1987 CUM OIL (Bbls) | 1987 CUM GAS (Mcf) | TOTAL CUM OIL (Bbls) | TOTAL CUM GAS (Mcf) |
|-------|-----------|-----|-----|---------|---------|---------|---------|
| Baldy Creek | Mesaverde | 0 | 3 | 9 | 47,037 | 0 | 432,739 |
| Divide Creek | Mesaverde | 8 | 3 | 0 | 138,336 | 0 | 49,842,793 |
| Grand Valley | Mesaverde | 1 | 11 | 263 | 322,009 | 427 | 526,190 |
| Hells Gulch | Mesaverde | 0 | 0 | 0 | 0 | 0 | 150,397 |
| Horsethief Creek | Mesaverde | 0 | 0 | 0 | 0 | 0 | 141,282 |
| Mam Creek | Mesaverde | 1 | 0 | 102 | 15,746 | 545 | 886,331 |
| Parachute | Wasatch | 0 | 30 | 112 | 740,228 | 112 | 1,327,499 |
| Rulison | Wasatch | 6 | 28 | 0 | 584,776 | 32 | 6,740,252 |
|  | Mesaverde | 10 | 14 | 1,268 | 365,305 | 14,898 | 7,820,432 |
| Wolf Creek | Mesaverde | 0 | 0 | 0 | 0 | 0 | 12,629,822 |
| TOTALS========> |  | 26 | 99 | 1,745 | 2,273,437 | 16,074 | 80,497,787 |

TABLE 4.   CUMULATITIVE PRODUCTION
          (TO 1-1-88)
          FOR FEDERAL WELLS
          GLENWOOD SPRINGS RESOURCE AREA

| FIELD | FORMATION | SIW | FE PRW | 1987 CUM OIL (Bbls) | 1987 CUM GAS (Mcf) | TOTAL CUM OIL (Bbls) | TOTAL CUM GAS (Mcf) | % FED. |
|-------|-----------|-----|--------|---------|---------|---------|---------|--------|
| Baldy Creek | Mesaverde | 0 | 1 | 0 | 17,341 | 0 | 17341 | 4.01% |
| Divide Creek | Mesaverde | 0 | 1 | 0 | 20,970 | 0 | 176130 | 0.35% |
| Grand Valley | Mesaverde | 1 | 5 | 263 | 244,193 | 460 | 379610 | 72.14% |
| Hells Gulch | Mesaverde | 0 | 0 | 0 | 4,763 | 0 | 150,397 | 100.00% |
| Horsethief Creek | Mesaverde | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| Mam Creek | Mesaverde | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| Parachute Rulison | Wasatch | 0 | 2 | 0 | 4,763 | 0 | 4763 | 0.36% |
|  | Wasatch | 1 | 4 | 0 | 47,133 | 0 | 616741 | 9.15% |
|  | Mesaverde | 3 | 1 | 88 | 67,190 | 805 | 2576359 | 32.94% |
| Wolf Creek | Mesaverde | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% |
| TOTALS========> |  | 5 | 14 | 351 | 406,353 | 1,285 | 3,921,341 |  |
| PERCENT FEDERAL==> |  |  |  | 20.11% | 17.87% | 7.99% | 4.87% |  |

B-17

BLM_0005903

TABLE 5.     U. S. GEOLOGICAL SURVEY GAS FIELD DISCOVERY
             PROBABILITY TABLE (FIELDS > 6 BCFG)

| PLAY | 0.95 | 0.05 |
|------|------|------|
| Uinta-Piceeance Tertiary Gas | 9 | 35 |
| Uinta-Piceeance upper Creatceous | 25 | 55 |

B-18

BLM_0005904

## POTENTIAL OF DEVELOPMENT

### POTENTIAL FOR OCCURRENCE AND DEVELOPMENT OF OIL AND GAS IN THE KREMMLING RESOURCE AREA

#### INTRODUCTION

The Kremmling Resource Area (KRA) is located within the Colorado Park Basin Province in North-Central Colorado and encompasses both the North Park and Middle Park Structure Basins. Both basins are essentially a single structural basin that is separated by Tertiary volcaniclastic and flow rocks of the east-west-trending Rabbit Ears Range. A detailed description of the geology of the basins can be found in Maughan's (1988) Open-File Report on the geology and petroleum potential of the province.

#### Hydrocarbon Occurrence

Oil and gas were first discovered in 1926 by Continental Oil Company in northeastern Jackson County. This discovery opened the North McCallum Field and consisted of gas, composed of 96 percent $CO_2$ and 4 percent hydrocarbons from the Cretaceous Dakota Sandstone.

It was not until 1952 that oil was discovered in the Coalmont area from fractures in Dakota shales. Since that time, 13 fields have been discovered and developed, all in North Park (Figure 1). During 1987, a total of 101 wells produced 233,351 BO and 292,098 MCFG, while 27 wells produced 1,128,761 MCF of $CO_2$.

No commercial hydrocarbons have been produced from the Middle Park Basin. However, the Granby Anticline (T.2-3 N., R. 76-77 W.), just north of the town of Granby, tested significant gas shows in the Niobrara and Muddy-Dakota interval in 1953 by British American.

Three subsequent wells had shows of gas, but also revealed the highly complex structure of the anticline (Wellborn 1977).

#### PROSPECTIVELY AVAILABLE FOR OIL AND GAS

The majority of the lands within the Resource Area are classified as prospectively valuable (PV) for oil and gas (Figure 2). Appendix 1 details the criteria for PV classifications.

Recent structural interpretations of the North Park Basin suggest that the PV classification needs to be revised. This is particularly evident at the northern terminus of the basin where Independence Mountain has been overthrust the Paleozoic and Mesozoic Section (Park 1977; Wellborn 1977).

### OIL AND GAS POTENTIAL

Oil and gas potential rating criteria are described in Appendix 2 and is the basis for the ratings described below for both the North Park and Middle Park Basins. In general, areas defined by the U.S. Geological Survey (USGS) as a play have a high potential for oil and gas, while lands not classified as PV have no potential.

Maughan (1988) describes two major plays that occur within the Resource Area. The first, upper Jurassic and lower Cretaceous structural play includes all of North Park and Middle Park Basins containing reservoirs and potential reservoirs within rocks of those ages. Reservoirs within that play are typically developed in combination traps. The fields occur within structural closure or entrapment against or adjacent to northwest-southeast trending faults and folds (Figure 3).

The second play is a hydrocarbon subthrust play that includes lands not classified as PV, due to the presence of Precambrian crystalline rocks on the surface. Several areas of outcropping Precambrian rocks actually are overthrusts and are represented by the Sheep Mountain, Independence Mountain Vasquez, Never Summer, and Williams Range thrust faults. Maughan concluded that the sedimentary rocks and structure of North Park extend northward underneath (12 miles) the Independence Mountain overthrust, and therefore, have the same oil and gas potential. The other overthrusts mentioned above occur along the eastern margin of the basins, and are probably limited in their overthrusting when compared to the Independence Mountain thrust, but are geologically similar (Figure 4).

Oil land gas potential for the Resource Area is shown in Figure 5. As can be seen the majority of the area is high potential based on the subthrust play and Jurassic and Lower Cretaceous structural plays defined by the

BLM_0005905

## APPENDIX B

USGS. Areas outside of these two plays have no potential.

## OIL AND GAS ACTIVITY

### Historical Background

Approximately 50 percent of the wells drilled in the Resource Area were completed as dry holes (Table 1). Figure 6 illustrates the drilling history for 1926 through 1988. Drilling activity has peaked during four periods with the greatest activity starting in the early 1970s and continuing into the early 1980s.

All production has been from 13 fields (Figure 1), in North Park from porous sandstone reservoirs of the Entrada Sandstone, Morrison Formation, Dakota Sandstones (Lakota, Dakota, and Muddy Sandstones), Codell Sandstone, and Pierre Shale. Production also occurs from fractured shale reservoirs in the Niobrara Formation.

Table 2 illustrates development and wildcat wells completed on BLM, U.S. Forest Service (USFS), and Fee/State lands. This table shows that approximately 58 percent of the development and 32 percent of the wildcat wells were completed on BLM lands, while no development wells and 7 percent of the wildcat wells were completed within National Forest lands.

Cumulative production of all the fields, through 1987, has been 14,962,306 BO and 9,690,708 MCFG, as well as 666,846,756 MCF of $CO_2$ produced from the McCallum Fields (Table 3). During the same period, cumulative production from federal wells has been 9,122,682 BO and 662,701 MCFG, and 659,721,551 MCF of $CO_2$ (Table 4). Federal production accounts for approximately 61 percent of oil produced, 7 percent of gas, and 99 percent of the CO2.

Exploratory drilling in the Middle Park Basin has not resulted in any commercial production.

## PRESENT ACTIVITY

Exploration and development activity has declined from a total of 48 wells drilled during the last peak of activity in 1984 to two in 1988. Development drilling in the McCallum and Canadian River Fields accounted for 90 percent of the activity. The decrease in activity is due to market conditions resulting from the collapse of oil prices.

## REASONABLY FORESEEABLE DEVELOPMENT ACTIVITY

Historical trends, USGS estimates, present activity, and professional judgment were the key ingredients in formulating the reasonably foreseeable development scenario for oil and gas activity in KRA.

While the USGS (Maughan 1988) has not estimated the number of fields yet to be discovered, there is an estimate of undiscovered recoverable oil and gas within the basin. At a 95 percent confidence level (probability), only negligible oil and 10 million MCFG are estimated as undiscovered recoverable. The volume increases to 30 million BO and 50 million MCFG at 5 percent probability, with a mean of 10 million BO and 20 million MCFG. The mean probability estimate translates to doubling the number of development wells completed to date.

Field size, based on 40-acre spacing units, varies from 40 to 3,000 acres. The largest fields are McCallum, McCallum-North, and Canadian River. Doubling of recoverable reserves would probably double the productive acreage, or an increase of approximately 8,400 acres.

### Forecasting Activity Based on Historical Trends

Since 1926, a total of 466 wells have been completed within the Resource Area. Future oil and gas activity is difficult to predict; however, a sudden increase in the demand for oil and gas or price increases could trigger a larger exploration and development program. Evaluation of past activity and professional judgment indicates that it is reasonable to expect at least one cycle of increased drilling activity during the next 20 years.

Trend analysis and statistical forecasting based on historical activity indicate that 225 wells are forecast to be drilled within the Resource Area. This forecast is based on the following assumptions:

BLM_0005906

## POTENTIAL OF DEVELOPMENT

- Best fit, statistically with lowest mean squared error.
- 62 percent of wells forecast are development and 38 percent wildcat.
- 57 percent of development and 32 percent of wildcat wells are drilled on BLM.
- 78 percent success rate for development and
  7 percent success rate of wildcat wells drilled on BLM.

Of the 225 wells forecast, 80 development and 28 wildcat wells will be drilled on BLM lands. Sixty-two of the development wells are expected to be completed for production in the upper Jurassic and lower Cretaceous structural play of North Park Basin. Only 28 percent of the wildcat wells have been drilled in Middle Park, with 18 percent drilled on BLM lands. Based on these statistics, two wells are expected to be drilled in Middle Park upper Jurassic and lower Cretaceous structural play. The remaining 20 wildcat wells will be drilled in North Park. Four wells will be drilled on BLM lands on the subthrust play (Independence Mountain overthrust) and the remaining 16 within the upper Jurassic and lower Cretaceous structural play.

The development and exploratory drilling is expected to be concentrated in the McCallum, Sheep Mountain-Delaney Butte, and Coalmont areas. Exploration in Middle Park will be in the Granby area, with one or two wells drilled in the Blue River Valley area (Figure 7).

As previously discussed, based on the USGS estimates of undiscovered reserves, the above estimate would be doubled.

B-21

BLM_0005907



# KREMMLING RESOURCE AREA

Resource Area Boundary

Field

**Figure 1    Oil and Gas Fields**

SCALE
in miles

0        10        20

B-22

BLM_0005908



## KREMMLING RESOURCE AREA

⌣ Resource Area Boundary

▨ Valuable for Oil and Gas

**Figure 2      Prospectively Valuable Lands**

SCALE
in miles

0        10        20

B-23

BLM_0005909

# KREMMLING RESOURCE AREA

Resource Area Boundary

Play

**Figure 3**   **Upper Jurassic and Lower Cretaceous**

**Structural Play**

SCALE
in miles

0          10          20

B-24

BLM_0005910



**KREMMLING RESOURCE AREA**

Resource Area Boundary

Play

SCALE
in miles

**Figure 4      Hydrocarbon Subthrust play**

B-25

BLM_0005911



**KREMMLING RESOURCE AREA**

Resource Area Boundary

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

**Figure 5    Oil and Gas Potential**

B-26

BLM_0005912



Figure 6.  Oil and gas drilling activity graph for the Kremmling Resource Area.

BLM_0005913



KREMMLING RESOURCE AREA

Resource Area Boundary

Area

**Figure 7**    **Areas of Expected Activity**

B-28

BLM_0005914

TABLE 1.  OIL AND GAS ACTIVITY IN THE KREMMLING RESOURCE AREA

| YEAR | BLM D&A | BLM PWR/SI | BLM TOTAL | FS D&A | FS PWR/SI | FS TOTAL | FEE/ST D&A | FEE/ST PWR/SI | FEE/ST TOTAL | D&A | PWR/SI | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1926 |  | 1 | 1 |  |  | 0 |  | 1 | 1 | 0 | 2 | 2 |
| 1927 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1928 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1929 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1930 |  |  | 0 |  |  | 0 | 2 |  | 2 | 2 | 0 | 2 |
| 1931 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1932 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1933 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1934 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1935 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1936 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1937 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1938 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1939 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1940 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1941 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1942 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1943 | 0 | 1 | 1 |  |  | 0 |  |  | 0 | 0 | 1 | 1 |
| 1944 | 0 | 5 | 5 |  |  | 0 | 0 | 3 | 3 | 0 | 8 | 8 |
| 1945 | 0 | 5 | 5 |  |  | 0 |  |  | 0 | 0 | 5 | 5 |
| 1946 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1947 | 1 | 0 | 1 |  |  | 0 | 1 |  | 1 | 2 | 0 | 2 |
| 1948 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1949 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1950 | 0 | 1 | 1 |  |  | 0 | 2 | 0 | 2 | 2 | 0 | 2 |
| 1951 | 2 | 1 | 3 |  |  | 0 | 3 | 1 | 4 | 5 | 2 | 7 |
| 1952 | 1 | 0 | 1 |  |  | 0 | 4 | 0 | 4 | 5 | 0 | 5 |
| 1953 | 1 | 0 | 1 |  |  | 0 | 3 | 0 | 3 | 4 | 0 | 4 |
| 1954 | 1 | 0 | 1 |  |  | 0 | 3 | 4 | 6 | 4 | 4 | 7 |
| 1955 | 1 | 0 | 1 |  |  | 0 | 2 | 4 | 6 | 3 | 4 | 7 |
| 1956 | 2 | 2 | 4 |  |  | 0 | 8 | 10 | 18 | 10 | 12 | 22 |
| 1957 | 1 | 3 | 4 | 1 | 0 | 1 | 6 | 4 | 10 | 8 | 7 | 15 |
| 1958 | 5 | 2 | 7 |  |  | 0 | 5 | 0 | 5 | 10 | 2 | 12 |
| 1959 | 3 | 6 | 9 | 1 | 0 | 1 | 0 | 3 | 3 | 4 | 9 | 13 |
| 1960 | 3 | 6 | 9 |  |  | 0 | 6 | 1 | 7 | 9 | 7 | 16 |
| 1961 | 3 | 2 | 5 |  |  | 0 | 4 | 1 | 5 | 7 | 3 | 10 |
| 1962 | 4 | 7 | 11 | 1 | 0 | 1 | 2 | 0 | 2 | 7 | 7 | 14 |
| 1963 | 3 | 1 | 4 |  |  | 0 | 1 | 0 | 1 | 4 | 1 | 5 |
| 1964 | 3 | 0 | 3 |  |  | 0 | 5 | 0 | 5 | 8 | 0 | 8 |
| 1965 |  |  | 0 |  |  | 0 | 3 | 0 | 3 | 3 | 0 | 3 |
| 1966 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1967 |  |  | 0 |  |  | 0 |  |  | 0 | 0 | 0 | 0 |
| 1968 |  |  | 0 | 1 | 0 | 1 |  |  | 0 | 1 | 0 | 1 |
| 1969 |  |  | 0 |  |  | 0 | 3 | 0 | 3 | 3 | 0 | 3 |
| 1970 |  |  | 0 |  |  | 0 | 1 | 0 | 1 | 1 | 0 | 1 |
| 1971 | 2 | 1 | 3 |  |  | 0 | 0 | 1 | 1 | 2 | 2 | 4 |
| 1972 | 13 | 20 | 33 |  |  | 0 | 5 | 7 | 12 | 18 | 27 | 45 |
| 1973 | 8 | 2 | 10 | 1 | 0 | 1 | 7 | 8 | 15 | 16 | 10 | 26 |
| 1974 | 4 | 9 | 13 | 1 | 0 | 1 | 1 | 2 | 3 | 6 | 11 | 17 |
| 1975 | 3 | 0 | 3 |  |  | 0 | 1 | 2 | 3 | 4 | 2 | 6 |
| 1976 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 5 | 5 | 2 | 5 | 7 |
| 1977 | 1 | 6 | 7 |  |  | 0 | 4 | 3 | 7 | 5 | 9 | 14 |
| 1978 | 3 | 16 | 19 | 1 | 0 | 1 | 2 | 2 | 4 | 6 | 18 | 24 |
| 1979 | 1 | 1 | 2 | 1 | 0 | 1 | 4 | 0 | 4 | 6 | 1 | 7 |
| 1980 | 0 | 1 | 1 |  |  | 0 | 5 | 6 | 11 | 5 | 7 | 12 |
| 1981 | 2 | 8 | 10 | 2 | 0 | 2 | 12 | 9 | 21 | 16 | 17 | 33 |
| 1982 | 0 | 5 | 5 | 1 | 0 | 1 | 9 | 6 | 15 | 10 | 11 | 21 |
| 1983 | 8 | 10 | 18 |  |  | 0 | 20 | 10 | 30 | 28 | 20 | 48 |
| 1984 | 6 | 7 | 13 | 1 | 0 | 1 | 1 | 1 | 2 | 8 | 8 | 16 |
| 1985 | 2 | 2 | 4 |  |  | 0 | 1 | 1 | 2 | 3 | 3 | 6 |
| 1986 | 2 | 1 | 3 |  |  | 0 | 3 | 0 | 3 | 5 | 1 | 6 |
| 1987 | 0 | 1 | 1 |  |  | 0 | 1 | 1 | 2 | 1 | 2 | 3 |
| 1988 | 0 | 1 | 1 |  |  | 0 | 0 | 1 | 1 | 0 | 2 | 2 |
| TOTALS==> | 89 | 134 | 223 | 13 | 0 | 13 | 137 | 93 | 230 | 239 | 227 | 466 |

B-29

TABLE 2.  DRILLING ACTIVITY IN OIL AND GAS FIELDS IN KREMMLING RESOURCE AREA

| FIELD | BLM D&A | BLM PWR/SI | BLM TOTAL | FS D&A | FS PWR/SI | FS TOTAL | FEE/ST D&A | FEE/ST PWR/SI | FEE/ST TOTAL | D&A | PWR/SI | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alkali Lake | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 |
| Battleship | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 9 | 13 | 4 | 9 | 13 |
| Butler Ck | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 |
| Canadian River | 0 | 1 | 1 | 0 | 0 | 0 | 34 | 42 | 76 | 34 | 43 | 77 |
| Carlstrom | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 |
| Coalmont | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 2 | 2 | 1 | 2 | 3 |
| Delany Butte | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 1 | 3 | 2 | 1 | 3 |
| Grizzly Ck | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 |
| Johnny Moore Mtn | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Lone Pine | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 16 | 19 | 3 | 16 | 19 |
| McCallum | 24 | 94 | 118 | 0 | 0 | 0 | 1 | 3 | 4 | 25 | 97 | 122 |
| McCallum, S | 12 | 31 | 43 | 0 | 0 | 0 | 0 | 1 | 1 | 12 | 32 | 44 |
| Michigan River | 0 | 1 | 1 | 0 | 0 | 0 | 2 | 2 | 4 | 2 | 3 | 5 |
| TOTALS==> | 37 | 130 | 167 | 0 | 0 | 0 | 46 | 79 | 125 | 83 | 209 | 292 |
| Wildcat | 52 | 4 | 56 | 13 | 0 | 13 | 91 | 14 | 105 | 156 | 18 | 174 |
| TOTALS==> | 89 | 134 | 223 | 13 | 0 | 13 | 137 | 93 | 230 | 239 | 227 | 466 |

TABLE 3.  TOTAL CUMULATIVE OIL AND GAS PRODUCTION IN THE KREMMLING RESOURCE AREA

| FIELD | SWI | PWR | TOTAL WELLS 1987 OIL | TOTAL WELLS 1987 GAS | CUMULATIVE OIL | CUMULATIVE GAS |
|---|---|---|---|---|---|---|
| Alkali Lake | 0 | 1 | 233 | 0 | 4,211 | 0 |
| Battleship | 2 | 3 | 19,220 | 0 | 2,877,152 | 1,390 |
| Butler Ck | 1 | 0 | 0 | 0 | 20,900 | 14,871 |
| Canadian River | 7 | 23 | 3,225 | 146,434 | 487,123 | 7,923,890 |
| Carlstrom | 0 | 0 | 0 | 0 | 7,741 | 4,194 |
| Coalmont | 1 | 1 | 3,467 | 0 | 126,909 | 76,235 |
| Delany Butte | 1 | 1 | 790 | 0 | 7,827 | 1,373 |
| Grizzly Ck | 0 | 0 | 0 | 0 | 1,342 | 0 |
| Johnny Moore Mtn. | 1 | 0 | 309 | 550 | 36,189 | 64,693 |
| Lone Pine | 4 | 14 | 81,531 | 15,282 | 2,159,617 | 611,996 |
| McCallum | 4 | 35 | 122,602 | 129,832 | 8,328,617 | 716,322 |
| McCallum, S | 0 | 0 | 0 | 0 | 771,010 | 119,958 |
| Michigan River | 1 | 1 | 1,974 | 0 | 133,668 | 155,786 |
| TOTALS==> | 22 | 79 | 233,351 | 292,098 | 14,962,306 | 9,690,708 |
| McCallum (CO2) | 18 | 9 | 0 | 1,128,761 | 0 | 512,050,758 |
| McCallum, S (CO2) | 0 | 0 | 0 | 0 | 0 | 154,795,998 |
| TOTALS==> | 18 | 9 | 0 | 1,128,761 | 0 | 666,846,756 |

BLM_0005916

TABLE 4. CUMULATIVE PRODUCTION FROM FEDERAL LANDS IN THE KREMMLING RESOURCE AREA

| FIELD | SWI | PWR | FEDERAL WELLS 1987 OIL | GAS | CUMULATIVE OIL | GAS | % FEDERAL OIL | GAS |
|---|---|---|---|---|---|---|---|---|
| Alkali Lake | 0 | 1 | 233 | 0 | 4,211 | 0 | 100.00% | |
| Battleship | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% | 0.00% |
| Butler Ck | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% | 0.00% |
| Canadian River | 0 | 0 | 0 | 0 | 27,609 | 91,583 | 5.67% | 1.16% |
| Carlstrom | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% | 0.00% |
| Coalmont | 0 | 0 | 0 | 0 | 13,448 | 16,560 | 10.60% | 21.72% |
| Delany Butte | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% | 0.00% |
| Grizzly Ck | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% | |
| Johnny Moore Mtn. | 1 | 0 | 309 | 550 | 36,189 | 64,693 | 100.00% | 100.00% |
| Lone Pine | 0 | 0 | 0 | 0 | 0 | 0 | 0.00% | 0.00% |
| McCallum | 3 | 35 | 119,804 | 46,222 | 8,292,753 | 362,621 | 99.57% | 50.62% |
| McCallum, S | 0 | 0 | 0 | 0 | 739,308 | 119,958 | 95.89% | 100.00% |
| Michigan River | 0 | 0 | 0 | 0 | 9,164 | 7,286 | 6.86% | 4.68% |
| TOTALS==> | 4 | 36 | 120,346 | 46,772 | 9,122,682 | 662,701 | 60.97% | 6.84% |
| McCallum (CO2) | 18 | 9 | 0 | 1,128,761 | 0 | 512,050,758 | | 100.00% |
| McCallum, S (CO2) | 0 | 0 | 0 | 0 | 0 | 147,670,793 | | 95.40% |
| TOTALS==> | 18 | 9 | 0 | 1,128,761 | 0 | 659,721,551 | | 98.93% |

B-31

BLM_0005917

## APPENDIX B

### OIL AND GAS POTENTIAL AND REASONABLE FORESEEABLE LITTLE SNAKE RESOURCE AREA

#### INTRODUCTION

The Little Snake Resource Area (LSRA) sets on the southern edge of the Southwest Wyoming Basins Province. The LSRA portion of the Province contains the Sand Wash Basin, the Axial Basin Uplift, and portions of the Uinta, and the Park Range Uplifts (Figure 1) (Law 1988). Tectonic elements of the region are illustrated in Figure 2. The production of oil is primarily from fields located in and adjacent to the Laramie Basin, which in LSRA is the Axial Basin Uplift. The remainder of the hydrocarbon production in the resource area is nonassociated gas. Producing reservoirs range from Cambrian through Tertiary rocks and are composed dominantly of sandstone with minor carbonate reservoirs.

#### PROSPECTIVELY VALUABLE FOR OIL AND GAS

Land described as prospectively valuable (PV) for oil and gas is based on criteria described in Appendix 1. PV lands for the LSRA are shown in Figure 3 and generally include lands that have 1,000 feet of sedimentary rock, favorable structural setting, and minimum evidence of potential for the occurrence of oil and gas. Areas not designated as PV are rated as having no potential. The PV lands in LSRA are rated 2, Intermediate Low; 3, Intermediate High; or 4, High potential for oil and gas occurrence and prospective development. Areas not rated as PV (Area 1) are rated as having no potential for occurrence or development, though there may be potential for exploratory drilling.

#### OIL AND GAS POTENTIAL

Oil and gas potential rating criteria are described in Appendix 2 and is the basis for the ratings described below. Areas defined by the U.S. Geological Survey (USGS) as a play have a high potential for oil and gas occurrence.

Sand Wash Basin

The Sand Wash Basin is the southern most basin of the Basin Center Play. This play includes the areas not considered in the other plays. It includes reservoirs that are stratigraphically equivalent to other assessed Cretaceous and Tertiary tight gas reservoirs as well as reservoirs stratigraphically above and below the tight gas reservoirs.

The tight gas play includes the Cretaceous and lower Tertiary reservoirs. The play is subdivided into five stratigraphic intervals: 1) the lower Cretaceous Dakota Sandstone and Upper Cretaceous Frontier Formation, 2) the Upper Cretaceous Mesaverde Group, 3) the Upper Cretaceous Lewis Shale, 4) the Upper Cretaceous Lance Formation, and 5) the lower Tertiary Fort Union Formation. Because of the difficulty in accurately locating the areas of conventional reservoirs within the tight reservoir area, some conventional reservoirs were probably included in the tight gas reservoir play.

Coal bed methane is assessed as part of the tight gas play.

Axial Basin Uplift

The Axial play area is located between the Piceance and Sand Wash Basins Fgure 4. It appears to be a southeast extension of the eastern end of the Uinta Mountains Uplift. During much of Paleozoic time, the Axial arch was a structurally depressed area referred to as the Colorado trough. The principal reservoirs in the play include the Pennsylvanian Minturn Formation and Weber Sandstone; Triassic Shinarump Sandstone, and Moenkopi Formation; Jurassic Entrada Sandstone and Morrison Formation; Lower Cretaceous Dakota Sandstone; and Upper Cretaceous Frontier Formation, Niobrara Formation, and Morapos Sandstone Member of the Mancos Shale. Porosity ranges from 12 to 20 percent and permeability ranges from 0.1 to 300 millidarcys. Reservoir thickness ranges from 8 to 65 feet. The depth of reservoirs ranges from 2,000 to 12,000 feet.

