

**Map L-1 Wild Horse Use Areas**

**L-4**

## LITTLE SNAKE RESOURCE AREA
### OIL AND GAS PLAN AMENDMENT

SAND WASH

*WILD HORSE USE AREAS*

N

COLORADO

Scale 1:1,000,000
1 inch equals Approximately 16 miles

10    0    10    20    30    40 Miles

10    0    10    20    30    40    50   Kilometers



**Map L-2 Wilderness Study Areas**

L-5

WEST COLD SPRING

DIAMOND BREAKS

# LITTLE SNAKE RESOURCE AREA
## WILDERNESS STUDY AREAS

CROSS MOUNTAIN
VALE OF TEARS
PETERSON DRAW
CHEW WINTER CAMP
ANT HILLS

N

COLORADO

Scale 1:1,000,000
1 inch equals Approximately 16 miles

10    0    10    20    30    40 Miles

10    0    10    20    30    40    50 Kilometers



Map L-3   Areas of Critical Environmental Concern

L - 6

LITTLE SNAKE RESOURCE AREA
AREAS OF CRITICAL
ENVIRONMENTAL CONCERN

COLORADO

CROSS MOUNTAIN
LOOKOUT MOUNTAIN
IRISH CANYON
LIMESTONE RIDGE

N

Scale 1:1,000,000
1 inch equals Approximately 16 miles

10    0    10    20    30    40 Miles

10   0   10   20   30   40   50   Kilometers

BLM_0006026

# APPENDIX M

# EXISTING ENVIRONMENT— SAN JUAN/SAN MIGUEL PLANNING AREA

BLM_0006027

# APPENDIX M

# EXISTING ENVIRONMENT— SJ/SMPA

TABLE M-1.  MILES OF STREAM AND RIPARIAN HABITAT NOT INVENTORIED WITHIN SAN JUAN/SAN MIGUEL PLANNING AREA.*

| Stream name | BLM miles |
|---|---|
| San Miguel River | 25.0 |
| Huff Gulch | 1.5 |
| Goat Creek | 0.5 |
| Little Bucktail Creek | 1.5 |
| Big Bucktail Creek | 3.0 |
| Coal Canyon | 11.0 |
| Campbell Creek | 7.0 |
| Spring Creek | 8.0 |
| Subtotal | 57.5 |
| | |
| Dolores River | 120.0 |
| Little Gypsum Creek | 4.0 |
| San Miguel Creek | 6.0 |
| Bush Canyon | 6.0 |
| Bill Creek (tributary to Bush Canyon) | 2.0 |
| Spring Creek (tributary to Disappointment Creek) | 9.0 |
| Subtotal | 147.0 |
| | |
| Animas River | 15.0 |
| Ruby Creek | 1.0 |
| Elk Creek | 1.5 |
| Molas Creek | 1.5 |
| Cement Creek | 4.0 |
| Subtotal | 23.0 |
| | |
| Streams (SW portion of RMP Area) | |
| Cross Canyon | 16.0 |
| Hovenweep Canyon | 10.0 |
| Yellowjacket Canyon | 8.0 |
| Sandstone Canyon | 9.0 |
| Rock Canyon | 5.0 |
| Sand Canyon | 3.0 |
| Goodman Canyon | 4.0 |
| Subtotal | 55.0 |
| Total | 282.5 |

* These estimated stream miles and riparian habitat areas are considered to have enough potential to warrant further investigation for watershed and aquatic/riparian habitat improvement.
Source: BLM Data, 1989

BLM_0006028

## APPENDIX M

TABLE M-2.  MILES OF STREAM AND STREAM HABITAT QUALITY IN THE SAN JUAN/SAN MIGUEL PLANNING AREA.

| Stream name | BLM miles | Aquatic/ riparian habitat condition | Species Present[1] | Pool riffle (ratio percent)[2] | CDOW fishery values[3] |
|---|---|---|---|---|---|
| Atkinson Creek | 5 | Fair | None | 40:60 | None |
| Beaver Creek | 17 | Fair | Rb,Ct,U | ND | Poor |
| Big Bear Creek | 5 | Fair | Bk,Ct | 30:70 | Below Average |
| Coyote Wash | 4 | Good | U | 20:80 | None |
| Disappointment Creek | 22 | Poor | U | 10:80 | ND |
| Elk Creek | 1 | Excellent | Ct | 80:20 | Below Average |
| Fall Creek | 7 | Fair | Rb,Bk,Bn,Ct,U | 70:30 | Below Average |
| LaSal Creek | 12 | Fair | S,D,Sc | 30:70 | ND |
| Leopard Creek | 4 | Fair | Rb,Bk,Ct | 10:90 | Excellent |
| Mesa Creek (South fork) | 11 | Fair | Rb,D,U | 45:55 | Below Average |
| Naturita Creek | 32 | Poor | Rb,S,D | 10:90 | Poor |
| Roc Creek | 4 | Fair | Ct,U | 40:60 | ND |
| Saltado Creek | 3 | Good | Bk,U | 50:50 | Average |
| Specie Creek | 2 | Fair | None | 70:30 | None |
| Tabeguache Creek | 15 | Poor | Rb,Bn,S | ND | None |
| Total | 144 | | | | |

[1] Rb=rainbow, Bn=brown, Bk=brook, Ct=cutthroat, U=unidentified species, Sc=sculpin, S=sucker, D=Dace.

[2] Assuming that higher quality streams would approach a 50:50 ratio.

[3] Fishery value is not necessarily representative of potential habitat quality in terms of BLM's philosophy of habitat management as opposed to species management.
Source:  BLM Data, 1989.

TABLE M-3.  SENSITIVE SPECIES

| Federally Listed Species | |
|---|---|
| Bald eagle | Haliaeetus leucocephalus |
| Peregrine falcon | Falco peregrinus |
| Black-footed ferret | Mustela nigripes |
| Colorado squawfish | Ptychocheilus lucius |
| Humpback chub | Gila cypha |
| Bonytail chub | Gila elegans |
| Federal Candidate Species | |
| Boreal western toad | Bufo boreas boreas |
| North American wolverine | Gulo luscus |
| Swift fox | Vulpes velox |
| White-faced ibis | Plegadis chihi |
| Ferruginous hawk | Buteo regalis |
| Southwestern otter | Lutra canadensis |

M-2

BLM_0006029



Map M-1  WILDLIFE RESOURCES

M-3

10   0   10   20   30   Miles

N

**SAN JUAN/SAN MIGUEL PLANNING AREA**

Planning Area Boundary

*Deer   and   Elk   Winter   Range*

*Elk   Calving   Area*

BLM_0006030



SAN JUAN/SAN MIGUEL PLANNING AREA

Map M-2  WILDLIFE RESOURCES

M-4

Planning Area Boundary
Peregrine Falcon Habitat
Winter Eagle Concentration Areas
Sage Grouse Strutting Grounds

10  0  10  20  30  Miles

N

BLM_0006031



Naturita   Ridge

10      0      10      20      30   Miles

Map M-3   WILD   HORSE   AREAS

M-5

Spring   Creek   Basin

N

SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

*Wild   Horse   Herd   Areas*

BLM_0006032



**Map M-4   FORESTRY RESOURCES**

M-6

10   0   10   20   30   Miles

N

# SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

*Forest Land Suitable for Management*

BLM_0006033



Map M-5   RECREATION   RESOURCES

M-7

Hanging   Flume

Dolores   River

Leopard   Creek

Fall   Creek

Dove   Creek   Overlook

American   Flats / Silverton

Lowry   Ruins

Dominguez / Escalante   Ruins

10   0   10   20   30   Miles

N

**SAN JUAN/SAN MIGUEL PLANNING AREA**

Planning Area Boundary

*Special   Recreation   Management   Area*

● *Recreation   Site*

BLM_0006034



BLM_0006035



Map M-7

Cultural Resources

M-9

Hanging Flume
Tabeguache Pueblo
Tabeguach Pueblo II and Tabeguache Canyon
Dolores Cave
Indian Henry's Cabin
Bull Canyon Rock Shelter

10   0   10   20   30   Miles

Basin Wickiup Sites
Dolores River Canyon
Telluride
Silverton
Silverton Historic District

N

Squaw Papoose,CrossRuin,Cahone Canyon
Lowry Ruins Complex
Mclean Basin Complex
Mockingbird Mesa
Seven Towers
Painted Hand
Easter Ruin
Dominguez/Escalante Ruins &AHC
Lightning Tree Tower Group
Bass Ruin
Cannonball Ruin
Sand Canyon
Battle Rock
Cortez
Painted Hand Petroglyphs
East Cortez   Durango
Hamilton Mesa

COLO
UT

COLO
N MEX

## SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary
Cultural Sites and Areas

BLM_0006036



# SAN JUAN/SAN MIGUEL PLANNING AREA

Planning Area Boundary

Wilderness Study Areas

Map M-8 Wilderness Study Areas

M-10



SAN JUAN/SAN MIGUEL PLANNING AREA

∿ ·Planning Area Boundary

⬭ -Acec

Map M-9 Areas of Critical Enviromental Concern

M-11

# APPENDIX N

# EXISTING ENVIRONMENT— KREMMLING RESOURCE AREA

BLM_0006039



**Map N-1  Wilderness Study Areas**

N-1

BLM_0006040



**Map N-2  Areas of Critical Enviromental Concern**

N-2

BLM_0006041

# APPENDIX O

# SOCIAL AND ECONOMIC TABLES

BLM_0006042

# APPENDIX O

# SOCIAL AND ECONOMIC

**TABLE O-1.  SOCIOECONOMIC INDICATORS
GLENWOOD SPRINGS RESOURCE AREA**

| | | | | % Change | |
|---|---|---|---|---|---|
| | 1977 | 1982 | 1987 | 1977-82 | 1982-87 |
| **Mesa County** | | | | | |
| Population | 67,294 | 94,075 | 86,498 | 39.8 | -8.1 |
| Employment | 34,169 | 49,186 | 43,515 | 43.9 | -11.5 |
| Personal Income * | 496.8 | 1,063.2 | 1,126.3 | 114.0 | 5.9 |
| **Garfield County** | | | | | |
| Population | 18,992 | 28,751 | 25,655 | 51.4 | -10.8 |
| Employment | 9,799 | 17,031 | 14,893 | 73.8 | -12.6 |
| County Revenue | 4.5 | 13.4 | 11.9 | 294.2 | -10.9 |
| Personal Income * | 146.4 | 376.0 | 365.4 | 156.8 | -2.8 |

* Million dollars.

**TABLE O-2.  POPULATION--KREMMLING RESOURCE AREA**

| | | 1960 | 1970 | 1980 | 1987 | Percent Change | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | o1960-70 | o1970-80 | o1980-87 |
| Grand County | | 3,557 | 4,107 | 7,475 | 9,548 | 15 | 82 | 28 |
| | Fraser-Winter Park | N/A | 509 | 950 | 1,438 | N/A | 87 | 50 |
| | Granby | 503 | 554 | 963 | 1,341 | 10 | 74 | 39 |
| | Grand Lake | 170 | 189 | 382 | 508 | 11 | 102 | 33 |
| | Hot Sulphur Springs | 237 | 220 | 405 | 458 | -7 | 84 | 13 |
| | Kremmling | 576 | 764 | 1,296 | 1,461 | 33 | 70 | 13 |
| Jackson County | | 1,758 | 1,811 | 1,863 | 1,653 | 3 | 3 | -11 |
| | Walden | 809 | 907 | 947 | 832 | 12 | 4 | -12 |
| Total Resource Area | | 5,315 | 5,918 | 9,338 | 11,201 | 11 | 58 | 20 |
| State of Colorado | | 1,753,925 | 2,207,259 | 2,888,834 | 3,296,269 | 26 | 31 | 14 |
| United States | | 179,323,175 | 203,212,926 | 226,504,825 | 243,399,000 | 13 | 11 | 7 |

BLM_0006043

**APPENDIX O**

**TABLE O-3.  LABOR FORCE, EMPLOYMENT & UNEMPLOYMENT RATE KREMMLING RESOURCE AREA**

|  | 1975 | 1980 | 1986 |
|---|---|---|---|
| **GRAND COUNTY** |  |  |  |
| Labor Force | 3,995 | 5,626 | 4,979 |
| Employment | 3,817 | 5,450 | 4,726 |
| Unemployment Rate | 4 | 3 | 5 |
|  |  |  |  |
| **JACKSON COUNTY** |  |  |  |
| Labor Force | 891 | 842 | 959 |
| Employment | 849 | 792 | 908 |
| Unemployment Rate | 4 | 5 | 5 |
|  |  |  |  |
| **ECONOMIC STUDY AREA** |  |  |  |
| Labor Force | 4,886 | 6,468 | 5,938 |
| Employment | 4,666 | 6,242 | 5,634 |
| Unemployment Rate | 4 | 3 | 5 |
|  |  |  |  |
| **GRAND COUNTY** |  |  |  |
| Population | 6,446 | 7,547 | 9,682 |
| **JACKSON COUNTY** |  |  |  |
| Population | 1,724 | 1,889 | 1,603 |
| **ECONOMIC STUDY AREA** |  |  |  |
| Population | 8,170 | 9,436 | 11,285 |

**TABLE O-4.  EMPLOYMENT BY SECTOR.  WAGE AND SALARY EMPLOYMENT KREMMLING RESOURCE AREA**

|  |  |  |  | PERCENT OF TOTAL | | |
|---|---|---|---|---|---|---|
| **GRAND COUNTY** | 1975 | 1980 | 1986 | 1975 | 1980 | 1986 |
| TOTAL | 3,052 | 4,517 | 5,949 | 100 | 100 | 100 |
|  |  |  |  |  |  |  |
| AGRICULTURE SERV. | 23 | 29 | 36 | 1 | 1 | 1 |
| MINING | 18 | W | W | 1 | N/A | N/A |
| CONSTRUCTION | 728 | 543 | 432 | 24 | 12 | 7 |
| MANUFACTURING | 168 | 218 | 242 | 6 | 5 | 4 |
| TRANSPORT & PU | 106 | 114 | 139 | 3 | 3 | 2 |
| WHLSL TRADE | 17 | 25 | 31 | 1 | 1 | 1 |
| RETAIL TRADE | 596 | 1,086 | 1,351 | 20 | 24 | 23 |
| FINANCE,INSUR, RE | 183 | 472 | 791 | 6 | 10 | 13 |
| SERVICES | 794 | 1,423 | 2,111 | 26 | 32 | 35 |
| GOVERNMENT | 419 | 605 | 815 | 14 | 13 | 14 |

Source:  Bureau of Economic Analysis
W:  Withheld to avoid disclosing confidential information
Note:  Percent of total detail may not add to 100 percent because of rounding
N/A:  Not Available

BLM_0006044

SOCIAL AND ECONOMIC

TABLE O-5. EMPLOYMENT BY SECTOR. WAGE AND SALARY EMPLOYMENT
KREMMLING RESOURCE AREA

| | | | | PERCENT OF TOTAL | | |
| JACKSON COUNTY | 1975 | 1980 | 1986 | 1975 | 1980 | 1986 |
|---|---|---|---|---|---|---|
| TOTAL | 638 | 764 | 710 | 100 | 100 | 100 |
| | | | | | | |
| AGRICULTURE SERV. | 19 | 0 | 0 | 3 | 0 | 0 |
| MINING | 42 | 130 | 22 | 7 | 17 | 3 |
| CONSTRUCTION | 20 | 31 | 47 | 3 | 4 | 7 |
| MANUFACTURING | 123 | 106 | 126 | 19 | 14 | 18 |
| TRANSPORT & PU | 39 | 31 | 44 | 6 | 4 | 6 |
| WHLSL TRADE | 0 | 0 | 0 | 0 | 0 | 0 |
| RETAIL TRADE | 122 | 177 | 172 | 19 | 23 | 24 |
| FINANCE,INSUR, RE | 25 | 25 | 23 | 4 | 3 | 3 |
| SERVICES | 89 | 84 | 88 | 14 | 11 | 12 |
| GOVERNMENT | 145 | 161 | 162 | 23 | 21 | 23 |

Source: Bureau of Economic Analysis
W: Withheld to avoid disclosing confidential information
Note: Percent of total detail may not add to 100 percent because of rounding
N/A: Not Available

TABLE O-6. EMPLOYMENT BY SECTOR. WAGE AND SALARY EMPLOYMENT
KREMMLING RESOURCE AREA

| | | | | PERCENT OF TOTAL | | |
| TOTAL RESOURCE AREA | 1975 | 1980 | 1986 | 1975 | 1980 | 1986 |
|---|---|---|---|---|---|---|
| TOTAL | 3,690 | 5,281 | 6,659 | 100 | 100 | 100 |
| | | | | | | |
| AGRICULTURE SERV. | 55 | 0 | 0 | 1 | 0 | 0 |
| MINING | 60 | 0 | 0 | 2 | 0 | 0 |
| CONSTRUCTION | 748 | 574 | 479 | 20 | 11 | 7 |
| MANUFACTURING | 291 | 324 | 368 | 8 | 6 | 6 |
| TRANSPORT & PU | 145 | 145 | 183 | 4 | 3 | 3 |
| WHLSL TRADE | 0 | 0 | 0 | 0 | 0 | 0 |
| RETAIL TRADE | 718 | 1,263 | 1,523 | 19 | 24 | 23 |
| FINANCE,INSUR, RE | 208 | 497 | 814 | 6 | 9 | 12 |
| SERVICES | 883 | 1,507 | 2,199 | 24 | 29 | 33 |
| GOVERNMENT | 564 | 766 | 977 | 15 | 15 | 15 |

Source: Bureau of Economic Analysis
W: Withheld to avoid disclosing confidential information
Note: Percent of total detail may not add to 100 percent because of rounding
N/A: Not Available

O-3

BLM_0006045

**APPENDIX O**

**TABLE O-7.  EMPLOYMENT BY SECTOR.  WAGE AND SALARY EMPLOYMENT KREMMLING RESOURCE AREA**

|  |  |  |  | PERCENT OF TOTAL | | |
|---|---|---|---|---|---|---|
| COLORADO | 1975 | 1980 | 1986 | 1975 | 1980 | 1986 |
| TOTAL | 1,204,940 | 1,567,530 | 1,875,300 | 100 | 100 | 100 |
|  |  |  |  |  |  |  |
| AGRICULTURE SERV. | 7,733 | 12,629 | 18,176 | 1 | 1 | 1 |
| MINING | 21,877 | 41,283 | 38,431 | 2 | 3 | 2 |
| CONSTRUCTION | 70,551 | 102,176 | 117,056 | 6 | 7 | 6 |
| MANUFACTURING | 140,510 | 185,022 | 194,579 | 12 | 12 | 10 |
| TRANSPORT & PU | 64,361 | 84,305 | 97,391 | 5 | 5 | 5 |
| WHLSL TRADE | 61,499 | 80,096 | 82,799 | 5 | 5 | 4 |
| RETAIL TRADE | 211,152 | 273,584 | 318,250 | 18 | 17 | 17 |
| FINANCE,INSUR, RE | 90,325 | 136,306 | 191,443 | 7 | 9 | 10 |
| SERVICES | 263,730 | 359,226 | 502,243 | 22 | 23 | 27 |
| GOVERNMENT | 273,199 | 292,903 | 314,934 | 23 | 19 | 17 |

Source: Bureau of Economic Analysis
W: Withheld to avoid disclosing confidential information
Note: Percent of total detail may not add to 100 percent because of rounding
N/A: Not Available

**TABLE O-8.  EARNINGS BY SECTOR--KREMMLING RESOURCE AREA**

|  | THOUSAND DOLLARS | | | PERCENT OF TOTAL | | |
|---|---|---|---|---|---|---|
| GRAND COUNTY | 1975 | 1980 | 1986 | 1975 | 1980 | 1986 |
| TOTAL | 32,803 | 51,595 | 78,671 | 100 | 100 | 100 |
|  |  |  |  |  |  |  |
| AGRICULTURE SERV. | 190 | 296 | 501 | 1 | 1 | 1 |
| MINING | 698 | 352 | 281 | 2 | 1 | 0 |
| CONSTRUCTION | 13,482 | 12,490 | 10,949 | 41 | 24 | 14 |
| MANUFACTURING | 1,474 | 2,661 | 3,902 | 4 | 5 | 5 |
| TRANSPORT & PU | 1,590 | 2,064 | 3,173 | 5 | 4 | 4 |
| WHLSL TRADE | 202 | 405 | 669 | 1 | 1 | 1 |
| RETAIL TRADE | 4,071 | 8,152 | 11,072 | 12 | 16 | 14 |
| FINANCE,INSUR, RE | 1,001 | 2,985 | 6,793 | 3 | 6 | 9 |
| SERVICES | 6,833 | 14,923 | 26,272 | 21 | 29 | 33 |
| GOVERNMENT | 3,262 | 7,267 | 15,059 | 10 | 14 | 19 |

Source: Bureau of Economic Analysis
W: Withheld to avoid disclosing confidential information
Note: Percent of total detail may not add to 100 percent because of rounding
N/A: Not Available

O-4

BLM_0006046

SOCIAL AND ECONOMIC

TABLE O-9.   EARNINGS BY SECTOR--KREMMLING RESOURCE AREA

| JACKSON COUNTY | THOUSAND DOLLARS | | | PERCENT OF TOTAL | | |
|---|---|---|---|---|---|---|
| | 1975 | 1980 | 1986 | 1975 | 1980 | 1986 |
| TOTAL | 5,642 | 11,051 | 10,511 | 100 | 100 | 100 |
| | | | | | | |
| AGRICULTURE SERV. | 212 | W | W | 4 | N/A | N/A |
| MINING | 911 | 3,900 | 726 | 16 | 35 | 7 |
| CONSTRUCTION | 286 | 437 | 798 | 5 | 4 | 8 |
| MANUFACTURING | 1,373 | 2,189 | 2,746 | 24 | 20 | 26 |
| TRANSPORT & PU | 486 | 502 | 739 | 9 | 5 | 7 |
| WHLSL TRADE | 112 | W | W | 2 | N/A | N/A |
| RETAIL TRADE | 682 | 1,136 | 1,586 | 12 | 10 | 15 |
| FINANCE,INSUR, RE | 197 | 321 | 347 | 3 | 3 | 3 |
| SERVICES | 407 | 546 | 566 | 7 | 5 | 5 |
| GOVERNMENT | 1,051 | 1,834 | 2,679 | 19 | 17 | 25 |

Source:  Bureau of Economic Analysis
W:  Withheld to avoid disclosing confidential information
Note:  Percent of total detail may not add to 100 percent because of rounding
N/A:  Not Available

TABLE O-10.   EARNINGS BY SECTOR--KREMMLING RESOURCE AREA

| TOTAL RESOURCE AREA | THOUSAND DOLLARS | | | PERCENT OF TOTAL | | |
|---|---|---|---|---|---|---|
| | 1975 | 1980 | 1986 | 1975 | 1980 | 1986 |
| TOTAL | 38,445 | 62,646 | 89,182 | 100 | 100 | 100 |
| | | | | | | |
| AGRICULTURE SERV. | W | W | 713 | N/A | N/A | 1 |
| MINING | 1,609 | 4,252 | 1,007 | 4 | 7 | 1 |
| CONSTRUCTION | 13,768 | 12,927 | 11,747 | 36 | 21 | 13 |
| MANUFACTURING | 2,847 | 4,850 | 6,648 | 7 | 8 | 7 |
| TRANSPORT & PU | 2,076 | 2,566 | 3,912 | 5 | 4 | 4 |
| WHLSL TRADE | W | W | 781 | N/A | N/A | 1 |
| RETAIL TRADE | 4,753 | 9,288 | 12,658 | 12 | 15 | 14 |
| FINANCE,INSUR, RE | 1,198 | 3,306 | 7,140 | 3 | 5 | 8 |
| SERVICES | 7,240 | 15,469 | 26,838 | 19 | 25 | 30 |
| GOVERNMENT | 4,313 | 9,101 | 17,738 | 11 | 15 | 20 |

Source:  Bureau of Economic Analysis
W:  Withheld to avoid disclosing confidential information
Note:  Percent of total detail may not add to 100 percent because of rounding
N/A:  Not Available

BLM_0006047

**APPENDIX O**

### TABLE O-11.  EARNINGS BY SECTOR--KREMMLING RESOURCE AREA

| COLORADO | THOUSAND DOLLARS | | | PERCENT OF TOTAL | | |
|---|---|---|---|---|---|---|
| | 1975 | 1980 | 1986 | 1975 | 1980 | 1986 |
| TOTAL | 12,119,900 | 23,604,800 | 37,138,400 | 100 | 100 | 100 |
| | | | | | | |
| AGRICULTURE SERV. | 58,226 | 120,113 | 191,827 | 0 | 1 | 1 |
| MINING | 473,960 | 1,241,990 | 1,441,770 | 4 | 5 | 4 |
| CONSTRUCTION | 938,980 | 2,064,920 | 2,802,940 | 8 | 9 | 8 |
| MANUFACTURING | 1,845,720 | 3,757,330 | 5,696,720 | 15 | 16 | 15 |
| TRANSPORT & PU | 961,474 | 1,988,090 | 3,085,000 | 8 | 8 | 8 |
| WHLSL TRADE | 845,397 | 1,680,500 | 2,232,840 | 7 | 7 | 6 |
| RETAIL TRADE | 1,447,880 | 2,578,470 | 3,854,020 | 12 | 11 | 10 |
| FINANCE,INSUR, RE | 701,941 | 1492,,420 | 2,775,180 | 6 | 6 | 7 |
| SERVICES | 2,170,080 | 4,509,460 | 8,391,980 | 18 | 19 | 23 |
| GOVERNMENT | 2,676,220 | 4,171,560 | 6,666,080 | 22 | 18 | 18 |

Source: Bureau of Economic Analysis
W: Withheld to avoid disclosing confidential information
Note: Percent of total detail may not add to 100 percent because of rounding
N/A: Not Available

### TABLE O-12.  LOCAL GOVERNMENT FINANCIAL DATA 1986--KREMMLING RESOURCE AREA

| | COUNTIES | | | COMMUNITIES | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | GRAND | JACKSON | FRASER | WINTER PARK | GRANBY | GRAND LAKE | HOT SULPHUR SPRINGS | KREMMLING | WALDEN |
| PER CAPITA ASSESSED VALUATION | 18000 | 14360 | 6550 | 32050 | 4250 | 12850 | 3130 | 5440 | 2790 |
| TOTAL MILL LEVY | 14.53 | 10.5 | 9.96 | 4.08 | 9.31 | 9 | 3.13 | 7.8 | 19 |
| PER CAPITA RETAIL SALES | 11710 | 8820 | 17070 | 39690 | 16100 | 16470 | 2520 | 9500 | 9490 |
| TOTAL SALES TAX RATE PERCENT | 4 | 6 | 8 | 8 | 8 | 8 | 8 | 8 | 6 |
| | | | | | | | | | |
| BUDGET GENERAL ACTIVITIES 000'S | | | | | | | | | |
| REVENUE | 7444 | 1748 | 606 | 1611 | 738 | 482 | 81 | 537 | 304 |
| OPERATING EXPENSES | 6355 | 1451 | 329 | 1086 | 539 | 429 | 35 | 352 | 269 |
| GENERAL OPERATING INDEBTEDNESS | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 180 | 0 |
| OTHER INDEBTEDNESS | 570 | 0 | 114 | 3928 | 115 | 221 | 0 | 0 | 0 |

Source: Local Government Financial Data Colorado Department of Local Affairs

BLM_0006048

SOCIAL AND ECONOMIC

TABLE O-13.  CURRENT EMPLOYMENT IN MOFFAT COUNTY LITTLE SNAKE RESOURCE AREA

| | Employment | | | Percent of Total | | |
|---|---|---|---|---|---|---|
| | 1980[a] | 1982[a] | 1985[b] | 1980 | 1982 | 1985* |
| Agriculture | 487 | 498 | 521 | 6 | 8 | 9 |
| Mining | 1,076 | 600 | 614 | 16 | 10 | 10 |
| Construction | 559 | 413 | 368 | 9 | 7 | 6 |
| Manufacturing | 278 | 135 | 114 | 4 | 2 | 2 |
| Trans., Comm., Utilities | 618 | (D) | 488 | 10 | --- | 8 |
| Trade | 1,363 | 1,036 | 1,153 | 21 | 17 | 21 |
| Finance, Inc., Real Estate | 180 | 191 | 333 | 3 | 3 | 6 |
| Services | 519 | 661 | 600 | 8 | 11 | 11 |
| Government | 666 | 944 | 812 | 10 | 16 | 14 |
| Unclassified | 722 | 1,553 | 703 | 11 | 26 | 13 |
| Total | 6,472 | 6,031* | 5,706 | 100* | 100 | 100 |
| Total Personal Income $(000) | 146,063 | 157,058 | 142,328 | | | |
| Percentage Unemployment | 8.3 | 8.4* | 10.9 | | | |

(D)  Not shown to avoid disclosure of confidential data.
*  Does not include confidential data (D)
[a] From the Draft EIS for the Little Snake RMP
[b] BLM Estimate

TABLE O-14.  CURRENT EMPLOYMENT IN ROUTT COUNTY LITTLE SNAKE RESOURCE AREA

| | Employment | | | Percent of Total | | |
|---|---|---|---|---|---|---|
| | 1980[a] | 1982[a] | 1985[b] | 1980 | 1982 | 1985* |
| Agriculture | 471 | 473 | 411 | 6 | 6 | 5 |
| Mining | 608 | 801 | 625 | 8 | 9 | 7 |
| Construction | 1,060 | 1,023 | 1,207 | 14 | 14 | 12 |
| Manufacturing | 70 | 100 | 117 | 1 | 1 | 1 |
| Trans., Comm., Utilities | 440 | 520 | 581 | 6 | 6 | 7 |
| Trade | 1,695 | 1,381 | 1,792 | 22 | 16 | 21 |
| Finance, Inc., Real Estate | 653 | 576 | 674 | 9 | 7 | 8 |
| Services | 1,130 | 1,442 | 2,007 | 14 | 17 | 23 |
| Government | 600 | 885 | 934 | 8 | 10 | 10 |
| Unclassified | 883 | 1,224 | 515 | 12 | 14 | 6 |
| Total | 7,610 | 8,629 | 8,687 | 100 | 100 | 100 |
| Total Personal Income $(000) | 189,146 | 192,806 | 203,359 | | | |
| Percentage Unemployment | 5.8 | 5.9 | 8.2 | | | |

*  Percent is rounded
[a]  From the Draft EIS for the Little Snake RMP
[b]  BLM Estimate

O-7

BLM_0006049

APPENDIX O

**TABLE O-15.  EMPLOYMENT AND PERSONAL INCOME FOR MINERAL-RELATED ACTIVITY**
**LITTLE SNAKE RESOURCE AREA**

| Activity | Activity Employment | | Total Two County Labor Force | | Percent of Total** | | Total Wages | | Total Personal Income LSRA All Categores | | Percent of Total** | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1982 | 1985 | 1982 | 1985 | 1982 | 1985 | 1982 | 1985 | 1982 | 1985 | 1982 | 1985 |
| Coal | 1,401 | 1,290 | 14,660 | 15,584 | 9.6 | 8.2 | 43,146,597 | 52,884,000 | 324,815,000 | 345,558,700 | 13.2 | 15.3 |
| Oil & Gas | 155 | 140 | 14,660 | 15,584 | 1.1 | .9 | 4,119,280 | 3,858,790 | 324,815,000 | 345,568,700 | 1.3 | 1.1 |
| Coal Power Plants | 565 | 560 | 14,660 | 15,584 | 3.8 | 3.5 | 12,182,530 | 13,428,820 | 324,815,000 | 345,568,700 | 3.8 | 3.8 |
| Total | 2,121 | 1,990 | 14,660 | 15,584 | 14.5 | 12.6 | 59,448,407 | 70,171,610 | 324,815,000 | 345,568,700 | 18.3 | 20.2 |

* Bureau of Economic Analysis, Regional Economic Information System, April
1984.  BEA Employment and Personal Income.
U.S. Department of Commerce, Washington, D.C.
**Percentages rounded to nearest tenth.

**TABLE O-16.  AGRICULTURE EARNINGS (IN THOUSANDS)**
**LITTLE SNAKE RESOURCE AREA**

| | Livestock Products | | Crops | | Total | |
|---|---|---|---|---|---|---|
| County | 1982 | 1984 | 1982 | 1984 | 1982 | 1984 |
| Moffat | $8,948 | $10,261 | $3,194 | $3,464 | $12,142 | $13,725 |
| Routt | $8,776 | $12,241 | $4,195 | $3,673 | $12,971 | $15,914 |

Source:  Bureau of Economic Analysis, Regional Economic Information System, 1983,4.  BEA Farm Income and
Expenditures.  U.S. Department of Commerce, Washington, D.C.  1984, data is the most recent at time of
analysis.

**TABLE O-17.  POPULATION IN MOFFAT AND ROUTT COUNTIES**
**LITTLE SNAKE RESOURCE AREA**

| County | 1980 | 1982 | 1986* |
|---|---|---|---|
| Moffat County | 13,133 | 14,500 | 10,840 |
| Craig | 8,133 | 10,000 | 8,230 |
| Dinosaur | 313 | 1,000 | 910 |
| Unincorporated | 4,687 | 3,500 | 1,700 |
| Routt County | 13,404 | 14,700 | 14,711 |
| Hayden | 1,720 | 1,904 | 1,280 |
| Oak Creek | 929 | 1,010 | 850 |
| Steamboat Springs | 5,098 | 5,627 | 6,031 |
| Yampa | 472 | 505 | 430 |
| Unincorporated | 5,185 | 5,654 | 6,120 |

Source:  Demographic Section, Colorado Division of Local Government, March, 1985.
* BLM Year End Estimate, 1986

BLM_0006050

SOCIAL AND ECONOMIC

## TABLE O-18.  HOUSING UNITS 1985 LITTLE SNAKE RESOURCE AREA

| County | Occupied | Vacant |
|---|---|---|
| Moffat County | | |
| Craig | 897 | 390 |
| Dinosaur | 100 | 33 |
| Routt County | | |
| Hayden | 559 | 51 |
| Oak Creek | 365 | 153 |
| Steamboat Springs | 2,111 | 1,320 |
| Yampa | 158 | 50 |

Source: U.S. Department of Commerce, 1980
Census of Population and Housing & 1985 BLM
estimate.
Note: Data not available for Maybell, Milner,
and Phippsburg.

## TABLE O-19.  LOCAL MUNICIPAL GOVERNMENT FINANCIAL DATA LITTLE SNAKE RESOURCE AREA

| | Craig | Dinosaur | Hayden | Oak Creek | Steamboat Springs | Yampa |
|---|---|---|---|---|---|---|
| Assessed Valuation (1985) | | | | | | |
| Total (000) | $40,168 | $1,141 | $4,864 | $2,100 | $83,910 | $1,335 |
| Per Capita | $4,880 | $1,253 | $3,800 | $2,470 | $13,913 | $3,104 |
| Mill Levy | 14.0 | 10.328 | 26.834 | 19,887 | 3.658 | 19,830 |
| Sales Taxes (FY 85) | | | | | | |
| Total (000) | $954 | $52 | $177 | $66 | $4,307 | $0 |
| Per Capita | $116 | $57 | $138 | $78 | $714 | $0 |
| Sales Tax Rate (%) (7/1/83) | 2.0 | 2.0 | 2.0 | 3.0 | 7.5 | 0 |
| Bonded Debt (12/31/82) (000) | | | | | | |
| General Obligation | $0 | $0 | $09 | $170 | $830 | $ 0 |
| Revenue | $0 | $0 | $0 | $0 | $1,185 | $0 |
| Remaining Bonding Capacity (000) | * | $141 | $486 | $210 | * | $0 |

Sources:  Colorado Division of Property Taxation, Fifteenth Annual Report.  Colorado Division of
Local Government, 1985 Local Government Financial Compendium.  Colorado Department of
Revenue, Annual Report 1983.
Percents are:  Community:  10% (3% of actual valuation which, at 30% assessment rate, equals 10%
of assessed valuation) School Districts:  20%
*Two measures are used:  bonding capacity and capital requirements.  Bonding capacity is a limit
established by the state legislature on the dollar value of general obligation bonds a local jurisdiction
may have outstanding.  It is based on assessed valuation, amounting to approximately 10 percent for
communities and 20 percent for school districts.  Home rule cities are not subject to this limit but,
since voter resistance increases as more bonds are issued, a similar limit may well apply.  General
obligation bonds outstanding as of 12/31/84 (the latest published data) were subtracted from gross
bonding capacity because the tracts are not included and because of the difficulty of projecting the
assessed valuation of oil shale properties.

O-9

BLM_0006051

**APPENDIX O**

**TABLE O-20.  LOCAL COUNTY GOVERNMENT FINANCIAL DATA LITTLE SNAKE RESOURCE AREA**

|  | Moffat County | Routt County |
|---|---|---|
| Assessed Valuation (1985) |  |  |
| Total (000)10 | $388,132 | $211,096 |
| Per Capita | $35,805 | $14,349 |
| Mill Levy | 13.63 | 18.89 |
| Sales Taxes (FY 85) |  |  |
| Total (000) | $556 |  |
| Sales Tax Rate (%)1/ (12/31/85) | 2.0 | 0 |
| Bonded Debt (12/31/85) (000) |  |  |
| General Obligation | $0 | $0 |
| Revenue | $0 | $0 |
| Remaining Bonding Capacity |  |  |
| Where Limited (000) | $38,813 | $21,109 |

Sources:  Colorado Division of Property Taxation, Fifteenth Annual Report.  Colorado Division of Local Government, 1985 Local Government Financial Compendium.  Colorado Department of Revenue, Annual Report 1985.

1/ County rate does not include state sales tax rate.

**TABLE O-21.  LOCAL SCHOOL DISTRICT FINANCIAL DATA LITTLE SNAKE RESOURCE AREA**

|  | South Routt School District | Hayden District | Steamboat Springs School District | Moffat County School District |
|---|---|---|---|---|
| Assessed Valuation (1985) |  |  |  |  |
| Total (000) | $33,796 | $58,909 | $117,325 | $388,132 |
| Per Capita | $11,265 | $18,502 | $14,135 | $35,805 |
| Mill Levy (1985) | 57.410 | 33.570 | 48.610 | 24.16 |
| Sales Tax | N/A | N/A | N/A |  |
| Sales Tax Rate | N/A | N/A | N/A |  |
| Bonded Debt (000) |  |  |  |  |
| General Obligation | $520 | $328 | $586 | $737 |
| Revenue | 0 |  |  |  |
| Remaining Bonding Capacity (000) 1/ | $6,655 | $11,716 | $23,347 | $77,479 |

Sources:  Colorado Division of Property Taxation, Eleventh Annual Report.  Colorado Division of Local Government, 1985 Local Government Financial Compendium. Colorado Department of Revenue, Annual Report 1985.

1/ Percentage of assessed valuation, less general obligation bonded debt. Percents are: Community:  10% (3% of actual valuation which, at 30% assessment rate, equals 10% of assessed valuation)  School Districts:  20%.

BLM_0006052

SOCIAL AND ECONOMIC

**TABLE O-22. FEDERAL, STATE, AND LOCAL MINERAL REVENUE GENERATED FROM THE RESOURCE AREA IN 1985 LITTLE SNAKE RESOURCE AREA**

| County | Generated | 50% Returned to State | County Share |
|--------|-----------|----------------------|--------------|
| Moffat | $10,838,3151 | $5,419,157 | $397,023 |
| Routt | $14,159,398 | $7,074,699 | $416,550 |

**TABLE O-23. POPULATION, PER CAPITA INCOME, AND EMPLOYMENT BY COUNTY--SAN JUAN/SAN MIGUEL PLANNING AREA**

| County | Population[1] | | Per Capita Income[2] | | Employment[3] | |
|--------|------|------|------|------|------|------|
| | 1980 | 1986 | 1980 | 1986 | 1980 | 1986 |
| Archuleta | 3,734 | 5,365 | 12,281 | 9,566 | 1,125 | 2,463 |
| Dolores | 1,664 | 1,562 | 12,363 | 13,194 | 560 | 772 |
| La Plata | 27,437 | 30,171 | 12,001 | 12,869 | 13,736 | 15,113 |
| Montezuma | 16,669 | 17,412 | 11,383 | 11,471 | 6,301 | 8,214 |
| Montrose | 24,543 | 25,240 | 10,482 | 10,681 | 11,649 | 12,102 |
| San Juan | 863 | 784 | 11,350 | 11,940 | 488 | 636 |
| San Miguel | 3,201 | 3,791 | 9,425 | 9,909 | 1,767 | 2,170 |
| Total | 78,111 | 84,325 | 11,300 | 11,579 | 35,626 | 41,470 |
| Colorado | 2,908,563 | 3,266,149 | 13,968 | 15,233 | 1,413,999 | 1,570,003 |

Source: Bureau of Economic Analysis.

[1] Mid-year population projection is reported in this table.

[2] Per Capita Income is reported in constant 1986 dollars.

[3] Employment is by place of work.

**TABLE O-24. 1986 EMPLOYMENT BY SECTOR FOR COUNTIES SAN JUAN/SAN MIGUEL PLANNING AREA**

| | Archuleta[2] | Dolores[2] | La Plata | Montezuma | Montrose | San Juan[2] | San Miguel |
|--------|------|------|------|------|------|------|------|
| Farm | 216 | 204 | 869 | 726 | 1,259 | 0 | 135 |
| Ag. Services | 31 | -- | 248 | 141 | 205 | 0 | 12 |
| Mining | 46 | -- | 141 | 307 | 415 | - | 12 |
| Construction | -- | 33 | 1,502 | 879 | 769 | - | 257 |
| Manufacturing | 46 | -- | 646 | 438 | 829 | 10 | 59 |
| Transportation & Public Utilities | 48 | 16 | 610 | 336 | 1,001 | - | 28 |
| Wholesale | -- | 31 | 327 | 203 | 284 | - | 0 |
| Retail | 531 | 115 | 3,795 | 1,558 | 1,743 | - | 465 |
| Finance, Insurance & Real Estate | 322 | -- | 1,410 | 430 | 997 | - | 322 |
| Services | -- | 47 | 5,662 | 1,613 | 2,690 | 53 | 570 |
| Government | 316 | 248 | 2,578 | 1,571 | 1,910 | 69 | 307 |
| Total[3] | 2,759 | 734 | 17,788 | 8,202 | 12,102 | 504 | 2,170 |

Source: Bureau of Economic Analysis

[1] The information in this table is employment by place of residence. This differs from employment reported in table 3-54 which is employment by place of work.

[2] Information is missing from some sectors of small counties so as not to divulge proprietary data.

[3] Totals as reported by Bureau of Economic Analysis.

BLM_0006053

**APPENDIX O**

**TABLE O-25. ESTIMATED IMPACT OF 1987 TOURISM ON COUNTIES SAN JUAN/SAN MIGUEL PLANNING AREA[1]**

| County | Archuleta | Dolores | La Plata | Montezuma | Montrose | San Juan | San Miguel |
|--------|-----------|---------|----------|-----------|----------|----------|------------|
| Expenditures | 27.955 | 966 | 118.613 | 31.144 | 19.264 | 5.242 | 4.807 |
| Payroll | 6.012 | 155 | 25.837 | 6.769 | 4.154 | 1.125 | 1.058 |
| State Tax | 1.007 | 014 | 4.302 | 1.136 | 685 | 186 | 168 |
| Local Tax | 231 | 005 | 2.550 | 467 | 246 | 076 | 041 |
| Employment[2] | 754 | 15 | 3,237 | 844 | 511 | 142 | 131 |

Source: The Economic Impact of Travel on Colorado Counties 1984, Colorado Tourism Board.
U.S. Travel Data Center Washington, D.C.
[1] Figures are 1984 projections given in millions of 1986 dollars.
[2] Employment figures are 1984 projections of the number of persons employed.

**TABLE O-26. 1988 HUNTING AND FISHING EXPENDITURES IN THOUSANDS OF 1988 DOLLARS--SAN JUAN/SAN MIGUEL PLANNING AREA[1]**

| County | Archuleta | Dolores | La Plata | Montezuma | Montrose | San Juan | San Miguel |
|--------|-----------|---------|----------|-----------|----------|----------|------------|
| DEER | | | | | | | |
| Resident[2] | 412.7 | 103.4 | 723.2 | 603.7 | 868.7 | 89.5 | 271.8 |
| Nonresident | 1228.7 | 318.0 | 1231.9 | 1220.5 | 1564.4 | 133.7 | 684.5 |
| ELK | | | | | | | |
| Resident | 664.1 | 126.7 | 889.6 | 513.5 | 560.5 | 99.6 | 266.4 |
| Nonresident | 1615.7 | 194.6 | 1318.5 | 595.2 | 692.5 | 126.2 | 373.2 |
| OTHER BIG GAME | | | | | | | |
| Resident | 31.6 | 5.4 | 47.7 | 26.1 | 33.1 | 3.4 | 9.7 |
| Nonresident | 3.2 | .5 | 3.0 | 2.0 | 2.3 | .3 | .7 |
| SMALL GAME | | | | | | | |
| Resident | 128.3 | 9.4 | 194.1 | 530.3 | 1022.0 | 5.3 | 497.8 |
| FISHING | | | | | | | |
| Resident | 1349.2 | 467.7 | 1919.1 | 689.3 | 925.7 | 300.3 | 492.6 |
| Nonresident | 688.6 | 533.4 | 2646.1 | 895.6 | 391.8 | 314.9 | 830.7 |

Source: Colorado Division of Wildlife Economic Impact Model
[1] The calculation of wildlife economic impacts are reported by The Colorado Department of Wildlife to be preliminary and of uncertain accuracy.
[2] Colorado Resident

BLM_0006054

**SOCIAL AND ECONOMIC**

TABLE O-27.   YEAR 2010--KREMMLING RESOURCE AREA

| ESA | Populations | Impact | Percent as Impact |
|---|---|---|---|
| Scenario 1 | | | |
| Current Trends and Conditions | 11,285 | | |
| Development | 11,307 | 22 | less than 1 percent |
| Scenario 2 | | | |
| Current Trends and Conditions | 11,285 | | |
| Development | 11,578 | 293 | 2.6 percent |

TABLE O-28.   YEAR 2009--LITTLE SNAKE RESOURCE AREA

| COUNTY | POPULATION | IMPACT | PERCENT AS IMPACT |
|---|---|---|---|
| ROUTT | | | |
| Current Trends and Conditions | 19,845 | | |
| Development | 19,921 | 76 | 1% |
| MOFFAT | | | |
| Current Trend and Conditions | 15,921 | | |
| Development | 16,214 | 293 | 1% |

TABLE O-29.   YEAR 2010.   PRESENT MANAGEMENT SAN JUAN/SAN MIGUEL PLANNING AREA

| ESA | POPULATION | IMPACT | PERCENT AS IMPACT |
|---|---|---|---|
| Scenario 1 | | | |
| Current Trends and Conditions | 84,325 | | |
| Development | 84,377 | 52 | less than 1 percent |
| Scenario 2 | | | |
| Current Trends and Conditions | 84,325 | | |
| Development | 84,334 | 1,009 | 1 percent |

O-13

BLM_0006055

**APPENDIX O**

**TABLE O-30.   YEAR 2010.   STANDARD TERMS AND CONDITIONS**
**SAN JUAN/SAN MIGUEL PLANNING AREA**

| ESA | POPULATION | IMPACT | PERCENT AS IMPACT |
|---|---|---|---|
| Scenario 1 | | | |
| Current Trends and Conditions | 84,325 | | |
| Development | 84,366 | 42 | Less than 1 percent |
| Scenario 2 | | | |
| Current Trends and Conditions | 84,325 | | |
| Development | 85,323 | 998 | 1 percent |

**TABLE O-31.   YEAR 2010.   PROPOSED ACTION**
**SAN JUAN/SAN MIGUEL PLANNING AREA**

| ESA | POPULATION | IMPACT | PERCENT AS IMPACT |
|---|---|---|---|
| Scenario 1 | | | |
| Current Trends and Conditions | 84,325 | | |
| Development | 85,377 | 52 | less than 1 percent |
| Scenario 2 | | | |
| Current Trends and Conditions | 84,325 | | |
| Development | 85,287 | 1,009 | 1 percent |

O-14

# APPENDIX P

# SPECIAL STATUS SPECIES INFORMATION

BLM_0006057



**UNITED STATES DEPARTMENT OF THE INTERIOR**
**FISH AND WILDLIFE SERVICE**
FISH AND WILDLIFE ENHANCEMENT
Colorado State Office
730 Simms Street, Suite 290
Golden, CO  80401
FTS 776-2675
COMM (303) 236-2675



IN REPLY REFER TO:
FWE/CO:BLM:Co Oil & Gas Leasing
Mail Stop 65412 Grand Junction

August 21, 1990

Memorandum

To:        Team Leader, Combined Oil and Gas Plan Amendment/EIS, Bureau of
           Land Management, Grand Junction, Colorado

From:      Colorado State Supervisor, Fish and Wildlife Enhancement, Fish and
           Wildlife Service, Golden, Colorado

Subject:   Comments on Colorado Oil and Gas Leasing Draft EIS

We offer the following comments on your Combined Oil and Gas Plan
Amendment/EIS which covers the Glenwood Springs, Kremmling, Little Snake,
Northeast, and San Juan/San Miguel Resource Areas.  First, we have published a
new candidate plant list February 21, 1990, in the Federal Register (55 FR
6184).  Since we sent you a previous species list on this project on June 16,
1989, we are therefore sending you an updated plant candidate list.

| Common Name | Scientific Name |
|---|---|
| **Glenwood Springs** | |
| Wetherill milkvetch | Astragalus wetherilli |
| Parachute beardtongue | Penstemon debilis |
| Harrington beardtongue | Penstemon harringtonii |
| DeBeque phacelia | Phacelia submutica |
| **Kremmling** | |
| Harrington beardtongue | Penstemon harringtonii |
| **Little Snake** | |
| Hamilton milkvetch | Astragalus hamiltonii |
| Wetherill milkvetch | Astragalus wetherillii |
| Ownbeyi thistle | Cirsium ownbeyi |
| Gibbens beardtongue | Penstemon gibbensii |

| Common Name | Scientific Name |
|---|---|
| **Northeast** | |
| none | |
| **San Juan/San Miguel** | |
| Mancos columbine | <u>Aquilegia</u> <u>miciantha</u> |
| Cronquist milkvetch | <u>Astragalus</u> <u>cronquistii</u> |
| Schmoll milkvetch | <u>Astragalus</u> <u>schmolliae</u> |
| Mesa Verde stickseed | <u>Hackelia</u> <u>gracilentia</u> |
| Pagosa skyrockets | <u>Ipomopsis</u> <u>polyantha</u> var. <u>polyantha</u> |
| Frosty bladderpod | <u>Lesquerella</u> <u>pruinosa</u> |

Also, Osterhout milkvetch (<u>Astragalus</u> <u>osterhoutii</u>) and Penland Beardtongue (<u>Penstemon</u> <u>penlandii</u>) are federally listed as endangered, whereas they appear on Table 3-2 on page 3-8 as federally threatened.

No Surface Occupancy Stipulations (NSO) are listed in your Appendix E for various resources/values in the different resource areas including candidate, threatened, and endangered species. With a forty-acre minimum, NSO's are most effective for protecting large populations of high concentration. In this regard, we recommend NSO's for the Osterhout milkvetch and Penland beardtongue in the Kremmling Resource Area, and the Gibbens beardtongue in the Little Snake Resource Area. Maps showing the recommended NSO's are attached. These species have been adequately surveyed and known populations of high concentration delineated.

Additionally, the June 16, 1989, memorandum discussed the importance of the Section 7 consultation process. However, we do not find any attention to the Section 7 process anywhere in the EIS. This should be corrected.

The Fish and Wildlife Service, with the cooperation of the BLM and Colorado Division of Wildlife, is currently evaluating black-footed ferret reintroduction sites in Colorado. At the present time, this is ongoing in the Little Snake and White River Resource Areas. Eventually, however, <u>all</u> BLM resource areas in Colorado will receive similar consideration. We therefore recommend changes to the EIS to recognize the implications the ferret reintroduction process may have on the management of prairie dogs on BLM lands.

The Fish and Wildlife Service is preparing guidelines for oil and gas activities in black-footed ferret recovery areas. A copy of the draft guidelines has been provided to Mr. Lee Upham and Mr. Bob Kline. The draft

BLM_0006059

EIS should incorporate reference to these guidelines where appropriate with a commitment to adopt specific mitigation techniques where necessary.

The Fish and Wildlife Service believes that major causes for the decline of the Colorado squawfish, humpback chub, bonytail chub, and the recently proposed razorback sucker, include the effect of impoundments and water depletion from the Colorado River and its tributaries such as the San Juan. Since oil and gas drilling involves a depletion of water, we believe that any action made possible by your Oil and Gas Leasing EIS that causes a depletion of water from the upper Colorado River basin should prompt a "may effect" finding for the listed and proposed fishes and necessitate consultation and conferencing under the Endangered species Act.

As we have previously discussed, the most efficient way to handle the many small depletions from individual wells would be to make an estimate of total depletion for the four resource areas in the upper Colorado River basin covered in the EIS. This estimate could be based on the Assumptions for the Potential of Development already presented in Appendix B.

This way the impacts to the endangered Colorado River fishes could be covered by one biological assessment and one biological opinion at the leasing stage, rather than many such documents for every oil and gas well authorized through the subsequent Application for Permit to Drill process.

Specific Comments

FWS Memo of 6/16/89

Page 2-9: Based on this table only, there appears to be only minor differences between the three plans. It is not clear what advantage the proposed amendment has to resource protection or the administration of oil and gas leasing.

Page 3-21: Threatened and endangered species. This section should receive consistent treatment for each planning area. For example, there should be a table for each resource area, similar to Table 3-90 prepared for the Northeast Planning Area. Each planning area should include those lists of species provided by the FWS to the BLM on June 16, 1989. The razorback sucker was proposed for Federal listing on May 22, 1990, and is therefore no longer a candidate species.

Page 3-26, left-hand column: The process of identifying potential black-footed ferret reintroduction sites will occur throughout all of Colorado. Consequently, we believe this paragraph should recognize that evaluation of candidate sites will eventually occur in all of the planning areas discussed in the EIS, not only northwest Colorado. Prairie dog abundance may be more than adequate to support black-footed ferrets in many other Resource areas.

Page 4-1, right-hand column: This paragraph should recognize that informal and/or formal consultation may be required under Section 7 of the

BLM_0006060

Page 4

Endangered Species Act. This consultation may in some cases be appropriate a the learning rather than the operational stage.

Page 4-5, right-hand column: What is "...the protection for T&E species." We believe it is premature to say that significant impacts to threatened and endangered species will not occur. Based on current inventories, there are 62,000 acres of prairie dog habitat in the Little Snake Resource Area. We are not aware of similar inventories in the other resource areas but suspect significant prairie dog acres in the San Juan/San Miguel Planning Area also. Consequently, we believe this section should recognize the guidelines for Oil and Gas Activities in Prairie Dog Ecosystems Managed for Black-footed Ferret Recovery being prepared by the Fish and Wildlife Service. It is not clear to us how the application of appropriate mitigation listed in Appendix D will preclude significant impacts. The key language in Appendix D, page D-7, appears to be "...effectively mitigate...to the degree that existing development rights are not unduly hindered or precluded."

Page 4-24, left-hand column: It is true that threatened and endangered species are covered by laws and regulations. However, it is possible for significant impacts to result from some activities. For example, while Section 7 of the Endangered Species Act requires a consultation process, impacts below the jeopardy-causing threshold may occur. We believe it is inappropriate to imply that the existence of laws will prevent significant impacts.

Page B-2: According to this table, the Little Snake Resource Area could realize the greatest surface disturbance of all the planning areas evaluated. Development in prairie dog towns prior to their evaluation for black-footed ferret recovery could compromise potential reintroduction proposals.

Page E-1, left-hand column: It is unclear what minor inventories or short-term special studies include. We can imagine a lessee arguing against mapping prairie dog towns and/or completing black-footed ferret searches.

Page D-7: Threatened and endangered species. We believe this section should restate the possibility of the consultation that could be required under section 7 of the ESA, and the guidelines for oil and gas activities in ferret recovery areas be prepared by the FWS.

Page E-2: No surface occupancy. Until black-footed ferret recovery potential has been evaluated in each planning area, and reintroduction decision documents are in place, we believe all prairie dog towns in each planning area should be designated NSO. According to the peregrine falcon recovery plan for the Rocky Mountain Southwest Populations, recovery task number 1221 asks that permanent disturbances be prohibited within 1 mile of falcon nesting cliffs. We believe the NSO stipulation should adopt this recommendation.

Page 5

Appendix L:  A threatened and endangered species animal list needs to be added
    here.  There should be a similar appendix for the Kremmling and
    Northeast Planning areas.

If the Service can be of further assistance, please contact John Anderson
(plants) or Bob Leachman (animals) of the Grand Junction office at (303) 243-
2778 or FTS 322-0351.

attachments

cc:   FWS/FWE, Salt Lake City
      FWS/FWE, Grand Junction

Gibbens beardtongue (Penstemon gibbensii)

## CANYON OF LODORE, COLORADO    MOFFAT COUNTY



Osterhout milkvetch (Astragalus osterhoutii)
Penland beardtongue (Penstemon penlandii)

BLM_0006064

# APPENDIX Q

# COMMENT LETTERS

BLM_0006065

## OIL & GAS ALERT **1**

### P U B L I C   C O M M E N T   N E E D E D ! ! !

Due to pressure from the environmental community to improve its oil and gas leasing program, the Bureau of Land Management (BLM) has released a draft environmental impact statement (EIS) covering oil and gas development in five of its eleven Colorado resource areas: Glenwood Springs, Kremmling, Little Snake, Northeast, and San Juan/San Miguel.

**38** The EIS fails to protect a great number of ecologically important areas from oil and gas development. Desert canyons, important river corridors, critical wildlife habitat, and endangered plant species are at risk. Your help is needed to change the final EIS and prevent the destruction of these areas.

**PLEASE WRITE THE BLM NOW!** Make these points in your letter:

**37** A. Tell the BLM that the best way to protect critical resources on their lands is to close an area to oil and gas development, not to issue leases with stipulations. The BLM has discretionary no-lease authority to close areas to oil and gas leasing, but has failed to prescribe its use in the EIS. Out of 3.2 million acres of BLM land the EIS covers, only 28,000 acres are closed to leasing under the no-lease authority! Demand that the following areas in the five resource areas be given no-lease status in order to protect their values:

**20** 1. Areas of Critical Environmental Concern (ACECs);
2. All wetland, riparian, and aquatic areas;
3. critical winter range, calving/fawning areas, and migration corridors for big game;
4. habitat for endangered species;
5. cultural sites; and,
6. developed and primitive recreation areas.

These specific areas are threatened with development and should be off-limits to oil and gas activity:

**21** 1. Vermillion Basin which includes the Irish Canyon ACEC and Lookout Mountain ACEC, a spectacular 88,000 acre roadless area in the Little Snake Resource Area that currently has no protection;
2. Sunlight Peak, a primitive recreation area in the Glenwood Springs Resource Area; and,
3. Anasazi ACEC in the San Juan/San Miguel Resource Area, where numerous outstanding ruins are threatened by oil and gas activity and attendant vehicle access to ruin areas.

**22** B. Tell the BLM that stipulations, and in particular the no-surface occupancy (NSO) stipulation, are not adequate to protect important resources. They BLM routinely grants waivers to stipulations, thus rendering the protection they are suppose to offer totally ineffective. Although vast areas are designated with a NSO stipulation in the EIS, it is economically feasible for companies to directionally drill into an area from only a 1/4 mile away. NSO stipulations encourage leasing of a parcel and then a waiver request by the oil company so that it can drill on-site in order to economically recover oil and gas.

---

**2**

SIERRA CLUB

Rocky Mountain Chapter
777 Grant Street  Suite 606   Denver, Colorado 80203  303 • 861 • 8819

Mark Pearson
P.O. Box 204
Grand Junction, CO 81502

July 4, 1990

Robert W. Kline
Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, CO 81506

Re: Colorado Oil and Gas Leasing and Development Draft Environmental Impact Statement

Dear Bob:

These comments on the Colorado Oil and Gas Leasing and Development Draft Environmental Impact Statement (DEIS) are submitted on behalf of the Rocky Mountain Chapter of the Sierra Club.

**27** It was difficult to get a feel for the leasing stipulations without the site specific maps for each resource area. I understand that BLM has budget limitations in preparing planning documents such as this one, but the handful of text pages in Appendices E and F are inadequate to convey the true sense of the DEIS. It is not reasonable to expect the interested public to travel to each corner of the state to review detailed larger maps in each resource area office. A better middle ground could be struck by including some graphical representation of leasing categories in the DEIS.

**THE RANGE OF ALTERNATIVES ANALYZED ARE INADEQUATE**

**26** The DEIS does not analyze an adequate range of alternatives as required by the National Environmental Policy Act (NEPA). The discretionary no lease acreage is identical for all three alternatives. BLM has made no effort to evaluate **23** the impacts to oil and gas development, if any, of placing additional high value surface resource lands, such as cultural areas, research natural areas, and ACECs, in a discretionary no leasing category.

**24** There is no information contained in the DEIS to support a claim that placing all ACECs, RNAs, Special Recreation Management Areas, and other sensitive areas in no leasing categories would impact oil and gas development because there are no alternatives in the DEIS that propose no placing the areas in no leasing categories. Since BLM lacks justification for not placing the areas in no leasing categories, we demand that BLM place no leasing stipulations on these

---

**2**

Mr. Bob Kline
July 4, 1990
Page 2

areas.

It is difficult to believe that BLM has not identified any areas where non-mineral resources require protection through a leasing prohibition in the Glenwood Springs, Little Snake, Kremmling, and San Juan/San Miguel Planning Areas. Apparently the only locations BLM will not lease are those areas where BLM does not own the surface, such as in the Northeast Planning Area. Considering the wide latitude granted BLM officials in overriding lease stipulations, the no leasing stipulation is the only stipulation that gives any assurance that surface resources will be protected.

**25** The San Juan/San Miguel Planning Area has arguably the most significant archaeological resources in the United States. Yet BLM has left the entire area open to no surface occupancy leasing at a minimum, and with provisions to drop these stipulations at the discretion of a BLM Authorized Officer. This is patently unacceptable to the Sierra Club. Only those areas which BLM cannot legally lease, the wilderness study areas, have been placed off limits to development in the DEIS. Every area in the San Juan/San Miguel Planning Area listed on pages E-4 and E-5 for NSO stipulations should be placed in no leasing categories.

Similar comments apply to the other planning areas. ACECs and RNAs such as Cross Mountain and the Little Yampa/Juniper Canyon should be off-limits to leasing until BLM adopts a system whereby the public is entitled to full participation in decisions to waive stipulations. NSO stipulations are simply not adequate to protect the resources at stake in these areas.

**THE DEIS GRANTS UNWARRANTED LATITUDE TO AUTHORIZED OFFICER**

The Sierra Club objects to the approach of the proposed action alternative whereby the "Authorized Officer" is given carte blanche to waive or modify stipulations. It has been our experience that BLM succumbs to industry pressure every time it is faced with a conflict between leasing stipulations and industry development plans. Iron-clad guarantees to uphold stipulations may be onerous, but BLM has not shown that it can be trusted to professionally evaluate development plans and to objectively implement its plans.

I am pleased with the statement in the DEIS (E-1) requiring plan amendments with full public participation in the event of a waiver, exception, or modification inconsistent with the plan:

"If the proposed waiver, exception, or modification is inconsistent with the plan, the plan will be amended or the change to the stipulation will be disallowed."

---

**2**

Mr. Bob Kline
July 4, 1990
Page 3

**15** are the public participation requirements those required by BLM's planning and NEPA regulations? BLM has interpreted its oil and gas regulations such that protests of AVOs are not allowed; instead protests are treated as "State Director Reviews" and are not accorded the full public participation process identified in planning regulations. The language of the DEIS indicates that the public participation requirements of the planning regulations will apply when decisions inconsistent with plans are made.

**THE PROPOSED ACTION VIOLATES NEPA REQUIREMENTS TO ANALYZE THE ENVIRONMENTAL IMPACTS OF OIL AND GAS LEASING PRIOR TO LEASING BECAUSE OF ITS LAX TREATMENT OF EXCEPTION CRITERIA**

The proposed action allows BLM to drop leasing stipulations at the discretion of the Authorized Officer without any public comment: "No public notice is required for exceptions to lease stipulations which conform to the plan" (DEIS at E-1). It is conceivable that because the DEIS does not analyze the environmental consequences of surface disturbing activities because of **4** proposed NSO stipulations, for example, the BLM Authorized Officer might then **5** approve an exception even where no exception criterion was identified (DEIS at E-1) and surface occupancy in spite of the NSO stipulation. No public notice would be required, with the consequence that no public review and no NEPA analysis would occur for this surface disturbing activity. Such a scenario is entirely possible given the BLM's proposed action alternative, and would clearly violate NEPA.

**51** BLM should require public notice and a 30-day public comment period in all cases in which exceptions to leasing stipulations are granted.

The only exceptions to the leasing stipulations should be identified in the DEIS. In a number of cases, the words "no exception criterion is identified" are found in the lease stipulations, but the DEIS also states that "even where no exception criterion is identified, exceptions are considered on a case-by-case basis" (DEIS at E-1). The Sierra Club would vigorously object to a BLM Authorized Officer granting exceptions that have not been identified in the DEIS, and the environmental consequences of which have not been analyzed.

Some exception criteria are unacceptably vague. In the DEIS at E-5, areas 35 through 37 (this is unclear since the numbering only goes to 35) have NSO stipulations with the exception criterion that includes "meeting objectives of special management for the area to the satisfaction of the Authorized Officer." The special management objectives for each of these areas should be applied out in the DEIS, and specific plans referenced that show how these management objectives will be met. Any activity that contradicts the special management objectives for areas such as these should be subject to public

---

**2**

Mr. Bob Kline
July 4, 1990
Page 4

comment and should not be granted approval through the exception process. The proposed exception criterion for these areas must be made specific as for other areas, or should be dropped from the DEIS.

**BLM MUST MAKE A SERIOUS EFFORT TO IMPLEMENT ITS DECISIONS**

7 The stipulations in the DEIS are all worthless until BLM develops a system to implement stipulations at the time of leasing. There is a statement in the DEIS (1-4) which goes to the root of the problem:

"These EAs documented leasing decisions for virtually every tract of public land and eliminated the need for reviews at field offices of each proposed lease."

BLM has repeatedly ignored existing stipulations in its lease sales precisely because field offices no longer review proposed leases. BLM minerals management personnel have repeatedly failed to attach existing stipulations to lease sales. Conservation groups have successfully protested many of the recent oil and gas lease sales because leases failed to include stipulations from approved Resource Management Plans. BLM needs to implement a training program to teach its state office minerals employees how to read RMPs and how to translate stipulations to leases. The ineptitude and recalcitrance of BLM mineral managers at the state office to attach stipulations to leases at the time of sale borders on the criminal. What assurance is BLM willing to give that the decisions in this document will be implemented?

In sum, the DEIS needs to improve its method of presenting information, prepare a sufficient set of alternatives for analysis, place significant resource lands off limits to leasing, restrict the latitude granted BLM officers to waive stipulations, and assure application of stipulations to leases. I look forward to seeing these improvements in the final EIS.

Sincerely,

Mark Pearson

Mark Pearson
Rocky Mountain Chapter, Sierra Club

---

**3**

OIL AND GAS EIS
PUBLIC MEETING COMMENTS

GRAND JUNCTION –July 2,1990

Kathy Zarlingo – Colo. Wildlife Federation –

The No Surface Occupancy stip does not provide adequate protection and can be modified without any public review. In the LSRA the special management area does not have enough protection (Vermillion Basin). The total no lease area is much too small and needs to be larger.

Neil Bradford – Colo. Mountain Club –

The exception clauses are too broad and are too much of a loophole.

Danni Langdon – self–

21 The cultural resources are not adequately protected. The description of the
56 insignificant impacts is not accurate. What procedures will BLM use to control the poisonous/noxious weeds.

Bill Prather – rancher –self–

234 The program ignores the rights of the private land owner. Gas resources are drained from private lands without any compensation. Private land is unitized without the private landowner's permission. Royalty payments are unclear as there is no difference between what NSO is for and what it is for. The BLM activities do impact private lands. The activities move from BLM to private lands and cause impacts. RDWs are built on private lands without regard for the private landowner and land uses. He gave an example of a pipeline construction that moved the Colo. river and it is now eroding his land and he is not allowed by the Corps of Engineers to riprap to protect the river banks. Mitigation of impacts on BLM can cause loss of uses on private lands. We ignore the private landowners' rights.

Mark Pearson – Sierra Club –

27 The maps are hard to use. BLM should show all the stipulations on a RA map and
145 make them available with the EIS. It is not feasible to ask the public to go to each RA to see the maps. Maps don't change enough to worry about, ie,
24 ACECs, SRMAs, WSAs. Stipulations can be dropped or changed with the exception criteria. AO can change the stip without public review. BLM should consider more no leasing areas. CSO does not put all the stips on all the leases they are supposed to. Environmental groups find errors all the time. Leases should go back to the RA office for a final review prior to leasing. The Present Management alternative is not a good alternative because it is legally deficient. This has been proven in WY and MT. BLM needs more alternatives and ones with much stricter protection. The BLM did not analyze the impacts when they grant an exception to the NSO, or other, stipulation.

---

**4**

OIL AND GAS EIS
PUBLIC MEETING COMMENTS

DENVER – July 9,1990

Don Thompson – self –

BLM is improving the resource protection. NSO should be no leasing. Need no leasing on Vermillion Basin, Sunlight Peak, Anasazi Cultural Area, set lands, migration routes. Does not know of any specific impacts.

Kurt Cunningham – Sierra Club –

26 The Alternatives are too narrow in scope, they need to be broadened. Areas that should not be disturbed are – riparian, alluvial valley floors, and arroyos. There should be no leasing in the following – Vermillion basin, critical winter range, T/E habitat, recreation corridors. Should not be able to see wells from WSAs, ie. Cross Mtn.. The public perception is that NSO does not do any good, it can be reversed without public review. Low potential areas should not be leased. The no leasing decision can be reversed at a later date if necessary. BLM is not foregoing anything by having no leasing areas.

Rocky Smith – self –

Oil & Gas production is destructive by nature. Stips have not been enforced or they have been waived. No lease needs to be expanded to include WSAs, roadless areas, wilderness, ACECs, birthing areas, migration routes, T/E habitat, sensitive species habitat, steep slopes (40%), cultural sites, and recreational areas. Full field development can destroy wildlife habitat. The BLM should begin with no leasing everywhere and then lease only where it can be proven that there will be no impacts.

Marty Walter – self –

26 Referenced letters to BLM from city of Denver about not leasing parks, etc. Some areas do not have the backing of large groups and they get leased. There is no difference between the alternatives as shown on page 2-9. Vermillion basin, Sunlight Peak and the Anasazi areas should all be no leasing.

Lee Baker – self–

There is less than 1% in no leasing category. Need to preserve the natural conditions. Need to have more lands in the no leasing category.

Roger Flynn – Environmental Law Society –

24 The avoidance stips are insufficient. The areas should be no leasing.
26 Insufficient range of alternatives. Page 2-9 – no real range of alternatives. BLM should be looking at the whole ecosystem not just BLM land. Need a no leasing alternative. Need a reasonable choice for the public. Need a basis for the insignificant impact determination. Submitted a written report on the

---

**4**

values of the Vermillion Basin. The Anasazi and Sunlight Peaks should all be no lease. Riparian zones should be no leasing. The protective leases described on pages 1-1 and 1-2 are illegal. Mentioned the BLM Vegetative Mgmt. EIS. We should include the effects of that proposal in with cumulative impacts.

Ron McClellan – self –

26 The EIS argues against current public opinion. BLM needs to change to current urban values. The document is not balanced. Many waivers being granted to NSO areas. O & G leasing foregoes other uses. Alternatives are too narrow. Appendix E should all be no leasing.

Paul Zogg – Colo. Wildlife Federation –

26 There is too much emphasis on O & G leasing. Need more no leasing. Need more alternatives. Not a balanced approach. The Sec. of the Interior can say no the BLM – No Leasing. Need to protect the wildlife habitat. Small areas of exclusion can work. Stips are inadequate. T/E disturbance is year round especially during oil and gas production phase. Waivers are a big problem with the wildlife habitat. CEQ audit showed stips not being put on leases. Biological sensitive areas need more protection.

Todd Robertson – Colo. Environmental Coalition –

Vermillion, Irish Canyon, etc. should all be no leasing. Questioned the BLMs methodology of determining the level of protection for the various ACECs – NSO on most but controlled surface use on LSRA and GSRA. NSO on other areas is not strong enough, should be no leasing.

Jan Hardin – Colo. Wilderness Study Group –

75% of the wildlife depend on the riparian areas. NSO is not adequate protection. 1/4 mile buffer is not big enough. Vermillion Basin needs more protection. Wetlands and sensitive soils all need no leasing.

Casey Mulligan – self –

Timing limitations do not apply to the production phase. Letter (5/19/89) from Chips Barry to Greg Shoop says that NSO is not adequate protection. Sec. of Interior does not have authority – see IBLA decision dated 2/6/90.

Wilbur Boldt – Colo. Wildlife Federation –

Cumulative impacts are not accurate. If they were added to all the others they would be a major impact.

**4**

Alissa Salmore - self -

How does the O&G industry convey their wishes and interests to the BLM ? Wells are noisy and disturbing. These areas should not be available for lease - Anasazi, Vermillion Basin, riparian zones, recreation areas. The alternatives are too narrow.

Julius Dahne - self -

**53**
There is no discussion of horizontal drilling and its effect on the aquifers. No leasing on the Anasazi area. BLM should be proactive not reactive. Should assess the need for that level of leasing is needed vs. other values. BLM should act with caution, we need to use conservation in the use of oil and gas.

---

**5**

OIL AND GAS EIS

PUBLIC MEETING COMMENTS

DURANGO - July 18,1990

L.G. Truby - self-

**207**
On page 4-11 there is a discussion of waste water disposal but no mention of mitigation. Near Cedar Hill and Bondad there are 180 water wells and 57 have hydrocarbons in them from the coal bed methane gas. On page 4-11 the last

**134** paragraph - 1st sentence - The BLM needs to discuss prevention of the depletion of the aquifers. 2nd sentence - If this occurs then we will have subsidence -

**135** need to discuss mitigation. 5th sentence - There are many fractures in this Area. BLM needs to address the problem of companies fracturing 2 to 3 times

**216** the allowable pressures. This increases the overburden pressures and is not addressed. Also need to address the problem of fracturing out of the zone

**217** intended. What is the legal reference for the BLM letting the state of Colorado set the well spacing. BLM should analyze the fact that water

**136** depletion actually allows gas production. Some areas deplete naturally. Water is going to naturally migrate. BLM should consider the New Mexico method of

**8** well casing to prevent gas migration - well casings are cemented up to the surface and water monitoring wells are within 200 feet of the gas well or at

**137** least one placed in every section. Waste water should be disposed of on public

**54** lands. Not on private lands or in another state.

Carl Weston - San Juan Citizen's Alliance -

**133**
The EIS does not differentiate between coal bed methane and natural gas. EIS did not address gas migration due to hydrostatic pressure. This migrating gas

**138** can kill vegetation and burrowing animals. Need additional studies to measure the gas migration and also water migration. The roads associated with the oil

**139** and gas industry are not included in the non-point source program and they should be. They should also be included in the EIS, especially in protecting

**206** the T/E species. Disposal of toxic wastes was not described and it should be. Cannot ignore the impacts. Waste water should be disposed of properly. Gave

**140** example of waste water being shipped to New Mexico for disposal. The BLM needs to track this and analyze the impacts. The BLM defers to the Colo. Oil and Gas

**215** Commission. They don't have the personnel or money to properly do their job. The EIS needs to evaluate the effectiveness of the Commission to do their job.

**9** Mr. Weston submitted two documents - an article from "The Workbook" about the effect of methane on vegetation and an EPA regulation on the wastes from oil

**141** and gas production. What are the impacts of a cathodic well that punctures a water course.

Mark Ricnert - San Juan Citizens' Alliance -

**6**
Referring to the O&G report on BLM management of the oil and gas program how is the BLM going to insure that this EIS is followed and that it works. BLM

**55** should also consider buying back the leases to protect important resources.

Patty Schuler - Sierra Club -

**158**
Page 3-4, 3rd paragraph - How does this affect the SJNA. Is concerned about the effectiveness of the protection for the critical wildlife water range.

---

**5**

Jan Nelcigh - self -

Is concerned that the tax incentives will encourage more drilling. The tax incentives for the coal bed methane are encouraging more drilling than for natural gas. Oil and gas is upstaging other resources.

Chuck Jones - Meridian Oil Inc -

**19** What leases will the proposed action effect.

---

**6**

SIERRA CLUB

Kirk Cunningham, Chairman
Water Quality Committee
1842 Canyon Blvd. #204
Boulder, CO, 80302
Rocky Mountain Chapter
777 Grant Street   Suite 606   Denver, Colorado 80203   303 - 861 - 8819

Robert W. kline, project manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, CO, 81506
August 10, 1990

Dear Gentlemen:

I would like to make some comments on behalf of the Water Quality Committee of the Rocky Mountain Chapter on the Oil and Gas Leasing and Development EIS, as well as some of my own comments on this document.

**205**
**204**
**214**
It is vitally important to protect water quality and riparian habitat values on public lands in oil and gas activities. I will deal here strictly with surface water quality problems that I have seen in my ramblings about BLM lands for recreation, and that I understand exist from other sources of information. The best way to protect surface water resources is to stay out of alluvial valley floors altogether. As outlined in the book "Arroyos and Environmental Change in the Southwest", authors Cooke and Reeves state that road building in the soft and easily-erodible soils of alluvial valleys is one of the historical causes of arroyo initiation and propagation. If no roads exist in an AVF, then don't build a new one! Secondly, the soils in AVF's tend to transmit ground water rapidly. Any contaminated water from drilling operations will tend to enter surface water faster in this case. I've seen a lot of unlined gas well water disposal pits in the desert AV's around Grand Junction that spoked pretty grim and certainly would not not have contributed positively to the already low water quality in that area. Is it not possible to require that all waste water from the drilling be trucked away for disposal in these surface-water-sensitive environments?

Certainly, oil and gas drilling operations should keep well away from areas that are now, or could be with some restoration work, riparian zones. As you are well aware, riparian zones in functioning condition on BLM land are rare indeed, usually due to past and present abusive grazing practices. Approximately 90% of the BLM's original riparian zone acreage has been damaged or destroyed altogether, according to a recent GAO report. In the Sierra Club's prioritization of things, even a commodity as valuable as oil is not as valuable as functioning riparian zones on our semi-desert lands.

**26**
As far as my own opinions on this DEIS are concerned, I think that the basic fault with the document is that it has not really examined a reasonable range of alternatives. One of the Tables in the DEIS shows this clearly when it compares the alternatives side by side: the descriptive terms are the same for each alternative, with one small exception! Surely, this approach defeats the purposes of NEPA.

Secondly, past experience and the reputation of the BLM in dealing with mineral leasing matters in general suggests to me that NSO stipulations will be subverted. If the agency really wants to exclude surface occupancy on environmentally sensitive lands, it should ban leasing on these lands altogether! Although great strides appear to have been made recently in slant and horizontal drilling technologies, it appears to me that NSO stipulations



**6**

Rocky Mountain Chapter
777 Grant Street Suite 606 Denver, Colorado 80203 303 · 861 · 8819

rigorously applied will prevent any drilling in large parts of the NSO acreages. If this comes to pass, then lessees with NSO lease stipulations will howl in pain and sue the agency on grounds of a taking of property rights, or some such. The net result will be little or no protection to areas that deserve it, areas like sensitive wildlife habitat, roadless areas, ACEC:s, etc. The fact that the BLM has given complete no-lease protection to only a few percent of the public lands in question in essence says that oil and gas exploration and production are the de facto dominant use of the public lands, despite the Multiple Use and Sustained Yield Act and other laws.

I trust that in its FEIS, BLM will correct the deficiencies of this document in its environmental analysis, and grasp the nettle of the leasing question by denying the possibility of leasing in the areas that it now considers only for leasing with NSO stipulations.

Thank you for your consideration of these opinions.

Sincerely,

Kirk Cunningham
Water Quality Chairman

---



**7**

Rocky Mountain Natural Resources Clinic   303 492-6552
Box 401, Fleming Law Building, Boulder, CO 80309

AIRBORNE EXPRESS

August 10, 1990

Robert W. Kline, Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, Colorado 81506

    Re:   Comments on the Colorado Oil and Gas Leasing Draft Environmental
          Impact Statement

Dear Mr. Kline:

On behalf of the National Wildlife Federation and the Land and Water Fund, we are pleased to submit the following comments on the Draft Environmental Impact Statement ("DEIS") for Oil and Gas Leasing on Bureau of Land Management lands in the Glenwood Springs, Kremmling, and Little Snake Resource Areas and the Northeast and San Juan/San Miguel Planning Areas in Colorado.

The National Wildlife Federation ("NWF"), with over 5 million members and supporters, is the nation's largest conservation organization. Over fifty thousand residents of Colorado are members of NWF. NWF is a non-profit public interest organization committed to ensuring that our natural resources are conserved and used wisely.

The Land and Water Fund of the Rockies is a regional environmental law center providing assistance to local citizens' groups in protecting the people, natural resources, and environment of the West.

In reviewing this DEIS, we discovered several inadequacies, failures to comply with applicable statutory and case law, and unfounded assertions. For example:

**44** { This DEIS fails to adequately consider the no leasing alternative, in violation of the National Environmental Policy Act ("NEPA") and Bob Marshall Alliance v. Hodel, 852 F.2d 1223 (9th Cir. 1988).

**26** { Since all of the alternatives considered present the same development scenario—with no variation in the amount of acreage open to lease—the DEIS does not provide the agency and the public with a

---

Robert W. Kline, Project Manager
August 10, 1990
Page 2

**7**

    meaningful basis for choice among options, once again in violation of NEPA.

**64** {
• Colorado BLM places undue reliance on seasonal stipulations (which do not apply to operation and maintenance phase of oil and gas activities); Conditions of Approval (which are not always attached to drilling permits); and No Surface Occupancy stipulations (which are subject to waiver, modification and exception) in protection of wildlife habitat and other resources. Moreover, all these stipulations require and assume that enforcement will be effective, and we have legitimate doubts as to BLM's ability to provide the necessary oversight.

**89** { • In some cases, BLM is unaware of the wildlife resources on some of the lands open to leasing in the Study Area.

**228** { • The evaluation in the DEIS of the cumulative impacts of oil and gas activities in combination with other activities on these lands is inadequate.

**157** { • Finally, a recent report by the Interior Department's Inspector General seriously challenges BLM's assumptions regarding effectiveness of mitigation and reclamation.

These problems indicate the need for serious revision of the DEIS.

I.    FAILURE TO CONSIDER THE NO-LEASING ALTERNATIVE

None of the proposed alternatives gave serious consideration to classifying any land in the discretionary no-lease category, with the exception of a few thousand acres in the Northeast Planning Area. Colorado BLM's refusal to close to leasing any land in the other Resource Areas other than areas closed to leasing by legislation or secretarial policy[1] raises questions about BLM's desire and ability to protect other resources from the impacts of oil and gas development.

Colorado BLM's failure to give "full and meaningful" consideration to the no-leasing alternative in areas involving potential resource conflicts violates the

[1] 43 C.F.R. § 3100.0-3 lists lands excluded from leasing including National Park System lands; Indian reservations; Naval Oil Shale Reserve; incorporated cities, towns and villages; and lands recommended for wilderness designation, wilderness study area, and lands in the National Wilderness Preservation System.

---

Robert W. Kline, Project Manager
August 10, 1990
Page 3

**7**

National Environmental Policy Act.[2] BLM's failure to seriously consider the no leasing alternative is hardly cured by two brief references:

    • an alternative of no leasing over the entire Study Area was considered, but not analyzed. No leasing was considered and analyzed on a more site-specific basis as part of the analyzed alternative. (DEIS, at 2-1).

    • These resources/values to be protected are also considered for no leasing areas, but it is determined that no surface occupancy is adequate for resource/value protection. (DEIS, at E2).

BLM never describes the extent of site-specific analysis of the no-leasing alternative; thus, the reader cannot ascertain the reasons for site-specific rejection of no leasing.

BLM provides no reasons for the "determination" that No Surface Occupancy provides adequate protection for all resources. No Surface Occupancy is not equivalent to no leasing for several reasons. First, the No Surface Occupancy classification still allows for directional drilling with potential downhole impacts. Second, the No Surface Occupancy classification, as identified in this DEIS, is subject to waiver, exception and modification—any of which render this classification useless for protecting resources. Finally, No Surface Occupancy stipulations are useless unless enforced, and recent reports (see § IX below) suggest BLM's ability to monitor and take necessary action is limited.

The failure of BLM to seriously consider the no-leasing alternative is demonstrated by the complete failure to discuss the impacts from the no leasing

[2] In Bob Marshall Alliance v. Hodel, 852 F.2d 1223, 1229 (9th Cir. 1988), cert. denied sub nom Robinson v. Alliance, 109 S.Ct. 1340 (1989), the Ninth Circuit summarized NEPA's requirement that the no-leasing alternative be considered:

    NEPA requires that federal agencies consider alternatives to recommended actions whenever those actions "involve[] unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E)(1982)....NEPA's requirement that alternatives be studied, developed and described both guides the substance of environmental decision making and provides evidence that the mandated decision making process has actually taken place.[] ...NEPA therefore requires that alternatives -- including the no-leasing alternative -- be given full and meaningful consideration.

852 F.2d 1228, 1228-29 (9th Cir. 1988)(citations omitted).

BLM_0006069

Robert W. Kline, Project Manager
August 10, 1990
Page 4

**7**

alternative in comparison to other alternatives. Nor is there any discussion of the results of site-specific analysis of the no leasing alternative.

BLM attempts to justify its summary dismissal of the no leasing alternative in the DEIS at page 3-1:

> Public lands are generally available for oil and gas leasing in accordance with the public policy expressed in the Mineral Leasing Act, and BLM's mandate for true multiple use of the public lands set out in the Federal Land Policy and Management Act...The BLM believes the three alternatives presented provide an adequate range of proposals and options to make a well informed choice.

This attempted justification hardly presents a "full and meaningful" consideration of no leasing. Moreover, no reasons are provided for the "determination" that No Surface Occupancy offers adequate protection for all resources.

In revising this DEIS, BLM should actually consider and analyze the no leasing alternative in comparison with the other alternatives in order to comply with NEPA and federal case law. Chapter Two of the DEIS compares the three analyzed alternatives; Table 2-6 summarizes impacts by resource for each alternative. At a minimum, the no leasing alternative should be included in these comparisons; preferably, the revised DEIS will include no leasing in the full discussion of environmental consequences in Chapter Four.

II.   NO BASIS FOR MEANINGFUL CHOICE AMONG ALTERNATIVES

The public and decision makers cannot make meaningful choices among the alternatives from the information and alternatives presented in the DEIS. The DEIS's alternatives present the same development scenario, with only minor variations in impacts and in protection for wildlife and other non-oil-and-gas values.

This DEIS fails to consider altering the amount of land within the Study Area to be made available for leasing – this amount is identical for all three of the proposed alternatives. (DEIS, Tables 2-3, 2-4, and 2-5). *Less than one percent* of the land in the Study Area under each alternative is leasing under the "discretionary no-leasing" designation. (Id.). Similarly, all three alternatives forecast an identical total number of acres disturbed and wells drilled in the Study

FPGSOAHOBAGAFCOJO_GENXBNL_DEIS.COM

---

Robert W. Kline, Project Manager
August 10, 1990
Page 5

**7**

Area.  This tunnel vision of leasing violates NEPA,[3] and deprives readers of a "clear basis for choice among options."

We recommend that BLM seriously evaluate whether the following areas should be closed to oil and gas leasing under BLM's discretionary authority:

- threatened and endangered species habitat including endangered bald eagle and peregrine falcon nesting, breeding and wintering areas;

- The area used by the only nesting population of the greater sandhill crane, a state endangered species;

- crucial riparian and wetland areas (these comprise a mere 3,400 acres of the more than 1,800,000 acres in the Little Snake Resource Area, yet 80 percent of all wildlife species in the LSRA are totally dependent on riparian habitat for sustenance);

- big game calving and crucial winter range areas;

- Winter, lek and nesting habitat for grouse;

- Important waterfowl breeding and nesting habitat;

- Areas suitable for potential relocation of the endangered black-footed ferret, including BLM lands in northwest Colorado where the U.S. Fish and Wildlife Service is considering reintroducing the rarest mammal in North America;

- other areas of important wildlife habitat;

- areas managed primarily for recreational values;

- areas with unstable soils;

- Areas of Critical Environmental Concern;

- sites listed in the National Register of Historic Places.

---

[3]   NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E). Council on Environmental Quality regulations mandate that the alternatives chosen must "sharply define" the issues presented and provide the agency and the public with a "clear basis for choice among options."  40 C.F.R. § 1502.14.

FPGSOAHOBAGAFCOJO_GENXBNL_DEIS.COM

---

Robert W. Kline, Project Manager
August 10, 1990
Page 6

**7**

We recommend these areas for closure because these resources may not adequately be protected by stipulation, and the resource values in these areas often outweigh onshore oil and gas development values.

III.   UNDUE RELIANCE ON INADEQUATE SEASONAL STIPULATIONS

For the more than three million acres of BLM-administered land in the Study Area, Colorado BLM maintains that lease stipulations provide adequate protection for all wildlife habitat areas to be leased. (DEIS, at E-2).  This assumption is at best undocumented and at worst simply wrong for the following reasons.

First, Timing Limitation stipulations, by their own terms, do not apply to the maintenance and operation of producing wells. (DEIS, at E-6).  While some of the timing limitations may be adopted as Conditions of Approval ("COAs") which apply to operation and maintenance phases, application of these COAs is completely within the discretion of the Authorized Officer. (DEIS, at D-1).[4]

Second, a recent report by the General Accounting Office" ("GAO Federal Land Management Report") substantiates our concerns that COAs, even if applied, will not provide adequate protection for wildlife and recreation values.  After evaluating four BLM state offices—including Colorado BLM—GAO found that, at the stages of lease issuance and approval of a drilling permit, these offices:

> continue to approve some drilling permits even though additional environmental studies, identified as needed by the agencies, have not been completed; and...do not always include mitigating measures (stipulations or conditions of approval) required in the leases or permits to minimize the environmental impact of oil and gas development.

GAO Federal Land Management Report, at 25.

GAO estimates that "an average of 19 percent of drilling permits, in the offices we visited were approved without one or more of the required conditions of approval." (Id., at 31).  According to the report:

---

[4]   The BLM asks the reader to "[n]ote that there is no commitment to the specific wording of a Condition of Approval."  (DEIS at D-1).  Additionally, the Authorized Officer is not required to choose any COAs until the field development stage.  (Id.)

[5]   United States General Accounting Office, Federal Land Management: Better Oil and Gas Information Needed to Support Land Use Decisions, GAO/RCED-90-71 (June 1990).

FPGSOAHOBAGAFCOJO_GENXBNL_DEIS.COM

---

Robert W. Kline, Project Manager
August 10, 1990
Page 7

**7**

> Colorado BLM officials...believe that drilling permits have missing conditions of approval because resource specialists responsible for identifying the potential impacts of oil and gas development on other resources did not properly review the permits to ensure all conditions were included.

Id. at 43.

The GAO report casts substantial doubt on whether BLM will enforce all conditions of approval.  When BLM does not set forth mandatory conditions of approval which it has identified as necessary prior to approving an Application for Permit to Drill, significant wildlife and recreational resources are at serious risk during development and production stages.

In sum, assertions by BLM that stipulations and conditions of approval will be properly applied to drilling permits, do not provide sufficient assurance that the surrounding environment will be protected.  More reliable protection measures must be applied *at the leasing stage* to prevent unnecessary environmental damage.

IV.   NO SURFACE OCCUPANCY STIPULATIONS MAY NOT BE ADEQUATE

While we are pleased to see that BLM recognizes the need to protect certain areas with NSO stipulations, even the more stringent NSO stipulations are subject to waiver and modification,[6] either of which compromise their protective nature. Although no exception criteria are identified for some of the site-specific NSO stipulations, this does not guarantee that BLM will not grant exceptions.  BLM states at page E-1 of the DEIS that, "Even where no exception criterion is identified, exceptions are considered on a case-by-case basis."

In addition, as noted earlier, BLM's track record in monitoring and enforcing stipulations (see § IX below) casts doubt on the actual effectiveness of No Surface Occupancy Stipulations.  If unenforced, an NSO stipulation is ineffective, whereas not leasing the land to begin with creates no risk to other resources.

For these reasons, we once again urge you to close more sensitive areas to leasing. Indeed, our concerns regarding protection of many of these areas are

---

[6]   Regarding modification, BLM states that a modification is made "when new information...shows that the protective measure is unnecessarily restrictive." (DEIS, at E-1).  A waiver is "the complete elimination of a stipulation from a particular lease contract. A stipulation is waived by the Authorized Officer after preparation of an environmental assessment and a decision is made that the stipulation in question is no longer required for a particular lease." (Id.)

FPGSOAHOBAGAFCOJO_GENXBNL_DEIS.COM

Robert W. Klhus, Project Manager
August 10, 1990
Page 8

substantiated by the comments of Chips Berry, Executive Director of the Colorado Department of Natural Resources:

> Certain sensitive wildlife areas should be off limits to oil and gas development. Areas of sufficient wildlife value could include habitats of threatened and endangered species, critical wetland and riparian areas, critical nesting sites, and sites which may be vital to the survival of a species. (Chips Berry, letter of May 18, 1989 to Greg Shoop) (emphasis added).

Despite the presence of high-quality wildlife habitat and the above-mentioned species, none of the alternatives recommends so much as one square foot of wildlife habitat within the study area for discretionary closure to leasing.

V.    COLORADO BLM IS UNAWARE OF THE WILDLIFE RESOURCES ON SOME LANDS OPEN TO LEASING

Some language in the DEIS suggests Colorado BLM is unaware of the wildlife resources in parts of the study area. At one point, the DEIS states: "Generally, adverse impacts could also occur in areas where data are not sufficient to determine possible impacts from oil and gas activity. The most likely situation for such impacts would be disturbance to undiscovered major nests, important plant species, etc." (DEIS at 4-49). Additionally, according to the DEIS the study area contains 28,583 acres of areas and riparian habitat in the San Juan/San Miguel Planning Area have not been inventoried for species presence.

BLM should take the time to obtain information on the resources before leasing the land. The information necessary to define possible impacts from oil and gas activity and to alleviate that impact is essential to the adoption of a reasonable decision without such information the public cannot determine whether the proposed protection in each area. BLM does not state that the cost of obtaining the information is prohibitive. Consequently, BLM should either correct the DEIS to include the necessary information, or justify its decision not to obtain the necessary data, for this DEIS to comply with CEQ regulations.[7]

---

[7]   The CEQ regulation containing procedures for dealing with incomplete or unavailable information in an environmental impact statement is published at 40 C.F.R. § 1502.22.

NATIONAL WILDLIFE FEDERATION (COLORADO) / BLM_0006071

---

Robert W. Klhus, Project Manager
August 10, 1990
Page 9

Until Colorado BLM possesses sufficient data to evaluate the impacts of oil and gas activity on the lands, these lands should not be considered for leasing.

VI.    THE EXCLUSION OF THE INTERIOR DOES NOT HAVE THE AUTHORITY TO MAKE WILDERNESS STUDY AREA LANDS

The Colorado BLM asserts that in cases involving drainage of oil and gas, the Secretary of the Interior may issue leases on the unleasable Wilderness Study Areas (WSAs) otherwise excluded from leasing by the Mineral Leasing Act. (BLM DEIS at 1-2) In fact, the Mineral Leasing Act, as amended, explicitly prohibits leasing WSA lands for oil and gas exploration and development:

> The Secretary shall not issue any lease under this chapter ... on lands within Bureau of Land Management wilderness study areas ...

30 U.S.C. § 226-3(a)(2) (Supp. 1989). The Secretary of the Interior, through the BLM, does not have the legal authority to issue wilderness study area lands under any circumstances. (See Sierra Club Legal Defense Fund, Protest of State of Oil and Gas Leases Within a Wilderness Study Area, February 6, 1990 (protest pending)). We call to your attention the undisputed assertion from the DEIS, at least until the protest is resolved.[7]

---

[7] (continued)

> (a) If the incomplete information relevant to reasonably foreseeable adverse impacts is essential to a reasoned choice among alternatives and is overall the cost of obtaining it is not exorbitant, the agency shall include the information in the environmental impact statement.

- This protest goes several reserves why BLM does not have authority to issue protective leases in WSAs.

- First, while 43 C.F.R. § 3101.3-3(d) states that the agency "has implied authority to lease lands 'otherwise unavailable for leasing' when oil and gas is being drained," this regulation attempts to grant to the Secretary authority under the Mineral Leasing Act to deal with drainage problems. The Secretary's authority to do what you think it should with those problems is derived from the Mineral Leasing Act, and that authority cannot expand explicit agency regulations. The Supreme Court has held that regulations cannot expand statutory authority beyond that granted by Congress. Chrysler v. Brown, 441 U.S. 281, 294-95 (1979). This limit of the power to issue regulations also applies to the Secretary.

- Second, the Mineral Leasing Act expressly limits the Secretary's authority to release drainage problems; the Secretary is authorized only to "negotiate ...

NATIONAL WILDLIFE FEDERATION (COLORADO) / BLM_0006071

---

Robert W. Klhus, Project Manager
August 10, 1990
Page 10

VII.    INADEQUATE ANALYSIS OF IMPACTS OF OIL AND GAS ACTIVITY ON WILDLIFE

The DEIS, at 4-3 to 4-8, analyzes the impacts under each alternative of oil and gas activity on wildlife, but neglects to analyze the dangers posed to migratory birds and other minerals by uncovered waste oil and chemical pits or drilling pits.

Wastes oil and chemical pits have reflective surfaces which make them resemble water. If wet the birds attracted to the reflective surfaces. The U.S. Fish and Wildlife Service discovered in a 1987 investigation that 250,000 birds were being killed annually in waste oil and chemical pits in eastern New Mexico alone.[8] In addition to those, numerous including deer, opossum, porcupine and rabbits have been lost to these uncovered pits.

The DEIS, at page D-15, contains the following mitigation measure concerning open pits:

> Mud pits, separation pits, and other containments used during oil and gas exploration or operation in the lease or in the storage of oil and other hazardous materials shall be fenced, posted or covered. Additional protective measures may be needed to minimize hazards and prevent access to humans, livestock, waterfowl, and other wildlife.

By making the covering of pits an optional "additional protective measure," BLM has not addressed the problems caused by these pits. BLM should develop a new COA, applicable to all leases, which would mandate the covering which makes w wire of all pits and pools used for the storage of oil and hazardous chemicals.

---

[8]  Land Attraction Oil Pits Are Death Traps for Wildlife, Conservation 90, / NATIONAL WILDLIFE FEDERATION, August 17, 1990, at 4.

BLM_0006071

---

Robert W. Klhus, Project Manager
August 10, 1990
Page 11

The BLM's lack of discussion of the significant and indivertible impacts of these pits on wildlife on this question the adequacy of the entire analysis in this DEIS of the impacts of oil and gas on wildlife.

VIII.    INADEQUATE EVALUATION OF CUMULATIVE IMPACTS

In this section of a entitled "Cumulative Impacts," Colorado BLM maintains that wildlife, regulation, soils, water, recreation, visual, and wilderness resources will suffer no significant overall, or cumulative, impacts.[9] We believe the DEIS is not adequate in its discussion of cumulative impacts because Colorado BLM makes no attempt to analyze the combined impact of the proposed development and other present and future activities on these resources. For instance, DEIS notes that "[r]iparian and wetland habitats ... by stipulations and COAs, and therefore, will not be subjected to any significant impacts." DEIS at 4-22. This statement does not analyze cumulative impacts; it is an analysis of the impact of individual projects at individual sites. Because such potential developments activities as logging and associated road-building, hardrock mining, and recreation ...

The Government Accounting Office has raised concerns that federal agencies continually fail to conduct satisfactory cumulative impact analyses:

> The key element most often missing from land use plans and related environmental studies is cumulative impacts. NEPA requires that cumulative impacts be disclosed in land use plans, but the agencies did not provide their guidance on the cumulative impacts of information. While both agencies have improved their guidance, it is still inadequate for assessing the cumulative impacts of

---

[9]  "Cumulative impact" is defined in the CEQ regulations at 40 C.F.R. § 1508.27:

> "Cumulative impact" is the impact on the environment which results from the incremental impact of the proposed action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

The discussion of the cumulative impacts on soils suffers from the same failure to look beyond the immediate proposed development. The DEIS notes "[t]he annual soil erosion of each square mile of affected land ... with reference to COAs and performance standards are necessary to prevent highly significant amounts of topsoil and surface ... (DEIS at 4-22, 4-23), but fails to analyze how this actions at other developments ... activities impact oil and gas leasing and thus it is not a cumulative impacts analysis.

NATIONAL WILDLIFE FEDERATION (COLORADO) / BLM_0006071

Robert W. Kline, Project Manager
August 10, 1990
Page 12

**7**

oil and gas leasing and development. (GAO Federal Land
Management Report, at 40).

It is apparent from the DEIS that Colorado BLM has not met GAO's concerns.
The cumulative impacts discussion should be reworked so that it complies with
the federal regulations by analyzing "collectively significant impacts" from all
"reasonably foreseeable future actions."

**IX.   BLM'S ASSUMPTIONS ON MITIGATION AND RECLAMATION ARE UNFOUNDED**

Colorado BLM explains the DEIS analysis relied on several assumptions,
including:

- All lease terms and conditions will be adhered to and that they are
  effective in mitigating impacts.

- Reclamation procedures will be completed and will be successful.
  (DEIS, at 4-1).

The first assumption is questionable at best, as indicated in a November 1989
report by the Inspector General for the Interior Department. It found BLM's
enforcement and inspection program was seriously deficient.[13]  Specifically, the
Inspector General discovered that BLM state, district and resource area offices
were neither uniformly enforcing regulations nor assessing penalties for violations,
and that "violations of existing regulations have resulted in environmental damage
... and a potentially substantial Government liability for plugging abandoned wells
and cleaning up well sites." (Inspector General Report 90-18, at 4).

According to the report, lease operators who violate oil and gas operations
regulations "often do so without the fear of being punished." (Id., at 16).  Of 1,317
incidents of noncompliance with these regulations in 1988, the total amount of
reported penalty assessments was only $11,500. (Id.).[14]  Additionally, based on

---

[13] U.S. Department of Interior, Office of Inspector General, Audit Report: Inspection
and Enforcement Program and Related Activities; Bureau of Land Management, Report
No. 90-18; November 1989.

[14] A recent General Accounting Office audit found additional evidence that lease
operators do not comply with oil and gas lease provisions and applicable regulations.
United States General Accounting Office report no. RCED-90-99, Mineral Revenues:
Shortcomings in Onshore Federal Oil and Gas Production Verification (June 1990), 66-67.
The auditors examined citations issued for violation of oil and gas leasing regulations by
six BLM field offices in New Mexico, Wyoming, and Montana between 1986 and 1988, and
found that 8.5% (480 of 5,410) of the citations were for unsatisfactory environmental
protection, and 2% (109) were for "surface use not in accordance with approved plan." (Id.)

---

Robert W. Kline, Project Manager
August 10, 1990
Page 13

**7**

field visits and discussions with inspectors, the authors believe that a large
number of wells are either not plugged or plugged improperly; these wells "could
be adversely impacting the environment." (Id.).

Given the Inspector General's findings, we feel the DEIS's environmental impacts
analysis is based on the faulty assumption that all terms and conditions in each
lease will be followed.  With questionable enforcement of lease provisions,
Colorado BLM's assumptions about impacts from oil and gas development are
dubious. Accordingly, the EIS should be reworked to take a harder look at likely
future impacts from oil and gas development; this second effort must not assume
away impending serious future consequences.

**X.   CONCLUSION**

Colorado BLM should redraft this DEIS; the new document should consider
meaningful alternatives which provide the public with a clear basis for choice
among options.  The additional alternatives must provide adequate protection for
increasingly scarce wildlife and recreation resources.

This DEIS is of crucial importance since it revises old oil and gas leasing procedures
affecting 3.2 million acres of BLM-administered surface lands.  The errors, flaws
and inadequacies described above indicate the need for revision of the document so
that it complies with federal law, common sense, and the public interest in
protection of scarce natural resources.

Thank you for the opportunity to comment on this document.

Respectfully submitted,

Thomas D. Lustig, Senior Staff
Attorney, National Wildlife
Federation
Kathleen C. Zimmerman, Senior
Attorney, Land and Water
Fund
Casey Mulligan, legal intern,
National Wildlife Federation

TDL:pey

---

**Mobil Exploration & Producing U.S. Inc.**

P.O. BOX 5444
DENVER, COLORADO 80217-5444

Denver Division - Land
August 13, 1990

Mr. Robert W. Kline
Bureau of Land Management
764 Horizon Drive
Grand Junction, CO 81501

**8**

RESOURCE MANAGEMENT PLAN
OIL AND GAS LEASING AMENDMENTS
GLENWOOD SPRINGS, CO.

Gentlemen:

Mobil Exploration and Producing U.S. "Mobil" commends the BLM's decision to
amend the resource management plans to conform to the Supplemental Program
Guidance (SPG) for fluid minerals in one Draft of Environmental Impact Statement
(DEIS).  This is an efficient use of time and budget allocations.

Mobil has actively acquired several million dollars in seismic and lease
acquisitions in the Glenwood Springs Resource Area and would like to offer you
the following comments:

**156**  First, we are concerned that the BLM did not consider in this DEIS the impact of
surface management oil and gas exploration and production.  It seems the DEIS
heavily restricts oil and gas activities through surface management without
adequate justification as suggested in the SPG.

**50**  Secondly, Mobil objects to the use of "worst case development" scenarios when
referring to future oil and gas development.  The BLM should use "reasonably
foreseeable development" which would be more appropriate as suggested by the
Council on Environmental Quality.  Mobil is committed to a clean environment as
we have demonstrated in the Piceance Creek Unit in Rio Blanco County and the
numerous exploratory wells drilled in Rocky Mountains.

**213**  Thirdly, Mobil is unaware of any situation where seismic disrupts normal water
aquifers or altered subsurface water flows which "result in reduced flows or
even the loss of all water in existing spring or water wells".  This was stated
on page 4-2 under the proposed action alternative for livestock grazing.  We
believe this misrepresents potential effects the oil and gas exploration has on
surface resource values.

**187**  Fourthly, Mobil feels the requirement to compensate for loss of crucial
habitation is unjust.  The BLM justifies the stipulation because competition
among ungulates may occur as a result of a reduction in big game winter ranges,
however, we feel the problem is overpopulation of ungulates that exceed the
range carrying capacity.  The potential effects to wildlife is equally
disturbing to Mobil.  The study done by Hayden-Wing and Associates for the Rocky
Mountain Oil & Gas Association identified two main problems:

---

**Mobil**

Mr. Robert W. Kline
August 13, 1990
Page Two

**8**

1) The deer herd population is above rangeland capacity and;
2) Over grazing has caused the browse to be in poor condition.

We believe a similar scenario can be made for the N.W. Colorado area.  A copy of
our interpretation of the Hayden-Wing Study is attached for your information as
Exhibit "A".

**186**  Furthermore, the DEIS states that a direct loss of 950 acres of habitat in any
given year could be expected from oil and gas activity.  This loss would not be
significant to wildlife in the study area because less than .003% of the acres
in the study area would be effected.

Mobil Oil Corporation is committed to working with the surface resources and
hopes the BLM will balance its resources equitably.

Very truly yours,

P. W. Sheets
Exploration Manager

SPC/ra556
Attachment

**Mobil**                                                                                    **8**

EXHIBIT "A"

Hayden-Wing and Associates recently conducted a study for the Rocky Mountain Oil
and Gas Association (RMOGA) to evaluate the impact of oil and gas activity on
deer in the Top LaBarge Field Area in Lincoln and Sublette County, Wyoming.

The primary general conclusions are that there has not been any significant
long-term impact caused by past impacts and gas activities and that mule
deer have habituated to this activity. It further concludes that the size of
the herd and the condition of their range are the dominate controlling factors.

This study identifies two main problems.

1.   The deer herd population is above the carrying
     capacity of the range land.

2.   The browse on the range is in extremely poor
     condition due to overgrazing by this large herd.

Specifically Hayden-Wing had the following recommendations:

1.   The USDI-BLM stipulation prohibiting surface disturbance on mule deer
     winter range from November 15 to April 30 be dropped. There is no
     correlation between deer mortality and drilling activity.

2.   The avoidance of mountain shrub communities should be encouraged but
     not absolutely prohibited when building roads and drill pads.

3.   Management emphasis should be on reducing the mule deer herd to levels
     that are desirable and sustainable by the winter habitats. The BLM in
     cooperation with the WGFD should agree on what this population level
     is and then manipulate and manage grazing allotments and hunter
     harvest programs so as to maintain the browse forage required to
     sustain it.

4.   Oil and gas operators should be required to cooperate in browse
     reclamation by establishing desired species of plants during their
     reclamation of roads and well sites. The BLM needs to set this as a
     goal to recommend to the operators the use of these desired species of
     plants.

5.   Oil and gas and other surface users should cooperate in a program of
     winter road closures that will not create undue hardship to surface
     user needs but at the same time restrict access of the general public
     to the winter range. Such closures are aimed primarily at the
     prevention of harassment of deer by motorized recreationalists.

6.   Mule deer should not be lumped into the same stipulation with elk and
     big horn sheep because of the great dissimilarities in their
     behavioral responses to human activity.

**Mobil**                                                                                    **8**

Exhibit "A" (continued)

We feel that a similar problem exists in many of the areas that we currently
operate in and are desirous of drilling on. Big game herds are too large and
the browse is in poor condition.

We would encourage the BLM and the Colorado Division of Wildlife to adopt the
recommendations of the Hayden-Wing report for their respective areas in
Colorado.

(The original of this letter is hand written; it was typed for clarity prior to
reproduction here)                                                                          **9**

VISINTAINER SHEEP CO.
Box 396
Craig, Colorado 81625
Aug. 11,1990

Robert W. Kline, Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, Colorado

Dear Mr. Kline,

**233**  On split estate this document does not address the problem of lambing and
calving on private lands, yet wildlife is granted relief. The expense of all
the change over the last several years is brushed aside for energy development.

**234**  In Chapter 4, page 2 a paragraph on reclamation on split estate leaves the
private land owner with little or no control over revegetation and water
erosion from drilling pads. If you can afford court action then you have
recourse.

On page D-14 paragraph dealing with well site development and revegetation on
split estate lands does not happen in many instances. Run off and noxious
weeds are not taken care of timely before the change has spread beyond the
drilling site.

Sincerely,

Dean Visintainer



colorado
environmental
coalition                                                                                  **10**

777 Grant Street, Suite 606
Denver, Colorado 80203

August 14, 1990

Robert W. Kline, Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, CO   81506

Re:  Comments on the Colorado BLM Oil and Gas Leasing Development
Draft Environmental Impact Statement

Dear Mr. Kline,

     The following are comments of the Colorado Environmental
Coalition (CEC) in regards to the Colorado BLM Oil and Gas
Leasing and Development Draft Environmental Impact Statement.
CEC is a non-profit environmental organization with over 1,000
individual members and 38 member organizations with a combined
membership of over 50,000 individuals.

SITE-SPECIFIC MAPS NEEDED AS PART OF DEIS

**27**  The DEIS is very difficult to comprehend without site-
specific maps for each resource area. The public has no firm
concept of what lands are affected by the particular lease
stipulations. CEC currently monitors the BLM Lease Sale in
Colorado. Without any maps we are severely hindered in our
ability to monitor oil and gas leasing. We feel a map with .5
inch/mile scale that shows accuracy down to 40 acres should
accompany this document. The map should illustrate which
stipulations are in place on each 40 acres of land. All previous
BLM planning documents have included maps. Why can't the BLM
include maps in this DEIS?

DEIS LACKS ADEQUATE ANALYSIS OF SITE-SPECIFIC IMPACTS

**228**  If the BLM intends for this DEIS to be the document that
decides what lands will be leased and how they will be leased
for oil and gas development, then a much more thorough study of
the indirect, direct, and cumulative impacts to specific areas
must be undertaken. Although the DEIS does discuss where the BLM
foresees future development occurring and at what level of
development will occur, the DEIS does not take the next step and
adequately discuss what the likely site-specific impacts from
this development will be.

     The BLM glosses over what the impacts to a particular

"Humanity belongs to earth, not earth to humanity"

BLM_0006073

**IO**

Robert Kline
August 14, 1990
Page Two

resource will be by stating that any impact that does occur due to oil and gas development will happen on only a very small portion of the entire study area. This reasoning is flawed. The reader already knows that the impacts will occur in a small area by looking at Appendix D, which outlines where the BLM foresees oil and gas development occuring. What is not known is what the impacts on a specific parcel will be. How can the public and BLM land managers make informed decisions on whether a particular parcel should be open to oil and gas development if the impacts to this particular parcel are not known? When looking at the impacts on a specific site, the BLM must consider all stages of development through full-field production.

**155**

CEC reminds that the BLM, under NEPA, the environmental impacts of the proposed action must be assessed before oil and gas leases are issued, since leasing constitues an irretrievable and irreversible commitment of resources. The current site-specific environmental analysis fails to address these impacts.

## RANGE OF ALTERNATIVES INADEQUATE

**26**

CEC strongly disagrees with the BLM that the three alternatives presented provide an adequate range of proposals and options to make a well informed choice. According to Table 2-9 on page 2-6 of the DEIS the three alternatives have nearly identical impacts on other resources. In addition, the three alternatives open the exact same amount of acreage to oil and gas leasing/development. This lack of meaningful choices among alternatives violates NEPA.

**43**

CEC insists that the BLM consider the no-lease option on a parcel by parcel basis on all of its lands covered by this DEIS. On page 2-1 of the DEIS you state, "an alternative of no leasing over the entire Study Area was considered, but not analyzed. No leasing was considered and analyzed on a more site-specific basis at part of the analyzed alternative." There is no reference throughout the document, however, where no-leasing is discussed at part of a site-specific analysis. CEC believes that there are parcels of land in the study area where a fundamental conflict between oil and gas development and other resources on that land exists. In these cases, where important resources will be irreversibly harmed or destroyed, the BLM should use its discretionary no-lease authority granted by Congress to protect other resources.

## UNDUE RELIANCE ON WSO STIPULATIONS TO PROTECT RESOURCES

---

**IO**

Robert Kline
August 14, 1990
Page Three

While reading the DEIS it is obvious that the BLM believes that all resource conflicts can be solved through the use of stipulations. CEC strongly disagrees with this belief. Use of stipulations to protect high value surface resource lands, especially the no surface occupancy (NSO) stipulation, does not avoid the conflict between oil and gas and other resources, it only delays the day that tough decisions will have to be made.

**73**

NSO stipulations on large tracts of land keep the door open for oil and gas development to occur on these lands. By placing a NSO stipulation on large areas encompassing many square miles, the BLM does not allow a realistic way for oil and gas companies to get at their oil and gas property right. Yet under the law, a company holding such a lease with a NSO stipulation still has the right to be able to get to their property. The company will request a waiver of the NSO stipulation since they cannot get to the fluid minerals any other way. BLM will be forced to waive this stipulation under the threat of a lawsuit by the company. Meanwhile environmental organizations will be forced to go to court to stop the drilling in order to protect the resources the NSO stipulation was suppose to in the first place.

Rather than set up the scenario for a bloody fight in the future, the BLM should use its no-lease authority, not a NSO stipulation, to protect those lands where there is a fundamental conflict between oil and gas development and other resources. BLM must face the fact that oil and gas activity on these lands is incompatible with the other resources found on these lands. CEC believes that all the lands listed as needing a NSO lease stipulation in the DEIS should instead be placed under no-lease by the BLM.

## TOO MUCH LATITUDE GRANTED TO AUTHORIZED OFFICER

CEC is distressed by the power the DEIS givess to its authorized officers in the field to grant waivers, exceptions, and modifications to stipulations that "conform to the plan," thus effectively leaving the public out of the planning process. Past experience has shown us that when faced by pressure from industry to modify or waive a stipulation, the BLM has always done so. What use is this planning document if it can easily and frequently be changed, as the following statement on page C-1 suggests: "Even where no exception criterion is identified, exceptions are considered on a case-by-case basis." While an exception to a stipulation might be warranted in some situations, such as decreasing the amount of time a critical winter range timing stipulation is in place because of a mild winter, CEC feels that other stipulation modifications are not so black and

---

**IO**

Robert Kline
August 14, 1990
Page Four

white and public participation is warranted.

While the DEIS states that when a critical wildlife habitat or endangered plant habitat shrinks a stipulation waiver or modification will be made, what happens when a critical habitat expands? Will a stipulation be modified by the authorizing officer to cover a larger area if a critical habitat expands?

## PRIVATE SURFACE OVER FEDERAL MINERAL ESTATE NOT ANALYZED

**234**

The DEIS fails to discuss how the surface resources of non-federal lands which are underlain by federal mineral estate are to be protected from the impacts of oil and gas development. For example, on page D-6 the DEIS states that all actions that disturb the surface require protection of historical, paleontological, and archeological resources on privately owned surface lands where federal action, such as a federal oil and gas lease, is taking place. Yet from our examination of the DEIS it appears that there was virtually no environmental analysis of these 1.7 million acres of private surface land. Page E-1 of the DEIS states that "stipulations are evaluated for use on all federal mineral estate regardless of surface ownership...", yet nowhere in Appendix E is a stipulation attached to a private surface parcel. If the BLM intends to lease the minerals below these private surface lands they must complete the same site-specific analysis on these lands as they are required to do on federal lands.

CEC has discovered that leasing of the federal mineral estate on non-federal lands is a serious problem with BLM's current oil and gas leasing program. In the August 1990 BLM Lease Sale CEC discovered a lease parcel offered for sale on a state wildlife area with no stipulations attached. When we contacted the Colorado Division of Wildlife to see if this was adequate to protect the surface resources of the wildlife area, they responded that they were unaware that a lease was even being offered. They are currently deciding whether the parcel should be withdrawn from the lease sale or if stipulations can adequately protect the wildlife area's resources. Clearly the time for this kind of analysis is not at the time of the lease sale, but during the oil and gas development planning stage.

## BLM DOES NOT HAVE AUTHORITY TO LEASE WSAs

**3**

CEC strongly disagrees with the statement on page 1-2 of the DEIS which says, "In order to protect the United States from loss of revenues resulting from the drainage of oil and gas under

---

**IO**

Robert Kline
August 14, 1990
Page Five

lands closed to leasing, the Secretary of the Interior has authority to issue protective leases within areas otherwise unavailable for leasing." Since when does the BLM have the ability to overrule to wishes of Congress concerning oil and gas development in BLM wilderness study areas? CEC believes the BLM does not has the legal authority to lease wilderness study areas under any circumstances. (See Sierra Club Legal Defense Fund, Protest of Sale of Oil and Gas Lease Within the Cahone Wilderness Study Area, February 8, 1990). This erroneous statement should be removed from the DEIS.

**3**

## AREAS THAT NEED NO-LEASE PROTECTION

As stated earlier in these comments, CEC believes all the high resource value areas that the BLM recommended in the DEIS as needing a NSO stipulation should instead be placed in the no-lease category. In addition to these areas, there are other areas we feel are incompatible with oil and gas development and thus need to be placed under no-lease:

1. Wetlands in all five resource areas. Currently only wetlands in the Kremmling Resource Area are identified as needing protection.
2. Fragile soil areas. CEC believes conditions of approval attached to the drilling permit are not enough to prevent massive erosion problems in these areas.
3. The Vermillion Basin area, including the Irish Canyon and Lookout Mountain ACECs. CEC is perplexed as to why the BLM did not treat these two ACECs like all the other ACECs in the study area and identify them as needing a NSO stipulation. These two ACECs have many outstanding resources that are incompatible with oil and gas development, including: cultural remains, fragile soils, and possible black ferret habitat. Furthermore, these two ACECs are part of a vast roadless area where oil and gas activities have not taken place in the past. Please refer to the enclosed maps for the boundaries of the Vermillion Basin area we feel needs protection.
4. The semi-primitive nonmotorized area around Sunlight Peak. The DEIS states that Sunlight Peak may be affected by road construction if fields develop nearby. CEC believes this area must continue to managed to protect its semi-primitive quality.

## CONCLUSION

After thoroughly reviewing the DEIS, CEC has found numerous instances where the BLM has failed to follow the appropriate regulations that apply to the environmental analysis of oil and

BLM_0006074

**10**

Robert Kline
August 14, 1990
Page Six

gas leasing/development. We feel that the DEIS must be rewritten to address these concerns before the FEIS is started.

A recent report published by the GAO, Better Oil and Gas Information Needed to Support Land Use Decisions, outlines five key elements in a planning document that makes oil and gas leasing and/or development decisions that must be addressed: 1) oil and gas potential; 2) reasonably foreseeable development scenario(s); 3) indirect impacts; 4) cumulative impacts; and 5) lease stipulations. GAO notes that "because these elements and criteria are not necessarily all-inclusive, the EISs and other environmental studies that meet our criteria for all five elements cannot be automatically assumed to fully comply with NEPA." CEC feels these elements are an absolute minimum that this DEIS must cover if it is going to be the leasing document for the five resource areas. As these comments have shown, CEC feels elements three, four, and five are not adequately addressed in this DEIS. In addition, CEC feels this DEIS must discuss the full range of alternatives as mandated by NEPA.

CEC appreciates this opportunity to comment. We look to a revised DEIS.

Sincerely,

Todd Robertson
Public Lands Coordinator

Enc.   Two maps of Vermillion Basin Area



**10**





**10**

**11**

## TRAPPER MINING INC.

August 14, 1990

Mr. Robert W. Kline, Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, CO 81506

Dear Mr. Kline:

I am writing to offer the comments of Trapper Mining Inc. (Trapper) on the BLM's draft Colorado Oil and Gas Leasing environmental impact statement (EIS). Trapper operates the Trapper Mine, a surface coal mine in northwest Colorado, which is one of the three largest coal-producing mines in the state. The land and mineral ownership at Trapper is mixed, including: private and state surface; private, county, state, and federal coal; and private, county, or coincident state and federal oil and gas.

Trapper is delivering coal under a 35-year contract executed in March, 1973. Virtually all of Trapper's surface mineable reserves will be required to fulfill the obligations of this contract. Our concern with the BLM's plans for oil and gas leasing stems from the agency's policy of leasing oil and gas coincident with the life of mine plan area of a permitted and active coal mine. This policy poses a substantial threat to an operation such as Trapper and yet the impacts are not addressed at all in the draft EIS.

If an oil and gas well is drilled in the path of our planned mining operations, numerous problems result. Under Colorado Mined Land Reclamation Division regulations (4.08.4(7)(b)), blasting cannot be conducted within 500 feet of a facility such as an oil or gas well or a pipeline unless a variance can be obtained. The federal Office of Surface Mining regulations (30 CFR 816.67(d) and 817.67(d)) also limit blasting in the area of facilities such as an oil or gas well or pipeline.

A coal company also faces safety, production, and economic impacts if oil wells are drilled on their mining area. Once a well is established, a coal company has only three alternatives: 1) negotiate a temporary abandonment with the oil company, plug the well, mine through the area, and reestablish the well; 2) leave a large area of coal unmined around the well (it is currently estimated that a 300-foot radius is acceptable) and lose the revenues from the unmined coal (the state and federal governments would also lose the royalty payments on unmined coal); or 3) buy the well from the oil company, plug the well and mine through the area and leave the well non-producing. All of these alternatives would result in economic hardship to the coal company while the oil company incurs no economic loss. There will also be economic and production losses due to roads, pipelines and other easements to the oil wells.

Existing law assumes a first in time, first in right standard in determining the priority for coincidental mineral owners with conflicting interests. Unfortunately for a coal operator, this concept has been interpreted to mean the first physical presence of a structure or facility - not a permit area or other non-physical commitment to a specific geographical point. The Trapper Mine is a good example of the problems that can develop for a coal operator under this approach. Though Trapper has committed over $60 million in capital

P.O. Box 187          Craig, Colorado 81626          (303) 824-4401

BLM_0006075

**11**

to its operation, obtained all required state and federal permits, and been in operation since the mid -70's, an oil and gas company can obtain a federal oil and gas lease and in a matter of weeks, begin drilling on coal in Trapper's permit area - coal that is needed to fulfill our 35-year contractual obligations. Trapper cannot pack up and move its operation when this occurs. We are not mobile like an oil and gas rig and the time required for us to obtain leases, permits and contracts is years - not weeks as it is for the oil and gas industry.

According to Trapper's latest life of mine plan, there are just enough reserves to meet contract commitments. If an oil company locates a promising reserve in the same area and develops producing wells, they could be forced to try to "deal" with the oil company, find alternative reserves, or perhaps default on its contractual obligations. With the requirement of a 500-foot buffer between oil well structures and blasting operations, a 150-foot highwall at one half to one (loss of 575 feet of coal around the well) equates to a loss of about 850,000 tons of coal per well or about 4.3 million total tons if five wells are developed. Although Trapper needs these reserves to meet its existing contracts, the oil company is not required to even negotiate with Trapper even though the coal mine has been in existence many years before such oil wells would be drilled. Since Trapper is first in time, the oil company should be required to assume all risk and costs of abandoning such a well to allow Trapper access to permitted coal and reestablishment of the well. This is a risk they could clearly foresee before their project began; Trapper could not. The most practical solution would be to prohibit drilling wells in a life of mine permit area in the first place.

**143** On the other hand, had the oil wells already been in existence, Trapper could have pre-negotiated an agreement, realized those costs beforehand, then made economic decisions on the project. At least their mining plans could include the loss of coal around the wells. In this case, the oil company would have the first in time, first in right priority.

**225** Underground mines also are not exempt from problems created by wells. They will be faced with the same abandonment problems or leaving a large reserve of coal unmined. This would be particularly difficult for a modern longwall operation to deal with a well. Moving a longwall set up to avoid a well is very expensive and may not feasible at all.

The above scenario is a very simplistic view of a complicated issue. As the leasing rules stand now, a coal developer has no way of protecting vested interests from oil and gas development. The federal government is causing a contradiction within itself because of leasing and permitting policies. They give the right and even mandate through diligence and optimum recovery requirements to mine all the coal in a given area within a certain time period and then allow other leases (oil and gas) in the same location that will hinder the required development. The right is given and then taken away. The BLM must correct this inequity and as part of their leasing program do not lease where a permitted mine exists. The "first in time, first in right" concept is a fair way to insure both parties interests are protected as long as a _permitted mine_ is considered first in time.

Sincerely,

_Frank W. Self_

Frank W. Self
Safety Manager

FWS/kaw/070
File 300.3

---

**12**

(The original of this letter is handwritten; it was typed for clarity prior to reproduction here)

Robert W. Kline
Bureau of Land Management
764 Horizon Dr.
Grand Jct., CO 81506

August 10,1990

Dear Mr. Kline,

I appreciate this opportunity to comment on the Colorado Oil and Gas Leasing Environmental Impact Statement.

The plan is lacking in information in almost every respect. The reader of this document is not given adequate information on the impacts or restrictions that will be placed on oil and gas development.

The plan fails to include many potential alternatives including a no lease alternative. The BLM should examine the following additional types of alternatives at a minimum;

- "A "No Lease" Alternative - where certain lands in all the resource areas are made off limits to leasing.

**26** - A natural resource protection alternative where ACECs; SSMAs; critical winter range, birthing areas, and migration routes for wildlife; rare, threatened, and endanger wildlife habitat, fragile soil and steep slope areas, cultural and historic sites; and paleontological sites are made off limits to leasing.

In fact, your own comparison of the alternatives that you examined (table 2-6) show little difference between the three alternatives examined in the plan.

Fragile Soils and Steep Slopes

Why has the BLM failed to protect fragile soil and steep slope areas from the adverse effects of oil and gas exploration, development, and production.
**39** Almost all RMPs in the nation have provided this basic protection. Your plan
**40** total ignores any protection for these areas. I recommend that NSO
**41** stipulations at a minimum be placed on all lands with slopes over 40% and on all fragile soil areas. The plan only proposes Controlled Surface Use stipulations for fragile soil areas in TWO of the five resource areas. Why do the other three resource areas not have this protection? However, Controlled Surface Use stips are very weak. NSO or No Lease would provide proper protection.

ACECs

**75** Why have Irish Canyon ACEC and Lookout Mountain ACEC not been given the same degree of protection (NSO stipulations) as the other ACECs that were set aside

---

**12**

**75** to protect sensitive plant communities? It seems that these two areas need to receive the same protection as the other ACECs in the five resource areas.

**267** Why did Appendix H fail to include avoidance stipulations for the Anasazi Cultural Multiple Use ACEC? Is the BLM planning on weakening the inadequate protection the area now has? I support very restrictive stipulations in this area which would prohibit any oil and gas exploration, development, or production which would harm cultural sites or increase access to pothunters in the area.

**76** The BLM should require that any company drilling in this area must pay for BLM
**90** surveillance and protection of cultural sites. I also understand a very unusual species of fish is found in the Cross and Cahone Canyons. No mention of this fish is made in the report. These canyons are located in the Anasazi Cultural ACEC.

Recreation

**77** The plan does not treat all SSMAs equally. The Kremmling R.A. has NSO
**78** stipulations for its SSMAs. Little Snake R.A. has the same. No mention in the plan is made for the Eagle River SSMA. Was this area been given an NSO stipulation? The San Juan/San Miguel R.A. protected only the Dolores SSMA with NSO stipulation. Why have the Anasazi and San Juan Triangle SSMAs not been given the same level of protection? My opinon is that all of these areas should be closed to leasing.

Paleontology

**79** The plan claims that all areas over 40 acres designated for protection of paleontological resources will receive an NSO stipulation. The plan, however, does not provide a list of these areas. Why was this neglected

Wildlife

The plan failed to provide any maps where timing stipulations for wildlife will
**4** be placed. This is a blatant violation of NEPA. I, for one, do not like the way in which the BLM is trying to keep the public in the dark regarding where these stipulations are to be placed. The Colorado State Office of BLM has a
**27** chronic problem of not placing proper stipulations on leases.

I view the lack of maps as an attempt by the BLM of trying to prevent any citizen oversight of implementation of this plan.

In conclusion, this EIS is totally inadequate in addressing the impact associated with oil and gas exploration, development, and production. The plan fails to even begin examining the impacts associated with the development and production phases.

Thank you for the opportunity to comment.

Sincerely yours
Kirk Koepsel
242 S. Thurmond # 4
Sheridan, WY 82801

---

**13**

CGG PROPRIETARY DATA
CGG AMERICAN SERVICES, INC.

August 15, 1990

Mr. Robert W. Kline, Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, CO 81506

Dear Mr. Kline:

Thank you for the opportunity to comment on the Colorado Oil and Gas Leasing DEIS. We would appreciate your consideration of our concerns expressed in this letter.

CGG has had extensive experience with all types of geophysical exploration techniques, and has been instrumental in pioneering several of the methods used today. Additionally, we have worked in many areas of the western U.S. and are familiar with the disparate requirements of landowners and government agencies in relation to exploration. We have looked at the Colorado DEIS for oil and gas leasing from a geophysical contractor's perspective and feel that there are several areas where further discussion is warranted. We feel that the restrictions as proposed for geophysical operations are, in many cases, more than is necessary for adequate protection of the resources.

Some of our concerns are as follows:

- Appendix A under geophysical exploration; "jugs" are no longer subterranean (paragraph 5, page A-1), they are now strung in a series of up to 20 per group, weighing 10 total lbs. Groups are placed every 50-300 feet along the seismic line.

- Next sentence paragraph 5, page A-1; sometimes the only connection for the recorder truck is a radio wave. By using full radio telemetry the recorder can be placed miles away from the seismic line.

**238** Additionally, the "thumper method" is not used currently and should not be considered a common method of exploration.

- "The vibrator method is replacing the explosive method in accessible areas" (A-1, paragraph 5). This statement is not true.

- "Detonation of the charge in some areas causes no surface disturbance which in others a small crater... is created" (A-2, paragraph 5) No operations today "create" craters as all holes are backfilled and tamped before shooting.

1036 Seventeenth Street
Suite 1405
Denver, CO 80265
303 626-6277
FAX 303 595-5060

**13**

Mr. Robert W. Kline
August 15, 1990
Page 2

The next several sentences of paragraph 3 should be rewritten to
incorporate Rule 334 of the Colorado Oil and Gas Conservation
Commission which describes an operator's responsibilities for
plugging and abandonment of seismic shotholes (copy of Rule 334
attached).

**256** The most important area which we feel requires modification as
well as further discussion in Appendix B - Geophysical
Operations.
Specifically, our concerns are as follows:

**241** A. Notification: The description for this chapter needs to
be contemplated with regard to the pending changes in the
Notice of Intent (NOI) system. Those potential changes from
the Washington office may cause this portion along with other
areas of the document to need to be rewritten.

**257** C. Cultural Resources: The first sentence together with most
of the rest of the chapter go beyond the requirements of
Section 106 of the National Historic Preservation Act. A
Class III inventory may be required only if there is a strong
likelihood of sites eligible for inclusion in the National
Register of Historic Places. It is the duty of the Bureau to
determine those areas which are likely to contain sites
eligible and not to categorically require Class III
inventories "on those portions of a seismic line crossing BLM
surface." We take exception to the premise that we must be
responsible for "100% cultural resource inventory of the
areas...."

**244** D. Threatened, endangered and sensitive species: Is it not
possible to argue that the whole resource area is potential
habitat? We would suggest that a map showing those areas of
concern be circulated so that operators may ask potential
concerns in advance.

**245** E. Construction: Paragraph 5, "However... within 1/4 mile to
springs, wells or impoundments..." Vibrosis is a safe,
controllable energy source that is used in heavily populated
downtown areas. To restrict that source from springs 1/4 mile
is unnecessary. Studies have been done which show that 50 lbs.
of explosives may be detonated within 150' of springs with no
effect. Likewise, Vibrosis operations need only limit
themselves in such distances as allow the driver safe passage
around the well or other physical barrier.

---

**13**

Mr. Robert W. Kline
August 15, 1990
Page 3

**245** F. Explosives: The Washington office is currently dealing
with this issue in a way that corrects the misunderstanding
inherent in "loaded shotholes shall not be left unattended".
Their language states: loaded shotholes shall not be left
unsecured according to ATF techniques. Powder magazines
should be stored and handled according to ATF standards and
not in conflict with any other applicable federal, state, or
local regulations.

**255** N. Miscellaneous: The last paragraph (p. D-5). How many of
those areas exist? Why is there a 24 hour restriction? Is
there no happy medium which allows both users excess during
different parts of the day? There must be a reasonable
alternative.

We would be happy to meet with your office at your convenience to
discuss possible modifications to the EIS. We would like to be of
specific assistance in developing some changes in the new EIS
that both meet your needs and allow industry to operate in a
reasonable manner consistent with statutory requirements and
environmental sensitivities. I will call your office next week
to arrange a meeting.

Sincerely yours,

J.Z. Woodward
Vice Chairman,
RMOC Rocky Mountain Operating Committee

FZW/dl
Attachment

---

**14**



1660 Lincoln Street, Suite 404 • Denver, Colorado 80295
303/860-0099

August 17, 1990

Mr. Robert W. Kline
Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, CO 81501

Dear Mr. Kline:

On behalf of the Rocky Mountain Oil & Gas Association (RMOGA) and the
Colorado Petroleum Association (CPA), the following comments are submitted on
the Draft Environmental Impact Statement (DEIS) on Oil and Gas Leasing in five
Resource Areas in Colorado. RMOGA is a trade association representing more than
four hundred members and member companies who account for more than 90% of the
oil and gas exploration, production and transportation activities in the Rocky
Mountain West. Consequently, we have very strong interests in how oil and gas
leasing and development will be managed and facilitated by the Colorado BLM.

We support the Colorado BLM's decision to amend the Resource Management
Plans (RMPs) for the Glenwood Springs, Kremmling, Little Snake, Northwest, and
San Juan/San Miguel Resource Areas to conform to the Supplemental Program
Guidance (SPG) for Fluid Minerals in one environmental impact statement. The
Colorado BLM has demonstrated a wise use of its time and budget allocations and,
therefore, sets a good example for other BLM offices, as well as other agencies,
which must also update the oil and gas leasing analyses contained in their
management plans.

**233** We are disturbed, however, that the BLM believes it can adequately address
oil and gas leasing without considering the effects of surface management
decisions on oil and gas opportunities. No issues relating to the impacts on
opportunities to explore for and develop oil and gas which could result from
surface management were addressed in the DEIS. Yet such issues were raised
during scoping for this DEIS by RMOGA, and we believe it is possible to make
trade-off decisions among uses without fully weighting the geological and

---

**14**

August 17, 1990

Mr. Robert W. Kline
Project Manager
Bureau of Land Management

page -2-

**42** developmental potential of an area against surface values. The BLM's
Supplemental Program Guidance for Fluid Minerals directs that areas with high
potential for oil and gas resources should receive special attention in the
planning process. We are concerned that this has not been done. Rather, the
DEIS focuses only upon the opportunity to heavily restrict oil and gas
activities without adequate justification.

**163** While we support the BLM's comprehensive approach for this leasing analysis,
such an approach is not without its problems, especially when used for the first
time. Significant clarification must be made throughout the document.
Specifically, the tables need to be verified, as do the cross-references among
chapters. For example, on page 4-1, it is stated that wildcat wells would
result in the loss of approximately 10 acres of vegetation per well, or a total
of 19,250 acres (from 1,920 wells) over a 20-year period. Yet page 4-22 states
that as many as 1,753 wells could be drilled. However, on page 2-2, Table 2-1
identifies the projected number of wells as 1,789. The discrepancies do not end
there. With the exception of the Little Snake Resource Area, the figures
discussed in Appendix B do not match any of the above-mentioned projections.
Similar inconsistencies are evident throughout the document and are cause for
great confusion.

**50** We strongly object to the use of "worst case scenarios" when predicting
future oil and gas development. The Council on Environmental Quality (CEQ)
regulations specifically direct that the use of worst case scenarios is
inappropriate in NEPA analyses. Instead, the CEQ directs that "reasonably
foreseeable development" be considered along with its cumulative effects. By
arbitrarily increasing the projected level of development far beyond what would
**45** be considered reasonable, the level of impacts are also arbitrarily increased.
Consequently, lease and operating restrictions would also be increased in an
effort to provide "adequate" protection to surface resources in accordance with
the impact analysis.

While we recognize the BLM is fearful that its NEPA analysis "remains valid
only for as long as drilling activity is at or below the levels assumed for
analysis purposes", this view is of great concern to RMOGA. The number of wells
drilled must not be the deciding factor whether further NEPA analysis is
required. If the level of impacts analyzed in the document has not been
reached, even if twice as many wells have been drilled than predicted, the NEPA
document should still be valid.

**48** There should be no need to double the number of projected wells to ensure a
**46** long life for the NEPA documentation. Determinations as to whether the NEPA
analysis is adequate must not be based solely upon the number of wells that have

BLM_0006077

**14**

August 17, 1990
Mr. Robert W. Kline
Project Manager
Bureau of Land Management
page -3-

been drilled in an area. Such determinations must also consider how many wellsites are producing, and how many have been reclaimed, as well as the types of mitigated measures employed. For instance, the BLM may predict that 500 wells could be drilled in an area. If 500 wells were drilled, but 490 of them were plugged, abandoned and reclaimed, then obviously the level of impacts associated with 500 wells has not been reached. Consequently, no additional NEPA analysis should be necessary until 500 wells are actually producing in the area. The distinction must be made between exploration and producing wells. Furthermore, even if the threshold is reached, the situation should be easily handled with a supplement to the existing documentation, rather than with a whole new analysis.

**144** Chapter 4, Environmental Consequences, needlessly exaggerates and/or misrepresents potential effects of oil and gas exploration and development activities on surface resource values. Neither standard nor special stipulations are explained or discussed; yet they are designed to significantly reduce or eliminate nearly all of the impacts identified. The manner in which potential effects are discussed in this chapter serves only to inflame public sentiment against oil and gas activities.

For example, on page 4-2, Proposed Action Alternative, under Livestock Grazing, it is stated, "Seismic activities utilizing explosive charges, thumpers, etc., could disrupt normal water aquifers, altering subsurface water flows. This could result in reduced flows or even the loss of all water to existing springs and water wells". How often has this situation actually occurred, and is it documented? We are unaware of any study which supports these allegations. In fact, there are objective studies which indicate that seismic activities as close as 250 feet to springs have had no impact on the subsurface water flow or aquifer. Furthermore, thumpers have not been in use for many years. It is possible that the BLM intended to refer to vibroseis

**246** trucks rather than thumpers. In that case, however, studies have shown that vibroseis exploration can take place within 50 feet of a sensitive resource without impact. In fact, the only reason for the 50-foot avoidance is to avert problems associated with human error. Finally, because the industry regularly backfills and tamps holes before shooting, no geophysical operations today create "small craters".

**154** We object to the BLM's failure to discuss potential effects which could reasonably occur during seismic activities. It would appear that the BLM is intent upon identifying bizarre situations that have no factual bases as if they were commonplace occurrences.

The discussion on potential effects to wildlife is equally unsettling. The BLM indicates that under the Preferred Alternative, effects from oil and gas

---

**14**

August 17, 1990
Mr. Robert W. Kline
Project Manager
Bureau of Land Management
page -4-

activities would be most significant during critical seasons when the animals are already under substantial stress. Yet timing limitations would be applied to all new leases issued in the study area in order to eliminate such impacts. Consequently, implementation of the proposed action would not result in the effects described in the DEIS.

We strongly recommend that the BLM improve the final EIS by presenting an accurate picture of effects which are reasonable to expect upon implementation of each of the alternatives. As currently written, Chapter 4 represents a "worst case scenario" which does not acknowledge that even the minimum standards and conditions applied to all leases--not to mention special stipulations-- provide the basis for protection of surface resources. The BLM must limit its discussion to potential effects which could occur only after stipulations have been applied in accordance with alternative direction.

**61** We are singularly opposed to the proposed stipulation which would require oil and gas lessees to compensate for the loss of crucial habitat, as proposed by the Glenwood Springs Resource Area. Compensation could be required either onsite or offsite--decisions for which would be made on a case-by-case basis. There is no need for such a stipulation. The BLM has always been able to work with operators to reach mutually agreeable solutions to perceived problems rather than resorting to a binding stipulation.

Moreover, such a stipulation is unwarranted because the effects expected from oil and gas activities are not significant. As justification for the stipulation, the BLM cites potential competition among ungulates on big game winter ranges due to loss of habitat from oil and gas activities. According to

**185** the BLM, the magnitude of this impact would be site-specific and could be minimized through compensatory offsite habitat enhancement. The level of oil and gas activity predicted by the BLM does not support the claim that ungulates would be forced to compete for winter range due to oil and gas operations. Competition for winter range would more likely stem from overpopulation.

**186** The DEIS states on page 4-3 that a direct loss of 960 acres of habitat in any given year, or 19,250 acres over 20 years, could be expected from oil and gas activities. Such a loss would hardly cause a significant impact to wildlife in the study area. Less than 0.003% of the 5 million-acre study area would be affected over a 20-year period.

**162** Specifically regarding the GSRA, under the proposed action a maximum of 54 wells is expected to be drilled in the next 20 years. This breaks down to an average of 2.7 wells per year, or 27 acres of surface disturbance. It is unclear how the BLM arrived at the conclusion that approximately 78.8 acres (25

---

**14**

August 17, 1990
Mr. Robert W. Kline
Project Manager
Bureau of Land Management
page -5-

**162** acres of which would be reclaimed) would be disturbed in any given year. For the sake of this discussion, we will not dispute this figure, even though it appears to be very high. According to Chapter 3 of the DEIS, mule deer winter range is comprised of nearly 392,000 acres, over 208,000 acres of which are crucial habitat. Elk winter range encompasses almost 305,000 acres with nearly 155,000 acres considered crucial. Obviously, surface disturbance on 78.8 acres would have little or no effect on either of these species or their habitats. Nor are any significant impacts expected to any other species. The level of impacts projected from oil and gas activities does not in any way support the conclusion that a special stipulation requiring habitat replacement is necessary. Therefore, this special stipulation should be dropped from further consideration and eliminated from the final EIS.

The BLM's mandate is to manage its lands for multiple-use. In the overall scheme of things, commodity uses must not be subjected to more restrictive management practices than other uses. Oil and gas resource uses are of equal importance as wildlife or recreation uses. In the interest of surface resources, however, oil and gas activities are required to be conducted in an environmentally sound manner with particular attention given to protecting surface values. This does not mean that the oil and gas industry should be required to improve wildlife habitat, particularly when the habitat is stressed due to uncontrolled population growth. The oil and gas industry should not be singled out and penalized for something over which it has no control.

**57** Another quandary regarding the GSRA is the staggering increase in restrictive stipulations proposed in the Preferred Alternative. How can the BLM possibly justify an increase of No-Surface-Occupancy (NSO) stipulations from 45,046 acres to a whopping 365,419 acres? This would leave a total of 332,173

**58** acres, less than half the Resource Area, available for lease with any type of surface occupancy. Current management allows leasing with surface occupancy on over 93% of the Resource Area. To make matters worse, the BLM proposed controlled surface use stipulations on 670,000 acres, as well as timing limitations on over 717,000 acres. These restrictive stipulations appear to be proposed for application at least twice on every acre available to leasing with surface occupancy. The GSRA management appears intent on paralyzing any type of oil and gas program in the area.

What has happened in the resource area since the plan was adopted that would require such an increase in restrictive stipulations? Our review indicates very little has changed, if anything. The comparison of alternatives displayed on page 2-9 indicates that the difference among alternatives is minimal regarding impacts which would indicate a need for more restrictive stipulations in the area. In other words, the use of standard terms and conditions throughout the

---

**14**

August 17, 1990
Mr. Robert W. Kline
Project Manager
Bureau of Land Management
page -6-

area would cause very small, if any, increases in impacts associated with oil and gas activities when compared with current management on the Preferred Alternative.

**49** The BLM is required by regulation and policy to justify the use of more restrictive stipulations over less restrictive stipulations. The BLM indicates on page 2-4 it has complied with this direction. However, the evidence presented in the DEIS does not indicate that this is true. In fact, the analysis indicates there is no need even for the restrictive stipulations that are currently in use throughout the five resource areas.

**27** A marked flaw in the document is the absence of resource area maps which generally depict where standard and special stipulations would be applied by alternative. Maps which show by alternative how areas will be stipulated are, in our view, one of the most important components of any management plan. A critical factor in determining how the oil and gas industry is impacted by the proposed action is the ability to compare the proposed action with current management. Without maps, this comparison is impossible. Therefore, we strongly urge the BLM to include stipulation maps by alternative in the final EIS. However, such maps should also be made available to the public before the final EIS is published in order to give interested parties an opportunity to review more clearly the proposed action.

The discussion of mitigation measures common to all alternatives on page 2-3 is representative of the concern we have regarding how oil and gas activities and potential impacts are portrayed in the document. The BLM explains that lease stipulations and permit conditions of approval are used to protect sensitive resources. Following the explanation is a discussion of hypothetical effects on elk during a severe winter which would be attributed to oil and gas activities if they were not monitored and controlled by the BLM. This example

**188** is quite unnecessary. Moreover, it implies that oil and gas activities would require the use of an entire winter range, thereby forcing elk to move to an adjacent winter range. Elk may move a short distance to avoid human activity, but the situation described by the BLM appears excessive and should be verified and documented in a study.

**251** Appendix B contains assumptions for the Potential of Development which consist of average disturbances, projected number of wells and total acres disturbed. The appendix is extremely confusing and requires extensive clarification. It is virtually impossible to follow the BLM's rationale and figures from one table to the next. While the problems extend throughout the entire appendix and involve the figures for each resource area, we have limited our comments to just a few examples.

BLM 0006079

14

August 17, 1990

Mr. Robert W. Kline
Project Manager
Bureau of Land Management

First, Table B-1 shows by resource area the average disturbance in acres expected from drillpads, roads, transmission lines and "miscellaneous uses". Obviously, this table is designed to show disturbances associated with individual well locations. However, it includes miscellaneous acres ranging from 100-250 acres, which leads the reader to conclude that an additional 100-250 acres would be required at each wellsite for miscellaneous uses.

254 According to Table B-4, these miscellaneous figures constitute the total additional disturbance expected over the life of the plan. This distinction must be made on Table B-1.

252 In another example, the narrative describing the potential for development in the GSRA indicates that 54 wells would be drilled in the area over the next 20 years. Using the information in Table B-1, one would calculate that an average of 34.7 acres would be disturbed per year and a total of 694 acres would be disturbed over 20 years. Yet, Table B-3 indicates that a total of 78.8 acres would be disturbed each year (25 acres would be reclaimed, leaving 53.8 acres per year), and Table B-4 indicates that 838 acres would be disturbed over 20 years. Such discrepancies must either be eliminated or fully explained.

253 Further, the information on Table B-3 does not coincide with that shown on Table B-4. According to the information displayed in Table B-3, approximately 180,164 acres could be disturbed over a 20-year period. Yet Table B-4 indicates a total of 20,219 acres would be disturbed over 20 years. What are the reasons for these incongruities? The BLM should verify, correct if necessary, or explain in greater detail how these figures were derived.

247 One last comment regarding Appendix B is that the maps and other information provided by each resource area should be standardized. One area presented its data in terms of square miles, while others provided similar data in acres. The potential maps are not consistent nor are the definitions of what constitutes high, medium, low or unknown potential. These types of inconsistencies make it extremely difficult to study the document.

257 Appendix D, Geophysical Operations, requires operators to perform Class III cultural resource inventories on all portions of seismic lines which cross BLM surface. This far exceeds the requirements of Section 106 of the National Historic Preservation Act. A Class III inventory is required only if there is a strong indication that sites exist which would be eligible for inclusion in the National Register of Historic Places. The BLM has the duty to determine which areas are likely to contain eligible sites, not to arbitrarily require a Class III inventory on seismic lines crossing BLM surface.

268 Appendix E identifies lease stipulations which will be considered for application in accordance with the proposed action. In many cases, exception

14

August 17, 1990

Mr. Robert W. Kline
Project Manager
Bureau of Land Management

268 criteria are identified; however, in some cases they are not. While it is stated that even where no exception criterion is identified exceptions will be considered on a case-by-case basis, this statement should be more prominently displayed in the appendix to avoid possible future conflicts.

277 An exception criterion identified for several NSO stipulations in the GSRA on page E-3 would require operators to "eliminate" drill rig and other equipment noise. This requirement is excessive and virtually impossible to achieve. We recommend the word "eliminate" be replaced with the word "reduce", which is more reasonable.

283 On page E-8, both the LSRA and GSRA would impose a Controlled Surface Use stipulation for the protection of fragile soils. Several performance objectives are identified which are designed to ensure soil productivity. This special stipulation is not necessary because fragile soils are adequately protected by standard terms and conditions of the lease. There is no need to overburden the lessee with excessive restrictions.

5 One final comment is that RMOGA never received notification of the BLM's public meetings on the subject DEIS. Since we were not informed of the meetings, we could not have representatives attend. We are sure that the BLM's failure to notify RMOGA was an oversight. We would hope, however, that the BLM is not relying solely upon press releases to provide public notification of meetings. Mailing lists should be compiled and used to inform interested parties of future activities.

We appreciate this opportunity to provide you with our views and comments. If you have any questions or would like to discuss our comments in greater detail, please contact me.

Sincerely,

Alice Frell Benitez
Public Lands Director
by C.W.

AFB:cw
c.c. Frank Salwerowicz, Deputy State Director for Mineral Resources

15

Colorado Chapter of The Wildlife Society

August 15, 1990

Mr. Robert W. Kline, Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, CO 81506

Mr. Kline:

The Colorado Chapter of The Wildlife Society offers the following comments on the Draft Environmental Impact Statement for Colorado Oil and Gas Leasing dated April 1990.

174 We consider the stipulations for mitigating direct losses of wildlife habitat and values to be inadequate. Only the Glenwood Springs RA (pg. 4-3) proposed stipulations requiring compensation for losses of crucial habitats. Why was this the only RA to do so? Certainly, there are crucial habitats in the remaining RAs that could be jeopardized by oil and gas development. Most lease stipulations (TL, NSO, CSU, Appendix E) concern avoiding impacts of initial exploratory or development activity. However, when permanent development occurs and habitats are altered, only the GSRA requires mitigating lost habitat or values. We believe the overall process addressing the compensation for wildlife losses needs to be more uniform among RAs. Mitigation strategies that would compensate for riparian habitats, threatened and endangered species and their habitats, and other wildlife species and habitats should be broadly defined for all RAs. The actions proposed by the Glenwood Springs RA would serve as a good model from which to start.

65 There appear to be inconsistencies among RAs regarding lease restrictions pertaining to ungulate fawning/calving habitats. Mule deer, common to all RAs, are not listed by any RA as a species needing any protection during periods critical to reproduction. Restrictions pertaining to elk calving areas are in place for GSRA, SJ/SMPA but not Kremmling RA. Elk are common to all these RAs. We believe all ungulate species should be granted some protection during these critical periods and the inconsistencies among RAs in protecting ungulates should be eliminated.

At this time, the Colorado Chapter of The Wildlife Society finds the current Draft EIS to be inadequate in presenting mitigation requirements for those situations were oil and gas development permanently affects habitats crucial to wildlife.

Sincerely,

David J. Freddy, President
P.O. Box 252
Kremmling, CO 80459
303-724-3635

16

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
REGION VIII
999 18th STREET - SUITE 500
DENVER, COLORADO 80202-2405

AUG 14 1990

Ref: 8WM-EA

Mr. Robert W. Kline, Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, Colorado 81506

Re: DEIS review for Oil and Gas Leasing & Draft Resource Management Plan, Glenwood Springs, Kremmling, Little Snake Resource Areas; the Northeast and San Juan/San Miguel Planning Areas

Dear Mr. Kline:

In accordance with our responsibilities under the National Environmental Policy Act (NEPA), and Section 309 of the Clean Air Act, Region VIII of the Environmental Protection Agency (EPA) has completed its review of the Draft Environmental Impact Statement (DEIS) for Colorado Oil and Gas Leasing and Draft Resource Management Plan for the above defined areas.

In general, this document does good job of identifying the anticipated impacts associated with the proposed action. However, there are some areas of concern that need to be more fully addressed.

181 In particular, anticipated impacts to wildlife are not sufficiently documented. This is not to say that the EPA doubts the assertions concerning these impacts, but merely stating that no impacts are anticipated without supporting documentation of wildlife inventories or other relevant field data is inappropriate.

The methodology used to determine the claimed levels of impacts needs to be documented. Where inventories are to be conducted in the future under contracts related to a particular development site, as is the case with endangered species, such methodology also needs to be documented. Will state or federal wildlife agencies be involved in the evaluation of monitoring plans and the results of inventory activities? The EPA suggests that, in cooperation with the above agencies, the BLM consider standardizing the methodology to be utilized in these analyses in order to insure a unified approach and the gathering of coherent data.

16

Groundwater is another area of concern in this document. In general, this document provides inadequate documentation of current groundwater hydrology, without which it is not possible to adequately document the nature of the physical system under consideration. Current water quality data is also lacking in this document. Without such information it is difficult to reach an informed decision as to the reasonableness of the levels of impacts anticipated as a result of project activities.

Our particular concerns are:

117 - Other than groundwater salinity values, what additional ambient water quality values are available?

198 - The first paragraph on page 4-10 fails to mention any anticipated adverse impacts associated with oil and gas exploration and development activities.

212 - Additional information relative to the proposed method for handling and disposing of water waste fluids (page 4-11), and anticipated dynamics around the percolation of such fluids from proposed reserve pits is needed.

211 - The nature of the liquid wastes proposed for deep well disposal needs to be documented, as well as the characteristics of the formations being considered for this purpose.

116 - What are the current and anticipated uses of the deep, bedrock aquifers in the project area?

115 - Additional clarification and documentation need to be provided before it is reasonable to assume that no routes of communication exists between shallow aquifers and coals at depth. The geology of the area basin margins needs to be documented.

There are, in addition, two general areas of comment to the BLM.

The EPA reviews NEPA documents, in part, from the point of view of members of the public. Not everyone in that public is going to be familiar with the assumptions around various technological approaches addressing particular environmental concerns. Where possible, agencies should avoid relying upon assumed knowledge or agreement concerning the efficacy of technology and provide at least a paragraph or two describing the particular technological approach in question and the problem it is meant to solve or avoid.

2

16

52 A good example is in the area of well design. Casing design and drilling methods have been adopted to avoid certain environmental and geological problems. A brief statement describing the problem and the solution would be helpful, rather than citing "industry standard procedures or techniques". These statements convey little to the reader unfamiliar with this industry.

153 In a somewhat related vein, the BLM has made assumptions of no or minor impacts in a number of areas in this document. Where such assumptions have been made, often inductively, no methods have been incorporated for monitoring to insure that the levels of impact anticipated are actually achieved.

The EPA does not wish to impose an unreasonable burden upon other agencies in this area, and does not expect extensive monitoring plans in response to this concern. However, in areas, like groundwater impacts, wildlife impacts, surface water impacts, among others, where impact analyses for a proposed action anticipates minor or no impacts, the BLM should consider establishing abbreviated monitoring efforts to verify that anticipated impact levels claimed in the analyses have not been exceeded.

46 Concerning all areas of anticipated environmental impacts, contingency plans in the event of project impacts being exceeded should be in place and documented in the Final Environmental Impact Statement (FEIS).

3

16

Taking into account our above areas of concern and utilizing our standard rating system (copy enclosed), EPA Region VIII rates this DEIS EC-2. This rating indicates that the EPA has environmental concerns with the proposed action which need to be addressed in the FEIS. Project implementation, monitoring and evaluation plans may require significant changes. Additionally, the EPA finds the amount of information provided in some areas, as mentioned above, to be inadequate. The BLM will need to provide additional relevant information in the FEIS.

The EPA appreciates the opportunity to review this DEIS, and looks forward to working with the BLM on future projects.

If you have any questions concerning our comments, please contact either myself, or Gene Kersey, Project Review Officer, at FTS 330-1699 or commercial 303-293-1699.

Sincerely,

Robert R. DeSpain

Robert R. DeSpain, Chief
Environmental Assessment Branch
Water Management Division

4

17

LAW OFFICES
POULSON, ODELL & PETERSON
SUITE 1400
1775 SHERMAN STREET
DENVER, COLORADO 80203

ROBERT D. POULSON
WILLIAM G. ODELL
RANDALL M. CASE
PETER A. BJORK
STEPHEN M. THOMPSON
CARLETON L. EKBERG
LAURA LINDLEY
GREGORY R. DANIELSON
JAMES B. DODSON
JOHN D. CARVER

C. M. PETERSON
RETIRED

A. T. SMITH
JAMES M. CAMPBELL
OF COUNSEL

August 16, 1990

Bureau of Land Management
764 Horizon Drive
Grand Junction, Colorado 81506

Attention: Mr. Robert W. Kline
Project Manager

Re: Oil and Gas Leasing Draft Environmental Impact Statement

Ladies and Gentlemen:

This letter is submitted in response to the Draft Environmental Impact Statement which BLM has prepared for the Glenwood Springs, Kremmling and Little Snake Resource Areas, and the Northeast and San Juan/San Miguel Planning Areas.

We commend your work on preparing the reasonably foreseeable development scenarios for the various units of the study area. The work is thorough and reasonable without relying on outrageous speculation.

The stipulations contained in Appendix "E" for the proposed action alternative provide that no surface occupancy stipulations will be imposed for areas within a one-quarter mile radius of ferruginous/red-tail hawk nests. In addition, all resource areas except the Kremmling Resource Area impose a timing limitation stipulation within a one mile radius of such a nest for the period of time from February 1 to July 15. Although the DEIS indicates at page 3-24 that ferruginous hawks are present in the Kremmling Resource Area, apparently the one mile restriction is not imposed. We recommend that the no surface occupancy stipulation be eliminated and only a timing limitation stipulation imposed for periods of time when the nest is occupied for nesting and brooding. It is excessive to prohibit surface occupancy within one-quarter mile of an unoccupied nest. The lessee could certainly be prohibited from disturbing a nest, but it seems unreasonable to prohibit occupancy for one-quarter mile around a nest when the nest is not occupied.

**17**

Bureau of Land Management
August 16, 1990

Page 2

**61** We object also to the controlled surface use stipulation which the Glenwood Springs Resource Area has indicated it will impose. Since the draft environmental impact statement already provides for the imposition of timing limitation stipulations to protect important habitat, there is no rationale for the inclusion of this additional stipulation proposed by the Glenwood Springs Resource Area. We urge that this stipulation not be imposed.

Thank you for your consideration of these comments.

Very truly yours,

POULSON, ODELL & PETERSON

Laura Lindley

LL:kml

---

| United States | Forest | White River | P.O. Box 948 |
| Department of | Service | National | Glenwood Springs, |
| Agriculture | | Forest | Colorado 81602 |
| | | | 303 945-2521 |

**18**

Reply to: 1950

Date: August 8, 1990

Mr. Robert Moore
USDI, Bureau of Land Management
Colorado State Office
2850 Youngfield Street
Lakewood, Colorado 80215-7076

Dear Mr. Moore:

The White River National Forest has reviewed the BLM Draft Environmental Impact Statement (DEIS) for Oil and Gas Leasing in Colorado, June 1990. The White River National Forest is in the process of defining the parameters and analyses which will be used in preparing our Forest-wide EIS for oil and gas leasing. Presently, the relationship between EISs of each agency have not been clearly defined. Consequently, decisions relative to our scope of analysis will be influenced by the scope of BLM's EIS. Because of this we believe it is important that various issues relating to cumulative impacts and determination of "significance" be addressed jointly by the BLM and the Forest Service.

We have concentrated our review of the DEIS on technical issues relative to the Kremmling and Glenwood Springs Resource Areas. This decision is based on common administrative boundaries and that we believe to be the need to conduct cumulative impact analyses for broad ranging resource issues that extend beyond a single agency's boundaries (i.e. wildlife, transportation, air and water quality). We may also want to jointly quantify the level of significance through analyses of effects on these resources.

Our comments related to specific resource areas are enclosed.

Because of the importance of having compatible standards, guidelines, and stipulations for both FS and BLM, we believe a meeting to discuss our comments would best serve the public prior to the BLM preparing it's Final EIS.

Sincerely,

THOMAS A. BOOTS
Forest Supervisor

cc: BLM, Glenwood Springs Resource Area
cc: BLM, Kremmling Resource Area

---

**18**

**WHITE RIVER NATIONAL FOREST COMMENTS ON BLM OIL & GAS LEASING EIS**

**Pg. 1-2 Relationship to BLM Plans and Program**

The DEIS describes nine steps involved in the plan amendment process (this EIS). The third step "inventories" states that data necessary to make informed decisions was collected. Pg.2-3 (2nd par.)further states that "various resources and values within each Resource Planning Area are inventoried."

Clarification is needed as to what type of inventories were used in the analysis of impacts under each alternative and to develop mitigation measures. It appears that wildlife data used in the wildlife analysis consists of existing CDOW database information on elk, deer, bighorn sheep, raptors and selected gambbirds for which WRIS maps are available. These species do not cover the range of habitat types which occur on BLM land. This level of inventory does not enable adequate disclosure of impacts on wildlife populations and their habitats. For all Alternatives there is only one mechanism for requiring additional studies/inventories. Unfortunately, these are restricted by the lease's rights which identify only "minor studies" and "short-term special studies". These may not be sufficient to develop adequate measures necessary to mitigate impacts to a level of insignificance for sensitive wildlife species or critical habitats discovered during the ADP process.

**Pg. 3-6 Vegetation (2nd par.)**

**94** The DEIS states that "species that are listed as Threatened or Endangered under the Endangered Species Act" are protected. Candidate Species are not Protected under the Endangered Species Act but "it is BLM policy to protect them the same as listed species." Federal Candidate and state listed sensitive plants are not protected by Federal and State statutes. Since BLM has not conducted an inventory which defines locations for these species and no special stipulations are provided in Appendix E to protect unknown sites, BLM should state how it proposes to afford these plant populations protection from development.

**62** Relocation up to 200 meters after the lease is issued may not be adequate to protect populations of Candidate and Sensitive plant populations from local extirpation. Will BLM require "minor inventories", by a qualified botanist at the time of year these species can be identified, during the site-specific environmental analysis phase for APDs under all leases? If not, BLM should state how it will provide protection under this "policy".

Comments are provided only for the Glenwood Springs and Kremmling Resource Areas due to their interface with the White River National Forest and potential cumulative impacts to wildlife from Oil and Gas Development on public, split-estate and privately owned lands with mineral rights (adjacent to public lands).

**Pg. 3-6 Glenwood Springs Resource Area**

The DEIS identifies the mountain shrub community, comprised of primarily oak brush and serviceberry, as a very important source of food and cover for many species of wildlife, including nongame species. This vegetative type consists of 20% of the Glenwood Resource Area.

(1)

---

**18**

The DEIS states "This habitat type is currently being lost to housing development".

**182** Although this habitat is described in Chapter 3 under Affected Environment, further loss of this habitat from Oil and Gas Development on dependent wildlife species is not analyzed for any of the alternatives or under cumulative impacts in Chapter 4 under Environmental Consequences. This is a deficiency that should be addressed in FEIS.

The same comment is relevant to the conifer vegetative community and aspen and riparian habitat types. The conifer woodland habitat type is described in the DEIS as providing "Very important winter thermal and hiding cover and food for many wildlife species". Furthermore, the DEIS describes existing alterations **231** of this habitat which are occurring as the result of fuel wood cutting, timber harvesting, pine beetle infestation and urban development. The potential added impact from oil and gas leasing should be addressed for the alternatives and under the cumulative impacts section in Chapter 4.

Aspen stands and riparian -related species such as cottonwood, willow groves and forbs are as the DEIS describes "small but significant vegetative type" **167** used by 75% of the wildlife species some time during their life cycle". If these vegetative communities are so valuable for wildlife, the DEIS should analyze potential impacts from Oil and Gas Leasing in Chapter 4. Adverse impacts from other existing uses ( road building, construction, gravel extraction, water diversions and livestock grazing) should be analysed under "Cumulative Impacts" in Chapter 4. Grazing has had a significant adverse impact on these habitats in the GSRA, and this information should be used to assess cumulative impacts to wildlife from additional losses due to oil and gas leasing.

**83** In addition, wetland locations are not identified in the DEIS for the Glenwood Springs Resource Area. How will these habitats be protected by BLM and how will 404 b(1) guidelines under the Clean Water Act interface? These issues, as well as, the previously identified issues need to addressed as the Glenwood Resource Area will potentially be an integral part of the White River's cumulative impact analysis for wildlife in the planned Oil and Gas EIS.

**Pg. 3-8 Kremmling Resource Area**
Information from this area will also be an important component of the White River's ability to identify and mitigate for cumulative impacts to wildlife under the planned Oil and Gas EIS

**84** pg3-8 (1st par.) Clarification is needed on definition of "irrigated meadow" which is one of the four major vegetation types described (15%) in the Kremmling Resource Area. Please state whether these meadows are considered wetlands and if so by what agency.

Pg. 3-8 (2nd paragraph)- The DEIS describes "the mountain shrub community which constitutes only 1% of the total vegetative cover in this Resource Area" as a vegetative community of "special note". The DEIS further states that "despite its thinly scattered distribution, it is one of the vital rangeland types in terms of nutrient and cover value for wildlife and livestock". If so, the potential loss of this vegetation type should be addressed in Chapter 4 specifically for this Resource Area or under Cumulative Impacts as Oil and Gas development would have a significant impact on wildlife dependent species.

(1)

---

**63** Recommend that a "No Surface Occupancy" stipulation be used to mitigate potential significant impacts resulting from loss of this limited habitat. This recommendation is also relevant to riparian vegetation which is also not protected under any of the Alternatives. **18**

pg. 3-12 Wildlife
(1st paragraph) The DEIS states that for "terrestrial wildlife, BLM emphasizes habitat management determined by legal status (T&E species) or commercial value for species of special interest to federal and state agencies." First, if BLM is focusing habitat management needs based on legal status; riparian and wetland areas, which are afforded protection under the Clean Water Act, should be emphasized. Secondly, the "commercial value" for species of interest to federal and state agencies can be interpreted to mean both game and nongame species of wildlife. Not only will maintenance of biological diversity be a key issue in the upcoming revision of Forest Plans nationwide, but there is an economic "value" attached to noncunsumptive use of wildlife (birdwatching, 
**183** OCW/FS "Watchable Wildlife" "Taking Wing" Programs, etc). Under this interpretation the scope of BLM's analysis for this EIS is inadequate under NEPA as it only analyzes impacts to sport/game species (deer, elk, sage grouse) and a few Federal Threatened and Endangered species. The disparity between BLM's scope for the EIS and the Forest Service's precludes the Forest Service having the ability to determine cumulative impacts to Management Indicator and other sensitive species which have been identified for analysis in the upcoming WRNF Oil and Gas Lease EIS.

pg. 3-12 Glenwood Springs Resource Area
**173** (Mule Deer and Elk)
The DEIS describes how winter range, severe winter range, and crucial habitat acreage has been reduced in the past ten years and gives projected loss due to development of private lands. Oil and gas leasing on BLM lands and potential significant impacts, due to the loss of additional habitat, should be addressed in the DEIS.

pg. 3-15 Upland Gamebirds, Waterfowl and Raptors
The DEIS describes "crucial habitats required by sage grouse, waterfowl, and raptors. Only documented crucial habitats for sage grouse and some species of 
**95** raptors (T&E) are protected through special stipulations. Due to the date given for these emphasis species, how will new crucial habitats discovered during the site-specific environmental analysis process required for APDs be protected? After reviewing the special stipulation requirements, it is obvious that timing restrictions of 60 days or less and relocation limitations of 200 meters or 
**96** less for well pads only will not be adequate to protect species not designated as federally listed Threatened or Endangered. Will discovery of a sage grouse strutting lek during the APD field review trigger an amendment to the EIS? Due to the time and costs involved in amending an existing EIS, it does not seem likely. The conclusion can be drawn that realistically unknown crucial habitats for these species will not be protected as discussed throughout the DEIS.

pg. 3-21 Threatened and Endangered Species
**105** It is unclear how BLM is planning to protect instream habitats for A and B populations of Colorado River cutthroat trout when development is not restricted in these watersheds or in the riparian zones.
(3)

Recommend that a No Surface Occupancy stipulation be provided for all watersheds where A and B populations occur. This information is available on a 1:24,000 scale from CDOW. The basis for this recommendation is the potential for water quality and instream habitat deterioration due to sediment and the large quantities of water required during the Exploratory Drilling phase of development (pg.A-4, 1st paragraph). **18**

g.3-21 Kremmling Resource Area
The DEIS describes the Kremmling Resource Area as providing "habitat for approximately 110 species of animals, including 220 birds, 60 mammals, 20 fish, seven amphibians, one reptile and 3 domestic herbivores". Yet, the DEIS only 
**97** describes crucial habitats for big game, upland game birds, waterfowl, and 
**190** raptors. Although the CDOW has identified public lands within the Kremmling Resource Area as Crucial habitat for greater sandhill cranes, potential impacts 
**184** from oil and gas leasing on this habitat is not addressed in Chapter 4 under this Resource Area analysis or for cumulative impacts. With BLM's emphasis on only four wildlife species groups within this Resource Area, analysis of potentially significant adverse impacts to more localized rare species cannot be accomplished. This lack of information on less common species, potentially dependent on habitat which may a limiting factor (mountain brush and riparian which both comprise 2% of the total vegetative community within this Resource Area) can lead to local extirpation of populations. As conservation/maintenance of populations is dependent on genetic diversity equating to population numbers, adverse impacts from oil and gas leasing and development in these two habitat types could be significant.

pg.3-24 (1st par.)
Federal Candidate species which occur within the Kremmling Resource Area 
**106** include Colorado cutthroat trout, Boreal western toad, white faced ibis, and ferruginous hawk. BLM should state how it will protect potential habitat for these species. There is no mechanism to protect their habitats if discovered during the ADP review process. Relocation of a well pad up to 200 meters may not be adequate especially if there is no mechanism for relocating roads and associated pipelines, etc. How will the Routt and White River National Forests analyze and mitigate potential cumulative impacts to these species and their habitats without adequate protection provided by BLM?

pg.3-25 (2nd par.)
The DEIS states that " most sage grouse nesting activity takes place within two 
**66** miles of strutting grounds, making such areas highly important to sage grouse reproduction". No Surface Occupancy stipulation #1 for protection of breeding habitat only includes a one-quarter mile buffer zone around the lek (strutting ground) when "nesting activity takes place within two miles of strutting grounds". How does this stipulation protect sage grouse populations?

pg.3-25 Aquatic/ Wetlands/Riparian
(2nd par.)
The DEIS states that "riparian communities, although limited in quantity and 
**87** quality, provide habitat for a large number of wildlife species and represent a highly important resource within the Resource Area". The DEIS needs to clarify why the "quality" of the riparian vegetation community is "limited". Is it due to grazing, water diversions, etc?
(4)

**168** The EIS should state how additional adverse impacts to riparian from oil and gas leasing and development will affect its value and function for wildlife, water quality, and channel stabilization. This issue should be addressed in the DEIS under specific Resource Area impacts or in the Cumulative Impact section. **18**

In addition, does the definition of "riparian community" include wetlands? If 
**82** so, should No Surface Occupancy stipulation # 1 for the Kremmling Resource Area only protect wetlands (for waterfowl) and shorebirds when the DEIS states "approximately 80% of all wildlife species known to inhabit the region are either totally dependent on riparian communities or utilize them more than other habitats". Recommend there be a No Surface Occupancy stipulation for riparian because this type of mitigation is lacking in the DEIS, and any disturbance or further loss of riparian habitat (which only comprises 1 % of the total vegetative community) will have a significant adverse impact. Neither this impact nor the degree of impact have been identified, addressed, or mitigated for in the DEIS.

3-34 Soils
(1st par.)
The DEIS states that "several potential prime farmland sites exist within the Study Area". These soils exhibit very high soil productivity potential and are eligible for special designation and protection. Special stipulations on surface-disturbing activities are used to prevent any unnecessary disturbance." Recommend special stipulations be provided for protection of riparian habitat.

pg. 3-34 Water
(4th par.)
The DEIS states that "Several critical watersheds are within the Glenwood Springs Resource Area." These are municipal watersheds for the cities of Rifle and New Castle and a flood hazard area around Glenwood Springs. Special stipulations have been provided in the DEIS to prevent any surface disturbing activity.

Other critical watersheds can be identified based on known highly erodible soils or the occurrence of A and B populations of Colorado cutthroat trout. Water quality protection is critical to both fish populations which occur in highly unstable watersheds and Colorado cutthroat streams. The CDOW list of Species of Special Concern identifies three species of fish and one game which could be adversely impacted by Oil and Gas leasing in unstable watersheds. In addition, Colorado cutthroat trout, a Federal Candidate Species, is potentially one to two years away from formal listing due its continued decline throughout historical range. Although throughout the DEIS, BLM purports to be protecting both Federal Candidate and State listed Sensitive species; there is no mechanism for doing so. Recommend that BLM protect highly unstable watershed 
**101** containing fish populations and Colorado cutthroat A and B strain through the placement of No Surface Occupancy stipulations on these "critical watersheds".

pg. 3-34 through 3-340; Forestry, Recreation and Livestock Grazing
The DEIS identifies current uses of BLM land, yet fails to analyze cumulative effects to wildlife and other resources resulting from additional impacts associated with oil and gas leasing and development.
(5)

Also applicable is the Transportation issue which has also not been addressed 
**223** in sufficient detail to analyze short and long-term impacts to BLM managed lands. **18**

An oversight in Chapter 3 is the lack of identification of caves as an issue. Potential for significant adverse impacts to this habitat type is extremely 
**131** high from all phases of oil and gas development. In addition, caves are critical habitat for both Federal Candidate and State listed Species of Special 
**199** Concern (bats), as well as, providing habitat for endemic species of invertebrates. An analysis of potential impacts from oil and gas leasing should be conducted and a special stipulation requiring No Surface Occupancy buffer zones established.

Chapter 4: Environmental Consequences

pg.4-1 Vegetation
(3rd par.)
The DEIS identifies the maximum amount of vegetation that could be lost over 20 
**165** years from oil and gas leasing as 19,000 acres. The DEIS concludes that "this is not considered to be a significant cumulative impact". The basis of this conclusion is questionable when information on proportional impacts to the various vegetation communities is lacking. If for example 20% of the impacts occur in riparian habitat (3,800 acres), then cumulative adverse impacts to wildlife (75-80% of all wildlife species are totally or partially dependent on riparian) would be significant. In addition, a cumulative analysis as required 
**229** under NEPA, should look at additive impacts to vegetation from all past, present, and foreseeable future land uses on BLM land within the scope of this EIS. It is also questionable whether BLM's cumulative analysis should exclude 
**230** adjacent private and split-estate lands.

It seems that prior to reaching a conclusion on "significance", an analysis of cumulative impacts for all land uses on major vegetative community types for both adjacent private, split-estate, and federal lands should be analyzed. With the information presented in the DEIS, there is no basis for this conclusion.

pg. 4-1 (4th paragraph)
The DEIS states that "impacts to riparian and wetland habitats would not be 
**152** significant." This conclusion is based on avoidance of development in these critical areas through the use of Conditions of Approval (COAs) during predrill 
**169** inspections. This would include moving well site locations up to 200 meters to avoid construction in riparian and wetlands. This conclusion that impacts 
**72** would not be significant is without basis. Large wetlands, wet meadows, and lower elevation areas of tundra habitat, to provide a few examples, would not be protected by only relocating well pads less than 200 meters. In addition, how would road construction be conditioned to protect riparian and wetland communities when filling of these areas may be required to reach pad sites? Where is compliance with 404 (c)) guidelines of the Clean Water Act and Federal Executive Orders which provide direction to BLM for protection of floodplains, etc.?
(6)

BLM_0006082

BLM_0006083



**United States Department of the Interior**
NATIONAL PARK SERVICE
ROCKY MOUNTAIN REGIONAL OFFICE
12795 W. Alameda Parkway
P.O. Box 25287
Denver, Colorado 80225-0287



L7619 (RMR-PP)

AUG 15 1990

Memorandum

To:      District Manager, Grand Junction District, Bureau of Land Management,
         Grand Junction, Colorado
         Attention:  Robert W. Kline, Project Manager

From:    Associate Regional Director, Planning and Resource Preservation,
         Rocky Mountain Region

Subject: Review of Colorado Oil and Gas Leasing and Development Environmental
         Impact Statement (DES 90/0011)

The National Park Service (NPS) has reviewed the above referenced document and
offers the following comments.

Management of the five Bureau of Land Management (BLM) Resource Areas or Planning
Areas is of concern to the NPS because oil and gas development activities
permitted on these lands have the potential to impact five NPS units; Mesa Verde
National Park, Hovenweep National Monument, Dinosaur National Monument, and Rocky
Mountain National Park; and other areas of NPS administration including Wild and
Scenic Rivers and National Natural Landmarks.

It is our belief that the intent of the Federal Land Policy and Management Act
and the Nationwide agreement between our two agencies requires impacts to
surrounding lands be analyzed. We also believe that a complete discussion of
how current and projected oil and gas development on BLM lands near NPS-
administered lands might impact significant resources is required by the Council
on Environmental Quality (CEQ) regulations at 40 CFR 1502.16 (c).

We are encouraged to see a move in the direction outlined in this document
regarding BLM oil and gas leasing policies.  We are certainly in favor of any
additional provisions that can be built into the leasing process to bring it into
full compliance with the National Environmental Policy Act.  We are concerned,
however, that this document does not fully evaluate the impacts of leasing and
development.

---

**GENERAL COMMENTS**

**Air Quality**

The air quality analysis in the Draft Environmental Impact Statement (DEIS) is
inadequate.  Individual oil wells can be major sources of air pollution,
generating more than 250 tons per year of one or more regulated pollutants such
as sulfur dioxide, hydrogen sulfide, nitrogen oxides, volatile organic compounds,
and carbon monoxide.  Nitrogen oxides and volatile organic compounds combine in
sunlight to form ozone.  The preferred alternative projects the opening of as
many as 47 new oil fields and up to 1,789 new oil wells in the study area.  The
DEIS concludes that this development would have "very minor, short-term, and very
localized" impacts on air quality.  There is no mention of control technology
to reduce the emissions of air pollutants, nor is there any mitigating measure
or requirement to use that technology.

Since some or many of the 1,789 wells may be developed near class I or II, or
category I or II areas, the final EIS should include an analysis of the potential
air pollution impacts on these areas and their resources, as well as required
control technology that will reduce the air pollution impacts.  Mitigation
measures that clearly describe the application of appropriate air pollution
control technology should also be included in the final EIS.

**Wild and Scenic Rivers**

The study area includes all or portions of five streams that are listed on the
Nationwide Rivers Inventory (NRI).  They are:

- The Arikaree River from the Nebraska/Kansas state line to Alder
  Creek, listed for its outstandingly remarkable fish, wildlife,
  historic, and cultural values;

- The Colorado River from State Bridge to Blue River, listed for its
  outstandingly remarkable scenic, recreational, geologic, and fish
  values;

- The North and South Forks of the White River, listed for their
  outstandingly remarkable scenic, recreational, fish, and wildlife
  values;

- The Yampa River from the Little Snake River to Williams Fork, listed
  for its outstandingly remarkable scenic, recreational, geologic,
  fish, wildlife, and cultural values; and

- The Animas River from Animas City to Mineral Creek, listed for its
  outstandingly remarkable scenic, recreational, geologic, fish,
  wildlife and historic values.

In addition, the Crystal River (including its North and South Forks) from the
national forest boundary to the sources of the North and South Forks is listed
on the NRI in your study area.  However, there appears to be no BLM lands along
this NRI segment.

---

We note the document references several of the above listed streams but we were
unable to identify the impacts that oil and gas developments would have on these
streams and their outstandingly remarkable values.

We have enclosed a copy of the procedures that Federal Agencies should follow
in assessing the impacts of their actions on NRI streams.

**National Natural Landmarks**

We have also enclosed a list of designated and proposed National Natural
Landmarks (NNL) for the State of Colorado.  Many of these NNL are located in or
near potential lease areas.  Because of their significance and because Federal
Agencies are responsible for considering impacts to NNL under Section 102 (2)
(c) of the National Environmental Policy Act, we would appreciate consideration
for these resources.

**Dinosaur National Monument**

The document notes that areas adjacent to Dinosaur National Monument are rated
as having low potential for development.  Given that this rating is the lowest
potential identified in the Little Snake Resource Area and given further the low
number of exploratory wells projected in this study area, closure of the areas
adjacent to the park should have minimal impact on potential production of oil
and gas from the Resource Area as a whole.  The potential impacts to park
resources and resource values far outweigh this low potential for oil and gas
development.

**Mesa Verde National Park**

Mesa Verde National Park is designated as a class I area under the Clean Air Act
of 1977, as amended.  The DEIS lists the visual air quality of the BLM lands
along the border of the park as "VRM Class II."  The VRM (visual Resource
management) classes as listed, when though explained, are confusing.  They could
be read as Air Quality Act designations.  This is confusing to us and likely
confusing to the general public.

**SPECIFIC COMMENTS**

1)  There are several maps included in the document, but only a very few identify
    NPS units or other areas of NPS concern.  We recommend that these areas be
    included in all appropriate maps in the final EIS.

2)  Page 1-2.  We recommend that the last two sentences be deleted since the
    issue of protective leasing in the case of drainage is not resolved, and too much
    detail would be needed to adequately explain the complexities of the issue.

3)  Page 2-5.  The text explaining Table 2-3 should clearly state that Federal
    lands not available for leasing, such as lands within NPS units, are not included
    in the table.

4)  Pages 2-5 and 2-6.  We note from Tables 2-3 and 2-4 that the proposed action
    would result in fewer restrictions on fewer acres in the Little Snake Resource
    Area than would the "No Action" alternative.  We were not able to determine on

---

which lands exploration and development would be less constrained.  Some further
explanation is warranted in the final document.

5)  Page 2-9.  Table 2-6 indicates that all the alternatives evaluated are
    clustered in the middle of the spectrum.  We would like to see additional
    stipulations that provide for increased protection in the areas of visual and
    air quality.

6)  Page 2-3.  Map 3-2 incorrectly delineates the boundary of Rocky Mountain
    National Park.  The map shows the the pre-1980 boundary.

7)  Page 3-9.  Table 3-4 should be amended.  Rare plant inventories in Dinosaur
    National Monument have identified nearly 40 species of special concern.  Those
    which are Federal candidate species, in addition to the species listed in Table
    3-4, include park rockcress (Arabis vivariensis) and above bog-orchid (Habenaria
    zeohizea).  Some other Category 1 and 2 species may occur in the Little Snake
    Resource Area, most notably Ladies' tresses orchid (Spiranthes diluvialis) and
    rock hymenoxys (Hymenoxys lapidicola).

8)  Page 3-25.  Table 3-6 fails to include the peregrine falcon (Falco
    peregrinus).  There is at least one documented aria which has been occupied since
    1988.  This information should also be included in the discussion of threatened
    and endangered species on page 3-26.

9)  Page 3-25.  This section, Affected Environment, does not mention other small
    species which may be rare or sensitive.  One such species is the spotted bat
    (Euderma maculatum), whose status is largely unknown.  The only known records
    of this species in Colorado are in and near Dinosaur National Monument.

10) Page 3-26.  In the discussion of the bald eagle (Haliaeetus leucocephalus),
    the document should note that significant roosts occur in Lily Park on BLM, NPS,
    and private lands.

11) Page 3-26.  The discussion on endangered fish should be expanded to reflect
    the proposed listing of the razorback sucker (Xyrauchen texanus) as endangered.
    The humpback chub (Gila cypha) has been reported in Cross Mountain Canyon and
    in the lower reaches of the Little Snake River.  We suggest that the Colorado
    Division of Wildlife (Tom Nessler, 303/484-2836) and the Fish and Wildlife
    Service (Dr. Harold Tyus, 801/789-0354) be contacted to acquire the most recent
    information on the location and status of the endangered fishes.

12) Page 3-29.  The discussion on threatened and endangered species mentions
    only vertebrates.  There is no reference to threatened and endangered plant or
    invertebrate species or the status of respective candidate species.  Of specific
    concern are several candidate plant species that may be found in the Weber and
    Manefee Mountain areas near Mesa Verde National Park.  Species that should be
    evaluated include:

    - Mesa Verde false forget-me-not (Hackelia gracilenta)
    - Mancos milkvetch (Astragalus humillimus)
    - Small flowered penstemon (Penstemon parviflorus)
    - Spurless Mancos columbine (Aquilegia micrantha menocana)

BLM_0006084

**19**

These are just four of an extensive list of plant species that should be surveyed prior to any land status change or leasing in the area.

**113** 13) Page 3-29. The document notes that the "Mexican spotted owl has been reported in Mesa Verde." The spotted owl (*Strix occidentalis*) has been found within Mesa Verde National Park by the Forest Service Region 2 Spotted Owl Survey Team. With this confirmed observation of spotted owls within the park, there is the possibility that the spotted owl may also be found on Weber and Menefee Mountains. Justification exists for a formal survey of the Weber and Menefee Mountains Wilderness Study Area (WSA) as spotted owl habitat.

**125** 14) Page 3-40. This page notes that the Yampa River constitutes a sensitive visual resource. We recommend expanding this section to note that Dinosaur National Monument and adjacent lands are also quite sensitive and vulnerable to degradation of visual resources and values. Oil and gas development adjacent to the Dinosaur National Monument could severely diminish the value of views from the park.

**119** 15) Page 3-43. We recommend that the Hovenweep Cooperative Management Strategies area and Dinosaur National Monument's Harpers Corner Road area be added to the Class II VRM listing, and that the Mesa Verde rim be moved to the Class I VRM listing.

**126** 16) Page 3-43. The cultural resources addressed in this section are specific to sites that are listed on the National Register of Historic Places. The four separate cultural sites located in the Colorado portion of Hovenweep National Monument were not included in the list provided. In fact, the existence of the park was not addressed in the cultural resource section at all. Except for the passing reference to no surface occupancy (NSO) made in Table 4-1 on page 4-21, the existence and location of Hovenweep sites within Colorado were not addressed.

**132** 17) Page 3-49. Table 3-11 notes that several WSA are recommended as non-suitable for wilderness designation. A change in action away from the current WSA management could allow for oil and gas development and impact the resources or values of nearby NPS units. We do not believe that the document provides the rationale for these recommendations and we question their validity.

**128** 19) Page 3-53. The map locations of Weber and Menefee Mountains have been reversed.

**130** 19) Page 3-63. The Area of Critical Environmental Concern (ACEC) located on Map 3-30 should be extended eastward to include the North Rim escarpment north of Mesa Verde National Park.

**180** 20) Page 4-2. This page states that the "adverse determination through analysis that the Proposed Action Alternative will not have an effect on any of the threatened or endangered species found in the study area." This statement may be incorrect since inventories for the study area are incomplete and the document later states on page D-7 that protection of endangered, threatened, and sensitive plants would only be "to the extent such protection does not unduly hinder or

**19**

preclude exercising valid existing rights" and "to the degree that existing development rights are not unduly hindered or precluded." Perhaps we did not find it, but we also did not see the analysis which might support the no effect statement.

**180**

**199** 21) Page 4-15. In the discussion of Environmental Consequences related to cultural resources, there is at least one apparent contradiction. Citing Mickens, et al. (1981), the document notes an increased potential for impacts to identified and unidentified sites. The very next paragraph suggests that major impacts to cultural resources are unlikely. We suggest that the document be expanded, with consideration of Grady (1984. *Environmental Factors in Archeological Site Locations*, Colorado Bureau of Land Management Cultural Resources Series, No. 9, Northwest Colorado Prehistoric Context, Denver), to more clearly delineate the magnitude of potential impacts to both surface and subsurface sites.

**201** 22) Page 4-16. The narrative on paleontology is not sufficient to ensure the reader that paleontological resources are adequately protected. The document notes that "identified sites must either be proven to have no significant fossils or..." What constitutes an "identified site?" If identified sites are only those known from the literature, a vast amount of paleontological material could be lost or damaged. Recent surveys in Dinosaur National Monument have shown that material like this is very small and would probably not be recognized by an untrained eye.

**222** In light of recent discoveries and considering that existing surveys are far from complete, we recommend a survey of all areas that will be subjected to surface disturbance. This survey could identify and assess the significance of surface materials. In those formations known to bear significant fossils, it might also be wise to survey materials disturbed by subsurface operations.

**220** Significant paleontological materials that will be impacted should be collected, prepared, stored, and placed in an acceptable repository. Burial or similar actions are not acceptable "otherwise protected" actions.

**221** The section concludes with the statement that "The unavoidable loss is insignificant in relationship to the widespread distribution of the resource." We suggest that this statement may be refuted by the significance of recent fossil finds in Dinosaur National Monument and elsewhere in western Colorado and eastern Utah. Some of the recent discoveries are classified as microfossils but, in spite of their small size, they have resulted in new prehistoric species and significant new gains in paleontological knowledge.

**200** 23) Page 4-21. Visual impacts to NPS units could be reduced by developing a visual protection zone around roads at Dinosaur National Monument and the Hovenweep Cooperative Management Strategies area.

**228** 24) Page 4-23. The cumulative impacts assessment discussion is inadequate and needs to be corrected. For example, while air quality impacts from drilling might be very short-term and minor, producing fields can degrade air quality long-term in a way that affects park resources and values. In the specific case of air quality, we recommend that a stipulation be developed that could slow

**19**

field development or require additional mitigation if emissions from a discovery well indicate that the air quality at NPS units would be degraded by full field development and production. Similar provisions should be made for other resources.

**266** 25) Page D-7. We are concerned that the Conditions of Approval related to endangered, threatened, and sensitive species (notably plants) and other resources (notably raptors and sandhill crane nests) provide for protection and/or mitigation only to the extent that such protection and/or mitigation does not unduly hinder or preclude existing development rights. It would seem incumbent on the BLM, by law, to impose whatever protections are necessary to ensure that threatened and endangered species and their habitats are not adversely impacted by exploration and/or development, even if these activities are proceeding pursuant to an existing lease.

26) Page D-7. We recommend that the Conditions of Approval regarding pipelines be amended to include requirements for automatic shut-off valves, double wall pipe, and response teams in each instance a pipeline crosses the Yampa River or any other stream where spills have the potential to impact endangered fishes. These areas contain resources, both inside and outside the park, which are often very vulnerable to alien substances such as petroleum, petroleum products, and other chemicals used in oil and gas drilling.

The Amoco oil spill in the Yampa River adequately demonstrated the potential for significant impacts, even from a relatively small spill. In that particular case, the pipe was single wall, there were no automatic shut-off valves, and the response team had neither the expertise nor equipment to effectively contain the spill in a riverine environment. Containment efforts were totally ineffective. Any of the suggested environmental safety requirements could have prevented or at least minimized the ecological damage to the Yampa and its resources.

**278** 27) Page E-5. We support the no surface occupancy stipulation for the Hovenweep Cooperative Management Strategy area. This stipulation should also include the Goodman Point and Cutthroat Castle resource protection zone areas.

**287** 28) Page L-1. Table L-1 should be updated to include the results of the 1987-1989 surveys conducted by the Colorado Natural Areas Program in and near Dinosaur National Monument. A copy of the summary table from that research is enclosed.

We appreciate the opportunity to comment on this document and wish to review more detailed action plans as they become available. If you have any questions on our comments, please contact Michael Duwe, Division of Planning and Compliance at FTS 327-2830 or commercial (303) 969-2830.

Richard A. Strait

Enclosures



STATE OF COLORADO   ROY ROMER, Governor

**DEPARTMENT OF NATURAL RESOURCES**

HAMLET J. BARRY III, Executive Director
1313 Sherman St, Room 718, Denver, Colorado 80203 866-3311

Geological Survey
Board of Land Commissioners
Mined Land Reclamation
Division of Mines
Oil and Gas Conservation Commission
Division of Parks & Outdoor Recreation
Soil Conservation Board
State Conservation Board
Water Conservation Board
Division of Water Resources
Division of Wildlife

**20**

August 17, 1990

Bob Kline
Bureau of Land Management
764 Horizon Drive
Grand Junction, CO 81506

Dear Mr. Kline:

Colorado State agencies have completed their review of the Oil and Gas Leasing Draft EIS. This letter and the accompanying documents constitute the state's comments on the draft environmental report.

In general we support specific lease stipulations, guidelines and monitoring in areas which have important, unique or especially sensitive natural values. While No Surface Occupancy restrictions may eliminate direct impacts on such parcels, it is important to evaluate the potential for impacts caused by nearby drilling, production and transportation.

**60** Given new techniques such as horizontal drilling, such monitoring and evaluation is critical. While we do not believe that an EIS should accompany each lease, these off-site impacts should be considered on a site-specific basis during subsequent stages of the approval process.

**151** We recommend that the Final EIS acknowledge and evaluate potential "off-site" impacts to sensitive or important areas, or that it include a commitment to complete such an investigation before drilling begins. The

**149** Final EIS should also describe how impacts associated with oil and gas drilling and production will be monitored. It should also explain how

**150** mitigation can be modified if necessary to reduce unexpected impacts to the environment.

**10** The treatment of leasing within state parks and recreation areas is somewhat ambiguous, but seems generally governed by No Surface Occupancy stipulations. In addition to imposing such a limitation, BLM should coordinate leasing and development activities with the Division of Parks and Outdoor Recreation. This is important to ensure that off-site drilling, production and support activities have minimum impact on recreation and natural features within the park as well as access to the park. Similar coordination should occur with respect to leasing and development adjacent to nominated and designated Natural Areas and research natural areas.

**20**

Bob Kline, BLM
August 17, 1990
Page Two

Finally, the addition of an index would make information in the
Final EIS more accessible to readers.  Please contact me if you have
questions or would like to discuss these comments further.

Sincerely yours,

Hamlet J. Barry III
Executive Director

HJB:sn:1579
Attachments

---

STATE OF COLORADO
Roy Romer, Governor
DEPARTMENT OF NATURAL RESOURCES
**DIVISION OF WILDLIFE**
An Equal Opportunity Employer
Perry D. Olson, Director
6060 Broadway
Denver, Colorado 80216
Telephone: (303) 297-1192



**20**

For Wildlife—
For People

M E M O R A N D U M

TO:     Steve Norris

FROM:   Don Smith

Date:   August 6, 1990

RE:     BLM Colorado Oil and Gas Leasing and Development Draft Environmental
        Statement and Draft Resource Management Plan Amendment

The Division of Wildlife has received the subject document and supports the
Bureau of Land Management's proposed action alternative for their oil and gas
leasing program in Colorado. Most of our concerns regarding wildlife have
been incorporated into this document thanks to BLM's early efforts to
coordinate with us and others.

In general, the DES provides good information on the three alternative
actions, the affected environment and the impacts of the program. The
glossary and the appendices were quite helpful in understanding more about
BLM's oil and gas leasing program and its complexity. We believe, however,
that the final report can be improved with (1) specific information on how
each alternative affects each of the five resource areas, (2) a better
explanation of alternative comparison, (3) explanation of the various tables,
(4) a uniform description of the affected environment for each resource area
(the CGRA was very good), (5) specific information on the environmental
consequences on wildlife for each resource area (not combined) and (6)
additional explanation of the cumulative impacts and which resource area would
be affected the most. In addition, the titles of appendices K, L & M should
be changed to T & E species if additional information is not added and
appendices should be added for existing environments of the Kremmling and
Northeast Resource Areas.

In addition to our general comments I am attaching specific comments which we
feel would improve the environmental statement and plan amendment. We applaud
BLM's effort to coordinate their oil and gas leasing program with their RMP's
and the programs of other agencies. Some problems will continue but hopefully
they can be resolved in the future.

DS/gj/2410M

Attachment

cc  McCloskey
    Goodman
    Regional Habitat Biologists

DEPARTMENT OF NATURAL RESOURCES, Hamlet J. Barry, Executive Director
WILDLIFE COMMISSION, William R. Hegberg, Chairman • Donna Luttrell, Vice Chairman • Eldon W. Cooper, Secretary
Felix Chavez, Member • Rebecca L. Frank, Member • Louis F. Swift, Member • George VanDenBerg, Member • Larry M. Wright, Member

---

**20**

Comments on BLM Oil and Gas Leasing
Colorado Division of Wildlife

| | Page | Col. | Para. | Remarks |
|---|---|---|---|---|
| 11 | 1-5 | 1 | 4. | It would be desirable if the MOU between BLM and the CDOC included wildlife mitigation and other protective environmental agreements as well as mining agreements. |
| 29 | 2-4 | 1 | 3. | The timing limitation stipulation does not always apply to maintenance activities, especially in emergency situations. Damage to wildlife habitat under these circumstances should be addressed and stipulations proposed for mitigating losses. |
| 32 | 2-5 | | Table 2-3. | More discussion of Tables 2-3, 2-4, and 2-5 would help differentiate between the three alternatives. |
| 33 | 2-8 | 1 | 1. | The comparison of alternatives should discuss other wildlife besides raptors. |
| 35 | 2-9 | | Table 2-6. | The impact of the second alternative, continuation of present management, on wildlife will be different from the proposed alternative and the table should reflect this. In addition, why would wildlife experience "losses" when wildlife are only "disturbed"? |
| 81 | 3-6 | 1 | last. | Add more information about the semi-desert shrub community like those of other community types. It comprises 20 percent of the vegetation in the CGRA and is important wildlife habitat. |
| 102 | 3-6 | 2 | last. | The paragraph is poorly written with no lead in to T&E plant species. Classification is needed. |
| 103 | 3-8 | 2 | 3. | A paragraph explaining T&E plant species in the KRA is needed to complement table 3-2. Are state listed plant species of special concern inventoried by the Resource Areas? |
| 85 | 3-9 | | Table 3-3. | Vegetated communities listed here should be discussed in the narrative to highlight importance of each as is done for the other Resource Areas. |
| 88 | 3-11 | 1 | 3. | The discussion on livestock grazing is inadequate and should be expanded to compare this use on the five Resource Areas. The impact of leasing on livestock use is considerably greater than that on air quality, yet climate and air quality receives three pages of narrative. |

---

Comments cont.
Page 2

**20**

| | Page | Col. | Para. | Remarks |
|---|---|---|---|---|
| 91 | 3-12 | 1 | 5. | More explanation of "crucial habitat" is needed. How does this relate to CDOW's WRIS definition of "critical habitat"? Winter concentration areas are very important but are not mentioned here. |
| 100 | 3-26 | 2 | 4. | The discussion of big game animals should be expanded to highlight important habitat on BLM land. |
| 99 | 3-26 | 2 | 5. | Other important bird species include bob white quail, turkey and pheasant. |
| 122 | 3-28 | | | The map should show the name of the Resource Area and be included on all maps of each Resource Area. |
| 113 | 3-31 | 1 | 1. | Additional information on the spotted owls should be addressed in the FES. A former BLM biologist reported at least twelve locations of spotted owls in the SJRA in the mid 1980's. In addition, the present CDOW activity at Cross Canyon may impact spotted owls in Cross Canyon. |
| 124 | 3-39 | 1 | 4. | The wild and scenic river study for the Yampa River has been completed. |
| 129 | 3-58 | 1 | 5. | New Raynor is misspelled. |
| 175 | 4-3 | 1 | 1. | Disturbance to wildlife should not automatically be considered an indirect impact. Oil and gas activity can and does have a direct impact through disturbance especially during nesting and birthing seasons. |
| 176 | 4-3 | 1 | 4. | All Resource Areas should have lease stipulations requiring the oil and gas lessee to compensate for the loss of crucial habitat. A map of big game crucial habitat in all Resource Areas would be helpful. |
| | 4-6 | 1 | 2. | Rewrite (1) of the first sentence. |
| 196 | 4-7 | 2 | 5. | In the first sentence "important" should be changed to wildlife. This would avoid the confusion between important habitats and crucial habitats mentioned in the last sentence. |
| 161 | 4-12 | 2 | last. | It would be helpful to know the number of acres of forest land impacted by oil and gas development. |

Comments cont.
Page 3

**20**

| Page | Col. | Para. | Remarks |
|------|------|-------|---------|
| 236 | 7-5 | 2 | 2. | The definition of mitigation should also include avoiding and compensating which today are considered essential to the mitigation process. |
| 237 | 7-7 | 2 | 2. | Did the State of Colorado have input to BLM's state list of sensitive species? Where is this document available? |
| 263 | 0-2 | 1 | 5. | The official title of Area Supervisors is now Area Wildlife Managers. |
| 264 | 0-3 | 1 | last. | T&E animal species should also be included. |
| | 0-5 | 1 | 1. | Colorado now has a third rifle season. |
| 265 | 0-7 | 2 | 5. | Have raptor and sandhill crane nests been inventoried, and will there be an opportunity to include such information after an APD or other action is granted? Nest sites are dynamic and may require protection after-the-fact of issuance of the necessary permits. |
| 270 | E-2 | 1 | 1. | A two-mile radius from the lek is necessary to protect grouse breeding habitat as explained on pages 3-24 and 4-4. |
| 273 | E-2 | 1 | 1-6 | Please discuss your criteria for permanent abandonment of nests. |
| 272 | E-2 | 1 | 2-6 | Usually a 1/2 mile radius from the nests of these raptor species is necessary for their protection. This distance should be consistent with that given on page E-6. For T&E species, recovery plan guidelines should be conditions of the lease rather than BLM general stipulations. |
| 276 | E-3 | 1 | last. | CDOW's Garfield Creek State Wildlife Area should be covered under a no surface occupancy stipulation because of its importance as an ecological unit. |
| 279 | E-6 | 1 | A2. | The radius for lek/nesting habitat for grouse should be 2 miles. |
| 280 | E-6 | 2 | A4. | Bald eagle nesting activity in nearly year-round in some areas with resident birds. Special stipulations may be needed in these areas. |
| 284 | E-9 | 142 | --. | The controlled surface use stipulations outlined by the GSRA should be applied to all Resource Areas. |

---



**STATE OF COLORADO**

**20**

DEPARTMENT OF HIGHWAYS

4201 East Arkansas Ave.
Denver, Colorado 80222
(303) 757-9011

July 26, 1990

Mr. Steve Norris
Department of Natural Resources
1313 Sherman, Room 718
Denver, Colorado 80203

Dear Mr. Norris:

The Colorado Department of Highways has completed its review of the Draft Environmental Impact Statement and Draft Resource Management Plan Amendment for the Colorado Oil and Gas Leasing and Development and has the following comments.

**202** Page 4-17 of the document discusses the construction of access roads to the locations of oil and gas development. The Bureau of Land Management should be aware that access permits from the Department of Highways are required for any new access point onto State highways. This information should be included in the Final EIS.

Thank you for the opportunity to provide comments on this document.

Very truly yours,

for
Barbara L. S. Barry
Manager
Office of Environmental Review and Analysis

RECEIVED
JUL 27 1990
DEPARTMENT OF
NATURAL RESOURCES

---

**STATE OF COLORADO**

**20**

**COLORADO DEPARTMENT OF HEALTH**

4210 East 11th Avenue
Denver, Colorado 80220
Phone (303) 320-8333

**MEMORANDUM**

TO: Steve Norris, Department of Natural Resources

FROM: George Gerstle  Air Pollution Control Division

DATE: June 4, 1990

SUBJECT: Colo. Oil and Gas Leasing DEIS and DRMP Amendment

------------------------------------------------------------

Thank you for the opportunity to comment on this document.

A discussion of coal bed methane development is included in this EIS, yet the document makes no mention of the cumulative air quality impacts of an influx of numerous compressor engines and turbines associated with such development. As a result, the discussion of air quality in the Environmental Consequences section is inadequate. Furthermore, "very minor, local impacts" should be defined **160** in light of the potential cumulative impacts of the proposed development.

If you have any questions, please call me at 331-8503.

RECEIVED
JUN 06 1990
DEPARTMENT OF
NATURAL RESOURCES

---

**21**

Texaco USA

PO Box 2100
Denver CO 80201
3401 CDC Boulevard
Denver CO 80237

August 17, 1990

Draft Resource Management Plan Amendments
Draft Oil and Gas Leasing Environmental Impact Statement (EIS)
Glenwood Springs, Kremmling, Little Snake, Northeast
and San Juan/San Miguel Resource Areas

Mr. Robert Kline, Project Manager
Bureau of Land Management
U.S. Department of Interior
764 Horizon Drive
Grand Junction, CO 81501

Dear Mr. Kline:

Texaco has reviewed the captioned draft plan amendments and oil and gas leasing EIS (DEIS) and we offer the following comments:

**General Comments**

We support the Colorado BLM's decision to amend five resource management plans in one document. This is an efficient use of your time and budget. However, we do have a number of general objections:

**27** A township-range map should have been provided in the DEIS which would identify the exact location of oil and gas restrictions for each resource area. It was impossible to measure any direct impacts on Texaco without matching restrictions to areas of moderate to high oil and gas potential. We suggest that you provide such a map with any future land use documentation.

**148** The DEIS appears to be heavily weighted in favor of non-commodity values such as wildlife habitat, cultural resources and recreation. Most of these areas have significant oil and gas potential yet there is a dramatic increase in no surface occupancy (NSO) stipulations. This will have a stifling impact on possible exploration and development of oil and gas resources. The BLM's Supplemental Program Guidance (SPG) for fluid minerals directs that areas with high potential for oil and gas resources should receive special attention in the planning process. This is also consistent with BLM's responsibility to manage public lands for multiple use.

**21**

50 ( Cumulative impacts of oil and gas activity appear to be based on "worst case development scenarios" rather than a "reasonable foreseeability analyses" as is required by the National Environmental Policy Act (NEPA). By arbitrarily increasing the predictive level of development, you increase the level of impacts and, therefore, the level of need for "adequate" protection to surface resources. Also, the BLM should improve the final DEIS by presenting an accurate picture of effects which are reasonable to expect after stipulations have been applied under each of the alternatives presented. This should reduce the impacts of oil and gas development considerably.

46 ( The adequacy of NEPA analyses should not be based solely upon the number of wells that have been drilled in an area. You should also consider how many wells sites are producing, have been reclaimed and whether mitigation measures were employed. A distinction needs to be made between exploration and production wells since only a small percentage of exploration wells ever result in further development.

1 ( Although we commend your efforts to combine several plan amendments into one document, this should have been done in a more logical and coordinated fashion. The document includes a number of discrepancies and is very confusing. For example, on page 4-1 it is stated that wildcat wells would result in the loss of approximately 10 acres of vegetation per well or a total of 19,200 acres (from 1,920 wells) over a twenty year period. Yet on page 4-22 it is stated that as many as 1,753 wells could be drilled. Then on page 2-2, Table 2-1 indicates that the projected number of wells is 1,789. Significant clarification is needed in the final document.

146 ( Chapter 4 on Environmental Consequences exaggerates the potential effects of oil and gas activity on other resource values. Standard and special stipulations are designed to mitigate environmental consequences, yet this was never discussed. The manner in which environmental consequences are discussed only serves to inflame public sentiment against oil and gas activity. Examples are:

Seismic activities such as explosive charges or thumpers, etc. "could disrupt normal water flows...loss of water to existing springs and water wells."

effects from oil and gas activities would be most significant during critical seasons when the animals are already under substantial stress."

How often do these situations occur and are the alleged consequences documented by any credible study? Without evidence of negative impact, such conclusions should not be drawn.

---

**21**

**Specific Comments**

Texaco recommends that the BLM adopt the Standard Terms and Conditions Alternative. We are not convinced that NSO, seasonal or other special stipulations are necessary to protect the various resource values in the five resource area special stipulations are evaluated. Since it is unlikely that you will adopt this alternative, we recommend the Continuation of Present Management Alternative as a second preference. Their appears to be little difference in cumulative impact according to your study between this alternative and the Proposed Action Alternative, yet there is a 359% increase in NSO stipulations from the Current Management Alternative to the Proposed Action Alternative (from 162,533 acres to 569,902 acres). In terms of impact to Texaco we conclude the following:

- Without maps which illustrate exact locations of lease stipulations it was difficult to ascertain direct impacts to Texaco. However, with some assistance from your state office in Denver we were able to identify and overlap general restriction areas for the 'Proposed Action Alternative' over areas which Texaco has interest in or considers to have significant oil & gas potential. We believe that there is moderate to high oil and gas potential in the Little Snake, Glenwood Springs and San Juan/Miguel Resource Areas. We have interest in leasing and/or drilling in these areas and we have producing wells in San Juan and Little Snake. Under the Proposed Action Alternative most of this area is encumbered with NSO stipulations. There is no guarantee that such stipulations would be waived at the time an APD is filed. Therefore, by increasing the risk factor, this restriction will act as a deterrent to Texaco's willingness to explore for and develop oil and gas resources.

61 ( In the Glenwood Springs Resource Area you would require operators through a special stipulation to compensate for the loss of crucial wildlife habitat. This stipulation exceeds mitigation measures required in the other four resource areas. It appears that the oil and gas industry is being singled out to pay for habitat improvements for which the BLM is responsible. Also, the level of disturbance discussed does not justify the need for such a stipulation. This represents increased cost to Texaco and would have a direct impact on our exploration and development decisions.

47 ( In the Little Snake Resource Area the BLM predicts that 550 wells will be drilled over the next 20 years based on historical data. Yet the BLM almost doubled its projections to 1000 wells, creating a "worst case scenario". This was done to avoid having to amend the planning document when the true threshold would be met. The problem is that such a projection increases the level of mitigation required to protect resource values. This in turn increases Texaco's cost of operation.

---

**21**

**Conclusion**

While Texaco commends the BLM for combining five resource area plan amendments in one document, we have a number of problems with the draft document:

- The Proposed Action Alternative which the BLM recommends for future land use management has dramatically and without justification increased NSO restrictions.

- BLM's discussion on environmental consequences of oil and gas activity is grossly exaggerated.

- The 'worst case oil and gas development scenarios" should be replace with 'reasonable foreseeable analyses".

- Maps which identify oil and gas restrictions should be available so industry can adequately measure impact.

- Areas studied have significant oil and gas potential and this is largely ignored in the final outcome of the planning process. Other resource values such as wildlife habitats, cultural resources and recreation activities are given preferential treatment.

We strongly recommend that the final plan amendments are designed to encourage the exploration and development of oil and gas resources and that the BLM fulfills its responsibility to manage public lands for multiple use.

Texaco appreciates the opportunity to comment on this important document. We hope that our comments will be considered in formulating your final resource management plan amendments and environmental impact statement.

Sincerely,

*[signature]*

Terrence M. Belton
Regulatory Affairs Coordinator
West Region Land Department

TMB\

ECB-MRC
JKH
BAV

---

**22**



Amoco Production Company

Denver Region
1670 Broadway
P.O. Box 800
Denver, Colorado 80201
303-830-4040

August 16, 1990

Robert W. Kline, Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, CO 81506

File:  RCV-238-011

**Colorado Oil and Gas Leasing and Development EIS**

Amoco Production Company, a wholly owned subsidiary of Amoco Corporation, is incorporated for the purposes of exploring for and developing oil and gas resources. Amoco Production Company has a large leasehold position and operations within Colorado on federal lands which could be affected by this document. Therefore, we believe it is important to provide our perspectives on the EIS for your consideration.

One important aspect of the document which we support is the BLM's decision to amend the various Resource Management Plans to conform with the Supplemental Program Guidance for fluid minerals. This approach will maximize the agency's time and budget resources for the future.

In reviewing the various appendices, several questions and concerns were identified. In an effort to better identify each concern, the appropriate appendix is referenced.

Appendix D

262 ( Cultural Resources: within this section there are numerous references to a 500' setback of seismic activities from cultural resources. In reviewing the restriction, there appears to be no flexibility provided in modifying this restriction. It is important to note that a variety of seismic alternatives are available that, depending on their application, may not pose a threat to a cultural resource. An example would be a shothole seismic program designed in such a manner that the explosive device would not possess enough energy to threaten a cultural resource from vibration. It is important that the process for allowing exceptions to this restriction be provided so that operators may be able to design a program that would protect the resource and still allow for data acquisition.

**22**

258 { Explosives:  the restriction that "loaded shotholes not be left unattended" is somewhat confusing.  The reason is that there may be short intervals between when the shothole was loaded and when it is detonated that the hole is unattended.  Even when these situations exist, the risk to the public is very remote since the lead wires are usually placed below the ground surface until detonation occurs.  Further, the charge could not be detonated even if the leads were exposed unless an electrical charge was used.  Therefore, the need to apply such a restriction does not appears justified.  It would be less cumbersome to eliminate this sentence considering the low risk factor and the nature of how shotholes are loaded and detonated.

E. Resources (other than oil and gas) – A paragraph
261 { states that water wells drilled to provide water will be offered to the BLM after use and that water rights will be held by the BLM.  It is important that the statement be added that BLM will also assume all legal responsibility for the well after assuming ownership. This is an important aspect that must be documented for future records maintained by the State of Colorado.

H. Production:  One requirement in this section states
259 { that rock surfacing will be required for all-weather operations.  This requirement is not necessary in all situations.  For example, some areas of Colorado contain certain soils, combined with arid conditions, that would make rock surfacing an unneeded and unnecessary cost.  It is important to note that traffic associated with production will constitute light traffic of a sporadic nature.  The need for this condition should only be applied on a case-by-case basis considering weather, soil and traffic.

260 { Another area of concern is the requirement that appropriate noise mitigation will be employed if the well is located within 2,500' of a residence.  A half mile radius to employ this rule is excessive.  There are a multitude of conditions that could affect noise on a given residence.  Such factors as terrain, certain noise frequencies emanating from the equipment, and wind direction and velocity affect the degree noise would impact a given residence.  By not considering the site specific conditions present for a given situation, operators could be forced to install noise mitigation measures which may not be needed once all

**22**

conditions and factors are analyzed.  As a result, this mitigation should only be required in cases when the need can be clearly demonstrated.  It is therefore recommended that this qualifier be included as part of this condition of approval.

Appendix E
269 { I. No Surface Occupancy Stipulations:  two specific areas of concern exist with this section.  One deals with the restriction regarding raptor nests.  The stipulation states that a 1/4 mile setback will be required for certain species of raptors.  Exception criteria is listed which includes evidence of permanent abandonment.  One criteria that is not mentioned is that some species develop multiple nests in a given area, but only utilize one nest in a given year. Therefore, instead of using only "permanently abandoned" nests as an exception criteria, we request that the term "unoccupied" be given equal weight as a consideration to granting an exception to this stipulation.

277 { Another area of concern deals with restrictions detailed in the Glenwood Springs Resource Area. Specifically, there are a number of special management areas where exception criteria to operate within the areas is dependent upon "eliminating drill rig and other equipment noise" as well as "screening operations from scenic view sheds".  These stipulations are unrealistic and not justified for a number of reasons. For one reason, these special areas are typically not utilized the entire year, and as much, operations could be scheduled to avoid conflicts with high use periods. Secondly, drilling operations are a temporary intrusion.  Consequently, this would reduce concerns from both a visual and noise perspective.  Third, it is not possible to eliminate equipment noise from operations.  However, the extent to which it could be heard would depend on a variety of factors, not the least is whether anyone using the area could even hear noise emanating from the operations.  This should be a valid consideration since technology exists to reduce noise to a degree where people in certain areas would probably not notice the operations.  Fourth, those areas which allow motorized traffic should not require oil and gas operations to mitigate noise when the management of the area allows outside noise intrusions as a part of the immediate environment.  Therefore,

**22**

taking into account these factors, it is recommend that the "elimination of noise" and "screening operations" requirement be deleted from the final EIS.

Amoco Production Company appreciates the opportunity to comment on the draft EIS.  Thank you for considering our comments.

*[signature]*

David R. Brown
Environmental Affairs

DRB

**23**

Chevron

**Chevron U.S.A. Inc.**
6400 South Fiddler's Green Circle, Englewood, CO  80111, P.O. Box 599, Denver, CO  80201

Lisa Flecha Mercer
Staff Analyst
Legislative and Regulatory Affairs
(303) 930-3324

August 17, 1990

Oil and Gas Leasing Amendments
Colorado BLM
Resource Management Plans

Mr. Robert W. Kline, Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, CO  81501

Dear Mr. Kline:

Chevron U.S.A. Inc. supports the Colorado BLM's decision to amend the Glenwood Springs, Kremmling, Little Snake, Northeast and San Juan/San Miguel Resource Management Plans for the purpose of satisfying the Supplemental Program Guidance requirements.  We believe that combining all five amendments into one EIS is the most expeditious and prudent approach.  We praise you for realizing the need to amend these plans, without causing a disruption to the oil and gas leasing program.

14 { However, we do have some serious concerns about your draft EIS.  First, the acreage figures throughout the document need to be reexamined, since many discrepancies between the acreage figures are present.  For example, on page 4-1 it is stated that wildcat wells would result in the loss of approximately 10 acres of vegetation per well, or a total of 19,200 acres (indicating 1,920 wells), over a twenty year period.  However on page 4-22 it is stated that as many as 1,753 wells could be drilled; on page 2-2, the number of wildcat wells in Table 2-1 adds up to 1,789; and the figures in Appendix B (except for the Little Snake Resource Area) do not match any of the above figures.  Which numbers are correct?

18 { Second, we believe the document would be easier to understand if, for the proposed action, you would itemize in one place all of the major changes that are proposed in the five RMP's.

17 { Third, for all of the proposed changes to the RMP's, you need to justify why such changes are necessary or desirable.  This was not done, leaving you vulnerable to a legal challenge.

50 { Fourth, we strongly object to the use of worst case development scenarios when projecting future activity.  Furthermore, the Council on Environmental Quality condemns this approach as well.  A reasonably foreseeable development scenario should be based on historical trends.  For example, based on historical data, the BLM predicts that 550 wells will be drilled in the Little Snake Resource Area over the next 20 years.  However, the BLM doubled its projections to 1000 wells. This approach greatly exaggerates the anticipated impacts from oil and gas

**23**

- 2 -                                                                                 August 17, 1990

activities, which in turn is used as justification for more restrictive, yet unnecessary, stipulations. To grossly overstate such historical trend figures only serves to distort what is reasonably anticipated and to overcompensate for impacts that very likely will never occur.

147  Our fifth concern relates to Chapter 4, "Environmental Consequences". This chapter exaggerates and misrepresents the impacts from oil and gas activities because it does not discuss the requirements and protections provided through the use of standard and special lease stipulations. These stipulations significantly reduce or eliminate virtually all of the impacts identified. Without a discussion of these stipulations, the public will be seriously misinformed about the BLM's role in managing oil and gas activities. The BLM should limit its discussion to potential effects which could occur with the lease stipulations in effect for each alternative.

Sixth, we are strongly opposed to the Glenwood Springs Resource Area's proposed stipulation which would require oil and gas lessees to compensate for the loss of crucial habitat, either on-site or off-site. This stipulation is unreasonable because of the small amount of acreage involved in oil and gas activities, combined with the temporary nature of such activities. Furthermore, the oil and gas industry should not be singled out from all other resource area users to pay for habitat improvements. We know from the frequent presence of wildlife on our roads and wellsites that our operations have a minimal negative impact, and sometimes even a positive impact, on wildlife. Can the same be said of other resources area users?

We question the BLM's justification for the proposed use of this stipulation: the reduction in big game winter ranges as the result of industry's activities. The level of oil and gas activity predicted by the BLM does not support the claim that ungulates would be forced to compete for winter range due to oil and gas operations. If there is competition for winter range, it would be more likely to result from overpopulation—which should then be worked out between the Colorado Division of Wildlife and the BLM.

69  Another serious concern with this proposed stipulation is its vague wording—how are "adverse impacts" going to be defined and predicted in advance? Such vague wording will very likely lead to confusion and the unwarranted use of this stipulation.

We are also convinced that this stipulation is not justified. The Glenwood Springs Resource Area (GSRA) predicts that with an average of 2.7 wells drilled per year there would be approximately 78.8 acres disturbed annually (which seems awfully high). According to Chapter 3 of the DEIS, 208,000 acres of mule deer winter range are crucial habitat, and 156,000 acres of elk winter range are considered crucial. No other species were identified as having its crucial winter range possibly impacted by oil and gas activities. Can the GSRA truly believe that an annual surface disturbance of 78.8 acres would have more than a minimal impact on the 263,000 acres of crucial habitat for these two species? Its objectivity and credibility would be seriously jeopardized if it insisted on

---

**23**

- 3 -                                                                                 August 17, 1990

the same. This stipulation is patently unreasonable and unnecessary, and should be deleted.

57  Seventh, we are disturbed by the GSRA's overwhelming increase in the use of the No Surface Occupancy stipulation—from 45,046 acres to 365,419 acres—an 800% increase! Less than half the GSRA would be available for lease with surface occupancy, and of those acres available, they would all apparently contain a controlled surface use stipulation as well as a timing limitation stipulation. The GSRA appears to be trying to exclude all oil and gas activities from the entire resource area, without any justification whatsoever. This approach amounts to a de facto withdrawal of land, and is unacceptable.

27  Our eighth concern is the lack of resource area maps which would show what stipulations would be applicable by alternative—we believe this information must be included in the final EIS in order to satisfy site specificity requirements.

Ninth, we believe the discussion of mitigation measures that will be used under
28  all the alternatives, on page 2-3, uses an inflammatory and unrealistic example by discussing the terrible effects of oil and gas activities on elk if the BLM did not manage the situation. Since the BLM does control and monitor our activities, this discussion is unrealistic, serves no purpose, and should be deleted.

250  Tenth, the figures throughout Appendix B need to be reexamined. It is inconsistent and confusing. Furthermore, the maps and data provided by each resource area should be standardized so they are all on the same scale, and are using the same definition of high, medium, low and unknown potential.

285  Eleventh, in Appendix F, page F-1, it is stated that one of the conditions of approval for the GSRA and Little Snake Resource Area in fragile soil areas is: "7) Before reserve pits, production pits, on emergency pits can be reclaimed, all residue will be removed and trucked off-site to an approved disposal site." Other alternatives must be considered. Since drilling mud is not toxic and is exempt from the Resource Conservation and Recovery Act, we do not believe it is reasonable to have such a strict requirement in these two resource areas. For example, Chevron quite often will solidify the solids with cement after the liquids are hauled off, which is a safe and commonly-used alternative.

We hope these comments have been constructive and will aid you in making necessary changes to your draft. Thank you for your consideration of our comments.

Sincerely,

Lisa Mercier

cc:   Mr. Frank Salwerowicz
      BLM Deputy State Director,
      Mineral Resources

---



**24**

UNITED STATES DEPARTMENT OF THE INTERIOR
FISH AND WILDLIFE SERVICE
FISH AND WILDLIFE ENHANCEMENT
Colorado State Office
730 Simms Street, Suite 290
Golden, CO  80401
FTS 776-2675
COMM (303) 236-2675

IN REPLY REFER TO:
FWE/CO:BLM:Co Oil & Gas Leasing
Mail Stop 65412 Grand Junction

August 21, 1990

Memorandum

To:       Team Leader, Combined Oil and Gas Plan Amendment/EIS, Bureau of
          Land Management, Grand Junction, Colorado

From:     Colorado State Supervisor, Fish and Wildlife Enhancement, Fish and
          Wildlife Service, Golden, Colorado

Subject:  Comments on Colorado Oil and Gas Leasing Draft EIS

We offer the following comments on your Combined Oil and Gas Plan Amendment/EIS which covers the Glenwood Springs, Kremmling, Little Snake, Northeast, and San Juan/San Miguel Resource Areas. First, we have published a
112  new candidate plant list February 21, 1990, in the Federal Register (55 FR 6184). Since we sent you a previous species list on this project on June 16, 1989, we are therefore sending you an updated plant candidate list.

| Common Name | Scientific Name |
|---|---|
| **Glenwood Springs** | |
| Wetherill milkvetch | Astragalus wetherillii |
| Parachute beardtongue | Penstemon debilis |
| Harrington beardtongue | Penstemon harringtonii |
| DeBeque phacelia | Phacelia submutica |
| **Kremmling** | |
| Harrington beardtongue | Penstemon harringtonii |
| **Little Snake** | |
| Hamilton milkvetch | Astragalus hamiltonii |
| Wetherill milkvetch | Astragalus wetherillii |
| Ownbey thistle | Cirsium ownbeyi |
| Gibbens beardtongue | Penstemon gibbensii |

---



**24**

Page 2

| Common Name | Scientific Name |
|---|---|
| **Northeast** | |
| none | |
| **San Juan/San Miguel** | |
| Mancos columbine | Aquilegia micrantha |
| Cronquist milkvetch | Astragalus cronquistii |
| Schmoll milkvetch | Astragalus schmolliae |
| Mesa Verde stickseed | Hackelia gracilenta |
| Pagosa skyrockets | Ipomopsis polyantha var. polyantha |
| Frosty bladderpod | Lesquerella pruinosa |

Also, Osterhout milkvetch (Astragalus osterhoutii) and Penland beardtongue (Penstemon penlandii) are federally listed as endangered, whereas they appear on Table 3-7 on page 3-8 as federally threatened.

No Surface Occupancy Stipulations (NSO) are listed in your Appendix E for various resources/values in the different resource areas including candidate, threatened, and endangered species. With a forty-acre minimum, NSO's are most effective for protecting large populations of high concentration. In this
III  regard, we recommend NSO's for the Osterhout milkvetch and Penland beardtongue in the Kremmling Resource Area, and the Gibbens beardtongue in the Little Snake Resource Area. Maps showing the recommended NSO's are attached. These species have been adequately surveyed and known populations of high concentration delineated.

Additionally, the June 16, 1989, memorandum discussed the importance of the
16  Section 7 consultation process. However, we do not find any attention to the Section 7 process anywhere in the EIS. This should be corrected.

The Fish and Wildlife Service, with the cooperation of the BLM and Colorado Division of Wildlife, is currently evaluating black-footed ferret reintroduction sites in Colorado. At the present time, this is ongoing in the Little Snake and White River Resource Areas. Eventually, however, all BLM
142  resource areas in Colorado will receive similar consideration. We therefore recommend changes to the EIS to recognize the implications the ferret reintroduction process may have on the management of prairie dogs on BLM lands.

The Fish and Wildlife Service is preparing guidelines for oil and gas activities in black-footed ferret recovery areas. A copy of the draft guidelines has been provided to Mr. Lee Upham and Mr. Bob Kline. The draft

BLM_0006090

**24**

Page

EIS should incorporate reference to these guidelines where appropriate with a commitment to adopt specific mitigation techniques where necessary.

**193** The Fish and Wildlife Service believes that major causes for the decline of the Colorado squawfish, humpback chub, bonytail chub, and the recently proposed razorback sucker, include the effect of impoundments and water depletion from Colorado River and its tributaries such as the San Juan. Since oil and gas drilling involves a depletion of water, we believe that any action made possible by your Oil and Gas leasing EIS that causes a depletion of water from the upper Colorado River basin should prompt a "may effect" finding for the listed and proposed fishes and necessitate consultation and conferencing under the Endangered species Act.

**192** As we have previously discussed, the most efficient way to handle the many small depletions from individual wells would be to make an estimate of total depletion for the four resource areas in the upper Colorado River basin covered in the EIS. This estimate could be based on the Assumptions for the Potential of Development already presented in Appendix B.

This way the impacts to the endangered Colorado River fishes could be covered by one biological assessment and one biological opinion at the leasing stage, rather than many such documents for every oil and gas well authorized through the subsequent Application for Permit to Drill process.

Specific Comments

FWS Memo of 6/16/89

**34** Page 2-9: Based on this table only, there appears to be only minor differences between the three plans. It is not clear what advantage the proposed amendment has to resource protection or the administration of oil and gas leasing.

**104** Page 3-2): Threatened and endangered species. This section should receive consistent treatment for each planning area. For example, there should be a table for each resource area, similar to Table 3-8D prepared for the Northwest Planning Area. Each planning area should include those lists of species provided by the FWS to the BLM on June 16, 1989. The razorback sucker was proposed for Federal listing on May 22, 1990, and is therefore no longer a candidate species.

**110** Page 3-26, left-hand column: The process of identifying potential black-footed ferret reintroduction sites will occur throughout all of Colorado. Consequently, we believe this paragraph should recognize that evaluation of candidate sites will eventually occur in all of the planning areas discussed in the EIS, not only northwest Colorado. Prairie dog abundance may be more than adequate to support black-footed ferrets in many other Resource areas.

Page 4-1, right-hand column: This paragraph should recognize that informal and/or formal consultation may be required under Section 7 of the

**24**

Endangered Species Act. This consultation may in some cases be appropriate a the learning rather than the operational stage.

**178** Page 4-5, right-hand column: What is "...the protection for T&E species." We believe it is premature to say that significant impacts to threatened and endangered species will not occur. Based on current inventories, there are 62,000 acres of prairie dog habitat in the Little Snake Resource Area. We are not aware of similar inventories in the other resource areas but suspect significant prairie dog acres in the San Juan/San Miguel Planning Area also. Consequently, we believe this section should recognize the guidelines for Oil and Gas Activities in Prairie Dog Ecosystems Managed for Black-footed Ferret Recovery being prepared by the Fish and Wildlife Service. It is not clear to us how the application of appropriate mitigation listed in Appendix D will preclude significant impacts. The key language in Appendix D, page D-7, appears to be "...effectively mitigate...to the degree that existing development rights are not unduly hindered or precluded."

Page 4-24, left-hand column: It is true that threatened and endangered species are covered by laws and regulations. However, it is possible for significant impacts to result from some activities. For example, while Section 7 of the Endangered Species Act requires a consultation process, impacts below the jeopardy-causing threshold may occur. We believe it is inappropriate to imply that the existence of laws will prevent significant impacts.

**248** Page 8-2: According to this table, the Little Snake Resource Area could realize the greatest surface disturbance of all the planning areas evaluated. Development in prairie dog towns prior to their evaluation for black-footed ferret recovery could compromise potential reintroduction proposals.

Page E-1, left-hand column: It is unclear what minor inventories or short-term special studies include. We can imagine a lessee arguing against mapping prairie dog towns and/or completing black-footed ferret searches.

Page D-2: Threatened and endangered species. We believe this section should restate the possibility of the consultation that could be required under section 7 of the ESA, and the guidelines for oil and gas activities in ferret recovery areas being prepared by the FWS.

**271** Page E-2: No surface occupancy. Until black-footed ferret recovery potential has been evaluated in each planning area, and reintroduction decision documents are in place, we believe all prairie dog towns in each planning area should be designated NSO. According to the peregrine falcon recovery plan for the Rocky Mountain Southwest Populations, recovery task number 131 states that permanent disturbances be prohibited within 1 mile of falcon nesting cliffs. We believe the NSO stipulation should adopt this recommendation.

**24**

Page 5

**286** Appendix L: A threatened and endangered species animal list needs to be added here. There should be a similar appendix for the Kremling and Northeast Planning areas.

If the Service can be of further assistance, please contact John Anderson (plants) or Bob Leachman (animals) of the Grand Junction office at (303) 243-2778 or FTS 322-0351.

*Ruth L. Coop*

attachments

cc: FWS/FWE, Salt Lake City
    FWS/FWE, Grand Junction

**25**

WEMINUCHE GROUP
Sierra Club
P.O. Box 1696
Durango, CO 81301

August 15, 1990

Robert W. Kline
Bureau of Land Management
764 Horizon Drive
Grand Junction, Co. 81506

Dear Mr. Kline:

After reviewing and discussing the recently released Draft EIS titled "Colorado Oil and Gas Leasing" our group has the following comments:

**13** The high amount of acreage open to leasing for oil and gas development shows an unbalanced management plan. Favoring the demands of oil and gas companies over other land users is apparent.

**70** No Surface Occupancy stipulations are cited as the method for protecting crucial wildlife areas and vegetation. It is our understanding that these stipulations are frequently waived at the request of developers and consequently offer little real protection. If an area is to be truly protected it should not be leased. NSO stipulations should not be waived.

Impacts to wildlife from roads, legal and illegal human activity, noise and disturbance of habitat would be many. We would like to see specifics for maintaining habitat at the time of the oil and gas activity, not "within a few years"(p4-4 describing the time it takes to reclaim disturbed areas).

**197** The statement (p4-8) "Some long term loss and irretrievable and irretrievable commitments of wildlife resources would occur, but no significant losses in wildlife populations or habitat would be expected" is open to question. How much is "significant"?

**209** Degradation of water quality is another issue that concerns us. The problems created by oil and gas development along the Colorado/New Mexico state line are well known. Migration of methane into adjacent water sources is a very real threat as is the depletion of overlying aquifers. We believe that it is likely to occur and would have a significant effect on water quality.

We appreciate this opportunity to comment and request that we be kept informed of further developments on oil and gas leasing

BLM_0006091

**25**

of BLM lands in Colorado.

Sincerely,

*Patricia L. Schuler*

Patricia L. Schuler
Conservation Chair

---

**26**



RAFTOPOULOS RANCHES

803 Stout Street
Craig, Colorado 81625
(303) 824-5750

August 10, 1990

Mr. Bob Moore
State Director
Bureau of Land Management
Colorado State Office
2850 Youngfield Street
Lakewood, Colorado 80215-7076

Dear Mr. Moore:

We would once more like to reiterate our opinions concerning the actions being taken in accordance with the Colorado Oil and Gas Leasing Environmental Impact Statement dated April 1990.

When the Little Snake RMP was in its draft stages, the NW Colorado Ranchers Association protested priority management areas where there were federal minerals with fee surface. To our knowledge, changes were made so that no restrictions would be placed on fee surfaces, resulting in the elimination of priority management areas. Our conclusion was that whenever any planning was to be made concerning federal minerals covered by fee surfaces that those land owners would be contacted for their input.

We are extremely anxious due to restrictions being placed on exploration, drilling and development activities during the time that wildlife are having their young. yet there are no similar stipulations to protect critical lambing and calving grounds for the same justifications. (Reference June 1989 Record of Decision, Page 12 Table 4). In all fairness to those affected. if restrictions are to be placed on oil and gas exploration for wildlife concerns similar restrictions should also be placed upon exploration, drilling and development activities for livestock purposes.

During the period from March 15 through June 30 the livestock industry is engaged in both its lambing and calving seasons. It is an exceptionally crucial stage for our business. Abnormal human or vehicular activities during this time period create inordinate stress on the livestock, which in turn will impede the crucial bonding between a mother and her offspring. If this bonding stage is hampered or impeded, a loss of lambs and calves will occur, a loss which can be detrimental to our industry.

74

71

---

**26**

Mr. Bob Moore
August 10, 1990
Page Two

There has been a precedent set as to restricting Oil and Gas activities during the critical period of time for the livestock industry. We would like to see these restrictions utilized further. We once again stress that we are very willing to work with the Bureau of Land Management in resolving this issue and would hope that we would not have to bring up the question of access or litigation in order to have our concerns incorporated into the Oil & Gas EIS.

Sincerely,

RAFTOPOULOS BROTHERS

*Steve Raftopoulos*
Steve Raftopoulos

cc: Bill Pulford, Craig District Manager
    Glen Secrist, Little Snake Resource Area Manager

---

**27**

| United States Department of Agriculture | Forest Service | Rocky Mountain Region | 11177 W. 8th Avenue Box 25127 Lakewood, CO 80225-0127 |
|---|---|---|---|

Reply to: 2920

Date: August 27, 1990

Mr. Robert W. Kline
Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction CO 81506

Dear Mr. Kline:

The opportunity to comment on your Draft EIS and RMP Amendment for oil and gas leasing in Colorado is appreciated. Our office is currently determining a process for leasing decisions in Region 2, and the legal, procedural, and environmental questions to be resolved in leasing decisions are numerous.

Because we are analyzing our process at this time, our comments will primarily relate to our perception of the procedures your agency has used. Other portions will no doubt provide comments on those and in response to areas listed in the Table of the management of specific areas.

The following comments are offered:

1. The discussions which interested parties have revealed that such are apparent of the NEPA decision points, and especially the relationship of the leasing activity and the gas development process. These discussions have had its problems that are not solved. A diagram and chart discussion of how the decisions being made in this document relate to the overall process might be useful. The same type of discussion is applicable to how the EIS process works. What happens when this document is approved might answer some questions. The proposed action, purpose and need, and decisions to be made are somewhat obscure and require careful reading.

2. Page 2-2 - What appears to be developed from a "worst case scenario". Is this statement a problem legally?

3. Page 2-2 - What happens if the POD is exceeded during the planning period of 20 years? Is there a threshold amount that allows for an additional percentage of the projected disturbance before an additional NEPA analysis is required?

4. Page 3-6 - Is there any old growth timber that could become an issue?

5. Page 3-1 - The different types are lack of page is somewhat confusing.

6. Page 3-40 - Some of the wilderness study areas may be adjacent to the old RARE II or roadless areas in the National Forests. The BLM and FS should coordinate the study of these areas to ensure that geographical boundaries are consistent and not agency boundaries.

12

50

46

80

27

127

Caring for the Land and Serving People

FS-6200-28(7-82)

---

Mr. Robert W. Kline
August 27, 1990
Page 2.

**27**

203
> 7. Page 4-24 - Although the cumulative effects of wildcat wells are generally insignificant, do field developments have effects that may be significant in some areas, for example, visuals or wildlife habitat? If the fields are only a few wells, the effect would be small. However, a large field of 50 wells could be significant.

208
> 8. Are there any plans for monitoring sediment loads, wildlife populations, etc. to determine the effects of oil and gas activities?

239
> 9. Appendix A - This section appears to be generalized oil and gas operations and could be confused with the proposed action alternative.

249
> 10. Appendix B - Some of the data and maps are difficult to understand. Are they needed for the document?

270
> 11. Appendix E - How are overlapping stipulations managed? Presumably, the most restrictive stipulation will be applied. The possibility and desirability of standardized leases between the BLM and FS to eliminate inconsistencies across boundaries has been discussed. The Montana BLM stipulations appear to be a good start, and we should pursue this opportunity in the near future.

Hopefully these comments will be useful in writing your final document. We will utilize some of your ideas in determining our process. We should strive to minimize the inconsistencies in the oil and gas surface management. If we do this, the interested publics will no doubt point them out to us.

If you have questions regarding the above comments, please contact Ed Phillips or Vern Schmitt at this office.

Sincerely,

CHARLES J. HENDRICKS
Director, Watershed, Soils, and
Minerals Area Engineering

BP:rp

---



**CYPRUS**
**Empire Corporation**

P.O. Box 66
Craig, Colorado 81626
303-824-8246

**28**

September 18, 1990

Mr. Robert W. Kline, Project Manager
Bureau of Land Management
764 Horizon Drive
Grand Junction, Colorado 81506

Dear Mr. Kline:

RE: Comments of Colorado Oil and Gas Leasing Draft: Environmental Impact Statement (EIS)

Cyprus Empire Corporation (CEC) does not believe that the above referenced EIS recognizes the significance of the potential conflicts between oil and gas development and the development of other mineral resources (particularly coal).

225
> Many coal resources can only be economically developed with the use of longwall mining techniques. The economics of coal mining and particularly longwall mining are dependent upon large continuous uninterrupted blocks of coal. Even one or two wells could sterilize an entire area from economic recovery. Coal mines (again particularly longwall mining) require large capital investments, long term commitment and large reserves in order to obtain a return on their investment.

224
> Therefore, just because there is no current mining in an immediate area does not mean there will not be significant future conflicts. Furthermore, freezing and other oil and gas development techniques could destroy roof and floor conditions, etc. causing permanent loss of coal resource even after oil and gas has been removed and wells are abandoned.

As a result, CEC recommends that the EIS be modified to require BLM to notify by certified mail all other mineral owners, lessees or parties which have expressed interest in other minerals on or directly adjacent to proposed oil and gas leases before issuance of any oil and gas leases or permits to drill.

We appreciate your consideration of this recommendation. Please feel free to contact us if additional details are needed.

Sincerely,

Ronald W. Stucki
Vice President; General Manager

RWS:dg

cc: Glen Secrist (BLM Area Manager LSRA)
    Jim Dodd
    Rick Mills
    Terrall Johnson

BLM_0006093



**United States Department of the Interior**
Bureau of Land Management
Colorado State Office
Colorado                                            October 1991



# WILDERNESS STUDY REPORT
## Volume Two, Pages 169-352
# Montrose District Study Areas



BLM_0006094

BLM_0006095

# TABLE OF CONTENTS

## Wilderness Study Area

### Volume 1 CRAIG DISTRICT

Bull Canyon   CO-010-001 . . . . . . . . . . . . . . . . . . . 3

Willow Creek   CO-010-002 . . . . . . . . . . . . . . . . . 17

Skull Creek   CO-010-003 . . . . . . . . . . . . . . . . . . 31

Black Mountain   CO-010-007A . . . . . . . . . . . . . . . . 45

Windy Gulch   CO-010-007C . . . . . . . . . . . . . . . . . 55

Oil Spring Mountain   CO-010-046 . . . . . . . . . . . . . . . 65

Platte River Contiguous   CO-010-104 . . . . . . . . . . . . . 75

Troublesome   CO-010-155 . . . . . . . . . . . . . . . . . . 83

West Cold Spring   CO-010-208 . . . . . . . . . . . . . . . . 93

Diamond Breaks   CO-010-214 . . . . . . . . . . . . . . . . 105

Ant Hills   CO-010-224 . . . . . . . . . . . . . . . . . . . 117

Chew Winter Camp   CO-010-224A . . . . . . . . . . . . . 127

Peterson Draw   CO-010-226 . . . . . . . . . . . . . . . . . 135

Vale of Tears   CO-010-229D . . . . . . . . . . . . . . . . . 145

Cross Mountain   CO-010-230 . . . . . . . . . . . . . . . . 153

### Volume 2   MONTROSE DISTRICT

Bill Hare Gulch   CO-030-085 . . . . . . . . . . . . . . . . 169

Larson Creek   CO-030-086 . . . . . . . . . . . . . . . . . 175

Redcloud Peak   CO-030-208 . . . . . . . . . . . . . . . . . 183

American Flats   CO-030-217 . . . . . . . . . . . . . . . . . 197

Handies Peak   CO-030-241 . . . . . . . . . . . . . . . . . 205

Menefee Mountain   CO-030-251 . . . . . . . . . . . . . . . 219

Weber Mountain   CO-030-252 . . . . . . . . . . . . . . . . 231

Cross Canyon   CO-030-265 . . . . . . . . . . . . . . . . . 243

Squaw/Papoose Canyon   CO-030-265A . . . . . . . . . . . . 255

# TABLE OF CONTENTS continued
## Wilderness Study Area                                          Page

Cahone Canyon    CO-030-265D . . . . . . . . . . . . . . .  267

McKenna Peak    CO-030-286 . . . . . . . . . . . . . . . .  279

Dolores River Canyon    CO-030-290 . . . . . . . . . . . . . 291

Tabeguache Creek    CO-030-300 . . . . . . . . . . . . . . . 301

Camel Back    CO-030-353 . . . . . . . . . . . . . . . . .  311

Adobe Badlands    CO-030-370B . . . . . . . . . . . . . . .  323

Gunnison Gorge    CO-030-388 . . . . . . . . . . . . . . . . 337

## Volume 3   CANON CITY DISTRICT

Browns Canyon    CO-050-002 . . . . . . . . . . . . . . . . 353

McIntyre Hills    CO-050-013 . . . . . . . . . . . . . . . .  363

Lower Grape Creek    CO-050-014 . . . . . . . . . . . . . .  373

Beaver Creek    CO-050-016 . . . . . . . . . . . . . . . . . 385

Upper Grape Creek    CO-050-017 . . . . . . . . . . . . . .  399

Sand Castle    CO-050-135 . . . . . . . . . . . . . . . . . 409

San Luis Hills    CO-050-141 . . . . . . . . . . . . . . . .  417

## Volume 4   GRAND JUNCTION DISTRICT

Demaree Canyon    CO-070-009 . . . . . . . . . . . . . . .  427

Little Book Cliffs    CO-070-066 . . . . . . . . . . . . . .  439

Black Ridge Canyons    CO-070-113 . . . . . . . . . . . . .  451

Black Ridge Canyons West   CO-070-113A . . . . . . . . . .  463

The Palisade    CO-070-132 . . . . . . . . . . . . . . . . . 477

Dominguez Canyon    CO-070-150 . . . . . . . . . . . . . .  487

Sewemup Mesa    CO-070-176 . . . . . . . . . . . . . . . . 501

Eagle Mountain    CO-070-392 . . . . . . . . . . . . . . . . 511

Hack Lake    CO-070-425 . . . . . . . . . . . . . . . . . . 519

Bull Gulch    CO-070-430 . . . . . . . . . . . . . . . . . . 527

Castle Peak    CO-070-433 . . . . . . . . . . . . . . . . . . 541

BLM_0006097

BLM_0006098



BLM_0006099

# BILL HARE GULCH

# WILDERNESS STUDY AREA

## The Study Area -- 406 acres

The Bill Hare Gulch WSA (CO-030-085) is located in Hinsdale County, Colorado approximately 4 miles north of Lake City. The WSA consists of 406 acres of BLM lands with no private or state inholdings. It is bounded on the north, east and south by private land and on the west by national forest land which is part of the Big Blue Wilderness. The area is depicted on the map.

This area is comprised of relatively steep terrain ranging from 8600 feet to 9400 feet in elevation. Access to the WSA is limited to a hiking trail leading in to Independence Gulch. The vegetation consists of aspen and conifer woodlands interspersed with a few open parks dominated by sagebrush, grasses and forbs. The topography is dissected by several drainages which originate on the national forest.

The WSA was studied under Section 202 of the Federal Land Policy and Management Act (FLPMA) and was included in the Gunnison Basin and American Flats/Silverton Wilderness Final Environmental Impact Statement filed in August 1987. There were three alternatives analyzed in the EIS; an all wilderness alternative, a partial wilderness alternative which proposed 313 acres for wilderness designation, and a no wilderness alternative which is the recommendation of this report.

## Recommendation and Rationale

> 0 acres recommended for wilderness
>
> 406 acres recommended for nonwilderness

The recommendation is to not designate any acres as wilderness and release all 406 acres for uses other than wilderness. The environmentally preferable alternative would be to designate the entire 406 acres as wilderness since this would result in the least change to the natural environment over the long term.

The area was not recommended for wilderness for several reasons. It was originally considered under Section 202 of FLPMA because it was adjacent to the existing Big Blue Wilderness. Addition of this area, however, would not add any significant values or features to the Big Blue Wilderness and would not improve the manageability of its boundary. The U.S. Forest Service, which manages the Big Blue, agreed with our recommendation for this area. The inaccessibility of the WSA also suggests that the character of the area is unlikely to change from its present condition.

169

BLM_0006100

| Table 1 - Land Status and Acreage Summary of the Study Area | |
| --- | --- |
| Within Wilderness Study Area | Acres |
| BLM (surface and subsurface) | 406 |
| Split Estate(BLM surface only) | 0 |
| Inholdings(State, Private) | 0 |
| Total | 406 |
| **Within the Recommended Wilderness Boundary** | |
| BLM (within WSA) | **0** |
| Split Estate (outside WSA) | **0** |
| Split Estate (within WSA) | **0** |
| Total BLM Land Recommended for Wilderness | **0** |
| Inholdings (State, Private) | **0** |
| Within the Area not Recommended for Wilderness | |
| BLM | 406 |
| Split Estate | 0 |
| Total BLM Land Not Recommended for Wilderness | 406 |
| Inholdings (State, Private) | 0 |

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The Bill Hare Gulch WSA is predominantly natural with negligible human impacts. Access from the adjacent highway is possible along a steep rocky footpath. The WSA includes the lower end of three gulches whose upper portions are part of the Forest Service Wilderness. The terrain is steep with limited access. The vegetation consists of aspen and conifers with shrubs along the drainages.

#### Solitude

The WSA contains 406 acres which would not by itself provide outstanding opportunities for solitude.

It is, however, adjacent to the 98,320 acre Big Blue Wilderness which does provide outstanding opportunities for solitude.

#### Primitive and Unconfined Recreation

Because of its small size, the WSA itself does not provide outstanding opportunities for primitive recreation. When taken along with the contiguous Big Blue Wilderness the area would not significantly add to opportunities for backpacking, hiking, fishing, hunting or nature study. The main access trail for the eastern part of the wilderness passes through this WSA and would be expected to remain open no matter what decision is made on wilderness.

#### Special Features

The area contains no special features or values.

BLM_0006101

## DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

*Assessing the diversity of natural systems and features as represented by ecosystems*

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilder- ness Preservation System (NWPS). The Rocky Mountain Forest Province is well represented in the NWPS. Existing wilderness in this area includes large acreages of the sagebrush meadows, aspen woodlands and spruce-fir forest found in this WSA.

### TABLE 2 - Ecosystem Representation

| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas acres | | Other BLM Studies areas acres | |
|---|---|---|---|---|
| *Nationwide* | | | | |
| Rocky Mt. Forest Province | | | | |
| Southwestern Spruce-Fir Forest | 10 | 612,622 | 13 | 51,528 |
| *Colorado* | | | | |
| Rocky Mt. Forest Province | | | | |
| Southwestern Spruce- Fir Forest | 6 | 406,528 | 13 | 51,528 |

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The WSA is within a day's driving time of two major population centers (Standard Metropolitan Statisti- cal Areas of 100,000 or more), Colorado Springs and Pueblo. Table 3 summarizes the number and acreage of designated areas and other BLM Study Areas within a day's drive of these population centers.

### TABLE 3 - Wilderness Opportunities for Residents of Major Population Centers

| Population Center | NWPS Areas areas acres | | Other BLM Studies areas acres | |
|---|---|---|---|---|
| Denver | 20 | 1,728,410 | 21 | 372,010 |
| Boulder | 20 | 1,728,410 | 21 | 372,010 |
| Colorado Springs | 19 | 1,845,350 | 19 | 336,925 |
| Pueblo | 19 | 1,865,011 | 19 | 336,925 |

BLM_0006102

### Balancing the Geographic Distribution of Wilderness Areas

The Bill Hare Gulch WSA would not contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. In a clockwise direction beginning due north is the West Elk Wilderness (176,412 acres), La Garita Wilderness (103,986 acres), Weminuche Wilderness (459,604 acres), Mt. Sneffels Wilderness (16,505 acres) and the Big Blue Wilderness (98,320 acres).

### MANAGEABILITY

The main reason for considering this WSA is as an addition to the existing Big Blue Wilderness. It is manageable as wilderness in conjunction with the Big Blue. The steep nature of the terrain restricts the potential for vehicle incursions and recreational use is very light. Unfortunately, this areas would not improve the manageability of the eastern boundary of the wilderness. Its irregular shape, lack of

identifiable topographic features along the border and closer proximity to vehicle access would further complicate the manageability of the wilderness boundary.

### ENERGY AND MINERAL RESOURCE VALUES

The *Mineral Summaries* prepared for BLM by U.S. Geological Survey and Bureau of Mines in 1990 states that no mineral resources have been identified in the study area. The WSA has a low mineral resource potential for metals, including uranium, and for coal, oil, gas, and geothermal energy.

### IMPACTS ON RESOURCES

The following table of comparative impacts summarizes the effects on pertinent resources for all alternatives considered including designation or nondesignation of the entire area as wilderness.

| Table 4 - Comparative Summary of the Impacts by Alternative | | | |
| --- | --- | --- | --- |
| **Impact Topics** | **Recommendation: No Wilderness Alternative** | **All Wilderness Alternative** | **Partial Wilderness Alternative** |
| *Impacts on Wilderness Values* | *No protection will be provided, however, wilderness values are not expected to be affected by non-designation.* | *Wilderness values on 406 acres would be protected in the long term.* | *Wilderness values would be legislatively protected on 313 acres. Values are not expected to be impacted on the remaining 93 acres.* |
| *Impacts on Mineral Resource Development* | *Mineral resource development would not be affected by non-designation since no development is predicted.* | *Exploration would be foregone. Since the potential is low there would be no impact on mineral resource production.* | *No impact on mineral development is expected in the suitable or nonsuitable portions of the WSA.* |
| *Impacts on Recreation Use* | *Recreation use would continue to be for access to the Big Blue Wilderness and should not exceed 100 user days.* | *Designation would protect the existing setting but would not affect use within the WSA. Use would remain at about 100 user days.* | *The recreation setting would not change in either the suitable or nonsuitable areas. Use patterns or amounts (100 user days) would not change as a result of designation or non-designation.* |

BLM_0006103

## LOCAL SOCIAL AND ECONOMIC
## CONSIDERATIONS

No significant social or economic effects would occur as a result of designation or non designation of this area as wilderness.

## SUMMARY OF WSA
## SPECIFIC PUBLIC COMMENTS

During the inventory phase, eight public comments were received on this area. These comments were mostly from people who did not understand the inventory criteria or study process. Comments were concerning the size, mineral potential, boundaries and naturalness of the area and questioned its suitability for study.

During formal public review of the draft EIS, a total of 26 comments specifically addressing this WSA were received. Of those, 18 were written and 8 were oral statements received at public hearings in Lake City, Silverton and Denver. In general, 22 comments supported wilderness designation for all or part of the WSA and 4 comments supported no wilderness designation for the WSA.

Those favoring wilderness designation cited the lack of conflicts with other resources and the potential for addition to the Big Blue Wilderness as major considerations. Those opposed to wilderness designation were generally opposed to any wilderness designation on the basis that it would preclude mineral development and that there was already enough wilderness.

### County

At the time of comment the Hinsdale County Planning Commission was opposed to any additional wilderness designation within the county.

### State

The Colorado Historical Society made no recommendation, but stated their concern for possible cultural resources in all our WSAs. The Division of Wildlife, Water Conservation Board, Natural Areas Program, Division of Water Resources, Geological Survey and Department of Health had no specific comments on this area.

### Federal

The U.S. Forest Service which manages the adjacent Big Blue Wilderness supported the no wilderness alternative. The National Park Service recommended wilderness designation for this area. The Environmental Protection Agency had no objections to the recommendation. The Fish and Wildlife Service agreed no threatened or endangered species would be affected. The Air Force made no specific recommendations, but expressed opposition to any decisions that would restrict military overflight.

BLM_0006104



| | RECOMMENDED FOR WILDERNESS (NONE) | | SPLIT ESTATE (NONE) |
| RECOMMENDED FOR NONWILDERNESS | | STATE (NONE) |
| LAND OUTSIDE WSA RECOMMENDED FOR WILDERNESS | | PRIVATE (NONE WITHIN THE WSA) |

R 4 W    R 3 W

Scale 1:50,000
1 inch equals Approximately 3/4 of a mile

**Larsen Creek WSA**
**Proposal**
**CO-030-086**

1    0    1    2

N

January 1991

BLM_0006105

# LARSON CREEK

# WILDERNESS STUDY AREA

## The Study Area -- 902 acres

The Larson Creek WSA (CO-030-086) is located in Hinsdale County, Colorado, approximately 2 miles north of Lake City. The WSA consists of 902 acres of BLM lands with no private or state inholdings. It is bounded on the north and west by the Big Blue Wilderness managed by the U.S. Forest Service and on the south and east by private land. The area is depicted on the map.

This area is comprised of relatively steep terrain ranging from 8,500 feet to 10,500 feet in elevation. Access to the WSA is very limited. There are no roads or trails in the area. A road approaches the southeast boundary from private land but no public access is allowed. The vegetation consists of open rocky slopes, aspen and conifer woodlands and open parks dominated by sagebrush, grass and forbs. The topography is dissected by several drainages which originate on the national forest.

The WSA was studied under section 202 of the Federal Land Policy and Management Act (FLPMA) and was included in the Gunnison Basin and American Flats/Silverton Wilderness Final Environmental Impact Statement filed in August 1987. There were three alternatives analyzed in the EIS: an all wilderness alternative, a partial wilderness alternative which proposed 480 acres for wilderness designation, and a no wilderness alternative which is the recommendation of this report.

## Recommendation and Rationale

> 0 acres recommended for wilderness
>
> 902 acres recommended for nonwilderness

The recommendation is to not designate any acres as wilderness and to release the entire area for uses other than wilderness. The environmentally preferred alternative would be to designate the entire 902 acres as wilderness since this would result in the least change to the natural environment over the long term.

The area was not recommended for wilderness for several reasons. It was considered under Section 202 of FLPMA because it was adjacent to the existing Big Blue Wilderness. Addition of this WSA, however, would not add any significant values or features to the Big Blue and would not improve the manageability of its boundary. The U.S. Forest Service which manages the Big Blue agreed with this recommendation in their input during the public comment period. In addition, the lack of vehicle access to the WSA also suggests that the character of the area is unlikely to change from its present condition.

175

BLM_0006106

| Table 1 - Land Status and Acreage Summary of the Study Area | |
|---|---|
| Within Wilderness Study Area | Acres |
| BLM (surface and subsurface) | 902 |
| Split Estate (BLM surface only) | 0 |
| Inholdings (State, private) | 0 |
| Total | 902 |
| **Within the Recommended Wilderness Boundary** | |
| **BLM (within WSA)** | **0** |
| **BLM (outside WSA)** | **0** |
| **Split Estate (within WSA)** | **0** |
| **Total BLM Land Recommended for Wilderness** | **0** |
| **Inholdings (State, Private)** | **0** |
| Within the Area Not Recommended for Wilderness | |
| BLM | 902 |
| Split Estate | 0 |
| Total BLM Land Not Recommended for Wilderness | 902 |
| Inholdings | 0 |

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The Larson Creek WSA is predominantly natural with negligible human imprints. There are no roads or trails within the area and none could be easily developed. There is an existing road on private land along the southern boundary. While there is the possibility of vehicle incursions into the unit from that road, this has not yet been a problem.

#### Solitude

The area contains 902 acres which by itself is too small to provide outstanding opportunities for solitude. It is, however, adjacent to the Big Blue Wilderness and the two areas taken together would provide outstanding opportunities for solitude.

#### Primitive and Unconfined Recreation

Because of its small size, the WSA itself does not provide outstanding opportunities for primitive recreation unless considered as a part of the adjacent Big Blue Wilderness. There are no hiking trails and no significant fishery in Larson Creek. Public access is very difficult and no development for recreation access has been planned.

#### Special Features

The area contains no special features or values.

BLM_0006107

LARSON CREEK WSA

CO-030-086

### DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

*Assessing the diversity of natural systems and features as represented by ecosystems*

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System (NWPS). The Rocky Mountain Forest Province is well represented in the NWPS. Existing wilderness in this area includes large acreages of the sagebrush meadows, aspen woodlands and spruce-fir forest found in this WSA.

| Table 2 - Ecosystem Representation | | | | |
|---|---|---|---|---|
| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas | acres | Other BLM Studies areas | acres |
| *Nationwide* | | | | |
| Rocky Mt. Forest Province | | | | |
| Southwestern spruce-fir Forest | 10 | 612,622 | 13 | 51,528 |
| *Colorado* | | | | |
| Rocky Mt. Forest Province | | | | |
| Southwestern spruce-fir Forest | 6 | 406,528 | 13 | 51,528 |

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The WSA is within a day's driving time of four major population centers (Standard Metropolitan Statistical Areas of 100,000 or more) - Denver, Boulder, Colorado Springs and Pueblo. Table 3 summarizes the number and acreage of designated areas and other BLM Study Areas within a day's drive of these population centers

| Table 3 - Wilderness Opportunities for Residents of Major Population Centers | | | | |
|---|---|---|---|---|
| Population Center | NWPS Areas areas | acres | Other BLM Studies areas | acres |
| Denver | 20 | 1,728,410 | 21 | 372,010 |
| Boulder | 20 | 1,728,410 | 21 | 372,010 |
| Colorado Springs | 19 | 1,845,350 | 19 | 336,925 |
| Pueblo | 19 | 1,865.011 | 19 | 336,925 |

177

BLM_0006108

### Balancing the geographic distribution of wilderness areas

The Larson Creek WSA would not contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. In a clockwise direction beginning due north from this area, is the West Elk Wilderness (176,412 acres), La Garita Wilderness (103,986 acres), Weminuche Wilderness (459,604 acres), Mount Sneffels Wilderness (16,505 acres) and the Big Blue Wilderness (98,320 acres).

### MANAGEABILITY

The main reason for considering this WSA is as an addition to the existing Big Blue Wilderness. It is manageable as wilderness in conjunction with the Big Blue. The steep nature of the terrain restricts the potential for vehicle incursions and recreation use is very light. Unfortunately, inclusion of this area would not improve the manageability of the eastern boundary of the wilderness. Its irregular shape and lack of identifiable topographic features along the boundaries would further complicate the manageability of the existing wilderness boundary.

### ENERGY AND MINERAL RESOURCE VALUES

The *Mineral Summaries* prepared for BLM by U.S. Geological Survey and Bureau of Mines in 1990, states there are no identified mineral resources in the study area. The WSA has a low mineral resource potential for metals, including uranium, and for coal, oil, gas, and geothermal energy.

### IMPACTS ON RESOURCES

The following table of comparative impacts summarizes the effects on pertinent resources for all the alternatives considered including designation or nondesignation of the entire area as wilderness.

### Table 4 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| Impacts on Wilderness Values | Although no protection would be provided, wilderness values on the 902 acre WSA are not expected to be affected by nondesignation. | Wilderness values on 902 acres would be protected in the long term. | Wilderness values would be legislatively protected on 480 acres. Values would not be protected on the remaining 422 acres but they are not expected to be affected by non-designation. |
| Impacts on Mineral Resource Development | Mineral resource development is not expected to be affected by nondesignation since no development is predicted. | Exploration would be foregone. Since the potential is low there would be no impact on mineral resource production. | No impact on mineral development or exploration in the suitable or non-suitable portions of the WSA is expected. |
| Impacts on Recreation Use | Recreation use would remain at about 20 user days. | Designation would protect the existing setting but would not affect use (about 20 user days) within the WSA. | The recreation setting would not change in either the suitable or non suitable areas. Use patterns or amounts (20 user days) would not change as a result of designation or non-designation. |

BLM 0006109

LARSON CREEK WSA                                                         CO-030-086



*Photo 1. Larson Creek WSA. Larson Creek drainage.*

### LOCAL SOCIAL AND ECONOMIC EFFECTS

No significant social or economic effects would occur as a result of designation or non designation of the area as wilderness.

### SUMMARY OF WSA SPECIFIC PUBLIC COMMENTS

During the inventory phase eleven public comments were received on this area. These comments were mostly from people who did not understand the inventory criteria or the study process. Comments were concerning the size, mineral potential, boundaries and naturalness of the area and questioned its suitability for study. Three comments supported further study.

During formal public review of the draft EIS, a total of 26 comments specifically addressing this WSA were received. Of those, 18 were written and 8 were oral statements received at public hearings in Lake City, Silverton and Denver. In general, 22

comments supported wilderness designation for all or part of the WSA and 4 comments supported no wilderness designation for the WSA.

Those favoring wilderness designation cited the lack of conflicts with other resources and the potential for addition to the Big Blue Wilderness as major considerations. Those opposed to wilderness designation were generally opposed to any wilderness designation on the basis that it would preclude mineral development and that there was already enough wilderness.

### *County*

At the time of comment, the Hinsdale County Planning Commission was opposed to any additional wilderness designation within the county.

### *State*

The Colorado Historical Society made no recommendation, but stated their concern for possible cultural resources in all BLM WSAs.

179

BLM_0006110

The Division of Wildlife, Water Conservation Board, Natural Areas Program, Division of Water Resources, Geological Survey and Department of Health had no specific comments on this area.

### Federal

The U.S. Forest Service which manages the adjacent Big Blue Wilderness supported the no wilderness alternative. The National Park Service recommended wilderness designation for this area. The Environmental Protection Agency had no objections to the recommendation. The Fish and Wildlife Service agreed no threatened or endangered species would be affected. The U.S. Air Force made no specific recommendation, but expressed opposition to any decisions that would restrict military overflight.

BLM_0006111

181

BLM_0006112



| R 6 W | R 5 W | R 5 W | R 4 W |

RECOMMENDED FOR WILDERNESS

RECOMMENDED FOR NONWILDERNESS

LAND OUTSIDE WSA RECOMMENDED FOR WILDERNESS

SPLIT ESTATE

STATE (NONE)

PRIVATE

SCALE 1:100000

Miles   1   0   1   2   3

**Red Cloud WSA
Proposal
CO-030-208**

N

**January 1991**

# REDCLOUD PEAK

# WILDERNESS STUDY AREA

## The Study Area -- 36,999 acres

The Redcloud Peak WSA (CO-030-208) is located in Hinsdale County, Colorado from one to ten miles west of Lake City. The WSA includes 34,972 acres of BLM lands, 1750 acres of BLM surface with State subsurface ownership. An additional 720 acres of BLM outside the original WSA was included in the partial wilderness alternative and analyzed for manageability reasons. There are also 15 parcels of private inholdings totalling 277 acres.*

The WSA is bounded on the north by a county road and private land along Henson Creek, on the east by the Round Top Mountain Road and private land near Lake San Cristobal. The Loop Road and private land form the southern boundary and a concentration of private lands define the western limits. Roads near Red Mountain Gulch and Bent Creek have been cherrystemmed.

Within this WSA are 30 peaks over 13,000 feet and 2 peaks over 14,000 feet. At lower elevations the vegetation is aspen and spruce/fir forest with small willow communities in some riparian areas. Above timberline is an alpine tundra ecosystem dominated by grasses, sedges and forbs. Steep mountain streams, some originating from alpine lakes, radiate toward the boundary from a central ridge of mountain peaks.

The area has outstanding scenic views both internally and to surrounding natural areas such as the Big Blue Wilderness to the north and the Handies Peak WSA to the south. Wilderness designation of this area would ensure the integrity of the scenery and maintain the attraction of the Alpine Loop National Backcountry Byway. This jeep road, which follows the paths of old wagon

roads from the late 1800's is one of the area's top recreation attractions. It receives over 500,000 recreation user days annually primarily by visitors who come to appreciate the special beauty of these mountains.   The nearby towns of Lake City, Silverton and Ouray rely heavily on these visitors for the revenue generated by the goods and services they consume.

The WSA was studied under Section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the Gunnison Basin and American Flats/Silverton Wilderness Final Environmental Impact Statement filed in August 1987. There were five alternatives analyzed in the EIS; an all wilderness alternative, a no wilderness alternative and three partial wilderness alternatives. The proposal in the Final EIS was to designate 27,989 acres as wilderness. The recommendation of this report, by Secretarial decision, is to not designate any of the area as wilderness.

## Recommendation and Rationale

0 acres recommended for wilderness

36,999 acres recommended for nonwilderness

The recommendation is to not designate Redcloud Peak WSA as wilderness and to release the area for uses other than wilderness. The environmentally preferred alternative would be to designate the entire 36,999 acres as wilderness as this would result in the least change from the natural environment over the long term.

The Secretary of the Interior has recommended that this area not be designated wilderness due to the occurrence of an identified large alunite deposit in

*NOTE: Acreages presented here are different from those presented in the final EIS. The EIS contained an error which showed approximately 2,860 more acres in the WSA than are reflected here. The acreages portrayed here reflect an updated and more accurately measured land status in and around the WSA.

BLM 0006114

a small portion of the eastern end of the WSA, and the high potential for occurrence of undiscovered precious metals in most of the remainder of the WSA. The U.S. Geological Survey (USGS) and Bureau of Mines (BOR) have estimated that a potential value of $4.9 billion of undiscovered in-place resources may exist within this WSA, and the nearby Handies Peak WSA. Over $4 billion of this value is projected for molybdenum for which the potential for occurrence is classified as moderate. The projected values are based on assumptions and statistical analysis of probabilities of mineral occurrence, and do not consider exploration, production, and transportation costs or market availability. See page 189 for further mineral information and for references to USGS publications.



*Photo 1. Redcloud Peak WSA. Looking Northeast from Burrows Park toward Redcloud Peak (14,034 ft.) and Sunshine Peak (14,001 ft.).*

BLM_0006115

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The Redcloud Peak WSA is predominately natural with negligible human imprints. The rugged topography has kept vehicle incursions to a minimum. There is a way extending 1 miles up the Cooper Creek drainage as access to a cluster of private inholdings. A newly constructed vehicle route extends approximately 2 miles up Silver Creek to provide access for mineral exploration on private inholdings. There is also an old road, cherry-stemmed in the original study but included in the partial wilderness alternatives, located between Bent Creek and Williams Creek. This road has been closed to traffic for several years and is slowly revegetating.

The rest of the WSA is a good example of natural ecosystems in the southern Rocky Mountains. There are healthy populations of mule deer, elk, bighorn sheep and many other wildlife species. Spruce, fir and aspen forests dominate the lower elevations and the alpine tundra ecosystem is prevalent above timberline.

#### Solitude

The Redcloud Peak WSA contains outstanding opportunities for solitude. The WSA is extremely rugged with high mountain peaks and numerous valleys. This highly dissected topography provides numerous opportunities for solitude. In the upper portion of the drainages, the mountainous terrain with its expanses of alpine tundra and open



*Photo 2. Redcloud Peak WSA. Looking northwest up Bent Creek toward Redcloud and Sunshine Peaks.*

BLM_0006116

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 94 of 418

## Table 1 - Land Status and Acreage Summary of the Study Area

| Within the Wilderness Study Area | Acres |
|---|---|
| BLM (surface and subsurface) | 34,972 |
| Split Estate (BLM surface only) | 1,750 |
| Inholdings (State, Private) | 277 |
| Total | 36,999 |
| **Within the Recommended Wilderness Boundary** | |
| **BLM (within WSA)** | **0** |
| **BLM (outside WSA)** | **0** |
| **Split Estate (within WSA)** | **0** |
| **Split Estate (outside WSA)** | **0** |
| **Total BLM Land Recommended for Wilderness** | **0** |
| **Inholdings (State, Private)** | **0** |
| Within the Area Not Recommended for Wilderness | |
| BLM | 34,972 |
| Split Estate | 1,750 |
| Total BLM Land Not Recommended for Wilderness | 36,722 |
| Inholdings (State, Private) | 277 |

scenic vistas, projects a feeling of vastness and of being alone. The lower elevations are often heavily forested and create a feeling of total seclusion.

### Primitive and Unconfined Recreation

This WSA, with its relatively large size and varied topography, contains outstanding opportunities for primitive and unconfined recreation. While topography often encourages the use of drainages for access, the majority of the WSA allows for unconfined freedom of movement.

The mountain peaks, particularly the two fourteen thousand foot peaks, attract many climbers. There are also opportunities for hiking, fishing, hunting, photography, horseback riding and nature study. Scenic values are extremely high in the Redcloud Peak WSA.

### Special Features

Redcloud Peak (14,034 feet) and Sunshine Peak (14,001 feet) are two of Colorado's 54 peaks over 14,000 feet. They are also two of the easiest to climb. This attracts many climbers each summer.

BLM_0006117

REDCLOUD PEAK WSA

CO-030-208

The area is high in educational and scientific study potential. The Colorado Outward Bound School regularly uses the area to teach skills in backcountry living and wilderness survival. Volcanic and Precambrian rock types are inter-mingled and glacial geomorphology is highly evident. There are also several rock glacier formations in the WSA. This unusual phenomena occurs when rocks in a steep talus slope "flow" downhill in a glacier-like manner. These charac-teristics make the WSA popular with geologic field trips from various colleges and universities.

The endangered Colorado cutthroat trout has been reintroduced in Cooper Lake and the Cooper Creek drainage. In 1978 a potentially new species of butterfly, the Uncompahgre Peak Fritillary, was discovered in this region. Only two populations were found, one on National Forest lands near Uncompahgre Peak and one in the Redcloud Peak WSA. The species has been listed as an endan-gered species. Field studies over the past few years indicate the population in the WSA is the largest and most viable of the known populations of this species. This discovery is one of only two new butterfly species to be classified this century.

## DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

### Assessing the diversity of natural systems and features as represented by ecosystems

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System (NWPS). The Rocky Mountain Forest Province is well repre-sented in the NWPS. Forest Service lands already designated as wilderness include large acreages of the southwestern spruce-fir forest, alpine meadows and barren vegetative classification types found in this WSA.

| Table 2 - Ecosystem Representation | | | | |
|---|---|---|---|---|
| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas | acres | Other BLM Studies areas | acres |
| *Nationwide* | | | | |
| Rocky Mountain Forest Province | | | | |
| Alpine Meadows and Barren | 32 | 1,988,190 | 6 | 54,741 |
| Southwestern Spruce-Fir Forest | 10 | 612,622 | 13 | 51,528 |
| *Colorado* | | | | |
| Rocky Mountain Forest Province | | | | |
| Alpine Meadows and Barren | 18 | 844,387 | 6 | 54,741 |
| Southwestern Spruce-Fir Forest | 6 | 406,528 | 13 | 51,528 |

BLM_0006118

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 96 of 418

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The Redcloud Peak WSA is within a day's driving time of four major population centers (Standard Metropolitan Statistical Areas of 100,000 or more). Those are Denver, Boulder, Colorado Springs, and Pueblo. Table 3 summarizes the number and acreage of designated areas and other BLM study areas within a day's driving time of these population centers.

## Table 3 - Wilderness Opportunities for Residents of Major Population Centers

| Population Center | NWPS Areas | | Other BLM Study Areas | |
|---|---|---|---|---|
| | areas | acres | areas | acres |
| Denver | 20 | 1,728,410 | 21 | 372,010 |
| Boulder | 20 | 1,728,410 | 21 | 372,010 |
| Colorado Springs | 19 | 1,845,350 | 19 | 336,925 |
| Pueblo | 19 | 1,865,011 | 19 | 336,925 |

*Balancing the geographic distribution of wilderness areas*

The Redcloud Peak WSA would not contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. In a clockwise direction beginning due north is the Big Blue Wilderness (98,320 acres), the La Garita Wilderness (103,986 acres), the Weminuche Wilderness (459,604 acres), the Lizard Head Wilderness (41,189 acres), and the Mt. Sneffels Wilderness (16,505 acres). Also the Powderhorn Primitive Area, recommended for wilderness designation, is nearby.

BLM_0006119

## MANAGEABILITY

The WSA is manageable as wilderness. The area
is large enough and topographical and vegetative
screening make the sights and sounds of man
substantially unnoticeable. Potential obstacles to
manageability are private inholdings and State
mineral tracts within the recommended portions.
The State has expressed interest in an exchange for
their mineral estate but it is unknown how the
private landowners feel about selling their
inholdings. Possible development of these
inholdings and the associated access routes would
compromise the naturalness of the Silver Creek
and/or the Cooper Creek drainages although
topographic screening would confine the visual
impacts of such activities. It is possible such
developments will never take place.

If the area were designated wilderness, a more
manageable boundary would include approxi-
mately 720 acres of BLM land outside of the WSA
boundary. This would provide more identifiable
boundaries and close a cherry-stemmed road
which receives little use.

## ENERGY AND MINERAL RESOURCES VALUES

The U.S. Geological Survey Bulletin 1715-B
entitled *Mineral Resources of the Redcloud Peak
and Handies Peak Wilderness Study Area* was the
result of considerable fieldwork done to identify
mineral potential in these WSA's. The report
speaks of these areas generally as one unit.

Except for a large alunite deposit in a small
portion of the eastern end of the WSA, no identi-
fied mineral resources were found in the Redcloud
Peak WSA. Much of the unit has high mineral
resource potential for precious (gold and silver)
and base (principally lead zinc and copper but also
antimony, barite, bismuth, cadmium, fluorspar,
manganese, mercury, selenium, tellurium and
tungsten) metals in vein type epithermal deposits.
The unit has mostly moderate potential for these
commodities in breccia-pipe epithermal deposits.
This area has a generally low potential for molyb-
denum and copper in porphyry type deposits. The
potential for uranium in veins is moderate in half

of the WSA, low in 30% and high in 20% of the
area. There is no energy resource potential for
coal, oil or natural gas in the WSA. There is no
present production of any mineral resource in the
WSA.

Additional information developed by USGS in
1991 provides a quantitative assessment of mineral
resources that projects a potential value of $4.9
billion of undiscovered in-place minerals within
the Red Cloud Peak and Handies Peak WSAs.
Over $4 billion dollars of this value is projected to
be molybdenum, for which the potential for
occurrence is classified as moderate. These
estimates do not consider exploration, production,
or transportation costs or market availability and
are based upon a number of assumptions and
statistical analysis of the potential for in-place
resources. (See USGS Open-File Report 91-384,
"Quantitative Assessments of the Energy and
Mineral Resources within Eighteen Wilderness
Study Areas in the States of Colorado, Nevada,
Oregon and Utah," 1991).

## IMPACTS ON RESOURCES

The following comparative impact table, Table 4,
summarizes the effects on pertinent resources for
all alternatives considered including designation or
nondesignation of the entire area as wilderness.

189

REDCLOUD PEAK WSA

CO-030-208

## Table 4 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Partial Wilderness (27,969 acres) | All Wilderness Alternative | Recommendation: No Wilderness Alternative | Partial Wilderness Alternative (35,980 acres) | Partial Wilderness Alternative (10,659 acres) |
|---|---|---|---|---|---|
| Impacts on Wilderness Values | Although a total of 27,969 acres would be designated and protected as wilderness, potential mineral development resulting from valid existing rights could reduce the acreage on which wilderness values would actually be preserved to 25,969. In addition, wilderness values would eventually be lost on 9,750 acres recommended as nonsuitable as a result of alunite mining and other small mineral operations. | Although a total of 37,719 acres would be designated and protected as wilderness, potential mineral development resulting from valid existing rights could affect 3,000 acres and reduce the acreage on which wilderness values are actually preserved to 34,719. | Approximately 520 to 585 acres would be disturbed from various mineral activities. Wilderness values would be directly lost on about 11,000 acres as a result of these activities. In the long term wilderness values would be lost on the entire 37,719 acres. | Although a total of 35,980 acres would be designated and protected as wilderness, potential mineral development resulting from valid existing rights could affect 2,000 acres and reduce the acreage on which wilderness values are actually preserved to 33,980. Wilderness values would also be lost on the 1,739 acres recommended nonsuitable. | Although 10,659 acres would be designated and protected as wilderness, potential development resulting from valid existing rights could reduce the acreage on which wilderness values would be preserved to 8,659. In addition wilderness values would be lost on about 9,000 acres in the nonsuitable portion of the WSA as a result of alunite mining and other small mineral operations. In the long term wilderness values would be lost on the 27,060 acres recommended nonsuitable. |
| Impacts on Recreation Use | The existing 4,500 user days of hiking, hunting, camping, photography and mountain climbing in a primitive back country setting would continue to occur within the suitable areas. This use would increase by about 9 percent annually. The current 500 user days of use in the nonsuitable portion would increase by about 5 percent annually and shift toward motorized recreation. | The existing 5,000 user days of hiking, hunting, camping, photography and mountain climbing in a primitive back country setting would continue to occur. This use would increase by about 9 percent annually. Access to Redcloud and Sunshine Peaks would shift from Silver Creek to Bent Creek. New trails would provide better dispersion of recreationists in the Alpine Gulch area. | The existing 5,000 user days would increase by about 5 percent annually. Existing activities would occur in a setting dominated by manmade intrusions. An additional 1,250 user days of motorized recreation use would occur on new mining roads. | The existing 4,750 user days of hiking, hunting, camping, photography and mountain climbing in a primitive back country setting would continue to occur within the suitable area. This use would increase by about 9 percent annually. The 250 user days of use in the nonsuitable portion would increase by about 5 percent annually with little change in the types of activities taking place. | The existing 2,500 user days of hiking, hunting, camping, photography and mountain climbing would continue to occur within the suitable area. This use is expected to increase by about 9 percent annually. The current 2,500 user days of use in the nonsuitable portion would increase by about 5 percent annually and shift toward motorized recreation in the Alpine Gulch area. |

190

BLM_0006121

REDCLOUD PEAK WSA                                                                CO-030-208

## Table 4 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Partial Wilderness (27,969 acres) | All Wilderness Alternative | Recommendation: No Wilderness Alternative | Partial Wilderness Alternative (35,980 acres) | Partial Wilderness Alternative (10,659 acres) |
|---|---|---|---|---|---|
| *Impacts on Mineral Resource Development* | *The proposed action would withdraw 27,969 acres from mineral entry subject to valid existing rights. Due to predicted valid existing rights development of 3 mines for the production of base and precious metals in the Silver and Cooper Creek drainages would still occur. The 9,750 acres recommended as nonsuitable would remain open to mineral entry. Production of 4 million tons of alunite as well as an unquantified amount of base and precious metals from 2 mines would occur. Alunite would generate 110 jobs and increase per capita income by 19 percent.* | *Subject to valid existing rights 37,719 acres would be withdrawn from mineral entry and the mineral potential would be foregone. Surface disturbing exploration activity would be foregone. Development of 4 million tons of alunite ore annually would not occur. The projected resultant 110 jobs and 19 percent increase in per capita income would also not occur. Five small mines for the production of base and precious metals would result from valid existing rights.* | *The entire 37,719 acre WSA would remain open to mineral entry with development of base and precious metals predicted to result from 5 small mines. If developed, the alunite mine on Red Mountain would produce 4 million tons of ore annually, generate 110 jobs and increase per capita income 19 percent.* | *Subject to valid existing rights mineral development on 35,980 acres recommended as suitable. Valid existing rights would allow development of 3 mines in Silver and Cooper Creeks. Two small mines and mineral exploration would be allowed on the 1,739 acres recommended nonsuitable. Development of 4 million tons of alunite would not occur. The projected resultant 110 jobs and 19 percent increase in per capita income would also not occur.* | *The proposed action would withdraw 10,659 acres from mineral entry, subject to valid existing rights. Due to predicted valid existing rights development of 3 mines for the production of base and precious metals in the Silver and Cooper Creek drainages would still occur. The 27,060 acres recommended as nonsuitable would remain open to mineral entry. Production of 4 million tons of alunite as well as unquantified amount of base and precious metals from 2 mines would occur. Alunite development would generate 110 jobs and increase per capita income 19 percent.* |
| *Impacts on Wildlife* | *Development of the alunite deposit would displace 50 to 80 deer and 100 to 130 elk to other portions of their summer range. Aquatic habitats in Alpine and East Alpine Gulch would be subject to degradation. Bighorn sheep, deer, and elk habitat would be protected on the 27,969 acres recommended suitable.* | *Impacts to terrestrial and aquatic wildlife from alunite development would not occur in this alternative. Overall impact would be the long term protection to 37,719 acres of habitat and about 200 elk, 120 deer and 20 bighorn sheep.* | *Development of alunite would result in displacing 50 to 80 deer and 100 to 130 elk to other portions of their summer range and degradation of water quality and loss of aquatic habitat in Alpine and East Alpine Gulch.* | *Impacts to terrestrial and aquatic habitat from alunite development would not occur. The overall impact would be the long term protection of 35,980 acres of habitat and about 200 elk, 120 deer and 20 bighorn sheep.* | *Development of the alunite deposit would displace 50 to 80 deer and 100 to 130 elk to other portions of their summer range. Aquatic habitat in Alpine and East Alpine Gulch would be degraded. Bighorn sheep, elk and deer habitat would be protected on 10,659 acres.* |

191

BLM_0006122

REDCLOUD PEAK WSA                                                               CO-030-208

## Table 4 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Partial Wilderness (27,969 acres) | All Wilderness Alternative | Recommendation: No Wilderness Alternative | Partial Wilderness Alternative (35,980 acres) | Partial Wilderness Alternative (10,659 acres) |
|---|---|---|---|---|---|
| Impacts on Soils | Within the suitable area soil would be disturbed and productivity lost on approximately 20 to 40 acres as a result of mineral development and trail construction. Disturbance of 25 to 50 acres from prospecting activity would be prevented. Soil would be disturbed and productivity lost on up to 495 acres from alunite and other development in the recommended nonsuitable. Overall 515 to 535 acres would be disturbed. | Disturbance and loss of productivity would occur on about 25 to 55 acres of soil from mineral development, access road construction and trail construction would occur. Designation would preclude disturbance to 35 to 70 acres from exploration activity and 460 acres from alunite development. Overall 25 to 55 acres would be disturbed. | Soil disturbance would occur and productivity would be lost on 520 to 585 acres as a result of predicted mineral activity. | Disturbance and loss of productivity would occur on 20 to 40 acres of soil from mineral development, access road construction and trail construction within the suitable area. Disturbance to 490 to 520 acres would be prevented. About 10 to 30 acres would be disturbed within the nonsuitable area. Overall 30 to 70 acres would be disturbed. | Within the suitable area soil would be disturbed and productivity would be lost on approximately 20 to 40 acres as a result of mineral development and trail construction. Disturbance of 10 to 20 acres from prospecting would be prevented. Soil would be disturbed on 460 acres from alunite and other mineral development in the area recommended nonsuitable. An additional 30 to 60 acres would be disturbed as a result of other mineral development and prospecting. Overall 500 to 560 acres would be disturbed. |
| Impacts on Water Quality | Degradation of water quality would occur in both the suitable and nonsuitable portions of the WSA. These would be concentrated in the Cooper and Silver Creek areas within the suitable portion. Alpine Gulch, East Alpine Gulch, Red Mountain Gulch, Wade Gulch and Henson Creek would be affected if alunite is developed in the nonsuitable portion of the WSA. Overall about 14 miles of stream would be affected. | Water quality would be degraded by mineral development in Silver and Cooper Creeks and along Henson Creek. Impacts to water quality associated with alunite development would not occur. About 5 miles of stream would be affected. | Mineral development in the Red Mountain area, Cooper and Silver Creeks and along the northern boundary as well as continued exploration would result in contamination of up to 14 miles of stream with sediment and heavy metals. This would be significant only in the case of Red Mountain development. | Water quality in 5 miles of stream within the suitable area would be affected by mineral development in Silver and Cooper Creeks. Impacts to water quality associated with alunite development would not occur. Slight impacts to Henson Creek might result from 2 mines in the nonsuitable area. | Degradation of water quality would occur in both the suitable and nonsuitable portions of the WSA. These would be concentrated in the Cooper and Silver Creek areas within the suitable portion. Alpine Gulch, East Alpine Gulch, Red Mountain Gulch, Wade Gulch and Henson Creek would be affected as a result of alunite development in the nonsuitable portion of the WSA. Overall, about 14 miles of stream could be affected. |

BLM_0006123

## LOCAL SOCIAL AND ECONOMIC

### CONSIDERATIONS

Designation of the entire WSA as wilderness could lead to the removal of some or all of the mining claims from the county tax rolls. If all of the claims lapsed this could mean a loss of $3,823 annually in tax revenues to Hinsdale County. Wilderness designation could create a minor favorable impact as a result of increased recreation use. By protecting important scenic values of the Alpine Loop Backcountry Byway, wilderness designation could ensure the area's continued attraction as a sight-seeing destination.

No significant social effects would occur as a result of wilderness designation or nondesignation.

## SUMMARY OF WSA
## SPECIFIC PUBLIC COMMENTS

During the inventory phase some comments were received which dealt with other resource values and potential resource conflicts. Thirteen comments were received stating the area should not be designated a WSA because of the mining conflicts. Two comments cited grazing as a conflict. Two comments expressed the feeling that outside sights and sounds would be in conflict with the unit being designated a WSA. One comment noted that mining activity devastates native flora and fauna and protection of the area would save minerals for a less destructive generation.

Comments received during the Management Framework Plan Amendment were specifically addressed as either favoring or opposing wilderness designation of the Redcloud Peak WSA. A total of 13 comments were received. Of those, 3 comments favored wilderness designation and 10 comments favored no wilderness designation. Opposition to designation stated the area is highly mineralized and mining development would be the highest and best use. Support for wilderness designation cited that wilderness would preserve and promote tourism around Lake City, it would protect the watershed, wildlife habitat and cultural resource values and would not affect grazing.

A series of public meetings and hearings were held in association with the study phase and draft EIS for the WSAs within the Gunnison Basin and American Flats/Silverton Planning Units. These meetings were a combination workshop and scoping meeting and were held in Lake City, Silverton and Denver. Formal public hearings were later held in these same communities. A total of 81 comments (22 oral and 59 written) were received. A total of 71 comments supported more wilderness than the draft EIS recommendation. Two comments supported the recommendation and 8 comments called for less wilderness than the recommendation.

### County

The Hinsdale County Planning Commission at that time was opposed to any additional designation within the county.

### State

The Division of Wildlife stated the wildlife resources in the Redcloud Peak Area would benefit from a larger wilderness designation than the DEIS recommendation. The Colorado Geological Survey stated their opposition to wilderness designation. The Colorado Historical Society made no recommendation but stated their concerns for cultural resources under wilderness designation. The Division of Water Resources made no recommendation but stated their concern for motorized access to possible future reservoir structures.

### Federal

The National Park Service stated they support the all-wilderness alternative. The U.S. Department of the Air Force made no recommendation but stated they would oppose any decisions to restrict military overflight.

BLM_0006124

CO-030-208

**Blank Page**

BLM_0006125

195

BLM_0006126



RECOMMENDED FOR WILDERNESS

RECOMMENDED FOR NONWILDERNESS

LAND OUTSIDE WSA RECOMMENDED FOR WILDERNESS

SPLIT ESTATE (NONE)

STATE (NONE)

PRIVATE

SCALE 1:100000

Miles 1 0 1 2 3

American Flats WSA
Proposal
CO-030-0217

N

January 1991

# AMERICAN FLATS

# WILDERNESS STUDY AREA

## The Study Area -- 4,800 acres

The American Flats WSA (CO-030-217) is located in Ouray and Hinsdale Counties, Colorado about 5 miles east of Ouray and 11 miles west of Lake City. The WSA includes 4,790 acres of BLM lands and 10 acres of split estate (BLM surface with State subsurface ownership). There are no private inholdings. The WSA is bounded on the north and west by national forest land, part of which is in the Big Blue Wilderness Area. On the south and east the boundary skirts old roads and patented mining claims in the American Flats, Boulder Gulch and Sunshine Mountain areas. (See Map)

This area consists primarily of alpine tundra ranging from 11,200 feet to 13,300 feet in elevation and dominated by grasses, sedges and forbs. In the western half of the WSA the topography is the gently rolling hills of American Flats. The eastern half is steeper alpine mountain ridges with associated drainages. There are five peaks over 12,000 feet and one alpine lake. There is a small stand of spruce-fir forest in the north central portion of the WSA surrounding North Henson Creek.

The WSA was studied under Section 202 of the Federal Land Policy and Management Act (FLPMA) and was included in the Gunnison Basin and American Flats/Silverton Wilderness Final Environmental Impact Statement filed in August of 1987. There were three alternatives analyzed in the final EIS; an all wilderness alternative, a no wilderness alternative, and a partial wilderness alternative which recommends 1,494 acres to be designated wilderness.

## Recommendation and Rationale

1,494 acres recommended for wilderness

3,306 acres recommended for nonwilderness

The recommendation is to designate 1,494 acres as wilderness and release 3,306 acres for uses other than wilderness. The environmentally preferred alternative would be to designate the entire 4,800

acres as wilderness since this would result in the least change to the natural environment over the long term.

The area recommended for wilderness creates a logical topographic continuation of the U.S. Forest Service Big Blue Wilderness (97,350 acres). Inclusion of these lands would improve the manageability of the Big Blue Wilderness because the present boundary between BLM and the designated wilderness is an unsurveyed, indefinite boundary. This area includes the southern flank of Wildhorse Peak (13,266) and American Lake. It is commonly used by hikers and horseback riders into the Big Blue. Within the recommended area there are no identified ore deposits, no private lands and no split estate lands. These lands offer outstanding viewpoints into the contiguous Big Blue Wilderness and the adjacent Red Cloud Peak WSA. They are a logical ecologic addition to the Big Blue and provide important summer habitat for the area's elk herd.

There are several parcels of land which are not recommended for wilderness designation. (See Map) Much of the boundary separating the recommended from the nonrecommended portions follows a prominent ridge line or parallels a maintained foot and horse trail into American Lake. The parcel east of the Ouray-Hinsdale county line is physically separated from both the Big Blue Wilderness and the western portion of the WSA. The southern portion of the WSA is open tundra with no natural barriers to prevent illegal vehicle access from adjacent roads. Also excluded is an infrequently used vehicle access for a mining operation on nonwilderness U.S. Forest Service lands. A small tract of split estate land along the southern boundary was excluded to avoid potential conflicts. It is projected that some mineral exploration and development may occur on private inholdings adjacent to the WSA in the southeastern portion of the WSA. This would compromise natural values in much of the surrounding open terrain. Finally, the boundaries of the portions not recommended are not easily identified on the ground and would be difficult to manage in an open tundra environment.

197

## Table 1 - Land Status and Acreage Summary of the Study Area

| Within Wilderness Study Area | | Acres |
|---|---|---|
| BLM (surface and subsurface) | | 4,790 |
| Split Estate (BLM surface only) | (estimated) | 10 |
| Inholdings (State, Private) | | 0 |
| Total | | 4,800 |
| **Within the Recommended Wilderness Boundary** | | |
| **BLM (within WSA)** | | **1,494** |
| **BLM (outside WSA)** | | **0** |
| **Split Estate (within WSA)** | | **0** |
| **Split Estate (outside WSA)** | | **0** |
| **Total BLM Land Recommended for Wilderness** | | **1,494** |
| **Inholdings (State, Private)** | | **0** |
| Within the Area Not Recommended for Wilderness | | |
| BLM | | 3,296 |
| Split Estate | (estimated) | 10 |
| Total BLM Land Not Recommended for Wilderness | | 3,306 |
| Inholdings (State, Private) | | 0 |

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The American Flats WSA is predominately natural with negligible human imprints. The majority of the area is comprised of an alpine tundra ecosystem. A small area below timberline is forested with spruce and fir. Several drainages radiate from Dolly Varden (12,932 feet) and Sunshine (13,321) Mountains including North Hensen Creek. A large portion of the WSA has an undulating topography with unobscured vistas of the surrounding mountain lands. The WSA includes American Lake and several smaller tundra ponds. The area provides summer habitat for elk and bighorn sheep populations.

The imprints of humans associated with this WSA are substantially unnoticeable. A vehicle way, essentially two tracks, extends approximately two-thirds of a mile along the North Fork of Henson Creek. This way is naturally rehabilitating in places and is often used as a foot or horseback trail and a stock driveway. Other imprints include mineral prospects which have an insignificantly low impact on the naturalness of the WSA. Foot and horseback trails are located primarily in the western portion of the WSA and provide access to the adjacent National Forest lands.

#### Solitude

Both by itself and in conjunction with the Big Blue Wilderness Area the American Flats WSA contains outstanding opportunities for solitude. The area's rolling, open alpine tundra does not provide for either

BLM_0006129

vegetative or topographic screening but the western portion readily combines geographically with the existing wilderness to offer the sense of vastness and solitude.

### Primitive and Unconfined Recreation

The tundra vegetation in this WSA allows unconfined movement for recreation both on and off trails. This combined with the high scenic quality of the mountainous landscape provides outstanding opportunities for primitive recreation such as hiking, backpacking, mountain climbing, hunting, photography and horseback riding.

### Special Features

The WSA has high scenic values encompassing rolling grassy tundra and the surrounding rugged

peaks. The area proposed for wilderness will extend and enhance outstanding opportunities for recreation on the adjacent Big Blue Wilderness.

## DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

### Assessing the diversity of natural systems and features, as represented by ecosystems

Wilderness designation on this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System (NWPS). The Rocky Mountain Forest Province is well represented in the NWPS. Forest Service lands already designated as wilderness include large acreages of the southwestern spruce-fir forest, alpine meadows and barren vegetation classification types found in this WSA.

### Table 2 - Ecosystem Representation

| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS areas | | Other BLM Studies | |
|---|---|---|---|---|
| | areas | acres | areas | acres |
| *Nationwide* | | | | |
| Rocky Mt. Forest Province | | | | |
| Alpine Meadows and Barren | 32 | 1,988,190 | 6 | 54,741 |
| Southwestern Spruce-Fir Forest | 10 | 612,622 | 13 | 51,528 |
| *Colorado* | | | | |
| Rocky Mt. Forest Province | | | | |
| Alpine Meadows and Barren | 18 | 844,387 | 6 | 54,741 |
| Southwestern Spruce-Fir Forest | 6 | 406,528 | 13 | 51,528 |

### Expanding the opportunities for solitude or primitive recreation within a day's driving time (5 hours) of major population centers

The American Flats WSA is within a day's driving time of four major population centers (Standard

Metropolitan Statistical Areas of 100,000 or more) - Denver, Boulder, Colorado Springs and Pueblo. Table 3 summarizes the number and acreage of designated areas and other BLM study areas within a day's driving time of these population centers.

199

AMERICAN FLATS WSA

CO-030-217

### Table 3 - Wilderness Opportunities for Residents of Major Population Centers

| Population Center | NWPS Areas areas | acres | Other BLM Study Areas areas | acres |
|---|---|---|---|---|
| Denver | 20 | 1,728,410 | 21 | 372,010 |
| Boulder | 20 | 1,728,410 | 21 | 372,010 |
| Colorado Springs | 19 | 1,845,350 | 19 | 336,925 |
| Pueblo | 19 | 1,865,011 | 19 | 336,925 |

*Balancing the geographic distribution of wilderness areas*

The American Flats WSA would not contribute to balancing the geographic distribution of areas within the NWPS. In a clockwise direction beginning due north are located the Big Blue Wilderness (98,320 acres), the La Garita Wilderness (103,986 acres), the Weminuche Wilderness (459,604 acres), the Lizard Head Wilderness (41,189 acres) and the Mt Sneffels Wilderness (16,505 acres).

### MANAGEABILITY

The portion of the WSA recommended for wilderness designation is manageable as wilderness. There are no private lands or split estate lands within this area. These lands are a logical continuation of the contiguous Big Blue Wilderness both topographically and ecologically.

The portions of the WSA not recommended for wilderness would be difficult to manage as wilderness. The area east of the Ouray-Hinsdale county line is physically separated from both the Big Blue Wilderness and the western portion of the WSA. The southern portion of the WSA is open tundra with no natural barriers to prevent illegal ORV use from adjacent roads. A small tract of split estate land along the southern boundary was excluded to avoid potential conflicts. It is expected that some mineral exploration and development would occur in the southeastern portion of the WSA. This would compromise natural values in much of the surround-



*Ph* ... ... part of Recommended ... American ... WSA
... L. American Flats Wilderness 200

BLM_0006131

ing area. Finally, the boundaries of the area not recommended are not easily identified on the ground and would be difficult to manage in an open tundra environment.

## ENERGY AND MINERAL RESOURCE VALUES

The U.S. Geological Survey Bulletin 1715-A entitled *Mineral Resources of the American Flats Wilderness Study Area* was the result of considerable fieldwork done to identify mineral potential in this WSA. The study found no identified mineral resources in the recommended portion of the WSA and a low mineral resource potential for all metals, including copper, lead, zinc, gold, silver, molybde-

num, uranium and geothermal energy. There is low potential for unique or easily recoverable deposits of gravel within the study area. There is no energy resource potential for oil, gas, or coal. The report did not address the non-recommended portion of the WSA. There is no present production of any mineral resource in the WSA.

## IMPACTS ON RESOURCES

The following comparative impact table (Table 4) summarizes the effects on pertinent resources for all alternatives considered including designation or nondesignation of the entire area as wilderness.

### Table 4 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Proposed Action Partial Wilderness Alternative | All Wilderness Alternative | No Wilderness Alternative |
|---|---|---|---|
| **Impacts on Wilderness Values** | *The 1,494 acres recommended suitable would receive the protection provided by wilderness designation. Wilderness values would be lost on about 315 acres within the nonsuitable area as a result of mineral development and eventually lost on the entire 3,205 acres not recommended.* | *Although 4,800 acres would be designated and protected as wilderness, potential mineral development resulting from valid existing rights could reduce the acreage on which wilderness values are actually preserved to 4,500.* | *Wilderness values would be lost on up to 320 acres primarily in the southeast portion of the WSA as a result of mineral exploration and development activity. Wilderness values on the remaining acreage would eventually be lost to human encroachment.* |
| **Impacts on Mineral Resource Development** | *Although the 1,494 acres recommended suitable would be withdrawn there should be no impact as the area has low potential for development. The remaining area would remain open to entry with one mine projected in the southeast portion of the WSA.* | *Subject to valid existing rights, exploration would be precluded within the entire 4,800 acres. Development of one mine in the southeastern portion of the WSA is projected to occur.* | *The entire WSA would remain open to entry with production of base and precious metals projected to result from one mine.* |

BLM 0006133

AMERICAN FLATS WSA                                                    CO-030-217

## Table 4 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: Partial Wilderness Alternative | All Wilderness Alternative | No Wilderness Alternative |
|---|---|---|---|
| *Impacts on Recreation Use* | *The 1,200 user days in the suitable area are expected to increase by about 9 percent annually. The hiking and hunting activities in this area will continue to occur in a backcountry setting. This setting would continue in the nonsuitable portion as well except near the potential mineral development. The 300 user days in the nonsuitable portion would increase by about 5 percent annually.* | *The existing backcountry setting and existing uses would be maintained except in the vicinity of projected mineral development where it would be altered to one influenced by the sights and sounds of mining activity. Recreation use of about 1,500 user days would increase by about 9 percent annually.* | *The existing backcountry recreation setting would remain except where altered by mineral development. The existing 1,500 user days would increase about 5 percent annually.* |
| *Impacts on Wildlife* | *Designation would protect habitat for 11 bighorn sheep. Mineral exploration and development in the nonsuitable portion of the WSA would have minimal impact on wildlife habitat.* | *Designation would protect habitat for 11 bighorn sheep. Mineral development would have a minimal effect on wildlife habitat.* | *Mineral exploration and development in the southeastern portion of the WSA would have minimal impact on wildlife habitat.* |
| *Impacts on Soils* | *Soil productivity would be protected within the suitable area and lost on up to 40 acres within the nonsuitable portion.* | *Soil productivity would be preserved on 10 to 15 acres that would otherwise be lost due to exploration work. Productivity would be lost on up to 15 acres as a result of mineral development.* | *Soil productivity would be lost on up to 40 acres as a result of mineral exploration and development.* |
| *Impacts on Water Quality* | *Water quality would be protected within the 1,494 acres recommended as suitable. Disturbance of up to 40 acres in the nonsuitable area due to mineral exploration and development could result in some unquantified degradation of water quality in small drainages in the WSA and in less than 1 mile of Henson Creek.* | *Disturbance would be precluded and water quality protected with the exception of one mineral development resulting from valid existing rights. Some unquantified contamination of less than one mile of Henson Creek could occur.* | *Disturbance of up to 40 acres due to mineral exploration and development could result in some unquantified degradation of water quality in small drainages in the WSA and less than 1 mile of Henson Creek.* |

BLM_0006133

AMERICAN FLATS WSA

CO-030-217

## SOCIAL AND ECONOMIC CONSIDERATIONS

Designation of the recommended portion of the WSA would result in an estimated loss of tax revenues to Ouray county from lapsed mining claims of $11.00 annually. It is not expected that the positive benefits of wilderness designation such as possibly increased recreation use and the protection of scenic values would result in measurable economic benefits.

No significant social effects would be expected as a result of wilderness designation.

## SUMMARY OF WSA - SPECIFIC PUBLIC COMMENTS

During the inventory phase some comments were received which dealt with other resource values and potential resource conflicts. Seven comments cited conflicts concerning the mineral resource with reference to metallic and uranium minerals as well as oil and gas. Two comments cited grazing as a conflict but did not provide specific information. One comment stated grazing is compatible with wilderness and another felt the sheep population should be reduced. Two comments noted that the area's ecological values needed protection. One person wished to see jeeps prohibited from this area. Another suggested that the area should be kept open to mineral exploration. One comment included geochemical sample and analysis results from locations within the WSA. One comment reflected a concern that the State had mineral rights in the area and suggested a land exchange to avoid conflict.

Comments received during the Management Framework Plan Amendment were specifically addressed as either favoring or opposing wilderness designation of the American Flats WSA. A total of 8 comments were received. Of those, 4 comments favored wilderness designation and 4 were opposed to wilderness. Opposition to designation stated the area lies within the highly mineralized San Juan-Lake City caldera complex and the area should be left open to mining. Support for wilderness designation pointed out that the American Flats is an ideal

extension to the Big Blue Wilderness Area and that the benefits of wilderness outweigh the mining interests.

A series of public meetings and hearings were held in association with the study phase and draft EIS. The meetings were a combination workshop and scoping meeting held in Lake City, Silverton and Denver. Formal public hearings were later held in these same communities.

A total of 49 comments were received (37 written and 12 oral). In these comments 37 people favored more wilderness than that recommended in the Draft EIS, 5 supported the recommendation and 7 commenters wanted less wilderness than the DEIS recommended.

### County

At the time of the DEIS the Hinsdale County Planning Commission was opposed to any additional wilderness within the county. No comments were received from Ouray County.

### State

The Division of Wildlife stated that wildlife resources in the general area would benefit from wilderness designation. The Colorado Geological Survey stated their opposition to wilderness designation. The Colorado Historical Society made no recommendation but stated their concerns for the cultural resources under wilderness designation. The Division of Water Resources made no recommendation but stated their concern for motorized access to possible future reservoir structures.

### Federal

The National Park Service stated they support the all wilderness alternative. The U.S. Air Force made no recommendation but stated they would oppose any decisions to restrict military overflight. The U.S. Forest Service stated they support BLM's recommendation.

203



RECOMMENDED FOR WILDERNESS

RECOMMENDED FOR NONWILDERNESS

LAND OUTSIDE WSA RECOMMENDED FOR WILDERNESS

SPLIT ESTATE

STATE (NONE)

PRIVATE

Handies Peak  WSA
Proposal
CO-030-0241

SCALE 1:100000

Miles

January 1991

# HANDIES PEAK

# WILDERNESS STUDY AREA

## The Study Area -- 16,836 acres

The Handies Peak WSA (CO-030-241) is located in Hinsdale County, Colorado, ten miles southwest of Lake City. The WSA includes 15,909 acres of BLM lands and 755 acres of BLM surface with State sub-surface ownership. The WSA is bounded on the south by the Gunnison National Forest and on the north by the Alpine Loop Backcountry Byway. The road up Wager Gulch is the eastern boundary and a concentration of patented mining claims in the upper portions of Grouse, Burns and Niagara Gulches bounds the west. Roads were cherrystemmed up Cottonwood Creek and into American Basin and also form WSA boundaries. Five acres within the end of the cherrystem in American Basin were excluded in the original WSA but were included in the study process within partial wilderness alternatives and analyzed for manageability reasons. (There are 13 parcels of private inholdings totalling 172 acres.*) The area is depicted on the map.

The WSA contains many outstanding natural features including twelve 13,000 foot peaks and one 14,000 foot peak, Handies Peak (14,048 feet). There are three major canyons, numerous small drainages and three alpine lakes within the area. In lower elevations the vegetation is mixed spruce, fir, and aspen. Above timberline is an alpine tundra ecosystem dominated by grasses, sedges, and forbs. Steep mountain streams, some originating from alpine lakes, radiate toward the boundary from a central ridge of mountain peaks.

These lands offer outstanding viewpoints into the adjacent Redcloud Peak WSA. Conversely, views into the Handies Peak WSA enhance the wildland values of the Redcloud Peak area. The Redcloud Peak and Handies Peak areas can logically be considered as one visually and ecologically continuous area divided only by the Cinnamon Pass jeep road. However, from the majority of locations within either the Handies Peak or Redcloud Peak areas, this road is essentially unnoticeable.

Wilderness designation of this area would enhance and add wilderness value to the recreational use of the Alpine Loop National Backcountry Byway, a jeep road which parallels the northern portion of the Handies Peak area and divides this area from Redcloud Peak WSA. Use of this road, which receives over 500,000 user days per season is not totally wilderness dependent, but such use is maintained by unsurpassed views of these undisturbed landscapes and high mountain peaks. Without wilderness designation these values could be degraded by mineral development and other impacting uses. In addition, the Alpine Loop National Backcountry Byway and the Cottonwood Creek jeep road provide numerous access points, reducing the need for fixed trail access and associated facilities. Public access is guaranteed and no easements or land purchases or exchanges are needed to provide trailhead access. Two main trails and one lesser developed route currently provide access from the periphery.

Wilderness designation of this area would coincide with the continued steady and stable growth of the recreation/tourism industry of Lake City, Silverton, and Ouray. The Alpine Loop Backcountry Byway is one of the primary recreational resources which provides economic benefits to these local communities. It provides an important seasonal base income to these towns. In addition, it also stimulates service-oriented types of businesses based on the tourism industry. Without wilderness designation there could be degradation of the wilderness values, which in turn could significantly detract from primitive and other outdoor types of recreation.

*Note: Acreages presented here are different from those presented in the final EIS. The EIS contained an error which showed approximately 2000 more acres in the WSA than the original study. The acreages portrayed here reflect an updated and more accurately measured land status in and around the WSA.

The WSA was studied under Section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the Gunnison Basin and American Flats/Silverton Wilderness Final Environmental Impact Statement filed in August 1987. There were four alternatives analyzed in the EIS; an all wilderness alternative, a no wilderness alternative and two partial wilderness alternatives. One of these includes 7,635 acres and the other includes 7,167 acres for wilderness designation. The latter deletes approximately 9,533 acres of BLM and private land from wilderness recommendation to avoid conflicts with development on private inholdings and to eliminate management problems. The recommendation of this report, by Secretarial decision, is to not designate any of the area as wilderness.

## Recommendation and Rationale

> 0 acres recommended for wilderness
>
> 16,836 acres recommended for nonwilderness

The recommendation is to not designate Handies Peak WSA as wilderness and to release the area for uses other than wilderness. The environmentally preferred alternative would be to designate the entire 16,836 acres as wilderness as this would result in the least change from the natural environment over the long term.

The Secretary of the Interior has recommended that this area not be designated wilderness due to the high potential for occurrence of undiscovered precious metals in the WSA. The U.S. Geological Survey (USGS) and Bureau of Mines (BOM) have estimated that a potential value of $4.9 billion of undiscovered in-place resources may exist within this WSA and the nearby Redcloud Peak WSA. Over $4 billion of this value is projected for molybdenum, for which the potential for occurrence is classified as moderate. The projected values are based on assumptions and statistical analysis of probabilities of mineral occurrence, and do not consider exploration, production, and transportation costs or market availability. See page 189 for further mineral information and for references to USGS publications.



*Ph*

.....umau nunuicy Peak (14,048 ft.) from American Basin.

206

ono I. Handies Peak WSA. Looking .......

BLM_0006137



*Photo 2. Handies Peak WSA. Looking south into scenic American Basin. The road is cherrystemmed.*



*Photo 3. Handies Peak WSA. Visual impacts of cherrystemmed roads to patented mining claims in Upper Snare Basin Handies Peak WSA.*

## Table 1 - Land Status and Acreage Summary of the Study Area

| Within Wilderness Study Area | | Acres |
|---|---|---|
| BLM (surface and subsurface) | | 15,909 |
| Split estate (BLM surface only) | (estimated) | 755 |
| Inholdings (State, Private) | (estimated) | 172 |
| Total | | 16,836 |
| **Within the Recommended Wilderness Boundary** | | |
| **BLM (within WSA)** | | **0** |
| **BLM (outside WSA)** | | **0** |
| **Split Estate (within WSA)** | **(estimated)** | **0** |
| **Split Estate (outside WSA)** | | **0** |
| **Total BLM Land Recommended for Wilderness** | | **0** |
| **Inholdings (State, Private)** | **(estimated)** | **0** |
| **Inholdings (Private outside WSA)** | | **0** |
| Within the Area Not Recommended for Wilderness | | |
| BLM | | 15,909 |
| Split Estate | (estimated) | 755 |
| Total BLM land not recommended for Wilderness | | 16,664 |
| Inholdings (State, Private) | (estimated) | 172 |

BLM_0006139

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The Handies Peak WSA is predominately natural with negligible human imprints. The area is extremely rugged and ranges from an elevation of 9,400 feet near Wager Gulch up to 14,048 feet on the summit of Handies Peak. The WSA contains numerous peaks and ridges above 13,000 feet and glacial cirques such as American Basin and steep-walled canyons such as Cottonwood Creek.

Although there are some spruce and aspen forests on the periphery of this WSA, the dominant vegetative type is alpine tundra. The WSA also contains several alpine lakes. This range of habitats supports elk, deer, and bear as well as a variety of smaller mammals and birds.

The majority of human imprints, associated with past mining activity and access routes, were excluded from the WSA during the wilderness inventory process. Some old prospects are found within the western portion of this WSA but they do not adversely impact the natural character of the landscape. The overall influence of human imprints on the naturalness of the area as perceived by the average visitor is negligible.

#### Solitude

The Handies Peak WSA contains outstanding opportunities for solitude. Much of the WSA is comprised of mountain peaks and ridges above 13,000 feet which divides the area into numerous remote glacial cirques and drainages, each facilitating opportunities for solitude. The majestic view of the surrounding mountains from within this WSA provides a feeling of spaciousness. The lower elevations and drainages, with their dense aspen and spruce stands, provide opportunities for seclusion and intimacy. The WSA's diversity encourages a freedom of movement within its boundaries.

The majority of the northern boundary of the Handies Peak WSA parallels the Alpine Loop Road. Due to the steepness of terrain along this road, as well as the cherrystemmed Cottonwood Creek Road, the sights and sounds of vehicle use are not so imposing as to outweigh the benefits of wilderness designation.

#### Primitive and Unconfined Recreation

The Handies Peak WSA, with its relatively large size, diversity, and ruggedness of terrain, contains outstanding opportunities for primitive and unconfined recreation.

The numerous high mountain peaks, including Handies Peak at 14,048 feet, provide excellent hiking and climbing opportunities. The glacial cirques and drainages and numerous lakes facilitate recreational activities such as backpacking, camping, and fishing. Wildlife viewing and hunting are also activities which occur in this WSA.

In addition, the outstanding scenic quality of this WSA and surrounding mountainous lands enhances the recreational values.

#### Special Features

Handies Peak (14,048 feet) is the 40th highest mountain in Colorado and is the highest point of land managed by the Bureau of Land Management outside of Alaska. In 1874, members of the Hayden Survey climbed Handies Peak. At an elevation of 13,500 feet they found prospect holes and concluded that miners had preceded them to the top. Early Forest Service maps referred to this peak as "Tobasco". The early historian H.H. Bancroft reported that Handies was named after a prominent pioneer of the area.

The scenic quality of the WSA is outstanding due to the interaction of the mountainous landform, multi-colored rock strata, diverse vegetation, and vast, open vistas.

The area is high in educational and scientific study potential. The Colorado Outward Bound School regularly uses the area to teach skills in backcountry living and wilderness survival. American Basin, because of its diverse native flora, has been the focus of a doctoral dissertation

on alpine tundra ecosystems. Volcanic and Precambrian rock types are intermingled and glacial geomorphology is highly evident. There is a rock glacier formation at the head of American Basin. This unusual phenomena occurs when rocks in a steep talus slope "flow" downhill in a glacier-like manner. These characteristics make the WSA popular with geologic field trips from various colleges and universities.

The WSA provides both summer and winter range for bighorn sheep which are scarce in this area. There have been some reported summer sightings of the very rare mountain goat in the WSA. The area also offers potential habitat for the recently listed endangered Uncompahgre Peak Fritillary. Studies are underway to determine if populations of this butterfly exist in the WSA.

### DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

*Assessing the diversity of natural systems and features, as represented by ecosystems*

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System (NWPS). Forest Service lands already designated as wilderness include large acreages of the southwestern spruce-fir forest, alpine meadows and barren vegetative classification types found in this WSA.

BLM_0006141

## Table 2 - Ecosystem Representation

| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas | acres | Other BLM Studies areas | acres |
|---|---|---|---|---|
| *Nationwide* | | | | |
| Rocky Mountain Forest Province | | | | |
| Alpine Meadows and Barren | 32 | 1,988,190 | 6 | 54,741 |
| Southwestern Spruce-Fir Forest | 10 | 612,622 | 13 | 51,528 |
| *Colorado* | | | | |
| Rocky Mountain Forest Province | | | | |
| Alpine Meadows and Barren | 18 | 844,387 | 6 | 54,741 |
| Southwestern Spruce-Fir Forest | 6 | 406,528 | 13 | 51,528 |

***Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers***

The Handies Peak WSA is within a day's driving time of four major population centers (Standard Metropolitan Statistical Areas of 100,000 or more) -Denver, Boulder, Colorado Springs, and Pueblo. Table 3 summarizes the number and acreage of designated areas and other BLM study areas within a day's driving time of these population centers.

## Table 3 - Wilderness Opportunities for Residents of Major Population Centers

| Population Center | NWPS Areas areas | acres | Other BLM Studies areas | acres |
|---|---|---|---|---|
| Denver | 20 | 1,728,410 | 21 | 372,010 |
| Boulder | 20 | 1,728,410 | 21 | 372,010 |
| Colorado Springs | 19 | 1,845,350 | 19 | 336,925 |
| Pueblo | 19 | 1,865,011 | 19 | 336,925 |

BLM 0006142

### *Balancing the geographic distribution of wilderness areas*

The Handies Peak WSA would not contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. In a clockwise direction beginning due north, is the 98,320 acre Big Blue Wilderness, the 103,986 acre La Garita Wilderness, the 459,604 acre Weminuche Wilderness, the 41,189 acre Lizard Head Wilderness, and the 16,505 acre Mount Sneffels Wilderness. Also, the Powderhorn Primitive Area, recommended for wilderness designation, is nearby.

### MANAGEABILITY

Except for some peripheral areas, the WSA is manageable as wilderness.

The southern and eastern portions of the WSA would be very difficult to manage as wilderness because they form a narrow strip of land sandwiched between land which would not be managed as wilderness. To the north, the heavily used Cottonwood Creek road forms one boundary. To the south, the Forest Service lands have been released from wilderness consideration and are to be managed for semi-primitive motorized recreation. This would leave a narrow strip of wilderness (ranging from 1/4 to 1/2 miles wide and 9 miles long) that would not have an easily identifiable nor manageable boundary. If the area were to be designated wilderness, more manageable boundaries exist and were addressed in the partial wilderness alternatives analyzed in the Final EIS.

### ENERGY AND MINERAL RESOURCE VALUES

The U.S. Geological Survey Bulletin 1715-B entitled *Mineral Resources of the Redcloud Peak and Handies Peak Wilderness Study Areas* was the result of considerable fieldwork done to identify mineral potential in these WSAs. The report speaks of the areas generally as one unit.

No identified mineral resources were found in the Handies Peak WSA. Much of the WSA has high mineral resource potential for occurrence of precious metals (gold and silver) and base metals (principally lead, zinc and copper, but also anti-

mony, barite, bismuth, cadmium, fluorspar, manganese, mercury, selenium, tellurium and tungsten) in vein-type epithermal deposits. The area has mostly moderate potential for these commodities in breccia-pipe epithermal deposits. This area has a generally low potential for molybdenum and copper in porphyry-type deposits but approximately 30% of the WSA shows a moderate potential for these elements. The potential for uranium in veins is moderate in 30% of the WSA and low in about 70% of the area. The potential for aluminum in alunite deposits is low throughout the study area. There is no energy resource potential for coal, oil or natural gas in the WSA. There is no present production of any mineral resource in the WSA. Additional information developed by USGS in 1991 provides a quantitative assessment of mineral resources that projects a potential value of $4.9 billion of undiscovered in-place minerals within the Redcloud Peak and Handies Peak WSAs. Over $4 billion of this value is projected to be molybdenum, for which the potential for occurrence is classified as moderate. These estimates do not consider exploration, production, or transportation costs or market availability and are based upon a number of assumptions and statistical analysis of the potential for in-place reserves. (See USGS Open-File Report 91-384, "Quantitative Assessments of the Energy and Mineral Resources within Eighteen Wilderness Study Areas in the States of Colorado, Nevada, Oregon and Utah," 1991.)

### IMPACTS ON RESOURCES

The following comparative impact table, Table 4, summarizes the effects on pertinent resources for all alternatives considered including designation or nondesignation of the entire area as wilderness.

BLM_0006143

## Table 4 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Partial Wilderness Alternative (7,167 acres) | All Wilderness Alternative | Recommendation: No Wilderness Alternative | Partial Wilderness Alternative (7,635 acres) |
|---|---|---|---|---|
| *Impacts on Wilderness Values* | *Although 7,167 acres would be designated and protected as wilderness, potential mineral development resulting from valid existing rights in American Basin could reduce the acreage on which wilderness values are preserved to 6,267. Wilderness values could be lost on 400 of the 9,674 acres recommended nonsuitable as a result of mineral development on private property near Campbell Creek. An additional 10 to 20 acres would be lost to mineral exploration. In the long term wilderness values would be lost on the entire 9,674 acres recommended nonsuitable.* | *Although the entire 16,841 acres would be designated and protected as wilderness, potential mineral development resulting from valid existing rights could reduce the acreage on which wilderness values would actually be preserved to 15,441.* | *Wilderness values would be lost on about 1,400 acres as a result of mineral activity. Wilderness values would be unprotected on the remaining acreage and in the long term would be lost.* | *Although 7,635 acres would be designated and protected as wilderness, potential mineral development resulting from valid existing rights in American Basin could reduce the acreage on which wilderness values would actually be preserved to 6,235. About 10 to 20 acres would be lost within the nonsuitable area as a result of mineral exploration. In the long term wilderness values will be lost on the 9,206 acres recommended nonsuitable.* |
| *Impacts on Mineral Resource Development* | *The 7,167 acres recommended suitable would be withdrawn from entry, although three mines are projected based on valid existing rights. One small scale mine would be developed within the nonsuitable area.* | *Subject to valid existing rights, the entire 16,841 acres would be withdrawn from mineral entry. Valid rights are expected to allow for development of base and precious metals from 4 mines in the American Basin and Campbell Creek areas.* | *The entire WSA would remain open to entry with development of base and precious metals, uranium, and strategic minerals projected to result from 4 mines.* | *7,635 acres recommended as suitable would be withdrawn from entry. Valid existing rights would allow for development of three mines in American Basin and near Campbell Creek. No development is projected in the nonsuitable portion of the WSA although exploration would continue.* |

BLM_0006144

## Table 4 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Partial Wilderness Alternative (7,167 acres) | All Wilderness Alternative | Recommendation: No Wilderness Alternative | Partial Wilderness Alternative (7,635 acres) |
|---|---|---|---|---|
| *Impacts on Recreation Use* | *The existing 3,000 user days of hiking, hunting, camping, photography and mountain climbing in a primitive backcountry setting would continue to occur in the suitable area except where affected by mineral development in American Basin. This use will increase by about 9 percent annually. Use of the nonsuitable area for hunting access would continue and increase by about 5 percent annually. Mineral development near Campbell Creek would detract from the backcountry experience in that area.* | *The current 4,000 user days would increase by about 9 percent annually with designation. Hiking, hunting, camping, photography, and mountain climbing would continue to occur in a primitive backcountry setting except on about 1,400 acres affected by mineral development.* | *The existing 4,000 user days would increase by about 5 percent annually. Existing activities would continue to occur in a primitive back country setting except in American Basin and near Campbell Creek where the setting would be influenced by the sights and sounds of mineral activity.* | *The existing 3,000 user days of hiking, hunting, camping, photography and mountain climbing in a primitive back country setting would continue to occur in the suitable area except where affected by mineral development in American Basin and Campbell Creek. This use will increase by about 9 percent annually. Use of the nonsuitable area for hunting access would continue and increase by about 5 percent annually.* |
| *Impacts on Soils* | *Within the suitable area productivity would be lost on 115 acres as a result of mineral development. Disturbance of 10 to 20 acres from exploration activities would be prevented. Soil would be disturbed and productivity lost on 10 to 20 acres as a result of mineral exploration in the nonsuitable area. Overall 125 to 145 acres would be disturbed.* | *Soil productivity would be lost on up to 115 acres as a result of mineral development. Disturbance of 20 to 40 acres from exploration activities would be prevented.* | *Soil productivity would be lost on about 115 acres as a result of mineral development. Soil would be disturbed and productivity lost on 20 to 40 acres as a result of mineral exploration. Overall 135 to 155 acres would be disturbed.* | *Within the suitable area productivity would be lost on 115 acres as a result of mineral development. Disturbance of 10 to 20 acres from exploration activities would be prevented. Soil would be disturbed and productivity lost on 10 to 20 acres as a result of mineral exploration in the nonsuitable area. Overall 125 to 145 acres would be disturbed.* |

BLM_0006145

## Table 4 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Partial Wilderness Alternative (7,167 acres) | All Wilderness Alternative | Recommendation: No Wilderness Alternative | Partial Wilderness Alternative (7,635 acres) |
|---|---|---|---|---|
| *Impacts on Water Quality* | *Mineral exploration and development resulting from valid existing rights within the suitable area would cause some unquantified increase in sediment and heavy metal concentrations in the Lake Fork. Preclusion of exploration activity would prevent any additional contamination of this drainage. Mineral exploration and development in the nonsuitable area would result in an unquantified increase in sediment and heavy metal concentrations in various drainages throughout the WSA. Overall, water quality could be degraded in up to 5 miles of stream.* | *Mineral exploration and development resulting from valid existing rights within the WSA would cause some unquantified increase in sediment and heavy metal concentrations in 5 miles of the Lake Fork and Campbell Creek. Preclusion of exploration activity as a result of designation would prevent any additional contamination of these drainages.* | *Mineral exploration and development within the WSA would cause some unquantified increase in sediment and heavy metal concentrations in the Lake Fork and Campbell Creek. Mineral exploration would result in an unquantified increase in sediment and heavy metal concentrations in various drainages throughout the WSA. Overall, up to 5 miles of stream could be affected.* | *Mineral exploration and development resulting from valid existing rights within the suitable area would cause some unquantified increase in sediment and heavy metal concentrations in the Lake Fork. Preclusion of exploration activity would prevent any additional contamination of this drainage. Mineral exploration and development in the nonsuitable area would result in an unquantified increase in sediment and heavy metal concentrations in various drainages throughout the WSA. Overall, about 5 miles could be affected.* |
| *Impacts on Wildlife* | *Mineral development in American Basin would displace about 10 elk to other portions of their summer range. Exploration activity would be precluded within the suitable area thereby protecting bighorn sheep and elk habitat. Mineral development and exploration in the nonsuitable area could result in a loss of about 5 bighorn sheep. Habitat would be protected on 7,167 acres.* | *Mineral development in American Basin would displace about 10 elk to other portions of their summer range. Exploration activity would be precluded thereby protecting bighorn sheep and elk habitat. Mineral development and exploration in the Campbell Creek area could result in a loss of about 5 bighorn sheep. Habitat would be protected on 16,841 acres.* | *Mineral development in American Basin would displace about 10 elk to other portions of their summer range. Mineral development and exploration could result in a loss of about 5 bighorn sheep. Habitat would not be protected by designation.* | *Mineral development in American Basin would displace about 10 elk to other portions of their summer range. Mineral development in the Campbell Creek area would result in a loss of about 5 bighorn sheep. Exploration activity would be precluded within the suitable area thereby protecting bighorn sheep and elk habitat on 7,635 acres.* |

215

## LOCAL SOCIAL AND ECONOMIC CONSIDERATIONS

Designation of the entire WSA as wilderness could lead to removal of some or all of the mining claims from the county tax rolls. If all the claims lapsed, this could mean a loss of $785 annually in tax revenues to Hinsdale County. Wilderness designation could create a minor favorable impact as a result of increased recreation use. By protecting important scenic values of the Alpine Loop Road, wilderness designation could ensure the area continued income from sightseeing-oriented travel on that road.

No significant social effects would occur as a result of wilderness designation or nondesignation.

## SUMMARY OF WSA SPECIFIC PUBLIC COMMENTS

During the inventory phase some comments were received which dealt with other resource values and potential resource conflicts. Five comments were received which stated the area should not be designated a WSA because of various hard rock mineral deposits. One comment stated the mineral resource should be saved for future, less destructive generations.

Comments received during the Management Framework Plan Amendment were specifically addressed as either favoring or opposing wilderness designation of the Handies Peak WSA. A total of 13 comments were received. Of those, 4 comments favored wilderness designation and 9 comments favored no wilderness designation. Opposition to designation stated the area is highly mineralized and mining development would be the highest and best use. Support for wilderness designation cited that wilderness would preserve and promote tourism around Lake City, it would protect the watershed, wildlife habitat would be protected, cultural resource values would be preserved, and grazing and timbering would not be affected by wilderness designation.

A series of public meetings and public hearings were held in association with the study phase and Draft Environmental Impact Statement for the

WSAs within the Gunnison Basin and American Flats/Silverton Planning Units. These meetings were a combination workshop and scoping meeting and were held in Lake City, Silverton, and Denver. Formal public hearings were later held in these same communities.

A total of 82 comments (23 oral and 59 written) were received. Of these, 71 comments supported more wilderness than the Draft EIS preferred alternative, 2 supported the preferred alternative and 9 comments wanted less wilderness than the DEIS preferred alternative.

### County

The Hinsdale County Planning Commission was opposed to any additional wilderness designation within the county.

### State

The Colorado Historical Society made no recommendation but stated their concern for the cultural resources under wilderness designation. The Division of Wildlife stated they support designation for the recommended area. The Division of Water Resources made no recommendation but stated their concerns for motorized access to possible future reservoir structures. The Colorado Geological Survey stated their opposition to wilderness designation.

### Federal

The National Park Service stated they support wilderness designation for the entire 16,669 acres. The U.S. Air Force made no recommendation but stated they would oppose any decisions to restrict military overflight.

BLM_0006147

CO-030-241

**Blank Page**

217

BLM_0006148



Menefee Mountain WSA
Proposal

CO-030-251

January 1991

BLM_0006149

# MENEFEE MOUNTAIN
# WILDERNESS STUDY AREA

## The Study Area -- 7,089 acres

The Menefee Mountain WSA (CO-030-251) is located in Montezuma County, approximately three miles south of Mancos, Colorado, 2 miles east of Mesa Verde National Park, and just east of BLM's Weber Mountain WSA. The WSA contains 6,969 acres of BLM land and 120 acres of BLM surface ownership and non-federal subsurface mineral rights (split estate). There is a 40 acre private inholding. For the most part, the WSA boundary follows private property lines. The extreme northern boundary was drawn to exclude a highly impacted area of roads, ways, mining activity, and fire suppression lines. East, west, and south boundaries mostly follow private property lines except for one section of state land on the west and a small section of BLM on the southwest which is bisected by the Weber Canyon road and is the main south access route to both Weber WSA and Menefee WSA. The WSA is surrounded by mostly private land with small sections of public and Colorado state land. The area is shown on the map.

Topography consists of numerous short, steep canyons radiating from Menefee Mountain, a north/south running linear-shaped mountain about 6 miles long and 1 to 2 miles wide. Elevations range from 6,500 feet at the base of the slope in Weber Canyon up to the long ridge of the mountain at 7,800 feet on the south and rising to 8,600 feet on the north. Vegetation varies with altitude; pinyon pine/juniper at lower elevations with oakbrush and pockets of ponderosa and spruce/fir at higher elevations (See Photo 1). Menefee Mountain, like Weber Mountain just to the west, is part of the same geologic landform upon which Mesa Verde National Park sits - a large, uplifted mesa formation sloping gently to the south. Weber Mountain was isolated from Mesa Verde by the cutting action of the Mancos River and Menefee Mountain is isolated from Weber Mountain by water-flow erosion which created Weber Canyon. As in Mesa Verde, Menefee WSA contains archeological sites related to the Anasazi culture - communities of prehistoric farmers who lived in earthen and stone structures 6-20 centuries ago.

The WSA was studied under section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the San Juan/San Miguel Planning Area Final Wilderness Environmental Impact Statement published November, 1990. Three alternatives were analyzed in the EIS: all wilderness (7,129 acres including the 40 acre private inholding), partial wilderness (5,416 acres included and 1,713 acres deleted), and a no wilderness alternative which is the recommendation of this report.

## Recommendation and Rationale

0 acres recommended for wilderness

7,089 acres recommended for nonwilderness

The recommendation is to not designate Menefee Mountain WSA as wilderness and to release the area for uses other than wilderness. The all wilderness alternative is the environmentally preferable alternative since its implementation would result in the least change to the natural environment over the long term.

During the study phase of the wilderness review process, BLM management decided that the wilderness values contained in this area were not of an overall quality and significance to warrant inclusion in the National Wilderness Preservation System. BLM did feel that these wilderness values were and will remain, locally or in some cases regionally important and therefore current management plans were devised to protect the sensitive resources found in Menefee Mountain WSA. BLM feels that the majority of primary values identified by the public as wilderness-related (roadless, visual, wildlife habitat, etc.) can be managed in a non-wilderness management scheme through professional application of the principles of multiple-use management.

The San Juan/San Miguel Resource Management Plan, September 1985, states that current management of Menefee Mountain WSA is directed toward the goal of preserving semiprimitive recreation

219

values, wildlife habitat, and the outstanding scenic qualities of the area. To do this, the majority of Menefee Mountain WSA is closed to off-road vehicles and managed under Visual Resource Management Class II standards. These standards state that the character of the existing landscape should be retained and the level of change to the landscape should be low. Activities and projects may be seen but should not attract the attention of the casual observer. Visual constraints on uses will remain reasonable but should reduce visual impacts to the extent possible. In addition, if future leasing for oil and gas does occur, a no-surface-occupancy stipulation will be included in the lease agreement for most of Menefee Mountain WSA. This stipulation prohibits occupancy or disturbance of all or part of the lease surface in order to protect special values or uses. Lessees may exploit the oil and gas or geothermal resource in this lease by directional drilling from sites outside the no-surface-occupancy area. As accessibility and economic potential for coal is rated poor in this area (see *Energy and Mineral Resource Values*, this report), no future coal leasing will occur.

An additional reason for the no wilderness recommendation is that wilderness management of Menefee would be made very difficult by the inclusion in the WSA of several parcels of land (1,713 acres total) which are easily accessible in motorized vehicles and are of a lesser wilderness quality than most of the WSA. The wilderness inventory process identified roadless natural areas which resulted in the 7,089 acre Menefee Mountain WSA. This roadless area included several undisturbed yet fairly flat parcels of land extending down off the slope of Menefee Mountain on the periphery of the WSA. These parcels abut private land, much of which has been cleared for grazing and cultivation. These parcels have a lowered wilderness quality and an increased potential for management conflicts due to vehicular access, the sights and sounds of working farm machinery, and other peripheral nonwilderness uses such as trespass fuelwood cutting and illegal dumping.



*Photo 1. Menefee Mountain WSA. Looking south down into Joe's Canyon from near Meneffee Peak. Thick mountain shrub understory in sparse spruce/fir.*

BLM_0006151

MENEFEE MOUNTAIN WSA                                           CO-030-251

## TABLE 1 - Land Status and Acreage Summary of the Study Area

| Within Wilderness Study Area | Acres |
|---|---|
| BLM (surface and subsurface) | 6,969 |
| Split Estate (BLM surface only) | 120 |
| Inholdings (State, Private) | 40 |
| Total | 7,129 |
| **Within the Recommended Wilderness Boundary** | |
| BLM (within WSA) | 0 |
| BLM (outside WSA) | 0 |
| Split Estate (within WSA) | 0 |
| Total BLM Land Recommended for Wilderness | 0 |
| Inholdings (State, Private) | 0 |
| Within the Area Not Recommended for Wilderness | |
| BLM | 6,969 |
| Split Estate | 120 |
| Total BLM Land Not Recommended for Wilderness | 7,089 |
| Inholdings (State, Private) | 40 |

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The Menefee Mountain WSA is predominantly natural in character with negligible human imprints. The majority of human imprints associated with past mining activities and access routes, were excluded during the inventory process. The dominant natural feature of this area is the north-south running, linear-shaped Menefee Mountain. A spine-like, high ridge (7,800 to 8,600 feet) runs the length of the mountain, branching frequently and creating many steep canyons radiating from the ridge to the valleys below. Exposed layered rock of the Cretaceous Mancos Shale, Point Lookout, and Cliff House Sandstone form many overhangs and vertical cliffs in the canyons and on the slopes of the mountain.

The WSA's topography ranges from the steep cliffs along the ridge of the mountain to the gently sloping terrain along the major drainages. In the eastern section of the WSA, Joe's Canyon and its associated drainages form fingerlike projections that cut into the side of the mountain. (See Photo 1) Another major drainage in the southern part of the WSA nearly bisects the mountain and causes the spine-like ridge to branch and break up as it approaches the south.

The vegetation is diverse and varies with altitude. The canyons sustain a thick underbrush of perennial and annual shrubs. Serviceberry, an important browse species, is abundant. Where there is flowing water, narrowleaf cottonwood can be found. Relatively thick stands of pinyon pine and juniper

BLM_0006152



*Photo 2.   Menefee Mountain WSA.   The recorded historic cabin in lower Joe's Canyon.*

dominate the area.  These stands open up to park-like expanses of sagebrush and associated drought-resistant plant species.  (See Photo 1)

As elevation increases, the pinyon-juniper gives way to oakbrush which becomes the dominant species above 7,000 feet.  Mountain mahogany and a variety of low-growing annuals and perennials can be found at this elevation.  Scattered stands of ponderosa pine and Douglas fir are evident on the summit of the mountain and in the upper portion of the drainages cutting into the mountain.

Menefee Mountain WSA, along with Weber Mountain WSA and Mesa Verde are isolated and mostly undisturbed island mesas rising above the San Juan River Basin to the south and the Montezuma Valley to the north.  The surrounding lands are heavily modified from their natural condition by intensive farming and ranching.  The WSA serves as a refuge for native flora and fauna that have been displaced by human activities.  Riparian vegetation along the numerous intermittent streams provides valuable and diverse habitat for many wildlife

species and is a vital component of the WSA environment.  In winter, deer and elk herds migrate from summer range on the Glade and the La Plata Mountains to the lower slopes of Menefee Mountain.  The area has a population of black bear and bobcat and the highest concentration of mountain lion in Colorado, most likely because they are not hunted at Mesa Verde and the resulting large population forces the younger lions out of the park.

This WSA contains six inventoried pair of golden eagles (year-round inhabitants) and two pair of hunting bald eagles during the winter.  The threatened and endangered peregrine falcons hunt the area during the summer.  The WSA may contain at least three federally listed threatened and endangered plant species:  *Sclerocactus mesa-verde* (Mesa Verde cactus), *Pediocactus knowltonii* (Knowlton miniature cactus), and *Astrogalus humillimus* (Mancos milkvetch).  These plants are from the desert zones to the south and are indicative of the unique transition ecosystem that exists in Menefee WSA.

222

BLM_0006153

Only minor imprints of man are found within the WSA. There are ways in the extreme northern part of the area and in East Canyon. There is one silted-in and revegetated stock pond in the southern part. Two small historic coal prospects and a deteriorating log cabin near the mouth of Joe's Canyon have all been recorded as historic cultural resource sites. (See Photo 2) These imprints are all screened by topography and vegetation and do not adversely affect the naturalness of the WSA.

## Solitude

Due to the topography and vegetative screening of the area, Menefee Mountain WSA offers outstanding opportunities for solitude. Access into the area is through a series of canyons interspersed throughout the WSA and separated from one another by steep slopes and cliffs. This limited access due to the rugged topography of the area would tend to disperse users throughout the canyons. Since the mountain top is more of a ridge-like spine, there are no distinguishable focal points that would concentrate use in one area.

Topographic isolation and screening within the canyons create numerous secluded sites. Along the slopes and ridges of the mountain, rocky outcrops and overhangs provide isolated alcoves. Vegetative screening within the pinyon-juniper and oakbrush further enhances opportunities for solitude. Along the ridge top, topographic and vegetative screening are lessened. The vastness of the view, however, gives one the feeling of remoteness, contributing to the sense of solitude.

## Primitive and Unconfined Recreation

Menefee Mountain WSA provides outstanding opportunities for primitive and unconfined recreation. The rugged terrain provides challenges for the hiker, backpacker, and climber. Some of the drainages get increasingly difficult to hike as one approaches the higher elevations and in a few places, technical climbing can be done. Though access to the top of the mountain is strenuous, the visitor is rewarded with panoramic views including the La Plata Mountains, Lone Cone and Dolores Peaks, Sleeping Ute Mountain and Mesa Verde - all in Colorado;

the Abajo Mountains in Utah; the Carrizo and Chuska Mountains, and Shiprock in New Mexico. (See Photo 3.)

Recreation opportunities include hunting, sightseeing, photography, exploring and bird watching. The exceptional scenic vistas, chance encounters with wildlife such as eagles and mountain lion, and viewing archaeologic sites, all enhance the area's outstanding opportunities for primitive and unconfined recreation.

## Special Features

Menefee Mountain WSA, like Weber Mountain WSA, is a continuation of the geologic landform upon which sits Mesa Verde National Park; isolated from the park by the Mancos River and Weber Mountain. (See Photo 3) The Mesa Verde Wilderness Area (8,105 acres) is in some places contiguous to Weber WSA. As Mesa Verde Wilderness Area is closed to the public because of fragile and important archeological values, Menefee offers a unique opportunity for ecological and archeological visitation and study by the public. Menefee Mountain is largely uninventoried for cultural resources. Out of a total of 7,089 acres, only 320 acres have been intensively inventoried. Four prehistoric and historic sites have been recorded. One of these sites is at the southern extreme of Menefee Mountain. The site is a large rubble mound and is probably a late Anasazi pueblo. This site is even mentioned in the original area land survey of 1877 by Jason Fahringer who writes of artifacts spilling off the mountain from a site above "with abundant pottery". One historic coal prospect and one historic homestead are also recorded. Some important sites are expected to exist but the area does not have a high potential for a large number of sites because the terrain is much more rugged and lacks the tableland aspect of Mesa Verde.

The area contains a scenic and interesting variety of sedimentary rock laid down during the Cretaceous Period. Mancos shale was formed as a result of large amounts of deposition under marine conditions. When this area became shore zone, Point Lookout and Cliff House Sandstone were laid down (and now form the massive, blocky cliffs) and the swamp vegetation formed coal beds. Many of these beds contain invertebrate mollusk remains and fossil plant material. The Mancos Shale and Menefee Formation are both known to contain fossil wood.

BLM_0006154

The formations are well exposed and provide excellent opportunity for geologic study as well as natural beauty - alternating beds of tan sandstone, gray and brown claystone and siltstone, coal and scattered layers of ironstone and limestone concretions (Fahringer, in the 1877 land survey, mentions "beds of fossiliferous limestone" in what is now the WSA).

## DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

### *Assessing the diversity of natural systems and features as represented by ecosystems*

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System, although Menefee's transition zone aspect is unique. The WSA is in the transition between and contains two ecosystems: the Colorado Plateau Province and the Rocky Mountain Forest Province (Bailey-Kuchler classification system). Menefee contains the pinyon/juniper woodland (5,894 acres) and pine-Douglas Fir (368 acres) vegetation zones from the Colorado Plateau Province. The Colorado Plateau pinyon/juniper ecosystem is represented in Colorado by only one other designated wilderness area; Mesa Verde National Park Wilderness Area which is closed to the public. The Colorado Plateau, pine-Douglas Fir ecosystem is not represented in Colorado. Menefee also contains the mountain mahogany-oak scrub zone from the Rocky Mountain Province (867 acres) which is represented in the National Wilderness Preservation System by 80,852 acres, none of which are in Colorado. (See Table 2)

## Table 2 - Ecosystem Representation

| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas | acres | Other BLM Studies areas | acres |
|---|---|---|---|---|
| **Nationwide** | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 11 | 1,401,745 | 85 | 2,142,602 |
| Pine-Douglas Fir | 6 | 125,523 | 8 | 18,930 |
| Rocky Mountain Forest Province | | | | |
| Mountain Mahogany-Oak Scrub | 7 | 80,852 | 7 | 35,840 |
| *Colorado* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 1 | 8,105 | 17 | 293,837 |
| Pine-Douglas Fir | 0 | 0 | 3 | 855 |
| Rocky Mountain Forest Province | | | | |
| Mountain Mahogany-Oak Scrub | 0 | 0 | 5 | 30,495 |

BLM_0006155



*Photo 3. Menefee Mountain WSA. View west from Menefee Peak across Weber Canyon to Weber WSA. Mesa Verde National Park in mid-photo and the Abajo Mountains in Utah are in the distant right.*

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The Menefee Mountain WSA is not within a five-hour drive of a major population center (Standard Metropolitan Statistical Area).

*Balancing the geographic distribution of wilderness areas*

The Menefee Mountain WSA would contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. The nearest designated wilderness area (Mesa Verde National Park Wilderness; 8,105 acres) is three miles to the west. Mesa Verde Wilderness is not open to the public due to important archeological values. Two to three hours to the north of Weber is Forest Service Lizard Head (41,189 acres) and Mt. Sneffels (16,210 acres) Wilderness Areas; areas of high mountain landform and ecosystem and thereby unavailable for most public use during winter and spring. Three hours to the north is the BLM Dolores

River Canyon WSA which contains 29,415 acres recommended for wilderness designation. Because of its near year-round accessibility and Colorado Plateau/Rocky Mountain Forest transition ecosystem, Menefee Mountain WSA would expand and balance opportunities to attain diverse wilderness experiences.

### MANAGEABILITY

The Menefee Mountain WSA could be effectively managed to preserve its wilderness character. There are no pre FLPMA or post FLPMA oil and gas leases, no coal leases, and no patented or unpatented mining claims within the WSA. Approximately one half of the WSA is unallotted for grazing although the Joe's Canyon area is part of a larger allotment which extends primarily onto private land to the east. No range improvement projects are planned. Even though the WSA contains a 40 acre private inholding and 120 acres of split-estate mineral land (80 acres of which belong to Montezuma County), no management conflicts would be expected.

BLM_0006156

The one potential management problem is associated with peripheral, flat-land parces included within the WSA boundaries (See *Recommendation and Rationale,* this report for a complete discussion). The Menefee Mountain WSA Environmental Impact Statement included a partial wilderness alternative which would enhance the manageability of this WSA. This alternative discussed deleting the several flat-land parcels (1,713 total acres) and using the base of the mountain as a more natural and more easily identifiable topographic boundary.

## ENERGY AND MINERAL RESOURCE VALUES

Menefee Mountain WSA energy and mineral resources were evaluated in *GEM (Geological, Energy, and Minerals); Resource Assessment for Region 4, Colorado Plateau* - submitted to BLM by Mountain States Mineral Enterprises Inc. in May 1983, and the *Mineral Summaries* prepared for BLM by the U.S. Geological Survey and the Bureau of Mines in February, 1990.

Hydrocarbons (oil, gas, carbon dioxide, helium): There is one well within the original WSA boundaries with a small "show" of oil and gas. There is a high probability that the resources could be found in the northwest tip of the WSA which is near the Sierra Oil and Gas Field, a small field of limited production. Accessibility of this resource is rated fair to poor and economic potential for this resource is rated poor.

Coal: Two historic coal prospects are recorded but no information on their coal deposits occurs. There is high probability that coal exists in the WSA (Menefee is partially in a Known Recoverable Coal Resource Area). Accessibility and economic potential for coal is rated as poor. There are no coal leases in the WSA.

Energy and related minerals (uranium, vanadium): No known deposits and moderate potential for occurrence although the Jurassic Morrison Formation (the uranium/vanadium bearing formation) is not exposed in the WSA. Accessibility and economic potential are not rated.

Precious and base metals (copper, gold, silver, lead, zinc): No known deposits and no potential that deposits exist.

Clays and cut sandstone: No known deposits, but a high probability that deposits exist. However, accessibility and economic potential are listed at low to moderate.

Overall, Menefee Mountain WSA is considered to have limited economic potential for mineral resource development, which is reflected in the absence of actual development.

## IMPACTS ON RESOURCES

The following comparative impact table (Table 3) summarizes the effects on pertinent resources for the three alternatives considered for this WSA.

BLM_0006157

## Table 3 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Wilderness Values* | *Under this alternative, wilderness values would remain largely unchanged in the 4,040 acres that are managed with the ORV restrictions and NSO stipulation. Naturalness could be irretrievably lost on the remaining 3,089 acres that are not managed with the ORV closure or NSO stipulation. However, because no ORV or mineral activity is projected, wilderness values will not be diminished.* | *Wilderness designation would provide statutory, long-term protection for wilderness values on 7,129 acres. Natural and supplemental values would be maintained by the prohibition of motorized recreational use and mineral development. Opportunities for solitude and primitive, unconfined recreation would be maintained because the anticipated increase in visitor use associated with wilderness designation would be incidental.* | *Under this alternative, the wilderness values in the 5,416 acres designated as suitable for wilderness would be permanently protected. Opportunities for primitive, unconfined recreation would not be diminished as a result of the anticipated increase in visitor use associated with wilderness designation. The wilderness values on the remaining 1,713 acres designated as nonsuitable could be irretrievably lost if these areas were to receive motorized use or were developed for minerals. Since no activity is projected, wilderness values in these areas would not change.* |
| *Impacts on Cultural Resources* | *Under this alternative, there would be no impact on the cultural resources protected by the management restrictions on ORV use and the NSO stipulation. And, since no ORV or mineral activity is projected in the remaining 3,089 acres not carrying these restrictions, there would be no impact on these cultural resources either.* | *Under this alternative, the cultural resources in the WSA would be well protected by wilderness management. Wilderness designation provides for the WSA-wide exclusion of motorized recreational use and by the mineral withdrawal. As such, this alternative would provide comprehensive protection for the cultural resources in the entire 7,129 acre WSA.* | *Under the Partial Wilderness Alternative, the cultural resources in the suitable portion of the WSA (5,416 acres) would be well protected by wilderness management and restrictions on motorized recreational use and mineral development. There are no known cultural resouces in the remaining 1,713 acres designated as nonsuitable. Any sites that may exist would be protected by natural terrain limitations, as well as ORV closure and NSO stipulation on parts of the area.* |

BLM 0006158

MENEFEE MOUNTAIN WSA                                                              CO-030-251

## Table 3 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Recreational Opportunities and Use* | *Approximately 400 user days of non-motorized, backcountry recreation use (hiking, horseback riding, hunting, backpacking) would be maintained under this alternative. Of the WSA, 4,040 acres (57 percent) are protected by the ORV closure and NSO stipulation. Since ORV recreation and mineral activity is not projected, recreation opportunities and use on the remaining 3,089 acres will not be diminished.* | *Recreational use would increase slightly over a 10-year period. Excellent opportunities will be preserved for non-motorized, backcountry recreational activities.* | *Under this alternative, recreational use in the 5,416 acres designated as suitable for wilderness would increase slightly over a 10-year period. However, this increase would be so incidental that it would not affect the character of recreational use in this area. Excellent opportunities will be preserved for non-motorized recreational use through exclusion of motorized use and mineral development.* |
| *Impacts on Energy and Mineral Exploration* | *Fifty-seven percent of the WSA has no surface occupancy; the remaining 43 percent is open. However, it is projected that the oil and gas reserves under the WSA would remain undeveloped. Production of locatable metal, energy minerals, and mineral materials is not projected to occur.* | *Under the All Wilderness Alternative, there would be no impact on production of energy or minerals in the WSA. There are no pre-FLPMA leases to be developed. And since there are no mining claims or coal leases and no projected development for these resources, the restriction on mineral development would have no impact on future exploration and production.* | *Under the Partial Wilderness Alternative, there would be no development or production for energy or minerals in the 5,416 acres designated as suitable. There are no pre-FLPMA leases. And since there are no mining claims or coal leases and no projected development for these resources, the restriction on mineral development would not affect future production.*<br><br>*Further, there probably would be no development or production for either energy or minerals in the remaining 1,713 acres designated as non-suitable. Although there could be exploration and production, no mineral activity is projected* |

228

BLM_0006159

## Table 3 - Comparative Summary of the Impacts by Alternative (continued)

| Impact   Topics | Recommendation: No  Wilderness Alternative | All   Wilderness Alternative | Partial   Wilderness Alternative |
|---|---|---|---|
| *Impacts  on   Wildlife Habitat  and Populations* | *Under this alternative, the existing habitat and forage conditions would be maintained for the populations of 220 deer and 45 elk. Restrictions on ORV use and mineral development would protect wildlife habitat and populations on 4,040 acres of the WSA. These resources would remain stable in the long-term on the remaining 3,089 acres without these restrictions since motorized use and mineral activity are not projected.* | *Under this alternative, the existing habitat and forage conditions would be maintained for the populations of approximately 220 deer and 45 elk. Prohibiting ORV use and mineral development would protect wildlife habitat and populations.* | *The existing habitat and forage conditions would be maintained for populations of approximately 220 deer and 45 elk. Restrictions on ORV use and mineral development would permanently protect wildlife habitat and populations on 5,416 acres of the WSA. The slight increase in visitor use would not affect the wildlife habitat or populations in this area.*<br><br>*Wildlife habitat and populations in the 1,713 non-suitable area would remain stable especially since ORV and mineral activity is not projected.* |

## LOCAL SOCIAL AND ECONOMIC CONSIDERATIONS

Designation or non-designation of this WSA as wilderness would have negligible impacts on local economic conditions. Social factors were not considered a significant issue in the study.

## SUMMARY OF WSA SPECIFIC PUBLIC COMMENTS

Public involvement has occurred throughout the wilderness review process. Certain comments received during the inventory process and early stages of the Draft EIS were used to develop significant study issues and various alternatives for the ultimate management of those lands with wilderness values.

During formal public review of the Draft Environmental Impact Statement, a total of 97 comments were received which specifically addressed this WSA--54 were written and 43 were oral statements received at public hearings. In general, 93 comments supported wilderness designation and 4 favored releasing the area for other uses (no wilderness). Specific comments by those favoring wilderness designation centered on the preservation of natural habitat for wildlife. Protection of ecological diversity and scenic beauty were also major concerns. Solitude, the primitive character of Menefee Mountain, and the proximity of Mesa Verde were all mentioned in several comments. Those opposing wilderness designation were concerned that wilderness would preclude oil, gas and coal development, or that there were range related conflicts. No comments specifically addressing this WSA were received from Federal, state or local agencies.

BLM_0006160



WEBER MOUNTAIN
WSA

RECOMMENEDED FOR WILDERNESS (NONE)

RECOMMENDED FOR NONWILDERNESS

LAND OUTSIDE WSA RECOMMENDED FOR WILDERNESS. (none)

SPLIT ESTATE (none)

STATE (none)

PRIVATE (none)

N

SCALE 1:100000

WEBER MOUNTAIN WSA
PROPOSAL
CO-030-252

Miles  1  0  1  2  3

January 1991

BLM_0006161

# WEBER MOUNTAIN
# WILDERNESS STUDY AREA

## The Study Area -- 6,303 acres

The Weber Mountain WSA (CO-030-252) is located in Montezuma County, approximately three miles south of Mancos, Colorado and just east of Mesa Verde National Park. There are no inholdings in the WSA; all 6,303 acres are BLM. The north boundary is defined by impacts of man - agricultural work or oil and gas well pads and access routes. The south boundary is determined by private property in the valley of Weber Canyon. The lateral boundaries - both east and west sides - are also the BLM/private property lines and a Colorado state land section. The west boundary is contiguous with Mesa Verde for approximately two miles in two separate sections. Most of the surrounding private parcels have been cleared for grazing or cultivation. (See Photo 1) The WSA is surrounded by mostly private land with small sections of public and Colorado state land. The area is shown on the map.

Topography consists of numerous short, steep canyons radiating from Weber Mountain, a north/south running linear-shaped mountain. (See Photo 2) Elevations range from 6,600 feet at the base of the slope up to the long ridge of the mountain at 8,200 feet. Vegetation varies with altitude; pinyon pine/juniper at lower elevations with oakbrush and pockets of ponderosa and spruce/fir at higher elevations. Weber Mountain, like Menefee Mountain just to the east, is part of the same geologic landform upon which Mesa Verde National Park sits - a large uplifted mesa formation sloping gently to the south. Weber Mountain was isolated from Mesa Verde by the cutting action of the Mancos River. As in Mesa Verde, Weber WSA contains archeological sites related to the Anasazi culture - communities of prehistoric farmers who lived in earthen and stone structures 6-20 centuries ago.

The WSA was studied under section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the San Juan/San Miguel Planning Area Final Wilderness Environmental Impact Statement published November 1990. Three alternatives were analyzed in the EIS: all wilderness (6,303 acres), partial wilderness

(5,362 acres included and 941 acres deleted), and a no wilderness alternative which is the recommendation of this report.

## Recommendation and Rationale

0 acres recommended for wilderness

6,303 acres recommended for nonwilderness

The recommendation is to not designate Weber Mountain WSA as wilderness and to release the area for uses other than wilderness. The all wilderness alternative is the environmentally preferable alternative since its implementation would result in the least change to the natural environment over the long term.

The primary reason for the no wilderness recommendation is the existence of 2 oil and gas leases dating from before the Federal Land Policy and Management Act of 1976 (pre-FLPMA oil and gas leases). Pre-FLPMA leases are not subject to the regulations that FLPMA created and therefore lease holders could develop these leases by building a road to, drilling from, and occupying a drill pad, all on the ground-surface of the lease. These 2 leases are on the northern tip of Weber Mountain and comprise 1,338 acres or 21 percent of the total acreage in the WSA. The leases are consolidated by unit agreements with producing leases outside the WSA - "held by production" - they will not expire as long as other wells in the unit agreement are producing. Even though the leases are held by production and extensive seismic exploration has been done in the WSA, no development of these leases has occurred, even in years of high oil and gas prices. This WSA is not in a KGS (Known Geologic Structure); an area of known production of oil and gas. It may be that even if oil and gas are present, profitable recovery is not possible; but it cannot be assumed that these leases will never be developed.

Because the leases are pre-FLPMA, and "no-surface-occupancy" stipulations cannot be imposed, management to preserve the wilderness characteristics of Weber Mountain WSA would be complex,

BLM 0006162

difficult, and expensive. It is estimated that a total of 10 acres of surface disturbance in 1 to 2-acre scattered parcels (drill pads plus access roads) would occur if both leases were developed. Some of the drill pads might be located on ridgelines or high points which would visually impact a large area, not just the directly disturbed small parcels. Solitude, naturalness, and opportunity for primitive and unconfined recreation would all be impacted in a large portion of the WSA because of the sights and sounds of well site construction.

Under the current management plan, BLM does require that there be no long-term visual impairment of the area by lease development. Because of the rugged, rocky topography and old growth pinyon-juniper woodland, total and acceptable reclamation can be a long and expensive process requiring great effort by both the lease holder and BLM. As a result of these stringent restrictions, the lease holder may find it to be more economical to use directional drilling (slant drilling) from outside the WSA boundary to hit a target under the WSA. It is estimated

that 80 percent of the oil and gas reserves of these leases could be recovered using direction drilling techniques, given current technology and market conditions. But it cannot be assumed that directional drilling would be the method employed in both leases as this method is not actually stipulated in the pre-FLPMA lease agreements.

The San Juan/San Miguel Resource Management Plan, September 1985 states that current management of Weber Mountain WSA is directed toward the goal of preserving semiprimitive recreation values, wildlife habitat, and the outstanding scenic qualities of the area. To do this, the majority of Weber Mountain is closed to off-road vehicles and managed under Visual Resource Management Class II standards. These standards state that the character of the existing landscape should be retained and the level of change to the landscape should be low. Activities and projects may be seen but should not attract the attention of the casual observer. Visual constraints on uses will remain reasonable but should reduce visual impacts to the extent possible.



..... Looking east in Weber WSA across agricultural land in the Mancos River Valley.

Photo 1. Weber Mountain WSA. Looking east ...

232

BLM_0006163

WEBER MOUNTAIN WSA                                                CO-030-252

In addition, if future leasing or renewal of pre-FLPMA leases does occur, a no-surface-occupancy stipulation will be included in the lease agreement for the majority of the WSA. This stipulation prohibits occupancy or disturbance of all or part of the lease surface in order to protect special values or uses. Lessees may exploit the oil and gas or geothermal resource in this lease by directional drilling from sites outside the no-surface-occupancy area.

An additional reason for the no-wilderness recommendation is that wilderness management of Weber would be made very difficult by the inclusion in the WSA of several parcels of land (941 acres total) which are easily accessible in motorized vehicles

and are of a lesser wilderness quality than most of the WSA. The wilderness inventory process identified roadless natural areas which resulted in the 6,303 acre Weber Mountain WSA. This roadless area included several undisturbed yet fairly flat land parcels extending down off the slope of Weber Mountain on the periphery of the WSA. These parcels abut private land, much of it cleared for grazing and cultivation. These parcels have a lowered wilderness quality and an increased potential for management conflicts due to vehicular access, the sights and sounds of working farm machinery, and other peripheral nonwilderness uses such as trespass fuelwood cutting and illegal dumping.

| TABLE 1 - Land Status and Acreage Summary of the Study Area | |
|---|---|
| Within Wilderness Study Area | Acres |
| BLM (surface and subsurface) | 6,303 |
| Split Estate (BLM surface only) | 0 |
| Inholdings (State, private) | 0 |
| Total | 6,303 |
| Within the Recommended Wilderness Boundary | |
| BLM (within WSA) | 0 |
| BLM (outside WSA) | 0 |
| Split Estate (within WSA) | 0 |
| Total BLM Land Recommended for Wilderness | 0 |
| Inholdings(State, private) | 0 |
| Within the Area Not Recommended for Wilderness | |
| BLM | 6,303 |
| Split Estate | 0 |
| Total BLM Land Not Recommended for Wilderness | 6,303 |
| Inholdings(State, private) | 0 |

BLM_0006164



*Photo 2.  Weber Mountain WSA.  Aerial photo looking north from the southern end of the WSA.*

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The Weber Mountain WSA is predominantly natural in character with negligible human imprints. The dominant natural feature of this area is the north-south running linear-shaped Weber Mountain. A spine-like, high ridge (8,000 to 8,200 feet) runs the length of the mountain, branching frequently and creating many steep canyons radiating from the ridge to the valleys below. (See Photo 2.) Exposed sandstone of the Cretaceous Mancos shale and sandstone series forms many overhangs and vertical cliffs in the canyons and on the slopes of the mountain. There is a 600 foot spire-shaped volcanic neck or plug, midslope on the west side of the mountain.

Vegetation varies with altitude. Pinyon/juniper is dominant at most elevations, but oakbrush increases at higher elevations. There are isolated areas of ponderosa and spruce/fir in the upper canyons and near the ridge. Open park-like stretches of sagebrush and perennial shrubs are interspersed among the oakbrush.

Weber Mountain WSA, along with Menefee Mountain WSA and Mesa Verde are isolated and mostly undisturbed island mesas rising above the San Juan River Basin to the south and the Montezuma Valley to the north. The surrounding lands are heavily modified from their natural condition by intensive farming and ranching. (See Photo 1.) The WSA serves as a refuge for native flora and fauna that have been displaced by human activities. Riparian vegetation along the numerous intermittent streams provides valuable and diverse habitat for many wildlife species and is a vital component of the WSA environment. In winter, deer and elk herds migrate from summer range on the Glade and the La Plata Mountains to the lower slopes of Weber Mountain. A small herd of bighorn sheep which was released in Mesa Verde National Park in 1946, has been observed here. The area has a population of black bear and bobcat and the highest concentration of mountain lion in Colorado, most likely because

BLM_0006165

they are not hunted at Mesa Verde and the resulting large population forces the younger lions out of the park.

This WSA contains potential nesting habitat for the threatened and endangered spotted owl and peregrine falcons. Peregrine falcons hunt in the area during summer and habitat is good for hunting by bald eagles in the winter. The WSA may contain at least three federally listed threatened and endangered plant species: *Sclerocactus mesa-verde* (Mesa Verde cactus), *Pediocactus knowltonii* (Knowlton miniature cactus), and *Astrogalus humillimus* (Mancos milkvetch). These plants are from the desert zones to the south and are indicative of the unique transition ecosystem that exists in Weber WSA.

Man's only imprint in the WSA is an old, silted-in water catchment along a drainage in the center of the area. The pond was 20 feet wide and 40 feet long with a three foot high dam. It contains no water and is revegetated with perennial and annual shrubs. There is no access way to the reservoir and its affect on the naturalness of the area is negligible.

### Solitude

Due to the topography and vegetative screening of the area, Weber Mountain WSA offers outstanding opportunities for solitude. Access into the area is possible through a series of canyons interspersed throughout the WSA and separated from one another by steep slopes and cliffs. This limited access due to the rugged topography of the area would tend to disperse users throughout the canyons. Since the mountain top is more of a ridge-like spine, there are no distinguishable focal points that would concentrate use in one area. (See Photo 2)

Topographic isolation and screening within the canyons create numerous secluded sites. Along the slopes and ridges of the mountain, rocky outcrops and overhangs provide isolated alcoves. (See Photo 3) Vegetative screening within the pinyon-juniper and oakbrush further enhances opportunities for solitude.

Along the ridge top, topographic and vegetative screening are lessened. The vastness of the view, however, gives one the feeling of remoteness, contributing to the sense of solitude. (See Photo 3)

### Primitive and Unconfined Recreation

Weber Mountain WSA provides outstanding

opportunities for primitive and unconfined recreation. The rugged terrain provides challenges for the hiker, backpacker, and climber. Some of the drainages get increasingly difficult to hike as one approaches the higher elevations and in a few places, technical climbing can be done. Though access to the top of the mountain is strenuous, the visitor is rewarded with panoramic views including the La Plata Mountains, Lone Cone, Dolores Peaks and Mesa Verde - all in Colorado; the Abajo Mountains in Utah; the Carrizo and Chuska Mountains, and Shiprock in New Mexico.

Recreation opportunities include hunting, sightseeing, photography, exploring and bird watching. The exceptional scenic vistas, chance encounters with wildlife such as bighorn sheep and mountain lion, and the archaeologic sites all enhance the area's outstanding opportunities for primitive and unconfined recreation.

### Special Features

Weber Mountain WSA is a continuation of the geologic landform upon which sits Mesa Verde National Park; isolated from the park by the Mancos River. The Mesa Verde Wilderness Area (8,105 acres) is in some places contiguous to Weber WSA. As Mesa Verde Wilderness Area is closed to the public because of fragile and important archeological values, Weber offers a unique opportunity for ecological and archeological visitation and study by the public. Weber Mountain is largely uninventoried for cultural resources. Out of a total of 6,303 acres, only 375 acres have been intensively inventoried and nine prehistoric sites have been recorded. Four of the sites are habitations and the remainder are limited activity sites. Some unrecorded pictographs have been found within the WSA by local users. Early land surveys in this area (1870's) did mention several large and significant sites on the lower slopes of Weber Mountain. Important sites are expected to exist but the area does not have a high potential for a large number of sites because the terrain is much more rugged and lacks the tableland aspect of Mesa Verde.

### DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

### Assessing the diversity of natural systems and features as represented by ecosystems

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilder-

ness Preservation System, although Weber's transition zone aspect is unique. The WSA is in the transition between and contains two ecosystems: the Colorado Plateau Province and the Rocky Mountain Forest Province (Bailey-Kuchler classification system). Weber contains the pinyon/juniper woodland vegetation zone (4,646 acres) from the Colorado Plateau Province and this ecosystem is

represented by only one designated wilderness area in Colorado, Mesa Verde National Park Wilderness Area, which is closed to the public. Weber also contains the pine/Douglas fir zone from both the Rocky Mountain (1,230 acres) and Colorado Plateau Province (427 acres). The Colorado Plateau, pine-Douglas fir ecosystem is not represented in Colorado by any designated wilderness areas. (See Table 2)

## Table 2 - Ecosystem Representation

| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas | acres | Other BLM Studies areas | acres |
|---|---|---|---|---|
| **Nationwide** | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 11 | 1,401,745 | 85 | 2,142,602 |
| Pine-Douglas Fir | 6 | 125,523 | 8 | 18,930 |
| Rocky Mountain Forest Province | | | | |
| Pine-Douglas Fir Forest | 10 | 210,751 | 13 | 93,601 |
| **Colorado** | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 1 | 8,105 | 17 | 293,837 |
| Pine-Douglas Fir | 0 | 0 | 3 | 855 |
| Rocky Mountain Forest Province | | | | |
| Pine-Douglas Fir Forest | 4 | 98,531 | 12 | 92,316 |

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The Weber Mountain WSA is not within a five-hour drive of a major population center (Standard Metropolitan Statistical Area).

*Balancing the geographic distribution of wilderness areas*

The Weber Mountain WSA would contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. The

nearest designated wilderness area (Mesa Verde National Park Wilderness; 8,105 acres) is contiguous to the west. Mesa Verde Wilderness is not open to the public due to important archeological values. Two hours to the north of Weber is Forest Service Lizard Head (41,189 acres) and Mt. Sneffels (16,210 acres) Wilderness Areas; areas of high mountain landform and ecosystem and thereby unavailable for most public use during winter and spring. Three hours to the north is the BLM Dolores River Canyon WSA which contains 29,415 acres recommended for wilderness designation. Because of its near year-round accessibility and Colorado

BLM_0006167

Plateau/Rocky Mountain Forest ecosystem, Weber Mountain WSA would expand and balance opportunities to attain diverse wilderness experiences.

## MANAGEABILITY

The Weber Mountain WSA could be effectively managed to preserve its wilderness character yet complex and expensive management problems could occur - management conflicts associated with 2 pre-FLPMA oil and gas leases and management problems associated with the peripheral, flat-land parcels (see *Recommendations and Rationale,* for a complete discussion). The Weber WSA Environmental Impact Statement included a partial wilderness alternative which could enhance the manageability of the area. This alternative discussed deleting the several flat-land parcels (941 total acres). This would also eliminate some but not all of the pre-FLPMA oil and gas lease acreage and would use the base of the mountain as a more natural and easily identifiable topographic boundary.

There are no other major manageability problems or resource conflicts which would result from wilderness designation. The entire WSA is BLM land; no inholdings. There are no patented or unpatented mining claims within the WSA. The WSA contains portions of four grazing allotments totaling 95 animal unit months (AUM's); however, most use occurs on the lower slopes and no range improvement projects have been proposed within the WSA. The eastern side of the WSA is unallotted.

## ENERGY AND MINERAL RESOURCE VALUES

Weber Mountain WSA energy and mineral resources were evaluated in *GEM (Geological, Energy, and Minerals); Resource Assessment for Region 4, Colorado Plateau* - submitted to BLM by Mountain States Mineral Enterprises Inc. in May 1983, and the *Mineral Summaries*, a U.S. Geological Survey and Bureau of Mines report prepared for BLM in February, 1990.

Hydrocarbons (oil, gas, carbon dioxide, helium): There are no known deposits in the WSA, but there is a moderate probability that the resources could be



*Photo 3. Weber Mountain WSA. From a high point on the west side of Weber Mountain, looking south.*

BLM_0006168

found in the northeast tip of the WSA which is near the Sierra Oil and Gas Field, a small field of limited production. Both accessibility and economic potential for this resource is rated poor.

Coal: No known deposits but there is high probability that coal exists in the WSA (Weber is partially in a Known Recoverable Coal Resource Area). Accessibility and economic potential for coal is rated as poor. There are no coal leases in the WSA.

Energy and related minerals (uranium, vanadium): No known deposits and low potential for occurrence as the Jurassic Morrison Formation (the uranium/vanadium bearing formation) is not exposed in the WSA. Accessibility and economic potential are not rated.

Precious and base metals (copper, gold, silver, lead, zinc): No known deposits and no potential that deposits exist.

Clays and cut sandstone: No known deposits, but a high probability that deposits exist. However, accessibility and economic potential are listed at low to moderate.

Overall, Weber Mountain WSA is considered to have limited economic potential for mineral resource development, which is reflected in the absence of actual development.

## IMPACTS ON RESOURCES

The following comparative impact table (Table 3) summarizes the effects on pertinent resources for the three alternatives considered for this WSA.

## Table 3 - Comparative Summary of the Impacts by Alternative

| Impact   Topics | Recommendation: No   Wilderness Alternative | All   Wilderness Alternative | Partial   Wilderness Alternative |
|---|---|---|---|
| *Impacts   on   Wilderness Values* | *Under this alternative, wilderness values would remain largely unchanged in the 4,680 acres that are managed with the ORV restrictions and NSO stipulation. Naturalness could be irretrievably lost on the remaining 1,623 acres that are not managed with the ORV closure or NSO stipulation. However, because no ORV or mineral activity is projected, wilderness values are not expected to diminish.* | *Wilderness designation would provide statutory, long-term protection for wilderness values on 6,303 acres. Natural and supplemental values would be maintained by the prohibition of motorized recreational use and mineral development. Opportunities for solitude and primitive, unconfined recreation would be maintained because the anticipated increase in visitor use associated with wilderness designation would be so incidental.* | *Under this alternative, the wilderness values in the 5,362 acres designated as suitable for wilderness would be permanently protected. Opportunities for primitive, unconfined recreation would not be diminished as a result of the anticipated increase in visitor use associated with wilderness designation. The wilderness values on the remaining 941 acres designated as nonsuitable could be irretrievably lost if these areas were to receive motorized use or were developed for minerals. However, since no activity is projected, wilderness values in these areas would not change.* |

BLM_0006169

## Table 3 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Cultural Resources* | *Under this alternative, there would be no impact on the cultural resources protected by the management restrictions on ORV use and the NSO stipulation. And, since no ORV or mineral activity is projected in the remaining 1,623 acres not carrying these restrictions, there would be no impact on these cultural resources either.* | *Under this alternative, the cultural resources in the WSA would be well protected by wilderness management. Wilderness designation provides for the WSA-wide exclusion of motorized recreational use and by the mineral withdrawal. As such, this alternative would provide comprehensive protection for the cultural resources in the entire 6,303 acre WSA.* | *The cultural resources in the suitable portion of the WSA (5,362 acres) would be protected by wilderness management and restrictions on motorized recreational use and mineral development. There are no known cultural resources in the remaining 941 acres designated as nonsuitable. Any sites that may exist would be protected by natural terrain limitations, as well as ORV closure and NSO stipulation on parts of the area.* |
| *Impacts on Recreational Opportunities and Use* | *Approximately 400 user days of non-motorized, backcountry recreation use (hiking, horseback riding, hunting, backpacking) would be maintained under this alternative. Of the WSA, 4,680 acres (74 percent) are protected by the ORV closure and NSO stipulation. Since ORV recreation and mineral activity is not projected, recreation opportunities and use on the remaining 1,623 acres will not be diminished.* | *Recreational use would increase slightly over a 10-year period. Excellent opportunities will be preserved for non-motorized, backcountry recreational activities.* | *Recreational use in the 5,362 acres designated as suitable for wilderness would increase slightly over a 10-year period. This increase would be so incidental that it would not affect the character of recreational use in this area. Excellent opportunities will be preserved for non-motorized recreational use through exclusion of motorized use and mineral development.*<br><br>*Recreational use in the remaining 941 acres designated as nonsuitable would not be impacted. Excellent opportunities would exist for non-motorized recreational use because of the restrictions to motorized use and mineral development in parts of the area and natural terrain limitations for ORV use.* |

239

BLM_0006170

## Table 3 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Energy and Mineral Exploration and Production* | *Seventy-four percent of the WSA has no surface occupancy; the remaining 26 percent is open. However, it is projected that the oil and gas reserves under the WSA would remain undeveloped. Production of locatable metal, coal, energy minerals, and mineral materials is not projected to occur.* | *Under the All Wilderness Alternative, there would be no impact on production of energy or minerals in the WSA. Exploration would be precluded. The two pre-FLPMA leases are not projected to be developed. And since there are no mining claims or coal leases and no projected development for these resources, the restriction on mineral development would have no impact on future exploration and production.* | *There would be no exploration or production for energy or minerals in the 5,362 acres designated as suitable, even on the two pre-FLPMA leases. And since there are no mining claims or coal leases and no projected development for these resources, the restriction on mineral development would not affect future exploration and production. Further, there would be no development or production for either energy or minerals in the remaining 941 acres designated as non-suitable. There could be exploration and production in these areas, however, no mineral activity is projected in these areas, even on the two pre-FLPMA leases.* |
| *Impacts on Wildlife Habitat and Populations* | *Under this alternative, the existing habitat and forage conditions would be maintained for wildlife populations, including 200 deer and 40 elk. Restrictions on ORV use and mineral development would protect wildlife habitat and populations on 4,680 acres of the WSA. These resources would remain stable in the long-term on the remaining 1,623 acres without these restrictions since motorized use and mineral activity are not projected.* | *Under this alternative, the existing habitat and forage conditions would be maintained for wildlife populations including approximately 200 deer and 40 elk. Prohibiting ORV use and mineral development would protect wildlife habitat and populations.* | *The existing habitat and forage conditions would be maintained for wildlife populations including approximately 200 deer and 40 elk. Restrictions on ORV use and mineral development would permanently protect wildlife habitat and populations on 5,362 acres of the WSA. The slight increase in visitor use would not affect the wildlife habitat or populations in this area.*<br><br>*Wildlife habitat and populations in the 941 acre nonsuitable area would remain stable since ORV and mineral activity is not projected.* |

BLM_0006171

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 149 of 418

## LOCAL SOCIAL AND ECONOMIC CONSIDERATIONS

Designation or non-designation of this WSA as wilderness would have negligible impacts on local economic conditions. Social factors were not considered a significant issue in the study.

## SUMMARY OF WSA SPECIFIC PUBLIC COMMENTS

Public involvement has occurred throughout the wilderness review process. Certain comments received during the inventory process and early stages of the Draft EIS were used to develop significant study issues and various alternatives for the ultimate management of those lands with wilderness values.

During formal public review of the Draft Environmental Impact Statement, a total of 100 comments were received which specifically addressed this WSA - 57 were written and 43 were oral statements received at public hearings. In general, 96 commenters supported wilderness designation and 4 favored releasing the area for other uses (no wilderness). Specific comments by those favoring wilderness designation centered on the preservation of natural habitat for wildlife. Protection of ecological diversity and scenic beauty were also major concerns. Solitude, the primitive character of Weber Mountain, and the proximity of Mesa Verde were all mentioned in several comments. Those opposing wilderness designation were concerned that wilderness would preclude oil, gas and coal development, or that there were range related conflicts. No comments specifically addressing this WSA were received from Federal, state or local agencies.

BLM 0006172



BLM_0006173

# CROSS CANYON

# WILDERNESS STUDY AREA

## The Study Area -- 12,588 acres

The Cross Canyon WSA (CO-030-265 and UT-060-229) is located in Dolores and Montezuma Counties, Colorado (11,580 acres) and in San Juan County, Utah (1,008 acres). The area is approximately 14 miles southwest of Cahone, Colorado, about one mile southwest of Lowry Pueblo Ruins National Historic Landmark, and five miles north of Hovenweep National Monument. There are no inholdings in this WSA; all 12,588 acres are BLM. The area centers on the Cross, Cow, and Ruin Canyon system. The boundary extends southwest, downcanyon to the point where two roads visually impact the area. Boundaries extend north and east, up canyon only to the point in each of the three canyons where roads, mines, private agriculture and human activity are encountered. The WSA is surrounded by a mixture of public and private land. The area is shown on the map.

The topography of the WSA includes portions of three main canyons (Cross, Ruin, and Cow), which are the topographic continuation of the Cahone Canyon WSA, separated by previous oil and gas activity and uranium mining and exploration. The perennial streams of Cow and Ruin Canyon enter the WSA at elevations of between 6200 and 6400 feet, while Cross Canyon stream enters at 5560 feet. The canyon/stream systems join and leave the WSA as one perennial drainage at 5140 feet. The relatively flat plateau through which these canyons are cut has a gentle southwest down-tilt from its 6500 feet elevation at the northeast boundary of the WSA. Numerous ledges, rock outcrops, and cliffs are exposed in the stair-stepped canyons which range in depth from 300 feet to 900 feet. Vegetation is thick pinyon pine-juniper woodland on the slopes and canyon rim, with sage parks and riparian growth along the canyon bottom. (See Photo 1.) Also present in Cross Canyon WSA are numerous and significant archeological sites related to the Anasazi culture - communities of prehistoric farmers who lived in earthen and stone structures, 6-20 centuries ago. (See Photo 3.)

The WSA was studied under section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the San Juan/San Miguel Planning Area Final Wilderness Environmental Impact Statement published November, 1990. Three alternatives were analyzed in the EIS: all wilderness (12,588 acres), partial wilderness (12,272 acres - the result of 933 acres deleted and 617 acres added from outside the WSA boundary), and a no wilderness alternative which is the recommendation of this report.

## Recommendation and Rationale

0 acres recommended for wilderness

12,588 acres recommended for nonwilderness.

The recommendation is to not designate Cross Canyon WSA as wilderness and to release the area for uses other than wilderness. The all wilderness alternative is the environmentally preferable alternative since its implementation would result in the least change to the natural environment over the long term.

The primary reason for the no wilderness recommendation is the existence of 36 oil and gas leases dating from before the Federal Land Policy and Management Act of 1976 (pre-FLPMA oil and gas leases). Pre-FLPMA leases are not subject to the regulations that FLPMA created and therefore lease holders could develop these leases by building a road to, drilling from, and occupying a drill pad, all on the ground-surface of the lease. These 36 leases comprise 8875 acres or 71 percent of the total acreage in the WSA. These 36 leases and much of Cross WSA are in the Sand Canyon Known Geologic Structure (KGS); an area of known production of oil and gas. The leases are consolidated by unit agreements with producing leases outside the WSA - "held by production" - they will not expire as long as other wells in the unit agreement are producing. Even though the leases are in a KGS and extensive seismic exploration has been done in the WSA, no development of these leases has occurred, even in years of high oil and gas prices. It may be that even

BLM 0006174

if oil and gas are present, profitable recovery is not possible, but it cannot be assumed that these leases will never be developed.

Because the leases are pre-FLPMA, and "no surface occupancy" stipulations cannot be imposed, management to preserve the wilderness characteristics of Cross Canyon WSA would be complex, difficult, and expensive. It is estimated that a total of 51 acres of surface disturbance in 1 to 2-acre scattered parcels (drill pads plus access roads) would occur if all 36 leases were developed. Some of the drill pads might be located within the canyon itself which would visually impact a large area, not just the directly disturbed small parcels. Solitude, naturalness, and opportunity for primitive and unconfined recreation would all be impacted in a large portion of the WSA because of the sights and sounds of well site construction.

Under the current management plan, BLM does require that there be no long-term visual impairment of the area by lease development. Because of the rugged, rocky topography and old growth pinyon-juniper woodland, total and acceptable reclamation

can be a long and expensive process requiring great effort by both the lease holder and BLM. As a result of these stringent restrictions, the lease holder may find it to be more economical to use directional drilling (slant drilling) from outside the WSA boundary to hit a target under the WSA. As Cross Canyon widens near the Utah state line, directional drilling becomes less efficient; rigs drilling from the mesa tops outside the WSA cannot tap reserves under the canyon bottoms as the offset angle is too great. (See Photo 2.) This leads to an estimate of 30-40 percent reserve recovery in the lower stretches of the WSA, yet it is estimated that 70 to 80 percent of reserves could be recovered in the WSA as a whole using this drilling technique. But it cannot be assumed that directional drilling would be the method employed in all 36 leases as this method is not actually stipulated in the pre-FLPMA lease agreements.

An additional reason for the no-wilderness recommendation is that wilderness management of Cross Canyon would be made difficult by the inclusion in the WSA of several parcels of land (933 total acres)



Photo 1. Cross Canyon WSA. Thick riparian vegetation along the main stream in Cross Canyon.

BLM_0006175

rim on the periphery of the WSA. The wilderness inventory process identified roadless natural areas which resulted in the 12,588 acre Cross Canyon WSA. This roadless area included several undisturbed yet flat parcels which extend away from the canyon rims and abut roads, chainings, and cultivated fields. These parcels have a lowered wilderness quality and an increased potential for management conflicts due to sights and sounds of road traffic, the working of farm machinery, and other peripheral non wilderness uses such as trespass firewood cutting and illegal dumping.

## Table 1 - Land Status and Acreage Summary of the Study Area

| | Colorado Acreage | Utah Acreage | Total Acreage |
|---|---|---|---|
| **Within Wilderness Study Area** | | | |
| BLM (surface and subsurface) | 11,580 | 1,008 | 12,588 |
| Split Estate (BLM surface only) | 0 | 0 | 0 |
| Inholdings (State, Private) | 0 | 0 | 0 |
| Total | 11,580 | 1,008 | 12,588 |
| **Within the Recommended Wilderness Boundary** | | | |
| BLM (within WSA) | 0 | 0 | 0 |
| BLM (outside WSA) | 0 | 0 | 0 |
| Split Estate (within WSA) | 0 | 0 | 0 |
| Total BLM Land Recommended for Wilderness | 0 | 0 | 0 |
| Inholdings (State, Private) | 0 | 0 | 0 |
| **Within the Area Not Recommended for Wilderness** | | | |
| BLM | 11,580 | 1,008 | 12,588 |
| Split Estate | 0 | 0 | 0 |
| Total BLM Land Not Recommended for Wilderness | 11,580 | 1,008 | 12,588 |
| Inholdings (State, Private) | 0 | 0 | 0 |

BLM_0006176

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The Cross Canyon WSA is predominantly natural in character with negligible human imprints. The dominant natural feature of this area is the confluence of three deep canyons (Cross, Cow, and Ruin), plus numerous smaller tributary canyons that have been cut by water-flow erosion into the Morrison Formation and Dakota Sandstone. The stair-step canyon slopes range in depth from 300 to 900 feet and are marked by shallow, rocky soils, numerous rock outcrops, and talus slopes. Sandstone cliffs and ledges line the canyon rims. Winding canyon bottoms support riparian vegetation including cottonwood, boxelder, Russian olive, willow, tamarisk and various shrubs. (See Photo 1) Dense pinyon pine-juniper woodland dominates the canyon sides and rim with sage and shrub understory including mormon tea, mountain mahogany, rabbitbrush, cliffrose and antelope bitterbrush.

Cross Canyon broadens as it reaches Utah and the landform gradually changes from semi-desert canyon to a large eroded basin with badland-type formations. (See Photo 2) Vegetation thins as the low eroded hills support only sparse pinyon-juniper with scattered sage, rabbitbrush and grasses. The perennial stream of Cross Canyon retains its character in these lower reaches with dense cottonwood and riparian vegetation.

Although the ecosystem of Cross WSA is in some respects similar to that of other canyons in the region, when considered in the context of the surrounding lands, these WSA canyons take on a greater ecological significance. The plain-like highlands above the canyons were once covered by expansive pinyon/juniper forests, but most of that semi-desert forest habitat has been radically modified in the last century. Nearly all of the private land in the area is now cultivated for dryland farming of beans, wheat and alfalfa. Much of the public land has been chained--the pygmy evergreen forest removed in hopes of improving the range for domestic livestock grazing. The result has been the elimination of much of the natural flora in the region. The rugged, nearly inaccessible canyons in this area

however, were left untouched and constitute refuges where indigenous flora and fauna are still abundant.

In addition, the riparian communities found in the canyon bottoms play a crucial role in arid ecosystems. (See Photo 1) They provide water and cover as well as a travel corridor for animals such as mule deer, that summer in higher country but winter in the canyons. Black bear, mountain lion, coyote and bobcat also use these canyon refuges, some as home territory and others as seasonal range. The riparian plant communities also support a diversity of animals that would otherwise not exist in the area, such as shorebirds and passerine birds that nest in and migrate through the canyons.

Rocky cliffs in the canyons offer nesting sites for raptors such as red-tailed and Cooper's hawks, various owls, golden eagles and prairie falcons. Two endangered raptors, the peregrine falcon and the bald eagle, have been sighted in the WSA and, although neither nests there, it appears that falcons and wintering bald eagles do utilize habitat in the area. Cross Canyon contains potential habitat for the BLM sensitive, federal candidate species *Astragalus naturitensis* (Naturita milkvetch). A 1989 baseline biological study of Cross Canyon found a previously unidentified species of fish which was given automatic BLM special protection status. The study also confirmed that this canyon system is the northern-most example of the Upper Sonoran ecosystem as documented by the identification of the gray hawk, desert spiney lizard, western ribbon snake and the Ord's kangaroo rat.

Three vehicle ways are the only imprints of modern-man. These ways are revegetating and are screened by the surrounding pinyon-juniper woodland - they do not significantly impair the naturalness of the area.

#### Solitude

Topographic and vegetative screening combine to provide outstanding solitude opportunities throughout the canyons of the WSA. The mesa-top parcels of the WSA (see *Recommendation and Rationale*, this report) are undisturbed and therefore offer natural vegetative screening but because of the flat topography and nearness to heavily impacted areas outside the WSA, do offer a wilderness quality and solitude of lesser value than that of the canyons. In

BLM_0006177

CROSS  CANYON  WSA                                                                                    CO-030-265/UT-060-229

the canyon, rugged terrain, stair-stepped deep winding canyons, numerous rock outcrops, and boulder strewn slopes provide topographic screening. The dense cover of pinyon-juniper on the slopes and canyon rims plus riparian growth in the canyon bottoms provide vegetative screening. The canyon-interior configuration of this WSA gives the visitor a feeling of isolation from the sights and sounds of human activity outside the canyon.

### Primitive and Unconfined Recreation

Cross Canyon WSA provides outstanding opportunities for primitive and unconfined recreation. The canyon bottoms provide routes for hiking or horseback riding; the area's geological and archeological features and wildlife offer scenic subject matter for photography and sightseeing; the rugged canyon slopes are a challenge for climbing and rock scrambling; and hunting is a historic use. Numerous secluded camping spots are available. From a mesa or cliff-top, the panorama is of Cross Canyon itself as well as other striking landforms in the area such as the Abajo Mountains to the northwest and

Sleeping Ute Mountain to the southeast. (See Photo 2) The dark green woodland and contrasting tan, gray, and black stained cliffs provide a scenic backdrop for all recreation activities.

### Special Features

Even though only 6 percent of the Colorado acreage has been intensively inventoried, it is known that the area has a high archeological site density. The area was heavily used by the Anasazi culture as it flourished from A.D. 450 to 1300 and some sites suggest that paleo-man may have roamed these canyons as early as 10,000 B.C. Anasazi pueblo habitation sites, rock shelters, cliff dwellings, great kivas, towers and water control devices are numerous. (See Photo 3) These sites are isolated from access and therefore have not yet been impacted by collectors and vandals. Also unique to the canyon because of its ruggedness and remoteness are a large number of historic Indian and European sites. Numerous outlaw and sheep camps, Navajo habitations and old homesteads can be found along the canyon bottoms and steep slopes. The interpre-



Photo 2.   Cross Canyon WSA.   Lower Cross Canyon as it widens into Utah.   Looking east with Sleeping Ute Mountain in background.

BLM_0006178

tative and scientific potential of this canyon is as yet untapped.

In Colorado, Cross Canyon WSA is managed as a Cultural Resource Emphasis Area within the Anasazi Culture Multiple Use Area of Critical Environmental Concern (internal BLM designation, 1986). Management direction prioritizes the preservation and enhancement of the cultural resource properties found within the area. Emphasis is focused on measures needed to protect the soil, vegetation, scenic, cultural, and wildlife resources and thereby the entire cultural resource setting.

Geological formations are well exposed for scientific and educational study: the Summerville and Morrison Formations of the Jurassic Period outcrop and are overlain by Burro Canyon and Dakota Formations of the Upper Cretaceous. The Morrison is rich in fossilized wood and plant remains as well as fossil vertebrate bones. These values are important to many recreation users who note that such a combination of archeological and educational values, scenic beauty and ruggedness can be found in few places.

## DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

### Assessing the diversity of natural systems and features as represented by ecosystems

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System. The WSA is in the Colorado Plateau Province (Bailey-Kuchler classification system) and contains pinyon-juniper woodland (11,588 acres) and Great Basin sagebrush (1,000 acres) vegetative zones. The pinyon-juniper woodland ecosystem is represented by only one wilderness area in Colorado; that being in Mesa Verde National Park and closed to public recreation, and one in Utah (Box-Death Hollow). The Great Basin sagebrush ecosystem is represented by two areas in the National Wilderness Preservation System, neither of which are in Colorado and one being partially in Utah. (See Table 2).

### Table 2 - Ecosystem Representation

| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas | | Other BLM Studies | |
|---|---|---|---|---|
| | areas | acres | areas | acres |
| *Nationwide* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-juniper Woodland | 11 | 1,401,745 | 85 | 2,142,602 |
| Great Basin Sagebrush | 2 | 95,875 | 5 | 58,421 |
| *Colorado* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-juniper woodland | 1 | 8,105 | 17 | 293,837 |
| Great Basin sagebrush | 0 | 0 | 4 | 57,541 |

BLM_0006179

CROSS CANYON WSA

CO-030-265/UT-060-229

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The Cross Canyon WSA is not within a five-hour drive of a major population center (Standard Metropolitan Statistical Area).

*Balancing the geographic distribution of wilderness areas*

The Cross Canyon WSA would contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. The nearest designated wilderness area (Mesa Verde National Park Wilderness; 8,105 acres) is approximately 1 and 1/2 hours to the southeast. Mesa Verde Wilderness is not open to the public due to important archeological values. Two to three hours to the east of Cross is Forest Service Lizard Head (41,189 acres) and Mt. Sneffels (16,210 acres) Wilderness Areas; areas of high mountain landform and ecosystem and thereby unavailable for most public use during winter and spring. Two hours to the north is the BLM Dolores River Canyon WSA which contains 29,415 acres recommended for wilderness designation. Because of its year-round accessibility and Colorado Plateau ecosystem, Cross Canyon WSA would expand and balance opportunities to attain diverse wilderness experiences.

## MANAGEABILITY

The Cross Canyon WSA could be effectively managed to preserve its wilderness character yet complex and expensive management problems could occur in two areas: management conflicts associated with 36 pre-FLPMA oil and gas leases and management conflicts associated with peripheral, flat-land parcels (see *Recommendations and Rationale,* above for a complete discussion). The Cross Canyon Environmental Impact Statement included a partial wilderness alternative which would enhance the manageability of this WSA. This alternative discussed deleting the several land parcels (933 total acres) by conforming the WSA boundary to the more easily and topographically identifiable canyon rim. This alternative also included the addition of two parcels totaling 617 acres from outside the WSA which would take advantage of natural topographic features to

improve the identifiability and therefore the manageability of the south WSA boundary.

There are no other major manageability problems or resource conflicts which would result from wilderness designation. The entire WSA is BLM land; no inholdings. There are no patented mining claims within the WSA but there are 9 unpatented post-FLPMA mining claims, most likely for uranium. Since the GEM report for Cross Canyon shows only moderate favoribility of uranium occurrence and no known deposits of uranium exist, and since these claims and all future claims are subject to FLPMA generated guidelines, site disturbance associated with access and development of these claims is unlikely (see *Energy and Mineral Resource Values* section below). For the most part, the entire WSA is one grazing allotment with minimal acreage in three other allotments totaling 1000 animal unit months (AUMs); however, no range improvement projects have been proposed within the WSA.

## ENERGY AND MINERAL RESOURCE VALUES

Cross Canyon energy and mineral resources were evaluated in *GEM (Geological, Energy, and Minerals); Resource Assessment for Region 4, Colorado Plateau* - submitted to BLM by Mountain States Mineral Enterprises Inc. in May 1983, and the *Mineral Summaries* prepared for BLM by the U.S. Geological Survey and Bureau of Mines in February, 1990. Extensive seismic testing has been done in and around the WSA; all in a non-impairing manner mostly by helicopter or on foot.

Hydrocarbons (oil, gas, carbon dioxide, helium): There are no known deposits or mineralization present in the WSA (GEM page 111-5). There is high potential that these resources could be found in the WSA, but accessibility and economic potential are unknown (GEM page 111-7). There are also no known deposits of coal in Cross Canyon. There is a low potential that coal is present with accessibility and economic potential unknown.

Energy and related minerals (uranium and vanadium): No known deposits in the WSA with a moderate potential for existence; therefore, accessibility and economic potential are unknown.

Precious and base metals (copper, gold, silver, lead, zinc): No known deposits and no potential that deposits exist.

249

BLM 0006180

Clays and cut sandstone: No known deposits, but a high probability that deposits exist. However, accessibility and economic potential are listed at low to moderate.

Overall, Cross Canyon WSA is considered to have limited potential for mineral discovery and development, which is reflected in the absence of actual development.

## IMPACTS ON RESOURCES

The following comparative impact table (Table 3) summarizes the effects on pertinent resources for the three alternatives considered for this WSA.

## Table 3 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Wilderness Values* | *Wilderness values would remain largely unchanged on 12,057 acres under this alternative. However, surface disturbance (51 acres) and impacts from sights and sounds (480 acres) from seismic exploration and wildcat well development would diminish the wilderness values on these 531 acres.* | *Wilderness designation would provide long-term protection for wilderness values on 12,588 acres. Natural and supplemental values would be maintained by the restrictions to motorized recreational use and mineral development. There would be short-term impacts on 111 acres associated with seismic work and test drilling. However, these disturbances would be reclaimed and substantially unnoticeable after two years. Opportunities for solitude and primitive, unconfined recreation would be maintained because the anticipated increase in visitor use associated with wilderness designation is incidental.* | *Under this alternative, the wilderness values in the 12,272 acres designated as suitable for wilderness would be protected. There would be short-term impacts on 243 acres associated with seismic work and test well drilling. However, these disturbances would be reclaimed and substantially unnoticeable after two years. Opportunities for primitive, unconfined recreation would be preserved.*<br><br>*The wilderness values in the remaining 933 acres designated as nonsuitable would be protected by the ORV closure and 683 acres of the remaining 933 acres designated as nonsuitable would be protected by the NSO stipulation; this area is expected to remain largely unchanged over the long-term.* |

BLM_0006181

CROSS CANYON WSA                                                    CO-030-265/UT-060-229

## Table 3 - Comparative Summary of the Impacts by Alternative (continued)

| Impact   Topics | Recommendation: No   Wilderness Alternative | All   Wilderness Alternative | Partial   Wilderness Alternative |
|---|---|---|---|
| *Impacts on Cultural Resources* | *Under this alternative, the cultural resources in the Colorado portion of the WSA would be protected by provisions in the ACEC plan which provide for protection of all sites and stabilization or recovery of information from 75 sites. In addition, cultural resources in this area will be protected through increased knowledge and management presence, as well as by management restrictions on motorized vehicle use and by an NSO stipulation on 9,580 acres. Cultural resources on the remaining 1,008 acres in Utah are expected to remain largely unchanged.* | *Under this alternative, the cultural resources in the WSA would be protected by wilderness management and by the ACEC plan which provides for protection for all sites and stabilization, or recovery of information from 75 sites. These protective measures would be further supported by the WSA-wide exclusion of motorized recreational use and by the mineral withdrawal. As such, this alternative would provide comprehensive protection for the cultural resources in the entire 12,588 acres WSA.* | *Under this alternative, the cultural resources in the suitable portion of the WSA (12,272 acres) would be protected by the closure to motorized recreational use and by the mineral withdrawal. As such, this alternative would provide comprehensive protection for the cultural resources in this portion of the WSA.*<br><br>*The cultural resources in 250 acres of the portion designated as nonsuitable would also be protected by both the ACEC plan and the closure to motorized recreational use. Although the cultural resources in 683 acres of the non-suitable portion do not have the NSO stipulations, they would continue to be protected by both the ACEC plan and the ORV closure.* |
| *Impacts on Energy and Mineral Exploration and Production* | *Two projected successful wells in the WSA could produce about 400 bbls of oil and 800 mcf of gas per day during the next 20 years. These wells represent 5 percent of the 40 new wells projected to be drilled and producible within Colorado's Paradox Basin in the next 20 years. It is projected that 85 percent of the recoverable reserves would be produced over time, mostly from more favorable wellsites outside the WSA through directional drilling.* | *Although some exploration will occur, production of energy or minerals probably will not occur from within the WSA. However, it is projected that 40 percent of the recoverable reserves would be produced over time by directional drilling from outside the WSA.* | *Under the Partial Wilderness Alternative, even though exploration will occur, production of energy or minerals probably will not occur from within the WSA. However, it is projected that 50 percent of the recoverable reserves would be produced over time by directional drilling the pre-FLPMA leases from outside the WSA.* |

BLM_0006182

CROSS CANYON WSA                                                CO-030-265/UT-060-229

## Table 3 – Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Recreational Opportunities and Use* | *Recreational use would increase to 880 user days per year under this alternative. Excellent opportunities for most backcountry recreational activities would continue to exist for most of the WSA.* | *Under this alternative, recreational use would increase slightly over a 3-5 year period. However, this increase would be so incidental that it would not affect the character of recreation use in this area. Over the long-term, excellent opportunities will be preserved for non-motorized, backcountry recreational activities by eliminating motorized recreational use and mineral development.* | *Under this alternative, recreational use in the 12,272 acres determined suitable for wilderness would increase slightly over a 3-5 year period. However, this increase would be so incidental that it would not affect the character of recreation use in this area. Over the long-term, excellent opportunities will be preserved for non-motorized recreational use through the exclusion of motorized use and mineral development.*<br><br>*The character of recreational use in the 933 acre area designated as non-suitable would not change. In this area, excellent opportunities would still exist for non-motorized recreational use because of the existing closure to motorized use and restrictions on mineral development on 250 acres.* |

### LOCAL SOCIAL AND ECONOMIC CONSIDERATIONS

Designation or non-designation of this WSA as wilderness would have negligible impacts on local economic conditions. Social factors were not considered a significant issue in the study.

### SUMMARY OF WSA-SPECIFIC PUBLIC COMMENTS

Public involvement has occurred throughout the wilderness review process. Certain comments received during the inventory process and early stages of the Draft EIS were used to develop significant study issues and various alternatives for the ul-

timate management of those lands with wilderness values.

During formal public review of the Draft Environmental Impact Statement, a total of 102 comments were received which specifically addressed this WSA - 59 were written and 43 were oral statements received at public hearings. In general, 97 commenters supported wilderness designation and 5 favored releasing the area for other uses (no wilderness). Specific comments by those favoring wilderness designation centered on the preservation of archeological values (prehistoric and historic). Protection of ecological diversity and geologic beauty were also major concerns. Wildlife and saving a vanishing resource of scientific and educational value for

BLM_0006183

CROSS CANYON WSA

CO-030-265/UT-060-229

future generations were both mentioned in several comments.

Those opposing wilderness designation were concerned that wilderness would preclude mineral development and grazing or that the area does not have wilderness characteristics.

One government agency comment specifically addressed this WSA: State of Colorado Department of Natural Resources supported wilderness designation of Cross Canyon WSA.



*Photo 3. Cross Canyon WSA. Standing wall structure, late Pueblo III Anasazi culture of the Hovenweep style.*

BLM_0006184



BLM_0006185

# SQUAW/PAPOOSE CANYON
# WILDERNESS STUDY AREA

## The Study Area — 11,287 acres

The Squaw/Papoose WSA (CO-030-265A and UT-060-277) is located in Dolores County, Colorado (4,611 acres) and San Juan County, Utah (6,676 acres). The area is approximately 12 miles southwest of Dove Creek, Colorado, 5 miles west of Lowry Pueblo Ruins National Historic Landmark and about 8 miles north of Hovenweep National Monument. There are no inholdings in this WSA; all 11,287 acres are BLM. The area centers on Squaw and Papoose Canyons and the narrow mesa that separates the two canyons. The boundary extends southwest, down-canyon to the point where a road visually impacts the area and Utah state land is encountered. Boundaries extend north and east, up-canyon only to the point in both canyons where oil and gas pads, roads or private property and associated development and agriculture are encountered. For the most part, lateral boundaries are the canyon walls. The WSA is surrounded by a mixture of public and private land. The area is shown on the map.

The topography of the WSA includes portions of two main canyons (Squaw, Papoose) and several smaller side drainages. The perennial stream of Squaw Canyon enters the WSA at 6,400 feet and the intermittent Papoose enters at 6,200 feet. The canyon/stream systems join and leave the WSA as one perennial drainage at 5,300 feet. The relatively flat plateau through which these canyons are cut has a gentle southwest down-tilt from its 6,600 feet elevation at the northeast boundary of the WSA. Numerous ledges, rock outcrops, and cliffs are exposed in the stair-stepped canyons which are 600 to 700 feet deep for most of the WSA. Vegetation is thick pinyon pine-juniper woodland on the slopes and canyon rim, with sage parks and riparian growth along the canyon bottom. (See Photo 1) Also present in Squaw/Papoose Canyon WSA are numerous and significant archeological sites related to the Anasazi culture - communities of prehistoric farmers who lived in earthen and stone structures, 6-20 centuries ago.

The WSA was studied under section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the San Juan/San Miguel Planning Area Final Wilderness Environmental Impact Statement published November, 1990. Three alternatives were analyzed in the EIS: all wilderness (11,287 acres), partial wilderness (9,933 acres included and 1,354 acres deleted), and a no wilderness alternative which is the recommendation of this report.

## Recommendation and Rationale

> 0 acres recommended for wilderness
>
> 11,287 acres recommended for non wilderness.

The recommendation is to not designate Squaw/Papoose Canyon WSA as wilderness and to release the area for uses other than wilderness. The all wilderness alternative is the environmentally preferable alternative since its implementation would result in the least change to the natural environment over the long term.

The primary reason for the no wilderness recommendation is the existence of 6 oil and gas leases dating from before the Federal Land Policy and Management Act of 1976 (pre-FLPMA oil and gas leases). Pre-FLPMA leases are not subject to the regulations that FLPMA created and therefore lease holders could develop these leases by building a road to, drilling from, and occupying a drill pad, all on the ground-surface of the lease. These 6 leases comprise 1,586 acres or 14 percent of the total acreage in the WSA. The leases are consolidated by unit agreements with producing leases outside the WSA - "held by production" - they will not expire as long as other wells in the unit agreement are producing. Even though the leases are held by production and extensive seismic exploration has been done in the WSA, no development of these leases has occurred, even in years of high oil and gas prices. Squaw/Papoose is not in a KGS (Known Geologic Structure); an area of known production of oil and gas. It may be that even if oil and gas are present, profitable recovery is not possible, but it cannot be assumed that these leases will never be developed.

255

BLM_0006186

SQUAW/PAPOOSE CANYON WSA                                    CO-030-265A/UT-060-277

Because the leases are pre-FLPMA, and "no surface occupancy" stipulations cannot be imposed, management to preserve the wilderness characteristics of the Squaw/Papoose WSA would be complex, difficult, and expensive. It is estimated that a total of 31 acres of surface disturbance in 1 to 2-acre scattered parcels (drill pads plus access roads) would occur if all 6 leases were developed. Some of the drill pads might be located within the canyon itself which would visually impact a large area, not just the directly disturbed small parcels. Solitude, naturalness, and opportunity for primitive and unconfined recreation would all be impacted in an estimated 410 acres of the WSA because of the sights and sounds of well site construction.

Under the current management plan for the Colorado portion of the WSA, BLM does require that there be no long-term visual impairment of the area by lease development. Because of the rugged, rocky topography and old growth pinyon-juniper woodland, total and acceptable reclamation can be a long and expensive process requiring great effort by

both the lease holder and BLM. (See Photo 2) As a result of these stringent restrictions, the lease holder may find it to be more economical to use directional drilling (slant drilling) from outside the WSA boundary to hit a target under the WSA. It is estimated that 80 percent of the carbon dioxide, oil and gas reserves could be recovered using direction drilling techniques, given current technology and market conditions. But it cannot be assumed that directional drilling would be the method employed in any of the leases as this method is not actually stipulated in the pre-FLPMA lease agreement.

An additional reason for the no-wilderness recommendation is that wilderness management of Squaw/Papoose would be made difficult by the inclusion in the WSA of several parcels of land (1,354 total acres) which are up on and extend away from the canyon rim on the periphery of the WSA. The wilderness inventory process identified roadless natural areas which resulted in the 11,287 acre Squaw/Papoose Canyon WSA. This roadless area included several undisturbed yet flat land parcels



*Photo 1. Squaw/Papoose WSA. Looking southwest, down canyon. Undisturbed, old-growth pinon/juniper on canyon slopes with natural meadows and sage parks along the meandering stream.*

256

BLM_0006187

CO-030-265A/UT-060-277

which extend away from the canyon rims and abut roads, chainings, and cultivated fields.  These parcels have a lowered wilderness quality and an increased potential for management conflicts due to sights and sounds of road traffic, the working of farm machinery, and other peripheral non-wilderness uses such as trespass firewood cutting and illegal dumping.

## TABLE 1 - Land Status and Acreage Summary of the Study Area

| | Colorado Acreage | Utah Acreage | Total Acreage |
|---|---|---|---|
| Within Wilderness Study Area | | | |
| BLM (surface and subsurface) | 4,611 | 6,676 | 11,287 |
| Split Estate (BLM surface only) | 0 | 0 | 0 |
| Inholdings (State, Private) | 0 | 0 | 0 |
| Total | 4,611 | 6,676 | 11,287 |
| Within  the  Recommended  Wilderness  Boundary | | | |
| BLM  (within  WSA) | 0 | 0 | 0 |
| BLM  (outside  WSA) | 0 | 0 | 0 |
| Split  Estate  (within  WSA) | 0 | 0 | 0 |
| Total  BLM  Land  Recommended  for  Wilderness | 0 | 0 | 0 |
| Inholdings(State,Private) | 0 | 0 | 0 |
| Within the Area Not Recommended for Wilderness | | | |
| BLM | 4,611 | 6,676 | 11,287 |
| Split Estate | 0 | 0 | 0 |
| Total BLM Land Not Recommended for Wilderness | 4,611 | 6,676 | 11,287 |
| Inholdings (State, Private) | 0 | 0 | 0 |

BLM 0006188

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The Squaw/Papoose WSA is predominantly natural in character with negligible human imprints. The dominant natural feature of this area is the confluence of two deep, nearly parallel canyons (Squaw and Papoose), plus numerous smaller tributary canyons that have been cut by water-flow erosion into the Morrison Formation and Dakota Sandstone. The stair-step canyon slopes range in depth from 300 to 700 feet and are marked by shallow, rocky soils, numerous rock outcrops, and talus slopes. Sandstone cliffs and ledges line the canyon rims. Winding canyon bottoms support riparian vegetation including cottonwood, sedges, rushes, cattail, willow, tamarisk and various shrubs. Dense pinyon pine-juniper woodland dominate the canyon sides and rim with sage and shrub understory including mormon tea, mountain mahogany, rabbitbrush, cliffrose and antelope bitterbrush.

Although the ecosystem of Squaw/Papoose WSA is in some respects similar to that of other canyons in the region, when considered in the context of the surrounding lands, these WSA canyons take on a greater ecological significance. The plain-like highlands above the canyons were once covered by expansive pinyon/juniper forests, but most of that semi-desert forest habitat has been radically modified in the last century. Nearly all of the private land in the area is now cultivated for dryland farming of beans, wheat and alfalfa. Much of the public land has been chained--the pygmy evergreen forest removed in hopes of improving the range for domestic livestock grazing. The result has been the elimination of much of the natural flora in the region. The rugged, nearly inaccessible canyons in this area however, were left untouched and constitute refuges where indigenous flora and fauna are still abundant. (See Photo 1.)

In addition, the riparian communities found in the canyon bottoms play a crucial role in arid ecosystems. They provide water and cover as well as a travel corridor for animals such as mule deer, that summer in higher country but winter in the canyons. Black bear, mountain lion, coyote, grey fox and bobcat also use these canyon refuges, some as home territory and others as seasonal range. The riparian plant communities also support a diversity of animals that would otherwise not exist in the area, such as shorebirds and passerine birds that nest in and migrate through the canyons and small mammals such as beaver, badger, and long-tailed weasel.

Rocky cliffs in the canyons offer nesting sites for raptors such as red-tailed and Cooper's hawks, various owls, golden eagles and prairie falcons. Two endangered raptors, the peregrine falcon and the bald eagle, have been sighted in the WSA and, although neither nests there, it appears that falcons and wintering bald eagles do utilize habitat in the area. Squaw/Papoose contains potential habitat for the BLM sensitive and federal candidate species *Astragalus naturitensis* (Naturita milkvetch).

One old, eroded and impassable vehicle way and an old fence line are the only imprints of modern-man. These impacts are revegetating and are screened by the surrounding pinyon-juniper woodland - they do not significantly impair the naturalness of the area. (See Photo 2)

#### Solitude

Topographic and vegetative screening combine to provide outstanding solitude opportunities throughout the canyons of the WSA. The mesa-top parcels of the WSA (see *Recommendation and Rationale*), are undisturbed and therefore offer natural vegetative screening but because of the flat topography and nearness to heavily impacted areas outside the WSA, do offer a wilderness quality and solitude of lesser value than that of the canyons. In the canyon, rugged terrain, stair-stepped deep winding canyons, numerous rock outcrops, and boulder strewn slopes provide topographic screening. (See Photo 1) The dense cover of pinyon-juniper on the slopes and canyon rims plus riparian growth in the canyon bottoms provide vegetative screening. The canyon-interior configuration of this WSA gives the visitor a feeling of isolation from the sights and sounds of human activity outside the canyon.

#### Primitive and Unconfined Recreation

The Squaw/Papoose Canyon WSA provides outstanding opportunities for primitive and unconfined recreation. The canyon bottoms provide routes for hiking or horseback riding; the area's

BLM_0006189

SQUAW/PAPOOSE CANYON WSA                                    CO-030-265A/UT-060-277

geological and archeological features and wildlife offer scenic subject matter for photography and sightseeing; the rugged canyon slopes are a challenge for climbing and rock scrambling; and hunting is a historic use. Numerous secluded camping spots are available. From a mesa or cliff-top, the panorama is of the canyons themselves as well as other striking landforms in the area such as the Abajo Mountains to the northwest and Sleeping Ute Mountain to the southeast. (See Photo 1) The dark green woodland and contrasting tan, gray, and black stained cliffs provide a scenic backdrop for all recreation activities.

### Special Features

Even though a very small percentage of the Squaw/ Papoose acreage has been intensively inventoried, it is known that the area has a high archeological site density. The area was heavily used by the Anasazi culture from A.D. 450 to 1300. Anasazi pueblo habitation sites, rock shelters, masonry granaries, tool processing sites and water control devices are numerous. These sites are isolated from access and therefore have not yet been impacted by collectors

and vandals. The interpretative and scientific potential of this canyon is as yet untapped.

In Colorado, the Squaw/Papoose Canyon WSA is managed as a Cultural Resource Emphasis Area within the Anasazi Culture Multiple Use Area of Critical Environmental Concern (internal BLM designation, 1986). Management direction prioritizes the preservation and enhancement of the cultural resource properties found within the area. Emphasis is focused on measures needed to protect the soil, vegetation, scenic, cultural, and wildlife resources and thereby the entire cultural resource setting.

Geological formations are well exposed for scientific and educational study: the Summerville and Morrison Formations of the Jurassic Period outcrop and are overlain by Burro Canyon and Dakota Formations of the Upper Cretaceous. The Morrison is rich in fossilized wood, plant remains and fossil vertebrate bones. These values are important to many recreation users who note that such a combination of archeological and educational values, scenic beauty and ruggedness can be found in few places.



*Photo 2. Squaw/Papoose WSA. Naturalness is not greatly impaired by this old revegetating way but photo does show difficulty of total reclamation.*

BLM_0006190

SQUAW/PAPOOSE  CANYON  WSA                                    CO-030-265A/UT-060-277

## DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

*Assessing the diversity of natural systems and features as represented by ecosystems*

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System. The WSA is in the

Colorado Plateau Province (Bailey-Kuchler classification system) and contains pinyon-juniper woodland vegetation type (11,287 acres). The pinyon-juniper woodland ecosystem is represented by only one wilderness area in Colorado; that being in Mesa Verde National Park which is closed to public recreation; and one area in Utah (Box-Death Hollow). (See Table 2)

## Table 2 - Ecosystem Representation

| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas acres | | Other BLM Studies areas acres | |
|---|---|---|---|---|
| *Nationwide* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 11 | 1,401,745 | 85 | 2,142,602 |
| *Colorado* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 1 | 8,105 | 17 | 293,837 |

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The Squaw/Papoose Canyon WSA is not within a five-hour drive of a major population center (Standard Metropolitan Statistical Area).

## Balancing the Geographic Distribution of Wilderness Areas

The Squaw/Papoose Canyon WSA would contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. The nearest designated wilderness area (Mesa Verde National Park Wilderness; 8,105 acres) is approximately 1 and 1/2 hours to the southeast. Mesa Verde Wilderness is not open to the public due to important archeological values. Two and one-half hours to the east of Squaw/Papoose is Forest Service Lizard Head (41,189 acres) and Mt. Sneffels (16,210 acres) Wilderness Areas; areas of high mountain landform and ecosystem and thereby unavailable for most public use during winter and

spring. Two hours to the north is the BLM Dolores River Canyon WSA which contains 29,415 acres recommended for wilderness designation. Because of its year-round accessibility and Colorado Plateau ecosystem, Squaw/Papoose Canyon WSA would expand and balance opportunities to attain diverse wilderness experiences.

## MANAGEABILITY

The Squaw/Papoose Canyon WSA could be effectively managed to preserve its wilderness character yet complex and expensive management problems could occur in two areas:  management conflicts associated with 6 pre-FLPMA oil and gas leases and management problems with the peripheral, flat land parcels (see *Recommendations and Rationale*). The Squaw/Papoose Canyon Environmental Impact Statement included a partial wilderness alternative which would enhance the manageability of this WSA. This alternative discussed deleting the several flat-land parcels (1,354 total acres), conforming the WSA boundary to the more easily identifiable canyon rim and thereby enhancing

BLM_0006191

the manageability of the area. Two of the six pre-FLPMA oil and gas leases are totally included within these peripheral parcels therefore deletion of these parcels would greatly reduce potential wilderness management problems associated with possible lease development. In addition, the then remaining four leases are in a very narrow section of the WSA which would allow for efficient reserve recovery using slant drilling from outside the WSA.

There are no other major manageability problems or resource conflicts which would result from wilderness designation. The entire WSA is BLM land; no inholdings. There are no patented mining claims within the WSA but there are 22 unpatented post-FLPMA mining claims, most likely for uranium. Since the GEM report for Squaw/Papoose Canyon shows only moderate favorability of uranium occurrence and no known deposits of uranium exist, and because these claims and all future claims are subject to FLPMA generated guidelines, site disturbance associated with access and development of these claims is unlikely (see *Energy and Mineral Resource Values* section below). The WSA contains portions of two grazing allotments administered in Utah and portions of three allotments administered in Colorado. There are approximately 455 animal unit months (AUMs) in use throughout the entire WSA and no range improvement projects have been proposed.

## Energy and Mineral Resource Values

Squaw/Papoose Canyon energy and mineral resources were evaluated in *GEM Geological, Energy, and Minerals; Resource Assessment for Region 4, Colorado Plateau* - submitted to BLM by Mountain States Mineral Enterprises Inc. in May 1983, and the *Mineral Summaries*, prepared for BLM by the U.S. Geological Survey and Bureau of

Mines in February, 1990. Extensive seismic testing has been done in and around the WSA; all in a non-impairing manner mostly by helicopter or on foot.

Hydrocarbons (oil, gas, carbon dioxide, helium): No known deposits but a high potential that these resources could be found in the WSA; accessibility and economic potential are rated good (GEM page 111-7). There are no known deposits of coal in Squaw/Papoose WSA. There is a low potential that coal is present with accessibility and economic potential unknown.

Energy and related minerals (uranium and vanadium): No known deposits in the WSA with a moderate potential for existence; therefore, accessibility and economic potential are unknown.

Precious and base metals (copper, gold, silver, lead, zinc): No known deposits and no potential that deposits exist.

Clays and cut sandstone: No known deposits, but a high probability that deposits exist. However, accessibility and economic potential are listed at low to moderate.

In summary, there is no present production of any mineral, oil or gas within the WSA, although there are two producing oil wells near the WSA boundary. Existence and quantity of these resources is unknown but potential for occurrence is moderate to high.

## Impacts on Resources

The following comparative impact table (Table 3) summarizes the effects on pertinent resources for the three alternatives considered for this WSA.

BLM_0006192

SQUAW/PAPOOSE CANYON WSA

CO-030-265A/UT-060-277

## Table 3 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Wilderness Values* | *Wilderness values would remain largely unchanged on 10,846 acres under this alternative. However, surface disturbance (31 acres) and impacts from sights and sounds (410 acres) from seismic exploration and wildcat well development would diminish the wilderness values on these 441 acres.* | *Wilderness designation would provide long-term protection for wilderness values on 11,287 acres. Natural and supplemental values would be maintained by the restrictions to motorized recreational use and mineral development. There would be short-term impacts on 146 acres associated with seismic work and test drilling. However, these disturbances would be reclaimed and substantially unnoticeable after two years. Opportunities for solitude and primitive, unconfined recreation would be maintained because the anticipated increase in visitor use associated with wilderness designation is incidental.* | *Under this alternative, the wilderness values in the 9,933 acres designated as suitable for wilderness would be protected. There would be short-term impacts on 291 acres associated with seismic work and test well drilling. However, these disturbances would be reclaimed and substantially unnoticeable after two years. Opportunities for primitive, unconfined recreation would be preserved.*<br><br>*The wilderness values in most of the remaining 1,354 acres designated as non-suitable would be protected by the ORV closure. 655 acres of the remaining 1,354 acres designated as non-suitable would be protected by the NSO stipulation. This area is expected to remain largely unchanged over the long-term.* |
| *Impacts on Cultural Resources* | *Under this alternative, the cultural resources in the Colorado portion of the WSA would be protected by provisions in the ACEC plan which provide for protection of all sites and stabilization or recovery of information from 84 sites. In addition, cultural resources in this area will be protected through increased knowledge and management presence, as well as by management restrictions on motorized vehicle use and by an NSO stipulation on 4,026 acres. Cultural resources on the remaining 6,676 acres in Utah are expected to remain largely unchanged.* | *Under this alternative, the cultural resources in the WSA would be protected by wilderness management and by the ACEC plan which provides for protection for all sites and stabilization, or recovery of information from 84 sites. These protective measures would be further supported by the WSA-wide exclusion of motorized recreational use and by the mineral withdrawal. As such, this alternative would provide comprehensive protection for the cultural resources in the entire 11,287 acres WSA.* | *Under this alternative, cultural resources on 11,142 acres would be protected, either by wilderness designation or ORV closure. Cultural resources on the remaining 145 acres would remain largely unchanged.* |

BLM_0006193

## Table 3 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Recreational Opportunities and Use* | *Recreational use would remain at 400 user days per year under this alternative. Excellent opportunities for most backcountry recreational activities would continue to exist for most of the WSA.* | *Under this alternative, recreational use would increase slightly over a 3-5 year period. However, this increase would be so incidental that it would not affect the character of recreation use in this area. Over the long-term, excellent opportunities will be preserved for non-motorized, backcountry recreational activities by eliminating motorized recreational use and mineral development.* | *Under this alternative, recreational use would increase slightly over a 3-5 year period. However, this increase would be so incidental that it would not affect the character of recreation use in this area. Over the long-term, excellent opportunities will be preserved for non-motorized recreational use.* |
| *Impacts on Energy and Mineral Exploration and Production* | *One projected successful well in the WSA could produce about 200 bbls of oil and 800 mcf of gas per day during the next 20 years. This well represents 2 1/2 percent of the 40 new wells projected to be drilled and producible within Colorado's Paradox Basin in the next 20 years. In addition, it is projected that 75 percent of the recoverable reserves would be produced over time, mostly from more favorable wellsites outside the WSA through directional drilling.* | *Although some exploration will occur, production of energy or minerals will not occur from within the WSA. However, it is projected that 60 percent of the recoverable reserves would be produced over time by directional drilling from outside the WSA.* | *Under the Partial Wilderness Alternative, even though exploration will occur, production of energy or minerals will not occur within the WSA. However, it is projected that 65 percent of the recoverable reserves would be produced over time by directional drilling the pre-FLPMA leases from outside the WSA.* |

BLM 0006194

## LOCAL SOCIAL AND ECONOMIC CONSIDERATIONS

Designation or non-designation of this WSA as wilderness would have negligible impacts on local economic conditions. Social factors were not considered a significant issue in the study.

## SUMMARY OF WSA SPECIFIC PUBLIC COMMENTS

Public involvement has occurred throughout the wilderness review process. Certain comments received during the inventory process and early stages of the Draft EIS were used to develop significant study issues and various alternatives for the ultimate management of those lands with wilderness values. Of the 27 public comments received during the inventory phase; 13 favored WSA designation and 14 were opposed to WSA designation. Of these 14, most pointed out impacts of man which they felt interfered with wilderness characteristics of the area. BLM used this information in eliminating impacted areas and developing boundaries which give the WSA its primarily natural character.

During formal public review of the Draft Environmental Impact Statement, a total of 99 comments were received which specifically addressed this WSA - 55 were written and 44 were oral statements received at public hearings. In general, 94 commenters supported wilderness designation and 5 favored releasing the area for other uses (no wilderness). Specific comments by those favoring wilderness designation centered on the preservation of archeological values. Protection of ecological diversity and geologic beauty were also major concerns. Wildlife and saving a vanishing reserve of scientific and educational value for future generations were both mentioned in several comments.

Those opposing wilderness designation were concerned that wilderness would preclude mineral development and grazing or that the area does not have wilderness characteristics. No comments specifically addressing this WSA were received from Federal, state, or local agencies.

BLM_0006195

BLM_0006196



**R 19 W | R 18 W**

| | | | | |
|---|---|---|---|---|
| ☐ | RECOMMENEDED FOR WILDERNESS | ▦ LAND OUTSIDE WSA RECOMMENDED FOR WILDERNESS. | ▤ | STATE |
| ▨ | RECOMMENDED FOR NONWILDERNESS | ⫿⫿ SPLIT ESTATE | ▨ | PRIVATE (None) |

**Scale 1:37500**

Miles 0  1  2  3

**Cahone Canyon Proposal CO-030-265D**

**January 1991**

N

BLM_0006197

# CAHONE   CANYON

# WILDERNESS   STUDY   AREA

## The Study Area -- 8,960 acres

The Cahone Canyon WSA (CO-030-265D) is located in Dolores and Montezuma Counties, approximately 4 miles west of Cahone, Colorado. The WSA is one mile north of Lowry Pueblo Ruins National Historic Landmark. There are no inholdings in this WSA; all 8,960 acres are BLM. The area centers on the Cross, Cahone and Dove Creek Canyon system. The boundary extends southwest, down-canyon to the point where road and oil well disturbances visually impact the area and separate this area from the Cross Canyon WSA. Boundaries extend north and east, up-canyon only to the point in each of the three canyons where agriculture and human activity are encountered. The WSA is surrounded by a mixture of public and private land. The area is shown on the map.

The dominant natural feature of this WSA is the confluence of three deep canyons marked by stair-stepped walls, sandstone cliffs and winding canyon bottoms. The three intermittent streams enter the WSA at elevations of 6,400 to 6,500 feet and leave the area as one stream at 5,900 feet. The streams have cut the canyon system through a flat plateau with an elevation of 6,600 feet causing the canyon walls to gradually rise downstream to a height of 700 feet. (See Photo 1) Vegetation is thick pinyon pine-juniper woodland on the slopes and canyon rim, with sage parks and riparian growth along the canyon bottom. (See Photo 2)

The WSA was studied under section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the San Juan/San Miguel Planning Area Final Wilderness Environmental Impact Statement published November, 1990.

Three alternatives were analyzed in the EIS: all-wilderness (8,960 acres), partial wilderness(7,548 acres included, 1,412 acres deleted),and a no-wilderness alternative which is the recommendation of this report.

## Recommendation and Rationale

> 0 acres recommended for wilderness
>
> 8,960 acres recommended for nonwilderness

The recommendation is to not designate Cahone Canyon WSA as wilderness and to release the area for uses other than wilderness. The all-wilderness alternative is the environmentally preferable alternative since its implementation would result in the least change to the natural environment over the long term.

The primary reason for the no-wilderness recommendation is the existence of 12 oil and gas leases dating from before the Federal Land Policy and Management Act of 1976 (pre-FLPMA oil and gas leases). Pre-FLPMA leases are not subject to the regulations that FLPMA created and therefore the lease holder could develop these leases by building a road to, drilling from, and occupying a drill pad, all on the ground-surface of the lease. These 12 leases comprise 2,360 acres or 26 percent of the total acreage in the WSA. These 12 leases and much of Cahone WSA are in the Sand Canyon Known Geologic Structure (KGS); an area of known production of oil and gas. The leases are consolidated by unit agreements with producing leases outside the WSA - "held by production" - they will not expire as long as other wells in the unit agreements are producing. Even though the leases are in a KGS and extensive seismic exploration has been done in the WSA, no development of these leases has occurred, even in years of high oil and gas prices. The WSA is on the extreme northern margin of the KGS and it may be that if oil and gas are present, profitable recovery is not possible. But it cannot be assumed that these leases will never be developed.

Because the leases are pre-FLPMA, and "no surface occupancy" stipulations cannot be imposed, management to preserve the wilderness characteristics of Cahone Canyon WSA would be complex, difficult, and expensive. It is estimated that a total of 25 acres of surface disturbance in 1 to 2-acre

scattered parcels (drill pads plus access roads) would occur if all 12 leases were developed. Some of the drill pads might be located within the canyon itself which would visually impact a large area, not just the directly disturbed small parcels. Solitude, naturalness, and opportunity for primitive and unconfined recreation would all be impacted in a large portion of the WSA because of the sights and sounds of well site construction.

Under the current management plan, BLM does require that there be no long-term visual impairment of the area by lease development. Because of the rugged, rocky topography and old growth pinyon-juniper woodland, total and acceptable reclamation can be a long and expensive process requiring great effort by both the lease holder and BLM. As a result of these stringent restrictions, the lease holder may find it to be more economical to use directional drilling (slant drilling) from outside the WSA boundary to hit a target under the WSA. It is estimated that 70 to 80 percent of reserves could be recovered

using this drilling technique. But it cannot be assumed that directional drilling would be the method employed in all 12 leases as this method is not actually stipulated in the lease agreements.

An additional reason for the no-wilderness recommendation is that wilderness management of Cahone Canyon would be made difficult by the inclusion in the WSA of several parcels of land (1,412 total acres) which are up on and extend away from the canyon rim on the periphery of the WSA. The wilderness inventory process identified roadless natural areas which resulted in the 8,960 acre Cahone Canyon WSA. This roadless area included several undisturbed yet flat land parcels which extend away from the canyon rims and abut roads and cultivated fields. These parcels have a lowered wilderness quality and an increased potential for management conflicts due to sights and sounds of road traffic, the working of farm machinery, and other peripheral non-wilderness uses such as trespass fuel wood cutting and illegal dumping.

### TABLE 1 - Land Status and Acreage Summary of the Study Area

| Within Wilderness Study Area | Acres |
|---|---|
| BLM (surface and subsurface) | 8,960 |
| Split Estate (BLM surface only) | 0 |
| Inholdings (State, private) | 0 |
| Total | 8,960 |
| **Within the Recommended Wilderness Boundary** | |
| BLM (within WSA) | 0 |
| BLM (outside WSA) | 0 |
| Split Estate (within WSA) | 0 |
| Total BLM Land Recommended for Wilderness | 0 |
| Inholdings (State, Private) | 0 |
| Within the Area Not Recommended for Wilderness | |
| BLM | 8,960 |
| Split Estate | 0 |
| Total BLM Land Not Recommended for Wilderness | 8,960 |
| Inholdings (State, Private) | 0 |

BLM_0006199

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The Cahone Canyon WSA is predominantly natural in character with negligible human imprints. The dominant natural feature of this area is the confluence of three deep canyons (Cross, Cahone, and Dove Creek) that have been cut by water-flow erosion into the Morrison Formation and Dakota Sandstone. The stair-step canyon slopes are marked by shallow, rocky soils, numerous rock outcrops, and talus slopes. Sandstone cliffs and ledges line the canyon rims. (See Photo 1) Winding canyon bottoms support cottonwood, boxelder, Russian olive, willow, tamarisk and various shrubs. (See Photo 2) Pinyon pine-juniper woodland with sage and shrub understory dominate the canyon sides.

The area's unroaded character and riparian habitat make it ideal as a natural refuge for native flora and fauna that have been displaced from neighboring areas by agriculture and other human activities. The habitat values which make this area more productive for deer and other fur-bearers than nearby



*Photo 1. Cahone Canyon WSA. Undisturbed outgrown pinyon-juniper ... tural meadows and sage parks along a meandering stream.*

CAHONE CANYON WSA                                                    CO-030-265D

BLM lands are the secluded alluvial benches and bottoms which serve as birthing and nursery habitat; highly productive alluvial and riparian sites which provide foraging habitat; and hiding cover provided by the unroaded, natural terrain. Small mammals (beaver and badgers), predators (mountain lion, bobcat, and red fox), and raptors (red-tailed and Cooper's hawks, great horned owls, and golden eagles) all use the area. Bald eagles winter-roost in the area and the habitat is ideal for the BLM sensitive and federal candidate species *Astragalus naturitensis* (Naturita milkvetch).

Two vehicle ways are the only imprints of present-day man; one on the southern rim and one on the northern rim of Cahone Canyon. These ways are revegetating and are screened by the surrounding pinyon-juniper woodland - they do not significantly impair the naturalness of the area.

## Solitude

Topographic and vegetative screening combine to provide outstanding solitude opportunities throughout the WSA. The mesa-top parcels of the WSA (see *Recommendation and Rationale*, this report) are undisturbed and therefore offer natural vegetative screening but because of the flat topography and nearness to heavily impacted areas outside the WSA, do offer a wilderness quality and solitude of lesser value than that of the canyons. In the canyon, rugged terrain, stair-stepped deep winding canyons, numerous rock outcrops, and boulder strewn slopes provide topographic screening. The dense cover of pinyon-juniper on the slopes and canyon rims plus riparian growth in the canyon bottoms provide vegetative screening. (See Photos 1 and 2) The canyon-interior configuration of this WSA gives the visitor a feeling of isolation from the sights and sounds of human activity outside the canyon.

## Primitive and Unconfined Recreation

Cahone Canyon WSA provides outstanding opportunities for primitive and unconfined recreation. The canyon bottoms provide routes for hiking or horseback riding; the area's geological and archeological features offer scenic subject matter for photography and sightseeing; the rugged canyon slopes are a challenge for climbing and rock scrambling; and hunting. Numerous secluded camping spots are available. The dark green woodland and contrasting tan, gray, and black stained cliffs provide a scenic backdrop for all recreation activities.

## Special Features

Even though only four percent of the WSA has been intensively inventoried, it is known that the area has a high archeological site density. The area was heavily used by the Anasazi culture as it flourished from A.D. 450 to 1300. Smaller pueblo habitations, cliff dwellings, masonry granaries, and water control devices are numerous. These sites are isolated from access and therefore have not yet been impacted by collectors and vandals. The pristine quality of these sites makes them highly important and potential exists for future discovery, scientific study, and interpretation.

Cross Canyon is managed as a Cultural Resource Emphasis Area within the Anasazi Culture Multiple Use Area of Critical Environmental Concern (internal BLM designation, 1986). Management direction prioritizes the preservation and enhancement of the cultural resource properties found within the area. Emphasis is focused on measures needed to protect the soil, vegetation, scenic, cultural, and wildlife resources and thereby the entire cultural resource setting.

Geological formations are well exposed for scientific and educational study: strata reveal the historic/geological processes of portions of the Jurassic and Cretaceous Periods. In addition, the Morrison Formation is rich in fossil plants and vertebrates.

## DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

### Assessing the diversity of natural systems and features as represented by ecosystems

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System. The WSA is in the Colorado Plateau Province (Bailey-Kuchler classification system) and contains pinyon-juniper woodland (8,204 acres) and Great Basin sagebrush zones (756 acres). The pinyon-juniper woodland ecosystem is represented by only one other wilderness area in Colorado, Mesa Verde National Park which is closed to public recreation. The Great Basin sagebrush ecosystem is represented by two areas in the National Wilderness Preservation System neither of which are in Colorado. (See Table 2)

BLM_0006201

## Table 2 - Ecosystem Representation

| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas | NWPS Areas acres | Other BLM Studies areas | Other BLM Studies acres |
|---|---|---|---|---|
| *Nationwide* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 11 | 1,401,745 | 85 | 2,142,602 |
| Great Basin Sagebrush | 2 | 95,875 | 5 | 58,421 |
| *Colorado* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 1 | 8,105 | 17 | 293,837 |
| Great Basin Sagebrush | 0 | 0 | 4 | 57,541 |

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The Cahone Canyon WSA is not within a five-hour drive of a major population center (Standard Metropolitan Statistical Area).

*Balancing the Geographic Distribution of Wilderness Areas*

The Cahone Canyon WSA would contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. The nearest designated wilderness area (Mesa Verde National Park Wilderness; 8,105 acres) is approximately 1 and 1/2 hours to the southeast. Mesa Verde Wilderness is not open to the public due to important archeological values. Two to three hours to the east of Cahone are the Forest Service Lizard Head (41,189 acres) and Mt. Sneffels (16,210 acres) Wilderness Areas; areas of high mountain landform and ecosystem and thereby unavailable for most public use during winter and spring. Two hours to the north is the BLM Dolores River Canyon WSA which contains 29,415 acres recommended for wilderness designation. Because of its year-round accessibility and Colorado Plateau ecosystem, Cahone Canyon WSA would expand and balance opportunities to attain diverse wilderness experiences.

## MANAGEABILITY

The Cahone Canyon WSA could be effectively managed to preserve its wilderness character yet complex and expensive management problems could occur in two areas: management conflicts associated with 12 pre-FLPMA oil and gas leases and management conflicts associated with peripheral, flat-land parcels (see *Recommendations and Rationale* for a complete discussion). The Cahone Canyon Environmental Impact Statement included a partial wilderness alternative which would enhance the manageability of this WSA. This alternative discussed deleting several land parcels (1,412 total acres), conforming the WSA boundary to the more easily identifiable canyon rim and thereby enhancing the manageability of the area.

There are no other major manageability problems or resource conflicts which would result from wilderness designation. The entire WSA is BLM land; no inholdings. There are no patented or unpatented mining claims within the WSA. The WSA does contain all of one and a small portion of another grazing allotment totaling approximately 415 animal unit months (AUM), however, no range improvement projects have been proposed within the WSA.

271

## ENERGY AND MINERAL RESOURCE VALUES

Cahone Canyon energy and mineral resources were evaluated in *GEM (Geological, Energy, and Minerals); Resource Assessment for Region 4, Colorado Plateau* - submitted to BLM by Mountain States Mineral Enterprises Inc., in May 1983 and the *Mineral Summaries* prepared for BLM by the U.S. Geological Survey and Bureau of Mines in February, 1990. Extensive seismic testing has been done in and around the WSA; all in a non-impairing manner mostly by helicopter or on foot.

Hydrocarbons (oil, gas, carbon dioxide, helium): There are no known deposits or mineralization present in the WSA (GEM page 111-3). There is high potential that these resources could be found in the WSA, but accessibility and economic potential are unknown (GEM page 111-7). There are also no known deposits of coal in Cahone Canyon. There is a moderate potential that coal is present with accessibility and economic potential unknown.

Energy and related minerals (uranium and vanadium): No known deposits in the WSA with a low potential for existence; therefore, accessibility and economic potential were not rated.

Precious and base metals (copper, gold, silver, lead, zinc): No known deposits and no potential that deposits exist.

Clays and cut sandstone: No known deposits, but a high probability that deposits exist. However, accessibility and economic potential are listed at low to moderate.

Overall, Cahone Canyon WSA is considered to have limited potential for mineral discovery and development, probably because the canyon system is not in the central area but on the northern extreme of the Sand Canyon KGS (Known Geologic Structure).

## IMPACTS ON RESOURCES

The following comparative impact table (Table 3) summarizes the effects on pertinent resources for the three alternatives considered for this WSA.



*Photo 2. Cahone Canyon WSA. Lush riparian along stream in this semi-desert canyon.*

BLM_0006203

## Table 3 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Wilderness Values* | *Wilderness values would remain largely unchanged on 8,579 acres under this alternative. However, surface disturbance (21 acres) and impacts from sights and sounds (360 acres) from seismic exploration and wildcat well development would diminish the wilderness values on these 381 acres.* | *Wilderness designation would provide long-term protection for wilderness values on 8,960 acres. Natural and supplemental values would be maintained by the restrictions to motorized recreational use and mineral development. Wilderness values would remain unchanged from the seismic exploration activity. Opportunities for solitude and primitive, unconfined recreation would be maintained because the anticipated increase in visitor use associated with wilderness designation would be so incidental.* | *Under this alternative, the wilderness values in the 7,548 acres designated as suitable for wilderness would be protected. There would be short-term impacts on 191 acres associated with seismic work and test well drilling. However, these disturbances would be reclaimed and substantially unnoticeable after two years. Opportunities for primitive, unconfined recreation would be preserved.*<br><br>*The wilderness values on the remaining 1,412 acres designated as nonsuitable would be protected by the ORV closure on the entire area and by the NSO stipulation on 739 acres. This area is expected to remain largely unchanged over the long-term.* |
| *Impacts on Energy and Mineral Exploration and Production* | *One projected successful well in the WSA could produce about 200 bbls of oil and 400 mcf of gas per day during the next 20 years. This well represents 2 1/2 percent of the 40 new wells projected to be drilled and producible within Colorado's Paradox Basin the next 20 years. In addition, it is projected that 80 percent of the recoverable reserves would be produced over time, mostly from more favorable wellsites outside the WSA through directional drilling.* | *Although some exploration will occur, production of energy or minerals will not occur from within the WSA. However, it is projected that 60 percent of the recoverable reserves would be produced over time by directional drilling from outside the WSA.* | *Under the Partial Wilderness Alternative, even though exploration will occur, production of energy or minerals will not occur from within the WSA. However, it is projected that 70 percent of the recoverable reserves would be produced over time by directional drilling the pre-FLPMA leases from outside the WSA.* |

BLM_0006204

## Table 3 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Cultural Resources* | *Under this alternative, the cultural resources in the WSA would be protected by provisions in the ACEC plan which provide for protection of all sites and stabilization or recovery of information from 28 sites. In addition, cultural resources will be protected through increased knowledge and management presence, as well as by management restrictions on motorized vehicle use (entire WSA is closed) and by an NSO stipulation on 7,851 acres.* | *Under this alternative, the cultural resources in the WSA would be protected by wilderness management and by the ACEC plan which provides for protection for all sites and stabilization, or recovery of information from 28 sites. These protective measures would be further supported by the WSA-wide exclusion of motorized recreational use and by the mineral withdrawal. As such this alternative would provide comprehensive protection for the cultural resources in the entire 8,960 acre WSA.* | *Under this alternative, all cultural sites in the suitable portion would be protected by provisions in the ACEC plan which provide for protection of all sites and stabilization or recovery of information from 28 sites. The cultural resources in the suitable portion of the WSA (7,548 acres) would be protected by the closure to motorized recreational use and by the mineral withdrawal. As such, this alternative would provide comprehensive protection for the cultural resources in this portion of the WSA.*<br><br>*The cultural resources in 739 acres of the portion designated as nonsuitable would also be protected by both the ACEC plan and the closure to motorized recreational use. Although, the cultural resources in 673 acres of the nonsuitable portion do not have the NSO stipulation, they would continue to be protected by both the ACEC plan and the ORV closure.* |

BLM_0006205

## Table 3 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative Impact |
|---|---|---|---|
| *Impacts on Recreational Opportunities and Use* | *Recreational use would remain less than 400 user days per year under this alternative. Excellent opportunities would continue to exist for non-motorized, backcountry recreational activities because of the closure to motorized recreational use (entire WSA is closed) and restrictions on mineral development (7,851 acres with NSO).* | *Under this alternative, recreational use would increase slightly over a 10-year period. However, this increase would be so incidental that it would not affect the character of recreation use in this area. Over the long-term, excellent opportunities will be preserved for non-motorized, backcountry recreational activities by eliminating motorized recreational use and mineral development.* | *Under this alternative, recreational use in the 7,548 acres determined suitable for wilderness would increase slightly over a 10-year period. However, this increase would be so incidental that it would not affect the character of recreation use in this area. Over the long-term, excellent opportunities will be preserved for non-motorized recreational use through the exclusion of motorized use and mineral development.*

*The character of recreational use in the 1,412 acre area designated as non-suitable would not change. In this area, excellent opportunities would still exist for non-motorized recreational use because of the existing closure to motorized use and restrictions on mineral development on 739 acres.* |

BLM_0006206

## LOCAL SOCIAL AND ECONOMIC EFFECTS

Designation or non-designation of this WSA as wilderness would have negligible impacts on local economic conditions. Social factors were not considered a significant issue in the study.

### SUMMARY OF WSA SPECIFIC PUBLIC COMMENTS

Public involvement has occurred throughout the wilderness review process. Certain comments received during the inventory process and early stages of the draft EIS were used to develop significant study issues and various alternatives for the ultimate management of those lands with wilderness values.

During formal public review of the draft Environmental Impact Statement, a total of 97 comments were received which specifically addressed this WSA - 54 were written and 43 were oral statements received at public hearings. In general, 93 commenters supported wilderness designation and 4 favored releasing the area for other uses (no wilderness). Specific comments by those favoring wilderness designation centered on the preservation of archeological values (prehistoric and historic). Protection of ecological diversity and geologic beauty were also major concerns. Wildlife and saving a vanishing reserve of scientific and educational value for future generations were both mentioned in several comments.

Those opposing wilderness designation were concerned that wilderness would preclude mineral development and grazing or that the area does not have wilderness characteristics.

No comments specifically addressing this WSA were received from Federal, State, or local government agencies.

BLM_0006207

277

BLM_0006208



T 43 N

T 42 N

R 16 W    R 15 W    R 15 W    R 14 W

RECOMMENEDED FOR
WILDERNESS  (NONE)

RECOMMENDED FOR
NONWILDERNESS

LAND OUTSIDE WSA
RECOMMENDED FOR WILDERNESS.

SPLIT ESTATE  (NONE)

STATE (NONE WITHIN THE WSA)

PRIVATE (NONE
WITHIN THE WSA)

McKenna Peak  WSA
Proposal
CO-030-286

Miles    1    0    1    2    3

January 1991

BLM_0006209

# MCKENNA PEAK

# WILDERNESS STUDY AREA

## THE STUDY AREA -- 19,398 acres

The McKenna Peak WSA (CO-030-286) is located
in San Miguel and Dolores Counties approximately
45 miles northeast of Dove Creek, Colorado. All
19,398 acres are administered by BLM. The area is
bounded on the south by the Disappointment Valley
Road and the private property that runs along that
road. The west boundary (from south to north) is a
drainage beyond which are roads and stock ponds;
a fence line; and an impassable but visible jeep trail.
The north boundary is the top of a sheer sandstone
cliff which in most places corresponds with the
BLM/private property lines or a Colorado State land
section. The narrow east boundary is the BLM/
private property line. The area is shown on the map.

Topography consists of Mancos shale badlands,
sandstone cliffs, canyons, mesas and rolling hills.
(See Photo 1) Elevations range from 6,300 feet
along Disappointment Creek in the south up to 8,600
feet on the Mesa Verde Sandstone promontory at
the north central part of the WSA. The predominant
topographic features of the WSA are McKenna
Peak rising 1,000 feet above the surrounding terrain,
and the Mesa Verde Sandstone cliff formation.
Vegetation varies with altitude and soil: no vegeta-
tion or sparse desert forbs, shrubs, and grasses at
lower elevations and on the badland slopes; pinyon
pine/juniper woodland in the middle elevations; on
up to Douglas fir stands with an understory of oak
and mountain mahogany at the higher elevations.
(See Photo 2)

The WSA was studied under section 603 of the
Federal Land Policy and Management Act
(FLPMA) and was included in the San Juan/San
Miguel Planning Area Final Wilderness Environ-
mental Impact Statement published November,
1990. Three alternatives were analyzed in the EIS:
all-wilderness (19,398 acres), a partial wilderness
alternative (18,472 acres included and 926 acres
deleted), and a no-wilderness alternative which is
the recommendation of this report.

## Recommendation and Rationale

0 acres recommended for wilderness

19,398 acres recommended for nonwilderness

The recommendation is to not designate McKenna
Peak WSA as wilderness and to release the area for
uses other than wilderness. The all-wilderness
alternative is the environmentally preferable
alternative since its implementation would result in
the least change to the natural environment over the
long term.

The primary reason for the no-wilderness recom-
mendation is that during the study phase of the
wilderness review process, BLM management
decided that the wilderness values contained in this
area were not of an overall quality and significance
to warrant inclusion in the National Wilderness Pres-
ervation System. BLM did feel that these wilder-
ness values were and will remain, locally, or in some
cases regionally important and therefore current
management plans were devised to protect the
sensitive resources found in McKenna Peak WSA.
BLM feels that the majority of primary values
identified by the public as wilderness related
(roadless, visual, wildlife habitat, etc.) can be
managed in a nonwilderness management scheme
through professional application of the principles of
multiple-use management.

The San Juan/San Miguel Planning Area Resource
Management Plan, September 1985, states that the
McKenna Peak WSA is to be managed for water-
shed improvement, wildlife values, livestock grazing
and off-road-vehicle restrictions (use of existing,
designated routes only). A main concern in the
McKenna area is watershed improvement and the
entire WSA is included in the Spring Creek Basin/
Disappointment Valley Watershed Activity Plan
(CO-030,SJ86-87). Salinity of the Colorado River is
a major downstream problem and the Dolores River
has been identified as the major salinity contributing
tributary of the Colorado. The Disappointment
Creek is identified as the major salinity contributor
to the Dolores and salinity concentrations of Disap-
pointment Creek increase greatly as it moves

279

BLM 0006210

through the area drained by Salt Arroyo, Alkali Wash, and Warden Draw all of which are located in McKenna Peak WSA. The Watershed Activity Plan gives highest priority to land surface and vegetative rehabilitation by developing a grazing system which will increase vegetative cover and reduce erosion and salinity of runoff by protecting key forage species during the critical spring growing season. Only if this proves insufficient, the plan proposes several structural projects including pond/pit dike systems, water retention pits, check dams, and retention dams. These projects are given low priority because of WSA status and because the terrain and soil types are only marginally conducive to structural control devices. Although these projects would involve very little surface area or disturbance, mechanized equipment could be required which would conflict with wilderness management of the area.

Off-road-vehicle restrictions are in place for the area covered by the Watershed Activity Plan which includes the entire WSA. Vehicle use is limited to existing, designated routes and trails. As there are no such designated routes within the WSA, off-road-vehicles are not allowed in the WSA. The objective of these restrictions is to reduce soil surface disturbance therefore slowing water runoff, reducing both erosion and salinity within the drainages resulting in the improved ecology of the area.

In addition, the no-wilderness recommendation reduces management conflicts arising from the construction of various range improvement projects that are proposed within the WSA. These fence and stock pond projects are designed to allow BLM to better manage both livestock and the wild horse herd that utilize the area (control herd movement and dispersal to reduce negative impact of concentrated grazing). The wild horse herd requires intensive management to control both numbers and location. The management plan designated a particular boundary for the herd and an average herd size of 50 (upper limit 65). Part of the designated horse range includes the western one-third of the WSA. Two and 1/4 mile of fencing in the WSA was built in 1989 to complete the horse range perimeter fence after an environmental assessment



*Photo 1. McKenna Peak WSA. Ribbed badlands and WSA north boundary cliffs. Looking east up Disappointment Valley. Lone Cone Peak in mid-background.*

BLM_0006211

MCKENNA PEAK WSA                                                                    CO-030-286

indicated it could be built within the WSA Interim Management Policy nonimpairment guidelines. Proposed fencing and stock ponds are needed to disperse the herd and relieve the pressure on sensitive riparian areas which are critical to the large number of bald eagles that utilize this area as roosting sites. Objectives common to all the range projects include: improve ecological condition; increase and improve forage and habitat for wildlife, wild horses, and livestock; improve watershed condition and runoff water quality; and, maintain or improve riparian vegetation. Even though the proposed fences would be built using foot and pack animal traffic, the ponds would require heavy equipment and both types of projects could cause conflict with wilderness management.

In addition, wilderness management of McKenna would be made difficult by the inclusion in the WSA of several parcels of land (926 acres total) which are easily accessible in motorized vehicles and are of a lesser wilderness quality than most of the WSA. The wilderness inventory process identified roadless natural areas which resulted in the 19,398 acre McKenna Peak WSA. This roadless area included several flat drainage bottoms that open onto the Disappointment Valley Road along the south boundary of the WSA. Along the north boundary, there are five small parcels which are actually on the flat mesa-top above the cliff edge. All of these parcels, both north and south, are easily accessible by vehicle and, in fact, several have been tracked by vehicles during the fall hunting season.

In conclusion, by not recommending McKenna Peak WSA for wilderness designation, BLM will be less limited in the methods used to improve water quality and riparian habitat in the area. Other improvement projects will reduce impacts of livestock grazing and in the long term, increase quantity and quality of forage available to livestock and wildlife as well as wild horses. The no wilderness recommendation also eliminates potential management problems associated with the scattered land parcels having vehicular access.

| TABLE 1 - Land Status and Acreage Summary of the Study Area | |
|---|---|
| Within Wilderness Study Area | Acres |
| BLM (surface and subsurface) | 19,398 |
| Split Estate (BLM surface only) | 0 |
| Inholdings (State, private) | 0 |
| Total | 19,398 |
| Within the Recommended Wilderness Boundary | |
| BLM (within WSA) | 0 |
| BLM (outside WSA) | 0 |
| Split Estate (within WSA) | 0 |
| Total BLM Land Recommended for Wilderness | 0 |
| Inholdings | 0 |
| Within the Area Not Recommended for Wilderness | |
| BLM | 19,398 |
| Split Estate | 0 |
| Total BLM Land Not Recommended for Wilderness | 19,398 |

BLM_0006212

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

### *Naturalness*

The McKenna Peak WSA is predominantly natural in character with negligible human imprints. The majority of human imprints associated with ranching activities - access routes, fences and stock ponds - were excluded during the inventory process. The few short ways present within the WSA are no longer kept open by the passage of vehicles (except those described in the *Recommendation and Rationale*, noted earlier in this section) and are screened and revegetating to a natural condition. An old ranch line camp, corral, and fence are screened by rugged topography and thick pinyon-juniper vegetation. Two old stock ponds are silted in and revegetated and therefore not noticeable except in the immediate vicinity. The cumulative impact of the ways and range improvements upon the WSA's naturalness is negligible because the few imprints present are widely dispersed and do not dominate the landscape.

The McKenna Peak WSA encompasses a varied topography, from highlands forested with ponderosa pine to intricately-eroded badlands carved of Mancos shale. Ribbed hills of shale adobe cover the lower elevations, accenting the diversity of physical geography which is one of the WSA's most impressive attributes. (See Photo 1) McKenna Peak, the landform for which the area is named, is a conspicuous cone-shaped mountain nearly 8,000 feet in elevation that is but one of a number of eroded highlands in the central part of the WSA. The Mesa Verde sandstone cap-rock has not broken down and eroded away along the northern edge of the area, creating massive buttress-like cliffs. (See Photo 2)

Vegetation is also diverse and varies with altitude and soil stability. The gray-black adobe badlands support little or no vegetation. Less steep lowland terrain supports desert forbs, grasses and shrubs such as shadscale, and the saltbush-greasewood ecosystem. The mid-elevation central part of the WSA is covered by thick pinyon-juniper woodland. Higher elevations leading up to and on top of the high bluffs, support ponderosa pine and Douglas fir stands with a mountain mahogany-gamble oak understory. The WSA does contain federally

threatened or endangered plant species: *Sclerocactus glaucus* (Uinta Basin hookless cactus), *Echinocereus triglochidiatus* (spineless hedgehog cactus), and the BLM sensitive *Astragalus naturitensis* (Naturita milkvetch). The limited riparian vegetation along the numerous intermittent streams provides valuable and diverse habitat for many wildlife species and is a vital component of the WSA environment.

This topographic and vegetative diversity together with the roadless aspect of the WSA make it ideal habitat for numerous wildlife species. Mule deer use the area year round but their population increases greatly during the winter. Elk also migrate down into the WSA from the mountains to the east and McKenna is a crucial wintering area. Pronghorn antelope are found here in unknown numbers. Predators that live in or utilize the area include mountain lion, black bear, bobcat, coyote and long tailed weasel. Raptors include the red tailed hawk, and kestrel. The cliffs are designated potential nesting habitat for the threatened and endangered peregrine falcon which do hunt the area. Bald and golden eagle winter in the lower reaches of the area where abundant, low vegetation supports a large prey base for the raptors.

### *Solitude*

The rugged topography and numerous groupings of vegetation create settings which allow for outstanding solitude experiences throughout most of the WSA. The rugged badland topography and narrow, twisting arroyos between dominant landforms promote a sense of physical isolation near the McKenna Peak/Brumley Point area. From Spring Creek Basin, many small canyons and ridges lead into the northern portion of the WSA. There, extremely dense pinyon/juniper forests, steep-walled canyons, and rock outcrops create a visual and physical maze that isolates the individual. Continuing upward and northward, one gradually enters the high mesa and ridge country dominated by mature stands of ponderosa pine and Douglas fir. Beneath this canopy are dense stands of Gambel's oak, four to twelve feet in height. These thickets are penetrated only by game trails and contribute to the ample, vegetative screening of the area. From ridges and high points, panoramic vistas give the feeling of vastness which enhance the sense of solitude.

282

BLM_0006213

### *Primitive and Unconfined Recreation*

Because of the diversity of topography and vegetation, the area provides outstanding opportunities for primitive and unconfined recreation. Both the varied terrain and the large size of the WSA afford outstanding opportunities for hiking and horseback riding excursions. The deeply eroded Mancos shale of the badlands provides challenging crosscountry trips for either the equestrian or the hiker. Extended overnight backpacking and horseback trips would provide more time to explore the contrasting terrain.

Vertical sandstone cliffs of varying heights and large sandstone boulders are found stretching across the central portion of the area. These rock outcrops provide opportunities for rock climbing in varying degrees of difficulty. Both the amateur or the expert climber can find challenging multi-pitch climbs.

The area provides excellent opportunities for exploring, birdwatching (especially for raptors), photography, and sightseeing. Because of the large numbers of big game in the area, hunting is a popular and historic use. The long light of sunset casting a red contrast to the black badlands and tan cliffs offers a spectacular backdrop for any recreation activity.

### *Special Features*

The unique geologic features of the McKenna Peak WSA may be its most significant supplemental value. The geologic history of the McKenna Peak landscape dates back roughly 100 million years to the Upper Cretaceous era when much of what is now southwestern Colorado was covered by shallow seas and estuarine areas. The fine sediments laid down formed what is now the light grey to black Mancos shale. This strata is rich in fossil marine invertebrates. Fossil clams and brachiopods are extraordinarily abundant throughout the WSA in arroyo beds and where shale strata are abruptly exposed.

As the seas began to recede from the area, sandstones of the Mesa Verde group were deposited. These sandstones and the scattered shale beds occasionally present therein indicate that beaches, marshes and swamps dominated the region at that time. When the last arms of that prehistoric sea dried up, large deposits of gypsum and other evaporite salts accumulated to form a series of salt domes in southwest Colorado. Collapse of the

local salt dome created Disappointment Valley and localized uplifting began the breakdown of the sandstone cap rock, allowing shale erosion and the resulting badland formations. (See Photo 1)

An additional special feature of the McKenna Peak WSA is the presence of wild horses. Wild horses have been present in the area at least since the turn of the century. A long-time resident of the Disappointment Valley remembered a herd of over 200 horses in the 1930's before many of them were rounded up for the Federal government. It is estimated that several dozen horses now inhabit the WSA. The uncommon opportunity to observe and study wild horses in a setting where their contact with people is negligible may interest animal behavior and range management students.

## DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

### *Assessing the diversity of natural systems and features as represented by ecosystems*

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System, although McKenna's transition zone aspect is unique and not well represented. The WSA is in the transition between and contains two ecosystems: the Colorado Plateau Province and the Rocky Mountain Forest Province, and four associated vegetation types (Bailey-Kuchler classification system). McKenna contains the pinyon-juniper woodland vegetation type from both the Colorado Plateau Province (4,390 acres) and the Rocky Mountain Forest Province (3,848 acres). These ecosystems are represented by only two other designated wilderness areas in Colorado, one being Mesa Verde National Park Wilderness Area which is closed to the public. From the Rocky Mountain Forest Province, McKenna contains the saltbush-greasewood vegetation type (10,410 acres) which occurs in only one designated wilderness (Great Sand Dunes National Monument). McKenna also contains the mountain mahogany-oak scrub zone (628 acres) from the Rocky Mountain Province which is represented in the National Wilderness Preservation System by only 80,852 acres, none of which are in Colorado. McKenna contains the pine-Douglas fir vegetation type from both the Colorado Plateau (60 acres and not represented in Colorado) and Rocky Mountain Forest Provinces (62 acres). (See Table 2)

BLM_0006214

## Table 2 - Ecosystem Representation

| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas | acres | Other BLM Studies areas | acres |
|---|---|---|---|---|
| *Nationwide* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-juniper woodland | 11 | 1,401,745 | 85 | 2,142,602 |
| Pine-Douglas fir | 6 | 125,523 | 8 | 18,930 |
| Rocky Mountain Forest Province | | | | |
| Mountain Mahogany-Oak Scrub | 7 | 80,852 | 7 | 35,840 |
| Saltbush-Greasewood | 1 | 33,445 | 5 | 26,867 |
| Pinyon-Juniper Woodland | 2 | 41,451 | 22 | 167,864 |
| Pine-Douglas fir | 10 | 210,751 | 13 | 93,601 |
| *Colorado* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 1 | 8,105 | 17 | 293,837 |
| Pine-Douglas fir | 0 | 0 | 3 | 855 |
| Rocky Mountain Forest Province | | | | |
| Mountain Mahogany-Oak Scrub | 0 | 0 | 5 | 30,495 |
| Saltbush-Greasewood | 1 | 33,445 | 5 | 26,867 |
| Pinyon Juniper-Woodland | 1 | 11,181 | 16 | 119,424 |
| Pine-Douglas Fir | 4 | 98,531 | 12 | 92,316 |

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The McKenna Peak WSA is not within a five-hour drive of a major population center (Standard Metropolitan Statistical Area).

*Balancing the Geographic Distribution of Wilderness Areas*

The McKenna Peak WSA would contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. The nearest designated wilderness area (Mesa Verde National Park Wilderness; 8,105 acres) is two hours to the south. Mesa Verde Wilderness is not open to the public due to important archeological values. Three hours to the east of McKenna is Forest Service Lizard Head (41,189 acres) and Mt. Sneffels (16,210 acres) Wilderness Areas; areas of high mountain landform and ecosystem and thereby unavailable for most public use during winter and spring. Forty-five minutes to the northwest is the BLM Dolores River Canyon WSA which contains 29,415 acres recommended for wilderness designation. Because of its near year-round accessibility

BLM_0006215

and Colorado Plateau/Rocky Mountain Forest transition ecosystem, McKenna Peak WSA would expand and balance opportunities to attain diverse wilderness experiences.

## MANAGEABILITY

The McKenna Peak WSA could be effectively managed to preserve its wilderness character. There are no pre FLPMA or post FLPMA oil and gas leases, no coal leases, and no patented mining claims within the WSA. There are several unpatented mining claims, most likely for uranium, but because energy mineral potential is low (see *Energy and Mineral Resource Values*, this section), potential for conflict with wilderness management is low. There are 6 grazing allotments in the WSA (1 complete and 5 partial) with an approximate total of 853 animal unit months (AUM's). There are several livestock and wild horse range improvement projects existing and planned as well as several water quality improvement and riparian habitat improvement projects planned. Many of these

projects could conflict with wilderness management of the WSA and this is discussed in more detail under *Recommendation and Rationale* section, this report.

Wilderness management conflicts could occur with the inclusion of several vehicular accessible peripheral parcels within the WSA. The McKenna WSA Environmental Impact Statement included a partial wilderness alternative which would enhance the manageability of this WSA. This alternative discussed deleting the several land parcels (926 total acres) which could present management problems.

## ENERGY AND MINERAL RESOURCE VALUES

McKenna Peak WSA energy and mineral resources were evaluated in *GEM (Geological, Energy, and Minerals); Resource Assessment for Region 4, Colorado Plateau* - submitted to BLM by Mountain States Mineral Enterprises Inc. in May 1983, and the *Minerals Summaries* prepared for BLM by the U.S. Geological Survey and Bureau of Mines in February, 1990.



*Photo 2. McKenna Peak WSA. Sparse vegetation on the Mancos shale badlands. Mesa Verde sandstone cliffs in background are north WSA boundary.*

BLM_0006216

Hydrocarbons (oil, gas, carbon dioxide, helium): There are no known deposits within the WSA and there is moderate potential for occurrence. Accessibility and economic potential for these resources is termed poor.

Coal: no known deposits within the WSA and a lack of coal-bearing formations in the WSA, therefore; no rating for accessibility and economic potential.

Energy and related minerals (uranium, vanadium): No known deposits within the WSA and a low potential for occurrence. No rating for accessibility and economic potential.

Precious and base metals (copper, gold, silver, lead, zinc): No known deposits and no potential for occurrence.

Clays and cut sandstone: No known deposits within the WSA but high potential that deposits of structural clays are present. Accessibility was not rated, but economic potential rated as moderate.

Overall, McKenna Peak WSA is considered to have low economic potential for mineral resource development, which is reflected in the absence of actual development.

## IMPACTS ON RESOURCES

The following comparative impact table (Table 3) summarizes the effects on pertinent resources for the three alternatives considered for this WSA.

## Table 3 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Wilderness Values* | *Under this alternative, long-term legislative protection of wilderness values would not be provided. Wilderness values would be lost on 7,000 acres as a result of cumulative impacts from existing range and wild horse projects and from proposed range and watershed projects.* | *Wilderness designation would provide statutory, long-term protection for wilderness values on the 19,398 acre WSA. Natural and supplemental values would be maintained by the prohibition of motorized recreational use and mineral development. Wilderness values would be temporarily impaired on 500 acres from range projects. The range projects would be substantially unnoticeable within 3 years following construction.* | *Wilderness designation would provide statutory, long-term protection for wilderness values on 18,472 acres of the WSA. Natural and supplemental values would be maintained by the prohibition of motorized recreational use and mineral development. Wilderness values would be temporarily impaired on 500 acres from range projects. The range projects would be substantially unnoticeable within 3 years following construction.* |

BLM_0006217

## Table 3 – Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| Impacts on the Watershed Resource | The construction of 17 watershed projects would result in a reduction of salt (2,061 tons) and sediment yields (68,694 tons) in Disappointment Creek (and ultimately the Colorado River System); improve wildlife habitat (cover); provide seasonal water for wildlife, wild horses, and livestock; and increase vegetative production to improve watershed conditions and provide forage for wild horses, wildlife and livestock. | Under the All Wilderness Alternative, no watershed restoration projects would be undertaken unless some problem were identified that posed an imminent danger to life or property. However, the quality of the watershed resources in the area would not change. | Under the Partial Wilderness Alternative, no watershed restoration projects would be undertaken unless some problem were identified that posed an imminent danger to life or property. However, the existing quality of the watershed resources in the area would not change. |
| Impacts on Livestock Operations | Constructing 2 stock ponds, building 1/4 mile of fence, and maintaining 4 other stock ponds would improve the distribution of livestock in the WSA. There would be no increase in AUMs. Restrictions on ORV use and livestock grazing use would continue to protect the grazing allotments from disturbance and erosion. | Building 1/4 mile of fence, and maintaining 4 other stock ponds would improve the distribution of livestock in the WSA. There would be no increase in AUMs. Restrictions on ORV use and livestock grazing use would continue to protect the grazing allotments from disturbance and erosion. | Building 1/4 mile of fence, and maintaining 4 other stock ponds would improve the distribution of livestock in the WSA. There would be no increase in AUMs. Restrictions on ORV use and livestock grazing use would continue to protect the grazing allotments from disturbance and erosion. |
| Impacts on Wild Horse Management and Operations | Under the No Wilderness Alternative, the management of the wild horse herd would not change. Wild horses will still be managed under the Spring Creek Basin Wild Horse Herd Management Plan which provides for an average herd size of 50 horses. | Under the All Wilderness Alternative, the management of the wild horse herds would not change. They would still be managed under the Spring Creek Basin Wild Horse Herd Management Plan which calls for maintaining an average herd size of 50 horses. | Under the Partial Wilderness Alternative, the management of the wild horse herd would not change. Wild horses would still be managed under the Spring Creek Basin Wild Horse Herd Management Plan which calls for maintaining an average herd size of 50 horses. |

BLM_0006218

## Table 3 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative | Partial Wilderness Alternative |
|---|---|---|---|
| *Impacts on Recreation Opportunities and Use* | *Recreation use would remain at less than 400 users per year under this alternative. Opportunities would continue to exist for non-motorized, backcountry recreational activities, especially big game hunting.* | *Under this alternative, recreational use would increase by 10 percent over a 3-5 year period. Opportunities would continue to exist for non-motorized, backcountry recreational activities because of the restrictions on motorized recreational use.* | *Under this alternative, recreational use would increase by 10 percent over a 3-5 year period. Opportunities would continue to exist for non-motorized, backcountry recreational activities because of the restrictions on motorized recreational use.* |

## LOCAL SOCIAL AND ECONOMIC CONSIDERATIONS

Designation or non-designation of this WSA as wilderness would have negligible impacts on local economic conditions. Social factors were not considered a significant issue in the study.

## SUMMARY OF WSA SPECIFIC PUBLIC COMMENTS

Public involvement has occurred throughout the wilderness review process. Certain comments received during the inventory process and early stages of the draft EIS were used to develop significant study issues and various alternatives for the ultimate management of those lands with wilderness values. A total of 22 comments were received during the initial and intensive inventory stages, with 13 supporting WSA designation and 9 against WSA designation.

During formal public review of the draft Environmental Impact Statement, a total of 98 comments were received which specifically addressed this WSA - 52 were written and 43 were oral statements received at public hearings. In general, 95 commenters supported wilderness designation and 3 favored releasing the area for other uses (no wilderness). Specific comments by those favoring wilderness designation centered on the preservation of natural habitat for wildlife and the wild horses specifically. Protection of ecological diversity and unique scenic beauty were also major concerns. Several comments mentioned the importance of protecting archeological resources and the fossils. Those opposing wilderness designation were concerned that wilderness would preclude oil, gas, and mineral development, or that there were range related conflicts.

The State of Colorado, Department of Natural Resources, supported wilderness designation of McKenna Peak WSA. No other Federal, state, or local agency comments were received.

BLM_0006219

289

BLM_0006220



BLM_0006221

# DOLORES RIVER CANYON

# WILDERNESS STUDY AREA

## The Study Area -- 28,668 acres

The Dolores River Canyon WSA (CO-030-290) is located in Montrose County, Colorado, approximately 17 miles west of Naturita and 28 miles north of Dove Creek, Colorado. All 28,668 acres are BLM lands and the area is surrounded by a mixture of public and private lands. The south boundary is the canyon opening as the Dolores River leaves the Little Gypsum Valley. The area centers on approximately 30 miles of deeply cut meandering canyon and includes those tributary canyons and surrounding rimlands that are primarily natural in character. The north boundary roughly follows the cessation of this canyon terrain as the river breaks into the Paradox Valley. The WSA is shown on the map.

The rugged canyons are cut through a series of sedimentary strata resulting in a vertical-walled canyon system with colorful ledges and massive cliffs. (See Photo 1) River elevation drops from 5300 feet to 5000 feet within the WSA. Benches of bedrock and rocky ridges rise 500 to 700 feet above the canyon bottom while the rim is approximately 1100 feet above the river. Vegetation in the area varies with terrain and elevation. The rim and mesa areas support pinyon-juniper woodlands with mixed desert shrubs on the canyon slopes while the canyon bottoms support thick desert riparian vegetation. There are scattered enclaves of cottonwood, ponderosa pine, aspen, and spruce-fir within the area.

The WSA was studied under Section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the San Juan/San Miguel Planning Area Final Wilderness Environmental Impact Statement (EIS) published in November, 1990. Three alternatives were analyzed in the EIS: all-wilderness, no-wilderness, and an enhanced all-wilderness, which is the recommendation of this report (29,415 acres--28,668 acres from the original WSA, plus an additional 947 acres from outside the WSA boundary and a deletion of 200 acres to be released for other uses).

## Recommendations and Rationale

29,415 acres recommended for wilderness
(includes an additional 947 acres from
outside the WSA boundary)

200 acres recommended for nonwilderness

It is recommended that 29,415 acres of the Dolores River Canyon WSA be designated as wilderness. This includes an additional 947 adjacent BLM acres from outside the WSA boundary which enhance the manageability of the area (parcels A, B, C, and D). Two hundred acres would be released for uses other than wilderness (parcel E). These areas are shown on the map. An environmentally preferable alternative would be to designate the entire 29,615 acres as wilderness since this would result in the least change to the natural environment over the long term.

The 29,415 acre enhanced WSA is recommended for wilderness designation primarily because of its outstanding natural scenery, opportunities for solitude and primitive, unconfined recreation, and for its ecological diversity. Designation of the Dolores River Canyon WSA as wilderness would preserve the scenic geological grandeur of one of the most spectacular desert river canyons in the United States. The focal point of the area is the Dolores River Canyon characterized by massive, sheer canyon walls interspersed with several individually unique side canyons such as Bull, Leach, Spring, Coyote Wash, LaSal, and Wild Steer. The rugged canyon system is cut through a series of sedimentary strata (layers laid down by running water, wind, or by ancient shallow seas), which results in many colorful ledges and massive cliffs interspersed with talus slope. (See Photo 1) The rock sequence exposed along the river corridor covers a period of 160 million years.

Designation of this WSA as wilderness would preserve forever the opportunity for solitude and primitive, unconfined recreation, as well as the outstanding scenic beauty of the canyon system. The area is relatively low in elevation and can be reached by maintained roads on both the north and south boundaries making it accessible for year-

BLM 0006222



*Dolores river WSA.   River-cut massive sandstone walls and riverbank riparian vegetation.*

round wilderness recreation opportunities such as hiking, backpacking, photography, geologic study, hunting, and rock climbing. This 30-mile stretch of river was recommended for inclusion in the Wild and Scenic River System in 1976, and historically, floatboating has been the major recreation use. (See Photo 3) The nature of the river and rapids requires minimal technical skill or equipment, and yet there are many particular spots that might challenge the more experienced boater. The rugged meandering topography of the WSA allows ample opportunities for solitude even if recreational use of the area does increase. The Dolores River Corridor, Management Plan(1990) allocates the amount and type of recreational boating use in the canyon.

Designation of this WSA as wilderness would preserve and enhance the ecological diversity of the National Wilderness Preservation System. The Dolores River WSA lies within the Colorado Plateau Province. Pinyon pine-juniper woodland and Great Basin sagebrush are the two primary vegetation types. The Colorado Plateau pinyon-juniper vegetation type occurs in only one designated wilderness area in Colorado (Mesa Verde National Park). The Great Basin sagebrush ecosystem is not represented by the wilderness system in Colorado. The size, ruggedness, and ecological diversity of the area combine to provide ideal habitat for many wildlife species including mountain lion, bobcat, and the recently reintroduced desert bighorn sheep and the state endangered river otter. There are confirmed nesting pairs of the endangered peregrine falcon within the area. The area contains 63 miles of aquatic and desert riparian habitat. The steep rugged nature of the canyon system has precluded most livestock grazing. This has resulted in relic areas (untouched by grazing) which are ideal habitat for rare plant study. The area contains or may contain at least seven species of plants and animals that are currently listed as federal candidate, threatened or endangered. This includes the federally endangered spineless hedgehog cactus. The WSA is a use area for bald eagles and contains hunting and nesting habitat for golden eagles.

No major manageability problems or resource conflicts would result from wilderness designation.

BLM_0006223

DOLORES RIVER CANYON WSA

The entire WSA is BLM land; no inholdings. There are no pre-FLPMA oil and gas leases within the WSA, yet there are several mining claims, probably for uranium, vanadium, and the base and precious metals. These are located primarily in LaSal Creek, Wild Steer Canyon, Coyote Wash, and near Buck Mesa--peripheral areas and not in the main river canyon. However, *Department of the Interior, Bureau of Mines, Mineral Land Assessment Report, 1987*, states that within the WSA, the main uranium formations are mostly absent, copper-silver veins are localized and do not extend into the WSA, gold potential is low, and no significant amounts of oil and gas have been discovered near the WSA. Therefore, no site disturbance associated with access to or development of mining claims is anticipated.

The WSA also contains all or portions of five grazing allotments totaling approximately 580 animal unit months (AUM). However, no range improvement projects have been proposed within the recommended area and no conflicts with range management are expected.

It is recommended that one parcel of land totaling 200 acres be released for uses other than wilderness. This parcel (parcel E on the map) is located on the periphery of the WSA, below the southwest edge of Andy's Mesa. The original boundary here was a jeep road. Excluding parcel E from wilderness designation would allow utilization of a natural topographic feature (the base of a cliff) as the area boundary. This will reduce potential conflicts along the jeep road thereby aiding manageability. This parcel has high potential for range improvement projects such as discing and seeding because it is flat and easily accessible by road.

It is recommended that four parcels totaling 947 acres of adjacent BLM land from outside the study area be added for designation as wilderness (see map). Parcel A (415 acres) is a sloping hillside leading up to Anderson Mesa. Adding this parcel would enhance manageability of the area by moving this boundary to a ridgeline on the slope; a natural topographical feature. Similarly, adding parcels B (61 acres) and C (411 acres) at the base of Wild



*Photo 2. Dolores River WSA. Wingate sandstone fin forms the Muleshoe Bend; one hour float brings you back to the same spot.*

293

BLM_0006224

Steer Mesa would utilize an easily identifiable natural feature, a cliff, as the WSA boundary. It is recommended that parcel D (60 acres) in Bull Canyon be added to further extend the area boundary up Bull Canyon. This brings Cummings Spring into the WSA which will add riparian habitat and enhance wildlife characteristics of the recommended wilderness area.

### Table 1 - Land Status and Acreage Summary of the Study Area

| | |
|---|---|
| **Within Wilderness Study Area** | |
| BLM (surface and subsurface) | 28,668 |
| Split Estate (BLM surface only) | 0 |
| Inholdings (State, private) | 0 |
| Total | 28,668 |
| **Within the Recommended Wilderness Boundary** | |
| **BLM (within WSA)** | **28,468** |
| **BLM (outside WSA)** | **947** |
| Split Estate (within WSA) | **0** |
| Total BLM Land Recommended for Wilderness | **29,415** |
| Inholdings (State, Private) | **0** |
| **Within the Area Not Recommended for Wilderness** | |
| BLM | 200 |
| Split Estate | 0 |
| Total BLM Land Not Recommended for Wilderness | 200 |
| Inholdings (State, Private) | 0 |

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### *Naturalness*

The Dolores River Canyon WSA is predominantly natural with negligible human imprints. This WSA centers on the deeply incised, meandering Dolores River Canyon, and includes tributary canyons and surrounding canyon rimlands. The rugged canyons are cut through an anticline (an elongated uplifted dome of bedded sedimentary rock) resulting in a vertical-walled canyon system with colorful ledges and massive cliffs interspersed with talus slopes. (See Photo 2) Approximately 30 miles of the

Dolores River are included in the WSA. As a result of the National Wild and Scenic River Study conducted in 1976, the BLM has proposed that the section of river from Gypsum Valley to Bedrock be designated a "wild" river. This recommendation has been made by the President to Congress on several occasions with no results.

Vegetation in the area varies with terrain and elevation. The rim and mesa areas support pinyon-juniper woodlands with occasional sage parks. There is a mixture of low desert shrubs on the canyon slopes: sagebrush, Mormon tea, squaw bush, and buffalo berry. Cottonwoods and ponderosa pine grow at water seeps just below the canyon rim. Enclaves of aspen, ponderosa pine, and spruce-

BLM_0006225

fir are scattered within the area. The bottom of the main canyon and some of the tributary canyons support thick riparian growth including cottonwoods and willow. The 63 miles of riparian vegetation provide valuable and diverse habitat for many wildlife species and is a vital component of the canyon environment.

The area's diversity, unroaded isolation, and riparian habitat make it ideal for numerous wildlife species including waterfowl, the collared lizard, coyote, mountain lion, bobcat, and muledeer. Raptor species include bald and golden eagle (hunting and nesting habitat for golden eagles), red-tailed hawk, and the endangered peregrine falcon. Colorado Division of Wildlife has recently transplanted desert bighorn sheep and the Colorado State endangered river otter into the Dolores River Canyon.

The majority of man's imprints associated with past mining activity and access routes were excluded from the WSA during the wilderness inventory process. The resulting WSA is primarily natural. Imprints of man within the area consist of unmaintained ways on the periphery which are becoming overgrown with vegetation and do not significantly impair the pristine quality of the area.

## Solitude

The rugged topography and vegetation groupings create settings which allow outstanding opportunities for solitude throughout most of the WSA. The deep meandering canyons with sheer walls, many rock outcrops, ledges, and talus fields with large boulders, block out sights and sounds and create many secluded settings. (See Photo 2) The numerous tributary canyons are often very narrow, sheer walled and boulder choked, leading up to hidden grotto pools of clear cool water with hanging ferns and other non-desert vegetation. These side trips from the main river canyon offer even more areas of solitude. Vegetative screening is provided by pinyon-juniper woodlands on the mesa tops and benches and by riparian vegetation along the river.

## Primitive and Unconfined Recreation

The Dolores River Canyon WSA provides outstanding opportunities for primitive and unconfined recreation. Historically, the Dolores River has provided scenic whitewater river opportunities for float boating, kayakers and canoeists. (See Photo 3) The rugged canyon system offers challenging cross-country hiking and backpacking, while numerous

high cliffs provide outstanding rock climbing opportunities. The view from the rim is of an immense red and buff-colored slick rock maze with sparse contrasting green vegetation and the changing water - a scenic backdrop for camping, sightseeing, nature photography, and geological study.

## Special Features

This WSA has several special features which enhance its wilderness quality. In conjunction with the Dolores River Corridor Management Plan (completed in 1990), an intensive cultural resource (archeological site) inventory of areas immediately adjacent to the river will be completed. River terraces, talus slopes, several of the major tributary areas, and portions of accessible canyon rims were inventoried during the 1988 and 1989 summer field season. This study should be completed by the end of the 1992 field season. Prehistoric sites thus far inventoried include tool production areas, many large rock art panels, and highly important stratified rock shelter habitation sites. Paleontological resources include rare triassic-age fish and armored crocodile fossils.

The geologic history of the area is clearly exposed by the deep cutting action of the river, offering students of geology a 160-million-year exhibit beginning with the oldest exposed rock; limestones of the Pennsylvanian Period (formed 300 million years ago) and progressing up to the youngest exposed material--outcrops of the Entrada Sandstone from the Jurassic Period formed some 140 million years ago. The predominant exposure is sedimentary rocks of the Cretaceous and Triassic Ages; Navajo Sandstone, the Kayenta Formation, Wingate Sandstone, the Chinle Formation (red siltstone), and the Entrada Sandstone.

There are three species of federally listed threatened or endangered animals which occur or may occur in the WSA: bald eagle (*Haliaeetus leucocephalus*), black-footed ferret (*Mustela nigripes*), and the peregrine falcon (*Falco peregrinus*). The spineless hedgehog cactus (*Echinocereus triglochidiatus var. inermis*), a federally endangered plant species, may also be found in this WSA. In addition to the federally listed species, the U.S. Fish and Wildlife Service indicates that the following species are candidates for official listing as threatened or endangered: kachina daisy (*Erigeron kachinensis*), Paradox lupine (*Lupinus crassus*), and southwestern otter (*Lutra canadensis sonorae*). Coyote Wash and Bull Canyon contain populations

BLM_0006226



*Photo 3.  Dolores River Canyon WSA.  Boating is the major recreation use in the WSA.*

of the candidate kachina daisy and also eastwood's monkeyflower (*Mimulus eastwoodiae*), a species of special interest to the state of Colorado. These plants occur in hanging gardens frequently visited by recreation users. Paradox lupine may also occur within the WSA and the otters have been reintroduced to the river system.

The WSA contains one known peregrine falcon eyrie and the possibility of at least one other eyrie.

Bald eagles are known to use this WSA for winter hunting. BLM inventories conducted in the early 1980's, identified five areas within the WSA which contain relic grassland plant communities. The presence of such a wide array of rare plant and animal species indicates that this area serves as a refuge for native flora and fauna that have been displaced from surrounding areas by agriculture, grazing, mining, and other human activity.

BLM_0006227

DOLORES RIVER CANYON WSA

CO-030-290

## DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

*Assessing the diversity of natural systems and features as represented by ecosystems*

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System. The WSA is in the Colorado Plateau Province (Bailey-Kuchler classifi-

cation system) and contains pinyon-juniper woodland (27,173 acres) and Great Basin sagebrush (1,495 acres) vegetation zones. The pinyon-juniper woodland ecosystem is represented by only one other wilderness area in Colorado; that being the Mesa Verde National Park Wilderness Area which is closed to public recreation. The Great Basin sagebrush ecosystem is represented by two areas in the National Wilderness Preservation System, neither of which are in Colorado (see Table 2).

### Table 2 - Ecosystem Representation

| Bailey -Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas | acres | Other BLM Studies areas | acres |
|---|---|---|---|---|
| *Nationwide* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-juniper woodland | 11 | 1,401,745 | 85 | 2,142,602 |
| Great Basin sagebrush | 2 | 95,875 | 5 | 58,421 |
| *Colorado* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-juniper woodland | 1 | 8,105 | 17 | 293,837 |
| Great Basin sagebrush | 0 | 0 | 4 | 57,541 |

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The Dolores River Canyon WSA is not within a five-hour drive of a major population center (Standard Metropolitan Statistical Area).

*Balancing the Geographic Distribution of Wilderness Areas*

The Dolores River Canyon WSA would contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. There are four designated wilderness areas within four hours of the Dolores WSA. Three hours south is Mesa Verde Wilderness Area (8,105 acres). Mesa Verde is not similar in landform to the Dolores, but does contain areas of similar vegetation. Mesa Verde Wilderness Area is not open to the public due to important archeological values. Three to four hours east of the Dolores is Lizard Head (41,189 acres) and Mt. Sneffels (16,210 acres) Wilderness Areas, areas of high mountain landform and ecosys-

tem and thereby unavailable for most public use in winter and spring. Four hours northeast of the Dolores is the Black Canyon of the Gunnison Wilderness Area (11,180 acres). Although the Black Canyon is a river canyon, the geology and ecosystem are of the Rocky Mountain province, not the Colorado Plateau as is the Dolores Canyon. Due to the unique year-round recreation opportunity of a desert river canyon in the Colorado Plateau ecosystem, the Dolores River WSA will expand and balance opportunities to attain diverse wilderness experiences.

### MANAGEABILITY

The Dolores River Canyon WSA, with boundaries as recommended in this report (see *Recommendation and Rationale* section above for a discussion of parcel addition and deletion), can be managed for wilderness values. There are no private inholdings and no pre-FLPMA leases; all minerals within the WSA are federally owned. There are several mining claims within the WSA, but with the Bureau

BLM 0006228

CO-030-290

of Mines recording low potential for discovery and development of minerals, site disturbance associated with access and development of these mining claims is unlikely.

## ENERGY AND MINERAL RESOURCE VALUES

The Department of the Interior, Bureau of Mines prepared a mineral assessment for the Dolores River Canyon WSA in 1987. The study area lies in the Uravan mineral belt. Commodities produced or prospected for in and near the WSA include uranium, vanadium, radium, copper, silver, and gold. The uranium-bearing Morrison Formation is mostly absent from the study area. Where it does underlie the area, the Morrison gives no surface indication of significant uranium or vanadium occurrences.

Small copper-silver deposits, in faults, are found in close proximity to the WSA at the Cashin and Cliffdweller mines (see Map, upper northwest corner of WSA). For the most part, mineral-bearing structures do not extend into the study area, but where they do, their exposures indicate little mineralization has taken place. Detailed subsurface exploration would be required to fully evaluate fault zones in the WSA.

Panned-concentrate placer sampling along the Dolores River indicate low gold content and a moderate resource potential, but no resources were delineated in river gravels and terrace deposits in the Dolores River Canyon WSA.

Development of the sand and gravel, sandstone, or evaporite mineral occurrences in the WSA is unlikely since ample and more easily accessible resources of these materials are available elsewhere in the region.

No significant amounts of hydrocarbons have been discovered in the study area, but there is a lack of information regarding subsurface structures in the region. There is moderate resource potential for the occurrence of oil and gas and no potential for coal.

## IMPACTS ON RESOURCES

The following comparative impact table (Table 3) summarizes the effects on pertinent resources for the three alternatives considered for this WSA.

### Table 3 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Recommendation: Enhanced All Wilderness Alternative | All Wilderness Alternative | No Wilderness Alternative |
|---|---|---|---|
| Impacts on Wilderness Values | Wilderness designation would provide statutory, long-term protection for wilderness values on 29,415 acres. Wilderness values on the 200 acres not designated will remain largely unchanged. | Wilderness designation would provide statutory, long-term protection for wilderness values on 28,668 acres. | Under this alternative, wilderness values would remain largely unchanged in the 28,668 acres of the WSA, although they would not be legislatively protected. These values would be maintained by the guidelines in the Dolores River Corridor RAMP and the restrictions to motorized recreation use. No impact from mineral development is anticipated. |

298

BLM_0006229

## Table 3 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: Enhanced All Wilderness Alternative | All Wilderness Alternative | No Wilderness Alternative |
|---|---|---|---|
| *Impacts on Recreational Opportunities and Use* | *Under the Enhanced All Wilderness Alternative, a 33 percent increase in visitor use is anticipated. However, in accordance with the Dolores River Corridor RAMP, this increase would be limited to carrying capacity to preserve the pristine and primitive character of the canyon. In conjunction with the prohibitions on motorized recreation use and mineral development associated with wilderness designation, the existing opportunities and type of recreation use would be maintained.* | *Under the All Wilderness Alternative, a 33 percent increase in visitor use is anticipated. However, in accordance with the Dolores River Corridor RAMP, this increase would be limited to carrying capacity to preserve the pristine and primitive character of the canyon. In conjunction with the prohibitions on motorized recreation use and mineral development associated with wilderness designation, the opportunities and type of recreation use would be maintained.* | *Under the No Wilderness Alternative, an increase in visitor use of approximately 25 percent is anticipated. However, in accordance with the RAMP, any increase would be monitored and limited to carrying capacity to preserve the pristine and primitive character of the canyon. These management guidelines in conjunction with the ORV closure that has been in place since 1985 would continue to preserve the excellent opportunities and type of recreation use in this area.* |

### LOCAL SOCIAL AND ECONOMIC EFFECTS

Designation of the WSA as wilderness would have minimal impacts on local economic conditions. Social factors were not considered a significant issue in the study.

### SUMMARY OF WSA SPECIFIC PUBLIC COMMENTS

Public involvement has occurred throughout the wilderness review process. Certain comments received during the inventory process and early stages of the EIS were used to develop significant study issues and various alternatives for the ultimate management of those lands with wilderness values.

During formal public review of the draft Environmental Impact Statement, a total of 115 comments addressing this WSA were received. 65 were written and 50 were oral statements received at public hearings on the EIS. In general, 101 commenters supported even more wilderness acreage than the draft EIS recommendation; 2 commenters supported wilderness as recommended. Twelve

commenters supported no wilderness or less acreage than the draft EIS.

Those favoring wilderness designation commented on the undisturbed, pristine quality of the WSA and the high recreational values associated with the river. The number of comments supporting increased wilderness acreage led to a reevaluation of wilderness and other resource values for three parcels which had been recommended for release to other uses. This resulted in the recommendation that these areas totaling nearly 800 acres be included for wilderness designation.

Those opposing wilderness designation were concerned that wilderness would preclude mineral development and grazing. The Board of Montrose County Commissioners opposed wilderness designation. The Bureau of Reclamation recommended an alternative wilderness boundary, reducing the WSA by 160 acres to accommodate their salinity injection wells. They have since acquired the needed land from other sources. The State of Colorado Department of Natural Resources supported wilderness designation.

BLM 0006230



**TABEGUACHE CREEK PROPOSAL**
CO-030-300

RECOMMENEDED FOR WILDERNESS

RECOMMENDED FOR NONWILDERNESS

LAND OUTSIDE WSA RECOMMENDED FOR WILDERNESS.

SPLIT ESTATE (NONE)

STATE (NONE)

PRIVATE (NONE WITHIN THE WSA)

Miles 0 1 2 3

January 1991

BLM_0006231

# TABEGUACHE CREEK
# WILDERNESS STUDY AREA

## The Study Area — 7,743 acres

The Tabeguache Creek WSA (CO-030-300) is located in Montrose County, approximately 4 miles north of Nucla, Colorado. All 7,743 acres are BLM lands and the WSA is surrounded by a mixture of public and private lands. The area is bounded on the east by the Uncompahgre National Forest. The north boundary is approximately one and one half miles of private property line and the Meadows Trail Road. A small portion of the west boundary along Tabeguache Creek is a public/private property line. The remainder of the west and south boundary is drawn to exclude old dirt tracks and the chainings in the Ross Fort Park and Horse Park area. The WSA is shown on the map.

Centered on Tabeguache Creek and its 400 to 800 foot cut into the surrounding terrain, the topography of the WSA is characterized by ridges and mesas incised by rugged tributary canyons. (See Photo 2) Elevations within the WSA range from 5,600 feet along the lower reaches of Tabeguache Creek in the west, up to 6,800 feet in the east as the land rises onto the Uncompahgre Plateau. Pinyon/juniper woodland is the dominant vegetative cover except for the riparian zone along Tabeguache Creek.

The WSA was studied under Section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the San Juan/San Miguel Planning Area Final Wilderness Environmental Impact Statement (EIS) published November, 1990. Two alternatives were analyzed in the EIS: the no-wilderness alternative, and an all-wilderness alternative which is the recommendation of this report (7,748 acres - comprised of the original WSA, 7,743 acres, plus 26 acres of a previously cherrystemmed way and minus 21 acres in minor boundary adjustments). See Table 1.

## Recommendations and Rationale

7,748 acres recommended for wilderness

21 acres recommended for nonwilderness

The recommendation for Tabeguache Creek WSA is to designate the entire area as wilderness (see map). This is also considered to be the environmentally preferable alternative as it will result in the least change to the natural environment over the long term. The 7,748 acre WSA is recommended for wilderness designation primarily because of its outstanding natural scenery, opportunities for solitude and primitive, unconfined recreation, and for its ecological diversity.

Designation of Tabeguache Creek WSA as wilderness would preserve one of the last pristine canyons along the Uncompahgre Plateau. The focal point of the area is the Tabeguache Creek Canyon containing a perennial stream and characterized by steep talus slopes and rocky ledges of Wingate and Entrada sandstone. (See Photo 1) Several steep, rugged side canyons cut into the benchlands that border Tabeguache Canyon on both the north and south. This rugged terrain has excluded most human use of the area while enhancing opportunities for solitude. The perennial stream, lush riparian vegetation, steep canyon walls and the semi-desert benchland beyond the main canyon, make this a scenic and diverse area for hiking, backpacking, hunting and fishing. (See Photo 2) The WSA's relatively low elevation makes it easily accessible for wilderness recreation opportunities throughout most of the year.

Designation of this WSA as wilderness would preserve and enhance the ecological diversity of the National Wilderness Preservation System. The narrow ribbon of canyon bottom riparian vegetation consisting of cottonwood, willow, wild rose, various shrubs and scattered ponderosa pine contrasts with the semi-desert, pinyon pine/juniper forest of the Colorado Plateau Province ecosystem which covers most of the WSA. (See Photo 2) The Colorado Plateau pinyon/juniper vegetation type occurs in only one designated wilderness area in Colorado (Mesa Verde which is closed to public use). As elevation increases to the east, the WSA becomes a transition zone from the pinyon/juniper to the dense pine, spruce, and fir forest of the Uncompahgre Plateau. Much of the WSA's eastern boundary

301

BLM 0006232

abuts Forest Service lands which were identified for wilderness review. BLM's Tabeguache Canyon WSA is part of a much larger pristine natural area which contains three different forest ecosystems and the riparian zone.

Designation of this WSA as wilderness would preserve an area of valuable wildlife habitat. The availability of year-round water together with the pristine character and ecological diversity of the area combine to provide ideal habitat for mountain lion, black bear, bobcat, red fox, raptors and snakes. Ecologically, the area is significant as an undisturbed refuge for indigenous flora and fauna in a region that has been greatly modified by man.

No major manageability problems or resource

conflicts would result from wilderness designation. The entire WSA is BLM land; no inholdings. There are no pre-FLPMA oil and gas leases and no patented mining claims within the WSA. The 1990 *Mineral Summaries* by the U.S. Geological Survey and Bureau of Mines indicates that as of December, 1989 there were no unpatented mining claims within the WSA and that there is low mineral potential for uranium and vanadium. Therefore, no site disturbance associated with access to or development of any future mining claim is anticipated.

The WSA contains all or portions of 4 grazing allotments totalling 286 animal unit months (AUM). No range improvement projects have been proposed and no conflicts with range management are expected.

| Table 1 - Land Status and Acreage Summary of the Study Area | |
|---|---|
| **Within Wilderness Study Area** | |
| BLM (surface and subsurface) | 7,769 |
| Split Estate (BLM surface only) | 0 |
| Inholdings (State, private) | 0 |
| Total | 7,769 |
| **Within the Recommended Wilderness Boundary** | |
| BLM (within WSA) | 7,722 |
| BLM (outside WSA) | 26 |
| Split Estate (within WSA) | 0 |
| Total BLM Land Recommended for Wilderness | 7,748 |
| Inholdings (State, Private) | 0 |
| **Within the Area Not Recommended for Wilderness** | |
| BLM | 21 |
| Split Estate | 0 |
| Total BLM Land Not Recommended for Wilderness | 21 |
| Inholdings (State, Private) | 0 |

BLM_0006233

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### *Naturalness*

The Tabeguache Creek Canyon WSA is predomi-nantly natural with negligible human imprints. The dominant natural feature of the area is Tabeguache Creek, a perennial stream running east to west through the center of the WSA, which has cut a deep canyon (400 to 800 feet) into the underlying sedimentary formations of the area. (See Photo 2) The walls of Tabeguache Creek Canyon generally consist of steep talus slopes and rocky ledges. In the eastern end of the canyon where Wingate and Entrada Sandstones are exposed, there are higher, more massive cliffs.

Both to the north and south of Tabeguache Creek and up out of the canyon itself, intermittent streams and drainages have cut several steep, rugged side canyons into the surrounding benchlands. Combined with numerous smaller washes and gullies, this has created an eroded terrain of canyons, cliffs, ridges and mesas. In the area south of Tabeguache Creek, the drainage pattern is divided by an east/west running ridge. North of the ridge a few intermittent streams drain into Tabeguache Creek. South of the ridge, longer and more numerous washes flow southwest into Doby and Coal Canyons. A few flat, open parks are located in the vicinity of Ross Fort Park and Horse Park.

Between Tabeguache Creek and Ross Fort Park there is an area of "badlands" topography eroded into the Morrison Formation. The exposed rock and soil which is nearly devoid of vegetation is colored with shades of gray, purple and yellow. In the southern portion of the WSA, north of Coal Canyon, there are a few areas of exposed "slickrock" - smooth expanses of sandstone without soil or vege-tative cover. Approximately 100 million years of sedimentary formation is exposed in the WSA.



*Photo 1. Tabeguache Creek WSA. Autumn along perennial Tabeguache Creek. Talus slopes and rocky ledges of Wingate and Entrada sandstone. Note hikers on far right, under cliff.*

BLM_0006234

Vegetation in the WSA consists primarily of a dense cover of pinyon and juniper trees, with some open areas supporting a growth of grasses, sagebrush and other desert shrubs. The exception to this is along Tabeguache Creek where there is a lush riparian growth of cottonwoods, willow, oaks, boxelder, mountain mahogany, and numerous other shrubs. (See Photos 1 and 2)

The availability of year round water and the unroaded character of this area, make it ideal habitat for numerous wildlife species including mule deer (dense population), black bear, mountain lion, bobcat, elk (incidental winter use), red fox and a variety of raptors and snakes.

The majority of man's imprints associated with past mining activity, vegetative manipulation for livestock, and access routes, were excluded from the WSA during the wilderness inventory process. The resulting WSA is primarily natural. Imprints of man within the area consist of four short, unmaintained ways and some ditching which are screened by vegetation and are themselves being eroded away, revegetated, and do not significantly impair the pristine quality of the area.

### Solitude

Topographic and vegetative screening combine to provide outstanding opportunities for solitude throughout the WSA. The benchlands with their numerous canyons, washes, and ravines provide excellent topographic screening. With the exception of a few open park, badland, and slickrock areas, this upland portion of the WSA is covered with a pinyon/juniper forest which provides a dense vegetative screen. From the higher mesa and rim areas in the benchlands, there are wide-ranging vistas of plateaus, canyons and the distant mountains which impart a feeling of vastness and enhance opportunities for solitude. Winding, narrow Tabeguache Creek Canyon with its lush riparian vegetation provides both topographic and vegetative screening. (See Photos 1 and 2)

### Primitive and Unconfined Recreation

Tabeguache Creek WSA provides outstanding opportunities for primitive and unconfined recreation. Tabeguache Canyon and the perennial creek within provide the scenic backdrop for hiking, horseback riding, backpacking, camping, and

fishing( the creek contains rainbow and brown trout). The old Indian trail along Tabeguache Creek provides access onto the Uncompahgre Plateau. The many cliffs and rock ledges provide interesting technical rock climbing and "bouldering" opportunities. (See Photo 1)

Benchlands above the canyon offer more challenging travel routes. Photography and sightseeing opportunities are available throughout the WSA and are enhanced by the geological and archeological features in the area. Hunting is an historic as well as prehistoric use of the area.

### Special Features

Tabeguache Creek WSA contains special features for scientific and educational study. Within the area, erosion of gently-dipping sedimentary strata has exposed the Dakota Sandstone, Morrison Formation, Entrada Sandstone, Wingate Sandstone and the Chinle Formation. These strata represent a time span of approximately 100 million years. On the steeper canyon slopes (especially in Tabeguache Canyon) where vegetation is very sparse, these strata are easily visible allowing excellent opportunities for study of geological and geomorphic features and processes.

Although no formal intensive archeological inventories have been done in the WSA, there is high potential for the existence of important archeological sites due to the topography, year-round water supply and proximity to Tabeguache Cave II. Tabeguache Cave II is on the creek just outside the WSA. A partial excavation in the 1930's by C.T. Hurst, yielded remains of three distinct cultural groups: the Archaic, Basketmaker II, and a later Ute occupation. It is known that the Tabeguache Creek Canyon served as a trail up onto the Uncompahgre Plateau for the Fremont Culture and Tabeguache Ute Indians but the existence of Archaic cultural remains indicates that the trail's use may extend back for seven thousand years. Hurst also found Anasazi Pueblo II pottery in the area which may support the idea of Anasazi Culture-Fremont Culture contact. The WSA has great potential for future archeological discovery, scientific study, and interpretation and BLM has proposed the canyon itself for designation as an Outstanding Natural Area (ONA) in order to protect the archeological and natural values of this area.

BLM_0006235

# DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

*Assessing the diversity of natural systems and features as represented by ecosystems*

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System. This WSA is in the Colorado Plateau Province (Bailey-Kuchler classification system) and contains the pinyon-juniper woodland vegetation type (7,748 acres). The pinyon-juniper woodland ecosystem is represented by only one designated wilderness area in Colorado; that being in Mesa Verde National Park and closed to public recreation. See Table 2. The abundance of water in this WSA does make Tabeguache unique among Colorado Plateau, pinyon/juniper WSA's.

## Table 2 - Ecosystem Representation

| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas | acres | Other BLM Studies areas | acres |
|---|---|---|---|---|
| *Nationwide* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-juniper woodland | 11 | 1,401,745 | 85 | 2,142,602 |
| *Colorado* | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-juniper woodland | 1 | 8,105 | 17 | 293,837 |

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The Tabeguache Canyon WSA is not within a five-hour drive of a major population center (Standard Metropolitan Statistical Area).

*Balancing the Geographic Distribution of Wilderness Areas*

The Tabeguache Creek WSA would contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. The nearest designated wilderness areas (Lizard Head Wilderness; 41,189 acres and Mount Sneffels Wilderness; 16,210 acres) are approximately 2 to 3 hours to the southeast and are areas of high mountain landform and ecosystem and thereby unavailable for most public use in winter and spring. Three hours south is Mesa Verde Wilderness Area (8,105 acres). Mesa Verde is not similar in landform to Tabeguache, but does contain areas of similar vegetation. Mesa Verde Wilderness Area is not open to the public due to important archeological values. BLM's Dolores River Canyon WSA (29,415 acres recommended for wilderness designation) is one hour to the southwest. Due to the year-round access, archeological values, and the unique qualities of a lush riparian canyon within the semi-desert Colorado Plateau ecosystem, Tabeguache Creek WSA will expand and balance opportunities to attain diverse wilderness experiences.

## MANAGEABILITY

Tabeguache Creek WSA can be managed for wilderness values. Within the WSA, there are no private inholdings, pre-FLPMA oil and gas leases, patented or unpatented mining claims and all minerals are federally owned. The ruggedness of the terrain inherently limits and discourages rangeland developments, off-road-vehicle (ORV) use, and

BLM_0006236

other human intrusions. This enhances the likelihood of the area remaining natural with opportunities for solitude preserved.

## Energy and Mineral Resource Values

Tabeguache Creek WSA energy and mineral resources were evaluated in "*Mineral Summaries, BLM Wilderness Study Areas in Colorado, February, 1990*", prepared by the U.S. Geological Survey and the U.S. Bureau of Mines. In addition, several oil and gas seismic tests have been done in the area; all in a non-impairing manner (primarily by helicopter). The WSA has no known mineral resources. Sand and gravel for road work are found but are more accessible outside the WSA.

Hydrocarbons (oil, gas, carbon dioxide, helium): No known resources and a moderate potential for undiscovered deposits. There is no resource potential for coal.

Energy and related minerals (uranium and vanadium): No known deposits and low potential for undiscovered resources.

Precious and base metals (gold, silver, copper, lead, zinc): No known deposits and low potential for undiscovered resources.

## Impacts on Resources

The following comparative impact table (Table 3) summarizes the effects on pertinent resources for the two alternatives considered for this WSA.



*Photo 2. Tabeguache Creek WSA. Looking east, upstream with Uncompahgre Plateau in background. Lush riparian vegetation of the creek contrasts with pinon/juniper of the surrounding benchlands.*

BLM_0006237

## Table 3 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Recommendation: All Wilderness Alternative | No Wilderness Alternative |
|---|---|---|
| **Impacts on Wilderness Values** | Wilderness designation would provide statutory, long-term protection for wilderness values on 7,748 acres. Natural and supplemental values would be maintained by the restrictions to motorized recreational use and mineral development. Opportunities for solitude and primitive, unconfined recreation would be maintained because the anticipated increase in visitor use associated with wilderness designation would be so incidental. | Under this alternative, wilderness values would remain largely unchanged in the 3,100 acres that would continue to be managed with the ORV closure and potential ONA designation. Wilderness values on 4,643 acres could be temporarily impaired by sights and sounds from ORV activity. However, no off-road vehicle activity or mineral exploration or production is projected in that area, so the wilderness values would not be diminished. |
| **Impacts on Cultural Resources** | Under this alternative, the cultural resources in the WSA would be protected by wilderness management. This protective measure would be further supported by the elimination of motorized recreational use and mineral development. Cultural resources would benefit from the additional management presence and funding that wilderness designation would carry with it. In addition to protection by wilderness designation, the cultural resources would be protected by the recovery of information from 4 sites. | Under this alternative, cultural resources on 3,100 acres would be protected by the management restriction on ORV use, NSO stipulations, and potential Outstanding Natural Area designation. Although 4,643 acres in the WSA have no protective measures and are not subject to any restrictive management, impacts to cultural resources are not projected from the potential of increased site accessibility resulting from ORV or mineral activity. |
| **Impacts on Recreational Opportunities and Use** | Under this alternative, overall recreational use levels would remain at approximately 750 user days per year. Excellent opportunities would continue to exist for non-motorized, backcountry recreational activities and they will be preserved by eliminating motorized recreational use and mineral development. | Approximately 750 user days of backcountry recreation use (hiking, horseback riding, hunting, backpacking, and archeological resource appreciation) would be maintained under this alternative. Of the WSA, 3,100 acres are protected by the ORV closure and 4,643 acres have no restrictions. |

BLM_0006238

## LOCAL SOCIAL AND ECONOMIC CONSIDERATIONS

Designation of the WSA as wilderness would have negligible impacts on local economic conditions. Social factors were not considered a significant issue in the study.

## SUMMARY OF WSA SPECIFIC PUBLIC COMMENTS

The final San Juan/San Miguel Resource Management Plan and Environmental Impact Statement was issued in December, 1984.   That document included the BLM's preliminary recommendations for the eight WSA's in the San Juan Resource Area. Tabeguache Creek was not recommended for wilderness designation at that time.  In light of the substantial public comment generated during the review process and the continued interest in the preliminary recommendations, the BLM re-evaluated those recommendations.  As a result, BLM changed the recommendation for Tabeguache.  A *Federal Register Notice*, July 20, 1988, stated that Tabeguache Creek WSA was recommended for wilderness designation.  BLM received 28 letters in response to the change in recommendation:  25 in support and 3 opposed.

During formal public review of the draft Wilderness Environmental Impact Statement, a total of 98 comments were received which specifically addressed this WSA - 53 were written and 45 were oral statements received at public hearings.  In general, 94 commenters supported wilderness designation and 4 favored releasing the area for other uses (no-wilderness).  Specific comments by those favoring wilderness designation centered on the preservation of archeological values and the protection of the ecological diversity and wildlife. Several commenters also focused on the unique scenic beauty, recreation values (tourist economy) and the primitive character (solitude) of Tabeguache.

Those opposing wilderness designation were concerned that wilderness would preclude oil, gas and mineral development or conflict with grazing.

The Board of Montrose County Commissioners opposed wilderness designation for Tabeguache Creek WSA.  No comments specifically addressing this WSA were received from other federal or state agencies.

BLM_0006239

309

BLM_0006240



RECOMMENEDED FOR WILDERNESS

RECOMMENDED FOR NONWILDERNESS

LAND OUTSIDE WSA RECOMMENDED FOR WILDERNESS.

SPLIT ESTATE

STATE

PRIVATE

SCALE 1:100000

Miles

Camel Back WSA
Proposal
CO-030-353

January 1991

N

BLM_0006241

# CAMEL BACK
# WILDERNESS STUDY AREA

## The Study Area -- 10,402 acres

The Camel Back WSA (CO-030-353) is located in southwestern Colorado in northwestern Montrose County, approximately nine miles southwest of Delta and 20 miles northwest of Montrose. The area contains 10,402 acres of public land and a 160-acre private inholding, and is surrounded by a mixture of public and private lands.

The WSA's northern boundary follows the cliff line of the east rim of Roubideau Canyon and private land boundaries. Its southern boundary is contiguous with the Uncompahgre National Forest. Private property also makes up a small part of the southern boundary. An unimproved jeep trail delineates approximately 6 miles of the area's western boundary. The eastern boundary is defined by a variety of noticeable human imprints, including approximately 4 miles of unimproved jeep trail, extensive areas of contour furrowing, and a large chaining area. The Camel Back WSA is depicted on the map across from this page.

The Camel Back WSA is characterized by a series of deep canyons and extensive mesas, sculptured by perennial and intermittent streams. These streams, which are oriented in a predominately north to south direction, have cut canyons with massive cliffs, amphitheaters, and talus slopes, and have isolated numerous highlands as mesas and buttes. Elevations range from 5,400 feet along Roubideau Creek to approximately 7,000 feet on Winter Mesa, the largest mesa in the area.

The canyon bottoms of the WSA are typical riparian areas with a grass and forb understory beneath cottonwoods, willows, tamarisk, and skunkbrush. Ponderosa pine and Douglas fir occur in the overstory in the upper reaches of the canyons. Slopes are vegetated with sparse pinyon-juniper and sagebrush. Mesa tops are mostly pinyon-juniper woodlands with sagebrush and grasslands parks, some of which are fairly large.

The WSA was studied under section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the Uncompahgre Basin Resource Area Final Resource Management Plan and Environmental Impact Statement (RMP/EIS) published September, 1988. Two alternatives were analyzed in the EIS: all wilderness (10,402 acres), and no wilderness, which is the recommendation of this report.

## Recommendation and Rationale

> 0 acres recommended for wilderness
>
> 10,402 acres recommended for nonwilderness

It is recommended that the entire 10,402 acres of the Camel Back WSA not be designated as wilderness and instead be released for uses other than wilderness. The environmentally preferred alternative would be to designate the entire 10,402 acres as wilderness since this would result in the least change from the natural environment over the long term.

While the BLM recognizes that the Camel Back WSA meets the minimum wilderness criteria, it does not feel that the area's wilderness qualities are of an overall quality and significance to warrant inclusion in the NWPS. The limited extent of wilderness qualities within the WSA, and the BLM's preference for other options for managing the area, are the primary reasons for recommending that it be released for uses other than wilderness.

Although the WSA does have some rugged terrain and outstanding natural features, the majority of its features are very common to lands throughout southern Colorado, and there is nothing to really set the area apart. (See Photo 1) There are some scenic vistas afforded from the top of the higher mesas and buttes in the WSA, however, these views are marred by the presence of large wildlife chainings, areas of contour furrowing, and numerous roads and ways on the west, east, and north boundaries of the area.

The naturalness and scenic qualities of Winter Mesa, the predominate formation in the WSA, are impaired by the presence of the Winter Mesa Way, a 6 mile jeep trail which essentially bisects the top of the mesa. The sparse vegetation and flat topogra-

BLM_0006242



*Photo 1. Camel Back WSA. Although the WSA does have some rugged terrain and outstanding natural features, such as the Camel Back ridge, shown here, the majority of its features are very common to lands thorughout southern Colorado.*

phy of the mesa top provide very little screening for the Way, or for a number of range improvements in the area. These improvements include 1.25 miles of fence, water troughs ( See Photo 2), three stock reservoirs, each covering approximately 1,300 square feet, and a large fenced water catchment facility, covering one third acre in the southwest portion of the area.

The catchment facility, which was added after the wilderness inventory process, is a highly visible imprint of human use in the area, and significantly impacts the area's naturalness. ( See Photo 3) Extensive spring and fall grazing also detract from the aesthetic and scenic values of the WSA.

Although portions of the Camel Back provide opportunities for solitude and primitive, unconfined recreation, very little of the use which actually occurs in and around the area is wilderness-related. Hunting is popular in the pinyon-juniper woodlands of the area, however, this use has always been associated with motorized vehicles.

BLM_0006243

CAMEL BACK WSA                                                   CO-030-353



*Photo 2.  Camel Back WSA.  The sparse vegetation and flat topography of the mesa tops provide very little screening for range improvements in the area.*

The WSA is rarely used for hiking, backpacking, nature study, or other primitive recreational activities.  The primary reason for this is that there is an abundance of public lands in the vicinity of the WSA that are considered more scenic, and geologically interesting.  These areas, such as Grand Mesa, the Gunnison Gorge WSA, and the adjacent Dominguez WSA, also offer a wider range of recreational opportunities, including whitewater rafting, canoeing, and fishing, which are not available in the Camel Back.

In addition, several factors detract from the overall quality of the recreational opportunities that are available in the area.  The WSA is considered too hot and dry during the summer months, and very few recreationists venture into the WSA from late June through September.  Winter snows and high spring runoff in the Potter and Roubideau creeks drainages restrict access to the majority of the WSA, further limiting the season of use.

Runoff from summer thunderstorm activity increases the turbidity in these streams and reduces their visual qualities.  Although Roubideau Creek does contain some game fish, the fishery is considered poor due primarily to the wide fluctuations in flow levels and the poor condition of the riparian habitat.

The recreational use which does occur in the WSA is primarily by the residents of Delta and Olathe who picnic and occasionally fish or car camp along Roubideau Creek in late spring and hunt in the fall.  Since cattle tend to concentrate in the riparian areas, which are the preferred areas for picnicking and camping, and since the periods of cattle use coincide with the times of highest recreational use (spring and fall), the result is a lower quality recreational experience for the users.

The WSA is also popular with the locals for unauthorized ORV use and fuelwood cutting.  In the years since the original wilderness inventory was

313

BLM_0006244

completed, there has been an increase in ORV use in and along the numerous roads and ways which border the WSA. In addition to being both visually and audibly distracting, ORV use has resulted in a significant reduction of the WSA's wilderness qualities, particularly those of solitude and naturalness.

Besides providing recreation for nearby residents, the Camel Back is also important for grazing and wildlife habitat management. By releasing the area for uses other than wilderness, approximately 76 percent of the WSA would continue to be managed for intensive livestock grazing. The remaining 24 percent of the area would be managed primarily for wildlife habitat, with an emphasis on riparian habitat improvement on approximately 680 acres.

It is also recommended that the entire Camel Back area (10,402 acres) would be closed to recreational ORV use to prevent accidental destruction of threatened and endangered plants, to protect visual qualities, and to reduce active erosion. Although wilderness designation would also provide protection for these resources by eliminating motor vehicle use in the area, the BLM prefers to manage the entire Camel Back area for these purposes under the more flexible guidance of multiple use principles. These principles would also allow for greater manageability of the grazing, wildlife, and riparian resources.

Approximately 514 Animal Unit Months (AUMs) of cattle use is authorized within the WSA. The existing range facilities, availability of early and late season forage, and the relatively flat terrain on top of Winter Mesa greatly contribute to the WSA's value for spring and fall grazing use. Twelve additional water developments are projected for the Camel Back in the EIS. These developments are intended to redistribute cattle use and relieve the pressure on sensitive riparian areas.

While four of these projects meet wilderness criteria for construction, the remaining eight developments would be precluded if the area is designated. The no wilderness recommendation reduces the management conflicts arising from the construction of these eight projects, and as such, increases the manageability of an important resource use of the area.

Approximately 2,482 acres in the Camel Back Ridge and Upper Roubideau Creek drainage areas, located in the south-eastern portion of the WSA would be designated a Wildlife Management Area. These areas, which are heavily vegetated in pinyon-juniper woodlands interspersed with pockets of open grassy parks, provide excellent winter range and habitat conditions for deer and elk. (See Photo 4)

Management of the wildlife area will consist primarily of an intensified level of monitoring of population levels and documenting changes in habitat and range conditions which are achieved through the grazing management program.

Improvement of riparian habitat would be emphasized on approximately 680 acres of perennial creek drainages in the area. Although there are no specific plans for wildlife treatments or riparian improvements at this time, the BLM wishes to continue to have the ability to construct projects in the future without the constraints of wilderness criteria.

In conclusion, by not recommending the Camel Back WSA for wilderness designation, the BLM will be less limited in the methods it chooses to improve livestock, wildlife, and riparian management, while still protecting other important scenic and natural resources in the area. This greater flexibility could, over the long term, reduce many of the impacts of livestock grazing, increase the quality of forage available to livestock and wildlife, and, most importantly, improve the manageability of the entire area.

BLM_0006245

| Table 1 - Land Status and Acreage Summary of the Study Area | |
|---|---|
| Within Wilderness Study Area | Acres |
| BLM (surface and subsurface) | 10,402 |
| Split Estate (BLM surface only) | 0 |
| Inholdings (Private) | 160 |
| Total | 10,562 |
| **Within the Recommended Wilderness Boundary** | |
| BLM (within WSA) | 0 |
| BLM (outside WSA) | 0 |
| Split Estate (within WSA) | 0 |
| Total BLM Land Recommended for Wilderness | 0 |
| Inholdings | 0 |
| Within the Area Not Recommended for Wilderness | |
| BLM | 10,402 |
| Split Estate | 0 |
| Total BLM Land Not Recommended for Wilderness | 10,402 |
| Inholdings (State, Private) | 160 |

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The dominating geomorphic features of the Camel Back WSA are canyons, mesas, and the Camel Back ridge. The majority of human imprints, including large wildlife chainings, roads, areas of contour furrowing, and numerous roads and ways on the west, east, and north boundaries of the area, were excluded from the WSA during the wilderness inventory process. These imprints remain visible, however, from the majority of the vantage points along the high mesas in the WSA.

Human imprints which remain in the WSA include one 6 mile long way, three stock reservoirs, each

covering approximately 1,300 square feet, one water catchment which covers approximately one third of an acre, and 1.25 miles of fence.

The Winter Mesa Way, a 6 mile long jeep trail, essentially bisects the top of the mesa, and detracts from the naturalness and scenic qualities of the WSA. The sparse vegetation and flat topography of the mesa top provide very little screening for the way or for the three stock reservoirs located adjacent to the way.

In the years since the original wilderness inventory was completed, there has been an increase in ORV use along this way, as well as along the numerous roads and ways which border the WSA. In addition to being both visually and audibly distracting, this intensified ORV use has resulted in a significant reduction of the WSA's wilderness qualities, particularly those of solitude and naturalness.

BLM_0006246



*Photo 3. Camel Back WSA. The catchment facility is a highly visible imprint of human use in the area, and significantly impacts the area's naturalness.*

The water catchment facility, also located on Winter Mesa, is a highly visible imprint, due primarily to its size, and its location in the middle of a wide, open grassland park, with limited topographic or vegetative screening in the vicinity.

### Solitude

The Camel Back does offer opportunities for solitude, in the more remote portions of the area. Vegetation and topographic screening produce feelings of intimacy and isolation in the canyon bottoms and along the perennial streams. On the mesa tops, where vegetation is sparse, the topography, size, and configuration of the area promote solitude. Solitude, however, is often affected by ORV use occurring in and along the borders of the WSA.

### Primitive and Unconfined Recreation

The Camel Back WSA does provide opportunities for primitive and unconfined recreation. The canyons and gulches provide easy to moderate cross-country hiking and horseback riding routes, while the steeper slopes offer more challenging hiking and rock climbing opportunities. The streams have produced alluvial deposits that provide secluded camping spots. Hunting is an historic use of the area. The many vantage points from the rims and mesas, although somewhat marred by the presence of human uses in the vicinity, do offer opportunities for photographers and sightseers.

### Special Features

The Camel Back WSA possesses several special features which enhance its wilderness qualities. Because the Camel Back is a transition zone between two unique ecosystems, it contains a diverse array of flora and fauna which makes the area valuable for educational, interpretive, and scientific study purposes.

The area contains numerous populations of the endangered spineless hedgehog cactus (*Echinocereus triglochcidiatus var. inermis*). Although the threat-

BLM_0006247

CAMEL BACK WSA                                              CO-030-353

ened Unita Basin hookless cactus (*Sclerocactus glaucus*) has not yet been discovered, it may occur on lower elevation benches throughout the area.

The Camel Back area provides crucial deer and elk winter range, and also important habitat for coyotes, raccoons, mountain lions, rabbits, and numerous non-game birds. The WSA also contains potential habitat for desert bighorn sheep, and bighorn will be reintroduced into the area if suitability studies prove positive.

There are a number of known cultural sites within the WSA, including one site which has been determined "field eligible" for listing on the National Register of Historic Places (NRHP) by BLM personnel.

## DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

### Assessing the diversity of natural systems and features as represented by ecosystems

Wilderness designation of this WSA would not add a new ecosystem and landform to the National

Wilderness Preservation System. The WSA is a transition between two ecosystems and two associated vegetation types: the Colorado Plateau Province and the Rocky Mountain Forest Province (Bailey-Kuchler classification system).

Camel Back contains the pinyon-juniper woodland vegetation type from the Colorado Plateau Province. The pinyon-juniper woodland ecosystem is represented by only one other designated wilderness areas in Colorado: the Mesa Verde National Park Wilderness Area, which is closed to the public. The saltbrush-greasewood vegetation types, representative of the Rocky Mountain Forest Province, occurs in only one designated wilderness (Great Sand Dunes National Monument). (See Table 2)

## Table 2 - Ecosystem Representation

| Bailey Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas acres | | Other BLM Studies areas acres | |
|---|---|---|---|---|
| **Nationwide** | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 11 | 1,401,745 | 85 | 2,142,602 |
| Rocky Mountain Forest Province | | | | |
| Saltbush-Greasewood | 1 | 33,445 | 5 | 26,867 |
| **Colorado** | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 1 | 8,105 | 17 | 293,837 |
| Rocky Mountain Forest Province | | | | |
| Saltbush-Greasewood | 1 | 33,445 | 5 | 26,867 |

BLM_0006248

CAMEL BACK WSA

CO-030-353

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The Camel Back WSA is not within a five-hour drive of a major population center (Standard Metropolitan Statistical Area).

*Balancing the geographic distribution of wilderness areas*

The Camel Back WSA would contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. There are 3 designated wilderness areas within 4 hours of the Camel Back WSA. Approximately 3 hours south of the Camel Back WSA is the Lizard Head Wilderness Area (41,189 acres); an area of high mountain landform and ecosystem, closed to public use in winter and spring.

Mesa Verde Wilderness Area (8,105 acres) is approximately 4 hours south of the WSA. Mesa Verde is not similar in landform to the Camel Back, but does contain areas of similar vegetation. The Wilderness Area is not open to the public due to important archeological values.

Approximately 1 hour southeast of the Camel Back is the Black Canyon of the Gunnison Wilderness Area (11,180 acres). The Black Canyon is a river canyon, and its geology and ecosystem are representative of the Rocky Mountain province, not a mixture of Colorado Plateau and Rocky Mountain provinces, as is the Camel Back. Because of its Colorado Plateau/Rocky Mountain Forest transition ecosystem, the Camel Back WSA would expand and balance opportunities to attain diverse wilderness experiences.



*Photo 4. Camel Back WSA. Approximately 2,482 acres of the WSA would be designated a Wildlife Management Area. These areas of pinyon-juniper woodlands and open grassy parks provide excellent winter range and habitat conditions for deer and elk.*

BLM_0006249

## MANAGEABILITY

The Camel Back WSA is manageable as wilderness. Except for a 160 acre private inholding, the entire area is BLM land. The boundaries of the WSA are defined primarily by existing roads and ways and perennial stream drainages with steep canyon sides. These man-made and natural topographic features provide the WSA with distinct, manageable boundaries.

There are no oil or gas leases, coal leases, or mining claims within the WSA, and no development is expected due to the area's lack of mineral resources.

### ENERGY AND MINERAL RESOURCE VALUES

The Geological, Energy and Miners (GEM) Report for the Camel Back WSA is *Phase 1: GEM Resouce Assessment for Region 4, Colorado Plateau, Dominguez Canyon/Adobe Badlands/Camel Back Area, GRA 6, 1983, MSME/Wallaby Enterprises*, on the mineral potential of leasable, locatable, and saleable minerals in the WSA.

According to the GEM report, there are no known mineral deposits in the WSA. The area has only a low favorability for the accumulation of locatable minerals, including base metals (copper, lead, and zinc) and precious metals (gold and silver), and, as such, a poor economic potential for production. There are no unpatented or patented mining claims located in the WSA.

Uranium and vanadium deposits are known too occur in the Morrison and Chinle geologic formations which are present in the WSA and throughout western Colorado and eastern Utah. Based on the extensive presence of these formations in the WSA, the GEM reports states that the geologic environment of the WSA indicates moderate favorability for the accumulation of uranium and vanadium. However, no uranium-vanadium deposits are known to occur within the boundaries of the WSA, and there has been no interest in exploration.

There are no oil and gas leases within the WSA. Although sedimentary formations found within the WSA have produced oil and gas in other regions of southwestern Colorado, the GEM report indicates only low favorability for oil and gas deposits. This low rating is due primarily to the shallowness of the sedimentary rock structure found in the Camel Back, which is unfavorable for the accumulation of oil and gas in any marketable quantities.

Although coal normally occurs in the outcrops of Dakota Formation, such as those found extensively in the WSA, there are no known coal seams of commercial value.

### IMPACTS ON RESOURCES

The following comparative impact table summarizes the effects on pertinent resources for the no wilderness (Recommendation) and all wilderness alternatives considered for the Camel Back WSA.

| Table 4 - Comparative Summary of the Impacts by Alternative | | |
|---|---|---|
| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative |
| *Impacts on Values* *Wilderness* | Wilderness values would remain largely unchanged on 10,402 acres. Opportunities for solitude, and primitive, unconfined types of recreation use would be increased by recreational ORV closures in the WSA. Twelve range improvement projects would slightly degrade naturalness on approximately one-quarter acre (10,800 square feet) of total area. | Wilderness designation would provide statutory, long-term protection for wilderness values on 10,562 acres. Opportunities for solitude and primitive, unconfined types of recreation would be increased by recreational ORV closures in the WSA. Eight range improvement projects would slightly degrade naturalness on approximately 5,200 square feet of total area. |

BLM_0006250

## Table 4 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative |
|---|---|---|
| *Impacts on Wildlife Habitat and Populations* | *Habitat and forage conditions would be maintained for the area's present yearlong population of 33 deer, and an additional 292 deer and 28 elk during the winter. ORV closures, range improvements and management actions to improve vegetative conditions would result in an overall improvement in herd condition and a gradual increase of 8 to 12 animals in the resident deer herd and 8 to 15 animals in the winter deer herd size. Habitat conditions necessary for a desert bighorn sheep reintroduction would be maintained, and possibly improved.* | *Habitat and forage conditions would be maintained for the area's present yearlong population of 33 deer, and an additional 292 deer and 28 elk during the winter. ORV closures, range improvements and management actions to improve vegetative conditions would result in an overall improvement in herd condition and a gradual increase of 8 to 12 animals in the resident deer herd and 8 to 15 animals in the winter deer herd size. Habitat conditions necessary for a desert bighorn sheep reintroduction would be maintained, and possibly improved.* |
| *Impacts on Recreation Opportunities and Use* | *Recreational use would decrease by 250 user days, or 50 percent, from the present level of 500 user days to 250 user days, as a result of ORV closures. Approximately 300 motorized recreational user days would be eliminated, and use would shift from predominately motorized use to non-motorized primitive use. The overall quality of recreational use would remain high.* | *Recreational use would increase by 100 user days, or 20 percent, from the present level of 500 user days to 600 user days, as a result of designation. Approximately 300 motorized recreational user days would be eliminated, and use would shift from predominately motorized use to nonmotorized primitive use. The overall quality of recreational use would remain high.* |
| *Impacts on Livestock Grazing and Management* | *Livestock grazing would be precluded from March 1 through range readiness and trailing use would be limited in riparian areas, resulting in increased trailing time and operating costs. Four stock reservoirs and eight depression ponds would be constructed to increase water supplies and redistribute concentrated grazing use away from riparian areas. Grazing allocations would continue at the present level of 514 AUMs, but could be reduced by 150 to 200 AUMS as a result of implementing a 35 percent utilization limit to further improve riparian conditions.* | *Livestock grazing would be precluded from March 1 through range readiness and trailing use would be limited in riparian areas, resulting in increased trailing time and operating costs. Four stock reservoirs would be constructed to increase water supplies and redistribute concentrated grazing use away from riparian areas. Eight depression ponds would not be constructed. Grazing allocations would continue at the present level of 514 AUMs, but could be reduced by 150 to 200 AUMS as a result of implementing a 35 percent utilization limit to further improve riparian conditions.* |

BLM_0006251

## LOCAL SOCIAL AND ECONOMIC CONSIDERATIONS

Designation of the WSA as wilderness would have minimal impacts on local economic conditions. Social factors were not considered a significant issue in the study.

## SUMMARY OF WSA SPECIFIC PUBLIC COMMENTS

Public involvement has occurred throughout the wilderness review process. Certain comments received during the inventory process and early stages of the EIS were used to develop significant study issues and various alternatives for the ultimate management of those lands with wilderness values.

During formal public review of the Draft Environmental Impact Statement, a total of 176 oral and written comments specifically addressing this WSA were received. Of those, 142 were written and 34 were oral statements received at three public hearings on the EIS. In general, 53 comments supported the proposed no wilderness recommendation; 123 comments supported wilderness recommendation for the WSA.

Those favoring wilderness designation commented on the undisturbed, pristine quality of the WSA, its scenic qualities, and the high recreational values associated with the area. The majority of the comments in favor of designation were from environmental groups and organizations. Of particular concern to these groups was the need to protect known populations and habitat of threatened and endangered cactus species which occur in the WSA.

Those opposing designation were concerned that wilderness would preclude the development of minerals in the area, and would conflict with or eliminate grazing in the WSA.

Written comments were received from the following federal, state, and local agencies: the National Park Service, Forest Service, Environmental Protection Agency (EPA), Bureau of Reclamation, U.S. Geological Survey, U.S. Bureau of Mines, U.S. Air Force, U.S. Fish and Wildlife Service, the Colorado Department of Natural Resources, and the City of Delta.

The U.S. Bureau of Mines stated that the geology and mineral resource descriptions for the Camel Back lacked a discussion of the uranium potential of the area. The Air Force supported the overall wilderness area concept, but was concerned that designation would adversely affect or restrict their use of low altitude airspace over a wilderness area. The EPA requested a clarification of how wilderness management would affect aquatic habitat, streambank stability, and water quality in the WSA. The State Department of Natural Resources supported wilderness designation for the area.

The other agencies did not identify a specific jurisdictional conflict with either the no wilderness or the all wilderness alternative for the Camel Back WSA.

BLM_0006252



| | RECOMMENDED FOR WILDERNESS (NONE) | | SPLIT ESTATE (NONE) |
| | RECOMMENDED FOR NONWILDERNESS | | STATE (NONE) |
| | LAND OUTSIDE WSA RECOMMENDED FOR WILDERNESS (NONE) | | PRIVATE (NONE) |

SCALE 1:100000

Miles

Adobe Badlands  WSA
Proposal
CO-010-370 b

January 1991

# ADOBE   BADLANDS
# WILDERNESS   STUDY   AREA

## The Study Area -- 10,425 acres

The Adobe Badlands WSA (CO-030-370B) is located in western Delta County in southwestern Colorado, approximately three miles northwest of Delta and 1.5 miles north of U.S. Highway 50. The WSA contains 10,425 acres of public land with no non-public inholdings. The area is surrounded by public and non-public lands. The northern boundary is contiguous with the Grand Mesa National Forest. The area's western boundary is defined primarily by a vehicle route which crosses both private and BLM public lands until it reaches the National Forest to the north. The southern and eastern boundaries follow BLM and non-public land boundaries. The area is shown on the map.

The topography of the area is characterized by abrupt sloping hills dissected by rugged serpentine canyons. Approximately 8,498 acres, or 82 percent, of the Adobe Badlands WSA is composed of the badlands-type Mancos shale formations known locally as the "adobes". This badlands area is very sparsely vegetated with low saltbush, desert trumpet, and buckwheat. The northern 18 percent of the WSA is characterized by the relatively steep foothills of Grand Mesa, and is heavily vegetated with pinyon-juniper woodlands and small, scattered grassland parks.

The WSA was studied under Section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the Uncompahgre Basin Resource Area Final Resource Management Plan and Environmental Impact Statement (RMP/EIS) published September, 1988. Two alternatives were analyzed in the EIS: all wilderness (10,402 acres), and no wilderness which is the recommendation of this report.

## Recommendation and Rationale

0 acres recommended for wilderness

10,425 acres recommended for nonwilderness.

It is recommended that the entire 10,425 acres of the Adobe Badlands WSA not be designated as wilderness and instead be released for uses other than wilderness. The environmentally preferred alternative would be to designate the entire 10,425 acres as wilderness since this would result in the least change from the natural environment over the long term.

While the BLM recognizes that the Adobe Badlands meets the minimum wilderness criteria, it does not feel that the area's wilderness qualities are of an overall quality and significance to warrant inclusion in the NWPS. The limited extent of wilderness qualities within the WSA, in addition to a number of manageability problems, and the BLM's preference for other options for managing the area, are the primary reasons for recommending that the area be released for uses other than wilderness.

Though the WSA does have some fairly rugged terrain and interesting natural features, particularly in the southern "badlands" formation, the majority of its features are very common to lands throughout southern Colorado, and there is nothing to really set the area apart.

There are some scenic vistas afforded from the higher elevations of the area, however, these views are marred by the presence of large areas of contour furrowing, numerous roads and ways along the west and eastern boundaries, and by the North Delta Canal and Highway 50 to the south. Also to the south lies the Delta city reservoir.

A number of structures including houses, barns, corrals, and a large trailer park on the area's western boundary are very visible from the majority of the WSA, as is the city of Delta, which lies only 3 miles to the south. The Delta county airport, landfill, sewage settling ponds, a number of county roads, and an abandoned city of Delta reservoir detract from the naturalness of the surroundings along the WSA's eastern border. There are also four vehicle ways totalling 2.5 miles within the WSA boundaries which are particularly noticeable in the southern portion of the WSA due to the lack of vegetation and topographic relief in that area.

Although portions of the WSA do offer opportunities for solitude and primitive, unconfined recreation use,

BLM_0006254



*Photo 1. Adobe Badlands WSA. Motorcycle use up the faces and along the ridges of the adobe hills in the "badlands" is particularly pronounced and obtrusive.*

very little of the use which actually occurs in and around the area is wilderness-related. Hunting is popular in the pinyon-juniper woodlands of the northern portion of the WSA, and this use has always been associated with motorized vehicles.

The Adobe Badlands is rarely used for hiking, back-packing, nature study, or other primitive recreational activities. The primary reason for this is that there is an abundance of public lands in the vicinity of the WSA that are considered more scenic and geologically interesting. These areas, such as Grand Mesa and the Gunnison Gorge and Dominguez WSAs, also offer a wider range of recreational opportunities, including whitewater rafting, canoeing, and fishing, which are not available in the Adobe Badlands.

In addition, the quality of the recreational opportunities which are available in the WSA is severely reduced by a number of factors, including the lack of any perennial water sources, the extreme hot and dusty summer climate, and the mancos shale soils which are very difficult to traverse when saturated

with snow melt or rain. A number of unauthorized, non-wilderness uses, described below, also contribute to a lower quality wilderness experience.

The present recreational use in the Adobe Badlands WSA is estimated at only 500 user days annually, 450 of which are unauthorized motorized user days. In the years since the original wilderness inventory was completed, there has been a significant increase in ORV use in the more open portion of the badlands area located in the southern portion of the WSA. Because this area, which encompasses approximately 1,000 acres or 10 percent of the WSA, is relatively low in elevation, and easily accessible from Delta, it has become very popular for year-round ORV use by the area residents.

In addition to being both visually and audibly distracting, increased ORV use in this area has resulted in a significant reduction of the WSA's wilderness qualities, particularly those of solitude and naturalness. Motorcycle use up the faces and along the ridges of the adobe hills in the Devil's Thumb area, in the southern portion of the WSA, has resulted in a

BLM_0006255

proliferation of unnatural looking scars and tracks. (See Photo 1)

Cross-country four-wheel drive, all terrain vehicle, and motorcycle traffic has created a network of branching ways, radiating out from the two major access routes along the east and west boundaries of the WSA. Numerous deep trenches and ruts have formed where vehicles have become stuck in "adobe clay" while attempting to transverse the many shallow washes and arroyos in the area.

This increased ORV use is also environmentally damaging to the area's highly erodible, saline soils. Use in late fall and early spring, when the soils are saturated, has resulted in a substantial increase in the amount of erosion and saline runoff from the area.

Besides ORV use, the topography of the lower badlands area is also conducive to a number of other "non-wilderness" uses. The area has become popular as a shooting range area, and many of the adobe hills along the south-eastern boundary of the WSA

have become splattered with broken glass from bottles used for target-shooting practice.

The numerous secluded washes and ravines along both the east and west boundaries provide ideal trash dump sites and blowing litter from these sites has become a common problem along the WSA's east and west boundaries. The "dobies"as locals refer to the area, is also a popular late-night party place for local teenagers, who build huge bonfires and leave large quantities of trash behind after the festivities.

ORV use, shooting, trash dumping, and large-scale partying in and around the WSA greatly distract from the area's wilderness qualities and significantly lower the quality of the recreational experience for other users in the area. So far, BLM's attempts to restrict ORV use to roads along the WSA boundaries and to eliminate non-wilderness uses from the WSA have met with little success. In some cases, management efforts have resulted in increased problems, such as theft or vandalism of wilderness boundary signs.



*Photo 2. Adobe Badlands WSA. Problems in managing the area are due to the WSA's relatively easy year-round accress, and the open, unvegetated nature of the lower badlands area, which provide few natural or manmade barriers for control.*

BLM 0006256

**ADOBE BADLANDS WSA**

**CO-030-370B**



*Photo 2. Adobe Badlands WSA. ONA/ACEC designation would provide essentially the same protection as wilderness for approximately 6,783 acres of the more outstanding adobe formations located in the central portions of the WSA.*

Problems in managing the area are primarily attributable to the WSA's relatively easy year-round access, and the open, unvegetated nature of the lower badlands area, which provide few natural or man-made barriers for control. In addition, the majority of these activities, (i.e., illegal trash dumping and partying) take place after the normal hours of BLM patrols. Fencing the perimeter and providing round-the-clock patrols for the area are cost prohibitive. Therefore, the BLM is severely limited as to methods for keeping such non-wilderness uses from occurring in the area.

Although the BLM believes that the wilderness qualities of the Adobe Badlands are not significant enough to warrant designation as wilderness, it is felt that the area's interesting landforms, threatened and endangered plants and habitat, and other values are deserving of some form of protection.

The Record of Decision for the Uncompahgre Basin Resource Area Resource Management Plan (RMP) designated 6,783 acres of the WSA as the Adobe Badlands Outstanding Natural Area and Area of Critical Environmental Concern (ONA/ACEC). The ONA/ACEC designation would provide essentially the same protection as wilderness designation for the more outstanding adobe formations located in central portion of the WSA and which

are relatively inaccessible to motorized vehicle. ( See Photo 2) ORV use will be allowed in areas outside the ONA, particularly in the open areas along the east and west boundaries of the WSA where such use is presently occurring.

In addition to the ONA/ACEC designation, approximately 1,927 acres in the northern portion of the WSA would be designated a Wildlife Management Area. This area is heavily vegetated in pinyon-juniper woodlands.

According to the RMP, motorized vehicle use, primarily associated with hunting activities, will be permitted in this wildlife management area. However, the motorized use will be limited to existing roads and ways from December 1 through April 30 to minimize habitat disturbance and reduce stress on wintering herds. Open ORV "play" will be allowed in the area from May through November.

If the area is not designated as wilderness, proposed management actions for the wildlife area include a land treatment project designed to improve crucial deer and elk winter range conditions. It is expected that this project will result in an overall improvement in the condition and health of the existing herd and an increase in both deer and elk herd size over the long term.

BLM_0006257

The BLM projects that wilderness designation, which would preclude this project, as well as any similar surface-disturbing projects in the WSA, would result in severe shortages of forage, a reduction in herd vigor, and the possible loss of 15 to 20 deer and 8 to 10 elk over the long term.

Approximately 1,715 acres of highly erodible saline soils throughout the remainder of the area would be managed to control salinity contributions to the Colorado River system. Motorized vehicle use will be allowed in these areas, but will be limited yearlong to designated roads and trails to reduce soil surface disturbance and water runoff. Although there are no specific plans for salinity control projects at this time, the BLM wishes to continue to have the flexibility to construct projects (i.e., check dams and monitoring stations) in the future without the constraints of wilderness criteria.

In conclusion, if the Adobe Badlands WSA is not designated as wilderness, the BLM will be less limited in the management methods it chooses to protect important scenic values, improve wildlife habitat, and control erosion and salinity in the WSA. The BLM also feels that its proposed management offers a better balance of recreational opportunities by providing areas for both primitive, non-motorized recreation in the ONA/ACEC and motorized recreation in the remainder of the area. The greater flexibility provided by multiple use management under the RMP is expected to result in beneficial, rather than negative impacts to deer and elk, fewer user conflicts, lower operation costs, and improved manageability of the entire area.

### Table 1 - Land Status and Acreage Summary of the Study Area

| Within Wilderness Study Area | Acres |
|---|---|
| BLM (surface and subsurface) | 10,425 |
| Split Estate (BLM surface only) | 0 |
| Inholdings (Private) | 0 |
| Total | 10,425 |
| **Within the Recommended Wilderness Boundary** | |
| BLM (within WSA) | 0 |
| BLM (outside WSA) | 0 |
| Split Estate (within WSA) | 0 |
| Total BLM Land Recommended for Wilderness | 0 |
| Within the Area Not Recommended For Wilderness | |
| BLM | 10,425 |
| Split Estate | 0 |
| Total BLM Land Not Recommnded for Wilderness | 10,425 |
| Inholdings (State, private) | 0 |

327



*Photo 4. Adobe Badlands WSA. Under the proposed alternative, 1,927 acres of pinyon-juniper in the northern portion of the WSA would be designated a Wildlife Management Area. A land treatment plan in this area would improve crucial winter range conditions for deer and elk.*

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS  CHARACTERISTICS

#### *Naturalness*

Geologically, the Adobe Badlands WSA is highly varied and diversified. Sixty-five percent of the WSA consists of badland-type formations, or "adobe" hills, where coloration changes abruptly with shifts in lighting. "Badlands" topography is characterized by a multitude of steep hills and dissected, rugged serpentine-like canyons. In portions of the unit, wind and water erosion have created isolated small, flat island-like mesas surrounded by a maze of deeply carved canyons, washes, and ravines.

Geologically, the adobe badlands are part of the Mancos shale formation which consists of ancient marine deposits. These deposits are known for their numerous fossils. Vegetation in the badlands section is notably sparse but in places is thickly covered in a mat of desert trumpet, which noticeably changes coloration from green in Spring to red-brown in the fall.

The northwest portion of the WSA which forms the foothills of Grand Mesa is heavily vegetated in pinyon/juniper. It is characterized by rolling, rugged topography and numerous, small drainages running southward into the badland topography. Small pocket-like grazing parks, scattered throughout this area, provide crucial winter feeding areas for deer and elk.

Four vehicle ways totalling 2.5 miles can be found within the area. In the higher elevations of the WSA, these ways are fairly well hidden by a combination of vegetation and topographic relief. In the lower, badlands portion of the WSA, the evidence of ORV use, and the resulting impacts of erosion, are highly visible due to the sparse vegetation and fairly steep topography. Motorcycle use in the area surrounding Devils Thumb, a popular landmark of the WSA, is particularly pronounced and obtrusive.

#### *Solitude*

The Adobe Badlands WSA contains a wide variety and diversity of opportunities for solitude. The numerous, intricate, and maze-like canyons of the central badlands area create feelings of intimacy and solitude. In the upper elevations, rolling, rugged ter-

BLM_0006259

rain heavily vegetated with pinyon and juniper effectively screen visitors from sights and sounds and foster feelings of seclusion. The ascending topography of the area offers vistas of the lower badlands as well as Grand Mesa, the Uncompahgre Plateau, and the San Juan Mountains and evokes feelings of vastness, remoteness, and solitude.

### Primitive and Unconfined Recreation

The WSA offers yearlong opportunities for hiking, backpacking, horseback riding, photography, and sightseeing. The upper woodland areas also provide excellent hunting opportunities

### Special Features

The Adobe Badlands WSA contains some supplemental values which enhance its wilderness qualities. The WSA's relatively low elevation, mild winters, and close proximity to the City of Delta make it accessible year-round.

The WSA provides year-round habitat for a wide diversity of wildlife including pronghorn antelope, prairie dogs, badgers, coyotes, bobcats, and numerous raptors such as red-tailed hawks and golden eagles. The upper portion of the WSA is crucial deer and elk winter range. The WSA also contains populations of the threatened Uinta Basin hookless cactus (*Sclerocactus glaucus*).

The badlands portion of the WSA changes remarkably with light and shadows offering numerous opportunities for site-seeing and photography. The geological and topographical features of the Mancos shale formation, in combination with the transition-zone ecology of the WSA also provide excellent educational, nature-study opportunities.

### DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

### Assessing the diversity of natural systems and features as represnted by ecosystems

Wilderness designation of this WSA would not add a new ecosystem or landform to the National Wilderness Preservation System. Shale-type badlands are presently represented in the NWPS by the Bisti and De-na-zin wilderness areas in New Mexico, both of which are similar in appearance to and within a day's driving distance of the Adobe Badlands WSA. Designation would, however, provide protection for the unique transition-zone ecosystem of the area, composed of two distinct vegetation types with only limited national and/or regional representation in the NWPS.

The Adobe Badlands WSA is a transition between two ecosystems and two associated vegetation types: the Colorado Plateau Province and the Rocky Mountain Forest Province (Bailey-Kuchler classification system). The majority of the WSA contains saltbrush-greasewood vegetation representative of the Rocky Mountain Forest Province.

This vegetation type occurs in only one designated wilderness (Great Sand Dunes National Monument). In addition to the saltbrush-greasewood vegetation indicative of "badlands", the WSA also contains the pinyon-juniper woodland vegetation type from the Colorado Plateau Province. Pinyon-juniper woodlands are currently represented by only one other designated wilderness areas in Colorado; that being Mesa Verde National Park Wilderness Area which is closed to the public. (See Table 2)

BLM 0006260

## Table 2 - Ecosystem Representation

| Bailey-Kuchler Classification Province/Potential Natural Vegetation | NWPS Areas areas | NWPS Areas acres | Other BLM Studies areas | Other BLM Studies acres |
|---|---|---|---|---|
| **Nationwide** | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 11 | 1,401,745 | 85 | 2,145,602 |
| Rocky Mountain Forest Province | | | | |
| Saltbush-Greasewood | 1 | 33,445 | 5 | 26,867 |
| **Colorado** | | | | |
| Colorado Plateau Province | | | | |
| Pinyon-Juniper Woodland | 1 | 8,105 | 17 | 293,837 |
| Rocky Mountain Forest Province | | | | |
| Saltbush-Greasewood | 1 | 33,445 | 5 | 26,867 |

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The Adobe Badlands WSA is not within a five-hour drive of a major population center (Standard Metropolitan Statistical Area).

### Balancing the geographic distribution of wilderness areas

The Adobe Badlands WSA would contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. There are three designated wilderness areas within four hours of the Adobes Badlands. Approximately three hours south of the WSA is the Lizard Head Wilderness Area (41,189 acres); an area of high mountain landform and ecosystem which is mostly inaccessible for public use in winter and spring.

Mesa Verde Wilderness Area (8,105 acres) is approximately 4 hours south of the WSA. Mesa Verde is not similar in landform to the Adobe Badlands, but does contain areas of similar vegetation. The Mesa Verde Wilderness Area, however, is not open to the public due to important archeological values.

Approximately one hour southeast of the Adobe Badlands is the Black Canyon of the Gunnison Wilderness Area (11,180 acres). The Black Canyon is a river canyon and its geology and ecosystem are representative of the Rocky Mountain province, but not of Colorado Plateau province. Because of its Colorado Plateau/Rocky Mountain Forest transition ecosystem, the Adobe Badlands WSA would expand and balance opportunities for diverse wilderness experiences

### MANAGEABILITY

As described in the Rationale section of this report, there are some major manageability problems associated with non-wilderness uses (ORV use, shooting, trash dumping, etc.) in the Adobe Badlands WSA. Such problems, however, are fairly well concentrated in relatively small sections of the WSA. With the exception of these areas, there are few resource conflicts throughout the remainder of the WSA that would hinder its management as wilderness.

The entire WSA is administered by the BLM and contains no non-public inholdings. There are no oil, gas, or coal leases within the WSA and no explora-

BLM_0006261

tion or development is anticipated. Although there are approximately 75 placer mining claims scattered throughout the WSA, there have been no validity exams conducted on these claims and no activity has occurred on them to date. No mineral development is expected due to the area's lack of mineral resources.

There are no range facilities within the boundaries of the WSA, and wilderness designation would not affect the 878 AUMs of winter sheep use presently allocated on three livestock grazing allotments within the boundaries of the Adobe Badlands WSA.

## ENERGY AND MINERAL RESOURCE VALUES

A Geological, Energy and Minerals (GEM) Report assessing the mineral potential of leasable, locatable, and saleable minerals in the Adobe Badlands WSA was completed in 1983 *(Phase 1: GEM Resource Assessment for Region 4, Colorado Plateau, Dominguez Canyon/Adobe Badlands/Camel Back Area, GRA 6, 1983, MSME/Wallaby Enterprises)*. According to this report, there are no known mineral deposits in the WSA. The area has only a low favorability for the accumulation locatable minerals. There are approximately 75 placer mining claims scattered throughout the WSA. There have been no validity exams conducted on these claims, which were located in 1982 and 1984, and no activity has occurred on them to date.

Uranium and vanadium deposits are known to occur in the Morrison and Chinle geologic formations throughout western Colorado and eastern Utah. These Morrison and Chinle formations underlie the Adobe Badlands WSA at depths of approximately 3,000 to 4,000 feet below the surface. Due to the

depths of these formations, however, the uranium and vanadium occurring in the WSA has been rated as having low potential for development. At present, no uranium-vanadium deposits are known to occur within the boundaries of the WSA.

Approximately 507 acres of the northern portion of the Adobe Badlands WSA lie within the Bookcliffs coal planning area. The Mesaverde formations in this area are estimated to contain approximately 21 million tons of moderate to high development potential coal reserves. Although coal of this type has been mined extensively using underground methods in the Cedaredge and North Fork areas, there are no leases within the WSA. The nearest producing coal mine (idle since 1984) is the Red Canyon Mine , about ten miles to the northeast.

According to the GEM Report, however, the geologic environment of the area indicates moderate favorability for the accumulation of oil and gas. Although there are no Known Geologic Structures (KGSs) within the WSA, three KGSs are within six miles of the WSA boundary. Mancos Shale formations, found extensively in the WSA, have yielded production of oil and gas five miles to the east of the area. The economic potential for production within the WSA is unknown at this time, and there are presently no oil and gas leases in the study area. Four oil and gas wells that were drilled immediately outside the WSA were dry holes.

## IMPACTS ON RESOURCES

The following table summarizes the effects on pertinent resources for the no wilderness (Recommendation) and all wilderness alternatives considered for the Adobe Badlands WSA.

BLM 0006262

ADOBE  BADLANDS  WSA                                                                    CO-030-370B

## Table 3 - Comparative  Summary of Impacts by Alternative

| Impact  Topics | Recommendation: No  Wilderness  Alternative | All  Wilderness  Alternative |
|---|---|---|
| *Impacts  on  Wilderness Values* | *Wilderness values would remain essentially unchanged on 6,783 acres within the ONA/ACEC, but would be slightly reduced on 3,642 acres by ORV use.  Naturalness would be irretrievably lost on approximately 145 acres as a result of a wildlife habitat treatment and oil and gas exploration activities.* | *Wilderness designation would provide statutory, long-term protection for wilderness values for solitude and primitive, unconfined types of recreation would be increased by the elimination of ORV use in the WSA.* |
| *Impacts  on  Wildlife  Habitat and  Populations* | *Seasonal restrictions on ORV use would reduce stress and maintain crucial winter range on 1,927 acres for 76 deer and 35 elk.  Improved forage conditions on 140 ares could result in improvement in overall herd condition and gradual increase of 5 to 7 deer and 2 to 4 elk over the long term. ORV closures on 6,783 acres and yearlong limitations on 1,715 acres would reduce stess and maintain habitat and forage conditions for approximately 30 resident pronghorn.* | *Closing the entire area to ORV use and oil and gas exploration would reduce stress and maintain existing habitat and forage conditions for the yearlong population of 30 pronghorn antelope, and 76 deer and 35 elk during the winter.  The inability to implement a land treatment project could result in short term shortages of forage and increased stress during severe winters, and over the long term, a reduction in herd vigor and the possible loss of 15 to 20 deer and 8 to 10 elk over the long term.* |
| *Impacts  on  Recreation Opportunities  and  Use* | *Recreational use would decrease by 400 user days, or 80 percent, from the present level of 500 user days to 100 user days. Approximately 400 motorized recreational user days would be eliminated by ORV closures within the ONA/ACEC (6,783 acres), but would be recovered on adjacent areas.  Opportunities for ORV use would be slightly impacted by yearlong restrictions on 1,715 acres and seasonal llimitations on 1,927 acres.  Use would shift from predominately motorized recreational activities to primitive recreational activities within the ONA/ACEC.* | *Recreational use would increase by 100 user days, or 20 percent, from the present level of 500 user days to 600 user days. Approximately 450 motorized user days would be displaced to adjacent areas.  Use of the area would shift from less primitive, motorized recreational activities to primitive, nonmotorized recreational activities.* |

BLM_0006263

## Table 3 - Comparative Summary of Impacts by Alternative (continued)

| Impact Topics | Recommendation: No Wilderness Alternative | All Wilderness Alternative |
|---|---|---|
| *Impacts on Energy and Mineral Exploration and Production* | *The entire 10,425 acres would be open for locatable mineral exploration and development, but there would be no impacts on production since no activity is projected. There would be no impacts on oil or gas production as a result of no surface occupancy stipulations on 6,783 acres in the ONA/ACEC or seasonal stipulations on 1,927 acres of crucial winter range since no exploration or production is anticipated within those areas. Seasonal stipulations on 1,715 acres would increase oil and gas exploration costs for 2-5 wells, however, there would be no impacts on production since none is projected. There would be no impacts on coal prod-cuction since no activity is anticipated.* | *The entire 10,425 acres would be closed to energy and mineral exploration and production. There would be no impacts on mineral production since no activity is projected due to the area's lack of mineral potential and the lack of present and future demand. No exploratory oil or gas wells would be drilled, however, there would be no impacts on production since none is projected. There would be no impacts on coal production since no activity is anticipated.* |

## LOCAL SOCIAL AND ECONOMIC CONSIDERATIONS

Designation of the WSA as wilderness would have minimal impacts on local economic conditions. Social factors were not considered a significant issue in the study.

## SUMMARY OF WSA SPECIFIC PUBLIC COMMENTS

Public involvement has occurred throughout the wilderness review process. Certain comments received during the inventory process and early stages of the EIS were used to develop significant study issues and various alternatives for the ultimate management of those lands with wilderness values.

During formal public review of the draft Environmental Impact Statement, a total of 176 oral and written comments specifically addressing this WSA were received. Of those, 142 were written and 34 were oral statements received at three public hearings on the EIS. In general, 53 commentors supported the proposed no wilderness recommenda-

tion; 123 commentors supported wilderness recommendation for the WSA.

The majority of the comments in favor of designation were from environmental groups and organizations. Of particular concern to these groups was the need to protect the known populations and habitat of the threatened Uinta Basin hookless cactus in the WSA.

Those opposing designation were concerned that wilderness would preclude the development of minerals in the area, and would conflict with or eliminate grazing in the WSA. Other stated that the area is used primarily by local residents for ORV recreation, shooting, and hunting, and were opposed to the elimination of these uses under wilderness designation.

Written comments were received from the following federal, state, and local agencies: the National Park Service, Forest Service, Environmental Protection Agency (EPA), Bureau of Reclamation, U.S. Geological Survey, U. S. Bureau of Mines, U. S. Air Force, U.S. Fish and Wildlife Service,

BLM_0006264

the Colorado Department of Natural Resources, and the City of Delta.

The U. S. Bureau of Mines stated that the geology and mineral resource descriptions for the Adobe Badlands lacked a discussion of the uranium potential of the area. The Air Force supported the overall wilderness area concept, but was concerned that designation would adversely affect or restrict their use of low altitude airspace over a wilderness area. The State Department of Natural Resources supported wilderness designation for the area.

The other agencies did not identify a specific jurisdictional conflict with either the proposed action or the all wilderness alternative for the Adobe Badlands WSA.

BLM_0006265

BLM_0006266



RECOMMENDED FOR WILDERNESS

RECOMMENDED FOR NONWILDERNESS

LAND OUTSIDE WSA RECOMMENDED FOR WILDERNESS.

SPLIT ESTATE

STATE

PRIVATE (None)

SCALE 1:100000

Miles  1  0  1  2  3

Gunnison Gorge WSA
Proposal
CO-010- 030-388

January 1991

BLM_0006267

# GUNNISON GORGE

# WILDERNESS STUDY AREA

## The Study Area -- 21,198 acres

The Gunnison Gorge WSA (CO-030-388) is located in Montrose and Delta counties, in south-western Colorado, approximately 10 miles east of Delta and 7 miles northeast of Montrose. The WSA contains 21,038 acres of public land, 160 acres of split-estate (private subsurface, BLM surface) and no private inholdings. The northern boundary of the WSA is located approximately 2 miles south of the confluence of the Gunnison River and the North Fork Gunnison River, near Hotchkiss, Colorado. The southeastern boundary of the area is contiguous to the Black Canyon of the Gunnison National Monument, administered by the National Park Service. Except for a few parcels of private lands, the remainder of the WSA is surrounded by the Gunnison Gorge Special Recreation Management Area (SRMA) lands which are administered by the BLM. The Gunnison Gorge WSA is depicted on the map.

The Gunnison Gorge WSA is primarily the lower, northern end of the Black Canyon of the Gunnison River, and is a geologic continuation of the Black Canyon of the Gunnison National Monument. The Gorge, however, offers a greater diversity of plant and animal communities than the adjacent monument. The Gorge also contains numerous observable examples of faulting, folding, and geologic inconformity, which are not present in the National Monument.

The WSA is oriented primarily around an extremely rugged double canyon system. This system is composed of a narrow inner canyon where depths vary from 400 to 800 feet and the width ranges from only 800 feet to a quarter of a mile, and a much wider outer canyon, where depths to the river vary from 1,000 to 2,000 feet, and the width is approximately one mile. The steep, narrow, inner canyon is carved into dark Precambrian rock which is streaked, stained and weathered by the elements. The upper canyon is made up of lighter, sedimentary formations.

The dominant geologic feature that is responsible for the existence of the Gunnison Gorge WSA and the Black Canyon National Monument is the still active agent - the Gunnison River. Throughout its 13.5 mile course in the WSA, the Gunnison River drops 300 feet in elevation, from 5400 feet to 5100 feet.

The elevation differential in the WSA ranges from 5,100 feet at river level to over 8,000 feet, with corresponding changes in vegetation types. The WSA is a transition between 2 ecosystems and 2 associated vegetation types; the pinyon-juniper woodland vegetation type of the Colorado Plateau Province, which occurs on the rims and benches of the inner gorge, and the saltbrush-greasewood vegetation types, representative of the Rocky Mountain Forest Province, found along the rim areas of the outer canyon. Riparian vegetation, composed primarily of tall grasses, reeds, and shrubs is found throughout the river corridor.

The WSA was studied under section 603 of the Federal Land Policy and Management Act (FLPMA) and was included in the Uncompahgre Basin Resource Area Final Resource Management Plan and Environmental Impact Statement (RMP/EIS) published September, 1988. Three alternatives were analyzed in the EIS: enhanced all wilderness (22,078 acres), all wilderness (21,198 acres) and no wilderness. The enhanced all wilderness alternative is the recommendation of this report.

## Recommendation and Rationale

22,078 acres recommended for wilderness

0 acres recommended for nonwilderness.

It is recommended that the entire Gunnison Gorge WSA, plus an additional 880 acres adjacent to the WSA, and 160 acres of acquired private mineral estate, or 22,078 total acres, be designated as wilderness. The original WSA boundaries, the 880 acre addition, located in Smith Fork Canyon near the northeast boundary of the WSA, and the 160 acres private mineral estate, located in Red Canyon in the

BLM 0006268

east-central portion of the WSA, are shown on the map.

The environmentally preferred alternative would be to designate the entire 22,078 acres as wilderness since this would result in the least change from the natural environment over the long term.

The WSA is recommended for wilderness designation primarily because of its outstanding wilderness values, which include spectacular natural and scenic qualities, geologic and ecologic diversity, and exceptional opportunities for solitude, and primitive, unconfined types of recreation.

Designation of the Gunnison Gorge WSA as wilderness would preserve forever the spectacular natural and scenic qualities of this wild, magnificent river canyon. The Gunnison Gorge WSA contains

the most outstanding scenic features in the area, with its rugged and diverse double canyon system composed of a steep, narrow, inner gorge and a much wider outer canyon. ( See Photo 1)

The starkness and grandeur of the sheer black Precambrian walls of the WSA's inner gorge area provide a vivid contrast to the bright, multi-colored sedimentary formations of the upper canyon. In addition to being highly scenic in nature, these canyon systems are also geologically and ecologically significant, due to the many examples of ancient rock formations, geologic unconformities, faulting, and folding and to the ecological diversity found within.

The Gunnison Gorge forms the eastern boundary of the old Uncompahgre Uplift. This uplift is a northwest trending upwarp about 30 miles wide and 100



*Photo 1. The Gunnison Gorge is oriented around an extremely rugged double canyon system composed of a narrow inner canyon carved into dark, Pre-Cambrian rock, and a wider upper canyon made up of lighter, multi-colored sedimentary formations.*

BLM_0006269



*Photo 2. The WSA contains many examples of exposed fault zones, the most spectacular of which is the eight-mile long Indian Fault Zone located in the northern portion of the area.*

miles long. Precambrian rocks, exposed by the downward cutting of the Gunnison River in the inner Gorge, have been determined to be approximately 1.7 to 2 billion years old and are some of the oldest exposed rocks on earth. According to Wallace Hansen, renowned geologist with the U.S. Geological Survey, there is nowhere in the world where Precambrian rock is better exposed than in the walls and canyon floor of the Gunnison Gorge. The outer canyon system of the WSA is composed of sedimentary rocks from the late Mesozoic to Quaternary periods, which are approximately 170 million years old.

One of the most significant geologic attributes of the Gunnison Gorge is the extent and display of large-scale faulting. The WSA contains many easily observable examples of exposed fault zones, the

most spectacular of which is the Ute Indian Fault Zone, located in the northern portion of the area. This 8-mile long fault zone is considered by many geologists to be one of the best examples of exposed fault zones in the Rocky Mountains. (See Photo 2)

Designation of the Gunnison Gorge as wilderness would preserve forever the outstanding opportunities for solitude and primitive and unconfined recreation which this area offers. Two of the most outstanding recreational opportunities in the Gunnison Gorge WSA are trout fishing and whitewater boating. Other activities include hiking, backpacking, horseback riding, sight-seeing, photography, geologic and nature study, hunting, wildlife viewing, and rock-climbing.

The WSA also contains several archaeological and historical sites that provide excellent

BLM_0006270

educational opportunities. The area is relatively low in elevation and accessible throughout the majority of the year, thus providing year-round wilderness recreation opportunities.

Numerous opportunities for solitude are provided by the winding course of the Gunnison River and by the sheer steep canyon walls of the narrow inner gorge. Isolated side canyons and gulches add to the feelings of remoteness with their steep slopes, rocky ledges, and numerous boulders. Thick riparian growth along the river corridor provides excellent vegetative screening.

The open ridgetops along the boundaries of the WSA afford sweeping vistas of the West Elk Mountains, the Black Canyon National Monument, Grand Mesa, and the Uncompahgre Plateau which impart feelings of vastness, and, as such, enhance opportunities for solitude as well as for photography and sight-seeing. In years with adequate snowfall, these rim areas also offer some good cross-country skiing and snowshoeing terrain.

Rugged benches, washes, ravines and scattered pinyon-juniper woodlands provide extensive topographic and vegetative screening throughout the reaches of the wider, upper canyon, and offer many opportunities for cross-country hiking and horseback riding. Cliffs and rock outcroppings throughout the area present interesting technical rock climbing and "bouldering" opportunities.

Designation of the Gunnison Gorge as wilderness would provide statutory protection for the spectacular scenic beauty of the Gunnison River and enhance the recreational experience of float-boaters, fishers, and other users in the river corridor. The river's watershed and shoreline are primitive and relatively inaccessible, and possess outstanding scenic, geologic, recreational, and wildlife values.

A number of trails, from the outer canyon rim to the river bottom and along the river corridor, offer challenging hiking opportunities. Small beaches and washes interspersed along the river corridor provide excellent, secluded camping spots for backpackers, fishers, and rafters. (See Photo 3)

Due to its exceptional wilderness qualities, approximately 26 miles of the Gunnison River, in the Black Canyon National Monument and through the WSA, have been proposed for inclusion into the National Wild and Scenic River System (NWSRS) as a wild



*Photo 3. Small beaches and washes interspersed along the river corridor provide excellent, secluded camping spots for backpackers, fishers, and rafters.*

BLM_0006271



*Photo 4. Due to its exceptional wilderness qualities, approximately 26 miles of the Gunnison River in the WSA and Black Canyon National Monument have been proposed for inclusion in the the National Wild and Scenic River System.*

river. (See Photo 4) President Carter administratively endorsed the Gunnison for inclusion into the NWSRS in 1979 when he forwarded the Wild and Scenic River Report on the river to Congress for a final decision.

The entire length of the Gunnison River in the WSA has been designated a Gold Medal Trout Stream by the Colorado Division of Wildlife (DOW), and is rated as one of the highest quality trout streams in the United States. The free-flowing nature of the river and a series of technical rapids also provide a challenging and unique experience for whitewater rafters, kayakers, and canoeists.

Designation of this WSA as wilderness would preserve and enhance the ecological diversity of the National Wilderness Preservation System (NWPS).

Although the adjacent Black Canyon Wilderness Area is also a river canyon very similar to the Gunnison Gorge, its geology and ecosystem are representative of only the Rocky Mountain province. The Gorge, on the other hand, contains a mixture of both the Colorado Plateau and Rocky Mountain provinces vegetative types.

The Mesa Verde Wilderness Area, located approximately 3 hours to the south of the WSA, does contain the Colorado Plateau pinyon-juniper vegetation type, however, it is totally different in landform to the Gunnison Gorge. In addition, due to important archaeological values, the Mesa Verde Wilderness Area is not open to the public.

The combination of a unique transition ecosystem, and year-round public accessibility offered by the Gunnison Gorge WSA would provide more diverse

BLM_0006272

wilderness opportunities within the region and enhance and balance the NWPS.

Designation of this WSA as wilderness would preserve important habitat for a wide variety of animals and plants, including a number of threatened, endangered, sensitive, and candidate species. The size, ruggedness and transition zone ecosystem of the Gunnison River corridor and canyon areas provides extremely high quality habitat for both terrestrial and aquatic wildlife species, including the state endangered river otter which was reintroduced by the DOW in 1977.

The inner gorge is considered crucial winter range for deer and elk, and excellent yearlong habitat for a reintroduced population of bighorn sheep. Other inhabitants of the WSA include mountain lion, black bear, coyotes, bobcats, ringtail cats, beaver, mink, and numerous other small mammals and birds.

The Gunnison River corridor provides crucial winter range for a large concentration of federally endangered bald eagles, and is within the hunting range of peregrine falcons which nest upstream in the National Monument. Confirmed resident raptors in the WSA include golden eagles, prairie falcons, ferruginous hawks, red-tailed hawks, kestrels, and turkey vultures.  The lower one-third of the river

corridor serves as a resting area and refuge for thousands of ducks in mid-winter, as well as a nesting area for geese.

The WSA also contains populations of the threatened Uinta Basin hookless cactus *(Sclerocactus glaucus* ) as well as potential habitat for the endangered clay-loving buckwheat, *(Eriogonum pelinophilum.)* Montrose penstemon, *(Penstemon retrorsus)* and Delta lomatium *(Lomatium concinnu),* candidates for federal listing under the Endangered Species Act (Category 2), could also occur in the area.

Designation of this WSA would not result in any major manageability problems or resource conflicts. There are no private inholdings within the WSA, and the BLM currently manages the surface of the 160 acres of private mineral estate proposed for inclusion under the enhanced all wilderness recommendation.  Natural topographic features provide very distinct, manageable boundaries throughout the majority of the WSA.  Except for a few parcels of private lands, the WSA is surrounded by the Gunnison Gorge Special Recreation Management Area (SRMA) lands which are administered by the BLM.



*Photo 5. Except for an abandoned vehicle way (center) which would be reclaimed, the 880 acres in the proposed Smith Fork Canyon addition are primarily natural in character and contain significant wilderness qualities.*

BLM_0006273

Current uses of the 880 acres in Smith Fork Canyon, also recommended for inclusion, are compatible with wilderness and are not projected to change. Except for an abandoned vehicle way, which would be reclaimed, these lands are primarily natural in character and offer similar opportunities for solitude, and primitive unconfined recreation as those found in the WSA. (See Photo 5) The inclusion of these lands would extend the boundary of the WSA up to a cliff top, which would provide a more manageable boundary in that area and preclude any future nonconforming uses which might affect wilderness values on adjacent lands.

The entire WSA and all the proposed addition areas have been closed to ORV use, the landing of aircraft, and bicycles since 1985 to protect and preserve the natural features. Approximately 15,595 acres of the WSA and approximately 690 acres in the proposed Smith Fork addition have been closed to mineral entry and location under a recreation withdrawal since 1972.

Although there are 18 post-FLPMA placer claims in the southern portion of the WSA outside the with-

drawal area, no activity has occurred on these claims to date. According to the findings in the U. S. Geologic Survey and U. S. Bureau of Mines report, there are no known mineral deposits in the Gunnison Gorge, and the WSA has only a low mineral resource potential. There are no coal, oil or gas leases in the area and the potential for energy exploration and development is rated as zero. Based on the WSA's low potential for energy and mineral resources no site disturbance associated with exploration or development is anticipated.

The BLM has developed specific guidance for management of recreational use within the WSA based on the area's recreational carrying capacity and wilderness management guidelines, and does not anticipate any significant impacts from increased visitation use as a result of designation. Outstanding opportunities for high quality, primitive recreation would be maintained through the continued use of permit systems that limit the amount and degree of recreation use in the area.

The WSA contains portions of 4 grazing allotments totalling approximately 662 animal unit months (AUMs). However, there are no existing



*Photo 6. Erosion and natural revegetation have obliterated the majority of seven vehicle ways (totalling 5 miles) within the WSA. Shown is a portion of an old bulldozed way once used for mineral exploration near the Ute Trailhead.*

BLM 0006274

| Table 1 - Land Status and Acreage Summary of the Study Area | |
|---|---|
| **Within Wilderness Study Area** | **Acres** |
| BLM (surface and subsurface) | 21,038 |
| Split Estate (BLM surface only) | 160 |
| Inholdings (Private) | 0 |
| Total | 21,198 |
| **Within the Recommended Wilderness Boundary** | |
| BLM (within WSA) | 21,038 |
| BLM (outside WSA) | 880 |
| Split Estate (within WSA) | 160 |
| Total BLM Land Recommended for Wilderness | 22,078 |
| Inholdings | 0 |
| **Within the Area Not Recommended for Wilderness** | |
| BLM | 0 |
| Split Estate | 0 |
| Total BLM Land Not Recommended for Wilderness | 0 |
| Inholdings (State, Private) | 0 |

range facilities in the area, and no projects or improvements are planned. Approximately 6,119 acres of the inner gorge are considered unsuitable for livestock grazing due to the steep slopes and low forage production.

There has been very strong public support for designating the Gunnison Gorge WSA as wilderness throughout the entire review process. During the formal review of the draft EIS, 191 of 227 commentors supported wilderness designation for the WSA. Those opposing wilderness were primarily concerned that designation would preclude the use of motorized vehicles in the area and restrict access to handicapped and elderly people, however, there are no roads within the boundaries of the WSA and the entire area has been closed to motorized vehicles since 1985.

## Criteria Considered in Developing the Wilderness Recommendations

### WILDERNESS CHARACTERISTICS

#### Naturalness

The Gunnison Gorge WSA is primarily natural in character. The few minor human imprints within the WSA are ways or trails, some mining activity, a small stock pond, and a few old wood and stone structures which add historical value to the area rather than impair its naturalness. The seven ways (totalling 5 miles) in the WSA are sets of tracks which have revegetated and are not substantially noticeable.

Erosion and natural revegetation have almost obliterated a one-half mile of an old bulldozed

BLM_0006275

trail near the Ute Trailhead. Evidence of this trail is visible only in the immediate vicinity. (See Photo 6) A number of old adits, mine shafts, and exploration pits, located in the southern portion of the WSA, have an insignificant effect on the naturalness of the area.

## Solitude

The Gunnison Gorge WSA provides outstanding opportunities for solitude. Factors affecting solitude include vegetation cover, topography, size and configuration of the area, and difficulty of access. Topographic screening is the main factor in the deep, narrow inner gorge. The rugged terrain and scattered pinyon-juniper woodlands of the outer canyon and rim areas contribute to opportunities for solitude.

## Primitive and Unconfined Recreation

The Gunnison Gorge WSA provides numerous opportunities for primitive and unconfined recreation, due primarily to its relatively large size, diversity and ruggedness of terrain. Fishing on the Gunnison River is excellent. The river also provides a challenging and unique experience for whitewater boaters. Hiking and backpacking are facilitated by 4 trails which descend from the outer rim to the river. Two of these trails, and a number of rim trails also provide excellent horseback riding opportunities. The many vantage points, geologic features, and historical and archaeological sites are ideal for photographers, sightseers, and other recreationists.

## Special Features

There are numerous special features which enhance the wilderness quality of the Gunnison Gorge WSA.

### Proposed Wild and Scenic River

Although the Gunnison River does have major upstream impoundments, it is free-flowing through the Monument and WSA, and its length is sufficient to provide a meaningful experience for floatboaters. There is an adequate volume of high quality water to permit full enjoyment of water-related recreational activities. The river's watershed and shoreline are primitive and relatively inaccessible, and possess outstanding scenic, geologic, recreational, and wildlife values.

Due to these exceptional attributes, approximately 26 miles of the Gunnison River, in the Black Canyon National Monument and through the WSA, have been proposed for inclusion into the National Wild and Scenic River System (NWSRS) as a wild river. President Carter administratively endorsed the Gunnison for inclusion into the NWSRS in 1979 when he forwarded the Wild and Scenic River Report on the river to Congress for a final decision.

Although there has been no formal designation by Congress, the BLM manages the Gunnison river and its corridor as "eligible" for inclusion according to the guidelines of the Wild and Scenic River Act.

### Wildlife and Vegetation

The Gunnison River and canyon area provide high quality wildlife habitat for a wide variety of terrestrial and aquatic species, including a number of threatened, endangered, or sensitive animal species, such as river otters and bald eagles. The gorge is hunting habitat for peregrine falcons. Confirmed resident raptors include golden eagles, prairie falcons, kestrels, red-tailed hawks, and turkey vultures. Wintering waterfowl concentrate in the gorge. The canyon is excellent bighorn sheep habitat.

The WSA also contains populations of the threatened Uinta Basin hookless cactus, (Sclerocactus glaucus) , and potential habitat for the endangered clay-loving buckwheat, (Eriogonum pelinophilum.) Montrose penstemon (Penstemon retrorsu), and Delta lomatium (Lomatium concinnu), candidates for federal listing under the Endangered Species Act (Category 2), could also occur in the area.

### Gold Medal Fishery

The Gunnison River also provides exceptional fishing opportunities as evidenced by its designation as a Class I Fishery Resource (Gold Medal Trout Fishery) by the Colorado DOW.

### Educational Values

The WSA is geologically interesting and contains numerous observable examples of faulting, folding, and geologic unconformities. According to Wallace Hansen, Geologist with the U.S. Geological Survey,

BLM 0006276

there is nowhere in the world where the Precambrian rock is better exposed than in the walls and canyon floor of the Gunnison Gorge. The WSA also contains several archaeological and historical sites that provide excellent educational opportunities.

## Scenic Quality

The Gunnison Gorge WSA contains the most outstanding scenic features in the area, with its steep, narrow, inner canyon carved into the dark Precambrian rock which is streaked, stained, and weathered by the elements, in addition to the lighter, multi-colored sedimentary formations of the upper canyon.

## DIVERSITY IN THE NATIONAL WILDERNESS PRESERVATION SYSTEM

### Assessing the diversity of natural systems and features as represented by ecosystems

Wilderness designation of this WSA would not add a new ecosystem and landform to the National Wilderness Preservation System. The WSA is a transition between 2 ecosystems and 2 associated vegetation types; the pinyon-juniper woodland vegetation type of the Colorado Plateau Province, which occurs on the rims and benches of the inner gorge, and the saltbrushgreasewood vegetation types, representative of the Rocky Mountain Forest Province, found along the rim areas of the outer canyon. As shown in Table 2, these ecosystems are already represented in the NWPS by areas within Colorado and nationwide.

## Table 2 - Ecosystem Representation

| Bailey-Kuchler   Classification Potential   Natural   Vegetation | | NWPS   Areas areas   ·   acres | | Other BLM Studies areas      acres | |
|---|---|---|---|---|---|
| | *Nationwide* | | | | |
| Colorado Plateau Province | | | | | |
| Pinyon-Juniper Woodland | | 11 | 1,401,745 | 85 | 2,142,602 |
| Rocky Mountain Forest Province | | | | | |
| Saltbush-Greas ewood | | 1 | 33,445 | 5 | 26,687 |
| | *Colorado* | | | | |
| Colorado Plateau Province | | | | | |
| Pinyon-Juniper  Woodland | | 1 | 8,105 | 17 | 293,837 |
| Rocky Mountain Forest Province | | | | | |
| Saltbush-Greasewood | | 1 | 33,445 | 5 | 27,111 |

BLM_0006277

*Expanding the opportunities for solitude or primitive recreation within a day's driving time (five hours) of major population centers*

The Gunnison Gorge WSA is not within a five-hour drive of a major population center (Standard Metropolitan Statistical Area of 100,000 or more).

*Balancing the geographic distribution of wilderness areas*

The Gunnison Gorge WSA would contribute to balancing the geographic distribution of areas within the National Wilderness Preservation System. There are 3 designated wilderness areas within four hours of the WSA. Approximately two hours south of the Gunnison Gorge WSA is the Lizard Head Wilderness Area (41,189 acres); an area of high mountain landform and ecosystem and thereby mostly inaccessible for public use in winter and spring.

The Mesa Verde Wilderness Area (8,105 acres) is approximately 3 hours south of the WSA. Mesa Verde is not similar in landform to the Gunnison Gorge, but does contain areas of similar vegetation. The Wilderness Area is not open to the public due to important archaeological values.

Immediately adjacent to the WSA's southeastern boundary is the Black Canyon of the Gunnison Wilderness Area (11,180 acres). Although the Black Canyon Wilderness Area is also a river canyon with portions which are very similar to the Gunnison Gorge, its geology and ecosystem are representative of only the Rocky Mountain province. The Gorge, on the other hand, is a mixture of both the Colorado Plateau and Rocky Mountain provinces, with approximately 19,960 acres representative of the Colorado Plateau province, and 1,078 acres representative of the Rocky Mountain province vegetation type.

Because of its Colorado Plateau/Rocky Mountain Forest transition ecosystem, the Gunnison Gorge WSA would expand and balance opportunities to attain diverse wilderness experiences.

## MANAGEABILITY

The Gunnison Gorge is manageable as wilderness. The boundaries of the WSA are defined primarily by the steep double-canyon system of the WSA. These natural topographic features provide the WSA with very distinct, manageable boundaries. There are no roads within the WSA, and the four-wheel drive jeep trails in the surrounding area provide access only to the outer canyon rim boundaries. From there, steep downhill terrain prohibits further travel into the WSA, except by foot or horseback.

The majority of the WSA is surrounded by the Gunnison Gorge Special Recreation Management Area (SRMA) lands which are administered by the BLM. There are no private land inholdings within the WSA, and the private lands which do border the area are primarily natural, with little or no development and very few roads or ways.

BLM currently manages the surface of the 160 acres of private mineral estate located in the WSA, and proposed for inclusion under the enhanced all wilderness recommendation. Management of this area is consistent with wilderness management and is not projected to change. Although no private mineral exploration or production activity is projected at this time, official designation would be the only method to assure long term protection of the wilderness values on this acreage.

Current uses of the 880 acres in Smith Fork Canyon, proposed for inclusion under the enhanced all wilderness recommendation, are compatible with wilderness and are not projected to change. These uses consist primarily of primitive recreational activities, including hiking, horseback riding, and sight-seeing. The addition of this acreage, which is primarily natural in character, would further enhance the wilderness resource by including lands with wilderness characteristics and precluding potential future nonconforming uses which might affect wilderness values on the adjacent WSA lands, thereby contributing to the manageability of the entire WSA.

The entire WSA and all the proposed additional areas have been closed to ORV use, the landing of aircraft, and bicycles since 1985 to protect and preserve the natural features. Approximately 15,595 acres of the WSA and approximately 690 acres in the proposed Smith Fork addition have been closed to mineral entry and location under a recreation withdrawal since 1972.

BLM 0006278

Wilderness designation would close an additional 5,443 acres within the WSA, 690 acres in Smith Fork Canyon, and 160 acres of acquired private mineral estate, or a total of 5,793 acres, to mineral entry, location, and leasing.

There are currently 18 post-FLPMA placer claims in the southern portion of the WSA outside the withdrawal area on which no activity has occurred to date. According to the findings in the U.S. Geologic Survey and U.S. Bureau of Mines report, there are no known mineral deposits in the Gunnison Gorge, and the WSA has only a low mineral resource potential.

There are no coal, oil or gas leases in the area and the potential for energy exploration and development is rated as zero. Based on the WSA's low potential for energy and mineral resources, no exploration, production, or leasing is anticipated.

The BLM already manages recreational use in the WSA according to wilderness management guidelines, and does not anticipate any significant impacts from increased visitation as a result of designation. The recreational carrying capactiy of the Gunnison River corridor within the WSA has been set at 75 persons per day. Permits are currently required for all commercial users, including rafting, walk-in fishing, and hunting outfitters.

Floatboating use on the Gunnison is monitored and managed for a maximum of six group encounters per day with other floating parties, and no more than ten combined encounters per day between floating parties and parties on shore. Commercial river outfitter launches are limited to a maximum of two per day. The target figure for private launches is a maximum of four per day. Maximum group size for both commercial and private launches is twelve persons. Low impact camping regulations are enforced throughout the WSA by BLM patrols.

The WSA contains portions of four grazing allotments totalling approximately 662 animal unit months (AUMs). However, there are no existing range facilites in the area, and no projects or improvements are planned. Approximately 6,119 acres of the inner gorge are considered unsuitable for livestock grazing due to the steep slopes and low forage production.

## ENERGY AND MINERAL RESOURCE VALUES

Approximately 15,595 acres, or 74 percent of the WSA have been closed to mineral entry and location under a recreation withdrawal since 1972. Other than some staking of placer claims in the southern portion of the WSA, there has been no energy or mineral activity occurring within the 5,433 acres which remain open to mineral entry and location.

In 1988, the U.S. Geological Survey (USGS) and the U.S. Bureau of Mines (USBM) conducted mineral surveys in the Gunnison Gorge WSA to determine if the area had any mineral values. The results of these extensive geological, geophysical, and geochemical investigations were published in the U.S. Geological Survey Bulletin Numbner 1715-D, *Mineral Resources of the Gunnison Gorge Wilderness Study Area, Montrose and Delta Counties, Colorado*, (U.S. Government Printing Office, 1989). The information presented in this section is a summary of that report.

According to the USGS/USBM report, the entire study area has a low mineral and energy resource potential for undiscovered base metals (copper, lead, and zinc), precious metals (gold and silver), uranium, and geothermal sources. Geophysical studies failed to identify any structures that may be related to any mineral-deposit-forming processes.

The only evidence of mining activity in the area is a block of 18 unpatented claims in the southern part of the WSA. These claims, which encompass about four square miles, are mostly over mancos shale, and were presumably staked for gold. Assay results indicate that small amounts of gold do occur in this area. Although this finding may prompt future speculation and exploration for gold in this easily accessible area, it is unlikely that any production would occur based on the WSA's low mineral potential.

Vast quantities of gypsum occur in the Wanakah Formation, which underlies approximately 60 percent of the study area. The gypsum, however, was identified in the study as being an "inferred subeconomic resource" of low development potential. According to the report, the gypsum would be uneconomical to mine because it occurs in relatively thin beds with generally thick overburdens which

BLM_0006279

make mining cost prohibitive. The remoteness of these beds from markets also make transportation costs prohibitive. There is currently no demand for gypsum in the area and USBM studies indicate that domestic, as well as foreign supplies of this commodity are enormous.

Coal occurs locally in the Dakota Sandstone which crops out over about six square miles in the study area. However, due to the thin and discontinuous nature of these coal seams, the coal in the Gunnison Gorge is not considered to be an economic resource. Therefore, no leasing or production of coal is anticipated.

Special attention was given in the survey to the Morrison Formation which underlies approximately 40 percent of the study area. Although this formation contains vanadium and uranium deposits in other parts of western Colorado, none of the samples taken from the Gorge contained measurable amounts of uranium or vanadium, and there are no known occurrences of these minerals in or near the study area.

Although sedimentary formations found in the WSA have produced oil and gas in other parts of southwestern Colorado, there are no known oil and gas occurrences in the study area or surrounding area. Due to the absence of hydrocarbon source beds, which provide favorable structures for the accumulation of oil and gas, the oil and gas potential of the WSA is rated as zero.

Some of the sandstone rocks of the study area could be used for common construction purposes. However, these rocks have no unique characteristics to make them more desirable than similar rocks outside the area that are closer to markets.

## IMPACTS ON RESOURCES

The following table summarizes the effects on pertinent resources for the enhanced all wilderness, the all wilderness, and the no wilderness alternatives considered for the Gunnison Gorge WSA.

## LOCAL SOCIAL AND ECONOMIC CONSIDERATIONS

Designation of the WSA as wilderness would have minimal impacts on local economic conditions. Social factors were not considered a significant issue in the study.

## Table 3 - Comparative Summary of the Impacts by Alternative

| Impact Topics | Recommendation: Enhanced All Wilderness Alternative | All Wilderness Alternative | No Wilderness Alternative |
|---|---|---|---|
| *Impacts on Wilderness Values* | *Wilderness designation would expand the adjacent Black Canyon of the Gunnison Wilderness Area and provide statutory, long-term protection for wilderness values on 22,078 acres. Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained.* | *Wilderness designation would expand the adjacent Black Canyon of the Gunnison Wilderness Area and provide statutory, long-term protection for wilderness values on 21,198 acres. Outstanding opportunities for solitude and primitive, unconfined recreation would be maintained.* | *Naturalness and scenic values would continue to be administratively protected by the ORV closure of the area, the mineral withdrawl on 15,595 acres, and the enforcement of low impact camping regulations. Mineral exploration and assessment work would decrease naturalness on approximately 2-8 acres outside the withdrawl area over the next 20-30 years.* |

BLM_0006280

### Table 3 - Comparative Summary of the Impacts by Alternative (continued)

| Impact Topics | Recommendation: Enhanced All Wilderness Alternative | All Wilderness Alternative | No Wilderness Alternative |
|---|---|---|---|
| *Impacts on Wildlife Habitat and Populations* | *Habitat and forage conditions would be maintained for the area's present yearlong population of 50 to 60 bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Closure of an additional 5,793 acres to mineral entry would eliminate the possibility of habitat disturbance by mineral exploration activities in those areas. Restrictions on recreational use would reduce stress on both game and non-game species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population.* | *Habitat and forage conditions would be maintained for the area's present year-long population of 50 to 60 bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Closure of an additional 5,603 acres to mineral entry would eliminate the possibility of habitat disturbance by mineral exploration activities in those areas. Restrictions on recreational use would reduce stress on both game and non-game species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population.* | *Habitat and forage conditions would be maintained for the area's present year-long population of 50 to 60 bighorn sheep and 35 deer, and an additional 579 deer and 125 elk during the winter. Mineral exploration and assessment activities would result in less than 2-8 acres of habitat disturbance over the next 20-30 years. Restrictions on recreational use would reduce stress on both game and non-game species, minimize further habitat disturbance, and encourage continued expansion of the bighorn sheep population.* |
| *Impacts on Recreational Opportunities and Use* | *Recreational use would increase by 2,000 user days, or 40 per cent, from the present level of 5,000 to 7,000 user days. Outstanding opportunities for high quality primitive recreation activities would be maintained. Permit systems would limit the amount and degree of recreation use.* | *Recreational use would increase by 2,000 user days, or 40 per cent, from the present level of 5,000 to 7,000 user days. Outstanding opportunities for high quality wilderness recreation activities would be maintained. Permit systems would limit the amount and degree of recreation use.* | *Recreational use would increase by 2,000 user days, or 40 per cent, from the present level of 5,000 to 7,000 user days. Outstanding opportunities for high quality wilderness recreation activities would be maintained. Permit systems would limit the amount and degree of recreation use.* |
| *Impacts on Energy and Mineral Exploration and Production* | *An additional 5,443 acres within the WSA, 190 acres in Smith Fork Canyon, and 160 of acquired private mineral estate (5,793 acres total) would be closed to mineral entry, location, and leasing. There would be no impacts on energy or mineral production, leasing, or disposal since no activity is projected.* | *An additional 5,443 acres within the WSA, 160 of acquired private mineral estate (5,603 acres total) would be closed to mineral entry, location, and leasing. There would be no impacts on energy or mineral production, leasing, or disposal since no activity is projected.* | *Approximately 5,603 acres would remain open to mineral entry but no activity beyond exploration is projected due to low potential for development. The entire area would be open to leasing but no exploration or production is anticipated due to low potential for development.* |

350

## Summary of WSA
## Specific Public Comments

Public involvement has occurred throughout the wilderness review process. Certain comments received during the inventory process and early stages of the EIS were used to develop significant study issues and various alternatives for the ultimate management of those lands with wilderness values.

During formal public review of the Draft Environmental Impact Statement (DEIS), a total of 227 oral and written comments specifically addressing this WSA were received. Of those, 173 were written and 54 were oral statements received at three public hearings on the EIS. In general, 191 commenters supported wilderness designation for the WSA, while 36 commenters were opposed to designation.

Those favoring wilderness designation commented on the need to provide statutory protection for the Gunnison Gorge's undisturbed, pristine quality, its outstanding scenic qualities, and the excellent recreational values associated with the area. Many of the letters were from environmental organizations who commented that wilderness designation would also add impetus to their ongoing efforts to secure legislation for Wild and Scenic designation of the Gunnison River.

Those opposing designation were primarily concerned that wilderness would preclude the use of motorized vehicles in the area and restrict access to handicapped and elderly people. Others felt that there were already too many wilderness areas and opposed any new ones being added.

Written comments were received from the following federal, state, and local agencies: the National Park Service, Forest Service, Environmental Protection Agency, Bureau of Reclamation, U. S. Geological Survey, U. S. Bureau of Mines, U. S. Air Force, U. S. Fish and Wildlife Service, the Colorado Department of Natural Resources, and the City of Delta.

The National Park Service stated that wilderness designation would be compatible with their management of the adjacent Black Canyon of the Gunnison National Monument. The Air Force supported the overall wilderness area concept, but was concerned that designation would adversely affect or restrict their use of low altitude airspace over a wilderness area.

The Colorado Department of Natural Resources supported wilderness designation for the WSA but asked that the BLM continue to work in cooperation with the Division of Wildlife's bighorn sheep reintroduction efforts in the Gorge. The agency also cited a need to maintain and enhance the Gold Medal fishery in the Gorge.

The City of Delta commented that the DEIS failed to adequately identify and discuss the development of hydropower resources in the Gunnison Gorge and the issue of the City of Delta's water right decrees on the Gunnison River.

The other agencies which commented on the DEIS did not identify a specific jurisdictional conflict with either the proposed action or the no wilderness alternative for the Gunnison Gorge WSA.

BLM_0006282

BLM_0006283

BLM_0006284

BLM_0006285

# U.S. Department of the Interior
# Bureau of Land Management
# Solid Minerals Reclamation Handbook



noncoal leasable minerals, locatable minerals, salable minerals
### BLM Manual Handbook H-3042-1

BLM_0006286

H-3042-1 - SOLID MINERAL RECLAMATION

Table of Contents

I.   INTRODUCTION
     A.   BACKGROUND AND GENERAL INTRODUCTION  . . . . . . .   I-1
     B.   AUTHORITIES  . . . . . . . . . . . . . . . . . .   I-2
     C.   POLICY . . . . . . . . . . . . . . . . . . . . .   I-3
     D.   RECLAMATION STANDARDS  . . . . . . . . . . . . .   I-3

II.  MINING OR EXPLORATION PLAN REVIEW AND RECLAMATION
     CRITERIA
     A.   INTRODUCTION . . . . . . . . . . . . . . . . . .   II-1
     B.   SURFACE DISTURBING ACTIVITIES  . . . . . . . . .   II-2
          Table II-1, Summary of Activities and
          Authorizations . . . . . . . . . . . . . . . .   II-3
     C.   NATIONAL ENVIRONMENTAL POLICY ACT. . . . . . . .   II-4
     D.   REQUIREMENTS FOR RECLAMATION PLAN CONTENT  . . .   II-4
     E.   BLM REVIEW OF THE RECLAMATION PLAN . . . . . . .   II-4
     F.   ADMINISTRATION OF THE RECLAMATION PLAN . . . . .   II-5

III. INSPECTION AND ENFORCEMENT
     A.   INTRODUCTION . . . . . . . . . . . . . . . . . .   III-1
     B.   INSPECTIONS  . . . . . . . . . . . . . . . . . .   III-1
     C.   INSPECTION SAFETY  . . . . . . . . . . . . . . .   III-3
     D.   ENFORCEMENT  . . . . . . . . . . . . . . . . . .   III-3
          1.   Leasable Minerals  . . . . . . . . . . . .   III-3
          2.   Locatable Minerals . . . . . . . . . . . .   III-4
          3.   Salable Minerals . . . . . . . . . . . . .   III-4
          4.   Notice of Noncompliance  . . . . . . . . .   III-4
          5.   Cessation of Operations  . . . . . . . . .   III-5
     E.   ENFORCEMENT INVOLVING FEE SURFACE AND LEASED
          FEDERAL MINERALS OR INDIAN LANDS  . . . . . . .   III-5
     F.   BONDING  . . . . . . . . . . . . . . . . . . . .   III-6

IV.  RECLAMATION OF SITE ACCESS
     A.   INTRODUCTION . . . . . . . . . . . . . . . . . .   IV-1
     B.   TRANSPORTATION AND TEMPORARY EXPLORATION ACCESS  .   IV-1
          1.   Roads  . . . . . . . . . . . . . . . . . .   IV-1
          2.   Road Location and Construction
               Guidelines . . . . . . . . . . . . . . . .   IV-1
          3.   Road Reclamation Guidelines  . . . . . . .   IV-2
               Figure IV-1, Typical Road Section . . . . .   IV-3
     C.   EXPLORATION ACCESS . . . . . . . . . . . . . . .   IV-4
          1.   Location Guidelines  . . . . . . . . . . .   IV-4
          2.   Reclamation Guidelines . . . . . . . . . .   IV-5
     D.   RAILROADS  . . . . . . . . . . . . . . . . . . .   IV-5

Corrects Format in Table of Contents

BLM_0006287

TC-2

## H-3042-1 – SOLID MINERAL RECLAMATION
## Table of Contents

V.  RECLAMATION OF DRILLING OPERATIONS
    A.  INTRODUCTION . . . . . . . . . . . . . . . . . . . .  V-1
    B.  DRILL HOLES . . . . . . . . . . . . . . . . . . . .  V-1
        Figure V-1, Drill Hole Plugging Requirements When
              No Water is Encountered . . . . . . . . .  V-2
        Figure V-2, Drill Hole Plugging Requirements When
        Static Water is Encountered . . . . . . . . . .  V-4
        Figure V-3, Drill Hole Plugging Requirements When
              Artesian Water Is Encountered . . . . . .  V-5
        Figure V-4, Drill Hole Plugging Requirements For
              Leasable Minerals Soluble in Water . . . . .  V-6
        Figure V-5, Drill Hole Surface Plugging . . . . .  V-7
        1.  Utilization of Drill Holes for Water Wells  .  V-8
        2.  Use of Drill Holes for Water Monitoring . . .  V-9
    C.  DRILL PADS . . . . . . . . . . . . . . . . . . . .  V-9
    D.  MUD PITS . . . . . . . . . . . . . . . . . . . . .  V-9
        Figure V-6, Drill Pad Reclamation. . . . . . . .  V-10

VI.  OTHER EXPLORATION-RELATED RECLAMATION
    A.  INTRODUCTION . . . . . . . . . . . . . . . . . . .  VI-1
    B.  SURFACE DISTURBING EXPLORATION ACTIVITIES . . . .  VI-1
        1.  Trenches  . . . . . . . . . . . . . . . . . .  VI-1
        2.  Exploration Mines . . . . . . . . . . . . . .  VI-1
        3.  Bladed areas  . . . . . . . . . . . . . . . .  VI-2

VII. DRAINAGE AND HYDROLOGY
    A.  INTRODUCTION . . . . . . . . . . . . . . . . . .  VII-1
    B.  SEDIMENT PONDS . . . . . . . . . . . . . . . . .  VII-2
        Figure VII-1, Examples of Typical Sediment
              Barriers . . . . . . . . . . . . . . . . .  VII-3
        Figure VII-2, Example Sedimentation Pond,
              Plan View . . . . . . . . . . . . . . . .  VII-5
        Figure VII-3, Example Sedimentation Pond, Profile
              and Cross-Sections . . . . . . . . . . .  VII-6
        Figure VII-4, Example Sedimentation Pond,
              Emergency Spillway . . . . . . . . . . .  VII-7
    C.  EROSION PREVENTION AND CONTROL . . . . . . . . .  VII-8
        Figure VII-5, Erosion Prevention Using Terraces
              and Benches . . . . . . . . . . . . . . .  VII-9
        Figure VII-6, Rock Filters  . . . . . . . . . .  VII-11
        Figure VII-7, Sediment Traps  . . . . . . . . .  VII-13
    D.  SHAPING AND GRADING . . . . . . . . . . . . . .  VII-14

Corrects Format in Table of Contents

BLM_0006288

H-3042-1 - SOLID MINERAL RECLAMATION
Table of Contents

E.   REVEGETATION . . . . . . . . . . . . . . . . .   VII-14
F.   EROSION AND INFILTRATION CONTROL . . . . . . .   VII-14
     1.   Cover Systems . . . . . . . . . . . . . .   VII-15
     Figure VII-8, Cover Systems . . . . . . . . .   VII-16
G.   SUBSURFACE DRAINAGE SYSTEMS . . . . . . . . .   VII-18
     Figure VII-9, Subsurface Drainage System . . .   VII-19
H.   WATER DIVERSIONS . . . . . . . . . . . . . . .   VII-20
     Figure VII-10, Temporary Diversion of Stream
          Channel . . . . . . . . . . . . . . . . .   VII-21
I.   AFFECTED BODIES OF WATER . . . . . . . . . . .   VII-22
     1.   General Procedures . . . . . . . . . . .   VII-22
J.   DRAINAGE RECONSTRUCTION. . . . . . . . . . . .   VII-22
K.   IMPOUNDMENTS . . . . . . . . . . . . . . . . .   VII-23
     Figure VII-11, Reconstructed Drainage . . . .   VII-24
L.   MAINTENANCE . . . . . . . . . . . . . . . . .   VII-25
     Figure VII-12, Acceptable Permanent Impoundment   VII-26

VIII.   MINE WASTE MANAGEMENT AND POLLUTION CONTROL
A.   INTRODUCTION . . . . . . . . . . . . . . . . .   VIII-1
B.   EXTERNAL WASTE DUMP DESIGN AND CONSTRUCTION . .   VIII-1
     Figure VIII-1, Types of Waste Dumps . . . . .   VIII-2
     Figure VIII-2, Types of Dump Failures . . . .   VIII-5
     Some References for Safety Factor Calculation .   VIII-9
C.   SURFACE AND GROUND WATER MANAGEMENT . . . . .   VIII-9
     1.   Introduction . . . . . . . . . . . . . .   VIII-9
     2.   Water Control . . . . . . . . . . . . . .   VIII-10
     3.   Planning . . . . . . . . . . . . . . . .   VIII-11
     4.   Monitoring . . . . . . . . . . . . . . .   VIII-11
     Table VIII-1, Typical Components of a Water Monitoring
          Program . . . . . . . . . . . . . . . .   VIII-12
     5.   Water Re-use . . . . . . . . . . . . . .   VIII-13
     6.   Specific Contamination Problems . . . . .   VIII-13
D.   ACID MINE DRAINAGE . . . . . . . . . . . . . .   VIII-14
E.   ALKALINE AND SALINE MINE DRAINAGE . . . . . .   VIII-19
F.   HEAVY METAL POLLUTION . . . . . . . . . . . .   VIII-20
G.   EUTROPHICATION . . . . . . . . . . . . . . . .   VIII-21
H.   DEOXYGENATION . . . . . . . . . . . . . . . .   VIII-23
I.   WATER TREATMENT . . . . . . . . . . . . . . .   VIII-24
J.   CYANIDE HEAP AND VAT LEACH SYSTEMS . . . . . .   VIII-24
     1.   Cyanide Solutions. . . . . . . . . . . .   VIII-25
     2.   Spent Ore Heaps and Tailings . . . . . .   VIII-36
     3.   Process Ponds. . . . . . . . . . . . . .   VIII-40

Corrects Format in Table of Contents

BLM_0006289

TC-4

## H-3042-1 - SOLID MINERAL RECLAMATION
### Table of Contents

        4.  Facilities Removal . . . . . . . . . .  VIII-41
        5.  Final Closure. . . . . . . . . . . . .  VIII-41
    K.  TAILINGS AND SLIME PONDS . . . . . . . . .  VIII-41
        Figure VIII-3, Tailings Impoundments . . . .  VIII-42
    L.  HAZARDOUS MATERIALS  . . . . . . . . . . .  VIII-45

IX.  CLOSURE OF UNDERGROUND MINE ACCESS
    A.  INTRODUCTION . . . . . . . . . . . . . . .  IX-1
    B.  IMPLEMENTATION . . . . . . . . . . . . . .  IX-1
    C.  CLOSURE OF SURFACE OPENINGS  . . . . . . .  IX-1
        1.  General Guidelines--Surface Openings . . . .  IX-2
        2.  Temporary Closures (Less than one year) . . .  IX-2
        3.  Permanent Closure . . . . . . . . . .  IX-3
        4.  Closure of Mine Openings . . . . . . .  IX-4
    D. SAFETY NOTES  . . . . . . . . . . . . . . .  IX-6
        1.  Personal Safety Precautions . . . . . .  IX-6
        2.  Security of Surface Operations . . . . .  IX-6
        Figure IX-1, Approximate Angle of Repose for
            Sloping Sides of Excavations . . . . . .  IX-7
        Figure IX-2, Use of the Angle of Repose for
            Determination of the Potential Failure Zone  IX-8
        3.  Ground Stability . . . . . . . . . . .  IX-9
        Figure IX-3, Worker and Public Safety Zone
            Calculations . . . . . . . . . . . . . .  IX-10
        4.  Mine Gases  . . . . . . . . . . . . .  IX-11
        5.  Types of Mine Gases . . . . . . . . .  IX-11
        6.  Mine Gas Precautions . . . . . . . . .  IX-12
    F.  PRINCIPAL FILL MATERIALS . . . . . . . . .  IX-14
        1.  General Purpose Fill . . . . . . . . .  IX-14
        2.  Hardcore  . . . . . . . . . . . . . .  IX-15
        3.  Clay  . . . . . . . . . . . . . . . .  IX-16
        4.  Concrete  . . . . . . . . . . . . . .  IX-16
        5.  Grouts  . . . . . . . . . . . . . . .  IX-17
    G.  MEASURES USED IN SHAFT TREATMENTS  . . . .  IX-17
        1.  Filling . . . . . . . . . . . . . . .  IX-18
        Figure IX-4, Controlled Backfill  . . . . . .  IX-19
        Figure IX-5, Multi-Level Controlled Backfill .  IX-20
        2.  Enclosures  . . . . . . . . . . . . .  IX-21
        3.  Covers  . . . . . . . . . . . . . . .  IX-22
        Figure IX-6, Light Duty Shaft Cover . . . . .  IX-23
        4.  Caps  . . . . . . . . . . . . . . . .  IX-24
        Figure IX-7, Heavy Duty Shaft Cover . . . . .  IX-25

Corrects Format in Table of Contents

BLM_0006290

H-3042-1 - SOLID MINERAL RECLAMATION
Table of Contents

Figure IX-8, Shaft Cap, Shallow Bedrock . . . . IX-26
Figure IX-9, Shaft Cap, Deep Bedrock . . . . . IX-28
5.  Shaft Plugs . . . . . . . . . . . . . . . IX-29
Figure IX-10, Shaft Plugs . . . . . . . . . . IX-30
6.  Roadway Stoppings and Dams . . . . . . . . IX-31
Figure IX-11, Temporary Adit Closure . . . . . IX-32
Figure IX-12, Permanent Adit Closure . . . . . IX-33
Figure IX-13, Permanent Slope Closure . . . . . IX-35

X.   REMOVAL AND RECLAMATION OF SURFACE IMPROVEMENTS
     A.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . X-1
     B.   FACILITY REMOVAL . . . . . . . . . . . . . . . . . . X-1
     C.   POWERLINES AND COMMUNICATION LINES . . . . . . . . . X-2
     D.   PIPELINES . . . . . . . . . . . . . . . . . . . . . X-2

XI.  LANDFORM RECLAMATION
     A.   INTRODUCTION . . . . . . . . . . . . . . . . . . . XI-1
     B.   SHAPING, GRADING, AND EROSION CONTROL . . . . . . . XI-1
          1.  Shaping and Grading Checklist . . . . . . . XI-2
          Figure XI-1, Top of Waste Dump Configuration    XI-3
     C.   PIT BACKFILLING . . . . . . . . . . . . . . . . . XI-4
          Figure XI-2, Equipment Slope Workability Graph   XI-5
          1.  Special Considerations for Open Pit Mining   XI-6
          Figure XI-3, Typical Open Pit Mine . . . . . . XI-7
          2.  Technical and Operational Aspects of Pit
              Backfilling . . . . . . . . . . . . . . . XI-8
          3.  Environmental Effects of Pit Backfilling . . XI-8
          4.  Effects of Complete Pit Backfilling . . . . . XI-8
          5.  Effects of Scree Slope Backfilling . . . . . XI-8
          Figure IX-4, Surface Strip Mine Backfilling      IX-9
          Figure XI-5, Scree Slope Backfilling . . . . . XI-10
          6.  Effects of Concurrent Backfilling . . . . . XI-11
     D.   HIGHWALLS . . . . . . . . . . . . . . . . . . . . XI-11
          1.  Reclamation . . . . . . . . . . . . . . . XI-11
          Figure XI-6, Highwall Reclamation . . . . . . . . XI-12

XII. REVEGETATION
     A.   INTRODUCTION . . . . . . . . . . . . . . . . . . XII-1
     B.   SOILS MANAGEMENT . . . . . . . . . . . . . . . . XII-1
          Table XII-1, Soil Suitability for Reclamation
              Purposes . . . . . . . . . . . . . . . . . XII-2
     C.   SEED BED PREPARATION . . . . . . . . . . . . . . XII-4

Corrects Format in Table of Contents

BLM_0006291

TC-6

H-3042-1 – SOLID MINERAL RECLAMATION
Table of Contents

D.   FERTILIZATION . . . . . . . . . . . . . . . . . . XII-5
E.   SOIL AMENDMENTS . . . . . . . . . . . . . . . . . XII-7
F.   SEED SELECTION AND HANDLING . . . . . . . . . . . XII-7
     1.   Species Selection . . . . . . . . . . . . . XII-8
     2.   Seed Acquisition . . . . . . . . . . . . . XII-9
G.   SEEDING AND PLANTING . . . . . . . . . . . . . . XII-10
H.   SHRUBS AND TREES AND OTHER TRANSPLANTED SPECIES   XII-12
I.   MULCHING . . . . . . . . . . . . . . . . . . . . XII-13
J.   REVEGETATION OF ACIDIC MINING WASTES . . . . . . XII-15
     1.   Lime Amendment . . . . . . . . . . . . . . XII-15
     2.   Bactericides . . . . . . . . . . . . . . . XII-16
K.   TEST PLOTS . . . . . . . . . . . . . . . . . . . XII-17

XIII.  POST-MINING MULTIPLE USE MANAGEMENT
     A.   INTRODUCTION . . . . . . . . . . . . . . . . XIII-1
     B.   WETLANDS AND RIPARIAN AREA MANAGEMENT . . . . XIII-1
          Figure XIII-1, Examples of Riparian and Wetland
               Areas . . . . . . . . . . . . . . . . XIII-2
     C.   WILDLIFE AND FISHERIES MANAGEMENT . . . . . . XIII-5
          Figure XIII-2, Examples of Wildlife
               Enhancements . . . . . . . . . . . . . XIII-6
          Figure XIII-3, Examples of Fisheries
               Enhancements . . . . . . . . . . . . . XIII-7
     D.   RANGE MANAGEMENT . . . . . . . . . . . . . . XIII-8
     E.   RECREATION MANAGEMENT . . . . . . . . . . . . XIII-8
     F.   FORESTRY MANAGEMENT . . . . . . . . . . . . . XIII-9
     G.   VISUAL RESOURCE MANAGEMENT . . . . . . . . . XIII-9
     H.   WILDERNESS MANAGEMENT . . . . . . . . . . . XIII-10

Glossary of Terms

Bibliography

Corrects Format in Table of Contents

BLM MANUAL

Rel. 3-275
4/8/92

BLM_0006292

Form 1221—2
(June 1969)



UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

MANUAL TRANSMITTAL SHEET

| Release |
| 3-275 |
| Date |
| 2/7/92 |

Subject

## H-3042-1 Solid Mineral Reclamation Handbook

1. <u>Explanation of Materials Transmitted</u>: This release transmits a new Handbook on the above subject. This handbook contains the nationwide guidance for solid mineral reclamation on Federal and Indian lands.

2. <u>Reports Required</u>; None.

3. <u>Material Superseded</u>: None.

4. <u>Filing Instructions</u>: File immediately after Manual Section.

REMOVE:                 INSERT:

None                    H-3042-1

                        (Total: 112 Sheets)

Assistant Director,
Energy and Mineral Resources

BLM_0006293

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 1

# I.   INTRODUCTION

## A.   BACKGROUND AND GENERAL INTRODUCTION

Multiple-use management is the central concept in the Federal Land Policy and Management Act of 1976 (FLPMA).  FLPMA mandates that "the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values."  Multiple-use management is defined in FLPMA (43 U.S.C. 1702(c)) and in regulations (43 CFR 1601.0-5(f)) as, in part, the "harmonious and coordinated management of the various resources without permanent impairment of the productivity of the lands and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output."  In addition, FLPMA mandates that activities be conducted so as to prevent "unnecessary or undue degradation of the lands" (43 U.S.C. 1732(b)).

The Mining and Minerals Policy Act of 1970 (30 U.S.C. 21a) established the policy for the Federal Government relating to mining and mineral development.  The Act states that it is policy to encourage the development of "economically sound and stable domestic mining, minerals, metal and mineral reclamation industries."  The Act also states, however, that the Government should also promote the "development of methods for the disposal, control, and reclamation of mineral waste products, and the reclamation of mined land, so as to lessen any adverse impact of mineral extraction and processing upon the physical environment that may result from mining or mineral activities."

Therefore, it is a statutory mandate that BLM ensure that reclamation and closure of mineral operations be completed in an environmentally sound manner.  To accomplish this task, it is necessary to establish nationwide standards as a basis for development of site-specific reclamation requirements.  The BLM professionals who establish site-specific requirements based on these nationwide standards, review reclamation plans and conduct inspection and enforcement on mineral operations will use these guidelines to judge the adequacy of the proposed and performed reclamation activities.  In addition, they will inform operators of the standards by which their reclamation efforts will be judged.

I-2

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 1

BLM exercises the authority to supervise exploration,
mining, and reclamation activities on Indian lands pursuant to
25 U.S.C. 396d and 25 CFR Parts 211, 212, and 216.  The
standards developed for reclamation and closure on Federal
lands will apply to operations conducted on Indian lands.  The
Government's trust responsibilities for the various Indian
tribes and entities require that BLM ensure proper reclamation
and closure practices.  The regulations governing operations on
Indian lands require that "adequate measures be taken to avoid,
minimize, or correct damage to the environment--land, water,
and air--and to avoid, minimize, or correct hazards to the
public health and safety" (25 CFR 216.1).

The BLM is providing in this H-3042-1 handbook,
reclamation information and guidance that is readily available
and applicable to various situations and conditions.  The BLM's
long-term reclamation goals are to shape, stabilize,
revegetate, or otherwise treat disturbed areas in order to
provide a self-sustaining, safe, and stable condition that
provides a productive use of the land which conforms to the
approved land-use plan for the area.  The short-term
reclamation goals are to stabilize disturbed areas and to
protect both disturbed and adjacent undisturbed areas from
unnecessary or undue degradation.

The purpose of this handbook is to provide consistent
reclamation guidelines for all solid non-coal mineral
activities conducted under the authority of the BLM minerals
regulations in Title 43 of the CFR.  The intent is to provide
the user with clear guidance which highlights a logical
sequence for managing the reclamation process and a summary of
key reclamation principles.

B.  <u>AUTHORITIES</u>

This handbook provides consistent reclamation guidelines
for all surface-disturbing activities conducted under the
authorities and implementing regulations listed in BLM Manual
Section 3042.  These authorities govern the exploration,
development and mining of noncoal solid minerals as well as
reclamation of lands disturbed as result of such operations.
Additional State and Federal environmental statutes and
regulations also provide authority for specific reclamation and
mitigation requirements.

Rel. 3-275
2/7/92

BLM_0006295

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 1

This handbook addresses reclamation for operations conducted under the provisions of the regulations at 43 CFR Group 3500 for the solid leasable minerals other than coal; 43 CFR Group 3600 for mineral materials; and 43 CFR Parts 3802 and 3809 for locatable minerals.  The authority for regulating surface coal mine reclamation was given to the Office of Surface Mining Reclamation and Enforcement when Congress enacted the Surface Mine Control and Reclamation Act of 1977.

Because of differences in the statutory authority granted the Secretary of the Interior and delegated to the Director of the Bureau of Land Management, the guidance in this handbook does not apply uniformly to all noncoal solid mineral operations on public lands.  These differences are noted where they exist, and specific programmatic guidance in other BLM manuals and handbooks are cited as cross-references, where applicable.  In most cases, the technical procedures are applicable to all types of operations, regardless of the authorizing authority.

C.  <u>POLICY</u>

The policy governing land reclamation is set forth in numerous BLM Manual Sections.  Of special note are Manual Sections 3042, 3590, 3600 and 3809.

D.  <u>RECLAMATION STANDARDS</u>

The required reclamation standards shall not conflict with the Resource Management Plan, the Management Framework Plan, or other land use planning document objectives.  An interdisciplinary approach shall be used to analyze the physical, chemical, biological, climatic, and other site characteristics and make recommendations for the reclamation plan.  Where appropriate, consider the early development of test plots to determine the best local procedures and practices for revegetation.  Revisions of the reclamation standards themselves may be made only with the consent of the operator. In order for a disturbed area to be considered properly reclaimed, the following must be complied with:

1.  <u>Waste Management</u>.  All undesirable materials (e.g. toxic subsoil, contaminated soil, drilling fluids, process residue, refuse, etc.) shall be isolated, removed, or buried, or otherwise disposed as appropriate, in a manner providing for long-term stability and in compliance with all applicable State and Federal requirements.

a.  The area shall be protected from future contamination resulting from an operator's mining and reclamation activities.

Rel. 3-275
2/7/92

BLM MANUAL

BLM_0006296

I-4

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 1


b.  There shall be no contaminated materials remaining at or near the surface.

c.  Toxic substances that may contaminate air, water, soil, or prohibit plant growth shall be isolated, removed, buried or otherwise disposed of in an appropriate manner.

d.  Waste disposal practices and the reclamation of waste disposal facilities shall be conducted in conformance to applicable Federal and State requirements.

2.  Subsurface.  The subsurface shall be properly stabilized, holes and underground workings properly plugged, when required, and subsurface integrity ensured subject to applicable Federal and State requirements.

3.  Site Stability.

a.  The reclaimed area shall be stable and exhibit none of the following characteristics:

(1)  Large rills or gullies.
(2)  Perceptible soil movement or head cutting in drainages.
(3)  Slope instability on or adjacent to the reclaimed area.

b.  The slope shall be stabilized using appropriate reshaping and earthwork measures, including proper placement of soils and other materials.

c.  Appropriate water courses and drainage features shall be established and stabilized.

4.  Water Management.  The quality and integrity of affected ground and surface waters shall be protected as a part of mineral development and reclamation activities in accordance with applicable Federal and State requirements.

a.  Appropriate hydrologic practices shall be used to protect and, if practical, enhance both the quality and quantity of impacted waters.

b.  Where appropriate, actions shall be taken to eliminate ground water commingling and contamination.

c.  Drill holes shall be plugged and underground openings, such as shafts, slopes, stopes, and adits, shall be closed in a manner which protects and isolates aquifers and prevents infiltration of surface waters, where appropriate.

Rel. 3-275
2/7/92

BLM MANUAL

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 1

d.  Waste disposal practices shall be designed and conducted to provide for long-term ground and surface water protection.

5.  Soil Management.  Topsoil, selected subsoils, or other materials suitable as a growth medium shall be salvaged from areas to be disturbed and managed for later use in reclamation.

6.  Erosion Prevention.  The surface area disturbed at any one time during the development of a project shall be kept to the minimum necessary and the disturbed areas reclaimed as soon as is practical (concurrent reclamation) to prevent unnecessary or undue degradation resulting from erosion.

a.  The soil surface must be stable and have adequate surface roughness to reduce run-off, capture rainfall and snow melt, and allow for the capture of windblown plant seeds.

b.  Additional short-term measures, such as the application of mulch or erosion netting, may be necessary to reduce surface soil movement and promote revegetation.

c.  Soil conservation measures, including surface manipulation, reduction in slope angle, revegetation, and water management techniques, shall be used.

d.  Sediment retention structures or devices shall be located as close to the source of sediment generating activities as possible to increase their effectiveness and reduce environmental impacts.

7.  Revegetation.  When the final landform is achieved, the surface shall be stabilized by vegetation or other means as soon as practical to reduce further soil erosion from wind or water, provide forage and cover, and reduce visual impacts. Specific criteria for evaluating revegetation success must be site-specific and included as a part of the reclamation plan.

a.  Vegetation production, species diversity, and cover (on unforested sites), shall approximate the surrounding undisturbed area.

b.  The vegetation shall stabilize the site and support the planned post-disturbance land use, provide natural plant community succession and development, and be capable of renewing itself.  This shall be demonstrated by:

(1)  Successful onsite establishment of the species included in the planting mixture and/or other desirable species.

BLM_0006298

I-6

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 1

(2)   Evidence of vegetation reproduction, either spreading by rhizomatous species or seed production.

(3)   Evidence of overall site stability and sustainability.

c.   Where revegetation is to be used, a diversity of vegetation species shall be used to establish a resilient, self-perpetuating ecosystem capable of supporting the post-mining land use.  Species planted shall include those that will provide for quick soil stabilization, provide litter and nutrients for soil building, and are self-renewing.  Except in extenuating circumstances, native species should be given preference in revegetation efforts.

d.   Species diversity should be selected to accommodate long-term land uses, such as rangeland and wildlife habitat, and to provide for a reduction in visual contrast.

e.   Fertilizers, other soil amendments, and irrigation shall be used only as necessary to provide for establishment and maintenance of a self-sustaining plant community.

f.   Seedlings and other young plants may require protection until they are fully established.  Grazing and other intensive uses may be prohibited until the plant community is appropriately mature.

g.   Where revegetation is impractical or inconsistent with the surrounding undisturbed areas, other forms of surface stabilization, such as rock pavement, shall be used.

8.   Visual Resources.  To the extent practicable, the reclaimed landscape should have characteristics that approximate or are compatible with the visual quality of the adjacent area with regard to location, scale, shape, color, and orientation of major landscape features.

9.   Site Protection.  During and following reclamation activities the operator is responsible for monitoring and, if necessary, protecting the reclaimed landscape to help ensure reclamation success until the liability and bond are released.

10.   Site Specific Standards.  All site-specific standards must be met in order for the site to be properly and adequately reclaimed.

BLM_0006299

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 277 of 418

# II.   MINING OR EXPLORATION PLAN REVIEW AND RECLAMATION CRITERIA

## A.   INTRODUCTION

The reclamation plan shall guide both the operator and the BLM toward a planned future condition of the disturbed area. This requires early coordination with the operator to produce a comprehensive plan.  The reclamation plan will serve as a binding agreement between the operator and the regulatory agencies for the reclamation methodology and expected reclamation condition of the disturbed lands and should be periodically reviewed and modified as necessary.

Although the operator will usually develop the reclamation plan, appropriate pre-planning, data inventory, and involvement in the planning process by the regulatory agencies, is essential to determine the optimum reclamation proposal.  Most determinations as to what is expected should be made before the reclamation plan is approved and implemented.  However, the regulations provide that plans can be modified to adjust to changing conditions or to correct for an oversight.  The operator should not conduct surface disturbing activities without an approved plan.  For notice level activities, the notice must contain an agreement to adhere to the reclamation requirements of the regulations and a proposal comprehensive enough for the BLM to ensure that unnecessary or undue degradation will not result. A reclamation plan should provide the following:

1.   A logical sequence of steps for completing the reclamation process.

2.   The specifics of how reclamation standards will be achieved.

3.   An estimate of specific costs of reclamation.

4.   Sufficient information for development of a basis of inspection and enforcement of reclamation and criteria to be used to evaluate reclamation success and reclamation bond release.

Format Corrected in Chapter 2

BLM_0006300

II-2

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 2

In preparing and reviewing reclamation plans, the BLM and the operator must set reasonable, achievable, and measurable reclamation goals which are not inconsistent with the established land-use plans.  Achievable goals will ensure reclamation and encourage operators to conduct research on different aspects of reclamation for different environments.  These goals should be based on available information and techniques, should offer incentives to both parties, and should, as a result, generate useful information for future use.

The purposes of the reclamation plan are as follows:

1.  Reclamation plans provide detailed guidelines for the reclamation process and fulfill Federal, State, County and other local agencies requirements.  They can be used by regulatory agencies in their oversight roles to ensure that the reclamation measures are implemented, are appropriate for the site, and are environmentally sound.

2.  Reclamation plans will be used by the operator throughout the operational period of the project and subsequent to cessation of exploration, mining, and processing activities.  In turn, responsible agencies, including the BLM, will use the reclamation plan as a basis to review and evaluate the success of the reclamation program.

3.  Reclamation plans should provide direction and standards to assist in monitoring and compliance evaluations.

B.  SURFACE DISTURBING ACTIVITIES

For the purposes of this Handbook, surface-disturbing activities will be separated into three broad categories.

Prospecting is the search for new deposits or mineral commodities.  Prospecting activities may include: geophysical/ geochemical studies, and hand sampling of mineral specimens.

Exploration includes efforts to determine the presence of economic deposits of mineral commodities.  Exploration activities may include:  road-building, drilling, trenching, bulk sampling, as well as any of the activities cited for prospecting.

.

Format Corrected in Chapter 2

Rel. 3-275
2/7/92

BLM_0006301

II-3

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 2

Development and mining or mineral processing is the process of extracting valuable minerals from the earth and removing impurities from these minerals. These activities may include: developmental drilling, road-building, underground mining (including shafts, portals, and adits), surface mining (including trenching, open pits, and strip mines), dredging, placer mining, construction of buildings and facilities, use of leaching solutions or other chemicals, and the creation of tailings disposal sites and waste dumps.

See Table II-1 for a summary of activities and authorizations.

TABLE II-1
Summary of Activities and Authorizations

| SURFACE-DISTURBING ACTIVITY | LOCATABLE AUTHORIZATION | SOLID LEASABLE AUTHORIZATION | SALABLE AUTHORIZATION |
|---|---|---|---|
| Prospecting | Generally casual use, no BLM authorization (43 CFR 3809.1-2) | Generally casual use, no BLM authorization | Generally casual use, no BLM authorization |
| Exploration | 3809 Notice sent to BLM 15 days before starting operations of 5 acres or less-no BLM authorization (43 CFR 3809.1-3). Approved Plan of Operations for greater than 5 acres or "special areas" (43 CFR 3809.1-4). Plan generally required in Wilderness Study Areas (43 CFR 3802.1-1). Bonds are required for Plans of Operations, not for Notices. See current 3809 bonding policy. | 43 CFR Part 3590 covers Solid Minerals (other than coal) for exploration and mining operations. The Authorized Officer (AO) has to approve the exploration plans which include reclamation plans. Prospecting permits required to conduct exploration. Bonds are required for prospecting permits. | Sampling and testing performed pursuant to a letter of authorization from the authorized officer (43 CFR 3602.2) |
| Mining or Milling | Same as Exploration. See current 3809 bonding policy. | 43 CFR Part 3590 covers operations. The AO must approve mining plans which include reclamation plans. Leases are required. Activities require a bond. | Noncompetitive sales (43 CFR 3610.2), competitive sales (43 CFR 3610.3), free use (43 CFR 3620). |

Format Corrected in Chapter 2

BLM MANUAL

Rel. 3-275
2/7/92

II-4

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 2

C. NATIONAL ENVIRONMENTAL POLICY ACT

In accordance with the NEPA (NEPA), an environmental document will be prepared for those mineral actions which propose surface disturbance and have not been categorically excluded for the purpose of identifying and mitigating the impacts to the environment. Notices under 43 CFR 3809 are not Federal actions subject to the provisions of NEPA. The requirements and mitigation measures recommended in an Environmental Assessment (EA) or Environmental Impact Statement (EIS) shall be made a part of the reclamation plan.

D. REQUIREMENTS FOR RECLAMATION PLAN CONTENT

The reclamation plan should be a comprehensive document submitted with the plan of operations, notice, exploration plan, or mining plan. It is expected that there will be changes to planned reclamation procedures over the life of the project. Any changes will generally be limited to techniques and methodology needed to attain the goals set forth in the plan. These changes to the plan may result from oversights or omissions from the original reclamation plan, permitted alterations of project activities, procedural changes in planned reclamation as a result of information developed by on-site revegetation research undertaken by the operator and studies performed elsewhere, and/or changes in Federal/State regulations. Specific requirements are given in Manual Section 3042.

E. BLM REVIEW OF THE RECLAMATION PLAN

When reviewing the reclamation plan, the AO should:

1. Immediately upon its receipt, conduct a completeness review to determine whether the reclamation plan is technically and administratively complete.

2. Review the plan for content, both in the office and on-site with the operator, as necessary.

3. Recommend revisions, if necessary, as a result of the on-site review, NEPA documentation, and consultation with appropriate BLM personnel and other SMA's.

Format Corrected in Chapter 2

BLM_0006303

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 2

4.  Ensure that the plan conforms to applicable State and Federal requirements.

5.  Approve or accept the reclamation plan within the appropriate timeframes.

6.  Set a schedule for inspection of operations and reclamation activities.  Inspections must be scheduled at key points in the reclamation process, as well as at regular intervals.

7.  Establish criteria for evaluating the success of reclamation.

F.  ADMINISTRATION OF THE RECLAMATION PLAN

When administering a reclamation plan, the AO should:

1.  Conduct scheduled inspections and other inspections as necessary to ensure compliance with the reclamation plan.

2.  Document inspections in an established case file and discuss needed changes with the operator.  These discussions with the operator should also be documented in the case file.

3.  Ensure that required interim reclamation is current and in accordance with the plan.

4.  Take appropriate action in the event of noncompliance.

5.  Require revisions of the reclamation plan as necessary.

6.  Monitor completed projects and evaluate the success of reclamation.

7.  Accept final reclamation and issue a decision.

Format Corrected in Chapter 2

Rel. 3-275
2/7/92

BLM_0006304

Case No. 1:20-cv-02484-MSK  Document 27-9  filed 04/27/21  USDC Colorado  pg 282 of 418

# III.  INSPECTION AND ENFORCEMENT

## A.  INTRODUCTION

The requirements of the reclamation plan and the appropriate regulations are enforced through regular inspections of the operation, both during the operation and as a part of post-operation reclamation and closure activities. The types of enforcement actions available to BLM vary depending upon the particular use authorization for the operation.  This section details the procedures to be used.

## B.  INSPECTIONS

Inspections shall be conducted in accordance with current BLM policy on both Federal and Indian lands where operations for exploration, development, production, preparation, reclamation, and handling of solid minerals are being conducted.  Inspections are conducted to determine compliance with the applicable laws, regulations, terms and conditions of leases, licenses, or permits, requirements of approved exploration plans, mining plans, plans of operation, reclamation plans, and orders or notices (hereafter referred to as the established requirements) as related to reclamation. BLM shall determine whether unnecessary or undue degradation of the land is occurring and the AO shall take appropriate enforcement action when such determination is made.

Field personnel shall be designated by the AO to conduct inspections and take enforcement actions (I&E).  The intent of this policy is to identify the personnel responsible for I&E, allow for oversight of the adequacy of the resources dedicated to I&E, and avoid the use of unqualified personnel for I&E functions.  A variety of disciplines may be needed to conduct inspections of reclamation activities, e.g., engineers, geologists, hydrologists, soil scientists, etc.  Therefore, the AO may designate several people in specific areas of responsibility or may designate one person as responsible for a specific operation and expect that person to obtain the appropriate assistance whenever necessary.

The reclamation-related aspects of inspections are for:

1.  Determining whether the operation is in compliance with the reclamation plan and other established requirements.

2.  Determining whether concurrent reclamation, as planned, is taking place.

BLM_0006305

III-2

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 3

3.   Identifying deficiencies in the reclamation plan and recommending appropriate modifications to the operator.

4.   Identifying any noncompliance.

5.   Taking appropriate enforcement action if noncompliance is identified.

6.   Monitoring reclamation success and completion.

7.   Providing complete documentation of the inspection record and updating of the SLMS data base (for solid leasables) or other appropriate ADP system.

Once the operation has ceased activities and has entered the closure phase (reclamation and closure in accordance with the approved plan), the operator shall submit an update to the existing reclamation plan if necessary.  This should reflect any modifications of the reclamation plan which affect proper closure of the mine site.   BLM should schedule joint inspections by State and Federal agencies, the BIA, Indian tribe, Native Corporation, and/or private surface land owners, as applicable.  These events should be correlated with the plan and all parties shall be notified of the schedule and their part in the oversight and final inspection functions.

BLM personnel shall observe plugging of underground mine portals in front of the seals to assure that openings are properly plugged.  Similar observation should be made of selected drill hole plugging by the responsible personnel.

A report of the completion of closure work will be prepared and included in the appropriate case file.  The report will contain a statement, signed by the AO or his delegated representative, that reclamation is complete, adequate, meets all plan requirements, and releases the operator's bond and the operator from further liability for reclamation.  A copy shall be given to the operator in addition to the copy placed in the case file.

BLM_0006306

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 3

C.  INSPECTION SAFETY

     BLM personnel conducting or participating in inspections
shall be knowledgeable of and comply with MSHA and OSHA safety
requirements; shall have the appropriate and mandatory safety
and health training for personnel working in and around surface
and underground mining operations; and shall comply with any
additional safety rules and regulations required by the
operator.  Personal protective equipment such as hard hat,
steel toed boots, and safety glasses may be worn during
inspections, as appropriate.  Other protective clothing and
equipment shall be worn when necessary.

     If possible, inspections shall be in the company of a
representative of the operator.  Exception to this requirement
may be granted by the AO if conditions warrant.

D.  ENFORCEMENT

     The types of enforcement actions for violations available
to the authorized officer vary depending upon the authorizing
regulations for a particular operation.  Refer to the
appropriate inspection and enforcement policy for the
appropriate regulatory program to find a complete discussion of
the available enforcement actions.  In all cases, the first
step in the enforcement process shall be a consultation with
the operator in an attempt to correct the violation.  Other
actions are discussed below.

     1.  Leasable Minerals.  For leasable minerals, if the
consultation with the operator has not resulted in the
correction of the violation, a notice of noncompliance (NON)
shall be issued.  If the violation remains uncorrected, or if
there is an imminent threat to public health and safety or the
environment, a cessation order shall be issued by the
authorized officer.  A continuing violation shall result in a
collection against the bond in the amount necessary to correct
the violation and protect public health and safety and the
environment.  If there is no action by the operator, the BLM
shall undertake proceedings to cancel the lease, license, or
permit.  Any required enforcement action involving Indian lands
shall be reported to the BIA for action.  The Superintendent of
the BIA must serve the NON pursuant to 25 CFR 216.10(b).

BLM_0006307

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 285 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 3

2. <u>Locatable Minerals</u>. For locatable minerals, a NON shall be issued if the operator does not correct the violation after consultation. If the operator fails to take action following the NON, the AO shall issue a Record of Noncompliance (RON) decision. If working under a notice, this will require the operator to submit a plan of operations for the ongoing operation and any future operations which would otherwise have been conducted under a notice. If the problem which caused the NON to be issued remains unresolved, it will be necessary to seek injunctive relief in an appropriate Court which orders the operator to correct the violation. The operator is liable for damages which result in unnecessary or undue degradation.

An uncorrected violation involving reclamation shall result in a collection against any existing bond in the amount required to correct the violation. There is no authority to cancel mining claims or an approved plan of operations for violations related to reclamation.

3. <u>Salable Minerals</u>. If the violation involves unauthorized activities, the authorized officer shall issue a trespass notice. If the violation involves a failure to reclaim or meet other stipulations, a NON shall be issued. Failure to comply with the NON or trespass notice shall result in a collection against the bond, if any, in the amount necessary to correct the violation. In the case of free use permits, the failure to comply with reclamation stipulations may result in a refusal by BLM to issue future permits to the violating permittee and billing of the permittee for the performance of reclamation.

4. <u>Notice of Noncompliance</u>

The AO shall serve a NON to the operator by delivery in person or by certified mail, return receipt requested, for failure to comply with any of the established requirements. Failure of the operator to take action within the specified time limits shall be grounds for an order for cessation of operations issued by the AO. The AO may initiate action for cancellation of the Federal lease or license and forfeiture of the bond for failure to correct the NON. The BIA, Tribe, Native Corporation allottees, as applicable, shall be notified or consulted, as circumstances warrant, prior to issuance of a cessation order on Indian lands. The Superintendent of the BIA must issue the NON and the cessation order.

BLM_0006308

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 286 of 418

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 3

The NON must specify the violation or noncompliance and what actions must be taken to correct the noncompliance. Time limits for compliance must also be stated in the notice. The operator shall notify the AO when the noncompliance has been corrected. The AO may direct a follow-up inspection or await the next scheduled inspection to verify correction of the NON, as appropriate. Once the operator has corrected the noncompliance, the BLM personnel shall submit a written report to the AO. Upon concurrence by the authorized officer that the noncompliance has been corrected, the operator shall be notified in writing.

5.   Cessation of Operations

With the exception of locatable mineral operations, an order for immediate cessation of operations without prior notice of noncompliance may be issued if the authorized officer has determined that a noncompliance exists which may, among other things, result in any conditions or accidents causing severe injury or loss of life or that could affect mining operations conducted under the mining plan or threaten significant loss of recoverable reserves or damage to the mine, the environment, or other resources. For serious violations which involve locatable mineral operations, other enforcement mechanisms may be required. These may include injunctive relief granted by an appropriate court, other agency enforcement or criminal citation.

E.   ENFORCEMENT INVOLVING FEE SURFACE AND LEASED FEDERAL MINERALS OR INDIAN LANDS

BLM policy regarding privately owned surface where the mineral estate is Federally-owned and regarding minerals under Indian lands is that protection of environmental values on private surface or Indian lands will be at least as stringent as would apply on federally-owned surface.

If the surface owner requests a variance from normal and complete reclamation of the surface (e.g. requests that a pond be left for watering or a road be left for access across the property), the operator must include such requests in the reclamation plan or modify the plan accordingly. A written agreement between the operator and the surface owner regarding such deviation shall be provided to the authorized officer and must specify which party (the operator or surface owner) is responsible for all future reclamation liabilities.

BLM_0006309

III-6

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 3

In no case shall the reclamation bond be released until future liability is established and an agreement signed by both the operator and the surface owner. The agreement and any related documents will be kept in the case file.

The Authorized Officer shall make a joint inspection to determine whether all operations have been completed in accordance with the terms and conditions of all leases, permits, or licenses, the requirements of the approved operating plan, and any modifications or requests for deviation from total reclamation.

F.   BONDING

The establishment of appropriate bond amounts shall include a consideration of the costs associated with actual performance of required reclamation, long-term monitoring and treatment, and closure procedures. In many States, the regulatory agency responsible for mined land reclamation establishes a rate per disturbed acre for reclamation costs. The BLM has cooperative agreements with many of these State agencies regarding bonding for mining operations. Where acceptable, the costs developed by the State should be used in setting the bond amount. Where required, the bond amount should cover not only actual reclamation costs and reclamation administration costs, but also the rental and royalty.

Where the State or other surface management agency has not established reclamation costs, the appropriate BLM office should develop a bonding rate based on local costs. Specific costs for revegetation, water management, reshaping, and other requirements may vary but, unless there are unusually difficult circumstances, bonding should be equitably set with respect to local reclamation costs. Consultation with other BLM offices, the Office of Surface Mining, the Forest Service, local mining companies, and universities is an effective method to help determine the most appropriate rate for the area in question.

Since the threat of cessation of operations or cancellation of the lease or other use authorization becomes less effective toward the end of the mine's life, it is imperative to have adequate bond coverage in case the operator defaults on their reclamation or abandonment obligations. The bond amount required to ensure proper reclamation shall be determined and the bond in place prior to approval of the exploration or mining plan.

BLM_0006310

## H-3042-1 – SOLID MINERAL RECLAMATION
### Chapter 3

If an operator fails to take appropriate action to complete required reclamation or closure work, it may be necessary to call for forfeiture of part or all of the bond. If BLM holds the bond, notices of forfeiture will be sent by the BLM to the party of record (lessee, licensee, permittee) and/or operator and to the party that issued the surety or bond. Such notification shall be by certified mail, return receipt requested. If the State holds the bond, any action must be coordinated through the appropriate State agency.

Not less than 30 days prior to cessation or closure of operations, the operator shall submit to the AO a notice of his intention to cease or close operations, together with a statement of the exact number of acres affected by his operations, the extent and kind of reclamation accomplished, and a statement as to the structures and other facilities that are to be removed from or remain on the operation site, or the leased, permitted, or licensed lands.

Prior to release of the bond, a final inspection must be conducted to ensure that reclamation and closure have been conducted in accordance with the approved plan and that all procedures have been successful. The overriding considerations are that the operator has completed the reclamation in such a manner as to minimize the potential that the Government would incur subsequent costs or liabilities or suffer future damages to any resources at the site. Where the operator has complied with all such requirements, the AO shall recommend that the appropriate period of bonded liability be terminated.

BLM MANUAL

Rel. 3-275
2/7/92

BLM_0006311

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 4

# IV. RECLAMATION OF SITE ACCESS

A.  INTRODUCTION

Roads, railroads, and other types of site access are common to virtually all phases of mineral development.  Careful consideration of the access requirements is crucial to a thorough analysis of any proposal.  Access can often be one of the major surface impacts related to exploration and mining activity.

B.  TRANSPORTATION AND TEMPORARY EXPLORATION ACCESS

1.  Roads

Determine before construction if the road is to be retained or reclaimed.  The road construction method determines the amount of disturbance which needs to be reclaimed.  Consult Bureau Manual Section 9113 for road construction guidelines for all roads, especially those which will be retained and incorporated into the Bureau road network.

2.  Road Location and Construction Guidelines

a.  Access routes should be planned for the minimum width needed for safe operations and should follow natural contours where practicable, to minimize cut and fill. If suitable for reclamation purposes, excess material from cuts should be appropriately stockpiled. Salvage topsoil during construction, and store uphill if possible.

b.  Select routes which minimize surface disturbance. Use existing access where appropriate to minimize surface disturbance.  Criteria considered during route location should reflect concerns discussed in the RMP or other land-use planning documents.

c.  Select routes which are stable and dry.  When wet areas cannot be avoided, consider the use of geotextiles, mattes, planking, or rock to improve the subbase and minimize rutting and erosion.

d.  Avoid sustained grades greater than 10 percent and side slopes greater than 45 percent.  Short sections of steep grade may be preferable to long sections of low grade in some locations.  Ridgeline and contour roads provide the flattest slopes.

BLM_0006312

IV-2

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 4

    e.  Drainage structures or energy dissipators should be used where appropriate on all roads.  Use filter windrows at the bottom of cut and fill slopes to help limit erosion.  Use design storm events as described in Chapter VII of this handbook.

    f.  When possible avoid areas where snow drifts stay late into the spring. These areas may be unstable and difficult to revegetate.

    g.  Where roads cross intermittent drainages, dips in the roadbed may be used to allow drainage across the road.

    h.  Most roads should be crowned and include ditches or sloped roadbeds.  See Figure IV-1.

    i.  Fill and cut slopes shall be constructed to ensure slope stability and erosion control.  Maintain a sufficient distance from the toe of the fill to streams depending on hillside slope and anticipated maximum stream flow.  Placement of fill in excess of two feet to construct roads or other earthen structures shall be compacted in accordsnce with acceptable geotechnical and civil engineering standards and practices.

3.  Road Reclamation Guidelines

    a.  Remove all surfacing (i.e. pavement) from the road surface.

    b.  If roads are to be utilized for more than one year, mulching and seeding of cut and fill slopes should be completed immediately after disturbance to control erosion and establish vegetative cover.  Seed types, fertilizer, and rates of application can be found in the revegetation section.

    c.  Remove culverts and restore drainage to its pre-disturbance configuration.

    d.  Shape roads and associated disturbance in conformance with the reclamation standards included in this handbook and Manual Section 3042.

    e.  Roads should be ripped to reduce compaction.

BLM_0006313

IV-3

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 4

Figure IV-1



**Figure IV - 1**
**Typical Road Section**

BLM MANUAL
Supersedes Rel.

Rel. 3-275
2/7/92

BLM_0006314

IV-4

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 4

    f.  Shaping and grading can range from only outsloping
the road surface to full restoration of the
disturbance to the original contours.  At the
minimum, pull the berm back into the road prism,
outslope the road surface, spread topsoil or other
suitable growth medium, and scarify the surface prior
to revegetation.

    g.  On wide roads where a travelway is to be retained,
locate it on the outside portion of the existing road
and reclaim the remaining road width.

    h.  Mitigate the visual impacts whenever possible by
reducing the cutslopes and introducing trees or
shrubs to the reclaimed road sites.  Consider
hydromulching cut slopes to reduce the long term
visual impacts.

C.   EXPLORATION ACCESS

1.   Location Guidelines

    Use existing access or consider cross country travel
whenever possible.  Where there is no existing access, use the
following guidelines:

    a.  Follow natural terrain wherever possible to minimize
cut and fill.

    b.  If access is located in dry intermittent drainage
way, do not alter the drainage way so as to impede
free drainage.  Do not channelize drainage way.

    c.  Keep side cast material as far as possible from
perennial water and riparian zones (seeps, springs,
etc.).  Sidecast material should not be placed in
ephemeral or intermittant drainages.

    d.  Crossing perennial water should be discouraged,
however, if necessary, BLM should work with the
operator to develop guidelines for each water
crossing on a site-specific basis.

    e.  For exploration access, a minimum of center line
staking and on-site examination prior to construction
is required.

    f.  The management of surface water drainage shall be
addressed for all roads constructed on public lands.

Rel. 3-275
2/7/92

BLM_0006315

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 4

2. <u>Reclamation Guidelines</u>

When post-exploration alternatives permit, exploration access should be stabilized and conditioned for those alternative uses. Exploration access roads which will not be a part of post-exploration use should be reclaimed in a timely manner. Exploration-related roads should be completely reclaimed when no longer necessary.

D. <u>RAILROADS</u>

Railroads are sometimes used in large mining operations. The reclamation of railroads is similar to that for roads. Ties and rails should be removed. Remove ballast or reclaim with the ballast in place. Railroad beds should always be considered for appropriate secondary uses.

BLM_0006316

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 5

# V.  RECLAMATION OF DRILLING OPERATIONS

## A.  INTRODUCTION

Many types of exploration activities have the potential for significant impact on the surface and other resources.  As a part of the required plan, notice or license, the operator must include provisions for reclamation and abandonment of drill holes, drill pads, and other surface and subsurface disturbances created by the exploration activity.  Specific requirements for reclamation of exploration activities must acknowledge and consider that activities conducted in areas which will be mined within one year may need minimal reclamation.

Drill holes and other excavations for exploration, development, or prospecting must be completed in a manner consistent with applicable state and Federal regulations. Methods of reclamation shall be approved in advance by the AO in a reclamation plan, and may include backfilling, regrading, revegetation, cementing or other plugging, and capped casing, or combinations of these, or other methods, as applicable.

## B.  DRILL HOLES

The proper abandonment of drill holes will be achieved when (1) all aquifers are adequately cemented or otherwise isolated to prevent the migration of liquids or gases, (2) the surface hole is properly plugged to prevent injury to the public, livestock, and wildlife, and (3) the surface is properly cleaned up and reclaimed according to the approved reclamation plan.

All holes drilled for the purpose of mineral exploration should be plugged, sealed or capped in a manner consistent with the state regulations.  These activities must be conducted in order to prevent adverse changes in ground water quality or quantity.  Capping of the drill holes shall be designed to ensure the safety of people, livestock, wildlife, and machinery in the area.  In the absence of state requirements, or when state requirements are less stringent, the standards in this chapter apply.

If water is not encountered, plugging, sealing, or capping will not be required if development of a mine or a mine expansion occurs within one year of the drilling activity. However, the hole must be securely covered in a manner which will prevent injury to persons or animals, or damage to equipment and generally filled with cuttings or drilling mud. See Figure V-1.

BLM MANUAL

Rel. 3-275
2/7/92

BLM_0006317

V-2

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 5

Figure V-1



**Figure V-I**
**Drill Hole Plugging Requirements When No Water Is Encountered**

Surface

3' — Compacted Fill or Cement Plug

Non-Metallic Plug

Cuttings

**Guidelines**

1. Backfill hole with cuttings or bentonite gravel to 3' below ground level.

2. Install a non-metallic plug with approved company identification.

3. Backfill and tamp final 3' with cuttings or use cement plug.

4. Spread excess cuttings to no more than 1" above original ground level.

BLM_0006318

V-3

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 5

If static water is encountered a preferred method is to fill the hole to the surface with bentonite pellets. Any bentonite drilling muds used to seal exploration drill holes must meet the following specifications, as provided in the latest edition of the American Petroleum Institute (API) Standard Procedures for Testing Drilling Fluids: 1) ten minute gel strength of at least 20 lbs./100 sq. ft., and 2) filtrate volume not to exceed 13.5 cc. If the drill rig is no longer on the site when the hole is plugged, the use of bentonite gravel is a suitable alternative. See Figure V-2.

If artesian water is encountered, the hole should be plugged to the surface with cement meeting API standards. Alternatively, bentonite may be used to plug the hole if it is able to contain the flow of water. See Figure V-3.

Drill holes for development which will not be mined through within the next 12 months shall be abandoned to the satisfaction of the AO by methods approved in advance by the AO and in a manner to protect the surface and, for leasable minerals, not to endanger any present or future underground operation or any deposit of oil, gas, other mineral substances, or water strata. In all cases, the AO must have for the records a sketch or description of the actual plugging procedure used.

If there are no state requirements, at a minimum, aquifers and mineralized zones within 500 feet of the surface should be cemented 50 feet above and below and through the zone. All aquifers and mineralized zones greater than 500 feet in depth need to be cemented through and 100 feet above and below the zone. These are minimum standards and may be increased by the AO as necessary by local conditions to include total cementing from the surface to total depth, as in the case of mineral deposits that are soluble in water. See Figure V-4.

At a minimum, all drill holes to be permanently abandoned require a 3-foot cement surface plug. In cultivated fields, the top of the surface plug may be set 2 feet below the surface and backfilled with compacted earth. For future reference, a brass or aluminum plug with identifying hole number and company name or initials or some other permanent marker set in the cement is desirable. See Figure V-5.

BLM_0006319

V—4

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 5

Figure V-2



**Figure V-2**
**Drill Hole Plugging Requirements When Static Water Is Encountered**

Surface

3'    Compacted Fill (If non-metallic plug is used)
or Cement plug otherwise

Non-Metallic Plug (may not be present)

Cuttings

Bentonite Pellets

50'

Static
Water
Level    Static Water Level

**Guidelines:**
1. Place plugging material* from bottom of hole
to above the static water level.
2. Backfill hole with cuttings to 3' below ground level.
3. Install a non-metallic plug with approved company
identification.
4. Backfill and tamp top 3' with hole cuttings or 3. Use a
minimum 3' cement plug to surface.
5. Spread excess cuttings to no more than 1" above original
ground level.

* **Specifications for Plugging Material:**
1. Chemically unaltered sodium bentonite (coarse ground)
2. Physical sizing: 3/8" minimum, 3/4" maximum
3. Moisture content: not more than 17% ± 2%
4. Inert solids: not more than 15% (in package)

**Hole Sizes and Volumes Table**

| Hole Diameter Inches | Hole Volume cu/ft/foot | Pounds Material to Fill One Foot | Feet Filled by One 50# Bag | Bags to Fill 100 ft. |
|---|---|---|---|---|
| 3 1/2 | 0.067 | 4.8 | 10.4 | 9.6 |
| 5 1/2 | 0.165 | 11.9 | 4.2 | 23.8 |
| 10 | 0.545 | 39.2 | 1.3 | 78.4 |

BLM_0006320

H-3042-1 – SOLID MINERAL RECLAMATION

Chapter 5

Figure V-3

### Figure V-3
### Drill Hole Requirements When Artesian Water is Encountered



— Water at Surface

— Compacted Fill (If non-metallic plug is used) or Cement Plug otherwise

— Non-Metallic Plug (may not be present)

— Bentonite Pellets or Concrete

— Aquifer

**Guidelines:**

1. These holes shall be plugged immediately.
2. Pour plugging material* at a slow rate until the material level is 3' below the ground level.
3. Allow hole set for 24 hours. If flow is contained, may install a non-metallic plug at 3'. Backfill and tamp final 3' of cuttings. Spread remaining cutting to no more than 1" above original ground level.
4. If flow cannot be contained, shot hole will be re-drilled and plugged from the bottom up with cement to 3' below ground level. Install a non-metallic plug at 3'. Backfill and tamp final 3' and spread cuttings or 3'. Use a minimum 3' cement plug to surface.
5. Notify authorizing office when drilling into artesian flows and report progress of plugging.

*Specifications For Plugging Material
1. Chemically unaltered sodium bentonite (coarse ground)
2. Physical sizing: 3/8" minimum, 3/4" maximum
3. Moisture content: not more than 17% ± 2%
4. Inert solids: not more than 15% (in package)

Hole Sizes and Volumes Table

| Hole Diameter Inches | Hole Volume cu/ft/foot | Pounds Material to Fill One Foot | Feet Filled by One 50# Bag | Bags to Fill 100 ft. |
|---|---|---|---|---|
| 3 1/2 | 0.067 | 4.8 | 10.4 | 9.6 |
| 5 1/2 | 0.165 | 11.9 | 4.2 | 23.8 |
| 10 | 0.545 | 39.2 | 1.3 | 78.4 |

BLM_0006321

V-6



**Figure V-4**
**Drill Hole Plugging Requirements For Leasable Minerals Soluble In Water**

BLM_0006322

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 5

Figure V-5

Figure V-5
Drill Hole Surface Plugging

V-8

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 5

Accordingly, upon completion of each drill hole, the operator will (1) properly plug and abandon the hole, or (2) condition the hole for use as a water well, or (3) condition the hole for retention as a monitoring well.

1. Utilization of Drill Holes for Water Wells

Some drill holes may be converted to water wells subject to the acceptability of parameters such as water quality, aquifer protection, hole stability, etc. Upon receipt of a written request from the surface owner or the appropriate surface management agency other than BLM, or a BLM-generated request, the AO may approve the conversion of an exploratory drill hole for further use as a water well. Approval of such conversion will be accompanied by a corresponding transfer of responsibility for any liability for damage and eventual plugging. When BLM is the party requesting the conversion to a water well, the BLM must agree to accept responsibility for ultimate reclamation of the drill hole. Nothing in this handbook supersedes or affects the applicability of any State law requirements with respect to such transfer.

The BLM will cooperate with and assist other Federal agencies and SMA's or surface owners that desire to obtain and convert drill holes for use as water-source wells. The BLM's primary responsibility is to ensure that the drill hole is properly abandoned. Any entity desiring to obtain such drill holes as water-source wells, including BLM, must take liability for any work on the drill hole not directly attributable to normal plugging and abandonment and must assume, by written agreement, future liability for such drill hole.

Conversion of drill holes to water-source wells and their subsequent operation may be subject to State laws, BLM regulation and/or special permits or stipulations set forth by the appropriate surface management agency. Accordingly, whoever obtains or operates such a well is responsible for familiarizing themselves with and abiding by such laws or restrictions as may be appropriate.

Every release of liability for conversion of such drill holes must be signed by either the surface management agency or the surface owner, as appropriate. Other agencies or individuals desiring use of such wells must make appropriate arrangements with the party accepting liability.

BLM_0006324

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 5

2. Use of Drill Holes for Water Monitoring

The operator may utilize exploration drill holes or surveillance wells for the purpose of monitoring the effects of subsequent operations on the quantity, quality, or pressure of ground water or mine gases only with the approval of the AO in consultation with State Agencies and/or the surface owner, as applicable. Approval for such use will continue the liability for eventual plugging, reclamation and abandonment. Nothing in this handbook supersedes or affects the applicability of any State law requirements.

C. DRILL PADS

When drill pad construction is required, the pad should be of minimum size required to accommodate the drill rig and associated equipment. Topsoil or other suitable growing medium should be segregated and stockpiled for spreading on the pad once the hole has been properly abandoned (see revegetation section).

Reclamation of the drill pad involves reshaping to prevent erosion and to establish contours which are consistent with the drainage patterns of the adjacent undisturbed areas. The visual impacts of any drill pad disturbance must also be mitigated. Excess drilling mud and drill cuttings, as well as any reactive or toxic materials uncovered during or created by drilling, shall be properly disposed of. Revegetation of the drill pad may be required to properly reclaim the site (see Revegetation, Chapter XII). If the drill site is on an exploration access, the site may be reclaimed concurrently with reclamation of the access. See Figure V-6.

D. MUD PITS

Mud pits or reserve pits are usually constructed adjacent to or on the drill pad. These pits are generally constructed without a complete assessment of the subsurface conditions, such as groundwater hydrology, soil mechanics, etc., of the specific location. Such pits shall be used only for disposal of drilling fluids and produced waters from the drilling operation. Where the potential for groundwater contamination exists, these pits should be constructed with a suitable liner to ensure protection of the environment.

In all cases, these disposal or holding pits must be reclaimed. Any hazardous substances in the pits must be removed and disposed of in a proper manner (see Chapter VIII on waste disposal). Once the material in the pits has sufficiently dried, the area should be reshaped, topsoil or other suitable growing medium shall be spread over the pit and the area revegetated.

BLM_0006325

No Steeper Than 3:1 Slope

3' to 4'  3' to 4'

6"
min.

Max. 25'

WATERBREAK DETAIL

Figure V-6
Drill Pad Reclamation

Stockpile Top Soil

Replace Top Soil

Drill Platform

Reduce Cut and Fill Slopes to No Steeper
Than 3:1; Place Waterbreaks on Contour,
Grade of 3% (See Detail)

Drill Site Position

1/2:1 - 1:1

1:1 - 1 1/2:1

Stockpile Top Soil

Original Ground Line

BLM_0006326

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 304 of 418

# VI. OTHER EXPLORATION-RELATED RECLAMATION

## A. INTRODUCTION

Proper reclamation of lands disturbed by exploration activities is designed to prevent unnecessary or undue degradation, prevent waste and damage to the mineral-bearing formations (43 CFR 3591.1), and protect the health and safety of the public, wildlife, and livestock. This will be accomplished by adherence to reclamation standards and guidelines. These guidelines are intended to be general in nature and provide the necessary flexibility for each specific case, taking into consideration the geologic setting, hydrology, topography, types of mineral present and other appropriate factors.

## B. SURFACE DISTURBING EXPLORATION ACTIVITIES

### 1. Trenches

To minimize potential hazardous situations, all exploration trenches should be backfilled and reclaimed as soon as practical. Ideally trenches should be reclaimed immediately after the needed samples or other information has been collected. If it is necessary to keep trenches open for a specified period, the sides of the trenches should be stabilized by reducing the slope angle to avoid caving. Any trench that cannot be reclaimed immediately must be designed to prevent erosion and water impoundment. In addition, all open trenches must be fenced to reduce the hazard to the public, livestock, and wildlife. Additional safety measures may be necessary under OSHA or other Federal or State requirements. When trenches are excavated, topsoil or growing medium should be segregated and stockpiled. Upon abandonment, trenches will be filled and reshaped. The stockpiled growing medium will be spread over the fill material and the area will be revegetated as necessary.

### 2. Exploration Mines

In some situations, exploration mines, including test pits and small underground operations, may be approved as part of an exploration operation. These test mines should be reclaimed and closed as soon as practical. If the exploration mines are to be used in later operations, interim stabilization and reclamation for a specified duration will be required in accordance with the reclamation plan.

BLM_0006327

VI-2

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 6

### 3. Bladed areas

Bladed areas include all areas disturbed by mechanized earthmoving equipment for various purposes during exploration. Final reclamation of exploration should be based on resource values. In cut-and-fill areas, reshape to a compatible slope. Replace side cast material into disturbed areas. All culverts should be removed and drainages reclaimed or reestablished. Round off berms and establish water bars or roughen the surface as necessary. Rip roads to reduce compaction and aid revegetation.

BLM_0006328

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 306 of 418

# VII.    DRAINAGE AND HYDROLOGY

## A.   INTRODUCTION

As a consequence of exploration, surface mining, and other mineral activities, disturbed areas may be subject to accelerated erosion of unstabilized soils and other materials.  The potential for sediment production is highest between initial disturbance and final physical stabilization of the site.  Erosion losses from unvegetated disturbance can be affected by weather conditions, type of materials, and slope factors (angle and length).  Without controls, this soil could be carried by surface run-off into the natural waterways.  The threat of siltation from the mine disturbance degrading downstream water quality is one of the most important issues confronting mine planners.

The hydrologic portion of the reclamation plan shall be designed in accordance with all Federal, State, and local water quality standards, especially those under the Clean Water Act National Pollutant Discharge Elimination System (NPDES) point source and non-point source programs.

The baseline survey should be conducted to identify the quantity and quality of all surface and subsurface waters which may be at risk from a proposed mineral operation.  All aspects of an operation which may cause pollution need to be investigated, so that every phase of the operation can be designed to avoid contamination.  It is better to avoid pollution rather than subsequently treat water.  The diversion of water around chemically reactive mining areas or waste dumps must be considered during the planning stage.  Site selection for waste dumps should be conducted to minimize pollution.

Reclamation plans should be prepared to include a detailed discussion of the proposed surface water run-off and erosion controls including how surface run-off will be controlled during the ongoing operations, during interim shutdowns, and upon final closure.

Reclamation plans should also include a properly designed water monitoring program to ensure operator compliance with the approved plan.  The purpose of the monitoring program is to determine the quantities and qualities of all waters which may be affected by mineral operations.

Corrects Format in Chapter 7

BLM_0006329

VII-2

<div align="center">

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 7

</div>

Operators should consider controlling all surface flows (i.e. run-on and run-off) with engineered structures, surface stabilization and early vegetative cover.  Where the threat to the downstream water quality is high, the plan should provide for total containment, treatment, or both, if necessary, of the surface run-off on the project site.  Sediment retention devices or structures should be located as near as possible to sediment source.

Common forms of sediment control include:

- Sediment ponds (siltation ponds/water retention ponds).

- Sediment barriers include both temporary and permanent structures, such as dams, brush barriers, silt fences, ditches, water spreaders, bales of straw, etc.  See Figure VII-1.

- Shaping waste embankments and disturbed areas to reduce run-off velocities.

B.  <u>SEDIMENT PONDS</u>

Good reclamation practices are essential to reduce the suspended solids content of surface run-off.  Sediment ponds are one of the most effective means to capture or detain surface run-off from disturbed lands for the purpose of removing the suspended solids.  The sediment trapping efficiency of a pond (i.e. the percentage of incoming sediment which remains in the pond) relates to the residence time of the water in the pond.  Longer residence times increase the pond efficiency.  The trapping efficiency of the sediment pond is dependent upon:

1.  The surface area of the settling basin.

2.  The rate of inflow.

3.  The horizontal velocity of flow through the basin.

4.  Settling velocity of the particles.

5.  Depth of the water in the settling basin.

6.  The flow pathway between the pond's inflow and outflow.

<div align="center">

Corrects Format in Chapter 7

</div>

BLM_0006330

H-3042-1 – SOLID MINERAL RECLAMATION

Chapter 7

Figure VII-1



**Figure VII-1**
**Example of Typical Sediment Barriers**

Hay

Profile

Plan

BLM 0006331

VII-4

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 7

Due to the importance of physically controlling contaminated
surface run-off from entering natural water-ways the following
sedimentation pond guidance is recommended:

- Prevent contamination of unpolluted surface flows by
diverting water flows around the disturbed areas or sediment
ponds.

- In locations where topographic confinements do not allow
for the construction of ideally shaped ponds and the pond inlets
and outlets are too close together, baffles can be used to
prevent short-circuiting.  Ponds should be deep enough to prevent
hydraulic scouring and to provide for additional storage volume
so the pond does not require frequent clean-out.  The pond should
be designed and maintained to ensure retention of the design
storm event.

- Where there exists a high potential for contaminated
run-off to impact natural waterways or fisheries, the pond should
be designed for total containment of the project site run-off
resulting from the design storm event.

- The integrity of the sedimentation pond must be ensured
through the proper design and construction of the pond dam,
standpipe system when used, and emergency spillway.  Emergency
spillways should not be constructed in fill material.  The
sedimentation pond should be a non eroding structure designed to
safely discharge the volume of water and sediment in excess of
the design storm event.  Emergency spillways should be protected
with coarse rock or 1/2 round culvert to resist erosion during
design storm events.  Where standpipes are installed, anti-piping
barriers and rock stilling basins (energy dissipating devices)
should be constructed at the discharge of the pipe.  See Figures
VII-2, VII-3, and VII-4.

- All sediment control structures such as ponds, ditches,
dikes, etc. should be designed under the direction of and
certified by a registered professional engineer.  The design must
be reviewed by the AO prior to construction.  Design of these
structures must address sediment capacity, the design storm event
and other appropriate factors.  These devices should be
constructed prior to upstream surface disturbing activities.

Corrects Format in Chapter 7

BLM_0006332

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 7

Figure VII-2



Figure VII-2
Example Sedimentation Pond, Plan View

BLM_0006333



Figure VII-3
Example Sedimentation Pond, Profile and Cross-Sections

BLM_0006334



**PLAN**

Rip Rap Graded From 1' to 3' Concrete
To Be Reinforced With 6 x 6 x 2 1/2
Welded Wire Fabric or No. 3 Bars
12" Centers Both Directions

Figure VII-4
Example Sedimentation Pond, Emergency Spillway

EMERGENCY SPILLWAY DESIGN

SECTION A-A

SECTION B-B

SECTION C-C

Drain Fill – Clean Gravel
< 5% Fines

H-3042-2 – SOLID MINERAL RECLAMATION

Chapter 7

Figure VII-4

VII-7

BLM_0006335

VII-8

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 7

- Sediment ponds shall not be constructed within permanent stream channels or on unstable slopes without the prior consent or approval of the AO.  The operator shall ensure that all such structures are constructed and maintained according to the design, and are periodically inspected for safety and structural stability.

- The operator shall monitor existing sediment ponds for capacity and stability on a regular basis.  Sediment ponds shall be maintained until the lands disturbed under a project have been reclaimed and the reclamation criteria have been met.  Ponds may be reclaimed or retained in accordance with the reclamation plan.

C.  EROSION PREVENTION AND CONTROL

Sediment control is an important feature of both mine operations and reclamation because of the high potential for erosion and sediment production.  Erosion can be caused by both wind and water.  Manmade slopes shall be designed to prevent sheetflow from run-off.  Disturbed areas are susceptible to wind erosion when the particle size is 0.1 mm or less, wind velocity generally exceeds 12 mph, and the spoil surface is periodically dry.  Higher wind velocities may erode larger particle sizes. Mill tailings are often extremely susceptible to wind erosion. Soil surveys of the site may provide additional information regarding the erodability of the soil from wind or water and soil loss tolerance.

The angle and length of the slope can adversely affect the amount of erosion caused by surface run-off.  With steeper slope angles, the higher the velocity and the silt carrying capacity of the run-off.  The longer the slope length, the greater the potential for erosion due to channeling.  Where excessive slope lengths (>100 feet, depending on slope angle) are to be expected, consider the use of terraces, benches, or other slope breaks to minimize erosion.  Terraces and benches should be designed to handle the expected peak flows and should be constructed wide enough to prevent overflowing during the alternate thawing and freezing weather conditions.  The benches should be designed to drain properly into natural drainages and construction allowances should be made for settling of the spoils.  See Figure VII-5.

Corrects Format in Chapter 7

BLM_0006336

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 7

Figure VII-5



**Figure VII-5**
**Erosion Prevention Using Terraces and Benches**

Contours Should Slope 1-2% for Drainage and Extend
Into Natural Drainage Patterns or Onto Flatter Slopes.

Contour Ditches Should Be Constructed With a Bottom
Width of 3-4 Feet and 1 1/2-2 Feet Free Board.

3:1 Maximum Slope

Maximum Distance Between
Contours Should be 25 Feet.

Undisturbed

Grade 0.5 - 1.0%     A

Undisturbed Soil

A

2:1 or Flatter

Section A

6"
Minimum

CONTOUR FURROW CROSS-SECTION

BLM_0006337

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 7


Appropriate mitigation measures for wind erosion must be taken.  To reduce wind erosion, materials should be covered with mulch or matting and/or coarse waste rock and then topsoil, if available.  A plant cover should be established if mulch, matting, or topsoil is used so long-term surface coverage is provided.  Barriers, such as snow fences, oriented perpendicular to the prevailing wind may also be used to help reduce erosion until a good plant cover is established.  If a plant cover cannot be established, the area can be covered with coarse rock (> 3 inches).

Erosion will increase with increasing storm intensity and duration, slope length, slope angle, material impermeability, and scarcity of ground cover.  Ideally, natural means of erosion control are preferred.  If erosion rates are relatively slow and time permits, revegetation should be used.

In most cases, some form of additional surface modification must be used to inhibit water flow.  Flow can be impeded and infiltration increased by disking, furrowing, terracing, and/or deep ripping on the contour.  Equipment may not be able to traverse the contour of a slope when it exceeds 2.5:1 (H:V) or 40%.  Terracing can also be used to break up the overall slope length.  Terrace width and spacing should be based on storm intensity and spoil permeability.  In wet areas or where the spoil is impermeable, terraces need to be wider and spaced closer together.  Berms constructed of windrowed rocks or brush are a means of breaking-up and slowing surface flow.  In particularly critical areas, lined ditches can be used to intercept overland flow and channel it to more stable locations.  Reshaping and grading can be used to reduce the slope and make the area more accessible for revegetation equipment.

Barriers should be used to reduce water velocity and minimize erosion.  Sediment barriers are usually only effective for small volumes of run-off and sediment and may be as simple as strategically placed straw bales or as complex as carefully installed geotextile filter cloth.  The specific type of barrier to use will depend on the suspended particulate size in the run-off, and the quantity and velocity of water flow.


Corrects Format in Chapter 7

BLM_0006338

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 7

Figure VII-6

**Figure VII-6
Rock Filters**



Rock Pile
Stream Centerline View
Keyed Into Bank and Streambed

Gabion Dam
Stream Centerline View

BLM_0006339

VII-12

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 7

Brush barriers have been proven moderately effective when located at the toe of waste embankments or other elevated disturbance. Brush barriers placed in the drainages above sediment ponds will slow the inflow velocity of the run-off, thus reducing sediment input into the ponds. These structures may require periodic maintenance. See Figure VII-1.

Rock filters can be effectively used in trapping sediments, and are simple to design and construct. The rock filter should be designed to handle the expected peak run-off flows in the area. Normally the rock filters are constructed using smaller rocks in the core to serve as the filter and coarse rock on the surface to protect the filter. See Figure VII-6.

Sediment traps or drop structures can be set-up within drainages to capture sediment after the particles have left the disturbed area. (See Figure VII-7). Such structures can be either porous or nonporous. These should only be used for short term control. Structures become ineffective if not properly maintained, and maintenance costs can be very high for long-term use. Structures should be placed within intermittent drainages, if possible. A series of traps down a drainage is usually more effective than a single large pond. Sediments should be removed when the trap is one-half to two-thirds full and properly disposed of.

Sediment traps or settling ponds function by reducing water velocity, and allowing suspended sediments to settle. Generally, the larger the settling pond, the more sediments will be trapped and the finer the size of the particles which will fall out. Settling ponds require the construction of an embankment or other structure. Local geology, groundwater hydrology, embankment design, and other geohydrologic factors must be considered in the overall design due to subsurface pore water pressure, seepage and piping concerns around, through, and beneath the structure.

Corrects Format in Chapter 7

BLM_0006340

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 7

Figure VII-7



Figure VII-7
Sediment Traps

BLM_0006341

VII-14

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 7

Porous structures are of a simpler design and easier to build. Their efficiency in trapping sediments is generally less than that of nonporous structures. Loose rock can be used and reinforced by wire mesh, steel posts or other materials. Rock should be sized to withstand the anticipated peak flows of the area. Rock can be sized smaller within the core of the dam to filter out smaller sediments. Porous structures will often promote vegetative growth behind the dam. If the vegetation is protected, the vigorously growing plants will help trap more and finer sediments and provide for long-term stability of the structure. Spillways should be an integral part of any design, even using porous materials.

Nonporous structures utilize spillways or perforated risers as water outlets from the sediment traps. The stilling effect of the pond is greater than with porous structures. This may be a significant factor in using them where deleterious or harmful sediments are involved. Nonporous structures require stronger anchoring because of the water pressure behind the dam. The dam should be removed after it has served its function, unless designed and approved as a permanent structure.

D.  SHAPING AND GRADING

Shaping and grading a disturbed site are fundamental reclamation measures for the purpose of creating a stable landform, providing for proper drainage control, reducing erosion, and preparing for revegetation (see Chapter XI on Landform Reclamation for more detail).

E.  REVEGETATION

Soil protection or stabilization to reduce erosion is the first objective of revegetation. The establishment of an early vegetative cover is one of the most effective methods for controlling erosion and sedimentation. Disturbed areas are most susceptible to erosion between initial disturbance and revegetation. Timely revegetation of mine disturbance is critical. See Chapter XII on Revegetation for more detail.

F.  EROSION AND INFILTRATION CONTROL

Infiltration into wastes can result from:

Corrects Format in Chapter 7

BLM_0006342

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 320 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 7

- Subsurface water movement
- Leakage from abandoned mines
- Downward percolation of surface waters and precipitation

The diversion of surface water around a chemically reactive mined area is highly preferable because it reduces erosion and generation of polluted water.  See the Chapter VIII, Mine Waste Management and Pollution Control, for additional information.

1.  Cover Systems

Cover systems should be constructed over disturbed areas that contain material susceptible to leaching.  See Figure VII-8. Together with the drainage system, the cover system forms a major component of mine water management and is a key factor in the limitation of infiltration and the support of vegetation. Minimizing rain and snow melt infiltration into chemically reactive, acidic, or toxic mine wastes reduces the formation and transport of pollutants out of mined areas.  Furthermore, measures to reduce water infiltration can reduce the oxygen supply which reduces the rate at which acid, and possibly other pollutants are produced.

The criteria for an effective cover system are:

- The cover system should possess low permeability to minimize water infiltration and oxygen availability.
- The covers should have a shallow slope with a well drained surface, free from depressions and hollows which could contribute to the retention of water.

- The cover system should be of a suitable thickness compatible with the performance objectives.

- The construction of the cover system should be simple and should maximize the use of locally available materials without the need for processing those materials.

- The covers should be resistant to erosion along slopes before vegetation is fully established.

Corrects Format in Chapter 7

BLM_0006343

VII-16

**Figure VII-8
Cover Systems**



BLM_0006344

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 7

- The cover system should support a vegetative cover
  in order to maximize the capacity of the upper soil
  zones to intercept infiltration and provide erosion
  resistance once the vegetation has become
  established.

- The cover system should be free from long-term
  maintenance requirements.

A cover system using these criteria results in a three zoned
system, the construction of which differs between the top
(flatter) surface of mined areas and external (steeper) slopes.
Thicknesses of these zones will depend upon site-specific
parameters. Additional information on this topic is referenced in
the bibliography. These zones, from the bottom up, are described
as follows:

Moisture Barrier

Once the top surface of the disturbed area has been reshaped
to relatively flat uniform gradients an infiltration resistant
layer is constructed. It is usually made from compacted clay
material or other impermeable materials, such as manufactured
textiles or membranes. Permeability after placement should be
$10^{-6}$ to $10^{-7}$ cm/s. Mining wastes which do not involve acid or
toxic materials subject to leaching may omit the moisture barrier
zone.

Moisture Retention Zone

The moisture retention zone, directly above the moisture
barrier, retains moisture to support vegetation during dry
seasons and provides a moisture source to assist in the
prevention of desiccation. This material is commonly a sandy
clay loam.

Corrects Format in Chapter 7

BLM_0006345

VII-18

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 7

**Erosion Resistant Zone**

This forms the upper layer of the three zoned cover system. In addition to providing resistance to erosive forces of rainfall and runoff this zone forms the seed bed for the vegetation and acts as a pore breaking zone (capillary break) to restrict moisture loss due to evaporation during dry seasons. A well-graded, gravelly sand usually works satisfactorily for this layer. Topsoil or other growth medium should be placed over this layer prior to revegetation.

Steep external slopes that cannot be reduced to less than approximately 3:1 (H:V) require a different type of erosion resistant zone. The erosion protection requirements for these areas are considerably higher than for gentler slopes. Consequently the material used commonly consists of competent crushed rock.

G.   SUBSURFACE DRAINAGE SYSTEMS

Subsurface drainage systems can be constructed to intercept groundwater at the interface between contaminated and non contaminated zones. Depending upon the depth of influence, this can be achieved by a variety of methods ranging from under drains and cutoff trenches to drawdown wells.

In circumstances where water cannot be diverted laterally, underdrains can be installed at the base of valley waste fills to improve drainage, enhance waste stability, and minimize retention time and the resultant polluted water generated from reactive material. The underdrain fill should be composed of competent rock with a nominal size of one to two feet or larger, depending on site-specific conditions. The underdrain should be constructed with an overlying filter layer to prevent clogging. These systems require detailed engineering for design and possible effluent treatment. See Figure VII-9.

Corrects Format in Chapter 7

BLM_0006346

VII-19

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 7

Figure VII-9



**Figure VII-9**
**Subsurface Drainage System**

a. Mound Drain

b. Combined Mound and Trench Drain

c. Blanket Drain

d. Sloping Blanket

e. Well Drain

f. Toe Drain

Legend — Conduit, Fine Filter, Coarse Filter

BLM_0006347

VII-20

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 7

H. <u>WATER DIVERSIONS</u>

Stream diversions may be a necessary part of the operational plan.  However, long-term diversions from original stream channels should be discouraged wherever possible.  The justification for stream diversions as well as structures or ponds, etc., that might occupy the original area of the stream channel, should be closely examined.  Check State and Federal laws or regulations controlling stream diversions.  A Corps of Engineers 404 permit may be required.  The following should be considered:

- Trans-basin diversions (where water is diverted from one drainage to another) are complex and should be discouraged. Discuss this with the State and Corps of Engineers for compliance and feasibility before approval.

- The longer a stream diversion is in place the greater the chance for failure or environmental damage.  Diversions designed for shorter duration can be managed more successfully than long-term diversions.

- Construction of a new stream channel should provide for stability of the stream bed and stream banks; this might include heavy rip-rap or protective vegetation being established in the channel.  See Figure VII-10.

- The headgate, where the stream is originally diverted, should be of adequate size and construction to handle the flow of the design storm event.

- The stream gradient of the new channel must be designed to minimize stream bed erosion and bedload potential.

- The reclamation plan should specify how the stream channel will be reclaimed.  All pipes or culverts should be removed from the area during reclamation.

- Constructed stream channel diversions that are no longer required, should be reclaimed.

Corrects Format in Chapter 7

BLM_0006348

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 7

Figure VII-10



**Figure VII-10**
**Temporary Diversion of Stream Channel**

BLM_0006349

VII-22

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 7

I.  AFFECTED BODIES OF WATER

Mining and related operations can impact water quality and quantity in onsite and offsite streams, rivers, lakes and wetlands.

   1.  General Procedures

      a.  During review of the reclamation plan and actual reclamation, premises should be inspected for potential water contamination problems.

      b.  If an actual or potential water contamination problem is evident, operator should plan and initiate containment measures and Federal and State environmental agencies should be consulted.

      c.  Post-reclamation resource values of the body of water should be consistent with the pre-disturbance values or the land-use plan.

      d.  Specific mitigation measures will depend on the specific problems encountered.

      e.  If reclamation efforts directly affecting a river, stream or wetland are proposed, an Army Corps of Engineers Section 404 permit or other State or Federal permits may be required.

J.  DRAINAGE RECONSTRUCTION

When drainages have been altered during an operation, the following guidelines should be used when those drainages are to be reconstructed.

   -  Streams and drainages should generally avoid abrupt changes in the slope between undisturbed and reclaimed channels.

   -  Activities should not obstruct the natural flow of water either through gravels or force the stream to flow underground.  Topsoil and mine wastes should not stored as a berm in the stream bank.

Corrects Format in Chapter 7

BLM MANUAL

Rel. 3-275
2/7/92

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 328 of 418

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 7

- Drainage areas, basin relief ratios, valley gradients, and drainage densities for all reclaimed drainage basins should approximate those that existed prior to disturbance.

- Reclaimed drainages should have similar geomorphic characteristics, including:  channel depth, top width, stream gradient, cross-sectional area, bendway radius of curvature, length and overall sinuosity to those found in the predisturbance drainages.  See Figure VII-11.

- The reclaimed drainages should have similar hydraulic characteristics, including:  flow depth, water surface top width, cross-sectional area of flow, water surface slope, mean channel velocity, bendway shear stress, and in-stream vegetal retardance or surface roughness to those found in undisturbed drainages.

- Upon inspection, there should not be signs of head cutting, bank failure, channel avulsion, or other indications of instability.

- Overall basin drainage density should be similar to pre-disturbance, with the exception of pre disturbance Order 1 and 2 streams.  They should generally be allowed to form on their own.

K.  IMPOUNDMENTS

In some cases, the reclamation plan may include the permanent construction of a water impoundment or authorization to leave pit areas which retain water.  This should only be approved under the following conditions:

- An impoundment must be a justifiable post-disturbance land use and be in conformance with the RMP or other land use plan.

- There should be enough water to meet the requirements of the post-mining land use.

Corrects Format in Chapter 7

BLM_0006351

VII-24



**Figure VII-11
Reconstructed Drainage**

Plan View

Section A - A¹

BLM_0006352

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 330 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 7

- The water quality must be suitable for the proposed land use.

- The construction of the impoundment will not adversely impact ground or surface water hydrology on or off of the reclaimed area.

- Impoundment and embankment structures must be designed taking into account local subsurface geologic and hydrogeologic considerations.

If an impoundment is approved as a part of the reclamation plan, it must meet all applicable State and Federal requirements, and be constructed to provide for the planned function. Any exposed pit areas must be stabilized and constructed to provide for safe access to the impoundment for wildlife, livestock, or people. See Chapter XI for details. Stabilization of the shoreline using riprap or other means may be required to prevent erosion. See Figure VII-12.

L.   MAINTENANCE

In general, reclamation practices should not involve long-term maintenance requirements. Where long-term maintenance of hydrologic structures, water treatment plants, fences, etc. will be necessary, some form of operator funding for maintenance will be required. Facilities requiring maintenance may prevent the termination of the period of liability and the release of the bond.

Corrects Format in Chapter 7

BLM_0006353

VII-26

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 7

Figure VII-12



**Figure VII-12**
**Acceptable Permanent Impoundment**

BLM_0006354

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

# VIII.   MINE WASTE MANAGEMENT AND POLLUTION CONTROL

## A.   INTRODUCTION

Handling of the waste materials generated during mining has a direct and substantial effect on the success of reclamation. Materials which will comprise the waste should be sampled and characterized for acid generation potential, reactivity, and other parameters of concern.  Final waste handling should consider the selective placement of the overburden, spoils, or waste materials, and shaping the waste disposal areas.  Creating special subsurface features (rock drains), sealing toxic materials, and grading or leveling the waste dumps are all waste handling techniques for enhancing reclamation.  Any problems with the placement of waste discovered after the final handling will be very costly to rectify.  Therefore, the selective placement of wastes must be considered during the mine plan review process in order to mitigate potential problems.  Waste materials generated during mining are either placed in external waste dumps, used to backfill mined out pits, or used to construct roads, pads, dikes etc.  The design of waste management practices must be conducted in cooperation with the State, the EPA, the BLM, other SMAs, and the operator.

## B.   EXTERNAL WASTE DUMP DESIGN AND CONSTRUCTION

The most common types of waste dumps include: (1) Head of Valley Fills, (2) Cross Valley Fills, (3) Side Hill Dumps, and (4) Flat Land Pile Dumps.  See Figure VIII-1.  In the design and construction of large waste dumps it is important to consider appropriate reclamation performance standards for stability, drainage, and revegetation.  Some guidance to consider during the mine plan review process includes the following:

- Waste dumps should not be located within stream drainages or groundwater discharge areas unless engineered to provide adequate drainage to accomodate the expected maximum flow.

Corrects Format in Chapter 8

BLM_0006355

VIII-2

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 8

Figure VIII-1



## Figure VIII-1
### Examples of Types of Waste Dumps

Original Ground Surface —

Highwall

Fill

Lateral Drain

Crowned Terraces

Rock-Filled Natural Drainway

Cross Section of Typical Head-of-Hollow Fill.

Regrading

Ditch

Drainage Pocket

Highwall

Bench

Contour

0.3%

Rock Drain

THREE DIMENSIONAL SKETCH OF VALLEY FILL

Rel. 3-275
2/7/92

BLM 0006356

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 334 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

- Waste dumps will be graded or contoured and designed for
  mass stability.  Design criteria should include a
  geotechnical failure analysis.  It is also recommended
  that prior to the construction of large waste dumps, a
  foundation analysis and geophysical testing be conducted
  on the dump site to ensure basal stability, especially on
  side hill dump locations.  The effects of local ground
  water conditions and other geohydrologic factors must be
  considered in the siting and designing of the dump.

- Cross valley fills should provide for stream flow through
  the base of the dump.  This is usually done using a rubble
  drain or french drain.  At a minimum, the drain capacity
  should be capable of handling a design storm flow.  To be
  effective, the drain must extend from the head of the
  upstream fill to the toe of the downstream face and should
  be constructed of course durable rock which will pass a
  standard slake test.  Toxic or acid-producing materials
  should not be placed in valley fills.

- Drainage should be diverted around or through head of
  valley and sidehill dumps.

- Drains must be constructed of durable, nonslaking rock or
  gravel.

- Topsoil or other suitable growth media should be removed
  from the proposed dump site and stockpiled for future use
  in reclamation.

- Placement of coarse durable materials at the base and toe
  of the waste dump lowers the dump pore pressure and
  provides for additional internal hydrologic stability.  An
  exception to this guidance would be in the case where the
  spoils materials exhibit high phytotoxic properties and
  the spoils must be sealed to prevent water percolation.

- The finer textured waste materials which are more
  adaptable for use as a growing medium should be placed on
  the outside or mantel of the waste dump.

Corrects Format in Chapter 8

BLM_0006357

VIII-4

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

- After the waste dump has been shaped, scarified, or
  otherwise treated to enhance reclamation, available
  topsoil or other selected subsoils should be spread over
  the surfaces of the dump as a growing medium.  Grading and
  scarification may be required.

- The dump should be designed to provide for controlled
  water flow which minimizes erosion and enhances structural
  stability.

- Control erosion on long face slopes by requiring some form
  of slope-break mitigation, such as benches to intercept
  the flow of water or rock/brush terraces to slow down the
  velocity of the run-off.

- Waste dump benches should be bermed or constructed wide
  enough to handle the peak design flows and to prevent
overflowing onto the face of the dump in the event of freezing
conditions.  Dump benches should be constructed to allow for mass
settling of the dump.

    Consider appropriate performance guidelines for dynamic
stability, drainage, and revegetation.  Safety requirements must
be calculated for large waste dumps or waste embankments.

    Waste dump slope stability is expressed as a Factor of Safety
(F).

    F = total force resisting sliding
        total force inducing sliding

When a slope is at the point of failure F≈1.

    1.  Waste dumps generally fail in three ways.  See Figure
VIII-2.  The following minimum factors of safety are adequate to
avoid specific types of slope failure under most conditions
(after Vandre):

            a.  Foundation slides F = 1.1
            b.  Shallow flow slides F = 1.3
            c.  Rotational slides F = 1.5

Corrects Format in Chapter 8

BLM_0006358

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 8

Figure VIII-2



Figure VIII-2
Types of Dump Failures

BLM_0006359

VIII-6

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8


2.  Factors of safety are calculated based on a number of conditions and considerations such as:

       a.  Foundation slope and competency
       b.  Dump slope angle and height
       c.  Cohesion, density, and saturation of dumped material (Internal design, particularly drainage design, affects saturation)
       d.  Compaction
       e.  End use of surface (ie. range vs. highway)
       f.  Seismic factors

3.  Calculating a factor of safety can be a complicated process (see references in this chapter).  Locally-accepted factors of safety should be used for construction within a given area.  If the dump conditions vary from the standard, or are subject to climatic conditions listed in item 10, a factor of safety must be calculated by the operator, and submitted to BLM for further action.

4.  In evaluating waste dump design, the following should be considered:

       a.  Some dumps up to 60' high may have single angle of repose slopes, depending on material characteristics and other site-specific factors, such as hydrology and location.

       b.  Dumps higher than 60' may have angle of repose slopes interrupted by benches or terraces, if the slopes and benches collectively have an overall factor of safety of 1.5 or greater (the forces resisting sliding should exceed forces causing sliding by 50% or greater).

       c.  Dumps higher than 60' may have slopes steeper than 2.5:1 if the operator can design those dumps with an F of 1.5 or greater to the  satisfaction of BLM or other appropriate regulatory agencies.


Corrects Format in Chapter 8

BLM_0006360

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

    d.  Benching or terracing slows runoff velocity on dump slopes.  Long, uninterrupted dump slopes tend to develop erosion features quickly.  Contour furrowing will minimize rilling and washouts on dump slopes and slow runoff velocity, but may be subject to breaching.

    e.  Waste dumps should be terraced to facilitate reshaping.  The reshaping costs for terraced waste dumps are much less than for single-lift dumps of an equal height.  The greater the number of terraces in the dump the less is the cost of reshaping because the dump will more closely approximate the final slope to be achieved during reclamation.

    f.  Depending on material characteristics, benching on waste dump slopes should be constructed:

        (1)  At least every 60' in elevation for angle of repose slopes
        (2)  At least every 100' in elevation for 2.5:1 slopes
        (3)  At least every 150' in elevation for 3:1 slopes
        (4)  At least every 200' in elevation for 3.5:1 slopes

    g.  Benching should be generally sloped gently inward and designed to accomodate the drainage of surface water.

  5.  Dumps should have an overall factor of safety of 1.5  or greater when:

    a.  Dump height exceeds 60'
    b.  Dump is above or supports a road
    c.  Dump is above a railroad (may require an even higher factor of safety due to vibrations generated by long trains)
    d.  Dump is adjacent to a stream
    e.  Dump is above or supports a building or powerline
    f.  Wherever the risk of failure, or the potential loss due to failure, is unusually high due to site-specific considerations.

Corrects Format in Chapter 8

BLM_0006361

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 339 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

6.  Setbacks should be required between the toe of the dump and:
   a.  Streams or rivers
   b.  Buildings
   c.  Powerlines
   d.  Roads and railroads
   e.  Some rights-of-way
   f.  Where other liability potential exists

7.  Proposals for revegetating slopes steeper than 2.5: 1 should be carefully evaluated.  Revegetation on steep slopes requires committment by the operator and extensive monitoring to assure success.

8.  Operating revegetation equipment on dump slopes steeper than 3:1 may be dangerous to the equipment operator.  Lesser slopes may also be dangerous under specific conditions (e.g. wet clays).  Alternative activities should be discussed with the operator.

9.  Dumps should have adequate internal drainage structures when saturation could affect dump stability.  Internal drainage structures should be capable of handling infiltration from the design flood event.

10.  Dumps should be designed for regional factors which may include:

   a.  High winds (when fines are present)
   b.  Snow
   c.  Flash flooding
   d.  Earthquakes
   e.  Poor foundation characteristics

11.  Dumps with excessive fines in arid regions may be covered with coarse durable material to avoid release of windblown fines in the absence of vegetative cover.

12.  Cracking and downslope movement indicate potential slope instability.  When these conditions are apparent, the operator should immediately evaluate embankment conditions to determine type of movement and consequences of failure and report to the AO.

Corrects Format in Chapter 8

BLM_0006362

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 340 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

<u>Some References for Factor of Safety Calculations</u>

Coates, D. F., and Y. S. Yu, editors, <u>Pit Slope Manual</u>, CANMET, Ottawa, Canada, 1977.

Hoek, E., and J. W. Bray, <u>Rock Slope Engineering</u>, revised 2nd edition, Institute of Mining and Metallurgy, London, England, 1977.

Jaeger, J. C., and N. G. W. Cook, <u>Fundamentals of Rock Mechanics</u>, 2nd edition, Chapman and Hall, 1976.

Vandre, B. C., <u>Stability of Non-Water Impounding Mine Waste Embankements</u>, U.S. Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1980.

C.  <u>SURFACE AND GROUND WATER MANAGEMENT</u>

   1.  <u>Introduction</u>

        Appropriate management of surface and ground water during operations has a direct substantial effect on reclamation success.  Water is used in most stages of mining and mineral processing.  Minimizing and controlling the discharge of contaminated water is probably the most important mine reclamation challenge today.  The States or the Environmental Protection Agency have ultimate responsibility for assuring that water quality standards are met.

        Adverse impacts to water can be caused primarily by two types of actions:

        -  Introduction of substances (or certain forms of energy such as heat) into natural waters, causing physical and or chemical changes.

        -  Interception or diversion of all or part of a water resource.

Corrects Format in Chapter 8

BLM_0006363

VIII-10

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

The effects of these actions are as follows:

- The quality of the water may be adversely affected, making it less suitable, or unsuitable for human, animal, or plant consumption, or industrial use.

- There may be ecological damage altering the composition of the natural biological communities inhabiting the water or surroundings, and therefore decreasing biological diversity.

- Water may no longer be available in the required and accustomed quantities at the pre-mining points of use.

Water percolating through contaminated material can become polluted. Therefore, control of infiltration requires that potentially toxic, acidic, or reactive waste be isolated from the water supply and that permeability be decreased. This is often achieved by a combination of methods which may include: the diversion of surface and ground water; capping and isolating toxic materials; selective placement of waste above the water table; installation of underdrains; regrading; covering; and revegetation.

2. <u>Water Control</u>

The physical control of water use and routing is a major task for mining projects. This analysis includes the need to:

- Minimize the quantity of water used in mining and processing

- Prevent contamination and degradation of all water

- Intercept water so that it does not come in contact with pollutant generating sources

- Intercept polluted water and divert it to the appropriate treatment facility.

Corrects Format in Chapter 8

BLM_0006364

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

Control may be complicated by the fact that many sources of water pollution are nonpoint sources and the contaminated water is difficult to intercept.

3.  Planning

A baseline survey should identify all water which may be at risk from a proposed mine as well as selected control waters. All aspects of a mine which may cause pollution need to be investigated, so that every phase of the operation can be designed to avoid contamination.  It is invariably better to avoid pollution rather than subsequently treat water.

4.  Monitoring

The purpose of a monitoring program is to determine the quantity and quality of all waters which will be affected by mining and processing.  A properly designed monitoring program will assess the degree to which a mine reclamation project satisfies objectives of the plan.  Specific objectives may include:

    -  Establishment of baseline data prior to mining

    -  Prediction of the effects of mining

    -  On-going assessment of current conditions

    -  Water use possibilities

Recently, a significant amount of research has been focused on pre-mine prediction of acid or other contaminated drainage.  This analysis is becoming increasingly important to determine whether the quality of water draining from a mine site will meet regulatory standards.  The results of this work can be used to plan mitigation activities to minimize the need for long-term or perpetual water treatment.

Corrects Format in Chapter 8

BLM_0006365

VIII-12

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8


The selection of parameters to be measured in a
monitoring program should be comprehensive and site-specific,
particularly in the case of baseline studies.  Analyze
preliminary samples for all potential contaminants using a scan
analysis.  Some of the more important water quality parameters to
be measured are shown in Table VIII-1.

TABLE VIII-1
TYPICAL COMPONENTS OF A
WATER MONITORING PROGRAM

Physical
        Temperature
        Turbidity
        Water flows
Chemical
        Conductivity (Specific conductance)
        Alkalinity/Acidity
        pH
        Hardness
        Color
        Dissolved Oxygen
        Chemical Oxygen Demand
        Biological Oxygen Demand
        Nitrogen
        Phosphorous
        Metals
        Total Solids
        Total Dissolved Solids
        Total Suspended Solids
        Other Anions and Cations
Biological
        Nektonic Organisms
        Planktonic Organisms
        Benthic organisms


Corrects Format in Chapter 8

BLM_0006366

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

Sampling procedures can be complex and often require specialized equipment and trained personnel, especially for biological sampling.  The sampling plan should be designed to reflect seasonal variations, flow extremes, and other regulatory requirements.  A process discharging a continuous stream of regular quality may require less frequent sampling than a highly variable effluent, which may be sampled hourly or even continuously.

Standardized analytical methods should be selected, and rigorously followed throughout the project.  In some cases analyses can be performed at the sampling stations, either by fixed automatic or portable manual equipment.

Ground water investigations should be conducted for all mining projects which are expected to involve excavation below the water table or the impoundment of water.

5.  <u>Water Re-Use</u>

If a closed-circuit system can be approached or attained, then discharge of effluent can be reduced or eliminated.  The principal components of closed recycle systems are treatment ponds for mine water and mill effluent, and associated pumps.

Re-use is complicated by the quality of water required for mining and processing.  For example, multi-stage milling circuits using flotation reagents in sequence, can suffer from reagent buildup interfering with the flotation process. Treatment of non-reusable waters must be addressed in the plan.

A technique predominantly used in arid regions is the use of evaporation ponds to reduce waste volumes.  This can significantly reduce the volume to be treated by other means. Disposal of residues is an important consideration and may contribute to hazardous waste problems.

Corrects Format in Chapter 8

BLM_0006367

VIII-14

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

**6. Specific Contamination Problems**

Since most States have adopted water quality criteria, the design of sediment control structures should be based on the removal of solids to meet specific state water quality standards. The designs should be referenced to a specific storm event. It is recommended that at a minimum, sediment ponds should be designed with excess capacity to retain the volume of water and sediment contributed from a 24 hour-10 year precipitation event, or to State standards where the state requirements are more stringent. The various standards consider all or some of the following parameters as being important with respect to surface and underground mining activities:

    a.  Total suspended solids.

    b.  pH (acidity or alkalinity).

    c.  Total dissolved solids.

    d.  Inorganic pollutants (toxic materials and heavy metals).

    e.  Organic pollutants and toxic organic material.

    f.  Oils, greases, and solvents.

Water contamination problems are seldom, if ever, attributable to any one specific contaminant. Rather, it is common for several pollutants to be found in any single waste water stream. The twelve groups of mining-related contamination include:

| | | |
|---|---|---|
| (1) Organic Reagents | (7) | Dissolved Solids (Soluble Salts) |
| (2) Oils | (8) | Anions and Cations |
| (3) Cyanides | (9) | Suspended Solids |
| (4) Acids and Alkalis | (10) | Turbidity |
| (5) Base Metals | (11) | Thermal |
| (6) Fluorides | (12) | Radioactivity |

The possible combinations of the above pollutants comprise five major problems:

Corrects Format in Chapter 8

BLM_0006368

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 346 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

- Acid mine drainage
- Alkaline and saline mine drainage
- Heavy metal pollution
- Eutrophication
- Deoxygenation

## D.  ACID MINE DRAINAGE

Most acid mine problems have the same origin:  oxidation of sulfide minerals.  Water entering mineralized zones by infiltration, and oxygen entering by diffusion and convection, support bacteriologically catalyzed chemical oxidation of the pyritic material.  This can produce sulfuric acid and dissolved metals at levels toxic to aquatic plant and animal life.  Most metallic ions are increasingly soluble with decreasing pH.  Thus, acid drainage will engender a problem with heavy metals.  Plans must include measures to prevent or control pollution of surface and ground water, to prevent damage to wildlife or their habitat, and other natural resources, as well as to protect public health and safety.

Acid mine drainage (AMD) is generally related to the following:

- Any deposit containing sulfide minerals, particularly iron sulfides, or their salts is a potential source of AMD. There is some evidence that size affects reactivity, e.g. microscopic pyrite is more reactive than massive pyrite.Acidification can occur at virtually all points of mining and beneficiation, including mining, stockpiling of ore and overburden, run-off from disturbed areas and stockpiles, percolation through mined and reclaimed areas, leaching, and following initial success at reclamation.

Corrects Format in Chapter 8

BLM_0006369

VIII-16

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

- AMD formation starts when sulfide minerals react with oxygen or ferric iron and water. While the AMD formation process is the result of a number of chemical reactions, some of which are catalyzed by the bacteria *Thiobacillus ferrooxidans*, AMD formation can be represented by the following basic reactions:

$$2FeS_{2(s)} + 7O_2 + 2H_2O \iff 2Fe^{2+} + 4H^+ + 4SO_4^{2-}$$

$$FeS_{2(s)} + 14Fe^{3+} + 8H_2O \iff 15Fe^{2+} + 2SO_4^{2-} + 16H^+$$

The oxidation of ferrous iron ($Fe^{2+}$) to ferric iron ($Fe^{3+}$) consumes oxygen and may remove dissolved oxygen from water.

Acidic water producing sites may be identified by the following:

- In more extreme cases, beds of receiving waters will be coated with brightly colored yellow orange-red iron precipitate known as "yellow-boy" in the mining industry. Coloration can grade from yellow-green to purple or black depending on other metals/minerals mobilized by the acid water and the state of oxidation. In some cases the water itself may be colored.

- Acid waters can be colorless, thus clarity is not always an indicator of low acidity.

- The presence of intermittent AMD in arid settings is usually most apparent following a precipitation event and may be indicated by appearance of:

  - mineral salt blooms in low places such as the toe of mined dumps and ore stockpiles;
  - irregular melting of snow over acid-generating materials; or
  - accumulation of whitish gypsum slimes along drainages emanating from these sites under certain ambient temperature ranges.

Corrects Format in Chapter 8

BLM_0006370

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

- Acid producing soils and spoils may have no substantial vegetative cover and there may be a noticeable lack of insect or small mammal activity.

AMD impacts the receiving environment in the following manner:

- AMD may render receiving waters unsuitable for consumptive or industrial use depending on the concentration, total acid load, and nature of receiving waters, and their ability to dilute and possibly buffer AMD.  Below pH 5.0, acid waters are corrosive to metal and concrete structures.  Low pH water mobilizes heavy metals increasing toxicity problems.  Surface water pollution can be more easily treated than ground water pollution.

- AMD impacts receiving waters by altering, eliminating, or inhibiting diversity of aquatic organisms through either direct chemical effects or by coating stream beds with precipitates.  Elevated total acidity, sulfate levels, iron, and total sulfur create a heavy demand for oxygen which rapidly depletes its availability to biotic organisms.  Sudden changes in pH can aggravate the problem of base metal toxicity. Freshwater fish can usually survive in pH levels of 5.0 to 8.5, but waters below pH 4.0 are toxic.

AMD can be controlled, but usually not entirely eliminated, in the following manner:

Corrects Format in Chapter 8

BLM_0006371

VIII-18

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

- Mine wastes and ore stockpiles should not be placed in natural drainages. Surface drainages should be diverted away from mine and waste/stockpile areas. Waste materials should be tested for the presence of reactive materials. Pyritic wastes should be promptly buried to minimize oxidation. Wastes should be compacted, sealed with a low-permeability cap, blanketed with soil or soil-like material, and revegetated to reduce ingress of air, and limit infiltration of water while enhancing transpiration. The use of capillary breaks in the waste piles will also inhibit the migration of water and contaminated solutions. A vegetative cover will yield organic acids and matter to the waste providing a metal-complexing source. They also tend to inhibit bacteriological activity and restrict air infiltration. Other techniques, including the addition of a layer of road salt between pyritic wastes and the impermeable cap, or the use of surfactants and bactericides, such as Promac, should be investigated for extreme cases. Any leached salt tends to inhibit *Thiobacilli* activity. The work done at the Rum Jungle mine in Australia provides a good example of these techniques. (Ryan, Peter, "Rum Jungle Mine Rehabilitation - Northern Territory, <u>Journal of Soil Conservation</u>)

- Underground workings may be allowed to flood if subsequent ground water movement can be restricted and hazards are not created by doing so. Without the influx of additional groundwater, the flooded works will become a chemically reducing environment, which will inhibit pyrite oxidation. See Chapter IX on "Closure of Underground Mine Access" for more details.

- Constructed wetlands may provide some benefit in removing some of the iron in AMD and potentially add alkalinity to effluent as a result of metal uptake and acid consumption by the plants. The use of constructed wetlands to remove other metals from AMD is still in the research stage. Two of the important questions to answer involve bioaccumulation of toxic metals and toxicity of metals in the AMD to the bacteria involved in the treatment mechanisms.

Corrects Format in Chapter 8

BLM_0006372

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 350 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

- If possible, impound to contain, re-use after proper conditioning, or evaporation can be used to reduce volume of AMD. Untreated AMD can yield compounds upon evaporation which will again form AMD upon contact with water. Direct treatment of AMD usually involves the addition of alkaline reagents such as lime, soda ash briquettes, or sodium hydroxide, often followed by aeration. There are a variety of schemes and equipment that can be employed to treat AMD, ranging from the passive and relatively inexpensive to capital and operation/maintenance intensive methods. The final product of these treatment operations is a hydroxide and/or sulfate sludge that must be disposed of. The metals in these sludges have the potential to be redissolved upon pH depression. The stability of the sludges is dependent on the final disposal environment, as well as the process and alkaline reagent used to create them.

- It may take several years before beneficial effects of AMD control measures are reflected in reduced acid and heavy metal content in receiving waters.

- The Bureau of Mines has conducted years of AMD control research and should be consulted in developing mitigative actions.

E.   ALKALINE AND SALINE MINE DRAINAGE

    Alkaline and saline soils and waste materials most often occur in arid to semi-arid regions where annual precipitation is less than 15 inches and the physiographic position allows salt accumulation. In these areas, evaporation exceeds precipitation resulting in higher levels of alkalinity or salinity. These areas may be characterized by the following:

- Limited vegetative cover.

- Dessication cracks in ground surface.

- Usually light colored soils and wastes with noticeable accumulation of salts.

Corrects Format in Chapter 8

Rel. 3-275
                                                          2/7/92

BLM_0006373

VIII-20

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

Over-neutralization of AMD can create alkaline drainage. Alkaline or saline mine drainage should be treated or prevented in a similar manner to the ways in which AMD is treated or prevented.  Soils and material that will comprise mine wastes should be sampled and characterized as a part of plan development to determine the potential for alkaline or saline drainage. Prevention of water infiltration is extremely effective in limiting alkaline and saline mine drainages.

In general, it is necessary to isolate alkaline or saline materials and to utilize suitable growth media if revegetation of alkaline or saline sites is desired.  The selection of alkaline or saline tolerant species is critical to revegetation success. The placement of coarse materials between alkaline or saline materials and the growth media can aid in limiting upward migration of mineral salts and the growth of plant roots in the alkaline or saline materials.

F.  HEAVY METAL POLLUTION

The heavy or base metals are those with a density greater than 5.0 and comprise 38 elements in total.  Not all are significant to mining situations.  Some of the elements of concern include zinc (Zn), copper (Cu), lead (Pb), cadmium (Cd), and mercury (Hg).  At even extremely low concentrations, some metals are lethal if regularly ingested.  Reclamation of the potentially toxic sites should include measures to stabilize the wastes and prevent both wind and water erosion.

Material that will comprise mine wastes should be sampled and analyzed for heavy metal content and mobility under anticipated weathering conditions and interaction with acid or alkaline materials.  Heavy metal contamination of soils, spoils, surface waters, and ground water is associated with AMD.  An acid problem often indicates a heavy metals problem.

In any specific mining situation, only some metals will be found at hazardous levels.  Toxicity, however, may be synergistically enhanced, and should be evaluated through analysis during plan development.  One or more metals will usually be present in concentrations high enough to cause concern if mine waters are acidic.

Corrects Format in Chapter 8

BLM_0006374

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 352 of 418

### H-3042-1 - SOLID MINERAL RECLAMATION
#### Chapter 8

Metal cations can cause problems in three basic areas of concern:

- Danger to human and terrestrial wildlife - some of the most significant cations are arsenic, cadmium, mercury, lead, nickel, manganese, and molybdenum and selenium.

- Danger to aquatic life - copper, chromium, and all of the above.

- Vegetation toxicity - iron, boron, aluminum and zinc.

State water quality standards for specific watersheds provide a good guide for limits on heavy metals at sites within the area covered by the watershed and should be utilized accordingly.

### G.  EUTROPHICATION

Lake eutrophication is a natural aging process due to accumulation of phosphate and nitrogen, increased biological productivity, and sedimentation.  Mining activity can greatly accelerate the eutrophication of downstream bodies of water. There is no universal restoration technique for eutrophy. Procedures which enhance water quality in one lake may diminish it in another.  Lakes are highly interactive systems.  Altering one characteristic such as clarity or nutrient level will affect other aspects of the system.

- The following are often eutrophication indicators:

  1. Algal bloom and associated reduction in water clarity
  2. Other aquatic plant growth
  3. Sedimentation rate
  4. Excessive fish kill from oxygen deficient water

Corrects Format in Chapter 8

BLM_0006375

VIII-22

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

- To determine the extent of eutrophication the following
  information is necessary:

  1. Total phosphorous sample
  2. Total nitrogen analysis (nitrate and nitrite, ammonia
     total Kjeldahl (organic) nitrogen)
  3. Sedimentation rate assessment
  4. Lake flushing rate
  5. Concentration of chlorophyll A
  6. Other site specific analysis, as needed

- Eutrophication causes may be:

  1. Treated at the source
  2. Treated between the source and the affected body of
     water, or
  3. Mitigated in the body of water

- Some treatments of eutrophication source material at
  minesite are:

  1. Shaping, contouring, establishing topsoil, and
     revegetation to reduce siltation
  2. Establishing new wetlands to filter out undesirable
     nutrients, contaminants, and sediment
  3. Avoidance of over fertilizing for revegetation

- Some treatments for locations between the mine and the
  affected body of water are:

  1. Establishing new wetlands
  2. Rock or sand bed filtration
  3. Overland flow through vegetated areas with similar
     filtering as wetlands, such as meander loops

- Use nonchemical means for lake treatment first, if
  possible.  Some treatments for lake site use are:

  1. Addition of aluminum sulphate to lake to effect
     phosphorous inactivation thereby reducing algae
     (Treatment longevity is 2 to 10+ years.  There are
     also some deleterious side effects.)

Corrects Format in Chapter 8

BLM_0006376

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

    2.   Addition of lime to lake as a buffer when pyrite is
present in sediment derived from mines

    3.   Dredging to counteract siltation and undesirable
nutrients and contaminants in the dredged material
(Effective, expensive, serious negative impacts high,
but short lived)

    4.   Flushing to dilute undesirable nutrients and
contaminants (Very effective with 10 to 15% flushing
rate per day.  Seldom feasible)

    5.   Eliminate bottom browsing fish when browsing releases
significant nutrients (Impacts lake interactive
system)

    6.   Apply algicide, usually copper sulfate.  (Very toxic
to aquatic life)

H.   <u>DEOXYGENATION</u>

    Most aquatic organisms need dissolved oxygen to survive.
Oxygen in water is replaced by plant photosynthesis and turbulent
surface water effects.  If water is deoxygenated assess the cause
to determine if there is a remedy.

   –  Deoxygenation is sometimes associated with eutrophication.
Algae may cause some deoxygenation.

    1.   Oxygen supersaturation of surface water by day caused
by algae

    2.   Oxygen depletion of surface water by night caused by
algae

    3.   Oxygen depletion of deeper waters due to decomposition
of plant and algal material

    4.   The above can occur simultaneously

   –  Acid-forming materials in infilling sediments strip oxygen
from water when reacting with other ions present.

Corrects Format in Chapter 8

BLM_0006377

VIII-24

<center>H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8</center>

- Excessive fish kill may indicate deoxygenated conditions, however, some summer and winter fish kill may be normal.

- Some eutrophication treatments are appropriate for deoxygenation (see the previous section).

    1. Algae reduction techniques
    2. Flushing
    3. Pyrite buffering
    4. Possible elimination of bottom browsing fish

I.  <u>WATER TREATMENT</u>

The complexities of surface and groundwater hydrology are such that it is often difficult to entirely prevent the formation of polluted water. Mine drainage is most commonly treated to remove those pollutants which present a threat to aquatic life. Water quality must meet State, local, and Federal water quality standards. Point source discharges will have to meet Federal and State NPDES effluent discharge requirements. In most cases, the effluent may have to be treated to drinking water standards if the drainage contributes to a potable water supply.

Treatment processes which have been used to treat mine effluents include: biological treatment, neutralization, adsorption on activated carbon, flocculation, ion exchange, precipitation, desalination, reduction, ultra-filtration, oxidation, cross-flow filtration, reverse osmosis, freezing, solvent extraction, evaporation, electrodialysis, and distillation.

J.  <u>CYANIDE HEAP AND VAT LEACH SYSTEMS</u>

Dilute solutions of sodium cyanide (NaCN) or potassium cyanide (KCN) are used to extract precious metals from ores. Concentrations of cyanide solution utilized range from 300 to 500 ppm for heap leach operations to 2000 ppm (0.2%) for vat leach systems.

<center>Corrects Format in Chapter 8</center>

BLM_0006378

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 356 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

Low-grade ores can be economically leached in heaps placed on impermeable pads where cyanide solution is sprinkled onto the ore.  The solution preferentially collects the metals as it percolates downward and is recovered at the bottom of the heap through various means.  Other metals besides gold and silver are mobilized by cyanide solutions.

Higher grade ores may be crushed, ground and agitated with cyanide solution in vats or tanks.  The solids are then separated from the gold or silver-bearing (pregnant) solution.  The precious metals are recovered from the pregnant solution and the solids are transferred to a tailings impoundment.  The tailings are often deposited in a slurry form and may contain several hundred parts per million of cyanide.

Part of the overall mine reclamation plan includes cyanide detoxification of residual process solutions, ore heaps, tailings impoundments, and processing components.  The following are general reclamation guidance and approaches for cyanide facilities.  Specific performance criteria may be found in individual State Cyanide Management Plans.

1.  Cyanide Solutions

     A key to reclamation of cyanide facilities is planning for the solution neutralization process.  The first step is to set a detoxification performance standard.  This will have to be site specific dependent on the resources present and their susceptibility to cyanide and metal contamination.  A minimum requirement would have to be the specific state standard.  BLM may need to require more stringent standards if sensitive resources are present.  Other considerations include the health advisory guideline used by EPA of 0.2 mg/l for cyanide in drinking water; and the freshwater chronic standard of 0.0052 mg/l for aquatic organisms.  Some species of fish are especially sensitive to cyanide.  Likewise metals, and other constituent levels, should be specified for detoxification of cyanide solutions.

Corrects Format in Chapter 8

BLM_0006379

Case No. 1:20-cv-02484-MSK Document 27-9 filed 04/27/21 USDC Colorado pg 357 of 418

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8


It is worthwhile to mention the various analytical procedures for cyanide in solutions. Three frequently employed categories are "free", "weak-acid-dissociable" (WAD), and "total" cyanide. These are listed in order of decreasing toxicity and increasing stability under ambient conditions. The preferred method for regulatory purposes is to use WAD cyanide. This method is most representative of potential toxicity and the least susceptible to analytical interference.

There are a variety of methods for achieving detoxification of cyanide solutions. These range from simple natural degradation, to active chemical or physical treatment of process waters. A thorough understanding of the metallurgical process generating the waste, and of the chemistry of the waste stream is necessary to select the most effective cyanide destruction technique. Laboratory studies and preferably pilot studies should be performed when evaluating the best method to treat cyanide wastes. The following is a brief description of cyanide treatment procedures and their advantages and disadvantages (condensed from McGill and Comba, 1990). More detailed technical articles should be consulted for additional information on any of these processes:

a.  Natural Degradation and Fresh Water Rinse

If enough time is available, natural degradation has alot of advantages for detoxification of cyanide facilities. The natural processes which reduce cyanide concentrations over time include; dilution via precipitation, UV radiation, oxidation, hydrolysis, biodegradation and volatilization.

Volatilization often dominates removal of the degraded cyanide compounds from the system. As the pH of the solution drops the cyanide anion (CN$^-$) is converted to HCN. At a pH of 7 or less essentially all of the cyanide will be in the HCN form and can come out of solution as a gas. Volatilization is temperature dependent and will be very minimal during cold winter months.


Corrects Format in Chapter 8

BLM_0006380

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

Natural degradation processes can be enhanced by introduction of fresh water rinsing which lowers pH and dilutes cyanide concentrations.  However, the disadvantage of fresh water rinsing is that large amounts of partially contaminated solution may be generated that could eventually require chemical treatment.

   b.  Alkaline Chlorination

   Alkaline chlorination is the most widely recognized destruction technique used in the mining industry in terms of engineering expertise and operating experience.  The oxidation reaction will destroy free cyanide and cyanide complexed with metals such as Au, Ag, Ni, Zn, Cu, Cr, and Cd, but the ferrocyanide and ferricyanide compounds are not oxidized (Ritcey, 1989).  The oxidizing agent is hypochlorite, OCL⁻.  The source of hypochlorite may be calcium or sodium hypochlorite, chlorine gas or chlorine dioxide.  The reaction of cyanide to cyanate requires a pH > 10.5, and about 3 parts chlorine per part cyanide.  In practice chlorine consumption is highly dependent on concentrations of other oxidizable compounds such as thiocyanate (CNS⁻) which are oxidized in preference to cyanide (Scott, 1984).  Chlorine consumption rates as high as 12 parts chlorine per part cyanide can occur.

   Effluent concentrations of <0.2 mg/l cyanide (WAD) can be produced with chlorination.  Metals which were complexed with the cyanides will precipitate as hydroxides at the elevated pH used in the process.

   Residual chlorine compounds present can be toxic to aquatic life and to vegetation in land application areas. Dechlorination of discharge waters may be necessary.

      Advantages of Alkaline Chlorination

   (1)  Widely used method; operating expertise available with process equipment and control reliable.

   (2)  Reaction reasonably rapid.  Suitable for emergency use.

Corrects Format in Chapter 8

BLM_0006381

VIII-28

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

   (3)  Free and WAD cyanide complexes removed to <0.2 mg/l.

   (4)  Thiocyanate can be oxidized, but greatly increases reagent consumption and cost.

   (5)  Most metals complexed with cyanide are precipitated as hydroxides.

   (6)  Chlorine is readily available in several forms.

   (7)  System adaptable to either continuous of batch operation.

   (8)  Process can be used for slurries and for clear solutions.

Disadvantages of Alkaline Chlorination

   (1)  Reagent costs can be high, particularly if complete oxidation is required.  Thiocyanate, thio-salts and ammonia are heavy consumers of chlorine.

   (2)  Control of pH necessary to prevent release of cyanogen chloride gas, a very toxic substance.

   (3)  Complexed iron cyanides are not removed.

   (4)  Residual chlorine compounds can be toxic to aquatic species.  Dechlorination may be necessary.

Corrects Format in Chapter 8

BLM_0006382

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 360 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

### c.  $SO_2$/Air Process

The $SO_2$ method is another chemical oxidation process that converts free and complexed cyanides to cyanate with the exception of ferrocyanide.  Metals dissociated during oxidation precipitate as hydroxides.  Two $SO_2$ processes have been patented, one by INCO Ltd. and the other by Noranda Inc.  The INCO process sparges the cyanide solution with $SO_2$ in an air stream whereas the Noranda process does not dilute the $SO_2$ with air but adds it directly to the cyanide solution.  In the INCO process, 2 to 5% $SO_2$ in air is sparged into the solution containing at least 50 mg/l $Cu^{2+}$, which can either be from the Cu leached from the ore, or added as copper sulfate.

The process is highly pH dependent.  Best results are obtained at pH 8-10, preferably 9.0.  Very slow reaction rates occur at pH 5-6, and conversion to cyanate is limited at pH 11 (Ritcey, 1989).  Since acid is produced by the process lime must be added to maintain proper pH.  The reaction is also temperature dependent.  At 25°C the reaction is rapid, leaving a residual cyanide of 0.2 mg/l.  Residence times very from 5 to 60 minutes.

Reagent consumptions are typically 5 to 6 parts liquid $SO_2$ and 0.11 parts Cu per part total cyanide (Devuyst, 1989).

Sulfides and thiocyanates are only oxidized to a limited extent (Piret, 1989), thereby reducing reagent consumption.  If necessary thiocyanate can be oxidized, but only after the cyanide has been oxidized.  Any ferricyanide present is reduced to ferrocyanide which will precipitate out of solution.

### Advantages of Sulfur Dioxide/Air Process

(1)  Effective in treatment of pulps as well as clarified barren and decant solutions.

(2)  Suitable for batch or continuous treatment.

(3)  All forms of cyanide are removed including stable iron complexed cyanides.

Corrects Format in Chapter 8

BLM_0006383

VIII-30

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

(4)  Heavy metals are removed through precipitation.

Disadvantages of Sulfur Dioxide/Air Process

(1)  With some waste streams the reagent costs ($SO_2$, lime, copper sulfate) can be excessive.

(2)  Large quantities of sludge are produced which may be considered hazardous.

(3)  Additional treatment may be necessary for removal of total cyanide, thiocyanate, cyanate, metals, and ammonia if stringent effluent requirements must be met.

(4)  The process creates high amounts of dissolved solids which may have undesirable environmental effects.

(5)  Strict control of process pH is required.

d.  Hydrogen Peroxide

Two processes have been designed and patented for cyanide destruction with hydrogen peroxide, the Kastone process and the Degussa process.  The Kastone process uses a solution containing 41% $H_2O_2$.  The peroxide solution containing 5 to 10 mg/l formaldehyde and 5 mg/l $Cu^{2+}$ is added to the cyanide solution.  If the $H_2O_2$ excess is 75 to 100 mg/l, the treatment time required is less than 2 hours to reach effluent cyanide levels of <0.2 mg/l.

Corrects Format in Chapter 8

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 362 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

The Degussa process uses copper in the form of copper sulfate, but without formaldehyde.  The optimal pH for the process is 9.0 to 10.5, although the process will operate over a wide range of pH values.  This pH range provides optimal removal of copper and iron complexed cyanide.  Copper consumption is usually about one tenth the concentration of WAD cyanide.  An excess of hydrogen peroxide of about 200 to 600 percent greater than theoretical is generally used in full scale operation. Reaction times vary from 5 minutes to 2 hours.  Total cyanide levels of 1 mg/l can be achieved.  WAD cyanide levels of less than 0.5 mg/l are obtained, and can be lowered to 0.1 mg/l with increased $H_2O_2$ consumption.  Solutions with high nickel content decompose the peroxide causing increased consumption to oxidize the cyanide.

### Advantages of Hydrogen Peroxide Process

(1)   Process relatively simple in design and operation.

(2)   All forms of cyanide in solution including iron and complexed forms, can be lowered to environmentally acceptable levels.

(3)   Heavy metals are significantly reduced through precipitation.

(4)   The process is adaptable for batch and continuous treatment operations.

(5)   The process has been used in treatment of pulps and clarified process solutions.

(6)   Close pH control is not required provided an alkaline pH is maintained.

(7)   The process does not produce high quantities of waste sludge.

Corrects Format in Chapter 8

BLM_0006385

VIII-32

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

(8)  No toxic intermediates are formed or undesired residual chemicals left in solution as a result of treatment.

Disadvantages of Hydrogen Peroxide Process

(1)  Reagent costs and consumption for copper sulfate and hydrogen peroxide can be high.

(2)  High reagent dosages required to remove ammonia and thiocyanate.

(3)  Additional treatment may be required if residual effluent concentrations of ammonia, thiocyanate and metals exceed acceptable environmental levels.

(4)  High $Ni^{2+}$ in solution may decompose the peroxide.

e.  Ferrous Sulfate Complexing

The addition of excess ferrous sulfate to solutions of free cyanide and the complexed cyanides of zinc and copper at pH 7.5 to 10.5, converts most of the cyanide to ferrocyanide (Huiatt, 1982). This is one of the oldest cyanide disposal methods.

The stable ferrocyanide salts formed settle to the bottom of the impoundment. Although iron-cyanide complexes are considered stable and non-toxic, they do decompose upon exposure to direct sunlight, releasing HCN. Photo-decomposition is slow in deep, turbid, and shaded receiving waters. Any release of HCN in these environments would be offset by loss of HCN to the atmosphere, or through other chemical and biological reactions.

Since long term stability of the iron cyanide precipitates is not determined this method may best be suited as a pre-treatment step for cyanide in a tailings slurry prior to discharge to an impoundment (Mudder, 1989).

Corrects Format in Chapter 8

BLM_0006386

VIII-33

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

Advantages of Ferrous Sulfate Complexing

(1)  Reagent costs are low.

(2)  Necessary equipment can be readily installed
     into existing mills with minimal capital
     investment.

(3)  Ferrous sulfate is a safer reagent to store on
     site than an oxidizer.

(4)  The process can be used in treatment of slurries
     and clear solutions.

(5)  For some waste streams the process provides a
     quick, easy method for decreasing free cyanide
     prior to impoundment.

Disadvantages of Ferrous Sulfate Complexing

(1)  The stability and fate of iron cyanide is not
     yet fully understood.

(2)  Some of the metals in solution do not
     precipitate as ferri- or ferrocyanides.

(3)  Intimate mixing of the ferrous sulfate into the
     waste stream is required.

(4)  Method has not been well documented and is not
     fully understood.  More lab studies needed.

   f.  Other Processes

        Some of the other treatment processes in use include
acidification-volitilization-recovery (AVR), reverse osmosis
(RO), and biological treatments.

Corrects Format in Chapter 8

BLM_0006387

VIII-34

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

The AVR process involves acidifying the cyanide solution with sulfuric acid. This converts the cyanide in solution to HCN gas which volatilizes out of solution and is recaptured for reuse. Lime is then added to raise the pH to 9.5 for metals removal. Total cyanide concentration of impoundment waters can be lowered to <5.0 mg/l. Additional treatment may be required for more stringent effluent standards. The big advantage of AVR is that cyanide is recovered for reuse. Disadvantages of AVR include the high capital cost for plant construction, high energy requirements for aeration, and the stringent safety precautions that are required when working with HCN vapor.

The reverse osmosis process passes solution through a semi-permeable membrane to produce a fresh water product (permeate) and a concentrate. Mobile RO units can be onsite in a matter of days for emergency use. Advantages include removal of most metals and metal-cyanide complexes, recovery of reagents and gold-silver values, and permeate low in metals that may be suitable for direct discharge. The main disadvantages are the need for secondary treatment of the permeate due to incomplete removal of free cyanide, and the creation of a concentrate.

Suitable microbes have been found to metabolize cyanide under aerobic conditions and employed in treatment systems. All forms of cyanide are treatable including the stable iron complexed cyanides. Cyanide biodegradation is currently in use to treat wastewater at Homestake Mining Company (Mudder, 1989).

g. Disposal of Treated Solutions

During mine life concurrent reclamation of process facilities should be undertaken to minimize the solution present at mine closure. For example a heap leaching operation may have several pads, or one pad segmented into units. Make-up water for new ore can be introduced into the process circuit as fresh water rinse for spent ore heaps or tailings and then directed into the new process unit. In this fashion sequential detoxification of older heaps, concurrent with operation of the mine, can be achieved. This will prevent accumulation of a large solution inventory of partially contaminated rinsate that would require treatment at the end of mine life.

Corrects Format in Chapter 8

BLM_0006388

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 366 of 418

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

        Final mine closure will require treatment and
disposal of process solutions.  Treatment options are discussed
above.  Disposal of the final treated solution may be
accomplished by direct discharge, evaporation, physical removal
to a disposal facility, (or another mine) or by spray irrigation
in a land application area.

        Direct discharge is desireable, but difficult to
acheive.  Treated water typically contains enough residual
contaminants that it will not meet direct discharge requirements
of most states, or would require additional permits (e.g. NPDES
permit).

        Evaporation is useful in reducing solution volumes
but can also result in increased contaminant concentrations.
High increases in salinity occur as evaporation proceeds.
Retreatment may be necessary.

        Land application disposal (LAD) has been proven
effective at several mine sites.  The LAD system is used to
dispose of solutions that have been treated to remove cyanide.
The soil profile is used as a medium for attenuating any residual
metals in the applied solutions.  Development of a LAD system
requires evaluation during mine permitting to characterize the
soils' metal attenuation capacity and determine the disposal
capacity of the spray area.  LAD systems are also useful for
control of water balance during operations in net precipitation
regions.

                    Corrects Format in Chapter 8

BLM_0006389

VIII-36

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

2.  Spent Ore Heaps and Tailings

a.  Material Characterization

In order to develop a detoxification plan during mine permitting a testing program should be undertaken in cooperation with the mine operator.  This can include column tests or small scale test heaps.  Often the same material that is used for metallurgical testing can afterward be used for reclamation testing.  However, the relationship between rinse solutions from a 10 to 20 foot column test to a heap over 200 feet thick is severely strained.

It is important to know how the ore material was processed and placed on the heap.  Run of mine ore will rinse quite differently than crushed and agglomerated ore.  Two other important items to consider for ore heaps is the materials specific moisture retention, and the potential for development of blind-offs.  Specific retention is the amount of water or solution retained in the heap after drain down.  It may range from as low as 4%, by weight, in coarse ores to over 15% in fine or clayey ore.  Blind-offs are zones inaccessible to solution movement and where cyanide degradation is limited.  Blind-offs develop as preferential flow paths are established during leaching by migration of fines.  In general, the finer the ore and the higher the clay content the greater potential for development of blind-offs.

Another consideration is whether the material has a net acid generating capacity.  If this is the case then the measures to prevent development of acid mine drainage need to be incorporated into the reclamation plan.

Corrects Format in Chapter 8

BLM_0006390

Case No. 1:20-cv-02484-MSK  Document 27-9  filed 04/27/21  USDC Colorado  pg 368 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

b.   Detoxification Evaluation

        To determine the amount of rinsing required the pore
volume of the heap material must be known and an estimate made as
to the concentration of cyanide in the retained solution.
However, this will only provide an estimate.  Depending on ore
character and treatment methods rinsing requirements may vary
from less than one-half to greater than 5 pore volumes.  Actual
experience at the mine site (or a mine site with similar ore)
will be the best source of information for establishing the
detoxification process.

        The amount of neutralizing solution to be applied to
the ore heap per unit area has to be calculated based on the
estimated rinsate required per ton of ore and the surface area to
tonnage ratio.  During the detoxification process cyanide will
diffuse from high concentration areas (blind-offs or low
permeability zones) to low concentration areas (preferential flow
paths) until an equilibrium is reached.  For ores with a high
amount of retained solution or with blind-off development this
process will dominate cyanide movement.  To conserve water and
reagent use the rinsing period should be followed by a rest
period to allow for diffusion of retained cyanide into the more
accessible flow paths.  This is a more efficient means of
accomplishing heap detoxification than by continuous rinsing.

        Cyanidated tailings from vat or tank leaching
operations can be extremely difficult to detoxify.  This is due
to the very fine nature of the tailings and the higher cyanide
concentrations used in processing.  Treatment of tailings during
placement in the impoundment is necessary to achieve most
reclamation criteria and to prevent a hazard to wildlife and area
waters during operation.

        Cyanide tailings impoundments need to be dewatered
during reclamation.  This serves several purposes by removing any
potentially toxic effluent, improving overall mass stability, and
providing a competent surface for use of reclamation earthmoving
equipment.  Internal drains and sumps should be placed in the
tailings impoundment during construction to provide for
dewatering.

                    Corrects Format in Chapter 8

BLM_0006391

VIII-38

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

No matter how well treated some cyanide will be retained in tailings and most heaps after rinsing. The amount, ultimate fate, and pathway of retained cyanide should be considered during reclamation planning. The degree to which this is of concern depends upon site specific conditions.

If detoxification of tailings or heaps cannot be achieved to necessary levels through treatment and rinsing, then capping of the facility with a low permeability material may be required. This is necessary to prevent infiltration of precipitation and subsequent generation of undesirable leachate.

In evaluating detoxification success both effluent and solid sampling may be employed. Solids sampling can be useful in checking for retained cyanide solutions. However, there is no approved method for collecting samples of solids for cyanide analysis. Significant degradation of cyanide may occur during solid sample collection so the results should be considered as the minimum in-place levels. Effluent sampling at the discharge point(s) are more representative of potential environmental concerns. An extended period of time should be allowed between cessation of neutralization and evaluation of effluent for establishing detoxification success. A six month or longer evaluation period, over a spring runoff or substantial precipitation event, may be necessary to demonstrate there will be no spiked releases and that the detoxification criteria has been reached. Once this has been established surface reclamation can begin.

Once detoxification criteria has been met the containment dike should be breached, and/or the liner material should be punctured and the drain holes filled with sized rock. This provides post-reclamation passage of infiltrating waters thus preventing a build-up of precipitation within the facility which could generate leachate and/or affect stability due to saturation.

Corrects Format in Chapter 8

BLM_0006392

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

c.   Shaping and Revegetation

After detoxification is complete, shaping is
necessary prior to placement of topsoil, or growth medium, and
revegetation.  Overly steep slopes will be susceptible to erosion
and exposure of the underlying cyanidated material.  This could
cause direct precipitation recharge and generate undesirable
leachate from retained cyanide or metals that were not removed
during treatment.

Reclaimed ore heaps should be reduced in slope to at
least 2h:1v.  At this grade slope length should not exceed 200
feet and benching or terracing may be necessary.  Tailings,
generally being finer material, are more likely to undergo water
and wind erosion.  Slopes flatter than 3h:1v are usually required
for reasonable erosion resistance and revegetation of tailings
(Vick, 1983).  The detoxified material may be pushed off the
liner to achieve necessary slope reduction.  Reshaping of cyanide
facilities should include a collection point to allow
representative sampling of discharge waters for post-reclamation
monitoring.

Revegetation is important on heaps or tailings to
provide for interception of precipitation that could generate
leachate.  Salvaged topsoil, or other available growth medium,
should be applied as soon as possible to the reclaimed facility.
Topsoil requirements and revegetation species selection and
procedures should be addressed in the operation's reclamation
plan (see Chapter XII for topsoil and revegetation guidance).

d.   Surface Water Diversions

Post-reclamation drainage for surface water run-off
from reclaimed cyanide facilities should be designed to pass
precipitation collected by the 100-year, 24-hour storm event or
spring snowmelt.  Reshaping should normally be completed so as
not to collect or pond precipitation in the facility.

Corrects Format in Chapter 8

BLM_0006393

VIII-40

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

        Post-reclamation diversion ditches or drains are
constructed up gradient to prevent surface run-on from entering
cyanide facilities.  The structures should be designed to divert
at least the anticipated run-on from the 100-year, 24-hour storm
event or spring snowmelt.  For facilities located in extremely
sensitive areas it may be necessary to size diversion structures
capable of handling the maximum probable flood event.

    3.  Process Ponds

        a.  Solution removal

        Cyanide solutions are removed from the process ponds,
treated, and disposed of as part of overall mine reclamation as
discussed in item J1.

        b.  Sludges

        Sludge which accumulates in process ponds should be
tested to make certain it does not constitute a hazardous waste.
Hazardous sludges need to be disposed of offsite at an approved
disposal facility.  Non hazardous sludges can still have adverse
environmental effects.  Mixing with cement and onsite burial are
appropriate disposal means.

        c.  Liner Disposal

        Liners can either be removed and disposed of offsite,
in an approved landfill, or folded, ripped and buried onsite in a
manner that does not effect groundwater movement or revegetation.

        d.  Reshaping and Revegetation

        Pond areas are backfilled and reshaped in a manner so
as not to collect and pond precipitation unless a secondary use
has been approved.

Corrects Format in Chapter 8

BLM_0006394

Case No. 1:20-cv-02484-MSK  Document 27-9  filed 04/27/21  USDC Colorado  pg 372 of 418

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8


Reclamation of tailings impoundments should involve the following steps:

1. Tailings characterization

The nature of the tailings to be impounded should be determined as early as possible during the development of any plan. Tailings exhibiting phytotoxic or other undesirable physical or chemical properties will require a more complex reclamation plan. Analysis should include a thorough review of groundwater flow patterns in the area and a discussion of potential groundwater impacts. An impermeable liner or clay layer may be required to avoid contamination of groundwater. Where tailings include cyanide, final reclamation may include either extensive groundwater monitoring or pumpback wells and water treatment facilities to assure (ensure) groundwater quality is protected. The presence of cyanide in the tailings will not normally complicate reclamation of the surface.

2. Dewatering

The first phase of actual reclamation will normally be the dewatering or drying of the impoundment so that equipment can gain access to the surface. This can range from simply letting the tailing material dry naturally to more complicated methods of trenching to allow water to escape from the tailings. This phase of reclamation is often complicated by surface crusting of the tailings. This phase of reclamation can take up to several years.

Reclamation of slimes will typically require some form of trenching using either balloon-tired vehicles or cable trenching tools. Slimes reclamation can be greatly accelerated by creating surface drainage for initial stabilization using peripheral and feeder trenches. Feeder trenches which drain into the peripheral trench are typically 25' to 40' apart, and up to 2' deep. Once the surface of the tailings has dried, heavier equipment can be used. Farm equipment can usually operate when the solid content exceeds 60% in the top 6 feet.


Corrects Format in Chapter 8

BLM_0006395

VIII-44

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 8

Revegetation of the tailings after trenching can
accelerate the drying process through evapotranspiration.  Dust
abatement may be required at this stage in order to avoid
airborne particulates which may constitute a substantial
environmental problem.

3.  Reshaping

Depending upon the nature of the tailings, it may be
necessary to modify the overall shape of the top of the
impoundment to avoid the concentration of water on the
impoundment and to improve visual quality.  This can involve the
addition of material to develop a "crown" on the impoundment and
the construction of artificial drainages.

4.  Surface Treatment

Depending upon the nature of the tailings materials, it
may be necessary to construct a cover system to isolate the
waste.  Where the tailing itself is a suitable growth medium, or
can be amended to provide a suitable growth medium, this will not
be needed.  Cover systems typically include:  water exclusion
layer, capillary break, and growth medium.  In some cases, it may
be impractical to revegetate the impoundment.  Because dry
tailings material is highly susceptible to wind erosion and
subsequent dust problems, it is important to cap the tailings
material with coarse durable rock.

5.  Revegetation

If the growth medium is to be the tailings, it should be
analyzed and evaluated.  It is likely the physical and chemical
characteristics will require some modification to ensure that the
ultimate reclamation goals will be met.  Common amendments
include fertilizer, organic material, limestone (for control of
acidity), acidifying agents (for control of alkalinity), and, in
some cases, bactericides to help control the oxidation of
sulfides during the initial stages of revegetation.

Corrects Format in Chapter 8

BLM_0006396

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

Plant species selected for revegetation should be adapted to the site-specific conditions in order to fulfill the ultimate reclamation objectives.  Factors to evaluate include:  drought tolerance, rooting depth, hardiness, metals accumulation, palatability, seed availability, stabilization ability, ease of propagation, and longevity.  Field trials on test plots during the mine life are often required to evaluate which species will work best on a particular site.

Seedbed preparation is the next important phase of reclamation.  Typically, this is performed by standard agricultural equipment and follows normal practices.  Roughening of the surface to be planted should result in a firm but friable surface.  In many cases, mulching and, occasionally, irrigation may be used to aid in establishment of vegetation.  It is important to realize that dust must be controlled during the early stages of revegetation or it will scour and kill emerging vegetation.  Following planting, the success of revegetation should be monitored to assure successful reclamation.

For a more thorough discussion of tailings reclamation, refer to the article by Richard C. Barth (1984) noted in the list of references.

L.  HAZARDOUS MATERIALS

Most mines use some type of hazardous material during development or operation.  These materials may include:  toxic materials, such as cyanide; corrosive materials, such as acids or bases;  flammable materials, such as organic solvents; reactive materials, such as oxidizing agents; and explosives.  All of these materials must be used, stored, handled, transported, and disposed of in accordance with applicable Federal and State laws, including "right-to-know" laws.

A BLM Hazardous Materials Coordinator can provide advice on the details of proper disposal of such materials, and the statutory requirements that make the particular disposal techniques necessary.  In general, disposal of hazardous wastes by pouring them on the ground or into streambeds, onsite burial of drums or other containers, or dumping of drums into tailings ponds, other ponds, or down mine shafts, does NOT constitute proper disposal.

Corrects Format in Chapter 8

BLM_0006397

VIII-46

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 8

If pipelines, vats, storage tanks, or other containers are to be removed at any time during the life of the mine, or as a part of the mine's closure and reclamation, they must be properly cleaned out. The materials used to clean such facilities and all other wastes must be disposed of in accordance with applicable waste laws.

Prior to final closure of the operation, the BLM should require that the operator certify that no hazardous materials or wastes have been left onsite unless specifically authorized by the AO with the concurrence of other Federal and State regulatory authorities. The appropriate Hazardous Materials Coordinator should be consulted as a part of the final closure of the operation.

Corrects Format in Chapter 8

BLM MANUAL

Rel. 3-275
2/7/92

BLM_0006398

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

# IX. CLOSURE OF UNDERGROUND MINE ACCESS

A.  <u>INTRODUCTION</u>

The closure of underground mine access presents special
concerns from the standpoint of protection of the environment and
public health and safety.  The costs associated with appropriate
closure techniques are often quite extensive.  In addition,
special expertise is necessary to design and evaluate the design
of closure techniques.  Different methods are applicable to
temporary and permanent closures.  The illustrations in this
section show various temporary and permanent mine closure
methods.  The BLM wishes to specifically acknowledge the use of
notes and illustrations excerpted from the National Coal Board
Handbook entitled:  <u>The Treatment of Disused Mine Shafts and
Adits</u>, published in 1982.

B.  <u>IMPLEMENTATION</u>

An experienced underground mining engineer shall review the
proposed closure plan involving underground mine access which
meets the applicable State and Federal requirements.  The mining
engineer should make periodic inspections of the closure site as
the work progresses and shall also inspect the results upon
completion.  Thereafter, periodic inspections should be conducted
to ensure that the closure remains adequate.

C.  <u>CLOSURE OF SURFACE OPENINGS</u>

Closure of surface openings must incorporate sound engi-
neering and construction principles in order to ensure the health
and safety of human life and the protection of all resources.  In
most cases, the method used to close the surface opening will
depend upon whether the closure is to be permanent or temporary,
and may also be site specific due to on-site conditions.  Prior
to closure, an on-site investigation should be conducted by a
qualified individual to determine if bats or other wildlife
inhabit or use the underground workings.  The method of closure
may need to be designed to allow for ingress and egress of small
animals.

Format Corrected in Chapter 9

BLM_0006399

IX-2

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 9

1. <u>General Guidelines--Surface Openings</u>

All surface openings must be properly closed when:  (1)
they are declared inactive by the operator; (2) State law or
regulations require that they be closed; or (3) closure is
necessary to mitigate hazards to public health and safety.
Reclamation or protection of surface areas no longer needed for
operations shall commence without delay.  The AO should designate
such areas where restoration or protection measures, or both, are
to be taken.

In mining or prospecting deposits of sodium, potassium or
other minerals soluble in water, all wells, shafts, prospecting
holes and other openings must be adequately protected with cement
or other suitable materials against the coursing or entrance of
water.  In accordance with the regulations (43 CFR 3594.5(a)),
the operator/lessee shall, when ordered by the AO, backfill with
rock or other suitable material to protect the roof from breakage
when there is a danger of the entrance of water.

2. <u>Temporary Closures (Less than one year)</u>

In areas in which there are no current operations, but
operations are to be resumed under an approved plan, the operator
shall maintain the site, structures, and other facilities of the
operation in a safe and clean condition during any non-operating
periods.  Temporary closure measures such as fencing,
barricading, or substantially filling in surface openings may be
required for short-term non-operation.  All
operators may be required, after an extended period of non-
operation for other than seasonal operations, to remove all
structures, equipment, and other facilities, and reclaim the site
of operations.  Permission may be granted by the AO to do
otherwise.  Conspicuous signs shall be posted prohibiting
entrance of unauthorized persons and warning of danger.  Warning
signs shall be constructed of durable materials and comply with
applicable Federal and State regulations.  All such protective
measures must be maintained in a secure condition by the operator
until such operations are resumed or permanently closed.

Format Corrected in Chapter 9

BLM_0006400

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

For leasable minerals, extensions for temporary closures may be granted by the AO in one year increments provided the operator can show just cause for not permanently closing the mine access.  Under no circumstances may a lease be relinquished or bond terminated until all mine openings are permanently closed. It is the responsibility of the operator to periodically inspect temporary closures to ensure their structural competence and make repairs to any damaged portion which would permit unauthorized entrance.

3.  Permanent Closure

Before permanent closure of exploration or mining operations, all openings and excavations, including mine shafts, portals, and acid mine drainage discharge points, must be closed or sealed in accordance with sound engineering practices and according to an approved plan.  Reclamation and clean-up around and near permanently closed underground mines includes, except where otherwise expressly provided for in an approved plan, removal of equipment and structures related to the mining operation.  No underground workings shall be permanently abandoned and rendered inaccessible without the advance consultation or written approval of the AO.

Historically, poorly engineered and constructed closures have reopened because of settling, erosion, vandalism, pressure failure, deterioration, etc.  Pushing dirt into the entrance of an adit or shooting down the portal are not acceptable practices, except for the case of shallow or minor underground workings.  As a part of the closure plan, the operator shall furnish drawings in plan view, front view, and side view of all proposed closures and describe the specifications of the construction materials to be used.

Closure must take any water discharging from openings into consideration.  If the mine emits potable water, the design of the closure may allow for its discharge.  In the case of contaminated water (e.g., acid mine drainage), the closure shall be designed to prohibit its release or provide for remedial treatment (see Mine Waste and Pollution Control section).

Format Corrected in Chapter 9

BLM_0006401

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 379 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

4. Closure of Mine Openings

In order to minimize potential hazards and problems, a complete report by the lessee/operator should be furnished to the AO. This report may consist of a copy of the material required by State or other Federal agencies. The report should include:

a. Detailed description of the proposed method of closing the shaft.

b. Geographic report shall include a map showing the location of the shaft in relation to all man-made facilities, other mines, roads, rivers, streams, lakes, etc., which may be influenced by the shaft and which may influence the future surface use surrounding the shaft. All anticipated subsidence must be shown.

c. The AO may request other information as needed for each specific shaft closure site.

In addition, for leasable mineral operations, the report must contain the following. This information may also be useful in evaluating the prevention of unnecessary or undue degradation for locatable mineral operations.

a. Geologic report including maps of all strata, faults, fracture and joint pattern, geologic structure, potential subsidence and any other facts which may influence the abandonment.

b. Hydrologic report of all aquifers, including the quantity, and quality of waters present, maximum and minimum flow rates, possibility for contamination, solubility of minerals present, the anticipated head which will develop if the workings flood, and any other relevant matters. In the event of subsidence, consideration must be given to potential for subsidence features to act as a conduit for surface waters to enter the underground workings.

Format Corrected in Chapter 9

BLM_0006402

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

    c.  Engineering report of shaft construction inc
all physical dimensions, (vertical cross sec
plan view), materials, thickness of shaft li
utilities present, obstructions, elevation o
collar, total depth, and all landings, prese
structural condition, and shaft pillar size.

    d.  Historical report of when construction began
shaft, problems encountered, when it was com
what its purpose was (e.g., ventilation, ore
hoisting, supplies, man cage, emergency exit
and location of other mines in the surroundi

After thorough investigation, the AO shall appro
writing the method of closure after consultation with th
management agency, the surface owner, the appropriate St
agency, other Federal agencies and the operator.  At a m
the AO should require the following:

    a.  Incombustible fill material;

    b.  Isolation of aquifers;

    c.  Closures and caps of reinforced concrete anc
competent rock by keying, or adequate mechan
means; and,

    d.  A permanent brass or aluminum plug giving th
case number, company name, and date of closu

The final relinquishment of responsibility and f
bond shall not be made until a joint site inspection has
conducted by the AO and other appropriate State and Fede
agencies and all are satisfied with the work performed.

Format Corrected in Chapter 9

BLM_0006403

IX-6

<div align="center">

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

</div>

D.  SAFETY NOTES

    Underground workings which are not actively being mined should only be entered when absolutely necessary.  In all cases, BLM personnel should inform the operator and State and Federal agencies involved with mine safety.  BLM personnel conducting or participating in inspections shall: be knowledgeable of and comply with MSHA and OSHA safety requirements; shall have the appropriate and mandatory safety and health training for personnel working in and around underground mining operations; and, shall comply with any additional safety rules and regulations required by the operator.

    1.  Personal Safety Precautions

    Persons engaged in underground mine access closure projects or in searching for old shafts and workings should be ever mindful of their own safety.  There should always be at least two persons present and they should be equipped with appropriate safety equipment, such as safety harnesses, ropes and anchorage pickets.  If operating in remote country, the party's plans should be known to a responsible person who should be informed of any major changes of plan and when the day's task is complete.  Extra care is necessary where the ground may be unstable, when mine gas may be present, and when working in adverse weather.

    2.  Security of Surface Operations

    At any open shaft it is necessary to provide fences or guards to protect personnel and plant from falling into the shaft and from other dangers (for example suction and blast during filling).  In addition it is necessary to ensure that all operations are carried out from stable ground (Figures IX-1 and IX-2) and that any necessary precautions are taken to deal with possible mine gases.

<div align="center">

Format Corrected in Chapter 9

</div>

BLM MANUAL

Rel. 3-275
2/7/92

BLM_0006404

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-1

**Figure IX-1**
**Approximate Angle of Repose for Sloping Sides of Excavations**



Note:
The Angle of Repose is measured from the horizontal.

SOURCE: 29 CFR 1926.652

BLM_0006405

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-2



## Figure IX-2
### Use of the Angle of Repose for Determination of the Potential Failure Zone

Potential Failure Zone = 2r+W Where:

W = Average Width of Shaft
r = Failure Radius = d/tan a
d = Depth to Competent Rock
a = Angle of Repose For Material Type
    Present at Site

SOURCE: D. G. Simpson and M. Kuhns (1989)

BLM_0006406

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

3.    Ground Stability

The factors influencing the stability include:

- nature of superficial deposits;
- groundwater levels;
- depth of firm bedrock;
- existence of shallow workings;
- other possible voids, for example, concealed ventilation drifts;
- strength and condition of the shaft lining.

These factors should be evaluated and where there is any doubt about the ability of a shaft lining to withstand the thrust from the ground and from any additional loading arising from the operations a potential collapse zone should be determined and clearly marked with fences and notices as may be appropriate (Figure IX-3). Similarly where cratering has occurred, the (potential) collapse zone is likely to extend beyond the crater edge. Cracking of the ground usually indicates that further failure is likely.

The operator should avoid using trackless equipment above or below areas where the possibility exists for ground collapse. In such cases, conveyors or other equipment allowing operator personal safety should be used.

No person should enter a collapse zone unless he is wearing a safety harness attached to a line anchored at least 15 feet outside of the zone. The safety line can be arranged to run overhead and be used for several harnesses. Plant and equipment should be similarly anchored to prepared points at least 30 feet outside of the zone, and such additional arrangements made as may be necessary for mobile equipment. Steel posts concreted into boreholes form reasonable anchorages for most purposes.

Format Corrected in Chapter 9

BLM_0006407

IX-10

**Figure IX-3**
**Worker and Public Safety Zone Calculations**



Calculations for Failure Limit:

Shallow Initial Failure Limit = 29/tan 55° = 20.5'
Deep Initial Failure Limit = 41.5/tan 75° + 29/tan 55° = 31.4'
Maximum Shallow Failure Limit = 29/tan 35° = 41.4'
Maximum Deep Failure Limit = 41.5/tan 75° + 29/tan 35° = 52.5'

SOURCE: D. G. Simpson and M. Kuhns (1989)

Rel. 3-275
2/7/92

BLM_0006408

Case No. 1:20-cv-02484-MSK  Document 27-9  filed 04/27/21  USDC Colorado  pg 386 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

### 4. Mine Gases

When final closure of underground workings is being conducted, gases may accumulate in the mine due to a change in mine ventilation. After mechanical ventilation ceases at a mine (which at the time may have both upcast and downcast shafts) the natural flow will depend on barometric pressure, variation of temperature and humidity, mine depth and changes taking place in the mine such as rising water levels or collapsing workings. In some cases, there may be no ventilation.

### 5. Types of Mine Gases

Firedamp (principally methane) may be found at some shafts, and blackdamp (carbon dioxide and nitrogen) is almost certain to be found in all shafts, adits and old workings. Firedamp is a dangerous combustible and explosive gas; but like blackdamp, it can also create an oxygen deficient atmosphere and so cause asphyxiation. More rarely, other gases may be found, notably carbon monoxide and hydrogen sulphide (stinkdamp) which are very poisonous even at low concentrations.

Firedamp, being lighter than air, tends to rise and in gassy mines significant volumes continue to be emitted from the strata for some time after working ceases. Eventually, the production of gas from the deposit dwindles. Blackdamp, being heavier than air, is likely to be found in old workings generally, particularly in the lower parts of shafts and adits.

Any of the gases may migrate to and accumulate in shafts, adits and other voids - in particular in shafts there is a danger that gas may migrate along the annulus between the lining and the strata. It is most important to note that if barometric pressure falls, gas may appear rapidly in places where it is not normally present.

Format Corrected in Chapter 9

BLM_0006409

IX-12

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

Mine gases which may exist before, during or after shaft treatment have an important influence in determining the nature of the treatment and the operational methods to be adopted.  Air, together with any included gas, is displaced during filling; when connected shafts are involved, fill placed in an upcast shaft is likely to cause complete reversal of any air flow and possibly emissions of gas in the downcast shaft.  The filling of shafts reduces the possibility of the accumulation in them of large quantities of gas, but voids in which gas may accumulate can be formed as fill is being deposited and during subsequent settlement.  This can be of importance when drilling through fills.

If domestic or industrial refuse has been deposited in the shaft, dangerous gases other than those mentioned above may be produced.

When entrances are to be sealed it may be necessary to provide vent pipes, fitted with flame arrestors and protected by lightning conductors, to allow gas to escape freely to atmosphere so preventing it from accumulating immediately below a shaft cap or plug or behind a stopping.  In the absence of a vent pipe, gas may flow along paths provided by cracks, fissures, fan drifts, service pipes, culverts, etc. and collect in unventilated voids and buildings.

Gypsum, cement or resin-based products or other suitable materials may be used to seal shaft covers and caps to restrict the emission of gases.

6.  Mine Gas Precautions

The guidance of ventilation engineers should be sought on the precautions required to deal with gas at shafts requiring treatment.  Approved handheld methanometers, automatic firedamp detectors and flame safety lamps should always be available.

At shafts where mechanical ventilation has ceased, the primary precaution, particularly where the conditions are unknown, is to establish a security zone within which all possible sources of ignition are prohibited.  Ignition sources may be:

Format Corrected in Chapter 9

BLM_0006410

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

- smoking;
- braziers and other open fires or naked lights;
- spark ignited internal combustion engines; and
- electrical apparatus which is not flameproof or
  intrinsically safe.

The security zone should be at least the same size as a
potential collapse zone (Figure IX-3) and should be tested with
flame safety lamps and hand held methanometers, working inward
from the periphery to the shaft, to establish the conditions.
Then all buildings, air locks, or other roofed enclosures within
the zone should be opened up (demolished if necessary) so that
the shaft or adit mouth and any buildings, etc., are well
ventilated.

Where gas may be a hazard the best conditions for its
ready dispersal are provided by clearing the area generally,
including removing stockpiles of material and grading out any
hollows in the ground.

Tests for firedamp should be made immediately before any
operations are begun and when they are to be restarted after a
period of stoppage.  The tests should be made at the shaft mouth
itself and at positions 60, 120, 180, 240, and 300 feet down the
shaft in accordance with the regulations.  If firedamp is
detected at any of these locations, no work which involves open
flames or sparks (for example flame cutting or welding) should be
undertaken within the security zone.

The ventilation engineer's guidance should specify in
each case the intervals between taking samples and when other
work should cease because of the presence of firedamp.  Whether
or not work should cease will depend not only on the percentage
of firedamp in the atmosphere but also upon other circumstances,
for example:

- location of the site (whether in open ground, or a
  built-up area);
- type of any work being done (stripping-out, removal
  of lining, filling);
- use of conveyors, dump trucks, draglines and other
  equipment;
- use of explosives; and,
- special circumstances (for example, the necessity
  of emergency work).

Format Corrected in Chapter 9

BLM_0006411

IX-14

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

Where blackdamp is the sole hazard, the work need not be restricted in any way except that the oxygen content must be checked regularly and when the shaft is being filled care is required at the shaft site as the gas will rise on top of the filling and eventually spill out at the surface.

At shafts where mechanical ventilation is available (at operational mines), it will normally be essential to retain the system in operation until the last connection is reached and then when the ventilation is stopped to make the seals as quickly as possible so as to minimize the emission of gas. This means that seals should be placed simultaneously on all the shafts or drifts when a mine is being abandoned or on the shaft and an underground roadway when only one shaft is being abandoned. It is necessary to ensure that the ventilating fan is kept within the acceptable range of its operating characteristics. The specific guidance of a ventilation engineer is required in all case with regard to the fan and the general precautions to be taken at the surface.

F.  PRINCIPAL FILL MATERIALS

The materials used for the bulk of filling in unused shafts and adits may be termed general purpose fill. Other materials used for special purposes include hardcore, clay (including suitable froth flotation tailings), concrete and grouts.

1.  General Purpose Fill

General fill should be of a granular nature and should have no unacceptably adverse quality such as toxicity, combustibility or poor engineering property which could affect its performance during or after filling. Mine waste may be used as fill material if it has appropriate characteristics. The chemistry of waters which will come in contact with the fill must be known in order to identify fill materials which will be nonreactive and in equilibrium with the water.

Format Corrected in Chapter 9

BLM_0006412

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 9

Most stable granular materials are acceptable, including some mining wastes. Hot or combustible materials and wastes with excessive carbonaceous matter must be excluded. Quartzitic or other hard rocks with high incendive temperature potential can cause sparking when striking iron and steel, and their inclusion in fills must be carefully considered in conditions where there may be firedamp. For the same reason, steel and iron should also be excluded from all fill materials as should be aluminum, magnesium and their alloys because of the possibility of thermite reaction.

Hardcore, as described below, is a better material and can obviously be used for general fill when economically available.

2.    Hardcore

Hardcore includes such materials as broken stone, brick or concrete demolition rubble and quarry and steelworks wastes. Its chief uses in shaft fills are: in shaft bottoms and at intermediate shaft insets into which it will run and build up at its angle of repose; in water-filled shafts; and where fill settlement must be minimized. Given sufficient length in the shaft above an opening, hardcore can give support to a weaker general fill material which is incapable of supporting itself or, worse, could hold up at first but fail some time later. Hardcore is free draining and will permit water to seep down into the workings, provided that the drainage paths do not become blocked.

Hardcore includes most clean, hard (uniaxial strength exceeding 2,900 psi) granular material of the types described above. The maximum size should not normally exceed a 12 inch cube. Hardcore larger than 15 inches in one dimension should be avoided, as it can damage shaft supports and cause obstructions which may interfere with closure objectives. The grading should be such as to give a reasonable density of filling while enabling water to drain through easily, suitable proportions being:

                12" to 3/4" – not less than 80%
                3/4" to 1/16" – not more than 15%
                minus 1/16" – not more than 5%

Format Corrected in Chapter 9

BLM_0006413

IX-16

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

The material should have a high and reasonably consistent angle of internal friction, be insoluble and be resistant to chemical attack.  As noted under general fill, materials with high incendive temperature potential must be carefully considered before their use is permitted in conditions where there may be firedamp.

　3.　Clay

Material in the fine silt to clay particle size range with a coefficient of permeability less than 1 x 10-6 cm/sec can be used to restrict the movement of water within a shaft or its entry from the surface.  Satisfactory material can sometimes be found close to the site.  If the clay is dry, it should be thoroughly wetted and worked until sufficiently plastic to consolidate into an effective seal.  The plasticity and sealing properties of clay materials can be improved by the addition of pulverized fuel ash (pfa) or, when economically justified, bentonite.

Some tailings waste in the form of filter press cakes may be of sufficiently fine particle size to be suitable for use as clay.  The cakes should be sufficiently plastic to compact and consolidate into a solid mass.

　4.　Concrete

Concrete used for good quality mass fill (3,600 psi) or for structural engineering purposes (4,300 psi) should comply with American Concrete Institute (ACI) Specifications.  The placing, compaction, reinforcement, forming and curing should generally be in accordance with ACI standards.  As concrete in shafts is liable to be subjected to chemical attack by aggressive groundwater, appropriate cements (for example sulphate-resisting) and aggregates should be selected.

Format Corrected in Chapter 9

BLM_0006414

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 392 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

5.   Grouts

        Grouts comprise a range of various materials injected
into pores, fissures and cavities in soils and rocks as liquids
or suspensions which solidify and thereby increase the strength,
or reduce the permeability, of the soil or rock.  The particular
grout for a given situation depends upon the size of pores,
fissures, or cavities to be filled and the purpose of the
operation.  The two main types in use are cement and chemical
grouts.  For grouting shaft fills having large pore spaces and
other cavities, Portland cement may be used with the addition of
sand, bentonite, slag or pfa; if necessary, large cavities should
be filled with pea gravel.

        Chemical grouts (which are more expensive than Portland
cement-based materials) have been developed for use in fine
grained rocks and sand, and may be required for injecting the
strata around shaft plugs and adit or roadway dams.

        Pfa mixed with 5 to 10 percent of Portland cement sets
in a similar way to concrete and, while it has lower strength, it
is still adequate for filling voids in shaft fills.  It has
advantages in that it does not segregate when dropped through
appreciable heights and, being of low bulk density, weight for
weight it fills more void than other types of grout.

G.   MEASURES USED IN SHAFT TREATMENTS

    Apart from the cases warranting special consideration and
design, the various shaft treatments can involve the following
measures:

        -   controlled filling;
        -   enclosure;
        -   covers;
        -   caps;
        -   shaft plugs; and
        -   roadway stoppings and dams.

    These are described below mainly with references to shafts,
any comparable measures for adits being referred to as appro-
priate.  In selecting the measures to be adopted, the particular
purpose of the treatment should constantly be borne in mind.

                    Format Corrected in Chapter 9

BLM_0006415

IX-18

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 9

1. <u>Filling</u>

For shafts with shallow sumps, controlled filling should be commenced with hardcore and brought above the roof of the shaft bottom roadways to a height equal to not less than five diameters for shafts up to 650 feet deep. Additional fill equivalent 0.25 diameters for every additional 650 feet of depth should be used. (See Figure IX-4.)  This calculated height includes two diameters to allow for the possibility of weak strata at the inset roofs and for the margin of error in depth measurements.  The hardcore may then be followed by general purpose fill, further hardcore being used at any other insets in the length of the shaft.

Deep sumps may be filled with general purpose material, but allowances must be made for settlement.  The height of hardcore above the shaft bottom roadway should therefore be increased by 5 to 7 percent of depth of the general purpose fill in the sump below.  Similar allowance is required for settlement at a mid-shaft inset  (Figure IX-5).  For all shafts, bulkheads should be considered when backfilling to prevent materials from washing out of the shaft into the workings.

In shafts where the positions of insets are unknown, hardcore should at least be used until it has been brought above the level of all likely locations.  Hardcore is also to be preferred for fill in shafts containing water.  Placing fill in a shaft containing water may result in a rise of the water level in the shaft causing an overflow of water at the surface.  A catchment basin or sedimentation pond may be needed to treat this water before it is released to the environment.  Concrete, or concrete and hardcore used in alternate phases at the shaft bottom, provides a higher degree of security than hardcore by itself.

Format Corrected in Chapter 9

BLM_0006416

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-4



Figure IX-4
Controlled Backfill

HEIGHT OF HARDCORE (H) IN SHAFT

H=kd+S
Where:
H=Height of Hardcore in Shaft
k=5 for Shaft Depths Up to 650 Ft.
  Add 0.25 Dia for Each Additional
  650 Ft.
d=Internal Diameter
S=Allowance for Settlement of
  General Purpose Fill Normally
  5 to 7%xl. (No Allowance Required
  for Hardcore)
l=Total Length of General Purpose
  Fill

Source: National Coal Board (U.K.)

BLM_0006417

IX-20

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-5



**Figure IX-5
Multi-Level Controlled Backfill**

Source: National Coal Board (U.K.)

BLM_0006418

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 396 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

Clay may be sandwiched between lengths of general fill to limit the passage of gas and/or water moving up or down the shaft. When internal access is available, the shaft lining, and all longitudinal materials, such as pipe, shaft guides, cables, anchors or buntons, boards, ladders, etc., should be removed at the shaft seal location. An impermeable strata, such as mudstone, should be selected for the location and placement of the clay seal. This will enable the clay to be squeezed tight up to impermeable strata. The clay seal should be installed below the water table to prevent it from drying out and developing shrinkage cracks; otherwise, the seal would be ineffective. The length of a clay seal against exposed strata should be not less than 3 feet per 300 feet head of water, subject to a minimum length of six feet.

Allowance should be made for a margin of error in measurement of the depth and of 5 to 7 percent for settlement in the length of clay and underlying general purpose fill. The time required for the settlement will depend upon the quality and quantity of the materials that were used. General fill containing large amounts of clay will take longer to settle than granular fill. Complete settlement of shaft fill may take several years.

When filling is complete, the shaft should be temporarily mounded over, fenced, and provided with warning notices until the fill settles and permanent capping is placed. Alternatively, if it is desired to clear the site quickly, the shaft can be capped immediately after the filling is complete, provided that provisions are made for eventual permanent closure treatment (e.g. grout the fill using pre-formed or drilled holes for grouting through the cap).

   2.   <u>Enclosures</u>

The combination of a properly maintained enclosure and a light shaft cover is normally an adequate temporary measure to prevent accidental access to an open shaft or adit.

Format Corrected in Chapter 9

BLM_0006419

IX-22

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 9

New enclosures, normally of fencing, should be of sufficient area to allow for subsequent operations and, wherever possible, a permanent access to the site should be made.  Two or more shafts may be conveniently included within one enclosure. At an adit mouth the enclosure should extend along the line of the roadway to a point where the rock is sufficiently thick to ensure protection.  The standard of fencing or walling to be provided should be determined by the circumstances at each location.  Recently-filled shafts where settlement is taking place should be temporarily protected by an enclosure.

Damage and normal deterioration of fencing usually entails regular inspection and maintenance.  Enclosures should not be necessary following proper closure and reclamation.

   3.   Covers

Covers are intended to prevent the accidental entry of persons and illegal dumping into an unfilled shaft but are not designed to protect the surface against subsidence by cratering. Generally, covers should not be used as permanent mine closures. Only backfilling will permanently support shaft lining walls and the shaft cap or plugged surface.

Covers should be clearly visible, self draining, and protected from being overloaded.  They should be used only where the lining is sound or has been suitably repaired or strengthened to ensure long term security of the ground surrounding the shaft mouth.  Gas vent pipes with flame arrestors may be necessary and fencing may be required to limit access to them.  The cover and any fittings should be vandal-proof and designed to preclude possibilities of burrowing under the edges, or of the easy lifting of any removable section of the cover.  Shaft covers may be divided into two classes -- light and heavy duty.

Light duty covers (Figure IX-6) may be constructed of timber, steel or concrete and should be designed for a uniformly distributed superimposed loading of 270 pounds per square foot. They should only be used in circumstances where an enclosure can be provided to prevent access by unauthorized persons and vehicles.  Frequent inspection and maintenance of the cover are likely to be necessary.

Format Corrected in Chapter 9

BLM_0006420

IX-23

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-6



**Figure IX-6**
**Light Duty Shaft Cover**

Typical Constructions (to Carry Superimposed Load of 270 Lbs./Ft.$^2$)
For Covers to Be Used Only Within a Secure Enclosure
- In-Situ Concrete Slab Strength = 4350 psi
- Pre-Cast Concrete Beams and Topping
- Steel Sections and Plating (Limited Life)
- Steel Sections and Heavy Timbers (Limited Life)

BLM_0006421

IX-24

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 9

Heavy duty covers (Figure IX-7) should be constructed of reinforced concrete and be designed to carry a uniformly distributed superimposed load of  700 pounds per square foot and should be not less than 12 inches thick.  They should incorporate a strong central monument to prevent vehicles from traveling over the cover and to mark the shaft.  The reference number, position of the center and the diameter and depth of the shaft should be recorded on the monument or the cover itself.  Enclosures may be required at some sites.

Comparable measures at an adit simply comprise walling-up the entrance, or fitting it with a strong steel door, and securing the roof against intrusion from the surface.  Provision for drainage and gas vent pipes may be required.  While regular inspection and possibly some maintenance may be necessary, an enclosure is not usually required.

    4.   <u>Caps</u>

Caps are intended to enable shafts to be permanently closed with little risk of subsidence at the surface even in the event of the loss of any fill or the collapse of the shaft walling.  They should be constructed of reinforced concrete and be designed to carry the weight of the overburden and a uniformly distributed superimposed load of 700 pounds per square foot.  The length of side (or diameter) of a cap should be not less than twice the internal diameter of the shaft (or twice the diagonal of a rectangular shaft) and there should be an 18-inch minimum thickness of 4,350 psi concrete.

Caps should be founded on competent material or solid rock where the solid rock is accessible from the surface (e.g., to a depth of approximately 20 feet) (Figure IX-8).

Format Corrected in Chapter 9

BLM_0006422

IX-25

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-7



Figure IX-7
Heavy Duty Shaft Cover

Notes: – Cover Designed for Superimposed Load of 700 Lbs./Ft.²
– Reinforced Concrete Slab Strength 4350 psi. Concrete Minimum Thickness 1.0'.
– Cover to be Marked With Shaft Reference Number Diameter and Depth, and Monument to be Positioned Centrally.

Source: National Coal Board (U.K.)

BLM_0006423

IX-26

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-8



**Figure IX-8**
**Shaft Cap, Shallow Bedrock**

If Required, Measures to Deal With
Gas Can Include Sealant Coatings or
Vent Pipes Fitted With Flame Arrestors.

Reinstated
Ground

2D Minimum

2.5' Min

3.0' Min
Cover

1.5' Min
Slab Thickness

Bedrock

Bedrock Under Cap to be
Secure Otherwise Shaft to
be Strengthened Internally
By Suspended Plug or
Other Means

Cap Positioned to Suit Bedrock
Levels Down to 20' Below
Ground Level. Not to Bear on
Shaft Lining – Separated By
Compressible Packing

Suspended
Plug as
Required

Shaft As Found, Already
Fitted or Shaft to Be
Filled

D

Notes:  - Cap Designed for Overburden Plus Superimposed Load of
700 Lbs./Ft.²
- Reinforced Concrete Slab Strength 4350 psi. Concrete
Minimum Thickness 1.5'
- Reinforcing Bars to be Not Less Than 1 5/8" Diameter and
to Have Not Less Than 4 Inches Cover.
- Cap to be Marked With Shaft Reference Number, Diameter
and Depth, and Position of Shaft Centre.

Source: National Coal Board (U.K.)

BLM_0006424

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 402 of 418

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

If rock is not within such reach, or if the excavation would be difficult (for example through water bearing ground), the cap can be founded in superficial deposts on a competent strata accessible from the surface (Figure IX-9). In this case, if the shaft is one which has not already been treated, the full shaft treatment should incorporate measures which either preclude the loss of fill or strengthen the length of the shaft throught the superficial deposits (Figure IX-9(A)).

If the shaft has been treated in the past, the fill may be strengthened by grouting, or excavated to bedrock level and replaced with grouted hardcore (Figure IX-9(B)). In exceptional circumstances where the above measures are not reasonably practicable, it may be possible to accept the risk of loss of fill if the ground from the cap down to the bedrock is all reasonably competent and failure is not likely to cause a major disturbance fo the site (Figure IX-9(C)). Other enginieering treatments of the ground outside the shaft may be devised.

If production of gas from the mine is expected, a vent pipe fitted with a flame arrestor should be provided and, if necessary, the site should be enclosed until the issue ceases. If the gas is discovered outside the shaft lining, grouting may seal it off or force it into the interior of the shaft from where it can be vented. In some cases, a sealant coating on the cap may be advantageous.

The cap should be marked with the reference number of the shaft, the position of the center and the diameter and depth of the shaft. Though monuments are not normally necessary, it may be appropriate in some situations to mark the site of some shafts permanently with a decorative or other feature.

The comparable treatment for an adit would be a plug, stopping or dam as described below.

Format Corrected in Chapter 9

BLM_0006425

IX-28

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-9



Figure IX-9
Shaft Cap, Deep Bedrock

BLM_0006426

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

5.    Shaft Plugs

A concrete plug placed at an appropriate position within a shaft is intended to prevent the loss of fill and, if required, to protect underground workings. As the construction of plugs demands internal access deep into the shaft, this is normally practicable only in operational shafts about to be abandoned. Plugs which must be watertight require the concrete/rock interface, and possibly the strata, to be injected with grout.

Figure IX-10 illustrates three types of shaft plugs for horizontal strata. Figure IX-10(A) shows the traditional conical shape where the load is carried by the strata in direct compression. The volumes of excavation and concrete needed and, if required, rock to be grouted are considerably greater than for the parallel plug (Figure IX-10(B)) which requires little excavation beyond the removal of the lining and any loose rock. Under vertical loading a plug shortens in length and expands laterally, which enables the plug to carry considerably higher loads than a design based on simple shear would permit.

Inset plugs (Figure IX-10(C)) are simple to construct but care is necessary to ensure that security is obtained at the inset roof/shaft junction, possibly requiring the removal of the shaft lining in this area and an extended length of plug up the shaft.

The plugs shown in Figure IX-10 assume horizontal strata; dipping strata may require the shapes to be slightly modified to suit. Shaft plugs require the design and construction of a substantial bottom form which must withstand the weight and pressure of the wet concrete placed on top of, or against, the form. A preferred design would be the use of steel beams hitched into the shaft sidewalls, decked over with 0.25 inch steel plate. Sand bags placed around the edge of the rock/steel plate interface will prevent the loss of wet concrete during the pouring operation. A concrete plug should be poured in one continuous operation to avoid the formation of latence (a plane of weakness) which will occur at the top of intermittent pouring operations.

Format Corrected in Chapter 9

BLM_0006427

IX-30

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-10



### Figure IX-10
### Shaft Plugs

(A) Conical Plug

(B) Parallel Plug

(C) Inset Plug

Notes: – Length (L)=D But Need Not Exceed 12 Feet.
– Concrete Strength, 4350 psi, Reinforced As Required.
– Ventilation and Drainage Pipes Provided As Necessary
During Construction.

Source: National Coal Board (U.K.)

BLM_0006428

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9

Plugs may incorporate pipes through which water from the upper part of the shaft can be drained into the workings below during construction. The drain pipe is grouted off after the drain pipe has had a chance to cure and after formation and contact grouting has been completed.  Ventilation is an important consideration.

Shaft plugs should normally have a minimum length equal to the shaft diameter.  Water will leak extensively past an ungrouted plug unless the hydraulic gradient or pressure drop from the 'wetside' (top of plug), to the 'dry side' (bottom of plug) can be adjusted by proper plug length and pressure grouting.  If the plug is to be watertight or where water cannot be permitted to flow into the shaft and workings below the plug, the length must be such that the pressure drop should not exceed 161 psi/ft.  The factor of safety for the hydraulic gradient divided by the plug length should be at least 4.  If the concrete/rock interface is grouted to a pressure equal to twice the head of water, then the safe pressure drop can be achieved.

In some circumstances it may be necessary to design a plug for possible uplift pressures caused by water from the mine rising within the shaft.

Plugs whose height/diameter ratio is in the order of one do not generally require steel reinforcement except across the base and around the periphery.  But if watertightness is critical, consideration should be given to including nominal reinforcement throughout in order to control shrinkage cracking. A degree of watertightness may also be provided by a clay seal placed on top of the concrete plug.

6.  Roadway Stoppings and Dams

Roadway stoppings and dams are used to seal adits.  If desired, they can also be used as alternatives to shaft plugs in operational mines which are about to be abandoned.  Figure IX-11 illustrates the use of chain link fence, channel iron and rock bolts to make a temporary adit closure for a timbered opening and a non-timbered opening.  Figure IX-12 illustrates a method for permanent adit closure.

Format Corrected in Chapter 9

BLM_0006429

IX-32

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-11

## Figure IX-11
## Temporary Adit Closure



Chain Link Fence Sandwiched Between Timber Post and Rolled Steel Channel or Angle. Secure With 5/8" Lag Screws. Tack Weld Lag Screws to Steel Channel or Angle.

Rock Bolt to Sandwich Chainlink Fence Between Floor and Steel Channel. Rock Bolts or Resin Bolts to be 18 to 24 Inches Long.

Typical Timbered Opening



Chain Link Fence Sandwiched Between Channel or Angle and Secured With Rock Bolts.

Not to Scale

Typical Non-Timbered Opening

Source: A. Vance, BLM Utah

BLM_0006430

IX-33

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-12



**Figure IX-12**
**Permanent Adit Closure**

Rock Filled Gabions To Act As Bulkhead For Compacted Backfill. Bulkhead tro be Placed In By the Portal to a Point Where the Overburden is at Least 3h.

Compacted Backfill

Top View        Rock Fill

Not to Scale

3h-10h

Earth Fill 3h-10h to Extend in to the Seal. Portal to be Backfilled With Rock for a Distance of h From the Entrance.

Rock Fill
h

Front View        Side View

Source: Adapted From Drawing by A. Vance, BLM Utah

BLM_0006431

IX-34

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 9


Stoppings are intended to retain only solid fill material; dams to retain both solids and water. Stoppings may be constructed of hard sandstone from the mine or hardcore or rubble packed tight to the roof and sides and between the end retaining walls. In level roadways, the length of the stopping between end walls should be not less than three times the roadway height or width, whichever is greater, at depths up to 650 feet. Over 650 feet, an additional length of 0.1 times the roadway height or width should be provided for each additional 300 feet of depth. In dipping roadways, the length may need to be increased by up to 33 percent.

Dams should be designed and constructed in concrete on the same basis as watertight plugs (Figure IX-13). In no case should their length be less than the roadway height or width, whichever is greater. The permeability of the rock at possible sites for dams in the mine roadways near the shaft is likely to be high and large quantities of grout may be absorbed in ground injection. It may therefore be preferable to use the combination of a dam located inby with a stopping at the shaft. Where access to the inby side of a dam will remain, provision should be made for the measurement of the pressure on the dam face.

In addition to constructed roadway stoppings and dams, it may be necessary to consider the structural strength and permeability of thin rock pillars separating a roadway or shaft from voids capable of accepting any substantial quantity of material should the pillar fall.

Format Corrected in Chapter 9

BLM_0006432

Figure IX-13
Permanent Slope Closure

Source: National Coal Board (U. K.)

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 9

Figure IX-13

IX-35

Rel. 3-275
2/7/92

BLM MANUAL

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 10

# X.  REMOVAL AND RECLAMATION OF SURFACE IMPROVEMENTS

## A.  INTRODUCTION

In each exploration, mining or processing operation, some impacts on the land are caused by improvements such as buildings, storage sheds, plants, water tanks, etc.  Complete reclamation of the site requires removal of these improvements unless an appropriate secondary use is anticipated in the reclamation plan, in the RMP or other land-use planning documents, or in consultation with the AO.

## B.  FACILITY REMOVAL

Provisions should be included in each reclamation plan to deal with removal of unnecessary facilities at end of mine life.  Consider the following when addressing the reclamation of such improvements:

1. Identify facilities that will be removed or retained during period of interim shutdown and any facilities that may be retained upon permanent closure.

2. Identify facilities that have potential to create environmental liability or problems and ensure they meet state and Federal environmental protection requirements.  These may include:

   - fuel tanks
   - surface storage tanks
   - chemical, drilling additive and explosive storage areas
   - shop and service areas (including areas where tires, lubricants, coolants, etc. may have been disposed)
   - openings to underground workings
   - unused machinery and equipment
   - septic systems
   - contaminated concrete pads and building foundations, and,
   - transformers (which may contain PCBs).

Coordinate with BLM Hazardous Materials coordinator to ensure proper removal, disposal, and necessary remediation.

BLM_0006434

X-2

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 10

3.   Removal of underground storage tanks (USTs) must be
     in compliance with EPA and other applicable Federal,
     state, and local regulations at the earliest feasible
     time.  Reclamation and remediation of the site should
     be completed in accordance with applicable EPA
     requirements and this handbook.  Coordinate with BLM
     State Office or District Office engineering staff.

4.   All foundations and paving associated with buildings
     and facilities to be removed should be broken up.
     Materials found to be in conformance with State and
     Federal requirements can be used for reclamation fill
     material, buried onsite, or removed.  The location of
     the materials should be accurately documented.  Any
     contaminated materials must be disposed of as
     necessary under applicable State and Federal
     requirements.  The disturbed area should be reclaimed
     in accordance with all the applicable sections of
     this handbook.

C.   POWERLINES AND COMMUNICATION LINES

     Reclamation of powerlines and communication lines in some
cases comes after other reclamation has been accomplished.  To
accomplish reclamation of powerlines, remove all towers, poles,
cable, guy wires, and anchors.  Reclaim access roads and
revegetate in accordance with Chapter XII of this handbook.
Where appropriate, a secondary use for some of the towers or
poles would be for raptor nesting or roosting sites.  This
secondary use should be coordinated with the BLM biologist.

D.   PIPELINES

     Where pipelines are needed, ensure that they do not create
unacceptable risks to environmental values.  Where substantial
environmental or human risk exists, periodic testing should be
required, and malfunction alarms, and automatic block valve
shutdowns should be installed.

     Pipelines used in mineral operations vary greatly in size
and material.  Surface or buried pipelines create environmental
impacts.  For reclamation, surface pipelines should be removed.
Any resulting berm or unvegetated areas should be revegetated
in accordance with Chapter XII of this handbook.

BLM_0006435

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 413 of 418

### H-3042-1 - SOLID MINERAL RECLAMATION
### Chapter 10

Buried pipelines which did not transport hazardous materials should be left in place to minimize surface disturbance.  Consideration should be given possible corrosion and long-term stability of all pipelines left in place. Failure or collapse of the pipeline could create subsidence and erosion problems.  Access to the pipeline should be closed to eliminate hazards to birds and other small animals, and for large pipelines, to people and larger animals.

If a pipeline was used to transport hazardous materials, it must be cleaned and detoxified.  The cleaning material must be disposed of properly and in accordance with existing regulations.  An effort such as this should be conducted with the assistance of the appropriate BLM hazardous materials coordinator.  The pipeline may then be removed, or if buried, left in place.

BLM_0006436

Case No. 1:20-cv-02484-MSK   Document 27-9   filed 04/27/21   USDC Colorado   pg 414 of 418

# XI.  LANDFORM RECLAMATION

A.  <u>INTRODUCTION</u>

Shaping, grading, erosion control, and visual impact mitigation of an affected site are important considerations during review of the reclamation plan.  The review process not only ensures that the topography of the reclaimed lands blend in as much as possible with the surrounding land forms, natural drainage patterns, and visual contrasts, but also enhances the success of revegetation.  The principles and standards presented in this section of the handbook should be used in close conjunction with the sections on hydrology and revegetation.

B.  <u>SHAPING, GRADING, AND EROSION CONTROL</u>

The final land form should:
- be mechanically stable
- promote successful revegetation
- prevent wind and water erosion
- be hydrologically compatible with the surrounding landforms, and
- be visually compatible with the surrounding landforms

The operator should not steepen slopes unnecessarily during the shaping process.  Steep slopes are difficult to traverse with revegetation equipment and are highly susceptible to erosion, slumping, and landslides.  Where practical, consider shaping the disturbance to a 3:1 slope (H:V) or flatter to enhance the success of revegetation.  The angle and length of slopes can adversely affect the run-off velocity and increase erosion.

Final waste dump grading prepares the spoils for topsoil application and the grading work is usually accomplished using dozers, scrapers, or similar earth-moving equipment.  Deep rip the shaped site prior to application of the topsoil or other suitable growth medium to eliminate compaction, to increase infiltration, and to provide for water retention reservoirs.  Compaction of the wastes under the topsoil can cause problems even if the topsoil bed is loose.  Plants that root in loose topsoil but can not penetrate the spoils under the topsoil, can be subject to soil-induced moisture or physical stress.  Always rip on the contour to reduce the effects of surface run-off erosion.

BLM_0006437

XI-2

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 11

Where large waste embankments are involved, see Chapter VIII on Mine Waste Management for more detail.  Depressions which will accumulate surface water on the top surface of waste dumps or benches should be avoided unless they are planned as a part of meeting reclamation objectives.  Accumulated water which is not planned for can supersaturate the wastes and cause slumping or dump failures and piping.  The top surfaces of waste dumps, or other elevated flat portions of mined out areas should be graded inward from the outer rim toward drainage channels to limit overflow of the rim.  See Figure XI-1.

Reapply topsoil, selected subsoil, or other suitable growth media to the shaped surface per the guidelines outlined under the Section on Topsoil Salvage and Reapplication and smooth or grade the growth medium to meet the reclamation requirements.

1.    Shaping and Grading Checklist

The mine operator, and if possible, the equipment operator should be included in discussion on reshaping, which addresses:

a.    Save topsoil or other suitable growth media to respread after shaping.

b.    Determine what landform is most desirable to meet post-mining land use; evaluate angle of repose versus 3h:1v slopes, etc.  Flatter is not always better; length of slope affects water velocity, erosion, and infiltration.  Terracing and benching may be used to limit the length and angle of the slope and thus enhance the chances of revegetation success.

c.    Reshape to a visually compatible contour.

d.    Do not steepen slopes in shaping.  This may cause slope failure.

e.    Do not create ponds or depressions that will accumulate surface water unless they are planned and engineered for a specific purpose which is compatible with ultimate reclamation goals.

f.    Leave graded surfaces somewhat roughened to trap seed, slow runoff, and provide favorable micro-climates for revegetation.

BLM_0006438

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 11

Figure XI-1



**Figure XI-1**
**Top of Waste Dump Configuration**

BLM_0006439

XI-4

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 11

g.  Provide for internal and external drainage of
treated areas.

h.  Consider long-term mass stability and safety
requirements. Where large tailings sites or waste
embankments are involved, get review and input
from a geotechnical engineer.  Characteristics of
material and types of equipment need to be
considered.

i.  Be aware that large dozers can push fill material
uphill on a 40-percent slope; beyond 40 percent
their efficiency is very limited.  See
Figure XI-2.

C.  PIT BACKFILLING

Pit backfilling provides an effective means for
reclamation of the disturbed lands to a productive post-mining
land use.  However, development of some commodities and deposit
types may not be compatible with pit backfilling.
Additionally, some waste material is not suitable for use as
backfilling material.

The reclamation plan should describe in detail the
proposed backfilling procedures.  Pit backfilling, where
technologically and economically feasible, should be planned
for the purposes of establishment of the contour of the land
consistent with the proposed post-mining land uses and
reduction of visual impacts.  While pit backfilling may satisfy
the post-mining land use and long-term visual impacts,
backfilling to original contour may be impossible or
undesireable.  Visual and land use concerns may be satisfied by
shaping of the backfilled material.  The reclamation plan
should address the mitigation of unique impacts such as re-
establishing big game migration routes and the development of
features which enhance wildlife habitat.

Reclamation of pits can occur either concurrently with
mining or upon completion of the mining phase of the operation.
Pit reclamation can result in complete pit backfilling, partial
pit backfilling (including scree slope backfilling), highwall
slope reduction, or a combination of these.  The method chosen
for pit reclamation is based upon the long-term land use
planning goals for the area, the mitigation of long-term
environmental impacts, and the associated need to reduce
offsite impacts associated with waste and tailings disposal.

BLM_0006440

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 11

Figure XI-2



**Figure XI-2**
**Equipment Slope Workability Graph**

BLM_0006441