Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 1 of 462

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 11

The reclamation plan should describe in detail the proposed backfilling procedures.  Concurrent pit backfilling can be considered as a means to accommodate backfilling to pits during the operational life of a mine.  The purpose of this mitigation measure is to backfill as much material as possible in conjunction with project activities, reduce the size of overburden piles, and reconstruct some wildlife habitat in the area of the mine pits.  This method for backfilling is generally employed at sites which have multiple pits.

A method of partial pit backfilling developed in an effort to accommodate some pit backfilling without covering the potential future ore resources is scree slope backfilling.  The primary objective in this approach is to conceal mining excavations (principally the upper portions of pit walls) from visibility.

   1.   Special Considerations for Open Pit Mining

      Open pit mine optimization is achieved by extending the pit to the point where the cost of removing overlying volumes of unmineralized "waste" rock just equal the revenues (including profit) from the ore being mined in the walls and bottom of the pit.  Because there is usually mineralization remaining, favorable changes in an economic factor (such as an increase in the price of the commodity or new technology resulting in a reduced operating cost) can result in a condition where mining can be expanded, or resumed at a future time.  This economically determined pit configuration is typical of the open pit metal mining industry and is of critical importance in efforts to maximize the recovery of the mineral resource.

      Figure XI-3 illustrates the "conical" configuration typically used in open pit mining.  To recover all the known ore reserves the entire pit must remain exposed through progressively deeper cuts.  Backfilling can not begin until the ore reserves within the specific pit are depleted at the conclusion of mining.

      Surface strip mining can often accommodate backfilling because the reserves usually occur in the form of a flat-lying bed, at shallow depth over a large spatial area.  See Figure XI-4.  Accordingly there is no need to stockpile and rehandle the excavated material, except during the first cuts.  Under certain circumstances, where multiple pits are being sequentially excavated, it is feasible to backfill one mined-out pit concurrently with mining of a subsequent pit.

BLM_0006442

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 2 of 462

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 11

Figure XI-3



### Figure XI-3
### Typical Open Pit Mine

A. Section Through an Ore Body Before Open-Pit Operations Start

B. Section Through Ore Body Just as Ore is Exposed

C. Section Through Ore Body as Ore Production Commences

D. Section Through Ore Body as Waste Stripping and Ore Production Proceed

E. Section Through Ore Body as Mining Continues

F. Section Through Ore Body as Economic Limit of Pit Operations is Reached

BLM_0006443

BLM MANUAL

XI-8

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter II

Figure XI-4



**Figure XI-4**
**Surface Strip Mine Backfilling**

600 to 1200 Feet

Up to 7000 Feet

Mineral Bed
(About 70 Feet
Thick)

Coal Haul Road

Overburden Removal
In 50 Foot High
Benches

❶ Removal of Topsoil          ❹ Loading of Overburden       ❼ Loading of Mineral
❷ Spreading of Topsoil on     ❺ Hauling of Overburden      ❽ Hauling of Mineral
   Graded Wastes
❸ Blasthole Drilling of       ❻ Dumping of Overburden      ❾ Reclaimed Land
   Overburden

XI-9

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 11

### 2. Technical and Operational Aspects of Pit Backfilling

Once an open pit has been mined, it is generally not possible to replace all the material excavated from the pit, or to restore the land surface to its former condition, due to physical constraints.  Broken rock occupies a much greater volume than solid rock.  As a result of this expansion or "swell factor", all of the rock that has been broken and removed from a pit during mining will not fit back into the pit.  As explained by the National Research Council in its report on surface mining of non-coal minerals:

o "...waste and tailings resulting from mining and processing expand an average of about 30 to 40 percent, and very few mines take out enough ore to leave space in the mine workings to backfill all waste and tailings. Thus, even if the huge cost of backfilling were incurred, waste and tailings would still remain on the surface at many mines..."(NRC, 1979)

### 3. Environmental Effects of Pit Backfilling

Since backfilling procedures involve activities associated with mining (loading, hauling, and dumping of materials), the types of impacts from this are similar to those which occur during mining.  Proper backfilling materials handling and placement is dependent upon chemical and physical material characteristics and site-specific considerations. Depending upon the size of the open pit, backfilling can extend the duration of operations from a few months to several years. The potential unavoidable impacts of pit backfilling are summarized as follows.

### 4. Effects of Complete Pit Backfilling

The primary change from a mining operation that does not include backfilling to one which includes complete backfilling is the extended duration of this project's effects. The benefit of complete pit backfilling is that the final landform will most closely approximate the pre-disturbance conditions.

BLM MANUAL

Rel. 3-275
2/7/92

XI-10

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 11

5. <u>Effects of Scree Slope Backfilling</u>

The primary objective of this alternative is to
conceal mining excavations that would otherwise be visible from
lower view points.  See Figure XI-5.  In areas where the
topography surrounding the pits is steep, scree slope
backfilling requires additional ground disturbance.  Therefore,
wildlife habitat is impacted because of the need to construct
haul roads to the top of the pit high walls.

6. <u>Effects of Concurrent Pit Backfilling</u>

This method is suggested as means to accommodate
backfilling of multiple mine pits concurrently during the
operational life of the project.  This alternative can reduce
the size of the overburden piles and reconstruct some wildlife
habitat in the area of the mine pits.  In most cases this
alternative results in no significant increase or decrease in
environmental impacts when compared to the alternative of not
backfilling the pits.

Concurrent pit backfilling generally can not be used
if material from different pits must be simultaneously mined
and blended to meet mill feed head requirements.  Also, the
second pit must be developed for production far enough in
advance so that ore from the initial pit can sustain the
operation until the second pit is capable of supplying all the
ore needed for the process plant.

D. <u>HIGHWALLS</u>

Final highwall configuration, including consideration of
overall slope angle, bench width, bench height, etc., should be
determined during the review of the plan.  The maximum height
of the highwall should be determined using site-specific
parameters such as rock type and morphology.  In most cases,
the maximum height is regulated by various State agencies.

1. <u>Reclamation</u>

The normal procedures are to either leave the exposed
highwall or to backfill and bury the highwall either totally or
partially.  It is important that the backfill requirements be
determined during the plan review process and included in the
approved plan.  Some overall guidance for highwall reclamation
follows.

BLM_0006446

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 11

Figure XI-5



Figure XI-5
Scree Slope Backfilling

Slope=2 (Horizontal): 1 (Vertical)

BLM_0006447

XI-12

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 11

a.   Shape partially exposed highwalls (above the
     backfill) when practical.  See Figure XI-6.

b.   Blasting down the exposed highwall is a practice
     not generally recommended.  Under certain
     conditions blasting could result in an
     unacceptable increase in the surface disturbance.
     Therefore, the impacts of blasting down highwalls
     should be carefully scrutinized.

c.   Where the exposed highwall exhibits a low profile,
     can be safely worked, and consists of soil
     materials capable of supporting plant life, it may
     be possible to hydromulch the exposed highwall
     using a slurry of water, seed, fertilizer,
     biodegradable fibers, and a tackifier to keep the
     mulching in place.

d.   Steep highwalls (exceeding 3:1 (H:V)) should be
     benched to provide a stable slope.  This has the
     additional benefit of creating  a niche for
     vegetation and provides nesting areas for birds.

e.   Benching near the top and rounding the edge back
     will provide a safety feature by reducing the
     distance of and the chance of falling.

f.   Appropriate fencing or berming at the top of the
     highwall is necessary to abate some of the hazards
     to people and animals.

BLM_0006448

XI-12                                                        XI-13

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 11

Figure XI-6

**Figure XI-6**
**Highwall Reclamation**



BLM_0006449

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 9 of 462

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 12

# XII.  REVEGETATION

## A.  INTRODUCTION

A primary goal of a revegetation program is to stabilize the surface against the long term effects of erosion.  Another major objective is the return of the site to a productive post-operational use.  The revegetation process begins after the disturbed area has been shaped, graded, and treated, and the topsoil or other suitable growth medium is spread and smoothed. The revegetation of the affected lands shall be accomplished in a timely manner and consistent with the reclamation plan.  Lands which did not support vegetation prior to mining because of soil conditions may require no revegetation.

## B.  SOILS MANAGEMENT

The use of topsoil or other selected replacement material as a growth medium to be spread over lands disturbed by mineral activities during reclamation must be considered during reclamation planning. The amount and quality of replacement soils used will have a effect on the future productivity of the reclaimed lands.  Proper soils management is critical to reclamation success.  Some factors to consider early in the reclamation planning process include:

1. Amount and quality of the topsoil to be saved.
2. Alternatives to spreading topsoil.
3. Storage location and duration of storage of salvaged soils.
4. Protection of stored and salvaged soils.
5. Feasibility of direct replacement of the salvaged soils.
6. Required thickness of replacement soil.
7. The volume of available replacement soil.
8. Availability of additional growth media to supplement topsoil replacement.

Corrects Format in Chapter 12

BLM_0006450

XII-2

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 12

A site-specific soil survey should be conducted as a part of the baseline studies. The soil survey should be conducted in accordance with the standards of the National Cooperative Soil Survey (See SCS USDA Handbooks 430 and 436). The purpose of the soil survey is to identify suitable soils for use as growth media or for other special purposes. Soil resources within the zones of proposed disturbance should be inventoried for volume and suitability prior to the disturbance. See Table XII-1. Soils high in clay content may not be suitable to support plant growth but may be suitable for use as an impermeable barrier in waste management. The acceptability of soils is also dependent upon moisture, organic matter, soluble salts, selenium and boron content, bulk density and other factors.

Table XII-1. Soil Suitability for Reclamation Purposes (courtesy of the USFS Intermountain Forest and Range Experimental Station-Logan, Utah)

| SOIL PROPERTY | SOIL QUALITY | | | |
|---|---|---|---|---|
| | GOOD | FAIR | POOR | UNSUITABLE |
| Texture | sandy loam loam silt loam | sandy clay loam silty clay loam clay loam | sandy clay loamy sand silty clay | clay >60% |
| Rock & Gravel (% by volume) | 0-10 | 10-20 | 20-40 | >40 |
| pH | 6-8 | 5-6 8-8.5* | 4.5-5 8.5-9* | <4.5 >9 |
| Na absorption ratio, (SAR) | 4 | 4-8 | 8-16 | >16 |
| Electrical Conductivity (millimhos/cm) | 3 | 3-7 | 7-15 | >15 |

*Check for heavy concentrations of Boron or Lime.

All replacement soils and material suitable for reclamation should be salvaged wherever feasible and stored for later use in reclamation or if conditions permit, applied directly to recontoured areas ready for reclamation.

Corrects Format in Chapter 12

BLM MANUAL

Rel. 3-275
2/7/92

BLM_0006451

XII-3

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 12

Salvaged materials should be properly stored and revegetated
if necessary to protect the stockpiled soils from erosion.
Concurrent topsoil replacement is preferable to long-term topsoil
storage.  Studies have indicated that long-term storage of
topsoil may result in the loss of vital organisms in the soil.
Stockpile sites should be located in areas which will not be
affected by future operations and are easily accessible for
removal at the time the soils are needed.

The appropriate replacement thickness of growth media is
usually based on the amount of available topsoil or growth media
and past experience with application depths.  In general, the
poorer the chemical and physical properties of the spoil or waste
materials, the greater the required depth of the replacement
soils.  When the availability of good soil materials is limited,
consider the qualities of the soils available.  Generally, a thin
layer of topsoil over unproductive subsoil will result in greater
plant productivity than a thin layer of topsoil alone.

In those cases where the waste materials are finely textured
and exhibit no phytotoxic properties (i.e. highly acid or
saline), about 6-12 inches of replacement topsoil or other
suitable growth medium, if available, should be sufficient.
Coarse textured (rocky) waste or waste exhibiting phytotoxic
properties may require greater thicknesses and additional
treatment.  Disturbed areas containing highly phytotoxic
materials may require some form of mechanical treatment, such as
sealing the dump with clays, prior to application of the topsoil.
Where the volume of replacement soils is limited, variances to
the above recommendations or uneven placement may be justified.

Certain fine grained substrata which exhibit favorable
reclamation properties, may be used to advantage as a soil medium
or as a mantle to cover rocky waste.

Reapplied topsoil or selected subsoils should be tested for
nutrients, pH, and toxicity factors prior to planting.

Corrects Format in Chapter 12

BLM_0006452

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 12 of 462

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 12

C.  <u>SEED BED PREPARATION</u>

The first revegetation step is to prepare the newly spread soil material for seeding and planting.  The soil material must be permeable enough to absorb precipitation and to allow for root penetration.  In arid zones, seedling establishment is difficult and highly variable; therefore, proper seedbed preparation is extremely critical.

Seedbed conditioning provides important benefits for plant germination, establishment, and long term vitality by loosening the compacted soil material, providing catchments to increase water available to plants, and creating microsites that shelter seeds and seedlings.  The seedbed should be conditioned to collect, hold, and absorb as much moisture as possible.

Equipment for seedbed conditioning ranges from rippers and discs or chisel plows to spring tooth harrows and rakes.

After the topsoil is applied and graded, consider scarifying, shallow ripping, or disking the site to eliminate compaction and provide for increased infiltration rates.  Ripping or disking will retain water in the seed bed which is essential to the success of the revegetation.  Rip, disk or harrow on the contour of the slope to reduce the effects of surface erosion.

Some important considerations in seedbed preparation are:

1.  Final shape or landform should be compatible with the surrounding landforms where practicable.  If possible, natural drainage should not be altered, except where necessary to protect unstable soils or tailings or toxic materials areas.  The seedbed should be tested for growth potential prior to seeding.  Capillary breaks may be necessary to isolate toxic subsoil materials.

2.  Soils and subsoils that have been highly compacted should be ripped.  Subsoils should be ripped prior to the placement of the topsoil or other growth media.

    a.  Rip the mantle when it is relatively dry to permit shattering beneath the surface.  Moisture content should not exceed field capacity.

Corrects Format in Chapter 12

BLM_0006453

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 13 of 462

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 12

b.  Ripping should generally be 2 to 3 feet deep on 2- to
3-foot centers.  A "rule of thumb" is the distance
between rippers should be equal to the depth ripped.
Ripping depth may be limited by the characteristics
of subsoil materials.  For example, in arid regions,
ripping may bring calcium-rich materials to the
surface, which may inhibit germination.

D.  <u>FERTILIZATION</u>

Many disturbed areas and waste embankments may be nutrient
deficient at the time the reclamation is performed and may
require fertilization to ensure the seedlings establish
themselves.  Fertilization is the addition of a natural or
man-made substance to the soil to supply plant nutrients.  Its
use can be justified when operations disrupt the soil balances
that affect nutrient availability.  Fertilization can be done
before, during, or after seeding, however it is usually more
advantageous to fertilize prior to seeding.  After the initial
fertilization and subsequent establishment of plants, the natural
process of nutrient cycling is expected to maintain the plant
community.  Consider the following when fertilizing reclamation
projects:

-  Soil materials should be tested for nutrient levels prior
to fertilization.  Only <u>available</u> nutrients are important.
Macronutrient (e.g. nitrogen, phosphorus, potassium,
calcium, magnesium, iron and sulfur) and micronutrient
(e.g. zinc, boron, selenium) deficiencies will be
determined by the soil sampling.

-  The nutrient content of bagged and bulk fertilizers is
expressed as a percent of the content by weight.
Example:  A 100-pound bag marked 10-10-10 means 10%
nitrogen, 10% phosphorus ($P_2O_5$), and 10% potash ($K_2O_5$).

-  Equipment to apply chemical fertilizers (common
agricultural fertilizers) range from broadcast spreaders
and drill seeders for dry or granular fertilizer, subsoil
injectors for liquid fertilizer, and hydro-seeders for
applying a slurry of fertilizer and water.  The
application of biologic fertilizers (manure, compost,
etc.) will require special equipment.

Corrects Format in Chapter 12

BLM_0006454

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 14 of 462

### H-3042-1 – SOLID MINERAL RECLAMATION
### Chapter 12

- For best results, fertilize before planting, and harrow or drill the fertilizer into the soil material to increase the effectiveness of the fertilizer.  If it can be demonstrated that the seedlings can be established without fertilizer, consider the application of the fertilizer after the seedlings are established.

- Usually fertilizer applied with a hydro-seeder will be done in conjunction with seeding.  Not only are fertilizer slurries sometimes incompatible with organic mulches, but can be toxic to the seed, and should be applied in separate operations.

- Nitrogen fertilizers should be those that will release at the time of germination.  Losses of available nitrogen over the winter season may reach 30%, therefore, adjust application rates to account for these potential losses.

- Adult plants which exhibit a yellowish-green color and drying of the lower parts of the plant usually are deficient in nitrogen or iron.  Phosphorus deficiencies in plants often cause a purplish color in the leaves and the plants display poor root development, stooling, and spreading.

- Application of low nitrogen levels reduces weed growth.  Higher levels of phosphorus improves root development with no appreciable increase in the growth of weedy species.

### Corrects Format in Chapter 12

BLM_0006455

XII-7

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 12

E.  SOIL AMENDMENTS

     The use of soil amendments is often an important part of
preparing disturbed areas for revegetation.  Most disturbed sites
exhibit soils that have received impacts to their chemical and/or
physical characteristics (e.g. compaction).  These impacts affect
the ability of the soil to function effectively as a growth
medium for vegetation and generally increase the likelihood of
soil surface instability.  Soil amendments are natural or man-
made materials incorporated into the soil to improve the soil-
water or soil-air relationships in the soil profile by altering
the chemical and/or physical properties of the disturbed soils.
Soil amendments help provide a suitable environment for
vegetation establishment.  Soil amendments include, but are not
limited to:  wood chips, calcium chloride, various organic
mulches, gypsum, and lime.  When incorporated into the soil,
these materials help mitigate compaction problems, improve water
infiltration, neutralize acidic or alkaline conditions, modify
soil structure, and enhance water holding capacity while
improving drainage.

F.  SEED SELECTION AND HANDLING

     The following are some general guidelines for seeding:

     -  Select species from a similar climatic zone and soil type.
        Minimum moisture requirements should determine selection.

     -  Seed a mixture of species.  Consider species for both warm
        and cool season growth.  Use a good balance of types which
        provide for the planned post-reclamation use, such as
        grazing or wildlife habitat.

     -  Do not over-seed.  Too many seedlings will compete for
        available moisture and nutrients.

     -  Protect seeded areas from use until the vegetative cover
        is established and self-sustaining.  In areas where it is
        impractical to limit access, use species which are quickly
        established.

Corrects Format in Chapter 12

BLM_0006456

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 16 of 462

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 12

1.  **Species Selection**

Selection of adaptable plant species is essential for
successful reclamation.  In severe environments such as deserts,
alpine zones, or windy ridgetop exposures, the number of
adaptable species will be less than for sites in moderate
climates.  The proper selection of adaptable plant species will
depend on the prevailing climatic and soil conditions in the
project area (see appropriate seed selection handbook for your
area).  The seed selection should be consistent with the Resource
Management Plan post-mining objectives, (i.e. wildlife habitat
and/or grazing).

Criteria for determining plant species adaptable for
the project site should include:

- Ability to quickly establish and stabilize the
  specified surface
- Ability to withstand the extremes of climate at the
  site
- Ability to survive with little or no maintenance
- Ability to establish itself on the soil material
- Availability of seed from commercial seed suppliers
- Form and growth characteristics
- Forage preference and palatability to grazing
  herbivores

The selection of plant species (seed mixes) should be
diverse, and when practical include grasses, forbs, and shrubs.
Trees and shrubs should be re-established where the post-mining
land use includes wildlife habitat.  Species to be planted as
permanent cover shall be self-renewing (perennial) to maintain
the plant community.  Introduced, naturalized or non-indigenous
plant species, may be included in the approved seed mixture if
they support the approved post-operational land uses and do not
conflict with long-term vegetation management goals.  See
Appendix 2 for some suggested species for reclamation use.

Seed mixes should include certain species which
provide for quick cover, embankment stabilization (i.e. deep
rooted legumes), litter production, nitrogen fixing capabilities,
etc.  Observe native plant species growing in the project area on
both the undisturbed lands and disturbed lands.

Corrects Format in Chapter 12

BLM_0006457

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 12

The purpose for seeding is to establish ground cover and protect the soil from erosion and to prevent invasion of undesirable species. Grass species are best suited to this because they have a fibrous root system. Sod forming species are best at reducing erosion.

Consult with BLM specialists, county agents, or other experts, and appropriate research reports regarding reclamation research and proper seed selection.

Some general considerations for species selection follow:

- Recommendations for species selection can be obtained from the BLM, the Soil Conservation Service (SCS), or the Forest Service.

- Elevation and slope aspect are also important factors that should be considered when selecting plant species.

- The Soil Conservation Service (SCS) Plant Material Centers has information about seed and seed dealers. The Centers are an excellent source of information. Also consider botanical gardens and native plant organizations as possible sources.

- All seed purchased should have species name, percent germination, percent pure live seed, percent weed seed and other contaminates, collection location (especially important for native species) and testing date specified on bag. States require that seed planted within the State contain no injurious or noxious weeds.

2. Seed Acquisition

Seed of adaptable plant species may be purchased or collected from native plants in the vicinity of the project site. Some guidelines to seed acquisition include:

Corrects Format in Chapter 12

BLM MANUAL

Rel. 3-275
2/7/92

BLM_0006458

XII-10

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 12

- Purchase seed from dealers with experience in the
  geographic area.  All purchased seed should be
  packed for the growing season in which it will be
  used.

- If collection of native seeds is viable, locate
  appropriate stands of adaptable seed species before
  the seed matures and collect the seed only after it
  matures.  Collect seed in cloth or paper containers
  but never seal in plastic bags as this practice may
  retain moisture and cause molding of the seed.
  Clean and separate the seed from the undesirable
  debris as soon as the material is dry.

- Store the cleaned seed in a cool dry location in
  cloth bags.  Be sure the germination percent,
  collection location, pure live seed, and percent
  weed contaminates are specified on the bag label.
  BLM may inspect the labels prior to the application
  of the seed.

- Legume seed and certain other types of seed (e.g.
  bitterbrush seed) should be inoculated for best
  results.

G.  SEEDING AND PLANTING

     Seeding and planting should be done as soon as the seedbed
preparation is completed, and if possible schedule the seeding
just prior to the longest precipitation period or when available
moisture is most favorable for seedling establishment.  In many
locations, seeding prior to snowfall enhances germination success
in the spring.  By beginning the revegetation immediately after
the seedbed preparation is completed, competitive less desirable
species will not be given an advantage and the seedbed will not
degrade physically or biologically.  Quick establishment of
vegetative cover protects the soil from erosion.  Seeding and
planting patterns should be designed to best provide the desired
post-mining use.

Corrects Format in Chapter 12

BLM MANUAL

Rel. 3-275
2/7/92

BLM_0006459

XII-11

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 12

Seeding rates must be based on pure live seed (PLS)
percentages and seeds per square foot or pounds of pure live seed
per acre.  Seeding rates which are too low may result in sparse
stands which may fail to stabilize the site, while excessive
rates waste seed and may result in stagnant, overly dense stands
with reduced plant vigor.  The seed mixtures and application
rates should be described in the plan and approved by the AO.

Two basic seeding techniques are drill seeding and broadcast
seeding.  The type of seeding to be used is dependent upon the
terrain and species to be used, and both methods may be employed
at the same site.  Broadcast seeding can be divided into ground
seeding, aerial seeding, and hydroseeding.  Drill seeding is
considered an effective method of seeding for most grass species,
while other species must be broadcast.  If the seedbed is smooth
and free of large rocks, consider seeding the site with a
cultipacker-type seeder to assure the seeds are evenly
distributed and to control seeding depth.  However, if the site
is rough and rocky, a rangeland type drill may be more effective.
Where broadcast seeding is the only alternative, do the seeding
immediately after the site has been prepared and cover the seed
by raking to provide for a good seed-soil contact.

Seeding depth is important for successful germination.
Generally, small seed should be seeded closer to the soil surface
than large seed.  Most seeds should be planted from 1/8 inch to
1/2 inch deep, depending upon seed size and type.  Seeding too
deeply delays emergence and reduces total emergence, while
seeding too shallowly increases desiccation and causes faulty
root systems.  Covering most seed is important.  Some seeds will
not germinate when uncovered, birds and rodents will feed on the
exposed seed, and seed may wash or blow away before it
germinates.

Steep slopes and rocky soils may prohibit the use of most
mechanical seeding equipment.  Where equipment can be used, seed
drills will usually ensure good seeding success.  Special note
should be given to the depth of planting.  The appropriate depth
of planting for the selected species should be used.

Corrects Format in Chapter 12

Rel. 3-275
2/7/92

BLM_0006460

XII-12

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 12


Broadcast seeding is often required on portions of the disturbed area. Some types of seed should always be covered with soil. Some suggested methods are a weighted chain link fence, light chain, culti-peater, or harrow. Broadcast seeding works best when done just after completion of the final earthwork, when the surface is soft and friable.

H. SHRUBS AND TREES AND OTHER TRANSPLANTED SPECIES

Planting techniques range from hand planting to sprigging to transplanting. Planting must be done so competition from other species on the site is minimized. It is preferable to establish shrubs and trees on critical revegetation sites through transplanting techniques using containerized or bare root stock. Where possible leave undisturbed buffers of trees between roads and pits to serve as a natural seed source.

Transplanting requires consideration of the following factors:

- Available sources of adaptable stock (e.g., Federal nurseries)
- Care and hardening of the plants prior to planting.
- Determination of the correct time to plant.
- Methods of planting, including considerations of spacing, watering, etc.
- Care and assessment following planting.

Shrubs and trees may often be planted in crucial big game areas to mitigate habitat loss. Well-placed shrubs and trees within the reclaimed area may provide a seed source for future establishment. Shrubs can be established from containerized stock or by selected excavations of shrubs just off site of the project area. The following should be considered when planting shrubs or trees:

- Adapted species should be selected for use with parent material from a similar climate zone.

- Care and hardening of the plants should be considered prior to planting. This can be done by the supplier.

- Adjust time of planting to local conditions.


Corrects Format in Chapter 12

BLM_0006461

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 21 of 462

H-3042-1 – SOLID MINERAL RECLAMATION
Chapter 12

- Site conditions and preparation at the time of planting.

- Methods of planting, spacing, fertilizing, watering, and post-planting care.

## I. <u>MULCHING</u>

Mulches can be used in reclamation to stabilize soils until permanent plant cover becomes established. Mulches not only reduce or prevent wind and water erosion, a good mulch cover will protect the seeded area from the severe effects of heat, cold, and drought. Mulching materials can be organic or inorganic, natural or man-made, soil enriching or inert. When organic mulches are decomposing they can create a serious carbon/nitrogen imbalance in the soil and may require additional nitrogen fertilizer to compensate for the nitrogen tied up in decomposing the mulch. Annual or non-competitive perennial cover crops may also be used as mulch. Commonly used mulches include, straw, hay, jute, wood chips and other woody material, and synthetic biodegradable fibers.

Hay and straw mulches should be applied at the rate of 2000 to 3000 pounds per acre. Fiber mulches are best applied as a hydromulch (in a slurry of water and tackifiers) at a rate of at least 2000 pounds per acre. If seed and fertilizer are added to the hydro-mulch, caution should be taken to ensure the addition of fertilizer to the slurry does not make the slurry toxic to the seed. Apply the hydromulch to a rough surface, such as an exposed road cut, using suitable tackifiers to keep the mulch in place. The use of hydro-mulching on cut-banks is effective for distances up to 150 feet.

Light colored mulches will reduce summer soil temperatures while dark colored mulches raise the soil temperatures (effective for raising spring soil temperatures).

The following are suggestions for using mulches:

- Commonly used mulches include; straw, crushed rock, hay, synthetic mulches, biodegradable fibers and blankets, wood chips and wood fiber, and jute. Care should be taken to ensure that hay mulch does not include noxious weed seeds.

Corrects Format in Chapter 12

BLM_0006462

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 22 of 462

## H-3042-1 - SOLID MINERAL RECLAMATION
### Chapter 12

- Dark-colored mulch will raise spring soil surface temperatures.

- Light-colored mulches will reduce summer soil surface temperatures.

- Mulching will reduce frost heaving of new seedlings.

- Mulch reduces rain splash, surface wind, particle movement and other erosional effects.

- Mulch should be applied to a roughened surface. Do not grade smooth. Apply asphalt or other suitable tackifiers or crimp mulch into the surface to keep it in place.

- Hay and straw mulches for seeding cover and erosion control should be applied at the rate of 1,000 to 3,000 pounds per acre. This amount will provide a 1- to 3-inch deep ground cover.

- Mulch can be applied by hand on 3:1 or less sloping sites up to 1 or 2 acres in size. Larger, steeper sites will require a power blower or mulcher. These power mulchers have a range of approximately 150 feet from an access road.

- Fiber mulches can be applied effectively in a slurry of water, seed, and fertilizer with a hydromulcher. In low-precipitation areas, seed should be applied prior to hydromulching.

- Mulching that is crimped into the soil on dry sites may wick moisture out of the soil in some conditions.

- The use of seeded blankets may be a viable alternative to separate seeding and mulching, especially on steep slopes.

Corrects Format in Chapter 12

BLM_0006463

J. REVEGETATION OF ACIDIC MINING WASTES

Revegetation of acidic mine wastes can pose particularly difficult long-term reclamation problems. Acidic mine wastes are toxic to most vegetation. Virtually all mines which recover ore from sulfide minerals have some potential for acid mine waste, either as tailings piles, waste rock dumps, or low-grade ore stockpiles. Acidic wastes must either be amended chemically or isolated from the weathering environment in order for ultimate reclamation to be successful. The exact measures necessary to ensure reclamation success will depend on a variety of site-specific factors. Often, acidic mine wastes will require some form of engineered cover system to isolate wastes from plant rooting zones. Capillary breaks are effective means of isolating the waste materials. For a detailed discussion of this topic, refer to Volumes I and II, Draft Acid Rock Drainage Technical Guide, prepared for the British Columbia Acid Mine Drainage Task Force. The Bureau of Mines may be able to provide additional assistance.

1. Lime Amendment

Inclusion of a lime amendment into the cover system may help prevent acidification and improve the potential for revegetation success. Lime amendments may also have other applications. A lime amendment is particularly effective when the cover system includes a capillary break from the acidic materials below. Inclusion of lime into a cover system is not likely to be effective in reducing acid mine drainage caused by water infiltration through the cover system. The waste material can usually release sufficient acid to overcome the effect of the amendment.

XII-16

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 12

Where the net neutralization potential (NNP) of waste rock or one of the cover layers is negative (i.e. the material is acidic), it may be beneficial to incorporate lime into the cover system as a neutralizing agent.  When considering lime application it is important to determine if it will be necessary to add lime above the amount indicated by the NNP.  The NNP is a minimum number and it is often necessary to substantially increase the amount of lime added to account for other natural processes, such as precipitation of iron on the lime, which limit the availability of the lime for acid neutralization.  The rate of lime incorporation is usually expressed in tons of $CaCO_3$ necessary to effectively neutralize 1000 tons of waste material.

Lime can be added in several different forms.  Slaked lime (CaO) and hydrated lime (CaOH) are the most effective neutralization agents.  However, the relative abundance and correspondingly lower cost of limestone ($CaCO_3$) make it more common for this use.  Lime amendments are usually disked or harrowed into the surface to prevent coating and subsequent reduction of moisture infiltration.  Application of more than 30 tons of lime per acre may prove to be impractical.  It is also possible to mix lime into waste material in batches to assure even distribution.  It is best to have a range of sizes present in the lime amendment to ensure consistent reaction and acid consumption.  Normally, an agricultural grind meets this requirement.

2.  <u>Bactericides</u>

The oxidation of sulfide minerals is catalyzed by the bacteria *Thiobacillus ferrooxidans*.  This bacteria can speed the reaction by several orders of magnitude.  The activity of the bacteria can be limited by the application of bactericides to pyritic waste materials and cover systems.  Bactericides should be considered short-term remedies, which may be particularly applicable in aiding the establishment of vegetation.  Once a vegetative cover is established, oxidation may be sufficiently inhibited to allow for reclamation success.

Corrects Format in Chapter 12

BLM_0006465

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 25 of 462

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 12

K.  TEST PLOTS

     It is often appropriate for an operator to install test plots
prior to revegetation of a large disturbed area.  This process
will enable the proper seed mixture, fertilization type and rate,
and other soil amendment requirements identified in the
reclamation plan to be evaluated on a site-specific basis.  In
addition, it allows for the use of new and innovative techniques
which have not been widely proven.  A major advantage in using
test plots is that failures are much less costly to the operator
and the environment than "real-life" failures.  Requirements for
test plots should be developed in conjunction with BLM renewable
resource specialists, such as range conservationists, wildlife
biologists, soil scientists, and surface protection specialists.

Corrects Format in Chapter 12

BLM MANUAL

Rel. 3-275
2/7/92

BLM_0006466

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 13

# XIII.   POST-MINING MULTIPLE USE MANAGEMENT

## A.   INTRODUCTION

The approved post-mining land use planned for in the RMP or other land-use planning document determines to great degree the specific requirements of the reclamation plan with regard to revegetation, land form reclamation, and many other aspects of reclamation. The specific post-mining use or uses may also have an impact during the operation which is directly related to the reclamation goals and activities necessary for a particular site. Specific considerations should be given to wetland and riparian area management, wildlife and fisheries management, range management, recreation management, forestry management, and visual resource management.

## B.   WETLANDS AND RIPARIAN AREA MANAGEMENT

Wetlands include areas adjacent to and influenced by streams (whether waters are surface, subsurface, or intermittent), springs, lake shores, marshes, potholes, swamps, muskegs, lake bogs, wet meadows, and esturine areas. Riparian areas are a form of wetland transitional between permanently saturated wetlands and upland areas. They include the vegetative zones along the banks of rivers and streams and around springs, bogs, wet meadows, lakes, and ponds. See Figure XIII-1. Of particular management concern are riparian areas in arid and semi-arid ecosystems.

Riparian-wetland areas are among the most productive and important ecosystems, comprising nearly 1 percent of the public lands. Characteristically, these areas display a greater diversity of plant and animal life and vegetation structure than adjoining ecosystems. Healthy riparian-wetland systems filter and purify water as it moves through the riparian zone, reduce sediment loads and enhance soil stability, provide micro-climate moderation when contrasted to extremes in adjacent areas, and contribute to groundwater recharge and base flow.

Departmental and BLM policy on riparian area management requires that action be taken to avoid adverse impacts associated with the use and modification of wetlands. Overall management of wetland areas must be based on site-specific characteristics and settings. The goal of reclamation of riparian/wetland sites is to minimize disturbance and to restore and preserve the natural beneficial functions of those wetlands. Such functions include:

Rel. 3-275
2/7/92

BLM_0006467

X111-2

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 13

Figure XIII-1



Figure XIII-1
Examples of Riparian and Wetland Areas

BLM_0006468

Case No. 1:20-cv-02484-MSK  Document 27-10  filed 04/27/21  USDC Colorado  pg 28 of 462

- Dissipating stream energies associated with high flows, thus reducing erosion.

- Filtering of sediment and pollutants carried with overland flow and aiding alluvial valley floor and floodplain deposition.

- Improvement of headwater storage potential, which can result in making water available for release throughout the year.

- Development of root masses that stabilize stream banks against cutting action.

- Providing vegetative cover adequate to shade the water and maintain water temperatures suitable for the survival of fisheries and other aquatic life.

- Maintenance of water oxygenation during the colder winter months suitable for survival of aquatic life.

- Production and maintenance of food chains which include fish.

- Maintenance of habitat to host the food chain base.

- Production and maintenance of a food supply and habitat for non-aquatic animals.

- Critical water sources for wildlife in many arid areas.

Specific reclamation actions should restore the natural functions of streams, including flood energy dissipation, bank building, sediment filtering, water storage, and aquifer recharge.  Where riparian and other wetland areas are in poor condition, efforts to improve or enhance the riparian resources should be made as a part of complete watershed management.

Wetland management must be conducted within the framework of Federal government policy, a policy of "no net loss of wetlands".  Reclamation activities must be conducted so as to provide this mitigation for any wetlands disturbed by the mining operation.  In addition, the construction of wetlands as a part of reclamation may provide mitigation for off-site losses of productive wetland areas.

BLM_0006469

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 29 of 462

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 13

- Dissipating stream energies associated with high flows, thus reducing erosion.

- Filtering of sediment and pollutants carried with overland flow and aiding alluvial valley floor and floodplain deposition.

- Improvement of headwater storage potential, which can result in making water available for release throughout the year.

- Development of root masses that stabilize stream banks against cutting action.

- Providing vegetative cover adequate to shade the water and maintain water temperatures suitable for the survival of fisheries and other aquatic life.

- Maintenance of water oxygenation during the colder winter months suitable for survival of aquatic life.

- Production and maintenance of food chains which include fish.

- Maintenance of habitat to host the food chain base.

- Production and maintenance of a food supply and habitat for non-aquatic animals.

- Critical water sources for wildlife in many arid areas.

Specific reclamation actions should restore the natural functions of streams, including flood energy dissipation, bank building, sediment filtering, water storage, and aquifer recharge.  Where riparian and other wetland areas are in poor condition, efforts to improve or enhance the riparian resources should be made as a part of complete watershed management.

Wetland management must be conducted within the framework of Federal government policy, a policy of "no net loss of wetlands".  Reclamation activities must be conducted so as to provide this mitigation for any wetlands disturbed by the mining operation.  In addition, the construction of wetlands as a part of reclamation may provide mitigation for off-site losses of productive wetland areas.

BLM_0006470

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 30 of 462

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 13

C.  <u>WILDLIFE AND FISHERIES MANAGEMENT</u>

     Minimizing impacts to the wildlife and fisheries resources
is an important consideration in reclamation.  Protection of
the threatened and endangered species and their habitat is
provided for under the Endangered Species Act of 1973, as
amended (16 U.S.C. 1531 <u>et seq.</u>).  Where wildlife and fisheries
habitat will be part of the post-operational uses, all wildlife
and fisheries habitat reclamation and mitigation procedures
should be described in the approved plan.  Baseline data of the
wildlife and fisheries use will provide a valuable reference
for development of the reclamation plan.  The reclamation plans
should include the following.

     For reclamation to provide wildlife habitat, emphasis
should be placed upon habitat features that promote maximum
vegetative species diversity and value following operations.
Reclamation designed to produce a desirable mix of shrubs,
grasses, and forbs will benefit wildlife.  Leave buffer zones
of native vegetation wherever possible to perpetuate the
re-establishment of native species.  Integrate the vegetative
components and those landform features required to perpetuate
diverse and habitat-sufficient plant communities.  To
accomplish this, incorporate diverse slopes, surface
undulations, minor depressions, swales, convoluted drainages
and rock or brush piles.  The reclamation plan should include a
statement of the wildlife and/or fisheries reclamation
objectives.

     Suggested reclamation practices to enhance wildlife
habitat include restoration of diverse land forms, direct
topsoil replacement to the disturbed or shaped areas, shrub and
tree transplants and construction of rock and brush piles and
water developments.  See Figure XIII-2.  Suggested reclamation
practices to enhance fisheries habitat include water source
development, where necessary, stream rehabilitation which
emphasizes diversity of habitat through stream morphology (ie.
gradient,sinuosity)  which includes a variety of fish habitat
structures like pools, riffles, lakes etc. as the objective.
See Figure XIII-3.  Riparian zones and wet meadows should be
protected, or the long term impacts mitigated.  Specific
impacts, such as the interruption of migration routes, loss of
critical species habitat and loss of wildlife production areas
should be mitigated.  Additional information which may be
useful is found in Chapter VII, Sections F, I, and J.

Rel. 3-275
2/7/92

BLM_0006471

XIII-6

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 13

Figure XIII-2

## Figure XIII-2
## Examples of Wildlife Enhancement



Wildlife Habitat Enhancement—
Slash Pile for Small Mammals + Birds



Rockpile for Small Mammals + Birds



Tree Snag Left for Nesting
and Roosting



Highwall With Niches
for Raptors

Rel. 3-275
2/7/92

BLM_0006472

H-3042-1 - SOLID MINERAL RECLAMATION

Chapter 13

Figure XIII-3

**Figure XIII-3**
**Examples of Fisheries Enhancements**



Source: *Placer Mining in Alaska*, BLM Alaska State Office, 1989.

BLM_0006473

XIII-8

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 13

D. RANGE MANAGEMENT

Rangeland postmining land use is a major land use on reclaimed areas in the West. Rangeland can be defined as a vegetation system established to provide for food or browse for domestic livestock and/or indigenous wildlife without the need for constant maintenance. Rangeland can thus be quite variable in the type of dominant vegetation: grasses; legumes; forbs; shrubs; or trees. Grassland, steppe, desert, or forest can be rangeland.

The vegetation established on reclaimed areas for rangeland use should be compatible with surrounding range. Rangeland restoration is basically no different from restoration of any other land use. A reestablished rangeland does not necessarily have to match premining conditions species for species or density for density, but should meet the requirements set forth in the reclamation plan.

E. RECREATION MANAGEMENT

Recreational land can be any land use or combination of land uses which provides for a planned or anticipated use by the general public. Examples of recreational use include hunting, hiking, camping, picnicking, and nature study. The combinations of revegetation systems and specific landform reclamation procedures useful for establishing recreational uses are limitless. In many cases of postmining recreational land use, it is desirable to establish a water resource. In addition, a diverse mixture of plant types is usually desirable for any recreational use. The typical recreational uses often occur on areas reclaimed for other postmining uses.

Planned uses for reclaimed areas can be tailored to recreation. These could include railroad beds converted into bike paths or off-road vehicle trails, revegetated mine roads to be used as hiking and nature study trails, and drill pads reclaimed for use as campsites. Many other recreational uses for reclaimed lands could be included as a part of the reclamation plan. These recreational uses should be planned taking into account the resource values present at a particular site, such as scenery, water resources, etc.

BLM_0006474

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 34 of 462

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 13

F.  FORESTRY MANAGEMENT

     Forestry uses of reclaimed land can be established for
commercial timber tree production, long-term watershed
protection, wildlife habitat, recreation, firewood production,
or any combination of these or other purposes.  A forestry use
will usually remain as such for long periods of time without
requiring intensive maintenance.  Maintenance can be applied,
and in some cases is very desirable for maintaining the quality
and vigor of the established stand.

     Whether the intended forest is comprised of a limited
number of species (as for tree farming) or a wide diversity of
species, there is little difference in the feasibility of the
reclamation, provided the proper techniques and methods are
applied in conformance with any existing timber management
plan.

G.  VISUAL RESOURCE MANAGEMENT

     The BLM has a basic stewardship responsibility to identify
and protect visual values on public lands under the authority
of FLPMA and NEPA. Actual reclamation of the site is conducted
in accordance with the Resource Management Plan and the
approved reclamation plan.  To the extent practicable the
reclaimed landscape should have characteristics approximating
or  compatible with the visual quality of the adjacent area
with regard to location,scale, shape, color, and orientation of
major landscape features and meet the needs of the planned post
disturbance land use.

     The visual management class of a particular area provides
guidance for the design, development, and reclamation of a
project in that area.  Visual design considerations should be
incorporated into all surface disturbing activities.  BLM
Manual Section 8431 provides the process for rating the visual
contrasts for an area and may be useful in evaluating the
impacts of an operation and the success of reclamation.

     The visual resource management (VRM) aspects of the
reclamation plan should be monitored in cooperation with the
VRM Coordinator in the appropriate field office.  Further
information on the VRM program can be found in BLM Manual
Sections 8400 (Visual Resource Management), 8410 (Visual
Resource Inventory), 8430 (Application of Visual Resource
Management Principles to Project Planning and Design), 8431
(Visual Resource Contrast Rating), and 8440 (Environmental
Assessment), and in BLM Handbooks H-8410-1 (Visual Resource
Inventory) and H-8431-1 (Visual Resource Contrast Rating).

BLM_0006475

Case No. 1:20-cv-02484-MSK   Document 27-10   filed 04/27/21   USDC Colorado   pg 35 of 462

H-3042-1 - SOLID MINERAL RECLAMATION
Chapter 13

H.  <u>WILDERNESS MANAGEMENT</u>

In some cases, mining will be conducted in wilderness study areas (WSAs).  Operations in WSAs must be reclaimed to be substantially unnoticeable in the area as a whole in order to meet the nonimpairment criteria unless grandfathered or valid existing rights exist.  Reclamation of these operations must ensure prevention of unnecessary or undue degradation of the environment and provide for reasonable measures to preserve the wilderness character of the area.  If mining operations are proposed in Wilderness Areas, the requirements for operational constraints and  reclamation are likely to be specific to a particular Wilderness because of the enabling legislation, valid existing or grandfathered rights.  For additional guidance refer to Manual Sections 8550 and 3802.

BLM_0006476

H-3042-1 - SOLID MINERAL RECLAMATION
Glossary of Terms


-A-

**acid mine drainage**:  water with a pH less than 6.0 discharged
from an active, inactive, or abandoned mining operation.

**acidic**:  a solution containing a high hydrogen ion
concentration (pH < 7).

**akaline**:  having the qualities of a base (pH > 7).

**alluvial valley floor**:  the unconsolidated stream-laid deposits
holding streams with water availability sufficient for
subirrigation or flood irrigation agricultural activities.

**authorized officer**:  any employee of the Bureau of Land
Management delegated the authority to perform the duty
described in the section in which the term is used.

-B-

**backfilling**:  the filling in of a place from which rock or ore
has been removed.

**baseline data**:  environmental or other data used to
characterize an area prior to the start of any mining or
reclamation activity.

**basin relief ratio**:  the ratio of basin relief to basin length,
i.e. the ratio of the difference in elevation of the highest
and lowest points in a stream drainage basin to the
horizontal distance of the straight line from the mouth of
the drainage to the farthest point on the drainage divide of
the basin, parallel to the principle drainage direction.

**bedload potential**:  the expected capacity of a stream to carry
materials, such as the larger and heavy materials (e.g.
boulders, pebbles, gravel), immediately above the stream bed
by traction or saltation.

**bendway radius of curvature**:  the radius of the inside curve of
a bend in a stream or waterway.

**bendway shear stress**:  the shear stress created at the outer
curve of a bend created by the change of direction of the
current of a stream or waterway.

**benthic organisms**:  organisms living on, in, or at the bottom
of a body of water.

**berm**:  an artificial ridge of earth.


Corrects Format in Glossary

BLM_0006477

Glossary, Page 2

H-3042-1 - SOLID MINERAL RECLAMATION
Glossary of Terms


**bioremediation techniques**:  the use of introduced or native organisms to minimize or correct pollution occurrences.

**bladed areas**:  any area where the original surface is disturbed by mechanical equipment such as graders, bulldozers, or front-end loaders.

**brush barriers**:  sediment control structures made from vegetation such as tree limbs, branches, etc.

-C-

**casual use**:  activities ordinarily resulting in only negligible disturbance of the Federal lands and resources.  See 43 CFR 3809.0-5(b).

**closure**:  the act of closing any phase of a mining operation where further operations is not intended.

**concurrent reclamation**:  reclamation activities carried out as an integral part of ongoing mineral exploration, development, or extraction operations.

**conductivity**:  the relative ability of a material to carry an electrical current.

**convection**:  transfer of heat by means of the upward motion of the particles of a liquid or gas that is heated from below.

**Corps of Engineers' Section 404 Permit**:  a permit obtained from the U.S. Army Corps of Engineers, as required by Section 404 of the Clean Water Act, necessary to conduct activities which impact wetlands or riparian areas.

**cover systems**:  designed structures or systems which minimize or prevent the infiltration of surface or meteoric waters.

**crimping**:  the act of mechanically pushing mulch into the soil to keep it in place.

**cross valley dump**:  a waste disposal system designed to traverse a valley perpendicular to the longitudinal direction of the valley.

**curved-arc failures**:  failure of a slope or highwall in excavated material characterized by a curved escarpment.


Corrects Format in Glossary

BLM_0006478

H-3042-1 - SOLID MINERAL RECLAMATION
Glossary of Terms

**cut slope angle**:  angle from horizontal of the slope of an
excavation.

**cutoff trenches**:  excavations designed to reduce the flow of
surface water across otherwise smooth surfaces.

-D-

**debris slide**:  a small, rapid movement of largely
unconsolidated material that slides downward to produce an
irregular topography.

**deoxygenation**:  the process of removing free oxygen from water.

**desalination**:  the process of making potable water from saline
waters.

**design storm event**:  the maximum probable precipitation event
for which structures are designed to contain and manage the
associated surface and subsurface flows (e.g. the 24-hour
storm event with a likelihood of reoccurance at 10-year
intervals, i.e. the 10-year, 24-hour storm event).

**diffusion**:  the permeation of one substance through another.

**drainage density**:  the ratio of the total stream lengths of all
stream orders with a drainage basin to the area of that
basin projected to the horizontal plane.

**drawdown wells**:  wells that when pumped lower the water table
or piezometric surface of an aquifer.

**drill seeding**:  a seeding technique where individual holes are
drilled for each seed or seed group.

**drill hole site**:  surface locations where a drill hole is
drilled.  This may or may not require excavation or pad
construction.

**drop structure**:  a hydrologic structure designed to reduced the
sediment load of a stream by allowing for controlled
sedimentation.

Corrects Format in Glossary

Glossary, Page 4

H-3042-1 – SOLID MINERAL RECLAMATION
Glossary of Terms

–E–

**earth flow**:  a rapidly moving flow of mixed soil, rock, and water.

**erosion**:  the group of physical and chemical processes by which earth or rock material is loosened or dissolved and removed from any part of the earth's surface.

**eutrophic**:  applied to a body of water which is rich in dissolved nutrients but has a seasonal oxygen deficiency in the stagnant bottom waters.

**exploration**:  the removal of overburden, drilling, trenching, construction of roads, or any other disturbance of the surface for the purpose of determining the location, quantity, or quality of a mineral deposit.

–F–

**factor of safety**:  the ratio of the available shear strength to the developed shear stress on a potential surface of sliding determined by accepted engineering practice.  Also called safety factor.

**flocculation**:  the gathering of suspended particles into aggregations.

**French drains**:  a covered ditch containing a layer of fitted or loose stone or other pervious material.

–G–

**gabion**:  a bottomless wicker cylinder or basket filled with stones and used in engineering to prevent erosion or to trap sediment.  Gabions are usually constructed of open weave metal, such as chain link fencing.

**geotextile**:  any of a number of plastic, rubber or other synthetic compounds which are used either as a cushion or drain layer in liner systems.

**ground water**:  water at or below the water table, used in a broad sense to include all water beneath the surface of the earth.

Corrects Format in Glossary

Rel. 3-275
2/7/92

BLM_0006480

H-3042-1 - SOLID MINERAL RECLAMATION
Glossary of Terms

<u>growth medium</u>:  soil or other material capable of supporting
plant growth.

-H-

<u>hazardous waste</u>:  a waste material which presents some
toxicological or mutagenic hazard to humans or animals.

<u>head of valley dump</u>:  a waste disposal system constructed at
the narrowest end of a valley.

<u>headgate</u>:  a watergate or floodgate of any race or sluice.

<u>heavy metal pollution</u>:  contamination of surface or ground
water, soil, or other material by cations or compounds of
metals such as lead, arsenic, mercury, etc.

<u>highwall</u>:  the unexcavated face of exposed overburden or ore in
an opencut of a surface or for entry to an underground mine.

<u>hydraulic scouring</u>:  the erosion of the bed or bank of a
waterway by the action of flowing water.

-I-

<u>incendive temperature potential</u>:  the temperature of the spark
generated by a particular material when struck.  The higher
the temperature, the more likely that the spark will create
an ignition of flammable material.

<u>infiltration</u>:  the act or process of passing into or through a
substance.

<u>interim reclamation</u>:  reclamation conducted during temporary
periods of operational cessation or shutdown.  In general,
interim reclamation is not adequate for permanent closure of
an operation.

<u>interim shutdown</u>:  a temporary closure of an operation or
cessation of activity for a short (less than 1 year) period.

-L-

<u>leach pads</u>:  mineralized material stacked so as to permit
wanted minerals to be effectively and selectively dissolved
by application of a suitable solute.

Corrects Format in Glossary

BLM_0006481

Glossary, Page 6

H-3042-1 - SOLID MINERAL RECLAMATION
Glossary of Terms


**leachate**:  liquid that has percolated through the soil or other medium.  A solution obtained by leaching.

**leaching**:  extracting a soluble compound from an ore by selectively dissolving it in a suitable solvent.

**liner**:  a layer of impervious material placed in a ditch or pond to prevent leakage.

-M-

**microclimate**:  the climatic conditions of a small, generally restricted, area.

**mill effluent**:  a liquid, solid, or gaseous product, frequently waste, discharged from a mineral processing facility.

**mining**:  the science, technique, and business of mineral discovery and exploitation.

**moisture barrier**:  an impermeable material or structure designed to prevent the inflow of water or aqueous solutions.

**moisture retention zone**:  a material or structure designed to capture and store water or aqueous solutions.

**mulch**:  a covering, as of straw, leaves, manure, etc., spread or left on the ground around plants to prevent excessive evaporation or erosion, enrich the soil, etc.

-N-

**National Pollutant Discharge Elimination Standards (NPDES) Permit**:  a permit obtained from EPA or an implementing State agency governing point source discharges of water or aqueous solutions into the waters of the United States under Clean Water Act authorities.

**neutralization**:  process by which acid is added to an alkaline solution or an alkali to an acid solution until they become neutral.

**neutralization potential**:  a measure of the relative ease by which a solution may be neutralized.

Corrects Format in Glossary

BLM_0006482

H-3042-1 - SOLID MINERAL RECLAMATION
Glossary of Terms

-O-

**open pit:** a form of mining operation designed to extract minerals that lie near the surface. Waste or overburden is first removed and the mineral is broken and loaded.

**operations:** activities conducted for the purpose of prospecting, exploration, extraction, or other exploitation of a mineral or minerals. Operations also include reclamation and closure activities.

**order 1 and 2 streams:** order 1 streams are the smallest, unbranched streams in a drainage basin. Order 2 streams are formed by the confluence of two Order 1 streams.

**overburden:** material of any nature, consolidated or unconsolidated that overlies a mineral deposit.

-P-

**permanent stream channels:** natural drainages containing persistent streams.

**permeability:** a measureme~~          ~~ree to which water or other fluid will n~                     tance.

**pH:** the sv~~          ~~          reciprocal of hydrogen ion co~                              ter. A measure of the relativ                                numbers (>7) being numbers                                  lution, with lower alkaline

**phytotoxic:**

**pit:** an exca                              \e earth.

**precipitation:**                               on in the atmosphere,

**prospecting:** an                           _cted towards locating a mineral dep~

**pure live seed:** a          _r the percentage of seeds of the desired species     _n will germinate out of the total seeds in a mixture.

Corrects Format in Glossary

BLM_0006483

Glossary, Page 8

H-3042-1 - SOLID MINERAL RECLAMATION
Glossary of Terms

-R-

**reagent**:  a substance that, because of the reactions it causes, is used in analysis and synthesis.

**reclamation**:  those actions taken to restore mined land to a post-mining use approved by the authorized officer.

**reclamation bond**:  a financial guarantee of cash or an approved surety held by the BLM or other regulatory or surface management agency to ensure proper reclamation is completed.

**reclamation plan**:  a document containing the specific procedures and techniques to be used to reclaim a site, which is approved by or submitted to BLM and/or any other surface management agency.  A reclamation plan is an integral part of a mine plan, exploration plan, plan of operations, notice, or permit, but can be prepared as a separate document.

**regrading/grading**:  shaping of the surface of an area disturbed by mining to prepare the area for reclamation.

**revegetation**:  reestablishment of vegetative cover on a disturbed area.

**rill**:  a small erosive feature caused by the channeling of water on slopes

**riparian area**:  a form of wetland, transitional between permanently saturated wetlands and upland areas.  They include the vegetative zones along the banks of rivers and streams and around springs, bogs, wet meadows, lakes and ponds.

**ripping**:  the act of mechanically breaking compacted soils or rock to facilitate excavation.

**rock filters**:  sediment trapping structures constructed of various sized rocks.

**rock stilling basins**:  a particular type of sediment trap constructed of rock.

Corrects Format in Glossary

BLM_0006484

H-3042-1 - SOLID MINERAL RECLAMATION
Glossary of Terms


-S-

**scarified**:  loosened with a cultivator or other mechanical
device.

**sediment ponds**:  any natural or artificial structure or
depression used to remove solids from water and store
sediment or other debris.

**sediment barrier**:  any natural or artificial structure used to
remove solids from streams or drainages.

**sediment trap**:  any natural or artificial depression used to
remove solids from streams or drainages.

**seedbed**:  topsoil or other suitable growth medium which has
been prepared for seeding by working and by addition of
necessary amendments.

**side-cast material**:  the material which is removed from an
excavated area by pushing, blasting, or using other methods,
and is disposed of adjacent to the excavated area.

**sidehill dump**:  a waste disposal method in which the waste
material is placed on the outslope of a natural hill.

**silt retention ponds**:  a sediment pond designed to store small
-sized (silt) sediments.

**siltation**:  small sized sedimentary particles carried by
surface runoff and redeposited.

**slime ponds**:  a reservoir of any kind into which slimes are
conducted in order that they may have time to settle or in
which they may be reserved for subsequent treatment.

**slope**:  average inclination of a surface, measured from the
horizontal.

**soil**:  the unconsolidated natural surface material present
above bedrock;  it is either residual in origin (formed by
the in-place weathering of bedrock) or it has been
transported by wind, water or gravity.

**spoil**:  overburden or other waste material removed during
mining.




Corrects Format in Glossary

BLM_0006485

H-3042-1 - SOLID MINERAL RECLAMATION
Glossary of Terms

**spoil piles**:  the area where mine waste or spoil materials are disposed of or stored.

**sprigging**:  a method of planting trees or shrubs using only small branches, or sprigs, of the plant.

**stooling**:  a growth pattern of some plants, especially grasses, where new shoots are produced directly from the roots in a cluster.

**subsoil drainage system**:  a natural or artificial drainage established under the ground.  Such systems are often necessary to establish the proper moisture level in the surface growing medium and to prevent erosion from excessive surface runoff.  Such systems are also necessary to allow proper aquifer recharge.

**surface water runoff control plan (also called a storm water management plan)**:  a plan, or portion of a larger plan, which addresses the issue of surface runoff of meteorological waters.  This plan is often a part of the required plans for an NPDES permit.

**surface mining**:  mining at or near the surface.  Also called strip mining, placer mining, opencast or opencut mining, and open-pit mining.

**suspended solids**:  solid material that can be separated from a liquid by filtration.

-T-

**tackifier**:  a material added to a hydroseeding or hydromulching mix to make the mix sticky and thus improve the chances of adherence of the mix to the soil or other growth media.

**tailings**:  the inferior leavings or residue of any mine product after most of the valuable ore has been extracted. Generally refers to mill effluent.

**toxic substances**:  refers to any substance that has a poisonous effect on a form of animal or plant life.

**turbidity**:  the state or condition of having the transparency or translucence disturbed, as when sediment in water is stirred up.

Corrects Format in Glossary

BLM_0006486

H-3042-1 - SOLID MINERAL RECLAMATION
Glossary of Terms

-V-

**valley leach**:  a leach pad which is constructed so as to fill or partially fill a valley.

**visual resource management**:  BLM system to classify the landscape into visual resource classes, each of which has a specific management prescription.

-W-

**waste embankments**:  Slopes composed of discarded overburden or other waste material as a part of some dump or pond structure.

**water bars**:  combination of ditches and barriers to direct flowing water off of a disturbed area.

**wetland area**:  area adjacent to and influenced by streams, springs, lake shores, marshes, potholes, swamps, muskegs, lake bogs, wet meadows and esturine areas.

Corrects Format in Glossary

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Aldon, E. F., "Revegetating Disturbed Areas in the Semiarid
Southwest," Journal of Soil and Water Conservation, Vol. 28,
1973, pp. 223-225.

Aldon, E. F., "Seed Sources, Species Selection and Current
Research in Species Adaptation for Mine Spoil Reclamation,"
in Kimery C. Vories, editor, Reclamation of Western Surface
Mined Lands, Ecology Consultants, Fort Collins, Colorado,
1976, pp. 99-101.

Amimoto, P. Y., Erosion and Sediment Control Handbook, California
Department of Conservation and U.S. Environmental Protection
Agency, EPA Publication No. EPA 440/3-78-003, 1977, 179 pp.
Reprinted 1981, California Division of Mines and Geology,
Sacramento, California.

Amimoto, P. Y., editor, Proceedings of the Mined Land Reclamation
Workshop, Special Publication 59, California Division of
Mines and Geology, Sacramento, California, 1982.

Astrup, M. H., "Ground Cover Plants and Planting," Highway
Research Board Roadside Development Reports, 1951, pp. 34-
37.

Attaway, Micheal, "Environmental Compliance at the Colosseum
Mine," in the California Desert Mineral Symposium
Compendium, BLM California Desert District Office and the
South Coast Geological Society, 1989.

Bachmat, Y., and others, Groundwater Management:  The Use of
Numerical Models, American Geophysical Union Water Resources
Monograph No. 5, Washington, DC, 1985, 127 pp.

"Backhoe Applications:  A New Approach for Reclamation,"  Mine
Quarry, Vol. 14, No. 11, November 1985, pp. 34-35.

Bagnold, R. A., An Approach to the Sediment Transport Problem
from General Physics, U.S. Geological Survey Professional
Paper 422-I, 1966, 37 pp.

Banks, Paul T., Robert E. Nickel, and Donald A. Blome,
Reclamation and Pollution Control:  Planning for Small Sand
and Gravel Mining Operations, Bureau of Mines Open File
Report OFR 35-81, Washington, DC, January 31, 1981, 143 pp.

Format and Correction made in Bibliography

BLM_0006488

Bibliography, Page 2

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Barrett, James, and others, <u>Procedures Recommended for Overburden and Hydrologic Studies of Surface Mines</u>, General Technical Report INT-71, U.S. Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah, January 1980, 120 p.

Barth, R. C., and B. K. Martin, <u>Soil-Depth Requirements to Reclaim Surface-Mined Areas in the Northern Great Plains</u>, Colorado School of Mines Research Institute, Golden, Colorado, 1982.

Barth, R. C., "Soil-Depth Requirements to Reestablish Perennial Grasses on Surface-Mined Lands in the Northern Great Plains," <u>Minerals and Energy Resources</u>, Vol. 27, No. 1, 1984.

Barth, R. C., and B. K. Martin, "Reclamation of Phytotoxic Tailings," <u>Minerals and the Environment</u>, Vol. 3, 1981, pp. 55-65.

Beasley, R. P., and others, <u>Erosion and Sediment Pollution Control</u>, 2nd edition, Iowa State University Press, Ames, Iowa, 1984, 354 pp.

Black, C. A., <u>Soil-Plant Relationships</u>, 2nd edition, John Wiley & Sons, Inc., New York, New York, 792 pp.

Brenner, Fred J., "Land Reclamation After Strip Coal Mining in the United States," <u>Mining Magazine</u>, Vol. 153, No. 3, September 1985, pp. 211-213, 215, 217.

Brown, Darrell, and Richard G. Hallman, <u>Reclaiming Disturbed Lands</u>, U.S Forest Service, Equipment Development Center, Missoula, Montana, November 1984, 91 pp.

Brown, D., <u>Handbook:  Equipment for Reclaiming Strip Mined Land</u>, U.S. Forest Service Equipment Development Center, Missoula, Montana, 1977, 58 pp.

Brown, L. F., and C. L. Jackson, "Reclamation of Urad Molybdenum Mine, Empire County," <u>Minerals and the Environment</u>, Vol. 6, 1984, pp. 77-82.

Format and Correction made in Bibliography

BLM_0006489

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Buckman, H. O., and N. C. Brady, <u>The Nature and Properties of Soils</u>, 7th edition, The MacMillan Company, New York, New York, 1969, 653 pp.

Bunin, Jane, JoAnn T. Hackos, and Michalann Harthill, "Sodding Native Grasslands for Mined Land Reclamation in the Northern Great Plains," <u>Mineral and Energy Resources</u>, Vol. 25, No. 3, May 1982, pp. 1-24.

Cairns, J., "Ecological Considerations in Reclaiming Surface Mined Lands," <u>Minerals and the Environment</u>, Vol. 1, No. 3, 1979, pp. 83-89.

Caldwell, J. A., and A. Robertson, "Geotechnical Stability Considerations in the Design and Reclamation of Tailings Impoundments," in <u>Geotechnical Stability in Surface Mining, Proceedings of the International Symposium</u>, A. A. Balkema, Boston, Massachusetts, 1986, pp. 255-258.

California Division of Mines and Geology, <u>Proceedings of Productive Second Uses of Mined Land Conference</u>, Special Publication 85, Sacramento, California, 1984, 174 pp.

California Division of Mines and Geology, <u>An Annotated Bibliography of Publications Pertaining to Surface Mined-Land Reclamation</u>, 1984, 102 pp.

California Division of Mines and Geology, <u>A Glossary of Surface Mined-Land Reclamation Terms</u>, 1984, 101 pp.

Chan, F. J., R. W. Harris, and A. T. Leiter, <u>Direct Seeding of Woody Plants in the Landscape</u>, Report AXT-N27, Agricultural Extension, University of California, 1972, 13 pp.

Coates, D. F., and Y. S. Yu, editors, <u>Pit Slope Manual</u>, CANMET, Ottawa, Canada, 1977.

Cook, C. W., R. M. Hyde, and P. L. Sims, <u>Revegetation Guidelines for Surface Mined Areas</u>, Publication Science Series No. 16, Colorado State University, Ft. Collins, Colorado, 1974, 70 pp.

Format and Correction made in Bibliography

BLM_0006490

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Coppin, N. J., and A. D. Bradshaw, Quarry Reclamation:  The
    Establishment of Vegetation in Quarries and Open-Pit Non-
    Metal Mines,  Mining Journal Books, London, England, 1982,
    112 pp.

Czarnsky, M. M., Annotated Bibliography on the Ecology and
    Reclamation of Drastically Disturbed Areas, General
    Technical Report NE-21, U.S. Forest Service, Northeastern
    Forest Experiment Station, Berea, Kentucky, 1976, 98 pp.

Davie, Brian L., and Kenneth C. Elverum, "Presentation on Mining
    Reclamation to the Joint Meeting of the Senate Committee on
    Natural Resources and the Assembly Committee on Natural
    Resources, Agriculture, and Mining," Reno, Nevada, February
    15, 1989, 20 pp.

Dean, Karl C., L. J Froisland, and M. B. Shirts, Utilization and
    Stabilization of Mine Wastes, U.S. Bureau of Mines Bulletin
    688, 1986, 46 pp.

Deely, D., Water Quality Management Guidance for Mine-Related
    Pollution Sources (New, Current, and Abandoned),
    Environmental Protection Agency Publication EPA-440/3-77-
    027, 1977.

Department of Energy, Mines, and Resources, Tentative Design
    Guide for Mine Waste Embankments, Ottawa, Canada, 1972.

DePuit, Edward J., and Joe G. Coenenburg, "Methods for
    Establishment of Native Plant Communities on Topsoiled Coal
    Stripmine Spoils in the Northern Great Plains," Reclamation
    Review, Vol. 2, No. 2, pp. 75-83.

Devuyst, E. A., B. R. Conrad, G. Robbins and R. Vergunst, 1989.
    Inco SO_2-Air Cyanide Removal Process Update.  Gold Forum on
    Technology and Practices-World Gold '89'.  Proceeding of the
    First Joint International Meeting Between SME and AusIMM,
    Reno, Nevada, Nov. 5-8, 1989.

Format and Correction made in Bibliography

BLM_0006491

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Doering, E. J., and W. O. Willis, <u>Chemical Reclamation for Sodic Strip-Mine Spoils</u>, Agricultural Research Service Report ARS-NC-20, Agricultural Research Service North Central Region, January 1975, 8 pp.

Dollhopf, D. J., I. B. Jensen, and R. L. Hodder, <u>Effects of Surface Configuration in Water Pollution Control on Semi-arid Mined Land</u>, Research Report 114, Montana Agricultural Experiment Station, Bozeman, Montana, 1977, 178 pp.

Dudeck, A. E., and others, "Mulches for Grass Establishment on Fill Slopes," <u>Agronomy Journal</u>, Vol. 62, 1970, pp. 810-812.

Eddleman, L. E., "Reclaiming Mine Spoils with Native Plants," <u>Western Wildlands</u>, Vol. 6, No. 1, pp. 6-9.

Ely, Marion F., "Natural Revegetation on Mined Lands," in the <u>California Desert Mineral Symposium Compendium</u>, BLM California Desert District Office and the South Coast Geological Society, 1989.

Ely, Marion F., "Cyanide in the Environment," in the <u>California Desert Mineral Symposium Compendium</u>, BLM California Desert District Office and the South Coast Geological Society, 1989.

Everett, H. W., G. V. Schultz, and R.F. Dudley, <u>Evaluation of Woody Plants and Development of Establishment Procedures for Direct Seeding and/or Vegetative Reproduction</u>, U.S. Department of Agriculture, Soil Conservation Service, 1973, 52 pp.

Farmer, E. E., Richardson, B. Z., and Brown, R. W., <u>Revegetation of Acid Mining Wastes in Central Idaho</u>, U.S. Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1976.

Farmer, Eugene, and Bruce P. Van Haveren <u>Soil Erosion by Overland Flow and Raindrop Splash on Mountain Soils</u>, U.S. Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1971.

Format and Correction made in Bibliography

BLM_0006492

Bibliography, Page 6

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Ferguson, R. B., and N. C. Frischknecht, "Shrub Establishment on
    Reconstructed Soils in Semiarid Areas," in Shrub
    Establishment on Disturbed Arid and Semiarid Lands, Wyoming
    Game and Fish Department, 1981.

Frischknecht, N. C., "Use of Shrubs of Mined Land Reclamation and
    Wildlife Habitat," in Proceedings: Workshop on Reclamation
    for Wildlife Habitat, Ecological Consultants, Inc., Ft.
    Collins, Colorado, 1978.

Furstenau, Maurice C. and Bruce R. Palmer, editors, Gold, Silver,
    Uranium, and Coal:  Geology, Mining, Extraction and the
    Environment, American Institute of Mining, Metallurgical,
    and Petroleum Engineers, New York, New York, 1980, 526 pp.

Gallaher, Wanda Jo, and Susan Lynn, "A Review of Hardrock Mine
    Reclamation Practices as Background for Proposed Nevada
    Legislation," unpublished, Public Resource Associates, Reno,
    Nevada, February 1989, 66 pp.

Garrett, W. S., and L. T. Campbell Pitt, "Tests On An
    Experimental Underground Bulkhead For High Pressures,"
    Journal of the South African Institute of Mining and
    Metallurgy, October 1958.

Garrett, W. S., and L. T. Campbell Pitt, "Design And Construction
    Of Underground Bulkheads And Water Barriers," Journal of
    the South African Institute of Mining and Metallurgy,  April
    1961.

Goodman, Richard E.,  Methods of Geological Engineering in
    Discontinuous Rocks, West Publishing Company, St. Paul,
    Minnesota, 1976, 472 pp.

Gray, D. H., "Reinforcement and Stabilization of Soil by
    Vegetation," ASCE Journal of the Geotechnical Engineering
    Division, Vol. 100, No. GT6, pp. 695-699.

Grim, E. C., and R. D. Hill, Environmental Protection in Surface
    Mining of Coal, Environmental Protection Agency Publication
    No. EPA 670/2-74-093, 1974.

Format and Correction made in Bibliography

BLM_0006493

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Hansen, D., K. Allred, and W. K. Ostler, <u>A Survey of Literature and Information about Reclamation Practices in the Overthrust Belt and Adjacent Areas</u>, NPI Reclamation Services, Final Report, 1985, 126 pp.

Harwood, G., <u>A Guide to Reclaiming Small Tailings Ponds and Dumps</u>, General Technical Report INT-57, U.S. Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1979.

Hekman, Jr., Louis H., Donald R. Davis, and Martin M. Fogel, <u>The Role of Hydrologic Variability in Complying with Regulatory Enforcement Standards for the Rehabilitation of Surface-Mined Coal Lands</u>, Office of Water Research and Technology Report No. OWRT-B-073-ARIZ(1), Washington, DC, June 1982, 87 pp.

Hoek, E., and J. W. Bray, <u>Rock Slope Engineering</u>, revised 2nd edition, Institute of Mining and Metallurgy, London, England, 1977.

Hossner, Lloyd R., editor, <u>Reclamation of Surface-Mined Lands</u>, 2 vols, CRC Press, Boca Raton, Florida, 1988, 469 pp.

Huiatt, J.L., J.E. Kerrigan, F.A. Olson, G.L. Potter, (ed.) 1982. Cyanide from Mineral Processing. Salt Lake City, Utah, U.S. Bureau of Mines and Utah Mining and Mineral Resources Research Institute, Febr. 2-3, 1982.

Hutnik, R. J., and G. Davis, <u>Ecology and Reclamation of Devastated Land</u>, 2 volumes, Gordon and Breach, New York, New York, 1973, 1042 pp.

Hyder, Donald N., editor, <u>Proceedings of the First International Rangement Congress</u>, Society for Range Management, Denver, Colorado, 1978.

Interagency Forage, Conservation and Wildlife Handbook Coordinating Committee, <u>The Interagency Forage, Conservation and Wildlife Handbook</u>, 1977, Reprint available from Montana Cooperative Extension Service, Montana State University, Bozeman, Montana.

Format and Correction made in Bibliography

BLM_0006494

H-3042-1 – SOLID MINERAL RECLAMATION
Bibliography

International Mine Water Association, "Proceedings of the Seminar on Some Current Ground Water Problems in Mining," _International Journal of Mine Water_, Vol. 5, Nos. 3-4, September and December 1986, 2 vols., 129 pp.

Jaeger, J. C., and N. G. W. Cook, _Fundamentals of Rock Mechanics_, 2nd edition, Chapman and Hall, 1976.

Jensen, Ingvard B., and Richard L. Hodder, _Rapid Soil Stabilization and Perennial Vegetation Establishment with Use of Annual Species, Irrigation and Seedbed Treatments_, Montana Agricultural Experiment Station Report 141, Vol. 1, Montana State University, Bozeman, Montana, 1979, 79 pp.

Jensen, Ingvard B., and Richard L. Hodder, _Tublings, Condensation Traps, Mature Tree Transplanting and Root Sprigging Techniques for Tree and Shrub Establishment in Semiarid Areas_, Montana Agricultural Experiment Station Report 141, Montana State University, Bozeman, Montana, 1979, 105 pp.

Johnson, M. S., and P. D. Putwain, "Restoration of Native Biotic Communities on Land Disturbed by Metalliferous Mining," _Minerals and the Environment_, Vol. 3, No. 3, 1981, pp. 67-85.

Johnson, W. S., G. D. Robinson, and R. L. Post, _Utilizing Native Vegetation to Enhance Man's Environment_, unpublished, University of Nevada, Reno, College of Agriculture.

Kay, B. L., _Mulches for Erosion Control and Plant Establishment on Disturbed Sites_, Agronomy Progress Report No. 87, Cooperative Extension Service, University of California, 1978, 20 pp.

Kleinmann, R. L. P., and P. M. Erickson, _Control of Acid Drainage from Coal Refuse Using Anionic Surfactants_, Bureau of Mines Report of Investigations, RI-8847, Pittsburgh, Pennsylvania, November 1983, 22 pp.

Larson, John E., _Revegetation Equipment Catalog_, U.S. Forest Service Equipment Development Center, Missoula, Montana, 1980, 198 pp.

Format and Correction made in Bibliography

BLM_0006495

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Law, D. L., Mined-Land Rehabilitation, Van Nostrand Reinhold Co., New York, New York, 1984, 184 pp.

Levitt, J., Responses of Plants to Environmental Stresses, Academic Press, New York, New York, 1972, 697 pp.

Lippsley, R. K., and J. Franzini, Water Resources Engineering, 3rd edition, McGraw-Hill, New York, New York, 1979, 716 pp.

Linsley, R. K., M. A. Kohler, and J. L. H. Paulhus, Hydrology for Engineers, 3rd edition, McGraw-Hill, New York, New York, 1982, 508 pp.

Long, S. G., Characteristics of Plants Used in Western Reclamation, 2nd edition, Environmental Research and Technology, Inc., Ft. Collins, Colorado, 1981, 146 pp.

Lowman, B. J., Catalog:  Equipment for Processing Small Seed Lots, U.S. Forest Service Equipment Development Center, Missoula, Montana, 1975, 57 pp.

Loy, Michael D., "Development and Evaluation of Methods for Reduction of Highwalls to Approximate Original Contour," Papers of the Symposium on Surface Coal Mining and Reclamation, Coal Conference and Expo 5, McGraw-Hill, New York, New York, 1979, pp. 220-226.

McGill, Sandra L. and Comba, Paul G., 1990.  A Review of Existing Cyanide Destruction Practices.  Presented at Nevada Mining Association and Nevada Department of Wildlife, Wildlife/Mining Workshop, March 29, 1990, Reno, Nevada.

Moore, L., and K. Thornton, editors, Lake and Reservoir Restoration Guidance Manual, 1988.

Morrey, D. R., J. A. Cooke, and A. J. M. Baker, "Use of Stabilisers and Mulches in the Revegetation of Metalliferous Mine Wastes," in International Conference - Heavy Metals in the Environment, CEP Consultants Ltd., Edinburgh, Scotland, 1983, pp. 996-1000.

Format and Correction made in Bibliography

Bibliography, Page 10

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Mudder, T.I., Ph.D., (ed.) 1989.  The Chemistry, Analysis, Toxicity and Treatment of Cyanidation Wastewaters.  SME Shortcourse Notes, AIME National Meeting, Las Vegas, Nevada, Febr. 1989.

National Academy of Sciences, Rehabilitation Potential of Western Coal Lands, Ballinger Publishing Company, Cambridge, Massachusetts, 1974, 198 pp.

National Coal Board (U.K.), The Treatment of Disused Shafts and Adits, National Coal Board, London, England, 1982, 88 pp.

Office of Engineering Services, University of Kentucky, Proceedings - 1986 Symposium on Mining, Hydrology, Sedimentology, and Reclamation, University of Kentucky, Lexington, Kentucky, 1986.

Office of Technology Assessment, Western Surface Mine Permitting and Reclamation, OTA-E-279, U.S. Government Printing Office, Washington, DC, June 1986, 296 pp.

Penrose, K. D., and D. J. Hansen, "Planting Techniques for Establishment of Container-Grown or Bareroot Plants," in Shrub Establishment on Disturbed Arid and Semiarid Lands, Wyoming Game and Fish Department, 1981.

Pionke, H. B., and A. S. Rogowski, "Placement of Acid Spoil Materials," Reclamation and Revegetation Research, Vol. 1, 1982, pp 3-17.

Piret, N.L. and H.J. Schippers, 1989.  Cyanide Destruction versus Cyanide Regeneration - Evaluation of the Processes for Optimum Mill Effluent Treatment.  Mining and Metallurgy Symposium, Extraction Metallurgy '89.  London, England, July 10-13, 1989.

Plummer, A. P., D. R. Christensen, and S. B. Monsen, Restoring Big-Game Range in Utah, Utah Division of Fish and Game Publication No. 68-3, Ephraim, Utah, 1968, 183 pp.

Preist, Stephen Donald, Hemispherical Projection Methods in Rock Mechanics, George Allen and Unwin, London, England, 1985.

Format and Correction made in Bibliography

BLM_0006497

H-3042-1 – SOLID MINERAL RECLAMATION
Bibliography

Public Resource Associates, <u>Bringing Back the Land:  Mining Reclamation in the Arid West</u>, Conference Synopsis, Reno, Nevada, July 1989, 77 pp.

Ramani, Raja V., and Richard J. Sweigard, <u>Development of a Procedure for Land Use Potential Evaluation for Surface-mined Land</u>, Bureau of Mines Open File Report OFR-151-83, Bureau of Mines, Washington, DC, January 31, 1983, 109 pp.

Richardson, B. Z., and E. E. Farmer, <u>Test of Methods for Amending and Seeding Spoils at the Blackbird Mine</u>, Research Paper INT-265, U.S. Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah, January 1981, 12 pp.

Richardson, B. Z., "Reclamation in the Intermountain Rocky Mountain Region," in McCarter, M. K., editor <u>Design of Non-Impounding Mine Waste Dumps</u>, American Institute of Mining, Metallurgical, and Petroleum Engineers, New York, New York, 1985, pp. 176-192.

Ritcey, G.M. 1989.  Tailings Management, Problems and Solutions in the Mining Industry.  Process Metallurgy 6.  Energy, Mines and Resources Canada, CANMET.  Elsevier, 970 pp.

Rude, P. H., B. E. Boesch, and J. T. Herron, "Strip Mine Reclamation Using Spoil and Native Vegetation,"  American Society of Agricultural Engineers Paper No. 86-2143, St. Joseph, Michigan, 1986.

Ryan, P., "Rum Jungle Mine Rehabilitation – Northern Territory," <u>Journal of Soil Conservation</u>, 1987.

Sauer, R. H., and W. H. Rickard, <u>Restoration of Surface-Mined Lands with Rainfall Harvesting</u>, Department of Energy Report No. PNL-4538, Washington, DC, December 1982, 46 pp.

Schaller, F. W., and P. Sutton, editors, <u>Reclamation of Drastically Disturbed Lands</u>, American Society of Agronomy, Crop Science Society of America, and Soil Science Society of America, Madison, Wisconsin, 1978.

Format and Correction made in Bibliography

BLM_0006498

Bibliography, Page 12

H-3042-1 – SOLID MINERAL RECLAMATION
Bibliography

Schuman, G. E., and others, "Revegetation of Mined Land:
    Influence of Topsoil Depth and Mulching Method," Journal of
    Soil and Water Conservation, Vol. 40, No. 2, 1985, pp. 249-
    252.

Scott, J.S. 1984.  An Overview of Cyanide Treatment Methods for
    Gold Mill Effluents.  Presented at the Symposium on Cyanide
    and the Environment, Tucson, Arizona, Dec. 1-4, 1984.

Sendlein, L. V. A., and others, Surface Mining:  Environmental
    Monitoring and Reclamation Handbook, Elsevier Press,
    Amsterdam, The Netherlands, 1983.

Simpson, D. G., and B.R. Maynard, "Reclamation Of Abandoned Deep
    Mine Entries," National Symposium and Workshop on Abandoned
    Mine Land Reclamation, Bismark, ND, May 21-22, 1984.

Simpson, D.G., and M. Kuhns, "Reclamation Of Abandoned Coal Mine
    Shafts, Safety Considerations," Symposium on Evolution of
    Abandoned Mine Land Technologies, Riverton, Wyoming, June
    14-16, 1989.

Soderberg, R. C., and R. A. Bush, Designing Guide for Metal and
    Non-Metal Tailings Disposal, Bureau of Mines Information
    Circular 8755, 1977, 136 pp.

Stevens, R., "Techniques for Planting Shrubs on Wildland
    Disturbances," in Shrub Establishment on Disturbed Arid and
    Semiarid Lands, Wyoming Game and Fish Department, 1981.

Stoddart, L. A., A. D. Smith, and T. W. Box, Range Management,
    3rd edition, McGraw-Hill Book Company, New York, New York,
    1975, 532 pp.

Thames, J. L., editor, Reclamation and Use of Disturbed Lands
    in the Southwest, University of Arizona Press, Tucson,
    Arizona, 1977.

Thorton, R. B., "Establishment of Vegetation on Subsoils,"
    Highway Research Board Record 93, 1965, pp. 31-37.

Format and Correction made in Bibliography

BLM_0006499

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Thornburg, A. A., Plant Materials for Use on Surface-Mined Lands in Arid and Semiarid Regions, Report SDS-TP-157, U.S. Soil Conservation Service, 1982, 88 pp.

Turelle, J. W., "Factors Involved in the Use of Herbaceous Plants for Erosion Control on Roadways," Highway Research Board Special Reports, Record N135, pp. 99-104.

U. S. Bureau of Land Management, Procedures and Guidelines for the Responsibility of Ensuring the Proper Abandonment of Lease/License/Permit Activities (Exploration/Mining Operations), Unpublished, Utah State Office, 1988.

U.S. Bureau of Mines, Mine Drainage and Surface Mine Reclamation, Volume I:  Mine Water and Mine Waste, Bureau of Mines Information Circular 9183, 1988, 413 pp.

U.S. Bureau of Mines, Mine Drainage and Surface Mine Reclamation, Volume II:  Mine Reclamation, Abandoned Mine Lands and Policy Issues, Bureau of Mines Information Circular 9184, 1988, 401 pp.

U.S. Bureau of Reclamation, Engineering and Research Center, Chemical and Vegetative Stabilization of Soils, 1977.

U.S. Environmental Protection Agency, Guidelines for Erosion and Sediment Control Planning and Implementation, EPA Publication EPA R2-72-015, 1972.

U.S. Environmental Protection Agency, The Ecological Impact of Land Restoration and Cleanup, EPA Technical Report EPA 520/3-78-006, 1978.

U.S. Environmental Protection Agency, Criteria for Developing Pollution Programs for Inactive and Abandoned Mine Sites, EPA Publication EPA 440/9-75-008, 1975.

U.S. Environmental Protection Agency, Processes, Procedures, and Methods to Control Pollution From Mining Activities, EPA Publication EPA 430/9-73-011, 1973.

Format and Correction made in Bibliography

BLM_0006500

Bibliography, Page 14

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

U.S. Environmental Protection Agency, <u>Demonstration of Coal Mine Haulroad Sediment Control Techniques</u>.  EPA Publication EPA 600/2-76-196, 1976.

U.S. Environmental Protection Agency, <u>Effectiveness of Surface Mine Sedimentation Ponds</u>, EPA Publication EPA 600/2-76-117, 1976.

U.S. Fish and Wildlife Service, <u>Ecology and Culture of Selected Species Useful in Revegetating Disturbed Lands in the West</u>, FWS/OBS-82/56, 1982, 347 pp.

U.S. Forest Service, <u>Managing Intermountain Rangelands -- Improvement of Range and Wildlife Habitats</u>, General Technical Report INT-157, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1982.

U.S. Forest Service, <u>Proceedings - Workshop on Engineering and Hydrology Research Needs for Phosphate Mined Lands of Idaho</u>, General Technical Report INT-192, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1985.

U.S. Forest Service, <u>Region 4 Reclamation Field Guide</u>, Region 4, Ogden, Utah, 1988, 81 pp.

U.S. Forest Service, <u>User Guide to Engineering:  Mining and Reclamation in the West</u>, General Technical Report INT-70, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1979.

U.S. Forest Service, <u>User Guide to Hydrology:  Mining and Reclamation in the West</u>, General Technical Report INT-74, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1980.

U.S. Forest Service, <u>User Guide to Soils:  Mining and Reclamation in the West</u>, General Technical Report INT-68, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1979, 80 pp.

Format and Correction made in Bibliography

BLM_0006501

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

U.S. Forest Service, <u>User Guide to Vegetation:  Mining and Reclamation in the West</u>, General Technical Report INT-64, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1979.

U.S. Forest Service, <u>User Guide to Wildlife:  Mining and Reclamation in the West</u>, General Technical Report INT-126, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1980, 77 pp.

U.S. Soil Conservation Service, <u>The Washington Interagency Guide for Conservation and Forage Plantings</u>, Miscellaneous Publication 0058, Washington State Cooperative Extension Service, 1983, 70 pp.

U.S. Soil Conservation Service, <u>Grasses and Legumes for Soil Conservation in the Pacific Northwest and Great Basin States</u>, Agriculture Handbook No. 339, 1979.

U.S. Soil Conservation Service, <u>The Oregon Interagency Guide for Conservation and Forage Plantings:  Seeding Guide</u>, 1987, 87 pp.

U.S. Soil Conservation Service, <u>The National Engineering Handbook</u>, 1971.

U.S. Soil Conservation Service, <u>Handbook 430</u>.

U.S. Soil Conservation Service, <u>Handbook 436</u>.

Vallentine, J. F., <u>Range Developments and Improvements</u>, 2nd edition, Brigham Young University Press, Provo, Utah, 1980, 545 pp.

Vandre, B. C., <u>Stability of Non-Water Impounding Mine Waste Embankments</u>, U.S. Forest Service, Intermountain Forest and Range Experiment Station, Ogden, Utah, 1980.

Vick, Steven G. 1983.  Planning, Design, and Analysis of Tailings Dams.  John Wiley and Sons Publications.  369 pp.

Format and Correction made in Bibliography

BLM_0006502

Bibliography, Page 16

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Vories, Kimery C., editor, <u>Reclamation of Western Surface Mined Lands</u>, Ecology Consultants, Fort Collins, Colorado, 1976.

Wali, Mohan K., editor, <u>Practices and Problems of Land Reclamation in Western North America</u>, University of North Dakota Press, Grand Forks, North Dakota, 1977.

Wali, Mohan K., editor, <u>Ecology and Coal Resource Development</u>, Pergammon Press, New York, New York, 1979.

Wali, Mohan K., editor, <u>Ecology and Coal Development, Volume 2</u>, Pergammon Press, Elmsford, New York, 1978.

Weiner, Daniel Philip, <u>Reclaiming the West</u>, INFORM, Inc., New York, New York, 1980, 451 pp.

Weise, Hans, "Reclamation Methods in Opencast Mines," <u>Journal o Mines, Metals & Fuels</u>, Vol. 34, No. 4, April 1986, pp. 229-236.

Wells, J. D., "Long-Term Planning for the Rehabilitation of Opencast Workings," <u>Journal of the South African Institute of Mining and Metallurgy</u>, Vol. 86, No. 3, March 1986, pp. 89-93.

Williams, R. Dean, and Gerald E. Schuman, <u>Reclaiming Mine Spoils And Overburden in The Western U.S.</u>, 1978.

Williams, R. E., <u>Waste Production and Disposal in Mining, Millin and Metallurgical Industries</u>, Miller Freemand Publications, Inc., 1974, 489 pp.

Wischmeier, W. H., and D. D. Smith, <u>Prediction Rainfall Erosion Losses - A Guide to Conservation Planning</u>, U.S. Department of Agriculture, Washington, DC, 1978, 537 pp.

Wong, M. H., "Reclamation of Wastes Contaminated by Copper, Lead and Zinc," <u>Environmental Management</u>, Vol. 10, No. 6, November 1986, pp. 707-713.

Format and Correction made in Bibliography

H-3042-1 - SOLID MINERAL RECLAMATION
Bibliography

Wright, R. A., editor, <u>Reclamation of Disturbed Arid Lands</u>,
    University of New Mexico Press, Albuquerque, New Mexico,
    1978.

Wyoming Department of Environmental Quality, <u>State of Wyoming
    Guidelines:  Guideline No. 1, Topsoil and Overburden</u>,
    Cheyenne, Wyoming, 1984.

Wyoming Department of Environmental Quality, <u>State of Wyoming
    Guidelines:  Guideline No. 2, Vegetation</u>, Cheyenne, Wyoming,
    1986.

Wyoming Department of Environmental Quality, <u>State of Wyoming
    Guidelines:  Guideline No. 5, Wildlife</u>, Cheyenne, Wyoming,
    1987.

Wyoming Department of Environmental Quality, <u>State of Wyoming
    Guidelines:  Guideline No. 8, Hydrology</u>, Cheyenne, Wyoming,
    1980.

Format and Correction made in Bibliography

BLM_0006504

**MONTROSE DISTRICT**
**ENVIRONMENTAL ASSESSMENT**
**COVER SHEET**

**UNCOMPAHGRE BASIN RESOURCE MANAGEMENT PLAN AMENDMENT**

EA No. CO-030-U-92-20

Legal Description:

Uncompahgre Basin Planning Area

List of Preparers:

JAMES SAZAMA

ROBERT D. WELCH

Bureau of Land Management
Uncompahgre Basin Resource Area
June 30, 1992

BLM_0006505

# Decision Record

## UNCOMPAHGRE BASIN RESOURCE MANAGEMENT PLAN AMENDMENT

### EA # CO-030-U-92-20

Decision:

Based upon the findings of this assessment, my decision is to amend the Uncompahgre Basin Resource Management Plan and consider fire as a management tool for the entire planning area, subject to site specific environmental analysis and approved burn plans.

Rationale:

Amending the plan will allow greater flexibility in managing plant communities and solving problems identified by wildlife, watershed, range, and recreation specialists. It will also allow BLM greater ability to deal with changing priorities and initiatives of other organizations with which we share common goals, including the Colorado Division of Wildlife, U.S. Forest Service, and the Fish and Wildlife Service.

Monitoring:

Monitoring studies will be established as identified in the site-specific Environmental Assessment prepared for each burn.

Finding No Significant Impact:

Based on the analysis in the attached environmental analysis, amendment of the Resource Management Plan will not result in significant impacts to the environment and will not have highly controversial effects; therefore an Environmental Impact Statement is not required.

Received by

Ron Huntley, Environmental Coordinator                    Sept 17, 1992
                                                            Date

BLM_0006506

Recommended by

_Allan J Belt_    _9/17/92_
Alan J. Belt, Area Manager    Date

Concurrence by

_Alan L. Kesterke_    _9/22/92_
Alan L. Kesterke, District Manager    Date

Approved by

_Bob Moore_    _10/5/92_
Robert Moore, State Director    Date

BLM_0006507

### UNCOMPAHGRE BASIN RESOURCE MANAGEMENT PLAN AMENDMENT

### EA # CO-030-U-92-20

## I.  PURPOSE AND NEED:

Habitat quantity and quality are of critical importance to the maintenance and well-being of Colorado's big game herds.  The quantity of habitat will continue to decline as the many human pressures seriously alter or destroy our valuable ecosystems.  Thus, a reduction in deer and elk numbers will occur unless we can compensate for losses in habitat quantity with increased habitat quality.

A priority strategy in the Colorado Division of Wildlife's Strategic Plan (Today's Strategy ... Tomorrow's Wildlife) states that the Division will "Increase carrying capacities of deer and elk habitats on public lands through controlled burning, chaining, fertilizing, timber management and similar methods."  Wildlife and land managers are well aware of the need for maintaining viable big game populations to meet rising demands for big game hunting and other forms of wildlife-oriented recreation.

One of the primary factors which limits big game populations in Colorado is availability and condition of winter range.  Winter ranges are continually being altered due to construction of dams, reservoirs, and highways; urban, industrial, agricultural, and recreational developments; and oil, gas, coal, and other mineral exploration.  To offset and mitigate winter range diverted to other uses, efforts must be concentrated on protection and proper management of existing ranges and on their improvement, whenever possible, to achieve greater productivity.

The Gambel oakbrush (Quercus gambelii), pinon (Pinus edulis), juniper (Juniperus spp) and sagebrush (Artemisia spp) vegetation types offer important fall, winter, and spring habitat for elk (Cervus elaphus nelsoni) and mule deer (Odocoileus hemionus).  Cattle often graze these vegetation types.  Many stands, however, are very dense.  Some appear to even physically exclude large herbivores.  Some of these species are important winter forage species for elk and deer but as they become older, they grow beyond reach of elk and deer and become unavailable.  Shading by taller plants, coupled with increased density, suppresses production of forbs and grasses in the understory.  This results in decreased elk, deer, sheep and cattle forage.  Tall dense stands need to be opened to make stands more accessible and increase forage production for grazing animals.  Untreated patches need to be left to provide wildlife cover and soil stability.

The Uncompahgre Basin Resource Management Plan was started in July, 1983 when a Notice of Intent in the Federal Register began the formal planning process.  The process included invitations to the public to participate in the process which included a series of public scoping meetings held in August, 1983 in Montrose, Delta, and Hotchkiss.  An RMP newsletter was published in March, 1985 and sent to 700 addresses.  A series of Open House meetings to review the RMP were held in January, 1986 in Montrose, Delta, and Paonia.  The draft RMP/EIS was filed in July, 1987.  Fifty-one (51) persons testified at the three public hearings held in September, 1987 and an additional 173 written comments were received.  No protests were received and Record of Decision dated July, 1989 was issued.

1

BLM_0006508

The existing land use decisions in that document relating to prescribed burning state, "Fire will be managed as displayed on the map in Appendix D. This management is based on resource conditions, proximity of private development and risk of fire spread." Additionally, under each Management Unit decision, an allocation of acreage of public land is made detailing what type of fire suppression activity will take place in that unit. As a result, fire may be considered as a management tool on only one-fourth (1/4) of the Planning Area. The restriction of the use of fire on such a large area is an unnecessary one and hampers BLM's ability to respond to changing priorities and initiatives such as the Colorado Division of Wildlife's Habitat Partnership Program.

## II. CONFORMANCE WITH LAND USE PLANS

The land use plan relating to the area covered by this Environmental Assessment is the Uncompahgre Basin Resource Management Plan.

## III. PROPOSED ACTION AND ALTERNATIVES

### A. Proposed Action

The proposed action would amend the Uncompahgre Basin Resource Management Plan to allow the use of fire through prescribed and planned ignitions on all 483,077 acres within the Uncompahgre Basin Planning Area. Currently, only about 1/4 of the Planning Area has fire identified as an acceptable and usable management tool. This amendment would change that status to allow fire to be considered as an option or alternative on all public land in the Planning Area. Prior to any ignitions, an Environmental Analysis, a burn plan, and a burning permit, each dealing on a site specific basis, would be prepared or obtained. This amendment would not eliminate or reduce any of the planning, public notification, or analysis work currently required when a planned ignition is proposed.

### B. No Action

The No Action alternative would consist of not amending the Uncompahgre Basin Resource Management Plan to allow the use of prescribed burns on all 483,077 acres within the Planning Area. Other methods of vegetation manipulation would still be available for use as a management tool and prescribed fire could still be used on roughly 1/4 of the planning area which was allowed in the RMP. Other alternative methods would include rollerchopping, chaining, herbicides, and other mechanical methods of treatment. The impacts of these methods was described in the Vegetation Treatment on BLM Lands in the Thirteen Western States, 1991.

## IV. AFFECTED ENVIRONMENT

The affected environment is generally described in the UBRA RMP, 1989, and the Integrated Analysis Roller Chopping and Controlled Burn EA.

BLM_0006509

## Climate, Air Quality, Topography, and Soils

The planning area has a dry high valley/mountainous continental climate characterized by low humidity, sunny days, clear nights, low to moderate precipitation and evaporation, and wide-ranging diurnal temperature changes. The complex regional topography causes considerable variation in site-specific temperatures, precipitation, and surface winds. Seasonal conditions vary from frigid and blizzard-like to hot and dry.

Although monitoring data for most pollutants is not available, air quality in the planning area is typical of undeveloped regions in the western United States. Ambient pollutant levels are usually near or below measurable limits. Locations vulnerable to decreasing air quality due to extensive development include the immediate operations areas (surface mines, milling operations, power plants, etc.) and local population centers.

The planning area is predominantly a broad river valley surrounded by rolling hills, high plateaus, deep canyons, and rugged mountains. Elevation varies from 5,000 feet in the Gunnison River valley northwest of Delta to just over 11,000 feet on Cimarron Ridge southeast of Montrose.

The eastern portion of the planning area is comprised largely of broken hills and narrow valleys along the western flanks of the West Elk Mountains. The southern portion of the area borders the very high, rugged terrain of the San Juan Mountains. The western portion is characterized by the tablelands and narrow, steep-sided canyons of the Uncompahgre Plateau. The high mesas, foothills, and steep valleys along the southern base of Grand Mesa are in the northern portion of the planning area. The mid-section of the area, with the exception of the Gunnison Gorge, is less rugged, with gently-sloping hills and valleys, leveling off into the Uncompahgre and North Fork river floodplains.

Intensive soil surveys have been completed for the entire planning area by the Soil Conservation Service (SCS). These are the Paonia, Ridgway, Delta-Montrose and Mesa County soil surveys. Copies of the surveys are available for review at the UBRA office.

## Water Resources

The western and northern portions of the Gunnison River drainage, a major component of the Upper Colorado River Basin, are within the planning area. Major subbasins include the Uncompahgre, North Fork of the Gunnison, and the lower Gunnison to the Delta/Mesa county line.

Peak flows on these river systems and their tributaries occur between April and the end of June as a result of high elevation snowmelt. Low flows originating primarily from ground water discharges (base flow) occur during fall and winter. The majority of the lower elevation drainages receive little precipitation (less than 15 inches annually) and consequently, have intermittent or ephemeral flows. High-intensity summer thunderstorms are common in the planning area, often producing high streamflows of short duration.

3

BLM_0006510

Table 1

WATER YIELD ESTIMATES
FROM SELECTED VEGETATION ZONES IN THE PLANNING AREA

| VEGETATION ZONE | PUBLIC LAND[1] (acres) | PERCENT OF PLANNING AREA | ESTIMATED ANNUAL PRECIPITA- TION (inches) | ESTIMATED ANNUAL WATER YIELD PER ACRE (inches) |
|---|---|---|---|---|
| Subalpine forests | 6,429 | 1.3 | 20-40 | 5-25 |
| Mountain shrub | 53,230 | 11.0 | 16-24 | 1-6 |
| Pinyon-juniper | 185,521 | 38.4 | 12-18 | 3-4 |
| Sagebrush | 91,938 | 19.0 | 8-20 | 1-4 |
| Salt desert shrub | 136,380 | 28.2 | 10 | 1 |

Sources: Hibbert 1979; BLM1978; Lusby 1979.

Notes:
[1] Does not include all public land in the planning area.

Sediment yield varies considerably over the planning area, being primarily dependent upon geology, soil type, precipitation, land use, and physical characteristics of the watershed. The high mountain lands in the upper Uncompahgre River subbasin, such as the Cimarron Ridge area, have the lowest sediment yields. Dense vegetation and igneous rock formations result in average sediment yields of less than 0.5 tons per acre annually. At the other extreme are the lower elevation soils derived from the Mancos formation. These highly erodible soils, combined with sparse vegetation cover, can produce ten tons of sediment per acre annually under natural conditions.

Sediment yields are accelerated in many years by surface-disturbing land uses such as grazing, mining activity, and off-road vehicle use. Poorly located and unmaintained roads and water developments also produce sediment.

Vegetation

Nine broad vegetation types occur within the planning area. The mountain shrub, pinyon-juniper woodland, sagebrush, and desert shrub types comprise 97 percent of the area. Table 2 lists the acreage and percentage of public land in each vegetation type. Additional information about these different vegetation types is available for review at the UBRA office.

4

Table 2

VEGETATION TYPES ON PUBLIC LANDS
IN THE PLANNING AREA

| VEGETATION TYPE | ACRES | PERCENT OF PUBLIC LAND |
|---|---|---|
| Coniferous forest | 5,353 | 1.1 |
| Aspen forest | 1,076 | .2 |
| Mountain shrub | 53,230 | 11.0 |
| Pinyon-juniper woodland | 185,521 | 38.4 |
| Sagebrush | 91,938 | 19.0 |
| Grassland | 1,230 | .3 |
| Desert shrub | 136,380 | 28.3 |
| Riparian | 1,034 | .2 |
| Barren-annuals | 7,315 | 1.5 |
| TOTALS | 483,077 | 100.0 |

Threatened and Endangered Species

Several plant species occurring within the planning area have been identified as threatened or endangered on federal or state lists. Others are considered to be candidate or sensitive species. These species are listed in Table 3. In addition, there are a number of sensitive, candidate, or federally-listed plants that are known to occur in the region but have not been located within the planning area.

Plant associations considered by the Colorado Natural Areas Program to be unique exist in the Escalante Canyon area. Table 4 lists these plant associations and the other plant species that constitute the special vegetation resources of the canyon.

Wildlife

Terrestrial Wildlife

The public lands within the planning area provide habitat for a wide variety of wildlife species which are managed by the Colorado Division of Wildlife. Since 1978, the BLM has increased monitoring of vegetation trend, browse condition, big game utilization, and, in cooperation with the DOW, big game

5

BLM_0006512

population numbers and trends.  Table 6 briefly lists the findings of these studies by DOW game management unit (GMU).

The greatest demand for forage on the public lands is made by mule deer during the winter (December through April).  The North Fork and the Uncompahgre river valleys have heavy winter concentrations of mule deer, and much of the area is considered crucial winter habitat.  The demand for forage on public lands is expected to continue to increase due to fencing and residential development on adjacent private land.

In 1986, the DOW reintroduced Rocky Mountain bighorn sheep to the Gunnison Gorge area.  It is anticipated the sheep population will reach 150 animals in eight to ten years.

Threatened and Endangered Wildlife

A total of twelve animal species listed as threatened, endangered, candidate, or sensitive are known to occur within the planning area.  These species are listed in Table 5.  The black-footed ferret (Mustela nigripes), a federal and state endangered species, may occur within the planning area but no sightings have been confirmed.

Aquatic Wildlife

Springs, seeps, reservoirs, streams, and rivers provide aquatic wildlife habitat.  There are approximately 500 miles of significant aquatic habitat (creeks, rivers, and water-courses) within the planning area, 160 miles of which occur on public lands.

Livestock Grazing

A total of 457,465 acres, or 95 percent, of the public land within the planning area is grazed by domestic livestock.  The area is divided into 159 grazing allotments with 132 livestock operators.  A total of 38,951 Animal Unit Months (AUMs) of forage is available for domestic livestock use; approximately 23, 667 AUMs are used in an average year.

Approximately half of the livestock grazing use is by cattle and half is by sheep.  Nearly all of the sheep use is from ewe/lamb operations which use public land for winter grazing from November through mid-March.  Cow/calf operations make up the majority of the cattle use although there are also several yearling operations.

Both cattle and sheep operations generally use the public land for spring grazing (May 1 to June 1) enroute to National Forest lands and again in the fall (October 1 through December) enroute to private wintering areas.  A few cow/calf operations graze summer-long on public lands contiguous to private pastures.

BLM_0006513

**Table 3**

**ENDANGERED, THREATENED, CANDIDATE, OR SENSITIVE PLANT SPECIES
KNOWN TO OCCUR WITHIN THE PLANNING AREA**

| COMMON NAME | SCIENTIFIC NAME | STATUS | HABITAT | ESTIMATED POPULATION | ESTIMATED[1] ACRES OF HABITAT |
|---|---|---|---|---|---|
| Spineless hedgehog cactus | Echinocereus triglochidiatus var. inermis | Endangered | Gravelly soils on flats and low hills along major drainages | 13,000 plus | app. 20,000 |
| Clay-loving wild buckwheat | Eriogonum pelinophilum | Endangered | Whitish soil within Mancos shale | 45,000-50,000 | 450-500 |
| Uinta Basin hookless cactus | Sclerocactus glaucus | Threatened | Rocky soils | 8,000[3] | app. 40,000 |
| Montrose penstemon | Penstemon retrorsus | Candidate[2] | Shallow slopes on Mancos shale | Unknown | Unknown |
| Delta Lomatium | Lomatium concinnum | Candidate[3] | Low altitude Mancos shale areas in association with saltbrush | 14,000[3] | 160[3] |
| Grand Junction milkvetch | Astragalus linifolius | BLM Sensitive | Steep rocky slopes and bottoms in major canyons | Unknown | Unknown |
| Eastwood monkeyflower | Mimulus eastwoodiae | BLM Sensitive | Limestone seeps, hanging gardens | Unknown | Very restricted |
| Grand Mesa penstemon | Penstemon Mensarum | Candidate[2] | Elevations above 8,000; oak/serviceberry reg. at lower elevation | Unknown | Unknown |
| Wetherill milkvetch | Aptragalus wetherillii | Candidate[2] | Sedimentary shale and sandstone soils; big sage communities | 161[4] | 24[4] |
| Barneby's columbine | Aquilegia barnebyi | BLM Sensitive | Base of vertical cliffs often in rock crevices | Unknown | Less than one |

Notes:

[1] Estimated populations and acres of habitat are on public land only.

[2] Listing as endangered or threatened would possibly be appropriate with further study.

[3] Status report by Jane Busch, 1/30/91.

[4] Status report by Jane Busch, 1/30/91.

[5] Gunnison Resource population for Recovery Plan.

BLM_0006514

## Table 4

## SPECIAL VEGETATION RESOURCES IN ESCALANTE CANYON

| COMMON NAME | SCIENTIFIC NAME | STATUS/RANKING[1] |
|---|---|---|
| Uinta Basin hookless cactus | Sclerocactus glaucus | Threatened species |
| Grand Junction milkvetch | Astragalus linifolius | BLM Sensitive |
| Eastwood's monkeyflower | Mimulus eastwoodiae | Sensitive species |
| Alkali cordgrass | Spartina gracilis | Globally secure; rare in Colorado; 20 to 40 known occurrences |
| Hanging garden association<br>    Small-flowered columbine<br>    Eastwood's monkeyflower | Aquilegia micrantha<br>Mimulus eastwoodiae | Globally secure; imperiled in Colorado; 6 to 20 known occurrences |
| Shadscale/Galleta grass association | Atriplex confertifolia<br>Hilaria jamesii | Very restricted global range; threatened globally; imperiled in Colorado; 6 to 20 known occurrences |
| Utah juniper/Galleta grass association | Juniperus osteosperma<br>Hilaria jamesii | Very restricted global range; threatened globally; imperiled in Colorado; 6 to 20 known occurrences |
| Needle-and-thread/Westslope grassland association | Stipa comata | Imperiled globally; imperiled in Colorado; 6 to 20 known occurrences |

Notes:

[1] These rankings are provided by the Colorado Department of Natural Resources, Natural Areas Program. A Standardized ranking process which was developed for use in 41 heritage programs throughout the United States was used to determine status.

8

Table 5

ENDANGERED, THREATENED, AND CANDIDATE ANIMAL SPECIES
KNOWN TO OCCUR WITHIN THE PLANNING AREA

| COMMON NAME | SCIENTIFIC NAME | STATUS | COMMENTS |
|---|---|---|---|
| Bald eagle | *Haliaeetus leucocephalus* | Federal and state endangered | Winter resident; hunting habitat |
| Peregrine falcon | *Falco peregrinus anatum* | Federal and state endangered | Yearlong resident; hunting habitat |
| Ferruginous hawk | *Buteo regalis* | Federal candidate | Possible breeder; winter migrant |
| Northern Goshawk | *Accipiter gentilis* | Candidate | Summer resident; migrant |
| Whooping crane | *Grus canadensis* | Federal and sate endangered | Fall and spring migrant |
| Greater sandhill crane | *Grus americana* | State endangered | Fall and spring migrant |
| Long-billed curlew | *Numenius americanus* | Federal candidate | Migrant |
| Western yellow-billed cuckoo | *Coccyzus americanus occidentalis* | Federal candidate | Summer resident; migrant |
| White-faced ibis | *Plegadis chihi* | Federal candidate | Migrant |
| River otter | *Ptychocheilus lucius* | State endangered | Reintroduced in the Gunnison Gorge, 1977 |
| Colorado squawfish | *Ptychocheilus lucius* | Federal and state endangered | Resident; Gunnison River |
| Mexican spotted owl | *Strix occidentalis lucida* | Proposed threatened | Potential resident |
| Roundtail chub | *Gila robusta* | Candidate | Resident in the Gunnison River |
| Flannelmouth Sucker | *Catostomus latipinnis* | Candidate | Resident in the Gunnison River |
| Razorback sucker | *Xyrauchen texanus* | State endangered and federal candidate | Resident; Gunnison River |

9

BLM_0006516

Table 6

FINDINGS FROM HABITAT MONITORING

| GAME MANAGEMENT UNIT | HABITAT CONDITION |
| --- | --- |
| GMU-411 | Browse condition fair to poor; some localized over-utilization is occurring. |
| GMU-52 | Browse condition fair to poor; browse may be stagnated. |
| GMU-521 | Browse condition good; increasing pressure on public land due to development on private land. |
| GMU-53 | A few acres of over-utilization exist; DOW population objectives may be too high. |
| GMU-62 | Early spring conflict between deer and livestock use exists; distribution of deer within the unit is a problem. |
| GMU-63 | Browse condition poor even with low utilization |
| GMU-64 | Deer distribution within the unit is poor, resulting in localized overstocking; elk are at their upper limit. |
| GMU-65 | Winter utilization a problem primarily due to distribution. |

Forestry

Of the 191,950 forested acres of public land within the planning area, approximately 3,685 acres of commercial forest lands and 45,886 acres of pinyon-juniper woodlands are suitable for sustained-yield management as identified by the Timber Production Capabilities Classification (TPCC) Inventory. Forest lands are classified as suitable if capable of yielding 20 cubic feet of wood products annually under intensive management practices and on a sustained yield basis.

Woodlands are classified as suitable if capable of stocking densities greater than 40 percent, crown closures have net annual growth rates often exceeding 20 cubic feet per acre, and slope gradients are less than 35 percent.

10

BLM_0006517

Woodlands

Most of the pinyon-juniper woodlands are on the Uncompahgre Plateau, and stands of Gambels oak occur on the south side of Grand Mesa.  No allowable harvest calculations are available for these resources.

Average annual woodland product sales within the planning area include approximately 900 MBF of wood products, 1200 Christmas trees, and 350 transplants.

Recreation

The BLM manages two types of recreation situations on public lands.  Most of the public lands are managed for dispersed recreation opportunities where recreationists have a freedom of recreational choice with a minimum of regulatory constraints.  There are few BLM recreation facilities or supervisory efforts on these extensive recreation management areas.  The other situation found in special recreation management areas may consist of designated areas with developed facilities such as interpretative signing, cabanas, and camping facilities.

Cultural Resources

A total of 2,237 sites have been recorded in the planning area.  Of these sites, one petroglyph panel is listed on the National Register of Historic Places, 150 sites appear to be eligible for listing, 1,120 sites are considered potentially eligible for listing but require further analysis to determine their significance.

Wilderness

There are three WSAs in the planning area: The Camel Back WSA, the Adobe Badlands WSA, and the Gunnison Gorge WSA.

Camel Back WSA

The Camel Back WSA is located nine miles southwest of Delta on the eastern slopes of the Uncompahgre Plateau.  There are 10,402 acres of public land and 160 acres of private inholdings within the WSA boundary.  The WSA is nearly surrounded by public lands and adjoins the Uncompahgre National Forest along its southern border.

Adobe Badlands WSA

The Adobe Badlands WSA is located three miles northwest of Delta on the southern slopes of Grand Mesa. There are 10,425 acres of public land within the WSA boundary. The WSA adjoins the Grand Mesa National Forest along its northern border.

11

BLM_0006518

## Gunnison Gorge WSA

The Gunnison Gorge WSA is located ten miles east of Delta. There are 21,038 acres of public land and no private inholdings within the WSA boundary. The southern border of the WSA is contiguous to a designated wilderness area within the NPS-administered Black Canyon of the Gunnison National Monument.

### Fire Management

The BLM is responsible for protecting public resources from fire and for suppressing fires on public land. Between 1975 and 1984 there were 172 fires (an average of 17 fires per year) on public lands within the planning area.

Eighty-three percent of the fires on public lands were caused by lightning, mostly in the pinyon-juniper vegetation type. Lightning-caused fires generally occur in the summer from mid-June through mid-September. Most human-caused fires occur in late spring or late fall.

Only nine fires (5 percent of the total) were ten acres of larger in size. Of these larger fires, five were human-caused. The three largest fires (burning 136, 200, and 400 acres) were started when individuals burning brush and debris on their private lands allowed the fires to escape to public lands.

## V. ENVIRONMENTAL IMPACTS

### A. Proposed Action

If the proposed action would be adopted and implemented, an additional 362,000 acres of public land within the Uncompahgre Basin Planning Area would be considered for the use of prescribed fire. At present, only 121,000 acres have been identified where fire may be considered as a management tool.

Amending the RMP by implementing the proposed action would increase the amount of acreage suitable for burning and thereby increase the probability of using fire as a management tool. There are basically two "burn windows"; periods of the year when a prescribed burn would be within a defined prescription, spring (March through April) and fall (late September through October). With an increased acreage identified as suitable for using prescribed fire on, there would be a likelihood that there would be more fires and more acreage burned than if the plan were not amended. The impacts of those fires in general terms are as follows.

BLM_0006519

## Air Quality

Fires release a wide range of chemicals and particles.  Typical releases per ton of woody fuel consumed:

| | |
|---|---|
| Particulates | 5 to 100 pounds; a major air pollution concern (visibility) |
| Carbon dioxide | 2,000 to 3,500 pounds (the oxygen comes from air) |
| Carbon monoxide | 30 to 200 pounds; a pollutant concern |
| Hydrocarbons | 10 to 40 pounds; over 50 compounds, may contribute to ozone |
| Sulfur dioxide | negligible; not a pollution concern |
| Ozone | is increased in upper plumes, but not well quantified |
| Nitrogen oxides | 2 to 6 pounds; direct pollutant, contributes to ozone |

Fires in forests are estimated to produce about 4% of the annual carbon monoxide production in the U.S.; values for other pollutants are: 3% of particulates; 2% of hydrocarbons; and 0.6% of nitrogen oxides.  For brief periods of time, columns of smoke would be visible to surrounding communities. Burning permits obtained from the State of Colorado would be requested by BLM and would detail how the burns would not violate clean air standards.  Because of downslope conditions created by mountains in the area, there is the potential for inversions to develop at night/early morning following the burn.

## Soils

The effects of fires on soils involve consumption of woody debris and part of the forest floor, and results in high temperatures that may damage fine roots, loss of nitrogen and other nutrients, and increase in soil pH and nutrient availability. Effects that occur during the first year or so following fire would be soil hydrophobicity, accelerated erosion, gradually declining soil pH and nutrient availability. Effects that last a decade or longer would be potentially decreased nitrogen supply and effects of regeneration (or lack of) on nutrient cycles (especially nitrogen fixation, when it occurs).

Post-fire erosion of soil may increase for several reasons including increased energy of raindrops that are not slowed down by the vegetation canopy; decreased water holding capacity of the soil profile which means decreased infiltration rates and increased surface runoff; and hydrophobicity.

Each of these processes can contribute to erosion increases, because they all tend to increase the energy of the water.  Effects depend on slope (flat areas erode less than slopes), fire characteristics (greater combustion of the protective forest floor leads to greater erosion), patchiness of the fire (erosion is limited by patch boundaries) and, of course, to rainfall events following the fire.

13

Biomass accumulation tends to acidify soils. Burning biomass reverses this process and raises soil pH. The change in pH would last for a year or two only and not harm site fertility.

Nitrogen loss during a set time period depends on temperature. Higher temperatures can oxidize more nitrogen than occurs at lower temperatures during the same period. Losses also occur as particulates are swept up in the smoky winds and blown off the site. Substantial losses of non-gas nutrients (such as calcium and potassium) occur this way, along with additional losses of nitrogen and sulfur.

Fires can also increase losses of nutrients through leaching from the soil profile; loses via this route tend to increase with fire severity. However, these losses are always negligible relative to gaseous and particulate losses.

<u>Water</u>

Fire would affect almost all components of the hydrologic cycle. By reducing forest canopy, losses due to evaporation of precipitation would be reduced, increasing the amount of water available for infiltration or runoff. The presence of litter and grass on the surface would also determine whether this additional water would be infiltration or runoff.

Absence of canopy also increases the force with which raindrops impact the soil surface. Burning would increase the erosion potential especially on slopes where the understory had not regrown since the burn.

The general impacts of fire on stream flows are increased springflows, increased annual flows, greater stormflows, and increased baseflows. Increased annual sediment yield in streams would occur but would be negligible in relation to water quality.

There would be a slight chance that nutrients washed off burned areas would concentrate in streams and impact aquatic systems. This would occur only if mass soil movement occurs and large temperature increases occur in the stream which received the eroded material so that the combination would result in an algal bloom.

<u>Vegetation</u>

Fire would tend to change the vegetation appearance of a landscape. In general, a fire would topkill (and in some cases, kill) woody species. It would tend to stimulate grassy species. The changed appearance then would consist of a more grassy appearing site with little vertical cover. In the long term, however, many woody species would be invigorated also by fire and tend to thicken (oakbrush is a good example) unless managed differently, post-fire.

The change to an initially grassy site, from a wooded site and then one later dominated by woody "fire" species dominated site, would have secondary impacts on hydrology, wildlife, and livestock grazing (see those sections of Impacts). These secondary impacts are much more apparent to people in terms of products derived from the site. Generally, more water would be produced, along with more red meat production (livestock and wildlife), on areas burned.

BLM_0006521

If exposed to fire, special status plants would be topkilled or, in an extreme situation, killed. The same would be true for special plant associations, fire could alter them significantly, but it may also serve as a beginning for the process to renew or expand the range.

Wildlife

Burning would have a significant impact on big game (deer and elk) habitat, especially the quality of winter ranges. Fire would remove old decadent browse stands, oakbrush, sagebrush, serviceberry and mountain mahogany and replace them with younger higher producing plants. These burns would become new foraging areas for biggame in winter. In the spring, these areas would also provide lush forage during critical calving and fawning periods. Burning would also increase the overall quantity of wildlife forage by increasing the number of acres of foraging areas in the winter time. This is especially important since winter range is continually being lost to agricultural and urban development.

Burning would also increase big game access to areas, since some areas re so heavily covered with brush that they physically exclude animals. Oakbrush is again a plant that exhibits this character.

Untreated sites would be left to provide cover for biggame. These would provide escape cover as well as thermal cover.

Burning would not negatively impact threatened or endangered species of wildlife.

Aquatic Wildlife

Burning would not directly impact aquatic systems. Impacts of a secondary nature would include sediment accumulation (slight probability) and temporary changes in water quality temporarily affecting those organisms in those systems.

Livestock Grazing

Impacts to livestock grazing of a prescribed burn would be similar to those experienced by big game. They are increased quality and quantity of forage and increased access to the forage resource.

Forestry

Fire would consume whatever plant species exist on a site, killing some, topkilling others. Indirectly, it would eliminate the sale of any forest products as they are consumed by the fire. No commercially significant products would be burned unless it was determined that no market existed for those products or that the loss of those products would not conflict with direction given in the UBRA RMP.

15

BLM_0006522

Recreation

Additional use by biggame to burned areas would create additional recreational opportunities for hunters on public land. These burned areas are very attractive to biggame because of the increased plane of nutrition found there and by hunters because of the increased line of site (lack of escape cover). Burning would have no negative impacts on the recreational resource.

Cultural

Fire would not impact most cultural sites such as petroglyphs, scattered ground sites, and rock shelters. Those sites not consisting of rock on or below soil surface which were burned would be destroyed or lost. No known threatened sites are known at this time.

Wilderness

Burning would have no direct impact on wilderness quality. All WSAs exhibit some signs of past burns which is considered a natural process. Allowing natural processes to function is one of the goals of Wilderness Management.

B.  No Action

The impacts of the No Action alternative are the same as described in the Proposed Action for areas where fire is used as a management tool (see that section for details). Briefly they are:

- increased water yield
- temporary potential for increased soil erosion due to water
- increased forage production (quantity and quality)
- increased red meat production
- increased hunting opportunities
- loss of non-commercial forest products
- temporary poor air quality
- maintain or threaten unique plant associations
- threaten non-permanent cultural sites (those where vegetative fuels exists)
- temporary changes in soil nutrients

The difference between the Proposed Action and the No Action alternatives is the number of acres on which impacts could be expected. The Proposed Action would potentially impact three times as much land as the No Action alternative would. Site specific differences exist on each acre of public land in terms of the response that would be expected and associated impacts. Those differences would be documented in a site specific Environmental Assessment identifying significant impacts.

16

BLM_0006523

## VI.  CONSULTATION and COORDINATION

Public consultation was accomplished in a variety of ways.  Over 200 news releases were sent out to addresses from the original RMP effort.  Three public meetings were held in Hotchkiss, Delta, and Montrose.  In addition, a press release was issued to the newspapers in the Planning Area.

Participation consisted of two (2) people attending the public meeting in Montrose and four written comments.  All comments, written and verbal, were in favor of amending the land use plan as described in the proposed action.  The State of Colorado, in its written, comments were not opposed to the proposed action.

### List of those also Consulted

| | |
|---|---|
| James Sazama | BLM |
| Robert Welch | BLM |
| Steve Ellis | BLM |
| Ron Huntley | BLM |
| Allan Belt | BLM |
| John Hawks | BLM |
| Joe Vinyard | BLM |
| Roger Lowry | DOW |
| Doug Homan | DOW |

17

BLM_0006524

DECISION RECORD/FONSI

EA CO-030-U93-17
SAN JUAN/ SAN MIGUEL RMP AMENDMENT, FOR THE PROPOSED
AREA OF CRITICAL ENVIRONMENTAL CONCERN AND
SPECIAL RECREATION MANAGEMENT AREA ON THE SAN MIGUEL RIVER

DECISION

The decision is to adopt the proposed plan amendment, for
Public Lands on the San Miguel River, and tributaries,
upstream of the old townsite of Pinon, within the
Uncompahgre Basin Resource Area of the Montrose District.
The amendment would designate 32,641 acres of Public Land as
a Special Recreation Management Area (SRMA). Within the
SRMA, 20,964 acres would also be designated as an Area of
Critical Environmental Concern. Decisions on land use
allocations coincide with the designations, and include: off
highway vehicle closures and restrictions, development of
two or three campgrounds, restrictions on camping in certain
areas, identification of forest management areas, closure of
the river bottom areas to the sale of sand and gravel,
identification of those areas suitable for major utilities,
trail and interpretive sign development, the protection of
riparian systems, and the continuation of livestock grazing
on currently used ranges.

FINDING OF NO SIGNIFICANT IMPACT

Based on the analysis of potential impacts contained in the
environmental assessment completed for this proposal, I have
determined that the environmental impacts are not expected
to be significant and therefore an environmental impact
statement is not required.

RATIONALE

Alternatives Considered

Two alternatives were considered: 1) Designation of Public
Lands on the San Miguel River, including the tributary
streams, from Deep Creek to the old town of Pinon, as a
Special Recreation Management Area. Within this area, the
public lands between Placerville and the confluence of
Horsefly Creek, would be designated as an Area of Critical
Environmental Concern. 2) Retention of the original land
use plan decisions was considered as the no-action
alternative.

Management Considerations

The riparian system of the San Miguel River contains

BLM_0006525

examples of a riparian plant community that is rare within Colorado, and some portions of that community are considered pristine.  The rapid growth of unregulated recreation within the canyon has begun to noticeably damage the riparian plant communities, scenic values of the area, and create some potential health hazards from human waste disposal.  The proposal provides BLM with land use decisions that facilitate effective management of the recreation activity and allow protection of the high quality riparian environment.  The management of the ACEC/SRMA will also be compatible with the Unaweep-Tabaquache Scenic and Historic Byway.

Public Involvement

BLM received an ACEC nomination from the Nature Conservancy in 1989.  Internal scoping resulted in a modified ACEC proposal being presented to the public in March of 1991. All persons, who participated in the original RMP, and who expressed interest in participating in the amendment were notified by mail to request comments.  The proposal was also presented to the public in an open house in Placerville, Colorado, on April 3, 1991.  The comment period for this segment lasted 30 days until April 29, 1991.  Comments were generally favorable, and only a few modifications to the original proposal resulted.  A second round of public comment was initiated on November 10, 1992 to solicit comments on the proposed ACEC.  This period lasted 60 days. Comments received raised no substantial issues that would preclude adoption of the proposed amendment.

APPROVED BY:

_____  **ACTING**          2/23/93
Bob Moore                                     Date
Colorado State Director

Attachments: EA #CO-030-U93-17
             Comments and Responses, ACEC

S A V E

UNCOMPAHGRE RESOURCE AREA COPY

### SAN JUAN/SAN MIGUEL RESOURCE MANAGEMENT PLAN AMENDMENT; SAN MIGUEL RIVER ACEC AND SRMA

Prepared by:

Bureau of Land Management
Uncompahgre Basin Resource Area
2505 South Townsend Avenue
Montrose, Colorado  81401



U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

BLM_0006527

# Table of Contents

PURPOSE AND NEED . . . . . . . . . . . . . . . . . . . . . . 4
    PROPOSED ACEC AND SRMA (FIGURE 1) . . . . . . . . . . . 5
    GENERAL LOCATION MAP (FIGURE 2) . . . . . . . . . . . . 6

PROPOSED ACTION AND ALTERNATIVES . . . . . . . . . . . . . 7

PROPOSED ACTION . . . . . . . . . . . . . . . . . . . . . . 7

NO ACTION ALTERNATIVE . . . . . . . . . . . . . . . . . . . 8

DESCRIPTION OF THE EXISTING ENVIRONMENT . . . . . . . . . . 9
    GENERAL LOCATION . . . . . . . . . . . . . . . . . . . 9
    PHYSICAL SETTING . . . . . . . . . . . . . . . . . . . 9
    CLIMATE AND AIR QUALITY . . . . . . . . . . . . . . . . 9
    TOPOGRAPHY AND LAND USES . . . . . . . . . . . . . . . 10
    MINERAL RESOURCES . . . . . . . . . . . . . . . . . . . 10
        COAL . . . . . . . . . . . . . . . . . . . . . . . 10
        OIL, GAS, AND GEOTHERMAL . . . . . . . . . . . . . 10
        LOCATABLE MINERALS . . . . . . . . . . . . . . . . 11
        SALEABLE MINERALS . . . . . . . . . . . . . . . . . 11
    LANDS . . . . . . . . . . . . . . . . . . . . . . . . 12
    WATER AND SOIL RESOURCES . . . . . . . . . . . . . . . 13
        WATER RESOURCES . . . . . . . . . . . . . . . . . . 13
        WATER QUALITY . . . . . . . . . . . . . . . . . . . 14
    LIVESTOCK MANAGEMENT . . . . . . . . . . . . . . . . . 15
    RECREATION . . . . . . . . . . . . . . . . . . . . . . 15
    OFF HIGHWAY VEHICLE USE (OHV) . . . . . . . . . . . . . 17
    VISUAL RESOURCES . . . . . . . . . . . . . . . . . . . 17
    CULTURAL RESOURCES . . . . . . . . . . . . . . . . . . 17
    FOREST RESOURCES . . . . . . . . . . . . . . . . . . . 17
    THREATENED AND ENDANGERED SPECIES . . . . . . . . . . . 18
        PLANTS . . . . . . . . . . . . . . . . . . . . . . 18
        ANIMALS . . . . . . . . . . . . . . . . . . . . . . 18
    WILDLIFE . . . . . . . . . . . . . . . . . . . . . . . 19
        TERRESTRIAL WILDLIFE . . . . . . . . . . . . . . . 19
        FISHERIES . . . . . . . . . . . . . . . . . . . . . 20
    VEGETATION: . . . . . . . . . . . . . . . . . . . . . 21
        RIPARIAN VEGETATION: . . . . . . . . . . . . . . . 21
            San Miguel River . . . . . . . . . . . . . 21
            Tributary Streams . . . . . . . . . . . . . 22
        UPLAND VEGETATION: . . . . . . . . . . . . . . . . 23
        NOXIOUS WEEDS . . . . . . . . . . . . . . . . . . . 24
    FIRE: . . . . . . . . . . . . . . . . . . . . . . . . 24

IMPACTS FROM THE PROPOSED ACTION AND ALTERNATIVES . . . . . 24
    INTRODUCTION: . . . . . . . . . . . . . . . . . . . . 24
    PROPOSED ACTION: . . . . . . . . . . . . . . . . . . . 25
        Introduction: . . . . . . . . . . . . . . . . . . . 25
        Energy and Minerals Resources . . . . . . . . . . . 25
        Vegetation . . . . . . . . . . . . . . . . . . . . 25
        Soils and Water . . . . . . . . . . . . . . . . . . 26
        Terrestrial Wildlife . . . . . . . . . . . . . . . 26

BLM_0006528

Aquatic Wildlife . . . . . . . . . . . . . . . 27
T&E Species . . . . . . . . . . . . . . . . . 27
Livestock Grazing . . . . . . . . . . . . . . 28
Forestry . . . . . . . . . . . . . . . . . . 28
Recreation . . . . . . . . . . . . . . . . . 28
Cultural Resources . . . . . . . . . . . . . 29
Visual Resources . . . . . . . . . . . . . . 29
Lands . . . . . . . . . . . . . . . . . . . . 29
Fire . . . . . . . . . . . . . . . . . . . . 30
NO ACTION ALTERNATIVE: . . . . . . . . . . . . . . 30
Introduction: . . . . . . . . . . . . . . . . 30
Energy and Minerals Resources . . . . . . . . 30
Vegetation . . . . . . . . . . . . . . . . . 30
Soils and Water . . . . . . . . . . . . . . . 30
Terrestrial Wildlife . . . . . . . . . . . . 31
Aquatic Wildlife . . . . . . . . . . . . . . 31
T&E Species . . . . . . . . . . . . . . . . . 31
Livestock Grazing . . . . . . . . . . . . . . 31
Forestry . . . . . . . . . . . . . . . . . . 31
Recreation . . . . . . . . . . . . . . . . . 31
Cultural Resources . . . . . . . . . . . . . 32
Visual Resources . . . . . . . . . . . . . . 32
Lands . . . . . . . . . . . . . . . . . . . . 32

CUMULATIVE IMPACTS . . . . . . . . . . . . . . . . 32

CONSULTATION AND COORDINATION . . . . . . . . . . . 32

BIBLIOGRAPHY . . . . . . . . . . . . . . . . . . . 34

APPENDIX A . . . . . . . . . . . . . . . . . . . . 36
TABLE 1 . . . . . . . . . . . . . . . . . . . 36
NO ACTION ALTERNATIVE . . . . . . . . . . 36
TABLE 2 . . . . . . . . . . . . . . . . . . . 37
PROPOSED ACTION . . . . . . . . . . . . . 37
TABLE 3 . . . . . . . . . . . . . . . . . . . 38
OIL AND GAS LEASING STIPULATIONS . . . . . 38
Management Guidance for Area L1: . . . . . . 39
Management Guidance for Area C1: Emphasis on Recreation 45
MANAGEMENT GUIDANCE FOR AREA A . . . . . . . 49
MANAGEMENT GUIDANCE FOR AREA B . . . . . . . 52
MANAGEMENT GUIDANCE FOR AREA E . . . . . . . 56
MANAGEMENT GUIDANCE FOR AREA G . . . . . . . 59
MANAGEMENT GUIDANCE FOR AREA H . . . . . . . 61
MANAGEMENT GUIDANCE FOR AREA J . . . . . . . 63

APPENDIX B . . . . . . . . . . . . . . . . . . . . 66
STREAMS ON PUBLIC LAND . . . . . . . . . . . 66
LIST OF ENDANGERED, THREATENED, CANDIDATE,
AND PROPOSED ANIMAL SPECIES . . . . . . . . . 67

APPENDIX C . . . . . . . . . . . . . . . . . . . . 68
LIST OF PREPARERS . . . . . . . . . . . . . . 68
APPENDIX D . . . . . . . . . . . . . . . . . . 69
Criteria for ACEC Designation . . . . . . . . 69

BLM_0006529

APPENDIX E; MAPS . . . . . . . . . . . . . . . . . . . . . 71
    PROPOSED ACTION . . . . . . . . . . . . . . . . . 72
    NO ACTION ALTERNATIVE . . . . . . . . . . . . . . 73
    OIL AND GAS LEASE STIPULATIONS . . . . . . . . . . 74
    OHV DESIGNATIONS . . . . . . . . . . . . . . . . . 75

BLM_0006530

## PURPOSE AND NEED

In November of 1989, The Nature Conservancy (TNC) submitted a public nomination for an Area of Critical Environmental Concern (ACEC) on the middle San Miguel River, from Placerville to Horsefly Creek. Included within their proposal were Leopard, Specie, Beaver, and Saltado Creeks and adjacent uplands.  In summary, this nomination requested the ACEC designation, restriction of vehicle use in the riparian forests, removal of campsites along the river, development of a campground and interpretive kiosk, prohibition of livestock grazing upstream of Norwood Bridge, development of vehicle parking areas for day use visitors, and fishery habitat improvement.  A later addition suggested determining if the River is suitable habitat for river otters, and, if so, reintroducing them.

BLM began internal scoping of this proposal during the summer of 1990.  Internal scoping included examining the values of the area for ACEC status, and determining whether the existing land use decisions, on adjacent public lands, would support management of the proposed ACEC.  The interdisciplinary team (see Appendix C) concluded that resource values in the area, and the conflicts that were developing there, principally from increasing recreation use, warranted pursuing the ACEC designation.  Documentation of the relevance of the area for ACEC designation is presented in Appendix D.  The team also concluded that the existing RMP decisions for the remainder of the river corridor from Deep Creek to Piñon were not adequate to promote successful management of the proposed ACEC.  In fact, without considering the ACEC, it was apparent that management of the area has not been facilitated by the existing land use decisions.  Although the San Juan/San Miguel Resource Management Plan (RMP) did emphasize management of the riparian systems within the corridor, none of the other land use decisions for the area supported that emphasis.  Because of this, there has been a lack of progress in management of the riparian systems.  Additionally, the RMP did not provide any management direction or resource allocations for the 2,800 acres acquired in the Carsten's land exchange which was completed in 1989.  As a result, in addition to TNC's petition, the ACEC proposal was expanded to include all public land from Deep Creek to Piñon.  The team believed that the best way to provide cohesive, integrated management of the area would be to designate the entire river corridor area as a Special Recreation Management Area (SRMA), comprised of 32,641 acres of public land.  The SRMA would include the proposed ACEC (20,964 acres of public land), which would emphasize preservation of the quality riparian ecosystems, scenic values, and intensified recreation management.  The team's intent would be to develop an integrated activity plan for the area that would consider all the resources managed on public land.  Figure 1, on the following page, shows the general location of the proposed ACEC and SRMA, and their relationship to the San Miguel River, and major tributaries.

4

The preliminary proposal was presented to the public in an open house, in Placerville, on April 3, 1991.  Although the public comment period closed on April 29, 1991, comments were received and considered as late as June 3, 1991.  The proposed action presented here is a result of public and agency comments, and the evolution of the proposal during preparation of the environmental assessment (EA).

The plan amendment boundary encompasses about 152,307 acres of land, 43,011 acres of which are public land, 8,612 are National Forest, 98,157 are privately owned, and 2,527 are state owned. Although non-BLM lands are included within the amendment boundary, land use decisions analyzed in this process do not pertain to lands that are not in public ownership.  Detailed maps of the amendment area are presented in Appendix E.

<div align="center">PROPOSED ACTION AND ALTERNATIVES</div>

INTRODUCTION

This section describes the proposed amendment to the San Juan/San Miguel Resource Management Plan (RMP), which would designate a portion of the San Miguel River corridor as a Special Recreation Management Area (SRMA) and Area of Critical Environmental Concern (ACEC).  Also described is the no action alternative which consists of continuation of the current management of the area, according to the land use decisions in the existing RMP.

Oil and gas leasing decisions would not be changed, in either alternative, from those appearing in the Record of Decision for the Oil and Gas Leasing and Development Environmental Impact Statement, 1991, and therefore, no discussion of impacts to oil and gas activities are presented.  A map showing the current restrictions to oil and gas development is included in Appendix E, and a table showing the acres of each restriction is located in Appendix A.

PROPOSED ACTION

The proposed action would designate that portion of the San Miguel River, from Placerville to Horsefly Creek, and its tributaries as an ACEC, and the area from Deep Creek to Piñon as a SRMA.  The SRMA would consist of three management areas; one area, identified as $L_1$, constitutes the ACEC, and the two remaining tracts, identified as $C_1$, form the remainder of the SRMA.  The primary emphasis of the $C_1$ areas would be for management of recreation resources, and protection of riparian and scenic values.  Within the ACEC ($L_1$ area) the primary emphasis would be protection of unique riparian resources, protection of scenic values, and recreation management. Maps showing the areas can be found in Appendix E.  Figure 1 shows the general relationship of the management areas to each other and the SRMA.

<div align="center">7</div>

BLM_0006532

Detailed management guidance for the two new management areas is presented in Appendix A. From the original RMP, portions of the General Management Area (G), Land Disposal Areas (H), Livestock Management Area (A), winter big game areas (BDEW), and Eagle Concentration Area (BE) would be retained within the amendment area boundary. None of the decisions for those areas would be altered by this proposal. The specific management guidance for these areas is presented in Appendix A. Table 2 in Appendix A shows the acreage for each management unit, of the proposed action, within the amendment area.

In order to clear up mapping voids in the amendment area, slight shifts were made in the boundaries of those original RMP management units that were retained. The primary units affected were management units A, and BDEW, in the San Miguel River Canyon downstream of Clay Creek.

Public Lands in the amendment area would be classified into one of two categories for disposal and multiple use management purposes. Category 1 lands are those for which a land use decision has been made that they meet the criteria for a public sale pursuant to the Federal Land Policy and Management Act of 1976 (FLPMA). These lands were identified as "H" areas in the original RMP, and have been retained in the proposed action. Category 2 lands are all remaining Public Lands in the existing land base in the amendment area. Lands in this category would be considered for disposal on a case-by-case basis through exchange, boundary adjustment, Recreation and Public Purposes Act applications, or other appropriate statute or authority. No land disposal would occur without site specific analysis of the public benefits and impacts of the disposal.

## NO ACTION ALTERNATIVE

The No Action Alternative consists of continuation of the current management. Appendix A contains copies of the 1985 land use decisions that pertain to the amendment area. Acreage for the management areas, A, BDEW, BE, BAR, ES, EF, G, H, and J, is also contained in a Table 1 in Appendix A.

The units each emphasize particular resource values. Area A emphasizes livestock management. The area is open to major utilities, forest product disposal, OHV use, and allows wildlife habitat management that does not conflict with livestock management goals. Riparian and aquatic habitats on priority streams were to receive special management consideration. Several of the livestock management areas, specifically those in the Beaver and Saltado Creek areas, are not high priority areas for management within the range program.

The BE, BDEW, and BAR areas are wildlife habitat emphasis areas. BE is managed for wintering bald eagles, BDEW for wintering big game, and BAR for riparian habitat values. The area is open for forest product disposal, and nonconflicting livestock grazing.

8

BLM_0006533

Major utilities are generally excluded, but not prohibited, depending on the impacts of the proposal. The wildlife management areas are open to OHV use.

EF and ES areas are minerals management areas. Within the amendment area the ES area is a nine acre tract identified for sale of dimension stone, and the EF area provides protective management of the unique fossils in the Placerville area. These areas allow OHV use, forest product disposal, livestock grazing, and limited wildlife habitat management. Protection of the fossils was to be handled on a case-by-case basis.

The G areas are general management areas that are open to OHVs and most other land uses, under The Federal Land Policy and Management Act (FLPMA) of 1976.

Forest management is emphasized in the J management areas. They are open to OHV use, livestock grazing, major utilities (in woodland areas), and limited wildlife habitat management. Riparian and aquatic habitats are to be protected.

Land disposal is the emphasis for the H areas, and investments of public funds for management is to be extremely limited. The areas are open to all uses subject to FLPMA guidelines.

## DESCRIPTION OF THE EXISTING ENVIRONMENT

### GENERAL LOCATION

The amendment area is located in the San Miguel River drainage, between the towns of Telluride and Naturita, and includes about 132,000 acres in San Miguel County, and about 20,000 acres in Montrose County, in southwestern Colorado. Figure 2 shows the general location of the amendment area. The upstream boundary is approximately at Deep Creek, about 9 miles upstream of Placerville. The downstream boundary is at the old town of Piñon, about 10 miles upstream from Naturita. On the north the area is bounded primarily by the Uncompahgre National Forest, and on the south primarily by private lands. Included within the amendment area are 38 miles of the San Miguel River Canyon, and 133 miles of tributary streams.

### PHYSICAL SETTING

The area is located on the boundary between the San Juan Mountains and the Uncompahgre Plateau. Elevations range from 9,000 feet, on the rim of Big Bear Creek Canyon, to 5,980 feet, near Piñon. Most of the lands within the amendment area are located within the canyons formed by the San Miguel River and its tributaries. A minor amount of the area is located above the canyon rims.

### CLIMATE AND AIR QUALITY

A general description of the area's climate, and air quality, can be found in the Draft San Juan/San Miguel Resource Management Plan

BLM_0006534

and Environmental Impact Statement. One weather station exists within the amendment area, at the town of Placerville. Average annual precipitation, for the years 1971 to 1990, was 22 inches (Colorado Climate Center, 1991). No data on temperatures is available from this station. Generally the weather is typical of high mountain valleys in the southern Rockies, with cold, moist winters and warm, dry summers.

TOPOGRAPHY AND LAND USES

The amendment area is typical of Colorado Plateau geology. It consists of gently dipping sedimentary rocks, where erosion has produced innumerable escarpments and structural benches. Relief is the result of the incision of deep, steep sided canyons below moderately flat terrain.

Within the amendment area, land uses on public land include mining, livestock grazing, recreation, wildlife habitat, rights-of-way, and woodland harvest. Private land uses vary with their location in the canyon. Upstream of Placerville, private lands are being devoted primarily to housing and recreational ranchettes. Downstream of Placerville, the uses remain primarily rural in nature with livestock grazing, and agricultural activity, on private land, being the dominant uses.

MINERAL RESOURCES

COAL

Coal is found in the Dakota sandstone in the form of poor quality, thin, flaggy, and discontinuous carbonaceous shale. It is not minable, and the area is rated by BLM as having low potential for coal production.

OIL, GAS, AND GEOTHERMAL

Although oil and gas are known to occur in most of the sedimentary formations which underlie the amendment area, the area has low oil and gas development or production potential. Within a 15 mile radius of the area, 44 dry oil wells, and 9 holes with gas shows have been drilled. No production has ever occurred. At present, the entire amendment area is open for oil and gas leasing, with seasonal stipulations imposed for wintering eagles and wintering big game in some areas, no surface occupancy restrictions for raptor nests and raptor roosts, and special restrictions for steep slopes (Colorado Oil and Gas Leasing and Development, Record of Decision, 1991). The acreage effected by each of these restrictions is presented in Appendix A, Table 3.

Geothermal waters occur at Lemon Hot Springs in Placerville. The water temperature is moderate and has no potential for power production. No geothermal leases exist within the amendment area and BLM rates the area as having low to moderate potential for geothermal production. At present, the entire amendment area is

10

open for geothermal leasing, with seasonal stipulations for wintering eagles and wintering big game in some areas.

LOCATABLE MINERALS

Gold bearing deposits occur as riverbed and terrace deposits in the San Miguel River area.  The younger and most extensive gravel deposits, are alluvium of the San Miguel River, and are principally of volcanic origin.  Placer gold deposits have been mined from 1878 through 1940 with a few short operations in the 1980's.  Most of this activity took place on the terrace gravels or high bars which are located 100 to 200 feet above the River.  One mining operation at Specie Creek was active in 1987 and 1988, and has not yet been reclaimed.  Another is proposed for the area above the junction of Leopard Creek and the San Miguel River.

Lode claims occur in the upper part of the Pony Express member of the Wanakah formation.  The ore occurs in galena and pyrite. Most of the production from these deposits occurred from 1890 through 1910.

Weekend recreational miners are common on the San Miguel during the summer months.  They use small suction dredges and attempt to remove the "flour" gold from the river sediments.

Uranium and vanadium were mined from the Entrada sandstone between 1910 and 1920, and from 1940 through 1944.  No production of these minerals is currently occurring.

BLM rates the amendment area as having low to moderate potential for the production of locatable minerals.  With the exception of the lands acquired in the Carsten's exchange, the entire amendment area is open for the location of mining claims under the 1872 Mining Law.  Within the amendment area, there are approximately 116 mining claims (BLM 5/11/92 Mining Claim Microfiche).

SALEABLE MINERALS

Saleable minerals include dimension stone, sand, gravel, and riprap.  BLM rates the amendment area as having low potential for the production of saleable minerals. Dimension stone is found where the Cutler, Dolores, and Dakota formations outcrop.  A few sales of dimension stone have occurred upstream and downstream of the proposed ACEC, but production has been limited.

Sand and gravel occur in the alluvial materials of the San Miguel and its tributaries, both in the stream channels and on the canyon terrace deposits.  Gravel mining has occurred in the San Miguel River in the past and one unreclaimed mining site near Specie Creek has not yet recovered from the mining activity which occurred over 20 years ago.  Within the last decade BLM has not sold any sand or gravel permits within the amendment area, but the entire area is open to the disposal of saleable materials.

BLM_0006536

LANDS

There are 43,011 acres of BLM land, 98,157 acres of private land, 2,527 acres of state land, and 8,612 acres of forest service lands located within the amendment boundary. There is a total of 152,307 acres within the plan amendment boundary area. A land exchange, completed in 1989, resulted in 2,800 acres of private land entering public ownership, and 2,400 acres of public land entering private ownership.

The area is traversed by state highways 62 and 145, both of which are designated scenic byways. A number of smaller county roads are also found in the amendment area.

The area has many rights-of-ways including powerlines, aerial and buried telephone lines, natural gas pipelines, and county and State highways. Major utilities (Defined in the original RMP, as pipelines 6 inches or larger and powerlines exceeding 115 kV) are represented by two overhead powerlines and two natural gas pipelines. The powerlines, a 230 kV and a 345 kV cross the San Miguel River between Beaver and Saltado Creeks. One natural gas distribution pipeline crosses the San Miguel River at Beaver Creek, and continues upstream to Telluride. A larger Rocky Mountain Natural Gas pipeline crosses the River about three miles upstream of Piñon. The planned TransColorado Gas Transmission Pipeline would cross the River approximately three miles upstream of Piñon. With the exception of about 300 acres of commercial forest, the entire area is open to major utilities.

San Miguel Power Association has a planned upgrade of their transmission line between Nucla and Telluride. The existing 69 KV line, which crosses Beaver and Saltado Creeks, is being operated over capacity, and plans are to replace it with a 115 KV line. San Miguel Power Association has also proposed an upgrade of 5.7 miles of distribution line from Sawpit upstream. The growth in the area upstream of Placerville has overloaded the existing line.

One major irrigation ditch, the Calamity Ditch, is located within the amendment area. It withdraws water from the San Miguel River at about Horsefly Creek and parallels the river downstream to Piñon.

Remnants of old narrow gage railways are found along the San Miguel and Leopard Creek. The old rail beds are generally in poor condition with the exception of the section from Sawpit upstream to near Vanadium, which is used as a road.

The San Miguel Project, which was proposed in the 1950's, is no longer being considered for construction by the Bureau of Reclamation. The original proposal would have placed a dam on the San Miguel River near Beaver Creek.

The San Miguel Water Conservancy District is still considering the proposed San Miguel Canyon Project. The project is proposed for a site due north of Redvale. The tentative proposal is for a pump storage hydroelectric facility. The project would require 2

12

reservoirs; water from the upper reservoir, to be located on the
top of Wrights Mesa, would be released to generate electricity
during peak demand periods.   There are no immediate plans to
construct the dam or file for the permits necessary to begin the
process.

Most of the lands in the canyon bottom, between Placerville and the
town of Piñon were withdrawn under Powersite Classification in
1925.   An estimated 12,040 acres remain withdrawn.   Withdrawals
within the proposed ACEC total 8,600 acres, and an additional 3,440
acres in the remainder of the proposed SRMA.   These withdrawals
have not yet been reviewed or modified.

## WATER AND SOIL RESOURCES

### WATER RESOURCES

The primary stream within the amendment area is the San Miguel
River, which is a tributary of the Dolores River.   A complete list
of streams on public land in the amendment area, and their lengths,
can be found on the stream/riparian table in Appendix B.   The San
Miguel's headwaters are located in the San Juan Mountains of
southwestern Colorado.   It flows northwesterly for over 80 miles
and drops 7,940 feet in that distance, for an average
river slope of 1.9 percent.   The river drains 660 square miles of
watershed at the lower boundary of the amendment area, and 1,550
square miles at the confluence with the Dolores River.

The average annual precipitation in the San Miguel Basin is 24
inches per year, and varies from a low of under 12 inches at the
Rivers lower terminus to over 50 inches at the headwaters.   Fifty
to sixty percent of the annual precipitation falls as snow.   The
remainder occurs as rainfall during spring frontal storms and in
the late summer and fall as high-intensity, short duration storms.

Except for a few small man-made impoundments, the River flows
uncontrolled from the headwaters through the amendment area.   Mean
annual flow varies from 150 cfs (cubic feet per second), at the
upper portion of the amendment area to approximately 250 cfs at the
lower boundary (see figure 2).   Baseflows in the River occur from
October through March.   Spring runoff usually peaks in early June.
High flows of short duration are common in response to high
intensity storm events in August and September.   The Calamity
Ditch, which diverts water from the River near Horsefly Creek,
results in a sharp drop in summer flows in the lower reaches of the
River within the amendment area.

The tributary streams exhibit runoff patterns that are similar to
those of the San Miguel.   These streams are characterized by steep
gradients, large channel substrates, and extreme valley confinement
due to the steep narrow canyons.   Road development along Leopard,
Fall, Big Bear, and Specie Creeks has further confined these
streams and increased the stream gradient, resulting in accelerated
channel and bank erosion, and in more severe cases the undercutting
and mass wasting of steep sideslopes.   These streams have poorly

BLM_0006538

functioning floodplains, which results in physical damage on-site and off-site to riparian systems, higher sediment yields, and higher flood peaks. Flood caused damage to the roads which confine the streams has been common. The streams, such as Beaver, Saltado, and Horsefly Creeks, which do not have roads within their canyon bottoms do not exhibit the maladies described above. The San Miguel River has been modified only slightly by the existing highway and bridges. Confinement of the river channel by the highway is limited to a small number of areas, and does not seem to have had significant effects on river channel geometry.

The primary groundwater aquifer is associated with the alluvium, found in varying thicknesses and depths along the entire river course. It is connected to the adjacent river and is responsible for maintaining river flows during the baseflow period. Depending on the thickness of the alluvium, water yields can reach 1,000 gallons per minute. Water quality should closely resemble that of the San Miguel River at Baseflows, due to the connection between the two.

Instream flows have been established with the State Water Conservation Board for the San Miguel River, downstream as far as Fall Creek. The DOW has filed for an instream flow in the river downstream as far as Beaver Creek. Instream flows also exist for Big Bear Creek, Fall Creek, and Leopard Creek (Colorado Water Conservation Board). Instream flows are pending for Beaver and Saltado Creeks.

WATER QUALITY

Heavy metals, released from local geology by natural weathering and from historic mining practices, are found in high concentrations in the headwaters of the San Miguel River. Downstream of Telluride, these concentrations decrease due to dilution from tributary streams, and biological and geochemical reactions.

Total dissolved solids (TDS) increase progressively downstream. This is especially true in the lower reaches of the study area where saline soils contribute salts to the tributary drainages. Average TDS concentrations range between 300 to 400 parts per million in the San Miguel River.

Sediment yields vary from year to year depending on the amount and rate of snowfall and the number, location, and intensity of rainfall events. Sediment yields range from less than 0.1 to 0.5 acre feet per square mile per year, with most of the sediment coming from the steep sideslopes of the San Miguel Canyon.

Although no data is available to assess the occurrence of biological pathogens in the amendment area, it is safe to assume that pathogens exist and could pose a health threat to those who consume untreated river and stream water.

BLM_0006539

## SOILS

The geologic structures of the San Miguel River Canyon exhibit interbedded sandstone, shales, and siltstone, which result in highly variable soils ranging from sandy loam to clay loam. Rock outcrops usually occupy higher positions on the sideslopes in the form of escarpments. Due to the steep slopes, rock outcrops, and often fine soil textures, the area experiences rapid runoff and moderate to high soil erosion. The erosion rates are highest during high intensity rainfall events that occur in late summer and early fall. The eroded soils are deposited along the base of natural and man-made cuts (such as the highway cuts). Highway crews routinely clean culverts and other areas along the highway, by depositing the material in the river, creeks, or along the floodplain of these streams.

## LIVESTOCK MANAGEMENT

Most livestock operations within the amendment area are cow-calf operations. One ewe-lamb operation is located upstream of Placerville. There are 18 allotments in the amendment area, only one of which is a high priority for intensive management. Grazing preferences total 873 AUM's for the amendment area, and 75% of the active preference is within the proposed ACEC area. Grazing occurs from spring through fall on public lands. Two allotments, Horsefly Common and Uncompahgre Common are grazed in conjunction with allotments on the Uncompahgre National Forest. Most of the allotments consist of large acreage, with a small grazing preference that averages 48.5 AUM's per allotment. Topography, in the form of steep slopes and broken rims, places a major constraint on grazing use and results in the majority of the acreage in the allotments being unusable. Most grazing occurs on the mesa tops and the streambottom riparian areas.

There is no indication that current livestock grazing levels and methods are detrimental to the majority of the riparian systems in the amendment area. One known exception occurs on Saltado Creek, where livestock are concentrating to the detriment of the riparian system.

A corral, located on public land on the San Miguel River, just upstream of Specie Creek, is used by sheepherders as a truck loading and unloading point for access to grazing areas on private land and on the National Forest. Use of this corral has impacted riparian vegetation, and has aggravated some bank instability problems in the immediate vicinity of the corral.

The San Miguel Canyon is a designated livestock driveway.

## RECREATION

The predominant recreation uses in the San Miguel River Canyon are motorized vehicle sightseeing, picnicking, rafting, fishing, and camping.

15

Two designated scenic byways traverse the amendment area. The San Juan Skyway, which follows State Highways 62 and 145 from Ridgway to Telluride, was designated in 1988. The Unaweep/Tabeguache Scenic and Historic Byway, designated in 1990, follows State Highways 141 and 145 between Placerville and Whitewater. Average traffic flow on the San Juan Skyway is estimated at 1,850 vehicles per day, and about half that amount on the Unaweep/Tabeguache Scenic and Historic Byway. Much of this traffic is associated with individuals enroute to Telluride as a destination. Traffic is expected to increase as the popularity of Telluride escalates, and as people become aware of the scenic byway. Studies completed on the San Juan Skyway have indicated that BLM can expect an annual increase in use of about 4-5% annually. Many of those driving the byway also make frequent stops to photograph scenery, fish, picnic, and hike.

BLM visitor patrols indicate that between 750 and 1,000 visitor days of use, associated with camping and/or hunting and fishing on BLM land, occurs annually within the San Miguel River corridor. During the summer the majority of campers are first time visitors who spend at least 2 to 4 days in the area. About half of these visitors spend some time fishing during their stay. Camping use peaks during the fall hunting seasons, and many of these visitors return every year for a stay of 7 to 14 days.

Camping use occurs on approximately 30 undeveloped and dispersed sites along the river corridor. All the sites have slowly been expanded over the past 10 years, impacting the riparian vegetation of the River and tributaries. Numerous vehicle paths have been created leading from Highway 145 to the river. Localized problems with soil compaction, tree cutting, trampling of vegetation, campfire rings and ashes, trash dumping, and disposal of human waste and trailer effluent have increased as the popularity of the area has attracted more visitors. One favored campsite for large campers and motor homes, upstream of the Specie Creek confluence, is heavily used all summer by individuals who remain in the area for extended periods, or return several times during the summer period.

During the past 4 years, BLM has noticed an increase in overnight camping along the San Miguel River by people attending the summer festivals in Telluride. As these 3 to 5 day long events increase in popularity, more and more overflow camping is expected on public land within the corridor. At present there is only one forest service campground within a reasonable service radius of Telluride. Another Forest Service fee campground is being planned.
Whitewater rafting and kayaking are popular activities on the stretch of river from Vanadium to Naturita. The majority of the use occurs during the May and June spring runoff period. The most popular section for rafting is the section from Specie Creek to the Norwood Hill Bridge. Some additional rafting occurs from the Norwood Hill Bridge to Naturita. River gradients are relatively constant and steep, with big waves, numerous hazards, and dangerous rapids. The irrigation water diversion at Horsefly Creek may

16

require portaging on private land, and the landowner is not willing to grant access across his land.

Three commercial floatboat outfitters, and an additional outfitter, use the River corridor for guided float trips.  Two of these also offer wade-walk fishing trips.  Commercial permit use is highly dependent on flows and can range from only 20 visitor days per year in 1990, to 1,500 visitor days per year in 1992 (BLM,Recreation Use Records).  Low water years offer more opportunity for wade-walk fishing trips, but this use constitutes only a small fraction of the fishing use on the River.  Most kayakers are private parties.

Bicycle use has increased in the area, and plans have been proposed by the San Miguel County Trails Council to construct a mountain bike/hiking trail on the old railroad grade paralleling highways 62 and 145.

OFF HIGHWAY VEHICLE USE (OHV)

Under the current Resource Management Plan (RMP), the entire amendment area is open for OHV use.  The management prescription for the "B" management areas does not mention OHV use for most "B" areas, they are therefore open yearlong to OHV use.

VISUAL RESOURCES

The existing RMP does not provide any guidance for management of visual resources.  The area is traversed by two scenic byways (see the Lands and Recreation descriptions), and is known for its scenic beauty.

CULTURAL RESOURCES

Inventories have identified 206 prehistoric archaeological sites, and 10 historic sites.  No sites have been determined to be eligible for the National Register of Historic Places.  Four sites are potentially eligible.  The majority of the amendment area was studied by the University of Colorado, and Fort Lewis College.  The cultural affiliation of the sites has not been established.

FOREST RESOURCES

The forest resources in the amendment area consist of the cottonwood-birch-alder-spruce riparian forest, piñon-juniper on the steep slopes, spruce-fir on the higher elevation steep slopes, and ponderosa pine-aspen on the mesa top areas.  Of these types, only the ponderosa pine and piñon-juniper forest types offer any commercial value.  Three commercially valuable stands were identified as forest management areas in the original RMP.  Three hundred twenty five acres of piñon-juniper, on the mesa top near the confluence of the San Miguel and Beaver Creek were part of the original forest management areas.  Two other areas of ponderosa pine, located on the mesa top south of the confluence of Goodenough Gulch have commercial value.  The site closest to Goodenough Gulch has no access.

17

BLM_0006542

Outside of the commercial timber resources described above, the primary uses for the remainder of the area include: Christmas trees, wildling transplants, posts, poles, firewood, and some piñon nut collection.  The entire amendment area is open for sale and harvest of forest products.  Demand for these products within the area has been low, and primarily for posts and poles.

## THREATENED AND ENDANGERED SPECIES

A list of endangered, threatened, candidate, and proposed species, with potential to occur in the amendment area, was submitted to the U.S. Fish and Wildlife Service on October 9,1991.  The Service concurred with the list on November 5,1991.  Subsequently, due to new information, the Ute ladies tresses orchid, fringe tailed bat, goshawk, black tern, and the loggerhead shrike were added to the list by BLM.  The U.S. Fish and Wildlife Service concurred with the revised list on September 9, 1992.

## PLANTS

The following plants, which occur in the region, were considered as having some potential to occur in the amendment area:

    Spineless hedgehog cactus; _Echinocereus triglochidiatus_ var. _inermis_ (E)
    Uinta Basin hookless cactus; _Sclerocactus glaucus_  (T)
    Clay-loving wild buckwheat; _Eriogonum pelinophilum_ (E)
    Grand Junction milkvetch; _Astragalus linifolius_  (Cat 3C)
    Kachina daisy; _Erigeron kachinensis_ (Cat 2)
    Colorado desert parsley; _Lomatium concinnum_ (Cat 2)
    Paradox Valley lupine; _Lupinus crassus_ (Cat 2)
    Dolores skeleton plant: _Lygodesmia dolorensis_ (Cat 2)
    Ladies tresses orchid: _Spiranthes diluvialis_ (T)

As a result of a review of BLM inventory information, Colorado's Rare Flora (O'Kane, 1988), the final biological assessment for the Carsten's land exchange, and consultation with the U.S. Fish and Wildlife Service it was determined that habitat for all but one of these species did not exist within the amendment area.  It is possible that the ladies tresses orchid (_Spiranthes diluvialis_), which is confined to riparian wetlands at elevations below 6,500', could occur in the riparian zones of the amendment area downstream of Norwood Hill.  There are no known populations of this species on the western slope of Colorado, the known populations are located in Boulder and Jefferson Counties on the eastern slope.  Other populations are known to occur in the Uinta Basin and Dinosaur area of Utah, and also in Nevada.

## ANIMALS

A list of endangered, threatened, candidate, and proposed species with potential to occur in the amendment area is included in Appendix B.  The list was developed in consultation with the U.S. Fish and Wildlife Service.  Also included on the list are species listed as endangered or threatened under Colorado law.  Of the

18

species listed, only those mentioned below are known to occur within the amendment area.

Bald eagles are present only during the winter months. The river corridor upstream of Norwood Hill is used only for incidental hunting, no concentration areas have been documented there. The area between Norwood Hill and Piñon is part of a bald eagle concentration area that stretches from Norwood Hill to the Nucla Powerplant, near Naturita. Up to 44 bald eagles have been documented in this area by BLM biologists, with average annual counts of 9 birds. There are 4 known communal roosts in the San Miguel Canyon, two of which are within the amendment area. One roost is located on public land just upstream of the confluence with Horsefly Creek, and a second roost within the amendment area is located on private land just downstream of the confluence of Horsefly Creek. These two roosts are the most heavily used of the 4 roosts on the river, perhaps because there is no convenient vehicle access to either of them, and human disturbance is limited. Large ponderosa pines with open branch structures are the preferred communal roost tree in the Canyon. Most of the birds that roost in the canyon are believed to feed primarily on winter killed big game concentrated on Wrights Mesa in the Redvale area. BLM's current RMP, and oil and gas EIS have imposed a seasonal closure from 12/1 to 4/15 (BLM 1991) on a total of 8,596 acres (6,952 of which are public land) to protect wintering eagles from disturbance caused by BLM authorized actions.

CDOW biologists have one recorded instance of a river otter, from the Dolores River reintroduction effort, occurring in the San Miguel River in the vicinity of Horsefly Creek (Olterman 1991). There is no evidence that a self sustaining population of otters is present within the amendment area. No analysis of habitat suitability is available. The Nature Conservancy has proposed a study to determine if the habitat on the San Miguel is suitable for otter reintroduction.

Limited inventories for the Mexican spotted owl have been completed in the Horsefly Creek area of the San Miguel River Canyon(ENSR, 1992) but no spotted owls were located. CDOW plans to complete some further inventories in the Specie Creek and Beaver Creek Canyon areas in 1992 (Rogers, Boyle, 1992).

## WILDLIFE

### TERRESTRIAL WILDLIFE

There have been no intensive inventories of the amendment area to determine the species that may be present. Stacy and Richard (1975) completed a literature review of the animals within the project area for the San Miguel Project, which includes most of the amendment area. BLM wildlife observation records contain information for many species common to the area, including: mountain lion, mule deer, elk, river otter, spotted sandpiper, belted kingfisher, coyote, raccoon, black bear, redtail hawks, golden eagle, and numerous others. The riparian plant communities

BLM_0006544

in the amendment area provide excellent nongame bird habitat, and excellent wildlife viewing opportunities for the public.

Under the existing RMP, 11,433 acres have seasonal restrictions from December 1 to April 30 (BLM 1991) to protect wintering deer and elk on crucial winter ranges. Of this acreage, 3,177 acres are public land. Most wintering big game animals concentrate on the tops of mesas and do not make heavy use of the stream and river bottom areas. Both mule deer and elk are present in limited numbers within the amendment area year-round.

FISHERIES

A complete list of the streams that occur on public land in the amendment area, their flow regime, and their length on public land, is located in Appendix B. A total of 63.8 miles of perennial and intermittent stream is present on public land within the amendment area. Of the total stream mileage within the amendment area, 57.3 miles are perennial streams. There are a number of unnamed streams with perennial flow, for which no data are available. In addition, there are 11.1 miles of stream on U.S. Forest Service lands and 69.2 miles of privately owned streams within the amendment boundary.

Based on DOW fish sampling data, rainbow, brown, brook, and cutthroat trout are found within the stream systems of the amendment area. Of the perennial streams listed, only Willow, Summit, Cottonwood, North Fork Cottonwood, McKenzie, Muddy, and Turner Creeks have no data indicating that they are trout fisheries. Non game fish include suckers, shiners, sculpins, and minnows, and are found in all perennial streams in the amendment area. These non game species may also be found in intermittent streams occasionally.

Fishery habitat quality has been degraded in Fall, Big Bear, and Specie Creeks as a result of road placement and construction activities, and extreme flood events. These streams, like most of the streams in the amendment area, are high gradient, and require healthy riparian systems to maintain stable stream channels and retain quality fishery habitat. Under the current situation in these three systems, little can be done to make a significant improvement in fishery habitat.

Fishery habitat quality in the San Miguel River is rated as poor by the CDOW. Large sediment yields from the watershed during summer storms are probably a limiting factor for this fishery. Much of the sediment is related to geologic factors, and cannot be altered. Annual stocking of catchable trout maintains the recreational fishery potential for the river.

Beaver Creek was electroshocked in 1991 by BLM to determine the kind of fish present and relative productivity. In spite of being in low flow conditions for 3 consecutive years as a result of drought, this stream appears to be extremely productive, . This

20

BLM_0006545

may be a reflection of the excellent condition of the riparian system of this stream.

The existing RMP has designated 2,878 acres of public land (3,400 acres total) as riparian/aquatic emphasis areas. This designation is present on the San Miguel River, Beaver Creek, Saltado Creek, Specie Creek, Leopard Creek, and Big Bear Creek.

VEGETATION:

RIPARIAN VEGETATION:

Riparian vegetation acreage on public land is summarized on the stream mileage table presented in Appendix B. There are an additional 80 miles of Forest Service, and privately owned stream within the amendment area, which contribute to the riparian acreage of the area.

**San Miguel River:** The riparian vegetation of the San Miguel was first described by Baker in 1986. This study of the riparian vegetation of west-central and southwest Colorado was an effort to rate the importance of these systems for preservation. This study, completed for the Nature Conservancy and Colorado Natural Areas Program, identified the San Miguel and Yampa Rivers as the most important systems in Colorado for protection. Baker identified remnant (pre-settlement condition) areas that were relatively unaffected by grazing, mining or other human activities. The riparian community on the San Miguel upstream of Horsefly Creek consists of Colorado blue spruce, narrowleaf cottonwood, Douglas fir, thin leaf alder, water birch, and red osier dogwood. This is the only Western Colorado riparian woodland with water birch as a major component of the plant community. Remnant, or relic, sites (defined as plant communities that are essentially untouched by human activity and retain all their original vegetation components and characteristics) are located on The Nature Conservancy's Middle San Miguel Preserve, downstream of Specie Creek, and on public land upstream of the Preserve. The general location of the known relic sites is shown on the proposed action map in Appendix E. This riparian community also occurs on the Yampa and Animas Rivers, but the San Miguel's vegetation is the least disturbed and it's flows the least regulated of the three. The water birch and thinleaf alder have declined or disappeared from other systems where stream flows have been altered by dams or irrigation diversions. Reductions in the reproduction of cottonwood have also been noted.

Four different areas of human impact and activity in this particular plant community are evident. The areas upstream of Placerville are used heavily by recreationists. Spillover camping from festivals in Telluride tends to concentrate in this area. The riparian community on the north side of the river has been impacted and narrowed somewhat by an old railroad grade, now used as a road. The section from Placerville to the Sanborn Park Road is increasingly being impacted by recreation use. This section is also lightly impacted by old gravel mining and placer mining operations. The section from the Sanborn Park Road to Horsefly

21

BLM_0006546

Creek is roadless, with limited access due to private lands at the upstream and downstream ends. Livestock grazing of this area has historically been light. This section exhibits the least evidence of overt human disturbance. From Horsefly Creek to Piñon, the river is characterized by a more open floodplain which historically has been used for livestock grazing, and placer mining. This lower section continues to be the one that is most frequently disturbed by mining activity, as well as, increased recreational use, primarily hunters and campers.

In spite of past and present disturbance, the riparian system is still in very good overall condition. The riparian system and the aquatic systems to which it is tied are functioning very well. Most sites that had been seriously disturbed in the past have recovered well and have few exotic plant species present. In recent years the most significant damage to the riparian community has occurred due to unregulated recreation use, especially off road vehicles and camping. Campers have continued to extend trails and vehicle tracks into the riparian system and campsites have continued to expand. Remnant sites on public lands and Nature Conservancy lands have been noticeably altered since Baker completed his field work in 1985.

Within the past ten years placer mining activity has had little effect on the section of the river from Deep Creek, downstream to Horsefly Creek. Most miners are using small suction dredges which do not damage riparian vegetation. One mine, at the mouth of Specie Creek, has damaged about two acres of riparian vegetation by the construction of a settling pond, and some unexplained blading of a riparian woodland, located just downstream of Specie Creek.

One section of riparian vegetation just east of Placerville, was removed over 20 years ago by gravel mining, and has not yet recovered. The failure to recover is due to the complete loss of channel stability, which results in the loss of newly established vegetation each time high water conditions occur. The channel in this location is braided, and provides no valuable habitat for aquatic organisms. Although some indication of recovery has been evident in the last 3 years, full recovery of this section may require mechanical reconstruction and replanting.

Downstream of Horsefly Creek, the riparian system is dominated by cottonwoods with a few scattered ponderosa pines. This area has been much more disturbed by irrigation diversions, grazing, and mining. Within the last decade most of the mining disturbance on the river has occurred in this area. The percentage of understory shrubs in this area has been reduced, and the percentage of Kentucky bluegrass has been increased. The appearance of the area on public land, as opposed to some adjacent private lands, is still predominantly that of a natural community.

**Tributary Streams:** Saltado and Beaver Creeks have riparian vegetation which is predominantly in excellent condition. The vegetation on both streams is similar in composition to that of the San Miguel. Portions of Beaver Creek that were formerly private

22

BLM_0006547

land, have been heavily grazed in the past, but appear to have
recovered well as a result of several years of rest.  The upper
portions of Saltado Creek on public land have been heavily grazed
in the recent past, resulting in a small area where riparian
vegetation is no longer in good condition.  When other tributary
streams in the upper San Miguel River system have been heavily
damaged by severe runoff events, these two streams have suffered
only light damage, from which they have largely recovered.

Fall, Big Bear, Leopard, and Specie Creeks have the potential for
riparian vegetation similar to the San Miguel.  All have been
damaged by human activities, and road placement and construction
has caused the worst damage.  Leopard Creek has suffered the least
damage, but is frequently used by the highway department as a
disposal area for waste soil and rock that falls on the uphill side
of the highway.  The other streams have had a percentage of their
riparian vegetation removed by road construction.  The road
construction also straightened and confined the streams somewhat
resulting in higher gradients.  When these systems were subjected
to extreme runoff events from summer storms in 1983, much of the
remaining riparian vegetation was damaged or removed, as were
portions of the roads.  Reconstruction of the roads has generally
constricted these systems even more, and recovery has not been
evident.  Livestock grazing does not appear to have been a
significant influence on these systems in recent times.

Horsefly and Cottonwood Creeks appear to be in good condition.
They contain a narrowleaf cottonwood community with an understory
of coyote willow, squawbush, and other species typical of low
elevation riparian systems in the lower San Miguel and Dolores
River drainages. Cattle grazing is occurring in these systems, and
the influence of livestock on the system is currently unknown, but
is assumed to be of minor importance.

The remaining streams, such as McKenzie Creek, Willow Creek, Huff
Gulch, and Deep Creek have very limited public acreage, or lack of
access, and generally have received little inventory attention from
BLM.  Huff Gulch, an intermittent stream with extremely high
gradient, has had some previous damage to its limited riparian
system due to road construction.  A new road is being constructed
in this drainage, and the final impacts to the riparian system are
not yet evident.

UPLAND VEGETATION:

An inventory of the vegetation and soils of the RMP area was
conducted in the years 1980 through 1982.  Within the amendment
area all the soils were mapped and sight write-up areas (SWA's)
were developed for vegetation communities in the areas west of
Beaver Creek.  The intent of the original inventory was to
determine the amount of livestock forage available.  Because
topography limits the amount of grazeable land within the amendment
area, vegetation data from this inventory is sketchy.

23

BLM_0006548

The upstream end of the amendment area is characterized by spruce-fir forest communities on steep slopes. Intermixed within these communities are islands of aspen. Because of the steep slopes, none of these forest types have been classified by BLM as having commercial value. Between Placerville and Norwood Hill, spruce/fir vegetation is maintained on the north facing slopes and the south facing slopes begin to be dominated by piñon pine and rocky mountain juniper, with small sagebrush parks. The mesa top areas have small stands of ponderosa pine, some of which have commercial value, although it may not be cost effective to log these small tracts.

Downstream of Norwood Hill, the predominant vegetation on the south and west facing slopes is piñon/juniper with mountain shrubs mixed into the stand on the more moist locations. North and east facing slopes in this area are dominated by mountain shrub communities. The tops of the mesas in the Sanborn Park and Dry Park areas, were piñon/juniper communities, and have been chained by BLM and the Forest Service to increase livestock forage production. These sites, which are livestock emphasis areas in the original RMP, are now dominated by introduced grasses.

Although all the communities described above contain grasses and forbs, grasses and forbs are not a major component in any of them, except for the treated areas.

NOXIOUS WEEDS:

Extensive surveys for noxious weeds have not been conducted in the amendment area. A brief survey along Highway 145 in 1992, did not locate any state or county listed noxious weeds. Further weed surveys will be conducted in the amendment area as funding allows.

FIRE:

Annually there are between 5 and 10 fires, from all causes, in the San Miguel River Canyon. Most fires are no more than a few acres. Because of the high visibility of the area, it has been standard practice to fully suppress all fires.

## IMPACTS FROM THE PROPOSED ACTION AND ALTERNATIVES

INTRODUCTION:

This section discusses the physical, biological and economic consequences of implementing the alternatives described earlier. Only those resources that would be affected are discussed; it is assumed that no important impacts to climate, air quality, geology, topography, transportation, noise, or prime and unique farmlands would result from these BLM actions. Where resource management would remain essentially unchanged, such as, the disposal tracts from the original RMP, the unique fossil areas, the commercial forest management areas, bald eagle winter concentration areas, a

24

BLM_0006549

formalized 14 day camping limit, and crucial big game winter ranges, no assessment of impacts is described.

Noxious weed control would occur within the area under either alternative, based on an Integrated Pest Management Plan developed by the San Miguel Basin Weed Board.  Control work on public land would be coordinated and approved by BLM.  The proposed ACEC may have a higher priority for inventory and control of noxious weeds.

The general, and specific, assumptions and guidelines found on pages 3-1 to 3-4 of the Draft San Juan/San Miguel Resource Management Plan were also used for this amendment.

Because the decisions pertaining to oil and gas leasing would not be altered by this amendment, no discussion of the impacts of oil and gas leasing is presented.

All acreage references in the impact analysis section refer to Public Land only.

PROPOSED ACTION:

Introduction:

This alternative generally protects riparian and recreation values within the San Miguel River Canyon, and the canyons of its major tributaries, between the old townsite of Piñon and Deep Creek. Impact discussions are provided by resource.

Energy and Minerals Resources:  The ACEC designation would require mining claimants to file a mine plan prior to surface disturbance, on 20,964 acres of public land.  This would result in some increased costs for the claimants and a minimum delay of 15 additional days in approval of their proposed activities. The requirement to use native species for reclamation and the potential to require additional mitigation, not required under a 3809 Notice, would also be expected to increase costs slightly.

Mineral material disposal would be prohibited on 20,964 acres of the ACEC and an estimated 730 acres of riparian systems within the planning area.  Since no mineral material sales have occurred in these systems within the past 10 years, the actual economic impact is believed to be negligible.  In the event that demand for these materials increases, alternate sources, outside of the closed areas, would have to be located.  Costs for the alternate sources would be somewhat higher due to increased trucking expenses.

No impacts are expected to coal, geothermal, or oil and gas activity.

Vegetation:  Riparian vegetation conditions would be maintained or improved on about 1,450 acres of publicly owned land.  Continued degradation of the riparian systems in the ACEC, due to unmanaged recreation activity would be curtailed.  Much of the damage done to the San Miguel River riparian system over the past few years would

25

BLM_0006550

be repaired, and recreation activity would be directed to sites that would cause no additional damage to riparian vegetation values.   The cohesive management philosophy established by this amendment should result in real progress in riparian vegetation management.   The relic riparian vegetation sites, near Specie Creek, would be protected from further damage.   The end result would be the preservation of the existing biodiversity of the San Miguel River ecosystem.

The requirement for submission and approval of a mining plan prior to conducting surface disturbing activities on mining claims, and the inclusion of specific reclamation and mitigation in those plans would reduce long term impacts to upland and riparian vegetation on 20,964 acres.

Management of livestock grazing on riparian vegetation would be improved, and the risk of damage to the systems reduced, as a result of establishing specific management objectives for the riparian areas.   An estimated 500 acres of suitable livestock range on acquired land, much of which is riparian, would be protected from any livestock impacts.

Off highway vehicle closures on 10,668 acres of currently unroaded areas would prevent degradation of the vegetation in those areas from off highway vehicle use.   The restriction of vehicles to designated roads and trails on 22,011 acres would reduce the acreage of vegetation currently impacted by OHV's and prevent an increase in unplanned vehicle trails.

Soils and Water:   Off highway vehicle closures on 10,668 acres and restriction to designated roads and trails on 22,011 acres should reduce soil erosion and improve soil stability.   The reclamation of closed, unnecessary roads would also reduce soil loss.

Stream system stability should improve slightly due to riparian vegetation management and restoration of damaged stream banks and channels, that are found on a small fraction of the stream systems in the amendment area.

The exclusion of livestock grazing from 500 acres of suitable range, out of the 2,800 acres of acquired land, would reduce non-point source pollution in surface water.   Much of the suitable acreage is in or adjacent to streams and riparian zones.

Stream flows would be protected by recommending instream flows to the Colorado Water Conservation Board.

Terrestrial Wildlife:   Riparian habitat conditions would be improved or maintained on about 1,456 acres of riparian system. Management of recreation impacts within the ACEC and SRMA would reduce some disturbance of wildlife by closing some unnecessary roads and camping areas on the river between Placerville and Norwood Hill.   Nongame bird species would be the primary beneficiary of the habitat maintenance and improvement.

26

BLM_0006551

The closure of 10,668 acres of habitat to OHVs and road development would prevent increased disturbance of wildlife and degradation of habitat.

Acquisition of key private parcels would enhance riparian system management and help to maintain riparian habitat values for the long term.

The closure of approximately 2,800 acres of acquired lands, 500 acres of which is suitable range, to livestock grazing would enhance riparian habitat values and reduce livestock-wildlife conflicts for forage and space.

Wintering big game would be protected from disturbance on crucial winter ranges on 8,240 acres of land, 1,340 acres of which are Public Land.  This is 1,400 fewer acres than the existing RMP, but is consistent with the Oil and Gas EIS, completed in 1991.   The acreage removed from winter closure is primarily private land in the Wilson Mesa area.  The decisions in the Oil and Gas EIS pertain only to oil and gas activities.   The amendment proposal would pertain to all BLM permitted actions on 1,340 acres of Public Land crucial winter range.

In cooperation with CDOW, river otters would be reintroduced into suitable habitat on the San Miguel River, and probably establish a population on up to 50 miles of River and stream habitat.   This would enhance biodiversity within the river corridor and within the region.

The inclusion of specific wildlife management objectives in the SRMA plan would provide improved direction for management of all types of wildlife habitat within the SRMA.

Aquatic Wildlife:  The planned increased emphasis on protection and improvement of habitat values on about 65 miles of stream and 1,450 acres of riparian habitat would improve aquatic habitat on an estimated 12 miles of stream that have been damaged by off highway vehicles, mining, recreation, road construction, and floods.

T&E Species:   The closure of 10,668 acres of upland habitat to OHVs, and the maintenance of those acres in a roadless state would prevent degradation of the best potential Mexican spotted owl habitat within the amendment area.

The closure of the river canyon, from the Sanborn Park Road to Horsefly Creek, to OHV's would protect wintering bald eagles from disturbance.   The closed area contains the only communal winter roosts on public land within the amendment area, and provides habitat for the largest number of eagles that winter on the San Miguel.

Improved management of the riparian systems, downstream of Norwood Hill, could enhance habitat values for the Ute ladies tresses orchid, if it is present in the area.

27

BLM_0006552

No other impacts to any T&E species, proposed species, or candidate species are anticipated.

Livestock Grazing:  No reductions in livestock grazing preferences are planned.  Grazing reductions, or changes in grazing schemes, may result if grazing operations cause degradation of riparian systems.  At present there is no indication the minor livestock problems present within the area would result in a situation requiring a reduction in grazing preference.

An estimated 500 acres of unallocated, suitable range on acquired lands would be lost to livestock grazing for the long term.

Inclusion of specific livestock management objectives in the SRMA plan would provide improved direction for livestock management, especially in riparian areas.

Forestry:  Approximately 20,166 acres of the ACEC, and 298 acres of the remainder of the SRMA would be closed to forest product disposal.  The closed acreage in the ACEC is located on steep slopes, in riparian areas, or on lightly stocked sites that have no commercial value.  Some potential loss of personal use forest products, such as firewood and juniper posts, would result, however, no permits for such sales have occurred within the ACEC area within the past 10 years.  Although closure of the riparian areas to forest product sales in the remainder of the SRMA would appear to forgo some economic benefits, in reality, harvests within riparian areas would probably not be authorized in order to protect the integrity of stream systems.  As a result the loss of wood fiber production would be insignificant.

Recreation:  The establishment of recreation management objectives for the land use plan, and completion of a management plan for the SRMA, would result in improved management of recreation resources, and improved visitor contacts and service, on 32,641 acres of public land.  BLM should also be better equipped to manage the continued increase in recreation pressure and demand that the area has been experiencing.

The requirement for mine plans, that include mitigation and reclamation for claims within the ACEC would result in the preservation of the quality recreation environment within the area.

Restricting car camping within the ACEC to a maximum of 3 sites would reduce the attractiveness of the area for some users, who prefer to vehicle camp in isolation from other campers.  The construction of campsites, bike trails, and interpretive sites, and improved management, of the authorized sites would enhance the useability of the area for other users.  The potential to further limit camping stays to periods shorter than 14 days would make the area less attractive to those users who wish to stay for the longer period.  If imposed, the shorter camping limit would help preserve the quality of the camping experience and insure that it is available to a larger number of users.

28

BLM_0006553

OHV restrictions and closures would also reduce the useability of the area for some users, but should retain a balance of motorized and non-motorized recreation opportunities. Closure of the ACEC to major utility corridors would maintain the physical setting attractive to recreation users, and reduce the potential for degradation of the scenic qualities of the area.

Establishment of VRM classes for the amendment area would also help to preserve the values of the area by maintaining the physical setting desired by the public. The proposed powerline to be constructed across Beaver and Saltado Creek canyons would cause a minor intrusion into the primitive setting of these canyons, but the thick vegetation of the canyon should limit the visual impact.

Planned restoration of damaged riparian/aquatic habitat would enhance the setting for recreational users, and ultimately result in better fishing opportunities and more frequent wildlife sightings.

The construction of trails into the area between the Sanborn Park Road and Horsefly Creek would provide public access to an area that has been inaccessible to the general public.

Exchanging and acquiring lands within the SRMA would allow the BLM to obtain key parcels of land needed to enhance recreation and riparian management.

Cultural Resources:   Inventory and management of cultural resources would improve due to development of specific management objectives being developed in the SRMA plan.

Visual Resources:  The proposal has established Visual Resource Management goals for 35,884 acres of public land.  These VRM guidelines should preserve the visual quality of the San Miguel River Canyon and its tributaries, and the visual qualities of the San Juan Scenic Byway and Unaweep/Tabeguache Scenic and Historic Byway.

Lands:  The restrictions imposed by the management of the ACEC, VRM classes, and the closure of the ACEC to major utilities would decrease the opportunities for rights-of-ways and other authorizations on public land.  One result of this may be an increase in construction costs for applicants who are required to select longer alternate routes or include more costly mitigation in their proposed project.  No estimate of the increased costs are available, since they would have to be calculated for each project independently.  The cost increases that could be incurred by major utilities bypassing the ACEC could be substantial.

Acquisition of key private parcels, and exchanges to facilitate the acquisitions, would initiate an increased short term workload for the BLM lands program.  The elimination of some inholdings would improve the efficiency of land use authorizations by BLM.

29

<u>Fire:</u>   Fire management would experience a slight increase in suppression costs due to the decision to place the area within the canyon rims, except the area between Clay Creek and Horsefly Creek, and the forest management areas, in the full suppression category. Since full suppression has been the informal management philosophy for this area, the change in costs should be minimal.   The use of fire to meet vegetation and fuel management objectives would be possible.

<u>NO ACTION ALTERNATIVE:</u>

<u>Introduction:</u>

Land use decision from the original RMP would continue in effect. Effective management of recreation resources and riparian ecosystems would be difficult.   Impact discussions are provided by resource.

<u>Energy and Minerals Resources:</u>   The entire 43,011 acres of Public Land in the amendment area would be open to locatable mineral development without the requirement for filing a mine plan, and open to mineral material disposal.

<u>Vegetation:</u>   Riparian vegetation conditions along the San Miguel River between the Sanborn Park Road and Deep Creek would continue to deteriorate due to unmanaged recreation impacts, resulting in the creation of additional campsites and vehicle trails to the River.   Reclamation of the damaged riparian sites within the amendment area may be completed, but progress would be slowed by a lack of coordinated management for the area.   The relic riparian sites on the River would continue to be damaged and deteriorated, by unmanaged recreation.

Livestock grazing in riparian systems would continue to lack specific objectives, and could cause riparian vegetation damage. An estimated 500 acres of suitable livestock range, on acquired lands, may be grazed by domestic livestock, resulting in some potential for degradation of the riparian systems involved.

Allowing OHV use on 43,011 acres of public land would result in some minor degradation of vegetation conditions through damage and removal.

<u>Soils and Water:</u>   Off highway vehicle use on 43,011 acres of public land would increase erosion and reduce soil stability.   The continued proliferation of vehicle trails in the riparian zones would cause accelerated degradation of hydrologic function, and an increase in stream channel instability.

The potential introduction of livestock grazing on 500 suitable acres, of the 2,800 acres of acquired land, would slightly increase nonpoint source pollution of surface water.

Instream flow filings may not be obtained to protect the function of stream systems.

BLM_0006555

**Terrestrial Wildlife:** Riparian habitat conditions would continue to deteriorate on the River and some tributaries as a result of unmanaged recreation. Additional vegetation would be removed to create campsites and vehicle trails to the River. Some riparian habitat improvement would be accomplished, but is not likely to keep pace with the increasing recreation pressure in the area.

Wintering big game would be protected from disturbance on 9,640 acres of land. This is about 1,400 acres more than is currently covered by seasonal restrictions under the Oil and Gas EIS plan amendment. Most of the 1,400 acres is private land in the Wilson Mesa area, and is not currently considered to be crucial winter range.

River otters would not be reintroduced into the River, even if the San Miguel River is suitable habitat for otters.

**Aquatic Wildlife:** Unmanaged recreation activity would continue to damage aquatic habitat along the River between Sanborn Park and Deep Creek. Vegetation would continue to be damaged and removed to create campsites and vehicle access to the river. Some minor habitat improvement would be accomplished on those streams that are riparian/aquatic emphasis areas.

**T&E Species:** Potential Mexican spotted owl habitat could be degraded by road construction and OHV use.

**Livestock Grazing:** Livestock grazing could be authorized on 2,800 acres of acquired land, about 500 of which is suitable for livestock grazing. Management would continue to be low priority for the BLM range program.

**Forestry:** The entire 43,011 acres of public land would be open to forest product disposal. Little of the acreage would be harvested due to steep slopes, poor stocking, and lack of demand.

**Recreation:** Management of the increased recreation activity in the area would continue to be hampered by a lack of land use plan direction on 43,011 acres of public land. Sanitation and trash problems, and campsite deterioration would continue. In time, the attributes that make the San Miguel River Canyon a desirable place for recreation would deteriorate as a result of continued, and escalating recreation impacts.

Camping and OHV use on 43,011 acres of public land would continue to be open and unregulated. Ultimately vehicular type activities could begin to dominate the recreation spectrum within the corridor.

The lack of VRM management guidelines would result in a gradual deterioration of the physical setting desired by the public. The scenic values of the scenic byways would also be deteriorated, especially by major utility construction that could occur anywhere in the canyon. Exchanges or land acquisitions to facilitate recreation management would be unlikely.

31

The area between Sanborn Park Road and Horsefly Creek would continue to be inaccessible to the recreating public.

Cultural Resources:  Cultural resource management, and inventory would not be emphasized on 43,011 acres of public land.  Some minimal inventory and interpretation would occur.

Visual Resources:  Without visual resource management guidelines, the visual qualities of the corridor would continue to be deteriorated by disturbances that do not blend with the environment.  The visual qualities of the scenic byways would not be preserved.

Lands:  The entire area, except 300 acres of commercial forest would be open to major utilities.  Rights of ways and other authorizations would be authorized with few restrictions from the land use plan.

## CUMULATIVE IMPACTS

No cumulative impacts are anticipated as a result of the proposed action.  The proposals of this amendment are primarily protective in nature, and would result in a reduction of surface impacts.  If any cumulative impacts were to accrue, they would be primarily beneficial, especially in the preservation of the biodiversity of the San Miguel River Canyon, and in the protection of the assets which make the canyon a desirable destination point and travel route.

## CONSULTATION AND COORDINATION

Notice of the intent to modify the land use plan was placed in the Federal Register on February 28,1991.  The local public was also notified of the plan modification, and open house concerning the amendment, through news releases to local newspapers and radio stations.  Individuals and organizations who participated in the original RMP were contacted in 1989 to see if they would be interested in receiving further information about the land use plan amendment for the San Miguel River.  Those individuals who responded in the affirmative were notified directly of the amendment and given a brief description of the proposal.

An open house was held in Placerville, on April 3, 1991, to obtain public comment on the preliminary proposal.  The thirty day public comment period ended on April 29, 1991, but comments were accepted until June 3, 1991.  A total of 42 comments were received.  One of these was a petition, with 103 signatures, in favor of the proposed amendment.  The majority of commenters were in favor of the amendment.  All commenters were added to the mailing list for this action.

Of the comments received, the major adverse concerns were that the proposal would overemphasize recreation, may prevent construction

BLM_0006557

_____. Various Years. Stream and Riparian System Inventory Data. BLM, Montrose, CO.

Baker, William. 1986. Riparian Vegetation of the Montane and Subalpine Zones in West-Central and Southwestern Colorado: Final Report. The Nature Conservancy and Colorado Natural Areas Program.

Nan Lederer. 1991. Personal Communication, regarding the riparian vegetation of the San Miguel downstream of Norwood Hill. The Nature Conservancy, Boulder, Co

_____.1992. Recreation Use Records for the San Miguel River, 1986-1992. Bureau of Land Management, Montrose, CO.

BLM_0006558

APPENDIX A

TABLE 1

## NO ACTION ALTERNATIVE

### (CURRENT MANAGEMENT GUIDANCE)

| MANAGEMENT AREA NAME | ACRES[1] |
|---|---|
| Aquatic/Riparian (BAR)♥ Management | 2,878 (BLM) 522 (PVT) |
| Livestock Management (A)♥ | 8,970 (BLM) 2,036 (PVT) |
| Bald Eagle Winter (BE)♥ Concentration Area | 13,134 (BLM) 2 (USFS) 1,642 (PVT) |
| Sand and Gravel (ES)♥ Management | 9 (BLM) |
| Deer and Elk (BDEW)♥ Winter Range | 3,178 (BLM) 29 (USFS) 8,204 (PVT) 22 (STATE) |
| Placerville Fossil (EF)♥ Area | 2,833 (BLM) 1,172 (PVT) |
| General Management (G)♥ | 17,270 (BLM) 8,541 (USFS) 82,198 (PVT) 2,505 (STATE) |
| Disposal Tracts (H)♥ | 724 (BLM) 556 (PVT)▲ |
| Forest Management (J)♥ | 798 (BLM) 123 (PVT)▲ |

[1]The acreage presented in the table does not equal the acreage of the amendment area because some management areas overlap, and are counted twice. Total acreage for the amendment area is presented on the table for the proposed action. All acreages are from BLM's electronic mapping system, and slight variations in acreage values may exist within the document due to electronic adjustments of the various maps that make up the amendment database.

♥ Denotes the map symbols from the original RMP.
▲ Acreage no longer in public ownership.

36

BLM_0006559

APPENDIX A

TABLE 2

PROPOSED ACTION

| MANAGEMENT AREA NAME | ACREAGE[1] |
|---|---|
| ACEC (L$_1$)♣ | 20,964 (BLM)<br>2 (USFS)<br>3,101 (PVT) |
| Recreation Management (C$_1$)♣ | 11,677 (BLM)<br>34 (USFS)<br>4,028 (PVT) |
| Livestock Management (A)♥ | 5,383 (BLM)<br>2 (USFS)<br>147 (PVT) |
| General Management (G)♥ | 3,022 (BLM)<br>8,572 (USFS)<br>90,271 (PVT)<br>2,527 (STATE) |
| Bald Eagle Winter (BE)♥<br>Concentration Area | 12 (BLM) |
| Disposal Tracts (H)♥ | 632 (BLM) |
| Deer and Elk Winter (BDEW)♥<br>Range | 1,321 (BLM)<br>433 (PVT) |

♥ Denotes the map symbols for the management units, from the original RMP.

♣ Denotes the map symbols for the new management units developed for the amendment.

**TOTAL ACREAGES:**
    BLM Lands.............43,011 ac.
    USFS lands.............8,612 ac.
    Private lands.........98,157 ac.
    State Lands............2,527 ac.
             Total...152,307 ac.

[1]All acreages are from BLM's electronic mapping system, and slight variations in acreage values may exist within the document due to electronic adjustments of the various maps that make up the amendment database.

BLM_0006560

APPENDIX A

TABLE 3

## OIL AND GAS LEASING STIPULATIONS

| STIPULATIONS | ACRES* |
|---|---|
| Crucial Winter Range(CWR)♥ (Big Game Crucial Winter Range) | 30,186 |
| No Surface Occupancy(NSO)♥ (Raptor Nests and Roosts) | 747 |
| Bald Eagle Winter(SME)♥ Concentration Area | 10,163 |
| Standard     (SSP)♥ Stipulations | 113,706 |

* Due to overlapping management areas, the total acreage exceeds that of the amendment area.   Total acreages are presented on the preceding table for the proposed action.

♥ Denotes the map symbols for the management units, from Oil and Gas Environmental Impact Statement and Plan Amendment.

BLM_0006561

Management Guidance for Area L1:
Area of Critical Environmental Concern

This management area is located in the San Miguel River Canyon between Placerville and Horsefly Creeks. It also includes the canyons of the tributary streams of Saltado and Beaver Creek. The management area contains 20,964 acres of public land, and 3,101 acres of private land.

Within this management area the primary emphasis is on the protection of unique, high quality, riparian vegetation resources, the scenic values of the corridor, and preservation of relic riparian communities. The provision of quality recreation experiences while maintaining these riparian systems is the second major goal of this management area. The ACEC is closed to major utility corridors (except as detailed below) in order to protect riparian and visual values.

Within the ACEC the recreation management objectives vary somewhat depending upon location. Along the highway corridor, management is directed toward the motorized segment of the recreation public, and management will be for a roaded natural setting (corresponds to the designated roads and trails areas on the OHV map). In the areas that are now basically roadless, the emphasis will be on primitive nonmotorized recreation (corresponds to the areas closed to OHVs on the OHV map).

Restoration of disturbed sites will be accomplished with species native to the sites. The use of trees and shrubs will be required, if appropriate to the site.

All applicable land disposal authorities would remain available for use to resolve unforeseen trespass situations.

Management Direction for Other Resource Values

| Resource/Activity | General Guidance | Specific Management |
|---|---|---|
| Cultural | Develop, inventory and protect suitable cultural resource properties. | Develop specific cultural resource management objectives for the SRMA plan.<br><br>Provide protective management of the unique fossils in the Placerville area through the use of stipulations on a case-by-case basis. |
| Visual | Preserve scenic values, enhance viewing opportunities and increase variety, where appropriate. Establish site specific visual quality objectives and design guidelines for landscape development projects during activity planning. | Manage the area under VRM Class II guidelines, except for the forest management areas from the original RMP which will be managed under Class IV guidelines. |

39

BLM_0006562

| Resource/Activity | General Guidance | Specific Management |
|---|---|---|
| Recreation | Manage for a variety of recreation opportunities consistent with maintenance of the riparian system and visual resource values. Provide necessary visitor management services and facilities required to reduce the impacts of unregulated recreation, and educate the public about the values of riparian systems.<br><br>All facility construction will protect riparian and scenic values.<br><br>Manage this area and the C1 areas as a Special Recreation Management Area (SRMA), and develop an integrated management plan for the area. The integrated plan will serve as the Recreation Area Management Plan. | Camping along the river, between Placerville and the Sanborn Park Road, will be limited to two designated locations (tentatively the motor home campsite near Specie Creek, and the acquired land at the base of Norwood Hill). The latter would be developed for tent camping only.<br><br>Minimal camping facilities would be constructed in Beaver Creek Canyon at the Beef Trail Road crossing.<br><br>A fourteen day camping limit will be enforced in the ACEC. This limit is further defined as: Fourteen days maximum in one location anywhere in the SRMA. A thirty day period must pass before camping anywhere else within the SRMA. The site must be completely vacated, personal property may not remain on the site beyond the fourteen day period, or moved to another location within the SRMA and left unattended. In the event that resource damage becomes evident as a result of the fourteen day limit, or demand for camp sites becomes extremely high, the camping limit may be shortened accordingly, with no land use plan amendment.<br><br>Develop a maximum of two interpretive sites, to include an environmental education center (developed jointly with The Nature Conservancy) at the base of Norwood Hill.<br><br>Trails in Saltado and Beaver Creek Canyons may be constructed as well as a boat ramp on the San Miguel at Beaver Creek. If feasible, a bicycle and foot trail would be constructed between Placerville and Norwood Hill.<br><br>Beaver Creek, Saltado Creek, Horsefly Creek and the San Miguel River between the Sanborn Park Road and Horsefly Creek will be managed for primitive non-motorized recreation. Construct a foot trail into the San Miguel River Canyon between horsefly Creek and the Sanborn Park Road. The remainder of the ACEC will be managed as a roaded natural area.<br><br>Construct vehicle parking areas, located outside of the flood plain, and riparian area with safe highway access to accommodate day use visitors.<br><br>Construct a foot trail from the Sanborn Park Road to Horsefly Creek, pending access through or around private land. If disturbance of wintering eagles becomes evident, close the area to public use from November 16 to April 30. |

BLM_0006563

| Resource/Activity | General Guidance | Specific Management |
|---|---|---|
| OHV Use | Designations of OHV areas is primarily directed at maintenance or restoration or riparian areas and scenic values. Roads will be designated at the time the activity plan for the SRMA is developed. | Beaver Creek Canyon, Saltado Creek, and the San Miguel River Canyon from the Sanborn Park road to Horsefly Creek, would be closed to off-highway vehicles. The access road in lower Beaver Canyon must remain usable for utility line maintenance, but would be closed to public vehicle use. Within the remainder of the ACEC, vehicle use would be limited to designated roads or trails. Designation of the roads to remain open will occur in the Recreation Area Management Plan (Integrated Resource Management Plan). |
| Wildlife | Provide the highest priority management to aquatic and riparian habitat to provide frequent wildlife sightings, fishing opportunities, recreational hunting, interpretive opportunities, and healthy plant communities. Continue to provide necessary management for T&E species. Riparian and aquatic habitats will receive priority for habitat management. | The area between the Sanborn Park Road and Horsefly Creek will be seasonally closed between November 16 and April 30 (Colorado Oil and Gas Leasing and Development EIS, Record of Decision, 1991) to protect wintering bald eagles. Bald eagle roost trees will be protected, and monitoring of wintering eagle use will be resumed.

Crucial big game winter ranges will be closed to all discretionary actions from December 1 to April 30 (Colorado Oil and Gas Leasing and Development EIS, Record of Decision, 1991).

Damaged riparian areas in the ACEC will receive f priority for restoration and management compared other areas within the SRMA.

Cooperate with the Nature Conservancy, and Colorado Division of Wildlife, to study the suitability of the San Miguel River for river otter reintroduction. Allow reintroduction into suitable habitat.

Wildlife habitat management objectives and planned projects will be incorporated into the SRMA plan.

To protect the riparian and aquatic systems within the SRMA, instream flow needs will be determined and filed with the State Water Conservation Board. |

BLM_0006564

| Resource/Activity | General Guidance | Specific Management |
|---|---|---|
| Livestock Management | Manage livestock to protect riparian system values. Do not attempt to improve forage production through vegetation projects. Range management improvements must not negatively effect riparian system values, or scenic values. | Those riparian areas not currently allotted, including acquired lands, would be closed to livestock use. Allotment boundaries would be adjusted to exclude areas unsuitable for livestock grazing due to physical characteristics. Grazing preferences would not be effected. Allotment management plans, or grazing systems, shall contain specific measurable objectives for riparian pastures.

Good or excellent condition riparian systems must be maintained in good to excellent condition. Where livestock management is a factor in systems being in less than good condition, livestock management practices would be changed to improve those systems to at least good condition. |
| Forestry | Forestry practices will be used to enhance riparian management, or control insect outbreaks. | With the exception of the three forest management areas designated in the original RMP, the ACEC is closed to forest product disposal, unless the criteria of improving riparian values and maintaining forest health are met. |
| Minerals | Manage mineral development to minimize impacts on riparian and recreation values. When possible, schedule activities so conflicts are minimized between recreational and mineral activities. Ensure site rehabilitation activities follow operating plans and address riparian management objectives. | The management area is closed to the disposal of mineral materials unless such disposal is needed to meet management goals for the river or riparian area, and is of a temporary, one-time nature.

The area will be open to oil and gas leasing subject to standard stipulations and timing limitations (Colorado Oil and Gas Leasing and Development EIS, Record of Decision, 1991). |

BLM_0006565

| Resource/Activity | General Guidance | Specific Management |
|---|---|---|
| Lands | All land use authorizations will be designed to mitigate riparian system values and recreation values. Acquisition of lands will be considered when opportunities for riparian and recreation management will be enhanced.<br><br>Land would be considered for disposal on a case-by-case basis. Although the intent of this management area is to retain lands in public ownership, disposal that enhances the management goals of the management area, and serves the public interest may be considered. Disposal may occur through exchange, boundary adjustment, and Recreation and Public Purposes Act conveyances. | The area is closed to the development of major utilities (defined in the original RMP), with the exception of the areas described below. Utility corridors, to be used only for major overhead electric transmission lines, will be established across Beaver Creek and Saltado Creek. As requested by San Miguel Power Association, only one of these corridors will ultimately be selected for use. The remaining one will be closed to major utility development. The corridor selected for use would be available for only one overhead transmission line. The corridors are located 1/4 mile on each side of San Miguel Power's existing 69 kV line, and 1/2 mile either side of the Beef Trail Road crossing Beaver Creek. The lines must span the riparian area to prevent disturbance to the riparian and aquatic resources of the streams. Visual impacts of line construction must be minimized to comply with VRM guidelines. Stipulations will be developed on a specific project basis to protect natural and scenic values.<br><br>Within the San Miguel Canyon upgrades of the existing major electric transmission lines would be authorized.<br><br>Bureau permitted actions, such as rights-of-way, bike trails, camping areas, etc., would not be permitted in the relic riparian communities within the ACEC. Elsewhere in the ACEC, such actions would be restricted to only those with an overriding public need which will not create long-term visual impacts, or damage to the riparian system. |
| Soils and Water | Maintain soil productivity, minimize man-caused erosion and strive to achieve adequate vegetation for watershed protection and plant vigor. Maintain or improve water quality and quantity for multiple-use resource needs. Secure sufficient water rights to provide for recreation and riparian management needs. | Where possible facility development will be located outside the 100 year floodplain. |

43

BLM_0006566

| Resource/Activity | General Guidance | Specific Management |
|---|---|---|
| Fire | Utilize fire management techniques that maintain long-term recreation quality objectives. Suppression of wildfires will generally occur, but prescribed fire will be allowed if it will meet or exceed riparian, visual, and recreation objectives. | To allow the use of fire as a management tool, the mesa top areas, such as the forest management areas and the area between Clay Creek and Horsefly Creek would be managed in a conditional fire suppression category, and as fire use and fuel management areas.<br><br>All areas within the upper canyon rims would be managed under the full fire suppression category. Within the Canyon, the Area Manager must approve the use of heavy equipment for fire suppression activities. These areas would also be placed in a fire use and fuels management category. |
| Access | Provide access to public land to enhance recreation values. Provide levels of maintenance on primary roads that promotes user safety. Minimal levels of maintenance would be provided on secondary roads. | Build and maintain a non-motorized trail, on existing easements, across private land in upper Saltado Creek to provide access to public land.<br><br>Construct trails around private land, or purchase easements, to provide access to the San Miguel River Canyon between the Sanborn Park Road and Horsefly Creek. |

Management Guidance for Area C1: Emphasis on Recreation

This management area consists of two separate sections located in the San Miguel River Canyon. The first section is located between Deep Creek and Placerville, including the tributary streams, and the second section is located between the canyon rims from Horsefly Creek to Piñon. The management area contains 11,674 acres of public land, 34 acres of Forest Service land, and 4,030 acres of private land.

Within this management area, recreation is identified as the principal management objective. The primary goals of management in these areas are those of continuing to provide a quality recreation experience, with diverse recreation opportunities, while protecting the riparian, and scenic values of the San Miguel River Canyon and its tributaries.

Recreation management objectives are to focus recreation uses, such as camping to managed sites, control off highway vehicle use, manage public and commercial boating activity and walk in fishing, and protect the visual qualities of the management area. This unit will be managed as a roaded natural area (this corresponds to the designated roads and trails OHV areas on the OHV map).

These management areas will, combined with the L1 management areas, be designated as the San Miguel River Special Recreation Management Area.

Revegetation of all disturbed riparian sites will be accomplished with native plant species only. Trees and shrubs will be required when they are appropriate to the site.

Management Direction for Other Resource Values

| Resource/Activity | General Guidance | Specific Management |
|---|---|---|
| Cultural | Develop, inventory and protect suitable cultural resource properties. | Develop specific cultural resource management objectives for the SRMA plan.<br><br>Provide protective management of the unique fossils in the Placerville area through the use of stipulations on a case-by-case basis. |
| Visual | Preserve scenic values, enhance viewing opportunities and increase variety, where appropriate. Establish site specific visual quality objectives and design guidelines for landscape development projects during activity planning. | Manage the area under VRM Class III guidelines, and protect the scenic values of the San Juan Scenic Byway. |

45

BLM_0006568

| Resource/Activity | General Guidance | Specific Management |
|---|---|---|
| Recreation | Manage for a variety of recreation opportunities consistent with physical and social recreation carrying capacities of the rriver corridor. Provide necessary visitor management services and facilities required to meet recreation program goals.

Cooperate with the U.S. Forest Service and The Nature Conservancy to develop recreation facilities and long-term management objectives for the river corridor.

Manage this area, and the L1 area as a Special Recreation Management Area, and develop an integrated resource management plan for the area. The integrated plan will serve as the Recreation Area Management Plan for the area. | Improved camping opportunities will be provided upstream of Placerville. A fee campground, upstream of Placerville, will be considered if an adequate site is acquired. If a suitable site is available, boating takeout facilities would be developed near Piñon.

A fourteen day camping limit will be enforced in the management units comprising the SRMA. This limit is further defined as: fourteen days maximum in one location anywhere in the SRMA. A thirty day period must pass before camping anywhere else within the SRMA. The site must be completely vacated, no personally owned items may be left on site for more than the fourteen day period, and may not be moved to another location within the SRMA and left unattended. In the event that resource damage becomes evident as a result of the fourteen day limit, or demand for camp sites becomes extremely high, the camping limit may be shortened accordingly.

Bicycle trails may be constructed along Leopard Creek and along the San Miguel, upstream of Placerville.

Off highway vehicle use would be limited to designated roads and trails. |

46

| Resource/Activity | General Guidance | Specific Management |
|---|---|---|
| Wildlife | Manage aquatic and terrestrial wildlife habitat to provide frequent wildlife sightings, good fishing opportunities, recreational hunting opportunities, and healthy plant communities. Continue to provide necessary management for T&E species. Other wildlife values will be managed to enhance the recreation experience. | Public lands, between the canyon rims, downstream of Horsefly Creek are closed from December 1 to April 15 to protect wintering bald eagles (Colorado Oil and Gas Leasing and Development EIS, Record of Decision, Plan Amendment, 1991).

Crucial big game winter range would be closed to all discretionary actions from December 1 to April 30 (Colorado Oil and Gas Leasing and Development EIS, Record of Decision, Plan Amendment, 1991).

The riparian systems of the San Miguel River, Leopard Creek, and Fall Creek will be maintained in good condition. Restoration efforts would also be undertaken on Fall Creek, if feasible. Work with the highway department to prevent further damage to these systems from road maintenance and construction.

Cooperate with the Nature Conservancy, and Colorado Division of Wildlife, to study the suitability of the San Miguel River for river otter reintroduction. Allow the reintroduction to occur into suitable habitat.

Wildlife habitat management objectives and plann projects will be incorporated into the SRMA plan.

To protect the riparian and aquatic systems within the SRMA, instream flow needs will be determined and filed with the State Water Conservation Board. |
| Livestock Management | Livestock grazing must not degrade recreation or riparian values. With the exception of prescribed fire, vegetation treatments will not be used to improve forage production. Where range improvements are located near visitor concentration areas, the improvements should be designed to enhance the recreation experience. | For vehicular safety reasons, the area along the State Highway will remain unallocated to livestock grazing. In locations where livestock grazing is a factor in riparian systems being in less than good condition, livestock management must be changed to improve those systems to at least good condition. Good or excellent condition riparian systems would be maintained in good to excellent condition. Desired plant communities, and measurable objectives will be developed for all allotted riparian areas within the SRMA.

Allotment boundaries will be redrawn to exclude unsuitable range, which will remain unallotted. Grazing preferences will not be reduced as a result of the boundary changes. |
| Forestry | Manage forested lands to enhance recreational opportunities and to maintain healthy stand conditions. | Riparian zones are closed to forest product disposal. Outside the riparian zone, disposal may occur if completed in a manner that preserves the scenic value of the area. |

BLM_0006570

| Resource/Activity | General Guidance | Specific Management |
|---|---|---|
| Minerals | Manage mineral development to limit conflict with management of high recreational values. When possible, schedule activities so conflicts are minimized between recreational and mineral activities. Ensure site rehabilitation activities follow operating plans and address recreation management objectives. | The river, creeks and their riparian corridors will be closed to mineral material disposal to protect scenic, recreational and biological values.<br><br>The area will be open to oil and gas leasing, subject to standard stipulations and timing limitations (BLM Oil and Gas Leasing and Development EIS, Record of Decision, 1991). |
| Lands | All land use authorizations will be designed to mitigate impacts to recreation and riparian system values. Acquisition of lands will be considered when opportunities for recreation and riparian management would be enhanced.<br><br>Land would be considered for disposal on a case-by-case basis. Although the intent of this management area is to retain lands in public ownership, disposal that enhances the management goals of the management area, and serves the public interest may be considered. Disposal may occur through exchange, boundary adjustment, and Recreation and Public Purposes Act conveyances. | Acquire private lands and easements needed to facilitate management. Any acquired lands would be managed according to the guidelines of this emphasis area.<br><br>The area would be open to major utility corridors, subject to VRM guidelines. The area downstream of Horsefly Creek would be open to major utilities until construction and maintenance impacts to the riparian zone reach 5% of the total riparian acreage. |
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion, and strive to achieve adequate vegetation for watershed protection and plant vigor. Maintain or improve water quality and quantity for multiple use resource needs. Secure sufficient water rights to provide for recreation management needs. | When possible, locate all facilities outside the 100 year floodplain. |
| Fire | Utilize fire management techniques that maintain long-term recreation quality objectives. Suppression of wildfires will generally occur, but prescribed fire will be allowed if it will meet or exceed recreation objectives. | All areas within the upper canyon rims would be managed under the full fire suppression category. Within the Canyon, the Area Manager must approve the use of heavy equipment for fire suppression activities. These areas would also be managed as fire use areas and fire fuels management areas.<br><br>Those areas above the canyon rims may be managed in a conditional suppression category, and as fire use and fire fuels management areas. |
| Access | Provide access to public land to enhance recreation values. Provide levels of maintenance on primary roads that promotes user safety. Minimal levels of maintenance would be provided on secondary roads. | Provide public access to the area from the Sanborn Park Rod to Horsefly Creek. |

BLM_0006571

Table 1-1. Management Guidance for Emphasis Areas

**Management Guidance for Area A: Emphasis on Livestock Management**

Management direction will emphasize increasing forage and livestock production on a sustained yield basis. Emphasis is upon increasing forage, red meat and animal fiber production, and improving forage composition and watershed conditions. Significant investments may be made in livestock improvements which will be multiple use oriented (i.e., wildlife, watershed, etc.). Investments for other resources will be minimal, although resource management activities compatible with livestock production will continue. Dispersed recreation opportunities will continue. Woodland products and timber will be made available. Wildlife habitat development generally will not be emphasized. Fire will be utilized to enhance forage production.

**Management Direction for Other Resource Values**

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Protect & manage important cultural resource properties. | |
| Recreation | Manage for dispersed recreation as the primary recreation activity. Permit yearlong, nonmotorized recreation activities throughout the area. Allow motorized, off-road vehicle (ORV) use. Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | |
| Wildlife | Maintain or improve wildlife habitat through interdisciplinary design of range improvement projects & diversity of native vegetation types. Allow compatible wildlife introductions or reintroductions or habitat improvements. Limit investments of wildlife program funds unless opportunity for substantial benefits to wildlife resources can be realized. Aquatic/riparian resources will receive special consideration at the activity planning stage to ensure maintenance or improvement of these resources. | All perennial streams within the planning area that have the potential of providing quality fisheries &(or) riparian habitat (approx. 400 mi have been identified) should receive special management consideration through the activity planning process & monitoring systems to maintain, improve, or enhance resource conditions associated with aquatic/riparian habitat. |
| | | Allow CDOW to introduce chukar & expand the pronghorn antelope herds. Other game species would be allowed if site-specific analysis indicates that significant conflicts with livestock will not occur. In all vegetation types, 5% to 15% of the existing vegetation should be maintained as leave |

49

BLM_0006572

Livestock Management
Area A (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | | strips or islands interspersed throughout the project areas to maintain dispersed, ecologic communities for wildlife. |
| Livestock Management | Manage suitable vegetation types for increased, sustained livestock production. One goal is to improve range condition & productivity on native rangeland. Use improved management systems such as rest-rotation & deferred-rotation, if appropriate. Invest in range improvements necessary to implement management systems. | Develop 71 AMPs (810,000 acres). |
| Forestry | Manage woodland products & timber to enhance range resources & for insect & disease control. | Provide reasonable opportunity to salvage forest products prior to & following range habitat improvement treatments. |
| | Timber species should be managed at a stocking level that maintains moderate to high herbage production. Utilize woodland products to the maximum extent practicable through commercial sales under the principle of sustained yield. Manage aspen forest types to perpetuate aspen, using even-aged silviculture. Limit clearcuts in aspen to a maximum of 40 acres or the size of an aspen clone, whichever is smaller. | Provide legal & physical access to vegetation treatments to facilitate salvage of forest products when feasible. |
| Minerals | Allow mineral development in all areas not withdrawn from entry. Provide protective stipulations to limit impacts to livestock improvements or management practices. | |
| Lands | Allow for disposal of parcels of public land that do not significantly affect livestock management. Major utility corridors would be allowed with protective stipulations to prevent or limit impacts to range management. Allow | |

50

BLM_0006573

Livestock Management
Area A (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
| --- | --- | --- |
| | other land actions, when there is a clear & significant public need, when they will result in minimal adverse impacts, or when they will be beneficial to grazing management.<br><br>Acquire or exchange lands when live-stock management opportunities will be enhanced. | |
| Soils and Water | Maintain soil productivity, mini-mize man-caused soil erosion & strive to achieve adequate vegeta-tion cover for watershed protection & plant vigor. Maintain water quality & quantity for multiple resource management. Secure suf-ficient water rights to provide for livestock management needs. | |
| Fire | Provide level of protection from wildfire that will result in least total cost & will gener-ally enhance range management values. Use prescribed fire when possible to enhance forage production. | Continue & expand (where appropriate) the limited fire suppression plan to enhance vegetation conditions for livestock grazing. |
| Access | Provide administrative access to public land to enhance management of the range resource. Provide maintenance of roads in the BLM transportation plan to minimum standards for user safety. | Acquire access to the following grazing allotments: 7016, 8011, 8013, 8018, & 8019. |

BLM_0006574

### Management Guidance for Area B: Emphasis on Wildlife

Management direction will emphasize achieving and maintaining the best possible habitat conditions for fisheries and wildlife. Emphasis will be upon increasing aquatic and terrestrial wildlife numbers within habitat capability, improving stream and watershed conditions and providing a high degree of vegetation diversity. Investments for wildlife habitat improvements could be high in certain areas. Woodland products and timber will be available. Dispersed recreation opportunities will continue. Livestock management will be of an intensity that will utilize available forage and maintain forage vigor while not degrading wildlife habitat. The season-of-use may be changed or the numbers of livestock may be reduced in some areas.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Protect & manage important cultural resource properties. | |
| Recreation | Manage for dispersed recreation as the primary recreation activity. Permit yearlong, non-motorized recreation activities throughout the area, except restrict recreation use to resolve people & wildlife conflicts, favoring wildlife in such cases. Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | Continue vehicle closure on Perins Peak & Animas Mountain area.<br><br>Continue seasonal (April 1-July 15) closure to public access at Perins Peak peregrine falcon eyrie. |
| Wildlife | Intensively manage for optimal terrestrial & aquatic/riparian wildlife habitat. Maintain or improve historically occupied or potentially suitable threatened & endangered (T&E) species habitat. Maintain or improve habitat for sensitive plant & wildlife species & "migratory bird species of high Federal interest." Provide for necessary investments to enhance wildlife habitat. Cooperate with CDOW for funding of habitat improvement projects & also cooperate with CDOW on the reintroduction program. | Terrestrial<br><br>Manage big game for the following numbers of animals, subject to monitoring results & availability of funds & personnel to implement needed improvements:<br>20,000 mule deer<br>1,600 elk<br>300 antelope<br>300 bighorn sheep<br><br>Continue management of Perins Peak & Paradox peregrine falcon eyries.<br>Continue management of bald eagle nests & winter eagle concentration areas.<br><br>Animas Mountain should be managed for its wildlife values (winter range) & maintained in a primitive state.<br><br>Complete habitat improvements. Invest wildlife funds for |

52

BLM_0006575

Wildlife
Area B (continued)

| Resource/<br>Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | | structural improvements & vegetation restoration projects to improve high priority riparian habitat at the following drainages: Roc, North & South Mesa, La Sal, & Dry creeks (East & West Fork, Dry Creek Canyon) & Cross, Cow, Cahone, Hovenweep, & Bridge canyons.<br><br>Continue to monitor & provide protection for endangered candidate & sensitive plant species in Paradox Valley & Spring Creek. |
| | | Aquatic/Riparian<br><br>Reestablish river otters in the Dolores River.<br><br>Improve or enhance aquatic/ riparian habitat on the following priority areas:<br><br>-Upper San Miguel River & its tributaries (44 miles)<br>-Upper Dolores River (30 miles)<br>-Lower San Miguel & its tributaries (20 miles)<br><br>Develop aquatic/riparian HMPs for these three priority areas (including intensive monitoring plans). |
| Livestock<br>Management | Manage suitable vegetation types under low to moderate intensity for livestock production, with intent to utilize available forage & maintain forage vigor, while not degrading wildlife habitat. Constrain range treatment projects in size, layout & type with intent to enhance wildlife & livestock forage, vegetation & habitat diversity. Reduce number of livestock and change season-of-use where needed to provide sufficient forage for wildlife & to protect | Limit total utilization of forage species current year's growth. Livestock use should be limited where necessary to protect highly preferred species of plants. Maintain an overall cover/forage ratio of 40:60. Limit width of vegetation openings to approx. 150 to 200 yards in big game winter ranges. In pinyon-juniper & shrub vegetation types, retain 35% to 40% of original cover when completing vegetation . |

53

BLM_0006576

Wildlife
Area B (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | aquatic/riparian resources, especially on big game winter & spring ranges. | |
| Forestry | Manage forest lands to enhance wildlife resource. Plan wood product sales in wildlife areas to improve big game forage & other wildlife needs. | Provide reasonable opportunity to salvage forest products prior to & following habitat improvement treatments.<br><br>Provide legal & physical access to vegetation treatments to facilitate salvage of forest products when feasible. |
| Minerals | Allow mineral development in all areas not withdrawn from entry. Provide protective stipulations to limit impacts to wildlife habitat or species. Limit &(or) provide protective stipulations for mineral development on habitat for T&E species. | Continue present leasing stipulations with changes for wildlife winter ranges & eagle concentration areas as shown in the Resource Conservation Alternative. |
| Lands | Allow for disposal of parcels of public land not determined to be significant & manageable for wildlife habitat. Major utility corridors would generally be excluded except on a case-by-case basis depending on site-specific impacts of the proposal. Acquire or exchange land when management opportunities for wildlife are enhanced. Acquire fishing easements on acreages associated with priority streams. Allow other land actions, when there is a clear & significant public need, when they will result in minimal adverse impacts, or when they are beneficial to wildlife. | Pursue exchange of public lands to enhance wildlife values in Dry Creek Basin. Primary consideration for exchange should be given to CDOW; however, other opportunities which may enhance wildlife values will not be dismissed. |
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion & strive to achieve adequate vegetation cover for watershed protection & plant vigor. Maintain or improve water quality & quantity for multiple use resource needs. Maintain minimum instream | |

54

BLM_0006577

Wildlife
Area B (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | flows for wildlife & fishery needs. | |
| Fire | Provide the level of protection from wildfire that will result in least total cost & will generally enhance wildlife management values. Use prescribed fire when possible to enhance wildlife habitat. | |
| Access | Provide administrative access to public land for managing wildlife habitat. Provide very little or no maintenance to roads. Close & reclaim any abandoned or poorly designed roads. Acquire public access where needed to allow wildlife-related recreation (including hunting & fishing in underutilized areas). | Acquire access to Chromo Mesa to enhance all management & public hunting opportunities. Acquire administrative access to Roc Creek. |

55

BLM_0006578

## Management Guidance for Area E: Emphasis on Mineral Development

Management direction will emphasize mineral development on the public lands. Mineral values indicate significant reserves of valuable minerals are present and development is either currently ongoing or will occur within the near future. Other resource uses will occur to the extent they are compatible with mineral development. Limited expenditures of public resources will be used on developing the present land resources. Livestock grazing will continue, wildlife habitat will be maintained where feasible, and cultural resources will receive the protection currently afforded by law.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Protect & manage important cultural resource properties. | |
| Recreation | Provide recreation opportunities that do not conflict with mineral development. Allow motorized ORV use. | |
| | Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | |
| Wildlife | Protect T&E species & maintain or improve their habitat. Provide for minimal investments to enhance key wildlife species. | Continue present leasing stipulations with changes to wildlife winter ranges & eagle concentration areas. |
| Livestock Management | Manage suitable vegetation types under moderate intensity for livestock production, with the intent to use available forage & maintain forage vigor. | |
| | Reduce the number and/or season-of-use for livestock where needed to minimize impacts to mineral operations & revegetation efforts or to minimize erosion from site. Limit range improvements on areas designated for mineral development to protect investments. Adjust livestock use as land is removed from production for mineral purposes. | |
| Forestry | Allow for the sale or disposal of forest products or timber that may be lost in mineral development or that is needed | |

56

Mineral Development
Area E (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | for managing the resource. Meet demand without degradation or conflict. | |
| Minerals | Allow mineral development on all areas not specifically excluded from development. Provide protective stipulations to limit impacts to other resource values. | Continue oil, gas, & $CO_2$ operations throughout planning area (183,000 acres in areas designated as KGSs). |
| | | Continue cooperative management to protect surface resources on 19,800 acres of DOE lease tracts. |
| | | Continue approved operations of 4,500 acres of hard rock mining under 43 CFR 3809 regulations. |
| | | Continue sodium lease (120 acres). |
| | | Continue sand & gravel operations (880 acres). In addition, 400 acres on Ewing Mesa would be available for development for sand & gravel. |
| | | Provide protective management of the unique fossils in the Placerville area through the use of stipulations on a case-by-case basis in environmental documents. |
| | | Allow coal leasing on 1,480 acres in the Nucla KRCRA & 46,000 acres in the Durango KRCRA.* |
| Lands | Allow for disposal of parcels of public land not needed for mineral development. Major utility corridors will be | |

* The priority of these areas was determined based on 1983 coal data & indications of interest by industry. The remaining coal lands determined to be suitable or identified as priorities for future leasing will be managed for other multiple use considerations. These lands would be made available for future leasing only when the coal priority areas had been depleted or a significant demand was expressed that could not be met by the existing coal priority area.

57

BLM_0006580

Mineral Development
Area E (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | allowed as long as they don't conflict with mineral development. Allow other land actions as long as they don't limit mineral development, or when there is a clear & significant public need. Acquire or exchange land & subsurface mineral estate when mineral development will be enhanced. | |
| Soils and Water | Maintain soil productivity & minimize soil erosion through rehabilitation efforts when mineral activities cease. Maintain water quality & quantity when possible for resource needs. | |
| Fire | Provide a level of protection from wildfire resulting in the least total cost & protection of mineral developments on the public lands. | |
| Access | Provide or maintain public access minimizing impacts to mineral development. Work with mineral developers to assure roads are maintained for public safety. | |

58

BLM_0006581

## Management Guidance for Area G:
### Emphasis on General Natural Resource Management

Management direction for these areas will consist of general multiple use as prescribed in the Federal Land Policy and Management Act (FLPMA) of 1976. The resource values contained in these areas are not significant to the degree that a dominant use exists. Management guidance will consist of existing laws, policy, and manuals concerning each resource program.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Manage cultural resource properties in accordance with applicable laws, regulations & public interest. | |
| | Provide for dispersed types of recreation opportunities. Utilize sign, maps, etc., to help manage the dispersed use. Allow ORV use. | |
| | Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | |
| Wildlife | Protect T&E species & maintain or improve their habitat. Manage all other habitat to provide satisfactory conditions. | |
| Livestock Management | Manage vegetation so it maintains itself satisfactorily with a generally upward trend. | |
| Forestry | Provide a sustained yield of forest products consistent with land capability, suitability, protection needs, & other resource values. | |
| Minerals | Provide for mineral development in all areas not withdrawn from mineral entry. Provide protective stipulations to limit impacts to other resource values. | |
| Lands | Allow for disposal of parcels of public land not needed for resource management. Acquire or exchange land when resource management opportunities will be enhanced. Major utility corridors would be allowed with protective stipulations to prevent or limit adverse impacts to | |

BLM_0006582

General Management
Area G (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| | other resource values. Allow other land actions to occur with appropriate stipulations, or when there is a clear & significant public need. | |
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion & strive to achieve adequate vegetation cover for watershed protection & plant vigor. Maintain water quality & quantity for resource needs. Secure sufficient water rights to provide for resource management. | |
| Fire | Provide a level of protection from wildfire that will result in the least total cost & will generally enhance resource conditions of the vegetation. Use prescribed fire when possible to enhance resource conditions. | |
| Access | Provide administrative & public access, where possible. Maintain roads to a level of minimum standards for public safety. | |

60

BLM_0006583

### Management Guidance for Area II: Emphasis on Public Land Disposal

Management of these areas will be for the disposal of the public lands; these areas will be subject to additional screening and clearances before any tracts identified for disposal in this plan may be transferred from BLM control. These activities include mineral assessment, cultural resource clearances, environmental analysis, appraisal and similar site-specific actions. Little or no public funds will be spent on these tracts for resource management; funds would only be spent to correct public health and safety problems or to correct severe resource deterioration we cannot allow to continue.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Provide cultural resource inventories & clearances so disposal of the tracts can occur. Pending disposal, manage the cultural resources under present laws & regulations. | |
| Recreation | Provide for very limited dispersed recreation activity. Allow motorized ORV use.<br><br>Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | Consider disposal of the Indian Springs site to CDOW as part of their Mike Young property management. Also consider CDOW cooperatively managing those heavily used hunter camp sites along the road between Miramonte Reservoir & Indian Springs (near Hamilton Mesa). |
| Wildlife | Provide for T&E species inventories & clearance prior to disposal. | |
| Livestock Management | Allow limited management of the rangeland to occur. Spend no public funds on rangeland improvements. Complete procedural notifications to grazing permittees. | |
| Forestry | Allow timber to be harvested & forest products to be used. | |
| Minerals | Continue to manage the mineral program for development. Retain all mineral rights unless an exception can be documented for transferring the mineral rights. | Transfer all mineral rights with the surface unless: (1) mineral values can be documented to justify retaining the mineral rights, or (2) transferring the mineral rights is prevented by law or regulation. |
| Lands | Provide for disposal of the public lands. Major utility corridors would be allowed. Allow other land actions to proceed, especially when there is a clear & significant public need. | Allow approx. 21,700 acres for land disposal (through sales, exchanges, or any other title transfer means). |

61

BLM_0006584

Disposal
Area H (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion & maintain a minimum amount of vegetation cover for watershed protection. | |
| | Maintain present water quality & quantity. Do not acquire water rights for resource needs unless an exception can be documented. Land disposals must be in conformance with Executive Order (E.O.) 11988 - Floodplain Management. | |
| Fire | Provide for a limited level of fire management. Suppress wildfires which may be threatening adjacent private, state or Federal property. | |
| Access | Acquire no access to these tracts unless an exception can be documented. Provide very little or no maintenance of roads. Reserve access rights across parcels when needed for public or resource management. | |

BLM_0006585

## Management Guidance for Area J:
## Emphasis on Forestry and Wood Products

This guidance is designed to increase the production and utilization of wood fiber, firewood, post and poles. Emphasis is on improved wood production and utilization resulting in extensive modification of tree and other vegetation cover. Investments may be made for forest management activities. Investments (in other emphasis areas) that are commensurate with level wood fiber production will be made. Opportunities will generally be moderate for wildlife management and for dispersed recreation. Livestock grazing will occur; however, disruptions may occur due to timber management actions or objectives.

### Management Direction for Other Resource Values

| Resource/ Activity | General Guidance | Specific Management Direction |
|---|---|---|
| Cultural | Protect important cultural resource properties. | |
| Recreation | Manage for dispersed recreation as the primary recreation activity. Allow motorized ORV use.<br><br>Establish site-specific visual quality objectives & design guidelines for landscape development projects during activity planning. | |
| Wildlife | Protect T&E species & maintain or improve their habitat. Provide investments to enhance wildlife species which will benefit from uneven-aged timber management. | Coordinate efforts on a case-by-case basis to ensure aquatic/ riparian resources are protected &, in some cases, improved. |
| Livestock Management | Allow livestock grazing on those areas & at times of the year when it will have no negative effects on timber management operations & objectives for the area.<br><br>Range vegetation treatments will generally not be allowed in timber areas. Range improvements will be designed to minimize conflicts with forest emphasis. | |
| Forestry | Manage lands suitable for timber production. Invest necessary funds to provide for intensive management of the forest resource. Provide firewood, Christmas trees, & other wood products. | Manage timber and woodland species on all available & capable lands with a combination of even & uneven-age systems. Manage aspen under an even-age system. Limit open patchcuts to 20 acres or less in commercial forest types & |

63

BLM_0006586

Forestry
Area J (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
| --- | --- | --- |
| | | 40 acres in woodland types. Regenerate all patchcuts, shelterwood, & selection harvest cuts, naturally or artificially, within 15 years. Continue management of all operable woodland & commercial sawtimber in other emphasis areas. |
| | | Manage approx. 10,960 acres for intensive forest management. Estimated allowable harvest would be 6.5 MMBF per decade. |
| | | Manage approx. 42,130 acres to provide woodland products (firewood, posts, poles, etc.). Estimated allowable harvest would be 6.4 MMBF (12,800 cords) per decade. |
| Minerals | Allow mineral development in all areas not withdrawn from mineral entry. Provide protective stipulations to limit impacts to the forest resource. | |
| Lands | Allow for disposal of public land parcels not needed for forest management. Acquire or exchange lands when forest management will be enhanced. Major utility corridors would generally not be allowed in commercial forests but would be allowed in woodland; exceptions could occur with specific analysis. Allow other land actions when they will result in minimal adverse impacts, when they will be beneficial to forest management, or when there is a clear & significant public need. | |
| Soils and Water | Maintain soil productivity, minimize man-caused soil erosion & ensure utilization of forestry practices which will provide for minimal soil losses.  Maintain water quality & quantity | |

64

BLM_0006587

Forestry
Area J (continued)

| Resource/ Activity | General Guidance | Specific Management Direction |
| --- | --- | --- |
| | for resource needs. Timber harvesting & associated activities will be conducted in a manner that will not degrade the water quality (from both point & non-point sources) below the Colorado Department of Health & Water Quality Standards & Classifications. | |
| Fire | Provide a level of protection from wildfire that will result in a least total cost & will enhance forest resources. Use prescribed fire when possible to enhance forest management objectives. | |
| Access | Provide administrative &, where needed, public access to public land to enhance forest management. Provide necessary maintenance of roads to ensure timber management practices can occur as planned. | |

BLM_0006588

APPENDIX B

## STREAMS ON PUBLIC LAND WITHIN THE AMENDMENT AREA

| Stream Name | Stream Type | BLM Miles | Acres |
|---|---|---|---|
| San Miguel River* | Perennial | 22.5 | 923.9 |
| Cottonwood Creek | Perennial | 2.0 | 7.0 |
| N. Fk. Cottonwood | Perennial | 0.7 | 0.3 |
| Telephone Draw | Intermittent | 0.3 | 0.0 |
| Dry Park Draw | Intermittent | 0.6 | 0.0 |
| Horsefly Creek | Perennial | 1.2 | 7.5 |
| Loggin Camp Dr. | Intermittent | 1.3 | 0.0 |
| Craig Draw | Intermittent | 0.8 | 1.8 |
| McKenzie Creek | Perennial | 1.2 | 2.8 |
| Beaver Creek * | Perennial | 14.0 | 340.4 |
| Comanche Draw | Intermittent | 0.6 | 0.0 |
| Turner Creek | Perennial | 1.0 | 6.1 |
| Goat Creek | Perennial | 0.5 | 2.9 |
| Goodenough Gulch | Intermittent | 0.1 | 0.0 |
| Huff Gulch* | Intermittent | 0.6 | 0.7 |
| Saltado Creek* | Perennial | 4.5 | 58.2 |
| Specie Creek | Perennial | 2.1 | 12.7 |
| Slaughterhouse Gl. | Intermittent | 1.3 | 4.5 |
| Leopard Creek* | Perennial | 2.5 | 30.8 |
| Alder Creek | Perennial | 0.3 | 0.9 |
| Fall Creek* | Perennial | 1.4 | 36.2 |
| Hyatt Draw | Intermittent | 0.9 | 0.0 |
| Big Bear Creek* | Perennial | 1.5 | 14.8 |
| Muddy Creek | Perennial | 0.5 | 1.5 |
| Summit Creek | Perennial | 1.0 | 2.7 |
| Willow Creek | Perennial | 0.4 | 1.2 |
| Totals | | 63.8 | 1,456.9 |

* Denotes streams with BLM inventory information used to determine riparian width and acres. For the remaining perennial streams acreage has been determined using an estimated average riparian width. Riparian acreage on uninventoried intermittent streams is assumed to be zero.

BLM_0006589

**APPENDIX B**

### LIST OF ENDANGERED, THREATENED, CANDIDATE, AND PROPOSED ANIMAL SPECIES POTENTIALLY OCCURRING IN THE AMENDMENT AREA

#### Endangered Species Act Listed Species

| | |
|---|---|
| Bald Eagle [1]E | Winter Visitor |
| Peregrine Falcon [1]E | No active or historic aeries |
| Black-footed Ferret [1]E | No suitable habitat |
| Whooping Cranes [1]E | Not on normal migration route |
| Grizzly Bear [1]T | Not present |
| Grey Wolf [1]E | Not present |
| Bonytail Chub [1]E | Not present |
| Humpback Chub [1]E | Not present |
| Colorado Squawfish [1]E | Not present |
| Razorback Sucker [1]E | Not present |

#### Endangered Species Act Candidate and Proposed Species

| | |
|---|---|
| North American Lynx [1] | Not present |
| North American Wolverine [1] | Not present |
| Spotted Bat | Not present |
| Southwestern River Otter | Not present |
| Mexican Spotted Owl [2] | Possible, not documented |
| Southwestern Willow Flycatcher | Possible, riparian shrubs |
| Long-billed Curlew | No favored habitat |
| Ferruginous Hawk | Possible, poor habitat |
| Loggerhead Shrike | Possible, riparian areas |
| Black Tern | Possible, no breeding habitat |
| Boreal Western Toad | Not present, no breeding habitat |
| Roundtail Chub | Not present |
| Flannelmouth Sucker | Not present |
| Colorado Cutthroat Trout | Not present |
| Fringe-tailed myotis | Possible, not documented |

#### Colorado State Listed Species

*(Listed here are only those species not covered as federally listed or candidate species)*

| | |
|---|---|
| Greater Sandhill Crane | Not on normal migration route |
| River Otter | Present, population unknown |
| Arctic Peregrine Falcon | Not known to be present |

[1]    Denotes those species listed as endangered under Colorado law.
[2]    This species is proposed for Threatened Status as of November 1991.
E    Denotes federally Endangered species
T    Denotes federally Threatened species

*(Final concurrence with this list was received from USFWS on September 9, 1992.)*

BLM_0006590

APPENDIX C

## LIST OF PREPARERS

| NAME | OFFICE | RESOURCE RESPONSIBILITY |
|------|--------|------------------------|
| Ron Huntley | Uncompahgre Basin Resource Area | Range Management |
| Teresa Pfifer | Uncompahgre Basin Resource Area | Lands |
| James R. Ferguson | Montrose District | Wildlife Habitat, T&E Species, Vegetation, Riparian Resources, EA and Plan Preparation |
| Dennis Murphy | Montrose District | Soil and Water Resources |
| Karen Tucker | Uncompahgre Basin Resource Area | Recreation |
| Lynn Lewis | Uncompahgre Basin Resource Area | Minerals and Geology |
| Dave Kauffman | Montrose District | Forestry |
| Dave Smith | Montrose District | Fisheries |
| Allan Belt | Uncompahgre Basin Resource Area | Area Manager |
| Roger Alexander | Montrose District | Environmental Coordination and Planning |

BLM_0006591

APPENDIX D

Criteria for ACEC Designation, (BLM Manual 1613), and Documentation of Qualification of the San Miguel River Canyon as an ACEC

.1   Characteristics of ACEC's.

.11   Identification Criteria.  To be considered as a potential ACEC and analyzed in resource management plan alternatives, an area must meet the criteria of relevance and importance, as established and defined in 43 CFR 1610.7-2.

A.   Relevance.

An area meets the "relevance" criterion if it contains one or more of the following:

1.   A significant historic, cultural, or scenic value (including but not limited to rare or sensitive archeological resources and religious or cultural resources important to Native Americans).

2.   A fish and wildlife resource (including but not limited to habitat for endangered, sensitive or threatened species, or habitat essential for maintaining species diversity).

3.   A natural process or system (including but not limited to endangered, sensitive, or threatened plant species; rare, endemic, or relic plants or plant communities which are terrestrial, aquatic, or riparian; or rare geological features).

4.   Natural hazards (including but not limited to areas of avalanche, dangerous flooding, landslides, unstable soils, seismic activity, or dangerous cliffs).  A hazard caused by human action may meet the relevance criteria if it is determined through the resource management planning process that it has become part of a natural process.

B.   Importance.

The value, resource, system, process, or hazard described above must have substantial significance and values in order to satisfy the "importance" criteria. This generally means that the value, resource, system, process, or hazard is characterized by one or more of the following:

1.   Has more than locally significant qualities which give it special worth, consequence, meaning, distinctiveness, or cause for concern, especially compared to any similar resource.

2.   Has qualities or circumstances that make it fragile, sensitive, rare, irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to adverse change.

3.   Has been recognized as warranting protection in order to satisfy national priority concerns or to carry out the mandates of FLPMA.

4.   Has qualities which warrant highlighting in order to satisfy public or management concerns about safety and public welfare.

5.   Poses a significant threat to human life and safety or to property.

BLM_0006592

## ACEC NOMINATION EVALUATION

NAME: San Miguel River    LOCATION: San Miguel River Canyon between Placerville and
                          Horsefly Creek

SIZE: 20,964 acres       NOMINATED BY: The Nature Conservancy

RATIONALE: The middle section of the San Miguel River contains one of the three longest
stretches of good condition riparian vegetation in the Montane region of western Colorado.
It contains examples of a blue spruce-narrowleaf cottonwood-thinleaf alder-water birch
riparian plant community that is known to occur in only 7 locations in Colorado. Included
in the area are relic sites which are believed to be in presettlement condition. This is
one of the few remaining rivers in the state which is unregulated, and exhibits natural
runoff patterns. Certain components of the riparian plant community are dependent on
natural flow regimes. Even within the San Miguel River watershed, most stream and
riparian systems have been mildly to severely altered and degraded.

RELEVANCE (must contain one or more of the following):

    1.    Significant historic, cultural, or scenic value?   The area contains
significant scenic values and is traversed by the Unaweep-Tabeguache Scenic and Historic
Byway. The scenic and natural qualities of the area are one of the major reasons for its
popularity with recreation users.

    2.    Fish and wildlife resource?  The lower end of the proposed ACEC is a bald
eagle winter concentration area, and contains a communal roost site.

    3.    Natural process or system?  The high quality riparian ecosystems on the San
Miguel River and several tributaries are in exceptionally good condition. These systems
can serve as benchmarks for other systems in the area and within the state.
    4.    Natural hazard? None.

IMPORTANCE (characterized by one or more of the following):

    1.    Has more than locally significant qualities which give it special worth,
          consequence, meaning, distinctiveness, or cause for concern, especially
          compared to any similar resource?
                The riparian system values of the area have at least statewide
          importance, as examples of good condition sites that can be used as
          benchmarks for similar systems. The scenic values of the area have
          been recognized by including it in the newly designated Unaweep-
          Tabeguache Scenic and Historic Byway. The increased growth of the
          tourist industry has had major impacts on the Telluride area that have
          spilled over onto public lands in the San Miguel River Canyon.

    2.    Has qualities or circumstances that make it fragile, sensitive, rare,
          irreplaceable, exemplary, unique, endangered, threatened, or vulnerable to
          adverse change?
                The riparian systems of the area are rare and highly susceptible to
          degradation, especially without active management of recreation
          activity, and other surface disturbances.

    3.    Has been recognized as warranting protection in order to satisfy national
          priority concerns or to carry out the mandates of FLPMA?
                The proposal fits well with BLM's emphasis on riparian system
          management and protection.

    4.    Has qualities which warrant highlighting in order to satisfy public or
          management concerns about safety and public welfare?
                None.

    5.    Poses a significant threat to human life and safety or to property?
                None.

BLM_0006593

APPENDIX E: MAPS OF THE PROPOSED ACTION, NO ACTION, OIL AND GAS RESTRICTIONS AND OHV DESIGNATIONS

BLM_0006594

BLM_0006595

## OFF HIGHWAY VEHICLE DESIGNATIONS
## FOR THE SRMA AND ACEC



SCALE 1: 200000

| | |
|---|---|
| Closed to Off Highway Vehicles | |
| Off Highway Vehicles Restricted to Designated Roads and Trails | |
| BLM Land | |
| U.S. Forest Service Land | |
| Private Land | |
| State Land | |
| CDOW Land | |

BLM_0008596

# OIL AND GAS LEASE STIPULATIONS



SCALE 1: 200000

SEASONAL CLOSURE; BIG GAME WINTER RANGE                    CWR

NO SURFACE OCCUPANCY; RAPTOR NESTS AND ROOSTS              NSO

BLM
FOREST
CDOW
STATE
TNC
PRIVATE

SEASONAL CLOSURE; BALD EAGLE WINTER CONCENTRATION          SME

STANDARD STIPULATIONS                                      SSP

AMENDMENT AREA BOUNDARY

BLM_0006597

## NO ACTION ALTERNATIVE



SCALE 1: 200000

| | |
|---|---|
| AMENDMENT AREA BOUNDARY | |
| LIVESTOCK MANAGEMENT AREA | A |
| RIPARIAN MANAGEMENT AREA | BAR |
| BALD EAGLE MANAGEMENT AREA | BE |
| BIG GAME WINTER RANGE | BDEW |
| FOSSIL MANAGEMENT AREA | EF |
| MINERALS MANAGEMENT AREA | ES |
| GENERAL MANAGEMENT AREA | G |
| DISPOSAL TRACTS | H |
| FOREST MANAGEMENT AREA | J |

BLM
FOREST
CDOW
STATE
TNC
PRIVATE

BLM_0006598

# PROPOSED ACTION



SCALE 1: 200000

| AMENDMENT AREA BOUNDARY | —— | BLM |
|---|---|---|
| ACEC | L1 | FOREST |
| RECREATION MANAGEMENT AREA | C1 | CDOW |
| LIVESTOCK MANAGEMENT | A | STATE |
| BIG GAME WINTER RANGE | BDEW | TNC |
| GENERAL MANAGEMENT | G | PRIVATE |
| DISPOSAL TRACTS | H | |

# MESA CREEK

## Coordinated

## Resource

## Management

## Plan

Environmental Assessment CO-030-U-93-36

Uncompahgre Basin Resource Area
Montrose District - BLM

May 27, 1993

BLM_0006599

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT
**UNCOMPAHGRE BASIN RESOURCE AREA**
2505 SOUTH TOWNSEND AVENUE
MONTROSE, COLORADO  81401
(303) 249-6047

In Reply Refer to:

1730 (CO-034)

JUN 2 9 1993

MEMORANDUM

To:        Mesa Creek Participants

From:      James Sazama

Subject:   Typing Errors in Mesa Creek CRMP

Dean Stindt recently pointed out two signifcant errors in the text of the Mesa Creek CRMP.  Unfortunately, they were both located in the Resource Condition Objectives section, which is a very important section that should be free of errors.  As a result, I have made the corrections which are on pages one and two indicating the revision date of June 25, 1993.  Please insert this corrected page into your copy of the CRMP.

Sorry for any inconvenience.

James Sazama

BLM_0006600

## PURPOSE AND NEED

Process. The Mesa Creek Coordinated Resource Management Plan (CRMP) encouraged public participation and depended heavily on public involvement in this planning process. Guided by the San Juan/San Miguel Resource Management Plan, the CRMP addresses specific management on the public lands in the Mesa Creek area. Early in the process, it became apparent that the scope of the plan would be greater than initially perceived. After an assessment of existing resource conditions and an evaluation of potential improvement, the size of the area expanded. The same is true for public input. What started as discussions with permittees on one grazing allotment grew to several allotments and involved people of the west end of Montrose County. Thirty to fifty people, mostly from local small communities, participated at various public meetings (CRMP Team). They played a key role in developing a list of issues and concerns, landscape descriptions and resource condition objectives and management actions.

## Resource Condition Objectives

### UPLANDS:

General Objective    The overall objective for the upland areas is to achieve desired plant communities, which provide desirable resource values, and increase their productivity and diversity.

Rationale:        The condition of these areas is important because the uplands provide a variety of habitats for wildlife, forage for livestock and wildlife, and contribute to a diverse landscape consisting of 12 ecological sites that are differentiated from one another by unique soil and climatic conditions. Upland conditions also influence erosion and the condition of riparian areas and water quality.

Specific Objectives    These specific objectives address the more important ecological sites where change in ecological conditions are desired.

a.    Change the composition on 60% of the semi-desert loam range sites, which were correlated with the SCS semi-desert loam range sites in the San Miguel Soil Survey. These areas occupy 3500 acres, or 25%, of the CRMP planning area, and will be managed for the following desired plant community.

| Species | Estimated %Composition by wt. |
|---|---|
| Sagebrush | 30-50% |
| Cool Season Grasses (Indian Ricegrass + Needlegrass) | 20-30% |
| Warm Season Grasses (Blue grama + Galleta) | 20-30% |
| Other Shrubs | 05-10% |

b.    Change the plant composition on 40% of the Pinon-Juniper ecological sites (areas where slopes are 30% or less).

On sites less than 6800 feet, manage for the following desired plant community to achieve a minimum basal cover of 8-10% (perennial live vegetation within 1 inch of the ground surface).

Revised (6/25/93)

1

BLM_0006601

| Species | Estimated %Composition by wt. |
|---------|-------------------------------|
| Pinon   | 30% |
| Juniper | 40% |
| Grass   | 10% |
| Shrubs  | 20% |

On sites more than 6800 feet manage for the following desired plant community to achieve a minimum basal cover of 10-12% (perennial live vegetation within 1 inch of the ground surface.

| Species | Estimated %Composition by wt. |
|---------|-------------------------------|
| Pinon             | 30% |
| Juniper           | 20% |
| Mountain mahogany | 10% |
| Serviceberry      | 10% |
| Oak               | 10% |
| Grasses           | 20% |

**RIPARIAN:**

General Objective   The overall objective for riparian areas is to manage for desired plant community, which provides the physical and vegetation structural components that contribute to stability and productivity.

> Rationale:   Riparian condition is important because these areas also provide a variety of habitats for wildlife, forage for livestock and wildlife, and significantly contribute to the diversity of the biotic community and overall quality of the area.

Specific Objectives   These specific objectives address the more important riparian sites where present conditions need to be managed for desired plant community.

a.   On properly functioning systems, which do not exhibit bank instability or erosion, maintain the following desired plant community and conditions on the South Fork of Mesa Creek above the East Fork; and on the North Fork of Mesa Creek above Moon Canyon:

| Species | Estimated %Composition by wt. |
|---------|-------------------------------|
| Tree  | 30-50% |
| Shrub | 20-30% |
| Grass | 10-20% |
| Other | 5-10%  |

| Conditions | % Cover |
|------------|---------|
| Bare soil along streambank | 5-10% |

b.   On improperly functioning areas, which do exhibit bank instability and are eroding including Public Lands along the mainstream of Mesa Creek, the South Fork of Mesa Creek below East Fork, and on the North Fork of Mesa Creek below Moon Canyon, change to this desired plant community and conditions:

Revised (6/25/93)

2

BLM_0006602



## United States Department of the Interior

BUREAU OF LAND MANAGEMENT
UNCOMPAHGRE BASIN RESOURCE AREA
2505 SOUTH TOWNSEND AVENUE
MONTROSE, COLORADO 81401



IN REPLY REFER TO:

1730 (CO-034)

Dear

Our records indicate that you participated in one or more of the public meetings that led to the development of the Mesa Creek Coordinated Resource Management Plan.  I would like to acknowledge your time and effort by including your signed participation record in the final CRMP.  Please sign and return to our office the enclosed participation record along with any comments you may have.

I am pleased to provide you with a copy of the Mesa Creek Coordinated Resource Management Plan.  We started the process a little over a year ago and have in place the foundation for a dynamic resource management decision making tool.  As I thank you for your past participation, I challenge you to keep involved in the process and to periodically advise me on how we can improve and make the process work more effectively.

Sincerely yours,

Allan J. Belt
Area Manager

Enclosure

MONTROSE DISTRICT
ENVIRONMENTAL ASSESSMENT
COVER SHEET

MESA CREEK COORDINATED RESOURCE MANAGEMENT PLAN

EA NO. CO-030-U-93-36

Legal Description:

West End, Montrose County

ALLAN J. BELT _____
Area Manager

Bureau of Land Management
Uncompahgre Basin Resource Area
May 19, 1993

BLM_0006604

COORDINATED RESOURCE MANAGEMENT PLAN

Mesa Creek #7014

A.    I, the undersigned user of the Federal Range in Colorado Grazing District No. 3, hereby agree to and accept the coordinated resource management plan for the Mesa Creek allotment.

B.    I understand that the grazing privileges so authorized herein are subject to all provisions of the Federal Range code for grazing districts and all subsequent amendments thereto.

C.    It is understood and agreed that, should periods of range depletion occur due to prolonged drought, fire or other natural causes, reduction in numbers of livestock or adjustment in periods of range use may be directed by the Area Manager or his authorized representative.

D.    The range user(s) will cooperate with the Area Manager or his authorized representative in the studies as outlined.

E.    The range users(s) and BLM will perform construction and maintenance as outlined.

F.    Revisions in these plans may be made by the concurrence of the operators and Area Manager, as indicated by initialing, dated and numbering of the page containing revisions.

G.    Actual use records will be supplied to BLM personnel as requested.

Accepted by:                          Approved by:


_____        _____

Permittee                              Area Manager/Authorized Representative

BLM_0006605

MESA CREEK COORDINATED RESOURCE MANAGEMENT PLAN

CO-030-U-93-36

| | (Signature) | (Date) |
|---|---|---|
| Range Specialist | | 5/20/93 |
| Range Specialist | | 5/20/93 |
| Wildlife Biologist | | 5/20/93 |
| Hydrologist | | 5/20/93 |
| Minerals Specialist | | 5/20/93 |
| Recreation Specialist | | 5-20-93 |
| Environmental Coord. | | 5-20-93 |
| Archeologist | | 5.20.93 |
| Forestry Specialist | | |
| Fisheries Biologist | | 21 May 93 |
| Hazardous Materials | | 6-1-93 |
| Ecologist | | 5/20/93 |

PARTICIPATION IN THE

MESA CREEK COORDINATED RESOURCE MANAGEMENT PLAN

I have participated in the development of the Mesa Creek Coordinated Resource Management Plan by attending public meetings, field trips, or providing written information to the Bureau of Land Management for inclusion in the CRMP. I understand that completion of the CRMP is just the first step in management of the natural resources of the Mesa Creek area and, as time allows, I may participate in future planning, monitoring, and work group sessions.

_____          _____

Signature                                                    Date

_____

_____

Address

--------------------------------------------------------------------------------------------------------------------

Yes, I wish to be kept informed of the implementation of the Mesa Creek Coordinated Resource Management Plan. Areas of interest include:

☐   Recreation
☐   Wildlife Management
☐   Minerals
☐   Grazing Management
☐   Archeology
☐   History
☐   Hydrology
☐   Vegetation Management
☐   Biodiversity
☐   Ecosystem Management
☐   Threatened and Endangered Species Management
☐   Travel Management

BLM_0006607

OPTIONAL EA FONSI AND DR FORM

ENVIRONMENTAL ASSESSMENT
EA NO.  CO-030-U-93-36

BLM Office:  UNCOMPAHGRE BASIN RESOURCE AREA    Lease/Serial/Case File No.: _____

Proposed Action Title/Type:  MESA CREEK COORDINATED RESOURCE MANAGEMENT PLAN _____

Location of Proposed Action:  WEST END MONTROSE COUNTY _____

Applicant (if any): _____

Conformance With Applicable Land Use Plan:

This proposed action is subject to the following land use plan:

Name of Plan:  SAN JUAN/SAN MIGUEL RMP _____    Date Approved:  SEPTEMBER, 1985 _____

This plan has been review to determine if the proposed action conforms with the land use plan terms and conditions as required by 43 CFR 1610.5.

Remarks:  THE CONTINUED PUBLIC INPUT IS NECESSARY FOR SUCCESSFUL IMPLEMENTATION OF THIS CRMP _____
_____
_____

Need for Proposed Action:

VEGETATIVE CONDITIONS ON THE UPLANDS AND RIPARIAN AREAS NEED TO CHANGE (IMPROVE) TO REDUCE WATER QUALITY PROBLEMS.  THE PRESENT SITUATION ALSO PRODUCES LESS THAN PREFERRED AMOUNTS OF FORAGE FOR WILDLIFE AND LIVESTOCK.  RECREATION USE IS INCREASING IN THE AREA.

Description of Proposed Action:

THIRTY-TWO (32) POTENTIAL MANAGEMENT ACTIONS HAVE BEEN PROPOSED TO ACCOMPLISH FOUR VEGETATIVE OBJECTIVES AND AN OBJECTIVE FOR THE PEOPLE AND LAND USES ASSOCIATED WITH THE AREA.  THIS IS A DYNAMIC PLAN WHICH WILL BE CONSTANTLY EVOLVING WITH THE USE OF MONITORING AND ANALYSIS.

Environmental Impacts:

| Critical Element | Affected Yes | No | Critical Element | Affected Yes | No |
|---|---|---|---|---|---|
| Air Quality | | X | T & E Species | | X |
| ACECs | | X | Wastes, Hazardous/Solid | | X |
| Cultural Resources | | X | Water Quality | | X |
| Farmlands, Prime/Unique | | X | Wetlands/Riparian Zones | | X |
| Floodplains | | X | Wild & Scenic Rivers | | X |
| Nat. Amer. Rel. Concerns | | X | Wilderness | | X |

BLM_0006608

ENVIRONMENTAL ASSESSMENT NO.  CO-030-U-93-36                                               Page 2

Description of Impacts:

GOALS HAVE BEEN DESIGNED TO IMPROVE WATER QUALITY BY IMPROVING THE VEGETATIVE CONDITIONS OF THE
UPLANDS AND RIPARIAN ZONES.  MANAGEMENT ACTIONS WILL BE DEVELOPED BY USING A TEAM OR COORDINATED
PLANNING EFFORT.  THERE WILL BE AN EMPHASIS TO VIEW MESA CREEK FROM AN ECOSYSTEM APPROACH WHEREBY
THE "WHOLE" IS EXAMINED AND MANAGED RATHER THAN BEING BROKEN INTO ITS PARTS.

(use additional pages if necessary)

Description of Mitigation Measures and Residual Impacts:
SITE SPECIFIC MANAGEMENT ACTIONS WILL BE ANALYZED IN ENVIRONMENTAL ASSESSMENTS.  THESE ACTIONS WILL
BE DEVELOPED AND UTILIZED TO ACCOMPLISH FOUR VEGETATIVE OBJECTIVES AS THE RESULT OF MONITORING
ANALYSIS.

Persons/Agencies Consulted:  SEE LAST PAGE OF EA
Preparer(s):  SEE PAGE 26 OF EA
Date:  MAY 12, 1993

............................................................................................

FINDING OF NO SIGNIFICANT IMPACT/DECISION RECORD

I have reviewed this environmental assessment including the explanation and resolution of any potentially significant
environmental impacts. I have determined that the proposed action with the mitigation measures described below will not have
nay significant impacts on the human environment and that an EIS is not required. I have determined that the proposed project
is in conformance with the approved land use plan. It is my decision to implement the project with the mitigation measures
identified below.

Mitigation Measures/Remarks:  ENVIRONMENTAL ASSESSMENTS PREPARED FOR SITE SPECIFIC MANAGEMENT ACTIONS
WILL CONTAIN MITIGATING MEASURES.

Authorized Official: _Allen J Eck_                           Date: _5/27/93_

BLM_0006609

PURPOSE AND NEED

Process. The Mesa Creek Coordinated Resource Management Plan (CRMP) encouraged public participation and depended heavily on public involvement in this planning process. Guided by the San Juan/San Miguel Resource Management Plan, the CRMP addresses specific management on the public lands in the Mesa Creek area.   Early in the process, it became apparent that the scope of the plan would be greater than initially perceived. After an assessment of existing resource conditions and an evaluation of potential improvement, the size of the area expanded.  The same is true for public input.  What started as discussions with permittees on one grazing allotment grew to several allotments and involved people of the west end of Montrose County.   Thirty to fifty people, mostly from local small communities, participated at various public meetings (CRMP Team).  They played a key role in developing a list of issues and concerns, landscape descriptions and resource condition objectives and management actions.

Resource Condition Objectives

UPLANDS:

General Objective   The overall objective for the upland areas is to achieve desired plant communities, which provide desirable resource values, and increase their productivity and diversity.

Rationale:         The condition of these areas is important because the uplands provide a variety of habitats for wildlife, forage for livestock and wildlife, and contribute to a diverse landscape consisting of 12 ecological sites that are differentiated from one another by unique soil and climatic conditions.   Upland conditions also influence erosion and the condition of riparian areas and water quality.

Specific Objectives   These specific objectives address the more important ecological sites where change in ecological conditions are desired.

a.   Change the composition on 60% of the semi-desert loam range sites, which were correlated with the SCS semi-desert loam range sites in the San Juan Soil Survey. These areas occupy 3500 acres, or 25%, of the CRMP planning area, and will be managed for the following desired plant community.

| Species | Estimated %Composition by wt. |
|---|---|
| Sagebrush | 30-50% |
| Cool Season Grasses | |
| (Indian Ricegrass + Needlegrass) | 20-30% |
| Warm Season Grasses | |
| (Blue gramma + Galleta) | 20-30% |
| Other Shrubs | 05-10% |

b.   Change the plant composition on 40% of the Pinon-Juniper range sites on 60% of the ecological sites, which were correlated with the SCS semi-desert loam range sites in the San Juan Soil Survey.  These areas occupy 3500 acres, or 25%, of the CRMP planning area, and will be managed for the following desired plant community.

On sites less than 6800 feet, manage for the following desired plant community to achieve a minimum basal cover of 8-10% (perennial live vegetation within 1 inch of the ground surface).

1

BLM_0006610



**MAP 1.  MESA CREEK CRMP AREA**

BLM_0006611



SCALE 1: 250000

MAP 2.  MESA CREEK CRMP AREA

BLM_0006612

| Species | Estimated %Composition by wt. |
|---------|-------------------------------|
| Pinon | 30% |
| Juniper | 40% |
| Grass | 10% |
| Shrubs | 20% |

On sites more than 6800 feet manage for the following desired plant community to achieve a minimum basal cover of 10-12% (perennial live vegetation within 1 inch of the ground surface.

| Species | Estimated %Composition by wt. |
|---------|-------------------------------|
| Pinon | 30% |
| Juniper | 20% |
| Mountain mahogany | 10% |
| Serviceberry | 10% |
| Oak | 10% |
| Grasses | 20% |

## RIPARIAN:

General Objective   The overall objective for riparian areas is to manage for desired plant community, which provides the physical and vegetation structural components that contribute to stability and productivity.

> Rationale: Riparian condition is important because these areas also provide a variety of habitats for wildlife, forage for livestock and wildlife, and significantly contribute to the diversity of the biotic community and overall quality of the area.

Specific Objectives   These specific objectives address the more important riparian sites where present conditions need to be managed for desired plant community.

a.   On properly functioning systems, which do not exhibit bank instability or erosion, maintain the following desired plant community and conditions on the South Fork of Mesa Creek above the East Fork; and on the North Fork of Mesa Creek above Moon Canyon:

| Species | Estimated %Composition by wt. |
|---------|-------------------------------|
| Tree | 30-50% |
| Shrub | 20-30% |
| Grass | 10-20% |
| Other | 5-10% |

| Conditions | % Cover |
|------------|---------|
| Bare soil along streambank | 5-10% |

b.   On improperly functioning areas, which do exhibit bank stability and are eroding including Public Lands along the mainstream of Mesa Creek, the South Fork of Mesa Creek below East Fork, and on the North Fork of Mesa Creek below Moon Canyon, change to this desired plant community and conditions:

2

| Species | Estimated<br>% Composition by wt. |
|---------|-----------------------------------|
| Tree    | 15-25%                            |
| Shrub   | 10-20%                            |
| Grass   | 40-50%                            |
| Other   | 20-30%                            |

| Conditions | % Cover |
|------------|---------|
| Bare soil along streambank | 20-25% |

## PEOPLE AND LAND USES:

<u>General Objective</u>   The overall objective is to manage public lands in the Mesa Creek CRMP area in a manner that contributes to social, cultural, and economic stability and provide for land uses balance and diversity.  Production Goals are broad goals that contribute towards the expected quality of life.  These are what people want to see the land provide, both intangible amenities and commodities.  The collective response given by the participants at these meetings can be characterized in this way:

> To maintain a pristine, aesthetly pleasing, healthy ecosystem with maximum number of species and age class diversity in both plant and animal populations. An ecosystem that produces abundant clean water, huntable and viewable wildlife populations, viable fisheries, diverse recreational opportunities, abundance of forage for wildlife and livestock, and a minimum of erosion.

> While:

> -   Providing for traditional cultural values that maintain rural integrity through livestock, mining, guide and outfitters, and wood product sales.

> -   Providing for increased low impact recreation and tourism industries.

> -   Providing for education of the public on multiple use concepts, protection of archaeological and cultural sites, and respect for private land.

> -   Providing for health and safety of the public land users and visitors.

To accomplish this, all user impacts including roadways, recreation, livestock, and commercial impacts, would be managed to reduce negative impacts to the ecosystem.

> Rationale:  The area is experiencing new growth primarily in recreation - tourism based land uses.  At the same time, an important concern among area residents is the preservation of a rural lifestyle and an agricultural - mining based economy.

## Specific Objectives

a.   Increase opportunities and the quality of experiences for a variety of recreation users.

b.   Preserve The Natural and Historic Character of the Unaweep/Tabeguache Scenic Byway Corridor.

c.   Manage and protect cultural resources for the best scientific and public use.

d.   Provide a stable and diverse economic base to sustain those whose livelihood is derived from resources associated with the CRMP area.

3

BLM_0006614

# CHAPTER I - ALTERNATIVES

## A.   Proposed Action

The proposed action is to implement this Coordinated Resource Management Plan to accomplish the resource condition objectives through appropriate management actions analyzed and documented in BLM's National Environmental Policy Act (NEPA) process. Implementation would consist of a minimum of as many planning meetings per year as necessary to ensure a coordinated plan implementation, identify data needs, and review how the plan is working (monitoring).   Participants in the planning meetings would be by those who expressed an interest in implementing the plan.

There was a need identified in all phases of the public involvement process for BLM to not only get the public more involved in the planning process, but to increase the number and frequency of public contacts as well as sharing the development and implementation of the CRMP. Long term public involvement and contribution has already started with a series of public meetings and field trips.   In addition, biannual meetings will be held that will serve as a focus for developing what will be built, burned, rested, or inventoried for the year.   Successes and failures will be reviewed and incorporated or avoided in future plans.   At these planning meetings, other meetings or field trips may be identified to accomplish BLM's goal of public involvement.

Other methods to enhance public involvement include questionnaires to those involved in the process and using those results to formulate future actions.   One possible action might consist of a frequent newsletter to interested parties summarizing management meetings, actions, and monitoring results.   Photographs and slide shows presented at various public meetings might also be used to inform and educate the public on how implementation of the CRMP is progressing.

Plans will be made available to those requesting copies.   The plan, including the appendices, may be revised due to drought, budget shifts, or other unexpected problems.   Revisions should be agreed upon in advance of the actual change and documented in the Mesa Creek CRMP file.   The planning effort will consider the findings of an annual evaluation conducted in early November each year.   The Area Manager's signature on the plan will signify approval of the plan for that year.

## 1.   Management Actions

To implement this Plan and accomplish the Resource Condition Objectives requires on-the-ground implementation of various resource management tools or management actions. When selecting a management action, its use can only be justified if it is helping achieve the objectives.   In the identification process of this plan, which revealed actions that might be implemented, a number of assumptions were made.   One was that the action must be legal (adhering to the Resource Management Plan as a minimum), ethical, and something which all parties would want to be associated with.   The list of management actions developed by the CRMP team consisted of just about all actions available to a land management agency anywhere, the only difference being how the actions were grouped by our specific team and that broad based support exists for implementing these actions.

A list of management actions by themselves is of little value unless there are specific guidelines for their use.   The use must be based on previous experience with the actions and the knowledge of whether or not the implementation of that action will move us toward the accomplishment of resource condition objectives.   Along with the development of the list of actions, a descriptive set of guidelines for each action was also created.   The guidelines were not based solely on scientific knowledge or theory but a blend of science, culture, beliefs, wants, desires, attitudes, and hopes. A specific management action identified may never be implemented because of the various guidelines identified here.   However, only those guidelines which are legal, ethical and something we want to be associated with will be used as part of that screening process.

4

The CRMP team identified 31 management actions that might be used to implement the Plan (Table 1). The actions range from the very broad (example: vegetation manipulation) to very narrow (vegetation manipulation in riparian zones to enhance turkey habitat) in scope. The management guidelines identified for each action are recorded in the July 10, 1992 Minutes for the Mesa Creek CRMP meeting. The guidelines were developed with the knowledge that new guidelines could be developed and used at any time as well as previously accepted guidelines could be changed or even deleted from consideration. Prior to the decision to approve an action for implementation, the action proposed for use would be analyzed using the recognized current guidelines and documented in the form of a site specific environmental analysis prepared by BLM.

### TABLE 1

### MESA CREEK CRMP MANAGEMENT ACTIONS

1.  Assign a visual class to Mesa Creek scenic corridor along byway (Class 2), presently not rated, retain a natural look.

2.  Review game/fish regulations for any necessary changes to be compatible with proposed uses.

3.  Woodland Management – accomplish multiple use objectives and maintenance (fire crew, free use, posts, firewood).

4.  Reconstruct, maintain some of the historic trail areas, includes interpretation.

5.  Create openings/meadows for turkeys.

6.  Public response – successful involvement, feedback, how successful have we been, visitor suggestion box.

7.  Livestock Grazing Practices
    -   timing to save feed, avoid occupancy at same time
    -   the way the area is grazed
    -   historical grazing patterns to review opportunities
    -   defer grazing for periods of time
    -   planning meetings semiannually

8.  Rest from grazing by livestock (longterm).

9.  Herding and riding of livestock.

10. Other facility developments – fences, cattleguards, electric fences, corrals.

11. Remove old/destructive fences.

12. Salting, other attractants feed (protein blocks).

13. Facilities – campground, restroom, hay turnout, trailhead parking, maintenance, rafting put-in/take-out spots, overlook (hay, river, uplands) riparian areas overuse.

14. Seasonal closures - winter wildlife, vehicles, (year long?), roads.

15. Wildlife reintroductions/Removal, biodiversity, sheep, turkey, wolves, grizzly.

16. Structural erosion control – dam, checks, riparian zone stabilization structures, instream structures.

17. Noxious Weed Mgmt – inventory, address initial invasion, weed board.

18. Coordination with other activities (mineral).

BLM_0006616

19.   Signing – byway, Interp., direction, access routes, public/private boundaries information, education, regulatory, enforcement gates, cattle/highway signs.

20.   OHV Plan – enforcement, seasonal closure.

21.   T&E Plan – protection of individuals and habitat education, watchable wildlife.

22.   Hunting – herd management

23.   Outfitter Mgmt. – compliance hunting, bike, commercial entities, numerous limits, areas or limited areas, timing of activities.

24.   Interpretation of Mesa Creek natural resources by a variety of sources (whatever is most effective).

25.   Fire – prescribed, natural, let-burns.

26.   Review transportation facilities (what needs to be there, what needs closed).

27.   Maintenance of roads for water hauling, erosion, recreation, hunting.

28.   Recommended in-stream flows to Colorado Water Board to obtain a right to water for fisheries.

29.   Review existing water structures and recommend rehabilitation, if necessary or reclaim  (water mgmt. plan).

30.   Develop new water sources – ponds, wells.

31.   Vegetation treatments

|  |  |
|---|---|
| rollerchopping | seeding |
| willow planting | rehabilitation |
| plowing | wood cutting |
| animal impact | low-deer range |
| mid-winter | |
| upper-elk range | |
| spraying | |

Some actions prior to being approved and implemented might require that additional data or further analysis of existing data be completed.  This data collection or analysis is not considered implementation nor is it an objective of the plan. Periodically, it will be necessary for team members to prepare amendments to this plan that will provide needed information for environmental analysis and for long term project planning and budget acquisition.  These amendments would become part of the plan.

2.   Monitoring Plan and Evaluation

Resource monitoring involves the systematic collection, analysis, and interpretation of resource data to evaluate the achievement of the plan objectives, and to ensure that effects of management actions are in compliance with existing laws and policy. The means to achieving the plan objectives are through the implementation of management actions. It is, therefore, the cumulative evaluation of management actions that determines the success or failure of the plan objectives. Consequently, monitoring efforts focus on specific management actions, and define the affected resource, the processes or variables influenced by the management action, the components of the ecosystem to be monitored, and threshold values to determine success from failure. Evaluation of monitoring data provides feedback to adjust management actions and/or objectives, respectively, if necessary to achieve plan goals. The following figure presents a generalized flow chart of the monitoring process:

6

BLM_0006617

All implemented management actions would be documented, describing the action and expected results, how it was implemented, it's location, and the associated plan objective(s). These management action descriptions would be compiled in the CRMP project file, and would serve as the basis for designing monitoring efforts. Monitoring efforts would be coordinated by the UBRA studies specialist/ecologist. This would maximize efficiency by eliminating redundant data collection, coordinate data collection efforts, and ensure that data collection is properly timed to evaluate the expected response of the management action. At least one annual meeting would be conducted, for all interested parties, to review implemented management actions, discuss monitoring results, and set the itinerary for future management actions.

The evaluation of monitoring data would be performed on a scheduled or cyclical basis, and coordinated by the UBRA studies specialist/ecologist. Scheduling evaluations provides a better focus on monitoring data collection efforts, the analysis and interpretation of monitoring data, and promotes interdisciplinary evaluation of the data. Interdisciplinary involvement in developing evaluation schedules would ensure that the anticipated change to all pertinent resources are considered, and the time lapsed between evaluations is ample to detect predicted change(s). Scheduled evaluations would be partly based on the capability to handle and process monitoring data collected between evaluations.



Figure 1–CRMP    Monitoring Process

Comparing management action evaluations over time defines the trend towards or away from the desired condition, which ultimately determines the success or failure of the management action. The results of management actions would be documented, in the project file, so successes can be repeated and failures eliminated.

The adjustment of plan objectives would only be considered after all feasible management actions have been tested and evaluated, and ample time has elapsed to ensure that objectives are not achievable. Any adjustment to plan objectives should be by consensus of the interdisciplinary team and other interested parties.

The CRMP will have at least one annual monitoring meeting to answer these needs. Once again, this type of meeting and input would be open to all interested individuals. Input would be provided in the format of evaluation sheets based on the observations of those involved. BLM will provide the opportunity to observe management actions through field trips, inventories, photos, resource measurements, and other appropriate means. Individual monitoring would then be done by the various participants. The individual monitoring would then be organized in developing the following years of management actions or revision of resource condition objectives.

B.   No Action

The No Action alternative consists of continuing existing resource management of the area as it currently exits. Basically, that consists of planning and executing the San Juan/San Miguel RMP with a series of individual Resource Management Plans such

7

BLM_0006618

as Recreation Area Management Plans, Allotment Management Plans, Forest Management Plans, or a series of implementing actions covered by an Environmental Assessment with limited input by those not directly affected (inside and outside of BLM) by the plan or action.  The benefit would be to quickly implement management by eliminating the sometimes lengthy public and inter/intra governmental input process.  Funding and implementation of management actions would be done by those resource activities with budget capabilities regardless of Resource Area priorities.  A logical sequence of management actions and crossfunding of projects by other benefitting resources would not always determine the next management action in implementing a plan.  Resource condition objectives would become more commodity oriented and monitoring of them much narrower in focus (not looking at the big picture).  As a result, successful plan implementation to one resource might not necessarily be evaluated as a success by another resource; win/lose situations predicated on the RMP allocation of resources would become the more common measure of successful plan implementation.

## CHAPTER II  -  AFFECTED ENVIRONMENT

The Mesa Creek Coordinated Resource Management Plan area lies in the west end of Montrose County along the western edge of the Uncompahgre Plateau, centered, more or less, around the unincorporated town of Uravan.  The allotment borders the Uncompahgre National Forest on the northeast, the Grand Junction Resource Area (Grand Junction BLM District) on the northwest, and several smaller allotments on the southwest not related to Mesa Creek.  Paradox Valley isolates a southern area known as the Wild Steer Pasture.

The area is composed of many mesas including Atkinson Mesa, Spring Mesas, Wild Steer, Long Mesa, Davis Mesa, Skien Mesa, Spring Creek Mesa, and Monogram Mesa.  Natural barriers make up an extensive portion of the allotment boundaries with short segments of fence establishing the remaining boundaries.  The principal access are highways 90 and 141.

Elevations range from 5,600 feet in the Wild Steer pasture to over 8,100 feet in the Spring Creek pasture.  The southern portion (Skein, Wild Steer, Davis, and Monogram Mesas) rise from the Paradox Valley on the north and is characterized by rock outcropping on the sides of mesas with large open areas on the mesa tops.  The larger and northern areas consists of a series of slight to moderately sloping mesas dissecting by deep canyons formed by both live and intermittent streams. Precipitation ranges from 14 to 16 inches per year, with about one-third occurring during the growing season.  The majority of the land drains into the Dolores River.

Previous management practices have resulted in the resource conditions discussed below. Those practices include aggressive fire suppression measures, control of large predator populations, overgrazing and continual use of the same areas especially in the spring, and successional problems associated with cyclical big game populations.

The following issues and concerns will be addressed in the management program to be developed.

VEGETATION AND THE ROLE OF FIRE

Pinon-juniper woodlands and sagebrush dominated range sites occupy most of the uplands on the CRMP area. On most of these sites, a combination of historic overgrazing and fire suppression has resulted in a substantial reduction in herbaceous understory vegetation, while the canopy cover of both pinon-juniper and sagebrush have increased. In this successional stage, fine fuels (herbaceous vegetation and litter) needed to carry fire and reset natural succession, is limited. Extreme fire conditions are needed before these sites burn, and natural ignitions are more often than not suppressed. Consequently, the interval between natural fire occurrence has increased from decades to centuries. The resultant longer interval between fires has also allowed the invasion of pinon-juniper into sagebrush sites.

Without fire or implementing other methods of vegetation conversion, to reset succession, these sites will most likely remain in a relatively stable stage indefinitely. At present, these sites provide little forage for wildlife and livestock, and are in poor hydrologic condition.

8

BLM_0006619

Other vegetative characteristics are important to note on the upland communities. On grass or grass-shrub dominated sites, there has been a pronounced shift in species composition. Cool season grasses have given way to warm season grasses, annuals and invader species. The result is a plant community which does not support the full range of native and endemic species which are valuable components of biodiversity. Additionally, the loss of the cool season species results in the loss of an important component of vegetation production.

Riparian vegetation is sparse and is dominated by herbaceous species especially on lower condition sites. On more productive riparian sites which are in good condition, there is an increased diversity of plant species and important structural components (grass, shrubs, trees). On deteriorated sites, the tree and shrub component is generally lacking.

SOILS, WATER, AND HYDROLOGY

Accelerated soil erosion is common over much of the CRMP area as evidenced by the occurrence of erosion pavement, soil pedestaling, and extensive rill and gully development. Soil surface erosion has been accelerated primarily as a result of reduced understory-herbaceous vegetation, exposing the bare soil surface to the forces of rainfall. The energy associated with intense rainfall tends to reduce the infiltration rate of water into exposed soil by creating erosion pavement or producing fine soil particles that seal the soil surface. Compaction of the upper soil matrix also occurs from raindrop impact. Consequently, surface runoff is increased and plant-available soil moisture is decreased. The increase in surface runoff is largely responsible for the common occurrence of incised channel systems. Poorly located and/or maintained roads also add to unstable channel conditions and increased rates of erosion. The accelerated rates of soil surface and channel erosion has increased the sediment yield into the Dolores River system from the CRMP area.

On most areas the rate of accelerated soil loss has been greater than the rate at which it forms. Therefore, the potential for these sites to produce vegetation has been diminished from pre-settlement conditions. The target basal vegetation densities in the plan objectives are less than the pre-settlement potential for the above-noted reasons.

Riparian systems in the CRMP area experience a wide variety of conditions. On riparian systems in less than desirable condition common problems include: unstable channel banks, incised channel conditions, and overgrazing of woody shrubs and herbaceous vegetation. Most channels have experienced some incisement, probably a result of increased runoff and/or direct physical disturbance to the channel from livestock. Several channel segments are in the latter stages of incisement with the channel bed and banks regaining stability, the development of functional floodplains, and attenuated stream flows. However, on channel reaches where livestock continue to concentrate, unstable channel conditions persist.

Incised channels proceed through a series of evolutionary sequences, resulting in stable channel conditions, similar to pre-incision conditions, but at a lower base (elevational) level. The rate at which channels proceed to stable channel conditions after incision depends to a large degree on the stresses placed on the channel during the recovery period. Unstable-incised channels have stabilized more rapidly where a diverse and vigorous riparian vegetation community has been promoted, and physical disturbances (accelerated rates of runoff, road crossings, livestock trampling, etc.) to the channel have been kept to a minimum.

The perennial tributaries (Mesa Creek, Atkinson Creek,and Spring Creek) to the San Miguel and Dolores Rivers, in the CRMP area, originate in the higher elevational areas of the Uncompahgre Plateau. In their headwaters, these streams typically gain flow from ground water discharge as they descend in elevation, supporting a viable salmonid fishery. However, along the lower flanks of the plateau, these streams commonly lose flow because of reduced groundwater discharge, higher rates of evapotranspiration, water right diversions, and in some reaches flow is lost to thick deposits of alluvium. Because of the lower flow and warmer water temperatures in the lower channel reaches, only an intermittent-mixed warm and cold water fishery exists. As these channels approach their confluence with the major river systems (Dolores and San Miguel Rivers) perennial warm water fisheries exist.

9

BLM_0006620

Streams in the CRMP area experience high flow during spring snow melt and, on a more local scale, from high intensity precipitation events most commonly occurring during July, August, and September. Some subbasins are more flood prone than others due to physical watershed characteristics such as land slope, basin aspect, land surface conditions, and drainage basin shape.

Following snowmelt, flows begin to recess, with minimum flows usually occurring in January. The low or base flow fraction of streamflow is comprised of groundwater discharge.

Ground water in the CRMP area occurs in several aquifers. The most shallow aquifers are local deposits of quaternary alluvium, commonly occurring along stream channels, and in isolated pockets on many of the mesa tops. Alluvium, where saturated, has the highest water yield of all the ground water systems in the area. The other relatively shallow aquifers include the Dakota sandstone, the Burro Canyon formation, and the Saltwash sandstone member of the Morrison formation. The Dakota sandstone and Burro Canyon formation are both unconfined aquifers. The Saltwash sandstone member being confined by the Brushy Basin shale member exhibits artesian conditions. Recharge to these aquifers is primarily from precipitation in the higher elevation areas of the Uncompahgre Plateau. The areal extent of the bedrock aquifers is often interrupted by the local geologic structure (salt anticlines to the west of the CRMP area) and the common occurrence of deeply incised canyons. Localized perched aquifers are common. Ground water discharge occurs as spring flow, evapotranspiration, water yielding wells, and discharge to the alluvium associated with the San Miguel and Dolores river systems and their tributaries.

Due to the hydraulic connection between ground and surface water systems, their water qualities are similar during the low flow period. The dominant ions are calcium, sodium, bicarbonate, and sulfate. The more shallow ground water systems typically exhibit water with Total Dissolved Solids (TDS) concentrations averaging 300-400 mg/l, while the deeper water systems commonly exceed 1000 mg/l. TDS concentrations of surface water systems varies depending on the proportion of flow from the various aquifers. TDS concentrations progressively decrease with higher flows because of the dilution effect from snowmelt and precipitation.

Approximately 90 water sources (Appendix 2) have been identified and inventoried in the CRMP area. These include surface water developments, wells, and springs. The water sources show significant variation in water quantity and quality, and the physical condition of developments.

LIVESTOCK GRAZING

Historically there has been little control over grazing animals on the Mesa Creek portion of the CRMP area. Grazing management in the past consisted of allowing the animals to drift across the allotment on their way to and from Forest Service permits. The animals, naturally, overgrazed the attractive areas such as the seedings and riparian areas. Overgrazing in this manner; especially during the critical spring growing season; has led to a loss of cool season forage species and a decrease in vigor of remaining forage species. The outcome of this type of grazing has been a shorter growing season, due to loss of cool season growing species, which along with decreased plant vigor of remaining species has lowered forage production for all grazing animals. Both the opportunistic and the less palatable species such as Sagebrush, Rabbitbrush, Snakeweed, Pinyon and Juniper, and noxious weeds now dominate areas formerly occupied by the more desirable forage species.  These encroaching species do not provide protection to the soil surface due to wider plant spacing, plant shape and their ability to out compete for free water herbaceous species.  The loss of surface protection provided by herbaceous species and associated litter has led to degradation of the soil productivity through increased wind and water caused erosion. This further reduces the vigor and survivability of remaining forage plants and reduces the chances of reproduction through seed germination.  Capping of the soil surface, pedestalling of plants, and sheet, rill, and gully erosion are all indications of these conditions and are found in the Mesa Creek area.

10

BLM_0006621

Conversely; other areas, less accessible and unwatered and therefore less attractive to drifting livestock often exhibit reduced plant vigor which could be attributable to lack of use by livestock and wildlife.  Forage plants in these areas have become wolfy, decadent and choked out by litter accumulations.  These areas have standing litter and therefore less organic matter in the soil and less litter on the ground to protect the soil surface.  Fire suppression has allowed for the encroachment of opportunistic, woody non-forage species resulting in lowered soil surface protection and therefore increased wind and water erosion.  The soil surface in these areas is fluffier due to the lack of compaction by grazing animals.  This factor coupled with the absence of seed trampling by grazing animals has reduced the germination rate of forage species and therefore lowered forage species competition to encroaching species.

The Spring Creek Mesa and Monogram Mesa areas of the Mesa Creek CRMP have been on an Allotment Management Plan since 1978.  This plan was changed in 1984 because pasture rotations became too complex and offered very little flexibility in case of lack of water or feed.  The vegetation on much of this area shows the same vegetation characteristics representative of poor livestock distribution that the Mesa Creek portion shows.  The trend studies last read in 1989 in the middle of a three year drought, show most of the area is static.  Visual observation shows forage plants appear to be more vigorous with increased production compared to the Mesa Creek area after the recent growing season of normal precipitation.

WILDLIFE

The CRMP area supports an uncounted variety of wildlife species.  Of these, big game species (mule deer, elk, turkey, and black bear) are the most studied, second best understood, due to their historic prominence in the ecosystem and their high social and economic values to this area.  Other species which are less understood, but yet important to the ecosystem, are the uncounted numbers of raptors, waterfowl, nongame, terrestrial and aquatic species.  The emphasis for managing wildlife species, and their habitats, will be based on their legal status (State and Federal) and to the ecosystem, bio-diversity, economics, and aesthetics.

Habitat conditions for many of these species are declining over much of the area. Habitat diversity has declined due to changing vegetative character of the landscape. Changes in environmental interactions brought about by historic overgrazing and fire suppression for many years are primarily responsible.  The reduced fire frequency has favored the occupation of pinon-juniper, and sagebrush to a lesser degree. Overgrazing by livestock, due to their preference for grasses, has favored the increasing dominance of sagebrush, and pinon-juniper to a lesser degree.

Pre-settlement conditions have been used as the measure of comparison for future achievement.  It is important to note that pristine conditions were the long term product of the interactions of the original set of environmental factors which had reached a point of dynamic equilibrium, or balance.  Since that time, changes have occurred in the environmental factors present, and their magnitudes.  No longer are the same factors interacting, nor at the same intensity.  Because of these changes it is unrealistic to expect to achieve the same pristine-like character across the entire CRMP area.  The major change has been the influence of fire.  During pristine times fire was the principle agent regulating ecosystem dynamics.  Now, without fire there is no means of initiating and maintaining a continuum of succession, the force creating dynamics of the system, and maintaining a properly functioning ecosystem.

**Mule Deer and Elk**

Mule deer and elk are present in the area year-round.  Both species use the area primarily as winter range, coming form higher elevation summer ranges surrounding the CRMP area.  The intensity of use varies widely from year to year and is controlled primarily by the variation in timing and amount of snowfall.  There are three primary centers for wintering animals (Figure 1); area 1) Atkinson, Long, Spring creek, and Horse mesas located north-east of the Dolores and San Miguel Rivers in Game Management Unit (GMU) 61; **area 2)** Martin mesa located west of the Dolores/San Miguel confluence in GMU 60, and Saucer Basin located south of the Dolores/San Miguel confluence in GMU 70 and; **area 3)** Monogram and Wild Steer Mesas located south of Paradox Valley in GMU

11

70.  In area 1 wintering mule deer and elk come primarily from summer ranges on the Uncompahgre Plateau.  In area 2, on Martin mesa they come mostly from summer ranges west on Carpenter Ridge and the La Sal Mountains in Utah, while some are year-long residents; in Saucer Basin most animals come from areas further east in GMU 70, although several are year-long residents and some come from GMU 61.

Wintering mule deer densities have declined during the past 10 years in areas 1 and 3, and increased slightly in area 2.  A comparison of Colorado Division of Wildlife 1982 and 1991 quadrate census data shows declines in area 1 from 35 to 13 deer/section, in area 3 from 26 to 13 deer/section, and in area 2 an increase from 6 to 11 deer/section.  These data also indicate the greatest number of animals, by far, are present in area 1, then area 3, and the least number exist in area 2.

Wintering Elk numbers have remained stable or have increased slightly during the past 10 years in all areas.  In area 1 many elk bypass traditional wintering areas located at the 6,000-8,000 ft. elevation zone along the forest boundary.  In these areas pinon-juniper has encroached onto most browse and grass producing sites. Only large expanses of homogeneous stand of pinon-juniper are present.  The browse that remains exists mostly as old-age, decadent stands on sites which are unsuitable for pinon-juniper occupation or in the understory of recently established, encroaching stands of pinon-juniper.  These areas no longer provide the amount nor quality of forage require by wintering elk or mule deer.  Suitable wintering conditions are usually found by elk on private land cultivated for crops or pasture.

**Turkey**

Turkeys nest and raise their broods primarily in the ponderosa pine-oakbrush zone in the higher elevations.  They winter on oak and pinon-juniper covered ridges, wherever mast production is adequate.  Riparian areas are used to some degree throughout the year.  Currently, many of the oakbrush stands in the uplands and riparian areas are too dense, extensive, and unproductive to provide maximum value as turkey habitat. The greatest deficiency appears to be a short supply of suitable nesting and brooding habitat.  High quality nesting and brooding habitat would have numerous small to medium sized meadows, interspersed with thick stands of shrubs and trees, scattered along a fairly wide-bottomed canyon containing live water as springs, seeps, or streams in close proximity to upland stands of ponderosa pine or other conifers suitable for nesting.  Early grass and forb green-up along the wet seepy areas are important for providing proper nutrition for the potential breeding birds and newly hatched broods.  Mature, less dense stands of oak and mature stands of pinon-juniper on ridge tops are needed to insure adequate production of winter food.

**Black Bear**

Black bear primarily use the higher elevation oakbrush zone and riparian areas with dense vegetation and live water during Spring, Summer, and Fall.  These areas are important for food and cover.

**Winter Range**

Both the quantity and quality of the mule deer and elk winter range is declining.  Advancing vegetative succession throughout the area is a major problem.  Most areas have passed through the seral stages suitable for maximum browse and grass production.  Specific problems are:

-    A shrinking amount of area capable of producing winter forage (browse and grass).

-    Declining herbaceous understory forage production in maturing pinon-juniper stands.

-    Increasing utilization pressure on existing winter forage areas, reducing plant vigor and production.

12

BLM_0006623

- Changing vegetative composition in all forage producing areas, reducing the variety of food items available (a decline in forbs and grasses).

- Decreasing interspersion (desired arrangement) of feeding and cover areas throughout the landscape decreasing the overall quality of the habitat.

Existing browse stands, which supply most of the winter forage for mule deer and a sizable amount for elk, show characteristics of declining trends. Six (6) factors, composition, density, vigor, availability, understory, and soil determine the overall value of a browse range. Measures of these determinants are used to evaluate their condition and trend. Composition refers to the species of browse plants present, age structure, and their relative food values. The better ranges have a variety of preferred species. Nutritional requirements of big game animals are much better met by a mixture of species than by a single species. Density is the percent of ground area covered by the live crown of browse plants. On ranges with low browse density too little forage is produced. On ranges with extremely high browse densities animals have difficulty penetrating the stand, making only the forage produced on the perimeters available. Vigor is the relative state of health of the browse plants, indicating its probable level of productivity, and is an appraisal of the age and hedging class. The amount of hedging reflects the level of past use that has occurred to the plant. Availability refers to the amount of usable forage in reach of the dependant animals. The forage produced that is beyond the reach of mule deer and elk is unusable. On ranges with a predominance of plants grown out of reach, production of winter forage is usually low. Understory refers to the composition and abundance of the understory vegetation, which is important to big game animals especially cool season growers. The abundance of forbs and grasses during late pregnancy (late winter/early spring) is critical to healthy fetal development and fawn survival during the first mounts of life. Soil condition is the measure of the condition of the soil surface stability. Vegetation and soil are basic resources. Over the long term, satisfactory range conditions can be maintained only on stable soils, and stable soils are maintained only under adequate vegetative cover.

The various browse stands throughout the area will show different values for each of the above determinants. Quantified data are not available at this time to make determinations about specific sites. However, qualified evaluations suggest the following problems may exist in specific areas: High elevation mountain shrub stands are too dense, unavailable, have low vigor, and poor soil surface conditions; low elevations mountain shrub stands on steep slopes have poor composition, are unavailable, and have low vigor; sagebrush stands throughout the area are generally plagued with low vigor and understory, and soil surface problems. Measures of these values at specific sites will indicate specific local problems.

The Colorado Division of Wildlife designates three categories of winter range for mule deer and elk, normal winter range, severe winter range, and winter concentration areas. Figures two (2) and (3) show the locations of these designations for mule deer and elk respectively in the CRMP area.

**Aquatic/Riparian Habitat**

Aquatic/Riparian habitats in the CRMP area exist primarily in association with one another. Riparian areas are those which include the area of transition between permanently saturated wetlands and uplands. These areas exhibit vegetative or physical characteristics reflective of permanent surface or subsurface water influence.

In the Mesa Creek CRMP area, riparian areas do not necessarily include all of the canyon bottoms. In most systems, they will include only a narrow band adjacent to the stream banks. The remainder of the canyon bottoms are uplands supporting upland vegetative species.

Riparian areas are extremely important habitat for a number of wildlife species, especially small birds, mammals, reptiles, and raptors. These species depend heavily upon the riparian vegetation, particularly stands of cottonwoods and shrubs, for food, cover, and nesting habitat. Such stands provide islands in the surrounding landscape of barren hillsides, pinion-juniper, and mountain shrubs. There are a total of 86.7

13

BLM_0006624

miles of permanent or intermittent streams in the area.  Public land riparian areas along Mesa Creek (2.1 mi.), North Fork of Mesa Creek (4.2 mi), and South Fork of Mesa Creek (10.9 mi.) totaling 17.2 miles have been designated by BLM as emphasis areas for aquatic/riparian management.

The apparent relative condition of the aquatic/riparian systems are distributed on an elevation gradient, with the highest conditioned areas at the highest elevations and the lowest quality areas at the lowest elevations.  The declining presence of water with declining elevation appear to be the major factor responsible. Susceptibility to impacts also appears to follow this same pattern along the elevation gradient.  At lower elevations riparian systems appear to be more fragile and take longer to recover.  This pattern is typical when comparing mesic and xeric systems. Also, the present condition of lower elevation systems are generally in worse condition than those at higher elevations, and have a greater disparity from pristine conditions.
The factors responsible for controlling conditions in aquatic/riparian areas are discussed in the soil, water, hydrology section.

### T & E Species

The following annotated list of Federal and State listed and candidate species are present on the CRMP area or have a high potential for occurring.  There is no proposed or designated critical habitat within the area.

### Mammals

#### River Otter (*Lutra canadensis*) State ENDANGERED.

River otters are not known to be present.  However, they were re-introduced by the Colorado Division of Wildlife in 1987 to historic habitats along the Dolores River upstream of the San Miguel confluence.  Although Colorado Division of Wildlife biologists evaluate the habitat on the Dolores River within the CRMP area as marginal, it is possible for otters to migrate to, and establish in this area; and in the lower San Miguel River.

#### Black-Footed Ferret (*Mustela nigripes*) Federal & State  ENDANGERED

Black-Footed Ferrets are not known to be present, but potential habitat exists in prairie dog towns.

### Birds

#### Bald eagle (*Haliaeetus leucocephalus*) Federal & State ENDANGERED

Bald eagles are known to winter in this region.  BLM inventories conducted in 1978 through 1980, and monitoring flights conducted through 1985, did not locate any roost or nest sites, or areas of winter concentration on or near the area.  Use levels along the San Miguel and Dolores Rivers within the CRMP area and in the immediate vicinity were low density, and only sporadic winter use occurred.

#### Ferruginous Hawk (*Buteo regalis*) Federal  C2

Ferruginous hawks are not known to be present.  They have been sighted further south in Colorado in habitats similar to those present in this area.

#### Peregrine falcon (*Falco peregrinus*) Federal & State ENDANGERED

Peregrine falcons are present.  Eyries exist and have been productive for several years.  The basic habitat qualities of deep canyons with steep-angle, high-walled cliffs are present through much of the area.  Extensive activity  exists over much of the rugged canyon areas for breeding, nesting, and hunting.  Incidental use is likely over most of the non-bluffy areas for hunting during spring and summer.  The number of peregrines and eyries are increasing in this area.

14

<u>Southwestern Willow Flycatcher</u> (*Empidonax trailii extimus*) Federal C1

The Southwestern Willow Flycatcher is not known to be present.  This area is within an overlap zone between the ranges of variety *E.t.extimus* to the south and *E.t.adastus*, a non-listed subspecies, to the north.  Northern limits of the known range of *E.t.extimus* is the N.M./CO state line, and *E.t. adastus* is known to occur in northern Colorado.  Breeding willow flycatchers (subspecies unknown) have been recorded in the zone between.  The preferred habitat of the Southwestern Willow Flycatcher is riparian shrub thickets away from tree overstory, which is present in this area.  Therefore, the presence of the Southwestern Willow Flycatcher is possible.

**Plants**

<u>Dolores Skeleton Plant</u> (*Lygodesmia doloresensis*) Federal C2

The Dolores Skeleton Plant is not known to be present.  A population does exist further downstream in the Dolores River canyon bottom in the reddish purple sandy soil derived form the Cutler Formation.  Due to the common occurrence of the Cutler Formation along stream courses in this area the presence of this species is possible.

<u>Eastwood's Monkeyflower</u> (*Mimulus eastwoodiae*)  BLM Sensitive

The Eastwood's Monkeyflower is not known to be present, but the possibility exists. It grows in "hanging gardens" on sandstone cliff faces, maintained by a year-round water supply  escaping from cracks in the sandstone formation.  It's nearest known occurrence is Escalante Canyon on the north slope of the Uncompahgre Plateau.  Similar habitat sites are known to exist in the CRMP area.

<u>Kachina Daisy</u> (*Erigeron kachinensis*) Federal C2

The Kachina Daisy is not known to be present.  However, two populations are known to exist at other locations along the Dolores River Canyon.  This species is also found in wet, seasonally-flooded sites, and in caves in which seeps through rock cracks allow development of "hanging garden".

<u>Paradox Valley Lupine</u> (*Lupinus crassus*) Federal C2

The Paradox Valley Lupine is not known to be present.  However, it does occur adjacent to the CRMP area on the north side of Paradox Valley near the Dolores River.  It grows beneath the juniper trees on fairly open ground, but also may be found in mixed stands of pinon-juniper.  Similar habitat is present within the CRMP area, therefore, its presence is possible.

<u>Spineless Hedgehog Cactus</u>  (*Echinocereus triglochidiatus inermis*) Federal  End., State  1

The Spineless Hedgehog Cactus is not known to be present.  It is present in the region and nearby areas of Paradox Valley.  It grows in fairly deep loamy soils under the canopy of mature stands of  pinon-juniper.  Similar sites exist within the CRMP area.

<u>Ute Ladies'-Tresses Orchid</u> (*Spiranthes diluvialis*) Federal THREATENED

The Ute Ladies'-Tresses Orchid is not known to be present.  Historically  it occurred throughout Colorado in riparian and wetland areas below 6,500 ft.  Because potential habitat exists within the CRMP area its presence is possible.

The following list of Federal and State listed and candidate species occurred in the area historically, occur in the region but are not known to be present on the CRMP area and have a low potential for occurring.

BLM_0006626

| Common Name | Scientific Name | Status |
|---|---|---|
| Mountain Plover | (*Chardrius montanus*) | Federal C2 |
| Mexican Spotted Owl | (*Strix occidentalis lucida*) | Federal PROP., State |
| Northern Goshawk | (*Accipiter gentilis*) | Federal C2 |
| Grey Wolf | (*Canis lupus*) | Federal & State End. |
| Grizzly Bear | (*Ursus arctos*) | Federal & State End. |
| Colorado Squawfish | (*Ptychocheilus lucius*) | Federal & State End. |
| Razorback Sucker | (*Xyrauchen texanus*) | Federal & State Prop. |
| Bonytail chub | (*Gila elegans*) | Federal & State End. |

RECREATION AND WILDERNESS

Recreational activities consist mainly of individual activities with undeveloped facilities, typified by hunting. However, as new recreational outlets such as mountain biking gain in popularity, new and different demands will appear with more developed facilities required.

The Mesa Creek CRMP area is managed by BLM as part of an Extensive Recreation Management Area or ERMA. ERMAs are areas where recreation is not the principal management objective but may be an issue of some significance in multiple-use management. Managing ERMAs does not normally require activity planning but does require minimal supervision either through occasional on-the-ground patrol or through the use of maps, brochures, or signs for the visitor.

The CRMP area is managed by BLM for dispersed, unstructured recreation use and opportunities. This use includes, but is not limited to sightseeing, auto touring, OHV use, camping, fishing, picnicking, mountain bicycling, horseback riding, rafting and kayaking, hunting, nature study, and photography in roaded natural settings. There are presently no BLM developed recreation facilities within the planning area.

Auto touring and sightseeing are becoming increasingly popular along the Dolores and San Miguel River corridors. This fact is evidenced by the designation of the Unaweep/Tabeguache (U/T) Scenic and Historic Byway (designated in 1990) which follows Highways 145 and 141 between the towns of Placerville and Whitewater. Approximately eight miles of the Byway are contained within the Mesa Creek CRMP area.

Colorado Department of Transportation (DOT) vehicle counts along Highway 145 currently average 950 vehicles per day. As the popularity of the Unaweep/Tabeguache Byway increases, visitation on BLM lands within the Mesa Creek area will undoubtedly increase. Studies done on the San Juan Skyway indicate that BLM can expect at least a 4-5% increase in visitation annually along the U/T Byway.

Besides driving for pleasure, travelers along the Byway also make frequent stops to photograph and view scenery and interest points. It is expected that many of these visitors will spend an extra day or more camping, fishing, picnicking, and hiking the Mesa Creek area. This increased used will most likely result in a higher demand for BLM to provide visitor services and facilities in the planning area.

A portion of the Mesa Creek CRMP area falls within the boundaries of the Dolores River Wilderness Study Area or WSA. The WSA has been recommended for wilderness designation by the BLM because of its significant wilderness values, which include naturalness, and outstanding opportunism for solitude and primitive, unconfined recreation. The WSA also contains recreational, archaeological, ecological, and geological and scenic supplemental values which enhance its wilderness qualities.

16

The proposed management actions described in this CRMP will not affect BLM's management of the Dolores River WSA's wilderness resources. The Mesa Creek grazing allotments are outside the WSA boundary, and there are no existing or proposed range projects in the area.

TRANSPORTATION AND OHV

The CRMP area is covered with a network of roads developed by grazing permittees, miners, hunters, and fire suppression activities. Many of the roads are poorly designed and constructed, serve no current function, and may be contributing to erosion and deteriorated riparian conditions. The road system will be reviewed and roads contributing to erosion will be closed or rebuilt.

A transportation plan was developed for the San Juan/San Miguel planning area in 1981 and incorporated into the San Juan/San Miguel Resource Management Plan (RMP) in 1985. A map developed for the planning process depicts the roads in the Mesa Creek CRMP area which were identified as part of the BLM's transportation system at that time.

The existing transportation plan and map identifies only those roads in the Mesa Creek area that are scheduled for regular maintenance. The plan, therefore, does not include many miles of unmaintained BLM roads, primitive ways (such as abandoned seismic lines), and trails in the Mesa Creek area.

Although many of the routes developed during the uranium boom years are not utilized today, a considerable number of them are used regularly by residents and visitors to the area. Range permittees use them for accessing their herd, and hauling water, feed, or emergency supplies.

These unmapped routes are also used by numerous recreationists, including off-highway vehicle motorists and hunters who use them to access remote sections of Mesa Creek and the surrounding area. Mountain bikers have discovered that these unmaintained routes offer challenging riding opportunities and that the numerous old mining spurs provide ready-made "loops" for trips of various length and difficulty.

The San Juan/San Miguel RMP does not provide any specific designations or guidance for such designations in the Mesa Creek CRMP area. Since no specific designations were made, the area is considered "open" yearlong to all forms of motorized vehicle use.

CRMP AFFECTED ENVIRONMENT

Cultural Resource

Previously collected data from the CRMP area suggests sporadic prehistoric and historic Native American utilization of the area for approximately 10,000 years, or more, and historic Euro-American utilization continuing from the late-19th century.

Architectural features and ceramic artifacts within the CRMP suggest both an Anasazi and a Fremont presence and/or influence in the vicinity. Western Colorado was established as a Ute Reservation (1868-1881), however, evidence documenting a Ute Tradition is, generally, very minimal. Indicators of a Ute component generally includes projectile point topologies, ceramics, and treelimb or brush (wickiup) shelters. Euro-american influence in the area dates from the 1870s. The primary activity of early Euro-Americans in the area included cattle ranching and homesteading, which included the establishment of small communities. By the early decades of the 20th-Century, mining exploration for and mining of radium, vanadium, and uranium contributed to the economic importance of Uravan.

Woodlands

The woodlands resource is widely scattered and covering much of the CRMP area. However, evidence suggests that little of woodland forests could be classified as productive, operable, and capable of being intensively managed. As a result, no woodland acreage was identified for intensive management, but rather, most activities would be implemented with an objective to improve forage production and improve range

17

BLM_0006628

conditions. The demand for woodland products in 1984 was considered low and consisted mainly of fuelwood and posts.

## VISUAL RESOURCES

BLM's current management direction is to provide protection for visual resources in highly visible outstanding scenic quality areas and wilderness study areas. Areas not highly visible and of relatively low scenic quality are open to major modification of natural visual qualities.

BLM aims to assure that construction and other land development projects are designed within established visual contrast limits. Visual contrast levels are prescribed by Visual Resource Management (VRM) classes established by RMPs or other approved plans.

The San Juan/San Miguel RMP does not provide specific VRM classifications for areas within the Mesa Creek area. The CRMP will address the issue of visual resource management and establish site-specific visual quality objectives (VRM classes) and design guidelines for landscape development projects which will maintain or improve the visual qualities of an area.

## SOCIAL AND ECONOMIC

The economic foundation of the area is agriculture and mining. Most agriculture is associated with livestock grazing. Numerous ranches are found in the area; most are small family cattle operations which supplement private owned pasture and grazing land with grazing permits on the Forest Service and BLM ranges. The dominant mining activity is associated with Uranium mines. Although current production is low, the industry once was booming and provided a significant contribution to the local economy. The recreation industry is growing rapidly in the area and placing many new demands on the local infrastructure. Most recreation is associated with big game hunting, sightseeing, OHV use, rafting, and fishing.

The area is sparsely populated. Most people live in the small communities of Nucla, Naturita or Norwood or on remotely located ranches which are scattered throughout the area. Residents of the area can be characterized as independent, somewhat conservative and concerned about the future. Maintenance of a rural lifestyle and traditions is as important as economic viability. In fact the point echoed over and over again at public meeting associated with the development of this CRMP is that people want to see balance and diversity. This is especially true as it relates to public land, its uses, and the expectations for this plan.

## QUALITY OF LIFE GOALS

A Quality of Life statement is a description of the kind of life people expect and how their surrounding environment contributes to this expected lifestyle. During these meetings, we asked people to think about the lives they lead, their pleasures and activities. Then we asked how the public land factors into the standard of living they enjoy. This was the resulting consensus:

"To provide a balance of multiple uses with harmonious cooperation from all users and common sense adaptable management from land agencies and local governments; while producing a sustainable yield of commodities needed to encourage and support stable rural communities; lifestyles and economies."

## LANDSCAPE DESCRIPTION

The Landscape Description is described in the sense of a panoramic landscape or as an overview. When compared to existing conditions (Affected Environment), the Landscape Description shows the need for desirable change. The agreed upon desired landscape description is:

18

The soil surface would be protected with mulch and litter to reduce erosion to normal levels and allow increased water infiltration resulting in higher plant available from soil moisture. Achieve and maintain a diverse and vigorous riparian plant community, resulting in greater stream channel stability, improved water quality and attenuated flow regimes.

Disturbed areas would be reclaimed to reduce erosion and noxious weed infestations resulting in increased native plant production. Plant production would be optimized with integrated vegetation management which could include biological, mechanical, chemical, and fire as methods to move plant communities towards mid- to late successional stages.

These actions will lead towards healthy vegetative communities producing healthy and balanced fauna, including big game, predator populations, fisheries and threatened and endangered species.

## CHAPTER III - ENVIRONMENTAL CONSEQUENCES

A.   Proposed Action

ECONOMICS

Livestock

Achievement of the objectives stated in the MESA CREEK CRMP will affect both livestock production and animal health in a positive manner. Increased forage production, species diversity, and ground cover resulting from changes in plant composition will lead to higher nutritional levels, cleaner and more abundant water, higher weaning weights, and decreased disease and death loss.

Concentration of animals into one herd and planned herd movements will result in increased seedbed preparation for native plants resulting in more forage, decreased fly and parasite problems and, therefore, less medical bills, shorter breeding cycle, improved conception and calving rates, improved marketability of a more uniform calf crop, and an easier to handle herd, overtime.

In the short term, permittees, the CRMP team, and BLM will spend more time planning herd movements to achieve the CRMP objectives. Over time, this will result in the ability to manage proactively instead of reactively to livestock and resource problems and give more flexibility to manage for changes such as drought and market conditions.

In the long term, there will be less labor and fuel cost in managing one herd versus two or three herds and more time for the operators to pursue other interests and goals.

Wood Products

Proposed management actions implemented to achieve upland vegetation objectives could require the removal of woodland products (pinon and juniper trees). If the products were removed by fire or some other action that would not result in a human use and, therefore, have no commercial benefit, there would be a monetary loss to the local economy as well as to the Federal Treasury. Likewise, wood products sold to commercial or private entities would benefit both the local economy as well as the Treasury. Primary economic uses of the wood products in the area would be fence posts, firewood, pinon nuts, Christmas trees and wildings.

Management and Administration Costs

The Plan will require a more intense management presence in the area than in the recent past. This applies not only to BLM, but to the Division of Wildlife, Montrose County, and even private parties especially the livestock permittees. This increased presence will require additional funds to be expended by the various agencies who have regulatory authority on matters that occur within the area. More emphasis on public

19

involvement will also increase costs as a result of additional field trips and meetings being held in the area. Increased costs to permittees from more intense livestock management will also result.

<u>Mining</u>

There are no anticipated impacts to oil and gas leasing or mineral material disposals. All public lands are open to mineral entry and development unless previously withdrawn.

The impacts to mining under the 1872 Ming Law or on the DOE lease tracts as a result of the CRMP may include road closures and reclamation of unvegetated sites.

It is assumed that road closures will only take place in areas where there is no use by mining claimants. Mining claimants have the right to access their claims. Roads put in by the claimants are required by law to be reclaimed by the claimant. If BLM reclaims a road, that is later required by the mining industry, the mining industry will be able to use the road for mining purposes and will be required to reclaim it when mining is completed. This will be an added cost to the claimant/operator if he was the one that originally put in the road. It is not anticipated that this will be a significant impact to the mining industry.

Areas closed to off-road vehicle use under 43 CFR 8340 are open to mining operations, however, all mining operations will require the submission of a Plan of Operations (43 CFR 3809) even if the area proposed for disturbance is five acres or less. This will be an added cost and time delay to the claimant/operator when permitting operations.

Reclamation of old abandoned dumps by BLM would be a positive impact. BLM will not reclaim dumps or areas where there are mining claims located as the claimant is responsible for reclamation.

<u>Community</u>

Continuation of a multiple-use type management philosophy would strengthen the local or community economic structure. It would be strengthened by relying on a diversity of enterprises and/or products carried out in whole or part on public lands which include livestock production, mining, forest products, and recreational uses including biggame hunting, mountain biking, and sightseeing along the Scenic Byway. The coordination of the management of these activities as proposed in the CRMP would result in improved community relations.

<u>Wildlife</u>

Increased opportunities for sport hunting would result from these increased numbers, which would generate additional revenues to the CDOW for management of these species and to the local economy through fees paid to guides and outfitters, and for accommodations in local communities during hunting seasons. There will be benefits to nonconsumptive uses of wildlife and such programs as Watchable Wildlife. This in turn will increase the recreational uses associated with such activities as bird watching.

Increased possibilities of damages by elk and deer on private lands would exist with increased numbers.

<u>Recreation</u>

Increased management focus on recreation-related issues such as improved signing, facilities, enforcement, and permit monitoring and compliance will result in higher recreation program costs and higher BLM administrative costs overall. Increased vandalism to signs and facilities will further strain already tight budgets. Close coordination with other resource management specialists and programs (both within and outside BLM) will be necessary to most efficiently utilize personnel and fiscal resources.

20

BLM_0006631

RIPARIAN VEGETATION

The condition of riparian areas would improve; vegetative cover, composition, density and diversity would increase; stream bank and channel conditions and stability would increase; and proper functioning conditions of most areas would be improved by the proposed CRMP.

Fisheries and other aquatic habitats would increase in quantity and quality due to water being present in the streams at lower elevations for longer periods of time resulting from improved upland watershed conditions. More intense livestock management, particularly the control of animals within riparian areas, would improve present riparian vegetation conditions.

The presence and quality of riparian areas would be expanded through out the area. An increased variety and quality of habitats would be available along riparian areas for a variety of wildlife species.

UPLAND VEGETATION

The focus of the CRMP is to increase regional biodiversity and habitat diversity by setting back natural succession and more plant communities towards a mid-serel to late-serel stage throughout a major portion of the CRMP area. This would be achieved by intensive management of wildlife, livestock, recreation, transportation, and other uses in the area.

Impacts from Proposed Vegetation Treatments:

Vegetation treatment would benefit as well as adversely impact both target and nontarget vegetation within the CRMP area. These impacts will be discussed specifically in site specific environmental assessments for vegetation treatment projects in the CRMP area.

Some injury or loss of nontarget vegetation may occur from all methods of vegetation treatment, particularly from herbicide use. Changes in species composition, plant community structure, species diversity, and productivity will result on sites where all vegetation is treated. Some species will be enhanced by treatment; others will be suppressed on the treated site. Treatment method and number of acres treated would determine the degree of vegetation impact. Positive impacts, the CRMP objectives, could include forest and rangeland improvement, wildlife habitat improvement, fuel hazard reduction, selection of desired woodland species, watershed protection, and reduction or elimination of noxious weeds.

Species diversity will be enhanced by all treatment methods. This increase in plant diversity will enhance and increase fuana associated with these species.

Manual treatment methods would have minimal adverse impacts on nontarget vegetation.

Normally, mechanical treatment methods would effect woody plants more than herbaceous plants because root-sprouting woody species cannot quickly replace above-ground structure, whereas, herbaceous species can replace their canopies annually.

Biological treatments with sheep, cattle, and goats would have slight impacts on a localized basis from feeding on nontarget vegetation to the extent that nontargets are interspersed with target species on a treatment site. Insect and pathogen treatments should have no impacts on nontarget plants because these techniques are species specific.

Prescribed burning could help prevent wildfires by removing fuel ladders and excess litter accumulations. Prescribed burning might decrease total plant productivity on a site but shift species composition from woody species dominance to dominance by herbaceous species and stimulate new growth of certain woody species.

The impacts of chemical treatments would vary depending on how closely related the target and nontarget species are, the selectivity of the herbicide, and the application time and rate.

21

BLM_0006632

More sensitive annual plants could be affected to a greater degree than perennial, especially if killed before producing seed, although the ability of many plants to maintain viable seeds in the soil for several years should reduce the susceptibility of these species to herbicides. All areas will be surveyed for Threatened and Endangered species prior to any vegetation treatment.

Impacts from Other Proposed Management Actions:

Uplands

The CRMP calls for an increase in cool and warm season grasses, forbs, and more diverse browse species and a decrease in sagebrush, invader species and pinon-juniper in this area. To achieve these positive changes in the vegetation community, the present composition of vegetation would change. The direction of this change would be toward species which are more abundant in ecologically stable communities. Depending on the tools used there could be a short term loss of soil as the site becomes reestablished after disturbance. Over the long term, range conditions will improve as plant diversity, vigor, reproduction, and basal cover all increase.

Riparian

On riparian areas that presently are not properly functioning, the CRMP prescribes an increase in tree, shrub and grass components and a decrease in bare ground. Reaching this objective, as a result of intensified livestock management and changes in vegetation composition, will stabilize stream channels thereby reducing streambank erosion and improving water quality.

WILDLIFE

Critical habitats of food, cover, and reproduction for mule deer, elk, and turkey would be preserved through time by regulating the amount and timing of vegetative treatments, livestock grazing, and recreational use as proposed in the CRMP. By manipulating seral stages, habitat diversity will increase and benefit nongame species in addition to deer, elk, and turkey.

Greater numbers of mule deer, elk, and turkey would exist, and their populations would be healthier, having better sex and age class compositions because of improved habitat conditions. Conditions improved would be water availability, increased forage production, and mix of habitat types.

The amount of acreage supporting sagebrush and the conditions of sagebrush stands on mule deer winter range in zone 1a would increase because of pinon and juniper removal and sagebrush stand removal because of fire or other disturbance. A more desirable arrangement of feeding and cover areas would be created and a greater volume of forage produced.

Additional elk winter range would be created in zone 1c by converting existing pinon and juniper areas to grass and shrubs and rejuvenating existing unproductive stands of oak and mountain shrub.

The arrangement of feeding and cover areas for elk would be improved in zones 1b, 1c, 2 and 3. The amount of acreage producing winter forage and the quality of winter forage would be increased.

Some of the elk use presently occurring on the USFS area northeast of zone 1c would shift to zone 1c as the result of vegetative treatments and improving winter forage production in zone 1c. Conflicts between livestock and elk in zone 1c for food and time of use may be created.

The amount and quality of turkey nesting and brood rearing habitat would be improved in the higher elevation riparian zones, in the dense unproductive stands of oakbrush on steep slopes and in thick p-j stands in zone 1c through vegetative treatments and implementing the grazing system to avoid critical habitats at critical times.

The availability of nutritious, early spring grass and forbs would be increased along

22

stream bottoms for potential breeding turkeys, improving productivity rates.

Winter feeding areas for turkey in zones 1b and 1c would be maintained or improved. The abundance of ponderosa pine would increase in zones 1b and 1c, providing higher quality nesting and brooding habitat. The number and quality of turkey roost trees would increase as ponderosa pine increases in abundance and matures.

Concentrated use by elk and mule deer on newly established vegetative treatments may result affecting the success of the projects. The arrangement and amount of acreage treated at once would be critical in determining the affect that would result.

Harassment or disturbances by human presence or activities to wildlife and livestock on critical ranges during critical times would be reduced by road closures, for example:

### TYPICAL IMPACT DISCUSSION

| CAUSE | → | EFFECT | → | IMPACT |
|-------|---|--------|---|--------|
| Road Closure | would | reduce harassment or disturbance to wildlife | and therefore | improve the quality of wildlife habitat especially for breeding. |

## CULTURAL RESOURCES

Management actions that attract recreational use to the area would increase vandalism to the cultural resources. As a result, some sites may need to be shielded from development of activities to protect them. Interpretive work done with cultural resources would increase the public awareness of the cultural history of the area. Overall, the public's knowledge would be increased as a result of management actions that would interpret the past.

## SEDIMENT PRODUCTION

Management actions implemented to achieve upland vegetation objectives would improve soil and water resource conditions. Diversifying plant species composition and increasing basal vegetation cover would alter soil surface conditions to where a greater fraction of precipitation would infiltrate into the soil mantle. The resultant increase in soil moisture would allow for increased plant production, providing greater soil surface protection from the erosive forces of rainfall and surface runoff.

With a greater soil-water infiltration capacity, surface runoff and erosion would be reduced. The occurrence and magnitude of high stream flows would also be lessened, reducing the erosional stress on stream channels and their adjacent riparian areas. Water quality improvements would be realized because of lower rates of sediment production.

Managing riparian areas, where needed, for more densely vegetated channel banks and increased tree and woody shrub densities would add stability to channel banks. Flood peaks would be attenuated because of the tendency of woody vegetation to reduce overbank flow velocities. Longer retention time of overbank flow on floodplains could increase ground water recharge and surface water base flows. Additional shade provided by vegetation would help reduce summer stream water temperatures which, at present, is a limiting factor for the survival of existing salmonids.

Securing instream flow rights on the North and South Forks of Mesa Creek would ensure ample surface water to maintain viable riparian and aquatic systems.

Obtaining water rights and permits on existing and proposed water source developments would provide legal protection to water needed for implementing many of the proposed management actions.

23

PUBLIC PARTICIPATION/EXPECTATIONS

There would be greater public participation as a result of implementing the CRMP. Reliance on public/volunteers' involvement in resource management decisions on the public lands would continue. Input would be gathered in both written and verbal formats. Input would be solicited on a variety of topics from very "site" specific questions" to very "general" guidance questions.

There would not be complete agreement amongst participants' input provided on all resource management questions. As a result, there might be dissatisfaction with the processes involving public participation. There is the potential that those who are dissatisfied might withdraw altogether from the process costing the CRMP effort one of its strengths, the diversity of inputs from a variety of backgrounds, thus reducing the plan to one of input from an accepted or standard approach.

There is also the potential that not all activities would be fully monitored and evaluated, or monitored only, so as to validate their continued existence. These activities might include, but are not limited to, wildlife and livestock, grazing, rest from grazing, protection from fires, lack of predators and their role in a healthy ecosystem (especially wolf, coyotes, and grizzly bear), long term climate changes, and the impact of hunting seasons.

Involving the public in advising BLM on resource management decisions would increase the public awareness on a variety of questions that would be addressed by the group. This would develop a more knowledgeable group of individuals in the natural resource fields. As people become more knowledgeable and are exposed to a wider variety of ideas on resource management, there would tend to be less antagonism when resource decisions are proposed or reached. This would result in improving the participants quality of input and increased commitment to the process.

RECREATION

Recreationists would benefit from proposed management of the planning area which would provide a wide diversity of high-quality, non-motorized and motorized recreation opportunities based primarily on a natural setting. A setting enhanced by improved resource conditions.

Managing the Unaweep/Tabequache (UT) Scenic and Historic Byway corridor under Class II Visual Management objectives would ensure the visual integrity of the corridor and provide increased protection of the area's scenic, historic, cultural, geologic, and other natural resource values.

Providing for the continued publication and disbursement of a UT Byway visitor's guide and developing and maintaining high quality, vandal resistant signs and other facilities along the UT Byway will enhance visitors' experiences and increase their awareness and understanding of the economic, historic, and scenic values of the Byway and the need to protect its visual integrity.

Significant increases in traffic along the Byway may result in resource damage and increased demand for facilities as more people discover and utilize the area. Also, increased livestock use in the highway corridor could result in recreation user conflicts and injury to both livestock and visitors.

Involving ranchers, miners, and other historic users and new users in development of recreational facilities and signing will decrease conflicts among these groups as well as between public land users and private land owners. Improved communication between users will also result in the faster identification and prioritization of areas that need management attention.

Developing signing, gate-fence crossing, trailhead parking, scenic overlooks, and other facilities will educate and facilitate a wide range of users and help to decrease impacts caused by recreationists in sensitive riparian areas, on road/trails, and in existing and potential camping areas. Adequate signing of access roads, mountain bike trails, and livestock travel routes along Highway 141 will also reduce safety hazards to motorists, bicyclists, and other users as well as to livestock.

24

BLM_0006635

Increased use of the highway corridor as a means of moving livestock from one pasture to another may result in additional road hazards.

Incorporating visitor safety information and low impact camping guidelines into signs and other interpretive materials will promote users' awareness of hazards in the area and decrease the potential for accidents and/or resource damage caused by inappropriate uses.

Increased patrols and monitoring efforts by BLM law enforcement and recreation staff during periods of peak use will promote visitor safety and resource protection along the Byway.

Increased management efforts in issuing and monitoring special recreation permits will improve outfitter/guide permit compliance and enhance user awareness of low impact camping techniques, private land boundaries, permit regulations, etc.

Developing specific guidelines and limitations where needed for all new recreational commercial uses in the area will ensure a diversity of high quality recreational opportunities for the outfitted public and decrease conflicts with private and historic users of the area.

ACCESS and OHV USE

Updating the existing San Juan/San Miguel transportation plan through the process of inventory, analysis, and mapping will help to define and evaluate the current and projected future transportation needs within the Mesa Creek planning area. Updating the plan will also enable the BLM to determine maintenance and construction needs for the CRMP area and set routine maintenance schedules for roads, trails, or routes that were not identified in the original plan.

Identification, designation, and proper signing of travel routes and off-highway vehicle (OHV) areas will provide a diversity of motorized recreational opportunities, increase the public's knowledge of these opportunities, and enhance user awareness of the need to protect sensitive areas, such as riparian corridors, from resource damage caused by unrestricted motorized use.

Closure of areas and/or roads, either permanently or on a seasonal basis, will reduce disturbances or harassment of wildlife or livestock, protect valuable wildlife habitat, and decrease impacts to vegetation and soil caused by motorized vehicle use.

Closing areas or roads and/or restricting travel to designated routes may lead to conflicts and complaints from recreationists, such as hunters, OHV users, etc., who are used to unrestricted access to the area. Such closures and restrictions may also result in increased management costs for the permittee and for other historic users, such as mining companies, which may need to develop alternative routes into areas and/or incur costs for reopening and subsequently reclaiming roads after mining operations have closed.

Identification and development of new roads into previously unroaded areas will increase public access and use in those areas. Increased use may, in turn, result in increased user conflicts as well as unwanted resource impacts such as increased soil erosion, wildlife and livestock harassment, habitat disturbance and degradation, and vandalism.

BIODIVERSITY

Biodiversity would be enhanced on regional and local scales through management that increases habitat diversity and also encourages growth of native and endemic species. Habitat diversity would be improved by increasing vegetation diversity created by implementing the proposed management actions. Habitat components required for the various life functions of the species would be more abundant and desirably arranged and the structural integrity of these habitats would be improved, especially in riparian and upland sagebrush communities.

25

BLM_0006636

The number of niches available for wildlife species would be increased, attracting additional species. Wildlife species requiring greater diversity of habitat types would be favored over large blocks of homogeneous habitat . The overall abundance of wildlife would increase.

Implementation of vegetative treatments would cause changes in wildlife habitat quality and suitability. Habitat would be destroyed for some wildlife while other wildlife would only be displaced. The displaced wildlife would move to surrounding areas increasing competition for available habitat. The availability of adjacent suitable habitat will ultimately determine the overall effect to the populations.

B.    No Action

The impacts of the no action alternative are the same as the proposed action since all of the management actions considered in that alternative would be considered in this alternative. Therefore, they will not be repeated here, see that section for the impacts. The only difference between the two alternatives is the probability of successfully implementing a management strategy to accomplish the resource condition objectives. Without a coordinated effort, the no action alternative would have a slightly smaller chance of success. The difference would be due to a smaller number of people working on the implementation and less commitment of those involved (especially those only marginally involved) to follow through with the intent of the plan. The larger the number of people involved the more likely there will be a commitment to attain the objectives.

CHAPTER IV – COORDINATION AND CONSULTATION

A.    Land Use Plan

The San Juan/San Miguel Resource Management Plan guided the development of the Mesa Creek CRMP. Constraints set forth in that document will be followed. This document also served as a Grazing Environmental Impact Statement. The Record of Decision for this document was issued in September, 1985.

B.    List of Preparers

        Dave Kauffman
        Bob Welch
        Karen Tucker
        Dennis Murphy
        Rich Fike
        Lynn Lewis
        James Sazama
        David Smith
        John Davis
        Ron Huntley
        Amanda Clemments

C.    List of Contributors

        (see next _2_ pages)

26

BLM_0006637

A. Goodtimes
Box 160
Norwood, CO  81423

Barney Mock
Box 556
Nucla, CO  81424

Ben Sievers
c/o UMETCO
2754 Compass Drive
Grand Junction, CO  81506

Pat Willits
Nature Conservancy
1244 Pine Street
Boulder, CO  80302

Bill Alexander - RMEF
21997 Uncompahgre Road
Montrose, CO  81401

Bob Bishop
c/o C.S.U. Extention
1510 W. Grand Ave.
Norwood, CO  81423

Carol Buchanan
P.O. Box 571
Norwood, CO  81423

Clyde B. Johnson
c/o BLM
701 Camino del Rio
Durango, CO  81301

Roger Culver
c/o Forum Newspaper
Nucla, CO  81424

Cotter Corporation
Attn:  Mary A. Dekoevend
P.O. Box 700
Nucla, CO  81424

Frank Wilson
P.O. Box 1962
Montrose, CO  81402

Curt Weimer
Box 590
Nucla, CO  81422

D.O.E.
2597 B3/4 Road
Grand Junction, CO  81506

David Blake
P.O. Box 431
Nucla, CO  81424

Dean Stindt
c/o SCS
Box 488
Norwood, CO  81423

Dick White
Box 222
Redvale, CO  81431

E.P.A.
Wayne Aspinall Fed. Bldg.
400 Rood Avenue - Room 229
Grand Junction, CO  81501

Earl Reams
P.O. Box 296
Naturita, CO  81422

Ernest Cooper
Box 572
Nucla, CO  81424

Frank and Mildred Wilson
Box 1962
Montrose, CO  81402

Herschel Hendrickson
P.O. Box 488
Montrose, CO  81402

John DeKoevend
P.O. Box 517
Nucla, CO  81424

James A. Garvey
Box 413
Nucla, CO  81424

Jan Showalter
P.O. Box 700
Nucla, CO  81424

Jody Weimer, Jr.

Nucla, CO  81424

Jody C. Weimer
P.O. Box 590
Nucla, CO  81424

John and Cynthia Walton
Mesa Creek Star Rt., Box 7
Naturita, CO  81422

Joseph Weimer

Nucla, CO  81424

Leo Large
P.O. Box 96
Nucla, CO  81424

Lyle Bennett
1267 County Road ZN
Norwood, CO  81423

M.J. Witt, Jr.
P.O. Box 490
Naturita, CO  81422

Martin Witt
P.O. Box 588
Nucla, CO 81424

Matt Weimer
P.O. Box 428
Naturita, CO  81424-0428

Melvin Staats
c/o Montrose Cty Comm.
320 South First
Montrose, CO  81401

Mike Shumway
Western States Mining
3180 Spanish Trail Road
Moab, UT  84532

Paul Dillon
Star Route, Box 10
Naturita, CO  81422

Rich Benintendi
Box 790
Norwood, CO  81423

Ron Arant
P.O. Box 67
Nucla, CO  81424

Stuart Krebs
P.O. Box 776
Montrose, CO  81401

Zene Weimer
P.O. Box 428
Naturita, CO  81424-0428

Jack Pera
P.O. Box 427
Telluride, CO  81435

BLM
Dave Stevens
2815 H Road
Grand Junction, CO 81506

Kelly Hutchison
The Nature Conservancy
P.O. Box 3140
Telluride, CO  81435

Michael Moore
Box 326
Nucla, CO  81424

Bob Bishop
Box 130
Norwood, CO  81423

Peggy Lyons
114 County Road 5
Ridgway, CO  81432

Richard E. Herring
599 Crabtree Road
Nucla, CO  81424

Ross Allen
2962 Hwy 92
Hotchkiss, CO  81419

U.S. Forest Service
Attn:  Ed Ullrey
764 Horizon Drive
Grand Junction, CO  81506

John Musser
P.O. Box 114
Delta, CO  81416

Jim Dollarschel
c/o BLM - GJRA
2815 H Road
Grand Junction, CO  81506

Dirk Richards
Nucla Airport
Nucla, CO 81424

U.S. Fish and Wildlife
Attn:  Lucy Jordan
529 25½ Road
Grand Junction, CO 81505-6199

Mike McClain
c/o Div. of Wildlife
2300 S. Townsend Ave.
Montrose, CO  81401

Naturita Town Clerk
P.O. Box 505
Naturita, CO  81422

Ray Snyder
993 County Road 43 ZS
Norwood, CO  81423

Robert Schwind
Box 532
Norwood, CO  81423

Scott Dillon
Box 65
Naturita, CO  81422

Amy Loper
Western Colorado Congress
7 North Cascade
Montrose, CO  81401

Division of Wildlife
c/o Rick Sherman
2300 S. Townsend Ave.
Montrose, CO  81401

Harley Metz
c/o BLM - GJDO
2815 H Road
Grand Junction, CO  81506

Pat Willits
The Nature Conservancy
P.O. Box 444
Norwood, CO 81423

BLM_0006639

# MESA CREEK CRMP

## CULTURAL MANAGEMENT APPENDIX

### I.   INTRODUCTION

The following cultural/paleontological objective for management of the Mesa Creek CRMP area was identified in the People and Land uses overall objective; to manage and protect cultural and paleontological resources for the best scientific and public use. Complementary recreation goals established under the San Juan/San Miguel Resource Management Plan (1985) include:

1.   Provide a diversity of high quality, dispersed, non-motorized and motorized recreation opportunities based primarily on a natural setting.

2.   Provide for the preservation and protection of the unique scenic, historic, cultural, geologic, paleontologic, and other natural resource values within the Unaweep/Tabeguache (UT) Scenic and Historic Byway corridor.

### II.   MANAGEMENT ACTIONS

The Mesa Creek CRMP cultural/paleontological objectives will be accomplished by implementing the following management actions.

A.   <u>Inventory</u>

1.   Conduct a Class II inventory to identify the diversity, distribution, density, and significance of the cultural resources in the study area.

2.   Re-evaluate 135 previously recorded cultural properties and assess significance and condition.

3.   Inventory and evaluate 18 known fossil localities and place in regional contest, then prepare a report with management guidelines and scientific and public use recommendations.

4.   Inventory historic sites such as homesteads, old cattle trails, mining-related sites, and prepare a report with management guidelines for their management.

B.   <u>Protection Strategies</u>

Various protection strategies have been proposed for the cultural/paleontological resource in the San Juan/San Miguel RMP.  They include:

1.   Avoidance of activities on or adjacent to known sites.

2.   Mitigating measures where avoidance is not an option, including testing and excavation.

1

BLM_0006640

3.    Coordinated interpretation of specific sites with integrated emphasis on cultural values and natural ecology, recreation and site stewardship, and general public awareness and education relating to cultural and paleontological resource.

4.    Conduct a Class III level inventory prior to allowing any surface disturbing activity.

# MESA CREEK CRMP

## FIRE MANAGEMENT APPENDIX

## I.    INTRODUCTION

Fire is a natural component of most ecosystems and can, or may, play a major role in controlling the ecosystem dynamics. Its role and function is determined by the presence and interactions of environmental components. The environment dictates the fire regime that occurs. In most cases, the natural fire regimes (pre-European Man) have been significantly altered or eliminated due to fire suppression in the past 100 years, more or less.   How fire is managed or used as a tool in the Mesa Creek CRMP area will influence ecosystem dynamics, the landscape appearance, and, perhaps, how efficiently the CRMP resource condition objectives are accomplished.

The resource conditions objectives, for the uplands primarily, could be at least partially accomplished by using fire, both naturally occurring and prescribed burns, as tools to accomplish desired vegetative treatments.

### A.    Fire Management Objectives

Use natural occurring fires and prescribed burns that approximate the natural fire regime in Mesa Creek ecosystem as a tool to accomplish desired landscape appearance and resource condition objectives.

## II.    MANAGEMENT ACTIONS

The following management actions relating to fire will be coordinated with the CRMP team to accomplish the overall resource conditions of the area.  Basically, two things are important to know concerning the fire regime; 1) the frequency of occupance and intensity of the fires and, 2) the average size of the burns.

### A.    Inventory

Collect data from the area and use published literature to determine the fire regime that existed in this ecosystem.  Experts in the field of fire ecology and management will be consulted.  Two sets of data are currently being collected in this area to determine fire

2

BLM_0006641

frequency; fire scar information from trees surviving past fires and ages of the next nearest tree to remaining fire killed snags.

**B.**    <u>Analysis</u>

Determine sites that should be protected from fires and sites that will respond most favorably from burning to achieve the CRMP objectives. Identify let-burn and fire protection areas based upon needs of other resources. Identify areas for treatment by fire to benefit wildlife, livestock, and recreation.

**C.**    <u>Implementation</u>

The use of fire will begin as soon as areas are identified (CRMP objectives - livestock and wildlife improvement projects) where burning is an acceptable method to achieve and funding is available.

**D.**    <u>Monitoring</u>

Pre and post-burn data will be collected to monitor vegetative changes that occur through time to evaluate the success of the project and to measure objective accomplishment. The tensity and frequency of data collection will be determined by the CRMP team.

# MESA CREEK CRMP

## LIVESTOCK GRAZING APPENDIX

**I.**    **PLANNED GRAZING AND LAND USE**

**A.**    <u>Holistic Resource Management</u>

Holistic Resource Management (HRM) will be used to accomplish the objectives and work toward the goals. It is applied to the land through use of the HRM model (see Appendix A) on a continuing basis through planning, monitoring, controlling (evaluation), and replanning as necessary. The tools chosen initially to address the goals and objectives are grazing, animal impact, technology and fire.

   **1.**    <u>Grazing</u>

Grazing will be managed by developing and using a biological planning chart (see Appendix B). The principles of time control will be applied to grazing and management. Grazing will be restricted, to the extent practical and necessary, to prevent grazing of regrowth and thereby minimizing overgrazing. When a pasture is grazed more than once annually, livestock will not be allowed back into the pasture until grass plants have had sufficient time to regrow and recover from the effects of previous grazing. Time spent in each pasture is determined by animal performance, the amount of forage present, and the rate

BLM_0006642

of plant growth. When growth is rapid, livestock are moved more frequently. When growth is slow, livestock may stay longer in a pasture. During plant dormancy, livestock moves will depend on forage availability, livestock performance, wildlife needs and the need to harvest old wolf plants.

2.   Animal Impact

Animal impact is gained through grazing and herd effect: thereby (1) hooves breaking soil crusts and incorporating manure and litter thereby increasing water infiltration and ground cover; (2) adding urine (urea) to the soil; (3) creating hoof print seedbeds and pockets for collection of litter and precipitation where seeds are compressed in mineral soil; and (4) pruning plants by grazing, trampling, crushing, etc. to stimulate new growth. Animal impact, when properly managed, has been the least understood, least applied, yet the greatest tool at a manager's disposal. Proper management of animal impact requires control and monitoring of the element of time.

3.   Technology

Technology will be employed to develop waters, fences and trails.

4.   Fire

When fire does occur, it will be followed up by planned grazings to employ animal impact to break hydrophobic soil crust and incorporate ash into the soil.

5.   Human Creativity, Money and Labor

Human creativity, money and labor will be used in the application of all the above tools. Hopefully, through continued collaboration and biological planning, more human creativity will be employed than labor and/or money.

B.   Rationale

HRM was chosen for application on this land unit for several reasons.

1.   It is believed that the application of the HRM processes and principles of time control grazing and animal impact, which minimize overgrazing and over rest, have greater potential for success in reaching objectives than do traditional grazing practices. (This has been the case in the application of HRM principles on the Mesa Creek area in the last two years.)

2.   The ranch family has been trained in HRM and has an excellent grasp of hits principles. The family is committed to making this process work. This plan is being developed in cooperation with the U.S. Forest Service (USFS), Colorado Division of Wildlife (CDOW), and interested private and local governmental parties.

3.   The topography, limited water, and large size of the allotment do not lend themselves to traditional grazing management practices. The permittee plans to combine innovative means of fencing and some herding to help resolve these

4

problems and at the same time maximize animal impact and minimize over grazing and overrest.

C.   **Livestock**

The current livestock enterprise at the Mesa Creek and Spring Creek ranches is a cow-calf operation.  The cattle will be run as a single herd.  At some point in the future, it is conceivable that the operation may include yearling cattle.  Frequent riding and herding will be required, even after pastures are developed.  This will ensure needed concentration of livestock to get the necessary animal impact to ultimately accomplish the objectives.

D.   **Annual Biological Plans**

Biological plans will be developed twice a year.  The first plan will be completed by the middle of February.  This plan will determine use by pasture, time and numbers for the active growing period of March through September.  The second plan will be completed by the end of September and will be for the dormant season grazing of October through February.

Duplicate biological plans will be made so the permittee and BLM's Coordinated Resource Management Plan (CRMP) Team will have copies (to facilitate monitoring). If preferred, a narrative of the plan may be completed for use by the BLM and the CRMP Team in lieu of a duplicate of the chart.  The plan may be revised at the option of either the permittee or BLM due to drought or other unexpected problems.  Revisions should be agreed upon in advance of the actual change and documented in the CRMP file under monitoring.  The biological planning effort will consider the findings of the annual evaluation conducted in early October each year. The Area Manager's signature and consultation with the CRMP Team on the biological plan will signify approval of the proposed grazing plan and stocking rate each year.

E.   **Management Guidelines**

The following will be used to guide the development of the biological plan.  They include operational requirements for grazing designed to help accommodate multiple use objectives and goals. These guidelines will be displayed on the annual biological planning chart and will serve to determine when grazing occurs in each pasture.

1.   In all new burn areas, when feasible, introduce animal impact within 30 days to break the hydrophobic crust and to prepare a seedbed for proper germination and establishment of residual and/or applied seed.

2.   Avoid livestock use as much as possible during hunting seasons in areas that are heavily hunted.

3.   Consider livestock management needs such as calving, branding, weaning, etc.

4.   Minimize effects of livestock use on big game areas during the period game is on winter range.

5

BLM_0006644

F.     Management Specifications

The following will be used to govern the actual conduct of the annual grazing operation.

1.     Pasture moves will be dictated by any of the following singly or in combination:

   a.     Animal behavior - livestock grazing when they should be resting.

   b.     Animal performance - livestock showing a lack of fullness.

   c.     Overgrazing - when a majority of once-grazed first or second choice plants (excluding annuals) regrow to a height at which grazing of regrowth is possible, livestock should be moved to avoid overgrazing. (This will be accomplished through daily monitoring by the permittee.)

   d.     Plane of nutrition - livestock should be on a first or second choice diet where these species are co-dominant.

2.     Salting will be done on ridges (on rocks where possible) at least one mile, if possible, from water.  Where salt must be placed on soil, it should be moved as frequently as possible during the period the pasture is used.

3.     Salt and other attractants may be used to promote animal impact in areas where it is other wise improbable.

4.     Vegetation cover in riparian areas will be managed to trap sediment and rebuild banks during peak flows, which occur during late April through May, and following summer thunderstorms.  For use during the growing season, the time allowed for regrowth should provide adequate cover on most streams (where livestock are removed prior to September 1).  For those pastures grazed later (dormant season), utilization should not exceed:

   a.     Woody species - 25% of current annual growth to favor the tallest native species and promote diversity in height and species.

   b.     Sedges, rushes and other herbaceous species within the stream channel - minimum five inches (5") average stubble height, or that amount which will trap sediment and rebuild banks.

   c.     Herbaceous vegetation on banks and overflow zones - five inches (5") minimum average stubble height, or that amount which will trap sediment and rebuild banks.  These criteria (4 a-c) will be overriding in determining pasture moves in those pastures containing riparian acreage.

5.     An annual evaluation will be conducted when the dormant season biological plan is developed (end of September).  The annual evaluation should include the previous years' successes, failures, problems, and changes to be made in management, stocking, facilities, and monitoring, etc. in the following year.

6

BLM_0006645

G.   **Preference and Carrying Capacity**

The objectives for this plan do not include increasing livestock forage production. To accomplish the objectives may, however, require a considerable increase in livestock numbers and concentrated use rather than scattered use in order to effect the changes desired in the soil surface and plant cover objectives.

1.   Under this type of grazing management, the traditional concepts and constraints of grazing capacity as applied to season long grazing are not appropriate.

    a.   Livestock will use a given pasture or use areas for only a short period (usually less than 3 weeks) during a given grazing period.

    b.   Grazing is managed to prevent, to the extent practical, the grazing of regrowth thus avoiding overgrazing. Following this plan will not absolutely eliminate all overgrazing (or overresting). The size of pastures, nature of the topography, distance to water, livestock habits, etc., will result in some plants' regrowth being grazed before the plant can recover from the effects of the first grazing. Likewise, some plants will not be grazed at all. However, the intent of grazing management is to prevent overgrazing to the extent possible. Where overgrazing does occur, the causes will be identified and alternative solutions analyzed and the problem corrected, if possible and practical. In some cases, larger pastures may need to be subdivided, stock density increased, or the time shortened. In isolated instances, it may be necessary to overgraze a pasture periodically where realistic economical solutions do not exist. This should not be a cause for alarm, as long as the plants have time to replenish roots and tops prior to the next grazing period, which is the intent of this plan.

    c.   Regrowth and recovery from effects of grazing and trampling on top and root health are provided for prior to the next grazing period.

2.   Carrying capacities or stocking levels will be determined by pasture based on previous actual use history, the existing forage growth, rate of growth, livestock behavior, livestock performance, aesthetics, riparian concerns, and wildlife considerations.

    During the dormant season, capacities (when in question) may be determined by random ocular estimates of several areas in each use area to determine how large an area is required to feed one animal for one day and then calculating the available forage in the entire use area. This should be done by both the permittee and BLM range manager and must consider the food and cover requirements of any wildlife present, or expected to be present, in the same area.

3.   Current preference will not constrain numbers of livestock or total AUMs harvested each year as long as trend towards objectives can be demonstrated through the results of monitoring.

7

BLM_0006646

The upper limits of livestock numbers will be agreed upon by BLM and the permittee at the February planning meeting each year, approved in writing by the Area Manager, and adjusted at the October meeting (see annual biological plan). this decision will be based on the following factors determined by and documented through monitoring:

- presence or absence of desired seedlings
- presence or absence of standing litter
- presence or absence of oxidized plant material
- health and vigor of desired vegetation, including riparian areas and uplands
- change in plant diversity
- change in soil cover
- adequacy of animal impact to reduce mature soil capping.

4. Use in excess of recognized preference will be billed as nonrenewable use and will only be authorized as long as this management plan is followed. Should HRM be discontinued, adherence to the recognized active grazing preference will be required.

Permanent increases in production may be used to satisfy wildlife, watershed, and livestock needs at the discretion of the area manager and CRMP Team as determined appropriate through monitoring and evaluation.

H. **Changes in Grazing Permit**

Upon approval of this plan, the term grazing permits will be modified to reflect the appropriate terms and conditions. The provisions of this management plan will become a term and condition of the permit.

I. **Wildlife and Habitat**

Continued discussion and coordination among the ranch family, BLM, CDOW, and the CRMP Team is essential to the success of this plan.

Mesa Creek serves as winter range for deer and elk. This area needs to be monitored from the standpoint of both livestock and wildlife. Wildlife concerns and priorities will be addressed in the biological planning process.

J. **Fire**

In accordance with the goals and objectives, BLM and the permittee will pursue agreements to manage the area covered by this plan as a limited suppression area.

II. **FLEXIBILITY**

The permittee may decide when pasture moves are appropriate following the management specifications and biological plan. Consultation is required prior to making changes in pasture scheduling or prior to any planned overgrazing - see management specifications. Recognizing the annual fluctuations of weather, the permittee may deviate from the biological plan as much

8

as five (5) days on each pasture without formal consultation with BLM, as long as management specifications are followed.  For any deviation greater than five days prior consultation is required.  The permittee is asked to record these deviations for consideration at the annual evaluation meeting.  In the event of a drought or unusual winter, a new or revised biological plan will be prepared as soon as the emergency becomes apparent.

To account for problems with gathering, flexibility in cow numbers between moves will be no more than five percent (5%).  The former pasture should be cleaned of strays within five (5) days of the date the main herd was moved.

When changes are required in the grazing plan and prior consultation with the BLM range manager is not possible, the permittee will, as soon as practical, document the change with the rationale and communicate same to BLM.

## III.   RANGE IMPROVEMENTS

### A.   Existing

Those range improvements of record are displayed in Appendix C.  An attempt will be made to inspect each of these improvements over the next few seasons in connection with the transportation plan, water management plan, and other multiple use plans as necessary.  Each will be evaluated as to whether it serves a useful purpose; its present condition and whether it needs maintenance; modification or abandoned and rehabilitated; and the records purged.  For those remaining in need of attention, a schedule will be developed by the permittee and BLM to insure that required maintenance, etc. is accomplished on a timely basis.

### B.   Proposed

The following projects are first priority for this CRMP.  Additional projects will be necessary as problems are discovered and opportunities occur for meeting the goals of the plan:

> South Mesa Creek cattleguard and fence;
> Atkinson Mesa fence - 2 miles;
> East Mesa Creek stock trail - ⅛ mile;
> Clubb Bench cattleguard;
> Fencing of Ed's place.

## IV.   BILLING PROCEDURE

All use will be billed after the fact.  The permittee must keep accurate records of the use made by livestock over six (6) months of age, including the number of livestock and the days of use in each pasture.

Split billings will be issued for that use billed after the fact to minimize problems with record keeping.  Actual use reports will be submitted on July 1 and March 1.

BLM_0006648

## V.    MONITORING AND EVALUATIONS

The following tables show the monitoring to be done.

### A.    Monitoring

| Type | Method | When | By Whom |
|------|--------|------|---------|
| 1. Actual Use | Written reports by pasture | See IV above | Permittee |
| 2. Precipitation | Data from local stations | Collect and array annually | BLM, Permittee |
| 3. Landscape Trend[1] (Plant Succession) | Photos, frequency and cover transect | Every 5 years | BLM, Permittee |
| 4. Riparia Trend | Photos and frequency | Every 2 years | BLM, Permittee |
| 5. Drainage Profiles | Photos and Channel cross-sections | Every year | BLM, Permittee |
| 6. Ecosystem Blocks Trend | Score card at landscape trend plots[1] | Every 5 years in conjunction with #3 | BLM, Permittee |
| 7. Production Goals | Ranch business records | Annually | Permittee |
| 8. Riparian Utilization | Ocular estimate and tape measurement | Annually | BLM, Manager |
| 9. Game Birds | Reserved[2] | Annually | BLM, Permittee, CDOW |
| 10. Distribution, Health, Diversity & Productivity of Wildlife Populations | Field surveys, observations (recorded), aerial counts | Annually | BLM, Permittee, CDOW |
| 11. Overgrazing | Visual observation of regrowth cage | Each 3 days during rapid growth, each 7 days during slow growth | Permittee |

[1]Minimum of one key area per pasture
[2]Pending location of leks and nesting areas

10

**B.**   Evaluation

Full scale evaluations will utilize and consider any and all data gathered based on the monitoring plan as they relate to the plan objectives.

1.   Annual
Annual evaluations will be conducted during October to discuss the previous years' successes, failures, problems, and changes to be made in management, stocking, facilities, and monitoring, etc. in the following year.

2.   Fifth Year
A full-scale evaluation of the entire plan and results will be conducted in the winter of 1995-96. Thereafter, evaluations will be conducted on 5-year intervals.

3.   In all evaluations, a key consideration will be the impacts of management on wildlife, their habitat and the riparian areas, as this is a primary concern of the permittees, the BLM and the CRMP Team.

# MESA CREEK CRMP

## MINERALS MANAGEMENT APPENDIX

**I.   INTRODUCTION**

**A.   Energy and Minerals Program**

The following principles will guide BLM in managing mineral resources on public lands (per BLM instruction Memorandum No. 84-568, dated June 28, 1984).

1.   Except for Congressional withdrawals, public lands shall remain open and available for mineral exploration and development unless withdrawal or other administrative action is clearly justified in the national interest.

2.   BLM actively encourages and facilitates the development by private industry of public land mineral resources so that national and local needs are satisfied and economically and environmentally sound exploration, extraction, and reclamation practices are provided.

3.   BLM will process mineral patent applications, permits, operating plans, mineral exchanges, leases, and other use authorizations for public lands in a timely and efficient manner.

BLM_0006650

4.      BLM's land use plans and multiple use management decisions will recognize that mineral exploration and development can occur concurrently or sequentially with other resource uses. BLM further recognizes that land use planning is a dynamic process and decisions will be updated as new data are evaluated.

5.      Land use plans will reflect geologic, energy, and mineral values on public lands through more effective data assessment of those values.

6.      BLM will monitor saleable and leasable mineral operations to ensure proper resource recovery and evaluation, production verification, diligence and inspection, and enforcement of the lease, sale, or permit terms. BLM will ensure receipt of fair market value for minerals commodities unless otherwise provided for by statute.

7.      BLM will maintain effective professional, technical, and managerial personnel knowledgeable in mineral exploration and development.

II.      **RESOURCE OBJECTIVES**

A.      Oil and Gas Leasing

As a general rule, public land is available for oil and gas leasing. In many areas, oil and gas leases will be issued without special lease stipulations. In highly sensitive areas, where special stipulations or information notices are not sufficient to protect important surface resource values, no surface occupancy stipulations will be implemented. Stipulations and information notices are located in Appendix Two of the San Juan/San Miguel Resource Management Plan.

B.      Locatable Minerals

All public land is open to mineral entry and development unless previously withdrawn. (i.e., wilderness, administrative withdrawals, etc.). Mineral exploration and development on public land will be regulated under 43 CFR 3800 to prevent unnecessary undue degradation of the land.

C.      Common Variety Mineral Materials

Applications for removing common variety mineral materials, including sand and gravel, will continue to be processed on a case-by-case basis. Stipulations to protect important surface values will be attached based on interdisciplinary review of each proposal.

III.      PLANNED ACTIONS

Continue oil and gas leasing subject to environmental stipulations. Lands open to development without special lease stipulations will be provided; lands open to development with lease stipulations (no surface occupancy) in accordance with the San Juan/San Miguel RMP.

12

BLM_0006651

Continue cooperative management to protect surface resources on the Department of Energy (DOE) uranium lease tracts.  Provide for necessary permits for sand and gravel.

IV.    MONITORING

BLM will monitor restrictions placed on any mineral (coal, oil and gas) activities within the resource area.

# MESA CREEK CRMP

## RECREATION MANAGEMENT APPENDIX

I.    **INTRODUCTION**

Recreation Management Objectives

The following two primary recreation objectives for management of the Mesa Creek CRMP Area are identified in the People and Land Uses overall objective.

1.    The Mesa Creek CRMP Area will be managed to provide a diversity of high quality, dispersed, non-motorized and motorized recreation opportunities based primarily on a natural setting.

2.    To provide for the preservation and protection of the unique scenic, historic, cultural, geologic, and other natural resource values within the Unaweep/Tabeguache (UT) Scenic and Historic Byway corridor.

Secondary recreation goals established under the San Juan/San Miguel Resource Management Plan (1985) include protecting resources, meeting legal requirements for visitor health and safety, and mitigating resource user conflicts involving recreation.

II.    **MANAGEMENT ACTIONS**

The Mesa Creek CRMP recreation objectives will be accomplished by implementing the following management actions.  The management actions fall within five broad categories including emergency services, information and interpretive services, visitor and resource protection, facilities, and special area permits.

A.    Information and Interpretive Services

Involve ranchers, miners, and other historic users and interest groups in development of recreational facilities, signing, etc., to

13

BLM_0006652

1.  Decrease conflicts between historic users and new users.
2.  Decrease conflicts between public land users and private land owners.
3.  Increase awareness of the value of enhancing recreation opportunities in a spirit of cooperation.
4.  Identify and prioritize areas that need facilities such as gate/fence crossings for mountain bikers and hikers, directional signs, private land signs, public access, etc.

Develop signing, gate/fence crossings, trailhead parking, and other facilities wherever needed that will facilitate a wide range of users, i.e., mountain bikers, hunters, byway visitors, etc. and decrease impacts caused by recreationists in sensitive riparian areas, on roads/trails, and in existing and potential campground areas.

Identify and develop means to protect and interpret existing historic trails in the area.
Increase awareness and understanding of the economic, historic, and scenic value of the UT Scenic Byway and the need to protect its visual integrity. This will, in part, be accomplished by providing for the continued publication of the UT Byway visitor's guide which contains interpretive, educational, and safety information about the area.

Provide for continued involvement and cooperation among all Byway sponsors including Umetco, Nature Conservancy, Mesa and San Miguel Counties, USFS, DOW, Nucla/Naturita Chamber of Commerce, etc. in all management issues that will affect the Byway.

**B.     Visitor and Resource Protection**

Provide protection of archeological and historical sites; interpret and provide access to only those that can be adequately protected from increased public awareness and potential vandalism.

Assign an interim Visual Resource Management (VRM) class to the Mesa Creek area and manage the corridor along the Unaweep/Tabeguache Byway under VRM Class 11 objectives (see Appendix ?) to preserve and protect its natural values. The San Juan/San Miguel Resource Management Plan provides for the establishment of site-specific visual quality objectives (VRM classes) and design guidelines for landscape development projects during activity planning.

Accurately sign all BLM access roads to area. Coordinate with Colorado Department of Highways to properly sign Highway 141 to reduce hazards to motorists and livestock as a result of increased activity in this area.

Monitor visitor use patterns throughout the area to determine if legal requirements for visitor health and safety are being met and develop corrective measures where needed to address problems.

**C.     Facilities**

Develop and sign a mountain bike trail system which will link the Tabeguache Trail to Highway 145 by using existing county and BLM roads in Mesa Creek and/or Blue Creek drainages.

14

BLM_0006653

Provide trailhead parking area(s) off Hwy. 141 for the mountain bike system with day use facilities, i.e., picnic tables, bulletin board/map, and restrooms where determined necessary.

Provide for continued development and maintenance of high quality, vandal resistent signs and facilities along the Unaweep/Tabeguache Scenic and Historic Byway corridor, including restrooms, scenic turnouts, kiosks, hiking trails, etc. where appropriate.

Develop a scenic overlook in coordination with the Forest Service along the BLM/USFS boundary on the Campbell Point Road.

Facility development and construction need to consider impacts to riparian areas and stream channel stability, and be compatible with other uses in the CRMP area. Development of recreation facilities in riparian areas should be avoided unless determined necessary to protect visitor health and safety.

**D.**   Special Area Use Permits

Improve outfitter/guide permit compliance and increase monitoring efforts for both commercial and private hunters by increasing BLM/hunter contacts to enhance hunters' awareness of low impact camping techniques, private land boundaries, outfitter/guide permit regulations, etc.

Develop guidelines as needed for all new commercial uses in area including mountain bike trail rides, scenic jeep touring, rafting, walk-wade fishing, horseback trail rides, recreational cattle drives, etc. Such guidelines may include limits, where appropriate, on the number of hunting outfitters and other commercial interests allowed to operate in the area.

**E.**   Emergency Services

The area will be patrolled, as funding permits, in the summer and fall seasons by seasonal and permanent personnel in vehicles. Visitor safety information and guidelines will be incorporated into signs and other interpretive materials developed for the area.

Whenever possible, hazards which pose a significant threat to human life or safety will be corrected.

## III.   IMPLEMENTATION

Implementation of the above management actions will be based, in part, on how they affect other CRMP objectives. For example, the placement of recreation facilities will be influenced by the transportation plan, big game and riparian needs, and other management constraints. Although signing may be considered a high priority for recreation, a sign plan for the CRMP area will not be done until other higher priority management actions are implemented.

BLM_0006654

For the most parts, the management actions described in this section will be implemented as budget and time allows. Wherever possible, joint funding with existing and new partnerships will be used to cover the costs of signs and recreation facilities.

In 1993, the Uncompahgre Basin and Grand Junction Resource Area BLM offices will sponsor a proposal for the use of state and federal 16K Surface Transportation Efficiency Act or STY funds to develop additional recreational facilities along the Unaweep/Tabeguache Byway. Other sponsors of the proposal include the Department of Highways, Colorado Nature Conservancy, Colorado Plateau Mountain Bike Trails Association (STY), and the UT Byway Committee.

If the proposal is accepted, STY funding would be used to develop the mountain bike trailhead facility and system that will link the Tabeguache Mountain Bike Trail to the Unaweep/Tabeguache Byway. If funding permits, additional byway kiosks, scenic and interpretive turnouts, restrooms, and other related facilities may be developed along the byway corridor in the CRMP area.

If STY funds are not available, the UBRA recreation planner will submit construction proposals for the facilities to BLM's Zone Engineering division for contracting and construction. Due to BLM's lack of funding for large construction projects, it is most likely that the project will be funded in phases as part of the BLM's annual work plan commitments over a period of two to four years.

Existing special recreation permits (SRPs) in the CRMP area will continue to be managed under the guidelines of the SRP program. Joint permits between the BLM and Forest Service are issued by the Uncompahgre National Forest office while BLM-specific permits are issued by the UBRA office in Montrose.

Signing needs will be identified in the BLM annual work plan based on priority and relationship to overall CRMP objectives. Signs will be purchased by joint funding from the CRMP benefiting programs.

## IV.   MONITORING

The monitoring plan for the Mesa Creek CRMP will serve the primary function of identifying adverse changes in either resource or social conditions in the area.

Environmental analysis reports, recreation project plans, grazing season, plans, and proposals for all other types of activities and/or construction within the Mesa Creek CRMP area will be reviewed by all planning team members. Attempts will be made to assure that such projects conform to the CRMP's management direction and would be expected to result in achieving the desired conditions set forth in the plan.

All Special Recreation Permits applications and operating plans received for providing commercial services in the Mesa Creek CRMP will be reviewed by the area recreation planner to determine if the proposed activities have been planned in a way which meets the recreation management objectives of the CRMP and do not adversely affect the overall objectives of the plan.

16

Hunting outfitters' compliance with Special Recreation Permit stipulations will continued to be monitored by joint efforts between the BLM, USFS, and DOW. Any complaints regarding permitted outfitters will be turned over to BLM law enforcement rangers for investigation. Resource damage in dispersed areas caused by recreationists will be monitored by annual field surveys conducted by recreation staff and other resource specialist working in the area. Records of resource impacts will be kept as a means of determining what and when additional management actions need to be implemented to correct adverse conditions.

Field reviews will also be used to assess the impacts of increased use, new developments and/or signs on adjacent private lands, and other factors which could affect the naturalness of the Unaweep/Tabeguache Scenic and Historic Byway corridor. Where there is significant threat to the resources of the Byway, BLM will consult with other Byway partners to determine a course of action.

Information derived from Colorado Department of Highway's vehicle reports on Highway 141 will be updated and evaluated to determine existing and projected recreation use and demand in the CRMP area. Significant increases in traffic along the Byway may result in resource damage and increased demand for facilities as more people discover and utilize the area.

Increased patrols by BLM law enforcement and recreation staff during periods of peak use will promote visitor safety and resource protection along the Byway route.

# MESA CREEK CRMP

## TRANSPORTATION MANAGEMENT APPENDIX

## I. INTRODUCTION

Transportation Management Objectives

The primary objective in developing transportation-related management actions for the Mesa Creek CRMP is to accurately portray the transportation system needs for the area, which will meet current and projected use while accomplishing the overall CRMP management objectives.

### Background

A transportation plan was developed for the San Juan/San Miguel planning area in 1981 and incorporated into the San Juan/San Miguel Resource Management Plan (RMP) in 1985. A map developed for the planning process depicts the roads in the Mesa Creek CRMP area which were identified as part of the BLM's transportation system at that time.

The existing transportation plan and map identifies only those roads in the Mesa Creek area that are scheduled for regular maintenance. The plan, therefore, does not include many miles of unmaintained BLM roads, primitive ways (such as abandoned seismic lines), and trails in the Mesa Creek area.

17

BLM_0006656

Although many of the routes developed during the uranium boom years are not utilized today, a considerable number of them are used regularly by residents and visitors to the area. Range permittees use them for accessing their herd, and hauling water, feed, or emergency supplies.

These unmapped routes are also used by numerous recreationists, including off-highway vehicle motorists and hunters who use them to access remote sections of Mesa Creek and the surrounding area. Mountain bikers have discovered that these unmaintained routes offer challenging riding opportunities and that the numerous old mining spurs provide ready-made "loops" for trips of various length and difficulty.

The existing RMP transportation plan needs to be updated to include all the roads, trails, and routes within the CRMP area which the CRMP team determines are necessary for effective resource management in the Mesa Creek area.

## II.   MANAGEMENT ACTIONS

The following management actions related to transportation management will be coordinated with the CRMP team and implemented in order to meet the overall CRMP objectives.

### A.   Inventory

Conduct an inventory of the road, trails, and primitive routes (such as seismic lines) in the CRMP area which are not currently shown on the RMP transportation map using photos and/or on-the-ground methods.

### B.   Analysis

Analyze the inventory data and determine which roads are needed in the transportation plan to achieve the objectives of the CRMP.

### C.   Off-Highway Vehicle Designations

Determine the appropriate off-highway vehicle (OHV) designations, based on overall CRMP management objectives, for roads, trails, routes, and management emphasis areas such as riparian areas, critical wildlife habitat, etc.

### D.   Mapping

Map and catalog the roads, trails, and primitive routes determined to meet CRMP objectives as additions to the RMP transportation plan. Incorporate all OHV designations which pertain to the transportation system on the map, and identify all mapped or unmapped road, trails, or primitive routes which are no longer needed.

### E.   Construction and Maintenance

Determine maintenance and construction needs for the transportation system in the CRMP area. Set schedules for those road, trails, or routes requiring routine maintenance. Determine the most efficient, cost-effective means for closing, obliterating, and rehabilitating those transportation routes identified as unnecessary.

18

F.      Signing

Determine the type and number of signs needed to adequately identify the transportation system in the Mesa Creek CRMP area and inform users of the various OHV designations throughout the area.

## III.   IMPLEMENTATION

The CRMP team has identified the need to define and evaluate the current and projected future transportation needs within the Mesa Creek area as a high priority in developing a final plan. The transportation system, once defined, will provide a basis for subsequent management actions needed to be implemented to meet the overall CRMP objectives.

For the most part, the inventory will be done in 1993 by BLM staff using existing and/or new photos of the area. Some on-the-ground work will be required to ensure that any newly developed routes, not shown on the photos are included.

The CRMP team will evaluate the inventory data based on criteria such as need, maintenance feasibility, public access, type of current and projected use, location to specific management emphasis areas such as critical wildlife habitat, wood cutting areas, recreation sites, water developments, etc.

Team consensus will decide which routes will be added to or deleted from the San Juan/San Miguel RMP transportation plan, as well as the OHV designations, maintenance and construction priorities, and signing needs for the area.

Signing needs will be identified in the BLM annual work plan based on priority and relationship to overall CRMP objectives. Signs will be purchased by joint funding from the CRMP benefiting programs.

BLM will coordinate maintenance, construction, and road obliteration and rehabilitation projects with Zone Engineering as needed. While closure of some roads or areas may require large-scale earthmoving by heavy equipment, the majority of closures will be accomplished through signing, reseeding, small rock barricades, and other relatively inexpensive measures.

## IV.   MONITORING

The transportation map developed for the CRMP area will provide the basis for monitoring the number and kinds of roads, trails, and other routes in the Mesa Creek area. Over time, should additional routes develop or be proposed, the CRMP team will determine whether they meet any existing or newly identified need. If determined needed, the route will be added to the transportation plan and placed on the maintenance schedule if needed. Routes not needed will be closed, obliterated, and/or rehabilitated in the most efficient and cost-effective manner.

All new and existing signs in the Mesa Creek CRMP area will be included in the UBRA sign inventory. The location of signs will be placed on a map and copies of the map will be issued to law enforcement for routine patrol purposes. Resource specialists, permittees, highway department employees, and others who work in the Mesa Creek area will also be informed of the location of new signs so they can help monitor their effectiveness and presence.

BLM_0006658

# MESA CREEK CRMP

## WATER MANAGEMENT APPENDIX

Managing the various resources to achieve the CRMP objectives, in most cases, requires some consideration of water. Examples include: having reliable water sources strategically located to achieve adequate distribution of livestock, providing water in sufficient quantity and of high enough quality to supply the needs of wildlife and recreationists, having water available for fire suppression, and securing instream flows to protect riparian and aquatic ecosystems. Therefore, the objective of this Water Management Plan is to identify and satisfy, in a legally, technically and environmentally sound manner, the water needs necessary to achieve the CRMP objectives. To achieve the Water Management Plan objective the following actions will be taken:

The water needs necessary to successfully achieve the CRMP objectives will be identified by, and coordinated between, the management actions. At minimum water needs will define: the intended use, volume or flow rate needed, season of use, water quality limitations, and location.

Before new water sources are developed, a comprehensive review of existing water facilities will be conducted. Data sources available to conduct this review include: the MDO Water Source database, which has identified approximately 85 water sources or watershed improvement structures (Table 1), water source locations in the MDO-GIS system (Figure 1), the Rangeland Improvement Project System (RIPS), color-infra red aerial photography programmed in the FY 93 budget, and information obtained from personnel communication with public land users. The water source review will identify water reliability, water quantity and quality, location, source or development type, and maintenance needs. Seasonal employees would be the most logical means of conducting the water source review.

Where possible existing water sources or developments will be used to satisfy identified water needs. This may require retro fitting or maintaining existing water developments to meet the identified water requirements. Existing water developments that are either in a degraded condition, or identified as not needed to meet the CRMP objectives, will be reclaimed and/or stabilized to minimize additional environmental disturbance.

Where existing water facilities are inadequate to meet the identified water needs, the potential for new water source developments will be explored. In semi-arid environments, like the CRMP area, ground water sources are usually more reliable that water structures designed to retain surface runoff. Therefore, a hydrogeologic investigation of the CRMP area will be conducted to define aquifer characteristics such as: location, depth, yield and water quality. Instream flow surveys will be conducted by the MDO-BLM and flow recommendations made to the Colorado Water Conservation Board. Surface water facilities will be located and designed using the physical watershed characteristics, and standard hydrologic techniques to estimate precipitation/runoff characteristics. The Colorado State Office Engineering Section will be used for project survey.

Existing water sources will be reviewed to ensure compliance with Colorado state water law. New water sources and conversions (e.g., mineral exploration holes converted to water wells)

20

BLM_0006659

will have approved permits and water rights prior to development. Where applicable water sources will meet or exceed water quality standards. Water quality monitoring will be conducted, by the benefitting activity, as defined in BLM manual 9184 - "Drinking Water Supply".

ITINERARY - MESA CREEK CRMP
WATER MANAGEMENT PLAN

| | 1993 | | | | | | | | | | | 1994 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | J | F | M | A | M | J | J | A | S | O | N | D | J | F | M | A | M | J | J | A | S S |
| Water Needs ID | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - - |
| Review Existing Sources | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - - |
| Hydrogeologic Investigation | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - - |
| Legal Review | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - - |
| Instream Flow Survey | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - - |

All data associated with the implementation of this water management plan will be filled with this plan.

# MESA CREEK CRMP

## WEED MANAGEMENT APPENDIX

I.   **INTRODUCTION**

The Mesa Creek CRMP area has weeds like everywhere else. What, where, and how many they are and how they will effect the goals and objectives of the Mesa Creek CRMP remains to be seen. Therein lies the need for a weed management plan for this management area.

II.   **GOVERNMENT INTERRELATIONSHIPS**

FLPMA, the federal noxious weed act, and the national Historic Preservation Act all provide direction for the BLM to coordinate and act in harmony with appropriate state and county weed laws.

21

BLM_0006660

In this instance, BLM will coordinate weed management closely with the San Miguel Basin Weed Board that was formed pursuant to the Colorado State Weed Law (Colorado Revised Statutes §35-102-5.5, et. seq.) (Attachment 1).

State and county listed noxious weeds will be the weeds of concern on this management area in accordance with the San Miguel Basin Weed Advisory Commission Management Plan. (Attachment 2)

## III.    INTERRELATIONSHIP WITH OTHER RESOURCES

All resource activities in the Mesa Creek CRMP area will address the problem of noxious weeds in their site specific plans and take measures to prevent the introduction or spread of these weeds.

Examples:     Only weed free hay will be authorized for use in permitted guide and outfitter hunting camps.

All reservoir maintenance and new construction or any surface disturbing activities will be seeded with species appropriate to the objectives of the CRMP.

## IV.    MAPPING AND INVENTORY

Mapping of noxious weeds was started on the CRMP area in 1992. This effort will continue and probably be completed in 1993.

## V.    STRATEGIES

Invite an interested member of the San Miguel Basin Weed Board to participate in the CRMP Team. Emphasis will be placed on education (include weed reports in all P.R. and brochure type public documents); preventative measures - responsible land stewardship and cultural control. When the extent of infestation is known, an integrated weed management plan will be developed through the mapping process for the CRMP area to control the infestations as found necessary.

# MESA CREEK CRMP

## WILDLIFE APPENDIX

## I.    INTRODUCTION

Successful achievement of the Mesa Creek CRMP resource condition objectives established for the uplands (No. 1 & 2) and riparian areas (No. 3 & 4), will be attained in part, through implementing management actions to protect and enhance the wildlife resources.

22

BLM_0006661

The way in which other resources are managed will affect wildlife populations and their habitats. Examples include, but are not limited to: the timing, duration, and amount of grazing pressure on winter ranges of mule deer and elk will influence the abundance, condition, and locations of winter ranges, which in turn will influence the use patterns of deer and elk, and perhaps their reproductive potential or status; the number of water sources presence, their distribution and reliability will influence species occurrence and distributions; the degree of control, or the manner in which recreation use is regulated will influence the distribution and perhaps the well being of some populations; and the places where vegetative treatments occur and the results achieved will affect the habitat quality for some species.

Therefore, a high priority has been placed on developing strategies for wildlife management and identifying specific wildlife needs.

A.    Background

The San Juan/San Miguel RMP objectives for wildlife placed special emphasis on maintenance and enhancement of:

-    crucial habitats for big game, upland game birds and waterfowl,

-    crucial habitats for nongame species of special interest and concern to State and Federal Agencies, and

-    Habitat for State and Federally listed Threatened and (or) Endangered species (both plant and animal).

Also, from an ecosystem perspective it is important to have a bio-diversity goal to shoot for concerning wildlife. Such a goal for this area might be:

Manage the area to support a biologically diverse group of wildlife species appropriate for the existing environment, including HUMAN INFLUENCES, to create a sustainable, balanced but dynamic ecosystem, capable of satisfying a balance of our environmental, social, and economic needs, and expectations.

The bio-diversity which exists in this area now and the status of each species has been influenced, and ultimately controlled by their interactions, through time, with the environmental components which were present. The magnitude, frequency, and timing of natural events such as fires, floods, droughts, diseases epizootic, human influences, etc., with respect to the condition of the various populations at the time the events occurred, also, played a roll in shaping the species character of this ecosystem.

B.    Big Game Management Strategy

Historically the big game species in the Mesa Creek area, as well as other parts of Colorado and the West, have been the most important wildlife species from a social and economic standpoint, as well as being prominent members of the ecosystem structure. At present these species probably still hold these same values, and therefore, are considered among the key species.

The strategy proposed for managing mule deer, elk, turkey, and black bear on the Mesa Creek CRMP area is as follows (see attached map):

Area 1.a.    Manage primarily for wintering mule deer use.

23

Area 1.b.        Manage as a barrier to separate wintering mule deer use in  area 1 from wintering elk use in area 3; also, for winter and spring turkey use.

Area 1.c.        Manage primarily for wintering elk use; also, for turkey nesting, brooding, and wintering, and for spring and fall bear feeding areas.

Area 2.          Manage primarily for wintering mule deer and elk use.

Area 3.          Manage primarily for wintering elk use, then secondarily for wintering mule deer use.

### C.    Wildlife management objective

The specific wildlife management objective which will allow accomplishment of the CRMP resource condition objectives, the RMP objectives, and the overall bio-diversity goal for wildlife is:

1.      Enhance, maintain, create, and protect essential and crucial habitats of all key species of wildlife identified by the CRMP management group or by State or Federal Laws, or policies.

Existing BLM and CDOW wildlife inventory information will provide the basis for determining essential and crucial habitats for key species.  Essential and crucial habitats will include, birthing or nesting areas, breeding sites, wintering areas, thermal and escape cover, watering sites, etc.  Basically any area that is required by a species to complete it's life functions and maintain a healthy, viable population.  With this information the CRMP team will then coordinate the development of other resource plans considering specific needs of the wildlife species.

### II.    MANAGEMENT ACTIONS

At this time the following management actions relating to wildlife have been identified and will be coordinated with the CRMP team to accomplish the CRMP objectives.  Because the CRMP is designed to be dynamic, as new data becomes available from inventories and monitoring efforts new actions may be identified and implemented.

### A.    Big Game Species

Area 1.a.  Maintain good interspersion of Pinyon-Juniper and sagebrush, for thermal and escape cover, and winter feed respectively. Protect and maintain Pinyon-Juniper stands along sagebrush park edges and old age stands of Pinyon-Juniper, wherever they occur on ridge tops, ridge points, and along rimrocks .  Key mule deer wintering areas are Atkinson and Spring Creek Mesas.

-       manage for stands of sagebrush adjacent to Pinyon-Juniper edges, 200 feet wide, with crown densities of 35-50%, and medium-high vigor.

-       in sagebrush treatment projects create undulating edges and leave untreated blocks scattered throughout which are at least 100 feet wide.  Leave 20-30% of the sagebrush plants in the treated areas.

-       in Pinyon-Juniper treatment projects create undulating edges and leave untreated blocks scattered throughout which are no less than 200 feet thick.  The maximum distance to cover should be no more than 400 feet.  Leave a zone of Pinyon-Juniper along sagebrush park edges of at least 300 feet wide.

24

- treat no more than 20% of the sagebrush within 300 feet of Pinyon-Juniper edges in a 5 year period of time.

Area 1.b.  Maintain large blocks of Pinyon-Juniper for thermal and escape cover for all species present. Manage for and protect old age stands of Pinyon-Juniper on ridge tops and along rim-rocks, and acorn producing oak stands in canyon bottoms and on side slopes.  Protect and manage for Ponderosa Pine where possible.

- limit vegetative treatments in this area to existing sagebrush parks.  Create undulating edges and leave untreated blocks within if the treatment area is larger than 10 acres. Leave 20-30% of sagebrush plants in treatment areas.

Area 1.c.  Manage for and protect Ponderosa Pine stands, old age stands of Pinyon-Juniper, oak and mountain shrub stands, and small grassy openings along live streams and around seeps and springs.

- create openings within the Pinyon-Juniper stands 50-200 acres in size and spaced form 1/2-1 mile apart. Treatments should have undulating edges and shaped where the greatest distance to cover is no more than 900 feet.  Enough area should be treated at one time to eliminate high elk concentrations on any one area, causing over use and limiting success of the project.

- create openings of 5-20 acres, in dense side slope oak and mountain shrub stands to reduce crown density, rejuvenate productivity, and improve diversity of age and size class to encourage increased use by all species.

- create and maintain small grassy meadows of 1/2-2 acres in size and separated by 1/4-1/2 mile along live stream banks and seepy areas.

Area 2.  Maintain good interspersion of Pinyon-Juniper, sagebrush, and mountain shrubs.  Protect and maintain Pinyon-Juniper stands along sagebrush park edges and old age stands of Pinyon-Juniper wherever they occur on ridge tops, ridge points, and along rim-rocks.

- manage for sagebrush stands adjacent to Pinyon-Juniper edges no less than 100 feet wide, with crown densities of 35-50%, and medium-high vigor.

- manage for mountain shrub stands adjacent to and within Pinyon-Juniper stands with crown densities of 15-35%, and medium-high vigor.

- in sagebrush and mountain shrub treatment projects, create undulating edges and leave untreated blocks scattered through out which are at least 100 feet thick.  Leave 20-30% of the sagebrush plants in the treated areas.

- in Pinyon-Juniper treatment projects create undulating edges and leave untreated blocks scattered through which are no less than 100 feet thick.  The maximum distance to cover should be no more than 400 feet.  Leave a 300 feet wide strip of Pinyon-Juniper along sagebrush park edges.

- treat no more than 20% of the sagebrush within 300 feet of P-J edges in a 5 year period of time.

Area 3.  Maintain the current balance and interspersion of Pinyon-Juniper and sagebrush.  Protect old age stands of Pinyon-Juniper along sagebrush park edges, in the canyon headers and along rim-rocks for thermal cover.

25

BLM_0006664

-   create openings, with undulating edges and shapes, in Pinyon-Juniper stands of 50-200 acres in size and spaced form 1-1/2 miles apart. The maximum distance to cover should be no more than 900 feet.  Enough area should be treated at one time to avoid heavy elk use form occurring on any one area, causing over use and limiting success of the project.

### B.    Other Species & Riparian

Included in this group are nongame, special interest, T & E, and fish species.  The presence and well being of many of these species in this area is tied to, and dependent upon, the riparian systems. Healthy riparian systems provide the habitat diversity needed to support the desired bio-diversity of species.  Existing BLM, CDOW, and U.S. Fish & Wildlife Service data will be used to identify habitats, or potential habitats for these species.  This information will be coordinated with other resources for plan development.   T & E clearances will be required prior to any project implementation or development. Management actions for this group of species and riparian areas go hand and hand, and will be primarily of a protective nature.  Therefore, the most important management action for these concerns would be for the CRMP team to encourage only those uses in riparian areas that would be compatible with producing a healthy, properly functioning riparian system.

### C.    Inventory

Additional wildlife inventories will be conducted as needed to provide data necessary to integrate wildlife management needs with management considerations of the other resource disciplines.  At this time base line data needs include:

-   fish species and habitat inventories.

-   jurisdictional wetland classification and inventory

-   coordination with CDOW and U.S. Fish & Wildlife Service to consolidate existing data to identify some of the essential and crucial habitats of wildlife species.

-   low level imagery and CIR photography may be needed to aid further identification of essential or crucial habitats.

## III. IMPLEMENTATION

The CRMP team has identified wildlife needs as important and requiring immediate action.  Existing BLM and CDOW information is being used to identify essential and crucial habitats of key wildlife species, which at this time include; mule deer, elk, turkey, black bear, raptors, and T & E species. Aerial photography, SVIM data, soils data, and other vegetation data will help identify specific areas for each species to protect and enhance.

## IV.    MONITORING

At present wildlife monitoring should include:

-   continued big game population and distribution counts by CDOW,

-   winter bald eagle counts along the San Miguel River,

26

- periodic searches for peregrine falcon eyries,

- annual eyrie studies to determine success once eyries are located,

- deer and elk winter range evaluations for condition and utilization on key areas.

Additional monitoring may be necessary as development of this CRMP progresses. Also, the schedule for monitoring has not been finalized. An assessment will be made to determine the frequency needed for specific monitoring studies.

# MESA CREEK CRMP

## WOODLAND MANAGEMENT APPENDIX

## I. INTRODUCTION

The primary woodland management objective for the Mesa creek CRMP area is to provide woodland products, such as firewood, posts, and Christmas trees for personal and commercial use. The resource condition objective for the uplands is to change the plant composition on forty percent (40%) of the pinon-juniper ecological sites (on slope less than thirty percent (30%)) and on sites below 6800 feet in elevation to achieve a minimum basal cover of eight-ten percent (8-10%) perennial live vegetation. The resource condition objective will be attained, at least partially, by the sale or free-use of woodland products. Additional areas may need to be treated by fire, mechanical, livestock, or other technological means to achieve the condition objective.

## II. MANAGEMENT ACTIONS

The following management actions related to woodland management will be coordinated with the CRMP Team to meet the overall CRMP objectives.

### A. Inventory

Conduct an inventory of the woodlands resource utilizing existing data, aerial photos, and analysis of topographic/slope GIS data. Conduct a market analysis for woodland products in the region.

### B. Analysis

Determine sites where vegetative response is most likely to achieve condition objectives and develop a management action strategy to accomplish the condition objectives as well as meeting the woodland product demand.

BLM_0006666

**C.**     Marketing

Develop a marketing plan on which areas can use commercial and individual sales to accomplish condition objectives and which areas might require alternative or creative marketing devices such as free-use. Treatment of woodland areas by harvesting woodland products would be preferable to methods of treatment where no products are obtained by the public.

**D.**     Treatments

Develop a treatment plan on areas which cannot provide a product for use by the public. Methods of treatment would include fire, livestock, herbicide, and/or mechanical treatment. Treatments would require an external funding source from such groups as BLM, Grazing Advisory Board, Rocky Mountain Elk Foundation and Division of Wildlife. The plan would also contain a strategy for obtaining these funds.

## III.     IMPLEMENTATION

The CRMP Team has identified vegetative treatments within Mesa Creek as important but not an action that must be done immediately. Other baseline inventory information such as the transportation system, wildlife information, livestock grazing plans, and water management plans were identified by the CRMP Team as requiring immediate action and development.

For the most part, the inventory work will begin in 1994 as aerial photography is obtained. Preliminary work will also be done using the Geographical Information System relating to slope and topography. A marketing strategy will begin to be developed immediately in response to public demand for woodland products. A critical element of selling woodland products will be having an adequate transportation plan for access to the sites.

## IV.     MONITORING

The monitoring plan for the Mesa Creek CRMP will serve the primary function of identifying changes in either resource or social conditions in the area. This includes vegetation studies to monitor the impacts of pinion-juniper removal, as well as studies to assess impacts to the woodlands resource itself. The marketing analysis will also monitor efforts to provide woodland products for the local economy.

28

BLM_0006667

# MESA CREEK CRMP

## HAZARDOUS MATERIALS MANAGEMENT

### I.    INTRODUCTION

The primary objective for HMM is to identify sources and sites where the threat of a hazardous material release or a release threatens public health and safety or the environment.  The purpose is to reduce the BLM's polluting activities on the land.

### II.    MANAGEMENT ACTIONS

**A.    Inventory**

1.    Conduct inventories to identify mine operations, sites, dumps, and other places that are causing air, soil, or water contamination.

2.    Inventories shall include oil and gas drill sites and related facilities, including pipelines and other transportation facilities.

3.    Further, inventories of all ROW's that could be release sites with pollution potential including complete review of all land uses contributing to the waste stream.

**B.    Analysis**

1.    Determine and prioritize sites for cleanup that are releasing pollutants to pathways.

2.    Isolate and control access to sites during cleanup and rehabilitation.  Prevent all surface uses until such time as the rehabilitated site is capable of supporting surface uses again.

**C.    Marketing**

Public input would be secured in the NEPA process and the CRMP team.  It is likely economic benefits may occur as sites are cleaned up.

**D.    Implementation**

1.    Funding would occur through the Bureau's normal budget process.  We will start an inventory process in 1993 and continue to end in 1997.

2.    Contracting will play a role and costs will be identified early in the process.

**E.    Monitoring**

Long term care may be required and all surface uses may be excluded permanently. This monitoring would require coordination with all activities during NEPA.

BLM_0006668

. LIST OFF REST RECORD_ID,SOURC_NAME,DIV_TOWNSH,DIV_RANGE,DIV_SECT,BROAD_DEV,SPECII
3,2)="36"

| RECORD_ID | SOURC_NAME | DIV_TOWNSH | DIV_RANGE | DIV_SECT | BROAD_DEV | SPECIF_DEV |
|---|---|---|---|---|---|---|
| B-570 | ROUGH BENCH 8 | 48N | 17. W | 29 | T | 7 |
| B-571 | N BENCH RSV 1 | 48N | 18. W | 24 | T | 7 |
| B-572 | N BENCH RSV 1 | 48N | 18. W | 25 | T | 7 |
| B-573 | N BENCH RSV 1 | 48N | 18. W | 24 | T | 7 |
| F | UPPER ANTHILL SPG | 49N | 17. W | 1 | S | 8 |
| B | LWR ANTHILL SPG | 49N | 17. W | 1 | S | 8 |
| D-283 | ATKINSON WINDMILL | 48N stock well | 18. W | 13 | A | 6 |
| F-288 | EARLY SPG | 48N | 17. W | 7 | S | 8 |
| F-289 | AIR PLANT SPG | 48N | 18. W | 14 | S | 8 |
| F-290 | TWO OWL SPG | 48N | 18. W | 23 | S | 8 |
| F-406 | RIVR ROAD SEEP | 48N | 17. W | 30 | S | 8 |
| F-407 | CONEJO SPG | 48N | 17. W | 15 | S | 8 |
| F-410 | CAMPBELL POINT SPG | 49N | 16. W | 6 | S | 8 |
| F-411 | AMES BENCH SPG RSV | 49N | 17. W | 1 | T | 8 |
| F-431 | OLD CHIMNEY SPG | 48N | 17. W | 21 | S | 8 |
| F-435 | MOON CYN SPG | 49N | 17. W | 16 | S | 8 |
| F-436 | LA LUNA SPG | 49N | 17. W | 16 | S | 8 |
| F-437 | MOONY SPG | 49N | 17. W | 10 | S | 8 |
| F-438 | GOOD SHERI SPG | 49N | 17. W | 15 | S | 8 |
| F-439 | DRY FK MESA CR SPG | 49N | 17. W | 34 | S | 8 |
| F-440 | E MESA CRK SPG | 48N | 17. W | 2 | S | 8 |
| F-453 | SAUCER BASIN SPG | 47N | 17. W | 6 | S | 8 |
| F-454 | HIEROGLYPHIC CYN S | 48N | 17. W | 34 | S | 8 |
| F-457 | ATKINSON MESA 3 | 48N | 17. W | 2 | Z | 6 |
| F-458 | ATKINSON MESA 2 | 49N | 16. W | 31 | T | 7 |
| F-459 | ATKINSON MESA 2 | 49N | 16. W | 31 | T | 7 |
| F-460 | ATKINSON MESA 2 | 49N | 16. W | 31 | T | 7 |
| F-461 | ROUGH BENCH PND 4 | 49N | 17. W | 34 | T | 7 |
| F-463 | ATCHESON RSVR 3 | 48N | 17. W | 16 | T | 7 |
| F | ATKINSON MESA PD 5 | 48N | 17. W | 17 | T | 7 |
| F | ATKINSON MESA PD 6 | 48N | 17. W | 19 | T | 7 |
| F-466 | ATCHESON RSVR 1 | 48N | 17. W | 18 | T | 7 |
| F-467 | LONG MESA PNDS 2 | 49N | 17. W | 32 | T | 7 |
| F-468 | LONG MESA PNDS 2 | 49N | 17. W | 32 | T | 7 |
| F-469 | LONG MESA PNDS 2 | 49N | 17. W | 32 | T | 7 |
| F-470 | LONG MESA PND 3 | 49N | 17. W | 31 | T | 7 |
| F-471 | LONG MESA PNDS 2 | 49N | 17. W | 32 | T | 7 |
| F-472 | CRAIG RSVR 2 | 48N | 17. W | 3 | T | 7 |
| F-479 | ROUGH BENCH 7 | 48N | 17. W | 19 | T | 7 |
| F-480 | ROUGH BENCH 7 | 48N | 17. W | 19 | T | 7 |
| F-481 | ROUGH BENCH PNDS 3 | 48N | 18. W | 11 | T | 7 |
| F-482 | ROUGH BENCH PNDS 3 | 48N | 18. W | 11 | T | 7 |
| F-483 | ROUGH BENCH PNDS 3 | 48N | 18. W | 11 | T | 7 |
| F-484 | ROUGH BENCH PNDS 5 | 48N | 18. W | 12 | T | 7 |
| F-485 | ROUGH BENCH PNDS 5 | 48N | 18. W | 13 | T | 7 |
| F-486 | ROUGH BENCH PNDS 5 | 48N | 18. W | 13 | T | 7 |
| F-487 | ROUGH BENCH PNDS 5 | 48N | 18. W | 13 | T | 7 |
| F-488 | ROUGH BENCH PNDS 5 | 48N | 18. W | 13 | T | 7 |
| F-489 | ROUGH BENCH PNDS 5 | 48N | 18. W | 13 | T | 7 |
| F-490 | ROUGH BENCH PNDS 5 | 48N | 18. W | 13 | T | 7 |
| F-491 | ROUGH BENCH PNDS 5 | 48N | 18. W | 13 | T | 7 |
| F-492 | WIND VAC PUMP WELL | 48N | 17. W | 7 | A | 3 |
| F-493 | STOCK TANK | 48N | 17. W | 7 | T | 7 |
| F-528 | CLUB BENCH RSV 3 | 47N | 17. W | 5 | T | 7 |
| F 3 | CLUB BENCH RSV 3 | 47N | 17. W | 5 | T | 7 |
| F | CLUB BENCH RSV 3 | 47N | 17. W | 5 | T | 7 |
| F-599 | SHORT DRAW SPG | 48N | 18. W | 15 | S | 8 |
| F-600 | SLOW GO SPG | 48N | 18. W | 23 | S | 8 |
| F-601 | CRAIG RSVR 1 | 48N | 17. W | 8 | T | 7 |

S=Diversion Source   D=Source

```
. GOTO TOP
. LIST OFF  REST RECORD_ID,SOURC_NAME,DIV_TOWNSH,DIV_RANGE,DIV_SECT,BROAD_DEV,SPECI
8,2)="36".
```

| RECORD_ID | SOURC_NAME | DIV_TOWNSH | DIV_RANGE | DIV_SECT | BROAD_DEV | SPECIF_DEV |
|---|---|---|---|---|---|---|
| B-574 | ATKINSON CRK SPG | 48N | 17. W | 15 | S | 8 |
| B-769 | STK TANK | 46N | 18. W | 12 | T | 7 |
| B-788 | INCA CK DAM | 48N | 16. W | 4 | T | 7 |
| B | IRON CK DAM | 48N | 16. W | 4 | T | 7 |
| B | SPG CRK RSV 4 | 48N | 17. W | 13 | T | 7 |
| B-791 | SPG CRK RSV 1 | 48N | 17. W | 27 | T | 7 |
| B-792 | SPG CRK RSV 2 | 48N | 17. W | 27 | T | 7 |
| B-793 | SPG CRK RSV 5 | 48N | 17. W | 27 | T | 7 |
| F-405 | HOG POINT WELL | 48N | 17. W | 14 | A | 5 |
| F-427 | BLUE SPGS POINT SP | 48N | 17. W | 23 | S | 8 |
| F-428 | HOG PK SEEP N POND | 48N | 17. W | 14 | S | 8 |
| F-429 | HOG PARK WASH SPG | 48N | 17. W | 14 | S | 8 |
| F-430 | LWR HOG PK WASH SP | 48N | 17. W | 22 | S | 8 |
| F-434 | BY THE BURN STKPND | 48N | 17. W | 2 | T | 7 |
| F-441 | BULL DRAW SPG | 49N | 16. W | 31 | S | 8 |
| F-448 | STEER SIDE SPG PND | 46N | 18. W | 24 | S | 8 |
| F-450 | YUCCA RSVR | 46N | 18. W | 15 | T | 7 |
| F-455 | AIRSTRIP WELL | 48N | 17. W | 25 | A | 6 |
| F-473 | SPRING CRK RSVR | 48N | 17. W | 24 | T | 7 |
| F-474 | TABEGUACHE WELL 1 | 47N | 17. W | 1 | W | 3 |
| F-475 | TABGUACHE WELL 2 | 47N | 17. W | 1 | W | 3 |
| F-494 | MONOGRAM MESA RSVR | 46N | 17. W | 20 | T | 7 |
| F-495 | CALF SPG | 46N | 18. W | 23 | E | 8 |
| F-497 | COTTER MINE PUMP | 46N | 17. W | 30 | Z | 3 |

BLM_0006670





**United States Department of the Interior**
Bureau of Land Management
Montrose District
Colorado

February 1993

# GUNNISON RESOURCE AREA

**Record of Decision,**
**Approved Resource Management Plan,**
**and Rangeland Program Summary**











BLM_0006671



# United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Montrose District Office
2465 South Townsend
Montrose, Colorado 81401



IN REPLY REFER TO:

February, 1993

Dear Reader:

This document is a copy of the Record of Decision, the approved Resource Management Plan, and the Rangeland Program Summary for the Gunnison Resource Area. This Record of Decision approves the Bureau of Land Management decisions in the Resource Management Plan, Chapter Two of this document, for managing approximately 585,012 acres of BLM-administered surface acres and 726,918 acres of BLM-administered mineral estate in the Gunnison Resource Area.

This Resource Management Plan has been approved in the Record of Decision as the land use plan for the Gunnison Resource Area for the next 10-12 years. The decisions in the plan will guide all future uses and activities within the Gunnison Resource Area.

The Rangeland Program Summary is included in this document in Chapter Three. The Rangeland Program Summary describes and summarizes the livestock grazing management and related decisions that are contained in the land use plan, the rangeland resource management objectives for the Gunnison Resource Area, and the actions intended to achieve those objectives.

This document has been sent to all recipients of the Proposed Resource Management Plan and Final Environmental Impact Statement published in April, 1992. Copies of this document are available by contacting the BLM at the Gunnison Resource Area, 216 North Colorado, Gunnison, Colorado 81230 (303)641-0471, the Montrose District Office, 2465 South Townsend Avenue, Montrose, Colorado 81401 (303)249-7791, or the Colorado State Office, 2850 Youngfield Street, Lakewood, Colorado 80215-7076 (303)239-3670.

We appreciate the input, cooperation, and assistance from the public and land users during the planning process, and are pleased to provide this copy for your reference and use. Please contact BLM at the Gunnison office for further assistance or information regarding the plan.

Sincerely yours,

Alan L. Kesterke
District Manager

BLM_0006672

# GUNNISON RESOURCE AREA
# RECORD OF DECISION,
# APPROVED RESOURCE MANAGEMENT PLAN, AND
# RANGELAND PROGRAM SUMMARY

## FEBRUARY, 1993

**Prepared by:**
United States Department of the Interior
Bureau of Land Management
Colorado State Office
Montrose District
Gunnison Resource Area

BLM_0006673

# TABLE OF CONTENTS

**RECORD OF DECISION FOR THE GUNNISON RESOURCE
MANAGEMENT PLAN** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i
        Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i
        Alternatives considered In The Draft Resource
        Management Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i
        Resolution Of Protests Received On The Proposed
             Resource Management Plan/Final EIS . . . . . . . . . . . . . . . ii
        Implementing And Monitoring Decisions . . . . . . . . . . . . . . . . . . . ii
        Maintaining And Amending Decisions . . . . . . . . . . . . . . . . . . . . . ii
        Public Involvement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii
        Consistency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii
        Availability Of This Document . . . . . . . . . . . . . . . . . . . . . . . . . iii
        State Director's Signature . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**CHAPTER ONE:   INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
        Planning Area For The RMP . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
        Relationship To The Bureau Planning System . . . . . . . . . . . . . . . 1-1
        Distribution Of The RMP . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-1
        Public Involvement And Coordination . . . . . . . . . . . . . . . . . . . . 1-1
        Changes To The Text Of The RMP And PRMP . . . . . . . . . . . . . 1-5
        Implementing And Monitoring The RMP Decisions . . . . . . . . . . . 1-6
        Maintaining And Amending Decisions . . . . . . . . . . . . . . . . . . . . 1-6
        Activity Plans And Future Environmental Documentation . . . . . . . 1-7

**CHAPTER TWO:   DESCRIPTION OF THE APPROVED
                RESOURCE MANAGEMENT PLAN** . . . . . . . . . . . . . . . . . . . 2-1
        Development And Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . 2-1
        Standard Management For The Resource Management Plan . . . . . 2-1
        Management Unit Prescriptions For The Resource
             Management Plan (Units 1-16) . . . . . . . . . . . . . . . . . . 2-19

**CHAPTER THREE: RANGELAND PROGRAM SUMMARY** . . . . . . . . . . . . . . . . 3-1
        Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-1
        Rangeland Program Summary Updates . . . . . . . . . . . . . . . . . . . 3-1
        Consultation, Coordination, And Cooperation . . . . . . . . . . . . . . . 3-1
        Livestock Grazing Management Decisions From
             Standard Management, Chapter Two . . . . . . . . . . . . . 3-2
        Livestock Grazing Management Decisions From
             Management Unit Prescriptions, Chapter Two . . . . . . . . . 3-8

**APPENDIXES**
    A:   Wildlife Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1
    B:   Livestock Grazing Management . . . . . . . . . . . . . . . . . . . . . . . . B-1
    C:   Preparation, Updating, Or Revision Of Activity Plans
        In The Resource Management Plan . . . . . . . . . . . . . . . . . . . . . C-1
    D:   Disposal Tracts, Acquisition Criteria, Rights-of-Way
             Corridors - Lands And Realty . . . . . . . . . . . . . . . . . . . . . . . . D-1
    E:   Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . E-1
    F:   Recreation Management And Off-Highway Vehicle Designations . . . . . . . . F-1
    G:   Fire Suppression . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G-1
    H:   Designated Areas Of Critical Environmental Concern . . . . . . . . . . . . . . H-1

BLM_0006674

I:      Soils and Water Resources   ................................. I-1
J:      Proposed Instream Flow Appropriations ........................ J-1
K:      Oil and Gas Stipulations .................................... K-1

## TABLES, LISTS, AND MAPS

### Tables And Lists

2-1     MANAGEMENT UNIT ACRES AND VALUES IN THE APPROVED RESOURCE
        MANAGEMENT PLAN  ...................................... 2-3

3-1     PARTIAL SUMMARY OF LIVESTOCK GRAZING PROGRAM
        BY ALLOTMENT ......................................... 3-16

3-2     CATEGORY "I" ALLOTMENT PRIORITIZATION FOR
        ACTIVITY PLAN DEVELOPMENT/REVISION ..................... 3-19

A-1     CDOW LONG RANGE HERD GOALS ........................... A-1

A-2     LONG-RANGE ELK HERD GOALS ON PUBLIC LANDS WITHIN THE
        PLANNING AREA ........................................ A-1

A-3     LONG-RANGE DEER HERD GOALS ON PUBLIC LANDS WITHIN THE
        PLANNING AREA ........................................ A-1

A-4     ELK AND DEER INTERIM HERD GOALS ON PUBLIC LANDS WITHIN THE
        PLANNING AREA ........................................ A-1

A-5     MANAGEMENT UNIT NUMBERS KEYED TO CDOW GAME MANAGEMENT
        UNIT NUMBERS IN THE PLANNING AREA ..................... A-2

        GUIDELINES FOR SAGE GROUSE HABITAT MANAGEMENT ........... A-2

        NON-GAME MANAGEMENT IN TIMBER MANAGEMENT AREAS ........ A-3

A-6     MITIGATION FOR BIRDS OF PREY HABITAT  .................. A-4

A-7     ALLOTMENTS WHERE A CHANGE IN KIND OF LIVESTOCK
        WILL OCCUR  .......................................... A-5

        RANGE READINESS CRITERIA FOR THE GUNNISON RESOURCE AREA  ... B-1

B-1     INDICATORS OF VEGETATIVE READINESS-SEASON LONG RANGE  ...... B-2

B-2     LIVESTOCK GRAZING MANAGEMENT ALLOTMENT DATA ............ B-4

        PREPARATION, UPDATING, OR REVISION OF ACTIVITY PLANS
        IN THE RESOURCE MANAGEMENT PLAN ...................... C-1

        RESOURCE MANAGEMENT PLAN CATEGORY I DISPOSAL TRACTS ...... D-1

E-1     AREAS TARGETED FOR ACCESS IN THE APPROVED RESOURCE
        MANAGEMENT PLAN  ..................................... E-1

BLM_0006675

F-1     DESIGNATED OFF-HIGHWAY VEHICLE ROUTES FOR THE GUNNISON
        RESOURCE MANAGEMENT PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-1

I-1     TARGET % BASAL COVER DENSITIES TO BE ACHIEVED FOR
        WATERSHED NEEDS AND PROTECTION ON SOILS WITH A
        MODERATE TO SEVERE EROSION POTENTIAL . . . . . . . . . . . . . . . . . . . . . . I-1

J-1     PROPOSED INSTREAM FLOW APPROPRIATIONS FOR
        FISHERY STREAMS - GUNNISON RESOURCE MANAGEMENT PLAN . . . . . . J-1

K-1     SUMMARY OF FEDERAL OIL, GAS AND GEOTHERMAL
        STIPULATIONS BY TYPE, MANAGEMENT UNIT, AND ACRES
        EFFECTED IN THE APPROVED RESOURCE MANAGEMENT PLAN . . . . . . . . K-1

        OIL AND GAS STIPULATIONS FOR THE APPROVED
        RESOURCE MANAGEMENT PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . K-2


**Maps**

1-1     General Location Map  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2

1-2     Resource Area and Planning Area Detail . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-3

A-1     Crucial Elk and Deer Winter Range In The Planning Area . . . . . . . . . . . . . . . A-6

A-2     Bighorn Sheep Range In The Planning Area  . . . . . . . . . . . . . . . . . . . . . . . . . A-7

A-3     Pronghorn Antelope Range In The Planning Area . . . . . . . . . . . . . . . . . . . . . . A-8

D-1     Rights-Of-Way Corridors - APPROVED RESOURCE
        MANAGEMENT PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-3

D-2     Rights-Of-Way Avoidance, Exclusion Areas, And Areas Open To
        Rights-Of-Way In A Portion Of The APPROVED RESOURCE
        MANAGEMENT PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . D-4

F-1     Off-Highway Vehicle Use - Limited Areas - APPROVED RESOURCE
        MANAGEMENT PLAN  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-3

F-2     Designated Routes, Unit 8, S. Beaver Creek Designated
        ACEC - APPROVED RESOURCE MANAGEMENT PLAN . . . . . . . . . . . . . . . F-4

F-3     Off-Highway Vehicle Use - Closed Areas - APPROVED RESOURCE
        MANAGEMENT PLAN  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-5

F-4     Special Recreation Management Areas In The Planning Area  . . . . . . . . . . . . . . F-6

G-1     Wildfire Suppression Areas - APPROVED RESOURCE
        MANAGEMENT PLAN  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . G-1

H-1     Designated ACECs - APPROVED RESOURCE MANAGEMENT PLAN . . . . . . . . H-1

BLM_0006676

K-1    No Surface Occupancy Oil & Gas Stipulations - APPROVED
       RESOURCE MANAGEMENT PLAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . K-6

K-2    Oil & Gas Timing Limitations - APPROVED RESOURCE
       MANAGEMENT PLAN   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . K-7

K-3    Controlled Surface Use Stipulations - APPROVED RESOURCE
       MANAGEMENT PLAN   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . K-8

       Map Of The Proposed Resource Management Plan . . . . . . . . . .   Inserted In Document

BLM_0006677

# MAP LIST

Proposed Resource Management Plan

BLM_0006678

# RECORD OF DECISION FOR THE
# GUNNISON RESOURCE MANAGEMENT PLAN

The purpose of this Record of Decision document (ROD) is to approve the Bureau of Land Management (BLM) decisions to manage the approximately 585,012 surface acres and 726,918 acres of mineral estate within the Gunnison Resource Area. These decisions, in Chapter Two of this document, will guide management for the next 10 to 12 years.

## DECISION

This ROD, which approves the resource management plan (RMP) for the Gunnison Resource Area, fulfills the requirements of the Federal Land Policy and Management Act (FLPMA) of 1976 (43 CFR 1600). The Gunnison Draft RMP and Environmental Impact Statement (DRMP) was published in March, 1991, and the Gunnison Proposed RMP and Final EIS (PRMP) was published in April, 1992, in compliance with the National EnvironmentAl Policy Act (NEPA) of 1969. Chapter Two of this document contains the same decisions as the PRMP, with the changes noted on pages 1-5 and 1-6 in Chapter One, and other clarifying changes that have been made. The decisions in Chapter Two of this document will guide all future uses and activities within the resource area.

## ALTERNATIVES CONSIDERED IN THE DRAFT RESOURCE MANAGEMENT PLAN

Five land use management alternatives were considered and analyzed in the Draft Resource Management Plan/Environmental Impact Statement (DRMP) for the public lands in the Gunnison planning area: Alternatives A (Continuation of Current Management or no Action Alternative), B, C, D, and E (the Preferred Alternative).

Alternative A, the Continuation of Current Management, or No Action Alternative, was developed using available inventory data, existing activity or project plans for a variety of resource programs, existing planning documents, and established land use allocations. This alternative would have continued multiple use management in much the same manner as is now being accomplished. The current rate of accomplishment of these activities and decisions would have continued. Alternative objectives for Alternative B, C, and D were developed by using the objectives that were developed for the Resource Capability Analysis (RCA) portion of the Management Situation Analysis (MSA). The information regarding each affected resource in the RCA was then used to rank BLM-managed resources/resource uses according to their ability to meet, or contribute to, the objectives for Alternatives B, C, and D. During the writing of these alternatives, the resource that was ranked highest generally took precedence over all other resources for management priority, the second-ranked resource took next precedence, and so on. Resource program functions which are of a support nature were considered in alternative formulation, but they did not effect resource ranking.

Under **Alternative B**, the BLM considered objectives to emphasize and/or be compatible with those resources which promote recreational opportunities and increase tourism as well as to promote economic stability and quality of life within the planning area. Under Alternative B, the BLM assumed that any resource use or activity would not be limited or restricted so long as it did not impair or diminish the recreational and/or tourism qualities. Modifications to existing management levels could have included increases or decreases, depending on the resource and its compatibility with this alternative objective.

Under **Alternative C**, the BLM considered objectives that called for a high degree of resource production and economic return. The natural environment would be maintained, protected, and/or enhanced at a level that is compatible with and not unreasonably restrictive of, the production, harvest, or extraction or use of renewable/non-renewable resources. Legislative mandates would be met.

Under **Alternative D**, the BLM considered objectives that called for a degree of resource management that would have provided a high degree of protection, enhancement, and maintenance for natural values, over and above that which is required by legislation, and the existing management situation. Under

i

RECORD OF DECISION

Alternative D, the BLM assumed that renewable and non-renewable production levels would be sustained at a level appropriate to natural values management, but would not necessarily be limited or unreasonably restricted.

**Alternative E, the Preferred Alternative**, was developed based on an examination of the objectives and environmental impacts of the other alternatives, issues raised throughout the planning process, specific environmental values and resources/resource uses, conflict resolution, public input, and laws and regulations. This alternative was developed by the Area Manager and planning team members, and represented the mix and variety of actions that, in the opinion of the preparers, best resolved the issues and management concerns that drove the preparation of the RMP.

The management described in the proposed plan that was published in April, 1992, was essentially that contained in Alternative E, with modifications as a result of internal review and public input gathered during the comment period on the DRMP.

## RESOLUTION OF PROTESTS RECEIVED ON THE PROPOSED RESOURCE MANAGEMENT PLAN/FINAL ENVIRONMENTAL IMPACT STATEMENT

The BLM responded to three protest letters regarding the Proposed Resource Management Plan and Final Environmental Impact Statement (PRMP). Those protests are addressed in Chapter One of this document.

## IMPLEMENTING AND MONITORING DECISIONS

Decisions in this plan will be implemented over a period of years and must be tied directly to the BLM budgeting process. A plan and schedule to implement the RMP will be developed and signed by the district manager within 90 days of the signing of this ROD. This plan and schedule will provide for the systematic accomplishment of all decisions in the approved RMP. Decisions will be continuously monitored to ensure necessary tracking and subsequent integration into the budget system occur on a timely basis. All decisions will be reviewed periodically to ensure that decisions are being implemented and that monitoring is occurring in a timely fashion, and according to plan. The status of each decision will be documented during these reviews in order to communicate, among other information, important implementation data and reasons why scheduled decisions are not implemented. Periodical assessments of the decisions within this plan will be completed by the district manager and forwarded to the state office.

## MAINTAINING AND AMENDING DECISIONS

Decisions in this plan will be continually maintained to reflect minor changes in information. Maintenance is limited to refining or further clarifying a plan decision and cannot expand the scope of a decision nor change the terms or conditions of a decision. Maintenance will be documented in supporting records. Plan decision amendments may become necessary if major changes are needed or if a large number of maintenance refinements occur. Plan decision amendments are accomplished according to a defined process in the BLM planning regulations, which includes public input and an environmental analysis.

## PUBLIC INVOLVEMENT

The views and concerns of the public were actively solicited throughout this planning process. Public participation is summarized in Chapter one of this document.

## CONSISTENCY

This plan is consistent with the plans, programs, and policies of other Federal, state, and local governmental agencies as well as those of the U.S. Department of the Interior.

ii

BLM_0006680

## RECORD OF DECISION

### AVAILABILITY OF THIS DOCUMENT

Copies of the Gunnison ROD/approved RMP are available from the Bureau of Land Management, c/o the Gunnison Resource Area, 216 North Colorado Street, Gunnison, Colorado 81230 , c/o the Montrose District, 2465 South Townsend Avenue, Montrose, Colorado 81401, and c/o the Colorado State Office (CO-912), 2850 Youngfield Street, Lakewood, CO 80215.

_Bob Moore_

Colorado State Director
Bureau of Land Management

February 5, 1993

Date

iii

# CHAPTER ONE

# INTRODUCTION

This Record of Decision (ROD), Approved Resource Management plan (RMP), and Rangeland Program Summary (RPS) document contains the land use decisions, generally expressed as actions, terms, or conditions, that will guide management of resources on Bureau of Land Management (BLM) administered lands within the Gunnison Resource Area (GRA). All future uses and activities within the GRA will conform to the decisions described in Chapter Two of this document. The RPS describes the livestock grazing management program that will be implemented in the planning area during the life of the plan.

This document has been prepared in accordance with Section 202 of the Federal Land Policy and Management Act of 1976 (FLPMA), the National Environmental Policy Act (NEPA), the BLM planning regulations issued under the authority of FLPMA (43 CFR 1600), and other BLM guidance. The decisions in the RMP will replace all land use planning guidance in the Gunnison Basin and the American Flats/Silverton Management Framework Plans, or MFPs (and as amended in 1978 and 1979). The RMP will replace all other related documents that direct land and minerals management within the GRA.

## PLANNING AREA FOR THE RMP

The planning area for the RMP contains a total of 960,730 acres and is located within the BLM's Montrose District, in southwest Colorado. The planning area contains approximately 585,012 acres of BLM-administered lands and 726,918 acres of federal mineral estate within parts of Hinsdale, Gunnison, Saguache, Montrose, and Ouray counties. A folded map accompanying this RMP depicts the Gunnison planning area, the boundary of the GRA, Category I disposal tracts, boundaries and labels for Management Units 1-16, and other physical features.

## RELATIONSHIP TO THE BUREAU PLANNING SYSTEM

Development of this RMP document, and the previously prepared or published related documents, has occurred within the framework of the BLM planning system. Planning operations within the BLM is divided into three distinct tiers: policy planning, land use planning, and activity planning. The completion of this RMP document satisfies the requirements for the land use planning tier of the BLM planning system.

Refer to Appendix C for a consolidated listing of activity plans that would be updated or prepared during implementation of this RMP. Where appropriate, integrated, multi-resource activity level plans would be encouraged and prepared, in lieu of individual resource activity level plans.

## DISTRIBUTION OF THE RMP

This RMP will be distributed to all addressees who have been involved in the land use planning process. The mailing list contains approximately 555 addressees. The mailing list is available for examination at the GRA or the Montrose District office by interested parties. Copies of this ROD and RMP are available at the BLM offices noted in the accompanying ROD.

## PUBLIC INVOLVEMENT AND COORDINATION

Throughout the preparation of this RMP concerns and interests of all publics were addressed in a variety of public participation activities. The area manager, team leader, and team members met with county commissioners, environmental and interest groups, the Montrose District Advisory Council, the Montrose District Grazing Advisory Board, and other concerned citizens.

BLM_0006682

CHAPTER TWO



**COLORADO**

**General Location of the Gunnison Resource Area**

Map 1-1
General Location Map

1-2

BLM_0006683

INTRODUCTION



**Map 1-2**
**Resource Area and Planning Area Detail**

1-3

BLM_0006684

## CHAPTER ONE

The Montrose District Multiple Use Advisory Board and Grazing Advisory Board has been kept apprised of the RMP progress and their comments and recommendations have been solicited.

Coordination with other agencies and assurance that the RMP is consistent with other plans was accomplished through communication and cooperative efforts between the BLM and involved federal, state, and local agencies and organizations. Bureau of Land Management personnel have met with county planners and commissioners to promote greater understanding of goals, objectives, and resources of both the counties and the BLM.

On September 15, 1988, a Notice of Intent was published in the Federal Register. This notice formally informed the public of the beginning of the planning process. At the same time, the first of two newsletters was sent to individuals, organizations, agencies, special interest groups, the media, business interests, and academic institutions inviting them to participate in the planning process. The general public was informed through news releases.

The contents of the first newsletter included an invitation for all publics to attend a series of afternoon and evening informal open houses held in Gunnison, Lake City, and Montrose, Colorado during October 1988. The purpose of the newsletter and the meetings was to explain the goals and objectives of this planning process and identify, discuss, and clarify issues and management concerns related to the plan. Issue statements and comments were accepted from the public by mail and at the open houses. Grazing, off-highway vehicle use, recreation and land use, and forestry issues received the most responses. The BLM requested, through this newsletter, that all interested parties return a self-addressed, stamped, questionnaire if they wanted to continue to receive information dealing with the Gunnison Resource Management Plan (RMP).

In November 1988, a second newsletter was published. This communique was a follow-up to the open houses, briefing the publics on changes resulting from their comments regarding issues and management concerns. A request for nominations or the identification of potential Areas of Critical Environmental Concern (ACECs) was included in the newsletter.

During the month of January 1989, the public was again asked to comment on a list of potential ACECs through a mailing to interested parties. A follow-up to this mailing was an ACEC workshop held in Gunnison on the evening of February 14, 1989. Comments received assisted BLM in identifying more ACECs to be considered as potential ACECs. In July 1989, a letter was mailed to the interested parties informing them of potential ACECs that would be carried through the planning process.

Availability of the Draft Resource Management Plan and Environmental Impact Statement (DRMP) for review and comment was announced in the *Federal Register* on February 28, 1991, and in a news release issued at the same time. The DRMP was published and distributed in March, 1991, to those on our mail list (over 700 copies) for a 90-day review period. The cover letter in the document announced dates and locations of public hearings that were held in April of 1991. Additional material was sent to several individuals and organizations upon request, including several documents and maps that were sent to the Gunnison County Stockgrower's Association in July of 1991.

The Colorado Governor's clearinghouse was supplied with numerous copies of the DRMP for review to ensure consistency with the state's ongoing plans.

A meeting with representatives of the Gunnison County Stockgrower's Association (GCSA) was held on July 10, 1991, to explain several recommendations in the DRMP, and to hear of their concerns. As a result, clarification of many recommendations in the Standard Management section for Livestock Grazing Management were included in the same section of the PRMP.

The BLM received a total of 88 letters or cards about the DRMP. A total of seven speakers gave recorded oral comments at the two public hearings held in Gunnison and Lake City. Each formal hearing was followed by an informal question and answer period.

Another meeting was held with the GCSA on December 18, 1991, to discuss livestock grazing management and other recommendations that would be contained in the Proposed Resource Management Plan and Final Environmental Impact Statement (PRMP).

1 - 4

Availability of the PRMP was announced in the *Federal Register* on April 3, 1992, and in a news release issued at the same time. The PRMP was published and distributed to the addressees on our updated mail list (690 copies to 555 addressees) in April, 1992, for a 30-day protest period which ended on May 4, 1992. After the protest period, the BLM responded to three protest letters in which the protesting parties expressed concerns about recommendations in the PRMP regarding forest management, easement access and road construction, livestock grazing management, riparian zone stubble heights, big game management, sage grouse management, bighorn-domestic sheep management, recreation management, special status plant and animal species and habitat, and off-highway vehicle designations. As a result, some language was added or modified in this RMP, but no recommendations in the PRMP were changed.   See the section immediately below for a summary of changes to the text of the RMP as a result of the internal review and input received during the protest period.

## CHANGES TO THE TEXT OF THE RMP AND PRMP

As a result of internal review, protest letters received on the PRMP during the protest period, and the BLM Director's responses to the protesting parties, the following text changes have been incorporated into the RMP.

1.    The paragraph immediately following, in bold text, has been inserted into the Livestock Grazing Management section of STANDARD MANAGEMENT in the RMP to help clarify concerns regarding minimum stubble heights for riparian areas. The riparian areas of concern are in category "I" Allotments and in Management Units 14 or 15. The language in bold text below has been inserted into the numbered section *4 (Riparian Area Management Specific To Units 14 and 15)*, and into the numbered section *6 (Management Common To All Riparian Zones in "I" Allotments)*, as item (c).

**In the event that minimum stubble heights do not exist in a riparian area in allotments at the prescribed turnout date, allotments would be looked at on a case-by-case basis and turnout will**

be either delayed, or livestock will be turned out on adjacent uplands and held there by salting, herding, hauling water, and/or other methods. These methods will be employed until riparian areas have received adequate growth.

2.    The sentence immediately below in bold text has been inserted into the description of Management Unit 5 (Redcloud Peak ACEC), in place of a similar sentence that was published in the description in the PRMP, in order to further clarify the livestock grazing management situation in the unit.

**Domestic sheep grazing is authorized within the unit, except on lands within the Silver Creek Drainage.**

3.    The following sentence in bold text has been added to the paragraph headed **Livestock Grazing Management** in the prescription for Management Unit 5, in order to help clarify and to provide rationale as to why certain lands will continue to be unavailable for domestic sheep grazing in the unit.

**Public lands in the Silver Creek drainage will continue to be unavailable for domestic sheep grazing in order to prevent destruction of Uncompahgre fritillary butterfly species or habitat.**

4.    During the analysis of one party's concerns raised in a protest letter on the PRMP, the BLM discovered that BLM made an error in two responses to comment #13 made by the Gunnison County Stockgrower's Association (GCSA) in their letter on the Draft Resource Management Plan and Environmental Impact Statement (DRMP).   The subject erroneous responses were published in the PRMP.

The first erroneous statement in the BLM response to the GCSA's subject comment #13 is found in the last sentence, 1st paragraph, page P-62, in the PRMP:

*"The number of elk at the end of the biological year are the population figures that are used by the CDOW and others to determine yearly population numbers."*

The above sentence in italics is substituted with the following language in bold text.

BLM_0006686

## CHAPTER ONE

"The big game yearly population levels are estimated by the CDOW using aerial data, usually gathered in December and January. The primary reason for gathering data in December and January is that animals are fairly well congregated, which facilitates data gathering and results in more accurate data."

The second erroneous statement, in italics below, is found in the next-to-last paragraph in the subject response, page P-62 (the entire paragraph is included below for convenience), in the PRMP.

"Column 4 is the estimated number of elk that survived the winter, and before new calves are born. *The number in this column represents the estimate of the population of elk for management purposes by BLM.*"

The sentence in italics immediately above is deleted. The BLM regrets the errors in the response we provided the GCSA in the PRMP, and the apparent confusion caused to readers. The notation of the errors above will serve as corrections to the subject responses.

5.     Total, Active, and Suspended Preference, expressed in Animal Unit Months (AUMs), has been updated for publication in this RMP in order to more accurately portray this aspect of the current livestock grazing program.   The Total Preference, 60,135 AUMs, and other livestock grazing management information, is displayed in this RMP in Table 3-1, page 3-18, Chapter Three, RANGELAND PROGRAM SUMMARY. Some of the factors that have resulted in this change in Total, Active, and Suspended Preference include, but are not limited to, agreements or decisions made prior to the completion of this RMP, loss of federal ownership, allotments being combined or separated, and the transfer of administration of some allotments to the adjacent San Juan Resource Area.  Total Preference is shown as 62,390 AUMs in Table B-5, Appendix B, in the DRMP, and 62,372 AUMs on page 4-6 in the PRMP.

6.     The recommendation in the PRMP to acquire public access into the Rock Creek area for recreation has not been carried forward into the RMP, as a

result of the BLM having constructed access into the area during the planning process.

7.     After internal review and analysis of one party's concerns raised in a protest letter on the PRMP, the BLM has changed the first sentence in the paragraph headed **Transportation and Access** in the prescription for Management Unit 1.  The changed sentence is shown in bold text below.

**If needed, administrative access will be acquired into the east-central part of the unit that includes Yaeger Gulch and Skunk and Trout Creeks for commercial forest management.**

The change is made to clarify that the BLM would only acquire administrative access into the Yeager Gulch and Skunk and Trout Creek areas for forest management purposes if needed.   Once merchantability inventories are completed, decisions will be made regarding access needs into these areas.

8.     A grammatical change in the text was made on page 2-7, second column, first full paragraph, second sentence.

9.   Appendix A, "Wildlife Management", Table A-1 was modified to include percentages of BLM-administered land in the Game Management Units.

## IMPLEMENTING AND MONITORING THE RMP DECISIONS

Implementation of the RMP will begin when the Colorado BLM State Director signs the Record of Decision (ROD) for the RMP.  Decisions in this plan will be implemented over a period of years, however, and will be tied directly to the BLM budgeting process.    An implementation schedule will be developed, as described in BLM Handbook H-1617-1, and signed by the Montrose District Manager within 90 days of the signing of the ROD.  This implementation schedule will provide for the systematic accomplishment of all decisions in the approved RMP.

The implementation of the RMP decisions will be monitored continually to ensure the necessary tracking and subsequent integration into the budget system occur on a timely basis.  The implementation progress will also be evaluated periodically.  Plan

BLM_0006687

amendments will be prepared if it is determined that a proposed management action is not consistent with the decisions prescribed in the RMP. Revisions or amendments to the RMP may be necessary to accommodate changes in resource or user needs, policies, or regulations. Other decisions will be issued in order to fully implement the RMP.

## MAINTAINING AND AMENDING DECISIONS

Plan decisions will be maintained continuously to reflect minor changes in information. Maintenance is limited to refining or further clarifying a plan decision and cannot expand the scope nor change the terms or conditions of resource uses. The GRA employees will maintain and monitor plan decisions and recommend plan amendments. Maintenance will be documented in supporting records as required by the "Colorado Plan Maintenance Guide". Plan decision amendments may become necessary if major changes are needed or if large quantities of minor changes occur. Amendments are prepared with public input and include environmental analyses.

## ACTIVITY PLANS AND FUTURE ENVIRONMENTAL DOCUMENTATION

Refer to Appendix C for a consolidated listing of activity plans that would be prepared, revised, or updated during implementation of this RMP. Where appropriate, integrated, multi-resource activity level plans, incorporating principles of ecosystem management, would be encouraged and prepared in lieu of individual resource activity level plans.

During implementation of the RMP, additional documentation required to comply with the National Environmental Policy Act (NEPA) may be required, such as environmental assessments (EAs). An EA documents NEPA requirements for site-specific actions. This is usually accomplished in the process of preparing activity plans, or in order to issue follow-on decisions while implementing broader decisions in the RMP. Environmental documentation can vary from a simple statement of conformance to the ROD, to complex documents that analyze several alternatives. All such documents will be prepared with the appropriate level of public input.

BLM_0006688

# CHAPTER TWO
# DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

## DEVELOPMENT AND OBJECTIVES

The Approved Resource Management Plan (RMP) is essentially the same plan described in Chapter Four of the April, 1992, Proposed Resource Management Plan PRMP), with changes reflecting BLM's internal analysis and letters received during the 30-day protest period for the PRMP. The RMP represents the mix and variety of actions that, in the judgement of the BLM, best resolves the issues and management concerns that drove the preparation of the plan. Under the RMP, resources and resource uses will be managed under the multiple use concept and according to the Standard Management section and the Management Unit prescriptions in this chapter.

Please refer to Table 2-1 for a list of Management Units and acres for the RMP. The Management Unit development for the RMP is explained in the section of this chapter titled MANAGEMENT UNIT PRESCRIPTIONS FOR THE APPROVED RESOURCE MANAGEMENT PLAN (1-16).

This chapter contains two sections: Standard Management and Management Unit Prescriptions. The folded map showing Management Unit boundaries, land ownership, and other features is inserted into this document.

All actions proposed in this plan will comply with current applicable state and federal regulations, laws, and policies. In certain instances, laws, regulations, or policies will require some management actions to receive overriding priority in conflict resolution, such as protection of threatened and endangered species, or historical or archaeological resources.

## STANDARD MANAGEMENT FOR THE RESOURCE MANAGEMENT PLAN

Under the RMP, some resource management programs will be implemented according to standard management directions throughout the Planning Area. Management of resources identified as a result of future inventories or discoveries will generally be the same as for resources discussed and identified in this RMP/EIS. *Unless changes in or additions to*

*standard management directions are specifically addressed in the prescription for each Management Unit, these resources/resource uses, programs and activities will be managed as follows:*

**Air Quality.** Activities and projects on public land will comply with applicable local, state, and federal air quality regulations. Mitigation to minimize air quality degradation will be incorporated into project proposals as necessary. Additional air quality monitoring may be implemented by BLM when necessary.

**Locatable Minerals.** Federal mineral estate in areas not under withdrawal will be open to entry and location under the general mining laws. Plans of operation will be required for proposed locatable mineral activity on the following lands: 1) lands under wilderness review, 2) lands closed to Off-Highway Vehicle (OHV) travel, and, 3) lands within designated Areas of Critical Environmental Concern (ACECs).

**Oil, Gas, and Geothermal Resources.** Federal oil, gas, and geothermal estate on both federal surface and split-estate lands, that is, private or other non-federal surface estate overlying federal mineral estate, will be open to leasing with standard lease terms. Other special stipulations and conditions such as no surface occupancy and seasonal restrictions are assigned or specified in each management unit prescription and as deemed necessary; these special stipulations and conditions will also apply to federal surface and split-estate lands. Additional conditions consistent with lease terms will be considered when BLM processes and develops mitigation for operational field applications. Operational field applications and activities include Applications For Permit To Drill (APDs), Sundry Notices, applications for rights-of-way, and Notices Of Intent (NOIs) for geophysical operations. See Appendix K for special stipulations and conditions for leasing on both federal surface and split-estate lands, and for an explanation of how stipulations assigned to split-estate lands will be applied, reviewed, waived, modified, or excepted, based on verification of

BLM_0006689

## CHAPTER TWO

surface and mineral estate resource information by BLM during review of Applications for Permit to Drill (APD). The most reasonable foreseeable level of oil, gas, and geothermal development in the planning area will involve a maximum of one or two APDs during the life of the plan, with an estimated total of ten acres of surface disturbance. Leasing of any federal minerals within existing Wilderness Study Areas (WSAs) will be prohibited according to existing legislation until WSAs are released by Congress by non-designation or other Congressional action, or until leasing is no longer prohibited by legislation.

**Saleable Minerals.** Disposal of mineral material on federal mineral estate will be permitted. Disposal of mineral materials from specific areas is discretionary with the authorizing official and will be determined on a case-by-case basis. Disposal of mineral materials within power site reserves or within other agency withdrawn lands will require approval of the agency reserving the withdrawal.

**Soils and Water Resources.** Soils and water resources will continue to be monitored to define problem areas, develop management strategies, and to determine effectiveness of solutions. Vegetation treatments on soils having a moderate to severe erosion potential, and lacking adequate plant basal cover will be designed and managed to increase plant basal cover, therefore reducing erosion. New forage created by wildlife or range improvements, treatments, or projects will be available for those programs after basal vegetation cover densities are achieved for watershed needs and protection, as defined in Table I-1 in Appendix I. Table I-1 in shows the target % basal cover to be achieved on various ecological (range) sites in the uplands before new forage will be allocated to wildlife or livestock grazing management. Table I-1 is derived from Appendix F of the Montrose District Soil Erosion Monitoring Guidelines, a document that provides techniques and a standardized approach for monitoring surface soil erosion in the Montrose District. Vegetation treatments will be designed and implemented in accordance with the Montrose District Rangeland Treatment Handbook. This handbook provides a standardized approach for planning and implementing vegetation manipulations

and treatments within the Montrose District. The sediment control plan for Long Gulch, and other plans will continue to be implemented.

Water rights will be applied for in the planning area where appropriate, including for instream flow on fishery streams identified in Table J-1, Appendix J, in the RMP, to ensure a sufficient amount of water for fisheries protection.

Best management practices will be employed to reduce soil erosion and water quality deterioration, and will be required in all plans involving surface disturbance. Roads and other developments will be maintained in good condition to minimize erosion.

**Vegetation.** Vegetation resources will be managed to maintain or achieve at least a late seral ecological status by maintaining or improving the vigor, production and diversity of desirable plants within alpine, sagebrush/mixed mountain shrub, and woodland types at a level to support a variety of resource uses, including, but not limited to livestock grazing, wildlife habitat and recreation.

Specific, desired plant communities will be identified in activity plans. Exceptions to a late seral ecological status needed to meet objectives will be identified in activity plans.

Resources and values in riparian areas will be maintained, restored, or improved, including the diversity, vigor, and quantity of herbaceous and woody plants necessary for the 1) proper hydrological functioning of riparian systems, 2) control of accelerated soil erosion, and 3) sustained high quality livestock forage and wildlife habitat.

**Riparian Zones.** Riparian areas will be managed to maintain, restore, or improve riparian conditions (hydrological, soil and vegetation), such that proper functioning conditions are achieved, and to enhance natural values. Riparian areas will be inventoried and prioritized where necessary to determine site-specific management strategies. Strategies, projects, or improvements will be included in activity plans and will be implemented by priority, as to be determined by the inventories. New water sources will be developed with concern for the protection of

BLM_0006690

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

riparian areas. Existing water source developments within riparian areas will be modified, or relocated, if inventories and studies indicate the hydrologic condition is being negatively impacted from use of the development. Water developments that are range improvements will be modified or relocated in accordance with 43 CFR 4120. Existing riparian demonstration areas and improvements will be maintained. Road construction or similar projects could be authorized in riparian areas only when a feasible, alternative route cannot be found; roads or similar projects will cross riparian zones as

Table 2-1

MANAGEMENT UNIT ACRES AND VALUES IN THE APPROVED RESOURCE MANAGEMENT PLAN

| MANAGE-MENT UNIT | ACRES OF PUBLIC LAND | PERCENTAGE OF THE PLANNING AREA[1] | IMPORTANT VALUES RESOURCES OR LAND USES |
|---|---|---|---|
| 1 | 95,827 | 15% | Recreation, wildlife, visual, historic, and locatable mineral resources |
| 2 | 47,762 | 8% | Recreation and visual resources |
| 3 | 2,710 | Less than 1% | Recreation, visual and mineral resources |
| 4 | 1,597 | Less than 1% | Recreation, visual and mineral resources |
| 5 | 5,960 | 1% | Special status species and mineral resources |
| 6 | 1,405 | Less than 1% | Geologic phenomena, interpretation, and locatable mineral resources |
| 7 | 28,275 | 5% | Wildlife and livestock grazing |
| 8 | 4,570 | Less than 1% | Special status species |
| 9 | 532 | Less than 1% | Visual resources and recreation |
| 10 | 15,112 | 3% | Wildlife |
| 11 | 57,525 | 10% | Wildlife, soils and livestock grazing |
| 12 | 91,547 | 16% | Wildlife, livestock grazing, and locatable mineral resources |
| 13 | 188,030 | 30% | Livestock, grazing, recreation, wildlife habitat, forestry and locatable mineral resources |
| 14 | 2,667 | Less than 1% | Riparian, wildlife, fisheries and livestock grazing |
| 15 | 4,725 | Less than 1% | Riparian, wildlife, fisheries and livestock grazing |
| 16 | 36,768 | 6% | General land uses, recreation and wildlife |

[1] Rounded to whole numbers; this column shows the percentage of the public land (surface estate) in the Planning Area that is located in each Management Unit in the RMP.

2 - 3

BLM_0006691

**CHAPTER TWO**

nearly perpendicular to the centerline of the riparian zone as is possible. Objectives are to limit road construction in riparian zones to an absolute minimum, in order to retain and protect as much riparian vegetation, soils, and water as is possible. Existing roads could be relocated or modified if degradation of the aquatic or riparian system is occurring. No commercial timber harvesting will occur in riparian areas, or in a 30-foot area either side of riparian areas, unless riparian or wildlife values will be improved. Logging decks or staging areas will not be permitted within riparian areas or in a 30-foot area either side of riparian areas. Trees cut adjacent to riparian areas will be felled in a direction away from the riparian area, or in such a manner as to minimize riparian area disturbance. Tracts of land which will enhance the recreational opportunity or ecological value of existing riparian areas will be identified for acquisition during the riparian inventory. Measures designed to minimize site-specific riparian deterioration will be required in all plans for surface-disturbing activities.

During the preparation of all plans for surface disturbing activities on public lands, affected wetlands will be inventoried, classified, and considered.

**Special Status Plant and Animal Species and Habitat.** Habitat supporting existing populations of United States Fish and Wildlife Service (USFWS) listed threatened and endangered species, and USFWS candidate, and BLM sensitive species, will be maintained and protected to ensure suitable habitat conditions and viable populations. These species will continue to be inventoried and monitored to provide information for future management. Measures to protect these species and associated habitat will be required in all plans for surface-disturbing activities. Supplemental releases and/or reintroduction of these species could be authorized following preparation of a release or reintroduction plan and environmental analysis, and consultation with the USFWS, Colorado Division of Wildlife (CDOW), and other affected parties. Section 7 consultations will be conducted with the USFWS regarding potential impacts to federally listed species. The Threatened and Endangered Species Act will provide full protection for USFWS listed species.

**Wildlife Habitat Management.** The Gunnison Basin Habitat Management Plan (HMP) will be revised and implemented to address more site-specific issues, consistent with BLM's Fish and Wildlife Plan for Colorado - Program for the Decade. The HMP revision will prescribe land use and species management guidance for the mutual benefit of wildlife, fish, special status plant and animal species and habitat, and other resources on public lands. Objectives of the revised HMP will include, but will not be limited to, methods to manage public lands to help meet, within carrying capacities of the habitat on public lands, CDOW long-range herd goals, maintain or improve vegetation communities to benefit both game and non-game wildlife, implement a program to increase the quantity and quality of crucial big game winter range, and implement cooperative plans and projects with CDOW and other organizations to maintain or enhance big game and/or upland game habitats. Recommended actions will be determined after considering and evaluating potential effects on other lands, resources, or uses.

The BLM will continue to participate in the Colorado Habitat Partnership Program (HPP) with private landowners and managers, and state and other federal land managing agencies. The HPP will, among other purposes, implement strategies to resolve concentrated big game forage utilization, and develop herd management objectives for the effected areas, whether on private, state, or federal lands. Public lands will play a vital role in these tasks, and revisions or amendments to the approved RMP could be necessary.

*Terrestrial Wildlife and Habitat*

*Elk and Deer Habitat:* Measures to increase and improve important deer and elk winter forage shrub species on uplands and riparian areas within crucial winter ranges on public lands will be determined and implemented through activity plans in order to increase and improve habitat and forage conditions on winter and summer ranges, and to help achieve, within carrying capacities of the habitat, CDOW long-range herd goals (as established by CDOW in April, 1985) of 9,000 elk and 16,600 deer. Big game utilization will be managed so that proper use levels on key wildlife forage species will not be

2 - 4

BLM_0006692

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

exceeded. The CDOW and BLM will continue to coordinate herd management objectives and goals on public lands, and will consider and evaluate the potential effects on other resources, lands, and uses, and whether public land big game ranges could support increases in animals, in order to insure that sufficient forage is available.

Existing and future wildlife utilization monitoring results will be evaluated to determine areas where use of key wildlife plant species consistently exceeds moderate use (40-60%). Factors resulting in this level of big game use will be determined, and adjustments will be recommended and made in numbers or habitat to achieve better forage conditions and a proper use level. Temporary decreases in big game numbers will be recommended, if necessary, in order to achieve proper use levels on key wildlife plant species. These changes and adjustments will remain in effect until habitat conditions improve such that allocations could be increased to former numbers. New or additional forage made available as a result of wildlife projects or treatments will be used first to satisfy watershed objectives as defined in the Montrose District Soil Erosion Monitoring Guidelines. Forage that is excess to watershed needs, and made available as a result of wildlife projects or treatments, will be used to meet overall habitat objectives. See Table I-1, Appendix I in this document, for target basal cover densities that will be achieved on treated areas before forage will be allocated to wildlife management (Table I-1 is derived from Appendix F of the Montrose District Soil Erosion Monitoring Guidelines).

Crucial winter range and commercial forest lands will be inventoried for condition, and monitored for utilization and trend relative to big game habitat. Public lands will be inventoried to identify elk calving areas. Acquisition of non-federal lands to increase or enhance management of big game crucial winter range will be emphasized. Reductions in CDOW's elk and deer long-range herd goals relative to BLM-managed lands will be recommended to CDOW for an interim period in Game Management Unit (GMU) 54, and for deer only in GMUs 55, 64, 65, 66, 67, and 551 (as shown in Table A-4 in Appendix A), until the vigor and production of key wildlife forage species on crucial winter ranges

increases such that habitat will support long-range herd numbers.

The BLM will manage big game habitat on public lands to help achieve, within carrying capacities, the CDOW long-range elk and deer herd goals in Tables A-2 and A-3 in Appendix A in the RMP. Table A-5 shows the CDOW GMU numbers keyed to the Management Unit numbers in this RMP.

*Pronghorn Antelope and Bighorn Sheep Habitat:* Measures to improve habitat for pronghorn antelope or bighorn sheep will be permitted.

Inventories will be completed to identify bighorn sheep lambing areas and suitable winter ranges, and suitable areas in which to establish new populations of bighorn sheep and pronghorn antelope. Supplemental releases and reintroduction could be authorized by the District Manager following environmental analysis. Pronghorn antelope and bighorn sheep habitat on public lands will be managed for 500 animals of each species. Monitoring studies will be established within bighorn sheep and pronghorn antelope ranges.

*Sage Grouse and Other Upland Game Bird Habitat:* Identified sage grouse brood-rearing habitat and nesting areas, and winter habitat will be maintained or improved, such that approximately 9,000 sage grouse could be supported on public lands. Sage grouse strutting grounds (leks) will be protected from destruction. No surface-disturbing activities will be permitted within 1/4 mile of all leks during the April 1 through May 31 strutting season to prevent disturbance to mating sage grouse. This period of time could be shortened or lengthened, depending on whether grouse are present and using the habitat. The guidelines for management of sage grouse habitat areas in Appendix A will be used whenever possible in the design and planning of land treatment projects to offset impacts from these projects to sage grouse and habitat.

Inventories will be conducted to identify suitable areas in which to establish populations of Columbian sharp-tailed grouse (*Pedioecetes phasianellus*) and Merrian's turkey (*Meleagris gallopavo*). Releases of Columbian sharp-tailed grouse (*Pedioecetes*

2 - 5

BLM_0006693

**CHAPTER TWO**

*phasianellus*) and Merrian's turkey (*Meleagris gallopavo*) could be authorized by the District Manager following preparation of a release or reintroduction plan and environmental analysis and documentation.

*Non-game Wildlife Habitat:* The quality of endemic non-game animal species habitat will be enhanced by 1) improving and/or maintaining a variety of native plant species and vegetative structure in upland and riparian areas, 2) improving the ecological condition of sagebrush communities, and 3) improving or maintaining non-game habitat within forest lands. Raptor nesting inventories will be updated to identify nesting areas. Measures and stipulations in Table A-6, Appendix A, designed to prevent disturbance to raptors through their post-fledgling period, will be considered in all plans involving surface disturbance.

*Fishery Resources (Aquatic Habitat)*

Fishery streams and associated riparian areas will be managed to improve or maintain the existing ecological status (hydrological, soil and vegetation). Streams and aquatic habitat will be inventoried and monitored where necessary to determine site-specific management strategies. Inventory information will be used to determine projects or improvements to be included in new or revised HMPs, CRMAPs, AMPs and other activity plans. The objectives and goals contained within the *BLM and Forest Service Recreational Fisheries Policy, 1990*, or as amended, will be implemented in order to meet cooperative fishery management objectives. This document provides cooperative policy and goals for fishery-related recreation activities for the BLM and the Forest Service.

Instream flow appropriations will be pursued on fishery streams in Table J-1, APPENDIX J, to ensure a sufficient amount of water for fisheries protection.

Surface disturbing activities will be designed with measures to prevent or mitigate damage to or loss of fishery stream channels and associated riparian habitat.

**Livestock Grazing Management.**

*General Management*

Approximately 470,460 acres of suitable public lands will be available for livestock grazing. Public lands unsuitable or unavailable for livestock grazing will continue to be excluded from livestock grazing unless monitoring or other sources of data indicate that the areas may be used for grazing. Total grazing preference in the Planning Area is approximately 60,135 Animal Unit Months (AUMs), of which approximately 45,539 AUMs will be authorized for active use, and the remainder will be suspended use. Allotment categorization will be re-examined as needed based upon a change in categorization factors identified from monitoring data or other management and resource information.

*General Management Within "M" and "C" Allotments*

Existing allotment categorization and corresponding management levels, as defined in the 1987 Rangeland Program Summary (RPS), will be carried forward on all category "M" and "C" allotments.

*Management Within "I" Allotments*

On category "I" allotments, existing management and/or forage allocation levels will be adjusted when supported by monitoring data or other management and resource information, in order to achieve or maintain a desired plant community.

On category "I" allotments, existing management and/or forage allocation levels will be adjusted when supported by monitoring data or other management and resource information, in order to meet the following resource needs.

*1. Within Uplands:*

Utilization of key forage species in uplands will be managed at levels that will allow for plant health or maintenance, watershed cover needs, and to provide quality forage and wildlife cover. On allotments without activity plans or grazing agreements prescribing grazing strategies

BLM_0006694

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

current years production by weight on key forage species during the period of use. This will allow for at least minimal management to begin on category "I" allotments until funding and personnel allow for activity planning and more intensive management.

2. *Riparian Area Management Specific To Unit 14:*

A 4-inch minimum stubble height will be maintained in Management Unit 14 (riparian areas that have been identified as important for sage grouse brood rearing) from June 15 through July 31, in order to provide for adequate brood rearing habitat. A 2½ inch stubble height will be required at all other times in Management Unit 14. It is expected that not only will sage grouse benefit, but in the mid to long-term, riparian areas will expand in size, resulting in more livestock forage.

3. *Riparian Area Management Specific To Unit 15:*

A 4-inch minimum stubble height will be maintained during the grazing period of use in Management Unit 15 (riparian areas that have been identified as important for fisheries management), in order to protect and maintain riparian and fishery values. These riparian areas will also be expected to improve in terms of fisheries, livestock forage production and other wildlife habitat needs.

4. *Riparian Area Management Specific To Units 14 and 15:*

In Management Units 14 or 15, the requirement to maintain a 4 inch stubble height will be flexible on allotments covered by activity plans or grazing agreements which prescribe other grazing strategies, if these strategies clearly demonstrate the ability to achieve riparian area management objectives. These site-specific riparian objectives will be consistent with riparian area goals established in this plan for Management Units 14 and 15. The 4 inch stubble height requirement will be incorporated into all existing activity plans in these two management units, since existing plans do not adequately address riparian

concerns. When these activity plans are evaluated, modified, or revised, riparian concerns will address the management guidance described above.

The requirement to maintain a four inch stubble height in units 14 or 15 will become effective upon the signing of the ROD. In these units, the minimum 4 inch stubble height requirement may be delayed if vigor and production of herbaceous riparian plants is not sufficient to meet livestock and wildlife needs, and adequate residual cover is not present. Flexibility will be considered for other management strategies defined in an activity plan or grazing agreement which adequately addresses riparian concerns.

In riparian areas in Management Units 14 and 15 where a 4 inch stubble height for key species will clearly not be achieved immediately upon implementation of the approved RMP, and where the key species have low vigor, there will be a recovery period of approximately one or two years that will depend on moisture conditions and other factors (recovery or improvement in vigor will be accomplished by rest, deferment, or other grazing strategies). The recovery period will allow plant vigor to improve and also will allow time to generate sufficient forage production for livestock needs and residue needed to maintain the 4 inch minimum stubble height. Where these conditions exist on allotments in units 14 or 15, a 2 1/2 inch minimum stubble height will be required during the period of use in order to help improve vigor of riparian vegetation. Flexibility to this 2 1/2" stubble requirement will be considered for those allotments in units 14 and 15 with activity plans or grazing agreements which prescribe other grazing strategies, if these strategies clearly demonstrate the ability to achieve riparian area management objectives.

In the event that minimum stubble heights do not exist in a riparian area in allotments at the prescribed turnout date, allotments will be looked at on a case-by-case basis and turnout will be either delayed, or livestock will be turned out on adjacent uplands and held there by salting, herding, hauling water, and/or other methods.

BLM_0006695

**CHAPTER TWO**

These methods will be employed until riparian areas have received adequate growth.

**5.** *Riparian Area Management Within "I" Allotments Except Those in Units 14 and 15:*

Utilization of key forage species within all other riparian zones will not exceed 40-60% of the current years production, with a 2½ inch minimum stubble height maintained throughout the period of use. Utilization levels lower than 40% may be prescribed in severely degraded riparian areas. The 2½ inch stubble will allow for at least minimal management to begin on category "I" allotments until funding and personnel allow for activity planning and more intensive management. Flexibility to this 2½ inch stubble will be considered on those allotments with new activity plans or grazing agreements that utilize other grazing strategies, if these strategies clearly demonstrate the ability to achieve riparian management objectives.

Site specific objectives will be consistent with riparian area goals established in this plan, including the maintenance, restoration, or improvement of riparian conditions (hydrologic, soil, and vegetation) and natural values. The 2½ inch stubble height will be incorporated into all existing AMPs or other activity plans. When these activity plans are evaluated, modified, or revised, riparian concerns will address the management guidance described above.

**6.** *Management Common To All Riparian Zones in "I" Allotments:*

a) Residual cover, or stubble height, is needed to improve or maintain riparian areas to a condition to allow proper hydrologic functioning during peak flows, reduce soil erosion, increase plant vigor (and eventually livestock forage), and to improve wildlife habitat (Clary and Webster 1989, Holechek et al 1989, Kinch 1989, Myers1989, Platts 1982, USDA 1985). A minimum stubble is necessary during critical periods, such as spring runoff and the July and August thunderstorm season. Critical periods vary from allotment to allotment due to elevation

and other factors. Livestock will generally be turned into areas after key species have made sufficient growth to maintain the required minimum stubble heights. This will be consistent with the existing range readiness criteria (Appendix B) and average turnout dates. On allotments with AMPs or other activity plans, objectives and actions from these plans will also be considered when determining turnout dates. This will provide flexibility for early turnout on areas where plant maintenance and riparian system needs have been met.

b) The key herbaceous riparian forage species managed to maintain either a 4" or a 2 1/2" minimum stubble height objective will be grasses such as, but not limited to, Kentucky bluegrass, bromegrass, redtop, wheatgrass, Timothy, tufted hairgrass, sedges, and rushes.

c) In the event that minimum stubble heights do not exist in a riparian area in allotments at the prescribed turnout date, allotments will be looked at on a case-by-case basis and turnout will be either delayed, or livestock will be turned out on adjacent uplands and held there by salting, herding, hauling water, and/or other methods. These methods will be employed until riparian areas have received adequate growth.

Livestock will be moved out of riparian areas to other pastures or other areas in the same pasture with adequate forage when the prescribed stubble height objective has been met or when other management prescriptions defined in activity plans or grazing agreements are fulfilled. Determining when required minimum stubble heights for riparian areas have been reached will be when key species average the minimum stubble height over 80% of a riparian area in a pasture. Realizing there are areas where cattle congregate or are gathered, the remaining 20% of a riparian area in a pasture or allotment could be grazed more heavily than required minimum stubble heights. Determining when other grazing

2 - 8

BLM_0006696

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

strategies, defined in activity plans or grazing agreements, have been fulfilled will be done by field compliance checks. Permittee participation in field compliance checks will be encouraged.

### Grazing Administration

Grazing administration under the RMP will be conducted in accordance with the following standard operating procedures as prescribed in the Code of Federal Regulations 43 CFR 4100:

1. Grazing permits specifying the season of use, number, and kind of livestock will be issued to each operator for each allotment. Operators will have to obtain BLM approval before changing the grazing specifications outlined in their permits.

2. Livestock operators will be required to file actual-use reports showing how many and how long livestock grazed in each allotment and/or pasture. Use on the allotments will be supervised by BLM throughout the grazing year.

3. If necessary, actions resolving unauthorized use will be initiated as described in 43 CFR 4150. The unauthorized use will be eliminated and appropriate penalties assessed.

4. If it were determined, through monitoring, that adjustments in grazing preference or active use were necessary, implementation of changes in available forage will be done in compliance with 43 CFR 4110.3. Where possible, adjustments will be implemented by mutual agreement with the permittee. If agreements could not be negotiated, adjustments will be implemented by decision.

### Range Improvements

Structural and non-structural range improvements such as fences, water developments, burns, spray treatments, and others will continue to be identified and prescribed in activity plans or agreements. This will facilitate livestock management to achieve specific management and resource objectives defined

in activity plans or agreements. Range projects and improvements constructed since 1981, and the amount of BLM funds expended for these improvements, are shown in Table B-2, Appendix B. Table B-2 shows past trends regarding range improvements constructed in the Planning Area. Range improvements identified in the Gunnison Basin Management Framework Plan (MFP) Record of Decision (ROD) will not be incorporated into the RMP. However, any range improvements identified in the MFP ROD that were not implemented, and will enhance or facilitate resource management objectives will be considered for development. Existing range improvements will continue to be maintained as assigned in cooperative agreements and range improvement permits.

Cooperative agreements will be the preferred method to authorize range improvements. These agreements will be used to authorize all structural and non-structural, multiple-use range improvements (removable and non-removable). Range improvement permits will be used to authorize single use, removable range improvements required for livestock operations. These range improvements will be paid for and constructed by the permittee, or other non-federal entities. Maintenance will be assigned and contributions defined in both cooperative agreements and range improvement permits. All range improvement permits and cooperative agreements will comply with 43 CFR 4120.3-2.

BLM's range improvement funding varies from year to year, depending on grazing fee receipts. Expenditures of funds will be budgeted and prioritized as follows:

1) Projects or treatments in which the Bureau of Land Management has the responsibility for operation, maintenance, or reconstruction.

2) Projects that conform with and will complete partially implemented activity plans.

3) Improvements prescribed in new activity plans or agreements.

Exceptions to this prioritization will be considered to avoid, minimize, or rehabilitate the effects of emergencies. Consideration will also be given to

BLM_0006697

**CHAPTER TWO**

removal, modifications, or additions to improvements prescribed in existing activity plans that will further enhance resource conditions or take advantage of contributed funds. Category "I" allotments will normally receive priority over category "M" and "C" allotments.

All cost share or BLM funded improvements will require site specific environmental analysis, economic analysis, and resource clearances (cultural, threatened and endangered species etc.) before being authorized. Rancher or user funded projects will also require environmental analysis and appropriate resource clearances before being approved. Cooperative agreements and range improvement permits will specify the standards, design, construction, maintenance, or special conditions for range improvements or treatments.

Any additional forage available for livestock as a result of range improvements, treatments, or grazing management procedures will be allocated in accordance with 43 CFR 4100, and after meeting basic soil and watershed needs defined in Table I-1, in Appendix I of this document (Table I-1, showing target basal cover densities that will be achieved on treated areas before forage will be allocated to livestock grazing management, is derived from Appendix F of the Montrose District Soil Erosion Monitoring Guidelines). Any additional forage available for livestock will be considered in reactivating suspended use or as a means to avoid suspending active use.

*Fences*

Fences will be installed according to spacing, height, and other specifications described in the BLM Manual, Section 1740 and Handbook H-1741-1, for the control of livestock as well as the protection of wildlife. An example will be spacing the bottom wire of a 3-wire fence at 16 inches above the ground in pronghorn antelope ranges. Variances from these standards require approval of the authorized officer after consultation with affected parties.

*Water Developments*

Federally funded livestock watering developments such as reservoirs (ponds), spring developments,

wells, water pipelines etc. will be developed and be safe for livestock and wildlife needs.

The appropriate State Engineer permits will be obtained for each project.

*Weed and Pest Control*

A noxious weed program, and control of noxious weeds, will be initiated in cooperation with the local county weed district, county governments, and other affected interests.

*Land Treatments*

Vegetation treatments will be done in accordance with approved BLM methods such as management application (grazing), burning, spraying, and chaining. Measures, such as (1) rest from livestock grazing for a minimum of two growing seasons, (2) fencing for protection of vegetation, and (3) establishing a grazing practice to ensure proper use, will be implemented on lands having recently been treated for vegetative manipulation purposes, in order to ensure the maximum opportunity for success of treatments. Land treatments will generally not be done on slopes greater than 25 percent depending on such factors as soils, type of treatment, and equipment limitations, in order to prevent soil erosion.

Reclamation of disturbed areas will involve seeding or planting a mixture of the major native species present within the range site/habitat type that are available commercially. If the erosion hazard is high, introduced species such as crested wheatgrass or annual rye may be used.

*Activity Plans and Grazing Agreements*

Existing and future activity plans, such as AMPs or CRMAPs, will, based on staffing capabilities, be evaluated and either modified or revised as necessary, using a coordinated interdisciplinary approach. New activity plans will also be developed with interdisciplinary input and consultation with permittees and other affected interests. Activity plans will incorporate allotment specific objectives for maintaining or improving livestock forage, wildlife and fish habitat, and riparian areas. Activity plans

2 - 10

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

will also prescribe appropriate management actions such as grazing practices, range improvements, or changes in season of use, to achieve allotment specific objectives. Innovative or non-traditional management strategies will also be considered.

Allotment specific objectives and management actions required to achieve those objectives will also be defined in grazing agreements, and management actions will be included in the terms and conditions of permits or leases in compliance with 43 CFR 4130.6-2. This will allow for intensive management to address resource concerns when inadequate funding or personnel exist to prepare activity plans.

*Monitoring*

Monitoring data collected will include interdisciplinary coordination and be conducted in accordance with the following procedures.

1. Actual use data will be obtained by indirect methods (statements from permittees which includes livestock numbers and periods of use) for all grazing allotments. All livestock operators will be required as part of the permit to submit actual use by pasture within 15 days from the end of the grazing season. Direct methods (counting livestock) for obtaining actual livestock numbers will be used as needed.

2. Utilization data will be collected on scheduled allotments or areas of concern using procedures described in BLM Technical Reference 4400-3. Stubble height measurements will document forage which is present during and/or after use has occurred. Stubble height will be measured as an average of the key species for the area observed. Utilization data will be used for evaluating the effects of grazing on rangeland to determine appropriate management strategies.

3. Rangeland trend monitoring will be conducted using procedures described in BLM Technical Reference 4400-4. The selection of method(s) for data collection will consider management objectives, vegetation attributes (density, frequency, production, etc.) and actions for the

allotment or area(s) of concern. Trend monitoring will be conducted as frequently as needed to satisfy data requirements for the allotment and/or other designated management area(s) evaluation.

4. Range readiness criteria, in Appendix B, for the Gunnison Resource Area considers both indicators of soil readiness and vegetative readiness. Plant species listed in Appendix B will be used, where applicable, as indicators of vegetative readiness. Key forage plant species will be considered as part of the overall range readiness evaluation for the specific allotment or area. Evaluation will be based on stage of development and/or size of plants. Ecological site, aspect, elevation and climate will be considered when evaluating development and/or size of plants.

   Range readiness criteria will be considered when requests for livestock turn-out dates are earlier than dates specified on permits or when vegetation growing conditions are affected by drought or other natural or man-caused influences, such as, fire.

   Range readiness will be incorporated into existing AMP's utilizing the criteria specified in Appendix B. However, the readiness criteria for allotments with AMP's or other activity plans will be specific to the allotment and/or areas within it. On allotments with AMPs or other activity plans, objectives and actions in these plans will also be considered when determining turnout dates. This will provide flexibility for early turnout on areas where plant maintenance and riparian system needs have been met. Range readiness criteria as documented in Appendix B will be used until allotment-specific criteria can be incorporated into each AMP or activity plan.

5. Use supervision on scheduled allotments or areas of concern will include counting livestock and observing distribution patterns; inspecting range improvements; observing apparent trend, utilization and growing conditions; and observing wildlife populations and movements, wildlife

2 - 11

BLM_0006699

**CHAPTER TWO**

habitat, watershed and riparian conditions as needed. Documented observations made during use supervision field visits will identify where changes in grazing management are needed or those areas where more intensive monitoring is needed.

6. Precipitation data from rain gauges along with soil moisture monitoring and temperature data will be used to correlate vegetation production variations resulting from yearly variations in climate.

7. Soil erosion will be assessed in conjunction with rangeland trend and utilization monitoring.

8. Water quality and quantity will be monitored as necessary to determine the location of problem areas.

9. Ecological site inventories for uplands and riparian areas will be conducted in preparation for activity plans as needed on category "I" allotments. This will be done as part of the activity plan preparation process and as funding and personnel allow.

The types of data listed above will be used when evaluating stated objectives or actions on an allotment or specific area. The intensity of monitoring conducted for an allotment or specific area are determined, in part, by the Bureau's classification criteria for I, M, and C allotments. Other considerations for monitoring implementation include allotments with AMP's, allotments delineated as high priority for AMP or other activity plan development, and delineated areas of concern (i.e. riparian areas).

**Forest Management.** Suitable commercial forest lands and woodlands will be managed for sustained yield production within the allowable cut restrictions and guidelines determined by the Timber Production Capability Classification (TPCC). Special emphasis will be placed on the harvest of over-mature and pest-killed trees.

Approximately 41,347 acres of suitable commercial forest lands, and 23,615 acres of suitable woodlands in several Management Units will be available for

harvest. Approximately 1,200 MBF of commercial timber, 490 cords of fuelwood, 400 wildings, and, on average, 300 Christmas trees could be considered for harvest annually on a sustained yield basis. Amounts of commercial timber or other forest products actually offered for disposal or sale annually will depend on staffing capabilities, management priorities, and other factors. Timber Production Capability Classification will be conducted on approximately 10,000 acres. Backlog reforestation will be conducted as funds become available. Site preparation will be completed as needed, with emphasis given to backlog site preparation. One Planning Area-wide FMP will be completed that will incorporate and update the two existing FMPs.

Harvest of commercial timber on slopes greater than 35% will be restricted to cable or helicopter methods only. Timber sales will be designed to allow sufficient elk hiding cover along logging roads and all clearcuts. Emphasis will be given to the maintenance and protection of watershed, soil, and vegetative resources in all timber sales and FMPs. Timber harvests will be designed and implemented to help improve or maintain non-game wildlife habitat. The conditions and standards in Appendix A will be incorporated into all plans for timber harvests in order to improve non-game habitat. Plans for aspen stand harvest will include design measures to increase the production and growth of young, vigorous aspen for big game forage. Sale area design and layout will include measures to blend harvest areas into the surrounding landscape and increase scenic variety. No commercial timber harvesting will occur in riparian areas, or in a 30-foot area either side of riparian areas, unless riparian or wildlife values will be improved. Logging decks or staging areas will not be permitted within riparian areas, or in a 30-foot area either side of riparian areas. Trees cut adjacent to riparian areas will be felled in a direction away from the riparian area, or in such a manner as to minimize riparian area disturbance.

No timber harvesting will be allowed from April 16 to June 30 in elk calving areas to prevent disturbance to calving elk. The harvesting of timber or timber products on lands within existing WSAs will not be permitted.

BLM_0006700

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

**Recreation Management.** The public lands within the Planning Area will be managed consistent with BLM's *Recreation 2000: A Strategic Plan* to ensure the continued availability and diversity of resource-dependent outdoor recreation opportunities. Management will focus on resource protection, visitor services and information, and the construction, operation and maintenance of recreation facilities. Emphasis will be placed on providing a variety of recreation opportunities and experiences through visitor awareness, information, interpretation, signing, and protection. Efforts will be made to expand and strengthen cooperative partnerships with Federal, State and local agencies, the private sector and volunteers to enhance recreation opportunities and tourism. Where appropriate, recreation opportunities will be enhanced through land ownership adjustments, improved access, easements, exchanges and other acquisitions. Tracts of land which will enhance the recreational opportunity or ecological value of existing riparian areas will be identified for acquisition during the riparian inventory.

The number of recreation visitors to the Planning Area is expected to increase by about 40% during the life of the plan.

The public lands in three locations, as shown on Map F-6 in Appendix F, will be designated and managed as the (1) Powderhorn Primitive Area Special Recreation Management Area (SRMA), (2) Alpine Triangle SRMA, and (3) Cochetopa Canyon SRMA. These SRMAs will be managed for a variety of recreation, scenic, and historical opportunities and settings at developed and dispersed sites.

1.  Public lands in the Powderhorn Primitive Area SRMA, unit 2, will be managed for primitive and semi-primitive, non motorized ROS settings, and according to the prescription for Management Unit 2, in order to maintain and enhance scenic, recreation, and natural values. A RAMP will be prepared for the SRMA, incorporating the management actions in the prescription for Management Unit 2.

2.  Resources in the Alpine triangle SRMA will be managed for the ROS settings in the existing Recreation Area Management Plan (RAMP) for the SRMA, the existing RAMP, and the appropriate management actions in the prescriptions for Management Units 1, 4, 5, 6, and 15. A CRMAP for the Alpine triangle SRMA will be prepared that incorporates appropriate actions contained in the existing RAMP and other activity plans, the to-be-completed Alpine Loop Cultural Resource Management Plan (CRMP), *Recreation 2000: A Strategic Plan* goals, and the prescriptions for resources in Management Units 1, 4, 5, 6, and part of 15.

3.  Resources in the Cochetopa Canyon SRMA will be managed for a roaded-natural Recreation Opportunity Spectrum (ROS) setting, and according to the prescription for Management Unit 3 and the existing activity plan for the SRMA.

Public lands not within a special recreation management area (SRMA), will make up the Gunnison Extensive Recreation Management Area (ERMA), and will be managed for a diversity of recreation opportunities. Potential recreation projects will be considered at Hartman's Rocks, Slate River, and High Mesa, and if proposed for development, these projects will be addressed in Recreation Project Plans.

Periodic cleanup and patrols will be conducted throughout the planning area. Commercial recreation use permits will be issued on a case-by-case basis in the planning area.

Unless otherwise specified in management unit prescriptions, public lands in the planning area will be open to motorized vehicular travel. Maps in Appendix F display Off-Highway Vehicle (OHV) designations for the RMP. Some roads will continue to be kept closed in the spring or other seasons until resource damage will likely not occur. Emergency road closures will occur if unacceptable resource damage occurs. The BLM will continue to recognize and respond to the need for seasonal closures in the planning area in order to prevent or mitigate potential

BLM_0006701

**CHAPTER TWO**

resource damage by installing gates at key access points, for instance, to restrict spring access until roads have dried out.

**Wild and Scenic River Study Segment.** No portion of any stream in the Planning Area will be recommended as being suitable for designation and inclusion into the National Wild and Scenic Rivers System.

The 13.3 mile long Segment A of The Lake Fork of The Gunnison River, a segment BLM found eligible, but not suitable for inclusion into the National Wild and Scenic Rivers System (System), is not recommended for designation or inclusion into the System, and will be managed according to Standard Management direction and the prescriptions for Management Units 1, 4, and 15 of this RMP.

**Visual Resource Management.** Public lands will be managed according to Visual Resource Management (VRM) classes and objectives contained in each Management Unit prescription.

Rehabilitation will be considered for VRM Class II R, III R, and IV R areas that contain existing man-made visual intrusions. Any public lands designated wilderness will be classified as VRM I lands.

**Wilderness Study Areas.** The six WSAs in the Planning Area will be managed according to BLM's Interim Management Policy and Guidelines for Lands Under Wilderness Review until Congress decides on designation regarding each area. Any part of any WSA acted on by Congress and not designated as wilderness will be managed according to the applicable management unit prescription(s) in the RMP. Wilderness Management Plans will be prepared for any part of any WSA designated and the area will be managed as wilderness.

**Archaeological and Historical Resources (Cultural Resources).** Protection of cultural resources will be considered in all activity plans. Class I inventory data will be consulted prior to surface disturbing

activities to determine the need for inventories. Prior to surface disturbing activities, Class III inventories will be conducted. Cultural resources identified or discovered will be evaluated using BLM's Cultural Resource Use Categories and/or will be mitigated as required by statute. Where appropriate, historic resources will be inventoried, stabilized, and interpreted to increase understanding and enjoyment for the recreating public, and to reduce safety hazards. Measures designed to protect, interpret, or otherwise enhance cultural resources will be included in all plans for surface disturbing activities. Avoidance will be the preferred method of protection.

The Alpine Loop Cultural Resource Management Plan (CRMP) will be prepared and incorporated into the CRMAP for the Alpine Triangle SRMA, to direct the inventory, development, maintenance, stabilization, and interpretation of the appropriate historic resources in the unit for passive, non-consumptive recreation opportunities.

Inventories will also be conducted to determine archaeological site density, diversity, significance, and distribution in order to build a data base for management of archaeological resources. Cooperative and compatible management of historic sites with private landowners, and other federal agencies will continue.

**Paleontological Resources.** Inventories will be completed in areas containing potential for the occurrence of paleontological resources (Morrison, Dakota, Mancos, and Mesa Verde geologic formation) prior to any surface disturbing activity. Measures to protect known or discovered fossil values will be implemented.

**Transportation and Access.** In addition to the specific access needs identified in the management unit prescriptions and Appendix M, the access needs identified in the Gunnison Resource Area transportation plan will be acquired as opportunities arise. The transportation plan and map will be updated.

2 - 14

BLM_0006702

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

**Disposal of Public Lands.** Public lands in the planning area will be classified into one of two categories for disposal and multiple use management purposes:

*Category I lands:* The 43 tracts of public lands shown on the map of the RMP and in Appendix D of the RMP, totaling approximately 3,120 acres, will be Category I lands, and will be considered for disposal through public sale under criteria in Section 203 of FLPMA, or by means other than public sale. Federal mineral estate will be conveyed with surface estate where feasible and in the public interest. See Appendix D for descriptions of tracts and the sale criteria met. Disposal determination will be contingent on these lands meeting NEPA and other statutory requirements. A land sale/disposal activity plan will be prepared for these tracts indicating disposal techniques, priorities, and implementation timing.

*Category II lands:* All public lands in the planning area exclusive of Category I lands will be Category II lands, will be managed by BLM for multiple use management purposes, and will be considered for disposal on a case-by-case basis through exchange, boundary adjustments, state indemnity selection, Recreation and Public Purpose Act applications, or other appropriate statute or authority, except through public sale, if disposal serves the public interest. These are public lands exclusive of public land in Category I. These lands will be available for consideration for disposal through exchange if the exchange will result in 1) consolidated land patterns, 2) improved manageability of lands and resources, or 3) if the exchange will otherwise be in the public interest, within the context of the provisions of Section 206 of FLPMA. Disposal will be contingent on actions meeting NEPA requirements.

**Acquisition of Non-Federal Lands:** Non-federal lands surrounded by or adjacent to Category II lands or lands categorized as being unavailable for disposal, will be considered as being suitable for acquisition on a case-by-case, willing seller-willing buyer basis in order to enhance Bureau management. Acquisition will be contingent on these lands meeting 1) NEPA requirements and 2) one or more of the criteria for acquisition found in Appendix D. Specific tracts for acquisition are identified in management unit prescriptions.

**Rights-of-Way.** Public lands within the Planning Area will be open to the location of rights-of-way, subject to stipulations in Management Unit prescriptions and standard terms, conditions, and stipulations contained in records of decision issued for each application. Right-of-way avoidance areas (where future rights-of-way may be granted only when no feasible alternative route or designated right-of-way corridor is available) and right-of-way exclusion areas (where future rights-of-way may be granted only when mandated by law) are described in each management unit prescription, if applicable.

**Rights-of-Way Corridors.** Public lands within one-half mile on each side of the centerline of Western Area Power Administrations' (WAPA) Curecanti to Salida 230 Kv electrical transmission line, and Tri-State Generation and Transmission Association's Blue Mesa to Lake City 115 Kv electrical transmission line will be designated as rights-of-way corridors. The WAPA line crosses Management Units 8, 11, 12, 13, 14, and 16. A right-of-way window 1000 feet in width, or 500 feet either side of the centerline, will be designated where the WAPA line crosses Management Unit 8. The Tri-State corridor crosses Management Units 1, 13, and 16. See map in Appendix D for the general locations of these corridors.

**Fire Management.** Wildfires on about 508,388 acres of public land will be suppressed according to a "conditional suppression" policy and about 76,624 acres of public land will be suppressed according to a "full suppression" policy. The choice of fire suppression methods and equipment to be used in each unit will be made with consideration given to protection of the values in the unit. Refer to Appendix G for maps showing these suppression areas within the planning area for Management Units in the RMP. Within conditional suppression areas there are isolated areas (i.e., public lands adjacent to private lands, or in recreation areas) where full suppression of wildfires will occur in order to protect valuable resources, investments, facilities, and property, life, and safety on federal and non-federal lands. Prescribed fires for resource enhancement or fuel hazard reduction could occur throughout the Planning Area in accordance with approved prescribed burn plans. A site-specific burn plan and Environmental Analysis (EA) will be prepared prior to authorizing any prescribed burns.

BLM_0006703

## CHAPTER TWO

**Withdrawals and Classifications.** Actions regarding public lands currently under a withdrawal, reserve, or classification will be implemented according to the recommendations below.   If public lands under withdrawal to another agency are relinquished, these lands will be managed according to Standard Management and the management unit prescription in which the lands are located.   Periodic review of existing withdrawals will continue in order to determine if the need for each continues to exist. Management activities on all withdrawn land will continue at current levels, and will be consistent with the purposes of withdrawals.

1.  The withdrawals affecting lands in the following existing Bureau of Reclamation (BofRec) and Federal Energy Regulatory Commission (FERC) withdrawals, and Bureau of Land Management Power Site reserves (BLM PSRs) located in the Planning Area adjacent to, or in close proximity to, the proposed boundary line of the Curecanti National Recreation Area (NRA) will be continued, and will be reviewed when Congressional action is taken regarding the exact boundary line location of the NRA.   At that time, those withdrawn lands will be reviewed, and if not needed for NRA, BofRec, or FERC purposes, will be recommended to be relinquished or revoked, and managed according to the applicable Management Unit prescriptions.   The acres affected by these withdrawals in the RMP adjacent or in close proximity to the Curecanti NRA are approximately as follows:

*BofRec Colorado River Reclamation Storage Project*

C-014843 in Management Units 1, 7, 12, 13, and 16:  265 acres

C-021956 in Management Units 7, 9, 12, 13, and 16:  301 acres

C-0124366 in Management Unit 13:  42 acres

*BofRec Gunnison-Arkansas Reclamation Project*

C-28255 in Management Units 1 (175 acres), 7 (7 acres), 12 (573 acres), and 16 (277 acres):  1,032 acres

*BLM PSRs*

No. 27, C-28590 in Management Units 7, 12, 13, and 16: 220 acres

No. 50, C-28588 in Management Units 13 and 16:  45 acres

*FERC*

Order of 11/9/1928 in Management Unit 16: 8 acres

2.  A 160-acre Bureau of Reclamation withdrawal between Haypress and Corral Creeks will be continued until the boundary for the Curecanti NRA is finalized.

3.  The lands and approximate acres identified in the various withdrawals, classifications, or reserves below will be recommended to be continued, and will be periodically reviewed.

*BLM protective withdrawals*

C-17286, Powderhorn Primitive Area SRMA, in unit 2:  43,697 acres

C-0125423, "Loop Road" south and west of Lake City, in units 1, (675 acres), 4 (2 acres), and 15 (444 acres):  1,122 acres in order to protect scenery within the Alpine Triangle Back Country Byway from potential mining activities.

Public Land Order (PLO) 4408, pending legislation transferring the affected lands in unit 16 to the United States Forest Service (USFS):  400 acres

C-014711, on Cebolla Creek, in units 10 (269 acres) and 12 (164 acres):  433 acres, to protect riparian and recreation values from potential mining activities

*BLM Federal Water Reserves*

C-17807, C-19375, C-19376, C-19377, and C-28514, totalling approximately 25,900 acres, and located throughout all units except

2 - 16

BLM_0006704

DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

5, 6, and 9; these water reserves will also be quantified.

*Federal Aviation Administration (FAA)*

C-12613 (197 acres) and C-022844 (62 acres): 269 acres

*USFS*

C-0123890, at Soap Creek, in unit 13: 65 acres

C-28325, at Old Agency, in unit 16: 40 acres

*BLM Recreation and Public Purposes Classifications (R&PPs)*

C-15671, Lake City Ski Hill, Hinsdale County, in unit 1: 25 acres

**4.** The 330 acre Department of Energy (DOE) withdrawal application for the Gunnison Uranium Mill Tailings Remedial Act (UMTRA) project disposal site in Management Unit 11 will be recommended to be terminated (approximately 115 acres within the area of the withdrawal application were transferred to DOE for construction of the disposal cell for the UMTRA project after publication of the Gunnison Proposed Resource Management Plan).

**5.** The following withdrawals or reserves will be recommended to be relinquished or revoked by the applicable agencies. Upon relinquishment, further action will be taken to terminate these withdrawals. Once terminated, the lands will then be managed according to the pertinent RMP Management Unit prescriptions and Standard Management.

*BofRec Gunnison-Arkansas Reclamation Project C-28255*

In unit 1, T. 46 N., R. 3 W., paralleling the Lake Fork of The Gunnison River near The Gate Campground:   approximately 1,040 acres, to insure that recreation improvements are not inundated

In Unit 12, T. 48 N., R. 6 W., paralleling the Little Cimarron River to insure no

inundation of crucial winter range: approximately 840 acres

In unit 16, T. 49 N., R. 34 W., Sec. 34: NE1/4:  approximately 160 acres

*BLM PSRs*

No. 50, C-28588, T. 50 N., R. 1 E., Sec. 4: N1/2SW1/4SE1/4SW1/4:  approximately 17 acres (unit 12)

*USFS*

C-010309, at Nine-Mile Hill, no longer needed, in unit 13:  10 acres

*FERC*

C-0123435 in units 1 (630 acres) and 6 (95 acres) , and C-0124134 in units 1 (290 acres) and 6 (5 acres), south of Lake City:  1,020 acres

**6.** The following BLM Recreation and Public Purpose (R & PP) classifications and a protective withdrawal will be recommended to be revoked or expanded in size:

The BLM Recreation and Public Purpose Classification C-083991, approximately 100 acres, at The Gate Campground, in unit 1, will be revoked, upon a recommended five-acre protective withdrawal taking effect at the recreation area.

The BLM Recreation and Public Purpose Classification C-021601, approximately 907 acres within unit 6 and a part of unit 1, at the Slumgullion Earthflow National Natural Landmark ACEC, unit 6, will be revoked upon a recommended protective withdrawal totalling approximately 1,442 acre taking effect in unit 6.

The BLM protective withdrawal C-17286 at the Powderhorn Primitive Area SRMA, Management Unit 2, will be expanded in size to include all public surface estate (approximately 47,762 acres) and the federal mineral estate (approximately 46,007 acres) in Management Unit 2 [an additional (approximately) 2,310 acres of federal mineral estate, and 4,065 BLM managed surface

2 - 17

**CHAPTER TWO**

acres].  The lands in this unit will also be recommended to be withdrawn from all forms of appropriation under the general land laws, in order to retain the lands in public ownership.

**7.**  The following new BLM protective withdrawals will be recommended in various Management Units. The federal mineral estate in these lands will be recommended to be withdrawn from mineral entry and location, in order to protect scenic and recreation values and improvements, or other values as noted from potential mining activities.

| | |
|---|---|
| Unit 1: | At the Mill Creek Campground, 20 acres |
| | At the Red Bridge Campground, 5 acres |
| | At The Gate Campground, 10 acres |

The lands in the three areas above will also be recommended to be withdrawn from all forms of appropriation under the general land laws for protection of recreation resources and BLM investments.

| | |
|---|---|
| *Unit 4:* | In the American Basin ACEC: approximately 1,590 acres |
| *Unit 6:* | In the Slumgullion Earthflow National Natural Landmark ACEC, to protect the integrity of the earthflow: approximately 1,442 acres |
| Unit 9: | In the Dillon Pinnacles ACEC: approximately 530 acres, to protect scenic values |

**8.**  Approximately 2,597 acres of federal mineral estate and 2,710 acres of BLM managed surface acres in the Cochetopa Canyon SRMA, unit 3, will be recommended to be withdrawn from mineral entry and location, and all forms of appropriation under the general land laws, in order to retain scenic, riparian, and recreation values, but the withdrawal will not effect the operation of the general land laws regarding discretionary leases, licenses, or permits.

**Waterpower and Storage Reservoir Sites.** Management Units 1, 3, 10, 14 and 15 will be recommended to be closed to the development of

water power and storage reservoir sites.  Subject to limitations and considerations in the management unit prescriptions, the remainder of public lands in the planning area will be available for the development of water power and storage reservoir sites.  The inventoried and potential sites will be managed to permit water and power site development unless another use is proposed for the site(s) in a Management Unit prescription.  Before any uses occur or facilities are developed on lands withdrawn for water power purposes, that will preclude or conflict with waterpower or storage development, the Federal Energy Regulatory Commission will be contacted regarding withdrawal status and need for the site.

**Areas of Critical Environmental Concern.**  Public lands in six Management Units, 4 through 9, totalling approximately 42,339 acres, will be designated as Areas of Critical Environmental Concern (ACECs).

These six areas (American Basin, Redcloud Peak, Slumgullion Earthflow National Natural Landmark, West Antelope Creek, South Beaver Creek, and Dillon Pinnacles) will be managed according to their Management Unit prescriptions and any future management plans that will be prepared.  Haystack Cave and Sapinero potential ACECs that were identified early in the planning process as potential ACECs, are contained within the West Antelope Creek ACEC.  Values within the remaining eight potential ACECs that were not designated will be sufficiently protected and managed by the actions in applicable Management Unit prescriptions.

**Hazards Management.**  Hazard sites or areas will be reviewed on a case-by-case basis and remedied to the degree necessary to protect public safety and health. Activity plans will consider the remediation of known hazards.  Management of other resources will involve reclamation/remediation of known hazard sites/areas as part of fulfilling objectives for management of that resource.

Coordination and cooperation with appropriate state or other agencies to remedy hazard sites will continue.  Existing sites/areas from past mineral development, which are considered to be potentially hazardous because of high side walls, deep pits, etc., will very likely continue until the Colorado Mined Land Reclamation Hazard abatement project is

BLM_0006706

**DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN**

completed.  The goal of this long-term project is to eliminate the hazards of these sites/areas.

**Hazardous Materials Management.**  Locations on public lands showing evidence of hazardous materials will be inventoried and examined on a case-by-case basis, and remedied to the degree necessary to protect public health, safety, and public or private property. Coordination and cooperation with appropriate state or other agencies to properly manage hazardous materials will continue.  Trespass dumping and littering on public lands will be controlled through public awareness, signing, and monitoring.

**Law Enforcement.**  Bureau patrols and law enforcement activities by authorized personnel will be conducted on a priority or demand basis as needed. Information dissemination and education regarding BLM resource management and regulations will be carried out during visitor or public contacts by BLM rangers.

**Monitoring Plan.**  The Gunnison Resource Area Monitoring Plan will be updated to incorporate monitoring necessary for implementation of the RMP.

## MANAGEMENT UNIT PRESCRIPTIONS FOR THE RESOURCE MANAGEMENT PLAN (UNITS 1-16)

According to the BLM's basic legislation, any particular land area and its resources may have the potential for a variety of uses, some of them mutually exclusive.  The BLM's major objective is to manage the public lands under a multiple-use philosophy and to provide maximum public benefits through the best combination of uses for which an area is capable.

Under the Approved Resource Management Plan (RMP), the planning area has been divided into management units based on the resources, uses, and values of the public lands within a particular geographic area and relative to the goals and objectives of the RMP.  Management Unit prescriptions for the RMP are derived from the PRMP, with changes made as a result of public comment and internal review during the protest period on the PRMP.  Please refer to the section titled **CHANGES TO THE TEXT OF THE RMP AND PRMP** in Chapter One of this document for the significant changes that have been incorporated into the RMP.  The size, number, and boundaries of the

Management Units in the RMP is identical to those in the PRMP.  Table 2-1 lists the acres in each Management Unit in the RMP.  The map that is inserted into this document displays the Management Units and general land status in the RMP.

Although each management unit will be managed under the multiple-use concept, its most outstanding resources, uses, or values will be given significant consideration to protect those specific qualities.  In recognition of this potential for loss or impact, management unit prescriptions may place constraints on opposing/competing resources, uses, or values within a unit.  In most cases, these other resources will be managed to the extent that such management will be compatible with the more significant resources, uses, or values in a unit.  In addition, future proposals will be evaluated in the context of the management prescriptions for units.

Public lands within the planning area where no particular resource, use, or value is outstanding, and where management will be minimal, are considered to be general resource management units (unit 16).

The following management unit prescriptions comprise The RMP.  Acreage figures used are approximations.  Table 2-1 and the RMP map identify the management units that were delineated for the RMP.  *If not specifically mentioned, and unless modified within the following Management Unit prescriptions, resources/resource uses and programs on public lands in the RMP will be managed according to guidance in the Standard Management section above.*  Please refer to the Standard Management section of this chapter for information on recommendations regarding water power and storage reservoir sites and withdrawals and classifications that will be implemented.

In this RMP, all Wilderness Study Areas (WSAs) in the Planning Area will be managed under BLM's Wilderness Interim Management Policy for Lands Under Wilderness Review (IMP).  If Congress designates public lands in any part of any WSA in the Planning Area as wilderness, those lands will be managed as wilderness and a wilderness management plan will be prepared for the area(s).  If, during the life of this plan, Congress acts on and decides to not designate any part of any WSA in the Planning Area as wilderness (effectively removing it from WSA status), those public lands will be managed according

2 - 19

BLM_0006707

**CHAPTER TWO**

to the actions in the following Management Unit prescriptions for the RMP.

**MANAGEMENT UNIT 1 (Part of Alpine Triangle SRMA)**

*Land ownership:* 95,827 acres of public surface; 15% of the Planning Area.

This management unit is currently managed as the Alpine Triangle Special Recreation Management Area (SRMA), and consists of the bulk of the SRMA. The unit extends south along the Lake Fork of the Gunnison River (Lake Fork) from the Curecanti National Recreation Area (NRA) and includes lands south and west of Lake City. This unit surrounds three recommended ACECs (4, 5 and 6) and important fisheries and riparian zones (parts of 15).

The lands south and west of Lake City are characterized by 13,000-14,000 foot peaks, fragile high-country tundra, important mining-era historical resources, summer range for domestic sheep grazing, heavy recreation visitation, and high quality scenic values. This unit is the most popular and heavily visited area BLM manages in Colorado, and is among the most scenic areas in the nation. Features within or adjacent to the unit include structures associated with the historic mining period, an 8.9 mile-long portion of the Segment A of the Lake Fork of the Gunnison River, a study segment eligible for inclusion into the National Wild and Scenic Rivers System, Mill Creek Campground, populations of the rare Uncompahgre fritillary butterfly, the Alpine Loop National Back Country Byway, Slumgullion Earthflow National Natural Landmark, and bighorn sheep habitat.

The lands along the Lake Fork from Lake City downstream to the NRA boundary are characterized by a steep-walled, narrow canyon and a meandering river valley with a variety of vegetation types. Intermingled land ownership occurs in this part of the unit. Features in this part of the unit include high quality visual resources, nine recorded historic railroad construction camp sites (three of which have been developed and are managed cooperatively by the National Park Service), various other historic sites, the Gate and Red Bridge campgrounds, several BLM minor wayside and fishing access improvements; crucial big game winter range; bighorn sheep habitat

and a bighorn sheep herd; and a 69 Kv electrical transmission line.

Concerns include potential impacts on fragile tundra ecosystems receiving heavy recreation use, visitor safety concerning high altitudes and open mine shafts, degraded visual quality, incompatible recreation, mining, and livestock grazing land use mixes, motorized vehicle use, access and management, vandalism, survey and inventory/recordation deficiencies, and other concerns associated with fragile historic structures. Concerns also exist regarding potential disease transfer to bighorn sheep from grazing domestic sheep and a growing demand for public access to the Lake Fork.

The unit will continue to be managed as part of the existing Alpine Triangle SRMA, providing a diversity of recreation opportunities, including interpretation, while protecting important historic, scenic, and natural values will be emphasized within the unit. Motorized sightseeing, hiking, camping, winter recreation, hunting, fishing, floatboating, and other recreation opportunities will be emphasized. Specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

Plans for surface-disturbing activities, including recreation use and development, will contain measures designed to minimize negative effects to resources, especially those that could impact adjacent recreation or scenic resources and fisheries and riparian habitat. Public lands will be managed for a combination of Primitive, Semi-Primitive Motorized, Semi-Primitive Non-Motorized, Roaded Natural, and Rural ROS settings as shown in the existing RAMP for the SRMA.

Management actions proposed for the unit in the existing RAMP for the Alpine Triangle SRMA will be implemented (facility and trail development, improvement, and maintenance, expanded recreation area administration and visitor services, additions to and maintenance of OHV routes, signing, patrols, and commercial recreation use supervision). Trail access to the western portion of the Powderhorn Primitive Area SRMA will be located and constructed in the Devil's Creek Area. Construction of a joint BLM/USFS visitor and administrative center in Lake City will be pursued. Overnight camping and fires

BLM_0006708

**DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN**

will be excluded within 50 feet of historic resources on public land. A follow-up visitor-use survey will be conducted in approximately 1994 to reassess the activities, settings, and experiences favored by the recreating public. If feasible, facilities at The Gate and Red Bridge Campgrounds will be upgraded and added such that entrance fees could be charged.

Historic sites will be inventoried, recorded, and evaluated within the unit, and determinations of eligibility prepared. Cadastral surveys will be conducted for historic sites with potential for stabilization or interpretation, if necessary, to determine public land locations.

Cooperative management with the NPS on lands along the Lake Fork of the Gunnison River from Red Bridge to Blue Mesa Reservoir will be continued for recreation facility and road maintenance, and the interpretation and protection of three historic railroad camp/construction sites. If appropriate, cooperative management of other sites will be considered.

Motorized vehicular traffic on public lands within the unit south of the north line of Section 12, T. 45 N., R. 4W., N. M. P. M., will be limited to designated routes in order to prevent potential impacts from this type of use, as shown on a map and Table F-1 in Appendix F of the RMP, and in maps in the Gunnison Resource Area office. Snowmobile use will be permitted on snow anywhere in the unit, except in any lands designated as wilderness. When the CRMAP for the Alpine Triangle SRMA is prepared, a map will be included and areas defined on the ground delineating appropriate pull-off and parking areas adjacent to designated routes available for OHV use.

Federal oil, gas, and geothermal estate totalling 675 acres within the existing protective withdrawal (C-0125423) along the Alpine Loop National Back Country Byway will be open to leasing with a no surface occupancy stipulation in order to protect recreation facilities and visual resources from fluid minerals exploration and development. Mineral material disposal on federal mineral estate on these same lands will not be authorized for the same reasons.

**Wildlife Habitat Management.** Disposal of mineral materials on 10,620 acres of federal mineral estate within crucial big game winter range will not be

authorized from December 1 through April 30 to prevent disturbance to wintering deer and elk.

**Livestock Grazing Management.** Livestock grazing will continue to be authorized in the unit within the capabilities of the ecosystems involved. On public lands within the riparian area along Henson Creek, from the North fork of Henson Creek downstream to Lake City, livestock grazing in this important fishery will continue not to be authorized in order to maintain stream and streamside conditions, including soils and vegetation.

**Wild and Scenic River Study Segment.** The 8.9 mile-long portion of Segment A of the Lake Fork of the Gunnison River, a segment BLM found eligible, but not suitable, for inclusion into the National Wild and Scenic Rivers System, will be managed according to this prescription and STANDARD MANAGEMENT for the RMP.

**Visual Resource Management.** Public lands in the unit will be managed according to VRM Class II (93,848 acres), VRM Class III (165 acres) and VRM Class IV (1,337 acres) objectives.

**Transportation and Access.** If needed, administrative access will be acquired into the east-central part of the unit that includes Yaeger Gulch and Skunk and Trout Creeks for commercial forest management. Public hiking and horse access will be acquired into the Alpine Gulch drainage for recreation and livestock grazing management. Public access will continue to be acquired, as opportunities arise, to BLM and USFS managed lands between Lake City and Red Bridge campground.

**Acquisition of Non-Federal Lands.** If available, selected non-federal lands necessary for management, protection and/or enhancement of recreation and visual resources and wildlife habitat on public lands will be acquired. If available, selected non-federal lands containing representative examples of thematic historic period sites, structures, or resources will be acquired through exchange or purchase.

**Rights-of-Way.** About 3,840 acres in the rights-of-way corridor containing the Tri-State Generation and Transmission Association's Blue Mesa to Lake City 115 Kv electrical transmission line will be open to development of all rights-of-way. With the exception of public lands in the rights-of-way corridor, the

BLM_0006709

## CHAPTER TWO

entire unit will be closed to the development of above-ground utilities (91,510 acres). Public lands north of the south line of Sections 16 and 17, T. 47 N., R. 3 W., N.M.P.M., approximately 2,560 acres, and about 76,880 acres south and west of Lake City will be classified an avoidance area for all other rights-of-way. The remainder of public lands in the unit, about 12,070 acres, will be open to all other rights-of-way. See Appendix D for a map showing these areas.

**Rights-of-Way Corridors.** Approximately 3,840 acres of public land along the Tri-State Generation and Transmission Association's Blue Mesa to Lake City 115 Kv electrical transmission line (see map in Appendix C) will be designated a rights-of-way corridor (see Standard Management for more detail).

**Fire Management.** Full suppression of wildfires will occur on 9,577 acres of public land to protect private property, BLM recreation sites, and other facilities. Conditional suppression will occur on 85,773 acres.

## MANAGEMENT UNIT 2 (Powderhorn Primitive Area SRMA)

*Land Ownership:* 47,762 acres of Public Surface; 8% of the Planning Area.

This unit consists of lands managed for primitive, non-motorized recreational and natural values.

This management unit is managed as the existing Powderhorn Primitive Area Special Recreation Management Area (SRMA). The entire existing Powderhorn Primitive Area is located within the unit. Few obvious human influences are apparent. The unit contains the popular Powderhorn Lakes and is characterized by a diversity of landscapes, high valued recreation resources, important fishery and riparian resources, and scenic and natural values. Livestock grazing occurs in part of the unit. Bighorn sheep habitat occurs within the unit. The BLM surface estate within the existing primitive area is withdrawn from all forms of appropriation under the general land laws (C-17286) and from mineral entry and location under the general mining laws. A concern for resources within the unit is that concentrated recreation use occurring along existing

trails and at the lakes area could potentially result in unacceptable impacts to scenic and other resources. Another concern is the potential for diseases being transferred to bighorn sheep from domestic sheep. The need to protect both the high quality and diversity of scenic, recreation, and other natural values, while reducing effects of recreation use will be recognized as important during the formulation of management decisions affecting the area.

Public lands in Management Unit 2 will be designated as the Powderhorn Primitive Area SRMA, and will be managed for recreation and scenic opportunities and for the maintenance and enhancement of natural values in Primitive and Semi-Primitive Non-Motorized ROS settings. The need to protect both the high quality and diversity of scenic, recreation, and other natural values, while reducing effects of recreation use will be recognized as important during the implementation of management decisions affecting the unit.

A Recreation Area Management Plan (RAMP) will be prepared for the Powderhorn Primitive Area SRMA, unit 2, emphasizing the enhancement of natural values and primitive recreation opportunities.

The boundary of the existing Powderhorn Primitive Area will be modified and expanded to include the public lands in this unit.

Measures to prevent soil erosion and water quality deterioration processes will be allowed to occur and surface-disturbing activities will be minimized. Commercial recreation use will be permitted and use levels established, if necessary, to maintain natural values in the unit; and commercial permits will contain stipulations and mitigation for vegetation and surface disturbance. A permit system and recreation use levels for private, non-commercial recreation use will be established and implemented in the unit if necessary in order to mitigate adverse environmental impacts resulting from recreation activities. Maps and interpretive brochures will be distributed to help inform users of low-impact camping skills. Trail access in the unit from the Devil's Creek area will be located and constructed. Trails and other facilities will be maintained periodically.

BLM_0006710

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

Public Lands in the unit will be closed to motorized vehicular traffic, unless otherwise authorized, to protect and maintain primitive recreation opportunities, as shown on a map in Appendix F of the RMP, and on maps in the Gunnison Resource Area office. The unit will also be closed to mountain bikes.

The federal oil and gas estate in the unit will be closed to future leasing in order to protect recreation and natural values. Disposal of mineral materials will not be authorized on federal mineral estate in the unit.

**Wildlife Habitat Management.** Fishery or other wildlife improvement projects or project maintenance, will be permitted only if compatible with the objectives of this unit. If the lands in the unit are acted upon by Congress for wilderness designation, and are not designated, lands in the unit could be evaluated and considered for moose introductions, which could be authorized by the District Manager following environmental analysis. The BLM's Interim Management Policy and Guidelines for Lands under Wilderness Review and a national-level agreement involving BLM prevents the introduction of moose or other non-indigenous species into public lands in Wilderness Study Areas or Wilderness areas.

**Livestock Grazing Management.** Domestic sheep grazing in grazing allotment 6112 will not be authorized in the unit in order to help prevent the potential for diseases being transferred to bighorn sheep from domestic sheep. Cattle grazing will be authorized and administered in the unit such that recommended ROS settings will be maintained. Vegetation treatments or improvements and treatment maintenance will be authorized if compatible with the objectives of this unit.

Livestock grazing along 2.2 miles of Fourth of July Creek, 10.2 miles of the East Fork of Powderhorn Creek, 8.3 miles of the Middle Fork of Powderhorn Creek, and 8.7 miles of the West Fork of Powderhorn Creek will be managed to maintain a 4-inch minimum stubble height for key forage species, during the grazing period of use, in these riparian zones containing important fisheries in order to improve and maintain stream and streamside

conditions, including soils and vegetation. The minimum stubble height requirements along Fourth of July Creek, East Fork of Powderhorn Creek, Middle Fork of Powderhorn Creek, and West Fork of Powderhorn Creek will be implemented according to the STANDARD MANAGEMENT section of this chapter.

**Forest Management.** The unit will be closed to the sale or harvest of forest products in order to maintain scenic and recreation values.

**Visual Resource Management.** Public lands will be managed according to VRM Class I objectives in order to maintain the scenic quality of the unit.

**Acquisition of Non-Federal Lands.** If available, 40 acres of private surface estate will be acquired. The acquisition of state-owned minerals in the unit will be pursued.

**Rights-of-Way.** Public lands in the unit will be classified an exclusion area for future rights-of-way.

**Fire Management.** Public lands in the unit will be managed under the conditional suppression category.

## MANAGEMENT UNIT 3 (Cochetopa Canyon SRMA)

*Land Ownership:* 2,710 acres of Public Surface; less than 1% of the Planning Area.

This unit consists of lands managed for day-use and overnight recreation along Cochetopa Creek.

Most of the public lands in this management unit are currently managed as the Cochetopa Special Recreation Management Area (SRMA). Resources and land uses are managed according to an existing activity plan for the unit. Colorado State Highway 114 traverses the unit, which is characterized by a steep, scenic canyon that restricts recreation use to the narrow riparian corridor along Cochetopa Creek. Day-use recreation such as sight-seeing, fishing, and picnicking, and overnight camping occur within the unit. Features within the unit include high-quality scenic resources, three semi-developed, and three undeveloped recreation sites. An elk calving area,

2 - 23

BLM_0006711

## CHAPTER TWO

Cochetopa Creek--an important fishery--and crucial big game winter range and bighorn sheep habitat occur within the unit. Concerns within the unit include a lack of recreation signing, general vandalism, and adverse impacts from recreation use to soils, vegetation and water quality, and deteriorating recreation facility conditions.

Public lands in Management Unit 3 will be designated the Cochetopa Canyon Special Recreation Management Area (SRMA), and will be managed according to the existing or updated RAMP for a variety of recreation, scenic, and other opportunities at developed and dispersed sites, and for a Roaded Natural ROS setting.

The RAMP will be updated to include the lands in this expanded SRMA and actions in the prescription for the unit in the RMP.

The management objectives for the unit will be to continue to provide and improve the existing diversity of recreation opportunities, with fishing and overnight camping adjacent to Highway 114 being emphasized. Recreation facilities at three semi-developed and three undeveloped recreation areas will be constructed and maintained to provide approximately 32 family campsites, 6 toilets, twenty parking spaces, and informational signing. Existing recreation facilities in the unit will be maintained. Periodic patrols will be conducted. Recreation use will be monitored and possibly restricted as necessary to protect natural features and recreation opportunities. Informational and interpretive signs will be installed. Public lands will be managed for a Roaded Natural ROS setting. The federal mineral estate within the unit, 2,592 acres, will be withdrawn from mineral entry and location under the general mining laws in order to provide protection for visual and recreation resources. This area has a low to moderate potential for the occurrence of mineral resources.

The entire Federal oil, gas, and geothermal estate in the unit, 2,592 acres under federal surface, will remain open to leasing with a no-surface occupancy stipulation in order to protect scenic and recreation resources in the narrow canyon in this unit.

**Wildlife Habitat Management.** Disposal of mineral materials on 1,317 acres of federal mineral estate in the unit within elk-calving areas will not be authorized in order to prevent disturbance to calving elk from April 16 through June 30. Mineral material disposal will not be permitted on 2,302 acres of federal mineral estate from December 1 through April 30 within big game crucial winter range in order to prevent disturbance to wintering deer and elk.

**Livestock Grazing Management.** Livestock grazing and watering will not be permitted in the riparian area along Cochetopa Creek in order to maintain or improve riparian and/or fishery conditions. Domestic sheep grazing will not be authorized throughout the unit to prevent disease transfer to bighorn sheep.

**Visual Resource Management.** The unit will be managed according to VRM Class II (2,220 acres) and VRM Class IV (487 acres) objectives.

**Rights-of-Way.** Public land in the unit will be classified an exclusion area for above-ground utility rights-of-way. Underground utility rights-of-way and development will be limited to previously disturbed areas associated with existing roads.

**Fire Management.** Wildfires will be managed under the full suppression category.

## MANAGEMENT UNIT 4 (American Basin ACEC)

*Land Ownership:* 1,597 acres of Public Surface; less than 1% of the Planning Area

This management unit is located south and west of Lake City between the Continental Divide and Handies Peak, and is one of the most scenic basins in the San Juan Mountains because of its midsummer wildflowers and the high-quality visual resources. Sloan Lake and approximately two and one-half miles of the headwaters of Segment A of the Lake Fork of the Gunnison River, a study segment eligible for inclusion into the National Wild and Scenic Rivers System, are located within the unit. The unit is also managed as part of the Alpine Triangle SRMA.

2 - 24

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

Concerns within the unit are conflicts regarding recreation users and domestic sheep grazing and the potential for mining to occur (there is a high to moderate likelihood for the occurrence of locatable minerals on public lands in the unit).

The unit will be designated and managed as the American Basin Area of Critical Environmental Concern (ACEC), including for the protection and enhancement of visual and other natural resources and existing related recreation opportunities in the unit.

The public lands in this ACEC will continue to be contained within, and managed accordingly, as part of the existing Alpine Triangle SRMA (see Map F-4, Appendix F in the RMP, for boundaries of the SRMAs in the planning area). Specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

Activities resulting in surface disturbances or visual impacts will not be permitted in order to prevent deterioration of scenic values. Specific and detailed management for this ACEC will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

The entire federal oil and gas estate within the unit, totalling 1,590 acres, will be open to future mineral leasing with a no surface occupancy stipulation in order to protect visual and recreation resources from deterioration as a result of possible oil and gas exploration or development. Disposal of mineral materials on federal mineral estate will not be permitted within the unit for the same reasons.

**Livestock Grazing Management.** Domestic livestock grazing will be administered in such a manner as to avoid conflicts between recreation visitors and grazing livestock. Livestock

management objectives will be to maintain recreation and scenic values, especially during the wildflower display and peak visitation periods. Specific livestock grazing management for the unit will be incorporated into the overall activity plan for the Alpine Triangle SRMA, and could include season of use changes,

restrictions in areas that could be grazed, or possibly elimination of grazing in some areas.

**Recreation Management.** Motorized vehicular travel will be limited to designated routes within the unit in order to prevent destruction to wildflower concentrations and visual resources in general, as shown on a map and in Table F-1 in Appendix F of the RMP, and on maps in the Gunnison Resource Area office. Public lands will continue to be managed for Semi-Primitive Motorized and Semi-Primitive Non-Motorized ROS settings, according to the RAMP for the Alpine Triangle SRMA. The hiking trail to Handies Peak will be maintained. Interpretive signing will be installed at appropriate locations in American Basin and, in addition to other interpretation, will explain livestock management objectives in the unit.

**Wild and Scenic River Study Segment.** The 2.5 mile-long Segment A of the Lake Fork of the Gunnison River, a segment BLM found eligible, but not suitable, for inclusion into the National Wild and Scenic Rivers System, will be managed according to this prescription and STANDARD MANAGEMENT for the RMP.

**Visual Resources.** Public lands will be managed according to VRM Class I objectives in order to maintain the natural setting in the unit. Existing visual intrusions will be rehabilitated to the extent possible.

**Transportation and Access.** One of two parallel roads that resulted from a detour will be closed and rehabilitated; the best located road will be retained for recreation access and will be maintained periodically to prevent resource impacts.

**Acquisition of Non-Federal Lands.** If available, approximately 40 acres of non-federal lands will be acquired in the unit in order to enhance and facilitate the management of visual and recreation resources.

**Rights-of-Way.** Public lands in the unit will be classified as an exclusion area for rights-of-way.

**Fire Management.** Wildfires in the unit will be managed under the conditional suppression category.

2 - 25

BLM_0006713

## CHAPTER TWO

### MANAGEMENT UNIT 5 (Redcloud Peak ACEC)

*Land Ownership*: 5,960 acres of Public Surface; 1% of the Planning Area

This unit is located southwest of Lake City within the boundary of the Alpine Triangle SRMA. The unit contains one of two known viable breeding populations of the Uncompahgre fritillary butterfly, an endangered species. A research effort by a national university is on-going regarding the butterfly. The 14,000 foot-plus Redcloud Peak is within this unit characterized by fragile high-country tundra. Other features within the unit are highly scenic visual resources and bighorn sheep habitat. Domestic sheep grazing is authorized within the unit, except on lands within the Silver Creek Drainage. The unit has a moderate to high potential for the occurrence of locatable materials. Concerns within the unit include fragile tundra that receives heavy recreation use and trampling of habitat of the Uncompahgre fritillary butterfly by domestic sheep.

The unit will be designated and managed as the Redcloud Peak Area of Critical Environmental Concern (ACEC). Protection and enhancement of habitat of the Uncompahgre fritillary butterfly and the species in the unit will be emphasized.

This ACEC will continue to be located within, and managed accordingly, as part of the existing Alpine Triangle SRMA, providing a diversity of recreation opportunities, including interpretation, while protecting important historic, scenic, and natural values (see Map F-4 in Appendix F in the RMP for boundaries of the SRMAs in the planning area). Specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

On-going efforts in research, monitoring, and inventory will continue and be expanded as needed. Surface disturbing activities will be restricted to protect the endangered species and existing and potential habitat of the species. Research or collecting will require authorization by BLM and the USF&WS.

The entire federal oil, gas, and geothermal estate in the unit, totalling 5,962 acres, will be open to leasing with a controlled surface use stipulation, and mineral material disposal will not be permitted in the unit in order to protect habitat of the Uncompahgre fritillary butterfly and the species. Please refer to Appendix K for the controlled surface use stipulation requirements within this unit.

**Livestock Grazing Management.** On public lands within the unit, domestic sheep grazing will be controlled to prevent destruction of Uncompahgre fritillary butterfly habitat. Public lands in the Silver Creek drainage will continue to be unavailable for livestock grazing in order to prevent destruction of Uncompahgre fritillary butterfly species or habitat.

**Recreation Management.** Motorized vehicular travel will be limited to designated routes, unless otherwise authorized, in order to protect habitat of the Uncompahgre fritillary butterfly, as shown on a map and Table F-1 in Appendix F of the RMP, and on maps in the Gunnison Resource Area office. No routes are designated in the unit in this RMP. Public lands will continue to be managed for Semi-Primitive Non-Motorized and Primitive ROS settings, according to the existing Alpine Triangle RAMP.

**Visual Resources.** Visual resources will be managed according to VRM Class II objectives in order to maintain the natural setting in the unit.

**Rights-of-Way.** Public lands in the unit will be classified an avoidance area for rights-of-way.

**Fire Management.** Wildfires in the unit will be managed under the conditional suppression category.

### MANAGEMENT UNIT 6 (Slumgullion Earthflow National Natural Landmark ACEC)

*Land Ownership:* 1,405 acres of Public Surface; less than 1% of the Planning Area

This unit is located approximately 2 miles southeast of Lake City and contains part of the Slumgullion Earthflow National Natural Landmark, a mass wasting phenomenon. A Recreation and Public

BLM_0006714

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

Purposes (R&PP) classification (C-0126201) applies to part of the public lands in the unit.

The unit is located within the Alpine Triangle Special Recreation Management Area (SRMA). The Colorado Natural Areas Program has designated most of the public lands in the unit as a Colorado Special Interest Area. The unit contains approximately 270 acres of crucial elk and deer winter range.

The unit will be designated and managed as the Slumgullion Earthflow National Natural Landmark Area of Critical Environmental Concern (ACEC) to enhance and protect the natural values within the earthflow.

This ACEC will continue to be located within, and managed accordingly, as part of the existing Alpine Triangle SRMA, providing a diversity of recreation opportunities, including interpretation of the earthflow, while protecting important historic, scenic, and other natural values (see Map F-4 in Appendix F in the RMP for boundaries of the SRMAs in the planning area). Specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

Surface disturbance within the unit will not be permitted if the natural values within the earthflow, including visual resources, will be degraded.

The entire federal, oil, gas, and geothermal mineral estate within the unit, 1,397 acres under federal surface and 45 acres of split estate, will be open to leasing with a no surface occupancy stipulation in order to protect values associated with the earthflow. Disposal of mineral material on 1,397 acres of federal mineral estate in the unit will not be permitted within the unit for the same reason.

**Forest Management.** Timber harvesting will not be permitted in the unit.

**Recreation Management.** Motorized vehicular traffic in the unit will be limited to designated routes, in order to prevent surface disturbance within the slide area, as shown on a map and Table F-1 in Appendix F of the RMP, and on maps in the Gunnison Resource Area office.

**Visual Resource Management.** The unit will be managed according to VRM class II objectives.

**Rights-of-Way.** Utility rights-of-way will not be allowed in the unit except for buried utilities along an eight-acre corridor where Highway 149 crosses the unit, and buried utility services to individual private inholdings or property.

**Fire Management.** Wildfires on about 1,060 acres of public lands will be managed according to a conditional suppression policy and about 347 acres will be managed according to a full suppression policy.

## MANAGEMENT UNIT 7 (West Antelope Creek ACEC)

*Land Ownership:* 28,275 acres of Public Surface; 5% of the Planning Area.

This management unit is generally bounded on the south and west by the Curecanti National Recreation Area, on the north by the Gunnison National Forest, and on the east by West Antelope Creek. The unit contains big game crucial winter range, the greatest concentration of wintering elk and deer in the planning area, bald eagle habitat, the Dillon Mesa bighorn sheep herd, and the Colorado Division of Wildlife Sapinero State Wildlife Area (the first tract of land purchased under the Pittman-Robertson Act in Colorado). Much of the elk and deer crucial winter range in the unit is characterized by fairly gentle terrain (sparsely vegetated, and dissected by narrow, shallow drainages) that results in long sight distances and few sound barriers that could serve as buffers. The unit receives extensive recreational hunting use, and contains crucial big game winter range important in maintaining huntable populations in the planning area on 26,157 acres of public lands. An elk-calving area occurs in the unit. The unit contains lands critical to early spring and summer livestock grazing. A 115 kv electrical transmission line is located in the southern part of the unit.

2 - 27

BLM_0006715

CHAPTER TWO

A major concern within the unit is that CDOW long-range elk and deer herd goals have reached or are beyond the carrying capacity in uplands and riparian areas, and attaining lower numbers in the next five years will be in the best interest of the habitat. Improper livestock grazing along North Willow Creek is a concern within that riparian area, along with the lack of administrative access into that watershed. Other concerns regarding elk and deer and their habitat are private land development within crucial winter ranges, the extent and distribution of palatable shrub browse species, vegetative/land treatments that remove winter browse, and disturbances and human activity during critical periods within crucial winter ranges. Another concern is that the bighorn sheep herd appears to be static and below herd goal numbers.

The unit will be designated and managed as the West Antelope Creek Area of Critical Environmental Concern (ACEC), and to improve the capabilities of the resources in the unit to support wintering elk, deer, and bighorn sheep.

A CRMAP will be prepared for the unit, and will include management actions within the recommended Dillon Pinnacles ACEC, unit 9.

Land uses will be designed and implemented so as not to degrade big game winter range.

Surface-disturbing activities on public lands will not be permitted from December 1 through April 30 on crucial elk and deer winter range. Within the first five years following designation, recommendations will be made to CDOW to manage total numbers of elk and deer on crucial winter range so as to improve the production and vigor of important browse species and to increase the winter range carrying capacity. Refer to Table A-4 in Appendix A for these interim herd goal numbers that will be recommended for BLM-managed lands. The habitat thereafter on BLM-administered lands will be managed to achieve CDOW's long-range herd goals, within carrying capacities of the habitat.

Federal oil and gas estate totalling 126 acres under federal surface within 1/4 mile radius of sage grouse lek sites will be open to leasing with a no surface occupancy stipulation to prevent disturbance to lek sites and strutting sage grouse. The BLM will, if necessary, through negotiations with operators or lessees, seek to obtain rescheduling of oil and gas related activities within federal oil and gas estate (26,112 acres under federal surface and 8,365 acres of split estate) on crucial big game winter range from December 1 through April 30 to prevent disturbances to wintering elk and deer, and to help maintain herd viability in this ACEC. This rescheduling could be in addition to the 60-day delay authorized in standard oil and gas lease terms. Federal oil and gas estate (17 acres under federal surface and 137 acres of split estate) within elk calving areas will be open to leasing with a timing limitation being in effect from April 16 through June 30 to prevent disturbance to calving elk. Variances to these stipulations may be granted (see Appendix K).

Disposal of mineral materials will not be authorized on 26,112 acres of federal mineral estate from December 1 through April 30 on crucial big game winter range to prevent disturbance to wintering deer and elk. Disposal will not be permitted on 17 acres of federal mineral estate from April 16 through June 30 within elk-calving areas to prevent disturbance to calving elk. Disposal will not be authorized on 126 acres of federal mineral estate within 1/4 mile of sage grouse lek sites from April 1 through May 31 to prevent disturbance to strutting sage grouse.

**Soils and Water.** Non-conflicting soil and watershed improvement projects, such as check dams, will be permitted.

**Livestock Grazing Management.** In order to permit riparian conditions to improve, livestock grazing will not be authorized on public lands along North Willow Creek in the Stevens Creek Common Allotment, No. 6202, until the riparian area has recovered sufficiently to permit livestock use. Any future grazing systems approved for this section of North Willow Creek will include measures to facilitate the continued improvement of riparian conditions and resources.

Livestock grazing will not be authorized within Allotment 6200 in this unit in order to remedy conflicts involving wildlife habitat. Non-conflicting and compatible livestock management objectives,

2 - 28

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

projects, and mitigating measures will be incorporated into new activity plans, such as AMPs, HMPs or CRMAPs, before being implemented.

**Forest Management.**

Commercial logging operations will be designed to enhance crucial big game winter range, and vegetation in general.

**Recreation Management.** Approximately 600 acres of public land within or adjacent to the Sapinero State Wildlife Area will be closed to motorized vehicular use in order to be compatible with CDOW management on adjacent state-owned lands. Motorized vehicular use on the remaining 27,615 acres of public lands in the unit will be limited to designated routes, if necessary, from December 1 through April 30, to prevent disturbance to wintering elk and deer in the event of excessive snow depths or big game herd concentrations. These designations and routes are shown on maps and Table F-1 in Appendix F of the RMP and on maps in the Gunnison Resource Area office.

**Visual Resource Management.** The unit will be managed according to VRM Class II (7,551 acres), VRM Class III (9,887 acres), and VRM Class IV (10,777 acres) objectives.

**Rights-of-Way.** Rights-of-way related construction activities will not be permitted on crucial big game winter range from December 1 through April 30 to prevent disturbance to wintering elk and deer.

**Fire Management.** Wildfires on about 20,365 acres of public lands will be managed according to a conditional suppression policy and about 7,850 acres will be managed according to a full suppression policy.

**MANAGEMENT UNIT 8 (South Beaver Creek ACEC)**

*Land ownership:* 4,570 acres of Public Surface; Less than 1% of the Planning Area

This unit is located between the Gold Basin Creek Road (Gunnison County Road 38) and South Beaver

Creek immediately southwest of Gunnison. The unit is characterized by sagebrush-covered rolling hills with many intermittent drainages and benches. A 230 kv electrical transmission line crosses the southern end of the unit. Several roads are located within the unit. About 1,960 acres of crucial big game winter range occur in the unit. The public lands in the north and east portions of the unit receive heavy OHV use. The unit contains scattered populations of skiff milkvetch *(Astragalus microcymbus)*, a USF&WS Category 2 and Colorado sensitive plant species. The species is not fully protected under the Threatened and Endangered Species Act.

The unit will be designated and managed as the South Beaver Creek Area of Critical Environmental Concern (ACEC). The unit will be managed to protect and enhance existing populations and habitat of skiff milkvetch. Plant monitoring studies will be designed and conducted cooperatively with the Colorado Natural Areas Program and The Nature Conservancy to determine population trends; actions designed to improve habitat conditions will be initiated. Surface disturbing activities will be restricted to protect the species and potential habitat. An ACEC management plan will be prepared. No chemical spraying will occur on public lands within the unit. Any research activities will require approval by the BLM.

No vegetative treatments, or treatment maintenance will be conducted in the unit that would adversely effect skiff milkvetch populations or habitat.

No additional forage allocations will be made for either wildlife habitat or livestock grazing management.

The entire Federal oil, gas, and geothermal estate in the unit, 4,540 acres, will be open to leasing with a controlled surface use stipulation in order to protect populations of skiff milkvetch. Please refer to Appendix K for the controlled surface use stipulation requirements for this unit.

Disposal of mineral materials on 4,540 acres of federal mineral estate within the unit will not be authorized for the same reason.

BLM_0006717

**CHAPTER TWO**

**Soils.** Non-conflicting erosion control measures that do not alter existing skiff milkvetch habitat will be permitted.

**Livestock Grazing Management.** Domestic sheep grazing will not be authorized in the unit to avoid possible destruction of skiff milkvetch populations and related habitat.

**Recreation Management.** To prevent accidental destruction of skiff milkvetch populations, and existing habitat, motorized vehicular traffic in the unit will be limited to designated routes, as shown on a map and Table F-1 in Appendix F of the RMP, and on maps in the Gunnison Resource Area office.

**Visual Resources.** The unit will be managed according to VRM Class III (2,800 acres) and VRM Class IV (1,765 acres) objectives.

**Disposal of Public Lands.** Public lands in the unit containing colonies of skiff milkvetch will not be available for disposal until future inventories show that sufficient colonies occur throughout the Planning Area such that disposal will not jeopardize the overall population.

**Acquisition of Non-Federal Lands.** If available, non-federal lands containing colonies of skiff milkvetch will be acquired if necessary for the enhancement, management, protection of the species, and to increase the number of colonies on public lands.

**Rights-of-Way.** Rights-of-way developments will be permitted throughout the unit, provided surface disturbance does not impair or degrade colonies of skiff milkvetch. An on-the-ground inventory and appropriate mitigation will be required on all rights-of-way involving surface disturbing activities.

**Fire Management.** Wildfires in the unit will be managed under the conditional suppression category.

**MANAGEMENT UNIT 9 (Dillon Pinnacles ACEC)**

*Land Ownership:* 535 acres of Public Surface; less than 1% of the Planning Area.

This unit is located near the edge of the planning area boundary on the north side of U.S. Highway 50 and the Blue Mesa Reservoir, and is adjacent to unit 5, West Antelope ACEC. The specific management for this unit will be included in the ACEC management plan for unit 7. The public lands are classified as crucial big game winter range. The unit contains portions of the steep, highly dissected cliffs (spires) that form a highly visible and scenic backdrop for Blue Mesa Reservoir. The National Park Service maintains a heavily used hiking trail to these spires. A concern within the unit is that private development could occur on approximately 270 acres of non-federal land.

The unit will be designated as the Dillon Pinnacles Area of Critical Environmental Concern (ACEC), and will be managed to protect scenic and recreational opportunities. Appropriate management actions and recommendations from this prescription will be incorporated into the management plan for the West Antelope Creek CRMAP, unit 7.

Surface disturbing activities will not be permitted in the unit.

The entire federal oil and gas estate in the unit, totalling 530 acres under federal surface and 22 acres of split estate, will be open to future mineral leasing with a no surface occupancy stipulation in order to prevent potential deterioration of scenic, recreation, and other natural values. Disposal of mineral materials on 530 acres of the federal mineral estate in the unit will not be permitted for the same reason.

**Livestock Grazing Management.** Livestock grazing will not be authorized within the unit in order to maintain a natural appearing landscape.

**Recreation Management.** The unit will be closed to motorized vehicular travel to prevent deterioration of scenic values, as shown on a map and in Table F-1 in Appendix F of the RMP, and on maps in the Gunnison Resource Area office.

**Visual Resource Management.** The unit will be managed according to VRM Class I objectives.

BLM_0006718

DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

**Acquisition of Non-Federal Lands.** If available, approximately 270 acres of non-federal lands will be acquired in order to enhance and facilitate management of visual, recreation, and other natural values, and to prevent deterioration of visual resources from potential private development.

**Rights-of-Way.** Public lands in the unit will be classified an exclusion area for rights-of-way.

**Fire Management.** Wildfires in the unit will be managed under the full suppression category.

**MANAGEMENT UNIT 10**

*Land Ownership:* 15,112 acres of Public Surface; 3% of the Planning Area

This unit consists of lands containing yearlong bighorn sheep and other wildlife habitat.

This unit consists of areas along Cebolla and Cochetopa Creek that are important for the viability of bighorn sheep in the Planning Area. The CDOW has frequently trapped bighorn sheep in this unit for reintroduction and transplants into other areas. The unit is grazed by cattle, and domestic sheep grazing occurred in the past. Diseases potentially being transferred from domestic sheep to bighorn sheep, and road construction and encroachment along the east side of the Cebolla Creek area are concerns within the unit.

The unit will be managed to maintain or improve habitat capable of supporting a self-sustaining population of bighorn sheep, with herd sizes of about 100-150 animals in the Cochetopa Canyon and about 150 animals in the Cebolla Creek area. An HMP will be prepared for the unit. Activities that will result in disturbance to lambing bighorn sheep will be restricted from April 15 through June 15. Monitoring will be conducted to determine habitat condition and trend, and forage utilization, including within existing treatment areas. Activities and land uses that will result in the deterioration of, or decrease in, bighorn sheep habitat or herd numbers will not be permitted. Wildlife treatments recommended in the HMP as a result of monitoring will be permitted.

Federal mineral estate totalling 269 acres within BLM protective withdrawal C-014711 along parts of Cebolla Creek will continue to be withdrawn from mineral entry and location in order to protect riparian and recreation values from potential mining disturbances.

The entire federal oil and gas estate in the unit, totalling 14,817 acres under federal surface and 590 acres of split estate, will be open to leasing with a no-surface-occupancy stipulation to prevent disturbance to bighorn sheep and their habitat. Disposal of mineral material on 14,817 acres of federal mineral estate will not be permitted from April 15 through June 15 to prevent disturbance to bighorn sheep habitat and lambing bighorn sheep. Disposal of mineral materials will not be permitted on 1,245 acres of federal mineral estate from April 15 through June 30 within elk-calving areas to prevent disturbance to, and on 225 acres yearlong within withdrawal C-014711 to protect recreation and riparian values along parts of Cebolla Creek from potential disturbances associated with mineral material disposal.

**Livestock Grazing Management.** Domestic sheep grazing will not be authorized in the unit to help prevent disease spreading from domestic sheep to bighorn sheep. Livestock grazing will be managed in a manner compatible with the objectives of this unit. Range improvements or treatments recommended in activity plans, such as AMPs or CRMAPs, as a result of monitoring will be permitted if compatible with maintaining bighorn sheep habitat.

**Visual Resource Management.** The unit will be managed according to VRM Class II (7,367 acres), VRM Class III (540 acres) and VRM Class IV (7,205 acres) objectives.

**Rights-of-Way.** Public lands will be open to the location of rights-of-way with appropriate mitigation to insure compatibility with the management of bighorn sheep. Rights-of-way construction or maintenance that will result in disturbance to lambing bighorn sheep will not be permitted from April 15 through June 15.

**Fire Management.** Wildfires on about 8,687 acres of public lands will be managed according to a

2 - 31

BLM_0006719

DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

will be managed according to a full suppression policy.

## MANAGEMENT UNIT 12

*Land ownership:*  91,547 acres of public surface; 16% of the Planning Area.

This unit contains elk and deer crucial winter range.

This management unit is located generally at lower elevations and throughout the planning area. Public lands totalling approximately 76,192 acres are crucial elk and deer winter range. Livestock grazing and other land uses occur on most of the public lands in the unit. The unit contains lands critical to early spring and summer livestock grazing. A variety of vegetation types occur within the unit, including some riparian zones. The unit also contains lands within the Gunnison ERMA; elk calving areas totalling 235 acres; and sage grouse brood-rearing areas.

Concerns within the unit include winter range occurring on mixed land ownership; large numbers of deer congregating along U.S. Highway 50; heavy to severe utilization of mountain mahogany by elk and deer and the lowering plant vigor in GMU 64 northeast of Cimarron; vegetative treatments that have resulted in the removal of browse species; and long-range CDOW herd goals possibly being too high in parts of the unit to maintain healthy browse stands under the current condition of the browse species in these GMUs (see Table A-1, Appendix A, for CDOW long-range herd goals for entire GMUs).

The unit will be managed to improve habitat conditions and increase the production and diversity of shrub species in upland and riparian vegetative types to support wintering populations of deer and elk, and to help meet CDOW long-range herd goals.

Any additional forage available for livestock as a result of range improvements, treatments, or grazing management procedures will be allocated in accordance with 43 CFR 4100, after meeting the basic soil and watershed needs defined in the Montrose District Soil Erosion Monitoring Guidelines. See Table I-1, Appendix I, for target basal cover densities that will be achieved on treated

areas before forage will be available for livestock grazing needs. Table I-1 is derived from Appendix F of the guidelines referenced above. Any additional forage available for livestock will be considered in reactivating suspended use or as a means to avoid suspending active use.

An HMP or a CRMAP will be developed focusing on overall habitat improvement and intensive habitat management. The plan will include treatments and projects in uplands and riparian ecosystems to increase the production and composition of bitterbrush, serviceberry, mountain mahogany, willows, and cottonwoods. Methods will include shrub plantings, burning, and techniques to convert decadent sagebrush stands to stands dominated by young sagebrush plants in the uplands. Wildlife habitat treatments will be maintained to ensure success. Monitoring of habitat conditions, utilization, and trend will be continued.

In the portions of GMU 55, 66, 67, and 551 within the unit, resources and land uses will be managed for the benefit of elk and deer winter habitat. In the portions of GMU 64 south and east of Cimarron in the unit big game utilization will be limited to 50% of the current years' growth of mountain mahogany. To help achieve this lower rate, a recommendation will be made to the CDOW to implement measures to temporarily reduce big game numbers in the GMU. See Table A-4 in Appendix A for proposed recommendations.

Interim deer herd goal numbers in portions of certain other GMUs within the unit (55, 66, 67, and 551) will be recommended to CDOW in order to permit the production and vigor of important browse species to increase such that winter habitat necessary to support CDOW's long-range herd numbers will be available. See Table A-4, Appendix A, for interim elk and deer numbers to be recommended on the BLM-managed lands, and Tables A-2 and A-3 for long-range elk and deer herd goals for BLM-managed lands within the unit.

Activities that will result in unnecessary disturbances to big game will be excluded from December 1 through April 30. Activities that will unnecessarily

2 - 33

BLM_0006721

**CHAPTER TWO**

disturb elk within calving areas from April 16 through June 30 will be excluded.

To prevent disturbance to calving elk, a timing limitation will be in effect on approximately 235 acres of federal oil, gas, and geothermal estate under federal surface, from April 16 through June 30, within elk-calving areas in the unit. Federal oil and gas estate totalling 882 acres under federal surface within 1/4 mile radius of sage grouse lek sites will be open to leasing with a no surface occupancy stipulation to prevent disturbance to strutting sage grouse. Variances to these stipulations may be granted (see Appendix K).

Disposal of mineral material within elk-calving areas will not be authorized on 235 acres of federal mineral estate from April 16 through June 30 to prevent disturbance to calving elk, on 74,185 acres of federal mineral estate from December 1 through April 30 within crucial big game winter range to prevent disturbance to wintering elk and deer, and on 882 acres of federal mineral estate within a 1/4 mile radius of sage grouse lek sites from April 1 through May 31 to prevent disturbance to strutting sage grouse and habitat.

The federal oil and gas estate in withdrawal C-041711 along Cebolla Creek, totalling 164 acres, will be open to mineral leasing with a controlled surface use stipulation being in effect that restricts oil and gas development, as well as related surface disturbance, to an area beyond all riparian vegetation, in order to prevent damage to or removal of riparian vegetation (See Appendix K for this stipulation and exception language). Mineral material disposal will not be permitted on these lands for the same reasons.

**Livestock Grazing Management.** Domestic sheep grazing and trailing will be excluded within the portion of GMU 64 in the unit from October 15 through April 15 in order to eliminate forage competition with big game. Compatible range improvements and treatments will be permitted.

**Forest Management.** Suitable forest lands and woodlands will be available for harvest, with a seasonal stipulation on harvesting from December 1 through April 30 to reduce stress on wintering big game. Inventories of all forest lands and woodlands will be conducted to determine associated big game habitat conditions and habitat improvements needs. Spur roads and temporary roads used for logging will be kept to a minimum and will be physically blocked and re-vegetated after completion of operations.

**Recreation Management.** Motorized vehicular traffic on public lands in the unit north of U.S. Highway 50, east of the Gunnison River and west of Quartz Creek will be limited to designated routes from December 1 through April 30, if necessary, due to big game herd concentrations or excessive snow depth, to prevent disturbance to wintering deer and elk. This designation and these routes are shown on a map and in Table F-1 in Appendix F of the RMP and on maps in the Gunnison Resource Area office.

**Visual Resource Management.** Public lands in the unit will be managed according to VRM Class II (7,747 acres) and VRM Class III (47,680 acres), and VRM Class IV (36,120 acres) objectives.

**Transportation and Access.** Public access will be acquired into the Bead Creek area for recreation and livestock grazing management.

**Fire Management.** Wildfires on about 83,012 acres of public lands will be managed according to a conditional suppression policy and about 8,535 acres will be managed according to al full suppression policy.

## MANAGEMENT UNIT 13

*Land Ownership:* 187,030 acres of Public Surface; 32% of the Planning Area

This unit generally contains "I" category livestock grazing allotments.

This management unit is located throughout the planning area except in the extreme eastern, northeastern, and northwestern portions. The unit consists of intensively managed BLM "I" category grazing allotments. The unit also contains pronghorn antelope habitat, elk calving areas, sage grouse nesting areas, and stands of suitable commercial forest lands. The unit also contains approximately

2 - 34

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

20,970 acres of crucial big game winter range on public lands. Public lands in the unit are located within the Gunnison Extensive Recreation Management Area and provide a variety of recreation resources and opportunities, including a hang-gliding site on Big Mesa and an area of concentrated public recreation use on High Mesa. Concerns within the unit are a lack of up-to-date vegetation trend data, a heavy-to-severe utilization of some riparian vegetation, resulting in below-potential forage production, undesirable plant compositions, stream channel and stream bank erosion and instability and other hydrological problems within riparian ecosystems, total forage production being far below potential, utilization of forage on public lands within a portion of the unit before range readiness criteria are met, sagebrush treatment location, design, and their later management, recreation users causing livestock control and management problems by leaving gates open, an unchecked increase in noxious weeds and their potential to reduce forage production and danger to livestock, and the shortage of AMPs.

The unit will be managed to improve or maintain ecological conditions. Suitable commercial forest lands will be available for harvest. Suitable public lands will be available for livestock grazing. Activity plans, such as CRMAPs or AMPs, will be developed, and existing AMPs will be updated as needed using CRMAP standards and procedures. Existing range improvements and treatments will be maintained and new range improvements and treatments will be developed according to updated or new activity plans. New or additional available forage will be allocated according to STANDARD MANAGEMENT. In order to permit riparian conditions and the fishery resource to improve, livestock grazing will not be authorized on public lands along approximately 1/4 mile of Los Pinos Creek in Allotment 6340 until the riparian area has recovered sufficiently to permit livestock use. Rangeland vegetation monitoring and inventory for condition, trend, and utilization patterns will continue. Activity plans developed that involve lands at High Mesa, Hartman Rocks, and Big Mesa will include and consider management objectives for all resources, including recreation management.

**Wildlife Habitat Management.** Federal oil and gas estate totalling 1,680 acres under federal surface and 42 acres of split estate on elk calving areas will be open to leasing with a timing limitation being in effect from April 16 through June 30 to prevent disturbance to calving elk. Federal oil and gas estate totalling 882 acres under federal surface within 1/4 mile radius of sage grouse lek sites will be open to leasing with a no surface occupancy stipulation to prevent disturbance to strutting sage grouse. Variances to these stipulations may be granted (see Appendix K). Disposal of mineral materials will not be permitted on federal mineral estate on these lands during these same time periods for the same reasons.

**Recreation Management.** One area on High Mesa will be considered for a campground.

Motorized vehicular traffic in the unit on public lands in the area north of U.S. Highway 50, east of West Antelope Creek, and west of the Gunnison River will be limited to designated routes from December 1 through April 30, if necessary, due to big game herd concentrations or excessive snow depths in order to prevent disturbance to wintering big game. This designation and these routes are shown on a map and in Table F-1 in Appendix F of the RMP and on maps in the Gunnison Resource Area office.

**Visual Resource Management.** The unit will be managed according to VRM Class II (26,312 acres), VRM Class III (47,680 acres) and VRM Class IV (11,718 acres) objectives. If feasible, rehabilitation measures will be conducted on 1,687 acres of public lands classified as VRM II R and IV R (lands with existing man-made visual intrusions) in order to improve scenic quality.

**Transportation and Access.** Administrative access will be acquired into the Huntsman Mesa area from Colorado Highway 149 for livestock grazing management and public access will be acquired into the Vulcan/Big Mud Pond area and into public lands east of Deer Beaver Creek for recreation and livestock grazing management; into Willow Creek in the Blue Mesa area for commercial forest, livestock grazing, and recreation management, and into the Sandy Mesa area and Poison Draw areas on Blue

2 - 35

**CHAPTER TWO**

Mesa for commercial forest and livestock grazing management.

**Fire Management.** Wildfires on about 160,110 acres of public lands will be managed according to a conditional suppression policy and about 27,467 acres will be managed according to a full suppression policy.

## MANAGEMENT UNIT 14

*Land Ownership:* 2,667 acres of Public Surface; less than 1% of the Planning Area

This unit consists of riparian areas containing important sage grouse broodrearing areas along about 25 miles of public land.

This management unit consists of public lands containing riparian areas within important sage grouse high production habitat. These lands are located east of Gunnison and are associated with perennial or intermittent streams. Some of the public lands within this unit are big game crucial winter range. The abundance of insects and lush herbaceous vegetation found in riparian areas is crucial for the survival of sage grouse chicks during the first twelve weeks after hatching. Resources within this unit are also important for the maintenance and enhancement of the quality of general riparian vegetation, aquatic/fishery habitat, stream channels, and water quality. Concerns within this unit are that riparian ecosystems in general are below their ecological potential and have been reduced in size due to water regimes being modified by improper livestock grazing and road locations. Downcutting or channel incision, and accompanying lowering of water tables has resulted in a reduction in riparian plant species and an invasion of upland plants.

The unit will be managed to protect, restore and enhance these riparian areas on public lands in order to optimize sage grouse populations. Management objectives will be to provide high quality brood-rearing habitat with a diversity of plant species composition and structure, aimed at achieving improved riparian conditions. Adequate vegetative cover necessary to avoid predation of foraging chicks will be another desired condition to be achieved.

Riparian improvement strategies and/or projects will be included in all CRMAPs and other activity plans and implemented.

Emphasis will be placed on rehabilitating riparian areas where the riparian or hydrological condition is degraded. The herbaceous plant species will be increased to improve forage plants and insects for sage grouse. The proportion of native bunch grasses will be increased to help meet escape and hiding cover requirements of sage grouse chicks. Measures to reduce impacts to the riparian ecosystems and associated stream channels, and to prevent unnecessary removal of sage grouse brood habitat will be included in all surface-disturbing plans. No surface disturbing activities will be permitted from June 15 through July 31 in order to prevent disturbance to sage grouse during the brood-rearing period. All leks will be protected from surface disturbance. Resources within this unit will continue to be inventoried and evaluated for potential, condition and trend, and monitoring studies will be conducted. Vegetation treatments compatible with the objectives of this unit will be permitted.

The federal oil and gas estate in the unit, totalling 2,440 acres under federal surface and 60 acres of split estate will be open to mineral leasing with a controlled surface use stipulation being in effect that restricts oil and gas development, as well as related surface disturbance, to an area beyond all riparian vegetation, in order to prevent damage to or removal of riparian vegetation and sage grouse brood-rearing habitat (see Appendix K for this stipulation and exception language). Federal oil and gas estate within 1/4 mile of sage grouse leks totalling 126 acres under federal surface will be open to leasing with a no surface occupancy stipulation to prevent disturbance to strutting sage grouse. Variances to these seasonal stipulations may be granted (see Appendix K).

Disposal of mineral materials on about 2,440 acres of federal mineral estate in the unit will not be authorized, from June 15 through July 31 to prevent disturbance to sage grouse during the brooding period, at sage grouse leks on 126 acres of federal mineral estate from April 1 through May 31 to prevent disturbance to strutting sage grouse, and from

2 - 36

## DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN

December 1 through April 30 on 1085 acres of federal mineral estate within crucial big game winter range to prevent disturbing wintering deer and elk.

**Livestock Grazing Management.**   A 4 inch minimum stubble height will be maintained from June 15 through July 31 in order to improve and provide cover for sage grouse chicks, to improve general riparian ecosystem conditions, and to help increase the proportion of native bunch grasses, resulting in more livestock forage. A 2½ inch stubble height will be required at all other times.

Where authorized, domestic sheep grazing will be permitted in the unit only after June 1 to prevent disturbance to nesting sage grouse and nests.

**Visual Resource Management.**   The unit will be managed according to VRM Class II (21 acres), VRM Class III (482 acres), and VRM Class IV (2,102 acres) objectives.

**Rights-of-Way.**   Mitigating measures will be included in rights-of-way authorizations to prevent disturbance within this unit to brooding sage grouse from June 15 through July 31 and from December 1 through April 30 on crucial big game winter range to prevent disturbance to wintering deer and elk.

**Fire Management.**   Wildfires on about 72 acres of public lands will be managed according to a conditional suppression policy and about 2,533 acres will be managed according to a full suppression policy.

## MANAGEMENT UNIT 15

*Land Ownership:* 4,725 acres of Public Surface; less than 1% of the Planning Area

This unit consists of riparian areas containing important fishery streams along approximately 57 miles of public land.

This unit consists of public land along 57 miles of streams and riparian zones containing a fishery or having the potential to support and maintain catchable populations of fish. Parts of the unit are located throughout the Planning Area, and are associated with

a variety of riparian zones. Parts of some of the streams contain crucial big game winter range, elk calving areas, lands suitable for grazing, lands within two SRMAs, and sage grouse brood-rearing habitat. This unit contains a 1.9 mile-long portion of Segment A of the Lake Fork of the Gunnison River, a study segment eligible for inclusion into the National Wild and Scenic Rivers System.   Concerns are water quality, streams being below their potential for providing aquatic habitat, livestock forage utilization, physical damage from livestock grazing and roads, and a lack of fishery resource information to use in planning for habitat improvement projects.

The unit will be managed to restore and enhance the condition of fishery streams.   Projects will be developed to stabilize and restore stream banks and improve instream conditions where necessary. Riparian vegetation and soil improvement projects will be permitted and included in all CRMAPs, AMPs, or other activity plans, and implemented to meet the objectives of this unit. The Resource Area HMP will be revised to include recommendations in this unit.  Resources will continue to be inventoried and monitored for condition, potential, and trend.

Federal oil, gas, and geothermal estate totalling 445 acres under federal surface, will be open to leasing with a no surface occupancy stipulation within BLM protective withdrawal C-0125423 to protect riparian values and scenery within the Alpine Loop back Country byway. Mineral material disposal on these lands will not be permitted yearlong for the same reasons.

Federal oil, gas, and geothermal estate within elk calving areas, 247 acres under federal surface, will be open to leasing with a timing limitation being in effect from April 16 through June 30 to prevent disturbance to calving elk.   Variances to these stipulations may be granted. Disposal of mineral materials on the federal mineral estate in these areas will not be permitted during those same times for the same reasons.

Disposal of mineral materials on 655 acres of federal mineral estate within crucial elk and deer winter range will not be authorized from December 1

BLM_0006725

**CHAPTER TWO**

through April 30 to prevent disturbance to wintering big game.

**Livestock Grazing Management.** When grazing occurs in the unit, a minimum stubble height of 4 inches will be maintained for key herbaceous forage species within riparian zones, in order to improve stream and streamside conditions, including soils and vegetation in the associated riparian zones. The minimum stubble height will be implemented according to the Livestock Grazing Management section of Standard Management.

Livestock grazing will continue to not be authorized along Henson Creek in order to maintain riparian, fishery, and scenic values.

**Recreation Management.** Motorized vehicular traffic in the unit will be managed as follows. These designations and routes are shown on maps and in Table F-1 in Appendix F of the RMP and on maps in the Gunnison Resource Area office.

1. Motorized vehicular traffic south of Lake City (1,680 acres) will be limited to designated routes yearlong, with snowmobile use permitted on snow, and when the CRMAP is prepared for the Alpine Triangle SRMA, a map will be included and areas defined on the ground delineating appropriate pull-off and parking areas adjacent to designated routes;

2. Motorized vehicular traffic in the unit on Alder Creek (235 acres) will be limited to designated routes, if necessary, from December 1 through April 30, in order to prevent disturbance to wintering elk and deer on crucial big game winter range.

The lands in this unit located within the boundaries of the Alpine Triangle SRMA, shown on map F-4, Appendix F, will be designated and managed as part of the SRMA. Appropriate management actions and recommendations from this prescription will be incorporated into the CRMAP for the Alpine Triangle SRMA. The portions of this unit in the Alpine Triangle SRMA will continue to be managed for the ROS settings in the RAMP for that SRMA.

**Wild and Scenic River Study Segment.** The 1.9 mile-long portion of Segment A of the Lake Fork of the Gunnison River, a segment found to be eligible, but not suitable, for inclusion into the National Wild and Scenic Rivers System, will be managed according to this prescription and STANDARD MANAGEMENT for the RMP.

**Visual Resource Management.** The unit will be managed according to VRM Class II objectives.

**Rights-of-Way.** No surface-disturbing activities will be permitted along Alder, Willow (west of Gunnison), and Razor Creeks, and along the lower one-mile of South Beaver Creek in the unit from July 1 through July 31 in order to prevent disturbance to sage grouse during the brood rearing period. Mitigating measures will be included in rights-of-way authorizations in these areas of this unit to prevent disturbance to brooding sage grouse.

**Fire Management.** Wildfires on about 3,470 acres of public lands will be managed according to a conditional suppression policy and about 1,485 acres will be managed according to a full suppression policy.

## MANAGEMENT UNIT 16

*Land Ownership:* 36,768 acres of Public Surface; 6% of the Planning Area

This unit consists generally of general resource lands.

This management unit is located throughout the planning area. Livestock grazing occurs in this unit containing public lands within "M" (20,300 acres) or "C" (4,777 acres), or "I" (915 acres) category grazing allotments. The unit is located within the Gunnison Extensive Recreation Management Area (ERMA). Concentrated public recreation use, such as camping and picnicking, occurs on a tract of public land approximately 400 acres in size along the Slate River.

The public lands will be managed according to this Management Unit prescription and Standard Management. No major BLM funded projects or

BLM_0006726

facilities will be developed. Studies and inventories involving habitat, vegetation, and other resources will be minimal.

Measures will be included in all plans for surface disturbing activities to prevent disturbance to wintering big game, soil erosion, and deterioration of visual resources and water quality.

Federal oil and gas estate totalling 252 acres under federal surface within 1/4 mile radius of sage grouse lek sites will be open to leasing with a no surface occupancy stipulation to prevent disturbance to strutting sage grouse. The federal oil and gas estate at the 40-acre Old Agency and the 60-acre Soap Creek FS administrative sites will be open to leasing with no surface occupancy in order to protect these uses and facilities from disturbance. Federal oil and gas estate, 4,580 acres under federal surface and 4,885 acres of split estate within elk calving areas, will be open to leasing with a timing limitation being in effect from April 16 through June 30 to prevent disturbance to calving elk. Variances to these stipulations may be granted (see Appendix K). For these same reasons, disposal of mineral materials will not be permitted on 4,580 acres of federal mineral estate from April 16 through June 30 within elk-calving areas, on 252 acres of federal mineral estate within 1/4 mile of sage grouse lek sites from April 1 through May 31, and on the two FS administrative sites yearlong.

**Livestock Grazing Management.** Livestock grazing will continue not to be authorized on 320 acres in Wildcat Creek drainage to help maintain Crested

Buttes' water supply. Range treatments or projects will be permitted otherwise in the unit, according to Standard Management for Livestock Grazing, and will be compatible with the objectives of this unit.

**Recreation Management.** The Slate River will be considered for the development of a campground.

Motorized vehicular traffic on public lands unit north of U.S. Highway 50, south of sections 17 and 18, T. 51 N, R. 1 W., N.M.P.M., east of West Antelope Creek, and west of the Gunnison River only (3,073 acres) will be limited to designated routes from December 1 through April 30 if necessary, due to excessive snow depths or herd concentrations in order to prevent disturbance to wintering elk and deer. This designation and these routes are shown on a map and in Table F-1 in Appendix F of the RMP and on maps in the Gunnison Resource Area office.

**Visual Resource Management.** The unit will be managed according to VRM Class II (11,159 acres), VRM Class III (6,892 acres) and VRM Class IV (14,882 acres) objectives. Rehabilitation measures will be conducted on 2,367 acres of public land classified as VRM IIR, IIIR, and IVR (lands with existing man-made visual intrusions) in order to improve scenic quality.

**Fire Management.** Wildfires on about 26,356 acres of public lands will be managed according to a conditional suppression policy and about 11,260 acres will be managed according to a full suppression policy.

BLM_0006727

# CHAPTER THREE
# RANGELAND PROGRAM SUMMARY

## INTRODUCTION

The livestock grazing management program, like all other resource programs in the Gunnison Resource Area, will be managed according to the decisions contained in this Record of Decision (ROD) and Approved Resource Management Plan (RMP) and policies and regulations relating to BLM management. The Rangeland Program Summary (RPS) describes the livestock grazing management and other decisions as contained within Chapter Two, DESCRIPTION OF THE APPROVED RESOURCE MANAGEMENT PLAN, rangeland resource management objectives for the RMP and planning area, and actions intended to achieve those objectives. Other decisions are included that are related to, or that could effect management of livestock grazing on public lands in the planning area. The information in this RPS complies with Supplemental Program Guidance for livestock grazing management in BLM Manual 1622.34.B, and BLM Manual Handbook H-4160-1, ADMINISTRATIVE REMEDIES.

The RPS is a communication bridge between the two major decision points affecting livestock grazing management: the determination of livestock grazing management and other related land use decisions, and the determination of mutual agreements or grazing decisions that could be necessary to be issued to individual grazing permittees or lessees. As such, the RPS is intended to be a consolidated tracking mechanism for the livestock grazing management program, from the analysis conducted during the RMP process, through subsequent RMP decisions, to the implementation of grazing management actions.

See Table 3-1 in this chapter for a partial summary of the livestock grazing management program for allotments in this RMP. This table updates part of the information contained in Table B-5 in the Gunnison Draft Resource Management Plan and Environmental Impact Statement. Table 3-1 also reflects livestock grazing management decisions anticipated in this RMP and ROD. Followup grazing decisions may be required in order to implement some livestock grazing management decisions in this RPS. Any implementation of these decisions or followup decisions will be made according to BLM policy and regulations.

## RANGELAND PROGRAM SUMMARY UPDATE(S)

Updates of this RPS will be issued as required by policy or more frequently as needed to document progress toward meeting objectives defined in the Gunnison Resource Area RMP. The RPS updates will serve primarily as a progress report and notice of future actions to be taken. The information in an RPS update will be sufficiently specific to allow interested parties to determine whether they may be adversely affected by any future actions. Those individuals or groups who notify the authorized officer in writing that anticipated decisions for a specific allotment may adversely affect their interests will be sent the proposed and final decisions by certified mail at the same time decisions are sent to the grazing permittees.

## CONSULTATION, COORDINATION, AND COOPERATION

Following distribution of this RPS and during the implementation of the Gunnison Resource Area RMP, the BLM is committed to communicating with all resource users. Consultation, cooperation, and coordination will focus on allotment-specific or general actions required to implement RMP objectives or decisions, such as:

1. Using every opportunity to notify and remind affected permittees of important resource management objectives in the RMP, for instance, during the annual issuance of grazing applications.

2. The timing, manner, and magnitude of any livestock use adjustments,

3. Formulation of action(s) needed to respond to resource management objectives and constraints,

3 - 1

CHAPTER THREE

4.  Development of needed grazing management practices,

5.  Opportunities for range improvements, including the feasibility of cooperative development plans - to include grazing use on lands administered by other agencies or lands controlled by the permittees, and

6.  A monitoring program which will evaluate progress in achieving resource management objectives.

The Montrose District Grazing Advisory Board will be consulted in setting priorities for developing and installing range improvement projects within allotments and for advice on activity plan development as it concerns livestock operations.

## LIVESTOCK GRAZING MANAGEMENT DECISIONS FROM STANDARD MANAGEMENT, CHAPTER TWO

Under the RMP, some resource management programs will be implemented according to standard management throughout the Planning Area. Management of resources identified as a result of future inventories or discoveries will generally be the same as for resources discussed and identified in this RMP. *Unless changes in or additions to standard management decisions are specifically addressed in the decisions for each Management Unit, these resources/resource uses, programs and activities would be managed according to the decisions below.*

Livestock Grazing Management.

*General Management*

Approximately 470,460 acres of suitable public lands will be available for livestock grazing. Public lands unsuitable or unavailable for livestock grazing will continue to be excluded from livestock grazing unless monitoring or other sources of data indicate that the areas may be used for grazing. Total grazing preference in the Planning Area is approximately 60,135 Animal Unit Months (AUMs), of which

approximately 45,539 AUMs will be authorized for active use, and the remainder will be suspended use. Allotment categorization will be re-examined as needed based upon a change in categorization factors identified from monitoring data or other management and resource information.

*General Management Within "M" and "C" Allotments*

Existing allotment categorization and corresponding management levels, as defined in the 1987 Rangeland Program Summary (RPS), will be carried forward on all category "M" and "C" allotments.

*Management Within "I" Allotments*

On category "I" allotments, existing management and/or forage allocation levels will be adjusted when supported by monitoring data or other management and resource information, in order to achieve or maintain a desired plant community.

The Gunnison Resource Area RMP establishes the riparian and upland management goals and objectives outlined in paragraphs 1 through 6 below that are now in effect. All category "I" Allotments will be managed consistent with these goals and objectives to meet resource needs. Existing management and/or forage allocation levels will be adjusted if necessary and when supported by monitoring data or other management and resource information that indicates resource needs are not being met. Adjustments will be made in close consultation, cooperation, and coordination with permittees by agreement or decision.

1. *Within Uplands:*

Utilization of key forage species in uplands will be managed at levels that will allow for plant health or maintenance, watershed cover needs, and to provide quality forage and wildlife cover. On allotments without activity plans or grazing agreements prescribing grazing strategies designed to meet these needs, the maximum use level in uplands will be 40-60% of the current years production by weight on key forage species during the period of use. This will allow for at

3 - 2

BLM_0006729

RANGELAND PROGRAM SUMMARY

during the period of use. This will allow for at least minimal management to begin on category "I" allotments until funding and personnel allow for activity planning and more intensive management.

2. *Riparian Area Management Specific To Unit 14:*

A 4-inch minimum stubble height will be maintained in Management Unit 14 (riparian areas that have been identified as important for sage grouse brood rearing) from June 15 through July 31, in order to provide for adequate brood rearing habitat. A 2½ inch stubble height will be required at all other times in Management Unit 14. It is expected that not only will sage grouse benefit, but in the mid to long-term, riparian areas will expand in size, resulting in more livestock forage.

3. *Riparian Area Management Specific To Unit 15:*

A 4-inch minimum stubble height will be maintained during the grazing period of use in Management Unit 15 (riparian areas that have been identified as important for fisheries management), in order to protect and maintain riparian and fishery values. These riparian areas will also be expected to improve in terms of fisheries, livestock forage production and other wildlife habitat needs.

4. *Riparian Area Management Specific To Units 14 and 15:*

In Management Units 14 or 15, the requirement to maintain a 4 inch stubble height will be flexible on allotments covered by activity plans or grazing agreements which prescribe other grazing strategies, if these strategies clearly demonstrate the ability to achieve riparian area management objectives. These site-specific riparian objectives will be consistent with riparian area goals established in this plan for Management Units 14 and 15. The 4 inch stubble height requirement will be incorporated into all existing activity plans in these two management units, since existing plans do not adequately address riparian concerns. When these activity plans are

evaluated, modified, or revised, riparian concerns will address the management guidance described above.

The requirement to maintain a four inch stubble height in units 14 or 15 will become effective upon the signing of the ROD. In these units, the minimum 4 inch height requirement may be delayed if vigor and production of herbaceous riparian plants is not sufficient to meet livestock and wildlife needs, and adequate residual cover is not present. Flexibility will be considered for other management strategies defined in an activity plan or grazing agreement which adequately addresses riparian concerns.

In riparian areas in Management Units 14 and 15 where a 4 inch stubble height for key species will clearly not be achieved immediately upon implementation of the approved RMP, and where the key species have low vigor, there will be a recovery period of approximately one or two years that will depend on moisture conditions and other factors (recovery or improvement in vigor will be accomplished by rest, deferment, or other grazing strategies). The recovery period will allow plant vigor to improve and also will allow time to generate sufficient forage production for livestock needs and residue needed to maintain the 4 inch minimum stubble height. Where these conditions exist on allotments in units 14 or 15, a 2 1/2 inch minimum stubble height will be required during the period of use in order to help improve vigor of riparian vegetation. Flexibility to this 2 1/2" stubble requirement will be considered for those allotments in units 14 and 15 with activity plans or grazing agreements which prescribe other grazing strategies, if these strategies clearly demonstrate the ability to achieve riparian area management objectives.

In the event that minimum stubble heights do not exist in a riparian area in allotments at the prescribed turnout date, allotments will be looked at on a case-by-case basis and turnout will be either delayed, or livestock will be turned out on adjacent uplands and held there by salting, herding, hauling water, and/or other methods.

BLM_0006730

**CHAPTER THREE**

These methods will be employed until riparian areas have received adequate growth.

**5.** *Riparian Area Management Within "I" Allotments Except Those in Units 14 and 15:*

Utilization of key forage species within all other riparian zones will not exceed 40-60% of the current years production, with a 2½ inch minimum stubble height maintained throughout the period of use. Utilization levels lower than 40% may be prescribed in severely degraded riparian areas. The 2½ inch stubble will allow for at least minimal management to begin on category "I" allotments until funding and personnel allow for activity planning and more intensive management. Flexibility to this 2½ inch stubble will be considered on those allotments with new activity plans or grazing agreements that utilize other grazing strategies, if these strategies clearly demonstrate the ability to achieve riparian management objectives.

Site specific objectives will be consistent with riparian area goals established in this plan, including the maintenance, restoration, or improvement of riparian conditions (hydrologic, soil, and vegetation) and natural values. The 2½ inch stubble height will be incorporated into all existing AMPs or other activity plans. When these activity plans are evaluated, modified, or revised, riparian concerns will address the management guidance described above.

**6.** *Management Common To All Riparian Zones in "I" Allotments:*

a) Residual cover, or stubble height, is needed to improve or maintain riparian areas to a condition to allow proper hydrologic functioning during peak flows, reduce soil erosion, increase plant vigor (and eventually livestock forage), and to improve wildlife habitat (Clary and Webster 1989, Holechek et al 1989, Kinch 1989, Myers 1989, Platts 1982, USDA 1985). A minimum stubble is necessary during critical periods, such as spring runoff and the July and August

thunderstorm season. Critical periods vary from allotment to allotment due to elevation and other factors. Livestock will generally be turned into areas after key species have made sufficient growth to maintain the required minimum stubble heights. This will be consistent with the existing range readiness criteria (Appendix B) and average turnout dates. On allotments with AMPs or other activity plans, objectives and actions from these plans will also be considered when determining turnout dates. This will provide flexibility for early turnout on areas where plant maintenance and riparian system needs have been met.

b) The key herbaceous riparian forage species managed to maintain either a 4" or a 2 1/2" minimum stubble height objective will be grasses such as, but not limited to, Kentucky bluegrass, bromegrass, redtop, wheatgrass, Timothy, tufted hairgrass, sedges, and rushes.

c) In the event that minimum stubble heights do not exist in a riparian area in allotments at the prescribed turnout date, allotments will be looked at on a case-by-case basis and turnout will be either delayed, or livestock will be turned out on adjacent uplands and held there by salting, herding, hauling water, and/or other methods. These methods will be employed until riparian areas have received adequate growth.

Livestock will be moved out of riparian areas to other pastures or other areas in the same pasture with adequate forage when the prescribed stubble height objective has been met or when other management prescriptions defined in activity plans or grazing agreements are fulfilled. Determining when required minimum stubble heights for riparian areas have been reached will be when key species average the minimum stubble height over 80% of a riparian area in a pasture. Realizing there are areas where cattle congregate or are gathered, the remaining 20% of a riparian area in a pasture or allotment could be grazed more heavily than required minimum stubble heights. Determining when other grazing strategies, defined in activity plans or grazing agreements, have been fulfilled will be done by

3 - 4

field compliance checks. Permittee participation in field compliance checks will be encouraged.

### Grazing Administration

Grazing administration under the RMP will be conducted in accordance with the following standard operating procedures as prescribed in the Code of Federal Regulations 43 CFR 4100:

1. Grazing permits specifying the season of use, number, and kind of livestock will be issued to each operator for each allotment. Operators will have to obtain BLM approval before changing the grazing specifications outlined in their permits.

2. Livestock operators will be required to file actual-use reports showing how many and how long livestock grazed in each allotment and/or pasture. Use on the allotments will be supervised by BLM throughout the grazing year.

3. If necessary, actions resolving unauthorized use will be initiated as described in 43 CFR 4150. The unauthorized use will be eliminated and appropriate penalties assessed.

4. If it were determined, through monitoring, that adjustments in grazing preference or active use were necessary, implementation of changes in available forage will be done in compliance with 43 CFR 4110.3. Where possible, adjustments will be implemented by mutual agreement with the permittee. If agreements could not be negotiated, adjustments will be implemented by decision.

### Range Improvements

Structural and non-structural range improvements such as fences, water developments, burns, spray treatments, and others will continue to be identified and prescribed in activity plans or agreements. This will facilitate livestock management to achieve specific management and resource objectives defined in activity plans or agreements. Range projects and improvements constructed since 1981, and the amount

of BLM funds expended for these improvements, are shown in Table B-2, Appendix B. Table B-2 shows past trends regarding range improvements constructed in the Planning Area. Range improvements identified in the Gunnison Basin Management Framework Plan (MFP) Record of Decision (ROD) will not be incorporated into the RMP. However, any range improvements identified in the MFP ROD that were not implemented, and will enhance or facilitate resource management objectives will be considered for development. Existing range improvements will continue to be maintained as assigned in cooperative agreements and range improvement permits.

Cooperative agreements will be the preferred method to authorize range improvements. These agreements will be used to authorize all structural and non-structural, multiple-use range improvements (removable and non-removable). Range improvement permits will be used to authorize single use, removable range improvements required for livestock operations. These range improvements will be paid for and constructed by the permittee, or other non-federal entities. Maintenance will be assigned and contributions defined in both cooperative agreements and range improvement permits. All cooperative agreements and range improvement permits will comply with 43 CFR 4120.3-2 and 43 CFR 4120,3-3, respectively.

BLM's range improvement funding varies from year to year, depending on grazing fee receipts. Expenditures of funds will be budgeted and prioritized as follows:

1) Projects or treatments in which the Bureau of Land Management has the responsibility for operation, maintenance, or reconstruction.

2) Projects that conform with and will complete partially implemented activity plans.

3) Improvements prescribed in new activity plans or agreements.

Exceptions to this prioritization will be considered to avoid, minimize, or rehabilitate the effects of emergencies. Consideration will also be given to removal, modifications, or additions to improvements

BLM_0006732

## CHAPTER THREE

prescribed in existing activity plans that will further enhance resource conditions or take advantage of contributed funds. Category "I" allotments will normally receive priority over category "M" and "C" allotments.

All cost share or BLM funded improvements will require site specific environmental analysis, economic analysis, and resource clearances (cultural, threatened and endangered species etc.) before being authorized. Rancher or user funded projects will also require environmental analysis and appropriate resource clearances before being approved. Cooperative agreements and range improvement permits will specify the standards, design, construction, maintenance, or special conditions for range improvements or treatments.

Any additional forage available for livestock as a result of range improvements, treatments, or grazing management procedures will be allocated in accordance with 43 CFR 4100, and after meeting basic soil and watershed needs defined in Table I-1, in Appendix I of this document (Table I-1, showing target basal cover densities that will be achieved on treated areas before forage will be allocated to livestock grazing management, is derived from Appendix F of the Montrose District Soil Erosion Monitoring Guidelines). Any additional forage available for livestock will be considered in reactivating suspended use or as a means to avoid suspending active use.

### Fences

Fences will be installed according to spacing, height, and other specifications described in the BLM Manual, Section 1740 and Handbook H-1741-1, for the control of livestock as well as the protection of wildlife. An example will be spacing the bottom wire of a 3-wire fence at 16 inches above the ground in pronghorn antelope ranges. Variances from these standards require approval of the authorized officer after consultation with affected parties.

### Water Developments

Federally funded livestock watering developments such as reservoirs (ponds), spring developments,

wells, water pipelines etc. will be developed and be safe for livestock and wildlife needs.

The appropriate State Engineer permits will be obtained for each project.

### Weed and Pest Control

A noxious weed program, and control of noxious weeds, will be initiated in cooperation with the local county weed district, county governments, and other affected interests.

### Land Treatments

Vegetation treatments will be done in accordance with approved BLM methods such as management application (grazing), burning, spraying, and chaining. Measures, such as (1) rest from livestock grazing for a minimum of two growing seasons, (2) fencing for protection of vegetation, and (3) establishing a grazing practice to ensure proper use, will be implemented on lands having recently been treated for vegetative manipulation purposes, in order to ensure the maximum opportunity for success of treatments. Land treatments will generally not be done on slopes greater than 25 percent depending on such factors as soils, type of treatment, and equipment limitations, in order to prevent soil erosion.

Reclamation of disturbed areas will involve seeding or planting a mixture of the major native species present within the range site/habitat type that are available commercially. If the erosion hazard is high, introduced species such as crested wheatgrass or annual rye may be used.

### Activity Plans and Grazing Agreements

Staff and permittee proposals will be considered and analyzed against office capabilities and priorities. If a decision is made to prepare an activity plan, a coordinated interdisciplinary approach will be used. Activity plans will also be developed with interdisciplinary staff input and consultation with permittees and other affected interests. Activity plans will incorporate allotment specific objectives for maintaining or improving livestock forage, wildlife and fish habitat, and riparian areas. Activity plans

3 - 6

BLM_0006733

will also prescribe appropriate management actions such as grazing practices, range improvements, or changes in season of use, to achieve allotment specific objectives. Innovative or non-traditional management strategies will also be considered. Table 3-2 illustrates Category "I" allotment prioritization for activity plan development/revision and management in general.

Allotment specific objectives and management actions required to achieve those objectives will also be defined in grazing agreements, and management actions will be included in the terms and conditions of permits or leases in compliance with 43 CFR 4130.6-2. This will allow for intensive management to address resource concerns when inadequate funding or personnel exist to prepare activity plans.

*Monitoring*

Monitoring data collected will include interdisciplinary coordination and be conducted in accordance with the following procedures.

1.  Actual use data will be obtained by indirect methods (statements from permittees which includes livestock numbers and periods of use) for all grazing allotments. All livestock operators will be required as part of the permit to submit actual use by pasture within 15 days from the end of the grazing season. Direct methods (counting livestock) for obtaining actual livestock numbers will be used as needed.

2.  Utilization data will be collected on scheduled allotments or areas of concern using procedures described in BLM Technical Reference 4400-3. Stubble height measurements will document forage which is present during and/or after use has occurred. Stubble height will be measured as an average of the key species for the area observed. Utilization data will be used for evaluating the effects of grazing on rangeland to determine appropriate management strategies.

3.  Rangeland trend monitoring will be conducted using procedures described in BLM Technical Reference 4400-4. The selection of method(s) for data collection will consider management

objectives, vegetation attributes (density, frequency, production, etc.) and actions for the allotment or area(s) of concern. Trend monitoring will be conducted as frequently as needed to satisfy data requirements for the allotment and/or other designated management area(s) evaluation.

4.  Range readiness criteria, in Appendix B, for the Gunnison Resource Area considers both indicators of soil readiness and vegetative readiness. Plant species listed in Appendix B will be used, where applicable, as indicators of vegetative readiness. Key forage plant species will be considered as part of the overall range readiness evaluation for the specific allotment or area. Evaluation will be based on stage of development and/or size of plants. Ecological site, aspect, elevation and climate will be considered when evaluating development and/or size of plants.

    Range readiness criteria will be considered when requests for livestock turn-out dates are earlier than dates specified on permits or when vegetation growing conditions are affected by drought or other natural or man-caused influences, such as, fire.

    Range readiness will be incorporated into existing AMP's utilizing the criteria specified in Appendix B. However, the readiness criteria for allotments with AMP's or other activity plans will be specific to the allotment and/or areas within it. On allotments with AMPs or other activity plans, objectives and actions in these plans will also be considered when determining turnout dates. This will provide flexibility for early turnout on areas where plant maintenance and riparian system needs have been met. Range readiness criteria as documented in Appendix B will be used until allotment-specific criteria can be incorporated into each AMP or activity plan.

5.  Use supervision on scheduled allotments or areas of concern will include counting livestock and observing distribution patterns; inspecting range improvements; observing apparent trend,

BLM_0006734

**CHAPTER THREE**

utilization and growing conditions; and observing wildlife populations and movements, wildlife habitat, watershed and riparian conditions as needed. Documented observations made during use supervision field visits will identify where changes in grazing management are needed or those areas where more intensive monitoring is needed.

6. Precipitation data from rain gauges along with soil moisture monitoring and temperature data will be used to correlate vegetation production variations resulting from yearly variations in climate.

7. Soil erosion will be assessed in conjunction with rangeland trend and utilization monitoring.

8. Water quality and quantity will be monitored as necessary to determine the location of problem areas.

9. Ecological site inventories for uplands and riparian areas will be conducted in preparation for activity plans as needed on category "I" allotments. This will be done as part of the activity plan preparation process and as funding and personnel allow.

The types of data listed above will be used when evaluating stated objectives or actions on an allotment or specific area. The intensity of monitoring conducted for an allotment or specific area are determined, in part, by the Bureau's classification criteria for I, M, and C allotments. Other considerations for monitoring implementation include allotments with AMP's, allotments delineated as high priority for AMP or other activity plan development, and delineated areas of concern (i.e. riparian areas).

## LIVESTOCK GRAZING MANAGEMENT DECISIONS FROM MANAGEMENT UNIT PRESCRIPTIONS, CHAPTER TWO

### MANAGEMENT UNIT 1 (Part of Alpine Triangle SRMA)

*Land ownership:* 95,827 acres of public surface; 15% of the Planning Area.

The unit will continue to be managed as part of the existing Alpine Triangle SRMA, providing a diversity of recreation opportunities, including interpretation, while protecting important historic, scenic, and natural values. Motorized recreation sightseeing, hiking, camping, winter recreation, hunting, fishing, floatboating, and other recreation opportunities will be emphasized. Specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

Plans for surface-disturbing activities, including recreation use and development, will contain measures designed to minimize negative effects to resources, especially those that could impact adjacent recreation or scenic resources and fisheries and riparian habitat.

Overnight camping and fires will be excluded within 50 feet of historic resources on public land.

Motorized vehicular traffic on public lands within the unit south of the north line of Section 12, T. 45 N., R. 4 W., N. M. P. M., will be limited to designated routes, as shown on a map and Table F-1 in Appendix F of the RMP, and in the Gunnison Resource Area office. Snowmobile use will be permitted on snow anywhere in the unit, except in any lands designated as wilderness. When the CRMAP for the Alpine Triangle SRMA is prepared, a map will be included and areas defined on the ground delineating appropriate pull-off and parking areas adjacent to designated routes available for OHV use.

On public lands within the riparian area along Henson Creek, from the North fork of Henson Creek downstream to Lake City, livestock grazing in this important fishery will continue not be authorized in order to maintain stream and streamside conditions, including soils and vegetation.

Public hiking and horse access will be acquired into the Alpine Gulch drainage for recreation and livestock grazing management.

BLM_0006735

**RANGELAND PROGRAM SUMMARY**

**MANAGEMENT UNIT 2 (Powderhorn Primitive Area SRMA)**

*Land Ownership:* 47,762 acres of Public Surface; 8% of the Planning Area.

This unit consists of lands managed for primitive, non-motorized recreational and natural values.

Public lands in Management Unit 2 will be designated as the Powderhorn Primitive Area SRMA, and will be managed for primitive and semi-primitive, non-motorized recreation and scenic opportunities and for the maintenance and enhancement of natural values. The need to protect both the high quality and diversity of scenic, recreation, and other natural values, while reducing effects of recreation use will be recognized as important during the implementation of management decisions affecting the unit.

Measures to prevent soil erosion and water quality deterioration processes will be allowed to occur and surface-disturbing activities will be minimized.

Trail access to the unit from the Devil's Creek area will be located and constructed.

Public Lands in the unit will be closed to motorized vehicular traffic, unless otherwise authorized, to protect and maintain primitive recreation opportunities.

If the lands in the unit are acted upon by Congress for wilderness designation, and are not designated, lands in the unit will be evaluated and considered for moose introductions, which could be authorized by the District Manager following environmental analysis.

Domestic sheep grazing in grazing allotment 6112 will not be authorized in the unit in order to help prevent the potential for diseases being transferred to bighorn sheep from domestic sheep.

Cattle grazing will be authorized and administered in the unit such that recommended ROS settings will be maintained.

Vegetation treatments or improvements and treatment maintenance will be authorized if compatible with the objectives of this unit.

Livestock grazing along 2.2 miles of Fourth of July Creek, 10.2 miles of the East Fork of Powderhorn Creek, 8.3 miles of the Middle Fork of Powderhorn Creek, and 8.7 miles of the West Fork of Powderhorn Creek will be managed to maintain a 4-inch minimum stubble height for key forage species, during the grazing period of use, in these riparian zones containing important fisheries in order to improve and maintain stream and streamside conditions, including soils and vegetation. The minimum stubble height requirements along Fourth of July Creek, East Fork of Powderhorn Creek, Middle Fork of Powderhorn Creek, and West Fork of Powderhorn Creek will be implemented according to the STANDARD MANAGEMENT decisions for Livestock Grazing Management in Chapter Two of the RMP/ROD.

**MANAGEMENT UNIT 3 (Cochetopa Canyon SRMA)**

*Land Ownership:* 2,710 acres of Public Surface; less than 1% of the Planning Area.

This unit consists of lands managed for day-use and overnight recreation along Cochetopa Creek. The management objectives for the unit will be to continue to provide and improve the existing diversity of recreation opportunities, with fishing and overnight camping adjacent to Highway 114 being emphasized.

Public lands in Management Unit 3 will be designated the Cochetopa Canyon SRMA, and will be managed according to the existing RAMP for a variety of recreation, scenic, and historical opportunities and settings at developed and dispersed sites.

Livestock grazing and watering will not be permitted in the riparian area along Cochetopa Creek in order to maintain or improve riparian and/or fishery conditions.

Domestic sheep grazing will not be authorized throughout the unit to prevent disease transfer to domestic sheep.

3 - 9

BLM_0006736

**CHAPTER THREE**

**MANAGEMENT UNIT 4 (American Basin ACEC, And Part of The Alpine Triangle SRMA)**

*Land Ownership:* 1,597 acres of Public Surface; less than 1% of the Planning Area

The unit will be designated and managed as the American Basin Area of Critical Environmental Concern (ACEC), and will be managed to protect and enhance visual and other natural resources and existing related recreation opportunities in the unit.

This ACEC will continue to be contained within, and managed accordingly, as part of the existing Alpine Triangle SRMA (see Map F-4, Appendix F in the RMP, for boundaries of the SRMAs in the planning area). Specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

Activities resulting in adverse visual impacts or unnecessary surface disturbances will not be permitted in order to prevent deterioration of scenic values.

Motorized vehicular travel will be limited to designated routes within the entire unit in order to prevent destruction to wildflower concentrations and visual resources in general.

Domestic livestock grazing will be administered in such a manner as to avoid conflicts between recreation visitors and grazing livestock, with the livestock management objective being to maintain recreation and scenic values, especially during the wildflower display and peak visitation periods.

Specific livestock grazing management for the unit will be incorporated into the overall CRMAP for the Alpine Triangle SRMA, and could include season of use changes, restrictions in areas that could be grazed, or possibly elimination of grazing in some areas.

**MANAGEMENT UNIT 5 (Redcloud Peak ACEC, And a Part of The Alpine Triangle SRMA)**

*Land Ownership:* 5,960 acres of Public Surface; 1% of the Planning Area

The unit will be designated and managed as the Redcloud Peak Area of Critical Environmental Concern (ACEC), and protection and enhancement of habitat of the Uncompahgre fritillary butterfly and the species in the unit will be emphasized.

This ACEC will continue to be located within, and managed accordingly, as part of the existing Alpine Triangle SRMA, providing a diversity of recreation opportunities, including interpretation, while protecting important historic, scenic, and natural values (see Map F-4 in Appendix F in the RMP for boundaries of the SRMAs in the planning area). Specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

Surface disturbing activities will be restricted to protect the endangered species and existing and potential habitat of the species.

Motorized vehicular travel will be limited to designated routes, unless otherwise authorized, in order to protect habitat of the Uncompahgre fritillary butterfly. No routes are designated in the unit in this RMP.

On public lands within the unit, domestic sheep grazing will be controlled to prevent destruction of Uncompahgre fritillary butterfly habitat.

**MANAGEMENT UNIT 6 (Slumgullion Earthflow National Natural Landmark ACEC, And a Part of The Alpine Triangle SRMA)**

*Land Ownership:* 1,405 acres of Public Surface; less than 1% of the Planning Area

The unit will be designated and managed as the Slumgullion Earthflow National Natural Landmark

BLM_0006737

Area of Critical Environmental Concern (ACEC) to enhance and protect the natural values within the earthflow.

This ACEC will continue to be located within, and managed accordingly, as part of the existing Alpine Triangle SRMA, providing a diversity of recreation opportunities, including interpretation of the earthflow, while protecting important historic, scenic, and other natural values (see Map F-4 in Appendix F in the RMP for boundaries of the SRMAs in the planning area). Specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

Surface disturbance within the unit will not be permitted if the natural values within the earthflow, including visual resources, will be degraded.

Motorized vehicular traffic in the unit will be limited to designated routes in order to prevent surface disturbance within the slide area.

## MANAGEMENT UNIT 7 (West Antelope Creek ACEC)

*Land Ownership:* 28,275 acres of Public Surface; 5% of the Planning Area.

The unit will be designated and managed as the West Antelope Creek Area of Critical Environmental Concern (ACEC), and to improve the capabilities of the resources in the unit to support wintering elk, deer, and bighorn sheep.

A CRMAP will be prepared for the unit, and will include management actions within the recommended Dillon Pinnacles ACEC, unit 9.

Land uses will be designed and implemented so as not to degrade big game winter range.

Surface-disturbing activities on public lands, including rights-of-way construction, will not be permitted from December 1 through April 30 on crucial elk and deer winter range, in order to prevent disturbances to wintering elk and deer.

In order to permit riparian conditions to improve, livestock grazing will not be authorized on public lands along North Willow Creek in the Stevens Creek Common Allotment, No. 6202, until the riparian area has recovered sufficiently to permit livestock use.

Grazing systems approved for public lands along North Willow Creek in the Stevens Creek Common Allotment, No. 6202, will include measures to facilitate the continued improvement of riparian conditions and resources.

Livestock grazing will not be authorized within Allotment 6200 in this unit in order to remedy conflicts involving wildlife habitat.

Non-conflicting and compatible livestock management objectives, projects, and mitigating measures will be incorporated into new activity plans, such as AMPs, HMPs or CRMAPs, before being implemented.

Approximately 600 acres of public land within or adjacent to the Sapinero State Wildlife Area will be closed to motorized vehicular use in order to be compatible with CDOW management on adjacent state-owned lands, as shown on a map in Appendix F in the RMP, and on maps in the Gunnison Resource Area office.

Motorized vehicular use on the remaining 27,615 acres of public lands in the unit will be limited to designated routes, if necessary, from December 1 through April 30, to prevent disturbance to wintering elk and deer in the event of excessive snow depths or big game herd concentrations, as shown on a map and Table F-1, Appendix F, in the RMP, and on maps in the Gunnison Resource Area office.

## MANAGEMENT UNIT 8 (South Beaver Creek ACEC)

*Land ownership:* 4,570 acres of Public Surface; Less than 1% of the Planning Area

The unit will be designated as the South Beaver Creek Area of Critical Environmental Concern (ACEC), and will be managed to protect and enhance existing populations and habitat of skiff milkvetch.

BLM_0006738

**CHAPTER THREE**

An ACEC management plan will be prepared.

No chemical spraying will occur on public lands within the unit.

No vegetative treatments, or treatment maintenance will be conducted in the unit that would adversely effect skiff milkvetch populations or habitat.

Non-conflicting erosion control measures that do not alter existing skiff milkvetch habitat will be permitted.

No additional forage allocations will be made for either wildlife habitat or livestock grazing management.

Domestic sheep grazing will not be authorized in the unit to avoid possible destruction of skiff milkvetch populations and related habitat.

To prevent accidental destruction of skiff milkvetch populations, and existing habitat, motorized vehicular traffic in the unit will be limited to designated routes as shown on a map and Table F-1, Appendix F, in the RMP, and on maps in the Gunnison Resource Area office.

**MANAGEMENT UNIT 9 (Dillon Pinnacles ACEC)**

*Land Ownership:* 535 acres of Public Surface; less than 1% of the Planning Area.

The unit will be designated and managed as the Dillon Pinnacles Area of Critical Environmental Concern (ACEC), and will be managed to protect scenic and recreational opportunities within the unit (the specific and appropriate management actions for this unit will be included in the ACEC management plan for unit 7).

Surface disturbing activities will not be permitted in the unit.

The unit will be closed to motorized vehicular travel to prevent deterioration of scenic values.

Livestock grazing will not be authorized within the unit in order to maintain a natural appearing landscape.

**MANAGEMENT UNIT 10**

*Land Ownership:* 15,112 acres of Public Surface; 3% of the Planning Area

This unit consists of lands containing yearlong bighorn sheep and other wildlife habitat.

An HMP will be prepared for the unit.

Surface disturbing activities will not be permitted in the unit.

Activities that will result in disturbance to lambing bighorn sheep will be restricted from April 15 through June 15.

Wildlife treatments recommended in the HMP as a result of monitoring will be permitted.

The unit will be managed to maintain or improve habitat capable of supporting a self-sustaining population of bighorn sheep, with herd sizes of about 100-150 animals in the Cochetopa Canyon and about 150 animals in the Cebolla Creek area.

Domestic sheep grazing will not be authorized in the unit to help prevent disease spreading from domestic sheep to bighorn sheep.

Livestock grazing will be managed in a manner compatible with the objectives of this unit.

Range improvements or treatments recommended in activity plans, such as AMPs or CRMAPs, as a result of monitoring will be permitted if compatible with maintaining bighorn sheep habitat.

**MANAGEMENT UNIT 11**

*Land ownership:* 57,525 acres of Public Surface; 10% of the Planning Area

This unit consists of sage grouse high production areas.

BLM_0006739

This management unit will be managed to improve and maintain sagebrush vegetative communities in order to optimize sage grouse populations.

Sagebrush treatments and management to improve sage grouse habitat will be considered in all activity plans, such as AMPs or CRMAPs, and their design, implementation, and management will incorporate as a minimum the sage grouse habitat management guidelines in Appendix A.

Deviations from the sage grouse habitat management guidelines in Appendix A may be granted by the authorized officer if it can be demonstrated that short term impacts will be offset by long term benefits to sage grouse and their habitat.

Proposed habitat improvements will be implemented and managed to maintain and improve these areas crucial to sage grouse populations.

All leks will be protected from destruction.

No surface disturbance will be permitted within 1/4 mile of all lek locations from April 1 through May 31 (strutting season) to prevent disturbance to sage grouse while mating.

Activities occurring on crucial elk and deer winter range in the unit will be restricted to prevent disturbance to wintering elk and deer from December 1 through April 30.

Compatible sagebrush treatments and projects will be permitted.

Range treatments, improvements, and projects meeting sage grouse habitat management objectives for this unit will be permitted.

## MANAGEMENT UNIT 12

*Land ownership:* 91,547 acres of public surface; 16% of the Planning Area.

This unit contains elk and deer crucial winter range.

The unit will be managed to improve habitat conditions and increase the production and diversity of shrub species in upland and riparian vegetative types to support wintering populations of deer and elk, and to help meet CDOW long-range herd goals.

An HMP or a CRMAP will be developed focusing on overall habitat improvement and intensive habitat management, and will include proposals for treatments and projects in uplands and riparian ecosystems to increase the production and composition of bitterbrush, serviceberry, mountain mahogany, willows, and cottonwoods (methods will include shrub plantings, burning, and techniques to convert decadent sagebrush stands to stands dominated by young sagebrush plants in the uplands).

Wildlife habitat treatments will be maintained to ensure success.

Domestic sheep grazing and trailing will be excluded within the portion of GMU 64 in the unit from October 15 through April 15 in order to eliminate forage competition with big game.

In the portions of GMU 55, 66, 67, and 551 within the unit, resources and land uses will be managed for the benefit of elk and deer winter habitat.

Activities that will result in unnecessary disturbances to big game will be excluded from December 1 through April 30.

Activities that will unnecessarily disturb elk within calving areas from April 16 through June 30 will be excluded.

Compatible range improvements, treatments, or projects will be permitted.

Motorized vehicular traffic on public lands in the unit north of U.S. Highway 50, east of the Gunnison River and west of Quartz Creek will be limited to designated routes from December 1 through April 30, if necessary, due to big game herd concentrations or excessive snow depth, to prevent disturbance to wintering deer and elk, as shown on a map and Table F-1 in Appendix F of the RMP, and on maps in the Gunnison Resource Area office.

Public access will be acquired into the Bead Creek area for recreation and livestock grazing management.

BLM_0006740

**CHAPTER THREE**

**MANAGEMENT UNIT 13**

*Land Ownership:* 187,030 acres of Public Surface; 32% of the Planning Area

This unit generally contains "I" category livestock grazing allotments.

The unit will be managed to maintain or improve ecological conditions.

Suitable public lands will be available for livestock grazing.

Activity plans, such as CRMAPs or AMPs, will be developed, and existing AMPs will be updated as needed using CRMAP standards and procedures.

In order to permit riparian conditions and the fishery resource to improve, livestock grazing will not be authorized on public lands along approximately 1/4 mile of Los Pinos Creek in Allotment 6340 until the riparian area has recovered sufficiently to permit livestock use.

Activity plans developed that involve lands at High Mesa, Hartman Rocks, and Big Mesa will include and consider management objectives for all resources, including recreation management.

Motorized vehicular traffic in the unit on public lands in the area north of U.S. Highway 50, east of West Antelope Creek, and west of the Gunnison River will be limited to designated routes from December 1 through April 30, if necessary, due to big game herd concentrations or excessive snow depths in order to prevent disturbance to wintering big game, as shown on a map and Table F-1 in Appendix F of the RMP, and on maps in the Gunnison Resource Area office.

Administrative access will be acquired into the Huntsman Mesa area from Colorado Highway 149 for livestock grazing management and public access will be acquired into the Vulcan/Big Mud Pond area and into public lands east of Deer Beaver Creek for recreation and livestock grazing management; into Willow Creek in the Blue Mesa area for commercial forest, livestock grazing, and recreation management, and into the Sandy Mesa area and Poison Draw areas on Blue Mesa for commercial forest and livestock grazing management.

**MANAGEMENT UNIT 14**

*Land Ownership:* 2,667 acres of Public Surface; less than 1% of the Planning Area

This unit consists of riparian areas containing important sage grouse broodrearing areas along about 25 miles of public land.

The unit will be managed to protect, restore and enhance these riparian areas on public lands in order to optimize sage grouse populations, with management objectives to provide high quality brood-rearing habitat with a diversity of plant species composition and structure, aimed at achieving improved riparian conditions, and achieving adequate vegetative cover necessary to avoid predation of foraging chicks. Emphasis will be placed on rehabilitating riparian areas where the riparian or hydrological condition is degraded.

Riparian improvement strategies and/or projects will be included in all CRMAPs and other activity plans and implemented.

The herbaceous plant species will be increased to improve forage plants and insects for sage grouse.

The proportion of native bunch grasses will be increased to help meet escape and hiding cover requirements of sage grouse chicks.

Measures to reduce impacts to the riparian ecosystems and associated stream channels, and to prevent unnecessary removal of sage grouse brood habitat will be included in all surface-disturbing plans.

No surface disturbing activities will be permitted from June 15 through July 31 in order to prevent disturbance to sage grouse during the brood-rearing period.

All leks will be protected from surface disturbance.

A 4 inch minimum stubble height will be maintained from June 15 through July 31 in order to improve and provide cover for sage grouse chicks, to improve general riparian ecosystem conditions, and to help increase the proportion of native bunch grasses,

3 - 14

BLM_0006741

resulting in more livestock forage. A 2½ inch stubble height will be required at all other times.

Where authorized, domestic sheep grazing will be permitted in the unit only after June 1 to prevent disturbance to nesting sage grouse and nests.

## MANAGEMENT UNIT 15

*Land Ownership:* 4,725 acres of Public Surface; less than 1% of the Planning Area.

This unit, consisting of riparian areas containing important fishery streams along approximately 57 miles of public land, will be managed to restore and enhance the condition of fishery streams.

The CRMAP to be prepared for the Alpine Triangle SRMA will also address the management of the riparian areas in this unit that are located within the SRMA boundary and appropriate management actions and recommendations from this prescription will be incorporated into the CRMAP (see Map F-4, Appendix F, for the boundary of the SRMA).

Projects will be developed where necessary to stabilize and restore stream banks and improve instream conditions.

The Resource Area HMP will be revised to include recommendations in this unit.

When grazing occurs in the unit, a minimum stubble height of 4 inches will be maintained for key herbaceous forage species within riparian zones, in order to improve stream and streamside conditions, including soils and vegetation in the associated riparian zones, and the minimum stubble height will be implemented according to the Standard Management Livestock Grazing Management decisions in Chapter Two of this RMP/ROD.

Livestock grazing will continue to not be authorized along Henson Creek in order to maintain riparian, fishery, and scenic values.

Motorized vehicular traffic in the unit is described in the numbered paragraphs below, and is shown on a map and Table F-4 in Appendix F of the RMP, and on maps in the Gunnison Resource Area office:

## RANGELAND PROGRAM SUMMARY

1. OHV traffic south of Lake City (1,680 acres) will be limited to designated routes yearlong, with snowmobile use permitted anywhere on snow (except on any areas eventually designated as wilderness). When the CRMAP is prepared for the Alpine Triangle SRMA, a map will be included and areas defined on the ground delineating appropriate pull-off and parking areas adjacent to designated routes.

2. Motorized vehicular traffic in the unit on Alder Creek (235 acres) will be limited to designated routes, if necessary, from December 1 through April 30, in order to prevent disturbance to wintering elk and deer on crucial big game winter range.

No surface-disturbing activities will be permitted along Alder, Willow (west of Gunnison), and Razor Creeks, and along the lower one-mile of South Beaver Creek in the unit from July 1 through July 31 in order to prevent disturbance to sage grouse during the brood rearing period.

## MANAGEMENT UNIT 16

*Land Ownership:* 36,768 acres of Public Surface; 6% of the Planning Area

This unit consists generally of general resource lands, and is located throughout the planning area.

No major BLM funded projects or facilities will be developed.

Measures will be included in all plans for surface disturbing activities to prevent disturbance to wintering big game, soil erosion, and deterioration of visual resources and water quality.

Livestock grazing will continue not to be authorized on 320 acres in Wildcat Creek drainage to help maintain Crested Buttes' water supply. Range treatments or projects will be permitted otherwise in the unit, according to Standard Management for Livestock Grazing, and will be compatible with the objectives of this unit.

Motorized vehicular traffic on public lands unit north of U.S. Highway 50, south of sections 17 and 18, T. 51 N, R. 1 W., N.M.P.M., east of West Antelope

3 - 15

## CHAPTER THREE

Creek, and west of the Gunnison River only (3,073 acres) will be limited to designated routes from December 1 through April 30 if necessary, due to excessive snow depths or herd concentrations in order to prevent disturbance to wintering elk and deer.

Table 3-1

PARTIAL SUMMARY OF LIVESTOCK GRAZING PROGRAM BY ALLOTMENT

| ALLOTMENT NUMBER | AMP CATEGORY[1] | STATUS[2] | GRAZING PREFERENCE (AUMs) | | | KIND OF LIVESTOCK[3] | SEASON OF USE[4] |
|---|---|---|---|---|---|---|---|
| | | | Active | Suspended | Total | | |
| 6001 | M | N | 280 | 94 | 374 | S | SP-SU-FA |
| 6003 | C | N | 22 | 46 | 68 | C | SP-SU-FA |
| 6004 | C | N | 13 | 11 | 24 | C | SP-SU-FA |
| 6005 | M | N | 10 | 18 | 28 | C | SP-SU-FA |
| 6006 | C | N | 27 | 133 | 160 | C | SP-SU-FA |
| 6007 | M | N | 29 | 61 | 90 | C | SP-SU-FA |
| 6008 | C | N | 17 | 17 | 34 | S | SP-SU-FA |
| 6011 | I | N | 186 | 67 | 253 | C | SP-SU |
| 6013 | C | N | 14 | 14 | 28 | C | SP-SU-FA |
| 6014 | C | N | 4 | 0 | 4 | C | SP-SU-FA |
| 6015 | C | N | 6 | 1 | 7 | C | SP-SU-FA |
| 6016 | C | N | 25 | 86 | 111 | S | SP-SU-FA |
| 6018 | I | N | 75 | 105 | 180 | S | SU |
| 6021 | C | N | 15 | 0 | 15 | C | SP-SU-FA |
| 6022 | M | N | 8 | 52 | 60 | C | SP-SU-FA |
| 6024 | C | N | 30 | 59 | 89 | C | SP-SU-FA |
| 6026 | C | N | 7 | 0 | 7 | S | SP-SU-FA |
| 6027 | C | N | 12 | 44 | 56 | C | SU |
| 6028 | C | N | 10 | 0 | 10 | C | SP    FA |
| 6029 | C | N | 9 | 27 | 36 | C | SU-FA |
| 6030 | C | N | 22 | 2 | 24 | C | SP-SU-FA |
| 6031 | M | N | 190 | 0 | 190 | C | FA |
| 6032 | M | N | 206 | 74 | 280 | S | SU-FA |
| 6033 | I | Y | 494 | 110 | 604 | C | SP-SU-FA |
| 6034 | I | N | 101 | 63 | 164 | C | SU-FA |
| 6035 | I | Y | 70 | 0 | 70 | C | SP-SU-FA |
| 6036 | C | N | 8 | 3 | 11 | S | FA |
| 6037 | C | N | 19 | 9 | 28 | C | SP-SU-FA |
| 6038 | C | N | 4 | 0 | 4 | C | FA-WI |
| 6040 | C | N | 31 | 0 | 31 | C | SU |
| 6043 | M | N | 75 | 0 | 75 | C | SP-SU |
| 6050 | M | N | 272 | 0 | 272 | S | SP-SU-FA |
| 6051 | I | N | 13 | 21 | 34 | S | SP-SU-FA |
| 6052 | I | N | 88 | 0 | 88 | S | SP-SU-FA |
| 6053 | M | N | 102 | 18 | 120 | S | SP-SU |
| 6054 | C | N | 21 | 15 | 36 | C | SU-FA |
| 6056 [5] | I | N | 107 | 75 | 182 | S | SP |
| 6057 | C | N | 9 | 0 | 9 | C | SU |
| 6100 | M | N | 1791 | 81 | 1872 | S | SP-SU-FA |
| 6101 | M | N | 684 | 0 | 684 | S | SP-SU-FA |
| 6102 | M | N | 347 | 0 | 347 | S | SU |
| 6103 | I | Y | 944 | 538 | 1482 | C | SP-SU-FA |
| 6104 | I | Y | 845 | 1495 | 2340 | C | SP-SU-FA |
| 6105 | I | Y | 475 | 126 | 601 | C | SP-SU-FA |
| 6106 | M | N | 190 | 0 | 190 | CS | SP-SU-FA |
| 6107 | I | Y | 10843 | 5035 | 15878 | C | SP-SU-FA |
| 6108 | I | Y | 1432 | 767 | 2199 | C | SP-SU-FA |
| 6109 | M | N | 496 | 0 | 496 | C | SP-SU-FA |

BLM_0006743

**RANGELAND PROGRAM SUMMARY**

Table 3-1 (continued)
PARTIAL SUMMARY OF LIVESTOCK GRAZING PROGRAM BY ALLOTMENT

| ALLOTMENT NUMBER | AMP CATEGORY[1] | STATUS[2] | GRAZING PREFERENCE (AUMs) | | | KIND OF LIVESTOCK[3] | SEASON OF USE[4] |
|---|---|---|---|---|---|---|---|
| | | | Active | Suspended | Total | | |
| 6110 | I | N | 31 | 0 | 31 | C | SP |
| 6111 | I | N | 250 | 23 | 273 | C | SP-SU-FA |
| 6112 [6] | I | N | 354 | 0 | 354 | C | SP    FA |
| 6113 | C | N | 13 | 1 | 14 | C | SP-SU-FA |
| 6114 [6] | C | N | 20 | 0 | 20 | C | SP-SU-FA |
| 6115 | I | N | 530 | 0 | 530 | S | SU |
| 6116 | M | N | 76 | 0 | 76 | C | SP-SU-FA |
| 6117 | M | N | 132 | 27 | 159 | C | SU-FA |
| 6118 | C | N | 4 | 0 | 4 | H | SU |
| 6119 | I | Y | 10 | 0 | 10 | C | FA |
| 6120 | I | N | 89 | 30 | 119 | C | SP    FA |
| 6121 | I | N | 165 | 46 | 211 | C | SP-SU-FA |
| 6123 | C | N | 9 | 0 | 9 | C | SP-SU-FA |
| 6125 | C | N | 8 | 8 | 16 | C | SP-SU |
| 6127 | M | N | 10 | 0 | 10 | C | SP-SU-FA |
| 6128 | C | N | 120 | 0 | 120 | C | SP-SU-FA |
| 6129 | C | N | 21 | 22 | 43 | C | SP-SU-FA |
| 6130 | C | N | 9 | 0 | 9 | C | SP-SU-FA |
| 6131 | C | N | 54 | 20 | 74 | C | FA-WI |
| 6132 | C | N | 5 | 0 | 5 | C | SP |
| 6150 | M | N | 23 | 16 | 39 | C | SP |
| 6180 | I | N | 74 | 0 | 74 | C | SP    FA |
| 6202 | I | N | 724 | 107 | 831 | C | SP    FA |
| 6203 | I | Y | 673 | 0 | 673 | C | SP-SU-FA |
| 6204 | M | N | 26 | 23 | 49 | H | SP-SU |
| 6205 | C | N | 8 | 0 | 8 | C | SP       WI |
| 6206 | I | N | 180 | 0 | 180 | C | SP |
| 6208 | I | N | 489 | 0 | 489 | C | SP |
| 6210 | I | N | 20 | 7 | 27 | C | SU |
| 6212 | M | N | 46 | 0 | 46 | C | SP-SU-FA |
| 6213 | M | Y | 166 | 0 | 166 | C | SP-SU-FA |
| 6216 | I | N | 167 | 58 | 225 | C | SP-SU |
| 6217 | M | N | 77 | 0 | 77 | C | SU-FA |
| 6300 | I | Y | 1111 | 0 | 1111 | C | SP-SU-FA |
| 6301 | I | Y | 1154 | 0 | 1154 | C | SP    FA |
| 6302 | I | Y | 1487 | 0 | 1487 | C | SP    FA |
| 6303 | I | N | 85 | 15 | 100 | C | SP    FA |
| 6304 | I | N | 234 | 40 | 274 | C | SP |
| 6305 | I | N | 421 | 134 | 555 | C | SP-SU-FA |
| 6306 | I | N | 45 | 5 | 50 | C | SP |
| 6307 | C | N | 26 | 0 | 26 | CH | SP-SU-FA |
| 6308 | I | N | 107 | 0 | 107 | C | SP-SU-FA |
| 6309 | I | N | 248 | 0 | 248 | C | SP-SU-FA |
| 6310 | I | N | 62 | 38 | 100 | C | SP |
| 6311 | I | Y | 3553 | 1264 | 4817 | C | SP-SU-FA |
| 6312 | I | Y | 1162 | 0 | 1162 | C | SP-SU-FA |
| 6313 | I | Y | 892 | 0 | 892 | C | SP-SU-FA |
| 6314 | M | N | 47 | 0 | 47 | C | SU |
| 6315 | M | N | 157 | 49 | 206 | C | SU-FA |
| 6316 | I | N | 318 | 122 | 440 | C | SP-SU |
| 6317 | I | N | 922 | 124 | 1046 | CH | SP-SU-FA |
| 6318 | I | N | 867 | 112 | 979 | C | SP-SU-FA |

3 - 17

**CHAPTER THREE**

Table 3-1 (continued)
PARTIAL SUMMARY OF LIVESTOCK GRAZING PROGRAM BY ALLOTMENT

| ALLOTMENT NUMBER | AMP CATEGORY[1] | STATUS[2] | GRAZING PREFERENCE (AUMs) | | | KIND OF LIVESTOCK[3] | SEASON OF USE[4] |
|---|---|---|---|---|---|---|---|
| | | | Active | Suspended | Total | | |
| 6319 | I | N | 318 | 0 | 318 | C | SP |
| 6320 | M | N | 147 | 0 | 147 | C | SP-SU |
| 6323 | I | N | 118 | 17 | 135 | C | SP-SU |
| 6324 | I | N | 22 | 0 | 22 | C | SP |
| 6325 | I | N | 137 | 0 | 137 | C | SP |
| 6326 | I | N | 80 | 0 | 80 | C | SP-SU |
| 6327 | I | N | 200 | 0 | 200 | C | SP-SU-FA |
| 6328 | M | N | 324 | 0 | 324 | C | SP-SU-FA |
| 6329 | I | N | 245 | 0 | 245 | C | SP-SU-FA |
| 6330 | I | N | 30 | 0 | 30 | C | SP-SU-FA |
| 6331 | I | N | 264 | 101 | 365 | C | SP-SU-FA |
| 6338 | M | Y | 120 | 0 | 120 | C | SP-SU-FA |
| 6339 | C | N | 23 | 0 | 23 | C | SP-SU-FA |
| 6342 | I | N | 215 | 69 | 284 | C | SU |
| 6344 | M | Y | 332 | 0 | 332 | C | SP-SU-FA |
| 6346 | M | N | 50 | 10 | 60 | C | SP-SU-FA |
| 6347 | M | Y | 216 | 423 | 639 | C | SP-SU-FA |
| 6348 | I | N | 108 | 86 | 194 | C | SP-SU-FA |
| 6349 | C | N | 10 | 0 | 10 | C | SP-SU-FA |
| 6350 | I | N | 144 | 26 | 170 | C | SP-SU-FA |
| 6352 | C | N | 10 | 0 | 10 | C | SU |
| 6353 | I | N | 138 | 0 | 138 | C | SU |
| 6358 | C | N | 21 | 0 | 21 | C | SP-SU-FA |
| 6359 | I | N | 40 | 60 | 100 | C | SP-SU |
| 6360 | M | N | 23 | 15 | 38 | C | SP-SU |
| 6362 | I | Y | 507 | 117 | 624 | CS | SP-SU-FA |
| 6365 | C | N | 11 | 0 | 11 | C | SP-SU |
| 6400 | C | N | 8 | 30 | 38 | C | SP-SU-FA |
| 6401 | C | N | 27 | 81 | 108 | C | SU-FA |
| 6500 | M | N | 126 | 402 | 528 | C | SP-SU-FA |
| 6501 | I | N | 43 | 0 | 43 | S | SU |
| 6502 | I | Y | 450 | 418 | 868 | S | SU-FA |
| 6503 | I | N | 242 | 0 | 242 | C | SP-SU-FA |
| 6504 | I | Y | 400 | 86 | 486 | S | SU-FA |
| 6505 | I | Y | 1080 | 711 | 1791 | S | SU |
| 6506 | I | Y | 300 | 0 | 300 | S | SU-FA |
| 6507 | I | Y | 236 | 31 | 267 | SH | SU-FA |
| 6508 | C | N | 65 | 0 | 65 | S | SU-FA |
| 6509 | I | Y | 550 | 355 | 905 | S | SU-FA |
| **TOTALS** | | | **45,539** | **14,596** | **60,135 [7]** | | |

[1] Allotment Category:"M" (32 Allotments) = maintain, "I" (66 Allotments) = improve, and "C" (41 Allotments) = custodial.

[2] AMP Status:"N" allotment has no AMP (Allotment Management Plan), "Y" allotment has an AMP.

[3] Kind of Livestock: "C" are cattle, "H" are horses, and "S" are sheep.

[4] Season of Use: "SP" is spring, "SU" is summer, "FA" is fall, and "WI" is winter.

[5] A grazing decision will be issued according to BLM policy and regulations to implement a change in season of use in this allotment, or part of the allotment (see Management Unit 12 for the land use decision regarding this change).

[6] A grazing decision will be issued according to BLM policy and regulations to implement a change in the kind of livestock that will be authorized for these allotments, or parts of these allotments.  See the prescriptions for units 2 and 10 for the land use decisions regarding these changes.

[7] After a review of grazing case files and preparation of this table for the RPS, the number of AUMs of Total, Active, and Suspended preference differs from numbers published in the Draft RMP/EIS and the Proposed RMP/Final EIS.  See Chapter One, Page 1-6, item 5, for an explanation of why these numbers are different in this document.

3 - 18

BLM_0006745

RANGELAND PROGRAM SUMMARY

Table 3-2
CATEGORY "I" ALLOTMENT PRIORITIZATION
FOR
ACTIVITY PLAN DEVELOPMENT/REVISION [1]

| General Ranking | Allotment Number | Allotment Name |
|---|---|---|
| 1 | 6107 | Iola Powderhorn [2] |
| 2 | 6317 | South Parlin Flats [3] |
| 3 | 6318 | Camp Kettle Gulch [4] |
| 4 | 6319 | Tomichi |
| 5 | 6304 | Doyleville Common |
| 6 | 6309 | Tomichi Dome |
| 7 | 6311 | Gold Basin |
| 8 | 6108 | Park Creek |
| 9 | 6313 | Stubbs Gulch |
| 10 | 6305 | Woods Gulch Common |
| 11 | 6208 | West Antelope Common |
| 12 | 6206 | Blinberry Gulch |
| 13 | 6312 | Lower Cochetopa Common |
| 14 | 6104 | Powderhorn |
| 15 | 6110 | Ranch Pasture |
| 16 | 6302 | Alder Creek |
| 17 | 6301 | Cabin Creek |
| 18 | 6505 | Grizzly Gulch |
| 19 | 6203 | Beaver Creek |
| 20 | 6103 | Indian Creek |
| 21 | 6035 | Metzler Basin |
| 22 | 6300 | Sheeps Gulch |
| 23 | 6509 | American Lake |
| 24 | 6502 | Red Cloud |
| 25 | 6362 | Cold Springs |
| 26 | 6033 | Willow Creek |
| 27 | 6011 | Big Willow |
| 28 | 6034 | Little Willow |
| 29 | 6326 | Snyder Gulch |
| 30 | 6105 | Yeager Gulch |
| 31 | 6504 | Hensen Creek |
| 32 | 6506 | Upper Burrows Park |
| 33 | 6507 | American Flats |

[1] The ability to complete planning is related to funding and staffing capabilities;
coordinated planning may accelerate the rate of planning on allotments
[2] Scheduled for completion in 1993
[3] Scheduled for completion in 1993
[4] Scheduled for completion in 1994

BLM_0006746

**CHAPTER THREE**

Table 3-2 (Cont'd.)
CATEGORY "I" ALLOTMENT PRIORITIZATION
FOR
ACTIVITY PLAN DEVELOPMENT/REVISION

| General Ranking | Allotment Number | Allotment Name |
|---|---|---|
| 34 | 6503 | Lower Burrows Park |
| 35 | 6202 | Stevens Creek |
| 36 | 6115 | Devils Lake |
| 37 | 6316 | Bead Creek |
| 38 | 6329 | Razor Creek Dome |
| 39 | 6331 | Los Pinos Creek |
| 40 | 6112 | Cebolla Creek |
| 41 | 6342 | Dome Pasture |
| 42 | 6111 | Cathedral |
| 43 | 6119 | Spring Creek |
| 44 | 6216 | Antelope Creek |
| 45 | 6121 | Spring Gulch |
| 46 | 6327 | Vouga Reservoir |
| 47 | 6348 | Texas Creek |
| 48 | 6056 | Highway |
| 49 | 6018 | High Mesa |
| 50 | 6350 | Van Tassel Gulch |
| 51 | 6353 | Lower Means |
| 52 | 6325 | Mill Hill Common |
| 53 | 6323 | Barrett Creek |
| 54 | 6120 | Red Bridge |
| 55 | 6308 | Hot Springs Creek |
| 56 | 6310 | Pleasant View |
| 57 | 6303 | Line Spring |
| 58 | 6359 | Razor Creek |
| 59 | 6052 | Big Park |
| 60 | 6180 | Rock Creek Park |
| 61 | 6306 | Waunita Hot Springs |
| 62 | 6501 | Ramboulet Park |
| 63 | 6051 | Big Blue |
| 64 | 6330 | East Moss Lake |
| 65 | 6210 | Deep Gulch |
| 66 | 6324 | Needle Creek |

BLM_0006747

# APPENDIX A
# WILDLIFE MANAGEMENT

Table A-1

CDOW LONG RANGE HERD GOALS

| GMU | ELK[1] | DEER[1] |
|---|---|---|
| 54[2] | 3,000 | 4,800 |
| 55/551[3] | 3,000 | 5,000 |
| 66/67[4] | 3,000 | 6,800 |
| Totals | 9,000 | 16,600 |

Note:  [1] Numbers represent the total projected animals present including Federal, State, and private lands.
[2] Approximately 30% of big game winter range in this GMU is BLM; National Park Service(NPS) land was excluded in the calculation.
[3] Approximately 45% of big game winter range in this GMU is BLM.
[4] Approximately 57% of big game winter range in this GMU is BLM; NPS land was excluded in the calculation.

Table A-2

LONG-RANGE ELK HERD GOALS
ON PUBLIC LANDS
WITHIN THE PLANNING AREA

| GMU | NUMBERS OF ELK[1] |
|---|---|
| 54 | 1,250 |
| 55 | 700 |
| 64 & 65 | 97 |
| 66 | 1,100 |
| 67 | 800 |
| 551 North | 400 |
| 551 South | 400 |
| Totals | 4,747 |

Note:  [1] Herd goal numbers would be managed to support elk numbers within proper utilization levels on public lands. Numbers are approximate.

Table A-3

LONG-RANGE DEER HERD GOALS
ON PUBLIC LANDS
WITHIN THE PLANNING AREA

| GMU | NUMBERS OF DEER[1] |
|---|---|
| 54 | 2,000 |
| 55 | 2,250 |
| 64 & 65 | 130 |
| 66 | 1,000 |
| 67 | 700 |
| 551 North | 1,000 |
| 551 South | 1,750 |
| Totals | 8,830 |

Note: [1] Herd goal numbers would be managed to support deer numbers within proper utilization levels on public lands. Numbers are approximate.

Table A-4

ELK AND DEER INTERIM HERD
GOALS ON PUBLIC LANDS
WITHIN THE PLANNING AREA

| GMU | ELK[1] | DEER[1] |
|---|---|---|
| 54 | 1,150 | 1,400 |
| 55 | 700 | 1,575 |
| 64 & 65[2] | 97 | 130 |
| 66 | 1,100 | 700 |
| 67 | 800 | 500 |
| 551 North | 400 | 700 |
| 551 South | 400 | 1,225 |
| TOTALS | 4,647 | 6,230 |

Note:    [1] Numbers represent recommended interim elk or deer herd goals for all BLM-managed lands in the Planning Area, until shrub production and vigor increases.
[2] A reduction in elk and deer numbers would be recommended to CDOW in GMU 64. The number is not known at the time this document was printed.

BLM_0006748

APPENDIXES

Table A-5

## MANAGEMENT UNIT NUMBERS
### KEYED TO CDOW GAME MANAGEMENT UNIT NUMBERS IN THE PLANNING AREA

| CDOW GMU NUMBER[1] | BLM RMP MU NUMBER[2] |
|---|---|
| 54 | 7[3], 9[3], 13, 16 |
| 55 | 12, 15, 16 |
| 64 | 12 |
| 65 | 1, 13, 15, 16 |
| 66 | 1, 2[3], 4[3], 5[3], 6[3], 10, 12, 13, 15, 16 |
| 67 | 3, 8[3], 10, 11, 12, 13, 14, 15, 16 |
| 551 North | 12, 14, 16 |
| 551 South | 3, 11, 12, 14, 15 |

Notes:

[1]  CDOW GMU = Colorado Division of Wildlife Game Management Unit

[2]  BLM RMP MU = Bureau of Land Management Resource Management Plan Management Unit

[3]  These Management Units are entirely contained in the noted GMU.

## GUIDELINES FOR SAGE GROUSE HABITAT MANAGEMENT

Manage for sagebrush conditions that maintain the following habitat components for sage grouse.

A.    **Management Guidelines Common to All Sage grouse Habitat Areas**

1.    Protect all strutting grounds, or leks, from destruction.

2.    Allow no treatments that would remove more than 25% of the sagebrush within one-half mile of all leks.

3.    Protect sagebrush taller than 15 inches on dry south facing slopes greater than or equal to five percent and on ridge tops with slopes less than or equal to five percent.

4.    Maintain sagebrush on public lands within 300 feet of irrigated hay meadows or pastures for escape cover.

5.    In sagebrush stands having an average height of 10 to 15 inches, maintain a 10 to 15% overstory cover for summer habitat.

6.    In order to protect brood-rearing cover and forage, maintain 50% of

A - 2

BLM_0006749

the sagebrush within a 600 foot buffer zone around wetlands, wet and sub-irrigated meadows, and riparian areas. Untreated areas will be representative of the total treatment area with the 600 feet prior to treatment.

7. Maintain 50% of the tall dense sagebrush in drainage for winter habitat.

8. Manage for a canopy cover of 20-30% in sagebrush stands 15 to 20 inches high.

B. **Management Guidelines in Sage Grouse High Production Areas**

1. Sagebrush treatments would not remove more than 30% of the sagebrush within two miles of a lek in high production areas. This 30% should contain equal amounts of all types of canopy cover and height.

C. **Management Guidelines Outside of Sage grouse High Production Areas but Within Sage Grouse Habitat Areas.**

1. Sagebrush treatments would not remove more than 50% of the sagebrush within two miles of a lek. This 50% should contain equal amounts of all types of canopy cover and height.

APPENDIX A

# NON-GAME MANAGEMENT IN TIMBER MANAGEMENT AREAS

Manage timber resources to improve or maintain habitat for timber dependent non-game wildlife.

Within all timber types, maintain a 200 acre block of undisturbed forest around all goshawk nests to meet nesting requirements. Maintain two slash piles and five logs 20" or greater DBH per acre for small mammals, black bears, and pine martens.

Within proposed clearcuts, maintain two-to-five snag trees for each three-to-four acres of clearcut; minimum diameter of snag trees at breast height would be 18", with a minimum height of 20 feet; if snag trees are not available in areas to be clearcut, live trees meeting these criteria would be girdled.

Maintain 30% of the ponderosa pine for Abert squirrels as follows: uneven-aged; 11-36 inches DBH; 200 stems per acre with basal area of 150-200 square feet, canopy closure greater than 80% with interlocking branches; and crowns 30-50 feet above the floor. Furthermore, trees meeting the parameters should occur in contiguous stands 1 to 2 acres.

Maintain a variety of all ecosystem timber types and all five forest structural stages that would maintain viable populations of non-game wildlife as identified in the Managing Forest Lands for Wildlife handbook. Increase the grass and forb component of sagebrush communities and maintain sage cover of 25%. A combination of good ground cover with sagebrush provides optimum habitat for small mammals and birds.

A - 3

BLM_0006750

**APPENDIXES**

Table A-6

MITIGATION FOR BIRDS OF PREY HABITAT

| SPECIES | HABITAT[1] TYPE | TYPES OF SURFACE DISTURBANCE RESTRICTIONS ON PUBLIC LANDS WITHIN OR SURROUNDING NESTS, ROOSTS, OR HABITAT[2] | |
|---|---|---|---|
| | | PUBLIC LANDS WHERE NO SURFACE DISTURBANCE WILL OCCUR YEARLONG | PUBLIC LANDS WHERE SEASONAL RESTRICTIONS FOR SURFACE DISTURBANCE WILL APPLY |
| Ferruginous Hawk | Nesting | 1/8 mile radius of nest | 3/1-6/31, between 1/8 and 1/4 mile radius |
| Golden Eagle | Nesting | 1/8 mile radius of nest | 2/15-7-15, between 1/8 and 1/4 mile radius |
| Prairie Falcon | Nesting | 1/8 mile radius of nest | 3/15-7-31, between 1/8 and 1/4 mile radius |
| Peregrine Falcon | Nesting | 1/8 mile radius of nest | 3/15-7/31, between 1/8 and 1/4 mile radius |
| Bald Eagle | Nesting Active/Inactive | 1/8 mile radius of nest | 11/15-7/31, between 1/8 and 1/2 mile radius |
| | Roost Diurnal/Nocturnal | 1/8 mile radius of nest | 11/15-3/15, between 1/8 and 1/2 mile radius |
| | Crucial Winter | 1/8 mile radius of nest | 11/15-3/15, between 1/8 and 1/2 mile radius |
| Other Raptors | Nesting | 1/8 mile radius of nest | 2/15-7/15, between 1/8 and 1/4 mile radius |

Notes:  [1]  Diurnal and Nocturnal = daytime and nighttime, respectively.
[2]  If habitat is located within planned surface disturbance site(s), specific inventories would determine if habitat would be affected and appropriate mitigation determined at that time.

A - 4

BLM_0006751

APPENDIX A

**CHANGES IN THE KIND OF LIVESTOCK FOR BIGHORN SHEEP OR PRONGHORN ANTELOPE IN THE PRMP**

Several grazing allotments were approved for conversion of the kinds of livestock that would be authorized from cattle or sheep to cattle only in 1989, in order to enhance management of bighorn sheep or pronghorn antelope and their habitat. Several allotments are proposed for the same type of change in the Resource Management Plan (RMP) in order to enhance management of bighorn sheep and their habitat. These changes were incorporated into the Draft Gunnison Resource Management Plan and Environmental Impact Statement (DRMP) and the Proposed Resource Management Plan and Final Environmental Impact Statement (PRMP), and are are incorporated into the Approved RMP and Record of Decision (ROD). Table A-7 below lists the allotments that will be subject to the changes.

Table A-7
ALLOTMENTS WHERE A CHANGE
IN KIND OF LIVESTOCK WILL OCCUR

| BIGHORN SHEEP | | PRONGHORN ANTELOPE |
|---|---|---|
| Allotments Approved For Conversion in 1989 | Allotments Proposed For Conversion in The RMP | Allotments Approved For Conversion in 1989 |
| 6312 | 6108 | 6312 |
| 6316 | 6109 | 6314 |
| 6317 | 6111 | 6319 |
| 6318 | 6112 | |
| 6328 | 6113 | |
| 6329 | 6114 | |
| 6338 | 6119 | |
| | 6180 | |
| | 6200[1] | |

[1]   Livestock grazing will not be authorized in Allotment 6200 in Management Unit 7. See the prescription for Management Unit 7.

A - 5



BLM_0006753



Resource Area Boundary
Planning Area Boundary
Major Highways

0                    11

Scale in Miles
1"= 11 Miles

Crested Butte

Gunnison

Lake City

BIGHORN SHEEP RANGE

Map A-2
Bighorn Sheep Range
in the Planning Area

A-7

BLM_0006754



**Map A-3**
**Pronghorn Antelope Range**
**in the Planning Area**

A-8

BLM_0006755

# APPENDIX B
# LIVESTOCK GRAZING MANAGEMENT

## RANGE READINESS CRITERIA FOR THE GUNNISON RESOURCE AREA

Criteria for range readiness consists of two elements: (1) soil readiness and (2) vegetation readiness.

**Soil Readiness.** Soils are especially vulnerable to damage in early season because of high soil moisture. Grazing at this time can damage soils, causing loss in productivity. Livestock should be excluded from the allotment at this critical period to allow the soil to become firm and plants to complete their early growth. Where applicable, snow should be absent from stock driveways.

Indicators of Soil Readiness:

Soils should be firm before grazing starts and moisture content should be low enough to insure that:

1. Soils will not be compacted resulting in hardpan surfaces which are impervious. This is especially true on fine-textured soils.

2. Sod covers in meadows and riparian areas will not be broken by hoof action.

3. Seedlings will not be pulled out of the ground because of high soil moisture.

**Vegetative Readiness.** The development stages of the species in Table B-1 will be used as indicators of readiness for grazing. This list is by no means complete. Additional species and developmental stages could be included when appropriate. These growth stages represent the earliest dates that use can begin on. When an allotment is dominated by a poor range condition, the guidelines prescribed in Table B-1 may have to be further altered to improve range condition and increase production.

Stages of plant development keyed to specific plants determine opening dates of the grazing season, and indicate when livestock grazing could occur. Under a system of management which provides for deferred use or rest, vegetation readiness may not be as important since the plants are provided a period for recovery. Under such grazing systems, vegetation may be grazed earlier than indicated by the following guides, provided the soils are ready. The goal is to maintain or restore the better forage plants. Therefore, growth stages of the perennial plants, not annuals, will govern vegetation readiness.

Range readiness observations will be made at key areas within an allotment. Key species will be the plants observed with emphasis on those plants which are primary forage species. This is a judgment decision to be made on the allotment. A list of plants which may be considered as key species when conducting range readiness is available for each range site. These lists can be found in the SCS Rangesite Descriptions for each site. However, the plants listed in the SCS descriptions do not include species which may be present in seral stages below the potential natural community (PNC) or introduced species.

Altitude also has a strong influence on vegetative readiness dates. Generally, each 100-foot (30 meters) difference in elevation is equal to one day's difference in range readiness. Also, a 10 to 15 day delay can be expected on north slopes compared to south slopes.

Other factors to consider are that plants will not produce seed head every year or, depending on site or moisture conditions, plants may not attain desired heights. These factors will be watched for (particularly plant height growth) and judgment used when determining range readiness.

B - 1

BLM_0006756

## APPENDIXES

Table B-1

INDICATORS OF VEGETATIVE READINESS - SEASON-LONG RANGE[1]

| SPECIES | COMMON NAME | STAGE OF DEVELOPMENT INDICATING RANGE READINESS[2] |
|---|---|---|
| **Grasses:** | | |
| Agropyron smithii | Western wheatgrass | 6-8" or more in height. |
| Agropyron spicatum | Bluebunch wheatgrass | 8" or more in height, heading out. |
| Agrostis spp. | Redtop | Heading out. |
| Bromus carinatus | Mountain brome | 8" or more in height, headed, panicle spreading. |
| Danthonia spp. | Oatgrass | In full bloom. |
| Deschampsia caespitosa | Tufted hairgrass | 6" or more in height, heading out. |
| Festuca arizonica | Arizona fescue | 8" or more in height, heading out. |
| Festuca idahoensis | Idaho fescue | 6" or more in height, heading out. |
| Festuca thurberi | Therber fescue | 12" or more in height, heading out. |
| Koeleria nitida | Prairie junegrass | Headed out. |
| Leucopoa kingii | Spike fescue | 12" or more in height, heading out. |
| Muhlenbergia montana | Mountain muhly | 6" or more in height, headed out. |
| Phleum alpinum | Alpine timothy | 6" or more in height, headed out. |
| Poa alpina | Alpine bluegrass | Headed out, panicle open. |
| Poa fendleriana | Mutton grass | Plants maturing, seed in dough stage. |
| Poa pratensis | Kentucky bluegrass | Panicle fully opened. |
| Poa secunda | Sandburg bluegrass | Development slightly behind Muttongrass. |
| Stipa spp. | Needlegrass | 6" or more in height, headed out to blooming. |
| **Grasslike:** | | |
| Carex spp. | Sedges | Heads blooming |
| Carex aquatilis | Water sedge | 7" - heading out. |
| **Forbs:** | | |
| Balsamorhiza spp | Balsamroot | Full to past blooming. |
| Castilleja spp. | Indian paintbrush | Full bloom. |
| Delphinium spp. | Low larkspur | Full to past bloom. |
| | Tall larkspur | Full growth, blooming to past bloom. |
| Erigeron spp. | Fleabane, Daisy | Full bloom. |
| Eriogonum spp. | Wild buckwheat | Full bloom. |
| Geranium spp. | Geranium | Full to past bloom. |
| Lupinus spp. | Lupine | Early to full bloom. |
| Martensia spp. | Bluebell | Full bloom. |
| Penstemon spp. | Penstemon | Full to past bloom. |
| Polygonum bistorta | Bistort | Full to past bloom. |
| Potentilla spp. | Cinquefoil | Early to full bloom. |
| Taraxacum officinal | Common dandelion | Seed disseminated on most plants. |
| Thermopsis spp. | Golden pea | Full bloom. |

B - 2

BLM_0006757

**APPENDIX B**

Table B-1

INDICATORS OF VEGETATIVE READINESS - SEASON-LONG RANGE[1]
(Cont'd)

| SPECIES | COMMON NAME | STAGE OF DEVELOPMENT INDICATING RANGE READINESS[2] |
|---|---|---|
| Valeriana spp. | Valerian | Fully developed, blooming. |
| Veratrum califonicum | False hellebore | Budding to early bloom. |
| Wyethia spp. | Mules ear or Wyethia | Full bloom to plants starting to dry. |
| Zygadenus spp. | Deathcamas | Full bloom. |
| **Browse and Trees:** | | |
| Amelanchier spp. | Serviceberry | Fruit forming. |
| Cercocarpus spp. | Mountain mahogany | Fully leafed. |
| Crataegus spp. | Hawthorn | In full bloom. |
| Populus tremuloides | Aspen | Fully leafed - deep green. |
| Potentilla fruticosa | Shrubby cinquefoil | In full bloom. |
| Prunus virginiana | Chokecherry | Full to past blooming |
| Purshia tridentata | Bitterbrush | In bloom. |
| Ribes spp. | Current, Gooseberry | Flowering 50% or more. |
| Salix spp. | Willow | Fully leafed. |
| Sambucus spp. | Elderberry | Full bloom. |
| Symphoricarpos spp. | Snowberry | Full leaf, budded to blooming. |

[1] Source: USFS Range Analysis and Management Handbook, R-2, FSH 3/85 Amendment No. 15.
[2] In every case, the key forage perennial grass species should have reached the stage development listed.  Leaf height is the average height of all leaves, except the few longest or the shortest, when held upright and measured.

B - 3

BLM_0006758

# APPENDIX C
# PREPARATION, UPDATING, OR REVISION
# OF ACTIVITY PLANS IN THE RESOURCE MANAGEMENT PLAN

This Appendix consolidates decisions and recommendations made in Chapter Two of the Gunnison Resource Management Plan (RMP) regarding the preparation or updating of a variety of activity level plans, such as Recreation Area Management Plans (RAMPs) or Cultural Resource Management Plans (CRMPs). Also included are the decisions and recommendations in the RMP regarding the preparation of integrated, comprehensive, and coordinated multi-resource level activity plans. The plans are referred to in the RMP as Coordinated Resource Management Activity Plans (CRMAPs). *If appropriate, managers are encouraged to combine single resource activity plans into CRMAPs.* This Appendix also consolidates the decisions and recommendations in the RMP that would require certain or all resources to be incorporated or considered during the preparation, revision, or updating of either single resource activity level plans or CRMAPs. The actions under the header "ACTIVITY PLAN DECISIONS IN THE STANDARD MANAGEMENT SECTION", below, would, unless otherwise noted, apply to the entire Planning Area. The actions under the header "ACTIVITY PLAN DECISIONS IN MANAGEMENT UNIT PRESCRIPTIONS", below, would apply to specific Management Units.

## ACTIVITY PLAN DECISIONS IN THE
## STANDARD MANAGEMENT SECTION, CHAPTER TWO

### DECISIONS TO PREPARE, DEVELOP, UPDATE, OR REVISE ACTIVITY PLANS

page 2-4:     **Wildlife Habitat Management.** The Habitat Management Plan (HMP) for the Planning Area would be revised and implemented consistent with BLM's Fish and Wildlife Plan for Colorado - Program for the Decade. The HMP will prescribe land use and species management guidance for the mutual benefit of wildlife, fish, special status plant and animal species and habitat, and other resources on public lands. Objectives of the revised HMP will include, but will not be limited to, methods to manage public lands to help meet, within carrying capacities of the habitat, CDOW long-range herd goals, maintain or improve vegetation communities to benefit both game and non-game wildlife, implement a program to increase the quantity and quality of crucial big game winter range, and implement cooperative plans and projects with CDOW and other organizations to maintain or enhance big game and/or upland game habitats.

page 2-10:     Existing and future activity plans, such as AMPs or CRMAPs, will, based on staffing capabilities, be evaluated and either modified or revised as necessary, using a coordinated, interdisciplinary approach. New activity plans will also be developed with interdisciplinary input and consultation with permittees and other affected interests. Activity plans will incorporate allotment specific objectives for maintaining or improving livestock forage, wildlife and fish habitat, and riparian areas. Activity plans will also prescribe management actions including grazing practices, range improvements, changes in season of use, and other management actions to achieve allotment specific objectives. Innovative or non-traditional management strategies will also be considered.

page 2-12:     One Planning Area-wide Forest Management Plan (FMP) will be completed that will incorporate and update the two existing FMPs.

page 2-13:     A CRMAP for the Alpine Triangle SRMA will be prepared that incorporates appropriate actions contained in the existing Recreation Area Management Plan (RAMP) and the prescriptions for Management Units 1, 4, 5, 6, and that part of unit 15 located in the SRMA.

C - 1

**APPENDIXES**

| | |
|---|---|
| page 2-13: | In Management Unit 2, public lands in the Powderhorn Primitive Area SRMA will be managed for primitive and semi-primitive, non motorized recreation and scenic opportunities and for the maintenance and enhancement of natural values. A RAMP will be prepared and will include goals within BLM's *Recreation 2000: A Strategic Plan.* |
| page 2-14: | Wilderness Management Plans will be prepared for any area(s) designated and the area(s) will be managed as wilderness. |
| page 2-14: | The transportation plan and map will be updated. |
| page 2-14: | Protection of cultural resources will be considered in all activity plans. |
| page 2-15: | A land sale/disposal activity plan will be prepared for Category I lands. indicating disposal techniques, priorities, and implementation timing. |
| page 2-15: | A site-specific burn plan and Environmental Analysis (EA) will be prepared prior to authorizing any prescribed burns. |

**DECISIONS TO INCLUDE, INCORPORATE, OR IDENTIFY CERTAIN RESOURCES/RESOURCE USES IN ACTIVITY PLANS**

| | |
|---|---|
| page 2-2: | Specific, desired plant communities will be identified in activity plans. Exceptions to a late seral ecological status needed to meet objectives will be identified in activity plans. |
| page 2-2: | Riparian management strategies, projects, or improvements will be included in activity plans and will be implemented by priority, as to be determined by riparian area inventories. |
| page 2-7: | In Management Units 14 or 15, the 4 inch stubble height requirement will be incorporated into all existing activity plans in these two management units, since existing plans do not adequately address riparian concerns. When these outdated activity plans are evaluated, modified, or revised, riparian concerns will address the following management guidance: site specific objectives will be consistent with riparian area goals established in this plan for Management Units 14 and 15. |
| page 2-8: | In all riparian areas, except in units 14 or 15, the 2½ inch stubble height will be incorporated into all existing AMPs or other activity plans. When these outdated activity plans are evaluated, modified, or revised, riparian concerns will address the following guidance: site specific objectives will be consistent with riparian area goals established in this plan, including the maintenance, restoration, or improvement of riparian conditions (hydrologic, soil, and vegetation) and natural values. |
| Page 2-9: | *Range Improvements* |
| | Structural and non-structural range improvements such as fences, water developments, burns, spray treatments, and others will continue to be identified and prescribed in |

C - 2

activity plans or grazing agreements.  This will facilitate livestock management to achieve specific management and resource objectives defined in activity plans or agreements.

page 2-11:          *Monitoring*

Range readiness will be incorporated into existing AMP's utilizing the criteria specified in Appendix B.  However, the readiness criteria for allotments with AMP's or other activity plans will be specific to the allotment and/or areas within it.  On allotments with AMPs or other activity plans, objectives and actions in these plans will also be considered when determining turnout dates. This will provide flexibility for early turnout on areas where plant maintenance and riparian system needs have been met.  Range readiness criteria as documented in Appendix B will be used until allotment-specific criteria can be incorporated into each AMP or activity plan.

page 2-12:          *Monitoring*

9)     Ecological site inventories for uplands and riparian areas will be conducted in preparation for activity plans as needed on category "I" allotments.  This will be done as part of the activity plan preparation process, and as funding and personnel allow.

page 2-18:          Activity plans will consider the remediation of known hazards.


# ACTIVITY PLAN DECISIONS IN MANAGEMENT UNIT PRESCRIPTIONS, CHAPTER TWO

## DECISIONS TO PREPARE, DEVELOP, UPDATE, OR REVISE ACTIVITY PLANS

page 2-22:          In Management Unit 2, the Powderhorn Primitive Area SRMA, a Recreation Area Management Plan (RAMP) will be prepared, emphasizing the enhancement of natural values and primitive recreation opportunities.

page 2-24:          In Management Unit 3, the Cochetopa Canyon SRMA, the existing RAMP will be updated to include the lands in this expanded unit, and management actions from the prescription for this unit.

page 2-28:          In Management Unit 7, the West Antelope Creek ACEC, a CRMAP will be prepared, and will include management actions within the recommended Dillon Pinnacles ACEC, unit 9.

page 2-29:          In Management Unit 8, the South Beaver Creek ACEC, an integrated ACEC management plan will be prepared.

page 2-31:          In Management Unit 10, a HMP will be prepared.

page 2-33:          For Management Unit 12, a HMP or a CRMAP will be developed focusing on overall habitat improvement and intensive habitat management.

BLM_0006761

**APPENDIXES**

page 2-35:    In Management Unit 13, activity plans, such as CRMAPs or AMPs, will be developed, and existing AMPs will be updated as needed using CRMAP standards and procedures.

page 2-37:    For Management Unit 15, the Resource Area HMP will be revised to include the recommendations in the Management Unit prescription.

## DECISIONS TO INCLUDE, INCORPORATE, OR IDENTIFY CERTAIN RESOURCES/RESOURCE USES IN ACTIVITY PLANS

page 2-20:    In Management Unit 1, specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

page 2-25:    In Management Unit 4, the American Basin ACEC, specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

page 2-26:    In Management Unit 5, the Redcloud Peak ACEC, specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

page 2-27:    In Management Unit 6, the Slumgullion Earthflow National Natural Landmark ACEC, specific and detailed management for resources in this unit will be included as part of the CRMAP to be prepared for the Alpine Triangle SRMA.

page 2-29:    In Management Unit 7, the West Antelope Creek ACEC, non-conflicting and compatible livestock management objectives, projects, and mitigating measures will be incorporated into new activity plans, such as AMPs, HMPs or CRMAPs, before being implemented.

Page 2-30:    For Management Unit 9, the Dillon Pinnacles ACEC, specific management actions will be included in the CRMAP for unit 7.

page 2-32:    In Management Unit 11, sagebrush treatments and management to improve sage grouse habitat will be incorporated into all activity plans, such as AMPs or CRMAPs, and their design, implementation, and management will incorporate as a minimum the sage grouse habitat management guidelines in Appendix A.

page 2-35:    In Management Unit 13, activity plans developed that involve lands at High Mesa, Hartman Rocks, and Big Mesa will include and consider management objectives for all resources, including recreation management.

page 2-36:    In Management Unit 14, riparian improvement strategies and/or projects will be included in all CRMAPs and other activity plans and implemented.

C - 4

BLM_0006762

# APPENDIX D
## DISPOSAL TRACTS, ACQUISITION CRITERIA,
## RIGHTS-OF-WAY CORRIDORS - LANDS AND REALTY

### RESOURCE MANAGEMENT PLAN CATEGORY I DISPOSAL TRACTS

1. T. 14 S., R 86 W., Sec. 1: S 1/2 SE 1/4 SW 1/4 -20 acre isolated tract, on East River near town of Crested Butte, difficult to manage and is adjacent to private subdivision developments on two sides.

2. T. 15 S., R. 87 W., Sec. 1: Lot 2, SW 1/4 NE 1/4 - 80.11 acre isolated tract, near Carbon Creek that is uneconomical to manage; adjacent to USFS.

3. T. 15 S., R. 86 W., Sec. 7: NE 1/4 SE 1/4 - 40 acre isolated tract, near Baldwin that is uneconomical to manage.

4. T. 15 S., R. 84 W., Sec. 28: SE 1/4 SE 1/4 - 40 acre isolated tract, near Taylor River in Elsinor Ranch, difficult and uneconomical to manage.

5. T. 49 N., R. 3 E., Sec. 8: SE 1/4 SW 1/4 - 40 acre isolated tract, near Quartz Creek, difficult and uneconomical to manage.

6. T. 49 N., R. 2 E., Sec. 17: SE 1/4 NE 1/4, NE 1/4 SE 1/4 - 80 acre isolated tract, near Tomichi Creek that is difficult and uneconomical to manage.

7. T. 49 N., R. 5 W., Sec. 21: E 1/2 NE 1/4, NE 1/4 SE 1/4 - 120 acre isolated tract, difficult and uneconomical to manage.

8. T. 49 N., R. 5 W., Sec. 34: NE 1/4 - 160 acre isolated tract, difficult and uneconomical to manage; Current BuRec withdrawal in revocation process.

9. T. 48 N., R. 4-1/2 E., Sec. 24: Lot 6 - 3.78 acre isolated sliver of public land, difficult and uneconomical to manage; Templeton ranch.

10. T. 48 N., R. 3 W., Sec. 8: NE 1/4 - 160 acre isolated tract, difficult and uneconomical to manage.

11. T. 48 N., R. 3 W., Sec. 21: SW 1/4 NE 1/4, SE 1/4 NW 1/4, W 1/2 SE 1/4 - 160 acre isolated tract.

12. T. 48 N., R. 5 W., Sec. 9: Lots 1,2,3,4, W 1/2 NW 1/4, NW 1/4 SW 1/4 - Western part of Section, adjacent to NPS; - 212.96 acre isolated tract.

13. T. 48 N., R. 5 W., Sec. 20: Lot 9; Sec. 21: Lot 1 - 57.08 acre isolated tract.

14. T. 48 N., R. 6 W., Sec. 13: Lots 1, 2, and 7 - 121.98 acre isolated tract.

15. T. 48 N., R. 6 W., Sec. 25: SE 1/4 SE 1/4 - 40 acre isolated tract.

16. T. 47 N., R. 1 W., Sec. 29: NW 1/4 NW 1/4 - 40 acre isolated tract - Big Mud Pond Area.

17. T. 47 N., R. 1 W., Sec. 34: S 1/2 SW 1/4 - 80 acre isolated tract.

18. T. 47 N., R. 1-1/2 W., Sec. 25: N 1/2 NE 1/4 - 80 acre isolated tract.

19. T. 47 N., R. 3 W., Sec. 19: E 1/2 NE 1/4, NE 1/4 SE 1/4 - 120 acre isolated tract.

20. T. 47 N., R. 3 W., Sec. 20: NE 1/4 NW 1/4 - 40 acre isolated tract.

21. T. 47 N., R. 3 W., Sec. 20: NE 1/4 SW 1/4, S; 1/2 SW 1/4; Sec. 29: NW 1/4 - 280 acre isolated tract.

22. T. 47 N., R. 3 W., Sec. 20: SE 1/4 NE 1/4, NE 1/4 SE 1/4 - 80 acre isolated tract.

23. T. 47 N., R. 5 W., Sec. 8: Lot 14 - 20.45 acre isolated tract.

24. T. 47 N., R. 5 W., Sec. 9: Lot 22 - 19.45 acre isolated tract.

25. T. 47 N., R. 5 W., Sec. 10: Lots 1,3,4,5, NE 1/4 SE 1/4 - 133.43 acre isolated tract.

26. T. 47 N., R. 6 W., Sec. 14: SE 1/4 SE 1/4 - 40 acre isolated tract.

D - 1

## APPENDIXES

27.  T. 47 N., R. 6 W., Sec. 14: NW 1/4 SW 1/4 - 40 acre isolated tract.

28.  T. 46 N., R. 2 E., Sec. 12: SE 1/4 NE 1/4 - 40 acre isolated tract.

29.  T. 46 N., R. 1 W., Sec. 33: SW 1/4 NE 1/4, Lot 1 - 82.58 acre isolated tract.

30.  T. 46 N., R. 2 W., Sec. 11: Lots 2, 3, 5, 6, 7, 8, 9, 12 & 13 - 103.95 acres in four isolated slivers around Iron Hill.

31.  T. 46 N., R. 2 W., Sec. 12: Lots 4, 5, 6, 7, 8, 9 & 10 - 75.46 acres in three isolated small tracts around Iron Hill.

32.  T. 46 N., R. 3 W., Sec. 18: SW 1/4 SE 1/4 - 40 acre isolated tract near Indian Creek.

33.  T. 46 N., R. 3 W., Sec. 17: SW 1/4 NE 1/4 - 40 acre isolated tract.

34.  T. 46 N., R. 3 W., Sec 20: NE 1/4 SE 1/4 - 40 acre isolated tract.

35.  T. 46 N., R. 3 W., Sec. 34: SW 1/4 NW 1/4 - 40 acre isolated tract.

36.  T. 45 N., R. 2 E., Sec. 10: SE 1/4 NE 1/4 - 40 acre isolated tract.

37.  T. 45 N., R. 2 E., Sec. 11: Lot 1 - 45.10 acre isolated tract.

38.  T. 45 N., R. 1 W., Sec. 3: E 1/2 SW 1/4 - 80 acre isolated tract in Rock Creek.

39.  T. 45 N., R. 1 W., Sec. 5: Lot 2 - 41.62 acre isolated tract.

40.  T. 48 N., R. 4 E., Sec. 30: Se 1/4 NE 1/4 - 40 acre isolated tract.

41.  T. 48 N., R. 3 W., Sec. 6: Lot 2 - 31.28 acre isolated tract.

42.  T. 44 N., R. 4 W., Sec. 11: Lots 2, 3, 4, 7, 8, and 11; Sec. 14: Lots 12 and 13 - 70.97 acres; irregularly shaped parcels difficult to manage.

43.  T. 43 N., R. 4 W., Sec. 9: NE 1/4 and SE 1/4, identified as Tract C on plat revised May 26, 1980 - .533 acres difficult and uneconomical to manage; this tract is too small to identify on map of the PRMP.

### CRITERIA FOR LAND ACQUISITIONS

The following list of general land acquisition criteria will be used to evaluate potential parcels for acquisition, by any means:

1.  Private lands within areas recommended as suitable for designation as wilderness or adjacent to such areas where the acquisition would add to the manageability and scenic value of the unit.

2.  Private lands needed for management of wild and scenic rivers and wild and scenic study rivers.

3.  Land adjacent to and inholdings within Special Recreation Management Areas, high value recreation lands or areas, and important scenic areas.

4.  Potential national or historic trails.

5.  Potential natural or research natural areas or areas for cultural or natural history designation.

6.  Potential areas of critical environmental concern.

7.  Special status plant and animal species or habitat.

8.  Aquatic, riparian, and wetland habitat areas (streams, rivers, lakes, ponds).

9.  Critical/crucial game winter range or other important wildlife habitat.

10.  Floodplain areas (100-year) as defined in Executive Order 11988, dated May 24, 1977.

11.  Private land that would improve public access.

12.  High country summer range.

BLM_0006764



**Map D-1**
Rights-of-Way Corridors
**APPROVED RESOURCE MANAGEMENT PLAN**

D-3

BLM_0006765



Map D-2
Rights-of-Way Avoidance and Exclusion Areas
and Areas Open to R.O.W.s in a Portion of the
**APPROVED RESOURCE MANAGEMENT PLAN**

D-4

BLM_0006766

# APPENDIX E
# ACCESS

Table E-1

AREAS TARGETED FOR ACCESS IN THE
APPROVED RESOURCE MANAGEMENT PLAN

| MANAGEMENT UNIT | TARGETED AREA | TYPE OF ACCESS DESIRED[1] | | BENEFITTING PROGRAMS | | |
|---|---|---|---|---|---|---|
| | | PUB | ADMIN | Livestock Grazing Management | Forestry | Recreation |
| 1 | DEVIL'S CREEK | X | | | | X |
| 1 | YAEGER GULCH, SKUNK & TROUT CREEKS | | X | | X | |
| 1 | ALPINE GULCH DRAINAGE (HIKING and HORSE ONLY) | X | | X | | X |
| 12 | BEAD CREEK | X | | X | | X |
| 13 | HUNTSMAN MESA (FROM COLORADO HIGHWAY 149) | | X | X | | |
| 13 | VULCAN/BIG MUD POND | X | | X | | X |
| 13 | PUBLIC LANDS EAST OF DEER BEAVER CREEK | X | | X | | X |
| 13 | SANDY MESA (ON BLUE MESA) | X | | X | X | |
| 13 | POISON DRAW (ON BLUE MESA) | X | | X | X | |
| 13 | WILLOW CREEK (IN BLUE MESA AREA) | X | | X | X | X |

Notes:   [1] Pub. = Public Access; Admin. = Administrative Access

E - 1

BLM_0006767

# APPENDIX F
# RECREATION MANAGEMENT AND
# OFF-HIGHWAY VEHICLE DESIGNATIONS

Table F-1
DESIGNATED OFF-HIGHWAY VEHICLE ROUTES
FOR THE GUNNISON RESOURCE MANAGEMENT PLAN
(See Maps F-1 and F-2 for location of routes 1-17)

| MAP F-1 REFERENCE NUMBER[1] | DESIGNATED ROUTE |
|---|---|
| 1 | BLM Road #3300 from Lake City, generally along Henson Creek to Engineer Pass and Planning Area boundary. |
| 2 | BLM Road #3303 along Nellie Creek to USFS boundary. |
| 3 | From BLM Road #3300 north along North Fork Creek to USFS boundary; includes a short segment that reenters BLM managed land upstream along North Fork Creek. |
| 4[3] | BLM Road 3320 from BLM Road #3300, south and east along Schaeffer Gulch, and to head of Hurricane Basin[3]. |
| 5 | BLM Road #3306, from Colorado Highway 149, generally along Lake Fork of the Gunnison River to Cinnamon Pass and Planning Area boundary. |
| 6 | BLM Road #3314 from BLM Road #3306 to about 0.8 miles north of Sloan Lake, in American Basin. |
| 7 | BLM Road #3309 along Cottonwood Creek, from Road #3306 to Junction of Snare Creek and Cuba Gulch. |
| 8 | BLM Road #3308 along Wager Gulch from BLM Road #3306 to USFS boundary. |
| 9[3] | From Road #3306 south of Lake San Cristobal in Red Mountain Gulch area, north generally to the northern part of section 29, T. 43 N., R. 4 W.[3] |
| 10 | BLM Road #3322 from Colorado Highway 149, and a trail extension at road's end to the USFS boundary. |
| 11[3] | From Colorado Highway 149 NE to bridge over Lake Fork of The Gunnison River, then approx. 1 mile north along existing two-track road paralleling river to a designated terminus.[3] |
| 12 | BLM Road #3305 from Colorado Highway 149 south of Lake City to a radio tower. |

THE NEXT SEVEN ROUTES , a) THROUGH g), ARE LOCATED IN THE ALPINE TRIANGLE SRMA, AND ARE TOO SHORT TO SHOW UP ON MAP F-1

| | |
|---|---|
| a)[3] | From BLM Road # 3306 southeast into the meadow across from the gravel pit; approximately 150 yards; T. 42 N., R. 4 W., Sec. 4: NE1/4NW1/4. |
| b)[3] | From BLM Road # 3306 east of Bent Creek, north to several undeveloped campsites; approximately 100 yards; T. 42 N., R. 5 W., Sec. 11: SW1/4SE1/4. |
| c)[3] | From BLM Road # 3306 w. of Bent Creek, s. past the Bent Creek toilet to several undeveloped campsites; about 120 yards; T. 42 N., R. 5 W., Sec. 11: SW1/4SE1/4. |

F - 1

BLM_0006768

**APPENDIXES**

Table F-1 (Cont'd.)
DESIGNATED OFF-HIGHWAY VEHICLE ROUTES
FOR THE GUNNISON RESOURCE MANAGEMENT PLAN
(see maps F-1 for locations of routes 1-17)

| MAP F-1 REFERENCE NUMBER[1] | DESIGNATED ROUTE |
|---|---|
| d)[3] | From BLM Road # 3309 (Cottonwood Creek Road), beginning about 100 yards beyond the Cataract Gulch trailhead, south to an undeveloped campsite; approximately 70 yards; T. 42 N., R. 5 W., Sec. 17: SE1/4. |
| e)[3] | From BLM Road # 3306 southeast to the Bon Homme mine; approximately .25 miles; T. 43 N., R. 6 W., Sec. 34: SE1/4, Sec. 35: SW1/4. |
| f)[3] | From BLM Road # 3300 northeast to the Nellie Creek meadow; approximately 100 yards; T. 44 N., R. 5 W., Sec. 35: SW1/4NE1/4. |
| g)[3] | From BLM Road # 3300 southwest to the Capitol City toilet and corral; approximately .25 miles; T. 43 N., R. 4 W., Sec. 12: SE1/4. |
| 13[2] | BLM Road #3087 (the Rainbow Lake Road) generally along East Fork Dry Creek to USFS boundary[2]. |
| 14[2] | Deep Gulch and Maggie Gulch Roads from Ohio Creek Road to West Antelope Creek Road and USFS boundary[2]. |
| 15[2] | BLM Road #3110 along Sheep Gulch and Lost Canyon to USFS boundary[2]. |
| 16[2] | BLM Road #3105 from Quartz Creek in North Parlin Flats vicinity to USFS boundary[2]. |
| 17[3] | See Map F-2 for designated routes in Unit 8, South Beaver Creek recommended ACEC. |

Notes:
[1] See numbers and routes on Maps F-1 and F-2 for general locations
[2] These routes would continue to be designated OHV routes, if necessary, in the event of heavy snowfalls and concentrated elk or deer herds from 12-1 through 3-31.
[3] These are newly designated routes for OHV use in the PRMP.

F - 2

BLM_0006769



Map F-1
Off-Highway Vehicle Use
Limited Areas
APPROVED RESOURCE MANAGEMENT PLAN

F-3

BLM_0006770



Map F-2
Off-Highway Vehicle Use
Designated Routes, Unit 8, S. Beaver Creek ACEC
APPROVED RESOURCE MANAGEMENT PLAN

F-4

BLM_0006771



Map F-3
Off-Highway Vehicle Use
Closed Areas
APPROVED RESOURCE MANAGEMENT PLAN

F-5

BLM_0006772



Map F-4
Special Recreation Management Areas
in the Planning Area

BLM_0006773

# APPENDIX G - FIRE SUPPRESSION



Map G-1
Full Wildfire Suppression Areas
APPROVED RESOURCE MANAGEMENT PLAN

G-1

BLM_0006774

# APPENDIX H - DESIGNATED AREAS OF CRITICAL ENVIRONMENTAL CONCERN



Resource Area Boundary
Planning Area Boundary
Major Highways

Scale in Miles
1"= 11 Miles

4 -     AMERICAN BASIN ACEC
5 -     REDCLOUD PEAK ACEC
6 -     SLUMGULLION EARTHFLOW
        NATIONAL NATURAL LANDMARK
7 -     WEST ANTELOPE ACEC
8 -     SOUTH BEAVER CREEK ACEC
9 -     DILLON PINNACLE ACEC

Map H-1
Designated AECEs
APPROVED RESOURCE MANAGEMENT PLAN

H-1

BLM_0006775

# APPENDIX I
# SOILS AND WATER RESOURCES

The table below lists target basal vegetation cover densities, expressed in percentages, for upland ecological sites in the Planning Area. These target basal vegetation cover densities apply to soils with a moderate to severe erosion potential. Additional forage could be allocated to livestock or wildlife management on these sites once these vegetative cover densities are achieved. The density of vegetation to be achieved will vary, depending upon the ecological site that exists where the activity is proposed. Determining when the target densities are reached will be accomplished by a monitoring schedule established during the planning stage for proposed activities.

Table I-1

TARGET % BASAL COVER DENSITIES TO BE ACHIEVED FOR WATERSHED NEEDS
AND PROTECTION ON SOILS WITH A MODERATE TO SEVERE EROSION POTENTIAL

| ECOLOGICAL SITES ON UPLANDS | % BASAL COVER OF VEGETATION |
|---|---|
| Alpine Slopes | 30 |
| Deep Clay Loam | 25 |
| Dry Mountain Loam | 10 |
| Mountain Meadow | 30 |
| Mountain Loam | 17 |
| Mountain Outwash | 10 |
| Mountain Swale | 25 |
| Subalpine Loam | 30 |
| Shallow Subalpine Loam | 16 |

Source:   *Appendix F, Montrose District Soil Erosion Monitoring Guidelines*

BLM_0006776

# APPENDIX J
# PROPOSED INSTREAM FLOW APPROPRIATIONS

Table J-1

PROPOSED INSTREAM FLOW APPROPRIATIONS
FOR FISHERY STREAMS - GUNNISON RESOURCE MANAGEMENT PLAN

| Stream Name | Approximate BLM Miles |
|---|---|
| Alkali Creek | 0.41 |
| Alpine Gulch | 1.59 |
| Antelope Creek | 2.31 |
| Beaver Creek | 1.00 |
| Willow Creek | 0.38 |
| Cebolla Creek | 3.0 |
| Cochetopa Creek | 0.5 |
| Deer Beaver Creek | 1.00 |
| East Beaver Creek | 0.57 |
| E. Fk. Blue Creek | 2.01 |
| E. Fk. Little Cimarron River | 1.34 |
| E. Fk. Powderhorn Creek | 10.15 |
| Fourth of July Creek | 2.20 |
| Gunnison River | 0.08 |
| Los Pinos Creek | 0.77 |
| Middle Blue Creek | 0.55 |
| Middle Fk. Powderhorn | 8.31 |
| Mill Creek | 0.15 |
| Monument Rock Creek | 1.49 |
| N. Willow Creek | 3.21 |
| Powderhorn Creek | 1.75 |
| Pine Creek | 1.41 |
| Razor Creek | 0.71 |
| Road Beaver Creek | 2.00 |
| Rock Creek | 4.69 |
| S. Beaver Creek | 7.73 |
| Spring Creek | 0.51 |
| Sugar Creek | 5.39 |
| S. Willow Creek | 5.38 |
| Townsite Gulch | 0.52 |
| Tomichi Creek | 0.45 |
| Trout Creek | 1.12 |
| Van Tassel Creek | 1.61 |
| W. Antelope Creek | 3.58 |
| W. Fk. Blue Creek | 1.15 |
| W. Fk. Powderhorn Creek | 8.70 |

DATA SOURCE: BLM 1988

J - 1

BLM_0006777

# APPENDIX K
# OIL AND GAS STIPULATIONS

The following stipulations will be added, as prescribed in the various Management Unit prescriptions in this Approved Resource Management Plan, to future oil and gas leases on both Federal surface and split-estate lands. The actual wording of these stipulations may be adjusted at the time of leasing to reflect future legislation, court decisions, or policy changes; however, protection standards in these stipulations will be maintained.  Any change to the protection content of the stipulation will require an amendment to the approved Resource Management Plan. Table K-1 is a summary of the stipulations.

APPENDIX K

TABLE K-1

SUMMARY OF FEDERAL OIL AND GAS STIPULATIONS
BY TYPE, MANAGEMENT UNIT, AND ACRES EFFECTED
IN THE APPROVED RESOURCE MANAGEMENT PLAN

| MGT. UNIT | TIMING LIMITATIONS[1] 4-16/6-30 Elk-Calving Areas | NO SURFACE OCCUPANCY[2] | | | | | | CONTROLLED SURFACE USE[3] | | TOTALS BY UNIT |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Alpine Triangle Special Recreation Mgt. Area | Cochetopa Canyon Special Recreation Mgt. Area | Areas of Critical Environmental Concern | Bighorn Sheep Habitat | Sage Grouse Leks | Forest Service Admin. Sites | Areas of Critical Environmental Concern | Riparian Wetland Vegetation | |
| 1 | | 675 | | | | | | | | 675 |
| 3 | | | 2,592 | | | | | | | 2,592 |
| 4 | | | | 1,590 - American Basin - Scenery | | | | | | 1,590 |
| 5 | | | | | | | | 5,962 - Redcloud Peak - Special Status Sp. | | 5,962 |
| 6 | | | | 1,442 - Slumgullion Earthflow - Mudslide | | | | | | 1,442 |
| 7 | 154 | | | | | 126 | | | | 280 |
| 8 | | | | | | | | 4,540 - S. Beaver Creek - Special Status Sp. | | 4,540 |
| 9 | | | | 552 - Dillon Pinnacles - Scenery | | | | | | 552 |
| 10 | | | | | 15,407 | | | | | 15,407 |
| 11 | | | | | | 1,134 | | | | 1,134 |
| 12 | 235 | | | | | 882 | | | 164 | 1,281 |
| 13 | 1,722 | | | | | 882 | | | | 2,604 |
| 14 | | | | | | 126 | | | 2,500 | 2,626 |
| 15 | 247 | 445 | | | | | | | | 692 |
| 16 | 9,465 | | | | | 252 | 100 | | | 9,817 |
| TOTALS | 11,823 | 1,120 | 2,592 | 3,584 | 15,407 | 3,402 | 100 | 10,502 | 2,664 | 51,194 |

Notes:   [1] Total Acres Timing Limitations = 11,823
    [2] Total Acres No-Surface Occupancy = 26,205
    [3] Total Acres Controlled Surface Use = 13,166

BLM_0006779

APPENDIXES

# OIL AND GAS STIPULATIONS FOR THE APPROVED RESOURCE MANAGEMENT PLAN

## NO SURFACE OCCUPANCY STIPULATIONS

**Alpine Loop National Back Country Byway, in Management Unit 1; G-1**

No surface occupancy or use is allowed on the lands described below:

For the purpose of:  Protecting the Primitive, Semi-Primitive Non-Motorized, Semi-Primitive Motorized and Roaded Natural recreation and scenic values along the Alpine Loop National Back Country Byway, within the Alpine Triangle Special Recreation Management Area (SRMA); Gunnison Resource Management Plan (Page 3- ).

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

**Cochetopa Canyon SRMA, Management Unit 3; G-2**

No surface occupancy or use is allowed on the lands described below:

For the purpose of:  Protecting the Roaded Natural recreation and scenic values within the Cochetopa Canyon Special Recreation Management Area (SRMA); Gunnison Resource Management Plan (Page   ).

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

**American Basin Proposed ACEC, Management Unit 4; G-3**

No surface occupancy or use is allowed on the lands described below:

For the purpose of:  protecting scenic and other natural resources and existing related recreation opportunities in the American Basin Area of Critical Environmental Concern (ACEC); Gunnison Resource Management Plan (Page   ).

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

**Slumgullion Earthflow National Natural Landmark Proposed ACEC, Management Unit 6; G-4**

No surface occupancy or use is allowed on the lands described below:

For the purpose of:  protecting the geological mass-wasting phenomenon in the Slumgullion Earthflow National Natural Landmark Area of Critical Environmental Concern (ACEC); Gunnison Resource Management Plan (Page   ).

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

**Dillon Pinnacles Proposed ACEC, Management Unit 9; G-5**

No surface occupancy or use is allowed on the lands described below:

For the purpose of:  protecting scenic and other natural resources and existing related recreation opportunities in the Dillon Pinnacles Area of Critical Environmental Concern (ACEC); Gunnison Resource Management Plan (Page   ).

Any changes to this stipulation will be made in accordance with the land use plan and/or the

BLM_0006780

regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

**Rocky Mountain Bighorn Sheep Habitat, Management Unit 10; G-6**

No surface occupancy or use is allowed on the lands described below:

For the purpose of: protecting bighorn sheep and their habitat selected because of topography, slope, aspect, and escape cover from disturbances that would alter the productivity or suitability of these areas as important bighorn sheep range; Gunnison Resource Management Plan (Page   ).

An exception to this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorized Officer that the bighorn sheep range is (1) not being utilized and is expected to remain in such condition because of a temporary change in climate and/or habitat, and (2) operations can be conducted in such a manner as to avoid altering vegetation, topography, slope, aspect, and escape cover on these lands.

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

**Sage Grouse Lek/Courtship sites; CO-2**

No surface occupancy or use is allowed within a one-quarter mile radius of sage grouse lek sites/courtship sites. Known lek sites are described or identified below:

For the purpose of protecting grouse courtship sites from disturbances that would force strutting sage grouse onto less desirable sites, or disturbances that would interfere with mating processes, or disturbances that could result in lek site destruction.

An exception may be granted by the Authorizing Officer, dependant upon the active status of the leks

or the geographical relationship of topographical barriers and vegetation screening to the site.

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

**TIMING LIMITATION STIPULATIONS**

**Elk-Calving Areas; CO-10**

No surface use is allowed during the following time period(s).  This stipulation does not apply to operation and maintenance of production facilities.

April 16 through June 30

On the lands described below:

For the purpose of protecting elk-calving areas from activities which would force elk into less suitable areas during the calving season; Gunnison Resource Management Plan (Pages   ).

An exception to this stipulation, in the form of an alteration or removal, may be approved by the Authorizing Officer when it has been determined through a site specific analysis that specific actions would not interfere with critical habitat function or compromise animal condition within the project vicinity.

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

**CONTROLLED SURFACE USE STIPULATION**

**Riparian/Wetland vegetation in Sage Grouse Brood Rearing Habitat; CO-28**

Activities associated with oil and gas exploration and development including roads, transmission lines, storage facilities, are restricted to an area beyond the

BLM_0006781

**APPENDIXES**

riparian/wetland vegetation zone on the lands described below:

For the protection of perennial water impoundments and streams, and/or riparian/wetland vegetation zone, important sage grouse brood-rearing habitat, and fish use, water quality, and other related resource values; Gunnison Resource Management Plan (Page   ).

Exceptions: This stipulation may be excepted subject to an on-site impact analysis with consideration given to degree of slope, soils, importance to the amount and type of wildlife and fish use, water quality, and other related resource values.

This stipulation will not be applied when the Authorized Officer determines that relocation up to 200 meters can be applied to protect the riparian system during location of the well site.

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

**Riparian/Wetland vegetation along a Portion of Cebolla Creek; CO-28**

Activities associated with oil and gas exploration and development including roads, transmission lines, storage facilities, are restricted to an area beyond the riparian/wetland vegetation zone along a portion of Cebolla Creek on the lands described below:

To protect perennial water impoundments and streams, and/or riparian/wetland vegetation and fish use, water quality, and other related resource values; Gunnison Resource Management Plan (Page  ).

Exceptions: This stipulation may be excepted subject to an on-site impact analysis with consideration given to degree of slope, soils, importance to the amount and type of wildlife and fish use, water quality, and other related resource values.

This stipulation will not be applied when the Authorized Officer determines that relocation up to

200 meters can be applied to protect the riparian system during location of the well site.

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

**Redcloud Peak Proposed ACEC, Management Unit 5; G-7**

Surface occupancy or use is subject to the following special constraints:

1. An inventory for populations of USF&WS listed threatened, endangered, candidate, and BLM sensitive species, especially the endangered Uncompahgre fritillary butterfly, and known or potential vegetative habitat of the species, will be conducted prior to approval of operations. The inventory will be used to prepare mitigative measures, consistent with lease rights granted, to reduce the impacts of surface disturbance to these special status species.

2. Relocation of proposed operations more than the 200 meters permitted in standard lease terms, in order to protect high value scenic resources. Mitigative measures will be prepared, consistent with lease rights granted, to reduce the impacts of surface disturbance to scenic resources.

Mitigation measures for the above two constraints may include, but are not limited to, relocation of roads, pads, pipelines, and other facilities, and fencing operations or habitat.

On the lands described below:

For the purpose of protecting USF&WS listed and candidate species and BLM sensitive special status species and their known or potential habitat, especially known or potential habitat of the endangered Uncompahgre fritillary butterfly, and high value scenic resources within the Redcloud Peak Area of Critical Environmental Concern (ACEC) or on the lands described above; Gunnison Resource Management Plan (Page ).

K - 4

BLM_0006782

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

**South Beaver Creek Proposed ACEC, Management Unit 8; G-8**

Surface occupancy or use is subject to the following special constraints:

1. An inventory for populations of USF&WS listed threatened, endangered, candidate, and BLM sensitive species, especially for skiff milkvetch, including known or potential habitat of the species, will be conducted prior to approval of operations. The inventory will be used to prepare mitigative measures, consistent with lease rights granted, to reduce the impacts of surface disturbance to these special status plant species.

2. Relocation of proposed operations more than the 200 meters permitted in standard lease terms, in order to protect special status plant species. Mitigative measures will be prepared, consistent with lease rights granted, to reduce the impacts of surface disturbance to special status plant species.

Mitigation measures for the above constraints may include, but are not limited to, relocation of roads,

pads, pipelines, and other facilities, and fencing operations or habitat.

On the lands described below:

For the purpose of protecting USF&WS listed and candidate species and BLM sensitive special status species and their known or potential habitat, especially known or potential habitat of skiff milkvetch, within the South Beaver Creek Area of Critical Environmental Concern (ACEC); Gunnison Resource Management Plan (Page   ).

An exception or alteration to the area covered by this stipulation may be approved if it can be demonstrated to the satisfaction of the Authorizing Officer that, after an impact analysis is conducted that considers such factors as the type and amount of surface disturbance proposed, plant frequency and density, and the relocation of disturbances, operations can be conducted without causing unacceptable impacts on USF&WS listed threatened, endangered, candidate, or BLM sensitive listed special status plant species or their occupied or potential habitat.

Any changes to this stipulation will be made in accordance with the land use plan and/or the regulatory provisions for such changes (For guidance on the use of this stipulation, see BLM Manuals 1624 and 3101, and Forest Service Manuals 1950 and 2820).

BLM_0006783

APPENDIX K



Map K-1
No Surface Occupancy Oil & Gas
Stipulations
APPROVED RESOURCE MANAGEMENT PLAN

BLM_0006784

**APPENDIX K**



Resource Area Boundary
Planning Area Boundary
Major Highways

Scale in Miles
0          11
1"= 11 Miles

Crested Butte

Gunnson

Lake City

AREAS COVERED BY
TIMING LIMITATIONS
(ELK CALVING AREAS)

Map K-2
Oil & Gas Timing Limitations
APPROVED RESOURCE MANAGEMENT PLAN

K-7

BLM_0006785

**APPENDIX K**



Resource Area Boundary
Planning Area Boundary
Major Highways

0      11
**Scale in Miles**
1"= 11 Miles

Crested Butte

UNIT 7 - SOUTH BEAVER
CREEK PROPOSED
ACEC

Gunnison

UNIT 14 - SAGE GROUSE BROOD
REARING HABITAT

CEBOLLA CREEK RIPARIAN AREA
VEGATATION

Lake City

UNIT 5 - REDCLOUD PEAK
PROPOSED ACEC

Map K-3
Controlled Surface Use Stipulations
**APPROVED RESOURCE MANAGEMENT PLAN**

BLM_0006786

UNCOMPAHGRE BASIN RESOURCE MANAGEMENT PLAN AMENDMENT

DECISION RECORD
FINDING OF NO SIGNIFICANT IMPACT

ENVIRONMENTAL ASSESSMENT
CO-034-94-23

<u>Decision</u>:  It is my decision to amend the existing land disposal decision in the Uncompahgre Basin Resource Management Plan (RMP) to classify public lands in the planning area, excluding special management retention areas, into one of two categories for disposal or multiple use management purposes.

The public lands in special management areas within the planning area, aggregating 45,549 acres, will remain unavailable for disposal because of their particular status.  These lands include the recommended Gunnison Gorge Wilderness Area, Adobe Badlands Wilderness Study Area (WSA), Camel Back WSA, Escalante Canyon Area of Critical Environmental Concern (ACEC), Fairview Research Natural Area/Area of Critical Environmental Concern (RNA/ACEC), and Needle Rock Outstanding Natural Area/Area of Critical Environmental Concern (ONA/ACEC).

The remaining public lands in the planning area are classified into the following two categories:

Category I lands are the tracts of public land which meet one or more of the criteria for disposal through public sale as set forth in Section 203 of the Federal Land Policy and Management Act (FLPMA).  Category I lands are primarily those lands currently identified as potential disposal tracts in the RMP.  A total of 128 tracts of public land totalling approximately 10,353 acres are classified as Category I.

Category II lands consist of the remaining 427,888 acres of public lands in the planning area.  Category II lands do not meet the Section 203 FLPMA sale criteria, and therefore will not be considered for disposal by sale.  These lands could, however, be considered for disposal on a case-by-case basis through exchange, boundary adjustments, state indemnity selection, R&PP Act applications, or other appropriate statute or authority, if the disposal serves the public interest.

<u>Alternative</u>:  In 1993, the County of Delta (County) identified and filed an application under the provisions of the Recreation and Public Purposes (R&PP) Act, as amended, for 440 acres of public land as a potential location for a new solid waste disposal facility (landfill).  Disposal of the site in the County's application would not be in conformance with the existing RMP land disposal decision as the subject lands are not presently identified for disposal.  This landfill alternative considered amending the

BLM_0006787

RMP to classify only those 440 acres of lands under application by the County as Category II lands, but did not address the larger issue of management flexibility regarding the potential disposal of any of the remaining lands within the planning area.  While this EA/DR would classify the 440 acres identified in the County's application as Category II lands (available for disposal by means other than FLPMA sale), this EA/DR does not analyze or make a decision regarding the County's proposed application.  That application will be further analyzed in accordance with NEPA and Bureau land disposal regulations to determine if it is in the public interest to make the land available to the County for use as a landfill.

Mitigation:  The decision to approve the plan amendment will replace the current land disposal decision in the RMP.  This decision to modify the RMP is a "paper change" only and does not authorize any surface disturbing activities, therefore mitigation measures have not been identified.  Any future proposed land disposal action will be analyzed in a site specific EA, and necessary mitigation measures will be identified at that time.

Rationale:  Amending the land disposal decision in the RMP will bring it into conformance with current land use planning guidance. It will also provide BLM with flexibility to complete individual disposal actions that are in the public interest without repeating the plan amendment process for each action.

Finding of No Significant Impact:  Based on the analysis of environmental impacts contained in the attached EA, I have determined that the impacts are not considered to be significant and the preparation of an Environmental Impact Statement is not required.

This decision on the plan amendment will become final at the end of the 30 day protest period and after the Governor's consistency review period which ends September 26, 1994, provided no inconsistencies are found or protests received.

Approved by:


_Bob Moore_ _____     _9/2/94_ _____
Bob Moore, State Director                       Date

Attachment (1)
  EA - CO-034-94-23

UNCOMPAHGRE BASIN RESOURCE MANAGEMENT PLAN AMENDMENT

ENVIRONMENTAL ASSESSMENT
CO-034-94-23

I.   PURPOSE AND NEED:

In accordance with the Federal Land Policy and Management Act of 1976 (FLPMA), the public lands managed by the Bureau of Land Management (BLM) are to be retained in Federal ownership unless the land use planning process determines that disposal of a particular tract will serve the national interest.   Disposal can be accomplished through sale, exchange, Recreation and Public Purpose Act sale, state indemnity selection, or other applicable statute or authority.  Section 203 of FLPMA (43 USC 1713) identifies specific criteria that must be met before a tract of public land can be sold:

   * such tract because of its location or other characteristics is difficult and uneconomic to manage as part of the public lands, and is not suitable for management by another Federal department or agency; or

   * such tract was acquired for a specific purpose and the tract is no longer required for that or any other Federal purpose; or

   * disposal of such tract will serve important public objectives, including but not limited to, expansion of communities and economic development, which cannot be achieved prudently or feasibly on land other than public land, and which outweigh other public objectives and values, including, but not limited to, recreation and scenic values, which would be served by maintaining such tract in Federal ownership.

The BLM's land use planning process utilizes Resource Management Plans (RMPs) to establish resource condition objectives, allocate land uses, and identify management direction and actions.

The purpose of the proposed action in this Environmental Assessment is to amend the land disposal decision in the Uncompahgre Basin RMP.   The proposed amendment evolved from an application filed under the provisions of the Recreation and Public Purposes (R&PP) Act, as amended, by the County of Delta (County).  In 1993, the County identified 440 acres of public land in Sections 15 and 16, Township 14 South, Range 95 West, 6th Principal Meridian, as a potential location for a new solid waste disposal facility (landfill).

The Uncompahgre Basin RMP, which was approved in 1989 and encompasses a planning area of approximately 483,790 acres of public land, identified 143 tracts of public land totalling 11,026

acres for further consideration for disposal by sale or exchange. The disposal tracts were identified using two criteria: first, individual tracts could not exceed 500 acres in size, and second, each tract had to meet at least one of the three sale criteria identified in FLPMA.

In accordance with FLPMA, the remaining 472,764 acres of public lands in the planning area, including the 440 acres identified in the County's application, are not available for disposal unless the Uncompahgre Basin RMP is amended.

This action is needed for three reasons; first, to make the land disposal decision in the Uncompahgre Basin RMP consistent with current land use planning guidance; second, to improve BLM's ability to respond in a timely manner to exchange proposals, R&PP applications, and other disposal initiatives; and third, to consider the County's R&PP application.

The current RMP land disposal decision is not consistent with current resource management planning guidance. Under the supplemental program guidance for land resources (BLM Manual 1623.2), public lands designated as available for disposal must be identified as Category I lands (those lands meeting the Section 203 FLPMA criteria for sale) or Category II lands (those lands available for disposal by means other than sale). The proposed plan amendment would bring the RMP land disposal decision into conformance with current planning guidance.

At present, BLM must prepare and approve a plan amendment before it can dispose of any tract of public land not currently identified for disposal in the RMP. The proposed plan amendment would provide the flexibility needed to analyze individual disposal actions, base BLM land tenure decisions on sound resource management goals, and eliminate the need to repeat the plan amendment process to respond to individual proposals.

The public lands identified in the County's R&PP application are not currently identified for disposal. If the land disposal decision in the Uncompahgre Basin RMP is amended to include these lands in either Category I or Category II, the County's application can be further analyzed in accordance with the National Environmental Policy Act (NEPA) and Bureau land disposal regulations to determine if it is in the public interest to make the land available to the County for use as a solid waste disposal facility.

II. CONFORMANCE WITH LAND USE PLANS

The land use plan relating to the area covered by this Environmental Assessment is the Uncompahgre Basin RMP. As explained above, the proposed action and the County alternative would amend the RMP to bring those actions into conformance with the RMP.

BLM_0006790

III. <u>PROPOSED ACTION AND ALTERNATIVES</u>

A.   <u>Proposed Action</u>

The proposed action is to amend the existing land use disposal decision in the Uncompahgre Basin RMP, except for public lands, aggregating 45,549 acres, in special management areas, which include the recommended Gunnison Gorge Wilderness Area, Adobe Badlands Wilderness Study Area (WSA), Camel Back WSA, Escalante Canyon Area of Critical Environmental Concern (ACEC), Fairview Research Natural Area/Area of Critical Environmental Concern (RNA/ACEC), and Needle Rock Outstanding Natural Area/Area of Critical Environmental Concern (ONA/ACEC). Public lands in these management areas would remain unavailable for disposal because of their particular status. See Appendix A for a description of these lands.

The remaining public lands in the planning area would be classified into one of two categories for disposal or multiple use management purposes:

Category I lands are the tracts of public land which meet one or more of the criteria for disposal through public sale as set forth in Section 203 of FLPMA. Lands that are proposed for Category I are primarily those lands currently identified as potential disposal tracts in the RMP. A total of 128 tracts of public land totalling approximately 10,353 acres would be classified as Category I. Individual disposal determinations would be subject to site-specific NEPA analysis and other statutory requirements. Federal mineral estate could be conveyed with surface estate where feasible and determined to be in the public interest. See Appendix B for descriptions of the tracts and applicable sale criteria. Although Category I lands meet the public sale criteria of FLPMA, other means of title transfer, such as exchange or R&PP conveyance, would not be precluded.

Category II lands would consist of the remaining 427,888 acres of public lands in the planning area. These lands comprise the land base to be managed by BLM for multiple use and ecosystem management purposes. Category II lands do not meet the Section 203 FLPMA sale criteria, and therefore would not be considered for disposal by sale. These lands could, however, be considered for disposal on a case-by-case basis through exchange, boundary adjustments, state indemnity selection, R&PP Act applications, or other appropriate statute or authority, if the disposal serves the public interest. These lands could be available for consideration for disposal through exchange if the exchange would result in improved manageability of lands and resources, consolidated land patterns or if the exchange would otherwise be in the public interest, pursuant to Section 206 of FLPMA. Individual disposals would be subject to site-specific NEPA analysis. The 440 acre parcel of public land under application by Delta County for landfill purposes is included in this category and would be available for conveyance subject to the results of the site-specific NEPA analysis.

The Uncompahgre Basin RMP contains 16 (sixteen) Management Units. A management unit is a geographically defined area which will be managed for a stated objective. The RMP identifies the management objective for each unit and describes the management actions which will be allowed, limited, or excluded to meet the stated objective.

The special management units and areas as previously described would not be modified as a result of this plan amendment. Public lands would not be identified for disposal, by sale or exchange, in these areas which total approximately 45,549 acres. These areas are further described as follows.

| Management Unit (MU) | Area | Acres |
|---|---|---|
| 4,6 * | Recommended Gunnison Gorge Wilderness Area | 22,416 |
| 12 | Escalante Canyon ACEC | 1,895 |
| 13 | Fairview RNA/ACEC | 377 |
| 14 | Needle Rock ONA/ACEC | 80 |
| 2,5,15 * | Adobe Badlands WSA | 10,282 |
| 1,2,3,9 * | Camel Back WSA | 10,499 |
| | | 45,549 |

* - denotes portion of the Management Unit

Public lands within the recommended Gunnison Gorge Wilderness Area and the Adobe Badlands and Camel Back WSAs would automatically become Category II lands if Congress determines that these lands, or portions thereof, are not suitable for wilderness and releases those lands from further wilderness review.

B.   Delta County Landfill Alternative

On October 9, 1991, The Environmental Protection Agency (EPA) published new regulations under Subtitle D, 40 CFR Part 258, which established criteria for municipal solid waste landfills. The regulations are comprehensive and provide specific guidelines for the management of all new and existing landfills and apply to landfills that receive waste on or after October 9, 1993. This date was subsequently extended to April 9, 1994. While these regulations provide nationwide standards for protecting the human health and the environment, the actual planning and direct implementation of solid waste programs remain largely State and local functions.

Delta County has operated three landfills; Delta Landfill, Tongue Creek Landfill and the North Fork Landfill. The Tongue Creek Landfill is on public land and is leased from BLM under the R&PP Act to the County. Because of Federal liabilities associated with leased sites, it is the BLM's policy to work with the local communities to patent (deed) new disposal sites to them. Existing leased sites are to be closed.

Since the new EPA regulations, Delta County has tried to identify potential sites suitable for the eventual development of a single

landfill for the county and to comply with Subtitle D. The County has since closed the Tongue Creek and Delta landfills. The County's Integrated Solid Waste Advisory Committee has been researching potential landfill sites on both private lands and the BLM administered public lands that were identified for disposal in the present RMP. The County has determined that none of these lands are suitable for a landfill because they either have drainage problems, are situated too near to major rivers or creeks, are legally or physically inaccessible because of topography or surrounding land ownership or are inconveniently located to serve the general public in Delta County.

In July 1992, the County filed a formal request with BLM for 440 acres of public land they have identified as a potential location for a solid waste disposal facility. In January 1993, the County filed an application under the provisions of the R&PP Act for the public land tract. The County is currently evaluating the site to determine if it meets the established criteria for solid waste disposal purposes as set forth by EPA and the Colorado Department of Health (CDH). These lands have been examined and found suitable for classification for conveyance to the County under the R&PP Act if the site meets EPA and CDH requirements.

Presently, disposal of the site in the County's application is not in conformance with the RMP as the lands are not identified for disposal. This landfill alternative would amend the RMP to classify only those 440 acres of lands under application by the County as Category II lands. This would make these lands available for consideration to allow for disposal under Category II and the remaining land disposal decisions in the RMP would remain unchanged. This is not the final EA for the landfill. The County's application will be further analyzed in accordance with NEPA and Bureau land disposal regulations to determine if it is in the public interest to make the land available to the County for use as a landfill.

c.   No Action

The No Action alternative would maintain the status quo. Existing land disposal decisions in the RMP would not be modified, and disposal of the lands in the County's application would not conform to the RMP and could not be approved.

IV.   AFFECTED ENVIRONMENT

The RMP planning area is in west-central Colorado in portions of Delta, Gunnison, Mesa, Montrose and Ouray counties. It encompasses approximately 1.38 million acres of which BLM has the administrative responsibility for the public lands and resources on 483,790 surface acres and 755,923 acres of subsurface federal mineral estate.

The planning area is predominantly a broad river valley surrounded by rolling hills, high plateaus, deep canyons and rugged mountains.

The elevation varies from 5,000 feet in the Gunnison River valley northeast of Delta to just over 11,000 feet on Cimarron Ridge southeast of Montrose. The area has a dry high valley/mountainous continental climate characterized by low humidity, sunny days, clear nights, low to moderate precipitation and evaporation, and wide-ranging diurnal temperature changes. Nine broad vegetation types occur within the planning area. The mountain shrub, pinyon-juniper woodland, sagebrush, and desert shrub types comprise 97 percent of the area. A more extensive description of the affected environment is included in the Draft Uncompahgre Basin RMP/EIS dated July 1989. This EA is tiered to that document by reference.

V.    ENVIRONMENTAL IMPACTS

    A.    Proposed Action

If the proposed action is adopted and implemented, 128 tracts of public lands containing approximately 10,353 acres would continue to be identified for disposal under Category I. Identification of these tracts as Category I lands does not mean that the lands must be sold, but only that the lands meet the criteria for sale under Section 203 of FLPMA and therefore, may be sold. Disposal determinations would be made on a case-by-case basis and would be subject to site-specific NEPA analysis and other statutory requirements. Specific disposal actions would reduce the public land acreage in the planning area, but the estimated disposal acreage is expected to be insignificant. During the past 15 years, approximately 220 acres have been sold in the planning area. On an annual basis, no public lands were sold in 11 of those years. Based on this historical data, it would be reasonable to estimate that approximately 150 acres would be sold during the next 10 years. Because no other Federal agencies are expected to sell any of their lands within the RMP area during this time frame, the cumulative impact to the non-private land base is expected to be insignificant.

The balance of the public lands in the planning area, excluding the special management areas previously identified (see Appendix A), would be identified as Category II lands. Although future demand is unknown at this time, the disposal of Category II lands would be expected to have a net beneficial impact to the human environment; more public lands would become available for R&PP conveyance, exchanges, state indemnity selections, and boundary adjustments. In exchanges, sensitive or critical habitats, areas with high public recreation potential, and areas providing access to more public lands would be acquired. Individual disposal actions (e.g., exchanges, R&PP conveyances, etc.) would be analyzed in site-specific NEPA documents.

Exchanges in particular are expected to have a positive impact on public lands and resources through the acquisition of sensitive or critical habitats, areas with high public recreation potential, and areas providing access to other public lands. Exchanges are generally "no net-loss" situations where the respective acreage of

the lands exchanged are approximately equal. In those situations where the acreages are not equal, the resource values on the lands returned to Federal ownership would off set the loss of public land and associated resources.

During the past 15 years, seven (7) exchanges have been completed in the Montrose District, resulting in the conveyance of 3,028.50 acres and the acquisition of 4,353.11 acres. Of these exchanges, one (1) exchange has been completed in this planning area resulting in 480 acres conveyed and 540 acres acquired. This exchange was completed in 1982, prior to the completion of the RMP in 1989. The existing RMP decision has proved to be restrictive in that it limits BLM's flexibility to favorably consider exchange proposals which would benefit natural resource management and the public in general.

Although the historical record indicates that it is unlikely that any exchanges would occur in the planning area in the next 10 years, amending the RMP to increase the flexibility to consider exchange proposals may provide better opportunities for beneficial land tenure adjustment through exchange.

The cumulative effect resulting from the disposal of Category II lands is expected to be insignificant because of the small amount of net gain/loss of public land acreage and the limited demand for R&PP conveyances. Although other Federal land management agencies have exchange and acquisition programs, they do not have outright disposal authority and therefore any gain/loss of federally managed lands would amount to an insignificant amount for the same reasons as apply to BLM managed lands. Cumulative impacts on the private property tax base would also be expected to be insignificant for the same reasons as explained above.

## B.    Delta County Landfill Alternative

The environmental impacts associated with the proposed R&PP application from the County cannot be fully analyzed within the scope of this environmental assessment because the site-specific information being gathered by Delta County and its contractors is not yet available. Under this alternative, BLM would classify 440 acres of public lands as Category II lands, so potentially the public land base in the planning area could be reduced by 440 acres if the County's request is finally approved. A site-specific environmental assessment would be required to analyze the environmental impacts of the proposed solid waste disposal facility prior to any land conveyance to the County.

## C.    No Action

Under the no action alternative, the RMP would not be amended and the current decision regarding land disposal would remain in effect. Only those tracts currently identified in the RMP would be available for disposal without case-by-case plan amendments. The no action alternative would leave BLM unable to effectively manage

public land resources by restricting our ability to respond favorably to proposals that would improve land status patterns and manageability.

VI.   <u>CONSULTATION AND COORDINATION</u>

A Notice of Intent to amend the RMP was published in the <u>Federal Register</u> on April 8, 1993. Approximately 75 letters were mailed to interested parties, and a news release was issued to four (4) newspapers in the planning area. Four public scoping meetings were held, two each in Montrose and Delta. Participation consisted of seven (7) people attending the public meeting in Montrose and twenty (20) people in Delta.

List of preparers:
Allan Belt, Area Manager, Uncompahgre Basin Resource Area (UBRA),
Teresa Pfifer, Realty Specialist, UBRA
Jim Sazama, Range Conservationist, UBRA
Bob Welch, Wildlife Biologist, UBRA
Karen Tucker, Recreation Planner, UBRA
Lynn Lewis, Geologist, UBRA
Ron Huntley, Environmental Coordinator, UBRA
Tom Hurshman, Realty Specialist, Montrose District Office (MDO)
Roger Alexander, Planning and Environmental Coordinator, MDO

# APPENDIX A

## SPECIAL MANAGEMENT AREAS

The recommended Gunnison Gorge Wilderness Area (Gorge) is comprised of portions of Management Units (MUs) 4 and 6, as defined in the RMP, and is located approximately 10 miles east of Delta, Colorado. The proposed area contains 22,416 acres and has been recommended as suitable for wilderness designation.  Until a final Congressional decision on wilderness designation or non-designation is made, the Gorge will be managed according to the Wilderness Interim Management Policy and the Gunnison Gorge Recreation Area Management Plan (RAMP).  If designated as wilderness, it would provide long-term protection for the area's wilderness values.  Wilderness designation would complement and enhance the adjacent Black Canyon of the Gunnison National Monument.

Management Unit (MU) 12 is designated as the Escalante Canyon Area of Critical Environmental Concern (ACEC).  This MU comprises 1,895 acres of public land in Escalante Canyon approximately sixteen miles southwest of Delta, Colorado.  Several listed plant species and two unique plant associations occur in the MU.  The area also receives significant recreational use due to its scenic qualities and the presence of eroded potholes in Escalante Creek.  This designation will enhance management and protection of the listed plant species and unique plant associations, and will improve the public's awareness of the recreational hazards of the Escalante potholes.

Management Unit 13 is designated as the Fairview Research Natural Area/Area of Critical Environmental Concern (RNA/ACEC).  This MU consists of two tracts totalling 377 acres of public land eight miles east of Montrose, Colorado.  These tracts contain the largest population of the endangered clay-loving wild buckwheat in the planning area and also have significant populations of Montrose penstemon, a candidate species.

Management Unit 14 is designated as the Needle Rock Outstanding Natural Area/Area of Critical Environmental Concern (ONA/ACEC). This MU is an 80-acre site of public land three miles northeast of Crawford, Colorado and consists of a volcanic structure with high-value scientific, interpretive, and scenic characteristics. Needle Rock is part of the Colorado Natural Areas Program and is one of the significant public land geologic features in Colorado as identified by the BLM's Geologic Advisory Group.

The Adobe Badlands Wilderness Study Area (WSA) is comprised of portions of MUs 2, 5 and 15 and contains 10,282 acres of public land located approximately three miles northwest of Delta, Colorado.  This area, commonly known as "the adobes", consists of Mancos shale hills and flats which, through wind and water erosion, have formed unique scenic formations.  This area has been proposed

as a WSA as it meets the criteria for potential wilderness designation, although this WSA has been recommended as nonsuitable for wilderness designation.

The Camel Back WSA comprises 10,499 acres of public land and is located approximately eleven miles west of Olathe, Colorado. This WSA contains portions of MUs 1, 2, 3 and 9. This area has been proposed as a WSA as it meets the criteria for potential wilderness designation, although this WSA has been recommended as nonsuitable for wilderness designation.

## APPENDIX B

## UNCOMPAHGRE BASIN RESOURCE MANAGEMENT PLAN
## CATEGORY I DISPOSAL TRACTS

North Half of Planning Area

1.   T. 11 S., R. 89 W., Sec. 19: Lots 8, 11; Sec. 30: Lot 6 - 39.73 acre isolated parcel, difficult and uneconomic to manage.

2.   T. 13 S., R. 89 W., Sec. 7: SE¼SW¼, Lot 4 - 76.09 acre isolated parcel, difficult and uneconomic to manage.

3.   T. 13 S., R. 89 W., Sec. 9: Lot 10; Sec. 10: Lots 11-14 - 156.45 acre isolated parcel, difficult and uneconomic to manage.

4.   T. 13 S., R. 89 W., Sec. 10: Lots 6, 7 - 51.91 acre isolated parcel, difficult and uneconomic to manage.

5.   T. 13 S., R. 89 W., Sec. 11: Lot 3 - 25.06 acre isolated parcel, difficult and uneconomic to manage.

6.   T. 12 S., R. 90 W., Sec. 7: NE¼NE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

7.   T. 12 S., R. 90 W., Sec. 11: SW¼NW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

8.   T. 12 S., R. 90 W., Sec. 12: SE¼SW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

9.   T. 12 S., R. 91 W., Sec. 2: Lot 7, 8; Sec. 3: Lot 5 - 42.93 acre isolated parcel, difficult and uneconomic to manage.

10.  T. 12 S., R. 91 W., Sec. 12: NE¼NE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

11.  T. 13 S., R. 91 W., Sec. 21: Lot 7; Sec. 22: Lot 10 - 75.25 acre isolated parcel, difficult and uneconomic to manage.

12.  T. 13 S., R. 91 W., Sec. 22: Lots 2, 3 - 84.03 acre isolated parcel, difficult and uneconomic to manage.

13.  T. 15 S., R. 91 W., Sec. 21: W½NE¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

14.  T. 15 S., R. 91 W., Sec. 21: NW¼SW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

15.  T. 15 S., R. 91 W., Sec. 22: NW¼NE¼, NE¼NW¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

BLM_0006799

16. T. 15 S., R. 91 W., Sec. 23: NW¼NW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

17. T. 15 S., R. 91 W., Sec. 26: E½NW¼, SW¼ - 240 acre isolated parcel, difficult and uneconomic to manage.

18. T. 13 S., R. 92 W., Sec. 34: Lots 7, 8; T. 14 S., R. 92 W., Sec. 3: Lot 4 - 121.34 acre isolated parcel, difficult and uneconomic to manage.

19. T. 14 S., R. 92 W., Sec. 3: NE¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

20. T. 14 S., R. 92 W., Sec. 17: SW¼NW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

21. T. 14 S., R. 92 W., Sec. 32: NW¼SW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

22. T. 14 S., R. 92 W., Sec. 32: SE¼SE¼; Sec. 33: SW¼SW¼; T. 15 S., R. 92 W., Sec. 4: Lot 4, SW¼NW¼; Sec. 5: Lots 1, 2, SW¼NE¼, SE¼SW¼ - 309.17 acre isolated parcel, difficult and uneconomic to manage.

23. T. 15 S., R. 92 W., Sec. 23: SE¼SW¼, SW¼SE¼; Sec. 26: NE¼NW¼ - 120 acre isolated parcel, difficult and uneconomic to manage.

24. T. 15 S., R. 92 W., Sec. 31: Lot 5 - 41.82 acre isolated parcel, difficult and uneconomic to manage.

25. T. 13 S., R. 93 W., Sec. 6: Lots 10-12, 19; T. 13 S., R. 94 W., Sec. 1: E½SE¼; Sec. 12: N½NE¼ - 309.12 acre isolated parcel, difficult and uneconomic to manage.

26. T. 14 S., R. 93 W., Sec. 17: SW¼SW¼; Sec. 19: NE¼NE¼; Sec. 20: NW¼ - 240 acre isolated parcel, difficult and uneconomic to manage.

27. T. 14 S., R. 93 W., Sec. 22: SW¼NE¼, E½NW¼ - 120 acre isolated parcel, difficult and uneconomic to manage.

28. T. 14 S., R. 93 W., Sec. 31: Lot 8 - 37.33 acre isolated parcel, difficult and uneconomic to manage.

29. T. 15 S., R. 93 W., Sec. 25: Lots 5-8 - 164.55 acre isolated parcel, difficult and uneconomic to manage.

30. T. 15 S., R. 93 W., Sec. 36: Lot 1 - 41.61 acre isolated parcel, difficult and uneconomic to manage.

31. T. 12 S., R. 94 W., Sec. 32: Lot 14 - 10.91 acre isolated parcel, difficult and uneconomic to manage.

32. T. 12 S., R. 94 W., Sec. 34: TR 81 - 1.60 acre isolated parcel, difficult and uneconomic to manage.

BLM_0006800

33. T. 12 S., R. 94 W., Sec. 34: TR 86 - 14.52 acre isolated parcel, difficult and uneconomic to manage.

34. T. 12 S., R. 94 W., Sec. 35: Lot 4; TR 83 - 24.47 acre isolated parcel, difficult and uneconomic to manage.

35. T. 14 S., R. 94 W., Sec. 20: SE¼SE¼; Sec. 21: W½SW¼ - 120 acre isolated parcel, difficult and uneconomic to manage.

36. T. 14 S., R. 94 W., Sec. 36: W½SW¼, NE¼SW¼, NW¼SE¼ - 160 acre isolated parcel, difficult and uneconomic to manage.

37. T. 15 S., R. 94 W., Sec. 1: Lots 22, 28, 29 - 69.94 acre isolated parcel, difficult and uneconomic to manage.

38. T. 15 S., R. 94 W., Sec. 19: NE¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

39. T. 15 S., R. 94 W., Sec. 32: W½NW¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

40. T. 15 S., R. 94 W., Sec. 32: SW¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

41. T. 12 S., R. 95 W., Sec. 25: Lot 6, SW¼SW¼; Sec. 36: Lot 3 - 120.68 acre isolated parcel, difficult and uneconomic to manage.

42. T. 12 S., R. 95 W., Sec. 36: Lot 9; T. 13 S., R. 95 W., Sec. 1: Lot 6 - 79.23 acre isolated parcel, difficult and uneconomic to manage.

43. T. 13 S., R. 95 W., Sec. 24: Lot 5 - 41.87 acre isolated parcel, difficult and uneconomic to manage.

44. T. 13 S., R. 95 W., Sec. 26: Lot 8 - 43.01 acre isolated parcel, difficult and uneconomic to manage.

45. T. 13 S., R. 95 W., Sec. 28: Lot 2 - 40.86 acre isolated parcel, difficult and uneconomic to manage.

46. T. 14 S., R. 95 W., Sec. 4: SW¼SW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

47. T. 15 S., R. 95 W., Sec. 13: NE¼NE¼SE¼ - 10 acre isolated parcel, difficult and uneconomic to manage.

48. T. 15 S., R. 95 W., Sec. 13: SW¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

49. T. 15 S., R. 95 W., Sec. 33: N½NW¼NE¼NE¼SE¼, N½NW¼NE¼SE¼ - 6.25 acre isolated parcel, difficult and uneconomic to manage.

BLM_0006801

50. T. 15 S., R. 95 W., Sec. 36: SE¼SE¼NE¼SW¼, NE¼NE¼SE¼SW¼, SW¼SW¼NW¼SE¼, NW¼NW¼SW¼SE¼ - 10 acre isolated parcel, difficult and uneconomic to manage.

51. T. 14 S., R. 96 W., Sec. 2: SE¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

52. T. 14 S., R. 96 W., Sec. 31: Lot 6 - 43.74 acre isolated parcel, difficult and uneconomic to manage.

53. T. 15 S., R. 96 W., Sec. 1: Lots 3, 4 - 78.49 acre isolated parcel, difficult and uneconomic to manage.

54. T. 15 S., R. 96 W., Sec. 30: N½SE¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

## South Half of Planning Area

55. T. 50 N., R. 5½ W., Sec. 35: Tract 38; Sec. 36: Tracts 37C and 38D - 91.45 acre isolated parcel, difficult and uneconomic to manage.

56. T. 47 N., R. 6 W., Sec. 30: Lot 2 - 40.38 acre isolated parcel, difficult and uneconomic to manage.

57. T. 48 N., R. 6 W., Sec. 8: SE¼SW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

58. T. 48 N., R. 6 W., Sec. 29: NE¼SW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

59. T. 49 N., R. 6 W., Sec. 7: Lot 4, SE¼SW¼, SW¼SE¼ - 132.10 acre isolated parcel, difficult and uneconomic to manage.

60. T. 50 N., R. 6 W., Sec. 3: SE¼SW¼, SW¼SE¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

61. T. 50 N., R. 6 W., Sec. 5: W½SE¼, SE¼SE¼; Sec. 8: N½NE¼ - 200 acre isolated parcel, difficult and uneconomic to manage.

62. T. 50 N., R. 6 W., Sec. 9: NE¼NE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

63. T. 50 N., R. 6 W., Sec. 9: E½SE¼; Sec. 16: NE¼, NE¼NW¼ - 280 acre isolated parcel, difficult and uneconomic to manage.

64. T. 50 N., R. 6 W., Sec. 19: SE¼NE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

65. T. 51 N., R. 6 W., Sec. 9: S½SW¼; Sec. 16: N½NW¼ - 160 acre isolated parcel, difficult and uneconomic to manage.

66. T. 51 N., R. 6 W., Sec. 10: Lots 1, 2; Sec. 11: Lot 2 - 57.90 acre isolated parcel, difficult and uneconomic to manage.

50. T. 15 S., R. 95 W., Sec. 36: SE¼SE¼NE¼SW¼, NE¼NE¼SE¼SW¼, SW¼SW¼NW¼SE¼, NW¼NW¼SW¼SE¼ - 10 acre isolated parcel, difficult and uneconomic to manage.

51. T. 14 S., R. 96 W., Sec. 2: SE¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

52. T. 14 S., R. 96 W., Sec. 31: Lot 6 - 43.74 acre isolated parcel, difficult and uneconomic to manage.

53. T. 15 S., R. 96 W., Sec. 1: Lots 3, 4 - 78.49 acre isolated parcel, difficult and uneconomic to manage.

54. T. 15 S., R. 96 W., Sec. 30: N½SE¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

## South Half of Planning Area

55. T. 50 N., R. 5½ W., Sec. 35: Tract 38; Sec. 36: Tracts 37C and 38D - 91.45 acre isolated parcel, difficult and uneconomic to manage.

56. T. 47 N., R. 6 W., Sec. 30: Lot 2 - 40.38 acre isolated parcel, difficult and uneconomic to manage.

57. T. 48 N., R. 6 W., Sec. 8: SE¼SW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

58. T. 48 N., R. 6 W., Sec. 29: NE¼SW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

59. T. 49 N., R. 6 W., Sec. 7: Lot 4, SE¼SW¼, SW¼SE¼ - 132.10 acre isolated parcel, difficult and uneconomic to manage.

60. T. 50 N., R. 6 W., Sec. 3: SE¼SW¼, SW¼SE¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

61. T. 50 N., R. 6 W., Sec. 5: W½SE¼, SE¼SE¼; Sec. 8: N½NE¼ - 200 acre isolated parcel, difficult and uneconomic to manage.

62. T. 50 N., R. 6 W., Sec. 9: NE¼NE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

63. T. 50 N., R. 6 W., Sec. 9: E½SE¼; Sec. 16: NE¼, NE¼NW¼ - 280 acre isolated parcel, difficult and uneconomic to manage.

64. T. 50 N., R. 6 W., Sec. 19: SE¼NE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

65. T. 51 N., R. 6 W., Sec. 9: S½SW¼; Sec. 16: N½NW¼ - 160 acre isolated parcel, difficult and uneconomic to manage.

66. T. 51 N., R. 6 W., Sec. 10: Lots 1, 2; Sec. 11: Lot 2 - 57.90 acre isolated parcel, difficult and uneconomic to manage.

BLM_0006802

67. T. 51 N., R. 6 W., Sec. 27: SW¼NE¼, S½NW¼, N½SW¼, SE¼SW¼, SE¼ - 400 acre isolated parcel, difficult and uneconomic to manage.

68. T. 46 N., R. 7 W., Sec. 32: NW¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

69. T. 49 N., R. 7 W., Sec. 7: NE¼NE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

70. T. 49 N., R. 7 W., Sec. 9: SW¼SW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

71. T. 49 N., R. 7 W., Sec. 17: S½NE¼, SE¼; Sec. 20: E½NE¼ - 320 acre isolated parcel, difficult and uneconomic to manage.

72. T. 49 N., R. 7 W., Sec. 19: NE¼NW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

73. T. 51 N., R. 7 W., Sec. 16: SW¼NW¼, NW¼SW¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

74. T. 44 N., R. 8 W., Sec. 11: Lots 12-14 - 120 acre isolated parcel, difficult and uneconomic to manage.

75. T. 44 N., R. 8 W., Sec. 13: Lots 17, 31 - 63.60 acre isolated parcel, difficult and uneconomic to manage.

76. T. 44 N., R. 8 W., Sec. 13: Lots 28, 30 - 32.99 acre isolated parcel, difficult and uneconomic to manage.

77. T. 44 N., R. 8 W., Sec. 14: E½SE¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

78. T. 46 N., R. 8 W., Sec. 15: N½NE¼, NE¼NW¼ - 120 acre isolated parcel, difficult and uneconomic to manage.

79. T. 46 N., R. 8 W., Sec. 24: NW¼NW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

80. T. 47 N., R. 8 W., Sec. 14: NW¼SW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

81. T. 47 N., R. 8 W., Sec. 15: NE¼SW¼, W½SE¼ - 120 acre isolated parcel, difficult and uneconomic to manage.

82. T. 47 N., R. 8 W., Sec. 19: NE¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

83. T. 48 N., R. 8 W., Sec. 2: S½SW¼, SW¼SE¼; Sec. 11: NW¼NW¼ - 160 acre isolated parcel, difficult and uneconomic to manage.

84. T. 48 N., R. 8 W., Sec. 9: SW¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

BLM_0006803

85. T. 48 N., R. 8 W., Sec. 15: NW¼NE¼, S½NE¼, NW¼SW¼, E½SW¼, SE¼ - 400 acre isolated parcel, difficult and uneconomic to manage.

86. T. 48 N., R. 8 W., Sec. 26: S½SW¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

87. T. 49 N., R. 8 W., Sec. 11: E½NW¼, NE¼SW¼, W½SE¼; Sec. 14: N½NE¼ - 280 acre isolated parcel, difficult and uneconomic to manage.

88. T. 49 N., R. 8 W., Sec. 13: SW¼NW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

89. T. 49 N., R. 8 W., Sec. 13: NW¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

90. T. 49 N., R. 8 W., Sec. 23: NE¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

91. T. 49 N., R. 8 W., Sec. 26: SE¼NW¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

92. T. 49 N., R. 8 W., Sec. 29: E½E½SW¼SW¼ - 10 acre isolated parcel, difficult and uneconomic to manage.

93. T. 49 N., R. 8 W., Sec. 31: N½NW¼NW¼NE¼, E½NE¼NE¼NW¼ - 10 acre isolated parcel, difficult and uneconomic to manage.

94. T. 49 N., R. 8 W., Sec. 31: SE¼SW¼NE¼ - 10 acre isolated parcel, difficult and uneconomic to manage.

95. T. 49 N., R. 8 W., Sec. 32: SE¼NE¼SW¼NW¼ - 2.5 acre isolated parcel, difficult and uneconomic to manage.

96. T. 49 N., R. 8 W., Sec. 32: SE¼SW¼SW¼NW¼ - 2.5 acre isolated parcel, difficult and uneconomic to manage.

97. T. 51 N., R. 8 W., Sec. 14: NE¼NE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

98. T. 44 N., R. 9 W., Sec. 9: SW¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

99. T. 45 N., R. 9 W., Sec. 14: SW¼SE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

100. T. 45 N., R. 9 W., Sec. 23: E½NW¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

101. T. 45 N., R. 9 W., Sec. 24: NE¼SW¼, NW¼SE¼ - 80 acre isolated parcel, difficult and uneconomic to manage.

102. T. 45 N., R. 9 W., Sec. 27: SE¼NE¼ - 40 acre isolated parcel, difficult and uneconomic to manage.

BLM_0006804

103. T. 46 N., R. 9 W., Sec. 15: NE½NE½ - 40 acre isolated parcel, difficult and uneconomic to manage.

104. T. 46 N., R. 9 W., Sec. 23: SE½NW½ - 40 acre isolated parcel, difficult and uneconomic to manage.

105. T. 47 N., R. 9 W., Sec. 2: Lot 12 - 38.04 acre isolated parcel, difficult and uneconomic to manage.

106. T. 47 N., R. 9 W., Sec. 22: SW½NW½ - 40 acre isolated parcel, difficult and uneconomic to manage.

107. T. 47 N., R. 9 W., Sec. 24: NE½SE½ - 40 acre isolated parcel, difficult and uneconomic to manage.

108. T. 47 N., R. 9 W., Sec. 36: NW½SW½ - 40 acre isolated parcel, difficult and uneconomic to manage.

109. T. 48 N., R. 9 W., Sec. 14: Lot 11, W½NE½, NW½SE½ - 160.84 acre isolated parcel, difficult and uneconomic to manage.

110. T. 48 N., R. 9 W., Sec. 14: Lots 2, 7 - 39.70 acre isolated parcel, difficult and uneconomic to manage.

111. T. 48 N., R. 9 W., Sec. 35: SE½SE½ - 40 acre isolated parcel, difficult and uneconomic to manage.

112. T. 50 N., R. 9 W., Sec. 7: E½E½NE½SW½NW½, E½SE½SW½NW½ - 7.5 acre isolated parcel, difficult and uneconomic to manage.

113. T. 47 N., R. 10 W., Sec. 1: Lot 3, SE½NW½ - 80.20 acre isolated parcel, difficult and uneconomic to manage.

114. T. 47 N., R. 10 W., Sec. 2: Lot 3 - 40.42 acre isolated parcel, difficult and uneconomic to manage.

115. T. 48 N., R. 10 W., Sec. 11: NW½NW½ - 40 acre isolated parcel, difficult and uneconomic to manage.

116. T. 48 N., R. 10 W., Sec. 11: SW½SW½; Sec. 14: W½NW½; Sec. 15: E½NE½, SW½NE½, NE½SE½ - 280 acre isolated parcel, difficult and uneconomic to manage.

117. T. 48 N., R. 10 W., Sec. 25: S½SW½; Sec. 36: N½NW½, SE½NW½, N½SW½, SW½SW½ - 320 acre isolated parcel, difficult and uneconomic to manage.

118. T. 49 N., R. 10 W., Sec. 21: E½SW½SW½ - 20 acre isolated parcel, difficult and uneconomic to manage.

119. T. 51 N., R. 10 W., Sec. 16: SW½SE½; Sec. 21: W½NE½  - 120 acre isolated parcel, difficult and uneconomic to manage.

120. T. 51 N., R. 10 W., Sec. 21: NE$\frac{1}{4}$SE$\frac{1}{4}$ - 40 acre isolated parcel, difficult and uneconomic to manage.

121. T. 51 N., R. 10 W., Sec. 22: SE$\frac{1}{4}$SW$\frac{1}{4}$ - 40 acre isolated parcel, difficult and uneconomic to manage.

122. T. 48 N., R. 11 W., Sec. 20: S$\frac{1}{2}$SE$\frac{1}{4}$; Sec. 29: NW$\frac{1}{4}$NE$\frac{1}{4}$, NE$\frac{1}{4}$NW$\frac{1}{4}$ - 160 acre isolated parcel, difficult and uneconomic to manage.

123. T. 48 N., R. 11 W., Sec. 27: SE$\frac{1}{4}$SW$\frac{1}{4}$; Sec. 34: E$\frac{1}{2}$NW$\frac{1}{4}$, NE$\frac{1}{4}$SW$\frac{1}{4}$ - 160 acre isolated parcel, difficult and uneconomic to manage.

124. T. 48 N., R. 11 W., Sec. 28: N$\frac{1}{2}$NW$\frac{1}{4}$ - 80 acre isolated parcel, difficult and uneconomic to manage.

125. T. 48 N., R. 11 W., Sec. 34: SW$\frac{1}{4}$SW$\frac{1}{4}$ - 40 acre isolated parcel, difficult and uneconomic to manage.

126. T. 49 N., R. 11 W., Sec. 29: SE$\frac{1}{4}$NE$\frac{1}{4}$ - 40 acre isolated parcel, difficult and uneconomic to manage.

127. T. 50 N., R. 11 W., Sec. 36: E$\frac{1}{2}$NE$\frac{1}{4}$SW$\frac{1}{4}$ - 20 acre isolated parcel, difficult and uneconomic to manage.

128. T. 48 N., R. 12 W., Sec. 14: Lot 1 - 40.58 acre isolated parcel, difficult and uneconomic to manage.

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

### Table of Contents

.01   Purpose
.02   Objectives
.03   Authorities
.04   Responsibility
.05   References
.06   Policy
.07   File and Records Maintenance
.08   Program Relationships

Glossary of Terms

BLM MANUAL                                              Rel. 8-58
                                                        1/26/90

BLM_0006807

.01

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


.01  <u>Purpose</u>.  This Manual Section is intended to provide an
easily accessible reference source within the BLM Manual system
for general information and general policy on BLM's various
coordination, consultation, and fiduciary responsibilities with
respect to Native American cultural and religious concerns; to
clarify legal relationships between BLM and Native American
groups relative to such concerns; and to bring attention to
administrative and management issues arising from those
responsibilities and relationships.  This Manual Section does
not provide operational policy or procedures for individual
management programs and administrative processes.  Such policy
and procedures are covered in specific directives under the
appropriate subject-function code.

.02  <u>Objectives</u>.

   A.  Inform managers and staffs of the responsibilities of
various BLM programs for ensuring that Native American issues and
concerns are given equitable and legally adequate consideration
during decision making.

   B.  Describe the special legal entitlements of tribal
governments and other Native American groups relative to
management of the public lands and public land resources.

   C.  Promote regular exchange of information among programs
having responsibilities for identifying and considering Native
American issues and concerns.

   D.  Provide guidance for collecting, evaluating, applying, and
protecting sensitive information relating to Native American
concerns.

   E.  Recognize the Bureau's ongoing fiduciary responsibility
toward Native American resource development and protection
programs on Indian lands.

BLM_0006808

.03

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

.03  Authorities.

  A.  General Authorities.

    1.  National Environmental Policy Act of 1969 ("NEPA"; P.L. 91-190; 83 Stat. 852; 42 U.S.C. 4321) establishes national policy for protection and enhancement of the human environment.  Part of the function of the Federal Government, as stated in the Act, is to "preserve important . . . cultural . . . aspects of our national heritage and maintain whenever possible an environment which supports diversity and variety of individual choice."

    2.  Federal Land Policy and Management Act of 1976 ("FLPMA"; P.L. 94-579; 90 Stat. 2743; 43 U.S.C. 1701) requires coordination with Indian tribes, as well as with other Federal agencies and State and local governments, in the preparation and maintenance of an inventory of the public lands and their various resource and other values; in the development and maintenance of long-range plans providing for the use of the public lands; and in the management of the public lands.

    3.  Alaska National Interest Lands Conservation Act of 1980 (P.L. 96-487; 94 Stat. 2371; 16 U.S.C. 3101) establishes various conservation system units in Alaska to preserve lands and waters with nationally significant values, including historic, archaeological, and cultural values.  The Act directs that, consistent with the conservation of healthy populations of fish and wildlife, utilization of public lands in Alaska is to cause the least impact on rural residents who depend on subsistence uses of the resources of such lands.  The Act also authorizes the Secretary, upon request, to advise, assist, and provide expertise to a Native corporation or group for preservation, display, and interpretation of cultural resources, and to provide training in identification, recovery, preservation, demonstration, and management of cultural resources.

BLM_0006809

.03B

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


B.  Authorities Specific to Native Americans

    1.  American Indian Religious Freedom Act of 1978 ("AIRFA";
P.L. 95-341; 92 Stat. 469; 42 U.S.C. 1996) resolves that it shall
be the policy of the United States to protect and preserve for
the American Indian, Eskimo, Aleut, and Native Hawaiian the
inherent right of freedom to believe, express, and exercise their
traditional religions, including but not limited to access to
religious sites, use and possession of sacred objects, and
freedom to worship through ceremonials and traditional rites.
Federal agencies are directed to evaluate their policies and
procedures to determine if changes are needed to ensure that such
rights and freedoms are not disrupted by agency practices.  The
Act, a specific expression of First Amendment guarantees of
religious freedom, is not implemented by regulations.  (Note:  A
U.S. Court of Appeals has determined that there is a compliance
element in the American Indian Religious Freedom Act, requiring
that the views of Indian leaders be obtained and considered when
a proposed land use might conflict with traditional Indian
religious beliefs or practices, and that unnecessary interference
with Indian religious practices be avoided during project
implementation, but specifying that conflict need not necessarily
bar Federal agencies from adopting proposed land uses in the
public interest.  Wilson v. Block, 708 F.2d 735, 747 (D.C. Cir.
1983)).


    2.  Indian Reorganization Act of 1934 (P.L. 73-576; 48
Stat. 984; 25 U.S.C. 461) establishes tribal self government for
many Indian communities.  The Act further provides for the
adoption of tribal constitutions and the incorporation of tribal
governments.  Tribal governments, so constituted, have primary
jurisdiction over the lands of the tribe and are empowered to
negotiate with Federal, State and local governments in all
matters affecting the tribe.  Pursuant to this Act, tribal
governments are judicially considered to hold sovereign immunity
in all governmental matters affecting the tribe (425 US 903, 96
S.Ct. 1492, 47 L.Ed2d. 752 (1976)).


    3.  Indian Self Determination and Education Assistance Act
of 1975 (P.L. 93-638; 88 Stat. 2203; 25 U.S.C. 450) provides
direct and primary authority to tribal governments to contract
and regulate programs and services, and also provides authority
for tribal governments to acquire lands adjacent to reservations
for purposes of the Act.

BLM_0006810

.03B4

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


4.  Alaska Native Claims Settlement Act of 1971 (P.L. 92-203; 85 Stat. 688; 43 U.S.C. 1601) establishes a "fair and just settlement of all claims by Natives and Native groups in Alaska, based on aboriginal land claims," with the settlements to be "accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives . . . [and] with maximum participation by Natives in decisions affecting their rights and property . . . ."

5.  Indian Mineral Development Act of 1982 (P.L. 97-382; 96 Stat. 1938; 25 U.S.C. 2101) provides authority to Indian tribes to develop mineral resources, and to enter into joint venture agreements, operating agreements, and leases.  The Act conveys and extends tribal authority to regulate and cooperate with private and governmental entities in the development of tribal energy and nonenergy mineral resources.  Related authorities that give BLM direct involvement in mineral operations on allotments and tribal lands, respectively, include the Act of March 3, 1909, as amended (P.L. 60-315; 35 Stat. 783; P.L. 84-255; 69 Stat. 540; 25 U.S.C. 396), and the Act of May 11, 1938 (P.L. 75-506; 52 Stat. 347; 25 U.S.C. 396a).

6.  Indian General Allotment Act of 1887 as amended (R.S. Chap. 119; 24 Stat. 389; 25 U.S.C. 334) provides for the allotment of lands to individual Indians for the purpose of settlement and subsistence through pastoral pursuits.  Similar provisions were made for Alaska Natives in a 1906 Act (P.L. 59-171; 34 Stat. 197; 48 U.S.C. 357).

C.  Authorities Specific to Cultural Resources.

1.  National Historic Preservation Act of 1966 (P.L. 89-665; 80 Stat. 915; 16 U.S.C. 470) addresses preservation of historic properties, including historical, archaeological, and architectural districts, sites, buildings, structures, and objects that are eligible for the National Register of Historic Places.  In some cases such properties may be eligible partly or wholly because of historical importance to Native Americans, including traditional religious and cultural importance.  Federal agencies must take into account effects of their undertakings on eligible properties.  A 1980 amendment to the Act (P.L. 96-515; 94 Stat. 3000; 16 U.S.C. 470a note) directs the Secretary in cooperation with the American Folklife Center of the Library of Congress to explore ways to preserve and conserve intangible elements of our cultural heritage and to encourage continuation of diverse cultural traditions (see .03C3 below).

BLM_0006811

.03C2

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

2.  Archaeological Resources Protection Act of 1979 (P.L.
96-95; 93 Stat. 721; 16 U.S.C. 470aa) provides for the protection
and management of archaeological resources, and specifically
requires notification of the affected Indian tribe if
archaeological investigations proposed in a permit application
would result in harm to or destruction of any location considered
by the tribe to have religious or cultural importance.  The Act
directs consideration of the American Indian Religious Freedom
Act (see .03B1 above) in the promulgation of uniform regulations
for the Act.

3.  American Folklife Preservation Act of 1976 (P.L.
94-201; 86 Stat. 1129; 20 U.S.C. 2101) creates the American
Folklife Center in the Library of Congress and directs the Center
to preserve and present American folklife through internal and
cooperative programs.  (See .03C1 above.)

D.  Treaties.  Treaties constitute negotiated settlements
between sovereign parties, and as such hold a unique status in
defining Federal obligations toward Indian tribes.  Rights
reserved to Indian tribes vary significantly from treaty to
treaty.  Hunting, fishing, and gathering rights and certain other
land uses are the most common rights reserved through treaty.
Tribes often refer to treaties in representing their interests
and validating their position in contacts with Federal agencies.
While BLM managers and appropriate professional staffs should be
aware of the terms of relevant treaties, the BLM's specific
responsibilities are defined through Federal law and regulations.

.04  Responsibility.

A.  Director and Deputy Director have overall responsibility
for establishing, implementing, and evaluating policy for meeting
BLM's Native American coordination responsibilities.

B.  Assistant Directors for Land and Renewable Resources,
Energy and Mineral Resources, and Support Services, acting
through their respective divisions and staffs as appropriate to
the resource programs or administrative processes involved, are
jointly responsible for developing the specific program- or
process-related guidance, procedures, and directives needed to
ensure that Native American coordination is carried out
consistently among the BLM's various programs and offices.

BLM MANUAL                                          Rel. 8-58
                                                    1/26/90

BLM_0006812

.04C

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

C. <u>Chief, Division of Recreation, Cultural, and Wilderness Resources and Chief, Branch of Recreation and Cultural Resources</u>, are responsible for leading affected divisions and staffs in developing, reviewing, and revising BLM's national level Native American coordination and consultation policy and procedures, and for maintaining contacts with other Federal bureaus, agencies, and departmental offices in Washington, D.C., regarding the proper consideration of Native American concerns.

D. <u>State Directors</u>, within their respective jurisdictions, are responsible for:

1. Directing the accomplishment of Native American coordination and consultation responsibilities.

2. Developing technical and policy guidance, information, strategies, procedures, and directives as required.

3. Establishing and maintaining contacts with other regional level Federal bureaus, agencies, and departmental offices regarding Native American concerns.

4. Developing and distributing to District Offices listings of federally recognized Indian tribes, and other Native American groups as appropriate, residing within their areas of administrative jurisdiction.

E. <u>District Managers or Area Managers</u>, as appropriate, are responsible for:

1. Identifying Indian tribes, Indian groups that have petitioned the Secretary for recognition as Indian tribes, and other Native American groups that have aboriginal and/or historic ties to lands under their administrative jurisdiction, regardless of where the tribe or group currently resides.

2. Identifying Native American concerns relating to BLM plans, actions, and programs within their respective areas of jurisdiction.

3. Giving adequate consideration to identified Native American concerns.

BLM_0006813

.04F

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


F.  Cultural Resource Specialists, in consultation with other knowledgeable staff, are responsible for providing professionally sound information, recommendations, and advice to managers regarding traditional Native American uses of public lands, Native American traditional lifeway values, and cultural properties that may be associated with those values.

G.  All Personnel are responsible for ensuring that their actions and recommendations do not overlook Native American concerns; for reporting to appropriate officials any Native American concerns that are identified to them; and for assisting in the BLM's execution of its Native American coordination and consultation responsibilities.

.05  References.

A.  BLM Manual Sections 1601, 1602, 1611, 1612, 1613, 1614, and 1615.

B.  BLM Manual Section 1790 and Handbook H-1790-1.

C.  BLM Manual Section 8111.

.06  Policy.  It is the policy of the BLM to:

A.  Recognize traditional Native American cultural and religious values as an important, living part of our Nation's heritage, and develop the capability to address adequately any potential disruption of the traditional expression or maintenance of these values that might result from BLM land use decisions.

B.  Coordinate and consult regularly with appropriate Native American groups to identify and consider their concerns in BLM land use planning and decision making, and document fully all coordination and consultation efforts.

C.  Review proposed land use planning decisions and other major BLM decisions for consistency with tribal land use and resource allocation plans (including Alaska Native village or regional corporation plans, as applicable).

D.  Participate in developing consistent interagency guidance, procedures, and expertise to address Native American and tribal government policies and programs.

E.  Avoid unnecessary interference with Native American religious practices.

BLM_0006814

.06F

## 8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

F.  Protect sensitive and confidential information about Native American values, practices, and specific locations with which they are associated from disclosure to the public, to the greatest degree possible under law and regulation.

.07  <u>File and Records Maintenance</u>.  See BLM Manual Section 1272 - Records Disposition; Manual Section 1602 - Plan Documentation and Records; Handbook H-1790-1 - National Environmental Policy Act Handbook; and Manual Section 8111 - Cultural Resource Inventory and Evaluation.

.08  <u>Program Relationships</u>.

A.  <u>Relationship to BLM Programs</u>.  While specific instances of Native American coordination and consultation may focus on particular lands and resources and a single BLM management program, Native American concerns will frequently cross-cut program boundaries and involve several programs simultaneously. The BLM's land use planning system and environmental review process, which generally operate at a level above individual programs and actions and which include effective mechanisms for public participation, are well suited to identifying and addressing Native American issues and concerns.

1.  <u>Relationship to General Administrative Procedures</u>. Land use planning and environmental review shall be the principal procedural systems for giving Native American cultural and religious issues due consideration, including the opportunity for direct input from those affected.  During the collection and evaluation of land use and resource information, before the preparation of land use plans and environmental documents, responsible managers and staff shall employ appropriate techniques to ensure the identification and consideration of Native American cultural and religious values potentially affected by BLM land use decisions.  At a minimum, Native American cultural and religious issues shall be addressed during public participation and inventory steps, as outlined below:

a.  <u>Public Participation</u>.  Native American issues and concerns shall be identified, to the extent possible, through standard public participation techniques (e.g., scoping, public notices, and informational mailings).  In addition, managers shall establish any additional effective means necessary for notifying Native American groups of any proposed actions which may affect traditional religious or cultural practices.  In some cases this may necessitate direct face-to-face communication with persons such as traditional religious practitioners who are not official governmental representatives of affected groups.

BLM_0006815

.08A1b

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

b.  Inventory.  At the initiation of planning and environmental review, interdisciplinary teams should be used to define and consider Native American issues and conflicts as they apply to various proposed program decisions and actions.

(1)  Special techniques may be needed to identify relevant information.  These techniques may include:

(a)  Review of ethnohistoric and ethnographic literature.

(b)  Interviews with knowledgeable members of the Native American community, who may or may not be official representatives of the tribal government or Native corporation.

(c)  Problem-oriented ethnographic field work focusing on Native American cultural and religious values.

(2)  Interviews and ethnographic field work should be limited to cases where little or no information exists on the specific Native American communities.  Before any proposed ethnographic field work or related long-term data collection projects are begun, they must be reviewed by BLM planning and resource management personnel and approved by the responsible manager, and they must also be reviewed and approved by appropriate official representatives of the specific Native American communities where field work would be conducted.  The BLM must observe appropriate safeguards for collection and use of, and access to, potentially sensitive information acquired through interviews and direct ethnographic techniques.  This may include locational information and the names of interview subjects or other contacts who are not official governmental representatives of affected groups.

c.  Consideration During Decision Making.  Managers shall ensure that information on Native American religious and cultural issues receives good faith consideration during decision making, and that BLM decisions do not unduly or unnecessarily burden the pursuit of traditional religion or traditional lifeways.

d.  Consultation and Consistency Review.  As part of its responsibilities under Sec. 202(c)(9) of FLPMA as implemented by 43 CFR 1610.3-2, the BLM shall, to the extent practicable, ensure consistency with affected Native American tribal or corporate land use and resource allocation plans.  Native American cultural and religious issues shall be part of this consistency review.

BLM_0006816

.08A1e

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

e.  Special Designations.  Designation of Areas of
Critical Environmental Concern, nomination to the National
Register of Historic Places, recommendation to the Secretary for
designation of National Historic Landmarks, and other appropriate
forms of special recognition may be proposed and should be
considered as potential means for ensuring continuing attention
to Native American cultural concerns.

f.  Documentation.  Environmental impact statements and
environmental assessments should ordinarily serve as the primary
documentation of the identification steps taken and the
consideration given to Native American cultural and religious
concerns.  When determining the need for NEPA review, care must
be taken not to overlook the potential impact of the proposed BLM
action on Native American cultural or religious values.  If for
any reason a NEPA document will not be prepared, an appropriate
non-NEPA document should be used to substantiate identification
and consideration of Native American concerns.

g.  Agreements.  Written agreements, such as Memoranda
of Understanding between the BLM and Native American groups, may
be considered for development where needed to define
relationships, issues of concern, contacts, and coordination and
consultation procedures.

2.  Relationship to Specific BLM Resource Management
Programs.  While identification and consideration of Native
American cultural and religious concerns occur during land use
planning and environmental review, rather than during day-to-day
program operations, program staff are responsible for assisting
managers in recognizing potential program conflicts with
identified concerns, and for ensuring that day-to-day operations
follow steps decided on in land use plans and NEPA documents.

a.  Lands.  Lands actions that would change the
ownership or the use of public lands may require attention to
Native American concerns.  Land tenure adjustments, withdrawals,
and occupancy and use authorizations may require particular
consideration of Native American needs and requests (e.g.,
continued access for religious practices or traditional uses,
tribal land base expansion).  Some Lands actions, such as
allotments and trust land annexations, pertain only to Native
American applicants.  These applications shall be processed in
the same manner as other (over-the-counter) applications and
proposals made by non-Native citizens, unless specified and
prioritized in an approved land use plan or amendment.
Applications submitted by tribal governments can be presumed to
meet coordination and consultation requirements.

BLM_0006817

.08A2b

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


　　　b.　<u>Minerals</u>.　Native American concerns should be considered when mineral development is proposed within areas having traditional cultural or religious importance.　For example, the lessee may be required to design operations on an oil and gas lease in a manner that preserves access to a traditional use area, or stipulations may be included in a geothermal lease to protect sacred hot springs.　The BLM also administers mineral leases and other mineral activities for certain allotted and unallotted Indian lands in accordance with authorities in .03B5, above, as implemented by 25 CFR Parts 211-214 and Part 216.　Such mineral administration is not subject to coordination and consultation under this Manual Section.

　　　c.　<u>Rangeland</u>.　Due consideration must be given to Indian tribal rights established by treaties, and to requests by tribes consistent with such rights, in the administration of the grazing management and range improvement programs.　For example, grazing season of use may need to be adjusted to accommodate traditional use of certain resources.　Similarly, proposed vegetation treatments such as burning, chaining, spraying, and seeding may need to be weighed in terms of tribal needs for maintenance of traditional plant use zones.

　　　d.　<u>Forestry</u>.　Proposed resource allocations and use authorizations should be sensitive to Native American requirements for the noncommercial use of renewable forest and woodland products (e.g., firewood, house logs, food plants, medicinal plants, ritual plants), and should accommodate demand when possible.　Monitoring may be needed to evaluate such uses.　Discretionary forest and woodland management activities (e.g., herbicide spraying, commercial pinyon nut harvesting) should involve tribal input, as appropriate.　Special authorizations relating to subsistence uses in Alaska will follow developed policy in that State.

　　　e.　<u>Wildlife and Fisheries</u>.　Where treaties provide for usual and accustomed uses of fish and wildlife in ceded or other lands, habitat management plans and improvement projects should give priority consideration to providing benefits for species traditionally used by affected tribes.　Native American concerns should be considered also when developing management plans and recovery plans for species valued for nonsubsistence reasons (e.g., eagles).

BLM_0006818

.08A2f

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

f. Soil, Water, and Air. Any proposed action that would affect water use must provide for Native American water requirements in accordance with established treaty rights and as confirmed by the responsible State water right authority or pertinent legal decisions. Native American water rights based on reserved water rights are not covered by State law but in many cases have been perfected under State water right adjudications. Where reserved rights are not certain, it may be necessary to clarify these rights through the Office of the Solicitor.

g. Cultural Resources. Cultural resource inventory and evaluation, use allocations, National Register nominations, use permits, public interpretation, and protection projects may require consultation with Native American groups as appropriate to the nature of the cultural resources or the areas affected. For example, identification of tribal traditional lifeway values and public land cultural properties associated with those values, and preparation of ethnological/sociological elements in class I inventories may include participation by tribal consultants and tribal review for accuracy and sufficiency.

h. Recreation. Native American cultural and religious concerns should be considered when collecting recreation inventory information, preparing recreation management plans, establishing use limitations, and processing special recreation use permits. For example, visual resource management classification should account for landscapes with attributed sacredness; seasonal off-road vehicle limitations might be necessary when traditional uses could be disrupted; and areas used for subsistence or ritual activities might need to have organized recreation use channeled away from them. Programs and materials for interpreting areas or subjects related to traditional Native American cultures and practices should consider and incorporate the perspectives of the Native Americans as appropriate.

i. Wilderness. Wilderness study reports and wilderness management plans should recognize areas used historically for Native American traditional activities, such as gathering medicinal plants and conducting religious ceremonies. Access by elders or other traditionalists who may require motorized transportation should be given special consideration. Although wilderness designation may protect traditional use areas from incompatible use or development, designation and management as wilderness may also have the unintended effect of disrupting established traditional uses. Potential conflicts should be identified and considered early in the process, and avoided as

BLM MANUAL                                                    Rel. 8-58
                                                             1/26/90

much as possible.

BLM_0006820

.08B

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

B.  Relationship to Other Federal Agencies.

     1.  Planning.  In the review of other Federal agencies'
land use plans under Section 202(c)(9) of FLPMA and 43 CFR
1610.3-2, special attention should be given to consistent
interagency recognition and consideration of Native American
issues and concerns.

     2.  Environmental Review.  When BLM acts as lead agency for
the environmental review of a proposed action that would affect
other agencies' lands, BLM is responsible for identifying Native
American concerns and issues for all potentially affected lands,
through consultation with cooperating agencies, through the NEPA
scoping process, and through other appropriate information
gathering methods.

     3.  Exchange of Information.  The BLM and other Federal
agencies should routinely share pertinent nonconfidential
information about Native American concerns and issues.  Sensitive
information obtained under promise of confidentiality may not be
shared without explicit permission from its source.

     4.  Cooperation.  The BLM should explore opportunities with
other Federal agencies to foster and improve opportunities for
tribal governments and other Native American groups to enter into
cooperative agreements (e.g., education, training,
interpretation, museum work/curation, basic data collection, and
ethnographic inventory) with Federal agencies.  Potentially
sensitive programs which may involve several agency jurisdictions
should be coordinated to the greatest degree possible (e.g., Wild
and Scenic River designations in areas of Native fisheries).

C.  Relationship to State and Local Governments.

     1.  Consistency.  In addition to land use planning
consistency under Section 202(c)(9) of FLPMA and 43 CFR 1610.3-2,
the BLM shall ensure that its policies and procedures are
consistent, to the extent allowed by Federal law, with State and
local government requirements relating to Native American
concerns.  The BLM should implement its programs, as they relate
to Native American concerns, as consistently as practical with
State and local laws and ordinances.  However, where Federal
lands are concerned, Federal law has precedence over State and
local law.

     2.  Exchange of Information.  The BLM should share
information relating to Native American issues and concerns with
State and local governments in the same manner and with the same

BLM MANUAL                                        Rel. 8-58
                                                  1/26/90

limitations as outlined in .08B3 above.

BLM MANUAL                                          Rel. 8-58
                                                    1/26/90

BLM_0006822

.08D

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

D.  Relationship to Native American Governments.

1.  Federally Recognized Tribes.  The governments of federally recognized tribes are the legal representatives for ensuring that tribal members may exercise rights and privileges held through treaties, executive orders, and agreements with the United States, both on and off reservations.  The special legal status of tribal governments requires that official relations with BLM, including coordination and consultation pursuant to this Manual Section, be conducted on a government-to-government basis.  Authorities and responsibilities of specific tribal governments are defined in the constitutions and bylaws of the individual tribes.

2.  Alaska Native Corporations.  The BLM in Alaska relates to regional profit and nonprofit Native corporations established under provisions of the Alaska Native Claims Settlement Act (see .03B4 above) as the primary units for Native American coordination and consultation concerning certain lands and planning issues.  The BLM also coordinates with the regional profit and nonprofit Native corporations to identify any additional needs for involving Alaska Native groups in coordination and consultation.

E.  Relationship to Native American Advocacy Groups.  The BLM notifies and considers the views of groups advocating positions of general interest to Native Americans in the same manner as it notifies and considers the views of other advocacy or special interest groups.  The concerns of these groups are considered through BLM's normal land use planning and NEPA compliance processes.

BLM_0006823

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION


Glossary of Terms

(See also Manual Section 8100, Glossary of Terms.)

-E-

ethnography:  structured and systematic, fieldwork-based study
    and description of specific cultures.

ethnohistory:  study of a cultural group's past based on the
    group's own historical record, especially oral tradition.

-F-

fiduciary responsibility:  the trust responsibility of the United
    States, executed through the Secretary of the Interior, to
    uphold obligations of the Federal Government to Native
    American groups.  Court decisions have interpreted this
    responsibility to extend to all Federal agencies.  For BLM,
    this obligation requires a reasonable and good faith effort
    to identify and consider, and to carry out programs in a
    manner sensitive to and consistent with, Native American
    concerns and tribal government planning and resource
    management programs.

-G-

government-to-government relationship:  the formal relationship
    that exists between agencies of the Federal Government and
    tribal governments under the laws of the United States.
    Tribal governments are considered domestic sovereignties
    with primary and independent jurisdiction (in most cases)
    over tribal lands.  Concerning BLM actions, the same level
    of consideration and consistency review provided to other
    agencies or governmental jurisdictions must be afforded to
    Indian tribes.

-I-

Indian group:  any Indian aggregation within the conterminous
    United States, which the Secretary of the Interior has not
    recognized as possessing tribal status.

Indian lands:  lands held in trust by the United States for
    individual Indians or tribes, or lands titled to individual
    Indians or tribes subject to Federal restrictions against
    alienation or encumbrance.

BLM_0006824

BLM MANUAL                                          Rel. 8-58
                                                     1/26/90

BLM_0006825

Glossary, Page 2

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

<u>Indian tribe</u>:  any Indian group in the conterminous United States that the Secretary of the Interior recognizes as possessing tribal status (listed annually in the Federal Register).

-N-

<u>Native American</u>:  a member of any of the indigenous cultural groups of the western hemisphere, including American Indians, Alaska Natives, Native Hawaiians, and other indigenous peoples.

-R-

<u>reservation</u>:  lands acquired in ownership by Indian tribal governments through aboriginal possession, treaty, act of Congress, Executive action (including action by the Secretary of the Interior pursuant to certain statutes), and/or by action of a colony, State, or foreign nation.

<u>reserved rights</u>:  those rights not specifically ceded in a treaty or agreement are considered to be reserved consistent with the purposes of the United States and the Indians entering into a transaction or formal relationship.  Rights may include hunting, fishing, and gathering privileges, or water and other resource use guarantees.

-S-

<u>subsistence use</u>:  the customary and traditional use by Native Americans of renewable resources on the public lands.  For Alaska, specific statutory definition of "subsistence uses" is ". . . the customary and traditional uses by rural Alaska residents of wild renewable resources for direct personal or family consumption as food, shelter, clothing, tools, or transportation; for the making and selling of handicraft articles out of non-edible by-products of fish and wildlife resources taken for personal or family consumption; for barter, or sharing for personal or family consumption; and for customary trade."

-T-

<u>tradition</u>:  longstanding, socially conveyed, customary patterns of thought, cultural expression, and behavior, such as religious beliefs and practices, social customs, and land or resource uses.  Traditions are shared generally within a social and/or cultural group and span generations.

BLM MANUAL                                                    Rel. 8-58
                                                                1/26/90

BLM_0006826

BLM MANUAL                                                Rel. 8-58
                                                            1/26/90

BLM_0006827

8160 - NATIVE AMERICAN COORDINATION AND CONSULTATION

<u>traditional</u>:  conforming to tradition.

<u>treaty</u>:  a formal agreement between the United States and one or more Native American groups.  Typically, these agreements ceded lands to the United States, reserving certain rights, privileges, and/or lands to the Native American signatories.

<u>tribal government</u>:  the formal representative governing body of a reservation or Indian community (as defined in 25 CFR 61 and published annually in the Federal Register).

<u>tribe</u>:  (See "Indian tribe.")

<u>trust responsibility</u>:  the same as "fiduciary responsibility" for purposes of this manual section.  (See "fiduciary responsibility.")

BLM_0006828

# COLORADO

# PUBLIC LAND HEALTH STANDARDS

This document contains the

## Decision Record & Finding of No Significant Impact

and

## Environmental Assessment

for

## Standards
for Public Land Health
and
## Guidelines
for Livestock Grazing Management

Bureau of Land Management

March 1997

BLM_0006829

# DECISION RECORD
# AND
# FINDING OF NO SIGNIFICANT IMPACT

## FOR ADOPTION OF

## *STANDARDS*

## FOR PUBLIC LAND HEALTH

## AND

## *GUIDELINES*

## FOR LIVESTOCK GRAZING MANAGEMENT

## IN

## COLORADO

### JANUARY 1997

BLM_0006830

**DECISION**

It is my decision to adopt the attached standards for public land health and guidelines for livestock grazing management (standards and guidelines), dated November 1996. They are similar to those described in the Standards and Guidelines Environmental Assessment (EA), dated June 28, 1996, but with some minor changes resulting from public comments.

This decision amends the Colorado Resource Management Plans (RMPs). These standards and guidelines supplement (i.e. add to) the existing decisions in each RMP. Some of the decisions in certain RMPs will be modified or replaced as shown in the individual RMP attachments to this Decision Record. The RMPs amended are:

Glenwood Springs
Grand Junction
Gunnison
Kremmling
Little Snake
Northeast
Royal Gorge
San Juan/San Miguel
San Luis
Uncompahgre Basin
White River (Proposed)

This decision will be effective on February 12, 1997 following resolution of any protests, completion of the Governor's consistency review, and approval by the Secretary of the Interior.

**ALTERNATIVES CONSIDERED**

In addition to the proposed action, adoption of the fallback standards and guidelines as described in 43 CFR 4180.2 was considered. By regulation, this alternative will be in effect after February 12, 1997 if the proposed action is not approved prior to that date. If this occurs, the Fallback standards and guidelines will continue in effect until the Colorado standards and guidelines are approved. This alternative was not selected because there was strong support from virtually all public land users to develop standards and guidelines for Colorado.

The alternative of continuing present management was considered. This alternative, although not legally implementable, served as a baseline for describing and comparing implementation processes and impacts with other alternatives.

**RATIONALE**

These standards and guidelines were developed in partnership with the three Colorado Resource Advisory Councils, utilizing input received during numerous public workshops and meetings, consultations with academicians, and from public comments on the EA.. Correctly applied, they will assure public land health. I am hopeful that the open, collaborative implementation process will help in building mutual trust and respect with and between public land users. Similarly, the common terminology used in assessing rangeland health, should reduce misunderstandings. The focus on sustaining natural systems using a landscape perspective further encourages a collaborative approach using the best information and methods available.

2

BLM_0006831

## FINDING OF NO SIGNIFICANT IMPACT

Based on the analysis of anticipated impacts described in the Standards and Guidelines EA., I have determined that no significant impacts will occur and an environmental impact statement is not required. Beneficial resource impacts will occur, including improved soil productivity, riparian function, water quality, plant density and diversity, and wildlife habitat. In a few isolated circumstances some grazing permittees and other public land users may be adversely impacted in the short term by increased costs, and/or reductions in authorized or allowable use. In the long term, grazing permittees should realize a gain, as more predictable, desirable forage is produced. Other public land users and local communities should benefit as well from the use and enjoyment of improved resource conditions on the public lands.

Recommended by:

Colorado BLM Area Managers (signatures on RMP attachments to this record)

Colorado BLM District Managers:

Mark Morse, District Manager
Craig and Grand Junction Districts

11-1-96
Date

Mark Stiles, District Manager
Montrose District

11-8-96
Date

Donnie Sparks, District Manager
Canon City District

11-7-96
Date

Approved by:

Robert V. Abbey, Acting State Director
Colorado

11-8-96
Date

Approved for Implementation by:

Bruce Babbitt, Secretary of the Interior

FEB 1997
Date

3

# *STANDARDS*
FOR PUBLIC LAND HEALTH

AND

# *GUIDELINES*
FOR LIVESTOCK GRAZING MANAGEMENT

## IN COLORADO
November 1996

## PREAMBLE

Humans use and derive benefits from public lands administered by BLM in Colorado in many ways: to earn a livelihood, to recreate, for education, for science, and to enjoy and appreciate open spaces and irreplaceable cultural heritage resources. Healthy public lands and the uses of those lands contribute to the health and economic well-being of Colorado communities. In turn, healthy human communities create healthy public lands by conserving, protecting, and properly utilizing public land resources and by effectively resolving conservation issues. Healthy public lands and healthy human communities are interrelated; therefore, social, economic, and environmental considerations must be properly balanced.

The interdependent relationship between human communities and their public land brings together people of diverse backgrounds and interests. Open, honest, and sincere interactions, in a spirit of trust and respect, are essential to achieving and maintaining healthy public lands. While all individuals have a voice in public land management goals, the responsibility to maintain healthy public lands ultimately falls with the users of those lands.

To help determine what constitutes healthy public lands, Standards for Public Land Health, by which the health of the land is measured, need to be established. This document defines such standards for BLM lands in Colorado. It also identifies Guidelines for Livestock Grazing Management, which are some of the tools that help achieve the standards.

## INTERPRETATION

Standards and guidelines can be an effective communication tool, providing a common understanding of expected resource conditions and acceptable management practices. Although the standards are the measures by which health of the land will be assessed, the results of these assessments are not well-suited for direct reporting of accomplishments. Any reporting of progress associated with application of these standards will need to consider and address the following factors:

- Standards and guidelines for each state will be different.
- To be meaningful, public land health assessment must be determined based upon all standards and not solely upon each individual standard.
- It will be many years before a full assessment of public land health is completed. Initially, statistics concerning public land health may be skewed due to the priority setting process which directs management attention to lands where problems exist.

4

BLM_0006833

**Standards** describe conditions needed to sustain public land health, and relate to all uses of the public lands. The standards are written in a two-part format. The standard is first described in a statement. Then indicators which relate to the standard are identified. The indicators help define the standard and describe features which are observable on the land. Additional indicators may also be applicable to some sites, and some indicators may not apply to every specific site. While a site should match the indicators it is not necessary for each site to perfectly match all the indicators to comply with the standard.

The appropriate use of resources will be determined by the authorized officer on a case by case basis, in consultation, coordination and cooperation with local cooperators and the interested public and in accordance with law and regulation.

Standards are observed on a landscape scale. It is not possible for each acre to achieve every standard. For example, a mosaic of vegetation types and age classes may produce the diversity associated with a healthy landscape; however, some individual vegetation communities within the mosaic may lack diversity.

Standards always relate to the potential of the landscape . Climate, landform, geologic, and biologic characteristics are factors that affect potential. Each landscape has a specific ability to provide values important to humans such as timber, livestock forage, water, wildlife, and minerals. Therefore, the potential of a site can also be altered through a wide variety of human socio-economic factors. When this occurs, a new potential exists. The authorized officer, through the consultation process, will evaluate the site based on its new potential . Comparative analysis of nearby landscapes, (that appear to have similar climate, geology, landform, biologic and socio-economic characteristics), is considered the most reliable means to identify the potential landscape.

It is common for landscapes with nearly identical potential to differ, in their appearance, and in the values they provide. Variability results from both natural plant succession patterns, and human uses. While the climax plant community is significant as an indicator of potential , the climax community does not automatically provide the comparative basis for evaluating the standard. In many circumstances local goals will identify a different plant community which provides the most optimum values. When this occurs, the plant community identified in the local goal replaces the climax community as the foundation for evaluating the standard.

Often, existing information will be sufficient to determine public land health.    It is not always necessary to collect measurable baseline data for each standard on each site to determine public land health. However, baseline data is important to establish so that changes can be observed and measured. The BLM's authorized officer will determine the amount and type of data each situation requires in consultation, coordination and cooperation with local cooperators and the interested public. In areas where the standards are not being achieved, current uses and management actions will be reviewed and modified if necessary to assure significant progress toward achieving a healthy ecosystem.

**Guidelines** are livestock grazing management tools, methods, strategies, and techniques (e.g., best management practices) designed to maintain or achieve healthy public lands as defined by the standards. Grazing by wildlife and wild horses, oil and gas activity, recreation, and logging can affect the health of the land. Guidelines for these and other uses may be developed as needed to conform with the new standards. Implementation of livestock grazing management guidelines must also be coordinated with other uses of the land; collectively, these uses should not detract from the goal of achieving healthy public lands.

5

BLM_0006834

## STANDARDS FOR PUBLIC LAND HEALTH

**STANDARD 1:** *Upland soils* exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor, and minimizes surface runoff.

Indicators:

- Expression of rills and soil pedestals is minimal.
- Evidence of actively-eroding gullies (incised channels) is minimal.
- Canopy and ground cover are appropriate.
- There is litter accumulating in place and is not sorted by normal overland water flow.
- There is appropriate organic matter in soil.
- There is diversity of plant species with a variety of root depths.
- Upland swales have vegetation cover or density greater than that of adjacent uplands.
- There are vigorous, desirable plants.

**STANDARD 2:** *Riparian systems* associated with both running and standing water, function properly and have the ability to recover from major disturbance such as fire, severe grazing, or 100-year floods. Riparian vegetation captures sediment, and provides forage, habitat and bio-diversity. Water quality is improved or maintained. Stable soils store and release water slowly.

Indicators:

- Vegetation is dominated by an appropriate mix of native or desirable introduced species.
- Vigorous, desirable plants are present.
- There is vegetation with diverse age class structure, appropriate vertical structure, and adequate composition, cover, and density.
- Streambank vegetation is present and is comprised of species and communities that have root systems capable of withstanding high streamflow events.
- Plant species present indicate maintenance of riparian moisture characteristics.
- Stream is in balance with the water and sediment being supplied by the watershed ( e.g., no headcutting, no excessive erosion or deposition).
- Vegetation and free water indicate high water tables.
- Vegetation colonizes point bars with a range of age classes and successional stages.
- An active floodplain is present.
- Residual floodplain vegetation is available to capture and retain sediment and dissipate flood energies.
- Stream channels have appropriate size and meander patterns for the streams' position in the landscape, and parent materials.
- Woody debris contributes to the character of the stream channel morphology.

6

BLM_0006835

**STANDARD 3:** Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations, and ecological processes.

Indicators:

- Noxious weeds and undesirable species are minimal in the overall plant community.
- Native plant and animal communities are spatially distributed across the landscape with a density, composition, and frequency of species suitable to ensure reproductive capability and sustainability.
- Plants and animals are present in mixed age classes sufficient to sustain recruitment and mortality fluctuations.
- Landscapes exhibit connectivity of habitat or presence of corridors to prevent habitat fragmentation.
- Photosynthetic activity is evident throughout the growing season.
- Diversity and density of plant and animal species are in balance with habitat/landscape potential and exhibit resilience to human activities.
- Appropriate plant litter accumulates and is evenly distributed across the landscape.
- Landscapes are composed of several plant communities that may be in a variety of successional stages and patterns.

**STANDARD 4:** Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by the BLM, and their habitats are maintained or enhanced by sustaining healthy, native plant and animal communities.

Indicators:

- All the indicators associated with the plant and animal communities standard apply.
- There are stable and increasing populations of endemic and protected species in suitable habitat.
- Suitable habitat is available for recovery of endemic and protected species.

**STANDARD 5:** The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands will achieve or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and antidegradation requirements set forth under State law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act.

Indicators:

- Appropriate populations of macroinvertabrates, vertebrates, and algae are present.
- Surface and ground waters only contain substances (e.g. sediment, scum, floating debris, odor, heavy metal precipitates on channel substrate) attributable to humans within the amounts, concentrations, or combinations as directed by the Water Quality Standards established by the State of Colorado (5 CCR 1002-8).

BLM_0006836

# COLORADO LIVESTOCK GRAZING MANAGEMENT GUIDELINES

1. Grazing management practices promote plant health by providing for one or more of the following:

- periodic rest or deferment from grazing during critical growth periods;
- adequate recovery and regrowth periods;
- opportunity for seed dissemination and seedling establishment.

2. Grazing management practices address the kind, numbers, and class of livestock, season, duration, distribution, frequency and intensity of grazing use and livestock health.

3. Grazing management practices maintain sufficient residual vegetation on both upland and riparian sites to protect the soil from wind and water erosion, to assist in maintaining appropriate soil infiltration and permeability, and to buffer temperature extremes. In riparian areas, vegetation dissipates energy, captures sediment, recharges ground water, and contributes to stream stability.

4. Native plant species and natural revegetation are emphasized in the support of sustaining ecological functions and site integrity.  Where reseeding is required, on land treatment efforts, emphasis will be placed on using native plant species. Seeding of non-native plant species will be considered based on local goals, native seed availability and cost, persistence of non-native plants and annuals and noxious weeds on the site, and composition of non-natives in the seed mix.

5. Range improvement projects are designed consistent with overall ecological functions and processes with minimum adverse impacts to other resources or uses of riparian/wetland and upland sites.

6. Grazing management will occur in a manner that does not encourage the establishment or spread of noxious weeds. In addition to mechanical, chemical, and biological methods of weed control, livestock may be used where feasible as a tool to inhibit or stop the spread of noxious weeds.

7. Natural occurrences such as fire, drought, flooding, and prescribed land treatments should be combined with livestock management practices to move toward the sustainability of biological diversity across the landscape, including the maintenance, restoration, or enhancement of habitat to promote and assist the recovery and conservation of threatened, endangered, or other special status species, by helping to provide natural vegetation patterns, a mosaic of successional stages, and vegetation corridors, and thus minimizing habitat fragmentation.

8. Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.

8

BLM_0006837

## FLEXIBILITY

The standards are designed to maintain or achieve healthy public lands while allowing for the development of local goals and objectives. For example, on sites of similar potential a desired plant community designed to provide deer winter range would differ from one designed for cattle summer range, yet both could achieve the standards. Local goals and specific objectives consistent with standards will be developed by BLM in consultation, cooperation and coordination with local cooperators and the interested public.

Guidelines were designed to provide direction, yet offer flexibility for local implementation through grazing permits. Activity plans may add specificity to the guidelines based on local goals and objectives. A wide variety of grazing management strategies can produce healthy rangelands. One or more guidelines would be employed to achieve the standards.

## IMPLEMENTATION

Recognizing that social and economic factors must be considered in achieving healthy public lands, the authorized officer will coordinate, consult and cooperate with the local cooperators and interested publics during all phases of implementing standards and guidelines, whether it be for an allotment, group of allotments, or watershed. BLM will strive to make use of collaborative approaches involving the various interested publics within an affected allotment, group of allotments, or watershed. The Resource Advisory Council (RAC) may be requested by any party to assist in reaching agreement in resolving disputes. As greater understanding of ecosystems, including socio-economic factors, becomes available, it will be applied to our management of public lands.

The section below describes the general process for applying the Colorado standards and guidelines in the field. If mutual agreement on a course of action is reached at any point during this process, such agreement may eliminate the need for some of the process steps described.

It is unreasonable to assume that standards and guidelines will be applied to all public lands immediately upon adoption. Therefore, it is imperative that a logical system for prioritizing work be adopted. Following are some criteria that the authorized officer uses to prioritize areas such as allotments, watersheds, or other landscapes:

- Are there situations where legal requirements must be met?
- Is there information to indicate resources at risk, or that the severity of resource damage demands immediate attention? (monitoring results, allotment categorization, professional judgement, results of ESI or other inventory data, etc.)
- Is use conflict present?
- Is there public concern or interest for possible resources at risk?
- What is scheduled for completion according to the RMP implementation schedule?
- Where can efficiencies with limited resources be realized?
- Where are the best opportunities to effect positive change toward public land health?
- Are there permits or other resource use authorizations that need to be acted upon (e.g.grazing, right-of-ways, timber sales, etc.)?

9

BLM_0006838

The following steps describe a typical sequence for assessing public land health and trend on established priority areas. The authorized officer will:

1. Using public scoping, identify issues and values in detail; identify existing management objectives from sources such as the Resource Management Plan (RMP), and activity plans.

2. Assess public land health and if possible determine the trend relating to public land health.

3. Determine the relationship between existing land uses and the assessed health of the land.

4. If needed, establish measurable objectives or redefine/modify existing management objectives that will result in desired conditions. (Note: If significant changes to RMP decisions are needed, an amendment to the RMP will be needed.)

5. Identify which land use actions will achieve the desired objectives and resource conditions.

NOTE: This document addresses the livestock grazing guidelines; guidelines that relate to other land uses will be consulted or developed as necessary to deal with the appropriate objectives.

6. Identify specific management practices, in conformance with the guidelines, and attach as terms and conditions on grazing permits, or as stipulations on specific projects or actions.

7. Establish an evaluation schedule to determine if the standard is being achieved or if significant progress is being made.

- If the evaluation indicates that objectives are being achieved or there is movement towards the objective, continue with management practices.

- If the evaluation indicates no movement or movement away from the objectives, reassess the objectives and management actions. Determine the objectives and management actions necessary to assure significant progress toward achieving the standards. Amend plans and permits as necessary.

The authorized officer will take immediate administrative action to implement appropriate guidelines upon a determination that the following three circumstances all apply:

1. Public land health is unaccepatable;

2. Existing management is not likely to produce significant progress towards public land health; and

3. The consultation process has failed to yield a negotiated resolution.

If needed, future modifications to the Standards and Guidelines may be made. Typically, a proposal for modification is presented to the local Designated Field Official (DFO). The DFO then forwards the proposal for modification to other DFOs throughout the state for consideration in consultation with the RACs. (A copy of the proposal for modification is also submitted to the State Director). The DFOs considering advise from the RACs then submit to the State Director recommendations regarding the proposal for modification. The State Director decides if the proposal for modification has merit. If so, a determination is made whether the modification is a maintenance change to the Resource Management Plans or requires a plan amendment. Maintenance changes require no action except to make a notation in the RMPs (43 CFR 1610.5-4). Actions requiring a RMP amendment will require NEPA analysis and conformance with 43 CFR 1610.5.

10

# GLOSSARY OF TERMS

**Activity Plan** - A more detailed and specific plan for management of a single resource program to achieve specific objectives undertaken only when needed to implement the more general resource management plan (RMP) decisions.

**Allotment** - An area of land designated and managed for the grazing of livestock by one or more livestock operators. It generally consists of public lands, but may include parcels of private or State-owned lands. The number of livestock and period of use are stipulated for each allotment.

**Allotment Management Plan** - A written plan for livestock grazing management, including supportive measures if required, designed to attain specific multiple-use management, sustained yield, economic and other goals in a grazing allotment.

**Best Management Practices** - Best Management Practices (BMPs) are methods, measures, or practices to prevent or reduce water pollution, including, but not limited to, structural and nonstructural controls and operation and maintenance procedures. Usually BMP's are applied as a system of practices rather than a single practice. BMPs are selected on the basis of site-specific conditions that reflect natural background conditions and political, social, economic, and technical feasibility.

**Biodiversity or Diversity** - The variety of plants and animals that occupy a landscape.

**Climax** - The natural plant community that occurs at the end of the plant successional path, in the absence of disturbances or physical site deterioration.

**Desired Plant Community** - A plant community that meets the goals established for a landscape.

**Ecosystem** - Living organisms and non-living substances, interacting to produce and exchange material between the living and non-living parts.

**Endemic Species** - A species or subspecies native to a particular location with narrow limits of habitat variability.

**Goal** - A general description of a desired future condition. (e.g. improve watershed conditions, achieve a desired plant community)

**Grazing Permit** - A document authorizing use of public lands within an established grazing district.

**Habitat Management Plans** - A type of activity plan relating to wildlife habitat.

**Heritage Resources** - Any prehistoric, historic, landscape, site, building, structure, or object, normally greater than 50 years of age and includes artifacts, records, and material remains associated therewith.

**Interested Public** - An individual, group or organization that has submitted a written request to the authorized officer to be provided an opportunity to be involved in the decision making process.

**Landscape** - A defined area that forms a management unit or basis of analysis.

**Land Treatments** - Controlled burning, mechanical, biological, or chemical manipulation of the land.

11

BLM_0006840

**Local Cooperator** - An individual who directly influences the management of public lands, and who's cooperation is needed to alter existing conditions.  BLM permit holders are local cooperators.

**Objective** - A measurable description of a desired future condition that specifies, what is to be accomplished, location, and time frame.

**Plant and Animal Communities** - Those plant and animals which occur on public land; the definition excludes people, livestock, and crops.

**Potential** - The ecological condition of an area that is possible due to physical, biological, social, and economic factors.

**Preliminary Assessment** - An analysis of a tract of land that provides general information on the status of the land.  This assessment does not provide in-depth issue analysis.

**Public Lands** - Those tracts of land owned by the people of the United States, that are administered by the Bureau of Land Management.

**Riparian** - An area of land directly influenced by permanent water.  It has visible vegetation or physical characteristics reflective of permanent water influence.  Lakeshores and streambanks are typical riparian areas.  Excluded are such sites as ephemeral streams or washes that do not have vegetation dependent on free water in the soil.

**Trend** - The direction of change in health of the land, observed over time.

12

BLM_0006841

# GLENWOOD SPRINGS RESOURCE MANAGEMENT PLAN

The Glenwood Springs RMP is amended to include the standards for public land health and guidelines for livestock grazing management dated November 1996. Existing RMP decisions modified or replaced by adoption of standards for public land health and guidelines for livestock grazing management are shown in the following table.

| Page # in Approved RMP | Description of Change/Rationale *(modifications are shown in italics)* |
|---|---|
| 11 | Replace (remove) the water yield management objective, that reads, "To increase water yield throughout the resource area through forest management practices and through treatment of mountain brush vegetation types to improve livestock and big game forage." <br> Rationale: This objective is inconsistent with the standards. |
| 18 | Modify the terrestrial habitat management objective by deleting, *"(the amount needed to meet Colorado Division of Wildlife goals in 1988)"* so that the objective reads, "To provide approximately 57,933 animal unit months (AUMs) of big game forage to improve existing wildlife habitat conditions, and to increase wildlife species diversity." <br> Rationale: This reference to the Colorado Division of Wildlife's 1988 goals is out of date, and is not needed. |
| 20 | Modify the first sentence of the livestock grazing management objective to read, "To provide 56,885 animal unit months of livestock forage *commensurate with meeting public land health standards."* <br> Rationale: This objective is modified to be consistent with the regulations and to avoid a potential conflict with the standards. |
| 31 | Modify the forest management objective to read, "To manage all suitable commercial forest land and woodland to meet sawtimber and fuelwood demand and *to maintain stand productivity commensurate with meeting public land health standards."* <br> Rationale: This objective is modified to assure consistency with the standards. |

Recommended by:

_Stephen L Moore_      _11/4/96_

Mike Mottice, Area Manager      Date
Glenwood Springs Resource Area

13

BLM_0006842

## GRAND JUNCTION RESOURCE MANAGEMENT PLAN

The Grand Junction RMP is amended to include the standards for public land health and guidelines for livestock grazing management dated November 1996. Existing RMP decisions modified or replaced by adoption of standards for public land health and guidelines for livestock grazing management:

| Page # in Approved RMP | Description of Change/Rationale (modifications are shown in italics) |
|---|---|
| 2-14 | Modify the first sentence of the wildlife management objective to read, "To provide sufficient forage, cover, and protection from disturbance to maintain a population of 15,500 deer and 2,950 elk in winter, *commensurate with public land health standards.*" Rationale: This objective is modified to assure consistency with the standards. |
| 2-17 | Modify the first sentence of the livestock management objective to read, "To manage livestock grazing as described in the Grand Junction Grazing Environmental Statement, *commensurate with public land health standards.*" Rationale: This objective is modified to assure consistency with the standards. |

**Recommended by:**

Catherine Robertson, Area Manager
Grand Junction Resource Area

10/31/96
Date

14

## GUNNISON RESOURCE MANAGEMENT PLAN

The Gunnison RMP is amended to include the standards for public land health and guidelines for livestock grazing management dated November 1996.  Existing RMP decisions modified or replaced by adoption of standards for public land health and guidelines for livestock grazing management:

| Page # in Approved RMP | Description of Change/Rationale (modifications are shown in italics) |
|---|---|
| 2-2 | Modify the vegetation objective by deleting, "*or achieve at least a late seral ecological status*" so it reads, "Vegetation resources will be managed to maintain or improve the vigor, production and diversity of desirable plants within alpine, sagebrush/mixed mountain shrub, and woodland types at a level to support a variety of resource uses, including, but not limited to livestock grazing, wildlife habitat and recreation."<br>Rationale:  Achieving late seral status is not always consistent with achieving public land health. |
| 2-5 | Modify the first sentence under Sage Grouse and Other Upland Game Bird Habitat to read, "Identified sage grouse brood-rearing habitat and nesting area, and winter habitat will be maintained or improved, such that approximately 9,000 sage grouse could be supported on public lands, *commensurate with achieving public land health standards.*"<br>Rationale:  This objective is modified to assure consistency with the standards. |
| 2-6 | Modify the first sentence of the livestock grazing management objective to read, "Allow grazing *if commensurate with public land health standards* on 470,460 acres (approximately 60,135 AUMs of which 45,539 are active and the balance are suspended)."<br>Rationale:  This objective is reworded for brevity and to assure that use is consistent with the standards. |

**Recommended by:**

Barry Tollefson, Area Manager
Gunnison Resource Area

11/4/96
Date

15

BLM_0006844

## KREMMLING RESOURCE MANAGEMENT PLAN

The Kremmling RMP is amended to include the standards for public land health and guidelines for livestock grazing management dated November 1996.  Existing RMP decisions modified or replaced by adoption of standards for public land health and guidelines for livestock grazing management:

| Page # in Approved RMP | Description of Change/Rationale *(modifications are shown in italics)* |
|---|---|
| 7 | Replace (remove) livestock grazing management objective 3 that reads, "To improve overall range condition on permitted lands from the current 20% in satisfactory condition to 70 %."<br>Rationale:  These percentages were expressed in terms of seral stages, and are not consistent with the standards. |
| 7 | Modify livestock grazing management objective 2 to read, "To increase sustained forage production in 20 years by 37% to an estimated level of 54,296 AUMs and intensify management on 76 large allotments representing 51% of the public land, *commensurate with public land health standards.*"<br>Rationale:  The referenced increases in forage levels, and intensified management may or may not be achieved or exceeded depending on the results achieved by applying the standards and guidelines. |
| 8 | Modify the first sentence of the wildlife habitat management objective to read, "Manage public land habitat to support optimum wildlife population levels as determined by the Colorado Division of Wildlife's Strategic Plan, *commensurate with public land health standards and other allocations.*"<br>Rationale:  This objective is modified to assure consistency with the standards. |

Recommended by:

_____                    11/1/96
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾                    ‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Linda Gross, Area Manager                           Date
Kremmling Resource Area

16

BLM_0006845

## LITTLE SNAKE RESOURCE MANAGEMENT PLAN

The Little Snake RMP is amended to include the standards for public land health and guidelines for livestock grazing management dated November 1996. Existing RMP decisions modified or replaced by adoption of standards for public land health and guidelines for livestock grazing management:

| Page # in Approved RMP | Description of Change/Rationale *(modifications are shown in italics)* |
|---|---|
| 11 | Modify the first sentence of planned action # 10 by deleting the word, "*all*" and adding the words, "*if needed.*" so that it reads, "Allotment management plans will be developed for allotments within the Little Snake Resource Area if needed." Rationale:   Attempting to implement allotment management plans on all allotments with the BLM's limited resources is unrealistic and inconsistent with the prioritization process described for implementing standards and guidelines. |

Recommended by:

_Craig Haynes_
John Husband, Area Manager
Little Snake Resource Area

_11-4-96_
Date

17

# NORTHEAST RESOURCE MANAGEMENT PLAN

The Northeast RMP is amended to include the standards for public land health and guidelines for livestock grazing management dated November 1996.

**Recommended by:**

Levi Deike, Area Manager
Royal Gorge Resource Area

_11 - 4 -96_
Date

18

BLM_0006847

## ROYAL GORGE RESOURCE MANAGEMENT PLAN

The Royal Gorge RMP is amended to include the standards for public land health and guidelines for livestock grazing management dated November 1996. Existing RMP decisions modified or replaced by adoption of standards for public land health and guidelines for livestock grazing management:

| Page # in Approved RMP | Description of Change/Rationale (*modifications are shown in italics*) |
|---|---|
| 2-2, referencing page 3-3 of the proposed RMP/Draft EIS | On page 3-3, in the last sentence of column 2, after "fire", insert, " and prescribed natural fire" so that the sentence reads, "Prescribed fire and prescribed natural fire could be used as a management tool to enhance other resources." Rationale:  This is to clarify that fire prescriptions may be written for natural ignitions also. |

Recommended by:

Levi Deike, Area Manager
Royal Gorge Resource Area

11-4-96
Date

**19**

BLM_0006848

## SAN JUAN/SAN MIGUEL RESOURCE MANAGEMENT PLAN

The San Juan/San Miguel RMP is amended to include the standards for public land health and guidelines for livestock grazing management dated November 1996. Existing RMP decisions modified or replaced by adoption of standards for public land health and guidelines for livestock grazing management:

| Page # in Approved RMP | Description of Change/Rationale (modifications are shown in italics) |
|---|---|
| 6 | Modify the first sentence under Critical Grazing Period by replacing, "*select "I" category allotments*" with, "*all allotments*" so it reads, "Spring use by domestic livestock in *all allotments* will not be permitted on native ranges during the critical period of early growth unless a grazing system is implemented that provides critical period rest once every three years, or a spring use pasture is developed to absorb grazing use in meeting rest requirements. Rationale: This modification is required to be consistent with guideline one, which requires, "periodic rest or deferment from grazing during critical growth periods;" |
| 26 | Modify the second sentence under Management Guidance for Area A: by adding, "*contingent on meeting public health standards*" so it reads, "Emphasis is on increasing forage, red meat and animal fiber production, and improving forage composition and watershed conditions, *contingent on meeting public land health standards.*" Rationale: This objective is modified to assure consistency with public land health standards. |
| 27 | Modify livestock management, specific management direction by replacing, "*71 AMPs(810,000 acres)*" with "*where needed.*" so it reads, "Develop AMPs *where needed.*" Rationale: Developing 71 AMPs is probably not realistic considering BLM's limited resources, and setting a specific number of AMPs to be developed is inconsistent with the prioritization process described for implementing standards and guidelines. |
| 33 | Modify the second paragraph under Management Guidance for Area C: by adding, "*contingent on developments being able to meet public land health standards*" so it reads, "The primary management goal is to ensure the continued availability of outdoor recreation opportunities which the public seek and which are not readily available from other public or private entities, *contingent on developments being able to meet public land health standards.*" Rationale: This goal is modified to assure consistency with public land health standards. |

Recommended by:

Cal Joyner, Area Manager

San Juan Resource Area

Allan Belt, Area Manager          Date: 11/1/96

Uncompahgre Basin R.A.

BLM_0006849

## SAN LUIS RESOURCE MANAGEMENT PLAN

The San Luis RMP is amended to include the standards for public land health and guidelines for livestock grazing management dated November 1996. Existing RMP decisions modified or replaced by adoption of standards for public land health and guidelines for livestock grazing management:

| Page # in Approved RMP | Description of Change/Rationale (modifications are shown in italics) |
|---|---|
| 9 | Modify the first sentence under Vegetation, by deleting, "*(late seral stage)*" so it reads, "Overall objectives will be to move toward good condition based on site potential using grazing management."<br>Rationale:   This modification is needed because managing to achieve a late seral stage is not always consistent with achieving public land health. |

Recommended by:

_____
Julie Howard, Divide District Ranger/
Area Mannager

_____
11/4/96
Date

_____
Carlos Pinto, Conejos Peak District
Ranger/ Area Manager

_____
4 Nov 96
Date

_____
Thomas Goodwin, Saguache District
Ranger/ Area Manager

_____
11/4/96
Date

21

BLM_0006850

## UNCOMPAHGRE BASIN RESOURCE MANAGEMENT PLAN

The Uncompahgre Basin RMP is amended to include the standards for public land health and guidelines for livestock grazing management dated November 1996.Existing RMP decisions modified or replaced by adoption of standards for public land health and guidelines for livestock grazing management:

| Page # in Approved RMP | Description of Change/Rationale (modifications are shown in italics) |
|---|---|
| 20 | Modify the first sentence under Livestock Grazing by adding, *"commensurate with public land health"* so it reads, "Livestock grazing and facility maintenance will be managed at levels and conditions established prior to wilderness designation *commensurate with public land health standards."* Rationale: This modification is needed to assure consistency with the standards and guidelines. |
| 22 | Modify the first sentence of the second paragraph under Management Unit 8, by adding, *"commensurate with public land health standards"* so it reads, "The management unit will be managed as open to OHV use, *commensurate with public land health standards."* Rationale: This modification is needed to assure consistency with the standards. |

**Recommended by:**

_Allan J. Belt_                  _11/1/96_

Allan Belt, Area Manager                  Date
Uncompahgre Basin Resource Area

22

BLM_0006851

## WHITE RIVER RESOURCE MANAGEMENT PLAN (PROPOSED)

The White River RMP is amended to include the standards for public land health and guidelines for livestock grazing management dated November 1996.

Recommended by:

_____

John J. Mehlhoff, Area Manager
White River Resource Area

11/7/96

Date

23

BLM_0006852

## FINDING OF NO SIGNIFICANT IMPACT

Based on the analysis of anticipated impacts described in the Standards and Guidelines EA., I have determined that no significant impacts will occur and an environmental impact statement is not required. Beneficial resource impacts will occur, including improved soil productivity, riparian function, water quality, plant density and diversity, and wildlife habitat. In a few isolated circumstances some grazing permittees and other public land users may be adversely impacted in the short term by increased costs, and/or reductions in authorized or allowable use. In the long term, grazing permittees should realize a gain, as more predictable, desirable forage is produced. Other public land users and local communities should benefit as well from the use and enjoyment of improved resource conditions on the public lands.

**Recommended by:**

Colorado BLM Area Managers (signatures on RMP attachments to this record)

Colorado BLM District Managers:

| | |
|---|---|
| Mark Morse, District Manager<br>Craig and Grand Junction Districts | 11-1-96<br>Date |
| Mark Stiles, District Manager<br>Montrose District | 11-8-96<br>Date |
| Donnie Sparks, District Manager<br>Canon City District | 11-7-96<br>Date |

**Approved by:**

Robert V. Abbey, Acting State Director
Colorado

11-8-96
Date

**Approved for Implementation by:**

Bruce Babbitt, Secretary of the Interior

‑‑ FEB 1997
Date

3



# STANDARDS

for Public Land Health

AND

# GUIDELINES

for Livestock Grazing
Management in Colorado

environmental assessment

prepared by **The Bureau of Land Management**
in partenership with **The Resource Advisory Councils**

June 28, 1996

BLM_0006854

Dear Reader:

Enclosed for your review and comment is the Environmental Assessment (EA) for Standards for Public Land Health and Guidelines for Livestock Grazing Management in Colorado (standards and guidelines). The proposed action is to amend the Colorado BLM Resource Management Plans (RMP) by adopting the standards and guidelines.

This proposed RMP amendment is in accordance with rangeland reform regulations finalized on February 22, 1995. This EA was prepared in partnership with the three Resource Advisory Councils in Colorado--Front Range, Southwest, and Northwest.

Numerous workshops have been held throughout the state to inform the public and gather comments on standards and guidelines. Now you have an opportunity to review the EA and provide comments. Please direct your written comments to Dennis Zachman, 2850 Youngfield, Lakewood, CO 80215, by close of business August 14, 1996.

Workshops to provide further information and receive additional comments will be held from July 8 through August 2, 1996. The workshops will be advertised in the local news media. You may also contact your local BLM office for a schedule of workshops.

All comments will be considered in the decision regarding standards and guidelines, which is tentatively scheduled for release by the end of September 1996.

Thank you for your interest.

Sincerely yours,

Don Glaser
State Director

CHANGES TO THE
ENVIRONMENTAL ASSESSMENT
FOR
STANDARDS FOR PUBLIC LAND HEALTH
AND
GUIDELINES FOR LIVESTOCK GRAZING IN COLORADO

NOVEMBER, 1996

| LOCATION | CHANGE |
|---|---|
| Page 1 Col.2 Fig.1 | Modify the description of Guidelines in Figure 1 to read as follows: "Guidelines are the tools that we use to achieve the standards, including acceptable grazing management practices and ~ land treatments, and types of monitoring procedures. |
| Page 2 Col.1 Para.2 | To the end of the second paragraph, add the following: "Plan amendments are authorized under the provisions of 43 CFR 1610.5-5." |
| Page 3 Col.1 | In reference to Resource Areas in the acreage chart, delete "...and San Miguel" |
| Page 3 Col.1 | In reference to the acreage chart make the following revisions: San Juan    606,876 ~ 606,624 Uncompahgre    918,293 ~ 919,221 Total    8,292,225 ~ 8,292,901 |
| Page 8 Col.1 Para.2 | Modify the second sentence to read as follows: "Uses of the public land resources will be made on a case-by-case basis in consultation with local cooperators and the interested public and in accordance with existing federal law and regulation." |
| Proposed Action p.7-12 | Proposed modifications to the standards and guidelines are displayed on the attached strikeout/redline version of the standards and guidelines. |
| Page 15 Col.1 | Add the following sentence before the header "Biological and Physical Components": Physical and biological as well as social and economic components are key factors in describing and achieving healthy public lands.  Existing conditions and trends of these components are described in this chapter. |
| Page 18 Col.1 Climate for Unit 1 | Modify paragraph on climate for Unit 1 to read: "...precipitation averages 24-28 inches annually ranges from about 10 inches to more than 30 inches, depending on elevation with less than half received during the winter." |
| Page 18 Col.1/2 Water Resources for Unit 1 | Modify paragraph on water resources for Unit 1 to read: "... streams, lakes, and ground water are abundant however some temporal and spatial variations exist. |

BLM_0006856

| LOCATION | CHANGE |
|---|---|
| Page 18<br>Col.2<br>Land<br>Ownership<br>and Use | Modify second sentence in Land Ownership and Use section to read:<br>"Saw timber is scarce" |
| Page 25<br>Col.2<br>Riparian<br>section | Modify the first sentence under Riparian resources as follows:<br>"According to the 1995 riparian condition assessments for BLM riverine milage, the following conditions exist: 29 percent of the miles are functioning properly (up from 20 percent in 1992 and 25 percent in 1994), 28 percent are functioning at risk (up from 10 percent in 1994), 21 percent are not functioning properly (down from 22 percent in 1994), and 22 percent of the miles have not been evaluated (down from 60 percent in 1992 and 43% in 1994)." |
| Page 33<br>Col.1<br>Para.3 | Add the following to the beginning of the third paragraph of the Introduction/Approach section and modify the first sentence to read:<br>"Achieving healthy public lands is analgous to a journey. The final destination is healthy public lands. The direction or path that is taken is variable and dependent on the advice, decisions, and actions taken by managers, users, local communities, and interested publics. How then, will can impacts be described?" |
| Page 34<br>Col.2 | Under Standard 2 modify as follows:<br>"....fishery inventories benchmark sites, BLM Technical References 1735-9 and 11." |
| Page 37<br>Col.1<br>Para.6 | Modify third sentence under #2 to read as follows:<br>"In general, laterally migrating riparian areas stream channels repair quicker than riparian areas channels that migrate downcut vertically." |
| Page 51<br>Glossary | Delete "Capability" and definition. |
| Page 53<br>Glossary | Add the following:<br>"Potential: The ecological condition of an area that is possible due to physical, social, and economic factors." |
| Page 53<br>Glossary | Add to the definition of Proper Functioning Condition the following:<br>"Uplands function properly when the existing vegetation and ground cover maintain soil conditions capable of sustaining natural biotic communities. The functioning condition of uplands is influenced by geographic features, soil, water and vegetation." |
| Page 55 | Insert the following after the Kittel reference entry:<br>"National Research Council Rangeland Health. (Washington, D.C.: National Academy Press, 1994)." |

| LOCATION | CHANGE |
|---|---|
| Page 64 | Modify the wildlife entry that begins "Big-game utilization....", to read as follows:<br>    "Big-game should not exceed moderate use(40-60%), commensurate with capability."<br><br>Modify the wildlife entry that begins "Provide habitat...", to read as follows:<br>    "Provide habitat to support 9,000 sage grouse on public lands, commensurate with potential. |
| Page 71 | In the last table entry insert, "Supplement" in both the Proposed S&G and the Fallback S&G columns. |
| Page 78 | Under the fire management entry, modify as follows:<br>    "Enhance resource management through the use of fire and prescribed natural fire.<br>In this same entry, change supplement to modify in the Proposed S&G column. |
| Page 99 | In the last table entry insert, "supplement" in both the Proposed S&G and the Fallback S&G columns. |
| Page 175 | Delete entry for Manco milkvetch on page 175 (it is already presented on page 174). |

# SUMMARY

This environmental assessment (EA) analyzes the effect of adopting standards for public land health and guidelines for livestock grazing management (standards and guidelines) in Colorado. The standards and guidelines will be incorporated by plan amendment into the 11 Resource Management Plans (RMPs) that cover 8.29 million acres of BLM-administered land in Colorado.

This proposed RMP amendment is in accordance with rangeland reform regulations issued on February 22, 1995. The standards and guidelines (which is the proposed action in this EA) were developed in partnership with Colorado's three Resource Advisory Councils (RAC) and with other substantial public input. Each RAC, authorized by the same rangeland reform regulation, is comprised of 15 members of the public and elected officials. representing various uses and interests on BLM-administered lands.

Three alternatives were considered in this document. The proposed action is to adopt the standards and guidelines by amendment into Colorado BLM's RMPs. The Fallback standards and guidelines defined in the rangeland reform regulations is another alternative. If standards and guidelines are not completed and in effect by February 12, 1997, the Fallback standards and guidelines shall apply and be implemented. They will remain in effect until such time standards and guidelines are developed. The third alternative is present management. It is considered in this document to provide a baseline for comparison with the other alternatives.

The proposed standards are common to all public lands administered by BLM in Colorado. They describe conditions needed to sustain public land health. They relate to all uses of the public lands. Specifically, proposed standards describe standards for upland soils, riparian, plant and animal communities, special status species, and water quality. Indicators are provided to help define the standards and describe features which are observable on the land. The indicators serve as starting points for collaborative discussions regarding public land health. The guidelines are specific to livestock grazing management and are "tools" that may be used to help meet the standards. Another key feature of the proposed standards and guidelines is the emphasis on collaboration between BLM, other agencies, affected users, and interested publics.

If approved, the standards and guidelines, in most cases, simply supplement existing decisions in the RMPs. This means that the standards and guidelines will work concurrent with the existing decisions. Certain decisions that allocate resources or use, such as off-highway vehicle decisions and forage allocations may need to be adjusted in the future if they conflict with public land health. There will, however, be some decisions in the present RMPs that will be modified or replaced by the standards and guidelines. Those decisions that will be modified or replaced are identified in the EA.

The anticipated effects of adopting the standards and guidelines are not major. It is expected that the standards and guidelines will allow managers to do their job better in several ways.
* The standards and guidelines provide common state-wide terminology in assessing public land health.
* The process associated with implementing standards and guidelines is based on effective and appropriate collaboration.
● Standards and guidelines encourage ecosystem management and consider public land health on a landscape basis.
● The attention given to standards and guidelines make the manager more accountable. More than ever, a priority system with defensible criteria must be used to direct limited resources.

i

BLM_0006859

# TABLE OF CONTENTS

SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . iii

ACRONYMS . . . . . . . . . . . . . . . . . . . . . . . . . . iv

CHAPTER 1 - INTRODUCTION . . . . . . . . . . . . . . . . . . 1

CHAPTER 2 - PROPOSED ACTION AND ALTERNATIVES . . . . . . . . 7

CHAPTER 3 - AFFECTED ENVIRONMENT . . . . . . . . . . . . . . 15

CHAPTER 4 - ANTICIPATED IMPACTS . . . . . . . . . . . . . . 33

CHAPTER 5 - PUBLIC INVOLVEMENT . . . . . . . . . . . . . . . 45

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . 51

REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . 55

APPENDICIES

    APPENDIX A - Standards and Guidelines Regulations . . . . . . . . 57

    APPENDIX B - RMP Decisions . . . . . . . . . . . . . . 59

    APPENDIX C - Implementation Examples . . . . . . . . . . . . . 103

    APPENDIX D - Flow Chart for Water Quality Compliance . . . . . . 167

    APPENDIX E - Riparian Condition Assessment . . . . . . . . . . 169

    APPENDIX F - Colorado Special Status Species . . . . . . . . . 171

    APPENDIX G - Colorado Stream Segments - Sediment and Nutrients . 179

    APPENDIX H - Colorado Economic Data . . . . . . . . . . . . . 185

BLM_0006860

# ACRONYMS

| | |
|---|---|
| ACEC | Area of Critical Environmental Concern |
| AD | Administrative Determination |
| ARMP | Approved Resource Management Plan |
| AUM | Animal Unit Month |
| BLM | Bureau of Land Management |
| CEC | Colorado Environmental Coalition |
| CFR | Code of Federal Regulations |
| CRMAP | Coordinated Resource Management Activity Plan |
| CWA | Clean Water Act |
| DFO | Designated Field Official |
| DOW | Division of Wildlife (Colorado) |
| DPC | Desired Plant Community |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESI | Ecological Site Inventory |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| FMP | Forest Management Plan |
| FR | Federal Register |
| FS | Forest Service |
| HMA | Herd Management Area |
| HRM | Holistic Resource Management |
| IAP | Integrated Activity Plan |
| IWM | Integrated Weed Management |
| ID | Interdisciplinary |
| LU | Landscape Unit |
| NEPA | National Environmental Policy Act |
| NOI | Notice of Intent |
| NPS | National Park Service |
| NRHP | National Register of Historic Places |
| NRCS | National Resources Conservation Service |
| OHV | Off Highway Vehicle |
| PFC | Proper Functioning Condition |
| PJ | Pinyon Juniper |
| PNF | Prescribed Natural Fire |
| PRMP | Proposed Resource Management Plan |
| RA | Resource Area |
| RAC | Resource Advisory Council |
| RCA | Resource Conservation Area |
| RMP | Resource Management Plan |
| RPS | Rangeland Program Summary |
| S&G | Standards and Guidelines |
| SCS | Soil Conservation Service |
| SRMA | Special Recreation Management Area |
| SSF | Soil Surface Factor |
| T&E | Threatened and/or Endangered |
| TPCC | Timber Production Capability Classification |
| USFS | United States Forest Service |
| USFWS | United States Fish and Wildlife Service |
| WSA | Wilderness Study Area |

iv

BLM_0006861

# CHAPTER 1 - INTRODUCTION

This section describes:
- Why the Bureau of Land Management (BLM) is proposing to adopt standards for public land health and guidelines for grazing management (standards and guidelines);
- What are standards and guidelines;
- The process used to develop and adopt them; and
- The public lands affected.

## PURPOSE AND NEED

Standards and guidelines have been developed to identify the characteristics of healthy ecosystems on public lands administered by BLM and the management actions that promote them. Healthy public lands are sustainable, thus insuring that natural resources and amenities are enjoyed by future generations. Healthy public lands also contribute to the social and economic well-being and health of many Colorado communities. In turn, healthy communities contribute to healthy public lands by conserving, protecting, and properly utilizing public land resources, and by effectively resolving conservation issues.

## BACKGROUND

In response to public concern about management of livestock grazing on western public lands, BLM began developing new regulations for grazing administration, using an Environmental Impact Statement (EIS) process. This process, characterized by extensive public involvement, resulted in the adoption of new regulations for grazing administration (43 CFR Part 4100; 60 FR 9894), which became effective August 21, 1995.

Subpart 4180 of the new regulations (see Appendix A), provides that BLM State Directors will, in consultation with Resource Advisory Councils (RAC), develop standards and guidelines for approval by the Secretary of the Interior by February 21, 1997. If this does not occur, the fallback standards and guidelines described in Subpart 4180.2 of the regulations will apply. BLM in Colorado is committed to the development and implementation of locally adapted standards and guidelines. This will be accomplished in collaboration with the three RACs that were established for Colorado.

## WHAT ARE STANDARDS & GUIDELINES?

Standards for public land health and guidelines for grazing management are described in Figure 1. Standards and guidelines are also defined in the Glossary.

*Figure 1* - Standards, Guidelines and Implementing Actions



STANDARDS

Standards are characteristics the public lands should have and the observable indicators that let us know if the lands have those characteristics.

GUIDELINES

Guidelines are the tools that we use to achieve the standards, including acceptable grazing management practices, land treatments, and types of monitoring procedures.

IMPLEMENT

Implementing actions are the specific actions we take to apply standards and guidelines on the ground. Examples include terms and conditions on grazing permits, and range improvement authorizations.

1

BLM_0006862

## PROCESS FOR DEVELOPING STANDARDS AND GUIDELINES

When the regulations became effective, BLM Colorado convened the three RACs, initiated a series of public scoping meetings in September and October, 1995 (locations: Lakewood, Salida, Montrose, Grand Junction, and Craig), and conducted internal meetings with staff specialists to begin development of standards and guidelines. Existing Resource Management Plans (RMPs) were reviewed to determine if the fallback standards and guidelines and those being developed in consultation with the RACs conformed to each RMP.

The 4180 section of the regulations direct implementation of standards and guidelines subject to the National Environmental Policy Act (NEPA) and BLM planning regulations. Adoption of the proposed standards and guidelines will clarify many decisions in the RMPs and could be treated as plan maintenance for those decisions. However, it was decided to consider the action a plan amendment to our RMPs. This decision was made to lessen confusion and simplify the proposal. (See Appendix B).

The NEPA/RMP amendment process was initiated with a Notice of Intent (NOI) published in the Federal Register on November 8, 1995. The NOI requested public comment on the proposal to prepare one environmental document and to modify all Colorado RMPs. Using the information received during these scoping activities, BLM decided to prepare this environmental assessment (EA) to assess and display the environmental consequences of implementing standards and guidelines.

The proposed standards and guidelines analyzed in this EA were developed jointly by the BLM staff, the three RACs, and a subgroup of academicians using public comment and advice obtained from a series of workshops conducted from September 1995 through January 1996. In addition, current management direction in the RMPs is also analyzed and presented in this EA to provide a baseline from which process and possible impacts may be measured.

The alternative of taking no action and allowing the fallback standards and guidelines to take affect was presented and analyzed.

A team was formed, that included representatives from each Resource Area office (see List of Preparers in section IV) to arrange continued public involvement and to prepare this Environmental Assessment Resource Management Plan amendment. The team met in February 1996 to agree on procedures that would assure a consistent, interdisciplinary analysis.

Representatives from each Resource Area office coordinated the interdisciplinary analysis for their Resource Area. This information was then incorporated into this EA for public review and comment.

The BLM, in consultation with the three RACs, will consider received comments in the development of a proposed decision.  Public notices containing the revised standards and guidelines will be issued, allowing an opportunity for the governor to review for consistency with state or local plans, policies, and programs. People who have participated in the process, and who are adversely affected may protest to the BLM Director.  Following resolution of any protests, the standards and guidelines will be referred to the Secretary for approval.

After the standards and guidelines are approved for use in Colorado, each office will begin implemen- tation.  The Area Manager, in consultation with interested parties and the RAC, will begin assessing public land health.  Because of funding and staffing limitations, it is unreasonable to assume that standards and guidelines will be assessed on all lands immediately upon adoption.  Therefore, it is imperative that a logical system for prioritization be adopted.  For those lands to which standards are applied, the Area Manager will determine which standards are not being met and whether grazing activities conform with the guidelines.

Where it appears that standards are not being met or where grazing related activities are not in conformance with the guidelines,

2

Area Managers will involve affected
interests to develop remedial
actions in a collaborative manner.
How standards and guidelines will be
implemented is presented in more
detail in the description of the
"Proposed Action" in Chapter 2.

## PUBLIC LANDS AFFECTED (PHYSICAL SCOPE)

The area encompasses all surface
acreage administered by BLM Resource
Area offices in Colorado.  The
Resource Area boundaries are shown
on Map 1.  Lands covered by Resource
Management Plans are shown on Map 2.

The acreage of public lands by
Resource Area are:

| Resource Area | Public Land Acreage |
|---|---|
| Kremmling | 381,729 |
| Little Snake | 1,339,603 |
| White River | 1,430,471 |
| Glenwood Springs | 446,732 |
| Grand Junction | 1,354,725 |
| Gunnison | 605,415 |
| San Juan and San Miguel | 606,876 |
| Uncompahgre | 918,293 |
| Royal Gorge | 688,146 |
| San Luis | 520,235 |
| Total | 8,292,225 |

The majority of the lands in
Colorado are managed under completed
RMPs.  RMPs and the date they were
completed are as follows:

| | |
|---|---|
| Kremmling RMP | - 12/19/84 |
| Little Snake RMP | - 04/26/89 |
| Glenwood Springs RMP | - 02/03/84 |
| Grand Junction RMP | - 01/29/87 |
| Gunnison RMP | - 02/05/93 |
| San Juan/San Miguel RMP | - 09/05/85 |
| Uncompahgre Basin RMP | - 07/26/89 |
| Royal Gorge RMP | - 05/13/96 |
| San Luis RMP | - 12/18/91 |
| Northeast RMP | - 09/16/86 |

The White River RMP is expected to
be finished in January 1997.

## ASSUMPTIONS

To guide the assessment and
analysis, certain assumptions are
made:

• Standards apply to all public
lands and all users of the land,
such as livestock operators,
recreational users, miners, etc.,

have a responsibility to meet the
standards.
• Guidelines are "tools" that can be
implemented to move resource
conditions toward the standards;
they are specific to livestock
grazing.  It is understood that
guidelines or other actions not
specific to livestock grazing will
also be needed to effect healthy
public lands.
• Much of the implementation will
occur later.  For example, planning
for allotments, eco-regions, etc.,
will happen at some future date.  If
approved, the standards and
guidelines addressed in this
document will provide the basis for
future assessments and corrective
management actions.
• Healthy ecosystems contribute to
the social and economic well-being
of Colorado's communities.  In turn,
healthy human communities contribute
to healthy public lands by
conserving, protecting, and properly
utilizing resources and by
effectively resolving conservation
issues.
• Appropriated funds for
improvements are diminishing, and
this trend will continue into the
foreseeable future.
• BLM staffing will continue to
decrease, affecting our ability to
manage.
• Implementation will occur over
time and will be constrained by
physical and financial capability.
• Demands for use of public lands by
a variety of publics will continue
to increase.
• The employment of sound,
scientific principals is key to
implementation of standards and
guidelines.  It is further
understood that monitoring is key in
determining the effectiveness of
management actions.
• Implementation of standards and
guidelines will be conducted in a
collaborative manner, involving
interested publics and affected
users.  The RACs will be key
contributors to the process.
• Naturally occurring catastrophic
events, such as severe drought or
major flooding, may, for a period of
time, make it impossible for
standards to be met.

3

BLM_0006864



# Colorado BLM Resource Areas
## Map 1

BLM_0006865

# Colorado BLM Resource Management Planning Areas
## Map 2



BLM_0006866

# CHAPTER 2 - PROPOSED ACTION AND ALTERNATIVES

Three alternatives are considered and analyzed in this document:

## Proposed Standards for Public Land Health and Guidelines for Grazing Management in Colorado Alternative - (Proposed Action)

The proposed action amends the Resource Management Plans in Colorado by adopting the proposed standards and guidelines as described in this chapter. This proposal is the culmination of a collaborative effort between BLM and the Resource Advisory Councils (RAC) with input from a variety of interested publics.

With the exception of the glossary, the entire proposed standards and guidelines document is presented in this chapter. This includes the preamble, interpretation, standards, guidelines, flexibility, and implementation. The expanded glossary that is part of this document contains all the glossary items that were part of the proposed standards and guidelines.

## Fallback Standards and Guidelines Alternative

The fallback standards and guidelines as described in 43 CFR Subpart 4180.2 is an alternative considered in this environmental assessment. If locally developed standards and guidelines are not developed and approved for Colorado, the fallback standards and guidelines go into affect. See Appendix A.

## Present Management Alternative

The range reform regulations require that standards and guidelines be used for future management and continuing with present management is not an option. However, continuation of present management is analyzed in this document as an alternative to provide a baseline to compare impacts and implementation processes. Existing decisions in the RMPs that are affected by the Proposed Action Alternative and the

Fallback Standards and Guidelines Alternative are located in Appendix B. Appendix B also details if the decision will be supplemented, modified, or replaced.

--------------------------------

### PROPOSED ACTION

STANDARDS FOR PUBLIC LAND HEALTH AND GUIDELINES FOR LIVESTOCK GRAZING MANAGEMENT IN COLORADO

PREAMBLE

Humans use and derive benefits from public lands administered by BLM in Colorado in many ways: to earn a livelihood, to recreate, for education, for science, and to enjoy and appreciate open spaces and irreplaceable cultural heritage resources. Healthy public lands and the uses of those lands contribute to the health and economic well-being of Colorado communities. In turn, healthy human communities create healthy public lands by conserving, protecting, and properly utilizing public land resources and by effectively resolving conservation issues. Healthy public lands and healthy human communities are interrelated; therefore, social, economic, and environmental considerations must be properly balanced.

The interdependent relationship between human communities and their public land brings together people of diverse backgrounds and interests. Open, honest, and sincere interactions, in a spirit of trust and respect, are essential to achieving and maintaining healthy public lands. While all individuals have a voice in public land management goals, the responsibility to maintain healthy public lands ultimately falls with the users of those lands.

To help determine what constitutes healthy public lands, Standards for Public Land Health, by which the health of the land is measured, need to be established. This document

7

defines such standards for BLM lands in Colorado. It also identifies Guidelines for Livestock Grazing Management, which are some of the tools that help meet the standards.

INTERPRETATION

Standards:

Standards describe conditions needed to sustain public land health and relate to all uses of the public lands. The standards are written in a two-part format. The standard is first described in a statement. Then indicators which relate to the standard are identified. The indicators help define the standard and describe features which are observable on the land. Additional indicators may also be applicable to some sites, and some indicators may not apply to every specific site. While a site should match the indicators, it is not necessary for each site to perfectly match all the indicators to comply with the standard.

The standards do not provide a model for utilization of resources. Uses of the public land resources will be made on a case-by-case basis, in consultation and coordination with local cooperators and the interested public.

Standards are observed on a landscape scale. It is not possible for each acre to meet every standard. For example, a mosaic of vegetation types and age classes may produce the diversity associated with a healthy landscape; however, some individual vegetation communities within the mosaic may lack diversity.

Standards always relate to the potential or capability of the landscape evaluated. Each landscape has a specific ability to provide values such as commodities, wildlife habitat, and water yield. Climate, landform and geologic characteristics are examples of factors that affect potential. The physical potential of a site can be altered through a wide variety of human socio-economic factors. When this occurs, the new potential of the site is referred to as the capability. The authorized officer, through the consultation process, will determine if a site should be

evaluated based on its natural potential or its existing capability. Comparative analysis of nearby landscapes (that appear to have similar climate, geology, landform, and socio-economic characteristics), is considered the most reliable means to identify the potential or capability of an individual landscape.

It is common for landscapes with nearly identical potential or capability to differ in their appearance and in the values they provide. Variability results from both natural plant succession patterns and human uses. While the climax plant community is significant as an indicator of potential or capability, the climax community does not automatically provide the comparative basis for evaluating the standard. In many circumstances local goals will identify a different plant community which provides the most optimum values. When this occurs, the plant community identified in the local goal replaces the climax community as the foundation for evaluating the standard.

Standards become measurable when baseline data are collected, and changes from baseline can be observed. It is not necessary to establish measurable baseline data for each standard on each site. BLM's authorized officer will determine the amount and type of monitoring information each situation requires in consultation and coordination with local cooperators and the interested public. In areas where the standards are not being met, current uses and management actions will be reviewed and modified if necessary to influence the trend toward achieving desired objectives of a healthy ecosystem.

Guidelines:

The guidelines being developed are livestock grazing management tools, methods, strategies, and techniques (e.g., best management practices) designed to maintain or achieve healthy public lands as defined by the standards. Grazing by wildlife and wild horses, oil and gas activity, recreation, and logging can affect the health of the land. Guidelines for these and other uses

8

BLM_0006868

may be developed as needed to conform with the new standards. Implementation of livestock grazing management guidelines must also be coordinated with other uses of the land; collectively, these uses should not detract from the goal of achieving healthy public lands.

STANDARDS OF PUBLIC LAND HEALTH

**Standard 1:** Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate, land form, and geologic processes. Adequate soil infiltration and permeability allows for the accumulation of soil moisture necessary for optimal plant growth and vigor and minimizes surface runoff.

Indicators:

• Expression of rills, soil pedestals is minimal.

• Evidence of actively-eroding gullies (incised channels) is minimal.

• Canopy and ground cover are appropriate.

• There is litter accumulating in place and is not sorted by normal overland water flow.

• There is appropriate organic matter in soil.

• There is diversity of plant species with a variety of root depths.

• Upland swales have vegetation cover or density greater than that of adjacent uplands.

• There are vigorous, desirable plants.

**Standard 2:** Riparian systems, associated with both running and standing water, function properly and have the ability to recover from major disturbance. Riparian vegetation captures sediment, and provides forage, habitat, and bio-diversity. Water quality is improved or maintained. Stable soils store and release water slowly.

Indicators:

• Vegetation is dominated by an appropriate mix of native or desirable introduced species.

• Vigorous, desirable plants are present.

• There is vegetation with adequate age class structure, vertical structure, composition, cover, and density.

• Streambank vegetation is comprised of species and communities that have root systems capable of withstanding high streamflow events.

• Plant species present indicate maintenance of riparian moisture characteristics.

• Stream is in balance with the water and sediment being supplied by the watershed (i.e., no excessive erosion or deposition).

• Vegetation and free water indicate high water tables.

• Vegetation colonizes point bars with a range of age classes and successional stages.

• An active floodplain is present.

• Residual floodplain vegetation is available to capture and retain sediment.

• Stream channels with size and meander pattern appropriate for the stream's position in the landscape, and parent materials.

• Woody debris contributes to the character of the stream channel morphology.

• Straight channel reaches between meanders with stable banks, as evidenced by absence of shearing and sloughing and the presence of vegetation on banks.

**Standard 3:** Healthy, productive plant and animal communities of native and other desirable species are maintained at viable population levels commensurate with the species and habitat's potential. Plants and animals at both the community and population level are productive, resilient, diverse, vigorous, and able to reproduce and sustain natural fluctuations and ecological processes.

9

BLM_0006869

Indicators:

• Noxious weeds and undesirable species are minimal in the overall plant community.

• Native plant and animal communities are spatially distributed across the landscape with a density and frequency of species suitable to ensure reproductive capability and sustainability.

• Plants and animals exhibit a range of population age classes necessary to sustain recruitment and mortality fluctuations.

• Landscapes exhibit connectivity of habitat or presence of corridors to prevent habitat fragmentation.

• Photosynthetic activity is evident throughout the growing season.

• Diversity and density of plant and animal species are in balance with habitat/landscape potential and exhibit resilience to human activities.

• Appropriate plant litter accumulates and is evenly distributed across the landscape.

• Landscapes composed of several plant communities that may be in a variety of successional stages and patterns.

Standard 4:  Special status, threatened and endangered species (federal and state), and other plants and animals officially designated by BLM are maintained and enhanced by sustaining healthy, native plant and animal communities.

Indicators:

• All the indicators associated with the plant and animal communities standard apply.

• There are stable and increasing populations of endemic species in suitable habitat.

• Suitable habitat is available for recovery of endemic species.

Standard 5: The water quality of all water bodies, including ground water where applicable, located on or influenced by BLM lands will meet or exceed the Water Quality Standards established by the State of Colorado. Water Quality Standards for surface and ground waters include the designated beneficial uses, numeric criteria, narrative criteria, and antidegradation requirements set forth under state law as found in (5 CCR 1002-8), as required by Section 303(c) of the Clean Water Act.

Indicators:

• Appropriate populations of macroinvertabrates, vertebrates, and algae are present.

• Surface and ground waters contain substances (e.g., sediment, scum, floating debris, odor, heavy metal precipitates on channel substrate) attributable to humans within the amounts, concentrations, or combinations established in the Water Quality Standards of the State of Colorado (5 CCR 1002-8).

COLORADO LIVESTOCK GRAZING MANAGEMENT GUIDELINES

1. Grazing management practices promote plant health by providing for one or more of the following:

• periodic rest or deferment from grazing during critical growth periods;

• adequate recovery and regrowth periods; and

• opportunity for seed dissemination and seedling establishment.

2. Grazing management practices address the kind and class of livestock, season, duration, distribution, frequency, and intensity of grazing use and livestock health.

3. Grazing management practices maintain sufficient residual vegetation on both upland and riparian sites to protect the soil from wind and water erosion and buffer temperature extremes.

4. Native plant species and natural revegetation are emphasized in the support of sustaining ecological functions and site integrity.  Where reseeding is required, on land treatment efforts, emphasis will be

10

BLM_0006870

placed on using native plant species. Seeding of nonnative plant species will be considered, based on local goals, native seed availability and cost, persistence of nonnative plants and annuals and noxious weeds on the site, and composition of nonnatives in the seed mix.

5. Range improvement projects are designed consistent with overall ecological functions and processes with minimum adverse impacts to other resources or uses of riparian/wetland and upland sites.

6. Grazing management will occur in a manner that does not encourage the establishment or spread of noxious weeds. In addition to mechanical, chemical, and biological methods of weed control, livestock may be used where feasible as a tool to inhibit or stop the spread of noxious weeds.

7. Natural occurrences, such as fire, drought, flooding, and prescribed land treatments should be combined with livestock management practices to move toward the sustainability of biological diversity across the landscape by helping to provide natural vegetation patterns, a mosaic of successional stages, and vegetation corridors, thus minimizing habitat fragmentation.

8. Colorado Best Management Practices and other scientifically developed practices that enhance land and water quality should be used in the development of activity plans prepared for land use.

FLEXIBILITY

The standards are designed to maintain or achieve healthy public lands while allowing for the development of local goals and objectives. For example, on sites of similar potential, a desired plant community that provides deer winter range would differ from one for cattle summer range, yet both could meet the standards. Local goals and specific objectives consistent with standards will be developed by BLM in consultation and coordination with local cooperators and the interested public.

Guidelines were designed to provide direction, yet offer flexibility for

local implementation through grazing permits. Activity plans may add specificity to the guidelines based on local goals and objectives. A wide variety of grazing management strategies can produce healthy rangelands. One or more guidelines will be employed to meet the standards.

Monitoring or site specific evaluation will determine if the standards are being met, if significant progress is being made towards achieving the standards, and if the appropriate guidelines are being applied.

IMPLEMENTATION

The authorized officer will coordinate and consult with the local cooperators and interested publics during implementation of guidelines to achieve the standards. This communication is of utmost importance in all phases of the process. BLM will strive to make use of collaborative approaches involving the various interested publics within an affected allotment, group of allotments, or watershed. The Resource Advisory Council may be requested by any party to assist in reaching agreement in resolving disputes. As greater understanding of ecosystems, including socio-economic factors, becomes available, it will be applied to our management of public lands.

The section below describes the general process for applying the Colorado standards and guidelines in the field. If mutual agreement on a course of action is reached at any point during this process, such agreement may eliminate the need for some of the process steps described.

The authorized officer will periodically conduct a review of all existing information to determine which public lands are not meeting standards. The standards and indicators will serve as the basis to conduct preliminary field assessments.

The preliminary assessment identifies where standards are not being met, but does not necessarily identify the cause of the problem, potential solutions, or current

11

trends.  From the preliminary assessment, the authorized officer will establish priorities among such allotments, watersheds or other landscapes for more specific evaluation.  The establishment of these priorities will serve as an implementation schedule.

The following steps describe a typical sequence for resolving public land management issues on established priority areas.  The authorized officer will:

1. Identify issues and values in detail;

2. Determine the objectives and management actions necessary to achieve the standards;

3. Reiterate existing goals and/or establish new goals for meeting the standards;

4. Establish or review baseline data through inventory and monitoring, and establish measurable objectives that relate to goals;

5. Identify which land use guidelines will result in achievement of desired objectives;

NOTE: This document addresses the livestock grazing guidelines. Guidelines that relate to other land uses will be consulted or developed as necessary to deal with the appropriate objectives.

6. Identify specific management practices, in conformance with the guidelines, and attach as terms and conditions on grazing permits, or as stipulations on specific projects or actions; and

7. Establish an evaluation schedule to determine if the standard is being met or if the trend is moving toward the standard.

- If the evaluation indicates that objectives are being met or there is movement toward the objective, continue with management practices.

- If the evaluation indicates no movement or movement away from the objectives, reassess the objectives and management actions. Determine the objectives and management actions necessary to achieve the standards. Amend plans and permits

as necessary.

The authorized officer will take immediate administrative action to implement appropriate guidelines upon a determination that the following three circumstances all apply:

1. An area of public land does not meet the standards;

2. Existing management is not likely to produce significant progress towards meeting the standards in a reasonable time frame relative to the values at risk; and

3. The consultation process has failed to yield a negotiated resolution.

If needed, future modifications to the standards and guidelines may be made.  Typically, a proposal for modification is presented to the local Designated Field Official (DFO).  The DFO then forwards the proposal for modification to other DFOs throughout the state for consideration in consultation with the RACs. (A copy of the proposal for modification is also submitted to the State Director).  The DFOs and the RACs then submit to the State Director recommendations regarding the proposal for modification.  The State Director decides if the proposal for modification has merit.  If so, a determination is made whether the modification is a maintenance change to the Resource Management Plans or requires a plan amendment.

Maintenance changes require no other action except to make a notation in the RMPs (43CFR1610.5-4).  Actions requiring an RMP amendment will require NEPA analysis and conformance with 43CFR1610.5.

----------------------------------

### FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE

In the event that state standards and guidelines are not completed and in effect by February 12, 1997, and until such time as state or regional standards and guidelines are developed and in effect, fallback standards and guidelines provided in 43 CFR 4180 (f)(1) and (f)(2) will apply and be implemented.  The full

BLM_0006872

text of 43 CFR 4180, which includes the fallback standards and guidelines, are included as Appendix A.

The fallback standards and guidelines are similar to those found in the Proposed Action. Notable differences are:

• The fallback standards do not include a specific standard on water quality.

• The fallback standards regarding upland soils, riparian-wetlands, plant and animal communities, and special status species are not as definitive as the Proposed Action.

• The fallback standards include no indicators which help define the standards and describe features which are observable on the land.

• The fallback standards do not address scale of analysis and biodiversity concerns.

• The fallback guidelines are generally more specific than the proposed guidelines. However, the fallback guidelines are worded to allow for management flexibility as are the proposed guidelines.

------------------------------------

## EXISTING MANAGEMENT ALTERNATIVE

According to the new regulations for grazing administration, continuation of present management is not an option. However, it is identified and analyzed in this document as baseline information to allow the reader to compare differences with the other alternatives.

Appendix B is a summary of the present decisions in the Resource Management Plans that are related to the Proposed Action and fallback standards and guidelines. They provide the reader with a sense of management direction for Resource Areas in Colorado. Some decisions will be replaced by the new standards and guidelines. Some decisions will be modified and others will be supplemented. Appendix B indicates how the existing decisions will be affected by adopting either the Proposed

Action or fallback standards and guidelines.

Implementation and application of existing decisions varies greatly among Resource Areas, the result of many variables. Variables include differences in management style, public demand, budget direction, interpretation of policy, and existing decisions in the RMPs. A factor considered constant is conformance with laws and regulations. All offices in varying degrees utilize the concepts of ecosystem management. The transition from a single resource program-oriented management to an integrated resource approach has evolved to varying degrees around the state.



13

BLM_0006873

# CHAPTER 3 - AFFECTED ENVIRONMENT

**BIOLOGICAL AND PHYSICAL COMPONENTS:**

Description of bio-physical characteristics is organized by Landscape Units (LUs). LUs are tracts of land where the various biotic and abiotic characteristics (climate, physiography, soils, vegetation, wildlife, water, etc.) are similar.

The LU delineations have been adapted from the U.S. Forest Service's (FS) draft map of "Ecological Sub-sections of the Rocky Mountain Region." The descriptions that follow are summarized from the FS publication "Ecological Subregions of the United States: Section Descriptions (July 1994)" and other information.

Map 3 shows the LUs in relation to BLM Resource Area (RA) boundaries and the location of the public lands managed by BLM. Map 4 shows the LUs in relation to the boundaries, towns, and major highways.

The LU descriptions that follow generally begin in the south central part of the state and trend clockwise around the map. Only those LUs that contain 10,000 acres or more of BLM managed public land or comprise more than 10 percent of the total LU area are described.

Selected definitions for the major headings include the following:

**Geology** - characteristics, origin, and development of landform and mineral composition and structure of rocks as classified by geographic position and chronological order.

Key geologic terms:
<u>Archaean</u> - Age from formation of the earth until 2500 million years ago.
<u>Proterozoic</u> - Age ranging from 2500 to 570 million years ago.
<u>Precambrian</u> - Age that includes Archaean and Proterozoic.
<u>Paleozoic</u> - Age ranging from 570 to 245 million years ago.
<u>Mesozoic</u> - Age ranging from 245 to 66 million years ago.

<u>Cenozoic</u> - Age ranging from 66 million years ago to present.

**Soil** - characterization by phases of orders, suborders, or great groups that typify the LU.

Key soil terms:
<u>Alfisols</u> - high base supply and subsurface horizons of clay accumulations.
<u>Andisols</u> - high amount of volcanic ash.
<u>Aridisols</u> - distinct horizons, low in organic matter, and usually dry.
<u>Entisols</u> - no distinct horizons.
<u>Histosols</u> - Organic (peat and muck).
<u>Inceptisols</u> - weakly differentiated horizons.
<u>Mollisols</u> - nearly black organic rich surface horizon & high base supply.
<u>Oxisols</u> - mixtures of kaolin, hydratedoxides, & quartz.
<u>Spodosols</u> - accumulation of amorphous material in subsurface horizons.
<u>Ultisols</u> - horizons of clay accumulation and low base supply.
<u>Vertisols</u> - Clay soils that crack when dry.

**Climate** - Temperature regimes (mean annual soil temperatures):
<u>Pergelic</u> - lower than 32° F.
<u>Cryic</u> - 32°-50° F, cool summers.
<u>Frigid</u> - 32°-50° F, warm summers.
<u>Mesic</u> - 50°-60° F, seasonal differences less than 5°
<u>Thermic</u> - 60°-72° F, seasonal differences less than 5°.
<u>Isothermic</u> - 60°-72° F, seasonal differences greater than 5°.
<u>Hyperthermic</u> - 72° F and greater, seasonal differences greater than 5°.
<u>Isohyperthermic</u> - 72° F, seasonal differences less than 56°.

Moisture levels:
<u>Aridic</u> - dry for more than half the year.
<u>Xeric</u> - dry during the summer and moist during the winter.
<u>Ustic</u> - moisture available when conditions are suitable for plant growth.
<u>Udic</u> - not dry for more than a quarter of the year.
<u>Aquic</u> - saturated by ground water.

**Vegetation** - existing and potential natural vegetative communities that could evolve without disturbance.

15

BLM_0006874

# Landscape Units of Colorado
## Map 3



Landscape Unit Boundaries
State Line
BLM Resource Areas
Public Lands Managed by BLM

### Landscape Unit Codes

1 - Southern Parks and
    Rocky Mountain Ranges
2 - Rio Grande Basin
3 - South-Central Highlands
4 - Canyonlands
5 - Northern Canyonlands
6 - Abajo Fan
7 - Book/Roan Cliffs
    and Piceance Basin
8 - Uinta Basin
9 - Uinta Mountains
10 - Green River Basin
11 - North-Central Highlands
     and Rocky Mountains
12 - Northern Parks and Ranges
13 - Northeast Piedmont
14 - Northeast High Plains
15 - Southeast Piedmont
16 - Southeast High Plains



Derived from :
Draft Ecoregions of Region 2
USDA Forest Service, 1996

0    50    100    150    200 Mil...

16

BLM_0006875



# Landscape Units of Colorado
## Map 4

Landscape Unit Boundaries

State Line
Cities
Interstate Highways
Other Highways

Landscape Unit Codes

1 - Southern Parks and
    Rocky Mountain Ranges
2 - Rio Grande Basin
3 - South-Central Highlands
4 - Canyonlands
5 - Northern Canyonlands
6 - Abajo Fan
7 - Book/Roan Cliffs
    and Piceance Basin
8 - Uinta Basin
9 - Uinta Mountains
10 - Green River Basin
11 - North-Central Highlands
     and Rocky Mountains
12 - Northern Parks and Ranges
13 - Northeast Piedmont
14 - Northeast High Plains
15 - Southeast Piedmont
16 - Southeast High Plains

N
W        E
S

Derived from :
Draft Ecoregions of Region 2
USDA Forest Service, 1996

0      50      100      150      200  Miles

BLM_0006876

Wildlife – characteristic mammals, birds, reptiles, and amphibians.

Climate – mean annual precipitation, temperature, and growing season.

Water Resources – relative occurrence and distinguishing characteristics of rivers, streams, lakes, and wetlands.

Disturbance – natural factors and forces that significantly influence ecological dynamics.

Land Ownership and Use – total acreage of the LUs and the amount of land managed by BLM, along with major uses of the resources within the area.

## SOUTHERN PARKS & ROCKY MOUNTAIN RANGE (UNIT CODE 1)

Geology – mountains and a few valley plains with the Sangre de Cristo Mountains being the major feature. Elevation ranges from over 5,800 to 13,800 feet.  Precambrian igneous and metamorphic rocks, but predominately Paleozoic sedimentary, with few Cretaceous and mid-Tertiary volcanic and volcaniclastic rocks.

Soil – Mollisols and Alfisols occur in montane, or mountain zones, Alfisols in the foothill area.

Vegetation – predominantly Douglas-fir and ponderosa pine in frigid soil, Engleman spruce and subalpine fir in cryic temperatures.

Wildlife – deer, elk, bighorn sheep, mountain lion, beaver, porcupine, and black bear.  Mice, squirrels, martens, chipmunks, mountain cottontails, and bushytail woodrats. Blue and ruffed grouse, hawks, and owls.

Climate – precipitation averages 24-28 inches annually with less than half received during the winter. Temperature averages 32-45° F with cold winters.  Growing season is between 70-110 days.

Disturbance Regimes – fire, but rare with cryic soil temperature and udic moisture conditions.

Water Resources – streams, lakes,

and ground water are abundent.

Land Ownership and Use – 2.6 million acres with 270,000 acres of BLM managed lands (10 percent of total).  Timber is scarce. Recreation, mining, and ranching are important uses.

## RIO GRANDE BASIN (UNIT CODE 2)

Geology – landforms include valley, lowland, and elevated plains and hills with elevations from over 7,200 to nearly 11,000 feet.  Major features are the San Luis Valley, Rio Grande River, and Great Sand Dunes.  Rocks are Cenozoic sedimentary with tertiary volcanic rocks, primarily associated with the San Luis Hills, and terrestrial basin fill of late Tertiary and Quaternary age.

Soil – Inceptisols, Alfisols, Entisols, Aridisols, and Mollisols. Temperature ranges from mesic to frigid and moisture ustic to aridic.

Vegetation – cold, desert shrubland consisting mainly of sparse shrub grass, with some areas of big sagebrush grass, greasewood saltgrass, and open stands of pinon juniper grass.  Grasses consist mainly of gramas, dropseeds, needlegrass, and wheatgrass. Cottonwood and willows are found along the riparian corridors.

Wildlife – elk, mule deer, bighorn sheep, antelope (pronghorn), and moose.  Predators include cougar, black bear, and coyotes.  Diverse bird populations, including abundant waterfowl, sandhill and whooping cranes, bald and golden eagles, and other raptors, including prairie and peregrine falcons.  Fish include the rainbow, brown, brook, golden, mackinaw, hybrid trout, and arctic grayling.

Climate – precipitation is 6-20 inches with less than half falling during winter.  Average temperatures are 39-57° F with cold winters. Growing season between 100-140 days.

Water Resources – limited precipitation with irrigation from the Rio Grande River and small reservoirs collecting mountain runoff.  Wells tap water in deep

18

soils in valley plains. Geothermal springs in conjunction with volcanic features.

**Disturbance Regimes** - soil salinity.

**Land Ownership and Use** - 2.4 million acres with 500,000 acres BLM managed public land (nearly 15 percent of total). Fifty percent of the area is farmed or ranched. About 25 percent is irrigated. Some grazing on native rangeland occurs as does mining.

## SOUTH-CENTRAL HIGHLANDS (UNIT CODE 3)

**Geology** - steeply sloping to precipitous mountains dissected by many narrow, steep gradient stream valleys. Upper mountain slopes and crests may be covered by snowfields and glaciers. High plateaus and steep walled canyons are common, especially in the west. Elevation ranges from over 4,300 to 13,800 feet. The San Juan Mountains are Tertiary volcanic ash flows, lavas, and conglomerates with local porphyritic intrusives. The western half is mostly Pennsylvanian through Cretaceous sandstones, siltstones, shales, and conglomerates, with local carbonates near the San Juan Mountains. In the extreme southern part of the Section is a small area of Tertiary sandstones, shales, and conglomerates.

**Soil** - frigid, cryic and pergelic temperatures, and aridic, ustic, and udic moisture regimes. Mollisols, Alfisols, Inceptisols, and Entisols are most dominant on the uplands and at higher elevations would include Cryoborolls, Cryochrepts, Argiborolls, and Haplustalfs. Eutroboralfs dominant at lower elevations. Valley bottoms and riparian areas with moist versions (aquic) of Mollisols and Entisols, and certain amounts of Histisols. Valley bottoms often contain Fluvaquents, Cryaquents, Cryaquolls, Haplaquolls, and Borohemists.

**Vegetation** - from shrub, grasslands, and forests to alpine tundra; spruce-fir forest, pine-Douglas-fir forest, mountain mahogany-oak scrub, Great Basin sagebrush, juniper-pinyon woodland, and alpine meadows and barren.

**Wildlife** - elk, mule deer, black bear, and mountain lion are common. Rocky Mountain bighorn sheep inhabit higher elevations, and moose have been introduced. Beaver, marmot, snowshoe hare, pine marten, pika, and prairie dogs. Forest-dwelling birds are Steller's jay, grey jay, and Clark's nutcracker, and blue grouse. Mountain bluebird, broad-tailed hummingbird, and Swainson's hawk are typical summer residents. Herpetofauna present include western garter snake, chorus frog, and leopard frog. Native cutthroat trout have been displaced in parts of their former range by brook, rainbow, and brown trout.

**Climate** - precipitation ranges from 15 to 30 inches. Temperature averages 32 to 45° F and a growing season of less than 70 days.

**Water Resources** - lakes, streams and rivers (Rio Grande, Animas, Gunnison, and San Miguel Rivers) are abundant, ground water is plentiful.

**Disturbance Regimes** - fire, insects, and disease.

**Land Ownership and Use** - 8.3 million acres with 1.5 million acres managed by the BLM (over 18 percent of total). Half of the unit is federally owned, the remainder is in farms, ranches, and private holdings. Most of the grassland and much of the open woodland is grazed. Some small valleys are irrigated. Recreation, mining, and timber harvest are important uses.

## ABAJO FAN (UNIT CODE 6)

**Geology** - alluvial flanking eastward from the Abajo Mountains in Utah. Elevation ranges from 5,000 to 9,500 feet. Gravel strath terraces in incised drainages, fine grained sand and silt forming the lower filled terraces, loess blanketing the uplands, and recent eolian deposits throughout the area. Complex system of canyons cut by fluvial erosion through uplifted sedimentary beds (sandstone, siltstone, shale) of Mesozoic age.

**Soil** - Entisols occur along floodplains of major streams, Aridisols cover plateau tops, older

19

terraces, and alluvial fans.

**Vegetation** - arid shortgrass sod seldom covering ground completely. Xeric shrubs grow in open stands among grasses. Open stands of pinyon and juniper ground sparsely covered by gramma and other grasses, herbs and various shrubs such as sagebrush. Cottonwoods, willows, boxelder and tamarisk along canyon bottoms.

**Wildlife** - deer, mountain lion, coyote, bobcat, blacktail jackrabbit, chipmunk, rock squirrel, porcupine skunk, and prairie dogs. Most abundant birds include bushtit, pinyon jay, red-tailed hawk, golden eagle. Horned and collared lizards and rattlesnake.

**Climate** - precipitation averages 8 to 20 inches. Temperature averages between 40-55° F, with cold winters and hot summer days.

**Disturbance** - summer thunderstorms and wind.

**Water Resources** - perennial streams with slight salinity. Mc Elmo Creek being the most obvious watercourse. The LU is part of the San Juan River Basin.

**Land Ownership and Use** - 296,000 acres with 148,00 of BLM managed lands (50 percent of total). Livestock grazing and irrigated cropland are agricultural uses. Recreational use especially around cultural resource values.

## NORTHERN CANYON LANDS (UNIT CODE 5)

**Geology** - lands are eroded by Colorado River tributaries with deep sheer-walled canyons, canyonlands, lines of cliffs, low plateaus, mesas, buttes, and badlands. Elevation ranges from nearly 4,600 to over 11,000 feet. Shales from the Cretaceous period, sandstones from the Jurassic period, and shales and sandstones from the Triassic period. Some eolian deposits occur along with inclusions of diorites in the lacolithic mountains.

**Soil** - Entisols and Aridisols occur in combination with mesic, frigid, and cryic soil temperature regimes,

along with ustic and aridic soil moisture regimes. Some soils are saline-sodic affected. Areas of very sandy and shallow soils exist. Higher elevations have Mollisols, Alfisols, and Inceptisols.

**Vegetation** - desert shrub and woodland vegetation with some big sagebrush; blackbrush, pinyon-juniper woodlands, saltbush-greasewood, and galleta-three awn shrub steppe. Some areas of ponderosa pine occur.

**Wildlife** - elk, mule deer, black bear, cougar, bobcat, gray fox, coyote, pronghorn antelope, and beaver. In the canyons peregrine falcon, Mexican spotted owl, violet-green swallow, white-throated swift, woodrats, ringtailed cat, spotted bat, rattlesnakes, spadefoot toads, collared lizard, and canyon tree frog. Desert species prairie dogs, badger, kit fox, ferruginous hawk, turkey vulture, and burrowing owl. Native fish include razorback sucker, bonytail chub, humpback chub, and Colorado cutthroat trout.

**Climate** - precipitation ranges from 6 to 30 inches annually, mostly during spring and fall. Dry and hot in the summer and cold and dry in the winter. Temperature averages 45 to 55° F. Growing season ranges from 60 to 180 days.

**Disturbance Regimes** - low intensity, short duration burns occur due to lightening, plus water and wind erosion.

**Water Resources** - water is scarce. Unit drained by the Colorado and Green Rivers and their tributaries and ground water supplies are limited. Summer rainstorms cause flash flooding. Few lakes and reservoirs occur.

**Land Ownership and Use** - 2.6 million acres with 1.1 million acres managed by BLM (over 40 percent of total). Recreation and sheep and cattle grazing is important with limited hay and pasture.

## Book/Roan Cliff and Piceance Basin (UNIT CODE 7)

**Geology** - Cretaceous with Paleocene and Eocene sedimentary rocks occur,

20

BLM_0006879

which are mainly shales, sandstones, and siltstones. Elevation ranges over 5,200 to 14,000 feet. A system of erosional cliffs rise upward, are abruptly cut of, and descend in giant steps to the valleys. The Book Cliffs are separated from Roan Cliffs by a bench or valley up to 10 miles wide. Prominent too is the oil shale rich Piceance Basin. The Book Cliffs are carved from marine Cretaceous sandstone, the Roan Cliffs were formed with Paleocene and Eocene river and flood plain deposits.

**Soil** - Entisols and Aridisols occur in combination with mesic and frigid soil temperatures, along with aridic soil moisture regimes at lower elevations. Between 8,000 and 10,000 feet, Mollisols dominate with frigid and cryic temperatures. Most soils have concentrations of calcium.

**Vegetation** - pinyon-juniper, black sagebrush, big sagebrush, mountain brush, Salina wildrye grasslands, ponderosa pine, aspen, Douglas-fir, and spruce-fir.

**Wildlife** - elk, mule deer, moose, antelope, cougar, black bear, beaver. Sage grouse, great horned owl, golden eagle, red-tailed hawk, northern harrier, kestrel, and other birds including mountain bluebird, bluegray gnatcatcher, red breasted nuthatch.

**Climate** - Precipitation ranges from 8 to 35 inches annually, much as snow at higher elevations and summer afternoon thunderstorms. Lower elevations are dry and hot in summer and cold and moist in winter. Higher elevations are warm and wet during summer, and cold and wet during winter. Temperature averages 34 to 45° F. High elevation areas have approximately 40 frost free days, while lower elevations have about 120 frost free days.

**Disturbance Regimes** - fire.

**Water Resources** - Water is scarce over most of the area and is generally confined to steep canyons. Lakes and reservoirs are few, and many water developments have been put on public lands to distribute livestock and to provide water for wildlife. Major water courses include Piceance Creek and White River.

**Land Ownership and Use** - 2 million acres with nearly 1.5 million acres managed by the BLM (70 percent of total). Grazing, mining, recreation, and wildlife habitat are the major land uses. Hay and pasture land also occur to a very limited extent along drainage ways.

## Uinta Basin (UNIT CODE 8)

**Geology** - a synclinal and topographical basin, with its east-west axis running near the south flank of the Unita Mountains. The central portion is gently rolling with eroded slopes. Elevation ranges from over 5,100 to 7,300 feet. Local relief ranges from 100 to 1,000 feet. Sedimentary rocks from the Cretaceous and Paleocene periods, dominantly shales, sandstones, and siltsones. Some glacial deposits occur on the northern portion and alluvial and colluvial deposits occur in the center.

**Soil** - Entisols and Aridisols occur in combination with mesic and frigid soil temperature regimes, along with aridic soil moisture regimes. Many soils are saline-sodic affected.

**Vegetation** - pinyon-juniper woodlands, saltbush-greasewood, and grasslands-shrub some big sagebrush. Series include juniper-pinyon and saltbushgreasewood.

**Wildlife** - dominated by species typical of high, cold deserts, including white-tailed prairie dog, black-tailed jackrabbit, coyote, beaver, red fox, porcupine, spotted skunk, and Townsend's big-eared bat. Year-round range for deer and antelope and winter range for elk and bald eagles and Golden eagles nest throughout. The Green River has been proposed as critical habitat for three endangered fishes endemic to the Colorado River system; Colorado squawfish,

21

razorback sucker, and bonytail chub.

**Climate** - precipitation averages 7 to 12 inches annually; mostly during spring and fall. Dry and hot in the summer with low humidity, and cold and dry in the winter, indicative of a desertic basin. Temperature averages 40 to 52° F. The growing season is 80 to 100 days.

**Disturbance Regimes** - mostly wind and water erosion with few low intensity short duration burns of sagebrush occurring due to summer thunderstorms.

**Water Resources** - Water is scarce, streams and rivers bring water in from adjoining mountains. Ground water supplies are limited. Major river is the Green. Few lakes and reservoirs occur.

**Land Ownership and Use** - 359,000 acres with 273,000 acres managed by the BLM (75 percent of the total area). Sheep and cattle grazing with limited hay and pasture along drainage ways.

### Uinta Mountains (UNIT CODE 9)

**Geology** - mountains are an anticlinal uplift with an east-west orientation. Higher elevations, periglacial and glacial processes shape landforms through freezing and thawing. Lower elevations, erosion by water and wind are active land forming processes. Elevations range from approximately 5,200 to 8,600 feet. Precambrian quartzite forms the core of the mountains, with inclusions of red pine shale. At lower elevations, predominantly Mississippian and Madison limestone.

**Soil** - Entisols, Inceptisols, and Alfisols dominate the timbered land and Mollisols in the meadows, aspen, sagebrush and grass, and mountain brush sites. Temperature regimes range from mesic to pergelic, and soil moisture regimes are aridic, xeric, and udic.

**Vegetation** - from higher to lower elevations, alpine tundra, Engelmann spruce, spruce-fir, lodgepole pine,

subalpine meadow, Douglas-fir, ponderosa pine, aspen, mountain big sagebrush, oak and mountain brush, and pinyon-juniper

**Wildlife** - elk, mule deer, reintroduced bighorn sheep, moose, antelope, cougar, black bear, coyote, bobcat, red fox, ringtail, and pine marten. Small mammals include pika and yuma myotis. Breeding raptors include red-tailed, Cooper's, sharp-shinned, Swainson's, marsh, and ferruginous hawks; kestrel; northern goshawk; flammulated, great horned, short-eared, long-eared, sawwhet, and boreal owls; golden eagle; and prairie falcon. Bald eagle and rough-legged hawk over winter. White-tailed ptarmigan and pheasant have been introduced; blue, ruffed, and sage grouse are native. The three-toed woodpecker is common. Bonneville and Colorado River cutthroat trout are native species. The Green and Yampa Rivers contain proposed critical habitat for the Colorado squawfish, razorback sucker, humpback chub, and bonytail chub, plus, two candidate species, flannelmouth sucker and roundtail chub.

**Climate** - precipitation ranges from 8 to 35 inches annually, mostly in the form of snow above 9,000 ft. Summer afternoon storms are common in higher elevations. Temperature ranges from 28 to 45° F and growing season is 20 to 90 days.

**Water Resources** - There is a high frequency of rapidly flowing rivers and streams. Rivers flow from north to south on the south slope, and from south to north on the north slope. Predominant flows on the south slope join flows from the west and continue south to join the Colorado River. Rivers are glaciated or stream cut, with numerous lakes and wet meadows associated with glaciated areas above 9,500 feet.

**Disturbance Regimes** - fire and periodic flooding in spring with snow melt.

**Land Use** - 486,000 acres with 246,000 managed by the BLM (50

22

percent of total area). Much of the land is set aside for national parks, monuments, and primitive areas. Livestock grazing and timber production are important uses, along with recreation and mining.

## Green River Basin (UNIT CODE 10)

Geology - rugged hills, and low mountains, and narrow valleys. Broad flood plains and fans are present on major rivers. Alluvial fans, piedmont plains and slopes from the surrounding mountains join to form broad intermountain basins. Elevation ranges from 5,300 to almost 9,500 feet. Most of the LU is Tertiary conglomerates, sandstones, siltstones, and shales, with local Quaternary dune sands and loess.

Soil - temperature regime is frigid. Soils include Mollisols, Aridisols, and Entisols, including Borolls, Orthents, Fluvents, and Argids.

Vegetation - grasses to grass-shrub to forests. Potential vegetation is sagebrush steppe (sagebrush-wheatgrass), saltbush-greasewood, and wheatgrass needlegrass shrub steppe.

Wildlife - antelop use the sagebrush areas throughout the year and mule deer during the winter. Other mammals include the coyote, black-tailed jackrabbit, pygmy cottontail, and kangaroo rats. Major birds include the marsh hawk, red-tailed hawk, Swainson's hawk, Cooper's hawk, golden eagle, bald eagle, prairie falcon, burrowing owl, and the long-eared owl. The sage grouse and chukar are the important game birds. Found in the desert shrub (saltbush-greasewood community) are the cactus mouse, long-tailed pocket mouse, desert kangaroo rat, black-tailed jackrabbit, and the antelope ground squirrel.

Climate - precipitation ranges from 7 to 20 inches. Temperature averages 39 to 52° F. Growing season ranges from 80 to 125 days.

Water Resources - water is scarce,

but major rivers (Yampa and Little Snake) plus small streams flow through the area. Ground water is meager or lacking in most areas, but it is abundant in the fill in some valleys. The Green and Lower Snake Rivers flow through here. Part of the Flaming Gorge Reservoir lies in this LU.

Disturbance Regimes - fire, insects, and disease.

Land Ownership and Use - 2 million acres with over one million (52 percent of total) managed by the BLM. About 80 percent of the area is in farms or ranches with 50 percent grazed by livestock. Many of the valleys and tracts along a few large streams are irrigated, but they make up no more than 5 percent of the area. About 20 percent of the area is dry farmed.

## North-Central Highlands and Rocky Mountains (UNIT CODE 11)

Geology - steeply sloping to precipitous flat-topped mountains dissected by narrow steep gradients stream valleys. High plateaus have steep walled canyons. There are gently rolling mountain parks, mountain ridges, and foothills. Elevation ranges from about 4,800 to 12,800 feet. Northern third of LU is predominantly Cretaceous sandstones, siltstones, shales, and coals, with local porphyritic intrusives and includes the White River uplift; the northeastern part is Tertiary basalt. Remaining area includes Lower Paleozoic carbonates and shales and Upper Paleozoic conglomerates, sandstones, siltstones, shales, and evaporates. Central area is Precambrian granite and biotite gneiss. In the extreme south are volcanic rocks, including ash flow tuffs, andesitic lavas, breccias, and conglomerates. Lower elevations in the southern two-thirds of the unit are Cretaceous and Tertiary sandstones, siltstones, shales, and local coals, also, local glacial drift and morainal deposits.

Soil - mesic, frigid, and cryic temperature regimes and includes

23

BLM_0006882

Mollisols, Alfisols, Inceptisols, and Entisols.

**Vegetation** - western spruce-fir forest, pine-Douglas-fir forest, pinyon-juniper woodland, mountain mahogany-oak scrub, and sagebrush steppe.   Above timberline, alpine tundra predominates.  At higher elevations types include Engelmann spruce, subalpine fir, Douglas-fir, ponderosa pine-Douglas-fir, aspen, and meadows of grass and sedge.  At lower elevations, there are pinyon pine, shrubs, grass, and shrub-grass vegetation.

**Wildlife** - elk, mule deer, black bear, and mountain lion with Rocky Mountain bighorn sheep at the higher elevations.  Smaller mammals include marmot, beaver, snowshoe hare, pika, and pine marten.  Forest-dwelling avifauna include Clark's nutcracker, grey jay, northern flicker, and Steller's jay.  White-tailed ptarmigan inhabit the higher elevations.  Mountain bluebirds are common summer nesters.  Herpetofauna include chorus frogs, leopard frogs, and western garter snakes.  Native cutthroat trout have been displaced in much of their former range by brook, rainbow, and brown trout.

**Climate** - precipitation ranges from 7 to 45 inches.  Temperature averages 32 to 45° F.  Growing season is 70 to 140 days.

**Disturbance Regimes** - fire, insects, and disease.

**Water Resources** - water from mountain streams and lakes is abundant, and ground water is plentiful.  Snowfields exist on upper slopes and crests.  Major rivers are the Yampa, White, Colorado, Eagle, Arkansas, Taylor, Gunnison, Crystal, Roaring Fork, and Frying Pan.  Transbasin diversions occur.

**Land Ownership and Use** - 5.8 million acres with .9 million acres managed by the BLM (16 percent of total).  Half the unit is federally owned and the remainder in farms and ranches.  Extensive livestock grazing use, irrigation along some rivers and streams, and recreation use, mining,

and timber harvest.

## Northern Parks and Ranges
## (UNIT CODE 12)

**Geology** - steeply sloping to precipitous mountains dissected by many narrow stream valleys with steep gradients.  Gently rolling mountain parks and valleys, with some mountain ridges.  In narrow bands along the eastern slope of the Rocky Mountains are rugged hills and low mountains strongly dissected and in many places crossed by large streams flowing eastward from the mountains.  Elevation ranges from 5,300 to over 14,000 feet.  Precambrian granite and biotitic, felsic, and hornblendic gneiss.  North, south, and middle parks have local Pennsylvanian through Cretaceous sandstones, siltstones, and shales.  Between middle and south parks are local Tertiary porphyritic intrusives.

**Soil** - mesic, frigid and cryic temperature regimes.  Soils include Mollisols, Alfisols, Inceptisols, and Entisols.

**Vegetation** - alpine meadows and barren, fescue-mountain muhly prairie, sagebrush steppe, pinyon-juniper woodland, and Great Basin sagebrush.

**Wildlife** - elk, mule deer, black bear, beaver, marmot, pika, pine marten, bobcat and mountain lion.  At higher elevations, Rocky Mountain bighorn sheep, isolated mountain goat populations, and white-tailed ptarmigan.  Common forest-dwelling birds are Steller's jay, Clark's nutcracker, and grey jay.  Wild turkeys are not numerous but are present.  Western garter snakes and leopard frogs; and, prairie rattlesnakes live at lower elevations in the eastern part of the LU.  Native cutthroat trout have been displaced to a large extent by introduced brook, rainbow, and brown trout.

**Climate** - precipitation averages from 5 to 50 inches.  Mean temperatures are  32 to 50° F.  The growing season ranges from less than

24

70 to 160 days.

**Disturbance Regimes** – fire, insects, and disease.

**Water Resources** – water from mountain streams and lakes is abundant, as is ground water. Snowfields occur on upper slopes and crests. Large reservoirs store water for domestic, power, and irrigation uses. Major rivers include the Arkansas, Fraser, Yampa, White, Crystal, Roaring Fork, Frying Pan, and Colorado. Transbasin diversions occur.

**Land Ownership and Use** – 10 million acres with 750,000 acres (7 percent of the total) of public land managed by BLM. Most of the mountain area is federally owned. Farming and ranching are important uses with irrigation along some rivers and streams in park areas and in some small mountain valleys. Grazing use is extensive, occurring on open mountain woodlands and grasslands, on almost all of the park areas, and on the woodlands and grasslands of the foothills. Recreation, mining, and timber harvest are present and past uses.

**Supplemental information related to the proposed standards:**

Upland Soils: The physical properties and characteristics of some soils on BLM lands in Colorado place severe limitations on management actions to effect change. For example, Mancos and Pierre shale do not respond well to most land treatments.

Mancos shale and Wasatch formations provide a significant amount of salt to the Colorado River. Through the past ten years, significant interagency attention has been devoted to ranking watersheds regarding salinity reduction. The salinity issue is considered in priority setting process.

Riparian resources: According to 1995 riparian condition assessments for BLM riverine mileage, the following conditions exist: 29 percent of the miles are functioning properly, 28 percent are functioning at risk, 21 percent are not functioning properly, and 22 percent of the miles have not been evaluated. For non-riverine riparian areas the following conditions existed in 1995: 14 percent is functioning properly, 4 percent is functioning at risk, 44 percent is not functioning properly, and 37 percent of non-rivering areas have not been evaluated. Table 1 displays the estimated riparian and wetland acreage by District. Additional information on the status of riparian resources on BLM lands is found in Appendix E.

**Table 1**

**Estimated Riparian-Wetland Acreage by Colorado BLM District**
**1995**

| OFFICE | BLM LAND (acres) | LENTIC RIPARIAN WETLAND (acres) | LOTIC RIPARIAN STREAM (miles) | LOTIC RIPARIAN STREAM (acres) | TOTAL RIPARIAN WETLAND (acres) | RIPARIAN WETLAND AREA (%) |
|---|---|---|---|---|---|---|
| Craig | 3,151,613 | 593 | 798 | 4,428 | 5,021 | 0.16 |
| Montrose | 2,130,584 | 5,300 | 2,247 | 17,984 | 23,284 | 1.09 |
| Canon City | 1,218,249 | 640 | 801 | 6,281 | 6,921 | 0.57 |
| Grand Junction | 1,802,472 | 33 | 815 | 4,811 | 4,844 | 0.27 |
| COLORADO TOTAL | 8,302,918 | 6,566 | 4,661 | 33,504 | 40,070 | 0.48 |

25

BLM_0006884

**Noxious Weeds:** All of the LUs identified in this Environmental Assessment are impacted by the presence and expansion of non-native invasive and/or noxious weed species. "Noxious" is a legal description, meaning that some local, state or national law has designated the species as undesirable.

Non-native invasive species may or may not be designated by law as undesirable, but they have the following characteristics: (1) they are plants of foreign origin that have accidently or intentionally been introduced into the United States; (2) they have come to the United States without the array of natural predators (insects and diseases) that help to keep them in balance with other plants in their area of origin; (3) non-native invasive plants are highly competitive species that displace native and desirable plants.

Often, populations get started in disturbed sites, such as roadsides or rights-of-way corridors but they are capable of moving into and taking over adjacent undisturbed sites. Once a non-native invasive plant takes over a site, the site cannot naturally rid itself of the species or keep the species from spreading. It takes intensive, often costly control work to restore a native plant community and contain an established non-native invasive species. Until recently, weeds were considered an agricultural problem rather than a natural resource problem. Consequently, most of the research on non-native invasives concentrated on how to control them in agricultural situations. Not much is known or understood about the biology and ecology of these plants. Sometimes a non-native invasive plant is present, but not problematic in a native community for years. Then, some unknown mechanism triggers rapid expansion of the species.

There are no current inventories of weed infestations in Colorado BLM. Estimates by weed experts indicate that between five and ten percent of BLM managed lands in Colorado are currently infested with non-native invasive weed species. These estimates do not include acres infested with cheatgrass or downy brome which is one of the most widespread non-native invasive plants in the western United States.

The State of Colorado first passed a weed law in 1990. At that time four species were placed on the state wide noxious weed list requiring active management by land owners. These four species are: Russian Knapweed, Spotted Knapweed, Diffuse Knapweed, and Leafy Spurge.

Counties are given the option of adding more species to the list of weeds that must be managed in that county. Some of the species most commonly/and or recently added by counties include Canada Thistle, Musk Thistle, White Top or Hoary Cress, Yellow Toadflax, Dalmatian Toadflax, and Purple Loosestrife.

During the 1996 Legislative session the Colorado weed law was amended and directs the Colorado Department of Agriculture to survey the counties on their most troublesome species. After the survey is complete, the state may increase the number of state listed weeds to up to ten species.

Of the four currently listed species, BLM has the most acres infested with Russian Knapweed and Leafy Spurge. Both Spotted and Diffuse Knapweeds are currently more common on the Front Range in Colorado, but they are expanding their ranges on the West Slope. The rate of invasive weed spread averages about fourteen percent per year. The average rate of weed spread on western BLM lands was estimated to be 2300 acres per day in 1994, and 8.5 million acres of BLM managed lands in the west are thought to be infested. Estimates of the spread of weeds on all public lands in the west is 4600 acres per day.

**Special Status Species:** Proposed Standard 4 provides special recognition and management emphasis

26

to a variety of plant and animal species at risk or in peril. Some species have been recognized by federal law (i.e., Endangered Species Act of 1973) and afforded special listing and protection in 50 CFR Part 17. This proposal was discussed with the U.S. Fish and Wildlife Service (USFWS). It is determined that consultation with USFWS under Section 7 of the Endangered Species Act is not appropriate at this time. As specific implementation actions tied to a definable land base are initiated, Section 7 consultation will occur. Other species are of special concern to the Colorado Division Wildlife, the Colorado Natural Heritage Program, and to BLM. Appendix F contains a detailed list of special status species and their occurrence on BLM lands in Colorado by District and Resource Area.

**Water Quality:** Most common contributors from BLM land to water quality problems are sediment and nutrients. Table 2 displays major river basins in Colorado and how many miles are affected by sediment and nutrients. Appendix G provides details on stream segments in Colorado that are affected by sediment and nutrients and the current severity of the problem.

Table 2

**Miles of Streams in Colorado Affected by Sediment and Nutrients.**

| RIVER BASIN | SEDIMENT | NUTRIENTS |
|---|---|---|
| Platte | 494 | 275 |
| Arkansas | 389 | 50 |
| Rio Grande | 146 | 53 |
| San Juan | 222 | 0 |
| Colorado | 668 | 125 |
| Green | 370 | 229 |

**SOCIAL AND ECONOMIC COMPONENTS:**

The movement of people into rural areas in Colorado is reflected on Map 5 which shows population changes by county for the period 1980-1994. This migration pattern is expected to continue into the 21st century as depicted on Map 6. The migration pattern reflects a reversal of the rural to urban migration pattern in most of the U.S. before the 1980s. The front range urban areas are continuing to grow in Colorado but the increase on the western slope communities, where most of the BLM lands are, is dramatic.

Many people are attracted to scenic areas, particularly those suitable for recreation. Some ranches are being sold for recreation uses or subdivided for homes. New people may buy lots and are not dependent on an economic return from the lot.

The population migration in the state has combined rural and urban values. Thus, newcomers may have differing beliefs and values from existing residents.

Most rural communities are moving from a long-term economic dependence on agriculture or mining to recreation and tourism. The community of Salida is illustrative of this trend. Historically, Salida relied on farming/ranching and mining to support the local economy. Then about 15 years ago, the Madonna mine on Monarch Pass, west of town virtually shut down and the Climax molybdenum mine near Leadville drastically scaled back operations.

27

BLM_0006886



# Colorado Population Growth 1980-1994
## Map 5

BLM_0006887

# Colorado Population Growth 1980-2020
## Map 6



BLM_0006888

This forced the community to explore alternatives to bolster the local economy.

About the same time as the southeast mine closures, rafting became popular. The commercial rafting industry grew enormously. Recreation, in general, along the Arkansas River increased significantly. The community opted to capitalize on these phenomena. They backed the formation of a partnership between BLM and Colorado State Parks, built boater access facilities, and took other supportive measures to support this emerging service industry and solidify economic conditions.

Specific economic data by region or county was not gathered for this document. However, statewide data will serve to provide some indication of economic trends in the state. As is the nation's, Colorado's economy is highly diversified.

Certain industries such as farming/ranching, mining, utilities, and some of the service industries rely on BLM lands directly or indirectly for support. Employment trends by industry are shown by the number of people employed and percentage of total employment in Appendix H. Over 1.6 million people were employed in 1981. This figure increased to 2.2 million in 1993. Employment in all industries grew except mining which declined significantly.

Industries in which employment increased as a percentage of total employment include agriculture, retail trade, and services. Industries that decreased as a percentage of total employment include mining, construction, manufacturing, wholesale trade, finance, insurance, and real estate, and government. Transportation, communications, utilities employment virtually stayed the same.

Employment in the service industry grew the most - from 382,000 jobs in 1991 to 678,000 jobs in 1993. The service industry increased its relative share of the rest of

Colorado's economy from 23 percent in 1981 to 31 per cent in 1993.

Appendix H also shows income trends by industry and income trends as percentages of total income. Colorado had a 26.9 billion dollar economy in 1981. This number increased to 56.7 billion in 1993. All sectors except mining showed positive growth in income over the period.

Industries whose income has increased as a percentage of total income include agriculture, transportation, communications, and utilities, finance, insurance and real estate, services and government. Industries whose income has decreased as a percentage of total income include mining, construction, manufacturing, wholesale trade, and retail trade.

The Rangeland Reform '94 Environmental Impact Statement (EIS) discussed rancher attitudes and values that may apply to this EA. The EIS referenced Fowler and others (1993) who published research on 4,336 ranches in 11 western states. Although their research does not represent all ranches with federal permits, it generally describes the ranching lifestyle, employment and rancher interactions with the western public. The ranchers surveyed were members of livestock producer organizations. The survey included nearly 11 percent of all federal permittees, who account for 35 percent of all federally allocated forage.

Some of the findings of the research are that ranching is a way of life for many respondents. The average respondent was 55 years old and worked on the same ranch for 31 years. The average ranch had nearly seven people associated with it, not including children. An average of 23 percent of the household income came from work away from the ranch. Many small ranches would not remain economically viable without the ranch income. Respondents estimated that they spend about $19,000 annually in local communities and that some local businesses depend on ranchers. Many ranchers believe that

30

BLM_0006889

livestock grazing on federal land is vital to the economic stability of rural communities. Over one-third of the respondents in Colorado reported that they would subdivide or develop their land.

The second Colorado Smart Growth Conference held November 1995 further reflects some of the beliefs of rural residents in the state. These beliefs represented their visions for their region. Common themes for those areas, including public lands, are the desire to maintain and enhance rural lifestyles, affordable housing, and protection of natural resources. Many have concerns about maintaining open spaces and balancing use of resources and economic growth. Many thought that public lands were critical to their areas for a variety of reasons.

**Public Land Uses:** In Colorado, there are 2670 permittees authorized to graze livestock on BLM and U.S.Forest Service land. Twenty-five (25) percent of cattle operators in the state are dependant on BLM/USFS forage; 35 percent of sheep operators are dependant on BLM/USFS forage. Overall, BLM accounts for approximately 36 percent of the total livestock forage on BLM and USFS lands in Colorado.

Timber harvest from BLM has steadily decreased over the past decade. In 1993, Colorado BLM sold the following timber products: 2.91 million board feet of firewood/posts/poles (a decrease of 60 percent from 1983), and .98 million board feet of sawtimber (a 87 percent decrease from 1983). The majority of sawtimber is in the Kremmling and Gunnison Resource Areas. Firewood and posts/poles are sold throughout all Resource Areas.

Recreation visitation to BLM in Colorado increased 30 percent from 1990 to 1993. Major activities include hunting, fishing, off-highway vehicle travel, floatboating. The number of commercial and other special recreation permits increased 37

percent and related visitation 15 percent from 1990 to 1993. Much of the BLM land in Colorado is lower elevation and accessible nearly year-round.

The number of authorizations and affected acreage for realty actions such rights-of-way, permits, and Recreation and Public Purposes leases, vary from year to year. During a typical year, Colorado grants 300 authorizations, most of which are linear (i.e., transmission lines, roads).

Oil and gas drilling activities vary from year to year depending on market conditions. Typically, 175 Applications for Permit to Drill are issued annually affecting approximately 700 acres.

Coal leasing on public lands has decreased in recent years. In 1993, two new coal leasing actions were authorized affecting 1,800 acres. In 1993, 134 permits were issued for 553,000 cubic yards of sand, gravel, moss rock, etc. affecting more than 1000 acres.



31

BLM_0006890

# CHAPTER 4 - ANTICIPATED IMPACTS

## INTRODUCTION/APPROACH

Standards will replace, modify, or supplement existing objectives in the RMPs. In some circumstances, the standards will be new to the RMP. Adoption of grazing management guidelines will supplement existing grazing management practices that are identified in the RMPs.

If adopted, standards and guidelines, together with the other decisions in Colorado's RMPs, provide a framework or base from which future decisions will be made. No decisions directly affecting any public land in Colorado will be made solely as a result of this environmental assessment.

How then will likely impacts be described? The following approach was taken. Each BLM Resource Area (RA) in the state was asked to participate in a simulation of how standards and guidelines would be applied. For each RA, an area of public land known to the staff was used as a sample area _for demonstration purposes only_. In most situations, the examples were developed with input from resource specialists, managers, and members from the Resource Advisory Councils (RAC). Several other hypothetical examples are also described. The examples, found in Appendix C, provide information on the processes used to implement standards and guidelines as well as possible impacts. It is impossible to display all possible implementation scenarios and to identify all possible impacts. However, this document will present a sufficient range of scenarios and assessments to allow the reader to come to some conclusions on what it will take to implement standards and guidelines and what the impacts may be. This chapter contains a summary of processes and impacts gleaned from the implementation examples in Appendix C.

## PRIORITIZING WORK

Standards apply to all public lands, however, because resources and staffing are limited, it is essential to prioritize the areas to which standards and guidelines will be assessed. The example exercises described in Appendix C were subjected to a logical system of prioritization in the Resource Area. A logical system of prioritization for application of standards and guidelines considers several criteria such as:

• What is scheduled for completion according to the RMP implementation?

• Is there information to indicate that a problem exists or that resources are at risk? (monitoring results, allotment categorization, professional judgement, results of ESI or other inventory data, etc.)

• Is there public concern or interest for possible resources at risk? Is use conflict present?

• Where can efficiencies with limited resources be realized? Are there opportunities for public or user group participation?

• Where are the best opportunities to effect positive change toward public land health?

• Are there situations or areas where legal requirements must be met?

• Are there permits or other resource use authorizations that need to be acted upon (e.g., grazing, rights-of-way, timber sales, etc.)?

A manager weighs these criteria to determine priority areas, utilizing information from staff, the RAC, and interested publics. A decision matrix or similar tool is helpful in determining priorities.

33

BLM_0006891

**FLEXIBILITY**

The examples used for this EA demonstrate that there are a variety of ways to assess standards and apply guidelines. Flexibility is required to allow for variations in management styles, publics, and management situations. Flexibility also allows for experimentation in finding new and improved "ways of doing business."

**IMPLEMENTATION THOUGHT PROCESS**

Regardless of the variations in how standards and guidelines are applied, the thought process is the same:

1. Are the standards being met on the land? What is the trend? Which indicators tell us that the standards are not being met?

2. Where a problem exists, what is causing the problem (i.e., preventing the land from meeting the standards)?

3. What are the options that <u>could</u> be taken to correct the problem? What is the decision?

4. What actions or tasks will be taken to implement the decision? What will the impacts be?

5. How will the effectiveness of the decisions be monitored?

Figure 2 graphically portrays this thought process.

**ASSESSING STANDARDS**

Each standard has a corresponding set of indicators that would be collectively evaluated to make an assessment on achievement of the standard. They provide a starting point for collaborative discussions. It may be necessary to supplement the standards with additional indicators to determine if public land standards are being met. The following are possibilities: gather existing information, conduct research, test, consult with academicians, and interested publics, identify landscape goals, compare with benchmark areas, or

quantify thresholds.

The following are possible resources and processes that may be needed to answer the question, "Are the standards being met?"

**Standard 1** (upland soils) - soils survey, photographs, vegetation classifiction, soils surface factor worksheets, benchmark sites.

**Standard 2** (riparian vegetation) - riparian analysis, photo points, vegetative trend, riparian classification data, aerial photos, greenline transects, channel stability evaluations, fishery inventories benchmark sites.

**Standard 3** (plant and animal communities) - vegetation classification, wildlife data bases, ESI data, satelite imagery, precipitation data, breeding bird transects, vegetative trend information.

**Standard 4** (specal status and threatened and endangered species) inventory, consultation with U.S. Fish and Wildlife Service, Colorado listed species list from the Colorado Division of Wildlife and Colorado Natural Heritage, and others.

**Standard 5** (water quality) - Colorado Water Quality Standards, Status of Water Quality in Colorado (report) which is prepared in response to Clean Water Act (CWA) Section 305b. Colorado Nonpoint Source Assessment Report (CWA Section 319 report) which lists waterbodies known to be affected by nonpoint-source pollution; current CWA Section 208 Plans in Colorado. Appendix D displays the water quality compliance process. To demonstrate the process at work in a real situation, a detailed account of a water quality determination is provided for in Examples 4 and 8 in Appendix C.

34

BLM_0006892

Figure 2

## APPLYING STANDARDS AND GUIDELINES ON PUBLIC LANDS 1/

Examples of "Tools" that may be used
during the process:
------------------------------
* Preliminary Assessment by
    Authorized Officer
* Review of management objectives
  for the area
* Evaluation
* ESI or other inventory
* Trend Analysis
* Field Visits
* RAC Consultation


------------------------------

* Analysis of current and
    historic use/events
* Review of management objectives
* RAC consultation


------------------------------

* Review data and possible mgt.
  actions
* Activity planning
* Environmental Assessment
* RAC consultation



1/ Collaboration among agencies, affected users, and interested publics is essential throughout the process.

2/ It is important to note that corrective action may or may not include the livestock grazing guidelines.
Examples of other possible actions include (but are not limited to) limiting OHV use, realigning roads, or
reducing wildlife numbers.

BLM_0006893

## ASSUMPTIONS

In discussing impacts, the following is assumed:

• BLM labor costs are $4,000 per month/person.

• "Short-term" is up to ten years following implementation. "Long-term" is considered 10-20 years.

• The ability to affect public land health is tempered by budget. As BLM's budget continues to fall or stay level, the ability for BLM to facilitate the processes needed to address public land health also decreases.

• The ability to affect public land health is also related to the effectiveness of coordination and consultation by the authorized officer, local cooperators, and interested publics.

• Some laws (e.g., Wild Horse and Burro Act, Threatened and Endangered Species Act, Mining Law of 1872) may place legal and regulatory constraints on management options.

• Responsibilities for wildlife lies jointly with the Colorado Division of Wildlife and BLM (DOW manages the animals and BLM manages the habitat). Cooperation between BLM and the Colorado Division is critical to public land health, especially relating to wildlife.

• BLM utilizes existing appropriations for labor. The labor costs identified for BLM in the examples displayed in Appendix C do not represent new costs.

• Management strategies and actions are planned and implemented using good scientific principles. Innovative practices are acceptable if grounded in good scientific principals.

• Land ownership patterns for BLM in Colorado vary widely. For example, lands near Craig are more concentrated than lands near Canon City. In many situations, this

constrains BLM's ability to improve public land health.

## GENERAL IMPACTS

Developing standards and guidelines facilitates ecosystem management. The process associated with implementing standards and guidelines encourages collaboration by bringing together resource specialists, managers, and interested publics to evaluate public land health and determine causal factors where problems exist. The Resource Advisory Councils, authorized by the new regulations, assist in collaboration. The process also advocates a landscape perspective of land health that transcends administrative boundaries.

Statewide standards allow for common terminology throughout the state. Although interpretation of what constitutes public land health may vary, the indicators that are part of the standards provide a common starting point for discussion and analysis.

Education and information are critical. An understanding of the scientific principles behind the standards and indicators by all parties will make it easier to identify problems, causal factors, and possible corrective measures. BLM will need to spend time and effort up-front in training and education.

A description of estimated state-wide effects of implementing standards and guidelines follows. By nature, the description of these impacts is somewhat general. Impacts related to specific applications of standards and guidelines for a variety of management scenarios are found in Appendix C.

## RESOURCE IMPACTS

Rarely will public land health be accomplished by implementing only one single action that affects one resource or use. Strategies

36

consider a variety of management actions depending on the causal factors. Therefore, this analysis estimates the effects to public land health that occur by implementing grazing management guidelines and other management actions. Fairly broad categories are used for this analysis. More detailed actions and procedures may be found in such documents as Colorado Best Management Practices, Integrated Weed Management Policy, Surface Operating Standards for Oil and Gas Exploration and Development, and the Resource Management Plans.

Grazing Systems for livestock (HRM, deferred rotation, etc.) consider the appropriate intensity of use, duration, numbers of livestock, and season of use. Actions frequently are reflected as terms and conditions of grazing permits. The cost to implement grazing systems is normally low to medium.

• Upland soils: Proper grazing systems increase soil infiltration and permeability rates, leading to improved soil productivity, add organic matter to the soil, reduce accelerated erosion, improve basal watershed cover conditions and soil productivity in the short- and long-term. The length of time for impact varies with soil and climatic conditions (e.g. fine textured soils in arid conditions will respond slower than coarser textured soils in more moist climates).

• Riparian: Riparian classification data is critical in determining appropriate grazing systems. Here are two examples.

1. Riparian areas with willow can be grazed during certain growth periods when the willows emit tannens which cattle avoid.

2. Certain types of sedge-brush commuities are more resistant to hoof action than others. Proper grazing systems can improve woody riparian habitat, improve vigor of plants, and increase plant density. In general, laterally migrating riparian areas repair quicker than riparian areas that migrate vertically. Most benefits are realized in the short-term and long-term.

• Plant and Animal Communities: Proper grazing systems increase plant density and frequency, improve diversity, assist in manipulation of succession (plant communities and animal habitat), maintain or create desired wildlife habitat conditions, contribute to weed control when used with integrated weed management, increase efficiency of photosynthesis (i.e., more cool and warm season plant species), and increase ground cover and litter for soil protection and forage. Animal impact can contribute to plant age diversity. Generally these benefits are long-term; control of residual vegetation for other animal use occurs in the short-term.

• Special Status and Threatened and Endangered Species: The same basic benefits noted for plant and animal communities apply here. Special consideration is given to affected species requirements. For example, no livestock grazing may be needed to protect snow willows, a critical element to the endangered Uncompahgre fritillary butterfly. Trampling is a concern for ground nesting birds and disturbances to sensitive habitats (e.g., alpine tundra and riparian zones).

• Water Quality: Proper grazing systems reduce sediment and salinity, nutrient, and bacterial loads. Benefits are short and long-term.

Land Treatments - erosion control structures consist of installed structures with the primary purpose of stopping soil erosion. Examples are gully plugs and contour furrowing. The cost to implement is medium to high.

• Upland soils: Generally, watershed improvements slow runoff and reduce soil surface erosion. Impacts are highly variable, depending on the type of improvement. Many land treatments are short-lived, so impacts are positive in the short-term but negative in the long term (e.g., contour furrows retain sediment and

37

BLM_0006895

runoff until full, then frequently breach).

• *Riparian*: Structures compatible with the channel type can assist in holding water and sediment, preventing a head cut, and establishing riparian vegetation communities. Generally, structures, such as gully plugs in the upper reaches of a system, are effective. When constructed in lower segments of a system, or improper channel type, they can actually cause negative effects. Benefits of properly constructed structures are short-term.

• *Plant and Animal Communities*: Treatments improve water control for local vegetation enhancement, and lessens the amount of disturbed land that supports early successional plant communities, including weed species. Benefits are short-term (see upland soils narrative).

• *Special Status and Threatened and Endangered Species*: Improved water quality within riparian-wetland plant communities is important for those amphibians and fish special status species where habitat conditions depend on water quality. Special consideration may be required for designated "critical habitat" by the Endangered Species Act." See the discussion for plant and animal communities.

• *Water Quality*: Treatments change the timing and quantity of runoff and pollutants reaching streams. They lengthen the time for runoff to reach stream, decrease peak flow, erosion potential, and volume of runoff. Benefits are short- and long-term.

Integrated Weed Management (IWM) guidelines for the control of weeds consist of cultural, mechanical control, biological, and herbicides. Cultural guidelines include properly managing vehicles, grazing systems, and other actions that benefit humans. These are discussed elsewhere in the document. This section focuses on mechanical control, such as grubbing and mowing, biological control, such as introduction of biological control

agents, and herbicides. The cost to implement is low to high.

• *Upland soils*: Treatments slow runoff and contribute to vigorous desirable plants. Impacts are highly variable; if an annual weed is replaced by a perennial, a positive, long-term benefit is likely. Conversely, a perennial weed replaced by an annual may have the opposite impact.

• *Riparian*: Control of tamarisk and Russian olive improves the water table and improves diversity of desirable plant species. Benefits are long-term.

• *Plant and Animal Communities*: Treatments increase and encourage desirable plant diversity by controlling weeds. Some treatments such as spraying or hoeing are localized and impacts will be short-term. Other treatments, such as using certain biological control agents affect broader areas and benefits tend to be long-term.

• *Special Status and Threatened and Endangered Species*: Treatments remove undesirable animal and plant species such as tamarisk, Russian olive, cheatgrass that are competing with and invading special status species habitats. See the plant and animal communities and riparian narratives.

• *Water Quality*: Impacts to water quality are minor, assuming herbicides are applied properly.

Land Treatments - seedings/ plantings: includes seeding by hand, plantings/transplants, and plowing/seeding. The cost to implement is low to high.

• *Upland soils*: Treatments reduce accelerated erosion, improve watershed cover conditions, and improve soil productivity. Benefits are short and long-term as long as plant diversity is improved or maintained.

• *Riparian*: Plantings of appropriate species, such as willows, contribute to vigorous desirable plants, stabilize banks, catch sediment,

38

BLM_0006896

provide cover for wildlife, contribute to diversity and density of desirable species, and accelerate the successional processes to the desired state. Benefits are short-term.

• *Plant and Animal Communities*: Treatments (seedings) manipulate spacial distribution of plant communities, contribute to habitat connectivity, contribute to energy cycle by contributing to plant and animal diversity, contribute to litter accumulation and soil protection, increase forage production for livestock, wild horses, and wildlife, and strengthen the presence of native species within plant communities. Seedings can negatively impact biodiversity by diluting genetic integrity of ecotypes, possibly reducing fitness of specially adapted populations of native plants. Benefits are long-term when done properly.

• *Special Status and Threatened and Endangered Species*: Generally, seedings are non-beneficial to special status species. Species diversity and relative density for most special status plant and animal species may be adversely affected by non-native seeding mixtures.

• *Water Quality*: Impacts will be similar to those discussed for land treatments-water control structures.

Land Treatments - chaining, roller chopping, etc., require mechanical manipulation of the land. The cost to implement is normally high.

• *Upland soils*: Treatments increase soil organic matter and obstruction for overland flow, thus decreasing erosion and improving watershed cover conditions. Benefits are short and long-term if supported with proper grazing and seeding.

* *Riparian*: Not applicable.

* *Plant and Animal Communities*: Treatments contribute to spacial distribution of plant communities, control habitat connectivity, improve habitat quality for wildlife, increase forage production for livestock and wildlife, provide

a variety of successional stages, increase photosynthetic activity (high energy flow), contribute to plant and animal diversity and balance, and contribute to weed control when used with Integrated Weed Management (IWM). Treatments generally provide immediate response in localized areas. Benefits are short and long-term if supported with proper grazing and seeding.

• *Special Status and Threatened and Endangered Species*: Generally, most species will not be affected by these treatments; species requirements may constrain the use of these treatments.

• *Water Quality*: Impacts will be similar to those discussed for Land treatments-water control structures.

Land Treatments - prescribed fire - involve planned use of fire to effect ecological change. Implementation costs are medium to high.

• *Upland soils*: Treatments increase soil movement and contribute to vegetative cover during the first one to five years after treatment. Benefits are long-term.

• *Riparian*: Prescribed fire is not frequently used in riparian areas, but may be used in some degraded riparian areas to help achieve vegetation objectives.

• *Plant and Animal Communities*: Treatments allow natural disturbances to alter succession on landscapes, control weeds when used with other tools, and can increase effectiveness of photosynthesis and energy flow. Treatments have the potential to manipulate large landscapes quickly and long-term benefits accrue if supported with proper grazing.

• *Special Status and Threatened and Endangered Species*: Treatments will benefit most special status species (see the plant and animal narrative).

• *Water Quality*: Impacts are similar to those discussed for Land treatments-water control structures.

39

BLM_0006897

Animal Reductions - wildlife - (if needed due to overstocking) are accomplished by hunting and trapping and relocating animals. The cost to implement is low to high.

• *Upland soils*: Actions increase basal watershed cover, reduce erosion and increase soil infiltration and permeability rates, leading to improved soil productivity. Benefits are short-term and are sustained long-term as long as suitable populations are maintained.

• *Riparian*: See plant and animal communities discussion.

• *Plant and Animal Communities*: Actions allow for habitat recovery on upland and riparian vegetation sites, provide additional cover in riparian systems previously heavily impacted. Benefits are generally realized in the short-term, but may continue long-term.

• *Special Status and Threatened and Endangered Species*: Removal may relieve trampling which is a concern for ground nesting birds and disturbances to sensitive habitats (e.g., alpine tundra and riparian zones).

• *Water Quality*: Actions reduce sediment, nutrient, and bacterial loads. Benefits are short- and long-term.

Animal Reductions - wild horses and burros -(if needed due to overstocking) are accomplished by drive trapping and water trapping. The cost to implement is medium to high.

• *Upland soils*: Same as animal reductions - wildlife.

• *Riparian*: Actions improve residual vegetation, stabilize steambanks, and contribute to plant vigor. Benefits are short-term and long-term only if appropriate animal populations are maintained.

• *Plant and Animal Communities*: Actions allow for increased

opportunities to properly manipulate livestock for increased vegetation cover, density, frequency, and plant and animal diversity, allow plant litter to accumulate in areas heavily impacted by wild horses, and provide more opportunity to manipulate successional stages. Benefits are short-term and long-term only if appropriate animal populations are maintained.

• *Special Status and Threatened and Endangered Species*: Removal may relieve trampling which is a concern for ground nesting birds and disturbances to sensitive habitats (e.g.riparian zones). Benefits are short-term.

• *Water Quality*: Actions reduce sediment, nutrient, and bacterial loads. Benefits are short- and long-term.

Facility Developments - animal distribution - include water structures, fences, etc. to facilitate livestock manipulation (and wildlife to lesser extent). Implementation costs are low to high.

• *Upland soils*: Developments increase watershed cover, reduce erosion and increase soil infiltration and permeability rates, leading to improved soil productivity. Benefits are short- and long-term, as long as the developments are properly maintained. The impacts are based on the assumption that water developments will solve animal distribution problems. Developments are short-lived unless maintained. If not maintained, developments may actually have adverse long-term impacts (e.g., breaching).

• *Riparian*: See discussion for plant and animal comminities.

• *Plant and Animal Communities*: Developments facilitate proper livestock grazing management (and wildlife to lesser extent) for timing, animal impact, and other desired management practices. Benefits are short- and long-term. See the discussion for upland soils.

40

BLM_0006898

• *Special Status and Threatened and Endangered Species*: Developments help control grazing animals to correct improper animal distribution and concentration problems in sensitive habitat types. Benefits are short- and long-term.

• *Water Quality*: Actions reduce sediment, nutrient, and bacterial loads. Benefits are short- and long-term.

Vehicle Management includes modifying decisions in the resource management plans, rehabilitating roads, and closing roads. Implementation costs are low to high.

• *Upland soils*: Management increases watershed cover and reduces erosion. Benefits are short-term and long-term as long as the ability to manage use continues. Designations can affect large areas and other actions are more site specific.

• *Riparian*: Proper vehicle management will decrease the sediment from eroding roads, and improve vegetative cover and vigor. Benefits from road rehabilitation are short-term. Benefits from designations are long-term.

• *Plant and Animal Communities*: Management minimizes weeds, reduces displacement of animals and assures their reproductive capability, improves diversity and density of plant and animal species by reducing habitat fragmentation and allows for resiliency to human activities and other disturbances. Benefits are short and long-term. See upland soils discussion.

• *Special Status and Threatened and Endangered Species*: Management directs vehicles away from occupied habitats. Benefits are realized in the short- and long-term.

• *Water Quality*: Actions reduce sediment loads. Benefits are short and long-term and can affect large areas.

Site Modification – recreation – includes barriers, closures, signs, rules, etc., that will modify human use patterns.

• *Upland soils*: Changes reduce soil compaction and improve watershed cover on a local area. Benefits are realized in the short-term.

• *Riparian*: Control measures at recreation sites will contribute to improved bank stability, vegetative cover. Benefits are short-term and generally local.

• *Plant and Animal Communities*: Modifications balance human use with plants and animals, increasing plant and animal communities' ability to recover from disturbances (resiliency). Benefits are short-term and generally local.

• *Special Status and Threatened and Endangered Species*: Proper design and regulations channel recreational activities away from breeding/ nesting sites during sensitive life cycle periods. Destruction of occupied habitats is avoided. Benefits are generally local and short-term.

• *Water Quality*: Impacts are minor.

Use Authorization Stipulations – mineral, realty, recreation – includes provisions, requirements, and conditions for use and rehabilitation of areas subject to the requirement for permit issuance/renewal. They serve to allow human activity consistent with maintaining public land health standards. The following discussion assumes that stipulations are complied with.
• *Upland soils*: Conditions reduce soil erosion and improve watershed cover conditions on a local basis (such as drill pads or camp sites) or along corridors such as rights-of-way. Benefits are short- and long- term.

• *Riparian*: Conditions protect areas from vegetative disturbance, sediment load, and the introduction of noxious or other undesirable weeds. Benefits are short-term.

• *Plant and Animal Communities*: Conditions serve to minimize noxious weeds and restore diversity and density of plant and animal species

41

BLM_0006899

on disturbed sites. Benefits generally are local and are short- and long-term. Unless care is taken, seeding may negatively impact the genetic integrity of local native populations.

• *Special Status and Threatened and Endangered Species*: Conditions provide requirements for safeguarding species and related habitat from human activities Benefits generally are local and are short- and long-term.

• *Water Quality*: Conditions emphasize compliance with state requirements and reduce sediment loads. Benefits are short- and long-term.

## PUBLIC LAND USER IMPACTS

<u>Grazing Permittee</u>: Changes in grazing systems require modifications to the permittee's operation. An effort is made to take corrective actions that achieve public land health with the least financial burden to the operator. Typically, this means that the permittee spends additional time and/or money participating in the collaborative processes, construct fences, move water, herd cattle, monitor utilization, etc. Infrequently (5 percent or less), drastic measures (such as large reductions in AUMs) are taken that place heavy financial burdens on an operator. Very few (1 percent or less) situations arise that will cause an operator to go out of business. As public land health improves, the permittee realizes more predictable, desirable forage sustained in the long-term.

<u>Permittees-Minerals/Realty</u>: Permittees are presently subject to terms and conditions that are consistent with the standards. These are found in such documents as Colorado Best Management Practices, Oil and Gas Surface Operating Standards, Right-of-Way Handbooks, and Resource Management Plans. The proposed standards do not appreciably affect these permittees.

<u>Mining (subject to the Mining Law of</u>

<u>1872)</u>: The standards supply additional criteria by which undue or unnecessary degradation is measured. Because of budget constraints very few cases of noncompliance on operations less than five acres are pursued. For those cases BLM chooses to pursue, standards provide BLM with some additional support to make changes. Adoption of standards does not appreciably impact operations greater than five acres that are subject to a plan of operation. Operators may find the standards helpful in devising their operating plans.

<u>Permittees-Recreation</u>: Some modifications to permits for recreational/competitive recreation (such as river guides, big game outfitters, and vehicle events) are likely to be needed. Typically, these changes result in changing use sites or times of use. These may cause inconvenience. On rare occasions, a permittee may not be allowed use of an area, and it may seriously disrupt the operation. As public land health improves, the permittee is afforded long-term use and enjoyment of the resources.

<u>Recreation Users</u>: Most recreational activities require the use of vehicles, either to access activities or to use in the activities. Vehicle management, such as changing OHV designations or closing badly eroding roads, affect recreationists the most. Changes in vehicle management lead to frustration, inconvenience, and at times anger on the part of some users. (Note: Very few BLM lands in Colorado are/will be totally closed to vehicle use). No significant adverse economic impacts to recreation users are expected. As public land improves, the user is afforded long-term use and enjoyment of the resources.

Those recreationists whose activities are more dependent on natural resources such as hunters, anglers, hikers, photographers and wildlife viewers will generally see gradual improvements in the resources that enhance their experiences.

42

BLM_0006900

## SOCIO-ECONOMIC IMPACTS

<u>Population</u>:  No significant impacts on human population are expected.

<u>Employment and Income</u>:  Adverse impact on ranching or agricultural employment and income ie expected to be insignificant and short term. Some livestock operators may quit rather than make the changes necessary to meet the standards on their allotment.  Consultation, cooperation, and coordination will mitigate this situation to a large degree.  Over the long term, agricultural employment and income is expected to be unaffected, or improve slightly, because the standards will assure a more reliable and sustained livestock forage resource.

In the short term, employment and income in service industries, such as commercial rafting, gas stations, etc., will likely experience modest increases, because of the more intensive management practices that are undertaken to achieve the standards.  These increases are expected to continue, especially in service industries that are directly and indirectly related to recreation-tourism due to improvements in resources that have recreational appeal.

Employment and income in the minerals and transportation sectors will not likely be measureably affected.

<u>Communities</u>:  Ranching and recreational activities associated with public lands are important socially and economically to western Colorado communities.  Achieving and maintaining healthy public lands will provide long-term sustainability of the resources that these activities rely upon.  A gradual improvement in social and economic conditions to industries dependent on healthy resources, is anticipated.

Along the I-70 cooridor, and at many other locations in Western Colorado, private lands are being sub-divided and converted to residential and commercial uses.  The public lands are becoming more important to sustain the natural systems upon which these communities depend.

<u>Bureau of Land Management</u>:  Loss of grazing revenues to BLM as the result of implementing either alternative would be insignificant.

<u>Cumulative Impacts</u>:  Ultimately, using the proposed standards and guidelines in daily management will result in public land health.  Under current funding levels, improvements in public land health will occur in the long-term.  Priority will generally be given to those areas most at risk.

Some adverse impacts to users will likely occur as a result of implementing standards and guidelines. However, the emphasis on consultation, cooperation, and coordination in the proposed action may actually lessen this impact over present management.  The cumulative effect of healthy public lands will benefit users and local communities by providing a resource that can be used and enjoyed over time.

**B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (identify difference from Proposed Action Alternative)**

Differences between this alternative and the proposed action are minor.

There is little latitude in the fallback standards and guidelines to utilize non-native species in achieving standards.  This constrains management options, possibly increases costs, and contradict some present management objectives.

The fallback standards and guidelines place less emphasis on species diversity and do not directly mention larger scale diversity, plant community distribution, and successional stage mosaics.  Consequently, landscape-scale disturbance and prescribed natural fire plans are not emphasized in this alternative.

The process of applying the Fallback standards and guidelines is not

43

BLM_0006901

clearly defined. The indicators for the standards in the proposed action help reduce ambiguity. While the indicators are not quantified, they provide a common basis for discussion.

## C. PRESENT MANAGEMENT (identify difference from Proposed Action Alternative)

Overall, the proposed action does not present significant or revolutionary changes to present management.

For several years, BLM in Colorado has been moving toward integrated ecosystem management. Previously, individual programs such as range, wildlife, and recreation drove various actions. However, the transition to integrated ecosystem management has been slow and there still is a tendency to view management of resources from a program perspective. Therefore, the processes used to evaluate public land health and take needed corrective action are less integrated, less interdisciplinary, and less collaborative.

Also, there is less emphasis on evaluating public land health across landscapes. Users tend to look at their own operation. BLM staff processing use authorizations may not fully consider the inter-relationships between the area applied for and surrounding areas. Cooperation between agencies and individuals is less.

The interest in public land health is not as high in this alternative. While BLM has always encouraged public participation and involvement, the Proposed Action is creating an increased interest in public land management.

Standards and guidelines vary among RMPs under present management. Consequently, there is less continuity among BLM Resource Areas (RA) in defining and assessing public land health. This causes confusion for the public, especially for those concerned about conditions in more than one RA.



44

# CHAPTER 5 - PUBLIC PARTICIPATION

Public participation for the implementation of standards and guidelines in Colorado began in August 1995. Four scoping meetings were held around the state. In September 1995, the three Resource Advisory Councils (RAC) were formed. The initial task of these citizen groups was to work with BLM in the development of the standards and guidelines. The councils met numerous times (most meetings were open to the public) working on several drafts that led to the document that is the proposed action in this EA. Input from academicians was also important in the development of the proposal. Members of the RACs and academicians are listed in this section.

On November 8, 1995, the NEPA/RMP amendment process was initiated with a Notice of Intent (NOI) published in the Federal Register. This notice requested public comment on the proposal to prepare one environmental document, and to modify all Colorado RMPs. No comments were received on the NOI.

After the current version of standards and guidelines was completed in April 1996, the RACs, supported by BLM, began meeting with the public to inform, educate, and listen to comments and concern. They used various methods to reach out to the public. They held meetings, addressed user groups and met one-on-one with individuals.

The RACs will continue to partner with BLM through the NEPA process. Their role is to:

• Continue to advise BLM on the standards and guidelines.

• Inform and educate constituents of the standards and guidelines.

• Serve as sounding boards and provide feedback to BLM concerning constituents' concerns and ideas

• Review and comment on draft copies of EA documents.

• Host or co-host public meetings and/or workshops to receive comments on the standards and guidelines.

• Assist with the analysis of public comments.

• Review and comment on advanced copies of the proposed Decision Record/Rationale statement.

Table 1 details the public participation plan that was created for the EA process. Included are tasks, rationale, and responsible parties.

Schedule for the process:

| | |
|---|---|
| June 28, 1996 | Complete and Distribute EA; begin 45-day Comment Period. |
| Sept. 25, 1996 | Issue Decision Notices; Initiate Governor's Consistency Review and Plan Protest Periods. |
| Dec. 15, 1996 | Complete resolution of any inconsistencies and protests |
| Jan. 15, 1997 | Request Secretary's Approval of Proposed S&Gs. |

45

BLM_0006903