Table 3

# COLORADO'S STANDARDS AND GUIDELINES ENVIRONMENTAL ASSESSMENT PUBLIC PARTICIPATION PLAN

| ACTION ITEM | PURPOSE | DATE(s) | RESPONSIBLE PARTNER |
|---|---|---|---|
| Complete National EIS - Rangeland Reform '94 | • NEPA Document (national) for proposed range regulations - including S&Gs.<br>• Provided for formal public comment. | 1993 through 1994 | BLM |
| Publish Federal Register Notice | • Formal public notification of intent to modify Resource Management Plans through the NEPA process.<br>• Invite participation and comment. | November 8, 1995 | BLM |
| Develop S&Gs with full and continuing involvement of RACs. | • Cooperative development of the S&Gs. | October, 1995 through March 31, 1996 | BLM, RACs |
| Conduct meetings with Educators and Scientists | • Assure that good science is reflected in the S&Gs. | October, 1995 through March 18, 1996 | BLM, RACs, Academia, Other Agencies |
| Conduct workshops/ information sessions on the proposed S&Gs. | • Inform constituents and interested publics about the S&Gs.<br>• Receive comments on concerns, potential impacts, etc.; provide feedback to BLM on results.<br>• Provide feedback to BLM on the need for additional meetings during the EA comment period. | April 1 through June 21, 1996 | RACs (lead), BLM (as needed). |
| Review of draft EA by staff and RACs. | • Provide comments on the content of the document.<br>• Provide important missing data.<br>• Correct errors. | June 5 through June 21, 1996 | BLM and RACs. |
| Publish notice of availability in local papers; send EA to interested publics. | • Notify public of the availability of the EA.<br>• Invite comment (45 days) on the action, alternatives, and impacts.<br>• Identify meetings/workshops that will be held (if any). | June 28, 1996 | BLM |
| Conduct meetings/workshops (if needed) | • Receive public comment on the EA | July 14 through August 2, 1996 | BLM and RACs |
| Analyze comments received during the comment period | • Assure that public comment is appropriately considered or used in the final decisions.<br>• Determine if additional NEPA analysis is needed. | August 14 through August 28, 1996 | BLM and RACs |
| Review draft Decision Record/Rationale | • See how public comment was used in the final decision. | September 6 through September 18, 1996 | RACs |
| Issue Decision | • Notify public of decision<br>• Initiate 45-day Governor's consistency review<br>• Initiate 30-day protest period | September 25, 1996 | BLM |

TABLE 4

PREPARERS AND CONTRIBUTORS OF COLORADO'S STANDARDS AND GUIDELINES ENVIRONMENTAL ASSESSMENT

| Name | Title | Office |
|---|---|---|
| Dennis Zachman | Community Planner | Colorado State Office |
| * Glenn Wallace | Community Planner | Colorado State Office |
| Tom Gratte | Rangeland Mgt Specialist | Royal Gorge Resource Area |
| Royce Wheeler | Rangeland Mgt Specialist | San Luis Resource Area |
| Robert Ball | Natural Resource Specialist | San Juan Resource Area |
| Amanda Clements | Ecologist | Uncompaghre Resource Area |
| Buddy Green | Rangeland Mgt Specialist | Gunnison Resource Area |
| David Stevens | Forester | Grand Junction Resource Area |
| Carla Scheck | Ecologist | Glenwood Spring Resource Area |
| Jeff Baker | Rangeland Mgt Specialist | Kremmling Resource Area |
| Greg Goodenow | Natural Resource Specialist | Little Snake Resource Area |
| Glenn Bessinger | Ecologist | Colorado State Office |
| Jeanette Pranzo | Economist | Colorado State Office |
| Richard Watson | Geologist/GIS Specialist | Colorado State Office |
| Ken Schauer | Cartographer | Colorado State Office |
| Mark Stiles | District Manager | Montrose District |
| Adrian Neisius | Assistant District Manager, Resource Services | Canon City District |
| John Riel | Rangeland Management Specialist | Colorado State Office |
| * James Sazama | Rangeland Management Specialist | Uncompahgre Resource Area |
| * Dennis Murphy | Hydrologist | Montrose District |
| * Lee Upham | Wildlife Biologist | Colorado State Office |
| * William Carey | Hydrologist | Colorado State Office |
| * James Cagney | Resource Advisor | Craig District |
| * John Carochi | Resource Advisor | Canon City District |
| * James Dollerschell | Rangeland Management Specialist | Grand Junction Resource Area |
| Brenda Mitchell | Wildlife Biologist | Colorado State Office |
| Renee Garfias | Visual Communication Specialist | Colorado State Office |
| Tina McDonald | Environmental Education/Interpretation | Colorado State Office |
| Carole Luckey | Physical Science Technician | Colorado State Office |
| Andy Senti | Realty Specialist | Colorado State Office |
| Scott Davis | Soil Scientist | Colorado State Office |
| Rick Athearn | Historian | Colorado State Office |

* Member of Standards & Guidelines Team

Table 5

NORTHWEST RESOURCE ADVISORY COUNCIL

| NAME | LOCATION | INTEREST |
|---|---|---|
| | Group 1 | |
| Penny Lewis | Kremmling, CO | Federal Grazing |
| John George Raftopoulos | Craig, CO | Federal Grazing |
| Angelo Theos | Meeker, CO | Federal Grazing |
| Walid Bou-Matar | Grand Junction, CO | Energy & Minerals |
| Thomas E. Steele | Glenwood Springs, CO | Dev./Comm. Recreation |
| | Group 2 | |
| William J. Schapley | Grand Junction, CO | Environmental |
| Cathie Zarlingo | Grand Junction, CO | Environmental |
| Toni Moore | Grand Junction, CO | Wild Horse & Burro |
| Donald C. Peach | Rangely, CO | Arch./Historical |
| James E. Majors | Grand Junction, CO | Dispersed Recreation |
| | Group 3 | |
| T. Wright Dickinson | Maybell, CO | Elected Officials |
| Marian Iona Smith | Glenwood Springs, CO | Elected Officials |
| James E. Ficke | Steamboat Springs, CO | Public |
| David B. Johnson | Glenwood Springs, CO | Public |
| William Kent Crowder | Walden, CO | Public |

Table 6

SOUTHWEST RESOURCE ADVISORY COUNCIL

| NAME | ADDRESS | INTEREST |
|---|---|---|
| | Group 1 | |
| Ross A. Allen | Hotchkiss, CO | Federal Grazing |
| Frank Garcia Jr. | Montrose, CO | Federal Grazing |
| Reece Malles | Cortez, CO | Federal Grazing |
| Jeff Spitler | Durango, CO | Energy & Minerals |
| Ronald Kirk Brink | Powderhorn, CO | Dev./Comm. Rec. |
| | Group 2 | |
| Stephen Farwell Hinchman | Paonia, CO | Environmental |
| Gary Lowell Sprung | Crested Butte, CO | Environmental |
| Richard N. Ellis | Durango, CO | Archeo./Historical |
| Ray Edward Jenkins | Montrose, CO | Archeo./Historical |
| Vernon Ebert | Telluride, CO | Dispersed Recreation |
| | Group 3 | |
| David Leeman Gann | Montrose, CO | Elected Official |
| Jim D. Ventrello | Delta, CO | Elected Official |
| William H. Romme | Durango, CO | Academicians |
| Mark Brian LeValley | Hotchkiss, CO | Public |
| Robert Spears | Lake City, CO | Public |

Table 7

## FRONT RANGE RESOURCE ADVISORY COUNCIL

| NAME | LOCATION | INTEREST |
|---|---|---|
| | **Group 1** | |
| Skip Crowe | Villa Grove, CO | Federal Grazing |
| James W. Coleman | Saguache, CO | Federal Grazing |
| R.N. "Nate" Patton | Canon City, CO | Federal Grazing |
| Thomas W. Sylvester | Alamosa, CO | Energy & Mineral |
| David Secunda | Boulder, CO | Develop./Comm. Rec. |
| | **Group 2** | |
| Cathy Carlson | Boulder, CO | Environmental |
| John H. Stansfield, Jr. | Monument, CO | Environmental |
| Virginia McConnell Simmons | Del Norte, CO | Archeo./Historical |
| Rodney Howard Munson | Westcliffe, CO | Dispersed Rec. |
| Fred Rasmussen | Salida, CO | Dispersed Rec. |
| | **Group 3** | |
| Loren R. Whittemore | Rush, CO | Elected Official |
| Vern Rominger | Del Norte, CO | Elected Official |
| Max Vezzani | Castle Rock, CO | State Employee |
| Rob Feder | Boulder, CO | Public |
| Bruce Goforth | Colorado Springs, CO | Public |

Table 8

## ACADEMICIAN CONTRIBUTORS

| Name | Department | Location |
|---|---|---|
| Dr. Bob Woodmansee | Range Ecosystem Science | Colorado State University |
| Dr. Roy Roath | Range Ecosystem Science | Colorado State University |
| Dr. Joe Trlica | Range Ecosystem Science | Colorado State University |
| Dr. Freeman Smith | Earth Resource | Colorado State University |
| Dr. Tom Hobbs | Colorado Division of Wildlife | Fort Collins |
| Dr. John Moore | University of Northern Colorado | Greeley |

# GLOSSARY

**Administrative Determination (AD) -** A determination that existing environmental documentation adequately discloses the impacts of a proposed action that is similar or the same as an action or actions previously analyzed.

**Area of Critical Environmental Concern (ACEC) -** An area established through the planning process where special management attention is required to protect and prevent irreparable damage to important natural systems or processes, or to protect life and afford safety from natural hazards.

**Activity Plan.** A more detailed and specific plan for management of a single resource program to achieve specific objectives undertaken only when needed to implement the more general resource management plan (RMP) decisions. Activity planning is now accomplished with Integrated Activity Plans (see IAP), or Coordinated Resource Management Plans (CRMP).

**Allotment -** An area of land designated and managed for the grazing of livestock by one or more livestock operators. It generally consists of public lands, but may include parcels of private or state-owned lands. The number of livestock and period of use are stipulated for each allotment.

**Allotment Categorization.** As an aid to prioritize grazing allotments for development of management plans all allotments have been placed into one of three categories: (M) Maintain, (I) Improve, or (C) Custodial.

**Allotment Management Plan (AMP).** A written plan for livestock grazing management, including supportive measures if required, designed to attain specific multiple-use management, sustained yield, economic and other goals in a grazing allotment.

**Animal Unit Month (AUM) -** The amount of forage necessary for the sustenance of one cow and one calf or its equivalent for a period of one month.

**Authorized Officer -** The BLM official responsible for making decisions pursuant to the delegation of authority found in BLM Manual 1203. Most decisions related to implementing standards and guidelines will be made by the Resource Area Manager.

**Best Management Practices -** Best Management Practices (BMP) are methods, measures, or practices to prevent or reduce water pollution, including, but not limited to, structural and nonstructural controls and operation and maintenance procedures. Usually BMPs are applied as a system of practices rather than a single practice. BMPs are selected on the basis of site-specific conditions that reflect natural background conditions and political, social, economic, and technical feasibility.

**Biodiversity or Diversity -** The variety of plants and animals that occupy a landscape

**Candidate Species -** Any species not yet officially listed but which are undergoing a status review.

**Capability -** The highest ecological status an area can attain given political, social or economic constraints. For example, a flood control dam changes the capability of the riparian zone below the structure.

**Climax -** The natural plant community that occurs at the end of the plant successional path, in the absence of disturbances or physical site deterioration.

**Coordinated Resource Management Plan (CRMP) -** An activity level plan developed with an interdisciplinary approach containing decisions for all resources in a given area/site.

**Designated Field Official (DFO) -** A BLM management official who is

BLM_0006908

authorized to take an action. For most land management actions this is the Area Manager.

**Desired Plant Community (DPC)** - A plant community that meets the goals established for a landscape.

**Ecological Site Inventory (ESI)** - The inventory of distinctive geographic units that differ from other geographic units in its ability to produce a characteristic natural plant community.

**Ecosystem** - Living organisms and non living substances, interacting to produce and exchange material between the living and non living parts.

**Endemic Species** - a species or subspecies native to a particular location with narrow limits of habitat variability.

**Environmental Assessment (EA)** - A concise public document prepared to determine whether to prepare an environmental impact statement or a finding of no significant impact. It includes a brief discussion of the need for the proposal, alternatives considered, environmental impact of the proposed action and alternatives, and a list of agencies and individuals consulted.

**Federal Land Policy and Management Act of 1976 (FLPMA)** - Public Law 94-579, which establishes public land policy, and guidelines for the administration of the public lands.

**Forest Management Plan (FMP)** - An activity plan containing forest management actions for a geographic area typically of commercial forest land.

**Goal** - A general description of a desired future condition. (e.g., improve watershed conditions, achievement of a desired plant community)

**Grazing Permit** - A document authorizing use of public lands within an established grazing district.

**Guidelines** - Livestock grazing management tools, methods, strategies, and techniques designed to maintain or achieve healthy public lands, as defined by the Standards (also see Standards).

**Habitat Management plan (HMP)** - A type of activity plan relating to wildlife habitat.

**Heritage Resources** - Any prehistoric, historic, landscape, site, building, structure, or object, normally older than 50 years that includes artifacts, records, and material remains associated with it.

**Integrated Weed Management (IWM)** - Management of weeds, or other undesirable plants utilizing physical, chemical and biological means in an integrated manner.

**Interested Public** - An individual, group or organization that has submitted a written request to the authorized officer to be provided an opportunity to be involved in the decision making process for the management of livestock grazing on specific allotments or has submitted written comments to the authorized officer regarding the management of livestock grazing on a specific allotment.

**Land Treatments** - all methods of land improvement and soil stabilization such as reseeding, brush control, pitting, furrowing, water spreading, controlled burning, and other mechanical, biological, or chemical manipulation of the land.

**Landscape** - A defined area that forms a management unit or basis of analysis.

**Lentic** - In riparian management, refers to streams, creeks, and other linear features.

**Lodic** - In riparian management, refers to ponds, lakes, and other nonlinear features.

**Local Cooperator** - An individual who directly influences the management of public lands, and whose cooperation is needed to alter

existing conditions. BLM permit holders are local cooperators.

**Mitigation** - Alleviation or lessening of possible adverse effects on a resource by applying appropriate protective measures or adequate scientific study.

**Multiple Spatial Scales** - Analysis of an area using different frames of reference. For example, from the perspective of an individual animal, a herd, and the total population of animals within the area.

**National Environmental Policy Act of 1969 (NEPA).** Public Law 91-190. Establishes environmental policy for the nation. Among other items, NEPA requires federal agencies to consider environmental values in decision making processes.

**Objective** - A measurable description of a desired future condition that specifies, what is to be accomplished, location, and time frame.

**Off Highway Vehicle (OHV) or Off Road Vehicle (ORV)** - Any motorized vehicle capable of or designed for travel on land, water, or other natural terrain.

**Plant and Animal Communities** - Those plants and animals which occur on public land; the definition excludes people, livestock, and crops.

**Potential Natural Vegetation (PNV)** - The biotic community that would become established if all successional sequences were completed without interferences by humans under the present environmental conditions. Natural disturbances are inherent in development. Includes naturalized non-native species.

**Preliminary Assessment** - An analysis of a tract of land that provides general information on the status of the land. This assessment does not provide in depth issue analysis.

**Prescribed Fire** - **(Prescribed Burning).** Application of fire to natural fuels under specific conditions of weather, fuel moisture, soil moisture, smoke, and other conditions intended to produce the intensity of heat and rate of spread required to accomplish certain objectives of wildlife habitat or livestock grazing management and/or hazard reduction.

**Proper Functioning Condition (PFC)** - Riparian-wetland areas are functioning properly when adequate vegetation, landform, or large woody debris is present to dissipate stream energy associated with high waterflows, thereby reducing erosion and improving water quality; filter sediment, capture bedload, and aid floodplain development; improve flood-water retention and ground-water recharge; develop root masses that stabilize streambanks against cutting action; develop diverse ponding and channel characteristics to provide the habitat and the water depth, duration, and temperature necessary for fish production, waterfowl breeding, and other uses; and support greater biodiversity.

**Proposed Species** - A species proposed for listing and published in the Federal Register by the Secretary of the Interior or the Secretary of Commerce; they need not be candidate species.

**Public Lands** - Those tracts of land owned by the people of the United States, that are administered by the Bureau of Land Management.

**Rangeland Program Summary (RPS)** - A report issued periodically by BLM that summarizes the progress made in implementing the actions described in a livestock grazing EIS.

**Record of Decision (ROD)** - A concise public record of an agency's decision on a proposal for which an environmental impact statement (EIS) was prepared.

**Resource Advisory Council (RAC)** - An advisory body established pursuant to 43 CFR 1780 and other authorities to advise BLM on resource management issues.

**Resource Area** - A geographic portion of a BLM District that is the smallest administrative

BLM_0006910

subdivision in the BLM.

**Resource Management Plan (RMP)** - A land use plan that establishes land use allocations, multiple-use guidelines and management objectives for a given planning area. The RMP planning system has been used by the BLM since about 1980.

**Riparian** - An area of land directly influenced by permanent water. It has visible vegetation or physical characteristics reflective of permanent water influence. Lake shores and stream banks are typical riparian areas. Excluded are such sites as ephemeral streams or washes that do not have vegetation dependent on free water in the soil.

**Seral Stage** - The present state of vegetation of an ecological site in relation to the potential natural community for the site. Vegetation status is the expression of the relative degree to which the kinds, proportions, and amounts of plants in a community resemble those of the potential natural community. The classes are potential natural community, late-seral, mid-seral, and early-seral.

**Standards** - A description of conditions needed to sustain public land health, and relates to all uses of the public lands (also see Guidelines).

**Threatened & Endangered (T&E)** - Any species or significant population of a species likely to become endangered throughout all or a significant portion of its range within the foreseeable future, or which is in danger of extinction. Usually includes only those species which have been recognized and listed as threatened or endangered by federal and state governments, but may include species categorized as rare, very rare, or depleted.

**Trend** - The direction of change in health of the land, observed over time.

**Vegetation Manipulation** - Planned alteration of vegetation communities through use of prescribed fire, plowing, herbicide spraying, or other means to gain desired changes in forage availability, wildlife cover, etc.

**Wetlands** - Permanently wet or intermittently flooded areas where the water table (fresh, saline, or brackish) is at, near, or above the soil surface for extended intervals, where hydric wet soil conditions are normally exhibited, and where water depths generally do not exceed two meters. Vegetation is generally comprised of emergent water-loving forms (hydrophytes) which require at least a periodically saturated soil condition for growth and reproduction. In certain instances, vegetation may be completely lacking. Marshes, shallows, swamps, muskegs, lake bogs, and wet meadows are examples of wetlands.

**Wilderness Study Area (WSA)** - An area determined to have wilderness characteristics. Wilderness study areas will be subject to interdisciplinary analysis through the BLM land use planning system and public comment to determine wilderness suitability. Suitable areas will be recommended to the President and Congress for designation as wilderness.

# REFERENCES

Fowler, J.M., D. Rush, and J.Hawkes. *Characteristics of the Western Livestock Industry*. (Las Cruces, New Mexico: New Mexico Cooperative Extension Service, 1993).

Hecox, Walter E. and Bradley L. Ack. *Charting the Colorado Plateau: An Economic and Demographic Exploration*. (Flagstaff, Arizona: Grand Canyon Trust, 1996).

Kittel, Gwen, Renee Rondeau, Nan Lederer, Dan Randolph. *A Classification of the Riparian Vegetation of the White and Colorado River Basin, Colorado*. (Boulder, Colorado: Colorado Natural Heritage Program, August, 1994).

Northwestern Resources Information Center, Inc. *Livestock Grazing on Western Riparian Areas*. (Eagle, Colorado: Northwestern Resources Information Center, July, 1990).

U.S. Department of Agriculture. Forest Service. *Ecological Subregions of the United States: Section Descriptions*. Compiled by W. Henry McNab and Peter E. Avers. (Washington, D.C.: U.S. Forest Service, July, 1994).

U.S. Department of Agriculture. Forest Service. *The Common Social Unit. Version 1.1*. (Denver: U.S. Forest Service, 1995)

U.S. Department of Commerce. Bureau of Economic Analysis. *Regional Economic Information System*. Regional Economic Measurement Division. (Washington, D.C.: Department of Commerce, 1995).

U.S. Department of the Interior, Bureau of Land Management. *Public Land Statistics, 1983*. (Washington, D.C.: Bureau of Land Management, 1984).

U.S. Department of the Interior, Bureau of Land Management. *Resource Management Plan and Record of Decision, Glenwood Springs Resource Area*. (Denver: Bureau of Land Management, January, 1984).

U.S. Department of the Interior, Bureau of Land Management. *Resource Management Plan and Record of Decision, Kremmling Resource Area*. (Denver: Bureau of Land Management, December, 1984).

U.S. Department of the Interior, Bureau of Land Management. *Resource Management Plan and Record of Decision, San Juan/San Miguel Planning Area*. (Denver: Bureau of Land Management, September, 1985).

U.S. Department of the Interior, Bureau of Land Management. *Resource Management Plan and Record of Decision, Northeast Resource Area*. (Denver: Bureau of Land Management, September, 1986).

U.S. Department of the Interior, Bureau of Land Management. *Resource Management Plan and Record of Decision, Grand Junction Resource Area*. (Denver: Bureau of Land Management, January, 1987).

U.S. Department of the Interior, Bureau of Land Management. *Resource Management Plan and Record of Decision, Little Snake Resource Area*. (Denver: Bureau of Land Management, June, 1989).

U.S. Department of the Interior, Bureau of Land Management. *Resource Management Plan and Record of Decision, Uncompaghre Basin Resource Area*. (Denver: Bureau of Land Management, July, 1989).

U.S. Department of the Interior, Bureau of Land Management. *Public Land Statistics, 1990*. (Washington, D.C.: Bureau of Land Management, 1991).

U.S. Department of the Interior, Bureau of Land Management. *Resource Management Plan and Record of Decision, San Luis Resource Area*. (Denver: Bureau of Land Management, December, 1991).

U.S. Department of the Interior, Bureau of Land Management. *Resource Management Plan and Record of Decision, Gunnison Resource Area*. (Denver: Bureau of Land Management, February, 1993).

U.S. Department of the Interior, Bureau of Land Management. *Process for Assessing Proper Functioning Condition*. TR 1737-9. (Bureau of Land Management, n.l., 1993)

U.S. Department of the Interior, Bureau of Land Management. *Public Land Statistics, 1993*. (Washington, D,C.: Bureau of Land Management, 1994).

U.S. Department of the Interior, Bureau of Land Management. *Draft Resource Management Plan, White River Resource Area*. (Denver: Bureau of Land Management, October, 1994.)

U.S. Department of the Interior, Bureau of Land Management. *Draft Environmental Impact Statement, Rangeland Reform '94*. (Washington D.C.: Bureau of Land Management, 1994).

U.S. Department of the Interior, Bureau of Land Management. *Resource Management Plan and Record of Decision, Royal Gorge Resource Area*. (Denver: Bureau of Land Management, May, 1996).

U.S. Department of the Interior, Bureau of Land Management. *Partners Against Weeds--An Action Plan*. (Washington, D.C.: Bureau of Land Management, January, 1996).

# APPENDIX A

## FUNDAMENTALS OF RANGELAND HEALTH AND STANDARDS AND GUIDELINES FOR GRAZING ADMINISTRATION 43 CFR 4180

§ 4180.1 Fundamentals of rangeland health.

The authorized officer shall take appropriate action under subparts 4110, 4120, 4130, and 4160 of this part as soon as practicable but not later than the start of the next grazing year upon determining that existing grazing management needs to be modified to ensure that the following conditions exist.

(a) Watersheds are in, or are making significant progress toward, properly functioning physical condition, including their upland, riparian-wetland, and aquatic components; soil and plant conditions support infiltration, soil moisture storage, and the release of water that are in balance with climate and landform and maintain or improve water quality, water quantity, and timing and duration of flow.

(b) Ecological processes, including the hydrologic cycle, nutrient cycle, and energy flow, are maintained, or there is significant progress toward their attainment, in order to support healthy biotic populations and communities.

(c) Water quality complies with State water quality standards and achieves, or is making significant progress toward achieving, established BLM management objectives such as meeting wildlife needs.

(d) Habitats are, or are making significant progress toward being, restored or maintained for Federal threatened and endangered species, Federal Proposed, Category 1 and 2 Federal candidate and other special status species.

§ 4180.2 Standards and guidelines for grazing administration.

(a) The Bureau of Land Management State Director, in consultation with the affected resource advisory councils where they exist, will identify the geographical area for which standards and guidelines are developed. Standards and guidelines will be developed for an entire state, or an area encompassing portions of more than 1 state, unless the Bureau of Land Management State Director, in consultation with the resource advisory councils, determines that the characteristics of an area are unique, and the rangelands within the area could not be adequately protected using standards and guidelines developed on a broader geographical scale.

(b) The Bureau of Land Management State Director, in consultation with affected Bureau of Land Management resource advisory councils, shall develop and amend State or regional standards and guidelines. The Bureau of Land Management State Director will also coordinate with Indian tribes, other State and Federal land management agencies responsible for the management of lands and resources within the region or area under consideration, and the public in the development of State or regional standards and guidelines. Standards and guidelines developed by the Bureau of Land Management State Director must provide for conformance with the fundamentals of § 4180.1. State or regional standards or guidelines developed by the Bureau of Land Management State Director may not be implemented prior to their approval by the Secretary. Standards and guidelines made effective under paragraph (f) of this section may be modified by the Bureau of Land Management State Director, with approval of the Secretary, to address local ecosystems and management practices.

(c) The authorized officer shall take appropriate action as soon as practicable but not later than the start of the next grazing year upon determining that existing grazing management practices or levels of grazing use on public lands are significant factors in failing to achieve the standards and conform with the guidelines that are made effective under this section. Appropriate action means implementing actions pursuant to subparts 4110, 4120, 4130, and 4160 of this part that will result in significant progress toward fulfillment of the standards and significant progress toward conformance with the guidelines. Practices and activities subject to standards and guidelines include the development of grazing-related portions of activity plans, establishment of terms and conditions of permits, leases and other grazing authorizations, and range improvement activities such as vegetation manipulation, fence construction and development of water.

(d) At a minimum, State or regional standards developed under paragraphs (a) and (b) of this section must address the following:

(1) Watershed function;
(2) Nutrient cycling and energy flow;
(3) Water quality;
(4) Habitat for endangered, threatened, proposed, Candidate 1 or 2, or special status species; and
(5) Habitat quality for native plant and animal populations and communities.

(e) At a minimum, State or regional guidelines developed under paragraphs (a) and (b) of this section must address the following:

(1) Maintaining or promoting adequate amounts of vegetative ground cover, including standing plant material and litter, to support infiltration, maintain soil moisture storage, and stabilize soils;

(2) Maintaining or promoting subsurface soil conditions that support permeability rates appropriate to climate and soils;

BLM_0006914

(3) Maintaining, improving or restoring riparian-wetland functions including energy dissipation, sediment capture, groundwater recharge, and stream bank stability;

(4) Maintaining or promoting stream channel morphology (e.g., gradient, width/depth ratio, channel roughness and sinuosity) and functions appropriate to climate and landform;

(5) Maintaining or promoting the appropriate kinds and amounts of soil organisms, plants and animals to support the hydrologic cycle, nutrient cycle, and energy flow;

(6) Promoting the opportunity for seedling establishment of appropriate plant species when climatic conditions and space allow;

(7) Maintaining, restoring or enhancing water quality to meet management objectives, such as meeting wildlife needs;

(8) Restoring, maintaining or enhancing habitats to assist in the recovery of Federal threatened and endangered species;

(9) Restoring, maintaining or enhancing habitats of Federal Proposed, Category 1 and 2 Federal candidate, and other special status species to promote their conservation;

(10) Maintaining or promoting the physical and biological conditions to sustain native populations and communities;

(11) Emphasizing native species in the support of ecological function; and

(12) Incorporating the use of non-native plant species only in those situations in which native species are not available in sufficient quantities or are incapable of maintaining or achieving properly functioning conditions and biological health;

(f) In the event that State or regional standards and guidelines are not completed and in effect by February 12, 1997, and until such time as State or regional standards and guidelines are developed and in effect, the following standards provided in paragraph (f)(1) of this section and guidelines provided in paragraph (f)(2) of this section shall apply and will be implemented in accordance with paragraph (c) of this section.

(1) Fallback standards.

(i) Upland soils exhibit infiltration and permeability rates that are appropriate to soil type, climate and landform.

(ii) Riparian-wetland areas are in properly functioning condition.

(iii) Stream channel morphology (including but not limited to gradient, width/depth ratio, channel roughness and sinuosity) and functions are appropriate for the climate and landform.

(iv) Healthy, productive and diverse populations of native species exist and are maintained.

(2) Fallback guidelines.

(i) Management practices maintain or promote adequate amounts of ground cover to support infiltration, maintain soil moisture storage, and stabilize soils;

(ii) Management practices maintain or promote soil conditions that support permeability rates that are appropriate to climate and soils;

(iii) Management practices maintain or promote sufficient residual vegetation to maintain, improve or restore riparian-wetland functions of energy dissipation, sediment capture, groundwater recharge and stream bank stability;

(iv) Management practices maintain or promote stream channel morphology (e.g., gradient, width/depth ratio, channel roughness and sinuosity) and functions that are appropriate to climate and landform;

(v) Management practices maintain or promote the appropriate kinds and amounts of soil organisms, plants and animals to support the hydrologic cycle, nutrient cycle, and energy flow;

(vi) Management practices maintain or promote the physical and biological conditions necessary to sustain native populations and communities;

(vii) Desired species are being allowed to complete seed dissemination in 1 out of every 3 years (Management actions will promote the opportunity for seedling establishment when climatic conditions and space allow.);

(viii) Conservation of Federal threatened or endangered, Proposed, Category 1 and 2 candidate, and other special status species is promoted by the restoration and maintenance of their habitats;

(ix) Native species are emphasized in the support of ecological function;

(x) Non-native plant species are used only in those situations in which native species are not readily available in sufficient quantities or are incapable of maintaining or achieving properly functioning conditions and biological health;

(xi) Periods of rest from disturbance or livestock use during times of critical plant growth or regrowth are provided when needed to achieve healthy, properly functioning conditions (The timing and duration of use periods shall be determined by the authorized officer.);

(xii) Continuous, season-long livestock use is allowed to occur only when it has been demonstrated to be consistent with achieving healthy, properly functioning ecosystems;

(xiii) Facilities are located away from riparian-wetland areas wherever they conflict with achieving or maintaining riparian-wetland function;

(xiv) The development of springs and seeps or other projects affecting water and associated resources shall be designed to protect the ecological functions and processes of those sites; and

(xv) Grazing on designated ephemeral (annual and perennial) rangeland is allowed to occur only if reliable estimates of production have been made, an identified level of annual growth or residue to remain on site at the end of the grazing season has been established, and adverse effects on perennial species are avoided.

# APPENDIX B

Appendix B is a list of decisions from BLM's Resource Management Plans in Colorado that relate to the proposed and fallback standards and guidelines. They are presented to provide the reader with a sense of management direction for Resource Areas in Colorado.

The proposed action amends the RMP in Colorado to adopt standards and guidelines. The tables that follow include determinations on what happens to existing decisions in the RMPs if the proposed standards and guidelines are adopted. Three possible actions may occur:

1. Replace the current decision. The existing decision does not conform with the purpose and intent of the standards and guidelines and is removed from the RMP.

2. Modify the current decision. The wording of the existing decision needs to be modified to conform with the standards and guidelines. The modification to the existing decision is described as the end of the last table for each RMP.

3. Supplement the current decision. The existing decision conforms with the standards and guidelines. These decisions remain part of the RMP and are used with standards and guidelines during implementation.

Other decisions in the RMP are not shown, for they are not affected by adoption of standards and guidelines. During implementation, other decisions may need to be changed through the RMP plan modification process if it is determined they are in conflict with standards and guidelines. This may be particularly true for RMP decisions that allocate resources, such as ORV designations, allocated recreation use, or forage allocations. If decisions need to be changed through a plan amendment, they will be analyzed in an appropriate environmental document with the involvement of interested publics and the RAC.

APPENDIX 81.1

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**GRAND JUNCTION RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | *Proposed S&Gs* | *Fallback S&Gs* |
| **Soils Management (p.2-3 of the ARMP/ROD)**<br><br>Objective: To reduce soil erosion and sediment yield, costs associated with unsuccessful land/vegetation treatment projects on unsuitable soils, hazards to life or property from soil failure due to the use of unsuitable soils; to maintain long-term soil productivity; and to provide for the safe and proper use of soils. | Supplement | Supplement |
| **Water Resource Management (p. 2-4 of the ARMP/ROD)**<br><br>Objectives: Maintain or improve existing water quality in the resource area when possible. Protect the municipal watersheds providing domestic water for the cities of Palisade and Grand Junction. | Supplement | Supplement |
| **Forest Management (p.2-12 of the ARMP/ROD)**<br><br>Objectives: To manage the suitable pinyon/juniper woodlands and commercial forest land to maintain stand productivity and to help meet fuelwood and sawtimber demands. | Supplement | Supplement |
| ***Wildlife Management (p.2-14 of the ARMP/Rod).***<br><br>Objectives: To provide sufficient forage to maintain a population of 15,600 deer and 670 elk in summer and 34,400 deer and 2,950 elk in winter, *commensurate with public land health standards.* | Modify (1) | Modify (1) |
| To maintain the existing species in the resource area, and improve the habitat of each species of game and non-game primarily according to the species' susceptibility to BLM influence and secondarily to the evidence of human demand. | Supplement | Supplement |
| *To maintain the existing riparian acreage and manage it for the greatest diversity in plant heights and for the species appropriate (native) to each site.* | Supplement | Supplement |
| To increase fish production on the producing aquatic areas and improve the cool water fisheries potential on marginal streams. | Supplement | Supplement |
| **Threatened and Endangered Species Management (p. 2-16 of the ARMP/ROD)**<br><br>Objective: To conserve plants and animals and their related habitats listed by federal and Colorado governments as threatened and endangered species, and to conserve plants and animals that are candidate for their lists. To maintain at least the present populations and their habitat and contribute to the overall objective of improving them so that they can be removed from the threatened or endangered status lists. | Supplement | Supplement |

APPENDIX B1.2

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**GRAND JUNCTION RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Livestock Management (p.2-17 of the ARMP/ROD).** | | |
| Objective: To manage livestock as described in the Grand Junction Grazing Environmental Statement, *commensurate with public land health standards.* | Modify (2) | Modify (2) |
| Grazing Management Decisions: | | |
| • Manage livestock grazing as described in the Grand Junction Grazing Management Environmental Statement using the new priorities and general management categories established in this Plan (i.e., ARMP/ROD). | Supplement | Supplement |
| • Revise allotment management plans to resolve conflicts between grazing and this plan's proposed actions for soils, riparian and water resources. | Supplement | Supplement |
| **Wild Horse Management (p.2-18 of the ARMP/ROD).** | | |
| Objective: To maintain a viable wild horse herd and continue implementing the Little Book Cliffs Wild Horse Management Plan. | Supplement | Supplement |
| **Fire Management (p.2-31 of the ARMP/ROD)** | | |
| Objectives: To minimize cost and loss, complement resource management objectives, and sustain the productivity of the biological ecosystems through fire management. | Supplement | Supplement |
| **Off-Road Vehicle Management (p.2-22 of the ARMP/ROD)** | | |
| Objective: To designate all public land for off-road vehicle use and use restrictions by September 30, 1987. | Supplement | Supplement |
| **Recreation Resource Management (p.2-20 of the ARMP/ROD)** | | |
| Objective: To ensure the continued availability of outdoor recreational opportunities which the public seeks and which are not readily available from other public or private entities. To protect resources, meet legal requirements for visitor health and safety, and mitigate resource user conflicts. | Supplement | Supplement |

(1) "add" commensurate with public land health standards
(2) "add" commensurate with public land health standards

APPENDIX B2.1

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**GLENWOOD SPRINGS RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Water Quality Management (p.8 of the ARMP/ROD)**<br><br>Objective: To maintain or improve existing water quality in the resource area where possible. | Supplement | Supplement |
| **Water Yield Management ( p.11 of the ARMP/ROD.)**<br><br>Objective: To increase water yield throughout the resource area through forest management practices and through treatment of mountain brush vegetation types to improve livestock and big game forage. | Replace | Replace |
| **Critical Watershed Areas (p.31 of the ARMP/ROD.**<br><br>Objective: To protect the municipal watersheds providing domestic water for the communities of Rifle and New Castle, to manage debris flow hazard zones adjacent to Glenwood Springs, and to protect watershed conditions in erosion hazard areas. | Supplement | Supplement |
| **Aquatic Habitat Management (p.34 of the ARMP/ROD)**<br><br>Objective: To increase fish production and recreational fishing use on streams having more than one-half mile of continuous flow access across public land and on lakes surrounded by at least 40 acres of public land. | Supplement | Supplement |
| **Terrestrial Habitat Management (p. 37 of the ARMP/ROD.)**<br><br>Objective: To provide approximately 57,933 AUMs of big game forage *(the amount needed to meet Colorado Division of Wildlife goals in 1988)* to improve existing wildlife habitat conditions, and to increase wildlife species diversity. | Modify (1) | Modify (1) |
| **Livestock Grazing Management (p.20-31 of the ARMP/ROD).**<br><br>Objective: To provide AUMs of livestock forage to accommodate active livestock preference, *commensurate with meeting standards.* Active livestock preference is that portion of the total preference for which grazing use may be authorized | Modify (2) | Modify (2) |
| Planned Management Actions:<br>• Intensively manage certain allotments identified on page 20 and using techniques described in Appendix A of the ARMP. | Supplement | Supplement |
| • Construct facilities such as springs, reservoirs, corrals, and livestock trails where necessary to control and distribute livestock. | Supplement | Supplement |

APPENDIX B2.2

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**GLENWOOD SPRINGS RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Livestock Grazing Management (con't)** | | |
| **Planned Management Actions (con't):** | | |
| (*The following is paraphrased from a lengthy section of the ARMP*) Additional forage that becomes available on allotments that are winter range for big game will be allotted to wild life but only within DOW goals; additional forage that becomes available on allotments with big game summer range will be allocated to livestock. | Supplement | Supplement |
| • Adjust the season of use on 53 allotments - changes are made when the allotment is transferred to a new permittee or when the current permittee volunteers to accept the changes. | Supplement | Supplement |
| • Specific allotment preference, use and allocation are found on pp. 22-29 of the ARMP). | | |
| **Forest Management (p.31 of the ARMP/ROD)** | | |
| Objective: To manage all suitable commercial forest land and woodland to meet sawtimber and fuelwood demand and maintain productivity. | Modify (3) | Modify (3) |
| **Fire Management (p.44 of the ARMP/ROD)** | | |
| Objective: To reduce losses, complement resource management objectives, and sustain the productivity of the biological ecosystems through fire management. Commensurate with maintaining productivity. | Supplement | Supplement |
| **Recreation Resource Management (p.30 of the ARMP/ROD)** | | |
| Objective: To ensure the continued availability of outdoor recreational opportunities which the public seeks and which are not readily available from other sources, to reduce the impacts of recreational use on fragile and unique resource values, and to provide for visitor safety. | Supplement | Supplement |
| **Off-Road Vehicle Management (p. 36 of the ARMP/ROD)** | | |
| Objective: To prevent fragile and unique resource values from damage by off-road vehicle (ORV) use and to provide ORV use opportunities where appropriate. | Supplement | Supplement |

(1) "delete" the amount needed to meet Colorado Division of Wildlife goals in 1988
(2) "add" commensurate with meeting standards
(3) "add" commensurate with maintaining productivity

APPENDIX B3.1

## HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

## GUNNISON RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **AREA-WIDE DECISIONS** | | |
| **Soils and Water Resources (p.2-2 of the ARMP/ROD)**<br>Objectives: Manage resources to achieve target basal densities on upland ecological sites as defined in Table I-1 of Appendix I of the ARMP/ROD.<br>• Additional forage generated from projects will go first to meet watershed needs. | Supplement | Supplement |
| **Vegetation (p.2-2 of the ARMP/ROD)**<br>Objectives: Manage vegetation resources to achieve *(at least a late seral)* ecological status by maintaining or improving the vigor, production, and diversity of desirable plants. Desired plant communities will be identified in activity plans. | Modify (1) | Modify (1) |
| **Riparian Zones (pp.2-2 thru 2-4 of the ARMP/ROD)**<br>Objectives: Manage riparian areas to maintain, restore, or improve riparian conditions such that proper functioning conditions are achieved, and to enhance natural values. | Supplement | Supplement |
| **Special Status Plant and Animal Species and Habitat (p.2-4 of the ARMP/ROD)**<br>Objective : Habitat supporting existing populations of USFWS listed threatened and endangered species, and USFWS candidate, and BLM sensitive species will be maintained and protected to ensure suitable habitat conditions and viable populations. | Supplement | Supplement |
| **Wildlife (pp. 2-4 through 2-6 of the ARMP/ROD)**<br>Objectives: Implement methods to manage public lands to help meet within the carrying capacities of the habitat, CDOW long-range herd goals, maintain or improve vegetation communities to benefit both game and non-game wildlife, implement a program to increase to quality and quantity of crucial big game winter range, and cooperate with CDOW and other organizations to maintain or enhance big game and/or upland game habitats. | Supplement | Supplement |
| • Big-game utilization should not exceed moderate use (40-60%), *commensurate with capability.* | Supplement | Supplement |
| • Provide habitat to support 9,000 sage grouse on public lands. | Modify (2) | Modify (2) |
| • Endemic non-game animal species habitat will be enhanced by improving and/or maintaining a variety of native plant species and vegetative structure in upland and riparian areas, improving the ecological condition of sagebrush communities, and improving of maintaining non-game habitat within forest lands. | Supplement | Supplement |
| • Fishery streams and associated riparian areas will be managed to improve or maintain the existing ecological status (hydrological, soil, and vegetation. | Supplement | Supplement |
| **Livestock Grazing Management (pp. 2-6 through 2-12 of the ARMP/ROD)**<br>Objectives: Allow grazing *if commensurate with public land health* on 470,460 acres (approximately 60,135 AUMs of which 45,539 are active and the balance are suspended). | Modify (3) | Modify (3) |
| • Allotment categorization for M and C allotments will be that as defined in the 1987 RPS. | Supplement | Supplement |

APPENDIX B3.2

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**GUNNISON RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Grazing (Con't)** | | |
| **Grazing Management Actions:** | | |
| • For "I" allotments, the RMP identifies utilization levels for the upland areas and for riparian areas (including maximum use levels and minimum stubble heights for key species in riparian areas). | Supplement | Supplement |
| • Continue to identify structural and non-structural improvements (including fences, water developments, weed and pest control, and land treatments such as burning, spraying and chaining)and prescribe them in activity plans or agreements. They must be designed and built to avoid conflicts with wildlife, scenic values, etc. | Supplement | Supplement |
| • Activity plans will be developed within funding capability using collaborative input. They will incorporate allotment specific objectives for protecting, maintaining, or improving livestock forage, wildlife and fish habitat, and riparian areas. | Supplement | Supplement |
| • Monitoring will consist of: actual use, utilization and trend data, use supervision, precipitation, ESI, soil erosion, and water quality and quantity. | Supplement | Supplement |
| • Best management practices will be used to reduce soil erosion. | | |
| • Public lands unsuitable or unavailable for livestock grazing will continue unavailable unless monitoring proves otherwise. | Supplement | Supplement |
| **Forest Management (p.2-12 of the ARMP/ROD)** Objectives: Suitable commercial forest lands will be managed for sustained yield production within the allowable cut restrictions and guidelines determined by TPCC. Special emphasis will be placed on over-mature and pest-killed trees. | Supplement | Supplement |
| **Fire Management (p.2-15 of the ARMP/ROD)** Objectives: "Conditionally" suppress wildfires on about 508,388 acres and "fully" suppress fire on 76,624 acres. | Supplement | Supplement |
| • Unit objectives will dictate the choice of fire suppression methods. | Supplement | Supplement |
| • Allow for prescribed fire unit-wide for resource enhancement and fuel hazard reduction. | Supplement | Supplement |
| **Unit #1 (p.2-20 of ARMP/ROD)** Objectives: This unit, a Special Recreation Management Area, will be managed to protect scenic recreation resources and to protect fragile ecosystems. | Supplement | Supplement |
| Livestock Grazing Actions: | | |
| • Grazing allowed within the capabilities of the ecosystems. | Supplement | Supplement |
| • No grazing along the north fork of Henson Creek to protect the fishery/stream conditions. | Supplement | Supplement |

APPENDIX B3.3

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**GUNNISON RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| Unit #2 (p.2-22 of ARMP/ROD)<br>Objectives: This unit is now a designated Wilderness Area, managed for those values.<br><br>Livestock Grazing Actions:<br>• Actions must comply with wilderness laws.<br>• No grazing in Allotment 6112 to prevent conflict with bighorn sheep.<br>• Livestock grazing along certain creeks will maintain 4 inch stubble height for key forage species.<br><br>Livestock Grazing Actions:<br>• None identified. | Supplement | Supplement |
| Unit #3 (p. 2-23 of the ARMP/ROD)<br>Objectives: Manage this SRMA to provide and improve the existing diversity of recreation opportunities.<br><br>Livestock Grazing Actions:<br>• Grazing is not permitted along Cochetopa Creek.<br>• No sheep grazing allowed to prevent conflicts with bighorn sheep. | Supplement | Supplement |
| Unit #4 (p.2-24/25 of the ARMP/ROD)<br>Objectives: Manage this ACEC for the protection and enhancement of visual and other natural resources and recreation opportunities.<br><br>Livestock Grazing Actions:<br>• Manage grazing to avoid conflicts with recreation.<br>• Manage consistent with unit objectives. | Supplement | Supplement |
| Unit #6 (p.2-26 of the ARMP/ROD)<br>Objectives: Manage this ACEC to protect the habitat of the Uncompahgre fritillary butterfly.<br><br>Livestock Grazing Actions:<br>• Control domestic sheep to protect habitat for the butterfly.<br>• No grazing along Silver Creek to protect the butterfly. | Supplement | Supplement |
| Unit #8 (pp.2-26/27 of ARMP/ROD)<br>Objectives: Manage this National Natural Landmark/ACEC to protect natural values within the earthflow.<br><br>Livestock Grazing Actions:<br>• None identified. | Supplement | Supplement |

APPENDIX B3.4

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

GUNNISON RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Unit #7 (p.2-27,28,and 29 of ARMP/ROD)**<br>**Objectives:** Manage this ACEC to improve the capabilities of the resources in the unit to support wintering elk.<br><br>**Livestock Grazing Actions:**<br>• No grazing along Stevens Creek and Allotment 6200. | Supplement | Supplement |
| **Unit #8 (p.2-28/29 of the ARMP/ROD)**<br>**Objectives:** Manage this ACEC to protect USFWS Category 2 species - the skiff milkvetch.<br><br>**Livestock Management Actions:**<br>• Domestic sheep grazing not allowed.<br>• No vegetative treatments that would adversely affect milkvetch habitat. | Supplement | Supplement |
| **Unit #9 (p.30 of the ARMP/ROD)**<br>**Objectives:** Manage this ACEC to protect scenic and recreational opportunities.<br><br>**Livestock Management Actions:**<br>• No livestock grazing will be authorized to protect scenic values. | Supplement | Supplement |
| **Unit #10 (p.2-31 of ARMP/ROD)**<br>**Objectives:** This unit will be managed to maintain or improve habitat for bighorn sheep.<br><br>**Livestock Grazing Actions:**<br>• No domestic sheep grazing to prevent conflict with bighorn sheep.<br>• Range improvements allowed if compatible with unit objectives. | Supplement | Supplement |
| **Unit #11 (p.2-32 of ARMP/ROD)**<br>**Objectives:** This unit will be managed to improve and maintain sagebrush vegetative communities in order to optimize sage grouse populations.<br><br>**Livestock Grazing Management:**<br>• Range improvements allowed if compatible with unit objectives.<br>• Additional forage, the result of livestock treatments will be allocated to livestock grazing. | Supplement | Supplement |

APPENDIX B3.5

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

GUNNISON RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Unit #12 (PP.2-33/34 of ARMP/ROD)**<br>**Objectives:** This unit will be managed to improve habitat conditions and increase the production and diversity of shrub species in upland and riparian vegetative types to support wintering populations of deer and elk and to meet CDOW long-range herd goals.<br><br>**Livestock Grazing Actions:**<br>• Domestic sheep grazing will be seasonally excluded in Game Unit 64 to eliminate competition with big game forage. | Supplement | Supplement |
| **Unit #13 (pp.2-34/35 of ARMP/ROD)**<br>**Objectives:** This unit will be managed to improve or maintain ecological conditions; suitable public land will be available for livestock grazing.<br><br>**Livestock Grazing Actions:**<br>• No livestock grazing along Los Pinos Creek until riparian conditions improve. | Supplement | Supplement |
| **Unit #14 (pp.2-36/37 of ARMP/ROD)**<br>**Objectives:** This unit will be managed to protect, restore, and enhance riparian areas containing important sage grouse broodbearing areas.<br><br>**Livestock Grazing Actions:**<br>• Seasonally maintain 4 inch stubble height to improve cover for sage grouse chicks; maintain 2½ inch stubble height at other times. | Supplement | Supplement |

APPENDIX B3.6

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**GUNNISON RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | *Proposed S&Gs* | *Fallback S&Gs* |
| **Unit #15 (pp.2-37/38 of ARMP/ROD)**<br>**Objectives:** This unit will be managed to restore and enhance the condition of fishery streams.<br><br>**Livestock Grazing Actions:**<br>• When grazing occurs, a minimum stubble height of 4 inches will be maintained. There is management flexibility with this standard.<br>• No livestock grazing allowed along Henson Creek. | Supplement | Supplement |
| **Unit #16 (pp.2-38/39 of ARMP/ROD)**<br>**Objectives:** This unit will be managed according to general management (these are somewhat fragmented lands).<br><br>***Livestock Grazing Actions:***<br>• No grazing along Wildcat Creek. | Supplement | Supplement |
| **Recreation Resource Management (p.2-13 of the ARMP/ROD)**<br><br>**Objective:** Manage public lands to ensure the continued availability and diversity of resource-dependent outdoor recreation opportunities. | Supplement | Supplement |

(1) "delete" at least late seral
(2) "add" commensurate with capability
(3) "add" if commensurate with public land health

APPENDIX B4.1

## HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

### KREMMLING RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Water Resource Management ( p.6 record of Decision)** | | |
| a. Objective - Protect and enhance groundwater and sensitive watersheds in association with actions of other resource programs and which meets state water quality standards. | Supplement | Supplement |
| b. Planned actions: | | |
| • Maintain streams that meet or exceed state water quality standards through limited management | Supplement | Supplement |
| • Protect ground water to maintain good quality | Supplement | Supplement |
| • Restrict activities that would adversely affect sensitive watersheds. | Supplement | Supplement |
| **Livestock Grazing Management (p.6,7)** | | |
| a. Objective - | | |
| • Allocate a base level of livestock forage at 39,726 AUMs and refine as monitoring data becomes available. | Supplement | Supplement |
| • Increase forage production in 20 years by 37% to a level of 54,296 AUMs; intensify management on 76 large allotments representing 51% of public land in the RA, *commensurate with public land health standards.* | Modify (1) | Modify (1) |
| • Improve overall range condition from the current 20% in satisfactory to 70%. | Replace | Replace |
| b. Planned Actions: | | |
| Provide intensive management for 76 of the 311 grazing allotment in the RA by: | | |
| • Adjust stocking rates to proper allocation levels in accordance with the range condition inventory and monitoring studies data. | Supplement | Supplement |
| • Design grazing systems providing minimum rest requirements and/or adjusting seasons of use. | Supplement | Supplement |
| • Conduct comprehensive use supervision and monitoring. | Supplement | Supplement |
| • Consult with permittees concerning adjustments and other decisions affecting their allotments. | Supplement | Supplement |
| • Invest in cost-effective range improvements to implement grazing systems.(Proposed are spring developments, stock ponds, wells, ditch, pipelines, fence, and land treatments). | Supplement | Supplement |
| • *Allocate additional forage made available through intensive management practices* | Supplement | Supplement |
| **Wildlife Management, Including Threatened and Endangered Species ( p.8 Record of Decision).** | | |
| a. Objective - manage public land habitat to support optimum wildlife populations as determined by the Colorado Division of Wildlife's Strategic Plan, *commensurate with public land health standards and other allocations.* Emphasis will be placed on intensively managing critical and important wildlife habitats including 326,000 acres of upland, 3 miles of riparian, 3,000 acres of wetlands, and 53 miles of stream. | Modify (2) | Modify (2) |

(1) "add" commensurate with public land health standards
(2) "add" commensurate with public land health standards and other allocations

APPENDIX B4.2

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**KREMMLING RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Recreation Resource Management (p.11 of the ARMP/ROD)**<br><br>Objective: To ensure the continued availability of outdoor recreational opportunities which the public seeks and which are not readily available from other sources, to reduce the impacts of recreational use on fragile and unique resource values, and to provide for visitor safety, and resource interpretation. | Supplement | Supplement |
| **Forest Management (p.10 of the ARMP/ROD)**<br><br>a. Objective: To manage all productive forest land that is suitable for producing a variety of forest products on a sustained yield basis. This action will create a healthy forest environment through continued forest management products.<br>b. Planned actions:<br>• Provide intensive management for approximately 40,000 acres - maintain and protect the remaining forested lands.<br>• Actions will emphasize improving forest vigor and growth, as well as minimizing losses caused by insects, diseases, or fire. | Supplement<br><br>Supplement<br>Supplement | Supplement<br><br>Supplement<br>Supplement |
| **Off-Road Vehicle Management (p.12 of ARMP/ROD)**<br><br>Objective: To protect fragile and unique resource values from damage by off-road vehicle (ORV) use and to provide ORV use opportunities where appropriate. | | |

APPENDIX B5.1

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

LITTLE SNAKE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **AREA-WIDE DECISIONS** | | |
| **Livestock Grazing (p.6 of the ARMP/ROD)** | | |
| Objectives: The Bureau's objective is to improve range conditions in terms of species diversity and abundance, as well as increasing carrying capacities for both livestock and wildlife. Estimates of stocking rates contained in the plan do not necessarily reflect the need for the intent to commensurately reduce livestock stocking levels. Monitoring studies will be conducted to more accurately determine carrying capacities and the condition and trend of plant communities in relation to the above stated objective. Decisions to increase/decrease livestock and/or wildlife numbers con only be made after this information has been determined and management techniques are developed so that livestock and wildlife utilization can be managed. If adjustments are determined to be necessary, every effort will be made to accomplish them through consultation with individual ranchers, the Colorado Division of Wildlife, and other interests, as appropriate. Consultation and coordination will also be sought during monitoring and other phases of the studies. The goal of the livestock management program is to improve the range land forage resource by managing toward a desired plant community. | Supplement | Supplement |
| Planned Actions: | | |
| • Livestock grazing utilizing federal preference (166,895 AUMs) will be allowed until rangeland monitoring studies are completed. | Supplement | Supplement |
| • BLM will immediately begin rangeland monitoring on M and I category allotments, including 13 conflict allotments. | Supplement | Supplement |
| • Surveys done during 1981-1983 for 73% of the area and earlier survey's for the rest of the area, which estimated forage available to support a grazing level of 148,821 AUMs will be used as baseline inventory data. | Supplement | Supplement |
| •Livestock use adjustments will be implemented in accordance with 43 CFR 4110.3-3 after acquiring a minimum of 2 years of rangeland monitoring data, in combination with baseline data. Decisions implementing changes in livestock use will be issued as soon as data are available to support that change. In no case will more than 5 years of rangeland monitoring data be required for adjustments. Any adjustments would result in consultation/coordination with the livestock operator. | Supplement | Supplement |
| • BLM policy is to issue decisions or enter into agreements within 5 years of publication of a Range-land Program Summary (RPS) following completion of a Grazing Environmental Impact Statement Resource Management Plan (EIS/RMP). An RPS is issued within 5 years after the RMP is signed. A five year implementation period will be used. Decisions will be issued in the third and fifth years to modify the adjustments as necessary to reach estimated grazing updates. Mutual agreements may be entered into at any time during the five year period. These will also be documented in the RPS updates. | Supplement | Supplement |
| • Grazing will be temporarily suspended in areas where key forage plants have been critically over-utilized. | Supplement | Supplement |

APPENDIX B5.2

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**LITTLE SNAKE RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Livestock Grazing (Con't)** | | |
| • Vegetation land treatments will involve interseeding, spraying, plowing, and reseeding. In conducting these treatments, BLM will adhere to established procedures and design specifications to protect all resource uses and values. A benefit/cost analysis and environmental analysis will be completed before any treatments are implemented. | Supplement | Supplement |
| • Range improvement projects will be completed on 69 allotments to control livestock use, improve distribution, and improve riparian/ wetland habitat. A benefit/cost analysis and environmental analysis will be completed before any projects are implemented. | Supplement | Supplement |
| • Management categorization will be updated as the result of rangeland condition change or as data changes becomes available through the monitoring program. | Supplement | Supplement |
| • Allotment management plans will be developed *if needed* for allotments within the Little Snake Resource Area. Level of detail for each plan will be determined from the management category for that allotment. | Modify (1) | Modify (1) |
| **Wildlife Habitat (p.12 of the ARMP/ROD).** | | |
| *Objectives: Improve those rangelands that are key wildlife habitats and have the potential for increased forage production for wildlife grazing by improving soil and water resources.* Maintain those rangelands that are at their desired plant communities. | Supplement | Supplement |
| • Determine stocking rates for wildlife and livestock that result in proper use of the public rangelands within the 13 conflict allotments. Issues decisions or enter into agreements to establish forage use and grazing capacity. The BLM will consult with the Colorado Division of Wildlife, affected grazing permittees, and other interested parties. | Supplement | Supplement |
| **Threatened/Endangered, Candidate, and Sensitive Plants (p.14 of the ARMP/ROD)** | | |
| Objectives: Protect, conserve, and manage Colorado BLM sensitive plant species and locations with adjacent critical sites that affect their habitat. If any threatened/ endangered or candidate plant species is identified in the Little Snake Resource Area, it would be protected through no-surface occupancy stipulations and any other actions needed to prevent its deterioration and allow its recovery. | Supplement | Supplement |
| **Wild Horses (p.15 of the ARMP/ROD)** | | |
| Objectives: | | |
| • Protect wild free-roaming horses in the Sand Wash Basin from un-authorized capture, branding, harassment, and destruction. | Supplement | Supplement |
| • Manage herds of wild horses as an integral part of the public lands ecosystem under the principle of multiple use. | Supplement | Supplement |
| • Manage wild horse habitat to achieve and maintain a thriving natural ecological balance. | Supplement | Supplement |

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

LITTLE SNAKE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Wild Horses (con't)** | | |
| • Maintain correct data about wild horse populations and their habitats. | Supplement | Supplement |
| • Remove excess wild horses periodically to maintain appropriate management levels on the herd management area. | Supplement | Supplement |
| • Remove horses that stray from Sand Wash as soon as practical. | Supplement | Supplement |
| **Soil and Water Resources (p.16 of the ARMP/ROD).** | | |
| Objectives: Prevent deterioration of soil conditions and stabilize and rehabilitate areas where accelerated erosion and runoff have resulted in unacceptable resource conditions. | Supplement | Supplement |
| • Prevent disturbance to fragile soil areas where resulting erosion could not be controlled. | Supplement | Supplement |
| • Maintain the integrity of streams and their associated riparian values in public lands that meet state water quality standards and have acceptable channel stability. | Supplement | Supplement |
| • Protect and maintain present groundwater quality and quantity. | Supplement | Supplement |
| **Forest Lands and Woodlands (p.16 of the ARMP/ROD)** | | |
| Objective: Manage the suitable pinon/juniper woodlands and commercial forest lands to maintain stand productivity and to help meet fuelwood and saw timber demand on a sustained-yield basis. | Supplement | Supplement |
| **Fire Management (pp.19-20 of the ARMP/ROD).** | | |
| Objective: | | |
| In full suppression zones the objectives are: | | |
| • Give full priority to personal safety, life, or property. | Supplement | Supplement |
| • Prevent wildfire from causing any tree mortality in current and proposed commercial timber sale and woodland product contract areas. | Supplement | Supplement |
| • Prevent wildfire from destroying any perishable designated cultural resource sites. | Supplement | Supplement |
| • Prevent wildfire from destroying areas with significant riparian values. | Supplement | Supplement |
| In conditional suppression zones: | | |
| • Suppress all wildfire by taking appropriate suppression action. Appropriate actions will be based upon preplanned analysis consistent with land management objectives including the threat of life and property, economic evaluations, and resource constraints. | Supplement | Supplement |
| • Use suppression strategies which do not require unnecessary exposure of firefighters and equipment to threatening situations. | Supplement | Supplement |
| • Until appropriate suppression actions which will avoid all unnecessary impairment of wilderness values and is consistent with Interim Management Policy. | Supplement | Supplement |

APPENDIX B5.4

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

LITTLE SNAKE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Fire Management (con't.)**<br><br>In prescribed fire zones, the objectives is to use planned and unplanned ignition meet the objectives of other resources, such as livestock and wildlife for the use of fire to improve vegetative conditions. | Supplement | Supplement |
| **Natural History (Area of Critical Environmental Concern) (pp.24-25 of the ARMP/ROD)**<br><br>Objective: To protect identified areas that contain important historic, cultural, scenic, and natural values or to protect human life and safety from natural hazards, pursuant to the FLPMA and BLM regulations at 43 CFR 1610. | Supplement | Supplement |
| **SPECIFIC UNIT OBJECTIVES AND ACTIONS**<br><br>**#1 Eastern Yampa:** The objectives for this unit are to realize the potential for development of coal,oil, and gas resources.<br><br>Livestock Grazing Actions:<br>• Public lands are open to grazing unless coal development is imminent.<br>• Management practices are allowable consistent with unit objectives. | Supplement | Supplement |
| **#2 Northern Central:** The objectives for this unit are to provide for the oil and gas resource and management of the commercially valuable stands of lodgepole and ponderosa pine.<br><br>Livestock Grazing Actions:<br>• Lands are open to grazing and management practices permissible consistent with management objectives. | Supplement | Supplement |
| **#3 Little Snake River:** The management objectives of this unit are to improve soil and watershed values, increase forage production, and enhance livestock grazing.<br><br>Livestock Grazing Actions:<br>AMPs, rangeland improvements, and vegetative land treatments will be developed to improve the vegetation, soil, and watershed resources and values. | Supplement | Supplement |
| **#4 Eastern Foothills:** The management objectives for this unit are to provide for the development of oil, gas, and geothermal resources.<br><br>Livestock Grazing Actions:<br>Same as #2. | Supplement | Supplement |

APPENDIX B5.5

HOW WILL STANDARDS AND GUIDELINE AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

LITTLE SNAKE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **#6 Northern Great Divide:** The management objectives for this unit are to maintain and improve critical habitat for sage grouse, mule deer, and pronghorn antelope.<br><br>Livestock Grazing Actions:<br>• Public Lands are open to livestock grazing.<br>• BLM-funded or livestock operator funded projects or land treatments are allowed when authorized when compatible with the management objectives for this unit. | Supplement | Supplement |
| **#7 Scattered Sands:** The objectives for this unit are to 1)provide for the development of the locatable minerals and leasable minerals other than coal, oil and gas, and geothermal resources, and 2) make areas available to supply demand for sand, gravel, and other saleable mineral materials.<br><br>Livestock Grazing Actions:<br>Same as #2. | Supplement | Supplement |
| **#8 Axial Basin:** The management objectives for this unit are to maintain and improve critical habitats for mule deer, elk, and sage grouse.<br><br>Livestock Grazing Actions:<br>Same as #6 | Supplement | Supplement |
| **#9 Cold Spring:** The management for these units are to maintain and improve the quality of 1) the habitat for elk, mule deer, big horn sheep, the fisheries in Beaver Creek, and 3) the recreational opportunities which exist here especially for hunting.<br><br>Livestock Grazing Actions:<br>Same as #6 | Supplement | Supplement |
| **#10 Cross Mountain and Diamond Breaks Wilderness Study Areas:** The objectives are to manage these areas for there wilderness characteristics.<br><br>Livestock Grazing Actions:<br>Allow livestock grazing in manner consistent with the area's wilderness values and in accordance with interim management policy. | Supplement | Supplement |
| **#11 Recreation Areas Little Yampa, Cedar Mountain, and Wild Mountain:** The objectives are to manage these areas for their recreation values and for the outstandingly remarkable values of the Yampa River (Wild and Scenic River criteria)<br><br>Livestock Grazing Actions:<br>Same as #2. | Supplement | Supplement |

APPENDIX B5.6

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

LITTLE SNAKE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **#12 Vermillion:** The objectives are to prevent any increases in erosion and/or sediment yield.<br>Livestock Grazing Actions:<br>• Grazing is permitted.<br>• Management practices or range improvement projects are subject to performance standards found on page 16 of the ARMP/ROD. | Supplement | Supplement |
| **#13 Limestone Ridge, Irish Canyon, and Lookout Mountain ACECs** : The management objectives for these areas are to protect and enhance remnant plant associations and Colorado BLM sensitive plant species, scenic qualities, and other natural values.<br><br>Livestock Grazing Actions:<br>• Same as #2 except that no range improvement projects or treatments are allowed in the Limestone ridge ACEC. | Supplement | Supplement |
| **#14 Middle Mountain** : The management objectives of this unit are to maintain and improve the quality of the habitat for the elk herd, mule deer, and raptors.<br><br>Livestock Grazing Actions:<br>• Same as #6. | Supplement | Supplement |
| **#15 Cross Mountain Foothills** : The management objectives for this unit are to maintain and improve the quality of the bighorn sheep, elk, and mule deer.<br><br>Livestock Grazing Actions:<br>• Same as #6. | Supplement | Supplement |
| **#16 West Red Wash** : The management objectives for this unit are to maintain and improve the quality of the habitat for bighorn sheep, elk and mule deer.<br><br>Livestock Grazing Actions:<br>• Same as #6. | Supplement | Supplement |
| **#17 Willow Creek** : The management objectives for this unit are to maintain and improve critical habitat for greater sandhill crane.<br><br>Livestock Grazing Actions:<br>• same as #6 | Supplement | Supplement |
| **Recreation Resource Management**<br><br>Objectives: Protect and maintain a diversity of outdoor recreation opportunities, activities, and experiences. Provide high-quality visitor services, including interpretive information. Maintain established recreation opportunity spectrum classes upon implementation of all planned management actions. Ensure maintenance and minimize degradation of existing visual resource management classes. | Supplement | Supplement |

(1) "deleted" all, "add" if needed

APPENDIX B6.1

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

ROYAL GORGE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **UNIT-WIDE DECISIONS**<br><br>**Sensitive Soils (p.3-1 of the PRMP\FEIS)**<br>Objectives: Manage resources and actions to avoid soil loss erosion and loss of watershed values during the life of the plan. | Supplement | Supplement |
| **Water Quality (p. 3-3 of the PRMP\FEIS)**<br>Objectives: Maintain or improve water quality in accordance with state and Federal standards. | Supplement | Supplement |
| **Noxious Weeds (p.3-3 of the PRMP\FEIS)**<br>Objectives: Control weeds through-out the planning area according to the principles of integrated pest management and the Colorado Undesirable Plant Act. | Supplement | Supplement |
| **Fire Management (p.3-3 through 3-4 of the PRMP\FEIS)**<br>Objectives: Protect property and interspersed lands, the entire area will be managed for full fire suppression.<br>• Enhance resource management through the use of prescribed fire. | Supplement | Supplement |
| **Vegetation Management (p. 3-5 of the PRMP/FEIS)**<br>Objectives: Attain healthy watershed and soil conditions based on site potential<br>• site specific objectives, including specific Desired Plant Communities (DPC) will be identified in integrated activity plans, and in most cases will be a diverse community of grasses, shrubs, and trees that could be reasonably achieved. | Supplement | Supplement |
| **Livestock Grazing Management (p.3-5)**<br>Objectives: Allow grazing according to the 1981 Grazing EIS with changes to address compatibility with other resource values identified in the plan. | Supplement | Supplement |
| **Livestock Grazing Actions:** | | |
| • Improvements and treatments are utilized if needed. | Supplement | Supplement |
| • Allocation of any additional forage will be made after consultation with affected interests. | Supplement | Supplement |
| • A rest standard for "I" and "M" allotments will be required to allow plants to regrow, retain vigor, and produce seeds and seedlings. | Supplement | Supplement |
| • Maximum allowable utilization will be 80% for grasses and 60% for shrub species. | Supplement | Supplement |
| • On single pasture allotments with season long spring/summer grazing, utilization will be held to the 40-60% range on forage species in lieu of a rest standard. | Supplement | Supplement |
| **Riparian (extracted from unit descriptions):**<br>Objectives: 75% of all riparian areas will be in properly functioning condition by 1997. | Supplement | Supplement |

APPENDIX B6.2

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

ROYAL GORGE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| Unit #1 - Arkansas River Subregion<br>This unit generally encompasses the Arkansas River Corridor from Canon City to Leadville.<br>Objectives: Protection and/or enhancement of water quality, fisheries, and recreation values are emphasized. | Supplement | Supplement |
| Livestock Grazing Actions:<br>• Exclude grazing in Mosquito Pass ACEC,restrict to portion of High Mesa Grassland ACEC; exclude grazing in developed recreation sites, and NRHP sites if needed. | Supplement | Supplement |
| • Use BLM fencing,cooperative projects, or elimination of grazing to eliminate livestock drift onto uncontrolled private land. | Supplement | Supplement |
| Unit #2 - Collegiate/Sangre Subregion - This unit represents the valley floor and foothills adjacent to the aforementioned mountains.<br>Objectives: Protection and/or enhancement of vegetation, special status plants and animals, wild- life, and wilderness values are emphasized. | Supplement | Supplement |
| Livestock Grazing actions:<br>• Adjust season of use and stocking rates in the Droney Gulch ACEC. | Supplement | Supplement |
| • Allotments re-categorized due to watershed and riparian conflicts. | Supplement | Supplement |
| Unit #3 - Badger Creek Sub-Region<br>This area encompasses the Badger Creek area north of the Arkansas River.<br>Objectives: The primary focus of this area is to improve the vegetation, watershed conditions, and riparian values. | Supplement | Supplement |
| Livestock Grazing Actions:<br>• Grazing will be excluded on potential NRHP sites if conflicts occur.<br>• Stocking rates and season of use will be adjusted on 28,600 acres. | Supplement | Supplement |
| • Categorization of some allotments will be modified to address riparian, wildlife, and watershed conflicts. | Supplement | Supplement |
| Unit #4 - South Park Sub-Region - This area encompasses south Park.<br>Objectives: Improvement of vegetation and land ownership patterns are emphasized. | Supplement | Supplement |
| Livestock Grazing Actions:<br>• Use BLM fencing,cooperative projects, or elimination of grazing to eliminate livestock drift onto uncontrolled private land. | Supplement | Supplement |
| • Categorization of some allotments will be modified to address riparian, wildlife, and watershed conflicts. | Supplement | Supplement |

APPENDIX B6.3

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

ROYAL GORGE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Unit #5** - Gold Belt Sub-region - This area encompasses the area north of Canon City to Cripple Creek.<br>Objectives: Improvement and protection of backcountry and extensive recreation values/ opportunities, wilderness resources, wildlife habitat, and vegetation are emphasized. | Supplement | Supplement |
| Livestock Grazing Actions:<br>• Stocking rates and season of use will be adjusted in the Garden Park ACEC, if needed.<br>• Use BLM fencing,cooperative projects, or elimination of grazing to eliminate livestock drift onto uncontrolled private land.<br>• Categorization of some allotments will be modified to address riparian, wildlife, and watershed conflicts. | Supplement<br>Supplement<br>Supplement<br>Supplement | Supplement<br>Supplement<br>Supplement<br>Supplement |
| **Unit #6** - Waugh Mountain/ Tallahassee Creek Sub-region.<br>This high mountain and pinion/ juniper/oak-covered hill country is located north of the Arkansas River northwest of Canon City.<br>Objectives: Protection/enhancement of vegetation, special status plants/animals, wildlife habitat, and natural values are emphasized. | Supplement | Supplement |
| Livestock Grazing Actions:<br>• Grazing on 56 acres (High Mesa Grasslands) will be limited.<br>• Use BLM fencing,cooperative projects, or elimination of grazing to eliminate livestock drift onto uncontrolled private land.<br>• Categorization of some allotments will be modified to address riparian, wildlife, and watershed conflicts. | Supplement<br>Supplement<br>Supplement | Supplement<br>Supplement<br>Supplement |
| **Unit #7** - Grape Creek Sub-region. this is the Grape Creek corridor and surrounding watershed from DeWeese Reservoir to Canon City.<br>Objectives: Improvement/protection of vegetation, water quality, riparian, wildlife habitat, and special status animals are emphasized. | Supplement | Supplement |
| Livestock Grazing Actions:<br>• Use BLM fencing,cooperative projects, or elimination of grazing to eliminate livestock drift onto uncontrolled private land.<br>• Adjust season of use in 2 ACECs.<br>• Categorization of some allotments will be modified to address riparian, wildlife, and watershed conflicts. | Supplement<br>Supplement<br>Supplement | Supplement<br>Supplement<br>Supplement |
| **Unit #8** - Huerfano Sub-region.<br>This area lies along the Huerfano River in southeast Colorado.<br>Objectives: Improvement/protection of vegetation, riparian, and wildlife habitat are emphasized. | Supplement | Supplement |

APPENDIX B6.4

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

ROYAL GORGE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| Unit #9 - Cucharas Canyon Sub-region. This area lies along the Cucharas River Northeast of Walsenburg.<br>Objectives: Protection/enhancement of vegetation, riparian, and cultural resources is emphasized. | Supplement | Supplement |
| Livestock Grazing Actions:<br>• Grazing will be excluded on the potential NRHP district if it becomes designated.<br>• Re-categorize allotments from "C" to "I". | <br>Supplement<br>Supplement | <br>Supplement<br>Supplement |
| Unit #10 - Other Lands Sub-region. This massive area is mainly private land; it is composed of mainly scattered public land south and east of Canon City to the Kansas border.<br><br>Objectives: Maintaining leasable mineral opportunities and protection of wildlife habitat (including special status species) are emphasized.<br><br>Livestock Grazing Actions:<br>• No special provisions. | Supplement | Supplement |
| Recreation Resource Management (pp.3-10, 11 of the PRMP/FEIS)<br><br>Objective: Manage lands along the Arkansas River and the Gold Belt Tour area for intensive recreation manage. Other lands will be managed to provide for a variety of dispersed recreation opportunities. | Supplement | Supplement |
| Off-Highway Vehicle Use<br><br>Objective: All BLM-administered lands in all eco-subregions will be formally designated in the Federal Register as open, limited, or closed. | Supplement | Supplement |

APPENDIX B7.1

## HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

## SAN JUAN RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **UNIT-WIDE DIRECTION** | | |
| **Livestock Grazing Management ( pp. 5-6 of the ARMP/ROD)**<br>Objectives: Maintain or improve the vegetation component of this ecosystem to permit a balanced mix of uses to ensure sustained yield. Grazing allotment have been categorized as "I" (improve resource conditions), "M" (maintain current satisfactory conditions, or "C" (custodial management). | Supplement | Supplement |
| **Grazing Management Actions:**<br>• Appendix 9 of the Draft RMP identifies the allotments, their categorization, allotted AUMs, and potential range improvements specific to the allotment. | Supplement | Supplement |
| • Future management actions including AMPs will be tailored to meet these objectives after consultation with livestock operators. | Supplement | Supplement |
| • Continue monitoring and evaluation plan. | Supplement | Supplement |
| • Adjust livestock use to meet objectives; includes class of livestock, season of use, stocking rate, or the grazing pattern. | Supplement | Supplement |
| • Approximately 64,200 AUMs are authorized initially until agreements are reached or decisions made on grazing capacity. | Supplement | Supplement |
| • If needed, range improvements are allowed (found in Appendix 9B of the Draft RMP). | Supplement | Supplement |
| • Grazing systems (typical systems are identified in Appendix 9 of the Draft RMP) will be implemented in cooperation with the livestock operator. | Supplement<br>Supplement | Supplement<br>Supplement |
| • Unallotted tracts are available for grazing except for those not currently authorized for grazing. | Supplement | Supplement |
| • Spring use in select "I" allotments ( Table 1 of the ARMP/ROD will not be allowed unless a suitable grazing system is implemented. | Modify (4) | Modify (4) |
| **Wildlife Management (p.12 of the ARMP/ROD).**<br>Objectives: Protect, maintain, and enhance:<br>- crucial habitats for big game, upland birds, and waterfowl.<br>- crucial habitats for non-game species of special interest and concern to state or other Federal agencies<br>- wetland and riparian habitats.<br>- habitat for state of federally listed T&E species.<br>Each objective is mandated and/or supported by specific federal regulation or legislation. | Supplement<br>Supplement<br>Supplement<br>Supplement<br>Supplement<br>Supplement | Supplement<br>Supplement<br>Supplement<br>Supplement<br>Supplement<br>Supplement |
| **Wild Horse Management (p.21 of the ARMP/ROD).**<br>Objectives: Manage a wild horse herd with and average number of 50 horses on the Spring Creek Basin and remove all wild horses from the Naturita Ridge herd area. | Supplement | Supplement |
| **Timber Management (p.21 of the ARMP/ROD).**<br>*Objectives: Public lands within forest management areas will be available for a full range of forest management activities.* | Supplement | Supplement |

APPENDIX B7.2

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**SAN JUAN RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Timber Management (Con't.)**<br>• Forest management activities will also be available in other emphasis areas subject to the objectives of those areas. | Supplement | Supplement |
| **Soil and Water Management (p.22 of the ARMP/RMP).**<br>Objectives: Soils will be managed to maintain productivity and to minimize erosion.<br>• Water quality will be maintained or improved in accordance with state and federal laws and approved standards.<br>• Protect municipal watersheds. | Supplement | Supplement |
| **ACEC - Anasazi Culture Multiple Use Area (p. 22-23 of the ARMP/ROD).**<br>Objectives: Through careful management, protect the important cultural, mineral, recreation, range, backcountry, and wildlife resources of this 156,000 acre area. | Supplement | Supplement |
| **Area A Emphasis Area Objectives:** This is a livestock emphasis area; it emphasizes increasing forage and livestock production on a sustained yield basis.<br>• Emphasis is on increasing forage, red meat and animal fiber production, and improving forage composition and watershed conditions, *contingent on meeting public land health standards.* | Modify (1) | Modify (1) |
| Livestock Grazing Actions:<br>• Use improved systems such as rest-rotation and deferred rotation.<br>• Invest in range improvements necessary to implement management systems.<br>• Develop *AMPs where needed.* | Supplement<br>Supplement<br>Modify (2) | Supplement<br>Supplement<br>Modify (2) |
| **Area B Emphasis Area Objectives:**<br>Emphasize achieving and maintaining the best possible habitat conditions for fisheries and wildlife. | Supplement | Supplement |
| Livestock Grazing Actions:<br>• Emphasis will be upon increasing aquatic and terrestrial wildlife numbers within habitat capability, improving stream and watershed conditions and providing a high degree of vegetation diversity . | Supplement | Supplement |
| **Area C Emphasis Area Objectives:**<br>Emphasis on recreation; ensure the continued availability of outdoor recreation opportunities which the public seek and which are not readily available from other public or private entities, *contingent on developments being able to meet public land health standards.* | Modify (3) | Modify (3) |

APPENDIX B7.3

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

SAN JUAN RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Area C Emphasis Area (Con't)** | | |
| **Livestock Grazing Actions:** | | |
| • No vegetation treatments to maintain or improve forage composition and production except prescribed fire where appropriate. | Supplement | Supplement |
| • Any improvements near developed recreation sites should be rustic in appearance. | Supplement | Supplement |
| **Area D Emphasis Area Objectives:** Emphasis on wilderness values; manage the area so that natural processes are unimpeded by human activities. | Supplement | Supplement |
| **Livestock Grazing Actions:** | | |
| • Manage for improved range conditions. | Supplement | Supplement |
| • No vegetative manipulations. | Supplement | Supplement |
| • Improvements must be primitive and of natural material. | Supplement | Supplement |
| **Area E Emphasis Area Objectives:** Emphasis on mineral development; other resource uses allowed in manner that does not impede mineral development | Supplement | Supplement |
| **Livestock Grazing Actions:** | | |
| • Management must not interfere with development or rehabilitation of mineral activity. | Supplement | Supplement |
| **Area F Emphasis Area Objectives:** Emphasis on cultural resources; protect,manage, and use the cultural resources in the area. | Supplement | Supplement |
| **Livestock Grazing Actions:** | | |
| • Reduce or control livestock to protect cultural resources as necessary. | Supplement | Supplement |
| **Area G Emphasis Area Objectives:** Manage these areas for general multiple use. | Supplement | Supplement |
| **Livestock Grazing Actions:** | | |
| • Manage vegetation so that trend is upward. | Supplement | Supplement |

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

SAN JUAN RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Area H Emphasis Area Objectives:** Emphasize the disposal of tracts of public lands meeting FLPMA criteria. | Supplement | Supplement |
| **Livestock Grazing Options:** | | |
| • No public monies on range improvements. | Supplement | Supplement |
| • Notify grazing permittees. | Supplement | Supplement |
| **Area I Emphasis Area Objectives:** Emphasize managing wild horse herds providing necessary forage and water. | Supplement | Supplement |
| **Livestock Grazing Actions:** | | |
| • Manage livestock to reduce conflicts with wild horses. | Supplement | Supplement |
| • Provide livestock waters year-round. | Supplement | Supplement |
| • Reduce numbers and\or season of use to eliminate forage competition with wild horses. | Supplement | Supplement |
| • Range projects must be compatible with wild horses. | Supplement | Supplement |
| • No licensing of domestic horses in these areas. | Supplement | Supplement |
| **Area J Emphasis Area Objectives:** Increase the production and utilization of wood, fiber, firewood, posts, and poles. | Supplement | Supplement |
| **Livestock Grazing Actions:** | | |
| • Grazing practices will have no adverse effects on timber management operations and objectives. | Supplement | Supplement |
| • Vegetation treatments generally not allowed. | Supplement | |
| • Range improvements must minimize effects to forest management. | Supplement | Supplement |
| | | Supplement |
| **Area K Emphasis Area Objectives:** Improve water quality and soil stability in these fragile watershed areas. | Supplement | Supplement |
| **Livestock Grazing Actions:** | | |
| • Manage livestock at low to moderate levels to maintain plant vigor. | Supplement | Supplement |
| • Reduce number or seasons of use to achieve soil and water objectives. | Supplement | Supplement |
| • Utilize soil and water improvements to improve range condition and diversify vegetation. | Supplement | Supplement |
| • Develop a grazing system for Disappointment Valley designed to meet soil,water, and salinity objectives. | Supplement | Supplement |
| **Area L Emphasis Area Objectives:** (See area decisions section). | | |
| **Recreation Resource Management (p.13 of ARMP/ROD)** Objective: A wide range of outdoor recreation opportunities will continue to be provided for all segments of the public, commensurate with demand. | Supplement | Supplement |

(1) "add" contingent on meeting public land health standards
(2) "delete" 71 AMPs (810,000), "add" AMPs where needed
(3) "add" contingent on developments being able to meet public land health standards
(4) "delete" category I allotments, "add" all allotments

APPENDIX BB.1

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**SAN LUIS RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **AREA-WIDE DIRECTION** (ARMP/ROD, p.7-12)<br><br>BLM lands and resources will continue to be managed to provide a variety of needed commodities and uses (e.g. livestock grazing, mineral material sales, etc.) to assist in the support of local and regional economies. Generally, management practices and prescriptions will favor maintaining or enhancing the natural setting (wildlife habitat, visual resources, recreation areas, etc.). Specific emphasis will be to enhance dispersed recreation opportunities, wildlife habitats, and related values and uses. Necessary constraints, stipulations, and mitigating measures will be included to protect these resources from irreversible damage. | Supplement | Supplement |
| **Vegetation**<br>• *Provide management that will move toward good condition based (late seral) on site potential using grazing management.*<br>• Allow vegetation manipulation and other practices to aid in accomplishing the above.<br>• Define desired plant communities in activity plans (in most cases, it will be a diverse community of grasses, shrubs, and forbes). | Modify (1) | Modify (1) |
| **Livestock Grazing Management**<br>• Manage livestock on 149 allotments encompassing approx. 474,000 acres.<br>• Adjustments to actual authorized AUMs will be authorized and made when climatic or other conditions warrant a temporary increase or decrease in livestock use.<br>• *Temporary livestock grazing will be allowed,pending and EA on any newly acquired lands.*<br>• Consider grazing on approximately 29,000 acres of suitable lands but presently unallotted for grazing.<br>• Allow improvements as noted in appendix D of the proposed RMP/final EIS.<br>• Manipulation of vegetation can be used if needed to meet management objectives.<br>• Manage allotments according to assigned management categories: M - manage to maintain current satisfactory conditions, I - manage *to improve resource conditions* C - custodial management; adjust categories as new info becomes avail-able, resource conditions change, or management activities are implemented.<br>• Based on monitoring, make livestock changes if warranted; changes made with EA and activity plan revision, if applicable. Types of changes include but are not limited to class of livestock, season of use, stocking rate, or the grazing management system.<br>• Utilize coordinated resource management plans if feasible; otherwise develop grazing systems by completing AMPs. | Supplement<br>Supplement<br><br>*Supplement*<br>Supplement<br>Supplement<br>Supplement<br>Supplement<br><br>Supplement<br><br>Supplement | Supplement<br>Supplement<br><br>*Supplement*<br>Supplement<br>Supplement<br>Supplement<br>Supplement<br><br>Supplement<br><br>Supplement |

APPENDIX B8.2

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

SAN LUIS RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Wildlife and Fish Habitat Management** | | |
| •All BLM-administered lands will be considered for protection and enhancement of wildlife habitat values. | Supplement | Supplement |
| • Continue monitoring HMAs, crucial big game range, birthing areas, and raptor sites. | Supplement | Supplement |
| • Maintain existing stream fisheries. | Supplement | Supplement |
| • Allow for reintroduction of native, or naturalized fish and wildlife species; authorized by the District Manager following environmental analysis. | Supplement | Supplement |
| **Fire Management** | | |
| • All wildfire will be suppressed. | Supplement | Supplement |
| • Prescribed burns are permissible to meet management goals. | Supplement | Supplement |
| **UNIT DECISIONS** | | |
| **San Luis Area -#1** Objectives: These are the lands in the Resource Area that are not designated as special areas. | Supplement | Supplement |
| • Maintain approximately 1,400 acres of riparian and wetlands in good to excellent condition and improve 455 acres. | Supplement | Supplement |
| • Maintain present good to excellent range condition; move toward good condition (appropriate seral stage) on the fair to poor condition range based on site potential. | Supplement | Supplement |
| • Manage streams to maintain fishery potential. | Supplement | Supplement |
| • Provide management to enhance, recover, or re-establish special status plant and animal values. | Supplement | Supplement |
| Livestock Grazing Management Decisions: | | |
| • Provide 40% of increased forage production to livestock grazing and 60% if needed to non-livestock uses (eg. wildlife, riparian, watershed, soils). | Supplement | Supplement |
| • Monitor all grazing areas and take appropriate methods to enhance riparian values, special status plant and animal habitat, and other RMP objectives. | Supplement | Supplement |
| • Avoid or mitigate conflicts with crucial wildlife use. | Supplement | Supplement |
| • Allow for early spring use (3/1 to 4/30) if consistent with allotment and management prescriptions. | Supplement | Supplement |
| **Trickle Mountain Area #2** Objectives: Provide special management to protect and enhance special wildlife values, other significant natural values, and special status plant values. | Supplement | Supplement |
| Livestock Grazing Decisions: • No specific decisions except that grazing actions will be considered in the development of a CRMAP that will emphasize crucial winter and birthing habitat special status plants and animals. | Supplement | Supplement |

APPENDIX 88.3

**HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?**

**SAN LUIS RESOURCE MANAGEMENT PLAN**

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Sand Castle Area #3**<br>**Objectives:** Special management will be provided to protect cultural and ecological resources. | Supplement | Supplement |
| **Livestock Grazing Decisions:**<br>• No specific decisions except that grazing actions will be considered in the development of a CRMAP that will emphasize cultural resources, especially the "Folsom" site. | Supplement | Supplement |
| **Blanca Area #4**<br>**Objectives:** Provide special management to maintain wetlands for waterfowl production.<br><br>**Livestock Grazing Decisions:**<br>• No specific grazing actions. | Supplement | Supplement |
| **Elephant Rocks #5**<br>**Objectives:** Provide special management to protect unique geological, scenic, visual, special status plant values, recreation, heritage resources and other significant natural resource values. | Supplement | Supplement |
| **Livestock Grazing Decisions:**<br>• No specific decisions except that grazing actions will be considered in the development of a CRMAP that will emphasize special status plants. | Supplement | Supplement |
| **Rajadero Canyon #6**<br>**Objectives:** Provide special management to protect and enhance special status plants and other significant natural values. | Supplement | Supplement |
| **Livestock Grazing Decisions:**<br>• No specific decisions except that grazing actions will be considered in the development of a CRMAP that will emphasize special status plants. | Supplement | Supplement |
| **Los Mogotes Area #7**<br>**Objectives:** Objectives: Provide special management to protect and enhance special status plants and to protect big game crucial winter habitat and birthing habitat.<br><br>**Livestock Grazing Decisions:**<br>• *Same as #3 (Trickle Mountain).* | Supplement | Supplement |

APPENDIX 88.4

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

SAN LUIS RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **San Luis Hills #8**<br>**Objectives:** Provide special management to maintain and, if possible improve the condition on the existing acres of Flat Top Mountain wetlands, big game habitat, and special status plant values.<br><br>**Livestock Grazing Decisions:**<br>• Same as #3, Trickle Mountain. | Supplement | Supplement |
| **Rio Grande River Corridor #9**<br>**Objectives:** Provide special management for the significant natural, scenic, and recreational values along the 22-mile stretch of the Rio Grande River north of New Mexico.<br><br>**Livestock Grazing Decisions:**<br>• No specific decisions except that grazing management will be considered in the CRMAP developed for the area. | Supplement | Supplement |
| ***Cumbres and Toltec Scenic Railroad Corridor #10***<br>**Objectives:** Provide special management for the scenic and historical values along this old railroad line.<br><br>**Livestock Grazing Decisions:**<br>• No specific decisions except that grazing management will be considered in the CRMAP developed for the area. | Supplement | Supplement |

(1) "delete" late seral

APPENDIX B9.1

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

UNCOMPAGHRE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **AREA-WIDE DIRECTION** | | |
| **Soils and Water Resources (p.10 of the ARMP/ROD)** | | |
| • Water quality and erosion conditions will be inventoried and monitored. | Supplement | Supplement |
| • Measures designed to minimize erosion and water quality deterioration will be requires in site specific plans for surface disturbing land use activities. | Supplement | Supplement |
| • The area will be open to land treatments and development of in-channel structures and project facilities. | Supplement | Supplement |
| **Riparian/Aquatic Systems (p.10 of the ARMP/ROD)** | | |
| • Inventory and monitoring will occur for proper management. | Supplement | Supplement |
| • Vegetative conditions and streambank cover will be maintained or improved. | Supplement | Supplement |
| • Mitigation to protect riparian area will be required in surface-disturbing land use activities. | Supplement | Supplement |
| **Threatened and Endangered Species ( p.10 of the ARMP/ROD).** | | |
| • Inventory and Monitoring will occur for proper management. | Supplement | Supplement |
| • Clearances will occur and US Fish and wildlife Service consulted. | Supplement | Supplement |
| • Measures to protect T&E species will be required in all land use activity plans. | Supplement | Supplement |
| • After analysis, releases and reintroduction of federal and state listed species are permitted after proper analysis and consultation. | Supplement | Supplement |
| **Wildlife Habitat (pp. 10-11 of the ARMP/ROD).** | | |
| • Maintain wildlife forage allocations at current levels until studies determine adjustments are needed. | Supplement | Supplement |
| • Additional forage divided equally between wildlife and livestock grazing. | Supplement | Supplement |
| • Wildlife habitat monitoring will occur on crucial winter ranges. | Supplement | Supplement |
| • Planning area is open to land treatments and project facility development; maintain existing facilities. | Supplement | Supplement |
| • Supplemental releases of native or naturalized fish and wildlife species may be authorized following environmental analysis. | Supplement | Supplement |
| **Livestock Grazing (p.11 of the ARMP/ROD).** | | |
| • Suitable public lands will be available for livestock grazing. | Supplement | Supplement |
| • Livestock use will continue at current allocation levels until studies indicate changes are needed to meet management objectives. | Supplement | Supplement |

APPENDIX 89.2

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

UNCOMPAHGRE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Livestock Grazing (Con't)** | | |
| • Maintain livestock facilities. | Supplement | Supplement |
| • Update AMPs as needed. | Supplement | Supplement |
| • New facilities or land treatments will be developed if needed to meet AMP objectives. | Supplement | Supplement |
| • Maximum sustained utilization of key forage species will be 50%. | Supplement | Supplement |
| • Allotment categorization will determine management and monitoring intensity. | Supplement | Supplement |
| **Forestry ( p.11 of the ARMP/ROD).** | | |
| • Commercial forest lands and pinon/juniper woodlands will be managed for sustained yield production within allowable cut restrictions. | Supplement | Supplement |
| **Cultural Resources (p.11 of the ARMP/ROD)** | | |
| • Measures designed to protect cultural and historical resources will be developed in consultation with the Advisory Council on Historic Preservation and the State Historic Preservation Officer, and will be required in all activity plans. | Supplement | Supplement |
| **Unit #1 Objectives:** The objective of this unit is to improve vegetative conditions and forage availability for livestock grazing. | Supplement | Supplement |
| Livestock Grazing Decisions: | | |
| • Facilities and land treatments will be developed to improve livestock forage and distribution will be developed. | Supplement | Supplement |
| • AMPs will be updated and new AMPs developed where none exist. | Supplement | Supplement |
| • New additional forage will be allocated to livestock. | Supplement | Supplement |
| • Relinquished, cancelled, or acquires livestock grazing permits will be reissued according to regulations. | Supplement | Supplement |
| **Unit #2 Objectives:** This unit will be managed to improve the areas' capability to support winter big game. | Supplement | Supplement |
| Livestock Grazing Decisions: | | |
| • Livestock grazing will continue at current levels unless studies determine adjustments are needed. | Supplement | Supplement |
| • New livestock forage generated from operator assisted improvements will be allocated to livestock. | Supplement | Supplement |
| • Non-conflicting livestock management objectives will be incorporated into new wildlife HMPs. | Supplement | Supplement |
| • Facility development and land treatment projects will be permitted if compatible with wildlife management objectives. | Supplement | Supplement |

APPENDIX B9.3

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

UNCOMPAHGRE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Unit #3 Objectives:** Manage for sustained yield production of the woodland resource. | Supplement | Supplement |
| **Grazing Management Decisions:** | | |
| • Non-conflicting grazing management objectives, projects, and mitigating measures will be incorporated into new FMPs. | Supplement | Supplement |
| • Existing livestock projects will be maintained and new projects developed if they will not decrease the woodland base. | Supplement | Supplement |
| **Unit #4 Objectives:** This unit consists of the Gunnison Gorge; primary objectives are to protect recreation objectives, values, opportunities, and use. | Supplement | Supplement |
| **Grazing Management Decisions:** | | |
| • Continue grazing at current levels and seasons of use unless studies indicate that adjustments are needed. | Supplement | Supplement |
| • Gunnison Forks Habitat area will remain unallotted for grazing | Supplement | Supplement |
| • If necessary, limit grazing use to 35% forage utilization in the Elephant Skin Wash area to protect soils. | Supplement | Supplement |
| **Unit #5 Objectives:** Management in this area (commonly known as the "adobes") will be to reduce salinity loads into the Upper Colorado River Basin. | Supplement | Supplement |
| **Livestock Grazing Decisions:** | | |
| • Allow grazing except from March 20 to range readiness to protect plant species during spring growth period. | Supplement | Supplement |
| • If basal ground cover is less than 10 % (7% on the salt flats), forage utilization will be managed at 35 % of key forage species to increase basal ground cover. | Supplement | Supplement |
| **Unit #6 Objectives:** Manage the areas wilderness characteristics until Congressional action. | Supplement | Supplement |
| **Livestock Grazing Decisions:** | | |
| • Maintain grazing levels prior to wilderness designation, *commensurate with public land health.* | Modify (1) | Modify (1) |
| • Allow rangeland improvements if determined to be necessary for rangeland and/or wilderness protection. | Supplement | Supplement |
| **Unit #7 Objectives:** Manage this area for both existing and potential coal development. | Supplement | Supplement |
| There are no specific livestock grazing management decisions. | | |
| **Unit #8 Objectives:** This area (a Mancos shale "badland" area) will be managed to provide recreational OHV use, *commensurate with public land health.* | Modify (2) | Modify (2) |

BLM_0006949

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

UNCOMPAHGRE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| *Unit #8 (Con't)* | | |
| Livestock Grazing Decisions:<br>• Allow grazing and facilities but in a manner not to impede OHV use. | Supplement | Supplement |
| Unit #9 Objectives: These are riparian zones in the planning area; the land will be managed to restore and enhance riparian vegetation along 40 miles of stream. | Supplement | Supplement |
| Livestock Grazing Decisions:<br>• Allow grazing except from March 1 through range readiness. | Supplement | Supplement |
| • Develop activity plans and develop management practices and principles. | Supplement | Supplement |
| • General guide will be utilization of 35% by weight of key forage species, but may vary. | Supplement | Supplement |
| • Trailing will be limited to roads as much as possible; no bedding of trailing livestock in riparian areas. | Supplement | Supplement |
| Unit #10 Objectives: Manage the area to enhance its use as an elk calving area. | Supplement | Supplement |
| Livestock Grazing Decisions:<br>• Any disturbance during the calving season will be limited as much as possible. | Supplement | Supplement |
| Unit #11 Objectives: Manage this area as waterfowl habitat. | Supplement | Supplement |
| Livestock Grazing Decisions:<br>No specific although disturbance from March 15 through June 30 is minimized. | Supplement | Supplement |
| Unit #12 Objectives: Manage this ACEC to protect T&E plant species | Supplement | Supplement |
| Livestock Grazing Decisions:<br>• Continue grazing at current levels until studies determine T&E species are being threatened. | Supplement | Supplement |
| Unit #13 Objectives: Manage this area as a research natural area and T&E species. | Supplement | Supplement |
| Livestock Grazing Decisions:<br>• Graze at current levels until studies determine T&E species are being degraded. | Supplement | Supplement |
| Unit #14 Objectives: Manage this volcanic area as an outstanding natural area. | Supplement | Supplement |
| Livestock Grazing Decisions:<br>• The allotment will remain unalloted for livestock grazing. | Supplement | Supplement |

APPENDIX B9.5

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

UNCOMPAHGRE RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Unit #15 Objectives:** This badland area will be managed as an outstanding natural area and will be protected from surface disturbing activities that degrade scenic qualities and accelerate erosion. | Supplement | Supplement |
| **Livestock Grazing Decisions:** | | |
| • Grazing allowed at current levels unless studies determine T&E species or habitat are being degraded. | Supplement | Supplement |
| • Utilization will be at 35% of key forage species if basal ground cover is less than 10%. | Supplement | Supplement |
| • No additional forage allocations will be made. | Supplement | Supplement |
| • No additional livestock improvements will be allowed. | Supplement | Supplement |
| **Unit #16 Objectives:** In general, operate according to general guidance and assumptions. | Supplement | Supplement |
| **Livestock Grazing Decisions:** No specific decisions are identified. | | |
| **Recreation Resource Management (p.11 of the ARMP/ROD)** | | |
| **Objective:** Public lands will be managed for extensive and diverse recreation use. | Supplement | Supplement |

(1) "add" commensurate with public land health
(2) "add" commensurate with public land health

APPENDIX B10.1

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

WHITE RIVER RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **AREA-WIDE DECISIONS** | | |
| **Soils Management (p.3-1 of the PRMP/FEIS)** | | |
| Objectives: Prevent impairment of soil productivity due to accelerated soil erosion and physical or chemical degradation resulting from surface use activities. Stabilize and rehabilitate watersheds where accelerated erosion and degradation have resulted have resulted in unacceptable resource conditions.State and federal laws as well as conditions of approval found in Appendix C will provide guidance. | Supplement | Supplement |
| **Hydrology Management (p.3-2 of the PRMP/FEIS)** | | |
| Objectives: | | |
| • Surface Water - Maintain or improve both water quality and quantity in specific watersheds to be compatible with existing and anticipated uses and applicable state and federal water quality standards. Protect from further degradation fragile watersheds which are major BLM land contributors of sediment and salinity to the Colorado River System and protect and improve priority streams that lack channel stability and have been identified as not meeting state water quality standards. | Supplement | Supplement |
| • Ground Water - Maintain and ensure the integrity of present aquifer system both in terms of quantity and quality throughout the resource area. utilize state standards. | Supplement | Supplement |
| • Water Rights - Working with the state of Colorado, protect water sources in support of other resource programs by obtaining legal water rights as necessary. | Supplement | Supplement |
| • Water Depletions - assure compliance with USFWS programmatic biological opinion for minor water depletions in the Colorado river Basin, from BLM administered projects. | Supplement | Supplement |
| **Vegetation Management (pp. 3-6 thru 3-9 of PRMP/FEIS)** | | |
| Objectives: | | |
| • Plant Communities - Management and/or maintenance of healthy diverse and sustainable rangeland and woodland plant communities which provide food, fiber, and enjoyment for human use and well being commensurate with the lands capabilities to produce, and which conserve healthy, diverse, populations of native plant. Landscapes will be composed of a plant community mosaic representing successional stages and distribution patterns consistent with the natural disturbance and regeneration regimes. | Supplement | Supplement |
| • Noxious Weeds - Manage such weeds so that they cause no further negative environmental, aesthetic, or economic impact. | Supplement | Supplement |

APPENDIX B10.2

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

WHITE RIVER RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Vegetation (Con't)** | | |
| • Riparian Areas - Achieve an advanced ecological condition *on all high and medium priority riparian habitats, except where resource* management objectives including proper functioning condition, require an earlier successional stage. | Supplement | Supplement |
| • Sensitive Plants and Remnant Vegetation Associations - Provide for conservation, protection, management of plant species designated as BLM sensitive species. Ensure that land use is complimentary to the protection , maintenance, or enhancement of BLM sensitive plant species and their habitat so as to avoid the need for subsequent listing and protection under the Endangered species Act. | Supplement | Supplement |
| **Forestry Management (pp. 3-10 thru 3-11 of PRMP/FEIS)** | | |
| *Objectives: Manage all timberlands to maintain productivity*, extent, forest structure, and for the enhancement of other resources. Provide for special management consideration for special or unique forest/woodland areas. | Supplement | Supplement |
| **Livestock Grazing (p.3-12 of the PRMP/FEIS)** | | |
| Objectives: Provide a healthy public rangeland capable of supplying forage on a sustained yield basis to meet the demand for livestock grazing. Provide opportunity for adequate forage plant growth and/or regrowth necessary to: 1) replenish the plants food reserves; and 2) produce sufficient seed to meet the reproduction needs necessary to maintain an ecological presence in the plant community. Manage livestock grazing to maintain or enhance a healthy rangeland vegetative composition, species diversity, and other resource values. | Supplement | Supplement |
| Management Actions: Livestock grazing would be managed as described in the 1981 Rangeland Program Summary (RPS), and the RPS updates issued in 1981 and 1984. These documents address five major actions: (1) allocation of forage among predominant grazing animals and other uses, (2) initiation of intensive grazing management, (3) continuation of existing intensive grazing management practices, (4) minimum period of rest for each allotment, and (5) range improvements to enhance rangeland productivity and management. | Supplement | Supplement |
| • *The forage allocations made* in the 1981 RPS for livestock would continue until sufficient data exists to require modification. | Supplement | Supplement |
| • A total of 126,490 AUMs would be allocated to livestock in the short term (10 to 20 years). It is estimated a total of 146,060 AUMs could be allocated to livestock over the long-term (over 20 years) through increases in sustainable rangeland production resulting from vegetation manipulations, improved livestock distribution and management, and improved rangeland health. | Supplement | Supplement |

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

WHITE RIVER RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Livestock Grazing (Con't)** | | |
| • Livestock grazing use levels have been reduced from 160,310 AUMs authorized in 1980 to the present level of 126,490 AUMs. The current allocation of 126,490 AUMs would continue for the short term. | Supplement | Supplement |
| • Monitoring studies would continue to be conducted on 81 grazing allotments to evaluate the effects of activity plan development, and if necessary, to further refine livestock grazing levels. | Supplement | Supplement |
| • Adjustments in livestock grazing levels would follow procedures outlined in 43 CFR 4110. Increases in available forage would be apportioned among competing uses, by: 1) filling the suspended livestock grazing preferences for the allotment; 2) providing big game wildlife forage needs; and 3) increasing wild horse forage allocations. This process may be modified during development of integrated activity plans. Increases or decreases in available forage would be apportioned in proportion to the allocation levels developed in the integrated activity plan.allocations. This process may be modified during development of integrated activity plans. Increases or decreases in available forage would be apportioned in proportion to the allocation levels developed in the integrated activity plan. | Supplement | Supplement |
| • The 144 grazing allotments affected by this RMP have been place in one of three management categories that define intensity of management: (1) Improve (I), Custodial (C), and (3) Maintain (M). | Supplement | Supplement |
| • The 54 allotments place in the "I" category were identified for development of allotment management plans (AMPs). The AMPs direct livestock management through decisions about grazing systems, season-of-use, number and kind of livestock, range developments or vegetative treatments required to meet resource objectives designed to improve and maintain healthy rangelands and to resolve conflicts with other public land uses. | Supplement | Supplement |
| • AMPs have been developed for 19 "I" category allotments involving 684,680 acres of BLM land. These allotments authorize a livestock grazing use level of 58,650 AUMs. AMPs for the remaining 35 allotments in the "I" category would be developed as time and funding permit. Current grazing levels and management practices would continue to be authorized on the 36 "M" and 54 "C" category allotments. The "I" category allotments would receive highest priority for public funding, and the "C" category allotments would receive the lowest priority for public funding. | Supplement | Supplement |
| • Allotments could be moved from one category to another as new information becomes available, resource conditions change, or management activities are implemented based on the category criteria listed in chapter 3 of the Draft RMP. | Supplement | Supplement |
| • Development of integrated activity plans (IAPs) would include all allotments within the activity plan boundaries regardless of current management category. | Supplement | Supplement |

APPENDIX B10.4

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

WHITE RIVER RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Livestock Grazing (Con't)** | | |
| • A minimum rest requirement would be developed for each allotment as IAPs are developed. This period of rest is the minimum time required to restore plant vigor, improve watershed and rangeland conditions. | Supplement | Supplement |
| • Minimum rest periods have been developed and will be proposed for the spring and early summer growing periods to meet the basic physiological requirements of forage plants, and to reduce livestock trampling damage to plants and soil during wet soil conditions after the spring thaw. | Supplement | |
| **Wild Horse Management (pp. 3-13 through 3-14)** Objectives: Manage a wild horse herd of 95-140 in a manner such that a thriving, ecological balance is maintained for all other plant, animal,and other species on that range. | Supplement | Supplement |
| **Wildlife Habitat Management Big Game (p.3-14)** Ensuring that big game habitat on public land provide habitat components and conditions necessary to sustain big game populations commensurate with multiple use objectives and State-established population objectives by: - enhancing/maintaining productivity of preferred forage on all big game range, - providing the forms, distribution, and extent of the vegetative cover and forage that satisfy the physiological and behavioral requirements of big game and encourage efficient use of available forage, - reducing and properly managing big game animal harassment. | Supplement | Supplement |
| **Raptor (p.3-15)** Objectives: maintain the short-term utility and long term development of suitable raptor habitats - include prey base, nest sites,and other special habitat features. | Supplement | Supplement |
| **Grouse (p.3-16)** Objectives: Enhance habitat conditions conducive to the maintenance/expansion of native grouse populations; reduce disruption of important seasonal use activities. | Supplement | Supplement |
| **Fisheries (p.3-17)** Objectives: Promote improvement and recovery of current,historic, and potential stream fisheries as a means of increasing | Supplement | Supplement |
| **Special Status Species (p. 3-18)** Objectives: populations of sport and native fishes, maintain facilities capable of supporting warm water fisheries, and increase recreational opportunities within the Resource Area. contribute to the recovery of special status animals in an effort to ultimately remove these species from special status consideration by: | Supplement | Supplement |
| - maintain/restore habitats | Supplement | Supplement |
| - assure that federally authorized actions do not disrupt or otherwise affect important biological activities or affect mortality. | Supplement | Supplement |
| - management activities will be conducted in a manner to improve to proper function condition those bank, channel, and flood-plain processes associated with designated critical habitats for listed and candidate fishes of the Upper Colorado River Basin. | Supplement | Supplement |

APPENDIX B10.5

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

WHITE RIVER RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Areas of Critical Environmental Concern (p.3-21) of the PRMP/FEIS.** **Objectives:** Manage 99,020 acres with special emphasis on identified resources within a multiple use framework.Concern (p.3-21) of the PRMP/FEIS. | Supplement | Supplement |
| **Motorized Vehicle Travel Management (p.3-23 of the PRMP/FEIS)** **Objectives:** Manage motorized vehicle travel on public lands to provide for public needs and demands, protect natural resources and the safety of the public land users, and minimize conflicts among various uses of public lands. | Supplement | Supplement |
| **Fire Management (p.3-29 of the PRMP/FEIS)** **Objectives:** Manage fire to protect public health,safety, and property and allowing it to carry out important ecological functions. | Supplement | Supplement |
| **Recreation (p.3-22 of the PRMP/FEIS)** **Objective:** Provide a broad spectrum or diversity of resource-dependent recreation opportunities to meet public land visitors' needs and demands; provide services to the visiting public; maintain high-quality facilities to meet public needs and demand, and improve public understanding and support of BLM programs through communication and partnership. | Supplement | Supplement |
| **Motorized Vehicle Travel Management (p.3-24 of the PRMP/FEIS** **Objective:** Manage motorized vehicle travel on public lands to provide for public needs and demands, protect natural resources and the safety of public land users, and minimize conflicts among various users of public lands. | | |

APPENDIX B11.1

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

NORTHEAST RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| **Wildlife Habitat (p.8 of ROD)** | | |
| 3a. Objective: Maintain or improve habitat on 33,910 acres of land.<br>Management actions:<br>• Management provided through cooperative management agreements with an appropriate state or federal wildlife agency or the development of a BLM habitat management plan. | Supplement | Supplement |
| 3b. Objective: General wildlife habitat will be protected on 3,180 acres.<br>Management Actions:<br>• Protect by considering wildlife concerns in environmental assessments of proposed actions. | Supplement | Supplement |
| **Livestock Grazing (pp.9-10 of ROD)** | | |
| 5a. Objective: Provide custodial-level management to 5,385 acres of land leased for livestock grazing.<br>Management actions:<br>• Operator initiated improvements, such as stock water impoundments, spring developments, fences, etc. | Supplement | Supplement |
| 5c. Objective: These lands are not available for grazing.<br>Management actions:<br>• Grazing applications for these lands will not be accepted. | Supplement | Supplement |
| **Water Quality (p.10 of ROD)** | | |
| 6a. Objective: Correct pollution or maintain quality on 23,880 acres.<br>Management actions:<br>• Removal or modification of pollution sources, limitations on uses or actions that may result in pollution. | Supplement | Supplement |
| 6b. Objective: Impacts to water quality on these acres will be minimized by stipulations in project design.<br>Management actions:<br>• Runoff control devices, proper logging practices, proper road location, maintenance of vegetative cover. | Supplement | Supplement |
| **Soil Erosion (p.10 of ROD)**<br>8a. Objective: Provide special corrective management actions on 850 acres of land to arrest unacceptable soil loss, restore soil stability and return soil to productivity.<br>Management actions:<br>• Vegetation establishment, soil additives, road construction limitations, mining controls, off-road vehicle restrictions. | Supplement | Supplement |

APPENDIX B11.2

HOW WILL STANDARDS AND GUIDELINES AFFECT APPLICABLE RESOURCE MANAGEMENT PLAN DECISIONS?

NORTHEAST RESOURCE MANAGEMENT PLAN

| EXISTING RMP DECISION | HOW S&Gs WILL AFFECT DECISION | |
|---|---|---|
| | Proposed S&Gs | Fallback S&Gs |
| Wildfire (p.11 of ROD)<br>10a. Objective: Provide prevention and suppression of wildfire on 22,520 acres.<br>Management actions:<br>* Cooperative fire management agreements. | Supplement | Supplement |
| Prescribed Burning (p.11 of ROD)<br>Objective: All acres are in "open" category of prescribed burning. | Supplement | Supplement |

# APPENDIX C

## IMPLEMENTATION EXAMPLES

This appendix contains examples of how standards and guidelines may be implemented in Colorado. Most of the examples were developed by resource specialists and managers from each BLM Resource Area as well as members from the Resource Area Councils who participated in a simulation. The simulation used a real area familiar to the staff with the understanding that the area was used for demonstration purposes only. It is impossible to display all possible implementation scenarios. However, the examples will present a sufficient range of scenarios to allow the reader to come to some conclusions on the processes needed to implement standards and guidelines and what the impacts may be.

It is assumed that standards are assessed at various and appropriate landscape scales. For some issues/resources, health is assessed at rather small scales. For other issues/resources, it may be necessary to look beyond analysis areas to properly assess a standard. The following are some examples of issues/resources and appropriate assessment scales:

| Example Issue/Resource | Scale |
|---|---|
| • Neo-tropical birds | International |
| • Salinity in the Colorado River Basin | Regional, major river basin |
| • Decline in sage grouse | Regional |
| • Wildlife habitat fragmentation | Watershed |
| • Decadent sage or pinon-juniper sites | Watershed |
| • Economic-grazing permittee's livestock operation | Administrative Unit (e.g., allotment) |
| • On-site soil loss | Administrative unit (e.g., allotment) |

BLM_0006959

## IMPLEMENTATION EXAMPLE 1

### PRESENT SITUATION

The permit on a grazing allotment consisting of approximately 2,100 acres is scheduled for renewal. It lies within the northern reaches of the Northern Parks and Range Landscape Unit at an elevation of about 7,800 feet. See Chapter 3. The allotment adjoins U.S. Forest Service and the current permittee's private ranch. The area is within critical mule deer and elk winter range. A small creek in properly functioning condition with a brook trout fishery flowing through the land.

An AMP is in place for the area. The allotment is classified as "M" according to the Rangeland Program Summary completed in 1995. No conflicts have surfaced regarding the condition of public land health standards. The area was not identified for rangeland health analysis in the priorities the Area Manager established for the year.

### A. PROPOSED ACTION

**Preliminary Assessment**

**Process and Resources Needed:**

During a staff meeting, the Rangeland Management Specialist advises the manager and staff of the permit renewal application. A discussion follows. No additional concerns are raised. The range staff is instructed to renew the permit under current conditions. An administrative determination is made and documented to the files that the existing environmental analysis prepared for the the RMP/EIS and AMP is sufficient. The permittee is advised informally and formally (i.e. a notation in the permit and AMP) of standards and guidelines requirements. The RAC is advised in regularly scheduled reports. BLM labor costs are $500.

**VI. What will be the Approach to Monitoring?**

Existing monitoring is deemed sufficient.

### B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (identify difference from Proposed Action Alternative)

There would be no difference.

### C. PRESENT MANAGEMENT (identify difference from Proposed Action Alternative)

Only interdisciplinary discussions regarding the permit occurs. Consideration of the action during the prioritization process likely does not occur. Standards and guidelines and related responsibilities are not discussed with the permittee.

## IMPLEMENTATION EXAMPLE 2

### PRESENT SITUATION

The 8,000-acre area lies in the north end of a mountain valley. A major U.S. highway forms the east boundary. The area lies within the Northern Rio Grande Basin Landscape Unit. See Chapter 3. Elevation ranges from 8,200 to 9,200 feet. Soils are formed in Colluvium from igneous rock. Vegetation consists of sagebrush/grass (50 percent), gamble oakbrush/grass (20 percent) and sparse shrub/grass (20 percent) and pine/aspen woodland (10 percent). The area is within critical mule deer and elk winter range and antelope fawning grounds. Several intermittent drainages and springs provide the only surface water for the area. Five grazing allotments comprise 7,250 acres of public lands. Three of the allotments currently have Management Plans. One of these allotments has a coordinated plan with the Forest Service and one is managed using Holistic Resource Management (HRM) grazing techniques. Two of the allotments are small allotments and do not have a Management Plan. About 1,200 acres of one of the allotments were designated a Resource Conservation Area (RCA) in 1964. The RCA area was plowed and seeded back in 1953 and then was brushed sprayed, contoured, and check dams and reservoirs constructed after it became an RCA demonstration area. The three grazing permittees also graze on adjacent U.S. Forest Service (USFS) land. Adjacent private land is rapidly being subdivided for recreational homesites.

Grazing leases for two of the permittees involving four of the allotments are up for renewal. The lease on the HRM allotment was recently renewed with the condition that it is subject to the standards and guidelines. Major problems with public land standards have not surfaced. Efficiencies are realized by evaluating all three allotments at the same time. Assume all three allotments will be evaluated to determine public land health and possible corrective measures.

### A. PROPOSED ACTION

### I. Preliminary assessment

Process and Resources Needed:

All applicable RMP decisions are identified by staff. The standards and other applicable guidelines detailed in Chapter 2 apply. The area is designated "limited" to off-highway vehicles (seasonally closed during the wet season). Currently, 1,041 AUMs of available forage are allocated to livestock (cattle). The RMP stipulates that crucial winter ranges will be managed to sustain available winter forage for 17,600 animals in the entire resource area although no specific amount of AUMs was identified for wildlife allocation. Approximately 50 to 75 deer and 100 to 150 elk winter in the area, and 75 to 100 antelope use the area for fawning. At present no conflicts for available forage exist between livestock and wildlife. Any additional forage is allocated as follows: 40 percent to livestock; and 60 percent to other users. A major utility corridor parallels the highway through the area.

The Area Manager and staff (range management specialist, wildlife biologist, and ecologist) meet to develop a strategy. These employees become the interdisciplinary (ID) team. A full plan is not necessary. Notify the livestock permittees, DOW, and U.S. Forest Service informally. The livestock permittees are also notified by letter to document the files. The Resource Advisory Council (RAC) is notified through the normal notification process. Courtesy phone calls are made to local RAC members. At this point, no other members have expressed an interest in the area. Initial scoping and notification occurs over a two week period; BLM labor costs are approximately $500.

**II. What standards are not being met? What is the trend?**

**Process and Resources Needed:**

The ID Team assembles needed, existing information: grazing case file review, trend data, Ecological Site Inventory (ESI), riparian assessments, soil survey, water quality data, critical winter range studies, climate data, and wildlife data (including T&E). One day is needed to compile this information; most of this data has already been analyzed. Conduct a field tour of the area involving the ID team, permittees, and DOW. Invite USFS although their attendance is not crucial. Also invite others who have expressed an interest in being involved in all phases of the process. The field tour will last approximately two days. BLM will spend approximately $2,000 in labor costs during this phase of the process conducted during a one month period.

**Findings :**

**Standard 1:** Standard met. Some minor gullying is present, but overall upland soils meet the standard. Trend is slightly upward.
**Standard 2:** Standard met. Riparian systems are properly functioning and trend is static or slightly upward.
**Standard 3:** Standard not met on the HRM allotment. Native plants aren't in balance with desired plant communities. Plants don't exhibit a proper range of age classes. There is less frequency of key species (but plant litter has increased). Overall trend is down slightly.
**Standard 4:** Not applicable.
**Standard 5:** Standard met. Water quality is satisfactory. No stream segments lying in, bounding, or immediately downstream of the area are listed in the 305b report, or the non-point source assessment report. Available water quality data indicate compliance with state water quality standards.

**III. What are the causes for the standards not being met?**

**Process and Resources Needed:**

Re-analyze trend data. Meet on site with the ID Team, permittees, and DOW. Notify the RAC and DOW of findings. This occurs over a month period and BLM will spend $1,000 in labor.

**Findings:**

Conditions in the two allotment up for renewal are satisfactory and the permits may be renewed under existing terms and conditions.

The other allotment needs improvement to meet standards. The allotment was converted to a HRM system in 1990. The goals of the HRM plan are to improve the health of the range: mineral and water cycles; energy flow; succession; range condition; reduce overgrazing; old growth, time plants are exposed to grazing and increase livestock density, convert permittee operation to yearling, shorten grazing period and increase production. To achieve the goals, BLM agreed to increase AUMs in a shorter season of use. Overstocking situation for the time period allowed is suspected to be a problem. Concerns are raised that it is too early to make changes in the HRM strategy.

**IV. What options for remedy are there? What is the decision?**

Process and Resources Needed:

Assuming cooperation, only the permittee needs to be actively involved further except possibly to help assess the situation. The permittee and ID team meet on-site. This occurs over a two week period and BLM spends $1,000 in labor. (Note: This phase of the process may be combined with the previous step).

Options:
* Reduce AUMs and numbers under existing system.
* Wait for additional monitoring data with year-to-year evaluation.
* Change rotation patterns.
* Reduce AUMs, shorten season, leave numbers the same, and also change rotation patterns for first year.

Decision:
* Shorten the grazing season (which will result in a reduction of AUMs) but leave numbers the same, and change rotation patterns for first year. This option is selected to see what effects this will have on the vegetation and to continue the HRM program.

**V. How will the decision be implemented? What are the impacts?**

Process:

Modify the permittee's grazing plan to reflect the changes. The permittee signs and dates the agreement. This occurs over a two-week period. BLM spends $200 in labor.

Impacts:

Resource impacts: Some improvement in the occurrence of key species and other problem indicators are noticeable within a year. Sufficient change should be noticeable in five years to determine if the further modifications in grazing management practices are needed.

Public land user impacts: the livestock permittee is forced to shift about 100 AUMs to other lands. Assuming $7.00/AUM for private pasture, this increases the permittee's costs by approximately $700. However, when BLM accepted the HRM plan it was with the understanding that changes may be needed to meet goals and objectives.

Socio-economic impacts: no major impacts are anticipated.

**VI. How will the corrective actions be monitored to determine effectiveness?**

Monitor trend on three existing transects and document the file. This will take one day per year at a cost of $200 to BLM.

**B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (identify difference from Proposed Action Alternative)**

Without indicators, it likely would have taken longer to arrive at the root of the problem.

**C. PRESENT MANAGEMENT (identify difference from Proposed Action Alternative)**

Without standards and guidelines, less attention and analysis is given to soils. Consultation especially early in the process is likely less. Corrective actions would not occur as quickly.

## IMPLEMENTATION EXAMPLE 3

### PRESENT SITUATION

This 10,700-acre area lies about 45 miles from a town of 10,000 population. It lies within the Green River Basin Landscape Unit. See Chapter 3. A river dissects the area. Elevation ranges from 5,900 to 7,500 feet. Soils on lands north of the area are clay and mildly erosive. Soils to the south of the river are sandy and sandy-loam. Sparsely populated pinon/juniper comprise 40 percent of the area and 60 percent is sagebrush. The area is critical mule deer, elk, and antelope winter range. Portions of the area are important sage grouse strutting grounds. The river, two wells, and two reservoirs supply year-round water in four of the five pastures, although the water sources are not evenly distributed. Approximately 20 percent of the area is a Wilderness Study Area (WSA) and the inner canyon of the river is designated an ACEC for threatened and endangered (T&E) plants and geologic features. The Colorado Environmental Coalition (CEC) has developed a wilderness proposal that would extend the boundary of the WSA. Both the existing WSA and the area proposed by CEC are very steep and rocky with relatively little forage for livestock. (Grazing is specifically allowed in both WSAs and designated wilderness.) The area is comprised of one livestock grazing allotment with five pastures. Four smaller pastures lie north of the river and one large pasture lies south of the river. The allotment has seen numerous operator changes, most recently in 1994. Current, active permitted use is 1,243 AUMs. Past vegetative treatments include seedings of 1,207 acres (crested wheat), and sagebrush sprayings on another 500 acres. The public also uses the area for rafting, fishing, hunting, hiking, and mountain biking.

BLM staff are concerned about utilization patterns in the allotment. The north pastures appear over-utilized and the south pasture is under-utilized. Noxious weeds along the river corridor have increased noticeably in recent years. The grazing allotment is ranked in the top ten by the allotment categorization process used by the resource area. Concern is growing over conflicts among users of the area and special status species and related habitat. Vehicle travel in the area is increasing especially during hunting season, creating user conflicts. Assume standards and guidelines will be assessed in response to these concerns and pending actions.

### A. PROPOSED ACTION

#### I. Preliminary assessment

Approximately 80 percent of the area is BLM-managed public lands. Applicable RMP decisions for the public lands in the area are identified. The standards and guidelines detailed in Chapter 2 apply. Other decisions include: 80 percent of the area is designated open to vehicle travel while the 20 percent of the area inside the WSA is closed. The area is permitted for grazing cattle, with a small amount of sheep use. Actual use has ranged widely over the past 10 years, from no use, up to 1,241 AUMs, with use occurring in the spring, summer, and fall. In general, about 30 percent of the use has occurred in the spring, 60 percent has occurred in the summer, and 10 percent in the fall. Based on available monitoring information, the potential stocking level with 50 percent utilization is about 1,129 AUMs. No specific forage is allocated for wildlife but general direction in the RMP recognizes the need to sustain the local mule deer, elk, and antelope populations by sustaining critical winter habitat. Recreational trail development is encouraged and commercial floatboating on the river is permitted. The corridor along the river is designated as an ACEC and 20 percent of the area is within a WSA.

BLM_0006965

After RMP decisions are identified, the Area Manager and staff meet to develop a strategy. An interdisciplinary (ID) team consisting of an ecologist, range management specialist, wildlife biologist, and recreation specialist is formed. The overall strategy is to provide initial notification to interested and affected publics. However, not all parties need to be brought together in the initial phases while needed information is collected. Based upon initial scoping, it is determined that the following individuals and groups need to be notified at this time: the livestock permittee, local trail groups, DOW, the county weed board, commercial river outfitters, CEC, and the RAC. The parties are notified by letter to document the files. The letter is supplemented with phone calls to provide a personal touch and to afford BLM an opportunity to clarify the process. The RAC advises if others should be notified at this time. Development of the strategy and notification occurs over a one-week period and BLM spends $1,000 in labor.

**II. What standards are not being met? What is the trend?**

**Process and Resources Needed:**

The ID Team reviews the area/situation and collects needed available data: utilization data, actual use data; wildlife information (ranges); soils survey; water quality data, threatened and endangered (T&E) species inventory; vegetation classification. BLM will spend approximately $500 for labor in gathering this data. An ecologist or range management specialist re-reads trend plots. This occurs over a two-week period and costs BLM $1,000 in labor costs. During this period, the county weed manager is invited by the ecologist to the assess noxious weed situation and fill out county forms. The wildlife biologist, DOW, and ecologist (permittee is invited) to review the shrub component. The situation on adjacent lands, especially the burns that have occurred, is reviewed at this time. This occurs during the same time period the trend plots are read. BLM labor costs are $1,000.

Findings :

**Standard 1:** Standard met on most of the area (7,500 acres), but not fully met on 3,200 acres. Indicators include rilling, active gullying, and lack of ground cover. The trend is static.

**Standard 2:** Standard not met. Lack of vigorous desirable plants such as willows and sedges along the river bank, the presence of undesirable plants (weeds), and the general lack of stream bank stabilizing vegetation are indicators. The trend is static.

**Standard 3:** Not met in part. The crested wheatgrass seedings lack vegetative diversity but they do provide ground cover. The biggest problem regarding noxious weeds lies along the river, particularly around recreation use areas. The shrub component needed for wintering wildlife in pastures north of the river is not vigorous. The absence of a range of shrub age classes and absence of plant litter is noticeable. Trend is static or up slightly. Declining sage grouse populations are a concern. This is a problem throughout the west and specific problems with this area are not readily identifiable.

**Standard 4:** Standard is met. Endangered fish in the river and peregrines in the canyon do not appear adversely affected by management. Future monitoring needs to consider the candidate plant species "Ute Lady Tresses."

**Standard 5:** Standard generally met. Runoff events may carry sediment and salt load to the river. Addressing the other standards serve to mitigate this situation to a small degree.

**III. What are the Causes for the Standards Not Being Met?**

**Process and Resources Needed:**

Staff gathers information and arrives at preliminary conclusions. In addition to the information that has already been gathered, historical use information is needed to properly assess causal factors. The livestock permittee, the previous livestock permittee, DOW, recreation users, the county extension agent, and adjoining private landowners are likely contacts. Contacts are made informally, many by phone. This occurs over a one-month period and BLM spends approximately $1000 in labor.

**Findings:**

During a drought several years ago, livestock and wildlife numbers were not adjusted, although numbers have varied greatly and full preference has often not been used. Currently, livestock and wildlife are poorly distributed. Vehicle use south of river is creating an extensive road/trail network, thereby contributing to the soils problem. Fire suppression practices have contributed to establishment of a decadent sagebrush overstory. Stocking rates for livestock were raised to unrealistic levels after past seedings. Recreation use at river access points and livestock grazing have denuded riparian vegetation. Insufficient water has concentrated livestock and wildlife in riparian area creating overutilization of vegetation in riparian areas and lands north of the river, and under utilization elsewhere. This problem as a whole reflects a lack of appropriate distribution. Noxious weeds are deposited by the river, by livestock, and by recreation users. Human encroachment on wildlife habitat and fire on adjacent lands wildlife habitat is forcing more animals onto the area.

**IV. What options for remedy are there? What is the decision?**

**Process and Resources Needed:**

The ID team meets to consolidate the findings and discuss preliminary corrective options. This occurs over a one-week period and BLM labor costs are $1,000. At this point, the publics originally notified are convened, preferably on site to discuss findings and to explore options. It is likely two meetings are needed to arrive at some consensus regarding the findings. BLM labor costs are $2,000 and this occurs over a two-month period.

**Options (in priority order):**

a. To better distribute livestock and wildlife, develop water repair existing well and develop one additional well (fix well $10,000 and new well $10,000 = $20,000).
b. Construct 1.5 miles of riparian fencing with cattle guard ($10,000).
c. To provide for better utilization of forage by livestock, modify the following aspects of the grazing system: rotation patterns, "on/off" dates, and utilization rates.
d. Temporarily reduce numbers of livestock (50 AUMs) and wildlife (50 AUMs)in the area.
e. Conduct direct weed control in the area. ($100/acre x 10 acres = $1,000 year)
f. As part of a larger effort, educate landowners/users about weed prevention.
g. Modify conditions of commercial recreation permits to better confine use to avoid vegetation trampling along the river.
h. Improve roads used for recreational access to reduce run-off and improve drainage ($50,000).
i. To improve ground cover, vegetative age classes, and mosaic patterns, conduct a variety of prescribed burns and allow more natural fire.( $15/acre x

700 acres = $10,050; to accomplish the same objectives manipulate areas with brush beating (300 acres x $30/acre = $9,000)
j. To promote vegetative diversity, interseed crested wheatgrass seedings ($30/acre x 500 acres = $15,000)
k. To mitigate gullying and sediment load into the river, install gully plugs (15 structures x $3,000 each = $15,000)
l. To reduce soil loss caused by roads amend RMP to limit vehicle use to designated roads and trails; install signs ($500/year).
m. To improve the composition of forbs for grouse by seeding forbs for grouse - ($20/Acre x 500 acres = $10,000).
n. Educate county officials about the impacts zoning and associated land development have on critical wildlife winter ranges.

Decisions:

* Implement a-e as priority actions, most of which will be completed during the first five years.
• Items f-n are implemented as priorities and resources allow.

**V. How will the decision be implemented? What are the impacts?**

Process:

Water developments and fencing: The projects are submitted as high priority items in the following year's budget. The permittee requests financial assistance from the District Board of Advisors (formerly District Grazing Boards). Because of wildlife benefits, financial assistance is also requested from DOW. An EA tiered to existing programmatic documents is prepared by staff. This occurs over a 1.5 year period.

Livestock grazing management: Assume the permittee agrees to the changes. Terms and conditions of the AMP and grazing permit are made to reflect changes. Assume the permittee agrees to the additional changes. An EA tiered to existing programmatic documents is prepared by staff and incorporated into the case files.

Wildlife big game numbers: BLM in partnership with DOW works with wildlife commissioners to modify big game goals for the area and/or conduct supplemental hunts for the area.

Weed control: In partnership with the county weed control officials and public land users share in cost of annual weed control. An EA is tiered to existing programmatic documents. The process takes approximately 1.5 years.

The rest of the corrective actions have merit and will be considered with other resource area priorities. Most likely, implementation will occur in five-10 years.

Impacts:

Resource Impacts: Improved utilization and vigor of riparian vegetation is observed within the first five years. Improvement in upland vegetation vigor north of the river is more gradual. The age class of shrubs on upland sites and plant litter north of the river improves gradually. Because of modified livestock and wildlife distribution, vegetative conditions south of the river diminish slightly but standards are still met. Concentrated efforts in priority areas eradicate noxious weeds on small acreage. Lower priority treatments and actions have a more immediate effect on vegetative vigor and composition and soils but on smaller acreage.

Public Land User Impacts - Livestock grazing management: The action is implemented within the first year. Terms and conditions are incorporated into the AMP/grazing permit. Labor costs to BLM are $1,000. The livestock permittee shifts 50 AUMs to other land or reduces his herd by that amount. Assuming $7.00/AUM for private pasture, this increases the permittee's costs by approximately $350. Revenue to BLM is decreased by approximately $100. Some initial irritation by recreationists will occur as certain roads are caused. Information and education will minimize this.

Socio-economic Impacts: The ranching operation may experience some additional costs or loss of revenue, associated with range improvements or changes in operation. While these changes may be noticeable, they are not expected to constitute a major change in the ranching operation, or be noticeable in the community. The primary cost to the operation is anticipated to be an increase in manpower to maintain water sources and possibly herd livestock.

**VI. How will the corrective actions be monitored to determine effectiveness?**

Conditions are monitored annually in conjunction with existing studies. This includes ongoing monitoring for range condition, wildlife habitat, recreation use, or noxious weeds within the Resource Area. However, no monitoring program specific to just this area is anticipated. The permittee may also assist in the monitoring program to see if strategies appear to be working. Monitoring may include sampling of vegetation, taking photographs, and ocular estimates. Periodically (every 2-3 years), the staff compiles the available data and evaluates progress in meeting standards.

**B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (identify difference from Proposed Action Alternative)**

The biggest differences lie in the process of applying the standards and guidelines. The specificity provided by the indicators reduces the ambiguity in the process of applying the standards. While the indicators are not quantified, they provide a common basis for discussion, and the process as a whole becomes a little more specific. Native species must be used in the fallbacks while the Proposed Action considers both native and desirable non-native species to achieve management objectives. Within the WSA, only native species would be used in either scenario. Outside of the WSA, non-native species would often be more cost-effective, and would probably be preferred for this reason under the Proposed Action.

**C. PRESENT MANAGEMENT (identify difference from Proposed Action Alternative)**

There are four primary differences from the Proposed Action:
First is an increased level of public involvement in the process. While the process has always been open to public participation, the Proposed Action is creating an increased interest in public land management.

Second, common public land health standards with indicators do not exist under present management. The standards and guidelines provide more specificity overall, but are not empirical standards (e.g., 50 percent utilization). Although many of the same items have been looked at by the staff in developing proposals, the documented standards and specific indicators serve to help provide a "level playing field" between areas.

Third, there is expanded interest from the public in rangeland management to look at and evaluate landscapes, geographic areas, or ecosystems. This encourages a broader basis for evaluating effective management practices across the landscape as a whole, helps users look beyond their own operation,

and promotes a wider base of cooperation between agencies and individuals. The "down" side is that the Proposed Action process requires more time.

Fourth, standards and guidelines are discussed in an orderly and systematic manner. Consequently, actions for a variety of resources (rather than just livestock grazing) are identified that might otherwise be overlooked.

## IMPLEMENTATION EXAMPLE 4

### PRESENT SITUATION

The 12,000 acre area lies adjacent to a town of 4,000 population. It lies within the Uinta Basin Section of the National Hierarchal Ecological Unit. (See Chapter 3.) Elevation ranges from 5,600 to 7,400 feet. Soils are derived from sedimentary rocks formed from sandstone and shale. Pinon/juniper comprise 50 percent of the area and 40 percent is sagebrush and greasewood. Remainder is oakbrush or badlands. The area receives 12 inches of precipitation annually, which is fairly evenly distributed between the seasons. Two small creeks and two reservoirs provide year-round sources of water in the area, but these are not evenly distributed throughout the allotment. The area is critical mule deer range. Several small (<40 acres) naturally occurring burns have occurred in the pinon/juniper and sagebrush. However, in most of the area, fire suppression policies have interrupted natural disturbance events. There is a small wood-cutting area in the northern portion of the area. Currently, the area receives approximately 750 AUMs of livestock grazing use and 136 AUMs of deer use.

BLM staff, supported by some data and professional judgement, are concerned over the condition of browse and utilization patterns related to RMP allocations in this area. Presently, livestock grazing (sheep) use on the largest allotment far exceeds the estimated carrying capacity of the range. At present, the livestock permittee for this allotment is not receptive about reducing numbers. The area contains four allotments, of which two are up for renewal. Erosion in some locations is a concern. Especially evident is the scarring caused by off-highway vehicles (OHV). A major pipeline traverses the area; revegetation has not been successful along some portions of the right-of-way (ROW). Efficiencies can be realized by evaluating all allotments together, which are similar in nature. Assume the area will be evaluated to determine public land health and possible corrective measures.

### A. PROPOSED ACTION

### I. Preliminary Assessment

**Process and Resources Needed:**

Applicable RMP decisions are identified. The standards and guidelines detailed in Chapter 2 apply. Other decisions include: The area is designated "open" to OHV use; forage allocation is 248 AUMs for livestock grazing and 292 for big game, mostly mule deer; adjustments to livestock preference must be supported by a minimum of three years monitoring data; manage the pinon/juniper woodlands for forest products.

The Area Manager and staff meet to develop a strategy. A full plan is not considered necessary. Because several conflicts and uses are present, notify stakeholders at this time - livestock permittees, Division of Wildlife (DOW), local OHV user group, and ROW company. During this initial period, communication is rather informal, mainly in the form of phone calls. A site visit involving the livestock permittee and the DOW is likely. Initial scoping and notification occurs over a one-month period; BLM labor costs are approximately $1,000. Ask the stakeholders to provide any information that may be helpful in the process. The RAC is notified, most likely through a periodic update (i.e., normal notification process).

BLM_0006971

**II. What Standards are Not Being Met? What is the Trend?**

**Process and Resources Needed:**

In addition to team meetings, the ecologist, wildlife biologist, range management specialist, and recreation specialist conduct field visits. A similar site in good condition is located to compare with the subject area. Team members gather existing data on climate, utilization, actual use, browse condition, big game populations, and site potential. There is very little existing data on vegetative cover and composition; and no trend data is available. Geographic Information System (GIS) is used to gather wildlife and soils data. Internal scoping by interdisciplinary team (staff) occurs over a two-month period; BLM labor costs are approximately $2,000.

**Findings :**

**Standard 1** - Not met. All identified indicators point to a problem, especially soil pedestalling and lack of appropriate ground cover. Trend is static or down.
**Standard 2** - Not applicable
**Standard 3** - Not met. The understory in the Pinon/Juniper stands consists largely of prickly pear cactus and dead or decadent sagebrush. The sagebrush stands are decadent and over-mature. Most browse species are over-utilized. Cheatgrass and other annuals dominate the understory. The diversity and age-class distribution of species is not in balance because of the dominance of old/decadent successional stages. Native perennial grasses and forbs are not spatially distributed. Mule deer populations have been declining, but this is likely more than a local or even regional problem. For all factors, the trend is static or down.
**Standard 4** - Not applicable.
**Standard 5** - Uncertain. Conditions may be contributing to off-site problems. (See analysis at end of this chapter.)

**III. What are the causes for the standards not being met?**

**Process and Resources Needed:**

Staff gathers information and arrives at preliminary conclusions. DOW, the permittee, and other individuals knowledgeable of the history of the area are consulted. Existing information in the form of grazing history, climate, human use, apparent trend, anecdotal data, and browse utilization and age/form class data, together with professional judgment, is sufficient to come to reliable conclusions regarding the cause. Much of the information gathered in the previous step is used for this step of the process. At this point, prepare a summary document that contains the information and preliminary findings. Mail the summary document and request comments. Notify the RAC, and advise of potential controversy. Arrange for another site visit. Use this meeting as an opportunity to begin discussing potential remedies. This step of the process occurs over a three-month period; BLM labor costs are approximately $6,000.

**Findings:**

Domestic sheep use is excessive and out of balance, as determined by comparison of this area with other similar areas. Sheep use is significantly above allocated levels and wildlife use (mule deer) is significantly below allocated levels. In addition, seasons of use, length of use, and distribution of livestock and wildlife are all lesser contributors to the problem. A history of overgrazing with use from early winter through the end of spring has contributed to the general decline of desirable native vegetation and the increase in undesirable annuals. Unrestricted OHV use and

the expanding network of OHV trails contribute to loss of plant cover and soil erosion. Long-term fire suppression has enabled the area to become dominated by later successional stage vegetation. Unsuccessful revegetation associated with the pipeline has created problems with soil erosion and lack of plant cover.

**IV. What options for remedy are there? What is the decision?**

Process and Resources Needed:

Conduct an on-site visit with all affected stakeholders to disclose findings (mentioned in IV above). This meeting is a good opportunity to discuss possible options for resolution. The RAC is consulted because of the likelihood of controversy.

Options:

* For livestock management, initially seek agreement on the part of the permittee of the largest allotment to change class of livestock to cattle, change distribution patterns, or reduce numbers. This will improve over-utilization of important browse species. Also, seek ways for other operators to improve distribution patterns.

* If voluntary changes are not agreed upon, conduct utilization mapping at a cost of $2,000 labor costs per year for three years to support eventual decision to reduce numbers. Exclosures were considered, but are expensive ($6,000 for .25 mile) and additional supporting information that would be gained make this option cost prohibitive.

* Negotiate with the pipeline company to reseed the pipeline. However, the degree of success may be minimized if OHV use is not controlled.

• Address OHV use by first mapping the area. Work with locals to develop acceptable OHV trail system. A RMP amendment is needed to change designation from "open" to "closed," or "designated roads and trails only."

* Look for opportunities to have fire affect the area, possibly through inclusion in a Prescribed Natural Fire Plan. Controlled burns may be cost-prohibitive due to the uncertainty of success. The potential for invasion by cheatgrass and other annuals is high. Any vegetation treatment would likely require reseeding due to the lack of desirable vegetation existing in the area to recolonize.

* Work with the county on education of land stewardship.

Decisions:

* Ask the livestock permittee to make operational changes, as noted above. It is unlikely that the permittee will agree and three years of utilization studies will be necessary.

• Request DOW support in the form of flights to provide data on animal distribution and numbers. This may be accomplished with other work DOW is doing.

• Begin mapping OHV use and consulting with the OHV community. Prepare vehicle plan, environmental assessment, and amendment with a one-year timeframe. Estimated BLM costs are $8,000 for labor and $1,000 for other needs.

* Consult with the pipeline company to devise a strategy for reseeding the ROW.

V. **How will the decision be implemented? What are the impacts?**

Process:

Livestock management actions: Request the livestock permittee make changes, including reductions. Convene permittees, DOW, and BLM to discuss other possible habitat improvement projects (water sources, fire, etc.). In advance of this meeting, staff completes some preliminary feasibility work. Assume the permittee does not agree to the changes. BLM puts the permittee on notice that supporting data will be gathered in anticipation of reducing preference. Initiate utilization studies and request support from DOW, as noted in VI. After three years, data has been gathered Summarize the data and develop recommendations (approximately 1 workmonth). Visit on-site with the stakeholders (DOW, permittee); have the RAC present. Attempt to reach satisfactory agreements on future actions. Ask the RAC for a recommendation. Assume an agreement is not reached. Prepare an environmental assessment and issue the proposed decision, which would reduce AUMs over a 5-year period. Consider any protest to the proposed decision. Possibly conduct another tour of the area with stakeholders/affected interests (RAC, permittees, base property owners, and DOW) as a last attempt to work out differences. Prepare final decision in consideration of protest points. Assume the final decision involves a substantial cut in AUMS and an appeal is filed. Prepare appeal case files and appeal report addressing such things as: chronology of events leading to the appeal, our response to allegations in the appeal, rationale for the AM's decision, appeal transmittal, and supportive evidence. Participate in the Appeals Hearing. (The protest/appeal process could last two years.)

Travel management: Designate a system of motorcycle riding trails with a variety of riding experiences and a motorcross track, and mitigate impacts as much as possible to reduce the geographic extent of the areas not meeting the standards. (Closure of the area would be impossible to enforce due to the close proximity of the area to town and lack of natural barriers.) Local users and user groups, adjacent landowners, the town, and county need to be involved in changing the management of public use in the area. A community/user needs and preferences assessment, an area trails inventory, a plan and environmental assessment are prepared to document the process. Seek to enter into cooperative agreements with the town, the county, landowners, and user groups to adopt and help implement the planned actions.

Pipeline right-of-way: Work with company to revegetate the site, in conjunction with the vehicle management plan to keep vehicles off the pipeline ROW. Document the case file on agreement items.

Impacts:

Resource Impacts: The browse community improves gradually as sagebrush seedlings and young plants replace older, decadent and dead plants. Also, long-term improvement in ground cover and diversity and abundance of perennial grasses and forbs is expected. Noticeable reduction in sediment production and soil erosion will accompany improved vehicle management and ROW reclamation in the short term.

Impacts to Public Land Users - Livestock Grazing Administration: Utilization studies and consultation occur over three years and BLM spends $8,000 in labor. To reduce AUMs on the grazing permit, BLM spends approximately $12,000 in labor over a 5-year period. The permittee pays for his/her for legal fees. The livestock permittee is forced to shift about 450 AUM to other land or

reduce his herd by that amount. Assuming $7.00/AUM for private pasture, this increases the permittee's costs by approximately $3,200. Vehicle Management: Approximately $8,000 in labor is needed to prepare an assessment; implementation costs depend on specific planned actions. Changing the OHV use designation and rules requires publishing legal notices at a cost of approximately $1,000. Visitor information and signing costs are approximately $2,500. Site improvements (trailheads and staging areas) costs are approximately $12,000. Rehabilitation of disturbed areas costs approximately $6,500. If a partnership is formed, these costs are shared. Right-of-Way Reclamation: The pipeline company reclamation (reseeding) costs are approximately $5,000.

Socio-economic: The area is immediately adjacent to a local community and improvements to the health of the area encourage casual use of the area (horseback riding, mountain biking, etc.). The process will bring together individuals from the region to work collaboratively to make the health of the area better. Direct economic impacts to the community are not significant.

**VI. How will the corrective actions be monitored to determine effectiveness?**

Utilization studies: Assume that 40 percent is the maximum sustainable use and half of this "acceptable" use is left for wildlife. Conduct utilization transects or checks in areas grazed. Visit the allotment once every week or two (mid-December to end of April) for five years, or until the entire livestock reduction occurs. BLM gives the permittee the opportunity to demonstrate that he/she can maintain utilization at an acceptable limit with current livestock numbers or with partial reductions. Check on utilization (forbs, grasses, shrub seedlings) in the spring. This will take two days per year for three years. Conduct utilization mapping throughout allotment to determine if distribution is the problem. This will take 4-5 days/year for 2-3 years. Total labor costs for this phase of monitoring is approximately $5,000.

Trend/Condition/Composition Studies: Establish baseline transects to measure trend in ground cover and forb/grass/seedling composition. Establishing 4-6 transects at a cost of $1,000. Reread every 8-10 years.

Production Studies - on private (if landowner/permittee allow): This will help determine if private land seedings are still producing at same level as when stocking rates were initially determined (late '70s for RMP). This is done only once and costs approximately $2,000.

Vehicle management: Visit the area several times a week throughout the season of use. The visits would be done with recreation staff and law enforcement. Monitoring would involve a "public land watch" system, with community partners and user groups. An annual evaluation of use and impacts would be done to identify corrected actions needed. Annual labor costs are approximately $4,000.

Right-of-Way: Evaluate reseeding success annually; document file. Use site visits mentioned under vehicle management to supplement monitoring of the right-of-way. Labor costs for BLM are $200.

Water quality: Requirements are identified with the ID team and done concurrently with other monitoring work.

**B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (identify difference from Proposed Action Alternative)**

Conclusions and decisions concerning grazing management and browse community conditon are similar under the fallback standards. Regarding travel management, the standards are less conclusive. It is possible that under the fallback standards, considering OHV activity in this area would not be a priority.

**C. PRESENT MANAGEMENT (identify difference from Proposed Action Alternative)**

Present management would be very similiar to the proposed action. Standards and guidelines serve to focus discussions and provide indicators with which to evaluate concerns.

The analysis and decision making process may be less interdisciplinary and involve fewer external stakeholders.

Actions likely occur on a program-by-program basis, resulting in less health over the entire area. For example, the pipeline company may be required to reseed the pipeline, but without a coordinated effort to minimize or eliminate OHV traffic on the pipeline, success would be marginal or short-lived. The decision to develop a travel management plan for the area might not occur because of a lack of emphasis on the cumulative impact of each activity and the overall health of the land.

***THE FOLLOWING IS PROVIDED TO DEMONSTRATE HOW WATER QUALITY (STANDARD 5) WOULD BE EVALUATED IN THIS EXAMPLE:***

1. Locate appropriate stream segment(s) or waterbodies flowing through, occurring on, or bounding area of interest. (Determined during preliminary assessment phase.)

**FINDINGS:**
**The area of interest is covered by Water Quality Standards for the Lower River C Basin. Creek A flows into creek B which then flows into river C. The confluence of creek B and river C occurs in segment 4 of the Lower River C Basin. Segment 4 covers all tributaries to river C from the confluence with River D to a point immediately below the confluence with Creek E.**

2. Determine antidegradation classification and designated beneficial use(s) from the State water-quality standards that apply to each segment and waterbody identified in step (1). (Determined during preliminary assessment phase.)

**FINDINGS:**
***Antidegradation classification: Unclassified. This means that these waters shall be maintained and protected at their existing quality unless it is determined that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. For these waters, no degradation is allowed unless deemed appropriate following an antidegradation review.**
*** Beneficial uses: Water-quality standards list the beneficial uses as Class 2 Cold Water Aquatic Life, Class 2 Recreation, and Agriculture.**

3. Are any segments or waterbodies designated as Outstanding state or national resource waters? *(Determined during preliminary assessment phase.)*

**FINDINGS:**
**No**

4. Determine the current water quality conditions from:

* Status of Water Quality in Colorado (Clean Water Act Section 305b report)

• Clean Water Act Section 303d list (published in 305b report) These two documents must be consulted because they contain descriptions of water-quality impaired and limited segments.

* Colorado Nonpoint Source Assessment Report (Clean Water Act Section 319 report). Lists waterbodies known to be affected by nonpoint-source pollution.

* Additional information may be obtained from: Current 208 Plans (upper Colorado, upper North Platte, and upper Yampa River basins only). This is determined during the preliminary assessment phase. If data is found, it will be analyzed to determine if the standards are being met.

FINDINGS:

Water Quality Reports: Creek A and Creek B are not mentioned in any of the water-quality reports or lists (305b, 303d, Nonpoint Source Assessment). Segment 4 of River C is listed as being water-quality limited due to sediment from streambank erosion and rangelands, but it has a low severity ranking and a low priority for TMDL analysis. "Water-Quality Limited" means that the designated beneficial uses are not measurably impaired due to water quality but assessment information or segment specified water-quality controls indicate the potential for impairment of the designated beneficial uses in the near future.

5. Are there any available data, or other pertinent reports for analysis?

No data are available to be analyzed for this example. The decision was made not collect additional data.

If data were available, it would be analyzed with respect to the following criteria: Numeric standards for segment 4 of River C that are relevant to grazing are:

• Dissolved Oxygen = 6.0 mg/l minimum except during spawning when the minimum is 7.0 mg/l; • pH = 6.5-9.0;

• Fecal Coliform = 2000/100ml.

• Nutrients:Colorado water-quality standards list numeric standards for nitrate, nitrite, and un-ionized ammonia, but there are no standards for phosphorus. The nitrate plus nitrite nitrogen content in drinking waters for livestock and poultry should be limited to 100 mg/l or less, and the nitrite nitrogen content alone be limited to 10 mg/l or less. These numeric values are "acute standards" which means that they are not to be exceeded by the concentration in a single sample or calculated as an average of all samples collected during a one-day period. The acute standard for un-ionized ammonia is a function of pH and temperature, and the chronic standard is 0.02 mg/L as N. A "chronic standard" is the value that is not to be exceeded by the concentration for either a single representative sample or calculated as an average of all samples collected during a thirty-day period. In lieu of state standards, it is generally recommended that the phosphorus content of total phosphate analyses be equal to or less than 0.10 mg/L for streams that do not discharge directly into lakes or impoundments.

• Sediment and dissolved solids:There are no numeric standards for dissolved solids or suspended sediment. These two parameters are covered by a very subjective narrative standard.

6. Are any segments identified in step (1) listed as being water-quality limited or impaired (305b report, 303d list)? This is determined during the preliminary assessment phase.

6a. Are any segments identified in step (1) listed as being affected by nonpoint-source pollution?
(Determined during preliminary assessment phase.)

FINDINGS:

No affected segments are identified. Specify and implement appropriate BMP's to protect and maintain the designated beneficial use(s) identified in (2). Implement compliance monitoring.

OTHER CONSIDERATIONS:

* During early field visits, a field analysis of pathways for delivery of sediment from erosion sites to the drainage network should be conducted. Erosion sites should be ranked by the likelihood that eroded soil will be delivered to the drainage network. Sampling suspended sediment in the stream is not recommended.

* Violation or compliance with the numeric criteria should be documented. Violations require further analysis of source areas. Once the major sources are identified appropriate management practices can be specified to reduce pollutant contributions. Since erosion has been identified as a problem the sediment-delivery pathway analysis can be used to specify management practices that reduce or prevent eroded soil from entering the drainage network.

* Water-quality is considered in overall monitoring needs for the area.

* Time and Cost Estimates: The preliminary office work associated with the steps listed above would take about one hour. Much more time would be required if the case had to be referred to an I.D. team (see attached flow chart). Searching for and obtaining available data would take two or three work days. The time required for data requests to be answered cannot be estimated. Time spent analyzing the data would be a function of the amount of data available, however one work week should be sufficient even for data rich areas. For most of BLM lands it is unlikely that data will be available from external sources. There will be notable exceptions, like the Animas Basin above Silverton. Specifying BMPs and drafting a compliance monitoring plan would be a team effort, but could probably be accomplished in one or two team-work days. The time required to make a discharge measurement and properly collect and preserve a water-quality sample is about two hours on site. Laboratory costs are about $50/sample for nutrients, $20/sample for bacteria, $10/sample for suspended solids, and $10 for total dissolved solids. For a site with little or no available data, between five and ten samples would be desirable to define variability related to season and use.

## IMPLEMENTATION EXAMPLE 5

### I. BACKGROUND

This 2,000-acre area serves as a "town park" for a community of 1,500 residents along the west slope. It lies within the South Central Highlands Landscape Unit. See Chapter 3. Elevation ranges from 6,200 to 7,400 feet. The north portion of the area is Mancos shale with large gullies. The balance of the area is sandstone over Mancos shale. The area is 85 percent pinon/juniper woodland and 15 percent sagebrush park. Some of the parks have been altered, plowed, seeded with crested wheat. The area receives 12 inches of annual precipitation, split evenly between cool and warm seasons. Less than .15 mile of a small creek with some riparian runs through the north portion of the area. Although not crucial habitat, deer and elk use the area. Due to adjacent alfalfa fields, mule deer now use the area year-round. Fire suppression policies have interrupted natural disturbance events. The area receives heavy human use: livestock grazing, mountain biking, all-terrain vehicles use, hiking (there is a hiking trail maintained by a local trail club and the Audubon Society), shooting, hunting, partying, illegal forest gathering (firewood, Christmas trees and posts), environmental education by local schools. A microwave communication site sits on top of the hill and a 245kV transmission line traverses the area.

This high-visibility area is under constant scrutiny by the public. Several members of the public have voiced concern over trash, erosion, and denuded vegetation in sage brush parks. The grazing permit is up for renewal. Similarly, a decision must be made on whether or not to establish a non-commercial wood cutting area. Trail development/enhancement is proposed. Assume standards and guidelines will be assessed in conjunction with these pending actions.

### A. PROPOSED ACTION

#### I. Preliminary Assessment

Note: Prior to assessing this piece of land, it is assumed that a regional effort was conducted to: (1) identify goals and objectives on a large landscape basis, (2) identify public concerns, (3) pool together existing information and data about the region and (4) set the stage for applying standards and guidelines in future management efforts. The effort, initiated with an open house, brought together agencies (e.g., Division of Wildlife (DOW), Soil Conservation Service, National Park Service, Bureau of Reclamation, U.S. Forest Service, Colorado Water Resources Division), stakeholders (e.g., ranchers, recreation outfitters, etc.), the Resource Advisory Councils, and interested publics. Participants were contacted through news releases, letters, and phone calls. Two field trips subsequent to the open house were conducted to educate and provide a better understanding of what the vision for the region should be. Products of the process included data sharing, a consolidated vision for the region, and a preliminary list of interested publics. This effort lasted approximately one year and BLM labor costs were approximately $8,000 (this effort will decrease costs for 10-20 different standard and guideline applications that will take place in this region.)

Applicable RMP decisions for the area are identified. The standards and guidelines detailed in Chapter 2 apply. Other decisions include: The area is designated "open" to OHV use. The area is permitted for grazing cattle (AUMs) in the spring. No specific forage is allocated for wildlife but general direction in the RMP recognizes the need to sustain the local mule deer

population. The pinon/juniper woodlands are to be managed for forest products.

Upon identification of RMP decisions, the Area Manager and staff meet to develop a strategy. An interdisciplinary (ID) team consisting of an ecologist, range management specialist, hydrologist, wildlife biologist, and recreation specialist is formed. Using the results of the visioning effort mentioned earlier, a list of interested publics is formed. For this site, the DOW, potential livestock permittees, the local trail club, the Audubon Society, and town officials are notified. The RAC is notified. Development of the strategy and notification occurs over a one-week period and BLM spends $1,000 in labor.

**II. What standards are not being met? What is the trend?**

**Process and Resources Needed:**

The ID Team reviews the area/situation and collects needed available data: trend, climate, soils survey, threatened and endangered (T&E) species, vegetation classification, satellite images, neo-tropical migratory bird patterns, and wildlife ranges (much of this data is already accessible to the ID team because of the work done by the regional effort/partnership). A possible benchmark site is identified to compare conditions. Most data is located in grazing case files and wildlife data bases. This occurs over a one-week period and BLM labor costs are $200 (this is less than normal because of regional effort). The ID team visits the site and the interested publics are invited to attend. Rapid assessment is conducted using the gathered information and other tools, such as a soils surface factor (SSF) form. They observe vegetation, animal, and soil indicators, especially in sagebrush parks which are known to have been highly impacted by past activities. The benchmark site is also visited to compare conditions. Evaluation requires two site visits, and BLM labor costs are $500.

**Findings:**

**Standard 1:** Not met. In the sagebrush parks, active gullying and rilling are occurring with significant soil loss. Trend is down or static at best. For the pinon/juniper areas, gullying and rilling are also occurring. There is also loss of litter on canopied slopes, which is fairly typical for this site. The RMP decisions encourage harvest of the woodlands. Trend is static.

**Standard 2:** Not met. None of the indicators are being met in the short stretch of creek that runs through one corner of the allotment. Trend is static.

**Standard 3:** Not met. A large portion of the flats is dominated by a monoculture consisting of non-native crested wheatgrass. The pinon-juniper understory in many areas is dominated by non-native cheatgrass. A range of population age classes is not present because old trees, sagebrush, and crested wheat dominate the area. Photosynthetic activity is not evident throughout the hot portion of the summer and early fall - most warm season grasses are missing, and much of the area is dominated by short-lived annuals. Diversity and density of species is not in balance because of the dominance of old/decadent successional stages. The understory in the sage and dry pinon-juniper sites is degraded and probably not resilient to major disturbance. Litter distribution tends to be clumped around trees and shrubs, with eroding bare ground in between. Older successional stages dominate the area. Trend is static for most of the site. Where fire has occurred, trend is up slightly.

**Standard 4:** Standard met.

**Standard 5:** Uncertain. There are few on-site problems. However, sedimentation the result of significant bare ground and roads could be contributing to problems off-site.

**III. What are the causes for the standards not being met?**

**Process and Resources Needed:**

Staff gathers information/completes the following to arrive at preliminary conclusions: map major deer use areas - feeding, resting, and travel (DOW, BLM wildlife expertise needed); map human use areas, such as trails and roads (BLM recreation and lands specialists); assess seedbank (BLM ecologist); evaluate condition of pinon-juniper, crested wheat and sagebrush; map vegetative age classes and species composition (BLM ecologist); evaluate watershed capability for supporting water catchments; analyze Landsat vegetation map and aerial photos. This work, occurring over a one-month period, will require several site visits, along with office evaluation time. BLM labor costs will be approximately $3,000.

**Findings:**

Soil, plant and litter ground cover problems are caused by a combination of factors: dominance of the area by late successional stage vegetation, which is in part a result of fire suppression; a history of heavy spring grazing by both cattle and deer; and the dense road network, OHV use, and other soil-baring human activities.

Riparian problems are caused by irregular flows in the creek, the result of irrigation tail-water dumping and water depletion upstream (this problem is outside of BLM control).

The problems with plant and community indicators are caused by a combination of factors: BLM's past range projects-plowing and seeding with crested wheat; long-term fire suppression and alteration of the natural disturbance regime; past overgrazing with constant use during all of growing seasons in the 1960s and 70s and repeated spring use during the 1980s; continuous heavy deer use due to allotment location neighboring large alfalfa fields; and insufficient native seed in seedbank to adequately recover from past mismanagement.

**IV. What options for remedy are there? What is the decision?**

**Process and Resources Needed:**

Utilize the same information that was collected to define the cause. Involve the permittees, user groups (trails, OHV, Audubon, etc.) and other interested parties. Note: Many of these options were probably discussed in earlier phases of the process.

Options in priority order (note: many of these actions are linked together):
(a) Build one additional reservoir ($1,000).
(b) Permittee herds livestock, move salt and supplement more frequently to eliminate overgrazing/undergrazing problems, includes use of electric cross fencing .
(c) Provide native seed to permittee to interseed crested wheat monocultures, decadent sage stands, and annual-dominated understory pinon/juniper; use livestock impact to incorporate seed into soil ($100/yr for 10 years).
(d) Permittee accepts 20 percent cut in AUMs (voluntary nonuse).
(e) Delineate road system, identify, close, and rehabilitate unnecessary roads

(BLM labor costs are $10,000, $50 seed costs).
(f) Intensive signing and education effort followed up with increased enforcement ($400 for signs, $2,000 BLM labor for sign placement, enforcement, maintenance; annual replacement and maintenance costs $150/yr and $2,000 BLM labor costs).
(g) Develop regional landscape disturbance plan, including Prescribed Natural Fire plan ($6,000 BLM labor costs, although benefits would extend to all other activities in the region).
(h) Use PNF whenever opportunity arises ($1,000 annual BLM labor costs).
(i) Lay out fuelwood and post sales to help with fuel management for PNF ($2,000 labor costs), $200 revenue to BLM).
(j) Rollerchop and seed 300 acres to help in fuel management for PNF ($5,000 and $1,000 BLM labor costs).
(k) Conduct 3 prescribed burns over next 10 years ($5,000/burn).
(l) Fence perimeter to eliminate trespass from outside and improve animal management inside ($2,000 for materials and $400 BLM labor).
(m) Install one bike cattleguard ($100).

Decisions:
* Options a-g are highest priority and should be implemented within 3-5 years.
* Options h-k,m have merit but must be considered with other resource area priorities.
* Option l will likely not be implemented.

**V. How will the decisions be implemented? What are the impacts?**

Process:

Develop and document an integrated strategy accompanied by an EA. Livestock management actions: The permittee is required to herd livestock, move salt, and supplement more frequently to eliminate overgrazing/ undergrazing problems. The permittee agrees to 20 percent cut in AUMs (voluntary nonuse). These are incorporated as term and conditions in the AMP and/or permit. BLM provides native seed to the permittee to interseed crested wheat monocultures, decadent sage stands, and annual-dominated understory pinon/juniper (using livestock impact to incorporate seed into soil). Build one additional reservoir in the first year of strategy implementation (costs are shared between BLM and permittee). Strategically place internal cross-fencing using electric fence to minimize livestock/recreation conflicts during grazing season of each year, implementing first year of strategy.

Recreation management actions: Delineate a road system. Identify, close, and rehabilitate unnecessary roads. Provide signing (directional and informational) supplemented with increased enforcement. It is important to develop partnerships to share costs. Road delineation completed first year of strategy, road closure and rehabilitation occurs in second and third years of strategy.

Other actions: Develop a regional landscape disturbance plan, including PNF (this action would cost BLM about $10,000 but benefits would extend to all activities in the region). Once plan completed (year 1.5 in strategy implementation), we will be able to use Prescribed Natural Fire for the area; this will be recurring each fire season. Rollerchop and seed 300 acres to help in fuel management for PNF, if funding available through grants in years 3-5 of strategy. Establish fuelwood and post sales areas to help with fuel management for the PNF, initial work in sale layout begins in year one of strategy, area open to fuel harvest years two and beyond. Conduct three prescribed burns over the next 10 years (years 4-10), if grant moneys available.

Impacts:

Resource impacts:
Reduction in overgrazing and occasional spring rest reduces the amount of rills and gullies, and sediment production by half or more for the next 4 to 50 years or longer unless significant climate change occurs . It also increases the amount of groundcover and improves litter distribution by at least two times for this period or longer. Reseeding areas with native seed using livestock impact improves plant diversity among understory species by a factor of 3 and increases ground cover by a measurable amount over the next 50 years. The impact will be moderate over the 3-5 years, but high over the long-term. It also extends the period during which photosynthesis is occurring by two additional months for the long term. Reseeding also improves distribution of native plant communities by returning native species to the crested wheat areas and to the drier pinon/juniper sites. Reintroduction of native seed into these areas will convert more than half of the acreage to native species assemblages for the long-term (50 years or more). The impact will be moderate over the short-term, but high over the long-term.

Vehicle management actions reduce sediment production and rills and gullies by more than half in former high-use areas for the next 20-50 years. The impact is moderate across the allotment, but high on a site-specific basis, and for the long-term. Vehicle management also increases the amount of groundcover and improves litter distribution by at least two times for the next 20-50 years. The impact is high on a site-specific basis and long-term.

Reintroduction of natural disturbance into the system by a series of well-planned woodcuts, rollerchops, prescribed burns, and finally prescribed natural fire reduces the amount of rills, gullies and sediment production by 50 percent across allotment over the next 50-100 years. The impact is high and self-sustaining. Natural disturbances also increase the amount of groundcover and improve litter distribution by at least two times for the next 50-100 years. The impact is high and long-term. They also improve plant community distribution and diversity on more than half of the acreage for the next 50-100 years. The impact is high and long-term. All of the above measures are designed to be as self-sustaining as possible and incorporate management adjustments, and or naturally occurring disturbances that will perpetuate them.

Public Land User Impacts: Assistance from the Board of District Advisors (formerly the Grazing Advisory Boards) is requested for the fencing and reservoir construction. Additional herding, salting and feeding costs the permittee $150 annually. Loss of AUMs costs the operator $400 annually and BLM $40 annually in lost revenue. Some users, such as motorcyclists are frustrated when required to modify existing use patterns.

Socio-economic Impacts: Because the area is located very near a community, many of the local users are affected. As the health of the area improves, sustained use of the area is assured. Direct economic impacts to the community are not substantial.

**VI. How will the corrective actions be monitored to determine effectiveness?**

Monitoring becomes a shared responsibility with the permittee and other users of the area. Performance standards for the permittee and other users of this area is one tool used in monitoring.

* Baseline, small-scale conditions (collected in initial assessment of indicators, causes) is collected by BLM recreation, ecologist, range, wildlife staff every 10 years by BLM. Data is supplemented by the permittee and other

partners in the interim. This will require 2-3 site visits by BLM staff, and may cost $500-1,000 every 10 years.

* Collect baseline and trend for large scale landscape patterns and plant/animal communities. BLM, with regional partners, collect every 3-5 years, cost may be $100 for analysis of this particular area each time it is assessed.

* Project compliance and effectiveness data (burns, rollerchops, interseedings) is collected through 1-2 visits following project. BLM and the livestock permittee is involved, and costs maybe $50-200 depending of level of evaluation needed, per assessment.

* Compile and report available data for the area every 3-5 years to enable management assess progress and if needed, take corrective actions if needed. report is shared with BLM staff, permittee, and interested publics (this may cost $100 in labor each time it is done).

**B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (identify difference from Proposed Action Alternative)**

Differences between this alternative and the proposed action are minor. Except for the interseeding of crested wheat seedings, other actions occur. (There is no reference in the fallback about community dominance by non-native species, and less emphasis placed upon species diversity). The fallbacks do not directly mention larger scale diversity, plant community distribution, and successional stage mosaics are not directly mentioned. Consequently, it is very possible that the landscape-scale disturbance and PNF plans are likely not emphasized in this alternative.

**C. PRESENT MANAGEMENT (identify difference from Proposed Action Alternative)**

The process is likely less integrated, interdisciplinary, and collaborative. Individual programs drive various actions. Some of the fencing, salt placement, and possibly water development actions occur. Recreation actions are limited to erecting and maintaining directional road signs with little enforcement activity. The wildlife program pursues one burn in the area to improve critical winter range condition for deer and elk. Woodcutting in the area occurs on a fairly dispersed level, and not in a way that would help create the conditions needed for prescribed burns or prescribed natural fire. These actions either perpetuate the static trend for indicators of concern, or result in minimal improvement.

## IMPLEMENTATION EXAMPLE 6

### PRESENT SITUATION

This 55,100 acre area of public land includes a deeply incised river channel and adjacent uplands to the west. There are eight BLM grazing allotments within the area comprising approximately 35,400 acres. The northernmost allotment includes the river corridor itself, with the remainder of the river corridor (about 19,680 acres) not grazed by livestock.

To the east of the river lie National Forest lands, and to the west of the area, most of the land is privately owned. In recent years, irrigated alfalfa has replaced dry land beans as the most common use of these private lands.

The area lies within the Northern Canyon Lands Landscape Unit. See Chapter 3. Elevations range from 8,200 feet on the uplands at the southern end of the area to 6,200 feet where the river canyon exits the area to the north. Soils are primarily sandstone derived. Vegetation varies from scattered box elder and willows along the river's riparian zone to uplands characterized by scattered sagebrush parks within thick stands of Gambel's oak and pinyon/juniper trees. The higher elevations contain dense stands of small ponderosa pine trees. Less dense stands of larger ponderosa pine are scattered along the river bottom and in the deeper side drainages. Years ago, about 10,000 acres of the sagebrush was chained.

Minerals activities include some recreational placer mining along the river, some old uranium prospects, and three shut-in wells in the southern portion of the area. At the north end of the area mineral resources are under the jurisdiction of the Department of Energy (DOE).

Other uses of the area include some old pipeline rights-of-way that have received little or no rehabilitation or monitoring. The ungrazed portion of the river corridor receives heavy recreational use for camping, fishing, and boating. Considerable hunting use also occurs within the area. An active hunter information program is used to assist hunters and minimize resource damage. Some cultural resources are also found along the river corridor. The area provides a habitat for a wide variety of wildlife including the Gunnison sage grouse and Desert bighorn. Public lands provide important deer and elk winter range providing browse, hiding and thermal cover.

In addition to an eleven year old RMP, a River Recreation Management Plan is in use and a Prescribed Natural Fire Plan is being prepared jointly with the Forest Service, which includes provisions for management ignited fires (MIF) to improve resource conditions. The River has been recommended for a scenic designation under the Wild & Scenic River Act (W&SR Act).

This area was selected for assessing public land health because of the diversity of resources and related problems and the number of livestock operations.

### A. PROPOSED ACTION

### I. Preliminary Assessment

**Process and Resources Needed:**

Applicable RMP and activity plan decisions are identified by the staff. The standards and guidelines detailed in Chapter 2 apply. Five of the eight allotments have grazing rotation plans which provide some deferment from livestock use during the growing season. Compliance with deferment provisions is not consistent across these five allotments. Another allotment is only

BLM_0006985

grazed during the dormant period and no rotation is necessary to provide for plant rest and recovery. The remaining two allotments are grazed summer long and have no grazing rotation system in place.

Other decisions include: Improve range condition and productivity on native rangeland. Use fire to enhance forage production. Improve aquatic and riparian habitat along the River and its tributaries. Manage one portion of the river corridor for semiprimitive non-motorized recreation opportunities and the roaded portion for semiprimitive motorized recreation opportunities. Manage timber and woodland species with a combination of even and uneven-age systems. Close the river corridor to off-highway vehicles (OHV). The uplands are designated "open" to OHV use.

Prior to initiating actions in this area the Area Manager attends the County Commissioner's meetings to advise them of what is planned. This is followed by an informal scoping meeting. Persons known to have an interest in this area are invited. This includes the County Commissioners, livestock permittees, commercial river rafting & fishing guides, Department of Energy, Division of Wildlife and Native American representatives. The Resource Advisory Council (RAC) is notified and invited to attend. Notification is largely by telephone and by letter if needed. The purpose of the scoping meeting is to ask interested publics for information, inform them of BLM's intentions, and to invite their continued participation in our efforts to assess and maintain or achieve healthy public lands for this area. Compiling and displaying existing information, and making the needed contacts require about one month, and the expenditure of about $ 4000 in BLM personnel costs.

**II. What Standards are not being met? What is the trend?**

**Process and Resources Needed:**

The staff is tasked with gathering and organizing information in preparation for an interdisciplinary (ID) team meeting on this area. Available information includes: personal knowledge of staff from field visits, watershed and vegetation trend data from frequency transects, county soil survey, T&E and SVIM inventory data, 1982 color and 1990 infrared aerial photo coverage, and surface geological and topographic map coverage. LANDSTAT information is ground truthed. Land status, surface transportation, and stream data is converted from the MOSS to ARC Info geographic information system (GIS). Relevant information from grazing case files is compiled. The Corps of Engineers (COE) is queried to see if they have additional aerial photo coverage, and the Forest Service and Native American Tribes are contacted for information. These efforts occur over about a 90 day period at a personnel cost of about $2000. At the ID team meeting the staff analyze and interpret the information concluding with a field visit. A meeting is then arranged with those persons who may be affected and those that expressed interest in this area during scoping (Scoping Group). This meeting is to share information and to determine what future actions are appropriate.

**Findings:**

Standard 1 - The standard is met. The upland soils standard is being met. Though some localized gullying is occurring it is within the levels one would expect under natural conditions in this area. Trend is satisfactory. In isolated geographic instances erosion levels exceed natural or geologic rates and are attributed to poorly revegetated pipelines, concentrated livestock use, and OHV travel. These site-specific problems are addressed individually.

Standard 2 - The standard is met. Overall the riparian areas are properly functioning and close to climax ecological condition. The construction of a large impoundment upstream has changed the vegetative potential of the riparian and changes are becoming apparent: the establishment of Gamble's oak and other more xeric species in the historic floodplain and poor recruitment

of box elder seedlings to replace the large mature individuals along the river. Both of these conditions are attributed to the absence of occasional scouring floods as a result of water management practices associated with the dam.

Standard 3 - The standard is not met. Decadent sage brush and oak brush plant communities are present. Similarly, the Ponderosa Pine stands are all of the same (immature) age class. There is a lack of diversity within these areas. The trend for these conditions is static.

Standard 4 - The standard is met. No federal threatened, endangered, or candidate species are known to inhabit this area. The southwestern river otter, previously a Candidate 2 species, was reintroduced to the river area and appears to be thriving (Colorado lists the otter as state endangered)..

Standard 5 - The standard is met and the trend is static.

**III. What are the Causes for the Standards Not Being Met?**

Process and Resources Needed:

The assessment on standards and causal factors is developed jointly with the Scoping Group. As part of the assessment, fire history information is collected. A local college assists by developing a vegetation/fire model to better determine what fire results might be. It takes about two weeks to gather this information together. Then a public meeting and on-site tour is conducted to provide everyone with the information that has been gathered and to seek solutions.

Findings:

Lack of natural fire appears to be a contributing factor to the "dog hair" stands of ponderosa pine and decadent oak and sage brush. The lack of natural fire is caused by past fire suppression in combination with past grazing which removed the fine fuels needed for fires to carry. The chaining appears to have contributed to the gullying. Other causes of gullying include unreclaimed rights-of-way, and OHV use along right-of-way roads primarily during hunting season. Livestock and elk also use these open trails. Controlled water flow in the river has caused the loss of beach areas and point bars. Improved compliance in keeping livestock off during the scheduled deferment periods is needed for plant rest & recovery.

**IV. What Options for Remedy are There? What is the Decision?**

Process and Resources Needed:

The complexity of the issues and how different the suspected causes may be from those initially identified determines whether this next step is done with a letter or a meeting. Information already obtained will be used to negotiate possible resolutions as described below.

Options:

a) Complete a joint fire plan. Design and implement management ignited and prescribed natural fire projects in the decadent sage brush and oak brush areas, to improve plant diversity and increase ground cover. The fire plan is completed the first year. On average, individual management ignited fires take 24 months to design and implement, at an average cost of $40/acre.

b) Diversity in the "dog-haired" stands of ponderosa pine is also achieved by management ignited fire or by commercial thinning projects. Each commercial

thinning contract will treat 30 -80 acres and cost about $6000 to layout and administer.

c) In the short term, gullying is addressed by contacting the right-of-way holders to have them rehabilitate roads where gullying is occurring. This needs to be done in combination with water barring and road closures. These short term measures will cost the right-of-way holders approximately $ 500 to $1000 per site and the BLM $500. Over the long term, rehabilitation success is checked before approving assignments or renewals.

d) Another action to reduce gullying is to amend the RMP to change the OHV designation from open to limited. Amending the RMP will likely take about six months and cost approximately $10,000, mostly in personnel costs.

e) Work with DOW and the Wildlife Commission to more closely manage the elk population. Once the DOW establishes a Habitat Partnership Program (HPP), work with the partnership to determine the feasibility of performing vegetative manipulations in other areas to disperse elk and deer populations. BLM costs are about $800/project.

f) Greater plant diversity and increased ground cover is achieved by resting the two allotments that are grazed summer long, every third year. Alternatively, the permittee of the larger of the two allotments install additional fencing and water and use a rotation system. This is impractical on the smaller 40 acre allotment. The cost to BLM for additional monitoring and field visits to coordinate the necessary changes is approximately $8,000. It will cost the permittee on the larger allotment about $600 every third year in higher pasture rates and transportation costs, assuming that he chose not to install additional fencing and water. The cost to the permittee on the smaller allotment will be about $100 every third year. BLM increases livestock use supervision in the other fire allotments.

g.) Re-establish beach areas and point bars along the river by negotiating with the water conservancy district to allow periodic floods.

h.) Enhance box elder recruitment by restricting campsites, and by planting trees. Campsites would be closed by signing and installing physical barriers.

Decisions:

* Options a,c,e,f and h will be continued or initiated immediately.

* Options b and d, must be considered with other resource area priorities.

* Option g is rejected. More intensive management of the recreation sites to protect resource values is adopted. Closure of the recreation sites is considered impractical. Tree planting is not considered cost effective.

**V. How will Decisions be Implemented? What are the impacts?**

Process:

a) In cooperation with the Forest Service, a Prescribed Natural Fire Plan, is completed. The decadent sage brush and oak brush stands in this area become a high priority for management initiated fire. Over a 15 year period, 15 management initiated fires are planned.

b) Ten commercial thinning projects are conducted in the ponderosa pine thickets, as funds and personnel become available.

c) Right-of-way holders are contacted and asked to rehabilitate the roads being lost to gullying. This is coordinated with BLM so that water bars and unneeded roads can be closed with physical barriers. A high priority is

placed on performing compliance checks on future right-of-way assignments and renewals in this area.

d) Although desirable, amending the RMP to limit OHV use in the area to designated roads and trails is considered too expensive in terms of the limited realty and recreation resources available. Instead, the hunter information program receives increased emphasis.

e) BLM works with the DOW and Wildlife Commission to try and gain agreement on better managing elk populations in this area. BLM will also work with the HPP (if established) to determine the feasibility of performing vegetative manipulations in other areas to disperse elk and deer populations.

f) The exemption in the RMP for "M"(Maintain) and "C"(Custodial) allotments that does not require plant rest and recovery during the critical spring growing season is revoked. The two allotments that are not currently providing rest will be required to provide a rest period every third year.

Impacts:

Resource Impacts:

The reintroduction of fire reduces the amount of decadent sage brush and oak brush stands by 6000 acres over a 15 year period. This greatly increases plant diversity. Forage for livestock, deer and elk, as well as ground cover is also increased, which impedes further gullying. When funds become available, similar improvements are seen in those areas where ponderosa pine thinning has occurred.

Rehabilitating right-of-way roads, constructing water bars and closing the unneeded roads in concert with the hunting information program, eliminates the existing gullying and prevents further gullying in these specific areas.

Assuming that negotiations to reduce elk populations and the HPP program efforts are successful in dispersing elk. Considerable improvement in plant diversity, vigor, and ground cover occurs throughout the area over a five to ten year period.

Adding a rest requirement to the two allotments presently lacking this requirement improves plant diversity and increases ground cover on 1500 acres of public land.

Public Land User Impacts:

Users of the public lands are inconvenienced during the period that the management initiated fires are being conducted. During each fire, some people may object to the smoke, and for a short period following the fire, some persons may object to the blackened vegetation. There is always a risk that the fire may escape control and present a threat to lives and property. Following the next growing season, forage for livestock is improved, which may result in increased weight gains. Big game forage, and accessibility for hunting improves, resulting in improved hunting success.

Commercial thinning contracts provide additional work and income for local woodcutters.

Right-of-way holders incur additional expenses of approximately $2500 to rehabilitate pipelines and other types of right-of-ways. If this work is not done now, greater rehabilitation costs occur in the future.

Hunters are inconvenienced slightly by roads that are closed to OHV use.

In the short term, reducing elk populations through supplemental hunts allow for more opportunities for hunters. In the long term , their chances for success diminish. If conflicts are resolved by changing the timing and location of elk use, it is likely no impacts to hunters occur.

The requirement to rest the allotment every third year will cost one permittee about $600, and another permittee about $100 for transportation costs and higher pasture fees.

Socio-economic Impacts:

Conducting management initiated fires likely requires mobilizing local fire departments and bringing in additional fire crews from outside the area. This increases revenues to local businesses for fuels, lodging, and meals. Again, property and lives may be at risk if a fire escapes.

Ponderosa pine thinnings bring in additional revenues to local woodcutters.

Rehabilitating, water barring and closing right-of-way roads results in some modest expenditures for equipment, fuels and other supplies.

If supplemental hunts occur, a temporary increase in expenditures by hunters occurs, followed by a decrease in expenditures. Neither the increase or the decrease is significant.

Owners of alfalfa fields to the west of the area experience fewer elk in their fields. Consequently, their hay production increases, and they will submit fewer and smaller damage claims to the DOW.

Vegetation manipulations conducted through the HPP result in local expenditures for equipment, fuel, and other supplies depending on the type of manipulation being conducted.

**VI. How will the Corrective Actions be Monitored to Determine Effectiveness?**

Transects are established to measure the effectiveness of the management initiated fires, and the ponderosa pine thinnings. These transects are read for two to three years following the fire.

Normal project compliance is performed on the right-of-way road rehabilitation to assure that it is properly done, and is effective.

The DOW monitors elk populations and shares that data with BLM, and the public.

Monitoring of range condition and trend on the "I" and "M" allotments is conducted every five or six years. Cover data is recorded as well. Forage/browse utilization studies are read annually each year after the livestock are removed. No wildlife browse or pellet count transects are conducted. Permittees are required to submit accurate records of the levels of livestock grazing use they have made at the end of each season. None of this information is collected on the 40 acre "C" allotment.

**B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (identify difference from the proposed action)**

There is not any significant difference between this alternative and the proposed action. The same management actions are undertaken. Seed mixtures used for rehabilitating the right-of-way roads and other disturbed sites

utilize only native species. This will increase costs slightly to public land users.

C. **PRESENT MANAGEMENT (identify difference from the proposed action)**

Only slight differences occur. The same management actions are undertaken, except that the two allotments that do not have a rest period during the critical spring growth period will continue to be exempted from this requirement until monitoring data shows that a change is necessary. These allotments are currently low priority and it is unlikely that BLM will monitor them for many years. The two permittees will are spared the expenses of transportation and higher pasture fees ($600 and $100) every third year. This might be somewhat offset by increased revenues from fatter cattle.

The management actions undertaken are likely accomplished using less of an interdisciplinary and collaborative approach.

## IMPLEMENTATION EXAMPLE 7

### PRESENT SITUATION

The area is approximately 48,000 acres in size. It lies about 15 miles west of a town of 18,000 population. It lies within the Southern Parks and Rocky Mountain Ranges Landscape Unit. (See Chapter 3.) Topography varies from open grasslands to rolling hills to steep, rugged, canyonlands. Elevation ranges from 6,000 to 8,500 feet. Pinon/Juniper is the dominant vegetation type. Other types include Ponderosa pine, white fir/Douglas fir, mountain shrub, and grassland. Soils are derived from decomposed granite. Precipitation ranges from 10 to 16 inches; most dependable precipitation comes in mid to late summer. Key animal species include mule deer, elk, turkey, brown trout, rainbow trout, brook trout, and cutthroat trout. Fires burn small areas most years. A 600-acre fire occurred in the north part of the area in 1981. Flash flooding is common. Although regulated, the creek also experiences springtime flooding. Two additional creeks (< 1cfs) also provide permanent water to the area. All are tributary to the Arkansas River. Grazing, mining, woodcutting, and most recently, recreational use have impacted the landscape. However, some portions of the area have characteristics to warrant Wilderness Study Area status (approximately 70 percent of the BLM lands) and is included in an Area of Critical Environmental Concern (ACEC) along the major creek. The ACEC is designated for scenic, wildlife, and riparian values. The area is bordered by rural subdivisions where there are cattle drift problems. The three grazing allotments are critical to the operations of three local operators. The water from the creek is an important supply for small farmers and homeowners in the town nearby.

The area is identified in the RMP as a subregion subject to development of an Integrated Activity Plan (IAP). According to the RMP implementation schedule, the IAP is now scheduled for development. The area consists of three major livestock grazing allotments, of which one is up for renewal, and several custodial allotments. Unauthorized grazing, mainly the result of cattle that stray off adjacent subdivided land, is a problem. A major, perennial creek parallels the east boundary portion of the area. Flows of the creek are regulated by an irrigation company who maintains a reservoir south of the area. Concerns by staff and the public have been raised over upland soil conditions and the riparian condition along the creek and some smaller feeder creeks. Vehicle use along the creek has increased significantly in recent years. Assume the area is a high enough priority for development of an IAP, which will consider standards and guidelines. (Note: It is not to be assumed that analysis of standards and guidelines must always culminate in a plan. However, this example will serve to illustrate the process and potential impacts when a major planning effort is undertaken.)

### A. PROPOSED ACTION

### I. Preliminary Assessment

**Process and Resources Needed:**

The standards and guidelines must now be considered in the development of the plan. Key decisions in the Resource Management Plan are: establish desired plant communities through the IAP, manage vegetation to accomplish other objectives, adjust the season of use in the ACEC. Vehicles will be limited to designated roads and trails except for the WSA which will be closed to vehicles. Grazing is allowed at current preference, but may be modified if needed through the IAP to resolve conflicts with riparian, critical wildlife habitat (including special status species), and allocations for the ACEC.

BLM_0006992

Harvesting of timber products is allowed in some areas.

An interdisciplinary (ID) team is assembled and a project manager is selected. Initially, the team consists of a rangeland management specialist, ecologist, wildlife biologist, riparian coordinator (who also has fishery expertise), recreation planner, and soils scientist. The team meets initially to scope out the project and develop a strategy. A press release is distributed to local papers informing the public of the effort. Stakeholders are notified individually by letter. In addition, some stakeholders, such as the livestock permittees, DOW, and the irrigation company are also given courtesy phone calls or visits. The RAC is notified through normal communication channels (most likely this will be through periodic updates).

**II. WHAT STANDARDS ARE NOT BEING MET? WHAT IS THE TREND?**

Process and Resources Needed:

The ID Team gathers the following existing information: riparian inventories, fisheries data, grazing files (actual use and utilization, climate, browse, and photos), historical uses, vegetation trend data, RMP decisions, and soil survey information. Historical use information is gathered from citizens (e.g., ranchers, historical society) that have a knowledge of the area through interviews or request letters. The ID team conducts field visits to assess the health of the area. Stakeholders (especially the livestock permittees and irrigation company) and RAC are invited. It is probable that additional discussions are needed to come to conclusions on how the area meets the health standards, using information collected during and prior to the field visits. During this period, potential causes of the problem will be discussed. Approximately $16,000 in BLM labor costs will be needed for this phase of the process, occurring over a six-month period.

Findings :

Standard 1 - The standard is not met on large areas within two adjacent grazing allotments (approximately 20,000 acres). Indicators of the standard that point to a problem are: presence of active rills and gullies; inappropriate ground cover (lack of adequate basal cover, as evidenced by a high percent of bare ground); plant litter is not accumulating in place; absence of organic matter in soil; lack of plant species with a variety of root depths; lack of vigorous plants. Trend is static.

Standard 2 - Only about 40 percent of the riparian zones are in properly functioning condition. Riparian zones not meeting the standard do not withstand high stream flow events well; lack woody riparian vegetation, stream is not in balance with the water and sediment being supplied by the watershed; residual vegetation not always present to capture and retain sediment; lack of woody debris contributing to the character of stream channel morphology. Trend is upward, but resources are at risk.

Standard 3 - Approximately 35 percent of the upland vegetation does not meet the standard, as evidenced by: lack of spatial distribution with appropriate density and distribution of plants, lack of population age classes, and appropriate plant litter; within pinon-juniper woodland sites, successional diversity is lacking.

Standard 4 - Standard is met. (The USFWS, DOW, and Nature Conservancy concur.)

Standard 5 - Standard is met.

**III. What are the causes for the Standards not being met?**

Process and Resources Needed:

During initial investigations, camping and fishing uses at access points along the creek are suspected as a potential cause for riparian problems. It is suspected that livestock grazing (past and present practices), past fire management policy, and off-highway vehicle use are also contributors to the problems. The ID team meets and develops initial findings. The Area Manager, ID Team, the livestock permittees, DOW, and representatives from recreation and OHV interests meet on-site to discuss the initial findings. Due to anticipated controversy, the RAC is invited to be represented on site. In addition to causal factors, potential remedial actions are also discussed at this time. Most causal factors are agreed upon except for the issues related to woody riparian vegetation along the creek. The Rangeland Resource Team (RRT), formed by the local RAC, will provide opinions on the unresolved issues. (The RRT is composed of two grazing permittees, an academician with expertise in vegetation and ecology, and two representatives from the environmental and recreation communities.) This step of the process occurs over a three-month period; BLM labor costs are approximately $6,000. Approximately six days will be expended by non-BLM participants and the RRT members.

Findings:
Fire suppression policy (past and present) has prevented interruption of successional stages in the pinon/juniper plant community. Interim management policy for the Wilderness Study Area prohibits forest management practices that promote successional diversity. Inappropriate livestock distribution has resulted in over-utilized riparian vegetation. (However, recently modified grazing practices, including drift fences and alternative pasturing, have lessened the impact along the creek.) Needed animal impact is lacking due to undeveloped and unmaintained springs. Off-highway vehicle use is funneled to creek bottoms resulting in damage to riparian resources.

**V. What options for remedy are there? What is the decision?**

Process and Resources Needed:

Reassemble the ID team, permittee, DOW, and other stakeholders that have been involved along the way, to discuss options. This meeting, possibly held on-site will be an extension of discussions that occurred during steps II and III of the process. Therefore, this phase of the process should proceed quickly. This will occur over a 1.5-month period and BLM labor costs will be $2,000.

Options:

* Intensify the development of drift fences and double the pastures along the creek. This should allow the riparian vegetation to become more vigorous, develop better root systems, and enhance willow growth.

* Using drift fences, create additional pasture on upland areas in order to keep livestock on these site. Animal impact in these areas will add needed organic matter to the soil and improve the vigor of desirable plants. The additional pastures are supplemented with development/redevelopment of six springs in the upland areas and strategic placement of salt.

* Reducing livestock is also considered, but necessary only if the aforementioned livestock grazing actions are not successful.

* Erosion abatement measures, such as gully plugs, trash collectors, etc., on upland drainages are considered.

* Identify the designated vehicle routes in the IAP. Initiate consultation and education through informational meetings and any additional meetings that are held for the IAP. Place barricades at unneeded access points to the area and sign strategic locations. Increase law enforcement and visitor information patrols in the area.

* Incorporate a prescribed fire strategy into the IAP. Fire is need to promote vegetative diversity identified as a problem.

* The option of amending the RMP to conditional suppression status is considered. However, because there is a significant amount of private land adjacent to the area, this option is not carried forward.

* Identify woodland areas for harvest in the IAP that will meet vegetative diversity objective.

Decisions:

• Except for changing the fire suppression classification and upland control measures, all of the options mentioned above will be adopted.

**VI. How will the decision be implemented? What are the impacts?**

Process and Resources Needed:

• All of the decisions noted above are included in the IAP. (Note: there likely are other actions in the IAP that are not related to the standards and guidelines analyzed in this document. Also, should there be a delay in completing the IAP, the grazing management actions may be implemented in advance of final approval of the IAP.)

* The prescribed fire portion of the plan and OHV decisions are subject to an environmental assessment in conjunction with the IAP. All grazing management actions are covered adequately under previous environmental documents and are documented through an administrative determination sheet. Timber harvest areas are identified, but cannot be acted upon at this time until Congress makes a decision on the WSA. Prescribed fire must conform to Wilderness interim management policy.

* The implementation plan for the IAP notes that the grazing management actions can be acted upon quickly. Once approved, the decisions pertaining to livestock grazing are documented in the AMP, which become terms and conditions of the permit. Other actions are dependent on available funding, partnerships, and or volunteer arrangements.

* Two additional meetings related to the IAP will be held. Labor costs to complete the plan, the EA, and conduct the meetings are $6,000.

Impacts:

Livestock Grazing Administration: The cost of implementing the grazing systems and improvements is approximately $7,200 and will be shared among three operators. Some financial assistance from DOW or the Board of District Advisors (formerly BLM's Grazing Advisory Board) may lessen the cost to the permittees. The permittees will need to spend additional time managing the livestock because there will be about twice as many pastures to move the livestock through during the use period.

Vehicle Management: The cost of implementing the OHV decisions are: using heavy equipment, construct barricades at 6 access points (12 days at $100/hr.)

at a cost of $9,600; erect/replace signs at a cost of $1,000. Also, initiating consultation and education with homeowners and increasing law enforcement and resource patrols requires a redirecting of priorities of existing personnel. The use of volunteers or "adopt-an-area" are pursued.

Prescribed Fire and Woodcutting: Prescribed fire costs are approximately $25 per acre. Pinon/juniper woodcutting areas cost approximately $4,000 in labor to establish (assuming a 15-acre cut). Approximately $1,000 is recuperated by charging for permits.

Other Impacts: Outside of burn and woodcutting areas, improvements to basal cover, plant litter, plant diversity, etc, will occur gradually over 20+ years. Areas subject to prescribed burns and woodcutting will experience noticeable improvement in most indicators within 5 years. The dependability of available forage for livestock and wildlife will increase. If fire and woodcuts are implemented, there will be a slight increase in available forage for livestock and wildlife.

**VII. How will the corrective actions be monitored to determine effectiveness?**

Utilization: Establish 12 streambank photo transects along the creek. Erect utilization cages in all pastures (10). BLM labor costs are $4,000. Monitor and document file annually. Annual BLM labor costs are $1,000. Establish five photo points for each burn and woodcutting area.

**B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (identify difference from Proposed Action Alternative)**

There is virtually no difference. Additional time may be needed during the standard analysis phase because of the absence of indicators.

**C. PRESENT MANAGEMENT (identify difference from Proposed Action Alternative)**

Without the standards and guidelines, the process would have likely focused on the riparian situation. Most likely, a strong analysis of upland soils and vegetation conditions would not have happened.

## IMPLEMENTATION EXAMPLE 8

### I. BACKGROUND

This 8,000 acre area lies adjacent to a small mountain park community of 1,200. It lies within the Northern Parks and Ranges Landscape Unit. (See Chapter 3.) Elevation ranges from 7,400 to 8,400 feet. Soils are predominantly deep, well-drained loams that were formed in alluvium from Pierre Shale. Vegetative communities are dominated by sagebrush parks. The area receives 10 to 14 inches of annual precipitation, split evenly between cold and warm seasons. Approximately 4 miles of riparian, comprised of 3 perennial streams, flow through the area. The sediment in one of the streams appears quite high. The area is critical deer and elk winter habitat. The area was identified as a Resource Conservation Area (RCA) in 1965, at which time an aggressive series of range improvement projects were implemented to manipulate the upland vegetation. These projects included 280 acres of crested wheatgrass seedings, 3,275 acres were chemically treated, and 100 acres were mechanically treated, to remove sagebrush. 3,550 acres remained untreated native range. Subsequent to the treatments, AUMs (cattle) associated with the grazing permit were increased by over 355 percent to 2,133 AUMs. Through the years, the AMP for the allotment was modified four times and AUMs were reduced with each modification. Current preference is 700 AUMs for livestock. The area receives heavy off-highway vehicle use (motorcycles and all-terrain vehicles). Other substantial human activities include target shooting, hunting, and partying.

This high-visibility area is under constant scrutiny by the local public. The grazing permit is up for renewal. Based on a cursory examination of monitoring data and ocular reconnaissance, some staff are concerned over riparian conditions and vegetative conditions. This is especially disturbing given the fact that substantial modifications to livestock grazing, including substantial reductions, have occurred. Assume the area is given priority status and standards and guidelines will be evaluated for the area. Although this area is the primary focal point for the analysis, the effects of surrounding BLM and private land are considered in the assessment.

### A. PROPOSED ACTION

### I. Preliminary Assessment

**Process and Resources Needed:**

Applicable RMP decisione are identified. The standards and guidelines detailed in Chapter 2 apply. Other decisions include: The area is designated "open" to OHV use. Forage allocation is 700 AUMs for livestock grazing and 200 AUMs (based on original AMP developed in 1970) for mule deer and elk. Also, an OHV Plan for the area prescribing designated routes and some road closures was prepared in 1988 but never implemented.

The Area Manager and staff meet to develop a strategy. An interdisclipinary (ID) team consisting of a range management specialist, ecologist, wildlife biologist, and recreation planner is selected. A full plan is not considered necessary. Because several conflicts and uses are present, notify potential stakeholders at this time - livestock permittees, Division of Wildlife (DOW), and the local OHV user group. During this initial period, communication is mostly informal, mainly in the form of phone calls. If the OHV club meets during this time, staff may wish to address the group. A press release is prepared for the local paper informing the public of the process. A site

visit involving the livestock permittee, the DOW, and a representative from the OHV club is likely. Ask the stakeholders to provide any information that may be helpful in the process. The RAC is notified, most likely through a periodic update (i.e., normal notification process). Initial scoping and notification occurs over a one-month period; BLM labor costs are approximately $1,000.

**II. What standards are not being met? What is the trend?**

Process and Resources Needed:

Team members gather aerial photos and existing data on climate, utilization, actual use, browse condition, big game populations, site potential, and water quality. Staff reads trend data (greenlines in riparian and uplands), establishes photo points along two drainages, conduct ESI inventory, and gather appropriate water samples (see Example 4). The stakeholders are invited to attend any of the field sessions. Internal scoping by interdisciplinary team (staff) occurs over a two-month period. BLM labor costs are $4,000 and other costs, such as lab fees are $500.

Findings :

Standard 1 - Problems identified. Substantial rilling, active, incised channeling, soil blow-outs, lack of ground cover, and plant litter are indicators. Trend is static or slightly downward.

Standard 2 - Problems identified on one of the three riparian areas. Lack of desirable riparian vegetation, excessive sediment loads without ability to capture, an unstable stream channel, and shortened surface flows without appropriate meandering are indicators. Woody species recruitment is occurring but with consistently high utilization levels. Trend is stable at current nonfunctioning condition.

Standard 3 - Problems identified. Sage grouse populations are declining regionally; the effects of this particular area on the sage grouse population are uncertain. Sage brush communities do not exhibit a range of population age classes. Plant litter is not accumulating across the landscape. Upland vegetation is only producing 30 percent to 40 percent of its capability to meet desired objectives. Trend is down along trails and travel corridors, up slightly through the remainder of the area.

Standard 4 - Not applicable.

Standard 5 - Problems identified on the stream mentioned in Standard 2. The temperature of the water is high and the water carries abnormal sediment loads. Trend is static. The path taken to address water quality in this example is displayed at the end of this example. See Example 4 and Appendix 4 for additional information on the process used to determine compliance with the water quality standard.

**III. What are the causes for the standards not being met?**

Process and Resources Needed:

It is suspected that past management practices are a major contributor to problems on the site. Review past inventory data, case file data, and historic uses. Also, review the OHV plan and the process used to develop it. Interview users that have a knowledge of the past uses of the area. Because the area is classified as a "limited" area due to sediment, a team is formed

to assess the situation and make recommendations. Include the permittee and DOW in the staff analysis. Prepare a report on preliminary findings. BLM staff, the livestock permittee, OHV club representatives, and the DOW meet on-site to disclose the preliminary findings and to discuss potential remedies. This step of the process would occur over a two-week period and BLM labor costs are approximately $2,000.

Findings:

Previous livestock grazing practices that included season-long use with excessive animal numbers reduced vegetative capability on the area. The condition is further exacerbated by current OHV use. Livestock use is determined now to be only a minor contributor to the area's inability to recover due to the intense management practices being applied under the current AMP. The area has been divided into five pastures where livestock are only grazed for a period of 30 days. The two pastures containing the affected riparian areas are grazed for five days and nine days respectively. Other water sources (wells, developed springs) were developed to help further diminish use on the riparian areas. Unrestricted OHV use in one of the drainages is the major contributor to the nonfunctioning condition in the riparian zone. OHV use is also a contributor to further depletion of upland vegetation and sediment into the drainage. Wildlife grazing distribution problems is also a minor contributor to the riparian problems.

**IV. What options for remedy are there? What is the decision?**

**Process and Resources Needed:**

Utilizing the information and ideas previously gathered, the Area Manager and staff develop a preferred action. The proposal and alternatives are discussed with the DOW, OHV club representatives, and the livestock permittee. The RAC is informed of progress but not directly involved at this time due to a perceived lack of conflict between user groups.

Options:

* For vehicle management, prepare a RMP plan amendment changing the existing designation from "open" to "limited to designated roads and trails." This occurs over a six-month period ($500 for notices and $3000 for labor). Note: designation on surrounding lands are also made part of the amendment process. Implement portions of the existing OHV Plan. Specifically: identify and close damaging roads and trails ($1,000 for materials and $6,000 labor); construct drift fences across riparian zones to impede off-road travel along subject trails ($500 for materials and $1,000 for labor). Installation costs could be reduced through the volunteer program. Develop an educational program with the local schools and OHV clubs to communicate resource issues and concerns.

* For livestock grazing, the current high intensity/short duration grazing system is supported as a good management tool to help with both the stream recovery process (although historical livestock use is considered to be a contributing factor to past degradation within the riparian area) as well as upland improvement.

* For riparian management, plant sedge plugs and willows within the riparian zone to collect upland sediment loads and to reduce channel erosion. Estimated costs to the BLM are $2,000 for labor and material, but possibly reduced through cost-sharing with the Habitat Partnership Program (HPP) program. Alternatives to this action are drop structures and gabiens, although these are considered cost prohibitive and unrealistic.

BLM_0006999

* To stop or slow sediment flows into the riparian area and to improve upland conditions, broadcast native seed onto sensitive areas adjacent to the riparian area in an effort to reduce surface runoff, stabilize upland soils, and to reduce erosional impacts. Other alternatives, such as recontouring upland areas and waterbar highly erosive areas are considered to be too cost prohibitive and unrealistic. Cost is $8,300 ($83/acre at 100 acres project size).

Decisions:

Implementation of the OHV Plan as noted above; prepare plan amendment for OHV designation. Establish "educational" programs with the local OHV club and school system to increase public awareness.

Construct drift fences within the riparian area to deter OHV use. Sign closed trails/roads within sensitive areas to further increase public awareness and to deter unauthorized OHV use within those areas. Monitor and cite OHV users found operating within closed areas.

Plant sedge plugs within stream to help start the recovery process and stabilize current stream channel conditions.

Reseed sensitive upland sites to reduce upland erosion and streambank sediment loads.

## V. How will the decision be implemented? What are the impacts?

Process:

Vehicle management - Prepare the plan amendment. Research aerial photos to determine existing roads prior to 1986. Update the OHV plan in conjunction with the amendment. Local users, user groups, the town, and county need to be involved in the changing management of the area. Cooperation from each of the parties would better help achieve success and acceptance of the decision.

Riparian revegetation - Suitable sites for planting sedge plugs are identified. Plugs are purchased and volunteers organized for planting.

Upland revegetation - Sites susceptible to erosion are surveyed and mapped for potential reseeding. Project analysis is completed over a two-year period. This is contingent on the grazing permittee taking voluntary nonuse on two pastures for two years.

Impacts:

Resource Impacts: Improvement to the stream through revegetation occurs at a relatively rapid pace (two years) once OHV use is controlled and sedge plugs planted. The woody component would gradually appear over a longer period due to the heavy concentrations of wildlife during the winter. A functioning-at-risk status for the riparian zone is expected within five to seven years. Ground cover on upland sites would improve quickly once plants from the seeding are established, although the desired potential community (DPC) would not be expected for another 20 years. Heavy soil depositions would continue to burden the riparian recovery process until improved vehicle management is put in place and the upland seedlings achieve permanent establishment (5-10 years). Limiting OHV use may move the activity to other areas, resulting in damage to outlying areas. The degree to which this occurs is contingent on how successful public information and awareness is and on which lands are covered in the OHV designation amendment.

Public Land Users Impacts: The impact expected toward the OHV user is mainly inconvenience. Initially, the voluntary nonuse (two years) temporarily reduces the grazing permittee 500 AUMs through the closure of two pastures for two years. Assuming $7.00/AUM for private pasture, this increases the permittee's costs by approximately $3,500 per year.

Socio-economic Impacts: The actions do not affect population and cause no more than very minor impacts to the local economy. Some of the local residents experience frustration over control and management placed on vehicle use.

**VI. How will the corrective actions be monitored to determine effectiveness?**

Utilization studies: Both range and wildlife programs would establish these studies to further determine grazing impacts on this area by livestock and wildlife. Estimated cost to each program are two days/year at $250 each.

Photopoints/Cross section studies: To monitor progress and development of the riparian system. Estimated cost to the BLM is $1,000 per year.

Quadrat Frequency/Trend: These studies currently exist for livestock grazing and are currently being monitored. No additional cost would be associated with this method.

Browse study: To determine grazing impacts from both livestock and wildlife on the woody component within the riparian area. Approximate cost is $2,000 to the BLM (two weeks/year).

Road/Trail monitoring: The trails would be visually monitored for condition and use. Monitoring would be done with recreation staff and law enforcement. A "public land watch" system, with community partners and user groups is encouraged. Annual labor costs are approximately $400 for 2-3 days/year.

**B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (identify difference from Proposed Action Alternative)**

Without indicators, it takes longer to arrive at the root cause of the problem.

**C. PRESENT MANAGEMENT (identify difference from Proposed Action Alternative)**

Without the emphasis on overall public land health, it is likely that problems are likely addressed on a piecemeal basis.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The following is provided to show the path taken in this example to determine conformance with water quality standards. See Appendix D that displays the flow chart for water quality compliance.

1- Locate appropriate stream segments during preliminary assessment

2- Determine antidegradation category and beneficial uses during preliminary assessment.

Findings ---→ Anti degradation : Undesignated
Beneficial Uses : Cold Water Aquatic Life 1,

Recreation Class 2, water supply, agriculture

3- Determine if National or State Waters during Preliminary Assessment
Findings---→ No

4- Determined Water Quality during Preliminary Assessment and Step 2 and/or if the area is classified as Limited or Impaired.
Findings---→ No existing data available; site testing conducted concluded sediment problems; the area is classified as limited due to sediment (low priority)

5- The situation is referred to a water quality ID Team.

## IMPLEMENTATION EXAMPLE 9

### PRESENT SITUATION

This 17,500-acre area is located in the South-Central Highlands Landscape Unit. (See Chapter 3.) It extends from the lower sagebrush country along a perennial stream to timber/park/sagebrush areas at the U.S. Forest Service (USFS) boundary on the south edge of the area. The elevation range is 7,800 to 9,750 feet. Average annual precipitation is approximately 11-12 inches.

Private lands are intermixed with public lands and the area is easily accessable from a major highway. Gates are sometimes left open resulting in livestock using unauthorized areas. The allotment is currently in its sixth year of rest from grazing as a result of the Department of Energy's Uranium Mill Tailings Removal Project (UMTRA). As part of the mitigation requirements for the UMTRA Project, grazing will not resume until a grazing plan is in place. Public lands within the area are permitted to one livestock operator. The permitted use is 318 AUMs, from May 15 to August 17. The permittee has requested that BLM evaluate his allotment and present recommendations to him.

### A. PROPOSED ACTION

### I. Preliminary Assessment

All applicable RMP decisions are identified and described in a table that lists ten criteria or concerns for this area. These criteria/concerns are: Southwest Willow Fly Catcher, Gunnison Sage Grouse, riparian areas, crested wheatgrass seedings and burned areas, rehabilitated sites, big game, private land ownership, poisonous plants, and native uplands. In addition, the standards and guidelines in Chapter Two apply.

This is a high production area for the Gunnison Sage Grouse, which is at risk, and may become a listed species under the Endangered Species Act (ESA). A considerable number of antelope utilize the area. Deer and elk use is minimal. Before livestock were removed, riparian areas had a static to downward trend due to heavy and severe livestock use and roads. The concern over riparian areas and livestock is even more critical because this allotment has potential habitat for the Southwestern willow flycatcher, an endangered species.

The area has crested wheatgrass seedings associated with burned areas. These are traditional "sore spots" in terms of heavy or severe use by livestock. Upland areas are largely static in trend, however, they are also fragmented by powerlines, existing roads and new or upgraded roads resulting from UMTRA, recreation, and other uses. Poisonous plants occupy a portion of the allotment requiring careful planning of livestock movement (rotations, etc.). The primary poisonous plants are low and tall larkspur along with monkshood.

The RMP prescriptions for the area require that spring use by livestock is rotated. Generally, a 4-inch stubble height must be maintained. Physical disturbances are minimized in sage grouse nesting and brood-rearing habitat from April 15 to July 1.

The biological staff spends about one week, compiling, summarizing, reviewing, and analyzing monitoring (actual use and utilization) data that has been collected over several years. Use supervision data is also compiled and reviewed. Informal contact is made with adjoining permittees to find out what concerns and insights they may have. Then the biological staff and area manager meet with the permittee to explain the need for action, find out what the permittee's goals are and to define everyones expectations. The RAC is

apprised through normal notification processes; most likely a summarized periodic update.

**II. What standards are not being met? What is the trend?**

**Process and Resources Needed:**

Existing livestock and wildlife utilization, actual use, and trend data along with soils and hydrology data is summarized. The homeowners association is contacted to get their input. Then a second meeting is held with the permittee to present the findings. To this point in the process, the BLM expends about $4,000 in labor costs during a one-month period.

**Findings:**

**Standard 1 - Upland Soils:** This standard is not being met, however, there is an acceptable trend toward meeting the standard because the allotment has been rested for six years. Pedestals, rills, and cutting are all present. Low vigor plants are present in most pastures. Like the erosive forces noted above, canopy and ground cover have an improving trend.

**Standard 2 - Riparian:** This standard is not being met. There are some areas that are acceptable, but one area in particular is not. The indicators include undesirable species, which because they are shallow rooted, are not able to protect streambanks, etc., during peak flows. The only exception is the upper end of one area. For the most part, the trend is upward (acceptable) toward healthy public lands, however, a few areas do not have an acceptable trend.

**Standard 3 - Plant and Animal Communities:** The standard for both plants and animals is not being met. Regionally, populations of the Gunnison Sage Grouse and Southwestern Willow Flycatcher should be much higher. The populations have declined to a dangerously low point throughout their range. The landscape is fragmented because of land treatments. There would be better habitat diversity if riparian areas were in better condition. There is a noxious weed problem with a state listed species (Russian Knapweed) and other nonlisted species. The animal trend is not acceptable because Gunnison Sage Grouse numbers have not increased and production is less than expected. Actions taken under UMTRA decreased birds by 20 percent, and data shows only a slight upward trend. The plant or habitat trend is up at an acceptable rate except for noxious weeds which spread last year. Habitat fragmentation is unacceptable, but has not changed.

**Standard 4 - Threatened & Endangered Species:** This standard is being met. The standard for the Southwestern Willow Flycatcher (SWWF), a recently listed species, is being met. The upper end of the allotment may have potential habitat, but none is suitable at this time. Elevation and gradient are the primary criteria used in determining the SWWF habitat (riparian areas). If the riparian habitat is improved to meet the riparian habitat standard, it will be suitable. The fundamental requirement is to address U.S. Fish and Wildlife Service (USFWS) criteria for suitable and occupied habitats, not potential, therefore, the standard is being met. Due to a lack of data, the trend is uncertain at this time.

**Standard 5 - Water Quality:** This standard is not being met. There is too much erosion and sediment in the drainages, however, upland springs and/or ponds meet the standard. The trend is acceptable because of rest from livestock grazing.

**III. What are the causes for the standards not being met?**

Process and Resources Needed:

The biological staff, area manager, DOW representative and the permittee review the information that has been gathered and summarized, and through discussions determine the likely causes and appropriate solutions.

Findings:

The causes for not meeting the standards are determined to be: (1) improper livestock grazing in the past that was done in conjunction with the current grazing system; (2) existing roads and new and/or upgraded roads, along with the disposal cell associated with the UMTRA project (including vehicle traffic); and (3) rangeland treatments (burns and seedings).

**IV. What options for remedy are there? What is the decision?**

Process and Resources Needed:

Existing information is used to prepare an activity plan for the area, which incorporates an EA to analyze and disclose the impacts of the proposed action and alternatives. This is prepared by one lead person assisted by three others at a labor cost of about $8,000.

Options:

Because a mitigation plan for the UMTRA Project is in place and efforts are already underway to address the Gunnison Sage Grouse and Southwestern Willow Flycatcher, it was determined that the most effective option was to address the basic components of livestock grazing in a manner that compliments these other ongoing efforts. The basic factors addressed include the timing, intensity, and duration of grazing.

Decision:

The decision is to move forward with changes in the timing, intensity and duration of livestock grazing. Permitted use is reduced to 250 AUMs. Utilization levels specified in the 1993 RMP will be used, and grazing duration will be reduced by half in most pastures.

**V. How will the decision be implemented? What are the impacts?**

Process:

Upon completion of the activity plan and EA, the new grazing permit (which references the activity plan as a term or condition) is offered along with a decision as per the new grazing regulations. The permittee is already aware of and indicated agreement with the provisions of the plan and permit. It is anticipated the permittee accepts the permit as offered.

To implement the proposed grazing system requires an expenditure of $16,000 for three miles of fence to facilitate more intensive management. Approximately $15,000 to reconstruct several springs to accommodate a larger herd size (but for 1/3 the duration of grazing). Approximately $500 is required annually for noxious weed control. These costs will be paid for by the BLM from approriated funds. Assistance from the District Board of Advisors are requested.

Impacts:

Resource Impacts: The concern with livestock grazing and the Southwestern

Willow Flycatcher is with the presence of cattle during the time the habitat is being utilized by the bird, and any effects that grazing may have on the willow plants. The corrective actions that are proposed are both positive and negative. The positive impact is that the period of grazing is reduced by 1/2 thus reducing the period of time that the bird is disturbed by the presence of cattle. In addition, the overall management of shortened duration, rotation of spring and summer pastures, and increased recovery time benefits the willow plants upon which the bird relies for habitat. The negative impact is that even with a larger number of livestock, this may result in "crowding" near areas with willows resulting in disturbance to the bird even if only for 1/2 the time. Overall, there would be a net gain to the bird.

The concern with the Gunnison Sage Grouse focuses on competition for habitat. The forage so valuable for livestock production is critical for nesting and early brood-rearing habitat for grouse. The corrective actions that are proposed result in more recovery time and thus improved vigor for the plants grouse rely on for cover. Disturbance to grouse by cattle during nesting and early brood-rearing would be reduced in terms of the amount of time livestock are present, however, with an increase in herd size, the likelihood of disturbance to the bird could increase but for a shorter period of time. Because of the benefits to the plants on which the bird relies for habitat and the shortened grazing period, there would be a net gain to this bird.

Riparian Areas are often grazed heavily or severely because of water availability, shading, quality and quantity of forage, forage stays greener longer in these areas, and topography. Corrective actions would reduce the amount of time cattle would graze these areas by 1/2 and increase the amount of time riparian plants have to recover from grazing. This combined with their resiliency results in an overall improvement in riparian conditions. With a greater number of livestock for a shorter period of time, use levels or riparian stubble heights will be difficult to meet. This could pose a problem for broods in these riparian areas if heights fall below the 4" stubble requirement. With inadequate cover, broods become vulnerable to predation. Adequate residue is also needed for watershed stability (stable banks, trapping sediment etc.) so if use levels become heavy or severe, the riparian area could degrade and become vulnerable to erosion. Overall, there is a net benefit to riparian areas from the corrective actions.

Crested Wheatgrass Seedings & burned areas - The primary concern with livestock grazing and seedings/burned areas is that these areas attract cattle because they are first to green up in the spring with palatable forage and are often grazed heavily or severely. The corrective actions shorten the duration of grazing and increase the amount of time these seeded areas have to recover from grazing. If use level requirements (4" residue) are not met, thie could adversely effect the health of the seedings, however, this would be mitigated, at least in part, by a shortened duration, and an increased recovery period. The end result is a net benefit to these areas.

The primary concern with livestock and the rehabilitated UMTRA sites is that grazing and trampling in newly seeded/mulched areas could result in the uprooting of seedling grass plants and thus degrade the site resulting in weed infestations and/or erosion. Grazing will not resume for another few years so these sites should be stable by the time grazing resumes. At that time, existing management geared toward shortened duration and increased recovery time should help to maintain these areas. If grazing levels become heavy or severe, these sites may degrade and be vulnerable to erosion, however, this should be mitigated, at least in part, by increased recovery time and a shortened grazing period.

The primary impact to big game is to antelope. To facilitate more intensive management, a pasture division fence is required thus creating a barrier to these animals. The fence is designed to accomodate their needs (16-20" bottom

strand), however, effects of fences are cumulative and should be viewed in a bigger picture. Effects to deer and elk are the same, however, they generally go over fences instead of under so they are vulnerable to getting their hind legs trapped in the top two wires resulting in death or injury to these animals. The effects of a shortened duration and increased recovery period benefit the plants that are important big game forage species.

Although native uplands are less resilient than riparian areas, the reduction in duration of grazing combined with the increased recovery period should benefit these areas by improving the vigor of native upland plants.

Impacts to Public Land Users: The livestock operator incurs a 16 % reduction in permitted use, and the season of use is cut in half in most pastures. To fully utilize his permit the operator will need to increase his herd size to 500 head. The proposed action requires that cattle not be moved into areas with poisonous plants during the period when cattle would be attracted to them. This avoids cattle losses, however should gates be left open or fences cut/unmaintained, cattle could wander into infected pastures and be vulnerable to poisoning and death.

The proposed action involves the owners of adjacent lands by considering their concerns/expectations and shortening the amount of time cattle are in areas that effect them.

Socio-economic: Impacts to the social and economic health of the area are negligible.

**VI. How will the Corrective Actions be Monitored to Determine Effectiveness?**

Monitoring is generally done by seasonal employees or the staff ecologist. However, other resource specialists may collect this data based on funding and priorities. The resource specialists are involved with use supervision annually, or as budget and priorities allow.

**B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (identify difference from Proposed Action Alternative)**

No significant difference in impacts are likely to occur.

**C. PRESENT MANAGEMENT (identify difference from Proposed Action Alternative)**

Very little difference in impacts are likely, if present management continued. Most management actions in this example are already being implemented, thus moving resource conditions toward the standards at an acceptable pace.

## IMPLEMENTATION EXAMPLE 10

### PRESENT SITUATION

The area is approximately 40,000 acres in size, and lies approximately one-half way between two towns of approximately 2,500 population each. Most of the area is within the Book/Roan Cliffs landscape unit and a small portionof thee northern edge is within the Uinta Basin landscape unit.

The dominate species associated with the pinyon/juniper type are pinyon and Utah juniper. The stand composition, site characteristics, and productivity are highly variable based on moisture relationships. On drier sites (lower precipitation or elevation or south and west aspects), Utah juniper becomes more dominant. As the moisture regimes increase pinyon increases in dominance, until at the upper limits of the vegetation type, stands tend to be entirely pinyon.

The dominate species associated with the sagebrush bottoms are Wyoming big sagebrush, greasewood, cheat grass, western wheatgrass, basin wildrye, rabbitbrush and a variety of forbs. At the lower elevations of these bottoms, greasewood is dominant, but becomes less dominant further up the drainages. At the upper drainages sagebrush and basin wildrye are the dominate species. Recently, about 1500 acres of bottom lands were burned and seeded. The results of these burns are not yet known.

The dominate species of the mountain shrub community are serviceberry, snowberry, mountain big sagebrush, oak brush, western wheatgrass, beardless bluebunch, elk sedge and a variety of forbs. This plant community is generally in good condition, producing 1200 to 1700 lbs/acre of forage annually.

Riparian vegetation is found along a major creek and at several upland springs. The creek above the intersection of a large gulch and spring to the allotment boundary is in non functioning condition. This appears to be the result of a combination of factors; livestock and wild horse use, and a poorly designed road which in many places is in the stream channel. This stream segment is characterized as lacking adequate vegetation to dissipate high flow events. Actively eroding stream banks, and poor water quality as evidenced by flies. Near the allotment boundary is a spring which produces water with high salt and sulfur content. Below the intersection of the large gulch, the creek functioning properly. There is adequate stream bank vegetation to dissipate high stream flow events, banks are stable and building, there is a functional flood plain, and water quality appears to be much improved, possibly by addition of good water from the spring, having a dilution effect. The upland springs are in non-functioning condition the result of heavy ungulate use.

This area contains an Area of Critical Environmental Concern (ACEC) for the enhanced management of several plant species of special concern. The area also contains two designated Remnant Vegetation areas. Objectives for these area emphasize the maintenance of these vegetation types.

These allotments are a part of a Herd Management area where the horses are to be managed for retention. Horse numbers vary due to the wandering nature of the horses, although several bands can be considered to be resident. The herd management area currently contains approximately 400 horses with the average number on this allotment at approximately 90 head. The resource management plan for this HMA proposes a herd size of 95-140 horses.

Horse use on this allotment is very concentrated in certain areas due in part to limited water supplies.

Management of livestock is currently in transition. The permittee recently acquired additional properties which need to be included into the grazing program. Two of the properties are exclusively summer ranges. It is expected that summer use of the allotment will end, fall and winter use will be on the private lands and these allotments will be used primarily as spring range. These allotments are also large enough to allow for a grazing system to be prepared the primary goal of meeting forage plants needs for growth, reproduction and carbohydrate storage.

This allotment currently lacks sufficient reliable water sources. This area is designated as Critical Winter Range for big game. The Resource Management Plan (RMP) is concerned with the condition and distribution of browse, primarily serviceberry, mahogany and sagebrush. Levels of use of browse species are limited. Wildlife and other objectives in the RMP are shown in Appendix B.

**A. PROPOSED ACTION**

**I. Preliminary Assessment**

Process and Resources Needed.

Because of on-going resource management planning, the Resource Area staff has all the information needed to do a preliminary assessment of this area. This includes a review of resource conditions and trends on surrounding areas and the influences they have on this area and vice versa. The grazing permittee, wild horse groups and DOW are identified as interested public/agencies and directly contacted. The RAC is apprised if the situation but not directly involved at this time.

**II. WHAT STANDARDS ARE NOT BEING MET? What is the trend?**

Process and Resources Needed:

The resource area compiles existing data on vegetation trend and utilization (including use pattern mapping), riparian function analysis, big game population statistics and soil survey information. No field trips are proposed at this time as the staff is well acquainted with the area. The grazing permittee is cooperative and open to discussing different grazing systems. Others who are interested in this area are encouraged to participate, and wild horse groups advise that they are strongly concerned and will participate.

Findings:

Standard 1 - Upland Soils: This area does not meet the standard. Some soils are considered fragile based on erosion potential, These soils also have slopes greater that 35%. Approximately 5,000 acres of upland soils show the indicators of non-functioning soils (pedestaling, rills, and lack of ground cover.) On the bottoms, approximately 50% of the soils exhibit characteristics of non-functioning soils. Overall, trend is static.

Standard 2 - Riparian: This area does not meet the standard. The large creek above the large gulch exhibits actively eroding banks and lacks adequate stream side vegetation to withstand high flow events. Upland springs are also in a non-functioning condition. Overall, trend is static.

Standard 3 - Plant & Animal Communities: This area does not meet the standard for plant communities. The problems shown by the soils are directly tied to the vegetation resource. Range condition is poor on about 25%, or about 10,000 acres of uplands. There are concerns about the maintenance of

vegetation to support the wintering deer population. Several catastrophic wild fires significantly decreased pinyon and juniper to the point where there may not be adequate thermal cover for wintering deer. Although the amount of palatable forage usually increases following fires, in portions of this area, overuse by wild horses and wildlife have raised concerns about the availability of sufficient forage for wintering deer. On the bottoms, approximately 50% of the area is also in poor vegetation condition. For animal communities the area meets the standard.

Standard 4 - Threatened & Endangered Species: This standard is being met on the remnant vegetation areas and areas of critical environmental concern.

Standard 5 - Water Quality: The creek above the junction with the large gulch has huge algal blooms, low diversity of riparian plant species, high water temperature, shallow depths, salt cedars, and inappropriate populations of macroinvertibrates dominated by black fly which is indicative of poor water quality. The standard is met on the creek below the gulch and spring, although during high runoff events state standards for sediment are sometimes exceeded.

**III. WHAT ARE THE CAUSES FOR THE STANDARDS NOT BEING MET?**

Process and Resources Needed:

Existing information, including input from the permittee and representatives of the wild horse groups is compiled and considered to determine the causes and potential solutions.

Findings:

Non-functioning soils are the result of livestock overgrazing on approximately 500 acres and natural plant progression on approximately 4,500 acres (i.e. pinyon/juniper invasion onto sage and mountain browse sites, which decreases ground cover). On the ridge lines there are about 3,000 acres where horses congregate, resulting in soil compaction and over utilization of available forage. Unsatisfactory vegetative conditions on about 2,000 additional acres is also attributed to over-utilization by horses.

In general, the degraded vegetative conditions are the result of past grazing practices which altered the vegetation to the point where the vegetation does a poor job of providing soil protection. The properties of the brush species now prevent seedling establishment of desirable species.

On the bottoms, approximately 50% of the area is in poor vegetative condition primarily as a result of past poor livestock management practices. Even with proper livestock management practices it will be difficult to improve the condition of these bottoms without direct vegetation management techniques (mechanical, prescribed fire, seeding, herbicides).

The poor riparian conditions are the result of (in order of importance) wild horses, livestock, poor water quality (from natural sources) and poor road construction. The upland springs are in non-functioning condition because of overuse by livestock, wild horses and elk.

**IV. What Options for Remedy are There? What is the decision.**

**Process and Resources Needed:**

Before implementing any of the options, Resource Area staff will meet with the permittee, DOW, representatives of the Wild Horse groups, and other publics that have been involved to discuss options with them, and get their feedback.

**Options:**

Remove horses within the HMA to the proposed RMP levels. In this area remove 100 head of horses. Continue to maintain the herd at the target level which requires removing 20% of the horses every year. The removal costs approximately $24,000, with yearly costs thereafter of about $480.

Develop a livestock management program which meets the requirements for plant growth, reproduction and carbohydrate storage. Labor costs for BLM are approximately $2,500 to assist the permittee in designing and implementing the new grazing system.

Develop additional water supplies to improve distribution of livestock and wild horses. To cost of developing two wells and pipelines for this area cost $100,000 for design and construction, and $1,000 annually for maintenance.

Improve forage conditions on sites not meeting potential. Primarily through manipulation of bottom vegetation by burning and seeding. Also, conduct prescribed burns in the mountain browse vegetation association. The prescribed burns and seedings cost about $10,000, and about $1,000 annually to maintain.

Close and reclaim the road that leads up the creek. This will cost about $500.

Initiate studies to determine big game/wild horse competition for browse on Pinyon/Juniper burns. This involves a cost of $300 per year for five years, or $1,500.

Continue to monitor the plant species of concern within the ACEC and remnant vegetation area. Take corrective action if any problems are found.

Use riparian fencing on the creek and the upland springs as determined necessary. Approximately $8,000 may be spent installing the fencing, with annual maintenance costs of $200 thereafter.

**Decisions:**

All of the options are consistent with the proposed Resource Management Plan, and all will be adopted, budget permitting. Creative funding options including partnerships and volunteerism is likely needed to develop the water sources.

**V. How will the Decisions be implemented? What are the impacts.**

**Process:**

Implementation takes place as funding and work load allows. It is estimated that it will require about 10 years to complete all of the actions that have been identified. The first action taken in the first year is to change the

grazing system to conform to the livestock grazing guidelines and the needs of the permittee.

It is difficult to predict when the wild horse removal occurs because of falling budgets and possible higher priorities for removal within the Resource Area. However, it is estimated that a gather is conducted within three years. If delays occur in the horse gather, the populations increase creating additional resource damage.

Impacts:

Resource Impacts: Gradual improvement to soils, riparian conditions, plant and animal communities and water quality occur as the actions described above are taken. On the upland sites, the most dramatic improvements occur very soon following the wild horse gather, initiation of the new grazing system, and development of the additional water supplies. On riparian sites, improvement will be most noticeable as riparian areas are fenced and the road up the creek is closed and reclaimed.

Public Land User Impacts: In the short term, the permittee incurs additional expenses, and likely is required to manage his/her livestock more intensively. In the long term, livestock forage conditions improve. People who enjoy wild horses lament the reduction in the herd, however, over the long term, water and forage conditions for the horses improve, thereby improving the health of the remaining herd. With improved health, use of these public lands improves for hunters, and wildlife viewers.

Socio-economic Impacts: Construction of the wells, pipelines, and riparian fencing have a slightly beneficial impact to local suppliers and contractors. Similarly, wild horse removal and the prescribed burns also result in increased local expenditures that slightly benefit the local economy.

**VII. How will the Corrective Actions be Monitored to Determine Effectiveness.**

Continue rangeland vegetation studies on the existing trend plots. Over the next five years, establish three additional plots on vegetation treatment sites.

On a three year interval, conduct the riparian function analysis.

Monitoring of rare plants in remnant vegetation areas continues as in the past.

There is no change in the wild horse census method or frequency.

**B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (identify differences from Proposed Action Alternative)**

None

**C. PRESENT MANAGEMENT (identify difference from Proposed Action Alternative**

Present management direction in the proposed RMP provides for the same(or similar) objectives to be met. No discernable difference are likely except that implementation may take slightly longer. Without the written standards it may take longer to gain acceptance among all the interested parties for the proposed actions.

## IMPLEMENTATION EXAMPLE 11

**PRESENT SITUATION**

This 81,170 acre area is a year round allotment. Within the allotment there are 70,270 acres of public lands, 9,540 acres of private lands owned or leased by the permittee, and 1,360 acres of other privately owned land.

Most of the area lies within Book/Roan Cliffs Landscape Unit and the balance lies within the Abajo Fan Landscape Unit. See Chapter 3. Elevations range from 4,500 feet to 8,500 feet. Soils are Aridisols to Mollisols derived from shale and sandstones. Vegetation ranges from salt desert,desert shrub, sagebrush, pinyon-juniper, to mountain shrub, Douglas-fir and oak brush. Precipitation ranges from 8 inches on the desert to 16 inches on the top of the plateau. The allotment has an intermittent stream with deep incised banks. The potential to bring this stream back to a perennial flow is high.

The natural disturbance regime is lightning caused fires and thunderstorms which cause flash floods and soil slumping in the higher canyons. Man caused disturbances include agriculture in the canyon bottoms, oil and gas exploration, grazing, recreation trails and roads, and water diversions.

The uses on this allotment include a year-round cattle operation with 8500 active AUMs; oil and gas exploration, pumping stations and pipelines; small game hunting,big game hunting, and guide and outfitting; motorcycle trails and horseback trails; archaeology interpretive sites; dinosaur interpretive quarry; and general use by the local population of 100,000 which is only half and hour away.

In addition to the Resource Management Plan (RMP), an allotment management plan (AMP), an archaeology activity plan, and a watershed activity plan cover all or portions of the area. In response to rapidly increasing recreational use, an integrated activity plan is being prepared to consolidate and update these existing activity plans.

This area was selected for assessing public land health because of this increasing public use and related conflicts with resources. The rancher has also initiated a coordinated resource management plan for his ranch and the allotment. The rancher is also a new permittee and is willing to improve the ranch and the allotment.

**A. PROPOSED ACTION**

**I. Preliminary Assessment**

**Process and Resources Needed:**

The allotment management plan needs to be updated so this is a good time to include the new standards and guidelines. Other applicable resource objectives and grazing management decisions are identified. The allotment management plan concept is modified to a coordinated resource management plan (CRMP) to involve interested users of Public Land.

Other key decisions are to establish Desired Plant Communities for the allotment, develop a grazing system, resolve conflicts with OHV users, improve riparian habitat, resolve oil and gas conflicts within a Wilderness Study Area (WSA), develop a Prescribed Fire Plan, which may involve prescribed natural fire, and analyze harvesting of forest products.

An interdisciplinary (ID) team is assembled to start the CRMP. The team meets to scope out issues and develop a time line to accomplish its objectives. The

stakeholders include: permittee, BLM, Natural Resource Conservation Service (NRCS), Colorado State Forest Service, Jeep Club, Ducks Unlimited (DU), Historical Society, Guide and Outfitter, RAC member, Water Users Assoc., Oil and Gas Co., DOW, and Colorado Environmental Coalition (CEC). Others will be invited if issues come up that need their participation.

BLM's part is to help gather analyze this data and to write a management plan for the Public Land.

## II. WHAT STANDARDS ARE NOT BEING MET? WHAT IS THE TREND?

Process and Resources Needed:

The ID Team gathers the following existing information: Site potential, soil survey, monitoring studies, Proper Functioning Condition (PFC) for streams, Riparian data, habitat type, historic grazing use, and watershed data. New information is needed on OHV use and erosion, wildlife/grazing forage allocation, timber inventory, non point source pollution and salinity control and fire effects. The ID team conducts field trips to assess healthy land problems and successes. During these field trips, potential causes of the problems are discussed. The approximate cost is six work months or $24,000.00 occurring over a one year period.

Findings:

Standard 1 (Soils) - The standard is not met on small areas within the allotment. Indicators of the standard that point to a problem are: presence of active rills and pedestals; inappropriate ground cover - increased amounts of cheat grass, loss of perennial grasses. Trend is static.

Standard 2 (Riparian) - The standard is not met on the stream that runs through the allotment. 95% of the riparian zone is in nonfunctioning condition. The stream does not withstand high steam flow events well. There is lack of woody vegetation. The stream is not in balance with the water and sediment being supplied by the watershed. Undesirable species (tamarisk, cheat grass, and rabbitbrush) dominate the incised banks. Trend is downward.

Standard 3 (Plant and Animal Communities) - Approximately 33% of the upland vegetation does not meet the standard as evidenced by: lack of spatial distribution with appropriate density and distribution of plants, cheat grass invasion, loss of shrub cover. Within pinyon-juniper woodland sites, successional diversity is lacking. Mule deer populations are declining and antelope are experiencing poor fawn recruitment. Trend is static.

Standard 4 (T&E Species) - Uncertain at this time about human effects on prairie dog colonies that may be sites for the black-footed ferret. Other species of interest are the kit fox. Their mortality rates seem to be high. The Ferruginous hawk is experiencing problems which may be due to food availability. Regionaly, the trend for the species is down.

Standard 5 (Water Quality) - This standard is not being met. Salinity and sediment problems are being caused by natural erosion. Small amounts of man induced causes include irrigation, grazing-loss of cover, oil and gas roads. However, overall trend is up.

## III. WHAT ARE THE CAUSES FOR THE STANDARDS NOT BEING MET?

Process and Resources Needed:

The assessment on standards and the causal factors are developed jointly among the CRMP team. The CRMP team discuss the findings and brainstorm ideas at

their monthly meeting and then conduct field trips to verify problem areas. This step of the process occurs over the three month field season and BLM labor costs are $4,000.00.

Findings:

Using the initial scoping sessions and field trips a list of causes were developed.

A. Soils: Past grazing practices, increased OHV use, fire perpetuating an undesirable seed source (cheat grass).
B. Riparian: Past grazing practices, road through the riparian area, and OHV use.
C. Plant and Animal Communities: game management policies, fire frequency perpetuated by areas of cheat grass, past grazing practices plus historic severe forage utilization caused by sheep trailing through the area to get to the mountains, decreasing shrub communities, increase in coyote populations.
D. T&E Species: causes unknown
E. Water Quality: past grazing practices, trailing up and down the riparian corridor.

**IV. WHAT OPTIONS FOR REMEDY ARE THERE? WHAT IS THE DECISION?**

Process and Resources Needed:

The CRMP team is reassembled to discuss the overall objectives and options. If additional issues surface, the interested parties are invited to become members of the CRMP team. Labor costs for BLM are $4,000.00

Options:

To address the Upland Soils, Riparian and Plant & Animal Communities Standards:
*Revisit the fire management plan for the Resource Area and identify tighter suppression constraints (decrease the allowable burn acreage to decrease cheat grass invasion) on the desert portion of the allotment. Increase prescribed fire acreage in the plateau areas for critical deer and elk winter range. Utilize fire rehab practices to establish perennial grasses and increase the shrub component in the desert.
*Develop a grazing system that incorporates the new standards and guidelines.
*For OHV use, establish a designated trail system.
*Define the riparian area and increase inventory studies.
*Evaluate animal damage control.

To address the T&E Species Standard:
*More inventory work is needed to identify options specific to this Standard.

To address the Riparian and Water Quality Standards:
*Control tamarisk, increase willow and cottonwood plantings, re-introduce beaver.
*Fence riparian areas, look at both private and public lands.
*Evaluate the use of stream structures, may need demonstration areas.
*Maintain standard design practices for oil and gas construction activities.

BLM_0007015

Decisions:

Depending on time and money all of the above options are attempted. Additional management actions may also be taken as more options are identified through the CRMP team meetings

## V. HOW WILL THE DECISION BE IMPLEMENTED? WHAT ARE THE IMPACTS?

Process:

Develop and document a coordinated strategy through the CRMP. This is accompanied by or included in an Environmental Assessment(EA).

Management Actions are prioritized as follows:

Priority #1 - Improve Riparian Habitat

The permittee agrees to follow the grazing management plan to reduce overgrazing and improve riparian habitat. This is incorporated as terms and conditions of the new 10 year permit. Range improvements such as fencing, water developments, and vegetation treatments and plantings will be identified in the CRMP and financial assistance is requested from sources such as the Board of District Advisors (formerly the Grazing Advisory Board), DOW, and the Rocky Mountain Elk Foundation. Costs incurred by BLM for planning are about $24,000.00. Construction and labor costs for each of the next five years is $20,000.00 from BLM range improvement funds.

Resource Impacts:

Implementing the grazing system and upland vegetation treatments and plantings. This increases desirable plants, improves cover and density and returns the stream to proper functioning condition in 20 years.

Public Land User Impacts:

Implementing a grazing system that provides periodic rest during critical growth periods, with adequate recovery and regrowth periods. This requires more intensive and costly livestock management by the rancher. In the event that sufficient funding is not obtained from the sources identified above, the rancher makes up the shortfalls. In the long term, improved forage conditions may result in improved livestock weight gains.

Socio-economic Impacts:

The expenditures for construction of range improvements will result in very slight increases in revenues to local suppliers of these goods and services.

Priority #2 - Control erosion and prevent salinity & sediment problems.

In addition to on-going management actions, this problem is addressed primarily through the establishment of a designated trail system for OHV use, developed jointly with local OHV users. An initial cost of about $45,000 is needed for coordinating the volunteer efforts, producing public notices and trail maps, signs and use supervision.

Resource Impacts:

Limiting OHV use in the area to the designated trail system. This decreases erosion, improves forage for livestock and wildlife and decreases salt and

sediment. The effectiveness is dependent on how successful BLM is in gaining public support for and compliance with the designated trail system.

Public Land User Impacts:

Some OHV users object to the loss of freedom that they now enjoy to operate their vehicles with few restrictions throughout this area. Other OHV users enjoy the opportunity to design and help construct the trail system.

Socio-economic Impacts:

No impacts are expected.

Priority #3 - Vegetation Manipulation

> Develop and implement vegetation manipulation projects designed to decrease cheat grass, increase desirable perennials, re-establish riparian habitat, manipulate upland forests and woodlands for increased water production, increase wetlands, and remove decadent oak brush stands to improve deer and elk winter range. Fire rehabilitation practices, greenstripping, and grazing prescriptions are also be used to achieve these same purposes. Construction and labor costs are $10,000.00 each year for five years. Other sources for funding have been mentioned.

Resource Impacts:

These vegetation manipulations increase spatial distribution and biodiversity by 20% over 20 years. Erosion decreases, desirable plants increase, and riparian habitat improves.

## VI. HOW WILL THE CORRECTIVE ACTIONS BE MONITORED TO DETERMINE EFFECTIVENESS?

Grazing System

Utilization Studies: Conduct utilization transects. Map utilization areas to determine distribution and watch riparian areas. The BLM cost for use supervision (one visit/month) is about $4,000.00.

*Frequency Studies: Continue frequency studies on the allotment.

*Wildlife Studies: Continue browse and pellet group transects.

*Riparian Studies: Establish photo points.

* Note: Studies can be done in conjunction with utilization checks.

OHV Management

Visit the area several times a week throughout the season of use. The visits are conducted with recreation staff and law enforcement. Monitoring also involves a "public land watch" system, with community partners and user groups, signing and education. Costs are approximately $10,000 per year.

Vegetation Manipulation Management

Monitoring may include Frequency studies, Utilization studies, photo points,

and ocular estimates. Within the already established monitoring schedule, the staff compile and evaluate the progress in meeting standards. The cost is approximately $4,000 per year.

**B. FALLBACK STANDARDS AND GUIDELINES ALTERNATIVE (Identify difference from Proposed Action Alternative)**

There is not any significant difference between this alternative and the proposed action. Most of the same management actions are undertaken. Additional time may be needed during the analysis phase because of the absence of indicators. Native species must be used in the Fallback standards, while the Proposed Action considers both native and desirable non-native species to achieve management objectives. Seed mixtures used for fire rehab and right of way rehab are more costly. The Fallback standards do not directly mention larger scale diversity and successional stage mosaics. It may mean that large scale vegetation manipulation projects and PNF are not emphasized.

**C. PRESENT MANAGEMENT (Identify difference from Proposed Action Alternative)**

The process is less integrated, interdisciplinary, and coordinated. Individual programs drive various actions. Without the standards and guidelines, the process likely focused on the riparian problems and OHV problems and not the overall health of the land. The standards and guidelines provide more specificity. Public land health problems and corrective actions are not as readily identified.

# APPENDIX D

FLOW CHART FOR WATER-QUALITY COMPLIANCE

LOCATE IMPACTED STREAM SEGMENTS AND WATERBODIES
ANTIDEGRADATION CATEGORY AND BENEFICIAL USES
OUTSTANDING NATIONAL OR STATE WATERS
NO
YES
CURRENT WATER-QUALITY
LIMITED OR IMPAIRED
NO
YES
AFFECTED BY NPS POLLUTION
RELATED TO ACTIVITY OR LAND USE
YES
NO
NO
YES
RELATED TO ACTIVITY OR LAND USE
BMP'S TO PROTECT AND MAINTAIN BENEFICIAL USES
REFER CASE TO ID TEAM
YES
NO
BMP'S MINIMIZE CONTRIBUTIONS TO NPS PROBLEM
COMPLIANCE MONITORING

167

BLM_0007019

# APPENDIX E

**RIPARIAN CONDITION ASSESSMENT - COLORADO BLM**
**1996**

| FUNCTIONING CONDITION STATUS | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HABITAT TYPES BY OFFICE | PROPER FUNCTIONING CONDITION | | FUNCTIONAL AT RISK | | | | | | NOT PROPERLY FUNCTIONING | | UNKNOWN | | TOTAL | |
| | | | TREND UP | | TREND NOT APPARENT | | TREND DOWN | | | | | | | |
| Lotic Riparian | mi | % | mi | % | mi | % | mi | % | mi | % | mi | % | mi | % |
| RIVERINE (miles) | | | | | | | | | | | | | | |
| Craig* | 182 | 23 | 51 | 6 | 151 | 19 | 4 | 1 | 105 | 13 | 305 | 38 | 798 | 17 |
| Montrose | 476 | 21 | 75 | 3 | 188 | 8 | 52 | 2 | 687 | 31 | 769 | 34 | 2,247 | 49 |
| Canon City | 139 | 19 | 2 | 0 | 490 | 65 | 6 | 1 | 148 | 20 | 16 | 2 | 801 | 17 |
| Grand Junction | 526 | 65 | 59 | 7 | 166 | 20 | 10 | 1 | 38 | 5 | 16 | 2 | 815 | 18 |
| RIVERINE TOTAL | 1,323 | 29 | 187 | 4 | 995 | 22 | 72 | 2 | 978 | 21 | 1,106 | 24 | 4,861 | 100 |
| NON-RIVERINE (acres) | | | | | | | | | | | | | | |
| Lentic Riparian | ac | % | ac | % | ac | % | ac | % | ac | % | ac | % | ac | % |
| Craig* | 132 | 22 | 0 | 0 | 46 | 8 | 5 | 1 | 0 | 0 | 410 | 69 | 593 | 9 |
| Montrose | 725 | 14 | 125 | 2 | 0 | 0 | 100 | 2 | 2,900 | 55 | 1450 | 27 | 5,300 | 81 |
| Canon City | 50 | 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 590 | 92 | 640 | 10 |
| Grand Junction | 32 | 97 | 0 | 0 | 0 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 33 | 1 |
| NON-RIVERINE TOTAL | 939 | 14 | 125 | 2 | 46 | 1 | 106 | 2 | 2,900 | 44 | 2,450 | 37 | 6,566 | 100 |

*Craig district based on 1995 data.

# APPENDIX F

## COLORADO BLM SPECIAL STATUS SPECIES

(Key is located at the end of the table)

June 20, 1996

| Species Common Name | Scientific Name | Status[1] | Designation and Ranking of other Agencies and Groups[1] (CDOW Regional Occurrences) | Species Code[2] | Occurrence[3] BLM Districts and Resource Areas | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Craig | Montrose | Canon City | Grand Junction |
| **MAMMALS** | | | | | | | | |
| Bear, grizzly | *Ursus arctos* | FT, SE, EXP | Extirpated from the state G4, SX | URAR | | | | |
| Ferret, black-footed | *Mustela nigripes* | FE, SE | G1, SH | MUNIG | LS*, WR*, | UN*, GN*, SJ* | SL*, RG* | GJ* |
| Wolf, gray | *Canis lupus* | FE, SE | Extirpated from state G4, SX | CALU | | | | |
| Fox, Kit | *Vulpes macrotis* | SC | G5, | VUMA | | UN | | GJ |
| **BIRDS** | | | | | | | | |
| Crane, whooping | *Grus americana* | FE, SE | G1, SA | GRAM | LS, WR | UN, GN, SJ | SL | GJ, GS |
| Curlew, Eskimo | *Numenius borealis* | FE | accidental migrant, nearly extinct | NUMBO | | | | |
| Eagle, bald | *Haliaeetus leucocephalus* | FE, ST | proposed rule to downlist to FT G4, S1B, S3N | HALE | LS, WR, KR | UN, GN, SJ | SL, RG | GJ, GS |
| Falcon, American Peregrine | *Falco peregrinus anatum* | FE, ST | G3, S2B, SZN | FAPEAN | LS, WR | UN, GN, SJ | SL, RG | GJ, GS |
| Falcon, Artic Peregrine | *Falco peregrinus tundrius* | FT, ST | G4, T4, S2N | FAPETU | | | | GJ* |
| Flycatcher, Southwestern willow | *Empidonax traillii extimus* | FE, | Proposed with critical habitat 7-23-93. G5, T2, SR | EMTREX | | SJ* | SL* | GJ* |
| Owl, Mexican spotted | *Strix occidentalis lucida* | FT, ST | Proposed critical habitat designed G3, T3, S1B | STOC | | UN*, SJ | RG | |
| Plover, piping | *Charadrius melodus* | FT, ST | G3, S1B, SZN | CHMEL | | | RG | |
| Tern, Interior least | *Sterna antillarum athalassos* | FE, SE | G4, T2Q, S1B | STALR | | | RG | |

| Species Common Name | Scientific Name | Status[1] | Designation and Ranking of other Agencies and Groups[1] (CDOW Regional Occurrences) | Species Code[2] | Occurrence[3] BLM Districts and Resource Areas | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Craig | Montrose | Canon City | Grand Junction |
| Goldeneye, Barrow's | *Bucephala islandica* | SC | G5, S2B,SZN (NE, SE, NW regions) | BUIS | LS, WR, KR | | | GJ*, GS |
| Hawk, ferruginous | *Buteo regalis* | SC | G4, S3BS5N, FS | BUREG | LS, WR, KR | UN, SJ | SL, RG | GJ |
| American, white pelican | *Pelecanus erythrorhynchos* | SC | G3, S1B, SZN, (NE region) | PEERY | | | RG | GJ |
| Plover, mountain | *Charadrius montanus* | FC | SC, S3, S2B, SZN, FS (NE, SE, NW regions) | CHMO? | LS, WR, KR | | SL, RG | |
| Plover, Western snowy | *Charadrius alexandrinus nivosus* | SC | G4T3,S1B,SZN (SE region) | CHALENI | WR | | SL | GJ |
| FISH | | | | | | | | |
| Chub, bonytail | *Gila elegans* | FE, SE | Critical habitat, G1, S1 | GIEL | LS | UN* | | GJ |
| Chub, humpback | *Gila cypha* | FE, SE | Critical habitat, G1, S1 | GICY | LS | | | GJ |
| Sturgeon, Pallid | *Scaphirhynchus albus* | FT | Downstream Platte River | | | | RG* | |
| Squawfish, Colorado | *Ptychocheilus lucius* | FE, SE | Critical habitat, G1, S1 | PTLU | LS, WR | UN | | GJ, GS |
| Sucker, razorback | *Xyrauchen texanus* | FE, SE | Critical habitat, G1, S1 | XYTE | | UN | | GJ, GS |
| Trout, greenback cutthroat | *Oncorhynchus clarki stomias* | FT, ST | G5, T2, S2 | SACLST | | | RG | |
| Chub, flathead | *Hybopsis gracilis* | SC | G5,S3, FS | PLGA? | | | RG? | |
| Chub, Rio Grande | *Gila pandora* | SC | G3, S1 (SW region) | GINI | | | SL* | |
| Chub, roundtail | *Gila robusta* | SC | G3, S2 | GIRO | LS, WR | UN, SJ | | GJ, GS |
| Minnow, brassy | *Hybognathus hankinsoni* | SC | G5,S3 (NE region) | HYHA | | | RG*? | GJ |
| Sucker, bluehead | *Catostomus discobolus* | SC | (NW region) | CADI | | UN | | GJ |
| Sucker, flannelmouth | *Catostomus latipinnis* | SC | G3G4,S3S4, (NW region) | CALAT | LS, WR | UN, SJ | | GJ, GS |

| Species Common Name | Scientific Name | Status[1] | Designation and Ranking of other Agencies and Groups[1] (CDOW Regional Occurrences) | Species Code[2] | Occurrence[3] BLM Districts and Resource Areas | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Craig | Montrose | Canon City | Grand Junction |
| Trout, Colorado River cutthroat | *Oncorhynchus clarki pleuriticus* | SC | G5T2T3, S2, FS | SACLPL | WR | GN | | GJ, GS |
| Trout, Rio Grande cutthroat | *Oncorhynchus clarki virginalis* | SC | F5T2, S2, FS (SW region) | SACLVI | | | RG | |
| Topminnow, plains | *Fundulus sciadicus* | SC | G4, S2, FS (NE region) | FUSC | | | | |
| **REPTILES** | | | | | | | | |
| Lizard, Eastern short-horned | *Phrynosoma douglassii brevirostre* | SC | | PHDO | | SJ | RG | |
| Lizard, Texas horned | *Phrynosoma cornutum* | SC | G5,S2, FS | PHCOR | | SJ | RG | |
| **AMPHIBIANS** | | | | | | | | |
| Frog, Blanchard's cricket | *Acris crepitans blanchardi* | SC | G5T5, S2 | ACCR | | | | GJ |
| Toad, boreal western | *Bufo boreas boreas* | FC | | BUBOBO | LS**, WR**, KR** | SJ** | RG** | GJ**, GS** |
| **INVERTEBRATES** | | | | | | | | |
| Butterfly, Uncompahgre fritillary | *Boloria acrocnema* | FE | G1, S1 | BOIMAC? | | GN, SJ' | | |
| Skipper, Pawnee montane | *Hesperia leonardus montana* | FT | G4, T1, S1 | HELEMO? | | | RG | |
| | | | | | | | | |
| **SNAILS (MOLLUSKS, CLASS GASTROPODS)** | | | | | | | | |
| Capshell, Rocky Mountain | *Acroloxus coloradensis* | SC | SC, G?, S2, FS | | | | RG? | |

| Species Common Name | Scientific Name | Status[1] | Designation and Ranking of other Agencies and Groups[1] (CDOW Regional Occurrences) | Species Code[2] | Occurrence[3] BLM Districts and Resource Areas | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Craig | Montrose | Canon City | Grand Junction |
| **PLANTS** | | | | | | | | |
| Mancos milkvetch | *Astragalus humillimus* | FE | S. Montezuma county (Ute Mtn Reservation) G1, S1 | ASHU | | SJ | | |
| Osterhout milkvetch | *Astragalus osterhoutii* | FE | Middle Park (Grand County) G1, S1 | ASOS | KR | | | |
| Clay-loving wild buckwheat | *Eriogonum pelinophilum* | FE | Critical habitat designated Austin-Montose, G5, S2 | ERPE | | UN | | |
| Penland Alpine Fen Mustard | *Eutreme penlandii* | FT | Park County, Co, G1, S1 | EUPE10 | | | RG | |
| Dudley Bluffs bladderpod | *Lesquerella congesta* | FT | Piceance Basin, Rio Blanco County, G1, S1 | LECO67 | WR | | | |
| Knowlton cactus | *Pediocactus knowltonii* | FE | SE LaPlata County (UTE Mtn. Reservation), G1, S1 | PEKN | | SJ | | |
| Pendland beardtongue | *Penstemon penlandii* | FE | Middle Park (Grand County) G1, S1 | PEPE ? | | | | |
| North Park phacelia | *Phacelia formosula* | FE | Walden (Jackson County) G1, S1 | PHFO2 ? | KR | | | |
| Piceance (Dudley's Bluff) twinpod | *Physaria obcordata* | FT | Piceance Basin (Rio Blanco County), G2, S2 | PHOB7 | WR | | | |
| Uinta Basin hookless cactus | *Sclerocactus glaucus* | FT | Mesa, Delta, Garfield County G3, S3 | SCGL | | UN | | GJ, GS |
| Mesa Verde cactus | *Sclerocactus mesae-verdae* | FT | S. Montezuma County (UTE Mtn. Reservation), G2, S2 | SCME | | SJ | | |
| Rydberg's columbine (Golden) | *Aquilegia chrysanta var. rydbergii* | BLMS | G4, T3, SH | AQCHRY | | | RG* | |
| Crandall rock-cress | *Arabis crandallii* | BLMS | | ARCR5 | | | | |
| Gunnison milkvetch | *Astragalus anisus* | BLMS | G3, S2 | ASAN4 | | GN | | |

| Species Common Name | Scientific Name | Status[1] | Designation and Ranking of other Agencies and Groups[1] (CDOW Regional Occurrences) | Species Code[2] | Occurrence[3] BLM Districts and Resource Areas | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Craig | Montrose | Canon City | Grand Junction |
| Cushion milkvetch | *Astragalus aretioides* | BLMS | G3, S2 | ASAR3 | | | | |
| Brandegee milkvetch | *Astragalus brandegei* | BLMS | G5, S1, S2 | ASBR5 | | | SL[*] | |
| Debris milkvetch | *Astragalus detritalis* | BLMS | G3, S2 | ASDET5 | | | | |
| Mancos milkvetch | *Astragalus humillimus* | FE | S. Montezuma county (Ute Mtn Reservation) G1, S1 | ASHU | | SJ | | |
| Starveling milkvetch | *Astragalus jejunus* | BLMS | G3, S1 | ASJE2 | | | | |
| Grand Junction milkvetch | *Astragalus linifolius* | BLMS | G2, S2 | ASLI5 | | UN | | GJ |
| Dragon milkvetch | *Astragalus lutosus* | BLMS | Not considered a rare plant G4, S3, S4 | ASLU2 | | | | GJ, GS |
| Ferron milkvetch | *Astragalus musiniensis* | BLMS | G3, S1 | ASMU3 | | | | GJ |
| Naturita milkvetch | *Astragalus naturitensis* | BLMS | G2, S2, S3 | ASNA | | UN, SJ | | GS |
| Nelson milkvetch | *Astragalus nelsonianus* | BLMS | G3, S1 | ASNE3 | | | | |
| Osterhout milkvetch | *Astragalus osterhoutii* | FE | Middle Park (Grand County) G1, S1 | ASOS | KR | | | |
| Sandstone milkvetch | *Astragalus sesquiflorus* | BLMS | G3, S1? | ASSE7 | | | | |
| Wetherill milkvetch | *Astragalus wetherillii* | BLMS | G3, S3 | ASWE2 | | UN[**] | | GJ, GS |
| Tufted cats-eye | *Cryptantha caespitosa* | BLMS | G3, S2 | CRCA7 | | | | |
| Osterhout cats-eye | *Cryptantha osterhoutii* | BLMS | G3, S1, S2 | CROS | | | | GJ |
| Rollins cats-eye | *Cryptantha rollinsii* | BLMS | G4, S2 | CRRO5 | | | | |
| Uinta Basin spring-parsley | *Cymopterus duchesnensis* | BLMS | G3, S1 | CYDU | | | | |
| Kat buckwheat | *Eriogonum acaule* | BLMS | G3, S1 | ERAC3 | | | | |
| NCN | *Eriogonum coloradense* | BLMS | G3, S2 | ERCO11 | | | | |
| Ephedra wild buckwheat | *Eriogonum ephedroides* | BLMS | G3, S1 | EREP | | | | |

| Species Common Name | Scientific Name | Status[1] | Designation and Ranking of other Agencies and Groups[1] (CDOW Regional Occurrences) | Species Code[2] | Occurrence[3] BLM Districts and Resource Areas | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Craig | Montrose | Canon City | Grand Junction |
| Clay-loving wild buckwheat | *Eriogonum pelinophilum* | FE | Critical habitat designated Austin-Montose, G5, S2 | ERPE | | UN | | |
| Tumor buckwheat | *Eriogonum tumulosum* | BLMS | G3, S2 | ERTU2 | | | | |
| Little green buckwheat | *Eriogonum viridulum* | BLMS | G4Q, S1 | ERVI11 | | | | |
| Snowy prairie gentian | *Eustoma grandiflorum* | FC-2 | G5, S3 | EUGR4 | | | | |
| Penland Alpine Fen Mustard | *Eutrema penlandii* | FT | Park County, Co, G1, S1 | EUPE10 | | | RG | |
| Colorado butterflyweed | *Gaura neomexicana ssp. coloradensis* | FC | population recently found near Ft Collins, G4, T2, S1 | GANE2 | | | RG | |
| Utah Gentian | *Gentianella tortuosa* | BLMS | G3, S1 | GETO3 | | | | |
| Narrowstem gilia | *Gilia stenothyrsa* | BLMS | G3, S1 | GIST2 | | | | *GJ* |
| Dudley Bluffs bladderpod | *Lesquerella congesta* | FT | Piceance Basin, Rio Blanco County, G1, S1 | LECO67 | WR | | | |
| Eastwood desert parsley | *Lomatium eastwoodiae* | BLMS | G3, S2, S3 | LOEA | | | | GJ, GS |
| Eastwood monkey flower | *Mimulus eastwoodiae* | BLMS | G3, S1, S2 | MIEA | | UN, SJ | | GJ |
| Nuttall's sandwort | *Minuartia nuttallii* | BLMS | G5, S1 | ARNU4 | | | | |
| Small-flowered nama | *Nama densum var. parviflorum* | BLMS | G5, S1 | NADEP | | | | |
| Ligulate feverfew | *Parthenium ligulatum* | BLMS | G3, S2 | PALI6 | | | | |
| Knowlton cactus | *Pediocactus knowltonii* | FE | SE LaPlata County (UTE Mtn. Reservation), G1, S1 | PEKN | | SJ | | |
| Paradox scurf pea | *Pediomelum aromaticum* | BLMS | G3, S2 | PSAR2 | | UN | | GJ |
| Parachute penstemon | *Penstemon debilis* | FC | G1, S1 | PEDE22 | | | | GS |
| Graham beardtongue | *Penstemon grahamii* | FC | G2, S2 | PEGR6 | WR | | | GJ* |
| White River penstemon | *Penstemon scariosus var. albifluvis* | FC | G4, T2, S1 | PESCA | WR | | | |

| Species Common Name | Scientific Name | Status[1] | Designation and Ranking of other Agencies and Groups[1] (CDOW Regional Occurrences) | Species Code[2] | Occurrence[3] BLM Districts and Resource Areas | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Craig | Montrose | Canon City | Grand Junction |
| North Park phacelia | *Phacelia formosula* | FE | Walden (Jackson County) G1, S1 | PHFO2 ? | KR | | | |
| Debeque phacelia | *Phacelia submutica* | FC | G4, T2, ST | PHSU6 | | | | GJ, GS |
| Piceance (Dudley's Bluff) twinpod | *Physaria obcordata* | FT | Piceance Basin (Rio Blanco County), G2, S2 | PHOB7 | WR | | | |
| Mesa Verde cactus | *Sclerocactus mesae-verdae* | FT | S. Montezuma County (UTE Mtn. Reservation), G2, S2 | SCME | | SJ | | |
| Capitate chicken-sage | *Sphaeromeria capitata* | BLMS | G3, S1 | SPCA8 | | | | |
| Ute ladies'-tresses | *Spiranthes diluvialis* | FT | Boulder, Jefferson County G2, S2 | SPDI6 | WR* | UN*, SJ* | | GJ* |
| Hanging garden sullivantia | *Sullivantia hapemanii var. purpusii* | BLMS | G3, T3, S3 | SUPU | | | | GJ, GS |
| Strigose Eastern-daisy | *Townsendia strigosa* | BLMS | G4, S1 | TOST | | | | |
| Andy's clover | *Trifolium andinum* | BLMS | G3, S1 | TRAN2 | | | | |
| Ute ladies'-tresses | *Spiranthes diluvialis* | FT | Boulder, Jefferson County G2, S2 | SPDI6 | WR* | UN*, SJ* | | GJ* |

[1] STATUS: The source used to assign status is from:
Colorado's Natural Heritage: Rare and Imperiled Animals, Plants, and Natural Communities; Vol.1, No.1, 5/1995.
Colorado's Threatened, Endangered, Special Concern, Undetermined Status List; 7/95. (Paper from J.Sheppard)

AGENCY: *US Fish and Wildlife Service*
- FE - Federally Endangered
- FT - Federally Threatened
- FC - Federal Candidate, substantial information on hand to support the biological appropriateness of proposing to list as endangered or threatened.

AGENCY: *Bureau of Land Management, Colorado*
- BLMS - Designated by BLM State Director, as species of special concern, as evidence by biological imperilment and downward trend in population abundance and distribution on BLM public lands within state.

STATE: *Colorado Division of Wildlife*
- SE - Endangered
- ST - Threatened
- SC - Species of Special Concern

GROUP: *Colorado Natural Heritage Program*
- CNHP - Global Rarity Ranking is based on the range-wide status of a species.
- G1 - Critically imperiled globally because of extreme rarity (5 or fewer occurrences, or very few remaining individuals), or because of some factor of its biology making it especially vulnerable to extinction. (Critically endangered throughout its range).
- G2 - Imperiled globally because of rarity (6 to 20 occurrences), or because of other factors demonstrably making it very vulnerable to extinction throughout its range. (Endangered throughout its range).
- G3 - Very rare or local throughout its range or found locally in a restricted range (21 to 100 occurrences). (Threatened throughout its range).
- G4 - Apparently secure globally, though it might be quite rare in parts of its range, especially at the periphery.
- G5 - Demonstrably secure globally, though it may be quite rare in parts of its range, especially at the periphery.
- T - Taxa of subspecies or varieties, ranked on same criteria as G1-G5.

- CNHP - State Rarity Ranking is based on the status of a species (relative abundance of individuals) in each state.
- S1 - Critically imperiled in state because of extreme rarity (5 or fewer occurrences, or very few remaining individuals), or because of some factor of its biology making it especially vulnerable to extirpation from the state. (Critically endangered in state).
- S2 - Imperiled in state because of rarity (6 to 20 occurrences), or because of other factors demonstrably making it very vulnerable to extirpation from the state. (Endangered or threatened in state).
- S3 - Rare in state (21 to 100 occurrences).
- S#B - Refers to the breeding season imperilment of elements that are not permanent residents. Where no consistent location can be discerned for migrants or non-breeding populations, a rank of SZN is used.
- S#N- Refers to the non-breeding season imperilment of elements that are not permanent residents.
- SZ- Migrant whose occurrences are too irregular, transitory, and/or dispersed to be reliably identified, mapped, and protected.

[2] SPECIES CODES: Are from the BLM Wildlife & Fisheries Information System Data Element Dictionary: Plants: DED 2646 3/25/88; Vertebrates: DED 6554 2/25/88; and Fishes: DED 6803 2/25/88

[3] OCCURRENCE:
Indicates Resource Area of known occurrence using the following DE codes:

Craig District (01)
Montrose District (03)
Canon City District (05)
Grand Junction District (07)

LS Little Snake (48),
UN Uncompahgre (48),
SL San Luis (48),
GJ Grand Junction (68),
WR White River (68),
GN Gunnison (68),
RG Royal Gorge (58)
GS Glenwood Springs (88)
KR Kremmling (78)
SJ San Juan (88),

- * - Not known to occur on BLM lands but should be considered.
- ** - Occurrence on BLM lands uncertain, past sightings have been recorded.

BLM_0007028

# APPENDIX G

## STREAM SEGMENTS IN COLORADO AFFECTED BY SEDIMENT AND NUTRIENTS

Platte River Basin

| SEGMENT | MILES AFFECTED | POLLUTANT | SEVERITY |
|---|---|---|---|
| Tarryall Creek from Jefferson Creek to Tarryall Reservoir | 7 | Sediment | Low |
| South Platte from Fairplay to confluence with North Fork | 95 | Sediment | Low |
| Cherry Creek | 11 | Sediment | Moderate |
| South Platte below Burlington Ditch and above Big Dry Creek | 20 | Sediment/Nutrients | Low |
| Boulder Creek below Boulder and above St. Vrain | 16 | Sediment/Nutrients | Moderate |
| St. Vrain below Hygiene Road and above the South Platte | 23 | Sediment/Nutrients | Moderate |
| South Platte below Big Dry Ck. and above Big Thompson River | 25 | Sediment/Nutrients | Moderate |
| Little Thompson R. below Culver Dam and above Big Thompson R. | 22 | Sediment | High |
| Big Thompson River below I-25 and above the South Platte | 16 | Sediment/Nutrients | High |
| Box Elder Creek from Wellington to confluence with the Cache La Poudre | 14 | Sediment/Nutrients | High |
| Poudre River below Box Elder Ck. and above the South Platte | 24 | Sediment | Moderate |
| South Platte below Big Thompson R. and above the State Line | 161 | Sediment/Nutrients | Moderate |
| Johnson Creek | 6 | Sediment | Moderate |
| Boswell Creek | 4 | Sediment | Moderate |
| Pole Creek | 5 | Sediment | Moderate |
| Illinois River | 23 | Sediment | N/A |
| Michigan River | 22 | Sediment | N/A |

**Arkansas River Basin**

| SEGMENT | MILES AFFECTED | POLLUTANT | SEVERITY |
|---|---|---|---|
| Badger Creek to Arkansas River | 15 | Sediment | Moderate |
| Arkansas R. below Badger Ck. and above Pueblo Reservoir | 70 | Sediment | Low |
| Grape Creek | 5 | Sediment | N/A |
| Upper Fourmile Creek | 12 | Sediment | Moderate |
| Fountain Creek below Monument Creek to Arkansas River | 50 | Sediment/Nutrients | Moderate |
| Arkansas River below Fountain Creek to John Martin Reservoir | 118 | Sediment | Moderate |
| Cucharas River below La Veta and above I-25 | 6 | Sediment | Low |
| Huerfano River below I-25 | 15 | Sediment | High |
| Apishapa River below Gulnare | 15 | Sediment | Moderate |
| Purgatoire River below Trinidad | 20 | Sediment | Moderate |
| Adobe Creek to confluence with the Arkansas River | 5 | Sediment | High |
| Arkansas River below John Martin Reservoir to State Line | 58 | Sediment | High |

**Rio Grande River Basin**

| SEGMENT | MILES AFFECTED | POLLUTANT | SEVERITY |
|---|---|---|---|
| Rio Grande River below Creede and above Alamosa | 80 | Sediment | Low |
| Alamosa River below Terrace Reservoir to Capulin | 13 | Sediment | Moderate |
| Rio Grande River below Alamosa to the State Line | 53 | Sediment/Nutrients | Low |

Colorado River Basin

| SEGMENT | MILES AFFECTED | POLLUTANT | SEVERITY |
|---|---|---|---|
| Fraser River near source to Tabernash | 16 | Sediment | Moderate |
| Willow Creek | 20 | Sediment | Moderate |
| Elk Creek | 8 | Sediment | Moderate |
| Soda Creek | 5 | Sediment/Nutrients | Moderate |
| Straight Creek from source to confluence with the Blue River | 7 | Sediment | Moderate |
| Otter Creek | 5 | Sediment/Nutrients | Moderate |
| Colorado R. below State Bridge and above Roaring Fork R. | 64 | Sediment | Low |
| Milk Creek | 5 | Sediment | High |
| Alkali Creek | 6 | Sediment | High |
| Muddy Creek | 8 | Sediment | Low |
| Gore Creek above Eagle River | 11 | Sediment | Low |
| Eagle River above Edwards to below Eagle | 17 | Sediment | Moderate |
| Seven Castles Creek source to Fryingpan River | 2 | Sediment | Moderate |
| Fryingpan R. from Seven Castles Creek to the Roaring Fork River | 4 | Sediment | Moderate |
| Roaring Fork River below Hunter Creek and above Basalt | 19 | Sediment/Nutrients | Low |
| Crystal River above the Roaring Fork River | 29 | Sediment | Low |
| Colorado River below Roaring Fork R. and above Parachute Ck. | 44 | Sediment | Low |
| Colorado River below Parachute Ck. and above the Gunnison R. | 45 | Sediment/Nutrients | Low |
| Roan Creek above Colorado River | 22 | Sediment/Nutrients | High |
| Colorado R. below the Gunnison R. and above the State Line | 37 | Sediment | Moderate |
| Big Salt Wash above the Colorado River | 8 | Sediment | High |
| East Salt Creek above Salt Ck. | 15 | Sediment | High |

Colorado River Basin (con't.)

| SEGMENT | MILES AFFECTED | POLLUTANT | SEVERITY |
|---|---|---|---|
| West Salt Creek above Salt Ck. | 10 | Sediment | High |
| Uncompahgre R. above Montrose | 38 | Sediment | Low |
| Red Canyon from Bostwick Park to the Gunnison River | 4 | Sediment/Nutrients | Moderate |
| Uncompahgre R. below Montrose and above the Gunnison River | 25 | Sediment/Nutrients | High |
| Tongue Creek | 33 | Sediment | High |
| North Fork Gunnison River below Paonia Reservoir and above Ditch | 27 | Sediment | Moderate |
| Gunnison River below the Uncompahgre River and above the Colorado River | 48 | Sediment | High |
| Disappointment Creek above the Dolores River | 15 | Sediment | High |
| Dolores R. below Glade Mountain | 10 | Sediment | Low |
| Dry Creek | 20 | Sediment | N/A |
| San Miguel River from Clay Creek to Uravan | 35 | Sediment | Moderate |
| San Miguel River from Uravan to confluence with the Dolores R. | 6 | Sediment | High |

San Juan River Basin

| SEGMENT | MILES AFFECTED | POLLUTANT | SEVERITY |
|---|---|---|---|
| Montezuma Creek | 7 | Sediment | N/A |
| San Juan River below Fourmile Creek to Navajo Reservoir | 25 | Sediment | Moderate |
| Piedra River below Indian Creek and above Navajo Reservoir | 21 | Sediment | Low |
| Los Pinos River below Highway 160 and above the State Line | 20 | Sediment | Low |
| Animas River below Junction Creek and above the State Line | 26 | Sediment | Low |
| Florida River below Farmers Canal and above Animas River | 10 | Sediment | Moderate |
| La Plata River below Hesperus and above the State Line | 27 | Sediment | Moderate |
| Mancos River below Highway 160 and above the State Line | 51 | Sediment | High |
| McElmo Creek below Cortez | 35 | Sediment | High |

Green River Basin

| SEGMENT | MILES AFFECTED | POLLUTANT | SEVERITY |
|---|---|---|---|
| Yampa River through and below Steamboat Springs | 5 | Sediment | Low |
| Wilson Creek source to confluence with Milk Creek | 10 | Sediment | Moderate |
| Yampa River below Lay Creek to the State Line | 76 | Sediment/Nutrients | Moderate |
| Morgan Gulch | 9 | Sediment | N/A |
| Little Snake River below Wyoming State Line to confluence with the Yampa River | 54 | Sediment/Nutrients | High |
| Flag Creek | 10 | Sediment | N/A |
| Sheep Creek | 9 | Sediment | N/A |
| Strawberry Creek | 6 | Sediment | N/A |
| White River below Meeker to State Line | 99 | Sediment/Nutrients | High |
| Wolf Creek above the White R. | 10 | Sediment | Low |
| Red Wash above the White River | 22 | Sediment | Moderate |
| Douglas Ck. from confluence of W. Douglas Ck. to the White R. | 20 | Sediment | High |
| Green River below Wyoming State Line to the Yampa River | 40 | Sediment | Moderate |

# APPENDIX H

## COLORADO EMPLOYMENT TRENDS

| INDUSTRY | NUMBER OF EMPLOYEES | | | % OF EMPLOYEES | | |
|---|---|---|---|---|---|---|
| | 1981 | 1985 | 1993 | 1981 | 1985 | 1993 |
| **EMPLOYMENT BY TYPE** | | | | | | |
| Total Employment | 1,706,173 | 1,888,601 | 2,231,928 | 100% | 100% | 100% |
| Wage/Salary Earners | 1,422,620 | 1,551,416 | 1,811,603 | 83.38% | 82.15% | 81.17% |
| Proprietors | 283,553 | 337,185 | 420,325 | 16.62% | 17.85% | 18.83% |
| Farm/Ranch Proprietors | 27,297 | 28,426 | 26,448 | 1.60% | 1.51% | 1.18% |
| Non Farm/Ranch Proprietors | 256,256 | 308,759 | 393,877 | 15.02% | 16.35% | 17.65% |
| | | | | | | |
| **EMPLOYMENT BY INDUSTRY** | | | | | | |
| Total Employment | 1,706,173 | 1,888,601 | 2,231,928 | 100% | 100% | 100% |
| Farm/Ranch | 45,340 | 43,240 | 40,288 | 2.66% | 2.29% | 1.81% |
| Agricultural Services 1/ | 13,135 | 17,329 | 24,004 | 0.77% | 0.92% | 1.08% |
| Mining | 53,501 | 48,807 | 26,097 | 3.14% | 2.58% | 1.17% |
| Construction | 105,163 | 116,889 | 126,237 | 6.16% | 6.19% | 5.66% |
| Manufacturing | 192,603 | 199,367 | 199,583 | 11.29% | 10.56% | 8.94% |
| T.C.U.* | 88,052 | 96,646 | 116,326 | 5.16% | 5.12% | 5.21% |
| Wholesale Trade | 84,517 | 87,719 | 99,286 | 4.95% | 4.64% | 4.45% |
| Retail Trade | 281,693 | 317,861 | 384,055 | 16.51% | 16.83% | 17.21% |
| F.I.R.E.** | 162,011 | 177,544 | 183,879 | 9.50% | 9.40% | 8.24% |
| Services | 382,430 | 475,070 | 677,774 | 22.41% | 25.15% | 30.37% |
| Government (Federal, State, Local) | 297,728 | 308,129 | 354,420 | 17.45% | 16.32% | 15.88% |
| | | | | | | |
| *Transportation, Communications, Utilities | | | | | | |
| **Finance, Insurance, Real Estate | | | | | | |
| | | | | | | |
| Source: U.S. Bureau of Economic Affairs | | | | | | |

Agricultural Services includes establishments primarily engaged in supplying soil preparation services, landscape services, landscape and horticultural services,

## COLORADO TOTAL INCOME BY INDUSTRY
(thousands of $)

| INDUSTRY | 1981 | 1985 | 1993 |
|---|---|---|---|
| Farm/Ranch | 261,872 | 375,229 | 990,046 |
| Agricultural Services | 113,130 | 186,389 | 345,068 |
| Mining | 1,787,617 | 1,630,009 | 1,257,290 |
| Construction | 2,075,859 | 2,603,483 | 3,482,030 |
| Manufacturing | 4,341,241 | 5,528,198 | 7,473,679 |
| T.C.U.* | 2,302,248 | 3,061,713 | 4,930,550 |
| Wholesale Trade | 1,847,718 | 2,238,734 | 3,364,220 |
| Retail Trade | 2,874,644 | 3,901,383 | 5,706,133 |
| F.I.R.E.** | 1,713,033 | 1,929,814 | 4,212,579 |
| Services | 5,188,075 | 7,712,163 | 15,889,774 |
| Government (Federal, State, Local) | 4,690,533 | 6,255,728 | 10,047,286 |
| TOTALS | 27,195,970 | 35,422,843 | 57,698,655 |
| | | | |
| *Transportation, Communications, Utilities | | | |
| **Finance, Insurance, Real Estate | | | |
| Source: U.S. Bureau of Economic Affairs | | | |

## COLORADO PERCENT OF TOTAL INCOME BY INDUSTRY

| INDUSTRY | 1981 | 1985 | 1993 |
|---|---|---|---|
| Farm/Ranch | 0.96% | 1.06% | 1.72% |
| Agricultural Services | 0.42% | 0.53% | 0.60% |
| Mining | 6.57% | 4.60% | 2.18% |
| Construction | 7.63% | 7.35% | 6.03% |
| Manufacturing | 15.96% | 15.61% | 12.95% |
| T.C.U.* | 8.47% | 8.64% | 8.55% |
| Wholesale Trade | 6.79% | 6.32% | 5.83% |
| Retail Trade | 10.57% | 11.01% | 9.89% |
| F.I.R.E.** | 6.30% | 5.45% | 7.30% |
| Services | 19.08% | 21.77% | 27.54% |
| Government (Federal, State, Local) | 17.25% | 17.66% | 17.41% |
| TOTALS | 100.00% | 100.00% | 100.00% |
| | | | |
| *Transportation, Communications, Utilities | | | |
| **Finance, Insurance, Real Estate | | | |
| Source: U.S. Bureau of Economic Affairs | | | |

Bureau of Land Management
Division of Resource Services (CO-931)
2850 Youngfield Street
Lakewood, CO 80215

FIRST-CLASS MAIL
POSTAGE & FEES
PAID
Bureau of Land
Management
Permit No. G-76

# HANDBOOK OF GUIDELINES AND PROCEDURES FOR INVENTORY, EVALUATION, AND MITIGATION OF CULTURAL RESOURCES

BUREAU OF LAND MANAGEMENT
COLORADO STATE OFFICE
1998
(Last Revised March 2011)

# TABLE OF CONTENTS

**I. PURPOSE AND OBJECTIVES** ... 1
**II. AUTHORITIES** ... 2
**III. GLOSSARY OF TERMS** ... 2
**IV. LIST OF BUREAU OF LAND MANAGEMENT MANUALS FOR CULTURAL RESOURCE MANAGEMENT** ... 5
**V. PROCEDURES FOR CULTURAL RESOURCE USE PERMITS** ... 6
A. Types of Permits ... 8
Survey and Recordation ... 8
Limited Testing and/or Collection ... 8
Excavation and/or Removal ... 9
B. Permit Application ... 10
Organizational Qualifications ... 10
Individual Qualifications ... 11
Qualifications of Proposed Curatorial Facility ... 14
Certification of Curatorial Facility ... 15
Cultural and Geographic Area Experience ... 16
C. Application Review and Evaluation ... 16
D. Permit Areas ... 17
E. Permit Numbers ... 17
F. Fieldwork Authorization ... 17
G. Pre-field Check-In. ... 18
H. Post-field Check-In ... 18
I. Annual Permit Reports to the State Office ... 18
J. Outreach ... 19
**VI. INVENTORY** ... 19
A. Objectives ... 19
B. Kinds of Inventory ... 19
Class I ... 19
Class II ... 20
Class III ... 20
Reconnaissance survey ... 20
C. Determination of Level of Inventory ... 20
D. Minimal Area to be Inventoried ... 21
Rights-of-Way (ROWs) ... 21
Coal ... 21
Oil and Gas ... 21
Geophysical ... 22
E. Level and Intensity of Inventory/Monitoring ... 24
F. Inventory Field Methods ... 26
G. Recording Cultural Resources ... 26
H. Digital Data Management Specifications ... 27
I. Evaluation ... 27
J. Reporting Process and Standards ... 28
Negative findings ... 28
Positive findings with no effect to cultural reesoures ... 28

Positive findings with effect to cultural reesoures.... ........28
K. Collection and Curation ........30
Collection... ........30
Curation.... ........31
L. Treatment Plans ........31
M. Treatment Options ........32
Avoidance.... ........32
Mitigation... ........33
Data Recovery.... ........33
Physical or Administrative Protection Measures... ........33
N. Unanticipated Discoveries ........33

## *I. PURPOSE AND OBJECTIVES*

This handbook addresses cultural resource standards and guidelines and provides direction to Bureau of Land Management (BLM), cultural resource specialists, cultural resource consultants, other federal agencies, and commercial developers, herein referred to as project proponents. The requirements that are discussed here and in the BLM Manual Series 8100 dated December 3, 2004 (http://www.blm.gov/wo/st/en/prog/more/CRM/policy_and_guidance.html) regarding cultural resource policy are to be used by cultural resource consultants that are applying for and holding a permit to conduct cultural resource work for a Federal undertaking or independent scientific study. This information is also used by the BLM to guide its own cultural program and by permit holders and project proponents to understand the scope and requirements that they may have to undertake in carrying out the stipulations attached to leases and permits they may be working under.

The BLM requires that the cultural resource consultant receiving a Cultural Resource Use Permit (CRUP) carry out the terms and conditions of the permit or face suspension or revocation of the permit. In order for a project proponent to proceed with a project the permit stipulations must be completed. Signing the permit indicates acceptance of these responsibilities.

The BLM will provide necessary guidance to both cultural resource consultants and project proponents as to what is required to meet the legal and regulatory requirements and concerns regarding cultural resource management. The BLM is not an arbitrator between cultural resource consultants and project proponents having business disputes. The BLM strongly suggests that explicit contracts be developed between these two business entities prior to any permit application or issuance to conduct work.

The BLM is required by law and regulation to ensure that Bureau-initiated or Bureau-authorized actions do not inadvertently harm or destroy cultural resource values. Because most cultural resources are unidentified, irreplaceable, and highly sensitive to ground disturbance, it is necessary that the resources are properly identified, evaluated, and reported prior to any proposed action that may affect their integrity or condition. All

project specific information and collected materials from public lands remain the property of the U. S. Government.

## II. AUTHORITIES

Other guidance provided for the identification, evaluation, treatment and management of cultural resources on BLM lands can be found in the Programmatic Agreement Among the Bureau of Land Management, the Advisory Council on Historic Preservation, and the National Conference of State Historic Preservation Officers Regarding the Manner in which BLM will Meet Its Responsibilities under the National Historic Preservation Act (1997) [Also see BLM Manual 8100 The Foundations For Managing Cultural Resources for listing and description of applicable historic preservation laws].

Specifically in Colorado, guidance is provided by the:

*BLM Colorado Manual 8100 dated December 3, 2004;

*State Protocol Agreement Between the Colorado State Director of the Bureau of Land Management and the Colorado State Historic Preservation Officer (SHPO) Regarding the Manner in which the Bureau of Land Management (BLM) will meet its Responsibilities under the National Historic Preservation Act (NHPA) and the National Programmatic Agreement (NPA) Among the BLM, The Advisory Council on Historic Preservation (Council), and the National Conference of State Historic Preservation Officers (NCSHPO) (1998);

* Colorado Office of Archaeology and Historic Preservation Cultural Resource Report Forms and Guidelines; and

* Colorado historic context documents.

## III. GLOSSARY OF TERMS

cultural resource or cultural property: a definite location of human activity, occupation, or use, normally greater than 50 years of age, identifiable through field inventory, historical documentation, or oral evidence. The term includes archaeological, historic, or architectural sites, structures, places, or sites or places with important public and scientific uses, and may include definite locations (sites or places) of traditional cultural or religious importance to specified social and/or cultural groups (cf. "traditional cultural property"). Cultural resources are concrete, material places and things that are located, classified, ranked, and managed through the system of identifying, protecting, and utilizing for public benefit described in laws, regulations, and the BLM Manuals.

definite location: having discernible, map able, more or less exact limits or boundaries, on a scale that can be established by a survey crew using conventional sensing and recording equipment, by an informant's direct on-the-ground indication, or by precise placement in a documentary source (see "cultural resource or cultural property).

historic property: any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the NRHP. The term includes, for purposes of these regulations, artifacts, records, and remains that are related to and located within such properties. The term "eligible" for inclusion in the NRHP includes both properties formally determined as such by the Secretary of the Interior and all other properties that meet NRHP listing criteria (quoted from 36 CFR 800.2(e); compare National Historic Preservation Act, Section 301, (See also "cultural resource or cultural property". Cultural resource or cultural property is an analogous BLM term not limited by NRHP status).

isolated find: a physical location of past human activity consisting of one or very few artifacts in a location that is interpreted as not representing patterned human behavior. [Note: The distinction between a site and an isolated find is, in many instances, difficult to quantify. The above definitions do not operationalize the distinction; they merely provide guidance to the Field Offices. In practice, the operational concepts of site and isolated find will be explicitly defined by each Field Office archaeologist and may, therefore, vary significantly from region to region within Colorado. Each Field Office should be asked to provide their definition before entering the field].

large-scale projects: involves acreage in excess of 160 acres with no sites, or any size acreage where sites are present. Test excavations, sample/full-scale excavations and scientific research are considered a large-scale project. There is some flexibility in the use of this guideline according to project complexity.

permittee: professional cultural resource consultant that holds a BLM CRUP.

proponent: operator, commercial developer, or any other party or organization proposing to conduct federal undertakings for which BLM is the lead agency.

Section 106 consultation: refers to consultation between the BLM (or other federal agency), the Colorado SHPO, the Advisory Council on Historic Preservation (ACHP), Tribes, local governments, and other consulting parties, in accordance with Section 106 of the NHPA following procedures specified in the State Protocol Agreement.

site: the location of activities or events, often used loosely to mean the same as cultural resources. In archaeological jargon, the basic meaning of site is a place where archaeological evidence occurs; with precise meanings vary considerably from region to region and among recording institutions within regions. Section 4c of the Archaeological Resources Protection Act uses site in the term "religious or cultural site" in its common dictionary sense; i.e. as a location, not as a synonym for "archaeological resources". If the Congress had meant "archaeological resource" in Section 4c, the drafters wither would have used that defined term or would have defined "site" to mean the same as "archaeological resource". According to the Glossary of Terms in National Register Bulletin No. 16A, site means "location of a significant event, a prehistoric or historic occupation or activity, or a building or structure, whether standing, ruined, or vanished, where the location itself possesses historic, cultural, or archeological value regardless of any existing structure".

small-scale projects with limited-results: linear projects not to exceed four (4) miles long and/or block areas of 160 acres or less with no sites and a maximum of four (4) isolated finds.

traditional cultural property: a property that derives significance from traditional values

associated with it by a social and/or cultural group, such as an Indian tribe or local community. See "cultural resource or cultural property" and "definite location". A traditional cultural property may qualify for the NRHP if it meets the criteria and criteria exceptions at 36 CFR 60.4. (See National Register Bulletin No. 38).

undertaking: a term with legal definition and application i.e., "actions carried out by or on behalf of the agency; those carried out with Federal financial assistance; those requiring a Federal permit, license, or approval; and those subject to State or local regulation administered pursuant to a delegation or approval by a federal agency" (See National Historic Preservation Act, Section 106 and Section 301(7), Appendix 5; 36 CFR Part 800). However, Section 106 does not apply to actions subject to State or local regulation only. The vast majority of land use authorizations approved by BLM, as well as BLM-funded projects, are undertakings for purposes of Section 106 of the NHPA.

**IV. LIST OF BUREAU OF LAND MANAGEMENT MANUALS FOR CULTURAL RESOURCE MANAGEMENT**

8100 THE FOUNDATIONS FOR MANAGING CULTURAL RESOURCES

8110 IDENTIFYING AND EVALUATING CULTURAL RESOURCES

8120 TRIBAL CONSULTATION UNDER CULTURAL RESOURCES

H-8120-1 GENERAL PROCEDURAL GUIDANCE FOR NATIVE AMERICAN CONSULTATION

8130 PLANNING FOR USES OF CULTURAL RESOURCES

8140 PROTECTING CULTURAL RESOURCES

8150 PERMITTING USES OF CULTURAL RESOURCES

8160 COLLECTIONS MANAGEMENT (reserved)

## V. PROCEDURES FOR CULTURAL RESOURCE USE PERMITS

A Cultural Resource Use Permit (CRUP) is a land use authorization that the State Director issues to a qualified applicant, pursuant to BLM Manual 8150, for the purposes of carrying out various identification and/or data recovery operations on cultural properties that are located on lands where BLM administers the surface. **The CRUP does not apply to non-federal surface.** Although permits are not issued for consultants working on non-federal land under BLM requirements, BLM is responsible for the quality of work done to satisfy historic preservation requirements and may ask to review both the project proponent's proposed choice of consultant and the adequacy of the work proposed and advise the proponent about adequacy of the qualifications and/or the work through official correspondence. The BLM must accept a consultant's work product before completing the historic preservation review process and approving the proponent's lands use application. **At no time should a consultant use the permit as the mechanism to gain access to non-federal surface.** The proponent is responsible for obtaining landowner consent.

Permits are issued partly under the authority of Section 302(b) of the Federal Land Policy and Management Act of 1976 (FLPMA) and the procedures in BLM Manual Section 2920, but in contrast to other "2920 permits", CRUP's are nonexclusive, noncompetitive, minimum impact permits, and are not subject to Notice of Realty Action, filing fees, or cost reimbursement. CRUP's are required for any person(s) performing cultural resource investigations on BLM-administered lands in Colorado. Permits also are issued under the authority of the Archaeological Resources Protection Act of 1979 (ARPA). CRUP's are issued by the BLM Colorado State Office. For more information, contact the State Archaeologist, BLM, 2850 Youngfield Street, Lakewood, Colorado 80215-7076; telephone number: (303) 239-3647; Email: dhaas@blm.gov

The State Director, through the Deputy State Director, Resources, or his/her designee, is responsible for receiving permit applications; preparing case files; conducting technical and management reviews to ensure that all qualifying requirements are met;

issuing, denying, modifying, suspending and revoking permits; and maintaining current files.

Field Office Managers or their designee are responsible for conducting technical and management reviews of permit applications as requested by the State Director; for making recommendations to the State Director for permit issuance, denial, modification, suspension, or revocation; for notifying and consulting with affected Indian tribes; for monitoring work conducted under permits; and for issuing fieldwork authorizations.

Cultural Resource Specialists on State and Field Office staffs are responsible for providing and documenting technical reviews and recommendations; for developing terms and conditions; for monitoring and documenting permittees' technical performance; and for compliance with permit terms and conditions.

While the Colorado BLM encourages and requires participation by permittees at various stages of the Section 106 process, the Colorado BLM retains ultimate responsibility for complying with all requirements of the NHPA.

Permits may be issued to appropriately qualified applicants, provided that work proposed would further knowledge in the public interest, would not conflict with other legitimate or protected uses of the public lands and resources, and would not be inconsistent with any approved management plan, objective, or established policy applicable to the public lands concerned.

Permits are not issued to other Federal agencies. Officially proposed cultural work may be authorized by a written agreement. Approval is subject to exactly the same review process and considerations as specified in Manual 8150. The written agreement can be a letter. The letter authorization is subject to the same special conditions as applied to other permit holders, which must be referenced in the letter with special conditions attached. Other Federal agencies are required to obtain a fieldwork authorization from the appropriate Field Office manager prior to beginning fieldwork. An employee of another Federal agency, proposing to conduct off-duty personal research that would require a permit, is subject to the regular permit application process.

The terms and conditions that apply to all permits are listed in and must be adhered to for all projects, or the permit may be suspended or revoked.

**A. Types of Permits**

Cultural resource consultants need to be specific about the type of permit being requested in their application. The following uses are authorized:

1. Survey and Recordation may be authorized for applicants who propose to identify, evaluate, record, or conduct similar non-impacting studies of cultural properties that will not include excavation and/or removal of material remains or other significant disturbance of cultural properties. As agreed to in advance, and specifically limited in the permit terms and conditions, such permits may authorize collection of isolated cultural materials, cultural materials that are at-risk of being damaged or removed by looters, and minor sub-surface probing to locate limits of cultural properties or unconfirmed archaeological deposits for mapping purposes. Minor, subsurface probing is limited to shovel pits or trowel tests. These permits may be issued on a multiple-Field Office or Statewide basis, for three (3) years to facilitate Section 106 compliance inventories. First-time permit holders are issued permits for one (1) year only, until they have established a history of successful project completion. Speculative permits are discouraged, and BLM may not issue a permit without a project. Also, BLM may not renew first-time permit holders, if work is not conducted under the permit during the year.

2. Limited Testing and/or Collection may be authorized for applicants who propose to conduct small-scale testing and/or systematic collection and removal of cultural material during field identification, evaluation, and recording activities, so that the significance or research potential of a cultural property may be better understood but not substantially diminished. Small scale testing should be limited to a maximum of three (3) square meters. It is important to understand that the purpose of limiting testing is to establish whether or not a site is eligible for nomination to the NRHP. Hence, testing should cease once it is determined that intact subsurface cultural deposits are present.

Exceptions to the 3-square meter rule will require written permission from the Field Office archaeologist detailing the site, project, time frame and reasons for the exemption. Excavation of any cultural property beyond limited evaluative or eligibility testing requires the issuance of a permit for excavation and/or removal (see 3. below). Work proposed may be used to determine future mitigation strategies. These permits are generally site-specific and issued for the project duration. Because these permits disturb relatively little of the cultural property, they generally can be issued without Native American consultation.

3. Excavation and/or Removal may be authorized for applicants who propose to excavate and/or remove material remains at a greater scale than the limited testing described above, with the result that the significance and/or future research potential of a cultural property or properties may be substantially altered. These permits are restricted to specific project areas and/or specific cultural properties and issued for the duration of the project. This permit includes major testing programs designed to answer research questions and to guide future data recovery efforts of an eligible cultural property. Ordinarily, these permits will be issued only after Native American notification and consultation required by ARPA and the Native American Graves Protection and Repatriation Act (NAGPRA) has been completed. Normally, work will be guided by a detailed treatment plan that has been reviewed and approved by BLM after consultation with the Colorado SHPO.

A combination of cultural resource activities described in 1. and 2. above may be authorized in a single permit, as appropriate to the extent and nature of work proposed in the application. A permit may be modified to authorize additional activities, project areas, and/or cultural properties that were not specified in the permit at the time of issuance. An excavation/removal permit normally will not be modified to include additional project areas and/or cultural properties. A new permit will be required.

A project-specific Fieldwork Authorization Request form (CSO 8151.3) is required **before** commencing fieldwork and is issued by the appropriate BLM Field Office. Fieldwork authorizations should not routinely be used to apply additional special conditions to the permit beyond what was attached at original issuance, nor should the authorization process be used as a second level of review of proposed personnel.

BLM archaeologists may participate in, or monitor work conducted by cultural resource consultants.

Curation agreements are required regardless of the use authorized. The agreement(s) should be submitted with the application or renewal request and **must be in place** before a permit is issued.

**B. Permit Application (Paleontological Permits will be handled separately under the Colorado 8270 Guidance Supplement)**

Any person may apply for a CRUP by submitting an application form (Form 8151-3) and required supporting documentation to the Deputy State Director, Resources or his/her designate. Only one (1) copy should be submitted. The application **should not** be sent to the Field Offices.

Application for modification or renewal of permits may be requested using Form 8151-6, "Request for Modification of Cultural Resource Use Permit". Applicants may need to submit supporting documentation as relevant to the requested modification or renewal. The modification or renewal request may be made 30 days prior to the expiration of the term of the permit or, provided the permit has not been used invalidly since it expired, within a reasonable period of time after expiration. If the existing permit is in good standing, during the time a permit modification or renewal is being reviewed and processed, the permit will remain in effect.

The following minimum requirements are listed to assist cultural resource consultants in preparing applications:

1. Organizational Qualifications. Applications must show the applicant's organizational ability to accomplish work of the type and scope proposed. A summary of organizational experience should be submitted providing the following minimum information:

a. Statement of applicant's organizational ability to accomplish work, including:

(1) location(s) of facilities and equipment;

(2) description of facilities and equipment;

(3) organizational structure and staffing;

(4) specification of which and to what extent facilities, equipment, and staff listed would be utilized.

b. Statement of applicant's organizational history in completing the type of work proposed, including:

(1) similar past projects;

(2) past government contracts;

(3) selected bibliography of project or contract reports and/or publications resulting from (1) and (2) above;

(4) previous federal permits held in the last 3 years, effective dates of permits currently in force, and applications pending or planned;

(5) suspended or non-renewed Federal permits;

(6) other pertinent organizational experience, such as research and special studies.

If the applicant is a newly formed entity, any information that might take the place of information requested in 1.a. and 1.b. above should be provided. In such cases, individual capabilities of personnel will carry greater weight in evaluation of organizational qualifications. Lack of an organizational history will not be the principal factor in a recommendation for permit denial.

2. Individual Qualifications.

a. Permit Administrator: Applications must show the name of the individual proposed to be responsible for carrying out the terms and conditions of the permit and otherwise complying with legal requirements applicable to the permitted activity. This individual must be legally empowered to obligate the applicant organization and must sign the application. Unless this individual is also named under 2.b. and 2.c. below, it is not necessary that this individual be a professionally qualified archaeologist, historian, or architect.

b. Project Director/Principal Investigator: Applications must include the name of any individual(s) proposed to be responsible for planning, supervising, and overseeing the overall project, including responsibility for the professional quality of evaluations and recommendations. Principal investigators shall have primary accountability for technical completeness and competence of work conducted under the permit. They shall be responsible for development of work plans and research designs, for performance of crew chiefs, for selection standards and limitations on work assignments of crew members, for analysis and interpretation of field data, for integration of field work results into comparative regional perspective, and for preparation of reports. Information must be included with the application to demonstrate that each individual has achieved the following:

(1) Adequate professional instruction. This may be obtained in either of the following two ways:

(a) Formal education resulting in a graduate or degree in the appropriate discipline for the permitted activity, **or**

(b) Formal education resulting in a bachelor's degree in the appropriate discipline for the permitted activity, **plus** at least 2 years of pertinent, professionally supervised experience with increasing responsibility leading to duties similar to those proposed in the application.

(2) Competence in theory and method, and in recording, collecting, handling, analyzing, evaluating, and reporting cultural resources data, relative to the type and scope of work proposed.

(3) Ability to plan, equip, staff, organize, and supervise activity of the type and scope of work proposed.

(4) Ability to carry research to completion, as evidenced by timely completion of theses, research reports, final reports, etc.

(5) Completion of at least sixteen (16) months of professional cultural resource management experience including similar duties as proposed in the application. This experience must include at least four (4) months of experience with comparable cultural resources in similar cultural and geographical areas. If equivalency is claimed under 2.b. (1) above, the sixteen (16) months of experience required here is to be included in, not in addition to, the 2 years of experience required in 2.b. (1) above.

c. Field Supervisor/Crew Chief: Applications must include the name of individual(s) proposed to be responsible for carrying out field projects and are in the field when fieldwork is underway. Crew chiefs shall be responsible for the technical quality of fieldwork, for the direct on-the-ground supervision of all aspects of fieldwork and data gathering, for proposing resource evaluations and recommendations for further treatment, and for preparing field records and descriptive reports. For each individual, information must be included with the application to demonstrate that the individual has achieved the following:

(1) Adequate professional instruction, obtained either of the following two ways:

(a) Formal education resulting in a BA or BS in the appropriate discipline (anthropology/archaeology, history, architecture) and at least 12 months of pertinent professionally supervised experience, with increasing responsibility leading to duties similar to those proposed in the application **or**;(b) Equivalent training and experience, including at least 30 months of pertinent, professionally supervised experience, with increasing responsibility leading up to responsibilities equivalent to those proposed in the application.

(2) Competence in recording, collecting, handling, analyzing, evaluating, and reporting cultural property data, relative to the type and scope of work proposed.

(3) Demonstrated ability to supervise activity of type and scope proposed.

(4) Completion of at least four (4) months of professional cultural resource management experience with comparable cultural resources in similar cultural and geographic areas. This may be part of the experience required in 2.c. (1) above.

The same individual may be named under 2.a.-c. above, that is, the same individual may be proposed to serve as permit administrator, project director, and field supervisor, provided that evidence is submitted to show that all pertinent criteria are met.

d. Monitors: Project excavation or trenching monitors must meet the same minimum qualifications as field supervisors/crew chiefs with the exception of having demonstrated supervision ability. Monitors must also have experience in excavation methods, either through an approved field school or through at least thirty (30) days supervised experience in excavation.

e. Historic Archaeologist: This designation is only for those with professional experience restricted to historic archaeology. Certification must meet the same minimum qualifications as principal investigator and field supervisor/crew chief.

f. Crew Members: All crew members must possess a minimum of eighteen (18) hours of anthropology or archaeology with two (2) months field experience or field school. The cultural resource consultant is responsible for assuring that these qualifications are met.

3. Qualifications of Proposed Curatorial Facility.

Materials collected from BLM-administered lands and associated records will be deposited in the following facilities unless otherwise noted in the permit:

a. Anasazi Heritage Center: San Juan Public Land Center, Gunnison and Uncompahgre Field Offices.

b. Museum of Western Colorado: Glenwood Springs, Grand Junction, Kremmling, Little Snake, and White River Field Offices.

c. No specified facilities are available for the Royal Gorge Field Office and the San Luis Valley Public Land Center. A no collection policy is currently in effect.

To the maximum extent possible, proposed curatorial facilities should meet the 36 CFR Part 79 standards and shall satisfy the following minimum considerations, as applicable:

a. Physical Considerations:

(1) Adequate security;

(2) Adequate protection for the types of materials expected to be housed, such as climate control for perishable material remains;

(3) Adequate protection for records, data, photographs, and other documents;

(4) Adequate records/accessioning/retrieval systems, including full capability to account for materials;

(5) Adequate provisions for scholarly access and study;

(6) Maintenance of physical plant insurance;

b. Administrative Considerations:

(1) Provision for permanent preservation, including transfer to a Federal or federally approved location in the event the facility should cease to exist;

(2) Adequate staffing;

(3) Provision for granting qualified scholars reasonable access to records and collections for research purposes.

4. Certification by Curatorial Facility.

Each application must include a curation agreement signed by a properly authorized official of the proposed curatorial facility, of willingness to accept any collections, as applicable, and records, data, photographs, and other documents generated during the proposed term of the permit, and to assume permanent curatorial responsibility and

accountability for such materials on behalf of the United States (U.S.) Government. The U.S. Government owns all collections and associated records. The cultural resource consultant is required to notify the curatorial facility of the term of the permit. The curation agreement will include the expiration date for the project.

5. Cultural and Geographic Area Experience.

The completion of at least four (4) months of professional cultural resource management field experience in applicable cultural and geographical areas associated with the Field Office or in areas of adjacent States involving similar cultural resources. The geographical area experience is based on project work by county. The resumes of personnel submitted with the application must clearly show the needed information or delays in the processing of the application will occur until this information is provided.

**C. Application Review and Evaluation**

The BLM State Archaeologist reviews each permit application with input from the Field Office in which the proposed work will occur. All permit applications are reviewed in the State Office and require minimally 30 calendar days to process. The applicant is responsible for seeking input from the appropriate Field Offices to better complete an application, particularly when the application involves data recovery plans.

Documentation of qualifications of all supervisory personnel shall be provided in resumes. Failure on the part of applicants to provide complete up-to-date information in the format required above will result in delays in the processing of the application until this information is provided.

The applicant shall be informed as quickly as possible what is needed for review. For this purpose, documented telephone or email contact is preferable to written notification.

Any application that fails to meet minimum qualification criteria, either upon initial receipt for missing information, may be rejected without further review, by following the permit denial procedures of BLM Manual 8150.

If an individual deliberately falsifies or grossly exaggerates his or her qualifications or experience on their resume, the BLM will suspend any further consideration of certifying that individual in a supervisory capacity for a period of time commensurate with the severity of falsification.

**D. Permit Areas**

Survey/Recordation permits are issued by Field Office area. Limited Testing/Collection and Excavation/Removal permits are issued by project area or cultural property.

**E. Permit Numbers**

Survey/Recordation and Limited Testing/Collection permits are issued numbers that will remain in effect through all modifications and renewals. Excavation/Removal permits are issued numbers that will remain in effect only through the term of the project.

**F. Field Work Authorization**

Prior to commencement of any field investigations, cultural resource consultants must notify the appropriate Field Offices of their intent to carry out fieldwork and submit a Fieldwork Authorization Request (Form 8151-3). This request may be for a project-specific authorization (in which case a map showing the proposed project area must be included) or for a blanket authorization, at the discretion of the BLM staff archaeologist or Field Office Manager. **At no time should a consultant use the authorization as the mechanism to gain access to non-federal surface.** The proponent is responsible for obtaining landowner consent. The BLM staff archaeologist will file a copy of the authorization in the

Field Office permit files and send the original to the Deputy State Director, Resources, or his/her designee for the permanent, Statewide CRUP file.

### G. Pre-field Check-In

Prior to each project, having received a Fieldwork Authorization and, before commencing fieldwork, a records search **must** be conducted. The BLM may not have the staff and time to conduct phoned-in or written requests for pre-field records checks. The cultural resource consultant will have to check the records at the BLM Field Office(s) and the Colorado Historical Society to identify all recorded cultural resource sites and previous inventories. This will ensure that the BLM is aware when fieldwork is taking place. Failure to conduct a pre-field records check may result in the rejection of the associated survey report and/or suspension or revocation of the permit.

### H. Post-field Check-In

As soon as possible, upon completion of the fieldwork, the cultural resource consultant will notify the appropriate BLM office of the results of the fieldwork. This may be done over the phone, or by electronic mail (Please see VI. I. Reporting time frames). For long-term projects, it is advisable to keep the BLM archaeologist informed as fieldwork proceeds.

### I. Annual Permit Reports to the State Office

Cultural resource consultants are **required** to submit an annual report of their work for the calendar year, even if no work was conducted. The report will include the following information: name and type of project, list of isolated finds and sites discovered (if any) and if artifacts were collected, and where and when they were curated. The report will be submitted to the Colorado State Office, at the same address as the permit application, no later than January 1 of each year. [Note: this report is not to be used as a substitute for any inventory or excavation reports or site evaluations. Failure to submit the annual report may be grounds for permit suspension and/or revocation.]

### J. Outreach

Cultural resource consultants are especially encouraged to educate project proponents about the value of cultural resources and the legal consequences of unauthorized damage and unauthorized removal of artifacts. It is strongly recommended that project proponents offer an employee education program for field employees.

## VI. INVENTORY

(See BLM Manual 8110 *Identifying and Evaluating Cultural Resources*)

### A. Objectives

The inventory objective is to identify all cultural resources including traditional cultural properties (TCPs) within a specified project area. The identification of cultural resources is conducted in accordance with professional standards detailed in the Secretary of the Interior's Standards and Guidelines for Archaeology and Historic Preservation (published by the NPS at 48 FR 44716, September 29, 1983).

### B. Classes of Inventory

The BLM cultural resource inventory system is composed of three kinds of inventory: Class I – existing information inventory; Class II – probabilistic field survey; and Class III – intensive field survey. Each is designed to provide specific kinds of cultural resource information for various planning and resource management needs. The most frequently employed method of inventory is Class III survey carried out for specific projects to enable BLM to comply with Section 106 of the NHPA before making decisions about proposed land and resource uses. In those cases, unless specifically prohibited in regulations, the cost of inventories shall be the responsibility of the project proponent or the benefiting BLM activity, as authorized in Section 110(g) of the NHPA.

1. Class I inventory is not merely a records search or prefield literature review, conducted prior to land disturbance actions. A Class I inventory is most useful for gaining a

comprehensive view of all the known archaeological, historic, cultural, and TCPs within a large area. By definition, it is a professionally prepared study that includes a compilation and analysis of all reasonably available cultural resource data and literature. Additionally, this study is a management-focused, interpretive, narrative overview and synthesis of the data.

2. Class II inventory is a professionally conducted, statistically-based sample survey designed to aid in characterizing the probable density, diversity, and distribution of cultural properties within a large area. Intensive pedestrian inventory is conducted in limited and discontinuous portions of the project area. Within individual sample units, survey aims, methods, and intensity are the same as those applied in a Class III inventory. A Class II inventory may include an approach that is based on a professional but judgmental strategy that needs to be specifically defined for a project. A Class II inventory may be conducted in several phases, using different sample designs to improve statistical reliability.

3. Class III inventory is a professionally conducted, continuous, intensive pedestrian survey of an entire project area aimed at locating and recording *all* cultural properties. Intensive inventory describes the distribution of properties in an area; determines the number, location and condition of properties; determines the types of properties actually present within the area; permits classification of individual properties; and records the physical extent of specific properties.

4. Reconnaissance survey is a focused or special-purpose information tool that is less systematic, less intensive, less complete, or otherwise does not meet Class III inventory standards. An area only surveyed by reconnaissance methods cannot be considered to be completed and may be subject to resurvey for other purposes.

### C. Determination of Level of Inventory

Once an application or notice of proposed activity is received, and the BLM has determined that it is an *undertaking*, as defined by 36 CFR 800.16(y), the BLM:

1. Shall determine the Area of Potential Effect (APE) of the proposed land use. Projects must be adequately designed and identified. Preliminary and final project design will be identified on USGS 7.5 Maps with sufficient detail for adequate determination of the potential effect a proposed project may have on cultural resources.

2. Shall review the project characteristics and all existing cultural resource inventory data (including Class I information) pertaining to the APE. Once this review is completed the BLM will instruct the cultural resource consultant as to the level and scope of inventory that will be required.

**D. Minimal Area to be Inventoried**

The following standards are intended to be minimal inventory guidelines. The BLM will exercise professional judgment on a case-by-case basis and some projects can be expected to deviate. All areas to be inventoried must be appropriately flagged and identified. Flagging must be removed upon completion of project.

Survey areas may be expanded beyond standard requirements to prevent site damage from inadvertent project activities, to assist in site avoidance for areas of high site density, or to allow for minimal project redesign. Survey areas must include a fifty (50) foot buffer beyond the APE. The following minimum standards shall apply to specific land uses:

1. Rights-of-Way (ROW): A Class III inventory will include fifty (50) feet along both sides of the centerline for a total width of one-hundred (100) feet; where the proposed ROW is wider than one-hundred (100) feet, a fifty (50) foot additional buffer on each side is **required**.

2. Coal: A Class III inventory will include an area of one (1) acre square, centered on the drill hole. The operator may choose to do more than this amount to ensure adequate coverage.

3. Oil and Gas: A Class III inventory will include a minimal area of ten (10) acres square, centered on the drill hole. The operator may choose to do more than this amount to

ensure adequate coverage. If several well sites are anticipated, block survey coverage should be considered. Access roads and other associated ROWs will conform to VI.D.1 (a) and (b) above. The inventory should be conducted with sufficient lead-time to ensure that the cultural resources report will be included in the Application for Permit to Drill (APD) package.

4. Geophysical: Geophysical operations can affect cultural properties through direct impacts (blasting, vehicle movements, road building, etc.). Generally, geophysical proposals shall be evaluated on a case-by-case basis to determine appropriate inventory or mitigation requirements. The following is provided to give specific information on geophysical project requirements.

a. Geophysical operations *may* be conducted without an inventory provided that 100 percent of the ground is snow-covered, there is a snow depth of at least six (6) inches and the ground is frozen. Class III inventory is required in areas where surface disturbance, such as blading, road construction, shot points, or other activities will take place. When filing the "Notice of Intent", the operator will furnish BLM a clear, accurate map (normally 7.5' USGS), showing the proposed line location and areas of proposed activity, including, but not limited to, seismic lines, staging areas, access routes, and drop zones. The map will form the basis for a literature search to determine inventory requirements. All project areas will be appropriately marked for BLM inspection and cultural fieldwork.

b. Where a Class III inventory has been determined necessary, it will include:

1) 100’ radius around each shot point;
2) 300’ radius around each shot point near a rim or rock/cliff face, or in areas otherwise identified during the records and literature review as having high potential for the occurrence of standing structures and/or rock art;

3) 100' wide swath (50' on either side of center line) on all source lines, receiver lines (if vehicles will be driven down the receiver lines), and access routes;
4) 300' wide swath will be inventoried on all source lines/points that are located along canyon rims and/or below cliffs and rock faces, or in areas otherwise identified during the records and literature review as having high potential for the occurrence of standing structures and/or rock art;
5) All helicopter landing zones, staging areas, parking areas for vibroseis buggies, or other locations of surface disturbance;
6) Personnel conducting the inventory will use existing vehicle access routes and keep to existing roads; and
7) The cultural resource consultant will sufficiently flag all cultural resources for avoidance during inventory. All material (i.e. flagging, stakes, lath, pin flags, etc.) used to mark sites will be removed by the cultural resource consultant after seismic work is completed in the area.

c. A cultural resource report will be submitted to BLM for review and Section 106 compliance *prior* to project authorization. Subsequent mitigation by avoidance or special stipulations may be formulated after review of the report. Where sites cannot be avoided or are damaged by operations, acceptable mitigation, via data recovery, will take place at the expense of the project proponent.

d. All employees of the operators and any subcontractors must be informed by the project proponent before commencement of operations that any disturbance to, defacement of, or removal of archaeological, historical, or cultural material (including pot sherds and arrowheads) will be treated as law enforcement/administrative issues. Project proponents will be held accountable for the conduct of their employees and subcontractors in this regard.

e. If subsurface cultural values are discovered during operations, all work in the vicinity of the resource will cease, and the BLM authorized officer will be notified immediately. The operator shall take any additional measures requested by the officer, including the possibility of hiring a qualified archaeologist to carry out specific instructions.

g. A cultural resource monitor (permitted archaeologist) may be required during operation and/or reclamation activities to ensure that no inadvertent damage occurs to cultural properties.

h. Additional stipulations may be added in some cases where additional or standard protection is needed. Examples may include but are not limited to: use of portable (helicopter) operations; cultural resource monitor for all operations in sensitive areas; weather restrictions; frequent compliance checks and contacts with all operational personnel on site; site fencing or restrictive use barriers; requirement for identification and monitoring of sites made more susceptible to vandalism or collection because of proposed land use; verification of site locations, even if a Class III inventory had previously been conducted; and special reclamation measures to reduce erosion.

These minimum standards apply in most cases and should be employed whenever feasible and prudent for efficient project design and implementation. Exceptions may occur, and they should be considered when the design is not routine and/or when environmental conditions allow for areas to be inventoried at less than these standards. The BLM may determine, on a case-by-case basis, that the Class III standards are not applicable.

**E. Level and Intensity of Inventory/Monitoring**

The BLM shall ensure that the class, level and intensity of inventory are commensurate with the proposed land use, the planning stage at which required consultation takes place, topographic setting, and the known distribution of cultural resources. Prior to any surface-disturbing activity, a Class III inventory is usually

conducted. Class III inventories must account for all visible surface sites within the defined area. All decisions to conduct less than a Class III inventory must be documented in writing and approved by BLM.

BLM-administered lands, unless meeting a specific exclusion, will be surveyed at a Class III level. The following environmental conditions may limit or preclude Class III coverage:

1. Previous natural ground disturbance that has modified the surface so extensively that the likelihood of finding cultural resources is negligible;

2. Human activity within the past 50 years that has created a new land surface to such an extent as to eradicate traces of cultural resources;

3. Survey at the same class and level previously conducted, and sites records adequately documenting the location, methods, and results of the survey;

4. Natural environmental characteristics that is unfavorable to the presence of cultural resources (such as recent landslides or rock falls):

a. Slopes greater than 30 degrees where no potential exists for rock shelters, rock art, or other cultural resources associated with rock faces or ledges. This particularly applies to steep talus or shale slopes. Field verification must be made of this condition.

b. Areas where vegetation cover is 100 percent. In most cases, there will be areas within heavily vegetated environments where spot ground checking is possible; some other methods of "seeing" through the vegetation may be recommended, such as testing or monitoring.

In all cases where a Class III survey has been determined necessary the project area must be at least 80 percent snow-free before the survey can take place. Cultural resource

monitoring where resources are present or reasonably expected is permitted only when the ground surface is free of snow, unfrozen, and dry.

**F. Inventory Field Methods**

In consultation with BLM, cultural resource consultants may use their own field methodologies within the following guidelines and limits:

1. All project areas must be adequately staked and/or flagged before any work is undertaken. For narrow linear projects it is important that right-of-way widths are precisely known. The appropriate BLM archaeologist must approve any variances from these requirements.

2. For block surveys and regional studies, crews will be limited to no more personnel than can be effectively managed by the field supervisor (experience has shown four or five to be about maximum).

3. Crew spacing should not normally exceed 15-20 meters. Exemptions from total coverage, due to terrain or other factors, must be coordinated with and approved by the appropriate BLM archaeologist.

4. Collection strategies must be coordinated with the appropriate BLM archaeologist. (see Section K: Collection and Curation).

5. If palentological resources are suspected or encountered during inventory, note the location, write a brief description of condition, and contact your BLM authorized officer, which will contact the BLM regional paleontologist.

**G. Recording Cultural Resources**

Upon finding unrecorded cultural resources, descriptive data shall be recorded on the appropriate State of Colorado site forms. Sites previously recorded on abbreviated or unofficial site forms or where information is outdated or incomplete will be re-recorded. A

Cultural Resources Reevaluation Form, or a BLM-approved monitoring form, will be filled out where adequately recorded cultural resources are inspected and lie within the project area.

Sites partially within the inventory area will be fully recorded. [**Note**: Portions of extensive sites may be excluded from this requirement on a case-by-case basis in consultation with the appropriate BLM archaeologist. Linear sites shall be recorded within project boundaries, on State of Colorado linear site component forms.

## H. Digital Data Management Specifications

[See BLM-Colorado Digital Data Management Specifications, last revised March 2011. *Supplement* to Handbook of Guidelines and Procedures for Inventory, Evaluation, and Mitigation of Cultural Resources, BLM-Colorado State Office, 1998, last revised March 2011]

## I. Evaluation

Often cultural resources cannot be evaluated from surface observations. The BLM Class III inventory methods allow for minor probing or shovel testing to locate the spatial limits of cultural resources, to determine whether buried cultural deposits are present, or to make determinations of eligibility. Limited testing may be necessary to determine whether buried cultural deposits exist. This testing for evaluation should not be confused with formal testing and should be kept to the minimum amount necessary to determine the presence of subsurface deposits. In no case should such evaluative testing exceed three (3) square meters of site surface. Test plots should also be shown on the site sketch. Criteria used to determine properties potentially eligible for the NRHP must be substantive, objective, and stated in the report.

The potential for subsurface cultural materials must be given special consideration in assessment of future monitoring and mitigation needs. Consultants are encouraged to use their best professional judgment to recommend whether or not sites are eligible for nomination to the NRHP. The “Need Data” determination should be applied sparingly and

only in those cases where both surface evidence and limited testing yield ambiguous results. Significance evaluations made by the cultural resource consulting firm are recommendations only. The BLM will determine eligibility and effect.

**J. Reporting Process and Standards**

Upon completion of the fieldwork, the cultural resource consultant must report the field findings to the appropriate BLM Field Office. Phone calls or electronic mail are acceptable methods of reporting results. **Cultural resource consultants do not have the authority to give permission for a client company, i.e., project proponent, to proceed with a project.** The BLM authorized officer is the only person who can authorize a proponent to proceed.

1. Negative findings: Cultural resource consultants can report negative findings by phone to the BLM Field Office archaeologist. The BLM Field Office archaeologist, however, does not have the authority to allow the project to proceed. The report of negative findings will be passed on to the appropriate BLM authorized officer. This reporting process will expedite the internal BLM review process. Often, other project considerations and stipulations may be applicable.

2. Positive findings with no effect to cultural resources: Field surveys with known cultural resources that can be avoided by the project will require BLM review. The BLM Field Office archaeologist will notify the appropriate BLM authorized officer of these findings.

3. Positive findings with effect to cultural resources: Field surveys with known cultural resources listed or potentially eligible for the NRHP that cannot be avoided, will require discussions between the cultural resource consultant, the project proponent and the BLM. Treatment plans will be developed and implemented in consultation with the SHPO. Authorization to proceed can occur only after consultation and treatment has been completed. The BLM Field Office archaeologist will notify the appropriate BLM authorized officer of these findings.

Prior to project authorization, a cultural resource report for survey, testing and excavation must be approved by the BLM. The project authorization document may include stipulations for additional cultural resource work (e.g. monitoring, data recovery, etc.). Deadline requirements for submission of additional cultural resource reports will be included in the authorization document.

All final reports are to be submitted to the BLM within ten (10) working days of completion of fieldwork, if no sites were encountered; thirty (30) days if sites were located. Extensions may be allowed in consultation with the BLM. However, all agreements between the BLM and the cultural resource consultant will be in writing and clearly defined dates for draft and final report reviews will be established as per instructions in BLM manual 8150.

The cultural resource consulting firm will submit all proprietary information directly to the appropriate BLM office. Proprietary information includes any documentation that is exempt from public disclosure under ARPA and NHPA including the location of cultural resources and traditional cultural properties. Reports with non-proprietary information may be made available to the project proponent. The disclosure of proprietary site information remains at the discretion of the BLM *only*.

The cultural resource consultant will submit two (2) copies of the final report to the appropriate BLM office. Original photos are required in both copies. BLM will provide the SHPO with the report and site forms and conduct the appropriate consultation. Site forms should be kept separate, i.e., not bound in the report.

Each report shall follow the Colorado Office of Archaeology and Historic Preservation Cultural Resource Report Forms and Guidelines. The reports must identify the number of acres from BLM land and from non-BLM land. Reports and site forms not in this format are not acceptable to the BLM or SHPO. These reports will be rejected and the project will not be allowed to proceed until an acceptable report is completed.

Professional peer review can be used to ensure quality products. Peer review is especially desirable for syntheses, historic contexts or research design development, or

other planning and inventory efforts that form the primary substantive and theoretical basis for evaluation and planning. It is also appropriate for planning, implementing, and reporting major inventory or data recovery projects.

**K. Collection and Curation**

Qualified individuals may be authorized by the State Director or his/her designee to remove cultural resource artifacts which are in danger of loss or which are needed for scientific study, public interpretation, or evaluation of the cultural property. Additionally, no paleontological resources may be collected under a cultural resource permit, unless the remains are in an archaeological context (i.e. Paleo bone in hearth, etc.), however, a paleontologist should be consulted. Cultural resource artifacts removed from BLM land in Colorado, along with copies of the associated records, are curated as property of the United States in a university, museum, or other scientific or educational institution within or near the State of Colorado.

1.Collection: Only limited collections will be made on BLM-administered lands in Colorado in the following circumstances.

a.Survey and Recordation: The BLM generally adheres to a no collection policy. Collection is only recommended if, in the opinion of the archaeologist, the artifact(s) are unique and vulnerable to unauthorized collection or destruction, diagnostic (time-sensitive), and cannot be readily identified in the field. A catalog sheet, drawings of the artifact(s), and location of the collection will be included in the body of the report and attached to the appropriate site form(s). The location of collected artifacts shall be accurately plotted on site sketch maps.

b.Limited Testing and Collection and Excavation/Removal: If artifacts are collected, justification rationale and the method and nature of any collection (e.g. systematic versus nonsystematic), shall be included in the data recovery plan submitted with the permit application and in the final report. Artifact provenience control shall be established and exercised. Collection will require

a more detailed assemblage analysis in the final report. A catalog sheet, drawings of the artifact(s), and location of the collection will be included in the body of the report and attached to the appropriate site form(s). The location of collected artifacts shall be accurately plotted on site sketch maps.

2. Curation: Collected artifacts must be curated according to the standards of the facility designated as the curatorial repository.

a.The permittee shall deposit all artifacts, samples, and collections, as applicable, and copies of all records, data, photographs, and other documents resulting from work conducted under a CRUP, with the curatorial facility named in the permit not later than 90 calendar days after the date the final report is submitted to the appropriate BLM official. Receipt of collections will be documented on the museum collections deposition statement form. Copies of the completed form will be provided by the permittee to the State Office within 30 calendar days of depositing the collections to the curatorial facility.

b.Not later than 180 calendar days after the final report is submitted, the permittee shall provide the appropriate BLM official with a catalog/list and evaluation of all materials deposited with the curatorial facility, including the facilities accession and/or catalog numbers. Failure to provide a list of materials deposited in approved curatorial facilities may result in the suspension or revocation of the permit.

c.No collections are exempted from deposit with the curatorial facility including type collections. Permittees wishing to hold type collections must do so through the issuance of curatorial loan agreement between them and the curatorial facility.

**L. Treatment Plans**

If a cultural property is determined eligible for or listed on the NRHP and will be adversely affected by a proposed development, the BLM prefers avoidance of the cultural

property rather than costly and lengthy mitigation projects. When cultural properties cannot be avoided, BLM will determine, in consultation with the SHPO, the appropriate treatment. Project proponents should be aware that cultural resource conflicts may not normally prevent development, but it will take time to formulate mitigation measures to prevent the loss of cultural information. These mitigating measures will be developed between the BLM Field Office archaeologist(s), the cultural resource consultant and the proponent.

The cultural resource consultant will submit a research design and treatment plan to guide a program of mitigation to the appropriate BLM Field Office archaeologist for review, unless stipulated differently in a project-specific agreement. The BLM must afford the SHPO ten (10) working days in which to comment upon the proposed treatment plan. The proposed plan shall conform to the Secretary of the Interior's Standards and Guidelines, Archaeology and Historic Preservation, and the SHPO's guidelines for "Data Recovery Plans" and "Reports". If the SHPO raises objections within the ten (10) working day period, the SHPO will have twenty (20) working days in which to comment on the treatment plan. The SHPO will provide BLM with written comments within this thirty (30) day period. The BLM will notify the cultural resource consultant upon concurrence of the data recovery plan.

**M. Treatment Options**

Treatment recommendations should be commensurate with the nature and significance of the involved cultural resources and the extent of possible damage; be cost-effective and realistic; consider project requirements and limitations; consider substantive input from concerned parties; and be Bureau approved.

1.Avoidance: The preferred strategy for treating potential direct adverse effects on cultural properties is avoidance. If avoidance involves project relocation, the new project area may require cultural resources inventory. The operators input shall be required prior to avoidance and/or mitigation measures.

2. Mitigation: If avoidance is imprudent or infeasible, recommendations should include a range of alternative treatments. Mitigation proposals may include data recovery, stabilization, monitoring, protective barriers and signs, or other physical and administrative measures.

3. Data Recovery: The recovery of cultural resource data employs scientific methods and techniques, which are guided by a consideration of current archaeological issues, questions, and objectives. Data recovery proposals should define study topics and discuss data collection priorities as related to the use(s) and/or significant qualities of specific cultural properties or types of cultural properties. The proposed work, including field methods and analysis techniques, should be justified in terms of the data recovery objectives. Proposals must include consideration of conservation and collections management.

4. Physical or Administrative Protective Measures: Proposals should include a feasibility justification and specifications.

**N. Unanticipated Discoveries**

All large-scale projects must include a strategy for dealing with discoveries. In the event that cultural resources and/or human remains are discovered during operations, activity in the vicinity of the discovery will cease, and the BLM authorized officer will be notified immediately. BLM, in cooperation with the project proponent and/or cultural resource consultant, will ensure that the cultural resources and/or human remains are protected from further disturbance until BLM determines the treatment approach, and the treatment is completed.

Unless otherwise noted in treatment plans or agreements, BLM will evaluate the cultural resources and, in consultation with the SHPO, select the appropriate mitigation option within 48 hours of the discovery. BLM will implement the mitigation in a timely manner. The process will be fully documented in reports, site forms, maps, drawings, and photographs. The BLM will forward documentation to the SHPO for review and concurrence.

If human remains are discovered on BLM-administered lands, the treatment of human remains will be in accordance with NAGPRA and BLM policy. If human remains are discovered on private or state land during a BLM undertaking, the BLM will notify the State of Colorado Archaeologist immediately, who will comply with the Colorado Revised Statutes regarding the discovery of human remains (24-80-1302).

# RIPARIAN AREA MANAGEMENT

*Process for Assessing Proper Functioning Condition*
*for Lentic Riparian-Wetland Areas*

by

U.S. Department of the Interior
Bureau of Land Management
Lentic Riparian-Wetland Area
Proper Functioning Condition Work Group

Don Prichard - Work Group Leader
Fishery Biologist/Riparian-Wetland Coordinator
Service Center, Colorado

**Work Group**

Clay Bridges
Wildlife Biologist
Canon City District Office, Colorado

Russ Krapf
Soil Scientist
Phoenix Training Center, Arizona

Steve Leonard
Range Scientist
Nevada State Office, Nevada

Warren Hagenbuck
Regional Wetland Coordinator
U.S. Fish and Wildlife Service
Albuquerque, New Mexico

Technical Reference 1737-11
1994, Revised 1998

U.S. Department of the Interior
Bureau of Land Management
Service Center
P.O. Box 25047
Denver, CO 80225-0047

2

BLM_0007075

# Acknowledgements

To assemble a document about such a valuable resource requires the assistance and support of many field offices and individuals. The work group wishes to acknowledge Bob Allan, Hugh Barrett, Tim Bozorth, Tim Burke, Jim Fogg, Joe Frazier, Bob Haburchak, Paula Ledford, and Randy McNatt, as well as the Eugene District, the Roswell District, the Salem District, the Winnemucca District, the Phillips Resource Area, and the Tonopah Resource Area for playing an important role in the development of this document.

The work group would also like to acknowledge those persons who reviewed this document for their various agencies or interest groups, providing valuable comments and helping make it the quality document that it is.

The work group also extends a special thank you to Linda Hill (Writer/Editor) and Janine Koselak (Visual Information Specialist) of the Technology Transfer Staff at the Service Center for doing a fine job in editing, layout, design, and production of the final document.

4

BLM_0007077

# Table of Contents

Page

I. Introduction ..... 1

A. Purpose ..... 1

B. Approach ..... 2

C. Definitions ..... 2

II. Process ..... 3

A. Review Existing Documents ..... 3

B. Analyze the Definition ..... 3

C. Assess Functionality ..... 4

1. Attributes and Processes ..... 4

2. Capability and Potential ..... 7

3. Functioning Condition ..... 8

III. Problem Wetlands ..... 10

A. Wetlands Dominated by Facultative Upland (FACU) Plant Species ..... 10

B. Evergreen Forested Wetlands ..... 10

C. Glacial Till Wetlands ..... 11

D. Highly Variable Seasonal Wetlands ..... 11

E. Interdunal Swale Wetlands ..... 11

F. Vegetated River Bars and Adjacent Flats Wetlands ..... 11

G. Vegetated Flats Wetlands ..... 12

H. Newly Created Wetlands ..... 12

I. Entisols (Floodplain and Sandy Soils) Wetlands ..... 12

J. Mollisols (Prairie and Steppe Soils) Wetlands ..... 12

IV. Instituting the Process ..... 13

A. Planning ..... 13

B. Management ..... 13

C. Monitoring ..... 14

V. Summary ..... 15

Literature Cited ..... 17

Glossary of Terms ..... 19

Appendix A - Lentic Riparian-Wetland Functional Checklist ..... 21

Appendix B - Lentic Riparian-Wetland Examples ..... 25

# Process for Assessing Proper Functioning Condition for Lentic Riparian-Wetland Areas

## I. Introduction

Federal policy defines wetlands as ***areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and which, under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions***. Bureau of Land Management (BLM) Manual 1737 (USDI, 1992), *Riparian-Wetland Area Management,* includes ***marshes, shallow swamps, lakeshores, bogs, muskegs, wet meadows, estuaries, and riparian areas as wetlands.***

Riparian-wetland areas, though they comprise less than 9 percent of the total land base, are the most productive and highly prized resources found on BLM lands. Riparian-wetland areas play a significant role in restoring and maintaining the chemical, physical, and biological integrity of the nation's water. Wildlife use riparian-wetland areas disproportionately more than any other type of habitat. In addition, riparian-wetland areas are highly prized for their economic values and other uses such as livestock production and recreation.

Riparian-wetland areas' soils, vegetation, and hydrology vary as a result of many factors; therefore, they are grouped into two major categories: 1) lentic, which is standing water habitat such as lakes, ponds, seeps, bogs, and meadows, and 2) lotic, which is running water habitat such as rivers, streams, and springs.

### A. Purpose

The BLM's *Riparian-Wetland Initiative for the 1990's* (USDI, 1991) document establishes national goals and objectives for managing riparian-wetland resources on public lands. This initiative's chief goal, comprised of two parts, is to: 1) restore and maintain riparian-wetland areas so that 75 percent or more are in proper functioning condition (PFC) by 1997 and 2) to achieve an advanced ecological status, except where resource management objectives, including PFC, would require an earlier successional stage, thus providing the widest variety of habitat diversity for wildlife, fish, and watershed protection. The *Riparian-Wetland Initiative for the 1990's* also contains a strategy to focus management on the entire watershed. Knowing the condition of the watershed is an important component in assessing whether a riparian-wetland area is functioning properly.

The purpose of this document is to provide a thought process for assessing PFC for lentic riparian-wetland areas on BLM-managed lands. This document supplements Technical Reference (TR) 1737-9, ***Process for Assessing Proper Functioning Condition*** (Prichard et al., 1993), which was principally designed for lotic riparian-wetland areas.

## B. Approach

BLM defines lentic riparian-wetland resources the same way they define lotic riparian-wetland resources, i.e., resources whose capabilities and potentials are defined by the interaction of three physical components: 1) vegetation, 2) landform/soils, and 3) hydrology. As for lotic riparian-wetland areas, some resource specialists regard fish and wildlife as a fourth element because of the ability of some wildlife species to alter a riparian-wetland area's capability and potential. Classifiers usually place wildlife species that have the ability to alter a riparian-wetland area's capability and potential as a special modifier under the hydrology component. Whether fish and wildlife species are dealt with as a resource component or identified as a special modifier, noting their presence and/or condition is important when assessing PFC of a lentic riparian-wetland area.

Since lentic riparian-wetland areas are characterized by the interactions of vegetation, soils, and hydrology and these areas are important to fish and wildlife, **the process of assessing whether a riparian-wetland area is functioning properly requires an interdisciplinary (ID) team**. The team should include, but not be limited to, specialists knowledgeable about vegetation, soil, and hydrology attributes and processes and fish and wildlife values.

## C. Definitions

To comprehend how a lentic riparian-wetland area operates, and to set in motion proper management practices that ensure it is functioning properly, **the capability and potential of the area must be understood**. Evaluating functionality is based upon an area's capability and potential. This document uses the same definitions for capability and potential that were used in TR 1737-9:

> **Capability** - The highest ecological status a riparian-wetland area can attain given political, social, or economical constraints. These constraints are often referred to as limiting factors.
>
> **Potential** - The highest ecological status an area can attain given no political, social, or economical constraints; often referred to as the "potential natural community" (PNC).

BLM Manual 1737, ***Riparian-Wetland Area Management*** (USDI, 1992), and TR 1737-9, establish definitions for proper functioning condition, functional—at risk, nonfunctional, and unknown when assessing functionality of riparian-wetland areas. Even though these definitions feature lotic riparian-wetland areas, they can be applied to lentic riparian-wetland areas with minor modifications. For example, instead of assessing whether adequate vegetation is present to dissipate stream energies, an assessment would determine whether adequate vegetation is present to dissipate wind and wave energies, thereby reducing erosion and improving water quality.

## II. Process

The process described in TR 1737-9 concentrated on assessing functional condition of lotic riparian-wetland areas for two reasons: 1) they are the form of wetland BLM most frequently has to resolve conflicts on and 2) inventory, classification, and monitoring efforts within and outside the Bureau have concentrated on this type of resource. However, the basic process to assess functioning condition on lentic forms of riparian-wetlands would be much the same, except that: 1) different attributes and processes define an area's capability and potential and 2) the attributes and processes of soil and vegetation play a stronger role in establishing functionality, while hydrology plays a lesser role.

### A. Review Existing Documents

TR 1737-9 should be reviewed before assessing functioning condition of lentic riparian-wetland areas. TR 1737-9 identifies a number of documents that provide a basis for assessing PFC. It also identifies additional documents that provide thought processes that will be useful in assessing functional status of riparian-wetland areas.

Like lotic riparian-wetland areas, the level of information necessary to assess PFC for lentic riparian-wetland areas will vary. Some will require the magnitude of effort provided by an Ecological Site Inventory (ESI) to assess functionality, while others can be assessed by using a checklist. Information pertaining to application of ESI can be found in TR 1737-7, ***Procedures for Ecological Site Inventory—With Special Reference to Riparian-Wetland Sites*** (Leonard et al., 1992).

Whether employing ESI or a checklist to assess functioning condition, existing files from BLM and other agencies should be reviewed for pertinent information. Information may exist to assess functionality for some riparian-wetland areas without having to go to the field. For others, the information will be useful in establishing capability and potential or trend.

### B. Analyze the Definition

In assessing PFC for lentic riparian-wetland areas, the definition of PFC must be analyzed, but adjusted for lentic areas. One way to do this is by breaking the definition down as follows:

> Lentic riparian-wetland areas are functioning properly when adequate vegetation, landform, or debris is present to:
>
> 1) dissipate energies associated with wind action, wave action, and overland flow from adjacent sites, thereby reducing erosion and improving water quality;
> 2) filter sediment and aid floodplain development;
> 3) improve flood-water retention and ground-water recharge;
> 4) develop root masses that stabilize islands and shoreline features against cutting action;

    5) restrict water percolation;
6) develop diverse ponding characteristics to provide the habitat and water depth, duration, and temperature necessary for fish production, waterbird breeding, and other uses;
7) and support greater biodiversity.

Lentic riparian-wetland areas are functioning properly when there is adequate structure present to provide the listed benefits ***applicable*** to a particular area. The analysis must be based on the riparian-wetland area's capability and potential. If, for example, the system ***does not have the potential*** to support waterfowl habitat, that criteria would not be used in the assessment.

## C. Assess Functionality

### *1. Attributes and Processes*

Assessing PFC for a lentic riparian-wetland area, just as for a lotic riparian-wetland area, involves understanding the attributes and processes occurring in that area. Table 1 provides a list of attributes and processes that may occur in any given lentic riparian-wetland area. When assessing PFC, attributes and processes for the area being evaluated need to be identified.

To understand these processes, an example of a palustrine wetland area in both a functional and nonfunctional condition is provided in Figure 1. Applying the Bureau's definitions for PFC, **State A** would be classified as PFC. Important attributes and processes present for **State A** are:

**Hydrogeomorphic** - Continuous permafrost; shoreline shape; and depth, duration, and frequency of inundation.

**Vegetation** - Community types and distribution, recruitment and reproduction, root density, community dynamics, and survival.

**Erosion/Deposition** - Shoreline stability.

**Soils** - Distribution of anaerobic soil and ponding frequency and duration.

**Water Quality** - No change.

**Biotic Community** - Aquatic plant recruitment and reproduction and nutrient enrichment.



**Figure 1.** Proper functioning condition (A) and nonfunctional condition (B) for a lentic palustrine wetland area.

Land activities that disrupt the permafrost layer would result in **State A** progressing to **State B**. **State B** would be classified as nonfunctional. The following changes in attributes/processes are likely in **State B**:

**Hydrogeomorphic** - Continuous permafrost (lost); shoreline shape (changed); and depth, duration, and frequency of inundation (decreased).

**Vegetation** - Community types and distribution (lost/changed), recruitment and reproduction, root density, community dynamics, and survival (decreased).

**Erosion/Deposition** - Shoreline stability (decreased).

**Soils** - Distribution of anaerobic soil and ponding frequency and duration (decreased).

**Water Quality** - Temperature (increased), pH (changed).

**Biotic Community** - Aquatic plant recruitment and reproduction and nutrient enrichment (decreased).

**Table 1.** Attributes/Processes List *

| Attributes/Processes |
|---|
| **Hydrogeomorphic** |
| Ground-Water Discharge |
| Permafrost |
|     Continuous |
|     Discontinuous |
| Flood Modification |
| Inundation |
|     Depth |
|     Duration |
|     Frequency |
| Semipermanently Flooded |
| Shoreline Shape |
| **Vegetation** |
| Community Types |
| Community Type Distribution |
| Surface Density |
| Canopy |
| Community Dynamics and Succession |
| Recruitment/Reproduction |
| Root Density |
| Survival |
| **Erosion/Deposition** |
| Shoreline Stability |
| Depositional Features |
| **Soils** |
| Soil Type |
| Distribution of Aerobic/Anaerobic Soils |
| Annual Pattern of Soil Water States |
| Ponding Frequency and Duration |
| Underlying Materials |
| **Water Quality** |
| Temperature |
| pH |
| Dissolved Solids |
| Dissolved Oxygen |
| **Biotic Community** |
| Aquatic Plants Recruitment/Reproduction |
| Nutrient Enrichment |

* This list provides examples of various attributes/processes that may be present in a riparian-wetland area. By no means is it complete.

The previous example would be found in Alaska and represents one of many types of lentic riparian-wetlands found on public lands. However, it is important to remember that there are other types and that:

> **Riparian-wetland areas do have fundamental commonalities in how they function, but they also have their own unique attributes. Riparian-wetland areas can and do function quite differently. As a result, most areas need to be evaluated against their own capability and potential. Even for similar areas, human influence may have introduced component(s) that have changed the area's capability and potential. Assessments, to be correct, must consider these factors and the uniqueness of each system**.

### *2. Capability and Potential*

Determining functionality of lotic riparian-wetland areas involves determining an area's capability and potential. This is also true for assessing functionality of lentic riparian-wetland areas. The same approach presented in TR 1737-9 can be used for lentic areas and is as follows:

- Look for relic areas (exclosures, preserves, etc.).
- Seek out historic photos, survey notes, and/or documents that indicate historic condition.
- Search out species lists (animals & plants - historic & present).
- Determine species habitat needs (animals & plants) related to species that are/were present.
- Examine the soils and determine if they were saturated at one time and are now well drained?
- Examine the hydrology; establish the frequency and duration of flooding/ponding.
- Identify vegetation that currently exists. Are they the same species that occurred historically?
- Determine the entire watershed's general condition and identify its major landform(s).
- Look for limiting factors, both human-caused and natural, and determine if they can be corrected.

This approach forms the basis for initiating an inventory effort like ESI. For some areas, conducting an ESI effort will be the only way to assess an area's capability and potential.

Some lentic riparian-wetland areas will be prevented from achieving their potential because of limiting factors such as human activities. For lentic riparian-wetland areas, most of these limiting factors can be rectified through proper management. To identify these factors, a limiting factor analysis should be part of any inventory method applied to determine capability and potential.

### 3. *Functioning Condition*

When determining whether a lentic riparian-wetland area is functioning properly, it is important to determine the condition of the entire watershed. The entire watershed can influence the quality, abundance, and stability of downstream resources by controlling production of sediment and nutrients, influencing ponding frequency and duration, and modifying the distribution of chemicals throughout the riparian-wetland area.

**Lentic riparian-wetland areas can function properly before they achieve their Potential Plant Community (PPC) or Potential Natural Community (PNC)**. The Bureau's definition does not mean PNC or optimal conditions for a particular species have to be achieved to be rated as functioning properly. But the Bureau's goal is to achieve an advanced ecological status, except where resource management objectives, including PFC, would require an earlier successional stage, thus providing the widest variety of habitat diversity for wildlife, fish, and watershed protection. After achieving PFC, management should progress towards achieving a desired plant community (DPC) and then achieving a desired future condition (DFC).

The steps in Figure 2 in TR 1737-9 (page 12) provide an example of the relationship between PFC and vegetation community succession for a lotic riparian-wetland area. This relationship can be applied to lentic riparian-wetland areas as well. If vegetation succession continues uninterrupted (Step 1 to Step 2), the riparian-wetland site will progress through some predictable changes from early seral to PNC (although not necessarily as linearly as depicted). As the vegetation community progresses, the riparian-wetland area will advance through phases of not functioning, functioning — at risk, and properly functioning.

At various stages within this successional process, the riparian-wetland area will provide a variety of values for different uses (Step 4). Optimal conditions for grazing occur when forage is abundant and the area is stable and sustainable (mid-seral). Wildlife goals depend upon the species for which the area is being managed. If the riparian-wetland area is to provide nesting habitat for waterfowl, the optimum conditions might be late seral. If the area is to provide feeding habitat for shorebirds, the optimum condition might be mid-seral. The threshold for any goal is at least PFC because any rating below this would not be sustainable. **For riparian-wetland areas, PFC may occur from early seral to late seral**. Desired plant community (DPC) is then determined based on management objectives through an interdisciplinary approach (Step 5), eventually achieving the desired future condition (Figure 2). **Selection of plant communities and future conditions needs to be balanced within a watershed(s) and within an ecoregion(s)**.

When rating functionality, it will be easy to categorize many lentic riparian-wetland areas as PFC or nonfunctional. For others it will not be easy. Difficulty in rating PFC usually arises in identifying the thresholds that allow a riparian-wetland area to move from one category to another.



**Figure 2.**

To provide consistency in reporting PFC, BLM has established a standard checklist for lentic riparian-wetland areas for field offices to initiate this process (Appendix A). BLM's lentic checklist may not answer the question of functionality for all lentic riparian-wetland areas. On occasion, field offices will find that blending the lentic checklist with the lotic checklist is necessary to assess functionality for some riparian-wetland areas. Some areas may require a more intensive inventory effort, like ESI.

Field offices can add elements to BLM's lentic or lotic checklist to address unique riparian-wetland attributes and processes. **If elements are added, field offices need to make sure additions can be quantified**.

To further assist field offices in assessing functionality, Appendix B provides examples of lentic riparian-wetland areas that depict categories of PFC, functional — at risk, and nonfunctional.

BLM_0007089

## III. Problem Wetlands

Certain wetlands may be difficult to identify because field indicators of the three wetland identification criteria may be absent, at least at certain times of the year. These wetlands are considered problem wetlands because the difficulty in identification is generally due to normal environmental conditions and not the result of human activities or catastrophic natural events, with the exception of newly created wetlands. Because of the difficulty in identifying these areas as wetlands, there will be a degree of difficulty in assessing their functionality. Field offices may need to add elements to the lentic checklist to assess these problem wetlands.

Examples of problem wetlands are discussed below. Learning how to recognize these wetlands and to understand their attributes/processes is important in assessing functionality.

### A. Wetlands Dominated by Facultative Upland (FACU) Plant Species

Since wetlands often exist along a natural wetness gradient between permanently flooded substrates and better drained soils, the wetland plant communities sometimes may be dominated by FACU species. Although FACU-dominated plant communities are usually uplands, they sometimes become established in wetlands. In order to determine whether a FACU-dominated plant community constitutes hydrophytic vegetation, the soil and hydrology must be examined. If the area meets the hydric soil and wetland hydrology criteria, then the vegetation is hydrophytic.

### B. Evergreen Forested Wetlands

Wetlands dominated by evergreen trees occur in many parts of the country. In some cases, the trees are obligate wetland (OBL) species, facultative wetland (FACW) species, and facultative (FAC) species, e.g., Atlantic white cedar (*Chamaecyparis thyoides*), black spruce (*Picea mariana*), balsam fir (*Abies balsamae*), slash pine (*Pinus elliottii*), and loblolly pine (*P. taeda*). In other cases, however, the dominant evergreen trees are FACU species, including red spruce (*Picea rubens*), Engelmann spruce (*P. engelmannii*), white spruce (*P. glauce*), Sitka spruce (*P. sitchensis*), eastern white pine (*Pinus strobus*), pitch pine (*P. rigida*), lodgepole pine (*P. contorta*), longleaf pine (*P. palustris*), ponderosa pine (*P. banksiana*), eastern hemlock (*Tsuga canadensis*), western hemlock (*T. heterophylla*), Pacific silver fir (*Abies amabilis*), white fir (*A. concolor*), and subalpine fir (*A. lasiocarpa*). In dense stands, these evergreen trees may preclude the establishment of understory vegetation or, in some cases, understory vegetation is also FACU species. Since these plant communities are usually found on nonwetlands, the ones established in wetland areas may be difficult to recognize at first glance. The landscape position of the evergreen forested areas, such as depressions, drainageways, bottomlands, flats in sloping terrain, and seepage slopes, should be considered because it often provides good clues to the likelihood of a wetland. Soils also should be examined in these situations. Procedures for identifying these wetlands are the same as those for FACU-dominated wetlands described above.

**C. Glacial Till Wetlands**

Sloping wetlands occur in glaciated areas where thin soil covers relatively impermeable glacial till or where layers of glacial till have different hydraulic conditions that permit ground-water seepage. Such areas are seldom, if ever, flooded, but downslope ground-water movement keeps the soils saturated for a sufficient portion of the growing season to produce anaerobic and reducing soil conditions. This promotes development of hydric soils and hydrophytic vegetation. Indicators of wetland hydrology may be lacking during the drier portion of the growing season. Hydric soil indicators also may be lacking because certain areas are so rocky that it is difficult to examine soil characteristics within 18 inches.

**D. Highly Variable Seasonal Wetlands**

In many regions (especially in arid and semiarid regions), depressional areas occur that may have indicators of all three wetland criteria during the wetter portion of the growing season, but normally lack indicators of wetland hydrology and/or hydrophytic vegetation during the drier portion of the growing season. In addition, some of these areas lack field indicators of hydric soil. OBL and FACW plant species normally are dominant during the wetter portion of the growing season, while FACU and obligate upland (UPL) species (usually annuals) may be dominant during the drier portion of the growing season and for some time after droughts. Examples of highly variable seasonal wetlands are pothole wetlands in the upper Midwest, playa wetlands in the Southwest, and vernal pools along the coast of California. It is important to become familiar with the ecology of these and similar types of wetlands and to be particularly aware of drought conditions that permit invasion of UPL species (even perennials).

**E. Interdunal Swale Wetlands**

Along the U.S. coastline, seasonally wet swales supporting hydrophytic vegetation are located within sand dune complexes on barrier islands and beaches. Some of these swales are inundated or saturated to the surface for considerable periods during the growing season, while others are wet for only the early part of the season. In some cases, swales may be flooded irregularly by the tides. These wetlands have sandy soils that generally lack field indicators of hydric soil. In addition, indicators of wetland hydrology may be absent during the drier part of the growing season. Consequently, these wetlands may be difficult to identify.

**F. Vegetated River Bars and Adjacent Flats Wetlands**

Along Western streams in arid and semiarid parts of the country, some river bars and flats may be vegetated by FACU species while others may be colonized by wetter species. If these areas are frequently inundated for 1 or more weeks during the growing season, they are wetlands. The soils often do not reflect the characteristic field indicators of hydric soils, however, and thereby pose delineation problems.

### G. Vegetated Flats Wetlands

Vegetated flats are characterized by a marked seasonal periodicity in plant growth. They are dominated by annual OBL species, such as wild rice (*Zizania aquatica*), and/or perennial OBL species, such as spatterdock (*Nuphar luteum*), that have non-persistent vegetative parts (i.e., leaves and stems break down rapidly during the winter, providing no evidence of the plant on the wetland surface at the beginning of the next growing season). During winter and early spring, these areas lack vegetative cover and resemble mud flats; therefore, they do not appear to qualify as wetlands. But during the growing season the vegetation becomes increasingly evident, qualifying the area as a wetland. In evaluating these areas, which occur both in coastal and interior parts of the country, the time of year of the field observation and the seasonality of the vegetation must be considered. Again, it is important to become familiar with the ecology of these wetland types.

### H. Newly Created Wetlands

These wetlands include manmade (artificial) wetlands, beaver-created wetlands, and other natural wetlands. Artificial wetlands may be purposely or accidentally created by human activities (e.g., road impoundments, undersized culverts, irrigation, and seepage from earth-dammed impoundments). Many of these areas will have indicators of wetland hydrology and hydrophytic vegetation. But the area may lack typical field characteristics of hydric soils, since the soils have just recently been inundated and/or saturated. Since all of these wetlands are newly established, field indicators of one or more of the wetland identification criteria may not be present.

### I. Entisols (Floodplain and Sandy Soils) Wetlands

Entisols are usually young or recently formed soils that have little or no evidence of pedogenically developed horizons. These soils are typical of floodplains throughout the U.S., but are also found in glacial outwash plains, along tidal waters, and in other areas. They include sandy soils of riverine islands, bars, and banks and finer-textured soils of floodplain terraces. Wet entisols have an aquic or peraquic moisture regime and are considered hydric soils, unless effectively drained. Some entisols are easily recognized as hydric soils, such as the sulfaquents of tidal salt marshes, whereas others pose problems because they do not possess typical hydric soil field indicators. Wet sandy entisols (with loamy fine sand and coarser textures in horizons within 20 inches of the surface) may lack sufficient organic matter and clay to develop hydric soil colors. When these soils have a hue between 10YR and 10Y and distinct or prominent mottles present, a chroma of 3 or less is permitted to identify the soil as hydric (i.e., an aquic moisture regime).

### J. Mollisols (Prairie and Steppe Soils) Wetlands

Mollisols are dark-colored, base-rich soils. They are common in the central part of the conterminous U.S. from eastern Illinois to Montana and south to Texas. Natural vegetation is mainly tall grass prairies and short grass steppes. These soils typically have deep, dark topsoil layers (mollic epipedons) and low chroma matrix colors to

considerable depths. They are rich in organic matter due largely to the vegetation (deep roots) and reworking of the soil and organic matter by earthworms, ants, moles, and rodents. The low chroma colors of mollisols are not necessarily due to prolonged saturation, so making wetland determinations in these soils requires particular care. It is important to become familiar with the characteristics of mollisols with aquic moisture regimes, since they are usually hydric, unless effectively drained, and to be able to distinguish these from nonhydric mollisols.

## IV. Instituting the Process

### A. Planning

The process established in TR 1737-9 for incorporating the information collected into a management plan would apply to lentic riparian-wetland areas also. That process is as follows:

**Step 1** **Existing Condition** - Determine the existing riparian-wetland and watershed condition using BLM standard inventory methods.

**Step 2** **Potential Condition** - Determine PNC by using relic areas, historic photos, etc. (ESI process).

**Step 3** **PFC** - Determine the minimum conditions required for the area to function properly.

**Step 4** **Resource Values** - Determine existing and potential resource values and the plant communities necessary to support these values.

**Step 5** **Management Goals** - Negotiate specific objectives to reach management goals for the watershed, DPC, or DFC.

**Step 6** **Planned Actions** - Design management actions to achieve the DPC.

**Step 7** **Monitoring** - Design appropriate monitoring strategies to assess progress towards meeting management goals.

**Step 8** **Flexibility** - Maintain management flexibility to accommodate change based upon monitoring results.

### B. Management

For BLM to be successful in reaching its goal of having 75 percent of its riparian-wetland areas functioning properly by 1997, best management practices need to be set in motion. Successful management strategies address the entire watershed. Upland and riparian-wetland areas are interrelated and cannot be considered separately. Technical references such as TR 1737-4 (Kinch, 1989) and TR 1737-6 (Smith and Prichard, 1992) are tools that can be used to develop management techniques.

### C. Monitoring

Management effectiveness can be assessed and progress towards meeting PFC can be documented through monitoring. Sites should be revisited periodically as part of the overall monitoring program. Areas rated at a single point in time can reflect short-term factors such as climatic conditions. Monitoring will reflect longer-term trends. Technical references such as TR 1737-3 (Myers, 1989) are tools that can be used to develop monitoring criteria.

BLM_0007095

## V. Summary

Riparian-wetland areas constitute an important resource on lands managed by BLM. BLM's goal is to have 75 percent of its riparian-wetlands functioning properly by 1997. This document supplements TR 1737-9 and provides a thought process for assessing functioning condition of lentic riparian-wetland areas.

The status of some lentic riparian-wetland areas will be relatively easy to discern while the status of others will be less evident. Appendix A contains the minimum national standards that BLM field offices will use in making this assessment for lentic riparian-wetland areas. For hard-to-discern areas, Ecological Site Inventory may be the only method to determine capability and potential and assess functionality. Using either method requires an interdisciplinary team to adequately address the complexities associated with lentic riparian-wetland areas and to report their functioning condition.

The lack of specific information will place many lentic riparian-wetland areas into the category of unknown. In order for BLM to make an adequate assessment of progress towards its goal, it is imperative that areas for which no data exists be evaluated and added to the data base. As information is acquired and resource values are identified, best management practices need to be set in motion. Successful management strategies have to address the entire watershed, as upland and riparian-wetland areas are interrelated and cannot be considered separately.

BLM_0007097

# Literature Cited

Kinch, G. 1989. Riparian Area Management: Grazing Management in Riparian Areas. TR 1737-4. Bureau of Land Management, BLM/YA/PT-87/021+1737, Service Center, CO. 48 pp.

Leonard, S., G. Staidl, J. Fogg, K. Gebhardt, W. Hagenbuck, and D. Prichard. 1992. Riparian Area Management: Procedures for Ecological Site Inventory - With Special Reference to Riparian-Wetland Sites. TR 1737-7. Bureau of Land Management, BLM/SC/PT-92/004+1737, Service Center, CO. 135 pp.

Myers, L.H. 1989. Riparian Area Management: Inventory and Monitoring of Riparian Areas. TR 1737-3. Bureau of Land Management, BLM/YA/PT-89/022+1737, Service Center, CO. 89 pp.

Prichard, D., H. Barrett, J. Cagney, R. Clark, J. Fogg, K. Gebhardt, P. Hansen, B. Mitchell, and D. Tippy. 1993. Riparian Areas Management: Process for Assessing Proper Functioning Condition. TR-1737-9. Bureau of Land Management, BLM/SC/ST-93/003+1737, Service Center, CO. 60 pp.

Smith, B. and D. Prichard. 1992. Riparian Area Management: Management Techniques in Riparian Areas. TR 1737-6. Bureau of Land Management, BLM/SC/PT-92/003+1737, Service Center, CO. 44 pp.

U.S. Department of the Interior. 1991. Riparian-Wetland Initiative for the 1990's. Bureau of Land Management, BLM/WO/GI-91/001+4340, Washington, DC. 50 pp.

_____________. 1992. BLM Manual 1737 - Riparian-Wetland Area Management. Bureau of Land Management, Washington, DC. 38 pp.

BLM_0007099

# Glossary of Terms

**Advanced Ecological Status** - A community with a high coefficient of similarity to a defined or perceived PNC for an ecological site, usually late seral or PNC ecological status.

**Aerobic** - A condition in which molecular oxygen is a part of the environment.

**Anaerobic** - A condition in which molecular oxygen is absent (or effectively so) from the environment.

**Duration-Frequency** - A general descriptive term for the average duration of soil inundation per flood occurrence for a geographic area. Categories include: very brief (less than 2 days); brief (2 to 7 days); long (7 days to 1 month); very long (more than 1 month); and flash flooding (less than 2 hours).

**Facultative (FAC) Species** - Plant species that are equally likely to occur in wetlands or nonwetlands (estimated probability 34-66%).

**Facultative Upland (FACU) Species** - Plant species that usually occur in nonwetlands (estimated probability 67-99%), but occasionally are found in wetlands (estimated probability 1-33%).

**Facultative Wetland (FACW) Species** - Plant species that usually occur in wetlands (estimated probability 67-99%), but occasionally are found in nonwetlands.

**Frost (or abnormal hydrologic) Heaving** - The lifting of a surface by the internal action of frost or hydrostatic pressure. It generally occurs after a thaw, when the soil is filled with water droplets and the temperature suddenly drops below freezing; the droplets then become ice crystals, and their expansion causes an upward movement of the soil. The process is exacerbated when there is compaction between plant tussocks (e.g., from hoof action) and/or excessive removal of thermal vegetation cover. The result is the hummocked appearance of plants being elevated above the normal ground surface, root shearing between plants, and exposure of interspaces to increased erosional forces.

**Hydric Soils** - Soils that are flooded, ponded, or saturated for usually 1 week or more during the period when soil temperatures are above biologic zero (41° F). Complete criteria can be found in BLM Technical Reference 1737-7.

**Obligate Upland (UPL) Species** - Plant species that occur in wetlands in another region, but occur almost always (estimated probability >99%) under natural conditions in nonwetlands in the region specified.

**Obligate Wetland (OBL) Species** - Plant species that occur almost always (estimated probability >99%) under natural conditions in wetlands.

**Ponding-Frequency** - A general descriptive term for the relative change of reoccurrence of a flooding event for a geographic area. Categories include: none (0 percent chance); rare (0 to 5 percent chance); occasional (5 to 50 percent chance); and frequent (greater than 50 percent chance).

**Potential Plant Community** - Represents the seral stage the botanical community would achieve if all successional sequences were completed without human interference under the present environmental conditions.

**Riparian-Wetland Ecological Site** - An area of land with a specific potential plant community and specific physical site characteristics, differing from other areas of land in its ability to produce vegetation and to respond to management. Ecological site is synonymous with range site.

**Vegetation Community Dynamics** - Response of plant communities to changes in their environment, to their use, and to stresses to which they are subjected. Climatic cycles, fire, insects, grazing, and physical disturbances are some of the many causes of changes in plant communities. Some changes are temporary while others are long lasting.

**Vegetation Community Succession** - Primary succession is a sequence of plant community changes from the initial colonization of a bare soil toward a PNC. Secondary succession may involve sequences of plant community change from PNC due to perturbations, or a sequence toward PNC again following a perturbation. Vegetation community succession may be accompanied by subtle but significant changes in temporal soil characteristics such as bulk density, nutrient cycling, and microclimatic changes, but is differentiated from major physical state changes such as landform modification or long-term elevation or lowering of a water table that would change the PNC of an ecological site.

# Appendix A

# Lentic Riparian-Wetland Functional Checklist

29

BLM_0007102

## General Instructions

1) This checklist constitutes the **Minimum National Standards** required to determine proper functioning condition of lentic riparian-wetland areas.

2) As a minimum, an **ID team** will use this checklist to determine the degree of function of a riparian-wetland area.

3) An ID team **must review existing documents**, particularly those referenced in this document, so that the team has an understanding of the concepts of the riparian-wetland area they are assessing.

4) An ID team **must determine the attributes and processes important** to the riparian-wetland area that is being assessed.

5) Mark one box for each element. Elements are numbered for the purpose of cataloging comments. The numbers do not declare importance.

6) For any item marked "**No**," the severity of the condition must be explained in the "**Remarks**" section and must be a subject for discussion with the ID team in determining riparian-wetland functionality. Using the "**Remarks**" section to also explain items marked "**Yes**" is encouraged but not required.

7) Based on the ID team's discussion, "**functional rating**" will be resolved and the checklist's summary section will be completed.

8) Establish photo points where possible to document the area being assessed.

# Lentic Standard Checklist

Name of Riparian-Wetland Area: ____________________

Date: ________ Area/Segment ID: ________ Acres: ________

ID Team Observers: ____________________

| Yes | No | N/A | HYDROLOGY |
|---|---|---|---|
| | | | 1) Riparian-wetland area is saturated at or near the surface or inundated in "relatively frequent" events |
| | | | 2) Fluctuation of water levels is not excessive |
| | | | 3) Riparian-wetland area is enlarging or has achieved potential extent |
| | | | 4) Upland watershed is not contributing to riparian-wetland degradation |
| | | | 5) Water quality is sufficient to support riparian-wetland plants |
| | | | 6) Natural surface or subsurface flow patterns are not altered by disturbance (i.e., hoof action, dams, dikes, trails, roads, rills, gullies, drilling activities) |
| | | | 7) Structure accommodates safe passage of flows (e.g., no headcut affecting dam or spillway) |

| Yes | No | N/A | VEGETATION |
|---|---|---|---|
| | | | 8) There is diverse age-class distribution of riparian-wetland vegetation (recruitment for maintenance/recovery) |
| | | | 9) There is diverse composition of riparian-wetland vegetation (for maintenance/recovery) |
| | | | 10) Species present indicate maintenance of riparian-wetland soil moisture characteristics |
| | | | 11) Vegetation is comprised of those plants or plant communities that have root masses capable of withstanding wind events, wave flow events, or overland flows (e.g., storm events, snowmelt) |
| | | | 12) Riparian-wetland plants exhibit high vigor |
| | | | 13) Adequate vegetative cover is present to protect shorelines/soil surface and dissipate energy during high wind and wave events or overland flows |
| | | | 14) Frost or abnormal hydrologic heaving is not present |
| | | | 15) Favorable microsite condition (i.e., woody debris, water temperature, etc.) is maintained by adjacent site characteristics |

| Yes | No | N/A | EROSION/DEPOSITION |
|---|---|---|---|
| | | | 16) Accumulation of chemicals affecting plant productivity/composition is not apparent |
| | | | 17) Saturation of soils (i.e., ponding, flooding frequency and duration) is sufficient to compose and maintain hydric soils |
| | | | 18) Underlying geologic structure/soil material/permafrost is capable of restricting water percolation |
| | | | 19) Riparian-wetland is in balance with the water and sediment being supplied by the watershed (i.e., no excessive erosion or deposition) |
| | | | 20) Islands and shoreline characteristics (i.e., rocks, course and/or large woody debris) are adequate to dissipate wind and wave event energies |

(Revised 1998)

## Remarks

________________________________________

## Summary Determination

**Functional Rating:**

Proper Functioning Condition __________
Functional—At Risk __________
Nonfunctional __________
Unknown __________

**Trend for Functional—At Risk:**

Upward __________
Downward __________
Not Apparent __________

**Are factors contributing to unacceptable conditions outside the control of the manager?**

Yes __________
No __________

**If yes, what are those factors?**

____ Dewatering ____ Mining activities ____ Watershed condition
____ Dredging activities ____ Road encroachment ____ Land ownership
____ Other (specify) ____________________

# Appendix B

# Lentic Riparian-Wetland Examples

33

BLM_0007106

# Forested Wetland—Oregon
# Proper Functioning Condition

Forested Wetland—Oregon
Proper Functioning Condition
Clay Bridges

Clay Bridges

Forested Wetland—Oregon
Functional—At Risk
Clay Bridges
28

Clay Bridges

## Forested Wetland—Oregon
## Proper Functioning Condition

The photo to the left is an example of a landslide sag pond found in the Coastal Range, Oregon. This lentic form of wetland would be rated ***PFC*** relative to BLM's definition. The wetland contains adequate vegetation, landform, and large woody debris which provide root masses that stabilize shoreline features against cutting actions; filter sediment and aid floodplain development; maintain hydric soils; restrict water percolation; and provide favorable microsite conditions that support greater biodiversity.

---

## Forested Wetland—Oregon
## Functional—At Risk

The photo to the left is an example of a lentic wetland in Oregon that would be rated ***functional — at risk.*** Most of the physical attributes/processes (i.e., diverse composition of vegetation for maintenance/recovery, underlying materials that restrict water percolation, etc.) are in place to allow this system to function properly. However, this wetland is rated ***functional — at risk*** because it lacks adjacent site characteristics to control water temperatures and to prevent soils from inundating the site due to excessive erosion.

## Lacustrine Wetland—New Mexico
## Functional—At Risk

Clay Bridges

Playa Wetland—New Mexico
Proper Functioning Condition

Clay Bridges

## Lacustrine Wetland—New Mexico
## Functional—At Risk

This photo shows an example of a lacustrine wetland in New Mexico that would be rated ***functional — at risk*** because natural overland flow patterns have been altered by surface disturbances. Surface disturbances, like the trails in this photo, intercept, divert, and concentrate overland flows away from the wetland site. This diversion and concentration of overland flows increase energies which form headcuts that drain the site, thus reducing the wetland's ability to maintain hydric soils and associated vegetation. If allowed to continue, the wetland will eventually be lost.

---

## Playa Wetland—New Mexico
## Proper Functioning Condition

In New Mexico, depressional areas (playas) such as in the photo to the left have wetland indicators during the wetter portion of a growing season, but normally lack indicators during the drier portion of the growing season (see Problem Wetlands section for more information). Assessing functionality of a playa requires understanding that system's attributes/processes (i.e., ponding frequency and duration, community dynamics and succession, recruitment and reproduction, etc.). The playa wetland in this photo would normally be rated ***PFC***.

This wetland would be rated ***functional — at risk*** if underlying materials have been disturbed that restricted percolation, or overland flows to the playa have been restricted. Alteration of the natural topography that drains the wetland would result in a rating of ***nonfunctional***.

## Lacustrine Wetland—Colorado
## Functional—At Risk/Proper Functioning Condition

BLM Kremmling Resource Area

Seep Wetland—Nevada
Nonfunctional

Mark Biddlecomb

## Lacustrine Wetland—Colorado
## Functional—At Risk/Proper Functioning Condition

The lacustrine wetland in the photo to the left would be rated ***functional — at risk*** on the left side and ***PFC*** on the right side. Most of the attributes/processes on the left side indicate a functioning system (i.e., diverse composition of vegetation, saturation of soils sufficient to compose and maintain hydric soils, no excessive erosion or deposition, etc.). The left side is rated ***functional — at risk*** due to the presence of abnormal hydrologic heaving. Over time, hydrologic heaving will change composition of vegetation and may drain the site.

All the attributes/process on the right side of this photo indicate a functioning system.

---

## Seep Wetland—Nevada
## Nonfunctional

The photo to the left shows an example of a seep located in Nevada that would be rated as ***nonfunctional*** relative to BLM's definition for proper functioning condition. This wetland **clearly** does not provide adequate vegetation to filter sediment and aid wetland development, lacks adequate cover to protect the area from erosion or deposition as a result of overland flows, lacks diverse age-class distribution and composition of vegetation to allow recovery, and does not provide wetland characteristics necessary to support aquatic or other species. This lack of vegetation and the area's lack of balance with the sediment being supplied have permitted three things to occur: 1) the extent of the wetland has been greatly reduced, 2) the wetland's water quality has been altered, and 3) the wetland's diversity of aquatic vegetation has been greatly reduced. The area provides little biodiversity.

## Palustrine Wetland—Nevada
## Proper Functioning Condition

Palustrine Wetland—Nevada
Proper Functioning Condition

Clay Bridges

Wet Meadow Wetland—Idaho
Functional—At Risk

Steve Leonard

## Palustrine Wetland—Nevada
## Proper Functioning Condition

Wetlands that have achieved late seral or PNC, as Locke's Pond has in the photo at left, can easily be placed into the appropriate category. Using the Bureau definition, Locke's Pond would have a rating of ***PFC***. Completing a lentic checklist on this area would result in a yes or N/A answer for the 20 items. The physical processes are functioning, and the wetland is supporting diverse ponding characteristics that provide the habitat and the water depth, duration, and temperature necessary for fish production, waterbird breeding, and other uses. Locke's Pond is providing biodiversity.

---

## Wet Meadow Wetland—Idaho
## Functional—At Risk

The wet meadow pictured at left would be rated ***functional — at risk*** relative to BLM's definition for proper functioning condition, even though most of the attributes/processes indicate a functioning system. Currently, most of the wetland is saturated at or near the surface with "relatively frequent events" that maintain its hydric soils, contains a diverse composition of vegetation which can maintain the wetland, is comprised of those plants or plant communities that have root masses capable of withstanding overland flow events, and is in balance with the water and sediment being supplied by the watershed (i.e., no excessive erosion or deposition), etc.

The reason this wetland is rated ***functional — at risk*** is that abnormal frost heaving is present. Hydrologic or frost heaving, allowed to continue over time, will change the vegetation composition. This change in vegetation will reduce the extent of the wetland and may eventually drain the wetland.

# Prairie Pothole Wetland—Montana
## Proper Functioning Condition

Prairie Pothole Wetland—Montana
Proper Functioning Condition

Ramone McCoy

Prairie Pothole Wetland—Montana
Functional—At Risk

Photos by: Ramone McCoy

## Prairie Pothole Wetland—Montana
## Proper Functioning Condition

Prairie potholes are classified as highly variable seasonal wetlands. During drier climatic cycles or the drier portion of a growing season, these wetlands may lack hydrology and/or hydrophytic vegetation indicators that would identify them as wetlands. During wet years, they provide a diverse composition of wetland vegetation, but during dry years, the wetland species may be replaced with upland species. Potholes in Montana, on average, are inundated only 1 in 5 years.

The photo to the left shows an example of a Montana prairie pothole wetland that would be rated ***PFC***. This pothole contains adequate vegetation to dissipate energies associated with wind action, wave action, and overland flow from adjacent sites; restricts water percolation; provides ponding characteristics that provide habitat for waterbird breeding; etc., relative to its capability and potential.

---

## Prairie Pothole Wetland—Montana
## Functional—At Risk

The photos to the left show an example of an artificially enhanced prairie pothole. An earthen dam has been constructed that collects and stores additional overland flow, creating a more permanent site. Previously this pothole would have been classified as highly variable seasonal wetland, but now it would be classified as a palustrine wetland.

At first glance this wetland would be rated ***PFC***. The wetland is saturated at or near the surface in relatively frequent events, provides water quality that supports wetland plants, provides a diverse age class and composition of vegetation, has adequate vegetative cover to protect shorelines during high wind and wave events, and provides greater biodiversity, etc. However, this wetland is not rated ***PFC*** because the structure is no longer accommodating the safe passage of flows. A headcut has developed in the spillway that threatens the integrity of the dam (see insert). The spillway is located to the left of the rock in the main photo. The correct rating would be ***functional — at risk***.

BLM_0007117

# REPORT DOCUMENTATION PAGE

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503.

**1. AGENCY USE ONLY** *(Leave blank)*

**2. REPORT DATE**
September 1994

**3. REPORT TYPE AND DATES COVERED**
Final

**4. TITLE AND SUBTITLE**
RIPARIAN AREA MANAGEMENT TR 1737-11
Process for Assessing Proper Functioning Condition for Lentic Riparian-Wetland Areas

**5. FUNDING NUMBERS**

**6. AUTHOR(S)**
Clay Bridges, Warren Hagenbuck, Russ Krapf, Steve Leonard, Don Prichard

**7. PERFORMING ORGANIZATION NAME(S) AND ADDRESS(ES)**
U.S. Department of the Interior
Bureau of Land Management—Service Center
P.O. Box 25047
Denver, CO 80225-0047

**8. PERFORMING ORGANIZATION REPORT NUMBER**
BLM/SC/ST-94/008+1737+REV98

**9. SPONSORING/MONITORING AGENCY NAME(S) AND ADDRESS(ES)**

**10. SPONSORING/MONITORING AGENCY REPORT NUMBER**

**11. SUPPLEMENTARY NOTES**
This technical reference is a supplement to RIPARIAN AREA MANAGEMENT TR 1737-9, Process for Assessing Proper Functioning Condition. Revised 1998; revision supersedes original.

**12a. DISTRIBUTION/AVAILABILITY STATEMENT**

**12b. DISTRIBUTION CODE**

**13. ABSTRACT** *(Maximum 200 words)*

This technical reference outlines the Bureau of Land Management's (BLM's) process for assessing the functioning condition of lentic riparian-wetland areas on public lands. Emphasis is placed on the interaction of vegetation, landform/soils, and hydrology in defining capability and potential of an area. The importance of using an interdisciplinary team is also stressed.

**14. SUBJECT TERMS**
- Wetlands
- Riparian areas
- Proper functioning condition
- Vegetation
- Hydrology
- Soils

**15. NUMBER OF PAGES**
46

**16. PRICE CODE**

| 17. SECURITY CLASSIFICATION OF REPORT | 18. SECURITY CLASSIFICATION OF THIS PAGE | 19. SECURITY CLASSIFICATION OF ABSTRACT | 20. LIMITATION OF ABSTRACT |
|---|---|---|---|
| Unclassified | Unclassified | Unclassified | UL |