The area is maturely explored. However, because the area is structurally complex and has experienced a long history of structural deformation, structural traps were likely formed as early as Pennsylvanian time. Thus, the temporal relationship between hydrocarbon generation and migration, and structural trap development were favorable.

BLM_0005918

## POTENTIAL OF DEVELOPMENT

### PRESENT ACTIVITY

Exploration and development activity has generally declined from the high in 1980-1981 for conventional reservoirs. However, tax incentives for the development of coal-bed methane has resulted in maintaining a fairly high level of overall activity.

### REASONABLY FORESEEABLE DEVELOPMENT ACTIVITY

Historical trends, present activity, and professional judgement were used to formulate the reasonably foreseeable development (RFD) scenario for oil and gas activity in the LSRA.

Based on analysis of historical trends, it is projected that 1,000 wells will be drilled within the planning unit in the next 20 years. Of that 1,000 wells, 550 could be on BLM-administered land within the planning unit. This projection is drawn from a gradually diminishing curve derived from the graph of past drilling activity.

The analysis of past drilling activity shows that 47 percent of the wells drilled in the LSRA were within unknown fields. (Note: The discovery well in each of the presently known fields is counted with the field total even though at the time of drilling the field itself would have been known). The remaining 53 percent of the wells drilled in the Resource Area are abandoned, unproductive wildcat wells. Assuming this ratio remains stable over the life of the plan, and applying it to the 550 projected wells, it means 259 more field development wells and 291 more wildcat wells will be drilled.

The average well densities of all known fields and projected drilling rates were applied to the potential ratings. Existing wells were counted in each of the potential areas and compared to the total wells within the LSRA.

| Potential Rating | Wells |
|---|---|
| 4 | 96.8% |
| 3 | 3.0% |
| 2 | 0.2% |
| 1 | < 0.1% |

The varying density of existing development between potential areas was applied to the overall assumption of 550 wells over the life of the plan to determine an assumed level of

## Uinta Uplift

The subthrust play is highly speculative. The play area is located along the overridden thrust margins of basins. Possible reservoirs include any of the reservoirs previously discussed in the province. The depth of occurrence is unknown but is related to depths of sedimentary rocks beneath the hanging wall of the thrust margin.

The Southwestern Wyoming province probably contains more wells drilled for this objective than anywhere else in the U. S., and most certainly, in the Rocky Mountain region. However, the play is immature to moderately maturely explored. There are large areas that appear to be unevaluated. There are no fields in the play but the attributes of the play and the relatively unexplored nature of the play are intriguing.

## Park Range Uplift

The Park Range is the western most expression of the Transcontinental Arch. It is composed primarily of Precambrian granitic rock.

This area is considered to have no potential for oil and gas occurrence (since there are no source rocks) and therefore none for development, even though it is recognized that exploration could take place.

## OIL AND GAS ACTIVITY

### Historical Background

Relatively small discoveries in the 1920s opened oil fields in Moffat and Routt counties. Tow Creek and Moffat oil fields were found in 1924. The major gas fields of Hiawatha and Powder Wash, in Sand Wash Basin, were discovered in 1925 and 1931 respectively (Rountree 1984).

Since 1924, fields have been discovered at the average rate of one field annually with peak discoveries in the late 1950s. Oil and gas development peaked in the late 1950s or early 1960s. Since that time, activity has remained at a relatively stable development level. Even in the late 1970s and early 1980s, while drilling records were being broken elsewhere in the Rocky Mountains, drilling activity did not surpass the record set in 1959 for LSRA.

BLM_0005919

## APPENDIX B

development for each of the zones by applying the current ratio of wildcat wells to development wells.

This report is taken largely from Law, B.E. 1988.

B-34

BLM_0005920



Figure 1.--Index map showing location of the Southwestern Wyoming Basins province and major structural features.

BLM_0005921



Figure 2.—Structure contour map of part of the Southwestern Wyoming Basins province. Structural datum is the top of the Lower Cretaceous Dakota Sandstone. Contour interval 2,000 and 5,000 ft. Modified from Sheeters and Hale (1972).

BLM_0005922

**Figure 3    Oil and Gas Potential**

B-37

## LITTLE SNAKE RESOURCE AREA

Resource Area Boundary

1 - None
2 - Low
3 - Moderate
4 - High

Scale 1:1,000,000
1 inch equals Approximately 16 miles





N

COLORADO

BLM_0005923



Figure A. --Map showing approximate locations of plays in the Southwestern
      Wyoming Basins province.

BLM_0005924

## POTENTIAL FOR OCCURRENCE AND DEVELOPMENT OF OIL AND GAS IN THE NORTHEAST PLANNING AREA

### INTRODUCTION

The Northeast Planning Area (NPA) is situated within the Denver Basin and Las Animas Arch petroleum provinces (Figure 1). Hydrocarbons occur in lower Cretaceous sandstones of the Dakota Group (D and J sandstones), marine sandstones of the Pierre Shale, and the Permian Lyons Sandstone in the Denver Basin. The Las Animas Arch is productive from shelf carbonates and channel sands of the Pennsylvanian System (Topeka Limestone, Cherokee Limestone, Morrow Sandstone), and shelf carbonates from the Mississippian System (Spergen Osage Formations).

The Hotline database contains over 29,000 well records for the NPA and represents approximately 66 percent of the wells drilled in Colorado. The Denver Basin and Las Animas Arch provinces have been prolific oil and gas producers since oil was first discovered in Boulder County in 1901 from fractures in the Pierre Shale. Donaldson and MacMillan (1980) provide a detailed history of Colorado oil and gas development.

Federal mineral ownership, exclusive of the Pawnee National Grasslands, is minor and widely scattered. Less than 1 percent of the wells drilled were on BLM managed lands (surface ownership or split estate).

### PROSPECTIVELY VALUABLE FOR OIL AND GAS

Land described as prospectively valuable (PV) for oil and gas is based on criteria described in Appendix 1. PV lands for the NPA include all lands east of the Front Range (approximately R. 70 W.).

### OIL AND GAS POTENTIAL

Oil and gas potential rating criteria are described in Appendix 2 and is the basis for the ratings described below. Areas described by the U.S. Geological Survey (USGS) as a play have a high potential, and areas not PV have no potential unless otherwise noted.

## POTENTIAL OF DEVELOPMENT

### Denver Basin

Oil and gas reservoirs in the Denver basin are both stratigraphically and structurally controlled, as well as combinations thereof. The Denver Basin play report has not been released by the USGS. For the purpose of this report, the Denver Basin, as shown on Figure 2, is predominantly high potential with moderate around the basin margin.

### Las Animas Arch

The USGS has defined three plays in the Las Animas Arch area. Play areas (Figure 2) have a high potential for oil and gas, which are structurally trapped in carbonate and siliciclastic rocks of late Paleozoic age (Merewether 1987). The principal plays are a Mississippian structural play, Early Pennsylvanian stratigraphic play, and a Middle and Late Pennsylvanian stratigraphic play.

### OIL AND GAS ACTIVITY

#### Historical Background:

Since the discovery of the Boulder Field in 1901, over 27,500 wells have been drilled within the Planning Area. This analysis includes oil and gas activity from 1953 through 1988. During the period, 25,294 wells were drilled with 52.5 percent completed as dry holes (Figure 3). Development wells had a success rate of 72.8 percent, while wildcat wells were only 13.4 percent.

Table 1 is a matrix of drilling activity broken down by major mineral ownership (BLM, U.S. Forest Service (USFS), and Fee/State) and by well type (development and wildcat). Only 171 wells or .68 percent of the total wells drilled were on BLM administered lands (exclusive of the Pawnee Grasslands). Total federal wells, including those on the grasslands is 336 (1.4 percent). Figure 3 illustrates the drilling history for federal lands during 1953 through 1988.

County drilling activity on federal lands is shown in Table 2 and Figure 4. The majority of activity has been on USFS lands in Weld County. Activity on BLM lands has been concentrated in Yuma County in and near the Eckley and Beecher Island fields, western

B-39

BLM_0005925

## APPENDIX B

Logan County, and scattered throughout Morgan County.

## PRESENT ACTIVITY

Oil and gas activity in northeast Colorado has been on a down turn since 1984. This is due to market conditions resulting from the collapse of oil prices.

## REASONABLY FORESEEABLE DEVELOPMENT ACTIVITY

Historical trends, USGS estimates, mineral ownership patterns, and professional judgment were the key ingredients in formulating the reasonable foreseeable development scenario.

Field size varies greatly within the Denver Basin. Fields that include federal lands have an average of one to two wells drilled on BLM lands. For instance, the Wattenberg Field has 2,930 wells, of which only four are on BLM lands. However, the Battle Canyon and Eckley Fields contain a much larger percentage of federal lands and have 15 of 43 and 35 of 99 wells completed on federal (BLM administered) lands, respectively. Therefore, it seems reasonable to expect future activity on federal lands to be within the areas having the highest percentage of federal minerals.

Oil and gas activity has been concentrated in the eastern portion of the Pawnee National Grasslands and resulted in the discovery and development of the Sooner, Lilli, and West Lilli Fields. It is conceivable that similar activity could occur on BLM managed-lands covered by this analysis. Therefore, the drilling forecast will include the federal wells drilled in the grasslands.

Forecasting Activity Based on Historical Trends

Since 1953, a total of 336 wells have been completed within the Planning Area. Future oil and gas activity is difficult to predict; however, a sudden increase in the demand for oil and gas or price increases could trigger a larger exploration and development program in the Planning Area. Evaluation of past activity and professional judgment indicates it is reasonable to expect at least one cycle of increased activity during the next 20 years.

Trend analysis and statistical forecasting based on historical activity indicate that 454 wells are forecast to be drilled within the high potential areas (Figure 2). An additional 22 wells are projected for the moderate and low potential areas. This forecast is based on the following assumptions and is the worst case scenario:
- Best fit, forecast to historical trend
- 51 percent of the wells are development and 9 percent are wildcat
- 66 percent success rate for development and 13 percent for wildcat wells

Of the 454 wells forecast, 232 development and 222 wildcat wells will be drilled on federal lands. One hundred fifty-three development and 30 wildcat wells are expected to be completed for production in the high potential areas. Four wells are forecast for the Las Animas Arch play area. An additional 20 wells, with three successful completions, are projected for the moderate potential area, and two dry holes in the low potential area.

B-40

BLM_0005926



# NORTHEAST PLANNING AREA

   Planning Area Boundary

Front Range

Denver Basin

Las Animas Arch

**Figure 1**     **Major Structural Elements**

B-41

BLM_0005927





# NORTHEAST PLANNING AREA

Planning Area Boundary

1 - None
2 - Low
3 - Moderate
4 - High

**Figure 2**      **Oil and Gas Potential**

B-42

BLM_0005928



Figure 3.  Oil and gas drilling activity graph for Northeast
Resource Area (all lands).

BLM_0005929



Figure 4.   Oil and gas drilling activity graph for Northeast
Resource Area (Federal lands: BLM and FS).

B-44

BLM_0005930

TABLE 1. NORTHEAST RESOURCE AREA OIL AND GAS DRILLING HISTORY
(1953 - 1988)

| | BLM | | | | | | | | | FEDERAL | | | | | | TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DEVELOPMENT | | | WILDCAT | | | TOTAL | | | DEVELOPMENT | | | WILDCAT | | | FEDERAL | | |
| YEAR | D&A | PWR | TOTAL | D&A | PWR | TOTAL | D&A | PWR | TOTAL | D&A | PWR | TOTAL | D&A | PWR | TOTAL | D&A | PWR | TOTAL |
| 1953 | 1 | 0 | 1 | 1 | 1 | 2 | 2 | 1 | 3 | 1 | 0 | 1 | 2 | 1 | 3 | 3 | 1 | 4 |
| 1954 | 2 | 1 | 3 | 2 | 1 | 3 | 4 | 2 | 6 | 2 | 1 | 3 | 5 | 1 | 6 | 7 | 2 | 9 |
| 1955 | 0 | 3 | 3 | 4 | 0 | 4 | 4 | 3 | 7 | 1 | 12 | 13 | 5 | 0 | 5 | 6 | 12 | 18 |
| 1956 | 4 | 7 | 11 | 1 | 0 | 1 | 5 | 7 | 12 | 6 | 8 | 14 | 3 | 1 | 4 | 9 | 9 | 18 |
| 1957 | 2 | 1 | 3 | 2 | 0 | 2 | 4 | 1 | 5 | 3 | 2 | 5 | 9 | 2 | 11 | 12 | 4 | 16 |
| 1958 | 1 | 1 | 2 | 4 | 0 | 4 | 5 | 1 | 6 | 3 | 1 | 4 | 11 | 0 | 11 | 14 | 1 | 15 |
| 1959 | 1 | 1 | 2 | 2 | 0 | 2 | 3 | 1 | 4 | 1 | 1 | 2 | 8 | 0 | 8 | 9 | 1 | 10 |
| 1960 | 0 | 0 | 0 | 4 | 0 | 4 | 4 | 0 | 4 | 0 | 0 | 0 | 4 | 0 | 4 | 4 | 0 | 4 |
| 1961 | 0 | 0 | 0 | 3 | 0 | 3 | 3 | 0 | 3 | 0 | 0 | 0 | 5 | 0 | 5 | 5 | 0 | 5 |
| 1962 | 0 | 1 | 1 | 3 | 1 | 4 | 3 | 2 | 5 | 1 | 3 | 4 | 4 | 2 | 6 | 5 | 5 | 10 |
| 1963 | 1 | 0 | 1 | 3 | 0 | 3 | 4 | 0 | 4 | 3 | 0 | 3 | 1 | 1 | 2 | 4 | 1 | 5 |
| 1964 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 |
| 1965 | 1 | 0 | 1 | 1 | 0 | 1 | 2 | 0 | 2 | 1 | 0 | 1 | 2 | 0 | 2 | 3 | 0 | 3 |
| 1966 | 1 | 0 | 1 | 1 | 0 | 1 | 2 | 0 | 2 | 1 | 1 | 2 | 1 | 0 | 1 | 2 | 1 | 3 |
| 1967 | 1 | 1 | 2 | 1 | 0 | 1 | 2 | 1 | 3 | 1 | 2 | 3 | 2 | 0 | 2 | 3 | 2 | 5 |
| 1968 | 1 | 0 | 1 | 3 | 0 | 3 | 4 | 0 | 4 | 2 | 0 | 2 | 5 | 0 | 5 | 7 | 0 | 7 |
| 1969 | 0 | 0 | 0 | 6 | 0 | 6 | 6 | 0 | 6 | 2 | 0 | 2 | 11 | 1 | 12 | 13 | 1 | 14 |
| 1970 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 8 | 1 | 9 | 8 | 1 | 9 |
| 1971 | 2 | 0 | 2 | 5 | 0 | 5 | 7 | 0 | 7 | 3 | 1 | 4 | 7 | 0 | 7 | 10 | 1 | 11 |
| 1972 | 0 | 0 | 0 | 3 | 0 | 3 | 3 | 0 | 3 | 1 | 0 | 1 | 5 | 1 | 6 | 6 | 1 | 7 |
| 1973 | 0 | 1 | 1 | 0 | 1 | 1 | 0 | 2 | 2 | 1 | 1 | 2 | 2 | 1 | 3 | 3 | 2 | 5 |
| 1974 | 2 | 2 | 4 | 2 | 0 | 2 | 4 | 2 | 6 | 2 | 2 | 4 | 2 | 0 | 2 | 4 | 2 | 6 |
| 1975 | 1 | 0 | 1 | 2 | 1 | 3 | 3 | 1 | 4 | 1 | 0 | 1 | 4 | 1 | 5 | 5 | 1 | 6 |
| 1976 | 2 | 1 | 3 | 2 | 0 | 2 | 4 | 1 | 5 | 2 | 1 | 3 | 4 | 0 | 4 | 6 | 1 | 7 |
| 1977 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 | 1 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 1 |
| 1978 | 0 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 2 | 0 | 1 | 1 | 2 | 0 | 2 | 2 | 1 | 3 |
| 1979 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 2 |
| 1980 | 0 | 2 | 2 | 1 | 2 | 3 | 1 | 4 | 5 | 0 | 3 | 3 | 0 | 0 | 0 | 0 | 3 | 3 |
| 1981 | 1 | 12 | 13 | 4 | 2 | 6 | 5 | 14 | 19 | 3 | 14 | 17 | 6 | 2 | 8 | 9 | 16 | 25 |
| 1982 | 3 | 2 | 5 | 0 | 0 | 0 | 3 | 2 | 5 | 5 | 5 | 10 | 2 | 0 | 2 | 7 | 5 | 12 |
| 1983 | 0 | 0 | 0 | 2 | 0 | 2 | 2 | 0 | 2 | 2 | 2 | 4 | 3 | 0 | 3 | 5 | 2 | 7 |
| 1984 | 1 | 14 | 15 | 2 | 0 | 2 | 3 | 14 | 17 | 1 | 16 | 17 | 7 | 0 | 7 | 8 | 16 | 24 |
| 1985 | 1 | 0 | 1 | 1 | 1 | 2 | 2 | 1 | 3 | 2 | 2 | 4 | 1 | 2 | 3 | 3 | 4 | 7 |
| 1986 | 1 | 6 | 7 | 1 | 0 | 1 | 2 | 6 | 8 | 2 | 9 | 11 | 6 | 1 | 7 | 8 | 10 | 18 |
| 1987 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 12 | 13 | 4 | 1 | 5 | 5 | 13 | 18 |
| 1988 | 0 | 2 | 2 | 0 | 1 | 1 | 0 | 3 | 3 | 2 | 13 | 15 | 1 | 2 | 3 | 3 | 15 | 18 |
| Totals==> | 31 | 61 | 92 | 68 | 11 | 79 | 99 | 72 | 171 | 58 | 114 | 172 | 143 | 21 | 164 | 201 | 135 | 336 |

| | FEE/STATE | | | | | | TOTAL | | | | | | GRAND TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | DEVELOPMENT | | | WILDCAT | | | DEVELOPMENT | | | WILDCAT | | | | | |
| YEAR | D&A | PWR | TOTAL | D&A | PWR | TOTAL | D&A | PWR | TOTAL | D&A | PWR | TOTAL | D&A | PWR | TOTAL |
| 1953 | 55 | 223 | 278 | 252 | 41 | 293 | 56 | 224 | 280 | 254 | 42 | 296 | 310 | 266 | 576 |
| 1954 | 114 | 458 | 572 | 534 | 87 | 621 | 116 | 459 | 575 | 539 | 88 | 627 | 655 | 547 | 1202 |
| 1955 | 199 | 379 | 578 | 656 | 84 | 740 | 200 | 379 | 579 | 661 | 84 | 745 | 861 | 463 | 1324 |
| 1956 | 146 | 197 | 343 | 513 | 50 | 563 | 152 | 198 | 350 | 516 | 51 | 567 | 668 | 249 | 917 |
| 1957 | 88 | 117 | 205 | 325 | 33 | 358 | 91 | 119 | 210 | 334 | 35 | 369 | 425 | 154 | 579 |
| 1958 | 121 | 117 | 238 | 318 | 40 | 358 | 124 | 117 | 241 | 329 | 40 | 369 | 453 | 157 | 610 |
| 1959 | 103 | 119 | 222 | 259 | 34 | 293 | 104 | 119 | 223 | 267 | 34 | 301 | 371 | 153 | 524 |
| 1960 | 66 | 74 | 140 | 150 | 16 | 166 | 66 | 74 | 140 | 154 | 16 | 170 | 220 | 90 | 310 |
| 1961 | 72 | 60 | 132 | 166 | 10 | 176 | 72 | 60 | 132 | 171 | 10 | 181 | 243 | 70 | 313 |
| 1962 | 90 | 105 | 195 | 273 | 13 | 286 | 91 | 107 | 198 | 277 | 15 | 292 | 368 | 122 | 490 |
| 1963 | 88 | 77 | 165 | 175 | 7 | 182 | 91 | 78 | 169 | 176 | 8 | 184 | 267 | 86 | 353 |
| 1964 | 79 | 60 | 139 | 177 | 9 | 186 | 80 | 60 | 140 | 177 | 9 | 186 | 257 | 69 | 326 |
| 1965 | 76 | 50 | 126 | 182 | 3 | 185 | 77 | 50 | 127 | 184 | 3 | 187 | 261 | 53 | 314 |
| 1966 | 66 | 71 | 137 | 157 | 8 | 165 | 67 | 71 | 138 | 158 | 8 | 166 | 225 | 79 | 304 |
| 1967 | 75 | 60 | 135 | 117 | 10 | 127 | 76 | 60 | 136 | 119 | 10 | 129 | 195 | 70 | 265 |
| 1968 | 72 | 61 | 133 | 157 | 8 | 165 | 74 | 61 | 135 | 162 | 8 | 170 | 236 | 69 | 305 |
| 1969 | 81 | 91 | 172 | 363 | 14 | 377 | 83 | 92 | 175 | 374 | 15 | 389 | 457 | 107 | 564 |
| 1970 | 72 | 96 | 168 | 290 | 24 | 314 | 72 | 97 | 169 | 298 | 25 | 323 | 370 | 122 | 492 |
| 1971 | 107 | 173 | 280 | 407 | 52 | 459 | 110 | 173 | 283 | 414 | 52 | 466 | 524 | 225 | 749 |
| 1972 | 106 | 220 | 326 | 237 | 37 | 274 | 107 | 221 | 328 | 242 | 38 | 280 | 349 | 259 | 608 |
| 1973 | 60 | 242 | 302 | 212 | 25 | 237 | 61 | 243 | 304 | 214 | 26 | 240 | 275 | 269 | 544 |
| 1974 | 59 | 250 | 309 | 184 | 31 | 215 | 61 | 250 | 311 | 186 | 31 | 217 | 247 | 281 | 528 |
| 1975 | 106 | 417 | 523 | 254 | 32 | 286 | 107 | 418 | 525 | 258 | 33 | 291 | 365 | 451 | 816 |
| 1976 | 87 | 445 | 532 | 198 | 25 | 223 | 89 | 445 | 534 | 202 | 25 | 227 | 291 | 470 | 761 |
| 1977 | 74 | 333 | 407 | 211 | 50 | 261 | 75 | 333 | 408 | 211 | 50 | 261 | 286 | 383 | 669 |
| 1978 | 99 | 284 | 383 | 210 | 71 | 281 | 99 | 284 | 383 | 212 | 71 | 283 | 311 | 355 | 666 |
| 1979 | 199 | 515 | 714 | 424 | 114 | 538 | 199 | 515 | 714 | 425 | 114 | 539 | 624 | 629 | 1253 |
| 1980 | 122 | 329 | 451 | 214 | 59 | 273 | 122 | 329 | 451 | 214 | 59 | 273 | 336 | 388 | 724 |
| 1981 | 182 | 561 | 743 | 292 | 79 | 371 | 185 | 563 | 748 | 298 | 81 | 379 | 483 | 644 | 1127 |
| 1982 | 213 | 669 | 882 | 261 | 72 | 333 | 218 | 669 | 887 | 263 | 72 | 335 | 481 | 741 | 1222 |
| 1983 | 152 | 608 | 760 | 201 | 66 | 267 | 154 | 608 | 762 | 204 | 66 | 270 | 358 | 674 | 1032 |
| 1984 | 187 | 843 | 1030 | 243 | 53 | 296 | 188 | 843 | 1031 | 250 | 53 | 303 | 438 | 896 | 1334 |
| 1985 | 168 | 768 | 936 | 251 | 63 | 314 | 170 | 770 | 940 | 252 | 65 | 317 | 422 | 835 | 1257 |
| 1986 | 96 | 575 | 671 | 115 | 21 | 136 | 98 | 576 | 674 | 121 | 22 | 143 | 219 | 598 | 817 |
| 1987 | 108 | 497 | 605 | 110 | 70 | 180 | 109 | 498 | 607 | 114 | 71 | 185 | 223 | 569 | 792 |
| 1988 | 100 | 401 | 501 | 105 | 14 | 119 | 102 | 403 | 505 | 106 | 16 | 122 | 208 | 419 | 627 |
| Totals==> | 3888 | 10545 | 14433 | 9193 | 1425 | 10618 | 3946 | 10566 | 14512 | 9336 | 1446 | 10782 | 13282 | 12012 | 25294 |

TABLE 2.  COUNTY DRILLING ACTIVITY TOTALS ON FEDERAL LANDS **
(1953-1988)

| COUNTY | DEVELOPMENT | | | WILDCAT | | | TOTALS | | | |
| | D&A | PWR | TOTAL | D&A | PWR | TOTAL | D&A | PWR | TOTAL | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Adams | 4 | 0 | 4 | 2 | 1 | 3 | 6 | 1 | 7 | 2.08% |
| Kit Carson | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 1 | 1 | 0.30% |
| Logan | 7 | 0 | 7 | 15 | 2 | 17 | 22 | 2 | 24 | 7.12% |
| Morgan | 6 | 15 | 21 | 29 | 3 | 32 | 35 | 18 | 53 | 15.73% |
| Sedgwick | 0 | 2 | 2 | 1 | 0 | 1 | 1 | 2 | 3 | 0.89% |
| Washington | 6 | 1 | 7 | 16 | 0 | 16 | 22 | 1 | 23 | 6.82% |
| Weld:  FS | 31 | 61 | 92 | 68 | 11 | 79 | 99 | 72 | 171 | 50.74% |
| Weld:  BLM | 0 | 3 | 3 | 12 | 2 | 14 | 12 | 5 | 17 | 5.04% |
| Yuma | 4 | 32 | 36 | 1 | 1 | 2 | 5 | 33 | 38 | 11.28% |
| TOTALS==> | 58 | 114 | 172 | 144 | 21 | 165 | 202 | 135 | 337 | 100.00% |

** - Forest Service lands only in Weld County

BLM_0005932

## POTENTIAL FOR OCCURRENCE AND DEVELOPMENT OF OIL AND GAS IN THE SAN JUAN/SAN MIGUEL PLANNING AREA

### INTRODUCTION

The San Juan/San Miguel Planning Area (SJ/SMPA) is situated within the San Juan Basin and Paradox Basin petroleum provinces (Figure 1). Tectonic elements of the region are illustrated in Figure 2. Both basins are classified as craton-accreted margin basins, characterized by two or more cycles of deposition. The cycles typically consist of a carbonate shelf or platform sediments followed by a second cycle of orogenic clastics. The cycles occurred during the Paleozoic and upper Cretaceous to Oligocene, respectively.

### PROSPECTIVELY VALUABLE FOR OIL AND GAS

Land described as prospectively valuable (PV) for oil and gas is based on criteria described in Appendix 1. PV lands for the SJ/SMPA are shown in Figure 3. Areas not designated as PV are rated as having no potential.

### OIL AND GAS POTENTIAL

Oil and gas potential rating criteria are described in Appendix 2 and are the basis for the ratings described below. Areas defined by the USGS as a play have a high potential for oil and gas.

#### San Juan Basin

Oil and gas reservoirs in the San Juan Basin are partially stratigraphically controlled. Huffman (1988) describes production from the central part of the basin as controlled by hydrodynamic forces and stratigraphy. Basin margin production is predominantly controlled by stratigraphy and structure. Pennsylvanian oil production is found along the northwestern margin of the basin and is restricted to porous biothermal carbonate buildups.

The USGS has defined seven plays in the San Juan Basin. Only six of the plays are found in the SJ/SMPA. They are the Pennsylvania, Dakota, Gallup, Mesaverde,

## POTENTIAL OF DEVELOPMENT

Pictured Cliffs, and Fruitland/Kirtland plays (Figures 4-9). A detailed description of each play can be found in Huffman (1988).

#### Paradox Basin

Oil and gas reservoirs in the Paradox Basin are both structural and stratigraphic, as well as combination traps. The principal reservoirs are developed in the Pennsylvanian Hermosa Group. Porous carbonate bioherm buildups trap oil and gas (i.e., including $CO_2$ at McElmo Dome Field) in the Paradox Formation. The younger Honaker Trail Formation contains gas reservoirs in fluvial basin margin sandstones and conglomerates.

The USGS report on the Paradox Basin plays has not been released. However, the Pennsylvanian play boundary is shown in the San Juan Basin report (Huffman 1988; Figure 4).

The majority of the Planning Area (Figure 4) is within the Pennsylvanian play, as defined by the USGS.

### OIL AND GAS ACTIVITY

#### Historical Background

Several dry holes were drilled prior to the discovery of the Red Mesa Field in the San Juan Basin in 1924 and the 1944 discovery of the McElmo Field in the Paradox Basin. Oil and gas exploration has accelerated through the 1930s, late 1940s to mid-1950s, through the 1960s, and peaked since the mid-1970s (Figure 10; Table 1). Present activity is due primarily to development of coal bed methane in the northern San Juan Basin.

Production has been from 16 fields in the Paradox Basin and nine fields in the San Juan Basin. Tables 2 and 3 illustrate development and wildcat wells drilled on BLM, U.S. Forest Service (USFS), and Fee/State lands for the Paradox and San Juan Basins, respectively. Approximately 68 percent of the Paradox Basin wells are drilled on BLM lands, while only 7 percent in the San Juan Basin.

Cumulative production from all fields in the Paradox Basin, through 1987, has been 10,529,390 BO and 72,556,573 MCFG, as well as 555,198,284 MCFG of $CO_2$ produced from the McElmo Field (Table 4).

BLM_0005933

## APPENDIX B

San Juan Basin production during the same period was 8,349,066 BO and 850,944,153 MCFG (Table 5). Oil and gas production from federal wells has been 9,645,030 BO and 68,472,003 MCFG, as well as 555,198,284 MCF of $CO_2$ from the Paradox (Table 6), while production from the San Juan amounted to 8,987 BO and 52 MCFG (Table 1).

Federal wells account for approximately 91 percent of oil, 94 percent of gas, and 100 percent of $CO_2$ in the Paradox and less than 1 percent of oil in the San Juan Basin.

### PRESENT ACTIVITY

Exploration and development activity has generally declined from the high activity of 1980-1981 (Table 1) for conventional reservoirs. However, tax incentives for the development of coal-bed methane has resulted in maintaining a fairly high level of activity.

### REASONABLY FORESEEABLE DEVELOPMENT ACTIVITY

Historical trends, USGS estimates, present activity, and professional judgment were used to formulate the reasonably foreseeable development (RFD) scenario for oil and gas activity in the SJ/SMPA. The main problem encountered with this evaluation is that the USGS hydrocarbon play analysis (Huffman 1988; Unreleased Report on Paradox Basin) and the Planning Area boundaries do not coincide. For this reason, the RFD scenario will be based on forecasting activity based on historical trends.

Forecasting Activity Based on Historical Trends

Since 1902, a total of 919 wells have been completed within the Planning Area (exclusive of Indian lands). Future oil and gas activity is difficult to predict; however, a sudden increase in the demand for oil and gas or price increases could trigger a larger exploration and development program. Evaluation of past activity and personal judgment indicates it is reasonable to expect at least one cycle of increased drilling activity during the next 20 years.

Trend analysis and statistical forecasting based on historical activity (Gardner 1988)

was developed on two main assumptions outlined below:

A. Tax credits for coal-bed methane and continued past 1990.

    1. Low development scenario.
       a. Best fit of forecast wells to actual historical wells drilled
       b. San Juan Basin
          (1) 55% total wells forecast
          (2) 7% on BLM: 43% development with 31% success rate and 57% wildcat with 10% success rate
       c. Paradox Basin
          (1) 45% total wells forecast
          (2) 68% on BLM: 60% development with 67% success rate and 40% development with 19% success rate

    2. High development scenario
       a. Best fit, statistically with lowest mean squared error
       b. As above in low development scenario
       c. As above in low development scenario

B. Tax credits for coal-bed methane not continued past 1990

    1. Low development scenario
       a. As above in A
       b. As above in A
       c. As above in A

    2. High development scenario
       a. As above in A
       b. As above in A
       c. As above in A

A total of 540 and 1,024 wells, respectively, are forecast under the low and high development scenarios of the forecast based on continuation of the tax credits; while 508 and 981 wells, respectively, are forecast under the forecast based on the tax credits being eliminated (Table 8).

The high development scenario is considered to be the worst case scenario that will be used to develop the oil and gas activity projection. Development drilling in the Paradox Basin is expected to be concentrated within and near existing fields, especially within the Blanding

B-48

BLM_0005934

## POTENTIAL OF DEVELOPMENT

Basin and Four Corners Carbonate Platform
(Figure 2). A total of 313 wells are projected
to be drilled on BLM lands, of which 188
will be development wells and 125 will be
wildcat wells. This projection will result in
126 development and 24 exploratory wells
completed for production within the areas
shown on Figure 11 (Table 9).

The San Juan Basin portion of the Planning
Area is expected to have about 40 wells
drilled on BLM lands (Figure 11). Sixteen of
the wells are projected to be development and
24 exploratory. Five of the development and
three of the exploratory wells will be
completed for production.

B-49

BLM_0005935



SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

Field

Figure 1   Major Oil and Gas Fields

B-50



**Figure 2.**--Structural elements in the vicinity of the San Juan Basin petroleum province (modified after Kelley and Clinton, 1960; Grose, 1972; and Woodward, 1974).

BLM_0005937



**SAN JUAN/SAN MIGUEL PLANNING AREA**

Planning Area Boundary

Valuable for Oil and Gas

Figure 3

Prospectively Valuable Lands

B-52

BLM_0005938



Figure 4    Pennsylvanian Play

B-53

SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

Play

BLM_0005939



SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

Play

Figure 5

Dakota Play

B-54

BLM_0005940



SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

Play

Figure 6   Gallup Play

B-55



**SAN JUAN/SAN MIGUEL PLANNING AREA**

Planning Area Boundary

Play

Figure 7   Mesa Verde Play

B-56

BLM_0005942



**SAN JUAN/SAN MIGUEL PLANNING AREA**

Planning Area Boundary

Play

Figure 8    Pictured Cliffs Play

B-57

BLM_0005943



SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

Play

Figure 9

B-58

Fruitland/Kirtland Play

BLM_0005944



Figure 10.  Oil and gas activity graph for the San Juan Resource Area
(1926 – 1988).

BLM_0005945



**Figure 11   Oil and Gas Potential**

B-60

# SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

Oil and Gas Potential
1 - None
2 - Low
3 - Moderate
4 - High

BLM_0005946

TABLE 1a.  OIL AND GAS ACTIVITY FOR SAN JUAN RESOURCE AREA (1902 – 1988)

| YEAR | BLM | | | FS | | | FEE/ST | | | GT | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | P&A | PWR/SI | TOTAL | P&A | PWR/SI | TOTAL | P&A | PWR/SI | TOTAL | P&A | PWR/SI | TOTAL |
| 1902 | 1 | | 1 | | | 0 | | | 0 | 1 | 0 | 1 |
| 1903 | | | 0 | | | 0 | 4 | | 4 | 4 | 0 | 4 |
| 1904 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1905 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1906 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1907 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1908 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1909 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1910 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1911 | 1 | | 1 | | | 0 | | | 0 | 1 | 0 | 1 |
| 1912 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1913 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1914 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1915 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1916 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1917 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1918 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1919 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1920 | | | 0 | | | 0 | 2 | | 2 | 2 | 0 | 2 |
| 1921 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1922 | | 1 | 1 | | | 0 | | | 0 | | 1 | 1 |
| 1923 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1924 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1925 | | | 0 | | | 0 | 1 | | 1 | 1 | 0 | 1 |
| 1926 | | | 0 | | | 0 | 1 | | 1 | 1 | 0 | 1 |
| 1927 | | | 0 | | | 0 | 1 | | 1 | 1 | 0 | 1 |
| 1928 | 1 | | 1 | | | 0 | 1 | | 1 | 2 | 0 | 2 |
| 1929 | | | 0 | | | 0 | 2 | | 2 | 2 | 0 | 2 |
| 1930 | | | 0 | 1 | | 1 | 3 | | 3 | 4 | 0 | 4 |
| 1931 | | | 0 | | | 0 | 7 | 1 | 8 | 7 | 1 | 8 |
| 1932 | | 1 | 1 | | | 0 | 1 | 1 | 2 | 1 | 2 | 3 |
| 1933 | | 1 | 1 | | | 0 | 2 | | 2 | 2 | 1 | 3 |
| 1934 | | | 0 | | | 0 | 1 | | 1 | 1 | 0 | 1 |
| 1935 | | | 0 | | | 0 | 2 | 1 | 3 | 2 | 1 | 3 |
| 1936 | | | 0 | | | 0 | 9 | 4 | 13 | 9 | 4 | 13 |
| 1937 | | | 0 | | | 0 | 2 | 1 | 3 | 2 | 1 | 3 |
| 1938 | | | 0 | | | 0 | 1 | | 1 | 1 | 0 | 1 |
| 1939 | | | 0 | | | 0 | 2 | 3 | 5 | 2 | 3 | 5 |
| 1940 | | | 0 | | | 0 | 1 | 2 | 3 | 1 | 2 | 3 |
| 1941 | | | 0 | | | 0 | 2 | | 2 | 2 | 0 | 2 |
| 1942 | | | 0 | | | 0 | 1 | | 1 | 1 | 0 | 1 |
| 1943 | | | 0 | | | 0 | | | 0 | 0 | 0 | 0 |
| 1944 | | | 0 | | | 0 | 2 | 3 | 5 | 2 | 3 | 5 |
| 1945 | | | 0 | | | 0 | 1 | 2 | 3 | 1 | 2 | 3 |
| 1946 | | | 0 | | | 0 | 1 | | 1 | 1 | 0 | 1 |
| 1947 | 1 | | 1 | | | 0 | 6 | 3 | 9 | 7 | 3 | 10 |
| 1948 | 1 | 3 | 4 | 2 | | 2 | 7 | 7 | 14 | 10 | 10 | 20 |
| 1949 | 2 | | 2 | 1 | | 1 | 7 | 4 | 11 | 10 | 4 | 14 |
| 1950 | 1 | | 1 | | | 0 | 3 | 2 | 5 | 4 | 2 | 6 |
| 1951 | 2 | | 2 | | | 0 | 2 | 5 | 7 | 4 | 5 | 9 |
| 1952 | | | 0 | | | 0 | 4 | 1 | 5 | 4 | 1 | 5 |
| 1953 | | | 0 | | | 0 | 2 | 1 | 3 | 2 | 1 | 3 |
| 1954 | 1 | | 1 | 1 | | 1 | 2 | | 2 | 4 | 0 | 4 |
| 1955 | 3 | | 3 | | | 0 | 2 | 3 | 5 | 5 | 3 | 8 |
| 1956 | 2 | 1 | 3 | 1 | | 1 | 11 | | 11 | 14 | 1 | 15 |
| 1957 | 11 | | 11 | | | 0 | 16 | 4 | 20 | 27 | 4 | 31 |
| 1958 | 9 | 1 | 10 | 1 | | 1 | 7 | | 7 | 17 | 1 | 18 |
| 1959 | 9 | 2 | 11 | | 1 | 1 | 3 | 1 | 4 | 12 | 4 | 16 |
| 1960 | 9 | 6 | 15 | 2 | | 2 | 3 | 2 | 5 | 14 | 8 | 22 |
| 1961 | 2 | 3 | 5 | 1 | 1 | 2 | 3 | | 3 | 6 | 4 | 10 |
| 1962 | 3 | 3 | 6 | 2 | | 2 | 6 | | 6 | 11 | 3 | 14 |
| 1963 | 8 | 2 | 10 | | | 0 | 1 | 1 | 2 | 9 | 3 | 12 |
| 1964 | 2 | 2 | 4 | 1 | | 1 | 3 | | 3 | 6 | 2 | 8 |
| 1965 | 5 | 8 | 13 | | | 0 | 4 | | 4 | 9 | 8 | 17 |
| 1966 | 5 | | 5 | 1 | | 1 | 2 | | 2 | 8 | 0 | 8 |

B-61

BLM_0005947

TABLE 1b.   OIL AND GAS ACTIVITY FOR SAN JUAN RESOURCE AREA (1902 - 1988)

| Year | BLM D&A | BLM PWR/SI | BLM TOTAL | FS D&A | FS PWR/SI | FS TOTAL | FEE/ST D&A | FEE/ST PWR/SI | FEE/ST TOTAL | GT D&A | GT PWR/SI | GT TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1967 | 2 | 4 | 6 | 2 | | 2 | 3 | | 3 | 7 | 4 | 11 |
| 1968 | 6 | 2 | 8 | 2 | | 2 | 2 | | 2 | 10 | 2 | 12 |
| 1969 | 4 | 1 | 5 | 1 | | 1 | 5 | 1 | 6 | 10 | 2 | 12 |
| 1970 | 8 | 3 | 11 | 6 | | 6 | 1 | | 1 | 15 | 3 | 18 |
| 1971 | 3 | 3 | 6 | 1 | | 1 | 1 | 2 | 3 | 5 | 5 | 10 |
| 1972 | 2 | 3 | 5 | | | 0 | 2 | | 2 | 4 | 3 | 7 |
| 1973 | 4 | 3 | 7 | 2 | | 2 | 5 | | 5 | 11 | 3 | 14 |
| 1974 | 3 | 2 | 5 | 1 | | 1 | 6 | 3 | 9 | 10 | 5 | 15 |
| 1975 | 6 | 3 | 9 | | | 0 | 8 | 11 | 19 | 14 | 14 | 28 |
| 1976 | 5 | 3 | 8 | | | 0 | 33 | 5 | 38 | 38 | 8 | 46 |
| 1977 | 7 | 3 | 10 | 1 | 1 | 2 | 8 | 13 | 21 | 16 | 17 | 33 |
| 1978 | 2 | 6 | 8 | | 2 | 2 | 6 | 5 | 11 | 8 | 13 | 21 |
| 1979 | 3 | 5 | 8 | | | 0 | 5 | 9 | 14 | 8 | 14 | 22 |
| 1980 | 4 | 2 | 6 | | | 0 | 14 | 8 | 22 | 18 | 10 | 28 |
| 1981 | 3 | 2 | 5 | 4 | 3 | 7 | 25 | 21 | 46 | 32 | 26 | 58 |
| 1982 | 5 | 6 | 11 | 6 | 2 | 8 | 31 | 8 | 39 | 42 | 16 | 58 |
| 1983 | 4 | 15 | 19 | | 1 | 1 | 13 | 8 | 21 | 17 | 24 | 41 |
| 1984 | 7 | 25 | 32 | | 1 | 1 | 9 | 8 | 17 | 16 | 34 | 50 |
| 1985 | 8 | 9 | 17 | 2 | 2 | 4 | 7 | 7 | 14 | 17 | 18 | 35 |
| 1986 | 7 | 1 | 8 | 1 | 8 | 9 | 3 | 8 | 11 | 11 | 17 | 28 |
| 1987 | 3 | 3 | 6 | | 1 | 1 | 2 | 4 | 6 | 5 | 8 | 13 |
| 1988 | 4 | 1 | 5 | 2 | 3 | 5 | 6 | 18 | 24 | 12 | 22 | 34 |
| TOTALS== | 179 | 139 | 318 | 45 | 26 | 71 | 339 | 191 | 530 | 563 | 356 | 919 |

TABLE  2.  FIELD SUMMARY SJRA PARADOX BASIN

| FIELD | BLM D&A | BLM PWR/SI | BLM TOTAL | FS D&A | FS PWR/SI | FS TOTAL | FEE/ST D&A | FEE/ST PWR/SI | FEE/ST TOTAL | GT D&A | GT PWR/SI | GT TOTAL | BLM % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Andy's Mesa | 2 | 5 | 7 | | | | | | | 2 | 5 | 7 | 100.00% |
| Cache | 0 | 9 | 9 | | | | | | | 0 | 9 | 9 | 100.00% |
| Cahone | 1 | 0 | 1 | | | | | | | 1 | 0 | 1 | 100.00% |
| Dove Ck | 2 | 1 | 3 | | | | 7 | 2 | 9 | 9 | 3 | 12 | 25.00% |
| Dry Ck | 1 | 0 | 1 | | | | | | | 1 | 0 | 1 | 100.00% |
| Egnar | 1 | 1 | 2 | | | | 1 | 0 | 1 | 2 | 1 | 3 | 66.67% |
| Flodine Pk | 12 | 8 | 20 | | | | | | | 12 | 8 | 20 | 100.00% |
| Flodine Pk, E. | 0 | 1 | 1 | | | | | | | 0 | 1 | 1 | 100.00% |
| Goodman Pt | 4 | 0 | 4 | | | | | | | 4 | 0 | 4 | 100.00% |
| Hamilton Ck | 1 | 1 | 2 | | | | 0 | 3 | 3 | 1 | 4 | 5 | 40.00% |
| Kernan Canyon | 2 | 0 | 2 | | | | 0 | 4 | 4 | 2 | 4 | 6 | 33.33% |
| Lisbon, SE | 2 | 2 | 4 | | | | | | | 2 | 2 | 4 | 100.00% |
| McClean | 2 | 2 | 4 | | | | 0 | 1 | 1 | 2 | 3 | 5 | 80.00% |
| McElmo | 12 | 50 | 62 | 1 | 0 | 1 | 2 | 6 | 8 | 15 | 56 | 71 | 87.32% |
| Papoose Canyon | 14 | 33 | 47 | | | | 2 | 5 | 7 | 16 | 38 | 54 | 87.04% |
| Squaw Ck | | | | | | | 1 | 1 | 2 | 1 | 1 | 2 | 0.00% |
| Wildcat | 91 | 21 | 112 | 17 | 7 | 24 | 59 | 15 | 74 | 167 | 43 | 210 | 53.33% |
| TOTALS==> | 147 | 134 | 281 | 18 | 7 | 25 | 72 | 37 | 109 | 237 | 178 | 415 | 67.71% |

B-62

BLM_0005948

TABLE 3. FIELD SUMMARY SJRA SAN JUAN BASIN

| FIELD | BLM | | | FS | | | FEE/ST | | | GT | | | BLM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | D&A | PWR/SI | TOTAL | D&A | PWR/SI | TOTAL | D&A | PWR/SI | TOTAL | D&A | PWR/SI | TOTAL | % |
| Chromo | | | | | | | 19 | 23 | 42 | 19 | 23 | 42 | 0.00% |
| Iganco Blanco | | | | 2 | 15 | 17 | 3 | 36 | 39 | 5 | 51 | 56 | 0.00% |
| Mancos River | 3 | 0 | 3 | | | | 22 | 2 | 24 | 25 | 2 | 27 | 11.11% |
| Menefee Mtn | 1 | 0 | 1 | | | | 12 | 14 | 26 | 13 | 14 | 27 | 3.70% |
| Navajo | | | | | | | 1 | 4 | 5 | 1 | 4 | 5 | 0.00% |
| Point Lookout | 1 | 0 | 1 | | | | 7 | 1 | 8 | 8 | 1 | 9 | 11.11% |
| Price Gramps | 1 | 1 | 2 | | | | 24 | 41 | 65 | 25 | 42 | 67 | 2.99% |
| Red Mesa | | | | | | | 1 | 0 | 1 | 1 | 0 | 1 | 0.00% |
| Sierra | 5 | 4 | 9 | | | | 38 | 20 | 58 | 43 | 24 | 67 | 13.43% |
| Wildcat | 21 | 0 | 21 | 25 | 4 | 29 | 140 | 13 | 153 | 186 | 17 | 203 | 10.34% |
| TOTALS==> | 32 | 5 | 37 | 27 | 19 | 46 | 267 | 154 | 421 | 326 | 178 | 504 | 7.34% |
| GT======> | 179 | 139 | 318 | 45 | 26 | 71 | 339 | 191 | 530 | 563 | 356 | 919 | 34.60% |

TABLE 4. TOTAL FIELD PRODUCTION SJRA PARADOX BASIN

| | | | | 1987 | CUMULATIVE | |
|---|---|---|---|---|---|---|
| FIELD | SI | PWR | OIL | GAS | OIL | GAS |
| Andy's Mesa | 0 | 7 | 0 | 429,356 | 21,184 | 17,405,075 |
| Cache | 3 | 9 | 64,272 | 36,463 | 3,906,168 | 7,020,736 |
| Cahone | 0 | 1 | 6,398 | 14,972 | 17,791 | 40,430 |
| Dove Ck | 1 | 0 | 0 | 0 | 82,961 | 946,234 |
| Flodine Pk | 2 | 7 | 33,662 | 98,367 | 2,340,832 | 8,531,211 |
| Flodine Pk, E. | 0 | 1 | 50,951 | 0 | 50,951 | 0 |
| Goodman Pt | 0 | 0 | 0 | 0 | 1,401 | 552 |
| Hamilton Ck | 3 | 0 | 0 | 215,270 | 0 | 925,481 |
| Kernan Canyon | 0 | 0 | 0 | 0 | 150 | 0 |
| Lisbon, SE | 3 | 2 | 41 | 274,718 | 156,037 | 14,089,322 |
| McClean | 2 | 2 | 39,430 | 45,537 | 246,008 | 248,833 |
| McElmo | 0 | 2 | 0 | 12,051 | 1,097 | 891,617 |
| Papoose Canyon | 7 | 24 | 336,536 | 1,936,621 | 3,693,621 | 22,432,750 |
| Squaw Ck | 0 | 0 | 0 | 0 | 11,189 | 24,332 |
| TOTALS==> | 21 | 55 | 531,290 | 3,063,355 | 10,529,390 | 72,556,573 |
| McElmo(CO2) | 5 | 23 | 0 | 173,560,252 | 0 | 555,198,284 |

B-63

BLM_0005949

TABLE  5.  TOTAL FIELD PRODUCTION SJRA SAN JUAN BASIN

|  |  |  | 1987 |  | CUMULATIVE |  |
|---|---|---|---|---|---|---|
| FIELD | SI | PWR | OIL | GAS | OIL | GAS |
| Chromo | 7 | 3 | 646 | 0 | 162,964 | 6,342 |
| Iganco  Blanco* | 96 | 938 | 5,204 | 27,004,071 | 42,145 | 849,611,960 |
| Mancos River | 0 | 2 | 427 | 0 | 25,242 | 0 |
| Menefee Mtn | 3 | 0 | 44 | 0 | 48,883 | 255 |
| Navajo | 0 | 3 | 4,132 | 0 | 4,686 | 0 |
| Point Lookout | 0 | 0 | 0 | 0 | 0 | 23,000 |
| Price Gramps | 4 | 26 | 50,862 | 0 | 6,524,698 | 0 |
| Red Mesa* | 15 | 88 | 93,467 | 104,016 | 1,419,441 | 1,273,575 |
| Sierra | 2 | 4 | 2,310 | 0 | 121,007 | 29,021 |
| TOTALS==> | 127 | 1064 | 157,092 | 27,108,087 | 8,349,066 | 850,944,153 |

* Includes Indian production

TABLE  6.  TOTAL FIELD PRODUCTION SJRA PARADOX BASIN - FEDERAL

|  |  |  | 1987 |  | CUMULATIVE |  |
|---|---|---|---|---|---|---|
| FIELD | SI | PWR | OIL | GAS | OIL | GAS |
| Andy's Mesa | 0 | 7 | 0 | 429,356 | 21,184 | 17,405,075 |
| Cache | 3 | 9 | 64,272 | 36,463 | 3,906,168 | 7,020,736 |
| Cahone | 0 | 1 | 6,398 | 14,972 | 17,791 | 40,430 |
| Dove Ck | 1 | 0 | 0 | 0 | 82,961 | 946,234 |
| Flodine Pk | 2 | 7 | 33,662 | 98,367 | 2,340,832 | 8,531,211 |
| Flodine Pk, E. | 0 | 1 | 50,951 | 0 | 50,951 | 0 |
| Goodman Pt | 0 | 0 | 0 | 0 | 1,401 | 552 |
| Hamilton Ck | 2 | 0 | 0 | 146,953 | 0 | 391,442 |
| Kernan Canyon | 0 | 0 | 0 | 0 | 0 | 0 |
| Lisbon, SE | 3 | 2 | 41 | 274,718 | 156,037 | 14,089,322 |
| McClean | 0 | 1 | 19,465 | 23,141 | 130,673 | 109,078 |
| McElmo | 0 | 2 | 0 | 12,051 | 1,097 | 891,617 |
| Papoose Canyon | 3 | 20 | 114,687 | 1,152,059 | 2,935,935 | 19,046,306 |
| Squaw Ck | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTALS==> | 14 | 50 | 289,476 | 2,188,080 | 9,645,030 | 68,472,003 |
| McElmo(CO2) | 5 | 23 | 0 | 173,560,252 | 0 | 555,198,284 |

B-64

BLM_0005950

TABLE 7.  TOTAL FIELD PRODUCTION SJRA SAN JUAN BASIN - FEDERAL

| FIELD | SI | PWR | OIL | 1987 GAS | CUMULATIVE OIL | GAS |
|---|---|---|---|---|---|---|
| Chromo | 0 | 0 | 0 | 0 | 0 | 0 |
| Iganco  Blanco | 0 | 0 | 0 | 0 | 0 | 0 |
| Mancos River | 0 | 0 | 0 | 0 | 0 | 0 |
| Menefee Mtn | 0 | 0 | 0 | 0 | 0 | 0 |
| Navajo | 0 | 0 | 0 | 0 | 0 | 0 |
| Point Lookout | 0 | 0 | 0 | 0 | 0 | 0 |
| Price Gramps | 0 | 0 | 0 | 0 | 0 | 0 |
| Red Mesa | 0 | 0 | 0 | 0 | 0 | 0 |
| Sierra | 0 | 0 | 0 | 0 | 8,987 | 52 |
| TOTALS==> | 0 | 0 | 0 | 0 | 8,987 | 52 |

TABLE 8.  FORECAST MATRIX FOR BLM DRILLING ACTIVITY
FOR 1989 THROUGH 2010.

| | | PARADOX BASIN | | | | | | | SAN JUAN BASIN | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | D&A | WC PWR | TOTAL | D&A | DEV PWR | TOTAL | SUB TOTAL | D&A | WC PWR | TOTAL | D&A | DEV PWR |
| Tax Credits | | | | | | | | | | | | |
| Low Dev. | 79 | 18 | 97 | 48 | 98 | 146 | 243 | 10 | 2 | 12 | 5 | 3 |
| High Dev. | 101 | 24 | 125 | 62 | 126 | 188 | 313 | 21 | 2 | 23 | 12 | 5 |
| No Tax Credit | | | | | | | | | | | | |
| Low Dev. | 50 | 12 | 62 | 31 | 62 | 93 | 155 | 10 | 2 | 12 | 5 | 3 |
| High Dev. | 97 | 23 | 120 | 60 | 120 | 180 | 300 | 20 | 2 | 22 | 11 | 5 |

TABLE 9.  FORECAST MATRIX FOR BLM DRILLING ACTIVITY
WITHIN OIL AND GAS POTENTIAL AREAS (FIGURE 11)

| | | PARADOX BASIN | | | | | | SAN JUAN BASIN | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | D&A | WC PWR | TOTAL | D&A | DEV PWR | TOTAL | D&A | WC PWR | TOTAL | D&A | DEV PWR | TOTAL | GRAND TOTAL |
| Area 4 | 65 | 15 | 80 | 40 | 80 | 120 | 21 | 3 | 24 | 11 | 5 | 16 | 240 |
| Area 3 | 32 | 8 | 40 | 20 | 40 | 60 | 0 | 0 | 0 | 0 | 0 | 0 | 100 |
| Area 2 | 4 | 1 | 5 | 3 | 5 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| Area 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

B-65

BLM_0005951

## APPENDIX B

## APPENDIX 1

### LANDS PROSPECTIVELY VALUABLE FOR LEASABLE MINERALS

Classification Criteria. Each leasable mineral has a unique set of limiting classification criteria, as set forth below, to identify lands prospectively valuable for that specific mineral.

Oil and Gas.

A. Approval Date. Criteria for classifying public lands as prospectively valuable for oil and gas were approved by the Director, USGS, on April 22, 1957. Those criteria have been revised and the new standards are presented herein. The approval date of the new classification criteria is the date of this Manual Release.

B. Criteria. Lands underlain by sedimentary rock shall be classified as prospectively valuable for oil and gas on the basis of the thickness and depth of sedimentary rocks, a favorable structural setting, and evidence of oil and gas potential. Although oil and gas normally occur within sedimentary rocks, these minerals may also accumulate in rocks of other than sedimentary origin. Classification of lands which do not contain sedimentary rocks should be based on knowledge of known accumulations. Such a determination requires considerable professional judgment.

1. Mineral thickness. In a sedimentary basin, the minimum thickness of sedimentary rocks considered to be prospectively valuable for oil and/or gas is 1,000 feet, unless a thinner sedimentary section is known to be productive.

2. Maximum depth. The lower depth limit of potentially productive sedimentary rock is considered to be 35,000 feet below the surface. Areas having a cover of igneous or metamorphic rock which has flowed or been thrust over sedimentary rock may be classified as prospectively valuable.

3. Evidence of oil and gas potential. Oil seeps, oil or gas shows in well tests, and past or present production constitute direct evidence of oil and gas potential. Indirect evidence may include seismic information, similarity with known producing rocks, or acceptable levels of thermal maturation. Either direct or indirect evidence may be used in classification.

BLM_0005952

**POTENTIAL OF DEVELOPMENT**

## APPENDIX 2

### OIL AND GAS POTENTIAL RATING CRITERIA

High, (a) in this area there is the demonstrated existence of: (1) source rock, (2) thermal maturation, and (3) reservoir strata possessing permeability and/or porosity, and (4) traps or (b) be part of an oil and gas play as defined by the USGS. (Open File Report 88-373 or related publication).

Moderate, there is a geophysical or geological indication that the following are present: (1) source rock, (2) thermal maturation and (3) reservoir strata possessing permeability and/or porosity, and (4) traps.

Low, there are specific indications that one or more of the following are not present: (1) source rock, (2) thermal maturation, or (3) reservoir strata possessing permeability and/or porosity, and (4) traps.

None, requires that the absence of source rock, or thermal maturation or reservoir rock prohibits the occurrence of oil and/or gas.

BLM_0005953

# APPENDIX C

# STANDARD LEASE TERMS AND CONDITIONS

BLM_0005954

# APPENDIX C

# STANDARD LEASE TERMS AND CONDITIONS

The standard terms and conditions for oil and gas leasing are part of all federal leases regardless of other considerations. These terms and conditions will automatically apply to all alternatives.

"Sec. 6. Conduct of Operations-Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. Lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. To the extent consistent with lease rights granted, such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with rights of lessee."

"Prior to disturbing the surface of the lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent to impacts to other resources. Lessee may be required to complete minor inventories or short term special studies under guidelines provided by lessor. If in the conduct of operations, threatened or endangered species, objects of historical or scientific interest, or substantial unanticipated environmental effects

are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects."

The "lease rights granted," as used in this section have also been partially defined in the Code of Federal Regulations, part 3101.1-2, shown below.

A lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold subject to: Stipulations attached to the lease; restrictions deriving from specific, nondiscretionary statutes; and such reasonable measures as may be required by the Authorized Officer to minimize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations at the time operations are proposed. To the extent consistent with lease rights granted, such reasonable measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. At a minimum, measures shall be deemed consistent with lease rights granted provided that they do not: require relocation of proposed operations by more than 200 meters; require that operations be sited off the leasehold; or prohibit new surface-disturbing operations for a period in excess of 60 days in any lease year.

The lease form is shown as Figure C-1.

C-1

BLM_0005955

Figure C-1

| Form 3100-11<br>(June 1988) | UNITED STATES<br>DEPARTMENT OF THE INTERIOR<br>BUREAU OF LAND MANAGEMENT | Serial No. |
| --- | --- | --- |

## OFFER TO LEASE AND LEASE FOR OIL AND GAS

The undersigned *(reverse)* offers to lease all or any of the lands in Item 2 that are available for lease pursuant to the Mineral Leasing Act of 1920, as amended and supplemented (30 U.S.C. 181 et seq.), the Mineral Leasing Act for Acquired Lands of 1947, as amended (30 U.S.C. 351-359), the Attorney General's Opinion of April 2, 1941 (40 Op. Atty. Gen. 41), or the

**READ INSTRUCTIONS BEFORE COMPLcTING**

1. Name

   Street

   City, State, Zip Code

2. This application/offer/lease is for: *(Check only One)*  ☐ PUBLIC DOMAIN LANDS          ☐ ACQUIRED LANDS (percent U.S. interest _____ )

   Surface managing agency if other than BLM: _____  Unit/Project _____

   Legal description of land requested:          *Parcel No.:_____          *Sale Date (m/d/y):_____ / _____ / _____

   *SEE ITEM 2 IN INSTRUCTIONS BELOW PRIOR TO COMPLETING PARCEL NUMBER AND SALE DATE.

   T.          R.          Meridian          State          County

   Total acres applied for _____

   Amount remitted: Filing fee $ _____          Rental fee $ _____          Total $ _____

   **DO NOT WRITE BELOW THIS LINE**

3. Land included in lease:

   T.          R.          Meridian          State          County

   Total acres in lease _____
   Rental retained $ _____

This lease is issued granting the exclusive right to drill for, mine, extract, remove and dispose of all the oil and gas *(except helium)* in the lands described in Item 3 together with the right to build and maintain necessary improvements thereupon for the term indicated below, subject to renewal or extension in accordance with the appropriate leasing authority. Rights granted are subject to applicable laws, the terms, conditions, and attached stipulations of this lease, the Secretary of the Interior's regulations and formal orders in effect as of lease issuance, and to regulations and formal orders hereafter promulgated when not inconsistent with lease rights granted or specific provisions of this lease.

NOTE: This lease is issued to the high bidder pursuant to his/her duly executed bid or nomination form submitted under 43 CFR 3120 and is subject to the provisions of that bid or nomination and those specified on this form.

Type and primary term of lease:

THE UNITED STATES OF AMERICA

☐ Noncompetitive lease (ten years)

by _____
          (Signing Officer)

☐ Competitive lease (five years)

_____          _____
          (Title)                    (Date)

☐ Other _____

EFFECTIVE DATE OF LEASE _____

*(Continued on reverse)*

C - 2

BLM_0005956

4. (a) Undersigned certifies that (1) offeror is a citizen of the United States; an association of such citizens; a municipality; or a corporation organized under the laws of the United States or of any State or Territory thereof; (2) all parties holding an interest in the offer are in compliance with 43 CFR 3100 and the leasing authorities; (3) offeror's chargeable interests, direct and indirect in either public domain or acquired lands do not exceed 246,080 acres in Federal oil and gas leases in the same State, of which not more than 200,000 acres are held under option, or 300,000 acres in leases and 200,000 acres in options in either Leasing District in Alaska; (4) offeror is not considered a minor under the laws of the State in which the lands covered by this offer are located; (5) offeror is in compliance with qualifications concerning Federal coal lease holdings provided in sec. 2(a)(2)(A) of the Mineral Leasing Act; (6) offeror is in compliance with reclamation requirements for all Federal oil and gas lease holdings as required by sec. 17(g) of the Mineral Leasing Act; (7) offeror is not in violation of sec. 41 of the Act.

(b) Undersigned agrees that signature to this offer constitutes acceptance of this lease, including all terms, conditions, and stipulations of which offeror has been given notice, and any amendment or separate lease that may include any land described in this offer open to leasing at the time this offer was filed but omitted for any reason from this lease. The offeror further agrees that this offer cannot be withdrawn, either in whole or in part, unless the withdrawal is received by the proper BLM State Office before this lease, an amendment to this lease, or a separate lease, whichever covers the land described in the withdrawal, has been signed on behalf of the United States.

**This offer will be rejected and will afford offeror no priority if it is not properly completed and executed in accordance with the regulations, and is not accompanied by the required payments. 18 U.S.C. 1001 makes it a crime for any person knowingly and willfully to make to any Department or agency of the United States any false, fictitious or fraudulent statements or representations as to any matter within its jurisdiction.**

Duly executed this _____ day of _____ , 19 _____ . _____

(Signature of Lessee or Attorney-in-fact)

## LEASE TERMS

Sec. 1. Rentals—Rentals shall be paid to proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are:

(a) Noncompetitive lease, $1.50 for the first 5 years; thereafter $2.00;
(b) Competitive lease, $1.50; for primary term; thereafter $2.00;
(c) Other, see attachment, or

as specified in regulations at the time this lease is issued.

If this lease or a portion thereof is committed to an approved cooperative or unit plan which includes a well capable of producing leased resources, and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified in (a), (b), or (c) for those lands not within a participating area.

Failure to pay annual rental, if due, on or before the anniversary date of this lease (or next official working day if office is closed) shall automatically terminate this lease by operation of law. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

Sec. 2. Royalties—Royalties shall be paid to proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. Royalty rates are:

(a) Noncompetitive lease, 12½%;
(b) Competitive lease, 12½%;
(c) Other, see attachment; or

as specified in regulations at the time this lease is issued.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of lessee.

Minimum royalty in lieu of rental of not less than the rental which otherwise would be required for that lease year shall be payable at the end of each lease year beginning on or after a discovery in paying quantities. This minimum royalty may be waived, suspended, or reduced, and the above royalty rates may be reduced, for all or portions of this lease if the Secretary determines that such action is necessary to encourage the greatest ultimate recovery of the leased resources, or is otherwise justified.

An interest charge shall be assessed on late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) (30 U.S.C. 1701). Lessee shall be liable for royalty payments on oil and gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rule, regulation, order, or citation issued under FOGRMA or the leasing authority.

Sec. 3. Bonds—A bond shall be filed and maintained for lease operations as required under regulations.

Sec. 4. Diligence, rate of development, unitization, and drainage—Lessee shall exercise reasonable diligence in developing and producing, and shall prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if deemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor.

Sec. 5. Documents, evidence, and inspection—Lessee shall file with proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements, and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that supports costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting offices for future audit by lessor. Lessee shall maintain required records for 6 years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor.

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552).

Sec. 6. Conduct of operations—Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. Lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of this section. To the extent consistent with lease rights granted, such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the approval of easements or rights-of-way. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short term special studies under guidelines provided by lessor. If in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.

Sec. 7. Mining operations—To the extent that impacts from mining operations would be substantially different or greater than those associated with normal drilling operations, lessor reserves the right to deny approval of such operations.

Sec. 8. Extraction of helium—Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessee shall include in any contract of sale of gas the provisions of this section.

Sec. 9. Damages to property—Lessee shall pay lessor for damage to lessor's improvements, and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

Sec. 10. Protection of diverse interests and equal opportunity—Lessee shall: pay when due all taxes legally assessed and levied under laws of the State or the United States; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the United States; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with section 28 of the Mineral Leasing Act of 1920.

Lessee shall comply with Executive Order No. 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee nor lessee's subcontractors shall maintain segregated facilities.

Sec. 11. Transfer of lease interests and relinquishment of lease—As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office a written relinquishment, which shall be effective as of the date of filing, subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties.

Sec. 12. Delivery of premises—At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor and, within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells.

Sec. 13. Proceedings in case of default—If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains a well capable of production of oil or gas in paying quantities, or the lease is committed to an approved cooperative or unit plan or communitization agreement which contains a well capable of production of unitized substances in paying quantities. This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default. Any such remedy or waiver shall not prevent later cancellation for the same default occurring at any other time. Lessee shall be subject to applicable provisions and penalties of FOGRMA (30 U.S.C. 1701).

Sec. 14. Heirs and successors-in-interest—Each obligation of this lease shall extend to and be binding upon, and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto.

BLM_0005957

## Discretionary No Lease Areas For Standard Terms and Conditions Alternative

GSRA -

| | |
|---|---|
| Rifle falls and Glenwood Springs Fish Hatcheries | 690 Acres |
| Deep Creek | 2,400 |
| Bull Gulch | 9,900 |
| Thompson Creek | 4,300 |
| Hack Lake | 3,100 |
| Rifle Mountain Park | 400 |
| Sunlight Peak | 1,900 |
| Eagle River SRMA | 1,800 |
| Colorado River SRMA | 13,144 |
| | 37,634 |

KRA -

| | |
|---|---|
| Kremmling Cretaceous Ammonite | 200 |
| North Park Phacelia | 300 |
| Windy Gap Cultural | 400 |
| Colorado River SRMA | 4,870 |
| North Sand Hills | 1,325 |
| | 7,095 |

LSRA -

| | |
|---|---|
| Greater Sand Hill Crane | 100 |
| Limestone Ridge | 1,350 |
| Cross Mountain Canyon | 3,000 |
| Little Yampa/Juniper Canyon | 19,800 |
| Cedar Mountain | 880 |
| Steamboat Lake State Park | 385 |
| Pearl Lake State Park | 270 |
| | 25,785 |

NPA -

| | |
|---|---|
| Military Bases | 125,000 |
| State, County & City Parks (outside incorporated areas) | 15,000 |
| Reservoir/Railroad ROWs, Riparian Areas | 60,000 |
| | 200,000 |

SJ/SMPA -

| | |
|---|---|
| Anasazi Cultural Area | 30,565 |
| Bridge Canyon | 443 |
| Menefee & Weber Mountains | 8,720 |
| Sand & East Rock Canyons | 5,880 |
| Squaw/Papoose,Cross,& Cahone Canyons | 28,464 |
| Hovenweep Buffer Zone | 600 |
| Cutthroat Castle Buffer | 320 |
| Horse Range Mesa | 40 |
| | 75,032 |

Grand Total    345,546

C-4

BLM_0005958

# APPENDIX D

# CONDITIONS OF APPROVAL—
# ALL ALTERNATIVES

BLM_0005959

# APPENDIX D

# CONDITIONS OF APPROVAL COMMON TO ALL ALTERNATIVES

**Mitigation Authority: Lease Rights Statement and Section 6 of Oil and Gas Lease Form**

## Introduction

Post-lease operations proposals are reviewed to ensure conformance with the plan. The mitigative measures listed in this appendix represent the post-lease environmental protection to which the BLM is committed as a result of the analysis in the plan/EIS. Note that there is no commitment to the specific wording of a Condition of Approval (COA).

The listed mitigative measures may apply to all oil and gas exploration and development activities and associated rights-of-way for all three alternatives. The Authorized Officer will choose among these measures at the field development stage to mitigate or avoid environmental impacts identified on a site specific basis. When attached to an approval document, the measures are known as COAs. The Authorized Officer is not limited to the list of COAs shown here, but may development others as unforeseen impacts occur so long as the new COAs conform with the limitations of the granted lease rights and the guidance set forth in this plan and subsequent amendments.

In addition to the COAs shown here others are derived from lease stipulations in the Proposed Action and Continuation of Present Management Alternatives. The application of those COAs will depend upon the alternative chosen in the Record of Decision. The COAs shown in this Appendix apply to all three alternatives, and will apply to the alternative chosen in the Record of Decision.

COAs are not added to applications if they are unnecessary (do not apply to the case in question) or, are duplicative, as when the mitigative measure is already incorporated in the operator's submittal.

## GEOPHYSICAL OPERATIONS

The following guidance is for the development of standards to be attached, as appropriate, to the Notice of Intent (NOI) for geophysical operations at the discretion of the Authorized Officer and in accordance with the Resource Management Plan/Environmental Impact Statement (RMP/EIS) Record of Decision. The statements below will be used as guidance by BLM field personnel in determining what protective measures will be used on geophysical operations. Only those items pertaining to a given operation will be appended to the NOI, and only if they are not already contained in the proposed plan of operation.

### A. NOTIFICATION

If noncompliance with terms and conditions occurs, the operator will be notified by BLM and instructed as to the appropriate action. If the operator fails to take appropriate action, the operator will be subject to enforcement action in accordance with 43 CFR 3163.

Wildfires begun or sighted during seismic operations will be reported immediately to the Grand Junction Fire Dispatch Office at 303/243-6555 and the Resource Area Office of jurisdiction. The operator is liable for the full cost of fire suppression of all fires on or in the vicinity of the project set or caused by his employees, whether set directly or indirectly as a result of operations.

The operator shall notify the Authorized Officer, or his representative at least 48 hours prior to beginning operations. The operator shall also report progress on a weekly basis

D-1

BLM_0005960

**APPENDIX D**

until completion. A pre-work conference may be required.

Immediately upon completion of operations, a Notice of Completion of Oil & Gas Exploration Operations and an updated BLM planimetric map or USGS topographic map showing revisions to the original NOI shall be submitted to the Authorized Officer. The map will be used to perform a final compliance inspection of the exploration area.

A copy of all COAs, along with a copy of the submitted NOI, shall be kept in the field by each seismic crew, for inspection by BLM personnel.

Any exploration greater than 1/4 mile from the proposed seismograph line route filed with the NOI will require prior approval from the Authorized Officer.

## B.  AGENCY RESPONSIBILITIES

The Authorized Officer will notify all affected District Wildlife Managers or Area Supervisors (Colorado Division of Wildlife) and livestock operators prior to commencement of seismic operations. This notice will contain information as to the expected timing, location, and type of exploration conducted.

## C.  CULTURAL RESOURCES

The Programmatic Agreement between the BLM, the State Historic Preservation Officer, and the Advisory Council on Historic Preservation, signed February 6, 1987, contains guidance for oil and gas, seismic, and other land use operations. Appendix B of the agreement specifically outlines BLM procedures for both oil and gas APDs and for seismic operations. In addition, guidance is provided in : "Handbook for Cultural Resources Inventory/Mitigation" (Colorado State Office Release 8-13), dated 1990.

In addition to the above guidance, the operator shall immediately bring to the attention of the Authorized Officer any and all antiquities or other objects of historic, paleontological, or scientific interest, including, but not limited to, prehistoric or historic ruins or artifacts discovered as a result of operations. The operator and the Authorized Officer shall consult and determine the best option for avoiding or mitigating site damage.

Operators are also reminded that the removal, injury, defacement, or alternation of any object of scenic, archaeological, historical, or scientific interest is a federal crime and may be punishable by fine and/or jail terms.

## D.  THREATENED, ENDANGERED, AND SENSITIVE SPECIES

An inventory for threatened and endangered plant species is required on any portions of the line or staging areas proposed in known or realistic potential habitat for threatened, endangered, or candidate plant species. A map will be maintained by the BLM outlining these areas and made available to the public.

## E.  CONSTRUCTION

All infestations of noxious or poisonous weeds, resulting from surface disturbance caused by the operator, will be controlled before spreading occurs into the surrounding area. Method of weed control will be reviewed by the Authorized Officer prior to commencement.

No dirt work or clearing of vegetation will occur without specific approval. All merchantable timber and/or firewood shall be purchased by the operator at the total appraised price that is determined by the BLM.

During periods of adverse conditions such as thawing, heavy rains, snow, or flooding, all activities off existing maintained roads that create excessive surface rutting will be suspended. When adverse conditions exist, the operator will contact the Authorized Officer for an evaluation and decision based on soil type, slope, vegetation, and cover.

Drill hole cuttings will be returned to the hole if possible, or at a minimum, raked and spread out so as not to impede regrowth of vegetation or to create erosion problems.

Operations shall be done in a manner which prevents damage, interference, or disruption of water flows and improvements associated with all springs, wells, or impoundments. It is the operator's responsibility to enact the

BLM_0005961

## CONDITIONS OF APPROVAL--ALL ALTERNATIVES

precautions necessary to prevent damage, interference, or disruptions. Vibrator sources will not be operated closer than 300 feet, and large explosive charges, greater than 40 pounds, will not be used closer than 1,320 feet of springs, wells, or impoundments. The Authorized Officer may approve closer source distances if the contractor demonstrates that the resource will be protected.

No fence will be cut unless no other alternative exists. Before cutting through any fences, the operator shall firmly brace the fence on both sides of the cut; a temporary gate will be installed for use during the course of operations unless the fence is immediately repaired. Upon completion of operations, fences shall be restored to at least their original condition.

Activities of the seismic operators shall not prevent, obstruct, or unduly interfere with any activities of other authorized users of the public lands. Removal or alteration of existing improvements (fences, cattle guards, etc.) is not allowed without prior approval. Fences are to be braced to BLM's standards prior to cutting them.

All debris, such as paper, cans, wire, flagging, or other trash, shall be removed and properly disposed of upon completion. No oil or lubricants shall be drained onto the ground.

All vehicles (including drills) will be limited to existing roads, except in approved areas. Improvement of existing roads and trails is not permitted, unless prior approval is obtained.

Water for drilling purposes will not be obtained from federally owned or controlled water sources such as reservoirs and springs unless specific permission is obtained from the Authorized Officer.

Any available information concerning water sands or artesian flows must be reported to the Resource Area Office.

Whenever possible, a portable mud pit shall be used when drilling with fluids.

There will be no straight line of sight dozing. Any path dozed through a timbered area will take an irregular path. Any pushed trees are

to be stockpiled adjacent to the line so they are readily retrievable without additional disturbance. All trees are to be pulled and spread back onto the line or access route.

Tall brush, sagebrush parks and open areas: There will be no removal of brush or grass by blading. Brush may be crushed or removed by keeping the blade six inches off the ground surface. In open or brush areas, vehicle paths will take an irregular path to discourage line of sight paths.

Improvement of existing roads or trails: Blading will be allowed only if the trail is impassable by vehicles or geophysical equipment. No widening or realignment will be allowed. Existing trails may have to be reclaimed or closed.

New trails can be constructed only when vehicle and equipment passage is impossible and only with the concurrence of the Authorized Officer. No straight line of sight trails will be allowed. All trails will be reshaped to original contour (including bench cuts). Waterbars will be placed on slopes as directed by the Authorized Officer.

Construction of drainage crossings which cannot otherwise be crossed: Existing fords are to be used if possible. A cut and stockpile process will be used to create a low water crossing or upgrade an existing crossing unless otherwise specified by the Authorized Officer.

### F. EXPLOSIVES

Powder magazine sites on public lands must be approved in writing by the Area Manager prior to use. The transportation, storage, and use of explosives on BLM surface will be done in accordance with ATF P 5400.7 (11/82).

### G. RIGHTS-OF-WAY

Access to federal lands across non-federal lands is not guaranteed by the government. Permission to enter or cross private, or state-owned lands must be obtained from the landowner(s).

### H. MISCELLANEOUS

All personnel (contractors, subcontractors) working in the field with the seismic operator

BLM_0005962

## APPENDIX D

will be familiar with and follow the conditions appended to the NOI.

Helicopters will operate between staging areas and seismic line within corridors and at altitudes that allow safe, efficient, and environmentally sensitive operations. Operating parameters will be determined on a line-to-line basis as mutually agreed by BLM, helicopter operator, and contractor.

Aircraft landing sites on public lands must be approved in writing by the Area Manager prior to use.

No helicopter or motor vehicle use would be allowed in the Wild Horse Herd Management Areas March 2 - June 30; foaling season for wild horses. BLM will maintain an area map for contractor inspection.

Between the hours of 4 pm and 10 am, no geophysical exploration operations are permitted within a one-mile radius of (Water Source) located at (Location) to allow wild horses uninhibited and undisturbed use of their critical drinking water source from March 1 to December 1. This is the period of no snow availability for wild horse use.

## I.   RECLAMATION

All surface disturbance would be recontoured and revegetated according to an approved reclamation plan.

Reclamation of disturbed areas shall be completed, as directed by the Authorized Officer, within 30 days of terminating seismograph work on any line. Delay of reclamation for any reason, such as weather, must be approved by BLM. Adequate vegetative cover (and seed mixture, based on site-specific analysis, to be used) shall be established by the Authorized Officer.

## APPLICATION FOR PERMIT TO DRILL OPERATIONS

The following guidance will be used to develop COAs which are attached, as appropriate, to approved APDs, Sundry Notices, or oil and gas related right-of-way actions at the discretion of the Authorized Officer and in accordance with the RMP/EIS Record of Decision.

This appendix shows the most common COAs used; however, the reader is reminded that COAs are designed for specific operations. In practice, COAs shown below may or may not be used on any given approval document, and other COAs, not specifically stated here, will be written to accomplish the tasks envisioned in this plan. The categories shown below are a good representation of the list of mitigative measures considered by BLM resource specialists for every approved field operation.

## A.   NOTIFICATION

In order for BLM inspectors to check the initial construction operations, it is necessary that the BLM be notified when construction begins. To help insure that all parties understand the requirements for construction, the operator must assure that all employees and sub-contractors are adequately aware of the COAs. Examples of such notification requirements are shown below:

The operator or his contractor will contact the approving Resource Area Office 48 hours before beginning any work on public land.

The operator will give the dirt contractor a copy of the Surface Use Plan and any additional BLM COAs before any work begins. A copy of the approved Surface Use Plan will be available on-site for inspection during construction.

The operator or his contractor will contact the approving Resource Area office 48 hours before starting reclamation work and within 48 hours of completion of reclamation work.

Proper precautions shall be taken at all times to prevent or suppress fires. Range or forest fires will be reported to the BLM District or Resource Area Office. All other fires or explosions that cause damage to property, equipment, loss of oil or gas, or result in injuries to personnel will be reported to the Authorized Officer.

## B.   OTHER AGENCY APPROVALS

Some operations on public lands affect adjoining private lands and require approval by state, local, or other federal agencies. It is solely the responsibility of the operator to be aware of these requirements and gain the

D-4

BLM_0005963

## CONDITIONS OF APPROVAL--ALL ALTERNATIVES

necessary approvals.  Upon notification by another agency of operators failure to obtain necessary permitting, a notice of noncompliance will be issued and operations may be suspended.  In a few cases, the BLM wants to make it clear that the "BLM approved" operations may not proceed until such approval is granted.  In those cases, a COA is appended to the approved application such as:  Use of water for operations will be approved by obtaining a temporary use permit from the Colorado State Water Resources Engineer and by receiving permission from the landowner or surface managing agency to use the land containing the water source.

## C.  CULTURAL RESOURCES

The Programmatic Agreement between the BLM, the State Historic Preservation Officer, and the Advisory Council on Historic Preservation, signed February 6, 1987, contains guidance for oil and gas, seismic, and other land use operations.  Appendix **B** of the agreement specifically outlines BLM procedures for both oil and gas APDs and for seismic operations.  In addition, guidance is provided in :  "Handbook for Cultural Resources Inventory/Mitigation" (Colorado State Office Release 8-13), dated 1990.

In addition to the above guidance, the operator shall immediately bring to the attention of the Authorized Officer any and all antiquities or other objects of historic, paleontological, or scientific interest, including, but not limited to, prehistoric or historic ruins or artifacts discovered as a result of operations.  The operator and the Authorized Officer shall consult and determine the best option for avoiding or mitigating site damage.

Operators are also reminded that the removal, injury, defacement, or alternation of any object of scenic, archaeological, historical, or scientific interest is a federal crime and may be punishable by fine and/or jail terms.

## D.  THREATENED, ENDANGERED, AND SENSITIVE SPECIES

The lessee may be required to provide inventory information for certain species if it is determined that inadequate information is available to make appropriate decisions relating to mitigation.  These species could involve threatened, endangered, sensitive and/or rare plant or animal species, or other species protected by law or of high interest, such as bighorn sheep lambing areas, elk calving areas, raptors, etc.

Apply "Suggested Practices for Raptor Protection on Power lines" on all proposed transmission lines to be constructed to insure they are properly grounded to prevent unnecessary electrocution of raptors.

The locations of all known populations of Colorado BLM sensitive plants and selected high priority remnant vegetation associations would be protected from human-induced surface disturbing activities to the extent such protection does not unduly hinder or preclude exercising valid existing rights.  The area of protection will include the actual location of the populations or occurrences of important vegetation associated to receive protection, and shall be determined in consultation and coordination with the Colorado Natural Areas Program (CNAP).

Those populations/occurrences, upon which analysis determines protection to be necessary, shall be protected by:  1) requiring relocation or rerouting of proposed well sites, pipelines, roads, other surface facilities, etc., or 2) applying other protective mitigation (i.e., fencing).  BLM will effectively mitigate potential impacts to important populations/occurrences to the degree that existing development rights are not unduly hindered or precluded.

## E.  RESOURCES (OTHER THAN OIL AND GAS)

Wind swept ridges and pinyon-juniper areas within identified wild horse areas will be avoided where necessary to insure availability of winter forage and year-round shelter for wild horses.

Surface-disturbing activities within or adjacent to intermittent or perennial water sources, associated floodplains, and riparian areas will only be allowed where mitigative measures can be employed to protect floodplains, water quality, and riparian values.

D-5

BLM_0005964

## APPENDIX D

Well pads, roads, and facilities will be constructed and maintained to avoid unnecessary impacts to air quality.

Raptor and sandhill crane nests will be protected from human-induced surface-disturbing activities to the extent such protection does not unduly hinder or preclude exercising valid existing rights.

All trees requiring removal shall be disposed of by the operator. Where earth blading is required, stumps shall be removed and scattered or buried in an area designated by the Authorized Officer. Where earth blading is not required, stump height shall not exceed 12 inches. A wood permit from BLM for the wood removed (for the appraised value) will be required prior to any clearing.

Water sources used by wild horses will be avoided, unless otherwise approved by the Authorized Officer.

Water wells drilled to provide water for drilling purposes will be approved by, and offered to, the BLM for use prior to plugging the water well. Water rights will be held by the BLM. The BLM will be notified of any water aquifers encountered during drilling which could be developed for water prior to final plugging of the well.

All operations will be conducted so as not to cause pollution or change the character of streams, lakes, ponds, water holes, seeps, or marshes. This relates directly to damages caused to fish and wildlife resources. Surface disturbance that causes active soil movement will be corrected.

## F.   CONSTRUCTION

Linear-type facilities such as roads, power lines, and pipelines shall cohabit and follow a common route unless otherwise approved by the Authorized Officer. Surface disturbance will be minimized.

Well pads, roads, and facilities will be located to minimize visual impacts.

To protect watersheds from accelerated erosion, increased slumping, and increased sediment and salinity loading, all development activities may be curtailed at the discretion of the Authorized Officer during periods when the soil is saturated.

Trash and garbage must be contained in an closed receptacle or in an earthen pit. If an earthen pit is used, it must be covered to prevent contents from escaping. Burning and/or burying is not authorized. Contents from a trash receptacle or pit must be hauled to an approved county landfill. This pertains to all phases of lease operations.

Surface disturbance and vehicular travel will be limited to the approved location and approved access route. Any additional area needed must be approved in advance.

Above-ground facilities will be painted to blend with the surrounding environment using a specified color from the Rocky Mountain Regional Committee Standard Environmental Color chart.

### a.  Roads (On Lease)

Existing roads should be used to the extent possible. Additional roads, if needed, shall be kept to an absolute minimum and the location of routes must be approved by BLM prior to construction. Upon determination of an impending field development, a transportation plan will be requested to reduce unnecessary access roads. Roads will be constructed and maintained to BLM road standards (BLM Manual Section 9113) unless otherwise authorized by the Authorized Officer.

Companies controlling roads which provide access into crucial wildlife areas may be required to close the road with a lockable gate to prevent general use of the road during critical periods of the year when resource problems are experienced (during hunting seasons, winter, etc.). This restrictive measure would be applied where needed to protect wildlife resources or to minimize environmental degradation.

Use of closed road segments will be restricted to legitimate, authorized agents of: 1) the lessee and/or their subcontractor(s), 2) the BLM, 3) other agencies with a legitimate need (CDOW, other law enforcement agencies, etc.). Unauthorized use or failure to lock gates during specified time frames by the lessee or its subcontractors would be considered a violation of the terms of the APD or associated grants. This would apply to BLM roads and other roads on public lands.

D-6

BLM_0005965

## CONDITIONS OF APPROVAL--ALL ALTERNATIVES

Improvement or upgrading of existing roads and trails shall conform to the same requirements as the approval APD.

The operator shall regularly maintain all roads used for access to the lease operation. This shall include installation of additional surfacing and surface drainage control structures whose need was not foreseen during construction.

At cessation of operations, the Authorized Officer will decide which roads will be closed and rehabilitated and which will remain open for public use.

Any access routes that had been previously available to the public will not be unnecessarily blocked off from public use.

Cattle guards heavy enough to handle proposed road traffic will be installed whenever access roads are through pasture gates or fences. These cattle guards shall be maintained on a regular basis to assure their effectiveness at turning livestock. This includes cleaning out under cattle guard bases when needed.

Improvement to existing access will be necessary and limited to a 14-foot crowned and ditched road surface with turnouts as needed and minimum disturbance of surrounding soil and vegetation (abrupt back sloped borrow ditch). New construction will be limited to the same specifications as above. Cleared trees and brush along the road right-of-way will be wind-rowed to the side in convenient clearings. Surfacing material will not be placed on the access road or location without prior BLM approval.

Waterbars: The operator will be required to construct waterbars on abandoned roads and pipeline routes. General guidelines for installation of waterbars are: less than two percent grade--200-foot spacing, four to five percent grade--75-foot spacing, greater than five percent grade--50-foot spacing. Unstable soils may require a closer spacing, whereas the spacing may be greater on stable soils and rock outcroppings. The waterbars shall be constructed to drain freely to the natural ground level and to prevent siltation and clogging.

New roads constructed for oil and gas purposes within crucial big game winter range and isolated and/or roadless areas will be reclaimed upon completion of the oil and gas operation.

New oil and gas roads on public lands within crucial big game winter range will be closed to the public from December 15 to April 30.

New roads on public lands within isolated and/or roadless areas will be closed to the public year-round.

### b.  Pads

Selecting Locations for Well Sites, etc.: In planning for well sites, tank batteries, sump, reserve and mud pits, and pumping stations, the operator shall select locations that involve the least disruption to scenic values and other surface resources. The operator shall employ construction techniques and design practices, including selection of material, camouflage techniques, and rehabilitation practices that will preserve scenic aesthetic qualities. The following guidelines can be used by operators to assist in minimizing surface disturbance and as an aid in the maintenance of the best possible conditions for rehabilitation.

Construction: Steep slopes shall be avoided, the site shall be located on the most level location obtainable that will accommodate the intended use.

View the site location as to how it will affect the road location. What may be gained on a good location may be lost from an adverse access route.

Adjust the site layout to conform to the best topographic situation. Deep vertical cuts and steep long fill slopes should be avoided. All cut and fill slopes should be constructed to the least percent slope practical.

The top 12 inches of soil material will be removed from the location and stockpiled separate from the trees on the location. Topsoil along the access will be reserved in place.

### c.  Pits  (All)

Excavations used for the permanent impoundment of usable water should be sloped at a 3:1 grade to establish safe access for humans, livestock, and wildlife.

D-7

BLM_0005966

## APPENDIX D

A minimum of two feet of free board will be maintained between the maximum fluid level and the top of the berm. These pits will be designed to exclude all surface runoff. The pits will have the maximum volume in cut.

Prior to closure, a randomly selected sample of drilling pits within established fields will be sampled for hazardous materials. In wildcat wells, all pits will be sampled for hazardous materials prior to abandonment, unless specifically exempted by the Authorized Officer. Sampling will be done by an independent contractor agreeable to the operator and Authorized Officer. Testing will be done at a lab with quality control standards acceptable to USGS.

Final written certification is required that there are no hazardous chemicals on the RCRA list left in the drilling fluids within the mud pit. If the operator cannot provide certification, the drilling fluids and pit liner must be disposed at a federally approved hazardous materials site.

Reserve and other containment pits that are used during the exploration and/or operation of the lease may require fences and/or other devices to exclude migratory birds, livestock, and/or wildlife. The need and type of protective requirement will be determined on a case-by-case basis.

All pits, cellars, rat holes, and other bore holes unnecessary for further lease operations, excluding the reserve pit, will be back-filled immediately after the drilling rig is released to conform with surrounding terrain. Pits, cellars and/or bore holes that remain on location must be fenced as specified for the reserve pit.

Reserve pit fluids will be allowed to evaporate through the entire summer season (June-August) after drilling is completed, unless an alternate method of disposal is approved. After the fluids disappear, the reserve pit muds will be allowed to dry sufficiently to allow back-filling. The back-filling of the reserve pit will be done so that the muds and associated solids will be confined to the pit and not squeezed out and incorporated in the surface materials. There will be a minimum of three feet of cover (overburden) on the pit. When the work is complete, the pit area will support the weight of heavy equipment without sinking.

Semi-closed or closed mud systems may be required where conditions warrant. Produced water will be injected, contained in a lined pit, or hauled to a federally approved disposal facility.

Closed Pits

Installed pit liners must be impermeable and must be resistant to weather, sunlight, hydrocarbons, aqueous acids, alkalies, salt, fungi, or other substances likely to be contained in the drilling fluids or produced water.

The reserve pit liner will be of sufficient strength and construction to insure impermeability. The liner will be underlain by a suitable bedding material and other measures taken as needed to protect the integrity of the liner.

A leak detection system will be installed to monitor lined reserve pits. This system must be installed in order to detect liner leakage. The leak detection plan must be submitted to and approved by the Authorized Officer during APD approval. This plan must include the system design including line installation, monitoring plan, and the individual responsible for the required monitoring.

For lined pits, the liner and contents will be buried in place and effectively capped with clay or other impermeable materials, or disposed of in a non-polluting method acceptable to the Authorized Officer.

If air or gas drilling, the operator shall control the blooie line discharge dust by use of water injection or any other acceptable method. The blooie line discharge shall be a minimum of 100 feet from the blow out preventer and be directed into the blooie pit so that the cuttings and waste are contained in the pit.

### d.   Pipelines

Alignment, siting, and reclamation of pipelines and flow-lines should be designed to conform to adjacent terrain and to prevent or minimize vehicular travel. If maintenance is necessary in problem areas, consider use of an all terrain vehicle (ATV) or snowcat etc., in lieu of regular truck. Surface disturbance for pipeline construction would be restricted to the minimum amount

BLM_0005967

## CONDITIONS OF APPROVAL--ALL ALTERNATIVES

necessary, as determined by the Authorized Officer. Relocation of portions of the line may be necessary to reduce the impact to surface resources.

For associated pipeline rights-of-way, except rights-of-way expressly authorizing a road after construction of the facility is complete, the right-of-way holder shall not use the right-of-way as a road for purpose other than routine maintenance. Necessary routine maintenance will be determined through consultation with the Authorized Officer.

Existing telephone, telegraph, power lines, pipelines, roads, trails, fences, ditches, and like improvements shall be protected during construction, operation, maintenance, and termination of an oil and gas facility. Damage caused by such activities shall be properly repaired to a condition which is satisfactory to the Authorized Officer or the facility owner/operator.

Pipeline routes will be graded to conform to the adjacent terrain, waterbarred, and reseeded.

When clearing is necessary, the width disturbed will be kept to a minimum. Bladed materials shall be placed back into the cleared route upon completion of construction.

Pipeline construction shall not block, dam, or change the natural course of any drainage. Suspended pipelines will provide adequate clearance for runoff.

Pipeline trenches shall be compacted during back-filling. These trenches will be maintained in order to correct settlement and prevent erosion. Waterbars and other erosion control devices will be repaired as necessary.

Pumping stations shall be kept in a neat and well-maintained condition.

Abandonment and Rehabilitation: Reclamation and abandonment of pipelines and flow-lines may involve: replacing fill in the original cuts, reducing and grading cut and fill slopes to conform to the adjacent terrain, replacement of surface soil material, waterbarring, and revegetating in accordance with rehabilitation practices.

Crossing of pipelines owned by other companies shall be accomplished in

accordance with an agreement secured with that company.

## G.  DRILLING

Water for drilling purposes will not be obtained from federally owned or controlled water sources such as reservoirs and springs unless specified permission is obtained from the Area Manager.

The BLM will be notified of any water aquifers encountered during drilling which could be developed for water prior to final plugging of the dry hole. Water rights will be held by the BLM.

## H.  PRODUCTION

Compaction and construction of the berms surrounding tank batteries will be constructed prior to storage of fluids and designed to prevent lateral movement of fluids through the utilized materials. The berms must be constructed to contain at minimum 120 percent of the storage capacity of the largest tank within the berm. All loading lines will be placed inside the berm.

Other Guidelines: Surface buildings, supporting facilities, and other structures, which are not required for present or future operations, shall be removed upon termination of use.

All improvements, including fences, gates, cattle guards, roads, trails, pipelines, bridges, water developments, and control structures will be maintained in a serviceable and safe condition.

Any release of production water on or across the land will need prior approval by the BLM.

Mud, separation pits, and other containments used during the exploration or operation of the lease for the storage of oil and other hazardous materials shall be adequately fenced, posted, or covered. Additional protective measures may be needed to minimize hazards and prevent access to humans, livestock, waterfowl, and other wildlife. The pits should be allowed to dry before back-filling and rehabilitation.

All production and storage facilities must have adequate protection from spills. The

D-9

BLM_0005968

## APPENDIX D

Spill Prevention Control and Countermeasure Plan required by the Environmental Protection Agency must be available for inspection at all appropriate field offices. All spills must be reported to the Authorized Officer.

The reserve pit and that portion of the location and access road not needed for production or production facilities will be reclaimed as described in the reclamation section. Enough topsoil will be kept to reclaim the remainder of the location at a future date. This remaining stockpile of topsoil will be seeded in place using the prescribed seed mixture.

A gate may be required to limit public access during the wildlife winter use periods (December 1 - April 15) when the operator maintains a road open for winter use.

If the well is located within 2,500 feet (1/2 mile) of residences, appropriate noise mitigation (i.e., hospital muffler, vegetation screening, electric motors, etc.) will be employed to ensure that federal, state, and local noise standards are adhered to during operation of the well.

Within 60 days of completion of construction, the holder shall provide the Authorized Officer an as-built survey of facilities as constructed.

## I. RECLAMATION

All disturbed areas not needed for lease operations will be revegetated as soon as possible. The operator will re-establish perennial vegetation that is compatible to surrounding undisturbed vegetation. The plant species to be seeded and the seeding rate will be approved by the Authorized Officer prior to seeding. Successful revegetation will be considered completed when the percent canopy cover is equal to surrounding undisturbed vegetation. The species considered in measuring percent cover will be those seeded as well as desirable preexisting species. Undesirable weedy species such as kuchia, cheatgrass, and other noxious weeds will not be included unless otherwise directed by the Authorized Officer. The operator will continue revegetation efforts using any and all cultural methods available until this standard is met.

Noxious weeds which may be introduced due to soil disturbance and reclamation will be treated by methods to be approved by the Authorized Officer. These methods may include biological, mechanical, or chemical. Should chemical methods be approved, the lessee must submit a Pesticide Use Proposal to the Authorized Officer 60 days prior to the planned application date.

In the event a producing well is developed, the unused disturbed areas surrounding the well location will be recontoured to appropriate confirmation (one which allows lease operations and avoids steep cut and fill slopes) as soon as possible. Some or all of the stockpiled topsoil will be evenly disturbed over these recontoured areas. Brush cleared prior to construction of the well site shall be scattered back over the recontoured area.

Mulching of the seed-bed following seeding may be required under certain conditions (i.e., expected severe erosion), as determined by the surface owner/manager.

Surface top soil-like material, if available, will be stripped from all areas where surface disturbance is necessary and stockpiled in a manner and location that will allow easy replacement. These stockpiles shall be protected from loss. After reshaping the site, soil material should be distributed to a uniform depth that will allow the establishment of desirable vegetation. The disturbed areas shall be scarified prior to replacement of surface soil material.

All disturbed areas will be recontoured to blend as nearly as possible with the natural topography. This includes removing all berms and refilling all cuts. All compacted portions of the pad will be ripped to a depth of 12 inches unless in solid rock.

After revegetation is complete, the stockpiled trees will be scattered evenly over the disturbed areas. The access will be blocked to prevent vehicular access.

Seed certification tags will be submitted to the Authorized Officer for seed used in reclamation.

Prior to abandonment of the facilities authorized by this grant, the holder shall contact the Authorized Officer to arrange a joint inspection of the right-of-way. The

BLM_0005969

## CONDITIONS OF APPROVAL--ALL ALTERNATIVES

inspection will be held to agree on an acceptable abandonment and rehabilitation plan. The Authorized Officer must approve the plan in writing prior to the holder commencing any abandonment and/or rehabilitation activities. The plan may include removal of surfacing material from the road, recontouring, replacement of topsoil, seeding, mulching, etc.

Cut and fill slopes shall be reduced and graded to conform the site to the adjacent terrain. The disturbed sites will be prepared to provide a seed-bed for re-establishment of desirable vegetation and reshaped to blend with the natural contour. Such practices may include contouring, terracing, gouging, scarifying, mulching, fertilizing, seeding, and planting.

Should additional site-specific environmental analyses at the time of exploration or development reveal the need for additional restrictions or the continuance of existing lease stipulations, these restrictions will become part of the development or operational plan.

Survey Monuments: All survey monuments, witness corners, reference monuments, and bearing trees shall be protected against destruction, obliteration, or damage. Any markers so affected must be re-established at the lessee's expense in accordance with the accepted BLM survey practices defined in the "Manual of surveying instructions for the Survey of the Public Lands of the United States."

## J. MISCELLANEOUS

Upon determination by the Authorized Officer of an impending field development, a transportation plan will be required to reduce unnecessary access roads.

Additional site surveys, grading plans, and engineering designs may be required in VRM Class II areas.

Should additional site-specific environmental analyses at the time of exploration or development reveal the need for additional restrictions or the continuance of existing lease stipulations, these restrictions will become part of the development or operational plan.

Survey Monuments: All survey monuments, witness corners, reference monuments, and bearing trees shall be protected against destruction, obliteration, or damage. Any markers so affected must be re-established at the lessee's expense in accordance with accepted BLM survey practices defined in the "Manual of Surveying Instructions for the Survey of the Public Lands of the United States."

Burning of solid or liquid wastes usually requires a burning permit. The permit must be obtained from the state air quality agency.

D-11

BLM_0005970

# APPENDIX E

# PROPOSED ACTION ALTERNATIVE

# LEASE STIPULATIONS

BLM_0005971

# APPENDIX E

# PROPOSED ACTION ALTERNATIVE LEASE STIPULATIONS

## INTRODUCTION

Oil and gas leases are issued granting the lessee the right to extract the oil and gas resource. Section 6 (see Appendix C) of the lease restricts the lease rights granted by requiring protection of other resources during development of the oil and gas. If it is necessary to restrict the rights more than in the standard lease contract, stipulations are appended to the lease. The additional restrictions needed to protect resources and values under this alternative are shown below, categorized by type of stipulation and Resource/Planning Area (GSRA, KRA, LSRA, NPA, and SJ/SMPA) to which they are applicable.

Stipulations are applied by legal description to oil and gas leases on the basis of standard quarter-quarter sections (40 acres) or lots. That is, any lease parcel containing at least a quarter-quarter section or lot needing mitigation will have the appropriate stipulation appended to the lease document. If the parcel of land needing mitigation is smaller than a quarter-quarter section or lot, no leasing stipulation is appended to the document since that small a parcel can be avoided by standard lease terms further defined in Code of Federal Regulations, Title 43, subpart 3101.1-2 (see discussion in Appendix C, page C-1). This means that sites requiring special protection, such as a one-acre site, do not require leasing stipulations. If, however, the same one-acre site must have protection for a quarter mile radius around the site, a leasing situation providing that protection would be written for the entire surrounding forty acre square (e.g., 1/4 1/4 section).

These stipulations are evaluated for use on all federal mineral estate regardless of surface ownership, with the exception of the federal mineral estate underlying surface administered by the U. S. Forest Service.

The regulations covering modification and waiver of stipulations are found in the Code of Federal Regulations (CFR), Title 43, Subpart 3101.1-4. Generally, a waiver, exception, or modification may be approved if the record shows that circumstances or relative resource values have changed or if the lessee can demonstrate that operations can be conducted without causing unacceptable impacts, and that less restrictive stipulations will protect the public interest. Waivers, exceptions, or modifications can only be granted by the Authorized Officer. If the proposed waiver, exception, or modification is inconsistent with the plan, the plan will be amended or the change to the stipulation will be disallowed. Even where no exception criterion is identified, exceptions are considered on a case-by-case basis. The Glossary in Chapter 7 contains the definitions used by the BLM for waiver, exception, and modification.

Exceptions to leasing stipulations will be granted by the Authorized Officer if the reason for the exception is consistent with that analysis. No public notice is required for exceptions to lease stipulations which conform to the plan. Other possible exceptions may be granted only upon plan amendment and public notification.

Modifications to stipulations are made if and when resource management determines the stipulation is no longer effective as written. This situation occurs when new information (for example, from a monitoring program, technical data, etc.) shows that the protective measure is unnecessarily restrictive. Modification of a stipulation requires the preparation of an environmental assessment to determine the potential impacts and plan

BLM_0005972

**APPENDIX E**

amendment or maintenance needs. If the modification is determined by the Authorized Officer to be substantial, a 30-day public notice will be given prior to modifying the lease stipulation.

Waiver means the complete elimination of a stipulation from a particular lease contract. A stipulation is waived by the Authorized Officer after preparation of an environmental assessment and a decision is made that the stipulation in question is no longer required for a particular lease. The decision to waive a substantial stipulation requires a plan amendment and a 30-day public notice period prior to waiver.

The stipulations common to two or more Resource/Planning Areas are listed first and the areas to which they apply are coded in a [ ] following the stipulation.

# I. No Surface Occupancy Stipulations (NSO)

---

Serial No._____

NO SURFACE OCCUPANCY STIPULATION

No Surface Occupancy or use is allowed on the lands described below (legal subdivision or other description).

For the purpose of:

Any change to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance of the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820

Form #/Date

Figure E-1
Uniform Oil and Gas Lease Stipulation Format

---

The No Surface Occupancy stipulation is intended for use only when other stipulations are determined insufficient to adequately protect the public interest. The plan amendment analysis shows that less restrictive stipulations are inadequate to protect the resource in question. These resources/values are to be protected are also considered for no leasing areas, but it is determined that No Surface Occupancy is adequate for resource/value protection. An NSO stipulation is not needed if the desired protection does not require relocation of proposed operations by more than 200 meters (43 CFR 3101.1-2).

The Uniform Oil and Gas Lease Stipulation Format, shown in Figure E-1, will be used to append all new NSO stipulations to the lease document.

1. Within area of approved surface coal mine: Conservation of natural resources. This stipulation may be waived without a plan amendment if the lessee agrees that any well approved for drilling will be plugged below the coal when the crest of the highwall approaches within 500 feet of the well, and that the well will be re-entered or redrilled after the completion of mining operations through the well location. A suspension of operations and production will be considered for the lease only when a well is drilled and then is plugged, and a new well or re-entry is planned when the mine moves through the location.

2. Grouse (includes sage grouse, mountain sharp-tailed, lesser and greater prairie chickens). NSO within one-quarter mile radius of a lek site (courtship area). [All]

Exception for grouse leks. The NSO area may be altered depending upon the active status of the lek or the geographical relationship of topographical barriers and vegetation screening to the lek site.

3. Raptors (includes golden eagle and osprey; all accipiters; falcons except kestrel; buteos; and owls). Raptors that are listed and protected by the Endangered Species Act are addressed separately. NSO within one-eighth mile radius of nest site. [All]

Exception for raptor nest site. The NSO area may be altered depending on the active status of the nest site or the geographical relationship of topographic barriers and vegetation screening to the nest site.

E-2

## PROPOSED ACTION ALTERNATIVE LEASE STIPULATIONS

4.   Bald Eagle  NSO within one-quarter mile radius of the roost or nest site. [All]

Exception for bald eagle roost site. The NSO applies to the essential features of the winter roost site complex. The NSO area may be altered depending on the active status of the roost or the geographical relationship of topographic barriers and vegetation screening.

There are no exceptions for nest sites.

5.   Peregrine Falcon  NSO within one-quarter mile radius of cliff nesting complex. [All]

There are no exceptions for cliff nesting complexes.

6.   Mexican Spotted Owl  NSO within one-quarter mile radius of the confirmed roost site and nesting site. [All]

There are no exceptions for confirmed sites.

7.   Waterfowl and Shorebird  NSO on significant production areas (Major areas are Waterfowl Habitat Management Areas and rookeries.) [All]

No exceptions.

8.   NSO on habitat areas with special status plant species (Includes federally listed and proposed species for listing and candidate species.) [All]

Exception for special status plant species habitat. The NSO may be altered after important factors are considered in the impact analysis such as the type and amount of surface disturbance; plant frequency and density; and the relocation of disturbances.

## Glenwood Springs Resource Area --(NSO)

1.   Major River Corridors: Protection of 1) threatened and endangered and sensitive fish and wildlife species, 2) riparian values, 3) waterfowl production areas, and 4) the lower Colorado River ACEC: One-half mile either side of the high water mark of the river: No exception criterion is identified.

2.   Rifle Falls and Glenwood Springs Fish Hatcheries: Protection of water quality and quantity supplying the Rifle Falls and Glenwood Springs Fish Hatcheries: Two-mile radius of the hatcheries: Exception criterion would include special mitigative measures developed in consultation with Colorado Division of Wildlife.

3.   Deep Creek ACEC/SRMA/VRM Class I/Cave Resource Area: Protection of recreational, visual, and cave resource values. No exception criterion identified. No Subsurface Occupancy: Drilling is prohibited through a zone beginning at the surface to an elevation of 5,600 feet above mean sea level. No exception criterion identified.

4.   Bull Gulch  ACEC/SRMA/VRM Class I: Protection of semi-primitive and non-motorized recreational values, and visual values: No exception criterion identified.

5.   Thompson Creek ACEC/SRMA/VRM Class I: Protection of semi-primitive non-motorized recreational and visual values: No exception criterion is identified.

6.   Hack Lake SRMA: Protection of semi-primitive non-motorized recreational and visual values: Exception criterion includes mitigative measures to screen operations from scenic view sheds; reduce to acceptable level drill rig and other equipment noise; and fence or otherwise protect recreating public from operations.

7.   Rifle Mountain Park: Protection of recreational and visual values: Exception criterion includes mitigative measures to screen operations from scenic view sheds; reduce to acceptable level drill rig and other equipment noise; and fence or otherwise protect recreating public from operations. Exception mitigation will be developed in consultation with Park authorities.

8.   Sunlight Peak Area: Protection of semi-primitive non-motorized recreational and visual values: Exception criterion includes mitigative measures to screen operations from scenic view sheds; make drill rig and other equipment noise substantially unnoticeable at a distance; and fence or make substantially unnoticeable at a distance or otherwise protect recreating public from operations.

E-3

## APPENDIX E

9. Garfield Creek, Basalt, and West Rifle Creek State Wildlife Areas: Protection of wildlife habitat values for which these areas were acquired: 1) Crucial big game and upland game winter habitat and concentration areas. 2) Riparian values. Exception criterion includes special mitigative measures approved by the Colorado Division of Wildlife.

10. Critical Watershed Areas: Protection of municipal watersheds providing domestic water for the communities of Rifle and New Castle and the for the protection of the Glenwood Springs Debris Flow Hazard Zone. No exception criterion is identified.

11. Colorado and Eagle Rivers SRMAs: NSO required to protect recreational and visual values: Exception criterion includes mitigative measures to screen operations from scenic view; make drill rig and other equipment noise substantially unnoticeable at a distance; and fence or otherwise protect recreation public from operations.

### Kremmling Resource Area--(NSO)

1. Kremmling Cretaceous Ammonite ACEC/RNA: Protection of ammonite fossils: No exception criterion is identified.

2. North Park Phacelia ACEC/RNA: Protection of a known endangered plant species: No exception criterion is identified.

3. Windy Gap Cultural RMA: Protection of archaeological sites: No exception criterion is identified.

4. Colorado River SRMA: Protection of recreational and scenic values along part of the Colorado River: No exception criterion is identified.

5. North Sand Hills SRMA: Protection of recreational values: No exception criterion is identified.

6. Sulphur Ranger District Office: Protection of a U.S. Forest Service administrative site: No exception criterion is identified.

### Little Snake Resource Area-- (NSO)

1. Limestone Ridge ACEC: Protection of remnant plant associations and sensitive plant species, and scenic values: No exception criterion is identified.

2. Cross Mountain Canyon ACEC: Protection of sensitive plants, endangered species, scenic and recreational values: No exception criterion is identified.

3. Little Yampa/Juniper Canyon SRMA: Protection of flatwater boating opportunities and scenic values: No exception criterion is identified.

4 Cedar Mountain SRMA: Protection of recreational and educational opportunities, and scenic values: No exception criterion is identified.

5 Steamboat Lake State Park: Protection of recreational and scenic values: No exception criterion is identified.

6. Pearl Lake State Park: Protection of recreational and scenic values: No exception criterion is identified.

### Northeast Planning Area--(NSO)

1. Reservoir and Railroad Right-of-Ways: Within certain reservoir and railroad rights-of-way to protect improvements. Exception criterion includes demonstrating to the satisfaction of the Authorized Officer that these lands can be occupied without damage to improvements.

2. Reservoirs and Rivers: Certain tracts that contain important riparian and wildlife values at or near the following: South Platte River; Prewitt Reservoir; Julesburg Reservoir; Prospect Reservoir; Horsecreek Reservoir; Milton Reservoir; Lower Latham Reservoir; Riverside Reservoir; Empire Reservoir; Bijou Reservoir; Ft. Collins Reservoir; South Republican River. Exception criterion includes demonstration to the Authorized Officer that operations can be conducted without causing unacceptable impacts to the values being protected.

3. State County and City Parks: Protection of recreational and scenic values: No exception criterion is identified.

BLM_0005975

## PROPOSED ACTION ALTERNATIVE LEASE STIPULATIONS

4.    I-70 Corridor:  Protection of scenic values along I-70 in Clear Creek County:  Exception criterion includes mitigative measures to screen operations from scenic view sheds.

### San Juan/San Miguel Planning Area--(NSO)

The following areas will have NSO stipulations appended to leases issued within them for the protection of scenic, natural, and cultural values and resources. No exception criterion is identified.

Cannonball Ruin

Lowry Ruin and Associations

Dominguez-Escalante Ruins

Tabeguache Cave II and Tabeguache Canyon

Dolores Cave

Tabeguache Pueblo

McLean Basin Towers and associations

Painted Hand Petroglyphs and associations

Painted Hand Ruin

Indian Henry's Cabin and associations

Lighting Tree Tower Group

Battle Rock

Easter Ruin

Seven Towers Ruin Group

Hovenweep Canyon

East Cortez

Goodman Canyon and Goodman Point Buffer Zone

Bass Ruin Complex

Sandstone Canyon

Brewer Well Complex

Yellowjacket Canyon

Basin Wickiup Village

Woods Canyon

Bridge Canyon

Porter Ruin

Upper Ruin Canyon

Bowdish Canyon

Sand and East Rock Canyons:  Protection of archaeological values.

Squaw/Papoose, Cross, and Cahone Canyons:  Protection of archaeological values.

Hovenweep National Monument Cooperative Management Strategies Area:  Protection of the archaeological resources of Horseshoe/Holly House segment of the Hovenweep National Monument.  No exception criterion identified.

Cutthroat Castle Ruin Group Buffer Zone:  Protection of archaeological values.

Dolores River Canyon:  Protection of recreational and visual values.

Bridge Canyon (McElmo) RNA:  Protection of habitat for rare species of flora and fauna.

Menefee and Weber Mountains:  Protection of recreational and visual values.

Horse Range Mesa Paleontological site (40 acres): Protection of vertebrate fossils:  Exception criterion includes funding of accredited paleontological excavation to recover all vertebrate fossils to the point of scientific insignificance.

## II.    Timing Limitation Stipulations  (TL)

The Timing Limitation (often called seasonal) stipulation prohibits fluid mineral exploration and development activities for time periods less than year-long.   The dates and location(s) limiting activity are as specific as possible.  A timing limitation stipulation is not necessary if the time limitation involves

E-5

BLM_0005976

**APPENDIX E**

the prohibition of new surface disturbing operations for periods of less than 60 days (43 CFR 3101.1-2).

Timing limitations shorter than 60 days do not require a lease stipulation. The restriction is added directly to the field operation approval as a Condition of Approval (see Appendices D and F), and may be noted on the lease as Lease Notices (see Appendix E). However, in those cases where two or more time restrictions combine or overlap to form a restriction of more than 60 days, the closure will be attached to the lease as a stipulation, as a matter of Colorado BLM policy. Additional restrictions of 60 days or less may still be added to field operations for protection of resources/values other than those stipulated.

---

Serial No._____

TIMING LIMITATION STIPULATION

No surface use is allowed during the following time period(s). This stipulation does not apply to operation and maintenance of production facilities.

On the lands described below:

For the purpose of (reasons):

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)

Form #/Date

Figure E-2.
Uniform Oil and Gas Stipulation Format

---

1.   Big game species (includes species of mule deer, elk, pronghorn antelope, and bighorn sheep). Note: Crucial winter habitat includes severe big game winter range or other definable winter ranges as mapped by the Colorado Division of Wildlife.

Big Game Crucial Winter Habitat - December 1 to April 30 [All]

Exception for big game crucial winter habitat. Under mild winter conditions, the last 60 days of the seasonal limitation period may be suspended. Severity of the winter will be determined on the basis of snow depth, snow crusting, daily mean temperatures, and whether animals were concentrated on the crucial winter range during the winter months.

Exception for big game crucial winter habitat. This limitation may or may not apply to work requiring a Sundry Notice pending environmental analysis of any operational or production aspects.

2.   Big Game Birthing Areas: (by species)
Elk calving - April 16 to June 30
Pronghorn Antelope fawning -
May 1 to July 15
Rocky Mountain Bighorn Sheep
Lambing -May 1 to July 15
Desert Bighorn Sheep Lambing -
March 16 to May 30 [All]

Exception for Big Game Birthing Areas. When it is determined through a site-specific environmental analysis that specific actions would not interfere with critical habitat function or compromise animal condition within the project vicinity, the restriction may be altered or removed.

3.   Grouse (includes sage grouse, mountain sharp-tailed, and lesser and greater prairie chickens)

Sage grouse crucial winter habitat - December 16 to March 15 [All]

There are no exceptions.

4.   Greater Sandhill Crane

Nesting and staging habitat areas - March 1 to October 16 [All]

There are no exceptions.

5.   White Pelican

Nesting and feeding habitat areas - March 16 to September 30 [All]

There are no exceptions.

E-6

BLM_0005977

## PROPOSED ACTION ALTERNATIVE LEASE STIPULATIONS

6.     Raptors (includes the golden eagle and osprey, and all accipiters; falcons, except the kestrel*; all butteos; and owls). Raptors that are listed and protected by the Endangered Species Act are addressed separately.

* Kestrels are very adaptable to nest in a variety of habitats and their populations are stable and widespread.

Raptor nesting and fledgling habitat - February 1 to August 15 [All]

This seasonal limitation applies to a one-quarter mile buffer zone around the nest site except for the ferruginous hawk and osprey.

Ferruginous hawk nesting and fledgling habitat - February 1 to August 15. The sensitivity of the ferruginous hawk to human associated disturbance activities requires a one-mile buffer zone to avoid nest abandonment.

Osprey nesting and fledgling habitat - April 1 to August 31. The sensitivity of osprey to human associated disturbance activities requires a half-mile buffer zone to avoid nest abandonment.

Exception for raptor nesting habitat. During years when a nest site is unoccupied or unoccupied by or after May 15, the seasonal limitation may be suspended. It may also be suspended once the young have fledged and dispersed from the nest.

7.     Mexican Spotted Owl

Mexican spotted owl nesting and fledgling habitat - February 1 to July 31. [All]

The Mexican spotted owl has been petitioned for listing as a threatened or endangered species to U.S. Fish and Wildlife Service. Subject to the petition determination, the following habitat management guidelines and restrictions will be used to protect the Mexican spotted owl. These guidelines are adopted from the interim timber harvest management guidelines issued by the Forest Service, Southwest Region (*Federal Register*, Vol. 54, No.124, June 29, 1989).

Proposed restriction for Mexican spotted owl habitat.   Core habitat areas are nesting, feeding, and roosting areas and are not considered to be overlapping.  The Mexican

spotted owl territory is estimated at 2,000 acres.  In core areas, 450 acres, with multiple sightings of the Mexican spotted owl but with no confirmed nest or roost sites, surface disturbance activities are restricted within the 450 acres of the total territory (2,000 acres). On the remaining acreage within the Mexican spotted owl territory, other surface activities are allowed pending impact assessments through the environmental analysis process.

In areas with a confirmed nest and roost site, surface management activities will be limited and will be determined on a case-by-case basis to allow as much flexibility as possible outside of the core area. The core area with a confirmed nest and roost site is 1,480 acres with restricted surface disturbance activities.

There are no exceptions.

8.     Bald Eagle

Nesting Habitat - December 15 to June 15 [All]

Restriction for bald eagle courtship behavior and nesting habitat. This time period is extremely sensitive to human disturbance activities and may cause nest abandonment and desertion of long established territories. A one-half mile buffer zone around the nest site is required to prevent disruption of nesting.

Exception for bald eagle nesting habitat. During years when a nest site is unoccupied by or after May 15, the timing limitation may be suspended. It may also be suspended once the young have fledged and dispersed from the nest.

Winter Roost Site - November 16 to April 15

Restriction for bald eagle winter roost site. The sensitivity of bald eagles to human disturbance activities requires a one-half mile buffer area around the roost site to avoid relocation to less suitable areas.

Exception for winter roost habitat. If there is partial or complete visual screening of the area of activity, the primary zone around the roost site may be reduced to one-quarter mile.

BLM_0005978

**APPENDIX E**

9.    Peregrine Falcon

Cliff Nesting Complex - March 16 to July 31 [All]

Restriction for peregrine falcon cliff nesting complex. The sensitivity of peregrine falcon to human disturbance activities requires a half-mile buffer area around the nesting complex to prevent abandonment and desertion of established territories.

The following exception would apply only after formal Section 7 Consultation with the U.S. Fish and Wildlife Service was consummated.

Exception for nesting habitat. During years when a nest site is unoccupied or unoccupied by or after May 15, the seasonal limitation may be suspended. It may also be suspended once the young have fledged and dispersed from the nest.

### Glenwood Springs Resource Area --(TL)

No additional.

### Kremmling Resource Area--(TL)

No additional.

### Little Snake Resource Area--(TL)

1.    Isolated and/or Roadless Areas: August 16 to November 14.

2.    No helicopter or motor vehicle use would be allowed in the Wild Horse Herd Management Area (March 2 to June 30)--foaling season for wild horses.

3.    No drilling or development operations activity would be permitted within a one-mile radius of the location listed below, from March 1 to December 1:
   Wild Horse Spring; NE1/4SE1/4 sec. 26, T. 10 N., R. 98 W.
   Sheepherder Spring; SE1/4SE1/4 sec. 8, T. 10 N., R. 98 W.
   Coffee Pot Spring; SE1/4NW1/4 sec. 22, T. 11 N., R. 98 W.
   Two Bar Spring: SE1/4SW1/4 sec. 35, T. 9 N., R. 99 W.
   Dugout Draw Spring; SW1/4SE1/4 sec. 33, T. 10 N., R. 97 W.

This restriction would allow wild horses the uninhibited and undisturbed use of their critical drinking water sources during the period when snow is generally unavailable. Exception criterion would include provision, by the operator, of an alternate dependable water source at a suitable location outside the mile radius of the spring prior to the authorized activity. The alternate source shall be installed and properly functioning in a continuous manner for a sufficient time, prior to activity, to allow the wild horses to locate and use the source. No activity will be allowed to commence until this stipulation is completely and satisfactorily complied with. Maintenance would be the sole responsibility of the operator.

### Northeast Planning Area--(TL)

1.    North Sterling Reservoir on Developed Recreation Lands: Protection of scenic and recreational values: May 15 - September 15. An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that operations can be conducted without causing unacceptable impacts to the scenic and recreational values.

2.    Cherokee Park State Wildlife Area (Middle, Lower, and Lone Pine Units): Protection of wildlife and recreational values: May 1 - September 30. An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that operations can be conducted without causing unacceptable impact to the wildlife and recreational values.

### San Juan/San Miguel Planning Area--(TL)

1.    Wild Horse Foaling Area: March 2 to June 30

## III.    Controlled Surface Use Stipulations (CSU)

The Controlled Surface Use (CSU) Stipulation is intended to be used when fluid mineral occupancy and use are generally allowed on all or portions of the lease area year-round, but because of special values or resource concerns, some aspects of lease activities must be strictly controlled. The CSU stipulation is used to identify

E-8

BLM_0005979

## PROPOSED ACTION ALTERNATIVE LEASE STIPULATIONS

constraints on surface use or operations which may otherwise exceed the mitigation available under Section 6 of the standard lease terms, regulations, and operating orders. The CSU stipulation is less restrictive than the NSO or TL stipulations, which prohibit all occupancy and use on all or portions of a lease for all or portions of a year. The use of this stipulation should be limited to areas where restrictions or controls are necessary for specific types of activities rather than all activity.

---

Serial No._____

CONTROLLED SURFACE USE STIPULATION

Surface occupancy or use is subject to the following special constraints.

On the lands described below:

For the purpose of:

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes. (For guidance on the use of this stipulation, see BLM Manual 1624 and 3101 or FS Manual 1950 and 2820.)

Form #/Date

Figure E-3
Uniform Oil and Gas Stipulation Format

---

1. For the conservation of natural resources, operations proposed within the area of an approved underground coal mine will be relocated outside the area to be mined or to accommodate room and pillar mining operations. This stipulation may be waived without a plan amendment if the lessee agrees that the drilling of a well will be subject to the following conditions: (1)(a) well must be plugged when the mine approaches within 500 feet of the well; (b) well must be plugged in accordance with Mine Safety and Health Administration (formerly Mine Enforcement and Safety Administration) Informational Report 1052; (c) operator will provide accurate location of where the casing intercepts the coal by providing a directional and deviation survey of the well to the coal operator; or (2) relocate well into a permanent pillar or outside the area to be mined. A suspension of operations and production will be considered when the well is plugged and a new well is to be drilled after mining operations move through the location. [All]

2. Fragile Soil Areas. Prior to surface disturbance of fragile soils, it must be demonstrated to the Authorized Officer through a plan of development that the following performance objectives will be met. [GSRA, LSRA]

Performance Objectives:

I. Maintain the soil productivity of the site.

II. Protect off-site areas by preventing accelerated soil erosion (such as landsliding, gullying, rilling, piping, etc.) from occurring.

III. Protect water quality and quantity of adjacent surface and groundwater sources.

IV. Select the best possible site for development in order to prevent impacts to the soil and water resources.

Fragile soil areas, in which the performance objective will be enforced, are defined as follows:

a. Areas rated as highly or severely erodible by wind or water, as described by the Soil Conservation Service in the Area Soil Survey Report or as described by on-site inspection.

b. Areas with slopes greater than or equal to 35 percent, if they also have one of the following soil characteristics: (1) a surface texture that is sand, loamy sand, very fine sandy loam, fine sandy loam, silty clay or clay; (2) a depth to bedrock that is less than 20 inches; (3) an erosion condition that is rated as poor; or (4) a K factor of greater than 0.32.

Performance Standards:

I. All sediments generated from the surface-disturbing activity will be retained on site.

E-9

BLM_0005980

**APPENDIX E**

II.   Vehicle use would be limited to existing roads and trails.

III.   All new permanent roads would be built to meet primary road standards (BLM standards) and their location approved by the Authorized Officer.   For oil and gas purposes, permanent roads are those used for production.

IV.   All geophysical and geochemical exploration would be conducted by helicopter, horseback, on foot, or from existing roads.

V.   Any sediment control structures, reserve pits, or disposal pits would be designed to contain a 100-year, 6-hour storm event.   Storage volumes within these structures would have a design life of 25 years.

VI.   Before reserve pits and production pits would be reclaimed, all residue would be removed and trucked off-site to an approved disposal site.

VII.   Reclamation of disturbed surfaces would be initiated before November 1 each year.

VIII.   All reclamation plans would be approved by the Authorized Officer in advance and might require an increase in the bond.

3.   Prior to surface disturbance on slopes of, or greater than, 40 percent, an engineering/reclamation plan must be approved by the Authorized Officer.   Such plans must demonstrate how the following will be accomplished:   [All]

a.   Site productivity will be restored.

b.   Surface runoff will be adequately controlled.

c.   Off-site areas will be protected from accelerated erosion such as drilling, gullying, piping, and mass wasting.

d.   Surface-disturbing activities will not be conducted during extended wet periods.

e.   Construction will not be allowed when soils are frozen.

Exception Criteria:   None.

4.   For the protection of perennial water impoundments and streams, and/or riparian/wetland vegetation zones, activities associated with oil and gas exploration and development including roads, transmission lines, storage facilities, are restricted to an area beyond the riparian vegetation zone. [All]

Exceptions:   This stipulation may be excepted subject to an on-site impact analysis with consideration given to degree of slope, soils, importance to the amount and type of wildlife and fish use, water quality, and other related resource values.

This stipulation will not be applied where the Authorized Officer determines that relocation up to 200 meters can be applied to protect the riparian system during well siting.

**Glenwood Springs Resource Area --(CSU)**

1.   Visual Resource Management Class II Areas:   Relocation of operations more than 200 meters as required to protect visual values:   Exception criteria include mitigative measures to screen operations from scenic view sheds and restoration of disturbed areas to a condition substantially unnoticeable to casual observer.

**Kremmling Resource Area--(CSU)**

No additional.

**Little Snake Resource Area-- (CSU)**

1.   Irish Canyon ACEC.   Inventory for sensitive plant and remnant vegetation associations will be required.   Sensitive plants and associations identified will be avoided.   Known geologic values and cultural resources will be avoided.

2.   Lookout Mountain ACEC.   Inventory for sensitive plant and remnant vegetation associations will be required.   Sensitive plants and associations identified will be avoided.

**Northeast Planning Area--(CSU)**

No additional.

E-10

BLM_0005981

## PROPOSED ACTION ALTERNATIVE LEASE STIPULATIONS

**San Juan/San Miguel Planning Area--(CSU)**

No additional.

## IV.   Special Administrative Stipulations (SA)

These are stipulations provided by another agency or organization. The BLM encourages other agencies to use the Rocky Mountain Regional Coordinating Committee's Uniform Stipulation Format, however, that is not always feasible.

**Glenwood Springs Resource Area --(SA)**

None

**Kremmling Resource Area--(SA)**

None

**Little Snake Resource Area--(SA)**

None

**Northeast Planning Area--(SA)**

1.   Bureau of Reclamation Lands will be subject to Special Stipulations developed by that agency. The "Special Stipulation" currently in use by the Bureau of Reclamation is available for review in the Northeast Resource Area Office.

2.   The Lowry Bombing Range (3,657 acres) lands will be subject to Special Stipulations developed by the U. S. Air Force. The Special Stipulations currently in use by the U. S. Air Force concerning unexploded ordnance is available for review in the Northeast Resource Area Office.

**San Juan/San Miguel Planning Area--(SA)**

None

## V.   Lease Notices (LN)

Lease Notices are attached to leases to transmit information at the time of lease issuance to assist the lessee in submitting acceptable plans of operation, or to assist in administration of leases. Lease Notices are attached to leases in the same manner as stipulations, however, there is an important distinction between Lease Notices and stipulations. Lease Notices do not involve new restrictions or requirements. Any requirements contained in a Lease Notice must be fully supported in either a law, regulations, standard lease terms, or onshore oil and gas orders. Guidance in the use of Lease Notices is found in BLM Manual 3101 and CFR 3101.1-3.

If a situation or condition is known to exist that could affect lease operations, there should be full disclosure at the time of lease issuance via a Lease Notice. If a lessee may be prevented from extracting oil and gas through a prohibition mandated by a specific nondiscretionary statute, such as the Endangered Species Act, a stipulation may be used even though a Lease Notice would be sufficient. It is at the discretion of the Authorized Officer whether a situation is sufficiently sensitive to warrant the use of a lease stipulation.

**Lease Notices common to two or more Resource/Planning Areas-- applicable areas are shown in a [ ] following the Notice.**

1.   Surface-disturbing activities in Class I and II Paleontological Areas will have an inventory performed by an accredited paleontologist approved by the Authorized Officer. [All]

2.   In order to protect nesting sage grouse, surface disturbing activities proposed during the period between March 1 and June 30 will be relocated, consistent with lease rights granted and section 6 of the standard lease terms, out of sage grouse nesting habitat. Sage grouse nesting habitat is described as sagebrush stands with sagebrush plants between 30 and 100 centimeters in height and a mean canopy cover between 15 percent and 40 percent. [All]

3.   Sensitive Species Areas: In areas of known or suspected habitat of sensitive plant or animal species, and high priority remnant vegetation associations, a biological and/or botanical inventory may be required prior to approval of operations. The inventory would be used to prepare mitigative measures (consistent with lease rights granted) to reduce the impacts of surface disturbance to

**E-11**

BLM_0005982

## APPENDIX E

the sensitive plant or animal species. These mitigative measures may include (but, are not limited to) relocation of roads, pads, pipelines, and other facilities, and fencing operations or habitat. [GSRA, LSRA]

### Glenwood Springs Resource Area --(LN)

1.   Blue Hill Archaeological ACEC: This area contains a high density of prehistoric and cultural resources. Mitigation will be required at the operator's expense upon discovery of any resources at the time of development. Mitigation would require the services of an archaeologist (private contractor) approved by the Authorized Officer to conduct extensive field work, such as excavation and monitoring of construction activities.

### Kremmling Resource Area--(LN)

No additional.

### Little Snake Resource Area--(LN)

1.   Exploration (including seismic exploration, drilling, or other development or production activity) will generally not be allowed on sheep lambing grounds during lambing activity. Lambing activities usually fall between April 10 and June 30 and last for approximately six weeks. Dates for the six-week closure will be determined for each operation as local conditions dictate.

2.   Prairie dog complexes are being evaluated to determine their habitat suitability for potential reintroduction of the federally endangered black-footed ferret. No surface disturbance activities will be allowed that may significantly alter the prairie dog complex making it unsuitable for reintroduction of the black-footed ferret.   Search guidelines developed by the U. S. Fish and Wildlife Service to determine the presence of the black-footed ferret will continue to be required under Section 7 Consultation requirements.

In areas where recovery actions for the black-footed ferret are likely to occur, the following guidelines will be used to assist in coordinating recovery efforts where petroleum development is proposed or currently exist.   These guidelines were developed by the U.S. Fish and Wildlife

Service, Denver Regional Office, Colorado as a draft document titled *Guidelines for Oil and Gas Activities in Prairie Dog Ecosystems Managed for Black-footed Ferret Recovery*, February 1990.

a.   Petroleum operations and servicing personnel should receive information and instructions about black-footed ferret natural history and it's recovery program to encourage an understanding of the significance of the recovery effort to the species' survival and recovery.

b.   New power lines through the recovery management area should be buried or designed to preclude use as hunting perches by raptorial species such as great horned owls, ferruginous hawks, and golden eagles. Buried power lines should be planned like pipelines as confined to corridors in ecologically less desirable areas outside of prairie dog colonies.

c.   Petroleum development in or near prairie dog colonies occupied by ferrets through recovery efforts should avoid, whenever possible, the period between March 1 to August 31 to avoid impacts to ferrets during breeding, gestation, and weaning periods.

d.   Management agencies, landowners, petroleum companies, and other involved agencies should be included early in general field evaluations and planning activities for petroleum developments. This cooperative effort will result in the development and approval of a Surface Use Plan of Operation that will identify the necessary permits, schedule, and activities commencing development operations.

e.   Proposed developments should be designed to avoid any unpermitted taking of black-footed ferrets. In any case where harm or taking of ferrets is deemed possible by the U.S. Fish and Wildlife Service or the Colorado Division of Wildlife, a permit is required to be issued by these agencies.

f.   Whenever proposed petroleum developments cannot be designed to avoid adverse impacts to black-footed ferret or their habitat (components of the prairie dog ecosystem important to ferrets), a compensation plan should be cooperatively developed and agreed to by the petroleum

E-12

## PROPOSED ACTION ALTERNATIVE LEASE STIPULATIONS

company proposing the development and the land management agency and other cooperating agencies and affected landowners.

### Northeast Planning Area--(LN)

1.    Air Force Cable Notice: Proposed operations located near Air Force underground cables will be moved so as to not interfere with cable performance.

### San Juan/San Miguel Planning Area--(LN)

No additional.

## VI.   No Lease Areas (NL)

The 1920 Mineral Leasing Act subjects all federally owned mineral estate to oil and gas leasing, with certain exceptions (see 43 CFR 3100.0-3). Exceptions include units of the National Park System; incorporated towns, cities and villages; wilderness study areas; wilderness areas; and others. BLM may make discretionary closures to leasing if resource/values are of sufficient importance and there is no way to mitigate impacts through a less stringent stipulation.

This section lists those discretionary closures within the planning units.

### Glenwood Springs Resource Area --(NL)

None

### Kremmling Resource Area--(NL)

1.    Split estate inside Troublesome WSA (625 acres)

### Little Snake Resource Area--(NL)

None

### Northeast Planning Area--(NL)

1.    Air Force Academy (17,900 acres)
2.    Bennett Army National Guard (242 acres)
3.    Fitzsimmons Army Medical Center (600 acres)
4.    Fort Carson (82,700 acres)
5.    Peterson Air Force Base (1,000 acres)
6.    Rocky Mountain Arsenal (17,707 acres)
7.    Rocky Mountain National Park (120 acres)
8.    Lowry Air Force Base (1,920 acres)
9.    Buckley Air National Guard (3,200)

### San Juan/San Miguel Planning Area--(NL)

None

E-13

BLM_0005984

# APPENDIX F

# PROPOSED ACTION ALTERNATIVE

# CONDITIONS OF APPROVAL

BLM_0005985

# APPENDIX F

# PROPOSED ACTION ALTERNATIVE CONDITIONS OF APPROVAL

The conditions of approval (COAs) shown in Appendix D will be used to protect resources analyzed within this Alternative. In addition to the COAs common to all alternatives, the following COAs will be appended to approval documents, as needed.

## THE FOLLOWING COAS ARE COMMON TO TWO OR MORE RESOURCE/PLANNING AREAS --APPLICABLE AREAS ARE SHOWN IN A [ ].

Class I and II Paleontological Areas will have an inventory performed by an accredited paleontologist approved by the Authorized Officer. [All]

In order to protect nesting sage grouse, surface disturbing activities proposed during the period between March 1 and June 30 will be relocated, consistent with lease rights granted and section 6 of the standard lease terms, out of sage grouse nesting habitat. Where relocation up to 200 meters will not remove the proposed operation out of identified habitat (generally where the habitat stand is in a block larger than 40 acres), proposed activities during this time period will be relocated to minimize disturbance to nesting grouse. Sage grouse nesting habitat is described as sagebrush stands with sagebrush plants between 30 and 100 centimeters in height and a mean canopy cover between 15 percent and 40 percent. [All]

Prairie dog complexes are being assessed to determine their suitability for reintroduction of the federally endangered black-footed ferret. An inventory will be conducted prior to starting operations. [GSRA, LSRA, NPA, SJ/SMPA]

Sensitive Species Areas: A biological and/or botanical inventory may be required prior to starting operations. [GSRA, LSRA]

Wells approved in an area of an approved surface coal mine plan must be plugged below the coal when the crest of the highwall approaches within 500 feet of the well. The well can be redrilled or re-entered at a later date. A suspension of operations and production would be considered when the well is plugged and a new well or re-entry is planned when the mine moves through the location. [All]

The following conditions apply to wells approved in areas of an approved underground coal mine plan: (1) (a) well must be plugged when mining approaches within 500 feet of the well; (b) well must be plugged in accordance with Mine Safety and Health Administration (formerly Mine Enforcement and Safety Administration) Informational Report 1052; (c) operator will provide accurate location of where the casing intercepts the coal by providing a directional and deviation survey of the well to the coal operator; or (2) relocate well into a permanent pillar or outside area to be mined. A suspension of operations and production will be considered when the well is plugged and a new well is to be drilled after mining operations move through the location. [All]

The following conditions apply to wells approved in areas outside of approved underground coal mines and where coal is leased: (1)(a) well must be plugged when mining approaches within 500 feet of the well; (b) well must be plugged in accordance with Mine Safety and Health Administration (formerly Mine Enforcement and Safety Administration) Informational Report 1052; (c) operator will provide accurate location of where the casing intercepts the coal by providing a directional and deviation survey of the well to to the coal operator. A suspension of operations and production will be considered when the well is plugged and a new well is to be drilled after mining operations move through the location. [All]

BLM_0005986

## APPENDIX F

### GLENWOOD SPRINGS RESOURCE AREA

Blue Hill Archaeological ACEC: This area contains a high density of prehistoric and cultural resources. Mitigation will be required at the operator's expense upon discovery of any resources at the time of development. Mitigation would require the services of an archaeologist (private contractor) approved by the Authorized Officer to conduct extensive field work, such as excavation and monitoring of construction activities.

### LITTLE SNAKE RESOURCE AREA

Lambing grounds: Exploration (including seismic exploration, drilling, or other development or production activity) will not be allowed on sheep lambing grounds during lambing activity. Lambing activities usually fall between April 10 and June 30 and last for approximately six weeks. Dates for the six week closure will be determined for each operation as local conditions dictate. An exception will be considered for this COA for drilling operations which would require more than nine months to complete and for which it was also shown to the satisfaction of the Authorized Officer that the drilling operations could not avoid taking place in lambing areas during lambing activities.

### NORTHEAST PLANNING AREA

Operations located near Air Force underground cables will be moved so as not to interfere with cable performance.

### SAN JUAN/SAN MIGUEL PLANNING AREA

When wells are proposed/drilled proximal to the outcrop of the producing Fruitland coal bed, geochemical surveys (e.g., soil gas surveys, water analyses, etc.) will be required along the outcrop and vicinity, on a case-by-case basis, to detect/monitor any changes in gas content. An initial survey is required to determine "baseline" conditions and establish "background" levels of methane in the soils. Subsequent surveys will be required on a periodic basis to determine if gas concentrations are changing.

F-2

# APPENDIX G

# PRESENT MANAGEMENT ALTERNATIVE

# LEASE STIPULATIONS

BLM_0005988

# APPENDIX G

# PRESENT MANAGEMENT ALTERNATIVE LEASE STIPULATIONS

Stipulations would be attached to oil and gas leases when they are issued for the Present Management (No Action) alternative.

## GLENWOOD SPRINGS RESOURCE AREA

1. No Surface Occupancy stipulations would be attached to leases issued in the following areas: Thompson Creek Natural Environment Area; Fryingpan, Roaring Fork, Eagle, Crystal, and Colorado River Corridors; Rifle Mountain Park and Rifle Fish Hatchery; Hack Lake Recreation Management Area; Deep Creek ACEC; Municipal watersheds; Glenwood Springs Debris Flow Hazard Zone.

2. Wildlife seasonal stipulations would be attached to leases issued in the areas listed below, prohibiting oil and gas development during the time periods listed.

## KREMMLING RESOURCE AREA

1. Wildlife seasonal stipulation would be attached to leases issued in the areas listed below, prohibiting oil and gas development during the time periods listed.

2. No Surface Occupancy stipulations would be attached to leases issued in the Kremmling Creataceous Ammonite Area of Critical Environmental Concern (ACEC).

3. No Surface Occupancy stipulations would be attached to leases issued on known

occurrences of Phacelia formosula and Osterhout's Milkvetch.

4. No Surface Occupancy stipulations would be attached to leases issued in the Windy Gap Cultural Resource Management Area.

5. No Surface Occupancy stipulations would be attached to leases issued in Colorado River and North Sand Hills Special Recreation Management Areas.

6. No Surface Occupancy stipulations would be attached to leases issued on sage grouse strutting grounds.

7. Notification is provided to oil and gas lessees on known recoverable coal areas that coal development may present conflicts with recovery of oil and gas resources.

### Glenwood Springs Resource Area

| Type of Area Restricted | Dates Activity Prohibited |
| --- | --- |
| Sage grouse strutting grounds | March 20 - May 20 |
| Sage grouse winter concentration areas | November 15 - March 15 |
| Raptor nesting areas | April 1 - August 31 |
| Critical deer and elk winter range | January 15 - April 30 |
| Elk calving area. | May 1 - July 1 |

### Kremmling Resource Area

| Type of Area Restricted | Dates Activity Prohibited |
| --- | --- |
| Greater sandhill crane nesting buffer zones | April 11 - July 1 |
| Sage grouse strutting ground buffer zones | March 16 - June 14 |
| Sage grouse critical winter range | December 17 - March 15 |
| Critical raptor nest buffer zones | March 1 - August 27 |
| Bald eagle wintering habitat | November 1 - March 15 |
| Big-game critical winter range | December 16 - April 15 |
| Elk calving | May 1 - June 15 |

BLM_0005989

## APPENDIX G

### LITTLE SNAKE RESOURCE AREA

1. Wildlife seasonal stipulation would be attached to leases issued in the areas listed below, prohibiting oil and gas development during the time periods listed.

2. No Surface Occupancy stipulations would be attached to leases issued in wildlife habitat for raptors, the greater sandhill crane, wildlife watering areas, beaver colonies, sage grouse strutting grounds, and potential black-footed ferret habitat (some prairie dog towns).

3. The following performance objectives would be attached to leases issued in areas of fragile soils.

I. Maintain the soil productivity of the site by reducing soil loss from erosion and through proper handling of the soil material.

II. Reduce impact to off-site areas by controlling erosion and/or overland flow from these areas.

III. Protect water quality and quantity of adjacent surface and groundwater sources.

IV. Reduce accelerated erosion caused by surface-disturbing activities.

V. Select the best possible site for development in order to reduce the impacts to the soil and water resources.

Fragile soil areas, in which the performance objective will be enforced, are defined as follows:

a. Areas rated as highly or severely erodible by wind or water, as described by the Soil

Conservation Service in the Area Soil Survey Report or as described by on-site inspection.

b. Areas with slopes greater than or equal to 35 percent, if they also have one of the following soil characteristics: 1) a surface texture that is sand, loamy sand, very fine sandy loam, fine sandy loam, silty clay, or clay; 2) a depth to bedrock that is less than 20 inches; 3) an erosion condition that is rated as poor; or 4) a K factor of greater than 0. 32.

Narrative: All proposed surface-disturbing activities within fragile soil areas will undergo a site-specific review at the resource area and/or district level.

To achieve the performance objectives, BLM has identified the following performance standards/stipulations that may apply to surface-disturbing activities. Depending on these variables, an applicant must demonstrate that the performance objectives have been met either through a plan of development, using alternative measures, or through use of the mitigative measures identified below. If the performance objectives through application of the performance standards/stipulations cannot be met, surface occupancy will not be authorized.

1) All sediments generated form the surface-disturbing activity will have to be retained on-site.

2) Construction or other surface-disturbing activities will not be allowed when the soils are saturated to a depth of more than three inches.

3) Vehicle use will be limited to existing roads and trails.

4) All new permanent roads will be built to meet primary road standards (BLM standards); their location will be approved by the Authorized Officer. For oil and gas purposes, permanent roads are those used for production.

5) All geophysical and geochemical exploration will be conducted by helicopter, horseback, on foot, or from existing roads.

Little Snake Resource Area

| Type of Area Restricted | Dates Activity Prohibited |
|---|---|
| Greater sandhill crane nesting and staging area buffer zones | March 1 - October 15 |
| Sage grouse strutting ground buffer zone | March 1 - May 31 |
| Critical raptor nest buffer zones | February 1 - July 31 |
| Bald eagle habitat | November 1 - April 15 |
| Sharptail grouse dance ground buffer zone | March 15 - June 15 |
| Mule deer, bighorn sheep, pronghorn antelope, mountain lion, elk critical winter range | December 1 - April 15 |
| Elk calving, pronghorn antelope fawning, bighorn sheep lambing | May 1 - June 30 |

G-2

BLM_0005990

## PRESENT MANAGEMENT ALTERNATIVE
## LEASE STIPULATIONS

6) Any sediment-control structures, reserve pits, or disposal pits will be designed to contain a 100-year, 6-hour storm event. Storage volumes within these structures will have a design life of 25 years.

7) Before reserve pits, production pits, or emergency pits can be reclaimed, all residue will be removed and trucked off-site to an approved disposal site.

8) Reclamation of disturbed surfaces will be initiated before November 1 each year.

4. No Surface Occupancy stipulations would be attached to leases issued in Limestone Ridge ACEC and Cross Mountain Canyon ACEC.

5. An avoidance stipulation will be attached to that portion of any oil and gas lease issued within Irish Canyon ACEC, Lookout Mountain ACEC, Ace-in-the-Hole Area, Hells Canyon Area, G-Gap Area, Vermillion Creek Area, Vermillion Bluffs Area, and Horse Draw Area and any other area where sensitive plants are found.

The avoidance stipulation states:

On-the-ground surveys for Colorado BLM sensitive plant species will be required before any surface-disturbing activity takes place in areas of previously unsurveyed potential habitat.

The locations of all known populations of Colorado BLM sensitive plants and selected high priority remnant vegetation associations will be protected from human-induced surface disturbing activities.

The area of protection will include the actual location of the populations or occurrence and, if present, adjacent sites critical to their habitat. Selected occurrences of important vegetation associations to receive protection shall be determined in consultation and coordination with the Colorado Natural Areas Program (CNAP).

Those populations/occurrences, upon which analysis determines protection to be necessary, shall be protected by: 1) requiring relocation or rerouting of proposed well sites, pipelines, roads, other surface facilities, etc., or 2) applying other protective mitigation (i.e., fencing). BLM will effectively mitigate potential impacts to important populations/occurrences.

6. A No Surface Occupancy stipulation would be attached to that portion of any oil and gas lease within the Little Yampa/Juniper Canyon Special Recreation Management Area and the Cedar Mountain management unit.

7. A No Surface Occupancy stipulation would be attached to that portion of any oil and gas lease within Steamboat Lake State Park.

## NORTHEAST PLANNING AREA

The table below summarizes the seasonal closure stipulations.

The appropriate stipulations would be attached where necessary when the lease is issued. The stipulations currently in use are listed below.

No Surface Occupancy Stipulation

1. No Surface Occupancy is allowed on the lands described below (legal subdivision or other description).

Within certain reservoir and railroad rights-of-way.

For the purpose of (reasons): Protecting structures within the rights-of-way, and because of the physical impossibility of occupying some of these lands.

**Northeast Resource Area**

| Type of Area Restricted | Dates Activity Prohibited |
|---|---|
| Important waterfowl breeding & nesting habitat | April 1 - June 30 |
| Greater prairie chicken courtship & nesting habitat | March 28 - July 15 |
| Bald eagle winter habitat | November 15 - April 15 |
| Raptor nesting habitat | February 15 - June 30 |
| Crucial mule deer & elk winter range | December 15 - May 31 |
| Elk & bighorn winter range & birthing areas | December 15 - June 30 |
| Turkey | April 1 - July 31 |
| Nesting & feeding habitat for white pelicans | March 15 - September 30 |

G-3

BLM_0005991

## APPENDIX G

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that these lands can be occupied without damage to improvements.

This stipulation may be waived by the Authorized Officer if it is determined that the structures within the rights-of-way have been abandoned.

2. No Surface Occupancy is allowed on the lands described below (legal subdivision or other description).

Certain tracts that contain important riparian and wildlife values at or near:

South Platte River
Prewitt Reservoir
Julesburg Reservoir
Prospect Reservoir
Horsecreek Reservoir
Milton Reservoir
Lower Latham Reservoir
Riverside Reservoir
Empire Reservoir
Bijou Reservoir
Ft. Collins Reservoir
South Republican River

For the purpose of (reasons): Protecting important wildlife and riparian values associated with these areas.

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that operations can be conducted without causing unacceptable impacts to the values being protected.

Timing Limitation Stipulation

No Surface Use is allowed during the following time period(s). This stipulation does not apply to operation and maintenance of production facilities.

1. May 15 to September 15

On developed recreation lands at North Sterling Reservoir.

For the purpose of (reasons): Protecting scenic and recreational values at North Sterling Reservoir.

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that operations can be conducted without causing unacceptable impacts to the recreational values.

This stipulation may be waived by the Authorized Officer if North Sterling Reservoir is no longer used for recreational purposes.

2. March 31 to July 1

Buffer zones around important waterfowl breeding and nesting habitat.

For the purpose of (reasons): Protecting waterfowl from activities that would alter breeding behavior, increase the incidence of nest abandonment, and decrease nesting success.

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that the waterfowl nesting area is not being utilized and is expected to remain so because of a temporary change in climate and/or habitat, or that impacts can be mitigated so as not to cause nest abandonment and decreased breeding success.

This stipulation may be waived by the Authorized Officer only upon a determination that waterfowl nesting areas do not exist within the lease.

3. March 28 to July 15

Buffer areas for greater prairie chicken courtship and nesting habitat.

For the purpose of (reasons): Protecting important habitat required by this species to maintain or increase its numbers in Colorado. The greater prairie chicken is a state endangered species.

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that the courtship/nesting habitat is not being utilized and is expected to remain so because of a temporary change in climate and/or habitat.

This stipulation may be waived by the Authorized Officer only upon determination

G-4

BLM_0005992

## PRESENT MANAGEMENT ALTERNATIVE
## LEASE STIPULATIONS

that courtship/nesting habitat does not exist within the lease.

4. November 15 to April 15

Buffer areas for bald eagle winter habitat including roost, perch, and hunting habitat.

For the purpose of (reasons): Protecting important bald eagle wintering habitat from disturbance which might cause the birds to abandon these areas for less suitable habitat.

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that the winter habitat is not being used and is expected to remain so because of a temporary change in climate and/or habitat, or that impacts can be mitigated to avoid the abandonment of winter habitat.

5. February 15 to July 1

On the lands described below:

Buffer areas around known or suitable potential raptor nesting habitat.

For the purpose of (reasons): Protecting nesting habitat from disturbance which could cause raptors to abandon areas that contain suitable nesting habitat, possibly resulting in an overall reduction in numbers in the state.

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that the nesting habitat is not being utilized and is expected to remain so, or that impacts can be mitigated to avoid the abandonment of occupied nesting habitat.

This stipulation may be waived by the Authorized Officer only upon the determination that potential nesting habitat does not exist within the lease.

6. December 15 to April 1

Crucial mule deer and elk winter range.

For the purpose of (reasons): Protecting crucial mule deer and elk winter range from activities that would cause these species to abandon areas of crucial winter cover and forage for less suitable areas.

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that the crucial winter range is not being utilized and is expected to remain so because of a temporary change in climate and/or habitat, or that impacts can be mitigated to avoid the abandonment of crucial winter range and forage.

This stipulation may be waived by the Authorized Officer only upon the determination that crucial winter range does not exist within the lease.

7. December 15 to July 1

Crucial elk and bighorn sheep winter habitat and calving and lambing areas.

For the purpose of (reasons): Protecting crucial elk and bighorn sheep winter range, as well as calving and lambing areas, from activities that could cause these species to abandon these areas and be forced to use less suitable ranges.

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that the crucial winter range, calving, or lambing areas are not being utilized and are expected to remain so because of a temporary change in climate and/or habitat, or that impacts can be mitigated to avoid the abandonment of these areas.

This stipulation may be waived by the Authorized Officer only upon the determination that crucial winter range, elk calving, or bighorn lambing areas do not exist within the lease.

8. March 15 to October 1

Important nesting, feeding, and resting areas for white pelicans.

For the purpose of (reasons): Protecting important nesting, feeding, and resting areas for white pelicans from activities that could cause the birds to abandon these areas for less suitable habitat.

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that the habitat is not being utilized and is expected to

G-5

BLM_0005993

## APPENDIX G

remain so because of a temporary change in climate and/or habitat, or that impacts can be mitigated to avoid the abandonment of these areas, and reduction of nesting success.

This stipulation may be waived by the Authorized Officer only upon the determination that important white pelican habitat does not exist within the lease.

In addition to the stipulations described above, certain lands will not be leased for oil and gas. These lands are those that are not within one-half mile of occupiable lands which are generally associated with large reservoirs, and within incorporated towns and cities.

On other lands that may or may not contain important surface use values, stipulations will be attached to the lease, or made part of the APD on a case-by-case basis. These are lands where the BLM does not have surface management authority. Generally, they are the lands associated with military bases and with certain state parks, and lands in the Front Range where oil and gas potential is considered very low.

## SAN JUAN/SAN MIGUEL PLANNING AREA

1. Mule Deer and Elk Crucial Winter Ranges

To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be prohibited from December 1 to April 15 on crucial mule deer and elk winter ranges. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by BLM's Authorized Officer.

2. Sage Grouse Strutting Grounds

To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be prohibited from March 15 to May 15 on sage grouse strutting grounds. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by BLM's Authorized Officer.

3. Bald Eagle Winter Concentration Areas - (under the Bald and Golden Eagle Protection

Act and Threatened and Endangered Species Act)

To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be prohibited from December 1 to April 15 on bald eagle winter concentration areas. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by BLM's Authorized Officer.

4. Crucial Peregrine Falcon Nesting Habitat (Perins Peak and Mesa Verde National Park)

No Surface Occupancy. Operations on these lands will not be approved in order to protect crucial peregrine falcon habitat.

5. Important Peregrine Falcon Nesting Habitat (Paradox Valley Area)

To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be prohibited from March 1 to August 31 on important peregrine falcon habitat. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by the Authorized Officer.

6. Elk Calving Area

To protect important seasonal wildlife habitat, exploration, drilling, and other developmental activity will be prohibited from May 1 to July 15 on elk calving area. This limitation does not apply to maintenance and operation of producing wells. Exceptions to this limitation in any year may be specifically authorized in writing by BLM's Authorized Officer.

7. Dolores River Canyon, Menefee, and Weber Mountains

These areas are receiving special management for their significant recreational and visual values. No Surface Occupancy on the described lands will be approved unless it is shown to the satisfaction of the Authorized Officer that the objectives of such special management can still be met.

BLM_0005994

**PRESENT MANAGEMENT ALTERNATIVE**
**LEASE STIPULATIONS**

8. McElmo Research Natural Area (RNA)

The McElmo Research Natural Area is receiving special management for its important habitat for rare species of flora and fauna. No Surface Occupancy on the described lands will be approved unless it is shown to the satisfaction of the Authorized Officer that the objectives of such special management can still be met.

9. Cultural Resources

The following areas are receiving special management for their important archaeological and historical values. No Surface Occupancy on the described lands will be approved unless it is shown to the satisfaction of the Authorized Officer that the objectives of such special management can still be met.

a.  Sand and East Rock Canyons
b.  Cannonball Ruin
c.  Lowery Ruin and Associations
d.  Dominguez-Escalente Ruins
e.  Tabeguache Cave II and Tabeguache Canyon
f.  Dolores Cave
g.  Bull Canyon Rockshelter
h.  Tabeguache Pueblo
i.  McLean Basin Towers
j.  Squaw/Papoose, Cross, and Cahone Canyons
k.  Painted Hand Petroglyphs
l.  Painted Hand Ruin
m.  Indian Henry's Cabin
n.  Lightning Tree Tower Group
o.  Buffer for Hovenweep National Monument
p.  Battle Rock
q.  Easter Ruin
r.  Seven Towers Ruin Group

G-7

BLM_0005995

# APPENDIX H

# PRESENT MANAGEMENT ALTERNATIVE

# CONDITIONS OF APPROVAL

BLM_0005996

# APPENDIX H

# PRESENT MANAGEMENT ALTERNATIVE CONDITIONS OF APPROVAL

The Conditions of Approval (COAs) shown in Appendix D will be used to protect resources analyzed within this alternative. In addition to the COAs common to all alternatives, a COA will be appended to approval documents, as needed, to implement the Fragile Soil Areas and Lambing Grounds oil and gas leasing stipulations shown in Appendix G for Little Snake Resource Area.

## LITTLE SNAKE RESOURCE AREA

Lambing grounds: Exploration (including seismic exploration, drilling, other development or production activity) will not be allowed on sheep lambing grounds during lambing activity. Lambing activities usually fall between May 1 and June 15 and last for approximately six weeks. This condition may be waived for drilling operations which would require more than nine months to complete and for which it was also shown to the satisfaction of the Authorized Officer that the drilling operations could not avoid taking place in lambing areas during lambing activities.

Fragile Soil Areas: 1) All sediments generated from the surface-disturbing activity will have to be retained on-site. 2) Construction or other surface-disturbing activities will not be allowed when the soils are saturated to a depth of more than three inches. 3) Vehicle use will be limited to existing roads and trails. 4) All new permanent roads will be built to meet primary road standards (BLM standards); their location will be approved by the Authorized Officer. For oil and gas purposes, permanent roads are those used for production. 5) All geophysical and geochemical exploration will be conducted by helicopter, horseback, on foot, or from existing roads. 6) Any sediment-control structures, reserve pits, or disposal pits will be designed to contain a 100-year, 6-hour storm event. Storage volumes within these structures will have a design life of 25 years. 7) Before reserve pits, production pits, or emergency pits can be reclaimed, all residue will be removed and trucked off-site to an approved disposal site. 8) Reclamation of disturbed surfaces will be initiated before November 1 each year.

Elk Migration Routes.

BLM_0005997

# APPENDIX I

# STANDARD TERMS AND CONDITIONS ALTERNATIVE

# CONDITIONS OF APPROVAL

BLM_0005998

# APPENDIX I

# STANDARD TERMS AND CONDITIONS ALTERNATIVE

# CONDITIONS OF APPROVAL

The Conditions of Approval (COAs) shown in Appendices D and F will be used to protect resources analyzed within this alternative. In addition to those COAs, more extensive use of Code of Federal Regulations (CFR) 3101.1-2 (Surface Use Rights) will be made. This section of the CFR defines the BLM's ability to influence the location and timing of a drilling operation. Since lease stipulations can not be written for this alternative, the regulatory authority to limit operations by as much as 60 days would be used to restrict the timing of operations to give at least partial protection to wildlife habitat. The regulatory flexibility of moving a proposed operation 200 meters would be employed as needed to protect raptor nests, fragile soils, riparian areas, etc.

I-1

BLM_0005999

# APPENDIX J

# CLIMATIC DATA

**TABLE J-1.  CLIMATIC DATA  (TEMPERATURES)**

| Station | Elevation (ft; Mean Sea Level) | Extreme Minimum | Mean Minimum | Annual Mean | Mean Maximum | Extreme Maximum |
|---|---|---|---|---|---|---|
| **Glenwood Springs Resource Area** | | | | | | |
| Aspen | 7928 | -33 | 26 | 41 | 56 | 93 |
| Climax | 11300 | -33 | 20 | 31 | 42 | 78 |
| Eagle | 6497 | -51 | 24 | 42 | 60 | 99 |
| Glenwood Springs | 5823 | -26 | 31 | 47 | 63 | 102 |
| Rifle | 5400 | -38 | 30 | 47 | 64 | 101 |
| **Kremmling Resource Area** | | | | | | |
| Dillon | 9065 | -45 | 18 | 35 | 53 | 86 |
| Fraser | 8560 | -53 | 13 | 32 | 51 | 98 |
| Grand Lake | 8680 | -43 | 18 | 35 | 52 | 90 |
| Green Mtn Dam | 7740 | -44 | 25 | 40 | 56 | 89 |
| Hot Sulfur Springs | 7800 | -42 | 21 | 38 | 54 | 93 |
| Red Feather Lakes | 7600 | -39 | 28 | 41 | 54 | 97 |
| Spicer | 8379 | -48 | 22 | 37 | 52 | 91 |
| Walden | 7149 | -49 | 20 | 36 | 52 | 91 |
| **Little Snake Resource Area** | | | | | | |
| Craig | 6285 | -45 | 27 | 42 | 58 | 99 |
| Hayden | 6300 | -45 | 26 | 42 | 58 | 100 |
| Steamboat Springs | 6770 | -43 | 18 | 35 | 52 | 90 |
| Yampa | 7892 | -24 | 25 | 39 | 54 | 88 |
| **Northeast Planning Area** | | | | | | |
| Akron | 4663 | -29 | 35 | 49 | 63 | 105 |
| Allenspark | 8500 | -38 | 28 | 41 | 53 | 91 |
| Bonny Dam | 3647 | -24 | 36 | 51 | 65 | 109 |
| Boulder | 5445 | -22 | 40 | 53 | 66 | 104 |
| Burlington | 4165 | -25 | 36 | 52 | 67 | 112 |
| Byers | 5200 | -31 | 34 | 50 | 66 | 106 |
| Cheesman | 6875 | -41 | 29 | 46 | 64 | 99 |
| Cherry Creek Dam | 5647 | -32 | 34 | 50 | 66 | 102 |
| Cheyenne Wells | 4250 | -23 | 36 | 52 | 67 | 106 |
| Denver Airport | 5283 | -25 | 36 | 50 | 64 | 102 |
| Estes Park | 7497 | -39 | 30 | 43 | 57 | 92 |
| Flagler | 4975 | -26 | 33 | 49 | 65 | 104 |
| Fonder | 4739 | -29 | 34 | 51 | 68 | 105 |
| Ft. Collins | 5001 | -41 | 34 | 48 | 62 | 102 |
| Ft. Lupton | 4885 | -37 | 34 | 50 | 66 | 108 |
| Ft. Morgan | 4321 | -41 | 34 | 49 | 64 | 105 |
| Georgetown | 8500 | -26 | 31 | 43 | 56 | 92 |
| Greeley | 4648 | -39 | 33 | 48 | 64 | 106 |
| Grover | 5090 | -27 | 34 | 49 | 64 | 104 |
| Holyoke | 3746 | -23 | 35 | 51 | 66 | 110 |
| Idaho Springs | 7555 | -32 | 28 | 43 | 58 | 94 |
| Julesburg | 3469 | -24 | 36 | 51 | 66 | 109 |
| Kassler | 5495 | -29 | 37 | 52 | 66 | 102 |
| Kauffman | 5250 | -30 | 31 | 47 | 63 | 105 |
| Kit Carson | 4284 | -24 | 34 | 51 | 68 | 109 |
| Limon | 5560 | -29 | 33 | 49 | 64 | 104 |
| Longmont | 4950 | -36 | 33 | 49 | 64 | 105 |
| Parker | 6300 | -38 | 32 | 48 | 64 | 103 |
| Sterling | 3939 | -29 | 34 | 49 | 64 | 106 |
| Stratton | 4334 | -22 | 36 | 51 | 66 | 108 |
| Waterdale | 5260 | -31 | 33 | 49 | 64 | 102 |
| Wray | 3575 | -24 | 36 | 52 | 68 | 112 |
| Yuma | 4125 | -27 | 36 | 51 | 67 | 108 |
| **San Juan/San Miguel Planning Area** | | | | | | |
| Cortez | 6177 | -27 | 33 | 49 | 65 | 100 |
| Durango | 6550 | -30 | 29 | 47 | 64 | 97 |
| Ft. Lewis | 7595 | -35 | 27 | 43 | 58 | 93 |
| Ignacio | 6424 | -34 | 29 | 46 | 64 | 102 |
| Mesa Verde NP | 7070 | -20 | 37 | 50 | 63 | 99 |
| Northdale | 6693 | -26 | 29 | 45 | 61 | 97 |
| Pagosa Springs | 7238 | -46 | 24 | 42 | 60 | 98 |
| Palisade Lakes | 8092 | -25 | 22 | 39 | 56 | 89 |
| Rico | 8842 | -36 | 22 | 39 | 56 | 87 |
| Silverton | 9322 | -37 | 19 | 36 | 53 | 85 |
| Vallecito Dam | 7650 | -35 | 27 | 43 | 59 | 92 |

Source: PEDCO Environmental, Inc. (1981)

BLM_0006000

**TABLE J-2. CLIMATIC DATA (PRECIPITATION AND FROST)**

| Station | Precipitation (inches) | | | | Frost-free Period | | |
|---|---|---|---|---|---|---|---|
| | Annual Mean | Monthly Maximum | Monthly Minimum | Mean Snowfall | Days | Mean Begin Date | Mean End Date |
| **Glenwood Springs Resource Area** | | | | | | | |
| Aspen | 19.3 | 2.1 | 1.2 | 140 | 76 | 6/13 | 8/28 |
| Climax | 23.6 | 2.6 | 1.3 | 278 | 9* | 6/27* | 7/6* |
| Eagle | 10.4 | 1.2 | 0.6 | 48 | 70 | 6/19 | 8/28 |
| Glenwood Springs | 16.0 | 1.7 | 1.1 | 63 | 138 | 5/17 | 10/2 |
| Rifle | 11.3 | 1.4 | 0.7 | 42 | 109 | 5/28 | 9/14 |
| **Kremmling Resource Area** | | | | | | | |
| Dillon | 15.7 | 1.9 | 0.9 | 158 | 6 | 6/28 | 7/4 |
| Fraser | 19.6 | 1.8 | 1.2 | 119 | 4 | 6/20 | 7/3 |
| Grand Lake | 20.2 | 2.4 | 1.1 | 155 | 7 | 6/29 | 7/6 |
| Green Mtn Dam | 15.6 | 1.8 | 1.0 | 98 | 82 | 6/10 | 8/31 |
| Hot Sulfur Springs | 12.7 | 1.5 | 0.8 | 92 | -- | -- | -- |
| Red Feather Lakes | 16.5 | 2.3 | 0.5 | 90 | 71 | 6/16 | 8/26 |
| Spicer | 13.8 | 1.9 | 0.8 | 149 | 40 | 6/21 | 7/31 |
| Walden | 9.9 | 1.5 | 0.4 | 49 | 40 | 6/22 | 8/1 |
| **Little Snake Resource Area** | | | | | | | |
| Craig | 13.4 | 1.6 | 0.8 | 85 | 94 | 6/8 | 9/10 |
| Hayden | 16.4 | 1.6 | 1.2 | 107 | 76 | 6/11 | 8/26 |
| Steamboat Springs | 24.0 | 2.8 | 1.6 | 165 | 28 | 6/23 | 7/21 |
| Yampa | 16.0 | 2.1 | 1.1 | 120 | 87* | 6/19* | 9/14* |
| **Northeast Planning Area** | | | | | | | |
| Akron | 16.1 | 3.1 | 0.4 | 39 | 142 | 5/13 | 10/2 |
| Allenspark | 20.8 | 2.8 | 1.0 | 156 | 71 | 6/12 | 8/22 |
| Betsey Dam | 15.3 | 2.7 | 0.2 | 27 | 161 | 5/4 | 10/12 |
| Boulder | 18.3 | 3.3 | 0.6 | 83 | 152 | 5/9 | 10/8 |
| Burlington | 15.7 | 2.8 | 0.4 | 19 | 151 | 5/5 | 10/3 |
| Byers | 15.0 | 2.5 | 0.4 | 48 | 138 | 5/15 | 9/30 |
| Cheesman | 15.8 | 2.6 | 0.4 | 61 | 120 | 5/26 | 9/23 |
| Cherry Creek Dam | 15.5 | 2.6 | 0.4 | 55 | 146* | 5/13* | 10/6* |
| Cheyenne Wells | 15.5 | 2.9 | 0.2 | 21 | 151 | 5/6 | 10/4 |
| Denver Airport | 15.5 | 2.6 | 0.5 | 62 | 160 | 5/3 | 10/12 |
| Estes Park | 14.2 | 2.2 | 0.4 | -- | 95 | 6/6 | 9/9 |
| Flagler | 15.7 | 3.4 | 0.3 | 28 | 153* | 56* | 10/6 |
| Fowler | 11.6 | 2.5 | 0.2 | 28 | -- | -- | -- |
| Ft. Collins | 14.7 | 2.9 | 0.4 | 46 | 148 | 5/10 | 10/1 |
| Ft. Lupton | 11.7 | 2.2 | 0.3 | -- | 151 | 5/10 | 10/5 |
| Ft. Morgan | 12.7 | 2.5 | 0.2 | 23 | 151 | 5/7 | 10/5 |
| Georgetown | 15.9 | 2.5 | 0.5 | 78 | 120 | 5/27 | 9/24 |
| Greeley | 11.7 | 2.4 | 0.3 | 27 | 142 | 5/11 | 9/30 |
| Grover | 14.2 | 2.6 | 0.2 | 37 | 132 | 5/18 | 9/27 |
| Holyoke | 17.6 | 3.7 | 0.3 | 35 | 145 | 5/11 | 10/3 |
| Idaho Springs | 15.4 | 2.4 | 0.4 | 86 | 107 | 6/3 | 9/18 |
| Julesburg | 17.5 | 3.6 | 0.4 | 20 | 150 | 5/7 | 10/4 |
| Kassler | 17.0 | 3.0 | 0.5 | 80 | 150 | 5/12 | 10/9 |
| Kauffman | 13.5 | 2.7 | 0.2 | 33 | 135* | 58* | 9/20* |
| Kit Carson | 13.6 | 2.2 | 0.2 | 23 | 140 | 5/9 | 9/26 |
| Limon | 14.5 | 2.7 | 0.2 | 27 | 143 | 5/14 | 10/4 |
| Longmont | 12.6 | 2.5 | 0.3 | 39 | 144 | 5/9 | 9/30 |
| Parker | 12.6 | 2.2 | 0.3 | 61 | 131 | 5/19 | 9/27 |
| Sterling | 14.7 | 3.1 | 0.2 | 21 | 139 | 5/10 | 9/26 |
| Stratton | 15.6 | 2.5 | 0.3 | 31 | 153 | 5/7 | 10/7 |
| Wauneta | 15.6 | 2.8 | 0.4 | 47 | 126 | 5/20 | 9/23 |
| Wray | 17.4 | 3.2 | 0.3 | 23 | 145 | 58 | 9/1 |
| Yuma | 17.2 | 3.0 | 0.4 | 34 | 143 | 5/13 | 10/3 |
| **San Juan/San Miguel Planning Area** | | | | | | | |
| Cortez | 12.5 | 1.7 | 0.4 | 43 | 126 | 5/29 | 10/2 |
| Durango | 18.6 | 2.6 | 0.7 | 67 | 113* | 6/8* | 9/29* |
| Pt. Lewis | 17.5 | 2.2 | 1.1 | 79 | 96 | 6/13 | 9/11 |
| Ignacio | 13.9 | 1.8 | 0.6 | 40 | 106 | 6/7 | 9/21 |
| Mesa Verde NP | 18.2 | 2.2 | 0.7 | 79 | 158 | 5/14 | 10/19 |
| Norwood | 11.9 | 1.6 | 0.4 | 37 | 98 | 6/10 | 9/16 |
| Pagosa Springs | 19.0 | 2.5 | 0.7 | 124 | 58 | 6/21 | 8/13 |
| Palisade Lakes | 21.7 | 3.1 | 1.0 | 130 | -- | -- | -- |
| Rico | 25.7 | 2.9 | 1.1 | 171 | 11* | 6/21* | 7/2* |
| Silverton | 23.4 | 3.0 | 1.2 | 140 | 10 | 6/28 | 7/8 |
| Vallecito Dam | 25.1 | 3.1 | 1.1 | 130 | 112 | 64 | 9/24 |

*U.S. Department of Commerce (1982)

Source: PEDCO Environmental, Inc. (1981)

BLM_0006001

TABLE J-3.  SELECTED ATMOSPHERIC DISPERSION DATA

| | Annual | Winter | Spring | Summer | Fall |
|---|---|---|---|---|---|
| Mixing Depth (m) | | | | | |
| Statewide* | | | | | |
| Morning | 350 | 300 | 450 | 350 | 250 |
| Afternoon | 2300 | 1300 | 2900 | 3200 | 2000 |
| Stability (percent) | | | | | |
| Akron | | | | | |
| Unstable | 16 | 9 | 14 | 26 | 14 |
| Neutral | 58 | 62 | 65 | 49 | 56 |
| Stable | 26 | 29 | 21 | 25 | 30 |
| Aurora | | | | | |
| Unstable | 25 | 16 | 25 | 35 | 24 |
| Neutral | 36 | 36 | 44 | 31 | 32 |
| Stable | 39 | 48 | 31 | 34 | 44 |
| Craig+ | | | | | |
| Unstable | 9 | 3 | 18 | 7 | 7 |
| Neutral | 51 | 54 | 55 | 43 | 53 |
| Stable | 40 | 43 | 27 | 50 | 40 |
| Denver | | | | | |
| Unstable | 23 | 13 | 23 | 34 | 22 |
| Neutral | 40 | 43 | 49 | 32 | 38 |
| Stable | 37 | 44 | 28 | 34 | 40 |
| Eagle | | | | | |
| Unstable | 23 | 16 | 21 | 33 | 24 |
| Neutral | 35 | 38 | 44 | 24 | 32 |
| Stable | 42 | 46 | 35 | 43 | 44 |

*Mixing depths are statewide averages.
+BLM, 1983 (GRHF II DEIS)
Source: PEDCO Environmental, Inc. (1981)

TABLE J-4.  STATE AND FEDERAL AIR QUALITY STANDARDS (MICROGRAMS PER CUBIC METER)

| | | Ambient b/ | | | | Increment c/ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Federal | | Colorado | | Federal | | | Colorado | | |
| | Averaging Time a/ | Primary | Secondary | Primary | Secondary | Class I | Class II | Class III | Category I | Category II | Category III |
| Carbon Monoxide | 8 hours | 10,000 | 10,000 | 10,000 | --- | --- | --- | --- | --- | --- | --- |
| | 1 hour | 40,000 | 40,000 | 40,000 | --- | --- | --- | --- | --- | --- | --- |
| Lead | Quarterly | 1.5 | 1.5 | --- | --- | --- | --- | --- | --- | --- | --- |
| Nitrogen Dioxide | Annual | | | | --- | | | | | | |
| | (Arith.) | 100 | 100 | 100 | --- | 2.5 | 25 | 50 | --- | --- | --- |
| Oxidants (Ozone) | 1 hour | 235 | 235 | 160 | --- | --- | --- | --- | --- | --- | --- |
| Sulfur Dioxide | Annual | | | | | | | | | | |
| | (Arith.) | 80 | --- | --- | --- | 2 | 20 | 40 | 2 | 10 | 15 |
| | 24 hours | 365 | --- | --- | --- | 5 | 91 | 182 | 5 | 50 | 100 |
| | 3 hours | --- | 1300 | 700 | --- | 25 | 512 | 700 | 25 | 300 | 700 |
| Total Suspended Particulates | Annual (Geom.) | 75 d/ | 60 d/ | 75 | 60 e/ | 5 | 19 | 37 | --- | --- | --- |
| | 24 hours | 260 d/ | 150 d/ | 260 | 150 | 10 | 37 | 75 | --- | --- | --- |
| Inhalable Particulates (PM10) | Annual (Arith.) | 50 | 50 | f/ | f/ | --- | --- | --- | --- | --- | --- |
| | 24 hours | 150 | 150 | | | --- | --- | --- | --- | --- | --- |

Sources:  National Primary and Secondary Ambient Air Quality Standards (40 CFR 50 et seq. as revised July 1, 1988).
Requirements for Preparation, Adoption and Submittal of Implementation Plans (40 CFR 51.166, as revised July 1, 1988).
Code of Colorado Regulations (Volume 5, Part 14, as amended May 27, 1980).
a/  Short-term standards (those other than Annual and Quarterly) are not to be exceeded more than once each year, except the federal ozone and PM10 standards.
Under federal regulations, the "expected number of days" with ozone or PM10 levels above the standard is not to be exceeded more than once per calendar year.
b/  Ambient standards are the absolute maximum level allowed to protect either public health (primary) or welfare (secondary).
c/  Incremental (Prevention of Significant Deterioration) standards are the maximum incremental amounts of pollutants allowed above the baseline in regions of clean air.
d/  Federal TSP standards were superseded by the Federal PM10 standards, effective July 31, 1987.  The TSP standards will be phased out over time.
e/  The Colorado annual secondary TSP standard was established as a guide in assessing implementation plans to achieve the 24-hour standard.
f/  Colorado is developing PM10 standards at least as stringent as the Federal standards.

J-3

TABLE J-5. ASSUMED BACKGROUND POLLUTANT CONCENTRATION VALUES
(MICROGRAMS PER CUBIC METER)

| Location | CO 1 hr Max | CO 8 hr Max | Lead Quart Mean | NO2 Ann Arit Mean | O3 2nd 1 hr Max | SO2 Ann Arit Mean | SO2 2nd 3 hr Max | SO2 2nd 24 hr Max | TSP Ann Geo Mean | TSP 2nd 24 hr Max | PM10 Ann Arit Mean | PM10 2nd 24 hr Max |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Glenwood Springs Resource Area | | | | | | | | | | | | |
| Rural | 2300 | 2300 | .05 | 28 | 167 | 3 | 131 | 210 | 25 | 85 | 25 | 85 |
| Aspen | 20700 | 6900 | .1 | 28 | 167 | 3 | 131 | 210 | 70 | 230 | 50 | 110 |
| Avon | 20700 | 6900 | .3 | 28 | 167 | 3 | 131 | 210 | 35 | 110 | 35 | 110 |
| Eagle | 2300 | 2300 | .3 | 28 | 167 | 3 | 131 | 210 | 95 | 210 | 50 | 110 |
| Snowmass | 20700 | 6900 | .3 | 28 | 167 | 3 | 131 | 210 | 30 | 75 | 30 | 75 |
| Vail | 20700 | 6900 | .3 | 28 | 167 | 3 | 131 | 210 | 75 | 270 | 35 | 110 |
| Kremmling Resource Area | | | | | | | | | | | | |
| Rural | 2300 | 2300 | .05 | 28 | 167 | 3 | 131 | 210 | 40 | 105 | 40 | 105 |
| Kremmling | 2300 | 2300 | .05 | 28 | 167 | 3 | 131 | 210 | 40 | 105 | 40 | 105 |
| Breckenridge | 20700 | 6900 | .3 | 28 | 167 | 3 | 131 | 210 | 70 | 245 | 35 | 110 |
| Little Snake Resource Area | | | | | | | | | | | | |
| Rural | 1725 | 1150 | .06 | 4 | 167 | 5 | 29 | 18 | 20 | 70 | 20 | 70 |
| Craig | 2300 | 2300 | .06 | 4 | 167 | 5 | 29 | 18 | 70 | 185 | 30 | 110 |
| Glenwood Spgs | 2300 | 2300 | .06 | 4 | 167 | 5 | 29 | 18 | 60 | 205 | 40 | 80 |
| Rifle | 2300 | 2300 | .06 | 4 | 167 | 5 | 29 | 18 | 80 | 315 | 40 | 160 |
| Steamboat Spgs | 20700 | 6900 | .3 | 47 | 167 | 3 | 131 | -- | 84 | 300 | 50 | 110 |
| Northeast Planning Area | | | | | | | | | | | | |
| Lincoln Rural | 2300 | 2300 | .05 | 2 | 169 | 0 | 8 | 5 | 30 | 90 | 30 | 90 |
| Jeffco Rural | 3910 | 2530 | .4 | 23 | 196 | 18 | 176 | 47 | 30 | 75 | 30 | 75 |
| Weld Rural | 2300 | 2300 | .05 | 8 | 167 | 3 | 18 | 8 | 25 | 100 | 25 | 100 |
| Castlerock | 39100 | 25300 | .5 | 30 | 196 | 18 | 176 | 47 | 80 | 195 | 40 | 110 |
| Downtown Denver | 42550 | 25300 | .8 | 90 | 225 | 31 | 320 | 128 | 135 | 415 | 45 | 260 |
| Estes Park | 11500 | 8050 | .3 | 8 | 172 | 3 | 18 | 8 | 35 | 100 | 35 | 100 |
| Ft. Collins | 32545 | 16330 | .5 | 8 | 178 | 3 | 18 | 8 | 60 | 165 | 35 | 100 |
| Ft. Lupton | 11500 | 8050 | .3 | 8 | 172 | 3 | 18 | 8 | 50 | 150 | 40 | 110 |
| Greeley | 26795 | 14605 | .5 | 8 | 202 | 3 | 18 | 8 | 55 | 185 | 40 | 90 |
| Johnstown | 11500 | 8050 | .3 | 8 | 172 | 3 | 18 | 8 | 90 | 350 | 40 | 110 |
| Limon | 2300 | 2300 | .04 | 2 | 169 | 0 | 8 | 5 | 35 | 110 | 35 | 110 |
| Loveland | 11500 | 8050 | .3 | 8 | 172 | 3 | 18 | 8 | 70 | 225 | 35 | 100 |
| Platteville | 11500 | 8050 | .3 | 8 | 172 | 3 | 18 | 8 | 70 | 195 | 40 | 110 |
| Sterling | 2300 | 2300 | .15 | 23 | 169 | 3 | -- | 21 | 65 | 175 | 40 | 110 |
| San Juan/San Miguel Planning Area | | | | | | | | | | | | |
| Rural | 2300 | 2300 | .05 | 4 | 98 | 13 | 26 | 26 | 15 | 50 | 15 | 50 |
| Durango | 2300 | 2300 | .7 | 4 | 98 | 13 | 26 | 26 | 65 | 195 | 30 | 90 |
| Mesa Verde NP | 2300 | 2300 | .01 | 4 | 98 | 13 | 26 | 26 | 10 | 50 | 10 | 50 |

Source: Chick (1989)

Underlined values indicate potential Ambient Air Quality Standard violations.

Air quality values are generalized indicators for broad geographic regions. Site-specific monitoring is necessary to determine local conditions.

J-4

BLM_0006003

# APPENDIX K

# EXISTING ENVIRONMENT— GLENWOOD SPRINGS RESOURCE AREA

BLM_0006004

# APPENDIX K

# EXISTING ENVIRONMENT—GSRA

**TABLE K-1. POPULATIONS OF COLORADO RIVER CUTTHROAT TROUT IN THE GLENWOOD SPRINGS RESOURCE AREA.**

| Location | Miles Surface Area | Year Sampled | Rating |
|---|---|---|---|
| Abrams Creek | 1.9 | 1980 | A- |
| Hack Lake | 2.0 | 1980 | A |
| Mitchell Creek | 0.8 | 1984 | A+ |
| East Fork Parachute Creek | 6.4 | 1983 | B+ |
| JQS Gulch | 1.4 | 1983 | B+ |
| East Middle Fork | | | |
| Parachute Creek | 1.2 | 1981 | C |
| Northwater Creek | 4.2 | 1983 | C |
| Possum Creek | 4.7 | 1980 | C |
| Red Dirt Creek | 1.0 | 1986 | C |
| Trapper Creek | 5.7 | 1983 | C |

K-1

BLM_0006005



## GLENWOOD SPRINGS RESOURCE AREA



Resource Area Boundary

Major Plant
Concentrations

Scale 1:1,000,000
1 inch equals Approximately 16 miles





**Map K-1   Major Concentrations of T&E and Candidate Plants**

K-2

BLM_0006006



## GLENWOOD SPRINGS RESOURCE AREA

 Resource Area Boundary

Muledeer Crucial Habitat

Scale 1:1,000,000
1 inch equals Approximately 16 miles





**Map K-2   Muledeer  Crucial  Habitat**

K-3



## GLENWOOD SPRINGS RESOURCE AREA

 Resource Area Boundary

Elk Crucial Habitat

Scale 1:1,000,000
1 inch equals Approximately 16 miles





**Map K-3   Crucial Elk Habitat**

K-4

BLM_0006008



## GLENWOOD SPRINGS RESOURCE AREA



Resource Area Boundary
Bighorn Sheep Area



Scale 1:1,000,000
1 inch equals Approximately 16 miles



**Map K-4   Bighorn Sheep Overall Range**

K-5

BLM_0006009



## GLENWOOD SPRINGS RESOURCE AREA

 Resource Area Boundary
Sage Grouse-Lek Habitat

Scale 1:1,000,000
1 inch equals Approximately 16 miles





**Map K-5   Sage Grouse Winter/Lek Habitat**

K-6

BLM_0006010



## GLENWOOD SPRINGS RESOURCE AREA

 Resource Area Boundary
Turkey Range

Scale 1:1,000,000
1 inch equals Approximately 16 miles





**Map K-6  Overall Turkey Range**

K-7

BLM_0006011



## GLENWOOD SPRINGS RESOURCE AREA

━━━━━ Resource Area Boundary

 Waterfowl Usage Areas



Scale 1:1,000,000
1 inch equals Approximately 16 miles

Map K-7   Major Waterfowl Use Areas

K-8

BLM_0006012



## GLENWOOD SPRINGS RESOURCE AREA

 Resource Area Boundary

Raptor Areas



Scale 1:1,000,000
1 inch equals Approximately 16 miles



**Map K-8  Raptor Concentration Areas**

K-9



## GLENWOOD SPRINGS RESOURCE AREA



Resource Area Boundary

Bald Eagle and
Blue Heron Areas



Scale 1:1,000,000
1 inch equals Approximately 16 miles



**Map K-9   Bald Eagle and Great Blue Heron Areas**

K-10

BLM_0006014



## GLENWOOD SPRINGS RESOURCE AREA

Resource Area Boundary

Special Recreation Management Areas

Scale 1:1,000,000
1 inch equals Approximately 16 miles



**Map K-10   Special Recreation Management Areas**

K-11

BLM_0006015



**GLENWOOD SPRINGS RESOURCE AREA**



**Map K-11  Visual Resource Management**

K-12

BLM_0006016



## GLENWOOD SPRINGS RESOURCE AREA

 Resource Area Boundary

 Paleontological Areas

Scale 1:1,000,000
1 inch equals Approximately 16 miles

**Map K-12   Sensitive Paleontological Areas**

K-13

BLM_0006017



## GLENWOOD SPRINGS RESOURCE AREA

 Resource Area Boundary

 Wilderness Study Areas



Scale 1:1,000,000
1 inch equals Approximately 16 miles

**Map K-13  Wilderness Study Areas**

K-14

BLM_0006018



## GLENWOOD SPRINGS RESOURCE AREA

 Resource Area Boundary

Areas of Critical
Environmental Concern

Scale 1:1,000,000
1 inch equals Approximately 16 miles





**Map K-14  Areas of Critical
Environmental Concern**

K-15

# APPENDIX L

# EXISTING ENVIRONMENT— LITTLE SNAKE RESOURCE AREA

BLM_0006020

# APPENDIX L

# EXISTING ENVIRONMENT —LSRA

**TABLE L-1.  COLORADO BLM SENSITIVE PLANTS KNOWN TO OCCUR IN MOFFAT COUNTY**

| Scientific Name | Common Name |
|---|---|
| Aster perelegans | Nuttall aster |
| Astragalus aretiooides | cushion milkvetch |
| Astragalus detritalis | debris milkvetch |
| Astragalus duchesnensis | Duchesne milkvetch |
| Astragalus hamiltonii | Hamilton milkvetch |
| Astragalus jejunus | starving milkvetch |
| Astragalus nelsonianus | Nelson milkvetch |
| Astragalus wetherilli | Wetherill's milkvetch |
| Cirsium owenbeyi | Owenby thistle |
| Cryptantha caespitosa | caespitose cryptantha |
| Cymopterus duchesnensis | Duchesne bisquitroot |
| Draba junipera | juniper draba |
| Erigeron uintahensis | Uintah fleabane |
| Eriogonum acaule | mat buckwheat |
| Eriogonum saurinum | Dinosaur buckwheat |
| Eriogonum tumulosum | tumor buckwheat |
| Eriogonum viridulum | little green buckwheat |
| Leptodactylon watsonii | Watson's buckwheat |
| Minuartia nuttallii | Nuttall's sandwort |
| Nama densum vary. parviflorum | small-flowered nama |
| Parthenium ligulatum | Uintah Basin feverfew |
| Penstemon gibbensii | Gibbon's beardtongue |
| Penstemon yampaensis | Yampa beard tongue |
| Sphaeromeria capitata | capitate chicken-sage |
| Townsendia strigosa | hairy townsendia |
| Trifolium andinum | Andy's clover |

Note:  Specific information on each taxon's habitat, biology, localities, and status is contained in the files at the Craig District Office and in the report submitted by the Colorado Natural Heritage Inventory prepared by J. Scott Peterson entitled, "Botanical Field Survey Study on BLM Public Lands, Volume II," 1983, which is also available at the Craig District Office.

L-1

BLM_0006021

## APPENDIX L

### TABLE L-2.  WILD HORSE CENSUS DATA

| Year | Mode of Observation | Bands | Studs | Mares | Yearlings | Colts | Total |
|------|---------------------|-------|-------|-------|-----------|-------|-------|
| 1971 | Fixed Wing | NI [1] | NI | NI | NI | NI | 65 |
| 1974 | Helicopter | 18 | 25 | 78 | 2 | 27 | 132 |
| 1976 | Ground Sample | 14 | 38 | 50 | 9 | 19 | 116 |
| 1977 | Helicopter | 20 | NI | NI | NI | NI | 124 |
| 1977 | Ground Sample | 56 | NI | NI | NI | NI | 350 |
| 1979 | Helicopter | 52 | NI | NI | NI | NI | 335 [2] |
| 1980 | Helicopter | 23 | NI | NI | NI | 23 | 184 |
| 1981 | Helicopter | 24 | NI | NI | NI | 24 | 183 |
| 1982 | Helicopter | 11 | NI | NI | NI | NI | 125 |
| 1985 | Helicopter | 24 | NI | NI | NI | NI | 173 |
| 1987 | Helicopter | 25 | NI | NI | NI | NI | 205 |
| 1988 | Helicopter | 32 | NI | NI | NI | 91 | 418 [3] |

[1] Not Identified

[2] Roundup removed 112 of these horses.

[3] Roundup removed 239 of these horses.

[3] Part of these horses moved back into Wyoming.

### TABLE L-3.  ARCHAEOLOGICAL SITE TYPES

| Kind | Characteristics |
|------|-----------------|
| Lithic scatter (open lithic, chippings, chipping station) | Area where the waste from the manufacture of stone tools or the tools themselves are found. |
| Campsite (habitation, camp, burnt spots, fire pots, hearths) | A lithic scatter with the addition of features connected spots, fire pots, hearths) with fire making: charcoal, ash, fire-cracked rocks, or burnt bone.  A campsite may also be a hearth, with no associated cultural materials. |
| Quarry (chippings, manufacturing areas) | An area containing a natural source of rocks suitable for making tools.  Unmodified rock, waste, and tools in all stages of manufacture are found. |
| Kill site (trap, jump) | An area containing stone and/or bone tools in association with the remains of one or more animals. |
| Rock shelter (cave, overhang) | An area protected from the weather by an overhanging rock formation.  Usually has a drip line.  May or may not have surface culture material. |
| Rock art  (a) pictograph  (b) petroglyph | Any artistic expression or message on a rock surface.  (a) Painted figures of people, animals, plants, letters, numbers, or abstracts.  (b) Incised figures of people, animals, plants, letters, numbers, or abstracts. |
| Burial | Remains of human beings, fragmentary or whole. |
| Tipi rings (stone circles, tipis) | Circular arrangement of spaced rocks, three to 15 meters in diameter. |
| Wickiup (tipi poles) | Poles or branches of pinyon or juniper laid up against living trees.  Interior floored with juniper bark. |
| Granary (cist, corncrib) | Mud-mortared sandstone slab structures, usually about 1.5x1.5x1.5 meters.  Most often built into sandstone ledges, sometimes mud-lined and capped or lidded with a large slab. |
| Rock walls (forts) | Alignments or walls of mud-mortared or dry-laid stone masonry.  May be single or multiple.  May have "doorway," usually built on ridge. |

Words in parentheses are synonyms for that kind of site.

BLM_0006022

EXISTING ENVIRONMENT
--LSRA

TABLE L-4.  HISTORIC SITE TYPES

| Kind | Characteristics |
|------|-----------------|
| Trails | Identified routes followed by early explorers or by many emigrants.  Physical evidence may (Overland) or may not (Dominguez-Escalante) remain. |
| Forts | Military establishments for the protection of persons or property.  Also gathering and exchange points before the establishment of towns. |
| Stage stations | Wayfarers' resting places and fresh harness animal acquisition points. |
| Homestead | One or more structures of varied size, shape, and materials used to shelter isolated Euro-American families claiming land under various homestead laws. |
| Ranch | Cluster of structures of single and multiple uses associated with a livestock-based family economic operation. |
| Railroad | Roadbed, tracks, trestles, bridges, depots, and rolling stock associated with early (and continued) industrial transportation of goods and people. |
| Town | Aggregation of structures sheltering domestic, business, education, social, political, and religious activities.  Individual structures may be single or multiple use, but population is multifamily. |
| Unique structure | Any structure's merit is associated with a particular person. |
| Site | The location where a historic event occurred but no tangible evidence remains of the action itself. |
| Architectural | A structure's merit is its manner or style of construction. |
| School | A structure built for educational purposes but whose historical function is as a community center in the absence of nearby towns. |
| Community center | A structure, often a public school, which provides a relatively local meeting place for residents of areas with few towns. |
| Mine | An outcropping of valuable mineral resource and the structures associated with the removal activity. |
| Reclamation projects | Structures associated with irrigation, water and soil retention, or flood control.  These are usually engineering features. |

BLM_0006023